# EXHIBIT E

Page 1

1

2                UNITED STATES DISTRICT COURT

3                EASTERN DISTRICT OF LOUISIANA

4      * * * * * * * * * * * * * * * * * * * * * * * *

5      IN RE: TAXOTERE (DOCETAXEL)   MDL NO. 2740
       PRODUCT LIABILITY

6      LITIGATION                    SECTION "N" (5)
                                     JUDGE MILAZZO

7

       This Document Relates to:

8                              MAG. JUDGE NORTH

9      Audrey Plaisance vs.
       Hospira, Inc., et al.,

10     No. 2:18-cv-08086

11

       * * * * * * * * * * * * * * * * * * * * * * * *

12

13                  Deposition of
                  LAURA CHAUVIN, M.D.

14

                  taken on October 15, 2020

15              commencing at 3:08 p.m.

16                    at the

                    offices of

17

                Thibodaux, Louisiana

18

19

20

21

22

23

24

25

Page 2

```
 1  APPEARANCES:
 2
 3  ATTORNEYS FOR PLAINTIFF:
        Davis & Crump PC
 4      2601 14th Street
        Gulfport, Mississippi 39501
 5      800.277.0300
        taylor.hardenstein@daviscrump.com
 6      trevor.rockstad@daviscrump.com
        BY: TAYLOR HARDENSTEIN, ESQ.
 7          TREVOR ROCKSTAD, ESQ.
 8
 9  ATTORNEYS FOR DEFENDANTS:
        Dechert LLP
10      1095 Avenue of the Americas
        New York, New York 10036
11      212.641.5665
        mara.cuskergonzalez@dechert.com
12      BY: MARA CUSKER GONZALEZ, ESQ.
            ASHLEY FLYNN, ESQ.
13          LAUREN GUMEROVE, ESQ.
14
15  ALSO PRESENT:
        Brian Rosenthal, Videographer
16
17
18  Reported by:  Evangeline A. Langston, CCR, RPR
                   Certified Court Reporter
19                 in and for the State of Louisiana,
                   Federal Certified Realtime Reporter,
20                 Registered Professional Reporter
21
22
23
24
25
```

Page 4

```
 1  * * * * * * * * * * * * * * * * * * * * *
 2               E X H I B I T S
 3  Number        Description           Page
 4  Exhibit 1     Folder 1              37
 5  Exhibit 2     Folder 2              37
 6  Exhibit 3     Folder 3              38
 7  Exhibit 4     Folder 5              54
 8  Exhibit 5     Tab 4                 71
 9  Exhibit 6     Tab 24               79
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  * * * * * * * * * * * * * * * * * * * * *
 2               I N D E X
 3                             Page
 4  Caption                      1
 5  Appearances                  2
 6  Stipulations                 5
 7  Examination by
 8    MR. ROCKSTAD               7
 9    MS. GONZALEZ             113
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1           S T I P U L A T I O N S
 2       It is stipulated and agreed by and between
 3   counsel for the parties hereto that the deposition
 4   of the aforementioned witness is hereby being taken
 5   under the Louisiana Code of Civil Procedure, for all
 6   purposes, in accordance with law;
 7       That the formalities of reading, signing,
 8   certification and filing are specifically not
 9   waived;
10       That all objections, save those as to the
11   form of the question and the responsiveness of the
12   answer, are hereby reserved until such time as this
13   deposition, or any part thereof, may be used or
14   sought to be used in evidence.
15
16            *    *    *    *    *
17
18       EVANGELINE A. LANGSTON, RPR, Certified Court
19   Reporter, in and for the State of Louisiana,
20   officiated in administering the oath to the witness.
21
22
23
24
25
```

2 (Pages 2 - 5)

1      THE VIDEOGRAPHER:  Good afternoon.  We
2   are now going on the record at 3:08 p.m.
3   on October 15th, 2020.
4      This is Media Unit Number 1 in the
5   video recorded deposition of Dr. Laura
6   Chauvin taken in the matter of Plaisance
7   versus Hospira, Inc., et al.  This
8   deposition is being recorded and
9   conducted remotely via Zoom.
10      My name is Brian Rosenthal.  I am the
11   videographer.  The court reporter is
12   Evangeline Aymond, both representing
13   Veritext.
14      Would counsel and all parties present
15   please state their appearances for the
16   record, after which would the court
17   reporter please swear in the witness.
18      MR. ROCKSTAD:  I'm Trevor Rockstad.  I
19   represent the plaintiff, Mrs. Plaisance.
20      MS. GONZALEZ:  And I'm Mara Cusker
21   Gonzalez, representing Defendant Hospira,
22   and I'm joined by two colleagues who I
23   don't think are on video, but I'll let
24   them introduce themselves as well.
25      MR. HARDENSTEIN:  Taylor Hardenstein

1   also for the plaintiff, Ms. Audry
2   Plaisance.
3      MS. GONZALEZ:  Ashley and Lauren,
4   could you state your appearances?
5      MS. FLYNN:  Ashley Flynn representing
6   Defendant Hospira.
7      MS. GONZALEZ:  And my colleague Lauren
8   Gumerove is also appearing for Hospira.
9      THE VIDEOGRAPHER:  And, Doctor, really
10   quickly, can you push your tablet back
11   just a hair so we have a little more head
12   room, a little more space on top of your
13   head?
14      THE WITNESS:  You want me to sit back?
15      THE VIDEOGRAPHER:  That works.  Thank
16   you so much.
17          Laura Chauvin, M.D.,
           having been first duly sworn,
18   testified as follows:
19   EXAMINATION
20   BY MR. ROCKSTAD:
21      Q.   Good afternoon, Doctor.  My name's
22   Trevor Rockstad.  I represent the plaintiff in this
23   case.
24      Can you state your name for the record,
25   please?

1      A.   Laura Chauvin.
2      Q.   And, Dr. Chauvin, have we ever met
3   before, in person?
4      A.   No.
5      Q.   You and I spoke on the phone briefly
6   this week; is that correct?
7      A.   We did.
8      Q.   Do you recall approximately how long we
9   were on the phone?
10      A.   Between 10 and 15 minutes.  I think it
11   was about 11.
12      Q.   Okay.  And have you spoken with any of
13   the other attorneys involved in this case?
14      A.   No.
15      Q.   Have you ever met any of the other
16   attorneys involved in this case?
17      A.   No.
18      Q.   Doctor, do you know what the case that
19   brings us here today is about?
20      A.   I think it's about permanent hair loss
21   from Taxotere.
22      Q.   Okay.  And what is your understanding of
23   who this lawsuit is filed against?
24      A.   I think the company called Hospira that
25   manufactures the generic version of Taxotere.

1      Q.   Okay.  Are you familiar with the term
2   docetaxel?
3      A.   Yes.
4      Q.   What is docetaxel?
5      A.   The generic name of Taxotere.
6      Q.   Okay.  Can we agree that if I slip up
7   through this deposition and say Taxotere, you will
8   understand that I mean docetaxel?
9      A.   Sure.
10      Q.   Okay.  And you understand this lawsuit's
11   not filed against you; correct?
12      A.   Yes.
13      Q.   And it's not filed against the hospital
14   that you work for?
15      A.   Right.
16      Q.   Doctor, have you done anything to
17   prepare for the deposition today?
18      A.   Yes.
19      Q.   What did you do?
20      A.   Oh, I just reviewed data on the
21   treatment of breast cancer, reviewed best I could
22   find on incidents of alopecia and, you know, other
23   side effects that might come up, things like that.
24   Certainly, I reviewed her record, my notes and
25   visits with her, the actual treatment she got.

3 (Pages 6 - 9)

Page 10

1       I went back over her diagnosis and
2 indications of treatment, prognostic factors,
3 aromatase inhibitor use that was used, a fair bit of
4 information, just being sure about the basics of her
5 treatment and breast cancer in general.
6     Q.  Okay.  I appreciate that.  It sounds
7 like you'll be ready to answer most of my questions
8 because that's what I'm going to ask you about for
9 the most part.
10      And did you receive some documents in
11 the mail from the attorneys in this case?
12    A.  Yes.
13    Q.  Did you receive two packages?
14    A.  I got two boxes.  I think one was from
15 you and one was from them.
16    Q.  Okay.  You can just keep those handy,
17 but you don't have to open them right now.  We'll
18 get to those later.
19    A.  Okay.
20    Q.  Have you ever given a deposition before,
21 Doctor?
22    A.  Yes.
23    Q.  How many depositions have you given?
24    A.  Two.
25    Q.  Okay.  Well, I'm just going to go over a

Page 11

1 few ground rules for a deposition that will help us
2 get through this process a little more smoothly.
3       The court reporter who usually would be
4 in the room with us if we were doing this all
5 together, she's here.  She's taking down everything
6 that we say.  So you're doing good so far.  If you
7 could just remember to answer verbally, out loud, no
8 nods of the head or head shakes will come down on a
9 transcript.
10      If we could also let each other finish.
11 I'll do my best to let you finish your answers, and
12 if you could let me finish my questions.
13      And since we're remote, I would also
14 request we give a little bit of a pause, and that's
15 hard for me to do, especially when we get into this
16 and get a little more conversational.  But because
17 we're doing this, it will be helpful to pause a
18 little bit at the end of the question and I'll do
19 the same at the end of your answers.
20    A.  Okay.
21    Q.  Just like that.
22      And if you need to take a break at any
23 time, including if you get that phone call that you
24 mentioned, just let us know, "Hold on, I need to
25 take a break," especially the phone call.

Page 12

1       Normally, I would say if you could go
2 ahead and answer whatever question has been asked
3 before you take a break, but if the phone call comes
4 through, I understand you need to get that.  So
5 that's fine if you want to take that, even if
6 there's a question pending.
7     A.  All right.
8     Q.  There may be some times through this
9 deposition where one of the attorneys makes an
10 objection.  If you'll just kind of pause, let the
11 objection be stated, and then go ahead and answer.
12 I just don't want that to throw you off.  But it's
13 just a procedural issue.
14    A.  Okay.
15    Q.  Doctor, I think in the deposition
16 notice, you were asked to bring a CV.  Did you bring
17 a CV with you?
18    A.  I forgot to get that, but I can print
19 one.
20    Q.  That's okay.  As long as opposing
21 counsel is okay with it, I would be fine with you
22 just sending that to us later.
23    A.  Okay.
24    Q.  I believe we're going to be asking you
25 to submit the documents that we mark as exhibits

Page 13

1 during this deposition, and you can just include
2 that.
3         MR. ROCKSTAD:  Mara, if it's okay with
4     you, we'll just do a placeholder exhibit
5     for the doctor's CV.
6         MS. GONZALEZ:  I think that's fine, if
7     you want to go ahead and have it printed
8     just so we make sure it's part of the
9     set, that makes sense.
10        THE WITNESS:  I can print it while I'm
11    sitting here.
12        MS. GONZALEZ:  Okay, thanks.
13 BY MR. ROCKSTAD:
14    Q.  And so what I'd like to do, though, is
15 go through -- and actually it may be helpful for you
16 so you have it for your reference.  I'm going to go
17 through your education and training.
18    A.  Okay.
19    Q.  I know for me it would be helpful to
20 have my CV for that.
21    A.  Okay.  I've got it up on my screen.
22    Q.  Okay, great.  Great.
23      Doctor, where did you go to college?
24    A.  Hendricks College, Conway, Arkansas.
25    Q.  Okay.  And where did you go to medical

4 (Pages 10 - 13)

1 school?
2     A.   University of Arkansas for medical
3 sciences in Little Rock, Arkansas.
4         And the printer's going to be making
5 noise.
6     Q.   We'll wait just a minute.
7     A.   Okay.  I don't have a fancy printer.
8 It's kind of slow.
9     Q.   That's okay.
10     A.   I'll have to update my boards.  I don't
11 have my recent board certification on there, but
12 I'll fix that.
13         Oh, it is on there.  Never mind, I see
14 it.
15         I think only two or three more pages.  I
16 used to be an academic, so, you know, there's a
17 bunch of that kind of stuff in there.
18     Q.   Okay.
19     A.   Okay.
20     Q.   All right.  When did you graduate from
21 medical school?
22     A.   1987.
23     Q.   And during medical school, did you take
24 any specific classes in oncology?
25     A.   No.

1     Q.   After --
2     A.   I don't know what you mean by that
3 exactly, but as a resident, I did a rotation on
4 oncology subspecialty.  But I wouldn't call that a
5 special class, necessarily.
6     Q.   Right.
7         And I was referring just in medical
8 school.  And so after medical school, you completed
9 a residency program?
10     A.   I did.
11     Q.   Okay.  And what was the focus of your
12 residency program?
13     A.   Internal medicine.
14     Q.   Where was that residency program
15 located?
16     A.   That was at the University of Arkansas
17 Med School.
18     Q.   Can you tell me a little bit about what
19 your responsibilities were during the course of your
20 residency?
21     A.   Well, we did a number of rotations on
22 different subspecialties of internal medicine, some
23 would be primarily outpatient work.  The majority
24 were in-patient, taking in-hospital calls every
25 third night.

1         We went to educational meetings several
2 times a week as part of the training, did morning
3 reports the day after calls every morning with the
4 chair of medicine.  That kind of thing.
5     Q.   Okay.  And you mentioned a rotation in
6 oncology?
7     A.   Yes.  I think that was probably -- yeah,
8 I think you're correct.  It was in residency more so
9 than medical school the last couple of years.
10     Q.   Okay.
11     A.   I think you're correct on that.
12     Q.   After you completed your residency, did
13 you participate in the fellowship program?
14     A.   I did.
15     Q.   Okay.  What was the focus of your
16 fellowship program?
17     A.   Hematology and oncology, three-year
18 training program.
19     Q.   Where was that located?
20     A.   At LSU Health Sciences Center.
21     Q.   And what were your basic duties as a
22 fellow?
23     A.   Seeing an outpatient hematology oncology
24 clinic, doing in-patient rounds with interns and
25 residents, and attending some rotations on the bone

1 marrow transplant unit, and, certainly, a load of
2 conferences.  We had nine educational conferences a
3 week.
4     Q.   Wow.
5         What did you do after completing your
6 fellowship?
7     A.   I went on staff at LSU in hematology
8 oncology and attending professor.
9     Q.   And how long were you at LSU?
10     A.   I was there for six years.
11     Q.   And what teaching roles did you have
12 while you were at LSU?
13     A.   Well, obviously, teaching on rounds.  I
14 participated in a medical ethics class and taught
15 how to interview patients, and I did discussion
16 groups -- subgroups of the medical students.  That
17 was actually medical students, not necessarily
18 hem-oncs that I was teaching with the medical
19 ethics.  That was for the medical school.
20         And then, you know, we all had to rotate
21 giving conferences whether we were on staff or
22 fellows.  And so every few months, you would give an
23 hour-long lecture.  And participated in grand rounds
24 at the med school to all medical personnel and
25 internal medicine, that kind of thing.

1    Q.   Did you ever --
2    A.   I do research --
3    Q.   What area was your research in?
4    A.   I did bench research and ended up
5 studying the ligation mediated PCR on the
6 transcriptional regulation of the erythropoietin.
7    Q.   Okay.  I don't have any follow-up
8 questions to that.
9         Have you ever attended or given any
10 lectures on the treatment of breast cancer?
11    A.   I'm sure some of my grand rounds were on
12 that when I gave them to the hem-oncs fellows.  I
13 tend to give more talks about breast cancer to
14 community groups through the years, even when I was
15 on staff.
16    Q.   Okay.
17    A.   So I'm sure --
18    Q.   Have you ever given any lectures -- I'm
19 sorry, Doctor.  Go ahead.
20    A.   No, that's okay.
21    Q.   Have you ever given any lectures on the
22 use of chemotherapy drugs in the treatment of breast
23 cancer?
24    A.   Yes.  I am recalling when Taxol came out
25 in 1991, I gave a talk on Taxol.

1    Q.   Do you remember what the substance of
2 that talk was?
3    A.   Well, the substance was it was a brand
4 new drug that looked really effective, and it was
5 interesting because it came from the yew tree in
6 California.  So I like it when I can tell patients
7 that treatments are not all genetic things designed
8 to kill you, they come from nature.  So it was a
9 break-through medication, and I talked really a lot
10 about it.  And back then, you know, its structure
11 and side effects and such.
12    Q.   Have you ever given any lectures or
13 talks on docetaxel?
14    A.   Not specifically on docetaxel.
15    Q.   Okay.  Have you ever published any
16 research papers or articles on breast cancer?
17    A.   No.
18    Q.   Have you ever published any research
19 papers or articles on chemotherapy drugs?
20    A.   No.  Let me be sure about that.
21         You know, I participated in
22 pharmaceutical trials, but when I was doing that,
23 that was more head and neck cancer and melanoma.  So
24 I don't think any of them were breast, but I don't
25 want to be caught in a lie.

1         Nope, not breast.
2    Q.   Doctor, what more certifications have
3 you held during the course of your career?
4    A.   Internal medicine boards, and I
5 recertified once on that.  And then I've maintained
6 current oncology boards.
7    Q.   How often do you have to recertify in
8 oncology boards?
9    A.   Every ten years.
10    Q.   And are you currently certified --
11    A.   Yes.
12    Q.   -- board-certified in oncology?
13    A.   Yes.
14         Okay, wait.  I lied.
15         I did participate in some pharmaceutical
16 company trials that included breast cancer
17 treatments.
18    Q.   Do you recall what pharmaceutical
19 company that was?
20    A.   I can't tell on this one.  It was a
21 breast cancer international research group, so that
22 wasn't a drug company.  That was a group trial,
23 Ortho Biotech.  So that was not docetaxel.
24         Let's see what the rest of them were.
25 Novartis was for a medicine to treat osteoporosis

1 risk in breast cancer patients.
2         Aventis -- it's been a long time since I
3 did all this.  So that was Aventis.  And then some
4 more -- let's see.
5         Novartis for an aromatase inhibitor
6 trial.
7         Actually, I remember participating in
8 the group trial through MD Anderson of prevention of
9 breast cancer trial.
10         Or the Biotech again for Propil, which
11 is not chemo.
12         Roche Laboratory.
13    Q.   Do you recall if you ever worked with
14 Hospira on any drug trials?
15    A.   No.
16    Q.   Have you ever had any sort of
17 professional relationship with Hospira?
18    A.   No.
19    Q.   Okay.  And back to your board
20 certifications.
21         When did you first become
22 board-certified in oncology?
23    A.   Let me look back, front page.
24         1991.  September 25th.
25    Q.   And you've been board-certified ever

Page 22

1  since in oncology?
2      A.   Yes.
3      Q.   What states are you currently licensed
4  to practice medicine in?
5      A.   Louisiana and Arkansas.
6      Q.   Are those the only states you've been
7  licensed to practice medicine in?
8      A.   Yes.
9      Q.   Are you required to take any continuing
10 education class for your state licenses?
11     A.   We just have to have 20 hours of
12 continuing medical education every year.
13     Q.   Do you have to obtain those hours in
14 oncology?
15     A.   No.
16     Q.   Have you taken continuing education
17 classes regarding breast cancer?
18     A.   Yes.
19     Q.   When is the last time you took such a
20 class or --
21     A.   November of last year.
22     Q.   Is that something you do frequently?
23     A.   Yes.  Every year or every other year,
24 same meeting.
25     Q.   What is that meeting?

Page 23

1      A.   It's Joyce O'Shaughnessy's School of
2  Breast Oncology, SOBO, S-O-B-O, School of Breast
3  Oncology.  It rotates sites.  I go to Emory most
4  every year.
5      Q.   Is there discussion of chemotherapy
6  drugs at that --
7      A.   Yes.
8      Q.   -- seminar?
9      A.   Yes.
10     Q.   Every year?
11     A.   Yes.
12     Q.   Do you recall whether in the last five
13 years there's been discussion of docetaxel at that
14 class?
15     A.   I'm sure it has been mentioned.  I don't
16 remember a specific lecture just on Taxotere, I'm
17 sure, but I'm sure it's included in regimens that
18 were reviewed.
19     Q.   Okay.  Who's your current employer?
20     A.   Thibodaux Regional Health Sciences
21 Hospital -- Health Systems, TRHS.  It used to be
22 Thibodaux Regional Medical Center if anybody got
23 that information, then the name changed to Thibodaux
24 Regional Health Systems.
25     Q.   And what's your title at Thibodaux

Page 24

1  Regional Health Systems?
2      A.   Just hematology/oncology physician.  No
3  title.
4      Q.   Do you have any teaching
5  responsibilities there?
6      A.   No.
7      Q.   Do you have hospital privileges at any
8  local hospitals?
9      A.   Just Thibodaux Regional.  Well, yeah.  I
10 see a clinic at an outlying hospital, but I don't
11 round in the hospital there.
12     Q.   What is that hospital?
13     A.   St. James Parish Hospital in Lutcher,
14 L-u-t-c-h-e-r, Louisiana.
15     Q.   Dr. Chauvin, what medical journals do
16 you subscribe to?
17     A.   New England Journal and ASCO, American
18 Society of Clinical Oncology.
19     Q.   Are those publications that you review
20 periodically?
21     A.   Yes.
22     Q.   Doctor, have you ever testified as an
23 expert in a lawsuit?
24     A.   No.
25     Q.   You said you've given two depositions in

Page 25

1  the past.  Was that in your capacity as a treating
2  physician?
3      A.   One of them was not.  And then one was.
4      Q.   What was the one that was not?  What was
5  that deposition about?
6      A.   The woman was a patient I took care of.
7  Her death didn't have anything to do with the reason
8  I took care of her, but she died in an ambulance on
9  the way, after a non cancer-related surgery, to a
10 larger city.  And they just had questions for me
11 about is it appropriate for a person to be on an
12 ambulance when the equipment doesn't work and they
13 couldn't resuscitate her.
14         That was pretty much it.  Wrongful death
15 kind of lawsuit, I suppose.
16     Q.   Okay.  Doctor, I'm going to move into
17 some questions about your experience in treating
18 breast cancer.
19         During your career, Doctor, how many
20 breast cancer patients would you estimate that
21 you've treated?
22     A.   Oh, since 1991?  Maybe one or two new
23 patients a week on average.  Maybe more.  Maybe
24 less.  We can do the math.  Maybe 100 new ones a
25 year for all that time.

7 (Pages 22 - 25)

1      There was a period of time I was at a
2  small hospital and that rate probably went down.
3      Q.   Would a fair estimate be two to three
4  thousand?
5      A.   Probably.
6      Q.   And you first began treating patients
7  with breast cancer in 1991?
8      A.   Yes.  You know, we rounded on them for
9  chemo side effects and such in internal medicine
10  rounds, but really, essentially, as a hem-onc fellow
11  that started, yes.
12      Q.   And do you still treat breast cancer
13  patients?
14      A.   Yes.
15      Q.   Do you treat other types of cancer?
16      A.   Yes, indeed.
17      Q.   What percentage of your practice
18  currently is treating breast cancer?  Just an
19  estimate.
20      A.   Maybe 15 percent.  Maybe 15, 20 percent.
21  Maybe more.
22      Q.   Okay.  Is that generally --
23      A.   I --
24      Q.   I'm sorry, go ahead.
25      A.   No, we don't get to subspecialize here

1  and have a focus.  We all just take it in rotation.
2  Yep.
3      Q.   Okay.  Can you walk me through the basic
4  steps of how you developed a chemotherapy treatment
5  regimen for breast cancer patients?
6      A.   Well, there are a lot of things that
7  contribute to that.  The subtype of breast cancer,
8  there are some rare subtypes that have some sort of
9  impact.  So one clearly has to review the cell type
10  of the cancer, the size of the tumor, whether it's
11  multifocal in the breast is important, whether lymph
12  nodes are ultimately involved.
13      There are many prognostic indicators
14  about breast cancers, including family history;
15  obesity; sedentary lifestyle; and certainly
16  indicators on one's pathology, whether one is
17  hormone receptor positive or not, HER2, another
18  receptor, if one is triple negative that's a
19  negative prognostic indicator.
20      We do gene surveys to determine any
21  genetic risk that can impact the role of different
22  treatments for breast cancer.  Actually, prognostic
23  information comes from the response of neoadjuvant
24  chemotherapy, which is chemotherapy given prior to
25  the surgery.

1      Many factors.
2      Q.   And what role does the -- you mentioned
3  the pathology.  What role does the pathological
4  indicators of breast cancer play in determining a
5  treatment regimen?
6      A.   Well, on some of those things I
7  mentioned, you end up with a pathological stage.  So
8  there's Stage I through IV and little subtypes of
9  that, which includes the size of the tumor, whether
10  lymph nodes were involved.  And some of those
11  characteristics I mentioned, estrogen receptor,
12  progesterone receptor, HER2/neu receptor.
13      More recently, an index of proliferative
14  rate Ki-67 is used to kind of break the tie if it's
15  unclear or there's not an obvious mandate of how
16  much treatment or not and what regimen to use.
17      So there are a lot of factors.
18      Whether there is perineural invasion,
19  lymphatic invasion, positive margin, multifocal
20  disease in the same breast.
21      A number of things.
22      Whether it involves the skin or not.
23      Q.   Okay.  What are some of the most common
24  chemotherapy drugs used to treat breast cancer?
25      A.   Adriamycin, Cytoxan, Taxol, docetaxel --

1  and Taxol is paclitaxel.  There are plenty of
2  other -- you know, I'm plugging into chemotherapy
3  medicines.
4      Did you ask about chemo or any
5  treatments?
6      Q.   Chemotherapy.
7      A.   Okay.  Those are the most common ones.
8      In refractory or recurrent cases,
9  carboplatin is used, gemcitabine is used, Navelbine.
10  There are a number of things we can rotate through
11  more so in, say, for metastatic patients, regarding
12  the latter.
13      Q.   So you mentioned Taxol.
14      Are Taxol and docetaxel both taxanes?
15      A.   Yes.
16      Q.   What's the difference between docetaxel
17  and Taxol or paclitaxel?
18      A.   The side effects profile is probably the
19  main difference.  Obviously the chemical structures
20  are probably a little bit different, but they're in
21  the same mechanism of action being microtubule
22  inhibitors and disrupting DNA replication.
23      Taxol has a risk of a hypersensitivity
24  reaction that when it first came out caused death in
25  some people.  We know how to deal with that very

8 (Pages 26 - 29)

Page 30

1  well now.  But Taxotere tends not to have that
2  nearly as frequently, and not as significantly.
3        Taxotere -- or docetaxel has less
4  neuropathy risk as a whole than Taxol does.
5        Those are the main differences.
6        So when docetaxel came about,
7  originally, we were happy because it had less
8  neuropathy and less risk of the hypersensitivity
9  reaction.
10     Q.   You still prescribe Taxol for treatment
11  of breast cancer?
12     A.   Yes.
13     Q.   What influences -- strike that.
14        Doctor, how do you learn about
15  chemotherapy drugs before you prescribe them?
16     A.   Well, I read them -- about them in
17  articles, not just from those journals but UpToDate
18  is a thing I use a lot.  And then I get emails.  I
19  signed up for email -- different email sources of
20  new fentanyl findings.  So I read information on
21  those emails.
22        Certainly I refer to the NCCN guidelines
23  on almost every new patient.  Well, really,
24  essentially, every patient that we see at this time
25  in life.  Some because I need to be sure I'm doing

Page 31

1  the right thing, clearly, and then some because
2  insurance won't cover things because they're on the
3  NCCN guidelines.
4        So there are a lot of ways I keep up.
5     Q.   What are the NCCN guidelines, Doctor?
6     A.   They're National -- I'll call them
7  government-based guidelines for the treatment of
8  almost every cancer that's out there.  And they
9  would define how to work up a cancer, diagnostic
10  procedures, prognostic information, and then
11  treatments by stage, kind of algorithmic.
12     Q.   So is that by -- is one way that it lays
13  out the different options of chemotherapy for -- are
14  based on pathological staging?
15     A.   Yes.
16     Q.   You mentioned UpToDate.  What is
17  UpToDate?
18     A.   That's a commercial venture of the
19  United States that has turned out to be really a
20  good source for quick review while you're on the fly
21  seeing patients for just about anything.
22        It's been validated to where we can get
23  the CME by researching on that.  So it makes clinics
24  flow a lot faster if you have anything you need to
25  look up:  drug interactions, side effects, you know.

Page 32

1        So I could look up anything on there,
2  and pretty quickly.
3     Q.   Can you look up information from a
4  drug's label?
5     A.   Yes.
6     Q.   Does UpToDate -- and this may be obvious
7  from the name, but does it send you updates on new
8  information that's added to a drug label?
9     A.   They have started in the last couple of
10  years sending alerts by email of new things.  And
11  then if you research a drug or a disease and
12  treatment thereof, sentinel thing, there's a pop-up
13  that tells you the most recent sentinel new thing.
14     Q.   How long have you been using UpToDate?
15     A.   Probably more than ten years.  I've been
16  here ten years, and I'm sure I started using it
17  before that.
18     Q.   Do you believe you would have been using
19  UpToDate at the time --
20     A.   Yeah.
21     Q.   Well, strike that.
22        Do you believe you would have been using
23  UpToDate in 2014 when you treated Mrs. Plaisance?
24     A.   Yes.
25     Q.   And do you use the information that you

Page 33

1  review in UpToDate and some of these other sources
2  that you've described to inform your prescribing
3  decisions?
4     A.   Yes.
5     Q.   Do you relay information that you
6  learned from these sources to your patients?
7     A.   No.
8     Q.   Do you recall when you first would have
9  begun prescribing docetaxel?
10     A.   I think that came out rather quickly in
11  just a year or two after Taxol came out.  So the
12  minute it was out, I'm sure I started using it.
13     Q.   Is UpToDate something you use even with
14  chemotherapy drugs that you've been using for quite
15  some time?
16     A.   Yes.
17     Q.   How often would you say you look at
18  UpToDate in relation to a chemotherapy drug?
19     A.   At least every other day.
20     Q.   Okay.  How about specific to docetaxel?
21     A.   Well, recently in the last two or three
22  days, a lot.
23        Just kidding.
24        No more frequently than any other chemo
25  medicine for any other cancer.  But before that, I

9 (Pages 30 - 33)

Page 34

1 think I looked it up in the last nine months or so
2 to be sure it is something that can cause plural
3 effusions, for example.  So if a patient comes in
4 with a clinical finding and I want to know whether
5 it could be secondary to any medication, much less
6 chemotherapy, I will look at UpToDate and pull up,
7 you know, the PDR, basically.
8     Q.   Do you periodically look at UpToDate in
9 reference to chemotherapy drugs just to make sure
10 you have the most up-to-date information on any new
11 risks that may be associated with the drug?
12     A.   Probably I look that up more so in
13 determining an unusual side effect a patient has,
14 but those sentinel things will pop up if there's
15 something new reported.
16         So I don't usually look going to see if
17 there's something new and devastating.  It usually
18 is emailed to me or pops up.
19     Q.   Doctor, have you ever heard of something
20 referred to as a "dear doctor" or "dear healthcare
21 provider" letter?
22     A.   No.
23     Q.   Have you ever received a letter from a
24 drug company that advised you of a newly discovered
25 risk of a drug?

Page 35

1     A.   I do believe so, and it might be called
2 that.
3     Q.   If you received something like that, is
4 that something you would review?
5     A.   Yes.
6     Q.   Do you provide your patients with any
7 written materials about chemotherapy drugs that you
8 prescribe?
9     A.   Yes.
10     Q.   Do you provide written materials about
11 specific drugs or chemotherapy in general?
12     A.   Specific drugs.
13     Q.   Where do you obtain those materials
14 from?
15     A.   Actually, our clinic director is a
16 former chemo nurse, and the patients have a
17 45-minute to an hour teaching session on their
18 specific chemotherapy.  And I'm not sure where they
19 print that information from.
20     Q.   Okay.
21     A.   It very well could be UpToDate, but I'm
22 not sure.
23         NCCN also has information like that.  I
24 don't know.
25     Q.   Do you know -- you mentioned the former

Page 36

1 oncology nurse.  What's her title at Thibodaux?
2     A.   I don't know her official title with the
3 corporate things, but she's a director of our
4 clinic.  And that's that.  We call her the director.
5 It may be something more specific.
6     Q.   Fair enough.  That's enough for me.
7         Doctor, do you recall treating Audry
8 Plaisance?
9     A.   Yes.
10     Q.   And you mentioned that you reviewed some
11 of her records.  Have you had an opportunity to
12 refresh your recollection about the treatment of
13 Mrs. Plaisance?
14     A.   Yes.
15     Q.   I'm going to direct you to the likely
16 bigger box that you received from Hospira's counsel.
17 There's folders --
18     A.   I've got some folders.
19     Q.   Okay.  I'm going to direct you to
20 Folders 1, 2, and 3.
21     A.   Okay.
22     Q.   If you'll pull those out.
23     A.   I've got them.
24     Q.   Okay.  Those are what we believe to be
25 your -- the records from your treatment of

Page 37

1 Mrs. Plaisance, and I want to walk through some of
2 those with you.
3         Let's focus for the -- well, let's see.
4 Let's -- and I hate to do this.
5         MR. ROCKSTAD:  Mara, how are we doing
6         the marking?  There's not a court
7         reporter there to put a sticker on it.
8         Can we just put it on the record and
9         figure that out later?
10         MS. GONZALEZ:  Yeah, we've been using
11         exhibit share, but I don't think you're
12         required to do that.  So I think we just
13         need to make a record, like you said, of
14         the page and we can stamp it later.
15         MR. ROCKSTAD:  Okay, thanks.
16 BY MR. ROCKSTAD:
17     Q.   And, Dr. Chauvin, if you would look at
18 the document in Folder 1.
19         MR. ROCKSTAD:  For the record, we'll
20         mark this document as Exhibit 1.
21         (Exhibit 1 was marked for
22         identification.)
23         MR. ROCKSTAD:  And then we'll go ahead
24         and mark Folder 2 document as Exhibit 2.
25         (Exhibit 2 was marked for

10 (Pages 34 - 37)

1        identification.)
2            MR. ROCKSTAD:  And Folder 3 document
3    as Exhibit 3.
4            (Exhibit 3 was marked for
5        identification.)
6    BY MR. ROCKSTAD:
7    Q.    So, Doctor, Exhibit 1, which is --
8    should be at the bottom you should see a Bates
9    number that says Thibodaux REGCNRCTRMR and then a
10   series of numbers.
11       Do you see that?
12   A.    On the folder?
13   Q.    No, on the document, the document in
14   Folder 1.
15   A.    Okay.  Where am I supposed to see that?
16   I see a reference ID.
17   Q.    You may -- do you have the -- does it
18   look like a set of medical records, or does it look
19   like a drug label?
20   A.    It looks like a drug label.
21   Q.    Okay.  Look in your other box.
22       MS. GONZALEZ:  Doctor, I think you
23       had -- it's a binder, a large --
24       THE WITNESS:  I have a binder, yes.
25       MS. GONZALEZ:  So I think when Trevor

1        was referring to Folder 1, it's actually
2        Tab 1 of that binder.
3            THE WITNESS:  Okay.
4            MS. GONZALEZ:  I believe.  I'll let
5        Trevor confirm.
6            MR. ROCKSTAD:  Yeah, that sounds
7        right.  I'm looking at the electronic
8        box.
9    BY MR. ROCKSTAD:
10   Q.    Do you see on Tab 1 -- does it look like
11   medical records there, Doctor?
12   A.    Yep, when I turn Page 1, yes.
13   Q.    Okay.  And down at the bottom right-hand
14   corner, do you see a Bates number that's Thibodaux
15   REGCNRCTRMR and then a series of numbers?
16   A.    Yes.
17   Q.    Okay.  Great.  We got the right records.
18   Let's dive into these records.
19       If you would flip to Page 114 of that
20   document.
21   A.    Okay.
22   Q.    What's the date of this visit that you
23   see?
24   A.    January 15th, 2014.
25   Q.    Okay.  And is this a visit that you had

1    with Mrs. Plaisance?
2    A.    Yes.
3    Q.    And, Dr. Chauvin, I see a reference to
4    William Dunn, MD.
5        Who's Dr. Dunn?
6    A.    He's a radiation oncologist.
7    Q.    And what was his involvement in
8    Mrs. Plaisance's care if you know?
9    A.    I believe she had a breast conserving
10   surgery or a lumpectomy; therefore, she required
11   radiation for local control.
12   Q.    And how did Mrs. Plaisance come to see
13   you on January 15th, 2014?
14   A.    Let's see.  She was referred by the
15   surgeon, Dr. Barry Landry, with a new breast cancer.
16   Q.    Okay.  When she came to see you on that
17   date, did she -- had she already been diagnosed with
18   cancer?
19   A.    Yes.
20   Q.    Did you assist in making the diagnosis?
21   A.    No.
22   Q.    What was Mrs. Plaisance's diagnosis?
23   A.    She had breast cancer, atypical cell
24   type.
25   Q.    Was there -- can you tell from this

1    record whether there was a pathological diagnosis?
2    A.    There was a pathological diagnosis, yes.
3    Q.    What was that diagnosis?
4    A.    She had a Phase IA breast cancer,
5    meaning her lymph nodes were negative.
6    Q.    And did she have any hormone receptor
7    diagnosis?
8    A.    Yes.
9        You want me to tell you those?
10   Q.    Yes, ma'am.  Please.
11   A.    She was estrogen receptor-positive and
12   progesterone receptor-positive and was HER2/neu --
13   that's H-E-R-2/n-e-u -- negative.  Other factors
14   were the size of her cancer, 0.7 centimeters.  And
15   she had had an Oncotype DX score, which is a
16   prognostic test, not a diagnostic test.
17   Q.    How is that number reached?  How is that
18   Oncotype diagnosis score reached or calculated?
19   A.    It's a test of a panel of genes known
20   to -- if there's a certain number of them,
21   determined by the people who did the statistics by
22   Oncotype DX, if there's a score that's high
23   suggesting a pattern of increased genetic risk, then
24   that score can determine whether someone with an
25   otherwise relatively low stage breast cancer would

11 (Pages 38 - 41)

Page 42

```
 1  benefit from chemotherapy.
 2        It's used primarily in people who are
 3  node-negative low Stage I or II stage breast cancers
 4  to help decide if you need chemo or not.
 5     Q.   And what was Mrs. Plaisance's Oncotype
 6  diagnosis score?
 7     A.   27.
 8     Q.   What does that diagnosis score relate to
 9  in terms of a risk of occurrence?
10     A.   Well, it suggests she's at a relatively
11  high risk of recurrence for someone with a Stage IA
12  breast cancer on the criteria used for staging.
13  Oncotype DX is not part of staging.
14     Q.   I see in this record there's a reference
15  to a 17 percent ten-year risk of recurrence; is
16  that --
17     A.   Right.
18     Q.   -- correct?
19     A.   Yes.
20     Q.   Okay.  Had Mrs. Plaisance undergone a
21  surgery in relation to her breast cancer prior to
22  seeing you in January of 2014?
23     A.   Yes.
24     Q.   Did you participate in that surgery?
25     A.   No.
```

Page 43

```
 1     Q.   Okay.  Was the -- well, strike that.
 2        Do you know if on January 15, 2014, when
 3  you saw Mrs. Plaisance, if she still had cancer in
 4  her breast?
 5     A.   Very interesting question that if I were
 6  at that meeting I told you about, people could
 7  pontificate, you know, for an hour or so.  We can
 8  only remove what we can see and feel.  So we know
 9  that doing additional treatments to people with
10  certain cancers, including breast, will kill some
11  cells sitting somewhere that we can't see or detect.
12        So the likelihood is that there are some
13  cells remaining in that breast and even could be out
14  in her body somewhere undetectable.
15     Q.   And is that the reason for your
16  recommendation that Mrs. Plaisance undergo
17  chemotherapy treatment?
18     A.   Yes.  With that Oncotype score, yes.
19     Q.   So there's a reference in this note,
20  Dr. Chauvin -- let me find it -- on Page 117.  You
21  say:  I educated the patient about chemotherapy
22  recommendations before Oncotype diagnosis and after,
23  discussed these results in detail.  Twenty minutes
24  on this counseling.
25        Could you tell me a little bit about
```

Page 44

```
 1  what you would have discussed with Mrs. Plaisance
 2  during that 20 minutes of counseling?
 3     A.   Well, sometimes -- and I don't remember
 4  anything other than what I would have written down
 5  there.
 6        But when patients have a Stage I cancer,
 7  breast cancer, and they come to see me, it seems
 8  they have the predisposed opinion that they're
 9  relieved they don't need chemotherapy.
10        So when that Oncotype comes back
11  indicating chemotherapy, one has to spend some time
12  talking about what happens when breast cancer
13  recurs.  And usually when it recurs, it is Stage IV
14  and incurable.
15        We discuss that there are treatments for
16  that, but ultimately it's incurable when it comes
17  back.  So we talk about the benefit of multiple
18  interventions that can be done to reduce that risk.
19        Effects, certainly.  We talk about
20  almost every side effect that there is.  And then,
21  you know, we talk about her comfort level on if she
22  does not have treatment, comfort level if she has
23  it.
24        I always emphasize that the preconceived
25  idea that everyone is like people on TV, shows --
```

Page 45

```
 1  retching and vomiting and in the hospital and
 2  miserable and no one can help them feel better -- is
 3  really not the case with chemotherapy now, that we
 4  have nausea medicines from 1991 that prevent that;
 5  and that people generally don't feel sick while
 6  they're on chemotherapy.
 7        So we spend a lot of time on that.  And
 8  then it depends on what the patient has questions
 9  about.  I usually continue talking until they've run
10  out of questions and exhibit understanding.
11     Q.   So you mentioned that you would have
12  discussed side effects of chemotherapy.  During that
13  20 minutes, would you have discussed side effects
14  specific to docetaxel?
15     A.   Yes.
16     Q.   And what side effects was it your
17  practice at that time to discuss with patients?
18     A.   Well, neuropathy is a big one.  I
19  usually emphasize the relative lack of the
20  hypersensitivity reaction.  Certainly risk of
21  infection is the most life-threatening thing, so I
22  discuss that.  And I discuss how to detect any hint
23  of infection with or without fever.  Tell people
24  what they need to do if such symptoms occur.
25        I talk about the fact that hair is going
```

12 (Pages 42 - 45)

Page 46

1  to fall out and talk about the timing of it.  And I
2  tell them -- and I'm sure I told her in the majority
3  of the cases, they're happy six months after their
4  chemo and their hair comes back.
5       And I usually tell them, you know,
6  permanent hair loss is unusual now.  Back then I
7  don't know if I really would have focused on a
8  discussion of permanent hair loss.  I think prior to
9  that time I hadn't had any patient with permanent
10 hair loss since 1991.
11      Q.   Do you recall if in 2014 you were aware
12 of a risk of permanent hair loss with docetaxel?
13      A.   Probably if you had asked me that
14 question I would have said it probably can happen
15 but I haven't seen it.
16      Q.   Do you recall whether Hospira ever gave
17 you any information prior to January 2014 regarding
18 that risk of permanent hair loss?
19      A.   I don't recall that, no.
20      Q.   If they had provided you with
21 information prior to January 2014 related to a risk
22 of permanent hair loss, is that information you
23 would have taken into consideration in your
24 prescribing decisions?
25      A.   I would have definitely warned the

Page 47

1  patient of it, certainly that could be emotionally
2  devastating.  And, frankly, I don't want them mad at
3  me later.
4       And, you know, that's a -- that's a big
5  one psychologically.  So, yeah, definitely would
6  have discussed it.
7       Q.   So ultimately in 2014 you recommended
8  Taxotere and Cytoxan for four cycles; is that
9  correct?
10      A.   Yes.
11      Q.   If Mrs. Plaisance had not been
12 comfortable with the side effect profile of
13 docetaxel at that time, what would you have
14 prescribed to her?
15           MS. GONZALEZ:  Object to the form.
16      A.   Say that again.
17      Q.   Let me rephrase that.
18      A.   No, I heard you.  Somebody else said
19 something.  I thought I heard --
20      Q.   She objected.
21      A.   Oh, she objected.  Okay.
22      Q.   Yes, ma'am, she objected.  She didn't
23 like the form of my question so I'm going to
24 rephrase it.  Let me take a step back.
25           In January 2014, were there other

Page 48

1  possible chemotherapy regimens besides Taxotere and
2  Cytoxan that you could have prescribed to
3  Mrs. Plaisance?
4       A.   Yes.
5       Q.   What are some examples of those other
6  regimens?
7       A.   About the only one I think anyone might
8  have recommended, but probably wouldn't have, would
9  be Adriamycin and Cytoxan.
10      Q.   What about Taxol?
11      A.   In the same --
12           MS. GONZALEZ:  Object to the form.
13      A.   That was an objection again?
14      Q.   You can go ahead and answer.
15      A.   Okay.  Taxol.
16           Generally not for a Stage IA cancer.  If
17 you were to do overkill but -- most people would
18 have considered it overkill.  You could have done
19 Adriamycin, Cytoxan, followed by Taxol, but
20 generally not for a Stage IA cancer.
21      Q.   Doctor, how important is a patient's
22 involvement in the decision-making related to the
23 cancer treatment they received?
24      A.   It's very important.
25      Q.   And do you encourage patients to be an

Page 49

1  active participant in deciding what chemotherapy
2  regimens they will receive?
3           MS. GONZALEZ:  Objection to form.
4       A.   What did she say?
5       Q.   She objected.  You can answer.
6           MS. GONZALEZ:  Just object to the
7  form.
8       A.   Oh.  So do I answer the question or not?
9       Q.   Yeah, you can answer.
10      A.   Okay.  Now do I involve them in which
11 chemotherapy choices?
12           Usually I involve them in everything.  I
13 wouldn't have offered her Adriamycin and Cytoxan,
14 however.  So.
15      Q.   Okay.
16      A.   Pretty much I would have probably
17 discussed only this.
18      Q.   Assume for me that Mrs. Plaisance had
19 told you that she was not comfortable receiving
20 docetaxel.  What would you have prescribed instead?
21           MS. GONZALEZ:  Object to form.
22      A.   Well, I would have --
23      Q.   You can answer.
24      A.   Okay.  I would have discussed Adriamycin
25 and Cytoxan, but I would have noted the 2 percent

13 (Pages 46 - 49)

1 risk of deadly acute leukemia from Adriamycin and
2 recommended against that.
3    Q.   Would there be any other options?
4    A.   For chemotherapy?
5    Q.   Yes.
6    A.   I don't think -- I don't think very
7 standard -- standard things, no. I have had women
8 try to talk me into single-agent treatments that
9 don't tend to lose hair, but they're not proven to
10 be effective in this setting so I don't recommend
11 them.
12        I lost one patient years ago because she
13 was very worried about her hair loss 15 years ago.
14 And she went to another physician and talked them
15 into single-agent treatment which is not proven to
16 be effective, and I don't agree with giving people
17 unproven, likely ineffective regimens.
18    Q.   Let's go back to those medical records,
19 Doctor.
20        If you'll look at Page 80 of that first
21 set of records, the Thibodaux Regional Cancer Center
22 records, what side effects did Mrs. Plaisance
23 experience during her chemotherapy treatment?
24    A.   I'll have to read.
25        She had a typical skin reaction, it

1 looks like, where the skin can turn red. Usually
2 not have symptoms but turn red for two or three days
3 after the infusion. That's one that's mentioned
4 there.
5        Oh, but it looks like it was related to
6 a different medication. That was her antacid
7 medication. So let's see.
8        She had some fatigue, it looks like.
9 Oh, and she did have -- well, the hives, but she --
10 it happened when she started taking Dexilant, an
11 antacid medication. So I don't think that was
12 related to the Taxotere.
13    Q.   What is orthostatic hypotension?
14    A.   That is when one may be relatively
15 dehydrated. Can relate to fatigue when you stand up
16 in a hurry. Momentarily, you get dizzy because your
17 blood goes south in your veins -- your arteries,
18 actually, and they don't clamp down fast enough to
19 maintain normal blood pressure. They adjust
20 quickly, and then it resolves.
21    Q.   Did Mrs. Plaisance ultimately undergo
22 the full rounds of docetaxel and Cytoxan that you
23 recommended?
24    A.   Yes.
25    Q.   What treatment did she have after she

1 finished her chemotherapy treatment?
2    A.   She went on an aromatase inhibitor pill.
3 I believe she went on letrozole or Femara.
4    Q.   What's the purpose of that drug?
5    A.   It down-regulates estrogen receptors and
6 progesterone receptors so if there are any cancer
7 cells sitting there, it decreases their ability to
8 remain immortal. It allows programmed cell death or
9 apoptosis.
10    Q.   Doctor, if you would, there's a folder
11 in the box that has folders.
12    A.   Okay.
13    Q.   Not the binder but the folders.
14    A.   Got it.
15    Q.   If you'll look at Folder Number 5.
16        Do you recognize this document?
17    A.   I'm not to it yet.
18        Yes.
19    Q.   What is this document?
20    A.   NCCN Guidelines For Breast Cancer.
21    Q.   And this isn't the whole document, I
22 take it.
23    A.   I think it's many more pages than that,
24 yes.
25    Q.   Yeah. I can represent to you that I

1 sent you some excerpts from the larger, I believe,
2 several-hundred-page document.
3        So you mentioned these guidelines
4 earlier. Are these guidelines considered to be
5 reliable?
6    A.   Yes.
7        MS. GONZALEZ: Hey, Trevor.
8        MR. ROCKSTAD: Hey, Mara.
9        MS. GONZALEZ: I'm sorry to interrupt.
10 If it's okay with you, Ashley has these
11 documents. Can she -- are you marking
12 this as the next exhibit?
13        MR. ROCKSTAD: Yeah, I probably will.
14        MS. GONZALEZ: Okay. Just so we can
15 put it in the exhibit share, just so we
16 can look at it.
17        Is that okay with you?
18        MR. ROCKSTAD: Oh, sure. That's fine.
19 Let's mark this. What number are we
20 on? 4?
21        MS. GONZALEZ: 4. So Ashley had
22 marked the first three, so she'll mark
23 this as 4. Sorry for interrupting.
24        MR. ROCKSTAD: No, thanks for
25 interrupting. And, Ashley, thank you for

14 (Pages 50 - 53)

1    doing that. I appreciate that.
2         (Exhibit 4 was marked for
3         identification.)
4    BY MR. ROCKSTAD:
5    Q.    Okay. So, Doctor, can you walk me
6    through how you -- you mentioned that you look at
7    these.
8         Would you walk me through how you would
9    use these guidelines to make treatment
10   recommendations for someone like Mrs. Plaisance?
11   A.    Well, you can look on the second page,
12   and it has her -- you see PT1, PT2, PT3. You see
13   that?
14        So she was a PT1, and her tumor was
15   greater than a half centimeter. So you consider the
16   gene assay, which is the Oncotype test. And then
17   you go from there and it tells you to consider
18   adjuvant endocrine treatment and/or adjuvant
19   chemotherapy.
20        And you want me to go through every
21   page? This is the follow-up --
22   Q.    Well --
23   A.    Okay.
24   Q.    Does it give you a list of chemotherapy
25   regimens, then, to consider?

1    A.    Yes. It refers to V, and it refers to
2    X. And on that page, it doesn't tell you where --
3    oh, yeah, it does. See adjuvant, endocrine, and
4    chemotherapy down there in the blue, yes. So it
5    refers you to possible chemo choices, which you have
6    on Page 4.
7    Q.    Okay. And so is this specific to a
8    certain pathological diagnosis or staging, these
9    regimens?
10   A.    You said pathological?
11   Q.    Yes.
12   A.    When you get to the preferred regimens,
13   it doesn't break it down for stage.
14   Q.    Why are there preferred regimens and
15   other regimens? What's the difference there?
16   A.    The preferred regimens -- hang on one
17   second. This is that call, I think.
18        (Off-record discussion.)
19        THE VIDEOGRAPHER: Off the record at
20        4:20 p.m.
21        (A 1-minute break was taken from 4:20
22        until 4:21 p.m.)
23        THE VIDEOGRAPHER: The time is
24        4:21 p.m. This begins Media Unit
25        Number 2, and we are back on the record.

1    BY MR. ROCKSTAD:
2    Q.    So I had asked, Dr. Chauvin, I had asked
3    the difference between preferred and other regimens
4    and what the distinction is there.
5    A.    Preferred regimens have the best data,
6    the best statistics. So most trustable data in
7    terms of benefit. And probably they consider
8    toxicity within that, but usually the main factor is
9    efficacy.
10   Q.    And which one of the three -- well,
11   strike that.
12        Did Mrs. Plaisance have one of these
13   three preferred regimens?
14   A.    Yep.
15   Q.    Which one?
16   A.    Docetaxel/cyclophosphamide, called TC.
17   Q.    Okay. And these other two preferred
18   regimens, would those have been something that she
19   could have had?
20   A.    I don't think anyone would recommend it,
21   but when you say could, that's a vague way to put it
22   for cancer.
23        I think around that time, and maybe
24   within a year or two before that, we had been pretty
25   much indicted for overtreating Stage I and some

1    Stage II cancers with the first two regimens. So
2    when you had a Stage IA cancer, even though high
3    risk or intermediate risk on the Oncotype test, then
4    it was the standard of care to use only the
5    docetaxel and cyclophosphamide.
6    Q.    Okay. So just to make sure I'm
7    understanding your answer, if Mrs. Plaisance had
8    told you when you recommended Taxotere and Cytoxan
9    that she was not comfortable receiving Taxotere, is
10   there anything else you could have recommended to
11   her besides just not having chemotherapy?
12        MS. GONZALEZ: Object to the form.
13   BY MR. ROCKSTAD:
14   Q.    You can answer.
15   A.    Okay. We said before Adriamycin and
16   Cytoxan can be used, but again we tend not to
17   recommend it because of the acute leukemia risk.
18   Well, it's only 2 percent. If they get that, they
19   usually die. Treatment-induced acute leukemia is
20   deadly.
21        So yeah. And I wouldn't have really
22   recommended the treatments that included Adriamycin,
23   Cytoxan, and Taxol, just way overtreatment for a
24   Stage IA cancer.
25        And the other regimens you list down

1  there have similar problems.  The epirubicin is akin
2  to Adriamycin.  It has a 4 percent risk of acute
3  leukemia.  The other regimens are overkill and much
4  more generally toxic for low blood counts, infection
5  rates, et cetera.
6      Q.   I'm starting to get a lot of feedback
7  all of a sudden.
8      A.   Somebody's mowing outside my window.
9      Q.   Oh, okay.  I just wanted to make sure it
10 wasn't a tech issue.
11     A.   I have a room with two windows which,
12 normally, is nice.
13          THE VIDEOGRAPHER:  Doctor, can we have
14          you move a little closer to the camera
15          and mic?  That may force it to cancel out
16          that background audio a little bit more.
17          Thank you.
18          MR. ROCKSTAD:  Mara, those are the
19          only questions I have.
20          Doctor, I appreciate your time, and I
21          may have some follow-up questions, but
22          I'm going to turn it over to Mara now.
23          THE WITNESS:  Okay.
24          MS. GONZALEZ:  Thank you.  And then
25          Dr. Chauvin, are you okay if we take

1  about a ten-minute break and come back?
2          THE WITNESS:  Okay.
3          THE VIDEOGRAPHER:  Off the record at
4          4:25 p.m.
5          (A 14-minute break was taken from 4:25
6          until 4:39 p.m.)
7          THE VIDEOGRAPHER:  The time is
8          4:39 p.m., and we are back on the record.
9      A.   I can't hear you.
10     Q.   Thank you.  Sorry.
11          Again, my name is Mara Custer Gonzalez.
12 Good afternoon, Dr. Chauvin.  I am from the law firm
13 Dechert and representing Hospira today, and I will
14 now be asking you some questions.
15          Can you please state your full name
16 again for the record?
17     A.   Laura Chauvin.
18     Q.   And have you ever gone by any other name
19 or names?
20     A.   Yes.  Laura Campbell before I married
21 Chauvin seven years ago.  And my maiden name was
22 Castille.  So I've had three names.
23     Q.   Three.  Thank you.
24          And have you and I ever spoken before
25 the deposition today?

1      A.   No.
2      Q.   And have you and I ever communicated in
3  any other way before today's deposition?
4      A.   No.
5      Q.   And I'm going to try hard not to repeat
6  areas that you've covered already, so it may take me
7  a little bit to jump around, but I really want to be
8  as efficient as possible.  So bear with me.
9          And, first, just because we're taking
10 this deposition remotely, can you please tell us
11 where you are currently located?
12     A.   I'm in my office at the cancer treatment
13 center in Thibodaux, Louisiana.
14     Q.   And what is the address of that
15 facility?
16     A.   It just changed.  We're in a temporary
17 building because we're building a new one, but close
18 enough would be 602 North Acadia Road, Thibodaux,
19 Louisiana.  I can ask real quick the accurate one
20 for this building.
21     Q.   That's fine, thank you.
22     A.   Okay.
23     Q.   And is there anyone else in the room
24 with you during this deposition?
25     A.   No.  No.

1      Q.   Thank you.
2          And you understand that we're here today
3  because of a lawsuit that your patient Audry
4  Plaisance filed against my client, Hospira?
5      A.   Yes.
6      Q.   And you understand that you're here
7  today to talk about your care and treatment of
8  Mrs. Plaisance?
9      A.   Yes.
10     Q.   And is Mrs. Plaisance a current patient
11 of yours?
12     A.   Yes.
13     Q.   And you began treating her for breast
14 cancer in early 2014; is that right?
15     A.   Yes.
16     Q.   And you have continued to treat her
17 through regular follow-up visits since then; is that
18 right?
19     A.   Yes.
20     Q.   And when did you last see
21 Mrs. Plaisance?
22     A.   I think it was October of '19, but I can
23 be more specific if you want to know.  I can look
24 that up.
25     Q.   Sure.  Thank you.

16 (Pages 58 - 61)

1    A.   October 16, 2019.
2    Q.   And have you spoken with Mrs. Plaisance
3  since you last saw her at that time?
4    A.   No.
5    Q.   And based on your care and treatment of
6  Mrs. Plaisance, how is she currently doing with
7  regard to her breast cancer?
8    A.   She has remained no evidence of disease.
9    Q.   And it's been more than six years now
10  since she completed her chemotherapy under your
11  care; is that right?
12   A.   Since she completed chemo?  I can be
13  real exact about that.  Last treatment was
14  March 20th, 2014, yes.
15   Q.   So Mrs. Plaisance has been cancer-free
16  for over six years; is that correct?
17   A.   Yes.  Yes.
18   Q.   And is that significant to you?
19   A.   Yes.
20   Q.   And why?
21   A.   Well, of course, we don't want the
22  cancer to come back because it would likely kill her
23  if it did, and she would have to undergo treatment
24  and such.  So we're always on the side of staying
25  disease free.

1    Q.   And do you credit Mrs. Plaisance's
2  survival in part to the chemotherapy regimen that
3  you prescribed for her?
4    A.   Yes.
5    Q.   And that regimen was TC or docetaxel in
6  combination with cyclophosphamide; is that right?
7    A.   Yes.
8    Q.   And when you prescribed that regimen for
9  Mrs. Plaisance, did you believe it was the best
10  treatment for her cancer?
11   A.   Yes.
12   Q.   And have you communicated with
13  Mrs. Plaisance about this lawsuit?
14   A.   No.
15   Q.   Prior to your learning about this
16  lawsuit, were you aware that Mrs. Plaisance had
17  allegedly experienced permanent hair loss that she
18  claims was caused by docetaxel?
19   A.   That's a complicated question because I
20  looked back at my notes, and I did put that her
21  alopecia was resolved.  But she probably did have
22  partial hair loss at that time.  So I did not
23  understand that she had a perception that she had
24  complete hair loss or permanent hair loss.
25   Q.   And you have not treated Mrs. Plaisance

1  for permanent hair loss; is that right?
2    A.   No, I have not.
3    Q.   And you have not been retained by any
4  party in this case as an expert; is that right?
5    A.   No.
6    Q.   And before today's deposition, you
7  testified earlier that you spoke with
8  Mrs. Plaisance's lawyer, Mr. Rockstad, earlier this
9  week; is that right?
10   A.   Yes.
11   Q.   And that was about a 15-minute phone
12  call?
13   A.   Yes.
14   Q.   And was that a call that had been
15  scheduled with you, or how did that come about?
16   A.   Yeah, somewhat scheduled.  I was
17  supposed to return a call and didn't return a call.
18   Q.   And what did -- during that call, what
19  did Mr. Rockstad say to you?
20   A.   Well, I think the primary couple of
21  points were what the lawsuit was about, about
22  permanent hair loss, and her psychological angst
23  over that.  And the fact that I wasn't being sued
24  was a relief to hear.
25        And not much more than that, though, you

1  know, probably some repetitive conversation.
2    Q.   And did you ask any questions about --
3  strike that.
4        Did Mr. Rockstad ask you if you would
5  provide certain testimony here today during the
6  deposition?
7    A.   Asked me if I would participate in the
8  deposition?
9    Q.   No, I'm sorry.  Let me rephrase it.
10       Did Mr. Rockstad ask you if you would be
11  providing or stating certain things today during the
12  deposition?
13   A.   No.
14   Q.   And did Mr. Rockstad cite you to any
15  particular documents or sources of information
16  during that call?
17   A.   The only thing he said was you will have
18  a box from us.  Don't open it.
19   Q.   Thank you.
20       And other than that phone call, have you
21  had any other communications with any lawyers for
22  Mrs. Plaisance?
23   A.   No.
24   Q.   And have you had any communications with
25  any other healthcare providers for Mrs. Plaisance

17 (Pages 62 - 65)

1  since the last time that you treated her back in
2  October of 2019?
3     A.  No.
4     Q.  Do you know anyone in Mrs. Plaisance's
5  family other than through your treatment and care of
6  her?
7     A.  I don't think so.  I did meet her
8  husband early on in her course, but after that, she
9  pretty much came independently.
10    Q.  And turning back to your treatment of
11 Mrs. Plaisance in January of 2014, what medical
12 specialty or specialties were you practicing during
13 that time?
14    A.  Hematology/oncology.
15    Q.  And is it your regular practice to try
16 to maintain complete records of your patients'
17 medical treatment?
18    A.  Yes.
19    Q.  And do you rely on the accuracy and
20 completeness of your records to help you to provide
21 proper treatment for your patients?
22    A.  Yes.
23    Q.  And is one of the reasons that you do
24 that because you may not see a patient for a number
25 of weeks or months between visits?

1     A.  I do that because we just have to do
2  that.  We have to do that for billing.  I like to be
3  thorough so I understand conversations I had with
4  people.  I list a number of diagnoses.  So I save
5  time when I come back and don't have to recall that
6  someone has had a bang and they're worried about,
7  you know --
8     Q.  Do you use your records to refresh
9  yourself on your patient's history?
10    A.  Yes.
11    Q.  And is it your usual practice to record
12 information about each visit close in time to the
13 visit?
14    A.  Yes.
15    Q.  And today it looks like you were looking
16 up a record.  Was that an electronic or hard-copy
17 record that you were consulting?
18    A.  Electronic.
19    Q.  And other than the documents that the
20 lawyers sent you today, did you bring any documents
21 with you to the deposition today?
22    A.  Yeah, I kept some records from some of
23 the things I researched.
24    Q.  And when you -- you spoke earlier about
25 chemotherapy prescribing decisions.  Is it important

1  to come up with a chemotherapy regimen that is
2  appropriate and specific to each patient that you're
3  treating?
4     A.  Yes.
5     Q.  And a chemotherapy regimen that's right
6  for one patient might not be right for another; is
7  that fair?
8     A.  Yes.
9     Q.  And chemotherapy agents are not
10 interchangeable; is that correct?
11    A.  That is correct.
12    Q.  And what is your number one goal in
13 prescribing chemotherapy for a patient?
14    A.  Dose density, getting the dose in on
15 time and at full dose as best we can so they have
16 the best efficacy from it.
17    Q.  And does your prescription of a
18 chemotherapy drug also take into account your
19 knowledge about that particular patient and her
20 medical history?
21    A.  Yes.
22    Q.  And do you only prescribe a chemotherapy
23 regimen for a patient after you've satisfied
24 yourself that the benefits of that regimen outweigh
25 the risks for that particular patient?

1     A.  Yes.
2     Q.  Okay, Doctor.  Just for some
3  housekeeping, if you can take that binder again -- I
4  know it's annoyingly voluminous.  And the first tab
5  there that's been marked as Exhibit 1 -- and this is
6  a set of records.  You'll see that we received from
7  Thibodaux Regional Cancer Center in response to
8  requests made for Mrs. Plaisance's records.
9        And if you're able to, can you flip
10 through and let us know if this appears to consist
11 of your records of your treatment of Mrs. Plaisance
12 as maintained by your practice?
13    A.  Yes.  I'm just realizing you've got
14 radiation oncology back there, so I didn't recognize
15 those right off the bat.  But, yes, it appears
16 consistent with our records.
17    Q.  And if we were looking for your records
18 of treatment of Mrs. Plaisance, is this the primary
19 source that we would want to go to, the Cancer
20 Center records?
21    A.  Yes.
22    Q.  Okay.  And if you can turn now to the
23 Tab 2, and I believe this has been marked as
24 Exhibit 2.  And this is what I understand to be a
25 subset of records that we received from Thibodaux

18 (Pages 66 - 69)

Page 70

1  Regional Medical Center, a different provider, but
2  that appear to also relate to your care and
3  treatment of Mrs. Plaisance.
4       Can you take a look and let me know if
5  these appear to consist of records of your treatment
6  that are held by that facility?
7       A.   This looks like a bunch of lab work.  It
8  doesn't look like notes from other doctors.
9       Did you say it was notes from other
10  doctors?
11       Q.   What we try to do is identify from a
12  larger set that Thibodaux Regional Medical Center
13  produced the documents that involve your treatment
14  of Mrs. Plaisance.
15       A.   Okay.
16       Q.   So I think -- is that a fair description
17  from your review?
18       A.   It looks like a list of laboratory and
19  medications, diagnosis list, yes.
20       Q.   Okay.  Including from your -- from your
21  visits with her?
22       A.   Yes.
23       Q.   And finally Tab Number 3 which I believe
24  was marked as Exhibit 3 -- and I'm sorry if you
25  already reviewed this.  I can't recall.

Page 71

1       But this is -- does this appear to be a
2  record of your October 16, 2019, visit with
3  Mrs. Plaisance?
4       A.   Yes.
5       Q.   And this was your last visit with her?
6  The most recent visit you had with her?
7       A.   Yes.
8       Q.   Okay.  And when are you next scheduled
9  to see Mrs. Plaisance?
10       A.   I think she's supposed to see me, well,
11  in a year from that.  So I think her visit's
12  upcoming.
13       Q.   And do you see her annually now or more
14  frequently?
15       A.   Annually.
16       Q.   And if you can turn next to Tab 4.
17       MR. ROCKSTAD:  And we'll mark this as
18  the next exhibit.  I believe it will be
19  Exhibit 5.
20       (Exhibit 5 was marked for
21  identification.)
22       A.   Okay.
23       Q.   And this is really our attempt to take
24  records from those prior exhibits and try to put
25  them in a chronological order.  But I'll be flipping

Page 72

1  through them and pointing you to the numbers on the
2  bottom of the page, the Bates numbers.
3       Unfortunately, they're not going to be
4  in order, the numbers, but I think we'll be able to
5  get through them pretty quickly.
6       And is it correct that before you
7  treated Mrs. Plaisance for her breast cancer in
8  2014, you had met with her in January 2012 to follow
9  up on a history of bilateral pulmonary emboli?
10       A.   Yes.
11       Q.   And if you turn in Tab 4 to the -- it
12  should be the fourth page in with the Number 300 at
13  the bottom.
14       Do you see that?
15       A.   You're under Tab 4 or Tab 5?
16       Q.   Tab 4.  Sorry, the fifth page in, the
17  300 at the bottom.
18       A.   Okay, I see it.
19       Q.   Okay.  And the physician there is Laura
20  Campbell.  That was your name at the time.  This
21  was --
22       A.   Yes.
23       Q.   -- January --
24       A.   Yes.
25       Q.   -- January 24th, 2012?

Page 73

1       A.   Yes.
2       Q.   All right.  Does this appear to be a
3  record of your visit with Mrs. Plaisance on
4  January 24th, 2012, in connection with apparent
5  bilateral pulmonary emboli?
6       A.   Yes.
7       Q.   And as part of that examination, you
8  evaluated and recorded her medical history, and
9  that's reflected on the second page of that record,
10  under past medical history?
11       A.   Yes.
12       Q.   And at that time, Mrs. Plaisance's
13  medical history included a history of TIAs,
14  hypertension, hyperlipidemia, diabetes, and chronic
15  depression, among other conditions noted there; is
16  that right?
17       A.   Yes.
18       Q.   And what is a TIA?
19       A.   Transient ischemic attack.  It's
20  something that, if it had persisted, would be a
21  stroke or decreased blood supply to part of the
22  brain.
23       And this is something that temporarily
24  causes stroke symptoms but resolves.
25       Q.   And Mrs. Plaisance's past medical

19 (Pages 70 - 73)

Page 74

1  history also included a surgical history of
2  hysterectomy and ovarian surgery; is that right?
3      A.   Yes.  She said something about ovarian
4  surgery, but she had maintained her ovaries.  So I'm
5  not sure what she had meant by that.
6      Q.   And at this time she was postmenopausal?
7      A.   Yes.
8      Q.   I believe 67 years old?
9      A.   Yes.
10      Q.   Is that --
11          And looking at the next page, there's a
12  list of current medications.  And as of January
13  2012, Mrs. Plaisance was on atorvastatin, and that's
14  for high cholesterol; right?
15      A.   Right.
16      Q.   And sertraline.  And that's Zoloft, an
17  antidepressant medication?
18      A.   Yes.
19      Q.   And Lodepine?  Is that for her
20  hypertension?
21      A.   Probably.  It can be used for heart rate
22  controls.  Something to do with her cardiovascular
23  system.
24      Q.   And she had an existing history of
25  cardiovascular disease at this time; is that right?

Page 75

1      A.   Well, a TIA, hypertension,
2  hyperlipidemia, all those.  But definitely
3  hypertension and the TIA.
4      Q.   And she was on Coumadin.  Was that in
5  connection with the pulmonary embolism?
6      A.   Yes.
7      Q.   And metformin, that was for her
8  diabetes; is that right?
9      A.   Yes.
10      Q.   And she also had a family history, you
11  noted, that included cancer, heart disease,
12  diabetes, hypertension, hyperlipidemia?
13      A.   Yes.
14      Q.   And as part of this evaluation that day,
15  were you evaluating Mrs. Plaisance for cancer as a
16  hematologist?  Or what was your role that day?
17      A.   I reviewed this note, and I'm pretty
18  sure -- we were still making sure she didn't have a
19  provable inherited tendency to clot.  So she had a
20  couple of other tests.  I think I followed up that
21  day.
22          So we -- I can tell you we didn't find
23  an intrinsic inheritance provable tendency for why
24  she has the pulmonary emboli that she had.  So that
25  was part of what we discussed -- main thing we

Page 76

1  discussed.
2      Q.   And you did some follow-up and saw her
3  again shortly after that.
4          If you turn to the next record with the
5  Bates number 123 at the bottom --
6      A.   Yeah, I think that's the one where we
7  had the other two tests I wanted to get, and then
8  those turn out negative.  Right.
9      Q.   Okay.  And this is in the record of your
10  visit with her on February 13, 2012, so a few weeks
11  later again in follow-up on the pulmonary emboli?
12      A.   It looks like it was actually
13  February 14th, but yes.
14      Q.   Okay.
15      A.   Okay, no, the visit was the 13th and
16  they transcribed it the next day.  Never mind.
17  Okay.
18      Q.   No problem.  And so then when you next
19  treated Mrs. Plaisance, it was for breast cancer in
20  2014; is that right?
21      A.   Yes.
22      Q.   And if you'll turn to the next visit
23  page, the number at the bottom is 114, established
24  patient notes.
25          Do you see that?

Page 77

1      A.   Okay.
2      Q.   And that was your visit with her on
3  January 15th, 2014?
4      A.   Yes.
5      Q.   And I think we looked at part of this
6  record earlier.  And this was evaluating her for
7  adjuvant treatment for her Stage IA breast cancer;
8  is that right?
9      A.   Yeah.  Yes.
10      Q.   And you noted under the chief complaint
11  section on the first page that Mrs. Plaisance's
12  husband was present with her today and was very
13  supportive, and she benefits from this visibly.
14          Do you see that?
15      A.   Yes.
16      Q.   And what did you mean by that?
17      A.   Pretty much what it said, that she has a
18  good support system, it looked like.
19      Q.   And as your care and treatment of
20  Mrs. Plaisance continued, did Mr. Plaisance continue
21  to attend visits with her?
22      A.   You know, I can't remember what he looks
23  like.  And I'm pretty sure fairly quickly into the
24  process he quit coming.
25      Q.   Did he continue to --

20 (Pages 74 - 77)

Page 78

1    A.   I probably documented that later in the
2 psychiatric part of her exams.  I usually document
3 that.
4    Q.   Sure.
5         And you mentioned that Dr. Landry had
6 diagnosed Mrs. Plaisance's breast cancer; is that
7 right?
8    A.   Yes.
9    Q.   And he was her breast cancer surgeon?
10   A.   Yes.
11   Q.   Did you speak with Dr. Landry before you
12 met with Mrs. Plaisance the first time?
13   A.   I don't remember if we spoke personally
14 or if I just reviewed the records that she sent.
15 Probably I just reviewed the records.
16   Q.   And do you -- so he would have sent the
17 records to you from his treatment?  And would those
18 become part of your file for her?
19   A.   Yes.
20   Q.   And would you rely on information in
21 those records in formulating your treatment plan?
22   A.   Mainly the pathology records.  We don't
23 like to trust what someone else understands the
24 pathology or the staging that they did.  Sometimes
25 staging is complicated.  So I rely on the path

Page 79

1 report.
2    Q.   Sure.
3         And if you can flip then to the Tab
4 Number 24 in your binder.
5         MR. ROCKSTAD:  We'll mark this as the
6         next exhibit, and that should be
7         Exhibit 6.
8         (Exhibit 6 was marked for
9         identification.)
10   A.   I'm there.
11   Q.   Thank you.
12        And is this the pathology report for
13 Mrs. Plaisance?
14   A.   That section right there for the
15 prognostic indicators, that's an addendum with the
16 prognostic information, the Oncotype and the HER2.
17 HER2 was considered equivocal in the
18 beginning.  So it was a specialized test on FISH had
19 to be done, and that verified that it was negative.
20 So that very page is a preliminary -- or was an
21 accurate report of those markers.
22        And then on the back page, it's got her
23 preliminary diagnosis at biopsy.  But that's not the
24 surgical specimen.
25   Q.   Okay.  But this report reports that she

Page 80

1 was PR-positive, HER2-negative?
2    A.   Yes.
3    Q.   And had an Oncotype score of 27?
4    A.   Right.
5    Q.   Could there have been another pathology
6 report?
7    A.   Yes, there would be a big, giant
8 synopsis that would review the nodal status, the
9 size of the cancer, the grade of the cancer, margin,
10 the neural invasion, et cetera.
11   Q.   Okay.  And that's something you would
12 have received and reviewed?
13   A.   Yes.
14   Q.   And the score of 27, the Oncotype score
15 of 27, did that place Mrs. Plaisance as an
16 intermediate risk of breast cancer return within
17 10 years?
18   A.   Yes.
19   Q.   And you provided counseling to
20 Mrs. Plaisance and her husband that day, as you
21 testified, about her Oncotype score and what it
22 meant?
23   A.   Yes.
24   Q.   And did Mrs. Plaisance express concern
25 to you about the chance of her cancer recurring or

Page 81

1 returning?
2    A.   I cannot go back and remember that exact
3 conversation and exactly what she said, but I think
4 she was quite concerned about preventing her cancer
5 from coming back.
6    Q.   And in treating -- in treating and
7 counseling Mrs. Plaisance that day, did you
8 recommend to her the chemotherapy regimen that you
9 thought had the best risk-benefit profile for her,
10 given her clinical history and breast cancer
11 features?
12   A.   Yes.
13   Q.   And what did you tell Mrs. Plaisance
14 about why you were recommending the TC regimen for
15 her?
16   A.   Probably what I discussed is that that
17 regimen had been compared to Adriamycin, Cytoxan,
18 and taxanes in previous years -- actually it had
19 been going on for five years or so -- and it was
20 fortunate that we only had to do four cycles of
21 chemotherapy to get a good response.
22        So recommended that regimen.  And that I
23 usually would discuss that it doesn't have the
24 hypersensitivity and reaction and the rate of
25 neuropathy that Taxol-containing regimens have,

21 (Pages 78 - 81)

1  though, you know, I was not recommending one.  But I
2  try to say that to help people feel happy about this
3  regimen and that drug as you talk about relative
4  lack of symptoms from this chemo regimen.
5      Q.   And would a Taxol regimen have required
6  additional cycles of therapy?
7      A.   Right.  It would have been twice as much
8  time and really more chemo than is needed to treat
9  her stage of disease.
10         You know, if you went to this breast
11  cancer meeting that I told you about and you said
12  you had done all that chemo, there would be a lot of
13  people coughing and hacking in the audience and
14  would end up trying to make a fool of you for having
15  to use that whole shemozzle.
16         The standard then was definitely to
17  limit to four cycles with TC.
18      Q.   And the other options that you
19  mentioned, or I think Mr. Rockstad cited from the
20  NCCN guidelines involved Adriamycin; is that right?
21  The other preferred regimen?
22      A.   Yes.
23      Q.   And did you have concerns about
24  Adriamycin for Mrs. Plaisance?
25      A.   She did not have a history of congestive

1  heart failure, and I wouldn't have had a concern
2  from that standpoint.  If she had absolutely refused
3  TC, I probably would have given her AC.
4      Q.   And what about her history of diabetes?
5  Did that factor into your prescribing decision for
6  her?
7      A.   Well, Taxotere has an incidence of
8  neuropathy.  They both do.  But -- well, the Taxol,
9  again, we're getting into as if I would have used
10  Taxol, which I wouldn't have, but the neuropathy
11  risk from Taxotere is relatively low.  And the type
12  of neuropathy that she had at that time was sciatica
13  and not typical of a drug-induced.
14         But, yes, that plays into risk of
15  neuropathy.
16      Q.   And was it your medical judgment that
17  the chemotherapy regimen that you recommended for
18  Mrs. Plaisance could help to prolong her life --
19      A.   Yeah.
20      Q.   -- including because -- and at that time
21  did you believe she had an especially long lifespan
22  ahead of her with the appropriate treatment?
23      A.   She was a pretty healthy, I think,
24  69-year-old at that time, in spite of her
25  comorbidities, pretty functional.  And certainly her

1  lifespan was expected to be ten years or more.  So
2  we generally would treat people at that age who
3  didn't have debilitating-type comorbidities.
4      Q.   And if you turn to your plan section of
5  that record at the page ending 117 --
6      A.   That's right after that pathology
7  report?
8      Q.   I'm sorry, that's my fault.  Sorry.
9  Please turn back to Tab 4, your records of
10  treatment.  Sorry.
11      A.   And you want Page 117?
12      Q.   Yes, thank you.
13      A.   Okay.
14      Q.   Do you see that?  This is your record of
15  your visit with her on January 15th, 2014, when you
16  were prescribing this under your plan in the first
17  paragraph there, that, you know, she's a very
18  healthy appearing version of a 69-year-old woman and
19  also that you determined that she would benefit with
20  life prolongation because she has a long-expected
21  lifespan?
22      A.   Yeah.
23      Q.   And were there any other comorbidities
24  that you considered in determining your treatment
25  plan for her that we haven't already discussed?

1      A.   No.
2      Q.   And TC at the time was a preferred
3  regimen for Mrs. Plaisance's breast cancer under the
4  NCCN guidelines; is that right?
5      A.   Yeah.
6      Q.   And did Mrs. Plaisance ask you any
7  questions about your treatment recommendations that
8  day?
9      A.   I'm sure she did.
10      Q.   Did she raise any concerns with you
11  about the plan that you were recommending for her?
12      A.   I can't remember them specifically, but
13  I think she was always a person who asked a lot of
14  questions and, you know, would ask them two or three
15  different ways until she was sure she understood.
16  Pretty vigilant person.
17         Under psychiatric, sometimes under the
18  exam, I'll put things about questions asked and
19  anxiety level.
20      Q.   If she had concerns, would you have
21  noted them?
22      A.   You know, in there I would say something
23  about if she doesn't do all treatment options, she
24  might regret it.  And then I put her husband agreed
25  with her.  So I think that she made a pretty solid

22 (Pages 82 - 85)

1  treatment decision to proceed with the chemotherapy.
2    Q.   And what you're referring there to is
3  that page ending 116, your notes under the
4  psychiatric section?
5    A.   Yes.
6    Q.   And you noted that she --
7    A.   Well, she said she would regret it later
8  if she didn't do it.  I think she was the one who
9  said that, yeah.
10       Okay.
11   Q.   I'll just make sure we're in the same
12 place.
13       You said that:  She verbalizes
14 understanding of our discussions today.  Patient is
15 quite intelligent and is appearing to cope well with
16 good personal insights.  For example, she
17 understands in herself that if she doesn't do all
18 treatment options, she would regret it later
19 considering her personality and belief.  She
20 expressed well.  Her husband appears to
21 unequivocally agree with her.
22   A.   Yes.
23   Q.   Is that the section you were referring
24 to?
25   A.   Yes.  Yes.

1    Q.   And Mrs. Plaisance and her husband
2  expressed those sentiments to you that day?
3    A.   They what?
4    Q.   Mrs. Plaisance and her husband expressed
5  those sentiments to you --
6    A.   Yes.
7    Q.   -- that day?
8    A.   Yes.  Yes.
9    Q.   And you spent -- I believe the record
10 notes a total of at least 70 minutes with
11 Mrs. Plaisance and her husband that day?
12   A.   Yes.
13   Q.   Including 50 minutes on counseling?
14   A.   Yes.
15   Q.   And after that counseling,
16 Mrs. Plaisance told you she wanted to follow that
17 recommendation and proceed with Taxotere and Cytoxan
18 chemotherapy?
19   A.   Yes.
20   Q.   And you understood that she wanted to do
21 that because she wanted to pursue all available
22 treatment options to beat her cancer?
23   A.   Yes.
24   Q.   And you also noted on the last page of
25 that record of page ending 118 that -- just the

1  paragraph there, the full paragraph, that:  We will
2  proceed with adjuvant chemotherapy quickly?
3    A.   Yes.
4    Q.   And why did you want to pursue
5  chemotherapy quickly?
6    A.   There is some data if you wait too long,
7  you lose efficacy.  They have softened those
8  criteria over the years.  She was in a time frame
9  that was adequate to begin, but she was already five
10 weeks out.  So we don't like to waste time if the
11 surgeon has cleared her for chemo.
12   Q.   And in addition to chemotherapy, did
13 your treatment plan for Mrs. Plaisance include
14 radiotherapy and an aromatase inhibitor?
15   A.   Yes.
16   Q.   And as of 2014, I believe you testified
17 earlier that you had already had experience treating
18 breast cancer with docetaxel; is that right?
19   A.   Yes.
20   Q.   And before you first prescribed
21 docetaxel, did you review the prescribing
22 information and the drug labeling?
23   A.   Yes.
24   Q.   And had you also had discussions over
25 the years with colleagues about docetaxel?

1    A.   Yes.
2    Q.   And were you also familiar with the
3  medical literature that supported its use in
4  treating breast cancer?
5    A.   Yes.
6    Q.   And based on your care and treatment of
7  your patients, was there a good body of evidence to
8  support the products used for adjuvant early breast
9  cancer treatment?
10   A.   Yes.
11   Q.   And it was a standard of care for
12 adjuvant breast cancer treatment at the time?
13   A.   Yes.
14   Q.   And I believe you've testified today
15 that you do not feel that there was another
16 treatment option for Mrs. Plaisance that would have
17 been a better treatment option for her; is that
18 right?
19   A.   Right.
20   Q.   And during your visit on
21 January 15, 2014, you also provided Mrs. Plaisance
22 information on potential risks and side effects of
23 the chemotherapy that you were prescribing for her?
24   A.   Yes.
25   Q.   And is it fair to say at that time you

23 (Pages 86 - 89)

1  knew those risks could be serious, up to and
2  including death?
3      A.  Yes.
4      Q.  And did you understand at the time that
5  you prescribed TC for Mrs. Plaisance that there was
6  a risk that she would experience persistent or even
7  permanent hair loss from chemotherapy treatment.
8          MR. ROCKSTAD:  Object to form.
9      A.  I'll admit I didn't -- what was that?
10  Someone else spoke.  Was that an objection?  Do I
11  answer?
12  BY MS. GONZALEZ:
13      Q.  You can answer.
14          MR. ROCKSTAD:  Yeah, I just objected
15      to the form, but you can answer, Doctor.
16      A.  Back then, I didn't really have an
17  understanding that it had a high risk of the
18  permanent hair loss.  And I didn't -- really didn't
19  discuss permanent hair loss frequently with patients
20  at all with that regimen or any other one.  I just
21  had not have people have permanent hair loss or --
22  well, just really hadn't.  I don't know if I was
23  lucky or I changed jobs too quickly and didn't
24  follow people long enough to where they said I'm not
25  happy with my hair.

1          But permanently, I didn't discuss
2  significantly back then.  If patients would ask me a
3  question, I would answer that I had not had someone
4  have that happen before.
5      Q.  You knew that it could cause hair loss?
6      A.  Oh, yes.
7      Q.  And let's turn now to your next visit
8  with Mrs. Plaisance which was just about two days
9  later, and this is -- if you flip about five pages
10  ahead, there's a recent with an established patient
11  note January 17th, 2014.
12          The page number at the bottom is 110.
13          Do you see that?
14      A.  Yes.
15      Q.  And Mrs. Plaisance started chemotherapy
16  that day according to the record; is that right?
17      A.  Correct.
18      Q.  And when she began chemotherapy, is it
19  your belief that Mrs. Plaisance understood the risks
20  and benefits of the chemotherapy medication that you
21  had prescribed for her?
22      A.  Yes.
23      Q.  And that she wanted to proceed,
24  notwithstanding the risks?
25      A.  Yes.

1      Q.  And did you also provide Mrs. Plaisance
2  with an informed consent form before she began
3  chemotherapy?
4      A.  Yes.
5      Q.  And if you turn about four pages, you'll
6  see a consent to treatment using chemotherapy with
7  the page number 167 at the bottom?
8      A.  Yes.
9      Q.  Do you see that?
10      A.  Yes.
11      Q.  And was this the informed consent form
12  that Mrs. Plaisance signed consenting to
13  chemotherapy?
14      A.  Yes.
15      Q.  And this was her written acknowledgement
16  that you had informed her of the risks of
17  chemotherapy with Taxotere and Cytoxan, as you've
18  described to us today and as outlined in this
19  document?
20      A.  Yes.
21      Q.  And the potential risks included the
22  risk of infection; right?
23      A.  Yes.
24      Q.  And that's -- do you see that's
25  underlined in the --

1      A.  Yes.
2      Q.  -- consent form?  Would you have -- did
3  you underline it?
4      A.  Yes.
5      Q.  And why?
6      A.  Because that's the most life-threatening
7  risk of the treatment, and I always emphasize that
8  so that people are careful about calling and coming
9  in if they have any hint of infection.
10      Q.  And does this informed consent form also
11  discuss the risks of damage to major organs
12  including heart attacks and lung attacks?
13      A.  Yes.
14      Q.  And a risk of secondary cancer as well?
15      A.  Yes.
16      Q.  And it says below the list of risks that
17  I understand the complications from chemotherapy
18  could cause death; right?
19      A.  Yes.
20      Q.  And is that your handwriting in the
21  section above the risks identifying the goal of
22  treatment?
23      A.  Yes.
24      Q.  And what was the goal that you wrote
25  there?

24 (Pages 90 - 93)

Page 94

1    A.   Decrease chance of her cancer coming
2  back.
3       Q.   And there's also a section for
4  identifying reasonable alternatives to this
5  chemotherapy treatment regimen.
6          Do you see that?
7    A.   Yes.
8       Q.   And did you identify any reasonable
9  alternative to this regimen for Mrs. Plaisance?
10    A.   Not on that form, for sure.
11       Q.   And you believe that the TC was the
12  right treatment for her to best decrease her chance
13  of cancer growing back?
14    A.   Yes.
15       Q.   And this form also informed
16  Mrs. Plaisance of a risk of hair loss with
17  chemotherapy -- with her chemotherapy regimen.
18          Do you see that?
19    A.   Yes.  Yep.
20       Q.   And it doesn't say that the risk of hair
21  loss involves only temporary hair loss; correct?
22    A.   Right.
23       Q.   And did you talk about the risk of hair
24  loss with Mrs. Plaisance, either before or when she
25  was reviewing this form?

Page 95

1    A.   Yes.
2       Q.   And what did you tell her?
3    A.   I pretty much tell all women on this
4  regimen that 10 to 14 days after the treatment they
5  likely will lose most of their hair, that the hair
6  follicles can even hurt a little bit when they fall
7  out.  I want to make sure they've gone by our
8  office.
9          We have someone who helps them pick out
10  the free wig from the American Cancer Society, that
11  kind of thing.
12          So I talk about how it tends to fall out
13  somewhat suddenly, it can take three days, be
14  prepared, it's hard to deal with.  But once you get
15  through it, then you usually get your wig on and you
16  can cope pretty well but that it's shocking.
17       Q.   And did you tell Mrs. Plaisance that her
18  hair was guaranteed to grow back after chemotherapy?
19    A.   No.
20       Q.   Did you tell her it was possible her
21  hair might grow back differently after chemotherapy?
22    A.   Yes.  I talk about the fact that
23  sometimes it comes back curlier or a different
24  color.  I usually tell people by six months they
25  usually have enough hair to be happy with it.

Page 96

1       Q.   Did you tell Mrs. Plaisance anything
2  beyond that about hair loss and chemotherapy?
3    A.   No.
4       Q.   Did she raise any concerns with you
5  about hair loss with chemotherapy?
6    A.   I'm not one hundred percent if she
7  mentioned that specifically as an unusual stressor
8  or not.  I didn't document that.  So I don't think
9  it was outstanding to me as a pivotal decisionmaking
10  factor for her.
11       Q.   And based on your discussion and her
12  signing this form, was it your understanding that
13  Mrs. Plaisance understood there was a risk of hair
14  loss with the chemotherapy you were recommending?
15    A.   Yes.
16       Q.   And she still agreed to proceed with it?
17    A.   Yes.
18       Q.   Correct.
19          And do you stand by your decision to
20  prescribe chemotherapy with docetaxel for
21  Mrs. Plaisance?
22    A.   Yes.
23       Q.   And do you still believe that it was an
24  appropriate treatment for her, given everything, you
25  know, about her condition and about docetaxel?

Page 97

1    A.   At that time, yes.
2       Q.   And do you agree that the best the
3  physician can do is weigh the risks and benefits of
4  a product for the patient based on the knowledge at
5  the time of that decision, that prescribing
6  decision?
7    A.   Yes.
8       Q.   And do you still prescribe docetaxel as
9  part of adjuvant chemotherapy for breast cancer
10  patients?
11    A.   Yes.
12       Q.   And did you provide Mrs. Plaisance with
13  any written information about the chemotherapy you
14  were prescribing?
15    A.   Well, we give them that binder.  On
16  occasion, I print something myself, and I can't
17  remember if I printed anything from UpToDate and
18  directly handed that to her or just left it to the
19  binder that we do.
20          I usually leave it to the binder, you
21  know, because it's way, way, lots of information
22  that they take home with them.
23       Q.   And so Mrs. Plaisance would have
24  received a binder from your office or facility at
25  that time?

25 (Pages 94 - 97)

Page 98

1    A.   I'm pretty sure we were doing that then.
2    Q.   And was there drug-specific information
3    included?
4    A.   Yes.
5    Q.   Was the binder tailored to the patient,
6    or was it a general binder that was given to all
7    chemotherapy patients?
8    A.   It was directed at breast cancer and
9    those drugs.
10   Q.   And did you or your office provide
11   information about drugs that came from
12   chemocare.com?  Was that the website that you used
13   or your office used?
14   A.   I don't know if that's what they use or
15   not.  I've not paid attention to where they get it.
16   Q.   And who would be the best source in your
17   office on what information was provided?
18   A.   The director is probably the best.
19   There's a person named Elizabeth Babin who is her,
20   kind of, secondary director.  Either one of them
21   would have that information.
22   Q.   Thank you.
23        I'm sorry, can you repeat the first
24   name?  I didn't hear it.
25   A.   Kay Arceneaux, A-r-c-e-n-e-a-u-x.  She's

Page 99

1    the director.
2    Q.   Okay.  Okay.  Thank you.
3        We've been going for about an hour.  Do
4    you want to take a break or prefer to keep going?
5    A.   I'm good.
6    Q.   Okay.  And did your office also provide
7    a chemotherapy teaching session to Mrs. Plaisance?
8    A.   Yes.
9    Q.   And what did that involve?
10   A.   A chemotherapy certified nurse sits down
11   one-on-one with the patient and goes over the
12   information in that booklet about a lot of things,
13   not just the chemo.
14   Q.   And that's -- the booklet, is that the
15   same as the binder that you referenced?
16   A.   The binder, uh-huh.
17   Q.   And is that chemotherapy teaching
18   something that takes place before the patient signs
19   the informed consent form, like the one we just
20   looked at?
21   A.   Back then, I have to think.  They may
22   have signed the consent form with me first back
23   then, and they may have gotten the binder after.
24   I'm not sure about that.
25        Now, absolutely, they have the chemo

Page 100

1    teaching class before and then we sign consent.  Kay
2    would know that.
3    Q.   Okay.  And I think if you look at your
4    record of the January 15, 2014, visit, and that's
5    just flipping back in Tab 4.
6        Let me see if I can find the Page 117 at
7    the bottom.
8    A.   There it is.  Yep.  Yep.
9    Q.   And if you look at the plan,
10   Paragraph 4, there's a note:  Concept for
11   chemotherapy will be obtained when she returns,
12   hopefully on Friday, and after she is at
13   chemotherapy teaching, the latter of which is
14   planned today.
15       Did that reflect a plan for her to have
16   the chemotherapy teaching and then come in and
17   receive the informed consent form?
18   A.   Yes.
19   Q.   And Mrs. Plaisance successfully
20   completed her four cycles of TC as prescribed; is
21   that right?
22   A.   Yes.
23   Q.   And were the cycles approximately three
24   weeks apart starting January 17th, 2014, and ending
25   March 20th, 2014?

Page 101

1    A.   Yes.
2    Q.   And was that a standard course of -- and
3    time frame for that treatment?
4    A.   Yes.
5    Q.   And did you prescribe a standard dose of
6    docetaxel for Mrs. Plaisance?
7    A.   Yes.
8    Q.   And I apologize if you covered this
9    already, but did Mrs. Plaisance experience some
10   chemotherapy-induced neutropenia after her first
11   cycle?
12   A.   I can look and tell you.  It sounds like
13   she did if you're mentioning it, but I can look.
14       It takes a while to get back to it on my
15   computer.
16       Yes.  January 27, she had very low white
17   cell count, approximately midway between cycle 1 and
18   cycle 2.
19   Q.   And did you prescribe some medications
20   to address the neutropenia?
21   A.   Such as growth factors?
22       Yes, we used growth factors after the
23   next cycle of chemotherapy in the form of Neulasta.
24   Q.   And did her neutropenia resolve with
25   treatment?

26 (Pages 98 - 101)

Page 102

1   A.   Yes.
2   Q.   And let's turn to under Tab 4, your
3  patient visit with her after her fourth cycle -- and
4  this is going to be Page 00075 at the bottom, and
5  then, sorry, you'll have to flip through.  They're
6  not in order but -- I apologize.  My plan didn't
7  work as I had hoped to make it easier and not
8  harder.
9       It's about maybe 30, 40 pages in, 00075.
10  A.   What's the date of the visit?
11  Q.   The date of the visit is March --
12  A.   March?
13  Q.   March 20th, 2014?
14  A.   Okay.  Okay, I'm there.
15  Q.   Okay.  Thanks.
16       And this is a record reflecting that
17 Mrs. Plaisance completed her fourth and final
18 chemotherapy cycle on March 20th, 2014; is that
19 right?
20  A.   Yes.
21  Q.   And you saw her that day as well?
22  A.   Yes.
23  Q.   And she presented with her spouse again
24 you noted under her chief complaint?
25  A.   Yes.

Page 103

1   Q.   Okay.  And if you turn to the third page
2  of the record under 77 at the bottom --
3   A.   Uh-huh.
4   Q.   -- and you reported that her -- she had
5  been tolerating the chemotherapy well; is that
6  right?
7   A.   Yes.
8   Q.   And you were planning to refer her to
9  her radiation oncologist?
10  A.   Yes.
11  Q.   And also begin on an aromatase inhibitor
12 as well; is that right?
13  A.   Yes.
14  Q.   And did you also treat Mrs. Plaisance
15 for complaints of insomnia?
16  A.   Yes.
17  Q.   And for how long did you treat her for
18 insomnia?
19  A.   I don't know.  I kind of look at her med
20 list here and see when we refilled the medications.
21 It doesn't look like she liked Ambien, apparently,
22 and then I last prescribed trazodone October 18 of
23 2018.
24  Q.   And do you have a chart or a list of
25 medications that you prescribed for her as part of

Page 104

1  your record?
2   A.   We keep a running tab of that, yes.
3   Q.   Okay.  And I'm not sure that we've seen
4  that, so we might request that from your office.  Is
5  there a name that you use internally for that or --
6   A.   Well, every --
7   Q.   A title?
8   A.   Every note has a list of her current
9  medications.  It's in paragraph form.
10  Q.   Okay.
11  A.   But, yeah, we have a bunch of different
12 ways you can access medications on the computer.
13 There's a medication history.  There's a list of
14 those most recently prescribed, that kind of thing.
15  Q.   Okay.  Thank you.
16       So let's turn next to the -- your next
17 established patient note for Mrs. Plaisance.  This
18 was about eleven days later, and it's page number --
19 page ending 68 at the bottom, March 31st, 2014.
20  A.   Okay.
21  Q.   And what did you record under chief
22 complaint that day?
23  A.   Just that she's completed her chemo and
24 she's here for radiotherapy and aromatase and
25 presents with her spouse.

Page 105

1   Q.   And if you turn to your plan for her
2  that day, Page Number 70, you noted that her -- she
3  had tolerated the cycle well; right?
4   A.   Yes.
5   Q.   And her neutropenia had resolved as
6  well?
7   A.   Yes.
8   Q.   And you noted in Paragraph 5 of your
9  plan her history of pulmonary embolisms?
10  A.   Yes.
11  Q.   That was something that you continued to
12 follow for her; is that right?
13  A.   Yes.
14  Q.   And you note that she had a history of
15 hormone replacement therapy, just having a history;
16 is that right?
17  A.   Yep.  Yep.
18  Q.   And had she stopped that hormone therapy
19 by the time she was treating with you for breast
20 cancer?
21  A.   Yes.
22  Q.   And that would have been estrogen
23 replacement therapy?
24  A.   I'm not sure what her gynecologist had
25 her on.  You can look back at the surgery notes,

27 (Pages 102 - 105)

Page 106

1   it's probably listed from 2012.
2       Q.   And I know you testified earlier about
3   prescribing an aromatase inhibitor for
4   Mrs. Plaisance after chemotherapy.  You ultimately
5   prescribed Femara or letrozole; is that right?
6       A.   Yes.
7       Q.   And that's an estrogen -- sometimes
8   known as an estrogen blocker; is that right?
9       A.   Yes.  Yes.
10      Q.   And is that a medication you had
11  prescribed before for patients?
12      A.   Yes.
13      Q.   And do you still prescribe it for breast
14  cancer patients?
15      A.   Yes.
16      Q.   And Mrs. Plaisance signed an informed
17  consent form prior to treatment with Femara as well;
18  is that right?
19      A.   I'm not sure if she did.  Somewhere
20  along the line, we started getting consent for that.
21      Q.   Okay.  Let me point you to that.  It
22  should be right after this record that we were just
23  reviewing.  It's in Tab 4, Page 160 at the bottom.
24      A.   Right.
25      Q.   And is this the informed consent form

Page 107

1   that Mrs. Plaisance signed agreeing to treatment
2   with the aromatase inhibitor you were prescribing
3   for her?
4       A.   Yes.
5       Q.   And that was -- that's dated, on the
6   last page, March 31st, 2014?
7       A.   Yes.
8       Q.   And that was signed by Mrs. Plaisance
9   that day?
10      A.   Yes.
11      Q.   And on the first page of the informed
12  consent form, did you include a benefit or purpose
13  of the medication you were prescribing for
14  Mrs. Plaisance?
15      A.   To decrease the growth of breast cancer
16  cells.
17      Q.   And did the form also provide
18  information about potential risks associated with
19  that treatment?
20      A.   Yes.
21      Q.   And would you have discussed risks of
22  that medication with Mrs. Plaisance as well?
23      A.   Yes.
24      Q.   And what risks would you have discussed?
25      A.   Main things I usually discuss are

Page 108

1   premature formation of cataracts, osteoporosis,
2   uterine cancer, -- but she had had a hysterectomy --
3   hot flashes, the fact that we try to use
4   preventative medicines to prevent osteoporosis and,
5   you know, under pressure.
6            Oh, yeah, liver damage.  And we just
7   check labs periodically to make sure it doesn't do
8   that.  And I usually tell them I've never seen
9   someone with liver damage from it, but we use it as
10  an excuse to check laboratories for other reasons
11  that can give hint to cancer coming back.
12           Hyperlipidemia, usually tell them to
13  follow closely with their primary care, that lipids
14  can get worse, that kind of thing.
15      Q.   Is it also a risk of myalgia?
16      A.   Oh, myalgia, for sure.  And I usually
17  tell them I choose Femara because in my experience
18  it has the least frequency of that.  People don't
19  usually come in complaining.  And if they have it,
20  it tends to go away in six weeks or so.  Right.
21      Q.   And is alopecia or hair loss also one of
22  the potential adverse reactions with Femara?
23      A.   It is listed, you know, in the PDR, but
24  my feeling is that that's a residual effect of
25  chemotherapy and it's really not the aromatase

Page 109

1   inhibitor.
2            There are plenty of people that we treat
3   only with aromatase inhibitors, and significant hair
4   loss, again, I've not seen.  But them again I hadn't
5   seen permanent hair loss from Taxotere either, so.
6       Q.   But you've had patients on Femara who
7   have experienced hair loss or thinning hair?
8       A.   Usually when they were preceded with the
9   use of chemotherapy.  So already gone on, already
10  there, and then, you know, how we do drugs in
11  America, if you have a symptom, it's listed as a
12  side effect where there's -- really, cause and
13  effect is not always clear.
14           Especially, you know, you'll look at
15  aromatase inhibitor, and it will list every side
16  effect of chemotherapy.  It even lists low white
17  blood cell account when that's just left over from
18  previous chemotherapy.
19      Q.   And you agree that listings of adverse
20  event reports do not represent a determination on
21  causation?
22      A.   They don't, necessarily.
23      Q.   Did you speak with Mrs. Plaisance about
24  hair loss as a potential risk or adverse effect of
25  Femara?

28 (Pages 106 - 109)

Page 110

```
1     A.   No.
2     Q.   And Mrs. Plaisance agreed to take on the
3   risks listed in this informed consent form for her
4   aromatase inhibitor and followed your recommendation
5   to proceed with it --
6     A.   Yes.
7     Q.   -- is that right?
8          And for how long did you recommend that
9   Mrs. Plaisance take Femara?
10    A.   Five years.
11    Q.   And is that something she was to take
12  orally every day?
13    A.   Yes.
14    Q.   And as far as you know, was she
15  compliant with taking Femara for the five years that
16  you prescribed it for her?
17    A.   Yes.
18    Q.   And do you know when she -- has she
19  stopped taking Femara?
20    A.   Yes.
21    Q.   Do you know when she completed her
22  therapy with it?
23    A.   Well, it was pretty much at five years.
24  It was probably in there that says exactly when she
25  had that date.
```

Page 111

```
1     Q.   Okay.  I ask just because she testified
2   that she thought she had discontinued it in 2020,
3   this year.  I think the records suggest it was 2019,
4   so I just --
5     A.   It was 2019.
6     Q.   It would have been 2019?
7     A.   Yep.  I can make sure of that, if you
8   want me to look at the records.  But I know she
9   completed her five years.  That's what my notes
10  said.
11    Q.   Would you have extended the time for her
12  for any reason beyond the five years?
13    A.   Only if she had quit for six months or
14  so, I usually try to make it up.  But I don't think
15  she quit.
16    Q.   And Mrs. Plaisance also completed the
17  radiation therapy that was prescribed for her by her
18  radiation oncologist, Dr. Dunn; is that right?
19    A.   Yes.  Yes.
20    Q.   And you've continued to treat
21  Mrs. Plaisance in 2014 with your regular follow-up
22  visits; is that right?
23    A.   Yes.
24    Q.   And she's had no recurrence of cancer
25  during that time?
```

Page 112

```
1     A.   Yes.
2     Q.   And was her five-year anniversary after
3   completing chemotherapy a significant milestone for
4   her to be cancer-free after five years?
5     A.   I think so.  People get to feel pretty
6   positively when they get to quit taking the
7   aromatase inhibitor and have a sense of job well
8   done, job complete.
9     Q.   And was that true for Mrs. Plaisance?
10    A.   Well, I think so, but you'd have to ask
11  her how she feels.
12    Q.   Sure.
13         Dr. Chauvin, could we take about a
14  ten-minute break and I will come back and complete
15  my questions with you?
16    A.   Okay.
17    Q.   Thank you.
18         THE VIDEOGRAPHER:  The time is
19  5:53 p.m. and we are off the record.
20         (A 14-minute break was taken from 5:53
21  until 6:07 p.m.)
22         THE VIDEOGRAPHER:  The time is
23  6:07 p.m.  This begins Media Unit
24  Number 3, and we are back on the record.
25  EXAMINATION
```

Page 113

```
1   BY MS. GONZALEZ:
2     Q.   Hi, Dr. Chauvin.
3     A.   Hello.
4     Q.   I'm sorry, I'm just trying to fix my
5   screen if you'll give me --
6          (Off-record discussion.)
7   BY MS. GONZALEZ:
8     Q.   Okay.  Thank you, Doctor.  Sorry.
9          What did Mrs. Plaisance's hair look like
10  before she began chemotherapy?
11    A.   I don't remember all that well.  And,
12  you know, I don't think we took pictures of people
13  back then.  I think it was not a real short haircut.
14  I think it was longer, but, boy, I don't remember
15  for sure.
16    Q.   Sure.
17         And she would have been 67 when you
18  first saw her in connection with the pulmonary
19  embolism and then 69 when you treated her for breast
20  cancer; is that right?
21    A.   Yes.
22    Q.   And she's now, I believe, 76 years old?
23    A.   Okay.
24    Q.   Does that sound right?
25    A.   Uh-huh.  75 on her last visit.
```

29 (Pages 110 - 113)

1     Q.    And are you aware that she's received
2  treatment for hair loss over the years beginning
3  before chemotherapy?
4     A.    No.
5     Q.    Did you know that she treated with a
6  Dr. John Jones, a dermatologist, for hair loss
7  dating back to 2003?
8     A.    No.
9           MR. ROCKSTAD:  Objection.
10 BY MS. GONZALEZ:
11    Q.    Do you know Dr. John Jones,
12 dermatologist?
13    A.    Yes.  Yes.
14    Q.    Do you know that she also treated for
15 hair loss with a dermatologist named Dr. Matherne.
16          MR. ROCKSTAD:  Objection.
17    A.    No.
18          Am I supposed to answer or not?
19          MR. ROCKSTAD:  Yes.
20 BY MS. GONZALEZ:
21    Q.    Oh, you can answer.
22    A.    Okay.
23    Q.    So I take it you haven't reviewed
24 records from Mrs. Plaisance's dermatologist about
25 her treatment for hair loss?

1     A.    You know, I don't remember that, but I
2  can look back and see if we have any of those
3  because if we have them, I would have reviewed them
4  and I don't see any.
5     Q.    Okay.  And I take it you haven't spoken
6  to Dr. Jones or Dr. Matherne about Mrs. Plaisance?
7     A.    No.
8     Q.    And during chemotherapy, did
9  Mrs. Plaisance lose her hair?
10    A.    I presume she did.  Well, I know she
11 did.  I looked at my notes.  She had alopecia and
12 then she had some regrowth.
13    Q.    And was the hair loss that she
14 experienced during chemotherapy typical of the hair
15 loss you see with breast cancer patients during
16 chemotherapy?
17    A.    Yes.
18    Q.    And did you monitor Mrs. Plaisance's
19 hair regrowth after she completed chemotherapy and
20 was returning for follow-up visits with you?
21    A.    I noted it, yep.  Not in any formal
22 counting of hairs in a square inch or anything.
23    Q.    Sure.
24          And you're not an expert in hair loss?
25    A.    No.

1     Q.    Or hair loss diagnoses; is that fair?
2     A.    Yes.
3     Q.    And if you can turn also in Tab 4 of the
4  binder, I believe this is Exhibit 5.  Again, I
5  apologize for this.  There's extra records that
6  we're not going through because we don't have time,
7  but if you can flip to a May 5th, 2014, visit, and
8  this is Page Number 54 at the bottom.
9     A.    This is in section 5.
10    Q.    This is in Tab 4.
11    A.    Oh.
12    Q.    It's about --
13    A.    And what page did you want again?
14    Q.    Halfway through.  It's page ending 54 at
15 the bottom.  It's a May 5th, 2014 visit.
16    A.    Okay.  Halfway through?
17    Q.    Yeah.
18    A.    5?
19    Q.    No, the --
20    A.    You said 54?
21    Q.    Yes.
22    A.    Got it.
23    Q.    Thank you.  And this would have been --
24 this would have been less than two months after she
25 had completed her last -- after she had completed

1  chemotherapy; is that right?
2     A.    Yes.
3           (Off-record discussion.)
4  BY MS. GONZALEZ:
5     Q.    And you conducted a physical exam that
6  day?
7     A.    Yes.
8     Q.    According to your records?
9     A.    Yep.
10    Q.    And that included examining her head and
11 her hair?
12    A.    Okay, yes.
13    Q.    And you noted under examination of head
14 that she -- or you wrote:  Feels has patchy areas of
15 no new hair growth but barely has any detectable
16 fuzz.
17          Was that based on your examination of
18 her head?
19    A.    Yes.
20    Q.    And did Mrs. Plaisance complain that day
21 about her hair or lack of hair?
22    A.    Probably so since I put she feels she
23 has patchy areas.
24    Q.    And if you turn to the next page under
25 your psychiatric section of your examination --

Page 118

1    A.    Uh-huh.
2    Q.    Did you also note there that she was
3  anxious, exhibited by hair situation above?
4    A.    Yes.
5    Q.    And what did she say or do that led you
6  to make note -- make that note?
7    A.    Well, I think she just described that it
8  didn't seem to be growing back as fast as she wanted
9  to and was worried.  Self-conscious.
10    Q.    And if you turn to the plan section of
11  your record in the last page of the record, do you
12  have a section there regarding her complaint of hair
13  loss?
14    A.    Yes.
15    Q.    And what did you include in your plan
16  about her hair?
17    A.    I included I thought it was normal and
18  that if she came back patchy or had any questions,
19  she should see her dermatologist.
20    Q.    And that's the section, just to make
21  sure we're on the same page, where you wrote:
22  Normal chemo-induced alopecia --
23    A.    Yeah.
24    Q.    -- if grows out with alopecia areata,
25  should discuss with derm, Dr. Jones.  She just saw

Page 119

1  him last week.  I doubt she has problems.  No real
2  growth yet at all.
3        And what did you mean by if grows out
4  with alopecia areata?
5    A.    Well, that's patchy regrowth of hair
6  with patches of no hair, and she would have to
7  pursue any options that might be available.  And I
8  usually refer people to a dermatologist.
9    Q.    Sure.
10        She complained about her hair regrowth,
11  and you examined her and recommended that if she had
12  a continuing concern to see her dermatologist about
13  it?
14    A.    Yep.
15    Q.    And you would expect the dermatologist
16  to diagnose and treat any hair loss for her?
17    A.    Yes.
18    Q.    And based on your care and treatment of
19  patients, how long does it usually take for your
20  patient's hair to regrow after chemotherapy?
21    A.    Enough to look normal in the grocery
22  store and have people not maybe take a second look,
23  usually about six months.
24    Q.    And based on this record at the time,
25  did you feel Mrs. Plaisance's hair was regrowing at

Page 120

1  a normal rate for someone who had just completed
2  chemotherapy?
3    A.    Well, it wasn't outstandingly abnormal.
4  Most of the time at two months people don't have
5  enough hair to feel happy.
6    Q.    But it was starting to come back?
7    A.    She had a little fuzz, yes.
8    Q.    And let's flip forward about four pages.
9  It's the page ending 46 at the bottom.
10    A.    Okay.
11    Q.    And is this your established patient
12  note from a follow-up visit on May 19th, 2014, with
13  Mrs. Plaisance?
14    A.    Yes.
15    Q.    And did you report here in her -- under
16  the chief complaint section that Mrs. Plaisance was
17  frustrated with little regrowth of
18  chemotherapy-induced alopecia?
19    A.    Yes.
20    Q.    And below that, under the HPI -- and
21  what does HPI refer to?
22    A.    History of present illness.
23        (Off-record discussion.)
24  BY MS. GONZALEZ:
25    Q.    And did you also address her complaint

Page 121

1  about hair regrowth in that section?
2    A.    Yes.
3    Q.    And what was your -- what was your
4  impression or response there?
5    A.    Well, essentially, I told her I thought
6  her hair would regrow and I thought it was premature
7  to be worried that it wouldn't.
8    Q.    And this was still just about two months
9  after completing chemotherapy; right?
10    A.    Right.
11    Q.    And again you examined her head and
12  included information under your physical exam about
13  the appearance of her hair regrowth; is that right?
14    A.    Right.
15    Q.    And noted:  Again feels patchy areas
16  with no new hair growth but barely has any
17  detectable fuzz.
18        And then it says:  Present and appears
19  somewhat black, 45 millimeters?
20        Do you know what that last phrase is
21  referring to?
22    A.    The length of her hair.
23    Q.    Okay.
24    A.    So it was about a half centimeter.
25    Q.    And in your plan on the last page, did

31 (Pages 118 - 121)

Page 122

1  you again record that your impression was that she
2  had normal, chemo-induced alopecia and that if it
3  were growing out with alopecia areatus, that she
4  should discuss with her dermatologist?
5      A.   Right.
6      Q.   And did you also note there that she
7  seemed to be coping better and that it was premature
8  to say that she has permanent alopecia?
9      A.   Yes.
10     Q.   And you strongly doubted that she did
11 have permanent alopecia?
12     A.   Yes.
13     Q.   And had you had patients who had had
14 permanent alopecia?
15     A.   Not until that point.  And then, you
16 know, I didn't call it that back then, but I've had
17 some since.  One.
18     Q.   Can you explain what you mean by you
19 didn't call it that back then?
20     A.   I didn't call it permanent alopecia back
21 then because I didn't think she had permanent
22 alopecia, right then.
23     Q.   At that time had you had other patients
24 who had had what they considered unsatisfactory hair
25 regrowth after chemotherapy?

Page 123

1      A.   No.
2      Q.   All of your patients had had full hair
3  regrowth that they were -- returning?
4      A.   Well, sometimes they would be upset that
5  it was curly when it used to be straight or straight
6  when it used to be curly or a different color, but
7  the problem had not been how much hair.
8      Q.   And did you strongly doubt that it was
9  permanent alopecia based on your experience of
10 treating other patients who had experienced --
11 sorry, let me just finish -- who had experienced
12 hair loss during chemotherapy?
13     A.   Well, I think experience affected that,
14 and the fact that she had some hair regrowing.
15     Q.   And were you -- strike that.  Let me
16 move forward.
17          You saw Mrs. Plaisance a couple of
18 months later in July of 2014.  I'll direct you to
19 that visit.  It's about six pages forward, and the
20 page number is 38.
21          And before we go there, had you had
22 other patients who had had alopecia areata in the
23 past?
24     A.   I have had friends who have had it, but
25 not patients.

Page 124

1      Q.   And turning to this record at Page 38,
2  this was your record of a follow-up visit on
3  July 1st, 2014; is that right?
4      A.   July 1st, 2014, yes.
5      Q.   And did you note under HPI on the first
6  page that Mrs. Plaisance notes her energy has
7  improved and almost back to normal and does not
8  complain about what she feels was delayed hair
9  growth after chemotherapy-induced alopecia?
10     A.   Yes.
11     Q.   And under your review of systems and
12 your physical exam, again, you examined her head
13 that day?
14     A.   Yes.
15     Q.   And you noted that her hair was
16 regrowing?
17     A.   Yes.
18     Q.   And that was based on -- based on your
19 examination?
20     A.   Yes.
21     Q.   And this was now over three months after
22 her chemotherapy had ended?
23     A.   Yes.
24     Q.   And in the plan section, on the last
25 date of your record, did you also note that her

Page 125

1  normal chemotherapy-induced alopecia was resolving
2  nicely?
3      A.   Yes.
4      Q.   And that was your observation of her
5  hair regrowth at the time?
6      A.   Yes.
7      Q.   And let's turn to the next visit, which
8  is the next page, if you flip over to Page 34.
9          And is this a record of your next
10 follow-up visit which was on January 14, 2015?
11     A.   Yes.
12     Q.   And now this was about twelve months
13 since you had first started treating Mrs. Plaisance
14 for her breast cancer and about ten months since she
15 had completed chemotherapy in March 2014; is that
16 right?
17     A.   Uh-huh.
18     Q.   And under your physical exam, did you
19 again examine her head that day?
20     A.   Yes.
21     Q.   And did you note that her alopecia
22 resolved?
23     A.   Yes.
24     Q.   And based on your treatment of her,
25 including your physical examination of her head, you

32 (Pages 122 - 125)

Page 126

1 determined she no longer had chemotherapy-induced
2 alopecia?
3    A.   Yes.
4    Q.   And did Mrs. Plaisance raise any concern
5 with you about her hair during this visit?
6    A.   I'll have to look at the HPI.  It does
7 not look that way, no.
8    Q.   And as you have done in the past, if she
9 had raised concern about her hair regrowth or had
10 been concerned about unsatisfactory hair regrowth,
11 you would have included that in the record; correct?
12    A.   Yes.
13    Q.   And you would also have addressed it in
14 your plan?
15    A.   Yes.
16    Q.   And we can look at the other follow-up
17 records since January 2015, but from what you know
18 and have seen in looking at these records, did
19 Mrs. Plaisance ever raise a concern with you about
20 unsatisfactory hair regrowth or about alopecia after
21 that January 2015 visit?
22    A.   I don't think so, but I didn't read
23 word-for-word every single one of them.
24    Q.   And if she had complained about alopecia
25 or lack of hair regrowth, what would you have told

Page 127

1 her?
2    A.   To see her dermatologist.
3    Q.   And would you have told her it could be
4 related to her chemotherapy treatment?
5    A.   If I had perceived that she had
6 alopecia, would I have discussed with her whether it
7 was due to chemotherapy?  I probably would have.  I
8 might have discussed other things that might
9 contribute to that.
10    Q.   And based on your treatment of
11 Mrs. Plaisance over the last -- well, starting in
12 2012, again since 2014, so over six years, she
13 hasn't been shy or hesitant in raising -- sorry, I'm
14 getting feedback.
15        Based on your treatment of
16 Mrs. Plaisance over this last six or seven years,
17 she hasn't been shy or hesitant in raising concerns
18 with you at her visits with you, has she?
19    A.   No.  She's very self-reliant.  Has
20 always spoken out for her wishes.
21    Q.   And you've encouraged that?
22    A.   Sure.
23    Q.   Thanks.
24        And you've addressed her concerns and
25 documented them in your records?

Page 128

1    A.   Yes.
2    Q.   And that includes when she's had
3 difficulty sleeping or had insomnia?
4    A.   Yes.
5    Q.   And she's also reported to you when
6 she's been experiencing anxiety or depression; is
7 that right?
8    A.   Yes.
9    Q.   And I think I've seen her report to you
10 about gastritis or other gastrointestinal symptoms.
11 She raises those with you?
12    A.   Yes.
13    Q.   She's also discussed with you her diet
14 and weight and diabetes control issues over the
15 years?
16    A.   Yes.
17    Q.   But since January 2015 -- or, sorry,
18 going back to the prior record -- I think it was
19 July 2014, she has not raised a concern about hair
20 loss; correct?
21    A.   July 2014 or '15?
22    Q.   Since the July 2014 record where we can
23 look back, she did raise a concern about --
24    A.   She did raise --
25    Q.   She did?

Page 129

1    A.   It was '15 I was looking at and she did
2 not express.  Correct.
3    Q.   Okay.  So since July 2014, she has not
4 raised a concern about hair loss --
5    A.   Yes.
6    Q.   -- with you; is that correct?
7    A.   (No verbal response.)
8    Q.   And let's just look at your most recent
9 visit with Mrs. Plaisance, and it's the last record
10 in this set.
11        So if you turn to the very last record
12 in Tab 4, the last record.
13    A.   Okay.
14    Q.   I wanted to ask about -- well, first,
15 let's look at -- and this is your October 16th,
16 2019, visit with Mrs. Plaisance; correct?
17    A.   Okay.
18    Q.   Is that right?
19    A.   October 16, 2019.  Yes.
20    Q.   Okay.  And under the plan there,
21 Number 1, you noted that based on your review and
22 exam and review of Dr. Landry's records, there was
23 no evidence of recurrent disease?
24    A.   Yes.
25    Q.   And that's referring to no evidence of

33 (Pages 126 - 129)

Page 130

1  recurrence of breast cancer?
2     A.   Right.
3     Q.   And on the next page ending in 07, at
4  the very bottom before Dr. Landry's name there's a
5  note that she had questions about breast cancer
6  recurrence years later as she has a friend who she
7  thinks recurred with Stage IV disease.
8         What questions did she have for you?
9     A.   Well, I'm sure a general question was:
10  How likely is it, is that going to happen to me?
11        And it unfortunately happen sometimes up
12  to 25 years, and I probably had that kind of
13  discussion with her.  But probably reiterated she
14  had a pretty low-stage breast cancer node-negative
15  and that she's doing all the right things of
16  exercising and eating low fat which can help prevent
17  recurrence.
18     Q.   And at the top of the page of that same
19  page, it looks like you noted that she had completed
20  aromatase inhibitor May 2019?
21     A.   Yes.
22     Q.   And that's consistent with your
23  recollection?
24     A.   Yes.
25     Q.   And you didn't examine her hair that

Page 131

1  day; correct?  Or her scalp?
2     A.   I probably didn't exactly palpate it or
3  pay much attention to it if she had hair.
4         Nope, I didn't note her hair that day.
5     Q.   And I think you testified earlier that
6  before you prescribed docetaxel, at least for the
7  first time, you would have reviewed the prescribing
8  information or the label; is that right?
9     A.   Generally, yeah.  I don't read the label
10  of every medicine right before I prescribe it but...
11     Q.   Do you know when you would have reviewed
12  the prescribing information for docetaxel?
13     A.   No, I don't remember exactly when I
14  looked at the PDR on it.  Looking up dose adjustment
15  for toxicity all the time, but I might have looked
16  at it specifically for alopecia indications.
17     Q.   And did you review Hospira's docetaxel
18  label before prescribing docetaxel for
19  Mrs. Plaisance?
20     A.   Not specifically.
21     Q.   And so you didn't rely on Hospira's
22  label in prescribing it for her; is that right?
23         MR. ROCKSTAD:  Object to form.
24     A.   No.  I can't tell you whose label I last
25  looked at.  I can put it that way.

Page 132

1  BY MS. GONZALEZ:
2     Q.   Did you rely on any information from
3  Hospira in prescribing docetaxel for Mrs. Plaisance?
4     A.   When I look up information on chemo
5  medicines, I go to UpToDate, and I don't think it
6  really notes who -- I don't pay any attention to who
7  the manufacturer is.
8     Q.   And when you prescribed docetaxel,
9  you're not prescribing a particular manufacturer's
10  docetaxel; is that correct?
11     A.   I prescribed the one with which the
12  cancer center has a contract.  I am employed.  They
13  negotiate the drug and the prices and that's what we
14  use.  And I'm not included in those choices.
15     Q.   You prescribe the medicine and then it's
16  administered by the pharmacy; is that right?
17     A.   Yeah --
18     Q.   Sorry, let me ask a better question.
19     A.   -- and it's administered by the chemo
20  nurses, yes.
21     Q.   So when you prescribe docetaxel, you
22  don't know which manufacturer's product will be
23  administered to the patient?
24     A.   The one we have now is what we call the
25  generic one.  And if y'all are the only

Page 133

1  manufacturer, that's the one -- of the generic,
2  that's what we have.
3     Q.   Okay.  And you don't know whether or not
4  Hospira --
5     A.   I can probably maybe find out.  I don't
6  know.  We'd have to talk with the director.
7     Q.   Sure.
8         And I'm just asking you, when you make
9  your decision, you're not prescribing a particular
10  -- you're not choosing to prescribe --
11     A.   Brand?  No.  No.
12     Q.   So just to be clear, because I think we
13  just spoke over one another, when you're prescribing
14  docetaxel, you're not prescribing that a particular
15  manufacturer's product be used?
16     A.   No.
17     Q.   Is that right?
18     A.   Correct.
19         (Off-record discussion)
20  BY MS. GONZALEZ:
21     Q.   Thank you, Doctor.  I'm just trying to
22  wrap this up as quickly as possible.  Just give me a
23  couple of minutes --
24     A.   Take your time.
25     Q.   -- to flip through.  Thank you.

34 (Pages 130 - 133)

1      And are you familiar with what the
2  labeling for docetaxel said about hair loss or
3  alopecia in 2014 when you prescribed it for
4  Mrs. Plaisance?
5      A.   Yes.
6           MR. ROCKSTAD:  Object to form.
7  BY MS. GONZALEZ:
8      Q.   And what did it say?
9      A.   A range of percentage of risk of
10 alopecia.  It didn't discuss permanent versus
11 temporary.
12     Q.   And so it warned of a potential risk of
13 hair loss or alopecia generally?
14     A.   Yes.
15     Q.   And that could include temporary or
16 permanent hair loss?
17     A.   I would think so.
18          MR. ROCKSTAD:  Object to form.
19 BY MS. GONZALEZ:
20     Q.   And would you agree that the -- strike
21 that.
22          You -- I think you mentioned earlier
23 that there can be different cause -- many different
24 causes or risk factors for hair loss; is that fair?
25     A.   I don't know about many, but there are

1  other things that can cause hair loss.
2      Q.   And we had talked about your awareness
3  of the risk of hair loss as a risk of chemotherapy.
4  Did the information you had about docetaxel at the
5  time you prescribed it for Mrs. Plaisance provide
6  sufficient information for you to do an appropriate
7  risk-benefit analysis for her?
8           MR. ROCKSTAD:  Object to form.
9      A.   You're asking about a risk-benefit as it
10 relates to hair loss?
11 BY MS. GONZALEZ:
12     Q.   In general for the product.
13     A.   For treatment of the cancer?
14     Q.   Yes.
15     A.   Yes.  I think it was the right treatment
16 for her cancer.
17     Q.   If there had been an additional
18 statement in the labeling for docetaxel that there
19 have been reports, cases, of permanent alopecia had
20 been reported, would that have changed your decision
21 to prescribe TC for Mrs. Plaisance?
22     A.   Well, if the percentage of that risk was
23 included and it was, you know, less than 0.5 percent
24 or something, probably not, but I would discuss with
25 people that it could be permanent.

1      It depends on the percentage risk.
2      Q.   And if it had been a statement in the
3  post-marketing adverse events section that simply
4  said that there had been cases of permanent alopecia
5  that had been reported, would that change your
6  prescribing decision?
7      A.   Again, it would have to do with the
8  percentage risk of that, how frequently that was
9  seen.
10     Q.   And we talked earlier about how the
11 risks of the chemotherapy medications that you
12 prescribed included potentially serious risks,
13 including death; right?
14     A.   Correct.
15     Q.   And those were risks that you took on
16 and Mrs. Plaisance took on in proceeding with her
17 chemotherapy regimen in 2014?
18     A.   Yes.
19     Q.   And what -- I'm sorry.
20          I think you said that you would have
21 discussed with a patient permanent hair loss if the
22 labeling had included a reference to cases of
23 permanent hair loss; is that right?
24     A.   Yes.
25     Q.   And what would you have -- what would

1  you tell the patient?
2      A.   Pretty much what I already would tell
3  them, that I've already seen it, but now it is
4  reported.  But I would, you know, like to know a
5  percentage before I start discussing something like
6  that.  You know, if it's in that minuscule one or
7  two people in the world that had hair loss, I'm not
8  going to be as worried.  If it's something like 3 to
9  5 percent, or -- I mean, 2 percent is a lot
10 considering permanent hair loss.  That's one in
11 fifty people.  So --
12     Q.   And, again, these are adverse event
13 reports, not determinations of causation; is that
14 right?
15     A.   True.
16     Q.   If I'm understanding you correctly, you
17 would want to have better understanding of the basis
18 for the information that's included in the label?
19     A.   Well, the label has percentages, as you
20 know, and it lists common and less common and that
21 kind of thing.
22          If a medication developed a
23 post-marketing thing of a pretty high percentage of
24 something when it was different before, that's very
25 pertinent.

35 (Pages 134 - 137)

Page 138

1     Q.    And you'd look at the percentages that
2   are listed for adverse event reports during clinical
3   trials?  Is that what you're referring to with the
4   reference to percentages?
5     A.    That's how I believe -- well, it's not
6   just trials.  Drug companies collect the
7   information, and then they report the percentages in
8   their inserts.  And I review those percentages all
9   the time for a lot of different side effects.
10    Q.    And if Mrs. Plaisance presented to you
11  today in the same state of health and with the same
12  medical history as she presented back when you saw
13  her, would you be comfortable prescribing docetaxel
14  to her with what you know today about the risks and
15  benefits of the medication?
16    A.    If she had not had a personal sense that
17  her hair didn't come back previously or as if she
18  had never --
19    Q.    Correct, without being able to predict
20  the future.
21    A.    If she came in today, a person without a
22  history of unusual hair loss known to me in that
23  stage of disease, I would probably still consider
24  Taxotere Cytoxan.  However, we've all been paying
25  attention to the advertisements about permanent hair

Page 139

1   loss, and we're reviewing that with patients.
2     Q.    What do you mean by advertisements?
3     A.    On TV, they're advertising -- lawyers
4   advertising for lawsuits about permanent hair loss
5   from chemotherapy.
6     Q.    And do you rely on those advertisements
7   in making prescribing decisions in your patients?
8     A.    I have to discuss them with patients
9   because they bring it up and they're concerned about
10  it.  And I have to be honest, that there probably is
11  some risk of permanent hair loss, though I don't see
12  it to be frequent.
13    Q.    And you continue to prescribe Taxotere
14  for breast cancer?
15    A.    Yes.
16    Q.    And I think you mentioned earlier that
17  you had done some research before today's
18  deposition?
19    A.    Uh-huh.
20    Q.    And what kind of research did you do?
21    A.    Well, you know, first thing a doctor
22  thinks is: Did I do something wrong?
23        I reviewed ways to prevent
24  chemotherapy-induced hair loss and there really
25  aren't very good ways.  There's one way just

Page 140

1   approved last year by the NCCN and no medications
2   appear to work from chemotherapy-induced alopecia.
3         So I reviewed that a bit.
4     Q.    And did you print out any documents?
5     A.    Some, uh-huh.  Whether I printed that
6   information, I can't remember what I printed.
7         You want to see what I printed about the
8   cool scalp thing?
9     Q.    If you can just tell me what information
10  you read and printed out?
11    A.    Okay.  Well, I reviewed details on the
12  Oncotype DX test.  I printed her Oncotype DX report.
13  I reviewed risk-benefit calculators for treatment of
14  breast cancer.  And there are a couple of them that
15  I used and reviewed for her.
16        I printed out some trials on Oncotype DX
17  and how to interpret them.  I printed her
18  risk-benefit predictors on those calculators.  And
19  then I just handwrote some notes about the benefits
20  of different chemo regimens comparing TC to AC.  And
21  TC actually is a better treatment than AC in terms
22  of efficacy for her situation.  So disease-free,
23  overall survival numbers in case you asked.
24    Q.    Thank you.
25        And it sounds like what you found and

Page 141

1   printed was consistent with what you already knew
2   about breast cancer treatment and chemotherapy
3   options?
4     A.    Yes.
5     Q.    Are you aware of any determination by
6   the FDA that docetaxel causes permanent hair loss?
7     A.    I did not look that up.  Not aware.
8     Q.    And you haven't done any kind of
9   exhaustive research or review of the literature on
10  docetaxel and a risk of permanent hair loss; is that
11  fair?
12    A.    I reviewed on UpToDate hair loss and
13  chemotherapy and I reviewed the circular on Taxotere
14  which, again, had something like a 26 or 36 to
15  76 percent alopecia but no reference to permanent or
16  not.
17    Q.    And what was that reference, the last
18  one you mentioned?
19    A.    That was basically the insert that
20  UpToDate has a link to.
21    Q.    Okay.  Thank you.
22        The prescribing information, the
23  label --
24    A.    Yes.
25    Q.    -- for the drug?

36 (Pages 138 - 141)

1    A.   Yes. Yes.
2    Q.   Thank you, Doctor.  Do you mind just
3  taking a really short break and then we'll wrap up
4  and I'll be done with my questions?  So about five
5  minutes?
6    A.   Ten minutes?  What is it?
7    Q.   Ten would be great if we're --
8    A.   Ten.  Okay.  All right.
9         THE VIDEOGRAPHER:  Off the record at
10       6:53 p.m.
11       (A 19-minute break was taken from 6:53
12       until 7:12 p.m.)
13       THE VIDEOGRAPHER:  The time is
14       7:12 p.m. and we are back on the record.
15  BY MS. GONZALEZ:
16   Q.   Dr. Chauvin, the research that you did
17  before today's deposition confirm your assessment
18  that your prescribing decision for Mrs. Plaisance
19  involving the TC regimen was appropriate for her?
20   A.   Yes.
21   Q.   And you're not an expert in diagnosing
22  the cause of a patient's hair loss; is that correct?
23   A.   Correct.
24   Q.   And based on your care and treatment of
25  Mrs. Plaisance, can you say with any degree of

1  medical certainty what caused Mrs. Plaisance's hair
2  loss to the extent she has hair loss?
3    A.   Well, I think her chemotherapy
4  definitely contributed.  Whether it was
5  multifactorial is another question.
6    Q.   And, again, you are not a dermatologist;
7  correct?
8    A.   Correct.
9    Q.   And have you attempted to evaluate what
10  caused any hair loss that Mrs. Plaisance might have?
11   A.   Have I attempted to get another
12  diagnosis for her hair loss?  Well, I haven't seen
13  her since I've been informed that she feels she has
14  permanent alopecia.
15   Q.   And you determined previously that her
16  hair loss that you attributed to chemotherapy had
17  resolved; correct?
18   A.   I did.  I did.
19   Q.   And you didn't thereafter diagnose her
20  with hair loss; correct?
21   A.   Correct.
22   Q.   And so you haven't done any causal
23  evaluation of permanent hair loss because you
24  haven't diagnosed hair loss in Mrs. Plaisance; is
25  that fair?

1    A.   That's fair at this time, yes.
2  Obviously, I diagnosed hair loss after the
3  chemotherapy.
4    Q.   Correct, and then you determined that it
5  had resolved?
6    A.   Right.
7    Q.   Thank you, Dr. Chauvin.  I don't have
8  any further questions for you at this time.  Thanks
9  for your time.
10   A.   You're welcome.
11       MR. ROCKSTAD:  I don't have any
12       questions for you either, Dr. Chauvin.  I
13       appreciate your time.
14       THE VIDEOGRAPHER:  The time is
15       7:15 p.m.  This concludes the recorded
16       video deposition, and we are off the
17       record.
18       THE REPORTER:  Do you need a copy of
19       the transcript?
20       MR. ROCKSTAD:  We've got a standing
21       order through Palmer Lambert's office.
22       He's liaison counsel in the MDL, and
23       we're supposed to direct any orders to
24       his office.
25       (Proceedings concluded at 7:17 p.m.)

1       REPORTER'S CERTIFICATE
2     This certification is valid only for a
   transcript accompanied by my original signature and
   original required seal on this page.
3       I, EVANGELINE A. LANGSTON, Certified Court
   Reporter in and for the State of Louisiana, as the
4  officer before whom this testimony was administered,
   do hereby certify that Laura Chauvin, M.D., after
5  having been duly sworn by me upon authority of R.S.
   37:2554, did testify as hereinbefore set forth in
6  the foregoing 144 pages;
7
      That this testimony was reported by me in the
8  stenotype reporting method; was prepared and
   transcribed by me or under my personal direction and
9  supervision, and is a true and correct transcript to
   the best of my ability and understanding;
10     That the foregoing transcript has been
   prepared in compliance with transcript format
11  guidelines required by statute or by the Rules of
   the Louisiana Certified Shorthand Reporter Board;
12  and that I am informed about the complete
   arrangement, financial or otherwise, with the person
13  or entity making arrangement for deposition
   services; that I have acted in compliance with the
14  prohibition on contractual relationships, as defined
   by the Louisiana Code of Civil Procedure Article
15  1434 and in rules and advisory opinions of the
   board;
16     That I have no actual knowledge of any
   prohibited employment or contractual relationship,
17  direct or indirect, between a court reporting firm
   and any party litigant in this matter, nor is there
18  any such relationship between myself and a party
   litigant in this matter;
19     That I am not of counsel, not related to
   counsel or the parties herein, nor am I otherwise
20  interested in the outcome of this matter.
21
22
23
      EVANGELINE A. LANGSTON, FCRR
24    CCR #27019, RPR #31609
25

37 (Pages 142 - 145)

Page 146

1 LAURA CHAUVIN, M.D.
2 laura.campbell@thibodaux.com
3           October 29, 2020
4 RE: Plaisance v. Hospira Worldwide, LLC Et Al
5    10/15/2020, Laura Chauvin, M.D. (#4291196)
6    The above-referenced transcript is available for
7 review.
8    Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16
17    Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 147

1 Plaisance v. Hospira Worldwide, LLC Et Al
2 Laura Chauvin, M.D. (#4291196)
3        E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Laura Chauvin, M.D.           Date
25

Page 148

1 Plaisance v. Hospira Worldwide, LLC Et Al
2 Laura Chauvin, M.D. (#4291196)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Laura Chauvin, M.D., do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____  _____
12 Laura Chauvin, M.D.           Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

Veritext Legal Solutions
800-227-8440                                              973-410-4040

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.