**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740** <br><br> *This document relates to:* <br> Audrey Plaisance, Case No. 2:18-cv-08086 |

**HOSPIRA'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**<u>MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. ANTONELLA TOSTI</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

    A.    Ms. Plaisance's Hair Condition Before Chemotherapy ...........................................2

    B.    Ms. Plaisance's Breast Cancer Treatment and Follow-Up Visits...........................2

    C.    Dr. Tosti's Review of the Records and Clinical Exam of Ms. Plaisance ...............4

LEGAL STANDARD............................................................................................................4

ARGUMENT .......................................................................................................................5

I.     DR. TOSTI'S SPECIFIC CAUSATION OPINION IS BASED ON AN
      UNRELIABLE METHODOLOGY. ...........................................................................6

    A.    Dr. Tosti Cannot Rule Out Endocrine Therapy as the Cause of Ms.
         Plaisance's Hair Condition. ....................................................................................6

         1.    Dr. Tosti's novel methodology does not support her opinion. ...................7

         2.    Even under her own methodology, Dr. Tosti cannot rule out
             endocrine-induced alopecia as the cause of Ms. Plaisance's hair
             loss. ...........................................................................................................9

    B.    Dr. Tosti's Opinions Are Based on an Incomplete Review of the Medical
         Records. ..................................................................................................................12

II.    DR. TOSTI'S GENERAL CAUSATION OPINIONS ARE INADMISSIBLE. ..............16

    A.    Dr. Tosti's Reliance on Drs. Madigan and Feigal Is Misplaced...........................17

    B.    Dr. Tosti's Case-Counting of PCIA Reports in the Literature Is Unreliable.........18

    C.    Sanofi's Clinical Overview Does Not Prove Causation. .......................................19

    D.    Dr. Tosti's Experience Does Not Prove Causation................................................20

III.   DR. TOSTI'S SUBSTANTIAL CONTRIBUTING FACTOR OPINION
      INVADES THE PROVINCE OF THE JURY. .................................................................21

CONCLUSION....................................................................................................................21

CERTIFICATE OF SERVICE ...........................................................................................23

i

**INTRODUCTION**

Plaintiff Audrey Plaisance alleges that she suffers from permanent chemotherapy-induced alopecia ("PCIA") caused by docetaxel.  In support, Ms. Plaisance proffers opinions by Dr. Antonella Tosti, who opines that (1) docetaxel causes PCIA, and (2) Ms. Plaisance suffers from PCIA caused by docetaxel.  For multiple reasons, Dr. Tosti's causation opinions should be excluded as unreliable under *Daubert*.[1]

*First*, Dr. Tosti cannot rule out Ms. Plaisance's five-year use of endocrine therapy as a cause of her hair loss.  Dr. Tosti conceded that she "cannot exclude endocrine therapy had some role" in Ms. Plaisance's hair loss.  Moreover, Ms. Plaisance's hair loss matches Dr. Tosti's definition of endocrine-induced alopecia.

*Second*, in evaluating and diagnosing Ms. Plaisance with PCIA, Dr. Tosti admitted she did not follow the standard methodology she employs when diagnosing a patient's hair condition.  Typically, she obtains and considers the complete hair history of her patients.  Here, however, Ms. Plaisance had a long history of documented hair loss *before* her breast cancer diagnosis, but Dr. Tosti was unaware of that crucial medical history until two days before Dr. Tosti's deposition—well after she formed her expert opinions and served her report.  Thus, she did not have the complete and accurate information she stated was necessary for a proper alopecia diagnosis.

*Third*, the Court should exclude Dr. Tosti's general causation opinions in their entirety because the methodology and data she uses to support her conclusions are unreliable.  Dr. Tosti does not identify any methodology, such as a Bradford Hill analysis, in support of her general

---

[1]  Although the Court has permitted Dr. Tosti to testify in *Earnest* and *Kahn*, the situation here is markedly different.  In this case, Dr. Tosti attempts to supplant with her own conjecture the contemporaneous and clear records documenting Ms. Plaisance's long history of hair loss before chemotherapy and her hair regrowth afterwards.  In addition, at the time she formed her opinions concerning Ms. Plaisance's hair loss, Dr. Tosti had not seen or considered—but wishes she had—numerous medical records documenting a several-year history of alopecia experienced by Ms. Plaisance before her breast cancer diagnosis.

causation opinions.  Instead, she cites various sources that do not provide adequate support for her conclusions.  For example, Dr. Tosti relies on Dr. Madigan's and Dr. Feigal's reports, but Dr. Tosti's reliance on those reports is not reasonable.  Dr. Madigan's observational meta-analysis since has been excluded.  Dr. Tosti also relies on case reports of PCIA in the literature and her own experience, but counting case reports and citing her own anecdotal experiences are not admissible under *Daubert* to prove causation.

*Fourth*, Dr. Tosti's expert report invades the province of the jury.  Dr. Tosti concludes that Ms. Plaisance's use of docetaxel was "the substantial contributing factor to Ms. Plaisance's PCIA."  Ex. A, Expert Report of Dr. Tosti (Aug. 2, 2021) ("Tosti Rep."), at 36.  The Court has already excluded Dr. Plunkett from offering this opinion in the *Kahn* trial.  For the same reasons, the Court should preclude Dr. Tosti from offering this opinion at Ms. Plaisance's trial.

## FACTUAL BACKGROUND

### A.    Ms. Plaisance's Hair Condition Before Chemotherapy

Ms. Plaisance has a long history of documented hair loss issues that pre-date her December 2013 cancer diagnosis by at least a decade.  Her prior dermatologist, Dr. Jones, diagnosed Ms. Plaisance with female pattern alopecia and telogen effluvium on at least 15 different occasions between 2003 and 2010.  Ex. B, Acadia Dermatology Records of Audrey Plaisance ("Acadia Derm. Rec.").

### B.    Ms. Plaisance's Breast Cancer Treatment and Follow-Up Visits

Plaintiff Audrey Plaisance was diagnosed with breast cancer on December 2, 2013.  Ex. C, Plaintiff Fact Sheet ("PFS"), at 12.  She underwent surgery for a right partial mastectomy on December 11, 2013.  *Id.*  Ms. Plaisance received chemotherapy treatments from January 17, 2014 to March 20, 2014.  *Id.*; Ex. D, Amended Short Form Complaint ("ASFC") ¶ 10.  Her regimen consisted of four cycles of docetaxel and Cytoxan administered approximately every three weeks.  Ex. C (PFS) at 15-16.  On March 31, 2014, eleven days after completing chemotherapy, Ms. Plaisance was prescribed Femara, an aromatase inhibitor for endocrine

therapy, and she took the drug for five years (until 2019).  Ex. E, Oncology Med. Rec. of Audrey Plaisance (Mar. 31, 2014) ("3.31.2014 Oncology Rec.") at 1, 8; Ex. F, Deposition of Dr. Chauvin (Oct. 15, 2020) ("Chauvin Dep.") at 110:8-111:5.

In May 2014, Ms. Plaisance consulted with her oncologist, Dr. Laura Chauvin, regarding her lack of hair regrowth in the two months after she completed chemotherapy.  Ex. G, Oncology Med. Rec. of Audrey Plaisance (May 19, 2014) ("5.19.2014 Oncology Rec.") at 2.  Dr. Chauvin noted that Ms. Plaisance is "[f]rustrated with little hair regrowth but it is premature to be concerned and she agrees to [be] patient."  *Id.*  In a July 2014 follow-up visit, Ms. Plaisance did "not complain about what she felt was delayed hair growth [a]fter chemotherapy-induced alopecia."  Ex. H, Oncology Med. Rec. of Audrey Plaisance (July 1, 2014) ("7.1.2014 Oncology Rec.") at 2.  Dr. Chauvin further observed that Ms. Plaisance's "hair [is] re-growing," *id.* at 5, and noted: "NORMAL CHEMO INDUCED ALOPECIA--resolving nicely," *id.* at 8.

Six months later in January 2015, Ms. Plaisance had another visit with Dr. Chauvin, where she recorded "alopecia resolved."  Ex. I, Oncology Med. Rec. of Audrey Plaisance (Jan. 14, 2015) ("1.14.2015 Oncology Rec.") at -00865.  In July 2015, Dr. Chauvin again noted: "alopecia resolved."  Ex. J, Oncology Med. Rec. of Audrey Plaisance (July 15, 2015) ("7.15.2015 Oncology Rec.") at -00891.  In August 2015, a radiation oncologist similarly concluded that Ms. Plaisance's alopecia had resolved.  Ex. K, Oncology Med. Rec. of Audrey Plaisance (Aug. 6, 2015) ("8.6.2015 Oncology Rec.") at -00908.  Neither the January, July, nor August 2015 medical records indicate that Ms. Plaisance complained of ongoing hair loss.

In March 2016, Ms. Plaisance complained to her dermatologist, Dr. Ryan Matherne, of hair thinning that "has been present for 6 years."  Ex. L, Dermatology Med. Rec. of Audrey Plaisance (Mar. 24, 2016) ("3.24.2016 Derm. Rec.") at 1.  This was the first time since May 2014 that Ms. Plaisance had complained about hair loss to a physician.  Ex. M, Deposition of Audrey Plaisance (Sept. 22, 2020) ("Plaisance Dep.") at 221:25-222:3.  Dr. Matherne has not diagnosed Ms. Plaisance with PCIA.  *See* Ex. N, Day 2 Deposition of Dr. Matherne (Oct. 30, 2020) ("Matherne Dep. Day 2") at 155:18-21.

### C.      Dr. Tosti's Review of the Records and Clinical Exam of Ms. Plaisance

Dr. Tosti conducted a clinical exam of Ms. Plaisance on May 7, 2021.  Ex. A (Tosti Rep.) at 20.  Prior to examining Ms. Plaisance and submitting her report on August 2, Dr. Tosti did not review the 15 dermatological records documenting Ms. Plaisance's hair loss issues before undergoing chemotherapy.  Ex. O, Deposition of Dr. Antonella Tosti (Sept. 20, 2021) ("Tosti Dep.") at 21:4-10.  Dr. Tosti also had not read Dr. Matherne's deposition testimony explaining the records of his visits with Ms. Plaisance until approximately a week before her own deposition.  *Id.* at 20:4-9.  The first time that Dr. Tosti reviewed the 15 dermatological records was 2 to 3 days before her deposition in September 2021.  *Id.* at 20:10-13.

### LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under the Rule, the witness must be qualified as an expert, and her opinions must be both reliable and relevant.  *See* Fed. R. Evid. 702.  Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  *Daubert* instructs courts to serve as gatekeepers, "impos[ing] a special obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only relevant, but reliable.'"  *Kumho Tire Co.*, 526 U.S. at 147 (second alteration in original) (quoting *Daubert*, 509 U.S. at 589); *see Wellogix, Inc. v. Accenture, LLP.*, 716 F.3d 867, 881 (5th Cir. 2013).

The threshold inquiry under Rule 702 is whether the individual is "qualified to testify in a particular field or on a given subject," based on her "knowledge, skill, experience, training, or education."  *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702).  After defining the permissible scope of the expert's testimony, the Court then assesses whether the opinion is reliable and relevant.  *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (per curiam).

To assess reliability, the Court considers whether the reasoning and methodology underlying the expert's testimony is "valid and can be reliably applied to the facts of the case."

*Id.* This "analysis applies to all aspects of an expert's testimony," including the "methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted). If the opinion is based on mere "subjective belief or unsupported speculation," then the Court should exclude it. *Daubert*, 509 U.S. at 590; *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) ("Since *Daubert* … parties relying on expert evidence have had notice of the *exacting standards* of reliability such evidence must meet." (second emphasis added)). The party offering the expert testimony bears the burden of establishing that the expert's findings and conclusions are reliable. *See Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)).

The Court also evaluates whether the testimony is relevant. In assessing relevance, the Court considers whether the expert's "reasoning or methodology 'fits' the facts of the case." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015) (citation omitted); *see also Daubert*, 509 U.S. at 591 (discussing Rule 702's relevancy requirement in terms of "fit" (citation omitted)). In other words, the expert opinion "must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Sandifer*, 907 F.3d at 809 (quoting Fed. R. Evid. 702).

Finally, Federal Rule of Evidence 703 provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if (1) they are of the kind reasonably relied upon by experts in the particular field; and (2) the testimony's probative value substantially outweighs its prejudicial effect. Fed. R. Evid. 703.

## ARGUMENT

Ms. Plaisance must prove through reliable expert testimony that her hair condition is a result of PCIA specifically caused by docetaxel—not some other form of alopecia. Because Dr. Tosti failed to (1) rule out other causes of Ms. Plaisance's hair condition, and (2) account for Ms. Plaisance's long history of documented hair loss before breast cancer, the plaintiff cannot meet her burden of showing specific causation. Dr. Tosti's general causation opinions also fail

because the information and methodology on which she bases her conclusions are unreliable. Finally, Dr. Tosti's testimony that docetaxel was "the substantial contributing factor" to Ms. Plaisance's hair loss improperly invades the jury's province.

## I.   DR. TOSTI'S SPECIFIC CAUSATION OPINION IS BASED ON AN UNRELIABLE METHODOLOGY.

The testimony provided by an expert must be "the product of reliable principles and methods." *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Earnest)* (Aug. 23, 2019), ECF No. 8094, at 2 (citing Fed. R. Evid. 702). To assess reliability, the Court must consider "whether the reasoning or methodology underlying the expert's testimony is valid." *Id.* at 3 (citing *Daubert*, 509 U.S. at 592-93).

### A.   Dr. Tosti Cannot Rule Out Endocrine Therapy as the Cause of Ms. Plaisance's Hair Condition.

Dr. Tosti admits that "[e]ndocrine therapy can cause androgenetic alopecia" and that she "cannot exclude endocrine therapy had some role" in Ms. Plaisance's hair condition. Ex. A (Tosti Rep.) at 34; Ex. O (Tosti Dep.) at 227:3-4. She also acknowledges that aging may play a role in the appearance of Ms. Plaisance's hair. Ex. O (Tosti Dep.) at 227:5-12. She further concedes that endocrine therapy and aging cause hair loss through a process separate from and independent of PCIA. *Id.* at 227:20-25. But Dr. Tosti nevertheless opines that Ms. Plaisance "definitely had the PCIA" and that age and endocrine therapy "can worsen PCIA." *Id.* at 227:4, 227:20-228:1.

As an initial matter, by her own admission, there is no support for Dr. Tosti's claim that endocrine therapy and aging can "worsen" PCIA. Dr. Tosti conceded that was speculation: "But there is no data on that. There is nothing published. … So we don't have those data. So it's just speculation." *Id.* at 228:21-229:6. Thus, those opinions should be excluded.

As for Dr. Tosti's opinion that Ms. Plaisance has PCIA, she bases it on nothing more than her conclusion that Ms. Plaisance "had incomplete hair regrowth with severe alopecia ***before*** starting endocrine therapy." Ex. A (Tosti Rep.) at 34 (emphasis added). According to Dr. Tosti:

"[P]atients with alopecia due to endocrine therapy have normal hair regrowth after chemotherapy and then develop progressive hair thinning several months after starting endocrine therapy." *Id.* She asserts that because Ms. Plaisance started endocrine therapy with incomplete hair regrowth, her hair issues cannot be attributed to endocrine therapy. *See* Ex. O (Tosti Dep.) at 226:16-227:2. Dr. Tosti's opinion is fatally flawed for two reasons.

### 1. Dr. Tosti's novel methodology does not support her opinion.

Dr. Tosti's methodology is based on her opinion that the "definition" of alopecia due to endocrine therapy is when a patient experiences complete hair regrowth after chemotherapy, begins endocrine therapy, and then loses her hair many months later. *See id.* at 241:6-21. This novel methodology does not support her opinions for two reasons.

*First,* this "definition" does not provide any reliable methodology that would answer the specific causation question in this case—whether her hair loss was caused by docetaxel. Because Ms. Plaisance has at least two potential causes of her hair loss—chemotherapy and endocrine therapy (Femara)—Dr. Tosti must reliably "rule out" endocrine therapy as a potential cause.[2] "The standard method for assessing specific causation is 'a differential diagnosis.'" *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Earnest)* (Aug. 23, 2019), ECF No. 8095, at 4 (citing *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 804 (E.D. La. 2011)). "In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury." *Id.* "The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *Id.* (citing *Wagoner*, 813 F. Supp. 2d at 804); *see In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (April 7, 2021), ECF No. 12401 ("*Kahn*"); *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (explaining that an expert's failure to reliably rule out alternative causes of plaintiff's Parkinson's disease turned on

---

[2]   Ms. Plaisance has other potential causes of her hair loss beyond chemotherapy and endocrine therapy; for example, age and medical and family history. For purposes of the instant argument concerning Dr. Tosti's failure to rule out endocrine therapy as a cause of her hair loss, however, we address only endocrine therapy.

speculation and failed to satisfy Rule 702); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423-24 (5th Cir. 1987) (holding that if a patient's "symptoms could have numerous causes," the expert cannot "simply pick[] the cause that is most advantageous to [the plaintiff's] claim").

Dr. Tosti's method does not do that—it *assumes* that the hair loss was caused by chemotherapy unless it is ruled out by complete hair regrowth after the chemotherapy ends. But where, as here, complete hair regrowth could not possibly occur in the period between completion of chemotherapy and initiation of endocrine therapy, endocrine therapy cannot be ruled out. The lack of complete regrowth could have been caused by endocrine therapy or chemotherapy (or another cause), and Dr. Tosti's method does not answer the question of which one it was. Thus, her entire methodology is unreliable on its face because it does not purport to rule out endocrine therapy as a cause. *See, e.g.*, *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 469-70 (E.D. Pa. 2008) (excluding as unreliable experts' testimony that prescription drug caused child's lymphoma because experts failed to adequately account for possibility that disease was idiopathic); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 566-67 (W.D. Pa. 2003) (excluding testimony where experts opined that a drug caused plaintiff's intracerebral hemorrhage without providing "reliable, reasonable explanation or sufficient diagnostic techniques to rule out other possible causes"); *see also Bowles v. Novartis Pharms. Corp.*, 2013 WL 5297257, at *4 (S.D. Ohio Sept. 19, 2013) (excluding expert's testimony that plaintiff's osteonecrosis of the jaw was caused by a specific drug where expert offered no evidence that "he reliably ruled out any alternative causes").

*Second*, Dr. Tosti has not "reliably applied [her] principles and methods to the facts of the case." Fed. R. Evid. 702. An expert's reasoning or methodology must "fit" the facts of the case. *Burst,* 120 F. Supp. 3d at 551. "[T]he proponent must show that the expert's reasoning or methodology was *applied properly to the facts at issue*." *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (emphasis added).

Dr. Tosti's method is based on identifying patients who have "normal hair regrowth after chemotherapy." Ex. A (Tosti Rep.) at 34. But Ms. Plaisance was prescribed Femara ***eleven days***

after completing chemotherapy.  Ex. E (3.31.2014 Oncology Rec.) at 1, 8.  She could not have

experienced complete hair regrowth during that time.  Indeed, Dr. Tosti testified that it is

necessary to wait at least six months after chemotherapy to know whether or not a patient has

complete hair regrowth.  Ex. O (Tosti Dep.) at 52:12-16.  Dr. Tosti herself acknowledged that it

is was "impossible" to diagnose whether a patient has PCIA or endocrine-induced alopecia when

she starts endocrine therapy days after completing chemotherapy:

> Q.   If Mrs. Plaisance's alopecia from chemotherapy had resolved by January
>       2015, could you still conclude that she does not have endocrine-induced
>       alopecia?
>
> MR. SCHANKER: Objection; form.
>
> A.   You know, endocrine-induced alopecia by definition, if you read definition
>       of the disease, is a type of alopecia that occurs when the patient has hair
>       regrow and start endocrine therapy.  *I see now they start -- at that time they*
>       *started endocrine therapy very close to chemotherapy, so this diagnosis was*
>       *probably impossible to make*.  But by any case, you know, the endocrine
>       alopecia shows up usually one year and half after starting the endocrine
>       therapy.

*Id.* at 241:6-21.  Nevertheless, Dr. Tosti opines that Ms. Plaisance's hair loss cannot be attributed

to Femara because she did not have normal hair regrowth at the time she began that medication.

Dr. Tosti's method does not "fit" the facts of Ms. Plaisance's case.

### 2.   Even under her own methodology, Dr. Tosti cannot rule out endocrine-induced alopecia as the cause of Ms. Plaisance's hair loss.

Even applying Dr. Tosti's method, she does not rule out endocrine therapy as a cause

because the chronology and facts of Ms. Plaisance's case squarely fit Dr. Tosti's definition of

endocrine-induced alopecia.

Ms. Plaisance experienced hair regrowth after chemotherapy followed by progressive

hair thinning after several months of taking endocrine therapy.  This is exactly Dr. Tosti's

definition of endocrine-induced alopecia.  Ms. Plaisance completed chemotherapy in March

2014.  Ex. C (PFS) at 12.  In a July 2014 follow-up visit, Dr. Chauvin noted that Ms. Plaisance's

"hair [is] re-growing," Ex. H (7.1.2014 Oncology Rec.) at 5, and she also recorded: "NORMAL

CHEMO INDUCED ALOPECIA--**resolving nicely**," *id.* at 8 (emphasis added).  Six months later in January 2015, Ms. Plaisance had another visit with Dr. Chauvin, where she noted "alopecia resolved."  Ex. I (1.14.2015 Oncology Rec.) at -00865.  In July 2015, Dr. Chauvin again noted: "alopecia resolved."  Ex. J (7.15.2015 Oncology Rec.) at -00891.  A radiation oncologist during an August 2015 visit similarly concluded that Ms. Plaisance's alopecia had resolved.  Ex. K (8.6.2015 Oncology Rec.) at -00908.  None of the follow-up visits in 2015 indicated any complaints from Ms. Plaisance about hair loss.  It was not until March 2016—nearly two years after starting endocrine therapy—that she complained to any physician about hair loss again. Ex. L (3.24.2016 Derm. Rec.); Ex. M (Plaisance Dep.) at 221:25-222:3.

In other words, the evidence is:  (i) Ms. Plaisance's chemotherapy-induced alopecia resolved within approximately ten or so months of completing chemotherapy; (ii) she did not complain of nor seek treatment for alopecia from any physician for the fourteen-month period of time between January 2015 and March 2016, even though Ms. Plaisance since 2003 has consistently sought treatment for hair loss when she has concerns; and (iii) after being on endocrine therapy for nearly two years, Ms. Plaisance complained of hair thinning/loss to a dermatologist.  This sequence of events corresponds fully with Dr. Tosti's diagnosis of endocrine-induced alopecia.  Thus, by her own methodology, Dr. Tosti cannot rule out endocrine-induced alopecia as the cause of Ms. Plaisance's hair loss.

Dr. Tosti attempts to sidestep this inevitable conclusion by pointing to Dr. Chauvin's testimony that "I looked back at my notes, and I did put that her alopecia was resolved.  But she probably did have partial hair loss at that time."  Ex. F (Chavin Dep.) at 63:19-22; *see* Ex. O (Tosti Dep.) at 114:24-115:7, 240:9-13.  But the question under Dr. Tosti's method is not whether Ms. Plaisance had any partial hair loss, it is whether she had "normal hair **regrowth** after chemotherapy"—in other words, whether her hair loss **from her chemotherapy** had resolved. Ms. Plaisance had a long history of alopecia before developing breast cancer and taking chemotherapy.  Thus, Dr. Chauvin's speculation that Ms. Plaisance could have had partial hair

loss in 2015 was entirely consistent with this pre-existing hair loss (and with Ms. Plaisance's ten-month use of Femara by that point).

More importantly, however, Dr. Chauvin was crystal clear in her deposition about what she actually meant regarding her 2015 records and that Ms. Plaisance's ***chemotherapy-induced*** hair loss had resolved:

> Q. And is this a record of your next follow-up visit which was on January 14, 2015?
>
> A. Yes.
>
> Q. And now this was about twelve months since you had first started treating Ms. Plaisance for her breast cancer and about ten months since she had completed chemotherapy in March 2014; is that right?
>
> A. Uh-huh.
>
> Q. And under your physical exam, did you again examine her head that day?
>
> A. Yes.
>
> ***Q. And did you note that her alopecia resolved?***
>
> ***A. Yes.***
>
> ***Q. And based on your treatment of her, including your physical examination of her head, you determined she no longer had chemotherapy-induced alopecia?***
>
> ***A. Yes.***
>
> Q. And did Ms. Plaisance raise any concern with you about her hair during this visit?
>
> A. I'll have to look at the HPI.  It does not look that way, no.
>
> ***Q. And as you have done in the past, if she had raised concern about her hair regrowth or had been concerned about unsatisfactory hair regrowth, you would have included that in the record; correct?***
>
> ***A. Yes.***
>
> Q. And you would have also addressed it in your plan?
>
> A. Yes.

11

Ex. F (Chauvin Dep.) at 125:9-126:15 (emphasis added).

Thus, Dr. Tosti's own methodology points to endocrine therapy, not chemotherapy as the cause of Ms. Plaisance's hair loss.

**B.    Dr. Tosti's Opinions Are Based on an Incomplete Review of the Medical Records.**

"[A]n expert must be aware of the plaintiff's pertinent medical history."  *McNabney v. Lab'y Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005) (per curiam) (citing *Viterbo*, 826 F.2d at 423) (rejecting expert testimony where the history an expert witness "used lacked reliability because it was incomplete in a critical area," specifically an awareness of the plaintiff's relevant medical history (citation omitted)).  Exclusion of specific causation opinions is appropriate when a medical expert "based his opinion on the plaintiff patient's oral history" while "unaware of the plaintiff's relevant medical symptoms" and relevant medical history.  *Id.* (summarizing *Viterbo*).

Dr. Tosti admitted that she was unaware of, and thus failed to consider, Ms. Plaisance's long history of alopecia prior to her breast cancer diagnosis when Dr. Tosti concluded she has PCIA.  Dr. Tosti testified at her deposition in this case that "for any medical disorder[,] clinical history is the ***most*** important thing, and it should be very accurate."  Ex. O (Tosti Dep.) at 55:24-56:1 (emphasis added).  She further testified in the *Kahn* trial that she strives to get the most accurate clinical history she can because an inaccurate history can impact the reliability of her diagnosis.  She controls for accuracy in what her patients tell her by checking the information in the medical records:

> Q.   And the clinical history is important, true?
>
> A.   Absolutely, yes.  The clinical history is very important.
>
> Q.   It's important not just in terms of, it provides, of course, information, it is important in terms of making a diagnosis, correct?
>
> A.   Yes, I agree with that.
>
> Q.   Okay. And when you take a clinical history, you want to be careful, and you want to make sure that you get an accurate history, true?

12

A.   I try to get the best accurate history, yes.

\* \* \* \* \*

Q.   Yeah. You said when you're getting a clinical history, that it's your belief that you're being provided with accurate information; is that fair?

A.   Yes.  That's my -- my attitude, yes.

Q.   Sure.  But the issue really is that, if the information in that clinical history is inaccurate, that can impact the reliability of your diagnosis, true?

A.   That's why I check all the information in the medical records.

Q.   Let me make sure I get an answer to that question.  Isn't it true that if you get an inaccurate clinical history, that that can impact the reliability of your diagnosis?

A.   Yes, if you don't control the accuracy.  But I control that accuracy with the medical records.  So I don't believe I was inaccurate.  I was very accurate.

Ex. P, Trial Tr. (Afternoon), *Kahn v. Sanofi-Aventis U.S. LLC,* No. 16-cv-17039 (Nov. 10, 2021), 757:16-758:1, 760:13-761:2.

Yet, when Dr. Tosti concluded on May 7, 2021 that Ms. Plaisance has PCIA, she did so on the basis of a significantly inaccurate and incomplete clinical history.  Dr. Tosti failed to follow the methodology that she asserts must be conducted to diagnose alopecia reliably.  *Cf. In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Jan. 29, 2021), ECF No. 12098, at 12-13 ("*Kahn II*") (finding significant how expert himself has independently written that a certain methodology is deficient, yet purports to follow said methodology in reaching conclusions for litigation).

Ms. Plaisance had a long history of documented hair loss issues pre-dating her December 2013 cancer diagnosis by a decade.  Her dermatologist, Dr. Jones, diagnosed her with female pattern alopecia and telogen effluvium on at least *15 occasions* between 2003 and 2010.  Ex. B (Acadia Derm. Rec.).  Dr. Tosti was wholly unaware of this history and had not reviewed these records before she diagnosed Ms. Plaisance with PCIA in May 2021 or before she submitted her expert report on August 2:

13

> Q.  Similarly, with regard to the medical records of Dr. Jones that you just read two days ago, because you had not read them until two days ago, you had not considered those records in preparing your opinions in this case; correct?
>
> A.  Correct.

Ex. O (Tosti Dep.) at 21:4-10.  Moreover, although Dr. Tosti had read the medical records of Ms. Plaisance's current dermatologist, Dr. Matherne, before the clinical exam, she did not read Dr. Matherne's testimony explaining and interpreting those records until approximately a week before her deposition.  *Id.* at 20:4-9.

Instead, Dr. Tosti's understanding of Ms. Plaisance's clinical hair history derives largely from Ms. Plaisance's recollection, as conveyed to Dr. Tosti in May of this year.  Ms. Plaisance told Dr. Tosti she had "normal hair density before chemotherapy" and that "she had an episode of excessive hair loss in the past, before chemotherapy, possibly in 2010."  Ex. A (Tosti Rep.) at 20.  That is the pre-breast cancer hair history on which Dr. Tosti bases her PCIA opinion.

When presented with Dr. Jones's records of Ms. Plaisance's pre-chemotherapy hair loss, Dr. Tosti admitted that she would have liked to have had access to them before examining Ms. Plaisance and before forming her opinions:

> Q.  But this is information you would have liked to have known about before two or three days ago; correct?
>
> A.  Yes, of course.
>
> Q.  You would have liked to have known about this information before you prepared your expert report; correct?
>
> A.  Yes.
>
> Q.  Is this information you would have liked to have known about on May 7 during Ms. Plaisance's clinical exam?
>
> A.  Yes. That's when I would really like to have had the information, before the clinical exam.
>
> Q.  And because you didn't have this information until a few days ago, your opinions in this case do not address or account for this February 2003 dermatology record noting hair thinning, hair loss, and alopecia in 2003; correct?

14

MR. SCHANKER: Objection; form.

A.   Yes.

Ex. O (Tosti Dep.) at 179:20-180:16.  A similar exchange occurred for each of the ***fifteen***

dermatological records that Dr. Tosti did not review in advance of the clinical exam or service of

her report.  For each record, Dr. Tosti admits that she would have wanted to review the record

before examining Ms. Plaisance and before making her expert conclusions.  *Id.* at 184:3-14,

186:14-21, 190:13-20, 192:19-193:2, 196:3-10, 198:22-199:4, 202:9-16, 204:21-205:3,

207:11-18, 209:13-21, 210:20-211:2, 212:6-13, 213:8-16, 215:9-16.

This case is like *McNabney v. Laboratory Corporation of America*, where the plaintiff's

causation expert stated that although he met with the plaintiff to conduct an exam, "he did not

review *any* medical records" pre-dating the alleged injury in question, and thus, he "was unaware

that Plaintiff had complained of many of the *same* symptoms before" sustaining the alleged

injury.  2004 WL 3241969, at *4 (W.D. Tex. Dec. 9, 2004), *aff'd*, 153 F. App'x 293 (5th Cir.

2005).  The district court held that the causation expert's "diagnosis was based solely on his one-

time examination and the history provided by the patient at that time," and the history upon

which the expert "relied was incomplete and wholly inadequate."  *Id.* at *5.  In affirming, the

Fifth Circuit noted that the plaintiff's causation expert "failed to exclude other possible causes of

[the plaintiff's injury], in part because he was unaware of [the plaintiff's] past medical history."

*McNabney*, 153 F. App'x at 295.

At her deposition, in response to Plaintiffs' counsel's questions, Dr. Tosti blithely

suggested that these 15 medical records she had reviewed only 2 days before her deposition did

not affect her conclusion that Plaisance has PCIA.  But this belated opinion is too little, too late,

and she cannot shrug off the records indicating other possible causes of Plaintiff's hair loss—

*e.g.*, female pattern hair loss—so easily.  It is the hallmark of an unreliable expert opinion when

the expert forms the opinion first, and then reviews the record.  *See Downs v. Perstorp*

*Components, Inc.*, 26 F. App'x 472, 476 (6th Cir. 2002) (identifying as a "red flag[ ]" that the

expert "reached a conclusion before conducting any research" and essentially "reason[ed] backwards from [Plaintiff's] condition").

The fact of the matter is that Dr. Tosti did not review or consider medical records that she concedes she undoubtedly would and should have. Moreover, although she gave the conclusory opinion that these crucial records regarding pre-existing hair loss would not have changed her ultimate opinion, she did not provide any valid explanation or analysis for why that is the case. Dr. Tosti did not engage in any methodology that attempted to rule out this pre-existing condition. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017) (noting that to ensure the "weight of the evidence criteria 'is truly a methodology, rather than a mere conclusion-oriented selection process … there must be a *scientific method* of weighting that is used and *explained*'" (alteration in original) (emphasis added) (citation omitted)). Dr. Tosti's specific causation opinion is unreliable. *McNabney*, 153 F. App'x at 295.

## II.   DR. TOSTI'S GENERAL CAUSATION OPINIONS ARE INADMISSIBLE.

Dr. Tosti opines that docetaxel causes PCIA. *See* Ex. A (Tosti Rep.) at 14. She does not identify, much less describe, the methodology by which she arrives at this conclusion. For example, Dr. Tosti did not conduct a Bradford-Hill analysis. Instead, she simply lists the sources of her conclusions. That is not enough. Dr. Tosti must explain the methodology she used to arrive at her conclusions so that its reliability can be validated and tested. *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3rd Cir. 2008) (affirming lower court's exclusion of expert's opinions, notably because the "report and deposition testimony fail to demonstrate any methodology, let alone peer-reviewed or generally accepted methodology, underlying" his conclusion).

Dr. Tosti's opinion that docetaxel causes PCIA is based on: (1) her reliance on the expert reports of Dr. David Madigan and Dr. Ellen Feigal; (2) her review of the medical literature and counting of the number of reports of PCIA in chemotherapy regimens with docetaxel; (3) her review of Sanofi's 2015 Clinical Overview; and (4) her experience treating alopecia. *See* Ex. A

(Tosti Rep.) at 15-19, 35.  They do not provide a valid basis for Dr. Tosti's general causation opinion.

### A.      Dr. Tosti's Reliance on Drs. Madigan and Feigal Is Misplaced.

Dr. Tosti states that "the expert reports of Dr. Madigan and Dr. Feigal support my experience as a clinician and researcher that Taxotere/docetaxel causes PCIA."  Ex. A (Tosti Rep.) at 17.  Based upon her review of those reports, "Taxotere/docetaxel is the only drug for which a causal association has been found."  *Id.* at 17.  She further elaborates that "Dr. Madigan and Dr. Feigal show that there is not a signal of PCIA with (Ms. Plaisance's) chemotherapy drugs other than Taxotere/docetaxel."  *See id.* at 35.  These opinions should be excluded for the following reasons.

*First*, Dr. Feigal's and Dr. Madigan's opinions on a "signal" do not show causation.  Dr. Feigal does not even offer signal detection opinions.  Rather, she cites to Dr. Madigan's signal detection opinions in her report, but conceded in her deposition that signal detection has nothing to do with Dr. Feigal's general causation opinion and that she blindly accepted Dr. Madigan's FAERS signaling opinions without any analysis of her own.  *See* Hospira's Mem. in Supp. of Mot. To Exclude or Limit Opinions of Dr. Ellen G. Feigal (Nov. 12, 2021).  This Court has already precluded Dr. Madigan from offering any causation opinions, and he has admitted that his "signal" opinions, based on adverse event reports in the FAERS database, do not show causation.  *See* Hospira's Mem. in Supp. of Mot. To Exclude or Limit Opinions of Dr. David Madigan (Nov. 12, 2021).

*Second*, this Court has excluded Dr. Madigan's observational meta-analysis as unreliable because of the high level of heterogeneity among the studies.  *See Kahn II* at 12-13.  Dr. Tosti does not conduct any meta-analysis of her own or opine that the literature shows a statistically significant risk to support her general causation opinions.  Nor could she.  Dr. Tosti has disclaimed any knowledge or expertise in statistics.  *See, e.g.*, Ex. Q, Deposition of Dr. Antonella

Tosti, *Kahn v. Sanofi S.A. et al*, 2:16-cv-17039 (Sept. 29, 2020) ("Sept. 29, 2020 Tosti Dep.") at 26:16-20, 29:9-17.

 *Third,* the Court has already held that unverified reliance on another expert is improper. *See In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Feb. 2, 2021), ECF No. 12109, at 9 ("To the extent she relies on opinions from Dr. Feigal, Dr. Bosserman did not validate these opinions in any way in her report.  This is the kind of 'unblinking reliance' on another expert's opinion that violates Federal Rule of Evidence 703."); *see also In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999) (excluding expert's opinion because "unblinking reliance" on another's opinion demonstrates that the expert's opinion was flawed under *Daubert*); *Burst*, 120 F. Supp. 3d at 554 ("[T]o the extent Dr. Harrison relies on Dr. Infante's report and the studies cited therein, his opinion is inadmissible because it reflects no original analysis or any evaluation of Dr. Infante's methodology or the studies upon which he relies.").

  **B.** **Dr. Tosti's Case-Counting of PCIA Reports in the Literature Is Unreliable.**

 Dr. Tosti reviewed "22 articles and abstracts regarding distinct cases of permanent chemotherapy-induced alopecia in the context of adjuvant breast cancer chemotherapy …."  Ex. A (Tosti Rep.) at 15.  She counted the reported cases of PCIA in those publications to conclude: "there are only 52 cases of permanent alopecia reported with non-taxane regimens with anthracyclines and/or cyclophosphamide in comparison with 650 reported cases with taxane regimens—487 of which are Taxotere/docetaxel regimens." *Id.*  From this exercise, Dr. Tosti concludes that docetaxel causes breast cancer. *Id.* at 15, 35.

 Dr. Tosti does not explain why merely tallying up case reports provides any relevant statistical or epidemiological information.  These calculations do not assist the jury in determining the causation issues.  Indeed, in the *Kahn* trial, Dr. Tosti testified that counting the number of reported cases of PCIA in docetaxel regimens is improper for determining risk or causation:

  Q. Doctor, you wrote down the number that had been reported for cases of
    Taxotere chemotherapy-induced hair loss and then you added them up, right?

A.   Yes, I reviewed and added them.

\*   \*   \*   \*   \*

Q.   So wait, let me ask a question, okay?  And my question is, you would agree
with me that you cannot just count the reports in a paper and make a
conclusion on which one of the drugs in that paper has a greater risk, right?

A.   Yes.  But this is not what I did.  And this should be very clear to the jury
because I want to clarify.  I didn't go and pick out cases and -- I just
summarize what the authors of the papers, the scientist reported in their
work.

Q.   And that's because, Doctor, you would also agree that you cannot determine
the risk for chemotherapies just by counting the number of reports or in this
case pom-poms, right?

A.   I did -- I didn't do that. I agree that's not the right methodology.

Ex. P, Trial Tr. (Afternoon), *Kahn v. Sanofi-Aventis U.S. LLC,* No. 16-cv-17039 (Nov. 10, 2021),

at 703:8-11, 704:9-22 (emphasis added); *see Sandifer*, 907 F.3d at 809 (explaining expert

opinion "must 'help the trier of fact to understand the evidence or to determine a fact in issue'"

(quoting Fed. R. Evid. 702)).

The calculations are also unreliable because they do not account for the differences in the

patients involved in the studies.  When there are significant differences in the design of the

various studies, it is improper to combine their results without accounting for those differences.

*Kahn II* at 12-13 (excluding Dr. Madigan's meta-analysis as unreliable due to the high level of

heterogeneity among the studies—a limitation of the analysis that Dr. Madigan himself

acknowledged).  Dr. Tosti does not even attempt to address the differences in the studies.  Thus,

she should not be allowed to opine that docetaxel causes PCIA based on her case counts.

### C.   Sanofi's Clinical Overview Does Not Prove Causation.

Dr. Tosti cites two paragraphs in Sanofi's Clinical Overview and concludes, without

discussion, that this analysis demonstrates docetaxel causes PCIA.  It does nothing of the sort,

and Dr. Tosti's mere citation to a document without connecting the dots on how the information

in that document demonstrates her general causation opinion is fatal to that opinion.

Dr. Tosti's *ipse dixit* regarding the significance of the Sanofi analysis is improper. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see Moore*, 151 F.3d at 277-78.  More importantly, it is also contradicted by the record.  When the FDA reviewed the information concerning PCIA submitted by Sanofi to the Agency—including the 2015 Clinical Overview— the FDA did not conclude that docetaxel causes PCIA.  Quite the opposite.  The Agency (Tatiana Prowell) concluded that "I think the Sponsor's (Sanofi's) simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data."  Ex. R (FDA Nov. 2015 Email).  Since 2016, the FDA-approved docetaxel labeling has never stated docetaxel causes PCIA.  Rather, the label simply states the unremarkable and uncontroversial fact that "cases of permanent hair loss have been reported." Dr. Tosti cannot use the Sanofi Clinical Overview to prove general causation.

### D.      Dr. Tosti's Experience Does Not Prove Causation

Dr. Tosti supports her opinion that docetaxel causes PCIA based on her own clinical and research experience.  *See* Ex. A (Tosti Rep.) at 17.  Dr. Tosti does not describe what she specifically means by "experience as a clinician and researcher" nor how those undefined experiences lead her to conclude that docetaxel causes PCIA.  *See id.*  But the Advisory Committee notes to amended Rule 702 make clear that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain ***how*** that experience leads to the conclusion reached, ***why*** that experience is a sufficient basis for the opinion, and ***how*** that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Fed. R. Evid. 702 advisory committee's note to 2000 amendments (emphasis added) (citation omitted).  Dr. Tosti has not met the requirements of Rule 702.

## III.    DR. TOSTI'S SUBSTANTIAL CONTRIBUTING FACTOR OPINION INVADES THE PROVINCE OF THE JURY.

Dr. Tosti opines that docetaxel is "the factor that substantially contributed to causing [Ms. Plaisance's] PCIA."  Ex. A (Tosti Rep.) at 35.  In the *Kahn* case, the Court excluded similar opinions by Dr. Plunkett.  As the Court explained:

> This opinion would "invade the province of the jury."  The jury will be tasked with determining proximate causation, and in the *Earnest* trial, the jury was instructed, per Louisiana law, to consider whether "Defendants' conduct was a 'substantial contributing factor' in bringing about the [alleged injury]."  If Dr. Plunkett were to tell the jury that Taxotere was a "substantial contributing factor" that led to permanent alopecia in patients who took combination regimens, the jury may see this as a direct answer to the question of proximate causation.  For these reasons, Dr. Plunkett may not testify that in combination regimens, Taxotere is a "substantial contributing factor" to permanent alopecia.

*In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Jan. 13, 2021), ECF No. 11823, at 5-6 (footnotes and citations omitted); *see also In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (July 23, 2021), ECF No. 13131, at 5 ("[O]pinions are just the sort of causation opinions that this Court previously ruled inadmissible.").

For these same reasons, the Court should preclude Dr. Tosti from testifying that docetaxel was a substantial contributing factor in Ms. Plaisance's hair loss.

## CONCLUSION

For foregoing reasons, Dr. Tosti's opinions should be excluded in their entirety.

Dated: November 12, 2021

Respectfully submitted,

*/s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Telephone: 202-434-5000
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Telephone: 504-858-7000
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc.,*
*Hospira Worldwide, LLC, and Pfizer Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Heidi K. Hubbard*