# EXHIBIT N

```
 1
 2            UNITED STATES DISTRICT COURT
 3            EASTERN DISTRICT OF LOUISIANA
 4   * * * * * * * * * * * * * * * * * * * * * * * *
 5   IN RE: TAXOTERE (DOCETAXEL)   MDL NO. 2740
     PRODUCT LIABILITY
 6   LITIGATION                    SECTION "N" (5)
                                   JUDGE MILAZZO
 7
     This Document Relates to:
 8
 9   Audrey Plaisance vs.
     Hospira, Inc., et al.,        MAG. JUDGE NORTH
10   No. 2:18-cv-08086
11
     * * * * * * * * * * * * * * * * * * * * * * * *
12
13                   Deposition of
                  RYAN MATHERNE, M.D.
14                   Volume II of II
15              taken on October 30, 2020
                commencing at 1:05 p.m.
16
                 via Zoom videoconference
17               with witness appearing in
18                  Thibodaux, Louisiana
19
20
21
22
23
24
25
```

### Page 132

1  APPEARANCES:
2
3  ATTORNEYS FOR PLAINTIFFS:
   Davis & Crump PC
4  2601 14th Street
   Gulfport, Mississippi 39501
5  800.277.0300
   taylor.hardenstein@daviscrump.com
6  trevor.rockstad@daviscrump.com
   BY: TAYLOR HARDENSTEIN, ESQ.
7      TREVOR ROCKSTAD, ESQ.
8
9  ATTORNEYS FOR DEFENDANTS:
   Dechert LLP
10 1095 Avenue of the Americas
   New York, New York 10036
11 212.641.5665
   mara.cuskergonzalez@dechert.com
12 BY: MARA CUSKER GONZALEZ, ESQ.
       GABRIELLE PIPER, ESQ.
13     LAUREN GUMEROVE, ESQ.
14
15 ALSO PRESENT:
   Ren, Videographer
16
17
18 Reported by: Evangeline A. Langston, CCR, RPR
       Certified Court Reporter
19     in and for the State of Louisiana,
       Federal Certified Realtime Reporter,
20     Registered Professional Reporter
21
22
23
24
25

### Page 133

1  * * * * * * * * * * * * * * * * * * * *
2          I N D E X
3                                  Page
4  Caption                         131
5  Appearances                     132
6  Stipulations                    135
7  Examination by
8    MS. CUSKER GONZALEZ           137
9  Reporter's Certificate          164
10 Witness's Certificate           167

### Page 134

1  * * * * * * * * * * * * * * * * * * * *
2          E X H I B I T S
3  Number      Description            Page
4  Exhibit 19  Recent office visit    138
5  Exhibit 20  Identifier photo       139

### Page 135

1         STIPULATIONS
2      It is stipulated and agreed by and between
3  counsel for the parties hereto that the deposition
4  of the aforementioned witness is hereby being taken
5  under the Louisiana Code of Civil Procedure, for all
6  purposes, in accordance with law;
7      That the formalities of reading, signing,
8  certification and filing are specifically not
9  waived;
10     That all objections, save those as to the
11 form of the question and the responsiveness of the
12 answer, are hereby reserved until such time as this
13 deposition, or any part thereof, may be used or
14 sought to be used in evidence.
15
16          * * * * *
17
18     EVANGELINE A. LANGSTON, RPR, Certified Court
19 Reporter, in and for the State of Louisiana,
20 officiated in administering the oath to the witness.

Page 136

1  THE VIDEOGRAPHER: Good afternoon.
2  We're now on the record. Today's date is
3  October 30th, 2020, and the time is now
4  approximately 1:05 p.m.
5  This begins the video recorded
6  deposition of Dr. Ryan Matherne in the
7  matter of Plaisance versus Hospira
8  Worldwide, LLC, et al.
9  Would counsel please identify
10  yourselves for the record?
11  MS. CUSKER GONZALEZ: I'm Mara Cusker
12  Gonzalez from Dechert, representing
13  Hospira, and I'm joined by my two
14  colleagues, Lauren Gumerove and Gabrielle
15  Piper. They are not on video, but they
16  are attending as well.
17  MR. HARDENSTEIN: Taylor Hardenstein,
18  representing Plaintiff Audry Plaisance,
19  and also on the line is my colleague
20  Trevor Rockstad, also representing the
21  plaintiff.
22  THE VIDEOGRAPHER: Would the court
23  reporter please swear in the witness?
24
25

Page 137

1  Ryan Matherne, M.D.,
   416 LA-308
2  Thibodaux, Louisiana 70301
   having been first duly sworn,
3  testified as follows:
4  EXAMINATION
5  BY MS. CUSKER GONZALEZ:
6  Q. Hi, Dr. Matherne.
7  A. Hey.
8  Q. Again, I'm Mara Cusker Gonzalez. I
9  represent Hospira. Thanks for making time for this
10  today.
11  Could you please state your full name
12  again for the record?
13  A. Yes. My name is Ryan Joseph Matherne.
14  I'm a board-certified dermatologist and
15  dermatopathologist, and I have my practice, which is
16  Matherne Dermatology.
17  Q. Thank you.
18  And where are you located today?
19  A. 416 Highway 308, Thibodaux, Louisiana,
20  70301.
21  Q. And, Doctor, did you do anything between
22  the time that we finished part one of your
23  deposition last week and today to prepare for the
24  completion of your deposition?
25  A. No, no additional preparation. The only

Page 138

1  thing was that I recall this week someone from
2  somewhere contacted my office asking for the office
3  visit from Mrs. Plaisance that was done a couple
4  days prior to our last time together and also a
5  photo which was her profile picture on her chart.
6  Q. Thank you.
7  And other than in connection with
8  scheduling the deposition, did you talk with anyone
9  about your deposition today?
10  A. No.
11  Q. And I will start by marking two
12  exhibits, and I believe these are the documents that
13  you just mentioned.
14  (Exhibit Number 19 was marked for
15  identification.)
16  MS. CUSKER GONZALEZ: Gabby, if you
17  can mark and show -- these aren't -- I
18  don't know if you have copies in front of
19  you, but we'll show them on the screen,
20  starting with Exhibit 19.
21  BY MS. CUSKER GONZALEZ:
22  Q. My colleague Gabrielle will show that on
23  the screen for us.
24  Can you see that document, Doctor?
25  A. Yes, ma'am.

Page 139

1  Q. And is this a record of your last visit
2  with Mrs. Plaisance, and that was on
3  October 22nd, 2020?
4  A. Yes.
5  Q. And --
6  MS. CUSKER GONZALEZ: Thanks, Gabby.
7  If you could turn back to the first page
8  of that document.
9  BY MS. CUSKER GONZALEZ:
10  Q. Doctor, with respect to Mrs. Plaisance's
11  scalp, the condition on which she was following up
12  and for which you treated her that day was oily
13  skin; is that right?
14  A. Yeah.
15  Q. Thanks.
16  And let's now mark as Exhibit 20.
17  (Exhibit Number 20 was marked for
18  identification.)
19  MS. CUSKER GONZALEZ: And Gabby will
20  show this as well.
21  BY MS. CUSKER GONZALEZ:
22  Q. Doctor, you had previously testified
23  that your office typically takes and maintains an
24  identifier photo for your patients; is that right?
25  A. Yes.

3 (Pages 136 - 139)

Page 140

1  Q. And looking at this photo on the screen,
2  Exhibit 20, is this the identifier photo that your
3  office has for Mrs. Plaisance?
4  A. Yes.
5  Q. Do you know when it was taken?
6  A. No, but I can look relatively quickly if
7  y'all have a second.
8  Q. Sure. Thank you.
9  A. Okay. That photo was taken
10 March 2nd, 2017.
11 Q. Thank you.
12 A. You're welcome.
13 Q. And can you tell me what you consulted
14 to determine that date?
15 A. Oh, so I guess I can show you our
16 electronic medical record here. So this is a list
17 of the attachments that we have in her chart, and it
18 says right here this file is patient image. You
19 click on it, brings up that same image.
20 Q. Thank you.
21 A. And the date next to it is 3/2/17.
22 Q. Thank you.
23 A. You're welcome.
24 Q. And is that the only image that you have
25 in the system for Mrs. Plaisance?

Page 141

1  A. Yes.
2  Q. Thanks.
3     And, Doctor, do you have the binder of
4  documents that we looked at last time?
5  A. Yes.
6  Q. Thanks. If you can pull that and turn
7  to Tab 3 of that binder.
8  A. Okay.
9  Q. And we marked that as Exhibit 18.
10    And if you can turn to the page marked
11 41 at the bottom with a Plaisance Skin Path
12 Diagnostics Bates stamp and the Number 41.
13 A. Okay. Got it.
14 Q. And, Doctor, is this a record of a visit
15 you had with Mrs. Plaisance on January 4th, 2018?
16 A. Yes.
17 Q. And you treated her that day for
18 follow-up on seb derm of the scalp, acne, necrotica
19 miliaris on the scalp, and alopecia on the scalp;
20 correct?
21 A. Yes.
22 Q. And she reported to you that day that
23 her alopecia was better than when she saw you in May
24 2017?
25 A. Yes.

Page 142

1  Q. Is that right?
2  A. Yes.
3  Q. And that's when, in May 2017 is when she
4  had been given the Viviscal supplement?
5  A. Yes.
6  Q. And she reported in January 2018
7  improvement of her alopecia with treatment?
8  A. Yes.
9  Q. And she also reported improvement of her
10 acne necrotica miliaris with treatment; is that
11 right?
12 A. Yes.
13 Q. And you conducted a scalp and hair
14 inspection during that visit?
15 A. Yes.
16 Q. And Mrs. Plaisance still had seb derm
17 and acne necrotic miliaris that required treatment;
18 correct?
19 A. Yes.
20 Q. And for the seb derm, in addition to the
21 treatment course that you prescribed previously,
22 including steroid injections, the keto shampoo, and
23 hydrocortisone cream, did you also prescribe for her
24 salicylic acid shampoo?
25 A. Yes.

Page 143

1  Q. And why did you prescribe that?
2  A. To provide better control for the
3  seborrheic dermatitis. We're always trying to
4  optimize therapy, and in treatment of seborrheic
5  dermatitis, if one can alternate shampoos that each
6  have a different method of action toward improving
7  the seborrheic dermatitis, you can achieve an
8  optimum result.
9  Q. And were you continuing to treat
10 Mrs. Plaisance for alopecia that you believe was
11 caused by her seb derm?
12 A. Yes.
13 Q. And you also continued the Viviscal for
14 her alopecia?
15 A. Yes.
16 Q. Thanks.
17    And, Doctor, if you can turn next to the
18 next two visits that follow in that same tab, it
19 will be Page 45 of the Matherne Dermatology record,
20 and that's the March 1st, 2018, visit.
21    Do you see that?
22 A. Yes.
23 Q. And then -- and I'll give you a chance
24 to look at these. If you can turn just two more
25 pages to Page 46, and this is Page 46 of Skin Path

4 (Pages 140 - 143)

Page 144

1  Diagnostics.
2       Do you see that April 5, 2018 visit?
3    A.  Yes.
4    Q.  Thank you. And if you can just review
5  those two visits, and I'll ask you a few questions.
6  Thank you.
7    A.  Okay.
8    Q.  Thank you.
9        And, Doctor, do these visits generally
10 follow the same course of treatment as the last
11 visit we looked at in January of 2018?
12   A.  Meaning? What -- you mean for those
13 specific diagnoses?
14   Q.  Yes. Continuing to treat seb derm?
15   A.  Yes.
16   Q.  Acne necrotic miliaris and alopecia?
17   A.  Yes.
18   Q.  And did Mrs. Plaisance continue to
19 report that her alopecia was improved with the
20 treatment you were recommending and prescribing for
21 her?
22   A.  Yes.
23   Q.  And based on your examination of her
24 hair and scalp, did you also note that her alopecia
25 was improved?

Page 145

1    A.  Yes.
2    Q.  And did you determine during this time
3  to discontinue administering steroid injections to
4  the scalp?
5    A.  Yes. We did not do steroid injections
6  at this visit.
7    Q.  And was that based on improvement that
8  you were seeing with the other treatments you were
9  prescribing --
10   A.  Yeah.
11   Q.  -- for her hair and scalp?
12   A.  Yes.
13   Q.  Thanks.
14       And, Doctor, if you can turn to the next
15 visit, which is Page 49.
16       Do you see that?
17   A.  Yes.
18   Q.  Is this a November 1st, 2018 visit that
19 you had with Mrs. Plaisance?
20   A.  Yes.
21   Q.  And under HPI, you noted that she
22 complained about loss of eyelashes; correct?
23   A.  Yes.
24   Q.  And Mrs. Plaisance described this
25 eyelash loss as mild in severity; is that right?

Page 146

1    A.  Yes.
2    Q.  And you noted also in HPI that
3  Mrs. Plaisance had a history of systemic disease.
4        Do you see that?
5    A.  I see that. Yeah, I'm not sure -- I
6  guess that would signify diabetes, hypertension,
7  other systemic diseases.
8    Q.  And you diagnosed her that day with
9  itching and atopic dermatitis throughout the body?
10   A.  Yes.
11   Q.  Is that right?
12   A.  Uh-huh.
13   Q.  And she was taking antihistamines for
14 the itching at that time?
15   A.  Yeah. Yes.
16   Q.  And I'm referring to the HPI notes that
17 she's currently using antihistamines?
18   A.  Yes.
19   Q.  And you recommended that she continue
20 the antihistamine use?
21   A.  Yes.
22   Q.  And you also diagnosed Mrs. Plaisance
23 with hypotrichosis of the eyelids?
24   A.  Yes.
25   Q.  Is that right?

Page 147

1    A.  Yes.
2    Q.  And what is hypotrichosis?
3    A.  It's a reduction in hair.
4    Q.  Did you identify a cause of
5  hypotrichosis --
6    A.  I did not.
7    Q.  -- of the eyelids?
8    A.  No.
9    Q.  And under your plan, did you note that
10 hypotrichosis can be genetic or related to an
11 autoimmune condition?
12   A.  Yes.
13   Q.  And based on your care and treatment of
14 patients, can genetics -- both genetics and
15 autoimmune conditions result in eyelash loss?
16   A.  Yes.
17   Q.  And you directed Mrs. Plaisance to
18 contact your office -- sorry, let me back up.
19       You prescribed Latisse for this
20 condition; is that right?
21   A.  Yes.
22   Q.  And then you directed Mrs. Plaisance to
23 contact your office if the condition did not improve
24 or if it worsened, despite the treatment; is that
25 right?

5 (Pages 144 - 147)

Page 148

1   A.  Yes.  Yes.
2   Q.  And, Doctor, based on your care and
3   treatment of patients, can use of electrolysis for
4   eyebrow grooming lead to permanent loss of eyebrow
5   hair?
6   A.  Yes.
7   Q.  And, Doctor, are you familiar with a
8   condition called trichiasis?  I don't know if I'm
9   pronouncing that right.
10  A.  How do you spell it?
11  Q.  Sure.
12      T-r-i-c-h-i-a-s-i-s.
13  A.  Yes.
14  Q.  And can that condition involve abnormal
15  eyelash growth?
16  A.  Yes.
17  Q.  And can it be treated by removal of
18  eyelashes?
19  A.  Yes.
20  Q.  Were you aware that Mrs. Plaisance was
21  treated for that condition in April, July, and
22  September of 2018 by an ophthalmologist?
23  A.  No, I was not.
24  Q.  And if she had removal by the
25  ophthalmologist of eyelashes with jewelers forceps,

Page 149

1   is that something that could impact her eyelash
2   growth?
3   A.  Yes.
4   Q.  Let's turn now to Page 53, Doctor, and
5   this should be a November 15th, 2018 record.
6       Do you see that?
7   A.  Yes.
8   Q.  And Mrs. Plaisance was there that day
9   for a follow-up on atopic dermatitis and alopecia?
10  A.  Yes.
11  Q.  And as to alopecia, she continued to
12  report that it was better with treatment; is that
13  right?
14  A.  Yes.
15  Q.  And you also examined her and noted that
16  her alopecia was improved?
17  A.  Yes.
18  Q.  And there's a note in the HPI under
19  alopecia that it was interfering with grooming.
20      Do you see that?
21  A.  Yes.
22  Q.  And what does that mean?
23  A.  That just means she was having trouble
24  hiding her area of hair loss by the way she styled
25  her hair.

Page 150

1   Q.  And Mrs. Plaisance continued on the
2   Viviscal?
3   A.  Yes.
4   Q.  And did she complain about her eyelashes
5   at this visit?
6   A.  I don't see where she did, so no.
7   Q.  Thanks.
8       And let's turn now to Page 57.
9       And, Doctor, is this a record of a visit
10  you had with Mrs. Plaisance on July 15, 2019?
11  A.  Yes.
12  Q.  And she was there following up on a
13  number of dermatological conditions, one of which
14  was alopecia?
15  A.  Yes.
16  Q.  And as for the alopecia, she continued
17  to report that it was better with medication?
18  A.  Yes.
19  Q.  And you also noted under your impression
20  and plan that her alopecia was improved?
21  A.  Yes.
22  Q.  And you continued the Viviscal?
23  A.  Yes.
24  Q.  And you also treated her for seb derm on
25  the scalp again with keto shampoo and fluocinonide?

Page 151

1   A.  Yes.
2   Q.  And, Doctor, based on your care and
3   treatment of Mrs. Plaisance over the years, does she
4   raise with you the dermatological conditions that
5   are bothering her?
6   A.  Yes.
7   Q.  And she does that so that you can
8   evaluate and treat them?
9   A.  Yes.
10  Q.  And that's included her concern -- her
11  complaints about hair loss?
12  A.  Yes.
13  Q.  And I tried to shortcut this, Doctor.
14      If you can turn now to Page 61.
15  A.  Okay.
16  Q.  And I'm going to ask you to look
17  through, starting with Page 61 up through Page 76,
18  and these appear to be four different visits during
19  2019.  If you can take a look through those and let
20  me know when you're done, I just have a couple of
21  questions.
22  A.  Okay.
23  Q.  Thanks.
24      And, Doctor, do these pages represent
25  records of your visit between August and December of

Page 152

1  2019 --
2  A. Yes.
3  Q. -- with Mrs. Plaisance?
4  A. Yes.
5  Q. And -- thank you.
6     Based on your review of the records, is
7  it correct that during that approximately six-month
8  period, Mrs. Plaisance was not presenting to you
9  with complaints of hair loss?
10 A. That is correct.
11 Q. And you did not diagnose her with a
12 hair-related condition at that time?
13 A. That is correct.
14 Q. And let's turn now to -- it's a little
15 bit confusing. We have the records from two
16 different sources. But after that December 12, 2019
17 visit, there should be a March 12, 2020, visit --
18 A. Yeah.
19 Q. -- on Page 75 of the Matherne
20 Dermatology records?
21 A. Yes.
22 Q. Do you see that?
23 A. Yes.
24 Q. And on that March 12, 2020 visit with
25 Mrs. Plaisance, under your HPI section of your

Page 153

1  record, did you note that she was complaining of
2  hair loss on the scalp?
3  A. I did.
4  Q. And she was complaining of, for you,
5  severe hair loss that was gradual in onset and
6  present for years?
7  A. Yes.
8  Q. And I think we've seen in the records
9  before this visit that Mrs. Plaisance described her
10 hair loss as mild in severity; is that right?
11 A. I believe so, yeah.
12 Q. Did you yourself observe a difference in
13 the clinical presentation of her hair at this visit
14 compared to the past?
15 A. No, I don't -- I don't see that.
16 Q. And you did not describe her hair loss
17 as severe in this record; correct?
18 A. No.
19 Q. And based on your examination of her
20 head and scalp at that visit, you diagnosed her with
21 oily skin on the scalp and prescribed --
22 A. Yes.
23 Q. -- the shampoo and also prescribed the
24 keto shampoo again?
25 A. Yes.

Page 154

1  Q. And is the oily skin that you diagnosed
2  related to her seb derm?
3  A. Essentially, they can be very -- very
4  similar. When there's not as much inflammation
5  there, it's more of an oily presentation. When
6  there's more inflammation, it appears dry but it's
7  just really scaly, but it's another form of oily
8  skin, essentially.
9  Q. And let's look at the last record of
10 this. That, Doctor, is Page 79.
11    Is this a record of your visit with
12 Mrs. Plaisance on June 18, 2020?
13 A. Yes.
14 Q. And she wasn't complaining of hair loss
15 at that visit; correct?
16 A. Correct.
17 Q. And she reported that her -- the oily
18 skin on her scalp was better?
19 A. Yes.
20 Q. And you continued her on the keto
21 shampoo?
22 A. Yes.
23 Q. And you did not diagnose any hair loss
24 condition that day; correct?
25 A. Correct.

Page 155

1  Q. Doctor, do you agree that your records
2  document improvement in Mrs. Plaisance's alopecia or
3  hair loss condition during this 2016 to 2020 time
4  period that you've treated her since you've had your
5  practice?
6  A. Yes.
7  Q. And is it also fair to say that the
8  scalp conditions and alopecia for which you've
9  treated Mrs. Plaisance during that 2016 to 2020 time
10 period are similar to the scalp conditions and
11 alopecia for which she was treated earlier by you
12 and your colleagues in Acadia Dermatology practice?
13 A. Yes.
14 Q. And you've treated Mrs. Plaisance now on
15 a regular basis for more than four years, including
16 for complaints of hair loss?
17 A. Yes.
18 Q. And you've never diagnosed
19 Mrs. Plaisance with permanent chemotherapy-induced
20 alopecia; correct?
21 A. Correct.
22 Q. And, Doctor, almost done. I just want
23 to ask you to run through briefly your education and
24 training, starting with your undergraduate degree.
25 A. Okay. In 2002, I completed an

7 (Pages 152 - 155)

Page 156

1 undergraduate degree at Nicholls State University in
2 Thibodaux, Louisiana, where I majored in biology and
3 minored in chemistry. From there, I subsequently
4 attended LSU School of Medicine in New Orleans where
5 I graduated in 2006.
6     From there, I completed a year of
7 internal medicine, which was an internship that's
8 required for all graduating physicians. I completed
9 that in 2007 at Earl K. Long Medical Center in Baton
10 Rouge, Louisiana.
11     Subsequently, I did my residency in
12 dermatology at University of Texas Medical Branch.
13 I completed that in 2010. And then in 2011, I
14 completed a dermatopathology fellowship at the same
15 school, University of Texas Medical Branch.
16   Q.   Thank you.
17     And are you board-certified?
18   A.   Yeah, I'm board-certified in
19 dermatology, and I'm also board-certified in
20 dermatopathology.
21   Q.   And you're currently licensed to
22 practice medicine in Louisiana; is that right?
23   A.   Yeah. Texas too.
24   Q.   You're licensed to practice in Texas as
25 well?

Page 157

1   A.   Yes. Yes.
2   Q.   And do you have any privileges at local
3 hospitals?
4   A.   Yes. I have privileges at Thibodaux
5 Regional Health System here in Thibodaux and also
6 St. James Parish Hospital in Lutcher, Louisiana.
7   Q.   And are you a member of any medical
8 organizations or societies in your field?
9   A.   Yeah, I'm a member of the American
10 Academy of Dermatology, the American Society of
11 Dermatopathology, probably several others I just
12 can't think of --
13   Q.   Sure.
14   A.   -- off the bat.
15   Q.   No problem.
16     And, last, Doctor, if you can just turn
17 to the first tab of your binder, I just want to look
18 back at the subpoena. Sorry, I'm wrong. It's
19 Tab 5. Apologies. This is Exhibit 1.
20     And I just want to ask you to take a
21 look at that last page of Exhibit 1. Do you see
22 that Exhibit A, list of requested documents?
23   A.   Yeah.
24   Q.   Can you take a look through this and
25 just let us know if you have any of these documents,

Page 158

1 and if you do, whether they would be documents that
2 are maintained separately from your office's medical
3 chart for Mrs. Plaisance?
4   A.   Well, the first one, curriculum vitae, I
5 assume you have that.
6   Q.   I don't believe we do. Is that
7 something that you have a copy of?
8   A.   It's just a resume. Yeah, it's just my
9 resume. I assume -- I think my office manager sent
10 y'all all these things.
11   Q.   Sure. I just wanted to make sure that
12 we do have what you have for Mrs. Plaisance. I know
13 we have records.
14   A.   Yeah, you have everything.
15   Q.   But -- okay.
16     And do you have any appointments
17 scheduled with Mrs. Plaisance?
18   A.   Not to my knowledge, I don't think.
19   Q.   Okay. Thank you.
20     Doctor, those are all the questions I
21 have for you today.
22   A.   Okay.
23   Q.   But my colleagues will now have a chance
24 to ask you questions. I may have some follow-up
25 after that, but other than that, I am done. Thank

Page 159

1 you for your time.
2   A.   Thanks. Thank you.
3     (Off-record discussion.)
4     THE VIDEOGRAPHER:  The time is now
5 1:34 p.m., we're going off the record.
6     (A 7-minute break was taken from 1:34
7 until 1:41 p.m.)
8     THE VIDEOGRAPHER:  The time is now
9 1:41 p.m., we're back on the record.
10 BY MR. HARDENSTEIN:
11   Q.   Good afternoon, Dr. Matherne. My name
12 is Taylor Hardenstein. I'm here today on behalf of
13 the plaintiff in the case, Ms. Audry Plaisance.
14     Have we ever met before?
15   A.   No.
16   Q.   Have we ever spoken on the phone?
17   A.   No.
18   Q.   I just have a few quick questions for
19 you, Doctor.
20   A.   Yes, sir.
21   Q.   Hang in there with me.
22     If you could turn to Tab 2.
23   A.   Okay.
24   Q.   And I believe that is some billing
25 records from your office; is that correct?

Page 160

1  A. Yes.
2  Q. Can you take a minute and look over
3  those few pages, and then specifically look at the
4  total, I think, at the end.
5  A. Okay.
6  Q. Dr. Matherne, is this the billing
7  records for the care and treatment of
8  Mrs. Plaisance?
9  A. Yes.
10 Q. Did your facility bill these?
11 A. Yes.
12 Q. Were the charges contained in the
13 billing records reasonable and necessary for
14 Mrs. Plaisance's treatment?
15 A. Yes.
16 Q. What is the total amount of that
17 billing?
18 A. The total charges are $5,174, and then
19 the patient's responsibility was $840.50. The
20 insurance paid $2,721.24, and then that line it says
21 total adjustments of $2,399.61. Those are overages
22 that are just like writeoffs from our office.
23     So if let's say, for example, if we know
24 insurance pays $100 for an office visit, the bill
25 might still go out for $175, but we expect to get

Page 161

1  paid $100. It's just the way things are done in
2  healthcare. So that's what those differences and
3  charges mean.
4  Q. Perfect. Thank you, Doctor.
5  A. Thanks.
6  Q. You can put those records to the side.
7  You're not going to need them anymore.
8  A. Okay.
9  Q. Now, Doctor, earlier you mentioned that
10 determining the underlying cause of a patient's hair
11 loss is difficult; is that correct?
12 A. Yes.
13 Q. Sitting here today, have you formed an
14 opinion to a reasonable degree of medical
15 probability as to the specific underlying cause of
16 Mrs. Plaisance's hair loss?
17 A. It's most likely multifactorial. She
18 most likely has some telogen effluvium associated
19 with her seborrheic dermatitis. There may be some
20 undiagnosed cause for her to have it also.
21     There's a form of alopecia called senile
22 alopecia, which is basically as people age, they
23 lose hair, and for no known reason. And whether or
24 not the chemotherapy played a role into it too is
25 yet to be determined, I think.

Page 162

1  Q. Doctor, were all the hair loss
2  treatments that we've looked at in the records
3  earlier intended to promote hair growth in
4  Mrs. Plaisance?
5  A. That was there in -- that was the final
6  sort of step in treatment is that they all don't
7  directly promote hair growth. Some of them, like
8  say for instance with intralesional steroid
9  injections to the scalp, will reduce inflammation
10 that's there, thereby promoting hair growth.
11     There are some things that promote
12 hair -- that directly lead to hair growth. So
13 whether or not it's direct or indirect, the ultimate
14 goal was to increase hair growth.
15 Q. Would you have prescribed these
16 treatments if you did not think there was a chance
17 they would have resulted in hair growth?
18 A. No, I would not.
19 Q. Doctor, also sitting here today, can you
20 rule out the possibility that Mrs. Plaisance
21 experienced any permanent hair loss due to her being
22 administered the chemotherapy drug
23 Taxotere/docetaxel?
24 A. No, I cannot rule that out.
25     MS. CUSKER GONZALEZ: Object to the

Page 163

1  form.
2  BY MR. HARDENSTEIN:
3  Q. Perfect.
4      Thank you, Doctor. That's all the
5  questions I have for you today.
6  A. Okay.
7  Q. Appreciate your time.
8  A. Yes, sir.
9      MS. CUSKER GONZALEZ: Thank you,
10     Doctor. I don't have any further
11     questions.
12     THE VIDEOGRAPHER: No further
13     questions from anyone, then?
14     MR. HARDENSTEIN: I think we're done.
15     THE VIDEOGRAPHER: Okay. The time is
16     now 1:46 p.m. We're going off the
17     record.
18     MR. HARDENSTEIN: For plaintiffs,
19     there's a standing order with Palmer
20     Lambert's office of the PFC for both the
21     transcript and the video.
22     (Proceedings concluded at 1:46 p.m.)

9 (Pages 160 - 163)

Page 164

1
2        REPORTER'S CERTIFICATE
3     This certification is valid only for a
   transcript accompanied by my original signature and
4  original required seal on this page.
       I, EVANGELINE A. LANGSTON, Certified Court
5  Reporter in and for the State of Louisiana, as the
   officer before whom this testimony was administered,
6  do hereby certify that Ryan Matherne, M.D., after
   having been duly sworn by me upon authority of R.S.
7  37:2554, did testify as hereinbefore set forth in
   the foregoing 38 pages;
8
       That this testimony was reported by me in the
9  stenotype reporting method; was prepared and
   transcribed by me or under my personal direction and
10 supervision, and is a true and correct transcript to
   the best of my ability and understanding;
11     That the foregoing transcript has been
   prepared in compliance with transcript format
12 guidelines required by statute or by the Rules of
   the Louisiana Certified Shorthand Reporter Board;
13 and that I am informed about the complete
   arrangement, financial or otherwise, with the person
14 or entity making arrangement for deposition
   services; that I have acted in compliance with the
15 prohibition on contractual relationships, as defined
   by the Louisiana Code of Civil Procedure Article
16 1434 and in rules and advisory opinions of the
   board;
17     That I have no actual knowledge of any
   prohibited employment or contractual relationship,
18 direct or indirect, between a court reporting firm
   and any party litigant in this matter, nor is there
19 any such relationship between myself and a party
   litigant in this matter;
20     That I am not of counsel, not related to
   counsel or the parties herein, nor am I otherwise
21 interested in the outcome of this matter.
22
23
24      _____
         EVANGELINE A. LANGSTON, FCRR
25       CCR #27019, RPR #31609

Page 165

1  DR. RYAN MATHERNE
2  ryanmatherne@gmail.com
3            November 10, 2020
4  RE: Plaisance v. Hospira Worldwide, LLC Et Al
5      10/30/2020, Dr. Ryan J. Matherne (#4317694)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16
17     Return completed errata within 30 days from
18 receipt of testimony.
19     If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 166

1 Plaisance  v. Hospira Worldwide, LLC Et Al
2 Dr. Ryan J. Matherne (#4317694)
3        E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23  _____   _____
24 Dr. Ryan J. Matherne           Date
25

Page 167

1 Plaisance  v. Hospira Worldwide, LLC Et Al
2 Dr. Ryan J. Matherne (#4317694)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Dr. Ryan J. Matherne, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____   _____
12 Dr. Ryan J. Matherne           Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

10 (Pages 164 - 167)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                 VERITEXT LEGAL SOLUTIONS
           COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.