# EXHIBIT O

Page 1

1        UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF LOUISIANA
2              MDL NO. 16-2740

3

4    IN RE: TAXOTERE (DOCETAXEL)            :
     PRODUCTS LIABILITY LITIGATION
5                                            :
     - - - - - - - - - - - - - - - - - - - -
6    This document relates to:             :
7    Audrey Plaisance, Case No. 2:18-cv-08068  :
     _____  X
8

9

10         VIDEOTAPED DEPOSITION OF:
11           ANTONELLA TOSTI, M.D.
12              (VIA ZOOM)
13

14        TRANSCRIPT of the stenographic notes of
15    the proceedings in the above-entitled matter, as
16    taken remotely by and before SEVA FLICSTEIN,
17    Certified Court Reporter (New Jersey License
18    No. 30XI000141300, California Certificate
19    No. CSR 8727), Registered Merit Reporter,
20    Certified Realtime Reporter, witness located in
21    Miami, Florida, on Monday, September 20, 2021,
22    commencing at 9:39 in the forenoon.
23

24

25

Page 2

1 A P P E A R A N C E S :
2 (ALL COUNSEL APPEARING REMOTELY)
3
4 ATTORNEYS FOR PLAINTIFFS AND
   PLAINTIFF STEERING COMMITTEE:
5
6    BACHUS & SCHANKER
     BY: DARIN SCHANKER, ESQ.
7    101 W Colfax Avenue, Suite 650
     Denver, CO 80203
8    (303) 893-9900
     dschanker@coloradolaw.net
9
     -and-
10
     PENDLEY BAUDIN & COFFIN
11   BY: JESSICA REYNOLDS
     24110 Eden Street
12   Plaquemine, LA 70765-0071
     jreynolds@pbclawfirm.com
13
     -and-
14
     PENDLEY, BAUDIN, & COFFIN, LLP
15   BY: LAUREN DAVIS, ESQ.
     1515 Poydras Street
16   Suite 1400
     New Orleans, LA 70112
17   lauren.rae.davis@gmail.com
18
19
20 ATTORNEYS FOR PLAINTIFF AUDREY PLAISANCE:
21
     DAVIS & CRUMP
22   BY: TREVOR B. ROCKSTAD, ESQ.
     2601 14th Street
23   Gulfport, Mississippi 39501
     (228) 863-6000
24   trevor.rockstad@daviscrump.com
25

Page 3

1 A P P E A R A N C E S   (Cont'd.):
2 (ALL COUNSEL APPEARING REMOTELY)
3
4 ATTORNEYS FOR DEFENDANT HOSPIRA:
5    WILLIAMS & CONNOLLY LLP
     BY: NEELUM WADHWANI, ESQ.
6        -and-
     APARNA DATTA, ESQ.
7    725 12th St NW
     Washington, DC 20005
8    (202) 434-5688
     nwadhwani@wc.com
9    adatta@wc.com
10
11 ATTORNEYS FOR DEFENDANTS SANOFI:
12
     SHOOK, HARDY & BACON, LLP
13   BY: JORDAN BAEHR, ESQ.
     2555 Grand Boulevard
14   Kansas City, Missouri 64108
     (816) 474-6550
15   jbaehr@shb.com
16
17
18 ATTORNEYS FOR DEFENDANTS ACTAVIS PHARMA, INC.,
   ACTAVIS LLC F/K/A ACTAVIS INC., AND SAGENT
19 PHARMACEUTICALS, INC.:
20   ULMER & BERNE LLP
     BY: MICHAEL J. SUFFERN, ESQ.
21   600 Vine Street, Suite 2800
     Cincinnati, Ohio 45202-2409
22   (614) 229-0000
     msuffern@ulmer.com
23
24
25

Page 4

1 A P P E A R A N C E S   (Cont'd.):
2 (ALL COUNSEL APPEARING REMOTELY)
3
4 ATTORNEYS FOR DEFENDANT ACCORD:
5    TUCKER ELLIS LLP
     BY: JULIE A. CALLSEN, ESQ.
6    950 Main Avenue, Suite 1100
     Cleveland, Ohio 44113
7    (216) 696-2286
     julie.callsen@tuckerellis.com
8
9
10
11 ATTORNEYS FOR DEFENDANTS SUN PHARMACEUTICAL
   INDUSTRIES, INC. f/k/a CARACO PHARMACEUTICAL
12 INDUSTRIES, LTD.:
13
     HINSHAW & CULBERTSON LLP
14   BY: KATHLEEN E. KELLY, ESQ.
     State Street, 27th Floor
15   Boston, Massachusetts 02109
     (617) 213-7047
16   kekelly@hinshawlaw.com
17
18 ATTORNEYS FOR DEFENDANT SANDOZ, INC.:
19
     GREENBERG TRAURIG LLP
20   BY: ERIC W. SWANIS, ESQ.
     10845 Griffith Peak Drive
21   Las Vegas, NV 89135
     (702) 792-3773
22   swanise@gtlaw.com
23
     ALSO PRESENT:
24
     CHRISTOPHER HANLON, Videographer
25

Page 5

1           I N D E X
2
3 WITNESS              EXAMINATION
4 ANTONELLA TOSTI, M.D.
5   By Ms. Wadhwani      10, 286
6   By Mr. Schanker      280
7
8
9        E X H I B I T S
10 NUMBER      DESCRIPTION            PAGE
11 Exhibit 1   Expert Report of Antonella   34
            Tosti, M.D.
12
   Exhibit 2   Materials Consulted    38
13
   Exhibit 3   Dermatopathology Report   67
14
   Exhibit 4   May 7, 2021 progress note   70
15
   Exhibit 5   Article, How to Optimize   142
16   Trichoscopy for Evaluation
     of Scalp Vessels
17
   Exhibit 6   May 7, 2021 requisition   155
18
   Exhibit 7   Notice of Videotaped   163
19   Deposition of
     Dr. Antonella Tosti
20
   Exhibit 8   Materials Consulted    165
21
   Exhibit 9   August 2, 2021 invoice   167
22
   Exhibit 10  August 12, 2021 invoice   169
23
   Exhibit 11  May 7, 2021 requisition   169
24
   Exhibit 12  Curriculum vitae       170
25

2 (Pages 2 - 5)

Page 6

1 (INDEX Cont'd.:)
2          E X H I B I T S
3 NUMBER          DESCRIPTION          PAGE
4 Exhibit 13   February 14, 2003 medical   175
       record
5
   Exhibit 14   March 11, 2003 medical   180
6       record
7 Exhibit 15   April 15, 2003 medical   184
       record
8
   Exhibit 16   July 7, 2003 medical   188
9       record
10 Exhibit 17   October 24, 2003 medical   190
       record
11
   Exhibit 18   July 6, 2004 medical   194
12       record
13 Exhibit 19   August 6, 2004 medical   196
       record
14
   Exhibit 20   February 24, 2006 medical   199
15       record
16 Exhibit 21   March 10, 2006 medical   202
       record
17
   Exhibit 22   February 19, 2009 medical   205
18       record
19 Exhibit 23   September 8, 2009 medical   207
       record
20
   Exhibit 24   November 9, 2009 medical   209
21       record
22 Exhibit 25   March 2010 medical record   211
23 Exhibit 26   April 12, 2010 medical   212
       record
24
   Exhibit 27   June 9, 2010 medical record   213
25

Page 7

1 (INDEX Cont'd.:)
2          E X H I B I T S
3 NUMBER          DESCRIPTION          PAGE
4 Exhibit 28   May 19, 2014 progress notes   229
5 Exhibit 29   July 1, 2014 progress notes   233
6 Exhibit 30   January 14, 2015 progress   238
       notes
7
   Exhibit 31   Visit Note, March 24, 2016   246
8
   Exhibit 32   Visit Note, July 7, 2016   259
9
   Exhibit 33   Visit Note, May 11, 2017   266
10
   Exhibit 34   Visit Note, January 4, 2018   273
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          THE VIDEOGRAPHER:  Good morning.
2 We are going on the record.  The date today is
3 September 20, 2021, and the time is 9:39 a.m.
4 Eastern Time.
5          This is media unit 1 of the
6 video-recorded deposition of Dr. Antonella Tosti
7 taken in the matter of in re Taxotere Products
8 Liability Litigation, filed in the U.S. District
9 Court for the Eastern District Louisiana.  This
10 is MDL No. 16-2740.
11          This deposition is being held
12 remotely in multiple locations.  My name is
13 Christopher Hanlon, a certified legal
14 videographer, and our court reporter today is
15 Seva Flicstein, and we are with Veritext
16 New Jersey.
17          I will note that I cannot go off
18 the record unless both parties agree.
19          And at this time I would ask
20 counsel to please state your appearances
21 starting with the noticing attorney, please.
22          MS. WADHWANI:  Good morning.  This
23 is Neelum Wadhwani from Williams & Connolly on
24 behalf of Hospira, and I have with me today
25 Aparna Datta.

Page 9

1          MR. SCHANKER:  Good morning.  This
2 is Darin Schanker, and here on behalf of the
3 plaintiff.
4          MS. REYNOLDS:  Jessica Reynolds, I
5 am also here present with Dr. Tosti and
6 Mr. Schanker on behalf of the plaintiff.
7          MS. DAVIS:  Good morning.  Lauren
8 Davis on behalf of plaintiff.
9          MR. ROCKSTAD:  This is Trevor
10 Rockstad here on behalf of plaintiff Audrey
11 Plaisance.
12          THE VIDEOGRAPHER:  Sounds like
13 that may be it.  At this time I would ask our
14 court reporter, Ms. Flicstein, to please
15 administer the oath and we can proceed.
16 A N T O N E L L A   T O S T I,   M.D.,
17      residing at 881 Belle Meade Island
18      Drive, Miami, Florida 33138,
19      having been duly sworn by the
20      Certified Court Reporter, testifies
21      as follows:
22          THE VIDEOGRAPHER:  Doctor, can you
23 tilt your camera down slightly so you are a
24 little higher.  Is that possible?  You're just a
25 little low.  Thank you, Doctor.

3 (Pages 6 - 9)

1    Thank you, Counsel.  You can
2 proceed.
3           -----
4           EXAMINATION
5           -----
6 BY MS. WADHWANI:
7    Q.   Good morning, Dr. Tosti.  My name
8 is Neelum Wadhwani.  I just introduced myself to
9 you before we got started.  You and I have never
10 met before; correct?
11    A.   Yes, correct.
12    Q.   Is this the first time I've ever
13 taken your deposition?
14    A.   Yes.
15    Q.   You've given depositions in the
16 past regarding docetaxel; correct?
17    A.   Yes.
18    Q.   Were you under oath in those
19 depositions?
20    A.   Yes.
21    Q.   Did you provide truthful testimony
22 in each of those depositions?
23    A.   Yes.
24    Q.   Any testimony you can think of
25 that you provided in prior docetaxel depositions

1 that was not truthful?
2    A.   No.
3    Q.   Where are you this morning,
4 Dr. Tosti?
5    A.   At the Marriott Biscayne Bay,
6 Miami.
7    Q.   And do you have counsel present in
8 the room with you?
9    A.   Yes, I do.
10    Q.   Who is present with you today?
11    A.   Darin and Jessica, two of them.
12    Q.   Do you understand that you are
13 here today concerning your opinions, your expert
14 opinions in a lawsuit brought by Mrs. Audrey
15 Plaisance?
16    A.   Yes, I understand.
17    Q.   You submitted your expert report
18 in that case on August 2, 2021; correct?
19    A.   Yes.
20    Q.   On that same day you also
21 submitted an expert report in a lawsuit brought
22 by Mrs. Clare Guilbeault; correct?
23    A.   Yes.
24    Q.   Do you understand you are not here
25 today to testify concerning your specific

1 opinions in Mrs. Guilbeault's case?
2    A.   Yes, I was told.
3    Q.   In fact, your deposition in
4 Mrs. Guilbeault's case is currently scheduled
5 for October 25; correct?
6    A.   I'm not sure the day right now,
7 but we establish a day.  Probably it's correct.
8    Q.   Okay.  So you understand, then,
9 that you are here today to testify only
10 concerning the opinions offered in your report
11 in Mrs. Plaisance's case; correct?
12    A.   Yes, correct.
13    Q.   Is there anything to prevent you
14 from giving me complete and accurate testimony
15 today?
16    A.   No.
17    Q.   Are you prepared to offer opinions
18 at trial related to Audrey Plaisance?
19    A.   Yes, if necessary.
20    Q.   Have you been told that you will
21 be coming to trial if Mrs. Plaisance's trial
22 goes forward?
23    A.   Yes, I did.
24    Q.   And are you prepared to come to
25 trial to testify in Mrs. Plaisance's case if her

1 case is selected for trial?
2         MR. SCHANKER:  Objection; form.
3    A.   Yes.
4    Q.   Does the expert report you
5 authored in Mrs. Plaisance's case describe the
6 opinions you are prepared to give at her
7 trial?
8    A.   Yes.
9    Q.   Does the expert report describe
10 the bases for those opinions?
11    A.   Yes.
12    Q.   One of those opinions is that
13 Mrs. Plaisance has permanent
14 chemotherapy-induced alopecia; correct?
15    A.   Yes, correct.
16    Q.   If I throughout your deposition
17 today use the shorthand of "PCIA" to refer to
18 permanent chemotherapy-induced alopecia, will
19 you understand what I mean?
20    A.   Yes, I do.
21    Q.   Are you okay if I shorthand during
22 the deposition by using "PCIA" to refer to
23 permanent chemotherapy-induced alopecia?
24    A.   Yes.
25    Q.   What information did you base your

4 (Pages 10 - 13)

1 conclusion on that Mrs. Plaisance has PCIA?
2     A.   I base my information on hair
3 clinical history, on hair clinical exam, on
4 dermoscopy, trichoscopy exam, on the results of
5 the pull test, on her medical records, on
6 reading her medical records, and on -- and also
7 on the pathology results.
8         (Reporter clarification.)
9     Q.   Sometimes, Dr. Tosti,
10 Ms. Flicstein will ask either you or me to
11 repeat ourselves because she is taking
12 everything down.  When she does that she is not
13 asking you for an explanation, she is asking you
14 or me to repeat ourselves to spell something,
15 to, you know, let her know what we're talking
16 about.  Is that okay?
17     A.   Absolutely.  I understand.  And I
18 apologize for my accent, so you can stop me any
19 minute.
20     Q.   When you say that one of the
21 things you based your opinion that
22 Mrs. Plaisance has PCIA on, when you say you
23 base that on her hair clinical history, what do
24 you mean there?
25     A.   You know, the history -- when you

1 see a patient, when a medical doctor see a
2 patient, he makes a clinical history.  So I ask
3 her when the problem started, ask about other
4 medical problems, ask about resolution of the
5 problem.  And sometimes just listen, let the
6 patient explain you what happened and what the
7 patient feels has happened.  That's what I
8 understand and I classify as a medical history.
9     Q.   You mentioned that you based your
10 conclusion that Mrs. Plaisance has PCIA on her
11 hair clinical history, her hair clinical exam, a
12 pull test, medical records, and the pathology
13 results.  Is there anything else --
14     A.   Trichoscopy.  Trichoscopy is a
15 very important part.
16     Q.   You did say that.  And I
17 apologize.
18     A.   Trichoscopy.
19     Q.   Trichoscopy.  I will need your
20 help today as well with some of the words.  I
21 apologize, I missed that.  So let me read that
22 list again.
23         Hair clinical history, hair
24 clinical exam, pull test, medical records,
25 pathology results, and trichoscopy.

1         Did you base your opinion that
2 Mrs. Plaisance has PCIA on anything else?
3     A.   On my experience with this
4 disease.  Because, of course, when you are a
5 doctor and you see a patient, all possible
6 differential diagnosis come in your mind, and
7 then you discriminate, eliminate some, look for
8 others.  And so it's like a complex process.
9 But, of course, maybe that is the main process;
10 the others are the basis that you utilize to
11 make your decision.
12     Q.   Is there anything else you based
13 your opinion that Mrs. Plaisance has PCIA on?
14     A.   In this moment, I don't think of
15 anything else.  My experience with this
16 disorder, what has been reported in the
17 literature about this disorder.  But this is
18 something I already had in the background, you
19 know.  I already knew the possibility of this
20 disorder and how this disorder presents and the
21 clinical features.  But, of course, that's part
22 of my judgment.
23     Q.   What was your understanding of
24 Mrs. Plaisance's hair history before her breast
25 cancer diagnosis in 2013?

1     A.   You know, she said that before she
2 had some --
3         (Reporter clarification.)
4     A.   She had some episodes of excessive
5 shedding.  She remember not exactly, but she
6 said six years before.  That's what she told me.
7 And that was treated and resolved.  So look like
8 telogen effluvium episodes to me.
9         T-e-l-o-g-e-n e-f-f-l-u-v-i-u-m.
10     Q.   Dr. Tosti, just so I understand
11 what you just said, when you say that
12 Mrs. Plaisance told you that she had an episode
13 of excessive hair shedding six years before, do
14 you mean six years before her breast cancer
15 diagnosis or six years before she came to see
16 you in 2021?
17         MR. SCHANKER:  Objection; form.
18     A.   From -- she was vague.  She said
19 she didn't understand exactly.  But from what I
20 understood was six years before the history of
21 cancer.
22     Q.   So your understanding was that six
23 years before Mrs. Plaisance developed breast
24 cancer she had had an episode of excessive hair
25 shedding; is that right?

5 (Pages 14 - 17)

Page 18

1    A.   That's what I understood.
2    Q.   When you say that it looked like
3  telogen effluvium, I'm not sure what you mean by
4  that.
5    A.   I mean that sometimes you may have
6  losing hair in the shower, finding hair,
7  everybody.  So that's what people sometimes
8  define excessive hair loss.  The scalp is
9  visible, just they lose more hair than normal.
10  And this is something that usually resolves
11  either by itself or by treatment.
12        So I thought that what she had,
13  but I cannot -- I cannot tell because there is
14  not precise documentation of this diagnosis.
15  And when I saw her, at that time the medical
16  records of her visits with Dr. -- I think the
17  name is Jones were, like, misplaced.  So I
18  haven't read those medical records.
19        I know she went to a dermatologist
20  from 2003 to maybe 2010, and she had multiple
21  injections.  But, again, the possible diagnosis
22  of that dermatologist included telogen
23  effluvium.  So that's what I believe may have
24  happened.
25    Q.   Did you read the medical records

Page 19

1  of Dr. Jones?
2    A.   I read the medical record of
3  Dr. Jones recently because the doctor
4  that -- those medical records were misplaced,
5  like, under billing.  So I didn't read those
6  medical records when I received the medical
7  records before the visit.
8        But I read those medical records
9  because I read the deposition of the
10  dermatologist and I found the medical records in
11  there, so I went searching.  And now I have read
12  all of those.
13    Q.   When did you read those medical
14  records?
15    A.   You know, I read the medical
16  records two, three days ago.  Recently.
17    Q.   Did you read the medical records
18  on Saturday?  Was that the first time?
19    A.   I think so, yes.  Possibly I read
20  one before.  I read one -- I read one because I
21  read two depositions.  I read her deposition,
22  and I believe one of those medical records were
23  in her deposition.  And then I ask the counsel
24  for the medical records.  And then I read the
25  other depositions inside the other one.

Page 20

1        So I don't know, the first one
2  maybe one week ago.  Okay.  All the other ones,
3  let's say on Saturday.
4    Q.   So if I'm understanding you
5  correctly, Dr. Tosti, the first time that you
6  read the deposition of a dermatologist that
7  Mrs. Plaisance visited was about a week ago; is
8  that right?
9    A.   Yes.
10    Q.   And the first time that you read
11  Dr. Jones' medical records from 2003 to 2010 was
12  on Saturday, two days ago; correct?
13    A.   Yes.
14    Q.   And you submitted your expert
15  report in this case on August 2, 2021;
16  correct?
17    A.   Yes.
18    Q.   So at the time you submitted your
19  expert report and opinions in this case, you had
20  not read the deposition of Mrs. Plaisance's
21  dermatologist; correct?
22    A.   Yes.
23    Q.   And so at that time, when you
24  prepared your opinions and submitted your
25  opinions in this case, you were not basing those

Page 21

1  opinions on the deposition testimony of
2  Mrs. Plaisance's dermatologist; correct?
3    A.   Yes.
4    Q.   Similarly, with regard to the
5  medical records of Dr. Jones that you just read
6  two days ago, because you had not read them
7  until two days ago, you had not considered those
8  records in preparing your opinions in this case;
9  correct?
10    A.   Correct.
11    Q.   When you say that reading the
12  deposition of Mrs. Plaisance's
13  dermatologist -- and let me interrupt myself.
14        Do you remember the name of the
15  dermatologist who was deposed?
16    A.   I think Matherne, something like
17  that.
18        (Reporter clarification.)
19    Q.   It's M-a-t-h-e-r-n-e.
20        So I'll ask that again.
21        You mentioned that when you read
22  the deposition of Dr. Matherne, you learned that
23  there were medical records relating to
24  Mrs. Plaisance's dermatological history that you
25  had not seen before, and you said you went

6 (Pages 18 - 21)

Page 22

1 searching for those.  Where did you go searching
2 for those?
3      A.   I asked the counsel.  So I had the
4 medical records because I saw the medical
5 records were in the exhibit.  But in the
6 beginning I didn't see the exhibits.
7           (Reporter clarification.)
8      A.   I saw the medical records from the
9 deposition should be in the exhibits.  But I had
10 seen the deposition without the exhibits.  So I
11 first ask for the exhibits, and that may be, you
12 know -- I don't remember, maybe it was last
13 week.
14           And then when I received the
15 exhibits, I saw that there were those medical
16 records.  And so I asked the counselor why I
17 didn't receive?
18           And then they found that medical
19 records were incorrectly labeled as being in a
20 subpart of the Dropbox.  You know, it was in the
21 Dropbox, in a folder, and it was a subfolder of
22 the Dropbox.  And inside subfolder there was the
23 medical record that was incorrectly reported as
24 a billing.  And that's probably why I didn't
25 see.

Page 23

1      Q.   But in any event, Dr. Tosti, when
2 you prepared your opinions in Mrs. Plaisance's
3 case, you did not do so on the basis of
4 Dr. Jones' medical records or Dr. Matherne's
5 deposition testimony; correct?
6      A.   Yes.  I didn't -- I didn't base on
7 Dr. Jones' visit.  Instead, I knew that
8 Dr. Matherne had seen the patient because I had
9 all of his medical records.
10      Q.   Right.  But you did not base your
11 opinions that you submitted on August 2 in
12 Mrs. Plaisance's case on either Dr. Jones's
13 medical records or on Dr. Matherne's deposition
14 testimony; correct?
15      A.   Correct.  Not on the testimony,
16 but, yes, on his medical records.
17      Q.   When you prepared Mrs. Plaisance's
18 hair history for purposes of preparing your
19 opinions in this case that you served in your
20 expert report on August 2, you relied on her
21 description of her hair history; is that
22 correct?
23      A.   Yes.
24      Q.   And did you rely on anything else
25 in gaining an understanding of Mrs. Plaisance's

Page 24

1 hair history before her breast cancer diagnosis
2 in 2013?
3      A.   Not -- on the clinical images she
4 provided, which to be honest are very poor
5 quality because they are very small, difficult
6 to establish the date, and the light is often
7 not good.  But I look at clinical images as
8 well.  And there are some images where she
9 definitely had very thick hair.  But those
10 images has no date so it's not something easy to
11 understand from those images.
12      Q.   When you say "clinical images,"
13 are these photographs that Mrs. Plaisance
14 brought to you?
15      A.   She -- the counsel gave to me.  I
16 think you also have those images, the images
17 that she provided.
18      Q.   Where did you access these
19 images?
20      A.   I access in the Dropbox together
21 with the medical records.
22      Q.   And I think you said that the
23 images were not of a high quality; correct?
24      A.   Absolutely.
25      Q.   And that it was difficult to tell

Page 25

1 what Mrs. Plaisance's scalp fully looked like
2 before she was diagnosed with breast cancer;
3 correct?
4      A.   There are a few -- not completely.
5 There are a few images showing that she had very
6 full head of hair.  But I cannot tell when those
7 images were taken.  So maybe it was when she was
8 30.  I don't know because there is no date.
9      Q.   Did you ask her when you saw her
10 what the date of those images was?
11      A.   No.  I honestly didn't ask her.
12 You know, she looked like somebody who was not
13 very digital or involved in the images and
14 pictures.  I asked her if she had any other
15 pictures and she said no.  I didn't ask her when
16 those images were taken.
17      Q.   Did you endeavor to find out when
18 those images were taken through another means?
19      A.   I ask the counselor.  But I think
20 I also ask for better images, for images of
21 better quality, better quality images.
22      Q.   Did you receive better images,
23 higher quality images of Mrs. Plaisance's hair
24 and scalp prior to her breast cancer diagnosis
25 after you made that request?

7 (Pages 22 - 25)

Page 26

1     A.   No.
2     Q.   Did you receive information about
3  the dates that the images that you did have were
4  taken?
5     A.   No.
6     Q.   What was your understanding of
7  Mrs. Plaisance's hair history after she finished
8  chemotherapy in March 2014 at the time that you
9  prepared and served your expert report in this
10  case?
11          MR. SCHANKER:  Objection; form.
12  Go ahead.
13     A.   So in March 2014, she just
14  finished the chemotherapy and she had no hair.
15  And after that, the hair regrow a little bit,
16  but never regrow as it was before.  So it was
17  incomplete hair regrow.  She had incomplete
18  regrow of the hair.
19     Q.   What did you base that
20  understanding on, Dr. Tosti?
21     A.   Understanding -- you know, I base
22  that understanding on what she said.  I can see
23  she complain with the oncologist very early,
24  like, in May, only two months after the end of
25  the chemotherapy, about this incomplete regrow.

Page 27

1  And I base on the fact that now she has an
2  incomplete regrow.
3     Q.   Do you base your understanding on
4  Mrs. Plaisance's hair history after she
5  completed chemotherapy on anything else?
6          MR. SCHANKER:  Objection; form.
7     A.   I base the history on also the
8  dermatologist examinations that didn't describe
9  alopecia.  When she went to see Dr. Matherne he
10  didn't see alopecia, in the beginning, at least,
11  until 2017.
12          However, he treated her for
13  actinic keratosis, that is something that
14  happens only when the scalp is not covered from
15  the hair, and also described red patches of the
16  scalp that he thought was sebhorreic dermatitis.
17          So I think she was seen by the
18  dermatologist, but the dermatologist didn't
19  diagnose the problem.  That is what I saw.
20          (Reporter clarification.)
21     Q.   Dr. Tosti, that information that
22  you described about basing your -- sorry, let me
23  start again.
24          The information you just described
25  about Mrs. Plaisance's hair history in regards

Page 28

1  to her visits with Dr. Matherne, is that
2  information you learned for the first time when
3  you read Dr. Matherne's deposition testimony?
4     A.   No.  That's what I read from the
5  medical record.  I always had his medical
6  record.
7     Q.   So you had read Dr. Matherne's
8  medical records before you read --
9     A.   Yes.
10     Q.   -- his deposition testimony; is
11  that correct?
12     A.   Yes, yes, correct.
13     Q.   And, Dr. Tosti, I know that
14  throughout the day you are going to largely know
15  where I am going with my questions and be ready
16  to answer, but for Ms. Flicstein's assistance,
17  if you could please wait until I finish to
18  answer, just so that it's a clean record and we
19  are not talking over each other.
20          Is that okay?
21     A.   Absolutely.
22     Q.   When is the first time that you
23  read Dr. Matherne's medical records?
24     A.   That was before I visit her.  So
25  probably, I believe, in May.  I don't remember

Page 29

1  exactly the day of the visit.  Before the visit.
2     Q.   Does May 7, 2021 sound correct to
3  you as the day that Mrs. Plaisance came to see
4  you for a clinical exam?
5     A.   Yes.  Probably, yes.  And so
6  probably I saw those medical records, let's say,
7  one, two -- two weeks before, one week before.
8          There are also in her medical
9  records, there is a visit from a radiologist
10  oncologist who visit her before starting the
11  chemotherapy that states that she has normal
12  hair density.  The name is Dr. Dunn.  I think
13  it's D-u-n-n, but I'm not 100 percent sure.
14          But that was the oncologist,
15  radiotherapy oncologist would refer to the other
16  oncologist that she followed, that followed her.
17          (Reporter clarification.)
18     A.   That's the doctor who referred her
19  to her oncologist for the chemotherapy.  So this
20  was before the chemotherapy.  Because she had
21  surgery, and after surgery, this doctor visit
22  her and refer her for the chemotherapy.  And he
23  wrote in his medical record that she had normal
24  hair density.
25     Q.   Dr. Tosti, I take it that you are

8 (Pages 26 - 29)

Page 30

1 not here to provide opinions about the
2 effectiveness of different chemotherapy agents;
3 correct?
4     A.   Absolutely correct.
5     Q.   And you are similarly not here to
6 opine on the best chemotherapy treatments for
7 treating breast cancer; correct?
8     A.   Absolutely.
9     Q.   You are also not here to opine on
10 the adequacy of Hospira's docetaxel warning
11 label; correct?
12     A.   Sorry.  I didn't understand the
13 question.
14     Q.   You are not here to opine on the
15 adequacy of Hospira's docetaxel warning label;
16 correct?
17     A.   Correct.
18     Q.   Dr. Tosti, what did you do to
19 prepare for your deposition?
20     A.   I read again my expert report, I
21 read my progress notes from the visit, I read
22 the medical records, I read the depositions of
23 the dermatologist, the oncologist of
24 Ms. Plaisance and her husband.  And I read again
25 the most important article that I thought was

Page 31

1 important for this deposition.  I'm not sure I
2 did a complete job.  That's basically what I
3 did.
4     Q.   What articles did you review in
5 preparation for your deposition?
6     A.   I mainly reviewed the same
7 articles that I've been reviewing before, but
8 all the articles on Taxotere, the articles on
9 estrogen treatment, the article -- basically,
10 the article on adjuvant chemotherapy, the
11 article where permanent alopecia has been
12 reported and described.
13     Q.   Did you meet with counsel in
14 preparation for your deposition?
15     A.   Yes, we did.  We met yesterday for
16 about three hours.
17     Q.   Is that the only time you met with
18 counsel in preparation for your deposition
19 today?
20     A.   Yes.  For this deposition, yes.
21     Q.   Have you read the deposition
22 transcript of Dr. Thompson from his deposition
23 taken last week on September 15?
24     A.   Yes.  Sorry, I forgot that.  I
25 also read that deposition.

Page 32

1     Q.   Is there anything in
2 Dr. Thompson's testimony from September 15 of
3 last week that you disagreed with?
4         MR. SCHANKER:  Objection; form.
5     A.   No, I agreed with everything.
6     Q.   Did you speak with Dr. Thompson
7 about his deposition testimony at any point
8 after his deposition?
9     A.   No.
10     Q.   How about before Dr. Thompson was
11 deposed on September 15 of 2021, had you spoken
12 with him about his opinions in Mrs. Plaisance's
13 case or anything else related to that case with
14 him?
15     A.   No.  It's a long time I don't
16 speak with him.  I didn't speak with him since
17 before the summer.  So I didn't speak with him
18 about this case.
19     Q.   Have you ever had any text
20 messages, emails, letters or other
21 correspondence, written correspondence, with
22 Dr. Thompson concerning Mrs. Plaisance's case?
23     A.   No, never.
24     Q.   Have you ever had any verbal
25 conversations with Dr. Thompson about

Page 33

1 Mrs. Plaisance's case?
2     A.   No, never.
3     Q.   Have you read the deposition
4 transcript of Dr. Madigan from his deposition
5 that was just taken on Friday, September 17?
6     A.   Dr. Madigan?
7     Q.   Yes.
8     A.   No.  I didn't.
9     Q.   So you read Dr. Thompson's
10 deposition testimony but you have not read
11 Dr. Madigan's deposition testimony, both from
12 last week, prior to today; correct?
13     A.   No, no, no.
14     Q.   Sorry.  Just so I understand --
15     A.   I read Dr. Thompson, but I didn't
16 read Dr. Madigan.  That's why in the beginning I
17 was surprised.  I read a very old Dr. Madigan.
18     Q.   When is the last deposition
19 transcript of Dr. Madigan's that you've read?
20         MR. SCHANKER:  Objection to form.
21     A.   To be honest, I'm not sure.  But
22 it was something that I read maybe at least one
23 year ago or more.  So I don't know when was that
24 deposition taken.  It definitely not taken last
25 week.

9 (Pages 30 - 33)

Page 34

1     Q.   Have you spoken with anyone who
2  you understand to be an expert in
3  Mrs. Plaisance's case about the docetaxel
4  litigation?
5         MR. SCHANKER:  Objection; form.
6     A.   No, with nobody.
7     Q.   Have you spoken with anyone you
8  understand to be an expert in Mrs. Plaisance's
9  case at any time about your opinions and report
10  in this case?
11         MR. SCHANKER:  Objection; form.
12     A.   No.
13         MS. WADHWANI:  Aparna, can you
14  please put into Exhibit Share Exhibit 101.
15         (Exhibit 1, Expert Report of
16  Antonella Tosti, M.D., was marked for
17  identification.)
18  BY MS. WADHWANI:
19     Q.   Dr. Tosti, my colleague,
20  Ms. Datta, is going to put in Exhibit Share for
21  you right now --
22     A.   I have to go from here to
23  internet?  I'm there.
24     Q.   And do you see a document -- it is
25  taking a second to publish.

Page 35

1         MR. SCHANKER:  Neelum, we are
2  going to go ahead and open the box that you sent
3  to us.
4         MS. WADHWANI:  Okay.
5         MR. SCHANKER:  Should we have
6  Dr. Tosti open the physical redweld as well?
7  Why don't we do that.  Why don't we take a
8  minute to do that.
9         MS. WADHWANI:  That's up to
10  Dr. Tosti.  She obviously can look at the hard
11  copy, she can look along with Exhibit Share.
12  It's really whatever is your preference,
13  Dr. Tosti.  I don't have a preference for how
14  you look at documents.
15         THE WITNESS:  If it works, I
16  probably prefer to look at the shared one.  But
17  I like to have the hard copy if I have to go
18  through.
19         MS. WADHWANI:  Sure.  What you can
20  do, I think my colleague has said if you just
21  refresh right now.
22         MR. SCHANKER:  This is taped like
23  Fort Knox, so I think maybe we can just take a
24  break and let us open these, if that's okay.
25         MS. WADHWANI:  Well, we are just,

Page 36

1  I think, going to start with her expert report
2  as the first document.
3         MR. SCHANKER:  We'd actually like
4  to have the physical exhibit in front of us.  We
5  can wait on the record if you want to give us
6  the time to open this, but it's going to take
7  some time.
8         THE WITNESS:  I am opening the
9  expert report.
10         MS. WADHWANI:  Why don't we just
11  take one minute for you guys to get some
12  scissors.
13         THE WITNESS:  My question -- okay,
14  I don't have a question.  I found Exhibit 1.
15  I'm good.
16         MR. SCHANKER:  It's hard to get
17  into so it may take more than a minute.
18         MS. WADHWANI:  Should we go off
19  the record for a couple of minutes?
20         MR. SCHANKER:  Yeah, why don't we.
21         THE VIDEOGRAPHER:  Very good.
22  Thank you.  This is the videographer.  The time
23  is 10:22.  We are going off the record.  This
24  ends media file 1.
25         (Break taken.)

Page 37

1         THE VIDEOGRAPHER:  We are back on
2  the record.  The time is 10:32.  We are
3  beginning media file 2.
4  BY MS. WADHWANI:
5     Q.   Are you ready to proceed,
6  Dr. Tosti?
7     A.   Yes.
8     Q.   Do you have up in front of you --
9     A.   I also found the hard copy so I
10  have both.
11     Q.   Okay.  So you have your expert
12  report in Mrs. Plaisance's case that you served
13  on August 2 of this year available to you?
14     A.   Yes.  I have two of them.
15     Q.   Does this report contain the
16  opinions you intend to offer at Mrs. Plaisance's
17  trial?
18     A.   Yes.
19     Q.   Just generally speaking, how did
20  you prepare this report?
21     A.   You know -- I'm sorry.  I prepare
22  the report starting from my previous expert
23  report, from the general part of the report,
24  meaning the part that describe different types
25  of alopecia and so on.  I added something,

Page 38

1 because I found from the other cases that
2 sometimes people get confused between thinning
3 of the hair and fine hair. So I add the section
4 to explain that, you know --
5     Q.   Where is that section in your
6 report, Dr. Tosti, that you added?
7     A.   It's called hair coverage. And I
8 think -- it's in the beginning of page 4. And
9 then I search for the new literature -- I found
10 two new publications since last September when
11 I -- I look at the literature, but there are two
12 new papers that I have been quoted and explain.
13         And then on the part that regard
14 Mrs. Plaisance, again, I made that part based on
15 her findings. But I kept the way that I always
16 keep to go so that I know, like, the steps I
17 follow to arrive at the diagnosis. So the type
18 of examination, the history, what we discussed
19 before.
20         (Exhibit 2, Materials Consulted,
21 was marked for identification.)
22 BY MS. WADHWANI:
23     Q.   Dr. Tosti, counsel produced to me
24 at about 11:00 last night some materials that
25 you may or may not have seen before, but they

Page 39

1 are not going to be in your box, they are only
2 going to be available electronically because I
3 did not receive them until very late last night.
4 So my colleague is going to put in your Exhibit
5 Share a document that will be marked tab 141.
6         Do you see that? And you might
7 need to refresh.
8     A.   Okay. So it's Exhibit 2?
9     Q.   Yes. Exhibit 2. Thank you.
10         And while you are looking at that,
11 Dr. Tosti reminded me that I have been a very
12 bad housekeeper. So for the record, I am
13 marking as Exhibit 1 the expert report of
14 Antonella Tosti served on August 2, 2021 in the
15 Plaisance case, and I am marking as Exhibit 2
16 the document you are just opening.
17         Do you have it?
18     A.   Yes.
19     Q.   Have you seen this document
20 before, Dr. Tosti?
21     A.   Exhibit D. I have Exhibit D.
22     Q.   Correct. That's correct.
23     A.   I don't know if I saw this
24 document.
25     Q.   Does this document reflect the

Page 40

1 materials you consulted?
2     A.   At the time of my expert report,
3 no. Because I receive the depositions recently.
4 So I didn't -- I didn't consult the deposition
5 at that time. But the references, yes. The
6 photographs, yes. The medical records, yes.
7 The deposition testimony, no. The Jerome Z.
8 Litt, yes. And the Won-Soo Lee, yes.
9         The only thing I didn't consult
10 were the depositions. Because as I told you, I
11 read those depositions recently in preparation
12 of this testimony.
13     Q.   So when you served your report on
14 August 2, if I understand you correctly, you had
15 not read the depositions of Dr. Chauvin,
16 Dr. Matherne, Audrey Plaisance, and Lloyd
17 Plaisance; correct?
18     A.   Correct.
19     Q.   So you didn't consider those four
20 depositions in forming your opinions; correct?
21     A.   Correct.
22     Q.   You've already told me when you
23 read Dr. Matherne's deposition testimony. When
24 did you first read Dr. Chauvin's deposition
25 testimony?

Page 41

1     A.   Maybe 10 days ago. Two, two weeks
2 ago.
3     Q.   When did you read Mrs. Plaisance's
4 deposition?
5     A.   That testimony I read, the first I
6 read was her deposition, and that was
7 probably -- again, two weeks ago, I would say.
8 Because during the weekend I did all this job.
9     Q.   And is the same true for Lloyd
10 Plaisance, did you read his deposition
11 approximately two weeks ago?
12     A.   Yes.
13     Q.   Now, if we go through some of the
14 items on what we've marked as Exhibit 2, the
15 second listing is "All photographs of Audrey
16 Plaisance uploaded to MDL Centrality."
17         Is this what you were referring to
18 earlier today when you told me you looked at
19 photographs of Mrs. Plaisance?
20     A.   Yes.
21     Q.   Did you know the dates of any of
22 the photographs that you looked at?
23     A.   You know, those photographs were,
24 like, screenshots from Facebook. So it's
25 something that is very complicated to establish.

11 (Pages 38 - 41)

1    (Simultaneous speakers.)
2    Q.   Are you telling me that you did
3 not know the dates of any of those photographs
4 or that you did know the dates of those
5 photographs?
6    A.   I knew the dates of these
7 photographs, but it's not very, you know, kind
8 of legal date.  You understand what I mean?
9 Sometimes photographs have a date that it, you
10 know, states.  And those were screenshots from
11 Facebook.  So I could see the date from Facebook
12 in some of them, not in all of them.
13    Q.   So if I understand your testimony,
14 what you are telling me is that for the
15 photographs that were part of a Facebook
16 screenshot, you could see the date of the
17 activity that was happening on Facebook on the
18 screenshot; correct?
19    A.   Exactly.
20    Q.   But you didn't have any
21 information as to whether the photograph was
22 from that same date; correct?
23    A.   Exactly.
24    Q.   And you don't know what date those
25 photographs that were posted on the Facebook

1 screenshot pages that you looked at were taken;
2 right?
3    A.   I don't know.
4    Q.   Did you know any of the dates of
5 any of the photos that you looked at?
6    MR. SCHANKER:  Objection; form.
7    A.   No.  But some of them I believe we
8 can -- you know, we can ask the date, it was,
9 like, the marriage of her son, and I believe she
10 knows the date.
11    Q.   Did you ask for the dates of any
12 of those photos?
13    A.   Sorry?
14    Q.   Did you ask her the dates of any
15 of those photos?
16    A.   No, I did not.
17    Q.   So sitting here today, is it
18 correct that you do not know the dates of any of
19 the photos that you looked at?
20    A.   I don't know.  But there is a
21 reason that the photo were not of good quality,
22 the photo was bad quality.  So even knowing the
23 date wouldn't make any progress in evaluation of
24 the photos.
25    Q.   So the photos would not have been

1 too helpful for you because you didn't know the
2 date and they were not good quality; correct?
3    A.   I agree.
4    MR. SCHANKER:  Objection to form.
5    A.   Yes.
6    Q.   Did any of the photos that you
7 reviewed include an image of the mid-scalp
8 portion of Mrs. Plaisance's head?
9    MR. SCHANKER:  I'm sorry.  You
10 broke up a little.  Can you repeat the question.
11    Q.   Oh, sorry.
12    Did any of the photos that you
13 reviewed, Dr. Tosti, include an image of the
14 mid-scalp portion of Mrs. Plaisance's head?
15    A.   I think some of them, but it was
16 far away, out of focus, with horrible light.
17 And those photos, were, like, really, really,
18 really small.  So, you know, it's always
19 difficult to evaluate on photo.  But those
20 photos was really terrible.
21    There are a few photos that were
22 small but of good quality that I could see she
23 had very thick hair but had no date, and were
24 not from Facebook.
25    Q.   Going down to the next entry on

1 your Materials Consulted that we've marked as
2 Exhibit 2, you refer to medical records.
3    In preparation of your expert
4 report that you served on August 2 that we've
5 marked as Exhibit 1, how many medical records
6 for Mrs. Plaisance did you review,
7 approximately?
8    A.   You know, many.  I think at least
9 70, possibly.  Because many -- I had many
10 duplicates of the same medical records.  And,
11 you know, sometimes medical records repeat every
12 time the same, you know, visit.  So it was a
13 very long process.
14    But I read all the medical records
15 from the oncologist, all the medical records
16 from the Matherne dermatologist, all the medical
17 records from the ophthalmology, the medical
18 records from her GP.  I read a lot of medical
19 records.
20    Q.   What was the earliest dated
21 medical record of Mrs. Plaisance's that you
22 reviewed in preparing your expert report?
23    A.   I'm sorry.  I didn't understand
24 the question.
25    Q.   Do you remember what the earliest

12 (Pages 42 - 45)

1 dated medical record was that you reviewed in
2 preparing your report?
3      A.  I believe, you know, I review
4 medical records of Dr. Chauvin when she had the
5 embolic -- pulmonary embolic that was before the
6 breast cancer, I think that was in 2012.  You
7 know, I think I review everything I had.  And I
8 believe some of them were before.
9      Q.   Sitting here today, do you recall
10 reviewing any medical records of
11 Mrs. Plaisance's dated before 2013?
12      A.   Yes.  So I read the medical
13 records of Dr. Chauvin, but she had another name
14 at that time because she changed name.  I don't
15 know if she remarried.  Because she saw the
16 patient because she had a pulmonary embolism,
17 okay, in 2012, and she was very sick.  And so I
18 read that medical record from 2012.
19      Q.   So you mentioned that you read
20 Mrs. Plaisance's oncology records.  Is it your
21 understanding that you read all of her oncology
22 records?
23      A.   Yes.
24      Q.   That you read Dr. Matherne's
25 medical records.  Did you read all of

1 Dr. Matherne's medical records for
2 Mrs. Plaisance?
3      A.   Yes.  The one that were misplaced
4 were the one handwritten.  All the medical
5 records that were electronic that were the
6 medical records after 2014, I read all of them.
7      Q.   My question was just a simple
8 question of did you read all of Dr. Matherne's
9 medical records in preparing your expert report,
10 Dr. Tosti?
11          MR. SCHANKER:  Objection to form.
12      A.   I read all of them except the ones
13 that -- except the Dr. Jones medical record that
14 some of them were, like, the same office.  But I
15 read all of Dr. Matherne's medical records.
16      Q.   Did you read all the ophthalmology
17 records that you referred to?
18      A.   Did I read all the --
19      Q.   Ophthalmology records that you
20 referred to?
21      A.   Yes, I did.
22      Q.   And why did you decide to read
23 Mrs. Plaisance's ophthalmology records?
24      A.   Because I read all of her records.
25 I also read the records she had onychomycosis,

1 she had other stuff.  She went to a lot of
2 doctors.
3      Q.   Moving down the Exhibit 2, you
4 list a text by Jerome Litt.  Why did you read
5 this document in preparing your report in this
6 case?
7      A.   This is like handbook for
8 evaluating skin and hair reactions from drugs.
9 And so I always use this text to check if I have
10 a doubt if a certain drug can cause hair loss
11 with high frequency.  Because every drug
12 basically can cause hair loss.  So everything
13 depend on the frequency.  So since she was
14 taking multiple medications, I want to check.
15      Q.   And which medications did you
16 specifically review in Dr. Litt's book?
17      A.   I review she was taking statins,
18 you know, all medications.  Hypertensive
19 medications.  I have a list of the medications
20 she was taking in my progress notes.  I don't
21 remember exactly, but I check all the
22 medications she was taking.
23      Q.   And Dr. Tosti, I want to make sure
24 I heard you correctly because I think when we
25 missed each other there because of the

1 limitations of technology, did you say that
2 every drug basically can cause hair loss?  Or
3 did you say something different?
4      A.   You know, I am saying that if you
5 look in the insert of most medications, hair
6 loss is reported as a possible side effect, but,
7 you know, only -- a few medications cause hair
8 loss with more frequency.
9          And so I'm discussing telogen
10 effluvium.  So when I wanted to check if the
11 medications that she was taking at the moment I
12 saw her were medications that increase frequency
13 or normal frequency.  So it's below 2 percent or
14 more than 2 percent.  And I use that book to
15 check that.
16      Q.   Moving down to the article by
17 Dr. Lee, why did you review this document?
18      A.   You know, this is a document that
19 has been utilized by the authors of the papers
20 on endocrine therapy alopecia to establish the
21 localization.  So I read that document because I
22 needed to better understand.
23          (Reporter clarification.)
24      A.   Localization, the pattern.
25      Q.   Dr. Tosti, in preparing your

13 (Pages 46 - 49)

Page 50

1 expert report for this case, had you read any
2 deposition testimony?
3     A.   I don't remember I did.
4     Q.   Have you spoken at any time with
5 any of Mrs. Plaisance's treating physicians
6 about their care and treatment of her?
7     A.   No, never.
8     Q.   Beyond the one time that you saw
9 Mrs. Plaisance in person, have you ever had any
10 conversations, meetings, or correspondence with
11 her?
12     A.   No, never.
13     Q.   Did you call her up at any point
14 to discuss your diagnosis of PCIA with her?
15         MR. SCHANKER:  Objection; form.
16     A.   No, I did not.
17     Q.   Did you call her up at any point
18 to discuss Dr. Thompson's pathology report?
19         MR. SCHANKER:  Objection; form.
20     A.   No, I did not.
21     Q.   Doctor, one of the opinions you
22 offer in your expert report we've marked as
23 Exhibit 1 is that there exists a condition
24 called permanent chemotherapy-induced alopecia
25 or PCIA; correct?

Page 51

1     A.   Yes.
2     Q.   Another opinion you offer is that
3 the chemotherapy medication docetaxel can cause
4 PCIA; right?
5     A.   Yes.
6     Q.   And does your report in this case
7 describe all the bases for your opinion that
8 docetaxel can cause PCIA?
9     A.   Yes.
10     Q.   And the reasons you list in your
11 report for your conclusion that docetaxel can
12 cause PCIA reflects your reasons for that
13 conclusion; correct?
14     A.   Yes.
15     Q.   How does docetaxel cause PCIA?
16         MR. SCHANKER:  Objection; form.
17     A.   We don't know the mechanism.  It's
18 something that is still unknown.
19     Q.   So if I understand your testimony
20 correctly, you believe that docetaxel causes
21 PCIA, but you don't know how; correct?
22     A.   Exactly.
23     Q.   Page 34 of your expert report is
24 what I am going to turn to.
25         Are you with me on page 34?

Page 52

1     A.   Yes.
2     Q.   I'm looking at the first sentence
3 under the section "Permanent
4 Chemotherapy-Induced Alopecia."
5         Do you see that?
6     A.   Yes.
7     Q.   What do you say is the first
8 sentence under that paragraph?
9     A.   "PCIA is defined as incomplete
10 hair regrowth six to eight months after the end
11 of chemotherapy."
12     Q.   Do you agree that you need to give
13 a patient six to eight months to know whether or
14 not she is going to have normal hair regrowth
15 after chemotherapy?
16     A.   Yes.
17     Q.   And because of that, you would not
18 diagnose hair loss or incomplete hair regrowth
19 as PCIA before a patient was six to eight months
20 past her last chemotherapy infusion; correct?
21     A.   Yes, I agree.
22     Q.   So, for example, you would not
23 call incomplete hair regrowth PCIA if only two
24 months had passed since a patient's last
25 chemotherapy infusion; correct?

Page 53

1     A.   Correct.
2     Q.   Do you agree that, on average, as
3 people age their hair density decreases?
4     A.   Yes, but not a lot.
5     Q.   Do you agree that, on average, the
6 average 70-year-old will have a lower hair
7 density than the average 20-year-old?
8     A.   Yes.
9     Q.   I would like you to turn now,
10 Dr. Tosti, to your habit and practice as it
11 relates to patient consultation and treatment.
12 When a patient comes --
13         (Technical interruption.)
14     A.   I lost you.
15         THE VIDEOGRAPHER:  Yeah, she
16 locked up a second.  Let's give it a second.
17 Either we are going to lose her or she'll come
18 back.
19         THE WITNESS:  Okay.
20         Mr. Schanker, I am going to go off
21 the record, if that's okay.
22         MR. SCHANKER:  Okay.
23         THE VIDEOGRAPHER:  Thank you.  The
24 time is 10:58.  We're going off the record.
25         (Pause in proceedings.)

14 (Pages 50 - 53)

Page 54

1          THE VIDEOGRAPHER:  The time is
2  10:59.  We're back on the record, continuing
3  media file 2.
4  BY MS. WADHWANI:
5      Q.    Dr. Tosti, if you began responding
6  to my question, I apologize.  As soon as I asked
7  my question, you all disappeared.
8          So with your indulgence, I will
9  ask my question again and have you repeat it.
10         When a patient comes to you
11 complaining of hair loss, what is the first
12 thing you do?
13     A.    I usually ask the clinical
14 history.  But sometimes I take a look to the
15 patient.  One, because hair loss is a very vague
16 word.  So I want to understand what is they
17 complaining.  The patient is complaining of
18 shedding, meaning excessive hair around.  If is
19 complaining of thinning, meaning that the scalp
20 is not covered, has patches.
21         So everybody complains of hair
22 loss, but I want to start looking at the patient
23 first so I understand even the question to ask.
24 And then I ask the questions on how long this
25 has been going, what happened before, medical

Page 55

1  diseases the patient may have, medical
2  treatment.  I ask about children.  I ask about
3  periods.  I ask about menopause.  I ask about,
4  you know, medications.  I ask about diet.  And,
5  you know, I ask if the patient lost weight
6  because this can be another common cause.
7          So I ask many questions.  But I
8  don't have set-up.  Questions depends on what I
9  see.  And then I ask -- for many disease, I ask
10 about family history.  And I -- that's basically
11 I think what I ask.  And I ask about treatment,
12 previous treatment, if they saw a doctor, if
13 they had the diagnosis before, and how this
14 treatment works.
15     Q.    I take it from that, Dr. Tosti,
16 that you obtain as best as you can an accurate
17 and complete clinical history of your patients;
18 correct?
19     A.    Correct.
20     Q.    Is the reason that you do that
21 because it is very important to obtain an
22 accurate and complete clinical history to
23 correctly assess their hair disorders?
24     A.    I believe for any medical disorder
25 clinical history is the most important thing,

Page 56

1  and it should be very accurate because sometimes
2  patients tell you things that you don't even
3  ask.  So you have to ask questions.
4          But in my opinion, you have also
5  to listen to the patient, because sometimes he
6  has some information that you don't ask that may
7  be very, very important.
8      Q.    So you try to obtain as accurate
9  and complete a clinical history as you can based
10 on that patient; correct?
11     A.    Exactly.
12     Q.    And so I take it, then, that when
13 a patient presents with complaints of hair loss
14 or other complaints related to the hair on their
15 scalp, that you try to find out their entire
16 hair history and any prior experience with hair
17 loss.  Is that right?
18     A.    Yes.
19     Q.    Why do you do that?
20     A.    Because, you know, chronology is
21 very important to understand conditions.
22 Because maybe the patient, for instance, has
23 alopecia areata, is going to tell me that he had
24 patches of alopecia and then the patches went
25 away and then the patches develop again.  So

Page 57

1  there are disease that are overlapping.
2          If a patient has telogen
3  effluvium, is going to say that they had a lot
4  of shedding and it was like that for a while and
5  then it improve and then sometimes got worse
6  again.
7          So some disease can, you know,
8  improve, other diseases just get worse.  So I
9  want to understand what is happening in that
10 specific patient and disease.
11     Q.    And so a patient's prior hair
12 history and prior experience with hair loss is
13 relevant to your assessment of the issues they
14 present to you; correct?
15         MR. SCHANKER:  Objection to form.
16     A.    It's a piece of information.
17 Okay.  The information is, like, a big thing,
18 and everything is a piece.  Of course, it is a
19 piece of information.
20     Q.    Is it helpful to you to have a
21 patient's prior hair history when they come to
22 you for assistance with complaints of hair
23 loss?
24     A.    Not always.  For instance, if I
25 have a patient with alopecia areata, I don't

15 (Pages 54 - 57)

Page 58

1  need to know exactly how many times he had
2  episodes of the disease.  And the same, if I
3  have patients with telogen effluvium, I don't
4  know exactly how many times he had excessive
5  shedding.  It depends on the disease also.
6      Q.   Do you typically try and obtain
7  prior relevant medical records from your
8  patients or from their treating physicians as
9  you take them on as new patients and work
10 through their concerns?
11     A.   No, I never do.  I just do for
12 these legal cases, but I don't do with my
13 patients.
14     Q.   After you finish taking a clinical
15 history of your patients, what is the next step
16 you take in regard to a patient who is seeking
17 your care and treatment related to hair loss
18 concerns?
19     A.   I look at the scalp because -- I
20 briefly look at the scalp in the beginning and
21 then I look at the scalp with more attention,
22 and I see if the alopecia -- the localization of
23 the alopecia.
24         If the alopecia is diffuse, if
25 it's more localized on the top of the scalp, if

Page 59

1  it's more localized on the hairline, if it's
2  patchy alopecia.
3          And then I want to establish if
4  that patient is still shedding.  So I take a
5  pull test in case I think it's useful, because
6  it's not always useful.  There are conditions
7  where it's not useful.
8          And I use my dermatoscope.  I have
9  a portable one, I look, I cannot take pictures
10 but I look at the scalp to get an idea.  And
11 then I take trichoscopy images using the
12 dermatoscope.
13         And then once I have those images,
14 in some cases I do need a biopsy.  In other
15 cases, I don't need a biopsy.  So I am going to,
16 you know, decide the need of the biopsy after
17 this exam.
18     Q.   What are your criteria for
19 determining whether to order a --
20     A.   Sorry.  Sorry to interrupt but I
21 missed something.
22         So I may order labs as well if I
23 think that this is a condition that may be
24 caused by nutritional deficiencies in vitamins,
25 in other nutrients, or may be caused by thyroid

Page 60

1  disease, other causes that I may look.  I may
2  order hormonal exam if the patient looks like
3  some hormonal abnormality.  So I also do this
4  before deciding to take a biopsy.
5      Q.   The things that you just listed as
6  what you look at and gain information on, does
7  that inform whether or not you order a scalp
8  biopsy on a patient seeking care for hair loss
9  concerns?
10     A.   I didn't understand the question.
11 Sorry.
12     Q.   Sure.  So let me ask it a
13 different way then.  That's fair.
14         What are your criteria for
15 determining whether to take a scalp biopsy on a
16 patient seeking care for hair loss concerns?
17     A.   Okay.  Depends on what type of
18 hair loss is involved.
19         So most -- in most cases I take a
20 biopsy when there is a suspicion of scarring
21 alopecia.  Because those are disorders that
22 require strong treatment.  Because if you don't
23 treat those disorders fast and aggressively, the
24 hair will not grow back.  So this is a situation
25 where I usually take a biopsy.

Page 61

1          And then I may take a biopsy when
2  my diagnosis is doubtful.  Sometimes I'm not
3  sure of the diagnosis, I take the biopsy.
4          But to be honest, when the
5  clinician doesn't have the diagnosis, often also
6  the pathologist doesn't come up with a
7  diagnosis.  Because the pathologist looks at
8  very small area, and so there is some
9  limitations as well.
10     Q.   Do you typically take a biopsy to
11 diagnose whether a patient has PCIA?
12     A.   Not really.  I don't do in my
13 patients.  I've seen many patients with this
14 problem.  I don't do in my patients.  Because I
15 think this is a diagnosis that is clinical and
16 from history, and you really don't need a biopsy
17 to confirm.
18     Q.   Now, Dr. Tosti, do you routinely
19 perform the scalp biopsies that you order for a
20 patient or do you typically have a colleague, a
21 resident, some other member of your staff
22 perform the biopsy?
23     A.   I usually have the resident
24 perform the biopsy.  But I am there with the
25 resident and I choose the biopsy type in all

16 (Pages 58 - 61)

Page 62

1 cases. In this particular case, I also took the
2 biopsy and the resident only suture.
3      Q.   Just to make sure I understood
4 you, in your typical practice, you have a
5 resident perform the biopsy under your
6 direction. Is that right?
7      A.   Yeah. I'm there, you know. I
8 don't just leave somebody else taking the biopsy
9 where they want to take. I choose where the
10 biopsy should be taken, meaning that I make a
11 circle in the area that should be biopsied. And
12 then I stay with the resident --
13      Q.   Do you have a typical number of
14 biopsy specimens you obtain for scalp biopsies
15 that you perform?
16      A.   Is this question, like, how many
17 biopsies do you perform a week?
18      Q.   No. Sorry.
19           My question is, on the scalp site,
20 on average, how many biopsy specimens will you
21 retrieve from a patient?
22      A.   In most cases, just one. In some
23 cases, two.
24      Q.   What are the cases, in general,
25 what are the reasons, in general, you would get

Page 63

1 two versus one biopsy specimen from the scalp?
2      A.   Okay. I'm telling my reasons and
3 then I am telling the reasons you can read in
4 the book.
5      Q.   I just want to know your reasons,
6 Dr. Tosti. I just want to know your reasons.
7      A.   Okay. My reasons, I take two
8 biopsy usually when I have a patch of alopecia
9 and, you know, I don't know if it's scarring or
10 non-scarring.
11           So in this case, I like to take a
12 biopsy from the center of the patch and the
13 biopsy from the periphery. Because if I only
14 take a biopsy from the periphery as suggested
15 for scarring alopecia, sometimes the pathologist
16 doesn't see any scarring, and I go back, I don't
17 know what he sees.
18           So if I also take from the center
19 of the patch, I know if it's a scarring process
20 and then I can discuss with the pathologist.
21 Because, you know, diagnosis with the
22 pathologist often requires a discussion and
23 clinical correlation. And, you know, my
24 pathologist, I like the same pathologist all the
25 time.

Page 64

1      Q.   And in this case, Mrs. Plaisance's
2 case, however, you did not consult with
3 Dr. Thompson about the biopsy specimens;
4 correct?
5      A.   Correct.
6      Q.   Do you know how biopsies are
7 supposed to be sectioned?
8      A.   You know, for most -- in
9 non-scarring alopecia, in most hair disorders,
10 we need horizontal sections, like, transverse
11 sections.
12      Q.   Do you typically prepare the
13 sections on scalp biopsies of your patients or
14 does the resident or someone else?
15      A.   No. The sections is the
16 laboratory. We take the punch, we send the
17 punch to the lab, and the lab does the sections.
18      Q.   And then --
19      A.   I always require horizontal, and
20 when I think it's important for vertical, I
21 require vertical.
22      Q.   In what situations would you
23 require vertical?
24      A.   You know, for instance, in lupus,
25 maybe important to have vertical. And in

Page 65

1 psoriasis, maybe it's important to have
2 vertical. Let's say few situations. But all
3 the situations where you have to look at the
4 epidermis very well, at the skin.
5           Because with transverse you get,
6 like, many sections but you don't see the top of
7 the skin well. With the vertical you see what's
8 happening inside the skin.
9      Q.   And what is the value with the
10 vertical sectioning to be able to see inside the
11 skin? What does that tell you?
12      A.   That some inflammatory disorders,
13 like, psoriasis, it is easier for the
14 pathologist to make the diagnosis if they see
15 the skin instead, because the clinical pictures
16 are more evidence. Some diseases may be more
17 evidence on the skin.
18      Q.   Is it similarly more difficult to
19 see an inflammatory process on horizontal
20 sectioning versus a vertical sectioning for
21 scalp hair loss?
22      A.   No. I would say just psoriasis.
23      Q.   Who sectioned the biopsies for
24 Mrs. Plaisance's biopsies?
25      A.   Dr. Thompson's lab.

17 (Pages 62 - 65)

1     Q.    So you took the biopsy in two
2 places from Mrs. Plaisance's scalp and then you
3 sent them to Dr. Thompson's lab and he performed
4 the sectioning; correct?
5     A.    Exactly.
6     Q.    And you -- did you instruct
7 Dr. Thompson to horizontally section those
8 specimens?
9     A.    He does in all cases.  He has a
10 special technique.  He only has this technique.
11 He also takes some vertical.  So using this
12 technique, he doesn't have the problem of
13 vertical and horizontal.  So his lab is probably
14 one of the best in the U.S. for this.
15     Q.    So Dr. Thompson only does
16 horizontal sectioning; is that what you said?
17     A.    No.  He use a technique, I don't
18 remember exactly the name.  With this technique,
19 the top of the section also he gets the
20 vertical, and then he gets horizontal.
21     Q.    Dr. Tosti -- I keep saying the
22 name Dr. Thompson and I am conflating the names.
23 So let me make a clear record.
24         Dr. Tosti, can you please get tab
25 108.  Aparna is going to put it in the

1 Exhibit Share, but you are welcome to get it
2 from your box as well.
3     A.    I lost the Exhibit Share.  Let me
4 go back.  Let me see what happened here.  I'm
5 going back.
6     Q.    It's uploading right now.
7     A.    Number 3.
8         MS. WADHWANI:  We are now going to
9 mark as Exhibit 3 a document that is Exhibit G
10 to your August 21 expert report in this case.
11         (Exhibit 3, Dermatopathology
12 Report, was marked for identification.)
13 BY MS. WADHWANI:
14     Q.    Have you seen this document
15 before?
16         MR. SCHANKER:  Counsel, can you
17 identify what it is?  I don't have a visual of
18 it.
19         THE WITNESS:  It's the back of the
20 document you have in your hand.  Pathology --
21         MS. WADHWANI:  Are you asking,
22 Darin, or do you want more information?
23         MR. SCHANKER:  That's good.  Thank
24 you, Dr. Tosti.
25     A.    Yes, I recognize it.

1     Q.    First let me ask, what is this
2 document?
3     A.    It's dermatopathology report of
4 Dr. Thompson.
5     Q.    Can you please turn to page 2.
6     A.    Of this one.  Okay.
7     Q.    And do you see the section in the
8 big text box that takes up most of the page
9 called "Microscopic"?
10     A.    Yes.
11     Q.    And Dr. Thompson here is
12 describing biopsy A and biopsy B, generally
13 speaking; correct?
14     A.    Yes.
15     Q.    Do you see that for both of those,
16 the description of biopsy A and biopsy B is that
17 they are horizontal sections?
18     A.    Yes.
19     Q.    Do you see going further down it
20 says "transverse sections" under both?
21     A.    Yes, it's the same.
22     Q.    So does that suggest to you that
23 Dr. Thompson just performed horizontal
24 sectioning of Mrs. Plaisance's biopsy
25 specimens?

1     A.    I don't think so.  I think he used
2 the same technique for everybody.  Just look at
3 the horizontal sections because there was no
4 reason in this case to look at the vertical
5 sections.
6     Q.    Did you ask him if that's what he
7 did?
8     A.    No, I didn't speak with him, but
9 I'm pretty sure.
10     Q.    You don't know with certainty one
11 way or the other whether Dr. Thompson conducted
12 vertical sectioning and/or whether he examined
13 that vertical sectioning; correct?
14     A.    I don't know.  But I know he
15 always use the same method, so I would be very
16 surprised if he didn't do that.  But I don't
17 know.  I didn't speak with him.  I just know
18 what he does because we work together for other
19 reasons.
20     Q.    Dr. Tosti, did you conduct a
21 clinical examination and biopsy of
22 Mrs. Plaisance on May 7, 2021?
23     A.    I think that's the day I saw her.
24 I think so.  But I have to get my progress notes
25 to be sure.  I don't want to answer without

Page 70

1 being 100 percent sure.
2    Q.   My colleague, Ms. Datta, is
3 loading that up into Exhibit Share.  You are
4 welcome, of course, to follow along with hard
5 copies.
6    A.   There's so many plaintiffs, and I
7 have to be sure this is the one.  Because
8 otherwise, it's complicating dates.
9        (Exhibit 4, May 7, 2021 progress
10 note, was marked for identification.)
11 BY MS. WADHWANI:
12    Q.   If you refresh --
13    A.   I did refresh.
14    Q.   Do you see Exhibit 4?
15    A.   It's still uploading.  Still
16 uploading.  Here, 4.  Yes.  This is my progress
17 note and -- yes.  May 7.  Yes.
18    Q.   And just for the record to
19 confirm, this is your progress note from your
20 visit with Mrs. Plaisance on May 7, 2021;
21 correct?
22    A.   Correct.
23    Q.   We've marked it as Exhibit 4.
24        Where did you conduct the exam and
25 biopsy of Mrs. Plaisance?

Page 71

1    A.   At University of Miami clinic.
2    Q.   Why did you conduct that exam and
3 biopsy?
4    A.   Because she was sent to me by the
5 counsel because she was a legal case.
6    Q.   So I take it you conducted that
7 examination and biopsy at the request of
8 Mrs. Plaisance's lawyers?
9    A.   Yes.
10    Q.   Did anyone else refer her to
11 you?
12    A.   No.
13    Q.   How long from start to finish did
14 your visit with Mrs. Plaisance take?
15    A.   Probably 45 minutes to one hour.
16    Q.   We have in front of us the
17 progress note from that visit.
18        Did you prepare any other notes
19 not contained in the progress notes that we're
20 looking at as Exhibit 4 right now during that
21 visit?
22    A.   No.  No.  That's what I wrote
23 during the visit.  And I think I had the
24 resident helping me.
25    Q.   Did you prepare any notes before

Page 72

1 or after the visit with Mrs. Plaisance?
2    A.   No.
3    Q.   So what we've marked as Exhibit 4,
4 these progress notes reflect all the notes you
5 prepared in connection with your visit with
6 Mrs. Plaisance; is that correct?
7    A.   Yes, it's correct.
8    Q.   I've seen and we will talk about
9 in a little bit the images and photographs you
10 took during the visit with Mrs. Plaisance.
11 Those are in what we've marked as Exhibit 4,
12 your progress note, as well as some photos in
13 Exhibit 1, your expert report.  Correct?
14    A.   Yes.
15    Q.   Did you take any other photographs
16 or images of Mrs. Plaisance that are not in your
17 expert report or your progress note?
18    A.   No, I did not.
19    Q.   Are there records you made in
20 connection with the exam and biopsy of
21 Mrs. Plaisance the same type of records you make
22 in the ordinary course of your practice?
23    A.   Yes.  Privately, yes.
24    Q.   Is the information you took from
25 Mrs. Plaisance and the notes you made of your

Page 73

1 visit with her consistent with the approach you
2 used for patients who are not visiting you as
3 part of a lawsuit?
4    A.   Yes.  Maybe here the hair history
5 is more detailed than the hair history I write
6 down for another patient, maybe I don't write
7 down everything.  That's what I ask in all
8 patients.  Maybe the documentation -- we have,
9 you know, time restrictions in our clinics
10 because we see many patients, so the
11 documentations of regular patients, it's
12 shorter.  I have 15 minutes for patients, and so
13 I don't have enough time to --
14    Q.   You are muted, Dr. Tosti.
15    A.   Basically, yes.  But, you know,
16 maybe -- normal patients are more scanty.
17    Q.   And did I hear you correctly when
18 you said that the hair history you took here
19 from Mrs. Plaisance was more detailed than the
20 hair history you typically take?
21    A.   Not -- I express myself wrongly.
22 What I wrote about the hair history is more
23 detailed.  Because I take the same type of hair
24 history, but here I wrote more than I usually
25 write for a patient.

19 (Pages 70 - 73)

Page 74

1    Q.   In your regular clinical practice,
2 Dr. Tosti, where are the medical records and
3 notes for your patients kept?
4    A.   They are kept in this electronic
5 medical system which is called EPIC, which is an
6 electronic medical system that the university
7 utilizes.
8    Q.   So that's basically a database
9 maintained by the University of Miami; is that
10 right?
11    A.   Yes.  Yes.  So all the medical
12 records are there, patients can access their own
13 medical records from outside, and also,
14 Mrs. Plaisance's medical records are in this
15 system.
16    Q.   Can other physicians and staff who
17 have appropriate credentials access this
18 database?
19    A.   Yes.
20    Q.   Do you strive to be accurate and
21 complete in your progress notes and medical
22 records for your patients?
23    A.   Yes, I try to be most accurate as
24 possible.
25    Q.   And so I think you said that the

Page 75

1 progress note here that you prepared as part of
2 your visit with Mrs. Plaisance on May 7 of this
3 year, that is also maintained in the University
4 of Miami's health system; correct?
5    A.   Yes.
6    Q.   So are Mrs. Plaisance's records
7 also available to appropriately credentialed
8 physicians and staff at the University of
9 Miami?
10    A.   Yes.  And also to her.
11    Q.   And also to her?
12    A.   Yes.  She should have received a
13 link, and through this link she is able to
14 access her medical records if she wants.
15    Q.   And, presumably, these records
16 would be available to any physician including in
17 Louisiana who made a proper records request for
18 them as part of his or her treatment of
19 Mrs. Plaisance; correct?
20    A.   I think so.  I'm not sure because
21 there are a lot of HIPAA, you know, problems.
22 And so I don't know how they give access.  This
23 is something I don't know exactly.
24    Q.   Fair enough.  You're not sure how
25 the university ensures that records requests

Page 76

1 are --
2       (Simultaneous speakers.)
3    Q.   You have an understanding that
4 there is a process --
5       COURT STENOGRAPHER:  You were both
6 speaking at the same time.
7    Q.   Do you have an understanding that
8 there is a process in place by the university
9 for physicians outside of the University of
10 Miami to access or to retrieve patient medical
11 records?
12    A.   I believe the patients should give
13 the permission first.  So everything is on the
14 patient.  So I believe that if the patient gives
15 the permission, somebody can access the medical
16 record.
17       But when my patients ask me that,
18 I suggest them, why don't you just bring
19 yourself your medical record and bring those
20 medical records to your doctor.  Because I think
21 it's probably possible, but it's not something
22 simple.
23    Q.   Fair enough.
24       So to put it most simply, there is
25 a way, subject to certain conditions, for a

Page 77

1 patient's other treating physicians to obtain
2 the medical records that you prepare for that
3 same patient; correct?
4    A.   I think so.  But I cannot say 100
5 percent sure.
6    Q.   And so, presumably, if there are
7 the certain criteria met, a physician of
8 Mrs. Plaisance's could obtain the progress note
9 that you prepared here as Exhibit 4; correct?
10    A.   Yes, I think so.
11    Q.   Did you note anywhere in your
12 progress note that Mrs. Plaisance was referred
13 to you by her attorneys?
14    A.   No, I did not.
15    Q.   Did you note anywhere in your
16 progress note here that Mrs. Plaisance visited
17 you in connection with a lawsuit?
18    A.   No, I did not.
19    Q.   Now, Dr. Tosti, I want to go
20 through these progress notes with you.
21       So if you have what we've marked
22 as Exhibit 4 in front of you, we'll probably go
23 through this for a little bit.  Okay?
24    A.   Okay.
25    Q.   You've already explained to me

20 (Pages 74 - 77)

Page 78

1 that this visit took place at the University of
2 Miami in May of 2021.
3        Next to "Reason for Visit," can
4 you please read what you have there?
5     A.   Reason for visit is something my
6 medical assistant does.  Reason for visit --
7        MR. SCHANKER:  Sorry, Counsel,
8 what page are you on?
9     Q.   Page 1 of Exhibit 4.  Right at the
10 top.
11     A.   Reason for Visit:  New Patient
12 Evaluation.
13        You know, that's what they usually
14 say, the system, new patient or follow-up.  So
15 it's a new patient evaluation.
16        Referred by, I think was referred
17 by me because I told the people to schedule
18 these patients because their counsel asked me to
19 see the patients.  And so probably that's what
20 means referred by PCP is me.
21     Q.   So you understand that
22 Mrs. Plaisance was not referred to you by her
23 primary care physician; correct?
24     A.   Yes.
25     Q.   But anyone who did not understand

Page 79

1 that and looked at this document that we've
2 marked as Exhibit 4, your progress note, would
3 think that Mrs. Plaisance was referred to you by
4 her primary care physician; right?
5     A.   Probably, yes.  But this is
6 something that people from scheduling does.  So
7 this is not part of the medical record that I
8 use.
9        The medical record at the top,
10 that comes from the people who schedule the
11 patient.  And that's what they say the reason
12 for the visit is new patient, the referral,
13 that's not my part.
14     Q.   Did you review this progress note
15 as part of your completion of it?
16     A.   When I review the progress note I
17 cannot change this part.  This part is
18 unchangeable.  So what I review and assess and
19 sign is all the medical part.  This initial part
20 is not -- the reason for visit is not
21 changeable.
22     Q.   I take it you didn't call down to
23 the department that intakes this information and
24 puts it in and ask them to change that notation;
25 correct?

Page 80

1     A.   No.  I didn't even -- to be
2 honest, you showed me that now, I didn't even
3 notice.
4     Q.   And is it true that Mrs. Plaisance
5 was not a new patient of yours in the
6 traditional sense; correct?  She came to you
7 through a lawsuit?
8     A.   But that's different.  It's a new
9 patient, it's not a follow-up.  They put new or
10 follow-up.  It's just two possibilities for a
11 patient to come.  It can be a new patient or it
12 can be a follow-up patient.
13        So even if she was sent by the
14 counsel, she was a new patient for the
15 University of Miami system.
16     Q.   Did any medical personnel attend
17 or participate in the visit with Mrs. Plaisance
18 with you?
19     A.   I believe the resident was there.
20     Q.   What's the name of the resident?
21     A.   I don't remember the name of the
22 resident.
23     Q.   Anyone else?
24     A.   My medical assistant is the one
25 who place the patient in the room, and the

Page 81

1 setup, all the general information for the
2 patient, like, check their address, check their
3 phone number, and set up the computer.  So the
4 medical assistant was there before me.  And then
5 I went in with my resident.
6        And sometimes the medical
7 assistant comes back because he may help with
8 the photography, he may help with the biopsy.
9 So that's the third person that is with me.
10     Q.   Do you remember the name of the
11 medical assistant who --
12        (Simultaneous speakers.)
13     A.   -- medical assistant name is
14 Roberto Pena.
15     Q.   And Dr. Tosti, please try your
16 best to let me finish my sentence --
17     A.   I'm sorry.
18     Q.   My question was, what is the name
19 of the medical assistant who participated in
20 Mrs. Plaisance's visit?
21     A.   The name of the medical assistant
22 was Roberto Pena.
23        MR. SCHANKER:  We've been going
24 another hour.  Can we take a break?
25        MS. WADHWANI:  Yeah, we can take a

21 (Pages 78 - 81)

Page 82

```
 1 break.
 2         MR. SCHANKER:  Thank you.
 3         THE VIDEOGRAPHER:  Thank you.
 4 This is the videographer.  The time is 11:39.
 5 We are going off the record.  This ends media
 6 file number 2.
 7         (Break taken.)
 8         THE VIDEOGRAPHER:  We are back on
 9 the record.  The time is 11:54.  We are
10 beginning media file number 3.
11 BY MS. WADHWANI:
12     Q.   Dr. Tosti, are you ready to
13 proceed?
14     A.   Yes.  Thank you.
15     Q.   When Mrs. Plaisance came to see
16 you in Miami in May of 2021, do you have an
17 understanding of whether anyone else accompanied
18 her to Miami?
19     A.   I think the husband accompanied
20 her.  But I'm not sure.
21     Q.   Do you have an understanding of
22 whether besides potentially Mr. Plaisance,
23 anyone else accompanied Mrs. Plaisance?
24     A.   I'm not sure it was the husband or
25 the son.  I don't remember, honestly.  I think
```

Page 83

```
 1 one family member accompanied her.  But now
 2 patients cannot come with somebody to the visit,
 3 I didn't see the family member, so I don't know
 4 who it was.  Maybe -- now I know the husband is
 5 in dialysis, so it probably wasn't the husband.
 6     Q.   Did you speak with a family member
 7 who accompanied Mrs. Plaisance?
 8     A.   No, I did not.
 9     Q.   Have you ever spoken with any of
10 Mrs. Plaisance's family members?
11     A.   No, never.
12     Q.   Do you know if counsel accompanied
13 Mrs. Plaisance to Miami?
14     A.   No, I don't know.
15     Q.   Where does Mrs. Plaisance live?
16     A.   I'm sorry?  Was the question?
17     Q.   Where does Mrs. Plaisance live?
18     A.   I think she lives in Louisiana.
19     Q.   So did Mrs. Plaisance travel to
20 Miami during the COVID pandemic?
21     A.   Yes.  But right now, everybody is
22 traveling to Miami, you know.  Miami is open.
23     Q.   And in May of 2021, did
24 Mrs. Plaisance travel to Miami?
25     A.   Yes.  It was open, Miami.
```

Page 84

```
 1     Q.   Did you ask her to come to
 2 Miami?
 3     A.   No.  She scheduled to come.  So I
 4 didn't ask, probably the counsel ask her.
 5     Q.   Did she express any reservations
 6 to you about having to travel to Miami during
 7 the pandemic?
 8     A.   No, she did not.
 9     Q.   Do you know the method of
10 transportation that Mrs. Plaisance used to get
11 to Miami?
12     A.   I think she took a plane, but I'm
13 not 100 percent sure.
14     Q.   Do you know if she took a
15 commercial plane or a private plane?
16     A.   No, I think a commercial plane.
17     Q.   Was Mrs. Plaisance vaccinated at
18 the time of her visit with you in May of 2021?
19         MR. SCHANKER:  Objection; form.
20     A.   Yes, she was.  I asked.
21     Q.   When Mrs. Plaisance came to Miami
22 for the visit with you, did she fill out any
23 medical forms?
24     A.   I don't think so.  But, again,
25 this is something you do with registration.
```

Page 85

```
 1 Probably no medical forms, but she probably
 2 sign, like, for HIPAA, for this kind of things.
 3     Q.   Have you seen those forms that she
 4 might have signed for HIPAA?
 5     A.   No, I don't see those forms.  I've
 6 never seen those forms.
 7     Q.   To the extent that she filled out
 8 those forms, where would they be maintained?
 9     A.   Again, in the medical record.
10     Q.   I take it, though, that you asked
11 Mrs. Plaisance some questions about her medical
12 history; correct?
13     A.   Yes.
14     Q.   Is the information she provided to
15 you about her history of hair loss documented in
16 your progress note that we've marked as
17 Exhibit 4?
18     A.   Yes.
19     Q.   Is that the information that is
20 documented on page 2 under "Hair history"?
21     A.   Let me check.  Yes.
22     Q.   Was there anything that
23 Mrs. Plaisance told you during her visit with
24 you about her hair history that you did not
25 write down in your progress notes?
```

22 (Pages 82 - 85)

1      A.   Not that I recall.  But I don't
2 think so because I tried to write down
3 everything.
4      Q.   Would you have written down
5 anything that you thought was noteworthy about
6 Mrs. Plaisance's hair history here?
7      A.   Probably, I would.  I try to write
8 down everything.  Because it's a legal case and
9 you never know, if something I don't write, then
10 may be important.
11      Q.   So it's your recollection sitting
12 here today that you did your best to write down
13 everything Mrs. Plaisance told you about her
14 hair history; correct?
15      A.   Yes, correct.
16      Q.   Did you do the same with regards
17 to her history and treatment of breast cancer,
18 did you do your best to write down the details
19 of that information that she provided to you?
20      A.   You know, I didn't detail as much.
21 As you see, the breast cancer even is much
22 bigger illness, I wrote six lines, and then
23 wrote more about hair.  But I wrote what I think
24 was the essential part to be included.  I'm
25 sorry.

1      Q.   Please, take your time.
2      A.   I'm okay.
3      Q.   During your May 7, 2021 visit with
4 Mrs. Plaisance, did she ask you about treatments
5 for hair loss?
6      A.   No, she did not.
7      Q.   Did you discuss possible
8 treatments with her?
9      A.   As you see, she told me she was
10 offered the Rogaine, but she didn't start
11 because she was afraid of side effect.  So I
12 didn't discuss because I don't think there was
13 anything else to be useful.  And she already
14 told me she didn't want to do Rogaine.
15      Q.   What side effects was
16 Mrs. Plaisance concerned about with Rogaine?
17      A.   She didn't explain in detail.
18 But, you know, most people are afraid of, you
19 know, having to take the drug for life, that may
20 develop excessive hair in other areas, the hair
21 may fall down more when they start the drug.
22 This is not very uncommon.  It is very common
23 for people not to want to start Rogaine.
24      Q.   I appreciate what may be common
25 among the average person.  I'm just focused on

1 Mrs. Plaisance.
2           Did she express to you what her
3 specific concerns were about the side effects of
4 Rogaine?
5      A.   I think that's what she said.  She
6 said that she was afraid of losing more hair
7 instead of gaining hair.
8      Q.   Had you suggested to her she
9 should take Rogaine?
10      A.   I didn't discuss a lot of
11 treatment, you know.
12      Q.   How did the conversation about
13 Rogaine come up?
14      A.   Because she told me what she did,
15 and she told me that she was offered Rogaine.
16 But she is not interested in Rogaine because
17 she's convinced that this may cause side effect.
18      Q.   Did you have any further
19 discussion with her about Rogaine?
20      A.   I don't remember.  To be honest, I
21 don't remember.  I may have said in reality
22 Rogaine is a very safe medication.  But I don't
23 remember.  I probably said that.
24      Q.   Did you do anything to confirm the
25 information Mrs. Plaisance gave you about her

1 hair history was accurate and complete?
2      A.   You know, I read medical records.
3 And some of the medical records I read before
4 the visit were consistent.  And even the ones
5 that I just found were basically consistent.
6 Because she told me she had this episodes of
7 shedding in the past.
8      Q.   So Dr. Tosti, my question was, did
9 you do anything at the time that Mrs. Plaisance
10 visited with you to confirm the information she
11 gave you about her hair history was accurate and
12 complete?
13      A.   You know, I check the medical
14 record.  As I already told you, I found in the
15 medical record that in 2014, before starting
16 chemotherapy, the doctor wrote that the hair
17 basically was normal.
18           And then I read the medical record
19 of Matherne Dermatology that show that she went
20 to see them in 2016, I think, or 2017
21 complaining of hair loss.  And, you know, that
22 also makes sense with the medical record.
23      Q.   And when did you read the Matherne
24 records, after Mrs. Plaisance's visit with you
25 or before?

23 (Pages 86 - 89)

1     A.   Before.  Those I read before.
2     Q.   And you did not note the
3 information in those records in your hair
4 history; correct?
5     A.   I think it's here.  She saw
6 dermatologist in 2016 and she was given
7 injection.  And --
8     Q.   Let's turn to that section,
9 Dr. Tosti.
10     A.   You see that in the end of the
11 hair history?  It's there.
12     Q.   I do.  And is that information
13 that Mrs. Plaisance provided to you --
14     A.   Yes.
15     Q.   -- and you wrote it down?
16     A.   Yes.
17     Q.   That's correct.
18          So you took these notes here, she
19 saw a dermatologist in 2016 and she was given
20 injections, that information and the information
21 following it is based on what Mrs. Plaisance
22 told you at the time; correct?
23     A.   Yes.  But I knew this information
24 was right because I had read the Dr. Matherne
25 medical record.

1     Q.   Fair enough.  So my question is
2 just going to be:  When you documented this
3 information under "Hair History" at the time,
4 was that based on what Mrs. Plaisance was
5 telling you during your visit with her?
6     A.   Yes.
7     Q.   What did you do in preparation, if
8 anything, for your visit with Mrs. Plaisance in
9 May of 2021?
10     A.   I read the medical records.
11     Q.   Are those the medical records that
12 you told me about earlier that you reviewed --
13     A.   Yes.  Those medical records I
14 reviewed before the visit.  And I look at the
15 images, even if they were bad.  And that is
16 everything I had at that time.
17     Q.   And so before you visited with
18 Mrs. Plaisance in May of 2021, you had not
19 reviewed the Dr. Jones medical records;
20 correct?
21     A.   Correct.
22     Q.   Because you just got those on
23 Saturday, right, two days ago?
24          MR. SCHANKER:  Objection; form.
25     A.   Correct.

1     Q.   And you had not reviewed the
2 deposition testimony of either Dr. Chauvin or
3 Dr. Matherne; correct?
4     A.   Correct.
5     Q.   When Mrs. Plaisance came to her
6 visit, did you follow the same basic steps for
7 conducting her clinical visit that you described
8 to me a little bit earlier today that you
9 conduct in your normal practice?
10     A.   Yes.  Absolutely, yes.
11     Q.   Before you conducted the pull
12 test, did you ask Mrs. Plaisance whether she had
13 recently washed her hair?
14     A.   Yes, I did.  But this is something
15 that now, there is a very recent paper showing
16 this not really important.
17     Q.   Did you ask her anyway?
18     A.   Yes, I did.
19     Q.   What did she say?
20     A.   She shampooed the day before.
21     Q.   You didn't note that anywhere in
22 your records, did you?
23     A.   I never note that in any patient
24 because it's nothing that is important nowadays.
25 It's a few years this paper has been published

1 showing that shampooing doesn't change the
2 results.
3     Q.   Why did you conduct a biopsy in
4 Mrs. Plaisance's scalp?
5     A.   Because she was a legal case.
6     Q.   Is that the only reason, because
7 she was sent to you by the lawyers?
8     A.   To be honest, yes.
9     Q.   Why did you perform biopsy at two
10 sites?
11     A.   Because as I said in the
12 beginning, a biopsy is a very small sample, and
13 taking two sides gives you more information.
14     Q.   Why did you select the vertex
15 scalp as one of the sites?
16     A.   Because this is an area that is
17 affected both in androgenetic alopecia and in
18 PCIA.  And so this is the right area to take the
19 biopsy.  And also, it's one area that was
20 severely affected.  I tried to take the biopsy
21 where you have the scalp more severely affected.
22     Q.   Can you please turn to page 13 of
23 your report that we marked as Exhibit 4.
24     A.   I don't see the pages here.
25     Q.   We are going to put them up.  I

24 (Pages 90 - 93)

1 think that is the problem, Dr. Tosti.  We are
2 going to Screen Share so it's easier to see the
3 pages.  Just give us a second.  Thank you.
4         MR. SCHANKER:  Just for the
5 record, the hard copy stops at page 4.
6         MS. WADHWANI:  That's the way the
7 document was served to us, was the pagination
8 stopped.  So that's why we are going to put it
9 up for purposes of noting what the pagination is
10 on the PDF.
11         Can you see the document on your
12 screens?
13         THE WITNESS:  I see page 2.  I do.
14 Now, let me see.  Now I see dermatoscopy
15 pictures.
16         MS. DATTA:  Is the Screen Share
17 working?  Can you see Exhibit F?
18         THE WITNESS:  Yes.
19         MS. WADHWANI:  The only person who
20 can't see it apparently is me.  The Screen Share
21 is not working on my screen.
22 BY MS. WADHWANI:
23     Q.   We will get there, Dr. Tosti,
24 slowly but surely with the technology.
25         All right.  So can you see this

1 image in front of you?
2     A.   Yes.
3     Q.   Does this photo show where on the
4 vertex scalp of Mrs. Plaisance you performed the
5 biopsy?
6     A.   Yes.
7     Q.   Is the biopsy identified by the
8 purple circle?
9     A.   Yes.  The purple circle is bigger
10 than the biopsy because the biopsy is just 6
11 millimeter.  That purple circle is probably 6
12 millimeter.
13         (Reporter clarification.)
14     A.   The purple circle is probably 6
15 millimeter and the biopsy is 4.  So the circle
16 indicates where to take the biopsy inside.  Not
17 all the circle was taken away, just a piece 4
18 millimeter big inside the circle.
19     Q.   I appreciate that explanation.
20         Why did you select the frontal
21 scalp as the second site or other site of
22 Mrs. Plaisance's biopsy?
23     A.   Because that was the site that was
24 mostly affected, and I also chose that site.
25     Q.   And what do you mean by "mostly

1 affected"?
2     A.   More severely.
3     Q.   I didn't catch that.  It was more
4 what?
5     A.   More severely.  She had more
6 thinning in that side.  The scalp was more
7 visible.
8         That's not the site.  There is
9 another picture --
10     Q.   Yes.  There is another picture of
11 frontal scalp.  Yes.
12     A.   With the blue mark.
13     Q.   Keep going back.
14     A.   No, no.  She's right --
15     Q.   There we go.
16     A.   This is the frontal scalp.
17         And I take on the side because I
18 don't want to take a biopsy in the middle
19 because that biopsy would be very visible.
20     Q.   So isn't the more visible site the
21 more affected site?
22     A.   I would say, of course, in the
23 center I show you well could be even more.  But
24 I don't want to leave biopsy scar in a patient
25 who already has a problem in the center of the

1 scalp.  So I took a little bit on the side,
2 which is probably less affected but I thought
3 was better for her.
4     Q.   And so, Dr. Tosti, based on your
5 testimony that generally you prefer the most
6 affected part, why not take a biopsy at
7 mid-scalp?
8     A.   Here, because depends how you take
9 the picture, you know.  This picture was taken
10 with parting here.  If you look at all the
11 pictures, you know, this is a bad picture.  It's
12 basically where I took the biopsy.  And this is
13 the frontal here.  The hair cover because of how
14 the hair is parted.  Pictures are difficult to
15 judge.  If you don't see -- sometimes these
16 patients look much less in pictures than in
17 reality.
18     Q.   Your report says that right here
19 on the mid-scalp she's experiencing severe
20 thinning; correct?
21     A.   She is experiencing severe
22 thinning in all the mid-scalp.  But the
23 mid-scalp goes from here to here in the parting,
24 in the center parting.
25     Q.   All right, Dr. Tosti, I want to

25 (Pages 94 - 97)

Page 98

1 continue talking about your progress note.
2       So stay on this document, but
3 let's go to page 2, please, of your progress
4 note, which is Exhibit 4.
5       A.   Okay. I go myself. Page 1, 2.
6 Okay. I'm here.
7       Q.   So I am going to focus on the
8 section called "Hair History."
9       Are you with me?
10      A.   Okay. Sorry. Yes.
11      Q.   Does the hair history you
12 described here reflect your knowledge of
13 Mrs. Plaisance's hair history at the time of
14 your examination with her?
15      A.   No. It reflects what she told me
16 when I examined her.
17      Q.   Does the hair history reflect the
18 information you considered related to her hair
19 history when you concluded on page 3 that she
20 had permanent chemotherapy-induced -- sorry.
21 Let me start again.
22      Does the hair history here on
23 page 2 reflect the full information you
24 considered related to Mrs. Plaisance's hair
25 history when you concluded on page 3 of

Page 99

1 Exhibit 4 that Mrs. Plaisance has permanent
2 alopecia after chemotherapy?
3       MR. SCHANKER: Objection; form.
4       A.   This is a piece. As I said, when
5 I see a patient I take the history. But in this
6 case I also look at the medical record. So this
7 is the history, what the patient told me. It's
8 called analysis in the old ways of talking with
9 the patient.
10      So when you see a patient you ask,
11 How do you feel? When did this happen? And in
12 fact, I use her words. She said hair before
13 chemotherapy was very good. So that is not
14 something I would define, you know. But that's
15 her definition.
16      Q.   Did you have an
17 understanding -- strike that.
18      Did you note in your progress
19 notes anywhere what additional information you
20 considered in coming up with the assessment that
21 she had permanent alopecia after chemotherapy?
22      MR. SCHANKER: Objection; form.
23      A.   I didn't understand the question.
24 Exactly what's the question?
25      Q.   In your progress notes do you note

Page 100

1 anywhere that you took into account her medical
2 records in concluding on page 3 that she had
3 permanent alopecia after chemotherapy?
4       A.   I don't think I wrote that. I
5 don't think I wrote on my progress note.
6       Q.   Why didn't you include that
7 information?
8       A.   It's never include when -- when I
9 do a progress note I never include why. This is
10 not part of the way the medical records are
11 taken. Doctors don't say why. You know,
12 that's --
13      (Simultaneous speakers.)
14      A.   -- differential diagnosis, but
15 they don't write why they decide this diagnosis
16 in the progress note.
17      Q.   It's your testimony that doctors
18 don't explain how they come to a diagnosis in
19 their medical records?
20      MR. SCHANKER: Objection; form.
21      A.   They usually don't write down how
22 they -- they describe the clinical findings and
23 then write down the diagnosis and the possible
24 differential if they have a differential. But
25 they don't write down, this is permanent

Page 101

1 alopecia because of this, this, this, this.
2 This is not the way we do when we do assessment.
3       Q.   Did the information noted under
4 "Hair History" here contribute to your
5 conclusion of permanent chemotherapy after
6 alopecia?
7       A.   Absolutely, yes. Together with
8 hair examination and hair history before, not
9 just the hair history, the breast cancer
10 history, and all the literature I've read,
11 everything I've been studying, and my personal
12 experience. Everything took part in making me
13 decide this diagnosis.
14      Q.   Do you know what Mrs. Plaisance's
15 hair density was 10 years before she took
16 chemotherapy?
17      A.   She told me it was very good. And
18 the doctor who saw her just before chemotherapy
19 said it was normal.
20      Q.   Right, Dr. Tosti. But that was in
21 2014, you said?
22      A.   Yes. Before 10 years ago, back in
23 2004, I don't know her hair. But I'm trying to
24 get the dates of those pictures. Because one of
25 those pictures she provided may be dated, in my

26 (Pages 98 - 101)

Page 102

1 opinion, and see if we can before the end of
2 this deposition have a date on one of those
3 pictures showing her hair density.
4      Q.    When you conducted this
5 examination you did not know what
6 Mrs. Plaisance's hair density was in 2011;
7 correct?
8      A.    Correct.  But that was not
9 important for me.  I want to be sure that her
10 hair density was good before starting
11 chemotherapy.
12          (Simultaneous speakers.)
13      Q.    And you did not know what
14 Mrs. Plaisance's hair density was in 2003?
15          MR. SCHANKER:  Counsel, she was
16 not done with her answer.  You interrupted her.
17          MS. WADHWANI:  I apologize.
18      A.    No, sorry.  So what I want to say,
19 that sometimes people have hair disease
20 that resolve.  This is very common.
21          (Reporter clarification.)
22      A.    Very commonly people have hair
23 disease that resolve.  Some people may have
24 alopecia areata, alopecia areata resolved.
25          So they had something 10 years

Page 103

1 ago, but they are not part of the current
2 problem, for many other medical problem.  So I
3 think I really focused on her hair just before
4 chemotherapy -- before that time.
5      Q.    I'm just asking a simple question,
6 Dr. Tosti.  Do you know what Mrs. Plaisance's
7 hair history was 10 years before she took
8 chemotherapy?
9          MR. SCHANKER:  Objection; form.
10      A.    I don't know.  But I think it's
11 irrelevant.
12      Q.    Do you know what Mrs. Plaisance's
13 hair density was five years before she took
14 chemotherapy?
15      A.    Again, I think this is not
16 relevant, but I don't know.
17      Q.    Why is it not relevant?
18      A.    Because she may have had another
19 disease that resolved after that, before the
20 chemotherapy.  What's important is that her hair
21 density was normal before starting the
22 chemotherapy, at the time she had the breast
23 cancer.
24      Q.    And you are basing that on the
25 medical record of the radiation oncologist;

Page 104

1 correct?
2      A.    I do.
3      Q.    Moving down in your note, it
4 states, "Had a temporary episode of increased
5 hair shedding years before her breast cancer,
6 possible 2010 but not sure.  Went to see a
7 dermatologist who gave her injections.  However,
8 she notes it resolved after stopping a diet that
9 she was doing."
10          I take it, again, that this is
11 information that Mrs. Plaisance provided to you
12 verbally during her May visit with you;
13 correct?
14      A.    Yes.
15      Q.    Can you explain what this note
16 means?
17      A.    I ask her, did you have any hair
18 loss before?  And she answer what is written
19 here, that she had some excessive shedding, and
20 that she was not sure about the dates.  She said
21 possibly 2010, not sure.  And what I wrote.  She
22 went to see a dermatologist who prescribed
23 injection.  And then she says that she thought
24 it was because of the diet.  And after stopping
25 the diet, she was doing well.

Page 105

1      Q.    Did Mrs. Plaisance explain to you
2 what she meant by "temporary," meaning how long
3 she experienced the hair shedding?
4      A.    Yes.
5          MR. SCHANKER:  Objection; form.
6      A.    Yes.  She told me that there were
7 times she found more hair under the shower, on
8 the pillow.  That's what she said.
9      Q.    Did she tell you when these events
10 happened of finding more hair under the shower
11 or on her pillow?
12      A.    As I've written, she was not sure.
13 So I ask.  You know, I try to name the period.
14 But she said around 2010, you know, but
15 possibly.  She didn't know.
16      Q.    Do you have an understanding of
17 what the diet was that Mrs. Plaisance was on?
18      A.    She told me that she wanted to
19 lose weight.
20      Q.    Did she explain what kind of diet
21 she was taking for that?
22      A.    No.  I didn't ask.
23      Q.    Why didn't you ask?
24      A.    Because that type of diet is not
25 so relevant.  There are studies showing even a

27 (Pages 102 - 105)

1 diet of 1,500 calories, which is a diet that is
2 not so strong, can cause telogen effluvium. So
3 I thought I believe she had telogen effluvium,
4 and the diet maybe was the trigger.
5          But, you know, at this point, I
6 was not very interested to understand which was
7 the trigger. She is not on diet anymore and
8 this is not relevant for the present problem.
9      Q.   Did Mrs. Plaisance provide you
10 with any photos of her hair as it looked like
11 while she was experiencing this shedding?
12      A.   You know, she's not technological
13 at all, no. When I asked about photo, I don't
14 think she even has a phone where she keeps the
15 photo. That's my understanding.
16      Q.   Did Mrs. Plaisance tell you that
17 this shedding episode was the only hair loss
18 episode she had experienced before she was
19 diagnosed with breast cancer?
20      A.   Basically, yes, she told me that.
21      Q.   And so your understanding at the
22 time of this visit was that Mrs. Plaisance had
23 had a single temporary episode of hair shedding
24 from her scalp; correct?
25      A.   That's what I understood, it just

1 was one. And then when I read the medical
2 records, I saw it was more than one.
3      Q.   But at the time of your visit with
4 her, you understood it was a single temporary
5 episode; correct?
6      A.   Yes.
7      Q.   Do you know the name of the
8 dermatologist that Mrs. Plaisance saw who you
9 are referring to here?
10      A.   The one in 2016 --
11      Q.   The one in 2010. Sorry.
12      A.   No, I didn't ask the name of the
13 dermatologist. Because she didn't even know the
14 date.
15      Q.   How did this information about her
16 single temporary episode of hair shedding figure
17 into your diagnosis of Mrs. Plaisance as having
18 permanent alopecia after chemotherapy as you
19 note on page 3?
20          MR. SCHANKER: Objection; form.
21      A.   What I think is that she had
22 telogen effluvium in the past. And people who
23 have telogen effluvium may have relapses of
24 telogen effluvium.
25          But telogen effluvium is nothing

1 to do with permanent alopecia after
2 chemotherapy. So I think these are two
3 unrelated problems.
4      Q.   And so in May, you concluded that
5 her temporary episode of hair shedding before
6 chemotherapy was unrelated to her permanent
7 alopecia after chemotherapy?
8      A.   Yes. I'm sure this is unrelated.
9 Even now I think it's unrelated.
10      Q.   Now, you did not say in your
11 progress note here that you considered that
12 episode of hair shedding to be unrelated to her
13 permanent alopecia after chemotherapy;
14 correct?
15      A.   This note is just report the
16 history. It's not a discussion of the problem.
17 So you don't discuss the problem in the
18 patient's note. You just report what's
19 happening and what the patient is saying. So
20 this is not the site to discuss. Never for any
21 patient I discuss.
22      Q.   But you did discuss in your expert
23 report how you came to your conclusion that, in
24 your opinion, that Mrs. Plaisance has permanent
25 chemotherapy-induced alopecia; correct?

1      A.   Yes. The expert report is a place
2 where I discuss. Here is a place where I just
3 report what's happening and what the patient
4 tells me.
5      Q.   And in your expert report -- which
6 we've marked as Exhibit 1 and you are free to
7 look at -- there is nowhere in that report where
8 you explain why you think Mrs. Plaisance's hair
9 loss episode that she described to you and her
10 permanent chemotherapy-induced alopecia are
11 unrelated; correct?
12      A.   I think there is. I have to check
13 and read the expert report. Can I do that?
14      Q.   Well, maybe when we go to a break.
15 But sitting here right now, do you recall --
16      A.   But I'm sure I discuss in expert
17 report. So to answer your question, yes, I
18 discuss that in the expert report.
19      Q.   Well, please turn to page 20 of
20 your expert report.
21      A.   So I go away from here, okay.
22      Q.   Yes. Exhibit 1. Sorry.
23      A.   Page 20.
24      Q.   Are you on page 20?
25      A.   Not yet. I am now. I'm here.

Page 110

1    Q.   So I'm looking under the section
2  called "History."  And in the fourth paragraph
3  down you identify, as you did in your progress
4  report, that Mrs. Plaisance has reported to you
5  this episode of excessive hair loss in the past,
6  before chemotherapy, possibly in 2010.
7        Correct?
8    A.   Yes.
9    Q.   And then if you go to page 35 of
10  your report -- actually, sorry.  Go to page 34
11  first, please.  And you see you have "Permanent
12  Chemotherapy-Induced Alopecia" in that section;
13  correct?
14    A.   Yes.
15    Q.   And about three paragraphs down
16  you talk about how Mrs. Plaisance lost her hair
17  during chemotherapy; right?
18        And then on the next page you have
19  some other discussions about Mrs. Plaisance's
20  hair density, point to her statements at the end
21  of 2014, her use of Viviscal, and that her
22  history and clinical findings are consistent
23  with a diagnosis of PCIA.
24    A.   Yes.  If you go in the
25  differential diagnosis, which is page 30, under

Page 111

1  "Telogen Effluvium" I explain why I don't think
2  telogen effluvium is part of the problem, you
3  know.
4        And you can see that page under
5  the image.  I said, "Although Mrs. Plaisance is
6  taking medication that can be associated with
7  telogen effluvium, and has history of telogen
8  effluvium in the past, this condition was
9  resolved a few years before chemotherapy.  She
10  is not shedding more than normal now, and her
11  pull test, clinical presentation, and dermoscopy
12  exclude this diagnosis."
13        So I consider that, you know.  I
14  consider in the differential where I usually
15  consider other factors.  But I did consider
16  that.
17    Q.   So your testimony is that page 30
18  is where you have addressed why this history is
19  not relevant to your determination that
20  Mrs. Plaisance had PCIA; correct?
21    A.   Yes.  I explain why this history
22  does not change my diagnosis of PCIA.  It can be
23  consistent with this diagnosis; it's not
24  something that excludes this diagnosis.
25    Q.   Sorry for all the toggling, but

Page 112

1  let's go back to Exhibit 4 right now, which is
2  your progress note.
3    A.   Okay.  Okay.  I'm here.
4    Q.   I am jumping down a couple of
5  sentences to the sentence that starts, "Hair
6  started to regrow about one month after her last
7  chemotherapy.  She notes it was very curly
8  before and when it regrew it was less curly."
9        Did Mrs. Plaisance provide you
10  with that information during your visit?
11    A.   Yes.
12    Q.   And then moving down, "She
13  discussed with her oncologist that her hair did
14  not seem to regrow properly.  The oncologist" --
15  is that supposed to be "thought"?
16    A.   Yes.  So what's the question?
17    Q.   I think what you are saying -- you
18  correct me if I'm wrong, I think what you are
19  saying here is, "She discussed with her
20  oncologist that her hair did not seem to regrow
21  properly.  The oncologist thought was just a
22  question of time."
23        Is that correct?
24    A.   That's correct.  Because she
25  discuss with the oncologist in May, and the

Page 113

1  oncologist, you know, said that it was too
2  early.
3    Q.   That's May of 2014; correct?
4    A.   Yes.
5    Q.   Did Mrs. Plaisance provide you
6  with this information during your visit with
7  her?
8    A.   No.  But I saw that in the medical
9  records.
10    Q.   And was May of 2014 more or less
11  than six months after Mrs. Plaisance completed
12  chemotherapy?
13    A.   No, it was less.  She completed in
14  March, I think, and May was two months.  So it
15  was too early.  I think the oncologist gave the
16  right answer.
17    Q.   Have you ever spoken with
18  Dr. Chauvin?
19    A.   No.  But I believe that maybe they
20  didn't understand between themselves.  Maybe she
21  expected then after this answer, she thought the
22  question of time could be a very long time.
23  That what I feel.  That what she told me.  No, I
24  didn't speak with any doctor.
25    Q.   And when you say, Dr. Tosti, just

29 (Pages 110 - 113)

Page 114

1  so the record is clear, maybe she expected then
2  after this answer, she thought it could be a
3  question of some time, is the "she"
4  Mrs. Plaisance?
5      A.   Sorry.  I didn't understand
6  exactly your question.
7          Do you want me to repeat what I
8  thought is that I thought that maybe she
9  misunderstood the oncologist and thought
10 question of time may be one, two years, and
11 that's why she didn't -- went back to ask.
12 That's what I think.
13     Q.   Did Mrs. Plaisance tell you that
14 that was her understanding of what her
15 oncologist told her?
16     A.   No, no.  That's my guess.
17     Q.   That's just your speculation;
18 right?
19     A.   My speculation.  I agree.
20     Q.   Do you have any reason sitting
21 here today to think that Dr. Chauvin's medical
22 records are inaccurate?
23     A.   No.
24     Q.   And you told me that at some point
25 you read Dr. Chauvin's deposition testimony.  Do

Page 115

1  you have any reason to believe she did not
2  provide truthful testimony during her
3  deposition?
4      A.   Absolutely not.  During her
5  testimony she said maybe she had some hair loss
6  and I didn't, you know, document that.  She saw
7  a phrase like that in her testimony.
8      Q.   This is Dr. Chauvin you are
9  talking about?
10     A.   Yes.
11     Q.   Moving down in your progress note,
12 "She saw a dermatologist in 2016 and she was
13 given injections."
14         I think we've talked a bit about
15 that this morning already.
16         I take it that the dermatologist
17 you are referring to here is Dr. Matherne;
18 correct?
19     A.   Yes.
20     Q.   And did you know it was
21 Dr. Matherne at the time that you wrote this
22 note?
23     A.   Yes.  Because I saw that she --
24 the one that she was seeing.  She has been
25 seeing for many years.

Page 116

1      Q.   And if I understand your note
2  correctly here, Dr. Matherne in 2016 gave her
3  injections for hair loss; correct?
4      A.   Yes.
5      Q.   Mrs. Plaisance told you that she
6  stopped taking those because she felt they
7  weren't working; right?
8      A.   I don't think she told me that.
9  Well, not helping, but she kept taking.  I think
10 they kept doing these injections.
11     Q.   So, then, help me to understand
12 your note here, Dr. Tosti, which says, "She saw
13 a dermatologist in 2016 and she was given
14 injections, which were not helping, and then he
15 recommended Viviscal, which she is still
16 taking."
17     A.   Yes, at one point he stop the
18 injections and gave Viviscal.  But the
19 injections were several sessions, as far as I
20 remember.
21     Q.   Do you have an understanding of
22 whether Mrs. Plaisance stopped taking the
23 injections when she started Viviscal?
24     A.   You know, in my mind, injections
25 are not all in the treatment of any type of

Page 117

1  alopecia, basically.
2          So as I read from his testimony,
3  he was giving the injections in the idea that
4  she may have seborrheic dermatitis that causing
5  inflammation.
6          But it is not a real treatment.
7  It's not a real treatment except for alopecia
8  areata.  So I didn't really put a lot of
9  interest in the injections because I know the
10 injections are not going to work.
11     Q.   My question is different,
12 Dr. Tosti.
13         My question was simply do you have
14 an understanding of whether Mrs. Plaisance
15 stopped taking the injections when she started
16 taking Viviscal?
17     MR. SCHANKER:  Objection; form.
18     A.   I think so.  You stop doing the
19 injections and they recommended Viviscal.  But
20 I'm not 100 percent sure.  You know, maybe he
21 still kept doing some injections once in a
22 while.
23     Q.   When your progress note says that
24 injections were not helping, where did you get
25 that information from?

30 (Pages 114 - 117)

Page 118

1     A.   From her.  She said they were not
2 helping.  But she didn't mean she stopped the
3 injections.  I didn't ask her, she stopped the
4 injections.  I wrote that her opinion were not
5 helping.  And doctor recommended Viviscal.
6     Q.   According to your note,
7 Mrs. Plaisance is still taking Viviscal;
8 right?
9     A.   At the time of my visit.
10     Q.   Fair enough.  At the time of your
11 visit in May 2021 --
12     A.   Yes.
13     Q.   -- she was still taking the
14 Viviscal; correct?
15     A.   Yes.
16     Q.   And had she been taking the
17 Viviscal since 2016?
18     A.   I think so.
19     Q.   Would it be your understanding
20 that she was taking the Viviscal for five years
21 because it was working?
22          MR. SCHANKER:  Objection; form.
23     A.   You know, there are no data on
24 Viviscal and PCIA.
25     Q.   Was it your understanding that

Page 119

1 Mrs. Plaisance was continuing to take the
2 Viviscal because she felt it was working?
3     A.   Yes.  My understanding is that.
4     Q.   Is that what she told you during
5 your visit with her?
6     A.   No, she didn't tell me it was
7 working.  She just told me she was still taking.
8          She is complaining of hair loss,
9 you know.  When she came to see me, she told me
10 that the hair loss was very big psychological
11 problem for her, she was unhappy.  So I don't
12 think she was happy with now taking the
13 Viviscal.  But maybe -- I think she thought it
14 was something she was doing.  Sometimes for them
15 it's important to do something.
16     Q.   Nevertheless, she was taking
17 Viviscal for five years; correct?
18     A.   Yes.
19     Q.   And, finally, you note here,
20 "Family history for hair loss:  Her son and one
21 of her brothers (has two brothers and two
22 sisters)."
23          Did Mrs. Plaisance provide you
24 with that information during your visit with
25 her?

Page 120

1     A.   Yes, she did.  Everything in the
2 history is information provided by her.
3     Q.   And in your report you also noted
4 that Mrs. Plaisance reports that her son and her
5 two brothers have androgenetic alopecia but
6 women in her family have normal hair density,
7 she has two sisters.  Correct?
8     A.   That's what she told me.
9     Q.   And that's what you wrote in your
10 report; right?
11     A.   Yes.
12     Q.   Now, you read the medical records,
13 as you've testified earlier today, of
14 Dr. Matherne; correct?
15     A.   Yes.
16     Q.   And did you see in one of his 2016
17 medical records that Mrs. Plaisance reported to
18 him that she had a maternal aunt who experienced
19 hair loss?
20     A.   Yes, I saw that.
21     Q.   Did Mrs. Plaisance tell you about
22 her aunt at this visit in May of 2021?
23     A.   No, she did not.
24     Q.   And you did not note in your
25 expert report that she had a maternal aunt who

Page 121

1 experienced hair loss; correct?
2     A.   Correct.  Because at that time I
3 haven't seen -- oh, maybe I didn't note.  I
4 didn't report.
5     Q.   Wouldn't it have been relevant to
6 your assessment of Mrs. Plaisance to know that
7 she had an aunt who suffered from hair loss?
8     A.   It is not a very close relative.
9 But, of course, if she told me, I would have
10 written it down.
11     Q.   Would it have been relevant to
12 your assessment of Mrs. Plaisance to know that
13 she had an aunt who suffered from hair loss?
14     A.   Sorry.  Tell me again.
15     Q.   Would it have been relevant to
16 your assessment of Mrs. Plaisance to know that
17 she had an aunt who suffered from hair loss?
18     A.   You know, it was something I would
19 like to know, but I don't think it change my
20 opinion.
21     Q.   Do you agree it's relevant history
22 regarding Mrs. Plaisance's alopecia, that she
23 has four family members with alopecia?
24          MR. SCHANKER:  Objection to form.
25     A.   Not four.  She has two brothers

31 (Pages 118 - 121)

Page 122

1  and one aunt.  Just three.
2      Q.  Oh, sorry.  I'm looking at the
3  wrong number.  Let me ask that question again.
4          Do you agree it's relevant history
5  regarding Mrs. Plaisance's alopecia that she has
6  three family members with alopecia?
7      A.  I think it's relevant, but doesn't
8  change my opinion.  It's part of the history,
9  you know.  But many people have family members
10  with alopecia and have full head of hair.  So
11  it's not something that changes the diagnosis.
12      Q.  Dr. Tosti, let me refer you to
13  page 20 of Exhibit 1, your expert report.
14      A.  Okay.  Let me go back.  Page --
15      Q.  Page 20.  Are you on page 20?
16      A.  No.  I'm fast but not so fast.  I
17  am.
18      Q.  Okay.  The second-to-last
19  paragraph of page 20 says, "Mrs. Audrey
20  Plaisance reports that her son and her two
21  brothers have androgenetic alopecia, but women
22  in her family have normal hair density."
23          So if we take Mrs. Plaisance's
24  son, her two brothers, and her aunt, that's four
25  family members with alopecia; correct?

Page 123

1      A.  Yes.
2      Q.  And is it relevant to you that
3  other than Mrs. Plaisance's son, three of those
4  four family members are on the maternal side?
5      A.  But, you know, the sister has no
6  problems, which is very important when I
7  evaluate.  And the mother has no problem.  So I
8  don't think -- I don't think this is relevant,
9  in my opinion.  I see that, but I don't think
10  it's relevant.
11      Q.  So your testimony sitting here
12  today is it's not relevant to you that
13  three -- let me finish, Dr. Tosti.
14          It's not relevant to you that
15  three of four members of Mrs. Plaisance's family
16  who have hair loss are from the maternal side;
17  is that correct?
18          MR. SCHANKER:  Objection; form.
19      A.  I would -- the two sisters are
20  also from the maternal side.  You know, her
21  mother has no problem.  So I don't think this is
22  a big -- I don't see anything big in this
23  because both of them on maternal side has no
24  problem in the women.  So I don't think this is
25  relevant and I don't think this is going to

Page 124

1  change my opinion at all.
2      Q.  Let's go back to Exhibit 4, which
3  is your progress note.
4      A.  I'm here.
5      Q.  And let's go to page 3, please.
6      A.  Okay.
7      Q.  And I am looking at the section
8  called "Trichoscopy" in the middle of the page.
9  Do you see it?
10      A.  Yes.
11      Q.  There is a reference there to
12  yellow dots.  What are yellow dots?
13      A.  Yellow dots are follicle openings
14  that are yellow because they are full of sebum
15  and keratotic debris.
16          (Reporter clarification.)
17      A.  Sebum, s-e-b-u-m, and debris of
18  keratin.
19      Q.  Why did you note here that on
20  trichoscopy you saw yellow dots on
21  Mrs. Plaisance's scalp?
22      A.  Because when I write trichoscopy,
23  I note all the trichoscopy pictures that I find.
24  It's like, list of possible pictures you can
25  find.  And those are among the trichoscopy, you

Page 125

1  know, pattern.  They are called trichoscopy
2  pattern.
3          As in dermatology we describe the
4  single lesion, can be a papular, can be a
5  pustule.  In trichoscopy we describe single
6  findings.  So I describe what I saw in the
7  images.
8      Q.  What is the significance of yellow
9  dots being present on Mrs. Plaisance's scalp?
10      A.  They are not very specific.  You
11  can see yellow dots in alopecia areata, that's
12  when you see many, many yellow dots.  You see
13  yellow dots in androgenetic alopecia.  And you
14  see yellow dots in PCIA.
15      Q.  What was the distribution of
16  yellow dots on Mrs. Plaisance's scalp?
17      A.  There are just a few scalp yellow
18  dots.
19      Q.  How many yellow dots did you
20  count?
21      A.  I believe -- I don't count yellow
22  dots.  But we can go to the images, can be two,
23  three, four.  It's not -- in the images -- I
24  remember they were more on the frontal scalp.
25      Q.  Did you identify in your report

32 (Pages 122 - 125)

1 anywhere how many yellow dots you counted?
2     A.   No.  Because we don't count the
3 yellow dots in any -- in trichoscopy we don't
4 count the yellow dots.  It's not something we
5 do.
6     Q.   You said there were more in the
7 frontal scalp?
8     A.   No, I believe they were just in
9 the frontal scalp.
10    Q.   Was it of regular distribution
11 across her frontal scalp?
12    A.   They are never in regular
13 distribution.  The yellow dots were there.  You
14 know, they are scattered.  I would describe
15 scattered.
16    Q.   Are yellow dots characteristic of
17 PCIA?
18    A.   No.  I said yellow dots are just
19 something you see, and you see in other
20 conditions, and you don't see in other
21 conditions.  So I would say yellow dots tell you
22 this is not telogen effluvium.  Yellow dots tell
23 you it's not scarring alopecia.
24         But don't -- I'm not specific for
25 a diagnosis, but I've seen in certain disease.

1 The most common, as I told you, are alopecia
2 areata.  Trichotillomania you see yellow dots.
3 And then you see yellow dots in androgenetic
4 alopecia.  And you see yellow dots in PCIA.
5     Q.   But they are not a hallmark of
6 PCIA; correct?
7     A.   No, absolutely not.
8     Q.   The presence of yellow dots can
9 also signify, as you said, androgenetic
10 alopecia; correct?
11        MR. SCHANKER:  Objection; form.
12    A.   It can signify different disease,
13 not just androgenetic alopecia.
14    Q.   Can it signify multiple alopecia
15 processes on one scalp?
16        MR. SCHANKER:  Objection; form.
17    A.   We don't know.  There are no
18 studies showing that multiple alopecia processes
19 on one scalp causes yellow dots.  But I
20 understand what you mean, and it's possible.  I
21 don't say it's impossible.
22        MR. SCHANKER:  We've been going
23 for over an hour.  Can we take a break?
24        MS. WADHWANI:  I have about three
25 more questions, and then let's take a break and

1 discuss lunch.  Okay?
2         MR. SCHANKER:  Is that okay,
3 Doctor?
4         THE WITNESS:  Absolutely, yes.
5 BY MS. WADHWANI:
6     Q.   So Dr. Tosti, there is no
7 discussion of the presence of yellow dots in
8 your discussion of female pattern hair loss and
9 alopecia areata in your expert report, is
10 there?
11    A.   I don't know.
12    Q.   If you go to pages 8 through 9 of
13 your expert report.
14    A.   Maybe not there, but when I do the
15 differential diagnosis with trichoscopy it's
16 there.  If not, it's my fault --
17    Q.   I am just focusing you first on
18 alopecia areata.
19    A.   Let me go to alopecia areata.
20 Just a second.
21         You know, it's not discussed, but
22 you can see them in the pictures, with page 31,
23 where you see the yellow dots.
24    Q.   When you say you can see them in
25 the pictures, you can see the yellow dots in the

1 trichoscopy picture of Mrs. Plaisance's scalp?
2     A.   No, no.  That's an example of
3 alopecia areata.
4         I agree with you, it's missing,
5 the yellow dots are not described.  But it's
6 page 31, you have a good example of yellow dots
7 in alopecia areata.
8     Q.   And there is no discussion in your
9 report of the presence of yellow dots in your
10 discussion of female pattern hair loss in
11 alopecia areata specifically with regards to
12 Mrs. Plaisance; correct?
13    A.   I think I didn't discuss the
14 yellow dots.  But as I tell you, the yellow
15 dots not specific --
16        (Reporter clarification.)
17    A.   I said that the yellow dots are
18 not a specific diagnostic sign, and that's the
19 reason probably I didn't discuss.  I guess that
20 is something obvious.  But you're right, it was
21 not obvious, I should have discussed.
22        MS. WADHWANI:  We can take a
23 break.
24        MR. SCHANKER:  Okay.
25        THE VIDEOGRAPHER:  Thank you.

33 (Pages 126 - 129)

1 This is the videographer.  The time is 1 p.m.
2 We are going off the record.  This ends media
3 file 3.
4          -----
5          (Lunch break taken.)
6          -----
7          AFTERNOON SESSION
8          -----
9          THE VIDEOGRAPHER:  Good afternoon.
10 We're back on the record.  The time is 1:40 p.m.
11 We are beginning media file 4.
12 BY MS. WADHWANI:
13     Q.   Dr. Tosti, did you have a good
14 break?
15     A.   You know, I just found ice cream,
16 but better than nothing.
17     Q.   That sounds pretty good to me.  I
18 hear what you are saying.  Are you ready to
19 proceed?
20     A.   Yes, I am.
21     Q.   Before we took our lunch break we
22 were in Exhibit 4, your progress note, under the
23 Trichoscopy section.  And I want to direct your
24 attention back there, please.
25     A.   I'm there.

1     Q.   What are circle hairs?  You note
2 circle hairs on review --
3     A.   Circle hair is more hair that turn
4 around as a circle.  Again, they are not
5 specific.  You can find those in alopecia
6 areata.  You can find those in androgenetic
7 alopecia.  You can find those in PCIA.  You can
8 find those in some hair shaft disorders.  Again,
9 I'm not very specific.
10     Q.   Did you identify circle hairs on
11 Mrs. Plaisance's scalp?
12     A.   Yes.
13     Q.   Did you identify circle hairs
14 anywhere else on Mrs. Plaisance's body?
15     A.   No.  This is something that, you
16 know, this type of circle hair I'm discussing is
17 something you see on the scalp.
18     Q.   What is the significance of circle
19 hairs being present?
20     A.   Again, this is like a list of
21 findings, and then you have to put the list
22 together and your knowledge of the dermoscopy
23 make a diagnosis.  So each of them is just a
24 symptom.  Okay.
25          Let's say circle hair is like

1 anemia, yellow dot is like low iron.  And you
2 put those together and you go to a diagnosis,
3 just to make an example.  But it is not like
4 that, of course.
5     Q.   Just so we are clear on the
6 record, circle hair you are not saying is
7 indicative of anemia?
8     A.   No, no.
9     Q.   And you are not saying yellow
10 dots -- sorry.
11     A.   Not indicative of any disease.
12 It's just a finding.  You know, dermatologist
13 like to describe.  That's the way we do also
14 with trichoscopy.  We describe what we see and
15 we try to make a way for people who read to
16 understand what we see.  Okay.
17          And so yellow dot means you see
18 something yellow.  Circle hair means you see
19 these hairs that circle.  But those two are not
20 specific signs of any disease.
21     Q.   Did you count how many circle
22 hairs you identified on Mrs. Plaisance's
23 scalp?
24     A.   No, we don't count.  As I told
25 you, in dermoscopy you don't count the findings.

1     Q.   That's not just true then of
2 yellow dots, is what you are saying, it's true
3 also of circle hairs?
4     A.   Yes.
5          MR. SCHANKER:  Objection to form.
6     A.   It's true for all the dermoscopy
7 pictures.
8     Q.   I take it -- strike that.  Let me
9 start again.  I am not doing well making the
10 transition here from lunch.
11          I take it, then, that it's not
12 your view that circle hairs are indicative of
13 PCIA; correct?
14     A.   Yes.
15     Q.   They could be indicative of
16 alopecia areata; right?
17     A.   No, they are not indicative of
18 anything.  They can be seen in both alopecia
19 areata, PCIA, and other hair disorders.  So they
20 are not indicative of anything.
21     Q.   Are you basing your determination
22 that circle hairs can be found in PCIA on any
23 literature?
24     A.   You know, there is literature on
25 the trichoscopy of PCIA.  But I base on my

34 (Pages 130 - 133)

1 experience. I see PCIA.
2     Q.   Is there any article that you can
3 point me to that talks about the presence of
4 circle hairs in PCIA?
5     A.   There are no articles on
6 trichoscopy of PCIA.
7     Q.   So that I guess -- let me just ask
8 this question for the record.
9         So that I take it, there is no
10 literature on the presence of yellow dots being
11 visible on PCIA; correct?
12     A.   Correct. There is not literature
13 on PCIA and dermoscopy.
14     Q.   Finally, in the Trichoscopy
15 section -- get that word down at some point
16 today, hopefully -- in the Trichoscopy section
17 of Exhibit 4 you note arborizing vessels;
18 correct?
19     A.   Yes.
20     Q.   What are arborizing vessels?
21     A.   Arborizing vessels are something
22 that you can see in the normal scalp, but
23 usually increase in number in sebhorreic
24 dermatitis and contact dermatitis. So this may
25 be, you know -- it's a sign of mild scalp

1 inflammation.
2     Q.   Did you identify what areas of
3 Mrs. Plaisance's skull the arborizing vessels
4 focally dominated?
5     A.   It's not written here, but it's in
6 the vertex.
7     Q.   And why did you not write down
8 that the arborizing vessels focally dominated in
9 the vertex?
10     A.   Because they are not dominating.
11 That's where I saw them. It's not in any of
12 these pictures it's dominating. I included the
13 pictures. In any case, it's in the vertex.
14     Q.   But you didn't discuss the
15 arborizing --
16     A.   This is not a feature of PCIA in
17 any case. I didn't discuss -- you see, you can
18 see from any finding, I didn't discuss where
19 they were seen. We look at the whole scalp and
20 we describe the findings.
21     Q.   Do you typically note in your
22 clinical practice progress notes the areas where
23 arborizing vessels focally dominate?
24     A.   No. No, I don't -- in my progress
25 note, in my legal practice, again, I just report

1 what is seen without describing where.
2     Q.   Now, going back to the circle
3 hairs for a minute, you didn't describe the
4 circle hair in your discussion of alopecia
5 areata or female pattern hair loss in your
6 report; correct?
7     A.   Correct. Because they are not
8 specific. I said, they are not specific of
9 anything. So you don't make a diagnosis of
10 alopecia areata from circle hair, you don't make
11 a diagnosis of female pattern hair loss from
12 circle hair, and you don't make a diagnosis of
13 PCIA from circle hair.
14         THE VIDEOGRAPHER:  Doctor, is
15 there any way to center your screen a little
16 bit?
17         THE WITNESS:  At this point I
18 don't see, but I will go back and see what's
19 going on.
20         THE VIDEOGRAPHER:  You are just
21 off to one side of the corner. Thank you,
22 Doctor.
23 BY MS. WADHWANI:
24     Q.   Dr. Tosti, can circle hairs be
25 visualized by the naked eye?

1     A.   Probably with a lens. Not naked
2 eye, but with a lens you can probably see them.
3     Q.   Can yellow dots be visualized with
4 a lens or by the eye?
5     A.   I don't think so.
6     Q.   Are you aware of any literature
7 concerning PCIA that talks about the presence of
8 circle hairs on a patient, patients being
9 described in that literature?
10     A.   Maybe just a patient, possibly.
11 I'm not aware in this moment, but it's possible.
12 But it is not a study of many patients
13 describing circle hair as a feature.
14     Q.   Sitting here today, you are not
15 aware of an article describing PCIA which notes
16 circle hairs in patients with PCIA; correct?
17     A.   In many patients, no.
18     Q.   Are you aware of any article you
19 can tell me about today that describes circle
20 hairs in patients with PCIA?
21     A.   In one patient is the question?
22 I'm not aware, but this article may exist. I'm
23 not aware, but I cannot dispute.
24     Q.   Are you aware of any literature
25 that describes the presence of yellow dots on

35 (Pages 134 - 137)

1 patients with PCIA?

2     A.   I believe they are described in

3 the CME article.  Just in the image of the

4 article, so it's not a full discussion.  But I

5 think they are mentioned.

6     Q.   Do you recall what the discussion

7 is in that article?

8     A.   No, not in the discussion.  These

9 are, like, the images, the dermoscopy images has

10 a description, and as here, describe what is

11 seen.  So it's not in the discussion.  I believe

12 it's just in the image and in the legend, that's

13 the right word, of the image.

14     Q.   Is that the only article you can

15 think of that discusses yellow dots in the

16 context of reporting on patients with PCIA?

17     A.   The only article that report, I

18 don't think discusses.  Discusses, I don't think

19 there is any article.  It is the article that

20 shows in the picture yellow dots, some yellow

21 dots.

22     Q.   Can you turn to page 32 of your

23 expert report, which is Exhibit 1.  Are you

24 there?

25     A.   Yes.

1     Q.   Do you see an image at the top

2 with language that says "Dermoscope image of

3 Audrey Plaisance's scalp"?

4     A.   I don't see.  But I see the images

5 so it's not the problem.  I see the bottles of

6 the biopsy first --

7     Q.   I think you are on the wrong

8 exhibit.

9     A.   There is a new exhibit?

10     Q.   No.  This is Exhibit 1, your

11 expert report.

12     A.   Oh, sorry.

13     Q.   I'm on your expert report, not

14 your progress notes.  I know we've been going

15 back and forth.

16     A.   Page 32?

17     Q.   Page 32 of Exhibit 1, your expert

18 report.

19     A.   Okay.  Yes, I'm here.

20     Q.   Is that at the top an image of

21 Mrs. Plaisance's scalp on dermoscopy?

22     A.   Yes.

23     Q.   Did you take the image of her

24 scalp?

25     A.   Yes, I took all the images.

1     Q.   Where specifically on

2 Mrs. Plaisance's scalp did you take this

3 image?

4     A.   This was taken from the vertex.

5     Q.   The vertex, did you say?

6     A.   Yes.  And you can see here the

7 arborizing vessels.  These are arborizing

8 vessels.

9     Q.   That was going to be my next

10 question to you.

11         All of these red spidery-looking

12 things on this picture, those are the arborizing

13 vessels; correct?

14     A.   Perfect.  And you see here the

15 circle hair.

16     Q.   That's sort of a third of the way

17 up from the bottom of the image, correct, there

18 is the circle hair?

19     A.   That's where my arrow is.

20     Q.   I can't see your arrow.

21     A.   Oh, you don't see my arrow.  Okay.

22 Let's say, like -- let me see -- 5:00.  It's,

23 like, 5:00.

24     Q.   I think we are on the same image,

25 Dr. Tosti.  Thank you.

1         Were there any arborizing vessels

2 that you identified on Mrs. Plaisance's scalp

3 radially emerging from the yellow dots?

4     A.   I don't understand the question.

5     Q.   Were there any arborizing vessels

6 that you identified on her scalp radially

7 emerging from the yellow dots?

8     A.   The arborizing vessels, those are

9 vessels.  So these are vessels that you see

10 through the scalp.  So they don't emerge from

11 the scalp.

12     Q.   Emerging from the yellow dots?

13     A.   There are no -- the yellow dots

14 have nothing do with the vessels.  Vascular

15 patterns are different from follicular patterns.

16         So yellow dots are follicular

17 pattern, meaning it is something that is on the

18 follicles.  The arborizing vessels are a

19 vascular pattern.  As you see on the image, they

20 are between the follicles.

21         So this question is not scientific

22 a answer.  Do you understand what I mean?  They

23 don't -- it's not something applicable.

24     Q.   I understand your testimony.  Just

25 give me one second.  Okay?

36 (Pages 138 - 141)

Page 142

1    A.    Sure.
2    Q.    Thank you, Dr. Tosti.
3         We are going to put into Exhibit
4 Share a document for you that you can also find
5 as tab 115 in your box, if you want, or it will
6 appear on your Exhibit Share in just a moment.
7         (Exhibit 5, Article, How to
8 Optimize Trichoscopy for Evaluation of Scalp
9 Vessels, was marked for identification.)
10 BY MS. WADHWANI:
11   Q.    If you refresh --
12   A.    Exhibit 5.
13   Q.    It's Exhibit 5, yes.  Do you see
14 that now?
15   A.    Yes, I do.
16   Q.    Do you know what this document is
17 that we've marked as Exhibit 5?
18   A.    Yes.
19   Q.    What is it?
20   A.    It's a study we did to optimize a
21 way you can evaluate vessels with trichoscopy.
22   Q.    And this is an article from
23 May 25, 2020 that you are an author on;
24 correct?
25   A.    Yes.

Page 143

1    Q.    If you could please go to what's
2 page 3 of the article, or in the bottom
3 left-hand it says page 218.
4    A.    218.
5    Q.    I am going to be looking or
6 focusing your attention here on this section
7 called "Arborizing Red Lines."
8         Do you see that?
9    A.    Yes.
10   Q.    In this first paragraph,
11 right -- the sentence right before the reference
12 to footnote 12, do you see that?
13   A.    Yes.
14   Q.    It says, "Thin arborizing vessels
15 radially emerging from large yellow dots are
16 considered a characteristic feature for DLE, in
17 the literature referred to as 'red spider in
18 yellow dot.'"
19   A.    Yes.  This is completely
20 different.  You know, they are not the normal
21 arborizing vessels.  These are something that
22 you see in the scarring alopecia.  It's
23 something that has nothing to do with this type
24 of arborizing vessels.
25   Q.    In this article you refer to

Page 144

1 arborizing vessels; correct?
2    A.    But I call it with the right name,
3 red spider in yellow dot, which is different.
4    Q.    I am just asking, Dr. Tosti, if
5 this article, in part, discusses arborizing
6 vessels; correct?
7    A.    Yes.  But discuss different type
8 of arborizing vessels and discuss different type
9 of yellow dot.  But I'm okay, I'm not saying
10 that there aren't these type of arborizing
11 vessels.  I'm just saying it's something
12 completely different which is seen in a scarring
13 alopecia.  And so has nothing to do with this
14 case.
15   Q.    Are arborizing vessels in scarring
16 alopecia different from arborizing vessels in
17 non-scarring alopecia?
18   A.    Definitely, yes.  Because in
19 scarring alopecia you have loss of follicular
20 opening, it's a completely different subset
21 of disease.
22   Q.    Well, the disease process is
23 different, but what I am asking is, the
24 arborizing vessels themselves, is there any
25 difference in an arborizing vessel itself

Page 145

1 between a non-scarring and a scarring alopecia?
2    A.    Yes.  In scarring alopecia you
3 usually don't have as many vessels, you have
4 fibrosis so you don't see the vessels.  And here
5 the ones that you see are very thin, are very
6 fine.  Because they are fibrosis, prevent you to
7 see through the skin, the vessels.  Okay.  So
8 they are different.
9    Q.    Well, what you are saying to me,
10 it sounds like the visibility of them, the
11 appearance of them may be different between a
12 scarring alopecia and a non-scarring alopecia,
13 but an arborizing vessel is an arborizing
14 vessel; correct?
15        MR. SCHANKER:  Objection to form.
16   A.    In scarring alopecia they are
17 thin.  Instead, usually they are kind of large.
18 Like in seborrheic dermatitis, normal scars,
19 those vessels are large.  In scarring alopecia
20 they are thin because they are compressed by the
21 fibrosis.  So the vessel is, like, narrowing,
22 compressed.  Like, the fibrosis push, press the
23 vessel from outside.
24   Q.    I appreciate that the vessels can
25 appear differently between non-scarring and

37 (Pages 142 - 145)

Page 146

1 scarring alopecia, and that there could be, as
2 you say, some compression in scarring alopecia
3 because of fibrosis.  But are the vessels the
4 vessels?  Are there two kinds of arborizing
5 vessels?  Or is there just one kind of
6 arborizing vessel?
7       MR. SCHANKER:  Object to form.
8       A.   Really, the arborizing vessels are
9 plexus, so they always are those vessels.  That
10 maybe change because of the situation around the
11 vessel.  So in certain situation, these vessels
12 dilate.  In other situations, these vessels get
13 compressed.  Okay.  So, you know, the vessel --
14 the vasculars of the scalp of course change
15 depending on the situation.  But, again,
16 arborizing vessels are not a diagnostic feature.
17 It's something that it's also seen in the normal
18 scalp.
19       Q.   And I am just trying to understand
20 your testimony, Dr. Tosti, about arborizing
21 vessels.
22       A.   So what I am saying is that
23 arborizing vessels are the vessels of the deep
24 plexus that you see through the skin.  So the
25 scalp has the vessel.  So you can see these

Page 147

1 vessels in the normal scalp.  You can see these
2 vessels in inflammatory scalp disorders.  And
3 there are situations where you see these vessels
4 less than normal or thinner than normal.  Okay.
5 And these are features in scarring -- this is a
6 particular feature seen in scarring alopecia.
7       But because basically the vessel
8 are compressed and become thinner because the
9 fibrosis make them more less.  In fact, there is
10 less vascular supply because the vessels are,
11 like, pushing by the fibrosis.
12       Q.   And are the arborizing vessels on
13 Mrs. Plaisance's scalp that we see here on
14 page 32, are those thin or thick?
15       A.   They are normal.  They are
16 typical, you know, large caliber.  Let's say
17 caliber, yeah.
18       Q.   And if you can stay on page 218
19 with me, Dr. Tosti, but go over to the second
20 column under --
21       A.   Which exhibit?  The same exhibit?
22       Q.   I'm sorry, Exhibit 5.  Exhibit 5,
23 page 218.
24       A.   218, I'm here.
25       Q.   And then under "Disclosure

Page 148

1 Statement," it notes that the authors have no
2 conflicts of interest to disclose.  And my
3 question is why did you not disclose that you
4 are a paid expert for plaintiff's counsel in
5 this litigation where you are utilizing
6 trichoscopy on plaintiff's scalp to help make a
7 determination of their alopecia?
8       MR. SCHANKER:  Objection; form.
9       A.   Because I thought, you know,
10 trichoscopy is utilized since years.  I describe
11 trichoscopy.  And I don't disclose the
12 litigation because I'm not presenting here any
13 data that is helpful for PCIA.  This is just a
14 description on how to better look at the vessel.
15       The name of this paper is to teach
16 the dermatologist they have to be careful with
17 pressure, because if they apply pressure, the
18 vessels disappear.  And that's why the paper was
19 written, not to make any special diagnosis from
20 the finding.
21       Q.   You performed trichoscopy on
22 Mrs. Plaisance; correct?
23       A.   I performed trichoscopy on every
24 patient I see.
25       Q.   And presumably you try and use the

Page 149

1 methods that lead to the best images you can get
2 of your patients, which is what you are
3 describing here, how to make sure trichoscopy
4 does not result in skewed images; correct?
5       A.   Yes.
6       Q.   Now I want to take you back to
7 Exhibit 4, which is your progress notes.
8       A.   I'm here.
9       Q.   And at the section after
10 "Trichoscopy" on Exhibit 4 there is a section
11 called "Assessment"; right?
12       A.   Yes.
13       Q.   And you assessed Mrs. Plaisance
14 with permanent alopecia after chemotherapy;
15 correct?
16       A.   Yes.
17       Q.   Did you note this assessment at
18 the time of your clinical examination on May 7,
19 2021?
20       A.   What exactly the question?  Yes, I
21 put this assessment at the time of my clinical
22 examination, yes.
23       Q.   When you were preparing your notes
24 of the examination on May 7, you included this
25 assessment at that time too; correct?

38 (Pages 146 - 149)

1    A.    Yes.
2    Q.    And at that time on May 7, 2021,
3  when you made this assessment of permanent
4  alopecia after chemotherapy, what did you base
5  that on?
6    A.    It was based on my knowledge of
7  the problem and experience on this disease, all
8  the literature that I review on this problem and
9  I personally written on this problem, on the
10  clinical history, on the clinical examination,
11  and on the trichoscopy.  On all the instruments
12  that I used to evaluate the patient, the pull
13  test, the trichoscopy.
14    Q.    When you made this assessment on
15  May 7, 2021, that Mrs. Plaisance had PCIA, did
16  you form that conclusion to a reasonable degree
17  of medical certainty?
18    A.    Yes.
19    Q.    And why did you need to perform a
20  biopsy on her?
21    A.    I performed biopsy because this is
22  a legal case, and I knew that if I didn't
23  perform biopsy I would be questioned why I
24  didn't perform a biopsy.  That is like the rule
25  to follow.

1    Q.    You performed a biopsy because of
2  litigation; correct?
3    A.    Because I want my diagnosis to be
4  confirmed also by pathology.
5    Q.    The results of the biopsy were not
6  available to you when you made this assessment;
7  right?
8    A.    Yes.  Because I made my diagnosis.
9  What I wanted is just also the diagnosis to be
10  confirmed by pathology.  The results were not
11  available.  I believe the results became
12  available probably after one week.
13    Q.    As far as her chemotherapy
14  regimen, Mrs. Plaisance took four cycles of
15  docetaxel and cyclophosphamide together between
16  January and March 2014; correct?
17    A.    Yes.
18    Q.    Do you agree that you can't rule
19  out the cyclophosphamide as the cause of her
20  alopecia based on the pathology?
21    A.    Which type of alopecia are we
22  discussing?
23    Q.    The permanent alopecia after
24  chemotherapy.
25    A.    You know, I don't think the

1  pathology can show the cause of the permanent
2  alopecia after chemotherapy; can just confirm
3  this diagnosis.
4    Q.    Do you agree, you can't rule out
5  the cyclophosphamide Mrs. Plaisance took based
6  on your clinical examination in concluding she
7  has PCIA?
8    A.    I believe that, again, you cannot
9  choose or think which medication cause the PCIA
10  from clinical examination.
11    Q.    Can you choose or determine which
12  chemotherapy medication caused the PCIA based on
13  photos of Mrs. Plaisance?
14    A.    No, I cannot determine which
15  medication caused PCIA based on photos.
16    Q.    Can you rule out cyclophosphamide
17  as causing Mrs. Plaisance's PCIA?
18    A.    Yes.  I don't think that
19  cyclophosphamide alone could have caused her
20  PCIA.
21    Q.    Are you aware of literature
22  finding PCIA in patients who take
23  cyclophosphamide who do not take docetaxel?
24         MR. SCHANKER:  Objection; form.
25    A.    You know, there are some patients

1  who took cyclophosphamide and doxorubicin who
2  had PCIA, and there are, like, very old cases of
3  patients who underwent bone marrow
4  transplantation, so it's completely different.
5  But the number are small.  And I am not aware of
6  any patients with only cyclophosphamide.
7    Q.    That wasn't my question.
8         My question is are you aware of
9  literature documenting PCIA in patients who took
10  a chemotherapy regimen cyclophosphamide without
11  taking docetaxel?
12         MR. SCHANKER:  Objection to form.
13    A.    Yes, I am aware of patients who
14  develop PCIA after taking the combination of
15  cyclophosphamide and Adriamycin, not just
16  cyclophosphamide.
17    Q.    And how can you rule out
18  cyclophosphamide as causing Mrs. Plaisance's
19  PCIA?
20    A.    I am aware of many patients who
21  had PCIA with the docetaxel in combination with
22  cyclophosphamide or cyclophosphamide and
23  Adriamycin.  So I believe that the combination
24  is important, and I believe that Taxotere is the
25  main contributing factor for these problems.

39 (Pages 150 - 153)

1    Q.   So do you believe in
2  Mrs. Plaisance's case that the combination of
3  docetaxel and cyclophosphamide caused her
4  PCIA?
5    A.   Yes, I believe it is a
6  combination.  But the Taxotere is the main
7  factor.  But Taxotere alone doesn't cause the
8  problem.  The problem always occurs with a
9  combination.
10    Q.   When you sent the pathology to
11  Dr. Thompson, did you ask him to perform any
12  particular type of analyses on the tissue?
13    A.   No.
14    Q.   Did you ask Dr. Thompson to do any
15  kind of stem cell testing?
16    A.   No.
17    Q.   Do you know whether or not any
18  stem cell testing was done on Mrs. Plaisance's
19  pathology?
20    A.   I don't know.  But I don't think
21  it was done.
22    Q.   And you sent Dr. Thompson a
23  requisition form; correct?
24    A.   Yes, I did.
25    Q.   In just a moment, Dr. Tosti --

1    A.   Okay.
2    Q.   -- you will see in the Exhibit
3  Share what is going to be Exhibit 6.
4    A.   I am going to refresh.  I'm not
5  sure.
6    Q.   Thank you for bearing with us with
7  the technology.  It is still uploading.
8    A.   It didn't upload.  I went back, I
9  have 1, 2, 3, 4, 5, I don't have 6.
10    Q.   I don't think that's your fault.
11  I think it's on the way.
12    A.   Maybe you have the paper?  We have
13  the paper?  I don't know.
14    Q.   So I was given by your counsel at
15  11:00 last night a form called "Requisition."
16  Were you aware of that?
17    A.   No.
18    (Exhibit 6, May 7, 2021
19  requisition, was marked for identification.)
20  BY MS. WADHWANI:
21    Q.   It's finally posted, Dr. Tosti.
22    A.   So should I refresh or I just
23  wait?
24    Q.   You can refresh now, yes.  Is it
25  showing up for you?

1    A.   Yes.
2    Q.   Is this the requisition form you
3  sent to Dr. Thompson?
4    A.   Yes.  This is my handwriting.
5    Q.   We've marked it as Exhibit 6.
6  Which is your handwriting, Dr. Tosti?  I only
7  ask because it appears there might be two
8  different types of handwriting on this document.
9    A.   This is my handwriting.
10    Q.   All of it?
11    A.   All of it.  "TRANS" is not me.
12    (Reporter clarification.)
13    A.   You know, here I believe the type
14  of order, I order the punch, and probably the
15  lab wrote "TRANS," which means transit.
16    Q.   I think, just for purposes of the
17  court reporter, you correct anything I say,
18  Dr. Tosti, is what you are saying that under the
19  column Specimen Data, A and B, in that first box
20  there is a notation TRANS.  Correct?
21    A.   That's not my handwriting.
22    Q.   That's not your handwriting.
23    And what about moving over, do you
24  see the numbers 4 by 4 by 7 for each of the
25  biopsies under "Gross"?

1    A.   That's not my handwriting.  But
2  this is clear.  How many sections they took,
3  this is something the technician did.
4    Q.   And that was really my only
5  question, is that some of this handwriting is
6  not yours; correct?
7    A.   Correct.
8    Q.   And I think you've identified for
9  us that the information in the Gross Labs
10  section and the information written as TRANS is
11  not your handwriting; correct?
12    A.   Exactly.
13    Q.   Do you know whose it is?
14    A.   I believe it is the technician.
15  That's my guess.  Okay.
16    Q.   You don't know one way or the
17  other, that's what you are saying?
18    A.   You have to read here "Gross Lab
19  Use Only," so that means that the lab did.  So
20  this is the lab technician.
21    Q.   And a technician at Dr. Thompson's
22  lab, correct, not the University of Miami?
23    A.   Yes, yes.  So I don't know who it
24  is.
25    Q.   And under "Clinical Findings" here

1  on the requisition form we've marked as
2  Exhibit 6, you note "Permanent alopecia after
3  chemotherapy" for both specimens; correct?
4      A.  Correct.
5      Q.  And there is -- that's in a
6  section called "Clinical Findings"; correct?
7      A.  Yes.
8      Q.  Is there a reason you did not note
9  for Dr. Thompson the clinical findings relevant
10  to Mrs. Plaisance's scalp and other hair loss
11  that you describe in your progress notes and
12  expert report?
13      A.  I usually send the pathologist
14  just my diagnosis.  I don't send, like, a paper
15  with all the data findings.
16      Q.  What is the reason for that?
17      A.  Because I believe that's the best.
18  You tell what's your diagnosis.  If he
19  disagrees, that's outside the legal, then we
20  will discuss.  But I don't put down 10
21  diagnosis.  Because I'm a hair expert and I
22  usually -- I have a diagnosis at the end of my
23  visit, and pathology mainly to confirm my
24  diagnosis.
25      Q.  And because you are an expert,

1  Dr. Tosti, would you agree with me that your
2  putting your diagnosis here for the pathologist
3  before he does his work has a risk of
4  introducing confirmation bias?
5          MR. SCHANKER:  Objection; form.
6      A.  I don't think so.  The pathologist
7  look at the slide.  And it's not uncommon for
8  the slide not to match the clinical findings.
9  Because as I said, pathology is a very small
10  piece of the tissue that you look at.  It is not
11  something that is the truth.  I don't believe
12  the truth is in pathology.  The truth is in
13  everything together.
14      Q.  So in your view, there is no risk
15  to the pathologist of confirmation bias in
16  seeing the diagnosis of hair loss expert
17  Dr. Tosti on this form?
18      A.  I don't think so.  And otherwise,
19  I would have written "incomplete hair regrow
20  after chemotherapy," which was basically the
21  same.  I'm sending to a pathologist who knows
22  the problem.
23      Q.  You also did not provide
24  differential diagnosis on the requisition form;
25  correct?

1      A.  Correct.  But this is something
2  that I usually don't do except for the special
3  cases.
4      Q.  What kind of cases do you provide
5  it for?
6      A.  You know, sometimes in scarring
7  alopecia, if I have a doubt between two types of
8  scarring alopecia.  But, otherwise, I just put
9  down my diagnosis.
10      Q.  You can set that document aside,
11  Dr. Tosti.  And I am going to ask you to go back
12  to Exhibit 4, your progress notes.
13          Do you see on page 3 of your
14  progress notes, the section called "Additional
15  Documentation"?
16      A.  Yes.
17      Q.  Underneath that header it says,
18  "Flowsheet:  Patient-reported data."  What does
19  that refer to?
20      A.  Sometimes patients upload stuff in
21  the system.  If you are a patient, you can
22  upload the electronic medical record what you
23  want, like, images, labs, and stuff like that.
24      Q.  Did Mrs. Plaisance do that here?
25      A.  No, she didn't.

1      Q.  Did you ask her to?
2      A.  No.  Because we don't ask patients
3  to do.  Some patients do that before the visit
4  for you to, you know, study their cases before.
5  Some patients, you know, have their medical
6  records.  This is something the patient does.  I
7  don't tell the patient ever to do.  Some
8  patients do.
9      Q.  Is there additional data you
10  received from Mrs. Plaisance that is stored at
11  the University of Miami separate from this
12  progress note?
13      A.  You know, yes, all the
14  documentation was not included in the medical
15  record.
16      Q.  And what kind of documentation is
17  that?
18      A.  The medical -- you know, the
19  medical records from previous visit.  Everything
20  we discuss about.
21      Q.  Is there information you received
22  from Mrs. Plaisance in connection with her
23  visit, that the University of Miami received, to
24  your knowledge, in connection with her visit
25  that is maintained separately from this progress

41 (Pages 158 - 161)

Page 162

1 note?
2      A.   Not from her.  I didn't receive
3 anything from her.  And there is nothing I know
4 is taken separately from this progress note.
5      Q.   Keeping in this section on page 3
6 of Exhibit 4, under "Additional Documentation,"
7 what is the encounter information?
8      A.   This is something, again, that the
9 people who schedule the patient have to fill.
10 Like, they want to know the insurance, they want
11 to know how to bill, they want to know, like,
12 allergies.  This kind of stuff they usually put
13 it down so you know from the beginning if the
14 patient is allergic to anesthetic or something
15 like that.
16      So this is something, again, it's
17 not the doctor who does, and this is something
18 that, you know, it's mainly -- I believe the
19 scheduling people.
20      Q.   Do you know if this information
21 that you just described was taken for
22 Mrs. Plaisance?
23      A.   I think so because she check in,
24 so probably there is this information in the
25 medical record, you can find this information.

Page 163

1      Q.   We are going to put another
2 document in the Exhibit Share for you,
3 Dr. Tosti.
4      A.   Tell me when I have to refresh.
5      Q.   Sure.  You can refresh.
6      (Exhibit 7, Notice of Videotaped
7 Deposition of Dr. Antonella Tosti, was marked
8 for identification.)
9 BY MS. WADHWANI:
10      Q.   Do you see the document?
11      A.   Not yet.
12      Q.   It will be Exhibit 7.
13      A.   Here it is.  Okay.  I see the
14 document.
15      Q.   Do you have it open?
16      A.   Yes.
17      Q.   Do you know what this document
18 is?
19      A.   Yes, I know.
20      Q.   What is it?
21      A.   It is called Notice of Deposition.
22 So it's a document where basically you ask me
23 what to produce today for my deposition.
24      Q.   All right.  It's a document
25 bringing you to this deposition today, and it

Page 164

1 also includes in Exhibit A items to be produced,
2 some document requests we made.
3      Did you bring any items or
4 documents responsive to this deposition notice
5 today?
6      A.   I think I did.  I didn't bring
7 everything.  I think Lauren should have sent you
8 everything.
9      MR. SCHANKER:  Counsel, we have
10 provided everything that was responsive --
11      MS. WADHWANI:  Darin, I can't hear
12 you at all.  You are very faint.
13      MR. SCHANKER:  Counsel, we
14 provided everything to you that was responsive
15 that was in Dr. Tosti's possession.
16 BY MS. WADHWANI:
17      Q.   Dr. Tosti, is it your
18 understanding that anything responsive to this
19 document request was provided to us last night
20 by counsel?
21      A.   Yes.
22      Q.   And I am just going to go through
23 for purposes of marking as exhibits some of
24 those documents.  We've already done some.  And
25 then we will maybe spend some time with a few of

Page 165

1 them.  Okay?
2      A.   Okay.  So I can go away from this?
3      Q.   You can go away from that
4 document, yes.
5      Is there Exhibit 8?  I'm being
6 told it's still loading.  I got too quick.
7      A.   Tell me when I have to refresh.
8      Q.   You can refresh now.
9      (Exhibit 8, Materials Consulted,
10 was marked for identification.)
11 BY MS. WADHWANI:
12      Q.   Do you see Exhibit 8?
13      A.   Not yet.  Okay.  I see.  Okay.  I
14 am here.
15      Q.   Have you seen this document
16 before, Dr. Tosti?
17      A.   Let me look at this.  It's an
18 exhibit, probably is one of my exhibits.  We saw
19 that this morning.
20      Q.   Well, we saw something similar.
21 If you note, this one has red lines; correct?
22      A.   No.  Blue lines.
23      Q.   Blue lines, that's fine.  I call
24 them red lines.  There's track changes;
25 correct?

42 (Pages 162 - 165)

Page 166

1    A.   Yes.
2    Q.   Did you make those track
3 changes?
4    A.   No.
5    Q.   Were you aware those track changes
6 were being made?
7    A.   No.
8        MR. SCHANKER:  Counsel, just for
9 the record, I have not -- hold on.  If I can
10 confer just for one second.  Can you turn off
11 the microphone.
12       THE WITNESS:  Can I --
13       MR. SCHANKER:  I just want to talk
14 to counsel briefly.  I'm not sure if this --
15       THE WITNESS:  Can I close the
16 microphone?
17       MS. WADHWANI:  You can mute.  I
18 will mute too.  I think Mr. Schanker is going to
19 consult with Ms. Perez.
20       (Discussion off the record.)
21       THE WITNESS:  Okay.
22       MR. SCHANKER:  I apologize.  No
23 objection.
24       MS. WADHWANI:  It's okay if we
25 proceed?

Page 167

1        MR. SCHANKER:  Yes.  Thank you.
2        MS. WADHWANI:  Okay.
3        MR. SCHANKER:  Although -- and I
4 hate to do this, we've been going an hour, and I
5 need to use the bathroom.  Can we go ahead and
6 take a break at this time?
7        MS. WADHWANI:  Can we just wait
8 two minutes?  I am just going to mark documents,
9 I will not ask questions about them.  Is that
10 okay?
11       MR. SCHANKER:  That's fine.
12       MS. WADHWANI:  As I said, we will
13 mark some documents, and maybe after the break
14 we'll come back to them.  Okay?
15       MR. SCHANKER:  Okay.
16       MS. WADHWANI:  Is that okay with
17 you, Dr. Tosti?
18       THE WITNESS:  Yes, absolutely.
19       MS. WADHWANI:  I think at this
20 point if you refresh you will see a series of
21 new exhibits starting with Exhibit 9.
22       (Exhibit 9, August 2, 2021
23 invoice, was marked for identification.)
24 BY MS. WADHWANI:
25    Q.   Is it being slow?

Page 168

1    A.   Yes.  I will tell you when I have
2 it.
3    Q.   Sounds good.
4    A.   Okay.  Exhibit 9.  I got many, 10,
5 11.  I got 9.
6    Q.   What we are going to do, just very
7 quickly before we take a break, is just these
8 documents that we are going through, Dr. Tosti,
9 and one of my questions will be for you to
10 correct me if I am wrong, but my understanding
11 is that these documents that we are going to
12 mark that you see in your Exhibit Share that
13 just got loaded up were documents produced in
14 response to the Notice of Deposition that we
15 looked at in Exhibit 7 as responsive to our
16 document request.  So I am just going through
17 and doing some housekeeping here to put them in.
18       Can you open up Exhibit 9.
19    A.   I'm open.
20    Q.   What's Exhibit 9?
21    A.   Is my invoice from August 2, 2021.
22    Q.   Have you submitted this invoice
23 yet?
24    A.   Yes, yes, I submitted.  It was
25 submitted on August 2, 2021.

Page 169

1        (Exhibit 10, August 12, 2021
2 invoice, was marked for identification.)
3 BY MS. WADHWANI:
4    Q.   Can you go to the next exhibit,
5 Exhibit 10.
6        Do you recognize this document?
7    A.   Yes.
8    Q.   What is it?
9    A.   It is another invoice I submitted
10 on August 12.
11    Q.   Of this year?
12    A.   Yes.  2021.
13       (Exhibit 11, May 7, 2021
14 requisition, was marked for identification.)
15 BY MS. WADHWANI:
16    Q.   Can you go to Exhibit 11, please.
17    A.   Okay.
18    Q.   Do you know what this document
19 is?
20    A.   Yes.  It is the same we saw
21 before.
22    Q.   This is that requisition form;
23 correct?
24    A.   Correct.
25    Q.   And if you go to page 2 and 3 of

43 (Pages 166 - 169)

1 Exhibit 11, what are those pages?
2     A.   A part of the requisition form.
3     Q.   And a custody form?
4     A.   It's a part of the same form.
5     Q.   You filled out the chain of
6 custody; is that correct?
7     A.   The chain of custody.  Okay.
8 Okay.  Okay.  Something I did on the same day.
9 And so it's, again, my handwritten.  And I
10 specify the size of the punch, power percent,
11 and I even took pictures.
12     Q.   So these pages 2 and 3 are what
13 you filled out and sent them on with a
14 requisition form to Dr. Thompson; right?
15     A.   I think I sent also to the lawyer.
16     Q.   To counsel for Mrs. Plaisance?
17     A.   Yes, yes.  I don't think I sent to
18 Dr. Thompson.  I don't know exactly.
19     Q.   But you filled these documents
20 out?
21     A.   I did.
22          (Exhibit 12, Curriculum vitae, was
23 marked for identification.)
24 BY MS. WADHWANI:
25     Q.   And then if you can go to

1 Exhibit 12, please.
2     A.   Yes.  This is my CV.
3     Q.   This CV is dated at the top May of
4 2021; correct?
5     A.   I think they sent you the wrong CV
6 because I just sent a few days ago a CV that was
7 updated to September.
8     Q.   I see.  I think we got the May
9 2021 CV again.
10          So we can -- maybe your counsel,
11 Lauren, Jessica or Darin, can send us the
12 updated CV.  But while we are working that out,
13 I will maybe ask you questions later, let me ask
14 you now, what has changed in your CV between May
15 and September?
16     A.   I published some papers.  Nothing
17 so important.
18     Q.   What was the subject matter of
19 those papers?
20     A.   None of them on PCIA.  I been
21 working mainly on COVID and hair loss, and I've
22 been working on alopecia areata, new treatment.
23 I believe those papers or this topic.  I've been
24 working on transgender hair loss, different
25 topics.  Nothing to do with PCIA, I'm sure.

1          But can you please, Darin, send
2 the updated CV?
3          MR. SCHANKER:  Yes.  Who, if we
4 can get that email, who should we email that to?
5          MS. WADHWANI:  You can just email
6 it to myself and Aparna.  I think Lauren sent
7 those.  And we will make sure everyone else who
8 needs it on our side it gets it.
9          MR. SCHANKER:  Okay.  Thank you.
10          MS. WADHWANI:  Thank you.
11 Why don't we take a break.
12          MR. SCHANKER:  Thank you.
13          THE WITNESS:  Thank you.
14          THE VIDEOGRAPHER:  Thank you.
15 This is the videographer.  The time is 2:40.  We
16 are going off the record.  This ends media file
17 number 4.
18          (Break taken.)
19          THE VIDEOGRAPHER:  We are back on
20 the record.  The time is 2:57.  We are beginning
21 media file 5.
22          MR. SCHANKER:  Counsel, for
23 clarification, on the CV that Dr. Tosti -- that
24 you have, it appears that the latest version of
25 the email that you all received from Lauren is

1 Dr. Tosti's updated CV.  Dr. Tosti just forgot
2 to change the May date to September.
3          MS. WADHWANI:  Okay.  So let me
4 repeat it back to make sure I'm clear, then we
5 can go forward.  Thank you for that
6 clarification.
7 BY MS. WADHWANI:
8     Q.   If I understand Mr. Schanker
9 correctly, he is saying that Exhibit 12 that we
10 just marked, your CV, is the September 2021
11 update despite the fact that up at the top of
12 page 1 of Exhibit 12 it says May 2021;
13 correct?
14     A.   Exactly.  I forgot to change the
15 date.  It's updated.
16     Q.   That's okay.  Thank you for that
17 clarification.
18          So I take it, then, that we are
19 all set, that Exhibit 12 reflects your current
20 CV; correct?
21     A.   Yes.
22     Q.   Okay.  Dr. Tosti, do you have any
23 invoices that you have prepared but not
24 submitted for your work on the Plaisance case?
25     A.   Not to even prepare yet.  I didn't

44 (Pages 170 - 173)

Page 174

1 bill the time I spent to prepare for the
2 deposition.
3     Q.   Approximately how long do you
4 estimate you spent preparing for the
5 deposition?
6     A.   Maybe all together 20 hours,
7 probably.
8     Q.   And at what rate are you billing
9 that preparation work?
10    A.   $600 an hour.  But the invoices
11 that you just showed me are not just for
12 Plaisance, they are also for another plaintiff
13 that I saw basically on the same date and I also
14 prepare the expert report.  So about half is for
15 her and half is for the other one.
16    Q.   Is the other plaintiff who --
17    A.   Yes.
18    Q.   -- constitutes half of those
19 invoices Clare Guilbault?
20    A.   Yes.  The one that was supposed to
21 be today and it's not anymore, yes.  For her.
22    Q.   And what is your billing rate for
23 deposition testimony?
24    A.   $1,000 an hour, including the
25 travel time.

Page 175

1     Q.   So the travel time it takes you to
2 get to and from the deposition you will charge
3 $1,000 an hour; correct?
4     A.   Yes.
5     Q.   How much time did it take you to
6 travel to arrive at the deposition?
7     A.   Here, maybe half an hour to go and
8 half an hour to go back.  But, of course, that
9 may change if I have to take a plane.  Now, Zoom
10 making it easier.
11    Q.   And what about your meeting with
12 counsel yesterday for three hours, at what rate
13 do you bill that?
14    A.   600.
15        (Exhibit 13, February 14, 2003
16 medical record, was marked for identification.)
17 BY MS. WADHWANI:
18    Q.   Dr. Tosti, I am going to mark as
19 Exhibit 13 a record that -- let me know if it's
20 in your Exhibit Share yet.
21    A.   I have to refresh, I will refresh.
22 Okay.
23    Q.   Do you see Exhibit 13?
24    A.   Yes, I do.
25    Q.   Have you seen this document

Page 176

1 before?
2     A.   Yes, I have.
3     Q.   Is this one of the documents you
4 saw for the first time this past Saturday?
5     A.   Yes.  This one maybe Friday.
6 Because this one was in her deposition, this
7 one.
8        MR. SCHANKER:  Counsel, we are
9 having a little trouble getting Exhibit 13 to
10 load.  I am assuming, there is no hard copy of
11 this?
12        MS. WADHWANI:  There is, sorry.
13 Darin, this is tab 116.  There is a hard copy of
14 this.
15        MR. SCHANKER:  Thank you.
16        MS. WADHWANI:  Are you okay if we
17 proceed, Darin?
18        MR. SCHANKER:  If I can just grab
19 it real quick and open it here.  Okay.  Thank
20 you.
21    Q.   Sure.  So, Dr. Tosti, you believe
22 you saw this document for the first time two or
23 three days ago; correct?
24    A.   Yes.
25    Q.   What do you understand this

Page 177

1 document to be?
2     A.   This is a medical record from a
3 doctor, dermatologist, who was in the same
4 practice as the other dermatologist.  You know,
5 he was the owner of the practice before, what I
6 understood.  And then he take his place in the
7 practice before starting his own practice.
8     Q.   You understand this to be a
9 medical record of Dr. Jones?
10    A.   Yes.
11    Q.   Do you see that the patient listed
12 here is Mrs. Plaisance?
13    A.   Yes.
14    Q.   Do you see the date of this visit
15 is February 14, 2003?
16    A.   Yes.
17    Q.   Moving down to Chief Complaints,
18 do you see that section?
19    A.   Yes.
20    Q.   The second column under "Chief
21 Complaints" notes that Mrs. Plaisance complained
22 of hair thinning on her scalp; correct?
23    A.   I can read thinning scalp.  I
24 cannot read the first word.  But maybe, as you
25 said, complaining, probably.

1    Q.    Does it look like "C/O" to you?

2    A.    Yes, yes.

3    Q.    Is that shorthand in the medical
4  community for "complaint of"?

5    A.    No.  But maybe this way, because
6  it's the same for the other things.

7    Q.    Nevertheless, you see under "Chief
8  Complaint" there is a notation of hair thinning
9  on the scalp; correct?

10    A.    Yes, I see that.

11    Q.    And if you move down, do you see
12  the section called "Areas Examined"?

13    A.    Yes.

14    Q.    Is the first one listed
15  "Scalp/Hair"?

16    A.    Yes.

17    Q.    What is the checkmark next to on
18  that?

19    A.    I think he wrote "hair loss."

20    Q.    And did he check "abnormal"?

21    A.    Yes.

22    Q.    And moving down to "Medical
23  Decision-Making," do you see the second column
24  within the same section as Problem 1?

25    A.    Yes.

1    Q.    Do you see that there is a note
2  that states "FPA"?

3    A.    Yes.

4    Q.    Do you know what that refers to?

5    A.    I see "FPA/TE," and probably he
6  means female pattern alopecia, telogen
7  effluvium, and then I read "alopecia."  And then
8  I have no idea what is "ROTA."

9    Q.    You see "female pattern alopecia/
10  telogen effluvium" in shorthand and "alopecia"
11  written on this February 2003 note; correct?

12    A.    Yes.

13    Q.    Is this information you would have
14  liked to have known about in preparing your
15  opinions in this case?

16        MR. SCHANKER:  Objection; form.

17    A.    I think this information, she
18  should have told me.  But I believe that doesn't
19  change my opinion on the case.

20    Q.    But this is information you would
21  have liked to have known about before two or
22  three days ago; correct?

23    A.    Yes, of course.

24    Q.    You would have liked to have known
25  about this information before you prepared your

1  expert report; correct?

2    A.    Yes.

3    Q.    Is this information you would have
4  liked to have known about on May 7 during
5  Mrs. Plaisance's clinical exam?

6    A.    Yes.  That's when I would really
7  like to have had the information, before the
8  clinical exam.

9    Q.    And because you didn't have this
10  information until a few days ago, your opinions
11  in this case do not address or account for this
12  February 2003 dermatology record noting hair
13  thinning, hair loss, and alopecia in 2003;
14  correct?

15        MR. SCHANKER:  Objection; form.

16    A.    Yes.

17        (Exhibit 14, March 11, 2003
18  medical record, was marked for identification.)

19  BY MS. WADHWANI:

20    Q.    There should be -- fingers
21  crossed -- Exhibit 14 loaded up for you,
22  Dr. Tosti.

23    A.    Yes.

24    Q.    Do you see it?

25    A.    Yes.

1    Q.    Do you have it open?

2    A.    Yes.

3    Q.    Have you seen this document
4  before?

5    A.    Yes.  I think it is another one I
6  saw, you know, on Saturday.

7    Q.    This is a document that you saw
8  two days ago; is that right?

9    A.    Yes.

10    Q.    And what is this document, to your
11  understanding?

12    A.    It is, again, a medical record
13  from 2003, March 11, 2003, of Mrs. Plaisance.
14  And I think it is, again, Dr. Jones, I have to
15  check.  I don't see the signature of the doctor.

16    Q.    The signature line is down at the
17  bottom, Dr. Tosti.  But you -- I'm sorry.

18    A.    It's handwriting, I cannot see the
19  name of the doctor in this document.

20    Q.    Fair enough.  Do you understand
21  this to be a dermatological record?

22    A.    Yes.  Yes, I do.

23    Q.    If we look at Chief Complaint on
24  this March 11, 2003 document, do you see under
25  "Problem 1" that it has FPA, alopecia, and TE

1 listed?
2     A.   Yes.  I see these three
3 complaints.
4     Q.   And the next row notes that the
5 complaint concerns Mrs. Plaisance's scalp;
6 correct?
7     A.   Yes.  He wrote something else that
8 I cannot really understand.
9     Q.   But you understand --
10    A.   I believe that he is saying that
11 the hair is falling, you know --
12    Q.   But what you do --
13    A.   -- itching.  So scalp
14 and -- increase falling, and also pruritus, that
15 means itching.  He documents increase falling of
16 the hair, increased shedding, and itching.
17    Q.   And he also notes, as you noted,
18 that she complains of female pattern alopecia,
19 alopecia, and telogen effluvium; correct?
20    A.   It's not "and," it's "slash."  So
21 I believe those are his differential.
22    Q.   If you go down to Areas Examined,
23 do you see it's checked "abnormal"?
24    A.   Yes, I do.
25    Q.   Do you see next to that this

1 dermatological record notes hair loss;
2 correct?
3     A.   Yes.
4     Q.   And under "Problem Number 1" under
5 "Medical Decision-Making," do you see that again
6 there is a notation of "FPA/alopecia/TE"?
7     A.   Yes.  I do believe it's a
8 differential because he puts slash, and that's
9 how we put differential.
10    Q.   Is this information you would have
11 liked to have known about in preparing your
12 opinions in this case?
13    A.   I believe it is the same
14 information as the previous document, basically.
15    Q.   Would you have liked to have known
16 that --
17    A.   Yes.
18    Q.   -- now twice in one month's time,
19 Mrs. Plaisance complained to her dermatologist
20 about hair loss in 2003?
21        MR. SCHANKER:  Objection; form.
22    A.   No.  In one month time doesn't
23 mean a lot.  Because hair loss when you have
24 telogen effluvium, it lasts minimum three
25 months.  So it's basically nonsense to see a

1 patient after one month.  I don't expect she
2 could have improved after one month.
3     Q.   Nevertheless, when you prepared
4 your opinions in this case, you were not aware
5 of this medical record; correct?
6     A.   I agree.
7     Q.   And when you saw Mrs. Plaisance
8 during your clinical visit with her in May 2021,
9 you were not aware of this record; correct?
10    A.   I agree.
11    Q.   And this is information you would
12 have liked to have had for both those occasions;
13 correct?
14    A.   Correct.
15        (Exhibit 15, April 15, 2003
16 medical record, was marked for identification.)
17 BY MS. WADHWANI:
18    Q.   You should have Exhibit 15 in your
19 folder now.  Please let me know if you do not.
20    A.   I don't, so I will refresh.
21    Q.   Yeah, I would refresh.
22        MR. SCHANKER:  What number is
23 that?
24        MS. WADHWANI:  This is tab 118.
25        MR. SCHANKER:  If you can tell us

1 so I don't have to interrupt, that would be
2 great.
3         MS. WADHWANI:  Sure.  Sure.
4         THE WITNESS:  So 15?
5         MS. WADHWANI:  Uh-huh.
6         MR. SCHANKER:  Hang on, Dr. Tosti.
7 Let us take out the hard copy.
8         THE WITNESS:  Yes, sure.
9         MR. SCHANKER:  Okay.  Thank you.
10 BY MS. WADHWANI:
11    Q.   Is everyone ready to proceed with
12 the document that we marked as Exhibit 15?
13    A.   Yes.
14    Q.   Have you seen this document
15 before, Dr. Tosti?
16    A.   Yes.
17    Q.   Is this one that you saw for the
18 first time in the last couple of days?
19    A.   Yes.
20    Q.   What is your understanding of what
21 this document is?
22    A.   That she came back to the
23 dermatologist in April.  That's April.
24    Q.   April 15, 2003, Mrs. Plaisance had
25 another visit with her dermatologist; correct?

Page 186

1     A.   Yes.  Again, it's basically one
2  month or less after her first visit.  And I can
3  see that, again, he writes the same
4  differential.  And I think that he also writes
5  that she has intralesional steroids and Nizoral
6  shampoo.
7          (Reporter clarification.)
8     A.   Intralesional steroid injections
9  and Nizoral shampoo, which is a shampoo.
10     Q.   And is this another record from
11  Acadia Dermatology noting FPA, alopecia, and
12  telogen effluvium for Mrs. Plaisance?
13     A.   Yes.
14     Q.   Is this information you would have
15  liked to have had when you prepared your expert
16  report?
17     A.   Yes.
18     Q.   Is this information you would have
19  liked to have had when you visited with
20  Mrs. Plaisance in May 2021?
21     A.   Yes.
22     Q.   But because you did not have this
23  information, your expert report and the opinions
24  contained therein do not address or account for
25  this third dermatology record noting FPA,

Page 187

1  alopecia, and TE in 2003; correct?
2     A.   But I don't think this is
3  important because this report doesn't really
4  report the diagnosis.  And I think that I knew
5  she had something in 2010.  And so doesn't make
6  any change in my general opinion.  But, of
7  course, I would have been happy to have those at
8  that time.
9     Q.   On what basis are you concluding
10  that this medical record doesn't contain a
11  diagnosis?
12     A.   Because there are three slash
13  between three different diseases.  So female
14  pattern alopecia and telogen effluvium are a
15  differential, you know.
16          A patient cannot have female
17  pattern alopecia and telogen effluvium and, you
18  know, has alopecia, which is not a diagnosis.
19  So I don't think he made a diagnosis, and he
20  continued to inject steroids that are typically
21  not a treatment for androgenetic alopecia.
22          So I believe she had telogen
23  effluvium.  And I knew she had telogen effluvium
24  before the chemotherapy.  Not just 2010, she had
25  even before.  That's something I would have

Page 188

1  liked to know.  It doesn't change the way I see
2  this case or my diagnosis.
3     Q.   Well, Doctor, in this record and
4  the other records that we've looked at so far,
5  there is nothing that states that the diagnosis
6  here is strictly telogen effluvium; correct?
7          MR. SCHANKER:  Objection; form.
8     A.   Basically, it's not diagnosis,
9  yeah.  This doctor didn't make a diagnosis.
10     Q.   That's your interpretation of
11  these records; right?
12          MR. SCHANKER:  Objection; form.
13     A.   Yeah.
14     Q.   I take it, you haven't talked with
15  Dr. Jones about these records to see if he
16  agrees with your interpretation; correct?
17          MR. SCHANKER:  Objection; form.
18     A.   No.  But I think he is retired.
19  He didn't even testify.
20     Q.   And you haven't spoken with him
21  yourself; right?
22          MR. SCHANKER:  Objection; form.
23     A.   No, no.
24          (Exhibit 16, July 7, 2003 medical
25  record, was marked for identification.)

Page 189

1  BY MS. WADHWANI:
2     Q.   You should have available to you
3  Exhibit 16, which is tab 119.
4          It should come up if you refresh,
5  Dr. Tosti.
6     A.   I did refresh.
7     Q.   Is it there, or no?
8     A.   I think it's there.  16.
9     Q.   16, please.
10     A.   Okay.  I am here.
11     Q.   Is it opening for you?
12     A.   Yes.
13     Q.   Have you seen this document
14  before?
15     A.   Yes.  A few days, two days ago.
16     Q.   What's your understanding of what
17  this document is?
18     A.   So she went back to the same
19  dermatology in July.
20     Q.   July of 2003; correct?
21     A.   Yes.
22     Q.   And do you see again that the
23  Chief Complaint notes FPA/alopecia/TE?
24     A.   Yes.
25     Q.   And do you see that under "Areas

48 (Pages 186 - 189)

1 Examined" it's marked "abnormal"?
2     A.   Yes.
3     Q.   And next to it a note that says,
4 "resolving thinning hair"?
5     A.   Yes.
6     Q.   Do you see below under "Medical
7 Decision-Making," again, "TE/alopecia/FPA"?
8     A.   Yes.  And I also see that he
9 continued giving the injection.
10     Q.   Is this information you would have
11 liked to have had when you -- let me start
12 again.
13          Is this information you would have
14 liked to have had when you prepared your
15 opinions in this case?
16     A.   Yes.
17     Q.   Is this information you would have
18 liked to have had when you conducted your
19 clinical exam of Mrs. Plaisance on May 7?
20     A.   Yes.
21          (Exhibit 17, October 24, 2003
22 medical record, was marked for identification.)
23 BY MS. WADHWANI:
24     Q.   If you refresh, Dr. Tosti, you
25 should see Exhibit 17 in -- it should already be

1 there.
2          And, Darin, it's tab 120.
3     A.   Exhibit 17, or no?
4     Q.   Exhibit 17 for you, and tab 120
5 for your counsel.
6          Do you have it open, Dr. Tosti?
7     A.   Yes.
8     Q.   Have you seen this document
9 before?
10     A.   Yes.
11     Q.   When is the first time you saw
12 this document?
13     A.   Two days ago.
14     Q.   What do you understand this
15 document to be?
16     A.   She went back to the dermatologist
17 in October.  And he writes, "Follow-up with, telogen
18 effluvium/alopecia/female pattern alopecia."
19     Q.   And just for the record, this
20 document is dated October 24, 2003; correct?
21     A.   October, yes, 2003.
22     Q.   Do you see under "Areas Examined"
23 it notes "Scalp/Hair, abnormal"?
24     A.   Yes.
25     Q.   And, again, under "Medical

1 Decision-Making," do you see under "Problem 1,"
2 "TE/alopecia/FPA"?
3     A.   Yes.  I think it was more -- in
4 the beginning it was FPA/alopecia/TE.  I believe
5 now he start understanding she has telogen
6 effluvium because he also write that it's a
7 follow-up --
8     Q.   Isn't it also possible that he's
9 just writing them in the order that he's
10 thinking of them, Doctor?
11          MR. SCHANKER:  Objection; form.
12     A.   Usually you don't write in the
13 order you are thinking, you are writing in the
14 order you think are most common.  But I cannot
15 say because I am not in his mind.
16     Q.   Right.  And you haven't spoken to
17 him about this record?
18     A.   No, no.  I agree.
19     Q.   Is this information you would have
20 liked to have had when you were preparing your
21 opinions and your expert report for this case?
22     A.   Yes.
23     Q.   Is this information you would have
24 liked to have had when you conducted your
25 clinical exam of Mrs. Plaisance in May of this

1 year?
2     A.   Yes.
3     Q.   Isn't the fact that Mrs. Plaisance
4 sought care and treatment for hair loss concerns
5 five times in 2003 relevant to your assessment
6 of her hair loss?
7          MR. SCHANKER:  Objection to form.
8     A.   Not really, because I knew she had
9 the problem in 2010, you know.  Which was,
10 again, probably she had twice.  And I think it's
11 quite common for people to have telogen
12 effluvium, go back to normal, and then have
13 telogen effluvium again.  This happen.
14     Q.   You note in your report that she
15 had telogen effluvium in approximately 2010, and
16 you note why you think that doesn't change your
17 opinion.  But your report does not because it
18 cannot address these five medical records from
19 2003; correct?
20          MR. SCHANKER:  Objection; form,
21 asked and answered --
22     A.   Correct.
23          MR. SCHANKER:  -- multiple times.
24 Go ahead.
25     A.   Doesn't change my report because

49 (Pages 190 - 193)

1 she had telogen effluvium more than one time.
2 But telogen effluvium by definition resolves.
3 Because otherwise, she would have had something
4 that, you know, is progressing. Instead, she
5 resolved. And then she had another episode.
6 This happen.
7    Q.   And none of these five records
8 that we looked at from 2003 state that the
9 diagnosis is only telogen effluvium; correct?
10    A.   Correct.
11       (Exhibit 18, July 6, 2004 medical
12 record, was marked for identification.)
13 BY MS. WADHWANI:
14    Q.   Can you please look at Exhibit 18,
15 which should be in your Exhibit Share. It's tab
16 121.
17    A.   I refresh, it's not there.
18    Q.   You might want to try it again.
19 The computer technology has been very
20 persnickety today.
21    A.   It's coming. No. No.
22       MR. SCHANKER: You don't have it?
23    Q.   Has it arrived for you yet?
24    A.   No. Looks like it's uploading.
25 But nothing open. Maybe she uploaded more than

1 one. Maybe that's the reason. I don't know.
2    Q.   Why don't you try refreshing
3 again, Dr. Tosti, and see if 18 pops up again.
4    A.   Okay. No. Okay. Okay. Here.
5    Q.   You have it?
6    A.   Yes. 18.
7    Q.   18. Have you seen this document
8 before?
9    A.   I just got the document.
10    Q.   Oh, sorry. Please, take your
11 time.
12    A.   This document I saw last Saturday.
13    Q.   A couple of days ago?
14    A.   Yeah.
15    Q.   The first time you saw this
16 document was two days ago; correct?
17    A.   Yes.
18    Q.   Is this another Acadia Dermatology
19 record?
20    A.   Yes.
21    Q.   Can you tell what the date is?
22    A.   July 2004.
23    Q.   Do you see where the chief
24 complaint is noted to be "alopecia" --
25    A.   "Follow-up of alopecia."

1    Q.   "Follow-up of alopecia"?
2    A.   Uh-huh.
3    Q.   Would this have been information
4 you would have liked to have had when you
5 prepared your opinions in your expert report?
6    A.   Yes.
7    Q.   Is this information you would have
8 liked to have had when you visited with
9 Mrs. Plaisance in May of 2021?
10    A.   Yes.
11       (Exhibit 19, August 6, 2004
12 medical record, was marked for identification.)
13 BY MS. WADHWANI:
14    Q.   You should have in your Exhibit
15 Share Exhibit 19. If it's not there, you can
16 try refreshing.
17    A.   No. I have also 20.
18    Q.   We'll take this in order. We will
19 start at Exhibit 19.
20    A.   I'm 19.
21    Q.   And that's tab 122.
22    A.   And this is August 2004.
23    Q.   Correct. And when is the first
24 time you saw this document?
25    A.   I saw that document on Saturday.

1    Q.   Two days ago?
2    A.   Yes.
3    Q.   Is this another medical record
4 from Acadia Dermatology?
5    A.   Yes.
6    Q.   What do you see as the chief
7 complaint?
8    A.   "Follow-up of alopecia."
9    Q.   And if you look down at the bottom
10 of the page under "Medical Decision-Making,"
11 what do you see there?
12    A.   Here it doesn't check the scalp as
13 abnormal. I see "alopecia/AD." I don't know
14 what "AD" is because "AD" is usually atopic
15 dermatitis, but doesn't make any sense. Slash,
16 "POD," but -- I don't know. It's something that
17 is not related probably to the problem.
18    Q.   And do you see, Dr. Tosti, that
19 under "Problem" in that line you just read the
20 term "alopecia"?
21    A.   Yes. I believe that slash other
22 two things.
23    Q.   Do you see "TE" still written down
24 here?
25    A.   No, I don't see that. Alopecia is

50 (Pages 194 - 197)

Page 198

1 not a diagnosis. Alopecia is not a diagnosis.
2     Q.   Do you know what
3 Dr. Thompson -- I'm sorry -- Dr. Jones meant
4 here when he said "alopecia"?
5     A.   I don't know. But it's not a
6 diagnosis. Alopecia just means any type of hair
7 loss, including telogen effluvium.
8          But I think this is another
9 doctor. The handwriting is different. I think
10 it's somebody there, but probably not him. I
11 don't know.
12     Q.   Well, the signature of each of the
13 records will reflect themselves --
14     A.   If we look, the handwriting is
15 different.
16     Q.   This is still a document
17 identifying a report and medical decision-making
18 of hair loss; correct?
19     A.   Yes.
20     Q.   And this is from August 2004?
21     A.   It's August of 2004.
22     Q.   Is this information you would have
23 liked to have had when you were preparing your
24 opinions in this case?
25     A.   Yes.

Page 199

1     Q.    Is this information you would have
2 liked to have had when you visited with
3 Mrs. Plaisance in May of 2021?
4     A.    Yes.
5     Q.    This is not information you had
6 for either of those things, your visit with her
7 or the preparation of your expert report;
8 correct?
9     A.    Correct.
10         (Exhibit 20, February 24, 2006
11 medical record, was marked for identification.)
12 BY MS. WADHWANI:
13     Q.    Okay. I think you told me that
14 you have Exhibit 20 in your Exhibit Share
15 already. Right?
16     A.    Yes.
17     Q.    And this is tab 123.
18         Have you seen this document
19 before, Dr. Tosti?
20     A.    Yes.
21         MR. SCHANKER: If you can hold on
22 one moment, we are just getting 123.
23         MS. WADHWANI: Darin, sorry, we
24 can't hear you at all.
25         THE WITNESS: He's finding the

Page 200

1 paper document.
2     Q.    Okay. We will give you a second.
3     A.    Okay. They got it.
4     Q.    When is the first time you saw
5 this document, Dr. Tosti?
6     A.    Two days ago.
7     Q.    Can you tell what the date of this
8 document is?
9     A.    I think it's February 2006, but
10 I'm not 100 percent sure because the handwriting
11 is difficult to read.
12     Q.    Let me see if I can help you out,
13 because I think the handwriting at the top date
14 is a little tricky.
15         Look at the bottom of this page,
16 in the bottom right. Do you see the date
17 there?
18     A.    Yes. It's February 2006.
19     Q.    Going back up to Chief Complaints,
20 do you see under "Problem 2" what is noted
21 there?
22     A.    "Follow-up alopecia, telogen
23 effluvium, sebderm."
24         And he states she see hair loss on
25 the pillow.

Page 201

1     Q.    From her scalp; correct?
2     A.    Yes. And then I don't read what
3 is after that.
4     Q.    And then if you go down to Areas
5 Examined, do you see under "Scalp/Hair" there is
6 a notation of "hair loss"?
7     A.    Yes, I see.
8     Q.    And then if you go down to Medical
9 Decision-Making, Problem 2, do you see that
10 there is a notation of "alopecia/sebderm"?
11     A.    Yes. I believe here the diagnosis
12 is clear because when you have hair on the
13 pillow, this is usually telogen effluvium. But,
14 of course, I agree it's not written.
15     Q.    Mrs. Plaisance's dermatologist at
16 the time in Medical Decision-Making does not
17 note telogen effluvium here; correct?
18     A.    But he notes in the symptoms, the
19 typical symptoms of telogen effluvium.
20     Q.    My question is just simply, here
21 in Medical Decision-Making does Mrs. Plaisance's
22 doctor note telogen effluvium?
23     A.    No, doesn't write down telogen
24 effluvium.
25     Q.    And we have seen him do so in

51 (Pages 198 - 201)

Page 202

1 prior records in Medical Decision-Making;
2 correct?
3      A.    Yeah.  But here he writes down in
4 the Chief Complaint.
5      Q.    Correct.  I am just focused on
6 Medical Decision-Making, he just writes down
7 alopecia and sebderm; correct?
8      A.    I agree, yes.
9      Q.    Is this information you would have
10 liked to have had when you were preparing your
11 opinions in this case?
12      A.    Yes.
13      Q.    Is this information you would have
14 liked to have known when you met with
15 Mrs. Plaisance in May of 2021?
16      A.    Yes.
17           (Exhibit 21, March 10, 2006
18 medical record, was marked for identification.)
19 BY MS. WADHWANI:
20      Q.    All right.  There should be
21 Exhibit 21 in Exhibit Share, which is tab 124.
22      A.    It's not there.  I'm going to
23 refresh.
24      Q.    Perfect.
25      A.    24.

Page 203

1      Q.    We're looking for 21, Dr. Tosti.
2      A.    Oh, sorry.
3      Q.    It's okay.  It's tab 124, for your
4 counsel's knowledge, so he can get the hard
5 copy, but for you it's Exhibit 21.
6      A.    Exhibit 21.
7      Q.    Let me know when you have it open.
8      A.    It's open.
9      Q.    Have you seen this document
10 before?
11      A.    Yes.
12      Q.    Was the first time you saw this
13 document two days ago, on Saturday?
14      A.    Yes, yes.
15      Q.    Can you tell what the date of this
16 document is?
17      A.    March of 2016 -- 2006.  Sorry.
18      Q.    This document is dated March 10,
19 2006; correct?
20      A.    Yes.
21      Q.    Is this document that we've marked
22 as Exhibit 21 another record from Acadia
23 Dermatology?
24      A.    Yes.
25      Q.    You understand this to be a visit

Page 204

1 by Mrs. Plaisance to her dermatologist?
2      A.    Yes.
3      Q.    Looking at Chief Complaints,
4 Problem 2, what's written on the top row in that
5 column?
6      A.    "Follow-up sebhorreic dermatitis
7 and alopecia."
8      Q.    If you go down to Areas Examined,
9 do you see that next to "Scalp/Hair" it notes
10 "thinning of hair"?
11      A.    Yes, I see that.
12      Q.    And under "Medical
13 Decision-Making," "Problem 2," do you see that
14 Mrs. Plaisance's dermatologist in 2006 noted
15 "sebderm/alopecia"?
16      A.    Yes, I do.
17      Q.    This was not information that you
18 had when you prepared your expert report in this
19 case; correct?
20      A.    Correct.
21      Q.    Is this information you would have
22 liked to have had when you prepared your expert
23 report in this case?
24      A.    Yes.
25      Q.    Is this information you would have

Page 205

1 liked to have had when you visited with
2 Mrs. Plaisance in May of 2021?
3      A.    Yes.
4           (Exhibit 22, February 19, 2009
5 medical record, was marked for identification.)
6 BY MS. WADHWANI:
7      Q.    Go to Exhibit 22.  And it's tab
8 125.
9      A.    Okay, I'm there.
10      Q.    Have you seen this document that
11 we marked as Exhibit 22 before?
12      A.    Yes, two days ago.
13      Q.    That was the first time you saw
14 this document was two days ago?
15      A.    Yes.
16      Q.    Can you tell what the date of this
17 document is?
18      A.    This is February 2009.
19      Q.    Is this another dermatological
20 record for Mrs. Plaisance?
21      A.    Yes.
22      Q.    Under "Chief Complaints," what is
23 noted under "Problem 1" on the top row?
24      A.    "Alopecia, sebum scalp."
25      Q.    Is Mrs. Plaisance following up for

52 (Pages 202 - 205)

1 alopecia in February 2009 with her
2 dermatologist?
3     A.   Yes.  That means that she didn't
4 go for at least three years.
5     Q.   It means that she didn't visit her
6 dermatologist for at least three years;
7 correct?
8     A.   Yes.  And probably since she went
9 to the dermatologist basically every month, it
10 mean that the hair loss subside, and then is
11 relapsing here in 2009.
12     Q.   Is it your understanding that if
13 Mrs. Plaisance has concerns about her hair loss,
14 she seeks attention from her dermatologist?
15     A.   Yes.  I think she always seeks
16 attention.  She went to the dermatologist many,
17 many times.
18     Q.   Do you see under "Areas Examined,"
19 "Scalp/Hair," it says "hair loss"?
20     A.   Yes.  I see it is checked both
21 normal and abnormal.
22     Q.   Do you see that it says "hair
23 loss" next to "Scalp/Hair"?
24     A.   I do.
25     Q.   And under "Medical

1 Decision-Making," do you see that Problem 1 is
2 listed "alopecia, sebderm"?
3     A.   Yes, I do.
4     Q.   Is this information that you had
5 when you prepared your opinions in this case?
6     A.   No, I did not.
7     Q.   Is this information that you had
8 when you conducted your clinical exam of
9 Mrs. Plaisance?
10     A.   No, I did not.
11     Q.   Is this information you would have
12 liked to have had when you prepared your
13 opinions in this case?
14     A.   Yes.
15     Q.   Is this information you would have
16 liked to have had when you conducted your
17 clinical exam of Mrs. Plaisance?
18     A.   Yes.
19         (Exhibit 23, September 8, 2009
20 medical record, was marked for identification.)
21 BY MS. WADHWANI:
22     Q.   You should have Exhibit 23 in your
23 box.  And that is tab 126.
24     A.   I have it in front of me.
25     Q.   You have it open in front of

1 you?
2     A.   Yes.
3     Q.   Have you seen this document
4 before, Dr. Tosti?
5     A.   Yes.  I seen it two days ago.
6     Q.   Was that the first time you saw
7 this document?
8     A.   Yes.
9     Q.   Can you tell what date -- sorry.
10         Can you tell what the date of this
11 document is?
12     A.   September 2009.
13     Q.   Is this another dermatological
14 record for Mrs. Plaisance?
15     A.   Yes.  It's a follow-up with her
16 dermatologist.
17     Q.   Do you see under "Chief
18 Complaints" --
19     A.   -- sebderm.
20         (Simultaneous speakers.)
21     Q.   I think we were talking over each
22 other, so let me start again and you respond.  I
23 know as the day goes on it gets harder for both
24 of us not to do that, so you remind me and I'll
25 remind you.  Is that a deal?

1     A.   Absolutely.
2     Q.   Under "Chief Complaint," do you
3 see "follow-up for alopecia and sebderm"?
4     A.   Yes, I do.
5     Q.   If you move down to "Areas
6 Examined," do you see next to "Scalp/Hair,"
7 "hair loss"?
8     A.   Yes.
9     Q.   And if you move down to Medical
10 Decision-Making, Problem 1, do you see
11 "alopecia, sebderm"?
12     A.   Yes, I do.
13     Q.   Is this information you would have
14 liked to have had when you prepared your expert
15 opinions and report in this case?
16     A.   Yes.
17     Q.   Is this information you would have
18 liked to have had when you conducted your
19 clinical exam of Mrs. Plaisance in May of
20 2021?
21     A.   Yes.
22         (Exhibit 24, November 9, 2009
23 medical record, was marked for identification.)
24 BY MS. WADHWANI:
25     Q.   Let's go to Exhibit 24, which is

Page 210

1 tab 127.
2     A.   I'm there.
3     Q.   Is the document open for you?
4     A.   Yes.
5     Q.   What's your understanding of what
6 this document is?
7     A.   This is a follow-up in November
8 2009, dermatology, same dermatologist, and
9 follow-up for alopecia and sebhorreic
10 dermatitis.
11     Q.   And so you see under "Chief
12 Complaint" that Problem Number 2 is
13 Mrs. Plaisance is following up for alopecia and
14 sebderm; correct?
15     A.   Yes.
16     Q.   And if you go down to Medical
17 Decision-Making, Problem 2, do you see
18 "alopecia, sebderm" listed there?
19     A.   Yes, yes.
20     Q.   Is this information you would have
21 liked to have had when you prepared your expert
22 report and opinions in this case?
23     A.   Yes.
24     Q.   Is this information you would have
25 liked to have had when you conducted your

Page 211

1 clinical exam of Mrs. Plaisance?
2     A.   Yes.
3          (Exhibit 25, March 2010 medical
4 record, was marked for identification.)
5 BY MS. WADHWANI:
6     Q.   Is Exhibit 25 available to you,
7 Dr. Tosti?
8     A.   I just refreshing.
9     Q.   Sure.  It's tab 128.
10     A.   Okay.  Okay.  25.  That's in front
11 of me.
12     Q.   Have you seen this document
13 before, Dr. Tosti?
14     A.   Yes.
15     Q.   When is the first time you saw
16 this document we've marked as Exhibit 25?
17     A.   Two days ago.
18     Q.   Is this another dermatological
19 record from Mrs. Plaisance?
20     A.   Yes.  She went back in March of
21 2010.
22     Q.   Do you see that under Problem
23 Number 2 it says "follow-up alopecia/sebderm"?
24     A.   Yes.
25     Q.   Do you see under "Areas Examined"

Page 212

1 it notes "hair loss"?
2     A.   Yes.
3     Q.   And do you see under Problem 2,
4 "alopecia/sebderm"?
5     A.   Yes.
6     Q.   Is this information you would have
7 liked to have had when you prepared your expert
8 opinions and report in this case?
9     A.   Yes.
10     Q.   Is this information you would have
11 liked to have had when you visited with
12 Mrs. Plaisance at your offices in May of 2021?
13     A.   Yes.
14          (Exhibit 26, April 12, 2010
15 medical record, was marked for identification.)
16 BY MS. WADHWANI:
17     Q.   There should be Exhibit 26
18 available to you, Dr. Tosti.  It's tab 129.
19     A.   Okay.  I'm here.
20          This is April 2010, same
21 dermatology.  Follow-up alopecia, sebhorreic
22 dermatitis.
23     Q.   Mrs. Plaisance is following up
24 with her dermatologist here in follow-up to her
25 alopecia and sebderm; correct?

Page 213

1     A.   Correct.
2     Q.   This is dated April 12, 2010?
3     A.   Yes.
4     Q.   And under "Medical
5 Decision-Making," does her dermatologist list
6 "alopecia/sebderm"?
7     A.   Yes.
8     Q.   Is this information you would have
9 liked to have had when you prepared your expert
10 opinions in this case?
11     A.   Yes.
12     Q.   Is this information you would have
13 liked to have had when you conducted your
14 clinical examination of Mrs. Plaisance in May of
15 2021?
16     A.   Yes.
17          (Exhibit 27, June 9, 2010 medical
18 record, was marked for identification.)
19 BY MS. WADHWANI:
20     Q.   Exhibit 27, which is tab 130.
21     A.   Okay.  I'm here.
22     Q.   Okay.  Have you seen this document
23 before, Dr. Tosti?
24     A.   Yes.  Two days ago.
25     Q.   Can you tell what the date of this

54 (Pages 210 - 213)

1 document is?
2     A.   It is, I think, June 2010.
3     Q.   Is this another dermatological
4 visit --
5     A.   Yes.
6     Q.   -- by Mrs. Plaisance to her
7 dermatologist?
8     A.   Yes.
9     Q.   Do you see under "Problem
10 Number 2" it says, "follow-up for
11 alopecia/sebderm"?
12     A.   Yes.
13     Q.   Do you see under "Areas Examined,"
14 "Scalp/Hair," one of the notations there is
15 "hair thinning"?
16     A.   Yes.
17     Q.   Do you have any understanding of
18 what the rest of those notations are next to
19 "Scalp/Hair"?
20     A.   I think he noted some hair
21 thinning.
22     Q.   I'm sorry, I didn't hear that.
23 You think he noted what?
24     A.   Thinning of the scalp hair.
25     Q.   So it says "hair thinning," and

1 then there are -- there's some other language on
2 that line.  Do you know what that refers to?
3     A.   No.  Absolutely, no.
4     Q.   If you go down to "Medical
5 Decision-Making," do you see that at this
6 dermatological visit it was noted
7 "alopecia/sebderm"?
8     A.   Yes.
9     Q.   Is this information you would have
10 liked to have had when you prepared your expert
11 opinions in this case?
12     A.   Yes.
13     Q.   Is this information you would have
14 liked to have had when you visited with
15 Mrs. Plaisance in May of 2021?
16     A.   Yes.
17     Q.   Dr. Tosti, we have just reviewed
18 15 medical records from 2003 to 2010 noting that
19 Mrs. Plaisance was complaining of hair loss;
20 correct?
21     A.   I think we don't know the
22 diagnosis.  She was complaining of hair shedding
23 definitely.  And at some point, the dermatology,
24 he was noting some thinning, but we don't know
25 the diagnosis.

1     Q.   We do know that over the course of
2 seven years Mrs. Plaisance went to her
3 dermatologist 15 times for follow-up on
4 alopecia; correct?  That's what the records
5 say?
6     A.   Yes.  But the record also show
7 that she didn't go for four years.  So she went
8 from 2003 to 2007, '06, '07, and then she didn't
9 go back until 2010.  Which indicates that she
10 probably got better at some point, that's why
11 she stopped going.  But that's just speculation.
12 I cannot say more than that.
13     Q.   All right.  And what we do know
14 without speculating is that between 2003 and
15 2010, she had 15 separate visits with her
16 dermatologist for concerns relating to hair
17 thinning and hair loss; correct?
18     A.   Correct.  But what you -- the
19 dermatologist kept doing intralesional
20 steroids --
21          (Reporter clarification.)
22     A.   I believe that one of the reasons
23 she went so many times is because the
24 dermatologist gave her intralesional steroids.
25 So he gave her a follow-up appointment every

1 month to give steroids again.  That's my
2 explanation for so many visits.  But,
3 undoubtedly, she had the problem at least twice
4 in 2003 and in 2010.
5     Q.   And she had 15 visits, correct,
6 for concerns with alopecia and hair loss between
7 2003 and 2010; correct?
8     A.   I agree.
9     Q.   And you would have liked to have
10 known about all of these visits in preparing
11 your expert opinions in this case; correct?
12          MR. SCHANKER:  Objection; form.
13     A.   Yes.
14     Q.   And you would have liked to have
15 known about these 15 dermatological visits where
16 Mrs. Plaisance expressed concerns about hair
17 loss when you visited with her in May 2021;
18 correct?
19          MR. SCHANKER:  Objection; form.
20     A.   Yes.
21     Q.   Mrs. Plaisance did not tell you
22 about each of these 15 visits; correct?
23          MR. SCHANKER:  Objection; form.
24     A.   I didn't understand your last
25 question.  I'm sorry.

55 (Pages 214 - 217)

1    Q.   And when you visited with
2  Mrs. Plaisance in May 2021, she didn't tell you
3  about each of these 15 visits; correct?
4         MR. SCHANKER:  Objection to form.
5    A.   She told me that she went to a
6  dermatologist.  But she didn't tell me she went,
7  you know, many times.
8    Q.   And so when you prepared your
9  opinions in this case, you did so without
10 factoring in this history of hair loss and
11 alopecia; correct?
12        MR. SCHANKER:  Objection; form.
13   A.   I knew that she had hair loss in
14 the past.  I don't like the term "alopecia"
15 because alopecia is not a diagnosis.  And "hair
16 loss" meaning hair shedding, she had hair
17 shedding in the past.  She told me she was
18 having shedding more than normal.  So she told
19 me around 2010.  She didn't tell me that she had
20 the same problem before.
21   Q.   And certainly the medical records
22 don't just state "hair shedding"; correct?  Many
23 of them state "hair loss"; right?
24   A.   You know, hair loss is not a
25 diagnosis.

1    Q.   I am just asking you, Dr. Tosti,
2  do many of these 15 records that we reviewed
3  state "hair loss"?
4         MR. SCHANKER:  Objection; form.
5    A.   It states hair loss, alopecia,
6  telogen effluvium.  It's a differential
7  diagnosis.  They don't have a precise diagnosis.
8    Q.   That's your interpretation of the
9  medical records; correct?
10        MR. SCHANKER:  Objection; form.
11   A.   I don't think it's my
12 interpretation.  I don't see a diagnosis, you
13 know, that you can find in a dermatological
14 textbook or a hair textbook.  The only diagnosis
15 that he wrote is telogen effluvium.
16        But there is no diagnosis of
17 alopecia, just alopecia, alopecia areata, the
18 type of alopecia.  So the only diagnosis I saw
19 was telogen effluvium and female pattern
20 alopecia.  Those were diagnosis.  Everything
21 else is not a diagnosis.
22   Q.   I understand that's your
23 testimony, Dr. Tosti, but as we know, you
24 haven't spoken with her dermatologist to
25 determine whether he made a diagnosis in those

1  notes; correct?
2         MR. SCHANKER:  Objection; form.
3    A.   Correct.
4         MS. WADHWANI:  I think we've
5  probably been going over an hour.  Should we
6  take a break here?
7         THE WITNESS:  Yes, let's take a
8  break.  Also, because we have no window.
9         THE VIDEOGRAPHER:  Thank you.
10 This is the videographer.  The time is 3:55.  We
11 are going off the record.  This ends media
12 file 5.
13        (Break taken.)
14        THE VIDEOGRAPHER:  The time is
15 4:10.  We are back on the record, beginning
16 media file 6.
17 BY MS. WADHWANI:
18   Q.   Hello, Dr. Tosti.  Did you have a
19 good break?
20   A.   Yes.
21   Q.   Are you ready to proceed?
22   A.   Yes, I am.
23   Q.   Dr. Tosti, were you aware that
24 Mrs. Plaisance was on hormone replacement
25 therapy for approximately 40 years before she

1  developed breast cancer?
2    A.   Yes, I read that in the medical
3  record.
4    Q.   And you are also aware, correct,
5  that she started Femara 11 days after completing
6  chemotherapy?
7    A.   Yes, I know Femara.
8    Q.   Is Femara an endocrine therapy?
9    A.   Yes, it is.
10   Q.   She took Femara from 2014 to 2019;
11 correct?
12   A.   Exactly.
13   Q.   I am going to ask you to pull up
14 in front of you your expert report, which is
15 marked as Exhibit 1 to this deposition.
16   A.   I have it.
17   Q.   Please go to page 34.
18   A.   Okay.
19   Q.   I am looking at the last paragraph
20 on that page before the section titled
21 "Permanent" -- the last paragraph on that page
22 before the section "Permanent
23 Chemotherapy-Induced Alopecia."
24        Do you see that paragraph?
25   A.   Yes.

Page 222

1    Q.   And the first sentence of that
2 paragraph is "Endocrine therapy can cause
3 androgenetic alopecia."  Correct?
4    A.   Correct.
5    Q.   But you conclude in that paragraph
6 that Mrs. Plaisance does not have androgenetic
7 alopecia due to her Femara because
8 Mrs. Plaisance, quote, had incomplete hair
9 regrowth with severe alopecia before starting
10 endocrine therapy; correct?
11    A.   Correct.
12    Q.   Now, based on your earlier
13 testimony today and your expert report at page
14 14, is it true that PCIA can only be diagnosed
15 following incomplete hair regrowth six to eight
16 months after the end of chemotherapy?
17    A.   Yes.
18    Q.   When Mrs. Plaisance started
19 Femara, was she bald or close to it?
20    A.   No, she was not.
21    Q.   Describe Mrs. Plaisance's hair to
22 me, as you understand it, 11 days after she
23 finished chemotherapy.
24    A.   She probably had complete alopecia
25 of the scalp due to anagen effluvium.

Page 223

1    Q.   Your understanding is that when
2 Mrs. Plaisance started her endocrine therapy
3 after she completed chemotherapy, she would have
4 had complete anagen effluvium; is that
5 correct?
6    A.   Yes.
7    Q.   When Mrs. Plaisance came to see
8 you in May 2021, she was not bald; correct?
9    A.   She was not bald.
10    MR. SCHANKER:  Objection to form.
11    A.   What the word "bald" do you mean?
12 "Bald" is a very, again, imprecise word.  So
13 explain me what you mean exactly.
14    Q.   She had hair on her head;
15 correct?
16    A.   Her hair didn't cover the scalp
17 properly.
18    Q.   You took photos of her hair --
19    (Reporter clarification.)
20    Q.   You took photos of Mrs. Plaisance
21 during her May 7, 2021 visit with you;
22 correct?
23    A.   Yes.
24    Q.   And those photos reflect the
25 amount of hair Mrs. Plaisance had on the day she

Page 224

1 saw you on May 7, 2021; right?
2    A.   Yes.
3    Q.   And you could run a comb through
4 her hair; correct?
5    A.   I could run a comb through her
6 hair, correct.
7    Q.   And according to your expert
8 report, it's your understanding that these
9 photos that you took on May 7, 2021 were also
10 what Mrs. Plaisance's hair looked like in 2014;
11 correct?
12    A.   Yes.  I don't know if they exactly
13 look like because I didn't see.  But, you know,
14 basically, mostly, yes.  Grossly, yes.
15    Q.   You didn't see any photos of
16 Mrs. Plaisance's hair from 2021; correct?  Let
17 me start again.  I'm sorry.
18    You didn't see any photos of
19 Mrs. Plaisance's hair from 2014; correct?
20    A.   I saw a photo which was taken at
21 doctor, dermatology doctor office, and that
22 photo in 2017 shows hair thinning.
23    Q.   Did you see any photos of
24 Mrs. Plaisance's hair from any point in 2014?
25    A.   I have those, you know, photos,

Page 225

1 but they are not good quality and I cannot
2 evaluate those photos.
3    Q.   And I think you also said, you
4 don't know what the dates of those photos are
5 too; right?
6    A.   Yes, yes.
7    Q.   If you turn to page 20 of
8 Exhibit 1, the expert report you are looking at.
9    A.   I'm here.
10    Q.   I'm looking under "History."  The
11 third paragraph, do you see that paragraph, it
12 starts, "Mrs. Audrey Plaisance"?
13    A.   Yes.
14    Q.   The second sentence says, "She
15 states that when her hair grew back in 2014 it
16 had the appearance that it has today."
17    Correct?
18    A.   Sorry.  Yes, I found the sentence.
19 Yes.
20    Q.   Is that what Mrs. Plaisance told
21 you?
22    A.   Yes.
23    Q.   And so was it your understanding
24 when you visited with Mrs. Plaisance in May of
25 2021 that her hair as it looked on May 7, 2021

57 (Pages 222 - 225)

1 is how it looked when her hair grew back in
2 2014?
3     A.   Yes.  That's my understanding.
4     Q.   And you base that understanding on
5 what Mrs. Plaisance told you at the visit on
6 May 7, 2021; correct?
7     A.   Yes.
8     Q.   And that was the only thing you
9 based it on; right?
10     A.   Yes.
11     Q.   So according to what
12 Mrs. Plaisance has told you in May 2021, her
13 hair loss has not changed at all in
14 approximately seven years; correct?
15     A.   Yes.  That's what she said.
16     Q.   And if she started Femara 11 days
17 after completing chemotherapy, how can you rule
18 out to a medical degree of certainty the
19 endocrine therapy as a cause of Mrs. Plaisance's
20 hair condition?
21     A.   What I am saying is that endocrine
22 alopecia by definition is defined as pattern
23 alopecia, which looks like androgenetic alopecia
24 that occur in women with complete hair regrow
25 after chemotherapy taking endocrine therapy.  So

1 to get that diagnosis you have to start with
2 hair, she didn't start with hair.
3     I cannot exclude endocrine therapy
4 had some role.  But she definitely had the PCIA.
5 And then, of course, aging, maybe the endocrine
6 therapy, all these things may play some role.
7     Q.   And the endocrine therapy and
8 aging may play some role in the way
9 Mrs. Plaisance's hair looked when she came to
10 see you in May of 2021; correct?
11     A.   Yes.  They can worsen PCIA.  So I
12 believe PCIA, as any other type of alopecia, can
13 be worsened by current factors --
14     (Reporter clarification.)
15     A.   By factors that occur, by other
16 factors that have nothing to do.  But in any
17 case, I believe -- I cannot say she's the same
18 based on her word, but I think it's basically
19 the same.
20     Q.   Do age and endocrine therapy
21 worsen PCIA or do they appear as a separate
22 process that causes hair loss?
23     MR. SCHANKER:  Objection; form.
24     A.   I believe that they are a second
25 process, but that second process can worsen

1 PCIA.
2     Q.   So explain that to me, Dr. Tosti,
3 because if I understand your report correctly,
4 PCIA is incomplete hair regrowth at least six to
5 eight months after the completion of
6 chemotherapy.  Correct?
7     A.   Yes.
8     Q.   And that means the hair has not
9 regrown; correct?
10     A.   Completely.  Has not regrown
11 completely.
12     Q.   And so how does endocrine therapy
13 worsen PCIA?
14     A.   Can overlap.  You have PCIA, you
15 already have thin hair, and also get the
16 endocrine therapy.  And maybe -- even it's not
17 in the definition because per definition, you
18 should have hair growth to make this diagnosis.
19 But it's not in the definition, maybe the
20 endocrine therapy can worsen the problem.
21     But, you know, you have already
22 much less hair than normal, and then endocrine
23 therapy can make it even worse.
24     But there is no data on that.
25 There is nothing published.  Because all papers

1 on this topic, they, you know, didn't evaluate
2 patients who already have PCIA.  They wanted
3 patients with complete hair regrowth to see what
4 was the role of endocrine therapy.  So we don't
5 have those data.  So it's just speculation.  But
6 I believe it's possible.
7     Q.   You know who Dr. Laura Chauvin is;
8 correct?
9     A.   The oncologist, I know who she is.
10     (Exhibit 28, May 19, 2014 progress
11 notes, was marked for identification.)
12 BY MS. WADHWANI:
13     Q.   My colleague is going to put a
14 document in Exhibit Share for you, which I think
15 is going to become Exhibit 28.  And it's tab
16 131.
17     A.   28.  I have 27.
18     Q.   Try and refresh.
19     A.   I did refresh.  Okay.  I will do
20 again.  Okay.  I do.
21     Q.   Is it coming up?
22     A.   Yes.  I have it here.
23     Q.   Have you seen this record before,
24 Dr. Tosti?
25     A.   Yes.

58 (Pages 226 - 229)

1     Q.   When is the first time you saw
2 this record?
3     A.   Before seeing Mrs. Plaisance.  So
4 I believe I saw it in, like, April.
5     Q.   April of 2021?
6     A.   Yes, 2021, of course.
7     Q.   Do you recognize this then as a
8 medical record of Dr. Chauvin's?
9     A.   Yes, I do.
10     Q.   Is this medical record dated
11 May 19, 2014?
12     A.   Yes.
13     Q.   Can you please turn to page 2.
14     A.   Yes.
15     Q.   I will direct your attention to
16 the section that says "Chief Complaint."  Do you
17 see that?
18     A.   Chief Complaint, yes.
19     Q.   And do you see there under "Chief
20 Complaint," Doctor, it notes some things about
21 why Mrs. Plaisance is there, lab and eval of
22 breast cancer, status post chemotherapy, six
23 more treatments of radiotherapy, frustrated with
24 little regrowth of chemotherapy-induced
25 alopecia.

1     This is consistent with what
2 Mrs. Plaisance told you in Miami in May of 2021;
3 correct?
4     A.   She told me, yes, she complain
5 with the oncologist.  And I believe this is
6 quite early to have regrow at this time.  But
7 it's consistent.
8     Q.   And so it's your understanding or
9 your conclusion that at this point in May of
10 2014, it would have been a little early for
11 Mrs. Plaisance to have seen a regrowth of her
12 hair.  Is that right?
13     A.   Yes.
14     Q.   Could you please turn to page 5 of
15 what we've marked as Exhibit 28.
16     A.   Okay.
17     Q.   Do you see that the top of
18 page 5 notes the physical exam that Dr. Chauvin
19 performed of Mrs. Plaisance?
20     A.   Yes.
21     Q.   And the second one down is "Head";
22 correct?
23     A.   Correct.
24     Q.   And that notation under "Head"
25 identifies Dr. Chauvin's assessment of

1 Mrs. Plaisance's head upon clinical examination;
2 right?
3     A.   Sorry?
4     Q.   I said, that section under "Head,"
5 under "Physical Exam," is it your understanding
6 that that notes Dr. Chauvin's impressions of her
7 examination of Mrs. Plaisance's head?
8     A.   Yes, yes, absolutely.
9     Q.   Turn to page 8, please.
10     A.   Okay.
11     Q.   Do you see the section called
12 "Plan"?
13     A.   Yes.
14     Q.   And going down the plan to what's
15 labeled section 1E that starts out in all caps,
16 do you see that?
17     A.   Yes.
18     Q.   What does Dr. Chauvin write
19 there?
20     A.   She wrote that she has a "Normal
21 chemo-induced alopecia.  If grows out with
22 alopecia areata" -- which I don't understand why
23 she writes this because alopecia areata has
24 nothing to do -- "should discuss with
25 dermatologist, Dr. Jones.  Repeated.  She seems

1 to be coping better.  It is premature to say she
2 has permanent alopecia, which I strongly doubt."
3     Q.   Do you make specific reference to
4 this medical record in your expert report?
5     A.   You know, I discuss that she went
6 to discuss with the oncologist and oncologist
7 said it was too early, which is basically what
8 this medical records say.
9     Q.   Is the fact that Mrs. Plaisance
10 was consulting with her oncologist in May 2014
11 concerning alopecia relevant to your assessment
12 of her hair loss?
13     MR. SCHANKER:  Objection; form.
14     A.   I believe that shows that she was
15 very concerned about hair, which is a part of
16 her evaluation.
17     She really -- hair for was
18 really important.  You can see that from how
19 many times she consulted the dermatologist for
20 hair loss.  And even here, after two months of
21 chemotherapy, she still -- she's already, you
22 know, concerned the hair is not going to grow
23 back.  And I don't think at that time she could
24 know about that, you know.
25     (Exhibit 29, July 1, 2014 progress

59 (Pages 230 - 233)

1 notes, was marked for identification.)
2 BY MS. WADHWANI:
3      Q.   Dr. Tosti, there should be
4 Exhibit 29 in your Exhibit Share.  And that is
5 tab 132.
6      A.   So I refresh because it's not
7 there.  So 29 or 30?
8      Q.   29.
9           I think I might have said this,
10 but just in case, Darin, that's tab 132.
11           Are you at the document,
12 Dr. Tosti?
13      A.   Yes, I am.
14      Q.   Can you tell what the date of this
15 document is?
16      A.   This is July 15.  No, sorry.
17 July 1.
18      Q.   And what is the year on this
19 document?
20      A.   2014.
21      Q.   Is this a July 1, 2014 medical
22 record by Dr. Laura Chauvin?
23      A.   Yes.
24      Q.   Have you ever seen this record
25 before?

1      A.   Yes.
2      Q.   When was the first time?
3      A.   You know, I believe in April.
4      Q.   Turn to page 2, please.
5      A.   Yes.
6      Q.   Do you see the section on page 2
7 called "HPI"?
8      A.   Yes.
9      Q.   And it notes, "Patient notes her
10 energy is improved and almost back to normal and
11 does not complain about what she felt was
12 delayed hair growth after chemotherapy-induced
13 alopecia."
14           Correct?
15      A.   Correct.
16      Q.   And if you go to page 5 of this
17 document that we've marked as Exhibit 29, are
18 you there?
19      A.   Yes, I'm there.
20      Q.   Under "Physical Examination,"
21 under "Head," do you see where it's noted by
22 Dr. Chauvin that Mrs. Plaisance's hair is
23 regrowing?
24      A.   Yes.
25      Q.   Is this approximately three and a

1 half months after Mrs. Plaisance stopped taking
2 chemotherapy?
3      A.   Yes.
4      Q.   Can you go to page 8.
5      A.   Yes.
6      Q.   Under -- do you see "Plan"?
7      A.   Yes.
8      Q.   Going down Plan to 1E, do you see
9 where it says, "Normal chemo-induced alopecia
10 resolving nicely"?
11      A.   Yes.
12      Q.   Do you mention this July 1, 2014
13 medical record for Mrs. Plaisance in your expert
14 report?
15      A.   I don't think I mentioned.  But it
16 is resolving, it is not resolved, which is a
17 very big difference.  Because, of course, she
18 has hair regrow.  But she didn't have complete
19 hair regrow, which is a different problem.
20      Q.   My question is just do you mention
21 this July 1, 2014 medical record in your
22 report?
23      A.   I don't think so.  But it's four
24 months after chemotherapy.  I don't think there
25 was any real reason to mention.  And doesn't

1 show that the hair is grown, just regrowing.  I
2 don't think so, but I have to check.
3           So do you want me to check my
4 expert report, just a second.
5      Q.   Just sitting here right now, do
6 you recall including this document in your
7 report?
8      A.   I -- you know, I did my report,
9 you know, two months ago.  I cannot remember
10 every document I included.  I know that I read
11 these reports, that I was aware of these reports
12 before.
13           But if I didn't include -- and I
14 cannot say I didn't include, because I maybe
15 included -- because didn't show anything
16 surprising, you know.  After four months people
17 had some hair regrow, you know, hair regrow.
18 The problem is that should completely regrow.
19           So before six months, there is no
20 reason to really look what is happening for
21 permanent alopecia.  Permanent alopecia, by
22 definition, is diagnosed after six months.  Four
23 months is too early for any possible diagnosis.
24      Q.   So is this record that we've
25 marked as Exhibit 29, July 1, 2014 visit with

60 (Pages 234 - 237)

Page 238

1 Dr. Chauvin, not relevant to your assessment of
2 Mrs. Plaisance's hair loss?
3      A.   It's relevant, but definitely it's
4 not relevant for diagnosis.  She still has what they
5 that after four months her hair were growing
6 back.  It doesn't show that were completely
7 grown back, you know.  She still has what they
8 call ongoing alopecia.  That's what this says.
9          (Exhibit 30, January 14, 2015
10 progress notes, was marked for identification.)
11 BY MS. WADHWANI:
12      Q.   I think you should have access now
13 to what we've marked as Exhibit 30, which is tab
14 133.
15      A.   Okay.  I'm there.
16      Q.   Have you seen this record
17 before?
18      A.   Yes.
19      Q.   When was the first time?
20      A.   April 2021.
21      Q.   What is your understanding of what
22 this record is?
23      A.   It's a follow-up of the
24 oncologist.
25      Q.   Is this visit dated January 14,

Page 239

1 2015?
2      A.   Yes.
3      Q.   Can you turn to -- please turn to
4 page 4.  There are no numbers page 4, so if it
5 helps you, the Bates number ending in the bottom
6 right is 865.
7      A.   Okay.
8      Q.   Are you there?
9      A.   I'm here.
10      Q.   And at the top of page 4 it notes
11 Dr. Chauvin's impressions of her physical
12 examination of Mrs. Plaisance's head; correct?
13      A.   Yes.
14      Q.   And Dr. Chauvin notes "alopecia
15 resolved"; right?
16      A.   Yes, I see that.
17      Q.   This January 2015 medical record
18 for Mrs. Plaisance is not mentioned in your
19 expert report; right?
20      A.   I don't think so.
21      Q.   And your opinions in this case did
22 not address or account for this January 2015
23 medical record; correct?
24      A.   You know, I read the medical
25 record, I saw the oncologist thought was

Page 240

1 resolved.  But doesn't say complete hair regrow.
2 Resolved, it's not, you know, complete regrow.
3      Q.   It says "alopecia resolved";
4 correct?
5      A.   Right.  But resolved doesn't mean
6 complete hair regrowth.  Because she had some
7 regrowth.  And so maybe that's the problem,
8 distinguishing between some regrow and complete
9 hair regrow.  And when I recently listened to
10 the deposition of the oncologist, she said in
11 the deposition that maybe she didn't really took
12 account of if she could have some residual
13 alopecia.
14      Q.   Nevertheless, Dr. Tosti, what
15 Dr. Chauvin wrote on her January 14, 2015 record
16 was "alopecia resolved"; correct?
17      A.   Yes.  Yes.  She wrote "alopecia
18 resolved."
19      Q.   And you don't have any pictures
20 that you are aware of of Mrs. Plaisance's scalp
21 from January 14, 2015; correct?
22      A.   I don't.
23      Q.   And you did not examine
24 Mrs. Plaisance at any time prior to May 7, 2021;
25 correct?

Page 241

1      A.   Correct.
2      Q.   By this time, it's been
3 approximately 10 months since Mrs. Plaisance
4 stopped taking chemotherapy; correct?
5      A.   Yes.
6      Q.   If Mrs. Plaisance's alopecia from
7 chemotherapy had resolved by January 2015, could
8 you still conclude that she does not have
9 endocrine-induced alopecia?
10          MR. SCHANKER:  Objection; form.
11      A.   You know, endocrine-induced
12 alopecia by definition, if you read definition
13 of the disease, is a type of alopecia that
14 occurs when the patient has hair regrow and
15 start endocrine therapy.
16          I see now they start -- at that
17 time they started endocrine therapy very close
18 to chemotherapy, so this diagnosis was probably
19 impossible to make.  But by any case, you know,
20 the endocrine alopecia shows up usually one year
21 and half after starting the endocrine therapy.
22      Q.   And this record from Dr. Chauvin
23 where she notes "alopecia resolved" is 10 months
24 after Mrs. Plaisance stopped taking
25 chemotherapy; correct?

61 (Pages 238 - 241)

Page 242

1    A.   Yes.  But, you know, the same
2  doctor had deposition, said that maybe the
3  alopecia, maybe she didn't really, you know,
4  took into account completely the possibility of
5  the alopecia was not completely resolved.
6    Q.   But based on what you just told
7  me, if the alopecia had resolved by January of
8  2015, and as we know, Mrs. Plaisance continued
9  to take endocrine therapy throughout that time
10  until 2019, how can you rule out
11  endocrine-induced alopecia?
12    MR. SCHANKER:  Objection; form.
13    A.   I don't think it had resolved.
14  The hair grow back, but, you know, it was
15  incomplete regrow.  And that's what I think.
16    Q.   But you don't have any photos of
17  that time?
18    A.   I agree with you, I don't.
19    Q.   That's just your speculation;
20  correct?
21    A.   You know, it's not speculation.
22  Counting history from the patient.  And I know
23  oncologist sometimes don't really look at the
24  alopecia because their endpoint are much more
25  important than the hair.  And so I think

Page 243

1  alopecia resolved, you know, doesn't describe
2  complete hair regrow, which is a different
3  thing.
4    Q.   Dr. Chauvin had seen
5  Mrs. Plaisance for the first time before she
6  ever took chemotherapy; correct?
7    A.   Yes.
8    Q.   So Dr. Chauvin had an
9  understanding of how Mrs. Plaisance's hair
10  presented clinically prior to taking
11  chemotherapy; correct?
12    MR. SCHANKER:  Objection; form.
13    A.   Yes.  I don't know because many
14  doctors don't look at the hair if they don't
15  have a special reason.  I don't believe -- when
16  you see a patient before chemotherapy, I don't
17  think you look at the hair.
18    Q.   She at least had visits with her
19  where she could see her physically; correct?
20    A.   Yes, correct.
21    Q.   And she continued to have visits
22  where she could see her physically for several
23  years; correct?
24    A.   Correct.
25    Q.   And she conducted physical

Page 244

1  examinations of Mrs. Plaisance's head as part of
2  those visits; correct?
3    A.   Not always.  I believe a few
4  times.
5    Q.   At this visit, where she noted
6  "alopecia resolved," she had conducted a
7  physical exam of Mrs. Plaisance's head;
8  correct?
9    A.   It's very like -- she doesn't say
10  the hair has grown back completely.  She just
11  said "alopecia resolved," which somehow
12  resolved.  You have complete alopecia, you grow
13  back some hair, the alopecia resolved, but
14  that's very different than complete regrow.  And
15  that's what I think has happened.
16    Q.   But you don't know for sure one
17  way or the other, do you, Dr. Tosti?
18    MR. SCHANKER:  Objection to form.
19    A.   You know, nobody knows for sure,
20  but I really think this is the case.
21    Q.   And that's based on your belief;
22  correct?
23    A.   Not on my belief.  You know, it's
24  based also on her deposition.  Because when she
25  was asked, she also said that she cannot 100

Page 245

1  percent say the hair had regrow completely.
2    We are discussing complete regrow,
3  not regrow.  So we have two different
4  situations.
5    Q.   Dr. Chauvin, you keep looking off
6  to the side.  Is there something that you're
7  looking at?
8    A.   No.  I can show you.
9    Q.   It's fine.  That's fine.
10    Is it your testimony sitting here
11  today then that we should disregard
12  Dr. Chauvin's contemporaneous impressions of
13  Mrs. Plaisance's hair in 2014 and 2015?
14    A.   No.
15    MR. SCHANKER:  Objection; form.
16    A.   I absolutely don't think so.  I
17  think that oncologist have different endpoint.
18  So Dr. Chauvin was very concerned about her
19  life, her cancer, and many other possible side
20  effects of the treatment.  And so alopecia was
21  not a big piece for her.  You know, this is very
22  normal for oncologists.
23    Q.   Dr. Chauvin's records indicate
24  that she at least paid attention to the fact
25  that this is a concern for Mrs. Plaisance and

62 (Pages 242 - 245)

1 did an examination of Mrs. Plaisance's head and
2 noted her impressions in her medical record;
3 correct?
4      A.   I think so, yes.  But, you know,
5 what I'm just saying, that she said the alopecia
6 resolved, she documents that, but she didn't say
7 that the hair grow back completely.
8           MS. WADHWANI:  We are going to get
9 some more exhibits to you, Dr. Tosti, if you
10 could give us a second.
11           THE WITNESS:  So I have to go back
12 to exhibit.
13           MS. WADHWANI:  Not right now.  I
14 am trying to put up some more -- not me.
15           THE WITNESS:  I just wait.
16           (Exhibit 31, Visit Note, March 24,
17 2016, was marked for identification.)
18 BY MS. WADHWANI:
19      Q.   She said that Exhibit 31 should be
20 available to you right now.
21      A.   So I refresh.
22      Q.   I'm sorry.  That's tab 134.
23      A.   Okay.  I'm here.  I'm here.
24      Q.   Have you seen this record
25 before?

1      A.   Yes.
2      Q.   What's your understanding of what
3 it is?
4      A.   It's a record from Dr. Matherne, I
5 think it's in his new office, from March 2016.
6      Q.   When is the first time you saw
7 this record?
8      A.   In April.
9      Q.   Of this year, 2021?
10      A.   2021, yes.
11      Q.   Do you see under "Chief Complaint"
12 is "hair loss"?
13      A.   Yes, I do.
14      Q.   Are you aware that Mrs. Plaisance
15 was seeking care and treatment for hair loss
16 between January 2015 and March 2016?
17      A.   I know she went to a dermatologist
18 in 2016, and that's him.
19      Q.   And are you aware of whether or
20 not Mrs. Plaisance sought out care and treatment
21 for hair loss from any physician between
22 January 14, 2015 and March 24, 2016?
23      A.   No, I don't have any information
24 of that.
25      Q.   You are not aware of any record

1 that identifies her as seeking out treatment for
2 concerns of hair loss between January 14, 2015
3 and March 2016; correct?
4      A.   Yes.
5      Q.   And I take it that Mrs. Plaisance
6 did not tell you that she had sought treatment
7 for hair loss between January 2014 and March
8 2016; right?
9           MR. SCHANKER:  Objection; form.
10      A.   I don't know of anything between
11 January -- between 2015 and 2016.  Maybe I
12 missed something.  But I don't know.
13      Q.   And today you are not aware of any
14 visit that Mrs. Plaisance paid to any of
15 her -- any physician with complaints of hair
16 loss between January of 2015 and March of 2016;
17 right?
18      A.   I don't know.
19      Q.   You don't know of any; right?
20      A.   I don't know of any.
21      Q.   If you look first at "Chief
22 Complaint," do you see it says "hair loss"?
23      A.   Yes, I do.
24      Q.   And if you go down to "HPI,"
25 Dr. Matherne notes, "This is a 71-year-old

1 female who comes in for a chief complaint of
2 hair loss on the scalp.  The hair loss is mild
3 in severity, gradual in onset, and has been
4 present for six years."
5           Is that correct?  Do you see
6 that?
7      A.   Yes.
8      Q.   So according to Dr. Matherne,
9 Mrs. Plaisance had told Dr. Matherne that her
10 hair loss had been present since at least 2010;
11 correct?
12      A.   That's what she also told me, that
13 she had the problem in 2010.  So maybe that's
14 why he wrote like this.
15      Q.   Well, the record says that "the
16 hair loss is mild in severity, gradual in onset,
17 and has been present for six years"; correct?
18      A.   I read it, yeah.
19      Q.   The record does not say that
20 Mrs. Plaisance told me about a temporary episode
21 of hair shedding in 2010; right?
22      A.   Yes.
23      Q.   Is this March 2016 medical record
24 from Mrs. Plaisance mentioned in your expert
25 report?

Page 250

1      A.   If you look in the
2 "Impression/Plan," Dr. Matherne says "telogen
3 effluvium."
4      Q.   I am asking you if this record is
5 mentioned specifically in your expert report
6 anywhere?
7      A.   I think I mentioned she went to a
8 dermatologist in my expert report.  Can I take a
9 look to my expert report?  I'm sure I said she
10 went to a dermatologist and this dermatology
11 gave her injection.
12      Q.   You can look wherever you want.
13 One place to help you is on page 20.  And that's
14 Exhibit 1.
15           MR. SCHANKER:  Take your --
16           (Reporter clarification.)
17           THE WITNESS:  He said I can look
18 at my report.  So my report is --
19           MS. WADHWANI:  Exhibit 1 --
20           (Technical interruption.)
21           MS. WADHWANI:  What I said is that
22 her report is Exhibit 1, and one place she can
23 start looking is page 20.  But, of course,
24 Dr. Tosti, you are free to look anywhere else in
25 your report.

Page 251

1           MR. SCHANKER:  Dr. Tosti, I
2 believe you have a copy.
3           THE WITNESS:  Yes, I see what you
4 mean.  I didn't report this in my report.  This
5 is in my progress record.  No, it's here.  She
6 consulted a dermatologist, on page 20, in 2016,
7 and was given Viviscal that she is still taking.
8 BY MS. WADHWANI:
9      Q.   Do you note anywhere in your
10 report that she visited a dermatologist in March
11 of 2016 who noted that her hair loss was mild in
12 severity, gradual in onset, and has been present
13 for six years?
14      A.   No.  But I read that he made a
15 diagnosis of telogen effluvium, that's what the
16 diagnosis he made, and I wrote that she was
17 given Viviscal.
18      Q.   But you don't note anywhere in
19 your report this diagnosis in March of 2016 of
20 telogen effluvium; correct?
21      A.   No.  But I said that, you know,
22 she consulted a dermatologist so -- and she went
23 for hair loss, you know.  I didn't write down
24 the diagnosis, but I wrote down that she did.
25      Q.   And in this report, do you see

Page 252

1 anywhere in this March 24, 2016 record where
2 Dr. Matherne prescribes Viviscal?
3      A.   I said that she was given Viviscal
4 that she's still taking.
5      Q.   Correct, in your expert report.
6           In this March 24, 2016 record, do
7 you see any mention of Viviscal?
8      A.   Let me go back, because I have to
9 go back.
10      Q.   Sure.  It's Exhibit 31.
11      A.   Maybe didn't give her Viviscal at
12 this visit but he gave her Viviscal afterwards.
13           I see you're right, he didn't give
14 Viviscal in this visit.  But he did give
15 Viviscal in the following visit.
16      Q.   Isn't the fact that Mr. Matherne
17 described Mrs. Plaisance's hair loss on
18 March 24, 2016 as mild in severity relevant to
19 your assessment of her hair loss?
20      A.   No.  Because he makes a diagnosis
21 of telogen effluvium, he checks -- if you go in
22 the plan, he explain that the possible reason,
23 he check the possible causes.  And he says just
24 come back if you don't improve.
25      Q.   Now, you served a report

Page 253

1 explaining your opinion that Mrs. Plaisance has
2 PCIA; right?
3      A.   Yes.
4      Q.   And nowhere in that report do you
5 mention this March 24, 2016 medical record, much
6 less address it; correct?
7           MR. SCHANKER:  Objection.
8 Objection to form.
9      A.   No, I disagree.  I said she went
10 to a dermatologist, and of course should be for
11 hair loss, and I said the dermatologist gave her
12 Viviscal.  So she went in 2016.  If she was
13 given Viviscal six months later, I said 2016.  I
14 didn't say March 2016.
15           So I had read the medical record.
16 Also, I knew at one point he gave the Viviscal,
17 and I read that his diagnosis was telogen
18 effluvium.  So when she told me that, this makes
19 sense.  I didn't quote specifically this medical
20 record, but I think that I discuss what happen.
21      Q.   Is the diagnosis of telogen
22 effluvium relevant to your assessment of
23 Mrs. Plaisance's hair loss?
24      A.   I didn't understand the question.
25 I'm sorry.

64 (Pages 250 - 253)

1     Q.   Is the diagnosis here of telogen
2 effluvium relevant to your assessment of
3 Mrs. Plaisance's hair loss?
4     A.   I think it's relevant, you know.
5 It's concern that she had, you know, telogen
6 effluvium in her life.  And people who have
7 telogen effluvium often may have relapses of
8 telogen effluvium.  So makes sense.
9     Q.   And so at this point in 2016, it
10 appears that Mrs. Plaisance is experiencing what
11 we have seen she had experienced before she took
12 chemotherapy, was episodes of telogen effluvium;
13 correct?
14     A.   Yes.
15          MR. SCHANKER:  Objection; form.
16     A.   Sorry.  Yes, I think so.
17     Q.   Dr. Tosti, you characterize in
18 your report Mrs. Plaisance's hair loss as
19 severe; correct?
20     A.   I don't think I wrote severe.
21     Q.   You characterize her as having a
22 grade 2 severity; correct?
23     A.   You know, grade 2 severity depends
24 on several factors, that include how
25 much -- basically how much you can cover the

1 scalp without people seeing that you have
2 alopecia.  If people look at you, they see you
3 have alopecia.
4          But also, the psychological impact
5 of the alopecia is part of this case.  So I
6 grade as a grade 2.  But, of course, this is a
7 kind of very limited scale, it's 1 and 2.  It's
8 not a scale where you have various
9 possibilities.
10          And so grade 2 encompass patients
11 with moderate alopecia and patients with severe
12 alopecia.  I don't think she has severe, I think
13 she has moderate.
14     Q.   Please turn back to Exhibit 1,
15 which is your expert report, page 25.
16     A.   Yes, I'm on page 25.
17     Q.   Okay.  I am looking at the top,
18 the very top paragraph where you say, "The
19 frontal, mid-scalp, and the vertex show severe
20 thinning without evidence of scarring."
21 I understand you now to be saying
22 that Mrs. Plaisance has moderate hair loss?
23          MR. SCHANKER:  Hold on.
24 Objection; form.  Go ahead.
25     A.   If you want to describe the

1 thinning, she had severe thinning.  But if you
2 want to describe the overall grading of the
3 alopecia, I grade her grade 2.  So I don't think
4 it's a mild problem.  But it's not --
5          There are grade 2 that they are
6 almost bald -- completely no hair in the scalp.
7 She's not in that spectrum.  The spectrum of
8 this grade 2 is very, very, you know, variable.
9     Q.   Is grade 2 a very wide spectrum of
10 hair classification?
11     A.   Yes.
12     Q.   And it could be someone with
13 moderate hair loss all the way to bald;
14 correct?
15     A.   All the way to someone with almost
16 no hair, you know.
17     Q.   So a grade 2 characterization in
18 and of itself does not mean that a person has
19 suffered severe hair loss; correct?
20          MR. SCHANKER:  Objection; form.
21     A.   I also disagree with that.
22 Because there are grade 2 in grade 2.  So this
23 grading is very, very, very poor.  That is
24 something that has to be in the future changed.
25          But, of course, you have just

1 grade 1 and grade 2, and you have many, many
2 different pattern of severity, and you have to
3 choose.  And is something that is subjective.
4 Okay.  There are no objective criteria.
5          So the criteria are:  Can the
6 patient camouflage the scalp or not?  And is the
7 patient psychologically impacted?
8          So these are not criteria that you
9 have, like, number that you can really grade as
10 with other problems.
11     Q.   And so when you say that grading
12 is very, very poor, what do you mean by that?
13     A.   That there is only two
14 possibilities.  And should have -- if you look
15 at grading of androgenetic alopecia, we have,
16 like, seven possibilities, I can include the
17 patient depending on severity.
18          This grading is only two
19 possibilities.  Either it is mild, so patients
20 who have less hair but don't need any
21 camouflage, anything to cover, people don't see
22 that, or 2, which is severe.
23          But this severity can go from
24 moderate severity to very, very severe.  And
25 that's what grade 2 is.

65 (Pages 254 - 257)

Page 258

1    Q.   Does the grading take into account
2 whether a patient elects to cover up their hair
3 or not and how they feel about the severity of
4 their hair?
5    A.   Not necessarily.  You know,
6 because there are patients that think that
7 wearing a wig is even worse than, you know,
8 trying to camouflage with hair styling or with
9 other way of camouflage.
10        You know, wigs is something that
11 is very difficult to wear.  I know that because
12 I'm following hair patients for many other
13 reasons.  And so some patients don't want a wig.
14 Even if their hair loss is evident, they prefer
15 other options.
16        MS. WADHWANI:  I am going to be
17 putting up a few exhibits.  These are not ones
18 because of timing that made it into the box of
19 documents we sent to counsel and Dr. Tosti.
20 There are three records.  But my colleague will
21 put them on Exhibit Share.
22        THE WITNESS:  So I should refresh
23 or I should wait?
24        MS. WADHWANI:  I think it's just
25 going to take her a moment, Dr. Tosti.  I will

Page 259

1 let you know when we have an understanding that
2 those are going to be available for you to
3 refresh.
4        (Exhibit 32, Visit Note, July 7,
5        2016, was marked for identification.)
6 BY MS. WADHWANI:
7    Q.   Dr. Tosti, if you refresh, and
8 please let me know if you see Exhibit 32.
9    A.   Okay.  Uploading now.  I will let
10 you know when I see.  Yes, I see Exhibit 32.
11        MS. WADHWANI:  Jessica and Darin,
12 are you able to see this document?
13        MR. SCHANKER:  Yes.
14    Q.   Have you seen this record before,
15 Dr. Tosti?
16    A.   Yes.
17    Q.   What do you understand this record
18 to be?
19    A.   This is a record from Dr. Matherne
20 from July 2016.
21    Q.   When is the first time you saw
22 this record?
23    A.   In April.
24    Q.   April of 2021?
25    A.   Yes, April 2021.

Page 260

1    Q.   Do you see that the chief
2 complaint is hair loss; correct?
3    A.   Yes.
4    Q.   Under "HPI" it states, "This is a
5 71-year-old female who comes in for a chief
6 complaint of hair loss on the scalp, eyebrows,
7 and eyelashes.  The hair loss is generalized,
8 mild in severity, gradual in onset, and has been
9 present for years."
10        Do you see that?
11    A.   I see.
12    Q.   Is this July 2016 medical record
13 specifically referred to in your expert
14 report?
15    A.   You know, I believe I just
16 included the medical records of 2016.  But, you
17 know, it says something different here from what
18 it said in the previous one.  Because it said
19 she had hair loss for six years, and now it says
20 it's for many years.
21        But in his deposition,
22 Dr. Matherne says that he doesn't do the history
23 of the patient.  So his medical assistant do the
24 history of the patient.  And that makes a very,
25 very big difference for hair loss.  Because the

Page 261

1 medical assistant has just very, you know --
2 they copy and paste, and that's why they make
3 nonsense with the previous one.  Okay.
4        But I see this medical record, I
5 saw the medical record, and I took in account
6 this medical record for 2016.
7    Q.   The previous medical record from
8 2016 that we marked as Exhibit 31 stated the
9 hair loss is mild in severity, gradual in onset,
10 and has been present for six years.  What in
11 this medical record contradicts that?
12        MR. SCHANKER:  Objection; form.
13    A.   It says "has been present for
14 years."  It's six years.  Why did he change his,
15 you know, history?  They should be the same.
16        Also, eyebrows and eyelashes.  I
17 don't think eyebrows and eyelashes develop in
18 three months.  Probably, one of the two didn't
19 include that.
20    Q.   Do you know that for a fact,
21 Dr. Tosti?  Or are you just speculating as to
22 what the medical assistant did?
23        MR. SCHANKER:  Objection; form.
24    A.   I know from a fact because that is
25 what he said in the deposition, he never take

66 (Pages 258 - 261)

1 the history.  He just look at the end and the
2 check.  But sometimes, you know, that's
3 impossible because he has a big volume.
4      Q.   I understand what Dr. Matherne's
5 testimony is.  My question is about your
6 testimony and the medical assistant.
7           Are you saying that the medical
8 assistant took down wrong information from
9 Mrs. Plaisance?
10          MR. SCHANKER:  Objection; form.
11     A.   That is different.  It is not
12 wrong.  It is not perfectly accurate, which
13 makes a very big difference.
14          But the most important thing I see
15 to say it's not very accurate is that here the
16 eyebrows and eyelashes are mentioned and three
17 months before they were not mentioned.  And I
18 cannot believe that that happened in three
19 months.
20          And also, you know, years, it's
21 not very precise.  Years means 10 years, 20
22 years.  The other one was more precise on the
23 timing.  This one has the eyebrows and the
24 eyelashes that was different than the other one.
25 But that's what I'm just noticing.

1      Q.   I understand that it's your belief
2 that something went wrong in the dictation here.
3 But the records say that on July 7, 2016,
4 Mrs. Plaisance came in with a chief complaint of
5 hair loss on the scalp, eyebrows, and eyelashes;
6 correct?
7           MR. SCHANKER:  Objection; form.
8      A.   Yes.  But it's not dictation.  He
9 just said that the medical assistant see the
10 patient, take the medical history, write down
11 everything, and then he goes in.
12     Q.   And you don't know what
13 Mrs. Plaisance said to the medical assistant on
14 this day on July 7, 2016, do you?
15     A.   I don't understand.  What's your
16 question?
17     Q.   Were you present during the
18 discussion that Mrs. Plaisance had with the
19 medical assistant on July 7, 2016?
20     A.   No, I was not.
21     Q.   So you don't know what
22 Mrs. Plaisance told the medical assistant on
23 July 7, 2016; correct?
24     A.   Correct.
25     Q.   Is this record that we've marked

1 as Exhibit 32, this July 7, 2016 record,
2 relevant to your assessment of Mrs. Plaisance's
3 hair loss?
4           MR. SCHANKER:  Objection; form.
5      A.   Not really.  Because the diagnosis
6 is sebhorreic dermatitis.  So this is something
7 I don't think has anything to do with her
8 problem.  You know, this record documents loss
9 of eyelashes and eyebrows.
10     Q.   And you've made an opinion in this
11 case, Dr. Tosti, that Mrs. Plaisance suffers
12 from permanent chemotherapy-induced alopecia,
13 including on her eyebrows; correct?
14     A.   Including her eyebrows and
15 eyelashes.
16     Q.   So isn't this record relevant to
17 that conclusion?
18     A.   It's part of the puzzle, of
19 course.  Here the alopecia of the eyebrows and
20 eyelashes is documented.
21     Q.   Have you seen any medical records
22 between January 2015 and July 7, 2016
23 documenting Mrs. Plaisance expressing concern
24 with hair loss on her eyebrows and eyelashes?
25     A.   No.

1           MR. SCHANKER:  Can we go ahead and
2 take a break?  We've been going over an hour.
3           MS. WADHWANI:  Sure.
4           THE VIDEOGRAPHER:  Thank you.
5 This is the videographer.  The time is 5:16.  We
6 are going off the record.  This ends media
7 file 5.
8           (Break taken.)
9           THE VIDEOGRAPHER:  The time is
10 5:28.  We are back on the record, beginning
11 media file 7.
12 BY MS. WADHWANI:
13     Q.   Dr. Tosti, how are you doing?
14     A.   I'm surviving.
15     Q.   Are you okay to continue?
16     A.   Yes, I am okay.
17     Q.   By surviving, am I treating you
18 okay?
19     A.   Yes, very, very nice.  But I
20 believe Zoom is more tiring than in person,
21 absolutely.
22     Q.   Yes.  We understood from your
23 counsel, Dr. Tosti, that you wanted to conduct
24 this deposition over Zoom.  But I agree with you
25 that Zoom is exhausting.

67 (Pages 262 - 265)

Page 266

1          (Exhibit 33, Visit Note, May 11,
2   2017, was marked for identification.)
3   BY MS. WADHWANI:
4       Q.   We have put on Exhibit Share
5   another document marked as Exhibit 33.
6       A.   It went away.  I don't know why.
7   I'm getting back.  The number 30?
8       Q.   33.  Do you have that?
9       A.   Yes, I do.  I have also 34.
10      Q.   We put that up to move the process
11  along, but we will start with 33 and then move
12  to 34.  Okay?
13      A.   Okay.
14      Q.   Do you have 33 up in front of
15  you?
16      A.   I have 33.
17      Q.   And do you see that that is a
18  medical record dated May 11, 2017 by
19  Dr. Matherne?
20      A.   Yes, I do.
21      Q.   Have you seen this record
22  before?
23      A.   Yes.
24      Q.   When was the first time?
25      A.   In April 2021.

Page 267

1       Q.   And do you see that the chief
2   complaint is "Follow-up for sebhorreic
3   dermatitis evaluated on April 6, 2017"?
4       A.   Yes.
5       Q.   Taking you down, Dr. Tosti, to
6   number 4, under "Impression/Plan," do you see
7   that?
8       A.   I see "alopecia."
9       Q.   Yes.  Do you see that says
10  "located on scalp"?
11      A.   I do.
12      Q.   And so at this visit on May 11,
13  2017, Dr. Matherne has made a diagnosis of
14  alopecia located on the scalp; correct?
15      A.   Correct.  But he also says
16  treatment depends on underlying etiology.  So he
17  knows that alopecia by itself is not really a
18  proper diagnosis.  And discuss different types
19  of alopecia.
20      Q.   But he does note alopecia;
21  correct?
22      A.   As I said before, alopecia is not
23  a diagnosis.  And he really expanded this here
24  in the counseling, you know.  He says the
25  treatment depends on the etiology, and the hair

Page 268

1   loss can be treated with Minoxidil, autoimmune
2   form can be treated with intralesional steroids.
3          So he puts many differential.  So
4   I think he doesn't exactly know the diagnosis.
5   And, you know, he also -- he includes many, many
6   possible things.
7       Q.   And he notes that Mrs. Plaisance
8   here on May 11, 2017 is suffering from hair
9   loss; correct?
10      A.   Hair loss, I don't see it written.
11      Q.   Well, isn't alopecia hair loss?
12      A.   Alopecia is a generic way to say
13  hair loss, but none of them are a diagnosis, you
14  know.  Alopecia should always have something
15  after that, like, androgenetic alopecia,
16  alopecia areata, permanent alopecia.
17         You know, alopecia itself is,
18  like, it's not a diagnosis.  Hair loss is not a
19  diagnosis.  And I think he expounds this lack of
20  diagnosis in the counseling.  So he explains
21  that alopecia, the treatment and the prognosis
22  depends on type of alopecia.  He says that.
23      Q.   Is it your testimony sitting here
24  today, Dr. Tosti, that Dr. Matherne has not made
25  a conclusion that Mrs. Plaisance is suffering

Page 269

1   from some hair loss?
2       A.   I think that he said that she has
3   alopecia probably because she complain of hair
4   loss, but he doesn't know exactly which type of
5   alopecia.  And he explains very well, you know,
6   in his consulting plan.  And then he gave her
7   the Viviscal.  The Viviscal was listed here.
8       Q.   He also notes on page 2 that
9   Mrs. Plaisance is to contact his office if her
10  hair loss fails to improve or worsens with
11  treatment; correct?
12      A.   This is a standard, you know,
13  sentence that I believe they put for every
14  problem.
15      Q.   Is it your testimony today,
16  Dr. Tosti, that Dr. Matherne did not have an
17  impression that Mrs. Plaisance was suffering
18  from hair loss at this visit on May 11, 2017?
19      A.   No.  I said something different.
20  I said that he documented that she had some type
21  of alopecia, but he explained the patient he
22  didn't know the type, and he explained the
23  treatment depend on type.  And I think he gave
24  the Viviscal because he thought it was probably
25  something going away.  That's why he said, just

68 (Pages 266 - 269)

1  contact us if it doesn't get better.  That's my
2  interpretation of this visit.
3      Q.    And is this the first record of
4  Dr. Matherne's since he began seeing
5  Mrs. Plaisance in 2016 that notes alopecia?
6          MR. SCHANKER:  Objection; form.
7      A.    No.  I believe the one that we
8  look in 2016, he also said it was not alopecia,
9  was hair loss.
10     Q.    He noted telogen effluvium;
11  correct?
12     A.    Okay, yes.  But here, alopecia may
13  mean telogen effluvium.  Telogen effluvium is a
14  type of alopecia.  Alopecia is like a box, where
15  you can put the different diagnosis.
16     Q.    Did Dr. Matherne state telogen
17  effluvium at this visit?
18     A.    He include telogen effluvium among
19  the possibilities, if you look.
20         "There are multiple causes of hair
21  loss, including organic, pattern hair loss,
22  temporary hair shedding, which is telogen
23  effluvium, autoimmune, inflammatory, external
24  trauma and infection, you know.  Long-standing
25  hair loss should be worked up with appropriate

1  tests."
2          You know, I believe that he
3  thought it was telogen effluvium, included all
4  these possible causes.  I don't think he thought
5  it was a serious problem, because otherwise he
6  would have gone for the labs or for other stuff.
7  He thought it was not very serious problem and
8  he prescribed Viviscal.
9      Q.    Is that your presumption about
10  what was going through Dr. Matherne's head at
11  the time that he visited with Mrs. Plaisance on
12  May 11, 2017 and wrote this note?
13         MR. SCHANKER:  Objection; form.
14     A.    Something is not my presumption,
15  something is something that he wrote.  So the
16  alopecia, the hair loss, which is something not
17  diagnosis, could be due to many possible causes,
18  and here he lists the possible causes.
19         And then from what I
20  prescribe -- he prescribed, I presume that he
21  thought was nothing very serious.  Because he
22  didn't prescribe a medication, he just
23  prescribed a supplement.
24         But that I agree is my
25  presumption, may be wrong.

1      Q.    Now, is this the medical record
2  that you were referring to in your report when
3  you noted that Mrs. Plaisance began taking
4  Viviscal?
5          MR. SCHANKER:  Objection to form.
6      A.    No.  If I look at my progress
7  note, I said she consulted for alopecia in 2016,
8  was treated with intralesional steroids, and she
9  said she didn't improve, she went back and she
10  got the Viviscal.
11         But I didn't write all these in
12  the medical records.  I just condense it in that
13  she went to a dermatologist and she was given
14  Viviscal, which is at the end what happened.
15     Q.    And so it's your testimony today,
16  Dr. Tosti, that these three visits that we have
17  been looking at, which we've marked as
18  Exhibit 31, Exhibit 32, Exhibit 33, the two 2016
19  visits with Dr. Matherne and the May 2017 visit
20  with Dr. Matherne, it's your testimony that the
21  sentence in your report that states "She
22  consulted with a dermatologist in 2016 and was
23  given Viviscal that she is still taking" takes
24  into account all three of these records?
25         MR. SCHANKER:  Objection to form.

1      A.    Yes, I think it takes into account
2  because that is what happened.  In my progress
3  note I dictate better, but what happened is
4  this.
5      Q.    And you do not note in your expert
6  report these impressions of telogen effluvium
7  and alopecia in 2016 and 2017, do you?
8      A.    I said that she consulted a
9  dermatologist for hair, hair loss, and that's
10  what the dermatologist says.
11         It's not -- as I said already,
12  alopecia is not a diagnosis.  He just list
13  possible types of alopecia in his plan.  And
14  that's, you know, the same.  It doesn't change
15  anything.  I think I was very clear and honest
16  in my report.  I don't think we see anything
17  here that change what I said.
18         (Exhibit 34, Visit Note,
19  January 4, 2018, was marked for identification.)
20  BY MS. WADHWANI:
21     Q.    Do you have Exhibit 34 available
22  to you in Exhibit Share?
23     A.    I think I do.  Okay.  I see that.
24     Q.    Do you see that this document that
25  we've marked as Exhibit 34 is a January 4, 2018

69 (Pages 270 - 273)

1 medical record?
2    A.    Yes.
3    Q.    Is this a record of
4 Dr. Matherne's?
5    A.    Yes.
6    Q.    Have you ever seen this record
7 before?
8    A.    Yes.
9    Q.    When was the first time?
10    A.    April 2021.
11    Q.    Is this fourth medical record that
12 we're looking at encapsulated in your one
13 sentence about Mrs. Plaisance's visits with
14 Dr. Matherne in your expert report?
15    A.    Yes.
16    Q.    But you don't talk about this
17 record specifically, do you, in your report?
18        MR. SCHANKER:   Objection; form.
19    A.    No.  I put all of them together.
20    Q.    And in one sentence; right?
21    A.    Yes.
22    Q.    Under "Chief Complaint" does
23 Dr. Matherne note in part that Mrs. Plaisance
24 was visiting with him in January of 2018 in
25 follow-up to the alopecia evaluated on May 11,

1 2017?
2    A.    Yes.
3    Q.    And that's the visit that we just
4 looked at at Exhibit 33; correct?
5    A.    Yes.
6    Q.    Moving down to number 2, under
7 "HPI" -- do you see number 2 under "HPI,"
8 Dr. Tosti?
9    A.    Yes.
10    Q.    It starts, "This is a 73-year-old
11 female who, number 2, is following up for
12 alopecia on the scalp.  She was seen on May 11,
13 2017, at which time was given Viviscal.  Since
14 then the patient states that the alopecia is
15 better.  The patient is now here for further
16 evaluation and management.  Today the patient
17 reports, modifying factors:  Improved with
18 treatment."
19        Do you see that?
20    A.    Yes, I do.
21    Q.    By definition, can permanent
22 alopecia get better with treatment?
23    A.    No.  But telogen effluvium, yes.
24 That's what I think she had again in 2016, and
25 she got better.

1    Q.    So it's your testimony sitting
2 here today that Mrs. Plaisance has experienced
3 several types of hair loss?
4    A.    I believe that she has permanent
5 alopecia after chemotherapy, and then, in her
6 life she had several episodes of telogen
7 effluvium.  Okay.  So now the first episode
8 occurred in 2003, and then she had relapses many
9 times in her life, and last one was 2016.
10    Q.    Did Mrs. Plaisance tell you her
11 alopecia was getting better from the Viviscal
12 when she saw you in May 2021?
13    A.    No, it's not alopecia getting
14 better.  You know, it's the hair shedding, which
15 is completely different.  I don't think the
16 alopecia can get better -- any type of alopecia
17 can get better with Viviscal, any possible type.
18        What I think she says was better
19 was the shedding.  So she didn't find the hair
20 as much as before when she shampoo.  That's my
21 interpretation.
22    Q.    That's your interpretation.  And
23 Dr. Matherne's words were, "Since then the
24 patient states the alopecia is better."
25 Right?

1    A.    These are his words.  But in the
2 previous medical record he explained very well
3 what he meant for alopecia, including that
4 several possible diagnoses.
5    Q.    And he notes here that the patient
6 states the alopecia is better; correct?
7    A.    Yes.  I see that.  At this time he
8 doesn't elaborate the possible differential
9 diagnosis because the patient is better, and
10 problem, you know, he doesn't need to explain to
11 patient again that alopecia, we don't know which
12 type of alopecia she had.  That's my
13 understanding.
14        But, of course, I'm not him, I
15 cannot completely know what he was thinking.
16    Q.    If you go to page 2 of Exhibit 34,
17 the same document that we're on, the January 4,
18 2018 Matherne record.  Are you there?
19    A.    Yes.
20    Q.    Do you see number 3 under
21 "Impression/Plan" is "alopecia located on the
22 scalp"?
23    A.    Yes.
24    Q.    And that the plan and treatment
25 regimen is to "Continue the following

1 treatments, Viviscal supplement BID"?
2    A.   Yes.
3    Q.   Is this medical record and the
4 information contained within it relevant to your
5 assessment of Mrs. Plaisance's hair loss?
6    A.   Yes.
7       MR. SCHANKER:  Objection to form.
8    A.   Yes. It was relevant, you know.
9 I saw that she improved because probably telogen
10 effluvium improve.  Of course, I don't think her
11 PCIA could improve in any case also because
12 Viviscal is not a possible treatment.  If she
13 had been treated with topical Minoxidil, I would
14 have maybe another opinion.  But Viviscal, I
15 don't, no.
16    Q.   What do you mean by that, if she
17 had been treated with topical Minoxidil, you
18 might have a different opinion?
19    A.   Because topical Minoxidil can
20 improve several types of alopecia independently
21 of their etiology.  So I would think maybe it
22 was the thinning that improved.
23       But if it says alopecia without
24 the diagnosis improved with Viviscal, I'm
25 convinced that the diagnosis is telogen

1 effluvium.  And I believe any hair expert would
2 be convinced of that.
3    Q.   That's your interpretation,
4 correct, that's not what Dr. Matherne says in
5 his record; right?
6    A.   It's not just my interpretation.
7 I've been studying hair loss for years.  I
8 published books on treatment.  It's something I
9 really feel I know.  Okay.  And I know
10 supplements, I also use supplement, and I know
11 why you use supplement, what you can get from
12 supplement.  So --
13    Q.   Is that -- sorry, Dr. Tosti.
14    A.   So I don't think you can ever
15 improve thinning of the hair with a supplement.
16       So either androgenetic alopecia,
17 either endocrine alopecia, or PCIA, all these
18 conditions cannot be improved by Viviscal.  If
19 she improved by Viviscal, it was something that
20 probably improved by itself, like telogen
21 effluvium.
22       MS. WADHWANI:  At this time I can
23 pass the witness, if you have any questions.
24       MR. SCHANKER:  We'll go ahead and
25 take a break and come back on.

1       MS. WADHWANI:  Sure.  And when we
2 come back on -- let's go off the record for
3 this.
4       THE VIDEOGRAPHER:  Thank you.  The
5 time is 5:49.  We are going off the record.
6       (Break taken.)
7       THE VIDEOGRAPHER:  We are back on
8 the record.  The time is 6:05.  We are
9 continuing media file 7.
10       -----
11       EXAMINATION
12       -----
13 BY MR. SCHANKER:
14    Q.   Good afternoon, Dr. Tosti, or good
15 evening.
16    A.   Good evening.
17    Q.   Are you doing okay?
18    A.   Yes, I'm doing okay.
19    Q.   And you were on the record being
20 asked questions for over six hours; is that
21 correct?
22    A.   I think so.  I didn't put it down.
23    Q.   I just want to go back through and
24 ask you a few questions based on the
25 conversation that you had with defense counsel.

1 Is that okay?
2    A.   Yes.
3    Q.   Clarify a few things.  One of
4 those, you were asked about what you reviewed in
5 this case and the medical records that you
6 reviewed.  Do you recall that?
7    A.   Yes, I do.
8    Q.   And I wrote something down and I
9 was confused.  I thought you said something
10 about 70 pages.
11       I just want to be clear, you
12 reviewed more than 70 pages of medical records
13 in this case, didn't you?
14       MS. WADHWANI:  Objection to form.
15    A.   I review 70 PDF documents, and
16 each document has a different number of pages.
17 Some documents were more than 300 pages, other
18 documents were maybe 20 pages, you know.  But I
19 don't know the number of pages, but I know there
20 was almost 70 PDF documents.
21    Q.   Dr. Tosti, in this case you have
22 offered the opinion and conclusion concerning
23 Taxotere; is that correct?
24    A.   Yes, I do.
25    Q.   Let me say, docetaxel.  Right?

71 (Pages 278 - 281)

1 Docetaxel?
2     A.   Yes.
3     Q.   Now, tell us what your opinion or
4 conclusion is concerning docetaxel and the
5 condition that the plaintiff suffers from?
6          MS. WADHWANI:  Objection; asked
7 and answered.  Go ahead, Dr. Tosti.
8     A.   I think that Taxotere was a
9 substantial contributing factor to the permanent
10 alopecia from chemotherapy that Mrs. Plaisance
11 developed.
12    Q.   Now, we understand that
13 Mrs. Plaisance also took cyclophosphamide.  You
14 know that; correct?
15    A.   Yes, I know.
16    Q.   Now, tell us what your opinion or
17 conclusion is concerning cyclophosphamide and
18 PCIA in this case?
19         MS. WADHWANI:  Objection to form,
20 asked and answered.
21    A.   I think cyclophosphamide was part
22 of the combination therapy.  And so it's part of
23 the treatment.  But I believe Taxotere was the
24 substantial contributing factor.  And I believe
25 that itself cyclophosphamide is never a possible

1 cause of PCIA, just in combination.  And even in
2 combination, it is an uncommon cause.
3     Q.   And, Doctor, is it fair to say
4 that it's your opinion that cyclophosphamide
5 alone does not cause PCIA, based on everything
6 that you've reviewed and studied in this case?
7          MS. WADHWANI:  Objection to form.
8     A.   For breast cancer, as far as I
9 know.  Because outside of breast cancer, I don't
10 know.  But for breast cancer, yes.
11    Q.   And thank you for that
12 clarification.
13         And, Doctor, based on your review
14 of the literature, have you seen and do you have
15 an opinion as to whether or not Taxotere alone
16 can cause PCIA?
17         MS. WADHWANI:  Objection to form.
18    A.   It's possible, but uncommon.  I
19 believe there are only few cases.  But that may
20 be also because Taxotere alone in breast cancer
21 is only used for metastatic, as far as I know.
22 So it's never used alone.  Its approval is for
23 combination treatment.
24    Q.   Doctor, you were asked a lot of
25 questions about the medical records of

1 Dr. Jones.  Do you recall that?
2     A.   Yes, I do.
3     Q.   And you testified that there were
4 some of those medical records of Dr. Jones which
5 had been, as you said, misplaced or put in the
6 Dropbox under billings.
7          Do you recall that testimony?
8     A.   Yes, yes.  Very well.  In a file
9 that was called "Billing."  And I didn't review
10 the file, it looked like the billings.
11    Q.   But you also testified that you
12 reviewed those records prior to this deposition
13 here today; is that correct?
14    A.   Yes.  I reviewed the records
15 because I found the records when I read the
16 deposition of Dr. Matherne.  And so I got aware
17 there was something from 2003 to 2010 that I
18 hadn't seen.
19    Q.   Now, after your review of those
20 records that you are referring to of Dr. Jones,
21 did that review in any way alter or change your
22 conclusions or opinions that you have offered in
23 this case?
24         MS. WADHWANI:  Objection to form.
25    A.   No.

1     Q.   Doctor, you also indicated that
2 after you had done your report in this case that
3 you reviewed the deposition of the
4 dermatologist, Dr. Matherne?
5     A.   Yes.
6     Q.   And we've pronounced his name
7 several different ways, but you know who I am
8 referring to, M-a-t-h-e-r-n-e, Dr. Matherne?
9     A.   Yes, yes.  He gave his deposition
10 in two parts.
11    Q.   Yes.
12    A.   I did.
13    Q.   Now, was there anything in that
14 deposition that in any way altered or changed
15 your opinions or conclusions that you offered in
16 your report in this case?
17         MS. WADHWANI:  Objection to form.
18    A.   Sorry.  No.
19         MS. WADHWANI:  Thank you,
20 Dr. Tosti.  If you could just wait a beat before
21 you answer your counsel's question, just to let
22 me lodge any objection.
23         THE WITNESS:  I will.  I'm sorry
24 about that.
25         MS. WADHWANI:  Understandable.

72 (Pages 282 - 285)

Page 286

1 Thank you.
2 BY MR. SCHANKER:
3     Q.   Dr. Tosti, you sat through several
4 hours of questioning by defense counsel today;
5 correct?
6     A.   Yes.
7     Q.   Has anything that has occurred in
8 this deposition here today changed the opinions
9 or conclusions which you offered in your report
10 in this case?
11     A.   No.
12         MR. SCHANKER:  We don't have any
13 further questions.
14         MS. WADHWANI:  I just have a
15 couple, if it's okay with you, Dr. Tosti, in
16 follow-up.
17         THE WITNESS:  Absolutely.
18         -----
19         EXAMINATION
20         -----
21 BY MS. WADHWANI:
22     Q.   Your counsel just asked you about
23 this Dropbox that contained medical records that
24 you accessed; right?
25     A.   Yes.

Page 287

1     Q.   Who provided that Dropbox to
2 you?
3     A.   You know, the counselor of the
4 plaintiff.
5     Q.   So Mrs. Plaintiff -- sorry, I'm
6 having a hard time talking since this afternoon.
7 Let me start again.
8         Mrs. Plaisance's counsel provided
9 to you the Dropbox containing the documents
10 including Dr. Jones' records; correct?
11     A.   Yes, correct.
12     Q.   And was it the folder that
13 contained Dr. Matherne's records that was
14 labeled "Billing"?
15     A.   No.  It was the folder that
16 contained Dr. Jones' records.
17     Q.   Thank you.  Sorry.  Long day.
18         In the Dropbox provided to you by
19 Mrs. Plaisance's counsel, was there a folder in
20 there called "Billing"?
21     A.   It was a -- you know, the Dropbox
22 had a folder, and then there is a subfolder that
23 was inside the Dropbox, and in that subfolder
24 there was the document that was erroneously, you
25 know, named "Billing."

Page 288

1     Q.   Is it your conclusion, Dr. Tosti,
2 that the combination of docetaxel and
3 cyclophosphamide caused Mrs. Plaisance's PCIA?
4         MR. SCHANKER:  Objection; form.
5     A.   I think that Taxotere is the main
6 substantial factor.  And then, Taxotere is
7 almost never used alone, it's used in
8 combination, so all these cases are reported in
9 combination.
10         But I report it in combination
11 with not just cyclophosphamide, also with
12 Adriamycin, and also with other drugs.  So I
13 think it's Taxotere that cause the problem, and
14 since it's used in combination, usually
15 combination therapy.
16     Q.   You note in Exhibit 1, your
17 report, that there are 52 cases of permanent
18 alopecia reported with non-taxane regimens with
19 anthracyclines and/or cyclophosphamide; correct?
20         MR. SCHANKER:  Objection; form.
21     A.   They were all basically by
22 association of cyclophosphamide and Adriamycin.
23 So as far as I know, there are no cases with
24 just cyclophosphamide.
25     Q.   My question is -- sorry.  My

Page 289

1 question is simpler than that --
2         MR. SCHANKER:  I don't think she
3 was done with her response.
4     A.   No, no.  I want to say, I may be
5 wrong, as far as I know, cyclophosphamide itself
6 never cause PCIA.
7     Q.   My question was a little simpler
8 than that, and I apologize if I interrupted you,
9 which is just, does your report state that there
10 are 52 cases of permanent alopecia reported with
11 non-taxane regimens with anthracyclines and/or
12 cyclophosphamide?
13         MR. SCHANKER:  Objection to form.
14     A.   Yes, that's true.
15     Q.   And your report also identifies
16 reports of PCIA containing combination docetaxel
17 regimens; correct?
18     A.   Yes.  Most cases are with
19 combination regimen with docetaxel.
20     Q.   Correct.  So it's the combination,
21 as you stated, that contributes to the PCIA;
22 correct?
23         MR. SCHANKER:  Objection; form.
24     A.   You know, Taxotere has been
25 reported even as monotherapy, but it's not used

73 (Pages 286 - 289)

Page 290

1  as monotherapy.  So most of the reported cases
2  in breast cancer, because I am discussing breast
3  cancer, are with combination therapy.  Because
4  that's what these patients get, combination
5  therapy.
6      Q.   And that's what you are basing
7  your conclusion related to the fact that PCIA
8  exists is literature reporting PCIA with
9  docetaxel used in combination; correct?
10        MR. SCHANKER:  Objection; form.
11     A.   It's not just literature.  This is
12  something I've seen, you know, many years ago
13  and I continue seeing.  So something I've been
14  involved much before being involved in this
15  litigation.
16        So it's a kind of disease I was
17  very interested at one point of my life, as I am
18  interested in other things now.  So I know that
19  also from experience, and I've been following
20  this literature for a long time.
21     Q.   And your experience is with
22  docetaxel used in combination; correct?
23        MR. SCHANKER:  Objection; form.
24     A.   Yes.  Because in treatments of
25  breast cancer, it's mostly used -- except for

Page 291

1  metastatic, as far as I know, it's only used in
2  combination.  And I believe it's approved as a
3  treatment in combination.
4        MS. WADHWANI:  I have no further
5  questions.  Thank you very much for your time
6  today, Dr. Tosti.
7        THE WITNESS:  Thank you.  It was a
8  pleasure to meet you.  And thank you for being
9  so nice with me.
10        MS. WADHWANI:  Thank you.
11        THE VIDEOGRAPHER:  Thank you,
12  everyone.  Nothing else for the record?
13        MR. SCHANKER:  No.
14        THE VIDEOGRAPHER:  Thank you.  The
15  time is 6:19.  We are going off the record.
16  This ends media file 7, and that concludes this
17  deposition.
18        (Time noted:  6:19 p.m.)
19
20
21
22
23
24
25

Page 292

1         C E R T I F I C A T E
2
3        I, SEVA FLICSTEIN, a Certified
4  Court Reporter of the State of New Jersey, do
5  hereby certify that prior to the commencement of
6  the examination the witness was sworn by me to
7  testify the truth, the whole truth and nothing
8  but the truth.
9        I DO FURTHER CERTIFY that the
10  foregoing is a true and accurate transcript of
11  the testimony as taken stenographically by and
12  before me at the time, place and on the date
13  hereinbefore set forth.
14        I DO FURTHER CERTIFY that I am
15  neither of counsel nor attorney for any party in
16  this action and that I am not interested in the
17  event nor outcome of this litigation.
18
19
20  _____
    New Jersey Certificate No. XI 01413
21  California Certificate No. 8727
    Registered Merit Reporter
22  Certified Realtime Reporter
23
24
25

Page 293

1
   IN RE: TAXOTERE (DOCETAXEL)        :
2  PRODUCTS LIABILITY LITIGATION
                                      :
3  - - - - - - - - - - - - - - - - - -
   This document relates to:         :
4
   Clare Guilbault, Case No. 2:16-cv-17061   :
5  Audry Mae Plaisance, Case No. 2:18-cv-08068
   _____   :
6
7
8      I have read the foregoing transcript and
   found it to be a truthful and accurate
9  representation of the testimony I gave in
   connection with the captioned matter on
10  _____.
11
12
13  _____
            ANTONELLA TOSTI, M.D.
14
15
16
   The State of:
17  County of:
18
   Sworn and subscribed to before me on this
19  day     of       , 2021
20
21  NOTARY PUBLIC _____
22  My commission expires:
23
24
25

Veritext Legal Solutions

800-227-8440                                   973-410-4040

Page 294

```
 1        E R R A T A   S H E E T
 2
 3      Please list any correction with the
        corresponding page and line numbers.
 4
 5      PAGE  LINE         CORRECTIONS
 6  1.          :
 7  2.          :
 8  3.          :
 9  4.          :
10  5.          :
11  6.          :
12  7.          :
13  8.          :
14  9.          :
15  10.          :
16  11.          :
17  12.          :
18  13.          :
19  14.          :
20  15.          :
21  16.          :
22  17.          :
23  18.          :
24  19.          :
25  20.          :
```

Veritext Legal Solutions

800-227-8440                                          973-410-4040

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.