**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

**MDL NO. 16-2740**

**IN RE: TAXOTERE (DOCETAXEL)**
**PRODUCTS LIABILITY LITIGATION**

*This document relates to:*
Audrey Plaisance, Case No. 2:18-cv-08068
Clare Guilbault, Case No. 2:16-cv-17061

**MEMORANDUM IN SUPPORT OF HOSPIRA'S MOTION FOR**
**<u>SUMMARY JUDGMENT BASED ON PREEMPTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................1

THE UNDISPUTED FACTS ....................................................................................3

ARGUMENT .............................................................................................................7

I.      PLAINTIFFS' STATE-LAW, FAILURE-TO-WARN CLAIMS ARE
        PREEMPTED BY FEDERAL LAW UNLESS PLAINTIFFS CAN PROVE
        THAT HOSPIRA HAD "NEWLY ACQUIRED INFORMATION" ................................7

II.     PLAINTIFFS HAVE FAILED TO ESTABLISH THAT HOSPIRA HAD
        "NEWLY ACQUIRED INFORMATION" ABOUT PERMANENT HAIR LOSS .........10

III.    HOSPIRA DID NOT POSSESS "NEWLY ACQUIRED INFORMATION" ................13

        A.      Hospira's Labeling Was Adequate at the Time of Approval in March 2011 ........14

        B.      Hospira Did Not Have "Newly Acquired Information" as of January 2014 .........14

                1.      No new evidence of greater frequency ......................................................15

                2.      No reliable scientific evidence of causation ..............................................23

CONCLUSION ........................................................................................................25

CERTIFICATE OF SERVICE ................................................................................27

## INTRODUCTION

It was not lawful under federal law for Hospira unilaterally to implement a labeling change to warn about permanent hair loss, as Plaintiffs Guilbault and Plaisance contend state law required. If Plaintiffs are right about what state law required, then federal and state law conflicted, and it was impossible for Hospira to comply with both. When that is true, as the undisputed facts establish here, federal law preempts state law. Accordingly, the Court should grant summary judgment for Hospira.

The FDA granted Hospira's 505(b)(2) application in March 2011 and, in so doing, specifically approved Hospira's proposed labeling. Like the Sanofi Taxotere labeling, the Hospira labeling in both the Highlights and Adverse Reactions sections described hair loss as one of the most common side effects of using docetaxel. The FDA *required* those exact warnings regarding hair loss as of the date of approval, and it would have been legally impossible for Hospira to have given doctors a different warning as of March 2011. Plaintiffs' expert, Dr. David Ross, acknowledges this fact, having testified that "I've not offered and I do not anticipate offering any opinions about what Hospira did prior to approval to get approval" and that he is not offering any opinion "that the Hospira label for docetaxel approved by FDA was inadequate at the time of approval in March of 2011."[1]

The issue, then, is whether Hospira was obligated at some point after FDA approval (March 2011), but before Plaintiffs Guilbault and Plaisance received treatment with docetaxel (September 2013 and January 2014, respectively) to use the Changes Being Effected ("CBE") regulation to add such a warning about permanent hair loss to the labeling. A drug manufacturer cannot resort to the CBE regulation, however, unless it has "newly acquired information"—that is, information (1) "not previously submitted" to the FDA that (2) reveals "risks of a different type or greater severity or frequency" than previously submitted to the agency and that (3) constitutes "reasonable evidence" of "a causal association" between the drug and a clinically

---

[1]   *See infra* n.22.

significant hazard.  21 C.F.R. § 314.70 (c)(6)(iii)(A).  Plaintiffs have the burden of establishing that Hospira came into possession of such "newly acquired information" after FDA approved Hospira's docetaxel and before Plaintiffs used the drug.

Whatever may be true of Sanofi regarding Taxotere (the brand-name and Reference Listed Drug), Plaintiffs have not met that burden as to Hospira's docetaxel.  Their expert, Dr. Ross, cannot make that showing, for he did not do the basic homework necessary to render an opinion about what "newly acquired information" Hospira may have had, never having reviewed the twelve volumes of data submitted in support of Hospira's docetaxel New Drug Application, nor the Periodic Safety Update reports, Periodic Adverse Experience reports and NDA annual reports submitted to the FDA by Hospira, nor the full record of correspondence between Hospira and the FDA regarding docetaxel—indeed, having reviewed only eight Hospira documents from the documentary record, six of them cherry-picked for him by Plaintiffs' counsel.[2]

Even if Plaintiffs did not have the burden of showing that Hospira had "newly acquired information," however, the undisputed evidence is that Hospira did not.  Ross testified that "between the time frame that I'm talking about and when they actually updated it, ***there was nothing new***.  There was ***nothing***— … I mean, you know, it was not, like, oh my God, here's a new 2014 paper."[3]  And there was nothing to prompt a re-analysis of what had been previously published in the scientific literature and reported to the FDA.  The number of adverse events reported to Hospira between March 2011 and January 2014 that involved permanent hair loss and pointed to docetaxel as the suspect drug could have been counted on two hands—and, indeed, was far smaller proportionately than the number of such reports before March 2011. Thus, from Hospira's vantage point, the sparse information about possible permanent hair loss

---

[2]   Hospira is filing contemporaneously a motion pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert* to exclude Dr. Ross's expert testimony.  See Hospira's Mem. Supp. Mot. Exclude Ross (Nov. 12, 2021).

[3]   Ex. AA, Deposition of David Ross, M.D., Ph.D. (Sept. 30, 2021) ("Ross Dep.") at 180:5-182:2.

did not meet the requirements for a CBE submission:  the information (1) did not "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA" and (2) did not reflect a causal relationship.

As a 505(b)(2) applicant, Hospira relied on the FDA's finding that Sanofi's Taxotere was safe and effective.  Hospira did not have access to Sanofi's New Drug Application and its supporting clinical trial data, nor to internal safety database with 15 years' worth of adverse event reporting information.  The limited information available to Hospira in the short period before Plaintiffs Guilbault and Plaisance used docetaxel did not provide the company legal warrant to make a CBE labeling change, nor was it sufficient to trigger a re-analysis of the data at hand.  As the FDA recognized, Sanofi had by far the most information and was in the best position to determine, working with the FDA, whether any labeling changes were warranted. Thus, in 2015, when the FDA was contacted by oncology patient advocates who expressed concern that the Taxotere labeling did not warn that hair loss could be permanent, the FDA sent an information request to Sanofi alone, without informing Hospira and the other 505(b)(2) manufacturers that it had made the request or that amendment of the hair-loss warning was under consideration.  In the FDA's apparent view, Hospira had nothing to contribute.  And, as demonstrated below, the FDA was right.

### THE UNDISPUTED FACTS

Hospira's docetaxel is an unbranded version of Taxotere, the branded docetaxel product developed by Sanofi US Services Inc. and Sanofi-Aventis U.S. LLC., and approved by the FDA for the treatment of advanced or metastatic breast cancer in 1996.  Statement of Undisputed Facts ("SOF") ¶ 10.  After Sanofi's patent for Taxotere expired in 2010, several manufacturers obtained FDA approval to sell docetaxel products under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, which permits follow-on medications to gain FDA approval through an abbreviated pathway based on the safety and efficacy data of the branded or Reference Listed Drug ("RLD").  Hospira submitted its § 505(b)(2) New Drug Application ("NDA") for docetaxel

in July 2007, and pursuant to § 505(b)(2), the FDA approved the NDA in March 2011. *Id.* ¶¶ 12-13. FDA approved the similar NDAs for the docetaxel products of Sandoz and Accord in June 2011. For all three products, the warnings, precautions and adverse reactions information in the approved labeling was identical to the information in the approved Taxotere labeling.[4]

Like the Taxotere labeling, the Hospira docetaxel labeling described alopecia as one of the most common adverse reactions and also referred to alopecia in the Patient Counseling section and five tables. (Indeed, the FDA-approved Hospira labeling was identical to that of Taxotere in every respect, with the minor difference in the preparation-and-administration section of the labeling, which described a single-step dilution for Hospira docetaxel versus a two-step process for Taxotere.) *Id.* ¶ 16. The term "alopecia" includes all types of hair loss, including more persistent or permanent cases. The FDA Adverse Event Reporting System ("FAERS") can be searched using the term "alopecia," but not "permanent alopecia" or "persistent alopecia."[5]

Hospira's NDA sought approval for docetaxel injection in a less concentrated formulation than Taxotere. Otherwise, Hospira docetaxel for injection was the same active ingredient, with the same route of administration, seeking the same indications as those of the previously approved Taxotere. Hospira did not submit new clinical data as part of its NDA, and the FDA relied entirely on its prior review of the Sanofi NDA for Taxotere to support the safety and efficacy of Hospira docetaxel. *Id.* ¶ 17.[6]

---

[4]   SOF ¶¶ 14-15; Ex. L, Hospira Docetaxel Launch Label (Feb. 2011), HOS00100000119-165; Ex. M, Accord Docetaxel Launch Label (June 2011); Ex. N, Sandoz Docetaxel Launch Label (June 2011); Ex. O, Sanofi Taxotere Label (May 2010).

[5]   SOF ¶ 20; Ex. F, Expert Report of Marianne C. Mann, M.D. (Oct. 8, 2021) ("Mann Rep.") 11; Ex. P, Deposition of Angeliki Kotsianti (Feb. 19, 2020) ("Kotsianti Dep.") at 164:11-165:8; Ex. Q, Deposition of Juergen Schmider (June 17, 2019) ("Schmider Dep.") at 233:14-236:10.

[6]   In September 2015, Pfizer acquired Hospira, after which Pfizer marketed docetaxel through Hospira, Inc. as a Pfizer subsidiary. SOF ¶ 18.

Hospira monitored its docetaxel product in the post-approval period using a three-tiered process of review that involved physicians and, ultimately the head of the global safety department.  Signal detection of a safety concern involved looking for an aberration in adverse event reports—i.e., a report different in the type or severity of an event or, across all reports, of the frequency of an event.  The sources of information available to Hospira from March 2011 to January 2014 were the scientific literature and post-marketing case reports.  *Id.* ¶¶ 21-22.

There had been case reports of permanent alopecia during the 15 years Taxotere was on the market before our docetaxel was approved.  Following the Hospira approval in March 2011, there were additional case reports.  The limited scientific literature in this time frame addressed single cases or small numbers of cases, which involved confounding variables.  The prevalence of permanent hair loss reported in this literature (0.059%, ~2%, and 3.9%) was lower than in articles submitted to the FDA before approval of Hospira's 505(b)(2) NDA or was described in the publications as "unknown."[7]

After oncology patient advocates contacted the FDA to express concerns that the docetaxel labeling did not state that hair loss could be permanent, the agency in March 2015 sent Sanofi (as the manufacturer of the RLD) a request for a summary of cases in Sanofi's internal clinical database regarding permanent partial or total alopecia associated with the use of docetaxel.  The FDA did not send a similar request to Hospira, nor did it advise the company that permanent hair loss was a concern, not did it make a public safety announcement about the risk of permanent hair loss.[8]  Sanofi found 2172 reports of alopecia (of all types) associated with docetaxel in its database.  Of that number, 70 percent involved the use of docetaxel in combination with other chemotherapy agents known to cause alopecia, and many reports

---

[7]   SOF ¶ 21, 24; Ex. BB, Nabholtz (2001); Ex. CC, Sedlacek (2006).

[8]   SOF ¶¶ 25-26.  These post-use facts are neither relevant nor admissible in the Plaisance and Guilbault cases, given the prescription dates in 2013 and 2014.  Hospira includes them here only to show that, regardless (with or without them), Plaintiffs' claims are still preempted.

concerned patients who also received hormonal therapies that cause alopecia. Only 117 reports (5.3%) described "permanent," "irreversible" or "lasting> 2 years" alopecia. The FDA medical officer who reviewed the Sanofi submission concluded: "I think the sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data."[9] In December 2015, Sanofi added the following sentence to the Adverse Reaction section of the labeling: "Cases of permanent alopecia have been reported." SOF ¶ 29.

The FDA did not advise Hospira of the revision once it was made and did not advise or instruct Hospira to make the same revision. After Hospira became aware of a July 2016 update regarding docetaxel labeling on the FDA website, it conducted a review to determine whether to also change its labeling. It, of course, first took note of the fact that Sanofi and FDA had already agreed to a labeling change based on the reports in Sanofi's internal database, information that had not been previously available to Hospira. But Hospira then proceeded to undertake a review of its pharmacovigilance safety database, searching through September 17, 2016, for all cases reporting "alopecia" with docetaxel.[10] That review identified 146 cases of alopecia reported to Hospira. In 43 of the 146 cases (29%), the person reporting the case described alopecia as "permanent" or "irreversible." In 33 (76%), the reporter listed co-suspect drugs; in 14 (33%), concomitant drugs; and in 20 (46%), prior chemotherapy or radiotherapy. The reporter identified docetaxel as the single agent or the only suspect drug in just 10 (6.8%) of the 146 cases. On

---

[9]   SOF ¶¶ 27-28; Ex. W, Prowell T to Diggs F, et al., Congressional Response Letter, Taxotere Adverse Events (Dec. 4, 2015).

[10]   SOF ¶ 30; Ex. Y, Deposition of Karilyn Halloran (Nov. 26, 2019) ("Halloran Dep.") at 94:9-18; Ex. V, Docetaxel 2.5 Clinical Overview: Addition of Permanent Alopecia to the Docetaxel United States Prescribing Information (Mar. 2017) ("Clinical Overview"), HOS002000030958 at -962.

further investigation of those 10 reports, however, Hospira determined that eight cases involved confounding chemo- or hormone therapies.[11]

On March 31, 2017, Hospira/Pfizer submitted a CBE application and, at the same time, implemented changes to the labeling that addressed reports of permanent alopecia in the Post-Marketing Experience and Patient Counseling sections of the labeling and in the Patient Package Insert.  The Post-Marketing Experience section noted, "Cases of permanent alopecia have been reported."  The Patient Counseling Information noted that the side effects associated with docetaxel may include "hair loss (cases of permanent hair loss have been reported)."  The Patient Information Leaflet noted, "hair loss:  In some people permanent hair loss has been observed."[12]

## ARGUMENT

I.  **PLAINTIFFS' STATE-LAW, FAILURE-TO-WARN CLAIMS ARE PREEMPTED BY FEDERAL LAW UNLESS PLAINTIFFS CAN PROVE THAT HOSPIRA HAD "NEWLY ACQUIRED INFORMATION"**

Plaintiffs contend that state law (Louisiana law, in the case of Plaintiffs Guilbault and Plaisance) required Hospira to warn that "cases of permanent hair loss have been reported" before they were treated with docetaxel.  But FDA regulations governing drug labeling prevented Hospira from unilaterally amending the FDA-approved docetaxel labeling to give that warning absent "newly acquired information."  Accordingly, the doctrine of conflict preemption bars Plaintiffs' failure-to-warn claim and warrants summary judgment in its favor.

The sequence of Supreme Court decisions from *Wyeth v. Levine*, 555 U.S. 555 (2009) to *Pliva, Inc. v. Mensing*, 564 U.S. 604 (2011) to *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013) to *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019) define the standard for conflict preemption where state law claims concern the adequacy of drug labeling.  State and federal law conflict when it is "impossible for a private party to comply with both state

---

[11]  SOF ¶ 31; Ex. F (Mann Rep.) 20; Ex. V (Clinical Overview) at -963; Ex. P, Kotsianti Dep. at 170:1-172:12.

[12]  SOF ¶¶ 32-33; Ex. Z, CBE-0 Submission (Mar. 31, 2017) HOS03200000001-62.

and federal requirements." *Albrecht*, 139 S. Ct. at 1672 (quoting *Bartlett*, 570 U.S. at 480). When such a conflict exists, state law is "without effect." *Id*. at 1678 (quoting *Bartlett*, 570 U.S. at 480).

What makes compliance with both state and federal law "impossible"?  The Supreme Court has answered that compliance is impossible when the private party cannot "independently do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (citing *Wyeth*, 555 U.S. at 573).  Although drug manufacturers have a legal duty under both state and federal law to provide an adequate warning, a manufacturer is not at liberty to provide whatever warnings it deems appropriate or compliant with state law whenever it wants.

In the first instance, before a manufacturer can sell the drug, the FDA determines what warnings are adequate; indeed, it determines the exact language of each warning. *Levine*, 555 U.S. at 568 ("The FDA's premarket approval of a new drug … includes the approval of the exact text in the proposed label.").[13]  Needless to say, a manufacturer cannot then amend on Day Two the labeling approved by the FDA on Day One.  The "default rule" is that a manufacturer "must secure FDA approval for a proposed change prior to distributing the product with the changed label."[14]  This close control of the labeling by the FDA is a "backstop to prevent manufacturers from warning of every possible adverse reaction in an effort to insulate themselves from any conceivable liability." *Gayle v. Pfizer Inc.*, 452 F. Supp.3d at 78, 85 (S.D.N.Y. 2020).  Such

---

[13]   *See also In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 779 F.3d 34, 37, 41 (1st Cir. 2015) (describing the FDA as "the exclusive judge of safety and efficacy based on information available at the commencement of marketing"); *Gayle v. Pfizer, Inc.*, 452 F. Supp. 3d 78, 84 (S.D.N.Y. 2020) ("[T]he FDA closely controls the label for all FDA-approved drugs ….  During a drug's initial application, the FDA must approve the label."), *aff'd*, 847 F. App'x 79 (2d Cir. 2021).

[14]   *Celexa.*, 779 F.3d at 37 (citing 21 C.F.R. § 314.70(b)(2)(v)(A)); *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019) ("[D]rug manufacturers are limited in their ability to unilaterally change the labels on their products.").

"over-warning" dilutes the warnings regarding the most serious adverse reactions and can unjustifiably deter patients from using the drug.[15]

The one exception to the FDA's close control of the labeling is provided by the Changes Being Effected ("CBE") regulation, 21 C.F.R. § 314.70 (c)(6)(iii), which permits a manufacturer to strengthen a warning if it has "newly acquired information"—a term defined by regulation to establish three conditions.[16]  First, the information must be "data, analyses, or other information not previously submitted to [FDA]."  21 C.F.R. § 314.3(b).  Second, the information must "reveal risks of a different type or severity or frequency than previously included in submissions to FDA."  *Id*.  And, third, the information must reflect "evidence of a causal association" between the drug and the risk.  21 C.F.R. § 314.70 (c)(6)(iii).

These conditions ensure that a manufacturer will act unilaterally only if the enhanced warning reflects truly new, scientifically justified information.[17]  Because hypotheses and preliminary conclusions do not constitute such information, courts have "caution[ed] against a quick trigger in determining the existence of newly acquired information.  *Knight v. Boehringer*

---

[15]  *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1673 (2019) ("The hierarchy of label information is designed to 'prevent overwarning' so that less important information does not 'overshadow' more important information."); *Gayle*, 452 F. Supp.3d at 85 ("Over-disclosure dilutes warnings …."); *In re Incretin-Based Therapies Prods. Liab. Litig*., 524 F. Supp. 3d 1007, 1028 (S.D. Cal. 2021) ("The regulations reflect the FDA's cautious approach to drug labeling, recognizing that … 'inclusion of speculative or hypothetical risks[] could discourage appropriate use of a beneficial drug ….'" (citation omitted)).

[16]  *See Silverstein v. Boehringer Ingelheim Pharms.*, 2020 WL 6110909, at *31 (S.D. Fla. Oct. 7, 2020) (recapping the three conditions).

[17]  *Albrecht*, 139 S. Ct. at 1679 ("[M]anufacturers cannot propose a change that is not based on reasonable evidence."); *In re Incretin-Based Therapies*, 524 F. Supp.3d at 1022 ("The FDA's regulations are intended to ensure that a label's wording is scientifically valid"); *id.* at 1028-29 ("[T]he FDA's CBE regulations are designed to ensure that only scientifically justified information is provided in the labeling for an approved product" and holding that evidence of an "indeterminate causal link" did not support a CBE submission); *Ridings v. Maurice*, 444 F. Supp. 3d 973, 992 (W.D. Mo. 2020) ("[S]tudies concluding that it 'remains unknown' whether a drug is linked to a particular adverse reaction or risk … do not constitute reasonable or well-grounded scientific evidence of 'clinically significant adverse effects' under the CBE regulation.").

*Ingelheim Pharm., Inc.*, 984 F.3d 329, 340 (4th Cir. 2021).  If the manufacturer did not have the requisite "newly acquired information" to support a CBE submission, "then the state law claim is preempted," and the preemption analysis stops there.  *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1018 (S.D. Cal. 2021).

If, on the other hand, the manufacturer did have "newly acquired information," then the analysis proceeds to the question whether there is clear evidence that the FDA would have rejected the amended warning.  The answer to that question turns on whether the FDA was "fully informed" about the purported justification for the amended warning and communicated its disapproval by action "carrying the force of law."  *Albrecht*, 139 S. Ct. at 1678-79.

Whether the manufacturer possessed "newly acquired information" that justified a CBE submission and whether there is clear evidence that the FDA would have rejected a labeling change are matters of law for the judge to decide.  *Id*. at 1676 ("We here decide that a judge, not the jury, must decide the pre-emption question.").

As demonstrated below, Plaintiffs have failed to come forward with evidence that Hospira had "newly acquired information" about permanent hair loss that supported a CBE submission.  Regardless of whether it is Plaintiffs or Hospira that has the burden of proving the existence of "newly acquired information," the undisputed evidence is that Hospira did not have such information before Plaintiffs used docetaxel.

## II.    PLAINTIFFS HAVE FAILED TO ESTABLISH THAT HOSPIRA HAD "NEWLY ACQUIRED INFORMATION" ABOUT PERMANENT HAIR LOSS

As a matter of precedent, logic and fairness, it is incumbent on Plaintiffs, in the first instance, to identify the "newly acquired information" that allegedly obligated Hospira to make a CBE submission adding the sentence, "Cases of permanent alopecia have been reported."  When defendants move to dismiss failure-to-warn claims on the ground of preemption, the courts regularly require the plaintiff to plead the facts that constitute the "newly acquired

information."[18]  It follows logically that, once discovery has been completed, the plaintiff must

have done at least as much in order to defeat summary judgment.  It is only fair to place this

burden of identifying the "newly acquired information" on the plaintiff, because the defendant

cannot guess what facts the plaintiff may contend constitutes such information and cannot prove

a negative.  *Silverstein v. Boehringer Ingelheim Pharms.*, 2020 WL 6110909, at *12 (S.D. Fla.

Oct. 7, 2020) ("This allocation of burdens avoids making [defendant] prove a negative—that it

acquired no new information after Pradaxa was approved that would have justified a CBE

modification.").[19]

Plaintiffs Guilbault and Plaisance have only partially identified the purported "newly

acquired information."  Their regulatory expert, Dr. David Ross, has opined that Hospira

(i) should have been aware of the scientific literature discussed by Drs. Feigal and Madigan (two

---

[18]   *See Gibbons*, 919 F.3d at 708 ("T]o state a claim for failure-to-warn that is not preempted by
the FDCA, a plaintiff must plead 'a labeling deficiency that [Defendants] could have
corrected using a CBE regulation.'"); *Celexa*, 779 F.3d at 41 ("[A] necessary step in
defeating [defendant's] preemption defense is to establish that the complaint alleges a
labeling deficiency that [defendant] could have corrected using the CBE regulation."); *Gayle*,
452 F. Supp.3d at 87 ("Plaintiff's complaint does not identify any 'newly acquired
information' on which Pfizer could have altered the Lipitor label."); *Dolin v.
GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018) (noting plaintiff's failure "to offer
evidence that [defendant] acquired new information" that "would have justified a change in
the label"); *Javens v. GE Healthcare Inc.*, 2020 WL 2783581, at *4-5 (D. Del. May 29, 2020)
(dismissing complaint where plaintiff failed to present sufficient allegations to establish
"newly acquired evidence" and thus "the requirements to invoke the CBE regulation are not
met"); *Sabol v. Bayer Healthcare Pharm.*, 439 F. Supp. 3d 131, 150-51 (S.D.N.Y. 2020)
(same); *McGrath v. Bayer Healthcare Pharms.*, 393 F. Supp. 3d 161, 166 (E.D.N.Y. 2019)
(requiring plaintiff to show that defendants could unilaterally change the label without FDA
approval and dismissing complaint).

[19]   The court in *Silverstein* explained that "there are situations where the party that does not bear
the ultimate burden of persuasion bears an initial burden of production."  2020 WL 6110909
at *12.  One such situation, the court held, is when the plaintiff contends that the defendant
manufacturer had "newly acquired information" that obligated it to make a CBE submission.
Then the plaintiff "bear[s] the initial burden of identifying and producing facts *that they
assert* were 'newly acquired information' that would have allowed [defendant] to invoke the
CBE regulations."  *Id*. (emphasis in original).

other experts), (ii) obviously knew what was said in its own foreign labeling, and (iii) possessed vicariously the alleged knowledge of Dr. Juergen Schmider, who left Sanofi in 2013 to work for Hospira; and (iv) adverse event reports in the FAERS database.[20]  But this listing of documents goes only part of the way to identifying "newly acquired information" because Dr. Ross does not identify (i) which documents were new (in the sense of not previously submitted to the FDA), (ii) which were new (in the sense of demonstrating that permanent hair loss was more frequent than reported in Sanofi's preapproval clinical trials), and (iii) which demonstrated the requisite reliable causal association between docetaxel and permanent hair loss.

Dr. Ross's expert report did not provide this necessary identification of what Plaintiffs assert was the "newly acquired information."  Nor did his deposition testimony.  To the contrary, when asked directly "[w]hat is it in 2012 that was new information that should have been a signal that alerted the company to the need to do the review you're suggesting," Dr. Ross answered, "[R]eally, between the time frame that I'm talking about and when [Hospira] actually updated it, *there was nothing new*.  There was nothing—… I mean, you know, it was not, like, oh, my God, here's a new 2014 paper."[21]

Merely listing articles and documents does not satisfy Plaintiffs' burden to identify the purported "newly acquired information."  Particularly when Plaintiffs acknowledge that "there was nothing new," they must specify what it is about the listed articles and documents that should have prompted Hospira to initiate a re-analysis of the information previously submitted to

---

[20]   Dr. Ross is Plaintiffs' only expert who even attempts to address this question.  Ex. DD, Deposition of David Madigan (Sept. 17, 2021) ("Madigan Dep.") at 29:1-15 (Dr. Madigan testifying he is "not a regulatory expert" and not offering any opinions about "the adequacy of Hospira's docetaxel labeling"); Ex. EE, Expert Report of Dr. Ellen Feigal (June 8, 2020) ("Feigal Rep.") at 1 (Dr. Feigal is "not offering regulatory opinions about FDA requirements"); Ex. FF, Deposition of Ellen Feigal (Sept. 29, 2021) ("Feigal Dep.") at 69:16-17 ("I am offering no regulatory opinions"); Ex. GG, Deposition of Laura Plunkett (Sept. 24, 2021) ("Plunkett Dep.") at 30:12-17 ("Q: [Y]ou're not offering any opinions on regulatory issues, right?  A:  That is correct.  There's another expert, it's my understanding, that will handle those issues.").

[21]   Ex. AA (Ross Dep.) at 180:5-182:2.

the FDA.  Because Dr. Ross did not do that, the burden does not shift to Hospira to prove by a preponderance of the evidence that the identified facts did not constitute "newly acquired evidence."  *Silverstein*, 2020 WL 6110909 at *12 ("Once these facts are identified, [defendant] bears the burden of proving by a preponderance of the evidence that these facts are not 'newly acquired information' within the meaning of the CBE regulations.").  For this reason alone, Hospira is entitled to summary judgment.

### III.   HOSPIRA DID NOT POSSESS "NEWLY ACQUIRED INFORMATION"

Even if Plaintiffs did not have the burden of identifying the purported "newly acquired information" with any greater specificity than did Dr. Ross, the undisputed evidence demonstrates that his listing of articles and documents does not constitute "newly acquired information" within the meaning of the CBE regulations.  For the most part, the listed scientific literature had been submitted to the FDA before it approved Hospira's docetaxel (March 2011) or was not published until after Plaintiffs Guilbault and Plaisance began their treatment (January 2014, at the latest).  What few articles were published between March 2011 and January 2014 did not indicate that permanent hair loss was any more frequent than had been reported in older, pre-approval studies—that is, exceedingly infrequent.  The same was true for the tiny number of adverse event reports received by Hospira between March 2011 and January 2014.  Because this limited information was the same information that informed Hospira's labeling in Israel, Hungary, and the United Kingdom (where different regulatory requirements governed), the foreign labeling itself does not constitute "newly acquired information."  Finally, the information that was available to Hospira did not reflect the requisite causal relationship.  In ultimately approving the language, "Cases of permanent alopecia have been reported," and nothing more, the FDA relied on information that was available to Sanofi, not Hospira, and even then recognized that any link between docetaxel and permanent hair loss was indeterminate.

Not only did Hospira not have "newly acquired information" within the meaning of the CBE regulations, but the undisputed evidence reflects, tellingly, that the FDA did not expect

Hospira to have such information.  When, at the request of patient advocacy groups, the agency sought a re-analysis of the safety data relating to permanent hair loss, it turned to Sanofi alone, recognizing that only the Reference Listed Drug manufacturer was likely to have access to sufficient data to conduct a meaningful analysis.

### A.      Hospira's Labeling Was Adequate at the Time of Approval in March 2011

The FDA approved Hospira's 505(b)(2) NDA for docetaxel in March 2011 and, in so doing, approved the proposed labeling.  That labeling tracked word for word the warnings, precautions and adverse reactions in the FDA-approved Taxotere labeling.  This labeling was adequate as a matter of law as of the time of approval, and Hospira could not have provided different information.  *See In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 779 F.3d 34, 37, 41 (1st Cir. 2015) ("the FDA [is] the exclusive judge of safety and efficacy based on information available at the commencement of marketing"); *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019) ("The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label." (citation omitted)).

In any event, there is no evidence that Hospira's labeling was inadequate as of March 2011.  Plaintiffs did not ask Dr. Ross to address the adequacy of the labeling as of that date, and he has no opinion on that subject.[22]

### B.      Hospira Did Not Have "Newly Acquired Information" as of January 2014

In his 37-page expert report, Dr. Ross tellingly devotes only three pages to discussion of the specific information that, in his opinion, should have prompted Hospira to amend the labeling.  In the one paragraph of his report that mentions the CBE regulation and what it requires, he fails to acknowledge that "newly acquired information" must be (i) "data, analyses, or other information not previously submitted to [FDA]" and (ii) must "reveal risks of a different

---

[22]   Ex. AA (Ross Dep.) at 107:9-20 ("Q. … [Y]ou're not offering any opinion that the Hospira label for doxetaxel approved by FDA was inadequate at the time of approval in March of 2011.  A. I was not asked to address that question.  Q. And so you … will not be offering that opinion. Right?  A.  Correct.").

type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). Not surprisingly, then, his opinion does not address either requirement.

There is a reason for this omission: during the relevant time period (i.e., before January 2014), Hospira was not in possession of information (i) not previously submitted to the FDA that (ii) revealed a greater frequency of permanent hair loss or (iii) scientifically reliable evidence of causation. The evidence known and available to the company after March 2011 showed the same information about permanent hair loss that was known before March 2011—a small number of patients reported permanent hair loss, and the same confounding factors were present that rendered causation indeterminate. Accordingly, Hospira was not authorized to submit a Changes-Being-Effected revision of the labeling to warn of permanent hair loss.

### 1.    No new evidence of greater frequency

**The scientific literature**. In his report, Dr. Ross says that "[h]ad Hospira performed an adequate literature search prior and signal detection analytics ***prior to market approval***, it would have seen the same literature and safety signal demonstrated in the reports of Drs. Feigal and Madigan."[23] But, as noted above, Dr. Ross testified at this deposition that Plaintiffs did not ask him to address whether the Hospira labeling was adequate at the time of market approval and that he would not be offering an opinion that it was inadequate.[24]

The question is whether there was scientific literature after FDA approval and before January 2014 of which Hospira should have been aware that met the definition of "newly acquired information" about permanent hair loss. On that question, Dr. Ross's report says only, "There was adequate scientific literature available prior to Ms. Sanford's [*sic*] initial infusion

---

[23]   Ex. I, Expert Report of David Ross, M.D., Ph.D., M.B.I. (June 8, 2020) ("Ross Rep.") ¶ 136.

[24]   *See supra* n.22.

date."[25]  Dr. Ross cannot really say when Hospira should have submitted a CBE labeling change. Pressed in his deposition to give a date, he said, "I don't believe it's possible to say … you know, on this date."  The most precise he could be was "sometime in 2012."[26]  Taking him at his word, it is absolutely clear that Hospira did not have "newly acquired information" between March 2011 and "sometime in 2012."  But as the discussion below demonstrates, the same is true even if one asks whether Hospira came into possession of "newly acquired information" between March 2011 and January 2014.  Dr. Ross does not identify by author or title any article in the scientific literature published between those dates that reported a higher incidence of permanent hair loss than previously reported in the literature.

Dr. Ross refers generally to the literature listed in the reports of Drs. Madigan and Feigal. But that literature mostly falls outside the period from March 2011 to January 2014, and the few articles that fall within the period disclose data that quite clearly does not qualify as "newly acquired information."  Dr. Madigan's report lists four published reports of irreversible alopecia.[27]  Of the four, three **post-date** the treatment of Plaintiffs Guilbault and Plaisance by three or more years[28] and one **pre-dates** the FDA's approval by five years.[29]  Dr. Feigal lists the same four published reports and fifteen more.[30]  But of those fifteen, ten either **post-date**

---

[25]   Ex. I (Ross Rep.) ¶ 136. Ms. Sanford received treatment with docetaxel in August 2013, one month before Guilbault started treatment and five months before Plaisance did.

[26]   Ex. AA (Ross Dep.) at 177:1–16.

[27]   *Docetaxel and Irreversible Alopecia*, Expert Report of David Madigan, Ph.D. (Mar. 23, 2020) ("Madigan Rep.") at 21.

[28]   *Id*. (listing studies in 2017, 2018 and 2019 by Crown, Martin, and Kang, respectively).

[29]   *Id*. (listing 2006 abstract by Sedlacek).

[30]   Ex. EE (Feigal Rep.) Table 2.

Plaintiffs' treatment or **pre-date** FDA approval of Hospira's docetaxel.[31]  The five other published reports signaled nothing new:[32]

       1.       Palamaras, *Permanent Chemotherapy-induced alopecia: a review* (March 2011). This letter to the editor reported on a retrospective study of the charts of 8,430 patients with non-scarring alopecia who attended the author's hair clinic over a seven-year period.  There were only seven cases of chemotherapy-induced permanent alopecia, and of that number, only five followed treatment with taxanes (i.e., docetaxel).  The reported incidence rate was ***0.059 percent***. This rate is more than ***100 times less frequent*** than the rate reported by Nabholtz in 2001 (7.4 percent) and Sedlacek in 2006 (6.3 percent), which plaintiffs cite as the two earliest reports of permanent hair loss, both long known to the FDA when it approved Hospira's docetaxel.

       2.       Miteva, *Permanent Alopecia After Systemic Chemotherapy:  A Clinicopathological Study of 10 Cases* (June 2011).  Of the 10 cases of permanent alopecia that were the subject of this study, only six patients were treated with docetaxel.  The authors did not describe the size of the universe of patients from which the 10 cases were drawn.  They concluded that both "[t]he cause of permanent alopecia due to chemotherapy" and "[t]he real prevalence" of permanent alopecia are unknown.

       3.       Kluger, *Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel:  a prospective study of 20 patients* (May 2012).  The authors of this prospective study followed 20 women treated for

---

[31]  Post-dating treatment are articles by Thorp (2015), Kim (2017), Fonia (2017), Werbel (2018), and Freites-Martinez (2019).  Pre-dating FDA approval are articles by Nabholtz (2001), Masidonski & Mahon (2009), Prevezas (2009), Bourgeois (2010), and Tallon (2010).

[32]  Ex. T, Palamaras (2011); Ex. HH, Miteva (2011); Ex. S, Kluger et al. (2012); Ex. II, Tosti (2013); Ex. U, Bertrand (2013).  The following discussion focuses on the fact that the publications, the majority of which are letters to the editor or poster presentations, do not constitute "newly acquired information."  The reports suffer from other limitations (e.g., none involve a "control" group that would permit the calculation of risk) that are not directly relevant to the subject of this motion.

breast cancer by a sequential FEC and docetaxel regimen and who experienced permanent hair loss.  There were significant confounding factors:  all had received FEC followed by docetaxel; all had been given hormonal and radiation therapy; and many had received other chemotherapy as well.[33]  These 20 were drawn from "[a]pproximately 1000 patients affected by early breast cancer [who] were treated with this type of … chemotherapy in our institution during the accrual period."  The authors spoke of "the relatively low incidence of this side-effect" and concluded that "the incidence of this side-effect in this patient population is ~*2%*"—i.e., ***less than one-third*** the rate reported by Nabholtz (2001) and Sedlacek (2006).

4.      Tosti, *Docetaxel and permanent alopecia* (May 2013).  This brief note to the editor of the Journal of the American Academy of Dermatology advised that the author had observed five patients with permanent loss following high-dose docetaxel chemotherapy during the preceding four years.  She stated, "The real prevalence of this devastating long-term side effect of docetaxel is unknown. …"

5.      Bertrand, *Permanent chemotherapy induced alopecia in early breast cancer patients after (neo)adjuvant chemotherapy: Long term follow up* (Dec. 2013).  This poster abstract reported on 79 patients treated with FEC and docetaxel, three of whom (***3.9 percent***) developed severe alopecia.

Thus, the "scientific literature" about permanent hair loss between March 2011 and January 2014 consists of two letters to journal editors, a poster abstract from a conference, and only two articles that reported on studies of any size.  The prevalence of permanent hair loss reported in the two studies was significantly lower (0.059 percent and ~2 percent) than the prevalence rates reported in pre-approval studies.  So was the prevalence in the Bertrand abstract (3.9 percent).  And the two other publications stated that the prevalence was "unknown."  No wonder, then, that Dr. Ross did not mention these five articles by name and explain how they "reveal[ed] risks of a different type or greater severity or frequency than previously included in

---

[33]     SOF ¶ 23; Ex. S, Kluger et al. (2012).

submissions to FDA." 21 C.F.R. § 314.3(b).  Plainly, they do not.  They gave reason to believe that permanent alopecia was less, not more, frequent.

**Hospira's European labeling**.  Dr. Ross does not state, but implies, that Hospira had "newly acquired information" because it "changed at least five of its European labels to include additional information regarding the TAX316 data and permanent alopecia."[34]  But Dr. Ross does not explain—and cannot—how the TAX316 data in the foreign labeling could be considered information that revealed "risks of a different type or greater severity or frequency than previously included in submissions to FDA."  21 C.F.R. § 314.3(b).

First, Hospira did not have access to the underlying clinical trial data from TAX316, a Sanofi trial.  Second, the information was not new, in the sense of not previously submitted to the FDA.  As Dr. Ross admitted, this Sanofi clinical trial data had been available to the FDA "for years" before Hospira's approval in 2011.[35]  Sanofi not only submitted the TAX316 data, but also in March, June and August 2004 proposed a labeling change to identify permanent alopecia as a "persistent reaction" based on the TAX 316 data—a change that the FDA each time rejected.[36]  Based on the same information, the European Medicines Agency recommended that Sanofi add alopecia as a "persistent reaction" in 2011.[37]

Third, Plaintiffs' expert, Dr. Feigal, states that "[a]t the end of the 10-year follow up period for TAX316, [permanent hair loss] was seen in *3.9%* of patients on the Taxotere-

---

[34]  Ex. I, Ross Rep. ¶ 138.

[35]  Ex. JJ, Deposition of David Ross, M.D., *Hughes v. Accord Healthcare, Inc.*, No. 2:17-cv-11769 & *Stewart v. Sandoz, Inc.*, No. 2:17-cv-10817 (Aug. 31, 2020) ("Aug. 31, 2020 Ross Dep.") at 346:14-347:25.

[36]  *See* SOF ¶ 19; Ex. F (Mann Rep.) 24.

[37]  Ex. F (Mann Rep.) 24-25.

containing regimen …."[38]  Thus, the information was not "newly acquired information" for purposes of the CBE regulations because it did not signal that permanent hair loss was more frequent than reported in pre-approval articles submitted to the FDA, but less frequent.

In short, Hospira's foreign labeling for docetaxel does not reflect that the company had any new information about permanent hair loss, but rather that other countries have "different and distinct regulatory standards and decisions." *Ridings*, 444 F. Supp.3d at 994 ("[T]he actual warnings approved for a foreign label are not in and of themselves newly acquired evidence when they are based on consideration of substantially information."); Ex. AA (Ross Dep.) at 168 (agreeing that the different regulatory requirements of different countries mean that the same information may be acted on differently).  That certain countries (Israel, Hungary, the United Kingdom) required Hospira to match the Sanofi foreign labeling does not reflect that Hospira had new information, but only that foreign regulators applied different labeling rules to that information.

**Dr. Schmider's alleged knowledge**.  Dr. Juergen Schmider was Vice President of Safety Surveillance and Product Safety for Sanofi from March 2011 through April 2013, then becoming Global Vice President of Pharmacovigilance and Product Safety for Hospira.  Dr. Ross opines that Hospira therefore had "unique" knowledge, because it knew what Dr. Schmider knew from his time at Sanofi.  And while there, "Sanofi submitted to the European Medicines Agency an application to revise the labeling to identify alopecia as a "persistent" reaction.[39]  As if identifying a smoking gun, Dr. Ross notes that Dr. Schmider had several Sanofi documents in his

---

[38]  Ex. EE (Feigal Rep.) ¶ 44, n.85.  Even 3.9 percent is an over-estimation of the prevalence or permanent hair loss.  Hospira disputes that Dr. Feigal has properly characterized many of these reports as permanent hair loss.

[39]  Ex. I (Ross Rep.) ¶¶ 131-32.

files, including the Sanofi Core Data Sheet for Taxotere, "which included information regarding [permanent hair loss] from TAX316."[40]

As an initial matter, Dr. Schmider's testimony makes clear that he did not have "unique" knowledge that he brought with him to Hospira.[41]  As explained above, moreover, the information that prompted the European Medicines Agency to recommend that Sanofi, Hospira, and others refer to permanent hair loss as a persistent reaction was not new, in the sense of "reveal[ing] risks of a different type or severity or frequency than previously included in submissions to FDA."  The Sanofi Core Data sheet, which included data from the TAX316 study, was (i) information previously submitted to the FDA by Sanofi and (ii) revealed an incidence rate of only 3.9 percent (according to Dr. Feigal), a lower rate than previously reported in the scientific literature.

**Adverse event reports**.  Dr. Ross opines that adverse event data from the FAERS database showed a signal "from as early as 2000."[42]  This opinion, however, is based entirely on Dr. Madigan's analysis, and Dr. Madigan has admitted there was no safety signal in 2012 that was not already present since the early 2000s.[43]  Thus, the FAERS data was not "newly acquired information."

Dr. Ross does not claim that the adverse events reported to Hospira constituted "newly acquired information."  He simply notes that when Pfizer/Hospira initiated a review of its safety database after Sanofi's December 2015 labeling change, it identified 146 cases of alopecia, of

---

[40]  *Id*. ¶ 133.

[41]  Dr. Schmider testified that he was not involved in creation of the Sanofi Core Data sheet or Sanofi's European labeling changes for docetaxel, and that he had no recollection of being aware of permanent hair loss as an issue while at Sanofi.  Ex. Q (Schmider Dep.) at 143:5-12; 163:2-11; 118:24-120:2; 124:19-125:19; 127:6-13; 131:20-132:8; 137:23-138:5.

[42]  Ex. I (Ross Rep.) ¶ 95.

[43]  Ex. DD (Madigan Dep.) at 76:11-12, 76:16-79:18.

which 43 were described as "permanent" or "irreversible."[44]  But Dr. Ross stops there and disregards what the Pfizer/Hospira clinical review of the adverse events reports—the document cited by Dr. Ross—went on to say.  The adverse event reports themselves (i.e., the information reported by the patient or patient's doctor or even a lawyer) identified docetaxel as the single agent or the only suspect drug in just 10 of the 43 cases.  Thus, according to the reporters, the vast majority of the 43 cases (33 or 76%) were confounded by co-suspect drugs (i.e., chemo- or hormone therapies believed to cause permanent hair loss).  Pfizer/Hospira delved deeper, however, examining medical records, and determined that docetaxel was the sole suspect drug in only *two* of the 43 reported cases of permanent alopecia.[45]

So small a number (whether 10 or two) did not constitute new information that permanent hair loss occurred with unexpected greater frequency.  According to Plaintiffs' expert, Dr. Feigal, there had been far more case reports of permanent hair loss reported in the scientific literature before Hospira's approval.[46]  She identifies 133 reported cases, or approximately 9 per year.  Even as many as 10 cases reported to Hospira between March 2011 and September 2016 represents two cases per year, or one-third the number of reports per year for the period before March 2011 (according to Dr. Feigal).

As a percentage of all women treated with Hospira's docetaxel, these reports are even less significant.  The "denominator" for these few adverse event reports was approximately 161,000 patients through mid-2014.   The total number of reports of permanent hair loss was

---

[44]   Ex. I (Ross Rep.) ¶ 139.

[45]   *See* SOF ¶ 31.

[46]   *See* Ex. EE (Feigal Rep.) Table 2.

therefore, 0.03 percent, at most.[47]  That percentage is far lower than the incidence rate reported by Sedlacek in 2006, not a risk occurring with greater frequency.

Moreover, "[u]nder a plain reading of the regulations, adverse event reports, without any analysis indicating causality, cannot constitute 'newly acquired information.'"  *Gayle*, 452 F. Supp.3d at 88.  *See also Sabol v. Bayer Healthcare Pharm.*, 439 F. Supp. 3d 131, 149 (S.D.N.Y. 2020) (finding that "observational studies such as case studies" were not sufficient evidence for a labeling change under the CBE regulation because the "authors here draw only a tentative, at best, suggestion of a causal relationship"); *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 669 (S.D.N.Y. 2017) (articles that express a desire for further investigation" do not meet the definition of newly acquired information.)  And Dr. Ross provided no such analysis.  *See* Part III.B.2, *infra*.

Thus, these small number of case reports were not "newly acquired information" that were the basis for a labeling change.  Rather, the key fact that triggered the change was that the FDA and Sanofi had already made a labeling change based on Sanofi's data that was not available to Hospira.[48]

### 2.    No reliable scientific evidence of causation

The CBE regulation itself requires more than new information about the greater severity or frequency of a risk.  It also requires that the information must reflect "evidence of a causal association" between the drug and the risk.  21 C.F.R. § 314.70 (c)(6)(iii).  This requirement reflects the FDA's cautious approach to drug labeling.  As the *Incretin-Based Therapies* MDL court held in granting the defendants' preemption summary judgment motion:

---

[47]   That percentage includes all 43 reports, even though there were confounding drugs used in 76 percent of those reports.  The percentage would be far lower if the percentage were calculated based on the of reports (2) of the use of docetaxel alone.

[48]   Ex. F (Mann Rep.) at 20-21.

[I]t bears repeating that ***the FDA's CBE regulations are designed to ensure that only scientifically justified information is provided in the labeling for an approved product.*** …   The regulations reflect the FDA's cautious approach to drug labeling, recognizing that "exaggeration of risk, or inclusion of speculative or hypothetical risks, could discourage appropriate use of a beneficial drug … or decrease the usefulness and accessibility of important information by diluting or obscuring it."[49]

In that case, where the FDA "maintained its position that scientific evidence of a causal association between incretin-based therapies and pancreatic cancer is ***indeterminate***,"[50] the court held that the defendants "cannot unilaterally change their product label."

The FDA came to the same conclusion about the relationship between docetaxel and permanent hair loss.  It found that virtually all the cases reported in the literature or Sanofi's safety database were confounded by the use of other agents known to cause hair loss.  In the end, although responding to patient advocacy groups, the FDA's medical officer concluded:  "I think that the sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data."[51]  That statement— "Cases of permanent alopecia have been reported"—makes no causal claim whatever.  In the FDA's view, any causal relationship was indeterminate "given the tremendous limitations of the available data," which included the fact both that (i) virtually every case of permanent hair loss also involved the use of confounding drugs and (ii) no report in the scientific literature ventured the conclusion docetaxel causes (or even potentially causes) permanent hair loss.  The scientific literature did posit a causal association as an hypothesis.  But the CBE regulations are designed to forbid the submission of labeling about risks that are speculative or hypothetical.  *Incretin-*

---

[49]   524 F. Supp.3d 1007, 1028 (S.D. Cal. 2021) (quoting *Albrecht*); *see Silverstein*, 2020 WL 6110909 at *8 ("Although the causal relationship need not be definitively established, it nevertheless must be scientifically reliable. … [I]t must conclusively establish, by scientifically valid measurable and statistically significant data, that the different or increased risks are actual and real." (citation omitted)).

[50]   *Incretin-Based Therapies*, 524 F. Supp.3d at 1029.

[51]   SOF ¶ 28; Ex. W, Prowell T to Diggs F, et al., Congressional Response Letter/Taxotere Adverse Events (Dec. 4, 2015).

*Based Therapies*, 524 F. Supp.3d at 1028; *McGrath v. Bayer Healthcare Pharmaceuticals, Inc.*, 393 F. Supp.3d 161, 167 (E.D.N.Y. 2019).

The FDA can, of course, mandate whatever language it deems appropriate.  But where the available information did not substantiate a causal relationship of any kind, Hospira, like the defendants in *Incretin-Based Therapies*, could not unilaterally change the docetaxel labeling.

Even if the evidence were sufficient to submit a labeling change, however, Hospira did not have that evidence.  Sanofi, the holder of the Reference Listed Drug, had the vast majority of the information about docetaxel, not Hospira, as the 505(b)(2) applicant.  Accordingly, it would be "highly unusual" for Hospira to initiate a labeling change outside of the Sanofi label unless "the literature or the adverse event reports raised a concern specific to [Hospira's] formulation." Ex. F (Mann Rep.) 9.  When the FDA approved the cases-of-permanent-alopecia-have-been-reported language, it did so based upon Sanofi's review of more than 2000 case reports of alopecia, including 117 reports of permanent alopecia, as well as the previously-submitted Sanofi clinical trial data.  This was information in the possession of Sanofi, not Hospira.  Thus, the information on which Sanofi and the FDA relied as the "newly acquired evidence" was not information that Hospira had and could have used as the basis for a labeling change.  There was no basis for Hospira to make a change to its label before Sanofi and the FDA had decided to change the Sanofi label.

**CONCLUSION**

As an 505(b)(2) applicant, Hospira was obligated to follow the already FDA-approved labeling for the Reference Listed Drug upon approval of its own docetaxel.  Thereafter, Hospira could change the labeling only if it had "newly acquired information."  The FDA determined in late 2015 that Sanofi had such information, but that information was nearly 20 years' worth of case reports in Sanofi's safety database and the Sanofi clinical trial data, to which only it had access.  That information was the "tipping point," and Hospira did not have it.  As Dr. Ross rightly stated, "between the time frame that I'm talking about and when [Hospira] actually

25

updated it, ***there was nothing new***.  There was ***nothing***— ….."[52]  Accordingly, it was impossible under federal law for Hospira to have made the labeling change purportedly required by state law.

Dated: November 12, 2021                          Respectfully submitted,

                                                  */s/ Heidi K. Hubbard*
                                                  Heidi K. Hubbard
                                                  Richmond T. Moore
                                                  Neelum J. Wadhwani
                                                  **WILLIAMS & CONNOLLY LLP**
                                                  725 Twelfth Street, N.W.
                                                  Washington, D.C. 20005-5901
                                                  Telephone: 202-434-5000
                                                  hhubbard@wc.com

                                                  John F. Olinde (Bar No.1515)
                                                  Peter J. Rotolo (Bar No. 21848)
                                                  **CHAFFE MCCALL LLP**
                                                  1100 Poydras Street
                                                  New Orleans, LA 70163
                                                  Telephone: 504-858-7000
                                                  olinde@chaffe.com

                                                  *Counsel for Defendants Hospira, Inc.,*
                                                  *Hospira Worldwide, LLC, formerly doing*
                                                  *business as Hospira Worldwide, Inc., and*
                                                  *Pfizer Inc.*

---

[52] Ex. AA (Ross Dep.) at 191:17-21.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Heidi K. Hubbard*