# EXHIBIT B

Page 1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3  * * * * * * * * * * * * * * * * * * * *
4  IN RE: TAXOTERE (DOCETAXEL)    MDL NO. 2740
   PRODUCT LIABILITY LITIGATION
5
6  This Document Relates to:
7
   Clare Guilbault vs. Hospira, et
8  al.,
   No. 2:16-cv-17061
9
10 * * * * * * * * * * * * * * * * * * * *
11
12              VIDEOTAPED DEPOSITION
13                       OF
14            CHRIS THEODOSSIOU, M.D.,
15      Taken on Wednesday, November 11, 2020
16            Commencing at 1:25 p.m.
17                    Via Zoom
18
19
20
21
22
23
24
25

Page 14

1  Q. When was the last time you spoke with
2  Ms. Guilbault?
3  A. Probably the last time I saw her physically,
4  and I'm not sure when that would be. You probably
5  have access to the records. I -- I don't, and I'm
6  still trying to get, you know, to the chart.
7  Q. Okay. Well, let me ask this question: Is
8  the last time you would have spoken with her be the
9  last time that you physically saw her in a follow-up
10  visit in your office?
11  A. Yes, sir.
12  Q. Based upon your care and treatment, how is
13  Ms. Guilbault doing currently with regard to her
14  breast cancer?
15  A. She is in remission. But, that being said,
16  she was a stage 3, which means she is at a higher
17  risk for recurrence.
18  Q. Was she a stage 3A, 3B?
19  A. I can't answer.
20  Q. Do you --
21  A. I know she's a stage 3, based on the number
22  of lymph nodes, but I don't have the chart in front
23  of me to tell you. She's a stage 3. And, you know,
24  in regards to the treatment, it doesn't make a
25  difference if she's a 3A or a 3B.

Page 15

1  Q. And it's now been, I guess, more than six
2  years since she completed her chemotherapy from
3  breast cancer; correct?
4  A. Correct.
5  Q. And she completed her chemotherapy under
6  your care; is that right?
7  A. Yes, sir.
8  Q. And so she's been without the recurrence of
9  cancer for more than six years --
10  A. Correct.
11  Q. -- right?
12  A. Uh-huh.
13  Q. Is that significant?
14  A. It is significant, but she's not out of the
15  woods. She can still recur, and she will be in risk
16  for recurrence for the rest of her life. The risk
17  will diminish over time, but it will never go down
18  to zero.
19  Q. And do you credit her lack of recurrence at
20  this point to the treatment regime that you've
21  prescribed for her?
22  A. I --
23     MS. REYNOLDS: Object to form.
24  BY MR. ROTOLO:
25  Q. It was just an objection by opposing

Page 16

1  counsel.
2  A. Oh, okay.
3  Q. You can answer.
4     MS. REYNOLDS: Sorry.
5     THE WITNESS: Well, I would attribute that
6     to two things: Number one, the biology of
7     her cancer; and number two, the treatment
8     that she received.
9  BY MR. ROTOLO:
10  Q. And is part of that treatment she received
11  from chemotherapy?
12  A. Initially, she received eight rounds of
13  chemotherapy, and then she had an operation.
14  Q. And the chemotherapy that you prescribed for
15  her was Adriamycin and Cytoxan, followed by
16  Docetaxel?
17  A. This was the standard preoperative regimen
18  back then. Since then I have switched, but that is
19  what I gave her.
20  Q. When you say that was the standard
21  preoperative regimen in 2013, what do you mean by
22  that?
23  A. The standard preoperative regimen is four
24  cycles of an Adriamycin-containing regimen and then
25  four cycles of a Taxane. There are two Taxanes.

Page 17

1  There was Taxotere and there was Taxol. The
2  nationwide studies that were done in the
3  preoperative setting used Taxotere or Docetaxel
4  rather than Taxol. So I was trying to emulate the
5  studies in using Taxotere.
6     But I had several cases with the issue of
7  alopecia, so we made the decision systemwide to
8  switch from Taxotere to Taxol.
9  Q. Does Ochsner not use Taxotere at all
10  anymore?
11  A. No. No. No. We still use it. But in the
12  preoperative setting, the medical oncologists that
13  treat breast cancer, we have pretty much abandoned
14  Taxotere or Docetaxel and switched to Paclitaxel or
15  Taxol.
16  Q. And when did that occur?
17  A. It's on an individual basis. The straw that
18  broke my back was when I saw a patient that I had
19  treated several years ago, and then her hair never
20  grew back. She looked like she was still under
21  chemotherapy. And that's when I decided that, you
22  know, it's okay to switch to Taxol. There's no
23  evidence that we're compromising the care by doing
24  that.
25     So, currently, my preoperative regimen is

5 (Pages 14 - 17)

Page 54

1  hormonal treatments and "Denosum"?
2  A. Denosumab, yes, sir.
3  Q. So if that lesion on T12 was cancer, then
4  she would not need chemotherapy; correct?
5  A. Correct. Correct.
6  Q. Because that would mean her cancer was not
7  curable?
8  A. Let me -- let me rephrase that. She would
9  not need to start with chemotherapy. Eventually she
10 would have received chemotherapy, but typically we
11 start with hormonal agents. We sequence the
12 patients through three or four hormonal agents, and
13 once we exhaust the endocrine options, we go to
14 chemotherapy.
15 Q. And then you said, "The rationale for the
16 above approach was explained to her. At her
17 request, I also discussed the life expectancy
18 associated with stage 4 breast cancer with bone only
19 metastasis."
20     And, Doctor, what would that discussion be
21 on the life expectancy --
22 A. Well --
23 Q. -- in this situation?
24 A. -- again, this was 2013. So back then the
25 generic survival for a stage 4 patient was

Page 55

1  24 months. But if you have bone-only metastases, no
2  visceral metastases, what we call the median
3  survival was 30 months. So I'm sure I had this
4  discussion with her.
5  Q. So, in the case, if that was a single bone
6  metastasis, the median would have been a 30-month
7  survival?
8  A. Correct. And the way I usually phrase it to
9  the patients is that if I have 10 patients like you
10 diagnosed today, in 30 months I'm going to be down
11 to 5. And if you double that and you go to
12 60 months, I will still have 2 patients, except I
13 have no idea at the very beginning who those 2 will
14 be out of the initial 10. That's the discussion
15 that takes place.
16 Q. And, Doctor, on this visit on September 17th
17 of 2013, I do not see that you made a recommendation
18 for chemotherapy; is that correct?
19 A. Correct. Because we don't if she's a stage
20 3 or a stage 4.
21 Q. Okay.
22 A. And if she were a stage 4, she wouldn't go
23 through chemotherapy initially.
24 Q. And as you left it at this visit, you
25 were -- there was going to be potentially a biopsy

Page 56

1  of the T12?
2  A. Correct.
3  Q. Doctor, do you know how large
4  Ms. Guilbault's tumor was?
5  A. I don't recall.
6  Q. If it may help, if you can turn to Tab --
7  A. I'm looking at my note that says, "There was
8  an ill-defined mass in the left breast. She had
9  palpable lymph nodes."
10     But I'm sure there's an ultrasound somewhere
11 that, you know, gives us the measurements.
12 Q. If you look at Tab 6, I think there's the
13 MRI of the breast. Would that be helpful?
14 A. Yes.
15 Q. Tab 6 is from Touro Imaging Center of
16 Ms. Guilbault of an MRI that was performed on
17 September 9th of 2013.
18     MR. ROTOLO: We'll mark that as Exhibit 2.
19     (Whereupon Exhibit No. 2 was marked for
20     identification.)
21 BY MR. ROTOLO:
22 Q. Can you tell from the report of the MRI the
23 size of her tumor?
24 A. Yeah, they say that it measures 2.2 by 1.9
25 by 1.8 centimeters, and then there's a satellite

Page 57

1  lesion 1.1 by 1.9.
2  Q. Would that have been the lymph nodes or
3  another lesion?
4  A. No. That's a satellite lesion in the
5  breast, not the lymph nodes.
6  Q. Doctor, that record that we just -- your
7  initial visit with Ms. Guilbault was on
8  September 17th of 2013, if you remember what we just
9  looked at.
10 A. Yes, sir.
11 Q. Can you turn to Tab 10(b).
12 A. Yes, sir.
13 Q. Doctor, this is a note labeled, "Encounter
14 Information: Telephone" that was contained in
15 Ms. Guilbault's medical records from Ochsner dated
16 the next day, September 18th of 2013.
17     Do you see that, at the top of Tab 10(b)?
18 A. I see that.
19 Q. Are you there, Doctor?
20 A. Yes. I see it.
21 Q. Okay. If you could turn to Bates Number
22 page 224 of that record.
23 A. Yes.
24 Q. It appears to be notes between -- e-mails
25 between you and your nurse.

15 (Pages 54 - 57)

Page 58

1  A. My nurse.
2  Q. April Wendt?
3  A. Uh-huh.
4  Q. And it starts out April e-mailing you on
5  9/18 of 2013, "Patient is scheduled for 9/24. We'll
6  see you on 9/25. Is that okay?"
7      And you respond right above that, "That's
8  good. What about her bone scan? Can she have it
9  sooner?"
10     And then April Wendt responds, "Bone scan is
11 9/24. That's the earliest date they can do it."
12     And then you respond, "That's fine. Can you
13 put her on the schedule for chemotherapy next week,
14 please. She will probably receive AC."
15     Do you see that?
16 A. Yes, I see that.
17 Q. When did you make the decision that
18 Ms. Guilbault was going to have chemotherapy?
19 A. I hadn't made it by the time those e-mails
20 had been written, but, you know, we have to plan in
21 advance and reserve a chemotherapy chair. So that's
22 why I said she will probably receive AC. So the
23 decision had not been made yet. I'm just reserving
24 a slot for the chemotherapy.
25 Q. So at that point there had been no biopsy or

Page 59

1  bone scan; correct?
2  A. Correct.
3  Q. Can you turn for me, please, to Tab
4  Number 11, which we'll mark as Exhibit 3.
5      (Whereupon Exhibit No. 3 was marked for
6      identification.)
7      THE WITNESS: Yes, sir.
8  BY MR. ROTOLO:
9  Q. Doctor, what is the multidisciplinary breast
10 cancer conference at Ochsner, as it existed in
11 September of 2013?
12 A. We would meet once a week and discuss the
13 new cases prospectively. So, typically, there's a
14 presentation. We look at the mammograms, the MRIs.
15 We look at the pathologist slides, if they're
16 available; and then the surgeon, the medical
17 oncologists, who were present at the meeting, and
18 the radiation oncologists formulate a plan.
19 Q. And who all is on that committee, Doctor?
20 I'm sorry. I may have missed -- you may have said
21 that.
22 A. I'm sorry. Can you repeat that question,
23 please?
24 Q. Sure.
25     Who was on the multidisciplinary breast

Page 60

1  cancer conference that would have reviewed the case
2  with you?
3  A. Several staff physicians. There's typically
4  one or two staff radiologists, typically two to
5  three medical oncologists, one or two radiation
6  oncologists, two to three surgeons, the pathologist,
7  and the trainees.
8  Q. And what is the purpose for presenting the
9  case to this conference?
10 A. It is standard operating procedure to -- in
11 order to maintain our accreditation, the cases have
12 to be presented prospectively and discussed.
13 Q. After the case is presented, is there a
14 report that is done to outline what the findings of
15 the conference were?
16 A. Yes, sir. And it's page 31 in the exhibit.
17 Q. So this is going to be the report of what
18 was determined at the committee?
19 A. Correct.
20 Q. At the conference?
21 A. Correct. It looks like that I have written
22 the plan because I was the one who presented it.
23 Q. And what was the plan --
24 A. The plan --
25 Q. -- on that?

Page 61

1  A. You know, we felt this is a possible
2  metastasis in T12. We said get an MRI to see if
3  there was any bone destruction. And if the MRI is
4  negative, preoperative chemotherapy. When you have
5  positive lymph modes, the standard of care is to
6  give preoperative chemotherapy.
7      So we knew that there was cancer on the
8  lymph nodes from the biopsy. So once you've ruled
9  out stage 4, the standard of care would have been
10 preoperative chemotherapy.
11 Q. And what if you could not rule out the stage
12 4?
13 A. Can you repeat the question, please?
14 Q. Sure.
15     And what would happen if you could not rule
16 out the stage 4 cancer?
17 A. We give them the benefit of the doubt. You
18 know, someone that we think that it is likely that
19 they are not stage 4 -- someone who has a small
20 nodule in the lung that is not amenable to a biopsy,
21 someone who has a small bone lesion that's not
22 amenable to a biopsy -- we give them the benefit of
23 the doubt and we treat them with curative intent,
24 which means chemotherapy.
25 Q. And when you determine the chemotherapy

16 (Pages 58 - 61)

Page 62

1  regime when you cannot rule out a stage 4, are you
2  balancing the need to cure them if they're stage 3
3  and to slow progression if they're stage 4?
4        MS. REYNOLDS:  Object to form.
5        THE WITNESS:  When we cannot rule out stage
6     4, we treat them aggressively for a
7     presumptive curable cancer.
8  BY MR. ROTOLO:
9     Q.  And, Doctor, the date on the report of the
10 multidisciplinary breast cancer conference that we
11 just looked at of -- looks like the form is dated
12 September 19th.
13       Would that be the date that it was presented
14 to the conference?
15    A.  Yes, sir.
16    Q.  So if you could turn to Tab 13, which is
17 going to be Exhibit Number 4.
18       (Whereupon Exhibit No. 4 was marked for
19       identification.)
20 BY MR. ROTOLO:
21    Q.  It begins with page Number 273.
22       Do you see that, Doctor?
23    A.  I have it.
24    Q.  And it looks like a telephone encounter.
25 And then if you look at Bates Number page 275, it

Page 63

1  looks like it's a message from Ms. Guilbault to --
2  or Ms. Wendt sending an e-mail saying:
3        "Patient wanted to push back her medical" --
4  "M.D. appointment and chemo start date to either
5  Thursday or Friday of next week.  She has concerns
6  about her job because she's already taken a lot of
7  time off.  I've passed the message on to
8  Robin Jackson, R.N., to call patient on Monday."
9        How did Ms. Guilbault learn that she was
10 going to undergo chemotherapy?
11    A.  It may have been a conversation that's not
12 documented.  I don't recall.  I'm sure there was a
13 radiologic study done in between.  Maybe the MRI
14 didn't show any bone destruction.
15    Q.  And, Doctor, would it be a standard practice
16 if a patient is undergoing chemotherapy to send them
17 for a cardiac evaluation?
18    A.  That's standard operating procedure.
19    Q.  Is that for all types of chemotherapy
20 medications or just certain ones?
21    A.  Just for the regimens that contain
22 Adriamycin.  In her case the Adriamycin --
23    Q.  Did --
24    A.  -- is what triggered the cardiac workup.
25    Q.  So if you look at Tab 15, which we'll mark

Page 64

1  as Exhibit 5.
2        (Whereupon Exhibit No. 5 was marked for
3        identification.)
4  BY MR. ROTOLO:
5     Q.  That is a consult with -- I think it was
6  Dr. Polin in cardiology.  And that would have been
7  ordered by you because you were contemplating giving
8  her Adriamycin?
9     A.  Correct.  I'm pretty sure that I ordered an
10 echocardiogram at some point.
11    Q.  Okay.  If you go to Tab 15, which is
12 Exhibit 5, Bates Number page 268.
13    A.  Yes, sir.
14    Q.  And you see that this is Dr. Polin's
15 progress note where she indicates:  "She was
16 recently diagnosed with left-sided breast cancer
17 with positive lymph nodes and possible thoracic
18 spine metastasis.  She is meeting with
19 Dr. Theodossiou next week to discuss her
20 chemotherapy regime.  She will likely be receiving
21 XRT also.  She has a longstanding hypertension,
22 which has been reasonably controlled."
23       And then -- so you would not have had a
24 discussion about chemotherapy with her before you
25 sent her for the cardiac consult?

Page 65

1     A.  I don't recall the specifics.  You know,
2  there was a time that any patient given potentially
3  cardiotoxic medication, we would automatically send
4  them to Dr. Polin.
5     Q.  Did Ms. Guilbault's hypertension -- long
6  history of hypertension have any effect on the
7  chemotherapy regimen that you were prescribing?
8     A.  Only if there was heart failure.  And I'm
9  sure there was an echocardiogram ordered, and I'm
10 sure it was normal; otherwise, I wouldn't have
11 treated her the way I did.  Yeah, it says her echo
12 was normal.  I'm looking at Dr. Polin's note, so...
13    Q.  What about a family -- I'm sorry.  Go ahead.
14    A.  Yeah.  What we call the left ventricular
15 ejection fraction was calculated to be 60 percent,
16 which is -- you know, that clears her to go for
17 chemotherapy.
18    Q.  Would there be any concern with the family
19 history of cardiac disease?
20    A.  No, sir.
21    Q.  Doctor, you indicated that you had sent her
22 for another MRI?
23    A.  My note indicates that she was going to get
24 an MRI of the thoracic spine.
25       MR. ROTOLO:  Okay.  If you look at Tab 17,

17 (Pages 62 - 65)

Page 66

1  which we'll mark as Exhibit 6.
2      (Whereupon Exhibit No. 6 was marked for
3      identification.)
4  BY MR. ROTOLO:
5   Q. And, specifically, at Bates Number page 280.
6      Would that be the MRI report that you had
7  ordered for her, that it looks like it occurred on
8  September 23rd of 2013?
9   A. Yes, sir.
10  Q. What was the finding of the MRI that you had
11 ordered?
12  A. I'll read it. "Enhancing lesion within the
13 anterior column of the T12 vertebral body which
14 corresponds to the area of increased FDG uptake on
15 recent PET scan, highly concerning for metastatic
16 disease in this patient with a reported history of
17 breast cancer."
18  Q. And so what was the significance of the MRI
19 finding?
20  A. We look for bone destruction. If you see
21 bone destruction, you know that this is cancer, and
22 sometimes you can forgo the biopsy. This, again,
23 looks highly suspicious for metastatic disease.
24  Q. Doctor, if you could turn to Tab 21, which
25 we'll mark as Exhibit 7.

Page 67

1      (Whereupon Exhibit No. 7 was marked for
2      identification.)
3  BY MR. ROTOLO:
4   Q. At the top of that Tab 21, Exhibit 7, it
5  says, "Encounter information: Office visit,
6  Ms. Guilbault," dated September 25th of 2013.
7      Do you see that?
8   A. Yeah, I see that.
9   Q. If you move forward to your progress note,
10 which begins on the bottom of page 335.
11  A. Yeah. I wonder. Was there a biopsy? I
12 mean the only --
13  Q. Doctor --
14  A. The only reason not to do a biopsy would be
15 if the radiologist felt that it wasn't amenable to a
16 biopsy.
17  Q. Doctor, we'll get there, but I will -- if we
18 can move ahead to page 337.
19  A. Yes, sir.
20  Q. Your plan. It says, "I had a long
21 discussion with Ms. Guilbault and her husband. I've
22 discussed her case with Dr. Stolier. It's possible
23 that she may have stage 4 disease with a solitary
24 bone metastasis. However, due to the location of
25 the suspicious lesion anteriorly on the bottom

Page 68

1  of" -- "body of T12, it is not safe to obtain a
2  biopsy to confirm the stage."
3      Do you have a recollection that the T12
4  lesion could not be biopsied before treatment?
5   A. I have to go by my notes. I mean that's
6  probably the discussion that took place with the --
7  in direction of radiologist. Again, when we have a
8  lesion that's not amenable to a biopsy, you always
9  give the patient the benefit of the doubt. And
10 instead of, you know, saying that we're not going to
11 try to cure you, we will treat her for a presumptive
12 stage 3, which is curable.
13  Q. Given the -- what you looked at on the MRI
14 of the breast and the staging, would Ms. Guilbault's
15 cancer be considered invasive carcinoma?
16  A. It is invasive, based on the biopsy.
17  Q. Based on this information that you had at
18 this time, would Ms. Guilbault's cancer be
19 considered early stage breast cancer?
20      MS. REYNOLDS: Object to form.
21      THE WITNESS: It wasn't early stage. I
22      mean, she -- you know, she was at least a
23      stage 2, maybe a stage 3, or a stage 4. But
24      she wasn't an early stage. The reason I'm
25      saying she's at least a stage 2 is that

Page 69

1      there has been a lymph node biopsy that
2      showed cancer. So she's not a stage 1,
3      period.
4  BY MR. ROTOLO:
5   Q. And you continue on in your note, "I think
6  that a reasonable approach would be for her to
7  proceed with neoadjuvant chemotherapy, followed by
8  resection. Upon completion of her resection, we can
9  offer radiation to T12 area and hormonal therapy
10 with aromatase inhibitors."
11      So that was the plan going forward?
12  A. That was the plan going forward, due to the
13 fact that the lesion was not amenable to a biopsy.
14  Q. So, Doctor, when that occurs, you are
15 treating her hoping that the bony metastasis is not
16 cancer?
17  A. Correct.
18  Q. But if it is cancer, you haven't done any
19 harm to Ms. Guilbault?
20  A. You haven't done any harm. But, you know,
21 if I flip the argument: If she turns out to be a
22 stage 3 and you treat her as a stage 4, you did do
23 her harm.
24  Q. Correct. So you would do what you can to
25 give her the best chance should it turn out to be

18 (Pages 66 - 69)

Page 82

1  there are two doses for Taxotere.  There is 75 per
2  square meter; there's a hundred per square meter.
3  And the dose, when you treat with curative intent,
4  is always a hundred.
5      Yes, we do see more myelosuppression.  Yes,
6  the risk of ending up in the hospital with an
7  infection is higher, but that's the dose that was
8  studied on the NSABP trial that was quoted.  So
9  that's the dose we use for preoperative chemo.
10     Q.  Did Ms. Guilbault ask you for alternative
11 chemotherapy regimes for her treatment?
12     A.  I don't recall.  But even she did -- if she
13 did, I would have told her that based on the
14 evidence available at that time, this was the best
15 regimen; because, as I mentioned, you go from the
16 12-percent complete remission rate to 24.6-percent
17 complete remission rate.
18     Q.  Did you -- if I'm understanding your
19 testimony, the only way that Ms. Guilbault would not
20 be getting chemotherapy would be if you had
21 determined she was stage 4?
22         MS. REYNOLDS:  Object to form.
23         THE WITNESS:  The only way she would not be
24     given chemotherapy initially would have been
25     if we had determined that she was stage 4;

Page 83

1      correct.
2  BY MR. ROTOLO:
3      Q.  Did you consider the potential risk of hair
4  loss when developing her treatment plan, her
5  chemotherapy treatment plan?
6          MS. REYNOLDS:  Object to form.
7          THE WITNESS:  I don't -- I don't recall the
8      details, but, you know, you're trying to
9      cure someone.  So you will go with the best
10     regimen available; and, again, at -- there
11     was evidence that the patient where you
12     achieve a complete remission are the ones
13     with the highest chance of a cure.
14        So if I have to pick between two
15     regimens, one of them with a 12-percent
16     complete remission rate versus 24.6 percent,
17     obviously, I'm going to try to go for the
18     one with the highest remission rate.  And I
19     tell them that, you know, it is longer.  You
20     will be getting eight runs of chemotherapy
21     rather than four, but you double the
22     complete remission rate.
23 BY MR. ROTOLO:
24     Q.  Did she raise any objections to the
25 chemotherapy regime that you recommended for her?

Page 84

1      A.  I don't recall, but I don't think that she
2  did.
3      Q.  And is it your practice to let your patients
4  know that they can contact you if they have concerns
5  or questions as they begin their course of
6  treatment?
7      A.  Of course.
8      Q.  Did Ms. Guilbault express concerns to you
9  about her chemotherapy regime while she was
10 undergoing treatment?
11     A.  I don't recall any specific complaints or
12 concerns, but it's --
13     Q.  What was your understanding of why she
14 wanted to proceed with chemotherapy?
15         MS. REYNOLDS:  Object to form.
16         THE WITNESS:  It was based on a
17     recommendation.  You know, she trusted the
18     team, and she went with whatever we
19     recommended.
20 BY MR. ROTOLO:
21     Q.  Was it your understanding that Ms. Guilbault
22 wanted to pursue all available treatment options to
23 try to cure her cancer?
24     A.  Correct.
25         MS. REYNOLDS:  Object to form.

Page 85

1  BY MR. ROTOLO:
2      Q.  In addition to chemotherapy, your treatment
3  plan for Ms. Guilbault also included surgery,
4  radiation, and aromatase inhibitor treatment with
5  Arimidex; is that right?
6      A.  Correct.
7      Q.  Doctor, before you prescribed the Docetaxel
8  for the first time, did you review the prescribing
9  information on the label?
10     A.  I don't recall, sir.  It's been a long time.
11 I probably told her that, you know, there are
12 certain side effects specific to Docetaxel.  I mean,
13 we do see leg swelling.  They have to take premeds
14 for the Docetaxel.  So I probably had this
15 discussion.  I do not recall whether I had a
16 discussion specifically pertaining to the risk of
17 permanent alopecia.  I just don't remember.
18     Q.  Thank you, Doctor, and my question may have
19 not been clear.
20        But when you first started practicing
21 medicine and Docetaxel became an option, did you
22 review the prescribing information for Docetaxel
23 before you prescribed it the first time?
24     A.  I'm sure I did.
25     Q.  And that would have been reviewing the

22 (Pages 82 - 85)

Page 86

1 prescribing information that's contained on the FDA
2 approved label?
3    A. You can pull up the label from different
4 online links. So I typically, you know, pull up the
5 link and read on it.
6    Q. And you're aware that Taxotere is the brand
7 name for Docetaxel; correct?
8    A. Correct.
9    Q. And at the time you prescribed Docetaxel to
10 Ms. Guilbault in September of 2013, would you have
11 reviewed at some point before then the labeling for
12 Taxotere, the branded product?
13    A. I probably had at some point.
14    Q. Did you review the Hospira Docetaxel label
15 before prescribing Docetaxel for Ms. Guilbault?
16    A. I don't recall.
17       MS. REYNOLDS: Objection to form.
18       THE WITNESS: I can't answer that question.
19 BY MR. ROTOLO:
20    Q. So you don't recall whether you relied upon
21 any information in the Hospira label before
22 prescribing Docetaxel to Ms. Guilbault?
23    A. No, sir, I do not recall.
24    Q. Did you prescribe Hospira's Docetaxel as the
25 Docetaxel product that you wanted Ms. Guilbault to

Page 87

1 receive?
2    A. I prescribed Docetaxel, and it's up to the
3 pharmacy to determine where they're going to procure
4 it for them. I don't prescribe a specific company's
5 product.
6    Q. So, if I'm hearing you right, when you
7 prescribe Docetaxel, you don't know which
8 manufacturer's product will be administered to the
9 patient?
10    A. Correct. The chemotherapy order that I
11 write says Docetaxel, but I have no idea where the
12 Docetaxel is coming from.
13    Q. Does your prescription go to the pharmacy
14 and then get filled, whichever Docetaxel the
15 infusion pharmacy has in stock?
16    A. Yes, sir.
17    Q. So the patient may receive a version made by
18 Sanofi, the brand name, or a version made by another
19 company, like Hospira?
20    A. Correct.
21    Q. And that was the case with Ms. Guilbault?
22 You didn't know which manufacturers of Docetaxel she
23 had received during her treatment?
24    A. No, sir. I don't know where the product is
25 coming from.

Page 88

1    Q. Doctor, would you agree that sometimes a
2 patient can experience an adverse event from a
3 medication that is nobody's fault?
4    A. Yes.
5       MS. REYNOLDS: Object to form.
6       THE WITNESS: Yes.
7 BY MR. ROTOLO:
8    Q. Have you ever prescribed a chemotherapy
9 agent for a patient and that -- other than what
10 we've talked about today, and that patient has
11 experienced an adverse event?
12    A. Many times.
13    Q. Did that mean that your initial decision to
14 use that product was improper?
15    A. No. The decision to use the regimen is
16 based on evidence. And the evidence here was the
17 NSABP trial.
18    Q. And would you agree that hindsight isn't the
19 best way to analyze a decision to use a product?
20    A. Correct.
21    Q. At the time you recommended treatment for
22 breast cancer with Docetaxel in September of 2003,
23 was that your best judgment of what was right for
24 Ms. Guilbault at the time?
25       MS. REYNOLDS: Object to form.

Page 89

1       THE WITNESS: It was based on the NSABP
2       trial that showed that there was a
3       24.6-percent complete remission rate, which
4       is the highest ever reported.
5 BY MR. ROTOLO:
6    Q. And you stand behind your decision to
7 prescribe AC plus Docetaxel to Ms. Guilbault?
8    A. Absolutely.
9       MS. REYNOLDS: Object to form.
10 BY MR. ROTOLO:
11    Q. Under the same circumstances, and without
12 being able to predict what goes on in the future,
13 would you make the same decision to prescribe that
14 chemotherapy regime to Ms. Guilbault?
15       MS. REYNOLDS: Object to form.
16       THE WITNESS: You mean now?
17 BY MR. ROTOLO:
18    Q. That --
19       (Simultaneous crosstalk.)
20       THE WITNESS: I have -- I'm sorry. Say that
21       again, please.
22 BY MR. ROTOLO:
23    Q. Under the same circumstances and without
24 being able to predict what would happen in the
25 future, would you make the same decision to

Page 122

1 that. She probably didn't, but that would been my
2 answer had she asked me.
3    Q. Let me have my assistant pull up some
4 pictures that were provided by Ms. Guilbault in
5 January of 2020, which would have been about five
6 years after the other ones that we've looked at and
7 about six or seven months before this last visit
8 that you had with her. And we'll mark those as
9 Exhibit 21.
10       (Whereupon Exhibit 21 was marked for
11       identification.)
12 BY MR. ROTOLO:
13    Q. And those will be shown on the screen. You
14 don't have them in your notebook.
15       Do you see those -- are you able to see
16 those pictures on your screen, Doctor?
17    A. Yes, sir. I see the first one.
18       MR. ROTOLO: And can you show him the second
19       one. There's one more, I think.
20    Q. And, Doctor, do those pictures look like
21 what you remember seeing of Ms. Guilbault's hair the
22 last time you examined her scalp?
23    A. Yes, sir. Pretty much that's what she looks
24 like.
25    Q. Do you see any difference between the

Page 123

1 pictures that we looked at in June of 2015 and these
2 from January of 2020?
3       MS. REYNOLDS: Object to form.
4       THE WITNESS: You know, it's hard for me to
5       tell without looking at them side-by-side,
6       but I wouldn't with the vertex. I'm not
7       going to say that it's any better.
8 BY MR. ROTOLO:
9    Q. Does it look like it's gotten worse?
10       MS. REYNOLDS: Object to form.
11       THE WITNESS: I can't really tell. Clearly,
12       it hasn't gotten better.
13 BY MR. ROTOLO:
14    Q. Doctor, would it be fair to say that you
15 would leave that determination up to a
16 dermatologist, and someone more experienced in
17 alopecia?
18    A. That would be fair.
19       MR. ROTOLO: If you could take those down,
20       please.
21    Q. Doctor, what is the difference between --
22       Oh. Doctor, the photographs that we looked
23 at, both from 2015 and 2020, can you say with any
24 degree of certainty, medical certainty, that the
25 hair loss that we saw was caused by Docetaxel?

Page 124

1       MS. REYNOLDS: Object to form.
2       THE WITNESS: I think that it is more likely
3       than not that this is a toxicity of
4       Docetaxel. It is consistent with a pattern
5       that I have seen previously with Docetaxel.
6 BY MR. ROTOLO:
7    Q. Can you rule out a family history of female
8 pattern baldness?
9       MS. REYNOLDS: Object to form.
10       THE WITNESS: I cannot rule out, but it
11       would be unlikely -- way less likely than
12       Docetaxel.
13 BY MR. ROTOLO:
14    Q. Can you rule out Arimidex that was started
15 while her hair was regrowing?
16       MS. REYNOLDS: Object to form.
17       THE WITNESS: It would be very, very, very
18       unusual for that pattern to be with the --
19       associated with the Anastrozole.
20 BY MR. ROTOLO:
21    Q. Doctor, what's the difference between a
22 clinical trial and a case report?
23    A. A case report is an anecdotal case or a
24 series of anecdotal cases. A clinical trial,
25 typically, there is randomization; not always, but

Page 125

1 for a phase 3 clinical trial, there is
2 randomization.
3    Q. Do you agree with me that a case report does
4 not equate to causation?
5    A. Correct.
6    Q. Doctor, are you familiar with what the
7 current Docetaxel label states with regard to
8 alopecia?
9    A. I haven't read it.
10    Q. Doctor, is the current language -- the
11 current FDA-approved language in the Hospira
12 Docetaxel label refers only to cases of permanent
13 hair loss have been reported.
14       Do you know if that's what it says?
15       MS. REYNOLDS: Object to form.
16       THE WITNESS: I haven't read the specific,
17       you know, package insert from Hospira.
18 BY MR. ROTOLO:
19    Q. Well, would you agree that if it only -- if
20 the FDA-approved labels says that cases of permanent
21 alopecia have been reported, that that does not say
22 that Docetaxel causes permanent hair loss?
23       MS. REYNOLDS: Object to form.
24       THE WITNESS: Again, between the two
25       Taxanes, that's the only Taxane where we

32 (Pages 122 - 125)

Page 126

1   have seen those anecdotal cases. So that's
2   as far as one can go.
3  BY MR. ROTOLO:
4     Q. Doctor, you testified earlier that case
5  reports were not causation; correct?
6     A. Correct.
7     Q. And if the label says that cases of
8  permanent alopecia have been reported, would you
9  agree with me that those case reports do not equate
10 to causation?
11       MS. REYNOLDS: Objection to form.
12       THE WITNESS: These reports are not
13    hypothesis-generated. You know, they always
14    raise a red flag, and when you see a lot of
15    those, you wonder.
16 BY MR. ROTOLO:
17    Q. You wonder, but it doesn't establish
18 causation, does it, Doctor?
19    A. It doesn't establish --
20       MS. REYNOLDS: Objection to form.
21       THE WITNESS: It doesn't establish, but it's
22    enough to sway us to change the pattern of
23    treatment.
24 BY MR. ROTOLO:
25    Q. Doctor, I'm going to look through my notes,

Page 127

1  but instead of delaying things, I'm going to turn
2  you over to Jessica in case she has any questions
3  for you while I do that.
4     A. Okay.
5       MS. REYNOLDS: Just a moment. Let's see.
6  EXAMINATION
7  BY MS. REYNOLDS:
8     Q. Thank you so much for being here with us
9  today, Dr. Theodossiou. I greatly appreciate it,
10 and I would like to just apologize formally for my
11 technological glitch earlier.
12      I do have some questions or some issues that
13 I'd like to discuss with you, if that's okay.
14    A. Yes, ma'am.
15    Q. One of the primary ones being: I want to
16 make sure that I fully understand the best that I
17 can when you learned that there was an association
18 between Docetaxel or Taxotere and this risk for
19 permanent alopecia.
20      How did you first learn that there was a
21 risk of permanent alopecia with the use of Taxotere?
22       MR. ROTOLO: Object to form.
23       THE WITNESS: I cannot give you an exact
24    time. Again, Taxotere has been used in the
25    preoperative setting since 2002, 2003. So

Page 128

1     it was a few years after that that those
2     cases started popping up. My guess is it
3     was in the early part of the last decade
4     that we realized that we were seeing those
5     patients.
6        And then, you know, I have only seen one
7     patient with total alopecia, and that was
8     about four years ago, maybe five years ago,
9     and that's when I changed my pattern. Most
10    of the patients I have seen and I have -- I
11    can recall at least four or five patients
12    with the similar alopecia pattern as
13    Ms. Guilbault.
14 BY MS. REYNOLDS:
15    Q. You had mentioned earlier something about a
16 TV advertisement in regards to permanent alopecia in
17 Taxotere.
18      Can you tell me what you were referring to?
19    A. I've seen it every once in a while -- they
20 still play it -- that if you received Taxotere for
21 breast cancer and your hair didn't grow back, call
22 so and so. I started seeing that advertisement -- I
23 don't know -- it's been around for about eight,
24 nine years, maybe.
25    Q. Would you have any reason to disagree with

Page 129

1  me if I told you that the first case that was filed
2  was filed roughly sometime around 2015, in terms of
3  Taxotere lawsuits?
4     A. No. I have no reason to disagree with you,
5  if you say so.
6     Q. Sure.
7       So is it possible that any television
8  advertisements that you saw related to that may have
9  actually occurred earlier than -- or excuse me --
10 later than that time period you just gave me?
11 Sometime, say, 2015 or after?
12    A. Honestly, I cannot recall when I started
13 seeing those advertisements. I know it was within
14 the last decade, but I cannot narrow it down.
15    Q. Sure. And that's fair enough.
16    A. But I will say this: When I started seeing
17 those advertisements, what I started telling the
18 patients, that there is a small risk that the
19 alopecia will be more of an issue.
20    Q. Prior to seeing those advertisements, did
21 you routinely tell your patients that if they
22 elected to use Taxotere, there was a risk that they
23 could have permanent hair loss?
24    A. I don't recall. I think that it became an
25 issue in the medical community sometime within the

33 (Pages 126 - 129)

| | |
|---|---|
| Page 146 | Page 148 |
| 1   Was that after the litigation and TV<br>2 advertisements started occurring?<br>3   A.  Yes, sir.  And, you know, when I say<br>4 campus-wide changes, I'm referring to the<br>5 New Orleans campus.  I don't know what they do in<br>6 Baton Rouge or North Shore or the other Ochsner<br>7 facilities.  There are three medical oncologists<br>8 that treat breast cancer at this campus, and we've<br>9 pretty much decided that we will switch from<br>10 Taxotere to Taxol.<br>11   Q.  And that's you, Doctor, and is that<br>12 Dr. Larned?<br>13   A.  Dr. Larned, Dr. Cole, and Dr. Xiao, who left<br>14 last week.  So we're the ones seeing the majority of<br>15 the breast cancer here.<br>16   Q.  Okay.  And, Doctor, do I understand your<br>17 testimony that you testified that the only<br>18 alternative you would have considered and<br>19 recommended for Ms. Guilbault would have been to<br>20 substitute Docetaxel with Taxol; correct?<br>21   A.  Yes, sir.  It's not evidence-based, but this<br>22 is based on clinical judgment and based on studies<br>23 of the postoperative chemotherapy setting to show<br>24 that there was equivalency between the two.<br>25 | 1   A.  I typically -- I rarely order the blood work<br>2 myself.  I tell them that, you know, this is a<br>3 primary care issue.  Your primary care physician<br>4 should do that.  If I were your primary care<br>5 physician, those are the things I would check.<br>6     Now, for the occasional patient who does not<br>7 have a primary care physician, I may have ordered<br>8 this myself just to facilitate the care.  But I<br>9 don't want to be doing primary care in this clinic.<br>10   Q.  Do you know if Ms. Guilbault had a primary<br>11 care physician?<br>12   A.  I do not.<br>13   Q.  And, Doctor, I just want to be clear because<br>14 you said something when Ms. Perez was questioning<br>15 you.<br>16     You said you were -- and we've talked about<br>17 this, but I just want to make sure I understand --<br>18 you said you were swayed to change from Docetaxel to<br>19 Paclitaxel by the one patient who had no hair; is<br>20 that correct?<br>21   A.  Correct.<br>22   Q.  And, Doctor, finally, you indicated that<br>23 your current -- after the TV ads and things, your<br>24 current warning that you give to patients that you<br>25 are giving Docetaxel to is that the risk of |
| Page 147 | Page 149 |
| 1   Q.  Doctor, those studies that were done, were<br>2 those studies done before September of 2013?<br>3   A.  Oh, yes.  I'm talking about studies from the<br>4 '90s and early 2000s.  So these are studies that are<br>5 at least 15, 20 years old.<br>6   Q.  But, Doctor, were there some studies<br>7 specifically, like, in 20 -- 2006, that indicated<br>8 there was a difference in efficacy between Docetaxel<br>9 and Paclitaxel?<br>10   A.  I think that was the stage 4 patients.  In<br>11 the adjuvant setting, which is postoperative, there<br>12 was essentially -- there was a study that looked at<br>13 different doses of Taxol and Taxotere.  They looked<br>14 at the weekly Taxol, weekly Taxotere; two, three<br>15 week Taxol; two, three week Taxotere.  Basically,<br>16 there was no difference in the efficacy.<br>17   Q.  Is that the Jones Study that you're<br>18 referring to?<br>19   A.  I don't recall the name, but it's -- you<br>20 know, this is an old study from probably the late<br>21 1990s.  It was a four-arm regimen.<br>22   Q.  You testified when Ms. Perez was asking you<br>23 some questions that, typically, if there was an<br>24 issue with hair, you would order blood work and then<br>25 you would send the patient to a dermatologist. | 1 permanent hair loss is rare, but it happens; is that<br>2 correct?<br>3   A.  Correct.  And, again, there are still<br>4 certain cohorts of patients that using Taxotere is<br>5 the right thing to do, such as HER2 positive<br>6 patients, both in the pre and postoperative setting,<br>7 and no negative -- HER2 negative patients in the<br>8 postoperative setting.<br>9     So for those patients we still give<br>10 Docetaxel, but I tell them that, "Look, this is the<br>11 drug that you may have seen the advertisements on TV<br>12 about permanent hair loss, but I would still<br>13 recommend you take it."  And if they refuse, that's<br>14 where I use the CMF regimen that I mentioned<br>15 earlier.<br>16   Q.  And, Doctor, with regard to Ms. Guilbault<br>17 specifically, her treatment that consisted of<br>18 surgery, radiation, aromatase inhibitor therapy, and<br>19 a chemotherapy regime with AC plus Docetaxel, that<br>20 has resulted in her, at this date, being cancer<br>21 free?<br>22     MS. REYNOLDS:  Object to form.<br>23 BY MR. ROTOLO:<br>24   Q.  Or not having a recurrence of cancer?<br>25   A.  Yes.  I mean part of it is, obviously, the |

Page 150

1 biology. Part of it is the treatment that she
2 received and the fact that she's still being
3 treated, even though she's more than five years out.
4     Honestly, if you had asked me six years ago
5 when I started the Anastrozole would I have thought
6 that she would be disease-free in 2020, I would tell
7 you she would have been more likely to have had a
8 recurrence by now. So she's done very, very well,
9 but I do not consider her being cured.
10   Q. Okay. Thank you, Doctor. That's all the
11 questions I have.
12     MS. REYNOLDS: Thank you very much.
13     THE WITNESS: You're welcome.
14     THE VIDEOGRAPHER: We are going off the
15     record at 4:58 p.m., and this concludes
16     today's testimony given by Dr. Theodossiou.
17     The total number of media units used was two
18     and will be retained by Veritext Legal
19     Solutions.
20       Thank you.
21
22     (Deposition adjourned at 4:58 p.m.)

Page 151

1       C E R T I F I C A T E
2
3    Certification is valid only for a transcript
4 accompanied by my original signature and
5 Original required seal on this page.
6
7    I, Noelle C. Krawiec, Certified Court
8 Reporter in and for the State of Louisiana, and
9 Registered Professional Reporter, as the officer
10 before whom this testimony was taken, do hereby
11 certify that CHRIS THEODOSSIOU, M.D., after having
12 been duly sworn by me upon authority of R.S.
13 37:2554, did testify as hereinbefore set forth in
14 the foregoing 146 pages; that this testimony was
15 reported by me in the stenotype reporting method,
16 was prepared and transcribed by me or under my
17 personal direction and supervision, and is a true
18 and correct transcript to the best of my ability and
19 understanding; that the transcript has been prepared
20 in compliance with transcript format guidelines
21 required by statute or by rules of the board, and
22 that I am informed about the complete arrangement,
23 financial or otherwise, with the person or entity
24 making arrangements for deposition services; that I
25 have acted in compliance with the prohibition on

Page 152

1 contractual relationships, as defined by Louisiana
2 Code of Civil Procedure Article 1434 and in rules
3 and advisory opinions of the board; that I have no
4 actual knowledge of any prohibited employment or
5 contractual relationship, direct or indirect,
6 between a court reporting firm and any party
7 litigant in this matter nor is there any such
8 relationship between myself and a party litigant in
9 this matter. I am not related to counsel or to the
10 parties herein, nor am I otherwise interested in the
11 outcome of this matter.
12
13
       This the 8th day of December, 2020.
14
15
16
17
18       _____
         NOELLE C. KRAWIEC, CCR
19
20
21
22
23
24
25