# EXHIBIT AA

Page 1

1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
2                       MDL NO. 16-2740
3
4
    * * * * * * * * * * * * * * * *
5                                     *
      IN RE:  TAXOTERE (DOCETAXEL)  *
6                                     *
      PRODUCTS LIABILITY LITIGATION *
7                                     *
    This pertains to:               *
8   Clare Guilbault,                *
        Case No. 2:16-cv-17061      *
9   Audrey Plaisance,               *
        Case No. 2:18-cv-08068      *
10                                    *
                                      *
11  * * * * * * * * * * * * * * * *
12
13      REMOTE VIDEOTAPE VIDEOCONFERENCE DEPOSITION OF
                    DAVID ROSS, M.D., Ph.D.
14
15
16              TRANSCRIPT of the stenographic notes of
17  the proceedings in the above-entitled matter, as
18  taken by and before LINDA M. JORRITSMA, a Certified
19  Registered Professional Reporter and Certified Court
20  Reporter and Notary Public, held via ZOOM
21  VIDEOCONFERENCE at various locations with the witness
22  located at 212 Stony Run Lane, Baltimore, Maryland,
23  on Thursday, September 30, 2021, commencing at 9:42
24  a.m.
25

Page 2

1  A P P E A R A N C E S (All Via Zoom):
2
3  For the Plaintiffs:
4
   MARTZELL, BICKFORD & CENTOLA
5  BY:  LARRY CENTOLA, ESQ.
   338 Lafayette Street
6  New Orleans, Louisiana  70130
   504-581-9065
7  ljc@mbfirm.com
8
   LEMMON LAW FIRM
9  BY:  ANDREW LEMMON, ESQ.
   15058 River Road
10 Hahnville, Louisiana 70057
   985-783-6789
11 andrew@lemmonlawfirm.com
12
   DAVIS & CRUMP, PC
13 BY:  TREVOR B. ROCKSTAD, ESQ.
      TAYLOR HARDENSTEIN, ESQ.
14 2601 14th Street
   Gulfport, Mississippi 39501
15 228-863-6000
   trevor.rockstad@daviscrump.com
16 taylor.hardenstein@daviscrump.com
   Attorneys for Plaintiff Audrey Plaisance
17
18
19
20
21
22
23
24
25

Page 3

1  A P P E A R A N C E S, continued:
2
3  For the Defendant Sun Pharmaceutical in Taxotere
   Litigation:
4
   HINSHAW & CULBERTSON
5  53 State Street, 27th Floor
   Boston, Massachusetts 02109
6  By:  ROBERT M. BUCHHOLZ, ESQ.
   617-213-7019
7  RBuchholz@hinshawlaw.com
8
9
   Counsel for Defendants Hospira Worldwide, LLC,
10 Formerly doing business as Hospira Worldwide, Inc.
   And Hospira, Inc.
11
12 ARNOLD & PORTER KAYE SCHOLER LLP
   BY:  JEFFREY HOROWITZ, ESQ.
13      ASHLEY BURKETT, ESQ.
      DIANA STERK, ESQ.
14 250 West 55th Street
   New York, New York 10019
15 (212) 836-7572
   Jeffrey.Horowitz@arnoldporter.com
16 Ashley.Burkett@arnoldporter.com
   Diana.Sterk@arnoldporter.com
17
18 For Defendant Accord Healthcare, Inc.
19 TUCKER ELLIS LLP
   JULIE A. CALLSEN, ESQ.
20 950 Main Avenue
   Suite 1100
21 Cleveland, Ohio 44113-7213
   216-696-2286
22 Julie.callsen@tuckerellis.com
23
24
25

Page 4

1  A P P E A R A N C E S (continued):
2  For the Defendant for Sandoz Inc.
3  GREENBERG TRAURIG, LLP
   BY:  EVAN HOLDEN, ESQ.
4  3333 Piedmont Road NE
   Suite 2500
5  Atlanta, Georgia  30305
   678-553-7320
6  holdene@gtlaw.com
7
   For Actavis Pharma, Inc., Actavis LLC and Sagent
8  Pharmaceuticals, Inc.
9  ULMER & BERNE LLP
   BY:  MICHAEL J. SUFFERN
10 600 Vine Street, Suite 2800
   Cincinnati, Ohio 45202-2409
11 513-698-5000
   msuffern@ulmer.com
12
13
   ALSO ATTENDING:
14    MARCELO RIVERA, Videographer
      MICHAEL ROBSON, Veritext Concierge
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          I N D E X
2  WITNESS:                 PAGE
3  DAVID ROSS, M.D., Ph.D.
   BY MR. HOROWITZ           6
4
5          E X H I B I T S
6  No.    Description        Page
   Exhibit 1    Expert Report of David Ross, M.D.,   12
7      Ph.D., M.B.I, dated June 8, 2020
   Exhibit 2    "Guidance for Industry Applications   46
8      Covered by Section 505(b)(2) Draft
      Guidance" dated October 1999
9  Exhibit 3    21 CFR 314.54       67
   Exhibit 4    Letter dated July 9, 2007, Original   72
10     New Drug Application,
      HOS0200007762 - HOS00200007765
11 Exhibit 5    E-Mail dated 11/9/2010, with     81
      attachments, HOS01400254441 -
12     HOS01400254568
   Exhibit 6    NDA Approval, HOS01400256285 -   87
13     HOS01400256346
   Exhibit 7    "Guidance for Industry, Good   119
14     Pharmacovigilance Practices and
      Pharmacoepidemiologic Assessment,
15     March 2005
   Exhibit 8    SEAK Seminar Brochure,   126
16     "Supplemental Income for
      Physicians", February 2014
17 Exhibit 9    SEAK Brochure, "Independent Medical   135
      Examination Training For
18     Physicians," Naples, Florida
   Exhibit 10   Updated Curriculum Vitae of David   140
19     B. Ross, M.D., Ph.D., M.B.I.
   Exhibit 11   Article, "Use of data mining at the   157
20     Food and Drug Administration"
   Exhibit 12   Notice of Deposition   203
21 Exhibit 13   Updated List of Expert Witness   204
      Testimony
22 Exhibit 14   Ross Statements and Invoices   210
23     SPECIAL REQUESTS
         Page   Line
24 Conference Manual   128   12
   re: Exhibit 8
25

Veritext Legal Solutions
800-227-8440                                    973-410-4040

Page 6

1       THE VIDEOGRAPHER:  Good morning.  We're
2  going on the record at 9:42 a.m. on September 30th,
3  2021.  This deposition is being taken remotely of
4  Dr. David Ross In Re: Taxotere Products Liability
5  Litigation.
6       My name is Marcelo Rivera from Veritext
7  Legal Solutions and I am the videographer.  The court
8  reporter is Linda Jorritsma in association with
9  Veritext Legal Solutions.
10      I am not related to any party in this
11  action nor am I financially interested in the
12  outcome.
13      Counsel and all present remotely will be
14  on the stenographic record.
15      Will the court reporter please swear in
16  the witness.
17  DAVID ROSS, 212 Stony Run Lane, Baltimore, Maryland
18  21210, having been duly sworn by the Notary Public,
19  testified as follows:
20  DIRECT EXAMINATION BY MR. HOROWITZ:
21      Q.   Good morning, Doctor.
22      A.   Good morning.
23      Q.   You and I have met on a prior occasion
24  so this is not the first time we've done this
25  together, is it?

Page 7

1       A.   It is -- it is not.  We had another
2  chance to converse.
3       Q.   Indeed.  And today you understand that I
4  represent Hospira for this deposition.
5       A.   Yes.
6       Q.   And you have been identified as an
7  expert for the plaintiffs in lawsuits filed against
8  Hospira involving allegations related to the
9  medication docetaxel.  True?
10      A.   Yes.
11      Q.   And you understand that the allegation
12  generally involves permanent alopecia, and alopecia
13  being hair loss.  Fair?
14      A.   That's my understanding, yes.
15      Q.   Okay.  And you've done this several
16  times before, have been deposed, and you I have done
17  this before, but you understand the purpose of this
18  is for me to understand your opinions and get a sense
19  of the testimony that you're going to offer at trial
20  in these cases.  You understand that.  Right?
21      A.   Yes.
22      Q.   And, in fact, because of the nature of
23  this particular litigation, as I understand it,
24  you've been deposed over the course of several days
25  by a few of my colleagues.  I think you were deposed

Page 8

1  for three days by the -- we'll call it the 505(b)(2)
2  defendants and Accord, and then I think you had a
3  one-day deposition with Sanofi about Taxotere.  Is
4  that right?
5       A.   Yes.
6       Q.   Okay.  And, obviously, I have those
7  transcripts and I'm not going to try to rehash
8  everything in those but obviously some concepts and
9  things will be unavoidable for us to have a
10  meaningful discussion today.  Is that fair?
11      A.   Yes.
12      Q.   Is there any reason you can't give
13  complete and accurate testimony this morning?
14      A.   Not that I'm aware of.
15      Q.   And I know you're good about this, but
16  if you don't understand one of my questions, if you
17  could just let me know so that I fix it for you;
18  otherwise, if you answer I'm going to assume that you
19  understood.  Is that fair?
20      A.   Yes.
21      Q.   Okay.
22      Let's -- let's jump right to it -- well,
23  actually, let me ask you this because it's been a
24  little bit of time since your last deposition.  What
25  did you do to get ready to come talk to me today

Page 9

1  about Hospira's docetaxel?
2       A.   So I reviewed my prior reports for this
3  litigation.  And reviewed materials, the underlying
4  materials that I had reviewed in preparing those
5  reports.  And I did look over the prior depositions
6  to refresh my memory.
7       Q.   By reports that you reviewed, was that
8  the report that is the subject of this deposition
9  that involves Hospira, Sandoz, and Accord, and also
10  the report that you prepared regarding Sanofi and
11  Taxotere?
12      A.   Yes.  So to be just specific, there's
13  the report that I understand is under discussion
14  today is the one that I submitted June 8th of 2020.
15      Q.   Correct.  Okay.  Did you review any
16  other reports?
17      A.   The other report that I referenced was
18  the one that was submitted in I believe it was
19  February of this year related to Sanofi.
20      Q.   Understood.  And did you meet with
21  attorneys and talk to them in advance of the
22  deposition?
23      A.   Yes.
24      Q.   And who did you meet with?
25      A.   Mr. Centola, Mr. Lemmon, and Mr. Miceli.

3 (Pages 6 - 9)

Page 10

1    Q.    And are they all lawyers that you
2 understand represent plaintiffs in this litigation?
3    A.    Yes.
4    Q.    Did you meet with them in person?  I
5 assume that you had a conference on your phone?
6    A.    Videoconferencing.
7    Q.    And how long -- how many meetings did
8 you have?
9    A.    Three, I believe.
10    Q.    And how long were each of those
11 meetings?
12    A.    Roughly an hour.
13    Q.    And did you review documents separate
14 and apart from those meetings or only during the
15 course of those meetings?
16    A.    There were the documents that I -- you
17 know, the documents that I mentioned earlier in terms
18 of my preparation, I looked at at times outside those
19 teleconferences.
20    Q.    And did you record your time for
21 purposes of creating future invoices for both in
22 reviewing documents and meeting with the attorneys?
23    A.    Yes.
24    Q.    All right.  How much time did you spend
25 reviewing documents separate and apart from your

Page 11

1 meanings with the attorneys?
2    A.    I'd say -- and this is not exact because
3 I haven't finalized all the work slips -- but
4 somewhere between, I would say, eight to ten hours.
5    Q.    And then that's separate and apart from
6 the three or so hours you spent in videoconferencing
7 with the attorneys.
8    A.    Correct.
9    Q.    And if I recall correctly, unless it's
10 changed since we last spoke, I think your billing
11 rate is $550 per hour?
12    A.    That's correct.
13    Q.    Did you speak with anyone besides
14 Mr. Centola, Lemmon, or Miceli in preparation?
15    A.    No.
16    Q.    Didn't talk to any other experts?
17    A.    No.
18    Q.    Did you review any -- or I should say
19 re-review any other expert reports besides your own?
20    A.    There are the reports that I referenced
21 in my report of June 8th from Drs. Feigal and
22 Madigan.  So those were among the -- those were
23 captured, so to speak, when I said materials that I
24 had reviewed in preparing the report originally.
25    Q.    Let's go ahead and mark your expert

Page 12

1 report that you referenced June 8, 2020, as
2 Exhibit 1.
3        (Exhibit 1, Expert Report of David Ross,
4 M.D., Ph.D., M.B.I, dated June 8, 2020, marked for
5 identification.)
6    Q.    And I think if we mark the magic
7 properly, it should be accessible to you.
8        Do you have the report?
9    A.    Well, I don't have the exhibit in front
10 of me and I may need a little bit of guidance here.
11 This is what sometimes happens when you get too
12 highly specialized.
13    Q.    Yeah.
14    A.    So I'm on Zoom.  I have the participants
15 on the right-hand side of my screen.
16    Q.    Let's see.  I believe we're able to show
17 it to you and maybe through Share Screen.  I have a
18 colleague.
19        MR. HOROWITZ:  Ashley, are you able to
20 bring it up in Share Screen?
21    Q.    There we go.  Are you able to see that,
22 Dr. Ross?
23    A.    I am.
24    Q.    And is Exhibit 1 a copy of your expert
25 report that you prepared dated June 8th, 2020, that

Page 13

1 you signed?
2    A.    If -- can I just go to the last page?
3    Q.    We'll go to the signature page.
4    A.    That's right.  The signature page,
5 that's what I meant.  There it is.  Yes, that is.
6    Q.    And why don't we keep scrolling.
7        As part of your expert report, there were
8 three exhibits, I believe, on the June 8, 2020,
9 report.  Your curriculum vitae I think was the first
10 exhibit.  Right?
11    A.    Yes.
12    Q.    And then your next exhibit I believe is
13 your materials -- no, no.  It's your testimony list
14 for the last four years.  Right?
15    A.    Correct.
16    Q.    And then finally, you have your list of
17 documents reviewed.
18    A.    Yes.
19    Q.    And let's -- let's stay here on Exhibit
20 C since we're here.
21        Well, let me ask you this:  There's a
22 couple things in your report maybe we should set out
23 up front.  You used the phrase, "Permanent
24 Chemotherapy Induced Alopecia, PCIA."  Is that
25 shorthand -- is "PCIA" shorthand for "Permanent

4 (Pages 10 - 13)

Page 14

1 Chemotherapy-Induced Alopecia"?
2     A.    Yes.
3     Q.    And can we use -- if we're talking about
4 permanent alopecia today, can we agree that that's
5 really just shorthand for PCIA?
6     A.    Yes.
7     Q.    And is your report a full and complete
8 summary of all the opinions that you have formed with
9 respect to regulatory issues related to Hospira's
10 docetaxel and permanent alopecia?
11    A.    We're just restricting my answer to the
12 questions that I was asked to address, and -- for the
13 report, and the information that is mentioned
14 in -- you know, that I reviewed it for this report.
15         Yes, there's a paragraph in there, as I'm
16 sure you're aware, that if there's additional
17 information that comes available for me or I'm asked
18 to respond to -- to reports from defendants' experts,
19 that I may -- that I reserve the right to respond.
20    Q.    Understood.
21    A.    But with that scope, the answer is yes.
22    Q.    So as we sit here now for our
23 conversation, your June 8, 2020, report is a full and
24 complete summary of the opinions that you have formed
25 and were asked to address with respect to regulatory

Page 15

1 issues related to Hospira's docetaxel and permanent
2 alopecia.  Correct?
3     A.    Yes.
4     Q.    And I know you include this paragraph as
5 most experts do about sort of this mythical
6 reservation of rights, but obviously you understand
7 that if you form any new opinions based on our expert
8 reports, Hospira's expert reports, or anything else,
9 that you'll let your -- the plaintiffs' lawyers know
10 and you and I will have a chitchat about what those
11 opinions might be.  You understand that.  Right?
12    A.    With -- and I'm sorry.  I'm saying this
13 a little bit -- but I understood.  I don't regard the
14 reservation as mythical, but I understand why you
15 said that.  The answer to your question is yes.
16    Q.    Okay.  And you understand the process
17 that, before you testify at trial, I should know and
18 have the opportunity, I should say, to talk to you
19 about what you might testify about and your opinions.
20 You get the process.  Right?
21    A.    Yes.
22    Q.    And by the way, I don't know that I
23 agree to the reservation of rights and I don't know
24 that I agree that, you know, that you should be
25 offering anything else beyond what you've already

Page 16

1 offered as we sit here now; but that said, that's a
2 fight for another day for when we have it.  So I'm
3 just putting that on the record, Doctor.
4     A.    I completely understand.  I appreciate
5 you saying that.
6     Q.    So let's go back to your -- well, before
7 we do that, too, I'm sorry.  Have you outside
8 of -- let me start that question again.  I'm sorry.
9         So it's fair to say that you were
10 retained by -- by lawyers representing plaintiffs in
11 this -- this lawsuit, this litigation.  Right?
12    A.    By the Plaintiffs' Steering Committee
13 for this MDL.
14    Q.    Okay.  I'm going to come back a little
15 later and talk to you about that original retention
16 and your understanding of it, but the lawyers as part
17 of the Plaintiffs' Steering Committee in the MDL, the
18 multi-district litigation with respect to these
19 cases, is it fair to say that they asked you to
20 provide opinions that you have now set forth in this
21 report?  This was done at their -- their -- their
22 ask, if you will.
23         MR. CENTOLA:  Object to form.
24    A.    So just to make sure that I'm --
25    Q.    Let me -- let me withdraw the question.

Page 17

1     A.    Go ahead.
2     Q.    And I think I can ask a better question.
3         But were you retained by plaintiffs'
4 lawyers to prepare an expert report and give
5 testimony in this case?
6     A.    Well, I think that the first task was
7 for me to review materials and see what my
8 conclusions were to specific regulatory questions.
9 That's before to reducing anything to writing, if
10 that's the right way to put it.
11    Q.    Is it fair to say that you didn't have
12 these opinions and conclusions before the lawyers
13 approached you and -- and retained you?
14         MR. CENTOLA:  Objection, form.
15    A.    I'm -- I'm not sure.  I'm -- I'm not
16 trying to split hairs here, but I think the general
17 question -- just to take one question that I was
18 asked, which is, do holders of NDAs approved under
19 505(b)(2) of the Food, Drug, and Cosmetic Act have
20 regulatory obligations that are independent of those
21 from the holder or holders of NDA or NDAs approved
22 under 505(b)(1) that they've relied on.  Sorry,
23 that's quite a mouthful.  I don't know that I've ever
24 been asked that question before in a general way or
25 even had an opportunity to think about it.  I do feel

5 (Pages 14 - 17)

Page 18

1 quite confident in saying that if I was asked that as
2 a general proposition without referencing a
3 litigation, I would have said yes, which is, you
4 know, obviously when asked to look at the details.
5 But I think it's not that I, you know, was unaware of
6 these issues, it's just that specific question on
7 docetaxel 505(b)(2) applications, I had never been
8 asked before.
9         But if -- and just if this were to have
10 come up in a discussion when I was at FDA, for
11 example, I -- I and other reviewers and review
12 officials would have said yes.
13         So I don't mean that there's no way I
14 would ever say anything but that.  Again, I have to
15 look at what the specific facts are because they may
16 involve other issues.  So I know that's quite a long
17 answer but I --
18    Q.    Quite a long answer, Doctor, but I got
19 you.  I got you.  And I appreciate that.  And you and
20 I have gone back and forth about your tendency to
21 give long answers and so we'll try and --
22    A.    If I -- if I may say, Mr. Horowitz, I
23 will try and do all of us a favor and be more
24 succinct.
25    Q.    I appreciate that.  Thank you, Doctor.

Page 19

1    A.    I want to make sure I'm not lumping
2 together and splitting things when it should be the
3 reverse, but I really will try and rein that in.
4    Q.    And I think you got to an important
5 distinction there.
6         So what you're telling me, I think, is
7 your views with respect to the obligations of what's
8 called a 505(b)(2) NDA holder, those are views that
9 you already had before you were approached by the
10 plaintiffs' lawyers, in summary.
11         I'm trying to help you out here, Doc.
12    A.    Let me just say if I had hypothetically
13 been asked the question as a general proposition, I
14 would say yes again.
15    Q.    Okay.  I'm sorry.
16    A.    But always -- you never say -- there's
17 no way it could be any different.
18    Q.    Okay.
19    A.    So I just want to say this.
20    Q.    And you're saying, too, that it's not
21 really a question that you ever addressed or been
22 asked before directly before -- before the lawyers
23 approached you.
24    A.    On docetaxel?  No.
25    Q.    Okay.  Well, that's the second piece.

Page 20

1 So with respect to docetaxel, is it fair to say that
2 the opinions you offer specific to docetaxel and
3 specific to Hospira are opinions that you only formed
4 after you were retained by the plaintiffs' lawyers in
5 this litigation?
6         MR. CENTOLA:  Object to form.
7    A.    Well, with an important qualification
8 that it was after -- I did not form then until after
9 I had reviewed materials.  It was not, obviously,
10 immediately upon retention.
11    Q.    And the materials you reviewed -- that's
12 fair.  But I didn't say immediately upon retention.
13 I mean, you described the process, the opinions --
14    A.    No, I -- I know --
15    Q.    Right.  Let me finish my question.
16         The opinions that you have offered in
17 your expert report with respect to docetaxel in
18 particular and Hospira in particular, these were all
19 opinions that you formed after you were approached by
20 the plaintiffs' lawyers to review materials and offer
21 opinions.  Right?
22    A.    On this specific issue, yes, correct.
23    Q.    And it's fair to say that you've never
24 published any of the opinions about Hospira and
25 docetaxel that you offer in this report anywhere

Page 21

1 outside of this litigation.  True?
2    A.    That is correct.
3    Q.    And you've never subjected your opinions
4 that are set forth in your expert report to peer
5 review, have you?
6         MR. CENTOLA:  Objection to form.
7    A.    Are you -- just to clarify -- talking
8 about these specific opinions in the report or the
9 more general question about 505(b)(2)'s?
10    Q.    Well, let's take them both.  Have you
11 ever subjected your opinions set forth in your expert
12 report about Hospira and docetaxel to peer review?
13         MR. CENTOLA:  Objection to form.
14    A.    By peer review, I'm going to understand
15 that to mean exactly what you're saying, that I mean,
16 one form, of course, is scientific publication with
17 peer review.  Not all publications are peer-reviewed.
18         Or peer review could mean, you know,
19 discussions with other regulatory experts.  I'm just
20 getting that distinction on the record, though the
21 answer to both of those would be no.
22    Q.    Both of those is no.  Right?
23    A.    Yes.
24    Q.    Okay.  And what about with respect to
25 505(b)(2) NDA holders and their obligations in

6 (Pages 18 - 21)

Page 22

1  general, have you ever subjected those opinions to
2  peer review outside of this litigation?
3     A.    So the answer to that is if in terms of,
4  again, going to this distinction or -- or
5  understanding that peer review is not limited to
6  scientific publication is one of the issues that
7  would get discussed internally at the FDA, that, you
8  know, what would a 505 -- an applicant seeking
9  approvals under 505(b)(2), would they need to do
10  anything in addition to -- anything extra in order to
11  garner approval.  And so that implicitly is do
12  they -- are they independent obligations.  So that
13  was discussed.  That is something, a discussion,
14  regarding my fellow reviewers and with the primary,
15  secondary, more senior that would be peer review, and
16  the answer to that would be yes as a general
17  proposition.
18         MR. HOROWITZ:  Well, objection, move to
19  strike, nonresponsive.
20     Q.    Doctor, have you ever published in the
21  peer-reviewed literature anything about 505(b)(2)
22  applications and the obligations of 505(b)(2) NDA
23  holders?
24     A.    By peer-reviewed, you mean the
25  scientific literature I'm going to assume?  Is

Page 23

1  that --
2         MR. HOROWITZ:  Can you read back the
3  question, please.
4     Q.    I think you're filibustering, but I'll
5  ask it again.
6         Doctor, have you ever published in the
7  peer-reviewed literature -- you know what
8  peer-reviewed literature is.  Right?
9     A.    I assume you're talking about scientific
10  literature?  Yes.
11     Q.    Have you ever published in the
12  peer-reviewed literature anything about the duties of
13  a 505(b)(2) New Drug Application holder?
14     A.    With the understanding that there have
15  been very few publications at all on this topic, no.
16     Q.    Doctor, the truth of the matter is you
17  have not attempted to publish and never have
18  published anything about 505(b)(2) New Drug
19  Application holders' duties.  Correct?
20         MR. CENTOLA:  Objection, form.
21     A.    I'm sorry.  I don't know if you heard my
22  answer.  I said that's correct.
23     Q.    With respect to your opinions set forth
24  in your report about specifically now Hospira and
25  docetaxel, you've never discussed those with -- with

Page 24

1  the FDA or advised FDA of those opinions, have you?
2     A.    No.
3     Q.    And before -- well, sorry.  As part of
4  your process in preparing your report and crafting
5  your opinions, you did not discuss with FDA their
6  views on Hospira and docetaxel and the docetaxel
7  label.  True?
8     A.    No.
9     Q.    And you've never discussed with FDA
10  anything about Hospira's approach to what we'll call
11  pharmacovigilance or drug safety monitoring.  Right?
12     A.    No.
13     Q.    And just so we're clear on your role in
14  this case, you are the regulatory expert, if you
15  will, proffered by plaintiffs' counsel.  Right?
16     A.    I'm not sure I'd say I'm the regulatory
17  expert.  I am a regulatory expert.
18     Q.    That's what I meant.  So your, if you
19  will, your bailiwick, you'll be talking about
20  regulatory issues in this case.
21     A.    Correct.
22     Q.    And by regulatory issues, we're really
23  talking about the FDA, the Food and Drug
24  Administration, and their rules and regulations.
25  Fair?

Page 25

1     A.    Yes.
2     Q.    And am I correct that you're not going
3  to be offering your opinions about whether docetaxel
4  can or does cause permanent alopecia?
5     A.    Any -- I'm going to be discussing issues
6  purely from a regulatory perspective; so in terms of
7  purely medical -- the medical causality or causation,
8  that is not an issue that I am addressing.  I'm going
9  to only be addressing issues from a regulatory point
10  of view.
11     Q.    And you also won't be talking
12  specifically about any particular plaintiff and
13  whether or not docetaxel caused her alopecia.
14  Correct?
15     A.    As I understand it right now -- and I
16  don't have any reason to think this is going to be
17  different, changed -- that's correct.
18     Q.    Do you know which plaintiffs you're here
19  to testify on behalf of today?
20     A.    I am -- I know that the names of the
21  plaintiffs in the bellwether trial -- trials that are
22  coming up are in the Notice of Deposition.  To be
23  honest with you, I -- I couldn't -- I would have to
24  look at it to recall them.  And also I just want to
25  say, and again I want to be very clear, I'm not

7 (Pages 22 - 25)

1 faulting you for saying this, but when you say
2 "testifying on behalf of plaintiffs," I just want to
3 make clear I am not representing myself the
4 plaintiffs. So I'm not advocating for them. I
5 just -- not that there's anything wrong with that,
6 but I just want to make clear that's not my role
7 here, either.
8    Q.    You don't view your role as an advocate.
9 True?
10    A.    Only for my opinion. My role -- and I'm
11 not just repeating these words -- is to assist the
12 trier-of-fact.
13    Q.    You don't view this as where
14 you're -- well, let me -- we'll come back to that.
15 I'm sorry. Let's not go down that rabbit hole.
16 We'll come back to that later, perhaps.
17       So I noticed in your report you
18 reference particular plaintiffs from the early, I
19 guess, process that are no longer part of this
20 particular trial setting. Right?
21    A.    Could I ask that you just -- yeah.
22 Paragraph 1.
23       That was -- again, as you're aware, over
24 15 months ago those were the specific plaintiffs.
25 Again, I'm going to the footnote. They

1 were -- excuse me. I mention that I may -- that
2 testimony of other -- testimony I give may involve
3 other cases.
4    Q.    And that's what's happened here is now
5 you would plug in the new names of -- of the new
6 plaintiffs for this particular report, but you didn't
7 actually do that. You just -- you left the old
8 plaintiffs in there. Is that fair?
9    A.    If I -- I'll just say if I had been
10 asked to do that. Again, my opinions from June 8th
11 were not specific to any particular plaintiff, they
12 involve this 505(b)(2) NDA holders in this case. So
13 that's -- that's fair. Again, if I had been asked
14 to, I certainly would have been willing to do that.
15    Q.    And is it fair to say you don't know the
16 dates of product use, of docetaxel use, for either of
17 the new two plaintiffs that are before us now?
18    A.    That's correct.
19    Q.    And so it's fair to say, then, that
20 you're not going to be offering any opinions about
21 regulatory issues and the timing of the use of
22 docetaxel by these individual plaintiffs.
23    A.    Correct.
24       MR. CENTOLA: Objection, objection to
25 form.

1    A.    So not directly, but I will say -- to be
2 honest, this came up a year ago in depositions, you
3 know, the question came up, well, when should the NDA
4 holders have been in a position -- when should they
5 have submitted a CBE supplement or when do I think
6 they should have.
7       So insofar as that has any bearing on
8 specific plaintiffs, that -- that would be. But I'm
9 not going to say -- I'm not talking about, you know,
10 a specific plaintiff and when they used an infusion.
11 It's just at what point in time information was
12 available to be added to the label.
13    Q.    You're not going to connect those two
14 things because you don't even know when these
15 particular plaintiffs took the drug. Right?
16    A.    I am -- and if I'm asked a question
17 about a specific time frame, I'll answer it to the
18 best of my ability. But I -- you know, as you look
19 at my report, I don't -- other than mentioning those
20 specific plaintiffs there, I believe I said somewhere
21 else where it's not going to be anything
22 case-specific that I'm going to be.
23    Q.    And to be clear, you don't know when
24 either of the plaintiffs here took the drug. Right?
25    A.    Not -- certainly not off the top of my

1 head.
2    Q.    That's another way in a lot of words
3 saying you don't know, do you?
4    A.    Yes, you're correct.
5    Q.    Let's go to Exhibit C of your report. I
6 think this is the materials reviewed list.
7       Did you prepare Exhibit C?
8    A.    If I recall correctly, you know,
9 certainly I reviewed it, but I believe retaining
10 counsel had prepared it to the best -- as best I
11 recall. And it's not that I didn't have anything to
12 do with it, but it was -- and obviously anything that
13 I mentioned, I think the reference -- I'm sorry,
14 under I, "All references in the content and footnotes
15 of my report," those were some issues -- you know,
16 some of those were materials I had obtained. So, you
17 know, I -- I was involved in preparing it and so was
18 retaining counsel.
19    Q.    And between your materials reviewed list
20 and the footnotes in the text, is that a full and
21 complete listing of the materials you reviewed in
22 order to form your opinions?
23    A.    Yes.
24    Q.    So let's go through.
25       The Roman numeral III, "Depositions

8 (Pages 26 - 29)

Page 30

1 & Deposition Exhibits," do you know which of
2 those -- well, let me -- let's frame this out a
3 little bit because I'm trying to do this a little
4 quickly.
5         But your report actually doesn't just
6 address Hospira, does it?
7     A.    Correct.
8     Q.    There's also opinions offered with
9 respect to another company called Sandoz. Right?
10    A.    Yes.
11    Q.    And another company called Accord.
12 Correct?
13    A.    Yes.
14    Q.    And what your report does at a high
15 level, and -- and I'm hoping I do this in a way that
16 we don't have to fuss about it, but you give some
17 general opinions like we talked about with respect
18 to the obligations of 505(b)(2) NDA holders, and we'll
19 obviously talk about those.
20        And then you give some sort of I guess
21 more specific opinions about the three companies with
22 respect to how they handled their docetaxels within
23 the auspices, if you will, of the FDA regulations.
24 Is that a generally fair summary?
25    A.    Yes.

Page 31

1     Q.    And the -- the report, though, in your
2 materials reviewed list, this list captures the
3 things related to all three companies in the entire
4 report. You had one single materials reviewed list
5 or list of documents reviewed. Right?
6     A.    Correct.
7     Q.    Okay. So -- and the depositions and
8 deposition exhibits, that listing there before you,
9 that includes depositions of -- of witnesses or
10 employees or former employees from all three
11 companies. Right?
12    A.    Yes.
13    Q.    And do you know which of those in
14 particular relate to Hospira or Hospira employees?
15    A.    At least, for at least one I -- I do.
16    Q.    Which one?
17    A.    So Dr. Schmider was deposed on
18 July 17th, 2019. And I believe -- I believe also
19 Dr. Mir was deposed in 2020.
20    Q.    Any others that you believe are Hospira?
21    A.    Looking at this, I don't believe so; but
22 to be honest with you, it's been a while looking at
23 some of these, so I -- I want to say I don't believe
24 so, but I would really -- to say definitively I
25 really need to look back at those quickly. But those

Page 32

1 two, Schmider -- Drs. Schmider and Mir I would say
2 are.
3     Q.    Do you know how many depositions of
4 Hospira employees were actually taken?
5     A.    I don't. I don't.
6     Q.    And did you -- were you ever provided a
7 list to make a -- you know, a selection or involved
8 in the selection process in any way?
9     A.    I asked -- in my report I mentioned that
10 it was my understanding the discovery for Hospira at
11 the time that I wrote this report -- by discovery I
12 mean depositions and anything else that's covered
13 under that if I'm not using that term right. Sorry.
14        So I said, you know, there may be other
15 information coming in. And I've asked about that and
16 I have not had -- I have to talk to retaining counsel
17 I think about -- about that. I don't want to -- I
18 just want to say that I -- I have asked about
19 other -- any additional -- subsequent information
20 from Hospira.
21    Q.    And you have not been provided any
22 additional deposition transcripts besides these two
23 with respect to Hospira.
24        MR. CENTOLA:  Objection, form.
25    A.    I'm sorry. Go ahead.

Page 33

1     Q.    Well, I'm not sure I heard your answer.
2 But you have not been provided any other Hospira
3 deposition transcripts, Hospira witness or employee
4 deposition transcripts besides Drs. Schmider and Mir.
5 Correct?
6         MR. CENTOLA:  Objection, form.
7     A.    So, again, I have asked if there's,
8 subsequent to this report and specifically about
9 Hospira, if there's any additional information that
10 would be arguably relevant. And so just --
11        THE WITNESS:  Mr. Centola, I assume
12 you'll stop me if I should not respond.
13    A.    I have asked and there's not been
14 anything else I have been told -- I have not been
15 told of anything else.
16    Q.    Okay. Let's go down to -- maybe I can
17 shortcut this.
18        The documents -- there's obviously some
19 things like the Code of Federal Regulations. There
20 may be some guidances, general materials. Is it fair
21 to say that those would apply to all three companies
22 in your discussion of the 505(b)(2) obligations and
23 duties, but that for the specific opinions about
24 Hospira and the specific opinions about Accord and
25 the specific opinions about Sandoz, the documents

9 (Pages 30 - 33)

Page 34

1 that are specific to those companies are what you
2 relied upon to form your specific opinions?
3    A.   Respectfully, no.  I mean, you're
4 correct about -- there was kind of two parts there.
5       First, you're correct that the things
6 such as guidances, the CFR, scientific publications,
7 apply to all of the defendants.
8       In terms of the specific companies.  I
9 guess, you know, if I saw something -- this is purely
10 hypothetical, and actually not even hypothetical,
11 this is mythical.
12       If a company said, you know, we really
13 want to change the label but the FDA has said no,
14 that would be an example of where I would have
15 reached a different conclusion.
16       But, you know, absent something like
17 that, it's a rebuttable -- not presumption, but a
18 conclusion that they all have an obligation to follow
19 those regulations unless there's some conflicting law
20 or regulation or non-public information that's
21 contained in there.
22       So, you know, basically, you know,
23 the -- looking at those documents and depositions,
24 if -- again, if there's something where it would say,
25 you know, we wanted to do it and we couldn't or we

Page 35

1 tried to do it and we couldn't, that's the sort of
2 thing where I would have reached a different
3 conclusion.
4       But -- so if there were no depositions,
5 nothing on that, I'd say until proven otherwise, this
6 is my conclusion.
7    Q.   I'm going to move to strike just because
8 I had a really hard time following that.  I'm not
9 sure it was responsive.  And in fairness, I might
10 have tried to put too much into one question.
11       But in any event, maybe I can come with
12 this differently because I don't want to take the
13 time to march through if we don't have to.
14       Is it fair to say that the documents on
15 this list that are internal documents to either
16 Sandoz or Accord, you're not using those internal
17 documents to form your opinions about Hospira's
18 docetaxel and Hospira's approach to its label and
19 pharmacovigilance?
20    A.   You're correct in that.  I'm sorry I
21 misunderstood.  You're correct.
22    Q.   Okay.  Good.
23       So let's then -- I'm going to skip over
24 the Accord and Sandoz stuff and I'm going to talk to
25 you a little bit about the Hospira documents you

Page 36

1 identified.
2       Let's go up a little bit first.
3       MR. HOROWITZ:  Ashley, I'm sorry.  The
4 page before.  There we go.
5    Q.   You list under, "US Labels" -- well,
6 let's skip that.  Well, let's just go down to the
7 PSURs.
8       Doctor, a PSUR is a Periodic Safety
9 Update Report.  Right?
10    A.   Correct.
11    Q.   And a PADER is a Periodic Adverse Drug
12 Experience Report?
13    A.   Correct.
14    Q.   And I notice that for your review you
15 list PSURs for -- for Sandoz.  And for PADERs you
16 list several for Sandoz and I think one for Accord.
17 Is it fair to say to say, though, that you don't list
18 any PSURs or PADERs for Hospira?
19    A.   That's correct.
20    Q.   And so you did not review as part of
21 your process of reviewing materials and forming your
22 opinions with respect to Hospira, you didn't review
23 Hospira's PADERs, did you?
24    A.   With the caveat that that would not have
25 affected my conclusions, no.

Page 37

1    Q.   Okay.  Doctor, I don't need to know why
2 you didn't do it --
3    A.   Okay.
4    Q.   -- I just need to know that you didn't
5 do it.  So it's fair to say you didn't do it.  Right?
6       MR. CENTOLA:  And I object to the
7 colloquy.  He can answer the question however he
8 wants to answer the question as long as he's
9 answering the question.
10    A.   That's right.  Answer the question,
11 Doctor.  You didn't review Hospira's Periodic Adverse
12 Drug Experience reports in forming your opinions in
13 this case, did you?
14    A.   Since it would be irrelevant to my
15 conclusions, no.
16    Q.   That's your opinion is that they're
17 irrelevant to your conclusions.  Right?  That's part
18 of your opinion.  In other words, folks could
19 disagree with you.  Right?  Others might say, Well,
20 you know what, Doctor, these actually are relevant to
21 your opinions.  I don't agree with you.  Would you
22 accept that?
23    A.   Certainly people have the right to
24 disagree.  They need to provide a basis as to how
25 those would change the opinion.

10 (Pages 34 - 37)

1   Q.   Got you.
2        All right.  So you didn't review the
3   PADERs because if you had you would have listed them
4   for Hospira.  Right?
5   A.   Correct.
6   Q.   Let's go down then to the Hospira
7   documents.
8        You've got one, two, three, four, five,
9   six, seven -- roughly eight documents listed here.
10  Correct?
11  A.   Correct.
12  Q.   Do you know how many documents were
13  produced by Hospira as part of this litigation?
14  A.   I have to believe it's tens or even
15  hundreds of thousands.
16  Q.   You just -- you know it's more than
17  eight though.  Right?
18  A.   Say it again?
19  Q.   You know it's more than eight?
20  A.   Oh, yeah.
21  Q.   And it's fair to say that as -- you
22  don't know how many documents.  You don't know if
23  it's tens of thousands, hundreds of thousands, or
24  even in the millions, but you know that you were
25  limited in your review to these eight documents

1   listed here.  Fair?
2   A.   I would not -- if I could answer.  I'm
3   sorry, I don't agree with the use of the
4   word "limited."  If I thought I needed more documents
5   or other documents, I would have asked for them.
6   Q.   So you felt that in applying your
7   methodology that you were comfortable forming your
8   opinions through the review of roughly eight Hospira
9   documents to form your opinions.
10       MR. CENTOLA:  Objection, form.
11  A.   That's correct.
12  Q.   And did you, yourself, select these
13  eight documents or were these selected for you by
14  retaining counsel, plaintiffs' lawyers?
15  A.   I don't agree with the use of the word
16  "selected."  I was provided these.  Again, I was
17  not -- my agreement with retaining counsel
18  specifically says that I can ask and they're
19  obligated to provide any -- any arguably relevant
20  materials.
21  Q.   Do you -- I'm sorry.
22  A.   Go ahead.
23  Q.   It sounds to me, though, like you make
24  the ask but you rely on the judgment of retaining
25  counsel to decide what's relevant for you.  Is

1   that -- is that my understanding?
2        MR. CENTOLA:  Objection to form.
3   A.   No, that's not correct.
4   Q.   So then I -- I guess my question is you
5   weren't provided access to Hospira's full document
6   production, were you?
7   A.   That's incorrect.
8   Q.   Did you get the document production and
9   search it yourself?
10  A.   So if I understand the process of
11  production, the volumes are so massive that law firms
12  frequently -- I'm not saying that's happened
13  here -- have attorneys whose sole task is to go
14  through the production and figure out which ones need
15  to be -- I don't want to say produced, but are
16  relevant when they've -- when they've got them.  So
17  that's not something that I have ever asked for is a
18  full production because it -- it's not necessary.
19       And, you know, again, when you
20  say "access," it's different from providing the whole
21  production.  My understanding is I have access unless
22  there's some reason -- and often privilege or
23  confidentiality which I didn't hear anything
24  about -- that if I ask for it, retaining counsel
25  would provide it to me.  It's that simple.

1   Q.   And so you were provided by retaining
2   counsel these eight documents listed here.  Right?
3   A.   Well, some of these I actually had
4   obtained on my own already.  So you know, others were
5   provided to me.  But, honestly, as I've said before,
6   this is a little bit like -- if I want to figure out
7   if someone is blind, I don't need to do -- look at
8   the retinal photographs, I need to just say, "Can you
9   see this light?"  And that's about --
10  Q.   Doctor, I'm not asking you -- yeah, I'm
11  sorry.  I'm sorry.  You're going off on a tangent
12  respectfully.
13       All I asked you was, you know, these
14  eight documents -- and I see here you have a label
15  and -- and, you know, the physician prescribing
16  information, which is also another word for label.
17  But the ones with Bates numbers, I guess six of them
18  have what we lawyers call Bates numbers.  Those six
19  were certainly just -- and all I'm asking is they
20  were provided to you, given to you by plaintiffs'
21  counsel.  Right?
22  A.   Yes.
23  Q.   Okay.  You did not review the entire New
24  Drug Application submitted by docetaxel to FDA for
25  approval of its -- did I say -- did I say "submitted

Page 42

1 by docetaxel."
2        Let me start that again.  You did not
3 submit -- we have to take a break in a minute.  Daddy
4 was up late last night, so...
5        You did not review the entire New Drug
6 Application submitted by Hospira to FDA for approval
7 of its docetaxel product, did you?
8     A.    That's correct.
9     Q.    And you did not review as we said the
10 Periodic Adverse Drug Experience reports either.
11 Correct?
12    A.    Correct.
13    Q.    You didn't review any NDA annual reports
14 submitted by Hospira to -- to FDA with respect to its
15 docetaxel product.  Correct?
16    A.    Correct.
17    Q.    You didn't review the full record of
18 correspondence between FDA and Hospira with respect
19 to regulation by FDA of Hospira's docetaxel product.
20 Right?
21    A.    Correct.
22    Q.    You did not review any individual
23 letters submitting 15-day adverse event reports,
24 expedited reports, by Hospira to FDA for its
25 docetaxel product, did you?

Page 43

1     A.    No.
2     Q.    Okay.  Has FDA ever taken any
3 enforcement action against Hospira with respect to
4 docetaxel?
5     A.    I don't know.
6     Q.    That's not something you looked into as
7 part of forming your opinions with respect to
8 docetaxel, Hospira's docetaxel in this case?
9     A.    I may have looked, but whether it has or
10 not would not have affected my conclusions.
11    Q.    Would you say that it would be
12 irrelevant to your opinions in this case?
13        MR. CENTOLA:  Objection, form.
14    A.    The lack of enforcement action by itself
15 does not automatically have implications for whether
16 a company is meeting -- has regulatory obligations or
17 is meeting them.
18    Q.    Okay.  And it's fair to say that you
19 have no idea as you sit here now whether FDA has ever
20 taken any enforcement action against Hospira with
21 respect to docetaxel?
22    A.    I -- I -- as I said, I don't know.
23    Q.    And has FDA ever found Hospira's
24 docetaxel to be misbranded?
25    A.    Not that I know of.

Page 44

1     Q.    Have you seen any FDA finding where FDA
2 has found that Hospira violated or was out of
3 compliance with any FDA regulation with regard to
4 docetaxel?
5     A.    Not that I'm aware of.
6     Q.    The answer is, no, you have not seen
7 that?
8     A.    Not that I'm aware of.
9     Q.    Doctor, in the interests of me needing
10 some coffee and maybe we should take a break.  We've
11 been going about an hour.  We'll try not to break
12 every hour, but if that's okay with you.
13    A.    I am a huge advocate of coffee and I may
14 do that in parallel, sir.
15        MR. HOROWITZ:  All right.  Excellent.
16 Let's make this fairly quick.
17    A.    Okay.  So how many minutes?
18        MR. HOROWITZ:  Maybe five, six minutes.
19 Is that all right, Larry?
20        MR. CENTOLA:  Perfect.
21        THE VIDEOGRAPHER:  The time is
22 10:45 a.m.  We are going off the record.
23        (A recess is taken.)
24        THE VIDEOGRAPHER:  The time is
25 10:55 a.m. and we're back on the record.

Page 45

1     Q.    Doctor, are you ready to continue?
2     A.    I am.
3     Q.    So, Doctor, we've been talking about
4 505(b)(2)'s as if we know what we're talking about.
5 And you and I might, but I want to dive into that a
6 little bit if you'll indulge me.  Is that okay?
7     A.    Sure.
8     Q.    Okay.  Now, you understand that Hospira
9 submitted a New Drug Application for docetaxel under
10 Section 505(b)(2) of the Federal Food, Drug and
11 Cosmetic Act.  Right?
12    A.    Yes.
13    Q.    And that's the approval pathway, the
14 505(b)(2) approval pathway is how docetaxel's -- I'm
15 sorry -- how Hospira's docetaxel was approved by FDA.
16 True?
17    A.    Yes.
18    Q.    And you would agree generally that this
19 approval pathway, the 505(b)(2) approval pathway,
20 allows sponsors of New Drug Applications to rely on
21 FDA's findings of safety and efficacy for drugs that
22 have already been approved.  That's part of it.
23 Right?
24    A.    Yes.
25    Q.    Let's take a look at an FDA Guidance if

12 (Pages 42 - 45)

Page 46

1 we could.
2         I'm going to mark as Exhibit No. 2 a
3 document titled, "Guidance for Industry Applications
4 Covered by Section 505(b)(2) Draft Guidance" dated
5 October 1999.
6         (Exhibit 2, "Guidance for Industry
7 Applications Covered by Section 505(b)(2) Draft
8 Guidance" dated October 1999, marked for
9 identification.)
10    A.    Yes.
11    Q.    And before we dive into the guidance, I
12 know you addressed this or guidances in your report
13 at paragraph 34, and I'm just going to read this to
14 you and just make sure we're on the same page.
15         In paragraph 34 of your report you
16 state, "Draft and Final Guidances published in the
17 Federal Register under FDA's Good Guidance Practices
18 regulation reflect the FDA's current thinking at a
19 given point of time on a particular regulatory or
20 technical issue."
21         Correct?
22    A.    Yes.
23    Q.    Okay.  And pharmaceutical companies and
24 folks who tried to comply with the FDA's rules and
25 regulations offer to look to these guidances -- and

Page 47

1 I'm trying to make this a little more
2 understandable -- for exactly what it says, guidance
3 for how they're supposed to proceed under the
4 regulations and how FDA would prefer they proceed.
5 Is that generally fair?
6    A.    With the understanding that that is not
7 the sole avenue for guidance.  And of course,
8 guidances are always subordinate to the constitution,
9 statutes, case law, and regulations.
10    Q.    You're not -- you don't want to revise
11 what you wrote in your report.  Right?
12    A.    No.  I'm simply giving that context.
13    Q.    And you also say in your report,
14 "Although technically not legally binding" -- and
15 this is paragraph 34 -- "Guidances represent a safe
16 harbor for FDCA."
17         That's the Federal Food Drug -- Food and
18 Drug and Cosmetic Act.  Right?  You say, "Guidances
19 represent a safe harbor for FDCA compliance, and
20 manufacturers who choose an approach different from
21 that described in a relevant Guidance" -- I screwed
22 that up.  Let me -- let me read that again.  I was
23 going to ask you if I read it correctly and I can
24 answer the question.  I did not.
25         It says, "Although technically not

Page 48

1 legally binding, Guidances represent a safe harbor
2 for FDCA compliance, and manufacturers who choose an
3 approach different from that described in a relevant
4 Guidance must still comply with FDCA.  In addition,
5 Guidances carry sufficient weight that Congress has
6 frequently directed the FDA through appropriate
7 legislation to develop Guidances on specific topics."
8         Did I read those sentences from your
9 report correctly?
10    A.    You did.  I want to -- I think it's
11 important to clarify one aspect in terms of my use of
12 the word "legally binding."  I -- this just happens
13 to be a notebook I have of the binder with the FDA
14 Guidance, and I'm -- this is going to be language
15 similar to this and any Guidance.
16         "This Guidance does not create or confer
17 any rights for or on any person and does not operate
18 to bind FDA or the public.  You can use an
19 alternative approach if the approach satisfies the
20 requirements of the applicable statutes and
21 regulations.  If you want to discuss an alternative
22 approach, contact the FDA staff responsible for
23 implementing this Guidance."
24         So --
25    Q.    Doctor, let me pause you there.  You

Page 49

1 just read from something.  What are you reading from?
2    A.    Oh, I'm sorry, I apologize.  And I'm
3 just -- this is actually -- I'm going to hold this
4 up.  And if the reporter needs it, this happens to be
5 from a May 2005 Guidance For Industry.  Apologies.  I
6 did want to use what it says in 1999 --
7    Q.    But -- I'm sorry.
8    A.    I'm talking over you.  Go ahead.  I'm
9 sorry.
10    Q.    No, I'm not fussing with you about the
11 meaning of a Guidance.
12    A.    Yeah, that's what it says.  I
13 just -- and, again, I'm sorry, I want to -- when I
14 say "legally binding," I just -- the reason I read
15 that is just to say that's in the context of FDA and
16 pharmaceutical manufacturers.
17    Q.    Okay.  Let me simplify this.
18         You agree with what you wrote in your
19 report.  Right?
20    A.    I do, I do.
21    Q.    And the paragraph you just read, just
22 for your own benefit if you want, but you just read
23 for me from the 2005 Guidance, and I think I've seen
24 in every Guidance, it's the same that appears on the
25 bottom of page 1 of the 1999 Guidance we just marked

13 (Pages 46 - 49)

Page 50

1 as Exhibit 2.
2     A.   Yes.  Yeah, and if I had that -- yes, if
3 I had that in front of me, Mr. Horowitz, I really
4 apologize, I would have asked you to read it.
5     Q.   No worries, no worries.
6     A.   I'm sorry.  Go ahead.
7     Q.   Let's move on and make some magic here
8 together.
9          So let's look at the cover page for this
10 Guidance For Industry.  And it says, "Applications
11 Covered by Section 505(b)(2).  Draft Guidance."  Do
12 you see that?
13     A.   I do.
14     Q.   And it's dated October 1999.  Do you see
15 that there?
16     A.   I do.
17     Q.   And this is an FDA Guidance in the
18 manner or -- or an example of one that we just
19 discussed in relation to paragraph 34 of your report.
20     A.   Yes.
21     Q.   So one question I have is did you review
22 this Guidance in the process of preparing your
23 opinions in this case?
24     A.   I had -- I've seen it before.  Certainly
25 I was aware of it.  Excuse me.

Page 51

1     Q.   I didn't see that listed in your
2 exhibit, materials reviewed list, and I didn't see it
3 cited anywhere in your text of your report, so can I
4 assume that you didn't review or rely upon it for the
5 specific purpose of giving your opinions in this
6 case?
7          MR. CENTOLA:  Objection, form.
8     A.   I certainly didn't rely on it.  You
9 know, I -- I did not review -- again, it's a document
10 I've seen many times.  It's -- but I did not review
11 it specifically for preparing my report.  Let me just
12 say that.  That's why it would not be listed on the
13 materials reviewed.
14     Q.   If you go to page 1, it says, "What is
15 the purpose of this Guidance?"  And by the way, for
16 your benefit, there's the paragraph you quoted at the
17 bottom there.  Do you see that?
18     A.   Yes.
19     Q.   Okay.  It says under Roman numeral I,
20 "What is the Purpose of this Guidance?"  I want to go
21 down to the third paragraph, the first couple of
22 sentences there.  Do you see it?  Are you with me
23 there, Doc?
24     A.   Yeah.
25     Q.   It says, "Section 505(b)(2) was added to

Page 52

1 the Act" -- and the Act is the FDCA, right, the
2 Federal Food, Drug and Cosmetic Act?
3     A.   Yes.
4     Q.   -- "by the Drug Price Competition and
5 Patent Term Restoration Act of 1984 (Hatch-Waxman
6 Amendments).  This provision expressly permits FDA to
7 rely, for approval of an NDA, a New Drug Application,
8 on data developed by the applicant."
9          Did I read that reasonably correctly?
10     A.   Yes.
11     Q.   Do you agree with those statements?
12     A.   I do.
13     Q.   And if you go to the last sentence of
14 that paragraph, it's actually on page 2.  FDA says,
15 "Section 505(b)(2) permits approval of applications
16 other than those for duplicate products and permits
17 reliance on such approvals on literature or an
18 Agency finding of safety and/or effectiveness for an
19 approved drug product."
20          Did I read that correctly?
21     A.   You did.
22     Q.   And is that consistent with your
23 understanding of what a Section 505(b)(2) application
24 permits?
25     A.   Yes.

Page 53

1     Q.   And then if you go to the next section,
2 Section II, it says, "What is a 505(b)(2)
3 Application?"
4          Do you see that?
5     A.   Um-hum.
6     Q.   And if you go to Section II-A, it says,
7 "What type of information can an applicant rely
8 upon" -- or "rely on?"  Do you see that?
9     A.   I do.
10     Q.   I want to go down to the second
11 paragraph labeled number 2 conveniently, subsection
12 2.
13          It says, "The Agency's finding of safety
14 and effectiveness for an approved drug."
15          Do you see that?
16     A.   Yes.
17     Q.   "An applicant should submit a 505(b)(2)
18 application for a change in a drug when approval of
19 the application relies on the Agency's previous
20 finding of safety and/or effectiveness for a drug.
21 This mechanism, which is embodied in a regulation at
22 21 CFR 314.54, essentially makes the Agency's
23 conclusions that would support the approval of a
24 505(j) application" -- let me pause here.  That's an
25 ANDA application.  Right?

14 (Pages 50 - 53)

Page 54

1     A.    That's abbreviated.  That's the section
2  of the Act that sets forth -- defines an Abbreviated
3  NDA and describes the process for that.
4     Q.    Okay.  It goes on to say -- "a 505(j) or
5  an ANDA application available to an applicant who
6  develops a modification of a drug."
7           Did I read all of this correctly so far?
8     A.    Yes.
9     Q.    Anything you disagree with?
10    A.    No.
11    Q.    It says, "Section 314.54 permits a
12 505(b)(2) applicant to rely on the Agency's finding
13 of safety and effectiveness for an approved drug to
14 the extent such reliance would be permitted under the
15 generic drug approval provisions under Section
16 505(j).
17          Do you see that?
18    A.    I do.
19    Q.    It says, "This approach is intended to
20 encourage innovation in drug development without
21 requiring duplicative studies to demonstrate what is
22 already known about a drug while protecting the
23 patent and exclusivity rights of the approved drug."
24          Did I read that correctly?
25    A.    You did.

Page 55

1     Q.    Is that consistent with your
2  understanding as to the purpose and policy behind a
3  505(b)(2) application?
4     A.    It's not only consistent with my
5  understanding, it's also consistent with my opinion,
6  or perhaps I should put that the other way around.
7           But I specifically discuss this issue in
8  my report about the similarities between 505(b)(2)'s
9  and 505(j)'s.
10          So, yes, I agree with everything you've
11 said there -- or more accurately, everything that
12 this Guidance says.
13    Q.    Okay.  Let's take a look at Section
14 II-B.  "What kind of application can be submitted as
15 a 505(b)(2) application?"
16          Do you see that?
17    A.    I do.
18    Q.    We're going to subsection 2 again.  It
19 says, "Changes to previously approved drugs," that
20 can be submitted under a 505(b)(2).  Do you see that?
21    A.    I do.
22    Q.    Okay.  And it goes on to say -- and I
23 guess let's go to the third sentence: "This use of
24 Section 505(b)(2)" -- it's the third sentence in.  Do
25 you see that?

Page 56

1     A.    Yes, I'm sorry.  Yes, go ahead.
2     Q.    Maybe Ashley can put the cursor on it.
3  You got it.  There it is.
4           "This use of Section 505(b)(2),
5  described in the regulations at 21 CFR 34.54, was
6  intended to encourage innovation without creating
7  duplicative work and reflects the same principles as
8  the 505(j) application.  It is wasteful and
9  unnecessary to carry out studies to demonstrate what
10 is already known about a drug."
11          Did I read that correctly?
12    A.    Not only did you read that correctly, I
13 agree 100 percent with -- obviously it's the FDA
14 writing this, but I believe that was valid in 1999
15 and it's still valid almost a quarter century later.
16    Q.    And you agree in particular it's
17 wasteful and unnecessary to carry out studies to
18 demonstrate what is already known about a drug.
19 True?
20    A.    That is actually, I would say, true not
21 just for ANDAs and 505(b)(2)'s, it's also true
22 for -- for traditional 505(b)(1)'s.  But please go
23 ahead.
24    Q.    All right.  Let's go to the glossary for
25 a second.  I just want to make sure we get into the

Page 57

1  weeds a little bit.  We're using -- speaking the same
2  language, if you will.
3     A.    Um-hum.
4     Q.    We're not going to do all of these.  I
5  think some of them are self-evident.  But I want to
6  talk about the first one, "active ingredient."  Do
7  you see that?
8     A.    Yes.
9     Q.    And it says, "Active ingredient:  Any
10 component that is intended to furnish pharmacologic
11 activity or other direct effect in the diagnosis,
12 cure, mitigation, treatment, or prevention of
13 disease, or to affect the structure or any function
14 of the body of man or of animals."
15          Do you see that?
16    A.    I do.
17    Q.    Is that in your mind an appropriate and
18 accurate definition of what an active ingredient is?
19    A.    Well, it's the definition of -- that's
20 provided in the cited section of the CFR.
21    Q.    So is that a "yes," you agree?
22    A.    That is a "yes."
23    Q.    Okay.  And in this, the context of our
24 discussion here today, the active ingredient in
25 docetaxel is docetaxel.  Right?

15 (Pages 54 - 57)

Page 58

1    A.   It is -- so I think it's important, just
2  for clarity, to say you look at the definition
3  immediately below that, which is "active moiety."
4  Okay?
5         So there's the same active moiety does
6  not reference whatever the ester of salt is that the
7  active ingredient is either complex with or bound to.
8         Having -- so they both, that and the
9  505(b)(1) NDA Taxotere have the same active moiety.
10 I believe that it is also the same active drug
11 ingredient.
12   Q.   So --
13   A.   To understand for Hospira's NDA.
14   Q.   Okay.  So we're on the same page.
15        So for docetaxel, then, the active
16 ingredient in Hospira's docetaxel and the active
17 ingredient in Sanofi's Taxotere, and you're telling
18 me the active moiety in Hospira's docetaxel and the
19 active moiety in Sanofi's Taxotere are the same.
20 Fair?
21   A.   Yes.
22   Q.   Let's take a look at "Listed Drug."  Do
23 you see that?
24   A.   Yes.
25   Q.   It says, "A listed drug is a new drug

Page 59

1  product that has an effective approval under Section
2  505(c) of the Act for safety and effectiveness, or
3  under Section 505(j) of the Act."
4         And then it goes on to talk about
5  withdrawn or suspended.  But they're not, you know,
6  any of those things.  Right?
7    A.   When you say, "they're not any of those
8  things" --
9    Q.   I'm sorry.  Yeah, I just was trying not
10 to read the whole paragraph.  I don't want you to
11 fuss with me if I say that you agree that a listed
12 drug is the new drug product that has an effective
13 approval under Section 505(c) of the Act for safety
14 and effectiveness or under 505(j) of the Act?
15   A.   I will make it even simpler.  A listed
16 drug is one that has an effective NDA that's
17 approved, which is 505(c), or an Abbreviated NDA to
18 be approved under 505(j).
19   Q.   Well said.
20   A.   So docetaxel is approved under 505(c).
21   Q.   Right.  And Taxotere is a 505(c) as well
22 but under 505(b)(1).  Right?
23   A.   So submitted under 505(b)(1).
24        Hospira's docetaxel is submitted as a
25 505(b)(2), which as I mention in my report, is a

Page 60

1  subset of 505(b)(1).
2    Q.   Okay.  Fair enough.
3         So -- but Taxotere is 505(b)(1),
4  docetaxel is 505(b)(2).  I mean, there's nothing to
5  fuss about there.  Right?
6    A.   No, and those are two
7  different standards for approval, if you will, 505(c)
8  and 505(j).
9    Q.   Let's go to the Orange Book.  You're
10 familiar with the Orange Book.  Right?
11   A.   Yes.
12   Q.   It's the approved drug products with
13 therapeutic equivalence evaluations.  Do you see
14 that?
15   A.   Yes.
16   Q.   Okay.  We'll talk about that in a
17 second.
18        And then the next definition is
19 "Pharmaceutical equivalent or duplicate."  Do you see
20 that?
21   A.   Yes.
22   Q.   And you're familiar with this as well?
23   A.   Yes.
24   Q.   And it says, "Drug products that contain
25 identical amounts of the identical active ingredient,

Page 61

1  i.e., the same salt or ester of the same therapeutic
2  moiety in identical dosage forms but not necessarily
3  containing the same inactive ingredients."
4         Do you see that?
5    A.   Yes.
6    Q.   And it says, "And that meet the
7  identical compendial or other applicable standard of
8  identity, strength, quality and purity including
9  potency, and where applicable, content uniformity,
10 disintegration times and/or dissolution rates."
11   A.   Yes.
12   Q.   Did I read that reasonably correct?  You
13 agree that that's the definition of "pharmaceutical
14 equivalence or duplicate."  Right?
15   A.   Yes.
16   Q.   Do you believe that -- or have an
17 opinion as to whether Hospira's docetaxel is the
18 pharmaceutical equivalent of Sanofi's Taxotere?
19   A.   My understanding is that it's not only a
20 pharmaceutical equivalent, it is also a
21 bioequivalent.  And this is from the Office of
22 Generic Drugs.  And it's been determined to be
23 therapeutically equivalent to Sanofi's Taxotere.
24        Let me -- hopefully I got rid of a couple
25 of questions.  I will add, though, that that does not

16 (Pages 58 - 61)

1 make it, quote, a generic drug because it's
2 therapeutically equivalent. The two are not
3 synonymous concepts. And, again, I'm not sure if I
4 have that in my report, but they're
5 not -- they're -- a generic drug approved under
6 505(j) is not necessarily therapeutically equivalent
7 to the Reference Listed Drug.
8    Q.    Yeah, sorry.
9    A.    But anyway, I just -- I just mean that's
10 a really important point.
11    Q.    And I'm not going to fuss with you on
12 that.
13    A.    Okay.
14    Q.    I know I've got some fuss on that. I'm
15 not going to do that.
16        But just so we're clear on our terms.
17 What you're saying is that a 505(j), an application
18 approved under 505(j) which is an Abbreviated New
19 Drug Application, that's when you label something
20 generic, that's what you have in mind in the first
21 instance. Right?
22    A.    Well, if we could just go back up on the
23 page -- the page in the Guidance you were reading
24 from, talking about the purpose, but just so I can
25 help to clarify the point a little bit.

1    Q.    Where are we?
2    A.    It is what is -- I'm sorry, I think it's
3 up one more.
4    Q.    You know, Doc, maybe I'll just withdraw
5 the question. Because it's really -- I'm not fussing
6 with you about --
7    A.    No, and I understand.
8        (Cross-talk.)
9    A.    That third paragraph goes over, you
10 know, distinguishes -- I think it's that one.
11 Actually, it's on the next -- the next page.
12    Q.    Yeah.
13    A.    The one that mentions department letter?
14    Q.    I'll let you finish your thought but
15 we're not going to fuss with that.
16    A.    All right. It distinguishes between
17 505(b)(2)'s and 505(j)'s is all I want to say.
18    Q.    Understood. Understood.
19        Okay. I think we got where we wanted to
20 be.
21        Let's just end with Reference Listed
22 Drug.
23    A.    Um-hum.
24        MR. HOROWITZ: If we can go back. I'm
25 sorry, Ashley. I'm blaming the doctor, though. He's

1 the one that made you go back up.
2    A.    I'm sorry. I apologize to the reporter.
3 I'm sorry, I'm not laughing as it's funny.
4    Q.    No worries.
5        Referenced Listed Drug. "The listed
6 drug identified by FDA as the drug product upon which
7 an applicant relies in seeking approval of its
8 abbreviated application."
9        Do you agree with that definition?
10    A.    Yes.
11    Q.    And the regulation that's referenced in
12 here a few times, several times, it sets forth the
13 procedure for submitting a 505(b)(2) application is
14 Section 21 CFR 314.54. Do you agree with that?
15    A.    I believe that's correct.
16    Q.    And just so we're on the same page, with
17 respect to a 505(b)(2) applicant, in general terms,
18 they're not required to demonstrate what is already
19 known about the drug. Right? We talked about that.
20    A.    I'm hesitating. I'm trying to spare you
21 a long answer.
22    Q.    Please.
23    A.    It's whether they -- whether they can
24 rely on AFSE. That's the abbreviation I use in my
25 report, the Agency's finding of safety and efficacy.

1    Q.    Correct.
2    A.    And sometimes they can and sometimes
3 they can't. And it may be that they can rely on it
4 for part of it but not other things they have to do
5 additional. So they want to do additional studies
6 because it will open up another door for them.
7 That's, I'll just say, a very interesting use and
8 very appropriate use of 505(b)(2)'s.
9        So to the extent that you can
10 extrapolate from what has already been demonstrated
11 to another, quote, new drug, the answer is yes. But
12 I'm sorry, I'm really trying not -- I'm a recovering
13 academic.
14    Q.    You can do that in the exceptions under
15 the rule. I understand what you're saying.
16    A.    Sorry.
17    Q.    That's why I was hesitant to even ask
18 this because, you know, it's like when lawyers try to
19 summarize and I don't think we even need to have this
20 conversation because I think we covered it.
21        But in other words, the whole point of
22 505(b)(2) is so that the applicant doesn't need to
23 repeat everything that was already done if they're
24 relying upon, let's say, a 505(b)(1) NDA such as
25 Taxotere in the docetaxel situation. The whole point

17 (Pages 62 - 65)

1 is that they're not required to do all of the same
2 studies, all of the same clinical trials, all of the
3 same pre-clinical. All of the same work done
4 under the -- that's just not part of the program.
5 Right?
6     A.   No. To the extent that you can. And
7 also -- and I know you know this, but it's -- it's
8 also to strike a balance between not requiring
9 wasteful use of resources and time and providing some
10 intellectual property protection for --
11     Q.   Yeah, intellectual property protection
12 you mean, just so I can clarify, is patents, and
13 things like that.
14     A.   Yes, yes.
15     Q.   Right. And just so -- I'm sorry. One
16 of the things we'll see with the 505(b)(2)
17 applications here is that there's a bit of a gap
18 between when they're first submitted and when they're
19 finally approved, and part of that is because of what
20 you're talking about, exclusivity and patent issues
21 related to the innovator product which here would
22 have been Taxotere. Right?
23     A.   Yes. And the third thing -- and forgive
24 me -- is also in making sure that there's covered
25 rails, so to speak, in terms of some regulatory or

1 labeling that you don't go beyond -- like, speaking
2 specifically about generics, that they have to stay
3 identical to the label. And I'm not talking about
4 suitability petitions or that kind of thing.
5     Q.   Yeah.
6     A.   And I'm sorry, I know that's -- I know
7 that's -- I'm not trying to fuss with you either, I
8 just feel like those are important considerations.
9     Q.   I got you. I know you like to caveat
10 and that's fine.
11     A.   Well, it's not caveat. Actually, I
12 think this is really important stuff for the Court.
13 Go ahead. Go ahead. Sorry.
14     Q.   We're torturing the court reporter now.
15 Poor Linda.
16        Let's go to a new exhibit because maybe
17 we can button this up a little bit with the
18 regulation.
19        Why don't we mark as Exhibit 3
20 21 CFR 314.54.
21        (Exhibit 3, 21 CFR 314.54, marked for
22 identification.)
23     Q.   Go ahead and put that up on the screen.
24        MR. HOROWITZ: Our first technical
25 glitch. It's loading. There we go.

1     Q.   And you recognize this, Doctor,
2 Exhibit 3 as 21 CFR 314.54, Procedure for submission
3 of a 505(b)(2) application requiring investigations
4 for approval of a new indication for, or other change
5 from, a listed drug.
6     A.   Yes. Can I ask? My eyes are not what
7 they were.
8     Q.   You want to make it bigger?
9     A.   Bless you. Thank you.
10     Q.   And this is obviously a regulation that
11 you're familiar with?
12     A.   Yes.
13     Q.   So let's go to the last paragraph of the
14 first section, because I think the first part kind of
15 covers our discussion before.
16        But you see it says, "The 505(b)
17 application need not -- need contain -- I'm sorry.
18 I'll do that again.
19        "This 505(b)(2) application need contain
20 only that information needed to support the
21 modification(s) of the listed drug."
22        Do you see that?
23     A.   Yes.
24     Q.   And then if you go down to little
25 number iii. Do you see that? I think we overshot

1 it. We are. There it is. Sorry.
2        "Identification of each listed drug."
3        Do you see that?
4     A.   Yes.
5     Q.   It says, "The applicant must submit a
6 complete archival copy of the application that
7 contains the following:"
8        And little number iii says,
9 "Identification of each listed drug for which FDA has
10 made a finding of safety and effectiveness and on
11 which finding the applicant relies in seeking
12 approval of its proposed drug product by established
13 name, if any, proprietary name, dosage form,
14 strength, route of administration, name of listed
15 drug's application holder, and listed drug's approved
16 NDA number. The listed drug(s) identified as relied
17 upon must include a drug product approved in an NDA
18 that, (A) is pharmaceutically equivalent to the drug
19 product for which the original 505(b)(2) application
20 is submitted; and (B), Was approved before the
21 original 505(b)(2) application was submitted."
22        Did I read all of that correctly?
23     A.   You did.
24     Q.   Okay. And this is the regulation that
25 governs what we've basically been discussing with

18 (Pages 66 - 69)

Page 70

1 respect to 505(b)(2) applications and what's
2 required. Fair?
3     A.    Well, it's -- it's one of them.  If I
4 can just comment.  First and foremost, so that the
5 thing in the paragraph that you just read, it
6 says "identification of each listed drug," and then
7 the last line there's a parenthetical (s).
8         Now, for a generic drug that is --
9     Q.    I'm sorry, Doctor --
10    A.    I know, I know, but I just --
11    Q.    You're going off on a tangent here.
12    A.    It's -- it's one of the things, it's one
13 of the things I just will say.
14    Q.    Doctor, I'll withdraw the last question.
15 Let me ask you this.
16    A.    Okay.
17    Q.    Do you agree that I read correctly the
18 FDA's regulation?
19    A.    This is one of the requirements for
20 approval of a 505(b)(2), yes.
21    Q.    And I think you said in your prior
22 deposition that when FDA reviews a 505(b)(2)
23 application, where there is a reliance upon a listed
24 drug and FDA's finding of safety and effectiveness,
25 that FDA doesn't go back to the beginning and redo

Page 71

1 everything and all the analyses that had previously
2 been done.  Do you remember saying that?
3     A.    I have to -- I'd want to see the exact
4 statement I made.  I would not say that never
5 happens.  But I'm certainly -- I'd want to see what
6 before, to be honest with you.
7     Q.    Let me ask you now.  Do you think FDA
8 goes back to the beginning of time and redoes all the
9 analysis and re-looks and redoes everything that was
10 previously done in the process of reviewing a
11 505(b)(2) application?
12    A.    No.  And I'd stand by, you know, just
13 leaving aside the exact wording, no.  But on the
14 other hand, they don't simply treat it as a black box
15 that says effective, safe and effective.  You want to
16 look at -- sorry -- for a 505(b)(2) specific aspects
17 of it.
18    Q.    Right.  I think that's what you said
19 before, too.  A 505(b)(2) application, when FDA is
20 reviewing that, they're going to look for issues that
21 are specific to the new 505(b)(2) filing.  Right?
22    A.    Yes.
23    Q.    And, essentially, FDA, you know, builds
24 upon what's already known about the approved product.
25 Agree with that?

Page 72

1     A.    Known, and also the regulatory analysis
2 and decisions that applied -- were applied to the
3 original drug.  But, again, I agree with your basic
4 point except generally they don't go back and do
5 everything again.  I would agree with you on that.
6         MR. HOROWITZ:  Let's mark as our next
7 exhibit, number 4, the NDA cover letter submission.
8         (Exhibit 4, Letter dated July 9, 2007,
9 Original New Drug Application, HOS00200007762 -
10 HOS00200007765, marked for identification.)
11        MR. HOROWITZ:  Ashley, that's Tab 7.
12 We're having loading issues.  It's just slow.
13    Q.    So, Doctor, what I've put in front of
14 you as Exhibit 4 is a document from Hospira's
15 production dated July 9, 2007.  It says, "Original
16 New Drug Application."  Do you see that?
17    A.    Yes.
18    Q.    And this would be the cover letter to
19 Hospira's submission of its New Drug Application for
20 its docetaxel product under Section 505(b)(2).
21 Right?
22    A.    Yes.
23    Q.    And if you go to the paragraph text in
24 the middle, it says, "Hospira, Inc., hereby submits a
25 New Drug Application for Docetaxel Injection in

Page 73

1 accordance with Section 505(b)(2) of the Federal
2 Food, Drug, and Cosmetic Act."
3         Do you see that?
4     A.    Yes.
5     Q.    "The basis for this submission is
6 Sanofi-Aventis U.S., NDA No. 20-449 for Taxotere
7 Injection Concentrate, approved on May 14, 1996."
8         Did I read that correctly?
9     A.    Yes.
10    Q.    And the reference to Taxotere is because
11 under the regulation that we just went through,
12 Taxotere would be the product that was already
13 approved as safe and effective that Hospira is
14 relying upon for this application.  Correct?
15    A.    Yes.
16    Q.    And if you go to the -- by the way,
17 the -- the May 14, 1996, date, that's the original
18 approval of Taxotere by FDA.  True?
19    A.    I believe that's correct, yes.
20    Q.    And that's roughly 11-plus years before
21 Hospira even submits this application.  Correct?
22    A.    Yes.
23    Q.    And not the direct subject of our
24 discussion today, but, generally, you would agree
25 that Sanofi once Hospira -- I'm sorry -- once

19 (Pages 70 - 73)

Page 74

1 Taxotere was on the market, you would expect that
2 they would be providing adverse event reports and
3 Periodic Adverse Drug Experience reports, and
4 expedited safety reports, and NDA annual reports, and
5 IND annual reports, and all of those things would be
6 provided to FDA as part of the regulatory obligations
7 of a New Drug Application holder. True?
8     A.   Yes.
9     Q.   And FDA would, of course, be charged
10 with the review and assessments of those materials
11 and its duty to regulate the Taxotere product. Fair?
12     A.   To the extent that it's able to do so,
13 of course.
14     Q.   And then if you turn to the next page of
15 Hospira's cover letter dated July 9, 2007, it says,
16 "The active ingredient, indications, route of
17 administration, and dosage form are the same as those
18 have the Reference Listed Drug."
19          Do you see that?
20     A.   I do.
21     Q.   And again, the Reference Listed Drug is
22 Taxotere. Right?
23     A.   That is not the correct use of that
24 term; but, yes -- to the term "Reference Listed
25 Drug," but, you're correct, that is what's identified

Page 75

1 by that.
2     Q.   Why is that not the correct use of the
3 term? I have to ask you that.
4     A.   If you -- we've looked at this before in
5 terms of the definition. That applies to generics
6 approved under 505(j). I mean, you can have -- a
7 generic by definition only has one listed drug on
8 which it relies. A 505(b)(2) can have more than one,
9 and that was -- you know, looking at 314.54, that was
10 one of the points in there.
11          So Reference Listed Drug, and I'm aware
12 that FDA has -- I think to save a mouthful, has in
13 recent years actually started using it. But that,
14 the definition in 314.3 for Reference Listed Drug
15 applies to 505(j)'s.
16     Q.   All right. So when I have documents
17 from FDA and context from FDA that talk about
18 Taxotere is the Reference Listed Drug with respect to
19 Hospira's docetaxel, you're saying that those folks
20 at FDA got it wrong as well?
21     A.   What I'm saying is that's not the
22 definition of Reference Listed Drug that we looked at
23 before in 314.3.
24     Q.   Okay. And your view is that Reference
25 Listed Drug is only something that is ever going to

Page 76

1 be used in the context of a 505(j) ANDA application?
2     A.   So if the Agency choose -- chooses to
3 use it as shorthand for a -- not the, but a listed
4 drug under which the 505(b)(2) NDA holder relies in
5 whole or in part on the Agency's findings of safety
6 and effectiveness, the Agency can do that. But it
7 does the risk of confusion.
8          And, again, I think the bottom line is
9 the definition in 3.14.3 for an RLD -- we can go back
10 and look.
11     Q.   Yeah, I think you're tilting at a
12 windmill. I've tried to do it for you, but you know,
13 this difference between 505(j) and 505(b)(2), we're
14 not going to be fighting very much about that today.
15 We're just not. So --
16     A.   I take --
17     Q.   Let me say --
18     A.   Believe me.
19     Q.   Everybody used it.
20     A.   Okay. I just want to say one thing.
21 Not about this but about process. And I know you're
22 tired and I'm really not trying to be difficult, but
23 I also would like to make sure I'm clear on the
24 record --
25     Q.   Okay.

Page 77

1     A.   -- for everybody's sake.
2          But you have enormous -- if you were up
3 late, believe me, last night, you have enormous
4 sympathy from me. I mean that. I just want to make
5 it clear, I'm not trying to tilt at windmills and be
6 difficult. I'm really not.
7     Q.   Let's continue.
8     A.   Go ahead.
9     Q.   It says, "The active ingredient,
10 indications, route of administration, and dosage form
11 are the same as those of the Reference Listed Drug."
12          And here Hospira is referring to
13 docetaxel. Is that fair?
14     A.   That's what it says, yes.
15     Q.   And if you go onto the end of that
16 paragraph, it says, "The differences between the
17 labeling content of the proposed drug product and
18 that of the Reference Listed Drug, Taxotere Injection
19 Concentrate, are noted in the side-by-side labeling
20 comparison provided in Module 1 (Section 1.14.3.1)."
21          Do you see that?
22     A.   Yes.
23     Q.   And, "A high-level summary of the
24 differences between Hospira, Inc.'s Docetaxel
25 Injection and the Reference Listed Drug Taxotere

20 (Pages 74 - 77)

1 Injection Concentrate is provided below."
2        Do you see that?
3    A.   I do.
4    Q.   And then they give the specific changes
5 with respect to their proposed product and Taxotere
6 Injection.
7        And we can look at those, but would you
8 agree with me that none of those changes relate to
9 information about adverse events or warnings?
10    A.   I would say not explicitly certainly,
11 but you know, there's -- I would just say there are
12 immediate precaution or patient safety issues that in
13 terms of labeling that these raise.
14        For example, you know, the question of
15 the first, the very first bullet, direct dilution.
16 And it's neither good nor bad in that way, but
17 it's -- there's labeling implications other than just
18 this.  But you're correct in terms of saying, well,
19 there's this adverse event or that, that does not by
20 itself have direct implications for the Adverse
21 Reactions section.
22    Q.   And, in fact, what's being submitted is
23 a side-by-side label comparison.  I mean, they're
24 literally putting the Taxotere label side by side
25 with the proposed Hospira label for FDA to take a

1 look at.  Right?
2    A.   Correct.
3    Q.   And to do that comparison.  True?
4    A.   Yes.
5    Q.   And if you go down to below the bullet
6 list of -- of differences, it says, "The data
7 supporting this application is provided in 12 volumes
8 and is organized according to the sections defined in
9 the FDA's Guidance For Industry."
10        Do you see that?
11    A.   I do.
12    Q.   And as we discussed earlier, you have
13 not reviewed those 12 volumes that FDA had to review
14 and reviewed before they approved this application.
15 Right?
16    A.   With the understanding that actually I
17 was not asked to address anything related to approval
18 itself, no, that's correct.
19    Q.   And is it your view that -- that
20 the -- well, let me ask it this way -- no, let me not
21 do that.  We'll come back to that.
22        Let's go to the next page.
23        It says in the middle there, do you see
24 where it says, "Hospira, Inc., requests a therapeutic
25 equivalence designation of AP"?  Do you see that?

1    A.   Yes.
2    Q.   -- "as defined in the FDA Orange Book
3 for Docetaxel Injection product upon approval of the
4 NDA."
5        Did I read that correctly?
6    A.   Yes, yes.
7    Q.   Do you know if that ultimately occurred?
8    A.   I don't know if that was the code.  My
9 understanding is that they did get an A code, which
10 as opposed to a B code, would mean therapeutic
11 equivalence.  I don't know if it was that specific
12 code, though.
13    Q.   Do you agree that FDA believes -- I'm
14 just reading from the Orange Book but I'm trying to
15 expedite this.
16        But when FDA talks about therapeutic
17 equivalence, it says, "FDA believes that products
18 classified as therapeutically equivalent can be
19 substituted with the full expectation that the
20 substituted product can be expected to have the same
21 clinical effect and safety profile as the prescribed
22 product when administered to patients under the
23 conditions specified in the labeling."
24        Is that your understanding of FDA's view
25 of pharmaceutical equivalence -- or I'm sorry,

1 therapeutic equivalence?
2    A.   Yes.
3    Q.   Okay.  Let's get back on track here.
4        MR. HOROWITZ:  Let's go to our next
5 exhibit, which will be Tab 8.
6        (Exhibit 5, E-Mail dated 11/9/2010, with
7    attachments, HOS01400254441 - HOS01400254568, marked
8    for identification.)
9    A.   Mr. Horowitz, apologies.  Just a brief
10 addendum.  That therapeutic equivalence, I do agree
11 that's FDA's -- that's my understanding of FDA's use
12 of therapeutic equivalence.  With the understanding
13 is that's at the time that therapeutic equivalence
14 determination is made.  I just want to add that
15 clarification.
16    Q.   And do you know for Hospira when that
17 was done with their docetaxel product and Taxotere?
18    A.   I believe -- I don't -- I honestly
19 don't.  I mean, I believe it was after approval,
20 obviously, but I would not be able to tell you when.
21    Q.   Let's go to exhibit -- which is probably
22 loading.  I believe we're up to Exhibit 5 or is it 6?
23 Anyone?  Larry, help me out?
24        MR. CENTOLA:  No clue.
25    Q.   Exhibit 5.

Page 82

1     All right.  Let's start at the top.  You
2 see this as an e-mail from Laurie Wojtko.  Do you
3 know who she is?
4     A.   I don't.  I gather she's a senior
5 associate in Reg Affairs for Hospira or was at the
6 time.
7     Q.   And we can agree you never read her
8 deposition.  Right?
9     A.   Correct.
10    Q.   She sends an e-mail on November 9th,
11 2010, to two individuals at FDA.  Do you see that?
12    A.   Yes.
13    Q.   And do you know who those individuals
14 are?
15    A.   I don't.
16    Q.   If you go to the next page, do you see
17 it's dated November 9, 2010, at the top?
18    A.   Yes.
19    Q.   And it's -- it says, "Telephone
20 Request - Labeling."
21        And this is a Hospira document.  Right?
22    A.   Yes.
23    Q.   And it says, "In response to the
24 telephone request from Modupe Fagbami at FDA, on
25 November 8, 2010, Hospira, Inc., hereby submits

Page 83

1 redlined labeling, created based upon the most recent
2 revision to the Reference Listed Drug's Taxotere
3 label 1-vial system label approved on August 2nd,
4 2010."
5        Did I read that correctly?
6     A.   Yes.
7     Q.   It says, "Hospira's label is unchanged
8 from its tentatively approved label, with the
9 exception of changes made to align with the RLD's
10 revisions."
11        And do you understand "RLD's revisions"
12 in this context to mean the Reference Listed Drug?
13    A.   Yes.
14    Q.   "Hospira has filed this application
15 using Taxotere's 2-vial system as its reference.
16 This redline label demonstrates alignment of
17 Hospira's proposed label with both the 1-vial and
18 2-vial system labels."
19        Did I read that correctly?
20    A.   Yes.
21    Q.   And in forming your opinions and as part
22 of the review, you did not review either this e-mail
23 contact report or the side-by-side labeling
24 comparison submitted to FDA.  Is that fair?
25    A.   No.

Page 84

1     Q.   Okay.  Let's go on then.
2        Well, let me ask you this.  We're going
3 to get to the approval in a second.  You know that
4 FDA ultimately approved Hospira's 505(b)(2) NDA
5 application for docetaxel.  Right?
6     A.   Yes.
7     Q.   Did FDA require any clinical studies for
8 Hospira's docetaxel before approval beyond those
9 already conducted by Sanofi?
10    A.   Keeping in mind that I was not asked to
11 address questions involving approval itself, as best
12 I'm aware, no.
13    Q.   So as far as you know and as far as you
14 understand it, FDA did not require any clinical
15 studies of Hospira as part of its approval of its
16 505(b)(2) application for docetaxel.  Fair?
17    A.   Yes.
18    Q.   And you're not going to be offering any
19 opinions about whether Hospira should have conducted
20 studies as part of its approval process.  As I
21 understand it, you're just not getting into the
22 approval process from what you've told me.
23    A.   If you mean -- here are you talking
24 about clinical trials?
25    Q.   Yeah, clinical studies.

Page 85

1     A.   I mean, I did not address that question
2 so I'm not -- yeah.  No, I do not plan on offering
3 opinions on pre-approval clinical trials.
4     Q.   And would you agree that Hospira is part
5 of -- well, prior to -- I'm sorry.
6        Would you agree that Hospira would not
7 have had access to Sanofi's proprietary clinical
8 trial information or pre-clinical information prior
9 to its approval of its 505(b)(2) NDA?
10    A.   To the extent that any of that
11 information was either not public, that is, posted on
12 FDA's website as part of -- with the reviews, or it
13 was not available under FOIA, I'd agree that that
14 material would not be available.
15    Q.   And do you agree that Hospira would not
16 have had access to all of the pre-approval
17 communications that occurred between FDA and Sanofi
18 before Taxotere was first approved?
19    A.   I don't know what material they would
20 have had available in terms of that correspondence.
21 And, again, that's not -- did not deal with my -- I'm
22 sorry -- wasn't relevant to the questions that I was
23 asked to look at.
24    Q.   Okay.  So if I asked you the same
25 question about, you know, post-approval, post-1996

22 (Pages 82 - 85)

Page 86

1  prior to the approval in 2011 of -- of Hospira's
2  docetaxel under 505(b)(2), you would give me the same
3  answer, this just wasn't something you were looking
4  at?
5      A.   Well, let me -- so --
6      Q.   I'm sorry.  What I mean by that is
7  specifically related to whether Hospira had access to
8  all of the back-and-forth between Sanofi and FDA.
9      A.   Only to the extent in terms of this
10 correspondence between the NDA holder, in this case
11 Sanofi, and FDA, only what either had been made
12 public for whatever reason, or that was available
13 under FOIA.  But otherwise, no.
14     Q.   And when you say, "available under
15 FOIA," you're not trying to suggest that Hospira
16 would have had access to proprietary information
17 related to the clinical studies and pre-clinical
18 studies and all of the back-and-forth between FDA and
19 Sanofi pre- or post-approval, you're not suggesting
20 that they could have accessed it that way, are you?
21     A.   No, and I just saying that if it is
22 FOIA-able, they have -- somebody, anybody would have
23 access to it.  But there's actually a specific
24 regulation -- I'm sorry, I can't remember the number,
25 it's somewhere in part 314 -- saying that actually

Page 87

1  this represents -- for example, trade -- I may not be
2  using the right term here -- trade secret or
3  commercial confidential, the FDA cannot release and
4  will not release.  I mean, the regs explicitly say
5  that the FDA will not even confirm the existence or
6  the submission of an application unless the applicant
7  says it's okay or does it itself.
8          MR. HOROWITZ:  Let's go on to our next
9  exhibit, which will be Exhibit 6.
10     Q.   I think we're still loading, Doctor.
11 Sorry.
12         MR. HOROWITZ:  I'm sorry, Tab 9.  I'm so
13 sorry, Ashley.
14         (Exhibit 6, NDA Approval, HOS01400256285
15 - HOS01400256346, marked for identification.)
16         (A discussion is held off the record.)
17         MR. HOROWITZ:  Hey, Ashley, maybe we can
18 make that a little bigger for the Doc.
19     Q.   All right.  Doctor, I put before you
20 what we've marked as Exhibit No. 6, and this is the
21 approval letter from FDA to Hospira with respect to
22 its Docetaxel 505 NDA, including the label and the
23 other materials.  Do you see that?
24     A.   I do.
25     Q.   And I believe it's dated -- go to the

Page 88

1  very end.  I will make this easy, it has an
2  electronic signature, March 8, 2011.  Do you see
3  that?
4      A.   Yes.
5      Q.   So it's fair to say then that the
6  Hospira docetaxel NDA under Section 505(b)(2) was
7  approved by the FDA on March 8, 2011.
8      A.   Sorry to be a purist, "was effectively
9  approved."  If you look at the beginning, it says it
10 was tentatively approved, and I assume it has to do
11 with patent and exclusivity issues.  But, yes,
12 effectively it was approved on that date.
13     Q.   I think you might be mixing two things.
14     A.   I could be.
15     Q.   This is the final approval.  This is
16 not --
17     A.   Yes, yes, and I'm -- I'm -- this is the
18 date on which it could be marketed.
19     Q.   This is the final approval.  I'm sorry.
20     A.   Yes, that's -- that's all I'm saying.
21     Q.   Okay.  And we'll cover that.  Nothing
22 tricky here.
23         Let's go to the first page and just
24 maybe clean this up a little.
25         Doctor, do you see there in the top right

Page 89

1  corner on this letterhead from FDA it says, "NDA
2  Approval."
3      A.   Yes, yes.  And I wasn't challenging
4  that.  I just was referring to that third paragraph
5  there.  That's all.
6      Q.   Understood.  Understood.
7          And so just to clarify then, you see the
8  third paragraph says, "Also please refer to our
9  tentative approval letter dated December 11, 2009."
10     A.   Yeah.
11     Q.   And so that was the tentative approval,
12 and then this is the final approval on March 8, 2011.
13     A.   Yeah, effective approval, yes.
14     Q.   And it says -- and by that we mean this
15 is the date upon which the company can now market and
16 put into the marketplace its docetaxel product.
17     A.   Correct.  In the United States, correct.
18     Q.   In the United States.  You are a purist.
19     A.   I'm sorry.  If it makes you feel any
20 better, I drive people -- in my day job I drive
21 people nuts with this.
22     Q.   I find that shocking.
23         All right.  And let's go through the
24 letter a little bit if you'll indulge it and I think
25 this will be it before lunch.

23 (Pages 86 - 89)

1    A.    Okay.
2    Q.    It says, "Dear Ms. Wojtko."  We talked
3  about that earlier.  She's in Regulatory Affairs at
4  Hospira.  Right?
5    A.    Yes.
6    Q.    It says, "Please refer to your New Drug
7  Application dated July 9, 2007, received July 11,
8  2007, submitted pursuant to Section 505(b)(2)."
9          Do you see that?
10    A.    Yes.
11    Q.    And it says there were some amendments
12  that were also submitted, several amendments there,
13  we don't have to go through them all.  But multiple
14  amendments particularly in 2010 and early 2011.  Do
15  you see that?
16    A.    Yes.
17    Q.    And then it goes on to say, "This NDA
18  provides for use of Docetaxel" -- "Docetaxel
19  Injection, 20 milligrams per 2 milliliters,
20  single-dose vial; 80 milligrams per 8 milliliters,
21  multi-dose vial; and 160 milligrams/16 milliliter
22  multi-dose vial for locally advanced or metastatic
23  breast cancer after failure of prior chemotherapy in
24  combination with doxorubicin and cyclophosphamide as
25  adjuvant therapy of operable node-positive breast

1  cancer," semicolon.
2          Putting aside my pronunciation, did I
3  read that reasonably correctly?
4    A.    Better than I would have.
5    Q.    So the first indication, if you will,
6  involves treatment of breast cancer.  Is that fair?
7    A.    A specific class of -- of -- the
8  people -- the patients with the more advanced breast
9  cancer, but yes.
10    Q.    And by "more advanced," what do you
11  mean?
12    A.    So as opposed to, for example, early
13  breast cancer or node-negative -- I'm sorry -- yeah,
14  or node-negative breast cancer.  I'm just -- and,
15  again, I'm just -- that's -- that's a specific
16  indication, and of course it's based on the Taxotere
17  label.  So typically approvals from cancer drugs are
18  going to be specific to a particular stage.  You
19  know, most commonly it's you start out with the most
20  advanced form compared to -- as opposed to earlier
21  stages, because those are generally the patients with
22  the fewest options.
23    Q.    And then it says, "For locally advanced
24  or metastatic non-small lung cancer after failure of
25  prior platinum-based chemotherapy in combination with

1  cisplatin for unresectable, locally advanced or
2  metastatic, untreated, non-small cell lung cancer,
3  and in combination with prednisone for androgen
4  independent (hormone refractory) metastatic prostate
5  cancer."
6          Again, did I read that reasonably
7  correctly?
8    A.    Yeah, that's absolutely it.
9    Q.    Okay.  So we're talking about a form of
10  lung cancer as -- as a next indication after -- after
11  what you described for us with respect to breast
12  cancer.  Right?
13    A.    Yes.
14    Q.    And, again, we're talking about advanced
15  or metastatic type of cancer?
16    A.    Yes.  Unresectable.
17    Q.    Understood.
18          And then the last would be the
19  metastatic prostate cancer.  Is that right?
20    A.    I'm sorry.  I'm just -- I'm seeing
21  distinctions here.  And I'm not trying to make any
22  particular problem here.  I mean, the hormone
23  refractory is particularly problematic.  So, again,
24  there's nothing bad about that.  I'm not saying, oh,
25  my God, that's terrible.  I'm just -- those

1  are -- cancer is a collection of several hundred
2  diseases ultimately and that's why these distinctions
3  are important, why the FDA labels -- and the company
4  studies it in a very precise way.
5          Go ahead.  I'm sorry, Mr. Horowitz.
6    Q.    All good.  All good.
7          And it goes on to say, "We have
8  completed our review of this application, as amended.
9  It is approved, effective on the date in this letter,
10  for use as recommended in the enclosed agreed-upon
11  labeling text."
12          Did I read that correctly?
13    A.    You did.
14    Q.    I mean, I think you said this, but we're
15  talking about pretty -- pretty life-threatening
16  conditions here with respect to these indications for
17  which this drug is being approved.  Right?
18    A.    Absolutely.
19    Q.    And would you agree that an
20  oncologist -- an oncologist is a doctor who
21  specializes in treating patients with -- with various
22  types of cancer.  Would you agree with that?
23    A.    Yes.
24    Q.    And you would agree that it's the role
25  of an oncologist to work with their patient when they

24 (Pages 90 - 93)

Page 94

1 prescribe a medication to treat these serious types
2 of cancer to consider the benefits and risks of that
3 medicine as they're prescribing it.
4      A.    Yes.
5      Q.    I guess one question I have is, in
6 forming your opinions about alopecia and permanent
7 alopecia, did you consider the risk -- I'm sorry, the
8 benefit here, the benefits out of the equation?
9           MR. CENTOLA:  Objection, form.
10     A.    I'm not -- I want to try and make my
11 answer as -- as succinct as possible so I'm going to
12 ask you to provide a little context to that.  I mean,
13 I have an answer but is it based on assumptions about
14 your question, I don't --
15     Q.    Yeah, let me ask it differently.  Have
16 you -- have you yourself assessed the benefit of
17 docetaxel as a treatment for any of the conditions we
18 just went through?
19     A.    The -- let me put it like this:  The
20 question of benefit was not one that I was asked to
21 look at and I certainly am not saying that there's
22 not benefit.  I mean, these are obviously patients
23 with extremely serious diseases.  So that's -- that's
24 not the question that I was asked to address.
25     Q.    Understood.  Understood.

Page 95

1           And did you look at any other risks when
2 you assessed at the request of the plaintiffs'
3 lawyers the issue of alopecia and permanent alopecia,
4 did you look at any of the risks associated with
5 docetaxel?
6      A.    Again, that was not -- well, two things.
7 First off, when the FDA is looking at, you know, a
8 labeling change, for example, it's going to be
9 focused on the specific adverse event or adverse
10 reaction.  It's not going to be looking at
11 automatically at all risks in the benefit unless
12 there's something where it dramatically alters the
13 benefit/risk ratio.  That's number one.
14          To answer your question directly, again,
15 this is the FDA just looking at labeling changes as
16 indicated.  I was not looking at that issue.  I mean,
17 it's just -- it's not -- generally it's not germane
18 to whether this adverse event met the threshold for
19 going in.
20     Q.    I'm not sure, there's one thing you said
21 I'm not sure I fully understood, which is, are you
22 suggesting that when FDA considers a particular
23 adverse event it does so, I guess, in a silo and
24 doesn't consider, you know, the benefits and risks in
25 association with that adverse event and -- and where

Page 96

1 that adverse event fits within the overall profile?
2      A.    No.  What I'm saying is that -- we can
3 go back to -- let me just -- and, again, just make
4 sure that I am -- so there's a -- you know, a
5 definition of an adverse event in the regs.  And then
6 the threshold for adding it to the Adverse Reactions
7 section -- and this is on paragraph 27 of my report
8 is -- there's some basis to believe that is a causal
9 relationship between the adverse event and the drug.
10 And in terms of a warning, it's reasonable evidence
11 of a causal -- the causal association.
12          It's -- the regs don't say, well,
13 there's a really important benefit to this so don't
14 list this.  Or don't list this, it's not -- you know,
15 it just doesn't say that.  I'm just looking at what
16 the regulatory standard is.
17          If it doesn't meet that standard, that's
18 a different issue.  But that information may not
19 change globally the benefit/risk ratio.  And most
20 often it doesn't.  But that doesn't mean for the
21 population for which it's approved, but it may be
22 extremely important information that oncologists and
23 patients have in terms of what do they do.  Even if
24 they say it's not going to affect my decision to use
25 this drug, there's other reasons that they should

Page 97

1 know it, and that's the basic principle of medical
2 ethics.
3      Q.    Doctor, let's -- let's look at the first
4 page of the label attached.  This is the enclosed
5 agreed-upon labeling text just for context.  Right?
6      A.    Yes.
7      Q.    We see the very first page, as it is
8 with all labels these days, we have the Highlights Of
9 Prescribing Information.  Do you see that?
10     A.    Yes.
11     Q.    The first thing, it says "Initial U.S.
12 Approval," it gives the date 1996.  Do you see that?
13     A.    I do.
14     Q.    And you understand that this is the
15 Hospira label for docetaxel.  Right?
16     A.    Yes.
17     Q.    But that initial U.S. approval date,
18 that's actually the Sanofi Taxotere approval date.
19 Correct?
20     A.    That is correct.
21     Q.    And the date that we just went through
22 for the first full effective approval of Hospira's
23 docetaxel is March 8, 2011.  Right?
24     A.    Yes.
25     Q.    And then you see there's a big box

25 (Pages 94 - 97)

1 warning. Right?

2  A.  Yeah.

3  Q.  And that's -- you know, that's not
4 uncommon with medications or drugs like this. Right?
5 Cancer drugs. Right?

6  A.  Yes.

7  Q.  And then if you go to "Recent Major
8 Changes," there's several listed there. Do you see
9 that?

10  A.  Yes.

11  Q.  And the first is "Dosage and
12 Administration," a change to Section 2.8 and a change
13 to Section 2.9. And that's July 2010. Do you see
14 that?

15  A.  I do.

16  Q.  And then it says, "Contraindications,"
17 Section 4. That's a change made May of 2010? Do you
18 see that?

19  A.  I do.

20  Q.  And then "Warnings and Precautions,"
21 Section 5.2, May of 2010. Do you see that?

22  A.  I do.

23  Q.  And "Drug Interactions," Section 7,
24 April 2010. Right?

25  A.  Yes.

1  Q.  Now, this is also before the effective
2 approval on March 8th, 2011, of Hospira's docetaxel.
3 Right?

4  A.  Yes.

5  Q.  And is it your understanding that these
6 changes are actually referring to changes made to
7 Sanofi's Taxotere label?

8  A.  Correct.

9  Q.  If you go over to the "Highlights"
10 section, I mean, it's got the Recent Major Changes,
11 Indications and Usage, Dosage and Administration,
12 Dosage Forms and Strength, Contradictions, and then
13 more warnings and precautions that are not
14 necessarily covered in the boxed warning. Right?

15  A.  Yes.

16  Q.  And underneath that is something called
17 Adverse Reactions. Do you see that?

18  A.  Yes.

19  Q.  And it goes through what it calls, "The
20 most common adverse reactions across all docetaxel
21 indications are." Do you see that?

22  A.  I do.

23  Q.  And you'd agree with me that alopecia is
24 one of those that is listed.

25  A.  Um, so it's -- it's, like, I think I'm

1 kind of -- it's the 20th out of 22nd, and it just
2 says "alopecia" rather than "persistent" or
3 "permanent alopecia."

4  Q.  I didn't ask you that. I simply said
5 "alopecia" is listed. Right?

6  A.  That single word is listed. Correct.

7  Q.  And "alopecia" means hair loss so we're
8 on the same page. Right?

9  A.  I'm not sure. I'm just commenting that
10 it's alopecia.

11  Q.  I'm sorry, you're not sure what
12 "alopecia" means?

13  A.  No, no. Again, I'm not -- you probably
14 know I mean I'm saying it's -- I would not agree that
15 alopecia and permanent alopecia are the same.

16  Q.  I didn't ask you that question. I
17 simply said alopecia means hair loss. Right?

18  A.  Yes.

19  Q.  Okay.

20  A.  That is correct.

21  Q.  All right.

22   Let's -- by the way, that's not the only
23 information on the label where alopecia information
24 is given, is it, the Adverse Reactions section, or do
25 you know?

1  A.  I mean, the -- when you're talking about
2 looking at Section 6 of the label. Is that --

3  Q.  You're talking about the clinical
4 trials?

5  A.  No, I'm talking about the adverse -- the
6 actual, the full prescribing information, the Adverse
7 Reactions section.

8  Q.  Right. I'm asking you if you know as
9 part of your review did you consider whether alopecia
10 was included elsewhere in the label in March of 2011
11 when it was first approved by FDA other than the
12 Adverse Reactions section?

13  A.  So what I looked at was -- was alopecia
14 included, was permanent alopecia included, was any
15 information provided on the incidence, and was there
16 any information on the duration.

17  Q.  What sections of the label do you know
18 was alopecia included other than the Adverse
19 Reactions section, or do you know?

20  A.  There's a kind of post-marketing
21 experience that's --

22  Q.  I'm not asking about post-marketing.
23 I'm just asking you in the whole label, there's no
24 post-market experience yet for Hospira. Right? I
25 mean, I'm asking at the time of this approval, what I

26 (Pages 98 - 101)

1 want to know is do you know where alopecia is
2 included in this label other than the Adverse
3 Reactions section. Do you know?
4     A.    I would want to go through the label and
5 take a look to give an accurate answer.
6     Q.    Okay. Let's go to the Patient
7 Information section. Let's go to -- it's on page 42
8 of 46 of the label.
9         Let me see if I have a PDF.
10        MR. HOROWITZ: Go up a little bit.
11 Yeah.
12    Q.    Do you see that, Doctor, it says
13 "Patient Information" -- there we go. "Patient
14 Information." Do you see that under -- on the screen
15 in front of you?
16    A.    Yes.
17    Q.    And this is a section of the -- of the
18 label. Right?
19    A.    Yes.
20    Q.    And it's directed actually to patients,
21 is it not?
22    A.    Yes.
23    Q.    And it says, "Read this Patient
24 Information before you receive your first treatment
25 with Docetaxel Injection and each time before you are

1 treated."
2        Did I read that correctly?
3    A.    Yes.
4    Q.    Okay. "There may be new information.
5 This information does not take the place of talking
6 with your doctor about your medical condition or your
7 treatment."
8        You would agree with that advice,
9 wouldn't you?
10    A.    Absolutely.
11    Q.    And then it starts, "What is the most
12 important information I should know about the
13 Docetaxel Injection?" And it talks about serious
14 side effects including death. Do you see that?
15    A.    Yes.
16    Q.    It talks about the possibility of
17 infecting your blood cells. Do you see that?
18    A.    Yes.
19    Q.    Serious allergic reactions. Things like
20 that. Right?
21    A.    Yes.
22    Q.    And if you go down to the side effects
23 discussion. Do you see there in bold letters, "What
24 are the possible side effects of Docetaxel
25 Injection?"

1        And then it answers, "Docetaxel
2 Injection may cause serious side effects including
3 death."
4    Q.    Do you see that?
5    A.    I do.
6    Q.    And then it discusses some of the things
7 that we just kind of ran through. Acute myeloid
8 leukemia, other bloods disorders, skin reactions,
9 neurological symptoms. Do you see all of that?
10    A.    Yes.
11    Q.    And that's written in a language
12 designed for patients to maybe absorb and understand.
13 Right?
14    A.    Based on the labeling.
15    Q.    Correct.
16        And it says, "The most common side
17 effects of Docetaxel Injection include." And instead
18 of the word "alopecia," if you go down, they have the
19 word "hair loss." Do you see that?
20    A.    I do.
21    Q.    That's actually two words, "hair loss."
22    A.    Okay.
23    Q.    And this, again, is in the Information
24 For Patients. Right?
25    A.    Yes.

1    Q.    And do you see underneath, it says,
2 "Tell your doctor."
3        "Tell your doctor if you have any side
4 effect that bothers you or does not go away."
5        Do you see that?
6    A.    Yes.
7    Q.    Okay. And you agree with me that that's
8 information that was included in the labeling for
9 docetaxel when it was first approved in -- in March
10 of 2011. Fair?
11    A.    That general statement does appear in
12 there. You're correct.
13    Q.    Okay. It says what it says. Right?
14    A.    I'm sorry?
15    Q.    It says what it says. Right?
16    A.    Correct.
17    Q.    It says, "Tell your doctor if you have
18 any side effect that bothers you or does not go
19 away." Right?
20    A.    It applies to all of these without
21 singling any of them out. You are correct.
22    Q.    And hair loss would be one of those that
23 it applies to. Right?
24    A.    One of the whole list, yes.
25    Q.    It's one of those. Right?

27 (Pages 102 - 105)

1    A.    Well, it is.  It doesn't single it out
2 or provide any indication that the hair loss might
3 not go away.  That's the only point I want to say.
4    Q.    It's not singling it out.  It applies to
5 this whole list including hair loss.  Right?
6    A.    Yes.
7    Q.    It doesn't exclude it.  Right?
8    A.    Doesn't particularly give any --
9    Q.    I didn't ask that.  It doesn't exclude
10 it.  Right?
11    A.    It does not -- let's say it -- it does
12 not exclude it.  If you were to say, though, you
13 know, this could make you feel bad, that would cover
14 the waterfront, too.
15         MR. HOROWITZ:  Objection.  Move to
16 strike everything after the responsive portion of the
17 question.
18    Q.    Doctor, why don't we stop for lunch.
19 It's just about 12:30.
20         Larry, what do you think, maybe usually
21 45 minutes?
22         MR. CENTOLA:  That sounds fine.
23         MR. HOROWITZ:  Is that good?
24         MR. CENTOLA:  Sure.
25         MR. HOROWITZ:  We'll pick up at 1:15?

1         THE VIDEOGRAPHER:  The time is 12:28.
2 We are going off the record.
3         (A lunch recess is taken.)
4         A F T E R N O O N   S E S S I O N
5         THE VIDEOGRAPHER:  The time is 1:21 p.m.
6 We are back on the record.
7    Q.    Doctor, are you ready to proceed?
8    A.    I am.
9    Q.    Doctor, I want to ask you if you'd agree
10 with me that with regard to your opinions -- and I
11 think you've said this but I want to be clear -- that
12 you're not offering any opinion that the Hospira
13 label for docetaxel approved by FDA was inadequate at
14 the time of approval in March of 2011.
15    A.    I was not asked to address that
16 question.
17    Q.    Okay.  And so you were not asked and you
18 are not so opining and will not be offering that
19 opinion.  Right?
20    A.    Correct.
21    Q.    And you're not going to offer any
22 opinions regarding Hospira's meeting of its
23 pre-approval regulatory obligations.  Correct?
24    A.    Correct.
25    Q.    And you won't be offering relatedly any

1 opinions with respect to FDA's decision to approve
2 the Hospira docetaxel 505(b)(2) NDA.  True?
3    A.    That's correct.
4    Q.    And you're not going to be offering any
5 opinions -- and I certainly didn't see anything in
6 your report, but I just want to button this
7 up -- that Hospira failed to submit any required
8 information to FDA.  Correct?
9    A.    With -- if your question is with regard
10 to its original NDA application, you are correct.
11    Q.    Okay.  I'm going to come back then to
12 the -- the second part of that.  I mean, are you
13 going to offer any opinions that Hospira ever failed
14 to submit any required information to FDA?
15         MR. CENTOLA:  Objection, form.
16    Q.    With respect to docetaxel.
17    A.    Can you be more specific about "required
18 information"?
19    Q.    No, I can't.  I mean, I think you know
20 what we're talking about.  There's regulations in
21 compliance with regulations, and my question is
22 pretty simple, and I don't see this in your report so
23 I thought this was an easy one but I'm going to ask
24 it again.
25         You're not going to be offering any

1 opinion, and I certainly don't see anything in your
2 report that suggests that Hospira failed to submit
3 any required information under the regulations to
4 FDA?
5         MR. CENTOLA:  And I will object to the
6 colloquy.  If you want to ask a question, that's
7 fine, but I think that you know that you're -- what
8 you're stating is incorrect.  So if you want to get
9 into a colloquy, we can get into a colloquy, if you
10 want to ask questions we can have questions, but you
11 know he is going to say that.
12         MR. HOROWITZ:  Whoa, whoa, whoa,
13 Seabiscuit.  No speaking objections there, Larry.
14 Come on.  Objection, form.
15    Q.    And my question is, Doctor --
16         MR. CENTOLA:  If you stick to questions,
17 I'll stick to objection to form.
18         MR. HOROWITZ:  Are you done?
19    Q.    Okay.  Let's do this again, Doctor.
20         Are you going to be offering any opinion
21 that Hospira failed to submit any required
22 information to FDA with respect to its docetaxel
23 product?
24         MR. CENTOLA:  Objection, form.
25    A.    Yes.

28 (Pages 106 - 109)

1    Q.    And what is that?  What did they fail to
2 submit?
3    A.    So --
4    Q.    Can I ask you -- it looks like you're
5 looking at something.  May I ask what you're looking
6 at?
7    A.    Oh, yes.  My -- my report.
8    Q.    And is that a hard copy of your report
9 or electronic?
10    A.    It's a -- hard copy, so I want to make
11 sure that I'm giving you an accurate citation of the
12 paragraph.
13        Paragraph 30 states that deposition
14 testimony provided by employees or representatives of
15 Sandoz, Hospira, and Accord demonstrate they did not
16 comply with their regulatory responsibilities
17 regarding post-marketing surveillance,
18 pharmacovigilance, and safety reporting to the FDA
19 during the relevant time period.
20        Paragraph 31, "Likewise, deposition
21 testimony provided by employees or representatives of
22 Sandoz, Hospira, and Accord demonstrate that they did
23 not comply with their regulatory responsibilities to
24 ensure that their products' labeling in the United
25 States -- in the U.S., was at all times not false and

1 misleading."
2        So the immediate answer to your question
3 is, yes, they did not submit a label that, as I
4 discussed in my report, they were obligated to,
5 adding permanent alopecia at a time when they
6 had -- when they had -- not just had available but
7 had information that there was some basis to
8 believe -- and I'm going to my report -- "that there
9 is a causal relationship between docetaxel and the
10 occurrence of irreversible alopecia."
11    Q.    I understand what you're saying.  Fair
12 enough.
13        So when you say, "failed to submit,"
14 what you're talking about is failure to submit a CBE,
15 a Change Being Effected label supplement to add
16 "permanent alopecia" as opposed to "alopecia."
17 That's what you're referring to here.
18    A.    Among other things, yes.
19    Q.    Okay.  I thought that's what you were
20 saying.  Okay.
21        What about -- you cited paragraphs 30
22 and 31.  What specific deposition testimony provided
23 by employees of Hospira -- and by the way, you said
24 all three companies here, and I don't see any
25 footnotes in these paragraphs.  But I want to ask

1 about Hospira, what specific testimony are you
2 referring to?
3    A.    So go to the section -- there is a
4 number of sections in my report where I describe
5 this.
6        Let me start with -- in the interest
7 of Hospira, starting at paragraph 130 of my report,
8 continuing through to paragraph 140.
9        So the footnotes there reference
10 Dr. Schmider's deposition, specific sections from it.
11    Q.    Did you read all of Dr. Schmider's
12 deposition?
13    A.    I did.
14    Q.    Did you yourself identify these
15 citations to his deposition that are included in the
16 footnotes to support the propositions you cite them
17 for?
18    A.    For as best as I can remember, yes.
19    Q.    And were you very careful in making sure
20 that the deposition citations that you included
21 actually supported the propositions you were citing
22 them for?
23    A.    Well, not careful enough, because I'll
24 note that for Footnote 97 I put down page 79 and that
25 really should be 119.  And I apologize for that.

1    Q.    Any other corrections you -- you want to
2 make?
3    A.    There are other typographical errors, I
4 believe.  But in the interest of time -- I'm sorry.
5    Q.    Well, I'm being specific.  I didn't mean
6 globally.  I meant with respect to the change in your
7 deposition citations, do you believe all the others
8 are correct and accurate?
9    A.    Correct and accurate.
10    Q.    Do you believe they're correct?  Let's
11 break it apart.
12    A.    Okay.  I'm not sure what they -- they
13 point to, again, with Section 97 what I intend them
14 to point to.  I'm not sure, accurate is different.
15    Q.    Well, let's do it this way.  You cite
16 here for Footnote 92, you say, "Similar to Sandoz,
17 Hospira utilizes a Core Safety Information, a
18 company-controlled document that sets forth the
19 minimum safety information to be listed in the labels
20 used in the countries where Hospira markets
21 docetaxel."
22        And then you direct the reader to the
23 Schmider deposition, pages 69, line 16, to pages 71,
24 line 3.
25        Do you see that?

29 (Pages 110 - 113)

Page 114

1   A.   I do.
2   Q.   And are you -- do you believe that that
3   deposition testimony supports what you say in the
4   text that I just read?
5   A.   Well --
6   Q.   I'm not asking you to figure it out now.
7   I'm asking --
8   A.   No, I'm sorry.  I can't answer that
9   question unless you let me look at it.  I just can't.
10  I'm not -- it's a 252-page deposition.  I'm sorry?
11  Q.   This exercise when you drafted the
12  report a year and a half ago or whatever it is,
13  15 months ago, did you go through this exercise and
14  make sure that you were accurately characterizing and
15  citing deposition testimony?
16  A.   I did, but obviously I made a
17  typographical error -- or there was a typographical
18  error.  But it does not -- you know, if you don't
19  want me to look at the page, I can't help you here in
20  terms of saying.  And I don't want to say, well, yes,
21  it's absolutely right, and then I haven't had a
22  chance to look.  Okay?
23  Q.   You did have a chance, Doctor.  You
24  wrote the report yourself.  Right?
25  A.   Fifteen months ago.

Page 115

1   Q.   All right.  And you certainly didn't
2   make any corrections in the interim 15 months before
3   you came in to talk to me today.  Right?
4   A.   If your question is -- I'm not sure what
5   your question is, honestly.  I have not -- since I
6   wrote it and submitted it and was deposed, it's not
7   something I've returned to every day.
8   Q.   It would be important, though, you
9   understand that we're in Federal Court and you
10  submitted a report with respect to a litigation, a
11  multi-district litigation.  Right?  Do you understand
12  that?
13  A.   I do.
14  Q.   You take that responsibility seriously,
15  don't you?
16  A.   I do.
17  Q.   You would want to be correct and
18  accurate in your representations to the Court and to
19  those involved in this litigation with respect to
20  what you say these depositions say.  Right?
21  A.   To the best of my ability, yes.
22  Not -- that may mean, if I may say, that also means
23  not answering your questions without looking at the
24  appropriate records.
25  Q.   And to be clear, for Hospira, you're

Page 116

1   citing Dr. Schmider's deposition.  The only other one
2   I saw, and we talked about this, was the Mir dep.  I
3   think you have a cite to Dr. Mir's deposition at
4   Footnote 97.  Do you see that?
5   A.   Yes.
6        Here it is.  Yes, I do.
7   Q.   And do you see where it says "rough"?
8   You've got, "Mir dep page 128 (rough)."  Do you see
9   that?
10  A.   Yes.
11  Q.   Do you know what "rough" means?
12  A.   My -- it's what it said on the
13  deposition.  My understanding is -- and this is,
14  again, I'm not an attorney, but that's the initial
15  rough transcript before it's been reviewed by the
16  deponent.
17  Q.   Well, it's actually before it's
18  finalized by the court reporter.  You understand
19  that.  Right?
20  A.   Okay.
21  Q.   It's -- it's the rough that gets sent
22  out the night after the deposition.  It hasn't been
23  even checked yet.  You know that.  Right?
24  A.   I'm willing to accept what you're saying
25  as being the description.

Page 117

1   Q.   And did you ever read Dr. Mir's full
2   final deposition transcript?
3   A.   Not -- you know, if I had, I would have
4   indicated as such in my report.
5   Q.   And --
6   A.   If you're saying that makes a
7   difference, I'm happy to consider that.
8   Q.   Did you know how many other employees of
9   Hospira that touch on pharmacovigilance were deposed
10  besides Drs. Schmider and Mir?
11  A.   I believe you asked a very similar
12  question early in this deposition and I indicated,
13  you know, I asked if there was any other Hospira
14  witnesses that had arguably relevant -- I didn't ask
15  specifically about that, but if there were other
16  information regarding Hospira that I should know
17  about; and answer -- the answer, I wasn't provided
18  with anything else.
19  Q.   And when you say you asked, just to be
20  clear, you're talking about asking the plaintiffs'
21  lawyers who retained you for purposes of this
22  litigation.  Right?
23  A.   Yes.
24  Q.   We'll talk a little bit more about the
25  pharmacovigilance since we're there.

30 (Pages 114 - 117)

Page 118

1          What is pharmacovigilance?  What does
2    that term mean?
3       A.    So, again, I define that term -- and
4    it's really taken from the FDA's definition at
5    paragraph 51 in my report.  And I refer to activities
6    which are described in the preceding paragraphs from
7    44 onwards.
8          So a continuing collection of
9    information on adverse events.  And in paragraph 46 I
10   indicate that those focus in large part on serious
11   adverse events and unexpected AE's.  Define those.
12         The need for expedited reporting for
13   unexpected serious adverse events.
14         The obligation to review, evaluate them,
15   and report the results of analyses to the FDA both in
16   PSURs and annual reports.
17         And developing -- this is paragraph
18   50 -- written procedures for surveillance, receipt,
19   evaluation, and reporting of post-marketing AE's.
20      Q.    In summary review -- and that's all
21   fair.  Do you agree that pharmacovigilance means all
22   scientific -- if we're going to try to give a single
23   definition to work from, the term
24   "pharmacovigilance" means all scientific and
25   data-gathering activities relating to the detection,

Page 119

1    assessment, and understanding of adverse events?
2       A.    Say that one more time?
3       Q.    Why don't we do it this way.  Let's mark
4    as the next exhibit a document you cited in your
5    report.
6          MR. HOROWITZ:  It's Tab 10, Ashley.
7          (Exhibit 7, "Guidance for Industry, Good
8    Pharmacovigilance Practices and Pharmacoepidemiologic
9    Assessment, March 2005, marked for identification.)
10      Q.    We're loading, Doctor.
11      A.    I understand.
12      Q.    Doctor, Exhibit 7 is another FDA
13   Guidance For Industry called, "Good Pharmacovigilance
14   Practices and Pharmacoepidemiologic Assessment,"
15   dated March 2005.  Do you see that?
16      A.    Yes.
17      Q.    And this is Guidance you are -- are
18   familiar with.  Right?
19      A.    Yes.
20      Q.    And, in fact, you cite this Guidance in
21   your expert report.  Correct?
22      A.    I believe it's Footnote 18, if I'm not
23   mistaken.
24      Q.    And so if you just go to page 4, I
25   wasn't trying to be tricky but I thought it would be

Page 120

1    easier now just for us to look at the same thing.  I
2    was trying to avoid marking another exhibit, but here
3    we are.
4          Do you see where it says at the top,
5    "This Guidance uses the term 'pharmacovigilance' to
6    mean all scientific and data-gathering activities
7    related to -- relating to the detection, assessment
8    and understanding of adverse events."
9          You agree with that general definition?
10      A.    You're talking about the second sentence
11   at the top of the page.  Correct?
12      Q.    Yeah, Doctor, the one we've read now
13   twice.
14      A.    Okay.  So --
15      Q.    Do you agree with it?
16      A.    Well, I agree that it says, "This
17   Guidance uses the term 'pharmacovigilance.'"  So for
18   this Guidance that's how it is using the
19   term "pharmacovigilance" is how I understand it.
20      Q.    Okay.  I don't know what that means, but
21   do you generally accept that that's what it means and
22   that these are the activities described that are
23   pretty typical of pharmacovigilance activities
24   undertaken?
25      A.    So understanding that it says,

Page 121

1    "Activities relating to detection, assessment, and
2    understanding of adverse events," and keeping in mind
3    that what I characterize as pharmacovigilance is
4    based on the Regulations 314.80, I agree that's what
5    this Guidance -- how this Guidance uses that term.
6       Q.    Do you disagree with how the Guidance
7    uses this term?  I mean, I -- I don't have any idea
8    why you're fussing with me on this, so help me
9    understand.
10      A.    I'm just trying to make sure that I
11   didn't -- someone doesn't think, oh, he's using a
12   different definition that uses different words and
13   therefore that's a mistake.  I just am pointing those
14   things out.  I have no problem with what that's
15   saying there about pharmacovigilance.
16      Q.    And the top of the next paragraph, says,
17   "Pharmacovigilance principally involves the
18   identification and evaluation of safety signals. "
19         Do you agree with that statement?
20      A.    As used in this Guidance, yes.
21      Q.    Do you agree with it in general in the
22   absence of it being used in this Guidance?
23      A.    Pharmacovigilance outside the scope of
24   this Guidance involves other activities that are
25   respond -- required by regulation.  For example,

31 (Pages 118 - 121)

Page 122

1 written procedures, the surveillance receipt,
2 evaluation, and reporting of post-marketing AEs.
3     Q.    There's a separate Guidance on Section
4 314.80 about good FDA pharmacovigilance reporting
5 practices, is there not?
6     A.    The subject of that Guidance is exactly
7 as you state.  It is not guidance on 314.80.
8     Q.    Doctor?
9     A.    Yes.
10     Q.    I guess I'm having a hard time
11 understanding.  Pharmacovigilance are activities
12 undertaken to detect, assess, and understand adverse
13 events.  Do you agree with that?
14     A.    So, again, as used in this Guidance,
15 that is how it is using it.
16     Q.    I'm going to switch gears for a second,
17 Doctor.
18     A.    Okay.
19     Q.    We'll come back to this.
20         Take a look at your CV.
21     A.    Um-hum.
22     Q.    Let's turn to Exhibit 1, page 2 of your
23 CV.
24         Are you with me?
25     A.    I am.

Page 123

1     Q.    Do you see where it says, you have a
2 section here called "Expert Witness Training."  Do
3 you see that?
4     A.    Yes.
5     Q.    And you and I chitchatted about this at
6 your last deposition, did we not?
7     A.    I do recall -- I believe so.  Then I
8 definitely remember your colleague asking me
9 questions about -- about it.  You also may have.  So
10 yes.
11     Q.    Remind me, what is SEAK again?
12     A.    SEAK is a company that offers training
13 to, among other things, just my interactions with it
14 would have been training on expert witnesses about,
15 you know, the -- what's required of an expert
16 witness.  How to do a good job as an expert witness
17 is the simplest way I can put it.
18     Q.    It's also what you advertise yourself
19 and hold yourself out as an expert that can be
20 retained for litigation.  Right?
21     A.    So SEAK publishes a directory that I
22 purchase a listing in.
23     Q.    Is that a "yes"?  I mean, we've had this
24 conversation before in connection with this question.
25     A.    Yeah, no.  I -- I -- I'm -- when you

Page 124

1 said, oh, SEAK is where you advertise yourself.  It's
2 not SEAK, it's a directory that SEAK publishes.  SEAK
3 is a company.  So that's why I'm --
4     Q.    And you have a listing that's available
5 in the SEAK, Inc., expert witness directory that's
6 available online with your picture where you are
7 advertising your services as an -- as an expert
8 witness.  Right?
9     A.    Yes.
10     Q.    And SEAK doesn't just allow you to
11 advertise your expert services but it provides
12 seminars and training for how to be an expert
13 witness, as you've just described.
14     A.    How to be an expert witness.  I
15 think -- yeah, I'd agree to that.  It's --
16     Q.    It teaches you how to be an effective
17 expert witness.  Right?
18     A.    If I'm going to interpret your question
19 as effective in terms of what we've talked about
20 before as being -- the role being to assist the
21 trier-of-fact.  So I would say yes.
22     Q.    Let's go to -- you actually attended
23 these seminars listed here for expert witness
24 training.  Right?
25     A.    Yes.

Page 125

1     Q.    And you went in 2014 to Florida.  Right?
2     A.    Yes.
3     Q.    2015 to Washington, DC?
4     A.    Yes.
5     Q.    2016 to Chicago.
6     A.    Yes.
7     Q.    Did it twice in 2016, right, in Chicago?
8 Two different seminars over four days?
9     A.    Yes, it was in the same venue and they
10 were both of interest to me.
11     Q.    And the last one -- I mean, the first
12 title was, "How to be an effective expert
13 witness," in 2014.  Right?
14     A.    Correct.
15     Q.    And then you have 2018, "How to excel at
16 your expert witness deposition, SEAK, Inc.,
17 December 1 to 2, Naples, Florida."
18         Do you see that?
19     A.    Yes.
20         MR. HOROWITZ:  Let's mark Tab 19 as your
21 next exhibit.
22         Still loading.  Oh, there we are.
23         This has been marked as exhibit
24 number -- Ashley, what number is this?  Eight, thank
25 you.

32 (Pages 122 - 125)

1    (Exhibit 8, SEAK Seminar Brochure,
2 "Supplemental Income for Physicians", February 2014,
3 was marked for identification.)
4    Q.    Exhibit 8 to your deposition, Dr. Ross.
5 This is the brochure for the seminar that you paid to
6 attend in Naples, Florida, on December 1 and 2, 2018,
7 that's identified in your curriculum vitae.  Is it
8 not?
9    A.    Well, these -- the dates on these are
10 2014.
11    Q.    All right.  We can use this one.  Let's
12 start with this one.
13       Do you see at the top it says,
14 "Supplemental Income For Physicians"?
15    A.    Yes.
16    Q.    Big bold letters?
17    A.    Yes.
18    Q.    There's a seminar called, "How to Start,
19 Build, and Run a Successful Expert Witness Practice."
20 You see that?
21    A.    The second bullet, yes.
22    Q.    Yeah.  And then the last bullet, "How to
23 be an Effective Medical Expert Witness."  Do you see
24 that?
25    A.    Yes.

1    Q.    All right.  And -- let's see.  Right
2 underneath that.
3       MR. HOROWITZ:  If we can go down a
4 little bit.
5    Q.    You see it says, "Lucrative
6 Assignments," right there in the middle?  Under "How
7 to be an Effective."  "Lucrative."  "Lucrative" means
8 financially lucrative, doesn't it?
9    A.    That's my understanding of it.
10    Q.    And then if we go to the discussion of
11 the seminars on, "How to be an Effective Medical
12 Expert Witness."
13       MR. HOROWITZ:  Make that a little
14 bigger.  There we are.
15    Q.    This is the specifics of what you
16 attended on February 8 and 9 of 2014.  "How to be an
17 Effective Medical Expert Witness," down there in
18 Clearwater Beach, Florida, at the Sandpearl Resort.
19 Right?
20    A.    Yes, I believe that's correct.
21    Q.    And the executive summary of the
22 seminar -- and you paid money to go to this, right,
23 as a registration fee?
24    A.    Correct.
25    Q.    And this registration fee, you paid over

1 a thousand -- you paid $1,295 of tuition to go down
2 there for this seminar.  Right?
3    A.    Well, not only that, but don't forget
4 the travel expenses down there.
5    Q.    You paid $1,295 in tuition.  Do you see
6 down there, "Registration Information"?
7    A.    Yes.
8    Q.    And it gives you a continental breakfast
9 and lunch with faculty each day.  And detailed
10 conference manual.  Do you see that?
11    A.    I do.
12    Q.    Okay.  Did you get the conference
13 manual?
14    A.    I'm sure I did.
15    Q.    Do you still have it?
16    A.    I -- I do not believe so.
17    Q.    Can you check for me?
18    A.    I can check.  I have moved since taking
19 this seminar a couple of times.  So I -- if I have
20 it, I would have to look for it.  I -- I doubt I do.
21 But I will look for it.
22    Q.    You see -- oh, I'm sorry.
23       There's an executive summary at the top.
24    A.    Um-hum.
25    Q.    It says, "The number one way to grow an

1 expert witness practice is to build the reputation of
2 being an effective witness."
3       Did I read that correctly?
4    A.    You did. It's the bold part.
5    Q.    Right.
6       And then the next sentence says,
7 "Participating Physicians" -- the second sentence, I
8 should say.  "Participating Physicians" -- you were a
9 participating physician.  Right?
10    A.    Yes.
11    Q.    -- "will learn how to become markedly
12 more effective and significantly more valuable expert
13 witnesses."  Did I read that correctly?
14    A.    I think so.
15    Q.    And by "valuable expert witness" here,
16 they mean valuable both in terms of your own finances
17 and valuable to the attorneys retaining you.  Right?
18       MR. CENTOLA:  Objection, form.
19    A.    Well, this actually doesn't say who it's
20 valuable to, I mean.
21    Q.    It says what it says.
22    A.    Certainly, it says what it says.  I
23 mean, I'm not going to read anything into it.  I
24 mean --
25    Q.    You were learning --

33 (Pages 126 - 129)

Page 130

1    A.   -- it's one group.  Not the only one but
2 that's one reasonable inference.  Not the only one.
3    Q.   Right.  And it's a reasonable inference
4 though.  Right?
5    A.   Yeah.
6    Q.   And it says, "Learning Objectives."  We
7 can maybe flush it down a little bit.
8         "At the conclusion of this workshop,
9 physicians" -- and, again, that would be you.
10    A.   Um-hum.
11    Q.   -- "should be able to," and it gives a
12 list of learning objectives and -- with bullet
13 points.  Do you see that?
14    A.   I do.
15    Q.   And the third one says, "Discuss
16 strategies that can be followed when giving an expert
17 deposition and when testifying at trial."
18         Do you see that?
19    A.   I do.
20    Q.   "Explain techniques for excelling at
21 videotaped depositions."
22         Did I read that correctly?
23    A.   Yes.
24    Q.   And the next one -- actually, two down
25 from that, "Describe techniques physicians can use

Page 131

1 when testifying at deposition and trial."
2         Did I read that correctly?
3    A.   Yes.
4    Q.   And did you, by the way, as a physician
5 at the conclusion of the workshop, were you able to
6 discuss strategies that can be followed when giving
7 an expert deposition and when testifying at trial?
8 Did you accomplish that objective?
9    A.   If I remember correctly, that was
10 actually something that you had to be able to say you
11 could do because, as you can see two paragraphs below
12 that, this course is actually given, accredited by
13 the ACCME for continuing medical education credits.
14 So I would -- those are the objections -- objectives
15 that you have to meet in order to be able to receive
16 credit.
17    Q.   I got you.
18         So the -- you're saying that this was
19 endorsed by the medical community is -- is what
20 you're saying.
21    A.   No.
22    Q.   Okay.
23         Let's go to the next --
24    A.   I'm sorry, just -- I just literally said
25 what it says there.  It's accredited by the ACCME.

Page 132

1 That's all.
2    Q.   That's great.
3         It's not required that you choose this
4 to reach your accreditation requirements, is it?
5    A.   It's --
6    Q.   There's other types of seminars.  You
7 don't have to go to the "How to be an Expert Witness"
8 seminar, do you?
9    A.   Let's open -- sorry.
10    Q.   You chose to do this.  Right?
11         MR. CENTOLA:  Can we let him finish?  He
12 was starting to answer.  Can you let him finish?
13         MR. HOROWITZ:  Oh, I'm sorry.
14    A.   I would say yes.  And it's -- if it was
15 not something that was related to CME, did not have a
16 valid educational purpose, it would not be accredited
17 by the ACCME.  That's all I would say.  So, yes, I
18 did choose to do this.
19    Q.   And you chose to do it because you
20 wanted to be a more effective and more valuable
21 expert witness.  Right?
22    A.   That is what that says as how they
23 advertise it.  That does not mean that I am doing it
24 for each and every one of the reasons that's there.
25 So that is not a valid conclusion.  It's --

Page 133

1    Q.   Let's see, the learning objectives that
2 you say are accredited.  The last one is "Discuss
3 techniques to make a positive impression on the
4 jury."
5         Do you think you accomplished that
6 objective?
7         MR. CENTOLA:  Objection, form.
8    A.   Of learning how to discuss techniques?
9 Yes.  That's different from making a positive
10 impression on the jury.  And I would say making a
11 positive impression on the jury is with respect to
12 your opinion and nothing else.
13    Q.   Let's go to the next page.  The section
14 on Deposition Skills.  There are actually several
15 sessions with respect to deposition skills.  Right?
16    A.   Yes.
17    Q.   One of those is called, "Deposition
18 Strategies For Experts," 9:30 to 10:15, that you
19 attended.  Do you see that?
20    A.   Yes.
21    Q.   It says, "You will learn a four-step
22 methodology for answering deposition questions."  Do
23 you see that?
24    A.   Yes.
25    Q.   Are you applying that methodology today

34 (Pages 130 - 133)

Page 134

1 as I talk to you?
2    A.   I will be honest with you, I can't
3 remember what those four steps are, Mr. Horowitz,
4 really.  So I can't -- I just don't know what -- I'm
5 trying to answer your questions.
6    Q.   How about "Videotaped Deposition:
7 Special Techniques" from 11 to 11:15?  It's a pretty
8 short one, I see.  Did they teach you anything?  "You
9 will learn special techniques which are applicable
10 when your deposition is being videotaped."
11          Did you -- are you applying those
12 special techniques that you learned down there today?
13    A.   Well, just one that I can think of,
14 which is I was looking at ties to wear and I
15 remembered the word "moray."  So I chose this tie,
16 for whatever it's worth, instead of another tie that
17 might be distracting.
18    Q.   How about 11:15 to 12 you learned
19 "Advanced Deposition Tactics For Experts"?  "You will
20 learn numerous techniques that will help you to excel
21 during your expert medical deposition."
22          Do you see that?
23    A.   I do.
24    Q.   So you learned tactics to come in and
25 talk to me and give a deposition.

Page 135

1    A.   Well, the primary tactic would be
2 prepare, read your report, and know what it says.
3 That's an example of -- that was the first -- that's
4 an example of a tactic.  So opposed to just winging
5 it.
6    Q.   So 1,300 bucks and a trip to Florida,
7 you could have saved yourself that if you had just --
8 just done what you said.  Right?
9          MR. CENTOLA:  Objection, form.
10    A.   I'm sorry.  Say that -- say that again?
11    Q.   Well, you said all you've got to do is
12 prepare and read your report, and that's really the
13 only tactic you need, except you paid $1,300 to go
14 down to Florida for two days to meet with these folks
15 to tune you up.  Right?  You could have saved
16 yourself the trouble.
17          MR. CENTOLA:  I don't think there was
18 even a question there.
19    Q.   Couldn't you?
20    A.   I did not say, respectfully, that was
21 the only thing that was involved.  I gave that as an
22 example.
23          MR. HOROWITZ:  Let's go to Tab 20.
24 Yeah, Tab 20.
25          (Exhibit 9, SEAK Brochure, "Independent

Page 136

1 Medical Examination Training For Physicians," Naples,
2 Florida, marked for identification.)
3    Q.   Doctor, this is the brochure, if you go
4 down, from December 1 of 2018 where you also went
5 back to "How to Excel At Your Expert Witness
6 Deposition" training seminar from SEAK."
7    A.   Yes.
8    Q.   And this was in Naples, Florida.  Right?
9    A.   Correct.
10    Q.   The Naples Beach Hotel & Golf Club,
11 December 1 to 2, 2018.  Right?
12    A.   You are correct.
13    Q.   And at the bottom of this glossy
14 brochure, it says, "Learn How to Supplement Or
15 Replace Your Clinical Income."  Did I read that
16 correctly?
17    A.   I -- I just, I don't see it on here, but
18 I -- oh, I see what you are saying.  In blue.  Yeah,
19 that's -- I was going to say I believe it probably
20 would say something like that.
21    Q.   Yeah, it says, "Learn How to
22 Supplement" -- in big bold letters -- "or Replace" --
23 in big, bold, and all cap letters also -- "Your
24 Clinical Income."
25    A.   They list that as your goal.  You are

Page 137

1 correct.
2    Q.   If you go to the description again of
3 the seminar, which is -- by the way, you paid, again,
4 another fee.  Right?  Another $1,295 for this one?
5    A.   You are correct.
6    Q.   Well, that's if you signed up on time.
7 Actually, the fee gets up to closer to $1,500
8 depending on when you signed up.  Does that sound
9 right?
10    A.   Yeah, I -- yes.
11    Q.   And there's -- on page 11 of the
12 brochure -- here we are -- there's a similar list of
13 bullet points that we just went through in the 2014
14 seminar.  Right?
15    A.   Correct.
16    Q.   A point, "Numerous proven strategies to
17 excel at deposition."
18          "Recognizing and defeat opposing
19 counsel's tactics."  Do you see that?
20    A.   I do.
21    Q.   "Effectively deal with skeletons in your
22 closet."  Do you see that?
23    A.   Yes.
24    Q.   Doctor, do you have any skeletons in
25 your closet?

35 (Pages 134 - 137)

Page 138

1    A.   I can go look, if you would like.  I can
2  turn the camera towards it, but I think there's only
3  dress shirts.
4    Q.   And it says, "Prepare an individualized
5  protocol to excel at expert witness depositions."  Do
6  you have an individualized protocol that you've
7  developed?
8    A.   Let me put it like this:  This is
9  a -- I'm here today under Rule 26.  Is that -- am I
10  right?  I get confused about all the rules.  So
11  there's rules that deal with expert witnesses.
12  There's Rule 702 and 703, and a Rule 26 at the State
13  level.  But it's one thing to see a rule, it's
14  another thing to know, okay, how do you do that?  How
15  do you provide an opinion that you believe in, that
16  you are confident in, when the counsel for the other
17  side -- and this is their job -- is trying to get you
18  to give up that opinion, but you honestly believe it.
19        So that's really what this is about is
20  following the rules.  And I would say I am actually
21  very -- I'm glad I signed up for this course.  I'm
22  glad I took it.  It has had a lot of other -- the
23  skills and the things that I learned are applicable
24  to things in other areas of my profession that don't
25  directly deal with legal matters.

Page 139

1        It's also taught me things not to do
2  that are not useful to the Court or retaining counsel
3  or to opposing counsel for that matter.
4        MR. HOROWITZ:  Objection, move to
5  strike, nonresponsive.
6    Q.   Let's see.  If you go to the next page,
7  I believe, there's a seminar, 10:30 to 11:15, "How to
8  Leave Yourself Wiggle Room."  Do you see that?
9    A.   Yes.
10    Q.   You were taught how to leave yourself
11  wiggle room.  Right?
12    A.   Yes.
13    Q.   And if you go to the next seminar,
14  "Deposition Strategies For Expert Witnesses," it
15  says, "Attendees" -- and that would be you, Dr.
16  Ross -- 47 -- whoo -- "47 techniques for excelling at
17  their deposition."
18        Do you see that?
19    A.   Yes.
20    Q.   One of those is not showing weakness,
21  avoiding absolute words, using time limits to your
22  advantage, breaking counsel's momentum, encouraging
23  opposing counsel to lose his cool.  These are the
24  deposition strategies among those 47 techniques that
25  you were taught at this seminar.  Right?

Page 140

1    A.   Well, I have to tell you, there may only
2  have been 44, so maybe I should get a refund.  I
3  think that's -- in all seriousness, that sounds about
4  right.
5    Q.   Okay.  So these are all things that you
6  learned down in Naples, Florida, about being an
7  effective expert witness at a deposition.  Right?
8    A.   That was the course that I -- that's
9  basically the course that I took.  I learned them as
10  best I could.
11    Q.   As best you could.  Is that what you
12  said?
13    A.   Yes.
14    Q.   Okay.  Fair enough.
15        Let's -- let's go back to our real work
16  for a little bit.
17    A.   Okay.  Please.
18    Q.   Actually, since we're on the subject and
19  hopefully we can put this to bed.  I was given a new
20  CV last night, I guess filed in response to our
21  Notice For Deposition which we'll get to at the end.
22        MR. HOROWITZ:  Why don't we go ahead and
23  mark that as our next exhibit.
24        (Exhibit 10, Updated Curriculum Vitae of
25  David B. Ross, M.D., Ph.D., M.B.I., marked for

Page 141

1  identification.)
2    Q.   Okay.  And this would be Exhibit No. 10.
3        Doctor, we've marked as Exhibit No. 10 a
4  curriculum vitae that we were provided last night via
5  e-mail, I guess in advance of this deposition.  Is
6  this a revised or a new version of your curriculum
7  vitae?
8    A.   Updated.  I mean, it's not -- it's
9  not -- there's a couple of additional papers that
10  I've had published.  Other than that, I don't believe
11  there's a whole lot -- anything else that's
12  different.
13    Q.   But one thing that's different is it
14  says, "Expert Not Retained," in enormous bold letters
15  across.  What on God's green earth is that?
16    A.   Oh, that is one of the things at SEAK,
17  you know, that they recommend because -- and I've had
18  this happen.  I've had people, attorneys, you know,
19  get my CV, and then without my knowledge say that I'm
20  their expert, which is a little problematic.
21        So, you know, once I'm retained by
22  somebody, obviously I remove that in the copy that I
23  give them.  I mean, this just -- this is -- I -- it's
24  just a watermark on the Word document.  That's all.
25    Q.   So if you are retained, you remove this?

36 (Pages 138 - 141)

Page 142

1    A.   Yes.
2    Q.   Can we agree that you are retained in
3 this litigation?
4    A.   Of course.
5    Q.   So this was just whenever you shot the
6 server to the plaintiffs' lawyers last night
7 electronically you just didn't get a chance to remove
8 your -- you forgot to remove your "Expert Not
9 Retained" stamp?
10    A.   Of course.  And I -- had I thought of
11 it, I would have removed it.
12    Q.   Okay.  And then there's one other change
13 I noticed in relation to what we were just
14 discussing.  But if you go to page 2, the SEAK
15 seminars in the Expert Witness Training section that
16 you had is no longer included.  It seems to have been
17 removed or deleted from your CV.
18    A.   Oh, that was -- I actually did not
19 realize that.  That was not at all intentional.  You
20 know, thank you for letting me know.  I'm going to
21 add that back in.
22    Q.   Did you send it to the plaintiffs'
23 lawyers with that in there, do you think?
24    A.   The original version that you have has
25 it added.  I mean, I, you know, updated this quickly.

Page 143

1 If I removed it, it was --
2    Q.   Well, let me ask you this.
3    A.   Yeah.
4    Q.   Did you, yourself, remove it?
5    A.   Yeah.  I -- I -- well, I think so.  I
6 mean, you know, it wasn't retaining counsel.  If I
7 did, it was -- not if I did, I mean, the fact that
8 it's not in there is inadvertent.  Again, I'm going
9 to correct that.  Because in my academic CV, which
10 this is -- well, I don't think this is it.
11         But can you go back up to the first page
12 for -- if you could for a minute, just so...
13         Yeah, this is not my -- this is for my
14 academic CV I use my work e-mail and I don't include
15 the -- the SEAK training because it's not relevant to
16 that.  But that was not something that I did
17 intentionally.
18    Q.   So I just want to make sure I
19 understand.  Do you keep two versions of a curriculum
20 vitae, one for academic purposes and one for expert
21 witness purposes?
22    A.   Correct.
23    Q.   And the one for expert witness services,
24 you include the seminars that you've attended
25 specifically for expert witness training offered by

Page 144

1 SEAK.  Correct?
2    A.   Correct.
3    Q.   And but in the academic arena, you
4 remove the SEAK seminars in the section on expert
5 witness training.  Fair?
6    A.   Yeah.  It's not something that is part
7 of the -- unless, you know, if you're doing something
8 with a -- a -- in law school, it might be relevant.
9 But in terms of biomedical.  And if somebody asks me,
10 do you do this, I would say sure.  I'm not going
11 to -- I'm not completely illegitimate, but, you know,
12 I -- it's just that's the distinction.  I
13 don't -- that this version -- and I apologize, I
14 didn't realize I had taken that out, it was certainly
15 unintentional.  And I can provide, you know, another
16 version.  I mean, I can do that -- not another
17 version, but I mean add those back in.  But that was
18 not something I was aware that I had done.
19    Q.   Okay.
20         Let's -- let's go back to where we were.
21         MR. HOROWITZ:  If you could pull back
22 up, Ashley, Exhibit 7.
23    Q.   I just wanted, I mean, I really was
24 using this for definitional purposes more than
25 anything else, Doctor, especially since you cited it

Page 145

1 in your report.
2    A.   Okay.
3    Q.   We left off, this was our discussion on
4 pharmacovigilance.
5    A.   Yes.
6    Q.   And I just -- you know, part of it is
7 just helping folks that are not steeped in, you know,
8 the pharma world like you and I are to follow along
9 with us.
10    A.   Okay.
11    Q.   So we were at the point where we were
12 talking about safety signals.  Do you recall that?
13 And by "talking about that," just definitionally.  I
14 think all I had done was read "Pharmacovigilance
15 principally involves the identification and
16 evaluation of safety signals."  I think that's where
17 we left off.  Okay?
18    A.   Yes.
19    Q.   And then it says, "In this Guidance
20 document" -- this FDA Guidance document -- "'safety
21 signal' refers to a concern about an excess of
22 adverse events compared to what would be expected to
23 be associated with a product's use."
24         Do you see that?
25    A.   Yes.

37 (Pages 142 - 145)

Page 146

1    Q.    And I guess I'm going to risk the
2  question, but do you agree with this characterization
3  of a safety signal; and if not -- or -- or if you
4  would want to modify it, how would you do so?
5    A.    Well, I agree with it.  I would modify
6  it by the following sentences, that signals could
7  arise from post-marketing data and other sources and
8  other products in the same pharmacologic class.  And
9  it's possible -- just reading from here.  Well, you
10  can see it.
11          And certainly -- well, a single well
12  documented case report can be viewed as a signal.
13          And they indicate rechallenge.  And
14  there's plenty of examples of that single case
15  representing not just a signal but by itself can meet
16  the threshold for modifying the label.  That's one
17  thing it says on the Adverse Reactions guidance which
18  I cite in my report.  I'm talking about the
19  January 2006 AR Guidance.
20    Q.    And just to be clear, though -- and I
21  agree with everything you said, you're -- you're
22  reading the rest of the definition to give it some
23  context in this paragraph of the Guidance.  Right?
24    A.    Yes.
25    Q.    And our discussion of safety signal.

Page 147

1          And you mentioned the single case report
2  can be viewed as a signal.  But it goes on to say,
3  "Particularly if a report describes a positive
4  rechallenge."  And you emphasized that and I just
5  don't want to gloss over that.  What do you mean by a
6  "positive rechallenge"?
7    A.    So please -- please indulge me.  If
8  somebody is on a drug and they develop an unwanted
9  effect that you think might be due to it, and you
10  stop the drug, that's a dechallenge.
11          If the effect goes away, that's a
12  positive dechallenge.
13          If you start the drug again or the agent,
14  or whatever it is, and the same event occurs, that's
15  a positive rechallenge.
16    Q.    Got you.  And then it goes on to say,
17  "Signals generally indicate the need for further
18  investigation which may or may not lead to the
19  conclusion that the product caused the event."
20          Do you agree with that statement?
21    A.    Yes.
22    Q.    It goes on to say, "After a signal is
23  identified, it should be further assessed to
24  determine whether it represents a potential safety
25  risk and whether other actions should be taken."

Page 148

1          Do you agree with that?
2    A.    Yes.
3    Q.    All right.
4          Do you agree -- I guess I should ask you
5  this while I have this open.  Page 9, I guess it's
6  on -- I assume it's PDF page 9.  There it is.
7          Do you see where it says, "Use of data
8  mining techniques is not a required part of signal
9  identification or evaluation"?  Do you see that?
10    A.    I do.
11    Q.    And do you agree with that?
12    A.    What I would say is the -- as with any
13  guidance, a guidance is not legally binding on FDA or
14  the public, i.e., drug manufacturers included in
15  that.  It is one way of meeting the requirements of
16  the underlying statute or regulation.
17    Q.    So -- I'm sorry.
18    A.    No, I was just going to say, I'd agree
19  with you it's not required.  Of course, if you want
20  to use an alternative approach, just quoting from the
21  Guidance statements at the beginning, then you should
22  make sure that it is meeting the requirements of the
23  regulation or statute.  But I'd agree with you on
24  that.
25    Q.    Okay.  And just to make it a little more

Page 149

1  specific to Hospira.  I know you talk about some data
2  mining techniques in your report and we'll talk a
3  little bit about that, but I want to be clear that
4  you're not saying that Hospira violated any
5  regulatory -- any regulation or any regulatory duty
6  if they did not employ the data-mining techniques
7  that you discuss in your report.  Fair?
8          MR. CENTOLA:  Objection, form.
9    A.    That is -- hang on one second.  I just
10  want to think through how to answer this.
11    Q.    Want me to read you the answer you gave
12  last time?
13    A.    Yes, I'm glad -- I'd love to -- I would
14  love it.  But I -- I think again, I hope it was
15  something similar.
16          Not -- by itself, it's -- that's not a
17  requirement in the regulation, that's a way of
18  meeting the regulation.  And if somebody meets it
19  another way, that's fine.  If that's -- by it -- but
20  if that were the only way and you don't do it -- and
21  I'm not saying that's not -- that's the case here --
22  then -- but it's not that data -- not doing the data
23  mining.  It's the underlying regulation that you need
24  to comply with or the manufacturer needs to comply
25  with.

38 (Pages 146 - 149)

Page 150

1    Q.    So you said in your August 31, 2020,
2  deposition, "I do not cite those" -- and the question
3  was about the data-mining techniques that I was
4  asking you about.
5    A.    Um-hum.
6    Q.    That you said in your report.
7         -- "as the kind of thing that a Court or
8  any of the Defendants should or should not have done.
9  I'm simply providing those as a description of the
10 kind of techniques that are available.  I am not
11 pointing to a specific technique and saying that they
12 should have done this."
13   A.    I think that's -- you can disagree, but
14 I think that's similar to what I said or it's
15 certainly -- I'm not contradicting myself.
16   Q.    Okay.
17   A.    I'd agree with myself, for what it's
18 worth.
19        Data mining is a tool, like anything
20 else.  And it's not -- sometimes it's a good tool,
21 sometimes it -- like, with any tool, it certainly has
22 its limitations.  And you know, I won't go on about
23 those, but it's a tool.
24   Q.    And the answer that I just read and
25 your -- your description, I wasn't really reading it

Page 151

1  to suggest that it was different than what you said.
2    A.    No, I -- I know.  I was going to say if
3  you didn't read it, I was going to ask you.
4    Q.    And I just want to make sure that that
5  answer applies here in this case with Hospira, and it
6  sounds like you're saying, yes, it does.
7    A.    Yes, yes.
8    Q.    Excellent.
9         I guess my other related question
10 is -- and maybe at a slightly higher level -- are you
11 offering any opinions in this case with respect to
12 the actual processes and procedures that Hospira did
13 use to conduct pharmacovigilance with respect to
14 docetaxel?
15        MR. CENTOLA:  Objection, form.
16   A.    Well, what I think I'm saying is, not
17 explicitly, but if -- I'm sorry.  I want to go back
18 to my conclusion here for a minute.
19        Conclusions.  Sorry, 30 and 31.
20        So here's this adverse reaction.  Added
21 to labels in other countries in 2012, and not
22 added -- and this is, you know, my conclusion about
23 labeling in paragraph 31.
24        And the previous paragraph I do say that
25 there was a -- in essence, a failure to comply with

Page 152

1  regulatory responsibilities about pharmacovigilance.
2  And that is reflected in the fact that the label
3  change was not proposed in the U.S. until 2017.
4    Q.    And in order to form this opinion
5  about -- we talked about the deposition testimony so
6  we don't need to relive that.  You can put that
7  aside.  I think we've covered that.
8    A.    Thank you.
9    Q.    But I'm asking you about other things.
10 For example, in forming your opinion about Hospira's
11 approach to pharmacovigilance with respect to
12 docetaxel, did you review any standard operating
13 procedures, SOPs, that were in effect at Hospira that
14 governed internally their pharmacovigilance
15 processes?
16   A.    So I'm just, I'm thinking about
17 Dr. Schmider's deposition testimony which is probably
18 the fullest -- not fullest, but it's one description.
19 So I think that's the one place where I learned about
20 it.
21        I think it's -- you know, I think
22 the -- the exact processes are not, you know, where
23 they broke down.  And this is, you know --
24   Q.    I'm sorry.  I don't mean to cut you off
25 but I'm going to move on.

Page 153

1    A.    I'm sorry.  Let me -- not in detail that
2  I can -- I mean, I'm trying to remember if I looked
3  at specific.
4    Q.    You know enough about companies and
5  pharmacovigilance to know that they -- well, first of
6  all, let's even take one step back.  I think you
7  referenced this earlier.
8         Companies are required to have written
9  processes and procedures with respect to their
10 pharmacovigilance and safety reporting activities.
11 Right?
12   A.    Correct.
13   Q.    Okay.  And Hospira, those SOPs, those
14 written processes and procedures, all I was asking
15 was, as part of the review you didn't look at those.
16 Right?
17   A.    I don't recall off the top of my head.
18 It didn't play -- whether I did or not, if I had, it
19 was not going to make a difference.  It's not so much
20 the processes but the outcomes.  The process outcomes
21 and then the equivalent of clinical outcome which is
22 the labeling.
23   Q.    Doctor, the rooster crows when the sun
24 rises.  Right?
25   A.    Well, not if you're at the North Pole.

39 (Pages 150 - 153)

Page 154

1    I'm sorry.  I'm not trying to be -- the
2 only thing is there's a -- under the regs there's --
3    Q.    I'll withdraw the question.  Let's get
4 away from the chicken and the rooster and the crow.
5 You saw my point.
6        But I'm not asking about any of that
7 because you didn't -- you didn't list this in your
8 materials reviewed and so I'd expect that you would
9 if you had reviewed them.  So is it fair to say that
10 you simply -- you didn't look and review the SOPs and
11 the written processes and procedures?
12    A.    No, that's -- so let me not -- you know,
13 looking at one of the cites I do have to
14 Dr. Schmider's --
15    Q.    That's deposition testimony.
16    A.    Okay.  If I could finish my answer.
17        Okay.  I mean, if you're looking,
18 saying -- when I hear someone say, no, we didn't look
19 at permanent alopecia separately, I don't -- again,
20 and going to, you know, say can somebody see or not.
21    Q.    You're changing the question,
22 respectfully, Doctor.
23    A.    No, I'm not.
24        MR. CENTOLA:  Can you let him finish,
25 please, Mr. Horowitz.

Page 155

1        MR. HOROWITZ:  No, We can't.  We can't.
2 We can't.  Because it's a waste of my time.
3    Q.    You've got to answer my questions.
4 That's what we're doing here, Doc.  And you
5 know -- you know the drill.
6        So respectfully, I'm not asking you
7 about --
8        MR. CENTOLA:  Let's be a little bit
9 considerate to the witness, please.  Let's not be
10 rude.
11        MR. HOROWITZ:  The record will speak for
12 itself, Dr. Ross.  You and I know this.  I'm being
13 very considerate, am I not?
14        MR. CENTOLA:  Well, that wasn't a
15 considerate statement, but can we please just let the
16 witness answer the question.
17        MR. HOROWITZ:  When you watch the video,
18 Larry, it's very considerate.
19    Q.    You've got to answer my questions,
20 Doctor, respectfully.
21        So all my question is if you put hands on
22 the written processes and procedures in forming your
23 opinions.  And I know you want to talk about the
24 deposition testimony, I'm not asking you about that.
25 I'm asking about the processes and procedures.  And

Page 156

1 my understanding is, just so I understand the basis
2 of your opinions, you didn't review those as part of
3 forming your opinions.  That's all I'm asking.
4    A.    Okay.  So if your question means did I
5 look at the flow chart or a written, you know, list.
6 For Sandoz, certainly I remember -- I'm mixing that
7 up.
8        For Hospira, I can't remember reviewing
9 something like that.  I'll add a caveat that that's
10 not the only way to get a sense of
11 whether there -- not a sense, but to determine
12 whether somebody is complying.  That's not the only
13 source of information.
14        But if you're talking about that specific
15 did I look at this specific set of processes for
16 Hospira, I can't remember doing that.
17    Q.    And you don't include in your list of
18 materials reviewed in Exhibit C any reference to
19 Hospira pharmacovigilance SOPs.  Correct?
20    A.    Let me think.  The reference I have is
21 the document that's labeled "2.5 Clinical Overview,"
22 which is where I got the information about clinical
23 processes -- I'm sorry -- SOPs.  Not as a catalog of
24 what was done, which is I think is what you're asking
25 about.

Page 157

1        So if you're talking about that catalog,
2 no.
3    Q.    Doctor, I'm asking you about SOPs.
4    A.    No, I understand.  I'm talking about a
5 catalog of, like, an SOP that says we do this, we do
6 this, we do this, we do this, we do this.  I don't
7 recall reviewing that particular type of SOP.
8    Q.    And you don't have an SOP identified in
9 your materials reviewed list for Hospira.  Correct?
10    A.    I believe you're correct.
11    Q.    And you don't have an SOP about
12 pharmacovigilance for Hospira identified in the
13 footnotes of the text of your report.  Right?
14    A.    I believe you are correct.
15    Q.    Let's take a look at something you did
16 cite.
17        MR. HOROWITZ:  Let's do Tab 11.
18        (Exhibit 11, Article, "Use of data mining
19 at the Food and Drug Administration", marked for
20 identification.)
21        MR. HOROWITZ:  Loading.
22        THE WITNESS:  I honestly, I mean, I
23 understand.  It's Thursday, the computers are tired,
24 so...
25        MR. HOROWITZ:  I came in yesterday and

40 (Pages 154 - 157)

1 my network was down. That was really pleasant.
2       THE WITNESS: Yes.
3       Q. Okay. And this is an article which
4 we'll mark as Exhibit 11, that you cited in your
5 report at Footnote 16 on page 15. And it's titled,
6 "Use of data mining at the Food and Drug
7 Administration."
8       Do you see that?
9       A. I do.
10       Q. And this is an article that you cited
11 and relied upon in forming your opinion. Right?
12       A. Well, the context was I was describing
13 data mining.
14       Q. And that's in the title of the article.
15 Right? "Use of data mining at the FDA."
16       A. Yes.
17       Q. Okay. And this is a 2015 article.
18 Right?
19       A. Correct.
20       Q. In the Journal of the American Medical
21 Information Association?
22       A. Informatics Association, yes.
23       Q. Is that peer-reviewed?
24       A. Yes.
25       Q. And there are actually 30 individuals

1 listed as authors on this paper. Do you see that?
2       A. I do.
3       Q. And all 30 of those individuals are
4 affiliated with FDA. Do you understand that?
5       A. I do.
6       Q. And it says -- well, actually, they --
7 if you go to the end of the article, they actually
8 represent nine different offices or centers
9 within -- within FDA. Do you see that?
10       A. Yes.
11       Q. Okay.
12       And it says, "Objectives. This
13 article" -- I'm sorry. Let's go to the abstract.
14 There it is. Just the first sentence probably will
15 frame it out for us, Doctor.
16       It says, "This article summarizes past
17 and current data mining activities at the United
18 States FDA."
19       Do you see that?
20       A. Yes.
21       Q. Let's look at some of the things that
22 they talked about.
23       If you can go to the Introduction, the
24 second paragraph. Are you able to read that? Is
25 that big enough for you, Doctor?

1       A. Yes, thank you.
2       Q. The first sentence says, "The FDA
3 collects and maintains sets of data that provide
4 safety information for its regulated products."
5       Did I read that correctly?
6       A. Yes.
7       Q. And that's true. Right?
8       A. Yes.
9       Q. And if you go to -- towards the end of
10 that paragraph, there's a sentence that
11 starts -- that starts, "These reports are entered
12 into various databases maintained by FDA" --
13       Do you see that?
14       A. Yes.
15       Q. -- "so that the Agency can perform
16 analyses to identify potential safety issues and
17 enhance understanding about those issues."
18       Correct?
19       A. Correct.
20       Q. And that's something that FDA does.
21 Right?
22       A. Correct.
23       Q. And then on the next column on the same
24 page it talks about what they're doing in this paper.
25 The second paragraph in the right-hand column starts,

1 "In this paper."
2       Do you see that?
3       A. Yes.
4       Q. "In this paper, we summarize the data
5 mining tools and methods that F -- that the FDA
6 currently uses to identify safety signals."
7       Did I read that correctly?
8       A. Yes.
9       Q. And if you go to next page, it talks
10 about the place of data mining in safety report
11 assessment.
12       Do you see that?
13       A. Yes.
14       Q. It says in the first sentence, "Data
15 mining analyses are used to detect potential signals
16 and generate hypotheses related to those signals, but
17 cannot be used in isolation to establish causality
18 between an adverse event and a product."
19       Do you agree with that statement?
20       A. In general I would agree with that.
21       Q. And it goes on to say, "There are many
22 possible reasons other than a direct causal
23 relationship for there to be a statistical
24 association between a product and an event." And it
25 gives an example.

41 (Pages 158 - 161)

Page 162

1      And then it goes on to say, "Hands-on
2 case reviews, analysis of other data sources, for
3 example, FDA regulatory databases, the World Health
4 Organization drug safety report -- drug safety report
5 database, public scientific literature, and public
6 knowledge databases, and further epidemiologic
7 assessments are necessary to characterize the
8 clinical and public health significance of signals
9 generated by data mining analyses."
10      Do you agree with that?
11      A.   In general.  I mean, it's not always
12 correct, but you know, as we've talked about, you can
13 have single cases that not only represent a signal
14 but may represent the need for a label change.  But
15 in general I believe I agree with that.
16      Q.   The single case.  That would be a unique
17 and unusual situation.  I'm not saying it doesn't
18 happen, but that's definitely not the norm.  Right?
19 I don't know why you keep bringing up the single case
20 report.
21      A.   Again, I mean, it's that what I learned,
22 "avoid absolutes."  But it's that's -- please go
23 ahead.
24      Q.   You got your money's worth, Doc, right
25 there.

Page 163

1      A.   I don't know about that, but please go
2 ahead.
3      Q.   All right.  It goes on to say, "When the
4 evidence of a new safety issue is compelling, the FDA
5 may take regulatory action such as issuing a product
6 recall or changing a product labeling and is
7 responsible for informing the public of these actions
8 along with any firm initiated communications."
9      Did I read that correctly?
10      A.   You did.
11      Q.   And that's true.  Right?
12      A.   With -- it may take regulatory action or
13 change in the product labeling.  Excuse me.  Of
14 course, if the company, the manufacturer says, hey,
15 we are submitting a label change, that may remove the
16 need for the FDA to take action.
17      Q.   It could, or FDA could initiate it
18 itself, which is what's expressed here.  Right?
19      A.   If it under -- well, I'll just say if
20 you're talking about ordering a safety label change
21 order under 505.04, the guidance on that says it's
22 FDA's expectation that most label changes are
23 going to come from the manufacturer, not FDA.
24      Q.   Sure, sure.  But none of that is in my
25 question at all.  So I move to strike, nonresponsive.

Page 164

1      I guess I'm just asking you -- I mean,
2 this is what the 30 authors in 2015 from the nine
3 different offices and divisions at FDA say in the
4 peer-reviewed published article, that when the
5 evidence for a new safety issue is compelling, the
6 FDA may take regulatory action such as issuing a
7 product recall or changing a product labeling, and is
8 responsible for informing the public of these actions
9 along with any firm-initiated communications.
10      Did I read that correctly?
11      A.   With the understanding that this is in a
12 paper and is not in a guidance or a regulation, you
13 did read it correctly.
14      Q.   Why do you need that understanding,
15 Doctor?  I never lied.
16      Never mind, I withdraw the question.
17      MR. HOROWITZ:  Move to strike the "with
18 that understanding."
19      Q.   Let me just be clear, though, on the
20 signal piece, Doctor.  Once you identify a signal
21 then there's certain things you would expect either
22 FDA or, frankly, a company to engage in to assess
23 that signal.  Is that fair?
24      A.   Correct.
25      Q.   Okay.  And some of the things that are

Page 165

1 spoken about here in the context of this article and
2 FDA is the hands-on case reviews, analysis of other
3 data sources, you know, regulatory databases, the
4 WHO, public scientific literature, epidemiologic
5 assessments, all of those things are possible ways to
6 assess the safety signal whether it's by the
7 regulatory body or by the company, in fairness.
8 Right?
9      A.   Well, that's a little bit -- first off,
10 the pharmacovigilance guidance does recommend that if
11 you have a signal.
12      If you're not looking for signals, then
13 obviously you can't do that.  When you say, no, we're
14 not going to do data mining, although on the first
15 page of this, the authors note that this is
16 recommended in the industry.
17      But if you don't do it, then these
18 activities, some of them you mentioned, for example,
19 scientific literature reviews, are still expected,
20 not just in the context of signal analysis.
21      Q.   Well, you mentioned two things, I think.
22 So I know you're talking about the duty to review the
23 literature for purposes of annual reports?  Is that
24 what you were referring to?
25      A.   No, actually, respectfully, I wouldn't

42 (Pages 162 - 165)

Page 166

1 say that I'm mixing two things, I'm distinguishing
2 between two things.
3         So literature analysis certainly would be
4 important if you identify a signal, but certainly
5 that should be something that is done anyhow.
6     Q.    Right.
7     A.    Regardless of whether you're doing data
8 mining analysis or not.
9     Q.    Got you.
10     A.    So it can be done as an independent
11 activity certainly in this context that it's
12 important.
13         MR. CENTOLA:  Do you mind if we take a
14 quick five-minute restroom break?
15         MR. HOROWITZ:  Sure.
16         THE VIDEOGRAPHER:  The time is 2:48 p.m.
17 Going off the record.
18         (A recess is taken.)
19         THE VIDEOGRAPHER:  The time is
20 2:59 p.m.  We are back on the record.
21     Q.    Doctor, are you ready to proceed?
22     A.    Yes.
23     Q.    I want to continue in our tour of the
24 Duggirala article.
25     A.    Um-hum.

Page 167

1     Q.    And if you could go to -- or we'll go
2 there for you -- on page 432 of the article.  The
3 bottom of the left column has a section
4 there -- there we go -- called, "Challenges Related
5 to Applying Data Mining to Safety Reports."  Do you
6 see that?
7     A.    Yes.
8     Q.    It goes on to say, "Specific data mining
9 methodologies and the interpretation of signals
10 requires database-specific understanding of," and
11 then it has six bullet points.  Do you see that?
12     A.    I do.
13     Q.    The first bullet point says, "Acceptance
14 of foreign versus domestic reports with different
15 reporting requirements."  Correct?
16     A.    Yes.
17     Q.    And you understand that there are
18 various health agencies around the world in various
19 countries and regions that are responsible for
20 regulating pharmaceutical products and drugs in their
21 own regions and countries.  Right?
22     A.    That's correct.  I mean, that's
23 certainly something that is that, you know, is one of
24 the reasons for the International Conference on
25 Harmonization.  There are differences and there are

Page 168

1 similarities, so you are correct on that.
2     Q.    Right.  And then they refer to, one of
3 the issues is, of course, countries and regions
4 outside the United States still have, to some degree,
5 different reporting requirements or can have
6 different reporting requirements in those countries
7 or regions.  Right?
8     A.    In terms -- you mean in terms of if
9 there's, like, a particular piece of data that is
10 there, how it gets acted on from a regulatory point
11 of view by one country versus another is what you
12 mean.  Is that correct?
13     Q.    Yes?
14     A.    I'd agree with that.
15         I -- I agree that, you know, there's a
16 particular piece of data and it's going to differ.
17 The piece of data itself doesn't change, though.
18     Q.    Right.  It's the reporting requirements
19 and how the regulatory agency may approach that piece
20 of data that can be different.  Right?
21     A.    Correct.
22     Q.    And the changing reporting requirements
23 over time is the next bullet point.  Do you see that?
24     A.    Yes.
25     Q.    And then the next one says, "Changing

Page 169

1 coding dictionaries for products and events resulting
2 in discrepant product names and/or events."
3         Do you see that?
4     A.    I do.
5     Q.    And I know that you've had some
6 discussions in the prior depositions about MedDRA, in
7 particular, one of the coding dictionaries.  I don't
8 think we need to relive that, but I'm pretty sure
9 that's what this is referring to there is MedDRA is
10 but one example of a coding dictionary.  Right?
11     A.    It's probably the predominant one
12 that's -- that's in -- I mean, whatever version is
13 used in any particular system.  I mean, it's
14 certainly not the only one, but that's correct.
15     Q.    In forming your opinions, did you -- did
16 you study MedDRA's definition of alopecia and how
17 it's treated within the confines of the MedDRA
18 dictionary?
19     A.    I did.
20     Q.    "The changing data entry and coding
21 processes" is the next bullet point.  Do you see
22 that?
23     A.    Yes.
24     Q.    And then the next bullet point says,
25 "Inconsistent database structure architecture."

43 (Pages 166 - 169)

1        And the last is everybody's favorite,
2  "Malicious reporting and spam." Right?
3        A.    Yes.
4        Q.    Okay. And then it goes on to say, the
5  article says by the 30 FDA folks, "Signal thresholds
6  are adjusted to account for the severity of the
7  adverse event related to the product and the severity
8  of the condition for which the product is being
9  used."
10        Do you see that?
11        A.    Yes.
12        Q.    And do you have an understanding as to
13  what that's referencing?
14        THE WITNESS: I'm sorry, if you could
15  just, the scrolling scrolled away for a minute.
16        Um, if you could just go up. Sorry. I
17  want to make sure I'm looking at it in context.
18        Um, I'm not quite sure what they're
19  referring to here. If -- if the question is, you
20  know, how sensitive do you set a -- what signal
21  you're going to look at for saying this is something
22  for cancer -- and as I said earlier, there's a lot of
23  different kinds of cancer. You know, that is how I'm
24  interpreting this purely in terms of a signal
25  threshold. Not -- I'm not interpreting it as

1  regulatory action, but just as signal analysis.
2        Q.    Right. They're talking about signal
3  detection. Right?
4        A.    It just says the threshold for
5  evaluating a safety issue.
6        Q.    Right. And then they say, "the
7  interpretation of signals." If you're going to
8  interpret what comes out of this data mining, you
9  need to have a database-specific understanding of
10  various points. And we just walked through those
11  points. Right?
12        A.    If we can go back, scroll back down so I
13  can take a look at it again.
14        Yes, that's -- that is what it says.
15        Q.    Okay. And then it gives an example of
16  what it means -- or the article or the FDA folks who
17  authored the article give an example of what they
18  mean by, "signal thresholds are adjusted to account
19  for the severity of the adverse event related to the
20  product and the severity of the condition for which
21  the product is being used."
22        Do you see that?
23        A.    Oh, I see the sentence at the bottom.
24  When you say, "an example" --
25        Q.    At the top.

1        A.    Sorry.
2        Q.    And it says, "For example." Now do you
3  see that?
4        A.    Yes.
5        Q.    It says, "For example, the threshold for
6  evaluating a safety issue for a drug used to treat
7  cancer would be different than the threshold for a
8  drug used to treat acne."
9        Do you see that?
10        A.    That is literally what it says. You are
11  correct.
12        Q.    Okay. And you don't take issue with the
13  FDA authors using this example with respect to data
14  mining and signal thresholds, do you?
15        A.    Well, I wouldn't call it an example.
16  You're talking about, certainly for cancer, two very
17  broad categories. You know, there's basal cell
18  carcinoma of the skin, which is very -- it's another
19  skin condition which is very rarely life-threatening.
20  So I'm -- that's a very -- that's not really an
21  example. And I'm actually -- so the --
22        Q.    I'm sorry.
23        A.    I -- I think it's actually I find it
24  more confusing than anything else.
25        Q.    So the nine divisions at FDA represented

1  by the 30 authors who actually used the words "for
2  example," and then give the example, you're saying
3  that they're wrong, you disagree.
4        A.    No, that's not what I said. But let me
5  unpack that question just quickly. You said the nine
6  divisions represented. First off, I'm not
7  clear -- these are nine employees -- I wasn't clear
8  that any of these are, quote, speaking officially
9  representing FDA. Certainly the ones that I'm
10  familiar with are not necessarily even decisionmaking
11  officials.
12        Secondly, I wouldn't take this as a
13  statement of FDA policy. So I'm not saying they're
14  wrong --
15        Q.    I'll withdraw the question, Doctor.
16  Your objections are sustained. Let's try it this
17  way.
18        The 30 authors -- you agree with me,
19  there's 30 authors who are affiliated with FDA.
20  Right?
21        A.    Yes.
22        Q.    Okay. The 30 authors who are affiliated
23  with FDA who published this article in the
24  peer-reviewed literature use the words, "for
25  example," when describing the threshold for

44 (Pages 170 - 173)

Page 174

1 evaluating a safety issue for a drug used to treat
2 cancer would be different than the threshold for a
3 drug used to treat acne, they're citing that as an
4 example. Right?
5    A.   Well, actually, what they're citing are
6 three references, references 2, 9, and 54, and I
7 don't know what those are. You know, from a
8 regulatory -- I don't know if they're speaking from a
9 regulatory standpoint or a pharmacoepidemio -- sorry.
10 I don't know what perspective they're talking from.
11 You're saying they must be talking about what the FDA
12 would do.
13    Q.   Okay. So the bottom line is the article
14 says what it says. Right? We can agree it says what
15 it says.
16    A.   Yes.
17    Q.   And it cites what it cites. Right?
18    A.   Yes.
19    Q.   Okay.
20        Do you agree that FDA evaluates the
21 severity of an adverse event against the severity of
22 the condition being treated?
23    A.   Respectfully, I -- really -- it's a
24 really broad question. And I'm not trying to be
25 difficult here, but you know, there's a lot of

Page 175

1 factors. Are you talking about a drug that's never
2 been approved? Are you talking about a drug, what
3 the nature of the risk is, or whatever. I'm
4 not -- in addition -- first off, there's no cap.
5 There's no upper limit to how many adverse reactions
6 or warnings there can be on a label, at least not in
7 the regulations. It's not like -- so if that gets
8 turned -- if that's what you're asking, they
9 certainly, in terms of making decisions about risk
10 mitigation and real world, are going to look at those
11 are things that -- a drug that has risks and very
12 little benefit in one situation, and the same risks
13 and greater -- much greater benefit in another, the
14 Agency is going to take that into account.
15    Q.   So you're aware of both FDA's statements
16 and policy statements with respect to adverse events
17 where FDA has talked about the need to evaluate the
18 severity of the event against the severity of the
19 condition being treated? Are you aware of that?
20    A.   I -- I'd ask what you're -- specifically
21 what you're referring to. I -- you know, I need to
22 see, you know, more specifically what you're asking
23 about.
24    Q.   And you agree there's -- there's the
25 labeling for pharmaceutical products is governed by

Page 176

1 Federal -- Code of Federal Regulation Section 21 of
2 the CFR. Right? Specifically 201.56 and 201.57?
3    A.   In general, yes.
4    Q.   And the criteria for what's required to
5 be included in the various sections of the product
6 labeling are set forth in Section 201.57. Right?
7    A.   For the vast majority of drugs, yes.
8    Q.   Including drugs like docetaxel. Right?
9    A.   Yes.
10    Q.   Taxotere?
11    A.   Yes.
12    Q.   So let's go to your report, Exhibit 1 in
13 paragraph 28. Let's take a look at that.
14        I want to focus on the first piece of
15 that. We talked about the plaintiffs this morning.
16 You say, "Each of these 505(b)(2) NDA holders" -- and
17 here you list Sandoz, Hospira, and Accord -- "knew or
18 had reason to know that sufficient evidence existed
19 to warrant a label change under 21 CFR 201.57(c)(6)
20 and/or 21 CFR 201.57(c)(7) at the time their
21 respective products" -- and then you talk about the
22 plaintiffs. Of course, at the time you wrote this
23 report, that was a different set of plaintiffs.
24 Right?
25    A.   That's my understanding, yes.

Page 177

1    Q.   Okay. So let's -- let's put aside -- we
2 talked this morning about the various plaintiffs. I
3 want to focus on the first piece.
4        What is it -- for Hospira, right? We
5 know Hospira was approved on March 8, 2011. What's
6 the date upon which, in your opinion, Hospira
7 was -- had sufficient evidence that warranted a
8 proposed label change to FDA?
9    A.   So, first, I don't believe it's possible
10 to say as -- you know, on this date. But I certainly
11 would say sometime in 2012 there was the -- the new
12 safety information that was available to Hospira as
13 well as the other companies and provided -- and I'm
14 reading from 27a -- "some basis to believe that
15 there's a causal relationship between docetaxel and
16 the occurrence of irreversible alopecia."
17    Q.   What specifically is the new evidence in
18 2012 you were referring to?
19    A.   So there's actually, you know, a number
20 of things. And I go over these in my report. But
21 just, you know, I mentioned a number of these
22 publications that were published before that. For
23 example, Nabholtz in 2001. I'm taking this from
24 Drs. Feigal and Madigan.
25        But I would certainly cite the abstract

45 (Pages 174 - 177)

Page 178

1 from 2006 by Dr. Sedlacek. The "Annals of Oncology"
2 paper from Dr. Kluger. And in addition, and this
3 falls within the, you know, part of the new analysis,
4 the label changes in Hungary, Israel, and other
5 countries that represents new safety information that
6 provided some basis to believe there is a causal
7 relationship.
8      Q.    Was there, in your view, a signal in
9 2012 that should have alerted Hospira to conduct an
10 evaluation of that signal with respect to permanent
11 alopecia in 2012?
12      A.    So I'm not -- I'm taking "signal" in a
13 very broad sense, not necessarily data mining, but
14 you know, having a, for example, a paper appear such
15 as Kluger where the change in label is a signal. And
16 when I said labels are a signal I don't mean in terms
17 of a regulatory change or a label change. Those
18 label changes reflected the -- an
19 underlying -- underlying information, the TAX 316
20 study; and regardless of whether FDA regulations are
21 the same or not as those in other countries, that
22 represents new safety information.
23      So I think the question of whether it's
24 a signal -- not a data mining signal,
25 obviously -- but it's -- it actually represents new

Page 179

1 safety information goes beyond a signal that
2 triggered the obligation to update the label.
3      Q.    So if I understand correctly, you've got
4 Tax 316 data that appeared in some ex-U.S. labels.
5 You've got some of the publications that were cited
6 by Dr. Feigal, and I guess maybe you said Madigan.
7      Anything else?
8      A.    Well, again, I think if you -- I
9 describe this in my report. I mean, there's the
10 Accord European labels, the Sandoz labels. I mean,
11 those are publicly available. The other publications
12 such as described in Dr. Feigal's report.
13      We talked about data mining. You know,
14 if Hospira had wanted to do that, there was nothing
15 stopping it. Those -- the AERS data I talked about
16 before are released quarterly.
17      Q.    But, Doctor -- oh, I'm sorry.
18      A.    No, go ahead. I'm sorry. Go ahead.
19      Q.    What I'm trying to understand is, we've
20 spent hours talking about the whole purpose of a
21 505(b)(2) and not having to reinvent the wheel, and
22 you seem to be suggesting that information that FDA
23 had or that really long predated, even if it's public
24 data -- and we can talk about whether FDA had
25 it -- you seem to be suggesting that there was some

Page 180

1 obligation on the part of Hospira to do some sort of
2 retrospective look. And I'm having a hard time
3 understanding what it is that you think should have
4 sparked that.
5      What is it in 2012 that was new
6 information that should have been a signal that
7 alerted the company to the need to do the review
8 you're suggesting in the first place?
9      MR. CENTOLA: Objection, form.
10      A.    That's a fair question. So first of
11 all, I just want to observe, I'm not suggesting that,
12 I'm saying it straight out. That's number one.
13      Number two, in terms of avoiding, you
14 know, duplicative studies, that refers to
15 pre-approval studies. It does not, not, not, refer
16 to post-marketing activities. Both Hatch-Waxman and
17 the regulations do not say anything, nor was that, as
18 far as I can see, with the passage of that act
19 anything that they said, well, we want to avoid
20 duplication in post-marketing as well. This doesn't
21 say that. It's all about pre-marketing.
22      Third, and this is a common myth that
23 new safety information only involves things that
24 appear in the last few months. And the statute and
25 the definition -- I'm sorry, the definition was

Page 181

1 drafted intentionally to be quite broad so that if
2 it's information that exists and is analyzed or added
3 as part of an analysis, that analysis is the new
4 safety information. It is not restricted -- it does
5 not exclude things that the FDA as individual bits
6 and pieces may know about just because they've been
7 there. In fact, it's -- the FDA has emphasized that
8 it's the company's responsibility to do this kind of
9 analysis and bring it to the FDA's attention.
10      So the new safety information, each of
11 these -- you're correct that each of these pieces
12 that I've talked about, they're -- may or may not be
13 in there in one way or another, but the -- if a
14 company says, you know, putting these all together,
15 clearly this is something where we need to update the
16 label, that's new safety information.
17      And, really, between the time frame that
18 I'm talking about and when they actually updated it,
19 there was nothing new. There was nothing -- it was
20 just -- I mean, you know, it was not, like, oh, my
21 God, here's a new 2014 paper. In fact, in the
22 clinical overview that I mentioned, the review that
23 Pfizer did specifically mentions the Kluger paper
24 from 2012.
25      So it's incorrect to say, well, this

46 (Pages 178 - 181)

Page 182

1  isn't really new, and that is exactly why this was
2  drafted the way it was.
3      Q.   Doctor, if I understood you correctly,
4  you -- you said that there was nothing new, it was
5  really putting together the bits and pieces that
6  already existed in 2012. That's what you just said.
7  Right?
8      A.   No.
9      Q.   Oh.
10     A.   That is not what I said.
11         It is that an analysis itself is new,
12 and it's not simply semantics.
13     Q.   I understand that, Doctor. You can
14 always do a new analysis of old data. Right? You
15 can always do that. Is that what -- just so we're
16 talking the same language.
17         There's an old -- there's an analysis of
18 data that exists, the preexisting analysis, right,
19 and then there's something that is truly new that
20 comes into existence that causes, you know,
21 that -- there's something that's surely new that
22 exists for the first time, and that's the distinction
23 you're making. Right?
24     A.   No. What I'm saying is, first off,
25 there is no -- let me finish. There's no definition

Page 183

1  of, quote, old data. There's -- you know, in the
2  regs.
3         Secondly, that is exactly how -- it's
4  not trivial to put things together.
5      Q.   I'm not suggesting that, Doctor, but --
6      A.   But it's not -- I'm trying to say it's
7  not just -- it's not new for its own sake. You can
8  do an analysis where it doesn't reveal something.
9      Q.   Okay. Let's try to get back on track
10 here. We're talking about new evidence. Right?
11     A.   New safety information.
12     Q.   My question is: How do you define as a
13 regulatory expert what is -- what is the definition
14 of "new evidence" you're applying to this duty that
15 Hospira had in 2012 to submit a CBE? What's the
16 definition you're using?
17     A.   Just a second -- just bear with me here.
18         So paragraph 45: "The FDCA broadly
19 defines new safety information as, quote, information
20 derived from a clinical trial, an adverse event
21 report, a post-approval study, or peer-reviewed
22 biomedical literature or other scientific data about
23 a serious risk or an unexpected serious risk
24 associated with the use of the drug the secretary has
25 become aware of that may be based on a new analysis

Page 184

1  of existing information since the drug was approved."
2         That's the definition that I'm using.
3      Q.   Is that the whole definition?
4      A.   There's ellipses in there.
5      Q.   What did you leave out, Doctor?
6      A.   You know what? If we can pull up the
7  statute, I could do it right now and read the whole
8  thing, if you'd like. But it's not -- it's things
9  that -- the words did not substantively change the
10 meaning of this. But if you'd like, I'll pull it up
11 right now and we can read it and I'm sure you've got
12 it.
13     Q.   You wouldn't want to leave anything out
14 that was important to the accuracy of your
15 definition, would you?
16     A.   No.
17     Q.   So was -- was there any particular truly
18 new piece of data or event that occurred in 2012 that
19 you can point to that you think was enough of a
20 signal that with respect to permanent alopecia that
21 you think Hospira should have conducted a signal
22 analysis and assessed?
23         MR. CENTOLA: Objection to form.
24     A.   So you used the term, "truly new."
25     Q.   Correct.

Page 185

1      A.   Okay.
2      Q.   That didn't exist in 2012. I'll define
3  it for you. That didn't exist before 2012.
4         MR. CENTOLA: Objection, form.
5      A.   Okay. First off, if a company does not
6  do an analysis that would constitute new safety
7  information, it will never exist. That's number one.
8         Number two -- and I pointed this
9  out -- the Kluger article, the label changes that are
10 described in my report, those certainly did not, you
11 know, appear.
12     Q.   You talked about Dr. Madigan and your
13 review and reliance on the report. Are you relying
14 on Dr. Madigan's report for your opinions in this
15 case?
16         MR. CENTOLA: Object to form.
17     A.   If I can --
18         MR. HOROWITZ: What's the objection?
19         MR. CENTOLA: Sure. You said, "Are you
20 relying on his report?" The question is are you
21 relying on data in his report? Are you relying on
22 the entire report? Did you use some of the
23 information in the report to impart his opinion
24 or -- you're -- it is an imprecise question.
25         MR. HOROWITZ: I got you.

47 (Pages 182 - 185)

1      MR. CENTOLA:  That's why there's a form
2  objection.  If you want to ask a precise question,
3  that's fine, but you can't say are you relying --
4  which part --
5      MR. HOROWITZ:  Objection, imprecise.
6  I'm with you, Larry.  I appreciate your explaining.
7      Q.   Doctor, are you relying upon
8  Dr. Madigan's report in forming your opinions in this
9  case?
10      MR. CENTOLA:  Objection to form.
11      A.   So the role of these reports is
12  described in paragraph 85.  "My understanding and
13  opinions are supported by the analyses and opinions
14  of the Plaintiffs' expert witnesses, Dr. Feigal,
15  Dr. Madigan, and Dr. Plunkett.  I have reviewed their
16  expert reports and I accept and consider their
17  assessments."
18      Q.   And to be clear, just so when you say
19  Plaintiffs' expert witnesses, Drs. Feigal and Madigan
20  and Plunkett are -- are witnesses such as yourself
21  who have been retained by Plaintiffs' counsel to
22  offer their opinions in these cases.  Is that right?
23      A.   That's my understanding.
24      Q.   And just as yourself, they are
25  compensated for the time they devote to preparing

1  reports and giving depositions and providing these
2  opinions in this litigation.  Right?
3      A.   That's my understanding from their
4  reports.
5      Q.   And do you know how much money either
6  of -- or any of the three of them have been paid with
7  respect to this litigation?
8      A.   I have no idea.
9      Q.   Do you know how frequently these folks
10  testify on behalf of plaintiffs' lawyers and how much
11  of their income comes from providing reports for
12  plaintiffs' lawyers in litigations like this?
13      A.   I have no idea.
14      Q.   And when you were at FDA, and I saw
15  something in your report about the internal processes
16  at FDA when you function as a medical officer,
17  sometimes you -- and not infrequently, you would rely
18  upon subject matter experts for their reports that
19  were outside of your direct area.  Correct?
20      A.   I think it might be more accurate to say
21  I would take their analyses and conclusions and
22  recommendations into consideration.
23      Q.   Correct.  And when you did that at FDA,
24  it seems to me that you're suggesting you might be
25  skeptical sometimes of their -- of the experts that

1  sent you reports in areas outside of your own
2  expertise and you would do your own sort of
3  assessment or -- or -- or due diligence with respect
4  to the conclusions and recommendations they were
5  making.  Right?
6      A.   I don't think "skeptical" is the right
7  word in the sense that -- that, you know, I would
8  read their reports.  The reports might be something I
9  completely agreed with or I'd agree with in a narrow
10  way but there was a broader context for viewing their
11  conclusions.  Certainly I didn't feel, you know,
12  like, I must accept what they're saying.  But I don't
13  think I -- skeptical?  I didn't automatically accept
14  what they would say.  You know, I read it and
15  evaluate it accordingly.
16      Q.   And did you apply the same level of
17  rigor here when you looked at the retained
18  compensated expert reports from Dr. Feigal, Madigan,
19  and Plunkett?
20      A.   Yes.
21      Q.   Okay.
22          What exactly did you do to assess the
23  quality of their reports?
24      A.   The quality of their reports?
25      Q.   Let me ask that differently.  What

1  exactly did you do to get yourself comfortable with
2  the -- the conclusions or whatever -- whatever it was
3  that you were relying upon from each of their
4  reports?  What did you do?
5      A.   So what I would say as to -- you know,
6  first off, the areas that they were offering opinions
7  on I certainly have some knowledge of.  It's not that
8  I know nothing about it.
9          So, you know, what I would do with any
10  report -- and, honestly, it doesn't matter whether
11  they're compensated or not or even what side they're
12  on, I have to make up my own mind.  I'm not -- you
13  know, if I'm reading -- there's reports that I've
14  looked at from -- retained by opposing counsel,
15  not -- not talking just limited to this case, and I
16  don't say, well, they're retained by the other side,
17  they must be wrong.  That's not how science works.
18          You say, okay, from what I know of
19  methodology in this -- and some of this is
20  general about the things that lead to incorrect
21  conclusions and not specific to any field -- are
22  there any obvious errors here?  Can I understand what
23  they're saying?  Are their methods supported by
24  previous work in the field?  And if there's a
25  regulatory aspect or -- regulatory implications, do I

48 (Pages 186 - 189)

Page 190

1 have the information I need to apply it.
2    Q.    Take a look at -- let's go back to your
3 report, Exhibit 1, paragraph 91.
4        You talk about how Dr. Madigan analyzed
5 the results of four observational studies.  Do you
6 see that?
7    A.    Yes.
8    Q.    And concluded that there was a
9 significantly increased risk of PCIA in
10 docetaxel-containing regimens versus the
11 non-docetaxel containing regimens when analyzed
12 cumulatively, and, for three of them (including
13 Sedlacek 2006) on their own.  Do you see that?
14    A.    Yes.
15    Q.    That was a metaanalysis, right, that he
16 conducted?
17    A.    Well, I think -- I'm not sure.  It
18 depends on the exact definition of metaanalysis that
19 one is using.  But essentially in terms of pooling
20 the data here, I'm not sure that -- I prefer to refer
21 to it as a pooled analysis.
22    Q.    Okay.
23    A.    But at any rate.
24    Q.    Dr. Madigan performed what you would
25 call a pooled analysis.  Right?

Page 191

1    A.    Well, I think that's one way to look at
2 it.  I think the point is that there's more than one
3 study and there's methodology for -- but for
4 metaanalyses and if you're just pooling things.  Not
5 just if you're pooling things, two are overlapping
6 but not necessarily the same.
7        But at any rate, that's something I would
8 refer to Dr. Madigan exactly how you would regard it.
9        But at any rate, please go ahead.
10    Q.    And you took the trouble to write this
11 in your report and include it as part of your report
12 that you submitted against Hospira in this case.
13 Right?
14        MR. CENTOLA:  Objection, form.
15    A.    I'm not sure I would say it was against
16 Hospira.  It was my opinion on these questions.
17    Q.    Are you aware that the Federal Judge
18 presiding over this case has ruled that Dr. Madigan's
19 analysis is not reliable?
20        MR. CENTOLA:  Objection, opinion.
21    Q.    Are you aware of that?
22    A.    I know that there was a Daubert motion
23 filed.  I'm looking at it from a scientific
24 perspective and not a judicial perspective.
25    Q.    Well, are you aware that the Judge

Page 192

1 stated that she finds it significant that Dr.
2 himself has written -- that means Dr. Madigan has
3 written himself outside the concepts of this
4 litigation -- "that in the face of high
5 heterogeneity" -- you do know what that is.  Right?
6 Heterogeneity?
7    A.    I do know.  It depends what the context
8 is; but please go ahead.
9    Q.    Okay.  I'll give you the context.
10 "Simply pooling data or performing a metaanalysis
11 would generally not provide satisfactory outputs."
12        Were you aware that the Judge wrote this
13 in her opinion about Dr. Madigan's analysis?
14    A.    I believe that I actually -- you know, I
15 think that was actually cited in my reliance
16 material.  Or not reliance, but my review materials,
17 if I'm not mistaken.  So if that's the line that I'm
18 thinking about, I did.
19    Q.    I'm sorry.  You're saying that the
20 Judge's opinion is cited in your reliance materials?
21 If I were to tell you that that's simply not the
22 case, would you --
23    A.    Then I may be -- then I may be mistaken,
24 which is always -- the one I'm thinking of here is
25 "Order and Reasons," Barbara Earnest.  I don't have

Page 193

1 that in front of me.  But I guess --
2    Q.    I'm talking about a different order, Dr.
3 Ross.
4    A.    Okay.  That's fine.  I guess what I
5 would say is there are two different -- you're
6 talking about the legal system versus looking at it
7 as a -- from a regulatory science perspective.  Those
8 are two different things.
9    Q.    Well, not -- not exactly, Doctor.
10 You -- you cited Daubert yourself.  Right?  You just
11 mentioned you understand that there are Daubert
12 decisions, and you know what that is, that the
13 Court's gatekeeping role on the reliability of the
14 methodology used --
15        MR. CENTOLA:  We're not here to argue
16 law, are we?  We're going to stick to science?
17    Q.    Doctor, you used the word "Daubert."
18 Right?  Can you answer my question?  You understand
19 what that is.
20    A.    I know it's a legal -- it's a case that
21 was applied in from -- in terms of expert witness.
22 It's not a regulatory concept, however.
23    Q.    It's a reliability of methodology
24 concepts.  Right?
25        MR. CENTOLA:  Objection to form.

49 (Pages 190 - 193)

1    A.    From a legal perspective.

2    Q.    Sure.  But it's assessing science in a
3 regulatory -- any other form of proffered expertise.
4 Right?

5         MR. CENTOLA:  Objection, form.

6    Q.    You understand that.  Right?

7    A.    Yes.

8    Q.    I'm getting an echo.  Do you have a
9 phone on in your room?

10   A.    I don't, but let me go on mute.  Maybe
11 that will help.

12   Q.    How can you go on mute if you have to
13 answer my questions?

14   A.    I'll go off mute.  I have this happen
15 sometimes at work.  I just -- you know,
16 somebody -- for whatever reason there's an echo.  But
17 I'll just go on mute.  You can hear me now.  I just
18 have to hit the space bar on my machine.

19   Q.    Doctor, with respect to Dr. Madigan's
20 FAERS database analysis that you talk about in your
21 report for the proposition that there were signals as
22 early as 2000, you didn't independently analyze the
23 adverse event data for FAERS regarding Taxotere and
24 docetaxel, did you?

25   A.    That's correct.

1    Q.    You -- you are only relying upon
2 Dr. Madigan's analysis.  True?

3    A.    So, again --

4         MR. CENTOLA:  Objection to form.

5    A.    -- tell me what paragraph.

6    Q.    Paragraph 95.

7    A.    Yes.  So as I said, the role of those
8 reports, as I say in paragraph 85, is that my
9 understanding and my opinions are supported by the
10 analyses and opinions of those expert witnesses.  I
11 don't use the word "rely" here.

12   Q.    Okay.  So then can we just -- I guess my
13 question is are you relying on these reports of
14 Madigan, Feigal, and Plunkett?  Are you relying on
15 them in any way?

16   A.    Again, the word that I use here is that
17 they support my understanding and opinions.  And I
18 really think that's what I would say.

19   Q.    So you could give your opinions in this
20 case with the absence of any recitation to any of
21 their three reports is what you're saying.

22        MR. CENTOLA:  Objection, form.

23   A.    No, that's not what I said.

24   Q.    Then you are relying on them.

25        MR. CENTOLA:  Objection, form.

1    A.    That is also not what I said.

2    Q.    Okay.  Because what you're saying,
3 honestly, Doctor, doesn't make any sense.  I mean,
4 you know, you're saying, "I've got an opinion and
5 they agree with it but I'm not relying upon them."

6         So if you have an opinion and they agree
7 with it but that's all you're doing, then they've got
8 nothing to do with your report.

9         MR. CENTOLA:  There's no question on the
10 table.  Can we ask questions?

11        MR. HOROWITZ:  There is a question.

12   Q.    Which is it, Doctor, are you relying
13 upon them or are you not?  That is the question.

14        MR. CENTOLA:  Well, that's a question
15 after a soliloquy.  Can we ask a question without
16 arguing with the witness.

17        MR. HOROWITZ:  I'm not arguing.  I'm
18 trying to understand.

19   Q.    You have to help me out here, Doctor,
20 because I really don't understand what you're saying.
21        I don't understand the role that you
22 think these reports play with respect to your report.
23 Could you explain that to me.

24   A.    So I'm trying to answer your question,
25 which is in terms of I don't need their report.  I

1 did not conduct the exercise of saying, well, let's
2 pretend I never saw these, would I still reach the
3 same conclusion?  I haven't done that nor would I do
4 that.  I mean, that's not the way that science works.
5 You don't say, well, what can I exclude here?  I
6 understand that exclusion or inclusion of evidence in
7 law in extremely important and I understand that, but
8 I'm not a lawyer and that's -- I'm a regulatory
9 expert.

10        Secondly, I don't -- in terms of "rely
11 on," I'm -- again, I use this wording and I don't say
12 that from my understanding and opinions I rely on the
13 analyses.  I also don't say I don't rely on them.  I
14 do say that my opinions are supported by the analyses
15 and opinions of plaintiffs' expert witnesses.  And,
16 again, I'm afraid I'm going -- that's the best I can
17 do to explain it.

18   Q.    Doctor, did you yourself do a pooled
19 analysis of the four articles that Dr. Madigan
20 analyzed, the four observational studies?

21   A.    No.

22   Q.    Did you, yourself, do an analysis of the
23 FAERS database that Dr. Madigan looked at?

24   A.    No.  I also paused because there was a
25 previous question in which you had posited that I,

Page 198

1 quote, agree with them.  What I said was --
2     Q.    Let's not go back to a previous
3 question, Doctor.  Answer the question in front of
4 you, please.
5     A.    I'm sorry, no.
6     Q.    Mr. Centola can ask you questions at the
7 end if you think there's something you want to go
8 back to.
9          And with respect to -- well -- and you
10 certainly didn't analyze the methodology that
11 Dr. Madigan used to conduct his FAERS analysis, did
12 you?
13     A.    I reviewed it.  If there had been
14 something that I did not find acceptable, I wouldn't
15 have written, "I accept and consider their
16 assessments valid. "
17          So I don't know if analyze it is what
18 you would say, but I -- I -- it was -- I did not
19 simply read the last paragraph of their -- either
20 reports, I guess I would say.  So --
21     Q.    I'm sorry.
22     A.    Please go ahead.
23     Q.    Sorry.  Did you verify whether or not
24 Dr. Madigan followed the same FDA guidance and best
25 practices that drug manufacturers should follow?

Page 199

1     A.    Which specific guidance are you -- or
2 best practices are you referring to?
3     Q.    Can you answer my question?  I mean, did
4 you do any sort of assessment as compared to any
5 particular guidance?
6     A.    There are hundreds of guidances that FDA
7 has issued including a large number on biometrics and
8 analysis, so I can't answer that question unless you
9 say did you look to see if you followed this or that
10 or the other thing.  So if you can do that, I can
11 answer your question; otherwise, I mean,
12 there's -- besides the guidances, there's -- you
13 know, I -- I can't answer that unless you say here's
14 what I'm talking about.
15     Q.    Did you look at any of them in
16 comparison to -- not in comparison, but when you were
17 assessing Dr. Madigan's analysis, did you look at any
18 of the guidances with respect to best practices on
19 post-marketing surveillance to see where his
20 methodology stacked up?
21     A.    So guidances and
22 scientific -- statistical, rather, and clinical trial
23 issues come first and foremost out of the underlying
24 science.  So if something is consistent with not just
25 the guidance but starting with the science, that's

Page 200

1 what I'm looking for.
2     Q.    I'm not asking --
3     A.    If I could -- if I could finish.
4     Q.    You're not answering my question.
5     A.    Well, the answer is these are guidances
6 for industry, so I'm not going to look at that with
7 respect to Dr. Madigan.  What the --
8     Q.    What about guidances -- oh, I'm sorry.
9 I thought you were done.
10     A.    I'm going to say, I, you know, did not
11 consult a whole slew of reference works that weren't
12 applicable.  There's a whole universe of those.  So,
13 no, I would not look at that because it wouldn't help
14 me.
15     Q.    What about any -- there are -- there are
16 maps and internal processes and procedures and
17 guidances within FDA for medical officer reviewers.
18 Right?  Are you familiar with those?
19     A.    Yes.
20     Q.    Did you look at any of those and make an
21 assessment as to whether Dr. Madigan was in
22 compliance with any of those guidances or protocols?
23     A.    That was not only -- it would be not
24 only irrelevant but potentially the wrong thing to
25 do.  So, again, it's -- he's not an FDA employee, was

Page 201

1 not doing this as a regulatory expert; so, no.
2     Q.    Are you offering an opinion that Hospira
3 was required to conduct an analysis of all of the
4 FAERS data regarding docetaxel before it submitted
5 it's 505(b)(2) application?
6     A.    Again -- again, I've not offered and I
7 do not anticipate offering any opinions about what
8 Hospira did prior to approval to get approval.
9     Q.    Paragraphs 91 to 94 you discuss the
10 medical literature that you cite.  Do you see that?
11     A.    I'm sorry.  Please go ahead.  I'm sorry.
12 I knocked over a cup.  Can you repeat the question?
13     Q.    I'm sorry.  Do you need a second, Doc?
14     A.    No, there was nothing in it.  I'm sorry.
15 Can you just repeat the question?
16     Q.    Yeah, sure.
17          Paragraphs 91 to 94 you discuss medical
18 literature.  Correct?
19     A.    Yes, that's correct.
20     Q.    Did you do your own independent review
21 of that literature or are you simply relying upon
22 what Dr. Feigal or Plunkett did?
23          MR. CENTOLA:  Objection, form.
24     A.    So, again, I reviewed their reports, and
25 I'm excerpting from those reports studies that I

51 (Pages 198 - 201)

Page 202

1 found -- in terms of testing my opinions, I found
2 supported the conclusions that I had drawn. Did I
3 review each and every one of these studies as they
4 did? No. Nor if I were doing this in an NDA review
5 or a review of a post-marketing issue, would I
6 necessarily have done that either.
7      Q.   Doctor, we're getting close. It
8 actually may help, you know, I think we're at the
9 point where I may streamline a bit.
10         MR. HOROWITZ: Larry, I can't see you
11 anymore for some reason. I don't know if it's me
12 or -- oh, there you are. I missed you, Larry.
13         MR. CENTOLA: Miss you, too.
14         MR. HOROWITZ: Well, if you could
15 indulge me for maybe -- maybe this will be ten
16 minutes because I think it will help us on the back
17 end, if that's okay.
18         (A discussion is held off the record.)
19         THE VIDEOGRAPHER: The time is
20 3:56 p.m. Going off the record.
21         (A recess is taken.)
22         THE VIDEOGRAPHER: The time is
23 4:15 p.m. and we're back on the record.
24      Q.   Doctor, it's getting a little later.
25 It's after four. We're getting there. I appreciate

Page 203

1 you hanging in.
2         Let's go to our next exhibit, which will
3 be Exhibit 12.
4         (Exhibit 12, Notice of Deposition, marked
5 for identification.)
6         MR. HOROWITZ: Which is Tab 12, Ashley,
7 the Notice of Deposition.
8      Q.   And, Doctor, while we are loading the
9 Notice of Deposition, Exhibit 12, you've -- you're
10 familiar with this process where we have what's
11 called a deposition notice and then we attach a list
12 sometimes and usually the items that we would like to
13 be produced. You're sort of familiar with that
14 process?
15      A.   Sort of.
16      Q.   And so were you sent -- and here's the
17 notice, the front page. But let's look at Exhibit A
18 which is the Items to Be Produced.
19         Did you take a look at this before your
20 deposition?
21      A.   I did.
22         MR. CENTOLA: I presume you received our
23 objections?
24         MR. HOROWITZ: I did. And, Larry, if
25 you want, we can put the sticker marker after. I'm

Page 204

1 just using this as a prop to get through this. Okay?
2         MR. CENTOLA: Sure.
3      Q.   Your most current curriculum vitae is
4 request number one. And I think we were given an
5 updated copy last night which we've already marked as
6 a deposition exhibit.
7         Number 2 is an up-to-date list of all
8 articles, abstracts -- I'm not going to read the
9 whole thing in the interest of everybody's sanity.
10 But I presume that your updated CV has anything
11 that's additional that you've published that is CV
12 worthy. Let's ask it that way.
13      A.   I like that expression. Correct.
14      Q.   And then there's always the glorious
15 list of testimony. We probably should mark this for
16 completeness. Your counsel last night was kind
17 enough to provide us with an updated list which I
18 believe is Tab 33.
19         MR. HOROWITZ: And we'll just go ahead
20 and mark that as Exhibit 13.
21         (Exhibit 13, Updated List of Expert
22 Witness Testimony, marked for identification.)
23      Q.   And I'll just have you verify that
24 that's an updated list of the past four years of your
25 testimony, deposition and trial.

Page 205

1      A.   Yes.
2      Q.   And did you -- I assume you prepared
3 that list?
4      A.   Yes.
5      Q.   Okay. So then we can dispense with the
6 loading. You're familiar with it and you obviously
7 provided it to counsel to provide to me. Fair?
8      A.   Yes.
9      Q.   With respect to -- I'm going to skip
10 number 4 for a minute.
11         Your file. I remember talking to you
12 about this in the other litigation I deposed you
13 about. What's the manner in which you keep your file
14 for this case? And by "this case" I mean, I guess,
15 the 505(b)(2) docetaxel report that you put together.
16 Is it electronic? Do you have hard copies? How does
17 that work?
18      A.   Electronic.
19      Q.   Okay. So everything that you were
20 provided, do you keep it in a single, kind of,
21 electronic file, a single file? Is it, like, with
22 multiple sub files? How do you keep that?
23      A.   I think you're crediting me,
24 Mr. Horowitz, with too much organizational skill. I
25 apologize. That's my goal. It's

52 (Pages 202 - 205)

1 essentially -- that's -- that's -- yeah, it tends to,
2 you know, some downloading things, things get
3 scattered. But that's basically it.
4    Q.   Do you take notes on the documents as
5 you review them or -- or reports, or anything that
6 you're reviewing that's been provided to you?
7    A.   Um, usually -- usually not. I mean, I
8 would never say never. I do have a folder, a
9 separate folder, just in case that's saying this is
10 part of my template that's marked -- you know,
11 marked-up materials. But I rarely, if ever, actually
12 use that. I mean, just -- it's not just in this
13 situation, it's usually almost any -- any case.
14    Q.   So when you -- you say you keep a folder
15 that's called, "Marked-Up Materials." Is that
16 materials that you would mark up or do they come to
17 you marked up?
18    A.   No, that's for anything. Because I -- I
19 sort of -- I think I know why you're asking. But in
20 case I need to -- you know, there's a request, you
21 know, in any case to, you know, please provide any
22 notes or whatever, anything, like, marked up. Marked
23 up, I mean, like scribbled a note or electronically,
24 I want to be able to identify those.
25    So I have that as sort of my -- I have a

1 standard format at the start of a case. And I've got
2 that as part of it. But I -- I've set up this system
3 a few years ago and I just -- it turns out I don't
4 typically mark -- mark stuff up or write notes on it.
5    Q.   Do you have any notes as you just
6 described in the manner that you keep them with
7 respect to your docetaxel report?
8    A.   I -- I checked in that folder. It's
9 empty. I mean, I did not had a chance yet to
10 check -- you know, do a more global search. But as
11 best as I know, no. Because, again, I -- you know,
12 it's -- you know, that's something that is
13 discoverable and I want to be able to find it so
14 that's why I have it. But I usually -- it's not
15 turned out to be helpful to me usually as I've gone
16 through materials.
17    Q.   Would you -- I mean, the request would
18 call -- calls for your whole file.
19    A.   Sure.
20    Q.   And you're right, what I'm most
21 interested in, frankly, are -- are documents that you
22 may have marked up or notes that you've taken, or if
23 any documents were provided to you pre-highlighted
24 or -- or pre-marked with notes, that's what I'm most
25 interested in.

1    A.   Oh, okay. So --
2    MR. CENTOLA: I think this is beyond the
3 scope of the Rule 26 and the Case Management Order.
4 Don't we have a Case Management Order of what's asked
5 to be produced? And Rule 26 that's what applies.
6    MR. HOROWITZ: Well, respectfully, let
7 me see if it even exists because I don't want to tilt
8 at a windmill.
9    Q.   So I guess my question is does it even
10 exist? Do the things I just described exist?
11    A.   Well, first and foremost, I really take
12 these rules very seriously. And I know everybody
13 says that and they mean it, but I really mean it.
14 It's not -- if it's there, then I'm obligated to
15 produce it, and you know, the other side is entitled
16 to it.
17    Having said that, I honestly don't think
18 so. But, you know, in terms of -- but I'm only
19 talking about right now things that I have marked up.
20 But I -- I want to make sure that I can say that and
21 feel comfortable. So I, you know, don't want to do
22 it in a rush right now. But I can --
23    Q.   Okay.
24    A.   -- certainly confirm that in the next
25 24 hours.

1    Q.   Okay. Understood.
2    And then, I guess, if you could check on
3 that. And then obviously it's between me and
4 Mr. Centola whether there's things that you would be
5 required to produce. But if you can at least, you
6 know, endeavor to look. And if you don't have
7 anything, you don't have anything. But if you do,
8 you know, maybe it's something I'm entitled to see
9 and certainly I'll pursue that if I can. And if I
10 can't, I can't.
11    And then the other piece was, I guess
12 I'm wondering, do you receive things from the
13 plaintiffs' lawyers in this case that are sort of
14 pre-highlighted and pre-marked up or are they blank
15 so you can review them yourself clean?
16    MR. CENTOLA: Objection to form.
17    Q.   Dr. Ross, you're on mute.
18    A.   Sorry. I thought I was interrupting
19 Mr. Centola.
20    I don't know the answer to that. And,
21 again, I would have to check and see what I've got,
22 but I can do that pretty quickly. And by quickly I
23 mean in the next 24 hours.
24    Q.   Okay. You'll check and we'll see what's
25 what.

Page 210

1  Let's turn then to the next exhibit.
2 It's really in response to the invoice request which
3 was number 4 in the items to be produced.  And I
4 think we were sent a PDF.  Let's pull that up and
5 mark it as one exhibit.  I think we're up to 14.
6  (Exhibit 14, Ross Statements and
7 Invoices, marked for identification.)
8  MR. HOROWITZ:  Loading.
9  Q.  So, Doctor, I'll represent to you that
10 we were provided, as I said, this PDF which we've
11 marked as Exhibit No. 14 last night which certainly
12 appears to me to be a collection of statements and
13 invoices with respect to your work on docetaxel for
14 this litigation.
15  Is this something you provided to
16 plaintiffs' counsel to provide to me?
17  A.  Yes.
18  Q.  And I'm hoping you can help walk us
19 through this.  I don't want to spend too much time
20 but I will confess that I'm not sure I fully followed
21 the methodology here, and I want to make sure that
22 we're all on the same page.
23  Maybe I can start with a simple question
24 which is:  It says on the first page, "February 24,
25 2020, Retainer."

Page 211

1  Do you see that?
2  A.  Yes.
3  Q.  And you were given a check for $11,000
4 as I'm going to assume that's the initial retainer
5 for this litigation?
6  A.  Yes.
7  Q.  And one of the questions -- I used "this
8 litigation" pretty cavalierly in that question.  I
9 know there's the 505(b)(2) aspect in the report that
10 I just deposed you about that includes Accord,
11 Hospira, and Sandoz.  And then I know you also did a
12 report with respect to Sanofi and Taxotere that you
13 were deposed about.  Is this retainer in this
14 retention, does this include both the 505(b)(2) and
15 the Sanofi Taxotere or is this just the 505(b)(2)?
16  A.  Both.
17  Q.  And do you separately invoice for the
18 work you do on Sanofi Taxotere versus the work you do
19 on the 505(b)(2)'s?
20  A.  I believe in general that's how
21 it's -- it just happened to work out.  I mean, I
22 don't -- I think for any given invoice it tends to
23 be -- so the structure of this -- and this may help.
24 I have work slips that are basically a particular
25 task or activity or event.  And then an invoice is

Page 212

1 composed of a number of completed work slips, that
2 is, where that activity of, you know, I said, okay,
3 that's all I'm putting on this slip.
4  And the way that it's happened to work
5 out is each invoice that has, I think, always been
6 for one or the other, not a mixture of 505(b)(2) and
7 Sanofi-related activities.
8  Q.  In the collection that I was provided
9 here, and if you need to go through it, does this
10 include only the work done on 505(b)(2) and not the
11 work that was done on Sanofi Taxotere?
12  A.  I believe it's both.
13  Q.  You believe it's both.  Okay.
14 Interesting.
15  Did you sign a retainer agreement?
16  A.  Yes.
17  Q.  And is your retainer agreement with the
18 entire Plaintiffs' Steering Committee as you have
19 here on your "Bill to" statement?
20  A.  I believe so, yes.
21  Q.  And I believe we did the math and we
22 counted eight invoices totaling $159,005.  Does that
23 sound right to you?
24  A.  It sounds about right.  I mean, I
25 obviously need to go through and say, yes, that's it.

Page 213

1 But that's -- that sounds about right.
2  Q.  And the last time entries we have are
3 for May 6 and 7, 2021.  Have you prepared
4 any -- well, let me ask it this way:  Presumably
5 you've done some work since May 6 and 7, 2021, that
6 you'll invoice for?
7  A.  Yes.
8  Q.  And I assume you have not yet prepared
9 those invoices?
10  A.  Correct.
11  Q.  Do you have -- and you're going to love
12 this question:  Do you have an estimate as to what
13 we're looking at -- and maybe I'll say once this
14 deposition is completed today -- what you think you
15 will bill?
16  MR. CENTOLA:  Objection, form.
17  Q.  And I understand it's an estimate,
18 Doctor.
19  You're on mute.  I can't hear you.
20  A.  Sorry.  I'm sorry.
21  It's related to this deposition.  So, you
22 know, as I -- which I don't have the time slips in
23 front of me.  But it's -- as I said, you know, not
24 counting teleconferences -- somewhere around eight to
25 ten hours.  And then videoconferences or

54 (Pages 210 - 213)

1 teleconferences.  And then -- then our discussion.
2     Q.    Okay.  And so you will provide, or you
3 will invoice the Plaintiffs' Steering Committee for
4 the additional work between May and -- and this
5 deposition.
6         MR. HOROWITZ:  And obviously we'll,
7 Larry, make a request to see those once they've been
8 received by you.
9     Q.    One of the things I was confused about.
10 There are invoice numbers that get skipped.  And
11 again, that's part of what raised my question about
12 whether this is everything or if this is just split
13 between 505(b)(2) and Taxotere.  Are you able to just
14 explain why some of the invoice numbers are skipped?
15     A.    Absolutely.
16         So almost always it's because that
17 invoice -- you know, the skipped invoice number is
18 connected with an unrelated case.
19         Sometimes it's just because I've -- I've
20 screwed up the number and I just void out the
21 invoice.  But usually it's -- you know, it's simply
22 another case.
23     Q.    Got you.
24         And have any of your invoices ever been
25 rejected by the Plaintiffs' Steering Committee?

1     A.    No.
2     Q.    If there are time entries for the same
3 day with the same description but on different
4 invoice numbers, how -- I guess my question is how
5 would that work?  Is it -- is it possible that you
6 just separately captured work done?  I guess -- I
7 guess how would that work or why would that be?
8         MR. CENTOLA:  Objection to form.
9     A.    So when I first started using this
10 particular software, you know, I'd start on, I don't
11 know, let's say October 5th.  And this isn't just for
12 this case.
13         And then, you know, if it's going over
14 several days, I would go -- you know, there would be
15 a bunch of start and stop times on different days.
16         And then I -- you know, I would say,
17 okay, it's completed as of this day.
18         That turned out to be confusing to
19 everybody because what happened -- you know, I would
20 say, okay, here's the date that it was completed.
21 Let's say October 9th.  But it didn't really -- you
22 know, it's like, okay, October 9th, 35 hours.  And
23 it's, like, okay, what's going on here?
24         So to try and untangle that, what I have
25 done is for a given activity, like, let's suppose I'm

1 reviewing -- well, I'm reviewing my report.  Okay?
2 And whatever I've done on a given day, if I spend two
3 hours on that day then I then finish and that work
4 slip is marked completed.  And then the next day, if
5 I do it, you know, do it on the next day, so it will
6 be October 6th, October 7th for that particular
7 activity and they'll all have the same title but it's
8 done on different days.
9         If I'm doing more than one activity on a
10 given day, it's -- you know, so let's suppose
11 I'm -- on a particular day I'm reviewing a report and
12 but I'm also doing a literature search.  That would
13 get put on a different slip, so that it makes it
14 easier, I hope makes it easier, to see how my
15 time -- I've allocated my time.
16     Q.    Got you.  Got you.  And I think you've
17 explained that before, I think, when I -- either I or
18 one of my colleagues spoke with you about this in the
19 past.
20         Okay.  I think I understand that.
21         When did -- do you have -- I didn't ask
22 you this, I'm sorry.  Do you have a lawyer -- a
23 plaintiffs' lawyer for the Steering Committee that
24 you kind of consider to be your primary contact for
25 the docetaxel cases?

1     A.    I -- yes.  I don't know if I'd say
2 primary, but I think the person who I speak with most
3 often is Mr. Miceli.
4     Q.    And is he the individual that originally
5 contacted you to get involved?
6     A.    I believe that's correct.
7     Q.    Do you know when he contacted you in
8 relationship to when you signed the February 24,
9 2020, retainer?
10     A.    I don't have the exact date.  It was --
11 would have been sometime, I believe, in January of
12 2020, I think.
13     Q.    And were you sent materials to review in
14 advance of you signing the retainer?
15     A.    Not -- not that I recall.  If I was, it
16 was -- it was only shortly before the retainer was
17 executed.
18     Q.    Okay.
19         Doctor, why don't --
20         MR. HOROWITZ:  And, Larry, if you give
21 me just a few minutes this time, I think this is the
22 point where I'm going to check my notes and make sure
23 I didn't skip anything that we consider to be mission
24 critical.  Okay?
25         MR. CENTOLA:  All right.

55 (Pages 214 - 217)

Page 218

1      THE VIDEOGRAPHER:  The time is 4:39 p.m.
2  We are going off the record.
3      (A recess is taken.)
4      THE VIDEOGRAPHER:  The time is 4:51 p.m.
5  We're back on the record.
6      Q.    Doctor, I just want to look at one more
7  part of your report, paragraph 76 in Exhibit 1.
8      A.    Okay.
9      Q.    The last sentence says, "Additionally,
10  the 505(b)(2) NDA holders" -- and you include Hospira
11  in there -- "did not uniformly or entirely adopt
12  Sanofi's December 11, 2015, label change."
13      Do you see that?
14      A.    Yes.
15      Q.    And I guess one of my questions is
16  really more a regulatory question, but I'm having a
17  hard time understanding your view of the duty.
18      Is it your view that the 505(b)(2) NDA
19  holder does have a duty to uniformly adopt label
20  changes by the innovator, the Reference Listed Drug,
21  and has an independent duty as well?  I'm trying to
22  reconcile those two things.  Do you see what I'm
23  saying?
24      A.    Yes, I do.
25      MR. CENTOLA:  Objection, form.

Page 219

1      Q.    Okay.  And could you explain it to me?
2      A.    Sure.  So let me contrast two situations
3  where -- I'm sorry -- compare and contrast, sorry,
4  adopting -- adoption of a changed label by a generic
5  drug approved under 505(j) and the drug approved
6  under NDA.
7      In the case of the 505(j), the reason
8  for the change is statute.  They -- they have to
9  change it because of the label has to be identical.
10      In a case of the 505(b), that label
11  change, the new information that's in that label
12  represents new safety information.  So, you know, as
13  soon as that new label from the, in this case,
14  Taxotere comes out, that is new scientific
15  information.
16      Now, they say, "Well, we actually
17  disagree with that and we are not going to change it
18  and here's why."  They could do that, but they
19  didn't.  They essentially -- the way that months and
20  months and months, even though this is new safety
21  information, and not only is that, you know, not -- I
22  mean, if you say, well, we're going through this
23  process or whatever, you know, why is it -- I could
24  see, you know, taking some time.  Obviously there's
25  internal processes.  But, you know, I mentioned --

Page 220

1      Q.    I'm sorry.  Do you remember my question?
2      A.    Yes, I do, and I'm explaining it and I'm
3  trying -- it's not something that I can do in one
4  sentence.
5      I am saying they have an independent duty
6  but -- or they have a duty to change their label, so
7  does the generic drug.  The generic drugs is because
8  they have to be same.  Theirs is because of the
9  requirements under 201.57.
10      Q.    I understand.  I understand.
11      Okay.  And so what you're saying is is
12  the data that's presented in the Taxotere label is
13  something that the 505(b)(2), it needs to -- it needs
14  to look at as potential new evidence in assessing the
15  safety of its drug and whether or not there needs to
16  be a label change based on that, or at least as part
17  of its analysis, I should say.  I think that's what
18  you're saying.
19      A.    Yes.
20      Q.    Okay.  Understood.  Understood.
21      And then you cite in a footnote when the
22  Hospira label change was approved is September 2017.
23  I noticed you didn't actually put when Hospira
24  submitted its supplement.  Do you know the date they
25  actually submitted their supplement to FDA?

Page 221

1      A.    I don't -- I probably did 15 months ago,
2  but I don't remember now.  It was -- I don't
3  remember.
4      Q.    And do you remember if you knew the date
5  when Hospira actually implemented the change as it
6  was submitted as a CBE-0?
7      A.    I don't.
8      Q.    And I guess the last thing is you
9  mentioned the time that went by.  You mentioned
10  earlier the -- the 2017 clinical IRB review that I
11  know you cite in your report that was submitted as
12  part of the CBE-0 from Hospira.
13      You understand that Hospira did do its
14  own review of alopecia in support of its label
15  change.  Right?
16      A.    Yes.
17      MR. HOROWITZ:  Doctor, with that, I have
18  no further questions at this time.
19      THE WITNESS:  Okay.
20      Thank you.  And both of us get some
21  rest.
22      MR. HOROWITZ:  I need to see my kids.
23      THE WITNESS:  That's even better.
24      MR. CENTOLA:  Any other counsel have
25  questions?

56 (Pages 218 - 221)

Page 222

1        Going once?  Going twice?  Thank you
2  very much.
3        MR. HOROWITZ:  Okay.  Are we done,
4  Larry?
5        MR. CENTOLA:  We're done.
6        MR. HOROWITZ:  Excellent.  Dr. Ross,
7  excellent to see you again.  Thank you for enduring
8  this always pleasant experience.
9        THE WITNESS:  The feeling is mutual.  It
10 really is.  Thank you.
11       MR. HOROWITZ:  Good to see you.
12       THE VIDEOGRAPHER:  The time is 4:58 p.m.
13 Going off the record.
14       (The deposition concluded at 4:58 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 224

1 ATTACH TO DEPOSITION OF:  DAVID ROSS, M.D., Ph.D.
2 IN THE MATTER OF:  IN RE: TAXOTERE (DOCETAXEL)
            PRODUCTS LITIGATION
3
  DATE TAKEN:   Thursday, September 30, 2021
4
5          E R R A T A   S H E E T
        I wish to make the following changes, for    the
6 following reasons:
  PAGE LINE:
7 ____  ____  CHANGE:_____
           REASON:_____
8 ____  ____  CHANGE:_____
           REASON:_____
9 ____  ____  CHANGE:_____
           REASON:_____
10 ____  ____  CHANGE:_____
           REASON:_____
11 ____  ____  CHANGE:_____
           REASON:_____
12 ____  ____  CHANGE:_____
           REASON:_____
13 ____  ____  CHANGE:_____
           REASON:_____
14 ____  ____  CHANGE:_____
           REASON:_____
15 ____  ____  CHANGE:_____
           REASON:_____
16 ____  ____  CHANGE:_____
           REASON:_____
17 ____  ____  CHANGE:_____
           REASON:_____
18 ____  ____  CHANGE:_____
           REASON:_____
19 ____  ____  CHANGE:_____
           REASON:_____
20 ____  ____  CHANGE:_____
           REASON:_____
21 ____  ____  CHANGE:_____
           REASON:_____
22 ____  ____  CHANGE:_____
           REASON:_____
23 ____  ____  CHANGE:_____
           REASON:_____
24 ____  ____  CHANGE:_____
           REASON:_____
25

Page 223

1        J U R A T
2
3        I DO HEREBY CERTIFY that I have read the
4  foregoing transcript and I certify that it is true and
5  correct to the best of my knowledge.
6
7
8
9
10       DAVID ROSS, M.D., Ph.D.
11
12
13
14
15 SWORN AND SUBSCRIBED
16
17 BEFORE ME ON THIS
18 DAY OF       2021.
19
   Notary Public of the State of
20
21
22
23
24
25

Page 225

1        CERTIFICATE
2     I, LINDA M. JORRITSMA, a Notary Public,
   Registered Professional Reporter and Certified Court
3  Reporter, do hereby certify that prior to the
   commencement of the examination, DAVID ROSS, M.D.,
4  Ph.D., was duly sworn by me to testify the truth, the
   whole truth and nothing but the truth.
5     I DO FURTHER CERTIFY that the foregoing is a
   true and accurate transcript of the testimony as
6  taken stenographically by and before me at the time,
   place and on the date hereinbefore set forth.
7     I DO FURTHER CERTIFY that I am neither a
   relative nor employee nor attorney nor counsel of any
8  of the parties to this action, and that I am neither
   a relative nor employee of such attorney or counsel,
9  and that I am not financially interested in the
   action.
10
11 _Linda M. Jorritsma_
   Notary Public of the State of New Jersey
12 My Commission expires December 14, 2023
13 Dated:  October 6, 2021
14
15
16
17
18
19
20
21
22
23
24
25

57 (Pages 222 - 225)

**&**

**&**   2:4,12 3:4,12
4:9 30:1 136:10

**0**

**0**   221:6,12
**02109**   3:5
**08068**   1:9

**1**

**1**   5:6 12:2,3,24
17:22 26:22 49:25
51:14 56:22 58:9
59:22,23 60:1,3
65:24 77:20 83:3
83:17 122:22
125:17 126:6
136:4,11 176:12
190:3 218:7
**1,295**   128:1,5
137:4
**1,300**   135:6,13
**1,500**   137:7
**1.14.3.1**   77:20
**10**   5:18 119:6
140:24 141:2,3
**100**   56:13
**10019**   3:14
**10:15**   133:18
**10:30**   139:7
**10:45**   44:22
**10:55**   44:25
**11**   5:19 73:20 89:9
90:7 134:7 137:11
157:17,18 158:4
218:12
**11,000**   211:3
**11/9/2010**   5:11
81:6
**1100**   3:20
**119**   5:13 112:25

**11:15**   134:7,18
139:7
**12**   5:6,20,24 79:7
79:13 134:18
203:3,4,6,9
**126**   5:15
**128**   5:24 116:8
**12:28**   107:1
**12:30**   106:19
**13**   5:21 204:20,21
**130**   112:7
**135**   5:17
**14**   5:22 73:7,17
210:5,6,11 225:12
**140**   5:18 112:8
**14th**   2:14
**15**   26:24 42:23
114:13 115:2
158:5 221:1
**15058**   2:9
**157**   5:19
**159,005**   212:22
**16**   90:21 113:23
158:5
**16-2740**   1:2
**160**   90:21
**17061**   1:8
**17th**   31:18
**18**   119:22
**19**   125:20
**1984**   52:5
**1996**   73:7,17 85:25
97:12
**1999**   5:8 46:5,8
49:6,25 50:14
56:14
**1:15**   106:25
**1:21**   107:5

**2**

**2**   5:7,8 8:1 17:19
18:7 19:8 21:9,25
22:9,21,22 23:13
23:18 27:12 30:18
33:22 45:4,10,14
45:19 46:2,4,6,7
50:1,11 51:25
52:14,15,23 53:2
53:11,12,17 54:12
55:3,8,15,18,20,24
56:4,21 59:25
60:4 63:17 64:13
64:17 65:8,22
66:16 68:3,19
69:19,21 70:1,20
70:22 71:11,16,19
71:21 72:20 73:1
75:8 76:4,13
83:15,18 84:4,16
85:9 86:2 88:6
90:8,19 108:2
122:22 125:17
126:6 136:11
142:14 174:6
176:16 179:21
201:5 204:7
205:15 211:9,14
211:15,19 212:6
212:10 214:13
218:10,18 220:13
**2.5**   156:21
**2.8**   98:12
**2.9.**   98:13
**20**   90:19 135:23,24
**20-449**   73:6
**2000**   194:22
**2001**   177:23
**2005**   5:15 49:5,23
119:9,15

**2006**   146:19 178:1
190:13
**2007**   5:9 72:8,15
74:15 90:7,8
**2009**   89:9
**201.56**   176:2
**201.57**   176:2,19,20
**201.57.**   176:6
220:9
**2010**   82:11,17,25
83:4 90:14 98:13
98:17,21,24
**2011**   86:1 88:2,7
89:12 90:14 97:23
99:2 101:10
105:10 107:14
177:5
**2012**   151:21
177:11,18 178:9
178:11 180:5
181:24 182:6
183:15 184:18
185:2,3
**2014**   5:16 125:1,13
126:2,10 127:16
137:13 181:21
**2015**   125:3 158:17
164:2 218:12
**2016**   125:5,7
**2017**   152:3 220:22
221:10
**2018**   125:15 126:6
136:4,11
**2019**   31:18
**2020**   5:7 9:14 12:1
12:4,25 13:8
14:23 31:19 150:1
210:25 217:9,12
**2021**   1:23 6:3
213:3,5 223:18
224:3 225:13

**2023**  225:12
**203**  5:20
**204**  5:21
**20th**  100:1
**21**  5:9 53:22 56:5
  64:14 67:20,21
  68:2 176:1,19,20
**210**  5:22
**212**  1:22 3:15 6:17
**21210**  6:18
**216-696-2286**  3:21
**228-863-6000**  2:15
**22nd**  100:1
**24**  208:25 209:23
  210:24 217:8
**250**  3:14
**2500**  4:4
**252**  114:10
**26**  138:9,12 208:3
  208:5
**2601**  2:14
**27**  96:7
**27a**  177:14
**27th**  3:5
**28**  176:13
**2800**  4:10
**2:16**  1:8
**2:18**  1:9
**2:48**  166:16
**2:59**  166:20
**2nd**  83:3

**3**

**3**  5:9 67:19,21
  68:2 113:24
**3.14.3**  76:9
**30**  1:23 110:13
  111:21 151:19
  158:25 159:3
  164:2 170:5 173:1
  173:18,19,22
  224:3

**30305**  4:5
**30th**  6:2
**31**  110:20 111:22
  150:1 151:19,23
**314**  86:25
**314.3**  75:14
**314.3.**  75:23
**314.54**  5:9 53:22
  54:11 67:21 68:2
  75:9
**314.54.**  64:14
  67:20
**314.80**  121:4 122:4
**314.80.**  122:7
**316**  178:19 179:4
**33**  204:18
**3333**  4:4
**338**  2:5
**34**  46:13,15 47:15
  50:19
**34.54**  56:5
**35**  215:22
**39501**  2:14
**3:56**  202:20

**4**

**4**  5:9 72:7,8,14
  98:17 119:24
  205:10 210:3
**42**  102:7
**432**  167:2
**44**  118:7 140:2
**44113-7213**  3:21
**45**  106:21 183:18
**45202-2409**  4:10
**46**  5:7 102:8 118:9
**47**  139:16,16,24
**4:15**  202:23
**4:39**  218:1
**4:51**  218:4
**4:58**  222:12,14

**5**

**5**  5:11 81:6,22,25
**5.2**  98:21
**50**  118:18
**504-581-9065**  2:6
**505**  5:8 8:1 17:19
  17:22 18:7 19:8
  21:9,25 22:8,9,21
  22:22 23:13,18
  27:12 30:18 33:22
  45:4,10,14,19 46:4
  46:7 50:11 51:25
  52:15,23 53:2,17
  53:24 54:4,12,16
  55:3,8,9,15,20,24
  56:4,8,21,22 58:9
  59:2,3,13,14,17,18
  59:20,21,22,23,25
  60:1,3,4,7,8 62:6
  62:17,18 63:17,17
  64:13,17 65:8,22
  65:24 66:16 68:3
  68:16,19 69:19,21
  70:1,20,22 71:11
  71:16,19,21 72:20
  73:1 75:6,8,15
  76:1,4,13,13 84:4
  84:16 85:9 86:2
  87:22 88:6 90:8
  108:2 176:16
  179:21 201:5
  205:15 211:9,14
  211:15,19 212:6
  212:10 214:13
  218:10,18 219:5,7
  219:10 220:13
**505.04**  163:21
**51**  118:5
**513-698-5000**  4:11
**53**  3:5

**54**  174:6
**550**  11:11
**55th**  3:14
**5th**  215:11

**6**

**6**  5:3,12 81:22
  87:9,14,20 101:2
  176:19 213:3,5
  225:13
**600**  4:10
**617-213-7019**  3:6
**67**  5:9
**678-553-7320**  4:5
**69**  113:23
**6th**  216:6

**7**

**7**  5:13 72:11 98:23
  119:7,12 144:22
  176:20 213:3,5
**70057**  2:10
**70130**  2:6
**702**  138:12
**703**  138:12
**71**  113:23
**72**  5:9
**76**  218:7
**79**  112:24
**7th**  216:6

**8**

**8**  5:7,15,24 12:1,4
  13:8 14:23 81:5
  82:25 88:2,7
  89:12 90:20 97:23
  126:1,4 127:16
  177:5
**80**  90:20
**81**  5:11
**836-7572**  3:15
**85**  186:12 195:8

**87** 5:12
**8th** 9:14 11:21
  12:25 27:10 99:2

**9**

**9** 5:9,17 72:8,15
  74:15 82:17 87:12
  90:7 127:16
  135:25 148:5,6
  174:6
**91** 190:3 201:9,17
**92** 113:16
**9254** 225:11
**94** 201:9,17
**95** 195:6
**950** 3:20
**97** 112:24 113:13
  116:4
**985-783-6789** 2:10
**9:30** 133:18
**9th** 82:10 215:21
  215:22

**a**

**a.m.** 1:24 6:2
  44:22,25
**abbreviated** 54:1
  54:2 59:17 62:18
  64:8
**abbreviation**
  64:24
**ability** 28:18
  115:21
**able** 12:16,19,21
  74:12 81:20 86:22
  130:11 131:5,10
  131:15 159:24
  206:24 207:13
  214:13
**absence** 121:22
  195:20

**absent** 34:16
**absolute** 139:21
**absolutely** 92:8
  93:18 103:10
  114:21 214:15
**absolutes** 162:22
**absorb** 104:12
**abstract** 159:13
  177:25
**abstracts** 204:8
**academic** 65:13
  143:9,14,20 144:3
**accept** 37:22
  116:24 120:21
  186:16 188:12,13
  198:15
**acceptable** 198:14
**acceptance** 167:13
**access** 40:5,20,21
  85:7,16 86:7,16,23
**accessed** 86:20
**accessible** 12:7
**accme** 131:13,25
  132:17
**accomplish** 131:8
**accomplished**
  133:5
**accord** 3:18 8:2
  9:9 30:11 33:24
  35:16,24 36:16
  110:15,22 176:17
  179:10 211:10
**account** 170:6
  171:18 175:14
**accreditation**
  132:4
**accredited** 131:12
  131:25 132:16
  133:2
**accuracy** 184:14

**accurate** 8:13
  57:18 102:5
  110:11 113:8,9,14
  115:18 187:20
  225:5
**accurately** 55:11
  114:14
**acne** 172:8 174:3
**act** 17:19 45:11
  47:18 52:1,1,2,5
  54:2 59:2,3,13,14
  73:2 180:18
**actavis** 4:7,7
**acted** 168:10
**action** 6:11 43:3
  43:14,20 163:5,12
  163:16 164:6
  171:1 225:8,9
**actions** 147:25
  163:7 164:8
**active** 57:6,9,18,24
  58:3,5,7,9,10,15
  58:16,18,19 60:25
  74:16 77:9
**activities** 118:5,25
  120:6,22,23 121:1
  121:24 122:11
  153:10 159:17
  165:18 180:16
  212:7
**activity** 57:11
  166:11 211:25
  212:2 215:25
  216:7,9
**actual** 101:6
  151:12
**acute** 104:7
**add** 61:25 81:14
  111:15 142:21
  144:17 156:9

**added** 28:12 51:25
  142:25 151:20,22
  181:2
**addendum** 81:10
**adding** 96:6 111:5
**addition** 22:10
  48:4 175:4 178:2
**additional** 14:16
  32:19,22 33:9
  65:5,5 141:9
  204:11 214:4
**additionally** 218:9
**address** 14:12,25
  30:6 79:17 84:11
  85:1 94:24 107:15
**addressed** 19:21
  46:12
**addressing** 25:8,9
**adjusted** 170:6
  171:18
**adjuvant** 90:25
**administered**
  80:22
**administration**
  5:20 24:24 69:14
  74:17 77:10 98:12
  99:11 157:19
  158:7
**adopt** 218:11,19
**adopting** 219:4
**adoption** 219:4
**advance** 9:21
  141:5 217:14
**advanced** 90:22
  91:8,10,20,23 92:1
  92:14 134:19
**advantage** 139:22
**adverse** 36:11
  37:11 42:10,23
  74:2,3 78:9,19,20
  95:9,9,18,23,25

96:1,5,6,9 99:17
99:20 100:24
101:5,6,12,18
102:2 118:9,11,13
119:1 120:8 121:2
122:12 145:22
146:17 151:20
161:18 170:7
171:19 174:21
175:5,16 183:20
194:23
**advertise** 123:18
124:1,11 132:23
**advertising** 124:7
**advice** 103:8
**advised** 24:1
**advocate** 26:8
44:13
**advocating** 26:4
**ae's** 118:11,19
**aers** 179:15
**aes** 122:2
**affairs** 82:5 90:3
**affect** 57:13 96:24
**affiliated** 159:4
173:19,22
**afraid** 197:16
**afse** 64:24
**agencies** 167:18
**agency** 52:18 76:2
76:6 160:15
168:19 175:14
**agency's** 53:13,19
53:22 54:12 64:25
76:5
**agent** 147:13
**ago** 26:24 28:2
114:12,13,25
207:3 221:1
**agree** 14:4 15:23
15:24 37:21 39:3

39:15 45:18 49:18
52:11 55:10 56:13
56:16 57:21 59:11
61:13 64:9,14
70:17 71:25 72:3
72:5 73:24 78:8
80:13 81:10 82:7
85:4,6,13,15 93:19
93:22,24 99:23
100:14 103:8
105:7 107:9
118:21 120:9,15
120:16 121:4,19
121:21 122:13
124:15 142:2
146:2,5,21 147:20
148:1,4,11,18,23
150:17 161:19,20
162:10,15 168:14
168:15 173:18
174:14,20 175:24
188:9 196:5,6
198:1
**agreed** 93:10 97:5
188:9
**agreement** 39:17
212:15,17
**ahead** 11:25 17:1
32:25 39:22 49:8
50:6 56:1,23
67:13,13,23 77:8
93:5 140:22
162:23 163:2
179:18,18 191:9
192:8 198:22
201:11 204:19
**alerted** 178:9
180:7
**align** 83:9
**alignment** 83:16

**allegation** 7:11
**allegations** 7:8
**allergic** 103:19
**allocated** 216:15
**allow** 124:10
**allows** 45:20
**alopecia** 7:12,12
13:24 14:1,4,10
15:2 25:4,13 94:6
94:7 95:3,3 99:23
100:2,3,5,7,10,12
100:15,15,17,23
101:9,13,14,18
102:1 104:18
111:5,10,16,16
154:19 169:16
177:16 178:11
184:20 221:14
**alternative** 48:19
48:21 148:20
**alters** 95:12
**amended** 93:8
**amendments** 52:6
90:11,12,14
**american** 158:20
**amounts** 60:25
**analyses** 71:1
118:15 160:16
161:15 162:9
186:13 187:21
195:10 197:13,14
**analysis** 71:9 72:1
162:2 165:2,20
166:3,8 171:1
178:3 181:3,3,9
182:11,14,17,18
183:8,25 184:22
185:6 190:21,25
191:19 192:13
194:20 195:2
197:19,22 198:11

199:8,17 201:3
220:17
**analyze** 194:22
198:10,17
**analyzed** 181:2
190:4,11 197:20
**anda** 53:25 54:5
76:1
**andas** 56:21
**andrew** 2:9,11
**androgen** 92:3
**animals** 57:14
**annals** 178:1
**annual** 42:13 74:4
74:5 118:16
165:23
**answer** 8:18 14:11
14:21 15:15 18:17
18:18 21:21 22:3
22:16 23:22 28:17
33:1 37:7,8,10
39:2 44:6 47:24
64:21 65:11 86:3
94:11,13 95:14
102:5 111:2 114:8
117:17,17 132:12
134:5 149:10,11
150:24 151:5
154:16 155:3,16
155:19 193:18
194:13 196:24
198:3 199:3,8,11
199:13 200:5
209:20
**answering** 37:9
115:23 133:22
200:4
**answers** 18:21
104:1
**anticipate** 201:7

anybody 86:22
anymore 202:11
anyway 62:9
ap 79:25
apart 10:14,25
  11:5 113:11
apologies 49:5
  81:9
apologize 49:2
  50:4 64:2 112:25
  144:13 205:25
appear 105:11
  178:14 180:24
  185:11
appeared 179:4
appears 49:24
  210:12
applicable 48:20
  61:7,9 134:9
  138:23 200:12
applicant 22:8
  52:8 53:7,17 54:5
  54:12 64:7,17
  65:22 69:5,11
  87:6
application 5:10
  23:13,19 41:24
  42:6 45:9 52:7,23
  53:3,18,19,24,25
  54:5 55:3,14,15
  56:8 62:17,19
  64:8,13 68:3,17,19
  69:6,15,19,21
  70:23 71:11,19
  72:9,16,19,25
  73:14,21 74:7
  76:1 79:7,14
  83:14 84:5,16
  87:6 90:7 93:8
  108:10 201:5

applications 5:7
  18:7 22:22 45:20
  46:3,7 50:10
  52:15 66:17 70:1
applied 72:2,2
  193:21
applies 75:5,15
  105:20,23 106:4
  151:5 208:5
apply 33:21 34:7
  188:16 190:1
applying 39:6
  133:25 134:11
  167:5 183:14
appreciate 16:4
  18:19,25 186:6
  202:25
approach 24:10
  35:18 47:20 48:3
  48:19,19,22 54:19
  148:20 152:11
  168:19
approached 17:13
  19:9,23 20:19
appropriate 48:6
  57:17 65:8 115:24
approval 5:12
  22:11 41:25 42:6
  45:13,14,19,19
  52:7,15 53:18,23
  54:15 59:1,13
  60:7 64:7 68:4
  69:12 70:20 73:18
  79:17 80:3 81:19
  84:3,8,11,15,20,22
  85:3,9,16,25 86:1
  86:19 87:14,21
  88:15,19 89:2,9,11
  89:12,13 97:12,17
  97:18,22 99:2
  101:25 107:14,23

180:15 183:21
  201:8,8
approvals 22:9
  52:17 91:17
approve 108:1
approved 17:18
  17:21 45:15,22
  52:19 53:14 54:13
  54:23 55:19 59:17
  59:18,20 60:12
  62:5,18 66:19
  69:15,17,20 71:24
  73:7,13 75:6
  79:14 83:3,8 84:4
  85:18 88:7,9,10,12
  93:9,17 96:21
  101:11 105:9
  107:13 175:2
  177:5 184:1 219:5
  219:5 220:22
april 98:24
ar 146:19
architecture
  169:25
archival 69:6
area 187:19
areas 138:24
  188:1 189:6
arena 144:3
arguably 33:10
  39:19 117:14
argue 193:15
arguing 196:16,17
arnold 3:12
arnoldporter.com
  3:15,16,16
article 5:19 157:18
  158:3,10,14,17
  159:7,13,16 164:4
  165:1 166:24
  167:2 170:5

171:16,17 173:23
  174:13 185:9
articles 197:19
  204:8
ashley 3:13 12:19
  36:3 56:2 63:25
  72:11 87:13,17
  119:6 125:24
  144:22 203:6
ashley.burkett
  3:16
aside 71:13 91:2
  152:7 177:1
asked 14:12,17,25
  16:19 17:18,24
  18:1,4,8 19:13,22
  27:10,13 28:16
  32:9,15,18 33:7,13
  39:5 40:17 41:13
  50:4 79:17 84:10
  85:23,24 94:20,24
  107:15,17 117:11
  117:13,19 208:4
asking 41:10,19
  101:8,22,23,25
  114:6,7 117:20
  123:8 150:4 152:9
  153:14 154:6
  155:6,24,25 156:3
  156:24 157:3
  164:1 175:8,22
  200:2 206:19
asks 144:9
aspect 48:11
  189:25 211:9
aspects 71:16
assess 122:12
  164:22 165:6
  188:22
assessed 94:16
  95:2 147:23

184:22
**assessing** 194:2
199:17 220:14
**assessment** 5:14
119:1,9,14 120:7
121:1 161:11
188:3 199:4
200:21
**assessments** 74:10
162:7 165:5
186:17 198:16
**assignments** 127:6
**assist** 26:11
124:20
**associate** 82:5
**associated** 95:4
145:23 183:24
**association** 6:8
95:25 96:11
158:21,22 161:24
**assume** 8:18 10:5
22:25 23:9 33:11
51:4 88:10 148:6
205:2 211:4 213:8
**assumptions** 94:13
**atlanta** 4:5
**attach** 203:11
224:1
**attached** 97:4
**attachments** 5:11
81:7
**attempted** 23:17
**attend** 126:6
**attended** 124:22
127:16 133:19
143:24
**attendees** 139:15
**attending** 4:13
**attention** 181:9
**attorney** 116:14
225:7,8

**attorneys** 2:16
9:21 10:22 11:1,7
40:13 129:17
141:18
**audrey** 1:9 2:16
**august** 83:3 150:1
**auspices** 30:23
**authored** 171:17
**authors** 159:1
164:2 165:15
172:13 173:1,18
173:19,22
**automatically**
43:15 95:11
188:13
**available** 14:17
28:12 54:5 85:13
85:14,20 86:12,14
111:6 124:4,6
150:10 177:12
179:11
**aventis** 73:6
**avenue** 3:20 47:7
**avoid** 120:2
162:22 180:19
**avoiding** 139:21
180:13
**aware** 8:14 14:16
26:23 44:5,8
50:25 75:11 84:12
144:18 175:15,19
183:25 191:17,21
191:25 192:12

| b |
| --- |

**b** 2:13 5:5,8,19 8:1
17:19,22 18:7
19:8 21:9,25 22:9
22:21,22 23:13,18
27:12 30:18 33:22
45:4,10,14,19 46:4
46:7 50:11 51:25

52:15,23 53:2,17
54:12 55:3,8,14,15
55:20,24 56:4,21
56:22 58:9 59:22
59:23,25 60:1,3,4
63:17 64:13,17
65:8,22,24 66:16
68:3,16,19 69:19
69:20,21 70:1,20
70:22 71:11,16,19
71:21 72:20 73:1
75:8 76:4,13
80:10 84:4,16
85:9 86:2 88:6
90:8 108:2 140:25
176:16 179:21
201:5 205:15
211:9,14,15,19
212:6,10 214:13
218:10,18 219:10
220:13
**back** 16:6,14
18:20 23:2 26:14
26:16 31:25 44:25
62:22 63:24 64:1
70:25 71:8 72:4
76:9 79:21 81:3
86:8,18 96:3
107:6 108:11
122:19 136:5
140:15 142:21
143:11 144:17,20
144:21 151:17
153:6 166:20
171:12,12 183:9
190:2 198:2,8
202:16,23 218:5
**bad** 78:16 92:24
106:13
**bailiwick** 24:19

**balance** 66:8
**baltimore** 1:22
6:17
**bar** 194:18
**barbara** 192:25
**basal** 172:17
**based** 15:7 83:1
91:16,25 94:13
104:14 121:4
183:25 220:16
**basic** 72:3 97:1
**basically** 34:22
69:25 140:9 206:3
211:24
**basis** 37:24 73:5
96:8 111:7 156:1
177:14 178:6
**bates** 41:17,18
**beach** 127:18
136:10
**bear** 183:17
**bearing** 28:7
**bed** 140:19
**beginning** 70:25
71:8 88:9 148:21
**behalf** 25:19 26:2
187:10
**believe** 9:18 10:9
12:16 13:8,12
28:20 29:9 31:18
31:18,20,21,23
38:14 56:14 58:10
61:16 64:15 73:19
76:18 77:3 81:18
81:19,22 87:25
96:8 111:8 113:4
113:7,10 114:2
117:11 119:22
123:7 127:20
128:16 136:19
138:15,18 139:7

141:10 157:10,14 162:15 177:9,14 178:6 192:14 204:18 211:20 212:12,13,20,21 217:6,11
**believes** 80:13,17
**bellwether** 25:21
**benefit** 49:22 51:16 94:8,16,20 94:22 95:11,13 96:13,19 175:12 175:13
**benefits** 94:2,8 95:24
**berne** 4:9
**best** 28:18 29:10 29:10 84:11 112:18 115:21 140:10,11 197:16 198:24 199:2,18 207:11 223:5
**better** 17:2 89:20 91:4 221:23
**beyond** 15:25 67:1 84:8 179:1 208:2
**bickford** 2:4
**big** 97:25 126:16 136:22,23 159:25
**bigger** 68:8 87:18 127:14
**bill** 212:19 213:15
**billing** 11:10
**bind** 48:18
**binder** 48:13
**binding** 47:14 48:1,12 49:14 148:13
**bioequivalent** 61:21

**biomedical** 144:9 183:22
**biometrics** 199:7
**bit** 8:24 12:10 15:13 30:3 35:25 36:2 41:6 45:6 57:1 62:25 66:17 67:17 89:24 102:10 117:24 127:4 130:7 140:16 149:3 155:8 165:9 202:9
**bits** 181:5 182:5
**black** 71:14
**blaming** 63:25
**blank** 209:14
**bless** 68:9
**blind** 41:7
**blood** 103:17
**bloods** 104:8
**blue** 136:18
**body** 57:14 165:7
**bold** 103:23 126:16 129:4 136:22,23 141:14
**book** 60:9,10 80:2 80:14
**boston** 3:5
**bothers** 105:4,18
**bottom** 49:25 51:17 76:8 136:13 167:3 171:23 174:13
**bound** 58:7
**box** 71:14 97:25
**boxed** 99:14
**break** 42:3 44:10 44:11 113:11 166:14
**breakfast** 128:8

**breaking** 139:22
**breast** 90:23,25 91:6,8,13,14 92:11
**brief** 81:9
**bring** 12:20 181:9
**bringing** 162:19
**broad** 172:17 174:24 178:13 181:1
**broader** 188:10
**broadly** 183:18
**brochure** 5:15,17 126:1,5 135:25 136:3,14 137:12
**broke** 152:23
**buchholz** 3:6
**bucks** 135:6
**build** 126:19 129:1
**builds** 71:23
**bullet** 78:15 79:5 126:21,22 130:12 137:13 167:11,13 168:23 169:21,24
**bunch** 215:15
**burkett** 3:13
**business** 3:10
**button** 67:17 108:6

**c**

**c** 2:1 3:1 4:1 13:20 29:5,7 59:2,13,17 59:20,21 60:7 156:18 176:19,20
**call** 8:1 24:10 41:18 172:15 190:25 207:18
**called** 19:8 30:9,11 99:16 119:13 123:2 126:18 133:17 167:4 203:11 206:15

**calls** 99:19 207:18
**callsen** 3:19
**camera** 138:2
**cancer** 90:23 91:1 91:6,9,13,14,17,24 92:2,5,10,12,15,19 93:1,22 94:2 98:5 170:22,23 172:7 172:16 174:2
**cap** 136:23 175:4
**captured** 11:23 215:6
**captures** 31:2
**carcinoma** 172:18
**careful** 112:19,23
**carry** 48:5 56:9,17
**case** 1:8,9 17:5 24:14,20 27:12 28:22 37:13 43:8 43:12 47:9 50:23 51:6 86:10 146:12 146:14 147:1 149:21 151:5,11 162:2,16,19 165:2 185:15 186:9 189:15 191:12,18 192:22 193:20 195:20 205:14,14 206:9,13,20,21 207:1 208:3,4 209:13 214:18,22 215:12 219:7,10 219:13
**cases** 7:20 16:19 27:3 162:13 186:22 216:25
**catalog** 156:23 157:1,5
**categories** 172:17
**causal** 96:8,11,11 111:9 161:22

177:15 178:6
**causality**   25:7
161:17
**causation**   25:7
**cause**   25:4 104:2
**caused**   25:13
147:19
**causes**   182:20
**cavalierly**   211:8
**caveat**   36:24 67:9
67:11 156:9
**cbe**   28:5 111:14
183:15 221:6,12
**cell**   92:2 172:17
**cells**   103:17
**centers**   159:8
**centola**   2:4,5 9:25
11:14 16:23 17:14
20:6 21:6,13
23:20 27:24 32:24
33:6,11 37:6
39:10 40:2 43:13
44:20 51:7 81:24
94:9 106:22,24
108:15 109:5,16
109:24 129:18
132:11 133:7
135:9,17 149:8
151:15 154:24
155:8,14 166:13
180:9 184:23
185:4,16,19 186:1
186:10 191:14,20
193:15,25 194:5
195:4,22,25 196:9
196:14 198:6
201:23 202:13
203:22 204:2
208:2 209:4,16,19
213:16 215:8
217:25 218:25

221:24 222:5
**century**   56:15
**certain**   164:21
**certainly**   27:14
28:25 29:9 37:23
41:19 50:24 51:8
71:5 78:10 94:21
108:5 109:1 115:1
129:22 144:14
146:11 150:15,21
156:6 166:3,4,11
167:23 169:14
172:16 173:9
175:9 177:10,25
185:10 188:11
189:7 198:10
208:24 209:9
210:11
**certificate**   225:1
**certified**   1:18,19
225:2
**certify**   223:3,4
225:3,5,7
**cfr**   5:9 34:6 53:22
56:5 57:20 64:14
67:20,21 68:2
176:2,19,20
**challenges**   167:4
**challenging**   89:3
**chance**   7:2 114:22
114:23 142:7
207:9
**change**   34:13
37:25 53:18 68:4
95:8 96:19 98:12
98:12,17 111:15
113:6 142:12
152:3 162:14
163:13,15,20
168:17 176:19
177:8 178:15,17

178:17 184:9
218:12 219:8,9,11
219:17 220:6,16
220:22 221:5,15
224:7,8,9,10,11,12
224:13,14,15,16
224:17,18,19,20
224:21,22,23,24
**changed**   11:10
25:17 219:4
**changes**   55:19
78:4,8 83:9 95:15
98:8 99:6,6,10
163:22 178:4,18
185:9 218:20
224:5
**changing**   154:21
163:6 164:7
168:22,25 169:20
**characterization**
146:2
**characterize**   121:3
162:7
**characterizing**
114:14
**charged**   74:9
**chart**   156:5
**check**   128:17,18
207:10 209:2,21
209:24 211:3
217:22
**checked**   116:23
207:8
**chemotherapy**
13:24 14:1 90:23
91:25
**chicago**   125:5,7
**chicken**   154:4
**chitchat**   15:10
**chitchatted**   123:5

**choose**   47:20 48:2
76:2 132:3,18
**chooses**   76:2
**chose**   132:10,19
134:15
**cincinnati**   4:10
**cisplatin**   92:1
**citation**   110:11
**citations**   112:15
112:20 113:7
**cite**   112:16 113:15
116:3 119:20
146:18 150:2
157:16 177:25
201:10 220:21
221:11
**cited**   51:3 57:20
111:21 119:4
144:25 158:4,10
179:5 192:15,20
193:10
**cites**   154:13
174:17,17
**citing**   112:21
114:15 116:1
174:3,5
**clare**   1:8
**clarification**   81:15
**clarify**   21:7 48:11
62:25 66:12 89:7
**clarity**   58:2
**class**   91:7 146:8
**classified**   80:18
**clean**   88:24 209:15
**clear**   24:13 25:25
26:3,6 28:23
62:16 76:23 77:5
107:11 115:25
117:20 146:20
149:3 164:19
173:7,7 186:18

[clearly - confused]                                        Page 9

clearly 181:15
clearwater 127:18
cleveland 3:21
clinical 66:2,3
  80:21 84:7,14,24
  84:25 85:3,7,8
  86:17,17 101:3
  136:15,24 153:21
  156:21,22 162:8
  181:22 183:20
  199:22 221:10
close 202:7
closer 137:7
closet 137:22,25
club 136:10
clue 81:24
cme 132:15
code 33:19 80:8,9
  80:10,12 176:1
coding 169:1,7,10
  169:20
coffee 44:10,13
colleague 12:18
  123:8
colleagues 7:25
  216:18
collection 93:1
  118:8 210:12
  212:8
collects 160:3
colloquy 37:7
  109:6,9,9
column 160:23,25
  167:3
combination
  90:24 91:25 92:3
come 8:25 16:14
  18:10 26:14,16
  35:11 79:21
  108:11 109:14
  122:19 134:24

163:23 199:23
  206:16
comes 14:17 171:8
  182:20 187:11
  219:14
comfortable 39:7
  189:1 208:21
coming 25:22
  32:15
commencement
  225:3
commencing 1:23
comment 70:4
commenting 100:9
commercial 87:3
commission
  225:12
committee 16:12
  16:17 212:18
  214:3,25 216:23
common 99:20
  104:16 180:22
commonly 91:19
communications
  85:17 163:8 164:9
community
  131:19
companies 30:21
  31:3,11 33:21
  34:1,8 46:23
  111:24 153:4,8
  177:13
company 30:9,11
  34:12 43:16 89:15
  93:3 113:18
  123:12 124:3
  163:14 164:22
  165:7 180:7
  181:14 185:5
company's 181:8

compare 219:3
compared 91:20
  145:22 199:4
comparison 77:20
  78:23 79:3 83:24
  199:16,16
compelling 163:4
  164:5
compendial 61:7
compensated
  186:25 188:18
  189:11
competition 52:4
complete 8:13
  14:7,24 29:21
  69:6
completed 93:8
  212:1 213:14
  215:17,20 216:4
completely 16:4
  144:11 188:9
completeness
  204:16
complex 58:7
compliance 44:3
  47:19 48:2 108:21
  200:22
comply 46:24 48:4
  110:16,23 149:24
  149:24 151:25
complying 156:12
component 57:10
composed 212:1
computers 157:23
concentrate 73:7
  77:19 78:1
concept 193:22
concepts 8:8 62:3
  192:3 193:24
concern 145:21

concierge 4:14
concluded 190:8
  222:14
conclusion 34:15
  34:18 35:3,6
  130:8 131:5
  132:25 147:19
  151:18,22 197:3
conclusions 17:8
  17:12 36:25 37:15
  37:17 43:10 53:23
  151:19 187:21
  188:4,11 189:2,21
  202:2
condition 103:6
  170:8 171:20
  172:19 174:22
  175:19
conditions 80:23
  93:16 94:17
conduct 151:13
  178:9 197:1
  198:11 201:3
conducted 84:9,19
  184:21 190:16
confer 48:16
conference 5:24
  10:5 128:10,12
  167:24
confess 210:20
confident 18:1
  138:16
confidential 87:3
confidentiality
  40:23
confines 169:17
confirm 87:5
  208:24
conflicting 34:19
confused 138:10
  214:9

**confusing** 172:24
215:18
**confusion** 76:7
**congress** 48:5
**connect** 28:13
**connected** 214:18
**connection** 123:24
**consider** 94:2,7
95:24 101:9 117:7
186:16 198:15
216:24 217:23
**considerate** 155:9
155:13,15,18
**consideration**
187:22
**considerations**
67:8
**considers** 95:22
**consistent** 52:22
55:1,4,5 199:24
**constitute** 185:6
**constitution** 47:8
**consult** 200:11
**contact** 48:22
83:23 216:24
**contacted** 217:5,7
**contain** 60:24
68:17,19
**contained** 34:21
**containing** 61:3
190:10,11
**contains** 69:7
**content** 29:14 61:9
77:17
**context** 47:12
49:15 57:23 75:17
76:1 83:12 94:12
97:5 146:23
158:12 165:1,20
166:11 170:17
188:10 192:7,9

**continental** 128:8
**continue** 45:1 77:7
166:23
**continued** 3:1 4:1
**continuing** 112:8
118:8 131:13
**contradicting**
150:15
**contradictions**
99:12
**contraindications**
98:16
**contrast** 219:2,3
**controlled** 113:18
**conveniently**
53:11
**conversation**
14:23 65:20
123:24
**converse** 7:2
**cool** 139:23
**copies** 205:16
**copy** 12:24 69:6
110:8,10 141:22
204:5
**core** 113:17
**corner** 89:1
**correct** 9:15 11:8
11:12 13:15 15:2
20:22 21:2 23:19
23:22 24:21 25:2
25:14,17 27:18,23
29:4 30:7,12 31:6
33:5 34:4,5 35:20
35:21 36:10,13,19
38:5,10,11 39:11
40:3 42:8,11,12,15
42:16,21 46:21
61:12 64:15 65:1
73:14,19,21 74:23
74:25 75:2 78:18

79:2,18 82:9
89:17,17 97:19,20
99:8 100:6,20
104:15 105:12,16
105:21 107:20,23
107:24 108:3,8,10
113:8,9,10 115:17
119:21 120:11
125:14 127:20,24
136:9,12 137:1,5
137:15 143:9,22
144:1,2 153:12
156:19 157:9,10
157:14 158:19
160:18,19,22
162:12 164:24
167:15,22 168:1
168:12,21 169:14
172:11 181:11
184:25 187:19,23
194:25 201:18,19
204:13 213:10
217:6 223:5
**corrections** 113:1
115:2
**correctly** 11:9
29:8 47:23 48:9
52:9,20 54:7,24
56:11,12 69:22
70:17 73:8 80:5
83:5,19 91:3 92:7
93:12 103:2 129:3
129:13 130:22
131:2,9 136:16
160:5 161:7 163:9
164:10,13 179:3
182:3
**correspondence**
42:18 85:20 86:10
**cosmetic** 17:19
45:11 47:18 52:2

73:2
**counsel** 3:9 6:13
24:15 29:10,18
32:16 39:14,17,25
40:24 41:2,21
138:16 139:2,3,23
143:6 186:21
189:14 204:16
205:7 210:16
221:24 225:7,8
**counsel's** 137:19
139:22
**counted** 212:22
**counting** 213:24
**countries** 113:20
151:21 167:19,21
168:3,6 178:5,21
**country** 168:11
**couple** 13:22
51:21 61:24
128:19 141:9
**course** 7:24 10:15
21:16 47:7 74:9
74:13 91:16
131:12 138:21
140:8,9 142:4,10
148:19 163:14
168:3 176:22
**court** 1:1,19 6:7
6:15 67:12,14
115:9,18 116:18
139:2 150:7 225:2
**court's** 193:13
**cover** 50:9 72:7,18
74:15 88:21
106:13
**covered** 5:8 32:12
46:4,7 50:11
65:20 66:24 99:14
152:7

**covers** 68:15
**crafting** 24:4
**create** 48:16
**created** 83:1
**creating** 10:21
  56:6
**credit** 131:16
**crediting** 205:23
**credits** 131:13
**criteria** 176:4
**critical** 217:24
**cross** 63:8
**crow** 154:4
**crows** 153:23
**crump** 2:12
**culbertson** 3:4
**cumulatively**
  190:12
**cup** 201:12
**cure** 57:12
**current** 46:18
  159:17 204:3
**currently** 161:6
**curriculum** 5:18
  13:9 126:7 140:24
  141:4,6 143:19
  204:3
**cursor** 56:2
**cut** 152:24
**cv** 1:8,9 122:20,23
  140:20 141:19
  142:17 143:9,14
  204:10,11
**cyclophosphami...**
  90:24

**d**

**d** 5:1
**daddy** 42:3
**data** 5:19 52:8
  79:6 118:25 120:6
  146:7 148:7 149:1

149:6,22,22 150:3
  150:19 157:18
  158:6,13,15
  159:17 160:3
  161:4,10,14 162:2
  162:9 165:3,14
  166:7 167:5,8
  168:9,16,17,20
  169:20 171:8
  172:13 178:13,24
  179:4,13,15,24
  182:14,18 183:1
  183:22 184:18
  185:21 190:20
  192:10 194:23
  201:4 220:12
**database** 162:5
  167:10 169:25
  171:9 194:20
  197:23
**databases** 160:12
  162:3,6 165:3
**date** 73:17 88:12
  88:18 89:15 93:9
  97:12,17,18,21
  177:6,10 204:7
  215:20 217:10
  220:24 221:4
  224:3 225:6
**dated** 5:7,8,9,11
  12:4,25 46:4,8
  50:14 72:8,15
  74:15 81:6 82:17
  87:25 89:9 90:7
  119:15 225:13
**dates** 27:16 126:9
**daubert** 191:22
  193:10,11,17
**david** 1:13 5:3,6
  5:18 6:4,17 12:3
  140:25 223:10

224:1 225:3
**davis** 2:12
**daviscrump.com**
  2:15,16
**day** 8:3 16:2 42:23
  89:20 115:7 128:9
  215:3,17 216:2,3,4
  216:5,10,11
  223:18
**days** 7:24 8:1 97:8
  125:8 135:14
  215:14,15 216:8
**dc** 125:3
**deal** 85:21 137:21
  138:11,25
**dear** 90:2
**death** 103:14
  104:3
**december** 89:9
  125:17 126:6
  136:4,11 218:12
  225:12
**dechallenge**
  147:10,12
**decide** 39:25
**decision** 96:24
  108:1
**decisionmaking**
  173:10
**decisions** 72:2
  175:9 193:12
**defeat** 137:18
**defendant** 3:3,18
  4:2
**defendants** 3:9 8:2
  14:18 34:7 150:8
**define** 118:3,11
  183:12 185:2
**defined** 79:8 80:2
**defines** 54:2
  183:19

**definitely** 123:8
  162:18
**definition** 57:18
  57:19 58:2 60:18
  61:13 64:9 75:5,7
  75:14,22 76:9
  96:5 118:4,23
  120:9 121:12
  146:22 169:16
  180:25,25 182:25
  183:13,16 184:2,3
  184:15 190:18
**definitional**
  144:24
**definitionally**
  145:13
**definitively** 31:24
**degree** 168:4
**deleted** 142:17
**demonstrate**
  54:21 56:9,18
  64:18 110:15,22
**demonstrated**
  65:10
**demonstrates**
  83:16
**dep** 116:2,8
**department** 63:13
**depending** 137:8
**depends** 190:18
  192:7
**deponent** 116:16
**deposed** 7:16,24
  7:25 31:17,19
  115:6 117:9
  205:12 211:10,13
**deposition** 1:13
  5:20 6:3 7:4 8:3
  8:24 9:8,22 25:22
  30:1 31:8 32:22
  33:3,4 70:22 82:8

110:13,20 111:22
112:10,12,15,20
113:7,23 114:3,10
114:15 116:1,3,13
116:22 117:2,12
123:6 125:16
126:4 130:17
131:1,7 133:14,15
133:17,22 134:6
134:10,19,21,25
136:6 137:17
139:14,17,24
140:7,21 141:5
150:2 152:5,17
154:15 155:24
203:4,7,9,11,20
204:6,25 213:14
213:21 214:5
222:14 224:1
**depositions** 9:5
28:2 29:25 31:7,9
32:3,12 34:23
35:4 115:20
130:21 138:5
169:6 187:1
**derived** 183:20
**describe** 112:4
130:25 179:9
**described** 20:13
47:21 48:3 56:5
92:11 118:6
120:22 124:13
179:12 185:10
186:12 207:6
208:10
**describes** 54:3
147:3
**describing** 158:12
173:25
**description** 5:6
116:25 137:2

**designation** 79:25
**designed** 104:12
**detail** 153:1
**detailed** 128:9
**details** 18:4
**detect** 122:12
161:15
**detection** 118:25
120:7 121:1 171:3
**determination**
81:14
**determine** 147:24
156:11
**determined** 61:22
**develop** 48:7
147:8
**developed** 52:8
138:7
**developing** 118:17
**development**
54:20
**develops** 54:6
**devote** 186:25
**diagnosis** 57:11
**diana** 3:13
**diana.sterk** 3:16
**dictionaries** 169:1
169:7
**dictionary** 169:10
169:18
**differ** 168:16
**difference** 76:13
117:7 153:19
**differences** 77:16
77:24 79:6 167:25
**different** 19:17
25:17 34:15 35:2
40:20 47:20 48:3
60:7 96:18 113:14

150:9,25 152:18
215:3
121:12,12 125:8
133:9 141:12,13
151:1 159:8 164:3
167:14 168:5,6,20
170:23 172:7
174:2 176:23
193:2,5,8 215:3,15
216:8,13
**differently** 35:12
94:15 188:25
**difficult** 76:22
77:6 174:25
**diligence** 188:3
**dilution** 78:15
**direct** 6:20 57:11
73:23 78:15,20
113:22 161:22
187:19
**directed** 48:6
102:20
**directly** 19:22
28:1 95:14 138:25
**directory** 123:21
124:2,5
**disagree** 37:19,24
54:9 121:6 150:13
173:3 219:17
**discoverable**
207:13
**discovery** 32:10
32:11
**discrepant** 169:2
**discuss** 24:5 48:21
55:7 130:15 131:6
133:2,8 149:7
201:9,17
**discussed** 22:7,13
23:25 24:9 50:19
79:12 111:4
**discusses** 104:6

**discussing** 25:5
69:25 142:14
**discussion** 8:10
9:13 18:10 22:13
33:22 57:24 68:15
73:24 87:16
103:23 127:10
145:3 146:25
202:18 214:1
**discussions** 21:19
169:6
**disease** 57:13
**diseases** 93:2
94:23
**disintegration**
61:10
**disorders** 104:8
**dispense** 205:5
**dissolution** 61:10
**distinction** 19:5
21:20 22:4 144:12
182:22
**distinctions** 92:21
93:2
**distinguishes**
63:10,16
**distinguishing**
166:1
**distracting** 134:17
**district** 1:1,1
16:18 115:11
**dive** 45:5 46:11
**divisions** 164:3
172:25 173:6
**doc** 19:11 51:23
63:4 87:18 155:4
162:24 201:13
**docetaxel** 1:5 7:9
9:1 14:10 15:1
18:7 19:24 20:1,2
20:17,25 21:12

23:25 24:6,6 25:3
25:13 27:16,22
35:18 41:24 42:1
42:7,15,19,25 43:4
43:8,8,21,24 44:4
45:9,15 57:25,25
58:15,16,18 59:20
59:24 60:4 61:17
65:25 72:20,25
75:19 77:13,24
80:3 81:17 84:5,8
84:16 86:2 87:22
88:6 89:16 90:18
90:18 94:17 95:5
97:15,23 99:2,20
102:25 103:13,24
104:1,17 105:9
107:13 108:2,16
109:22 111:9
113:21 151:14
152:12 176:8
177:15 190:10,11
194:24 201:4
205:15 207:7
210:13 216:25
224:2
**docetaxel's**  45:14
**docetaxels**  30:22
**doctor**  6:21 16:3
18:18,25 22:20
23:6,16 36:8 37:1
37:11,20 41:10
44:9 45:1,3 48:25
63:25 68:1 70:9
70:14 72:13 87:10
87:19 88:25 93:20
97:3 102:12 103:6
105:2,3,17 106:18
107:7,9 109:15,19
114:23 119:10,12
120:12 122:8,17

136:3 137:24
141:3 144:25
153:23 154:22
155:20 157:3
159:15,25 164:15
164:20 166:21
173:15 179:17
182:3,13 183:5
184:5 186:7 193:9
193:17 194:19
196:3,12,19
197:18 198:3
202:7,24 203:8
210:9 213:18
217:19 218:6
221:17
**document**  40:5,8
46:3 51:9 72:14
82:21 113:18
119:4 141:24
145:20,20 156:21
**documented**
146:12
**documents**  10:13
10:16,17,22,25
13:17 31:5 33:18
33:25 34:23 35:14
35:15,17,25 38:7,9
38:12,22,25 39:4,5
39:9,13 41:2,14
75:16 206:4
207:21,23
**doing**  3:10 132:23
144:7 149:22
155:4 156:16
160:24 166:7
196:7 201:1 202:4
216:9,12
**domestic**  167:14
**door**  65:6

**dosage**  61:2 69:13
74:17 77:10 98:11
99:11,12
**dose**  90:20,21,22
**doubt**  128:20
**downloading**
206:2
**doxorubicin**  90:24
**dr**  6:4 12:22 31:17
31:19 112:10,11
116:1,3 117:1
126:4 139:15
152:17 154:14
155:12 178:1,2
179:6,12 185:12
185:14 186:8,14
186:15,15 188:18
190:4,24 191:8,18
192:1,2,13 193:2
194:19 195:2
197:19,23 198:11
198:24 199:17
200:7,21 201:22
209:17 222:6
**draft**  5:8 46:4,7,16
50:11
**drafted**  114:11
181:1 182:2
**dramatically**
95:12
**drawn**  202:2
**dress**  138:3
**drill**  155:5
**drive**  89:20,20
**drs**  11:21 32:1
33:4 117:10
177:24 186:19
**drug**  5:10,20
17:19 23:13,18
24:11,23 28:15,24
36:11 37:12 41:24

42:5,10 45:9,10,20
47:17,18 52:2,4,7
52:19 53:14,18,20
54:6,13,15,20,22
54:23 56:10,18
58:10,22,25,25
59:12,12,16 60:12
60:24 62:1,5,7,19
63:22 64:5,6,6,19
65:11 68:5,21
69:2,9,12,16,17,18
70:6,8,24 72:3,9
72:16,19,25 73:2
74:3,7,18,21,25
75:7,11,14,18,22
75:25 76:4 77:11
77:17,18,25 83:12
90:6 93:17 96:9
96:25 98:23 147:8
147:10,13 148:14
157:19 158:6
162:4,4 172:6,8
174:1,3 175:1,2,11
183:24 184:1
198:25 218:20
219:5,5 220:7,15
**drug's**  69:15,15
83:2
**drugs**  45:21 55:19
61:22 91:17 98:4
98:5 167:20 176:7
176:8 220:7
**due**  147:9 188:3
**duggirala**  166:24
**duly**  6:18 225:4
**duplicate**  52:16
60:19 61:14
**duplication**
180:20
**duplicative**  54:21
56:7 180:14

duration 101:16
duties 23:12,19
  33:23
duty 74:11 149:5
  165:22 183:14
  218:17,19,21
  220:5,6

**e**

e 2:1,1 3:1,1 4:1,1
  5:1,5,11 81:6 82:2
  82:10 83:22 107:4
  107:4 141:5
  143:14 224:4,4,4
earlier 10:17
  79:12 90:3 91:20
  153:7 170:22
  221:10
early 26:18 90:14
  91:12 117:12
  194:22
earnest 192:25
earth 141:15
easier 120:1
  216:14,14
eastern 1:1
easy 88:1 108:23
echo 194:8,16
education 131:13
educational
  132:16
effect 57:11 80:21
  105:4,18 147:9,11
  152:13
effected 111:15
effective 59:1,12
  59:16 71:15,15
  73:13 89:13 93:9
  97:22 99:1 124:16
  124:19 125:12
  126:23 127:7,11
  127:17 129:2,12

132:20 140:7
effectively 88:8,12
  137:21
effectiveness
  52:18 53:14,20
  54:13 59:2,14
  69:10 70:24 76:6
effects 103:14,22
  103:24 104:2,17
efficacy 45:21
  64:25
eight 11:4 38:9,17
  38:19,25 39:8,13
  41:2,14 125:24
  212:22 213:24
either 26:7 27:16
  28:24 35:15 42:10
  58:7 67:7 83:22
  85:11 86:11
  164:21 187:5
  198:19 202:6
  216:17
electronic 88:2
  110:9 205:16,18
  205:21
electronically
  142:7 206:23
ellipses 184:4
ellis 3:19
embodied 53:21
emphasized 147:4
  181:7
employ 149:6
employee 33:3
  200:25 225:7,8
employees 31:10
  31:10,14 32:4
  110:14,21 111:23
  117:8 173:7
empty 207:9

enclosed 93:10
  97:4
encourage 54:20
  56:6
encouraging
  139:22
endeavor 209:6
endorsed 131:19
enduring 222:7
enforcement 43:3
  43:14,20
engage 164:22
enhance 160:17
enormous 77:2,3
  141:14
ensure 110:24
entered 160:11
entire 31:3 41:23
  42:5 185:22
  212:18
entirely 218:11
entitled 1:17
  208:15 209:8
entries 213:2
  215:2
entry 169:20
epidemiologic
  162:6 165:4
equation 94:8
equivalence 60:13
  61:14 79:25 80:11
  80:17,25 81:1,10
  81:12,13
equivalent 60:19
  61:18,20,23 62:2,6
  69:18 80:18
  153:21
error 114:17,18
errors 113:3
  189:22

especially 144:25
esq 2:5,9,13,13 3:6
  3:12,13,13,19 4:3
essence 151:25
essentially 53:22
  71:23 190:19
  206:1 219:19
establish 161:17
established 69:12
ester 58:6 61:1
estimate 213:12
  213:17
ethics 97:2
european 179:10
evaluate 118:14
  175:17 188:15
evaluates 174:20
evaluating 171:5
  172:6 174:1
evaluation 118:19
  121:18 122:2
  145:16 148:9
  178:10
evaluations 60:13
evan 4:3
event 35:11 42:23
  74:2 78:19 95:9
  95:18,23,25 96:1,5
  96:9 147:14,19
  161:18,24 170:7
  171:19 174:21
  175:18 183:20
  184:18 194:23
  211:25
events 78:9 118:9
  118:11,13 119:1
  120:8 121:2
  122:13 145:22
  169:1,2 175:16
everybody 76:19
  208:12 215:19

**everybody's** 77:1
170:1 204:9
**evidence** 96:10
163:4 164:5
176:18 177:7,17
183:10,14 197:6
220:14
**evident** 57:5
**ex** 179:4
**exact** 11:2 71:3,13
152:22 190:18
217:10
**exactly** 21:15 47:2
122:6 182:1 183:3
188:22 189:1
191:8 193:9
**examination** 5:17
6:20 136:1 225:3
**example** 18:11
34:14 50:18 78:14
87:1 91:12 95:8
121:25 135:3,4,22
152:10 161:25
162:3 165:18
169:10 171:15,17
171:24 172:2,5,13
172:15,21 173:2,2
173:25 174:4
177:23 178:14
**examples** 146:14
**excel** 125:15
134:20 136:5
137:17 138:5
**excellent** 44:15
151:8 222:6,7
**excelling** 130:20
139:16
**exception** 83:9
**exceptions** 65:14
**excerpting** 201:25

**excess** 145:21
**exclude** 106:7,9,12
181:5 197:5
**exclusion** 197:6
**exclusivity** 54:23
66:20 88:11
**excuse** 27:1 50:25
163:13
**executed** 217:17
**executive** 127:21
128:23
**exercise** 114:11,13
197:1
**exhibit** 5:6,7,9,9
5:11,12,13,15,17
5:18,19,20,21,22
5:24 12:2,3,9,24
13:10,12,19 29:5,7
46:2,6 50:1 51:2
67:16,19,21 68:2
72:7,8,14 81:5,6
81:21,22,25 87:9,9
87:14,20 119:4,7
119:12 120:2
122:22 125:21,23
126:1,4 135:25
140:23,24 141:2,3
144:22 156:18
157:18 158:4
176:12 190:3
203:2,3,4,9,17
204:6,20,21 210:1
210:5,6,11 218:7
**exhibits** 13:8 30:1
31:8
**exist** 185:2,3,7
208:10,10
**existed** 176:18
182:6
**existence** 87:5
182:20

**existing** 184:1
**exists** 181:2
182:18,22 208:7
**expect** 74:1 154:8
164:21
**expectation** 80:19
163:22
**expected** 80:20
145:22 165:19
**expedite** 80:15
**expedited** 42:24
74:4 118:12
**expenses** 128:4
**experience** 36:12
37:12 42:10 74:3
101:21,24 222:8
**expert** 5:6,21 7:7
11:19,25 12:3,24
13:7 15:7,8 17:4
20:17 21:4,11
24:14,17,17
119:21 123:2,14
123:15,16,19
124:5,7,11,12,14
124:17,23 125:12
125:16 126:19,23
127:12,17 129:1
129:12,15 130:16
131:7 132:7,21
134:21 136:5
138:5,11 139:14
140:7 141:14,20
142:8,15 143:20
143:23,25 144:4
183:13 186:14,16
186:19 188:18
193:21 195:10
197:9,15 201:1
204:21
**expertise** 188:2
194:3

**experts** 11:16
14:18 15:5 21:19
133:18 134:19
187:18,25
**expires** 225:12
**explain** 130:20
196:23 197:17
214:14 219:1
**explained** 216:17
**explaining** 186:6
220:2
**explicitly** 78:10
87:4 151:17
**expressed** 163:18
**expression** 204:13
**expressly** 52:6
**extent** 54:14 65:9
66:6 74:12 85:10
86:9
**extra** 22:10
**extrapolate** 65:10
**extremely** 94:23
96:22 197:7
**eyes** 68:6

**f**

**f** 107:4 161:5
**face** 192:4
**fact** 7:22 26:12
78:22 119:20
124:21 143:7
152:2 181:7,21
**factors** 175:1
**facts** 18:15
**faculty** 128:9
**faers** 194:20,23
197:23 198:11
201:4
**fagbami** 82:24
**fail** 110:1
**failed** 108:7,13
109:2,21 111:13

**failure** 90:23
  91:24 111:14
  151:25
**fair** 7:13 8:10,19
  16:9,19 17:11
  20:1,12,23 24:25
  27:8,13,15,19
  30:24 33:20 35:14
  36:17 37:5 38:21
  39:1 43:18 47:5
  58:20 60:2 70:2
  74:11 77:13 83:24
  84:16 88:5 91:6
  105:10 111:11
  118:21 140:14
  144:5 149:7 154:9
  164:23 180:10
  205:7
**fairly** 44:16
**fairness** 35:9
  165:7
**falls** 178:3
**false** 110:25
**familiar** 60:10,22
  68:11 119:18
  173:10 200:18
  203:10,13 205:6
**far** 54:7 84:13,13
  180:18
**faulting** 26:1
**favor** 18:23
**favorite** 170:1
**fda** 18:10 22:7
  24:1,1,5,9,23
  30:23 34:13 41:24
  42:6,14,18,19,24
  43:2,19,23 44:1,1
  44:3 45:15,25
  47:4 48:6,13,18,22
  49:15 50:17 52:6
  52:14 56:13 64:6

69:9 70:22,25
  71:7,19,23 73:18
  74:6,9 75:12,17,17
  75:20 78:25 79:13
  80:2,13,16,17
  82:11,24 83:24
  84:4,7,14 85:17
  86:8,11,18 87:3,5
  87:21 88:7 89:1
  93:3 95:7,15,22
  101:11 107:13
  108:8,14 109:4,22
  110:18 118:15
  119:12 122:4
  145:20 148:13
  158:15 159:4,9,18
  160:2,12,20 161:5
  162:3 163:4,16,17
  163:23 164:3,6,22
  165:2 170:5
  171:16 172:13,25
  173:9,13,19,23
  174:11,20 175:17
  177:8 178:20
  179:22,24 181:5,7
  187:14,16,23
  198:24 199:6
  200:17,25 220:25
**fda's** 45:21 46:17
  46:18,24 70:18,24
  79:9 80:24 81:11
  81:11 85:12 108:1
  118:4 163:22
  175:15 181:9
**fdca** 47:16,19 48:2
  48:4 52:1 183:18
**february** 5:16
  9:19 126:2 127:16
  210:24 217:8
**federal** 33:19
  45:10 46:17 47:17

52:2 73:1 115:9
  176:1,1 191:17
**fee** 127:23,25
  137:4,7
**feel** 17:25 67:8
  89:19 106:13
  188:11 208:21
**feeling** 222:9
**feigal** 11:21
  177:24 179:6
  186:14,19 188:18
  195:14 201:22
**feigal's** 179:12
**fellow** 22:14
**felt** 39:6
**fewest** 91:22
**field** 189:21,24
**fifteen** 114:25
**fight** 16:2
**fighting** 76:14
**figure** 40:14 41:6
  114:6
**file** 205:11,13,21
  205:21 207:18
**filed** 7:7 83:14
  140:20 191:23
**files** 205:22
**filibustering** 23:4
**filing** 71:21
**final** 46:16 88:15
  88:19 89:12 117:2
**finalized** 11:3
  116:18
**finally** 13:16 66:19
**finances** 129:16
**financially** 6:11
  127:8 225:9
**find** 89:22 172:23
  198:14 207:13
**finding** 44:1 52:18
  53:13,20 54:12

64:25 69:10,11
  70:24
**findings** 45:21
  76:5
**finds** 192:1
**fine** 67:10 106:22
  109:7 149:19
  186:3 193:4
**finish** 20:15 63:14
  132:11,12 154:16
  154:24 182:25
  200:3 216:3
**firm** 2:8 163:8
  164:9
**firms** 40:11
**first** 6:24 13:9
  17:6 34:5 36:2
  51:21 57:6 62:20
  66:18 67:24 68:14
  68:14 70:4 78:15
  78:15 85:18 88:23
  91:5 95:7 97:3,7
  97:11,22 98:11
  101:11 102:24
  105:9 125:11
  135:3 143:11
  153:5 159:14
  160:2 161:14
  165:9,14 167:13
  173:6 175:4
  176:14 177:3,9
  180:8,10 182:22
  182:24 185:5
  189:6 199:23
  208:11 210:24
  215:9
**fits** 96:1
**five** 38:8 44:18
  166:14
**fix** 8:17

**floor** 3:5
**florida** 5:18 125:1
  125:17 126:6
  127:18 135:6,14
  136:2,8 140:6
**flow** 156:5
**flush** 130:7
**focus** 118:10
  176:14 177:3
**focused** 95:9
**foia** 85:13 86:13
  86:15,22
**folder** 206:8,9,14
  207:8
**folks** 37:18 46:24
  75:19 135:14
  145:7 170:5
  171:16 187:9
**follow** 34:18 145:8
  198:25
**followed** 130:16
  131:6 198:24
  199:9 210:20
**following** 35:8
  69:7 138:20 146:6
  224:5,6
**follows** 6:19
**food** 5:20 17:19
  24:23 45:10 47:17
  47:17 52:2 73:2
  157:19 158:6
**footnote** 26:25
  112:24 113:16
  116:4 119:22
  158:5 220:21
**footnotes** 29:14,20
  111:25 112:9,16
  157:13
**foregoing** 223:4
  225:5

**foreign** 167:14
**foremost** 70:4
  199:23 208:11
**forget** 128:3
**forgive** 66:23
**forgot** 142:8
**form** 15:7 16:23
  17:14 20:6,8 21:6
  21:13,16 23:20
  27:25 29:22 32:24
  33:6 34:2 35:17
  39:9,10 40:2
  43:13 51:7 69:13
  74:17 77:10 91:20
  92:9 94:9 108:15
  109:14,17,24
  129:18 133:7
  135:9 149:8
  151:15 152:4
  180:9 184:23
  185:4,16 186:1,10
  191:14 193:25
  194:3,5 195:4,22
  195:25 201:23
  209:16 213:16
  215:8 218:25
**format** 207:1
**formed** 14:8,24
  20:3,19
**former** 31:10
**formerly** 3:10
**forming** 36:21
  37:12 39:7 43:7
  83:21 94:6 152:10
  155:22 156:3
  158:11 169:15
  186:8
**forms** 61:2 99:12
**forth** 16:20 18:20
  21:4,11 23:23
  54:2 64:12 86:8

86:18 113:18
  176:6 225:6
**found** 43:23 44:2
  202:1,1
**four** 13:14 38:8
  125:8 133:21
  134:3 190:5
  197:19,20 202:25
  204:24
**frame** 28:17 30:2
  159:15 181:17
**frankly** 164:22
  207:21
**frequently** 40:12
  48:6 187:9
**front** 12:9 13:23
  50:3 72:13 102:15
  193:1 198:3
  203:17 213:23
**full** 14:7,23 29:20
  40:5,18 42:17
  80:19 97:22 101:6
  117:1
**fullest** 152:18,18
**fully** 95:21 210:20
**function** 57:13
  187:16
**funny** 64:3
**furnish** 57:10
**further** 147:17,23
  162:6 221:18
  225:5,7
**fuss** 30:16 59:11
  60:5 62:11,14
  63:15 67:7
**fussing** 49:10 63:5
  121:8
**future** 10:21

**g**

**gap** 66:17
**garner** 22:11
**gatekeeping**
  193:13
**gather** 82:4
**gathering** 118:25
  120:6
**gears** 122:16
**general** 17:16,24
  18:2 19:13 21:9
  22:1,16 30:17
  33:20 64:17
  105:11 120:9
  121:21 161:20
  162:11,15 176:3
  189:20 211:20
**generally** 7:12
  30:24 45:18 47:5
  72:4 73:24 91:21
  95:17 120:21
  147:17 192:11
**generate** 161:16
**generated** 162:9
**generic** 54:15
  61:22 62:1,5,20
  70:8 75:7 219:4
  220:7,7
**generics** 67:2 75:5
**georgia** 4:5
**germane** 95:17
**getting** 21:20
  84:21 194:8 202:7
  202:24,25
**give** 8:12 17:4
  18:21 27:2 30:16
  30:20 78:4 86:2
  102:5 106:8
  118:22 134:25
  138:18 141:23
  146:22 171:17

173:2 192:9
195:19 217:20
**given** 41:20 46:19
100:24 131:12
140:19 204:4
211:3,22 215:25
216:2,10
**gives** 97:12 128:8
130:11 161:25
171:15
**giving** 47:12 51:5
110:11 130:16
131:6 187:1
**glad** 138:21,22
149:13
**glitch** 67:25
**global** 207:10
**globally** 96:19
113:6
**glorious** 204:14
**gloss** 147:5
**glossary** 56:24
**glossy** 136:13
**go** 11:25 12:21
13:2,3 16:6 17:1
26:15 29:5,24
32:25 33:16 36:2
36:4,6 38:6 39:22
40:13 49:8 50:6
51:14,20 52:13
53:1,6,10 55:23
56:1,22,24 60:9
62:22 63:24 64:1
67:1,13,13,16,23
67:25 68:13,24
70:25 72:4,23
73:16 76:9 77:8
77:15 79:5,22
81:4,21 82:16
84:1 87:8,25
88:23 89:23 90:13

93:5 96:3 98:7
99:9 102:4,6,7,10
102:13 103:22
104:18 105:4,18
106:3 112:3
114:13 119:24
124:22 127:3,10
127:22 128:1
131:23 132:7
133:13 135:13,23
136:3 137:2 138:1
139:6,13 140:15
140:22 142:14
143:11 144:20
150:22 151:17
159:7,13,23 160:9
161:9 162:22
163:1 167:1,1,4
170:16 171:12
176:12 177:20
179:18,18 190:2
191:9 192:8
194:10,12,14,17
198:2,7,22 201:11
203:2 204:19
212:9,25 215:14
**goal** 136:25
205:25
**god** 92:25 181:21
**god's** 141:15
**goes** 54:4 55:22
59:4 63:9 71:8
90:17 93:7 99:19
147:2,11,16,22
161:21 162:1
163:3 167:8 170:4
179:1
**going** 6:2 7:19 8:7
8:18 16:14 21:14
22:4,25 25:2,5,8
25:16 26:25 27:20

28:9,13,21,22 35:7
35:23,24 41:11
44:11,22 46:2,13
47:23 48:14 49:3
55:18 57:4 62:11
62:15 63:15 70:11
71:20 75:25 76:14
84:2,18 91:18
94:11 95:8,10,19
96:24 107:2,21
108:4,11,13,23,25
109:11,20 111:8
118:22 122:16
124:18 129:23
136:19 142:20
143:8 144:10
146:1 148:18
151:2,3 152:25
153:19 154:20
163:23 165:14
166:17 168:16
170:21 171:7
175:10,14 193:16
197:16 200:6,10
202:20 204:8
205:9 211:4
213:11 215:13,23
217:22 218:2
219:17,22 222:1,1
222:13
**golf** 136:10
**good** 5:13 6:1,21
6:22 8:15 35:22
46:17 78:16 93:6
93:6 106:23 119:7
119:13 122:4
123:16 150:20
222:11
**governed** 152:14
175:25

**governs** 69:25
**great** 132:2
**greater** 175:13,13
**green** 141:15
**greenberg** 4:3
**group** 130:1
**grow** 128:25
**gtlaw.com** 4:6
**guess** 26:19 30:20
34:9 40:4 41:17
55:23 94:5 95:23
122:10 140:20
141:5 146:1 148:4
148:5 151:9 164:1
179:6 193:1,4
195:12 198:20
205:14 208:9
209:2,11 215:4,6,7
218:15 221:8
**guidance** 5:7,8,13
12:10 45:25 46:3
46:4,6,8,11,17
47:2,7,21 48:4,14
48:15,16,23 49:5
49:11,23,24,25
50:10,11,17,22
51:15,20 55:12
62:23 79:9 119:7
119:13,17,20
120:5,17,18 121:5
121:5,6,20,22,24
122:3,6,7,14
145:19,20 146:17
146:19,23 148:13
148:13,21 163:21
164:12 165:10
198:24 199:1,5,25
**guidances** 33:20
34:6 46:12,16,25
47:8,15,18 48:1,5
48:7 199:6,12,18

199:21 200:5,8,17
200:22
**guilbault** 1:8
**gulfport** 2:14

**h**

**h** 5:5 224:4
**hahnville** 2:10
**hair** 7:13 100:7,17
104:19,21 105:22
106:2,5
**hairs** 17:16
**half** 114:12
**hand** 12:15 71:14
160:25
**handled** 30:22
**hands** 155:21
162:1 165:2
**hang** 149:9
**hanging** 203:1
**happen** 141:18
162:18 194:14
**happened** 27:4
40:12 211:21
212:4 215:19
**happens** 12:11
48:12 49:4 71:5
**happy** 117:7
**harbor** 47:16,19
48:1
**hard** 35:8 110:8
110:10 122:10
180:2 205:16
218:17
**hardenstein** 2:13
**harmonization**
167:25
**hatch** 52:5 180:16
**head** 29:1 153:17
**health** 162:3,8
167:18

**healthcare** 3:18
**hear** 40:23 154:18
194:17 213:19
**heard** 23:21 33:1
**held** 1:20 87:16
202:18
**help** 19:11 62:25
81:23 114:19
121:8 134:20
194:11 196:19
200:13 202:8,16
210:18 211:23
**helpful** 207:15
**helping** 145:7
**hereinbefore**
225:6
**hesitant** 65:17
**hesitating** 64:20
**heterogeneity**
192:5,6
**hey** 87:17 163:14
**high** 30:14 77:23
192:4
**higher** 151:10
**highlighted**
207:23 209:14
**highlights** 97:8
99:9
**highly** 12:12
**hinshaw** 3:4
**hinshawlaw.com**
3:7
**hit** 194:18
**hold** 49:3 123:19
**holden** 4:3
**holdene** 4:6
**holder** 17:21 19:8
23:13 69:15 74:7
76:4 86:10 218:19
**holders** 17:18,21
21:25 22:23 23:19

27:12 28:4 30:18
176:16 218:10
**hole** 26:15
**honest** 25:23 28:2
31:22 71:6 134:2
**honestly** 41:5
81:18 115:5
138:18 157:22
189:10 196:3
208:17
**hope** 149:14
216:14
**hopefully** 61:24
140:19
**hoping** 30:15
210:18
**hormone** 92:4,22
**horowitz** 3:12 5:3
6:20 12:19 18:22
22:18 23:2 36:3
44:15,18 50:3
63:24 67:24 72:6
72:11 81:4,9 87:8
87:12,17 93:5
102:10 106:15,23
106:25 109:12,18
119:6 125:20
127:3,13 132:13
134:3 135:23
139:4 140:22
144:21 154:25
155:1,11,17
157:17,21,25
164:17 166:15
185:18,25 186:5
196:11,17 202:10
202:14 203:6,24
204:19 205:24
208:6 210:8 214:6
217:20 221:17,22
222:3,6,11

**hos00200007762**
5:10 72:9
**hos00200007765**
5:10 72:10
**hos01400254441**
5:11 81:7
**hos01400254568**
5:12 81:7
**hos01400256285**
5:12 87:14
**hos01400256346**
5:13 87:15
**hospira** 3:9,10,10
7:4,8 9:9 20:3,18
20:24 21:12 23:24
24:6 30:6 31:14
31:14,20 32:4,10
32:20,23 33:2,3,9
33:24 35:25 36:18
36:22 38:4,6,13
39:8 42:6,14,18,24
43:3,20 44:2 45:8
72:24 73:13,21,25
77:12,24 78:25
79:24 81:16 82:5
82:21,25 83:14
84:15,19 85:4,6,15
86:7,15 87:21
88:6 90:4 97:15
101:24 107:12
108:2,7,13 109:2
109:21 110:15,22
111:23 112:1,7
113:17,20 115:25
117:9,13,16 149:1
149:4 151:5,12
152:13 153:13
156:8,16,19 157:9
157:12 176:17
177:4,5,6,12 178:9
179:14 180:1

183:15 184:21
191:12,16 201:2,8
211:11 218:10
220:22,23 221:5
221:12,13
**hospira's** 9:1 14:9
15:1,8 24:10
35:17,18 36:23
37:11 40:5 42:19
43:8,23 45:15
58:13,16,18 59:24
61:17 72:14,19
74:15 75:19 83:7
83:17 84:4,8 86:1
97:22 99:2 107:22
152:10
**hotel** 136:10
**hour** 10:12 11:11
44:11,12
**hours** 11:4,6
179:20 208:25
209:23 213:25
215:22 216:3
**huge** 44:13
**hum** 53:5 57:3
63:23 122:21
128:24 130:10
150:5 166:25
**hundred** 93:1
**hundreds** 38:15
38:23 199:6
**hungary** 178:4
**hypotheses** 161:16
**hypothetical**
34:10,10
**hypothetically**
19:12

**i**

**i.e.** 61:1 148:14
**idea** 43:19 121:7
187:8,13

**identical** 60:25,25
61:2,7 67:3 219:9
**identification** 12:5
46:9 67:22 69:2,9
70:6 72:10 81:8
87:15 119:9
121:18 126:3
136:2 141:1
145:15 148:9
157:20 203:5
204:22 210:7
**identified** 7:6 36:1
64:6 69:16 74:25
126:7 147:23
157:8,12
**identify** 112:14
160:16 161:6
164:20 166:4
206:24
**identity** 61:8
**ii** 53:2,6 55:14
**iii** 29:25 68:25
69:8
**illegitimate** 144:11
**immediate** 78:12
111:2
**immediately** 20:10
20:12 58:3
**impart** 185:23
**implemented**
221:5
**implementing**
48:23
**implications** 43:15
78:17,20 189:25
**implicitly** 22:11
**important** 19:4
20:7 48:11 58:1
62:10 67:8,12
93:3 96:13,22
103:12 115:8

166:4,12 184:14
197:7
**imprecise** 185:24
186:5
**impression** 133:3
133:10,11
**inactive** 61:3
**inadequate** 107:13
**inadvertent** 143:8
**inc.'s** 77:24
**incidence** 101:15
**include** 15:4 69:17
104:17 143:14,24
156:17 191:11
211:14 212:10
218:10
**included** 101:10
101:14,14,18
102:2 105:8
112:15,20 142:16
148:14 176:5
**includes** 31:9
211:10
**including** 61:8
87:22 103:14
104:2 106:5 176:8
190:12 199:7
**inclusion** 197:6
**income** 5:16 126:2
126:14 136:15,24
187:11
**inconsistent**
169:25
**incorrect** 40:7
109:8 181:25
189:20
**increased** 190:9
**ind** 74:5
**independent** 5:17
17:20 22:12 92:4
135:25 166:10

201:20 218:21
220:5
**independently**
194:22
**indicate** 118:10
146:13 147:17
**indicated** 95:16
117:4,12
**indication** 68:4
91:5,16 92:10
106:2
**indications** 74:16
77:10 93:16 99:11
99:21
**individual** 27:22
42:22 181:5 217:4
**individualized**
138:4,6
**individuals** 82:11
82:13 158:25
159:3
**induced** 13:24
14:1
**indulge** 45:6 89:24
147:7 202:15
**industry** 5:7,13
46:3,6 49:5 50:10
79:9 119:7,13
165:16 200:6
**infecting** 103:17
**inference** 130:2,3
**informatics**
158:22
**information** 14:13
14:17 28:11 32:15
32:19 33:9 34:20
41:16 53:7 68:20
78:9 85:8,8,11
86:16 96:18,22
97:9 100:23,23
101:6,15,16 102:7

102:13,14,24
103:4,5,12 104:23
105:8 108:8,14,18
109:3,22 111:7
113:17,19 117:16
118:9 128:6
156:13,22 158:21
160:4 177:12
178:5,19,22 179:1
179:22 180:6,23
181:2,4,10,16
183:11,19,19
184:1 185:7,23
190:1 219:11,12
219:15,21
**informing** 163:7
164:8
**infrequently**
187:17
**infusion** 28:10
**ingredient** 57:6,9
57:18,24 58:7,11
58:16,17 60:25
74:16 77:9
**ingredients** 61:3
**initial** 97:11,17
116:14 211:4
**initiate** 163:17
**initiated** 163:8
164:9
**injection** 72:25
73:7 77:18,25
78:1,6 80:3 90:19
102:25 103:13,25
104:2,17
**innovation** 54:20
56:6
**innovator** 66:21
218:20
**insofar** 28:7

**instance** 62:21
**intellectual** 66:10
66:11
**intend** 113:13
**intended** 54:19
56:6 57:10
**intentional** 142:19
**intentionally**
143:17 181:1
**interactions** 98:23
123:13
**interest** 112:6
113:4 125:10
204:9
**interested** 6:11
207:21,25 225:9
**interesting** 65:7
212:14
**interests** 44:9
**interim** 115:2
**internal** 35:15,16
187:15 200:16
219:25
**internally** 22:7
152:14
**international**
167:24
**interpret** 124:18
171:8
**interpretation**
167:9 171:7
**interpreting**
170:24,25
**interrupting**
209:18
**introduction**
159:23
**investigation**
147:18
**investigations**
68:3

**invoice** 210:2
211:17,22,25
212:5 213:6 214:3
214:10,14,17,17
214:21 215:4
**invoices** 5:22
10:21 210:7,13
212:22 213:9
214:24
**involve** 18:16 27:2
27:12
**involved** 29:17
32:7 115:19
135:21 217:5
**involves** 7:12 9:9
91:6 121:17,24
145:15 180:23
**involving** 7:8
84:11
**irb** 221:10
**irrelevant** 37:14
37:17 43:12
200:24
**irreversible**
111:10 177:16
**isolation** 161:17
**israel** 178:4
**issue** 20:22 25:8
46:20 55:7 95:3
95:16 96:18 163:4
164:5 171:5 172:6
172:12 174:1
202:5
**issued** 199:7
**issues** 14:9 15:1
18:6,16 22:6
24:20,22 25:5,9
27:21 29:15 66:20
71:20 72:12 78:12
88:11 160:16,17
168:3 199:23

**issuing** 163:5
164:6
**items** 203:12,18
210:3

**j**

**j** 4:9 53:24 54:4,16
55:9 56:8 59:3,14
59:18 60:8 62:6
62:17,18 63:17
75:6,15 76:1,13
219:5,7 223:1
**january** 146:19
217:11
**jeffrey** 3:12
**jeffrey.horowitz**
3:15
**jersey** 225:11
**job** 89:20 123:16
138:17
**jorritsma** 1:18 6:8
225:2
**journal** 158:20
**judge** 191:17,25
192:12
**judge's** 192:20
**judgment** 39:24
**judicial** 191:24
**julie** 3:19
**julie.callsen** 3:22
**july** 5:9 31:18 72:8
72:15 74:15 90:7
90:7 98:13
**jump** 8:22
**june** 5:7 9:14
11:21 12:1,4,25
13:8 14:23 27:10
**jury** 133:4,10,11

**k**

**kaye** 3:12

**keep**  13:6 143:19
  162:19 205:13,20
  205:22 206:14
  207:6
**keeping**  84:10
  121:2
**kids**  221:22
**kind**  34:4 55:14
  67:4 68:14 100:1
  101:20 104:7
  150:7,10 181:8
  204:16 205:20
  216:24
**kinds**  170:23
**kluger**  178:2,15
  181:23 185:9
**knew**  176:17
  221:4
**knocked**  201:12
**know**  8:15,17
  10:17 14:14 15:4
  15:9,17,22,23,24
  17:23 18:4,5,16
  20:14 21:18 22:8
  23:7,21 25:18,20
  27:15 28:3,9,14,18
  28:23 29:3,8,15,17
  30:1 31:13 32:3,7
  32:14 34:9,12,16
  34:22,22,25 37:1,4
  37:20 38:12,16,19
  38:22,22,24 40:19
  41:4,13,15 43:5,22
  43:25 45:4 46:12
  51:9 59:5 62:14
  63:4,10 65:18
  66:7,7 67:6,6,9
  70:10,10 71:12,23
  75:9 76:12,21
  78:11,14 80:7,8,11
  81:16 82:3,13

84:3,13 85:19,25
  91:19 95:7,24
  96:4,14 97:1 98:3
  100:14,25 101:8
  101:17,19 102:1,1
  102:3 103:12
  106:13 108:19
  109:7,11 114:18
  116:11,23 117:3,8
  117:13,16 120:20
  123:15 134:4
  135:2 138:14
  141:17,18,21
  142:20,20,25
  143:6 144:7,11,15
  145:6,7 149:1
  150:22 151:2,22
  152:21,22,23
  153:4,5 154:12,20
  155:5,5,12,23
  156:5 162:12,19
  163:1 165:3,22
  167:23 168:15
  169:5 170:20,23
  172:17 174:7,7,8
  174:10,25 175:21
  175:22 176:18
  177:5,10,19,21
  178:3,14 179:13
  180:14 181:6,14
  181:20 182:20
  183:1 184:6
  185:11 187:5,9
  188:7,11,14 189:5
  189:8,9,13,18
  191:22 192:5,7,14
  193:12,20 194:15
  196:4 198:17
  199:13 200:10
  202:8,11 206:2,10
  206:19,20,21,21

207:10,11,11,12
  208:12,15,18,21
  209:6,8,20 211:9
  211:11 212:2
  213:22,23 214:17
  214:21 215:10,11
  215:13,14,16,19
  215:22 216:5,10
  217:1,7 219:12,21
  219:23,24,25
  220:24 221:11
**knowledge**  141:19
  162:6 189:7 223:5
**known**  54:22
  56:10,18 64:19
  71:24 72:1

**l**

**label**  24:7 28:12
  34:13 35:18 41:14
  41:16 62:19 67:3
  78:23,24,25 83:3,3
  83:7,8,16,17 87:22
  91:17 97:4,15
  99:7 100:23 101:2
  101:10,17,23
  102:2,4,8,18
  107:13 111:3,15
  146:16 152:2
  162:14 163:15,20
  163:22 175:6
  176:19 177:8
  178:4,15,17,18
  179:2 181:16
  185:9 218:12,19
  219:4,9,10,11,13
  220:6,12,16,22
  221:14
**labeled**  53:11
  156:21
**labeling**  67:1
  77:17,19 78:13,17

80:23 82:20 83:1
  83:23 93:11 95:8
  95:15 97:5 104:14
  105:8 110:24
  151:23 153:22
  163:6,13 164:7
  175:25 176:6
**labels**  36:5 83:18
  93:3 97:8 113:19
  151:21 178:16
  179:4,10,10
**lack**  43:14
**lafayette**  2:5
**lane**  1:22 6:17
**language**  48:14
  57:2 104:11
  182:16
**large**  118:10 199:7
**larry**  2:5 44:19
  81:23 106:20
  109:13 155:18
  186:6 202:10,12
  203:24 214:7
  217:20 222:4
**late**  42:4 77:3
**laughing**  64:3
**laurie**  82:2
**law**  2:8 34:19
  40:11 47:9 144:8
  193:16 197:7
**lawsuit**  16:11
**lawsuits**  7:7
**lawyer**  197:8
  216:22,23
**lawyers**  10:1 15:9
  16:10,16 17:4,12
  19:10,22 20:4,20
  39:14 41:18 65:18
  95:3 117:21 142:6
  142:23 187:10,12
  209:13

**lead**  147:18
189:20
**learn**  129:11
133:21 134:9,20
136:14,21
**learned**  134:12,18
134:24 138:23
140:6,9 152:19
162:21
**learning**  129:25
130:6,12 133:1,8
**leave**  139:8,10
184:5,13
**leaving**  71:13
**left**  27:7 145:3,17
167:3
**legal**  6:7,9 138:25
193:6,20 194:1
**legally**  47:14 48:1
48:12 49:14
148:13
**legislation**  48:7
**lemmon**  2:8,9 9:25
11:14
**lemmonlawfirm....**
2:11
**letter**  5:9 63:13
72:7,8,18 74:15
87:21 89:9,24
93:9
**letterhead**  89:1
**letters**  42:23
103:23 126:16
136:22,23 141:14
**letting**  142:20
**leukemia**  104:8
**level**  30:15 77:23
138:13 151:10
188:16
**liability**  1:6 6:4

**lied**  164:15
**life**  93:15 172:19
**light**  41:9
**likewise**  110:20
**limit**  175:5
**limitations**  150:22
**limited**  22:5 38:25
39:4 189:15
**limits**  139:21
**linda**  1:18 6:8
67:15 225:2
**line**  5:23 70:7 76:8
113:23,24 174:13
192:17 224:6
**list**  5:21 13:13,16
29:6,19 31:2,2,4,5
32:7 35:15 36:5
36:15,16,17 51:2
79:6 96:14,14
105:24 106:5
130:12 136:25
137:12 154:7
156:5,17 157:9
176:17 203:11
204:7,15,17,21,24
205:3
**listed**  38:3,9 39:1
41:2 51:1,12
58:22,25 59:11,15
62:7 63:21 64:5,5
68:5,21 69:2,9,14
69:15,16 70:6,23
74:18,21,24 75:7
75:11,14,18,22,25
76:3 77:11,18,25
83:2,12 98:8
99:24 100:5,6
113:19 124:23
159:1 218:20
**listing**  29:21 31:8
123:22 124:4

**literally**  78:24
131:24 172:10
**literature**  22:21
22:25 23:7,8,10,12
52:17 162:5 165:4
165:19,23 166:3
173:24 183:22
201:10,18,21
216:12
**litigation**  1:6 3:3
6:5 7:23 9:3 10:2
16:11,18 18:3
20:5 21:1 22:2
38:13 115:10,11
115:19 117:22
123:20 142:3
187:2,7 192:4
205:12 210:14
211:5,8 224:2
**litigations**  187:12
**little**  8:24 12:10
15:13 16:14 30:3
30:3 35:25 36:2
41:6 45:6 47:1
57:1 62:25 67:17
68:24 69:8 87:18
88:24 89:24 94:12
102:10 117:24
127:4,13 130:7
140:16 141:20
148:25 149:3
155:8 165:9
175:12 202:24
**ljc**  2:7
**llc**  3:9 4:7
**llp**  3:12,19 4:3,9
**loading**  67:25
72:12 81:22 87:10
119:10 125:22
157:21 203:8
205:6 210:8

**locally**  90:22
91:23 92:1
**located**  1:22
**locations**  1:21
**long**  10:7,10 18:16
18:18,21 37:8
64:21 179:23
**longer**  26:19
142:16
**look**  9:5 18:4,15
25:24 28:18 31:25
41:7 45:25 46:25
50:9 55:13 58:2
58:22 71:16,20
76:10 78:7 79:1
85:23 88:9 94:21
95:1,4 97:3 102:5
114:9,19,22 120:1
122:20 128:20,21
138:1 153:15
154:10,18 156:5
156:15 157:15
159:21 170:21
171:13 175:10
176:13 180:2
190:2 191:1 199:9
199:15,17 200:6
200:13,20 203:17
203:19 209:6
218:6 220:14
**looked**  10:18 43:6
43:9 75:4,22
101:13 153:2
188:17 189:14
197:23
**looking**  31:21,22
34:23 75:9 86:3
95:7,10,15,16
96:15 101:2 110:5
110:5 115:23
134:14 154:13,17

165:12 170:17
191:23 193:6
200:1 213:13
**looks**   71:9 110:4
**lose**   139:23
**loss**   7:13 100:7,17
104:19,21 105:22
106:2,5
**lot**   29:2 138:22
141:11 170:22
174:25
**louisiana**   1:1 2:6
2:10
**love**   149:13,14
213:11
**lucrative**   127:5,7,7
127:8
**lumping**   19:1
**lunch**   89:25
106:18 107:3
128:9
**lung**   91:24 92:2,10

**m**

**m**   1:18 3:6 225:2
**m.b.i**   5:7 12:4
**m.b.i.**   5:19 140:25
**m.d.**   1:13 5:3,6,19
12:4 140:25
223:10 224:1
225:3
**machine**   194:18
**madigan**   11:22
177:24 179:6
185:12 186:15,19
188:18 190:4,24
191:8 192:1,2
195:14 197:19,23
198:11,24 200:7
200:21
**madigan's**   185:14
186:8 191:18

192:13 194:19
195:2 199:17
**magic**   12:6 50:7
**mail**   5:11 81:6
82:2,10 83:22
141:5 143:14
**main**   3:20
**maintained**
160:12
**maintains**   160:3
**major**   98:7 99:10
**majority**   176:7
**making**   66:24
112:19 133:9,10
175:9 182:23
188:5
**malicious**   170:2
**man**   57:14
**management**
208:3,4
**manner**   50:18
205:13 207:6
**manual**   5:24
128:10,13
**manufacturer**
149:24 163:14,23
**manufacturers**
47:20 48:2 49:16
148:14 198:25
**maps**   200:16
**marcelo**   4:14 6:6
**march**   5:15 35:13
88:2,7 89:12
97:23 99:2 101:10
105:9 107:14
119:9,15 177:5
**mark**   11:25 12:6
46:2 67:19 72:6
119:3 125:20
140:23 158:4
204:15,20 206:16

207:4,4 210:5
**marked**   12:4 46:8
49:25 67:21 72:10
81:7 87:15,20
119:9 125:23
126:3 136:2
140:25 141:3
157:19 203:4
204:5,22 206:10
206:11,15,17,22
206:22 207:22,24
208:19 209:14
210:7,11 216:4
**markedly**   129:11
**marker**   203:25
**market**   74:1 89:15
101:24
**marketed**   88:18
**marketing**   101:20
101:22 110:17
118:19 122:2
146:7 180:16,20
180:21 199:19
202:5
**marketplace**
89:16
**markets**   113:20
**marking**   120:2
**martzell**   2:4
**maryland**   1:22
6:17
**massachusetts**   3:5
**massive**   40:11
**material**   85:14,19
192:16
**materials**   9:3,4
11:23 13:13 17:7
20:9,11,20 29:6,16
29:19,21 31:2,4
33:20 36:21 39:20
51:2,13 74:10

87:23 154:8
156:18 157:9
192:16,20 206:11
206:15,16 207:16
217:13
**math**   212:21
**matter**   1:17 23:16
139:3 187:18
189:10 224:2
**matters**   138:25
**mbfirm.com**   2:7
**mdl**   1:2 16:13,17
**mean**   18:13 20:13
21:15,15,18 22:24
32:12 34:3 60:4
62:9 66:12 75:6
77:4 78:23 80:10
81:19 83:12 84:23
85:1 86:6 87:4
89:14 91:11 92:22
93:14 94:12,22
95:16 96:20 99:10
100:14 101:1,25
108:12,19 113:5
115:22 118:2
120:6 121:7
123:23 125:11
129:16,20,23,24
132:23 141:8,23
142:25 143:6,7
144:16,17,23
147:5 152:24
153:2 154:17
157:22 162:11,21
164:1 167:22
168:8,12 169:12
169:13 171:18
178:16 179:9,10
181:20 196:3
197:4 199:3,11
205:14 206:7,12

206:23 207:9,17 208:13,13 209:23 211:21 212:24 219:22
**meaning** 49:11 184:10
**meaningful** 8:10
**meanings** 11:1
**means** 100:7,12,17 115:22 116:11 118:21,24 120:20 120:21 127:7 156:4 171:16 192:2
**meant** 13:5 24:18 113:6
**mechanism** 53:21
**meddra** 169:6,9 169:17
**meddra's** 169:16
**medical** 5:17 25:7 25:7 97:1 103:6 126:23 127:11,17 131:13,19 134:21 136:1 158:20 187:16 200:17 201:10,17
**medication** 7:9 94:1
**medications** 98:4
**medicine** 94:3
**meet** 9:20,24 10:4 61:6 96:17 131:15 135:14 146:15
**meeting** 10:22 43:16,17 107:22 148:15,22 149:18
**meetings** 10:7,11 10:14,15
**meets** 149:18

**memory** 9:6
**mention** 27:1 59:25
**mentioned** 10:17 14:13 29:13 32:9 147:1 165:18,21 177:21 181:22 193:11 219:25 221:9,9
**mentioning** 28:19
**mentions** 63:13 181:23
**met** 6:23 95:18
**metaanalyses** 191:4
**metaanalysis** 190:15,18 192:10
**metastatic** 90:22 91:24 92:2,4,15,19
**methodologies** 167:9
**methodology** 39:7 133:22,25 189:19 191:3 193:14,23 198:10 199:20 210:21
**methods** 161:5 189:23
**miceli** 9:25 11:14 217:3
**michael** 4:9,14
**middle** 72:24 79:23 127:6
**milligrams** 90:19 90:20,21
**milliliter** 90:21
**milliliters** 90:19 90:20
**millions** 38:24
**mind** 57:17 62:20 84:10 121:2

164:16 166:13 189:12
**minimum** 113:19
**mining** 5:19 148:8 149:2,6,23 150:3 150:19 157:18 158:6,13,15 159:17 161:5,10 161:15 162:9 165:14 166:8 167:5,8 171:8 172:14 178:13,24 179:13
**minute** 42:3 143:12 151:18 166:14 170:15 205:10
**minutes** 44:17,18 106:21 202:16 217:21
**mir** 31:19 32:1 33:4 116:2,8 117:10
**mir's** 116:3 117:1
**misbranded** 43:24
**misleading** 111:1
**missed** 202:12
**mission** 217:23
**mississippi** 2:14
**mistake** 121:13
**mistaken** 119:23 192:17,23
**misunderstood** 35:21
**mitigation** 57:12 175:10
**mixing** 88:13 156:6 166:1
**mixture** 212:6
**modification** 54:6 68:21

**modify** 146:4,5
**modifying** 146:16
**module** 77:20
**modupe** 82:24
**moiety** 58:3,5,9,18 58:19 61:2
**momentum** 139:22
**money** 127:22 187:5
**money's** 162:24
**monitoring** 24:11
**months** 26:24 114:13,25 115:2 180:24 219:19,20 219:20 221:1
**moray** 134:15
**morning** 6:1,21,22 8:13 176:15 177:2
**motion** 191:22
**mouthful** 17:23 75:12
**move** 22:18 35:7 50:7 106:15 139:4 152:25 163:25 164:17
**moved** 128:18
**msuffern** 4:11
**multi** 16:18 90:21 90:22 115:11
**multiple** 90:13 205:22
**mute** 194:10,12,14 194:17 209:17 213:19
**mutual** 222:9
**myeloid** 104:7
**myth** 180:22
**mythical** 15:5,14 34:11

**n**

**n**   2:1 3:1 4:1 5:1
  107:4,4,4
**nabholtz**   177:23
**name**   6:6 69:13,13
  69:14
**names**   25:20 27:5
  169:2
**naples**   5:18 125:17
  126:6 136:1,8,10
  140:6
**narrow**   188:9
**nature**   7:22 175:3
**nda**   5:12 17:21
  19:8 21:25 22:22
  27:12 28:3 30:18
  42:13 52:7 54:3
  58:9,13 59:16,17
  65:24 69:16,17
  72:7 73:6 74:4
  76:4 80:4 84:4
  85:9 86:10 87:14
  87:22 88:6 89:1
  90:17 108:2,10
  176:16 202:4
  218:10,18 219:6
**ndas**   17:18,21
**ne**   4:4
**necessarily**   61:2
  62:6 99:14 173:10
  178:13 191:6
  202:6
**necessary**   40:18
  162:7
**need**   12:10 22:9
  31:25 37:1,4,24
  40:14 41:7,8
  65:19,22 68:17,17
  68:19 118:12
  135:13 147:17
  149:23 152:6

162:14 163:16
  164:14 169:8
  171:9 175:17,21
  180:7 181:15
  190:1 196:25
  201:13 206:20
  212:9,25 221:22
**needed**   39:4 68:20
**needing**   44:9
**needs**   49:4 149:24
  220:13,13,15
**negative**   91:13,14
**neither**   78:16
  225:7,8
**network**   158:1
**neurological**   104:9
**never**   18:7 19:16
  20:23 21:3 23:17
  23:25 24:9 71:4
  82:7 164:15,16
  175:1 185:7 197:2
  206:8,8
**new**   2:6 3:14,14
  5:10 15:7 23:13
  23:18 27:5,5,17
  41:23 42:5 45:9
  45:20 52:7 58:25
  59:12 62:18 65:11
  67:16 68:4 71:21
  72:9,16,19,25 74:7
  90:6 103:4 140:19
  141:6 163:4 164:5
  177:11,17 178:3,5
  178:22,25 180:5
  180:23 181:3,10
  181:16,19,21
  182:1,4,11,14,19
  182:21 183:7,10
  183:11,14,19,25
  184:18,24 185:6
  219:11,12,13,14

219:20 220:14
  225:11
**night**   42:4 77:3
  116:22 140:20
  141:4 142:6 204:5
  204:16 210:11
**nine**   159:8 164:2
  172:25 173:5,7
**node**   90:25 91:13
  91:14
**non**   34:20 91:24
  92:2 190:11
**nonresponsive**
  22:19 139:5
  163:25
**norm**   162:18
**north**   153:25
**notary**   1:20 6:18
  223:19 225:2,11
**note**   112:24
  165:15 206:23
**notebook**   48:13
**noted**   77:19
**notes**   1:16 206:4
  206:22 207:4,5,22
  207:24 217:22
**notice**   5:20 25:22
  36:14 140:21
  203:4,7,9,11,17
**noticed**   26:17
  142:13 220:23
**november**   82:10
  82:17,25
**number**   53:11
  68:25 69:8,16
  72:7 86:24 95:13
  112:4 125:24,24
  128:25 177:19,21
  180:12,13 185:7,8
  199:7 204:4,7
  205:10 210:3

212:1 214:17,20
**numbers**   41:17,18
  214:10,14 215:4
**numeral**   29:25
  51:19
**numerous**   134:20
  137:16
**nuts**   89:21

**o**

**o**   107:4,4,4
**object**   16:23 20:6
  37:6 109:5 185:16
**objection**   17:14
  21:6,13 22:18
  23:20 27:24,24
  32:24 33:6 39:10
  40:2 43:13 51:7
  94:9 106:15
  108:15 109:14,17
  109:24 129:18
  133:7 135:9 139:4
  149:8 151:15
  180:9 184:23
  185:4,18 186:2,5
  186:10 191:14,20
  193:25 194:5
  195:4,22,25
  201:23 209:16
  213:16 215:8
  218:25
**objections**   109:13
  131:14 173:16
  203:23
**objective**   131:8
  133:6
**objectives**   130:6
  130:12 131:14
  133:1 159:12
**obligated**   39:19
  111:4 208:14

**obligation** 34:18 118:14 179:2 180:1
**obligations** 17:20 19:7 21:25 22:12 22:22 30:18 33:22 43:16 74:6 107:23
**observational** 190:5 197:20
**observe** 180:11
**obtained** 29:16 41:4
**obvious** 189:22
**obviously** 8:6,8 15:6 18:4 20:9 29:12 30:19 33:18 56:13 68:10 81:20 94:22 114:16 141:22 165:13 178:25 205:6 209:3 212:25 214:6 219:24
**occasion** 6:23
**occurred** 80:7 85:17 184:18
**occurrence** 111:10 177:16
**occurs** 147:14
**october** 5:8 46:5,8 50:14 215:11,21 215:22 216:6,6 225:13
**offer** 7:19 20:2,20 20:25 46:25 107:21 108:13 186:22
**offered** 16:1 20:16 30:8 143:25 201:6
**offering** 15:25 25:3 27:20 84:18 85:2 107:12,18,25

108:4,25 109:20 151:11 189:6 201:2,7
**offers** 123:12
**office** 61:21
**officer** 187:16 200:17
**offices** 159:8 164:3
**officially** 173:8
**officials** 18:12 173:11
**oh** 38:20 49:2 92:24 110:7 121:11 124:1 125:22 128:22 132:13 136:18 141:16 142:18 171:23 179:17 181:20 182:9 200:8 202:12 208:1
**ohio** 3:21 4:10
**okay** 7:15 8:6,21 9:15 15:16 16:14 19:15,18,25 21:24 31:7 33:16 35:22 37:1,3 41:23 43:2 43:18 44:12,17 45:6,8 46:23 49:17 51:19 54:4 55:13,22 57:23 58:4,14 60:2,16 62:13 63:19 69:24 70:16 75:24 76:20 76:25 81:3 84:1 85:24 87:7 88:21 90:1 92:9 100:19 102:6 103:4 104:22 105:7,13 107:17 108:11 109:19 111:19,20

113:12 114:22 116:20 120:14,20 122:18 128:12 131:22 138:14 140:5,14,17 141:2 142:12 144:19 145:2,10,17 148:25 150:16 153:13 154:16,17 156:4 158:3,17 159:11 164:25 170:4 171:15 172:12 173:22 174:13,19 177:1 183:9 185:1,5 188:21 189:18 190:22 192:9 193:4 195:12 196:2 202:17 204:1 205:5,19 208:1,23 209:1,24 212:2,13 214:2 215:17,20,22,23 216:1,20 217:18 217:24 218:8 219:1 220:11,20 221:19 222:3
**old** 27:7 182:14,17 183:1
**once** 73:25,25 141:21 164:20 213:13 214:7 222:1
**oncologist** 93:20 93:20,25
**oncologists** 96:22
**oncology** 178:1
**ones** 40:14 41:17 173:9
**online** 124:6

**onwards** 118:7
**open** 65:6 132:9 148:5
**operable** 90:25
**operate** 48:17
**operating** 152:12
**opining** 107:18
**opinion** 26:10 37:16,18,25 55:5 61:17 107:12,19 109:1,20 133:12 138:15,18 152:4 152:10 158:11 177:6 185:23 191:16,20 192:13 192:20 196:4,6 201:2
**opinions** 7:18 14:8 14:24 15:7,11,19 16:20 17:12 20:2 20:3,13,16,19,21 20:24 21:3,8,11 22:1 23:23 24:1,5 25:3 27:10,20 29:22 30:8,17,21 33:23,24,25 34:2 35:17 36:22 37:12 37:21 39:8,9 43:7 43:12 50:23 51:5 83:21 84:19 85:3 94:6 107:10,22 108:1,5,13 151:11 155:23 156:2,3 169:15 185:14 186:8,13,13,22 187:2 189:6 195:9 195:10,17,19 197:12,14,15 201:7 202:1
**opportunity** 15:18 17:25

**opposed** 80:10
91:12,20 111:16
135:4
**opposing** 137:18
139:3,23 189:14
**options** 91:22
**orange** 60:9,10
80:2,14
**order** 22:10 29:22
131:15 152:4
163:21 192:25
193:2 208:3,4
**ordering** 163:20
**organization**
162:4
**organizational**
205:24
**organized** 79:8
**original** 5:9 16:15
69:19,21 72:3,9,15
73:17 108:10
142:24
**originally** 11:24
217:4
**orleans** 2:6
**outcome** 6:12
153:21
**outcomes** 153:20
153:20
**outputs** 192:11
**outside** 10:18 16:7
21:1 22:2 121:23
168:4 187:19
188:1 192:3
**overall** 96:1
**overlapping** 191:5
**overshot** 68:25
**overview** 156:21
181:22

**p**

**p** 2:1,1 3:1,1 4:1,1
**p.m.** 107:5 166:16
166:20 202:20,23
218:1,4 222:12,14
**pader** 36:11
**paders** 36:15,18
36:23 38:3
**page** 5:2,6,23 13:2
13:3,4 36:4 46:14
49:25 50:9 51:14
52:14 58:14 62:23
62:23 63:11 64:16
74:14 79:22 82:16
88:23 97:4,7
100:8 102:7
112:24 114:10,19
116:8 119:24
120:11 122:22
133:13 137:11
139:6 142:14
143:11 148:5,6
158:5 160:24
161:9 165:15
167:2 203:17
210:22,24 224:6
**pages** 113:23,23
**paid** 126:5 127:22
127:25 128:1,5
135:13 137:3
187:6
**paper** 159:1
160:24 161:1,4
164:12 178:2,14
181:21,23
**papers** 141:9
**paragraph** 14:15
15:4 26:22 46:13
46:15 47:15 49:21
50:19 51:16,21
52:14 53:11 59:10

63:9 68:13 70:5
72:23 77:16 89:4
89:8 96:7 110:12
110:13,20 112:7,8
118:5,9,17 121:16
146:23 151:23,24
159:24 160:10,25
176:13 183:18
186:12 190:3
195:5,6,8 198:19
218:7
**paragraphs**
111:21,25 118:6
131:11 201:9,17
**parallel** 44:14
**parenthetical** 70:7
**part** 13:7 16:16
24:3 26:19 36:20
37:17 38:13 43:7
45:22 65:4 66:4
66:19 68:14 74:6
76:5 83:21 84:15
84:20 85:4,12
86:25 101:9
108:12 118:10
129:4 144:6 145:6
148:8 153:15
156:2 178:3 180:1
181:3 186:4
191:11 206:10
207:2 214:11
218:7 220:16
221:12
**participants** 12:14
**participating**
129:7,8,9
**particular** 7:23
20:18,18 25:12
26:18,20 27:6,11
28:15 31:14 46:19
56:16 91:18 92:22

95:22 157:7 168:9
168:16 169:7,13
184:17 199:5
211:24 215:10
216:6,11
**particularly** 90:14
92:23 106:8 147:3
**parties** 225:8
**parts** 34:4
**party** 6:10
**passage** 180:18
**patent** 52:5 54:23
66:20 88:11
**patents** 66:12
**pathway** 45:13,14
45:19,19
**patient** 78:12
93:25 102:6,13,13
102:23
**patients** 80:22
91:8,21 93:21
94:22 96:23
102:20 104:12,24
**pause** 48:25 53:24
**paused** 197:24
**pc** 2:12
**pcia** 13:24,25 14:5
190:9
**pdf** 102:9 148:6
210:4,10
**peer** 21:4,12,14,17
21:17,18 22:2,5,15
22:21,24 23:7,8,12
158:23 164:4
173:24 183:21
**people** 37:23
89:20,21 91:8
141:18
**percent** 56:13
**perfect** 44:20

**perform** 160:15
**performed** 190:24
**performing**
  192:10
**period** 110:19
**periodic** 36:8,11
  37:11 42:10 74:3
**permanent** 7:12
  13:23,25 14:4,10
  15:1 25:4 94:6
  95:3 100:3,15
  101:14 111:5,16
  154:19 178:10
  184:20
**permits** 52:6,15,16
  52:24 54:11
**permitted** 54:14
**persistent** 100:2
**person** 10:4 48:17
  217:2
**perspective** 25:6
  174:10 191:24,24
  193:7 194:1
**pertains** 1:7
**petitions** 67:4
**pfizer** 181:23
**ph.d.** 1:13 5:3,7,19
  12:4 140:25
  223:10 224:1
  225:4
**pharma** 4:7 145:8
**pharmaceutical**
  3:3 46:23 49:16
  60:19 61:13,18,20
  80:25 167:20
  175:25
**pharmaceutically**
  69:18
**pharmaceuticals**
  4:8

**pharmacoepide...**
  174:9
**pharmacoepide...**
  5:14 119:8,14
**pharmacologic**
  146:8
**pharmacological**
  57:10
**pharmacovigila...**
  5:14 24:11 35:19
  110:18 117:9,25
  118:1,21,24 119:8
  119:13 120:5,17
  120:19,23 121:3
  121:15,17,23
  122:4,11 145:4,14
  151:13 152:1,11
  152:14 153:5,10
  156:19 157:12
  165:10
**phone** 10:5 194:9
**photographs** 41:8
**phrase** 13:23
**physician** 41:15
  129:9 131:4
**physicians** 5:16,18
  126:2,14 129:7,8
  130:9,25 136:1
**pick** 106:25
**picture** 124:6
**piece** 19:25 164:20
  168:9,16,17,19
  176:14 177:3
  184:18 209:11
**pieces** 181:6,11
  182:5
**piedmont** 4:4
**place** 103:5 152:19
  161:10 180:8
  225:6

**plaintiff** 2:16
  25:12 27:11 28:10
**plaintiffs** 2:3 7:7
  10:2 15:9 16:10
  16:12,17 17:3
  19:10 20:4,20
  24:15 25:18,21
  26:2,4,18,24 27:6
  27:8,17,22 28:8,15
  28:20,24 39:14
  41:20 95:2 117:20
  142:6,22 176:15
  176:22,23 177:2
  186:14,19,21
  187:10,12 197:15
  209:13 210:16
  212:18 214:3,25
  216:23
**plaisance** 1:9 2:16
**plan** 85:2
**platinum** 91:25
**play** 153:18
  196:22
**pleasant** 158:1
  222:8
**please** 6:15 23:3
  56:22 64:22 89:8
  90:6 140:17 147:7
  147:7 154:25
  155:9,15 162:22
  163:1 191:9 192:8
  198:4,22 201:11
  206:21
**plenty** 146:14
**plug** 27:5
**plunkett** 186:15
  186:20 188:19
  195:14 201:22
**plus** 73:20
**point** 25:9 28:11
  46:19 62:10,25

  65:21,25 72:4
  106:3 113:13,14
  137:16 145:11
  154:5 167:13
  168:10,23 169:21
  169:24 184:19
  191:2 202:9
  217:22
**pointed** 185:8
**pointing** 121:13
  150:11
**points** 75:10
  130:13 137:13
  167:11 171:10,11
**pole** 153:25
**policy** 55:2 173:13
  175:16
**pooled** 190:21,25
  197:18
**pooling** 190:19
  191:4,5 192:10
**poor** 67:15
**population** 96:21
**porter** 3:12
**portion** 106:16
**posited** 197:25
**position** 28:4
**positive** 90:25
  133:3,9,11 147:3,6
  147:12,15
**possibility** 103:16
**possible** 94:11
  103:24 146:9
  161:22 165:5
  177:9 215:5
**post** 85:25,25
  86:19 101:20,22
  101:24 110:17
  118:19 122:2
  146:7 180:16,20
  183:21 199:19

202:5
posted  85:11
potency  61:9
potential  147:24
  160:16 161:15
  220:14
potentially  200:24
practice  126:19
  129:1
practices  5:14
  46:17 119:8,14
  122:5 198:25
  199:2,18
pre  66:3 85:3,8,16
  86:17,19 107:23
  180:15,21 207:23
  207:24 209:14,14
precaution  78:12
precautions  98:20
  99:13
preceding  118:6
precise  93:4 186:2
predated  179:23
prednisone  92:3
predominant
  169:11
preexisting  182:18
prefer  47:4 190:20
preparation  10:18
  11:14
prepare  17:4 29:7
  135:2,12 138:4
prepared  9:10
  12:25 29:10 205:2
  213:3,8
preparing  9:4
  11:24 24:4 29:17
  50:22 51:11
  186:25
prescribe  94:1

prescribed  80:21
prescribing  41:15
  94:3 97:9 101:6
present  6:13
presented  220:12
presiding  191:18
presumably  213:4
presume  203:22
  204:10
presumption
  34:17
pretend  197:2
pretty  93:15,15
  108:22 120:23
  134:7 169:8
  209:22 211:8
prevention  57:12
previous  53:19
  151:24 189:24
  197:25 198:2
previously  55:19
  71:1,10
price  52:4
primary  22:14
  135:1 216:24
  217:2
principally  121:17
  145:15
principle  97:1
principles  56:7
prior  6:23 9:2,5
  70:21 85:5,8 86:1
  90:23 91:25 169:6
  201:8 225:3
privilege  40:22
probably  81:21
  100:13 136:19
  152:17 159:14
  169:11 204:15
  221:1

problem  92:22
  121:14
problematic  92:23
  141:20
procedure  64:13
  68:2
procedures  118:18
  122:1 151:12
  152:13 153:9,14
  154:11 155:22,25
  200:16
proceed  47:3,4
  107:7 166:21
proceedings  1:17
process  15:16,20
  20:13 24:4 26:19
  32:8 36:21 40:10
  50:22 54:3 71:10
  76:21 84:20,22
  153:20 203:10,14
  219:23
processes  151:12
  152:15,22 153:9
  153:14,20 154:11
  155:22,25 156:15
  156:23 169:21
  187:15 200:16
  219:25
produce  208:15
  209:5
produced  38:13
  40:15 203:13,18
  208:5 210:3
product  27:16
  42:7,15,19,25
  52:19 59:1,12
  64:6 66:21 69:12
  69:17,19 71:24
  72:20 73:12 74:11
  77:17 78:5 80:3
  80:20,22 81:17

89:16 109:23
  147:19 161:18,24
  163:5,6,13 164:7,7
  169:2 170:7,8
  171:20,21 176:5
product's  145:23
production  40:6,8
  40:11,14,18,21
  72:15
products  1:6 6:4
  52:16 60:12,24
  80:17 110:24
  146:8 160:4
  167:20 169:1
  175:25 176:21
  224:2
profession  138:24
professional  1:19
  225:2
proffered  24:15
  194:3
profile  80:21 96:1
program  66:4
pronunciation
  91:2
prop  204:1
properly  12:7
property  66:10,11
proposed  69:12
  77:17 78:5,25
  83:17 152:3 177:8
proposition  18:2
  19:13 22:17
  194:21
propositions
  112:16,21
proprietary  69:13
  85:7 86:16
prostate  92:4,19
protecting  54:22

**protection** 66:10
66:11
**protocol** 138:5,6
**protocols** 200:22
**proven** 35:5
137:16
**provide** 16:20
37:24 39:19 40:25
94:12 106:2
138:15 144:15
160:3 192:11
204:17 205:7
206:21 210:16
214:2
**provided** 32:6,21
33:2 39:16 40:5
41:1,5,20 57:20
74:6 77:20 78:1
79:7 101:15
110:14,21 111:22
117:17 141:4
177:13 178:6
205:7,20 206:6
207:23 210:10,15
212:8
**provides** 90:18
124:11
**providing** 40:20
66:9 74:2 150:9
187:1,11
**provision** 52:6
**provisions** 54:15
**psur** 36:8
**psurs** 36:7,15,18
118:16
**public** 1:20 6:18
34:20 48:18 85:11
86:12 148:14
162:5,5,8 163:7
164:8 165:4
179:23 223:19

225:2,11
**publication** 21:16
22:6
**publications** 21:17
23:15 34:6 177:22
179:5,11
**publicly** 179:11
**publish** 23:17
**published** 20:24
22:20 23:6,11,18
46:16 141:10
164:4 173:23
177:22 204:11
**publishes** 123:21
124:2
**pull** 144:21 184:6
184:10 210:4
**purchase** 123:22
**purely** 25:6,7 34:9
170:24
**purist** 88:8 89:18
**purity** 61:8
**purpose** 7:17 51:5
51:15,20 55:2
62:24 132:16
179:20
**purposes** 10:21
117:21 143:20,21
144:24 165:23
**pursuant** 90:8
**pursue** 209:9
**put** 17:10 35:10
55:6 56:2 67:23
72:13 87:19 89:16
94:19 112:24
123:17 138:8
140:19 152:6
155:21 177:1
183:4 203:25
205:15 216:13
220:23

**putting** 16:3 78:24
91:2 181:14 182:5
212:3

| q |
| --- |

**qualification** 20:7
**quality** 61:8
188:23,24
**quarter** 56:15
**quarterly** 179:16
**question** 15:15
16:8,25 17:2,17,17
17:24 18:6 19:13
19:21 20:15 21:9
23:3 28:3,16
35:10 37:7,8,9,10
40:4 47:24 50:21
63:5 70:14 78:14
85:1,25 94:5,14,20
94:24 95:14
100:16 106:17
107:16 108:9,21
109:6,15 111:2
114:9 115:4,5
117:12 123:24
124:18 135:18
146:2 150:2 151:9
154:3,21 155:16
155:21 156:4
163:25 164:16
170:19 173:5,15
174:24 178:23
180:10 183:12
185:20,24 186:2
193:18 195:13
196:9,11,13,14,15
196:24 197:25
198:3,3 199:3,8,11
200:4 201:12,15
208:9 210:23
211:8 213:12
214:11 215:4

218:16 220:1
**questions** 8:16
14:12 17:8 61:25
84:11 85:22
109:10,10,16
115:23 123:9
133:22 134:5
155:3,19 191:16
194:13 196:10
198:6 211:7
218:15 221:18,25
**quick** 44:16
166:14
**quickly** 30:4 31:25
142:25 173:5
209:22,22
**quite** 17:23 18:1
18:16,18 170:18
181:1
**quote** 62:1 65:11
173:8 183:1,19
198:1
**quoted** 51:16
**quoting** 148:20

| r |
| --- |

**r** 2:1 3:1 4:1 107:4
223:1 224:4,4
**rabbit** 26:15
**rails** 66:25
**raise** 78:13
**raised** 214:11
**ran** 104:7
**rarely** 172:19
206:11
**rate** 11:11 190:23
191:7,9
**rates** 61:10
**ratio** 95:13 96:19
**rbuchholz** 3:7
**reach** 132:4 197:2

**reached** 34:15
35:2
**reaction** 95:10
151:20
**reactions** 78:21
96:6 99:17,20
100:24 101:7,12
101:19 102:3
103:19 104:8
146:17 175:5
**read** 23:2 46:13
47:22,23 48:8
49:1,14,21,22 50:4
52:9,20 54:7,24
56:11,12 59:10
61:12 69:22 70:5
70:17 73:8 80:5
82:7 83:5,19 91:3
92:6 93:12 102:23
103:2 112:11
114:4 117:1
120:12 129:3,13
129:23 130:22
131:2 135:2,12
136:15 145:14
149:11 150:24
151:3 159:24
160:5 161:7 163:9
164:10,13 184:7
184:11 188:8,14
198:19 204:8
223:3
**reader** 113:22
**reading** 49:1
62:23 80:14 146:9
146:22 150:25
177:14 189:13
**ready** 8:25 45:1
107:7 166:21
**real** 140:15 175:10

**realize** 142:19
144:14
**really** 14:5 19:3,21
24:22 31:24,25
34:12 35:8 50:3
62:10 63:5 65:12
67:12 76:22 77:6
96:13 112:25
118:4 134:4
135:12 138:19
144:23 150:25
158:1 172:20
174:23,24 179:23
181:17 182:1,5
195:18 196:20
208:11,13 210:2
215:21 218:16
222:10
**reason** 8:12 25:16
40:22 49:14 86:12
176:18 194:16
202:11 219:7
224:7,8,9,10,11,12
224:13,14,15,16
224:17,18,19,20
224:21,22,23,24
**reasonable** 96:10
130:2,3
**reasonably** 52:9
61:12 91:3 92:6
**reasons** 96:25
132:24 161:22
167:24 192:25
224:6
**rebuttable** 34:17
**recall** 11:9 25:24
29:8,11 123:7
145:12 153:17
157:7 163:6 164:7
217:15

**receipt** 118:18
122:1
**receive** 102:24
131:15 209:12
**received** 90:7
203:22 214:8
**recess** 44:23 107:3
166:18 202:21
218:3
**rechallenge**
146:13 147:4,6,15
**recitation** 195:20
**recognize** 68:1
**recognizing**
137:18
**recommend**
141:17 165:10
**recommendations**
187:22 188:4
**recommended**
93:10 165:16
**reconcile** 218:22
**record** 6:2,14
10:20 16:3 21:20
42:17 44:22,25
76:24 87:16 107:2
107:6 155:11
166:17,20 202:18
202:20,23 218:2,5
222:13
**records** 115:24
**recovering** 65:12
**redline** 83:16
**redlined** 83:1
**redo** 70:25
**redoes** 71:8,9
**reducing** 17:9
**refer** 89:8 90:6
118:5 168:2
180:15 190:20
191:8

**reference** 26:18
29:13 58:6 62:7
63:21 73:10 74:18
74:21,24 75:11,14
75:18,22,24 77:11
77:18,25 83:2,12
83:15 112:9
156:18,20 200:11
218:20
**referenced** 9:17
11:20 12:1 64:5
64:11 153:7
**references** 29:14
174:6,6
**referencing** 18:2
170:13
**referring** 77:12
89:4 99:6 111:17
112:2 165:24
169:9 170:19
175:21 177:18
199:2
**refers** 145:21
180:14
**reflect** 46:18
**reflected** 152:2
178:18
**reflects** 56:7
**refractory** 92:4,23
**refresh** 9:6
**refund** 140:2
**reg** 82:5
**regard** 15:13 44:3
107:10 108:9
191:8
**regarding** 9:10
22:14 107:22
110:17 117:16
194:23 201:4
**regardless** 166:7
178:20

regimens  190:10 190:11
regions  167:19,21 168:3,7
register  46:17
registered  1:19 225:2
registration  127:23,25 128:6
regs  87:4 96:5,12 154:2 183:2
regulate  74:11
regulated  160:4
regulating  167:20
regulation  34:20 42:19 44:3 46:18 53:21 64:11 67:18 68:10 69:24 70:18 73:11 86:24 121:25 148:16,23 149:5,17,18,23 164:12 176:1
regulations  24:24 30:23 33:19 34:19 46:25 47:4,9 48:21 56:5 108:20 108:21 109:3 121:4 175:7 178:20 180:17
regulatory  14:9,25 17:8,20 21:19 24:14,16,17,20,22 25:6,9 27:21 43:16 46:19 66:25 72:1 74:6 90:3 96:16 107:23 110:16,23 149:5,5 152:1 162:3 163:5 163:12 164:6 165:3,7 168:10,19 171:1 174:8,9

178:17 183:13 189:25,25 193:7 193:22 194:3 197:8 201:1 218:16
rehash  8:7
rein  19:3
reinvent  179:21
rejected  214:25
relate  31:14 78:8
related  6:10 7:8 9:19 14:9 15:1 31:3 66:21 79:17 86:7,17 120:7 132:15 151:9 161:16 167:4 170:7 171:19 212:7 213:21
relatedly  107:25
relating  118:25 120:7 121:1
relation  50:19 142:13
relationship  96:9 111:9 161:23 177:15 178:7 217:8
relative  225:7,8
release  87:3,4
released  179:16
relevant  33:10 37:20 39:19,25 40:16 47:21 48:3 85:22 110:19 117:14 143:15 144:8
reliability  193:13 193:23
reliable  191:19
reliance  52:17 54:14 70:23

185:13 192:15,16 192:20
relied  17:22 34:2 69:16 158:11
relies  53:19 64:7 69:11 75:8 76:4
relive  152:6 169:8
rely  39:24 45:20 51:4,8 52:7 53:7,8 54:12 64:24 65:3 187:17 195:11 197:10,12,13
relying  65:24 73:14 185:13,20 185:21,21 186:3,7 189:3 195:1,13,14 195:24 196:5,12 201:21
remember  71:2 86:24 112:18 123:8 131:9 134:3 153:2 156:6,8,16 205:11 220:1 221:2,3,4
remembered  134:15
remind  123:11
remote  1:13
remotely  6:3,13
remove  141:22,25 142:7,8 143:4 144:4 163:15
removed  142:11 142:17 143:1
repeat  65:23 201:12,15
repeating  26:11
replace  136:15,22
report  5:6 9:8,10 9:13,17 11:21,24 12:1,3,8,25 13:7,9

13:22 14:7,13,14 14:23 16:21 17:4 20:17,25 21:4,8,12 23:24 24:4 26:17 27:6 28:19 29:5 29:15 30:5,14 31:1,4 32:9,11 33:8 36:9,12 46:12,15 47:11,13 48:9 49:19 50:19 51:3,11 55:8 59:25 62:4 64:25 83:23 96:7 108:6 108:22 109:2 110:7,8 111:4,8 112:4,7 114:12,24 115:10 117:4 118:5,15 119:5,21 135:2,12 145:1 146:12,18 147:1,3 149:2,7 150:6 157:13 158:5 161:10 162:4,4,20 176:12,23 177:20 179:9,12 183:21 185:10,13,14,20 185:21,22,23 186:8 187:15 189:10 190:3 191:11,11 194:21 196:8,22,25 205:15 207:7 211:9,12 216:1,11 218:7 221:11
reporter  1:19,20 6:8,15 49:4 64:2 67:14 116:18 225:2,3
reporting  110:18 118:12,19 122:2,4 153:10 167:15

168:5,6,18,22
170:2
**reports**  9:2,5,7,16
11:19,20 14:18
15:8,8 37:12
42:10,13,23,24
74:2,3,4,4,5
118:16 160:11
165:23 167:5,14
186:11,16 187:1,4
187:11,18 188:1,8
188:8,18,23,24
189:4,13 195:8,13
195:21 196:22
198:20 201:24,25
206:5
**represent**  7:4 10:2
47:15,19 48:1
159:8 162:13,14
210:9
**representations**
115:18
**representatives**
110:14,21
**represented**
172:25 173:6
**representing**
16:10 26:3 146:15
173:9
**represents**  87:1
147:24 178:5,22
178:25 219:12
**reputation**  129:1
**request**  82:20,24
95:2 204:4 206:20
207:17 210:2
214:7
**requests**  5:23
79:24
**require**  84:7,14

**required**  64:18
66:1 70:2 108:7
108:14,17 109:3
109:21 121:25
123:15 132:3
148:8,19 153:8
176:4 201:3 209:5
**requirement**
149:17
**requirements**
48:20 70:19 132:4
148:15,22 167:15
168:5,6,18,22
220:9
**requires**  167:10
**requiring**  54:21
66:8 68:3
**reservation**  15:6
15:14,23
**reserve**  14:19
**resort**  127:18
**resources**  66:9
**respect**  14:9,25
16:18 19:7 20:1
20:17 21:24 23:23
30:9,17,22 32:23
36:22 42:14,18
43:3,7,21 64:17
70:1 75:18 78:5
87:21 92:11 93:16
108:1,16 109:22
113:6 115:10,19
133:11,15 151:11
151:13 152:11
153:9 172:13
175:16 178:10
184:20 187:7
188:3 194:19
196:22 198:9
199:18 200:7
205:9 207:7

210:13 211:12
**respectfully**  34:3
41:12 135:20
154:22 155:6,20
165:25 174:23
208:6
**respective**  176:21
**respond**  14:18,19
33:12 121:25
**response**  82:23
140:20 210:2
**responsibilities**
110:16,23 152:1
**responsibility**
115:14 181:8
**responsible**  48:22
163:7 164:8
167:19
**responsive**  35:9
106:16
**rest**  146:22 221:21
**restoration**  52:5
**restricted**  181:4
**restricting**  14:11
**restroom**  166:14
**resulting**  169:1
**results**  118:15
190:5
**retained**  16:10
17:3,13 20:4
117:21 123:20
141:14,21,25
142:2,9 186:21
188:17 189:14,16
**retainer**  210:25
211:4,13 212:15
212:17 217:9,14
217:16
**retaining**  29:9,18
32:16 39:14,17,24
40:24 41:1 129:17

139:2 143:6
**retention**  16:15
20:10,12 211:14
**retinal**  41:8
**retrospective**
180:2
**returned**  115:7
**reveal**  183:8
**reverse**  19:3
**review**  9:15 10:13
11:18,19 17:7
18:11 20:20 21:5
21:12,14,17,18
22:2,5,15 36:14,20
36:22 37:11 38:2
38:25 39:8 41:23
42:5,9,13,17,22
50:21 51:4,9,10
74:10 79:13 83:22
83:22 93:8 101:9
118:14,20 152:12
153:15 154:10
156:2 165:22
180:7 181:22
185:13 192:16
201:20 202:3,4,5
206:5 209:15
217:13 221:10,14
**reviewed**  9:2,3,4,7
11:24 13:17 14:14
20:9,11 21:17
22:21,24 23:7,8,12
29:6,9,19,21 31:2
31:4,5 51:2,13
79:13,14 116:15
154:8,9 156:18
157:9 158:23
164:4 173:24
183:21 186:15
198:13 201:24

**reviewers**  18:11
  22:14 200:17
**reviewing**  10:22
  10:25 36:21 71:10
  71:20 156:8 157:7
  206:6 216:1,1,11
**reviews**  70:22
  85:12 162:2 165:2
  165:19
**revise**  47:10
**revised**  141:6
**revision**  83:2
**revisions**  83:10,11
**rid**  61:24
**right**  7:20 8:4,22
  10:24 12:15 13:4
  13:10,14 14:19
  15:11,20 16:11
  17:10 20:15,21
  21:22 23:8 24:11
  24:15 25:15 26:20
  28:15,24 30:9
  31:5,11 32:13
  36:9 37:5,10,17,19
  37:23 38:2,4,17
  41:2,21 42:20
  44:15,19 45:11,23
  47:11,18 49:19
  52:1 53:25 56:24
  57:25 59:6,21,22
  60:5,10 61:14
  62:21 63:16 64:19
  66:5,15,22 71:18
  71:21 72:21 74:22
  75:16 79:1,15
  82:1,8,21 84:5
  87:2,19 88:25
  89:23 90:4 92:12
  92:19 93:17 97:5
  97:15,23 98:1,4,5
  98:24 99:3,14

100:5,8,17,21
101:8,24 102:18
103:20 104:13,24
105:13,15,19,23
105:25 106:5,7,10
107:19 114:21,24
115:1,3,11,20
116:19,23 117:22
119:18 123:20
124:8,17,24 125:1
125:7,13 126:11
127:1,1,6,19,22
128:2 129:5,9,17
130:3,4 132:10,21
133:15 135:8,15
136:8,11 137:4,9
137:14 138:10
139:11,25 140:4,7
146:23 148:3
153:11,16,24
157:13 158:11,15
158:18 160:7,21
160:25 162:18,24
163:3,11,18 165:8
166:6 167:21
168:2,7,18,20
169:10 170:2
171:2,3,6,11
173:20 174:4,14
174:17 176:2,6,8
176:24 177:4
182:7,14,18,23
183:10 184:7,11
186:22 187:2
188:5,6 190:15,25
191:13 192:5
193:10,18,24
194:4,6 200:18
207:20 208:19,22
212:23,24 213:1
217:25 221:15

**rights**  15:6,23
  48:17 54:23
**rigor**  188:17
**rises**  153:24
**risk**  76:7 94:7
  95:13 96:19 146:1
  147:25 175:3,9
  183:23,23 190:9
**risks**  94:2 95:1,4
  95:11,24 175:11
  175:12
**river**  2:9
**rivera**  4:14 6:6
**rld**  76:9
**rld's**  83:9,11
**road**  2:9 4:4
**robert**  3:6
**robson**  4:14
**rockstad**  2:13
**role**  24:13 26:6,8
  26:10 93:24
  124:20 186:11
  193:13 195:7
  196:21
**roman**  29:25
  51:19
**room**  139:8,11
  194:9
**rooster**  153:23
  154:4
**ross**  1:13 5:3,6,19
  5:22 6:4,17 12:3
  12:22 126:4
  139:16 140:25
  155:12 193:3
  209:17 210:6
  222:6 223:10
  224:1 225:3
**rough**  116:7,8,11
  116:15,21

**roughly**  10:12
  38:9 39:8 73:20
**route**  69:14 74:16
  77:10
**rude**  155:10
**rule**  65:15 138:9
  138:12,12,13
  208:3,5
**ruled**  191:18
**rules**  24:24 46:24
  138:10,11,20
  208:12
**run**  1:22 6:17
  126:19
**rush**  208:22

**s**

**s**  2:1 3:1 4:1 5:5
  21:9 45:4 55:8,9
  56:21,22 63:17,17
  65:8 68:21 69:16
  70:7 75:15 107:4
  107:4,4 211:19
  224:4
**safe**  47:15,19 48:1
  71:15 73:13
**safety**  24:11 36:8
  45:21 52:18 53:13
  53:20 54:13 59:2
  59:13 64:25 69:10
  70:24 74:4 76:5
  78:12 80:21
  110:18 113:17,19
  121:18 145:12,16
  145:20 146:3,25
  147:24 153:10
  160:4,16 161:6,10
  162:4,4 163:4,20
  164:5 165:6 167:5
  171:5 172:6 174:1
  177:12 178:5,22
  179:1 180:23

181:4,10,16
183:11,19 185:6
219:12,20 220:15
**sagent** 4:7
**sake** 77:1 183:7
**salt** 58:6 61:1
**sandoz** 4:2 9:9
30:9 33:25 35:16
35:24 36:15,16
110:15,22 113:16
156:6 176:17
179:10 211:11
**sandpearl** 127:18
**sanity** 204:9
**sanofi** 8:3 9:10,19
73:6,25 84:9
85:17 86:8,11,19
97:18 211:12,15
211:18 212:7,11
**sanofi's** 58:17,19
61:18,23 85:7
99:7 218:12
**satisfactory**
192:11
**satisfies** 48:19
**save** 75:12
**saved** 135:7,15
**saw** 34:9 116:2
154:5 187:14
197:2
**saying** 15:12 16:5
18:1 19:20 21:15
26:1 29:3 40:12
62:17 65:15 71:2
75:19,21 78:18
86:21,25 88:20
92:24 94:21 96:2
100:14 111:11,20
114:20 116:24
117:6 121:15
131:18,20 136:18

149:4,21 150:11
151:6,16 154:18
162:17 170:21
173:2,13 174:11
180:12 182:24
188:12 189:23
192:19 195:21
196:2,4,20 197:1
206:9 218:23
220:5,11,18
**says** 39:18 47:2,25
49:6,12 50:10
51:14,19,25 52:14
53:2,6,13 54:11,19
55:12,19 57:9
58:25 60:24 61:6
68:16 69:5,8 70:6
71:15 72:15,24
74:15 77:9,14,16
79:6,23,24 80:17
82:19,23 83:7
87:7 88:9 89:1,8
89:14 90:2,6,11
91:23 97:11 98:16
100:2 102:12,23
104:16 105:1,13
105:13,15,15,17
116:7 120:4,16,25
121:16 123:1
126:13 127:5
128:25 129:6,21
129:21,22,22
130:6,15 131:25
132:22 133:21
135:2 136:14,21
138:4 139:15
141:14 145:19
146:17 148:7
157:5 159:6,12,16
160:2 161:14
163:14,21 167:13

168:25 169:24
170:5 171:4,14
172:2,5,10 174:14
174:14,14,15
181:14 208:13
210:24 218:9
**scattered** 206:3
**schmider** 31:17
32:1,1 33:4
113:23 117:10
**schmider's** 112:10
112:11 116:1
152:17 154:14
**scholer** 3:12
**school** 144:8
**science** 189:17
193:7,16 194:2
197:4 199:24,25
**scientific** 21:16
22:6,25 23:9 34:6
118:22,24 120:6
162:5 165:4,19
183:22 191:23
199:22 219:14
**scope** 14:21
121:23 208:3
**screen** 12:15,17,20
67:23 102:14
**screwed** 47:21
214:20
**scribbled** 206:23
**scroll** 171:12
**scrolled** 170:15
**scrolling** 13:6
170:15
**seabiscuit** 109:13
**seak** 5:15,17
123:11,12,21
124:1,2,2,2,5,10
125:16 126:1
135:25 136:6

141:16 142:14
143:15 144:1,4
**search** 40:9
207:10 216:12
**second** 19:25
53:10 56:25 60:17
84:3 108:12
120:10 122:16
126:21 129:7
149:9 159:24
160:25 183:17
201:13
**secondary** 22:15
**secondly** 173:12
183:3 197:10
**secret** 87:2
**secretary** 183:24
**section** 5:8 45:10
46:4,7 50:11
51:25 52:15,23
53:1,2,6 54:1,11
54:15 55:13,24
56:4 57:20 59:1,3
59:13 64:14 68:14
72:20 73:1 77:20
78:21 88:6 90:8
96:7 98:12,13,17
98:21,23 99:10
100:24 101:2,7,12
101:19 102:3,7,17
112:3 113:13
122:3 123:2
133:13 142:15
144:4 167:3 176:1
176:6
**sections** 79:8
101:17 112:4,10
176:5
**sedlacek** 178:1
190:13

**see** 12:16,21 17:7
41:9,14 50:12,14
51:1,2,17,22 53:4
53:8,15 54:17
55:16,20,25 57:7
57:15 58:23 60:13
60:19 61:4 66:16
68:16,22,25 69:3
71:3,5 72:16 73:3
74:19 77:21 78:2
79:10,23,25 82:2
82:11,16 87:23
88:2,25 89:7 90:9
90:15 97:7,9,12,25
98:8,13,18,21
99:17,21 102:9,12
102:14 103:14,17
103:23 104:4,9,19
105:1,5 108:5,22
109:1 111:24
113:25 116:4,7,8
119:15 120:4
123:1,3 125:18
126:13,20,23
127:1,5 128:5,10
128:22 130:13,18
131:11 133:1,19
133:23 134:8,22
136:17,18 137:19
137:22 138:13
139:6,8,18 145:24
146:10 148:7,9
154:20 158:8
159:1,9,19 160:13
161:2,12 167:6,11
168:23 169:3,21
170:10 171:22,23
172:3,9 175:22
180:18 190:6,13
199:9,19 201:10
202:10 208:7

209:8,21,24 211:1
214:7 216:14
218:13,22 219:24
221:22 222:7,11
**seeing** 92:20
**seeking** 22:8 64:7
69:11
**seen** 44:1,6 49:23
50:24 51:10
**select** 39:12
**selected** 39:13,16
**selection** 32:7,8
**self** 57:5
**semantics** 182:12
**semicolon** 91:1
**seminar** 5:15
126:1,5,18 127:22
128:2,19 132:8
136:6 137:3,14
139:7,13,25
**seminars** 124:12
124:23 125:8
127:11 132:6
142:15 143:24
144:4
**send** 142:22
**sends** 82:10
**senior** 22:15 82:4
**sense** 7:18 156:10
156:11 178:13
188:7 196:3
**sensitive** 170:20
**sent** 116:21 188:1
203:16 210:4
217:13
**sentence** 52:13
55:23,24 120:10
129:6,7 159:14
160:2,10 161:14
171:23 218:9
220:4

**sentences** 48:8
51:22 146:6
**separate** 10:13,25
11:5 122:3 206:9
**separately** 154:19
211:17 215:6
**september** 1:23
6:2 220:22 224:3
**serious** 94:1,23
103:13,19 104:2
118:10,13 183:23
183:23
**seriously** 115:14
208:12
**seriousness** 140:3
**serve** 203:10
**server** 142:6
**services** 124:7,11
143:23
**sessions** 133:15
**set** 13:22 16:20
21:4,11 23:23
156:15 170:20
176:6,23 207:2
225:6
**sets** 54:2 64:12
113:18 160:3
**setting** 26:20
**seven** 38:9
**severity** 170:6,7
171:19,20 174:21
174:21 175:18,18
**share** 12:17,20
**shirts** 138:3
**shocking** 89:22
**short** 134:8
**shortcut** 33:17
**shorthand** 13:25
13:25 14:5 76:3
**shortly** 217:16

**shot** 142:5
**show** 12:16
**showing** 139:20
**side** 12:15 77:19
77:19 78:23,23,24
78:24 83:23,23
103:14,22,24
104:2,16 105:3,18
138:17 189:11,16
208:15
**sign** 212:15
**signal** 145:21
146:3,12,15,25
147:2,22 148:8
162:13 164:20,20
164:23 165:6,11
165:20 166:4
170:5,20,24 171:1
171:2,18 172:14
178:8,10,12,15,16
178:24,24 179:1
180:6 184:20,21
**signals** 121:18
145:12,16 146:6
147:17 161:6,15
161:16 162:8
165:12 167:9
171:7 194:21
**signature** 13:3,4
88:2 225:11
**signed** 13:1 137:6
137:8 138:21
217:8
**significance** 162:8
**significant** 192:1
**significantly**
129:12 190:9
**signing** 217:14
**silo** 95:23
**similar** 48:15
113:16 117:11

137:12 149:15
150:14
**similarities**  55:8
168:1
**simple**  40:25
108:22 210:23
**simpler**  59:15
**simplest**  123:17
**simplify**  49:17
**simply**  47:12
71:14 100:4,17
150:9 154:10
182:12 192:10,21
198:19 201:21
214:21
**single**  31:4 90:20
100:6 106:1
118:22 146:11,14
147:1 162:13,16
162:19 205:20,21
**singling**  105:21
106:4
**sir**  44:14
**sit**  14:22 16:1
43:19
**situation**  65:25
162:17 175:12
206:13
**situations**  219:2
**six**  38:9 41:17,18
44:18 167:11
**skeletons**  137:21
137:24
**skeptical**  187:25
188:6,13
**skill**  205:24
**skills**  133:14,15
138:23
**skin**  104:8 172:18
172:19

**skip**  35:23 36:6
205:9 217:23
**skipped**  214:10,14
214:17
**slew**  200:11
**slightly**  151:10
**slip**  212:3 216:4,13
**slips**  11:3 211:24
212:1 213:22
**slow**  72:12
**small**  91:24 92:2
**software**  215:10
**sole**  40:13 47:7
**soliloquy**  196:15
**solutions**  6:7,9
**somebody**  86:22
141:22 144:9
147:8 149:18
154:20 156:12
194:16
**soon**  219:13
**sop**  157:5,7,8,11
**sops**  152:13
153:13 154:10
156:19,23 157:3
**sorry**  15:12 16:7,8
17:22 19:15 23:21
24:3 26:15 29:13
32:13,25 35:20
36:3 39:3,21
41:11,11 45:15
49:2,7,9,13 50:6
56:1 59:9 62:8
63:2,25 64:2,3
65:12,16 66:15
67:6,13 68:17
69:1 70:9 71:16
73:25 80:25 85:5
85:22 86:6,24
87:11,12,13 88:8
88:19 89:19 91:13

92:20 93:5 94:7
100:11 105:14
113:4 114:8,10
128:22 131:24
132:9,13 135:10
148:17 151:17,19
152:24 153:1
154:1 156:23
159:13 170:14,16
172:1,22 174:9
179:17,18 180:25
192:19 198:5,21
198:23 200:8
201:11,11,13,14
209:18 213:20,20
216:22 219:3,3
220:1
**sort**  15:5 30:20
35:1 180:1 188:2
199:4 203:13,15
206:19,25 209:13
**sound**  137:8
212:23
**sounds**  39:23
106:22 140:3
151:6 212:24
213:1
**source**  156:13
**sources**  146:7
162:2 165:3
**space**  194:18
**spam**  170:2
**spare**  64:20
**sparked**  180:4
**speak**  11:13,23
66:25 155:11
217:2
**speaking**  57:1
67:1 109:13 173:8
174:8

**special**  5:23 134:7
134:9,12
**specialized**  12:12
**specializes**  93:21
**specific**  9:12 17:8
18:6,15 20:2,3,22
21:8 26:24 27:11
28:8,10,17,20,22
30:21 33:23,24,25
34:1,2,8 48:7 51:5
71:16,21 78:4
80:11 86:23 91:7
91:15,18 95:9
108:17 111:22
112:1,10 113:5
149:1 150:11
153:3 156:14,15
167:8,10 171:9
189:21 199:1
**specifically**  23:24
25:12 33:8 39:18
51:11 55:7 67:2
86:7 117:15
143:25 175:20,22
176:2 177:17
181:23
**specifics**  127:15
**specified**  80:23
**spend**  10:24
210:19 216:2
**spent**  11:6 179:20
**split**  17:16 214:12
**splitting**  19:2
**spoke**  11:10
216:18
**spoken**  165:1
**sponsors**  45:20
**stacked**  199:20
**staff**  48:22
**stage**  91:18

stages  91:21
stamp  142:9
stand  71:12
standard  61:7
  96:16,17 152:12
  207:1
standards  60:7
standpoint  174:9
start  16:8 42:2
  82:1 91:19 112:6
  126:12,18 147:13
  207:1 210:23
  215:10,15
started  75:13
  215:9
starting  112:7
  132:12 199:25
starts  103:11
  160:11,11,25
state  3:5 46:16
  122:7 138:12
  223:19 225:11
stated  192:1
statement  71:4
  105:11 121:19
  147:20 155:15
  161:19 173:13
  212:19
statements  5:22
  52:11 148:21
  175:15,16 210:6
  210:12
states  1:1 89:17,18
  110:13,25 159:18
  168:4
stating  109:8
statistical  161:23
  199:22
statute  148:16,23
  180:24 184:7
  219:8

statutes  47:9
  48:20
stay  13:19 67:2
steeped  145:7
steering  16:12,17
  212:18 214:3,25
  216:23
stenographic  1:16
  6:14
stenographically
  225:6
step  133:21 153:6
steps  134:3
sterk  3:13
stick  109:16,17
  193:16
sticker  203:25
stony  1:22 6:17
stop  33:12 106:18
  147:10 215:15
stopping  179:15
straight  180:12
strategies  130:16
  131:6 133:18
  137:16 139:14,24
streamline  202:9
street  2:5,14 3:5
  3:14 4:10
strength  61:8
  69:14 99:12
strike  22:19 35:7
  66:8 106:16 139:5
  163:25 164:17
structure  57:13
  169:25 211:23
studies  54:21 56:9
  56:17 65:5 66:2
  84:7,15,20,25
  86:17,18 93:4
  180:14,15 190:5
  197:20 201:25

202:3
study  169:16
  178:20 183:21
  191:3
stuff  35:24 67:12
  207:4
sub  205:22
subject  9:8 73:23
  122:6 140:18
  187:18
subjected  21:3,11
  22:1
submission  68:2
  72:7,19 73:5 87:6
submit  42:3 53:17
  69:5 108:7,14
  109:2,21 110:2
  111:3,13,14
  183:15
submits  72:24
  73:21 82:25
submitted  9:14,18
  28:5 41:24,25
  42:6,14 45:9
  55:14,20 59:23,24
  66:18 69:20,21
  78:22 83:24 90:8
  90:12 115:6,10
  191:12 201:4
  220:24,25 221:6
  221:11
submitting  42:23
  64:13 163:15
subordinate  47:8
subscribed  223:15
subsection  53:11
  55:18
subsequent  32:19
  33:8
subset  60:1

substantively
  184:9
substituted  80:19
  80:20
successful  126:19
succinct  18:24
  94:11
suffern  4:9
sufficient  48:5
  176:18 177:7
suggest  86:15
  151:1
suggesting  86:19
  95:22 179:22,25
  180:8,11 183:5
  187:24
suggests  109:2
suitability  67:4
suite  3:20 4:4,10
summarize  65:19
  161:4
summarizes
  159:16
summary  14:8,24
  19:10 30:24 77:23
  118:20 127:21
  128:23
sun  3:3 153:23
supplement  28:5
  111:15 136:14,22
  220:24,25
supplemental  5:16
  126:2,14
support  53:23
  68:20 112:16
  195:17 221:14
supported  112:21
  186:13 189:23
  195:9 197:14
  202:2

supporting  79:7
supports  114:3
suppose  215:25
  216:10
supposed  47:3
sure  14:16 16:24
  17:15 19:1 24:16
  33:1 35:9 45:7
  46:14 56:25 62:3
  66:24 76:23 95:20
  95:21 96:4 100:9
  100:11 106:24
  110:11 112:19
  113:12,14 114:14
  115:4 121:10
  128:14 143:18
  144:10 148:22
  151:4 163:24,24
  166:15 169:8
  170:17,18 184:11
  185:19 190:17,20
  191:15 194:2
  201:16 204:2
  207:19 208:20
  210:20,21 217:22
  219:2
surely  182:21
surveillance
  110:17 118:18
  122:1 199:19
suspended  59:5
sustained  173:16
swear  6:15
switch  122:16
sworn  6:18 223:15
  225:4
sympathy  77:4
symptoms  104:9
synonymous  62:3
system  83:3,15,18
  169:13 193:6

207:2

**t**

t  5:5 107:4 223:1
  224:4,4
tab  72:11 81:5
  87:12 119:6
  125:20 135:23,24
  157:17 203:6
  204:18
table  196:10
tactic  135:1,4,13
tactics  134:19,24
  137:19
take  17:17 21:10
  35:12 42:3 44:10
  45:25 55:13 58:22
  76:16 78:25 102:5
  103:5 115:14
  122:20 153:6
  157:15 163:5,12
  163:16 164:6
  166:13 171:13
  172:12 173:12
  175:14 176:13
  187:21 190:2
  203:19 206:4
  208:11
taken  1:18 6:3
  32:4 43:2,20
  44:23 107:3 118:4
  144:14 147:25
  166:18 202:21
  207:22 218:3
  224:3 225:6
talk  8:25 9:21
  11:16 15:18 16:15
  30:19 32:16 35:24
  57:6 59:4 60:16
  63:8 75:17 115:3
  117:24 134:1,25
  149:1,2 155:23

176:21 179:24
  190:4 194:20
talked  30:17 64:19
  90:2 116:2 124:19
  152:5 159:22
  162:12 175:17
  176:15 177:2
  179:13,15 181:12
  185:12
talking  14:3 21:7
  23:9 24:19,23
  25:11 28:9 45:3,4
  49:8 62:24 66:20
  67:3 84:23 92:9
  92:14 93:15 101:1
  101:3,5 103:5
  108:20 111:14
  117:20 120:10
  145:12,13 146:18
  156:14 157:1,4
  163:20 165:22
  171:2 172:16
  174:10,11 175:1,2
  179:20 181:18
  182:16 183:10
  189:15 193:2,6
  199:14 205:11
  208:19
talks  80:16 103:13
  103:16 160:24
  161:9
tangent  41:11
  70:11
task  17:6 40:13
  211:25
taught  139:1,10,25
tax  178:19 179:4
taxotere  1:5 3:3
  6:4 8:3 9:11 58:9
  58:17,19 59:21
  60:3 61:18,23

65:25 66:22 73:6
  73:10,12,18 74:1
  74:11,22 75:18
  77:18,25 78:5,24
  81:17 83:2 85:18
  91:16 97:18 99:7
  176:10 194:23
  211:12,15,18
  212:11 214:13
  219:14 220:12
  224:2
taxotere's  83:15
taylor  2:13
taylor.hardenstein
  2:16
teach  134:8
teaches  124:16
technical  46:20
  67:24
technically  47:14
  47:25
technique  150:11
techniques  130:20
  130:25 133:3,8
  134:7,9,12,20
  139:16,24 148:8
  149:2,6 150:3,10
teleconferences
  10:19 213:24
  214:1
telephone  82:19
  82:24
tell  81:20 105:2,3
  105:17 140:1
  192:21 195:5
telling  19:6 58:17
template  206:10
ten  11:4 202:15
  213:25
tendency  18:20

**tends** 206:1
211:22
**tens** 38:14,23
**tentative** 89:9,11
**tentatively** 83:8
88:10
**term** 32:13 52:5
74:24,24 75:3
87:2 118:2,3,23
120:5,17,19 121:5
121:7 184:24
**terms** 10:17 22:3
25:6 34:8 48:11
62:16 64:17 66:25
75:5 78:13,18
85:20 86:9 96:10
96:23 114:20
124:19 129:16
144:9 168:8,8
170:24 175:9
178:16 180:13
190:19 193:21
196:25 197:10
202:1 208:18
**terrible** 92:25
**testified** 6:19
**testify** 15:17,19
25:19 187:10
225:4
**testifying** 26:2
130:17 131:1,7
**testimony** 5:21
7:19 8:13 13:13
17:5 27:2,2
110:14,21 111:22
112:1 114:3,15
152:5,17 154:15
155:24 204:15,22
204:25 225:5
**testing** 202:1

**text** 29:20 51:3
72:23 93:11 97:5
114:4 157:13
**thank** 18:25 68:9
125:24 142:20
152:8 160:1
221:20 222:1,7,10
**theirs** 220:8
**therapeutic** 60:13
61:1 79:24 80:10
80:16 81:1,10,12
81:13
**therapeutically**
61:23 62:2,6
80:18
**therapy** 90:25
**thing** 35:2 66:23
67:4 70:5 76:20
95:20 97:11 120:1
135:21 138:13,14
141:13 146:17
150:7 154:2 184:8
199:10 200:24
204:9 221:8
**things** 8:9 13:22
19:2 28:14 31:3
33:19 34:5 59:6,8
65:4 66:13,16
70:12,13 74:5
88:13 95:6 103:19
104:6 111:18
121:14 123:13
138:23,24 139:1
140:5 141:16
152:9 159:21
164:21,25 165:5
165:21 166:1,2
175:11 177:20
180:23 181:5
183:4 184:8
189:20 191:4,5

193:8 206:2,2
208:10,19 209:4
209:12 214:9
218:22
**think** 7:25 8:2
11:10 12:6 13:9
17:2,6,16,25 18:5
19:4,6 23:4 25:16
28:5 29:6,13
32:17 36:16 48:10
49:23 57:5 58:1
63:2,10,19 65:19
65:20 67:12 68:14
68:25 70:21 71:7
71:18 75:12 76:8
76:11 87:10 88:13
89:24 93:14 99:25
106:20 107:11
108:19 109:7
116:3 121:11
124:15 129:14
133:5 134:13
135:17 138:2
140:3 142:23
143:5,10 145:14
145:16 147:9
149:10,14 150:13
150:14 151:16
152:7,19,21,21
153:6 156:20,24
165:21 169:8
172:23 178:23
179:8 180:3
184:19,21 187:20
188:6,13 190:17
191:1,2 192:15
195:18 196:22
198:7 202:8,16
204:4 205:23
206:19 208:2,17
210:4,5 211:22

212:5 213:14
216:16,17,20
217:2,12,21
220:17
**thinking** 46:18
152:16 192:18,24
**third** 51:21 55:23
55:24 63:9 66:23
89:4,8 130:15
180:22
**thought** 39:4
63:14 108:23
111:19 119:25
142:10 200:9
209:18
**thousand** 128:1
**thousands** 38:15
38:23,23
**threatening** 93:15
172:19
**three** 8:1 10:9 11:6
13:8 30:21 31:3
31:10 33:21 38:8
111:24 174:6
187:6 190:12
195:21
**threshold** 95:18
96:6 146:16
170:25 171:4
172:5,7 173:25
174:2
**thresholds** 170:5
171:18 172:14
**thursday** 1:23
157:23 224:3
**tie** 134:15,16
**ties** 134:14
**tilt** 77:5 208:7
**tilting** 76:11
**time** 6:24 8:24
10:20,24 28:11,17

32:11 35:8,13
44:21,24 46:19
66:9 71:8 81:13
82:6 101:25
102:25 107:1,5,14
110:19 111:5
113:4 119:2
122:10 137:6
139:21 149:12
155:2 166:16,19
168:23 176:20,22
180:2 181:17
182:22 186:25
202:19,22 210:19
213:2,22 215:2
216:15,15 217:21
218:1,4,17 219:24
221:9,18 222:12
225:6
**times** 7:16 10:18
51:10 61:10 64:12
64:12 110:25
128:19 215:15
**timing** 27:21
**tired** 76:22 157:23
**title** 125:12 158:14
216:7
**titled** 46:3 158:5
**today** 7:3 8:10,25
9:14 14:4 25:19
57:24 73:24 76:14
115:3 133:25
134:12 138:9
213:14
**told** 33:14,15
84:22
**tool** 150:19,20,21
150:23
**tools** 161:5
**top** 28:25 82:1,17
88:25 120:4,11

121:16 126:13
128:23 153:17
171:25
**topic** 23:15
**topics** 48:7
**torturing** 67:14
**totaling** 212:22
**touch** 117:9
**tour** 166:23
**track** 81:3 183:9
**trade** 87:1,2
**traditional** 56:22
**training** 5:17
123:2,12,14
124:12,24 136:1,6
142:15 143:15,25
144:5
**transcript** 1:16
116:15 117:2
223:4 225:5
**transcripts** 8:7
32:22 33:3,4
**traurig** 4:3
**travel** 128:4
**treat** 71:14 94:1
172:6,8 174:1,3
**treated** 103:1
169:17 174:22
175:19
**treating** 93:21
**treatment** 57:12
91:6 94:17 102:24
103:7
**trevor** 2:13
**trevor.rockstad**
2:15
**trial** 7:19 15:17
25:21 26:20 85:8
130:17 131:1,7
183:20 199:22
204:25

**trials** 25:21 66:2
84:24 85:3 101:4
**tricky** 88:22
119:25
**tried** 35:1,10
46:24 76:12
**trier** 26:12 124:21
**triggered** 179:2
**trip** 135:6
**trivial** 183:4
**trouble** 135:16
191:10
**true** 7:9 21:1 24:7
26:9 45:16 56:19
56:20,21 73:18
74:7 79:3 108:2
160:7 163:11
195:2 223:4 225:5
**truly** 182:19
184:17,24
**truth** 23:16 225:4
225:4,4
**try** 8:7 18:21,23
19:3 44:11 65:18
94:10 118:22
173:16 183:9
215:24
**trying** 17:16 19:11
30:3 47:1 59:9
64:20 65:12 67:7
76:22 77:5 80:14
86:15 92:21
119:25 120:2
121:10 134:5
138:17 153:2
154:1 174:24
179:19 183:6
196:18,24 218:21
220:3
**tucker** 3:19

**tuckerellis.com**
3:22
**tuition** 128:1,5
**tune** 135:15
**turn** 74:14 122:22
138:2 210:1
**turned** 175:8
207:15 215:18
**turns** 207:3
**twice** 120:13 125:7
222:1
**two** 27:17 28:13
32:1,22 34:4 38:8
60:6 62:2 82:11
88:13 95:6 104:21
125:8 130:24
131:11 135:14
143:19 165:21
166:1,2 172:16
180:13 185:8
191:5 193:5,8
216:2 218:22
219:2
**type** 53:7 92:15
157:7
**types** 93:22 94:1
132:6
**typical** 120:23
**typically** 91:17
207:4
**typographical**
113:3 114:17,17

| u |
|---|

**u** 223:1
**u.s.** 73:6 97:11,17
110:25 152:3
179:4
**ulmer** 4:9
**ulmer.com** 4:11
**ultimately** 80:7
84:4 93:2

| | | | |
|---|---|---|---|
| **um** 53:5 57:3 63:23 99:25 122:21 128:24 130:10 150:5 166:25 170:16,18 206:7 | 40:21 47:6 52:23 55:2,5 61:19 79:16 80:9,24 81:11,12 99:5 116:13 119:1 120:8,25 121:2 122:11 127:9 | **untangle** 215:24 **untreated** 92:2 **unusual** 162:17 **unwanted** 147:8 **update** 36:9 179:2 181:15 **updated** 5:18,21 140:24 141:8 | **various** 1:21 93:21 160:12 167:18,18 171:10 176:5 177:2 **vast** 176:7 **venue** 125:9 **verify** 198:23 204:23 |
| **unavoidable** 8:9 **unaware** 18:5 **unchanged** 83:7 **uncommon** 98:4 **underlying** 9:3 148:16 149:23 178:19,19 199:23 **underneath** 99:16 105:1 127:2 **understand** 7:3,11 7:17,18,20,23 8:16 9:13 10:2 15:6,11 15:14,16 16:4 21:14 25:15 40:10 45:8 58:13 63:7 65:15 83:11 84:14 84:21 97:14 104:12 111:11 115:9,11 116:18 119:11 120:19 121:9 122:12 143:19 156:1 157:4,23 159:4 167:17 179:3,19 182:13 189:22 193:11,18 194:6 196:18,20,21 197:6,7 213:17 216:20 220:10,10 221:13 **understandable** 47:2 **understanding** 7:14 16:16 22:5 23:14 32:10 40:1 | 156:1 160:17 164:11,14,18 167:10 170:12 171:9 176:25 180:3 186:12,23 187:3 195:9,17 197:12 218:17 **understood** 8:19 9:20 14:20 15:13 63:18,18 89:6,6 92:17 94:25,25 95:21 182:3 209:1 220:20,20 **undertaken** 120:24 122:12 **unexpected** 118:11,13 183:23 **uniformity** 61:9 **uniformly** 218:11 218:19 **unintentional** 144:15 **unique** 162:16 **united** 1:1 89:17 89:18 110:24 159:17 168:4 **universe** 200:12 **unnecessary** 56:9 56:17 **unpack** 173:5 **unrelated** 214:18 **unresectable** 92:1 92:16 | 142:25 181:18 204:5,10,17,21,24 **upper** 175:5 **usage** 99:11 **use** 5:19 14:3 27:16,16,21 39:3 39:15 48:11,18 49:6 55:23 56:4 64:24 65:7,8 66:9 74:23 75:2 76:3 81:11 90:18 93:10 96:24 126:11 130:25 143:14 145:23 148:7,20 151:13 157:18 158:6,15 173:24 183:24 185:22 195:11,16 197:11 206:12 **useful** 139:2 **uses** 120:5,17 121:5,7,12 161:6 **usually** 106:20 203:12 206:7,7,13 207:14,15 214:21 **utilizes** 113:17 | **veritext** 4:14 6:6,9 **version** 141:6 142:24 144:13,16 144:17 169:12 **versions** 143:19 **versus** 167:14 168:11 190:10 193:6 211:18 **vial** 83:3,15,17,18 90:20,21,22 **video** 155:17 **videoconference** 1:13,21 **videoconferences** 213:25 **videoconferenci...** 10:6 11:6 **videographer** 4:14 6:1,7 44:21,24 107:1,5 166:16,19 202:19,22 218:1,4 222:12 **videotape** 1:13 **videotaped** 130:21 134:6,10 **view** 25:10 26:8,13 75:24 79:19 80:24 168:11 178:8 218:17,18 **viewed** 146:12 147:2 **viewing** 188:10 |
| | | **v** | |
| | | **valid** 56:14,15 132:16,25 198:16 **valuable** 129:12 129:15,16,17,20 132:20 | |

**views** 19:7,8 24:6
**vine** 4:10
**violated** 44:2
  149:4
**vitae** 5:18 13:9
  126:7 140:24
  141:4,7 143:20
  204:3
**void** 214:20
**volumes** 40:11
  79:7,13

**w**

**walk** 210:18
**walked** 171:10
**want** 19:1,19
  25:24,25 26:2,6
  31:23 32:17,18
  34:13 35:12 40:15
  41:6 45:5 47:10
  48:10,21 49:6,13
  49:22 51:20 53:10
  56:25 57:5 59:10
  63:17 65:5 68:8
  71:3,5,15 76:20
  77:4 81:14 94:10
  102:1,4 106:3
  107:9,11 108:6
  109:6,8,10 110:10
  111:25 113:1
  114:19,20 115:17
  143:18 146:4
  147:5 148:19
  149:3,10,11 151:4
  151:17 155:23
  166:23 170:17
  176:14 177:3
  180:11,19 184:13
  186:2 198:7
  203:25 206:24
  207:13 208:7,20
  208:21 210:19,21

218:6
**wanted** 34:25
  63:19 132:20
  144:23 179:14
**wants** 37:8
**warning** 96:10
  98:1 99:14
**warnings** 78:9
  98:20 99:13 175:6
**warrant** 176:19
**warranted** 177:7
**washington** 125:3
**waste** 155:2
**wasteful** 56:8,17
  66:9
**watch** 155:17
**waterfront** 106:14
**watermark**
  141:24
**waxman** 52:5
  180:16
**way** 15:22 17:10
  17:24 18:13 19:17
  29:2 30:15 32:8
  51:15 55:6 73:16
  78:16 79:20 86:20
  93:4 100:22
  111:23 113:15
  119:3 123:17
  128:25 131:4
  137:3 148:15
  149:17,19,20
  156:10 173:17
  181:13 182:2
  188:10 191:1
  195:15 197:4
  204:12 212:4
  213:4 219:19
**ways** 165:5
**we've** 6:24 44:10
  45:3 69:25 75:4

87:20 120:12
  123:23 124:19
  141:3 152:7
  162:12 179:19
  204:5 210:10
**weakness** 139:20
**wear** 134:14
**website** 85:12
**weeds** 57:1
**weight** 48:5
**went** 73:11 94:18
  97:21 125:1 136:4
  137:13 221:9
**west** 3:14
**wheel** 179:21
**whoa** 109:12,12
  109:12
**whoo** 139:16
**wiggle** 139:8,11
**willing** 27:14
  116:24
**windmill** 76:12
  208:8
**windmills** 77:5
**winging** 135:4
**wish** 224:5
**withdraw** 16:25
  63:4 70:14 154:3
  164:16 173:15
**withdrawn** 59:5
**witness** 1:21 5:2
  5:21 6:16 33:3,11
  123:2,16,16 124:5
  124:8,13,14,17,23
  125:13,16 126:19
  126:23 127:12,17
  129:1,2,15 132:7
  132:21 136:5
  138:5 140:7
  142:15 143:21,23
  143:25 144:5

155:9,16 157:22
  158:2 170:14
  193:21 196:16
  204:22 221:19,23
  222:9
**witnesses** 31:9
  117:14 123:14
  129:13 138:11
  139:14 186:14,19
  186:20 195:10
  197:15
**wojtko** 82:2 90:2
**wondering** 209:12
**word** 39:4,15
  41:16 48:12 100:6
  104:18,19 134:15
  141:24 188:7
  193:17 195:11,16
**wording** 71:13
  197:11
**words** 26:11 29:2
  37:18 65:21
  104:21 121:12
  139:21 173:1,24
  184:9
**work** 11:3 56:7
  66:3 93:25 118:23
  140:15 143:14
  189:24 194:15
  205:17 210:13
  211:18,18,21,24
  212:1,4,10,11
  213:5 214:4 215:5
  215:6,7 216:3
**works** 189:17
  197:4 200:11
**workshop** 130:8
  131:5
**world** 145:8 162:3
  167:18 175:10

**worldwide**  3:9,10
**worries**  50:5,5
    64:4
**worth**  134:16
    150:18 162:24
**worthy**  204:12
**write**  191:10 207:4
**writing**  17:9 56:14
**written**  104:11
    118:18 122:1
    153:8,14 154:11
    155:22 156:5
    192:2,3 198:15
**wrong**  26:5 75:20
    173:3,14 189:17
    200:24
**wrote**  32:11 47:11
    49:18 114:24
    115:6 176:22
    192:12

**x**

**x**  5:1,5

**y**

**yeah**  12:13 26:21
    38:20 41:10 49:12
    50:2 51:24 59:9
    62:8 63:12 66:11
    67:5 76:11 84:25
    85:2 89:10,13
    91:13 92:8 94:15
    98:2 102:11
    120:12 123:25
    124:15 126:22
    130:5 135:24
    136:18,21 137:10
    143:3,5,13 144:6
    201:16 206:1
**year**  9:19 28:2
    114:12

**years**  13:14 73:20
    75:13 204:24
    207:3
**yesterday**  157:25
**york**  3:14,14

**z**

**zoom**  1:20 2:1
    12:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.