# EXHIBIT DD

Page 1

1                  UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF LOUISIANA
2                       MDL NO. 16-2740
3
4       IN RE: TAXOTERE (DOCETAXEL)              :
        PRODUCTS LIABILITY LITIGATION
5                                                :
        - - - - - - - - - - - - - - - - - - - - -
6       This document relates to:               :
7       Clare Guilbault, Case No. 2:16-cv-17061  :
        Audry Mae Plaisance, Case No. 2:18-cv-08068
8       _____  :
9
10                  VIDEOTAPED DEPOSITION OF:
11                    DAVID MADIGAN, PH.D.
12                       (VIA ZOOM)
13
14           TRANSCRIPT of the stenographic notes of
15      the proceedings in the above-entitled matter, as
16      taken remotely by and before SEVA FLICSTEIN,
17      Certified Court Reporter (New Jersey License
18      No. 30XI000141300, California Certificate
19      No. CSR 8727), Registered Merit Reporter,
20      Certified Realtime Reporter, witness located in
21      Boston, Massachusetts, on Friday, September 17,
22      2021, commencing at 9:34 in the forenoon.
23
24
25

```
 1   A P P E A R A N C E S :
 2    (ALL COUNSEL APPEARING REMOTELY)
 3
 4   ATTORNEYS FOR PLAINTIFFS AND
     PLAINTIFF STEERING COMMITTEE:
 5
 6          WILLIAMS HART BOUNDAS EASTERBY, LLP
            BY: BRIAN ABRAMSON, ESQ.
 7          8441 Gulf Freeway
            Houston, Texas 77017
 8          713-230-2343
            babramson@whlaw.com
 9
            -and-
10
            MICELI LAW LLC
11          BY: DAVID F. MICELI, ESQ.
            P.O. Box 2519
12          Carrollton, Georgia 30116
            404-915-8886
13          dmiceli@miceli-law.com
14
15
16   ATTORNEYS FOR PLAINTIFF AUDRY MAE PLAISANCE:
17
            DAVIS & CRUMP
18          BY:  TAYLOR HARDENSTEIN, ESQ.
                     -and-
19              TREVOR B. ROCKSTAD, ESQ.
            2601 14th Street
20          Gulfport, Mississippi 39501
            228-863-6000
21          taylor.hardenstein@daviscrump.com
            trevor.rockstad@daviscrump.com
22
23
24
25
```

```
                                                    Page 3
 1   A P P E A R A N C E S    (Cont'd.):
 2   (ALL COUNSEL APPEARING REMOTELY)
 3
 4   ATTORNEYS FOR DEFENDANT HOSPIRA:
 5         WILLIAMS & CONNOLLY LLP
           BY:  RICHARD T. MOORE, ESQ.
 6                   -and-
               ISIA JASIEWICZ, ESQ.
 7                   -and-
               LORI INTERLICCHIO, ESQ.
 8         725 12th St NW
           Washington, DC 20005
 9         202 434-5688
           rtmoore@wc.com
10         ijasiewicz@wc.com
           linterlicchio@wc.com
11
12
     ATTORNEYS FOR DEFENDANTS SANOFI:
13
14         SHOOK, HARDY & BACON, LLP
           BY: CHRIS McRAE, ESQ.
15                  -and-
               TORREY MICHELLE PETERSON, ESQ.
16         2555 Grand Boulevard
           Kansas City, Missouri 64108
17         (816) 474-6550
           cmcrae@shb.com
18         tpeterson@shb.com
19
20
     ATTORNEYS FOR DEFENDANTS ACTAVIS PHARMA, INC.,
21   ACTAVIS LLC F/K/A ACTAVIS INC., AND SAGENT
     PHARMACEUTICALS, INC.:
22
           ULMER & BERNE LLP
23         BY:  JENNIFER HEIS, ESQ.
           600 Vine Street, Suite 2800
24         Cincinnati, Ohio 45202-2409
           jheis@ulmer.com
25
```

```
 1   A P P E A R A N C E S    (Cont'd.):
 2   (ALL COUNSEL APPEARING REMOTELY)
 3
 4   ATTORNEYS FOR DEFENDANT ACCORD:
 5        TUCKER ELLIS LLP
          BY:  JULIE A. CALLSEN, ESQ.
 6        950 Main Avenue, Suite 1100
          Cleveland, Ohio 44113
 7        (216) 696-2286
          julie.callsen@tuckerellis.com
 8
 9
10
11   ATTORNEYS FOR DEFENDANTS SUN PHARMACEUTICAL
     INDUSTRIES, INC. f/k/a CARACO PHARMACEUTICAL
12   INDUSTRIES, LTD.:
13
          HINSHAW & CULBERTSON LLP
14        BY:  KATHLEEN E. KELLY, ESQ.
          State Street, 27th Floor
15        Boston, Massachusetts 02109
          (617) 213-7047
16        kekelly@hinshawlaw.com
17
18   ATTORNEYS FOR DEFENDANT SANDOZ, INC.:
19        GREENBERG TRAURIG, ESQ.
          BY: JULIA FAYNGOLD COVEY, ESQ.
20        One International Place
          Suite 2000
21        Boston, Massachusetts 02110
          (617) 310-6231
22
23   ALSO PRESENT:
24        MARCELO RIVERA, Videographer
25        JAYSUN LOUSHIN, Concierge
```

Page 5

1                      I N D E X
2
3  WITNESS                          EXAMINATION
4  DAVID MADIGAN, PH.D.
5
        By Mr. Moore                        10
6
7
8
9
                  E X H I B I T S
10
   NUMBER            DESCRIPTION            PAGE
11
   Exhibit 1    Report prepared by David         11
12              Madigan, Ph.D., Docetaxel and
                Irreversible Alopecia,
13              dated March 23, 2020
14  Exhibit 2    Plaintiffs' Disclosure of        12
                Witnesses, July 9, 2021
15
   Exhibit 3    David Madigan Reliance List       14
16
   Exhibit 4    Curriculum Vitae, dated           15
17              September 1, 2021
18  Exhibit 5    Deposition and Trial             17
                Testimony - Last Four Years
19
   Exhibit 6    Clinical Study Report, Study      32
20              Number: TAX 316
                (EFC6041/BCIRG001)
21
   Exhibit 7    March 16, 2012 email to           40
22              Matthew Ernst, Ph.D., email
                string, w/attachment,
23              Response to Agency Request
24  Exhibit 8    Clinical Study Report,           56
                Study Number: TAX.ES1.301/
25              GEICAM 9805

Page 6

1    (INDEX Cont'd.:)
              E X H I B I T S
2

     NUMBER            DESCRIPTION            PAGE
3

     Exhibit 9      ClinicalTrials.gov, Docetaxel    68
4                   in Node Positive Adjuvant
                    Breast Cancer (TAX316)
5

     Exhibit 10     MedWatch form, Bates-stamped     86
6                   Sanofi_00243374,
                    Sanofi_00243375
7

     Exhibit 11     Medical Dictionary for           95
8                   Regulatory Activities
9    Exhibit 12     Guidance for Industry E2E        102
                    Pharmacovigilance Planning,
10                  April 2005
11   Exhibit 13     Best Practices in Drug and       109
                    Biological Product Postmarket
12                  Safety Surveillance for
                    FDA Staff
13

     Exhibit 14     Potential Signals of Serious     125
14                  Risks/New Safety Information
                    Identified from the AERS
15                  between April-June 2008
16   Exhibit 15     Potential Signals of Serious     125
                    Risks/New Safety Information
17                  Identified from the AERS
                    between January-March 2008
18

     Exhibit 16     Potential Signals of Serious     125
19                  Risks/New Safety Information
                    Identified from the AERS
20                  between July-September 2008
21   Exhibit 17     Potential Signals of Serious     125
                    Risks/New Safety Information
22                  Identified from the AERS
                    between October-December 2008
23

     Exhibit 18     January-March 2012 Potential     129
24                  Signals of Serious Risks/New
                    Safety Information Identified
25                  from the AERS

1   (INDEX Cont'd.:)

2                 E X H I B I T S

3   NUMBER            DESCRIPTION                PAGE

4   Exhibit 19    April-June 2012 Potential      129
                  Signals of Serious Risks/New
5                 Safety Information Identified
                  from the AERS
6
    Exhibit 20    July-September 2012 Potential   129
7                 Signals of Serious Risks/New
                  Safety Information Identified
8                 from the AERS
9
    Exhibit 21    October-December 2012 Potential 129
10                Signals of Serious Risks/New
                  Safety Information Identified
11                from the AERS
12  Exhibit 22    README.DOC File for Quarterly   132
                  Data Extract from the AERS,
13                Revised March 8, 2006
14  Exhibit 23    Report prepared by David        140
                  Madigan, Ph.D., Docetaxel
15                and Irreversible Alopecia,
                  dated June 7, 2020
16
    Exhibit 24    README.DOC File for Quarterly   168
17                Data Extract from the FAERS,
                  Last Revised:  June 2015
18

19

20

21

22

23

24

25

                                                      Page 8

1                    THE VIDEOGRAPHER:  Good morning we

2      are going on the record at 9:34 a.m. on

3      September 17, 2021.  This deposition is being

4      taken remotely of Dr. David Madigan in the

5      matter in re Taxotere Products Liability

6      Litigation.

7                    My name is Marcelo Rivera from

8      Veritext Legal Solutions and I am the

9      videographer.  The court reporter is Seva

10     Flicstein, in association with Veritext Legal

11     Solutions.  I am not related to any party in

12     this action nor am I financially interested in

13     the outcome.

14                    Counsel and all present remotely

15     will now state their appearance and affiliations

16     for the record.  If there are any objections to

17     proceeding, please state them at the time of

18     your appearance, beginning with noticing

19     attorney.

20                    MR. ABRAMSON:  This is Brian

21     Abramson from Williams Hart.

22                    MR. MOORE:  Good morning.  This is

23     Rich Moore on behalf of Hospira.

24                    MS. PETERSON:  Torrey Peterson on

25     behalf of Sanofi.

Page 9

1                    MS. COVEY:  Julia Fayngold Covey

2      on behalf of Sandoz.

3                    MR. MICELI:  David Miceli on

4      behalf of PSC.

5                    MS. HEIS:  Jennifer Heis on behalf

6      of Actavis LLC, Actavis Pharma Inc., and Sagent

7      Pharmaceuticals Inc.

8                    MS. CALLSEN:  Julie Callsen on

9      behalf of Accord.

10                    MS. KELLY:  Kathleen Kelly on

11      behalf of Sun Pharmaceutical Industries.

12                    MR. ROCKSTAD:  Trevor Rockstad on

13      behalf of Audry Plaisance.

14                    MR. HARDENSTEIN:  Taylor

15      Hardenstein on behalf of Audry Plaisance.

16                    THE VIDEOGRAPHER:  Will the court

17      reporter please swear in the witness.

18                    MR. MOORE:  We also have Isia

19      Jasiewicz and Lori Interlicchio from Williams &

20      Connolly as well on behalf of Hospira.

21      D A V I D    M A D I G A N,    P H . D.,

22              residing at 27 Colchster Street,

23              Brookline, Massachusetts 02446, having

24              been duly sworn by the Certified Court

25              Reporter, testifies as follows:

```
1                   -----
2                 EXAMINATION
3                   -----
4    BY MR. MOORE:
5         Q.    Good morning, Dr. Madigan.
6         A.    Good morning.
7         Q.    My name is Rich Moore.  We just
8    met for the first time this morning.  Is that
9    right?
10        A.    Yes.
11        Q.    And we are taking this deposition
12   remotely.  Where are you physically located
13   today?
14        A.    I am in a conference room at
15   Northeastern University.
16        Q.    That's in Boston, Massachusetts?
17        A.    Yes.
18        Q.    Dr. Madigan, you've been deposed
19   four times in this litigation; is that right?
20        A.    That's correct.
21        Q.    And you also testified once at
22   trial; right?
23        A.    That's right.
24        Q.    And I believe the last time you
25   were deposed was about a year ago, in August
```

Page 11

1    2020; is that right?

2         A.    I think that's right, yes.

3         Q.    And you were under oath when you

4    testified in those depositions and at trial;

5    correct?

6         A.    Yes, I was.

7         Q.    You testified truthfully in the

8    deposition and at trial?

9         A.    Yes, I did.

10        Q.    Okay.  So I am going to do my best

11   to be efficient today and not go back over the

12   same testimony.  Okay?

13        A.    Thank you.

14        Q.    I want to start with your report

15   that you served in this case.

16             MR. MOORE:  Could we please see

17   tab 4, Jaysun.

18             (Exhibit 1, Report prepared by

19   David Madigan, Ph.D., Docetaxel and Irreversible

20   Alopecia, dated March 23, 2020, was marked for

21   identification.)

22             THE WITNESS:  I've got it.

23   BY MR. MOORE:

24        Q.    Can you see that, Dr. Madigan?

25        A.    Yes, I can.  I also have it in the

Page 12

1  Exhibit Share as well.

2          Q.    Thank you.  Let's mark -- this has

3  been marked as Exhibit 1.  And you understand

4  that this is the expert report that you served

5  in this case against Hospira; right?

6          A.    I believe so, yes.

7          Q.    And this is the same expert report

8  that you disclosed in March of 2020 in an

9  earlier case against Sanofi; is that right?

10         A.    I'm not certain.  That may well be

11  true, yes.

12         Q.    Are you denying that this is the

13  same report that you served in the Kahn case

14  against Sanofi?

15         A.    I'm not denying it.  I just don't

16  remember whether it's exactly the same one or

17  not.  I just don't know.

18              MR. MOORE:  Okay.  Well, let's

19  look at -- if you could turn to tab 5-A, please,

20  Jaysun.  Tab 5-A is a different document.  Could

21  we pull that up, please, Jaysun.

22              (Exhibit 2, Plaintiffs' Disclosure

23  of Witnesses, July 9, 2021, was marked for

24  identification.)

25              THE WITNESS:  I've got it.

Page 13

1    BY MR. MOORE:

2          Q.    If you could turn to page 2 of 6.

3          A.    Okay.

4          Q.    Do you see where it says plaintiff

5    disclosed your expert report in the matter of

6    Elizabeth Kahn?

7                Do you see that?

8          A.    I do.

9          Q.    You agree this report that you

10   served in this case is the same report that you

11   served in the Elizabeth Kahn case; correct?

12         A.    Yes.  That's a reasonable

13   inference, yes.

14               MR. MOORE:  And, Jaysun, could we

15   turn back to Exhibit 1.

16         Q.    Dr. Madigan, this report that

17   we've marked as Exhibit 1 contains the opinions

18   that you intend to offer in this case; is that

19   correct?

20         A.    That is correct.

21         Q.    And you made some calculations in

22   this report to support your opinions, and those

23   are in the appendices; am I right?

24         A.    I just -- the way you phrased it

25   there is kind of throwing me for a loop.  You

Page 14

1    said I made some calculations that are in the

2    appendices.  There are the results of

3    calculations in the body of the report as well.

4            Q.    Right.  So the calculations and

5    the supporting documentation for your report are

6    contained in the four corners of your report and

7    in your appendix; right?

8            A.    Yes.

9            Q.    And you also provided along with

10   your report a list of your reliance materials;

11   correct?

12           A.    Correct.

13           MR. MOORE:  Jaysun, could we see

14   tab 4-A, please.  Can we introduce that as

15   Exhibit 2.

16           THE WITNESS:  You mean 3.

17           MR. MOORE:  Correct.  Exhibit 3.

18   My apologies.

19           (Exhibit 3, David Madigan Reliance

20   List, was marked for identification.)

21   BY MR. MOORE:

22           Q.    This is your reliance list

23   entitled "David Madigan Reliance List";

24   correct?

25           A.    That's correct.

Page 15

1          Q.    So Exhibit 3 is a list of

2   materials that you relied on to form your

3   opinions in your expert report?

4          A.    Yes, that's the intention.

5          Q.    And the reliance list along with

6   the references in your report provide the entire

7   set of materials that you relied upon to form

8   the opinions in your report in this case;

9   right?

10          A.    That's right.

11               MR. MOORE:  Jaysun, could we mark

12   tab 31 as Exhibit 4, please.

13               (Exhibit 4, Curriculum Vitae,

14   dated September 1, 2021, was marked for

15   identification.)

16   BY MR. MOORE:

17          Q.    Dr. Madigan, this is a copy of

18   your CV from September 2021; correct?

19          A.    Yes.

20          Q.    And this was provided to us last

21   night.  And is this the most current version of

22   your CV?

23          A.    Yes.

24          Q.    And this was updated since your

25   last CV that you provided and dated July 2020

1    for your last deposition; correct?

2             A.    Yes.

3             Q.    And included on your updated CV, I

4    see you have some additional publications from

5    2020 and '21.  Is that right?

6             A.    That's right.

7             Q.    And do any of these publications

8    relate to alopecia?

9             A.    No.

10            Q.    Do any of them relate to

11   docetaxel?

12            A.    No.

13            Q.    Have you published any of the

14   opinions that you express in your expert report

15   in any of these publications?

16            A.    No, I have not.

17            Q.    Have you ever published in any

18   scientific or medical publication the opinions

19   that you've set forth in your expert report?

20            A.    Sorry.  Was that -- I hope I

21   answered the last question correctly.  Was that

22   the same question or a different question?

23            Q.    I just mean for all of the

24   publications on your CV, you've never published

25   the opinions in your expert report in any

Page 17

1    publication?

2            A.    I have not.

3            Q.    And are you aware of any

4    scientific or medical publication that has

5    published the opinions that you've expressed in

6    your expert report?

7            A.    I am not.

8            Q.    You also provided to us an updated

9    list of your testimony.  And I am going to mark

10   that as Exhibit 5.

11            MR. MOORE:  Jaysun, that's tab 32.

12            (Exhibit 5, Deposition and Trial

13   Testimony - Last Four Years, was marked for

14   identification.)

15   BY MR. MOORE:

16           Q.    Dr. Madigan, do you have access to

17   that already or do you have to wait for it to

18   come up?

19            It's up now.  It's up now.

20            Dr. Madigan, you provided some

21   additional testimony, deposition testimony, in

22   '20 and '21 on this list that was not on your

23   previous list in August 2020; correct?

24           A.    Yes.

25           Q.    And specifically, since your last

Page 18

1   deposition, you've given deposition testimony in

2   the following matters:  Abilify, Talc, Combat

3   Arm Earplugs, Asbestos, and Valsartan.  Is that

4   right?  And Navient as well.

5            A.    That is correct.

6            Q.    And you also gave deposition

7   testimony in the Zostavax litigation as well?

8            A.    Yes.  I did in that time frame,

9   yes.

10           Q.    In all of these cases, did you

11   appear for the plaintiff?

12           A.    Yes.

13           Q.    Did any of these cases involve

14   alopecia?

15           A.    No.

16           Q.    Did any of the cases involve

17   docetaxel?

18           A.    No.

19           Q.    So since your last deposition on

20   August 24, you've only testified in cases for

21   the plaintiff.  Is that right?

22           A.    That's right.

23           Q.    Dr. Madigan, what did you do to

24   prepare for your deposition today?

25           A.    So last -- a few days ago I reread

Page 19

1   my -- I read my report, and I read through some

2   of the transcripts of the previous depositions.

3           Q.    When you refer to transcripts of

4   previous depositions, are you referring to the

5   four deposition transcripts in this matter?

6           A.    Yes.

7           Q.    Did you review your trial

8   testimony from the Earnest case?

9           A.    I did not.

10          Q.    Did you review any documents to

11  prepare for this deposition other than

12  transcripts and your expert report?

13          A.    I did not.

14          Q.    Did you communicate with any

15  individuals to prepare for your deposition

16  today?

17          A.    So I had a session with two of the

18  attorneys.

19          Q.    I don't want you to tell me what

20  you talked about, just I would like for you to

21  tell me when that was, please?  When did you

22  meet with these two attorneys?

23          A.    I'm sorry.  I'm just looking at my

24  calendar.  Give me a second.  Sorry.

25                I think it was on Tuesday, Tuesday

Page 20

1    afternoon.

2              Q.    How long did you meet?

3              A.    It was about a half an hour.

4              Q.    Was that remote?

5              A.    Yes.

6              Q.    Have you communicated with any of

7    the other experts in this litigation about your

8    testimony today?

9              A.    No.

10             Q.    Have you communicated with any of

11   the experts in the litigation since your last

12   deposition in August 2020?

13             A.    No.

14             Q.    Have you reviewed the reports of

15   any of the other experts in the litigation since

16   your last deposition in August 2020?

17             A.    No.

18             Q.    Since the last time you were

19   deposed in August 2020, have you done any work

20   related to the March 2020 report that we just

21   discussed?

22             A.    I have not.

23             Q.    Have you sent any invoices

24   regarding the Taxotere litigation since your

25   August 2020 deposition?

Page 21

1          A.    I think I sent an invoice after

2     that deposition; I assume you have that.  But

3     not since then.

4          Q.    So the last invoice that you sent

5     was the one that covered the time period leading

6     up to the August 2020 deposition?

7          A.    That's correct.  Yes.

8          Q.    So since -- you haven't sent any

9     invoices for any work done after the August 2020

10    deposition?

11         A.    I have not.

12         Q.    And that's because you haven't

13    done any work on the litigation other than what

14    you just described in terms of preparing for

15    this deposition; is that right?

16              MR. ABRAMSON:  Objection to form.

17         A.    That's right.  There were also a

18    few hours in July of this year where I was

19    prepped -- I was preparing for a trial, but it

20    was ultimately postponed.

21         Q.    And that was the Kahn trial that

22    we just talked about; is that right?

23         A.    I'm not sure.  It may well be.

24         Q.    And during that prep session, you

25    were discussing the testimony that you provided

Page 22

1    in the Kahn case; right?

2           A.    I recall reading my report,

3    reading some of the transcripts.  I don't

4    actually recall anything beyond that.

5           Q.    And that report, as we discussed,

6    is the same report that you've issued in this

7    case; right?

8           A.    That's right.

9           Q.    And how long did you spend in that

10   prep session, approximately?

11          A.    It was about three hours, is my

12   memory.

13          Q.    Is that the only work that you've

14   done since August 2020 in the litigation?

15          A.    Yes, I believe so.

16          Q.    Now, you understand that your

17   opinions in your report in this case relate to

18   cases brought against Hospira by two plaintiffs,

19   Audry Plaisance and Clare Guilbault?

20          A.    I may have seen those names.  I

21   don't know anything about them.

22          Q.    Have you ever communicated with

23   Ms. Plaisance?

24          A.    No.

25          Q.    Have you ever communicated with

1    Ms. Guilbault?

2             A.    No.

3             Q.    Have you reviewed any of the

4    medical records of Ms. Plaisance?

5             A.    No.

6             Q.    Have you reviewed the medical

7    records of Ms. Guilbault?

8             A.    No.

9             Q.    Have you read the deposition of

10   Ms. Plaisance?

11            A.    No.

12            Q.    Have you read the deposition of

13   Ms. Guilbault?

14            A.    No.

15            Q.    Have you ever communicated with

16   Ms. Plaisance's physicians?

17            A.    No.

18            Q.    Have you ever communicated with

19   Ms. Guilbault's physicians?

20            A.    No.

21            Q.    Have you ever reviewed the

22   depositions of Ms. Plaisance's physicians?

23            A.    No.

24            Q.    Have you reviewed the depositions

25   of Ms. Guilbault's physicians?

Page 24

1           A.    No.

2           Q.    Do you know why Ms. Plaisance's

3   physician prescribed docetaxel for her?

4           A.    I do not.

5           Q.    Do you know why Ms. Guilbault's

6   physician prescribed docetaxel for her?

7           A.    I do not.

8           Q.    Do you have any knowledge of

9   Ms. Plaisance's current medical condition?

10          A.    I do not.

11          Q.    Do you have any knowledge of

12  Ms. Guilbault's current medical condition?

13          A.    I do not.

14          Q.    Are you giving any opinions about

15  the medical care and treatment of

16  Ms. Plaisance?

17          A.    No.

18          Q.    Are you giving any opinions about

19  the medical care and treatment of

20  Ms. Guilbault?

21          A.    No.

22          Q.    Are you providing any opinions

23  that docetaxel caused Ms. Plaisance to have

24  permanent hair loss?

25          A.    I am not.

Page 25

```
 1              Q.    Are you providing any opinion that

 2     docetaxel caused Ms. Guilbault to have permanent

 3     hair loss?

 4              A.    I am not.

 5              Q.    If you turn back to the list of

 6     reliance materials, please.  That's Exhibit 3.

 7              A.    Yes.

 8              Q.    Now, there are several documents

 9     on here that have a Sanofi Bates stamp; right?

10              A.    I see that.

11              Q.    And do you understand those

12     documents were produced by Sanofi in this

13     litigation?

14              A.    I presume so.

15              Q.    And plaintiffs' attorneys provided

16     these Sanofi documents to you?

17              A.    Yes.

18              Q.    And there aren't any documents on

19     your reliance list with a Hospira Bates stamp;

20     right?

21              A.    Correct, there are not.

22              Q.    So there aren't any Hospira

23     internal documents that's on your reliance list;

24     right?

25              A.    That's correct.
```

Page 26

1          Q.    You haven't reviewed any internal

2   Hospira documents that Hospira has produced in

3   this litigation; right?

4          A.    I don't believe so.

5          Q.    So you haven't reviewed any of

6   Hospira's internal files related to docetaxel or

7   alopecia?

8          A.    I have not.

9          Q.    You haven't reviewed any Hospira

10  policies or procedures related to

11  pharmacovigilance?

12         A.    I have not.

13         Q.    And you haven't reviewed Hospira's

14  internal event -- adverse event database;

15  right?

16         A.    Correct, I have not.

17         Q.    You didn't review any information

18  about what adverse events were reported to

19  Hospira; correct?

20         A.    Correct.

21              MR. ABRAMSON:  Objection to form.

22  He hasn't reviewed any Hospira documents.  Are

23  we going to list out every single document that

24  he didn't review?

25              MR. MOORE:  Brian, if you would

1    like to make an objection you can make an

2    objection.  Otherwise, please stop interfering

3    with the deposition.

4                MR. ABRAMSON:  Objection; form.

5    BY MR. MOORE:

6         Q.    Have you reviewed any internal

7    analysis by Hospira with respect to docetaxel

8    and permanent alopecia?

9         A.    No.

10               MR. ABRAMSON:  Objection to form,

11   asked and answered.

12        A.    I have not.

13        Q.    Have you reviewed any of Hospira's

14   labeling for docetaxel?

15               MR. ABRAMSON:  Objection to form,

16   asked and answered.

17        A.    I have not.

18        Q.    Have you reviewed any

19   correspondence between Hospira and the FDA?

20               MR. ABRAMSON:  Objection; form,

21   asked and answered.

22        A.    I have not.

23        Q.    Have you reviewed any Hospira

24   periodic safety update reports or submissions to

25   FDA regarding adverse events?

Page 28

1               MR. ABRAMSON:  Objection to form,

2      asked and answered.

3          A.    I have not.

4          Q.    Are you aware of any information

5      showing that Hospira had access to the internal

6      Sanofi documents identified in your reliance

7      materials?

8          A.    I have no idea.  I don't know.

9          Q.    You don't have any

10     information -- my question is, do you have any

11     information showing that Hospira had access to

12     the internal Sanofi documents identified in your

13     reliance materials?

14         A.    Fine.  Thank you.  I do not.

15         Q.    Your reliance list also includes

16     several deposition transcripts; correct?

17         A.    Yes.

18         Q.    These deposition transcripts are

19     of Sanofi employees; is that right?

20         A.    I believe that's true in each

21     case, yes.

22         Q.    And so you haven't reviewed the

23     deposition transcripts of any Hospira employees;

24     correct?

25         A.    I have not.

Page 29

1          Q.    Dr. Madigan, you are not a
2    regulatory expert; correct?
3          A.    Correct, I am not.
4          Q.    So you are not providing any
5    opinions about whether Hospira complied with FDA
6    regulations; is that right?
7          A.    Correct, I am not.
8          Q.    You are not offering any opinions
9    about the regulatory requirements for drugs
10   approved under section 505(b)(2) of the Food,
11   Drug, and Cosmetic Act; is that correct?
12         A.    Correct, I am not.
13         Q.    Are you offering any opinions
14   about the adequacy of Hospira's docetaxel
15   labeling?
16         A.    I am not.
17         Q.    Are you offering any opinions
18   about what Hospira knew about docetaxel and hair
19   loss?
20         A.    I am not.
21         Q.    Are you offering any opinions
22   about what Hospira should or should not have
23   done with respect to any safety signal for
24   docetaxel?
25         A.    I am not.

Page 30

1           Q.    Are you here to criticize Hospira
2    as a company?
3           A.    I am not.
4           Q.    Do you have any reason to believe
5    that Hospira is not a responsible company?
6           A.    I have no reason to believe
7    that -- I have no information about that company
8    one way or another.
9           Q.    Dr. Madigan, I would like to shift
10   gears here and talk to you about Section 7 of
11   your expert report.
12          A.    Okay.
13          Q.    Section 7 of your expert report is
14   entitled "Irreversible Alopecia in the TAX 301
15   and TAX 316 studies"; is that right?
16          A.    Right.
17          Q.    Just so we can get oriented here,
18   these are Sanofi clinical trials; is that
19   right?
20          A.    That's correct.
21          Q.    I will try to be specific and talk
22   about them as TAX 301 and TAX 316, but I may
23   refer to them together as the Sanofi clinical
24   trials.  Okay?
25          A.    Okay.

Page 31

```
 1          Q.    Now, Hospira didn't conduct these
 2     studies; right?
 3          A.    I don't believe so, no.
 4          Q.    I'm sorry.  I think we have a
 5     double negative there.
 6                Did Hospira conduct these tests?
 7          A.    I'm sorry.  No, they did not.
 8          Q.    So let's talk about TAX 316 first.
 9     Okay?
10          A.    Okay.
11          Q.    And I will refer to your
12     description in paragraph 59 of your report.
13          A.    Okay.
14          Q.    And I just want to break this down
15     a little bit in terms of just explaining what
16     the study was.  So if you could help me with
17     that.
18                First of all, TAX 316 was a
19     randomized controlled clinical trial; right?
20          A.    Yes.
21          Q.    And in that study they gave two
22     groups of patients two different chemotherapy
23     regimens; right?
24          A.    Yes.
25          Q.    One group was given docetaxel in
```

1    combination with doxorubicin and

2    cyclophosphamide; right?

3         A.    Correct.

4         Q.    And the other group was given

5    5-fluorouracil in combination with doxorubicin

6    and cyclophosphamide; right?

7         A.    Correct.

8         Q.    So doxorubicin and

9    cyclophosphamide are both chemotherapy drugs;

10   right?

11        A.    That's my understanding.  I don't

12   know much about them.

13        Q.    But patients in both groups took

14   those two drugs; right?

15        A.    Yes.

16             MR. MOORE:  If we could see tab 7,

17   please, and introduce that as the next exhibit.

18             (Exhibit 6, Clinical Study Report,

19   Study Number: TAX 316 (EFC6041/BCIRG001), was

20   marked for identification.)

21   BY MR. MOORE:

22        Q.    This has been marked as Exhibit

23   Number 6.

24             And, Dr. Madigan, do you recognize

25   this as the final clinical study report for the

1    TAX 316 study?

2         A.    I do.

3         Q.    And this is a document that you

4    relied on; right?

5         A.    Yes, I believe so.  Yes.

6         Q.    It's dated September 9, 2010?

7         A.    Yes.

8         Q.    And if we could just turn to the

9    second page of that document, in the synopsis it

10   has a list of the objectives.  Do you see

11   that?

12        A.    I do.

13        Q.    And the primary objectives of TAX

14   316 were to compare disease-free survival

15   between the two chemotherapy regimens; right?

16        A.    Yeah, that was that primary

17   objective.

18        Q.    And the secondary objection of TAX

19   316 was to compare the overall survival,

20   toxicity, and quality of life between the two

21   regimens; is that right?

22        A.    Yes.  Objective.  I think you said

23   "objection."

24        Q.    Thank you.  I will say it again.

25              The secondary objective of TAX 316

Page 34

1    are to compare overall survival, toxicity, and

2    quality of life between the two regimens;

3    right?

4            A.    Yes.

5            Q.    So nothing in the objections say

6    anything specifically about studying alopecia;

7    right?

8                  MR. ABRAMSON:  Objection; form.

9            A.    The word "alopecia" is not in

10   there, right.

11           Q.    So TAX 316 wasn't designed with

12   the specific objection of evaluating alopecia?

13                 MR. ABRAMSON:  Objection; form.

14   You keep on saying "objection" instead of

15   "objective."

16           A.    Not specifically, but toxicity is

17   in there so that -- I would interpret that to

18   mean adverse events in general.

19           Q.    A secondary objective is to look

20   at toxicity; correct?

21           A.    That's right.  It's one of the

22   secondary objectives.

23           Q.    But it's not the primary objective

24   of the study to address alopecia; right?

25           A.    It's not the primary endpoint,

1    it's not the primary objective.

2            Q.    And in the report, on page 37,

3    there is a table --

4                Jaysun, that's going to be -- the

5    Bates stamp number 4298 or page 37 as the

6    document is internally numbered.

7                Are you with me, Dr. Madigan?

8            A.    I am, yes.

9            Q.    So I am showing you a Table 7 that

10   appears on page 37 of the TAX 316 final clinical

11   study report; right?

12           A.    Right.

13           Q.    And in this table, it lists 29

14   patients as having ongoing alopecia in their TAC

15   arm; is that right?

16           A.    That's right.

17           Q.    And it lists 16 patients as having

18   ongoing alopecia in the FAC arm; is that

19   right?

20           A.    That's right.

21           Q.    And just so I'm clear, those are

22   the patients that you used to do your analysis

23   of TAX 316; right?  The 29 versus the 16, that's

24   the comparison that you did?

25           A.    That's an odd way to phrase it.  I

Page 36

1   mean, I used all of the data to do my analysis.

2   But, yes, the number that had -- that I -- that

3   had ongoing alopecia was 29 in the TAC arm and

4   16 in the FAC arm.  Yes, that is true.

5           Q.    And so this table reflects those

6   two numbers; is that right?

7           A.    Sure, yeah.

8           Q.    And the patients that we're

9   talking about are ones that were reported as

10  having ongoing alopecia; right?

11          A.    That's how -- yes, that's how they

12  describe it in this table.

13          Q.    So the clinical study report

14  describes these patients as having ongoing

15  alopecia, but it doesn't say that they have

16  permanent or irreversible alopecia; right?

17                MR. ABRAMSON:  Objection; form.

18          A.    Not in this table.  I'm actually

19  not sure anywhere else in the document.  I just

20  don't know.

21          Q.    Well, this is a document that you

22  relied on; right?

23          A.    Yes.

24          Q.    And is there anything in the

25  clinical study report anywhere that states that

1    these 29 patients had permanent hair loss?

2              MR. ABRAMSON:  Objection; form.

3         A.    I don't know.  I'm not -- I don't

4    know.  I don't have a photographic memory.  I

5    don't know.

6         Q.    Take a moment if you need to to

7    look through the document, and just let me know

8    if there's anywhere in there that refers to

9    permanent or irreversible alopecia.

10        A.    Unfortunately, this version of the

11   document is not searchable.

12              I don't -- I don't believe so, but

13   I can't -- I'm not able to search the document

14   right now so I can't be 100 percent certain.

15        Q.    You are not aware of anything in

16   this clinical study report that states that

17   these 29 patients had permanent hair loss;

18   right?

19              MR. ABRAMSON:  Objection; form.

20        A.    I am not.  I am not aware of such

21   a statement in here.  I just don't know.

22        Q.    Now, am I correct that in your

23   meta-analysis you considered that all of the 29

24   patients that are identified here on Table 7 had

25   ongoing alopecia at the completion of the

Page 38

```
 1   10-year study?
 2           A.    I'm sorry.  Try again.  I got lost
 3   in the question.  Sorry.
 4           Q.    Your meta-analysis considered
 5   these 29 patients listed on Table 27 [sic];
 6   right?
 7                 MR. ABRAMSON:  Objection; form.
 8           A.    Sure.  And every other patient,
 9   yes.
10           Q.    And your meta-analysis considered
11   that these 29 patients had ongoing alopecia at
12   the completion of the 10-year study; right?
13           A.    Sure.
14           Q.    These 29 patients, you didn't
15   review any of their medical records; right?
16           A.    No, I did not.  I mean, all I had
17   looked at is the data from the clinical trials
18   that's in the SAS file.
19           Q.    I will ask a better question.  My
20   apologies.
21                 Did you review any of the medical
22   records for these 29 patients?
23           A.    I did not.
24           Q.    Did you review any of the
25   underlying case forms for these 29 patients?
```

1          A.    If you mean the case report forms

2    that would have been completed during the

3    conduct of the trial, no, I did not.

4          Q.    Did you review any of the patient

5    narratives describing any of the medical

6    conditions of these 29 patients?

7          A.    The patient narratives, I did not.

8          Q.    Other than the classification as

9    "ongoing," you haven't done any further

10   investigation to determine whether any of these

11   29 patients actually had permanent hair loss?

12             MR. ABRAMSON:  Objection; form.

13         A.    No, I suppose, is the simple

14   answer to that question.  They had ongoing

15   alopecia at the end of the study, and that was

16   the endpoint I analyzed.

17         Q.    You considered if they had ongoing

18   alopecia, that meant they had permanent hair

19   loss for purposes of your study; is that

20   right?

21         A.    Yeah.  For the purposes of my

22   analysis, I interpret that as

23   irreversible -- irreversible alopecia.

24         Q.    By way of clarification, also, I

25   consider the words "irreversible alopecia" and

Page 40

1    "permanent alopecia" to be the same for purposes

2    of this deposition.  So if I use "permanent

3    alopecia," I know you've used "irreversible

4    alopecia" in your report, can we just agree that

5    those two words are interchangeable for purposes

6    of this deposition?

7              A.    That's fine.

8              Q.    Now, in paragraph 67 you refer to

9    a Sanofi document suggesting a much shorter TAX

10   316 follow-up time for alopecia than those

11   provided in the actual TAX 316 clinical trial

12   SAS data.

13              That's paragraph 67 of your

14   report?

15              A.    Yes.

16              MR. MOORE:  I would like to show

17   you tab 8, please.  We can mark that as

18   Exhibit 7.

19              (Exhibit 7, March 16, 2012 email

20   to Matthew Ernst, Ph.D., email string,

21   w/attachment, Response to Agency Request, was

22   marked for identification.)

23   BY MR. MOORE:

24              Q.    This is the document that you are

25   citing in paragraph 67 and footnote 51 of your

1   report; right?

2               I will ask a better question.

3               This is a report from Sanofi to

4   the Canadian Health Authority; correct?

5       A.    Yes.

6       Q.    Is this the document that you are

7   reefing to in paragraph 67 and footnote 51 of

8   your report?

9       A.    Yes.

10      Q.    And you understand that Health

11  Canada is Sanofi's regulator in Canada; right?

12      A.    Sanofi's regulator, that's not a

13  way to phrase it.  They are the pharmaceutical

14  regulator in Canada.

15      Q.    Fair enough.  You understand that

16  Health Canada is the pharmaceutical regulator in

17  Canada?

18      A.    Yes.

19      Q.    And you agree that as a drug

20  manufacturer, Sanofi has a responsibility to

21  provide accurate information to government

22  regulator?

23      A.    I certainly do.

24      Q.    If you turn to page 8842.

25      A.    Yes.

Page 42

1          Q.    Am I correct that Health Canada

2    has requested that Sanofi clarify the definition

3    of "ongoing" in its clinical trial?

4          A.    That appears to be the case, yes.

5          Q.    So Health Canada is asking Sanofi

6    to explain the meaning of "ongoing" in Table 7

7    of the TAX 316 clinical study report that we

8    just looked at; right?

9          A.    That appears to be the case.

10         Q.    And if you turn to the page that

11   ends 8845.

12         A.    Okay.

13         Q.    In the last paragraph, Sanofi gave

14   its response to this question; correct?

15         A.    That seems to be what that is,

16   yes.

17         Q.    So you agree that Sanofi's view is

18   that "ongoing" does not necessarily mean that

19   the adverse events were ongoing for the entire

20   10-year follow-up period?

21              MR. ABRAMSON:  Objection; form.

22         A.    That's -- you are reading the

23   sentence.  That's what they wrote.

24         Q.    My question though is, Sanofi's

25   view is that "ongoing" does not necessarily mean

Page 43

```
 1    that the adverse events were ongoing for the
 2    entire 10-year follow-up period; right?
 3                MR. ABRAMSON:  Objection to form.
 4         A.    You are asking me what does Sanofi
 5    think.  I mean, I accept that that's what that
 6    sentence says in that document, in their
 7    response to Health Canada, yeah.
 8         Q.    So Sanofi has stated that
 9    "ongoing" does not necessarily mean that the
10    adverse events were ongoing for the entire
11    10-year follow-up period; right?
12                MR. ABRAMSON:  Objection to form.
13         A.    You keep repeating that's what
14    they wrote there.  I agree with you.
15         Q.    And according to Sanofi, the last
16    visit could have been at any time during the
17    10-year follow-up period?
18                MR. ABRAMSON:  Objection to form.
19         A.    I don't know how -- I don't infer
20    that from that statement, if that's the
21    question.
22         Q.    Let me refer you to the first
23    sentence.
24                It says, "The 'Ongoing' columns in
25    Tables 7 and 9 present data in regards to those
```

Page 44

1    AEs that were persisting or starting during the

2    follow-up period and that were present at the

3    last follow-up visit (whenever this visit

4    occurred - starting 30 days after the last IV

5    treatment and up to the end of the 10-year

6    follow-up)."

7              Did I read that correctly?

8         A.    You did.

9         Q.    According to Sanofi, the last

10   visit could have been at any time during the

11   10-year follow-up period starting 30 days after

12   the last treatment up to the end of the 10-year

13   follow-up period; right?

14             MR. ABRAMSON:  Objection to form.

15        A.    I suppose.  I mean, certainly not

16   all patients were followed for exactly 10 years.

17   From the SAS data I can tell you exactly how

18   long each patient was followed up for and when

19   the last visit was.

20             Am I answering your question?

21        Q.    No, I don't think so.

22             My question is, according to

23   Sanofi, the last visit could have been at any

24   time during the 10-year follow-up?

25             MR. ABRAMSON:  Objection to form.

Page 45

1          A.    I see what you are saying.  That's

2    correct, the last visit didn't occur at exactly

3    10 years to the minute.  It occurred -- actually

4    sometimes before 10 years it occurred and in

5    some cases after 10 years.

6          Q.    And it could have been less than

7    six months after the last dose of chemotherapy;

8    correct?

9          A.    It may be.  I'd have to check in

10   the SAS data.  I don't in my head know what the

11   minimum last visit date was.

12         Q.    And do you agree with Sanofi's

13   explanation of what "ongoing" means?

14              MR. ABRAMSON:  Objection to form.

15         A.    I'm not entirely sure.  I mean, I

16   can tell you the table we looked at in the

17   clinical study report, the 29 and the 16, I know

18   exactly how they got that number, what their

19   definition is of "ongoing" at the end of the

20   study.  I know precisely what it is because we

21   have a SAS program that has -- the program that

22   computed those numbers.

23              So I know exactly what they meant

24   by those numbers in that table in the clinical

25   study report.

Page 46

1          Q.    Maybe I didn't ask the right

2    question.

3                With regard to Sanofi's

4    explanation of "ongoing" in Exhibit 7, do you

5    agree with their explanation?

6                MR. ABRAMSON:  Objection; form.

7          A.    No, not quite.  So, you know, in

8    actual fact, first of all, what they don't say

9    in there is that they're treatment-emergent

10   adverse events.  So that's something that's

11   missing.

12               And the other thing that's missing

13   is it wouldn't be marked as ongoing if it was

14   marked as resolved, you know, somewhere during

15   follow-up.  That's kind of missing here as well.

16               It's a bit loose, is how I would

17   describe it.

18         Q.    Other than those -- other than

19   those two caveats, do you agree with Sanofi's

20   definition of "ongoing"?

21         A.    No.  That's like telling me other

22   than the fact that it's a bit fuzzy and

23   inaccurate, do I agree with it?

24               No, it's not technically the

25   definition that they used to characterize the

1    number of ongoing alopecias at the end of the

2    study in the definitive clinical study report.

3          Q.    So you have a different view from

4    Sanofi about the meaning of the term

5    "ongoing"?

6                MR. ABRAMSON:  Objection to form.

7          A.    I have Sanofi's view.  I have

8    their program.  I know exactly what they

9    computed to get -- to arrive at the 29 and the

10   16 that we've been talking about.  So I know

11   exactly what they did.

12         Q.    But you have a different view than

13   Sanofi about the meaning of the term

14   "ongoing" -- excuse me.

15                You have a different view than

16   Sanofi's definition of "ongoing" in this

17   document about the meaning of the term

18   "ongoing"?

19                MR. ABRAMSON:  Objection to form.

20         A.    I wouldn't put it that way.  The

21   way I'd phrase it is this is not very precise,

22   it's kind of fuzzy.  We have a formal, very

23   precise, sort of mathematically precise

24   definition of "ongoing" in their SAS program,

25   and that's the one that Sanofi actually

Page 48

1    implemented.

2         Q.    But you didn't -- did you consider

3    this definition of "ongoing" that Sanofi

4    provided in Exhibit 7 in your analysis?

5              MR. ABRAMSON:  Objection; form.

6         A.    No, I didn't, nor would I.  I used

7    the definition that is in the clinical study

8    report and the SAS program referenced there,

9    therein.

10        Q.    So if we turn to the table that's

11   listed in this document, beginning on the next

12   page.

13             Jaysun, are we able to turn that

14   sideways?  Thank you.

15             If you will go to the previous

16   page, this is the table that you referred to in

17   footnote 51 of your report; right?

18        A.    Yeah.

19        Q.    I can go through these or I can

20   just ask you, I'll start with just asking you,

21   will you agree with me that, according to this

22   chart, the last time that many of these patients

23   were recorded as having alopecia, ongoing

24   alopecia, was less than six months after the

25   patient finished chemo?

Page 49

1              MR. ABRAMSON:  Objection to form.

2        A.    That's a hard question to answer

3   in the sense that these aren't right, these

4   aren't the follow-up times.  They are not -- I'm

5   not sure I ever figured out what they are.  I'm

6   not entirely sure, but they are not correct.

7   These are not the actual follow-up times.

8              But if you want to ask me the

9   numbers in the right-hand column, are many of

10  these numbers less than 0.5, a half a year, yes,

11  I agree.

12        Q.    So let me break that down.

13             I understand you don't agree with

14  the calculations of follow-up duration in this

15  chart.  Right?

16        A.    I don't.  It's not what they did

17  to produce the analysis in the clinical study

18  report.

19        Q.    But according to this chart, the

20  last time that many of the patients were

21  recording having ongoing alopecia was less than

22  six months after the patient finished

23  chemotherapy; correct?

24             MR. ABRAMSON:  Objection to form.

25        A.    There's a document here that has a

Page 50

1    column that says "Follow-up duration," and I

2    agree with you that some of the numbers in that

3    column are less than six months.

4         Q.   So you agree that under Sanofi's

5    interpretation of the word "ongoing," that many

6    of these 29 patients who are recorded as having

7    ongoing alopecia had their last follow-up for

8    alopecia less than six months after the patient

9    stopped using chemotherapy?

10              MR. ABRAMSON:  Objection; form.

11         A.   I don't.  I know exactly what

12   Sanofi means by "ongoing," as described in the

13   definitive clinical study report, and this is

14   not it.

15         Q.   Fair enough.  Let me rephrase

16   that.

17              You agree that under Sanofi's

18   presentation in this chart, many of the 29

19   patients who are recorded as having ongoing

20   alopecia had their last follow-up for alopecia

21   less than six months after the patient stopped

22   chemo?

23              MR. ABRAMSON:  Objection to form.

24         A.   That's not an entirely

25   unreasonable interpretation of this at face

Page 51

1    value.  I know it's wrong, they are not the

2    follow-up times.

3              Q.    I am not trying to argue.  I

4    understand that you and I aren't going to agree

5    on that.

6                    You disagree with the chart;

7    right?

8              A.    I do, yes.

9              Q.    My question is, this chart that

10   Sanofi prepared shows that many of the 29

11   patients who were recorded as having ongoing

12   alopecia had their last follow-up for alopecia

13   less than six months after the patient stopped

14   using chemotherapy; correct?

15             A.    I am going to give you the same

16   answer, right, which is that at face value,

17   that's a reasonable interpretation, but it's not

18   correct.

19                   Actually, two quick things.  One

20   is, I've answered a thousand questions about

21   this in previous depositions, and we've been all

22   over this over and over, and there is another

23   document that looks exactly the same as this one

24   that has follow-up times that agree with what I

25   calculated, what Sanofi's SAS program

1    calculates.

2              I was never entirely sure of the

3    problems of this document that we are looking

4    at.  There is another one that is exactly the

5    same that has the correct follow-up times.

6              I've talked about this --

7              (Simultaneous speakers.)

8         Q.    When you did your analysis, you

9    didn't use the calculations that are here

10   provided by Sanofi about the follow-up duration;

11   correct?

12        A.    I didn't use the calculations --

13   I'm not entirely sure how they calculated these.

14   I know how they calculated it for the clinical

15   study report.  I have a SAS program, it's their

16   program.  That's what I did.

17             I'm not entirely sure, at least I

18   don't remember, I don't think I ever figured out

19   where these numbers came from.  But they are not

20   correct.

21        Q.    So I think your answer to my

22   question is you did not use the calculations

23   that Sanofi provided about the follow-up

24   duration in your calculation?

25             MR. ABRAMSON:  Objection; form.

1           A.    You asked me did -- I'm just

2    stumbling --

3           Q.    Let me rephrase.

4                 You did not use the calculations

5    that Sanofi provided in this document about

6    follow-up durations in your calculations?

7           A.    I didn't use these numbers.  I

8    think these numbers are incorrect.  I used the

9    final locked SAS data and their program to

10   produce the follow-up times.  That's what I did.

11          Q.    So you did not use the numbers on

12   this chart?  That's all I am asking.

13          A.    I did not, nor would I.

14          Q.    And are you familiar with the

15   testimony of Dr. Kopreski?  You relied on his

16   deposition testimony; correct?

17          A.    I read his deposition.

18          Q.    And he's a witness from Sanofi;

19   correct?

20          A.    That's my understanding.

21          Q.    And are you aware that

22   Dr. Kopreski went back and looked at the

23   individual case reports for the patients in

24   TAX 316 who were reported as having permanent

25   alopecia?

1          A.    So, again, I've answered a lot of

2    questions about this in the past.  It's not

3    particularly fresh in my memory.  For accurate

4    answers you should refer to my previous

5    testimony.  I understand he did something like

6    that.

7          Q.    And I'm not going to have many, I

8    just want to -- just a few.

9               I am just asking, you are aware

10   generally that he went back and examined the

11   individual case reports for the patients in the

12   TAX 316 study who were reported as having

13   permanent alopecia?

14               MR. ABRAMSON:  Objection; form.

15         A.    Broad brush strokes, yeah, he did

16   something like that years after the fact.

17         Q.    And he concluded that only six of

18   the patients in the docetaxel group had ongoing

19   alopecia more than six months.  Are you aware of

20   that?

21         A.    I don't remember the number.

22         Q.    But you didn't apply

23   Dr. Kopreski's analysis in your analysis; is

24   that right?

25         A.    Certainly, nor would I.  It's

Page 55

1    Monday morning quarterbacking.  We have the

2    final locked data from the clinical trial, we

3    have the actual analysis that Sanofi did that is

4    then reflected in the clinical study report.

5    That's what I did.

6             Q.    So my question is simply, when you

7    did your analysis, it doesn't reflect

8    Dr. Kopreski's review of the individual medical

9    records and whether the patients had ongoing

10   alopecia more than six months?

11                MR. ABRAMSON:  Objection to form.

12          A.    It does not, nor would it.

13                MR. MOORE:  We've been going about

14   an hour.  I am happy to keep going or take a

15   break.

16                THE WITNESS:  Short break, two or

17   three minutes.

18                MR. MOORE:  Sure.

19                THE VIDEOGRAPHER:  The time is

20   10:36 a.m.

21                (Break taken.)

22                THE VIDEOGRAPHER:  The time is

23   10:41 a.m.  We are back on the record.

24   BY MR. MOORE:

25          Q.    Dr. Madigan, I am going to switch

Page 56

1  over to the TAX 301 study.

2          A.    Okay.

3          Q.    You refer to that in paragraph 60

4  of your report; right?

5          A.    I do.

6          Q.    And just so we are clear on the

7  terminology, that's a study that is sometimes

8  referred to as the GEICAM 9805 study; right?

9          A.    Right.

10          Q.    So the TAX 301 study and the

11  GEICAM 9805 study are the same study?

12          A.    Yes, that's correct.

13              MR. MOORE:  If you could turn to

14  tab 10, please, let's publish that as the next

15  exhibit, 8.

16              (Exhibit 8, Clinical Study Report,

17  Study Number: TAX.ES1.301/GEICAM 9805, was

18  marked for identification.)

19              CONCIERGE:  Little bit of a larger

20  file, it's taking a second.

21              THE WITNESS:  I've got it.

22  BY MR. MOORE:

23          Q.    Dr. Madigan, do you recognize this

24  as the final clinical study report for the TAX

25  301 study?

Page 57

1          A.      Yes, I believe so.

2          Q.      This is a document you relied

3    on?

4          A.      Yes.

5          Q.      And if we could turn to the

6    objectives page in the synopsis.

7          A.      Yes, I'm there.

8          Q.      And you will agree that in terms

9    of the design of the study, it also compared two

10   groups of patients like TAX 316, one who used

11   TAC and the other used FAC.  Right?

12         A.      Right.

13         Q.      And the main difference in the

14   study between TAX 316 and TAX 301 is the TAX 301

15   studied patients with negative axillary lymph

16   nodes; is that right?

17         A.      That's my understanding, yes.

18         Q.      And you will agree that TAX 301

19   also was not designed with the specific primary

20   objective of evaluating the risk of permanent or

21   irreversible alopecia with docetaxel?

22         A.      I agree.

23         Q.      And on page 111 of the clinical

24   study report, there is a Table 47, Bates-stamped

25   9707.

Page 58

1            Are you with me, Dr. Madigan?

2       A.    Yes.

3       Q.    Table 47 contains information

4   about ongoing alopecia in both arms; right?

5       A.    Right.

6       Q.    And it reports that there were

7   three patients who had ongoing alopecia in the

8   TAC arm and one patient who had ongoing alopecia

9   in the FAC arm; is that right?

10      A.    I said yes.  I'm not sure if it

11  was audible.

12      Q.    Those are the numbers that you

13  used to perform your analysis; correct?

14      A.    Sure.  I analyzed the complete

15  data, but they are the relevant numbers for

16  ongoing alopecia.

17      Q.    And so according to my

18  calculations, less than 1 percent of the

19  patients in the docetaxel arm were reported as

20  having ongoing alopecia.  Is that right?

21      A.    That's correct.

22      Q.    And the discussion that we've had

23  about the meaning of "ongoing" with regard to

24  TAX 316 also applies to the definition of

25  "ongoing" in TAX 301; correct?

1          A.     I think that's reasonable, yes.

2          Q.     And you didn't do an analysis of

3    the patient medical records to see whether these

4    patients who were classified as ongoing alopecia

5    had permanent or irreversible hair loss;

6    right?

7          A.     I did not.  I analyzed the final

8    locked clinical trial data, the quantitative

9    data.

10         Q.     And just to clarify, that

11   quantitative data that you reviewed, that

12   doesn't include any of the patients' individual

13   medical records; correct?

14         A.     I think I'm agreeing with you.

15   But you could argue it is a medical record.

16   It's patient-level data.  But, you know, I

17   certainly didn't look at any -- what you would

18   typically call medical records, like, notes or

19   anything like that.  I don't have that.

20         Q.     You didn't look at the case report

21   form for any of these patients to see if they

22   have permanent or irreversible alopecia;

23   right?

24         A.     I did not look at case report

25   forms.  I'm just looking at the SAS data.

Page 60

1          Q.    Now, you noted in your report that
2     in TAX 301 there was poor information on whether
3     the patients in the study had alopecia in the
4     follow-up period; right?
5          A.    Sure.  Yeah.  There was only -- I
6     think it was 12 of the 55 study sites had
7     follow-up.
8          Q.    And so you are suggesting there
9     was a large group of patients in the study where
10    there was no follow-up?
11         A.    So it appears, for alopecia.
12         Q.    And you agree that in terms of
13    poor follow-up, that applied to the patients who
14    took docetaxel and the ones who didn't take
15    docetaxel; right?
16         A.    Sure.  Applies to the patients in
17    this study.
18         Q.    Right.  So for the patients with
19    no follow-up, you don't know whether the
20    patients who took docetaxel have more cases of
21    ongoing alopecia than the patients who didn't
22    take docetaxel?
23         A.    That's right.  There's --
24               (Simultaneous speakers.)
25         Q.    I didn't mean to interrupt you.

Page 61

1           A.    You know, what they represent is,

2     actually looking at this table, that only about

3     10 percent, less than 10 percent of the patients

4     had alopecia that persisted into follow-up.  I

5     have no way of knowing -- we have no way of

6     knowing if that's correct or not.

7                 We know it for those patients, the

8     three and the one, you know, they had ongoing

9     alopecia at the end.  But for the others, I just

10    don't know.

11          Q.    Right.  So the vast majority of

12    the patients, you don't know whether the

13    patients who took docetaxel have more cases of

14    ongoing alopecia than the patients who didn't

15    take docetaxel?

16          A.    I don't know if they had alopecia

17    at all.  We just don't know.  I analyzed the

18    locked final data and this is what it showed.

19          Q.    I understand that.

20                I am just trying to understand,

21    for most patients, the vast majority of the

22    patients, you just don't have any data as to

23    whether or not they had alopecia or not?

24          A.    It's just not recorded one way or

25    another, you know, for many of these patients.

Page 62

1          Q.    Most of them; right?

2          A.    Yeah.   Sure.

3          Q.    So you don't know whether the

4    patients who took docetaxel in that group have

5    more alopecia than the ones who didn't take

6    docetaxel, you just don't know?

7          A.    Well, you know, I'm raising a

8    concern about follow-up.   I'm raising a concern

9    that it appears that there wasn't -- that the

10   follow-up was not complete.

11               But be that as it may, I have the

12   locked final clinical trial data, and it shows

13   three ongoing in one arm, in the TAC arm, and

14   one in the FAC arm.   That's what the clinical

15   trial data showed.

16         Q.    That's not statistically

17   significant --

18               (Court reporter clarification.)

19         Q.    Under the ordinary measurement of

20   statistical significance, you will agree that is

21   not statistically significant, three versus one?

22         A.    So, sure.   If you conduct a

23   statistical test comparing the rate of ongoing

24   alopecia in the TAC arm versus the FAC arm, it's

25   a relative risk of around three, but it does not

Page 63

1    reach statistical significance.  That is

2    correct.

3            Q.    And I think you agree that the

4    results of TAX 316 also were not statistically

5    significant according to that measurement;

6    right?

7            A.    Same kind of answer.  In and of

8    itself, if you conduct a statistical analysis

9    comparing the rate of ongoing alopecia in the

10   TAC arm to that in the FAC arm and conduct a

11   statistical hypothesis test, that produces a

12   p-value that's slightly above 0.05 and therefore

13   you would not call that statistically

14   significant in and of itself.

15           Q.    So you took -- you took the two

16   results of the two studies and you combined them

17   and made an analysis; right?

18           A.    Right.  I performed a

19   meta-analysis of the two studies.

20           Q.    And so even though they weren't

21   statistically significant in and of themselves,

22   you concluded that when they were combined they

23   were statistically significant; is that right?

24           A.    That's just a matter of fact.  If

25   you conduct a meta-analysis of the two studies

1    looking at the ongoing alopecia endpoint, that

2    produces an estimate of 1.85 for the rate ratio

3    and the p-value is 0.04, which is -- we refer to

4    that as statistically significant because it's

5    less than 5 percent.

6           Q.    Are you aware of anyone else who

7    has ever combined the results of the two Sanofi

8    clinical trials on the issue of alopecia?

9           A.    Not something I've looked for.  I

10   have no idea.

11          Q.    The investigators who conducted

12   the study never combined the results of the two

13   studies on the issue of alopecia; right?

14                MR. ABRAMSON:  Objection; form.

15          A.    I have no idea.

16          Q.    Are you aware of any information

17   that the investigators who conducted the study

18   ever combined the results of the two studies on

19   the issue of alopecia?

20          A.    I am not.  It's just the way you

21   phrased the question, did the investigators ever

22   do X, Y or Z?  I have no idea whether they did

23   or didn't.  But I am agreeing with you, I have

24   not seen any such analysis.

25          Q.    I will ask a better question.

Page 65

1           Are you aware of any information
2  that the investigators who conducted the studies
3  ever combined the results of the two studies on
4  the issue of alopecia?
5           A.    I am not aware of any such
6  analysis.
7           Q.    Are you aware of any published
8  medical or scientific articles that ever
9  combined the results of the two studies on the
10 issue of alopecia?
11          A.    I'm not.
12          Q.    To your knowledge, has anyone
13 other than you in this litigation ever combined
14 the results of the two studies on the issue of
15 alopecia?
16          A.    I am not aware.  I don't know.
17          Q.    Are you aware of any published
18 medical or scientific article that found a
19 statistically significant risk of permanent
20 alopecia in TAX 316?
21          A.    I am not.
22          Q.    Are you aware of any published
23 medical or scientific article that ever found a
24 statistically significant risk of permanent
25 alopecia in TAX 301?

Page 66

1          A.    I am not.

2          Q.    Are you aware of any published

3    medical or scientific articles that found a

4    statistically significant risk of permanent

5    alopecia when you combine the two Sanofi

6    clinical trials?

7          A.    I am not aware of any such

8    analysis other than my own.

9          Q.    Now, you based your analysis of

10   the Sanofi clinical trials on information you

11   received from Sanofi; right?

12         A.    Sure.  The locked clinical trial

13   data that came from Sanofi.

14         Q.    And you are not aware of any

15   evidence showing that Sanofi provided the data

16   from the TAX 316 and TAX 301 studies to Hospira;

17   right?

18         A.    I am not.

19         Q.    You are not aware of any evidence

20   showing that Sanofi provided the clinical study

21   reports for the TAX 316 and TAX 301 studies to

22   Hospira; right?

23         A.    I am not.

24         Q.    Are you aware of any evidence that

25   Hospira had access to any of the clinical

1    Sanofi -- excuse me.  I will ask that again.

2                   Are you aware of any evidence

3    showing that Hospira had access to any of the

4    Sanofi clinical trial data?

5          A.    I am not.

6          Q.    Are you aware that any of the

7    information that you used to prepare your

8    analysis -- strike that.  Let me start over.

9                   Are you aware that any of the

10   information about the Sanofi clinical trial data

11   that you used to prepare your analysis was

12   publicly available?

13         A.    Any of the information?

14         Q.    I will ask it again.

15                  Are you aware that the information

16   that you used to prepare your meta-analysis was

17   publicly available?

18         A.    I am not actually -- I think you

19   phrased this am I aware.  I am not aware.  It's

20   not something I looked for.  I don't know what's

21   on ClinicalTrials.gov, for example.  It's just

22   not something I've looked for.

23         Q.    Well, let's look at

24   ClinicalTrials.gov.

25                  If we can go to tab 11, please.

```
                                                Page 68
 1                 (Exhibit 9, ClinicalTrials.gov,
 2     Docetaxel in Node Positive Adjuvant Breast
 3     Cancer (TAX316), was marked for identification.)
 4     BY MR. MOORE:
 5          Q.    ClinicalTrials.gov is a government
 6     website that contains information about clinical
 7     trials; is that right?
 8          A.    Sure.  Yes.
 9          Q.    And this is -- is this is an
10     example of the website, Exhibit 9?
11          A.    Seems to be, yes.
12          Q.    And this is a ClinicalTrials.gov
13     website on TAX 316.  Do you agree with that?
14          A.    Seems to be, yes.
15          Q.    And you see that it says that the
16     results were first posted in 2011.  Right?
17          A.    Yes.
18          Q.    So on page 12 of the document
19     there is a table that contains information about
20     alopecia; right?
21          A.    Where is it?
22          Q.    Keep scrolling down, please.
23                Do you see where it says
24     "Alopecia"?
25          A.    I do.
```

Page 69

1          Q.    So the information on

2    ClinicalTrials.gov doesn't contain any

3    information about how many individuals had

4    ongoing alopecia; right?

5          A.    It appears not.  But you are

6    showing me one place in this document.  I'm sure

7    you're right, but I'd need to look at the whole

8    document, the whole --

9          Q.    Take a minute.  It's not a very

10   big document.  If you would, just take a minute

11   to confirm that this information on the

12   ClinicalTrials.gov web page doesn't contain any

13   information on how many patients had ongoing

14   alopecia.

15         A.    I agree.  I just did a search.

16   Yes, that appears to be the case, it does not

17   provide that information.

18         Q.    You would agree, Hospira couldn't

19   have obtained from ClinicalTrials.gov the

20   information on ongoing alopecia that you used to

21   prepare your analysis; right?

22               MR. ABRAMSON:  Objection to form.

23         A.    Yes, it appears to be the case

24   that ClinicalTrials.gov does not present that

25   information.

```
 1          Q.    So you are not aware of any
 2   publicly available information about the Sanofi
 3   clinical trial data that was available to
 4   Hospira that it could have used to do the same
 5   analysis that you did in your meta-analysis;
 6   right?
 7                MR. ABRAMSON:  Objection.
 8          A.    I am not.  But I just want to make
 9   sure, that doesn't mean I looked for it and I
10   know for a fact it's not there.  I don't know
11   that.  But I am not aware of anyplace in the
12   public domain where you can find that
13   information.
14          Q.    Okay.  I am going to ask you some
15   questions about your FAERS analysis.  Okay?
16          A.    Okay.
17          Q.    If you can turn to Section 4 of
18   your report.
19                That's the part of your report
20   where you discuss your docetaxel FAERS analysis;
21   right?
22          A.    Right.
23          Q.    Just a little background here,
24   FAERS stands for the FDA Adverse Event Reporting
25   System; is that right?
```

Page 71

```
 1            A.    Yes.
 2            Q.    And that's an FDA database that
 3   collects adverse event reports for various
 4   drugs?
 5            A.    Sure, yes.
 6            Q.    And adverse event reports are also
 7   sometimes called case reports; is that right?
 8            A.    Sure.  Or spontaneous reports,
 9   yes.
10            Q.    In your report you describe
11   adverse event as any medical event coincident
12   with drug therapy regardless of an index of
13   suspicion by the reporter.
14            A.    You are reading something there
15   that sounds familiar, but I'm not sure --
16            Q.    We can look at it, if you'd like.
17   Paragraph 12.
18                  I am just trying to understand
19   what an adverse event is in your opinion.  You
20   describe it as a "medical event coincident with
21   drug therapy regardless of an index of suspicion
22   by the reporter."
23                  Did I read that right?
24            A.    Sure.
25            Q.    Does that mean that if someone is
```

Page 72

1   taking the drug and experiences a medical event
2   at the same time, it's considered an adverse
3   event even if the person doesn't suspect that
4   the drug and the medical event are related?
5           A.    Sure.  The one thing I would just
6   add there, you said at the same time, it could
7   be later.
8           Q.    That's a fair point.  So I will
9   ask that again.
10          If someone is taking a drug and
11  experiences a medical event, that's considered
12  an adverse event even if the person doesn't
13  suspect that the drug and the medical event are
14  related; correct?
15          A.    So it's -- this is all in the
16  context of FAERS, in the context of spontaneous
17  reporting systems.  So in that context, yeah,
18  that's correct.
19          Q.    What do you mean by "in that
20  context"?
21          I am asking you about adverse
22  event reports, right, whether they are reported
23  to FAERS or in any other place.  That definition
24  applies to any type of adverse event report;
25  right?

1          A.    So in the context of spontaneous

2    reporting, you receive a report -- you are a

3    pharmaceutical company or you are the FDA and

4    you receive a report, and on that report the

5    person says -- they tick the box that they took

6    a certain drug, and they list, you know, that

7    they got a headache.

8                So, you know, the point of this

9    sentence in paragraph 12 is, you know, there is

10   not a place where you ask a person, Do you think

11   that the drug caused the headache?  That

12   question isn't part of the form.  Right.

13               So the person -- one presumes they

14   think the adverse event is related to the drug;

15   otherwise, why are they reporting it.  But

16   regardless, it is what it is.  You receive the

17   form, it has the drug, it has the headache.

18               And like in clinical trials it's

19   different.  In clinical trials you are

20   systematically recording adverse events from

21   patients.  And, in fact, it's standard practice

22   to -- for the clinicians to record whether they

23   think it was causally related to the drug

24   entity, to the intervention or not.

25               So maybe this discussion is

Page 74

1   getting too esoteric.  But I am drawing

2   distinctions between adverse event reporting in

3   the context of spontaneous reporting system and

4   adverse event reporting in formal clinical

5   trials.

6            Q.    Thank you for that.

7                  In the context of adverse events

8   that are reported as spontaneous adverse event

9   reports, just because someone reports an adverse

10  event report about a drug and a medical event

11  doesn't necessarily mean that those two things

12  are causally related; right?

13           A.    That's right.

14           Q.    And in your report, you did an

15  analysis of whether there was a safety signal in

16  the FAERS database for docetaxel and permanent

17  alopecia; right?

18           A.    I did.

19           Q.    And you used various statistical

20  models in your analysis; correct?

21           A.    Sure.  I did the analysis in a few

22  different ways.

23           Q.    Okay.  And the first way you did

24  it was a PRR analysis.  And that's reflected at

25  page 14 of your report, Figure 1.  Is that

Page 75

1   right?

2           A.    That's right.

3           Q.    I just want to go through these

4   individually and make sure I understand what

5   they mean.

6                 Your PRR analysis, you determined

7   that a safety signal appeared in the first

8   quarter of 2000 and then remained in place until

9   to date.  Is that right?

10          A.    That's right.

11          Q.    And then your second model, that's

12  the SEBGM model, the safety signal appeared in

13  the first quarter of 2000, then it disappeared,

14  reappeared in the fourth quarter of 2004, and

15  then reappeared in the second quarter of 2008?

16          A.    That's right.

17          Q.    And the third model, SEB05, the

18  safety signal appeared in the second quarter of

19  2012; right?

20          A.    That's right.  Just to be picky,

21  you are referring to these models.  They are

22  really statistics.  They are not models, per se.

23          Q.    What word can I use?  Is it

24  statistical model?

25          A.    Just statistic.  It's a statistic.

Page 76

1    SEB05 is a statistic.

2          Q.    It's a statistical analysis;

3    right?

4          A.    Just to be picky, SEB05, strictly

5    speaking, is a statistic.  I used that statistic

6    in this statistical analysis.

7          Q.    Well, you will agree that these

8    three statistics show three different results

9    for when the safety signal appeared?

10         A.    Sure, yes.

11         Q.    And there is a 12-year difference

12   between the time that the safety signal appeared

13   in your first statistic, PPR, and the time when

14   the safety signal in the third statistic, SEB05;

15   correct?

16         A.    That's right.  They varied -- one

17   is more conservative than the other.

18         Q.    And there is a 12-year difference

19   between when they showed a safety signal?

20         A.    That's kind of what happens when

21   you use these statistics; the more conservative

22   ones don't signal until later.

23         Q.    And you also did a regression

24   analysis; is that right?

25         A.    I did several regression analyses,

Page 77

1    yes.

2         Q.    And those are in Tables 3, 4 and

3    5?

4         A.    That's correct.

5         Q.    And the first version shows a

6    safety signal in 2010, Table 3; right?

7         A.    That's correct.  Using a threshold

8    of 2, yes.

9         Q.    Threshold of 2 is the one you

10   used; right?

11        A.    Yeah.  I said -- I reported only

12   docetaxel that shows a persisting safety signal

13   using the conventional threshold of 2, yes.

14        Q.    I just want to understand.

15   Because the table, it doesn't jump off the page

16   here as to what you are saying.  I just want to

17   clarify.

18             I think you are agreeing with me

19   that version -- the first version of your

20   regression analysis, Table 3, shows a safety

21   signal appearing in 2010 using the conventional

22   threshold of 2?

23        A.    Correct.

24        Q.    And the second version, Table 4,

25   also shows a safety signal in 2010; right?

Page 78

1           A.    That's correct.

2           Q.    And the third version shows a

3    safety signal in 2003?

4           A.    That is correct, yes.

5           Q.    So with regard to the regression

6    analysis, there is a seven-year difference

7    between when the safety signal appeared in the

8    various statistics; right?

9           A.    That's correct.

10          Q.    Now, you conclude that concerning

11   docetaxel and irreversible alopecia, depending

12   on the metric, your analysis shows the emergence

13   of a safety signal at various times dating back

14   as early as 2000; right?

15          A.    Right.

16          Q.    So am I understanding you to say

17   that there was a safety signal present as early

18   as early 2000s, according to your analysis?

19          A.    Yes.

20          Q.    And one of your models, SEB05,

21   shows a safety signal appearing in second

22   quarter of 2012; right?

23          A.    Yeah.  That metric or that

24   statistic doesn't signal until 2012.

25          Q.    But as I understand what you are

Page 79

1    saying, that doesn't mean that there wasn't

2    a safety -- excuse me.

3              As I understand it, that doesn't

4    mean that the safety signal appeared for the

5    first time in 2012; right?

6         A.    No.  There are different metrics

7    that are in use, different statistics that are

8    in use, and they show signals at different

9    times.  That's perfectly normal.

10             So the PRR is the one that shows

11   the signal at the earliest point in time, and

12   SEB05 is the one that shows it at the latest

13   point in time.  I think that's true, isn't it?

14        Q.    I believe so.

15             But you are not saying there was a

16   new safety signal in 2012 that wasn't already

17   present going back to the 2000s; right?

18        A.    No, I'm not.

19        Q.    Now, let's talk a little bit about

20   your search methods for identifying cases of

21   permanent alopecia.  Okay?

22        A.    Right.

23        Q.    We talked a little bit about

24   adverse event forms.  When a person submits an

25   adverse event to the FDA, they submit it on

Page 80

1    what's known as a MedWatch form; is that

2    right?

3             A.    Sure.   There's also a CIOMS form,

4    another version.

5             Q.    MedWatch is one example of a form

6    that someone can use to report an adverse event

7    report to the FDA; right?

8             A.    Yes.

9             Q.    And the MedWatch form contains

10   information on the adverse event and details

11   about the adverse event; right?

12            A.    Sure.   Most of them, yes.

13            Q.    You say in your report that when

14   an adverse event report gets reported, they are

15   classified according to standardized adverse

16   event coding dictionaries?

17            A.    That's right.

18            Q.    And an example of an adverse event

19   coding dictionary is MedDRA?

20            A.    Correct.

21            Q.    And that contains standardized

22   adverse event codes; right?

23            A.    That's right.

24            Q.    So when someone reports an adverse

25   event, the information in the narrative section

Page 81

1    as well as the other information, that gets

2    coded according to these standardized terms;

3    right?

4              A.    That's right.

5              Q.    And there's no standardized code

6    for permanent alopecia; right?

7              A.    There is not.

8              Q.    There is no standard code for

9    irreversible alopecia?

10             A.    There is not.

11             Q.    So you created in this litigation

12   your method for identifying cases of permanent

13   alopecia; right?

14             A.    That's an odd way to phrase it.  I

15   combined the MedDRA term with the outcome.  I've

16   done that type of analysis many times over the

17   years.

18             Q.    So for this -- for purposes of

19   this litigation, your method of identifying

20   cases of permanent alopecia was to combine the

21   code alopecia and the outcome of disability or

22   permanent damage; right?

23             A.    That's right.

24             Q.    And those are the patients that

25   you considered to have permanent alopecia for

Page 82

1    purposes of your report; right?

2         A.    That's right.  And as I testified

3    before, I -- maybe it's in my report, I

4    consulted with Dr. Kessler on this point.

5         Q.    And you identify 31 cases of

6    permanent alopecia by the end of 2017 based on

7    your analysis; right?

8         A.    I'd have to check.  If you say so,

9    it sounds about right.  But I don't have it in

10   front of me.

11        Q.    It's in Appendix 4 to your report.

12   You testified to it before, but I'm happy to

13   show it to you.

14        A.    I'm pulling it up here.  I'm sure

15   it's fine.

16        Q.    My question is, you identified 31

17   cases of permanent alopecia by the end of 2017?

18        A.    Give me a second.

19              You know, you might have to show

20   it to me because the version I have here, it

21   says 31.  So there must be some --

22        Q.    31 was what I --

23        A.    Sorry, I thought you said 37.

24        Q.    My apologies.  Let me just start

25   over.

Page 83

1          In your analysis, you identified

2    31 cases of permanent alopecia by the end of

3    2017; correct?

4          A.    With Taxotere, yes.

5          Q.    In your analysis, you identified

6    31 cases of permanent alopecia in patients

7    taking Taxotere or docetaxel by the end of 2017;

8    right?

9          A.    Correct.

10         Q.    And all of the statistics that we

11   looked at earlier rely on this calculation of

12   those 31 cases of permanent alopecia; correct?

13         A.    They rely on a lot more than that,

14   but that's one of the things that they rely on.

15         Q.    Okay.  But all of the statistical

16   models that you've used are based on your

17   calculation that there were 31 cases of

18   permanent alopecia by the end of 2017?

19              MR. ABRAMSON:  Objection; form.

20         A.    I mean, it's a funny way to phrase

21   it.  First of all, I do an analysis over time;

22   not just at the end of 2017, I do it quarter by

23   quarter.  I replay history.  But then my

24   analysis relies on all of the -- all of the

25   reports, Taxotere and the background,

he

Page 84

1    non-Taxotere reports, and it relies on which

2    ones had alopecia and permanent outcome and

3    which ones didn't.

4           Q.    And understand, I'm not suggesting

5    that this is the only aspect of your analysis.

6    That's not what I am trying to suggest.  I am

7    asking a more narrow question.

8                 For purposes of each of your

9    statistical analyses, you identified cases of

10   permanent alopecia that were used in that

11   analysis; right?

12          A.    Right.

13          Q.    And those cases that you

14   identified of permanent alopecia were the 31

15   cases that we just discussed in each of those

16   analyses; right?

17          A.    At the end.  By the time you get

18   to Q4 of 2017, that number is 31.

19          Q.    So if some of the 31 cases were

20   not actually cases of permanent alopecia, then

21   your statistical analysis would change; right?

22          A.    That's tantamount to saying if the

23   data were different, the analysis would be

24   different.  Yes.

25          Q.    All of the statistical analysis

Page 85

1    would change if your number of 31 cases were

2    incorrect?

3              A.    Sure.  If any -- if any of the

4    inputs in the analysis change, if they are

5    incorrect, as you put it, then the analysis

6    would have been different.  Now, would it be

7    materially different?  That all depends,

8    obviously.

9              Q.    You haven't done that analysis

10   based on any other data?  You've assumed in each

11   of your analysis that 31 cases, and you haven't

12   done any alternate analysis; correct?

13                   MR. ABRAMSON:  Objection to form.

14             Q.    I'll withdraw the question.

15                   Now, if you look at -- let me ask

16   one question.

17                   You mentioned that you don't know

18   whether the analysis would be materially

19   different if your calculation of 31 cases was

20   incorrect.  You don't know whether the analysis

21   would be materially different if that number

22   were incorrect because that's not something that

23   you've done; right?

24             A.    Sure.  I'd need to do that

25   analysis.

Page 86

1              MR. MOORE:  Now I am going to show

2   you tab 29.  We will mark that as Exhibit 9, I

3   believe.  Is that the next exhibit?

4              THE WITNESS:  10.

5              MR. MOORE:  10.  Let's mark that

6   as Exhibit 10, please.

7              (Exhibit 10, MedWatch form,

8   Bates-stamped Sanofi_00243374, Sanofi_00243375,

9   was marked for identification.)

10  BY MR. MOORE:

11       Q.    This is an example of a MedWatch

12  form; is that right?

13       A.    Yes.

14       Q.    And it contains narrative

15  information about the medical event; correct?

16       A.    Sure.  Yes.

17       Q.    And most MedWatch forms contain

18  this type of narrative information.  Do you

19  agree with that?

20       A.    Yes.

21       Q.    And that narrative information is

22  not something that you reviewed in your

23  analysis; right?

24       A.    It is not.

25       Q.    And this example, if you turn to

```
                                        Page 87
 1   the second page, it mentions in the narrative
 2   section in the -- next to the bottom, third
 3   sentence I think from the bottom, "She is also
 4   experiencing hair loss, nail changes, and
 5   feeling cold all the time."
 6            A.    I see that.
 7            Q.    So you agree, this has a report of
 8   hair loss?
 9            A.    Yes.
10            Q.    And this should be coded to
11   alopecia in the database based on that report;
12   right?
13            A.    I don't know.  You are
14   asking -- that's not my expertise.  I'm not a
15   coder.  I don't know.
16            Q.    Right.  But there is a report of
17   alopecia, and you agree that -- if there are
18   reports of alopecia, they should be coded as
19   alopecia in the database?
20                  MR. ABRAMSON:  Objection to form.
21            A.    I don't know.
22            Q.    You don't know.
23            A.    Generally speaking, yes.  But I
24   don't know in this particular case --
25            Q.    I understand you don't know
```

Page 88

1    whether this one was coded as alopecia.  That's

2    what you are saying; right?

3            A.    No, I'm saying more than that.

4    I'm saying I'm not prepared to offer an opinion

5    that the MedDRA term "alopecia" should be

6    applied to this report.  That's outside of my

7    expertise.

8            Q.    But there was an adverse event

9    report for alopecia in this MedWatch?

10           A.    The word "alopecia" appears there.

11   But whether the MedDRA code for alopecia should

12   be attached to this, I have no idea.

13           Q.    That's not something you looked

14   at?

15           A.    That's outside my expertise, I'm

16   not a coder.

17           Q.    Also on the top it's indicated, on

18   the first page, that it's checked "disability";

19   is that right?

20           A.    I see that.

21           Q.    So if this were coded as alopecia,

22   and you will agree that this is an example of a

23   report that would meet your criteria for

24   permanent hair loss because it is also checked

25   with disability; right?

Page 89

1          A.    Could be.  Whether it's in FAERS

2     or not, I have no idea.

3          Q.    That's a different question.  I

4     understand you don't -- you're not prepared to

5     say whether this report was recorded in FAERS.

6     That's what you are saying; right?

7          A.    Yes.

8          Q.    But my question is a little

9     different.

10               If this were coded as alopecia and

11    reported to FAERS, then it would meet the

12    criteria for your permanent hair loss because

13    it's also checked as disabled; right?

14         A.    Yes.  That's correct.

15         Q.    And you didn't actually perform a

16    review to see whether or not -- of this report

17    or any other report to see whether or not these

18    patients had -- actually had permanent alopecia;

19    right?

20         A.    It's outside my expertise.  I

21    conducted a statistical analysis of the FAERS

22    database.  And if you want -- if you wanted to

23    review the underlying reports, it's not my area

24    of expertise, you'd have to look at all of them.

25    You can't just look at the ones that have

Page 90

1  alopecia and permanent outcome, you would have

2  to look at all of them.

3         Q.    So you didn't look at the

4  underlying reports for the patients other than

5  the 31 to see whether or not they had permanent

6  alopecia or not?  That's what you are saying;

7  right?

8         A.    No, no.  That's not what I'm

9  saying.

10         I'm saying I did an analysis of

11  the FAERS database as is, right, as we've been

12  talking about.

13         What you're asking about is could

14  one take a look at the underlying MedWatch

15  reports, like the one that you have on the

16  screen here, and do a different classification,

17  whether it's permanent alopecia or not with some

18  expert judgment.  You could do that.  That's not

19  the nature of my analysis.

20         But what I'm saying is there is

21  kind of a commonness understanding in the hours

22  I've spent answering these questions that you

23  could just look at the 31.  Right.  But you

24  can't.  You also have to look at the background

25  and all the permanent alopecia cases in the

Page 91

1    background.  Otherwise, you would be biasing the

2    analysis.

3              Strictly speaking, you need to

4    look at all the reports that don't have Taxotere

5    because they enter into the calculation as well.

6              So could one conceivably do

7    something like this?  You could.  But it's a

8    huge -- it's an impractical undertaking,

9    actually.

10         Q.    I understand your position on

11   this.  I'm familiar with that.  I just want to

12   make sure I understand what you did and didn't

13   do.  Okay?

14         A.    Okay.

15         Q.    So let me just ask you first, with

16   regard to the 31 patients that hit on your

17   identification criteria, you did not do a review

18   of the MedWatch forms for those 31 patients?

19         A.    I did not --

20         Q.    That's the first question.  That's

21   the first question.

22         A.    I did not, nor would I.  I'm a

23   statistician, that's outside my area of

24   expertise.

25         Q.    And you are also saying that you

1    did not do a review of the other adverse event

2    reports that are in the FAERS database that did

3    not turn up as part of your 31 cases to see

4    whether or not they had permanent alopecia?

5              A.    Sure.

6              Q.    Right?

7              A.    Same answer.  No, I didn't, nor

8    would I.  It's outside my expertise,

9    impractical.

10             Q.    So looking back at this MedWatch

11   form, there is nothing on the MedWatch form that

12   indicates that the checkmark for disability on

13   page 1 is associated with alopecia.  You will

14   agree with that; right?

15             A.    That's correct.  It covers the

16   entire form, it's not specific to an individual

17   adverse event.

18             Q.    So just because someone checks

19   disability on an adverse event report form and

20   that gets coded as disability in the database

21   doesn't mean that the disability is associated

22   with alopecia; right?

23             A.    Not necessarily.  It's associated

24   with the adverse events in the form.  It doesn't

25   specify, is it all of them, one of them, some of

Page 93

1   them.  It doesn't specify that.

2           Q.    So you don't know which adverse

3   event report that's reported in the adverse

4   event report is associated with the report of

5   disability?

6           A.    I think you mean, you don't know

7   which adverse event in the adverse event report

8   is associated with the outcome of disability.

9   And, no, it just doesn't have that level of

10  specificity.

11          Q.    I think you are agreeing with me,

12  you don't know which adverse event report -- let

13  me ask -- I see what you are saying.  Let me ask

14  the question again.

15                You don't know which adverse event

16  that's reported in the adverse event report is

17  associated with the outcome of disability?

18          A.    There we go.  No, you can't be

19  sure.  It doesn't specifically tie the outcome

20  to a particular -- to an individual adverse

21  event.  In the event that there is more than

22  one, you know, in this form, there might be more

23  than one code.  I don't know.

24          Q.    So if you look at the second page

25  of this report -- can you refer to the second

Page 94

1    page of the report, please.

2              Do you see where it says, "The

3    patient has experienced fluid buildup so severe

4    she could not walk.  Emergency surgery was

5    performed due to fluid accumulation in her heart

6    and lungs.  She was hospitalized in the

7    intensive care unit for nine days due to this

8    event and was treated with two drugs."

9              Is that right?

10         A.    I see that.

11         Q.    And so when the outcome of

12   disability was checked on the first page of this

13   form, you don't know whether that was related to

14   these events or hair loss; right?

15         A.    You know, I am agreeing with you.

16   If there's more than one adverse event in a

17   MedWatch form, more than one MedDRA code is the

18   way I view it, the outcome could apply to all of

19   them or just one of them or some of them.  The

20   form is not specific in that regard.

21         Q.    I am just trying to understand,

22   the fact that the report is coded as alopecia

23   and has the outcome of disability doesn't mean

24   that those two things are connected?

25         A.    If it's the only adverse event, I

Page 95

1    think it does.  If it's not the only adverse

2    event, then there's uncertainty.

3            Q.    And you haven't done, again, any

4    review of these narratives to determine to see

5    whether the outcome of disability was connected

6    to the alopecia?

7            A.    Outside my area of expertise, not

8    something I've done, not something I would do.

9            Q.    One of the codes in the MedDRA

10   dictionary is "alopecia," as we've discussed;

11   right?

12           A.    There's a higher level term

13   "alopecias," and then within that, there's

14   so-called preferred terms.  I don't actually

15   have them on my fingertips.

16               MR. MOORE:  Well, let's look at

17   tab 17, please.

18               (Exhibit 11, Medical Dictionary

19   for Regulatory Activities, was marked for

20   identification.)

21   BY MR. MOORE:

22           Q.    Do you recognize this as an online

23   version of the MedDRA terms that we were just

24   talking about?

25           A.    Could be, yeah.  I don't know what

Page 96

1    this website is, but it looks like it.

2           Q.    You are familiar with the MedDRA

3    dictionary; right?

4           A.    I am.

5           Q.    This appears, based on your

6    experience, to be a screenshot of the MedDRA

7    dictionary?

8           A.    It's a screenshot of some website

9    that pertains to the MedDRA dictionary, it would

10   appear.

11          Q.    You are not disputing -- you are

12   not going to argue with me that this is a

13   correct --

14          A.    I am not.

15          Q.    -- version of the MedDRA

16   dictionary?

17                You were just talking, I think,

18   about the higher level terms and the preferred

19   terms.  Do you see on here where it says "HLT"?

20   Does that refer to "higher level term"?

21          A.    Yes.

22          Q.    And then it says "Alopecias" next

23   to that.  And that's what you were just

24   explaining is the higher level term for alopecia

25   in MedDRA; right?

Page 97

1          A.     That's right.

2          Q.     And then listed below "Alopecias"

3     is the list of preferred terms, lower

4     level -- let me ask a better question.

5               Below the higher level term

6     "Alopecia," there is a list of the lower level

7     preferred terms; right?

8          A.     The preferred terms.  It's

9     unfortunate to use the term "lower level"

10    because there is a lower level than preferred

11    term.

12              So let me phrase it this way.  It

13    lists the preferred terms within the higher

14    level term "Alopecias."

15         Q.     Very good.  So this chart lists

16    the preferred terms within the higher level term

17    for alopecia?

18         A.     That's right, yes.

19         Q.     And included within those

20    preferred terms are various types of alopecias;

21    right?

22         A.     Yes.

23         Q.     And as I understand your

24    methodology, you included in your identification

25    of the 31 cases any case that was coded with the

1    higher level term "Alopecias"; right?

2         A.    Yes.

3         Q.    And you didn't exclude any cases

4    based on how they were recorded with regard to

5    their preferred term; right?

6         A.    That's a funny question.  Maybe I

7    can give you an answer that might be answering

8    the question.

9              So the endpoint I am looking for

10   in my analysis is the higher level term

11   "Alopecias."  On MedWatch forms -- in the FAERS

12   database there are preferred terms.  So if any

13   one of the preferred terms on the list that's on

14   the screen there, if any one or more of those

15   preferred terms appeared in the report in FAERS,

16   I count that, in your words, amongst the 31.

17        Q.    I think we're saying the same

18   thing.

19             So if someone -- if someone coded

20   an event using one of these preferred terms,

21   that would also be coded as a higher level term

22   "Alopecias," and therefore, it would be included

23   within the list of 31 cases that you identify?

24        A.    That's correct.

25        Q.    And so if someone, for example,

Page 99

1    submitted an adverse event report to the FDA and

2    that report was coded as "androgenetic

3    alopecia," that's a report that would be

4    identified in your methodology as a potential

5    case of permanent alopecia?

6           A.    It's conceivable, yeah.  I looked

7    at this at some point.  I'm pretty sure none of

8    these -- the only one that ever actually

9    occurred is the preferred term "Alopecia."

10          Q.    But my question is, if someone

11   coded any adverse event according to any of

12   these lower level preferred terms, they would be

13   included in your list of 31?

14          A.    Yes, conceivably.  Yes.

15          Q.    So if someone coded an event as

16   "scarring alopecia," that still would be

17   considered a potential case of permanent

18   alopecia under your methodology; right?

19          A.    Sure.  And I would point out, this

20   is what Sanofi did when they did their own

21   adverse event analysis, they used the higher

22   level term "Alopecia."

23          Q.    I represent Hospira.  You

24   understand that; right?

25          A.    Yes, sure.

Page 100

1          Q.    So I am asking -- I'm not asking
2     about their internal analysis at this point.
3     We'll get to that later, Sanofi's internal
4     analysis.  I am just asking you about your
5     analysis.
6                Let me stop and ask the question,
7     if someone coded an event as "scarring
8     alopecia," you wouldn't have excluded that from
9     your list of potential cases of permanent
10    alopecia; right?
11         A.    I would not.
12         Q.    If someone coded an event as
13    "radiation alopecia," you would not have
14    excluded that from your list of potential cases
15    of permanent alopecia; right?
16         A.    I would not.
17         Q.    If someone coded something as
18    "androgenetic alopecia," you wouldn't exclude
19    that from your list of potential cases of
20    permanent alopecia; right?
21         A.    I would not.
22         Q.    And your FAERS analysis, as I
23    understand it, is designed to offer an opinion
24    about when there was a safety signal; right?
25         A.    Sure.

Page 101

1           Q.    And I just want to -- let's just
2     be sure we're talking about the same thing when
3     we talk about a safety signal.  Okay?
4           A.    Okay.
5           Q.    A safety signal is a concern about
6     a potential safety risk; right?
7           A.    Sure.
8           Q.    In particular -- well, strike
9     that.
10          It doesn't mean -- a safety signal
11    doesn't mean the drug causes a safety risk;
12    right?
13          A.    Correct.
14          Q.    Safety signal requires further
15    investigation to determine whether it's a
16    potential safety risk; right?
17          A.    Sorry.  You trailed off.  I
18    couldn't hear the last bit.
19          Q.    A safety signal requires further
20    investigation to determine whether it's actually
21    a safety risk?
22          A.    Sure.  I mean, in and of itself it
23    doesn't establish causation.
24          Q.    And you set forth in your report
25    FDA guidances on safety signal identification,

Page 102

1    best practices, et cetera; right?

2              A.    I reference those documents, I

3    believe, yes.

4              Q.    And one of the documents that you

5    referenced is -- it's tab 19.

6                    Let's mark that as Exhibit 12,

7    please.

8                    (Exhibit 12, Guidance for Industry

9    E2E Pharmacovigilance Planning, April 2005, was

10   marked for identification.)

11   BY MR. MOORE:

12             Q.    You are familiar with this

13   document, which is Guidance for Industry E2E

14   Pharmacovigilance Planning, April 2005;

15   right?

16             A.    Right.

17             Q.    This is a document that was cited

18   in your report?

19             A.    I can't remember.  If you say so,

20   it certainly could have been.

21             Q.    I want to ask you about page 11.

22             A.    Okay.

23             Q.    And --

24             A.    Right.  I'm there.

25             Q.    I'm sorry.  Let me find it.  It's

Page 103

1    the next page.  There we are, "Systematic

2    Methods for the Evaluation of Spontaneous

3    Reports."

4               A.    I see that.

5               Q.    I just want to read to you the

6    first part of this description.

7                    "More recently, systematic methods

8    for the detection of safety signals from

9    spontaneous reports have been used.  Many of

10   these techniques are still in development and

11   their usefulness for identifying safety signals

12   is being evaluated.  These methods include the

13   calculation of proportional reporting ratio, as

14   well as the use of Bayesian and other techniques

15   for signal detection.  Data mining techniques

16   have also been used to examine drug-drug

17   interactions."

18                    Did I read that correctly?

19              A.    Yes.

20              Q.    One of the techniques that you

21   used in your report was proportional reporting

22   ratio; right?

23              A.    Yes.

24              Q.    And the other two metrics, EBGM

25   and EB05, those are Bayesian methods; right?

Page 104

1        A.    Right.

2        Q.    So do you agree that your analysis

3    in your report used data mining techniques?

4        A.    No.  No.

5        Q.    And you explained, I believe, in

6    your report why you don't believe that's true;

7    right, as I understand it?  Paragraph 18.

8        A.    Okay.

9        Q.    I'll help you out.

10        A.    Yes.

11        Q.    And that's your explanation;

12    right?  In paragraph 18 you say because you are

13    looking only at two events, in retrospect,

14    essentially, you don't consider that to be a

15    data mining exercise.

16            Is that my understanding you

17    correctly?

18        A.    That's correct.  And having this

19    document in front of us is making that

20    distinction also.

21        Q.    And it says data mining -- the

22    next sentence, that we didn't read, states,

23    "Data mining techniques should always be used in

24    conjunction with, and not in place of, analyses

25    of single case reports."

Page 105

1              Is that right?

2         A.    I see that.

3         Q.    So I understand you don't believe

4    you are doing data mining.

5         A.    I'm not.

6         Q.    If you were doing data mining,

7    that should always be used in conjunction with

8    and not --

9              (Court reporter clarification.)

10        Q.    -- and not in place of analyses of

11   single case reports, according to this

12   document?

13             MR. ABRAMSON:  Objection to form.

14        A.    So -- it's complicated.  Right.

15   Data mining, which is not what I am doing here,

16   but certainly one can do data mining and some

17   people do do data mining in this database.

18             I'm certainly not opposed to

19   reviewing individual case reports.  But the

20   data -- like, if I'm doing data mining, I'm not

21   looking at individual case reports, I don't have

22   that expertise.  So I would do a data mining

23   exercise, have done these kinds of things in my

24   life, and I presented the results in different

25   contexts.

Page 106

1           You know, would it be reasonable
2    or advisable for other people to look at the
3    underlying case reports?  Sure.  I don't have
4    any problem with that.
5           Q.   Okay.  That's a long answer, and I
6    appreciate that.  Make sure I understand what
7    you are saying.
8           If you were doing a data mining
9    exercise, you think it's reasonable for someone
10   to take a look at and analyze the underlying
11   cases?
12          A.   Sure.  It wouldn't be me.  But,
13   sure, why not.
14          Q.   You don't have the expertise, is
15   what you are saying; right?
16          A.   Absolutely not.
17          Q.   But someone who is involved in the
18   process of analyzing the safety signal and
19   whether or not it presented actual safety risk
20   should analyze the underlying case report if you
21   are doing data mining; right?
22          A.   It's a reasonable thing to do.
23   I'm not being prescriptive here; it's outside my
24   area of expertise.  You certainly could.
25          If you are doing a data mining

1    exercise, you are going on a fishing expedition,

2    something pops up, sure, it's reasonable to say,

3    let's look at the underlying reports, let's look

4    at lots of other things too.  I'm not opposed to

5    it.

6          Q.    And it's not only that you are not

7    opposed to it.  The FDA in this document that

8    you cited states that that review of the

9    underlying case reports is something that should

10   always be used in conjunction with a data mining

11   exercise; you don't dispute that.  Right?

12         A.    I don't dispute that that's what

13   they wrote.

14         Q.    You disagree with the FDA -- do

15   you disagree with the FDA on this?  I am trying

16   to --

17         A.    It's overly prescriptive and it's

18   not what they always do themselves.  It's

19   not -- it's not unreasonable.  I'm not saying

20   don't look at the case reports.  Sure, look at

21   the case reports.  That's fine.  But they should

22   always be, certainly not what happens in

23   practice.

24         Q.    And you are aware of FDA data

25   mining exercises in which they don't look at

Page 108

1    underlying case reports?

2          A.    Well, they are running data

3    mining exercises -- some of the safety officers

4    are running data mining exercises all the time.

5    And they might or might not look at the

6    underlying case reports.  Other safety officers

7    there do look at the underlying reports.  So the

8    agency is not uniform in terms of how they go

9    about doing these things.

10          Q.    Can you cite an example of an FDA

11    data mining exercise in which they didn't look

12    at an underlying case report?

13          A.    Not off the top of my head.  We

14    could look at the literature.  I don't know.

15          Q.    You can't sit here as we sit here

16    today and identify an example of the FDA doing a

17    data mining exercise without analyzing the

18    underlying case report; right?

19          A.    Isn't that the same question?  No,

20    I cannot identify such a thing sitting here

21    today.

22          Q.    But since you say you are not

23    doing data mining, your methodology did not

24    follow this FDA guidance on data mining; fair?

25          A.    Sure.  Yeah.

 1          Q.     Now, there's another document I am

 2     going to show you, it's tab 20.

 3                 Are you familiar with this

 4     document?  Let me describe it for you.  It's

 5     called "Best Practices in Drug and Biological

 6     Product Postmarket Safety Surveillance for FDA

 7     Staff," dated November 2019.

 8          A.     I'm sorry, I don't have it yet.

 9     I'm waiting.  Oh, yeah, sure.  I'm familiar with

10     this document.

11                 (Exhibit 13, Best Practices in

12     Drug and Biological Product Postmarket Safety

13     Surveillance for FDA Staff, was marked for

14     identification.)

15     BY MR. MOORE:

16          Q.     It's not something you cited in

17     your report though; right?

18          A.     If you say so.  I don't remember.

19     I don't think it's been finalized.

20          Q.     It's indicated as a draft on here;

21     right?  But it's something you are familiar

22     with; right?

23          A.     Yes.

24          Q.     And these are the FDA's best

25     practices on pharmaceutical safety surveillance;

1   is that right?

2           A.    That's what it purports to be,

3   yes.

4           Q.    Do you have disagreement with this

5   document?

6           A.    No.  Don't know much about it.

7   It's been quite a while since I've looked at it.

8           Q.    If you look at the table of

9   contents, Section 6 of this document is entitled

10  "Safety Signal Identification."

11          A.    Okay.

12          Q.    And Section 7 is called "Signal

13  Evaluation and Documentation."

14          A.    Okay.

15          Q.    And if you turn to page 21, there

16  is an explanation, I believe, of the difference

17  between those two phrases.

18          A.    Okay.

19          Q.    It's Section 6 in the preamble

20  under "Safety Signal Identification."

21          A.    I see that.

22          Q.    So it says, "For purposes of this

23  document, the term 'signal identification' is

24  broad in scope.  It includes the activities of

25  screening FAERS, VAERS, and the medical

Page 111

1    literature, as well as accepting other

2    information sources, to identify potential

3    safety signals.  Identified signals are

4    prioritized for more extensive evaluation."

5              Did I read that correctly?

6        A.   Yes.

7        Q.   By the way, VAERS, that stands for

8    the Vaccine Adverse Event Reporting database?

9        A.   That's right.

10       Q.   That's a similar database but it

11   just contains adverse event reports on vaccines

12   rather than --

13       A.   That's right.

14       Q.    -- other prescription drugs?

15             And so you will agree with me that

16   according to this FDA document on best

17   practices, there are two steps in the process:

18   the signal identification and then the signal

19   evaluation.  Right?

20       A.   Sure, yes.

21       Q.   And once a signal is identified,

22   it needs more extensive evaluation to determine

23   whether there is a safety issue; right?

24       A.   Sure.  In general, if you see a

25   signal, you investigate it.

1          Q.    And I'm trying to understand,

2     which of these two steps are you performing in

3     your analysis?

4          A.    I'm doing a bit of both.  My FAERS

5     analysis in and of itself is a signal

6     identification analysis.  And I'm doing an

7     evaluation -- I'm doing exactly what the agency

8     does when they evaluate a signal; they look at

9     clinical trial data, they look at observation

10    studies, they look at any data sources that are

11    germane to the question of causation.  And

12    that's what they do when they evaluate a signal.

13         Q.    So your FAERS analysis is a signal

14    identification; right?

15         A.    Right.

16         Q.    And then the other parts of your

17    report you are saying are addressing the second

18    phase of signal evaluation?

19         A.    Yeah.  I didn't sequence it that

20    way, but you can certainly -- it's a reasonable

21    characterization of what I did.

22         Q.    Okay.  So just focusing now

23    specifically on your FAERS analysis, in this

24    document, Section 6.1, it lists a description of

25    data sources that are used in safety signal

```
                                          Page 113
 1   identification; right?
 2          A.    Yep.
 3          Q.    And the first one under 6.1.1 is
 4   entitled "FAERS and VAERS"; right?
 5          A.    I see that.
 6          Q.    Is it accurate to say that this
 7   section of the report is describing the process
 8   for safety signal identification in the FAERS
 9   database?
10          A.    That seems reasonable.  It's in a
11   section called "Safety Signal Identification,"
12   and then under -- we are looking at the data
13   sources under that section.  Sure.
14          Q.    So the first method for analyzing
15   the FAERS database in the safety signal
16   identification is individual ICSR screening.
17   Correct?
18          A.    I don't know.  There is a section
19   called "Safety Signal Identification," but now
20   we're in the Data Sources section.  The first
21   subsection is FAERS and VAERS.  And now I don't
22   know what they are describing.  They are
23   describing something they are calling individual
24   case report screening, and then they describe
25   what that is.  But I don't -- I don't see them
```

1    saying this is the first thing you should do.

2           Q.    Okay.  Fair enough.

3                 I will just ask you, in this

4    section there is a description of individual

5    ICSR screening.  Okay?

6           A.    We can agree on that, there is.

7           Q.    And ICSR stands for Individual

8    Case Safety Report; right?

9           A.    Yes, I think that's right.  I

10   think the S is safety.

11          Q.    And this process is describing the

12   FDA's best practice on screening Individual Case

13   Safety Reports; right?

14          A.    I suppose, yeah.  It's in a funny

15   section.

16          Q.    It says, "Using the information in

17   the narrative and other sections of the

18   Individual Case Safety Report, reviewers attempt

19   to establish a temporal relationship between

20   administration of the product and occurrence of

21   the adverse event to determine whether there is

22   sufficient support for further evaluation of the

23   potential safety signal."  Right?

24          A.    You read that correctly.  I see

25   that.

1        Q.     So the FDA is recommending as part

2   of its best practices that when you are doing

3   individual case report screening, you look at

4   the narrative report; right?

5        A.     I think you're overstating it

6   there.  They are saying matter of factly, this

7   is what reviewers attempt to do.  You are

8   characterizing it as they are stating this is

9   best practice.  They are stating this is what

10  reviewers do.

11       Q.     In the best practice document,

12  they state that this is what FDA reviewers do

13  when they are doing individual case screening,

14  and that is, they look at the underlying

15  narrative.  Is that fair?

16       A.     Sure.  That's fair.

17       Q.     And in the next section, they also

18  describe a process called cumulative screening;

19  right?

20       A.     I see that.

21       Q.     And that also says in the last

22  sentence that "In the course of cumulative

23  screening, the reviewer may identify one or more

24  adverse events that may cause the reviewer to

25  read in detail all ICSRs for the adverse event."

Page 116

1    Right?

2              A.    Sure.

3              Q.    So when the reviewer -- under the

4    FDA best practices, when a reviewer is doing

5    cumulative screening, they have a choice of

6    whether they want to go and look at the

7    underlying case report or not.  Is that how you

8    understand that, they may choose to do so?

9              MR. ABRAMSON:  Objection to form.

10             A.    I think you are misinterpreting

11   there.  They are free to look at the reports any

12   which way they want any time they want, and they

13   do look at individual case reports.

14             I think here, the spirit of this

15   is more they are seeing reports coming in, they

16   see accumulating evidence or accumulating

17   reports of a particular adverse event, and they

18   may then look at all reports for those adverse

19   events, they might pull reports and look at

20   those.  I understand that's what this is saying.

21             Q.    Yeah, okay.  But the last sentence

22   there, the separate sentence says, "Periodic,

23   cumulative screening of case reports complements

24   ongoing screening at the individual report

25   level."  Right?

1          A.    Sure.  You're a million miles here

2     from anything I did.  Just saying.

3          Q.    I think that's what I am trying to

4     establish here, is that you didn't follow this

5     FDA guidance here on how they did case screening

6     of individual case reports; right?

7               MR. ABRAMSON:  Objection to form.

8          A.    That's not the nature -- I did a

9     statistical analysis of FAERS.  I'm not a safety

10    reviewer.  I don't do what safety reviewers do.

11    I did a statistical analysis -- I'm a

12    statistician.  I did a statistical analysis of a

13    data set, and you have the results in my report.

14         Q.    And what I am asking you about --

15    and let me go back to my question -- is under

16    the cumulative screening process, the FDA says

17    that periodic cumulative screening of case

18    reports complements ongoing screening at the

19    individual report level.  Right?

20         A.    All for it.  No problem with that.

21    Good luck to you.

22         Q.    We'll talk about your analysis and

23    your point in a second, I just want to ask you

24    first, the FDA is suggesting that best practices

25    for reviewing these case reports includes

Page 118

1    screening at the individual report level?

2              A.    Yeah.   It includes looking at the

3    reports.   Sure.   If I'm a safety officer of the

4    FDA, these reports are flowing in, sure, I

5    should look at them.

6                   I'm doing something completely

7    different, I'm doing a statistical analysis of

8    the FAERS database.

9              Q.    And in your statistical analysis,

10   that's also a signal identification method,

11   right, as I understand?

12             A.    Sure.   I would prefer to call it a

13   statistical analysis of the FAERS database.   I'm

14   using signaling metrics, and I'm trying to

15   identify when, if there is a signal, when the

16   signal became apparent.   That's the nature of my

17   analysis.

18             Q.    And as I understand what you are

19   telling me, though, your analysis and what you

20   did in your statistical analysis does not follow

21   the FDA best practices that are described here

22   in this document?

23                   MR. ABRAMSON:   Objection; form.

24             A.    No.   This is, like --

25                   (Simultaneous speakers.)

1          Q.    It's different --

2          A.    That's like saying the FDA has a

3    process for analyzing chemicals, and it's like

4    saying you didn't follow that process in doing

5    your analysis here.  You're talking about

6    something different --

7                (Simultaneous speakers.)

8          Q.    I don't mean to -- I don't mean to

9    interrupt --

10                MR. MICELI:  Excuse me, Rich.

11   Rich, could you let the witness finish?

12         Q.    I was just about to say, I'm

13   sorry, Dr. Madigan, did I interrupt you?

14         A.    I was basically finished with my

15   point.  You are looking at, you know -- I know

16   safety reviewers, I'm friends with some safety

17   reviewers, this is what they do.  The reports

18   are coming in, they look at them, they are doing

19   quantitative analysis, they are doing highly

20   qualitative analysis of these reports.  That's

21   what they do.  There's nothing wrong with that.

22   I'm all for that.

23                It's not what I did.  What I did

24   was a statistical analysis of the FAERS

25   database.  And I'm not qualified to do the

1    clinical qualitative analysis of these reports.

2           Q.    I understand.  So let me see if I

3    can summarize.

4                 This document we've been looking

5    at that's describing the best practices for

6    pharmacovigilance safety according to the FDA is

7    not the type of analysis that you did in your

8    report?

9                 MR. ABRAMSON:  Objection; form.

10          A.    Yes.  This document does not

11   provide guidance on statistical analysis of

12   FAERS.  The other document we looked at is a bit

13   closer to that.  But I'm screening -- I'm

14   glancing at this document up and down, and they

15   don't -- they don't get into -- they don't

16   provide guidance here for statistical analysis

17   in this document.

18          Q.    So your report and this type of

19   statistical analysis that you did is different

20   than the type of analysis that's being described

21   in the FDA best practices.  Is that what you are

22   saying?

23                MR. ABRAMSON:  Objection to form.

24          A.    I'm scanning it up and down here

25   to see if there's any more in here.  In my

1  report I quote several, many FDA analyses that
2  are just like what I did.  They do -- the kind
3  of analysis I did, they do that all the time.
4          Is that described in this
5  particular document?  Maybe not.
6      Q.   In which of the analyses that you
7  cite in the FDA -- back up.
8          You said that you in your report,
9  you quote many FDA analyses that are just like
10 the one you did.  Is that right?
11     A.   Right.
12     Q.   In which one of those analyses did
13 they not review the underlying case report?
14     A.   I have no idea whether they did or
15 they didn't.
16     Q.   So when you say just like the one
17 you did, you don't know whether they reviewed
18 the underlying case report as part of that
19 analysis?
20     A.   There are citations to documents
21 in my report, they are in paragraph 29 to FDA
22 documents where they are presenting analysis
23 like mine.  Did they also look at the underlying
24 reports?  I don't know.
25          I'm not opposed to it.  You are

Page 122

1   holding this out as if this is something I think

2   is -- I'm opposed to this, one shouldn't do

3   that.  It's fine.  It's just not what I do.

4   It's not my role to look at the underlying

5   reports and read narratives.

6            Q.    Right.  But when you say the FDA

7   did the same analysis you did, you don't know

8   whether they actually looked at the underlying

9   reports or not?

10           A.    I answered that question already.

11  They may have, they may not.  I simply don't

12  know.  It's not something I've looked for.

13                MR. ABRAMSON:  Rich, we've been

14  going over an hour, let's take a break.

15                MR. MOORE:  I think it's about

16  noon here Eastern time.  I am happy to take a

17  lunch break now, if it's a good time.

18                THE WITNESS:  Fine with me.

19                MR. MOORE:  This is probably as

20  good a time as any.  We have another hour, I

21  guess, if we can start back.

22                THE VIDEOGRAPHER:  We are still on

23  the record.

24                THE WITNESS:  Half an hour?

25                MR. MOORE:  Fine here.

Page 123

1           THE VIDEOGRAPHER:  The time is

2    12:06 p.m.  We're going off the record.

3                    -----

4           (Lunch break taken.)

5                    -----

6           AFTERNOON SESSION

7                    -----

8           THE VIDEOGRAPHER:  The time is

9    12:33 p.m.  We're back on the record.

10   BY MR. MOORE:

11          Q.    Dr. Madigan, are you aware that

12   FDA conducts its own signal protection as part

13   of its process?

14          A.    Sure.

15          Q.    And it publishes those in

16   quarterly reports; right?

17          A.    They publish alerts.  I haven't

18   looked at this a while, but, yeah.

19          MR. MOORE:  Let's look at, if we

20   could, tab 21.

21          And I will represent to you that

22   these are FDA quarterly reports from 2008.

23          THE WITNESS:  That's not very

24   promising.

25          CONCIERGE:  Hold on one second.  I

Page 124

1   just checked the source and it's the exact same

2   way.

3                 MR. MOORE:  Can we go off the

4   record for just a couple of minutes, and let me

5   see if I can correct this technical problem and

6   make this document available.  We are having a

7   problem with the exhibit apparently.

8                 You are not seeing anything,

9   Dr. Madigan, just PDF?

10                THE WITNESS:  Yes.  For best

11  experience, blah, blah.

12                MR. MOORE:  Let's just go off the

13  record very quickly.  We will try to efficiently

14  resolve this.

15                THE VIDEOGRAPHER:  The time is

16  12:36 p.m.  We are going off the record.

17                (Pause in proceedings.)

18                THE VIDEOGRAPHER:  The time is

19  12:42 p.m.  We're back on the record.

20                MR. MOORE:  I would like to

21  introduce the next four documents together as

22  one exhibit.  And those are tabs -- we will make

23  it four exhibits.  I would like to introduce

24  exhibit 21A, 21B, 21C and 21D.

25                Jaysun, if you could please put

Page 125

1    those in the Marked Exhibits folder.

2                    Have those been published?

3                    CONCIERGE:  No.  Do you want me to

4    share the screen for those?

5                    MR. MOORE:  If you could put all

6    four in the Marked Exhibits.

7                    CONCIERGE:  All right.  I'm doing

8    that now.

9                    (Exhibit 14, Potential Signals of

10   Serious Risks/New Safety Information Identified

11   from the AERS between April-June 2008, was

12   marked for identification.)

13                   (Exhibit 15, Potential Signals of

14   Serious Risks/New Safety Information Identified

15   from the AERS between January-March 2008, was

16   marked for identification.)

17                   (Exhibit 16, Potential Signals of

18   Serious Risks/New Safety Information Identified

19   from the AERS between July-September 2008, was

20   marked for identification.)

21                   (Exhibit 17, Potential Signals of

22   Serious Risks/New Safety Information Identified

23   from the AERS between October-December 2008, was

24   marked for identification.)

25   BY MR. MOORE:

1           Q.    Dr. Madigan, we originally tried

2    to put these together as one exhibit, I think

3    that's what caused the technical problem.  I

4    will represent to you that these are four

5    quarterly reports from 2008 that are the FDA's

6    signal detection quarterly reports.

7           A.    Okay.

8           Q.    And have you had a chance to

9    review these?

10          A.    You mean right now?

11          Q.    Yeah.  I'm just asking, if you

12   look at the first one, for example, you agree

13   with me that's what this is is a quarterly

14   report of the FDA's signal detection activities

15   for the January to March 2008?

16          A.    Actually, the one I'm looking at

17   is April to June.

18          Q.    Okay.  The one you are looking at

19   is April to June of 2008.  And so that's the

20   FDA's report of signals that it found in that

21   quarter, second quarter of 2008; is that right?

22          A.    Yeah.  It purports to be, you

23   know, potential signals of serious risks/new

24   safety information that were identified for

25   these products during that quarter, yeah.  I

1    don't know whether it's intended to be

2    comprehensive or not, but it's the ones that

3    they've chosen to put on this alert.

4            Q.    Okay.  And the second quarter of

5    2008, that's the quarter in which you found that

6    your SEBGM statistic showed a safety signal for

7    docetaxel and permanent alopecia; right?

8            A.    That's right.

9            Q.    So in that quarter, the FDA didn't

10   find any signal for docetaxel and permanent

11   alopecia as part of its signal detection review;

12   right?

13           A.    I have no idea.  They didn't put

14   it on this list, we can agree on that.  But

15   whether they detected it or not, I haven't a

16   clue whether they were looking at this issue or

17   not.

18           Q.    You are not aware of any other

19   analysis from the FDA that concluded that there

20   was a safety signal for permanent alopecia and

21   docetaxel in the second quarter of 2008;

22   right?

23           A.    I'm not aware of any such thing.

24   I have no idea if they were looking at this or

25   not.

1      Q.    And so you are not aware of anyone

2    else other than you that's concluded that there

3    was a safety signal for docetaxel and permanent

4    alopecia in 2008 based on FAERS database?

5         A.    I have no idea if anyone else has

6    done this analysis.  I'm not aware of any such

7    analysis, I don't know whether such analysis was

8    done or not.  I have no idea.

9         Q.    It's certainly not reflected in

10   the FDA's published report on their signal

11   detection activities for the second quarter of

12   2008 in Exhibit 14; right?

13        A.    We can certainly agree it's not on

14   this list.

15        Q.    And if we look at your SEB05

16   statistic, you conclude that there was a safety

17   signal in that statistic in 2012; correct?

18        A.    Yes.

19        Q.    And specifically the second

20   quarter of 2012; is that correct?

21        A.    That's right.

22        Q.    And so if you look at tab 22B, I

23   believe.  Is that right?

24        A.    I don't have a tab 22 in the box

25   right now.

1          Q.    One second.  I'm sorry.

2                MR. MOORE:  Jaysun, can you mark

3     as exhibits the documents that are in the folder

4     22A, B, C and D as the next four exhibits.

5                CONCIERGE:  Yes.

6                MR. MOORE:  Those will be exhibits

7     18, 19, 20 and 21.

8                (Exhibit 18, January-March 2012

9     Potential Signals of Serious Risks/New Safety

10    Information Identified from the AERS, was marked

11    for identification.)

12                (Exhibit 19, April-June 2012

13    Potential Signals of Serious Risks/New Safety

14    Information Identified from the AERS, was marked

15    for identification.)

16                (Exhibit 20, July-September 2012

17    Potential Signals of Serious Risks/New Safety

18    Information Identified from the AERS, was marked

19    for identification.)

20                (Exhibit 21, October-December 2012

21    Potential Signals of Serious Risks/New Safety

22    Information Identified from the AERS, was marked

23    for identification.)

24    BY MR. MOORE:

25          Q.    Can you see those now,

Page 130

1   Dr. Madigan?

2           A.    Not quite.  Hang on.  I see 22A,

3   that's January to March 2012.  Is that the one

4   you want me to look at?

5           Q.    No.  I'd like you to look at 22B,

6   please, the second quarter.

7           A.    Yes, I have it in front of me.

8           Q.    First of all, I will represent to

9   you tabs 22A, B, C and D are the FDA quarterly

10  reports for its signal detection activities for

11  2012.  Okay?

12          A.    Okay.

13          Q.    And in tab 22B, which is

14  Exhibit 19, I believe --

15          A.    Yes.

16          Q.    -- you will agree with me that

17  this is the FDA's report of the signal detection

18  activities that it did in second quarter of

19  2012; right?

20          A.    No.  You refer to it as their

21  report.  It is a report.  I have no idea of what

22  signals make it on to this list.

23          Q.    It's a report of the FDA signal

24  detection activities in second quarter of 2012

25  and what it found; right?

Page 131

1          A.     Yes.   It's a report.   There is no

2     representation here that this is comprehensive.

3          Q.     You are not aware of any other FDA

4     reports on signal detection in the second

5     quarter of 2012; right?

6          A.     No, I'm not aware of any other

7     reports.   That doesn't mean that there aren't

8     many other signals that they are looking at.

9          Q.     But you are not aware that the FDA

10    found any signal between docetaxel and permanent

11    alopecia in the second quarter of 2012; right?

12         A.     I have no idea.   No idea.   I'm not

13    aware of any such analysis that they did, but I

14    have no idea whether they were even looking at

15    this issue or not.   I haven't a clue.

16         Q.     And this published quarterly

17    report in Exhibit 19 does not contain any

18    finding that there was a signal between

19    docetaxel and permanent alopecia?   You will

20    agree with that; right?

21         A.     Yes, it does not contain any

22    report of such a signal.

23         Q.     Now, in your -- your report, you

24    compare docetaxel to other drugs?

25         A.     Right.

1        Q.    And you did that comparison based
2   on the FAERS data; right?
3        A.    That's a funny way to put it.   In
4   my FAERS analysis I also ran comparator drugs.
5        Q.    I think we're saying the same
6   thing but I am just trying to simplify it.
7              You ran a comparison between
8   docetaxel and other drugs in your FAERS
9   analysis?
10       A.    Sure.  Yes.
11       Q.    And your FAERS analysis was based
12  on FAERS data?
13       A.    Sure.
14       Q.    And are you familiar with the
15  instructions for use of FAERS data that are
16  published on the FDA's website when you download
17  it?
18       A.    Yes.  Sure.
19             MR. MOORE:  So if we put up tab 23
20  is the next exhibit, 22, Exhibit 22.
21             (Exhibit 22, README.DOC File for
22  Quarterly Data Extract from the AERS, Revised
23  March 8, 2006, was marked for identification.)
24             THE WITNESS:  Okay.
25  BY MR. MOORE:

Page 133

1           Q.    And these are the instructions

2    that the FDA provides to anyone who downloads

3    the adverse event data from the FDA website; is

4    that fair?

5           A.    I believe that's the case.  I'm a

6    little bit bothered by the -- it hasn't been

7    revised since March 8, 2006.  Is this the

8    current version?

9           Q.    Yes.

10          A.    Okay.

11          Q.    I'm sorry.  I don't know a hundred

12   percent whether there's been a revision since

13   then or not.  But I will note your --

14          A.    Yes.

15          Q.    -- your point on that.

16                According to this version, there

17   is a set of instructions about what anyone who

18   is going to download the adverse event data

19   should follow; right?

20          A.    Sure.  Yeah.  That's not unusual.

21          Q.    And it has some caveat in

22   Section B on the second page?

23          A.    Right.

24          Q.    I'm sorry.  The next page, please,

25   Jaysun.

Page 134

```
 1              So you see that there are caveats
 2    that are listed there; right?
 3         A.    I see that.
 4         Q.    And it says there are important
 5    things to keep in mind when reviewing or
 6    analyzing AERS data.
 7              That's the same thing as FAERS
 8    data; right?
 9         A.    Yes.
10         Q.    It says, "For any given report,
11    there is no certainty that a suspected drug
12    caused the reaction."
13              And you agree with that; right?
14         A.    Sure.  We talked about that
15    earlier this morning.
16         Q.    And then it says, "This is because
17    physicians are encouraged to report suspected
18    reactions; however, the event may have been
19    related to the underlying disease being treated,
20    or caused by some other drug being taken
21    concurrently, or simply occurred by chance at
22    that time."
23              Did I read that correctly?
24         A.    Yes.
25         Q.    Do you agree with that
```

Page 135

1    statement?

2          A.    Yes.

3          Q.    Do you agree with the statement

4    that "Accumulated reports cannot be used to

5    calculate incidence (occurrence rates) or to

6    estimate drug risk"?

7          A.    Generally, yes.  An instance rate

8    is the rate at which an event occurs.  What

9    fraction of people get a headache after they

10   take a certain drug?  You can't calculate that

11   from FAERS because you don't know the

12   denominator.

13         Q.    Well, the FDA guidance actually

14   does say that there are ways that you can get a

15   rough estimate of the denominator, for example,

16   through statistical data on how many of these

17   drugs are being sold nationwide.  Although not

18   perfect, the FDA guidance says that it is

19   possible to get that information; right?

20         A.    Of course it's possible, but not

21   from FAERS.  That's my point.

22         Q.    Exactly.  But you can compare the

23   information in FAERS, which would be your

24   enumerator, with a denominator, which would be

25   the overall number of patients who took the

1    product regardless of whether they reported any

2    adverse event.  That's something you can do;

3    right?

4              A.    Yes, someone can do that.

5              Q.    And the FDA in fact in its

6    guidance encourages people to do that by

7    calculating rough estimates of the overall

8    exposure to the drug in the population.

9                    You are familiar with that;

10   right?

11                   MR. ABRAMSON:  Objection to form.

12             A.    In general terms, yes.  If your

13   business is to identify incidence rates, then

14   there's various things you can do, yes.

15             Q.    Incidence rate, you consider that

16   to be the same thing as an absolute risk?  Am I

17   right about that?

18             A.    Yeah.  It's closely related, yes.

19   The absolute risk is the probability that

20   somebody is going to get an adverse event if

21   they consume a drug.

22             Q.    So if the incidence rate is sort

23   of one in a million, that means there is a one

24   in a million chance you are going to get it,

25   that's kind -- that's the absolute risk?

Page 137

1          A.     Sure.  Yes.

2          Q.     But my point is just you haven't

3    done any -- you haven't done any calculation

4    here in your report about what the actual

5    incidence rate is for permanent alopecia in the

6    population of patients who took docetaxel

7    overall in the general population?

8          A.     That's right, that's not something

9    I've looked at.

10          Q.     And the last sentence of this

11    caveats says, "Comparisons between drugs cannot

12    be made from these data."

13              Do you see that?

14          A.     I see that.

15          Q.     Do you agree with that?

16          A.     No, and the FDA doesn't agree with

17    that.  The FDA -- it's in there, I know it's in

18    there, and there's a sentence like that in one

19    of the 2005 guidances.

20              But the 2005 guidance also -- I

21    quoted in my report, also says, and I quote,

22    "Comparisons of reporting rates and their

23    temporal trends can be valuable, particularly

24    across similar products or across different

25    product classes prescribed for the same

Page 138

1    indication."

2                  And that's what I do, and that's

3    what the FDA does, and I quote often.  And I

4    cite to several examples where the FDA does

5    that.

6         Q.    We've talked about those already;

7    right?  Those are the examples in paragraph 29

8    of your report; right?

9         A.    Right.

10        Q.    And those are the examples

11   that -- in which you are saying that the FDA

12   does conduct some comparison between drugs; is

13   that right?

14        A.    They do -- yeah, they do analysis

15   just like what I did quite frequently.  That was

16   not meant to be exhaustive, I just cited to

17   several examples where they do that.

18        Q.    Right.  But you are not aware or

19   you can't say whether or not in those analyses

20   or any other FDA analyses they review the

21   underlying case reports as part of that?  We've

22   been over that.

23        A.    That's quite the non sequitur.  Do

24   you really want to go back there?

25        Q.    No, fine.

Page 139

1          This is the same FDA analyses that
2   we talked about earlier; right?
3          A.    Yeah.
4          Q.    Now, in your -- after you
5   submitted this report in the Kahn case in March
6   2020, you actually offered a later report in
7   June 2020.
8                Do you remember that?
9          A.    Not really.  I can --
10         Q.    I can show it to you.  Let's look
11  at tab 28.
12               I believe -- you already testified
13  about this report in your August 2020
14  deposition, and I think you were asked about all
15  the differences between this report and your
16  March 2020 report, which we've been talking
17  about today.  I'm not going to go back over
18  those.  Okay?
19         A.    Okay.
20         Q.    I will represent to you that one
21  of the differences in your two reports is
22  regarding the different drugs that you included
23  on your list of comparator drugs.
24               Does that ring a bell?
25         A.    Yeah.

1          Q.    So if we look in particular at the

2    graphs that are in your later report from June

3    2020, can you turn to those please?

4          A.    Yeah.  It's not in the box.  I

5    think I have it in front of me.

6              MR. MOORE:  We're on Exhibit 23,

7    Jaysun.

8              CONCIERGE:  Sorry, I missed the

9    tab number.

10             MR. MOORE:  Tab 28.

11             (Exhibit 23, Report prepared by

12    David Madigan, Ph.D., Docetaxel and Irreversible

13    Alopecia, dated June 7, 2020, was marked for

14    identification.)

15    BY MR. MOORE:

16          Q.    I think you have it, Dr. Madigan,

17    don't you, on your screen?

18          A.    I'm pretty sure I do.

19          Q.    It's on page 14 of the tab 28, it

20    shows three graphs.  And my question is, in this

21    version you replaced two drugs --

22             (Reporter clarification.)

23          Q.    -- you replaced two drugs.  And I

24    can spell it for you, if you'd like.  The first

25    drug is Gemcitabine, the second drug is

Page 141

1    Bevacizumab.

2                    So Dr. Madigan, just trying to ask

3    what the difference was between the two reports.

4                    So in this report in June 2020 you

5    replace two of the comparator drugs, Gemcitabine

6    and Bevacizumab, with two other drugs,

7    Trastuzumab and Carboplatin.  Is that right?

8         A.    No.  Carboplatin was in the other

9    report.  I think I dropped Gemcitabine and

10   Bevacizumab, and added Trastuzumab, I think is

11   the difference.

12        Q.    So you added -- you added

13   Trastuzumab into your June 2020 report, and

14   that's not a drug that you looked at in your

15   March 2020 report?

16                    MR. ABRAMSON:  Objection to form.

17        A.    That's correct.

18        Q.    Do you know that Trastuzumab has

19   the brand name Herceptin?

20        A.    Yeah, I might have known that.

21        Q.    And each of your metrics shows

22   that Herceptin had a safety signal starting in

23   2010 and continuing through the present day;

24   right?

25                    MR. ABRAMSON:  Objection to form.

1      A.     Through the end of my analysis,

2   yes.

3             Hang on.  Actually, I should be

4   more careful.  You said each of my analyses, is

5   that true?

6      Q.     That's what I was asking.  I

7   believe it is true, but check me on that.

8      A.     It's not true in the regression

9   analysis.

10     Q.     Fair point.  I'm asking

11  specifically about PRR, SEBGM and SEB05.

12     A.     Right.  So it does appear to be

13  the case.  What you said is true with respect to

14  those three metrics.

15     Q.     So I will ask that again then.

16             With respect to the three metrics

17  PRR, SEBGM and SEB05, those three metrics show

18  that Herceptin had a safety signal starting in

19  2010 and continuing to the present day; right?

20             MR. ABRAMSON:  Objection; form.

21     A.     Yes.

22     Q.     And that signal is reflected in

23  the brown dotted line that spikes up in 2010 and

24  then comes back down in each of those three

25  graphs?

1           A.    That's right.

2           Q.    And do you still stand by this

3    report as accurate?

4           A.    Sure.

5           Q.    Now, I want to turn to a different

6    part of your report, and that's Section 5.

7                 Could you turn there, please.

8    This is page 20.

9                 This is a part of your report that

10   is Analysis of Internal Safety Databases;

11   right?

12          A.    Right.

13          Q.    And I just want to be clear about

14   this.  This is an analysis of Sanofi's internal

15   safety databases?

16          A.    That's right.

17          Q.    This is not an analysis of

18   Hospira's internal safety databases; right?

19          A.    Correct.

20          Q.    And you are not aware of any

21   evidence that Hospira had access to the Sanofi

22   internal safety database; right?

23          A.    I am not.

24          Q.    And you refer in paragraphs 51 and

25   53 to Sanofi's analysis of its internal database

Page 144

1    in 2011 and 2015; right?

2          A.    Correct.

3          Q.    And this refers to an internal

4    analysis by Sanofi; right?

5          A.    That's right.

6          Q.    This doesn't refer to any internal

7    analysis by Hospira; right?

8          A.    It does not.

9          Q.    You are not aware of any evidence

10   that Hospira had access to Sanofi's internal

11   analysis from 2011 and 2015; correct?

12         A.    I am not.

13         Q.    So you are not opining that this

14   information -- Sanofi's internal safety base was

15   a safety signal to Hospira?

16         A.    I don't think Hospira knows -- had

17   access to this at all, as far as I know.  Maybe

18   they did.  I don't know if they did.

19         Q.    Right.  So you are not offering an

20   opinion that this information in Sanofi's safety

21   base was a safety signal to Hospira?  That's not

22   part of your report; right?

23         A.    Correct.

24         Q.    Now, in Table 6 you do some

25   calculations about the number of reports in the

Page 145

1    Sanofi database?

2            A.    Right.

3            Q.    And those are case reports as well

4    that were reported to the company?

5            A.    Right.

6            Q.    And so the same limitations we

7    talked about with regard to case reports in the

8    FAERS database would also apply to those in

9    terms of their limitations?

10           A.    Generally, yes.

11                 MR. MOORE:  Give me one second, I

12   think we might be done.  Why don't we take a

13   five- or ten-minute break.  Why don't we say 10

14   minutes.

15                 THE WITNESS:  1:23 p.m. we'll be

16   back.

17                 THE VIDEOGRAPHER:  The time is

18   1:13 p.m.  We are going off the record.

19                 (Break taken.)

20                 THE VIDEOGRAPHER:  The time is

21   1:23 p.m.  And we're back on the record.

22   BY MR. MOORE:

23           Q.    Dr. Madigan, I just want to

24   clarify one thing.

25                 We had a discussion before the

Page 146

```
1    break about Section 5 of your report.  It was

2    brought to my attention that we still had on the

3    screen the June 2020 report and not your March

4    2020 report that's at issue in this case.

5                I just want to clarify, that

6    section of your report is the same in both

7    reports, I believe?

8         A.    Yes, it is.

9         Q.    So those questions that we were

10   asking about Section 5 of your report, those

11   apply to Section 5 of the March 2020 report,

12   which is the one that you issued in this case;

13   right?

14        A.    Yes.

15        Q.    And you had a question with regard

16   to the instructions that we looked at from the

17   FDA and the date of those instructions.  So if

18   we could go back to tab 23.

19        A.    Yes.

20        Q.    I believe you asked about the

21   date, the March 8, 2006 date, and whether that

22   was the current version.

23                Do you remember those questions?

24        A.    Right.

25        Q.    So my understanding is
```

1   that -- this document is entitled

2   "README.DOC"?

3           A.    Right.

4           Q.    So this is the README.DOC file

5   that downloads automatically with the 2008

6   quarterly data from the FAERS website.

7           A.    Got it.  That makes sense.

8           Q.    And so that was data that you used

9   in your analysis; right?  The 2008 quarterly

10  data?

11          A.    Well, yes.  And all the other

12  quarters.

13          Q.    Exactly.  So my point is that this

14  would have been -- this was the instruction that

15  applies to the data from that time period.

16  Okay.

17          A.    Sure.  Yes.  And I haven't looked

18  at it recently.  Maybe it's still the same, I

19  don't know.

20          Q.    I just wanted to show you the

21  current version.  And that's tab 34.

22          A.    Am I supposed to be seeing tab 34

23  in the share?

24                MR. MOORE:  Jaysun, could you pull

25  up tab 34, please.

Page 148

1           CONCIERGE:  Sorry, it's spinning.

2     It will be there in a second.

3           THE WITNESS:  Yes, there it is.

4           (Exhibit 24, README.DOC File for

5     Quarterly Data Extract from the FAERS, Last

6     Revised:  June 2015, was marked for

7     identification.)

8     BY MR. MOORE:

9           Q.    Please turn to the second page of

10    that document so you can see the same caveats.

11          A.    Yeah, I see it there.

12          Q.    Are you satisfied,

13    Dr. Madigan -- I know it's changed a little bit

14    in terms of the formatting, putting into bullet

15    points, but are you satisfied now that the same

16    language that we discussed in the 2006 version

17    is also in the current version?

18          A.    Yes.  Thank you.

19          Q.    Now, we talked a little bit about

20    Hospira's access to information and its access

21    in particular to the clinical study reports.

22          I believe in the past you've said

23    that Hospira may have been able to obtain the

24    reports, even though they are not publicly

25    available, but from the FDA through a FOIA

Page 149

1    request.  Do you remember being asked about

2    that?

3              A.    Yes.

4              Q.    And so have you ever attempted to

5    attain Sanofi's clinical trial data through a

6    FOIA request?

7              A.    Personally, no.

8              Q.    Are you aware of anyone else who

9    has?

10             A.    No.

11             Q.    What are the exemptions to the

12   FOIA and FDA role?  Do you know what they are?

13             A.    I do not.

14             Q.    Do you know anything about the

15   exemption about protecting disclosure of

16   commercial information obtained from a

17   company?

18             A.    I -- not specifically.  I've been

19   involved in FOIA requests once or twice in my

20   life.  I don't know much about it.

21             Q.    You don't know whether or not

22   Hospira would have been able to obtain the

23   clinical study requests through a FOIA request;

24   right?

25             A.    Right, I don't.

1            MR. MOORE:  I believe that's all I

2    have.  Thank you, Dr. Madigan.

3            THE WITNESS:  Thanks very much.

4            MR. ABRAMSON:  No questions.

5            THE VIDEOGRAPHER:  The time is

6    1:30 p.m.  We are going off the record.

7            (Time noted:  1:30 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 151

1                  C E R T I F I C A T E

2

3              I, SEVA FLICSTEIN, a Certified

4    Court Reporter of the State of New Jersey, do

5    hereby certify that prior to the commencement of

6    the examination the witness was sworn by me to

7    testify the truth, the whole truth and nothing

8    but the truth.

9              I DO FURTHER CERTIFY that the

10   foregoing is a true and accurate transcript of

11   the testimony as taken stenographically by and

12   before me at the time, place and on the date

13   hereinbefore set forth.

14              I DO FURTHER CERTIFY that I am

15   neither of counsel nor attorney for any party in

16   this action and that I am not interested in the

17   event nor outcome of this litigation.

18

19

20   _____

         New Jersey Certificate No. XI 01413

21       California Certificate No. 8727

         Registered Merit Reporter

22       Certified Realtime Reporter

23

24

25

Page 152

1    IN RE: TAXOTERE (DOCETAXEL)                    :
2    PRODUCTS LIABILITY LITIGATION
                                                     :
3    - - - - - - - - - - - - - - - - - - - - - - -
     This document relates to:                       :
4
     Clare Guilbault, Case No. 2:16-cv-17061         :
5    Audry Mae Plaisance, Case No. 2:18-cv-08068
     _____   :
6

7

8            I have read the foregoing transcript and
     found it to be a truthful and accurate
9    representation of the testimony I gave in
     connection with the captioned matter on
10   _____.
11

12

13                        _____
                                DAVID MADIGAN, PH.D.
14

15

16
     The State of:
17   County of:
18
     Sworn and subscribed to before me on this
19   day        of                   , 2021
20
21   NOTARY PUBLIC  _____
22   My commission expires:
23

24

25

Page 153

1           E R R A T A    S H E E T

2

3        Please list any correction with the

corresponding page and line numbers.

4

5        PAGE     LINE              CORRECTIONS

6    1.                    :

7    2.                    :

8    3.                    :

9    4.                    :

10   5.                    :

11   6.                    :

12   7.                    :

13   8.                    :

14   9.                    :

15   10.                   :

16   11.                   :

17   12.                   :

18   13.                   :

19   14.                   :

20   15.                   :

21   16.                   :

22   17.                   :

23   18.                   :

24   19.                   :

25   20.                   :

[& - 29]                                                                                     Page 1

**&**

**&**   2:17 3:5,14,22
  4:13 9:19

**0**

**0.04**   64:3
**0.05**   63:12
**0.5**   49:10
**00243374**   6:6 86:8
**00243375**   6:6 86:8
**01413**   151:20
**02109**   4:15
**02110**   4:21
**02446**   9:23
**08068**   1:7 152:5

**1**

**1**   5:11,17 11:18
  12:3 13:15,17
  15:14 58:18 74:25
  92:13 153:6
**1.85**   64:2
**10**   5:5 6:5 38:1,12
  42:20 43:2,11,17
  44:5,11,12,16,24
  45:3,4,5 56:14
  61:3,3 86:4,5,6,7
  145:13 153:15
**100**   37:14
**102**   6:9
**109**   6:11
**10:36**   55:20
**10:41**   55:23
**11**   5:11 6:7 67:25
  95:18 102:21
  153:16
**1100**   4:6
**111**   57:23
**12**   5:14 6:9 60:6
  68:18 71:17 73:9
  76:11,18 102:6,8
  153:17

**125**   6:13,16,18,21
**129**   6:23 7:4,6,9
**12:06**   123:2
**12:33**   123:9
**12:36**   124:16
**12:42**   124:19
**12th**   3:8
**13**   6:11 109:11
  153:18
**132**   7:12
**14**   5:15 6:13 74:25
  125:9 128:12
  140:19 153:19
**140**   7:14
**14th**   2:19
**15**   5:16 6:16
  125:13 153:20
**16**   5:21 6:18 35:17
  35:23 36:4 40:19
  45:17 47:10
  125:17 153:21
**16-2740**   1:2
**168**   7:16
**17**   1:21 5:18 6:21
  8:3 95:17 125:21
  153:22
**17061**   1:7 152:4
**18**   6:23 104:7,12
  129:7,8 153:23
**19**   7:4 102:5 129:7
  129:12 130:14
  131:17 153:24
**1:13**   145:18
**1:23**   145:15,21
**1:30**   150:6,7

**2**

**2**   5:14 12:22 13:2
  14:15 29:10 77:8
  77:9,13,22 153:7
**20**   7:6 17:22 109:2
  129:7,16 143:8

**153**:25
**2000**   4:20 75:8,13
  78:14
**20005**   3:8
**2000s**   78:18 79:17
**2003**   78:3
**2004**   75:14
**2005**   6:10 102:9,14
  137:19,20
**2006**   7:13 132:23
  133:7 146:21
  148:16
**2008**   6:15,17,20,22
  75:15 123:22
  125:11,15,19,23
  126:5,15,19,21
  127:5,21 128:4,12
  147:5,9
**2010**   33:6 77:6,21
  77:25 141:23
  142:19,23
**2011**   68:16 144:1
  144:11
**2012**   5:21 6:23 7:4
  7:6,9 40:19 75:19
  78:22,24 79:5,16
  128:17,20 129:8
  129:12,16,20
  130:3,11,19,24
  131:5,11
**2015**   7:17 144:1,11
  148:6
**2017**   82:6,17 83:3
  83:7,18,22 84:18
**2019**   109:7
**202**   3:9
**2020**   5:13 7:15
  11:1,20 12:8
  15:25 16:5 17:23
  20:12,16,19,20,25
  21:6,9 22:14

**139**:6,7,13,16
  140:3,13 141:4,13
  141:15 146:3,4,11
**2021**   1:22 5:14,17
  8:3 12:23 15:14
  15:18 152:19
**21**   7:9 16:5 17:22
  110:15 123:20
  129:7,20
**213-7047**   4:15
**216**   4:7
**21a**   124:24
**21b**   124:24
**21c**   124:24
**21d**   124:24
**22**   7:12 128:24
  132:20,20,21
**228-863-6000**   2:20
**22a**   129:4 130:2,9
**22b**   128:22 130:5
  130:13
**23**   5:13 7:14 11:20
  132:19 140:6,11
  146:18
**24**   7:16 18:20
  148:4
**2519**   2:11
**2555**   3:16
**2601**   2:19
**27**   9:22 38:5
**27th**   4:14
**28**   139:11 140:10
  140:19
**2800**   3:23
**29**   35:13,23 36:3
  37:1,17,23 38:5,11
  38:14,22,25 39:6
  39:11 45:17 47:9
  50:6,18 51:10
  86:2 121:21 138:7

**[2:16 - added]**

**2:16**  1:7 152:4
**2:18**  1:7 152:5

**3**

**3**  5:15 14:16,17,19
15:1 25:6 77:2,6
77:20 153:8
**30**  44:4,11
**301**  30:14,22 56:1
56:10,25 57:14,14
57:18 58:25 60:2
65:25 66:16,21
**30116**  2:12
**30xi000141300**
1:18
**31**  15:12 82:5,16
82:21,22 83:2,6,12
83:17 84:14,18,19
85:1,11,19 90:5,23
91:16,18 92:3
97:25 98:16,23
99:13
**310-6231**  4:21
**316**  5:20 30:15,22
31:8,18 32:19
33:1,14,19,25
34:11 35:10,23
40:10,11 42:7
53:24 54:12 57:10
57:14 58:24 63:4
65:20 66:16,21
68:13
**32**  5:19 17:11
**34**  147:21,22,25
**37**  35:2,5,10 82:23
**39501**  2:20

**4**

**4**  5:16 11:17 14:14
15:12,13 70:17
77:2,24 82:11
153:9

**40**  5:21
**404-915-8886**  2:12
**4298**  35:5
**434-5688**  3:9
**44113**  4:6
**45202-2409**  3:24
**47**  57:24 58:3
**474-6550**  3:17

**5**

**5**  5:18 12:19,20
17:10,12 32:5
64:5 77:3 143:6
146:1,10,11
153:10
**505**  29:10
**51**  40:25 41:7
48:17 143:24
**53**  143:25
**55**  60:6
**56**  5:24
**59**  31:12

**6**

**6**  5:19 13:2 32:18
32:23 110:9,19
144:24 153:11
**6.1**  112:24
**6.1.1**  113:3
**60**  56:3
**600**  3:23
**617**  4:15,21
**64108**  3:16
**67**  40:8,13,25 41:7
**68**  6:3
**696-2286**  4:7

**7**

**7**  5:21 7:15 30:10
30:13 32:16 35:9
37:24 40:18,19
42:6 43:25 46:4
48:4 110:12

140:13 153:12
**713-230-2343**  2:8
**725**  3:8
**77017**  2:7

**8**

**8**  5:24 7:13 40:17
56:15,16 132:23
133:7 146:21
153:13
**8131**  151:19
**816**  3:17
**8441**  2:7
**86**  6:5
**8727**  1:19 151:21
**8842**  41:24
**8845**  42:11

**9**

**9**  5:14 6:3 12:23
33:6 43:25 68:1
68:10 86:2 153:14
**95**  6:7
**950**  4:6
**9707**  57:25
**9805**  5:25 56:8,11
56:17
**9:34**  1:22 8:2

**a**

**a.m.**  8:2 55:20,23
**abilify**  18:2
**able**  37:13 48:13
148:23 149:22
**abramson**  2:6
8:20,21 21:16
26:21 27:4,10,15
27:20 28:1 34:8
34:13 36:17 37:2
37:19 38:7 39:12
42:21 43:3,12,18
44:14,25 45:14
46:6 47:6,19 48:5

49:1,24 50:10,23
52:25 54:14 55:11
64:14 69:22 70:7
83:19 85:13 87:20
105:13 116:9
117:7 118:23
120:9,23 122:13
136:11 141:16,25
142:20 150:4
**absolute**  136:16
136:19,25
**absolutely**  106:16
**accept**  43:5
**accepting**  111:1
**access**  17:16 28:5
28:11 66:25 67:3
143:21 144:10,17
148:20,20
**accord**  4:4 9:9
**accumulated**
135:4
**accumulating**
116:16,16
**accumulation**  94:5
**accurate**  41:21
54:3 113:6 143:3
151:10 152:8
**act**  29:11
**actavis**  3:20,21,21
9:6,6
**action**  8:12 151:16
**activities**  6:8
95:19 110:24
126:14 128:11
130:10,18,24
**actual**  40:11 46:8
49:7 55:3 106:19
137:4
**add**  72:6
**added**  141:10,12
141:12

| | | | |
|---|---|---|---|
| **additional** 16:4 17:21 | 48:21 49:11,13 50:2,4,17 51:4,24 | 87:17,18,19 88:1,5 88:9,10,11,21 | 100:2,4,5,22 104:2 112:3,5,6,13,23 |
| **address** 34:24 | 57:8,18,22 60:12 | 89:10,18 90:1,6,17 | 117:9,11,12,22 |
| **addressing** 112:17 | 62:20 63:3 68:13 | 90:25 92:4,13,22 | 118:7,9,13,17,19 |
| **adequacy** 29:14 | 69:15,18 76:7 | 94:22 95:6,10 | 118:20 119:5,19 |
| **adjuvant** 6:4 68:2 | 86:19 87:7,17 | 96:24 97:6,17 | 119:20,24 120:1,7 |
| **administration** 114:20 | 88:22 92:14 104:2 111:15 114:6 | 99:3,5,9,16,18,22 100:8,10,13,15,18 | 120:11,16,19,20 121:3,19,22 122:7 |
| **adverse** 26:14,18 | 126:12 127:14 | 100:20 127:7,11 | 127:19 128:6,7,7 |
| 27:25 34:18 42:19 | 128:13 130:16 | 127:20 128:4 | 131:13 132:4,9,11 |
| 43:1,10 46:10 | 131:20 134:13,25 | 131:11,19 137:5 | 138:14 142:1,9 |
| 70:24 71:3,6,11,19 | 135:3 137:15,16 | 140:13 | 143:10,14,17,25 |
| 72:2,12,21,24 | **agreeing** 59:14 | **alopecias** 47:1 | 144:4,7,11 147:9 |
| 73:14,20 74:2,4,7 | 64:23 77:18 93:11 | 95:13 96:22 97:2 | **analyze** 106:10,20 |
| 74:8,9 79:24,25 | 94:15 | 97:14,20 98:1,11 | **analyzed** 39:16 |
| 80:6,10,11,14,15 | **alert** 127:3 | 98:22 | 58:14 59:7 61:17 |
| 80:18,22,24 88:8 | **alerts** 123:17 | **alternate** 85:12 | **analyzing** 106:18 |
| 92:1,17,19,24 93:2 | **alopecia** 5:12 7:15 | **analyses** 76:25 | 108:17 113:14 |
| 93:3,7,7,12,15,16 | 11:20 16:8 18:14 | 84:9,16 104:24 | 119:3 134:6 |
| 93:20 94:16,25 | 26:7 27:8 30:14 | 105:10 121:1,6,9 | **androgenetic** 99:2 |
| 95:1 99:1,11,21 | 34:6,9,12,24 35:14 | 121:12 138:19,20 | 100:18 |
| 111:8,11 114:21 | 35:18 36:3,10,15 | 139:1 142:4 | **answer** 39:14 49:2 |
| 115:24,25 116:17 | 36:16 37:9,25 | **analysis** 27:7 | 51:16 52:21 63:7 |
| 116:18 133:3,18 | 38:11 39:15,18,23 | 35:22 36:1 37:23 | 92:7 98:7 106:5 |
| 136:2,20 | 39:25 40:1,3,4,10 | 38:4,10 39:22 | **answered** 16:21 |
| **advisable** 106:2 | 48:23,24 49:21 | 48:4 49:17 52:8 | 27:11,16,21 28:2 |
| **aers** 6:14,17,19,22 | 50:7,8,20,20 51:12 | 54:23,23 55:3,7 | 51:20 54:1 122:10 |
| 6:25 7:5,8,11,12 | 51:12 53:25 54:13 | 58:13 59:2 63:8 | **answering** 44:20 |
| 125:11,15,19,23 | 54:19 55:10 57:21 | 63:17,19,25 64:24 | 90:22 98:7 |
| 129:10,14,18,22 | 58:4,7,8,16,20 | 65:6 66:8,9 67:8 | **answers** 54:4 |
| 132:22 134:6 | 59:4,22 60:3,11,21 | 67:11,16 69:21 | **anyplace** 70:11 |
| **aes** 44:1 | 61:4,9,14,16,23 | 70:5,5,15,20 74:15 | **apologies** 14:18 |
| **affiliations** 8:15 | 62:5,24 63:9 64:1 | 74:20,21,24 75:6 | 38:20 82:24 |
| **afternoon** 20:1 | 64:8,13,19 65:4,10 | 76:2,6,24 77:20 | **apparent** 118:16 |
| 123:6 | 65:15,20,25 66:5 | 78:6,12,18 81:16 | **apparently** 124:7 |
| **agency** 5:23 40:21 | 68:20,24 69:4,14 | 82:7 83:1,5,21,24 | **appear** 18:11 |
| 108:8 112:7 | 69:20 74:17 78:11 | 84:5,11,21,23,25 | 96:10 142:12 |
| **ago** 10:25 18:25 | 79:21 81:6,9,13,20 | 85:4,5,9,11,12,18 | **appearance** 8:15 |
| **agree** 13:9 40:4 | 81:21,25 82:6,17 | 85:20,25 86:23 | 8:18 |
| 41:19 42:17 43:14 | 83:2,6,12,18 84:2 | 89:21 90:10,19 | **appeared** 75:7,12 |
| 45:12 46:5,19,23 | 84:10,14,20 87:11 | 91:2 98:10 99:21 | 75:18 76:9,12 |

78:7 79:4 98:15
**appearing** 2:2 3:2
4:2 77:21 78:21
**appears** 35:10
42:4,9 60:11 62:9
69:5,16,23 88:10
96:5
**appendices** 13:23
14:2
**appendix** 14:7
82:11
**applied** 60:13 88:6
**applies** 58:24
60:16 72:24
147:15
**apply** 54:22 94:18
145:8 146:11
**appreciate** 106:6
**approved** 29:10
**approximately**
22:10
**april** 6:10,15 7:4
102:9,14 125:11
126:17,19 129:12
**area** 89:23 91:23
95:7 106:24
**argue** 51:3 59:15
96:12
**arm** 18:3 35:15,18
36:3,4 58:8,9,19
62:13,13,14,24,24
63:10,10
**arms** 58:4
**arrive** 47:9
**article** 65:18,23
**articles** 65:8 66:3
**asbestos** 18:3
**asked** 27:11,16,21
28:2 53:1 139:14
146:20 149:1

**asking** 42:5 43:4
48:20 53:12 54:9
72:21 84:7 87:14
90:13 100:1,1,4
117:14 126:11
142:6,10 146:10
**aspect** 84:5
**associated** 92:13
92:21,23 93:4,8,17
**association** 8:10
**assume** 21:2
**assumed** 85:10
**attached** 88:12
**attachment** 5:22
40:21
**attain** 149:5
**attempt** 114:18
115:7
**attempted** 149:4
**attention** 146:2
**attorney** 8:19
151:15
**attorneys** 2:4,16
3:4,12,20 4:4,11
4:18 19:18,22
25:15
**audible** 58:11
**audry** 1:7 2:16
9:13,15 22:19
152:5
**august** 10:25
17:23 18:20 20:12
20:16,19,25 21:6,9
22:14 139:13
**authority** 41:4
**automatically**
147:5
**available** 67:12,17
70:2,3 124:6
148:25

**avenue** 4:6
**aware** 17:3 28:4
37:15,20 53:21
54:9,19 64:6,16
65:1,5,7,16,17,22
66:2,7,14,19,24
67:2,6,9,15,19,19
70:1,11 107:24
123:11 127:18,23
128:1,6 131:3,6,9
131:13 138:18
143:20 144:9
149:8
**axillary** 57:15

**b**

**b** 2:19 5:9 6:1 7:2
29:10 129:4 130:9
133:22
**babramson** 2:8
**back** 11:11 13:15
25:5 53:22 54:10
55:23 78:13 79:17
92:10 117:15
121:7 122:21
123:9 124:19
138:24 139:17
142:24 145:16,21
146:18
**background** 70:23
83:25 90:24 91:1
**bacon** 3:14
**base** 144:14,21
**based** 66:9 82:6
83:16 85:10 87:11
96:5 98:4 128:4
132:1,11
**basically** 119:14
**bates** 6:5 25:9,19
35:5 57:24 86:8
**bayesian** 103:14
103:25

**bcirg001** 5:20
32:19
**beginning** 8:18
48:11
**behalf** 8:23,25 9:2
9:4,5,9,11,13,15
9:20
**believe** 10:24 12:6
22:15 26:4 28:20
30:4,6 31:3 33:5
37:12 57:1 79:14
86:3 102:3 104:5
104:6 105:3
110:16 128:23
130:14 133:5
139:12 142:7
146:7,20 148:22
150:1
**bell** 139:24
**berne** 3:22
**best** 6:11 11:10
102:1 109:5,11,24
111:16 114:12
115:2,9,11 116:4
117:24 118:21
120:5,21 124:10
**better** 38:19 41:2
64:25 97:4
**bevacizumab**
141:1,6,10
**beyond** 22:4
**biasing** 91:1
**big** 69:10
**biological** 6:11
109:5,12
**bit** 31:15 46:16,22
56:19 79:19,23
101:18 112:4
120:12 133:6
148:13,19

**blah** 124:11,11
**body** 14:3
**boston** 1:21 4:15
  4:21 10:16
**bothered** 133:6
**bottom** 87:2,3
**boulevard** 3:16
**boundas** 2:6
**box** 2:11 73:5
  128:24 140:4
**brand** 141:19
**break** 31:14 49:12
  55:15,16,21
  122:14,17 123:4
  145:13,19 146:1
**breast** 6:4 68:2
**brian** 2:6 8:20
  26:25
**broad** 54:15
  110:24
**brookline** 9:23
**brought** 22:18
  146:2
**brown** 142:23
**brush** 54:15
**buildup** 94:3
**bullet** 148:14
**business** 136:13

**c**

**c** 2:1 3:1 4:1 129:4
  130:9 151:1,1
**calculate** 135:5,10
**calculated** 51:25
  52:13,14
**calculates** 52:1
**calculating** 136:7
**calculation** 52:24
  83:11,17 85:19
  91:5 103:13 137:3
**calculations** 13:21
  14:1,3,4 49:14

52:9,12,22 53:4,6
  58:18 144:25
**calendar** 19:24
**california** 1:18
  151:21
**call** 59:18 63:13
  118:12
**called** 71:7 95:14
  109:5 110:12
  113:11,19 115:18
**calling** 113:23
**callsen** 4:5 9:8,8
**canada** 41:11,11
  41:14,16,17 42:1,5
  43:7
**canadian** 41:4
**cancer** 6:4 68:3
**captioned** 152:9
**caraco** 4:11
**carboplatin** 141:7
  141:8
**care** 24:15,19 94:7
**careful** 142:4
**carrollton** 2:12
**case** 1:7,7 11:15
  12:5,9,13 13:10,11
  13:18 15:8 19:8
  22:1,7,17 28:21
  38:25 39:1 42:4,9
  53:23 54:11 59:20
  59:24 69:16,23
  71:7 87:24 97:25
  99:5,17 104:25
  105:11,19,21
  106:3,20 107:9,20
  107:21 108:1,6,12
  108:18 113:24
  114:8,12,18 115:3
  115:13 116:7,13
  116:23 117:5,6,17
  117:25 121:13,18

133:5 138:21
  139:5 142:13
  145:3,7 146:4,12
  152:4,5
**cases** 18:10,13,16
  18:20 22:18 45:5
  60:20 61:13 79:20
  81:12,20 82:5,17
  83:2,6,12,17 84:9
  84:13,15,19,20
  85:1,11,19 90:25
  92:3 97:25 98:3
  98:23 100:9,14,19
  106:11
**causally** 73:23
  74:12
**causation** 101:23
  112:11
**cause** 115:24
**caused** 24:23 25:2
  73:11 126:3
  134:12,20
**causes** 101:11
**caveat** 133:21
**caveats** 46:19
  134:1 137:11
  148:10
**certain** 12:10
  37:14 73:6 135:10
**certainly** 41:23
  44:15 54:25 59:17
  102:20 105:16,18
  106:24 107:22
  112:20 128:9,13
**certainty** 134:11
**certificate** 1:18
  151:20,21
**certified** 1:17,20
  9:24 151:3,22
**certify** 151:5,9,14

**cetera** 102:1
**chance** 126:8
  134:21 136:24
**change** 84:21 85:1
  85:4
**changed** 148:13
**changes** 87:4
**characterization**
  112:21
**characterize** 46:25
**characterizing**
  115:8
**chart** 48:22 49:15
  49:19 50:18 51:6
  51:9 53:12 97:15
**check** 45:9 82:8
  142:7
**checked** 88:18,24
  89:13 94:12 124:1
**checkmark** 92:12
**checks** 92:18
**chemicals** 119:3
**chemo** 48:25
  50:22
**chemotherapy**
  31:22 32:9 33:15
  45:7 49:23 50:9
  51:14
**choice** 116:5
**choose** 116:8
**chosen** 127:3
**chris** 3:14
**cincinnati** 3:24
**cioms** 80:3
**citations** 121:20
**cite** 108:10 121:7
  138:4
**cited** 102:17 107:8
  109:16 138:16
**citing** 40:25

**city** 3:16
**clare** 1:7 22:19
  152:4
**clarification** 39:24
  62:18 105:9
  140:22
**clarify** 42:2 59:10
  77:17 145:24
  146:5
**classes** 137:25
**classification** 39:8
  90:16
**classified** 59:4
  80:15
**clear** 35:21 56:6
  143:13
**cleveland** 4:6
**clinical** 5:19,24
  30:18,23 31:19
  32:18,25 35:10
  36:13,25 37:16
  38:17 40:11 42:3
  42:7 45:17,24
  47:2 48:7 49:17
  50:13 52:14 55:2
  55:4 56:16,24
  57:23 59:8 62:12
  62:14 64:8 66:6
  66:10,12,20,25
  67:4,10 68:6 70:3
  73:18,19 74:4
  112:9 120:1
  148:21 149:5,23
**clinicaltrials.gov**
  6:3 67:21 68:1,5
  68:12 69:2,12,19
  69:24
**clinicaltrials.gov.**
  67:24
**clinicians** 73:22

**closely** 136:18
**closer** 120:13
**clue** 127:16 131:15
**cmcrae** 3:17
**code** 81:5,8,21
  88:11 93:23 94:17
**coded** 81:2 87:10
  87:18 88:1,21
  89:10 92:20 94:22
  97:25 98:19,21
  99:2,11,15 100:7
  100:12,17
**coder** 87:15 88:16
**codes** 80:22 95:9
**coding** 80:16,19
**coincident** 71:11
  71:20
**colchster** 9:22
**cold** 87:5
**collects** 71:3
**column** 49:9 50:1
  50:3
**columns** 43:24
**combat** 18:2
**combination** 32:1
  32:5
**combine** 66:5
  81:20
**combined** 63:16
  63:22 64:7,12,18
  65:3,9,13 81:15
**come** 17:18
**comes** 142:24
**coming** 116:15
  119:18
**commencement**
  151:5
**commencing** 1:22
**commercial**
  149:16

**commission**
  152:22
**committee** 2:4
**commonness**
  90:21
**communicate**
  19:14
**communicated**
  20:6,10 22:22,25
  23:15,18
**company** 30:2,5,7
  73:3 145:4 149:17
**comparator** 132:4
  139:23 141:5
**compare** 33:14,19
  34:1 131:24
  135:22
**compared** 57:9
**comparing** 62:23
  63:9
**comparison** 35:24
  132:1,7 138:12
**comparisons**
  137:11,22
**complements**
  116:23 117:18
**complete** 58:14
  62:10
**completed** 39:2
**completely** 118:6
**completion** 37:25
  38:12
**complicated**
  105:14
**complied** 29:5
**comprehensive**
  127:2 131:2
**computed** 45:22
  47:9
**conceivable** 99:6

**conceivably** 91:6
  99:14
**concern** 62:8,8
  101:5
**concerning** 78:10
**concierge** 4:25
  56:19 123:25
  125:3,7 129:5
  140:8 148:1
**conclude** 78:10
  128:16
**concluded** 54:17
  63:22 127:19
  128:2
**concurrently**
  134:21
**condition** 24:9,12
**conditions** 39:6
**conduct** 31:1,6
  39:3 62:22 63:8
  63:10,25 138:12
**conducted** 64:11
  64:17 65:2 89:21
**conducts** 123:12
**conference** 10:14
**confirm** 69:11
**conjunction**
  104:24 105:7
  107:10
**connected** 94:24
  95:5
**connection** 152:9
**connolly** 3:5 9:20
**conservative**
  76:17,21
**consider** 39:25
  48:2 104:14
  136:15
**considered** 37:23
  38:4,10 39:17
  72:2,11 81:25

99:17
**consulted** 82:4
**consume** 136:21
**cont'd** 3:1 4:1 6:1
7:1
**contain** 69:2,12
86:17 131:17,21
**contained** 14:6
**contains** 13:17
58:3 68:6,19 80:9
80:21 86:14
111:11
**contents** 110:9
**context** 72:16,16
72:17,20 73:1
74:3,7
**contexts** 105:25
**continuing** 141:23
142:19
**controlled** 31:19
**conventional**
77:13,21
**copy** 15:17
**corners** 14:6
**correct** 10:20 11:5
13:11,19,20 14:11
14:12,17,24,25
15:18 16:1 17:23
18:5 21:7 25:21
25:25 26:16,19,20
28:16,24 29:2,3,7
29:11,12 30:20
32:3,7 34:20
37:22 41:4 42:1
42:14 45:2,8 49:6
49:23 51:14,18
52:5,11,20 53:16
53:19 56:12 58:13
58:21,25 59:13
61:6 63:2 72:14
72:18 74:20 76:15

77:4,7,23 78:1,4,9
80:20 83:3,9,12
85:12 86:15 89:14
92:15 96:13 98:24
101:13 104:18
113:17 124:5
128:17,20 141:17
143:19 144:2,11
144:23
**correction** 153:3
**corrections** 153:5
**correctly** 16:21
44:7 103:18
104:17 111:5
114:24 134:23
**correspondence**
27:19
**corresponding**
153:3
**cosmetic** 29:11
**counsel** 2:2 3:2 4:2
8:14 151:15
**count** 98:16
**county** 152:17
**couple** 124:4
**course** 115:22
135:20
**court** 1:1,17 8:9
9:16,24 62:18
105:9 151:4
**covered** 21:5
**covers** 92:15
**covey** 4:19 9:1,1
**created** 81:11
**criteria** 88:23
89:12 91:17
**criticize** 30:1
**crump** 2:17
**csr** 1:19
**culbertson** 4:13

**cumulative** 115:18
115:22 116:5,23
117:16,17
**current** 15:21 24:9
24:12 133:8
146:22 147:21
148:17
**curriculum** 5:16
15:13
**cv** 1:7,7 15:18,22
15:25 16:3,24
152:4,5
**cyclophosphami...**
32:2,6,9

**d**

**d** 5:1 9:21,21,21
9:21 129:4 130:9
**damage** 81:22
**data** 7:12,17 36:1
38:17 40:12 43:25
44:17 45:10 53:9
55:2 58:15 59:8,9
59:11,16,25 61:18
61:22 62:12,15
66:13,15 67:4,10
70:3 84:23 85:10
103:15 104:3,15
104:21,23 105:4,6
105:15,16,17,20
105:20,22 106:8
106:21,25 107:10
107:24 108:2,4,11
108:17,23,24
112:9,10,25
113:12,20 117:13
132:2,12,15,22
133:3,18 134:6,8
135:16 137:12
147:6,8,10,15
148:5 149:5

**database** 26:14
71:2 74:16 87:11
87:19 89:22 90:11
92:2,20 98:12
105:17 111:8,10
113:9,15 118:8,13
119:25 128:4
143:22,25 145:1,8
**databases** 143:10
143:15,18
**date** 45:11 75:9
146:17,21,21
151:12
**dated** 5:13,16 7:15
11:20 15:14,25
33:6 109:7 140:13
**dating** 78:13
**david** 1:11 2:11
5:4,11,15 7:14 8:4
9:3 11:19 14:19
14:23 140:12
152:13
**davis** 2:17
**daviscrump.com**
2:21,21
**day** 141:23 142:19
152:19
**days** 18:25 44:4,11
94:7
**dc** 3:8
**december** 6:22 7:9
125:23 129:20
**defendant** 3:4 4:4
4:18
**defendants** 3:12
3:20 4:11
**definition** 42:2
45:19 46:20,25
47:16,24 48:3,7
58:24 72:23

definitive 47:2
50:13
denominator
135:12,15,24
denying 12:12,15
depending 78:11
depends 85:7
deposed 10:18,25
20:19
deposition 1:10
5:18 8:3 10:11
11:8 16:1 17:12
17:21 18:1,1,6,19
18:24 19:5,11,15
20:12,16,25 21:2,6
21:10,15 23:9,12
27:3 28:16,18,23
40:2,6 53:16,17
139:14
depositions 11:4
19:2,4 23:22,24
51:21
describe 36:12
46:17 71:10,20
109:4 113:24
115:18
described 21:14
50:12 118:21
120:20 121:4
describes 36:14
describing 39:5
113:7,22,23
114:11 120:5
description 5:10
6:2 7:3 31:12
103:6 112:24
114:4
design 57:9
designed 34:11
57:19 100:23

detail 115:25
details 80:10
detected 127:15
detection 103:8,15
126:6,14 127:11
128:11 130:10,17
130:24 131:4
determine 39:10
95:4 101:15,20
111:22 114:21
determined 75:6
development
103:10
dictionaries 80:16
dictionary 6:7
80:19 95:10,18
96:3,7,9,16
difference 57:13
76:11,18 78:6
110:16 141:3,11
differences 139:15
139:21
different 12:20
16:22 31:22 47:3
47:12,15 73:19
74:22 76:8 79:6,7
79:8 84:23,24
85:6,7,19,21 89:3
89:9 90:16 105:24
118:7 119:1,6
120:19 137:24
139:22 143:5
disability 81:21
88:18,25 92:12,19
92:20,21 93:5,8,17
94:12,23 95:5
disabled 89:13
disagree 51:6
107:14,15
disagreement
110:4

disappeared 75:13
disclosed 12:8
13:5
disclosure 5:14
12:22 149:15
discuss 70:20
discussed 20:21
22:5 84:15 95:10
148:16
discussing 21:25
discussion 58:22
73:25 145:25
disease 33:14
134:19
dispute 107:11,12
disputing 96:11
distinction 104:20
distinctions 74:2
district 1:1,1
dmiceli 2:13
docetaxel 1:4 5:12
6:3 7:14 11:19
16:11 18:17 24:3
24:6,23 25:2 26:6
27:7,14 29:14,18
29:24 31:25 54:18
57:21 58:19 60:14
60:15,20,22 61:13
61:15 62:4,6 68:2
70:20 74:16 77:12
78:11 83:7 127:7
127:10,21 128:3
131:10,19,24
132:8 137:6
140:12 152:1
document 1:6
12:20 26:23 33:3
33:9 35:6 36:19
36:21 37:7,11,13
40:9,24 41:6 43:6
47:17 48:11 49:25

51:23 52:3 53:5
57:2 68:18 69:6,8
69:10 102:13,17
104:19 105:12
107:7 109:1,4,10
110:5,9,23 111:16
112:24 115:11
118:22 120:4,10
120:12,14,17
121:5 124:6 147:1
148:10 152:3
documentation
14:5 110:13
documents 19:10
25:8,12,16,18,23
26:2,22 28:6,12
102:2,4 121:20,22
124:21 129:3
doing 105:4,6,15
105:20 106:8,21
106:25 108:9,16
108:23 112:4,6,7
115:2,13 116:4
118:6,7 119:4,18
119:19 125:7
domain 70:12
dose 45:7
dotted 142:23
double 31:5
download 132:16
133:18
downloads 133:2
147:5
doxorubicin 32:1
32:5,8
dr 8:4 10:5,18
11:24 13:16 15:17
17:16,20 18:23
29:1 30:9 32:24
35:7 53:15,22
54:23 55:8,25

56:23 58:1 82:4
119:13 123:11
124:9 126:1 130:1
140:16 141:2
145:23 148:13
150:2
**draft** 109:20
**drawing** 74:1
**dropped** 141:9
**drug** 6:11 29:11
41:19 71:12,21
72:1,4,10,13 73:6
73:11,14,17,23
74:10 101:11
103:16,16 109:5
109:12 134:11,20
135:6,10 136:8,21
140:25,25 141:14
**drugs** 29:9 32:9,14
71:4 94:8 111:14
131:24 132:4,8
135:17 137:11
138:12 139:22,23
140:21,23 141:5,6
**due** 94:5,7
**duly** 9:24
**duration** 49:14
50:1 52:10,24
**durations** 53:6

**e**

**e** 2:1,1 3:1,1 4:1,1
4:14 5:1,9 6:1 7:2
151:1,1 153:1,1,1
**e2e** 6:9 102:9,13
**earlier** 12:9 83:11
134:15 139:2
**earliest** 79:11
**early** 78:14,17,18
**earnest** 19:8
**earplugs** 18:3

**easterby** 2:6
**eastern** 1:1 122:16
**eb05** 103:25
**ebgm** 103:24
**efc6041** 5:20 32:19
**efficient** 11:11
**efficiently** 124:13
**elizabeth** 13:6,11
**ellis** 4:5
**email** 5:21,22
40:19,20
**emergence** 78:12
**emergency** 94:4
**emergent** 46:9
**employees** 28:19
28:23
**encouraged**
134:17
**encourages** 136:6
**endpoint** 34:25
39:16 64:1 98:9
**ends** 42:11
**enter** 91:5
**entire** 15:6 42:19
43:2,10 92:16
**entirely** 45:15
49:6 50:24 52:2
52:13,17
**entitled** 1:15 14:23
30:14 110:9 113:4
147:1
**entity** 73:24
**enumerator**
135:24
**ernst** 5:22 40:20
**esoteric** 74:1
**esq** 2:6,11,18,19
3:5,6,7,14,15,23
4:5,14,19,19
**essentially** 104:14

**establish** 101:23
114:19 117:4
**estimate** 64:2
135:6,15
**estimates** 136:7
**et** 102:1
**evaluate** 112:8,12
**evaluated** 103:12
**evaluating** 34:12
57:20
**evaluation** 103:2
110:13 111:4,19
111:22 112:7,18
114:22
**event** 26:14,14
70:24 71:3,6,11,11
71:19,20 72:1,3,4
72:11,12,13,22,24
73:14 74:2,4,8,10
74:10 79:24,25
80:6,10,11,14,16
80:18,22,25 86:15
88:8 92:1,17,19
93:3,4,7,7,12,15
93:16,21,21 94:8
94:16,25 95:2
98:20 99:1,11,15
99:21 100:7,12
111:8,11 114:21
115:25 116:17
133:3,18 134:18
135:8 136:2,20
151:17
**events** 26:18 27:25
34:18 42:19 43:1
43:10 46:10 73:20
74:7 92:24 94:14
104:13 115:24
116:19
**evidence** 66:15,19
66:24 67:2 116:16

143:21 144:9
**exact** 124:1
**exactly** 12:16
44:16,17 45:2,18
45:23 47:8,11
50:11 51:23 52:4
112:7 135:22
147:13
**examination** 5:3
10:2 151:6
**examine** 103:16
**examined** 54:10
**example** 67:21
68:10 80:5,18
86:11,25 88:22
98:25 108:10,16
126:12 135:15
**examples** 138:4,7
138:10,17
**exclude** 98:3
100:18
**excluded** 100:8,14
**excuse** 47:14 67:1
79:2 119:10
**exemption** 149:15
**exemptions**
149:11
**exercise** 104:15
105:23 106:9
107:1,11 108:11
108:17
**exercises** 107:25
108:3,4
**exhaustive** 138:16
**exhibit** 5:11,14,15
5:16,18,19,21,24
6:3,5,7,9,11,13,16
6:18,21,23 7:4,6,9
7:12,14,16 11:18
12:1,3,22 13:15,17
14:15,17,19 15:1

15:12,13 17:10,12
25:6 32:17,18,22
40:18,19 46:4
48:4 56:15,16
68:1,10 86:2,3,6,7
95:18 102:6,8
109:11 124:7,22
124:24 125:9,13
125:17,21 126:2
128:12 129:8,12
129:16,20 130:14
131:17 132:20,20
132:21 140:6,11
148:4
**exhibits** 124:23
125:1,6 129:3,4,6
**expedition** 107:1
**experience** 96:6
124:11
**experienced** 94:3
**experiences** 72:1
72:11
**experiencing** 87:4
**expert** 12:4,7 13:5
15:3 16:14,19,25
17:6 19:12 29:2
30:11,13 90:18
**expertise** 87:14
88:7,15 89:20,24
91:24 92:8 95:7
105:22 106:14,24
**experts** 20:7,11,15
**expires** 152:22
**explain** 42:6
**explained** 104:5
**explaining** 31:15
96:24
**explanation** 45:13
46:4,5 104:11
110:16

**exposure** 136:8
**express** 16:14
**expressed** 17:5
**extensive** 111:4,22
**extract** 7:12,17
132:22 148:5

### f

**f** 2:11 3:21 4:11
151:1
**fac** 35:18 36:4
57:11 58:9 62:14
62:24 63:10
**face** 50:25 51:16
**fact** 46:8,22 54:16
63:24 70:10 73:21
94:22 136:5
**factly** 115:6
**faers** 7:17 70:15
70:20,24 72:16,23
74:16 89:1,5,11,21
90:11 92:2 98:11
98:15 100:22
110:25 112:4,13
112:23 113:4,8,15
113:21 117:9
118:8,13 119:24
120:12 128:4
132:2,4,8,11,12,15
134:7 135:11,21
135:23 145:8
147:6 148:5
**fair** 41:15 50:15
72:8 108:24 114:2
115:15,16 133:4
142:10
**familiar** 53:14
71:15 91:11 96:2
102:12 109:3,9,21
132:14 136:9
**far** 144:17

**fayngold** 4:19 9:1
**fda** 6:12 27:19,25
29:5 70:24 71:2
73:3 79:25 80:7
99:1 101:25 107:7
107:14,15,24
108:10,16,24
109:6,13 111:16
115:1,12 116:4
117:5,16,24 118:4
118:21 119:2
120:6,21 121:1,7,9
121:21 122:6
123:12,22 127:9
127:19 130:9,23
131:3,9 133:2,3
135:13,18 136:5
137:16,17 138:3,4
138:11,20 139:1
146:17 148:25
149:12
**fda's** 109:24
114:12 126:5,14
126:20 128:10
130:17 132:16
**feeling** 87:5
**figure** 74:25
**figured** 49:5 52:18
**file** 7:12,16 38:18
56:20 132:21
147:4 148:4
**files** 26:6
**final** 32:25 35:10
53:9 55:2 56:24
59:7 61:18 62:12
**finalized** 109:19
**financially** 8:12
**find** 70:12 102:25
127:10
**finding** 131:18

**fine** 28:14 40:7
82:15 107:21
122:3,18,25
138:25
**fingertips** 95:15
**finish** 119:11
**finished** 48:25
49:22 119:14
**first** 10:8 31:8,18
43:22 46:8 68:16
74:23 75:7,13
76:13 77:5,19
79:5 83:21 88:18
91:15,20,21 94:12
103:6 113:3,14,20
114:1 117:24
126:12 130:8
140:24
**fishing** 107:1
**five** 145:13
**flicstein** 1:16 8:10
151:3
**floor** 4:14
**flowing** 118:4
**fluid** 94:3,5
**fluorouracil** 32:5
**focusing** 112:22
**foia** 148:25 149:6
149:12,19,23
**folder** 125:1 129:3
**follow** 40:10 42:20
43:2,11,17 44:2,3
44:6,11,13,24
46:15 49:4,7,14
50:1,7,20 51:2,12
51:24 52:5,10,23
53:6,10 60:4,7,10
60:13,19 61:4
62:8,10 108:24
117:4 118:20
119:4 133:19

**followed** 44:16,18
**following** 18:2
**follows** 9:25
**food** 29:10
**footnote** 40:25
41:7 48:17
**foregoing** 151:10
152:8
**forenoon** 1:22
**form** 6:5 15:2,7
21:16 26:21 27:4
27:10,15,20 28:1
34:8,13 36:17
37:2,19 38:7
39:12 42:21 43:3
43:12,18 44:14,25
45:14 46:6 47:6
47:19 48:5 49:1
49:24 50:10,23
52:25 54:14 55:11
59:21 64:14 69:22
73:12,17 80:1,3,5
80:9 83:19 85:13
86:7,12 87:20
92:11,11,16,19,24
93:22 94:13,17,20
105:13 116:9
117:7 118:23
120:9,23 136:11
141:16,25 142:20
**formal** 47:22 74:4
**formatting** 148:14
**forms** 38:25 39:1
59:25 79:24 86:17
91:18 98:11
**forth** 16:19 101:24
151:13
**found** 65:18,23
66:3 126:20 127:5
130:25 131:10
152:8

**four** 5:18 10:19
14:6 17:13 19:5
124:21,23 125:6
126:4 129:4
**fourth** 75:14
**fraction** 135:9
**frame** 18:8
**free** 33:14 116:11
**freeway** 2:7
**frequently** 138:15
**fresh** 54:3
**friday** 1:21
**friends** 119:16
**front** 82:10 104:19
130:7 140:5
**funny** 83:20 98:6
114:14 132:3
**further** 39:9
101:14,19 114:22
151:9,14
**fuzzy** 46:22 47:22

**g**

**g** 9:21
**gears** 30:10
**geicam** 5:25 56:8
56:11,17
**gemcitabine**
140:25 141:5,9
**general** 34:18
111:24 136:12
137:7
**generally** 54:10
87:23 135:7
145:10
**georgia** 2:12
**germane** 112:11
**getting** 74:1
**give** 19:24 51:15
82:18 98:7 145:11
**given** 18:1 31:25
32:4 134:10

**giving** 24:14,18
**glancing** 120:14
**go** 11:11 48:15,19
67:25 75:3 93:18
108:8 116:6
117:15 124:3,12
138:24 139:17
146:18
**going** 8:2 11:10
17:9 26:23 35:4
51:4,15 54:7
55:13,14,25 70:14
79:17 86:1 96:12
107:1 109:2
122:14 123:2
124:16 133:18
136:20,24 139:17
145:18 150:6
**good** 8:1,22 10:5,6
97:15 117:21
122:17,20
**government** 41:21
68:5
**grand** 3:16
**graphs** 140:2,20
142:25
**greenberg** 4:19
**group** 31:25 32:4
54:18 60:9 62:4
**groups** 31:22
32:13 57:10
**guess** 122:21
**guidance** 6:9
102:8,13 108:24
117:5 120:11,16
135:13,18 136:6
137:20
**guidances** 101:25
137:19
**guilbault** 1:7
22:19 23:1,7,13

24:20 25:2 152:4
**guilbault's** 23:19
23:25 24:5,12
**gulf** 2:7
**gulfport** 2:20

**h**

**h** 5:9 6:1 7:2 9:21
153:1
**hair** 24:24 25:3
29:18 37:1,17
39:11,18 59:5
87:4,8 88:24
89:12 94:14
**half** 20:3 49:10
122:24
**hand** 49:9
**hang** 130:2 142:3
**happens** 76:20
107:22
**happy** 55:14 82:12
122:16
**hard** 49:2
**hardenstein** 2:18
9:14,15
**hardy** 3:14
**hart** 2:6 8:21
**head** 45:10 108:13
**headache** 73:7,11
73:17 135:9
**health** 41:4,10,16
42:1,5 43:7
**hear** 101:18
**heart** 94:5
**heis** 3:23 9:5,5
**help** 31:16 104:9
**herceptin** 141:19
141:22 142:18
**hereinbefore**
151:13
**higher** 95:12
96:18,20,24 97:5

97:13,16 98:1,10
98:21 99:21
**highly**  119:19
**hinshaw**  4:13
**hinshawlaw.com**
4:16
**history**  83:23
**hit**  91:16
**hlt**  96:19
**hold**  123:25
**holding**  122:1
**hope**  16:20
**hospira**  3:4 8:23
9:20 12:5 22:18
25:19,22 26:2,2,9
26:19,22 27:7,19
27:23 28:5,11,23
29:5,18,22 30:1,5
31:1,6 66:16,22,25
67:3 69:18 70:4
99:23 143:21
144:7,10,15,16,21
148:23 149:22
**hospira's**  26:6,13
27:13 29:14
143:18 148:20
**hospitalized**  94:6
**hour**  20:3 55:14
122:14,20,24
**hours**  21:18 22:11
90:21
**houston**  2:7
**huge**  91:8
**hundred**  133:11
**hypothesis**  63:11

**i**

**icsr**  113:16 114:5
114:7
**icsrs**  115:25
**idea**  28:8 64:10,15
64:22 88:12 89:2

121:14 127:13,24
128:5,8 130:21
131:12,12,14
**identification**
11:21 12:24 14:20
15:15 17:14 32:20
40:22 56:18 68:3
86:9 91:17 95:20
97:24 101:25
102:10 109:14
110:10,20,23
111:18 112:6,14
113:1,8,11,16,19
118:10 125:12,16
125:20,24 129:11
129:15,19,23
132:23 140:14
148:7
**identified**  6:14,17
6:19,22,24 7:5,7
7:10 28:6,12
37:24 82:16 83:1
83:5 84:9,14 99:4
111:3,21 125:10
125:14,18,22
126:24 129:10,14
129:18,22
**identify**  82:5
98:23 108:16,20
111:2 115:23
118:15 136:13
**identifying**  79:20
81:12,19 103:11
**ijasiewicz**  3:10
**implemented**  48:1
**important**  134:4
**impractical**  91:8
92:9
**inaccurate**  46:23
**incidence**  135:5
136:13,15,22

137:5
**include**  59:12
103:12
**included**  16:3
97:19,24 98:22
99:13 139:22
**includes**  28:15
110:24 117:25
118:2
**incorrect**  53:8
85:2,5,20,22
**index**  6:1 7:1
71:12,21
**indicated**  88:17
109:20
**indicates**  92:12
**indication**  138:1
**individual**  53:23
54:11 55:8 59:12
92:16 93:20
105:19,21 113:16
113:23 114:4,7,12
114:18 115:3,13
116:13,24 117:6
117:19 118:1
**individually**  75:4
**individuals**  19:15
69:3
**industries**  4:11,12
9:11
**industry**  6:9 102:8
102:13
**infer**  43:19
**inference**  13:13
**information**  6:14
6:16,19,21,24 7:5
7:7,10 26:17 28:4
28:10,11 30:7
41:21 58:3 60:2
64:16 65:1 66:10
67:7,10,13,15 68:6

68:19 69:1,3,11,13
69:17,20,25 70:2
70:13 80:10,25
81:1 86:15,18,21
111:2 114:16
125:10,14,18,22
126:24 129:10,14
129:18,22 135:19
135:23 144:14,20
148:20 149:16
**inputs**  85:4
**instance**  135:7
**instruction**  147:14
**instructions**
132:15 133:1,17
146:16,17
**intend**  13:18
**intended**  127:1
**intensive**  94:7
**intention**  15:4
**interactions**
103:17
**interchangeable**
40:5
**interested**  8:12
151:16
**interfering**  27:2
**interlicchio**  3:7
9:19
**internal**  25:23
26:1,6,14 27:6
28:5,12 100:2,3
143:10,14,18,22
143:25 144:3,6,10
144:14
**internally**  35:6
**international**  4:20
**interpret**  34:17
39:22
**interpretation**
50:5,25 51:17

**interrupt** 60:25
119:9,13
**intervention** 73:24
**introduce** 14:14
32:17 124:21,23
**investigate** 111:25
**investigation**
39:10 101:15,20
**investigators**
64:11,17,21 65:2
**invoice** 21:1,4
**invoices** 20:23
21:9
**involve** 18:13,16
**involved** 106:17
149:19
**irreversible** 5:12
7:15 11:19 30:14
36:16 37:9 39:23
39:23,25 40:3
57:21 59:5,22
78:11 81:9 140:12
**isia** 3:6 9:18
**issue** 64:8,13,19
65:4,10,14 111:23
127:16 131:15
146:4
**issued** 22:6 146:12
**iv** 44:4

**j**

**january** 6:17,23
125:15 126:15
129:8 130:3
**jasiewicz** 3:6 9:19
**jaysun** 4:25 11:17
12:20,21 13:14
14:13 15:11 17:11
35:4 48:13 124:25
129:2 133:25
140:7 147:24

**jennifer** 3:23 9:5
**jersey** 1:17 151:4
151:20
**jheis** 3:24
**judgment** 90:18
**julia** 4:19 9:1
**julie** 4:5 9:8
**julie.callsen** 4:7
**july** 5:14 6:20 7:6
12:23 15:25 21:18
125:19 129:16
**jump** 77:15
**june** 6:15 7:4,15
7:17 125:11
126:17,19 129:12
139:7 140:2,13
141:4,13 146:3
148:6

**k**

**k** 3:21 4:11
**kahn** 12:13 13:6
13:11 21:21 22:1
139:5
**kansas** 3:16
**kathleen** 4:14 9:10
**keep** 34:14 43:13
55:14 68:22 134:5
**kekelly** 4:16
**kelly** 4:14 9:10,10
**kessler** 82:4
**kind** 13:25 46:15
47:22 63:7 76:20
90:21 121:2
136:25
**kinds** 105:23
**knew** 29:18
**know** 12:17 22:21
24:2,5 28:8 32:12
36:20 37:3,4,5,7
37:21 40:3 43:19
45:10,17,20,23

46:7,14 47:8,10
50:11 51:1 52:14
59:16 60:19 61:1
61:7,8,10,12,16,17
61:25 62:3,6,7
65:16 67:20 70:10
70:10 73:6,8,9
82:19 85:17,20
87:13,15,21,22,24
87:25 93:2,6,12,15
93:22,23 94:13,15
95:25 106:1
108:14 110:6
113:18,22 119:15
119:15 121:17,24
122:7,12 126:23
127:1 128:7
133:11 135:11
137:17 141:18
144:17,18 147:19
148:13 149:12,14
149:20,21
**knowing** 61:5,6
**knowledge** 24:8
24:11 65:12
**known** 80:1
141:20
**knows** 144:16
**kopreski** 53:15,22
**kopreski's** 54:23
55:8

**l**

**labeling** 27:14
29:15
**language** 148:16
**large** 60:9
**larger** 56:19
**latest** 79:12
**law** 2:10
**law.com** 2:13

**leading** 21:5
**legal** 8:8,10
**level** 59:16 93:9
95:12 96:18,20,24
97:4,5,6,9,10,14
97:16 98:1,10,21
99:12,22 116:25
117:19 118:1
**liability** 1:4 8:5
152:2
**license** 1:17
**life** 33:20 34:2
105:24 149:20
**limitations** 145:6
145:9
**line** 142:23 153:3
153:5
**linterlicchio** 3:10
**list** 5:15 14:10,20
14:22,23 15:1,5
17:9,22,23 25:5,19
25:23 26:23 28:15
33:10 73:6 97:3,6
98:13,23 99:13
100:9,14,19
127:14 128:14
130:22 139:23
153:3
**listed** 38:5 48:11
97:2 134:2
**lists** 35:13,17
97:13,15 112:24
**literature** 108:14
111:1
**litigation** 1:4 8:6
10:19 18:7 20:7
20:11,15,24 21:13
22:14 25:13 26:3
65:13 81:11,19
151:17 152:2

**little** 31:15 56:19
70:23 79:19,23
89:8 133:6 148:13
148:19
**llc** 2:10 3:21 9:6
**llp** 2:6 3:5,14,22
4:5,13
**located** 1:20 10:12
**locked** 53:9 55:2
59:8 61:18 62:12
66:12
**long** 20:2 22:9
44:18 106:5
**look** 12:19 34:19
37:7 59:17,20,24
67:23 69:7 71:16
85:15 89:24,25
90:2,3,14,23,24
91:4 93:24 95:16
106:2,10 107:3,3
107:20,20,25
108:5,7,11,14
110:8 112:8,9,10
115:3,14 116:6,11
116:13,18,19
118:5 119:18
121:23 122:4
123:19 126:12
128:15,22 130:4,5
139:10 140:1
**looked** 38:17 42:8
45:16 53:22 64:9
67:20,22 70:9
83:11 88:13 99:6
110:7 120:12
122:8,12 123:18
137:9 141:14
146:16 147:17
**looking** 19:23 52:3
59:25 61:2 64:1
92:10 98:9 104:13

105:21 113:12
118:2 119:15
120:4 126:16,18
127:16,24 131:8
131:14
**looks** 51:23 96:1
**loop** 13:25
**loose** 46:16
**lori** 3:7 9:19
**loss** 24:24 25:3
29:19 37:1,17
39:11,19 59:5
87:4,8 88:24
89:12 94:14
**lost** 38:2
**lot** 54:1 83:13
**lots** 107:4
**louisiana** 1:1
**loushin** 4:25
**lower** 97:3,6,9,10
99:12
**luck** 117:21
**lunch** 122:17
123:4
**lungs** 94:6
**lymph** 57:15

**m**

**m** 9:21
**madigan** 1:11 5:4
5:12,15 7:14 8:4
10:5,18 11:19,24
13:16 14:19,23
15:17 17:16,20
18:23 29:1 30:9
32:24 35:7 55:25
56:23 58:1 119:13
123:11 124:9
126:1 130:1
140:12,16 141:2
145:23 148:13
150:2 152:13

**mae** 1:7 2:16
152:5
**main** 4:6 57:13
**majority** 61:11,21
**making** 104:19
**manufacturer**
41:20
**marcelo** 4:24 8:7
**march** 5:13,21
6:17,23 7:13
11:20 12:8 20:20
40:19 125:15
126:15 129:8
130:3 132:23
133:7 139:5,16
141:15 146:3,11
146:21
**mark** 12:2 15:11
17:9 40:17 86:2,5
102:6 129:2
**marked** 11:20
12:3,23 13:17
14:20 15:14 17:13
32:20,22 40:22
46:13,14 56:18
68:3 86:9 95:19
102:10 109:13
125:1,6,12,16,20
125:24 129:10,14
129:18,22 132:23
140:13 148:6
**massachusetts**
1:21 4:15,21 9:23
10:16
**materially** 85:7,18
85:21
**materials** 14:10
15:2,7 25:6 28:7
28:13
**mathematically**
47:23

**matter** 1:15 8:5
13:5 19:5 63:24
115:6 152:9
**matters** 18:2
**matthew** 5:22
40:20
**mcrae** 3:14
**mdl** 1:2
**mean** 14:16 16:23
34:18 36:1 38:16
39:1 42:18,25
43:5,9 44:15
45:15 60:25 70:9
71:25 72:19 74:11
75:5 79:1,4 83:20
92:21 93:6 94:23
101:10,11,22
119:8,8 126:10
131:7
**meaning** 42:6 47:4
47:13,17 58:23
**means** 45:13 50:12
136:23
**meant** 39:18 45:23
138:16
**measurement**
62:19 63:5
**meddra** 80:19
81:15 88:5,11
94:17 95:9,23
96:2,6,9,15,25
**medical** 6:7 16:18
17:4 23:4,6 24:9
24:12,15,19 38:15
38:21 39:5 55:8
59:3,13,15,18 65:8
65:18,23 66:3
71:11,20 72:1,4,11
72:13 74:10 86:15
95:18 110:25

medwatch 6:5
80:1,5,9 86:7,11
86:17 88:9 90:14
91:18 92:10,11
94:17 98:11
meet 19:22 20:2
88:23 89:11
memory 22:12
37:4 54:3
mentioned 85:17
mentions 87:1
merit 1:19 151:21
met 10:8
meta 37:23 38:4
38:10 63:19,25
67:16 70:5
method 81:12,19
113:14 118:10
methodology
97:24 99:4,18
108:23
methods 79:20
103:2,7,12,25
metric 78:12,23
metrics 79:6
103:24 118:14
141:21 142:14,16
142:17
miceli 2:10,11,13
9:3,3 119:10
michelle 3:15
miles 117:1
million 117:1
136:23,24
mind 134:5
mine 121:23
minimum 45:11
mining 103:15
104:3,15,21,23
105:4,6,15,16,17
105:20,22 106:8

106:21,25 107:10
107:25 108:3,4,11
108:17,23,24
minute 45:3 69:9
69:10 145:13
minutes 55:17
124:4 145:14
misinterpreting
116:10
missed 140:8
missing 46:11,12
46:15
mississippi 2:20
missouri 3:16
model 75:11,12,17
75:24
models 74:20
75:21,22 78:20
83:16
moment 37:6
monday 55:1
months 45:7 48:24
49:22 50:3,8,21
51:13 54:19 55:10
moore 3:5 5:5 8:22
8:23 9:18 10:4,7
11:16,23 12:18
13:1,14 14:13,17
14:21 15:11,16
17:11,15 26:25
27:5 32:16,21
40:16,23 55:13,18
55:24 56:13,22
68:4 86:1,5,10
95:16,21 102:11
109:15 122:15,19
122:25 123:10,19
124:3,12,20 125:5
125:25 129:2,6,24
132:19,25 140:6
140:10,15 145:11

145:22 147:24
148:8 150:1
morning 8:1,22
10:5,6,8 55:1
134:15

## n

n 2:1 3:1 4:1 5:1
9:21
nail 87:4
name 8:7 10:7
141:19
names 22:20
narrative 80:25
86:14,18,21 87:1
114:17 115:4,15
narratives 39:5,7
95:4 122:5
narrow 84:7
nationwide 135:17
nature 90:19
117:8 118:16
navient 18:4
necessarily 42:18
42:25 43:9 74:11
92:23
need 37:6 69:7
85:24 91:3
needs 111:22
negative 31:5
57:15
neither 151:15
never 16:24 52:2
64:12
new 1:17 6:14,16
6:19,21,24 7:4,7
7:10 79:16 125:10
125:14,18,22
126:23 129:9,13
129:17,21 151:4
151:20

night 15:21
nine 94:7
node 6:4 68:2
nodes 57:16
non 84:1 138:23
noon 122:16
normal 79:9
northeastern
10:15
notary 152:21
note 133:13
noted 60:1 150:7
notes 1:14 59:18
noticing 8:18
november 109:7
number 5:10,20
5:24 6:2 7:3 32:19
32:23 35:5 36:2
45:18 47:1 54:21
56:17 84:18 85:1
85:21 135:25
140:9 144:25
numbered 35:6
numbers 36:6
45:22,24 49:9,10
50:2 52:19 53:7,8
53:11 58:12,15
153:3
nw 3:8

## o

oath 11:3
objection 21:16
26:21 27:1,2,4,10
27:15,20 28:1
33:18,23 34:8,12
34:13,14 36:17
37:2,19 38:7
39:12 42:21 43:3
43:12,18 44:14,25
45:14 46:6 47:6
47:19 48:5 49:1

49:24 50:10,23
52:25 54:14 55:11
64:14 69:22 70:7
83:19 85:13 87:20
105:13 116:9
117:7 118:23
120:9,23 136:11
141:16,25 142:20
**objections** 8:16
34:5
**objective** 33:17,22
33:25 34:15,19,23
35:1 57:20
**objectives** 33:10
33:13 34:22 57:6
**observation** 112:9
**obtain** 148:23
149:22
**obtained** 69:19
149:16
**obviously** 85:8
**occur** 45:2
**occurred** 44:4
45:3,4 99:9
134:21
**occurrence** 114:20
135:5
**occurs** 135:8
**october** 6:22 7:9
125:23 129:20
**odd** 35:25 81:14
**offer** 13:18 88:4
100:23
**offered** 139:6
**offering** 29:8,13
29:17,21 144:19
**officer** 118:3
**officers** 108:3,6
**oh** 109:9
**ohio** 3:24 4:6

**okay** 11:10,12
12:18 13:3 30:12
30:24,25 31:9,10
31:13 42:12 56:2
70:14,15,16 74:23
79:21 83:15 91:13
91:14 101:3,4
102:22 104:8
106:5 110:11,14
110:18 112:22
114:2,5 116:21
126:7,18 127:4
130:11,12 132:24
133:10 139:18,19
147:16
**once** 10:21 111:21
149:19
**ones** 36:9 60:14
62:5 76:22 84:2,3
89:25 127:2
**ongoing** 35:14,18
36:3,10,14 37:25
38:11 39:9,14,17
42:3,6,18,19,25
43:1,9,10,24 45:13
45:19 46:4,13,20
47:1,5,14,16,18,24
48:3,23 49:21
50:5,7,12,19 51:11
54:18 55:9 58:4,7
58:8,16,20,23,25
59:4 60:21 61:8
61:14 62:13,23
63:9 64:1 69:4,13
69:20 116:24
117:18
**online** 95:22
**opining** 144:13
**opinion** 25:1 71:19
88:4 100:23
144:20

**opinions** 13:17,22
15:3,8 16:14,18,25
17:5 22:17 24:14
24:18,22 29:5,8,13
29:17,21
**opposed** 105:18
107:4,7 121:25
122:2
**ordinary** 62:19
**oriented** 30:17
**originally** 126:1
**outcome** 8:13
81:15,21 84:2
90:1 93:8,17,19
94:11,18,23 95:5
151:17
**outside** 88:6,15
89:20 91:23 92:8
95:7 106:23
**overall** 33:19 34:1
135:25 136:7
137:7
**overly** 107:17
**overstating** 115:5

**p**

**p** 2:1,1 3:1,1 4:1,1
9:21 63:12 64:3
**p.m.** 123:2,9
124:16,19 145:15
145:18,21 150:6,7
**p.o.** 2:11
**page** 5:10 6:2 7:3
13:2 33:9 35:2,5
35:10 41:24 42:10
48:12,16 57:6,23
68:18 69:12 74:25
77:15 87:1 88:18
92:13 93:24 94:1
94:12 102:21
103:1 110:15
133:22,24 140:19

143:8 148:9 153:3
153:5
**paragraph** 31:12
40:8,13,25 41:7
42:13 56:3 71:17
73:9 104:7,12
121:21 138:7
**paragraphs**
143:24
**part** 70:19 73:12
92:3 103:6 115:1
121:18 123:12
127:11 138:21
143:6,9 144:22
**particular** 87:24
93:20 101:8
116:17 121:5
140:1 148:21
**particularly** 54:3
137:23
**parts** 112:16
**party** 8:11 151:15
**patient** 38:8 39:4,7
44:18 48:25 49:22
50:8,21 51:13
58:8 59:3,16 94:3
**patients** 31:22
32:13 35:14,17,22
36:8,14 37:1,17,24
38:5,11,14,22,25
39:6,11 44:16
48:22 49:20 50:6
50:19 51:11 53:23
54:11,18 55:9
57:10,15 58:7,19
59:4,12,21 60:3,9
60:13,16,18,20,21
61:3,7,12,13,14,21
61:22,25 62:4
69:13 73:21 81:24
83:6 89:18 90:4

91:16,18 135:25
137:6
**pause**  124:17
**pdf**  124:9
**people**  105:17
106:2 135:9 136:6
**percent**  37:14
58:18 61:3,3 64:5
133:12
**perfect**  135:18
**perfectly**  79:9
**perform**  58:13
89:15
**performed**  63:18
94:5
**performing**  112:2
**period**  21:5 42:20
43:2,11,17 44:2,11
44:13 60:4 147:15
**periodic**  27:24
116:22 117:17
**permanent**  24:24
25:2 27:8 36:16
37:1,9,17 39:11,18
40:1,2 53:24
54:13 57:20 59:5
59:22 65:19,24
66:4 74:16 79:21
81:6,12,20,22,25
82:6,17 83:2,6,12
83:18 84:2,10,14
84:20 88:24 89:12
89:18 90:1,5,17,25
92:4 99:5,17
100:9,15,20 127:7
127:10,20 128:3
131:10,19 137:5
**persisted**  61:4
**persisting**  44:1
77:12

**person**  72:3,12
73:5,10,13 79:24
**personally**  149:7
**pertains**  96:9
**peterson**  3:15 8:24
8:24
**ph.d.**  1:11 5:4,12
5:22 7:14 11:19
40:20 140:12
152:13
**pharma**  3:20 9:6
**pharmaceutical**
4:11,11 9:11
41:13,16 73:3
109:25
**pharmaceuticals**
3:21 9:7
**pharmacovigila...**
6:9 26:11 102:9
102:14 120:6
**phase**  112:18
**photographic**  37:4
**phrase**  35:25
41:13 47:21 81:14
83:20 97:12
**phrased**  13:24
64:21 67:19
**phrases**  110:17
**physically**  10:12
**physician**  24:3,6
**physicians**  23:16
23:19,22,25
134:17
**picky**  75:20 76:4
**place**  4:20 69:6
72:23 73:10 75:8
104:24 105:10
151:12
**plaintiff**  2:4,16
13:4 18:11,21

**plaintiffs**  2:4 5:14
12:22 22:18 25:15
**plaisance**  1:7 2:16
9:13,15 22:19,23
23:4,10 24:16,23
152:5
**plaisance's**  23:16
23:22 24:2,9
**planning**  6:9
102:9,14
**please**  8:17 9:17
11:16 12:19,21
14:14 15:12 19:21
25:6 27:2 32:17
40:17 56:14 67:25
68:22 86:6 94:1
95:17 102:7
124:25 130:6
133:24 140:3
143:7 147:25
148:9 153:3
**point**  72:8 73:8
79:11,13 82:4
99:7,19 100:2
117:23 119:15
133:15 135:21
137:2 142:10
147:13
**points**  148:15
**policies**  26:10
**poor**  60:2,13
**pops**  107:2
**population**  136:8
137:6,7
**position**  91:10
**positive**  6:4 68:2
**possible**  135:19,20
**posted**  68:16
**postmarket**  6:11
109:6,12

**postponed**  21:20
**potential**  6:13,16
6:18,21,23 7:4,6,9
99:4,17 100:9,14
100:19 101:6,16
111:2 114:23
125:9,13,17,21
126:23 129:9,13
129:17,21
**ppr**  76:13
**practice**  73:21
107:23 114:12
115:9,11
**practices**  6:11
102:1 109:5,11,25
111:17 115:2
116:4 117:24
118:21 120:5,21
**preamble**  110:19
**precise**  47:21,23
47:23
**precisely**  45:20
**prefer**  118:12
**preferred**  95:14
96:18 97:3,7,8,10
97:13,16,20 98:5
98:12,13,15,20
99:9,12
**prep**  21:24 22:10
**prepare**  18:24
19:11,15 67:7,11
67:16 69:21
**prepared**  5:11
7:14 11:18 51:10
88:4 89:4 140:11
**preparing**  21:14
21:19
**prepped**  21:19
**prescribed**  24:3,6
137:25

prescription
  111:14
prescriptive
  106:23 107:17
present   4:23 8:14
  43:25 44:2 69:24
  78:17 79:17
  141:23 142:19
presentation
  50:18
presented   105:24
  106:19
presenting   121:22
presume   25:14
presumes   73:13
pretty   99:7 140:18
previous   17:23
  19:2,4 48:15
  51:21 54:4
primary   33:13,16
  34:23,25 35:1
  57:19
prior   151:5
prioritized   111:4
probability
  136:19
probably   122:19
problem   106:4
  117:20 124:5,7
  126:3
problems   52:3
procedures   26:10
proceeding   8:17
proceedings   1:15
  124:17
process   106:18
  111:17 113:7
  114:11 115:18
  117:16 119:3,4
  123:13

produce   49:17
  53:10
produced   25:12
  26:2
produces   63:11
  64:2
product   6:11
  109:6,12 114:20
  136:1 137:25
products   1:4 8:5
  126:25 137:24
  152:2
program   45:21,21
  47:8,24 48:8
  51:25 52:15,16
  53:9
promising   123:24
proportional
  103:13,21
protecting   149:15
protection   123:12
provide   15:6
  41:21 69:17
  120:11,16
provided   14:9
  15:20,25 17:8,20
  21:25 25:15 40:11
  48:4 52:10,23
  53:5 66:15,20
provides   133:2
providing   24:22
  25:1 29:4
prr   74:24 75:6
  79:10 142:11,17
psc   9:4
public   70:12
  152:21
publication   16:18
  17:1,4
publications   16:4
  16:7,15,24

publicly   67:12,17
  70:2 148:24
publish   56:14
  123:17
published   16:13
  16:17,24 17:5
  65:7,17,22 66:2
  125:2 128:10
  131:16 132:16
publishes   123:15
pull   12:21 116:19
  147:24
pulling   82:14
purports   110:2
  126:22
purposes   39:19,21
  40:1,5 81:18 82:1
  84:8 110:22
put   47:20 85:5
  124:25 125:5
  126:2 127:3,13
  132:3,19
putting   148:14

## q

q4   84:18
qualified   119:25
qualitative   119:20
  120:1
quality   33:20 34:2
quantitative   59:8
  59:11 119:19
quarter   75:8,13,14
  75:15,18 78:22
  83:22,23 126:21
  126:21,25 127:4,5
  127:9,21 128:11
  128:20 130:6,18
  130:24 131:5,11
quarterbacking
  55:1

quarterly   7:12,16
  123:16,22 126:5,6
  126:13 130:9
  131:16 132:22
  147:6,9 148:5
quarters   147:12
question   16:21,22
  16:22 28:10 38:3
  38:19 39:14 41:2
  42:14,24 43:21
  44:20,22 46:2
  49:2 51:9 52:22
  55:6 64:21,25
  73:12 82:16 84:7
  85:14,16 89:3,8
  91:20,21 93:14
  97:4 98:6,8 99:10
  100:6 108:19
  112:11 117:15
  122:10 140:20
  146:15
questions   51:20
  54:2 70:15 90:22
  146:9,23 150:4
quick   51:19
quickly   124:13
quite   46:7 110:7
  130:2 138:15,23
quote   121:1,9
  137:21 138:3
quoted   137:21

## r

r   2:1 3:1 4:1 151:1
  153:1,1
radiation   100:13
raising   62:7,8
ran   132:4,7
randomized   31:19
rate   62:23 63:9
  64:2 135:7,8
  136:15,22 137:5

**rates** 135:5 136:13
  137:22
**ratio** 64:2 103:13
  103:22
**reach** 63:1
**reaction** 134:12
**reactions** 134:18
**read** 19:1,1 23:9
  23:12 44:7 53:17
  71:23 103:5,18
  104:22 111:5
  114:24 115:25
  122:5 134:23
  152:8
**reading** 22:2,3
  42:22 71:14
**readme.doc** 7:12
  7:16 132:21 147:2
  147:4 148:4
**really** 75:22
  138:24 139:9
**realtime** 1:20
  151:22
**reappeared** 75:14
  75:15
**reason** 30:4,6
**reasonable** 13:12
  51:17 59:1 106:1
  106:9,22 107:2
  112:20 113:10
**recall** 22:2,4
**receive** 73:2,4,16
**received** 66:11
**recognize** 32:24
  56:23 95:22
**recommending**
  115:1
**record** 8:2,16
  55:23 59:15 73:22
  122:23 123:2,9
  124:4,13,16,19

145:18,21 150:6
**recorded** 48:23
  50:6,19 51:11
  61:24 89:5 98:4
**recording** 49:21
  73:20
**records** 23:4,7
  38:15,22 55:9
  59:3,13,18
**reefing** 41:7
**refer** 19:3 30:23
  31:11 40:8 43:22
  54:4 56:3 64:3
  93:25 96:20
  130:20 143:24
  144:6
**reference** 102:2
**referenced** 48:8
  102:5
**references** 15:6
**referred** 48:16
  56:8
**referring** 19:4
  75:21
**refers** 37:8 144:3
**reflect** 55:7
**reflected** 55:4
  74:24 128:9
  142:22
**reflects** 36:5
**regard** 46:3 58:23
  78:5 91:16 94:20
  98:4 145:7 146:15
**regarding** 20:24
  27:25 139:22
**regardless** 71:12
  71:21 73:16 136:1
**regards** 43:25
**regimens** 31:23
  33:15,21 34:2

**registered** 1:19
  151:21
**regression** 76:23
  76:25 77:20 78:5
  142:8
**regulations** 29:6
**regulator** 41:11,12
  41:14,16,22
**regulatory** 6:8
  29:2,9 95:19
**relate** 16:8,10
  22:17
**related** 8:11 20:20
  26:6,10 72:4,14
  73:14,23 74:12
  94:13 134:19
  136:18
**relates** 1:6 152:3
**relationship**
  114:19
**relative** 62:25
**relevant** 58:15
**reliance** 5:15
  14:10,19,22,23
  15:5 25:6,19,23
  28:6,13,15
**relied** 15:2,7 33:4
  36:22 53:15 57:2
**relies** 83:24 84:1
**rely** 83:11,13,14
**remained** 75:8
**remember** 12:16
  52:18 54:21
  102:19 109:18
  139:8 146:23
  149:1
**remote** 20:4
**remotely** 1:16 2:2
  3:2 4:2 8:4,14
  10:12

**repeating** 43:13
**rephrase** 50:15
  53:3
**replace** 141:5
**replaced** 140:21
  140:23
**replay** 83:23
**report** 5:11,19,24
  7:14 11:14,18
  12:4,7,13 13:5,9
  13:10,16,22 14:3,5
  14:6,10 15:3,6,8
  16:14,19,25 17:6
  19:1,12 20:20
  22:2,5,6,17 30:11
  30:13 31:12 32:18
  32:25 35:2,11
  36:13,25 37:16
  39:1 40:4,14 41:1
  41:3,8 42:7 45:17
  45:25 47:2 48:8
  48:17 49:18 50:13
  52:15 55:4 56:4
  56:16,24 57:24
  59:20,24 60:1
  70:18,19 71:10
  72:24 73:2,4,4
  74:10,14,25 80:6,7
  80:13,14 82:1,3,11
  87:7,11,16 88:6,9
  88:23 89:5,16,17
  92:19 93:3,4,4,7
  93:12,16,25 94:1
  94:22 98:15 99:1
  99:2,3 101:24
  102:18 103:21
  104:3,6 106:20
  108:12,18 109:17
  112:17 113:7,24
  114:8,18 115:3,4
  116:7,24 117:13

117:19 118:1
120:8,18 121:1,8
121:13,18,21
126:14,20 128:10
130:17,21,21,23
131:1,17,22,23
134:10,17 137:4
137:21 138:8
139:5,6,13,15,16
140:2,11 141:4,9
141:13,15 143:3,6
143:9 144:22
146:1,3,4,6,10,11
**reported**   26:18
36:9 53:24 54:12
58:19 72:22 74:8
77:11 80:14 89:11
93:3,16 136:1
145:4
**reporter**   1:17,19
1:20 8:9 9:17,25
62:18 71:13,22
105:9 140:22
151:4,21,22
**reporting**   70:24
72:17 73:2,15
74:2,3,4 103:13,21
111:8 137:22
**reports**   20:14
27:24 53:23 54:11
58:6 66:21 71:3,6
71:7,8 72:22 74:9
74:9 80:24 83:25
84:1 87:18 89:23
90:4,15 91:4 92:2
103:3,9 104:25
105:11,19,21
106:3 107:3,9,20
107:21 108:1,6,7
111:11 114:13
116:11,13,15,17

116:18,19,23
117:6,18,25 118:3
118:4 119:17,20
120:1 121:24
122:5,9 123:16,22
126:5,6 130:10
131:4,7 135:4
138:21 139:21
141:3 144:25
145:3,7 146:7
148:21,24
**represent**   61:1
99:23 123:21
126:4 130:8
139:20
**representation**
131:2 152:9
**request**   5:23 40:21
149:1,6,23
**requested**   42:2
**requests**   149:19
149:23
**requirements**   29:9
**requires**   101:14
101:19
**reread**   18:25
**residing**   9:22
**resolve**   124:14
**resolved**   46:14
**respect**   27:7 29:23
142:13,16
**response**   5:23
40:21 42:14 43:7
**responsibility**
41:20
**responsible**   30:5
**results**   14:2 63:4
63:16 64:7,12,18
65:3,9,14 68:16
76:8 105:24
117:13

**retrospect**   104:13
**review**   19:7,10
26:17,24 38:15,21
38:24 39:4 55:8
89:16,23 91:17
92:1 95:4 107:8
121:13 126:9
127:11 138:20
**reviewed**   20:14
23:3,6,21,24 26:1
26:5,9,13,22 27:6
27:13,18,23 28:22
59:11 86:22
121:17
**reviewer**   115:23
115:24 116:3,4
117:10
**reviewers**   114:18
115:7,10,12
117:10 119:16,17
**reviewing**   105:19
117:25 134:5
**revised**   7:13,17
132:22 133:7
148:6
**revision**   133:12
**rich**   8:23 10:7
119:10,11 122:13
**richard**   3:5
**right**   10:9,19,22
10:23 11:1,2 12:5
12:9 13:23 14:4,7
15:9,10 16:5,6
18:4,21,22 21:15
21:17,22 22:1,7,8
25:9,20,24 26:3,15
28:19 29:6 30:15
30:16,19 31:2,19
31:23 32:2,6,10,14
33:4,15,21 34:3,7
34:10,21,24 35:11

35:12,15,16,19,20
35:23 36:6,10,16
36:22 37:14,18
38:6,12,15 39:20
41:1,11 42:8 43:2
43:11 44:13 46:1
48:17 49:3,9,15
51:7,16 54:24
56:4,8,9 57:11,12
57:16 58:4,5,9,20
59:6,23 60:4,15,18
60:23 61:11 62:1
63:6,17,18,23
64:13 66:11,17,22
68:7,16,20 69:4,7
69:21 70:6,21,22
70:25 71:7,23
72:22,25 73:12
74:12,13,17 75:1,2
75:9,10,16,19,20
76:3,16,24 77:6,10
77:25 78:8,14,15
78:22 79:5,17,22
80:2,7,11,17,22,23
81:3,4,6,13,22,23
82:1,2,7,9 83:8
84:11,12,16,21
85:23 86:12,23
87:12,16 88:2,19
88:25 89:6,13,19
90:7,11,23 92:6,14
92:22 94:9,14
95:11 96:3,25
97:1,7,18,21 98:1
98:5 99:18,24
100:10,15,20,24
101:6,12,16 102:1
102:15,16,24
103:22,25 104:1,7
104:12 105:1,14
106:15,21 107:11

108:18 109:17,21
109:22 110:1
111:9,13,19,23
112:14,15 113:1,4
114:8,9,13,23
115:4,19 116:1,25
117:6,19 118:11
121:10,11 122:6
123:16 125:7
126:10,21 127:7,8
127:12,22 128:12
128:21,23,25
130:19,25 131:5
131:11,20,25
132:2 133:19,23
134:2,8,13 135:19
136:3,10,17 137:8
138:7,8,9,13,18
139:2 141:7,24
142:12,19 143:1
143:11,12,16,18
143:22 144:1,4,5,7
144:19,22 145:2,5
146:13,24 147:3,9
149:24,25
**ring** 139:24
**risk** 57:20 62:25
65:19,24 66:4
101:6,11,16,21
106:19 135:6
136:16,19,25
**risks** 6:14,16,19
6:21,24 7:4,7,10
125:10,14,18,22
126:23 129:9,13
129:17,21
**rivera** 4:24 8:7
**rockstad** 2:19 9:12
9:12
**role** 122:4 149:12

**room** 10:14
**rough** 135:15
136:7
**rtmoore** 3:9
**running** 108:2,4

**s**

**s** 2:1 3:1 4:1 5:9
6:1 7:2 114:10
153:1
**safety** 6:12,14,16
6:19,21,24 7:5,7
7:10 27:24 29:23
74:15 75:7,12,18
76:9,12,14,19 77:6
77:12,20,25 78:3,7
78:13,17,21 79:2,4
79:16 100:24
101:3,5,6,10,11,14
101:16,19,21,25
103:8,11 106:18
106:19 108:3,6
109:6,12,25
110:10,20 111:3
111:23 112:25
113:8,11,15,19
114:8,10,13,18,23
117:9,10 118:3
119:16,16 120:6
125:10,14,18,22
126:24 127:6,20
128:3,16 129:9,13
129:17,21 141:22
142:18 143:10,15
143:18,22 144:14
144:15,20,21
**sagent** 3:21 9:6
**sandoz** 4:18 9:2
**sanofi** 3:12 6:6,6
8:25 12:9,14 25:9
25:12,16 28:6,12
28:19 30:18,23

40:9 41:3,20 42:2
42:5,13 43:4,8,15
44:9,23 47:4,13,25
48:3 50:12 51:10
52:10,23 53:5,18
55:3 64:7 66:5,10
66:11,13,15,20
67:1,4,10 70:2
86:8,8 99:20
143:21 144:4
145:1
**sanofi's** 41:11,12
42:17,24 45:12
46:3,19 47:7,16
50:4,17 51:25
100:3 143:14,25
144:10,14,20
149:5
**sas** 38:18 40:12
44:17 45:10,21
47:24 48:8 51:25
52:15 53:9 59:25
**satisfied** 148:12,15
**saying** 34:14 45:1
77:16 79:1,15
84:22 88:2,3,4
89:6 90:6,9,10,20
91:25 93:13 98:17
106:7,15 107:19
112:17 114:1
115:6 116:20
117:2 119:2,4
120:22 132:5
138:11
**says** 13:4 43:6,24
50:1 68:15,23
73:5 82:21 94:2
96:19,22 104:21
110:22 114:16
115:21 116:22
117:16 134:4,10

134:16 135:18
137:11,21
**scanning** 120:24
**scarring** 99:16
100:7
**scientific** 16:18
17:4 65:8,18,23
66:3
**scope** 110:24
**screen** 90:16 98:14
125:4 140:17
146:3
**screening** 110:25
113:16,24 114:5
114:12 115:3,13
115:18,23 116:5
116:23,24 117:5
117:16,17,18
118:1 120:13
**screenshot** 96:6,8
**scrolling** 68:22
**se** 75:22
**search** 37:13
69:15 79:20
**searchable** 37:11
**seb05** 75:17 76:1,4
76:14 78:20 79:12
128:15 142:11,17
**sebgm** 75:12 127:6
142:11,17
**second** 19:24 33:9
56:20 75:11,15,18
77:24 78:21 82:18
87:1 93:24,25
112:17 117:23
123:25 126:21
127:4,21 128:11
128:19 129:1
130:6,18,24 131:4
131:11 133:22
140:25 145:11

148:2,9
**secondary** 33:18
33:25 34:19,22
**section** 29:10
30:10,13 70:17
80:25 87:2 110:9
110:12,19 112:24
113:7,11,13,18,20
114:4,15 115:17
133:22 143:6
146:1,6,10,11
**sections** 114:17
**see** 11:16,24 13:4
13:7 14:13 16:4
25:10 32:16 33:10
45:1 59:3,21
68:15,23 87:6
88:20 89:16,17
90:5 92:3 93:13
94:2,10 95:4
96:19 103:4 105:2
110:21 111:24
113:5,25 114:24
115:20 116:16
120:2,25 124:5
129:25 130:2
134:1,3 137:13,14
148:10,11
**seeing** 116:15
124:8 147:22
**seen** 22:20 64:24
**sense** 49:3 147:7
**sent** 20:23 21:1,4,8
**sentence** 42:23
43:6,23 73:9 87:3
104:22 115:22
116:21,22 137:10
137:18
**separate** 116:22
**september** 1:21
5:17 6:20 7:6 8:3

15:14,18 33:6
125:19 129:16
**sequence** 112:19
**sequitur** 138:23
**serious** 6:13,16,18
6:21,24 7:4,7,10
125:10,14,18,22
126:23 129:9,13
129:17,21
**served** 11:15 12:4
12:13 13:10,11
**session** 19:17
21:24 22:10 123:6
**set** 15:7 16:19
101:24 117:13
133:17 151:13
**seva** 1:16 8:9
151:3
**seven** 78:6
**severe** 94:3
**share** 12:1 125:4
147:23
**shb.com** 3:17,18
**shift** 30:9
**shook** 3:14
**short** 55:16
**shorter** 40:9
**show** 40:16 76:8
79:8 82:13,19
86:1 109:2 139:10
142:17 147:20
**showed** 61:18
62:15 76:19 127:6
**showing** 28:5,11
35:9 66:15,20
67:3 69:6
**shows** 51:10 62:12
77:5,12,20,25 78:2
78:12,21 79:10,12
140:20 141:21

**sic** 38:5
**sideways** 48:14
**signal** 29:23 74:15
75:7,12,18 76:9,12
76:14,19,22 77:6
77:12,21,25 78:3,7
78:13,17,21,24
79:4,11,16 100:24
101:3,5,10,14,19
101:25 103:15
106:18 110:10,12
110:20,23 111:18
111:18,21,25
112:5,8,12,13,18
112:25 113:8,11
113:15,19 114:23
118:10,15,16
123:12 126:6,14
127:6,10,11,20
128:3,10,17
130:10,17,23
131:4,10,18,22
141:22 142:18,22
144:15,21
**signaling** 118:14
**signals** 6:13,16,18
6:21,24 7:4,7,10
79:8 103:8,11
111:3,3 125:9,13
125:17,21 126:20
126:23 129:9,13
129:17,21 130:22
131:8
**signature** 151:19
**significance** 62:20
63:1
**significant** 62:17
62:21 63:5,14,21
63:23 64:4 65:19
65:24 66:4

**similar** 111:10
137:24
**simple** 39:13
**simplify** 132:6
**simply** 55:6
122:11 134:21
**simultaneous** 52:7
60:24 118:25
119:7
**single** 26:23
104:25 105:11
**sit** 108:15,15
**sites** 60:6
**sitting** 108:20
**six** 45:7 48:24
49:22 50:3,8,21
51:13 54:17,19
55:10
**slightly** 63:12
**sold** 135:17
**solutions** 8:8,11
**somebody** 136:20
**sorry** 16:20 19:23
19:24 31:4,7 38:2
38:3 82:23 101:17
102:25 109:8
119:13 129:1
133:11,24 140:8
148:1
**sort** 47:23 136:22
**sounds** 71:15 82:9
**source** 124:1
**sources** 111:2
112:10,25 113:13
113:20
**speakers** 52:7
60:24 118:25
119:7
**speaking** 76:5
87:23 91:3

**specific** 30:21 34:12 57:19 92:16 94:20
**specifically** 17:25 34:6,16 93:19 112:23 128:19 142:11 149:18
**specificity** 93:10
**specify** 92:25 93:1
**spell** 140:24
**spend** 22:9
**spent** 90:22
**spikes** 142:23
**spinning** 148:1
**spirit** 116:14
**spontaneous** 71:8 72:16 73:1 74:3,8 103:2,9
**st** 3:8
**staff** 6:12 109:7,13
**stamp** 25:9,19 35:5
**stamped** 6:5 57:24 86:8
**stand** 143:2
**standard** 73:21 81:8
**standardized** 80:15,21 81:2,5
**stands** 70:24 111:7 114:7
**start** 11:14 48:20 67:8 82:24 122:21
**starting** 44:1,4,11 141:22 142:18
**state** 4:14 8:15,17 115:12 151:4 152:16
**stated** 43:8
**statement** 37:21 43:20 135:1,3

**states** 1:1 36:25 37:16 104:22 107:8
**stating** 115:8,9
**statistic** 75:25,25 76:1,5,5,13,14 78:24 127:6 128:16,17
**statistical** 62:20 62:23 63:1,8,11 74:19 75:24 76:2 76:6 83:15 84:9 84:21,25 89:21 117:9,11,12 118:7 118:9,13,20 119:24 120:11,16 120:19 135:16
**statistically** 62:16 62:21 63:4,13,21 63:23 64:4 65:19 65:24 66:4
**statistician** 91:23 117:12
**statistics** 75:22 76:8,21 78:8 79:7 83:10
**steering** 2:4
**stenographic** 1:14
**stenographically** 151:11
**steps** 111:17 112:2
**stop** 27:2 100:6
**stopped** 50:9,21 51:13
**street** 2:19 3:23 4:14 9:22
**strictly** 76:4 91:3
**strike** 67:8 101:8
**string** 5:22 40:20
**strokes** 54:15

**studied** 57:15
**studies** 30:15 31:2 63:16,19,25 64:13 64:18 65:2,3,9,14 66:16,21 112:10
**study** 5:19,19,24 5:24 31:16,21 32:18,19,25 33:1 34:24 35:11 36:13 36:25 37:16 38:1 38:12 39:15,19 42:7 45:17,20,25 47:2,2 48:7 49:17 50:13 52:15 54:12 55:4 56:1,7,8,10 56:11,11,16,17,24 56:25 57:9,14,24 60:3,6,9,17 64:12 64:17 66:20 148:21 149:23
**studying** 34:6
**stumbling** 53:2
**submissions** 27:24
**submit** 79:25
**submits** 79:24
**submitted** 99:1 139:5
**subscribed** 152:18
**subsection** 113:21
**sufficient** 114:22
**suggest** 84:6
**suggesting** 40:9 60:8 84:4 117:24
**suite** 3:23 4:6,20
**summarize** 120:3
**sun** 4:11 9:11
**support** 13:22 114:22
**supporting** 14:5
**suppose** 39:13 44:15 114:14

**supposed** 147:22
**sure** 21:23 36:7,19 38:8,13 45:15 49:5,6 52:2,13,17 55:18 58:10,14 60:5,16 62:2,22 66:12 68:8 69:6 70:9 71:5,8,15,24 72:5 74:21 75:4 76:10 80:3,12 82:14 85:3,24 86:16 91:12 92:5 93:19 99:7,19,25 100:25 101:2,7,22 106:3,6,12,13 107:2,20 108:25 109:9 111:20,24 113:13 115:16 116:2 117:1 118:3 118:4,12 123:14 132:10,13,18 133:20 134:14 137:1 140:18 143:4 147:17
**surgery** 94:4
**surveillance** 6:12 109:6,13,25
**survival** 33:14,19 34:1
**suspect** 72:3,13
**suspected** 134:11 134:17
**suspicion** 71:13,21
**swear** 9:17
**switch** 55:25
**sworn** 9:24 151:6 152:18
**synopsis** 33:9 57:6
**system** 70:25 74:3
**systematic** 103:1,7

**systematically**
73:20
**systems**  72:17

**t**

**t**  3:5 5:9 6:1 7:2
151:1,1 153:1,1
**tab**  11:17 12:19,20
14:14 15:12 17:11
32:16 40:17 56:14
67:25 86:2 95:17
102:5 109:2
123:20 128:22,24
130:13 132:19
139:11 140:9,10
140:19 146:18
147:21,22,25
**table**  35:3,9,13
36:5,12,18 37:24
38:5 42:6 45:16
45:24 48:10,16
57:24 58:3 61:2
68:19 77:6,15,20
77:24 110:8
144:24
**tables**  43:25 77:2
**tabs**  124:22 130:9
**tac**  35:14 36:3
57:11 58:8 62:13
62:24 63:10
**take**  37:6 55:14
60:14,22 61:15
62:5 69:9,10
90:14 106:10
122:14,16 135:10
145:12
**taken**  1:16 8:4
55:21 123:4
134:20 145:19
151:11
**talc**  18:2

**talk**  30:10,21 31:8
79:19 101:3
117:22
**talked**  19:20 21:22
52:6 79:23 134:14
138:6 139:2 145:7
148:19
**talking**  36:9 47:10
90:12 95:24 96:17
101:2 119:5
139:16
**tantamount**  84:22
**tax**  5:20 30:14,15
30:22,22 31:8,18
32:19 33:1,13,18
33:25 34:11 35:10
35:23 40:9,11
42:7 53:24 54:12
56:1,10,24 57:10
57:14,14,14,18
58:24,25 60:2
63:4 65:20,25
66:16,16,21,21
68:13
**tax.es1.301**  5:24
56:17
**tax316**  6:4 68:3
**taxotere**  1:4 8:5
20:24 83:4,7,25
84:1 91:4 152:1
**taylor**  2:18 9:14
**taylor.hardenstein**
2:21
**technical**  124:5
126:3
**technically**  46:24
**techniques**  103:10
103:14,15,20
104:3,23
**tell**  19:19,21 44:17
45:16

**telling**  46:21
118:19
**temporal**  114:19
137:23
**ten**  145:13
**term**  47:4,13,17
81:15 88:5 95:12
96:20,24 97:5,9,11
97:14,16 98:1,5,10
98:21 99:9,22
110:23
**terminology**  56:7
**terms**  21:14 31:15
57:8 60:12 81:2
95:14,23 96:18,19
97:3,7,8,13,16,20
98:12,13,15,20
99:12 108:8
136:12 145:9
148:14
**test**  62:23 63:11
**testified**  10:21
11:4,7 18:20 82:2
82:12 139:12
**testifies**  9:25
**testify**  151:7
**testimony**  5:18
11:12 17:9,13,21
17:21 18:1,7 19:8
20:8 21:25 53:15
53:16 54:5 151:11
152:9
**tests**  31:6
**texas**  2:7
**thank**  11:13 12:2
28:14 33:24 48:14
74:6 148:18 150:2
**thanks**  150:3
**therapy**  71:12,21
**thing**  46:12 72:5
98:18 101:2

106:22 108:20
114:1 127:23
132:6 134:7
136:16 145:24
**things**  51:19 74:11
83:14 94:24
105:23 107:4
108:9 134:5
136:14
**think**  11:2 19:25
21:1 31:4 33:22
43:5 44:21 52:18
52:21 53:8 59:1
59:14 60:6 63:3
67:18 73:10,14,23
77:18 79:13 87:3
93:6,11 95:1
96:17 98:17 106:9
109:19 114:9,10
115:5 116:10,14
117:3 122:1,15
126:2 132:5
139:14 140:5,16
141:9,10 144:16
145:12
**third**  75:17 76:14
78:2 87:2
**thought**  82:23
**thousand**  51:20
**three**  22:11 55:17
58:7 61:8 62:13
62:21,25 76:8,8
140:20 142:14,16
142:17,24
**threshold**  77:7,9
77:13,22
**throwing**  13:25
**tick**  73:5
**tie**  93:19
**time**  8:17 10:8,24
18:8 20:18 21:5

40:10 43:16 44:10
44:24 48:22 49:20
55:19,22 72:2,6
76:12,13 79:5,11
79:13 83:21 84:17
87:5 108:4 116:12
121:3 122:16,17
122:20 123:1,8
124:15,18 134:22
145:17,20 147:15
150:5,7 151:12
**times** 10:19 49:4,7
51:2,24 52:5
53:10 78:13 79:9
81:16
**today** 10:13 11:11
18:24 19:16 20:8
108:16,21 139:17
**top** 88:17 108:13
**torrey** 3:15 8:24
**toxicity** 33:20 34:1
34:16,20
**tpeterson** 3:18
**trailed** 101:17
**transcript** 1:14
151:10 152:8
**transcripts** 19:2,3
19:5,12 22:3
28:16,18,23
**trastuzumab**
141:7,10,13,18
**traurig** 4:19
**treated** 94:8
134:19
**treatment** 24:15
24:19 44:5,12
46:9
**trends** 137:23
**trevor** 2:19 9:12
**trevor.rockstad**
2:21

**trial** 5:18 10:22
11:4,8 17:12 19:7
21:19,21 31:19
39:3 40:11 42:3
55:2 59:8 62:12
62:15 66:12 67:4
67:10 70:3 112:9
149:5
**trials** 30:18,24
38:17 64:8 66:6
66:10 68:7 73:18
73:19 74:5
**tried** 126:1
**true** 12:11 28:20
36:4 79:13 104:6
142:5,7,8,13
151:10
**truth** 151:7,7,8
**truthful** 152:8
**truthfully** 11:7
**try** 30:21 38:2
124:13
**trying** 51:3 61:20
71:18 84:6 94:21
107:15 112:1
117:3 118:14
132:6 141:2
**tucker** 4:5
**tuckerellis.com**
4:7
**tuesday** 19:25,25
**turn** 12:19 13:2,15
25:5 33:8 41:24
42:10 48:10,13
56:13 57:5 70:17
86:25 92:3 110:15
140:3 143:5,7
148:9
**twice** 149:19
**two** 19:17,22
22:18 31:21,22

32:14 33:15,20
34:2 36:6 40:5
46:19 51:19 55:16
57:9 63:15,16,19
63:25 64:7,12,18
65:3,9,14 66:5
74:11 94:8,24
103:24 104:13
110:17 111:17
112:2 139:21
140:21,23 141:3,5
141:6
**type** 72:24 81:16
86:18 120:7,18,20
**types** 97:20
**typically** 59:18

## u

**ulmer** 3:22
**ulmer.com** 3:24
**ultimately** 21:20
**uncertainty** 95:2
**underlying** 38:25
89:23 90:4,14
106:3,10,20 107:3
107:9 108:1,6,7,12
108:18 115:14
116:7 121:13,18
121:23 122:4,8
134:19 138:21
**understand** 12:3
22:16 25:11 41:10
41:15 49:13 51:4
54:5 61:19,20
71:18 75:4 77:14
78:25 79:3 84:4
87:25 89:4 91:10
91:12 94:21 97:23
99:24 100:23
104:7 105:3 106:6
112:1 116:8,20
118:11,18 120:2

**understanding**
32:11 53:20 57:17
78:16 90:21
104:16 146:25
**undertaking** 91:8
**unfortunate** 97:9
**unfortunately**
37:10
**uniform** 108:8
**unit** 94:7
**united** 1:1
**university** 10:15
**unreasonable**
50:25 107:19
**unusual** 133:20
**update** 27:24
**updated** 15:24
16:3 17:8
**use** 40:2 52:9,12
52:22 53:4,7,11
75:23 76:21 79:7
79:8 80:6 97:9
103:14 132:15
**usefulness** 103:11

## v

**v** 9:21
**vaccine** 111:8
**vaccines** 111:11
**vaers** 110:25
111:7 113:4,21
**valsartan** 18:3
**valuable** 137:23
**value** 51:1,16
63:12 64:3
**varied** 76:16
**various** 71:3 74:19
78:8,13 97:20
136:14
**vast** 61:11,21
**veritext** 8:8,10

**version**   15:21
37:10 77:5,19,19
77:24 78:2 80:4
82:20 95:23 96:15
133:8,16 140:21
146:22 147:21
148:16,17
**versus**   35:23 62:21
62:24
**videographer**   4:24
8:1,9 9:16 55:19
55:22 122:22
123:1,8 124:15,18
145:17,20 150:5
**videotaped**   1:10
**view**   42:17,25 47:3
47:7,12,15 94:18
**vine**   3:23
**visit**   43:16 44:3,3
44:10,19,23 45:2
45:11
**vitae**   5:16 15:13

**w**

**w**   5:22 40:21
**wait**   17:17
**waiting**   109:9
**walk**   94:4
**want**   11:14 19:19
31:14 49:8 54:8
70:8 75:3 77:14
77:16 89:22 91:11
101:1 102:21
103:5 116:6,12,12
117:23 125:3
130:4 138:24
143:5,13 145:23
146:5
**wanted**   89:22
147:20
**washington**   3:8

**way**   13:24 30:8
35:25 39:24 41:13
47:20,21 61:5,5,24
64:20 74:23 81:14
83:20 94:18 97:12
111:7 112:20
116:12 124:2
132:3
**ways**   74:22 135:14
**wc.com**   3:9,10,10
**we've**   13:17 47:10
51:21 55:13 58:22
90:11 95:10 120:4
122:13 138:6,21
139:16
**web**   69:12
**website**   68:6,10,13
96:1,8 132:16
133:3 147:6
**went**   53:22 54:10
**whlaw.com**   2:8
**williams**   2:6 3:5
8:21 9:19
**withdraw**   85:14
**witness**   1:20 5:3
9:17 11:22 12:25
14:16 53:18 55:16
56:21 86:4 119:11
122:18,24 123:23
124:10 132:24
145:15 148:3
150:3 151:6
**witnesses**   5:14
12:23
**word**   34:9 50:5
75:23 88:10
**words**   39:25 40:5
98:16
**work**   20:19 21:9
21:13 22:13

**wrong**   51:1 119:21
**wrote**   42:23 43:14
107:13

**x**

**x**   5:1,9 6:1 7:2
64:22
**xi**   151:20

**y**

**y**   64:22
**yeah**   33:16 36:7
39:21 43:7 48:18
54:15 60:5 62:2
72:17 77:11 78:23
95:25 99:6 108:25
109:9 112:19
114:14 116:21
118:2 123:18
126:11,22,25
133:20 136:18
138:14 139:3,25
140:4 141:20
148:11
**year**   10:25 21:18
38:1,12 42:20
43:2,11,17 44:5,11
44:12,24 49:10
76:11,18 78:6
**years**   5:18 17:13
44:16 45:3,4,5
54:16 81:17
**yep**   113:2

**z**

**z**   64:22
**zoom**   1:12
**zostavax**   18:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.