# EXHIBIT JJ

1          David B. Ross, M.D., Ph.D., M.B.I.

2            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
3

4   - - - - - - - - - - - - - -
                                |
5   IN RE: TAXOTERE              |
                                |
6   (DOCETAXEL) PRODUCTS         |   MDL Number: 2740
                                |
7   LIABILITY LITIGATION         |   Section H(5)
                                |
8   This Document Relates to:    |   Hon. Jane Milazzo
                                |
9   Alice D. Hughes vs. Accord   |   Magistrate Judge
    Healthcare, Inc., Case       |   Michael B. North
10  Number 2:17-cv-11769         |
                                |
11    - and -                    |
                                |
12  Wanda Stewart v. Sandoz,     |   Section N(5)
    Inc., Civil Case No.         |
13   2:17-cv-10817               |
    - - - - - - - - - - - - - -+

14

15

16          Remote Videotaped Deposition of

17          DAVID B. ROSS, M.D., Ph.D., M.B.I.

18                  (Volume 2)

19              Monday, August 31, 2020

20                  9:16 a.m.

21

22

23   Job No. 183201

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

Page 207

1    David B. Ross, M.D., Ph.D., M.B.I.
2        Remote Deposition of
3    DAVID B. ROSS, M.D., Ph.D., M.B.I.
4            (Volume 2)
5
6
7
8
9
10
11
12
13
14
15
16
17
18        Taken pursuant to notice, before
19   Laurie Donovan, Registered Professional
20   Reporter, Certified Realtime Reporter, and
21   notary public for the District of Columbia.
22
23
24
25

Page 208

1    David B. Ross, M.D., Ph.D., M.B.I.
2        A P P E A R A N C E S
3    ON BEHALF OF THE PLAINTIFFS:
4        The Gomez Firm
5        655 West Broadway
6        San Diego, California 92101
7        By:  Lindsay Stevens, Esq. (phone)
8
9
10   ALSO ON BEHALF OF PLAINTIFFS:
11       Lemmon Law Firm
12       15058 River Road
13       Hahnville, LA 70057
14       By:  Andrew Lemmon, Esq. (phone)
15
16
17
18   ALSO ON BEHALF OF PLAINTIFFS:
19       Williams Hart Boundas Easterby
20       8441 Gulf Freeway,
21       Houston, TX 77017
22       By:  Brian Abramson, Esq. (phone)
23
24
25

Page 209

1        David B. Ross, M.D., Ph.D., M.B.I.
2    (Appearances continued)
3    ALSO ON BEHALF OF PLAINTIFFS:
4        The Maher Law Firm
5        P.O. Box 2209
6        271 West Canton Avenue, Suite 1
7        Winter Park, FL 32790
8        By:  Jason Fraxedas, Esq. (video)
9
10
11   ON BEHALF OF DEFENDANT SANDOZ, INC.:
12       Greenberg Traurig
13       Terminus 200
14       3333 Piedmont Road Northeast
15       Atlanta, GA 30305
16       By:  Cliff Merrell, Esq. (video)
17
18
19   ON BEHALF OF DEFENDANT SUN PHARMACEUTICALS:
20       Hinshaw & Culbertson
21       53 State Street
22       Boston, MA 02109
23       By:  Geoffrey Coan, Esq. (phone)
24
25

Page 210

1        David B. Ross, M.D., Ph.D., M.B.I.
2    (Appearances continued)
3    ON BEHALF OF DEFENDANTS ACTAVIS PHARMA, INC.;
4    ACTAVIS LLC; and SAGENT PHARMACEUTICALS, INC.:
5        Ulmer & Berne
6        600 Vine Street
7        Cincinnatti, OH 45202
8        By:  Michael Suffern, Esq. (phone)
9
10
11
12   ON BEHALF OF DEFENDANT SANOFI, S.A.:
13       Shook Hardy & Bacon
14       2555 Grand Boulevard
15       Kansas City, MO 64108
16       By:  Chris McRae, Esq. (phone)
17           Matt Depaz, Esq. (phone)
18
19
20
21
22
23
24
25

Page 211

1        David B. Ross, M.D., Ph.D., M.B.I.
2   (Appearances continued)
3   ON BEHALF OF DEFENDANTS HOSPIRA WORLDWIDE, LLC,
4   and PFIZER, INC.:
5        Williams & Connolly
6        725 12th Street Northwest
7        Washington, DC 20005
8        By:  Richmond Moore, Esq. (phone)
9
10
11   ON BEHALF OF ACCORD HEALTHCARE, INC.
12        Tucker Ellis
13        950 Main Avenue
14        Cleveland, OH 44113
15        By:  Julie Callsen, Esq. (video)
16
17
18
19   ALSO PRESENT:
20        Nolan Wileman, Videographer
21
22
23
24
25

Page 212

1        David B. Ross, M.D., Ph.D., M.B.I.
2        EXAMINATION INDEX
3                    PAGE
4   EXAMINATION BY MR. MORIARTY . . . . . . . . . 216
5
6
7
8
9
10
11        E X H I B I T S
12   EXHIBIT    DESCRIPTION           PAGE
13   Exhibit 9  List of materials reviewed  . . . 217
14   Exhibit 10  Updated list of materials
15        reviewed  . . . . . . . . . . . 219
16   Exhibit 11  Notice of Deposition  . . . . . . 237
17   Exhibit 12  Article entitled "The FDA and the
18        Case of Ketek" written by David B.
19        Ross  . . . . . . . . . . . . . .  260
20   Exhibit 13  21 U.S.C.A 355-1, Risk Evaluation
21        and Mitigation Strategies . . . . 306
22   Exhibit 14  Comparison of Label Changes made
23        by Sanofi, Sandoz, Hospira and
24        Accord, June 2011 - December 2015 310
25

Page 213

1        David B. Ross, M.D., Ph.D., M.B.I.
2   (Exhibits continued)
3   EXHIBIT    DESCRIPTION          PAGE
4   Exhibit 15  Accord's Application to Market
5        a New or Abbreviated New Drug
6        or Biologic for Human Use,
7        Bates ACC.00087944  . . . . . . . 331
8   Exhibit 16  Letter to FDA from Accord dated
9        December 30, 2015, regarding
10        docetaxel CBE, Bates
11        ACC.00030608 . . . . . . . . . . 335
12   Exhibit 17  Letter from FDA to Accord regarding
13        its NDA, Bates ACC.00087907 . . . 337
14   Exhibit 18  Another letter from FDA to Accord
15        Bates ACC.00083941  . . . . . . . 350
16   Exhibit 19  Agarwal article entitled "Overview
17        of Recently Approved 505(b)(2)
18        NDAs (2010 - 2012) Role of Clinical
19        Pharmacology"  . . . . . . . . . 354
20   Exhibit 20  Letter from FDA, dated October 14,
21        2003, response to citizens
22        petition  . . . . . . . . . . . 368
23
24
25

Page 214

1        David B. Ross, M.D., Ph.D., M.B.I.
2        P R O C E E D I N G S
3        THE VIDEOGRAPHER:  Good morning,
4   ladies and gentlemen.  My name is Rick
5   Richey.  I'm a legal videographer in
6   association with TSG Reporting, Inc.
7        Due to the severity of the COVID-19
8   and following the practices of social
9   distancing, I will not be in the same room
10   with the witness.  Instead, I will record
11   this videotaped deposition remotely.  The
12   court reporter, Laurie Donovan, also will not
13   be in the same room, and will swear the
14   witness remotely.
15        Do all parties stipulate to the
16   validity of this video recording and remote
17   swearing and that it will be admissible in
18   the courtroom as if it had been taken
19   following Rule 30 of the Federal Rules of
20   Civil Procedures and the state rules where
21   the case is pending?
22        Do all agree?
23        MR. MORIARTY:  Yes.
24        MR. FRAXEDAS:  We agree.
25        MR. MERRELL:  Cliff Merrell for

Page 215

1    David B. Ross, M.D., Ph.D., M.B.I.
2  Sandoz.  We agree.
3        THE VIDEOGRAPHER:  This will be the
4  video-recorded deposition of David Ross,
5  M.D., Ph.D., volume 2.  Today's date is
6  August 31, 2020.  It's 9:16 a.m.  The case is
7  In Re Taxotere (Docetaxel), MDL number 2740,
8  in the United States District Court, Eastern
9  District of Louisiana.
10        Would the attorneys please
11  introduce themselves.
12        MR. FRAXEDAS:  Jason Fraxedas on
13  behalf of the plaintiffs.
14        MR. MORIARTY:  Matthew Moriarty on
15  behalf of Accord Healthcare, Inc.
16        MR. MERRELL:  Cliff Merrell on
17  behalf of Sandoz.
18        THE VIDEOGRAPHER:  Would the court
19  reporter please swear in the witness.
20        (Witness duly sworn.)
21
22
23
24
25  ///

Page 216

1    David B. Ross, M.D., Ph.D., M.B.I.
2        * * * * *
3        DAVID ROSS, M.S., Ph.D.,
4  having been first duly sworn, testified
5  upon his oath as follows:
6    EXAMINATION BY COUNSEL FOR ACCORD
7  BY MR. MORIARTY:
8    Q   Just for the record, before I start
9  asking Dr. Ross questions, when I looked at the,
10  my notes and the rough transcript over the
11  weekend, I noticed that no one delineated on the
12  record at what time I began questioning on Friday.
13  The last denoted time was at a break that ended at
14  4:30.  Mr. Merrell questioned for 20 or 30
15  minutes.  I don't -- I didn't keep track of that,
16  and then I started somewhere around 5:00 and
17  concluded at 6:08 p.m.  So my estimate is that I
18  still have five hours and 50 minutes of
19  questioning to go.  We can -- if anybody objects
20  to that, we can check that at a break.
21        Dr. Ross, are you ready?
22    A   Yes, sir.
23    Q   The first session of your deposition in
24  this case ended Thursday evening at about
25  6:10 p.m.

Page 217

1    David B. Ross, M.D., Ph.D., M.B.I.
2        Between then and this morning, before we
3  started the deposition, did you review any new
4  materials that you would rely on to form opinions
5  in this case?
6    A   I want to make sure I understand.  You
7  mean any new materials beyond the reliance list
8  that was provided separately by retaining counsel?
9    Q   Yes, sir.
10    A   No, I have not.
11    Q   All right.  Did you have additional
12  conferences with plaintiffs' counsel to continue
13  to prepare for this second session?
14    A   Yes.
15        MR. MORIARTY:  All right.  I would
16  like to mark -- I believe we're up to Exhibit
17  9, and it's my understanding we're going to
18  mark consecutively, and that Mr. Merrell
19  ended with Exhibit 8 last week.
20        So I'd like to mark as Exhibit 9,
21  which is a Word document transmitted to us on
22  Thursday, that was then a draft list of
23  documents reviewed.
24        (Exhibit 9 was marked for
25        identification.)

Page 218

1    David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3    Q   Dr. Ross, did you see this on Thursday
4  during the day when we were debating what was
5  going on with your, as we call it, "reliance
6  list"?
7    A   No, I don't believe so.
8    Q   Did you see it at any point between
9  Thursday and late Friday?
10    A   Could, could you -- could I just see the
11  additional pages on this, if there are any?
12    Q   Sure.
13    A   Thank you.
14    Q   That's the second page.
15    A   Okay.
16    Q   And that's the third page.
17    A   Okay, and when you say "late Friday" --
18    Q   Well, did you see this document at any
19  point after it was discussed among the lawyers on
20  Thursday?
21    A   Yes.
22        MR. MORIARTY:  All right.  Let's
23  mark the next exhibit, which will be Exhibit
24  10.
25

Page 219

1      David B. Ross, M.D., Ph.D., M.B.I.
2      (Exhibit 10 was marked for
3          identification.)
4  BY MR. MERRELL:
5      Q   Sorry, Doctor.  It takes a minute to
6  upload and appear on the screen.
7      A   The computers have not had enough
8  coffee, I assume.
9      Q   All right.  This, Doctor, is something
10  we received late Friday in a PDF format and was
11  considered the final list of documents reviewed.
12  So I assume that at some point Thursday night or
13  during the day Friday, you saw Exhibit 9, and
14  ultimately it got revised into what we see as
15  Exhibit 10.
16      Is that fair?
17      A   If I, again, could just see the --
18      Q   So that's the second page of Exhibit 10
19  on the screen now.
20      A   Okay.  Go to the next page.
21      Q   That's the third page, and we're about
22  to see the fourth page.
23      A   Right.
24      Q   So am I correct that Exhibit 9 was
25  revised throughout Thursday night to Friday to

Page 220

1      David B. Ross, M.D., Ph.D., M.B.I.
2  become the final, which is Exhibit 10?
3      A   You mean by retaining counsel?
4      Q   With or without your participation.
5  Either way.  I'm just asking for the best of your
6  knowledge.
7      A   To the best of my knowledge, yes.
8      Q   All right.  Let's walk through a few
9  things on what is Exhibit 10, and at the top it
10  says "Exhibit C," because this would be Exhibit C
11  to your expert report package, right?  That's what
12  it was called when we originally got it.  Do you
13  know that?
14      A   That is my understanding.
15      Q   Okay.  Let's start with expert reports.
16  Did you tell us last Thursday that you had
17  reviewed the expert report of a gentleman named
18  Mukul Agarwal, M-U-K-U-L, Agarwal, Ph.D.?
19      I'm not asking whether it's on the list.
20  I'm asking whether you reviewed it.
21      A   I'm sorry.  I have two different
22  questions here.  One is did I tell you on last
23  Thursday, and secondly is have I reviewed it.
24      Q   Have you reviewed the expert report of
25  Mukul Agarwal?

Page 221

1      David B. Ross, M.D., Ph.D., M.B.I.
2      A   I have read it, yes.
3      Q   Okay, and it is not on this list; is
4  that correct?
5      A   That is correct.
6      Q   All right.  Let's go down to "FDA
7  Documents," the second bullet point.  Do you see
8  where it says "Supplemental Approval from
9  Department of Health and Human Services to Accord
10  Healthcare," and then it gives an NDA number?
11      A   Yes.
12      Q   Is that the 2016 FDA approval of Accord
13  Healthcare, Inc.'s CBE application for a label
14  change?
15      A   I believe that is correct.
16      Q   All right.  Let's go to the next page.
17  Look under "US Labels."  Do you see the bottom two
18  bullet points are Accord docetaxel labels with
19  dates?
20      A   Yes.
21      Q   I will represent to you that if we went
22  back to Exhibit 9, those do not appear on that
23  list.  So is that an oversight as to Exhibit 9?
24      A   I'm afraid I don't understand the
25  question.

Page 222

1      David B. Ross, M.D., Ph.D., M.B.I.
2      Q   These two items, the Accord labels, were
3  not on Exhibit 9.  They were also not on the list
4  that we marked last week during your deposition
5  as -- I think it was Exhibit 4.  I'm just
6  wondering whether that was an oversight or whether
7  these are new items that you have reviewed.
8      A   So -- I'm sorry.  I thought someone was
9  about to say something.
10      MR. FRAXEDAS:  I'm going to object
11  to form.
12      THE WITNESS:  So, Mr. Moriarty,
13  there are two questions that I hear in that.
14  One is:  Is this an oversight?  The second
15  is:  Are these items that, reviewed that are
16  new?  Those are the the, the two separate
17  questions if I understand correctly.  Is
18  that -- am I correct?
19  BY MR. MORIARTY:
20      Q   When I asked the second issue, you said
21  you didn't understand the first one, so you can
22  answer -- if you understand either question, just
23  answer.
24      MR. FRAXEDAS:  Object to form.
25      THE WITNESS:  With regard to the

Page 223

1        David B. Ross, M.D., Ph.D., M.B.I.
2    second question, these are not materials
3    that -- I'm specifically referring to the
4    last two bullets under heading VII, "U.S.
5    Labels," the Accord label dated June 8, 2011,
6    the Accord label dated July 26, 2016.  Those
7    are not new items.  These were reviewed in
8    preparation of my report.
9    BY MR. MORIARTY:
10       Q   So it was an oversight.  All right.
11   Let's go down to Roman numeral IX, please.
12       A   Mm-hmm.
13       Q   It says "Accord Foreign Labels:  Accord
14   docetaxel European Union -- European Union,"
15   excuse me, label, date May 2012.
16           Do you see that?
17       A   Yes.
18       Q   Do you know that that is not the -- the
19   entity that filed that foreign label is not a
20   party to this lawsuit; do you know that?
21           MR. FRAXEDAS:  Object to form.
22           THE WITNESS:  I do not know what
23   the status is of this in terms of the
24   relationship of the party who filed this.
25

Page 224

1        David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3        Q   Okay.  Do you know the name of the
4    pharmaceutical company that filed what you have
5    listed under Roman numeral IX?
6        A   Could you repeat the question for me?
7        Q   Do you know the name of the
8    pharmaceutical company that filed the application
9    which led to the label that you list under Roman
10   numeral IX in your list of documents reviewed,
11   Exhibit 10?
12           MR. FRAXEDAS:  Object to form.
13           THE WITNESS:  So I would say that
14   for purposes of my review and my analysis,
15   the identity of that entity that filed was
16   not a primary consideration, so that's what I
17   would say.
18   BY MR. MORIARTY:
19       Q   Was it a consideration at all?
20       A   Yes.
21       Q   Okay.  Well, why isn't it a primary
22   consideration?
23       A   Because the relevant factor, the most
24   relevant factor in regulatory analysis concerns
25   the availability of new safety information to an

Page 225

1        David B. Ross, M.D., Ph.D., M.B.I.
2    NDA holder.
3        Q   What NDA holder?  Are you an NDA holder?
4        A   No not specifically.  I'm speaking in
5    general terms.  I'm reciting from -- if I might
6    refer to my report.
7        Q   Well, no.  I'm just asking you a very
8    simple question now.  I will get into detail about
9    European labeling later.  I just want to
10   understand this list, okay?
11       A   Okay.
12       Q   And listed under Roman numeral XI on
13   your reliance list, Exhibit 10 which is on the
14   screen, way at the bottom, "Accord docetaxel
15   PADERs market as exhibits to deposition of Accord
16   Healthcare, Inc., October 7, 2019."
17           Do you see that?
18           MR. FRAXEDAS:  Object to form.
19           THE WITNESS:  Yes.
20   BY MR. MORIARTY:
21       Q   Why did you review those?
22       A   So first of all, again, just in the
23   interest of clarity, there was a previous question
24   on the table.  You had asked do you mean the US
25   NDA holder, and I began to answer that, and -- by

Page 226

1        David B. Ross, M.D., Ph.D., M.B.I.
2    saying I would refer to my report, and you broke
3    in at that point with a question, a different
4    question.  So I just want to make sure that I'm
5    understanding, in terms of that previous question,
6    was I referring to the USA, the US NDA holder.  Is
7    that question still on the table?  Because I have
8    not responded, as far as I can understand.
9        Q   It is not.  It is not on the table.  I
10   want you to -- no.  I'll withdraw that question.
11           Answer the question now about the Accord
12   docetaxel PADERs.  When did you review them?
13       A   So these were reviewed as part of the
14   review of documents in preparation of my report.
15       Q   Do you have an explanation, Dr. Ross,
16   for why that item is not on Exhibit 4, the
17   reliance list we had before last Thursday, and is
18   not on Exhibit 9, the reliance list we were given
19   Thursday, and first appears in this reliance list,
20   Exhibit 10?  Do you know why?
21           MR. FRAXEDAS:  Object to form.
22           THE WITNESS:  What I can offer you
23   as to why -- and this is information that was
24   communicated to me by retaining counsel -- is
25   that the -- there was an original reliance

Page 227

1       David B. Ross, M.D., Ph.D., M.B.I.
2   list which was provided by retaining counsel
3   to opposing parties' counsel.  It was not the
4   correct version, and they emphasized that
5   this was not something that I had knowledge
6   of; and in terms of, in terms of any further
7   details, I would ask that you -- I refer you
8   back to retaining counsel.
9   BY MR. MORIARTY:
10      Q   I did not find anywhere in your report,
11  which I believe was Exhibit 5, any discussion of
12  Accord's PADERs.
13      Laurie, PADERs is all caps, P-A-D-E-R-s.
14      I didn't find any discussion of Accord's
15  PADERs in your report.
16      Did I miss something?
17      MR. FRAXEDAS:  Object to form.
18      THE WITNESS:  Can I take a minute
19  to refer to my report?
20      MR. MORIARTY:  Sure.
21      Let's go off the video and the
22  record while he takes the time to review
23  that.
24      THE VIDEOGRAPHER:  9:37.  We're off
25  the record.

Page 228

1       David B. Ross, M.D., Ph.D., M.B.I.
2       (Whereupon, a short recess was
3       taken.)
4       THE VIDEOGRAPHER:  9:39.  We're
5   back on the record.
6   BY MR. MORIARTY:
7       Q   Dr. Ross, my question is:  I never saw a
8   discussion in your report of Accord's PADERs, and
9   I was asking whether I had missed something.
10  You've now had a chance to recheck your report.
11  Is there any discussion of Accord's PADERs in it?
12      MR. FRAXEDAS:  Object to form.
13      THE WITNESS:  I'll preface my
14  answer by saying that inclusion of material
15  on this list does not automatically imply
16  that it is explicitly mentioned or cited.
17  However, it does indicate that I reviewed it
18  and it contributed to my opinions.
19      With that said, no, I, I think
20  you're -- as you said, those, those literal
21  words are not within the four corners of this
22  document.
23  BY MR. MORIARTY:
24      Q   Where in your report, Dr. Ross, does it
25  say that you reviewed them and that they

Page 229

1       David B. Ross, M.D., Ph.D., M.B.I.
2   contributed to your opinions, or are you just
3   making an implication?
4       A   Neither, sir.
5       Q   But does it say anywhere in your report
6   that you reviewed Accord's PADERs and that they
7   contributed to your opinions?
8       A   So --
9       Q   Doctor, let's just make clear:  It's
10  fine if you reviewed them.  I'm just asking a
11  simple question.
12      Do you say anywhere in your report that
13  you reviewed them and that they contributed to
14  your opinion?
15      MR. FRAXEDAS:  Object to form.
16      THE WITNESS:  Respectfully,
17  Mr. Moriarty, in the last session during your
18  questioning, I asked you, when I'm answering,
19  if you could refrain from interrupting me,
20  and you agreed to that, so --
21  BY MR. MORIARTY:
22      Q   Can you answer my question?
23      A   Okay.
24      MR. FRAXEDAS:  Same objection.
25      THE WITNESS:  Again, I'm sorry.

Page 230

1       David B. Ross, M.D., Ph.D., M.B.I.
2   With the interruption, I lost track.  Would
3   you please repeat it again.  I'm sorry.  I'm
4   not trying to waste your time, but I do want
5   to try and answer your question accurately,
6   sir.
7   BY MR. MORIARTY:
8       Q   That's fine.  I asked you when you
9   read them.  You said you read them in preparation
10  of your opinions and your report, okay?  Then I
11  asked do you mention them explicitly, and you said
12  no, but that doesn't mean I didn't review and that
13  they didn't contribute.  I got the impression,
14  from the way you said that, that somewhere in the
15  report you say that explicitly.
16      I just want to know:  Is there anywhere
17  in the report itself, Exhibit 5, where it says
18  that you reviewed Accord's PADERs and that they
19  contributed to your opinion?
20      MR. FRAXEDAS:  Object to form.
21      THE WITNESS:  Do I -- I just want
22  to make sure I understand the question.  Do I
23  have an explicit statement in there?  I
24  reviewed these documents, and they
25  contributed to my opinion.  Is that what,

Page 231

David B. Ross, M.D., Ph.D., M.B.I.
1
2  what you're asking me?  I don't mean to put
3  words in your mouth.
4  BY MR. MORIARTY:
5     Q   No, that's what I'm asking.
6     A   Okay.  So those exact words do not
7  appear in my report.  You're correct.
8     Q   All right.  Let's go to Roman numeral
9  XIV.
10       Do you see it's a list of Accord
11  documents?
12    A   Yes.
13    Q   All right.  The first is "Answers to
14  First Set of Interrogatories."  Is there anything
15  from Accord's answers to the first set of
16  interrogatories that were significant to your
17  regulatory opinions in this case?
18    A   Yes.
19       THE REPORTER:  I'm sorry.  I
20  couldn't hear the answer.
21  BY MR. MORIARTY:
22    Q   Sorry.  I didn't hear.  If you answered,
23  it got cut off.
24    A   Sorry.  The answer was yes -- is yes.
25    Q   Do you remember what that was?

Page 232

David B. Ross, M.D., Ph.D., M.B.I.
1
2     A   So again, I want to make sure I'm
3  answering accurately.
4     Q   I just want to know if you, if you
5  remember off the top of your head what facts you
6  got from that document that was significant to
7  your regulatory opinion.
8     A   Okay.  I -- in order to answer that, I
9  do not wish to answer off the top of my head.  I
10  wish to answer accurately, as I swore to do, so if
11  you would please let me refer to my report.
12    Q   No.  I'm withdrawing the question,
13  Doctor.
14    A   Okay.
15    Q   All right.  The third bullet is Accord
16  Healthcare, Inc.'s "New Drug Application," and
17  then you give a number of Bates pages.
18       Do you see that?
19    A   I do.
20    Q   By my count, that's approximately 99
21  pages worth of material.
22       Do you know how many pages is the full
23  NDA?
24       MR. FRAXEDAS:  Object to form.
25       THE WITNESS:  I do not.

Page 233

David B. Ross, M.D., Ph.D., M.B.I.
1
2  BY MR. MORIARTY:
3     Q   Did you choose these specific pages that
4  you list here?
5     A   No.
6     Q   All right.  Did counsel choose those
7  particular pages?
8        MR. FRAXEDAS:  Object to form.
9        MR. MORIARTY:  What's the matter
10  with the form of that question?  I'd like a
11  chance to cure it.
12       MR. FRAXEDAS:  You're asking -- can
13  you hear me?
14       MR. MORIARTY:  Yeah, I can hear
15  you.  It was a yes-or-no question.
16       MR. FRAXEDAS:  Communications with
17  attorneys for plaintiffs is privileged
18  information as well as speculation.
19       MR. MORIARTY:  Okay.
20  BY MR. MORIARTY:
21    Q   Dr. Ross, did you receive information
22  about Accord's NDA from anyone other than
23  plaintiffs' counsel?
24    A   No.
25    Q   Okay.

Page 234

David B. Ross, M.D., Ph.D., M.B.I.
1
2        The fifth bullet says "Department of
3  Health and Human Services, Complete Response."  Is
4  that the -- it looks like it's three pages.
5        Do you remember what that document is?
6     A   Yes.
7     Q   What is it?
8     A   That is -- so just to be clear, that is
9  actually a four-page document.  That was a
10  complete response letter.
11    Q   To the original NDA?
12    A   Yes.
13    Q   Okay.  So that was probably back in
14  2011; is that correct?
15    A   I don't believe so.
16    Q   Was that 2016?
17    A   No.
18    Q   All right.  I'll check on that at a
19  break.
20       The next bullet is an NDA approval.  Is
21  that the original NDA approval back in 2011?
22    A   I believe so.
23    Q   And did that Bates range of documents
24  that you referred to include the label that was
25  approved by FDA?

Page 235

1    David B. Ross, M.D., Ph.D., M.B.I.
2    A   I believe it did.
3    Q   All right.  The last bullet is "European
4  Commission Implementing Decision."
5       Do you know how many pages that was?
6    A   I believe so.
7    Q   Give me a ballpark, and you can use it
8  in reference to is it more than five pages, more
9  than 50 pages . . .
10    A   The best of my recollection, it's 140
11  pages.
12    Q   All right, and did you find that on the
13  internet yourself, or did someone supply you that
14  document?
15    A   The latter.
16    Q   All right.  Do you know anything about
17  the difference between Accord Healthcare, Inc. and
18  Accord Healthcare, Ltd.?
19       MR. FRAXEDAS:  Object to form.
20       THE WITNESS:  When you say
21       "anything," can you be more specific than
22       that?
23  BY MR. MORIARTY:
24    Q   I'm going to ask a different question.
25  I appreciate your, your asking for clarification.

Page 236

1    David B. Ross, M.D., Ph.D., M.B.I.
2       Do you know anything -- I'm sorry.  Are
3  you an expert, and are you going to express expert
4  opinions about the legal significance of the
5  difference between Accord Healthcare, Ltd. and
6  Accord Healthcare, Inc.?
7       MR. FRAXEDAS:  Object to form.
8       THE WITNESS:  So my -- as I say in
9       my report, my conclusions, my opinions are
10       regulatory conclusions, not opinions of law.
11  BY MR. MORIARTY:
12    Q   You have a regulatory opinion about the
13  difference between those two entities?
14    A   As I mentioned earlier, that was not the
15  focus of my regulatory analysis.
16    Q   Okay.  Were you asked to assume any
17  facts about the relationship between those two
18  entities?
19    A   Not that I can recall.
20       MR. MORIARTY:  All right.  Doctor,
21       there was a Notice of Deposition that we
22       filed, asking you to bring or produce certain
23       documents, and I'll mark that as an exhibit;
24       and plaintiffs' counsel did file objections
25       to that.  It's going to be Exhibit 11.

Page 237

1    David B. Ross, M.D., Ph.D., M.B.I.
2       (Exhibit 11 was marked for
3       identification.)
4  BY MR. MORIARTY:
5    Q   Let's go to page 7 of this document.  Do
6  you know whether you've ever seen this before?
7  It's very similar to the one that was filed by
8  Sandoz.  Do you know whether you've ever seen this
9  before?
10    A   I am not sure that I have.
11    Q   Okay.  Item number 4 -- and I'm
12  skipping, because some of these have already been
13  asked and debated between lawyers.
14       I'm sorry.  Let's go to number 3.
15       Last Thursday, toward the end of the
16  day, I asked you whether you had a list of all
17  litigation matters, not just those you had
18  participated in in the last four years.
19       Did you look for such a list?
20       MR. FRAXEDAS:  I'm going to object
21       to that, based on being outside the scope of
22       Rule 26.
23  BY MR. MORIARTY:
24    Q   All I'm doing right now is asked whether
25  there is such a list.

Page 238

1    David B. Ross, M.D., Ph.D., M.B.I.
2    A   So I will discuss this with retained
3  counsel.
4    Q   Okay.  Well, did you look in response to
5  my request that you do so?
6    A   So again, I will discuss this with
7  retained counsel.
8    Q   All right, and by -- when you say
9  "retained counsel," did you retain separate
10  counsel or are you referring to plaintiffs'
11  counsel?
12    A   I'm sorry.  Plaintiffs' counsel.  Thank
13  you for clarifying that.
14    Q   All right.  Number 4 is "All
15  Communications by or between You and any other
16  Person relating to Chemotherapy and/or hair loss
17  as a side effect of cancer treatment."
18       I just want to know if such -- any such
19  documents exist.
20       MR. FRAXEDAS:  And I'll object to
21       this Response and instruct the witness not to
22       respond to the extent that it involves
23       communications between plaintiffs' counsel
24       and Dr. Ross that do not relate to specific
25       facts applied to him to form his expert

Page 239

1    David B. Ross, M.D., Ph.D., M.B.I.
2  opinions.
3        If you can answer within those
4  confines, Dr. Ross, go ahead.
5  BY MR. MORIARTY:
6    Q   Doctor, based on his objection, I'm
7  going to withdraw my question.  I'm going to ask
8  it a different way, okay?
9        Before you were ever retained as an
10  expert in this litigation, did you have any
11  communications that fit the description of Exhibit
12  4 [sic]?
13    A   I don't believe so.
14    Q   Since you were retained as an expert,
15  have you had any such communications with anyone
16  other than plaintiffs' counsel?
17    A   I don't believe so.
18    Q   Number 5 is similar, but it's asking
19  about presentations and posters and slides, things
20  of that nature.
21        Did you ever have any of those before
22  you were retained as an expert in this litigation?
23    A   Possibly.
24    Q   Explain that, please.
25    A   This is listed on my CV.  It would have

Page 240

1    David B. Ross, M.D., Ph.D., M.B.I.
2  been sometime in the 1990s.  I gave a -- I can't
3  remember, honestly.  It was a poster presentation
4  or an oral presentation at an infectious disease
5  meeting on complications of chemotherapy related
6  to risk of infectious disease.
7    Q   And is that the presentation you
8  discussed with Mr. Merrell last week?
9    A   Mr. Moriarty, I honestly -- I don't --
10  I'd have to look at the transcript, and I honestly
11  don't remember specifically which presentation.  I
12  really don't.  I'm happy to answer that if I can
13  get a transcript.  I, I don't remember exactly
14  which presentation that was, but . . .
15    Q   Did you use presentation materials, or
16  were those in computers at FDA?
17    A   I don't know.  That was -- God, that was
18  almost a quarter of a century ago.  I don't know.
19    Q   Okay.  During the Thursday session, I
20  asked if you still had the SEAK -- S-E-A-K, all
21  caps -- materials from that seminar that
22  Mr. Merrell asked you about.
23        Do you still have those?
24    A   Again, I will discuss those with -- that
25  issue with retaining counsel, and by "retaining

Page 241

1    David B. Ross, M.D., Ph.D., M.B.I.
2  counsel" -- just in the interest of time, when I
3  refer to "retaining counsel," I mean plaintiffs'
4  counsel.  It's just -- it's -- so I just want to
5  be clear that I'm not referring to, unless I say
6  otherwise, not counsel, but getting back to your
7  question, sir, I will discuss that with
8  plaintiffs' counsel.
9    Q   Number 17, do you have a consulting or
10  retention contract with plaintiffs' counsel?  I
11  just want to know if you had one, not what the
12  contents are.
13        MR. FRAXEDAS:  I'm going to object
14    and incorporate our Rule 26 objections that
15    were submitted with our objections to the
16    Notice of Deposition here.
17  BY MR. MORIARTY:
18    Q   What's your answer to the question,
19  Doctor?
20    A   Am I permitted -- well, am I permitted
21  to answer on the record?
22        MR. FRAXEDAS:  Subject to the
23    objections, yeah, go ahead.
24        THE WITNESS:  Yes.
25

Page 242

1    David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3    Q   Doctor, there was a series of questions
4  last week with Mr. Merrell when you were going
5  back and forth with him about -- he was asking
6  whether you had read, for example, the entire
7  deposition of a particular witness, and whether
8  you had read the, all of the exhibits to that
9  particular deposition, even though you only cited
10  in your report certain pages or certain exhibits.
11        Do you remember that back-and-forth
12  colloquy with Mr. Merrell?
13    A   Yes.
14    Q   All right.  If I remember your responses
15  correctly, you -- I think you were trying to make
16  the point that it was reasonable to infer, from
17  what you had put in the materials, that you had
18  read the entirety of the deposition and all of the
19  exhibits.
20        Is that what you were trying to convey
21  in your answers to his questions?
22        MR. FRAXEDAS:  Object to form.
23        THE WITNESS:  I was trying to
24    convey that I had, in fact, reviewed those
25    entire depositions.

Page 243

1         David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3         Q    Even though it did not say that
4    explicitly in your report, correct?
5         A    Correct.
6         Q    So am I fair in saying that sometimes
7    you, as a professional, say or write things, and
8    you expect other professionals to make reasonable
9    inferences from what you say or write?
10             MR. FRAXEDAS:  Object to form.
11             THE WITNESS:  So with regard to
12        this specific issue, that was not what I was
13        attempting to communicate.  I was looking at
14        the exhibit, and I'm sorry, I don't remember
15        which number it was, but it was the reliance
16        list that was shown last week, and I was -- I
17        knew that I had reviewed those materials.  I
18        honestly did not recognize at the time that
19        there might be an issue with that specific
20        reliance list, and so I was trying to convey
21        that I had read it, but that was, that was
22        the, that was the only intent that I had
23        there.
24    BY MR. MORIARTY:
25         Q    Okay.

Page 244

1         David B. Ross, M.D., Ph.D., M.B.I.
2         A    It's not a question of --
3         Q    After --
4         A    It's not a question I normally --
5         Q    Go ahead.
6         A    It's not a question whether I normally
7    expect that.  I'm just explaining what the
8    situation was.
9         Q    I'm just asking generally now, not with
10   regard to that specific incident, Thursday.
11   Generally, do you expect professionals with whom
12   you are communicating, whether that communication
13   is in writing or when you're talking to them, for
14   them to make some reasonable inferences based on
15   what you actually say either out loud or in your
16   writing?
17             MR. FRAXEDAS:  Object to form.
18             THE WITNESS:  You know, I think
19        that is, unfortunately, such a broad
20        question, it, it really depends on the
21        context.  It really -- and the, to whom I am
22        speaking, whether they know context that I --
23        I can assume they know context or not or
24        whether I have to provide that context, so it
25        really -- that's also in a different setting

Page 245

1         David B. Ross, M.D., Ph.D., M.B.I.
2    than this one.
3    BY MR. MORIARTY:
4         Q    Do you know Dr. Agarwal?
5         A    No, I don't believe so.
6         Q    Do you have any reason to doubt that he
7    is a qualified regulatory expert?
8             MR. FRAXEDAS:  Object to form.
9             THE WITNESS:  I don't have any
10        basis for forming an opinion one way or the
11        other.
12   BY MR. MORIARTY:
13        Q    Just off the top of your head, do you
14   have any recollection of any specific comments
15   that he made in his report about which you
16   disagree?
17        A    So I do not -- I will say, first off, I
18   did not.  If anything, it strengthened my opinion,
19   but having said that, in terms of specifics, I
20   would want to have the report as an exhibit in
21   front of me before answering any question about
22   specifics.
23        Q    Okay.  Doctor, in your report -- and I
24   can't give you a page, but I know you used the
25   term "vertically integrated."

Page 246

1         David B. Ross, M.D., Ph.D., M.B.I.
2        Do you remember using that term?
3         A    I'd like to consult my report.  Again,
4    I'm -- let me just put this out there, okay, and I
5    understand you would like to get questions and get
6    answers for them.  I'm not trying to frustrate
7    that.  On the other hand, I do not want to give an
8    answer that's wrong -- it's that simple -- or
9    misleading, and that's what the, uh . . .
10             MR. MORIARTY:  Okay.  Let's go off
11        the record while he searches for that, and I
12        will look at the report and see if I can find
13        it.
14             THE VIDEOGRAPHER:  10:10.  We're
15        off the record.
16             (Whereupon, a short recess was
17             taken.)
18             THE VIDEOGRAPHER:  10:13.  We're
19        back on the record.
20   BY MR. MORIARTY:
21        Q    Doctor, I actually made a mistake, so
22   I'm going to ask my question again.
23        You used the term "globally integrated"
24   in your report, and we've been able to find that
25   that's at page -- footnote 52.

Page 247

1     David B. Ross, M.D., Ph.D., M.B.I.
2     Do you see that?
3     A   Yes.
4     Q   Is that a regulatory term?
5     A   Is it a regulatory term?
6     Q   Yes.  Is "globally integrated" a
7  regulatory term?
8     A   It's -- not in the way that "new drug
9  application" or "new chemical entity" would be,
10 but I mean it's a description of an entity.
11    Q   All right.  Let me, let me try this
12 another way.
13       Many of the regulations that apply to
14 pharmaceutical NDAs and other regulations
15 surrounding that have definition sections, don't
16 they?
17    A   Yes.
18    Q   All right.  To the best of your
19 knowledge, is "globally integrated" a term defined
20 in any FDA regulations?
21    A   To the best of my knowledge, no.
22    Q   To the best of your knowledge, is the
23 term "globally integrated" discussed in any FDA
24 guidance documents?
25    A   I -- to the best of my knowledge, I've,

Page 248

1     David B. Ross, M.D., Ph.D., M.B.I.
2  I've never seen it.  Whether it's there or not, I
3  don't know whether it's defined.  I can't say.
4     Q   Okay.  Is it a term -- as you use it in
5  footnote 52, is it a term that you came up with in
6  this case, or is it a quote from a document or
7  witness?
8     A   If I remember correctly -- and this is
9  the best of my recollection -- it's Accord's
10 description of itself.
11    Q   All right.  Well, you don't have a
12 citation in footnote 52.  Do you know from where
13 you got that information?
14    A   So I mention Accord's website.
15    Q   Is it a fact you were asked to assume?
16    A   To the best of my recollection, no.
17    Q   Okay.
18       All right.  Dr. Ross, other than
19 consulting for litigation, can you tell us what
20 FDA regulatory work or consulting that you have
21 done since you left FDA in 2006?
22    A   When you say "FDA work," can you clarify
23 that?
24    Q   Have you done any consulting work
25 directly with FDA since you left your employment

Page 249

1     David B. Ross, M.D., Ph.D., M.B.I.
2  there in 2006?
3     A   To the best of my recollection, no.
4     Q   And I did look at the transcript from
5  Thursday, and Mr. Merrell asked you whether you
6  had done consulting work for any pharmaceutical
7  company regarding regulatory things outside the
8  context of litigation, and your answer was that
9  you had not, correct?
10    A   So when you say "correct," correct,
11 that's what I said, or does that correctly --
12    Q   Yes.
13    A   -- describe the situation?
14    Q   Well --
15       THE REPORTER:  I'm sorry.  What was
16 it?
17       THE WITNESS:  I obviously don't
18 have the transcript, but that does accurately
19 describe the situation.
20 BY MR. MORIARTY:
21    Q   Okay.  So other than litigation, have
22 you done any FDA regulatory consulting work since
23 you left your employment with FDA in 2006?
24    A   So I'm going to ask for a clarification.
25 You're only asking about consulting as the

Page 250

1     David B. Ross, M.D., Ph.D., M.B.I.
2  individual activity, not about any FDA-related
3  issues that I've dealt with working for my current
4  employer; is that correct?
5     Q   Your current employer meaning the
6  Veterans Administration?
7     A   U.S. Department of Veterans Affairs.
8     Q   Yes.
9     A   Okay.
10    Q   Yes.  Any other consulting outside
11 things that may come up in your VA job, during FDA
12 reg --
13    A   I'm sorry.  Sorry.  Please go ahead.
14    Q   Go ahead.  I was done with my question.
15    A   Okay.  I just -- I'm sorry.  I thought
16 maybe you had one thing to add.
17       So excluding that, in terms of
18 consulting as a -- outside of my VA work, no, not
19 to the best of my recollection.
20    Q   What percentage of your work at the VA
21 involves FDA regulatory issues?
22    A   I, I honestly can't provide a
23 quantitative answer to that, simply because things
24 come up episodically, and it, you know, really
25 depends on the time frame, that kind of thing.  I

Page 251

1    David B. Ross, M.D., Ph.D., M.B.I.
2  mean they certainly come up, but it's sort of
3  incorporated into things that I do. It's
4  understood that that's something that I'm dealing
5  with, but in terms of a percentage of time, it's
6  not possible to break it out like that.
7    Q   All right. I want to get back on
8  something I touched on very briefly last Thursday,
9  and that is your references to Drs. Madigan,
10  Plunkett and Feigal in your expert report.
11    Each of those experts -- am I correct
12  that each of those three experts is offered as an
13  expert in a discipline different from FDA
14  regulatory affairs, which is what you were offered
15  for in this case?
16    A   Respectfully, I would not say that is
17  completely correct.
18    Q   Okay. Have you made an independent
19  assessment, separate from any assessments that
20  they made, regarding whether certain clinical
21  studies, medical articles, or adverse event
22  reports needed to be reported to FDA and, if so,
23  when they needed to be reported?
24    A   So again, I'm, I'm hearing two questions
25  here. Have I done an independent assessment of

Page 252

1    David B. Ross, M.D., Ph.D., M.B.I.
2  whether adverse events needed to be -- well, I
3  don't want to put words in your mouth, but if you
4  could break this into two questions; just an
5  independent assessment of what, and then the
6  second one is when they need to be reported.
7  Okay.
8    Q   I'm not asking generally about their
9  duties, okay? I'm asking whether you formed --
10  made an independent assessment and, hence, whether
11  you formed independent opinions about whether
12  particular clinical studies or particular medical
13  articles or particular adverse events needed to be
14  reported to FDA, and if so, when they needed to be
15  reported.
16    A   So I do not wish to put words in your
17  mouth, but the issue for me was what is called
18  "new safety information," and so I did do an
19  independent assessment, relying on the reports of
20  the experts you mentioned, about whether that
21  constituted new scientific information -- new
22  safety information, rather, the answer to that
23  part, new safety information, which is the
24  regulatory issue here, and I formed a conclusion
25  about that, and then the answer to your second

Page 253

1    David B. Ross, M.D., Ph.D., M.B.I.
2  question about when that should have been
3  reported, I have formed a conclusion about that as
4  well.
5    Q   All right. So if I just pick a random
6  example, whether -- I think there was a study
7  called GEICAM, G-E-I-C-A-M. I think that's how it
8  was spelled, and that's all caps, Laurie. That's
9  just an example. I'll get into this in more
10  detail later.
11    You formed an independent assessment,
12  separate and apart from anything that Madigan,
13  Feigal or Plunkett did, that that constituted or
14  did not constitute new safety information?
15    A   So I don't believe that's what I said.
16  What I said was that I -- the question I addressed
17  was whether taking the information from their
18  reports, whether there was new safety information.
19  That's number one.
20    Number two, in terms of the specific
21  article or study that you mentioned, again, I was
22  looking at the overall results, the totality of
23  the evidence from Drs. Feigal, Madigan and
24  Plunkett as to whether there was new safety
25  information. I -- that specific article, again,

Page 254

1    David B. Ross, M.D., Ph.D., M.B.I.
2  I'd want to see that in front of me, but that was
3  not the methodology that I used, trying to
4  reproduce that they had done. I relied on their
5  reports and their conclusions.
6    Q   Yes. I've got one person completely
7  dropped off the screen, and another person has
8  gone dark. I assume that the dark is still Cliff,
9  but Jason may have dropped off the video.
10    Oh, he's back.
11    Okay. Doctor, let me, let me keep
12  plugging away at this and see if I can understand
13  it.
14    Before you ever read the expert reports
15  of Feigal, Madigan and Plunkett, did you
16  independently read the medical articles and the
17  clinical studies and the PADERs, and then come to
18  a conclusion; or, in the alternative, were the
19  Feigal, Madigan and Plunkett reports available to
20  you in your initial review of materials?
21    A   So we're going to have to -- I'm sorry.
22  We're going to have to unpack this a little bit.
23  First off, what do you mean by "initial
24  review of materials"?
25    Q   All right. Let's stick with my original

Page 255

David B. Ross, M.D., Ph.D., M.B.I.

1  question.
2  Before you ever reviewed the Madigan,
3  Feigal and Plunkett expert reports, had you
4  already reviewed the PADERs, the clinical studies,
5  and the medical literature?
6  A   You know, again, that's very, very
7  broad, and I, I can't answer it. I'm sorry. I
8  can't answer your question. I certainly did look
9  at -- and by "PADERs" I assume you mean what's on
10  the review list. I looked at those in conjunction
11  with my review of the expert reports.
12  Q   Okay, but you don't recall or you -- do
13  you recall reviewing medical literature sent to
14  you or found by you before you ever read the
15  reports of those three other experts?
16  A   Again, let me -- I feel like I need to
17  provide this context rather than just say yes or
18  no, because I don't want to be misleading.
19  My regulatory analysis was not based on
20  trying to replicate or validate those experts'
21  results. I relied on their report. I was
22  considering a question that was related to the
23  subject of their reports and their analyses, but
24  was not the same.

Page 256

David B. Ross, M.D., Ph.D., M.B.I.

1  MR. MORIARTY: Okay. Let me find
2  my exhibit list here.
3  (Discussion was held off the
4  record.)
5  BY MR. MORIARTY:
6  Q   Doctor, I want to pull up an article
7  that you authored. I just have a couple of
8  questions about it. We have to find it. It's
9  buried in the list.
10  Let me ask you a question about it while
11  my colleague looks for the exhibit.
12  You wrote an article about the FDA in
13  the case of Ketek, K-E-T-E-K. Do you remember
14  that article?
15  A   Yes.
16  Q   All right. In that article at page
17  1602, you said that foreign post-marketing reports
18  were unreliable data. I would like to know why
19  you said that.
20  A   Well, I'm tempted to ask how much time
21  you have left for questions, Mr. Moriarty. I'm
22  sorry. I'm teasing you a little bit. This is
23  a -- I do not want to inflict another lecture on
24  anybody. The context --

Page 257

David B. Ross, M.D., Ph.D., M.B.I.

1  Q   Well, let me ask, let me ask my question
2  a different way.
3  In one paragraph or less, why did you
4  say in this article that foreign post-marketing
5  reports were unreliable data?
6  A   So the context for that statement, which
7  is critical, is this was used for the initial
8  demonstration by the manufacturer that product of
9  the tradename Ketek was safe and effective for
10  Ketek to use, so that was for its initial
11  approval.
12  It was in the context of -- which I
13  discuss elsewhere in this article -- oh, 3014,
14  that was riddled with flaws, which the company
15  knew of, and then submitted the data.
16  So the question on the table was: Could
17  foreign safety data from a variety of sources, a
18  variety of reporting mechanisms be used to
19  substitute for respectively collected safety data
20  from adequate and well-controlled trials, given
21  concern over a serious -- so that was the
22  question, not look at whether -- excuse me. If I
23  could finish. Not -- that was the question. It
24  was not about the utility of such data for

Page 258

David B. Ross, M.D., Ph.D., M.B.I.

1  post-marketing surveillance.
2  Q   Okay, thank you.
3  All right. Did Accord's -- let me
4  restart the question.
5  Did Accord Healthcare, Inc.'s docetaxel
6  receive an AP rating from FDA?
7  A   Just to be clear, are you referring to a
8  therapeutic equivalence rating?
9  Q   I am.
10  A   Okay, and the reason I asked is "AP" is
11  sometimes also used about counsel approval
12  letters.
13  I don't know.
14  Q   Do you think that that would be
15  important to know in formulating your opinions in
16  this case?
17  A   Without asking you to clarify the word
18  "important," knowing that information would not
19  change my opinions.
20  Q   Succinctly explain to us, please -- and,
21  and I thank you for recognizing we have time
22  limits, but succinctly explain to us, please, what
23  it means to have an AP rating.
24  A   Well, I'm -- to be honest with you,

Page 259

1      David B. Ross, M.D., Ph.D., M.B.I.
2   that's something where I would want to go to
3   what's called the Orange Book.  This is not an
4   issue that I was asked to opine on.  Again, I will
5   just say that that was not the, the focus.  The
6   original approval was not the focus of my
7   analysis, if that helps.
8      Q   All right.  It does help.  Thank you for
9   saying that, because when I asked you last week
10  what were you asked to render opinions on, you
11  used the word post, post-market – "post-approval"
12  or "post-marketing."  I can't remember which you
13  used.
14      So is that the scope of the opinions
15  that you're going to express about Accord
16  Healthcare, Inc. in this litigation, not
17  pre-approval, but post-approval?
18      A   In terms of – excuse me –
19  post-approval obligations and actions.
20      Q   Okay.
21      THE REPORTER:  Mr. Moriarty, that
22  last exhibit you had there, we didn't give
23  mark it, we didn't give it a number.
24      MR. MERRELL:  Oh, you're right.
25  Thank you very much.  That should be Exhibit

Page 260

1      David B. Ross, M.D., Ph.D., M.B.I.
2   12, the Ketek article.
3      (Exhibit 12 was marked for
4      identification.)
5      MR. FRAXEDAS:  Mr. Moriarty, if
6   you're switching gears, do you mind if we
7   take a quick break?
8      MR. MORIARTY:  Yes.  Is that you,
9      Jason?
10      MR. FRAXEDAS:  Yes.  Can you –
11  we've been going about an hour.
12      MR. MORIARTY:  That's fine.  Just
13  tell me when you want to be back.  I see
14  10:40 on my clock.
15      MR. FRAXEDAS:  Yea, so you want to
16  just do ten minutes?  Does that work?  10:50?
17      MR. MORIARTY:  Sure.
18      THE VIDEOGRAPHER:  10:40.  We're
19  off the record.
20      (Whereupon, a short recess was
21      taken.)
22      THE VIDEOGRAPHER:  10:53.  We are
23  back on the record.
24  BY MR. MORIARTY:
25      Q   Okay, Dr. Ross, are you ready?

Page 261

1      David B. Ross, M.D., Ph.D., M.B.I.
2      A   Yes, sir.
3      Q   Have you seen any information in this
4   case to indicate that FDA sent Accord Healthcare,
5   Inc. any warning letters regarding their label or
6   their marketing – I'm sorry.  Let me restart that
7   question.
8      Have you seen any documents in this case
9   to indicate that FDA sent Accord Healthcare, Inc.
10  any warning letters regarding the labeling of its
11  docetaxel product?
12      A   No.
13      Q   Has FDA ever declared Accord Healthcare,
14  Inc.'s docetaxel product to be mislabeled or
15  misbranded?
16      MR. FRAXEDAS:  Object to form.
17      THE WITNESS:  Mislabeled or
18  misbranded?  I have not seen any such
19  communication publicly from FDA.
20  BY MR. MORIARTY:
21      Q   All right.  Is docetaxel currently
22  considered to be safe and effective?
23      MR. FRAXEDAS:  Object to form.
24      THE WITNESS:  I need to clarify.
25  By whom?

Page 262

1      David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3      Q   By operation of the FDA regulations, is
4   it considered to be safe and effective?
5      MR. FRAXEDAS:  Object to form.
6      THE WITNESS:  I'm sorry.  I
7   can't – you know, I can't answer the
8   question in that form.  It's just – I'm, I'm
9   not clear.  Are you asking whether I consider
10  it, whether the FDA considers it?  Who, who
11  would consider it?  I just, I can't answer in
12  the current form.
13  BY MR. MORIARTY:
14      Q   All right.  Thank you.
15      Are you going to render an opinion that
16  Accord Healthcare, Inc.'s docetaxel product is not
17  safe or not effective?
18      A   So the opinions that I'm going to
19  express are contained in my report –
20      Q   Right.
21      A   – based on the information – as you
22  know, I've also said that if there's additional
23  information or I'm asked additional questions,
24  asked to opine on additional questions, you know,
25  that's something where I reserve the right to

Page 263

David B. Ross, M.D., Ph.D., M.B.I.

1  amend or modify my opinions, but in terms of the
2  basic answer to your question, those are contained
3  in my report.
4  Q  Dr. Ross, I think, from the content of
5  your report, you're generally aware that Sanofi's
6  Taxotere product was approved by FDA in 1996.
7     Were you aware of that?
8  A  Yes.
9  Q  From a regulatory perspective, did that
10  approval mean that FDA had determined that the
11  benefits of Taxotere outweighed its risks?
12  A  Based on the information that FDA had at
13  the time, the FDA determined that Taxotere was
14  safe and effective for the conditions of use
15  described in the label at that time.
16  Q  And does that come with it an
17  implication, from a regulatory standpoint, that
18  the benefits outweighed the risks?
19     MR. FRAXEDAS:  Object to form.
20     THE WITNESS:  So I'm, I'm afraid
21  the question is broad, especially because
22  drugs are marketed in the U.S., but they're
23  administered to individual patients, so
24  I'm -- if you could clarify that a bit, that

Page 264

David B. Ross, M.D., Ph.D., M.B.I.

1  would be helpful.
2  BY MR. MORIARTY:
3  Q  Well, I, I appreciate your, your answer,
4  but does the finding of safety and effectiveness
5  for the conditions of use imply that, in general,
6  for the majority of patients, the drug's benefits
7  would exceed its risks?
8     MR. FRAXEDAS:  Object to form.
9     THE WITNESS:  Again, I'm -- the,
10  the -- it's not possible to make a global
11  statement that it -- what I would say is that
12  it met regulatory conditions, or, more
13  accurately, none of the conditions for
14  declining or failing to approve -- refusing
15  to approve, rather -- implications were
16  found.
17     So, you know, it really -- in terms
18  of majority of patients, that's not what an
19  approval necessarily means.
20  BY MR. MORIARTY:
21  Q  Okay.  Has, has the term "alopecia"
22  always been in the Taxotere label?
23  A  You know, to be honest with you, I, I
24  believe it was in the original label, but I'd have

Page 265

David B. Ross, M.D., Ph.D., M.B.I.

1  to go back and look.  I don't want to say yea or
2  nay without actually having that label in front of
3  me.
4  Q  All right, and I believe at the end of
5  the labels, there's typically like a patient
6  counseling or a patient portion that's in more
7  plain English; is that true?
8  A  Yes.  It's referred to as the "Patient
9  Package Insert" or sometimes called the "Med
10  Guide."
11  Q  Okay.  Has the term "hair loss" always
12  been in that guide in association with the
13  Taxotere label?
14  A  Again, I'd want to look at the actual
15  text, have it in front of me.  I don't -- I
16  really -- I'm not saying it hasn't been.  I just
17  don't want to give -- I want to be careful about
18  giving a definitive answer without having the
19  document in front of me.
20  Q  To the best of your knowledge, from 1996
21  up until December of 2015, was the term "alopecia"
22  or "hair loss" always neutral as to time?  In
23  other words, it didn't contain a description of
24  transient or consistent.

Page 266

David B. Ross, M.D., Ph.D., M.B.I.

1  Am I correct about that?
2  A  So the term that was used -- sorry.
3     MR. FRAXEDAS:  Object to form.
4     THE WITNESS:  So to the best of my
5  understanding, the term that was used was
6  simply "alopecia."
7  BY MR. MORIARTY:
8  Q  All right.  As part of your review in
9  this case and to form opinions, have you read a
10  communication between Sanofi and FDA between 1996
11  and early December 2015 so far as it concerned the
12  alopecia portion of the Taxotere label?
13  A  Oh, if there's specific documents that
14  are related to that that you'd like to ask me
15  about, I can answer that kind of question.  Again,
16  I don't want to say, you know -- except in
17  association with the supplement where "alopecia"
18  was changed to "permanent alopecia," I really
19  don't want to say off the top of my head.  Again,
20  if there's a specific document that you'd like me
21  to answer questions about, I'm happy to do that.
22  Q  I don't have a specific document I want
23  to ask you about.  What I'm trying to find out
24  is -- and maybe this is part of your reliance

Page 267

David B. Ross, M.D., Ph.D., M.B.I.
1  David B. Ross, M.D., Ph.D., M.B.I.
2  materials.  If over the years Sanofi had
3  communications with FDA regarding that portion of
4  the label, did you review it all, in any year
5  prior to two thousand -- November and December of
6  2015?
7        MR. FRAXEDAS:  Object to form.
8        THE WITNESS:  Again, nothing comes
9     to mind, but I will also say that if there
10    was such correspondence, I would have
11    considered it, but in general, that would not
12    have altered my conclusions.
13 BY MR. MORIARTY:
14    Q   Hypothetically, Dr. Ross, if the
15 evidence shows that Sanofi gave everything that
16 Drs. Feigal, Plunkett and Madigan suggest should
17 have been given to FDA, and proposed changes to
18 the alopecia part of the label, and FDA rejected
19 those proposed changes, would that affect your
20 opinions in this case?
21       MR. FRAXEDAS:  Object to form.
22       THE WITNESS:  I can't speak to
23    hypotheticals.  I can say that in ten and a
24    half years with the FDA, I never saw -- the
25    only time I would see a situation like that

Page 268

1  David B. Ross, M.D., Ph.D., M.B.I.
2  is if the agency felt that the sponsor was
3     understating the severity of the problem.
4  BY MR. MORIARTY:
5     Q   Well, Dr. Ross, we are entitled to ask
6  hypothetical questions, but can you answer my
7  hypothetical other than the answer you've already
8  given?
9        MR. FRAXEDAS:  Object to form.
10       THE WITNESS:  So can you repeat the
11    question again?
12 BY MR. MORIARTY:
13    Q   Yes.  If the evidence shows that Sanofi
14 gave FDA everything that Drs. Madigan, Feigal and
15 Plunkett suggest that they should have, and asked
16 for changes to the alopecia part of the label --
17 the proposed changes, I should say, to the
18 alopecia part of the label, and FDA rejected
19 proposed changes, would that affect your opinions
20 in this case?
21       MR. FRAXEDAS:  Object to form.
22       THE WITNESS:  It would depend -- it
23    would depend on the rationale that the agency
24    gave.  Again, it's hypothetical.  You know,
25    certainly if there is such correspondence, I

Page 269

1  David B. Ross, M.D., Ph.D., M.B.I.
2  would be happy to take a look at it and
3     provide an answer based on what actually
4     happened, but just to repeat a basic
5     principle here, FDA is in charge of enforcing
6     the Food, Drug & Cosmetic Act.  Manufacturers
7     are responsible for complying with it.
8  BY MR. MORIARTY:
9     Q   Between 1996 and 2015, did FDA ever
10 unilaterally revise the Taxotere patient brochure,
11 specifically the portion regarding hair loss?
12    A   Can you clarify what you mean by
13 "unilaterally revise"?
14    Q   Yes.  Without prompting, requesting or
15 proposing by Sanofi.
16    A   Respectfully, the -- I, I can't answer
17 that question, because the FDA is not the NDA
18 holder.  It's the manufacturer's product.  I mean
19 the FDA has certain authorities at, at various
20 times, but it's not the FDA's NDA.  So I just --
21 I, I'm -- the FDA doesn't print it, it doesn't
22 distribute the drug.  I, I -- so I'm sorry.
23 Respectfully, I don't understand the question.
24    Q   Okay.  It seems to me from your answer
25 you find it hard to believe that FDA would ever do

Page 270

1  David B. Ross, M.D., Ph.D., M.B.I.
2  that.  My question is:  Do you know whether, in
3  fact, they ever did it between 1996 and 2015?
4        MR. FRAXEDAS:  Object to form.
5        THE WITNESS:  So it, it's not --
6     I'm sorry, Mr. Moriarty.  I'm trying to
7     address your question, but the FDA, as far as
8     I know -- and perhaps there's some counter
9     example.  I would be happy to look at it.
10    The FDA cannot do that with regard to any
11    drug, and that includes generics.
12       I mean they can take various
13    enforcement actions, but they themselves do
14    not revise the label.  I, I'm just -- I mean
15    they don't print the label.  The FDA can't
16    just say, well, we're going to print up a new
17    label and ship it off to pharmacies and
18    say -- I mean the FDA doesn't do that.
19 BY MR. MORIARTY:
20    Q   If FDA unilaterally told Sanofi to
21 revise it, do you know whether they did that?  I'm
22 not asking whether they printed it themselves and
23 stuck it on drug packages.
24    A   Well --
25    Q   Do you know whether they ever

Page 271

1    David B. Ross, M.D., Ph.D., M.B.I.
2  unilaterally revised it and told Sanofi that's the
3  new label or that's the new section?
4         MR. FRAXEDAS:  Object to form.
5         THE WITNESS:  So again, I, I –
6  BY MR. MORIARTY:
7    Q   I just want to know if you know if they
8  did that, not how incredible you find it.  I just
9  want to know, from your review of the materials,
10  whether that happened.
11         MR. FRAXEDAS:  Object to form.
12         THE WITNESS:  So I am not aware of
13    any instance prior to enactment of the FDA
14    Amendments Act in 2007 in which the FDA
15    applied for, through judicial proceedings, to
16    enforce a change in the label with respect to
17    permanent alopecia or, after 2007, issued a,
18    what's known as a labeling safety order with
19    respect to this, under Section 505.04, I
20    believe it is, of the Act, with regard to
21    permanent alopecia.
22         So that's the best I can answer
23    your question.
24  BY MR. MORIARTY:
25    Q   Do you have any reason to dispute that

Page 272

1    David B. Ross, M.D., Ph.D., M.B.I.
2  FDA had all of Sanofi's clinical trial
3  information, post-marketing adverse event reports,
4  and other studies up through June of 2011 when it
5  approved Accord Healthcare, Inc.'s docetaxel
6  505(b)(2) application?
7         MR. FRAXEDAS:  Object to form.
8         THE WITNESS:  So again with the
9    understanding that my opinions concern
10    post-approval actions, I actually would not
11    be able to tell you what FDA did or didn't
12    have in its possession at the time of
13    approval.
14  BY MR. MORIARTY:
15    Q   Okay.  In a, in a general setting –
16  well, would you agree that Accord Healthcare, Inc.
17  would not have access to Sanofi's proprietary
18  clinical information, clinical trial information?
19         MR. FRAXEDAS:  Object to form.
20         THE WITNESS:  With the caveat that
21    that is not the question that determined my
22    conclusions, I would agree with that.
23         THE REPORTER:  I'm not sure I got
24    the answer exactly right.
25         THE WITNESS:  Well, let me -- I'm

Page 273

1    David B. Ross, M.D., Ph.D., M.B.I.
2  sorry.  I'm going to start leaning a little
3  closer.
4         I said with the caveat that that
5    actually did not determine the regulatory --
6    my regulatory conclusion, I would agree with
7    that, with what Mr. Moriarty asked about.
8  BY MR. MORIARTY:
9    Q   Well, do you agree that Accord would not
10  have access or communication between FDA and
11  Sanofi that occurred post-, post-approval?
12         THE REPORTER:  You said post or
13    pre?
14         THE WITNESS:  Again – sorry.  Go
15    ahead.
16         THE REPORTER:  You said
17    "post-approval" or "post- or pre-approval"?
18         MR. MORIARTY:  Post-approval.
19         THE REPORTER:  Okay.
20         MR. FRAXEDAS:  Same objection.
21         THE WITNESS:  So with the same
22    caveat that that fact would not affect my
23    conclusions, yes, I would agree with that.
24  BY MR. MORIARTY:
25    Q   And I assume, then, that you'd agree

Page 274

1    David B. Ross, M.D., Ph.D., M.B.I.
2  that Accord wouldn't have access to Sanofi's
3  post-marketing adverse event data; that your
4  answer would be the same, correct?
5    A   Not completely.  Along with the caveat
6  that I previously expressed, any data provided
7  by – post-marketing data provided by Sanofi to
8  FDA, which was subsequently made publicly
9  available through the FDA adverse event reporting
10  system, would be available to the entire public.
11    Q   Now, I know you read some NDA submission
12  material regarding Hospira.  That's mentioned in
13  your reliance list, correct?
14    A   Yes.
15    Q   And we keep calling it "reliance list."
16  You actually call it "list of documents reviewed."
17  Fair, if we're talking about the same thing, can I
18  use that shortcut?
19    A   Yes.
20    Q   Did you read any NDA materials from a
21  company called Actavis?
22    A   Not to the best of my recollection.
23    Q   Did you read any NDA information from
24  companies Pfizer or Sun Pharma?
25    A   Not to the best of my recollection.

Page 275

David B. Ross, M.D., Ph.D., M.B.I.
2  Q  Do you know when FDA approved
3  applications by Actavis, Pfizer or Sun Pharma to
4  market docetaxel?
5  A  I don't.
6  Q  Do you have any information to indicate
7  whether the Actavis, Pfizer and Sun Pharma
8  approved labeling was consistent with what the
9  Reference Listed Drug Taxotere label was at that
10  time?
11  A  So I think I know what you mean by
12  "Reference Listed Drug," but because that term is
13  generally applied to abbreviated NDAs, I'm going
14  to just say assume Taxotere -- and I don't know
15  anything about these drugs -- an NDA, you're
16  referring to it in the context of an NDA that
17  those sponsors relied on, or the, those sponsors
18  relied on the agency's findings of safety and
19  effectiveness.  I don't, I don't know anything
20  about that.
21  Q  Okay.  Are you aware of any reason why
22  FDA would accept a pharmaceutically and
23  therapeutically equivalent drug under 505(b)(2)
24  who have different warnings on the, as I'm calling
25  it, the "RLD," or in this case Taxotere?

Page 276

David B. Ross, M.D., Ph.D., M.B.I.
2  A  I don't know if it's a matter of what
3  FDA would expect about this in terms of what the
4  regulations say in terms of NDA holders'
5  obligations.
6  Q  Well, if, for example, a company files a
7  505(b)(2), and the drug is pharmaceutically and
8  therapeutically equivalent to Taxotere, and they
9  ask for FDA to have the [same] warnings, that
10  would be appropriate from a regulatory standpoint,
11  wouldn't it?
12  MR. FRAXEDAS:  Object to form.
13  THE WITNESS:  Sure.  Could you
14  repeat?  I didn't hear all the entire
15  question here.
16  BY MR. MORIARTY:
17  Q  That was pretty convoluted.
18  THE REPORTER:  Do you want me to
19  read it, counsel?
20  MR. MORIARTY:  Yeah, that would be
21  great, Laurie.  Thank you.
22  (Whereupon, reporter reads
23  requested material.)
24  BY MR. MORIARTY:
25  Q  It should be "the same warnings."

Page 277

David B. Ross, M.D., Ph.D., M.B.I.
2  Go ahead, Doctor.
3  A  Thank you.
4  MR. FRAXEDAS:  Object to form.
5  THE WITNESS:  It, it depends.  This
6  is not a generic, which is a duplicate.
7  505(b)(2)s may be different in some respects
8  from the original product and still be
9  pharmaceutically and therapeutically
10  equivalent.  You know, in terms of -- for
11  example, I'll just take -- well, actually,
12  this could apply to anything.  There may be
13  differences in terms of the formulation
14  excipients, which -- for example, or dilution
15  mechanisms that could result in different
16  warnings.
17  So it's not something where I would
18  say generally, unless we were saying it is --
19  unlike generics, which must, in general, have
20  the same dosage form, strength, route of
21  administration, and conditions for use, those
22  can differ between a 505(b)(2) and the NDA
23  that it is basing the -- on which the sponsor
24  is requesting approval.  So it really depends
25  on the details.

Page 278

David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3  Q  And it may, as you said, or it may not
4  require a different warning, right?
5  A  I would phrase it more, even more
6  generally than that.  I would say it may require
7  differences in labeling that would include
8  differences in warning, precautions, adverse
9  events, and so on.
10  Q  Okay.  When there are several
11  manufacturers making a particular drug product,
12  and, like here, they are interchangeable, doesn't
13  FDA strive for uniformity in its -- in the
14  labeling of those drugs?
15  MR. FRAXEDAS:  Object to form.
16  THE WITNESS:  Depending on the, A,
17  the signs, and B, the information that
18  actually is submitted to the agency, they
19  strive for it, but the primary consideration
20  is does the label provide adequate directions
21  for its intended use, and that would override
22  uniformity at the cost of communicating those
23  adequate directions.
24  BY MR. MORIARTY:
25  Q  Doctor, if there is not uniformity --

Page 279

David B. Ross, M.D., Ph.D., M.B.I.
1   David B. Ross, M.D., Ph.D., M.B.I.
2   under those circumstances where we're talking
3   about an interchangeable group of drugs made by
4   different manufacturers, okay, if there was not
5   uniformity in the labeling, and a company could
6   unilaterally change its labeling, would it
7   potentially cause confusion among doctors and
8   patients?
9       MR. FRAXEDAS:  Object to form.
10      THE WITNESS:  I think, honestly,
11   respectfully, there's too many "ifs" there.
12   It depends on what the information is.
13      If there's appropriate safety
14   information that is submitted, new safety
15   information that is submitted that requires
16   updating the label, the agency could -- you
17   know, I don't believe that it is correct to
18   say, oh, the agency would just reject it.
19      They have the authority, since
20   2007, to order administratively, rather than
21   go to court, companies to update their label
22   if necessary, but if -- in the circumstances
23   you describe, if this is new safety
24   information that's correct, that meets the
25   regulatory criteria, and a company says we

Page 280

1   David B. Ross, M.D., Ph.D., M.B.I.
2   want to do the right thing and update our
3   label, you know, the question would not, to
4   my mind, would not be, oh, well, the FDA
5   turned it down because it wants to keep
6   everything the same.  The question will be
7   why wouldn't they try and stretch the
8   uniformity by having the other labels
9   updated.
10   BY MR. MORIARTY:
11      Q   Are you -- is it your opinion that a
12   pharmaceutical company in that setting, where
13   there are multiple manufacturers and they are
14   considered interchangeable, that one of those
15   companies can make a label change with no input
16   from FDA?
17      MR. FRAXEDAS:  Object to form.
18      THE WITNESS:  First off, what kind
19   of label are we talking about here?
20   BY MR. MORIARTY:
21      Q   An adverse -- change to an adverse
22   event, like, like it is here.  We're talking about
23   this case.
24      A   Okay.  So when you say they're
25   "interchangeable," I'm not quite sure what you

Page 281

1   David B. Ross, M.D., Ph.D., M.B.I.
2   mean by -- you mean interchangeable from an FDA
3   regulatory sense?  There -- I just -- I'm sorry.
4   I just don't completely understand the question.
5      Q   Are you going to, are you going to
6   render opinions that -- to the effect that
7   Accord's docetaxel, Sanofi's Taxotere, Sandoz's
8   docetaxel product -- I mean I could go on down the
9   line -- are not considered interchangeable from a
10   regulatory standpoint?
11      A   No, that's not what I was -- I'm not
12   talking about interchangeability.  That's not
13   within the scope of my opinions.
14      Q   Okay.  So what I'm trying to find out,
15   Doctor, let's assume you've got five -- you got a
16   reference drug like Sanofi's Taxotere, and you've
17   got four or five what I'll just lump in as
18   generics, 505(j)s and 505(b)(2)s, okay?  Are you
19   going to tell a jury that one of the generics,
20   regardless of whether it's a 505(b)(2) or a
21   505(j), can unilaterally update its label with no
22   input from FDA --
23      MR. FRAXEDAS:  Object to form.
24   BY MR. MORIARTY:
25      Q   -- and put it on products and distribute

Page 282

1   David B. Ross, M.D., Ph.D., M.B.I.
2   it?
3      A   So --
4      MR. FRAXEDAS:  Object to form.
5      THE WITNESS:  The premise at the
6   heart of that question is incorrect.
7   505(b)(2) --
8   BY MR. MORIARTY:
9      Q   What is incorrect?
10      A   505(b)(2)s and 505(j)s, it may be
11   convenient shorthand to refer to both of them as
12   "generics," but from a regulatory point of view,
13   they are not the same.
14      An application approved under Section
15   505(j) of the Act -- as I said in my report, I'm
16   not talking about petitioned ANDAs -- must have
17   the same label, which is -- except for things like
18   is it a different manufacturer, a different date
19   of approval or something like that.  That is not
20   true.
21      Q   Well, let me go back and fix my
22   question.  Let me fix my question so you and I are
23   on the same page.
24      First of all, among Actavis, Hospira,
25   Sandoz, Pfizer and Sun Pharma, how many of those

Page 283

David B. Ross, M.D., Ph.D., M.B.I.

1  are 505(j) and how many are 505(b)(2)?
2
3      A   I, you know, just -- I would -- I don't
4  know, and I certainly am not going to guess.
5      Q   All right.  So let's just take a setting
6  where Accord is a 505(b)(2), and Taxotere is the
7  RLD to it, okay?  Is it -- are you going to tell a
8  jury that Accord could have unilaterally updated
9  its label with no input from FDA, before those
10  labels went out to distributors and doctors and
11  hospitals?
12     MR. FRAXEDAS:  Object to form.
13     THE WITNESS:  What I would say is
14     that unlike 505(j) drugs, 505(b)(2) NDAs,
15     which are a subset of 505(b)(1)s, are able to
16     change their label if it's -- in terms of
17     updating it, if it's based on new safety
18     information, that they do have that
19     authority, and that there are specific
20     regulations, as outlined in my report, that
21     give them authority.  If the FDA -- these
22     could be done as Changes Being Effected
23     supplements.  That's what I --
24  BY MR. MORIARTY:
25     Q   I don't think you're listening to my

Page 284

David B. Ross, M.D., Ph.D., M.B.I.

1  question, okay, with all due respect.
2
3      Are you going to tell a jury that a
4  company like Accord, which is a 505(b)(2), can
5  uni- -- if it, if it has what it believes is new
6  safety information, that it can unilaterally
7  implement label changes with no input from FDA?
8      MR. FRAXEDAS:  Object to form.
9      THE WITNESS:  Well, can you clarify
10     what you mean by "unilaterally" before I
11     answer this question?
12  BY MR. MORIARTY:
13     Q   Yes.  By itself, with zero input from
14  FDA.
15     A   Zero prior input; is that what you're
16  saying?
17     Q   Yes.
18     A   Well, they do that now.  NDA holders do
19  that all the time right now.  Most CBE supplements
20  are not solicited, so yes, I would say that -- I
21  don't say unilaterally.  FDA has to review and
22  approve it.  If the FDA does not agree with the
23  labeling, the typical response is "we want you to
24  make these changes, please; add at the next
25  printing."  So yes, I would be very comfortable

Page 285

David B. Ross, M.D., Ph.D., M.B.I.

1  telling a jury that.
2
3      Q   Okay.
4      Now, I see from your list of materials
5  reviewed, you never looked at the, Accord's
6  pre-IND meeting minutes from their meeting with
7  FDA.  Is that because they were pre-approval and
8  were not essential to the opinions you intend to
9  express in this case?
10     A   Well, I, I can't, I can't exactly say,
11  speaking, you know, without a document that I
12  don't recall having reviewed, but in general, as I
13  said earlier, my opinions concern what was
14  reported or not reported and what actions were
15  taken or not taken post-approval.
16     Q   Did you even know that Accord
17  Healthcare, Inc. had a pre-IND meeting?
18     MR. FRAXEDAS:  Object to form.
19     THE WITNESS:  I, I don't know.
20     Honestly, again, I'm looking at
21     post-approval, so that particular universe of
22     data that's pre-approval would not affect my
23     opinions about what happened after the date
24     of approval, starting on day one.
25

Page 286

David B. Ross, M.D., Ph.D., M.B.I.

1  BY MR. MORIARTY:
2
3      Q   All right.  Let me go back to my last
4  question.
5      Exactly what regulation do you believe
6  allows a pharmaceutical company to implement a
7  label change without the approval of FDA?
8      A   I want to be clear.  You're saying
9  without the prior approval of FDA; is that
10  correct?
11     Q   Yes.
12     A   Okay.  I again want to make sure I'm
13  giving you a correct citation here.
14     So the regulations are contained in
15  21 C.F.R. 314 and concern when the Changes Being
16  Effected supplement may be submitted.
17     Q   Can you be more specific?  Is this
18  314.70?
19     A   I believe that's correct.  Say it again.
20     Q   Is it 314.70 or some other section?
21     A   I believe that it is contained in -- I,
22  I mean there certainly are other relevant
23  sections, but I believe it is in 314.70.
24     Q   All right.  Would you agree in general,
25  Dr. Ross, that FDA instructs manufacturers, under

Page 287

1    David B. Ross, M.D., Ph.D., M.B.I.
2  505(b)(2) pathways, to rely "to the fullest extent
3  possible" on what has already been established
4  with regard to the safety and efficacy of the
5  reference listed drug?
6    A   To the fullest extent possible?  I
7  would -- honestly, I don't know whether I can
8  agree or disagree, but I would want to know what
9  the source is for that statement and what the
10  context is.
11    Q   So based on what I think you've told me
12  so far, as of the middle of June 2011, Accord's
13  docetaxel was not mislabeled or misbranded,
14  correct?
15    MR. FRAXEDAS:  Object to form.
16    THE WITNESS:  I was not asked to
17    address the question of whether it was
18    misbranded or whether the label was false or
19    misleading in any particular at that time, at
20    the time.  I was not asked to opine on that.
21  BY MR. MORIARTY:
22    Q   Okay.  Do applications under 505(b)(2)
23  bear characteristics of both ANDAs and standalone
24  NDAs?
25    A   Again, I think you're going to have to

Page 288

1    David B. Ross, M.D., Ph.D., M.B.I.
2  be more specific.  I mean, you know, start,
3  start -- they all have in common that they are
4  submitted to the U.S. Food & Drug Administration,
5  for example.  What, what specific similarities or
6  differences are you asking about?
7    Q   Doctor, I'm going to return to that
8  question later.  I'm going to need time to find my
9  questions about that.
10    When things were rolling out in real
11  time after approval for Accord Healthcare, Inc. in
12  June of 2011, do you agree that the decisions it
13  had to make regarding the label were based on
14  facts available to them at the time as well as the
15  content of the FDA regulations?
16    A   I'm sorry.  You're going to have to
17  repeat that question.  Again, I'm, I'm going to
18  just tell you I'm going to ask you to clarify
19  things, so if you could just repeat that for me.
20    Q   Well, I'll, I'll rephrase it.
21    So I have a practical question for you.
22  When the Accord Healthcare, Inc. people in North
23  Carolina, after approval, let's say the end of
24  June 2011, are three quarters of the way through
25  that calendar year, are into 2012, as it went on

Page 289

1    David B. Ross, M.D., Ph.D., M.B.I.
2  in time, they would have to make decisions about
3  labeling based on the information available to
4  them as well as the FDA regulations, correct?
5    MR. FRAXEDAS:  Object to form.
6    THE WITNESS:  I guess I would say
7    they would have to comply with the
8    regulations based on the regulations and data
9    available to them.
10  BY MR. MORIARTY:
11    Q   At that time?
12    A   Well, as of -- again I'm, I'm having a
13  little heartburn about the word "available,"
14  because there's a difference between available and
15  I have it right now.  So it's not just what they
16  have but what they are expected to have as part of
17  pharmacovigilance activities required under safety
18  reporting.
19    Q   Okay.  All right.  Let's, let's get back
20  to your report, which was marked as Exhibit -- I
21  think it was Exhibit 5 last week.  Let me just
22  double-check that and make sure.
23    Yes, it is Exhibit 5, and I don't know
24  if we need to put it up on the screen, because I
25  think everybody has it, but go to your paragraph

Page 290

1    David B. Ross, M.D., Ph.D., M.B.I.
2  23, please.
3    Are you there?
4    A   I am.
5    Q   All right, and this is in the Summary of
6  Opinions section, correct?
7    A   Yes.
8    Q   All right, and would I be correct that
9  based on everything you've told me now, that the
10  last statement you made in paragraph 23 applies to
11  the post-approval duties?
12    A   That is what I am writing about here.
13    Q   Okay.  To put it another way,
14  pre-approval, FDA permits a 505(b)(2) applicant,
15  in compliance with regulations, to submit
16  different material than that that is required of
17  the 505(b)(1).
18    Do you understand the question?
19    A   No.  I actually was going to ask if you
20  could put it in the form of a question.  I'm
21  sorry.  Please, please go ahead.
22    Q   All right.  So 505(b)(1)'s need to
23  submit, for example, clinical study data that they
24  have done to prove safety and effectiveness.  The
25  FDA, for a 505(b)(2), does not require that a

Page 291

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2    505(b)(2).  A 505(b)(2) may rely on what has
3    already been done previously, correct?
4          MR. FRAXEDAS:  Object to form.
5          THE WITNESS:  That is not
6    completely correct in the sense that -- for
7    both B1 ands B2s.
8    BY MR. MORIARTY:
9      Q   All right.  Let me, let me see if I can
10   shortcut this, because I think we're on the same
11   page, and you're being very technical, which is
12   fine.
13         The pre-approval duties for 505(b)(1)s
14   and 505(b)(2)s are not exactly the same, correct?
15     A   I'm sorry.  Say that one more time.
16     Q   The pre-approval duties for 505(b)(1)
17   applicants versus 505(b)(2) applicants are not
18   exactly the same, correct?
19     A   No, and I'm, I am not being technical,
20   I'm not being picky, I'm not playing semantics,
21   truly.  I'm really not.  Both are NDAs.  Both must
22   provide substantial evidence of effectiveness and
23   safety.  Where they may differ -- let me just
24   finish.  I know time is on the -- the clocks march
25   on.  They both have to provide full study reports.
```

Page 292

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2          In the case of B2s, the applicant may
3    rely, for some of the material, on data that --
4    studies it has not itself conducted or does not
5    have the right of reference to, but --
6      Q   Okay.
7      A   -- they both have to -- they both have
8    the same approval criteria.
9      Q   All right.
10     A   How they act -- some of those may
11   differ.  You're -- that is where I want to be
12   clear what I'm talking about, but that is --
13   certainly there is no distinction made that I've
14   seen in terms of post-approval requirements.
15   Pre-approval, yes, they can rely on the -- that
16   responded, yada, yada, yada.
17     Q   All right.  So when we talk about
18   paragraph 24, at least for -- of your report, for
19   purposes of this litigation, what you're
20   testifying about is the post-approval duties of
21   Accord, right?
22     A   That is correct.
23     Q   Is it ultimately FDA's decision
24   regarding the content of the label for a
25   505(b)(2)?
```

Page 293

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2      A   I would say it's their decision as to
3    whether to approve a label and under exactly what
4    conditions, based on the information provided to
5    them by the applicant.
6      Q   And based upon all other information it
7    knows about other similar drugs?
8          MR. FRAXEDAS:  Object to form.
9          THE WITNESS:  So what I would say
10   is -- again, I want to give another one of my
11   caveats here.  There's an assumption that the
12   FDA is like a computer, and it just instantly
13   retrieves all the information that's
14   available.  That may happen; it may not
15   happen.
16         Ultimately, it is up to the
17   applicant to make sure that it has made its
18   case that it has demonstrated safety and
19   effectiveness in its submission, and again,
20   the regulations, you know, don't speak to --
21   you know, the contents -- assume that the
22   contents of your application will be
23   supplemented by other things that the agency,
24   quote, "knows" or "remembers" or whatever.
25         So I would say that certainly to
```

Page 294

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2    greater and lesser degrees, the agency during
3    its review will take into account that, but
4    if it doesn't, that does not mean that the
5    applicant has automatically fulfilled its
6    responsibilities.
7    BY MR. MORIARTY:
8      Q   Okay, but in the case of a 505(b)(2)
9    that is relying on information on the safety and
10   effectiveness determination by an RLD, you would
11   expect FDA to bring to bear, in looking at the
12   505(b)(2), everything submitted by the 505(b)(2),
13   and take into account what it already knows about
14   the RLD, correct?
15         MR. FRAXEDAS:  Object to form.
16         THE REPORTER:  Mr. Fraxedas, I can
17   barely hear you.
18         MR. FRAXEDAS:  Sorry.  Object to
19   form.
20         THE REPORTER:  Got it.
21         THE WITNESS:  No, I, I don't agree
22   in the sense that the company cannot just
23   say, well, we're going to -- in one sentence
24   saying we're relying on the agency's findings
25   of safety and effectiveness, and just say,
```

Page 295

David B. Ross, M.D., Ph.D., M.B.I.
1. David B. Ross, M.D., Ph.D., M.B.I.
2. well, that's enough.
3. I, I think that it's – so no, I
4. wouldn't, I wouldn't agree that – you know,
5. it's something that does happen during the
6. review process, but again, I can't advise
7. this too strongly. FDA approval does not
8. automatically mean that the label – that the
9. FDA has done – made the right decision.
10. At the end of the day – and I'm
11. not criticizing the FDA. They have to make a
12. decision, but that is not by itself – you
13. know, sometimes the FDA doesn't get the full
14. information, but there's normal things that
15. happen, so, you know, it's a little bit like
16. if I'm speeding, and a state trooper doesn't
17. pull me over, and I crash into somebody, I
18. can't say, well, the state trooper didn't
19. pull me over, I didn't do anything wrong.
20. BY MR. MORIARTY:
21. Q. Okay. Let's go to paragraph 25 of your
22. report.
23. A. Yes.
24. Q. Is the opinion you give in paragraph 25,
25. does that apply pre- and post-approval?

Page 296

David B. Ross, M.D., Ph.D., M.B.I.
1. David B. Ross, M.D., Ph.D., M.B.I.
2. A. Yes.
3. Q. All right, and tell us in what ways
4. does – I want you to assume we're talking about
5. the context that we have here.
6. A. Sure.
7. Q. Accord and maybe others have relied on
8. Taxotere and have sought and obtained approval of
9. 505(b)(2)s, okay? We're not doing this in the
10. abstract. We're talking about these specific
11. drugs.
12. Give me an example or two of ways that
13. the 505(b)(2) label could substantively differ
14. from Sanofi's label and what, in general, is the
15. regulatory basis for them allowing that to happen.
16. MR. FRAXEDAS: Object to form.
17. THE WITNESS: Let me start by – I
18. don't – the one example I'll give right now,
19. I would want to look at the labels, but if I
20. take the Sandoz NDA label on approval, that
21. differs in sections 2.8 and 2.9 from the
22. Taxotere label.
23. BY MR. MORIARTY:
24. Q. Okay. What was the basis for the
25. difference? What scientific basis led to the

Page 297

David B. Ross, M.D., Ph.D., M.B.I.
1. David B. Ross, M.D., Ph.D., M.B.I.
2. ability for there to be that difference?
3. A. Well, the original Taxotere – or not
4. original, but Taxotere, the excipients basically
5. result in it being a very viscous solution that
6. requires dilution, and if you look at the, those
7. sections specify just clearly says because of the
8. differences in the excipients, there are certain
9. things you shouldn't do with the Sandoz product.
10. Q. Give me, give me another example,
11. please.
12. A. Sure. So I'll stick with Sandoz for
13. right now, but the dosage strength differs.
14. That's a very substantive difference. So
15. basically I really, I really need the labels in
16. front of me to do this, but if the strength is –
17. if I remember correctly – for the original
18. product 20 milligrams per mil, whereas it's
19. 20 milligrams for two mls for the Sandoz product,
20. and that is not some minor difference.
21. Q. I appreciate those examples. Let me ask
22. you this question then, and I appreciate those
23. examples.
24. Was there any substantive scientific
25. difference between Accord's docetaxel product and

Page 298

David B. Ross, M.D., Ph.D., M.B.I.
1. David B. Ross, M.D., Ph.D., M.B.I.
2. Sanofi's Taxotere that warranted a difference
3. between the two labels, whether it's dose, route
4. of administration, excipients, active ingredients,
5. inactive ingredients, anything?
6. Do you understand my question?
7. A. I understand your question. This is
8. something where I would want to have the labels in
9. front of me in order to answer that question.
10. Q. All right. Would you – do you know
11. whether, at the time of approval in 2011, whether
12. there was any difference in any of those
13. substantive ways that would have warranted a
14. difference between the labels?
15. A. Again, I'm – I, I really want the
16. labels in front of me to answer that question.
17. (Discussion was held off the
18. record.)
19. THE WITNESS: Please go ahead,
20. Mr. Moriarty. I'm sorry.
21. BY MR. MORIARTY:
22. Q. Okay. In the case of – sorry. My
23. computer went out.
24. In the case of Accord Healthcare, Inc.'s
25. docetaxel NDA, did FDA ever ask for or permit the

Page 299

1    David B. Ross, M.D., Ph.D., M.B.I.
2  label to be different than Sanofi's?
3       MR. FRAXEDAS:  Object to form.
4       THE WITNESS:  It, it may have, and
5  again, I'm, I'm -- this is something where
6  I'd have to look, go back and look at the
7  exact labels, but I, I know in at least one
8  instance -- and I just -- I apologize -- I
9  can't remember if it was Accord.  This is
10  post-approval.  There was a change made to a
11  505(b)(2) label post-approval, before such
12  change was made in the Taxotere label.
13  BY MR. MORIARTY:
14    Q  But sitting here right now, you don't
15  remember if that was Accord or not?
16    A  It, it may have been, and I'm just --
17  I'm -- I, I just don't remember if it was, but
18  certainly it can be done.  I mean I think that's
19  the fundamental point is it's not -- again, if you
20  have a generic, and I mean a 505(j), I'm not
21  talking about a petitioned ANDA, other than these
22  minor allowable changes, like manufacturer name,
23  that sort of thing, you're not going to see that.
24    Q  Let's go to your paragraph 29, footnote
25  4.  Tell me when you're there.

Page 300

1    David B. Ross, M.D., Ph.D., M.B.I.
2    A  I'm, I'm there.
3    Q  Do you still agree with what you wrote
4  in footnote 4?
5    A  I do.
6    Q  And here's a term that Laurie has not
7  heard yet, but the MedDRA, M-e-d-D-R-A.  Is the
8  MedDRA dictionary the source of definitions for
9  adverse events?
10    A  I would say it's more -- not necessarily
11  the definition, but what's called a controlled
12  vocabulary.
13    Q  Do you know -- I, I see that the MedDRA
14  dictionary was on your list of materials reviewed.
15  Is there a definition of "persistent chemotherapy-
16  induced alopecia" in the MedDRA dictionary?
17    A  Well, again, I don't know that MedDRA is
18  going to provide general definitions.  I mean
19  there may be some terms in terms of how the,
20  what's called the taxonomy -- Laurie, I'm sorry.
21  That's T-A-X-O-N-O-M-Y -- is organized.
22       Basically, you know, in this kind of
23  setting, and I'd have to go back to the -- MedDRA
24  is also constantly being updated and revised, but
25  it would be -- alopecia, you know, would be

Page 301

1    David B. Ross, M.D., Ph.D., M.B.I.
2  assigned to an available, mapped to an available
3  term that was the closest, represented the closest
4  concept.
5    Q  I mean I'm, I'm not asking you
6  theoretical.  Whether you call it "defined" or
7  "controlled vocabulary," use whatever you deem
8  appropriate, but is, is there some explanation,
9  definition, or controlled vocabulary for what PCIA
10  is?
11    A  So MedDRA would not be the source, so
12  let me -- but, but I don't want to get hung up on
13  that.  In terms of --
14    Q  That, that is the extent of my question.
15    A  Oh, okay.  I, I don't know that --
16       THE REPORTER:  What was
17  the question?
18       THE WITNESS:  Go ahead.
19       THE REPORTER:  You're both, you're
20  both talking at the same time.
21       THE WITNESS:  I'm so sorry.
22  Please, Mr. Moriarty.  Go ahead.
23       MR. MORIARTY:  Let's go up to
24  paragraph 37.
25       MR. FRAXEDAS:  Was there a question

Page 302

1    David B. Ross, M.D., Ph.D., M.B.I.
2  and answer to that last exchange?  Because I
3  didn't have an opportunity to object.  I
4  couldn't hear.  Where you were talking over
5  each other, was there an answer?
6       MR. MORIARTY:  I thought, I thought
7  before I started talking over him, that he
8  had answered my question.  If that's not
9  true, we should go back.
10  BY MR. MORIARTY:
11    Q  But my question was:  Whether you call
12  it "defined, controlled vocabulary" or not, does
13  the MedDRA dictionary establish what PCIA is?  And
14  I thought he said it does not, and then he was
15  going to go on to something else.
16    A  So let me go back and answer.
17       MedDRA does not necessarily contain
18  definitions in the sense of, well, what is this
19  thing, what is it in other words.  It is a list of
20  terms, but -- and actually, it's not a minor
21  technical distinction.  It's the name -- it's the
22  map versus the territory, if you will; the name
23  versus the concept.
24       So the terms are not -- that are in
25  there, for example, "alopecia," are not

Page 303

1    David B. Ross, M.D., Ph.D., M.B.I.
2  necessarily going to be defined in MedDRA itself.
3  It provides standard terminology – maybe that's a
4  better word – for describing these adverse
5  events.
6    Q   All right.  I think I had asked you to
7  go up to paragraph 37.
8    A   I'm there.
9    Q   Does the FDCA, do the regulations
10  implementing it mention anything about foreign
11  drug labeling?  And I'll give you examples of what
12  I mean by that if you'd like it.  Does the FDCA or
13  the regs mention whether to submit such
14  information to FDA, under what circumstances to
15  submit it to FDA, or any description of the
16  significance, if any, that FDA would ascribe to
17  it?
18    A   Okay.  To answer your question – I'm
19  sorry.  To answer your question, in the context
20  that we're talking about here, if a foreign
21  label – now, just in the interest of time, I'll
22  restrict it to this.  If a foreign label
23  represents – I'm going to paragraph 45 of my
24  report.
25    "Information derived from a clinical

Page 304

1    David B. Ross, M.D., Ph.D., M.B.I.
2  trial, an adverse event report, a post-approval
3  study . . . or peer-reviewed biomedical literature
4  . . . or other scientific data . . . about a
5  serious risk or an unexpected serious risk," if
6  the foreign label fell under that definition, or
7  that information from a label met the requirements
8  for reporting under a 15-day alert, then yes, that
9  information would need to be reported to the
10  agency.
11    Q   All right.  I think what you're
12  saying – and please correct me if I'm wrong.
13  It's not foreign labeling as an independent item,
14  it's what is the data that drove the foreign
15  labeling; is that correct?
16    MR. FRAXEDAS:  Object to form.
17    THE WITNESS:  I'd need to go –
18  this may be spelled out in more detail in
19  guidances about use of what are called
20  periodic benefit risk update reports, but
21  simply reporting that without the underlying
22  data, the underlying source, I think would be
23  problematic.
24    In the case of literature, for
25  example, an applicant reporting new safety

Page 305

1    David B. Ross, M.D., Ph.D., M.B.I.
2  information from a published study would be
3  expected to submit the actual article.  So
4  the other – and I, I want to just also
5  mention that periodic reports of various
6  types and annual – including annual reports,
7  will – assuming the annual reports, there's
8  frequently a section on regulatory actions
9  taken in other countries.
10  BY MR. MORIARTY:
11    Q   All right.  So let me, let me linger
12  here.
13    First, if I understand what you just
14  said, if a pharmaceutical company in the United
15  States just gave FDA a foreign label with a
16  proposal that something happen, I think you said
17  it would be very unlikely that FDA would just take
18  that and approve it; in other words, FDA would
19  want the underlying data.
20    Is that a fair characterization of some
21  of what you said there?
22    A   Well, what FDA would want is a – and
23  this is part of pharmacovigilance – is
24  information, an analysis of why this is or is not
25  new safety information, why it does or does not

Page 306

1    David B. Ross, M.D., Ph.D., M.B.I.
2  merit the label update, and then the actual data,
3  but I think the key thing is, it would need to be
4  not just throwing a label on there and assuming
5  the agency finds it, but including it if it's a
6  serious unexpected adverse event, addressing it.
7    Q   Okay.  In your answer to what I was
8  asking you about paragraph 37, you referred to
9  your paragraph 45, and I'm going to deal with
10  paragraph 45 now and then go backwards.  So look
11  at paragraph 45 if you will.
12    (Discussion was held off the
13    record.)
14  BY MR. MORIARTY:
15    Q   While my colleague is looking for your
16  cite in paragraph 45, the cite that you discuss
17  there is 21 United States Code 355-1(b), correct?
18    A   Yes.
19    MR. MORIARTY:  I have put – we
20  have put on the screen and are marking as
21  Exhibit 13, 21 U.S.C.A. 355-1.  That's the
22  reference you made.
23    (Exhibit 13 was marked for
24    identification.)
25

Page 307

1    David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3    Q    Is this -- does the Risk Evaluation and
4  Mitigation Strategies section of the Code apply to
5  the circumstances with docetaxel and Accord?  I
6  mean does the FDA -- was this ever called an REM?
7    A    So I -- again, there's two questions on
8  the table, but before getting to that, I actually
9  reference paragraph B on, on this.
10    Q    It's here.  So you're just going to the
11  definitions section of the Risk Evaluation and
12  Mitigation Strategy section of the Code?
13    A    I don't know that I would say "just,"
14  but that's what the cite refers to.  It doesn't
15  refer to the initial page that you have here.
16  That's why I was saying I wanted to go to
17  paragraph B where the definition of New Safety
18  Information is found.
19    Q    Well, the definition section B says "for
20  purposes of this section," and when the United
21  States legislature, Congress, passes a law and
22  refers to this section, it's referring to 21 USCA
23  355-1, correct?
24    A    Yes.
25        MR. FRAXEDAS:  Object to form.

Page 308

1    David B. Ross, M.D., Ph.D., M.B.I.
2        THE WITNESS:  But if I, if I may, I
3  discuss new safety information and its
4  significance in paragraph 27, in which I
5  discuss 21 -- the requirements when an update
6  to a label is triggered, and that's under 21
7  C.F.R. 201.57(c)(6) and (c)(7), and it's
8  again paragraph 27(a) and (b).
9  BY MR. MORIARTY:
10    Q    What I'm trying to find out is:  Do you
11  believe that what we have marked as Exhibit 13 is
12  the legal definitions for things outside the Risk
13  Evaluation and Mitigation Strategies section of
14  the United States Code?
15        MR. FRAXEDAS:  Object to form.
16        THE WITNESS:  So I, I am, as I
17  mentioned before, not an attorney.  I'm not
18  offering legal opinions.
19  BY MR. MORIARTY:
20    Q    Okay.  All right.  So we were talking
21  about paragraph 37, and then we went to paragraph
22  35.
23        THE VIDEOGRAPHER:  Mr. Moriarty,
24  this is Rick, the videographer.  Within the
25  next five minutes, we need to take a break so

Page 309

1    David B. Ross, M.D., Ph.D., M.B.I.
2  I can rename the file.  It's getting pretty
3  big.  We've been on the record about an hour
4  and 26 minutes, and they like me to break
5  about an hour and 30.
6        MR. MORIARTY:  Okay.  Let me ask
7  one question, and then we can take a break.
8  BY MR. MORIARTY:
9    Q    Doctor, I'd like you to look at
10  paragraphs 30 through 44 of your report, okay?
11    A    Okay.
12    Q    In general, Dr. Ross, do those apply to
13  and describe the obligations and what Sanofi did
14  in this case?
15    A    In general, yes.
16        MR. MORIARTY:  All right.  Let's
17  take a break.  We can go off the video
18  record, Rick.
19        THE VIDEOGRAPHER:  12:20.  We are
20  off the record.
21        (Discussion held off the video and
22        stenographic record.)
23        MR. MORIARTY:  Rick, how long have
24  we been on the record today?
25        THE VIDEOGRAPHER:  Two hours and 48

Page 310

1    David B. Ross, M.D., Ph.D., M.B.I.
2  minutes.
3        (Whereupon, the lunch recess was
4        taken.)
5        THE VIDEOGRAPHER:  1:11.  We're
6  back on the record.
7        MR. MORIARTY:  Dr. Ross, we're
8  going to mark Exhibit 14 and put it up on the
9  screen.
10        (Exhibit 14 was marked for
11        identification.)
12  BY MR. MORIARTY:
13    Q    Okay.  This is a document listed in your
14  list of documents reviewed as "Comparative Label
15  Changes made by Sanofi, Sandoz, Hospira and
16  Accord, June 2011 through December 2015."
17        Did you draft this document?
18        If you're answering, we can't hear you.
19  You may be on mute.
20    A    I am on mute.  I'm sorry.  I apologize.
21  No.
22    Q    Did you receive it from someone other
23  than plaintiffs' counsel?
24    A    No.
25    Q    And it says "Draft" in the upper

Page 311

David B. Ross, M.D., Ph.D., M.B.I.

1    right-hand corner on the first page.  Do you know
2    whether you received more than one of these?
3    Q    To the best of my recollection, no.
4    A    To the best of my recollection, no.
5    Q    Did you ever ask them to create a
6    similar chart but include label changes proposed
7    by any of these entities in that same period of
8    time?
9    A    By "same period of time," you mean the
10   dates in the two right-hand columns, correct?
11   Q    Well, June 2011 through December 2015.
12   Did you ask them to prepare a chart with proposed
13   changes as opposed to the changes actually made?
14   A    To the best of my recollection, no.
15   Q    All right.  I'm done with that.
16        Now, is it your opinion that Accord
17   Healthcare, Inc. could have updated its docetaxel
18   label at some point between the middle of
19   June 2011 and the end of December 2015?
20   A    Yes.
21   Q    I want to know exactly when the earliest
22   date is that, in your opinion, Accord Healthcare,
23   Inc. could have done that.
24   A    The date of approval was June 8, 2011.
25   The first 90-day periodic safety update report was

Page 312

David B. Ross, M.D., Ph.D., M.B.I.

1    due 90 days after that.  That label change should
2    have been put in place by Accord by then.
3    Q    All right, and I assume it's your
4    opinion that that duty continued from after those
5    90 days up until at least the end of 2015.  I
6    don't want to ask you every month, every year,
7    every day between those two times.
8         Is that your opinion?
9    A    Yes.
10   Q    All right.  In your opinion, what was
11   the precise regulatory vehicle that Accord
12   Healthcare, Inc. should have used to either apply
13   for or effectuate the change in label that you
14   believe should have been made?
15   A    So with the caveat that there are many
16   additional routes to communicate new safety
17   information about patients and providers in
18   addition to the label, the most appropriate route
19   would have been what we discussed before, which is
20   a changes being effected supplement.
21   Q    Can you be specific about exactly which
22   regulation, including the subpart?
23        MR. FRAXEDAS:  Object to form.
24        THE WITNESS:  So I believe I'm –

Page 313

David B. Ross, M.D., Ph.D., M.B.I.

1    A    Okay, so – and this would be – let's
2    subject to checking the exact, the exact
3    citation, I would say it is three – 21
4    C.F.R. 314.70(c)(6) I believe is the correct
5    citation for that.  If I'm – I may have the
6    actual letter, construing of letters and
7    numbers, I don't want to . . .
8    BY MR. MORIARTY:
9    Q    This is of vital importance to our
10   client, Accord, to know exactly which regulation
11   you believe – so you said "21 C.F.R. 314.70," and
12   then I could not hear the subparts after that that
13   you said.
14   A    I, I understand, and I want to be clear.
15   What I'm referring to is the regulation that
16   describes changes being effected.
17   Q    Yes, I understand that.  I'd like to
18   know exactly which subpart.
19        What are you looking at, Doctor?
20   A    I'm just actually looking at the exact
21   citation that you want in the C.F.R. to make sure
22   I'm getting it right.
23   Q    Okay.  That's fine.  I just don't know
24   what you're looking at, and I want to know what
25   you're looking at.

Page 314

David B. Ross, M.D., Ph.D., M.B.I.

1    A    Okay, so – and this would be – let's
2    see.  21 C.F.R. 314.70(c)(6)(III)(A).
3    Q    All right.  What is the basis for your
4    opinion that Accord Healthcare, Inc. should have
5    initiated that process on or immediately after 90
6    days from June 8, 2011?
7    A    So to clarify, I say that it should have
8    been done within the 90 days –
9    Q    Oh, okay.
10   A    – from the date of the first required
11   periodic safety update report.
12   Q    So sometime within June 9 through the
13   next 90 days?
14   A    June 9 of 2011, correct.
15   Q    The day after the label was approved by
16   FDA, it's your opinion that Accord Healthcare,
17   Inc. had a duty to initiate a change to it,
18   correct?
19        MR. FRAXEDAS:  Object to form.
20        THE WITNESS:  No, sir.  That's not
21   what I said.
22   BY MR. MORIARTY:
23   Q    You tell me what you said, because that
24   sure sounded like what you said.

Page 315

David B. Ross, M.D., Ph.D., M.B.I.

2  A   No.

3       MR. FRAXEDAS:  Object to form.

4       THE WITNESS:  What I said was that

5  during the 90-day period "beginning" June 9,

6  was what I was referring to.  I was not

7  saying "on" June 9.

8  BY MR. MORIARTY:

9   Q   No, but you're saying that the duty to

10  do this started on June 9, correct?

11  A   I need some clarity here, because we're

12  talking about two different things.  You're

13  talking about a duty -- and I understand that's an

14  important issue here -- versus when it should have

15  been done, which is related, obviously, but not

16  the same, so which are you asking me about?

17   Q   Well, what's the difference?  You're

18  testifying as a regulatory expert that they had a

19  duty to do it?

20       MR. FRAXEDAS:  Object to form.

21       THE WITNESS:  Sorry.  Go ahead.

22       MR. FRAXEDAS:  No, no.  Go ahead.

23  I objected.

24       THE WITNESS:  Okay.  So you're

25  asking me not just about the duty, but

Page 316

David B. Ross, M.D., Ph.D., M.B.I.

2  actually executing that as well, so I'm just

3  asking for clarity on which you are asking

4  about.  When did the duty begin or when

5  should they have executed it by?

6  BY MR. MORIARTY:

7   Q   Well, you're saying that the duty begins

8  June 9, 2011, correct?

9  A   That is correct.

10   Q   And they should have executed that duty

11  on June 9, 2011 or in the next 89 days, correct?

12  A   I'm not saying it should have been done

13  by June 9.  I am saying that it should have been

14  done by the date of the first periodic safety

15  update report.

16   Q   But you are saying the duty -- the clock

17  on the duty began to run June 9, 2011?

18  A   I, I'm not saying the clock.  I'm saying

19  like any other NDA, post -- by definition,

20  post-marketing responsibility begin for any NDA

21  holder, including Accord, immediately after

22  approval.  There's no gap.  It's not unique to

23  Accord.  It's true for any NDA holder.

24   Q   Okay.  Doctor, I'm not saying -- I'm not

25  asking you who it applies to.  I'm trying to get a

Page 317

David B. Ross, M.D., Ph.D., M.B.I.

2  date.  My client is entitled to know when they had

3  this duty and when you believe they violated the

4  duty.

5       So it sounds to me like what you're

6  saying is that duty started on June 9, and they

7  had from between June 9 and the next 89 days after

8  June 9 to put it into effect; is that correct?

9       MR. FRAXEDAS:  Object to form.

10       THE WITNESS:  Again, let me restate

11  what I said, and, respectfully, I did answer

12  your question.  I said for any NDA holder,

13  post-approval obligations begin upon

14  approval.  Accord had its NDA approved on

15  June 8; therefore, they began immediately on

16  approval, so yes, that would be June 9.

17  That's a simple --

18  BY MR. MORIARTY:

19   Q   When, in your opinion --

20  A   -- a simple --

21   Q   When, in your opinion -- when, in your

22  opinion, did Accord first violate its duty to

23  update the label?

24  A   So again, as I said previously, the

25  label should have been updated to reflect the

Page 318

David B. Ross, M.D., Ph.D., M.B.I.

2  available information regarding permanent alopecia

3  no later than the date on which the first periodic

4  safety update report was to be submitted, which is

5  90 days after approval.

6   Q   Okay.  Now, what is the basis for your

7  opinion that this duty was triggered on June 9,

8  2011?

9       MR. FRAXEDAS:  Object to form.

10       THE WITNESS:  The basis -- sorry.

11  So the basis is first that, as explained in

12  21 C.F.R. 314.80 -- excuse me.  Paragraph

13  46 and following.  Sorry.  21 C.F.R.

14  314.80(a).  That, that states what the

15  obligations are for an NDA holder.

16  BY MR. MORIARTY:

17   Q   Okay.  That's the pharmacovigilance,

18  correct?  Point 80 is the pharmacovigilance

19  obligation, right?  Post-marketing reporting of

20  adverse drug experiences; is that correct?

21  A   It's reporting, but pharmacovigilance,

22  as I explain elsewhere in my report, is broader

23  than that.

24   Q   I understand, but what facts about

25  docetaxel and Accord triggered the duty on June 9,

Page 319

David B. Ross, M.D., Ph.D., M.B.I.

1    2011?
2    A    Their NDA was approved.
3    Q    What facts regarding Accord Healthcare,
4    Inc. and docetaxel triggered the duty to change
5    the label?
6    A    Number one, that duty began when the NDA
7    was approved.  Two, 21 C.F.R. 201.57 provides –
8    let me refer to my report here – that – sorry?
9    Q    I didn't say anything.  I'm waiting for
10   your answer.
11   A    Okay.  Provides – I'm citing 21 C.F.R.
12   201.57(c)(6) – that the label must be updated if
13   there is – as soon as there is a reasonable
14   evidence of a causal association, and in this case
15   there was reasonable evidence of a causal
16   association between docetaxel and the occurrence
17   of permanent alopecia – I say in my report
18   "irreversible alopecia" -- well before this date,
19   and –
20   Q    Are you done?
21   A    I'm, I'm sorry.  You asked for the
22   facts, and I'm just telling you, and as I detail
23   in my report, there was ample information
24   available to all of the NDA holders.  This is

Page 320

David B. Ross, M.D., Ph.D., M.B.I.

1    detailed in Dr. Madigan's report and Dr. Feigal's
2    report, that that information existed and was
3    available to them, and some of the information had
4    been available for years.
5    So those are the facts.
6    Q    And do you believe that 21 C.F.R. 201.57
7    contains the standard that Accord needed to follow
8    in order to trigger the obligation to file a CBE
9    under 21 C.F.R. 314.70?
10   MR. FRAXEDAS:  Object to form.
11   THE WITNESS:  Yes.
12   BY MR. MORIARTY:
13   Q    Does 21 C.F.R. 314.7 – let me withdraw
14   that question.
15   All right.  So you told us that there
16   was knowledge of this causal association prior to
17   June 2011, according to the reports of Madigan,
18   Feigal and Plunkett, and that this information was
19   known already by June of 2011, correct?
20   A    No.  Sorry.  That is not what I said.
21   THE REPORTER:  Was there an
22   objection there?  If there was, I didn't hear
23   it.
24   MR. FRAXEDAS:  Yes.  I objected to

Page 321

David B. Ross, M.D., Ph.D., M.B.I.

1    form.
2    BY MR. MORIARTY:
3    Q    I'm trying to clarify, Doctor.  I want
4    to know – okay.  You've told me what regulation
5    you believe applied, and then I was asking about
6    facts, and when I asked you about facts, you said
7    that per the reports of Madigan, Feigal and
8    Plunkett, by June of 2011 it was already known
9    that there was a causal association between
10   docetaxel and an increased risk of PCIA.
11   Isn't that what you said?
12   A    No, sir.  What I said was –
13   MR. FRAXEDAS:  Object to form.
14   BY MR. MORIARTY:
15   Q    I–
16   A    Sorry.  Go ahead.  What I said was –
17   THE REPORTER:  Wait a minute.
18   Counsel, I did not hear the question at all.
19   For some reason, Mr. Moriarty, you were
20   completely silent on that question, so I
21   don't know if the mute got accidentally
22   touched.
23   MR. MORIARTY:  Okay.  I need one
24   minute to look at my notes, and you can stay

Page 322

David B. Ross, M.D., Ph.D., M.B.I.

1    on the record.
2    THE REPORTER:  Okay, but you heard
3    what I said, that I, I didn't get whatever it
4    was you said?
5    MR. MORIARTY:  I'm looking at my
6    notes.  I am not listening to you at this
7    very moment, but I will listen to you when I
8    come back.
9    All right.  I'm trying to figure
10   out what the issue is here, so, Laurie, could
11   you go back?  I asked him a question about
12   what were the facts, and he answered the
13   question based on 21 C.F.R. 201.57(c)(6), and
14   then he went on to talk about Madigan, Feigal
15   and Plunkett.  I would like you to read that
16   answer back, please.
17   (Whereupon, reporter reads
18   requested material.)
19   BY MR. MORIARTY:
20   Q    Doctor, did you listen to her read back
21   your answer?
22   A    I did.
23   Q    Can you tell me what information it was
24   that was available to the NDA holders, some of

Page 323

David B. Ross, M.D., Ph.D., M.B.I.
1
2   which was available for years?  What information
3   are you referring to?
4        A   Certainly.  So I'm simply, again,
5   because I want to make sure I am quoting it
6   accurately, going to the C.F.R.
7        So the information I'm referring to
8   constitutes -- and this is -- I'm quoting directly
9   from, from the reg, from 201.57.
10       Q   Before you take off on the reg, what I'm
11  asking about is the facts that were available to
12  the NDA holders, because you just referred to
13  facts were available to them, some for years.
14  What facts are you talking about?
15       A   Okay.  Again, I'm -- what I'm saying is
16  the facts constituted reasonable evidence of a
17  causal association.  That's number one.
18       You say what facts.  Dr. Feigal and
19  Dr. Madigan's analysis point to the increase of
20  published studies showing an increase in risk of
21  permanent alopecia, or PCIA, among other things,
22  as reviewed by Dr. Feigal.
23       And I'm not saying this is a whole
24  universe, but going back to 2000, there were
25  signals in the FAERS database as early as 2000,

Page 324

David B. Ross, M.D., Ph.D., M.B.I.
1
2   showing that there was reasonable evidence -- part
3   of the totality of the evidence, that there was
4   reasonable evidence in causal association.
5        So that's in part what I'm referring to.
6   That's described further in Dr. Feigal's report
7   and Dr. Madigan's report, and, as I mentioned
8   previously, Dr. Plunkett's report.
9        Q   All right.  So you said published
10  studies of an increased risk and signals in the
11  FAERS database.
12       A   Among -- sorry.  Please go ahead.
13       Q   Well, I don't want "among other things."
14  I want all the things.
15       A   So --
16       Q   If you are on Feigal and Madigan, just
17  tell me what they said.
18       A   Sure.
19       MR. FRAXEDAS:  Object to form.
20  BY MR. MORIARTY:
21       Q   Tell me what you're relying on from
22  Feigal and Madigan of the other things.  I want to
23  know them all, not just examples.  You've already
24  told us the published studies and signals in the
25  FAERS database.

Page 325

David B. Ross, M.D., Ph.D., M.B.I.
1
2        MR. FRAXEDAS:  Object to form.
3        THE WITNESS:  Let me again refer
4   back to my report, and I list the facts that
5   you were asking about there in paragraph 91.
6   BY MR. MORIARTY:
7        Q   If you're referring to your report,
8   please tell us what paragraph.
9        A   It's paragraph 91 --
10       Q   Okay.
11       A   -- and following.
12       Q   So Doctor, when you say "paragraph 91
13  and following," for example, at page 30 -- or I'm
14  sorry -- footnote 36, you list some citations, but
15  most of the -- and later on the page you have one
16  article, but mostly you are quoting Madigan and
17  Plunkett, correct?
18       A   I'm referring and relying on their
19  reports.
20       THE REPORTER:  I'm referring what?
21  I'm referring what?
22       THE WITNESS:  I'm sorry.  Referring
23  and relying -- referring to and relying on
24  their reports.
25

Page 326

David B. Ross, M.D., Ph.D., M.B.I.
1
2   BY MR. MORIARTY:
3        Q   All right.  Did you ever run your own
4   analysis of the FAERS database?
5        A   With regard to this issue, no.
6        Q   Did you, did you see anything in the
7   Accord PADERs to which you refer in your list of
8   documents reviewed to indicate there were any more
9   than one or two adverse events regarding
10  persistent alopecia?
11       MR. FRAXEDAS:  Object to form.
12       THE WITNESS:  Would you repeat the
13  question again?  I'm sorry.  I want to make
14  sure I got the, got it completely.
15  BY MR. MORIARTY:
16       Q   In your list of documents reviewed,
17  which is Exhibit 10, you list Accord docetaxel
18  PADERs marked as exhibits to a deposition of an
19  Accord Healthcare, Inc. witness.  I assume you
20  reviewed those PADERs as part of your analysis of
21  this case, correct?
22       A   Yes.
23       Q   How many adverse event reports were
24  there, to Accord, of persistent alopecia following
25  the use of docetaxel used either alone or in

Page 327

1    David B. Ross, M.D., Ph.D., M.B.I.
2  combination with other chemotherapeutic agents?
3    A   So with the caveat – I say this in my
4  report quite explicitly, that pharmacovigilance
5  does not consist of simply tallying up events and
6  passing them on to the FDA.  I'm not sure that I
7  saw any –
8    Q   Okay.
9    A   – reports prepared by Accord.
10    Q   Is it your testimony that Accord had an
11  obligation to analyze the entire FAERS database on
12  an ongoing basis, starting June 9, 2011?
13    MR. FRAXEDAS:  Object to form.
14    THE WITNESS:  That is the
15    responsibility for any NDA holder, so Accord
16    would –
17  BY MR. MORIARTY:
18    Q   Can you –
19    A   – fall under.
20    Q   Okay.  Can you cite to me a regulation
21  or guidance which says or suggests that that is
22  the case?
23    A   Certainly.  I mean this was – I just
24  gave in my report – sorry.
25    MR. FRAXEDAS:  Go ahead.

Page 328

1    David B. Ross, M.D., Ph.D., M.B.I.
2    THE REPORTER:  Was there an
3    objection?
4    THE WITNESS:  So my report on
5    the page numbers –
6    MR. FRAXEDAS:  Yes.  Object to the
7    form.
8    THE WITNESS:  – but this is from
9    paragraph 57, footnote 18.  I refer to the
10    fundamental guidance that was issued or
11    promulgated in 2005 by FDA on good
12    pharmacovigilance practices.
13  BY MR. MORIARTY:
14    Q   And somewhere in that document, if I
15  review it, I will find a statement or suggestion
16  about an ongoing duty to review the entire FAERS
17  database –
18    MR. FRAXEDAS:  Object to form.
19  BY MR. MORIARTY:
20    Q   – by a 505(b)(2) holder?
21    A   It actually refers to NDA holders in
22  general, but I'm – except for the guidances that
23  specifically are titled 505(b)(2), I have not run
24  across guidances with regard to safety reporting
25  that make any distinction between traditional and

Page 329

1    David B. Ross, M.D., Ph.D., M.B.I.
2  505(b)(2) NDA holders.
3    Q   All right.  Doctor, so if I understand
4  you correct, your testimony correctly, any NDA
5  holder would have had an ongoing obligation, after
6  approval, to conduct complete FAERS database
7  analyses in compliance with their duties
8  under the regulations; is that correct?
9    MR. FRAXEDAS:  Object to form.
10    THE WITNESS:  I don't believe that
11    I used the word "complete."  They have the
12    responsibility to conduct appropriate
13    pharmacovigilance activities.  Examining
14    FAERS, which is – as I mentioned, FDA
15    releases data files quarterly.  They're
16    available to people all over the world.  So
17    that is an obligation that NDA holders have,
18    beginning with approval, and that, in
19    general, are aware of when they submit their
20    application.
21  BY MR. MORIARTY:
22    Q   And are you saying that when Accord
23  started with this duty on June 9, for example, of
24  2011, that an analysis of the FAERS database would
25  have included retrospective data as well as going

Page 330

1    David B. Ross, M.D., Ph.D., M.B.I.
2  on into the future contemporaneous data?
3    A   That is correct.
4    Q   And the guidance you cite at footnote 18
5  addresses that?
6    A   I'm – I'd have to look at it.  Simply
7  saying – it does not make scientific sense,
8  though, to say, well, we're only going to look at
9  things going forward, and we're not going to look
10  at anything that came before.  That makes less
11  than no sense.  That is accumulated data that's
12  available, and you need to examine it.
13    Again, they're relying on the NDA
14  holder, the NDA traditional one, for the agency's
15  findings of safety and efficacy at the time of
16  approval, but there's nothing that says they can
17  rely on it for post-marketing safety.
18    Q   Okay.  So what you're telling us,
19  hypothetically it could happen that a company
20  could get its drug and label approved on day one,
21  and on day two it could do some research and find
22  all sorts of information that would trigger the
23  duty to change the label pretty much immediately,
24  correct?
25    A   That is not what I said.

Page 331

1    David B. Ross, M.D., Ph.D., M.B.I.
2        MR. MORIARTY:  Okay.  All right.  I
3    want to ask you about some things that
4    happened at the end of 2015.
5        So, Julie, if you could upload our
6    number 10.  We're going to mark it as Exhibit
7    15.
8        (Exhibit 15 was marked for
9           identification.)
10   BY MR. MORIARTY:
11   Q   Do you see Exhibit 15 there on the
12   screen?
13   A   I do.
14   Q   At least according to your list of
15   documents reviewed, this Accord document is not
16   something you looked at; is that fair to say?
17   A   No.  I actually believe this is listed
18   among the documents that I reviewed.
19   Q   Find it.  Find it, please.
20   A   I certainly will do my best.  That is
21   Bates number --
22   Q   Use the document.  Go ahead.
23       THE REPORTER:  I'm sorry.  What was
24   the question?
25       THE WITNESS:  I'm sorry.

Page 332

1    David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3    Q   Where is it on Exhibit 10?
4    A   If you would give me a minute,
5    Mr. Moriarty, I will do my best to find it.
6    Q   Are you looking for the document or
7    Exhibit 10?
8    A   Well, right now I only have Exhibit 15
9    in front of me.
10       MR. MORIARTY:  Do you want to put
11   up Exhibit 10, Julie?
12   BY MR. MORIARTY:
13   Q   Doctor, we're going to put up Exhibit 10
14   for you.
15   A   Okay.
16   Q   This is your final list of documents
17   reviewed.  Please look at page 1.  Let us know
18   when you've looked at page 1.
19   A   I have looked at it.
20   Q   Is the -- is Exhibit 15 somewhere on
21   page 1 of your list of documents reviewed?
22   A   If we could go to the next page.
23   Q   Is it on page 2?
24   A   No.  If you could please continue.
25   Q   Is it on page 3?

Page 333

1    David B. Ross, M.D., Ph.D., M.B.I.
2    A   Okay.  If you could allow me to just
3    look at the list under XIV.
4    Q   Roman numeral XIV is what I believe
5    you're referring to.
6    A   That is correct.  I believe that it is
7    in this list, one of the -- most likely the new
8    drug application, the third bullet, so if you will
9    give me a minute, I will try and tell you which of
10   these long strings of numbers represents the form
11   356h.
12   Q   All right.  So when you were talking
13   about the third bullet under Roman numeral XIV,
14   all it says there is "new drug application."
15   You're talking now about something that happened
16   long after the NDA was approved.
17   A   No, sir.
18   Q   Exhibit, Exhibit 15 is a CBE document --
19   A   I will --
20   Q   -- pertaining to docetaxel.
21       THE REPORTER:  You're both
22   talking -- you're both talking at the same
23   time.  I did not get the last exchange at
24   all.
25       Mr. Moriarty, you said "Exhibit 15

Page 334

1    David B. Ross, M.D., Ph.D., M.B.I.
2    is a CBE document," and I didn't get anything
3    after that.
4        MR. MORIARTY:  He wants to see
5    Exhibit 15, so we're putting it back up.
6    BY MR. MORIARTY:
7    Q   When it comes up, Dr. Ross, please look
8    at the upper right-hand corner of the document for
9    the date of submission, 12/23/2015.
10       Do you see that?
11   A   I do.
12   Q   All right.  This is not part of the
13   original NDA application, is it?
14   A   I do not see a date stamp on it from the
15   CDER document room, but assuming this is it --
16   this would not be the original NDA.  I apologize.
17   I leaped to the conclusion this was the 356h
18   submitted with the original NDA, so I misspoke.
19   Q   I want to go to the second page of this
20   document, Doctor.  Look in the upper right-hand
21   corner.  Does it say "CBE" with a check box next
22   to it?
23   A   Yes.
24       MR. MORIARTY:  Okay.  Now I want to
25   show you Exhibit 16.

Page 335

David B. Ross, M.D., Ph.D., M.B.I.
1
2       (Exhibit 16 was marked for
3          identification.)
4  BY MR. MORIARTY:
5     Q   You see this is on Accord letterhead?
6     A   Right now it's still not clear.
7     Q   Do you see the exhibit?
8     A   I see the first, the first page.
9     Q   Okay.  It's on Accord letterhead,
10  correct?
11    A   It appears to be.
12    Q   And the date is December 30, 2015?
13    A   Is that a question?
14    Q   Is the date December 30, 2015?
15    A   Yes.
16    Q   And I have looked at your list of
17  documents reviewed, and nowhere do I find this
18  document.
19      Do you believe you've seen this before
20  today?
21    A   I honestly don't know.
22    Q   All right.  I want to ask you some
23  questions about this document.
24      In the bolded section after the address,
25  it says "Special Supplement - Changes Being

Page 336

David B. Ross, M.D., Ph.D., M.B.I.
1
2  Effected [CBE]," correct?
3     A   Yes.
4     Q   Then in the first sentence it says,
5  "Pursuant to 21 C.F.R. 314.70(c)," and it goes on
6  to discuss what Accord Healthcare, Inc. is
7  submitting, correct?
8     A   Yes.
9     Q   The next paragraph, the first sentence
10  refers, does it not, to Taxotere's label having
11  just been revised and approved as of the middle of
12  December 2015, does it not?
13      MR. FRAXEDAS:  Object to form.
14      THE WITNESS:  Yes.
15  BY MR. MORIARTY:
16    Q   And you know from your review of the
17  materials that that is in the general time period
18  in which Sanofi applied under the CBE regulations
19  and was granted permission by FDA to change its
20  label regarding the alopecia section of the
21  adverse events, correct?
22      MR. FRAXEDAS:  Object to form.
23      THE WITNESS:  You mean that they --
24  you mean, you mean they approved the labeling
25  supplement?  Is that -- that, that is what

Page 337

David B. Ross, M.D., Ph.D., M.B.I.
1
2  FDA did.
3  BY MR. MORIARTY:
4     Q   Okay, and then in the boxes underneath
5  that, in the first four boxes under "Documents,"
6  Accord refers to its proposed package insert,
7  labeling text, package insert, package insert.
8  They used the word "proposed" four times out of
9  the five boxes, correct?
10    A   They do.
11      MR. MORIARTY:  All right.  Let's go
12  to paragraph 17 [sic].  I'm sorry.  Exhibit
13  17.
14      (Exhibit 17 was marked for
15          identification.)
16  BY MR. MORIARTY:
17    Q   Dr. Ross, we've marked this as Exhibit
18  17, and I would like to go to the last page before
19  I question you about it.  I don't know why, but
20  this is how FDA does it.  This is the date that
21  this person from FDA signed and sent this letter,
22  correct?
23    A   I don't know when it was sent, but in
24  terms of the electronic archiving system that FDA
25  uses, that would be the date, the date stamp on

Page 338

David B. Ross, M.D., Ph.D., M.B.I.
1
2  it.
3     Q   Okay.  February 5, 2016?
4     A   Yes.
5     Q   Let's go back to the first page.  You
6  see in the upper right-hand corner, it says -- and
7  this is a letter from FDA to Accord Healthcare,
8  Inc. in North Carolina, correct?
9     A   Yes.
10    Q   And it says to the right of that "CBE
11  Supplement - Acknowledgement," correct?
12    A   Yes.
13    Q   Down in the -- under the date of
14  receipt, after talking about what Accord proposes,
15  does FDA say "Unless we notify you within 60 days
16  of the receipt date that the application is not
17  sufficiently complete . . . we will file the
18  application on February 28, 2016, in accordance
19  with," and it cites a paragraph of the C.F.R.
20      Am I -- are we on the same page here?
21    A   Yes.
22    Q   And it says, "If the application is
23  filed, the goal date will be June 30, 2016"; is
24  that correct?
25    A   That is what it says.

Page 339

David B. Ross, M.D., Ph.D., M.B.I.

1

2    Q   And the FDA did not immediately give

3    permission or approve Accord's proposed label

4    change, did it?

5        MR. FRAXEDAS:  Object to form.

6        THE WITNESS:  I don't, I don't

7    quite understand your question.

8    BY MR. MORIARTY:

9    Q   It's a simple question.  Based on this

10   letter, this was telling Accord that it did not

11   have permission or approval to immediately begin

12   implementing the label change and issuing it with

13   its packages, did it?

14   A   No, sir, that is incorrect.

15       MR. FRAXEDAS:  Object to form.

16   BY MR. MORIARTY:

17   Q   What is this letter – in your, in your

18   opinion, what is this letter saying?

19   A   I wouldn't say it's my opinion.  It's –

20   this is an FDA – this is not a prior – this is

21   acknowledging explicitly that it is not a prior

22   approval supplement, something that the

23   manufacturer can't do until FDA approves it.  It's

24   explicitly saying that it's not that.

25       It's a changes being effected

Page 340

David B. Ross, M.D., Ph.D., M.B.I.

1

2    supplement.  That is the opposite of what you're

3    saying.  This is a CBE supplement submitted under

4    21 C.F.R. 314.70(c), as I said before, and it

5    refers – it says in the regulations, this does

6    not need to be reviewed by FDA before it goes into

7    effect.

8    Q   What's the goal date?

9    A   Ah, the goal date.  So under the

10   Prescription Drug User Fee Act of 1992 and its

11   successive reenactment, applications that are sent

12   to the FDA, there is a side agreement to those,

13   uh, that legislation where FDA says we're going to

14   try and do 90 percent, review 90 percent of

15   particular kinds of applications within a certain

16   period of time.

17       So for labeling supplements – and I

18   don't know the details for whenever the PDUFA

19   version of this was.  What they're saying is we

20   will accept it for review, which is what they mean

21   by "file," as of February 28, 2016, and then they

22   are going to try and review it by June 30 of 2016.

23   That is what they mean by the action goal date,

24   but that has nothing to do with whether Accord

25   could implement it before.  This is a CBE-0

Page 341

David B. Ross, M.D., Ph.D., M.B.I.

1

2    supplement.  They could do it right away.

3    Q   Did FDA – in Exhibit 17, did FDA

4    approve the label change?

5    A   I, I don't know.

6    Q   Well, you've got the exhibit up on the

7    board.  Anywhere in this letter, did FDA tell

8    Accord Healthcare, Inc. that the first label

9    change was approved?

10   A   The only thing that calls for a changes

11   being effected is that the company can institute

12   it without prior approval.  That's, that's in the

13   regulation very explicitly.  There will be an

14   action letter at some point, hopefully by the

15   action goal date, saying that the application is

16   approved or not approved.  That's after the fact.

17   Q   So even though Sanofi had just updated

18   its label, and Accord was asking FDA or proposing

19   that it update its label in the exact same manner

20   regarding alopecia, you're saying that FDA is

21   basically in this letter saying you can do it, but

22   we're not telling you it's approved?

23       What are you saying?

24       MR. FRAXEDAS:  Object to form.

25       THE WITNESS:  It's – first off,

Page 342

David B. Ross, M.D., Ph.D., M.B.I.

1

2    there has to be some supplement associated

3    with a change in the label, whether it's

4    prior approval or it's changes being

5    effected.  There has to be something.

6        I mean that actually, you know,

7    could sometimes occur in the setting of an

8    NDA annual report, that that's how the label

9    change is effected, but, you know, this

10   letter – if, if the FDA – if you look at a

11   letter for a prior approval supplement where

12   it's acknowledging it, there will be text in

13   there – and I don't remember the exact

14   text – saying you can't change this until we

15   review it.  You don't see that here.

16   BY MR. MORIARTY:

17   Q   Is it your, is it your testimony in this

18   case that Exhibit 16 is exactly what Accord should

19   have done, except sooner, like back to 2011, use

20   that same vehicle?

21       MR. FRAXEDAS:  Object to form.

22       THE WITNESS:  Yes, that, that's –

23   the basis would not have been the same; that

24   is, a change in the Taxotere label; on – the

25   basis would have been, as I mentioned, the

Page 343

1      David B. Ross, M.D., Ph.D., M.B.I.
2   abundance of evidence from a variety of
3   sources described in my report, yes. I
4   mean -- and I'm not -- something to say it's
5   permanent alopecia, so yes, that is exactly
6   my contention.
7   BY MR. MORIARTY:
8      Q   I will get back to this subject in a
9   minute with the approval letter, but I want to go
10  to something else first, Dr. Ross.
11        Are you familiar with a clinical study
12  called PAX 702?  P-A-X, all caps.
13     A   I may have seen something about it.  It
14  does not ring a bell.  It does not mean that I
15  haven't seen something about it.
16     Q   Did you read the study and its results
17  yourself?
18        Doctor, you turned your camera off by
19  accident.
20     A   I'm, I'm still on the line here.  I'm
21  afraid it wasn't by accident.  It was probably one
22  of those HAL 9000 computers at work.  Just bear
23  with me.
24        THE VIDEOGRAPHER:  This is the
25  videographer.  Before you went off, you had

Page 344

1      David B. Ross, M.D., Ph.D., M.B.I.
2   been locking up on my end.  I don't know if
3   anybody else noticed it, but everybody else
4   was moving in their pictures, and yours was
5   locked up.
6        THE REPORTER:  I noticed it.
7        MR. FRAXEDAS:  Yeah, I noticed that
8   as well.
9        THE WITNESS:  Well, I was trying to
10  get the pavÈ doors open, I just want you to
11  know.  Hopefully I'll be back up in a minute
12  here.
13        I'm reconnected, but there's no
14  image available for anyone.
15        MR. MORIARTY:  I don't think you
16  feel comfortable answering my questions while
17  you're fiddling with the video, so let's just
18  go off the video record for a few minutes.
19        THE VIDEOGRAPHER:  2:18.  We're off
20  the video record.
21        (Whereupon, a short recess was
22  taken.)
23        THE VIDEOGRAPHER:  2:29.  We're
24  back on the record.
25

Page 345

1      David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3      Q   All right, Doctor, the question that was
4   pending is:  Did you ever read the study results
5   from the study called PAX 702?
6      A   I don't recall doing so.
7      Q   Do you know who gave that study result
8   to FDA for exam?
9      A   I don't.
10     Q   Would it matter to your opinions in this
11  case?
12     A   I, I would need to know more
13  information.
14     Q   Okay.  You've heard of a study called
15  TAX316, have you not?
16     A   Yes.
17     Q   Did you read the results of that study
18  yourself?
19     A   I just want to make sure.  I know it's
20  mentioned in my report.  I want to just see
21  exactly how I cite it.  I believe I did, but I
22  just want to make sure that I'm . . .
23        THE REPORTER:  Did you say PAX316
24  or TAX316?
25        THE WITNESS:  T-A-X.  Tango, alpha,

Page 346

1      David B. Ross, M.D., Ph.D., M.B.I.
2   X-ray.
3        I believe, at the very least, I
4   certainly looked at them.  This is described
5   in paragraph 96.
6   BY MR. MORIARTY:
7      Q   Does that mean you read it yourself, or
8   could Madigan, Feigal or Plunkett have read it,
9   and you just relied on them?
10     A   No.  I certainly looked at the --
11  Sanofi's summary of product characteristics, and
12  that I reviewed myself about the, from PCIA data
13  and TAX316.
14     Q   Do you know who gave the interim results
15  of TAX316 to the FDA?  Do you know?
16     A   I do not.
17     Q   Do you know when it was given to FDA?
18     A   But when you say -- yes.  What
19  specifically are you talking about?  Again, what
20  dataset are you describing here?
21     Q   There were interim results that were
22  available by March of 2004.  There were final
23  results available by September of 2010.  Do you
24  know what company gave that data to FDA or when
25  they gave it to FDA?

Page 347

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2          MR. FRAXEDAS:  Object to form.
3          THE WITNESS:  I, I honestly don't
4    know.
5  BY MR. MORIARTY:
6    Q    Is it significant to your opinions?
7    A    Is it significant to my opinions?
8    Q    Is the fact of when that data was given
9  to FDA significant to your opinions?
10         MR. FRAXEDAS:  Object to form.
11         THE WITNESS:  I'm -- the question I
12   analyzed was not when things became available
13   to FDA.  It's when it became available to the
14   NDA holders.  That's the regulatory question
15   I analyzed.
16  BY MR. MORIARTY:
17   Q    Okay.  So as far as you know, the
18  results, the interim and then final results of
19  TAX316 were available for years to FDA?
20   A    I'm sorry.  Did you say "to FDA" or
21  "through FDA"?
22   Q    To FDA.
23   A    So your question is -- as far as I know,
24  they were available for years to FDA.  I'm going
25  to, I'm going to accept that.
```

Page 348

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2    Q    Okay.  There was a study called GEICAM
3  9805.  I referred to that earlier.  Do you know
4  who gave it to FDA or when?
5          MR. FRAXEDAS:  Object to form.
6          THE WITNESS:  With the caveat that
7    again my analysis was not focused on when
8    information became available to FDA, it was
9    when it became available to NDA holders, I
10   don't know.
11  BY MR. MORIARTY:
12   Q    Let me ask you about some medical
13  articles that Drs. Madigan, Feigal and Plunkett
14  referred to, and then I believe you referred to
15  them in your report as footnotes.
16         There is a Dr. Sedlacek,
17  S-E-D-L-A-C-E-K, who made a presentation in 2006.
18  Do you know when the data underlying his paper was
19  given to FDA or who gave it to FDA?
20         MR. FRAXEDAS:  Object to form.
21         THE WITNESS:  So again, with the
22   caveat that my analysis focused on the
23   availability of new information to the NDA
24   holders, not the FDA, no, I don't know.
25
```

Page 349

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3    Q    Why do you have to keep giving the
4  caveat?  Can't you just answer no, you don't know?
5    A    Well, respectfully, no, because I --
6    Q    I'm asking do you think it's
7  significant.  You're interpreting this and saying
8  it's misleading so you can make a speech.  I'm
9  asking very simple questions, Doctor.
10        Dr. Prevevas, P-R-E-V-E-V-A-S, published
11  an article in 2009.  Do you know who gave it to
12  FDA or when?
13        MR. FRAXEDAS:  Object to form.
14        THE WITNESS:  So with the caveat
15   that every question I addressed is when
16   information became available to the NDA
17   holders, no, I don't know when it was given
18   to the FDA.
19  BY MR. MORIARTY:
20   Q    Doctor Bourgeois, B-O-U-R-G-E-O-I-S,
21  wrote an article in 2010.  Do you know who gave
22  that information to FDA or when?
23        MR. FRAXEDAS:  Object to form.
24        THE WITNESS:  With the caveat that
25   my regulatory analysis, the regulatory
```

Page 350

```
1          David B. Ross, M.D., Ph.D., M.B.I.
2    question that I needed to answer is when it
3    became available to NDA holders, no, I don't
4    know.
5  BY MR. MORIARTY:
6    Q    Maybe to shortcut this, Doctor, do you
7  know when or who gave the following three medical
8  articles to FDA?  Dr. Talen's 2010 article,
9  Dr. Mitevasvs, M-I-T-E-V-A-S-V-S, article in June
10  of 2011, Dr. Kluger's 2012 article; do you know
11  who gave it to FDA or when?
12        MR. FRAXEDAS:  Object to form.
13        THE WITNESS:  Same answer as before
14   with the caveat.
15        MR. MORIARTY:  Ms. Callsen, would
16   you do me a favor, please, and put up our tab
17   7?  That's Exhibit 18.
18        (Exhibit 18 was marked for
19        identification.)
20  BY MR. MORIARTY:
21   Q    Doctor, I'm going to circle back to the
22  approval of the CBE, and I will represent to you
23  that the signature date from the FDA at the end of
24  this document is July 26, 2016.
25        Do you have any reason to dispute me on
```

Page 351

David B. Ross, M.D., Ph.D., M.B.I.
1
2  that?
3      A   I'm sorry.  Say the date one more time.
4      Q   Doctor, do you see the exhibit on your
5  screen?
6      A   I don't.  I'm sorry.
7      Q   Okay.  We have a technical issue.  Let
8  me see if I can ask some questions while we fix
9  our technical problems.  I'm going to have to log
10  back in.  It will take a minute, but I need to ask
11  about these.
12        Do you now see the document?
13        MR. FRAXEDAS:  There we go.  You
14  got him now.
15  BY MR. MORIARTY:
16      Q   All right.  This is the July 26, 2016
17  letter from FDA, and I believe you've seen this
18  and it's in your reviewed materials, correct?
19      A   I believe that is correct.
20      Q   All right, and it says in the second
21  paragraph -- from the beginning it just says when
22  FDA received certain information, and then it
23  says, "This Changes Being Effected supplemental
24  new drug application provides for revisions to
25  align with the current package insert for the

Page 352

David B. Ross, M.D., Ph.D., M.B.I.
1
2  Reference Listed Drug Taxotere."
3        Do you see that?
4      A   Yes.
5      Q   And in the next section it says, "We
6  have completed our review of the supplemental
7  application, as amended.  It is approved,
8  effective on the date of this letter, for use as
9  recommended in the enclosed, agreed-upon labeling
10  text."
11        Did I read that correctly?
12      A   Yes.
13      Q   All right.  So back in December when
14  Accord sent the proposal, is it, is it your
15  testimony that FDA expected Accord to immediately
16  implement the changes before sending out an
17  approval letter similar to the one in Exhibit 18?
18        MR. FRAXEDAS:  Object to form.
19        THE WITNESS:  No, that's not
20  exactly what I'm saying.
21  BY MR. MORIARTY:
22      Q   All right.  From a practical standpoint,
23  does it make sense for a pharmaceutical company to
24  order, print, pay for, and begin to use labels
25  that the FDA may later say are not approved or to

Page 353

David B. Ross, M.D., Ph.D., M.B.I.
1
2  suggest some revisions to it?
3        MR. FRAXEDAS:  Object to form.
4        THE WITNESS:  So again I'm -- let
5  me answer, but this -- respectfully, the
6  premise is that, oh, the FDA might turn us
7  down, and then we've got to pull everything
8  back.
9        I have never seen that happen, and
10  that's during my time at FDA and since,
11  unless, as I mentioned, there was a company
12  submitting something as a CBE supplement, and
13  the FDA said, no, wait a minute, wait, you're
14  understating things, and converted them to a
15  prior approval supplement.  Never seen that
16  happen.
17        So does it make sense?  Yes, it
18  does, because you're talking -- what you're
19  talking about is a nonexistent risk.  If FDA
20  says, you know, we think it should be phrased
21  like this, and it's not a major change,
22  they're not going to make them pull it all
23  back.  They're going to say at the next
24  printing, please change it.
25

Page 354

David B. Ross, M.D., Ph.D., M.B.I.
1
2  BY MR. MORIARTY:
3      Q   Do you know what discussions and
4  amendments may have taken place between Accord
5  Healthcare, Inc. and FDA between December 30, 2015
6  and July 26, 2016?
7        MR. FRAXEDAS:  Object to form.
8        THE WITNESS:  No.
9        MR. MORIARTY:  Could you go to our
10  tab 23, please.
11        I'm going to have another exhibit
12  marked.  It's Exhibit 19.
13        (Exhibit 19 was marked for
14        identification.)
15  BY MR. MORIARTY:
16      Q   And Doctor, if you could turn to your
17  report while that's getting teed up, to paragraph
18  112.
19        All right.  So it says -- you're talking
20  about the variation you just testified about, the
21  authority to retroactively block CBE supplements,
22  and in paragraph 112 you say, "On the other hand,
23  manufacturers may consult with the FDA before
24  submitting a CBE supplement.  Based on my
25  background, education, training and experience,

Page 355

David B. Ross, M.D., Ph.D., M.B.I.

2  such prior consultation is unusual."
3       Do you see that?
4    A   I do.
5    Q   And you drop a footnote to, number 61,
6  an article by, coincidentally, a Dr. Agarwal.
7       Do you see that?
8    A   Yes.
9    Q   Did you read that article?
10   A   I did.
11   Q   Did you come up with this article, or
12  was it given to you, as part of your reliance, by
13  plaintiffs' counsel or someone other than
14  plaintiffs' counsel?
15      MR. FRAXEDAS:  Object to form.
16      THE WITNESS:  I believe that I
17   retrieved that article.
18  BY MR. MORIARTY:
19   Q   All right.  I have that article up as
20  Exhibit 19, and in the abstract it's talking about
21  a review of 106 505(b)(2) NDAs approved in a
22  basically two-year window of time, from 2010 to
23  2012.
24      Do you see that?
25   A   Well, it's a little bit small on my

Page 356

David B. Ross, M.D., Ph.D., M.B.I.

2  screen here.  Let me just try and blow it up a
3  little bit if I can.
4       Ah, here we go.  Okay.
5    Q   Doctor?
6    A   Yes.
7    Q   Did that zoom on your screen when I
8  zoomed it on mine?
9    A   Oh, maybe.  Hey, first off, let's --
10   Q   Go to the bottom, the bottom left of the
11  image screen, there's a magnifying glass.  If you
12  hit that, it will allow you to zoom in and make
13  the print bigger.
14      All right.  So among the 106 505(b)(2)s
15  approved from 2010 to 2012, that's the universe
16  that they are discussing in this article, correct?
17   A   I believe that's correct.  It's
18  excluding what are called "PEPFAR" applications.
19   Q   So I want to go to the third page of the
20  article.
21      Do you see where it says "Summary of the
22  Pre-Submission Interaction Information for the
23  505(b)(2) NDAs"?
24   A   Yes.
25   Q   And it says there, "Our survey indicated

Page 357

David B. Ross, M.D., Ph.D., M.B.I.

2  that among the 106 non-PEPFAR 505(b)(2) NDAs
3  approved between 2010 and 2012, the sponsors of 62
4  products," which is 58 percent of the number,
5  "engaged in a pre-submission interaction with the
6  Agency."
7       Do you see that?
8    A   Yes.
9    Q   So among this population of 505(b)(2)s
10  for this study, and these are NDAs, 58 percent
11  have pre-submission interaction with FDA, correct?
12   A   Yes.  I believe that is the basis for
13  that final sentence in paragraph 112.
14   Q   So you said that pre-submission,
15  basically pre-submission interaction was
16  "unusual," but it's more likely than not, isn't
17  it, to take place, according to the study you
18  cited?
19   A   So let me read the beginning of
20  paragraph 112.
21      "On the other hand, manufacturers may
22  consult with the FDA before submitting a CBE
23  supplement.  Based on my background, education,
24  training and experience, such prior consultation
25  is unusual."

Page 358

David B. Ross, M.D., Ph.D., M.B.I.

2       That refers to the first sentence, which
3  are CBE supplements.  I then go on to point out
4  that there's not a requirement to consult even for
5  more substantive applications, and I specifically
6  cite 505(b)(2)s, but the word "unusual" applies to
7  prior consultation with regard to CBE supplements.
8    Q   Do you have any statistics or articles
9  that support that statement?
10   A   I have my ten and a half years of
11  experience as an FDA medical officer.
12   Q   Okay, and you'd agree with me that this
13  article that you cited doesn't discuss CBEs at
14  all, correct?
15   A   Yes, I would agree with that.
16   Q   Doctor, have you made any independent
17  assessment in this case about which adverse events
18  are "serious" and "unexpected"?  And I'm referring
19  specifically to paragraphs 46 and 47 of your
20  report where you discuss the subject.  I just want
21  to know if you did an independent assessment of
22  that in this case.
23   A   I'm not sure what you mean by
24  "independent."
25   Q   Independent of your analysis of the

Page 359

1      David B. Ross, M.D., Ph.D., M.B.I.
2  Feigal, Madigan and Plunkett reports.
3      A  So I examined this issue, and it does
4  not depend on any specific adverse event report.
5      So an unexpected adverse event, by
6  definition, is one that is not included in the
7  label.  The definition of "serious" --
8      Q  That's what you said.  Hold on.
9      A  Please.  I'm sorry.  Please go ahead.
10  Yes.  The answer to your question is yes.  Sorry.
11     Q  What independent -- so which, which
12  PADERs did you review -- did you review the PADERs
13  and mark down somewhere which ones were serious
14  and unexpected?
15     A  I don't believe so.
16     Q  All right.  Let's talk about paragraphs
17  54 to 56, which generally cover the subject of
18  data mining, okay, and you refer specifically to
19  Bayesian, B-A-Y-E-S-I-A-N, data mining.
20      Is there a statute, regulation, or
21  guidance which informs pharmaceutical companies
22  that they need to use these techniques as part of
23  their pharmacovigilance?
24     A  So, yes.
25     Q  What statute, regulation or guidance

Page 360

1  addresses the use of these data mining techniques?
2      A  So the immediate one that I would point
3  to is the guidance which I previously cited on
4  good pharmacovigilance practices.
5      Q  I forget what footnote that was, but
6  we'll figure it out.
7      Is that the same guidance you answered
8  when I was asking you about the use of analyzing
9  the FAERS database?
10     A  When you say -- what, what was the
11  specific question about FAERS?  I just don't --
12  I'm sorry.  I don't remember exactly --
13     Q  I was asking some questions about FAERS
14  and whether there was a statute, reg or guidance
15  which addressed that, and you referred to a
16  particular footnote in your report.
17      Are you now referring to the same
18  footnote and guidance?
19     A  So with the caveat that I don't exactly
20  remember, but I -- I think I do, but I just want
21  to make clear.  Is this what you were referring
22  to?  This is the footnote.
23     Q  18.
24     A  I'm sorry.

Page 361

1      David B. Ross, M.D., Ph.D., M.B.I.
2      Q  Footnote 18.  Footnote 18 I believe is
3  what you referred us to.
4      A  So referring to paragraph 57, I provide,
5  as an example, the 2005 Pharmacovigilance
6  Guidance, and I provide citations in footnote 18.
7      Q  I'm asking whether there's a specific
8  statute, reg or guidance regarding the data mining
9  techniques that you discuss in paragraphs 54 to
10  56.
11     A  So with the caveat that regulations --
12  unless we're talking about specific drugs or
13  monographs -- do not descend to that level of
14  granularity, I don't believe so.
15      I will say that there may be reference
16  to it in either the FDA Amendments Act of 2007 or
17  the committee reports that accompanied that
18  legislation.  I would have to see.  The other may
19  be covered or subsumed in the regulations,
20  specifically 314.3, but with the caveat that I
21  wouldn't expect that level of detail in a statute
22  or regulation, I don't know that there's anything
23  like this.
24     Q  Okay.  Did you run any of these data
25  mining techniques or programs as part of your

Page 362

1      David B. Ross, M.D., Ph.D., M.B.I.
2  workup in this case?
3      A  With the caveat that Dr. Madigan states
4  explicitly that he has not engaged in data mining
5  in his analysis, I did not do that myself.
6      Q  Do you know how to?
7      A  I know how to?
8      Q  How to run those data-mining techniques.
9  Do you have that software available to you,
10  whatever it takes?  Have you ever done it?
11     A  So there's multiple questions on the
12  table.  I have done it in the past, distant past.
13  I don't currently have that software, and it's
14  more than just a software.  It's also knowing how
15  to use it and frame the questions.  So I would not
16  feel comfortable conducting these kinds of
17  analyses on my own, but I know that general terms
18  how they're conducted.
19     Q  Now, the database to which you're
20  referring that should be searched, it's FDA's
21  database, isn't it?
22      MR. FRAXEDAS:  Object to form.
23      THE WITNESS:  If you're referring
24  to FAERS, that would be correct.

Page 363

1        David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3        Q   Well, in paragraphs 54 to 56 of your
4    report, I assume that you're suggesting that a
5    certain technique should have been used to search
6    a particular database.
7            Is it the FAERS database you believe
8    that should have been searched in the techniques
9    that you refer to here?
10       A   So that's not actually what I said.
11       Q   Well, let me put it to you a different
12   way:  Are you going to render opinions at the time
13   of trial that Accord violated some regulatory duty
14   if it did not employ the data mining techniques
15   that you discuss in paragraphs 54, 55, 56?
16           MR. FRAXEDAS:  Object to form.
17           THE WITNESS:  I, I do not cite
18       those as the kind of thing that Accord or any
19       of the defendants should or should not have
20       done.  I'm simply providing those as a
21       description of the kind of techniques that
22       are available.  I am not pointing to a
23       specific technique and saying they should
24       have done this.
25

Page 364

1        David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3        Q   All right.  Now, before, we were talking
4    about the CBE regulation, 21 C.F.R. 314.70, and we
5    had both honed in on Subsection C.  Is there
6    another different regulation that in your opinion
7    Accord should have used to update its label
8    between 2011 and 2016, or is that the reg we need
9    to focus on?
10       A   That is one mechanism by which they
11       could have, if they had wished to, updated the
12       label.  It's not the only opportunity that they
13       had in terms of -- or regulatory obligation,
14       depending on, on exactly what their development
15       program looked like.
16       Q   Well, is 21 C.F.R. 314.70 the one that
17       you believe was required, or that Accord was
18       required to follow for your opinions in this case?
19       A   So the regulations include that
20       201.57(c), regarding the need to update the label;
21       the description of what should be reported under
22       314.80 and 81, including reference to appropriate
23       guidances.
24       Q   Okay, Doctor, I think you misperceived
25       my question, and maybe it was a bad question.

Page 365

1        David B. Ross, M.D., Ph.D., M.B.I.
2    I just want to know the regulatory
3    vehicle.  21 C.F.R. 314.70 is what I look at as
4    the regulatory vehicle, the thing that Accord
5    needed to do to meet 301.57, okay?
6            So is there another regulatory vehicle
7    besides 314.70 that, in your opinion, Accord was
8    required to employ before it used the CBE
9    mechanism in 2015 and '16?
10           MR. FRAXEDAS:  Object to form.
11           THE WITNESS:  I want to try and --
12       the vehicle is not the same thing as the
13       duty.  Yea, vehicle, 314.70, is the mechanism
14       for complying with it.  Duty is ultimately in
15       21.57.
16           Another example of a vehicle, as I
17       mentioned before, would be labeling changes
18       that are put in effect in an NDA annual
19       report.
20           And then lastly, there are
21       regulations that mention the pre-IND meeting
22       that Accord had.  There are regulations on
23       safety reporting.  I believe that -- I
24       believe it's 21 C.F.R. 312.32, and FDA has
25       issued a guidance on that.

Page 366

1        David B. Ross, M.D., Ph.D., M.B.I.
2            So these are not, by the way,
3    mutually exclusive.  I'm really not --
4    BY MR. MORIARTY:
5        Q   Doctor, when a pharmaceutical company
6    wants to change the label, they go to 314.70;
7    that's the reg the FDA expects them to use to
8    change the label, correct?
9            MR. FRAXEDAS:  Object to form.
10           THE WITNESS:  For an approved drug,
11       that is the section titled "Supplements to an
12       Approved NDA."
13   BY MR. MORIARTY:
14       Q   All right.  Let's go to paragraph 75 of
15       your report.
16           And Jason, no insults intended, but
17       Dr. Ross is so unresponsive that we are going to
18       seek more time to complete this deposition.  We
19       can argue about that later.
20           MR. FRAXEDAS:  Yeah, we can, we can
21       talk about that another time.  Obviously, we,
22       we would disagree, but we can discuss that
23       later.
24   BY MR. MORIARTY:
25       Q   All right.  Doctor, are you at page 75?

Page 367

1      David B. Ross, M.D., Ph.D., M.B.I.
2      A   I'm at paragraph 75.
3      Q   I'm sorry.  Paragraph 75.
4      A   Yes.
5      Q   I want to read -- I want to deal with
6  the last two sentences, okay?  They're talking
7  about the difference between the labeling
8  requirements or the similarities between labels
9  are due entirely to the similarity between the
10 science underlying the approval, right?
11     A   Correct.
12     Q   The last sentence:  "In other words, the
13 drug labels are similar because they both make use
14 of the same 'full reports,' not because of
15 statutory and/or regulatory dictates," correct?
16     A   That's what I write in there, yes.
17     Q   All right.  So just from a practical
18 standpoint, if the, if the 505(b)(2)'s drug is
19 equivalent in its delivery system, its active
20 ingredients, in all the substantive ways, the
21 science in effect is what drives FDA to look at
22 sameness or similarities in the labels?  Is that
23 really what you're saying here?
24     A   With the understanding that I am not
25 addressing issues involving patents that might

Page 368

1      David B. Ross, M.D., Ph.D., M.B.I.
2  result in differences in intended use, yes.
3      Q   Okay.  In general, do you agree with the
4  belief and some statements by FDA that a 505(b)(2)
5  can rely to the fullest extent possible on what is
6  already known about a drug?
7      A   I --
8          MR. FRAXEDAS:  Object to form.
9          THE WITNESS:  I -- you've mentioned
10     this statement before.  I don't know truly
11     where it's drawn from or what the context is,
12     so I can't answer that question.
13 BY MR. MORIARTY:
14     Q   Okay.  Give me a minute to talk to
15 Ms. Callsen about something in my notes, okay?
16     A   Okay.
17     Q   Stay on the record.
18         All right, Doctor, I think we found what
19 we need.  This will be Exhibit 20.
20         (Exhibit 20 was marked for
21         identification.)
22 BY MR. MORIARTY:
23     Q   All right.  When you were at FDA between
24 1996 and 2006, did you have anything to do with
25 writing any part of this document which we refer

Page 369

1      David B. Ross, M.D., Ph.D., M.B.I.
2  to as the "response to the citizen petitions"?
3      A   I don't believe so.
4      Q   All right.  Are you familiar with it?
5      A   It's a 38-page document.  I, I have read
6  it, but that's the best I can say.
7      Q   Okay.  Let's look at page 3.
8          Doctor, is this -- I mean this is an
9  official pronouncement of FDA on issues
10 surrounding 505(b)(2)s, is it not?
11     A   This is a letter, if I remember
12 correctly, signed by either Janet Woodcock or Doug
13 Throckmorten.  Is that, is that correct?
14         THE REPORTER:  You said "Jana"
15     Woodcock or Doug something?
16         THE WITNESS:  Janet, J --
17         THE REPORTER:  Woodcock?
18         MR. MORIARTY:  Yes, Woodcock, like
19     in Butch Cassidy and the Sundance Kid.
20         THE REPORTER:  Yeah, and there was
21     another name, Doug something.
22         THE WITNESS:  Right.  I guess I did
23     say that name.  Doug was the deputy for --
24     may still be.  So that's
25 T-H-R-O-C-K-M-O-R-T-O-N.

Page 370

1      David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3      Q   All right.  I'm at the third page of
4  this document, and if you look, after the, after
5  the bullet-pointed paragraph, there's a paragraph
6  that says "each type," and I want to go to the
7  first sentence of the paragraph after that.
8          It says, "A 505(b)(2) application shares
9  characteristics of both ANDAs and standalone
10 NDAs."
11         Do you agree with that statement from
12 FDA?
13     A   I agree.  If I might, this is a letter
14 sent by Janet Woodcock, so I'm going to -- when
15 you say statements from FDA, Dr. Woodcock I
16 believe at the time was center director and not in
17 the Office of the Commissioner, so that's the
18 first thing I would say.
19         Secondly, this is a letter.  It is not a
20 guidance or other official document, so I think I
21 need to be very, very clear about that.  I agree
22 that's what it says.
23     Q   I didn't, I didn't ask for a bunch of
24 disclaimers.  I just asked if you agreed or
25 disagreed with the statement.

Page 371

```
1        David B. Ross, M.D., Ph.D., M.B.I.
2           MR. FRAXEDAS:  Object to form.
3           THE WITNESS:  Those are not, those
4    are not disclaimers.  I am not agreeing with
5    your statement that this is from FDA, that
6    this is an official statement from FDA, so
7    that's -- those are not disclaimers, sir.
8           I want to adequately characterize
9    this document.  It is not a guidance
10   document, a proposed rule, a preamble to a
11   proposed rule, a rule, or a preamble to a
12   rule.
13          Having said that, I agree that's
14   what it says.
15   BY MR. MORIARTY:
16   Q    When you worked there, did you work in
17   the Center for Drug Evaluation and Research?
18   A    I did.
19   Q    So in 2003, Janet Woodcock was your
20   boss, right?
21   A    I don't know what you -- when you say my
22   boss, she did not write my performance review, and
23   I, as I said, I don't know what position she held
24   in 2003.
25   Q    Was she your boss's boss?
```

Page 372

```
1        David B. Ross, M.D., Ph.D., M.B.I.
2    A    Again, I don't know what position she
3    held.
4    Q    Okay.  Well, it says right here on her
5    signature line, she was the director of the Center
6    for Drug Evaluation and Research, so she was the
7    director of that division of FDA.  So she, she was
8    superior to you at FDA, correct?
9    A    She was above me in the hierarchy.
10   Q    All right.  Let's move down further on
11   the page.
12          The last paragraph begins, "FDA's
13   long-standing interpretation of Section 505(b)(2)
14   is intended to permit the pharmaceutical industry
15   to rely to the greatest extent possible under the
16   law on what is already known about a drug."
17          Do you agree with that statement?
18   A    So what I would say is I agree that's
19   what it says.  I would say also that's different
20   from what you said earlier, where you said that
21   FDA encouraged companies to rely to the greatest
22   extent possible.
23          And then lastly, going back to the
24   discussion where you called this an official
25   statement, I realize I should have noted, this is
```

Page 373

```
1        David B. Ross, M.D., Ph.D., M.B.I.
2    a response to a citizen's petition.  That is the
3    specific scope of this.
4    Q    Do you know, Dr. Ross, whether FDA has
5    any subsequent documents referring back to this
6    citizen's petition as authority for given
7    positions?
8    A    It may have.  I don't know.
9          Mr. Moriarty, I'm sorry.  I think you're
10   speaking, but there's, there's no, there's no
11   audio.
12   Q    I haven't said anything.
13   A    Oh, okay.  Sorry.  There must be a lag
14   then involved.
15   Q    There's a crane that runs outside our
16   building that sometimes is background noise.
17          Have you ever conducted -- I'm sorry.
18   You can take that exhibit down.
19          Dr. Ross, have you ever conducted and
20   published a meta-analysis of observational
21   studies?
22   A    In what area?
23   Q    In any area.
24   A    May I refer back to my CV?
25   Q    Sure, and I'm just asking for that
```

Page 374

```
1        David B. Ross, M.D., Ph.D., M.B.I.
2    specific type of article, a meta-analysis of
3    observational studies.
4    A    Just a quick look here.
5           MR. MORIARTY:  Let's go off the
6    video record while he looks.
7           THE VIDEOGRAPHER:  3:23.  We're off
8    the video record.
9           (Whereupon, a short recess was
10          taken.)
11          THE VIDEOGRAPHER:  3:29.  We're
12   back on the record.
13   BY MR. MORIARTY:
14   Q    All right.  Doctor, the pending question
15   was whether you had even conducted and published a
16   meta-analysis of observational studies.
17          Have you or not?
18   A    I'm sorry?
19   Q    Have you or not?
20   A    I don't see any papers in my CV where
21   I've used that particular technique.
22   Q    All right.  When Accord did send its CBE
23   letter on December 30, 2015, was that letter in
24   compliance with the CBE regulation?
25          MR. FRAXEDAS:  Object to form.
```

Page 375

1    David B. Ross, M.D., Ph.D., M.B.I.
2        THE WITNESS:  It followed the
3    formatting requirements.  It did not
4    contain -- was on a regulatory basis rather
5    than a scientific basis of the sort that I
6    referred to previously with 201.57 with
7    regard to reasonable evidence of a causal
8    association.
9    BY MR. MORIARTY:
10   Q    Are you done with your answer?
11   A    Yes.
12   Q    So when, when Sanofi sought and obtained
13   permission to update its label, it had to submit
14   the underlying scientific data, did it not?
15       MR. FRAXEDAS:  Object to form.
16   BY MR. MORIARTY:
17   Q    The FDA would have asked for them to
18   submit the data to support the proposed change,
19   wouldn't they?
20   A    So, I'm sorry.  Which question -- there
21   was two questions in a row here.  Which one would
22   you like me to answer?
23   Q    Just one question, Dr. Ross.
24   A    I'm sorry?
25   Q    Sanofi, Sanofi didn't just say "here's

Page 376

1    David B. Ross, M.D., Ph.D., M.B.I.
2    our proposed change," and FDA approved it.
3    Wouldn't you assume, based on your years of
4    experience, that Sanofi submitted scientific data
5    to support the change?
6        MR. FRAXEDAS:  Object to form.
7        THE WITNESS:  They -- if I remember
8    correctly, they submitted adverse event
9    reports.
10   BY MR. MORIARTY:
11   Q    Are you suggesting that on December 30
12   when Accord sent its letter, 2015, when Accord
13   sent its CBE, you're not suggesting that it was
14   required to submit or resubmit scientific data,
15   are you?  It had every regulatory right to rely on
16   what Taxotere and Sanofi had done; true?
17       MR. FRAXEDAS:  Object to form.
18       THE WITNESS:  That is not what --
19       THE REPORTER:  "That is not what"
20   what?
21   BY MR. MORIARTY:
22   Q    That's not what?
23   A    That is not what I am saying.
24   Q    Was it permissible for Accord to wait
25   for approval before implementing the label change

Page 377

1    David B. Ross, M.D., Ph.D., M.B.I.
2    in 2016?
3    A    Well, what I would say is that their
4    doing so and their waiting, in essence, four years
5    did not comply with the applicable regulations of
6    401.57.
7    Q    Okay.  In paragraph 124 of your report,
8    you refer to something called a "Core Data Sheet."
9    Is a Core Data Sheet required by any statute,
10   regulation, or guidance from FDA in the United
11   States?
12   A    I'm sorry.  Could you say again what --
13   I thought you said 142, but I don't believe I have
14   such a paragraph in my report.
15   Q    I said 124.
16   A    124.  Thank you.
17       With the caveat that I never said that
18   there is such a requirement, no, there isn't such
19   a requirement.
20   Q    Thank you.  That's all I needed to know.
21       At paragraph 126, you're referring to
22   some European Union document.  I have questions
23   about that subject.
24   A    Mm-hmm.
25   Q    Do you know when Accord Healthcare, Ltd.

Page 378

1    David B. Ross, M.D., Ph.D., M.B.I.
2    applied for its marketing authorization in the EU?
3    A    What I have written here is June 22,
4    2011.
5    Q    Do you know when the EU approved Accord
6    Healthcare, Ltd.'s application?
7    A    I believe it was sometime in May 2012.
8    Q    So at least from June of 2011 through
9    May of 2012, Accord Healthcare, Ltd. did not have
10   an approved label or marketing authorization in
11   the EU, true?
12   A    As far as I know, that statement is
13   correct.
14   Q    Once FDA did approve the labeling
15   changes in the United States, it approved those
16   changes to take place in the adverse reaction
17   section of the label, correct?
18   A    With the caveat that that was based on
19   the information submitted to it by Accord and what
20   Accord had proposed, yes.
21   Q    Move to strike the "caveats."
22       Let's talk about European labeling.  Do
23   you know exactly what information was submitted to
24   the regulators in Europe by Accord Healthcare,
25   Ltd. when it filed the application in June of

Page 379

1     David B. Ross, M.D., Ph.D., M.B.I.
2  2011?
3     A   Exactly what information, no.
4     Q   All right.  Was there another product
5  already authorized in Europe, another docetaxel
6  product authorized in Europe before June 2011?
7     A   Let me consult my report regarding the
8  other 505.
9        THE REPORTER:  The other what?
10        THE WITNESS:  I'm sorry.  The other
11     505(B)(2).  I believe that there were
12     formulation -- there was a formulation
13     marketed by Sandoz in the, at least one
14     country in the European Union.
15  BY MR. MORIARTY:
16     Q   Was there a Sanofi product before
17  June 2011 in the EU?
18     A   I believe that may be correct as well,
19  so those are at least two that I believe were
20  marketed there.
21     Q   So I think I know the answer to this
22  question based on what you told me.  I asked
23  whether you knew exactly what information was
24  submitted to the EU.  You don't know whether the
25  information that was submitted to the EU is

Page 380

1     David B. Ross, M.D., Ph.D., M.B.I.
2  information that FDA already had prior to June of
3  2011, do you?
4     A   With the caveat that my regulatory
5  analysis focused on what the NDA holder had, not
6  the FDA, no, I don't.
7     Q   Motion to strike the "caveats."
8        Does FDA routinely rely on foreign
9  labeling information when it makes decisions about
10  labeling in the United States?
11     A   I don't know what you mean by
12  "routinely."  I mean it certainly does review it,
13  but I'm not sure what you mean by "routinely."
14     Q   Well, I'm not asking whether it reviews
15  it.  My question involved does it rely on it.
16  Does FDA rely on foreign labeling information when
17  making decisions about labeling in the United
18  States?
19     A   Again, I think the question, as phrased,
20  is way too deep for me to answer it meaningfully.
21     Q   Do you know whether FDA ever asked
22  Accord Healthcare, Inc. to submit foreign labeling
23  information from a company called Accord
24  Healthcare, Ltd.?
25     A   I do not know.  Foreign regulatory

Page 381

1     David B. Ross, M.D., Ph.D., M.B.I.
2  actions generally require to be recorded in an NDA
3  annual report.
4        THE REPORTER:  Can you say that
5     answer again?  I'm not sure I got it.
6        THE WITNESS:  I'm sorry, Laurie.
7     So I don't know.  Foreign regulatory actions
8     are generally required to be reported in an
9     NDA annual report, and possibly in the
10     periodic safety update reports that we've
11     discussed.
12  BY MR. MORIARTY:
13     Q   All right.  So if Accord Healthcare,
14  Inc. had foreign labeling, it would submit that
15  information to FDA through the channels you just
16  suggested, correct?
17     A   So I just want to get some
18  clarification, and I'm certainly aware that there
19  are different entities with the name Accord.
20        If we're talking about the holder of the
21  NDA in the United States, Accord, they would
22  submit it to the FDA.  If the information in there
23  represented, met the criteria for a 15-day alert,
24  that is a serious and unexpected adverse event.
25  Then they would need to report it within 15 days,

Page 382

1     David B. Ross, M.D., Ph.D., M.B.I.
2  I believe it's calendar days, of having become,
3  having become available to them.
4     Q   If I understand what you just said,
5  you're saying if the NDA holder in the United
6  States has foreign labeling, obviously in some
7  other country, that would be reportable through
8  the route that you just suggested, correct?
9     A   Yes, with the distinction that if there
10  was information in there that represented a
11  serious and unexpected adverse event, then the
12  obligation would be to report it as a 15-day alert
13  rather than a periodic report such as an annual
14  report or a periodic safety update report.
15     Q   Have you seen any evidence in this case
16  that Accord Healthcare, Inc., the United States
17  NDA holder for docetaxel, has labeling in any
18  country outside the United States?
19     A   So with the caveat that the question
20  centers on what it had available, not what it's
21  marketing, no.
22     Q   Would you agree that -- well, move to
23  strike the "caveat" as nonresponsive.
24        Would you agree with me, Dr. Ross, that
25  foreign drug labeling is a product of different

Page 383

David B. Ross, M.D., Ph.D., M.B.I.

1    David B. Ross, M.D., Ph.D., M.B.I.
2  and distinct regulatory standards and decisions
3  from those of FDA in the United States?
4        MR. FRAXEDAS:  Object to form.
5        THE WITNESS:  I would say there are
6    similarities and there are differences.
7  BY MR. MORIARTY:
8     Q   Are you an expert in the similarities
9  and differences between USFDA and the EU labeling?
10    A   I have not been retained to give
11  opinions on foreign labeling, drug labeling, per
12  se, so I'm not representing -- for purposes of
13  this proceeding, I'm not representing myself as an
14  expert on that very narrow slice, only as far as
15  it is relevant to FDA drug labeling.
16    Q   Okay.  I know it feels late.  We've been
17  going at this a couple of days, and this question
18  here, the language is a little clumsy, so bear
19  with me, okay?
20    A   Sure.
21    Q   Do you believe that an FDA-approved
22  label in the United States that differs from an
23  EU-approved label for the same drug means that the
24  FDA-approved label is somehow misbranded or
25  mislabeled?

Page 384

1    David B. Ross, M.D., Ph.D., M.B.I.
2        MR. FRAXEDAS:  Object to form.
3  BY MR. MORIARTY:
4     Q   Just that fact alone.
5     A   I -- it, it depends.  I do not believe
6  there is some general rule.  It, it really
7  depends.
8     Q   So that fact alone does not mean that
9  the U.S. drug label is mislabeled or misbranded;
10  you would need more information, true?
11        MR. FRAXEDAS:  Object to form.
12        THE WITNESS:  I would not be able
13  to draw an opinion one way or the other
14  that -- whether the label was not false and
15  misleading or it was false and misleading
16  without more information.
17        THE REPORTER:  Was there an
18  objection there?
19        MR. FRAXEDAS:  Yes, there was.
20  Sorry.  We kind of talked over each other.
21  BY MR. MORIARTY:
22    Q   Doctor, I've got so many notes here, and
23  I've made such a mash-up mess of going through
24  them and jumping around.  What I'd like to do is
25  go off the record, review my notes with my

Page 385

1    David B. Ross, M.D., Ph.D., M.B.I.
2  colleague, regroup, and be efficient with the last
3  approximately 35 plus minutes of my time.
4        Is that okay?
5     A   Absolutely.
6        MR. MORIARTY:  All right.  Let's
7  come back at say 4:05.  That's 15 minutes.
8  That's good?
9        MR. FRAXEDAS:  That works.
10        MR. MORIARTY:  Okay.
11        THE VIDEOGRAPHER:  3:49, we're off
12  the record.
13        (Whereupon, a short recess was
14        taken.)
15        THE VIDEOGRAPHER:  4:07, we're on
16  the record.
17  BY MR. MORIARTY:
18    Q   Dr. Ross, your reliance list contains
19  reference to three depositions from Accord
20  Healthcare, Inc. personnel.  Do you have in mind
21  or in a separate note somewhere exactly what
22  testimony from those three witnesses you are
23  relying upon to say that they did not -- that the
24  company did not comply with its regulatory
25  obligations?

Page 386

1    David B. Ross, M.D., Ph.D., M.B.I.
2        MR. FRAXEDAS:  Object to form.
3        THE WITNESS:  I'm sorry.  I did not
4  completely get, understand your question.
5  BY MR. MORIARTY:
6     Q   Okay.  Hang on a second.  I'm just going
7  to repeat it.
8     A   Okay.
9     Q   In your reliance list you have the
10  depositions of three Accord Healthcare, Inc.
11  employees.  What I want to know is whether you can
12  tell today if there are specific pages of those
13  depositions that you are relying on for your
14  opinion that Accord Healthcare, Inc. did not
15  comply with its regulatory obligations.
16        MR. FRAXEDAS:  Object to form.
17  BY MR. MORIARTY:
18    Q   And Doctor, to make this go faster, I
19  would direct you to paragraphs 30 and 31.  You
20  have no page cite there.
21    A   You mean in the section labeled "Summary
22  of Opinions"?
23    Q   Yes.
24    A   Yes, that's -- you are correct.  That is
25  a summary.

Page 387

1      David B. Ross, M.D., Ph.D., M.B.I.
2      Q   Do you have page cites for the pages on
3  which you rely there or in some other place in
4  your report?
5      A   So to address your question, I cite in
6  paragraph 123 and continuing, specific portions of
7  Nair's.
8          THE REPORTER:  Portions of what?
9          THE WITNESS:  So Nair is spelled
10  N-A-I-R.
11  BY MR. MORIARTY:
12      Q   Are you done with your answer?
13      A   No, sir, I'm not.
14          In paragraph 128 in footnote 90, I cite
15  one of many examples that I could of Dr. Nair's
16  belief that Accord is a 505(j) drug that is not
17  permitted to change its label rather than a
18  505(b)(2) that has the same obligations as any
19  other NDA holder.  That is –
20      Q   Are you now done –
21      A   No, sir.
22      Q   – with your answer?
23      A   No, sir.  I, I – please.  I've asked
24  you multiple times.  Please.  I would ask – I
25  know you would like to get things in.  Please let

Page 388

1      David B. Ross, M.D., Ph.D., M.B.I.
2  me finish.
3      Q   Doctor, you paused, and all I did was
4  ask if you were done with your answer.  That's all
5  I asked.  If you were not done, I was happy to let
6  you go on.
7      A   Okay.
8      Q   There was a long pause, so I don't know
9  when to begin, okay?
10      A   Okay.
11      Q   Do you have more – answer the question
12  I asked.  Go ahead if you do.
13      A   Are you through, sir?  Are you through,
14  sir?
15      Q   I'm asking whether you're done with your
16  answer.  If you're not, please continue with your
17  answer.
18      A   Are you through, sir?
19      Q   I've asked my question.
20      A   Okay.  So that is one example, um, that
21  I cited along with other examples that could be
22  cited, so, um, I will stop right now.
23      Q   All right.  Paragraph 123 talks about
24  having a contract with Lambda, L-A-M-B-D-A,
25  Therapeutic.  That's not a violation of the

Page 389

1      David B. Ross, M.D., Ph.D., M.B.I.
2  regulations, is it?
3      A   Well –
4          MR. FRAXEDAS:  Object to form.
5          THE WITNESS:  – looking at these
6      excerpts – and I was limited in the amount
7      of space that I could provide, sir – it was
8      not clear to me that the NDA holder, Accord,
9      was doing anything substantive that you would
10      characterize as pharmacovigilance.
11  BY MR. MORIARTY:
12      Q   My question to you, Dr. Ross, is
13  specifically about 123.  Is it permissible for NDA
14  holders to enter into contracts with other
15  companies to assist it in performing its
16  pharmacovigilance duties?
17      A   The question you asked me before was
18  different.  It was whether there was anything
19  there that I saw as a violation.  The new
20  question, which is different from the one you just
21  asked me, was is there anything wrong with their
22  entering into a contract.
23      The answer to the first question is that
24  Dr. Nair's deposition testimony, along with the
25  totality of the evidence, illustrates that Accord

Page 390

1      David B. Ross, M.D., Ph.D., M.B.I.
2  was not in compliance.
3      The answer to your second question?  No.
4  Remembering that Lambda is not responsible for the
5  updated label.  Accord is.
6      Q   Okay.  That's not what I'm asking you.
7  At least I don't think so.  I'm going to see if we
8  can clarify our miscommunication here.
9      Is it permissible under the FDA
10  regulations for NDA holders to have contractors
11  assist them in performing their pharmacovigilance
12  duties?
13      A   Assist them?  Yes.
14      Q   Okay.  I'm not trying to say, Doctor,
15  that they're passing the buck to some other
16  company.  The NDA holder is responsible for the
17  pharmacovigilance.  You and I agree on that,
18  correct?
19      A   Yes.
20      Q   But the, just the fact that they
21  contract out "certain pharmacovigilance
22  activities," as you quote here, is not a violation
23  of the regulations, is it?
24      A   Dr. Nair testified that Lambda provides
25  not "certain" but all the pharmacovigilance for

Page 391

David B. Ross, M.D., Ph.D., M.B.I.

1 Accord. I would agree with you.

2 Q   Okay. Are you going to testify in this

3 case that docetaxel and Taxotere are not

4 pharmaceutically equivalent?

5 A   That was not a question I was asked to

6 address.

7 Q   Are you going to testify that docetaxel

8 and Taxotere are not therapeutically equivalent?

9 A   That is not a question I was asked to

10 address.

11 Q   Were you asked to address any opinions

12 about substantive chemical differences between

13 Accord's docetaxel and Sanofi's Taxotere?

14 A   No.

15 Q   Are you aware that most states have

16 adopted laws and regulations that encourage the

17 substitution of interchangeable drug products?

18 MR. FRAXEDAS: Object to form.

19 THE WITNESS: So understanding that

20 "interchangeable" and "generic" are not --

21 "interchangeable" is actually a term that has

22 been more recently applied to biosimilars.

23 Um, I'm certainly aware of that. To the

24 extent to what, which that applies to drugs

25

Page 392

David B. Ross, M.D., Ph.D., M.B.I.

1 marketed under an abbreviated, abbreviated

2 NDA versus a 505(b)(2) NDA is something that

3 I don't know.

4 BY MR. MORIARTY:

5 Q   All right. Well, as a specific example,

6 at the VA, if an oncologist orders Taxotere for

7 the treatment of a breast cancer patient -- or

8 prescribed it, I should say -- do you know whether

9 the pharmacy at various VA medical centers is

10 allowed to automatically substitute either any of

11 the 505(b)(2) docetaxels or the 505(j) docetaxels

12 in place of the name brand product?

13 A   So it's not a matter of substitution.

14 The VA national formulary relies on a national

15 contracting process, whether it's a drug that's

16 actually on the formulary or is obtained outside

17 the formulary, so there's no question of

18 substitution. That's the best I can answer that.

19 Q   I don't know what you mean by "no

20 question of substitution." In other words, the

21 patient could receive the 505(b)(2) or a 505(j)

22 product instead of Taxotere?

23 A   They could, unless there was a basis for

24 what's called the, the Medication Advisory Panel

25

Page 393

David B. Ross, M.D., Ph.D., M.B.I.

1 to believe that particular products marketed as

2 505(b)(2)s or as ANDAs require more information

3 for whatever reason.

4 Q   Do many health insurance plans require

5 prescriptions be filled with generic medications

6 if they are available?

7 MR. FRAXEDAS: Object to form.

8 THE WITNESS: I honestly don't know

9 overall what the situation is with that.

10 BY MR. MORIARTY:

11 Q   Do you write prescriptions for patients

12 you see on a clinical basis at the Washington,

13 D.C. VA Medical Center?

14 A   Yes.

15 Q   And when you do that, are you aware of

16 the possibility that it may -- even if you name

17 the name brand, it may be substituted with a

18 generic by the pharmacist?

19 A   So I don't write for, quote, "a name

20 brand." I mean it may be that that is what is

21 dispensed, but there is a single national contract

22 that applies to all VA facilities, unless a

23 provider wishes to get another formulation of the

24 same drug for some reason.

25

Page 394

David B. Ross, M.D., Ph.D., M.B.I.

1 Q   Okay. Dr. Ross, do you have any

2 evidence on which to base an opinion that the FDA

3 would have approved a proposed label change

4 regarding the alopecia adverse event, had one been

5 proposed in 2011 or '12 or '13 or '14 or earlier

6 in 2015 than it did?

7 MR. FRAXEDAS: Object to form.

8 THE WITNESS: The answer to that

9 question is it depends.

10 BY MR. MORIARTY:

11 Q   What does it depend on?

12 A   The quality of the data submitted by the

13 applicant.

14 Q   Are you done with your answer?

15 A   To that question, yes.

16 Q   Well, I asked what does it depend on.

17 Does it depend on anything other than the quality

18 of the data?

19 A   That would be the primary consideration,

20 and by "quality of data," I want to be clear that

21 I mean has the applicant put together a package

22 that looks at newly acquired information and

23 provides an analysis of why this is warranted. If

24 the applicant were to submit something and then

25

Page 395

David B. Ross, M.D., Ph.D., M.B.I.

1 say, well, we're only going to put in really weak
2 data, that would be --
3
4     Q   I guess my -- go ahead.
5     A   -- what it depends on.  So let me stop.
6 Go ahead.
7     Q   My question isn't in the abstract.  My
8 question is whether you have formed opinions and
9 expressed them in your report regarding whether or
10 not an earlier application by Accord would have
11 been approved before the, before FDA approved
12 Sanofi's Taxotere label change in 2015, specific
13 facts in this case.
14     A   Yes, I have formed such an opinion.
15        THE REPORTER:  Was there an
16     objection there?
17 BY MR. MORIARTY:
18     Q   Is your opinion written in your report
19 somewhere?
20     A   So I would say that the summary of my
21 opinions in paragraphs 26 through 31, which are
22 amplified or expanded elsewhere in the report,
23 make that clear, along with other sections where I
24 discuss the extremely low likelihood that FDA
25 would ever reject an appropriately presented

Page 396

David B. Ross, M.D., Ph.D., M.B.I.

1 request for a label change.
2
3     Q   I'm looking at the paragraphs to which
4 you referred me.
5     A   Mm-hmm.
6     Q   Just to make sure that I understand --
7 well, let me withdraw that question.
8        Let me just consult with Ms. Callsen for
9 a second.
10     A   Of course.
11        (Discussion held off the record.)
12        MR. MORIARTY:  Dr. Ross, I don't
13     have any other questions for you at this
14     time.
15        THE WITNESS:  Okay.  Thank you,
16     sir.
17        MR. MORIARTY:  What do you want to
18     do about --
19        MR. MERRELL:  Sorry.  I was just
20     going to say for the record that, as we
21     discussed on Friday, that Sandoz is going to
22     reserve any time to ask questions for a date
23     in the future we agree to, and perhaps when
24     we go off the record, we can even figure out
25     what day works best for everyone.

Page 397

David B. Ross, M.D., Ph.D., M.B.I.

1
2        MR. FRAXEDAS:  I have no questions
3     for Dr. Ross at this point either, so do you
4     want to go off the record now?
5        MR. MORIARTY:  I'm sorry.  I didn't
6     hear what someone said, and I didn't know
7     whether it was Andrew or Jason.
8        MR. FRAXEDAS:  So Jason.  I talked
9     after Cliff.  Did you hear what Cliff said?
10        MR. MORIARTY:  I heard what Cliff
11     said.  I'm sorry.  I didn't hear what you
12     said.
13        MR. FRAXEDAS:  I said I have no
14     questions for Dr. Ross either, so would you
15     all like to go off the record now?
16        MR. MORIARTY:  Well, that's fine
17     with me.
18        MR. FRAXEDAS:  Okay.
19        THE WITNESS:  I, I'm happy to stay
20     on if you need me.  If not, I don't want to
21     intrude.  So should I, should I exit the
22     deposition?
23        MR. FRAXEDAS:  No.  Stay on,
24     because -- wait a minute.  Hold on, because
25     if Cliff, if Cliff is going to give us a

Page 398

David B. Ross, M.D., Ph.D., M.B.I.

1
2 date, then we're going to need to know
3 Dr. Ross' availability as well.
4        MR. MERRELL:  Sure.  Yeah, let's
5 just get off the record, and then we can have
6 that discussion.
7        THE VIDEOGRAPHER:  4:31.  We're off
8 the record.
9        (Signature having not been waived,
10     Volume 2 of the deposition of DAVID
11     B. ROSS, M.D., Ph.D., M.B.I. was
12     concluded at 4:31 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 399

```
1        David B. Ross, M.D., Ph.D., M.B.I.
2
3
4
5
6        ACKNOWLEDGEMENT OF WITNESS
7            I, David B. Ross, M.D. Ph.D.,
8     M.B.I., do hereby acknowledge that I have
9     read and examined the foregoing testimony,
10    and the same is a true, correct and complete
11    transcription of the testimony given by me,
12    and any corrections appear on the attached
13    Errata sheet signed by me.
14
15
16    _____ _____
17    (DATE)          (SIGNATURE)
18
19
20
21
22
23
24
25
```

Page 400

```
1        David B. Ross, M.D., Ph.D., M.B.I.
2                 E R R A T A   S H E E T
3     IN RE:  TAXOTERE PRODUCTS LIABILITY LITIGATION
4     RETURN BY:
5     PAGE   LINE            CORRECTION AND REASON
6     _____ _____ _____
7     _____ _____ _____
8     _____ _____ _____
9     _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____
25    (DATE)       (SIGNATURE)
```

Page 401

```
1        David B. Ross, M.D., Ph.D., M.B.I.
2
3
4
5     CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
6            I, Laurie Donovan, Registered
         Professional Reporter, Certified Realtime
7       Reporter, and notary public for the District
         of Columbia, the officer before whom the
8        foregoing deposition was taken, do hereby
         certify that the foregoing transcript is a
9        true and correct record of the testimony
         given; that said testimony was taken by me
10        stenographically and thereafter reduced to
         typewriting under my supervision; and that I
11       am neither counsel for, related to, nor
         employed by any of the parties to this case
12        and have no interest, financial or otherwise,
         in its outcome.
13
             IN WITNESS WHEREOF, I have hereunto
14    set my hand and affixed my notarial seal this
         12th day of September, 2020.
15
16      My commission expires:  March 14, 2022
17
18
19    _____
20    LAURIE DONOVAN
       NOTARY PUBLIC IN AND FOR
21    THE DISTRICT OF COLUMBIA
22
23
24
25
```