# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: TAXOTERE (DOCETAXEL) | : | MDL NO. 2740 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION "H" (5) |
| | : | |
| THIS DOCUMENT RELATES TO: | : | HON. JANE TRICHE MILAZZO |
| | : | MAG. JUDGE MICHAEL NORTH |
| | : | |
| *Hilda Adams v. Accord Healthcare, Inc.* | : | |
| *Gloria J. Cooper v. Accord Healthcare, Inc.* | : | |
| *Carol Woodson v. Accord Healthcare, Inc.* | : | |
| | : | |
| *Case No. 2:16-cv-17583* | | |
| *Case No. 2:18-cv-00194* | | |
| *Case No. 2:17-cv-12674* | | |

## DEFENDANT ACCORD HEALTHCARE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PREEMPTION GROUNDS

Date: November 18, 2021

Respectfully submitted,

*/s/ Julie A. Callsen*
Julie A. Callsen
Michael J. Ruttinger
Brenda A. Sweet
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Telephone:  216.592.5000
Facsimile:  216.592.5009
Email:      julie.callsen@tuckerellis.com
            michael.ruttinger@tuckerellis.com
            brenda.sweet@tuckerellis.com

*Attorneys for Defendant*
*Accord Healthcare, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND .............................................................................................. 3

        A.      Plaintiffs are breast cancer survivors whose chemotherapy included
                docetaxel and who allege that they would not have used docetaxel had
                they been more strongly warned about the risk of permanent hair loss ................ 3

        B.      In June 2011, the FDA approved Accord's docetaxel as a generic version
                of Taxotere® under the § 505(b)(2) regulatory pathway ............................................ 4

                1.      As part of its § 505(b)(2) approval regulatory pathway, the FDA
                        expected Accord to forego clinical trials and rely to the "greatest
                        extent possible" on pre-existing studies and knowledge about
                        Taxotere®. ....................................................................................... 4

                2.      Following approval, Accord implemented its post-market
                        pharmacovigilance obligations by monitoring and reporting
                        adverse events to the FDA. .......................................................... 9

        C.      In late 2015, the FDA requested that Sanofi, as the manufacturer of
                Taxotere®, investigate a potential association with permanent alopecia. ............. 10

III.    LAW AND ARGUMENT ............................................................................. 12

        A.      Under well-established preemption law, *Plaintiffs* must show that Accord
                received "newly acquired information" such that Accord could have
                updated its docetaxel label without prior FDA approval. ....................................... 12

        B.      Accord could not have used the CBE regulation to update its docetaxel
                label because it did not have newly acquired information about permanent
                hair loss associated with docetaxel. ....................................................................... 14

                1.      Plaintiffs' regulatory expert, Dr. Ross, fails to show that Accord
                        had newly acquired information about permanent alopecia. ..................... 14

                2.      Accord's post-market safety reports and adverse event reporting
                        data confirms that Accord lacked newly acquired information
                        about a potential association between docetaxel and permanent
                        alopecia. ............................................................................................ 16

                3.      Plaintiffs cannot establish newly acquired information by relying
                        on evidence that pre-dates or post-dates the relevant timeframe or
                        by reference to foreign regulatory submissions. ....................................... 17

i

4.  Medical literature published from 2011 to 2014 does not constitute newly acquired information because it does not show a hair-loss risk "of a different type" or "greater severity or frequency." ...................19

C.  Accord's unique position as a therapeutically and pharmaceutically equivalent § 505(b)(2) manufacturer exempt from conducting clinical trials highlights why it would have been impossible for Accord to acquire newly acquired information supporting a CBE label change. .............................21

IV.  CONCLUSION..............................................................................................................25

## **TABLE OF AUTHORITIES**

**Cases**

*Gayle v. Pfizer, Inc.*,
  No. 19-cv-3451, 2020 WL 1685313  (S.D.N.Y. Apr. 7, 2020) ........................................ 13, 21

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
  779 F.3d 34 (1st Cir. 2015) ................................................................................................. 9, 15

*In re Incretin-Based Therapies Products Liability Litigation*,
  524 F. Supp. 3d 1007 (C.D. Cal. 2021) ............................................................................. 13, 19

*In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)*,
  508 F. Supp. 3d 71 (E.D. La. 2020)................................................................................. 11, 13, 17

*Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
  984 F.3d 329 (4th Cir. 2021) ....................................................................................... 12, 13, 15

*Lyons v. Boehringer Ingelheim Pharm., Inc.*,
  491 F. Supp. 3d 1350 (N.D. Ga. 2020) ............................................................................. 14, 19

*Mahnke v. Bayer Corp.*,
  No. 2:19-cv-07271, 2020 WL 2048622 (C.D. Cal. March 10, 2020)...................................... 14

*Maze v. Bayer Healthcare Pharm., Inc.*,
  No. 4:18-CV-21-TAV-CHS, 2019 WL 1062387 (E.D. Tenn. Mar. 6, 2019) ........................... 9

*McDowell v. Eli Lilly & Co.*,
  No. 13 Civ. 3786, 2015 WL 845720 (S.D.N.Y. Feb. 26, 2015) ............................................... 18

*McGee v. Boehringer Ingelheim Pharmaceuticals*,
  No. 4:16-CV-2082-KOB, 2018 WL 1399237 (N.D. Ala. Mar. 20, 2018) ............................... 15

*McGrath v. Bayer HealthCare Pharm., Inc.*, 393 F. Supp. 3d 161, 166 (E.D.N.Y. 2019)  ......... 17

*Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019)................................. 12, 13, 19

*Meridia Prods. Liab. Litig. v. Abbot Labs.*, 447 F.3d 861 (6th Cir. 2006) ................................... 18

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) ............................................................ 6, 12, 24, 25

*Pradaxa Cases*, No. CJC-16-004863, 2019 WL 6043513
  (Cal. Super. Ct. Nov. 8, 2019) ............................................................................................. 13, 14

*Ridings v. Maurice*, 444 F. Supp.3d 973 (W.D. Mo. 2020)....................................... 16, 18, 19, 20

*Roberto v. Boehringer Ingelheim Pharm., Inc.*, No. CPLHHDCV166068484S, 2019 WL
  5068452 (Super. Ct. Conn.) ...................................................................................................... 17

*Silverstein v. Boehringer Ingelheim Pharm., Inc.*,
No. 19-CIV-81188, 2020 WL 6110909 (S.D. Fla. Oct. 7, 2020) ............................................ 19

**Statutes**
Food, Drug and Cosmetic Act § 505(b)(1) ................................................................................ 5

Food, Drug and Cosmetic Act § 505(b)(2) .......................................................................... passim

Food, Drug and Cosmetic Act § 505(c) ................................................................................... 5

Food, Drug and Cosmetic Act § 505(j) .................................................................................. 4, 5

**Other Authorities**
Food and Drug Administration, Approved Drug Products with Therapeutic Equivalence
Evaluations ......................................................................................................................... 7, 24

Oct. 14, 2003 FDA Response to Citizens' Petition ...................................................... 4, 5, 6, 23

FDA, Draft Guidance for Industry:
Applications Covered by Section 505(b)(2)  (December 1999) ................................................. 5

M. Cooper, Ph.D., CMC Considerations for 505(b)(2) Applications (Oct. 2011) ...................... 8

N. Kluger, et al., Permanent Scalp Alopecia Related to Breast Cancer Chemotherapy by
Sequential Fluorouracil/Epirubicin/Cyclophosphamide (FEC)
and Docetaxel: a Prospective Study of 20 Patients, 23 Annals of Oncology 2879 (2012) ...... 20

N. Thorp, et al., Long Term Hair Loss in Patients with Early Breast Cancer
Receiving Docetaxel Chemotherapy, 2014 San Antonio Breast Cancer Symposium .............. 20

**Regulations**
21 C.F.R. § 201.57(c)(6) ........................................................................................................ 15

21 C.F.R. § 314.70(b) ............................................................................................................ 12

21 C.F.R. § 314.70(c)(6)(iii) .................................................................................................... 1

21 C.F.R. § 314.80 .................................................................................................................. 9

## I.      INTRODUCTION

Plaintiffs Hilda Adams, Gloria J. Cooper, and Carol Woodson—among thousands of similarly situated plaintiffs in this MDL—allege that state law required Defendant Accord Healthcare, Inc. ("Accord") to do the impossible: act sooner to add a warning about a potential association with permanent hair loss (alopecia) to the FDA-approved label for its generic drug docetaxel. To survive summary judgment, Plaintiffs must identify evidence showing that Accord was aware of "newly acquired information" about permanent alopecia that would have enabled Accord to update its label, unilaterally, using the FDA's "Changes Being Effected" ("CBE") regulation, 21 C.F.R. § 314.70(c)(6)(iii). Their inability to do so results in preemption.

This Court is familiar with the Taxotere®/docetaxel regulatory story. In 1996, the FDA approved Sanofi's New Drug Application ("NDA") to market the chemotherapy drug Taxotere® as a new molecular entity. In the years following, the FDA approved multiple supplemental NDAs and label changes based on additional clinical trial information and Periodic Safety Update Reports ("PSURs") submitted by Sanofi. From 2011 to 2014, the FDA approved multiple NDAs for docetaxel submitted by competitors through the § 505(b)(2) regulatory pathway, which Congress created as an abbreviated pathway for new drug approval without the need for duplicative and expensive studies and clinical trials. Then, in 2015, the FDA responded to complaints from cancer survivors about poor hair regrowth following Taxotere® use by asking Sanofi, and Sanofi only, to submit a summary of cases of permanent alopecia associated with docetaxel use. Sanofi did so and, following its submission, which included a summary of both its global pharmacovigilance and clinical trial data, the FDA and Sanofi agreed in October 2015 to add a warning about permanent alopecia to the Taxotere® label. The final updated label was approved in December 2015. Within three weeks, Accord submitted its own Supplemental NDA to conform its label to that of the Reference Listed Drug ("RLD"), Taxotere®.

Accord's regulatory story calls for preemption. When Accord submitted its § 505(b)(2) NDA for docetaxel, it relied on—as the law allows—the safety and efficacy data approved by the FDA in connection with the RLD, Taxotere®. With its application, as is typical with submissions of this type, Accord provided the FDA with a label that followed the safety and efficacy labeling of the RLD, and Accord continued to update the safety and efficacy components of its label promptly when Sanofi updated the label of the RLD.

When Sanofi updated the Taxotere® label to add a permanent alopecia warning in 2015, it was responding to the FDA's request for a comprehensive re-analysis of the same proprietary clinical trial data, and nearly two decades' worth of global pharmacovigilance reports, on which Accord relied as part of its § 505(b)(2) NDA for docetaxel. Plaintiffs allege that Accord should have made the same update, and done so more than two years earlier, even though Accord lacks both access to, and a right of reference to use, Sanofi's clinical trial data, and only receives a minute fraction of the pharmacovigilance reports. The record confirms that from Accord's vantage point, there *was no* newly acquired information to trigger a CBE. Unable to identify any such information received by Accord, Plaintiffs imply that Accord should have *sought out* newly acquired information by acting like the RLD holder, Sanofi, even though Accord brought docetaxel to the market decades later and through an abbreviated regulatory pathway.

When Congress enacted the § 505(b)(2) pathway, it expressed its intent that applicants *not* conduct duplicative clinical research or studies. The whole purpose of this abbreviated pathway was to advance to market price-competitive generic drugs like docetaxel in order to expand access to lifesaving medicine. For that reason, § 505(b)(2) contemplates that an applicant will rely to the greatest extent possible on what is already known about the safety and efficacy of a drug—in this instance, Taxotere®. If a company like Accord were to duplicate the same clinical trials and studies

2

as the RLD, it would drive up costs, lengthen the time-to-market for lifesaving generic alternatives, and frustrate the very purpose for which Congress enacted § 505(b)(2). This Court should therefore reject any attempt to hypothesize a failure-to-warn claim against Accord based on what it *might* have known if it did what Congress never intended for it to do. This is an attempt to rewrite legislation through the courts, not a showing of newly acquired information.

The case for preemption is straightforward. Plaintiffs have not identified any evidence that would have permitted Accord to use the CBE regulation to add a warning about permanent alopecia before December 2015, much less November 2014. Federal law therefore preempts their failure-to-warn claims. And Plaintiffs cannot evade preemption by suggesting that Accord *could* have acquired newly acquired information if only it had acted like the RLD by conducting clinical trials or seeking out additional data—a role that would be contrary to Congress's purpose in enacting the § 505(b)(2) pathway in the first place. This Court should therefore hold Plaintiffs' failure-to-warn claims against Accord preempted and grant summary judgment in Accord's favor.

## II.    BACKGROUND

### A.    Plaintiffs are breast cancer survivors whose chemotherapy included docetaxel and who allege that they would not have used docetaxel had they been more strongly warned about the risk of permanent hair loss.

Ms. Woodson, Ms. Cooper, and Ms. Adams—each of whom were subject to Phase I discovery in this MDL as to Accord—share overlapping facts. All three were diagnosed with breast cancer and began treatments with Accord's docetaxel (as well as other chemotherapy agents) as part of a lifesaving regimen. All three later claimed to have experienced permanent alopecia, which they attribute to docetaxel. The key difference is the date of treatment:

- Plaintiff Hilda Adams received docetaxel as part of her treatment regimen from January 4, 2013 to April 24, 2013. Statement of Undisputed Material Facts ("SUMF") ¶ 1;

- Plaintiff Carol Woodson received docetaxel as part of her treatment regimen from May 1, 2013 to July 3, 2013. *Id.* ¶ 2; and

- Plaintiff Gloria J. Cooper received docetaxel as part of her treatment regimen from November 17, 2014 to March 23, 2015. *Id.* ¶ 3.

Each Plaintiff faults Accord for failing to warn about a risk of permanent alopecia at an early enough date to give her an opportunity to choose a different treatment regimen. *See Adams*, No. 2:16-cv-17583, Rec. Doc. 7, 2d Am. Short Form Compl. ¶ 8; *Woodson*, No. 2:17-cv-12674, Rec. Doc. 5, Short Form Compl. ¶ 12; *Cooper*, No. 2:18-cv-00194, Rec. Doc. 3, Am. Short Form Compl. ¶¶ 12–13. For the reasons detailed below, should this Court conclude that Accord did not receive newly acquired information relevant to an association between docetaxel and permanent alopecia before any one of these three plaintiff's first date of usage, then that plaintiff's claims are preempted. Here, the record confirms that Accord lacked newly acquired information at *any* of those times, necessitating preemption of *all* Plaintiffs' claims.

**B.      In June 2011, the FDA approved Accord's docetaxel as a generic version of Taxotere® under the § 505(b)(2) regulatory pathway.**

Accord's docetaxel was approved through the FDA's § 505(b)(2) pathway, which, along with the § 505(j) pathway for Abbreviated New Drug Applications ("ANDAs"), is one of two abbreviated pathways created by the Drug Price Competition and Patent Term Restoration Act of 1984, commonly referred to as the "Hatch-Waxman Amendments." The Amendments "reflect Congress's attempt to balance the need to encourage innovation with the desire to speed the availability of lower cost alternatives to approved drugs." Ex. U, Oct. 14, 2003 FDA Response to Citizens' Petition ("Citizen Pet. Resp.") at 3–4. The new pathway enabled manufacturers to bring new drugs to market more quickly than the expensive and resource-intensive approval process for traditional "stand alone" New Drug Applications ("NDAs"), which are regulated by § 505(b)(1).

**1.      As part of its § 505(b)(2) approval regulatory pathway, the FDA expected Accord to forego clinical trials and rely to the "greatest**

extent possible" on pre-existing studies and knowledge about Taxotere®.

Section 505(b)(2) is a "hybrid" pathway, which "shares characteristics of both ANDAs and standalone NDAs":

> Like a stand-alone NDA, a 505(b)(2) application is submitted under section 505(b)(1) and approved under section 505(c). As such, it must satisfy the requirements for safety and effectiveness information. A 505(b)(2) application is similar to an ANDA as well because it may rely on the FDA finding that the listed drug it references is safe and effective as evidence . . . .

Ex. U, Citizen Pet. Resp. at 3.

The FDA's "longstanding interpretation of section 505(b)(2) is intended to permit the pharmaceutical industry to rely *to the greatest extent possible under the law* on what is already known about a drug." *Id.* (emphasis added). This reliance on the Reference Listed Drug, or "RLD," facilitates several FDA goals and policies:

> The Agency's approach is to use the 505(b)(2) drug approval pathway to avoid requiring drug sponsors to conduct and submit studies that are not scientifically necessary. The conduct and review of duplicative studies would (1) divert industry resources that could be used to undertake innovative research, (2) increase drug costs, (3) strain FDA review resources, and (4) slow the process for drug approval with no corresponding benefit to the public health.

*Id.*; *see also* FDA, Draft Guidance for Industry: Applications Covered by Section 505(b)(2) (December 1999) at 3, https://www.fda.gov/media/72419/download (last visited Nov. 9, 2021) (explaining that section 505(b)(2) creates an abbreviated pathway for drugs "that would not be permitted under section 505(j)," but "without creating duplicate work and reflects the same principle as the 505(j) application: it is wasteful and unnecessary to carry out studies to demonstrate what is already known about a drug"). It also facilitates the cost-saving goals of Congress by "treat[ing] generic manufacturers as just that—manufacturers, not inventors or testers—and thereby keep[ing] their market-entry costs low." Br. for Generic Pharmaceutical Assoc. as Amicus Curiae Supporting Petitioners, *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011)

(Nos. 09-993, 09-1039, 09-1501), 2011 WL 343069, at \*11 (Jan. 31, 2011) ("GPhA Amicus Br."). Section 505(b)(2) has been particularly useful in the field of cancer treatment therapies: "Use of the 505(b)(2) pathway has allowed some sponsors to avoid using scarce cancer research resources to conduct unnecessary trials to re-demonstrate efficacy." Ex. U, Citizen Pet. Resp. at 20.

Taxotere® is the RLD for docetaxel. *See* SUMF ¶ 4. When the patent for Taxotere® expired in 2010, Accord—an emerging pharmaceutical company incorporated in 2005 with a focus on the generic pharmaceutical market, *see id.* ¶ 5—was one of several manufacturers that applied for and obtained approval under § 505(b)(2) to sell its own docetaxel drug. *See* MDL No. 2740, Doc. 4407, 2d Am. Master Long Form Compl. ("Master Complaint") ¶¶ 32–36, 45, 59, 71, 82, 92, 105.

Accord conducted every aspect of the docetaxel approval process in partnership with the FDA. Accord representatives met with employees of the FDA at a June 2008 Pre-Investigational New Drug ("Pre-IND") meeting to discuss Accord's eligibility to use the § 505(b)(2) pathway for docetaxel and what submissions Accord would be required to make to the FDA. SUMF ¶ 6. The report issued from that meeting confirmed a joint understanding that:

- Accord's docetaxel would contain the same "active ingredient, route of administration, dosage form, strength, proposed indications, and dosing regimen" as Taxotere®;

- Accord's docetaxel would contain the "same concentration of the active ingredient" as Taxotere®;

- its inactive ingredients "have been previously approved for use in the same route of administration, at levels above those reflected in the [proposed] formulation";

- conditioned on these similarities, Accord could "rely on the agency's findings of safety and efficacy for [the RLD]";

- conditioned on these similarities, docetaxel was eligible for a waiver of bioequivalence and could apply for an "A" rating of interchangeability from the Office of Generic Drugs[1]; and

- FDA would not require Accord to conduct additional toxicological or clinical studies in light of its plan to demonstrate that docetaxel and Taxotere® are pharmaceutically equivalent.

SUMF ¶ 7.

On December 21, 2009, Accord submitted its § 505(b)(2) NDA for docetaxel. *Id.* ¶ 8. As anticipated, Accord relied on Sanofi's clinical studies of the RLD and the FDA's finding of safety and efficacy. *Id.* ¶ 10. Accord's docetaxel differs from the RLD only by the inclusion of two inactive ingredients: citric acid and polyethylene glycol. *Id.* ¶ 11. Consistent with the discussions at the pre-IND meeting, Accord requested that the FDA waive the requirement for *in vivo* bioequivalence studies of docetaxel because the active ingredient, route of administration, dosage form, and strength of the drug were the same as Taxotere®. *Id.* ¶ 12. The FDA agreed and granted Accord's docetaxel an "A" rating as the therapeutic equivalent of Taxotere®, which means that Accord's docetaxel can be freely substituted for the RLD. *See id.* ¶ 13. The FDA approved Accord's § 505(b)(2) application on June 8, 2011. *Id.* ¶ 14.

Accord likewise relied fully on the FDA-approved labeling for the RLD. The FDA expects that a 505(b)(2) applicant's warnings will be the *same as* the RLD unless there is a clinical difference between the two products that supports a difference. SUMF ¶ 15 (citing Ex. H, FDA Presentation by Monica Cooper, Ph.D., "CMC Considerations for 505(b)(2) Applications," Oct.

---

[1] An "A" rating is part of the therapeutic equivalence designation given by the FDA's Office of Generic Drugs to generic drugs that are considered "interchangeable" with the RLD by the FDA. A therapeutically equivalent drug can be substituted "with the full expectation that the substituted product can be expected to have the same clinical effect and safety profile as the prescribed product." *See* Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") at viii, xiii (40th ed. 2020), *available at* http://www.fda.gov/media/71474/download (last visited Nov. 9, 2021).

2011, slide 4 ("A 505(b)(2) applicant may rely upon . . . FDA's finding of safety and/or effectiveness for one or more listed drugs (*includes approved product labeling*. . .") (emphasis added)). Consistent with this expectation, Accord submitted to the FDA a side-by-side comparison of its docetaxel label with Taxotere® to demonstrate the sameness of the warnings. *Id.* ¶ 16. The FDA subsequently conducted an independent review of the proposed labeling for Accord's docetaxel. *See id.* ¶¶ 17–19.

In its 505(b)(2) Assessment, a tabbed review within the Approval Package in which the FDA provided input on Accord's application, the FDA recognized that Accord intended to rely on the safety and efficacy data contained in the Taxotere® label, with no change in indication(s) or dosage form. *Id.* ¶ 17. FDA reviewers from the Division of Drug Marketing, Advertising, and Communications likewise commented on the need for the docetaxel label to "match" the Taxotere® label, down to the level of detail of requiring that Accord use one asterisk in the label rather than two, since "[a]ccording to the RLD there should only be one asterix (sic)." *Id.* ¶ 18. FDA reviewers also noted in the Executive Summary of the Label and Labeling Review that because the design for the Taxotere® labeling had gone through several revisions "over the years," Accord should modify its docetaxel label to reflect the same design. *Id.* ¶ 19.

At the time of approval, Accord included an unqualified warning about alopecia as an adverse reaction under the Prescribing Information section of its docetaxel labeling, which tracked *exactly* the Taxotere® label warnings. SUMF ¶ 20. Further, just as with Taxotere®, Accord's Patient Counseling Information for docetaxel instructed doctors to "[e]xplain to patients that side effects such as . . . hair loss are associated with docetaxel administration," noting that "hair loss" was one of the "most common side effects of docetaxel Injection." *Id.* It therefore follows from the FDA's subsequent consideration and approval that Accord's docetaxel label was adequate as

a matter of law as of the date of approval, June 8, 2011. *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41 (1st Cir. 2015) (explaining that "the line so drawn lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops"); *see also Maze v. Bayer Healthcare Pharm., Inc.*, No. 4:18-CV-21, 2019 WL 1062387, at *3 (E.D. Tenn. Mar. 6, 2019) (citing *In re Celexa* and noting that "[i]t follows from the above that any claim asserted by Maze and based on information known to the FDA as of April 2012—when the label at issue here was approved—is plainly preempted by federal law").

        **2.**    **Following approval, Accord implemented its post-market pharmacovigilance obligations by monitoring and reporting adverse events to the FDA.**

Following approval, Accord implemented its post-market safety and surveillance obligations under 21 C.F.R. § 314.80 with respect to docetaxel, which requires both NDA and ANDA holders to "promptly review all adverse drug experience information obtained or otherwise received by the applicant" and "report to FDA adverse drug experience information." As demonstrated through the testimony of Accord Vice President of Regulatory Affairs Sabita Nair, Accord adopted dozens of Standard Operating Procedures ("SOPs") to ensure compliance, including procedures for reviewing new adverse events and reporting them to the FDA through its quarterly Periodic Adverse Event Reports ("PADERs"). SUMF ¶ 21. Significantly, Plaintiffs' regulatory expert, Dr. David Ross, did not identify any specific deficiencies or criticisms of

Accord's PADER submissions or pharmacovigilance procedures in his expert report. *See generally* Ex. V, Expert Report of David Ross, M.D., Ph.D., M.B.I. ("Ross Report").[2]

Accord reconciles all adverse event reports received by it on a weekly basis. SUMF ¶ 22. In addition, Accord contracted with the pharmacovigilance group at Lambda Therapeutic Ltd. ("Lambda") to assist in carrying out pharmacovigilance monitoring "to make sure that [Accord has] covered all adverse events." *Id.* ¶ 23. Lambda "is involved in evaluating the safety reports . . . that Accord receives from the market" and also "puts into place a review process," such that "Lambda arranges for submission of those reports to the FDA on behalf of Accord." *Id.* In this capacity, Lambda compiles the PADERs for Accord's review and submission to the FDA. *Id.* It is undisputed that a review of Accord's PADERs related to hair loss reveals that Accord received *no* reports of permanent or persistent hair loss from the time of the FDA's docetaxel approval to the start of the last plaintiff's (Cooper's) treatment in November 2014. *Id.* ¶ 24. Further, Accord does not have access to other manufacturers' PADERs. *Id.* ¶ 25.

### C.   In late 2015, the FDA requested that Sanofi, as the manufacturer of Taxotere®, investigate a potential association with permanent alopecia.

This Court is familiar with the chain of events leading up to the addition of a permanent alopecia warning to the Taxotere® label. In early 2015, one of the plaintiffs in this MDL contacted the FDA about her experience with Taxotere® and hair loss. *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)*, 508 F. Supp. 3d 71, 78 (E.D. La. 2020). The FDA opened an investigation into permanent alopecia and asked Sanofi for "a summary of cases of permanent partial or total alopecia associated with docetaxel use." *Id.* The FDA did *not* reach out to the § 505(b)(2) manufacturers of

---

[2] Although Dr. Ross's expert report was prepared for the *Hughes* matter, Plaintiffs have not submitted an expert report in subsequent Trial Selection cases, rather adopting Dr. Ross's report as issued in that matter as applying to the 505(b)(2) Defendants.

docetaxel, including Accord, to alert them to this investigation or ask for their data. On April 10, 2015, Sanofi responded with a 25-page analysis including "a review of 2,118 cases of alopecia from Sanofi's pharmacovigilance database; a chart of reports of long-standing alopecia associated with Taxotere® use; a summary of the alopecia data from GEICAM 9805; and Sanofi's overall analysis of the potential side effect." *Id.* After reviewing Sanofi's submission, the FDA responded on October 2, 2015 to request additional information and "that Sanofi update its label, 'due to the possibility that permanent alopecia may be associated with docetaxel use.'" *Id.*

In response to the FDA request, Sanofi submitted a CBE update to add warnings that "[c]ases of permanent alopecia have been reported," which the FDA approved on December 11, 2015. SUMF ¶ 26; *see also id.* ¶ 28. The FDA cautioned, however, that "[Sanofi's] simple statement that permanent cases have been reported is *all that can reliably be said* given the *tremendous limitations* of the available data," and directed Sanofi to add the following statement to the Adverse Reactions section of its label: "Cases of permanent alopecia have been reported." *Id.* ¶ 27 (emphases added). Accord followed suit just weeks later, filing its own Supplemental New Drug Application (NDA 201195/S-009) on December 30, 2015, advising the FDA that it intended to revise its label "in line with the current package insert of RLD Taxotere (docetaxel) Injection." *Id.* ¶ 29. The FDA approved Accord's label update on July 26, 2016, but with restrictions that emphasized the need for Accord to match the Taxotere® label. SUMF ¶¶ 30–32 (noting FDA's instruction to "delete" additional warning language that would have differentiated Accord's label from that of the RLD). The message was clear: do not deviate from the RLD label unless a drug-specific characteristic requires. Because docetaxel was approved as a therapeutic equivalent to Taxotere® with the differences limited to inactive ingredients, there was no basis for Accord to do anything but follow the Taxotere® label.

11

III.   **LAW AND ARGUMENT**

A.   **Under well-established preemption law, *Plaintiffs* must show that Accord received "newly acquired information" such that Accord could have updated its docetaxel label without prior FDA approval.**

The Supreme Court has articulated a clear, concise test for preemption. In *Merck Sharp & Dohme Corp. v. Albrecht*, the court held that preemption occurs when it is "impossible for a private party to comply with both state and federal requirements." 139 S. Ct. 1668, 1672 (2019). This question of "impossibility" requires a determination "whether the private party could *independently* do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621 (2011) (emphasis added). If "a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency," then it cannot act "independently." *Id.* at 623–24. The trial court must resolve this as a question of law. *Albrecht*, 139 S. Ct. at 1680-81.

Since *Albrecht*, federal courts have reached a consensus on how the rules of preemption interact with the burden of proof in pharmaceutical failure-to-warn cases. Earlier this year, the Fourth Circuit held in *Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 984 F.3d 329, 337 (4th Cir. 2021) that "[a] state law challenge to FDA-approved warnings, including a tort action under state law, can [] proceed only when the defendant has the unilateral ability to change that labeling; otherwise the claim is preempted." In so holding, the court put the focus on the CBE regulation and the existence of "newly acquired information":

> Under FDA regulations, companies cannot unilaterally change the Medication Guide without prior FDA approval because doing so is considered a 'major' change. *See* 21 C.F.R. § 314.70(b) (explaining that 'any change to a Medication Guide' requires 'supplement submission and approval prior to distribution of the product made using the change'). But companies can change the physician label under the CBE regulation 'if the change is designed to 'add or strengthen a . . . warning' where there is 'newly acquired information' about the 'evidence of a causal association' between the drug and a risk of harm.'

*Knight*, 984 F.3d at 337-38 (citing *Albrecht*, 139 S. Ct. at 1673). Thus, the key to preemption in *Knight*—as here, was whether the manufacturer had "'newly acquired information' as defined in the regulation that could have justified a unilateral change in" the label. *Id.*

Other federal courts have arrived at the same conclusion, such as the recent decision issued in *In re Incretin-Based Therapies Products Liability Litigation*, 524 F. Supp. 3d 1007 (C.D. Cal. 2021), where the court distilled the test into this simple formulation:

> [W]hether federal and state laws irreconcilably conflict entails the threshold inquiry of **whether there is 'newly acquired information'** to support a CBE submission. . . . **If the answer is no, then the state law claim is preempted**.

*Id.* at 1018 (citing *Albrecht*, 139 S. Ct. at 1679, and *Knight*, 984 F.3d at 332) (emphases added). *See also, e.g.*, *Pradaxa Cases*, No. CJC-16-004863, 2019 WL 6043513, at *2 (Cal. Super. Ct. Nov. 8, 2019); *Gayle v. Pfizer, Inc.*, No. 19-cv-3451, 2020 WL 1685313, at *4 (S.D.N.Y. Apr. 7, 2020).

As this Court recognizes, while "the existence of 'newly acquired information' is the appropriate question, the critical issue is how 'newly acquired information' is defined." *In re Taxotere (Docetaxel) (Kahn)*, 508 F. Supp. 3d 71, 78 (E.D. La. 2020). Federal law defines "newly acquired information" as: "data, analyses, or other information not previously submitted to the [FDA], which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) *if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA*." 21 C.F.R. § 314.3(b) (emphasis added).

Newly acquired information must predate treatment, because the manufacturer must have had the ability to change the label before the plaintiff's treatment. *E.g.*, *Knight*, 984 F.3d at 338 (explaining that an article published after the injury "would not have made any difference to [the plaintiff]" and thus did not qualify as "newly acquired information"); *Mahnke v. Bayer Corp.*, No. 2:19-cv-07271, 2020 WL 2048622, at *3 (C.D. Cal. March 10, 2020). Further, speculation about

13

what a manufacturer *might* have discovered does not suffice, because newly acquired information "cannot be rooted in conjecture or hypothesis." *Lyons v. Boehringer Ingelheim Pharm., Inc.*, 491 F. Supp. 3d 1350, 1364 (N.D. Ga. 2020) (citing *Pradaxa Cases*, 2019 WL 6043513, at *3, and explaining that the plaintiff must present evidence that the manufacturer *acquired* the new information *before* the injury).

Thus, to evade preemption, Plaintiffs must identify newly acquired information received by Accord prior to—at the latest—November 17, 2014.[3]

> **B. Accord could not have used the CBE regulation to update its docetaxel label because it did not have newly acquired information about permanent hair loss associated with docetaxel.**

The record confirms that Accord lacked newly acquired information—and therefore could not submit a CBE regarding permanent alopecia—until late 2015, when the FDA and Sanofi decided to add a warning that "[c]ases of permanent alopecia have been reported" following Sanofi's reanalysis of 2,000+ of its own adverse event reports and clinical trial data. The regulatory record illustrates how Sanofi's reanalysis of its clinical trial data in context with thousands of adverse event reports was necessary for the FDA to conclude that a reference to permanent alopecia was appropriate, and Accord lacked any of that information.

> **1. Plaintiffs' regulatory expert, Dr. Ross, fails to show that Accord had newly acquired information about permanent alopecia.**

Dr. David Ross, the mouthpiece by which Plaintiffs seek to show that Accord failed to adequately comply with its regulatory obligations, does not identify *any* evidence that Accord was aware of newly acquired information as necessary for a CBE in his expert report. *See generally*

---

[3] As noted in Part II.A, *supra*, there are three different dates on which the three different Plaintiffs started treatment: January 4, 2013 (Adams), May 1, 2013 (Woodson), and November 17, 2014 (Cooper). Because Plaintiffs *cannot* demonstrate newly acquired information at any of these times, the result should be the same in all of these cases—summary judgment in Accord's favor.

14

Ex. V, Ross Report. Tellingly, the phrase "newly acquired information" appears *nowhere* in his report. At most, Dr. Ross says that Accord was aware of "some evidence of a potential causal relationship" between docetaxel and PCIA. *Id.* ¶ 127. That is not enough. "[N]ewly acquired information" must "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b); *accord Knight*, 984 F.3d at 338. Not only does Dr. Ross not identify newly acquired information, but he never addresses whether the information in his report was submitted to the FDA.[4]

Holding Plaintiffs' claims preempted in the absence of newly acquired information follows the consensus of federal courts across the country. For instance, in *In re Celexa*, the First Circuit rejected plaintiffs' warnings claims against the manufacturer of the antidepressant Lexapro after observing that: (1) the FDA approved the drug's label, and (2) the two academic articles relied on by the plaintiffs did not amount to "newly acquired information" that would have justified a label-change through the CBE regulation. 779 F.3d at 42–43. Similarly, in *McGee v. Boehringer Ingelheim Pharmaceuticals*, No. 4:16-CV-2082-KOB, 2018 WL 1399237 (N.D. Ala. Mar. 20, 2018), the district court concluded that defective warning claims against the maker of the diabetes drug Jardiance were preempted because the plaintiff failed to identify any new instances of diabetic ketoacidosis (DKA) between the time the FDA approved the drug's label and the time plaintiff experienced DKA, *id.* at *4–5 (noting that the plaintiff "still fails to specify whether any new DKA adverse events occurred after Jardiance's approval and before [his] harm"). The same conclusion applies here. *See*, *e.g.*, *Ridings v. Maurice*, 444 F. Supp. 3d 973, 1000 (W.D. Mo. 2020) (granting

---

[4] Moreover, Dr. Ross's "*some* evidence of a *potential* causal relationship" opinion falls short of the "*reasonable* evidence of a causal association" standard for labeling identified in 21 C.F.R. § 201.57(c)(6) (emphasis added) (for "Warnings and precautions").

preemption-based summary judgment in the absence of evidence of "newly acquired information").[5]

> **2.  Accord's post-market safety reports and adverse event reporting data confirms that Accord lacked newly acquired information about a potential association between docetaxel and permanent alopecia.**

The primary way in which any holder of a marketed drug obtains information about drug risks is through post-marketing surveillance, which includes reviewing adverse events reported regarding the drug. *See* Ex. V, Ross Report ¶¶ 101–13. As explained on page 9, *supra*, Accord instituted numerous SOPs, reconciled adverse events, and submitted PADERs all to comply with these requirements. Neither Plaintiffs nor Dr. Ross has identified any evidence to suggest that Accord's post-marketing surveillance were incomplete or deficient.

Yet, it is undisputed that from June 2011 through the end of 2014, Accord received *no* adverse event reports concerning permanent or persistent hair loss in patients who used docetaxel. SUMF ¶ 24. This absence of any adverse event reports regarding permanent hair loss stands in stark relief next to the volume of adverse events relied on by Sanofi, as the manufacturer of the RLD, when it performed a re-analysis of its own adverse event reports at the FDA's request in April 2015, which involved "a review of 2,118 case of alopecia from Sanofi's pharmacovigilance database," as well as Sanofi's clinical trial data. *Kahn*, 508 F. Supp. 3d at 78. Not only did Accord not receive any reports in the relevant time period, but also it did not have access to Sanofi's NDA

---

[5] Plaintiffs' inability to identify pre-treatment newly acquired information is consistent with the undisputed fact that the FDA *continued* to approve other manufacturers' § 505(b)(2) applications for generic docetaxel products, with the *same* warnings, through March 2014. *Cf.* MDL 2740, Rec. Doc. 4407, 2d Am. Master Long Form Compl. ¶¶ 45–46 (Sandoz, June 29, 2011), 92–93 (Pfizer, March 13, 2014), and 105–06 (Actavis, April 12, 2013). The FDA independently reviewed and approved each of these applications. Each time the FDA reviewed and approved these labels, it reaffirmed the adequacy of Accord's June 2011 warnings.

and its clinical trial data, nor its many years' worth of adverse event reporting information. When the FDA approved the addition of a permanent hair-loss statement for Taxotere® in December 2015, it observed that even the data analyzed by Sanofi had "tremendous limitations." SUMF ¶ 27. If the FDA considered Sanofi's decades' worth of data to be tremendously limited evidence of a potential association, then Accord's lack of *any* received adverse events confirms that it is impossible for Plaintiff to establish that Accord received newly acquired information.

    **3.    Plaintiffs cannot establish newly acquired information by relying on evidence that pre-dates or post-dates the relevant timeframe or by reference to foreign regulatory submissions.**

Unable to point to any post-marketing pharmacovigilance evidence that Accord received about permanent hair loss, Dr. Ross cites studies and "safety signals" that (1) pre-date FDA's approval of Accord's § 505(b)(2) NDA and label, or (2) post-date Plaintiffs' use of docetaxel. Ex. V, Ross Report ¶ 28; *id.* ¶ 93 (referencing retrospective studies published in March 2011 and May 2012); ¶ 94 ("study published in October 2010"); ¶ 95 (analyses of adverse event "signals" from 2000, 2008, 2010). Detached from the relevant timeframe—*i.e.*, between Accord's June 2011 approval and the beginning of Plaintiffs' treatment regimens in 2013 and 2014—none of these are newly acquired information on which Accord could have based a CBE. *Roberto v. Boehringer Ingelheim Pharm., Inc.*, No. CPLHHDCV166068484S, 2019 WL 5068452, at *14 (Super. Ct. Conn.); *McGrath v. Bayer HealthCare Pharm., Inc.*, 393 F. Supp. 3d 161, 166 (E.D.N.Y. 2019).

Next, Dr. Ross, notes that on June 22, 2011, Accord Healthcare Ltd., a company independent from Accord, submitted its application to market docetaxel to the European Medicines Agency health authorities, and that this label—which was approved in 2012—contained the statement that "[c]ases of persisting alopecia have been reported." Ex. V, Ross Report ¶¶ 126–27. According to Dr. Ross, "[t]his statement demonstrates Accord's knowledge of both the risk of PCIA generally, and Sanofi's TAX316 clinical trial data demonstrating the risk of PCIA." *Id.*

¶ 126. But the record does not support any link between Accord Healthcare Ltd. and Accord. As this Court knows, Magistrate Judge Michael North has rejected previous attempts to connect Accord with Accord Healthcare Ltd., and denied plaintiffs discovery into that entity precisely because plaintiffs "ha[ve] not established a sufficient link between the Accord defendant in this case and purportedly related foreign Accord entities." MDL 2740, Doc. No. 8239, Minute Entry at 1 (E.D. La. Sept. 17, 2019). Even if Accord and Accord Healthcare Ltd. *were* related, this statement proves nothing. Accord did not have access to the underlying clinical trial data from TAX316, a Sanofi trial. And the information was *not* new; Dr. Ross admitted during his deposition that this Sanofi clinical trial data had been available to the FDA "for years" before Accord's docetaxel was approved. Ex. W, Aug. 31, 2020 Dep. of David Ross ("Ross *Hughes* Dep.") at 346:14-347:25.

Foreign labeling determinations are not relevant to the standard for considering the adequacy of an FDA-approved label:

> Foreign drug labeling is the product of different and distinct regulatory standards and decisions. As a consequence, courts routinely hold that "[t]he mere existence of a differently structured and written European label does not establish that the U.S. label is insufficient, misleading, or legally inadequate."

*Ridings*, 444 F. Supp. 3d at 994 (quoting *McDowell v. Eli Lilly & Co.*, No. 13 Civ. 3786, 2015 WL 845720, at *5 (S.D.N.Y. Feb. 26, 2015)); *see also Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 867 (6th Cir. 2006) (declining to consider argument that U.S. label was inadequate based on fact that "the warning label for [the drug's] European equivalent contained more detailed instructions for the treating physician"). Nor does Dr. Ross offer *any* basis for concluding that this "evidence" meets the definition of newly acquired information under 21 C.F.R. § 314.3(b).

Plaintiffs' inability to show newly acquired information, standing alone, is reason enough to grant Accord's Motion. It is not Accord's burden to "prove a negative (*e.g.*, asking a

pharmaceutical company to prove that there was no new evidence available).” *Ridings*, 444 F. Supp. 3d at 980; *see also Silverstein v. Boehnringer Ingelheim Pharm., Inc.*, No. 19-CIV-81188, 2020 WL 6110909, at *12 (S.D. Fla. Oct. 7, 2020) (noting that allocating the burden of proving newly acquired information on plaintiffs “avoids making [the defendant] prove a negative—that it acquired no new information . . . that would have justified a CBE modification.”). Without newly acquired information, Accord could not *propose* a change to its FDA-approved warnings, much less implement one. *Albrecht*, 139 S. Ct. at 1679 (2019); *see also In re Incretin-Based Therapies*, 524 F. Supp. 3d at 1018 (observing that “if the answer is no” to the question of newly acquired information, “then the state law claim is preempted”).

>    **4.   Medical literature published from 2011 to 2014 does not constitute newly acquired information because it does not show a hair-loss risk “of a different type” or “greater severity or frequency.”**

Medical literature can constitute newly acquired information only if the articles in question “‘reveal a risk of a different type or greater severity or frequency than previously included in submissions to FDA’ under 21 C.F.R. § 314.3(b).” *Lyons*, 491 F. Supp. 3d at 1366. Plaintiffs, however, cannot identify any literature meeting this definition published during the relevant timeframe—the period between Accord’s docetaxel approval in June 2011 and the date when the last plaintiff, Ms. Cooper, began her treatment with docetaxel, November 2014.

There are only two studies falling within this timeframe addressed in the MDL plaintiffs’ Master Complaint, and neither meets the definition of newly acquired information. These are: (1) a May 2012 article in the Annals of Oncology reporting nine cases of permanent alopecia after systemic chemotherapy related to taxanes; and (2) an October 2013 presentation by Drs. Thorp, *et al.*, at the Clatterbridge Cancer Centre in the United Kingdom (subsequently published for the 2014 San Antonio Breast Cancer Symposium), which concluded based on a retrospective

19

questionnaire of 189 patients that "[l]ong term significant scalp alopecia . . . may affect 10–15 percent of patients following docetaxel." Rec. Doc. 4407, Master Compl. ¶¶ 159–61.[6]

First, the Kluger Article falls well short of establishing a permanent hair-loss risk of "greater severity or frequency." The Master Complaint in this MDL alleges reports of persistent lair loss in as many as 9.2% of patients based on the results of Sanofi's GEICAM 9805 clinical trial study. *See id.* ¶ 149. In comparison, the Kluger article "roughly estimated that the incidence of this side-effect in this patient population is ~2%"—significantly *less* than previous reports. Ex. X, Kluger Article at 2883. That contrast, alone, rules the Kluger article out as newly acquired information because it does not reflect a risk of greater severity or frequency.

Second, the Clatterbridge Study[7] is not newly acquired information because it presents, at best, substantially similar results to the GEICAM 9805 trial alleged in the Master Complaint—not a risk of greater severity or frequency. *See, e.g.*, *Ridings*, 444 F. Supp. 3d at 985-86 (2011 Clinical Overview Statement was not "newly acquired information" because it presented data that was "substantially similar" to pre-approval data submitted to the FDA). But the study is also confounded by methodological flaws that rule it out as newly acquired information. For example, the study relied entirely on voluntary patient responses without independent medical verification and with no analyses of patient histories or potential alternative causes. The study thus reflects

---

[6] *See also* Ex. X, N. Kluger et al., Permanent Scalp Alopecia Related to Breast Cancer Chemotherapy by Sequential Fluorouracil/Epirubicin/Cyclophosphamide (FEC) and Docetaxel: a Prospective Study of 20 Patients, 23 Annals of Oncology 2879 (2012) (hereinafter "Kluger Article"); Ex.Y, N. Thorp et al., Long Term Hair Loss in Patients with Early Breast Cancer Receiving Docetaxel Chemotherapy, 2014 San Antonio Breast Cancer Symposium (abstract of presentation, hereinafter "Clatterbridge Study").

[7] The fact that preliminary aspects of the Clatterbridge Study were first presented in October 2013 (following an October 2013 postal questionnaire) rules it out as "newly acquired information" for Plaintiffs Adams and Cooper, who completed their treatment earlier in 2013.

little more than a compilation of anecdotal case reports, which fall well short of the standard for newly acquired information. *See, e.g.*, *Gayle*, 2020 WL 1685313 at *5 ("Courts have . . . rejected the notion that analyses based on adverse event reports—much less the reports standing alone—can constitute newly acquired information."); *McGrath*, 393 F. Supp. 3d at 169 ("[r]eports and studies that discuss" adverse events do not constitute "newly acquired information").

### C.   Accord's unique position as a therapeutically and pharmaceutically equivalent § 505(b)(2) manufacturer exempt from conducting clinical trials highlights why it would have been impossible for Accord to acquire newly acquired information supporting a CBE label change.

Even if Plaintiffs *could* identify newly acquired information received by Accord about the risk of permanent hair loss—and they cannot—Accord's regulatory record highlights precisely why it would have been impossible to initiate a CBE labeling update about permanent hair loss at *any* point before Sanofi's update in December 2015. At all times during the approval process for docetaxel, Accord was expected to rely to the greatest extent possible on Taxotere® as the RLD. The FDA recognized that Accord's docetaxel is the same as Taxotere® in every meaningful way—the same active pharmaceutical ingredients, route of administration, dosage form, strength, concentration of active pharmaceutical ingredients, indications, and dosing regimen. *See* SUMF ¶¶ 7–13 (citing Report of 6-4-2008 Pre-IND Meeting). These similarities led the FDA to approve docetaxel as a therapeutic equivalent of Taxotere®. *See id.* ¶¶ 12–14. Indeed, precisely *because* the two drugs were pharmaceutically equivalent, the FDA approved Accord's docetaxel for market without additional toxicological or clinical studies. *See id.* ¶¶ 7–14. Accord was therefore allowed to rely on Sanofi's clinical trial data for approval of its § 505(b)(2) NDA even though Accord does not have access to—or a right of reference to—Sanofi's clinical trial data.[8]

---

[8] The FDA has specifically defined "right of reference or use" in the context of clinical trial data in 21 C.F.R. § 314.3(b) as "the authority to rely upon, and otherwise use, an investigation for the

Under the FDA's regulations, information is only "newly acquired" if it is "data, analyses, or other information not previously submitted to" the FDA *and* reveals "risks of a *different type or greater severity or frequency* than previously included in submissions to FDA." 21 C.F.R. § 314.3(b) (emphasis added). This regulation implicitly requires drug manufacturers to analyze new information in context of what the manufacturer *already* knows about a drug—just like Sanofi did at the FDA's request in 2015. Accord lacked *both* the underlying clinical trial data (and thus an initial reference point) and new adverse event reports or scientific literature revealing risks of a "different type or greater severity or frequency" than those previously submitted to and considered by the FDA. It could not, for example, compare articles to Sanofi's clinical trial data, to which Accord lacked a right of reference. Consequently, while Accord implemented all of its post-market surveillance obligations by collecting, reconciling, and reporting literature and any adverse events to the FDA, nothing in the record or identified by Plaintiffs suggests that it could have initiated a CBE about permanent hair loss before Sanofi, which had the benefit of far more robust and comprehensive data.

At every turn, the FDA's regulation of Accord insisted that it follow Sanofi's lead, not the other way around. *See* Part II.B.1, *supra*. This is by design. The very purpose of the Hatch-Waxman Amendments, by which Congress codified § 505(b)(2), was "to balance the need to encourage innovation with the desire to speed the availability of lower cost alternatives to approved drugs." Ex. U, Citizen Pet. Resp. at 3–4. A drug like Accord's docetaxel is a perfect example of what Congress sought to accomplish—a lifesaving medicine brought quickly to market as a less expensive option for consumers precisely *because* Congress and the FDA, through

---

purpose of obtaining approval of an NDA, including the ability to make available the underlying raw data from the investigation for FDA audit, if necessary."

§ 505(b)(2) and its implementing regulations, created a path-to-market for drugs like docetaxel, which are the therapeutic and pharmaceutical equivalents of drugs that have *already* been proven safe and effective and studied through robust clinical trials. Accord could bring docetaxel to market in this way precisely because it could rely on what was already known about the safety and efficacy of Taxotere® as a foundation for its approval. This would not have happened if Accord would have been required to expend years' worth of resources on additional studies and clinical trials.

Plaintiffs have not put forward any evidence to suggest that it would even be *possible* for Accord to track down and analyze clinical trial data or adverse event reports from other manufacturers, including Sanofi.[9] And even if it could, placing a legal obligation on Accord to do so—which would be the logical result of concluding that Plaintiffs' failure-to-warn claims may proceed—would turn the § 505(b)(2) pathway on its head. Put simply, § 505(b)(2)'s core purpose contemplates that while there may be rare instances where a manufacturer may submit a CBE (for example, to caution about new information learned about an ingredient or formulation unique to the drug), in almost all instances the FDA expects a § 505(b)(2) applicant to follow the lead of the RLD on labeling. That is *exactly* how the FDA regulated Taxotere® and docetaxel, requiring Accord to match the RLD label to a granular level of detail lest Accord risk losing its A-rating for interchangeability.[10] Accord thus fulfilled its role in the process by conducting its own post-market

---

[9] The FDA did not launch a public dashboard for searching for adverse events submitted voluntarily by other manufacturers until September 2017. *See* FDA Adverse Event Reporting System (FAERS) Public Dashboard *available at* https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard (last visited Nov. 15, 2021).

[10] Accord would have risked losing its A-rating for interchangeability if it unilaterally changed its labeling. FDA guidance required Accord to adhere to the conditions of its NDA. *See* FDA Orange Book Preface (40th ed.), *available at* https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface (last accessed Nov. 10, 2021).

surveillance, reporting results to the FDA, and promptly updating its own label once the RLD (Sanofi) and the FDA instituted an updated warning for Taxotere®.

Allowing Plaintiffs to pursue a theory that suggests § 505(b)(2) manufacturers should change their label *before* the RLD on which their approval is conditioned would have serious consequences, both for the manufacturers and the FDA's regulation of generic drugs. If Plaintiffs were correct and state law could require a generic drug manufacturer to unilaterally change its FDA-approved label, that "would affect not only the labeling of the brand-name reference drug and every generic version of that drug, but also every brand-name [drug] in the same therapeutic class, together with every generic version of those brands . . . ." GPhA Amicus Br., 2011 WL 343069, at *28. If a generic manufacturer defies its sameness and follow-the-leader obligations and adopts new warnings, then the RLD and other therapeutically equivalent drugs would have an unlikely new leader—a manufacturer who did not conduct the safety and efficacy studies[11]—and would have to choose between the RLD's FDA-approved labels and multiple outlier labels, all without FDA guidance. Thus, as Representative Henry Waxman—one of the authors of the aforementioned Hatch-Waxman Amendments, acknowledged in his amicus brief for *Mensing* (albeit arguing against the Court's ultimate preemption decision):

> It is clear that a generic and brand-name label **must be the same** and that **a generic firm cannot unilaterally change its label**. To permit individual generic drug labels to differ significantly from their brand-name counterparts—particularly with respect to safety information—would thwart the "sameness" goal reflected in the Hatch-Waxman Amendments.

---

[11] As the GPhA Amicus Brief in *Mensing* explained, generic manufacturers are "just that— manufacturers, not inventors or testers." 2011 WL 343069, at *11. Generic manufacturers do not have access to the full range of information about a drug like the brand-name manufacturer: "The generic pharmaceutical market is, by congressional design, highly fragmented, with many competitors, any one of whom can possess only a small piece of the overall safety and therapeutic puzzle . . . . Only FDA can see the entire picture puzzle. . . ." *Id.* at *28.

Br. for Rep. Henry A. Waxman as Amicus Curiae Supporting Respondents, *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), 2011 WL 794113, at *14 (emphasis added).

## IV.   CONCLUSION

To apply the test for preemption in this case, this Court need only answer one question: could Accord independently change its docetaxel label to warn about the risk of permanent hair loss before the Plaintiffs began their chemotherapy regimens that included docetaxel —all more than a year before the FDA allowed the brand-name RLD to update its label? If it could not do so without "the exercise of judgment by a federal agency," then Plaintiffs' claims are preempted. *Mensing*, 564 U.S. at 624.

The record confirms that Accord could not have done so. The only means by which a § 505(b)(2) NDA holder can "independently" update its warnings is through the CBE regulation, and yet Plaintiffs have failed to identify newly acquired information that would have enabled Accord to use that pathway. That alone justifies summary judgment. In any event, the record of Accord's docetaxel approval confirms that it would have been impossible for Accord to update its docetaxel warnings before Sanofi updated its label for Taxotere® in December 2015—more than a year after the last of these Plaintiffs completed her treatment regimen.

No genuine issue of fact remains for trial. Thus, Accord respectfully requests that this Court GRANT its motion for summary judgment, and ENTER JUDGMENT in Accord's favor on the claims against it, and for any such other relief the Court deems appropriate.

Date: November 18, 2021                Respectfully submitted,

/s/ *Julie A. Callsen*
Julie A. Callsen
Michael J. Ruttinger
Brenda A. Sweet
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Telephone:    216.592.5000
Facsimile:    216.592.5009
Email: julie.callsen@tuckerellis.com
        michael.ruttinger@tuckerellis.com
        brenda.sweet@tuckerellis.com

*Attorneys for Defendant*
*Accord Healthcare, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2021, a true and correct copy of *Defendant Accord Healthcare, Inc.'s Memorandum in Support of Motion for Summary Judgment on Preemption Grounds* was filed with the Court via CM/ECF and notice was provided to all parties via the court filing system.


/s/ *Julie A. Callsen*
Julie A. Callsen

5347852