# EXHIBIT J

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3                          -  -  -
 4   IN RE: TAXOTERE          : MDL No. 2740
     (DOCETAXEL) PRODUCTS     : Section "H" (5)
 5   LIABILITY LITIGATION     :
                              :
 6   This Document Relates    : Judge Milazzo
     To:                      :
 7                            :
     All Cases                : Mag. Judge North
 8
 9                          -  -  -
10                      July 8, 2019
11                          -  -  -
12
13        Videotaped Deposition of SABITA NAIR taken
14   pursuant to notice, was held at Accord Healthcare,
15   1009 Slater Road, Suite 210B, Durham, North Carolina,
16   commencing at 9:10 a.m., on the above date, before
17   Karen Kidwell, Registered Merit Reporter, Certified
18   Realtime Reporter.
19
20                          -  -  -
21
22
23
24             GOLKOW LITIGATION SERVICES
            877.370.3377 ph| 917.591.5672 fax
25                   deps@golkow.com
```

### Page 18

1  broad.
2      THE WITNESS: Could you specify that?
3  BY MR. GOMEZ:
4      Q. What pharmacovigilance processes have you
5  created that apply to your docetaxel product?
6      MS. CALLSEN: Objection. Again, I just
7      want to clarify. You mean apply to docetaxel
8      versus any other product?
9      MR. GOMEZ: Yes.
10     MS. CALLSEN: Is there -- are there any
11     processes that you've put in place that apply to
12     docetaxel any different from any other product?
13     THE WITNESS: No.
14 BY MR. GOMEZ:
15     Q. Okay. Then describe all of your
16 processes.
17     A. The -- in general, right?
18     Q. Yes.
19     A. So we have processes in place where we --
20 we have systems in place to capture reports of
21 adverse events or product complaints that relate to
22 any of Accord's products. That includes docetaxel.
23 And we have systems in place to document those
24 reports and to evaluate them medically, or from a
25 quality perspective, and eventually to submit them to

### Page 19

1  the FDA.
2      Q. Okay. And -- and why -- why do you have
3  those processes in place?
4      A. Those are part of our responsibilities
5  that an ANDA or NDA holder has with respect to those
6  submissions, a commitment to the FDA, as an online --
7  as an ongoing management of -- of a product.
8      Q. And so do you believe that with regard to
9  a 505(b)(2) product that you put on the market, that
10 you have an ongoing duty to alert the FDA to adverse
11 events involving that product?
12     MS. CALLSEN: Objection to form.
13     THE WITNESS: Accord's responsibilities
14     lie in handling all pharmacovigilance
15     responsibilities or duties that pertain to a
16     particular product, and those are taken care of
17     by Accord.
18 BY MR. GOMEZ:
19     Q. And does that include docetaxel as a
20 505(b)(2) drug?
21     A. Yes.
22     Q. And so I've seen somewhere a reference to
23 a company called Lambda.
24     A. Yes.
25     Q. What is Lambda?

### Page 20

1      A. Lambda is a contracted organization,
2  Accord has contracted Lambda to perform its safety
3  evaluation as part of its pharmacovigilance
4  responsibilities.
5      Q. Okay. And what does Lambda do separate
6  than what Accord does?
7      A. Lambda is involved in evaluating the
8  safety reports that we receive, that Accord receives
9  from the market. Lambda puts into place a review
10 process, and eventually Lambda arranges for
11 submission of those reports to the FDA on behalf of
12 Accord.
13     Q. And so how does Accord receive adverse
14 reports?
15     A. Accord can receive adverse reports through
16 multiple means. They could receive reports via phone
17 call. They could receive reports via e-mail. And
18 they could receive reports via post.
19         So Accord has put into place systems
20 where -- one of the systems is Accord has contracted
21 with a call center, PPG, Pro Pharma Group. It's --
22 it's called PPG. It's a call center. And this PPG
23 company would receive calls on behalf of Accord,
24 would arrange for follow-ups for additional
25 information from different reporters, from reporters

### Page 21

1  of a particular event, and would transfer those
2  information to Accord.
3      Q. Okay. And so you said the company's
4  called PPG?
5      A. That's right.
6      Q. Does that stand for something?
7      A. Pro Pharma Group. It's an abbreviation
8  for Pro Pharma Group.
9      Q. Proforma Group?
10     A. Uh-huh.
11     Q. So it's PFG?
12     A. PPG, Pro Pharma, P-h-a-r-m-a.
13     Q. Oh, Pro Pharma?
14     A. Yeah.
15     Q. I'm sorry. And where is that located?
16     A. It's in Kansas.
17     Q. And they've established a call center for
18 you?
19     A. Yes.
20     Q. And have you provided them particular
21 protocols or procedures about how they should handle
22 calls involving your products?
23     A. Yes. Pro Pharma Group is comprised of
24 medical people, including pharmacists. So they --
25 they have copies of our package insert. They have

Page 62

1 listed drug?
2    A. Can you say that again?
3    Q. It was a long question.
4       So based upon your experience, was there
5 some rule against you, Accord, bringing to the
6 attention of the FDA possible side effects of a drug
7 you were bringing to market that were not included in
8 the package insert?
9       MS. CALLSEN: Objection to form.
10      THE WITNESS: I'm not aware of the
11   presence or absence of any such rule, I would
12   say.
13 BY MR. GOMEZ:
14   Q. Is that something you've ever done as a
15 company, said, "Hey, you know, we've become aware
16 through our global presence of these possible side
17 effects with drugs, but they're not listed in the
18 reference listed drug's package insert"?
19      MS. CALLSEN: Objection to foundation.
20      THE WITNESS: Specifically what we would
21   do as part of our postmarket pharmacovigilance
22   responsibilities would be to submit periodic
23   adverse drug reports, which would contain
24   information from -- from all over the -- all
25   over the globe, and including reports from the

Page 63

1  United States, that describe docetaxel. And all
2  of that information would be submitted to the
3  FDA on a routine basis.
4     So we do inform FDA of all the reports
5  that come to us, on a routine basis, we are --
6  the periodic adverse drug report, PADERs.
7 BY MR. GOMEZ:
8    Q. And you do that on a postmarket basis,
9 once you actually bring the drug to market?
10   A. That's right.
11   Q. Because, as we talked about earlier, you
12 recognize that that's your responsibility, even as a
13 505(b)(2) company?
14   A. That's right.
15   Q. I guess 505(b)(2) product.
16   A. That's right.
17      MR. GOMEZ: So I'll mark -- what are we up
18   to? Next one will be 6.
19      (Exhibit 6 was marked for identification.)
20 BY MR. GOMEZ:
21   Q. Here you go. I have one extra.
22      Take a look at 6, if you would.
23   A. Yes.
24   Q. Do you generally recognize what that is?
25   A. Yes, I do.

Page 64

1    Q. And what is that?
2    A. It's an e-mail from a member of Lambda,
3 and it describes docetaxel PADERs.
4    Q. Essentially, this person is requesting
5 data and information to include in the docetaxel
6 PADER?
7    A. That's right.
8    Q. And that person, Janki Malli, is that
9 someone you work with?
10   A. I have worked with -- I guess -- the
11 document says 2014, so she would have been there at
12 that time.
13   Q. Okay. Do you recognize that as a person
14 that compiled some of the docetaxel PADERs?
15   A. It appears to be so, yes.
16   Q. And it's addressed to Kanishka?
17   A. That's right.
18   Q. Who -- is that one of the people you named
19 earlier?
20   A. I have not named him, because he's no
21 longer with the group.
22   Q. I see.
23   A. He was working with -- he was one of the
24 members of the Accord Group at that time.
25   Q. So he's no longer with Accord?

Page 65

1    A. He's no longer with Accord.
2    Q. Thank you. And I think you did name Shail
3 Shah earlier?
4    A. That's right.
5    Q. Can you remind me where that person works?
6    A. He works here, in the -- yes, in this
7 office.
8    Q. Okay. Very good. And then there's a CC.
9 It says "Accord." Is there -- is that an independent
10 e-mail, like Accord, like a group e-mail?
11   A. I --
12   Q. Or you don't know?
13   A. I don't know, no.
14   Q. No problem. And then Rakesh Barmy, where
15 is that person?
16   A. He is associated with Lambda.
17   Q. Okay. And then Harleen Bedi, where does
18 that person work?
19   A. They all seem to be associated with Lambda
20 or Accord.
21   Q. Right. So does Harleen Bedi work for
22 Accord?
23   A. Not for Accord Healthcare Inc.
24   Q. For Accord generally?
25   A. Could be. I'm not aware of this

Sabita Nair

Page 86

1  ability to do that, as a drug company?
2     A.  I don't think so.
3     Q.  So you think that there's some law that
4  prohibits you from updating your label before the
5  manufacturer of the reference listed drug does so?
6     A.  We do --
7        MS. CALLSEN:  Objection to form.
8        THE WITNESS:  We do -- we do understand
9     that we need to rely upon the RLD's labeling for
10    -- with respect to updating our own labeling
11    information as far as the -- the indication,
12    safety, et cetera, information is concerned.  We
13    do update our labels when it comes to
14    administrative information or some information
15    that's specific to our formulation.
16 BY MR. GOMEZ:
17    Q.  And so assume that with your
18 pharmacovigilance and adverse drug events, that
19 you're noting a side effect such as permanent
20 alopecia, do you believe that you do not have the
21 ability to change your label to warn of that side
22 effect until the reference listed drug manufacturer
23 does so?
24    A.  Our responsibility lies in informing FDA
25 about that -- that information that has come to us,

Page 87

1  and we do that, via the PADERs.  So we do inform FDA
2  about that information, and we -- we rely on FDA's
3  decision to change the label.  And once that happens,
4  we change our own labels.
5     Q.  Okay.  And so you believe that essentially
6  your responsibility is to provide the data to the FDA
7  and then wait to determine if they order a label
8  change?
9     A.  That's right.
10    Q.  And so how do you come of that
11 understanding?
12    A.  I didn't get that question.
13    Q.  Let me ask it a better way:  Why do you
14 believe that to be the case?  Why do you believe that
15 as the manufacturer of a drug, that you don't have an
16 independent duty to update your label to warn of side
17 effects?
18    A.  And that's because -- one of the reasons
19 being -- I'm -- I'm still not sure if I understood
20 the completeness of your question, but one of the
21 reasons would be we -- the -- as a sponsor of a
22 505(b)(2) or a 505(g), we rely on the RLD information
23 for safety and efficacy.  So we would rely to -- on
24 the RLD information to begin with, and so we would
25 continue to rely on that information going forward.

Page 88

1     Q.  And so you believe that the -- is there
2  any internal analysis of the adverse drug events and
3  literature searches that you receive?  That is, does
4  Accord look at that data, or simply pass it along to
5  the FDA?
6     A.  We do -- we do -- we do weekly
7  reconciliations of all reports that we receive for
8  that particular week.  We do monthly reconciliations
9  with Lambda.  We -- Accord has a summary of all the
10 information that is -- that is received for each
11 product.  And Accord, in itself, would -- I also
12 present that information to the -- to the senior
13 management, notifying them that these reports were
14 received.  And we -- as part of Accord's
15 responsibility, we make sure that Lambda reports
16 these events in appropriate formats, and that they
17 are submitted on a timely basis to the FDA.
18    Q.  And so I think you said that you have
19 these reconciliation meetings, and then you make
20 reports to senior management?
21    A.  That's right.
22    Q.  When you say "senior management," who
23 would that be?
24    A.  The senior management at Accord.
25    Q.  So who is that?

Page 89

1     A.  It would be a group of people.  We -- we
2  have weekly meetings, and we would -- as part of my
3  responsibility, I would summarize the information
4  that we have received for that particular week, and
5  we -- I would inform the group.
6     Q.  And do you ever remember providing them
7  information about persistent or permanent alopecia in
8  patients using docetaxel?
9     A.  Again, not specifically.  I -- I would
10 have done that for all molecules, and I -- we
11 consider all adverse events.  We take it seriously,
12 each and every adverse event we receive.
13       So I wouldn't want to single out a
14 specific product or specific molecule here, but
15 that's been our policy, that we would look at all the
16 adverse events we receive.  We do the reconciliation
17 for all molecules, including docetaxel, as it comes
18 for -- on a weekly basis.
19    Q.  Do you provide that in a written report?
20    A.  Yes.
21    Q.  And is that weekly, you said?
22    A.  It is weekly, and we also have a monthly
23 reconciliation with Lambda, to make sure that we have
24 covered all adverse events.
25    Q.  Okay.  And so do you believe -- I'm not