# EXHIBIT K

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\- - -

IN RE: TAXOTERE : MDL No. 2740
(DOCETAXEL) PRODUCTS : Section "H" (5)
LIABILITY LITIGATION :
:
This Document Relates : Judge Milazzo
To: :
:
All Cases : Mag. Judge North

\- - -

October 7, 2019

\- - -

Videotape Rule 30(b)(6) deposition of Accord Healthcare Inc. by SABITA NAIR taken pursuant to notice, was held at Accord Healthcare, 1009 Slater Road, Suite 210B, Durham, North Carolina, commencing at 1:01 p.m., on the above date, before Karen Kidwell, Registered Merit Reporter, Certified Realtime Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

BY MR. GOMEZ:

Q. And so assume that there's literature out there dealing with hair loss -- that is, permanent hair loss -- caused by the use of docetaxel. Do you believe that Accord has an obligation to review that literature?

A. Again, I'm reading a question as being an assumption. So if I -- if follow that question to its entirety, if it's an assumption, the assumption would be that if it's a literature report that talks about an adverse event, that would have been captured in the literature survey that Accord would have done on behalf of -- Lambda would have done on behalf of Accord Healthcare, Inc.

Q. Okay. And so you believe that's information that Lambda would have captured for you?

A. Yes.

Q. And have you seen any such literature, or heard of any such literature, before this lawsuit?

A. Again, I'm -- I'm basing my response as assumption because you started it off as an assumption. So I'm assuming that if it's part of a literature, it would have been. But I do not have specific instances of actually having seen that.

Q. Okay. Thank you so much.

And so, prior to this lawsuit, did you know that there were reports that the use of docetaxel could cause permanent hair loss?

A. Again, not specifically, because I would not have followed each molecule specifically. But as it pertains to receipt of adverse events, we would have looked at all of the adverse events that came in for a particular molecule and would have processed it according to our procedures.

Q. And so let me ask it this way, because you are here as a corporate representative.

A. Yes.

Q. Prior to this lawsuit, did Accord have any knowledge that the use of its docetaxel product could cause permanent hair loss?

A. Accord's knowledge of all adverse events for docetaxel, including hair loss, would have come from the updates that the RLD Taxotere would have made on their labels. So that's -- that's the source of information that Accord would have had for docetaxel.

Q. And so prior to Taxotere changing its label, then Accord had no information that the use of its own docetaxel product could cause permanent hair loss?

A. Not specifically.

Q. At all, that you're aware of?

A. I'm not aware of.

Q. Okay. So you're not aware of any knowledge that Accord had that the use of its docetaxel product could cause permanent hair loss before Taxotere actually changed its label, true?

A. True.

Q. Okay. Thanks. And so I -- I know -- and we'll get into these topics later, but Accord has this relationship with Lambda. And is it Lambda that performs the actual pharmacovigilance relating to Accord's docetaxel product?

MS. CALLSEN: Objection to form.

THE WITNESS: Again, what do you mean by "pharmacovigilant"?

BY MR. GOMEZ:

Q. Let me ask it this way: What -- what do you do in-house -- that is, Accord -- what -- what pharmacovigilance does Accord do in-house relating to its docetaxel product?

A. Accord has, to begin with, contracted the safety reporting functions with Lambda, and has also contracted safety reporting functions -- safety management functions with PPG, our call center.

Those are the four steps that Accord has taken to take care of pharmacovigilance obligations.

And during the -- during the -- the business of handling pharmacovigilance, Accord is responsible for -- Accord is in the position to receive reports from consumers, is in a position to receive reports via different forms, such as e-mails, phone calls, letters, et cetera. And we would coordinate that with Lambda and PPG to make sure that our obligations are met.

Q. Okay. With respect to the PADERs reports, Lambda prepares those?

A. Yes.

Q. And then do you submit them under your name?

A. It is submitted under Accord Healthcare, Inc.

Q. And does Accord Healthcare, Inc. ever make changes or suggest changes to the PADERs reports that Lambda prepares?

A. It's a general question. We typically do not, unless there is some information that is required to be changed. But otherwise we believe that Lambda is the safety expert, and Lambda -- Lambda has safety experts who would have prepared the

PADERs, because the PADERs contain medical evaluation of cases.

Q. Okay. And as you sit here today, who would be the person that would review the PADERs reports that came in relevant to your docetaxel product?

A. We would -- Accord Healthcare, Inc. would look at the PADERs.

Q. And who in Accord Healthcare, Inc.?

A. The members of my team, under my direction.

Q. Was any particular person in charge of that?

A. The entire team was involved in pharmacovigilance, would be doing it. There's no individual person who would specifically look at docetaxel.

Q. Did you ever look at the PADERs reports relating to docetaxel?

A. Yes, I would have.

Q. You believe you did?

A. Yes.

Q. And did -- did Accord ever make any suggestions or recommendations for any change to any of the PADERs reports relating to docetaxel?

A. No.

Q. Can you describe to us the level of analysis that Accord undertakes with regard the PADERs reports that it receives from Lambda?

MS. CALLSEN: Objection to form.

THE WITNESS: Yeah, could you specify what you mean by "level of analysis"?

BY MR. GOMEZ:

Q. Right. So other than putting your name on it, what does Accord do to the PADERs report?

A. We look at the report. We review the contents. And we also provide the packaging -- prescribing information leaflet to Lambda, on the basis of which they would make changes, revise or create the PADERs.

So we would also look at the report -- the cases that have been listed in the PADERs and make sure that they are reconciled with the cases that we have received. So we look at the accuracy of the case information contained in those PADERs.

Q. And how long does that process, on average, take a member of Accord?

A. It's a very general question. It would depend upon the PADER. It would depend upon the molecule. But it would be anywhere from a couple

days to a week.

Q. And is there e-mail correspondence during that time between Accord and Lambda?

A. There could be. Again, it's a general question, but -- not specifically to docetaxel, but in -- as a general procedure, there would be e-mails, because we correspond via e-mails.

Q. Is that your general mode of communication between Accord and Lambda, e-mail?

A. General e-mail as well as phone calls, as the cases -- as the need -- need arises.

Q. And as it relates to docetaxel, is it Lambda (United Kingdom) or Lambda (India) that performs the pharmacovigilance?

A. As it relates to Accord Healthcare, Inc., it's both of these entities.

Q. Are you able to identify one that was primarily in charge of docetaxel?

A. No.

Q. Okay. And so I think we went through -- and you said you reviewed your testimony and it was correct -- the sort of people employed by Accord Healthcare, Inc. in regulatory and pharmacovigilance.

So I think I have that part. So let me go to the next topic. I think I'm okay with that one,

too.

Let me mark, actually. This will be Exhibit 3.

(Exhibit 3 was marked for identification.)

BY MR. GOMEZ:

Q. And so what are we looking at? What is Exhibit 3?

A. The document reads, a signal management report, and it seems to have been created by -- I don't see who it was created by.

Q. This -- on the front is a Dr. Vivek Nanda?

A. Yeah.

Q. Who is that person?

A. His title reads as medical reviewer.

Q. Is that a -- do you recognize that to be a person employed by Lambda?

A. I do not specifically know this individual, but I'm making an assumption that he would have been employed by Lambda.

Q. Okay. And so remind me -- maybe you testified to this already, but why did -- it says "MAH Accord Healthcare Limited." What is Accord Healthcare Limited?

A. That is the European entity of Accord Healthcare.

and make a recommendation as to necessary label changes to the FDA?

MS. CALLSEN: Objection to form. Had so many terms packed in that one question.

MR. GOMEZ: If you want to read it back.

(Whereupon the Court Reporter read the previous question.)

THE WITNESS: So is that -- is that a question? I don't think so.

BY MR. GOMEZ:

Q. Why is that?

A. Because we believe that the information that Accord has from their own products would be just a -- a small portion of the information that otherwise FDA would receive from all applicants, including the innovator product. So it is -- it is easier for the agency and more thorough and efficient for the agency to make that recommendation, as compared to Accord making the recommendation out of its small data set.

Q. Are the PADERs reports submitted by other 505(b)(2) companies and the reference listed drug manufacturer available to Accord?

A. No.

Q. You can't get those?

A. We have never attempted to find out if we can get it or not.

Q. You haven't asked?

A. No.

Q. Would you agree that a drug label must contain language that accurately informs prescribing physicians as to common adverse events?

A. Are you reading it from some text which I should look at? I'm not even --

Q. No, I'm --

A. -- is that -- so can you --

Q. I'm reading it from an outline.

A. Can you repeat that, please?

Q. Sure. Does Accord agree that a drug label must contain language that accurately informs prescribing physicians as to common adverse events?

A. Yes. That is the general definition of labeling.

Q. And Accord agrees that a drug manufacturer must warn about common side effects that are known to the manufacturer at the time of distribution?

A. Yes.

Q. And Accord agrees that a warning is inadequate if the manufacturer fails to warn about

common side effects that were known at the time of sale?

MS. CALLSEN: Objection to form.

THE WITNESS: Accord believes that the label that accompanies Accord's products should be compliant with FDA -- FDA-approved labeling at the time of the product distribution. So Accord understands that if that is the case, Accord would have been up to date with the warnings and side effect information available for that particular product.

BY MR. GOMEZ:

Q. And Accord agrees that if its product label is incomplete or misleading, then it should correct the label?

MS. CALLSEN: "If."

THE WITNESS: Yeah. It's based on an assumption that there would be incomplete or incorrect information on Accord's label.

BY MR. GOMEZ:

Q. Then Accord agrees it would have an obligation to correct the label?

A. On the assumption that there is incomplete information.

Q. So yes?

A. Yes.

Q. And I think we talked about this before, but Accord recognizes that an important reason for its labels are to inform physicians so they can in turn inform their patients?

A. That is a definition of a prescribing information leaflet. It is intended for the prescribers.

Q. So yes?

A. Yes.

Q. And Accord agrees that's important so that patients can make choices about the drugs they take?

A. That is not Accord's understanding.

Q. And what --

A. That's not Accord's position to take.

Q. What do you mean by that?

A. Accord's -- Accord's responsibility is to provide the prescribing information leaflet along with Accord's product. What decision the patient or consumer would take would depend upon the discussion between the patient and/or consumer and their prescribers. Accord cannot make a statement as to what the consumer should or should not do.

Q. Sure. But Accord recognizes that the reason it's important to provide accurate information

Q. What does it say at the top? "Hi" --
A. "Hi, Samir."
Q. Yes. And there's a reference to the promotional materials or package insert that Accord was using in the UK. Do you see that?
A. I read that.
Q. And so is that type of information -- that is, information related to products sold by Accord entities in other countries -- is that readily available to you here at Accord Healthcare, Inc.?
A. I am not sure. What do you mean by "readily available"?
Q. Is -- well, here, basically, you're getting ready to launch in the U.S., right --
A. Uh-huh.
Q. -- as you read this?
A. It does not say so specifically. I'm making an assumption here.
Q. Right. There's -- one of the e-mails says, "I hope you're doing well. We're getting close to bringing docetaxel in" --
A. Can you --
Q. -- "the U.S. market."
A. Can you tell me where that is?
Q. Page 6.

A. 6? Yes.
Q. From Grace?
A. Yeah. We're looking at that e-mail?
Q. Yeah.
A. Okay.
Q. Grace Shen, at intaspharma.com?
A. Uh-huh.
Q. Do you see that?
A. Yeah.
Q. And are you -- what's your e-mail again? Is it intaspharma?
A. That's right.
Q. And so here they're getting ready to bring it to market in the U.S., and they're looking at the UK insert.
A. Where does it say that they're looking at the UK insert?
Q. On the back. Page 8. Or maybe the UK package.
A. I do not know what it means by "Taxotere LBL." I do not know what that means, so I do not want to make assumption that it means the prescribing information leaflet.
Q. Okay.
A. I have no idea what "LBL" means.

Q. Do you -- does Accord look at -- does Accord look at products, including labels, from Accord products in other countries?
A. Not that I'm aware of. Not as a general procedure.
Q. That's not something you generally do?
A. No.
Q. Okay. All right. Well, let me huddle again. You can have whatever communications you guys want to. Emily's going crazy on something.
MS. KING: No, it's just -- just me.
MR. GOMEZ: I guess.
Yeah, we're off the record.
VIDEOGRAPHER: Off record at 3:36 p.m.
(A recess transpired from 3:36 p.m. until 3:39 p.m.)
VIDEOGRAPHER: On record at 3:39 p.m.
MR. GOMEZ: Oh, so I'm all done. I'll pass --
MS. CALLSEN: Oh, you are?
MR. GOMEZ: -- the witness. Yeah, I'm sorry.
MS. CALLSEN: I'm sorry.
MR. GOMEZ: I'm sorry. I --
MS. CALLSEN: No. Oh, okay.

MR. GOMEZ: I saw you making copies out there. I thought you were ready to go.
MS. CALLSEN: No, no, I'm not quite ready to go. I've got to grab my copies. I'm so sorry.
MR. GOMEZ: Oh, I'm sorry.
MS. CALLSEN: I should have asked you before. Okay.
MR. GOMEZ: It was -- I was being stupid.
MS. CALLSEN: All right.
MR. GOMEZ: Yeah.
MS. CALLSEN: No, I'll grab my copies.
VIDEOGRAPHER: Off record at 3:40 p.m.
(A recess transpired from 3:40 p.m. until 3:47 p.m.)
VIDEOGRAPHER: On record at 3:47 p.m.

EXAMINATION

BY MS. CALLSEN:
Q. Good afternoon, Ms. Nair. I'm going to ask you some follow-up questions.
First of all, I'm going to put in front of you a standard operating procedure which was used at your initial deposition. And can you read off the title to that standard operating procedure.
A. Yeah.

MS. CALLSEN: I gave you -- here is your copy.
MR. GOMEZ: Oh, thank you.
THE WITNESS: "Procedure for the Compilation and Submission of Post Marketing Periodic Report of Adverse Drug Experiences For Marketed Prescription Drug Products."
BY MS. CALLSEN:
Q. And is this the SOP that Accord put in place with respect -- that -- that you would refer to with respect to PADERs?
A. That's right.
Q. Okay. Could you take a look at the SOP, and refer us to the section specifically on the PADERs -- well, I guess which would start on "Background," correct?
A. Yes.
Q. Okay.
A. It -- it --
Q. So just -- you don't have to read it out loud, but what -- just give me a summary of what the background is.
A. It just describes whom Accord has contracted with and what's the whole purpose of this -- this document, which is -- is to explain the

background to the document, background to the pharmacovigilance operations.
Q. Okay. And it states that Accord has contracted with Lambda --
A. Right.
Q. -- correct?
A. Right.
Q. For the screening of worldwide published literature, correct?
A. Yes, that's right.
Q. And -- and for Lambda to maintain a global safety database for --
A. Accord's --
Q. -- Accord's approved products --
A. That's right.
Q. -- correct? Okay. And then if we turn to the next page, page 3.
Okay. Yeah. Under "Procedure," it lists the intervals --
A. Yes.
Q. -- for -- can you just read that into the record.
A. "The post marketing periodic reports shall be due quarterly for the first three years after U.S. approval of the application and annually thereafter.

The post marketing periodic reports submission schedule for Accord's approved products is enclosed as an attachment."
Q. So earlier today, we marked all the periodic adverse event -- well, I guess it's periodic adverse experience reports --
A. Uh-huh.
Q. -- excuse me. And some of them were quarterly, correct?
A. Right.
Q. Okay. And is that pursuant to this requirement here?
A. Yes.
Q. Okay. And then they were -- now they're annually; is that right?
A. That's right.
Q. Okay. And I put in front of you Exhibit 26, which is the annual report, the reporting period from June of 2015 --
A. Right.
Q. -- through June of 2016, correct?
A. Right.
Q. And how many pages is that report? You can take the rubber band off. Oh, I guess you did.
A. Yeah, it says -- it says 222 pages.

Q. Okay. And can you review with us some of the types of reports that are in there?
A. Right. It -- it describes in the table of contents, to begin with, the -- the type of reports. So basically it would be 15-day reports. It would be general 15-day, non-15-day reports by classification of the seriousness, labeling, et cetera.
So all of that information, including any actions that have been taken, then listing of non-15-day reports, and which would -- which would also include all literature information. So that would be the summary of the --
Q. The literature information?
A. Yes.
Q. Okay. And you said that this is prepared by Lambda --
A. Yes.
Q. -- correct?
A. Yes.
Q. Okay. Can you turn to some of the reports that are summarized by Lambda, and tell me some of the countries from which those reports are from.
A. So if you see page 7 of 22, you will see a report describing an event from Germany. It's a literature report from Germany, and that describes --

Q. And is the analysis set forth there, is that -- is that Lambda's analysis there?
A. Yes. The -- the analysis is Lambda's, and so you would -- there would be information on this report in different table -- tabular formats, the rest of the document.
But this analysis is from Lambda. So Lambda analyzes each report and provides its own summary of -- and its own comments on what it understands out of the medical evaluation.
Q. Okay. And so -- and that narrative summary goes through page what?
A. Yes.
Q. And what -- how long is that narrative summary?
A. So, summary is about half a page.
Q. No, I meant the entire narrative. Because you said it's reflected in table form then?
A. Yes.
Q. Okay.
A. So -- so it's -- it's reflecting different portions of the -- of the application, depending upon what kind of report this is. So . . .
Q. Well, give me an example of some of the countries.



A. If you see, there's -- there's -- we saw Germany. Then there's Italy. Then, if you see -- let's see. Poland. Croatia -- sorry, South Korea. There are reports from U.S., too.
Q. Okay.
A. Morocco.
Q. Morocco?
A. Uh-huh. France. Czechoslovakia. Italy again. India.
Q. And what page does the table -- do the table summaries start in that report?
A. It starts from page 158. It lists all the reports -- so you will see the country, the source of origin: France, Czechoslovakia, Italy.
Q. And what events are listed?
A. This particular table talks about the 15-day reports.
Q. Okay.
A. So this goes on and on.
Q. And just take us to the next section, once the next section starts, and just describe what's reported there.
A. Then there's the summary of the report in itself. It describes how, depending upon the -- for example, this title talks about the number of adverse



experiences by body system, seriousness, labeling, geography, distribution. So that goes on. And it describes in detail the serious unlabel, serious label.
So it's a summary of all the studies -- reports that have been here. They summarize it from a different context, in terms of seriousness, nonseriousness, et cetera. Labeled, unlabeled.
Q. Okay.
A. So the events that have not been labeled would also be reflected in this PADER.
Q. Okay. And take us to the next section, or the next table.
A. Yeah. So then there is -- this table talks about 15-day, non-15-day reports by classification of seriousness. These are all labels -- tables as defined by FDA guidance on --
Q. Okay. And I was just going to say --
A. -- PADERs.
Q. Go on.
A. FDA's guidance. And then there's a listing of lack-of-efficacy cases. Again, you break -- break up all of the reports into a different category, which is lack of efficacy. Then list of non -- most suspect drug reports.



So in which case the suspect drug is not docetaxel; however, docetaxel is one of the concomitant medications. So you would find instances of other drugs in the report. In this case, it has anastrozole, gemcitabine, fluorouracil, cisplatin. So all of the oncology medications would find reflection here, because they would have been used concomitantly with docetaxel.
Then you have the other sections, which talk about the warnings and precautions, adverse reactions, to match with what is on the prescribing information leaflet for the U.S.
Q. And all this, Lambda compiles based on the database it maintains, correct?
A. Yes. Based on the reports that they receive from us, from their own databases, from -- from the rest of the world, in terms of other Accord entities. All of these reports would be -- would be -- would be found here, in this -- in this document.
Q. Okay. Now, I want -- yeah, go ahead and put that all back together, please.
A. Yes.
Q. And how do you know that Accord is doing -- that Lambda is doing its job?

A. So we -- like I mentioned earlier in the deposition, we do have auditing functions, that Accord audits Lambda. In addition to that, Accord also has this compliance monitoring of functions that Lambda performs for us. And in this context, we do -- we have an SOP that outlines what we exactly do in terms of monitoring Lambda's functions. So if there --
Q. Okay. Just back up for a second. So I've -- I've put in front of you Exhibit 28.
(Exhibit 28 was marked for identification.)
(Exhibit 29 was marked for identification.)
BY MS. CALLSEN:
Q. And that's a standard operating procedure, correct?
A. Yes.
Q. Okay. So read the title of that SOP.
A. "Procedure for Compliance Monitoring of Pharmacovigilance Functions."
Q. Okay. And so this is -- you are monitoring Lambda for compliance with --
A. The pharmacovigilance functions.
Q. Okay.
A. And what we do here is, as -- as indicated earlier, Lambda reports -- Lambda submits 15-day

reports after its evaluation. Lambda submits PADERs quarterly and annually. So we do have a system of reconciliation of all these reports on a weekly basis. And once -- once Lambda submits these reports, we have a reconciliation on a monthly basis, in the sense we -- we find out the compliance metric. If there are any late cases, if there are any questions that we have for Lambda, we have a monthly reconciliation process where we get into a call with them. We go through the process. We understand the deviations if they have -- if there are any. We discuss CAPAs, the corrective and preventative actions, et cetera.
So all of these are outlined in our -- in Accord's function as a compliance -- Accord's function of monitoring compliance of Lambda's responsibilities.
Q. And that's outlined in that SOP in front of you?
A. That's right.
Q. Okay. And the reconciliation reports that you discussed -- and I think you also testified about those last time during your deposition -- are those reports that Lambda receives from -- like spontaneous reports from calls, or -- or you receive? I mean,

tell me what reports you're actually looking at here.
A. All of them. So --
Q. Including literature reports?
A. It is -- okay. So the 15-day reports go from our side to Lambda, so that was part of the reconciliation. The literature reports would be part of the PADERs. So when we say -- if the PADER has not been submitted on time, if there's a delay or if there are any questions in the PADER, those would capture the literature reports.
When Accord submits reports to Lambda through our PPG, or through our e-mails or phone calls, those would be spontaneous reports. So all of those reports would find mention in the reconciliation that we do monthly. The weekly reconciliation would simply have the spontaneous reports that we receive. The monthly reconciliation with Lambda would include everything, which would be a check on their compliance metrics.
Q. And at my request, did you look through all the reconciliation reports with Lambda from 2011 through 2016?
A. Yes.
Q. And were any of those reconciliation reports dealing with docetaxel and alopecia?

A. No.
Q. Okay. Next -- I'm switching gears on you -- there were three FDA guidance documents that you also reference that you use as reference, correct?
A. Yes.
Q. That you also told me that you use as reference, correct?
A. Yes.
Q. Okay. And I've marked 30, 31.
(Off record discussion.)
(Exhibit 30 was marked for identification.)
(Exhibit 31 was marked for identification.)
(Exhibit 32 was marked for identification.)
COURT REPORTER: 30, 31, and 32.
BY MS. CALLSEN:
Q. Okay. So let's look first at the -- the -- no, not the 30. Let's look at 31 and 32. Those have the same title, don't they?
A. Yes.
Q. Okay. So what's the difference between 31 and 32?
A. One is a draft guidance, and the other is a final document.
Q. Okay. Can you tell me what the title is?