# EXHIBIT V

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In Re: TAXOTERE (DOCETAXEL)**
**PRODUCTS LIABILITY LITIGATION**

**Case No. MDL 2740**

**Expert Report of David Ross, M.D., Ph.D., M.B.I.**

**CONFIDENTIAL**

## I.      INTRODUCTION

### A.      Consultation questions

1.      I have been retained by the In Re: TAXOTERE (DOCETAXEL), MDL 2740, Plaintiffs' Steering Committee to serve as an expert witness in connection with three trials currently scheduled in the multi-district litigation consolidated in the US District Court for the Eastern District of Louisiana: (i) Alice Hughes (2:17-cv-11769); (ii) Dora Sanford (2:17-cv-09417); and (iii) Wanda Stewart (2:17-cv-10817).[1]  In connection with these three trials, and more broadly with the Taxotere (docetaxel) Multi-District Litigation, I have been asked to provide opinions regarding the regulatory obligations of drug manufacturers for products approved under Section 505(b)(2) of the Food, Drug, and Cosmetic Act (FDCA), including those related to pharmacovigilance and safety reporting; whether such manufacturers have labeling obligations, particularly with respect to safety and label updates, independent of the holder of the NDA on which their approval relies; and whether the actions of the defendants herein in these three trials (Accord, Sandoz, and Hospira) met those regulatory obligations with respect to labels for their respective docetaxel products marketed in the United States.  I offer the following opinions based on my regulatory, scientific and clinical training, knowledge, and experience in reviewing and evaluating drugs, labels, and compliance with the applicable regulations.

### B.      Professional background and qualifications

2.      I am a physician whose medical career, research, and publications have centered on public health and patient safety.  I served as a medical officer at the FDA from 1996 to 2006 in various positions of increasing responsibility, as more fully outlined in my attached curriculum vitae.  My duties during this time included determining whether products regulated by the FDA that were marketed or proposed for marketing in the United States met the scientific and regulatory standards required for marketing.  They also included recommending, and in some cases, deciding on regulatory actions, including enforcement, based on such determinations.

---

[1] The opinions set forth in this report relate only to these three cases.  I reserve the right to review these consultation questions in the context of other cases at both earlier and later dates.  I also reserve the right to supplement this report should additional documents or information be made available.

**CONFIDENTIAL**

3.      I have lectured, written, and presented extensively regarding the approval of new drugs, regulatory issues related to safety and effectiveness, clinical trial design, conduct, analysis and interpretation, safety and effectiveness, and risk/ benefit analysis.  I have also testified before the U.S. Congress on these issues.

4.      I began my tenure as a medical officer at the FDA in 1996, serving as a primary medical reviewer in the Division of Anti-Infective Drug Products (DAIDP) within FDA's Center for Drug Evaluation and Research (CDER). I subsequently advanced to the position of Senior Medical Reviewer in DAIDP, and then was promoted in 2000 to Medical Team Leader in DAIDP, while continuing to hold the title of Senior Medical Reviewer. In 2004, I became Deputy Director of the Office of Drug Evaluation VI (ODE VI) in CDER. In this role, I became a member of the Senior Leadership Team within the Office of New Drugs (OND) within CDER. Following the planned decommissioning of ODE VI in 2005, I served as the Associate Director for Regulatory Science in CDER's Office of Oncology Drug Products (OODP).

5.      As a primary medical reviewer, my major duties and responsibilities focused on clinical review of Investigational New Drug Applications (INDs) and New Drug Applications (NDAs), including NDAs submitted under Section 505(b)(2) of the Food, Drug, and Cosmetic Act (FDCA), as well as INDs for drug development programs anticipated to result in submission of a 505(b)(2) NDA.  Such reviews included both the initial documents submitted to the FDA as part of a regulatory docket, and subsequent filings.  With respect to NDAs, such filings included prior approval supplemental NDAs (sNDAs) seeking approval for a new indication or other changes to the approved labeling, as well as Changes Being Effected (CBE) sNDAs, which most often concerned changes implemented by the holder of an NDA, including those submitted under Section 505(b)(2), to safety-related information in the approved label prior to formal FDA review.

6.      My responsibilities included regulation of approved, marketed drug products, primarily with respect to post-marketing surveillance of adverse events. These responsibilities included review of reports required of NDA holders, such as annual NDA reports, periodic safety update reports, initial and follow-up reports of serious and unexpected adverse events, and clinical study reports. They also included analysis of data in FDA's Adverse Event Reporting System

**CONFIDENTIAL**

(FAERS), which I performed on my own as well as in collaboration with pharmacoepidemiologists and other scientists in CDER.

7.     As Medical Team Leader and Senior Medical Reviewer in DAIDP, Deputy Director of ODE VI, and Associate Director for Regulatory Science in OODP, my responsibilities broadened to include secondary, and in some instances tertiary, reviews of findings, conclusions, and recommendations from primary reviewers regarding NDAs, Biologics Licensing Applications (BLAs), and supplements to such applications. I was also responsible for synthesizing findings from the primary multi-disciplinary review team into an integrated written summary of the basis for the regulatory action taken.  Both as a primary medical reviewer and a more senior review official, I was responsible for understanding and incorporating non-clinical review findings and recommendations into my reviews, including reviews in the disciplines of chemistry, manufacturing, and controls; microbiology; toxicology; clinical pharmacology; and statistics.

8.     My regulatory expertise is based on my FDA training, broad experience in applying regulatory concepts to specific submissions, including 505(b)(2) NDAs, and contributions to regulatory science.  As a primary medical reviewer, I received extensive didactic training covering the spectrum of products regulated by FDA, as well as mentorship by more experienced primary and senior reviewers. My practical training involved detailed discussions with senior FDA officials during reviews of specific products to ensure that I was applying regulatory principles correctly, as well as consultation with reviewers in other disciplines.  Such discussions frequently involved FDA staff with experience specific to a particular regulatory issue, which on multiple occasions included 505(b)(2) NDAs. My written reviews were considered by a supervisory reviewer, with unresolved differences in opinion regarding regulatory and scientific issues generally addressed through a written secondary regulatory review. This training and experience also involved participating in discussions and debates regarding applications being reviewed by other FDA staff.

9.     As a more senior review official, I became responsible for providing regulatory and scientific guidance to reviewers whom I was now supervising. As a medical team leader, I routinely gave tutorials to my review staff on a range of regulatory topics, covering topics such as the regulatory requirements for NDA approval and electronic labeling.  As a practical matter, I was now responsible for secondary review of NDAs, including 505(b)(2) NDAs; for such

**CONFIDENTIAL**

situations, I was responsible for providing guidance to the primary review team on issues such as the distinctions between traditional NDAs, 505(b)(2) NDAs, and abbreviated NDAs.

10.     In addition, my tenure as Deputy Director for ODE VI provided additional experience directly relevant to 505(b)(2) NDAs, because of the complex differences between regulation of drugs and therapeutic biologics. At that time, there was no approval pathway for therapeutic biologics equivalent to either the 505(b)(2) NDA or ANDA (505(j)) pathways. However, the concept of "generic" or "follow-on" biologics had been introduced at this time, and as a senior review official in the office that handled therapeutic biologics, with experience in both drug regulation and biochemistry, I participated in discussions about the practical barriers to such pathways. As an example of the relevance of my role, I participated in analyzing why a therapeutic biologic could not be approved through a 505(b)(2) pathway.

11.     I acquired additional regulatory expertise by leading development of FDA guidance in areas such as antimicrobial resistance and medical countermeasures against diseases such as anthrax. This work involved issues closely related to regulation of 505(b)(2) NDAs, particularly use of studies not conducted by an applicant to support NDA approval. It also required presentations at FDA Advisory Committee meetings, including both closed and open sessions, to solicit advice and recommendations from outside scientific experts.

12.     My ability to execute these duties and responsibilities at a high performance standard was based on my clinical and scientific training and experience prior to and during my tenure at FDA; the extensive didactic and pragmatic training and experience during my time at FDA, as described above; progressive increases during my tenure at FDA in the complexity of regulatory submissions assigned to me; and as discussed above, experience in supervising and mentoring less experienced FDA scientists.

13.     I continue to focus on public health and patient safety as the Director of HIV, Hepatitis, and Related Conditions Programs for the United States Department of Veterans Affairs (VA), a position I have held since leaving the FDA in 2006.[2] I supervise the VA's National Human

---

[2] This report was prepared in my personal capacity and outside of my tour of duty. It does not necessarily represent the views of the United States Government (USG) or the U.S. Department of Veterans Affairs. In addition, because

Immunodeficiency Virus (HIV) program and its National Viral Hepatitis program, the two largest clinical programs in the U.S. for individuals living with or at risk of these disorders. My duties and responsibilities continue to involve recommendations and decisions regarding drug safety and effectiveness. They also involve close coordination and collaboration in the area of clinical pharmacy. In addition, I provide guidance on policy programs and products related to issues involving clinical public health, that is, public health matters that are relevant to clinical providers within the VA.

14. Since moving from the FDA to my current position, I have maintained my knowledge and other qualifications related to regulation of drugs, biologics, and other products under the FDA's jurisdiction. Doing so has been motivated in part by the repeated need to address such regulatory issues in my current position. I have remained current on such issues through researching and reviewing specific regulatory issues; membership in appropriate professional societies; and through work done as part of my forensic consulting practice.

15. I have been a faculty member at the George Washington University School of Medicine and Health Sciences since 2000, holding the rank of Associate Clinical Professor of Medicine since 2008. I also continue working as an active clinician; since 1998, I have served as an attending physician at the Washington D.C. Veterans Affairs Medical Center, regularly delivering primary and specialty care to Veterans enrolled in care there. I am a Diplomate of the American Board of Internal Medicine in Infectious Diseases.

16. I received a Bachelor of Science in Molecular Biophysics and Biochemistry from Yale University in 1980. I received Master of Science and Doctor of Philosophy degrees in Biochemistry from New York University in 1985 and 1988, respectively. In 1988, I received a Doctor of Medicine degree from New York University School of Medicine. I completed a categorical internal medicine residency at New York University Medical Center from 1988 to 1991, and subsequently completed an infectious disease fellowship at Yale University from 1991 to 1994, which included clinical training in both adult and pediatric infectious disease. I subsequently served on the medical staffs of Yale-New Haven Hospital and the West Haven, CT

the USG does not have a direct and substantial interest in this matter, my service as an expert witness in this matter is permitted under 5 CFR 2635.805.

**CONFIDENTIAL**

Department of Veterans Affairs Medical Center, before joining the FDA in 1996.  In 2012, I received a Master's degree in Biomedical Informatics from Oregon Health and Sciences University.

17.     A copy of my curriculum vitae is attached as Exhibit A to this report.  It contains more information relating to my professional background and qualifications.

18.     A list of cases in which I have testified as an expert in the last four years is attached as Exhibit B.

19.     The materials I considered in reaching the opinions and conclusions set forth below are cited herein and listed in Exhibit C.  This list includes, among other things, relevant scientific literature, FDA guidance documents, and published standards. My review also included depositions and documents/exhibits provided to me, labels of docetaxel products, and the reports of expert witnesses identified in this consolidated litigation listed in Exhibit C. Finally, the report cites relevant statutes, regulations, and guidance documents relied upon.

20.     My opinions represent regulatory conclusions but not conclusions of law.

21.     I am being compensated for time spent working on this matter at a rate of $550 per hour.  My compensation is not related to the outcome of this litigation.

22.     I reserve the right to offer rebuttal testimony to any evidence or argument advanced by Defendants, to comment on any expert reports submitted by Defendants, and to supplement this report as appropriate or necessary.  Further, this report is based upon evidence that is currently available. It is my understanding that discovery is ongoing and that witnesses for Defendant Hospira have yet to be completed, including witnesses in the areas of pharmacovigilance and safety, and I reserve the right to amend my opinions and bases as further information and evidence become available.

## C.     Summary of opinions

23.     A 505(b)(2) NDA holder's regulatory responsibilities are the same as those for a 505(b)(1) NDA holder.  Importantly, a 505(b)(2) NDA holder's regulatory responsibilities are

independent of those held by a 505(b)(1) NDA holder, regardless of the extent to which the 505(b)(2) NDA relies on one or more 505(b)(1) NDA(s) for evidence of safety and effectiveness.

24.     A 505(b)(2) NDA holder's regulatory responsibilities include, but are not limited to, post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA.  In addition, a 505(b)(2) NDA holder is responsible for ensuring that the label for its product is not false and misleading, and this obligation is not fulfilled merely by imitating the label approved as part of a 505(b)(1) application.  A 505(b)(2) NDA holder has the ability and obligation to change its product's label and propose product label changes in the same way that 505(b)(1) NDA holders do.

25.     In other words, unlike a generic drug approved under Section 505(j) of the FDCA, the label for a 505(b)(2) NDA can substantively differ from the label for an NDA relied on for initial approval.

26.     The holders of the 505(b)(2) NDAs for the docetaxel products involved in this litigation – Sandoz, Hospira, and Accord – have independent regulatory obligations for their respective docetaxel products independent of those owed by Sanofi, the manufacturer and holder of the NDA for Taxotere, the docetaxel formulation initially approved for marketing in the U.S. The responsibilities of these 505(b)(2) NDA holders include updating the labels of their respective docetaxel products if the availability of new scientific information causes the label(s) for those product(s) to become inaccurate, false or misleading.  This responsibility for the adequacy of the labeling for Sandoz, Hospira, and Accord's respective docetaxel products is governed by the same regulations as those governing Sanofi's responsibility to update the Taxotere label, but are independent of Sanofi's regulatory obligations. In other words, actions or omissions by Sanofi with regard to the Taxotere labeling do not affect the independent responsibility of Sandoz, Hospira, and Accord to ensure the adequacy of the labeling for their respective products.

27.     Specifically, the obligation to update a drug product label is triggered when there is new safety information, or analysis available to these NDA holders that provides either:

    a.  "some basis to believe there is a causal relationship" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(7)

**CONFIDENTIAL**

or

    b. "reasonable evidence of a causal association" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(6)

28.    Each of these 505(b)(2) NDA holders – Sandoz, Hospira and Accord – knew or had reason to know that sufficient evidence existed to warrant a label change under 21 CFR 201.57(c)(6) and/or 21 CFR 201.57(c)(7) at the time their respective products were used by the plaintiffs to whom this report applies.[3]

29.    Submissions by these 505(b)(2) NDA holders – Sandoz, Hospira and Accord – to foreign regulatory authorities demonstrate they knew or had reason to know of the increased risk of permanent chemotherapy induced alopecia (PCIA)[4] and the need for inclusion of a warning, precaution, and/or adverse event listing in the label, communicating the nature, duration, and severity of the risk of PCIA.

30.    Deposition testimony provided by employees or representatives of Sandoz, Hospira and Accord demonstrate that they did not comply with their regulatory responsibilities regarding post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA during the relevant time period.

31.    Likewise, deposition testimony provided by employees or representatives of Sandoz, Hospira and Accord demonstrate that they did not comply with their regulatory responsibilities to ensure that their products' labeling in the U.S. was at all times not false and misleading.

---

[3] I have not reviewed the individual medical records of any Plaintiff in this MDL. Instead, I have been asked to assume the use of the products occurred as stated herein.

[4] There is no consistent definition of PCIA. The definitions vary in the medical literature, ranging from six months to over two years. For purposes of my report, I do not utilize a single definition of PCIA nor does my analysis require me to do so.

**CONFIDENTIAL**

## II.      METHODS

32.      In analyzing FDA regulatory issues, I take the same approach that I employed as an FDA reviewer charged with making recommendations regarding a regulatory decision.  This approach is based on documented best practices within CDER, which are formally referred to as Good Review Practices (GRPs).  GRPs, which were introduced during my tenure at the FDA, are published as sections of CDER's Manual of Policy and Procedures (MAPP), and are publicly available.[5]  As explained in MAPP 6025.1, *Good Review Practices,* GRPs "improve efficiency, clarity, and transparency of the review process and review management."[6]

33.      Unless otherwise indicated, the terms "regulation" and "regulatory" refer to the FDA, as opposed to another Executive Branch agency.  The terms "drug" and "new drug" are used as defined in the Food, Drug, and Cosmetic Act (FDCA) at 21 USC 321(g) and 21 USC 321(p); they do not necessarily refer to a product that is the subject of an NDA or BLA.  Unless otherwise indicated, the term "505(b)(2) NDA holders" refers to the three Defendants, Sandoz, Hospira and Accord.

34.      Regulatory analyses in this report generally rely on FDA guidances, the default regulatory and technical standards used by FDA reviewers.[7,8]  Draft and Final Guidances published in the *Federal Register* under FDA's Good Guidance Practices regulation[9] reflect the FDA's current thinking at a given point of time on a particular regulatory or technical issue. Although technically not legally binding,[10] Guidances represent a safe harbor for FDCA compliance, and manufacturers who choose an approach different from that described in a relevant Guidance must

---

[5] "CDER Manual of Policies & Procedures (MAPP)," *available at* https://www.fda.gov/about-fda/center-drug-evaluation-and-research/cder-manual-policies-procedures-mapp.

[6] CDER MAPP 6025.1: *Good Review Practices* (February 2017), *available at* https://www.fda.gov/media/72747/download.

[7] 21 CFR 10.115(d)(3).

[8] 21 CFR 10.115(b)(1).

[9] 21 CFR 10.115.

[10] 21 CFR 10.115(b)(2).

**CONFIDENTIAL**

still comply with the FDCA.[11]  In addition, Guidances carry sufficient weight that Congress has frequently directed the FDA, through appropriate legislation, to develop Guidances on specific topics.[12]

## III.    REGULATION OF DRUG MARKETING IN THE UNITED STATES

### A.    Historical perspective

35.    Drugs are meant to help people live longer, better, or both.  In addition to potential benefits, however, all drugs have risks.  No drug is completely safe, and for some drugs (*e.g.*, agents used in cancer chemotherapy), virtually all patients receiving the drug will suffer unwanted side effects, also known as adverse events.  Thus, in assessing benefits and risks, a drug should do more good than harm.  From a regulatory perspective, whether a drug is considered "safe" is tied inextricably to the benefit provided by the drug.  Even when associated with severe toxicities, a drug may be considered "safe" if it provides a substantial clinical benefit.  Conversely, a drug that has less benefit, especially when compared to other treatments or to other drugs for the same condition, must have little if any significant toxicity to be considered safe.

36.    In addition, information about the relative balance between drug benefits and harms is critical not only for health care providers choosing between different options for patients, but also for patients themselves. It is a bedrock principle of medical ethics that patients cannot provide meaningful consent to a treatment offered to them by a provider unless they have sufficient information to exercise agency.

### B.    The Food, Drug, and Cosmetic Act

#### 1.    General provisions

37.    The United States has a sophisticated system for regulating drug development and marketing, based primarily on the Food, Drug, and Cosmetic Act of 1938, as amended (FDCA; 21 USC 301 *et seq*.) and its implementing regulations in Title 21 of the Code of Federal Regulations (CFR).  The FDCA defines a "drug" as an article recognized in two official drug compendia, the

---

[11] 21 CFR 10.115(d)(2).

[12] E.g., Food and Drug Amendments Act of 2007 § 911, 21 USC 360a.

**CONFIDENTIAL**

United States Pharmacopeia (USP) and the National Formulary (NF).  21 USC 321(g).  The United States Pharmacopeial Convention, a private non-profit organization, publishes these two references in combination annually as the USP-NF.  Outside of drugs contained in the USP and NF, the FDCA's definition of a drug also includes "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" and "non-food articles intended to affect the structure or any function of the body of man or other animals." 21 USC 321(g)(1).[13]

38.    A drug that is not generally recognized as safe and effective (GRASE) is referred to as a "new drug." 21 USC 321(p)(1). Marketing new drugs requires FDA approval, as discussed below.

39.    The FDCA is enforced by the U.S. Food and Drug Administration, an Executive Branch agency located within the U.S. Department of Health and Human Services.  The FDA's regulatory authority and responsibilities cover a broad range of medical products, including human drugs, veterinary drugs, vaccines, blood products, medical devices.  The FDA is organized into several centers, which have responsibility for individual aspects of the agency's mission.  The largest of these is the Center for Drug Evaluation and Research (CDER), which regulates human drugs.

### 2.    New Drug Applications

40.    To market a new drug in the United States, a company must obtain FDA approval of a New Drug Application (NDA)[14] containing relevant data on the chemistry, manufacturing processes, toxicology, clinical pharmacology, clinical effectiveness, and risks connected with the drug.  The data contained in an NDA are generally obtained from studies conducted under an Investigational New Drug Application (IND). The IND holder is generally referred to as a *sponsor*.

---

[13]  The FDCA also defines a drug as any article contained in the Homoeopathic Pharmacopoeia of the United States, or National Formulary, or any supplement to these official compendia, or any article intended for use as a component of another article meeting these various definitions of a drug. 21 USC 321(g).

[14] These requirements also apply to biologics, which require submission of a Biologics Licensing Application (BLA) and are also regulated under Section 351 of the Public Health Service Act (42 USC 262).

41.     When submitting an NDA to market a drug in the US., a sponsor must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 USC 505(b)(1). FDA approval of an NDA requires that these "full reports" demonstrate that the drug described in the NDA is safe and effective for its proposed use. 21 USC 355(d); 21 CFR 314.125.  Failure to include such "full reports" in an NDA can result in the FDA summarily rejecting the application through a refuse-to-file action. 21 CFR 314.101(d)(3).

42.     An NDA under § 505(b)(1) must include detailed reports on the subject drug's chemistry and manufacturing; results of animal studies; results of pharmacokinetic studies in humans; and results from controlled studies in humans, along with other clinical data collected during the drug development program. To garner FDA approval, the data in the NDA must demonstrate the drug's safety and effectiveness.[15]

43.     The sponsor of an NDA has the burden of demonstrating safety.  Under 21 USC 355(d)(1), it is not enough for the sponsor to find an absence of risk; the sponsor must affirmatively demonstrate the safety of a drug.  In practical terms, this means excluding the occurrence of particular drug risks at frequencies greater than a threshold level that would impact the balance of the magnitude of a drug's benefit compared to its risks.

### 3.     Post-approval NDA regulatory obligations

44.     After NDA approval, the sponsor of the application (the NDA holder) has continuing regulatory responsibilities. For purposes of this report, the most important of these responsibilities are evaluating and reporting available safety information to the FDA and ensuring that the product's label remains accurate by incorporating new safety information regarding the drug that has become available to the NDA holder.

45.     The FDCA broadly defines new safety information as "information derived from a clinical trial, an adverse event report, a post-approval study . . .  or peer-reviewed biomedical literature; . . .  or other scientific data . . .  about a serious risk or an unexpected serious risk associated with use of the drug that the Secretary has become aware of (that may be based on a

---

[15] 21 CFR 314.50(c)

**CONFIDENTIAL**

new analysis of existing information) since the drug was approved . . ." 21 USC 355-1(b). The definition also includes FDA analyses of AE reports submitted to the FDA Adverse Event Reporting System (FAERS).

46.     An NDA holder's post-marketing regulatory responsibilities focus in large part on serious adverse events (SAEs) and unexpected AEs.  The FDA classifies an AE as serious if it results in death, a life-threatening AE, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect. However, the governing regulation at 21 CFR 314.80(a) explains that an AE can be considered serious even if it does not result in one of these outcomes.

47.     An "unexpected AE" is one that is not listed in the current labeling for the drug. The governing regulation at 21 CFR 314.80(a) explains that this definition includes AEs that are "symptomatically and pathophysiologically related" to a listed AE, but differ because of greater severity or specificity.

48.     One of an NDA holder's most important post-approval regulatory obligation concerns unexpected SAEs, i.e., those not listed in the current drug label. An NDA holder is required to report all such events to the FDA within 15 calendar days after receipt, investigate them, and provide follow-up information.

49.     More generally, an NDA holder is required to promptly review all AEs, evaluate them, and report the results of its analyses to the FDA, both in periodic safety update reports and annual reports.

50.     Lastly, the NDA holder must develop written procedures for the surveillance, receipt, evaluation, and reporting of post-marketing AEs to the FDA.

51.     Taken together, these activities are termed *pharmacovigilance* and represent critical post-marketing regulatory obligations for NDA holders.  Pharmacovigilance plays an essential role in monitoring drug safety post-marketing because of the enormous difference between the limited power of pre-approval clinical trials to detect adverse events, particularly SAEs, and the number of patients in the real world who may be exposed to a drug once it enters the marketplace.

**CONFIDENTIAL**

52.     Because of the broad range of pharmacoepidemiologic data sources and methods developed over the last quarter-century, an NDA holder that passively counts up adverse events and dutifully transmits tallies to the FDA cannot be regarded as meaningful review or "evaluation" of AEs as required under 21 CFR 314.80(b). The statistical power of large adverse event datasets, combined with sophisticated analytic techniques and increased computing capabilities that allow identification of safety signals for further exploration.

53.     For example, as of 2014, FDA's Adverse Event Reporting System (FAERS) contained over 7,000,000 adverse event reports, with over 750,000 new reports added annually.[16]

54.     Two decades ago, the limitations of passive voluntary surveillance databases, such as incomplete information in individual reports and population-level under-reporting of adverse events, had been regarded as barriers to meaningful use of these datasets as a source of new safety information. However, the introduction of techniques such as Bayesian data mining (e.g., disproportionality analysis of an excess of adverse events occurring in reports for a particular drug than would be expected by chance alone), in combination with the very large number of individual reports available, have made FAERS and similar data sources flexible, powerful tools for pharmacovigilance. For example, data mining of adverse event databases has been used to predict in advance addition of new safety information to drug labels.[17]

55.     The details and application of such methods are explained at greater length in Dr. David Madigan's report, which I refer to below.

56.     The FDA has issued multiple detailed Guidances to Industry on how drug manufacturers can meet their pharmacovigilance obligations with respect to surveillance of drug AEs; analyzing aggregated AE data and identifying potential safety signals; analyzing and evaluating such signals; and taking appropriate actions.

---

[16] Duggirala HJ, *et al*. Use of data mining at the Food and Drug Administration. J Am Med Inform Assoc. 2016 Mar;23(2):428-34.

[17] Gurulingappa H, *et al*. Automatic detection of adverse events to predict drug label changes using text and data mining techniques. Pharmacoepidemiol Drug Saf. 2013 Nov;22(11):1189-94.

**CONFIDENTIAL**

57.     For example, a 2005 Pharmacovigilance Guidance issued by FDA[18] provides recommendations to NDA holders on good pharmacovigilance practices, such as prospectively constructing a pharmacovigilance plan for a drug; use of a standardized controlled terminology for AEs, such as the Medical Dictionary for Regulatory Activities (MedDRA); use of active and passive AE surveillance; and data mining of large AE datasets, such as the FDA's Adverse Event Reporting System (FAERS), to identify safety signals.

58.     Pharmacovigilance is a critical foundation for another major post-marketing regulatory obligation of NDA holders, ensuring that the label for a marketed drug is at all times accurate and   is not false or misleading in any particular. 21 CFR 314.125(b)(6). Maintaining the accuracy and completeness of the safety information in a drug's label is an essential component for meeting this obligation, particularly since a drug's toxicity profile will change as more patients are exposed to it.

59.     As discussed above, it is the NDA holder's responsibility to ensure that a drug's label is not false and misleading, and the sponsor's responsibility to demonstrate safety. An NDA holder can propose a change in a drug's label by submitting a supplemental NDA. Many labeling changes (e.g., adding a new indication to the label) require prior approval by the FDA. However, an NDA holder can change a label without prior FDA approval if it will "add or strengthen a contraindication, warning, precaution, or adverse reaction," based on new safety information that meets a regulatory threshold. Such a change is implemented by submitting a *Changes Being Effected (CBE)* supplement (sometimes referred to as a *labeling supplement*) to the FDA at least 30 days prior to the change. Unless a CBE supplement requires review of clinical data unrelated to the safety-related labeling change, the NDA holder does not need to pay a user fee for FDA's review.

---

[18] Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (March 2005), *available at* https://www.fda.gov/media/71546/download.

**CONFIDENTIAL**

60.     The FDA reviews CBE supplements after the NDA holder has implemented the changes in the label, and in theory, has the authority to retroactively reject them.  However, this rarely, if ever occurs.

61.     FDA's perspective on CBE supplements was well-expressed by Dr. Robert Temple (Excerpts from Deposition of Robert Temple, M.D. 2004). When asked if the FDA would regard a drug as being misbranded if the sponsor added language to strengthen a warning even without a scientific basis, Dr. Temple, stated that *"I mean, the fact is that the company strongly wants labeling. . . . Even if we think it's a little flimsy, we would probably defer. We would have to be quite persuaded to that it really was, uh, without merit."*[19]

### 4.      Abbreviated NDAs and 505(b)(2) NDAs

62.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act (Public Law 98-417), often referred to as the Hatch-Waxman Act or the Hatch-Waxman amendments to the FDCA, to promote competition in the pharmaceutical marketplace, while encouraging innovation in drug development.

63.     The Hatch-Waxman Act allows a generic drug to be approved by relying on the "Agency's findings of safety and efficacy" (AFSE) for a previously approved new drug (the *Reference Listed Drug*, or RLD). 21 USC 355(j). FDA approval of a generic drug only requires a generic drug manufacturer to submit an abbreviated NDA (ANDA) showing that its copy of the RLD is chemically the same as and is bioequivalent to the RLD, along with acceptable data on drug manufacturing.

64.     From a review perspective, one key difference between an NDA and an ANDA is the requirement for "full reports" of safety and effectiveness. Unlike an NDA, which the FDA will refuse to file for review without such reports, an ANDA does not need to contain such "full reports"

---

[19] Deposition of Robert Temple, MD. In Re Paxil Products Liability Litigation CV 01-07937 MRP. 7 December 2004.

**CONFIDENTIAL**

of safety and effectiveness.[20] The bioequivalence and other similarity data submitted in the ANDA act as a bridge to the AFSE for the RLD.

65.     One other key difference between an NDA and an ANDA is that under the Hatch-Waxman Act, the proposed label for a generic ANDA drug must be identical to that for the RLD.[21] 21 USC 355(j)(v); 21 CFR 314.94(a)(8)(iv). If it is not, the FDA will refuse to review the ANDA.[22] As discussed below, there is no such statutory or regulatory requirement for an NDA.

66.     The Hatch-Waxman Act also allowed a new NDA category by adding Section 505(b)(2) to the FDCA. 505(b)(2) NDAs are true NDAs that, like traditional NDAs submitted under Section 505(b)(1), must contain "full reports of investigations" of safety and effectiveness for approval. They differ from traditional NDAs in that the "full reports" of safety and effectiveness rely, at least in part, on studies that the applicant did not conduct or have a right of reference to. Such studies may consist of information from published papers in the biomedical literature. Alternatively, it can include safety and efficacy studies used for approval of an original NDA submitted by another applicant. In other words, a 505(b)(2) NDA may rely on the AFSE of a previously approved drug, in essence, incorporating the AFSE by reference.

67.     However, unlike a generic drug manufacturer submitting an ANDA, the sponsor of a 505(b)(2) NDA may still need to conduct additional studies, depending on its development program. For example, if the scientific standards in use when the NDA being relied on was approved have changed significantly, the sponsor of the 505(b)(2) NDA may need to perform new clinical and/or non-clinical studies to ensure that the AFSE for the first NDA can still be relied on.

68.     In addition, unlike ANDAs, 505(b)(2) NDAs are not subject to the statutory and regulatory requirement that the product label be identical to the RLD.

### 5.     ANDAs and 505(b)(2) NDAs are not the same

---

[20] In fact, an ANDA cannot contain such reports; if it does, the FDA may direct the applicant to refile the submission as a true NDA.

[21] Some differences between the RLD label and the generic label may be acceptable, e.g., if a generic version is manufactured by a different manufacturer producing the RLD versus the generic drug. 21 CFR 314.94(a)(8).

[22] This is termed a refuse-to-receive action, rather than a refuse-to-file action.

CONFIDENTIAL

69.     Although they are distinct regulatory pathways, ANDAs and 505(b)(2) NDAs are sometimes confused. This confusion arises from both pathways owing their creation to the same legislation (Hatch-Waxman Act); the similarity of patent provisions in the FDCA applicable to ANDAs and 505(b)(2) NDAs; the reliance on studies contained in the NDA for an innovator drug to demonstrate safety and effectiveness for all ANDAs and many (but not all) 505(b)(2) NDAs; and the seemingly analogous relationships between   i) the labelling for a generic drug approved under an ANDA and the labeling for its RLD, and ii) the labeling for a drug approved under a 505(b)(2) NDA that relies on safety and effectiveness studies for an innovator drug approved under a 505(b)(1) NDA, and the labeling for the innovator drug.

70.     The differences between these two approval pathways, however, are far more important than these surface similarities. In summary, applicants for and holders of 505(b)(2) NDAs are subject to the same regulatory requirements and post-market surveillance and labeling obligations as those for traditional NDAs approved under § 505(b)(1), rather than the ANDA requirements.

71.     First, by definition, 505(b)(2) NDAs must contain "full reports of investigations of safety and effectiveness." In contrast, ANDAs do not need to contain such reports. In fact, as discussed above, the FDA is prohibited from requesting more information for ANDAs than is statutorily permitted.

72.     Second, the general requirements for NDAs described in Section 505(b)(1) of the FDCA apply to 505(b)(2) NDAs, which are defined as a subset of NDAs as follows:

"An application submitted under paragraph (1) for a drug for which the investigations described in clause (A) of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted . . ."

73.     Of note, the preamble to the proposed implementing regulations for the Hatch-Waxman Act states that

**CONFIDENTIAL**

"Applications described in section 505(b)(2) of the act are submitted under section 505(b)(1) of the act. They are therefore subject to the same statutory provisions that govern full new drug applications."[23]

74.     Furthermore, the same NDA approval requirements applicable to traditional § 505(b)(1) NDAs are used by FDA for review of 505(b)(2) NDAs. 21 USC 355(d).  Of note, 505(b)(2) NDAs are reviewed in the same division in CDER's Office of New Drugs as the corresponding innovator drug, while ANDAs are reviewed exclusively in CDER's Office of Generic Drugs.

75.     Importantly, unlike generic drugs approved under an ANDA, which must have the same labeling as the RLD,[24] there is no statutory or regulatory requirement that the label for a drug approved under 505(b)(2) be the same as the label for an innovator drug on which the former relies for evidence of safety and effectiveness. For a 505(b)(2) NDA that relies on full reports of safety and effectiveness from a 505(b)(1) NDA, similarities between the labels of the two drugs are due entirely to the similarity between the scientific evidence underlying approval of both NDAs. In other words, the drug labels are similar because they both make use of the same "full reports," not because of statutory and/or regulatory dictates.

76.     In fact, unlike a generic drug approved under an ANDA, a drug approved under a 505(b)(2) NDA can have a label that differs significantly from the innovator drug used to support approval.  In the present instance, each of the § 505(b)(2) NDA holders – Sandoz, Hospira and Accord – initial labels included language that was not included in Sanofi's label until months later. Additionally, the § 505(b)(2) NDA holders here – Sandoz, Hospira and Accord – did not uniformly or timely adopt Sanofi's December 11, 2015, label change. [25]

---

[23] 54 FR 28875.

[24] 21 USC 505(j)(v).

[25] Accord's adoption of Sanofi's December 11, 2015 label change approval was approved July 2016, seven months later; Hospira's adoption of Sanofi's December 11, 2015 label change approval was approved September 2017, nearly 2 years later; and Sandoz's adoption of Sanofi's December 11, 2015 label change approval was approved October 2016, ten months later.  See https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process.

**CONFIDENTIAL**

77.     Finally, the FDA itself has issued Guidance for Industry distinguishing between ANDAs and 505(b)(2) NDAs.[26] First, the FDA will not review a drug that is eligible for approval under Section 505(j) as a 505(b)(2) NDA. Second, while limited confirmatory data can be submitted as part of an ANDA, submission of extensive clinical investigations as part of an ANDA is considered to go beyond the scope of information that can be relied on for ANDA approval.

78.     The differences between 505(b)(2) NDAs and ANDAs relevant to this litigation are summarized in Table 1. Similarities between 505(b)(1) and 505(b)(2) NDAs are summarized in Table 2.

| **Table 1.** Differences between 505(b)(2) NDAs and ANDAs | | |
|---|---|---|
| | 505(b)(2) NDAs | ANDAs[27] |
| Submitted under Section 505(b)(1) of the FDCA | Yes | No[28] |
| Content and format governed by 21 CFR 314.50 | Yes | No[29] |
| Approved under Section 505(c) of the FDCA | Yes | No[30] |
| Regulated by CDER's Office of New Drugs | Yes | No[31] |
| Contain full reports of safety and effectiveness | Yes | No |
| Can contain clinical studies of safety and effectiveness | Yes | No |
| Demonstration of bioequivalence to a listed drug not required for approval | Yes | No |

| **Table 2.**  Similarities between 505(b)(1) and 505(b)(2) NDAs | | |
|---|---|---|
| | 505(b)(1) NDAs | 505(b)(2) NDAs |
| Submitted under Section 505(b)(1) | Yes | Yes |
| Approved under Section 505(c) | Yes | Yes |
| Regulated by CDER's Office of New Drugs | Yes | Yes |

---

[26] Guidance for Industry: Determining Whether to Submit an ANDA or a 505(b)(2) Application, May 2009, *available at* https://www.fda.gov/media/124848/download.

[27] This does not include petitioned ANDAs.

[28] ANDAs are submitted under Section 505(j) of the FDCA.

[29] The content and format of an ANDA are specified in 21 CFR 314.94.

[30] ANDAs are approved under Section 505(j) of the FDCA.

[31] ANDAs are regulated by CDER's Office of Generic Drugs.

**CONFIDENTIAL**

| | | |
|---|---|---|
| Contain full reports of safety and effectiveness | Yes | Yes |
| Post-market reporting specified in 21 CFR 314.80 | Yes | Yes |
| Other responsibilities (e.g., annual reports) specified in 21 CFR 314.81 | Yes | Yes |

## IV.     Regulatory and Scientific Background

### A.     Regulatory Background

79.     The original Taxotere (docetaxel) NDA was submitted on July 24, 1994 by Rhone-Poulenc-Roher. The FDA issued an Approvable letter on October 27, 1995, requiring additional data prior to approval. The sponsor amended and resubmitted the NDA on December 1, 1995, with an Approval letter issued on May 14, 1996 for the treatment of women with advanced or metastatic breast cancer.

80.     The FDA's approval of the original Taxotere NDA was made under the accelerated approval regulations (21 CFR 314.500), which allow provisional approval on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity.

81.     Accelerated approval requires that the sponsor submit post-marketing data to describe and verify the benefit of the drug. The sponsor submitted the required data as a sNDA, which was approved on June 22, 1998, converting the accelerated approval to a traditional approval.

82.     In 2004, the sponsor submitted an efficacy sNDA, seeking approval to add the indication of treatment of operable, node-positive breast cancer to the label. The sNDA received accelerated approval on August 18, 2004.

83.     The regulatory history of relevant 505(b)(2) NDAs for docetaxel is summarized in Table 2.

| Applicant | NDA # | Date submitted | Date approved |
|---|---|---|---|
| Hospira | 22234 | 7/9/2007 | 3/8/2011 |
| Accord | 201195 | 7/21/2009 | 6/8/2011 |
| Sandoz | 201525 | 9/16/2010 | 6/29/2011 |

**CONFIDENTIAL**

### B.  Scientific Background

84.     To understand the scientific evidence available to the 505(b)(2) NDA holders, I have reviewed the following data sources that were available to the 505(b)(2) NDA holders before and after approval of their docetaxel-based products: (1) publicly available medical literature; (2) reporting from the FDA's Adverse Event Reporting Database ("FAERS"); (3) information made available by Sanofi in their worldwide Taxotere labeling; and (4) information set forth by the 505(b)(2) NDA holders in worldwide labeling of their docetaxel products, and other foreign public data.

85.     My understanding and opinions are supported by the analyses and opinions of Plaintiffs' expert witnesses Dr. Ellen Feigal, Dr. David Madigan, and Dr. Laura Plunkett.  I have reviewed their expert reports, and I accept and consider their assessments valid.[32]

86.     By way of background, 21 CFR 201.57(c)(6), which describes the required content of the WARNINGS AND PRECAUTIONS section of the label, provides that this section should contain

> "clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards (including those that are expected for the pharmacological class or those resulting from drug/drug interactions), limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification)."

87.     The regulation further requires that "the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."

88.     FDA's Guidance for Industry on the WARNINGS AND PRECAUTIONS section explains that

---

[32] *See* Expert Reports of Dr. Ellen Feigal, dated 3/15/2020; Dr. David Madigan, dated 3/9/2020; and Dr. Laura Plunkett, dated 3/13/2020.

CONFIDENTIAL

"Some factors to consider in assessing whether there is reasonable evidence of a causal relationship include: (1) the frequency of reporting; 2) whether the adverse event rate in the drug treatment group exceeds the rate in the placebo and active-control group in controlled trials; (3) evidence of a dose-response relationship; (4) the extent to which the adverse event is consistent with the pharmacology of the drug; (5) the temporal association between drug administration and the event; (6) existence of dechallenge and rechallenge experience; and (7) whether the adverse event is known to be caused by related drugs."[33]

89.     21 CFR 201.57(c)(7), which describes the required content of the ADVERSE REACTIONS section of the label, provides that this section "must describe the overall adverse reaction profile of the drug based on the entire safety database." It limits the content to "only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."

90.     FDA's Guidance for Industry on the ADVERSE REACTIONS section explains that

"Serious, low-frequency adverse events generally will be listed when there is reason to suspect that the drug may have caused the event. Typical reasons to suspect causality for an event include (1) timing of onset or termination with respect to drug use, (2) plausibility in light of the drug's known pharmacology, (3) occurrence at a frequency above that expected in the treated population, and (4) occurrence of an event typical of drug-induced adverse reactions (e.g., liver necrosis, agranulocytosis, Stevens-Johnson syndrome). For serious events that are typical of drug-induced adverse reactions, the occurrence of even a single event could be a basis for inclusion in the list."[34]

---

[33] Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products — Content and Format (October 2011), *available at* https://www.fda.gov/media/71866/download.

[34] Guidance for Industry: Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products — Content and Format (January 2006), *available at* https://www.fda.gov/media/72139/download.

**CONFIDENTIAL**

91.     With respect to publicly available medical literature regarding an increased risk of PCIA in patients receiving docetaxel, compared to control patients, as Dr. Feigal notes in her expert report, there was a 6.4 to 8 times increased number of reported cases of PCIA in docetaxel-containing regimens compared to non-docetaxel-containing regimens across the 19 published studies she reviewed.[35] Dr. Madigan analyzed the results from four observational studies[36] (Crown 2017, Kang 2019, Martin 2018, and Sedlacek 2006), and concluded that there was a statistically significant increased risk of PCIA in the docetaxel-containing regimens versus the non-docetaxel-containing regimens when analyzed cumulatively and, for three of them (including Sedlacek 2006), on their own.[37]

92.     Dr. Plunkett reviewed the medical literature and found, among other opinions, that a causal relationship between PCIA and Taxotere is biologically plausible.[38]

93.     There are several studies published both before and after approval of the 505(b)(2) NDAs in 2011 that provide evidence of a causal relationship between docetaxel-containing regimens and PCIA.  These include a retrospective study published in March 2011 reviewing records of 8,430 patients who attended a hair clinic during the previous 7 years with non-scarring alopecia, which identified seven cases of PCIA, 5 of which occurred after administration of docetaxel-containing regimens.[39]  A retrospective clinicopathological study published in June 1011 found that 6 of 10 cases of post-chemotherapy PCIA cases occurred in breast cancer patients treated with docetaxel-containing regimens.[40]  A retrospective study published in May 2012

---

[35] Feigal Report at § VIII(D), Table 2, notes; § IX.

[36] Crown J *et al.* Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer. *Annals of Oncology* 2017; 28(suppl 5): Abstract 206P; Kang D, *et al.* Permanent Chemotherapy-Induced Alopecia in Patients with Breast Cancer: A 3-Year Prospective Cohort Study. Oncologist. 2019 Mar;24(3):414-420. Martín M, *et al.* Persistent major alopecia following adjuvant docetaxel for breast cancer: incidence, characteristics, and prevention with scalp cooling. Breast Cancer Res Treat. 2018 Oct;171(3):627-634. Erratum at pp. 635-6; Sedlacek, S. Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer. Breast Cancer Research and Treatment 2006; 100 (suppl 1): S116.

[37] Madigan Report at § 6, Irreversible Alopecia and Observational Studies.

[38] Plunkett Report at ¶ 33.

[39] Palamaras I, et al. Permanent chemotherapy-induced alopecia: a review. J Am Acad Dermatol. 2011 Mar; 64(3):604-6.

[40] Miteva M, *et al*. Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am J Dermatopathol. 2011 Jun; 33(4):345-50.

**CONFIDENTIAL**

described 20 breast cancer patients suffering PCIA after receiving docetaxel-containing regimens.[41]

94.    These studies were published on the heels of several other studies published before or during review, but before approval, of the 505(b)(2) NDAs that are the subject of this report. These included a study published in October 2010 involving 108 cases of persistent alopecia; in 104 of these, the patient had received a docetaxel-containing regimen.[42] Other available information regarding PCIA after treatment with a docetaxel-containing regimen including PCIA case reports in 2009 and 2010[43,44,45].

95.    With respect to the FAERS database, as Dr. Madigan noted in his report, there was a proportional reporting rate (PRR) signal for docetaxel from as early as 2000, a permanent empirical Bayes' geometric mean (EBGM) signal by the middle of 2008, and  signal for SEB05, an EBGM-related metric by the middle of 2012.[46]  Moreover, Dr. Madigan's lasso logistic regression and exponentiated lasso logistic regression analyses evidenced a signal crossing the EBGM threshold level  of 2 in 2010.[47]  As discussed above, FAERS data are publicly available for download, meaning that the 505(b)(2) NDA holders could have performed such analyses prior to submission of their NDAs.

---

[41]   Kluger N, *et al*. Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients. Ann Oncol. 2012 Nov; 23(11):2879-84.

[42]   Bourgeois H *et al*.,  Long Term Persistent Alopecia and Suboptimal Hair Regrowth after Adjuvant Chemotherapy for Breast Cancer: Alert for Emerging Side Effect: French ALOPERS Observatory. Ann Oncol 2010; 21(8) Viii83-84 (2010).

[43]   Prevezas C, *et al.* Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer. Br J Dermatol. 2009 Apr; 160(4):883-5.

[44]   Tallon B, *et al*. Permanent chemotherapy-induced alopecia: case report and review of the literature. J Am Acad Dermatol. 2010 Aug; 63(2):333-6.

[45]   Masidonski P, Mahon SM. Permanent alopecia in women being treated for breast cancer. Clin J Oncol Nurs. 2009 Feb;13(1):13-4.

[46]   Madigan Report at ¶¶ 42-43.

[47]   Madigan Report at ¶¶ 44-47.

**CONFIDENTIAL**

96.     Moreover, Sanofi's worldwide labeling (but not US labeling) provided the 505(b)(2) NDA holders with publicly available information regarding the events of ongoing alopecia from Sanofi's TAX 316 clinical trial.  Specifically, Sanofi's 2010 Summary of Product Characteristics provided information regarding the interim PCIA data from the TAX316 clinical trial.[48]  In 2012, Sanofi's SPC for Taxotere was updated to provide information regarding the final clinical trial data in which 29 out of 687 TAC patients had ongoing alopecia as of the end of the 10-year follow-up period, and a statement that cases of persisting alopecia have been reported was added to the SPC.[49]

97.     It's clear that the 505(b)(2) NDA holders not only should have known about this new scientific information, but did in fact know and were on notice of this additional information. This evidence supporting this is described more fully below, but generally, each of the 505(b)(2) NDA holders were on notice and not only knew of the availability of the results regarding ongoing alopecia at the end of chemotherapy in Sanofi's TAX 316 clinical trial, but actually had the relevant data.  Specifically, each of the 505(b)(2) NDA holders communicated TAX 316 clinical trial data to prescribers and patients outside of the US well before any such information was ever provided in their US labels.  And non-US labels for these 505(b)(2) NDA holders demonstrate that they possessed this new scientific information regarding the risk of PCIA.

98.     For example, Hospira's 2012 labels in Israel, Hungary, and UK (among others) stated: "*Skin and subcutaneous tissue disorders:* Alopecia was observed to be ongoing at the median follow-up time of 55 months in 22 patients out of the 687 patients with alopecia at the end of the chemotherapy."[50]  This statement in Hospira labels shows that Hospira possessed new scientific information regarding PCIA in the TAX 316 clinical trial and, had Hospira reviewed Sanofi's SPC for Taxotere at that time, Hospira would have had access to the final clinical trial

---

[48] Sanofi_00727021 (2010 Sanofi Summary of Product Characteristics).

[49] Sanofi_00726237 (2012 Sanofi Summary of Product Characteristics).

[50] Hospira Docetaxel 2012 Israeli Label.

**CONFIDENTIAL**

data and additional statements regarding the risk of PCIA.  Hospira did not add any information regarding the risk of PCIA to its US label until September 2017.[51]

99.     Accord's[52] 2012 labeling approved by the European Commission stated: "*Skin and subcutaneous tissue disorders:*  In study TAX316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 TAC patients and 645 FAC patients.[53]  At the end of the follow-up period, alopecia was observed to be ongoing in 29 TAC patients (4.2%) and 16 FAC patients (2.4%)."[54]  Moreover, Accord's 2012 European label stated in Section 4.8 that "Cases of persisting alopecia have been reported."[55]  Like with Hospira, these foreign regulatory submissions show that Accord was on notice of information regarding PCIA in the TAX 316 clinical trial.  Accord is different than Hospira, however, in that Accord elected to include the TAX 316 final clinical trial data and additional statements regarding the risk of PCIA into foreign labeling.  Despite this, Accord Healthcare, Inc. did not add any information regarding the risk of PCIA to its US label until July 2016.[56]

100.     Sandoz's 2011 Australian label provided interim data regarding PCIA from the TAX316 study.[57]  Sandoz's labels in Austria, Germany, and Australia, along with the company's core data sheet, were all updated in 2013 to provide detailed information regarding the final TAX316 clinical trial data and, like Accord, warn that cases of persisting alopecia have been

---

[51] Hospira Docetaxel 2017 US Label.

[52] Accord is a globally integrated company.  Accord Healthcare, Inc. is the US marketing entity according to Accord's website.  Accord's 2012 EC label is attached to a regulatory implementing decision that references Accord's June 2011 authorization application for its docetaxel medicinal product.

[53] Accord Docetaxel 2012 European Label.

[54] Accord Docetaxel 2012 European Label.

[55] Accord Docetaxel 2012 European Label.

[56] Accord Docetaxel 2016 US Label.

[57] Sandoz Docetaxel 2011 Australian Label.

CONFIDENTIAL

reported.[58]  Like Hospira and Accord, Sandoz did not add any information regarding the risk of PCIA to its US label until October 2016.[59]

## V.      REGULATORY ANALYSIS

### A.      505(b)(2) NDA holders have the same regulatory obligations with respect to post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA as 505(b)(1) NDA holders

101.    A 505(b)(2) NDA holder's regulatory responsibilities are the same as those for a 505(b)(1) NDA holder.  Importantly, a 505(b)(2) NDA holder's regulatory responsibilities are independent of those held by a 505(b)(1) holder of an NDA

102.    After NDA approval, sponsors are required under the FDCA to continuously assess the safety of their products (a process known as pharmacovigilance), report their findings to the FDA, and take appropriate actions to warn providers and patients about serious or unexpected adverse events associated with the use of their drugs. This is particularly important because the randomized controlled trials used for drug approval not only have limited power to detect adverse events, but also exclude many patients from enrollment to avoid confounding assessment of safety or efficacy. However, when a drug is approved and marketed, such patients are not excluded from receiving the drug, and this results in exposure of patient populations in which the drug's safety and efficacy were never studied.

103.    As I discussed above, the FDA has issued Guidance on Good Pharmacovigilance Principles.  This Guidance represents a "safe harbor" for compliance with the FDCA and its implementing regulations, which are legally binding. The principles include definition of safety signals, potential techniques for evaluating signals, and discussion of the limitations of specific methods, particularly spontaneous case reports. While the approach outlined in this guidance is not legally binding, compliance with the underlying statute and regulations is, specifically the requirements described at 21 CFR 314.80 and 314.81.

104.    A 505(b)(2) NDA holder's regulatory responsibilities include, but are not limited to, post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA.  In addition,

---

[58] Sandoz Docetaxel 2013 Austria, Germany, and Australian Labels.

[59] Sandoz Docetaxel 2016 US Label.

**CONFIDENTIAL**

a 505(b)(2) NDA holder is responsible for ensuring that the label for their product is not false and misleading, and this obligation is not fulfilled merely by imitating the label approved as part of a 505(b)(1) application.

105.    As I noted above, unlike a generic drug approved under Section 505(j) of the FDCA, the label for a 505(b)(2) NDA may differ from the label for an NDA relied on for initial approval.

**B.    A 505(b)(2) NDA holder's responsibilities for ensuring that the label for their product is not false and misleading are the same as those for a 505(b)(1) NDA holder**

106.    505(b)(2) NDA holders have the same regulatory obligations as 505(b)(1) NDA holders with respect to updating their label with new safety information.

107.    The required format and content of labeling are set forth in Title 21 of the Code of Federal Regulations (CFR); the format was substantially revised in 2006 with the publication of the Physician Labeling Rule (PLR), a regulatory change intended to improve the readability and accessibility of important information, particularly safety information, contained in drug labels.

108.    The obligation to update a drug product label is triggered when there is new safety information or analysis available to these NDA holders that provides either:

a.    "some basis to believe there is a causal relationship" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(7)

or

b.    "reasonable evidence of a causal association" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(6).

**C.    505(b)(2) NDA holders have the same authority as 505(b)(1) NDA holders to submit Changes Being Effected Label Supplements.**

109.    A drug manufacturer may, on its own initiative, update a drug label to a contraindication, warning, precaution, or adverse reaction where evidence of a causal association has been met in accordance with 21 CFR 201.57(c).

**CONFIDENTIAL**

110.    Under the Changes Being Effected regulation, the manufacturer must notify the FDA that it intends to do so.  Such notices are referred to as "changes being effected" (CBE) supplements to an NDA.[60]

111.    The FDA has the authority to retroactively block such CBE supplements, but based on my background, education, training, and experience, in practice rarely does so.  Indeed, most manufacturers generally institute such changes without waiting for FDA feedback.

112.    On the other hand, manufacturers may consult with the FDA before submitting a CBE supplement. Based on my background, education, training, and experience, such prior consultation is unusual. In fact, a manufacturer is not required to consult with the review division before submitting any supplement to an NDA – even an efficacy supplement – or even an original NDA. An FDA analysis of over a hundred 505(b)(2) NDAs submitted between 2010 and 2012 found pre-submission interactions between an applicant and the FDA for less than 60% of the NDAs in the analysis.[61]

113.    Concerns over a drug being deemed "misbranded" because of a manufacturer's decision to add <u>strengthened</u> warnings about a drug's association with a serious adverse event are specious, based on the history of FDA enforcement actions.  Misbranding cases are typically triggered by the opposite behavior, namely a sponsor's <u>failure</u> to include relevant risk information. Furthermore, based on my background, education, training and experience, I am unfamiliar with a single instance in which FDA has pursued a civil or criminal action against a sponsor who sought to add a strengthened warning to its drug label.

## D.    Evidence of Knowledge of 505(b)(2) NDA holders Sandoz, Accord and Hospira

114.    As an initial matter, the earliest date on which any of the 505(b)(2) NDA holders that are the subject of the opinions offered herein made a change to its United States label to reflect any information concerning the risk of PCIA associated with the use of docetaxel was on July 2016, when Accord changed its label.  Thus, at the time the relevant docetaxel products were used by Plaintiffs Hughes, Sanford and Stewart, none of the 505(b)(2) NDA holders warned or

---

[60] 21 CFR 314.70.

[61] Agarwal S, Qiu W, Sahajwalla C. Overview of recently approved 505(b)(2) new drug applications (2010-2012): role of clinical pharmacology. J Clin Pharmacol. 2014 Dec;54(12):1330-6.

**CONFIDENTIAL**

communicated in any way the nature, severity or duration of PCIA.  That is, neither Sandoz, Hospira nor Accord warned the Plaintiffs or their treating/prescribing physicians of the risk of PCIA.  I will address the available evidence known or reasonably knowable to the 505(b)(2) NDA holders at the time of each Plaintiff's use of each respective product.

### 1.    Sandoz

115.    Sandoz marketing of docetaxel dates back to 2003.[62]  Sandoz utilizes a document referred to as a "Core Data Sheet" that tracks the minimum safety information that is to be listed in the labels used in the countries where Sandoz markets docetaxel.[63]  Sandoz's 2006 Core Data Sheet for docetaxel does not mention the risk of PCIA as a side effect of the company's product.[64] Sandoz did not the amend its Core Data Sheet with respect to PCIA and docetaxel until November 2013.[65]

116.    Sandoz did not amend the docetaxel Core Data Sheet or update its US label for docetaxel despite providing the following information about PCIA in its October 2010 docetaxel label in Austria:

- "One case of alopecia non-reversible at the end of the [docetaxel 100 mg/m2 single agent] study."

- "Alopecia was observed to be ongoing at the median follow-up time of 55 months in 22 patients out of the 687 patients with alopecia at the end of chemotherapy." This reports the interim follow up results of the TAX316 study.[66]

117.    Further, Sandoz' global regulatory affairs group was aware of the information contained in this October 2010 Austrian docetaxel label.[67]  This demonstrates that Sandoz had

---

[62] SANDOZ-TAXO-PSUR-00001976.

[63] Rau Dep. 90:15-91:8; 94:13-18.  Rau, Sandoz' FRCP, Rule 36(b) designee on, among other topics, interaction among and between Sandoz global units and Sandoz US, is the Global Head of Safety Label Management for Sandoz. From January 2013 – December 2017 Ms. Rau was the Core Data Sheet and Signal Detection Manager.  responsibility for understanding and communicating the contents of the Core Data Sheet within Sandoz, including what was to be implemented in the countries where the company marketed docetaxel. Rau dep. Ex. 2.

[64] B. Watson Dep., 212:23-215:18.

[65] Rau Dep. at 149:14-20.

[66] Rau Dep. Ex. 11.

[67] Rau Dep. 205:23 – 206:4; 209:19-210:8.

**CONFIDENTIAL**

notice of this information prior to obtaining market approval in the United States.  This is further confirmed by Sandoz's inclusion of the same language in its German docetaxel label in February 2011.[68]  And in April 2011, Sandoz included the following information in the docetaxel label in Australia: ""[t]he following events were observed to be ongoing at the median follow-up time of 55 months: alopecia, amenorrhea, neurosensory and peripheral oedema."[69] All of these labels were updated to include information on PCIA prior to Sandoz being approved to market docetaxel in the United States on June 29, 2011.[70]

118.    In November 2013,[71] Sandoz updated its Core Data Sheet for docetaxel to reflect the company's current state of knowledge. Rau Dep., 183:11 – 184:7; see Rau Dep. Ex.  9. The changes to its Core Safety Information included the following:[72]

- It deleted the prior sentence about the complete reversibility of alopecia.

- It added "One case of alopecia non-reversible at the end of the [docetaxel 100 mg/m2 single agent] study."

- It added the final TAX316 data regarding alopecia: "In study TAX316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 TAC patients and 645 FAC patients. At the end of the following period, alopecia was observed to be ongoing in 29 TAC patients (4.2%), and 16 FAC patients (2.4%)."

- It added "Cases of persisting alopecia have been reported."

Ms. Rau again stated that the changes to the CDS were consistent with the best available scientific data, and serves to guarantee the adequate and safe use of docetaxel.[73]  This updated Core Data Sheet was provided to Sandoz affiliates around the world, including U.S. Regulatory Affairs.[74] No

---

[68] Rau Dep. 210:9-215:19; Rau Dep. Ex. 12.

[69] Rau Dep. 200:10 – 209:7; Rau Dep. Ex. 13.

[70] Rau Dep. 216:23-217:9.

[71] In 2012, Sandoz formed a task force to address the issue of its Core Data Sheets not being timely updated, and Sandoz labels for its drugs in countries around the world not being consistently updated to be in line with the Core Data Sheets. Rau Dep. 229:11 – 232:8; 248:15-20; see also Rau Dep. Ex. 16.

[72] See Rau Dep. Ex. 8 at 15, 23, 29; Rau Dep. Ex. 9 at 39, 50, 58. See also, Rau Dep. 169:1-170:18; 174:6-176:11; 178:21-179:18; see Rau Dep. Ex. 8 at 15, 23, 29; Rau Dep. Ex. 9 at 39, 50, 58.

[73] Rau Dep. 187:24-191:15.

[74] Rau Dep. 187:24-188:6.

**CONFIDENTIAL**

one from Sandoz U.S. Regulatory Affairs looked at the updated Core Data Sheet or used it for any purpose, and Sandoz did not request a label change in the United States until October 2016.[75]

119.    On November 29, 2013, within several weeks of receiving the updated Core Data Sheet for docetaxel, Sandoz Australia requested to change its docetaxel label to be in line with the updated Core Data Sheet.[76] Specifically, Sandoz stated "The change is in response to a Global CDS update."  Even though the Sandoz docetaxel label in Australia already contained some information about persisting alopecia dating back to 2011, Sandoz changed its label to add the following statement to ensure consistency with the Sandoz updated Core Data Sheet: "Cases of persisting alopecia have been reported."

120.    In addition to the above, as evidenced by the multiple recitations of the body of scientific literature outlined in the prior reports of Drs. Feigal, Plunkett, and Madigan, the growing signal in the FAERS database, and the like, in keeping with its post marketing pharmacovigilance obligations as a 505(b)(2) holder, Sandoz is responsible for understanding the science impacting its product.

  a.    Based on the above, Sandoz had knowledge of the risk of PCIA prior to Ms. Stewart's use of its product in June 2014. The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or,  the evidence that existed provided Sandoz with reasonable evidence of a causal association between its docetaxel product and PCIA in as early as October 2010. As discussed above, this triggered Sandoz's obligation to update the label for its docetaxel product. "some basis to believe there is a causal relationship" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(7)

    or

  b.    "reasonable evidence of a causal association" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(6).

---

[75] Seitz Dep. (rough), 61:6-7.

[76] Rau Dep., 217:15-228:8; see Rau Dep. Ex. 14, 15.

**CONFIDENTIAL**

2.     **Accord**

121.     Accord Healthcare, Inc. ("Accord US") obtained approval to market its formulation of Taxotere in June 2011.[77]   Accord US is the commercial arm of Intas Pharmaceuticals, a biopharmaceutical company operating in Ahmedabad, India.[78]   According to its corporate overview, Accord US had nine employees on staff as of November 2011.[79]

122.     Accord US's former President, Dr. Samir Mehta, testified that he never saw Intas and Accord as separate companies and that there was "definitely collaboration" between Accord regulatory affairs and Intas regulatory affairs.[80]   Gerald Price elaborated on the relationship and testified that Accord has access to Intas' regulatory experts directly.[81]

123.     According to the deposition testimony of Accord US's Vice President of Regulatory Affairs, Dr. Sabita Nair, Accord U.S. contracted with a third-party clinical research organization named Lambda Therapeutic, Ltd. to conduct "certain pharmacovigilance activities, including literature surveillance, case processing, aggregate reporting, signal detection, and risk evaluation" for docetaxel,[82] and "to perform its safety evaluation as part of its pharmacovigilance responsibilities."[83]   More specifically, Dr. Nair testified that "all safety information that Accord Healthcare, Inc. receives is from Lambda. Lambda creates the safety information for all of Accord Healthcare Inc.'s products."[84]   Dr. Nair further explained that Lambda provides *all* of the pharmacovigilance for Accord,[85] and Lambda provides all safety information for Accord U.S. based on the information that Lambda collects in their global safety database.[86]

---

[77] Approval Letter, ACC00012697-00012770.

[78] *See* Accord Website – Company Profile.

[79] *See* Overview of Accord USA at a15.

[80] *See* Depo. of Dr. Samir Mehta at 14:22-15:1 and 50:20-51:2.

[81] Depo of Gerald Price at 27:3-16.

[82] *See also* Accord Responses to Interrogatories No. 14.

[83] Sabita Nair July 8, 2019 30(b)(1) testimony, 20:1 – 20:4.

[84] Sabita Nair Oct. 7, 2019 30(b)(6) testimony 33:7 – 33:11.

[85] *Id*. at 38:2 – 38:4 (emphasis added).

[86] *Id*. at 25:11 – 25:17; 47:17 – 47:23.

**CONFIDENTIAL**

124.    Unlike Sandoz, Accord U.S. does not maintain a Core Data Sheet or similar document for docetaxel.

125.    Despite not maintaining a docetaxel Core Data Sheet or similar document, Accord Healthcare Ltd. (Accord's global entity) provided the information about PCIA ongoing in TAX 316 in its May 2012 docetaxel label for the European Union. [87]

126.    Accord Healthcare Ltd. submitted its application to market in the European Union, attaching its label to the application, on June 22, 2011[88]—just 14 days after Accord gained approval in the United States.  This statement demonstrates Accord's knowledge of both the risk of PCIA generally, and Sanofi's TAX316 clinical trial data demonstrating the risk of PCIA.

127.    This knowledge is likewise consistent with the European Medicines Agency's published "Taxotere: Procedural steps taken and scientific information after authorization."[89] That document lists all updates to the product information (SmPC) on Taxotere, the referenced drug for Accord's docetaxel product. On pages 8-9 of the exhibit is a line listing for "II/0100, SmPC section regarding the risk of renal dysfunction, respiratory disorders, persisting alopecia. . ."  Moreover, in Accord's 2012 label for docetaxel, there is a statement that "Cases of persisting alopecia have been reported." This statement again evidences Accord's knowledge of the final TAX 316 clinical trial data demonstrating a causal association between docetaxel and PCIA. This is also "some evidence of a potential causal relationship" between docetaxel and PCIA.

128.    In addition to the above, as evidenced by the multiple recitations of the body of scientific literature outlined in the prior reports of Drs. Feigal, Plunkett, and Madigan, the growing signal in the FAERS database, and the like, in keeping with its post marketing pharmacovigilance obligations as a 505(b)(2) holder, Accord US is responsible for understanding the science impacting its product.[90]

---

[87] European Union Accord Docetaxel SmPC, p. 19.

[88] European Union Accord Docetaxel SmPC ("[having] regard to the application submitted by Accord Healthcare Limited, on 22 June 2011, under article 4(1), . . ." The Commission's decision attaches Accord's Summary of Product Characteristics (SmPC)).

[89] EMA Taxotere SmPC Overview.

[90] According to Dr. Nair, as Accord US's designated representative for pharmacovigilance, Accord's obligation to "update[s] the labels as soon as FDA requires it to do so, or as soon as there is a labeling change in the [Reference Listed Drug, e.g. Taxotere]." Nair Dep. 89:7 – 89:22, Oct. 7, 2019.  Accord only "rel[ies] upon the RLD's labeling" in updating and maintaining its own label.[90]  This is incorrect.  As a 505(b)(2) NDA holder, Accord US has the same

129.   Based on the above, Accord US had knowledge of the risk of PCIA at the time of approval of its docetaxel product in the United States, and thereafter prior to the Plaintiff's use of its product in June 2011.  The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or  the evidence that existed provided Accord with reasonable evidence of a causal association between its docetaxel product and PCIA prior to June 22, 2011.  As discussed above, this triggered Accord's obligation to update the label for its docetaxel product.

### 3.   Hospira.

130.   Hospira received authorization to market its US docetaxel product on March 8, 2011.[91]  Similar to Sandoz, Hospira utilizes a Core Safety Information – "a company controlled document" that sets forth the minimum safety information to be listed in the labels used in the countries where Hospira markets docetaxel.[92]

131.   Hospira is unique in its knowledge of docetaxel, and particularly concerning drug safety and side effect profile, because of a high-ranking employee that had specific experience with the pharmacovigilance of Taxotere/docetaxel at both Sanofi and Hospira.  Juergen Schmider was the Sanofi Vice President of Safety Surveillance and Product Safety with the department of Epidemiology, with responsibilities for Taxotere, from March 2011 through April 2013.[93]  After leaving Sanofi in April 2013, Dr. Schmider became the Global Vice President of Pharmacovigilance and Product Safety for Hospira, again with responsibilities for Taxotere.[94]

132.   While at Sanofi, Dr. Schmider dealt directly with pharmacovigilance and drug safety, and during his tenure, Sanofi submitted to the European Medicines Agency an application

---

labeling obligations as a 505(b)(1) innovator NDA holder – including to update its label to include or modify a contraindication, warning, precaution, or adverse reaction where evidence of a causal association or causal relationship has been met in accordance with 21 CFR 201.57(c).

[91] NDA APPROVAL - HOS01400256285 - Record No. 572206 and Original New Drug Application - HOS00200007762 - Record No. 463130.

[92] Schmider 30(b)(6) depo, 69:16 – 71:3.

[93] J. Schmider dep., 48:1-3.

[94] J. Schmider dep., 48:23-49:8.

CONFIDENTIAL

to update its label concerning, among other safety issues, persistent alopecia.[95]  Specifically, the EMA stated that "Given the serious psychological consequences of this adverse effect in, often young, patients treated mainly in an adjuvant scheme, health care professionals and patients should be informed of the possible irreversibility of alopecia. Therefore, the CHMP requested the MAH to update the SmPC [label] in this respect in order to address this risk more clearly."

133.    In addition, when Dr. Schmider was deposed in this case, he brought with him documents marked "property of the sanofi-aventis group - strictly confidential."   One of these documents was Sanofi's Core Data Sheet for Taxotere dated June 28, 2011 date, which included information regarding PCIA from TAX 316.[96]

134.    Based on these documents and his experience while at Sanofi, Dr. Schmider—and in turn, Hospira—knew or should have known of the risk of PCIA with docetaxel.

135.    According to Dr. Schmider, Hospira did not follow up on reports of alopecia, however, because alopecia is a known side effect of chemotherapy.[97]  Due to the lack of follow up, and despite having knowledge of EMA's report statement concerning the "the serious psychological consequences of this adverse effect" Hospira did not capture or assess the nature, duration or severity of persistent alopecia events, despite the growing body of scientific knowledge.

136.    Hospira claims that its pharmacovigilance department periodically performed literature searches for all of its products.  There was adequate scientific literature available prior to Ms. Sanford's initial infusion date.  Had Hospira performed an adequate literature search and signal detection analytics prior to market approval, it would have seen the same literature and safety signal demonstrated in the reports of Drs. Feigal and Madigan. This is true for all manufacturers addressed in this report.

137.    All of these events are underscored by an inspection by the British Medicines & Healthcare products Regulatory Agency.[98]   Also, in 2013 the Belgian Federal Agency for Medicines and Health Products issued a Pharmacovigilance Inspection Report finding a number

---

[95] Schmider dep., Ex. 9, p. 2, 6-7.

[96] Schmider dep. Ex. 7 and 5, respectively.

[97] Schmider dep., 79:15-18; Mir dep., 128 (rough).

[98]  01 - MHRA - HOS01400019056.

**CONFIDENTIAL**

of critical shortcomings, including a lack of risk based audits, procedures for pharmacovigilance operations, lack of training, deficient receipt and management of suspected adverse events, and an incomplete master pharmacovigilance file.[99]

138.    As noted above, Hospira's 2012 label in Israel, Hungary, the United Kingdom, and other countries referenced a summary of Sanofi's TAX 316 clinical trial data, including ongoing (permanent) alopecia. In July 2013, Hospira changed at least five of its European labels to include additional information regarding the TAX316 data and permanent alopecia.

139.    In addition, after Hospira was purchased by Pfizer and after Pfizer became aware of the Sanofi December 2015 label change, Pfizer conducted a clinical overview. As part of the clinical overview, a search of the safety database was performed in September 2016. That search revealed 146 cases of alopecia, of which 29% were described as "permanent" or "irreversible."[100] The results of the clinical overview, including the results of the safety database search, led to Hospira seeking a label change in March 2017 to state "cases of permanent alopecia have been reported."[101]

> Based on the above, Hospira had knowledge of the risk of PCIA prior to the Plaintiff's use of its product in March 2011. The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or the evidence that existed provided Hospira with reasonable evidence of a causal association between its docetaxel product and PCIA in as early as 2011, and as evidenced in its own 2012. labels in Israel, Hungary, and the United Kingdom, among other countries Hospira's label was not changed to reflect the change Sanofi received approval for in December 2011, until nearly 2 years later – in 2017.  Prior to this Hospira never warned of the risk PCIA in its label.

140.    As discussed above, this triggered Hospira's obligation to update the label for its docetaxel product.

141.    I state all of my opinions herein to a reasonable degree of professional regulatory certainty.

---

[99] Benelux - No markup - HOS01400186232, see also Mir dep., 64-93 (rough).  It is important to note that this report from outside the United States is relevant to this opinion because a large majority of the pharmacovigilance operations for Hospira were conducted from outside the United States.  Mir dep. p. 24-26, 30-28 and 81 (rough).

[100] March 2017 - HOS00200030958.

[101] Docetaxel Oct. 2019 Label - HOS02100035549.

**CONFIDENTIAL**

Dated: June 8, 2020.

_____
David B. Ross, M.D., Ph.D., M.B.I.

**CONFIDENTIAL**