**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL No. 2740 |
| | Section: N(5) |
| This Document Relates To: *Arquice Conley v. Sandoz Inc.* Civil Case No. 2:18-cv-09799 | JUDGE JANE TRICHE MILAZZO |
| | MAG. JUDGE NORTH |

**SANDOZ INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR**
<u>**SUMMARY JUDGMENT ON PREEMPTION GROUNDS**</u>

**GREENBERG TRAURIG, LLP**
Lori G. Cohen
R. Clifton Merrell
Evan C. Holden
Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
(678) 553-2100

Gregory E. Ostfeld
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 476-5056

*Counsel for Defendant Sandoz Inc.*

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND...............................................................................3

      A.      Plaintiff's Claims Arise Out of Her Life-Saving Treatment with Sandoz'
            Docetaxel from October 2011 to January 2012, Just Months After FDA's
            Approval of Sandoz' Docetaxel.......................................................................3

      B.      The § 505(b)(2) Regulatory Pathway Used to Approve Docetaxel.......................4

      C.      FDA Approved Sandoz' Docetaxel Via the § 505(b)(2) Regulatory
            Pathway on June 29, 2011 ...............................................................................5

      D.      Sandoz' Docetaxel Warnings Matched the FDA-Approved Label
            Warnings for Taxotere® ...................................................................................7

      E.      Sandoz Updated Its Docetaxel Warnings in March 2016 to Match Sanofi's
            December 2015 Label Change...........................................................................8

      F.      Plaintiff's Asserted Grounds for a Permanent Alopecia Warning........................10

III.    ARGUMENT .......................................................................................................12

      A.      Plaintiff's Claims Are Preempted Because There Is No Evidence That
            Sandoz Had "Newly Acquired Information"........................................................12

      B.      The Record Lacks Any Evidence of "Newly Acquired Information"
            Supporting a Label Change by Sandoz Under the CBE Regulation......................15

            1.      The Record Does Not Demonstrate Sandoz Obtained Any "Newly
                  Acquired Information" Not Previously Submitted ....................................16

            2.      The Record Does Not Demonstrate Any Purported "Newly
                  Acquired Information" Revealed Risks of a Different Type or
                  Greater Severity or Frequency .................................................................19

             3.      The Record Does Not Demonstrate the Purported "Newly
                  Acquired Information" Provided Reasonable Evidence of a Causal
                  Association Between Docetaxel and a Clinically Significant
                  Hazard or Adverse Reaction ....................................................................23

IV.     CONCLUSION....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arquice Conley v. Sandoz Inc.*,
No. 2:18-cv-09799-JTM-MBN, ECF No. 1 ...........................................................................4

*Blackburn v. Shire Us, Inc.*,
No. 2:16-CV-963-RDP, 2017 U.S. Dist. LEXIS 69664 (N.D. Ala. May 8,
2017) ...................................................................................................................................17

*Buckman Co. v. Plaintiffs Legal Cte.*,
531 U.S. 341 (2001) ...........................................................................................................17

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
779 F.3d 34 (1st Cir. 2015) .................................................................................12, 14, 17

*Crockett v. Luitpold Pharm., Inc.*,
No. CV 19-276, 2020 WL 433367 (E.D. Pa. Jan. 28, 2020) ....................................14

*Dolin v. GlaxoSmithKline LLC*,
901 F.3d 803 (7th Cir. 2018) ...........................................................................................14

*Drescher v. Bracco Diagnostics Inc.*,
No. CV-19-00096-TUC-RM (LCK), 2020 U.S. Dist. LEXIS 17192 (D. Ariz.
Jan. 31, 2020) .....................................................................................................................13

*Evans v. Gilead Scis., Inc.*,
No. 20-CV-00123-DKW-KJM, 2020 WL 5189995 (D. Haw. Aug. 31, 2020) ...........15

*Gayle v. Pfizer Inc.*,
452 F. Supp. 3d 78 (S.D.N.Y. 2020) ...............................................................................14

*Gibbons v. Bristol-Myers Squibb Co.*,
919 F.3d 699 (2d Cir. 2019) .......................................................................................12, 14

*Holley v. Gilead Scis., Inc.*,
379 F. Supp. 3d 809 (N.D. Cal. 2019) ......................................................................17, 18

*Ideus v. Teva Pharm. USA, Inc.*,
No. 4:16-CV-3086, 2017 U.S. Dist. LEXIS 211611 (D. Neb. Dec. 12, 2017) ...............14

*Ignacuinos v. Boehringer Ingelheim Pharm., Inc.*,
No. 3:19-cv-672 (SRU), 2020 U.S. Dist. LEXIS 174215 (D. Conn. Sep. 23,
2020) ...................................................................................................................................22

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
524 F. Supp. 3d 1007 (S.D. Cal. Mar. 9, 2021) .....................................................20, 21

*Javens v. GE Healthcare Inc.*,
Civil Action No. 18-1030-RGA-SRF, 2020 U.S. Dist. LEXIS 94067 (D. Del.
May 29, 2020) ....................................................................................................................14

*Knight v. Boehringer Ingelheim Pharms., Inc.*,
  984 F.3d 329 (4th Cir. 2021) ......................................................................12, 20, 21, 22

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Prods. Liab.
  Litig.*,
  185 F. Supp. 3d 761 (D.S.C. 2016).........................................................................17

*Lyons v. Boehringer Ingelheim Pharm.*,
  No. 1:18-CV-04624-WMR, 2020 U.S. Dist. LEXIS 184234 (N.D. Ga. Sep.
  29, 2020) ...........................................................................................................16, 19

*Mahnke v. Bayer Corp.*,
  No. 2:19-cv-07271-RGK-MAA, 2020 U.S. Dist. LEXIS 76572 (C.D. Cal.
  Mar. 10, 2020).............................................................................................................16

*McGrath v. Bayer Healthcare Pharm. Inc.*,
  393 F. Supp. 3d 161 (E.D.N.Y. 2019) ......................................................14, 18, 24, 25

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S. Ct. 1668 (2019)....................................................................................3, 12, 15

*Mitchell v. Boehringer Ingelheim Pharm., Inc.*,
  No. 1:16-cv-02384-STA-egb, 2017 U.S. Dist. LEXIS 192498 (W.D. Tenn.
  Nov. 21, 2017) ........................................................................................................23, 24

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011)...........................................................................................3, 12

*Pradaxa Cases*,
  No. CJC-16-004863, 2019 WL 6043513 (Cal. Super. Nov. 8, 2019) ..............................14, 24

*Rice v. Normal Williams Co.*,
  458 U.S. 654 (1982)...............................................................................................15

*Ridings v. Maurice*,
  444 F. Supp. 3d 973 (W.D. Mo. 2020) ....................................................................14, 17, 22

*Roberto v. Boehringer Ingelheim Pharm., Inc.*,
  No. CPLHHDCV166068484S, 2019 WL 5068452 (Conn. Super. Ct. Sept. 11,
  2019) ......................................................................................................14, 17, 19, 22, 24

*Sabol v. Bayer Healthcare Pharm.*,
  439 F. Supp. 3d 131 (S.D.N.Y. 2020).....................................................................14, 23

*Silverstein v. Boehringer Ingelheim Pharm., Inc*.,
  No. 19-CIV-81188, 2020 WL 6110909 (S.D. Fla. Oct. 7, 2020) ..............................15, 23, 24

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*,
  No. MDL 16-2740, 2020 WL 2747279 (E.D. La. May 27, 2020).................................................2

*Utts v. Bristol-Myers Squibb Co.*,
  251 F. Supp. 3d 644 (S.D.N.Y. 2017), *aff'd sub nom. Gibbons*, 919 F.3d 699..........14, 19, 24

*Wyeth v. Levine*,
  555 U.S. 555 (2009)..................................................................................................12

*In re Zofran (Ondansetron) Prods. Liab. Litig.*,
    2021 U.S. Dist. LEXIS 102782 (D. Mass. June 1, 2021) .......................................................12

**Statutes**

21 U.S.C. § 351(b) ..............................................................................................................................6

21 U.S.C. § 352(g) ..............................................................................................................................6

21 U.S.C. § 355(b)(2) ...........................................................................................................1, 2, 4, 5, 6, 7

21 U.S.C. § 355(d)(7) ........................................................................................................................17

**Other Authorities**

21 C.F.R. § 201.57(c) ........................................................................................................................13

21 C.F.R. § 201.57(c)(6)(i) .....................................................................................................2, 13, 23

21 C.F.R. § 201.57(c)(6)(i) ..............................................................................................................17

21 C.F.R. § 201.57(c)(7) ...................................................................................................................13

21 C.F.R. § 299.5 .................................................................................................................................6

21 C.F.R. § 314.3(b) .........................................................................................................13, 17, 20, 21, 22

21 C.F.R. § 314.3(b) .........................................................................................................................17

21 C.F.R. § 314.70 ............................................................................................................................13

21 C.F.R. § 314.70(b)(2)(v)(A) ........................................................................................................12

21 C.F.R. § 314.70(c)(iii) ..................................................................................................................17

21 C.F.R. § 314.70(c)(6)(iii) .............................................................................................................13

21 C.F.R. § 314.70(c)(6)(iii)(A) .....................................................................................................2, 13

21 C.F.R. § 314.125(b)(6) .................................................................................................................17

73 Fed. Reg. 49,603, 49,604 (Aug. 22, 2008) ..................................................................................13

73 Fed. Reg. at 49,604 ......................................................................................................................23

73 Fed. Reg. 2848 (Jan. 16, 2008) ...................................................................................................23

*Black's Law Dictionary* (9th ed. 2009) ............................................................................................23

*In re: Taxotere (Earnest)*, MDL 2740, Doc. 7973 ......................................................................1, 15

*In re: Taxotere (Hughes)*, MDL 2740, Doc. 12521 ............................................................................1

*In re: Taxotere (Stewart)*, MDL 2740, Doc. 12494 ...........................................................................1

## I.   INTRODUCTION

Plaintiff Arquice Conley ("Plaintiff") seeks damages from Sandoz Inc. ("Sandoz"), the manufacturer of the chemotherapy medication that she acknowledges cured her cancer and saved her life, based on an alleged side effect, alopecia, which she acknowledges she knew existed and was already incorporated into the drug's U.S. Food & Drug Administration ("FDA")-approved label. Plaintiff asserts Mississippi law required Sandoz to insert the word "permanent" into the existing alopecia warning in its version of the chemotherapy drug docetaxel before Plaintiff received cancer treatments. Yet to escape federal preemption of her claims, Plaintiff must have evidence that Sandoz obtained newly acquired information about the risk of "permanent" alopecia between June 29, 2011 (when its version of docetaxel received FDA approval) and October 14, 2011 to January 24, 2012 (when Plaintiff received her docetaxel treatment). The evidence must also show a causal association between Sandoz' docetaxel and a clinically significant hazard. The record lacks any such evidence of newly acquired information during the short time between FDA approval of Sandoz' docetaxel and Plaintiff's life-saving treatment, and further lacks any evidence of a causal association between Sandoz' docetaxel and a clinically significant hazard. Accordingly, federal law prohibited Sandoz from unilaterally making the label change Plaintiff contends it was required to make under Mississippi law, and Plaintiff's claims are all preempted by federal law.[1]

Docetaxel is the generic version of the brand-name chemotherapy drug Taxotere® manufactured by Sanofi. Sandoz brought its docetaxel to market in June 2011 using the § 505(b)(2)

---

[1] The Court did not consider these grounds for preemption as part of its Order entered in the *Earnest* case, which involved brand-name Taxotere®, a separate regulatory history, and distinct questions of material fact. *See generally In re: Taxotere (Earnest)*, MDL 2740, Doc. 7973. And while Sandoz and Accord previously moved for summary judgment on these grounds in the *Stewart* and *Hughes* cases, respectively, the Court granted summary judgment in those cases on other grounds and dismissed the preemption motions as moot. *See generally In re: Taxotere (Stewart)*, MDL 2740, Doc. 12494; *In re: Taxotere (Hughes)*, MDL 2740, Doc. 12521. Sandoz reserves the right to move for summary judgment in this case on additional, alternative grounds, if this Motion is denied in full or in part.

regulatory pathway of the federal Food, Drug, and Cosmetic Act ("FDCA"). *See* 21 U.S.C. § 355(b)(2). A drug approved through the § 505(b)(2) pathway relies on what is already known about the Reference Listed Drug ("RLD") it follows—Taxotere® in this case—including previous findings by FDA that the RLD is safe and effective. The warnings for the § 505(b)(2) drug likewise generally match the RLD's warnings, as they did here. And the § 505(b)(2) drug manufacturer is prohibited from revising its FDA-approved warnings without prior FDA approval, unless the manufacturer relies on "newly acquired information" to "add or strengthen a contraindication, warning, precaution, or adverse reaction" through a Changes Being Effected ("CBE") supplement. 21 C.F.R. § 314.70(c)(6)(iii)(A). Even then, this "newly acquired information" must present "reasonable evidence" of a "causal association" between the drug and a "clinically significant hazard" to proceed without prior FDA approval. 21 C.F.R. § 201.57(c)(6)(i).

Here, Sandoz submitted and FDA approved the same warnings, precautions, and adverse reactions for Sandoz' docetaxel label as in Sanofi's previously-approved Taxotere® label, including identical references to "alopecia" in the adverse reaction section and elsewhere in the labeling and a "hair loss" warning in the patient counseling section. There is no evidence Sandoz obtained any "newly acquired information" between FDA approval in June 2011 and Plaintiff's treatment from October 2011 to January 2012, nor is there any "reasonable evidence" of a "causal association" between docetaxel and a "clinically significant hazard." Thus, it was impossible for Sandoz to unilaterally change its label to add a "permanent" alopecia warning through the CBE process until it did so after Sanofi changed its label for Taxotere® in 2015, following an exhaustive FDA review process, to state "[c]ases of permanent alopecia have been reported."[2]

---

[2] This Court has confirmed the adequacy of the 2015 warning label as a matter of law. *See In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. MDL 16-2740, 2020 WL 2747279, at *2 (E.D. La. May 27, 2020) ("Because the [2015] label clearly and consistently warned of the precise injury Plaintiffs suffered, the Court finds that the label was adequate.").

These undisputed material facts require summary judgment for Sandoz. Under principles of conflict preemption, federal law preempts a state law claim where it is "impossible" for the defendant to "independently do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011). That includes any state law claim demanding a new or different warning that requires prior FDA approval. When the only way for a party to "satisfy its state duties" is with "the Federal Government's special permission," and that permission "is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24. Whether there was "reasonable evidence" sufficient for a manufacturer to "propose a change" by CBE supplement without prior FDA approval is not "a matter of fact for a jury" but "a matter of law for the judge to decide." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019); *see also id*. at 1680-81. Here, the undisputed record lacks any evidence of "newly acquired information" during the relevant time period to support Sandoz proposing a new permanent alopecia warning. Plaintiff's claims are thus preempted in their entirety and the Court should enter judgment for Sandoz.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Claims Arise Out of Her Life-Saving Treatment with Sandoz' Docetaxel from October 2011 to January 2012, Just Months After FDA's Approval of Sandoz' Docetaxel

Plaintiff was diagnosed with breast cancer on August 5, 2011. Statement of Undisputed Material Facts ("SUMF") ¶ 1 (Second Amended Plaintiff Fact Sheet ("PFS") ¶ V.5). She commenced chemotherapy treatments on October 14, 2011, and received a combination of docetaxel with cyclophosphamide and doxorubicin, about every three weeks through January 24, 2012. *Id.* ¶ 2 (PFS ¶¶ V.11-12; Deposition of Arquice Conley ("Conley Dep.") 209:7-11, 232:16-19, 247:2-5). Plaintiff's treatment was successful, and she has been cancer-free since. *Id*. ¶ 4 (Conley Dep. 305:8-14, 306:5-8, 370:9-11). Plaintiff acknowledges that docetaxel saved her life

3

and cured her breast cancer. *Id*. ¶ 5 (Conley Dep. 306:5-13). Plaintiff began losing hair after her first chemotherapy cycle, and knew chemotherapy was associated with hair loss prior to undergoing treatment. *Id*. ¶ 6 (Conley Dep. 34:8-25, 249:10-14). Sandoz' docetaxel label included multiple warnings of "alopecia" and "hair loss." *See* Section D, *infra*.

Plaintiff's prescribing oncologist, Dr. John Whitecar, testified he would have recommended treatment with the docetaxel regimen even if he *had* been warned of the risk of permanent hair loss in the docetaxel labeling, because the docetaxel regimen provided the best shot at disease-free survival and the benefits of the chemotherapy drugs outweigh the risks for the appropriate treatment in the appropriate patient. *Id*. ¶ 3 (Deposition of Dr. John Whitecar ("Whitecar Dep.") 23:6-12, 42:3-8, 43:11-15).

Plaintiff claims she experienced permanent and persistent hair loss beginning at the time she started chemotherapy treatment in October 2011, and that she noticed in late 2012 that her hair was not growing back as she anticipated. *Id*. ¶ 8 (Conley Dep. 258:14-260:3, 268:21-269:24). Plaintiff filed suit against Sandoz on October 22, 2018. *See Arquice Conley v. Sandoz Inc.*, No. 2:18-cv-09799-JTM-MBN, ECF No. 1 (Short Form Complaint). Plaintiff brings claims for strict products liability failure to warn, negligence, negligent misrepresentation, fraudulent misrepresentation, fraudulent concealment, and fraud and deceit, all predicated on the theory that Sandoz failed to adequately warn of the risk of permanent or persistent hair loss in the docetaxel labeling. Sandoz denies all of Plaintiff's claims and causes of action.

### B.    The § 505(b)(2) Regulatory Pathway Used to Approve Docetaxel

Sandoz' docetaxel is a version of Sanofi's Taxotere®, approved through the § 505(b)(2) regulatory pathway. SUMF ¶ 9. The § 505(b)(2) pathway is one of two drug approval options, alongside the § 505(j) pathway for Abbreviated New Drug Applications ("ANDAs"), created and added to the FDCA as part of the Drug Price Competition and Patent Term Restoration Act of

1984, commonly referred to as the "Hatch-Waxman Amendments." *Id.* ¶ 10. The two pathways "reflect Congress's attempt to balance the need to encourage innovation with the desire to speed the availability of lower cost alternatives to approved drugs." *Id.* (Citizen Pet. Resp., pp. 3-4). Each pathway is faster and less expensive than the traditional New Drug Application ("NDA") pathway under § 505(b)(1), used for the first-time approval of a new drug.

The § 505(b)(2) pathway "shares characteristics of both ANDAs and standalone NDAs." Citizen Pet. Resp., p. 3. It "must satisfy the requirements for safety and effectiveness information," the same as a traditional NDA, but also "may rely on the FDA finding that the listed drug it references is safe and effective as evidence in support of its own safety and effectiveness," similar to an ANDA. *Id.* FDA's "longstanding interpretation of section 505(b)(2) is intended to permit the pharmaceutical industry to rely to the greatest extent possible under the law on what is already known about a drug." *Id.* This reliance on the RLD avoids scientifically unnecessary studies, preserves resources, reduces drug costs, reduces strain on FDA review resources, and speeds the process for drug approval. *Id.*; *see also* FDA, Draft Guidance for Industry: Applications Covered by Section 505(b)(2) (December 1999) at 3, https://www.fda.gov/media/72419/download (last visited Nov. 6, 2021) (explaining that the § 505(b)(2) pathway avoids "duplicate work" and averts "wasteful and unnecessary … studies to demonstrate what is already known about a drug").

### C.   FDA Approved Sandoz' Docetaxel Via the § 505(b)(2) Regulatory Pathway on June 29, 2011

Sanofi's Taxotere® entered the market in 1996. *See* SUMF ¶ 11. When the patent for Taxotere® expired in 2010, Sandoz was one of several manufacturers that applied for and obtained approval under § 505(b)(2) to sell its own docetaxel product. *Id.* (Second Amended Master Long Form Complaint, MDL No. 2407, Doc. 4407, ¶¶ 32–36, 45, 59, 71, 82, 92, 105).

Sandoz or its affiliate conducted all aspects of the § 505(b)(2) approval process for

docetaxel in consultation with FDA. *Id.* ¶ 12. Sandoz' FDA and regulatory expert, Roger L. Williams, M.D., has issued a report detailing the approval process and has testified in full support of Sandoz' regulatory compliance and the adequacy of its labeling.[3] The process began with Sandoz' affiliate by subsequent merger, Ebewe Parenta Pharmaceuticals ("Ebewe"), which requested a pre-NDA meeting with FDA by letter dated March 28, 2008. *Id.* The letter stated that Ebewe's proposed product contained the "same active ingredient and indications" as Taxotere®, and differed from Taxotere® only with respect to certain inactive ingredients, indications for head and neck cancer, and in being ready for use without a diluent. *Id.* (SANDOZ-TAXO-NDA-00016679-685). FDA set a tentative date for the pre-NDA meeting of July 2, 2008 (IND# 102081). *Id.* ¶ 13 (SANDOZ-TAXO-NDA-00016024-25).

Ebewe submitted meeting materials ahead of the pre-NDA meeting that included several questions. *Id.* ¶ 14 (SANDOZ-TAXO-NDA-00016715-805). Ebewe stated in its meeting materials that its docetaxel product "has the same end concentration and has the same indications (except for the indications for head and neck cancer)" as the RLD, and that "[r]eference will be made to clinical studies documented in the Taxotere® injection labeling … to support the clinical safety profile and efficacy of the active pharmaceutical ingredient," with no additional clinical studies planned. *Id.* ¶ 15 (SANDOZ-TAXO-NDA-00016715-805). Ebewe asked, "Does the Agency agree that no additional clinical studies are required to support a 505(b)(2) NDA application?", and FDA answered "Yes." *Id.* ¶¶ 16-17 (SANDOZ-TAXO-NDA-00016539-45).

---

[3] Sandoz served Dr. Williams' expert report on July 24, 2020, and Plaintiff deposed Dr. Williams on September 22, 2020. Dr. Williams worked at the FDA for ten years, and was director of the Office of Generic Drugs, spending considerable time on new drug applications and drug labeling. He was also Chief Executive Officer and Chair of the Council of Experts at the United States Pharmacopeial Convention ("USPC"), which is responsible for the United States Pharmacopeia and the National Formulary, both of which set legally enforceable standards as to the strength, quality, purity, packaging, and labeling of drugs. *See* 21 U.S.C. §§ 351(b), 352(g); 21 C.F.R. § 299.5. He is now a consultant for drug companies advising on drug approval and labeling, including § 505(b)(2) drugs.

6

By correspondence dated January 12, 2010, Ebewe and Sandoz gave notice to FDA that Ebewe had become an affiliated entity of Sandoz on September 23, 2009, when it was acquired by Novartis AG. *Id.* ¶ 18 (Williams Rpt., p. 18). Sandoz continued to pursue an NDA for a docetaxel product that had the same concentration as the Hospira docetaxel product but otherwise would have similar labeling to Sanofi's Taxotere®. *Id.* ¶ 19 (Williams Rpt., p. 18).

Sandoz submitted its NDA for FDA review on September 16, 2010. *Id.* ¶ 20 (SANDOZ-TAXO-NDA-000373-76). The NDA contained no new non-clinical or clinical information other than the concentration of the formulations. *Id.* ¶ 21 (Williams Rpt., p. 18).

FDA approved the Sandoz § 505(b)(2) NDA for docetaxel on June 29, 2011. *Id.* ¶ 23 (SANDOZ-TAXO-NDA-0016364-432). FDA's biopharmaceutics experts determined that the Sandoz formulation was sufficiently equivalent to the RLD, and granted a waiver to a possible requirement to provide in vivo bioequivalence data. *Id.* ¶ 24 (Williams Rpt., p. 18).

**D.      Sandoz' Docetaxel Warnings Matched the FDA-Approved Label Warnings for Taxotere®**

Sandoz submitted labeling in its NDA submission for docetaxel in September 2010 that followed the approved Sanofi labeling for Taxotere®. SUMF ¶ 25 (Williams Rpt., p. 21). The Sandoz submissions to FDA directly referenced the Taxotere® labeling and provided it for comparison. *Id.* ¶ 26 (Williams Rpt., p. 22). The warnings, precautions, adverse reactions, and alopecia information was the same for both the Sandoz and Taxotere® labeling. *Id.* ¶ 27 (Williams Rpt., p. 4). During the review process, FDA never questioned the use of the Taxotere® labeling as the appropriate base labeling and never suggested any different language with respect to warnings and precautions. *Id.* ¶ 28 (Williams Rpt., pp. 4, 21, 25). Indeed, the Taxotere® labeling changed to remove language that "hair generally grows back" and Sandoz followed suit, changing that language during the NDA review process. *Id.* ¶ 29 (Williams Rpt., p. 25). FDA never questioned

7

Sandoz' methodology in relying on the RLD labeling. *Id*. ¶ 28.

The Sandoz labeling included reference to "alopecia" in the adverse reactions section, with no temporal limitation such as "temporary" or "permanent". *Id*. ¶ 30 (Williams Rpt., p. 21; SANDOZ-TAXO-LABELING-000004-62). There were multiple references to "alopecia" throughout the Sandoz labeling. *Id*. ¶ 31 (Williams Rpt., pp. 21-22; SANDOZ-TAXO-LABELING-000004-62). The patient counseling section included a warning of "hair loss" in a section with common side effects. *Id*. ¶ 32 (Williams Rpt., p. 22; SANDOZ-TAXO-LABELING-000004-62). It advised patients to "Tell your doctor if you have any side effect that bothers you or does not go away." *Id*. ¶ 33 (Williams Rpt., p. 22; SANDOZ-TAXO-LABELING-000004-62). All of this language matched the Taxotere® labeling. *Id*. (Williams Rpt., pp. 4, 21, 25; SANDOZ-TAXO-LABELING-000004-62).

FDA accepted Sandoz' use of the Taxotere® labeling, and only provided comments or revisions on those sections of the labeling that were specific to Sandoz' docetaxel, none of which relate to warnings, precautions, or adverse reactions or alopecia specifically. *Id.* ¶ 34 (Williams Rpt., p. 22). Ultimately, FDA approved the Sandoz labeling when it approved the NDA on June 29, 2011, including the warnings with respect to alopecia, which were identical to those in the Taxotere® labeling. *Id.* ¶ 35 (Williams Rpt., p. 22; SANDOZ-TAXO-NDA-00016364-432).

**E.  Sandoz Updated Its Docetaxel Warnings in March 2016 to Match Sanofi's December 2015 Label Change**

On March 23, 2015, FDA requested that Sanofi provide a summary of cases of persistent total or partial alopecia associated with docetaxel use. *Id.* ¶ 36 (Williams Rpt., p. 24; Sanofi_01574962). Sanofi responded, and FDA followed up on October 2, 2015 with a request that Sanofi provide any additional information regarding permanent or irreversible alopecia and amend the package insert to add information on permanent or irreversible alopecia within 60 days.

8

*Id*. ¶ 37 (Williams Rpt., p. 24; Sanofi_ 00805353). Sanofi responded on November 24, 2015 with an updated clinical overview evaluating docetaxel and permanent alopecia, and provided a CBE labeling supplement (which FDA approved on December 11, 2015) to update the Taxotere® labeling. *Id*. ¶ 38 (Williams Rpt., p. 24). Sanofi proposed adding to the Taxotere® package insert, in the "Adverse Reactions, Post Marketing Experiences" section, "Cases of permanent alopecia have been reported." *See id*. ¶ 39 (Williams Rpt., p. 24; Sanofi_03333249). FDA approved the change in December 2015. *Id*. ¶ 40 (Williams Rpt., p. 24).

Sandoz reviewed any changes in the Sanofi Taxotere® labeling and, when appropriate, submitted similar changes to its own labeling. *Id*. ¶ 41 (Williams Rpt., p. 26; Seitz Dep. 76:3-16; Fernandez Dep. 84:3-24). That approach complies with FDA regulations, guidance, and industry standards. *Id*. ¶ 42 (Williams Rpt., p. 26). For example, on August 15, 2013, Sandoz submitted revised labeling to FDA in a CBE submission to reflect changes Sanofi made to its labeling. *Id*. ¶ 43 (SANDOZ-TAXO-NDA-00006903-04). Sandoz made many similar submissions to follow changes made by Sanofi. *Id*. ¶ 44 (Williams Rpt., p. 26).

Pursuant to this approach, Sandoz' labeling with respect to alopecia remained the same until March 7, 2016, when Sandoz changed the alopecia language to conform to Sanofi's December 2015 changes. *Id.* ¶ 45 (Williams Rpt., p. 22; SANDOZ-TAXO-NDA-00009896-97). This was submitted by Sandoz as a CBE supplement on March 7, 2016, which noted that the labeling would be implemented on April 7, 2016. *Id*. ¶ 46 (Williams Rpt., p. 22; SANDOZ-TAXO-NDA-00009896-97). FDA approved the labeling change on October 21, 2016. *Id.* ¶ 47 (Williams Rpt., p. 22; SANDOZ-TAXO-NDA-00016286-351). Matching Sanofi's change, Sandoz' change added language stating, "Cases of permanent alopecia have been reported." *Id.* ¶ 48 (Williams Rpt., p. 22; SANDOZ-TAXO-NDA-00009896-97). FDA never suggested to Sandoz changing the

alopecia warning prior to its submission of the CBE supplement on March 7, 2016. *Id.* ¶ 49 (Williams Rpt., p. 22).

### F.      Plaintiff's Asserted Grounds for a Permanent Alopecia Warning

Plaintiff has attempted to support her allegations that Sandoz failed to adequately warn of a risk of permanent alopecia with Sandoz' docetaxel through the expert report of Dr. David Ross.[4] *Id.*, Ex. W ("Ross Rpt."). Dr. Ross opines that Sandoz had information sufficient to support a unilateral change in its FDA-approved label to add the statement that "[c]ases of permanent alopecia have been reported," long before Sandoz did so in 2016, based on: (1) labeling submissions by Sandoz to "foreign regulatory authorities"; (2) the "body of scientific literature"; and (3) FDA's adverse event report database. Ross Rpt. ¶¶ 29, 128.

Dr. Ross opines that Sandoz "knew or had reason to know of the increased risk of permanent chemotherapy induced alopecia (PCIA) and the need for inclusion of a warning, precaution, and/or adverse event listing in the label[.]" *Id.* ¶ 29. He further opines that Sandoz had "knowledge of the risk of PCIA" going back "as early as October 2010[.]"*Id.* ¶ 120. He bases these opinions on foreign regulatory submissions (Germany in October 2010, Australia in April 2011, and Sandoz' Core Data Sheet and labels in Austria, Germany, and Australia in 2013). *Id.* ¶¶ 96, 100, 116-19. The foreign regulatory submissions involved other countries' *different* labeling regimes, under which Sandoz matched the *different* approved Taxotere® label in each country, some of which included certain language or information from the "TAX316 study" that FDA had also received but had not required in the Taxotere® label for the United States. *See id.*

Dr. Ross further claims Sandoz should have changed its label earlier based on an alleged

---

[4] Sandoz maintains its position that Dr. Ross's opinions should be excluded or limited, and reserves the right to challenge Dr. Ross's expert report in this bellwether case as Sandoz previously did in the *Stewart* bellwether trial case, but nevertheless argues for purposes of this Motion that even considering the opinions of Dr. Ross, Plaintiff's claims are preempted.

"body of scientific literature" and "growing signal in the [FDA Adverse Event Reporting System ('FAERS')] database[.]"*Id*. ¶ 120. Much of the putative "scientific literature" refers to studies published prior to FDA's approved of Sandoz' docetaxel in June 2011 or after Plaintiff was prescribed docetaxel in October 2011, including studies from 2006, 2009, 2010, March 2011, 2012, 2017, 2018, and 2019. *Id*. ¶¶ 91, 93-94. Dr. Ross also cites one "retrospective clinicopathological study published in June 1011 [sic]" describing cases of PCIA in breast cancer patients treated with docetaxel-containing regiments. *Id*. ¶ 93. Dr. Ross does not opine or show that this article provided information about a risk of hair loss that was different from information that had already been submitted to FDA, or that the article purported to document a causal association between docetaxel and PCIA. *See id*.

With respect to the FAERS database, Dr. Ross refers to alleged "signals" from 2000, 2008, and 2010, prior to the period at issue here. *Id*. ¶ 95. He also references a putative "signal" from "the middle of 2012," which was after Plaintiff's period of docetaxel use from October 2011 to January 2012, and does not reference sufficient adverse event reports directed to Sandoz' docetaxel during the June 2011 to January 2012 time period to generate such a signal. *Id*. In fact, it is undisputed that Sandoz received an "extremely small number of potential adverse event reports of permanent alopecia," and these reports "would not have constituted a signal or required any action by Sandoz." Williams Rpt. at 31. Dr. Williams opines that Sandoz acted prudently and complied with FDA regulations in monitoring and updating its labeling based on the Sanofi labeling. Williams Rpt. at 4-5; Williams Dep. at 118:16-120:24.

III.   **ARGUMENT**

A.   **Plaintiff's Claims Are Preempted Because There Is No Evidence That Sandoz Had "Newly Acquired Information".[5]**

The legal test for conflict preemption is straightforward: "The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *Mensing*, 564 U.S. at 621. A party cannot act "independently" under federal law if it "cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *Id.* at 623-24. That is a question of law for the Court, not one of fact for the jury. *Albrecht*, 139 S. Ct. at 1680-81.

It is settled that a drug manufacturer is prohibited by federal law from acting independently to change its FDA-approved warnings for a prescription drug without prior FDA approval, except under very limited circumstances. The "default rule is that a manufacturer must secure FDA approval for a proposed change prior to distributing the product with the changed label." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 36 (1st Cir. 2015) (citing 21 C.F.R. § 314.70(b)(2)(v)(A)). Since the U.S. Supreme Court's ruling in *Wyeth v. Levine*, 555 U.S. 555 (2009), there has been only one recognized mechanism for the manufacturer of an NDA-approved drug to "independently" change its FDA-approved warnings without prior FDA approval—the CBE regulation. *Id.* at 568. *See also Mensing*, 564 U.S. at 624; *Albrecht*, 139 S. Ct. at 1673. Drug manufacturers are "limited in their ability to unilaterally change the labels on their products" because "to make a change on their own," they "must comply" with the CBE regulation. *Gibbons*

---

[5] As all of Plaintiff's claims are predicated on the theory that Sandoz allegedly failed to warn of the risk of permanent, or persistent alopecia, the following analysis applies to all claims, regardless of the legal theory under which they are asserted. *See, e.g.*, *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2021 U.S. Dist. LEXIS 102782, at *140 (D. Mass. June 1, 2021) ("Plaintiff's claims—all of which, in substance, are premised on a failure to warn—are therefore preempted by federal law."); *Knight v. Boehringer Ingelheim Pharms., Inc.*, 984 F.3d 329 (4th Cir. 2021) (fraud claim predicated on failure to warn theory was preempted).

*v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019). Thus, Plaintiff's state law claims requiring Sandoz to change its FDA-approved warnings for docetaxel are preempted as a matter of law unless Plaintiff can show Sandoz could have independently and unilaterally added the "permanent" alopecia warning Plaintiff seeks under the CBE regulation.

Submission of a CBE supplement to "add or strengthen a contraindication, warning, precaution, or adverse reaction" without prior FDA approval requires "newly acquired information." 21 C.F.R. § 314.70(c)(6)(iii)(A). "Newly acquired information" is "data, analyses, or other information not previously submitted to [FDA], which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b); *see also Drescher v. Bracco Diagnostics Inc.*, No. CV-19-00096-TUC-RM (LCK), 2020 U.S. Dist. LEXIS 17192, at *9 (D. Ariz. Jan. 31, 2020). To be actionable under the CBE regulation, the "newly acquired information" must further provide "reasonable evidence" of a "causal association" between the drug and a "clinically significant hazard." 21 C.F.R. § 201.57(c)(6)(i); 21 C.F.R. § 314.70(c)(6)(iii)(A).[6]

Numerous courts have considered how these principles play out in the context of a

---

[6] Dr. Ross opines that there is also an obligation to update a drug product label under the CBE regulation where there is "some basis to believe there is a causal relationship" between the drug and an adverse reaction under 21 C.F.R. § 201.57(c)(7). Ross Rpt. ¶ 27. But the only instance in which the regulations provide that the labeling "must be revised" in "accordance with" 21 C.F.R. § 314.70 (the CBE regulation) is "to include a warning about a clinically significant hazard" based on "reasonable evidence of a causal association with a drug[.]" 21 C.F.R. § 201.57(c)(6)(i). The separate adverse reaction provision cited by Dr. Ross references the general definition of an "adverse reaction." *See* 21 C.F.R. § 201.57(c)(7). The CBE regulation allows FDA to permit changes in the labeling to "reflect newly acquired information" to add an adverse reaction "for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c)." 21 C.F.R. § 314.70(c)(6)(iii). FDA has clarified that this standard is met "only if there is sufficient evidence of a causal relationship" to satisfy the standard. 73 Fed. Reg. 49,603, 49,604 (Aug. 22, 2008). Under either standard, including the one proposed by Dr. Ross, Sandoz had no obligation to update the label during the time period in question and should succeed on this Motion.

dispositive motion on conflict preemption grounds. The predominant and better-reasoned view is that it is the *plaintiff's* burden, as the proponent of the failure-to-warn claims, to show that there existed "newly acquired information" establishing that the defendants could unilaterally change the label pursuant to the CBE regulation without prior FDA approval. Only after the plaintiff satisfies this burden—if she can—does the burden shift to the defendant as the proponent of the preemption defense to show by "clear evidence" that FDA "would not have approved the labeling change made on the basis of this newly acquired information." *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 661 (S.D.N.Y. 2017), *aff'd sub nom. Gibbons*, 919 F.3d 699; *see also Gayle v. Pfizer Inc.*, 452 F. Supp. 3d 78 (S.D.N.Y. 2020) (same); *Ridings v. Maurice*, 444 F. Supp. 3d 973, 991 (W.D. Mo. 2020) (same); *Pradaxa Cases*, No. CJC-16-004863, 2019 WL 6043513, at *2 (Cal. Super. Nov. 8, 2019) (same); *Roberto v. Boehringer Ingelheim Pharm., Inc.*, No. CPLHHDCV166068484S, 2019 WL 5068452, at *11 (Conn. Super. Ct. Sept. 11, 2019) (same).[7]

Plaintiff has previously argued for the minority view adopted by only a handful of courts that, because preemption is an affirmative defense, at the pleadings stage the plaintiff need not allege the existence of "newly acquired information" to support a label change under the CBE process. *See Crockett v. Luitpold Pharm., Inc.*, No. CV 19-276, 2020 WL 433367, at *8 (E.D. Pa.

---

[7] *See also Gibbons*, 919 F.3d at 708 (holding that plaintiff "must plead 'a labeling deficiency that [Defendants] could have corrected using the CBE regulation" before the burden shifts to the defendant to demonstrate by "clear evidence" that FDA would not have approved the change) (quoting *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41, 40-41 (1st Cir. 2015)); *Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018) (noting plaintiff's failure "to offer evidence that [defendant] acquired new information" that "would have justified a change in the label"); *Javens v. GE Healthcare Inc.*, Civil Action No. 18-1030-RGA-SRF, 2020 U.S. Dist. LEXIS 94067, at *11-13 (D. Del. May 29, 2020) (dismissing complaint where plaintiff failed to present sufficient allegations to establish "newly acquired evidence" and thus "the requirements to invoke the CBE regulation are not met"); *Sabol v. Bayer Healthcare Pharm.*, 439 F. Supp. 3d 131, 150-51 (S.D.N.Y. 2020) (dismissing complaint for failing to plead facts demonstrating defendant had "newly acquired information permitting it to unilaterally add [the] claimed warning under the CBE regulation"); *McGrath v. Bayer Healthcare Pharm. Inc.*, 393 F. Supp. 3d 161, 166 (E.D.N.Y. 2019) (requiring plaintiff to show that defendants could unilaterally change the label without FDA approval); *Ideus v. Teva Pharm. USA, Inc.*, No. 4:16-CV-3086, 2017 U.S. Dist. LEXIS 211611, at *6 (D. Neb. Dec. 12, 2017) (quoting *In re Celexa*, 779 F.3d at 41, 42-43 (finding there must be "some indication of 'newly acquired information' [so] as to trigger the applicability of the CBE regulation" for a claim to survive).

Jan. 28, 2020); *Evans v. Gilead Scis., Inc.*, No. 20-CV-00123-DKW-KJM, 2020 WL 5189995, at

*10 (D. Haw. Aug. 31, 2020). Plaintiff's authorities are inapposite to the present summary

judgment, where the question before the Court is whether the record supports application of the

CBE regulation to implement the label change. Allocating the burden in the manner Plaintiff

proposes imposes on the manufacturer the burden to "prove a negative – that it acquired no new

information after [the drug] was approved that would have justified a CBE modification."

*Silverstein v. Boehringer Ingelheim Pharm.*, Inc., No. 19-CIV-81188, 2020 WL 6110909, at *12

(S.D. Fla. Oct. 7, 2020). Even where the ultimate burden of persuasion may be upon Sandoz to

establish preemption, Plaintiff must bear the "initial burden of production" to identify "the specific

information" she asserts constituted "newly acquired information" under the CBE regulation. *Id.*[8]

On the record before this Court, the burden of proof issue is largely beside the point, as

there is no evidence of any "newly acquired information" supporting a label change, and indeed

the record reflects the absence of any such evidence. Regardless of where the burden of proof lies,

the ultimate question of law for this Court is whether the label change Plaintiff demands under

state law "irreconcilably conflic[ts]" with federal law. *Albrecht*, 139 S. Ct. at 1672 (quoting *Rice

v. Normal Williams Co.*, 458 U.S. 654, 659 (1982)). Here, the record confirms it does.

### B.     The Record Lacks Any Evidence of "Newly Acquired Information" Supporting a Label Change by Sandoz Under the CBE Regulation

The record does not contain any evidence that Sandoz obtained "newly acquired

information" in the less than four months between FDA's approval of Sandoz' docetaxel and the

---

[8] *Albrecht* likewise does not relieve Plaintiff of her burden to produce the "newly acquired information" to support the label change sought, as it does not address when "newly acquired information" will support a label change under the CBE regulation or which side bears the burden on that question, but only the next-stage inquiry of what constitutes "clear evidence" that FDA would not have approved the proposed change. 139 S. Ct. at 1672. That was also the principal question before this Court in the *Earnest* case when it placed the burden of proof on Sanofi to show FDA would have not have approved its label change sooner. *See In re: Taxotere (Earnest)*, MDL 2740, Doc. 7973.

commencement of Plaintiff's treatment, or of any "newly acquired information" prior to the conclusion of plaintiff's treatment three months later in January 2012. The record further lacks any evidence of any risks of a different type or greater severity or frequency than previously included in submissions to FDA, or any reasonable evidence of a causal association between docetaxel and a clinically significant hazard or adverse reaction. Accordingly, there is no triable issue as to whether Sandoz has any basis under federal law to submit a unilateral label change during the relevant time period to add a "permanent" alopecia warning; it did not.

### 1.   The Record Does Not Demonstrate Sandoz Obtained Any "Newly Acquired Information" Not Previously Submitted

Plaintiff's claimed "newly acquired information" could not have formed the basis for a new permanent alopecia warning by Sandoz under the CBE regulation because there is no evidence that Sandoz acquired such information in the small window of time between FDA's approval of Sandoz' docetaxel in June 2011 and Plaintiff's treatment with it from October 2011 to January 2012. That is the only time period relevant to Plaintiff's claims. *See Lyons v. Boehringer Ingelheim Pharm.*, No. 1:18-CV-04624-WMR, 2020 U.S. Dist. LEXIS 184234, at *25 (N.D. Ga. Sep. 29, 2020) ("Plaintiff has not met her burden of showing that Defendant possessed newly acquired information" to unilaterally "change Pradaxa's labeling after the FDA's October 2010 approval and before Ms. Underwood's alleged March 2016 injury."); *see also Mahnke v. Bayer Corp.*, No. 2:19-cv-07271-RGK-MAA, 2020 U.S. Dist. LEXIS 76572, at *7 (C.D. Cal. Mar. 10, 2020).[9]

Information acquired *prior* to FDA approval cannot constitute "newly acquired information," because it is equally accessible to FDA, and "newly acquired information" must be

---

[9] Additionally, only information in *Sandoz*' possession is the focus of this inquiry; any monitoring activities conducted by and information known to Sanofi during that time cannot be imputed to Sandoz and is not relevant in assessing whether Sandoz had "newly acquired information" to prompt a labeling change.

information not previously submitted to FDA. 21 C.F.R. § 314.3(b).[10] It encompasses only data "submitted to (or available to) the FDA for the first time," and "new analyses of previously existing data." *Blackburn v. Shire Us, Inc.*, No. 2:16-CV-963-RDP, 2017 U.S. Dist. LEXIS 69664, at *11-12 (N.D. Ala. May 8, 2017). Plaintiff cannot ground her claims on pre-approval data, analyses, and other information already submitted or available to FDA, "because the CBE regulation cannot be used to make a label change based on such information." *Roberto*, 2019 WL 4806271, at *13 (quoting *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Prods. Liab. Litig.*, 185 F. Supp. 3d 761, 769 (D.S.C. 2016)). Limiting the CBE regulation to materials not previously available to FDA makes "pragmatic sense" because FDA is "the exclusive judge of safety and efficacy based on information available at the commencement of marketing[.]" *In re Celexa*, 779 F.3d at 41. It is Plaintiff's obligation to identify "whether—and if so, when" alleged "newly acquired information" was provided to FDA. *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 829 (N.D. Cal. 2019). Indeed, upon approval, the labeling is deemed sufficient and not "false or misleading" based on "a fair evaluation of all material facts" by FDA approval. *In re Celexa*, 779 F.3d at 36 (quoting 21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6)).

Information that post-dates Plaintiff's injury likewise cannot supply the basis for Plaintiff's claims, because it was not available and thus could not supply "reasonable evidence of a causal association" permitting Sandoz to change its labeling to "reflect" the asserted information prior to Plaintiff's use of the product. 21 C.F.R. §§ 314.3(b), 314.70(c)(iii), 201.57(c)(6)(i). For this reason, "studies published after the plaintiff's injury in the case would not be relevant to constitute newly acquired information." *Roberto*, 2019 WL 4806271, at *14. *See also Ridings*, 444 F. Supp. 3d at

---

[10] Plaintiff does not allege or present evidence that Sandoz or any other manufacturer concealed information from FDA and any such claim would be a "fraud on the FDA" claim impliedly preempted by the FDCA. *See Buckman Co. v. Plaintiffs Legal Cte.*, 531 U.S. 341, 347-48 (2001).

993; *McGrath v. Bayer HealthCare Pharm. Inc.*, 393 F. Supp. 3d 161, 166 (E.D.N.Y. 2019).

Here, essentially all of Plaintiff's claimed "newly acquired information" either pre-dates FDA's June 2011 approval of Sandoz' docetaxel or post-dates Plaintiff's October 2011 to January 2012 use of Sandoz' docetaxel. The pre-approval information identified by Dr. Ross includes: Sandoz' October 2010 docetaxel label in Austria; Sandoz' February 2011 docetaxel label in Germany; Sandoz' April 2011 label in Australia; Sanofi's worldwide labeling from 2010; interim PCIA data from the TAX316 clinical trial; scientific literature from 2006, 2009, 2010, and March 2011; and FAERS "signals" from 2000 and 2008. *See* § II.F, *supra*. There is no evidence any of this information was not previously available to FDA at the time Sandoz' docetaxel was approved. Indeed, it "would be an unreasonable inference to conclude" that none of this information was submitted to FDA across the lengthy regulatory history of Taxotere® and the various other versions of docetaxel. *Holley*, 379 F. Supp. 3d at 829. Without more, the Court "cannot conclude" that Sandoz possessed "newly acquired information" between June 29, 2011 and January 24, 2012 that differed from prior FDA submissions and from the contents of FDA's own FAERS database. *Id*. at 830. The post-use information includes the May 2012 "retrospective study"; the putative "signal" from the "middle of 2012" on the FAERS database; foreign regulatory submissions from 2013; and the putative "scientific literature" from 2017, 2018, and 2019. *See* § II.F, *supra*. Because neither the pre-approval nor post-use materials can qualify as "newly acquired information" as a matter of law, they are immaterial to this motion.

Dr. Ross references only *one* study—the June 2011 "retrospective clinicopathological study"—that could even arguably potentially fall within the June 29, 2011 to January 14, 2012 timeframe—if it were assumed the study was published on the last day of the month. *See* Ross Rpt. ¶ 93 & n. 40 (citing Miteva M, *et al*. Permanent alopecia after systemic chemotherapy: a

clinicopathological study of 10 cases. Am J Dermatopathol. 2011 Jun; 33(4):345-50). But Plaintiff presents no evidence that the information in that study was "previously known" to Sandoz before Plaintiff's treatment, nor any evidence that it presented any risks of a different type or greater severity or frequency than previously included in submissions to FDA or of a causal association between docetaxel and a clinically significant hazard or adverse reaction. Absent proof of Sandoz' acquisition of this study prior to January 2012, or that the study presented any changed circumstances sufficient to justify Sandoz in seeking a unilateral label change to add a "permanent" alopecia warning—and there is no such proof—is also is immaterial to this motion.

It is not enough for Plaintiff to assert that some hypothetical scintilla of "new information" existed somewhere in the world for Sandoz to unearth. Plaintiff must show that Sandoz *actually acquired* or had knowledge of the information in order to submit it to FDA. *See Lyons*, 2020 U.S. Dist. LEXIS 184234, at *26 ("Plaintiff must show that [defendant] acquired the new information before [the] injury."); *Utts*, 226 F. Supp. 3d at 179 n.6 (stating that if the Court cannot find "that a manufacturer *possessed* 'newly acquired information' to support label changes," Plaintiff's claims are preempted). The information must be "previously known to the manufacturer, but not submitted to the FDA[.]" *Roberto*, 2019 WL 4806271, at *13. Here, the record lacks any evidence that the June 2011 Miteva study was "previously known" to Sandoz prior to or at any time during Plaintiff's life-saving docetaxel treatment, much less that it revealed any new risk sufficient to support a unilateral label change under the CBE regulation.

### 2. The Record Does Not Demonstrate Any Purported "Newly Acquired Information" Revealed Risks of a Different Type or Greater Severity or Frequency

Even were it assumed that Sandoz possessed knowledge or information not previously submitted to FDA—though there is no evidence to support this assumption—there is no evidence that such "newly acquired information" revealed risks of a "different type or greater severity or

frequency" than previously included in submissions to FDA. 21 C.F.R. § 314.3(b); *Knight*, 984 F.3d at 338. In particular, Plaintiff has failed to offer any evidence that the materials identified in Dr. Ross's report after June 2011 disclosed risks of permanent alopecia that differed in type, severity, or frequency from the materials identified in his report prior to June 2011. According to Dr. Ross, Sandoz was reporting "non-reversible" alopecia and "ongoing" alopecia as early as its 2010 and 2011 Austria, Germany, and Australia labels, all reflective of the interim results of the TAX316 study. *See* § II.F, *supra*. Dr. Ross also identified studies from 2009, 2010, and March 2011 purportedly identifying a relationship between docetaxel-containing regimens and permanent alopecia, as well as three FAERS signals from 2000, 2008, and 2010. *See id*.

Plaintiff offers no evidence that the purported "newly acquired information" identified from the period after June 2011 and before January 2012—which consists at the very most of just *one* "retrospective clinicopathological study," as discussed above—differed in type, severity, or frequency from the information known or available to FDA prior to June 2011. The additional "retrospective clinicopathological study" is not differentiated from the studies and signals preceding June 2011. *See id*. Because there is no evidence Plaintiff's purported "newly acquired information" revealed risks of a different type, severity, or frequency than those previously considered by FDA, Plaintiff's one study cannot stave off preemption. *See In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1022 (S.D. Cal. Mar. 9, 2021) (granting summary judgment where plaintiffs failed to put forth evidence of safety information revealing risks of a different type, severity, or frequency than previously considered by FDA).

Nor can Plaintiff rely on information or literature that became available after January 2012 to infer that data were available during the relevant timeframe that constitute newly acquired information. The reason federal law requires "*reasonable* evidence of causal association" before

proposing a label change is "to ensure that a label's wording is scientifically valid, and . . . to prevent over-warning, exaggeration of risk, and inclusion of speculative or hypothetical risks that could discourage appropriate use of a beneficial drug." *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d at 1022 (emphasis added); *see also Knight*, 984 F.3d at 340-41 (finding that even "preliminary thoughts" and "preliminary conclusions" that emerge concerning risks are not "newly acquired information"). Preliminary and unpublished data, even if known to Sandoz (and there is no evidence of this) cannot support a label change.

Moreover, Plaintiff does not, and cannot, differentiate the putative "additional literature" in May 2012, and the purported additional FAERS signal from the "middle of 2012," from the earlier studies and signals that were available before June 2011. *See* § II.F, *supra*. The 2013 updates to the Core Data Sheet and the Austria, Germany, and Australia labels were all to reflect the final TAX316 clinical trial data, which Plaintiff likewise does not differentiate from the interim TAX316 clinical trial data Sanofi had already submitted to FDA before it approved Sandoz' docetaxel. *See* § II.F, *supra*. Those updates merely added information on cases of permanent and persistent alopecia, all of which were already known and identified risks in the earlier 2009, 2010, and 2011 studies and the 2000, 2008, and 2010 FAERS signals. *Id*. Of note, the Core Data Sheet, which followed the Sanofi labeling, is not required by FDA, and FDA never mandated that additional information regarding alopecia and hair loss be included despite being aware of the TAX316 study. Williams Rpt. at 4-5; Williams Dep. at 120:1-24; 139:22-140:11.

Plaintiff also cannot assert that Sandoz possessed "newly acquired information" in the form of "new analyses of previously existing data (e.g. meta-analyses)" that "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). First, as already discussed, Plaintiff has offered no evidence that the limited data

identified by Dr. Ross between June 2011 and January 2012 reveals any risks of a "different type or greater severity or frequency" than the data already submitted to FDA. Second, at most Ross merely hypothesizes that Sandoz could have undertaken a new "signal" analysis of the FAERS database, but not until "the middle of 2012" (after the time period at issue) and again without demonstrating that the 2012 signal revealed risks of a different type or greater severity or frequency as compared to the earlier alleged "signals" from 2000, 2008, and 2010. Ross Rpt. ¶ 95. Third, Dr. Ross does not present any evidence that his purported "signals" are based on adverse event reports in the FAERS database directed to Sandoz' docetaxel. *Id*. Fourth, it is undisputed that Sandoz received an "extremely small number of potential adverse event repots of permanent alopecia," and these reports "would not have constituted a signal or required any action by Sandoz." Williams Rpt. at 31. Accordingly, Plaintiff's proposed "new analyses of previously existing data" do not qualify as "newly acquired information" because they "are not grounded in scientific research" or "well-grounded in scientific evidence" as required to satisfy the CBE regulation. *Ignacuinos v. Boehringer Ingelheim Pharm., Inc.*, No. 3:19-cv-672 (SRU), 2020 U.S. Dist. LEXIS 174215, at *24-25 (D. Conn. Sep. 23, 2020); *see also Knight*, 984 F.3d at 338 (quoting 21 C.F.R. § 314.3(b)) (holding that new analysis did not reveal risks of a different type or greater severity or frequency where it discussed risks of the same general type already known to the FDA).

Summary judgment is appropriate where, as here, Plaintiff has failed to demonstrate that her putative "newly acquired information" establishes any "risks of a different type or greater severity or frequency than previously included in submissions to FDA." *Ridings*, 444 F. Supp. 3d at 997 (quoting *Roberto*, 2019 WL 5068452, at *16). "[I]f the reports of adverse events are consistent in type, severity, and frequency with information previously provided to FDA, such reports may not constitute newly acquired information appropriate for a CBE supplement."

*Mitchell v. Boehringer Ingelheim Pharm., Inc.*, No. 1:16-cv-02384-STA-egb, 2017 U.S. Dist. LEXIS 192498, at *15 (W.D. Tenn. Nov. 21, 2017) (quoting 73 Fed. Reg. 2848 (Jan. 16, 2008)). Here, each of Plaintiff's post-June 2011 references to persistent or permanent alopecia is consistent in type, severity, and frequency with Plaintiff's pre-June 2011 alopecia references.

> **3.     The Record Does Not Demonstrate the Purported "Newly Acquired Information" Provided Reasonable Evidence of a Causal Association Between Docetaxel and a Clinically Significant Hazard or Adverse Reaction**

Lastly, Plaintiff has not shown that her "newly acquired information" satisfies the CBE regulation's requirement of "reasonable evidence" of a "causal association" between the drug and a "clinically significant hazard," 21 C.F.R. § 201.57(c)(6)(i), or "sufficient evidence of a causal association" to an adverse reaction, 73 Fed. Reg. at 49,604. Plaintiff has presented no evidence that the risk of permanent or persistent alopecia is a "clinically significant hazard" in relation to a life-saving cancer treatment already known to carry an alopecia risk, and has also presented no evidence of the requisite "causal connection" or "causal association" to permanent alopecia.

A "clinically significant hazard" is "one that is potentially fatal, serious even if infrequent, or can be prevented through appropriate use of the drug; it includes safety hazards from drug interactions." *Silverstein*, 2020 U.S. Dist. LEXIS 188176, at *18; see also *Sabol v. Bayer Healthcare Pharm.*, 439 F. Supp. 3d 131, 147 (S.D.N.Y. 2020) (quoting 21 C.F.R. § 201.57(c)(6)(i)). That understanding aligns with the ordinary meaning of a "hazard," which connotes physical danger or peril. *See Black's Law Dictionary* (9th ed. 2009) (defining "hazard" as "[d]anger or peril"); *Merriam Webster Online,* (defining "hazard" as "a source of danger").

Here, Plaintiff has made no showing that the persistent or permanent alopecia risks allegedly disclosed in putative "newly acquired information" between June 2011 and January 2012 constitute a "clinically significant hazard." The only potential "newly acquired information"

Plaintiff has identified even arguably from the relevant time period is the June 2011 Miteva study. Even assuming *arguendo* that this study could satisfy the other elements of "newly acquired information," Plaintiff offers no evidence that the supposed incidents of persistent or permanent alopecia in the study were potentially fatal, serious, or preventable through appropriate use of docetaxel, and presents no evidence of any physical danger, peril, or other compromise to patient safety. To the contrary, Plaintiff acknowledges that Sandoz' docetaxel saved her life. *See* § II.A, *supra*. Though permanent alopecia undoubtedly carries with it an emotional consequence, the record is devoid of any proof that it rises to the level of a "clinically significant hazard."

The record also lacks the requisite causal connection or causal association to persistent or permanent alopecia. "Although the causal relationship need not be definitively established, it nevertheless must be scientifically reliable." *Silverstein*, 2020 U.S. Dist. LEXIS 188176, at *20. CBE changes "cannot be rooted in conjecture or hypothesis," but "must conclusively establish, by scientifically valid measurable and statistically significant data, that the different or increased risks are actual and real." *Id*. at *20-21 (quoting *Pradaxa Cases*, 2019 WL 6043513, at *3). The FDA sets this high bar out of recognition "that exaggeration of risk, or inclusion of speculative or hypothetical risks, could discourage appropriate use of a beneficial drug ... or decrease the usefulness and accessibility of important information by diluting or obscuring it." *McGrath*, 393 F. Supp. 3d at 167 (citing *Utts*, 241 F. Supp. 3d at 659)). "Indeed, labeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to lose its significance." *Id*.; *see also Roberto*, 2019 WL 4806271, at *13. The "newly acquired information" must constitute "sufficient, scientifically-reliable evidence of a causal association between the drug and a hazard that is potentially fatal, serious even if infrequent, or can be prevented through appropriate use of the drug." *Silverstein*, 2020 U.S. Dist. LEXIS 188176, at *90.

For all his discussion of different "studies" and "signals," Dr. Ross does not identify evidence among his cited "newly acquired information" that conclusively establishes, by scientifically valid measurable and statistically significant data, that there are actual and real differences or increased risks of permanent alopecia from treatment with docetaxel. It "helps precious little to mount scientific minutiae on top of technical jargon" without establishing "a plausible causal association." *McGrath*, 393 F. Supp. 3d at 169.

## IV.    CONCLUSION

Sandoz could not propose or implement any independent, unilateral change to its FDA-approved warnings for docetaxel, given Plaintiff's failure to produce evidence that Sandoz had any "newly acquired information" means. Indeed, the record conclusively establishes that Sandoz lacked "newly acquired information" in the few months between FDA's approval of its docetaxel in June 2011 and Plaintiff's treatment with docetaxel between October 2011 and January 2012. Sandoz was dependent on FDA to approve any new warnings, and thus federal law prohibited Sandoz from doing unilaterally what Plaintiff asserts state law required of it. Plaintiff's claims are preempted as a matter of law.

Dated: November 19, 2021                      Respectfully submitted,

                                              **GREENBERG TRAURIG, LLP**

                                              */s/ Lori G. Cohen*
                                              Lori G. Cohen
                                              R. Clifton Merrell
                                              Evan C. Holden
                                              Terminus 200
                                              3333 Piedmont Road, N.E., Suite 2500
                                              Atlanta, Georgia 30305
                                              (678) 553-2100
                                              (678) 553-2386 (facsimile)
                                              CohenL@gtlaw.com
                                              MerrellC@gtlaw.com
                                              HoldenE@gtlaw.com

Gregory E. Ostfeld
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 476-5056
(312) 899-0420 (facsimile)
OstfeldG@gtlaw.com

*Attorneys for Sandoz Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 19, 2021, a copy of the foregoing document was served on all counsel of record via email.

*/s/ Lori G. Cohen*
Lori G. Cohen