# **EXHIBIT M**

 **DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

NDA 020449

**SUPPLEMENT REQUEST**

sanofi-aventis U.S. LLC
Attention: Fran Polizzano, PharmD
Senior Manager, US Regulatory Affairs Marketed Products
55 Corporate Drive, Mail Stop: 55C-205A
Bridgewater, NJ 08807

Dear Dr. Polizzano:

Please refer to your New Drug Application (NDA) for Taxotere® (docetaxel) Injection
Concentrate, 20 mg/mL and 80 mg/4 mL.

We have recently reviewed your response to the Agency's information request dated
April 10, 2015.

**PRESCRIBING INFORMATION**

Your prescribing information (PI), approved in Physician Labeling Rule (PLR) format, must
conform to the content and format regulations found at 21 CFR 201.56(d) and 201.57.  Your PI
must contain a summary of the essential scientific information needed for the safe and effective
use of your product and must be informative and accurate and neither promotional in tone nor
false or misleading.  You must update your PI when new information becomes available that
causes the labeling to become inaccurate, false, or misleading [see 21 CFR 201.56(a)].

Based on our review of your currently approved PI, we have identified the following labeling
issues that need updating:

1. Provide any additional information regarding permanent or irreversible alopecia.
2. Amend the package insert in Section 6.2 (Postmarketing Experience) (and patient
   information, if appropriate) to add information on permanent or irreversible alopecia.

Submit draft PI as a supplement to this application, addressing all of the identified issues.  To
facilitate review of your submission, provide a highlighted or marked-up copy that shows all
your proposed changes, as well as a clean Word version.  The marked-up copy should also
include annotations that support all your proposed changes, including annual reportable changes.
Your supplement must include updated content of labeling in structured product labeling (SPL)
format, according to 21 CFR 314.50(l)(1)(i).
(see http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm).

The supplement should be submitted within 60 days.

Reference ID: 3827211

Confidential

NDA 020449
Page 2

If you have any questions, contact Sakar Wahby, Regulatory Project Manager, at (240) 402-5364 or email me at sakar.wahby@fda.hhs.gov.

Sincerely,

*{See appended electronic signature page}*

Geoffrey Kim, MD
Division Director
Division of Oncology Products 1
Office of Hematology and Oncology Products
Center for Drug Evaluation and Research

Reference ID: 3827211

Confidential

Sanofi_00805354

----------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

----------------------------------------------------------------------------------------------------

/s/

--------------------------------------------------

GEOFFREY S KIM
10/02/2015

Reference ID: 3827211

Confidential                                                                          Sanofi_00805355

# **EXHIBIT N**





24 November 2015

Geoffrey Kim, M.D. Deputy Director
Division of Oncology Products 1 (DOP1)
Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

**Subject:**   **NDA 020449; TAXOTERE® Injection Concentrate; docetaxel; XRP6976**
   **Labeling Supplement - Changes Being Effected**
   *eCTD Sequence No. 0131*

Dear Dr. Kim:

Reference is made to the subject NDA 020449 TAXOTERE® (docetaxel) Injection Concentrate.

Reference is also made to the Agency's supplement request letter dated 02 October 2015. The Agency requested the following:

   1. Provide any additional information regarding permanent or irreversible alopecia.

   2. Amend the package insert in Section 6.2 (Postmarketing Experience) (and patient information, if appropriate) to add information on permanent or irreversible alopecia.

This submission includes a clinical overview that evaluates docetaxel and permanent alopecia in Module 2.5 in response to the request to provide additional information.

In accordance with 21 CFR 314.70 (c), please find enclosed a Changes Being Effected labeling supplement which includes revisions to the TAXOTERE® Injection Concentrate package insert.

As requested by the FDA, the following additions of permanent alopecia have been made to the TAXOTERE® labeling:
- Subsection 6.2 Post-Marketing Experiences
- Section 17 PATIENT COUNSELING INFORMATION
- "What are the possible side effects of TAXOTERE?" of Patient Information.

Also, Sanofi has taken the opportunity to make the following editorial changes to the TAXOTERE® labeling:
- Removal of "Warnings and Precautions (5.9)" from RECENT MAJOR CHANGES in Highlights
- Removal of a period after the word "including" under "Neurologic reactions" of the WARNINGS AND PRECAUTIONS in Highlights
- Update of the revision date to "11/2015" in Highlights and at the end of Prescribing Information

SANOFI US 55 Corporate Drive, Bridgewater, New Jersey 08807 Tel : 908.981.5000



SANOFI

- Addition of a vertical line between the two columns of Table 2
- Removal of the vertical line from Subsection 5.9 Eye Disorders
- Update of the most serious adverse reactions list at the beginning of Section 6 ADVERSE REACTIONS consistent with relevant subsections in Section 5 WARNINGS AND PRECAUTIONS
- Removal of a comma in the first sentence of the last paragraph under "Combination therapy with TAXOTERE in chemotherapy-naïve advanced unresectable or metastatic NSCLC" in Subsection 6.1 Clinical Trial Experience
- Update of the copyright date to "2015" at the end of Prescribing Information

Sanofi is a Transaction Partner; accordingly, the subject information is being submitted via the FDA Electronic Submissions Gateway (ESG). All files were verified to be free of viruses. Please contact Andrew Swingle by telephone (908-981-4788) for any ESG questions or concerns.

We understand that this application and all information contained therein, unless otherwise made public by sanofi-aventis U.S., is CONFIDENTIAL.

For questions or comments concerning this submission, please contact me by telephone 908-981-3693, facsimile 908-575-4478 or secured electronic mail (frances.polizzano@sanofi.com).

Sincerely,

Sanofi US Services Inc.
on behalf of sanofi-aventis U.S. LLC, A SANOFI COMPANY

Fran Polizzano, Pharm.D.
Senior Manager
North America and Global Regulatory Affairs

# **EXHIBIT O**

Gregory Seitz

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
- - -

IN RE:  TAXOTERE        :  MDL NO. 2740
(DOCETAXEL) PRODUCTS    :
LIABILITY LITIGATION    :  SECTION "H"
                        :  (5)
                        :
THIS DOCUMENT RELATES   :  HON. JANE T.
TO ALL CASES            :  MILAZZO


IN THE SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX
- - -

IN RE:  TAXOTERE        :  CASE TYPE:
LITIGATION              :  MCL NO. 628
                        :
                        :  MASTER DOCKET
                        :  NO.
                        :  MID-L-4998-18
                        :  -CM


- - -

July 19, 2019

- - -


        Videotaped deposition of
GREGORY SEITZ, taken pursuant to notice,
was held at the law offices of Reed
Smith, LLP, 136 Main Street, Princeton,
New Jersey, beginning at 9:04 a.m., on
the above date, before Michelle L. Gray,
a Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.


- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Gregory Seitz

Page 74

Page 76

3    stated in the labeling, it would
4    include both.
5    BY MR. LEMMON:
6        Q.    Other than what's in the
7    Taxotere label that is attached as
8    Appendix 2 in this Exhibit Number 6, what
9    did -- what did EBEWE and Sandoz know
10   about the safety profile of Taxotere?
11       MR. MERRELL:  Object to
12   form.
13       THE WITNESS:  Other than
14   what's available publicly, I'm not
15   sure what else was known at that
16   point in time.

Page 75

Page 77



20  (Pages 74 to 77)

Gregory Seitz

Page 250

1
2       CERTIFICATE
3
4
5           I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.
7
            It was requested before
8   completion of the deposition that the
    witness, GREGORY SEITZ, have the
9   opportunity to read and sign the
    deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  August 7, 2019
16
17
18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Page 252

1           - - - - - -
2         E R R A T A
             - - - - - -
2
3
4   PAGE  LINE  CHANGE
5   ____ ____ _____
6        REASON: _____
7   ____ ____ _____
8        REASON: _____
9   ____ ____ _____
10       REASON: _____
11  ____ ____ _____
12       REASON: _____
13  ____ ____ _____
14       REASON: _____
15  ____ ____ _____
16       REASON: _____
17  ____ ____ _____
18       REASON: _____
19  ____ ____ _____
20       REASON: _____
21  ____ ____ _____
22       REASON: _____
23  ____ ____ _____
24       REASON: _____

Page 251

1       INSTRUCTIONS TO WITNESS
2
3           Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8           After doing so, please sign
9   the errata sheet and date it.
10          You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14          It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 253

1
2       ACKNOWLEDGMENT OF DEPONENT
3
4           I,_____, do
5   hereby certify that I have read the
6   foregoing pages, 1 - 254, and that the
7   same is a correct transcription of the
8   answers given by me to the questions
9   therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  GREGORY SEITZ              DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20_____.
21  My commission expires:_____
22
23  _____
23  Notary Public
24

64  (Pages 250 to 253)

Gregory Seitz

Page 254

```
 1              LAWYER'S NOTES
 2         PAGE  LINE
 3         ____  ____  _____
 4         ____  ____  _____
 5         ____  ____  _____
 6         ____  ____  _____
 7         ____  ____  _____
 8         ____  ____  _____
 9         ____  ____  _____
10         ____  ____  _____
11         ____  ____  _____
12         ____  ____  _____
13         ____  ____  _____
14         ____  ____  _____
15         ____  ____  _____
16         ____  ____  _____
17         ____  ____  _____
18         ____  ____  _____
19         ____  ____  _____
20         ____  ____  _____
21         ____  ____  _____
22         ____  ____  _____
23         ____  ____  _____
24         ____  ____  _____
```

# **EXHIBIT P**

Confidential - Shirley Fernandez

1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF LOUISIANA
3                      -  -  -
4    IN RE:  TAXOTERE        :  MDL NO. 2740
     (DOCETAXEL) PRODUCTS   :
5    LIABILITY LITIGATION   :  SECTION "H"
                             :
6                            :  HON. JANET. MILAZZO
     THIS DOCUMENT RELATES  :  MAG. JUDGE NORTH
7    TO ALL CASES           :
8            C O N F I D E N T I A L
9                      -  -  -
10             December 17, 2019
11                     -  -  -
12             Videotaped deposition of
     SHIRLEY FERNANDEZ, taken pursuant to
13   notice, was held at the law offices of
     Reed Smith, LLP, 506 Carnegie Center,
14   Suite 300, Princeton, New Jersey,
     beginning at 9:50 a.m., on the above
15   date, before Michelle L. Gray, a
     Registered Professional Reporter,
16   Certified Shorthand Reporter, Certified
     Realtime Reporter, and Notary Public.
17
18                     -  -  -
19
         GOLKOW LITIGATION SERVICES
20    877.370.3377 ph | 917.591.5672 fax
             deps@golkow.com
21
22
23
24

Confidential - Shirley Fernandez



Page 82

Page 84

1 preparing, I mean, because we are
2 so used to writing ANDAs, this was
3 one NDA that we had. So it's --
4 automatically it comes.
5     And once you have that form,
6 the next form you refer to the
7 previous one to make sure that you
8 have the correct number. And that
9 has been carried over.
10     And so the global form may
11 have the ANDA number all
12 throughout.
13 BY MR. LEMMON:
14     Q.   Now, Melissa Henry replaced
15 Bernadette; is that right?
16     A.   Yes.
17     (Document marked for
18 identification as Exhibit
19 Fernandez-7.)
20 BY MR. LEMMON:
21     Q.   I'll show you Exhibit 7.
22 Can you identify this document?
23     A.   This is a cover letter.
24     Q.   Cover letter to what?

Page 83

Page 85

Confidential - Shirley Fernandez

---

Page 138

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, SHIRLEY FERNANDEZ, have the opportunity to read and sign the deposition transcript.

_____

MICHELLE L. GRAY,
A Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public
Dated: January 6, 2020

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

---

Page 139

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

---

Page 140

- - - - - -
E R R A T A
- - - - - -

PAGE LINE CHANGE
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____
____ ____ _____
     REASON: _____

---

Page 141

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 142, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
SHIRLEY FERNANDEZ          DATE

Subscribed and sworn to before me this
_____ day of _____, 20_____.
My commission expires:_____

_____
Notary Public

---

# **EXHIBIT Q**



Bernadette Attinger
Director, Regulatory Affairs

Sandoz Inc.
506 Carnegie Center, Ste 400
Princeton, NJ 08540

Tel: (609) 627-8865 (Direct)
Fax: (609) 395-2792

August 15, 2013

Food and Drug Administration
Center for Drug Evaluation and Research
Office of Oncology Drug Products
Division of Drug Oncology Products, HFD-150
5901-B Ammendale Road
Beltsville, MD 20705-1266

**LABELING SUPPLEMENT**

**NDA 201525 (Sequence 0030)**
**DOCETAXEL INJECTION 10 mg/mL (20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL)**
**CBE-0 UPDATE TO PACKAGE INSERT IN ACCORDANCE WITH REFERENCE**
**LISTED DRUG**

Dear Sir or Madam:

Sandoz Inc. hereby submits a CBE-0 Labeling Supplement to the approved New Drug Application for Docetaxel Injection 10 mg/mL (20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL), NDA 201525 in accordance with *The April 2004 Guidance for Industry Changes to an Approved NDA Section X (C)* to provide for revisions made to the package insert in accordance with the latest approved labeling for the Reference Listed Drug.

Specifically, on June 26, 2013, FDA approved a labeling revision to the Reference Listed Drug, Taxotere®, manufactured by Sanofi-Aventis, which was the basis for submission of Sandoz's Docetaxel Injection NDA 201525. In particular, changes were made to "**Highlights of Prescribing Information**" and "**Full Prescribing Information**" sections of the package insert. The summary of changes to the Sandoz Docetaxel Injection labeling is provided below.

1. **Highlights of Prescribing Information:**

   - Deletion of Recent Major Changes (Section 2.9)
   - Updated revision date

2. **Full Prescribing Information:**
   - Deletion of vertical lines associated with Section 2.9
   - ADVERSE REACTIONS; Section 6.2 Post-Marketing Experiences, Respiratory:

     *Revised from:*
     "**Respiratory**: dyspnea, acute pulmonary edema, acute respiratory distress syndrome, interstitial pneumonia. Pulmonary fibrosis has been rarely reported. Rare cases of radiation pneumonitis have been reported in patients receiving concomitant radiotherapy."

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# ⚠ SANDOZ

*To:*

"**Respiratory**: dyspnea, acute pulmonary edema, acute respiratory distress syndrome/pneumonitis, interstitial lung disease, interstitial pneumonia, respiratory failure, and pulmonary fibrosis have rarely been reported and may be associated with fatal outcome. Rare cases of radiation pneumonitis have been reported in patients receiving concomitant radiotherapy"

- Updated revision date

**3. Patient Information Leaflet:**
The statement "*What are the ingredients in Docetaxel Injection*" was updated to include polyethylene glycol 300 and citric acid inactive ingredients, to be consistent with Sandoz product description (Section 11).

In support of this supplement, please find the updated Package Insert in Word and PDF formats, provided in Module 1.14.2.2. A side-by-side comparison of the proposed package insert with the currently approved package insert is provided in Module 1.14.3.1. The reference listed drug labeling is provided in Module 1.14.3.3.

Changes to the labelling will be implemented on October 1, 2013.

Sandoz Inc. is providing this supplement in electronic format via the electronic submission gateway (ESG). The size of the submission is approximately 6 MB. This submission is virus free. The files were checked for virus using McAfee Virus Scan Enterprise Version 8.5i. Please note that a letter of non-repudiation agreement was submitted by Sandoz on November 30, 2007.

*This document contains trade secrets and/or confidential commercial information and is therefore exempt from disclosure under the Freedom of Information Act and FDA implementing regulations.*

For all technical issues, including submission through the gateway and or the eCTD organization, please contact Sandoz Inc. at e.sub@sandoz.com.

If there are any questions regarding this submission, please contact Bernadette Attinger at (609) 627-8865, via facsimile at (609) 395-2792 or by e-mail at bernadette.attinger@sandoz.com.

Sincerely,

Bernadette Attinger
Director, Regulatory Affairs

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# **EXHIBIT R**



| | Melissa Henry | Sandoz Inc. |
|---|---|---|
| | Director, | 100 College Road West |
| | Regulatory Affairs | Princeton, NJ 08540 |
| | | |
| | | Tel: (609) 627-5205 (Direct) |
| | | Fax: (609) 395-2792 |

March 7, 2016

Food and Drug Administration
Center for Drug Evaluation and Research
Office of Oncology Drug Products
Division of Drug Oncology Products, HFD-150
5901-B Ammendale Road
Beltsville, MD 20705-1266

> **Sequence: 0052**

## – CHANGES BEING EFFECTED (CBE) SUPPLEMENT –
## (LABELING)

**NDA 201525 (Sequence 0052)**
**DOCETAXEL INJECTION, 10 mg/mL (20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL)**
**CBE SUPPLEMENT - UPDATE TO PACKAGE INSERT LABELING  IN**
**ACCORDANCE WITH REFERENCE LISTED DRUG**

Dear Sir/Madam:

Sandoz Inc. hereby submits a Changes Being Effected (CBE) Labeling Supplement to the approved New Drug Application for Docetaxel Injection 10 mg/mL (20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL), NDA 201525 in accordance with *The April 2004 Guidance for Industry Changes to an Approved NDA Section X (C)* to provide for revisions made to the package insert in accordance with the latest approved labeling for the Reference Listed Drug.

Specifically, on December 11, 2015, FDA approved a labeling revision to the Reference Listed Drug, Taxotere®, manufactured by Sanofi-Aventis, which was the basis for submission of Sandoz's Docetaxel Injection NDA 201525.

This labeling supplement adds information on permanent or irreversible alopecia to Section 6.2 (Post-marketing Experience), Section 17 (Patient Counseling Information) of the Package Insert, and the Patient Package Insert (PPI) labeling.

In support of the labeling changes, Sandoz Inc. has provided the updated Package Insert in clean Microsoft Word version and PDF formats in **Module 1.14.2.2.** To facilitate review of this submission, Sandoz Inc. also provided the tracked-changes copy that shows all changes between the proposed package insert with the currently approved package insert in **Module 1.14.3.1** (Word version). The reference listed drug labeling is provided in **Module 1.14.3.3**.

As soon as possible, Sandoz Inc. submits the content of labeling in Structured Product Labeling (SPL) format using the FDA automated drug registration and listing system (eLIST).

Changes to the labeling will be implemented on April 7, 2016 or at the time of next printing, whichever comes first.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER



| | |
|---|---|
| Melissa Henry<br>Director,<br>Regulatory Affairs | Sandoz Inc.<br>100 College Road West<br>Princeton, NJ 08540<br><br>Tel: (609) 627-5205 (Direct)<br>Fax: (609) 395-2792 |

Sandoz Inc. is providing this supplement in electronic format via the electronic submission gateway (ESG). The size of the submission is approximately 20 MB. This submission is virus free. The files were checked for virus using McAfee Virus Scan Enterprise Version 8.7*i*. Please note that a letter of non-repudiation agreement was submitted by Sandoz on November 30, 2007.

*This document contains trade secrets and/or confidential commercial information and is therefore exempt from disclosure under the Freedom of Information Act and FDA implementing regulations.*

For all technical issues, including submission through the gateway and or the eCTD organization, please contact Sandoz Inc. at e.sub@sandoz.com.

If there are any questions regarding this submission, please contact me at (609) 627-5205, via facsimile at (609) 395-2792 or by e-mail at missy.henry@sandoz.com.

Sincerely,

Verkh Faina

Digitally signed by Verkh Faina
DN: SERIALNUMBER=895793 +
CN=Verkh Faina, OU=GX, OU=people,
DC=novartis, DC=com
Reason: For Melissa Henry
Date: 2016.03.07 11:29:08 -5:00

Melissa Henry
Director, Regulatory Affairs

SANDOZ-TAXO-NDA-00009897

# EXHIBIT S



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration
Silver Spring MD 20993

NDA 201525/S-012

RECEIVED                SUPPLEMENT APPROVAL

Sandoz, Inc.
Attention: Melissa Henry
Director, Regulatory Affairs          NOV   2 2016
100 College Road West
Princeton, NJ 08540
                                    Regulatory Affairs
                                    SANDOZ INC.

Dear Ms. Henry:

Please refer to your Supplemental New Drug Application (sNDA) dated March 7, 2016, received
March 7, 2016, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act
(FDCA) for Docetaxel Injection, 10 mg/mL (20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL).

This Changes Being Effected Supplemental New Drug Application proposes to include
information on permanent or irreversible alopecia to Section 6.2 (Post-marketing Experience),
Section 17 (Patient Counseling Information) of the Package Insert, and the Patient Package Insert
(PPI) labeling.

## APPROVAL & LABELING

We have completed our review of this supplemental application. It is approved, effective on the
date of this letter, for use as recommended in the enclosed, agreed-upon labeling text and with
the minor editorial revisions listed below.

- Periods after major section heading numbers have been removed to be consistent with
  PLR formatting requirements.

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, submit the content of
labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using the FDA
automated drug registration and listing system (eLIST), as described
at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.
Content of labeling must be identical to the enclosed labeling (text for the package insert, text for
the patient package insert, Medication Guide), with the addition of any labeling changes in
pending "Changes Being Effected" (CBE) supplements, as well as annual reportable changes not
included in the enclosed labeling.

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016286

NDA 201525/S-012
Page 2

Information on submitting SPL files using eList may be found in the guidance for industry titled
"SPL Standard for Content of Labeling Technical Qs and As
at http://www.fda.gov/downloads/DrugsGuidanceComplianceRegulatoryInformation/Guidances/
UCM072392.pdf.

The SPL will be accessible from publicly available labeling repositories.

Also within 14 days, amend all pending supplemental applications that include labeling changes
for this NDA, including CBE supplements for which FDA has not yet issued an action letter,
with the content of labeling [21 CFR 314.50(l)(1)(i)] in MS Word format, that includes the
changes approved in this supplemental application, as well as annual reportable changes and
annotate each change.  To facilitate review of your submission, provide a highlighted or marked-
up copy that shows all changes, as well as a clean Microsoft Word version.  The marked-up copy
should provide appropriate annotations, including supplement number(s) and annual report
date(s).

**REQUIRED PEDIATRIC ASSESSMENTS**

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new
active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of
administration are required to contain an assessment of the safety and effectiveness of the
product for the claimed indication(s) in pediatric patients unless this requirement is waived,
deferred, or inapplicable.

Because none of these criteria apply to your application, you are exempt from this requirement.

**REPORTING REQUIREMENTS**

We remind you that you must comply with reporting requirements for an approved NDA
(21 CFR 314.80 and 314.81).

If you have any questions, call Kim J. Robertson, Regulatory Health Project Manager, at
(301) 796-1441.

Sincerely,

*{See appended electronic signature page}*

Amna Ibrahim, MD
Deputy Director
Division of Oncology Products 1
Office of Hematology and Oncology Products
Center for Drug Evaluation and Research

ENCLOSURE(S):
    Content of Labeling

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016287

HIGHLIGHTS OF PRESCRIBING INFORMATION
These highlights do not include all the information needed to use Docetaxel Injection safely and effectively. See full prescribing information for Docetaxel Injection.

DOCETAXEL INJECTION,
Solution for Intravenous Infusion (IV)

Initial U.S. Approval: 1996

---

**WARNING: TOXIC DEATHS, HEPATOTOXICITY, NEUTROPENIA, HYPERSENSITIVITY REACTIONS, and FLUID RETENTION**

*See full prescribing information for complete boxed warning*

- Treatment-related mortality increases with abnormal liver function, at higher doses, and in patients with NSCLC and prior platinum-based therapy receiving docetaxel at 100 mg/m$^2$ (5.1)
- Should not be given if bilirubin > ULN, or if AST and/or ALT > 1.5 x ULN concomitant with alkaline phosphatase > 2.5 x ULN, LFT elevations increase risk of severe or life-threatening complications. Obtain LFTs before each treatment cycle (8.6)
- Should not be given if neutrophil counts are <1500 cells/mm$^3$. Obtain frequent blood counts to monitor for neutropenia (4)
- Severe hypersensitivity, including very rare fatal anaphylaxis, has been reported in patients who received dexamethasone premedication. Severe reactions require immediate discontinuation of Docetaxel Injection and administration of appropriate therapy (5.4)
- Contraindicated if history of severe hypersensitivity reactions to docetaxel or to drugs formulated with polysorbate 80 (4)
- Severe fluid retention may occur despite dexamethasone (5.5)

---

——————INDICATIONS AND USAGE——————
Docetaxel Injection is a microtubule inhibitor indicated for:
- **Breast Cancer (BC):** single agent for locally advanced or metastatic BC after chemotherapy failure; and with doxorubicin and cyclophosphamide as adjuvant treatment of operable node-positive BC (1.1)
- **Non-Small Cell Lung Cancer (NSCLC):** single agent for locally advanced or metastatic NSCLC after platinum therapy failure; and with cisplatin for unresectable, locally advanced or metastatic untreated NSCLC (1.2)
- **Hormone Refractory Prostate Cancer (HRPC):** with prednisone in androgen independent (hormone refractory) metastatic prostate cancer (1.3)
- **Gastric Adenocarcinoma (GC):** with cisplatin and fluorouracil for untreated, advanced GC, including the gastroesophageal junction (1.4)
- **Squamous Cell Carcinoma of the Head and Neck Cancer (SCCHN):** with cisplatin and fluorouracil for induction treatment of locally advanced SCCHN (1.5)

——————DOSAGE AND ADMINISTRATION——————
Administer in a facility equipped to manage possible complications (e.g., anaphylaxis). Administer intravenously (IV) over 1 hr every 3 weeks. PVC equipment is not recommended.
- BC locally advanced or metastatic: 60 mg/m$^2$ to 100 mg/m$^2$ single agent (2.1)
- BC adjuvant: 75 mg/m$^2$ administered 1 hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^3$ every 3 weeks for 6 cycles (2.1)
- NSCLC: after platinum therapy failure: 75 mg/m$^2$ single agent (2.2)
- NSCLC: chemotherapy-naive: 75 mg/m$^2$ followed by cisplatin 75 mg/m$^2$ (2.2)

- HRPC: 75 mg/m$^2$ with 5 mg prednisone twice a day continuously (2.3)
- GC: 75 mg/m$^2$ followed by cisplatin 75 mg/m$^2$ (both on day 1 only) followed by fluorouracil 750 mg/m$^2$ per day as a 24-hr intravenous infusion (days 1-5), starting at end of cisplatin infusion (2.4)
- SCCHN: 75 mg/m$^2$ followed by cisplatin 75 mg/m$^2$ intravenously (day 1), followed by fluorouracil 750 mg/m$^2$ per day as a 24-hr intravenous infusion (days 1-5), starting at end of cisplatin infusion; for 4 cycles (2.5)
- SCCHN: 75 mg/m$^2$ followed by cisplatin 100 mg/m$^2$ intravenously (day 1), followed by fluorouracil 1000 mg/m$^2$ per day as a 24-hr intravenous infusion (days 1-4); for 3 cycles (2.5)

For all patients:
- Premedicate with oral corticosteroids (2.6)
- Adjust dose as needed (2.7)

——————DOSAGE FORMS AND STRENGTHS——————
Multiple dose vial: 20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL (3)

——————CONTRAINDICATIONS——————
- Hypersensitivity to docetaxel or polysorbate 80 (4)
- Neutrophil counts of <1500 cells/mm$^3$ (4)

——————WARNINGS AND PRECAUTIONS——————
- Acute myeloid leukemia: In patients who received docetaxel, doxorubicin and cyclophosphamide, monitor for delayed myelodysplasia or myeloid leukemia (5.6)Cutaneous reactions: Reactions including erythema of the extremities with edema followed by desquamation may occur. Severe skin toxicity may require dose adjustment (5.7)Neurologic reactions: Reactions including paresthesia, dysesthesia, and pain may occur. Severe neurosensory symptoms require dose adjustment or discontinuation if persistent. (5.8)
- Eye disorders: Cystoid macular edema (CME) has been reported and requires treatment discontinuation. (5.9)
- Asthenia: Severe asthenia may occur and may require treatment discontinuation. (5.10)
- Alcohol content: The alcohol content in a dose of Docetaxel Injection may affect the central nervous system. This may include impairment of a patient's ability to drive or use machines immediately after infusion. (5.11)
- Pregnancy: Fetal harm can occur when administered to a pregnant woman. Women of childbearing potential should be advised not to become pregnant when receiving Docetaxel Injection (5.12, 8.1)

——————ADVERSE REACTIONS——————
Most common adverse reactions across all docetaxel indications are infections, neutropenia, anemia, febrile neutropenia, hypersensitivity, thrombocytopenia, neuropathy, dysgeusia, dyspnea, constipation, anorexia, nail disorders, fluid retention, asthenia, pain, nausea, diarrhea, vomiting, mucositis, alopecia, skin reactions, myalgia (6)

To report SUSPECTED ADVERSE REACTIONS, contact Sandoz Inc., at 1-800-525-8747 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*

——————DRUG INTERACTIONS——————
- Cytochrome P450 3A4 inducers, inhibitors, or substrates: May alter docetaxel metabolism. (7)

See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling

Revised 10/2016

---

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016288

**FULL PRESCRIBING INFORMATION: CONTENTS\***

WARNING
1   INDICATIONS AND USAGE
    1.1   Breast Cancer
    1.2   Non-Small Cell Lung Cancer
    1.3   Prostate Cancer
    1.4   Gastric Adenocarcinoma
    1.5   Head and Neck Cancer
2   DOSAGE AND ADMINISTRATION
    2.1   Breast Cancer
    2.2   Non-Small Cell Lung Cancer
    2.3   Prostate Cancer
    2.4   Gastric Adenocarcinoma
    2.5   Head and Neck Cancer
    2.6   Premedication Regimen
    2.7   Dosage Adjustments During Treatment
    2.8   Administration Precautions
    2.9   Preparation and Administration
    2.10  Stability
3   DOSAGE FORMS AND STRENGTHS
4   CONTRAINDICATIONS
5   WARNINGS AND PRECAUTIONS
    5.1   Toxic Deaths
    5.2   Hepatic Impairment
    5.3   Hematologic Effects
    5.4   Hypersensitivity Reactions
    5.5   Fluid Retention
    5.6   Acute Myeloid Leukemia
    5.7   Cutaneous Reactions
    5.8   Neurologic Reactions
    5.9   Eye Disorders
    5.10  Asthenia
    5.11  Alcohol Content
    5.12  Use in Pregnancy
6   ADVERSE REACTIONS
    6.1   Clinical Trial Experience
    6.2   Post-Marketing Experiences
7   DRUG INTERACTIONS
8   USE IN SPECIFIC POPULATIONS
    8.1   Pregnancy
    8.3   Nursing Mothers
    8.4   Pediatric Use
    8.5   Geriatric Use
    8.6   Hepatic Impairment
10  OVERDOSAGE
11  DESCRIPTION
12  CLINICAL PHARMACOLOGY
    12.1  Mechanism of Action
    12.3  Human Pharmacokinetics
13  NONCLINICAL TOXICOLOGY
    13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility
14  CLINICAL STUDIES
    14.1  Locally Advanced or Metastatic Breast Cancer
    14.2  Adjuvant Treatment of Breast Cancer
    14.3  Non-Small Cell Lung Cancer (NSCLC)
    14.4  Hormone Refractory Prostate Cancer
    14.5  Gastric Adenocarcinoma
    14.6  Head and Neck Cancer
15  REFERENCES
16  HOW SUPPLIED/STORAGE AND HANDLING
    16.1  How Supplied
    16.2  Storage
    16.3  Handling and Disposal
17  PATIENT COUNSELING INFORMATION

\*Sections or subsections omitted from the full prescribing information are not listed

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016289

## FULL PRESCRIBING INFORMATION

> **WARNING: TOXIC DEATHS, HEPATOTOXICITY, NEUTROPENIA, HYPERSENSITIVITY REACTIONS, and FLUID RETENTION**
>
> The incidence of treatment-related mortality associated with docetaxel therapy is increased in patients with abnormal liver function, in patients receiving higher doses, and in patients with non-small cell lung carcinoma and a history of prior treatment with platinum-based chemotherapy who receive docetaxel as a single agent at a dose of 100 mg/m$^2$ *[see Warnings and Precautions (5.1)]*.
>
> Docetaxel Injection should not be given to patients with bilirubin > upper limit of normal (ULN), or to patients with AST and/or ALT >1.5 x ULN concomitant with alkaline phosphatase >2.5 x ULN. Patients with elevations of bilirubin or abnormalities of transaminase concurrent with alkaline phosphatase are at increased risk for the development of grade 4 neutropenia, febrile neutropenia, infections, severe thrombocytopenia, severe stomatitis, severe skin toxicity, and toxic death. Patients with isolated elevations of transaminase >1.5 x ULN also had a higher rate of febrile neutropenia grade 4 but did not have an increased incidence of toxic death. Bilirubin, AST or ALT, and alkaline phosphatase values should be obtained prior to each cycle of Docetaxel Injection therapy *[see Warnings and Precautions (5.2)]*. Docetaxel Injection therapy should not be given to patients with neutrophil counts of <1500 cells/mm$^3$. In order to monitor the occurrence of neutropenia, which may be severe and result in infection, frequent blood cell counts should be performed on all patients receiving Docetaxel Injection *[see Warnings and Precautions (5.3)]*.
>
> Severe hypersensitivity reactions characterized by generalized rash/erythema, hypotension and/or bronchospasm, or very rarely fatal anaphylaxis, have been reported in patients who received a 3-day dexamethasone premedication. Hypersensitivity reactions require immediate discontinuation of the Docetaxel Injection infusion and administration of appropriate therapy *[see Warnings and Precautions (5.4)]*. Docetaxel Injection must not be given to patients who have a history of severe hypersensitivity reactions to docetaxel or to other drugs formulated with polysorbate 80 *[see Contraindications (4)]*.
>
> Severe fluid retention occurred in 6.5% (6/92) of patients despite use of a 3-day dexamethasone premedication regimen. It was characterized by one or more of the following events: poorly tolerated peripheral edema, generalized edema, pleural effusion requiring urgent drainage, dyspnea at rest, cardiac tamponade, or pronounced abdominal distention (due to ascites) *[see Warnings and Precautions (5.5)]*.

## 1   INDICATIONS AND USAGE

### 1.1   Breast Cancer

Docetaxel Injection is indicated for the treatment of patients with locally advanced or metastatic breast cancer after failure of prior chemotherapy.

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                          SANDOZ-TAXO-NDA-00016290

Docetaxel Injection in combination with doxorubicin and cyclophosphamide is indicated for the adjuvant treatment of patients with operable node-positive breast cancer.

## 1.2 Non-Small Cell Lung Cancer

Docetaxel Injection as a single agent is indicated for the treatment of patients with locally advanced or metastatic non-small cell lung cancer after failure of prior platinum-based chemotherapy.

Docetaxel Injection in combination with cisplatin is indicated for the treatment of patients with unresectable, locally advanced or metastatic non-small cell lung cancer who have not previously received chemotherapy for this condition.

## 1.3 Prostate Cancer

Docetaxel Injection in combination with prednisone is indicated for the treatment of patients with androgen independent (hormone refractory) metastatic prostate cancer.

## 1.4 Gastric Adenocarcinoma

Docetaxel Injection in combination with cisplatin and fluorouracil is indicated for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who have not received prior chemotherapy for advanced disease.

## 1.5 Head and Neck Cancer

Docetaxel Injection in combination with cisplatin and fluorouracil is indicated for the induction treatment of patients with locally advanced squamous cell carcinoma of the head and neck (SCCHN).

## 2   DOSAGE AND ADMINISTRATION

For all indications, toxicities may warrant dosage adjustments *[see Dosage and Administration (2.7)]*.

Administer in a facility equipped to manage possible complications (e.g. anaphylaxis).

## 2.1 Breast Cancer

- For locally advanced or metastatic breast cancer after failure of prior chemotherapy, the recommended dose of Docetaxel Injection is 60 mg/m$^2$ to 100 mg/m$^2$ administered intravenously over 1 hour every 3 weeks.

- For the adjuvant treatment of operable node-positive breast cancer, the recommended Docetaxel Injection dose is 75 mg/m$^2$ administered 1 hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ every 3 weeks for 6 courses. Prophylactic G-CSF may be used to mitigate the risk of hematological toxicities *[see Dosage and Administration (2.7)]*.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

## 2.2 Non-Small Cell Lung Cancer

- For treatment after failure of prior platinum-based chemotherapy, docetaxel was evaluated as monotherapy, and the recommended dose is 75 mg/m$^2$ administered intravenously over 1 hour every 3 weeks. A dose of 100 mg/m$^2$ in patients previously treated with chemotherapy was associated with increased hematologic toxicity, infection, and treatment-related mortality in randomized, controlled trials *[see Boxed Warning, Dosage and Administration (2.7), Warnings and Precautions (5), Clinical Studies (14)]*.

- For chemotherapy-naïve patients, docetaxel was evaluated in combination with cisplatin. The recommended dose of Docetaxel Injection is 75 mg/m$^2$ administered intravenously over 1 hour immediately followed by cisplatin 75 mg/m$^2$ over 30-60 minutes every 3 weeks *[see Dosage and Administration (2.7)]*.

## 2.3 Prostate Cancer

- For hormone-refractory metastatic prostate cancer, the recommended dose of Docetaxel Injection is 75 mg/m$^2$ every 3 weeks as a 1 hour intravenous infusion. Prednisone 5 mg orally twice daily is administered continuously *[see Dosage and Administration (2.7)]*.

## 2.4 Gastric Adenocarcinoma

- For gastric adenocarcinoma, the recommended dose of Docetaxel Injection is 75 mg/m$^2$ as a 1 hour intravenous infusion, followed by cisplatin 75 mg/m$^2$, as a 1 to 3 hour intravenous infusion (both on day 1 only), followed by fluorouracil 750 mg/m$^2$ per day given as a 24-hour continuous intravenous infusion for 5 days, starting at the end of the cisplatin infusion. Treatment is repeated every three weeks. Patients must receive premedication with antiemetics and appropriate hydration for cisplatin administration *[see Dosage and Administration (2.7)]*.

## 2.5 Head and Neck Cancer

Patients must receive premedication with antiemetics, and appropriate hydration (prior to and after cisplatin administration). Prophylaxis for neutropenic infections should be administered. All patients treated on the docetaxel containing arms of the TAX323 and TAX324 studies received prophylactic antibiotics.

- *Induction chemotherapy followed by radiotherapy (TAX323)*
  For the induction treatment of locally advanced inoperable SCCHN, the recommended dose of Docetaxel Injection is 75 mg/m$^2$ as a 1 hour intravenous infusion followed by cisplatin 75 mg/m$^2$ intravenously over 1 hour, on day one, followed by fluorouracil as a continuous intravenous infusion at 750 mg/m$^2$ per day for five days. This regimen is administered every 3 weeks for 4 cycles. Following chemotherapy, patients should receive radiotherapy. *[see Dosage and Administration (2.7)]*.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016292

- *Induction chemotherapy followed by chemoradiotherapy (TAX324)*
  For the induction treatment of patients with locally advanced (unresectable, low surgical cure, or organ preservation) SCCHN, the recommended dose of Docetaxel Injection is 75 mg/m$^2$ as a 1 hour intravenous infusion on day 1, followed by cisplatin 100 mg/m$^2$ administered as a 30-minute to 3 hour infusion, followed by fluorouracil 1000 mg/m$^2$/day as a continuous infusion from day 1 to day 4. This regimen is administered every 3 weeks for 3 cycles. Following chemotherapy, patients should receive chemoradiotherapy *[see Dosage and Administration (2.7)]*.

## 2.6 Premedication Regimen

All patients should be premedicated with oral corticosteroids (see below for prostate cancer) such as dexamethasone 16 mg per day (e.g., 8 mg twice daily) for 3 days starting 1 day prior to Docetaxel Injection administration in order to reduce the incidence and severity of fluid retention as well as the severity of hypersensitivity reactions *[see Boxed Warning, Warnings and Precautions (5.4)]*.

For hormone-refractory metastatic prostate cancer, given the concurrent use of prednisone, the recommended premedication regimen is oral dexamethasone 8 mg, at 12 hours, 3 hours and 1 hour before the Docetaxel Injection infusion *[see Warnings and Precautions (5.4)]*.

## 2.7 Dosage Adjustments During Treatment

Breast Cancer
Patients who are dosed initially at 100 mg/m$^2$ and who experience either febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than 1 week, or severe or cumulative cutaneous reactions during Docetaxel Injection therapy should have the dosage adjusted from 100 mg/m$^2$ to 75 mg/m$^2$. If the patient continues to experience these reactions, the dosage should either be decreased from 75 mg/m$^2$ to 55 mg/m$^2$ or the treatment should be discontinued. Conversely, patients who are dosed initially at 60 mg/m$^2$ and who do not experience febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than 1 week, severe or cumulative cutaneous reactions, or severe peripheral neuropathy during Docetaxel Injection therapy may tolerate higher doses. Patients who develop ≥grade 3 peripheral neuropathy should have Docetaxel Injection treatment discontinued entirely.

Combination Therapy with Docetaxel Injection in the Adjuvant Treatment of Breast Cancer Docetaxel Injection in combination with doxorubicin and cyclophosphamide should be administered when the neutrophil count is ≥1,500 cells/mm$^3$. Patients who experience febrile neutropenia should receive G-CSF in all subsequent cycles. Patients who continue to experience this reaction should remain on G-CSF and have their Docetaxel Injection dose reduced to 60 mg/m$^2$. Patients who experience grade 3 or 4 stomatitis should have their Docetaxel Injection dose decreased to 60 mg/m$^2$. Patients who experience severe or cumulative cutaneous reactions or moderate neurosensory signs and/or symptoms during Docetaxel Injection therapy should have their dosage of Docetaxel Injection reduced from 75 mg/m$^2$ to 60 mg/m$^2$. If the patient continues to experience these reactions at 60 mg/m$^2$, treatment should be discontinued.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Non-Small Cell Lung Cancer

*Monotherapy with Docetaxel Injection for NSCLC treatment after failure of prior platinum-based chemotherapy*

Patients who are dosed initially at 75 mg/m$^2$ and who experience either febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than one week, severe or cumulative cutaneous reactions, or other grade 3/4 non-hematological toxicities during Docetaxel Injection treatment should have treatment withheld until resolution of the toxicity and then resumed at 55 mg/m$^2$. Patients who develop ≥grade 3 peripheral neuropathy should have Docetaxel Injection treatment discontinued entirely.

*Combination therapy with Docetaxel Injection for chemotherapy-naïve NSCLC*

For patients who are dosed initially at Docetaxel Injection 75 mg/m$^2$ in combination with cisplatin, and whose nadir of platelet count during the previous course of therapy is <25,000 cells/mm$^3$, in patients who experience febrile neutropenia, and in patients with serious non-hematologic toxicities, the Docetaxel Injection dosage in subsequent cycles should be reduced to 65 mg/m$^2$. In patients who require a further dose reduction, a dose of 50 mg/m$^2$ is recommended. For cisplatin dosage adjustments, see manufacturers' prescribing information.

Prostate Cancer

*Combination therapy with Docetaxel Injection for hormone-refractory metastatic prostate cancer*

Docetaxel Injection should be administered when the neutrophil count is ≥1,500 cells/mm$^3$. Patients who experience either febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than one week, severe or cumulative cutaneous reactions or moderate neurosensory signs and/or symptoms during Docetaxel Injection therapy should have the dosage of Docetaxel Injection reduced from 75 mg/m$^2$ to 60 mg/m$^2$. If the patient continues to experience these reactions at 60 mg/m$^2$, the treatment should be discontinued.

Gastric or Head and Neck Cancer

*Docetaxel Injection in combination with cisplatin and fluorouracil in gastric cancer or head and neck cancer*

Patients treated with Docetaxel Injection in combination with cisplatin and fluorouracil must receive antiemetics and appropriate hydration according to current institutional guidelines. In both studies, G-CSF was recommended during the second and/or subsequent cycles in case of febrile neutropenia, or documented infection with neutropenia, or neutropenia lasting more than 7 days. If an episode of febrile neutropenia, prolonged neutropenia or neutropenic infection occurs despite G-CSF use, the Docetaxel Injection dose should be reduced from 75 mg/m$^2$ to 60 mg/m$^2$. If subsequent episodes of complicated neutropenia occur the Docetaxel Injection dose should be reduced from 60 mg/m$^2$ to 45 mg/m$^2$. In case of grade 4 thrombocytopenia the Docetaxel Injection dose should be reduced from 75 mg/m$^2$ to 60 mg/m$^2$. Patients should not be retreated with subsequent cycles of Docetaxel Injection until neutrophils recover to a level >1,500 cells/mm$^3$ and platelets recover to a level >100,000 cells/mm$^3$. Discontinue treatment if these toxicities persist. *[see Warnings and Precautions (5.3)]*.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                 SANDOZ-TAXO-NDA-00016294

Recommended dose modifications for toxicities in patients treated with Docetaxel Injection in combination with cisplatin and fluorouracil are shown in **Table 1**.

**Table 1 – Recommended Dose Modifications for Toxicities in Patients Treated with Docetaxel Injection in Combination with Cisplatin and Fluorouracil**

| Toxicity | Dosage adjustment |
|---|---|
| Diarrhea grade 3 | First episode: reduce fluorouracil dose by 20%. Second episode: then reduce Docetaxel Injection dose by 20%. |
| Diarrhea grade 4 | First episode: reduce Docetaxel Injection and fluorouracil doses by 20%. Second episode: discontinue treatment. |
| Stomatitis/mucositis grade 3 | First episode: reduce fluorouracil dose by 20%. Second episode: stop fluorouracil only, at all subsequent cycles. Third episode: reduce Docetaxel Injection dose by 20%. |
| Stomatitis/mucositis grade 4 | First episode: stop fluorouracil only, at all subsequent cycles. Second episode: reduce Docetaxel Injection dose by 20%. |

Liver dysfunction:

In case of AST/ALT >2.5 to ≤5 x ULN and AP ≤2.5 x ULN, or AST/ALT >1.5 to ≤5 x ULN and AP >2.5 to ≤5 x ULN, Docetaxel Injection should be reduced by 20%.

In case of AST/ALT >5 x ULN and/or AP >5 x ULN Docetaxel Injection should be stopped.

The dose modifications for cisplatin and fluorouracil in the gastric cancer study are provided below:

Cisplatin dose modifications and delays
Peripheral neuropathy: A neurological examination should be performed before entry into the study, and then at least every 2 cycles and at the end of treatment. In the case of neurological signs or symptoms, more frequent examinations should be performed and the following dose modifications can be made according to NCIC-CTC grade:
• Grade 2: Reduce cisplatin dose by 20%.
• Grade 3: Discontinue treatment.
Ototoxicity: In the case of grade 3 toxicity, discontinue treatment.

Nephrotoxicity: In the event of a rise in serum creatinine ≥grade 2 (>1.5 x normal value) despite adequate rehydration, CrCl should be determined before each subsequent cycle and the following dose reductions should be considered (see **Table 2**).

For other cisplatin dosage adjustments, also refer to the manufacturers' prescribing information.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016295

**Table 2 – Dose Reductions for Evaluation of Creatinine Clearance**

| Creatinine clearance result before next cycle | Cisplatin dose next cycle |
|---|---|
| CrCl ≥60 mL/min | Full dose of cisplatin was given. CrCl was to be repeated before each treatment cycle. |
| CrCl between 40 and 59 mL/min | Dose of cisplatin was reduced by 50% at subsequent cycle. If CrCl was >60 mL/min at end of cycle, full cisplatin dose was reinstituted at the next cycle.<br><br>If no recovery was observed, then cisplatin was omitted from the next treatment cycle. |
| CrCl <40 mL/min | Dose of cisplatin was omitted in that treatment cycle only.<br><br>If CrCl was still <40 mL/min at the end of cycle, cisplatin was discontinued.<br><br>If CrCl was >40 and <60 mL/min at end of cycle, a 50% cisplatin dose was given at the next cycle.<br><br>If CrCl was >60 mL/min at end of cycle, full cisplatin dose was given at next cycle |

CrCl = Creatinine clearance

Fluorouracil dose modifications and treatment delays
For diarrhea and stomatitis, see **Table 1.**
In the event of grade 2 or greater plantar-palmar toxicity, fluorouracil should be stopped until recovery. The fluorouracil dosage should be reduced by 20%.

For other greater than grade 3 toxicities, except alopecia and anemia, chemotherapy should be delayed (for a maximum of 2 weeks from the planned date of infusion) until resolution to grade ≤1 and then recommenced, if medically appropriate.

For other fluorouracil dosage adjustments, also refer to the manufacturers' prescribing information.

Combination Therapy with Strong CYP3A4 inhibitors:
Avoid using concomitant strong CYP3A4 inhibitors (e.g., ketoconazole, itraconazole, clarithromycin, atazanavir, indinavir, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin and voriconazole). There are no clinical data with a dose adjustment in patients receiving strong CYP3A4 inhibitors. Based on extrapolation from a pharmacokinetic study with ketoconazole in 7 patients, consider a 50% Docetaxel Injection dose reduction if patients require co-administration of a strong CYP3A4 inhibitor. *[see Drug Interactions (7), Clinical Pharmacology (12.3)].*

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

## 2.8  Administration Precautions

Docetaxel Injection is a cytotoxic anticancer drug and, as with other potentially toxic compounds, caution should be exercised when handling and preparing Docetaxel Injection solutions. The use of gloves is recommended. Please refer to *[see How Supplied/Storage and Handling (16.3)]*.

If Docetaxel Injection or diluted solution for intravenous infusion should come into contact with the skin, immediately and thoroughly wash with soap and water. If Docetaxel Injection or diluted solution for intravenous infusion should come into contact with mucosa, immediately and thoroughly wash with water.

Contact of the Docetaxel Injection with plasticized PVC equipment or devices used to prepare solutions for infusion is not recommended. In order to minimize patient exposure to the plasticizer DEHP (di-2-ethylhexyl phthalate), which may be leached from PVC infusion bags or sets, the final Docetaxel Injection dilution for infusion should be stored in bottles (glass, polypropylene) or plastic bags (polypropylene, polyolefin) and administered through polyethylene-lined administration sets.

Docetaxel Injection requires dilution prior to administration. Please follow the preparation instructions provided below.

## 2.9  Preparation and Administration

**Docetaxel Injection (10 mg/mL) requires NO prior dilution with a diluent and is ready to add to the infusion solution.**

*Dilution for Infusion*

1.  Aseptically withdraw the required amount of Docetaxel Injection solution (10 mg docetaxel/mL) with a calibrated syringe and inject (as a single injection) into a 250 mL infusion bag or bottle of either 0.9% Sodium Chloride solution or 5% Dextrose solution to produce a final concentration of 0.3 to 0.74 mg/mL.

    If a dose greater than 200 mg of Docetaxel Injection is required, use a larger volume of the infusion vehicle so that a concentration of 0.74 mg/mL Docetaxel Injection is not exceeded.

2.  Thoroughly mix the infusion bag or bottle manually by gentle inversion and rotation in a controlled manner and avoid foaming. Shaking or vigorous agitation should be avoided during preparation and transportation to the patient for administration.

3.  As with all parenteral products, Docetaxel Injection should be inspected visually for particulate matter or discoloration prior to administration whenever the solution and container permit. If the Docetaxel Injection vial or diluted solution is not clear or appears to have precipitation, these should be discarded.

    The Docetaxel Injection diluted solution for infusion should be administered intravenously as a 1-hour infusion under ambient room temperature below 25°C (77°F) and lighting conditions.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                SANDOZ-TAXO-NDA-00016297

**2.10 Stability**

Docetaxel Injection infusion solution, if stored between 2°C and 25°C (36°F and 77°F) is stable for 4 hours in either 0.9% Sodium Chloride solution or 5% Dextrose solution. Use within 4 hours including storage and administration. Do not freeze infusion solution.

**3    DOSAGE FORMS AND STRENGTHS**

**Docetaxel Injection 10 mg/mL is supplied as 20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL.**

Each mL of Docetaxel Injection contains 10 mg docetaxel; 80 mg polysorbate 80; 648 mg polyethylene glycol 300; 275.9 mg alcohol 96% (v/v), and 4 mg citric acid.

**4    CONTRAINDICATIONS**
- Docetaxel Injection is contraindicated in patients who have a history of severe hypersensitivity reactions to docetaxel or to other drugs formulated with polysorbate 80. Severe reactions, including anaphylaxis, have occurred *[see Warnings and Precautions (5.4)]*.
- Docetaxel Injection should not be used in patients with neutrophil counts of <1500 cells/mm$^3$.

**5    WARNINGS AND PRECAUTIONS**

**5.1  Toxic Deaths**

Breast Cancer

Docetaxel administered at 100 mg/m$^2$ was associated with deaths considered possibly or probably related to treatment in 2.0% (19/965) of metastatic breast cancer patients, both previously treated and untreated, with normal baseline liver function and in 11.5% (7/61) of patients with various tumor types who had abnormal baseline liver function (AST and/or ALT >1.5 times ULN together with AP >2.5 times ULN). Among patients dosed at 60 mg/m$^2$, mortality related to treatment occurred in 0.6% (3/481) of patients with normal liver function, and in 3 of 7 patients with abnormal liver function. Approximately half of these deaths occurred during the first cycle. Sepsis accounted for the majority of the deaths.

Non-Small Cell Lung Cancer

Docetaxel administered at a dose of 100 mg/m$^2$ in patients with locally advanced or metastatic non-small cell lung cancer who had a history of prior platinum-based chemotherapy was associated with increased treatment-related mortality (14% and 5% in two randomized, controlled studies). There were 2.8% treatment-related deaths among the 176 patients treated at the 75 mg/m$^2$ dose in the randomized trials. Among patients who experienced treatment-related mortality at the 75 mg/m$^2$ dose level, 3 of 5 patients had an ECOG PS of 2 at study entry *[see Dosage and Administration (2.2), Clinical Studies (14)]*.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                    SANDOZ-TAXO-NDA-00016298

### 5.2  Hepatic Impairment

Patients with combined abnormalities of transaminases and alkaline phosphatase should not be treated with Docetaxel Injection *[see Boxed Warning, Use in Specific Populations (8.6), Clinical Studies (14)]*.

### 5.3  Hematologic Effects

Perform frequent peripheral blood cell counts on all patients receiving Docetaxel Injection. Patients should not be retreated with subsequent cycles of Docetaxel Injection until neutrophils recover to a level >1500 cells/mm$^3$ and platelets recover to a level > 100,000 cells/mm$^3$.

A 25% reduction in the dose of Docetaxel Injection is recommended during subsequent cycles following severe neutropenia (<500 cells/mm$^3$) lasting 7 days or more, febrile neutropenia, or a grade 4 infection in a Docetaxel Injection cycle *[see Dosage and Administration (2.7)]*.

Neutropenia (<2000 neutrophils/mm$^3$) occurs in virtually all patients given 60 mg/m$^2$ to 100 mg/m$^2$ of docetaxel and grade 4 neutropenia (<500 cells/mm$^3$) occurs in 85% of patients given 100 mg/m$^2$ and 75% of patients given 60 mg/m$^2$. Frequent monitoring of blood counts is, therefore, essential so that dose can be adjusted. Docetaxel Injection should not be administered to patients with neutrophils <1500 cells/mm$^3$.

Febrile neutropenia occurred in about 12% of patients given 100 mg/m$^2$ but was very uncommon in patients given 60 mg/m$^2$. Hematologic responses, febrile reactions and infections, and rates of septic death for different regimens are dose related *[see Adverse Reactions (6.1), Clinical Studies (14)]*.

Three breast cancer patients with severe liver impairment (bilirubin >1.7 times ULN) developed fatal gastrointestinal bleeding associated with severe drug-induced thrombocytopenia. In gastric cancer patients treated with docetaxel in combination with cisplatin and fluorouracil (TCF), febrile neutropenia and/or neutropenic infection occurred in 12% of patients receiving G-CSF compared to 28% who did not. Patients receiving TCF should be closely monitored during the first and subsequent cycles for febrile neutropenia and neutropenic infection *[see Dosage and Administration (2.7), Adverse Reactions (6)]*.

### 5.4  Hypersensitivity Reactions

Patients should be observed closely for hypersensitivity reactions, especially during the first and second infusions. Severe hypersensitivity reactions characterized by generalized rash/erythema, hypotension and/or bronchospasm, or very rarely fatal anaphylaxis, have been reported in patients premedicated with 3 days of corticosteroids. Severe hypersensitivity reactions require immediate discontinuation of the Docetaxel Injection infusion and aggressive therapy. Patients with a history of severe hypersensitivity reactions should not be rechallenged with Docetaxel Injection.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                SANDOZ-TAXO-NDA-00016299

Hypersensitivity reactions may occur within a few minutes following initiation of a Docetaxel Injection infusion. If minor reactions such as flushing or localized skin reactions occur, interruption of therapy is not required. All patients should be premedicated with an oral corticosteroid prior to the initiation of the infusion of Docetaxel Injection *[see Dosage and Administration (2.6)]*.

### 5.5 Fluid Retention

Severe fluid retention has been reported following docetaxel therapy. Patients should be premedicated with oral corticosteroids prior to each Docetaxel Injection administration to reduce the incidence and severity of fluid retention *[see Dosage and Administration (2.6)]*. Patients with pre-existing effusions should be closely monitored from the first dose for the possible exacerbation of the effusions.

When fluid retention occurs, peripheral edema usually starts in the lower extremities and may become generalized with a median weight gain of 2 kg.

Among 92 breast cancer patients premedicated with 3-day corticosteroids, moderate fluid retention occurred in 27.2% and severe fluid retention in 6.5%. The median cumulative dose to onset of moderate or severe fluid retention was 819 mg/m$^2$. Nine of 92 patients (9.8%) of patients discontinued treatment due to fluid retention: 4 patients discontinued with severe fluid retention; the remaining 5 had mild or moderate fluid retention. The median cumulative dose to treatment discontinuation due to fluid retention was 1021 mg/m$^2$. Fluid retention was completely, but sometimes slowly, reversible with a median of 16 weeks from the last infusion of docetaxel to resolution (range: 0 to 42+ weeks). Patients developing peripheral edema may be treated with standard measures, *e.g.,* salt restriction, oral diuretic(s).

### 5.6 Acute Myeloid Leukemia

Treatment-related acute myeloid leukemia (AML) or myelodysplasia has occurred in patients given anthracyclines and/or cyclophosphamide, including use in adjuvant therapy for breast cancer. In the adjuvant breast cancer trial *(TAX316)* AML occurred in 3 of 744 patients who received docetaxel, doxorubicin and cyclophosphamide (TAC) and in 1 of 736 patients who received fluorouracil, doxorubicin and cyclophosphamide *[see Clinical Studies (14.2)]*. In TAC-treated patients, the risk of delayed myelodysplasia or myeloid leukemia requires hematological follow-up.

### 5.7 Cutaneous Reactions

Localized erythema of the extremities with edema followed by desquamation has been observed. In case of severe skin toxicity, an adjustment in dosage is recommended *[see Dosage and Administration (2.7)]*. The discontinuation rate due to skin toxicity was 1.6% (15/965) for metastatic breast cancer patients. Among 92 breast cancer patients premedicated with 3-day corticosteroids, there were no cases of severe skin toxicity reported and no patient discontinued docetaxel due to skin toxicity.

### 5.8 Neurologic Reactions

Severe neurosensory symptoms *(e.g.* paresthesia, dysesthesia, pain) were observed in

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

5.5% (53/965) of metastatic breast cancer patients, and resulted in treatment discontinuation in 6.1%. When these symptoms occur, dosage must be adjusted. If symptoms persist, treatment should be discontinued *[see Dosage and Administration (2.7)]*. Patients who experienced neurotoxicity in clinical trials and for whom follow-up information on the complete resolution of the event was available had spontaneous reversal of symptoms with a median of 9 weeks from onset (range: 0 to 106 weeks). Severe peripheral motor neuropathy mainly manifested as distal extremity weakness occurred in 4.4% (42/965).

### 5.9 Eye Disorders

Cystoid macular edema (CME) has been reported in patients treated with docetaxel. Patients with impaired vision should undergo a prompt and comprehensive ophthalmologic examination. If CME is diagnosed, docetaxel treatment should be discontinued and appropriate treatment initiated. Alternative non-taxane cancer treatment should be considered.

### 5.10 Asthenia

Severe asthenia has been reported in 14.9% (144/965) of metastatic breast cancer patients but has led to treatment discontinuation in only 1.8%. Symptoms of fatigue and weakness may last a few days up to several weeks and may be associated with deterioration of performance status in patients with progressive disease.

### 5.11 Alcohol Content

Cases of intoxication have been reported with some formulations of docetaxel due to the alcohol content. The alcohol content in a dose of Docetaxel Injection may affect the central nervous system and should be taken into account for patients in whom alcohol intake should be avoided or minimized. Consideration should be given to the alcohol content in Docetaxel Injection on the ability to drive or use machines immediately after the infusion. Each administration of Docetaxel Injection at 100 mg/m$^2$ delivers 2.6 g/m$^2$ of ethanol. For a patient with a BSA of 2.0 m$^2$, this would deliver 5.2 grams of ethanol *[see Description (11)]*. Other docetaxel products may have a different amount of alcohol.

### 5.12 Use in Pregnancy

Docetaxel Injection can cause fetal harm when administered to a pregnant woman. Docetaxel caused embryofetal toxicities including intrauterine mortality when administered to pregnant rats and rabbits during the period of organogenesis. Embryofetal effects in animals occurred at doses as low as 1/50 and 1/300 the recommended human dose on a body surface area basis.

There are no adequate and well-controlled studies in pregnant women using Docetaxel Injection. If Docetaxel Injection is used during pregnancy, or if the patient becomes pregnant while receiving this drug, the patient should be apprised of the potential hazard to the fetus. Women of childbearing potential should be advised to avoid becoming pregnant during therapy with Docetaxel Injection *[see Use in Specific Populations (8.1)]*.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016301

## 6    ADVERSE REACTIONS

The most serious adverse reactions from docetaxel are:

- Toxic Deaths *[see Boxed Warning, Warnings and Precautions (5.1)]*
- Hepatotoxicity *[see Boxed Warning, Warnings and Precautions (5.2)]*
- Neutropenia *[see Boxed Warning, Warnings and Precautions (5.3)]*
- Hypersensitivity *[see Boxed Warning, Warnings and Precautions (5.4)]*
- Fluid Retention *[see Boxed Warning, Warnings and Precautions (5.5)]*
- Acute Myeloid Leukemia *[see Warnings and Precautions (5.6)]*
- Cutaneous Reactions *[see Warnings and Precautions (5.7)]*
- Neurologic Reactions *[see Warnings and Precautions (5.8)]*
- Eye Disorders *[see Warnings and Precautions (5.9)]*
- Asthenia *[see Warnings and Precautions (5.10)]*
- Alcohol Intoxication *[see Warnings and Precautions (5.11)]*

The most common adverse reactions across all docetaxel indications are infections, neutropenia, anemia, febrile neutropenia, hypersensitivity, thrombocytopenia, neuropathy, dysgeusia, dyspnea, constipation, anorexia, nail disorders, fluid retention, asthenia, pain, nausea, diarrhea, vomiting, mucositis, alopecia, skin reactions, and myalgia. Incidence varies depending on the indication.

Adverse reactions are described according to indication. Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

Responding patients may not experience an improvement in performance status on therapy and may experience worsening. The relationship between changes in performance status, response to therapy, and treatment-related side effects has not been established.

### 6.1    Clinical Trial Experience

Breast Cancer

*Monotherapy with docetaxel for locally advanced or metastatic breast cancer after failure of prior chemotherapy*

Docetaxel 100 mg/m$^2$: Adverse drug reactions occurring in at least 5% of patients are compared for three populations who received docetaxel administered at 100 mg/m$^2$ as a 1-hour infusion every 3 weeks: 2045 patients with various tumor types and normal baseline liver function tests; the subset of 965 patients with locally advanced or metastatic breast cancer, both previously treated and untreated with chemotherapy, who had normal baseline liver function tests; and an additional 61 patients with various tumor types who had abnormal liver function tests at baseline. These reactions were described using COSTART terms and were considered possibly or probably related to docetaxel. At least 95% of these patients did not receive hematopoietic support. The safety profile is generally similar in patients receiving docetaxel for the treatment of breast cancer and in patients with other tumor types (See **Table 3**).

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Table 3 - Summary of Adverse Reactions in Patients Receiving Docetaxel at 100 mg/m$^2$

| Adverse Reaction | All Tumor Types Normal LFTs* n=2045 % | All Tumor Types Elevated LFTs** n=61 % | Breast Cancer Normal LFTs* n=965 % |
|---|---|---|---|
| **Hematologic** | | | |
| Neutropenia | | | |
| <2000 cells/mm$^3$ | 96 | 96 | 99 |
| <500 cells/mm$^3$ | 75 | 88 | 86 |
| Leukopenia | | | |
| <4000 cells/mm$^3$ | 96 | 98 | 99 |
| <1000 cells/mm$^3$ | 32 | 47 | 44 |
| Thrombocytopenia | | | |
| <100,000 cells/mm$^3$ | 8 | 25 | 9 |
| Anemia | | | |
| <11 g/dL | 90 | 92 | 94 |
| <8 g/dL | 9 | 31 | 8 |
| Febrile Neutropenia*** | 11 | 26 | 12 |
| **Septic Death** | 2 | 5 | 1 |
| **Non-Septic Death** | 1 | 7 | 1 |
| **Infections** | | | |
| Any | 22 | 33 | 22 |
| Severe | 6 | 16 | 6 |
| **Fever in Absence of Infection** | | | |
| Any | 31 | 41 | 35 |
| Severe | 2 | 8 | 2 |
| **Hypersensitivity Reactions** Regardless of Premedication | | | |
| Any | 21 | 20 | 18 |
| Severe | 4 | 10 | 3 |
| With 3-day Premedication | n=92 | n=3 | n=92 |
| Any | 15 | 33 | 15 |
| Severe | 2 | 0 | 2 |
| **Fluid Retention** Regardless of Premedication | | | |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| Any | 47 | 39 | 60 |
| Severe | 7 | 8 | 9 |
| With 3-day Premedication | n=92 | n=3 | n=92 |
| Any | 64 | 67 | 64 |
| Severe | 7 | 33 | 7 |
| **Neurosensory** | | | |
| Any | 49 | 34 | 58 |
| Severe | 4 | 0 | 6 |
| **Cutaneous** | | | |
| Any | 48 | 54 | 47 |
| Severe | 5 | 10 | 5 |
| **Nail Changes** | | | |
| Any | 31 | 23 | 41 |
| Severe | 3 | 5 | 4 |
| **Gastrointestinal** | | | |
| Nausea | 39 | 38 | 42 |
| Vomiting | 22 | 23 | 23 |
| Diarrhea | 39 | 33 | 43 |
| Severe | 5 | 5 | 6 |
| **Stomatitis** | | | |
| Any | 42 | 49 | 52 |
| Severe | 6 | 13 | 7 |
| **Alopecia** | 76 | 62 | 74 |
| **Asthenia** | | | |
| Any | 62 | 53 | 66 |
| Severe | 13 | 25 | 15 |
| **Myalgia** | | | |
| Any | 19 | 16 | 21 |
| Severe | 2 | 2 | 2 |
| **Arthralgia** | 9 | 7 | 8 |
| **Infusion Site Reactions** | 4 | 3 | 4 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN
**Elevated Baseline LFTs: AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN
***Febrile Neutropenia: ANC grade 4 with fever >38°C with intravenous antibiotics and/or hospitalization

**Hematologic Reactions**

Reversible marrow suppression was the major dose-limiting toxicity of docetaxel [see Warnings and Precautions (5.3)]. The median time to nadir was 7 days, while the median duration of severe neutropenia (<500 cells/mm$^3$) was 7 days. Among 2045

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER  SANDOZ-TAXO-NDA-00016304

patients with solid tumors and normal baseline LFTs, severe neutropenia occurred in 75.4% and lasted for more than 7 days in 2.9% of cycles.

Febrile neutropenia (<500 cells/mm$^3$ with fever >38°C with intravenous antibiotics and/or hospitalization) occurred in 11% of patients with solid tumors, in 12.3% of patients with metastatic breast cancer, and in 9.8% of 92 breast cancer patients premedicated with 3-day corticosteroids.

Severe infectious episodes occurred in 6.1% of patients with solid tumors, in 6.4% of patients with metastatic breast cancer, and in 5.4% of 92 breast cancer patients premedicated with 3-day corticosteroids.

Thrombocytopenia (<100,000 cells/mm$^3$) associated with fatal gastrointestinal hemorrhage has been reported.

**Hypersensitivity Reactions**

Severe hypersensitivity reactions have been reported *[see Boxed Warning, Warnings and Precautions (5.4)]*. Minor events, including flushing, rash with or without pruritus, chest tightness, back pain, dyspnea, drug fever, or chills, have been reported and resolved after discontinuing the infusion and instituting appropriate therapy.

**Fluid Retention**

Fluid retention can occur with the use of docetaxel *[see Boxed Warning, Dosage and Administration (2.6), Warnings and Precautions (5.5)]*.

**Cutaneous Reactions**

Severe skin toxicity is discussed elsewhere in the label *[see Warnings and Precautions (5.7)]*. Reversible cutaneous reactions characterized by a rash including localized eruptions, mainly on the feet and/or hands, but also on the arms, face, or thorax, usually associated with pruritus, have been observed. Eruptions generally occurred within 1 week after docetaxel infusion, recovered before the next infusion, and were not disabling.

Severe nail disorders were characterized by hypo- or hyperpigmentation, and occasionally by onycholysis (in 0.8% of patients with solid tumors) and pain.

**Neurologic Reactions**

Neurologic reactions are discussed elsewhere in the label *[see Warnings and Precautions (5.8)]*

**Gastrointestinal Reactions**

Nausea, vomiting, and diarrhea were generally mild to moderate. Severe reactions occurred in 3-5% of patients with solid tumors and to a similar extent among metastatic breast cancer patients.

Reference ID: 4002498

The incidence of severe reactions was 1% or less for the 92 breast cancer patients premedicated with 3-day corticosteroids.

Severe stomatitis occurred in 5.5% of patients with solid tumors, in 7.4% of patients with metastatic breast cancer, and in 1.1% of the 92 breast cancer patients premedicated with 3-day corticosteroids.

## Cardiovascular Reactions

Hypotension occurred in 2.8% of patients with solid tumors; 1.2% required treatment. Clinically meaningful events such as heart failure, sinus tachycardia, atrial flutter, dysrhythmia, unstable angina, pulmonary edema, and hypertension occurred rarely. Seven of 86 (8.1%) of metastatic breast cancer patients receiving docetaxel 100 mg/m$^2$ in a randomized trial and who had serial left ventricular ejection fractions assessed developed deterioration of LVEF by $\geq$10% associated with a drop below the institutional lower limit of normal.

## Infusion Site Reactions

Infusion site reactions were generally mild and consisted of hyperpigmentation, inflammation, redness or dryness of the skin, phlebitis, extravasation, or swelling of the vein.

## Hepatic Reactions

In patients with normal LFTs at baseline, bilirubin values greater than the ULN occurred in 8.9% of patients. Increases in AST or ALT >1.5 times the ULN, or alkaline phosphatase >2.5 times ULN, were observed in 18.9% and 7.3% of patients, respectively. While on docetaxel, increases in AST and/or ALT >1.5 times ULN concomitant with alkaline phosphatase >2.5 times ULN occurred in 4.3% of patients with normal LFTs at baseline. Whether these changes were related to the drug or underlying disease has not been established.

## Hematologic and Other Toxicity: Relation to dose and baseline liver chemistry abnormalities

Hematologic and other toxicity is increased at higher doses and in patients with elevated baseline liver function tests (LFTs). In the following tables, adverse drug reactions are compared for three populations: 730 patients with normal LFTs given docetaxel at 100 mg/m$^2$ in the randomized and single arm studies of metastatic breast cancer after failure of previous chemotherapy; 18 patients in these studies who had abnormal baseline LFTs (defined as AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN); and 174 patients in Japanese studies given docetaxel at 60 mg/m$^2$ who had normal LFTs (see **Tables 4** and **5**).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                          SANDOZ-TAXO-NDA-00016306

**Table 4 - Hematologic Adverse Reactions in Breast Cancer Patients Previously Treated with Chemotherapy Treated at Docetaxel 100 mg/m$^2$ with Normal or Elevated Liver Function Tests or 60 mg/m$^2$ with Normal Liver Function Tests**

| Adverse Reaction | Docetaxel 100 mg/m$^2$ | | Docetaxel 60 mg/m$^2$ |
|---|---|---|---|
| | Normal LFTs* n=730 % | Elevated LFTs** n=18 % | Normal LFTs* n=174 % |
| **Neutropenia** | | | |
| Any  <2000 cells/mm$^3$ | 98 | 100 | 95 |
| Grade 4  <500 cells/mm$^3$ | 84 | 94 | 75 |
| **Thrombocytopenia** | | | |
| Any  <100,000 cells/mm$^3$ | 11 | 44 | 14 |
| Grade 4  <20,000 cells/mm$^3$ | 1 | 17 | 1 |
| **Anemia  <11 g/dL** | 95 | 94 | 65 |
| **Infection*** | | | |
| Any | 23 | 39 | 1 |
| Grade 3 and 4 | 7 | 33 | 0 |
| **Febrile Neutropenia**** | | | |
| By Patient | 12 | 33 | 0 |
| By Course | 2 | 9 | 0 |
| **Septic Death** | 2 | 6 | 1 |
| **Non-Septic Death** | 1 | 11 | 0 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN
**Elevated Baseline LFTs: AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN
***Incidence of infection requiring hospitalization and/or intravenous antibiotics was 8.5% (n=62) among the 730 patients with normal LFTs at baseline; 7 patients had concurrent grade 3 neutropenia, and 46 patients had grade 4 neutropenia.
****Febrile Neutropenia: For 100 mg/m$^2$, ANC grade 4 and fever >38°C with intravenous antibiotics and/or hospitalization; for 60 mg/m$^2$, ANC grade 3/4 and fever >38.1°C.

**Table 5 - Non-Hematologic Adverse Reactions in Breast Cancer Patients Previously Treated with Chemotherapy Treated at Docetaxel 100 mg/m$^2$ with Normal or Elevated Liver Function Tests or 60 mg/m$^2$ with Normal Liver Function Tests**

Reference ID: 4002498

SANDOZ-TAXO-NDA-00016307

| Adverse Reaction | Docetaxel 100 mg/m$^2$ | | Docetaxel 60 mg/m$^2$ |
|---|---|---|---|
| | Normal LFTs* n=730 % | Elevated LFTs** n=18 % | Normal LFTs* n=174 % |
| **Acute Hypersensitivity Reaction Regardless of Premedication** | | | |
| Any | 13 | 6 | 1 |
| Severe | 1 | 0 | 0 |
| **Fluid Retention*** Regardless of Premedication** | | | |
| Any | 56 | 61 | 13 |
| Severe | 8 | 17 | 0 |
| **Neurosensory** | | | |
| Any | 57 | 50 | 20 |
| Severe | 6 | 0 | 0 |
| **Myalgia** | 23 | 33 | 3 |
| **Cutaneous** | | | |
| Any | 45 | 61 | 31 |
| Severe | 5 | 17 | 0 |
| **Asthenia** | | | |
| Any | 65 | 44 | 66 |
| Severe | 17 | 22 | 0 |
| **Diarrhea** | | | |
| Any | 42 | 28 | NA |
| Severe | 6 | 11 | |
| **Stomatitis** | | | |
| Any | 53 | 67 | 19 |
| Severe | 8 | 39 | 1 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN
** Elevated Baseline Liver Function: AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016308

***Fluid Retention includes (by COSTART): edema (peripheral, localized, generalized, lymphedema, pulmonary edema, and edema otherwise not specified) and effusion (pleural, pericardial, and ascites); no premedication given with the 60 mg/m$^2$ dose
NA = not available

In the three-arm monotherapy trial, TAX313, which compared docetaxel 60 mg/m$^2$, 75 mg/m$^2$ and 100 mg/m$^2$ in advanced breast cancer, grade 3/4 or severe adverse reactions occurred in 49.0% of patients treated with docetaxel 60 mg/m$^2$ compared to 55.3% and 65.9% treated with 75 mg/m$^2$ and 100 mg/m$^2$ respectively. Discontinuation due to adverse reactions was reported in 5.3% of patients treated with 60 mg/m$^2$ vs. 6.9% and 16.5% for patients treated at 75 and 100 mg/m$^2$ respectively. Deaths within 30 days of last treatment occurred in 4.0% of patients treated with 60 mg/m$^2$ compared to 5.3% and 1.6% for patients treated at 75 mg/m$^2$ and 100 mg/m$^2$ respectively.

The following adverse reactions were associated with increasing docetaxel doses: fluid retention (26%, 38%, and 46% at 60 mg/m$^2$, 75 mg/m$^2$, and 100 mg/m$^2$ respectively), thrombocytopenia (7%, 11% and 12% respectively), neutropenia (92%, 94%, and 97% respectively), febrile neutropenia (5%, 7%, and 14% respectively), treatment-related grade 3/4 infection (2%, 3%, and 7% respectively) and anemia (87%, 94%, and 97% respectively).

*Combination therapy with docetaxel in the adjuvant treatment of breast cancer*
The following table presents treatment emergent adverse reactions observed in 744 patients, who were treated with docetaxel 75 mg/m$^2$ every 3 weeks in combination with doxorubicin and cyclophosphamide (see **Table 6**).

**Table 6 – Clinically Important Treatment Emergent Adverse Reactions Regardless of Causal Relationship in Patients Receiving Docetaxel in Combination with Doxorubicin and Cyclophosphamide (TAX316).**

| | Docetaxel 75 mg/m$^2$ + Doxorubicin 50 mg/m$^2$ + Cyclophosphamide 500 mg/m$^2$ (TAC) n=744 % | | Fluorouracil 500 mg/m$^2$ + Doxorubicin 50 mg/m$^2$ + Cyclophosphamide 500 mg/m$^2$ (FAC) n=736 % | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any** | **Grade 3/4** | **Any** | **Grade 3/4** |
| **Anemia** | 92 | 4 | 72 | 2 |
| **Neutropenia** | 71 | 66 | 82 | 49 |
| **Fever in absence of infection** | 47 | 1 | 17 | 0 |
| **Infection** | 39 | 4 | 36 | 2 |
| **Thrombocytopenia** | 39 | 2 | 28 | 1 |
| **Febrile neutropenia** | 25 | N/A | 3 | N/A |
| **Neutropenic infection** | 12 | N/A | 6 | N/A |

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| Hypersensitivity reactions | 13 | 1 | 4 | 0 |
| Lymphedema | 4 | 0 | 1 | 0 |
| Fluid Retention* | 35 | 1 | 15 | 0 |
| Peripheral edema | 27 | 0 | 7 | 0 |
| Weight gain | 13 | 0 | 9 | 0 |
| Neuropathy sensory | 26 | 0 | 10 | 0 |
| Neuro-cortical | 5 | 1 | 6 | 1 |
| Neuropathy motor | 4 | 0 | 2 | 0 |
| Neuro-cerebellar | 2 | 0 | 2 | 0 |
| Syncope | 2 | 1 | 1 | 0 |
| Alopecia | 98 | N/A | 97 | N/A |
| Skin toxicity | 27 | 1 | 18 | 0 |
| Nail disorders | 19 | 0 | 14 | 0 |
| Nausea | 81 | 5 | 88 | 10 |
| Stomatitis | 69 | 7 | 53 | 2 |
| Vomiting | 45 | 4 | 59 | 7 |
| Diarrhea | 35 | 4 | 28 | 2 |
| Constipation | 34 | 1 | 32 | 1 |
| Taste perversion | 28 | 1 | 15 | 0 |
| Anorexia | 22 | 2 | 18 | 1 |
| Abdominal Pain | 11 | 1 | 5 | 0 |
| Amenorrhea | 62 | N/A | 52 | N/A |
| Cough | 14 | 0 | 10 | 0 |
| Cardiac dysrhythmias | 8 | 0 | 6 | 0 |
| Vasodilatation | 27 | 1 | 21 | 1 |
| Hypotension | 2 | 0 | 1 | 0 |
| Phlebitis | 1 | 0 | 1 | 0 |
| Asthenia | 81 | 11 | 71 | 6 |
| Myalgia | 27 | 1 | 10 | 0 |
| Arthralgia | 19 | 1 | 9 | 0 |
| Lacrimation disorder | 11 | 0 | 7 | 0 |
| Conjunctivitis | 5 | 0 | 7 | 0 |

* COSTART term and grading system for events related to treatment.

Of the 744 patients treated with TAC, 36.3% experienced severe treatment emergent adverse reactions compared to 26.6% of the 736 patients treated with FAC. Dose reductions due to hematologic toxicity occurred in 1% of cycles in the TAC arm versus 0.1% of cycles in the FAC arm. Six percent of patients treated with TAC discontinued treatment due to adverse reactions, compared to 1.1% treated with FAC; fever in the absence of infection and allergy being the most common reasons for withdrawal among TAC-treated patients. Two patients died in each arm within 30 days of their last study treatment; 1 death per arm was attributed to study drugs.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**Fever and Infection**

Fever in the absence of infection was seen in 46.5% of TAC-treated patients and in 17.1% of FAC-treated patients. Grade 3/4 fever in the absence of infection was seen in 1.3% and 0% of TAC- and FAC-treated patients respectively. Infection was seen in 39.4% of TAC-treated patients compared to 36.3% of FAC-treated patients. Grade 3/4 infection was seen in 3.9% and 2.2% of TAC-treated and FAC-treated patients respectively. There were no septic deaths in either treatment arm.

**Gastrointestinal Reactions**

In addition to gastrointestinal reactions reflected in the table above, 7 patients in the TAC arm were reported to have colitis/enteritis/large intestine perforation vs. one patient in the FAC arm. Five of the 7 TAC-treated patients required treatment discontinuation; no deaths due to these events occurred.

**Cardiovascular Reactions**

More cardiovascular reactions were reported in the TAC arm vs. the FAC arm; dysrhythmias, all grades (7.9% vs. 6.0%), hypotension, all grades (2.6% vs. 1.1%) and CHF (2.3% vs. 0.9%, at 70 months median follow-up). One patient in each arm died due to heart failure.

**Acute Myeloid Leukemia (AML)**

Treatment-related acute myeloid leukemia or myelodysplasia is known to occur in patients treated with anthracyclines and/or cyclophosphamide, including use in adjuvant therapy for breast cancer. AML occurs at a higher frequency when these agents are given in combination with radiation therapy. AML occurred in the adjuvant breast cancer trial (TAX316). The cumulative risk of developing treatment-related AML at 5 years in TAX316 was 0.4% for TAC-treated patients and 0.1% for FAC-treated patients. This risk of AML is comparable to the risk observed for other anthracyclines/cyclophosphamide containing adjuvant breast chemotherapy regimens.

Lung Cancer
*Monotherapy with docetaxel for unresectable, locally advanced or metastatic NSCLC previously treated with platinum-based chemotherapy*

Docetaxel 75 mg/m$^2$: Treatment emergent adverse drug reactions are shown in **Table 7.** Included in this table are safety data for a total of 176 patients with non-small cell lung carcinoma and a history of prior treatment with platinum-based chemotherapy who were treated in two randomized, controlled trials. These reactions were described using NCI Common Toxicity Criteria regardless of relationship to study treatment, except for the hematologic toxicities or where otherwise noted.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**Table 7 - Treatment Emergent Adverse Reactions Regardless of Relationship to Treatment in Patients Receiving Docetaxel as Monotherapy for Non-Small Cell Lung Cancer Previously Treated with Platinum-Based Chemotherapy\***

| Adverse Reaction | Docetaxel 75 mg/m$^2$ n=176 % | Best Supportive Care n=49 % | Vinorelbine/ Ifosfamide n=119 % |
|---|---|---|---|
| **Neutropenia** | | | |
| Any | 84 | 14 | 83 |
| Grade 3/4 | 65 | 12 | 57 |
| **Leukopenia** | | | |
| Any | 84 | 6 | 89 |
| Grade 3/4 | 49 | 0 | 43 |
| **Thrombocytopenia** | | | |
| Any | 8 | 0 | 8 |
| Grade 3/4 | 3 | 0 | 2 |
| **Anemia** | | | |
| Any | 91 | 55 | 91 |
| Grade 3/4 | 9 | 12 | 14 |
| **Febrile Neutropenia\*\*** | 6 | NA$^†$ | 1 |
| **Infection** | | | |
| Any | 34 | 29 | 30 |
| Grade 3/4 | 10 | 6 | 9 |
| **Treatment Related Mortality** | 3 | NA$^†$ | 3 |
| **Hypersensitivity Reactions** | | | |
| Any | 6 | 0 | 1 |
| Grade 3/4 | 3 | 0 | 0 |
| **Fluid Retention** | | | |
| Any | 34 | ND$^{‡†}$ | 23 |
| Severe | 3 | | 3 |
| **Neurosensory** | | | |
| Any | 23 | 14 | 29 |
| Grade 3/4 | 2 | 6 | 5 |
| **Neuromotor** | | | |
| Any | 16 | 8 | 10 |
| Grade 3/4 | 5 | 6 | 3 |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016312

| | | | |
|---|---|---|---|
| **Skin** | | | |
| Any | 20 | 6 | 17 |
| Grade 3/4 | 1 | 2 | 1 |
| **Gastrointestinal** | | | |
| Nausea | | | |
|   Any | 34 | 31 | 31 |
|   Grade 3/4 | 5 | 4 | 8 |
| Vomiting | | | |
|   Any | 22 | 27 | 22 |
|   Grade 3/4 | 3 | 2 | 6 |
| Diarrhea | | | |
|   Any | 23 | 6 | 12 |
|   Grade 3/4 | 3 | 0 | 4 |
| **Alopecia** | 56 | 35 | 50 |
| **Asthenia** | | | |
| Any | 53 | 57 | 54 |
| Severe*** | 18 | 39 | 23 |
| **Stomatitis** | | | |
| Any | 26 | 6 | 8 |
| Grade 3/4 | 2 | 0 | 1 |
| **Pulmonary** | | | |
| Any | 41 | 49 | 45 |
| Grade 3/4 | 21 | 29 | 19 |
| **Nail Disorder** | | | |
| Any | 11 | 0 | 2 |
| Severe*** | 1 | 0 | 0 |
| **Myalgia** | | | |
| Any | 6 | 0 | 3 |
| Severe*** | 0 | 0 | 0 |
| **Arthralgia** | | | |
| Any | 3 | 2 | 2 |
| Severe*** | 0 | 0 | 1 |
| **Taste Perversion** | | | |
| Any | 6 | 0 | 0 |
| Severe*** | 1 | 0 | 0 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN
**Febrile Neutropenia: ANC grade 4 with fever >38°C with intravenous antibiotics and/or hospitalization
***COSTART term and grading system
†Not Applicable
†† Not Done

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                    SANDOZ-TAXO-NDA-00016313

*Combination therapy with docetaxel in chemotherapy-naïve advanced unresectable or metastatic NSCLC*

**Table 8** presents safety data from two arms of an open label, randomized controlled trial (TAX326) that enrolled patients with unresectable stage IIIB or IV non-small cell lung cancer and no history of prior chemotherapy. Adverse reactions were described using the NCI Common Toxicity Criteria except where otherwise noted.

**Table 8 - Adverse Reactions Regardless of Relationship to Treatment in Chemotherapy-Naïve Advanced Non-Small Cell Lung Cancer Patients Receiving Docetaxel in Combination with Cisplatin**

| Adverse Reaction | Docetaxel 75 mg/m$^2$ + Cisplatin 75 mg/m$^2$ n=406 % | Vinorelbine 25 mg/m$^2$ + Cisplatin 100 mg/m$^2$ n=396 % |
|---|---|---|
| **Neutropenia** | | |
| Any | 91 | 90 |
| Grade 3/4 | 74 | 78 |
| **Febrile Neutropenia** | 5 | 5 |
| **Thrombocytopenia** | | |
| Any | 15 | 15 |
| Grade 3/4 | 3 | 4 |
| **Anemia** | | |
| Any | 89 | 94 |
| Grade 3/4 | 7 | 25 |
| **Infection** | | |
| Any | 35 | 37 |
| Grade 3/4 | 8 | 8 |
| **Fever in absence of infection** | | |
| Any | 33 | 29 |
| Grade 3/4 | <1 | 1 |
| **Hypersensitivity Reaction*** | | |
| Any | 12 | 4 |
| Grade 3/4 | 3 | <1 |
| **Fluid Retention**** | | |
| Any | 54 | 42 |
| All severe or life-threatening events | 2 | 2 |
| Pleural effusion | | |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016314

|  | | |
|---|---|---|
| Any | 23 | 22 |
| All severe or life-threatening events | 2 | 2 |
| Peripheral edema | | |
| Any | 34 | 18 |
| All severe or life-threatening events | <1 | <1 |
| Weight gain | | |
| Any | 15 | 9 |
| All severe or life-threatening events | <1 | <1 |
| **Neurosensory** | | |
| Any | 47 | 42 |
| Grade 3/4 | 4 | 4 |
| **Neuromotor** | | |
| Any | 19 | 17 |
| Grade 3/4 | 3 | 6 |
| **Skin** | | |
| Any | 16 | 14 |
| Grade 3/4 | <1 | 1 |
| **Nausea** | | |
| Any | 72 | 76 |
| Grade 3/4 | 10 | 17 |
| **Vomiting** | | |
| Any | 55 | 61 |
| Grade 3/4 | 8 | 16 |
| **Diarrhea** | | |
| Any | 47 | 25 |
| Grade 3/4 | 7 | 3 |
| **Anorexia\*\*** | | |
| Any | 42 | 40 |
| All severe or life-threatening events | 5 | 5 |
| **Stomatitis** | | |
| Any | 24 | 21 |
| Grade 3/4 | 2 | 1 |
| **Alopecia** | | |
| Any | 75 | 42 |
| Grade 3 | <1 | 0 |
| **Asthenia\*\*** | | |

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                     SANDOZ-TAXO-NDA-00016315

| | | |
|---|---|---|
| Any | 74 | 75 |
| All severe or life-threatening events | 12 | 14 |
| **Nail Disorder\*\*** | | |
| Any | 14 | <1 |
| All severe events | <1 | 0 |
| **Myalgia\*\*** | | |
| Any | 18 | 12 |
| All severe events | <1 | <1 |

\* Replaces NCI term "Allergy"
\*\* COSTART term and grading system

Deaths within 30 days of last study treatment occurred in 31 patients (7.6%) in the docetaxel+cisplatin arm and 37 patients (9.3%) in the vinorelbine+cisplatin arm. Deaths within 30 days of last study treatment attributed to study drug occurred in 9 patients (2.2%) in the docetaxel+cisplatin arm and 8 patients (2%) in the vinorelbine+cisplatin arm.

The second comparison in the study, vinorelbine+cisplatin versus docetaxel+carboplatin (which did not demonstrate a superior survival associated with docetaxel, *[see Clinical Studies (14.3)]*) demonstrated a higher incidence of thrombocytopenia, diarrhea, fluid retention, hypersensitivity reactions, skin toxicity, alopecia and nail changes on the docetaxel+carboplatin arm, while a higher incidence of anemia, neurosensory toxicity, nausea, vomiting, anorexia and asthenia was observed on the vinorelbine+cisplatin arm.

Prostate Cancer
*Combination therapy with docetaxel in patients with prostate cancer*
The following data are based on the experience of 332 patients, who were treated with docetaxel 75 mg/m$^2$ every 3 weeks in combination with prednisone 5 mg orally twice daily (see **Table 9**).

**Table 9 - Clinically Important Treatment Emergent Adverse Reactions (Regardless of Relationship) in Patients with Prostate Cancer who Received Docetaxel in Combination with Prednisone (TAX327)**

| | Docetaxel 75 mg/m$^2$ every 3 weeks + prednisone 5 mg twice daily n=332 % | | Mitoxantrone 12 mg/m$^2$ every 3 weeks + prednisone 5 mg twice daily n=335 % | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any** | **Grade 3/4** | **Any** | **Grade 3/4** |
| **Anemia** | 67 | 5 | 58 | 2 |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016316

| | | | | |
|---|---|---|---|---|
| Neutropenia | 41 | 32 | 48 | 22 |
| Thrombocytopenia | 3 | 1 | 8 | 1 |
| Febrile neutropenia | 3 | N/A | 2 | N/A |
| Infection | 32 | 6 | 20 | 4 |
| Epistaxis | 6 | 0 | 2 | 0 |
| Allergic Reactions | 8 | 1 | 1 | 0 |
| Fluid Retention*<br>Weight Gain*<br>Peripheral Edema* | 24<br>8<br>18 | 1<br>0<br>0 | 5<br>3<br>2 | 0<br>0<br>0 |
| Neuropathy Sensory | 30 | 2 | 7 | 0 |
| Neuropathy Motor | 7 | 2 | 3 | 1 |
| Rash/Desquamation | 6 | 0 | 3 | 1 |
| Alopecia | 65 | N/A | 13 | N/A |
| Nail Changes | 30 | 0 | 8 | 0 |
| Nausea | 41 | 3 | 36 | 2 |
| Diarrhea | 32 | 2 | 10 | 1 |
| Stomatitis/Pharyngitis | 20 | 1 | 8 | 0 |
| Taste Disturbance | 18 | 0 | 7 | 0 |
| Vomiting | 17 | 2 | 14 | 2 |
| Anorexia | 17 | 1 | 14 | 0 |
| Cough | 12 | 0 | 8 | 0 |
| Dyspnea | 15 | 3 | 9 | 1 |
| Cardiac left ventricular function | 10 | 0 | 22 | 1 |
| Fatigue | 53 | 5 | 35 | 5 |
| Myalgia | 15 | 0 | 13 | 1 |
| Tearing | 10 | 1 | 2 | 0 |
| Arthralgia | 8 | 1 | 5 | 1 |

*Related to treatment

Gastric Cancer
*Combination therapy with docetaxel in gastric adenocarcinoma*

Data in the following table are based on the experience of 221 patients with advanced gastric adenocarcinoma and no history of prior chemotherapy for advanced disease, who were treated with docetaxel 75 mg/m$^2$ in combination with cisplatin and fluorouracil (see Table 10).

**Table 10 - Clinically Important Treatment Emergent Adverse Reactions Regardless of Relationship to Treatment in the Gastric Cancer Study**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016317

| Adverse Reaction | Docetaxel 75 mg/m$^2$ + cisplatin 75 mg/m$^2$ + fluorouracil 750 mg/m$^2$ n=221 | | Cisplatin 100 mg/m$^2$ + fluorouracil 1000 mg/m$^2$ n=224 | |
|---|---|---|---|---|
| | Any % | Grade 3/4 % | Any % | Grade 3/4 % |
| Anemia | 97 | 18 | 93 | 26 |
| Neutropenia | 96 | 82 | 83 | 57 |
| Fever in the absence of infection | 36 | 2 | 23 | 1 |
| Thrombocytopenia | 26 | 8 | 39 | 14 |
| Infection | 29 | 16 | 23 | 10 |
| Febrile neutropenia | 16 | N/A | 5 | N/A |
| Neutropenic infection | 16 | N/A | 10 | N/A |
| Allergic reactions | 10 | 2 | 6 | 0 |
| Fluid retention* | 15 | 0 | 4 | 0 |
| Edema* | 13 | 0 | 3 | 0 |
| Lethargy | 63 | 21 | 58 | 18 |
| Neurosensory | 38 | 8 | 25 | 3 |
| Neuromotor | 9 | 3 | 8 | 3 |
| Dizziness | 16 | 5 | 8 | 2 |
| Alopecia | 67 | 5 | 41 | 1 |
| Rash/itch | 12 | 1 | 9 | 0 |
| Nail changes | 8 | 0 | 0 | 0 |
| Skin desquamation | 2 | 0 | 0 | 0 |
| Nausea | 73 | 16 | 76 | 19 |
| Vomiting | 67 | 15 | 73 | 19 |
| Anorexia | 51 | 13 | 54 | 12 |
| Stomatitis | 59 | 21 | 61 | 27 |
| Diarrhea | 78 | 20 | 50 | 8 |
| Constipation | 25 | 2 | 34 | 3 |
| Esophagitis/dysphagia/ odynophagia | 16 | 2 | 14 | 5 |
| Gastrointestinal pain/cramping | 11 | 2 | 7 | 3 |
| Cardiac dysrhythmias | 5 | 2 | 2 | 1 |
| Myocardial ischemia | 1 | 0 | 3 | 2 |
| Tearing | 8 | 0 | 2 | 0 |
| Altered hearing | 6 | 0 | 13 | 2 |

Clinically important treatment emergent adverse reactions were determined based upon frequency, severity, and clinical impact of the adverse reaction.
*Related to treatment

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016318

<u>Head and Neck Cancer</u>
*Combination therapy with docetaxel in head and neck cancer*

**Table 11** summarizes the safety data obtained from patients that received induction chemotherapy with docetaxel 75 mg/m$^2$ in combination with cisplatin and fluorouracil followed by radiotherapy (TAX323; 174 patients) or chemoradiotherapy (TAX324; 251 patients). The treatment regimens are described in Section 14.6.

**Table 11 - Clinically Important Treatment Emergent Adverse Reactions (Regardless of Relationship) in Patients with SCCHN Receiving Induction Chemotherapy with Docetaxel in Combination with Cisplatin and Fluorouracil Followed by Radiotherapy (TAX323) or Chemoradiotherapy (TAX324)**

| Adverse Reaction (by Body System) | TAX323 (n=355) | | | | TAX324 (n=494) | | | |
|---|---|---|---|---|---|---|---|---|
| | Docetaxel arm (n=174) | | Comparator arm (n=181) | | Docetaxel arm (n=251) | | Comparator arm (n=243) | |
| | Any % | Grade 3/4 % | Any % | Grade 3/4 % | Any % | Grade 3/4 % | Any % | Grade 3/4 % |
| Neutropenia | 93 | 76 | 87 | 53 | 95 | 84 | 84 | 56 |
| Anemia | 89 | 9 | 88 | 14 | 90 | 12 | 86 | 10 |
| Thrombocytopenia | 24 | 5 | 47 | 18 | 28 | 4 | 31 | 11 |
| Infection | 27 | 9 | 26 | 8 | 23 | 6 | 28 | 5 |
| Febrile neutropenia* | 5 | N/A | 2 | N/A | 12 | N/A | 7 | N/A |
| Neutropenic infection | 14 | N/A | 8 | N/A | 12 | N/A | 8 | N/A |
| Cancer pain | 21 | 5 | 16 | 3 | 17 | 9 | 20 | 11 |
| Lethargy | 41 | 3 | 38 | 3 | 61 | 5 | 56 | 10 |
| Fever in the absence of infection | 32 | 1 | 37 | 0 | 30 | 4 | 28 | 3 |
| Myalgia | 10 | 1 | 7 | 0 | 7 | 0 | 7 | 2 |
| Weight loss | 21 | 1 | 27 | 1 | 14 | 2 | 14 | 2 |
| Allergy | 6 | 0 | 3 | 0 | 2 | 0 | 0 | 0 |
| Fluid retention** | 20 | 0 | 14 | 1 | 13 | 1 | 7 | 2 |
| Edema only | 13 | 0 | 7 | 0 | 12 | 1 | 6 | 1 |
| Weight gain only | 6 | 0 | 6 | 0 | 0 | 0 | 1 | 0 |
| Dizziness | 2 | 0 | 5 | 1 | 16 | 4 | 15 | 2 |
| Neurosensory | 18 | 1 | 11 | 1 | 14 | 1 | 14 | 0 |
| Altered hearing | 6 | 0 | 10 | 3 | 13 | 1 | 19 | 3 |
| Neuromotor | 2 | 1 | 4 | 1 | 9 | 0 | 10 | 2 |
| Alopecia | 81 | 11 | 43 | 0 | 68 | 4 | 44 | 1 |
| Rash/itch | 12 | 0 | 6 | 0 | 20 | 0 | 16 | 1 |
| Dry skin | 6 | 0 | 2 | 0 | 5 | 0 | 3 | 0 |
| Desquamation | 4 | 1 | 6 | 0 | 2 | 0 | 5 | 0 |
| Nausea | 47 | 1 | 51 | 7 | 77 | 14 | 80 | 14 |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016319

| Stomatitis | 43 | 4 | 47 | 11 | 66 | 21 | 68 | 27 |
|---|---|---|---|---|---|---|---|---|
| Vomiting | 26 | 1 | 39 | 5 | 56 | 8 | 63 | 10 |
| Diarrhea | 33 | 3 | 24 | 4 | 48 | 7 | 40 | 3 |
| Constipation | 17 | 1 | 16 | 1 | 27 | 1 | 38 | 1 |
| Anorexia | 16 | 1 | 25 | 3 | 40 | 12 | 34 | 12 |
| Esophagitis/dysphagia /Odynophagia | 13 | 1 | 18 | 3 | 25 | 13 | 26 | 10 |
| Taste, sense of smell altered | 10 | 0 | 5 | 0 | 20 | 0 | 17 | 1 |
| Gastrointestinal pain/cramping | 8 | 1 | 9 | 1 | 15 | 5 | 10 | 2 |
| Heartburn | 6 | 0 | 6 | 0 | 13 | 2 | 13 | 1 |
| Gastrointestinal bleeding | 4 | 2 | 0 | 0 | 5 | 1 | 2 | 1 |
| Cardiac dysrhythmia | 2 | 2 | 2 | 1 | 6 | 3 | 5 | 3 |
| Venous*** | 3 | 2 | 6 | 2 | 4 | 2 | 5 | 4 |
| Ischemia myocardial | 2 | 2 | 1 | 0 | 2 | 1 | 1 | 1 |
| Tearing | 2 | 0 | 1 | 0 | 2 | 0 | 2 | 0 |
| Conjunctivitis | 1 | 0 | 1 | 0 | 1 | 0 | 0.4 | 0 |

Clinically important treatment emergent adverse reactions based upon frequency, severity, and clinical impact.
*Febrile neutropenia: grade ≥2 fever concomitant with grade 4 neutropenia requiring intravenous antibiotics and/or hospitalization.
**Related to treatment.
*** Includes superficial and deep vein thrombosis and pulmonary embolism

## 6.2  Post-Marketing Experiences

The following adverse reactions have been identified from clinical trials and/or post-marketing surveillance. Because they are reported from a population of unknown size, precise estimates of frequency cannot be made.

**Body as a whole:** diffuse pain, chest pain, radiation recall phenomenon.

**Cardiovascular:** atrial fibrillation, deep vein thrombosis, ECG abnormalities, thrombophlebitis, pulmonary embolism, syncope, tachycardia, myocardial infarction.

**Cutaneous:** very rare cases of cutaneous lupus erythematosus and rare cases of bullous eruptions such as erythema multiforme, Stevens-Johnson syndrome, toxic epidermal necrolysis, and Scleroderma-like changes usually preceded by peripheral lymphedema. In some cases multiple factors may have contributed to the development of these effects. Severe hand and foot syndrome has been reported. Cases of permanent alopecia have been reported.

**Gastrointestinal:** abdominal pain, anorexia, constipation, duodenal ulcer, esophagitis, gastrointestinal hemorrhage, gastrointestinal perforation, ischemic colitis, colitis, intestinal obstruction, ileus, neutropenic enterocolitis and dehydration as a consequence to gastrointestinal events have been reported.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**Hematologic:** bleeding episodes. Disseminated intravascular coagulation (DIC), often in association with sepsis or multiorgan failure, has been reported. Cases of acute myeloid leukemia and myelodysplasic syndrome have been reported in association with docetaxel when used in combination with other chemotherapy agents and/or radiotherapy.

**Hypersensitivity:** rare cases of anaphylactic shock have been reported. Very rarely these cases resulted in a fatal outcome in patients who received premedication.

**Hepatic:** rare cases of hepatitis, sometimes fatal primarily in patients with pre-existing liver disorders, have been reported.

**Neurologic:** confusion, rare cases of seizures or transient loss of consciousness have been observed, sometimes appearing during the infusion of the drug.

**Ophthalmologic:** conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported. Rare cases of transient visual disturbances (flashes, flashing lights, scotomata) typically occurring during drug infusion and in association with hypersensitivity reactions have been reported. These were reversible upon discontinuation of the infusion. Cases of cystoid macular edema (CME) have been reported in patients treated with docetaxel.

**Hearing:** rare cases of ototoxicity, hearing disorders and/or hearing loss have been reported, including cases associated with other ototoxic drugs.

**Respiratory:** dyspnea, acute pulmonary edema, acute respiratory distress syndrome/pneumonitis, interstitial lung disease, interstitial pneumonia, respiratory failure, and pulmonary fibrosis have rarely been reported and may be associated with fatal outcome. Rare cases of radiation pneumonitis have been reported in patients receiving concomitant radiotherapy.

**Renal:** renal insufficiency and renal failure have been reported, the majority of these cases were associated with concomitant nephrotoxic drugs.

**Metabolism and nutrition disorders:** cases of hyponatremia have been reported.

7    **DRUG INTERACTIONS**

Docetaxel is a CYP3A4 substrate. *In vitro* studies have shown that the metabolism of docetaxel may be modified by the concomitant administration of compounds that induce, inhibit, or are metabolized by cytochrome P450 3A4.

*In vivo* studies showed that the exposure of docetaxel increased 2.2-fold when it was coadministered with ketoconazole, a potent inhibitor of CYP3A4. Protease inhibitors, particularly ritonavir, may increase the exposure of docetaxel. Concomitant use of Docetaxel Injection and drugs that inhibit CYP3A4 may increase exposure to docetaxel and should be avoided. In patients receiving treatment with Docetaxel

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Injection, close monitoring for toxicity and a Docetaxel Injection dose reduction could be considered if systemic administration of a potent CYP3A4 inhibitor cannot be avoided *[see Dosage and Administration (2.7) and Clinical Pharmacology (12.3)]*.

# 8   USE IN SPECIFIC POPULATIONS

## 8.1   Pregnancy

Pregnancy Category D *[see 'Warnings and Precautions' section]*
Based on its mechanism of action and findings in animals, Docetaxel Injection can cause fetal harm when administered to a pregnant woman. If Docetaxel Injection is used during pregnancy, or if the patient becomes pregnant while receiving this drug, the patient should be apprised of the potential hazard to the fetus. Women of childbearing potential should be advised to avoid becoming pregnant during therapy with Docetaxel Injection.

Docetaxel Injection can cause fetal harm when administered to a pregnant woman. Studies in both rats and rabbits at doses $\geq 0.3$ and 0.03 mg/kg/day, respectively (about 1/50 and 1/300 the daily maximum recommended human dose on a $mg/m^2$ basis), administered during the period of organogenesis, have shown that docetaxel is embryotoxic and fetotoxic (characterized by intrauterine mortality, increased resorption, reduced fetal weight, and fetal ossification delay). The doses indicated above also caused maternal toxicity.

## 8.3   Nursing Mothers

It is not known whether docetaxel is excreted in human milk. Because many drugs are excreted in human milk, and because of the potential for serious adverse reactions in nursing infants from Docetaxel Injection, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

## 8.4   Pediatric Use

The alcohol content of Docetaxel Injection should be taken into account when given to pediatric patients *[see Warnings and Precautions (5.11)]*.

The efficacy of docetaxel in pediatric patients as monotherapy or in combination has not been established. The overall safety profile of docetaxel in pediatric patients receiving monotherapy or TCF was consistent with the known safety profile in adults.

Docetaxel has been studied in a total of 289 pediatric patients: 239 in 2 trials with monotherapy and 50 in combination treatment with cisplatin and 5-fluorouracil (TCF).

**Docetaxel Monotherapy**

Docetaxel monotherapy was evaluated in a dose-finding phase 1 trial in 61 pediatric patients (median age 12.5 years, range 1-22 years) with a variety of refractory solid tumors. The recommended dose was 125 $mg/m^2$ as a 1-hour intravenous infusion every 21

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                      SANDOZ-TAXO-NDA-00016322

days. The primary dose limiting toxicity was neutropenia.

The recommended dose for docetaxel monotherapy was evaluated in a phase 2 single-arm trial in 178 pediatric patients (median age 12 years, range 1-26 years) with a variety of recurrent/refractory solid tumors. Efficacy was not established with tumor response rates ranging from one complete response (CR) (0.6%) in a patient with undifferentiated sarcoma to four partial responses (2.2%) seen in one patient each with Ewing Sarcoma, neuroblastoma, osteosarcoma, and squamous cell carcinoma.

### Docetaxel in Combination

Docetaxel was studied in combination with cisplatin and 5-fluorouracil (TCF) versus cisplatin and 5-fluorouracil (CF) for the induction treatment of nasopharyngeal carcinoma (NPC) in pediatric patients prior to chemoradiation consolidation. Seventy-five patients (median age 16 years, range 9 to 21 years) were randomized (2:1) to docetaxel (75 mg/m²) in combination with cisplatin (75 mg/m²) and 5-fluorouracil (750 mg/m²) (TCF) or to cisplatin (80 mg/m²) and 5-fluorouracil (1000 mg/m²/day) (CF). The primary endpoint was the CR rate following induction treatment of NPC. One patient out of 50 in the TCF group (2%) had a complete response while none of the 25 patients in the CF group had a complete response.

### Pharmacokinetics

Pharmacokinetic parameters for docetaxel were determined in 2 pediatric solid tumor trials. Following docetaxel administration at 55 mg/m² to 235 mg/m² in a 1-hour intravenous infusion every 3 weeks in 25 patients aged 1 to 20 years (median 11 years), docetaxel clearance was $17.3 \pm 10.9$ L/h/m².

Docetaxel was administered in combination with cisplatin and 5-fluorouracil (TCF), at dose levels of 75 mg/m² in a 1-hour intravenous infusion day 1 in 28 patients aged 10 to 21 years (median 16 years, 17 patients were older than 16). Docetaxel clearance was $17.9 \pm 8.75$ L/h/m², corresponding to an AUC of $4.20 \pm 2.57$ μg.h/mL.

In summary, the body surface area adjusted clearance of docetaxel monotherapy and TCF combination in children were comparable to those in adults [*see Clinical Pharmacology (12.3)*].

**8.5   Geriatric Use**

In general, dose selection for an elderly patient should be cautious, reflecting the greater frequency of decreased hepatic, renal, or cardiac function and of concomitant disease or other drug therapy in elderly patients.

*Non-Small Cell Lung Cancer*
In a study conducted in chemotherapy-naïve patients with NSCLC (TAX326), 148 patients (36%) in the docetaxel+cisplatin group were 65 years of age or greater. There were 128 patients (32%) in the vinorelbine+cisplatin group 65 years of age or greater. In the docetaxel+cisplatin group, patients less than 65 years of age had a median survival of 10.3 months (95% CI: 9.1 months, 11.8 months) and patients 65 years or older had a

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016323

median survival of 12.1 months (95% CI: 9.3 months, 14 months). In patients 65 years of age or greater treated with docetaxel+cisplatin, diarrhea (55%), peripheral edema (39%) and stomatitis (28%) were observed more frequently than in the vinorelbine+cisplatin group (diarrhea 24%, peripheral edema 20%, stomatitis 20%). Patients treated with docetaxel+cisplatin who were 65 years of age or greater were more likely to experience diarrhea (55%), infections (42%), peripheral edema (39%) and stomatitis (28%) compared to patients less than the age of 65 administered the same treatment (43%, 31%, 31% and 21%, respectively).

When docetaxel was combined with carboplatin for the treatment of chemotherapy-naïve, advanced non-small cell lung carcinoma, patients 65 years of age or greater (28%) experienced higher frequency of infection compared to similar patients treated with docetaxel+cisplatin, and a higher frequency of diarrhea, infection and peripheral edema than elderly patients treated with vinorelbine+cisplatin.

*Prostate Cancer*
Of the 333 patients treated with docetaxel every three weeks plus prednisone in the prostate cancer study (TAX327), 209 patients were 65 years of age or greater and 68 patients were older than 75 years. In patients treated with docetaxel every three weeks, the following treatment emergent adverse reactions occurred at rates ≥10% higher in patients 65 years of age or greater compared to younger patients: anemia (71% vs. 59%), infection (37% vs. 24%), nail changes (34% vs. 23%), anorexia (21% vs. 10%), weight loss (15% vs. 5%) respectively.

*Breast Cancer*
In the adjuvant breast cancer trial (TAX316), docetaxel in combination with doxorubicin and cyclophosphamide was administered to 744 patients of whom 48 (6%) were 65 years of age or greater. The number of elderly patients who received this regimen was not sufficient to determine whether there were differences in safety and efficacy between elderly and younger patients.

*Gastric Cancer*
Among the 221 patients treated with docetaxel in combination with cisplatin and fluorouracil in the gastric cancer study, 54 were 65 years of age or older and 2 patients were older than 75 years. In this study, the number of patients who were 65 years of age or older was insufficient to determine whether they respond differently from younger patients. However, the incidence of serious adverse reactions was higher in the elderly patients compared to younger patients. The incidence of the following adverse reactions (all grades, regardless of relationship): lethargy, stomatitis, diarrhea, dizziness, edema, febrile neutropenia/neutropenic infection occurred at rates ≥10% higher in patients who were 65 years of age or older compared to younger patients. Elderly patients treated with TCF should be closely monitored.

*Head and Neck Cancer*
Among the 174 and 251 patients who received the induction treatment with docetaxel in combination with cisplatin and fluorouracil (TPF) for SCCHN in the TAX323 and

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016324

TAX324 studies, 18 (10%) and 32 (13%) of the patients were 65 years of age or older, respectively.

These clinical studies of docetaxel in combination with cisplatin and fluorouracil in patients with SCCHN did not include sufficient numbers of patients aged 65 and over to determine whether they respond differently from younger patients. Other reported clinical experience with this treatment regimen has not identified differences in responses between elderly and younger patients.

### 8.6   Hepatic Impairment

Patients with bilirubin >ULN should not receive Docetaxel Injection. Also, patients with AST and/or ALT >1.5 x ULN concomitant with alkaline phosphatase >2.5 x ULN should not receive Docetaxel Injection *[see Boxed Warning, Warnings and Precautions (5.2), Clinical Pharmacology (12.3)]*.

The alcohol content of Docetaxel Injection should be taken into account when given to patients with hepatic impairment *[see Warnings and Precautions (5.11)]*.

## 10   OVERDOSAGE

There is no known antidote for Docetaxel Injection overdosage. In case of overdosage, the patient should be kept in a specialized unit where vital functions can be closely monitored. Anticipated complications of overdosage include: bone marrow suppression, peripheral neurotoxicity, and mucositis. Patients should receive therapeutic G-CSF as soon as possible after discovery of overdose. Other appropriate symptomatic measures should be taken, as needed.

In two reports of overdose, one patient received 150 mg/m$^2$ and the other received 200 mg/m$^2$ as 1-hour infusions. Both patients experienced severe neutropenia, mild asthenia, cutaneous reactions, and mild paresthesia, and recovered without incident.

In mice, lethality was observed following single intravenous doses that were ≥154 mg/kg (about 4.5 times the human dose of 100 mg/m$^2$ on a mg/m$^2$ basis); neurotoxicity associated with paralysis, non-extension of hind limbs, and myelin degeneration was observed in mice at 48 mg/kg (about 1.5 times the human dose of 100 mg/m$^2$ basis). In male and female rats, lethality was observed at a dose of 20 mg/kg (comparable to the human dose of 100 mg/m$^2$ on a mg/m$^2$ basis) and was associated with abnormal mitosis and necrosis of multiple organs.

## 11   DESCRIPTION

Docetaxel is an antineoplastic agent belonging to the taxoid family. It is prepared by semisynthesis beginning with a precursor extracted from the renewable needle biomass of yew plants. The chemical name for docetaxel is (2R,3S)-N-carboxy-3-phenylisoserine, N-*tert*-butyl ester, 13-ester with 5β-20-epoxy-1,2α,4,7β,10β,13α-hexahydroxytax-11-en-9-one 4-acetate 2-benzoate. Docetaxel has the following structural formula:

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                          SANDOZ-TAXO-NDA-00016325

Docetaxel is a white to almost-white powder with an empirical formula of $C_{43}H_{53}NO_{14}$, and a molecular weight of 807.88. It is highly lipophilic and practically insoluble in water.

Docetaxel Injection is a clear, colorless to pale yellow solution. Docetaxel Injection is sterile, non-pyrogenic, and is available in multiple dose vials, supplied as 20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL.

Each mL of Docetaxel Injection contains 10 mg docetaxel, 275.9 mg alcohol 96% (v/v), 4 mg citric acid, 648 mg polyethylene glycol 300, and 80 mg polysorbate 80.

## 12   CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Docetaxel is an antineoplastic agent that acts by disrupting the microtubular network in cells that is essential for mitotic and interphase cellular functions. Docetaxel binds to free tubulin and promotes the assembly of tubulin into stable microtubules while simultaneously inhibiting their disassembly. This leads to the production of microtubule bundles without normal function and to the stabilization of microtubules, which results in the inhibition of mitosis in cells. Docetaxel's binding to microtubules does not alter the number of protofilaments in the bound microtubules, a feature which differs from most spindle poisons currently in clinical use.

### 12.3 Human Pharmacokinetics

Absorption: The pharmacokinetics of docetaxel have been evaluated in cancer patients after administration of 20 mg/m$^2$ to 115 mg/m$^2$ in phase 1 studies. The area under the curve (AUC) was dose proportional following doses of 70 mg/m$^2$ to 115 mg/m$^2$ with infusion times of 1 to 2 hours. Docetaxel's pharmacokinetic profile is consistent with a three-compartment pharmacokinetic model, with half-lives for the α, β, and γ phases of 4 min, 36 min, and 11.1 hr, respectively. Mean total body clearance was 21 L/h/m$^2$.

Distribution:   The   initial   rapid   decline   represents   distribution   to   the   peripheral

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016326

compartments and the late (terminal) phase is due, in part, to a relatively slow efflux of docetaxel from the peripheral compartment. Mean steady state volume of distribution was 113 L. *In vitro* studies showed that docetaxel is about 94% protein bound, mainly to $\alpha_1$-acid glycoprotein, albumin, and lipoproteins. In three cancer patients, the *in vitro* binding to plasma proteins was found to be approximately 97%. Dexamethasone does not affect the protein binding of docetaxel.

Metabolism: *In vitro* drug interaction studies revealed that docetaxel is metabolized by the CYP3A4 isoenzyme, and its metabolism may be modified by the concomitant administration of compounds that induce, inhibit, or are metabolized by cytochrome P450 3A4 *[see Drug Interactions (7)]*.

Elimination: A study of $^{14}$C-docetaxel was conducted in three cancer patients. Docetaxel was eliminated in both the urine and feces following oxidative metabolism of the *tert*-butyl ester group, but fecal excretion was the main elimination route. Within 7 days, urinary and fecal excretion accounted for approximately 6% and 75% of the administered radioactivity, respectively. About 80% of the radioactivity recovered in feces is excreted during the first 48 hours as 1 major and 3 minor metabolites with very small amounts (less than 8%) of unchanged drug.

Effect of Age: A population pharmacokinetic analysis was carried out after docetaxel treatment of 535 patients dosed at 100 mg/m$^2$. Pharmacokinetic parameters estimated by this analysis were very close to those estimated from phase 1 studies. The pharmacokinetics of docetaxel were not influenced by age.

Effect of Gender: The population pharmacokinetics analysis described above also indicated that gender did not influence the pharmacokinetics of docetaxel.

Hepatic Impairment: The population pharmacokinetic analysis described above indicated that in patients with clinical chemistry data suggestive of mild to moderate liver impairment (AST and/or ALT >1.5 times ULN concomitant with alkaline phosphatase >2.5 times ULN), total body clearance was lowered by an average of 27%, resulting in a 38% increase in systemic exposure (AUC). This average, however, includes a substantial range and there is, at present, no measurement that would allow recommendation for dose adjustment in such patients. Patients with combined abnormalities of transaminase and alkaline phosphatase should not be treated with Docetaxel Injection. Patients with severe hepatic impairment have not been studied. *[see Warnings and Precautions (5.2) and Use in Specific Populations (8.6)]*.

Effect of Race: Mean total body clearance for Japanese patients dosed at the range of 10 mg/m$^2$ to 90 mg/m$^2$ was similar to that of European/American populations dosed at 100 mg/m$^2$, suggesting no significant difference in the elimination of docetaxel in the two populations.

Effect of Ketoconazole: The effect of ketoconazole (a strong CYP3A4 inhibitor) on the pharmacokinetics of docetaxel was investigated in 7 cancer patients. Patients were randomized to receive either docetaxel (100 mg/m$^2$ intravenous) alone or docetaxel (10 mg/m$^2$ intravenous) in combination with ketoconazole (200 mg orally once daily for 3

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

days) in a crossover design with a 3-week washout period. The results of this study indicated that the mean dose-normalized AUC of docetaxel was increased 2.2-fold and its clearance was reduced by 49% when docetaxel was co-administration with ketoconazole *[see Dosage and Administration (2.7) and Drug-Drug Interactions (7)].*

Effect of Combination Therapies:

- Dexamethasone: Docetaxel total body clearance was not modified by pretreatment with dexamethasone.
- Cisplatin: Clearance of docetaxel in combination therapy with cisplatin was similar to that previously observed following monotherapy with docetaxel. The pharmacokinetic profile of cisplatin in combination therapy with docetaxel was similar to that observed with cisplatin alone.
- Cisplatin and Fluorouracil: The combined administration of docetaxel, cisplatin and fluorouracil in 12 patients with solid tumors had no influence on the pharmacokinetics of each individual drug.
- Prednisone: A population pharmacokinetic analysis of plasma data from 40 patients with hormone-refractory metastatic prostate cancer indicated that docetaxel systemic clearance in combination with prednisone is similar to that observed following administration of docetaxel alone.
- Cyclophosphamide and Doxorubicin: A study was conducted in 30 patients with advanced breast cancer to determine the potential for drug-drug-interactions between docetaxel (75 mg/m$^2$), doxorubicin (50 mg/m$^2$), and cyclophosphamide (500 mg/m$^2$) when administered in combination. The coadministration of docetaxel had no effect on the pharmacokinetics of doxorubicin and cyclophosphamide when the three drugs were given in combination compared to coadministration of doxorubicin and cyclophosphamide only. In addition, doxorubicin and cyclophosphamide had no effect on docetaxel plasma clearance when the three drugs were given in combination compared to historical data for docetaxel monotherapy.

## 13   NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenicity studies with docetaxel have not been performed.

Docetaxel was clastogenic in the *in vitro* chromosome aberration test in CHO-K$_1$ cells and in the *in vivo* micronucleus test in mice administered doses of 0.39 to 1.56 mg/kg (about 1/60th to 1/15th the recommended human dose on a mg/m$^2$ basis). Docetaxel was not mutagenic in the Ames test or the CHO/HGPRT gene mutation assays.

Docetaxel did not reduce fertility in rats when administered in multiple intravenous doses of up to 0.3 mg/kg (about 1/50th the recommended human dose on a mg/m$^2$ basis), but decreased testicular weights were reported. This correlates with findings of a 10-cycle toxicity study (dosing once every 21 days for 6 months) in rats and dogs in which testicular atrophy or degeneration was observed at intravenous doses of 5 mg/kg in rats and 0.375 mg/kg in dogs (about 1/3rd and 1/15th the recommended

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

human dose on a mg/m² basis, respectively). An increased frequency of dosing in rats produced similar effects at lower dose levels.

## 14    CLINICAL STUDIES

### 14.1 Locally Advanced or Metastatic Breast Cancer

The efficacy and safety of docetaxel have been evaluated in locally advanced or metastatic breast cancer after failure of previous chemotherapy (alkylating agent-containing regimens or anthracycline-containing regimens).

Randomized Trials
In one randomized trial, patients with a history of prior treatment with an anthracycline-containing regimen were assigned to treatment with docetaxel (100 mg/m² every 3 weeks) or the combination of mitomycin (12 mg/m² every 6 weeks) and vinblastine (6 mg/m² every 3 weeks). Two hundred three patients were randomized to docetaxel and 189 to the comparator arm. Most patients had received prior chemotherapy for metastatic disease; only 27 patients on the docetaxel arm and 33 patients on the comparator arm entered the study following relapse after adjuvant therapy. Three-quarters of patients had measurable, visceral metastases. The primary endpoint was time to progression. The following table summarizes the study results (See **Table 12**).

**Table 12 - Efficacy of Docetaxel in the Treatment of Breast Cancer Patients Previously Treated with an Anthracycline-Containing Regimen (Intent-to-Treat Analysis)**

| Efficacy Parameter | Docetaxel (n=203) | Mitomycin/ Vinblastine (n=189) | p-value |
|---|---|---|---|
| Median Survival | 11.4 months | 8.7 months | p=0.01 Log Rank |
| Risk Ratio*, Mortality (Docetaxel: Control) | 0.73 | | |
| 95% CI (Risk Ratio) | 0.58-0.93 | | |
| Median Time to Progression | 4.3 months | 2.5 months | p=0.01 Log Rank |
| Risk Ratio*, Progression (Docetaxel: Control) | 0.75 | | p=0.01 Log Rank |
| 95% CI (Risk Ratio) | 0.61-0.94 | | |
| Overall Response Rate | 28.1% | 9.5% | p<0.0001 Chi Square |
| Complete Response Rate | 3.4% | 1.6% | |

*For the risk ratio, a value less than 1.00 favors docetaxel.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016329

In a second randomized trial, patients previously treated with an alkylating-containing regimen were assigned to treatment with docetaxel (100 mg/m$^2$) or doxorubicin (75 mg/m$^2$) every 3 weeks. One hundred sixty-one patients were randomized to docetaxel and 165 patients to doxorubicin. Approximately one-half of patients had received prior chemotherapy for metastatic disease, and one-half entered the study following relapse after adjuvant therapy. Three-quarters of patients had measurable, visceral metastases. The primary endpoint was time to progression. The study results are summarized below (See **Table 13**).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**Table 13 - Efficacy of Docetaxel in the Treatment of Breast Cancer Patients Previously Treated with an Alkylating-Containing Regimen (Intent-to-Treat Analysis)**

| Efficacy Parameter | Docetaxel | Doxorubicin | p-value |
|---|---|---|---|
| Median Survival | 14.7 months | 14.3 months | |
| Risk Ratio*, Mortality (Docetaxel: Control) | 0.89 | | p=0.39 Log Rank |
| 95% CI (Risk Ratio) | 0.6 8- | | |
| Median Time to Progression | 6.5 months | 5.3 months | |
| Risk Ratio*, Progression (Docetaxel: Control) | 0.9 2 | | p=0.45 Log Rank |
| 95% CI (Risk Ratio) | 0.71-1.16 | | |
| Overall Response Rate Complete Response Rate | 45.3% 6.8 | 29.7% 4.2% | p=0.004 Chi |

*For the risk ratio, a value less than 1.00 favors docetaxel.

In another multicenter open-label, randomized trial (TAX313), in the treatment of patients with advanced breast cancer who progressed or relapsed after one prior chemotherapy regimen, 527 patients were randomized to receive docetaxel monotherapy 60 mg/m$^2$ (n=151), 75 mg/m$^2$ (n=188) or 100 mg/m$^2$ (n=188). In this trial, 94% of patients had metastatic disease and 79% had received prior anthracycline therapy. Response rate was the primary endpoint. Response rates increased with docetaxel dose: 19.9% for the 60 mg/m$^2$ group compared to 22.3% for the 75 mg/m$^2$ and 29.8% for the 100 mg/m$^2$ group; pair-wise comparison between the 60 mg/m$^2$ and 100 mg/m$^2$ groups was statistically significant (p=0.037).

Single Arm Studies
Docetaxel at a dose of 100 mg/m$^2$ was studied in six single arm studies involving a total of 309 patients with metastatic breast cancer in whom previous chemotherapy had failed. Among these, 190 patients had anthracycline-resistant breast cancer, defined as progression during an anthracycline-containing chemotherapy regimen for metastatic disease, or relapse during an anthracycline-containing adjuvant regimen. In anthracycline-resistant patients, the overall response rate was 37.9% (72/190; 95% C.I.: 31.0-44.8) and the complete response rate was 2.1%.

Docetaxel was also studied in three single arm Japanese studies at a dose of 60 mg/m$^2$, in 174 patients who had received prior chemotherapy for locally advanced or metastatic breast cancer. Among 26 patients whose best response to an anthracycline had been progression, the response rate was 34.6% (95% C.I.: 17.2-55.7), similar to the response rate in single arm studies of 100 mg/m$^2$.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

## 14.2 Adjuvant Treatment of Breast Cancer

A multicenter, open-label, randomized trial (TAX316) evaluated the efficacy and safety of docetaxel for the adjuvant treatment of patients with axillary-node-positive breast cancer and no evidence of distant metastatic disease. After stratification according to the number of positive lymph nodes (1-3, 4+), 1491 patients were randomized to receive either docetaxel 75 mg/m$^2$ administered 1-hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ (TAC arm), or doxorubicin 50 mg/m$^2$ followed by fluorouracil 500 mg/m$^2$ and cyclosphosphamide 500 mg/m$^2$ (FAC arm). Both regimens were administered every 3 weeks for 6 cycles. Docetaxel was administered as a 1-hour infusion; all other drugs were given as intravenous bolus on day 1. In both arms, after the last cycle of chemotherapy, patients with positive estrogen and/or progesterone receptors received tamoxifen 20 mg daily for up to 5 years. Adjuvant radiation therapy was prescribed according to guidelines in place at participating institutions and was given to 69% of patients who received TAC and 72% of patients who received FAC.

Results from a second interim analysis (median follow-up 55 months) are as follows: In study TAX316, the docetaxel-containing combination regimen TAC showed significantly longer disease-free survival (DFS) than FAC (hazard ratio=0.74; 2-sided 95% CI=0.60, 0.92, stratified log rank p=0.0047). The primary endpoint, disease-free survival, included local and distant recurrences, contralateral breast cancer and deaths from any cause. The overall reduction in risk of relapse was 25.7% for TAC-treated patients. (See **Figure 1**).

At the time of this interim analysis, based on 219 deaths, overall survival was longer for TAC than FAC (hazard ratio=0.69, 2-sided 95% CI=0.53, 0.90). (See **Figure 2**). There will be further analysis at the time survival data mature.

### Figure 1 - TAX316 Disease Free Survival K-M curve



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016332

## Figure 2 - TAX316 Overall Survival K-M Curve



The following table describes the results of subgroup analyses for DFS and OS (See **Table 14**).

**Table 14 - Subset Analyses-Adjuvant Breast Cancer Study**

| Patient subset | Number of patients | Disease Free Survival | | Overall Survival | |
|---|---|---|---|---|---|
| | | Hazard ratio* | 95% CI | Hazard ratio* | 95% CI |
| **No. of positive nodes** | | | | | |
| Overall | 744 | 0.74 | (0.60, 0.92) | 0.69 | (0.53, 0.90) |
| 1-3 | 467 | 0.64 | (0.47, 0.87) | 0.45 | (0.29, 0.70) |
| 4+ | 277 | 0.84 | (0.63, 1.12) | 0.93 | (0.66, 1.32) |
| **Receptor status** | | | | | |
| Positive | 566 | 0.76 | (0.59, 0.98) | 0.69 | (0.48, 0.99) |
| Negative | 178 | 0.68 | (0.48, 0.97) | 0.66 | (0.44, 0.98) |

*a hazard ratio of less than 1 indicates that TAC is associated with a longer disease free survival or overall survival compared to FAC.

### 14.3 Non-Small Cell Lung Cancer (NSCLC)

The efficacy and safety of docetaxel has been evaluated in patients with unresectable, locally advanced or metastatic non-small cell lung cancer whose disease has failed prior platinum-based chemotherapy or in patients who are chemotherapy-naïve.

<u>Monotherapy with Docetaxel for NSCLC Previously Treated with Platinum-</u>

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016333

Based Chemotherapy

Two randomized, controlled trials established that a docetaxel dose of 75 mg/m$^2$ was tolerable and yielded a favorable outcome in patients previously treated with platinum-based chemotherapy (see below). Docetaxel at a dose of 100 mg/m$^2$, however, was associated with unacceptable hematologic toxicity, infections, and treatment-related mortality and this dose should not be used *[see Boxed Warning, Dosage and Administration (2.7), Warnings and Precautions (5.3)].*

One trial (TAX317), randomized patients with locally advanced or metastatic non-small cell lung cancer, a history of prior platinum-based chemotherapy, no history of taxane exposure, and an ECOG performance status ≤2 to docetaxel or best supportive care. The primary endpoint of the study was survival. Patients were initially randomized to docetaxel 100 mg/m$^2$ or best supportive care, but early toxic deaths at this dose led to a dose reduction to docetaxel 75 mg/m$^2$. A total of 104 patients were randomized in this amended study to either docetaxel 75 mg/m$^2$ or best supportive care.

In a second randomized trial (TAX320), 373 patients with locally advanced or metastatic non-small cell lung cancer, a history of prior platinum-based chemotherapy, and an ECOG performance status ≤2 were randomized to docetaxel 75 mg/m$^2$, docetaxel 100 mg/m$^2$ and a treatment in which the investigator chose either vinorelbine 30 mg/m$^2$ days 1, 8, and 15 repeated every 3 weeks or ifosfamide 2 g/m$^2$ days 1-3 repeated every 3 weeks. Forty percent of the patients in this study had a history of prior paclitaxel exposure. The primary endpoint was survival in both trials. The efficacy data for the docetaxel 75 mg/m$^2$ arm and the comparator arms are summarized in **Table 15** and **Figures 3** and **4** showing the survival curves for the two studies.

**Table 15 - Efficacy of Docetaxel in the Treatment of Non-Small Cell Lung Cancer Patients Previously Treated with a Platinum-Based Chemotherapy Regimen (Intent-to-Treat Analysis)**

| | TAX317 | | TAX320 | |
|---|---|---|---|---|
| | Docetaxel 75 mg/m$^2$ n=55 | Best Supportive Care n=49 | Docetaxel 75 mg/m$^2$ n=125 | Control (V/I*) n=123 |
| Overall Survival Log-rank | p=0.01 | | p=0.13 | |
| Risk Ratio[††], Mortality (Docetaxel: Control) | 0.56 | | 0.82 | |
| 95% CI (Risk Ratio) | (0.35, 0.88) | | (0.63, 1.06) | |
| Median Survival | 7.5 months** | 4.6 months | 5.7 months | 5.6 months |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016334

| | | | | |
|---|---|---|---|---|
| 95% CI | (5.5, 12.8) | (3.7, 6.1) | (5.1, 7.1) | (4.4, 7.9) |
| % 1-year Survival | 37%**† | 12% | 30%**† | 20% |
| 95% CI | (24, 50) | (2, 23) | (22, 39) | (13, 27) |
| Time to Progression | 12.3 weeks** | 7.0 weeks | 8.3 weeks | 7.6 weeks |
| 95% CI | (9.0, 18.3) | (6.0, 9.3) | (7.0,11.7) | (6.7, 10.1) |
| Response Rate | 5.5% | Not Applicable | 5.7% | 0.8% |
| 95% CI | (1.1,15.1) | | (2.3,11.3) | (0.0, 4.5) |

* Vinorelbine/Ifosfamide
** $p \leq 0.05$
† uncorrected for multiple comparisons
†† a value less than 1.00 favors docetaxel.

Only one of the two trials (TAX317) showed a clear effect on survival, the primary endpoint; that trial also showed an increased rate of survival to one year. In the second study (TAX320) the rate of survival at one year favored docetaxel 75 mg/m$^2$.

**Figure 3 - TAX317 Survival K-M Curves - Docetaxel 75 mg/m$^2$ vs. Best Supportive Care**



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                SANDOZ-TAXO-NDA-00016335

Figure 4 - TAX320 Survival K-M Curves - Docetaxel 75 mg/m$^2$ vs. Vinorelbine or Ifosfamide Control



Patients treated with docetaxel at a dose of 75 mg/m$^2$ experienced no deterioration in performance status and body weight relative to the comparator arms used in these trials.

<u>Combination Therapy with Docetaxel for Chemotherapy-Naïve NSCLC</u>
In a randomized controlled trial (TAX326), 1218 patients with unresectable stage IIIB or IV NSCLC and no prior chemotherapy were randomized to receive one of three treatments: docetaxel 75 mg/m$^2$ as a 1 hour infusion immediately followed by cisplatin 75 mg/m$^2$ over 30 to 60 minutes every 3 weeks; vinorelbine 25 mg/m$^2$ administered over 6 to 10 minutes on days 1, 8, 15, 22 followed by cisplatin 100 mg/m$^2$ administered on day 1 of cycles repeated every 4 weeks; or a combination of docetaxel and carboplatin.

The primary efficacy endpoint was overall survival. Treatment with docetaxel+cisplatin did not result in a statistically significantly superior survival compared to vinorelbine+cisplatin (see table below). The 95% confidence interval of the hazard ratio (adjusted for interim analysis and multiple comparisons) shows that the addition of docetaxel to cisplatin results in an outcome ranging from a 6% inferior to a 26% superior survival compared to the addition of vinorelbine to cisplatin. The results of a further statistical analysis showed that at least (the lower bound of the 95% confidence interval) 62% of the known survival effect of vinorelbine when added to cisplatin (about a 2-month increase in median survival; Wozniak et al. JCO, 1998) was maintained. The efficacy data for the docetaxel+cisplatin arm and the comparator arm are summarized in **Table 16**.

**Table 16 - Survival Analysis of Docetaxel in Combination Therapy for Chemotherapy-Naïve NSCLC**

| Comparison | Docetaxel+Cisplatin n=408 | Vinorelbine + Cisplatin n=405 |
|---|---|---|
| Kaplan-Meier Estimate of Median Survival | 10.9 months | 10 months |
| p-value[a] | 0.122 | |
| Estimated Hazard Ratio[b] | 0.88 | |
| Adjusted 95% CI[c] | (0.74, 1.06) | |

[a]From the superiority test (stratified log rank) comparing docetaxel+cisplatin to vinorelbine+cisplatin
[b]Hazard ratio of docetaxel+cisplatin vs. vinorelbine+cisplatin. A hazard ratio of less than 1 indicates that docetaxel+cisplatin is associated with a longer survival.
[c]Adjusted for interim analysis and multiple comparisons.

The second comparison in the same three-arm study, vinorelbine+cisplatin versus docetaxel+carboplatin, did not demonstrate superior survival associated with the docetaxel arm (Kaplan-Meier estimate of median survival was 9.1 months for docetaxel+carboplatin compared to 10.0 months on the vinorelbine+cisplatin arm) and the docetaxel+carboplatin arm did not demonstrate preservation of at least 50% of the survival effect of vinorelbine added to cisplatin. Secondary endpoints evaluated in the trial included objective response and time to progression. There was no statistically significant difference between docetaxel+cisplatin and vinorelbine+cisplatin with respect to objective response and time to progression (see **Table 17**).

**Table 17 - Response and TTP Analysis of Docetaxel in Combination Therapy for Chemotherapy-Naïve NSCLC**

| Endpoint | Docetaxel+Cisplatin | Vinorelbine+ Cisplatin | p-value |
|---|---|---|---|
| Objective Response Rate (95% CI)[a] | 31.6% (26.5%, 36.8%) | 24.4% (19.8%, 29.2%) | Not Significant |
| Median Time to Progression[b] (95% CI)[a] | 21.4 weeks (19.3, 24.6) | 22.1 weeks (18.1, 25.6) | Not Significant |

[a]Adjusted for multiple comparisons.
[b]Kaplan-Meier estimates.

**14.4 Hormone Refractory Prostate Cancer**

The safety and efficacy of docetaxel in combination with prednisone in patients with androgen independent (hormone refractory) metastatic prostate cancer were evaluated in a randomized multicenter active control trial. A total of 1006 patients with Karnofsky Performance Status (KPS) ≥60 were randomized to the following treatment groups:

- Docetaxel 75 mg/m$^2$ every 3 weeks for 10 cycles.
- Docetaxel 30 mg/m$^2$ administered weekly for the first 5 weeks in a 6-week cycle for 5 cycles.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                         SANDOZ-TAXO-NDA-00016337

- Mitoxantrone 12 mg/m$^2$ every 3 weeks for 10 cycles.

All 3 regimens were administered in combination with prednisone 5 mg twice daily, continuously.

In the docetaxel every three week arm, a statistically significant overall survival advantage was demonstrated compared to mitoxantrone. In the docetaxel weekly arm, no overall survival advantage was demonstrated compared to the mitoxantrone control arm. Efficacy results for the docetaxel every 3 week arm versus the control arm are summarized in **Table 18** and **Figure 5**.

**Table 18 - Efficacy of Docetaxel in the Treatment of Patients with Androgen Independent (Hormone Refractory) Metastatic Prostate Cancer (Intent-to-Treat Analysis)**

|  | Docetaxel+ Prednisone every 3 weeks | Mitoxantrone+ Prednisone every 3 weeks |
|---|---|---|
| Number of patients | 335 | 337 |
| Median survival (months) | 18.9 | 16.5 |
| 95% CI | (17.0-21.2) | (14.4-18.6) |
| Hazard ratio | 0.761 | - |
| 95% CI | (0.619-0.936) | - |
| p-value* | 0.0094 | - |

*Stratified log rank test. Threshold for statistical significance = 0.0175 because of 3 arms.

**Figure 5 - TAX327 Survival K-M Curves**



### 14.5 Gastric Adenocarcinoma

A multicenter, open-label, randomized trial was conducted to evaluate the safety and

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016338

efficacy of docetaxel for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who had not received prior chemotherapy for advanced disease. A total of 445 patients with KPS >70 were treated with either docetaxel (T) (75 mg/m$^2$ on day 1) in combination with cisplatin (C) (75 mg/m$^2$ on day 1) and fluorouracil (F) (750 mg/m$^2$ per day for 5 days) or cisplatin (100 mg/m$^2$ on day 1) and fluorouracil (1000 mg/m$^2$ per day for 5 days). The length of a treatment cycle was 3 weeks for the TCF arm and 4 weeks for the CF arm. The demographic characteristics were balanced between the two treatment arms. The median age was 55 years, 71% were male, 71% were Caucasian, 24% were 65 years of age or older, 19% had a prior curative surgery and 12% had palliative surgery. The median number of cycles administered per patient was 6 (with a range of 1 to 16) for the TCF arm compared to 4 (with a range of 1 to 12) for the CF arm. Time to progression (TTP) was the primary endpoint and was defined as time from randomization to disease progression or death from any cause within 12 weeks of the last evaluable tumor assessment or within 12 weeks of the first infusion of study drugs for patients with no evaluable tumor assessment after randomization. The hazard ratio (HR) for TTP was 1.47 (CF/TCF, 95% CI: 1.19 to 1.83) with a significantly longer TTP (p=0.0004) in the TCF arm. Approximately 75% of patients had died at the time of this analysis. Overall survival was significantly longer (p=0.0201) in the TCF arm with a HR of 1.29 (95% CI: 1.04 to 1.61). Efficacy results are summarized in **Table 19** and **Figures 6 and 7.**

**Table 19 - Efficacy of Docetaxel in the Treatment of Patients with Gastric Adenocarcinoma**

| Endpoint | TCF n=221 | CF n=224 |
|---|---|---|
| Median TTP (months) (95% CI) | 5.6 (4.86-5.91) | 3.7 (3.45-4.47) |
| Hazard ratio[†] (95% CI) *p-value | 0.68 (0.55-0.84) 0.0004 | |
| Median survival (months) (95% CI) | 9.2 (8.38-10.58) | 8.6 (7.16-9.46) |
| Hazard ratio[†] (95% CI) *p-value | 0.77 (0.62-0.96) 0.0201 | |
| Overall Response Rate (CR+PR) (%) p-value | 36.7 | 25.4 |
| | 0.0106 | |

*Unstratified log-rank test
[†]For the hazard ratio (TCF/CF), values less than 1.00 favor the docetaxel arm.

Subgroup analyses were consistent with the overall results across age, gender and race.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                                          SANDOZ-TAXO-NDA-00016339

**Figure 6 - Gastric Cancer Study (TAX325) Time to Progression K-M Curve**



**Figure 7 - Gastric Cancer Study (TAX325) Survival K-M Curve**

### 14.6 Head and Neck Cancer

Induction chemotherapy followed by radiotherapy (TAX323)

The safety and efficacy of docetaxel in the induction treatment of patients with squamous cell carcinoma of the head and neck (SCCHN) was evaluated in a multicenter, open-label, randomized trial (TAX323). In this study, 358 patients with inoperable

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

locally advanced SCCHN, and WHO performance status 0 or 1, were randomized to one of two treatment arms. Patients on the docetaxel arm received docetaxel (T) 75 mg/m$^2$ followed by cisplatin (P) 75 mg/m$^2$ on Day 1, followed by fluorouracil (F) 750 mg/m$^2$ per day as a continuous infusion on Days 1 to 5. The cycles were repeated every three weeks for 4 cycles. Patients whose disease did not progress received radiotherapy (RT) according to institutional guidelines (TPF/RT). Patients on the comparator arm received cisplatin (P) 100 mg/m$^2$ on Day 1, followed by fluorouracil (F) 1000 mg/m$^2$/day as a continuous infusion on Days 1 to 5. The cycles were repeated every three weeks for 4 cycles. Patients whose disease did not progress received RT according to institutional guidelines (PF/RT). At the end of chemotherapy, with a minimal interval of 4 weeks and a maximal interval of 7 weeks, patients whose disease did not progress received radiotherapy (RT) according to institutional guidelines. Locoregional therapy with radiation was delivered either with a conventional fraction regimen (1.8 Gy to 2 Gy once a day, 5 days per week for a total dose of 66 to 70 Gy) or with an accelerated/hyperfractionated regimen (twice a day, with a minimum interfraction interval of 6 hours, 5 days per week, for a total dose of 70 to 74 Gy, respectively). Surgical resection was allowed following chemotherapy, before or after radiotherapy.

The primary endpoint in this study, progression-free survival (PFS), was significantly longer in the TPF arm compared to the PF arm, p=0.0077 (median PFS: 11.4 vs. 8.3 months respectively) with an overall median follow up time of 33.7 months. Median overall survival with a median follow-up of 51.2 months was also significantly longer in favor of the TPF arm compared to the PF arm (median OS: 18.6 vs. 14.2 months respectively). Efficacy results are presented in **Table 20** and **Figures 8** and **9**.

**Table 20 - Efficacy of Docetaxel in the Induction Treatment of Patients with Inoperable Locally Advanced SCCHN (Intent-to-Treat Analysis)**

| ENDPOINT | Docetaxel+ Cisplatin+ Fluorouracil n=177 | Cisplatin+ Fluorouracil n=181 |
|---|---|---|
| Median progression free survival (months) | 11.4 | 8.3 |
| (95% CI) | (10.1-14.0) | (7.4-9.1) |
| Adjusted Hazard ratio (95% CI) *p-value | 0.71 (0.56-0.91) 0.0077 | |
| Median survival (months) | 18.6 | 14.2 |
| (95% CI) | (15.7-24.0) | (11.5-18.7) |
| Hazard ratio (95% CI) **p-value | 0.71 (0.56-0.90) 0.0055 | |
| Best overall response (CR + PR) to chemotherapy (%) (95% CI) | 67.8 (60.4-74.6) | 53.6 (46.0-61.0) |
| ***p-value | 0.006 | |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| Best overall response (CR + PR) to study treatment [chemotherapy +/- radiotherapy] (%) (95% CI) | 72.3 (65.1-78.8) | 58.6 (51.0-65.8) |
|---|---|---|
| ***p-value | 0.006 | |

A Hazard ratio of less than 1 favors docetaxel+cisplatin+fluorouracil
* Stratified log-rank test based on primary tumor site
** Stratified log-rank test, not adjusted for multiple comparisons
*** Chi square test, not adjusted for multiple comparisons

**Figure 8 - TAX323 Progression-Free Survival K-M Curve**



**Figure 9 - TAX323 Overall Survival K-M Curve**



<u>Induction chemotherapy followed by chemoradiotherapy (TAX324)</u>
The safety and efficacy of docetaxel in the induction treatment of patients with locally advanced (unresectable, low surgical cure, or organ preservation) SCCHN was evaluated in a randomized, multicenter open-label trial (TAX324). In this study, 501 patients, with locally advanced SCCHN, and a WHO performance status of 0 or 1, were randomized to one of two treatment arms. Patients on the docetaxel arm received docetaxel (T) 75 mg/m$^2$ by intravenous infusion on day 1 followed by cisplatin (P) 100 mg/m$^2$ administered as a 30-minute to three-hour intravenous infusion, followed by the continuous intravenous infusion of fluorouracil (F) 1000 mg/m$^2$/day from day 1 to day 4. The cycles were repeated

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER           SANDOZ-TAXO-NDA-00016342

every 3 weeks for 3 cycles. Patients on the comparator arm received cisplatin (P) 100 mg/m$^2$ as a 30-minute to three-hour intravenous infusion on day 1 followed by the continuous intravenous infusion of fluorouracil (F) 1000 mg/m$^2$/day from day 1 to day 5. The cycles were repeated every 3 weeks for 3 cycles.

All patients in both treatment arms who did not have progressive disease were to receive 7 weeks of chemoradiotherapy (CRT) following induction chemotherapy 3 to 8 weeks after the start of the last cycle. During radiotherapy, carboplatin (AUC 1.5) was given weekly as a one-hour intravenous infusion for a maximum of 7 doses. Radiation was delivered with megavoltage equipment using once daily fractionation (2 Gy per day, 5 days per week for 7 weeks for a total dose of 70-72 Gy). Surgery on the primary site of disease and/or neck could be considered at anytime following completion of CRT.

The primary efficacy endpoint, overall survival (OS), was significantly longer (log-rank test, p=0.0058) with the docetaxel-containing regimen compared to PF [median OS: 70.6 versus 30.1 months respectively, hazard ratio (HR)=0.70, 95% confidence interval (CI)= 0.54 to 0.90]. Overall survival results are presented in **Table 21** and **Figure 10**.

**Table 21 – Efficacy of Docetaxel in the Induction Treatment of Patients with Locally Advanced SCCHN (Intent-to-Treat Analysis)**

| ENDPOINT | Docetaxel+Cisplatin+ Fluorouracil n=255 | Cisplatin+ Fluorouracil n=246 |
|---|---|---|
| Median overall survival (months) (95% CI) | 70.6 (49.0-NE) | 30.1 (20.9-51.5) |
| Hazard ratio: (95% CI) *p-value | 0.70 (0.54-0.90) 0.0058 | |

A Hazard ratio of less than 1 favors docetaxel+cisplatin+fluorouracil
* un-adjusted log-rank test
NE - not estimable

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016343

Figure 10 - TAX324 Overall Survival K-M Curve



## 15  REFERENCES

1. NIOSH Alert: Preventing occupational exposures to antineoplastic and other hazardous drugs in healthcare settings. 2004. U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 2004-165.
2. OSHA Technical Manual, TED 1-0.15A, Section VI: Chapter 2. Controlling Occupational Exposure to Hazardous Drugs. OSHA, 1999.
3. American Society of Health-System Pharmacists. (2006) ASHP Guidelines on Handling Hazardous Drugs. *Am J Health-Syst Pharm.* 2006;63:1172-1193
4. Polovich, M., White, J. M., & Kelleher, L.O. (eds.) 2005. Chemotherapy and biotherapy *guidelines and recommendations* for practice (2nd. ed.) Pittsburgh, PA: Oncology Nursing Society.

## 16  HOW SUPPLIED/STORAGE AND HANDLING

### 16.1 How Supplied

Docetaxel Injection is supplied in a multiple dose vial as a sterile, pyrogen-free solution. Docetaxel Injection requires NO prior dilution with a diluent and is ready to add to the infusion solution. The following strengths are available:

| Strength | NDC Number | Volume |
|---|---|---|
| 20 mg/2 mL | 66758-050-01 | Carton of 1 x 2 mL Multiple Dose Vial |
| 80 mg/8 mL | 66758-050-02 | Carton of 1 x 8 mL Multiple Dose Vial |
| 160 mg/16 mL | 66758-050-03 | Carton of 1 x 16 mL Multiple Dose Vial |

### 16.2 Storage

Store between 2°C and 25°C (36°F and 77°F). Retain in the original package to protect

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

from bright light. Freezing does not adversely affect the product.

After initial puncture, Docetaxel Injection multiple dose vials are stable for 28 days when stored between 2°C to 8°C and at room temperature, with or without protection from light.

### 16.3 Handling and Disposal

Procedures for proper handling and disposal of anticancer drugs should be considered. Several guidelines on this subject have been published *[see References (15)]*.

## 17   PATIENT COUNSELING INFORMATION
*See FDA-Approved Patient Labeling*

- Docetaxel Injection may cause fetal harm. Advise patients to avoid becoming pregnant while receiving this drug. Women of childbearing potential should use effective contraceptives if receiving Docetaxel Injection *[see Warnings and Precautions (5.11) and Use in Specific Populations (8.1)]*.
- Obtain detailed allergy and concomitant drug information from the patient prior to Docetaxel Injection administration.
- Explain the significance of oral corticosteroids such as dexamethasone administration to the patient to help facilitate compliance. Instruct patients to report if they were not compliant with oral corticosteroid regimen.
- Instruct patients to immediately report signs of a hypersensitivity reaction.
- Tell patients to watch for signs of fluid retention such as peripheral edema in the lower extremities, weight gain and dyspnea.
- Explain the significance of routine blood cell counts. Instruct patients to monitor their temperature frequently and immediately report any occurrence of fever.
- Instruct patients to report myalgia, cutaneous, or neurologic reactions.
-
- Explain to patients the possible effects of the alcohol content in Docetaxel Injection, including possible effects on the central nervous system. Patients in whom alcohol should be avoided or minimized should consider the alcohol content of Docetaxel Injection. Alcohol could impair their ability to drive or use machines immediately after infusion.
- Explain to patients that side effects such as nausea, vomiting, diarrhea, constipation, fatigue, excessive tearing, infusion site reactions, and hair loss (cases of permanent hair loss have been reported) are associated with docetaxel administration.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER          SANDOZ-TAXO-NDA-00016345

**Patient Information**

Docetaxel (doe-se-TAKS-el) Injection
Intravenous Infusion

Read this Patient Information before you receive your first treatment with Docetaxel Injection and each time before you are treated. There may be new information. This information does not take the place of talking with your doctor about your medical condition or your treatment.

**What is the most important information I should know about Docetaxel Injection?**
**Docetaxel Injection can cause serious side effects, including death.**

1. **The chance of death in people who receive Docetaxel Injection is higher if you:**
   - have liver problems
   - receive high doses of Docetaxel Injection
   - have non-small cell lung cancer and have been treated with chemotherapy medicines that contain platinum

2. **Docetaxel Injection can affect your blood cells.** Your doctor should do routine blood tests during treatment with Docetaxel Injection. This will include regular checks of your white blood cell counts. If your white blood cells are too low, your doctor may not treat you with Docetaxel Injection until you have enough white blood cells. People with low white blood counts can develop life threatening infections. The earliest sign of infection may be fever. Follow your doctor's instructions for how often to take your temperature while taking Docetaxel Injection. Call your doctor right away if you have a fever.

3. **Serious allergic reactions** can happen in people who take Docetaxel Injection. Serious allergic reactions are medical emergencies that can lead to death and must be treated right away.
   Tell your doctor right away if you have any of these signs of a serious allergic reaction:
   - trouble breathing
   - sudden swelling of your face, lips, tongue, throat, or trouble swallowing
   - hives (raised bumps), rash, or redness all over your body.

4. **Your body may hold too much fluid (severe fluid retention)** during treatment with Docetaxel Injection. This can be life threatening. To decrease the chance of this happening, you must take another medicine, a corticosteroid, before each Docetaxel Injection treatment. You must take the corticosteroid exactly as your doctor tells you. Tell your doctor or nurse before your Docetaxel Injection treatment if you forget to take the corticosteroid dose or do not take it as your doctor tells you.

**What is Docetaxel Injection?**

**Docetaxel Injection is a prescription anti-cancer medication used to treat certain people with:**

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SANDOZ-TAXO-NDA-00016346

- breast cancer
- non-small cell lung cancer
- prostate cancer
- stomach cancer
- head and neck cancer

It is not known if Docetaxel Injection is effective in children.

**Who should not receive Docetaxel Injection?**
Do not receive Docetaxel Injection if you:
- have had a severe allergic reaction to:
  - o   docetaxel, the active ingredient in Docetaxel Injection, **or**
  - o   any other medicines that contain polysorbate 80. Ask your doctor or pharmacist if you are not sure.

  See "What is the most important information I should know about Docetaxel Injection?" for the signs and symptoms of a severe allergic reaction.
- have a low white blood cell count.

**What should I tell my doctor before receiving Docetaxel Injection?**

Before you receive Docetaxel Injection, tell your doctor if you:

- are allergic to any medicines. See "Who should not receive Docetaxel Injection?" Also, see the end of this leaflet for a complete list of the ingredients in Docetaxel Injection.
- have liver problems
- have any other medical conditions
- are pregnant or plan to become pregnant. Docetaxel Injection can harm your unborn baby.
- are breastfeeding or plan to breastfeed. It is not known if docetaxel passes into your breast milk. You and your doctor should decide if you will receive Docetaxel Injection or breastfeed.

**Tell your doctor about all the medicines you take,** including prescription and over-the-counter medicines, vitamins, and herbal supplements. Docetaxel Injection may affect the way other medicines work, and other medicines may affect the way Docetaxel Injection works.

Know the medicines you take. Keep a list of them to show your doctor and pharmacist when you get a new medicine.

**How will I receive Docetaxel Injection?**
- Docetaxel Injection will be given to you as an intravenous (IV) injection into your vein, usually over 1 hour.
- Docetaxel Injection is usually given every 3 weeks.
- Your doctor will decide how long you will receive treatment with Docetaxel Injection.

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

- Your doctor will check your blood cell counts and other blood tests during your treatment with Docetaxel Injection to check for side effects of Docetaxel Injection.
- Your doctor may stop your treatment, change the timing of your treatment, or change the dose of your treatment if you have certain side effects while receiving Docetaxel Injection.

**What are the possible side effects of Docetaxel Injection?**
**Docetaxel Injection may cause serious side effects including death.**

- See "What is the most important information I should know about Docetaxel Injection?"

- **Acute Myeloid Leukemia (AML),** a type of blood cancer, can happen in people who take Docetaxel Injection along with certain other medicines.

- **Other Blood Disorders.** Changes in blood counts due to leukemia and other blood disorders may occur years after treatment with Docetaxel Injection.

- **Skin Reactions** including redness and swelling of your arms and legs with peeling of your skin.

- **Neurologic Symptoms** including numbness, tingling, or burning in your hands and feet.

- **Vision Problems** including blurred vision or loss of vision.

- **Docetaxel Injection contains alcohol.** The alcohol content in Docetaxel Injection may impair your ability to drive or use machinery right after receiving Docetaxel Injection. Consider whether you should drive, operate machinery or do other dangerous activities right after you receive Docetaxel Injection treatment.

The most common side effects of Docetaxel Injection include:
- changes in your sense of taste
- feeling short of breath
- constipation
- decreased appetite
- changes in your fingernails or toenails
- swelling of your hands, face or feet
- feeling weak or tired
- joint and muscle pain
- nausea and vomiting
- diarrhea
- mouth or lips sores
- hair loss: in most cases normal hair growth should return. In some cases (frequency not known) permanent hair loss has been observed.
- rash
- redness of the eye, excess tearing
- skin reactions at the site of Docetaxel Injection administration such as increased skin pigmentation, redness, tenderness, swelling, warmth or dryness of the skin.
- tissue damage if Docetaxel Injection leaks out of the vein into the tissues

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016348

Tell your doctor if you have any side effect that bothers you or does not go away.

These are not all the possible side effects of Docetaxel Injection.   For more information ask your doctor or pharmacist.

**Call your doctor for medical advice about side effects.  You may report side effects to FDA at 1-800-FDA-1088.**
**General information about Docetaxel Injection**

Medicines are sometimes prescribed for purposes other than those listed in a Patient Information leaflet. This Patient Information leaflet summarizes the most important information about Docetaxel Injection. If you would like more information, talk with your doctor. You can ask your pharmacist or doctor for information about Docetaxel Injection that is written for health professionals.

For more information, call 1-800-525-8747.

**What are the ingredients in Docetaxel Injection?**
Active ingredient: docetaxel
Inactive ingredients: alcohol, citric acid, polyethylene glycol 300, and polysorbate 80

---

**Every three-week injection of Docetaxel Injection for breast, non-small cell lung and stomach, and head and neck cancers**
**Take your oral corticosteroid medicine as your doctor tells you.**
                    **Oral corticosteroid *dosing*:**
**Day 1** Date:_____   Time: ____AM_____ PM

**Day 2** Date:_____   Time: ____AM_____ PM
**(Docetaxel Injection Treatment Day)**

**Day 3** Date:_____   Time: ____AM_____ PM

---

**Every three week injection of Docetaxel Injection for prostate cancer**
**Take your oral corticosteroid medicine as your doctor tells you.**
                    **Oral corticosteroid *dosing*:**
Date:_____   Time:_____

Date:_____   Time:_____
**(Docetaxel Injection Treatment Day)**

                    Time:_____

---

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER          SANDOZ-TAXO-NDA-00016349

This Patient Information has been approved by the U.S. Food and Drug Administration.

Manufactured for:                    Manufactured by:

 **SANDOZ**

Princeton, NJ 08540          EBEWE Pharma Ges.m.b.H. Nfg.KG
                             A-4866 Unterach, Austria


Revised:  October 2016

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    SANDOZ-TAXO-NDA-00016350

---------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---------------------------------------------------------------------------------------

/s/

----------------------------------------------------

AMNA IBRAHIM
10/21/2016

Reference ID: 4002498

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER          SANDOZ-TAXO-NDA-00016351

# **EXHIBIT T**

HIGHLIGHTS OF PRESCRIBING INFORMATION
These highlights do not include all the information needed to use Docetaxel Injection safely and effectively. See full prescribing information for Docetaxel Injection.

Docetaxel Injection,
Solution for Intravenous Infusion

Initial U.S. Approval: 1996

---

WARNING: TOXIC DEATHS, HEPATOTOXICITY, NEUTROPENIA, HYPERSENSITIVITY REACTIONS, and FLUID RETENTION
*See full prescribing information for complete boxed warning*
• **Treatment-related mortality increases with abnormal liver function, at higher doses, and in patients with NSCLC and prior platinum-based therapy receiving docetaxel at 100 mg/m³ (5.1)**
• **Should not be given if bilirubin > ULN, or if AST and/or ALT > 1.5 x ULN concomitant with alkaline phosphatase > 2.5 x ULN. LFT elevations increase risk of severe or life-threatening complications. Obtain LFTs before each treatment cycle (8.6)**
• **Should not be given if neutrophil counts are < 1500 cells/mm³. Obtain frequent blood counts to monitor for neutropenia (5.3)**
• **Severe hypersensitivity, including very rare fatal anaphylaxis, has been reported in patients who received dexamethasone premedication. Severe reactions require immediate discontinuation of Docetaxel Injection and administration of appropriate therapy (5.4)**
• **Contraindicated if history of severe hypersensitivity reactions to docetaxel or to drugs formulated with polysorbate 80 (4)**
• **Severe fluid retention may occur despite dexamethasone (5.5)**

---

———————INDICATIONS AND USAGE———————
Docetaxel Injection is a microtubule inhibitor indicated for:
• **Breast Cancer (BC):** single agent for locally advanced or metastatic BC after chemotherapy failure, and with doxorubicin and cyclophosphamide as adjuvant treatment of operable node-positive BC (1.1)
• **Non-Small Cell Lung Cancer (NSCLC):** single agent for locally advanced or metastatic NSCLC after platinum therapy failure; and with cisplatin for unresectable, locally advanced or metastatic untreated NSCLC (1.2)
• **Hormone Refractory Prostate Cancer (HRPC):** with prednisone in androgen independent (hormone refractory) metastatic prostate cancer (1.3)
• **Gastric Adenocarcinoma (GC):** with cisplatin and fluorouracil for untreated, advanced GC, including the gastroesophageal junction (1.4)
• **Squamous Cell Carcinoma of the Head and Neck Cancer (SCCHN):** with cisplatin and fluorouracil for induction treatment of locally advanced SCCHN (1.5)

———————DOSAGE AND ADMINISTRATION———————
Administer in a facility equipped to manage possible complications (e.g., anaphylaxis). Administer intravenously over 1 hr every 3 weeks. PVC equipment is not recommended.
• BC locally advanced or metastatic: 60 mg/m² to 100 mg/m² single agent (2.1)
• BC adjuvant: 75 mg/m² administered 1 hour after doxorubicin 50 mg/m² and cyclophosphamide 500 mg/m² every 3 weeks for 6 cycles (2.1)
• NSCLC: after platinum therapy failure: 75 mg/m² single agent (2.2)
• NSCLC: chemotherapy-naive: 75 mg/m² followed by cisplatin 75 mg/m²

(2.2)
• HRPC: 75 mg/m² with 5 mg prednisone twice a day continuously (2.3)
• GC: 75 mg/m² followed by cisplatin 75 mg/m² (both on day 1 only) followed by fluorouracil 750 mg/m² per day as a 24-hr intravenous infusion (days 1-5), starting at end of cisplatin infusion (2.4)
• SCCHN: 75 mg/m² followed by cisplatin 75 mg/m² intravenously (day 1), followed by fluorouracil 750 mg/m² per day as a 24-hr intravenous infusion (days 1-5), starting at end of cisplatin infusion; for 4 cycles (2.5)
• SCCHN: 75 mg/m² followed by cisplatin 100 mg/m² intravenously (day 1), followed by fluorouracil 1000 mg/m² per day as a 24-hr intravenous infusion (days 1-4); for 3 cycles (2.5)

For all patients:
• Premedicate with oral corticosteroids (2.6)
• Adjust dose as needed (2.7)

———————DOSAGE FORMS AND STRENGTHS———————
Multiple dose vial 20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL (3)

———————CONTRAINDICATIONS———————
• Hypersensitivity to docetaxel or polysorbate 80 (4)
• Neutrophil counts of <1500 cells/mm³ (4)

———————WARNINGS AND PRECAUTIONS———————
• Acute myeloid leukemia: In patients who received docetaxel, doxorubicin and cyclophosphamide, monitor for delayed myelodysplasia or myeloid leukemia (5.6)
• Cutaneous reactions: Reactions including erythema of the extremities with edema followed by desquamation may occur. Severe skin toxicity may require dose adjustment (5.7)
• Neurologic reactions: Reactions including paresthesia, dysesthesia, and pain may occur. Severe neurosensory symptoms require dose adjustment or discontinuation if persistent. (5.8)
• Asthenia: Severe asthenia may occur and may require treatment discontinuation. (5.9)
• Pregnancy: Fetal harm can occur when administered to a pregnant woman. Women of childbearing potential should be advised not to become pregnant when receiving Docetaxel Injection (5.10, 8.1)

———————ADVERSE REACTIONS———————
Most common adverse reactions across all docetaxel indications are infections, neutropenia, anemia, febrile neutropenia, hypersensitivity, thrombocytopenia, neuropathy, dysgeusia, dyspnea, constipation, anorexia, nail disorders, fluid retention, asthenia, pain, nausea, diarrhea, vomiting, mucositis, alopecia, skin reactions, myalgia (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Sandoz Inc., at 1-800-525-8747 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch***

———————DRUG INTERACTIONS———————
• Cytochrome P450 3A4 inducers, inhibitors, or substrates: May alter docetaxel metabolism. (7)

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling**
06/2011

SANDOZ-TAXO-LABELING-000004

**FULL PRESCRIBING INFORMATION: CONTENTS***

**WARNING**
**1 INDICATIONS AND USAGE**
  1.1 Breast Cancer
  1.2 Non-Small Cell Lung Cancer
  1.3 Prostate Cancer
  1.4 Gastric Adenocarcinoma
  1.5 Head and Neck Cancer
**2 DOSAGE AND ADMINISTRATION**
  2.1 Breast Cancer
  2.2 Non-Small Cell Lung Cancer
  2.3 Prostate Cancer
  2.4 Gastric Adenocarcinoma
  2.5 Head and Neck Cancer
  2.6 Premedication Regimen
  2.7 Dosage Adjustments During Treatment
  2.8 Administration Precautions
  2.9 Preparation and Administration
  2.10 Stability
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
  5.1 Toxic Deaths
  5.2 Hepatic Impairment
  5.3 Hematologic Effects
  5.4 Hypersensitivity Reactions
  5.5 Fluid Retention
  5.6 Acute Myeloid Leukemia
  5.7 Cutaneous reaction
  5.8 Neurologic Reactions
  5.9 Asthenia
  5.10 Use in Pregnancy

**6 ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
  6.2 Post Marketing Experiences
**7 DRUG INTERACTIONS**
**8 USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy
  8.3 Nursing Mothers
  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.3 Human Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
  14.1 Locally Advanced or Metastatic Breast Cancer
  14.2 Adjuvant Treatment of Breast Cancer
  14.3 Non-Small Cell Lung Cancer (NSCLC)
  14.4 Hormone Refractory Prostate Cancer
  14.5 Gastric Adenocarcinoma
  14.6 Head and Neck Cancer
**15 REFERENCES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
  16.1 How Supplied
  16.2 Storage
  16.3 Handling and Disposal
**17 PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed

SANDOZ-TAXO-LABELING-000005

## FULL PRESCRIBING INFORMATION

> **WARNING: TOXIC DEATHS, HEPATOTOXICITY, NEUTROPENIA, HYPERSENSITIVITY REACTIONS, and FLUID RETENTION**
>
> The incidence of treatment-related mortality associated with docetaxel therapy is increased in patients with abnormal liver function, in patients receiving higher doses, and in patients with non-small cell lung carcinoma and a history of prior treatment with platinum-based chemotherapy who receive docetaxel as a single agent at a dose of 100 mg/m$^2$ *[see Warning and Precautions (5.1)]*.
>
> Docetaxel Injection should not be given to patients with bilirubin > upper limit of normal (ULN), or to patients with AST and/or ALT >1.5 x ULN concomitant with alkaline phosphatase >2.5 x ULN. Patients with elevations of bilirubin or abnormalities of transaminase concurrent with alkaline phosphatase are at increased risk for the development of grade 4 neutropenia, febrile neutropenia, infections, severe thrombocytopenia, severe stomatitis, severe skin toxicity, and toxic death. Patients with isolated elevations of transaminase >1.5 x ULN also had a higher rate of febrile neutropenia grade 4 but did not have an increased incidence of toxic death. Bilirubin, AST or ALT, and alkaline phosphatase values should be obtained prior to each cycle of Docetaxel Injection therapy *[see Warning and Precautions (5.2)]*. Docetaxel Injection therapy should not be given to patients with neutrophil counts of <1500 cells/mm$^3$. In order to monitor the occurrence of neutropenia, which may be severe and result in infection, frequent blood cell counts should be performed on all patients receiving Docetaxel Injection *[see Warning and Precautions (5.3)]*.
>
> Severe hypersensitivity reactions characterized by generalized rash/erythema, hypotension and/or bronchospasm, or very rarely fatal anaphylaxis, have been reported in patients who received a 3-day dexamethasone premedication. Hypersensitivity reactions require immediate discontinuation of the Docetaxel Injection infusion and administration of appropriate therapy *[see Warning and Precautions (5.4)]*. Docetaxel Injection must not be given to patients who have a history of severe hypersensitivity reactions to docetaxel or to other drugs formulated with polysorbate 80 *[see Contraindications (4)]*.
>
> Severe fluid retention occurred in 6.5% (6/92) of patients despite use of a 3-day dexamethasone premedication regimen. It was characterized by one or more of the following events: poorly tolerated peripheral edema, generalized edema, pleural effusion requiring urgent drainage, dyspnea at rest, cardiac tamponade, or pronounced abdominal distention (due to ascites) *[see Warning and Precautions (5.5)]*.

## 1.   INDICATIONS AND USAGE

### 1.1   Breast Cancer

Docetaxel Injection is indicated for the treatment of patients with locally advanced or metastatic breast cancer after failure of prior chemotherapy.

SANDOZ-TAXO-LABELING-000006

Docetaxel Injection in combination with doxorubicin and cyclophosphamide is indicated for the adjuvant treatment of patients with operable node-positive breast cancer.

### 1.2 Non-Small Cell Lung Cancer

Docetaxel Injection as a single agent is indicated for the treatment of patients with locally advanced or metastatic non-small cell lung cancer after failure of prior platinum-based chemotherapy.

Docetaxel Injection in combination with cisplatin is indicated for the treatment of patients with unresectable, locally advanced or metastatic non-small cell lung cancer who have not previously received chemotherapy for this condition.

### 1.3 Prostate Cancer

Docetaxel Injection in combination with prednisone is indicated for the treatment of patients with androgen independent (hormone refractory) metastatic prostate cancer.

### 1.4 Gastric Adenocarcinoma

Docetaxel Injection in combination with cisplatin and fluorouracil is indicated for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who have not received prior chemotherapy for advanced disease.

### 1.5 Head and Neck Cancer

Docetaxel Injection in combination with cisplatin and fluorouracil is indicated for the induction treatment of patients with locally advanced squamous cell carcinoma of the head and neck (SCCHN).

### 2. DOSAGE AND ADMINISTRATION

For all indications, toxicities may warrant dosage adjustments *[see Dosage and Administration (2.7)]*.

Administer in a facility equipped to manage possible complications (e.g. anaphylaxis).

### 2.1 Breast Cancer

- For locally advanced or metastatic breast cancer after failure of prior chemotherapy, the recommended dose of Docetaxel Injection is 60 mg/m$^2$ to 100 mg/m$^2$ administered intravenously over 1 hour every 3 weeks.

- For the adjuvant treatment of operable node-positive breast cancer, the recommended Docetaxel Injection dose is 75 mg/m$^2$ administered 1 hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ every 3 weeks for 6 courses. Prophylactic G-CSF may be used to mitigate the risk of hematological toxicities *[see Dosage and Administration (2.7)]*.

### 2.2 Non-Small Cell Lung Cancer

- For treatment after failure of prior platinum-based chemotherapy, docetaxel was

SANDOZ-TAXO-LABELING-000007

evaluated as monotherapy, and the recommended dose is 75 mg/m$^2$ administered intravenously over 1 hour every 3 weeks. A dose of 100 mg/m$^2$ in patients previously treated with chemotherapy was associated with increased hematologic toxicity, infection, and treatment-related mortality in randomized, controlled trials *[see Boxed Warning, Dosage and Administration (2.7), Warnings and Precautions (5), Clinical Studies (14)].*

- For chemotherapy-naïve patients, docetaxel was evaluated in combination with cisplatin. The recommended dose of Docetaxel Injection is 75 mg/m$^2$ administered intravenously over 1 hour immediately followed by cisplatin 75 mg/m$^2$ over 30-60 minutes every 3 weeks *[see Dosage and Administration (2.7)].*

## 2.3 Prostate cancer

- For hormone-refractory metastatic prostate cancer, the recommended dose of Docetaxel Injection is 75 mg/m$^2$ every 3 weeks as a 1 hour intravenous infusion. Prednisone 5 mg orally twice daily is administered continuously *[see Dosage and Administration (2.7)].*

## 2.4 Gastric adenocarcinoma

- For gastric adenocarcinoma, the recommended dose of Docetaxel Injection is 75 mg/m$^2$ as a 1 hour intravenous infusion, followed by cisplatin 75 mg/m$^2$, as a 1 to 3 hour intravenous infusion (both on day 1 only), followed by fluorouracil 750 mg/m$^2$ per day given as a 24-hour continuous intravenous infusion for 5 days, starting at the end of the cisplatin infusion.   Treatment is repeated every three weeks. Patients must receive premedication with antiemetics and appropriate hydration for cisplatin administration *[see Dosage and Administration (2.7)].*

## 2.5 Head and Neck Cancer

Patients must receive premedication with antiemetics, and appropriate hydration (prior to and after cisplatin administration). Prophylaxis for neutropenic infections should be administered. All patients treated on the docetaxel containing arms of the TAX323 and TAX324 studies received prophylactic antibiotics.

- *Induction chemotherapy followed by radiotherapy (TAX323)*
For the induction treatment of locally advanced inoperable SCCHN, the recommended dose of Docetaxel Injection is 75 mg/m$^2$ as a 1 hour intravenous infusion followed by cisplatin 75 mg/m$^2$ intravenously over 1 hour, on day one, followed by fluorouracil as a continuous intravenous infusion at 750 mg/m$^2$ per day for five days. This regimen is administered every 3 weeks for 4 cycles. Following chemotherapy, patients should receive radiotherapy. *[see Dosage and Administration (2.7)].*

- *Induction chemotherapy followed by chemoradiotherapy (TAX324)*
For the induction treatment of patients with locally advanced (unresectable, low surgical cure, or organ preservation) SCCHN, the recommended dose of Docetaxel

SANDOZ-TAXO-LABELING-000008

Injection is 75 mg/m$^2$ as a 1 hour intravenous infusion on day 1, followed by cisplatin 100 mg/m$^2$ administered as a 30-minute to 3 hour infusion, followed by fluorouracil 1000 mg/m$^2$/day as a continuous infusion from day 1 to day 4. This regimen is administered every 3 weeks for 3 cycles. Following chemotherapy, patients should receive chemoradiotherapy *[see Dosage and Administration (2.7)]*.

## 2.6 Premedication Regimen

All patients should be premedicated with oral corticosteroids (see below for prostate cancer) such as dexamethasone 16 mg per day (e.g., 8 mg twice daily) for 3 days starting 1 day prior to Docetaxel Injection administration in order to reduce the incidence and severity of fluid retention as well as the severity of hypersensitivity reactions *[see Boxed Warning, Warnings and Precautions (5.4)]*.

For hormone-refractory metastatic prostate cancer, given the concurrent use of prednisone, the recommended premedication regimen is oral dexamethasone 8 mg, at 12 hours, 3 hours and 1 hour before the Docetaxel Injection infusion *[see Warnings and Precautions (5.4)]*.

## 2.7 Dosage Adjustments During Treatment

Breast Cancer
Patients who are dosed initially at 100 mg/m$^2$ and who experience either febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than 1 week, or severe or cumulative cutaneous reactions during Docetaxel Injection therapy should have the dosage adjusted from 100 mg/m$^2$ to 75 mg/m$^2$. If the patient continues to experience these reactions, the dosage should either be decreased from 75 mg/m$^2$ to 55 mg/m$^2$ or the treatment should be discontinued. Conversely, patients who are dosed initially at 60 mg/m$^2$ and who do not experience febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than 1 week, severe or cumulative cutaneous reactions, or severe peripheral neuropathy during Docetaxel Injection therapy may tolerate higher doses. Patients who develop ≥grade 3 peripheral neuropathy should have Docetaxel Injection treatment discontinued entirely.

Combination Therapy with Docetaxel Injection in the Adjuvant Treatment of Breast Cancer
Docetaxel Injection in combination with doxorubicin and cyclophosphamide should be administered when the neutrophil count is ≥1,500 cells/mm$^3$. Patients who experience febrile neutropenia should receive G-CSF in all subsequent cycles. Patients who continue to experience this reaction should remain on G-CSF and have their Docetaxel Injection dose reduced to 60 mg/m$^2$. Patients who experience grade 3 or 4 stomatitis should have their Docetaxel Injection dose decreased to 60 mg/m$^2$. Patients who experience severe or cumulative cutaneous reactions or moderate neurosensory signs and/or symptoms during Docetaxel Injection therapy should have their dosage of Docetaxel Injection reduced from 75 to 60 mg/m$^2$. If the patient continues to experience these reactions at 60 mg/m$^2$, treatment should be discontinued.

Non-Small Cell Lung Cancer

*Monotherapy with Docetaxel Injection for NSCLC treatment after failure of prior platinum-based chemotherapy*

Patients who are dosed initially at 75 mg/m$^2$ and who experience either febrile

SANDOZ-TAXO-LABELING-000009

neutropenia, neutrophils <500 cells/mm³ for more than one week, severe or cumulative cutaneous reactions, or other grade 3/4 non-hematological toxicities during Docetaxel Injection treatment should have treatment withheld until resolution of the toxicity and then resumed at 55 mg/m². Patients who develop ≥grade 3 peripheral neuropathy should have Docetaxel Injection treatment discontinued entirely.

*Combination therapy with Docetaxel Injection for chemotherapy-naïve NSCLC*
For patients who are dosed initially at Docetaxel Injection 75 mg/m² in combination with cisplatin, and whose nadir of platelet count during the previous course of therapy is <25,000 cells/mm³, in patients who experience febrile neutropenia, and in patients with serious non-hematologic toxicities, the Docetaxel Injection dosage in subsequent cycles should be reduced to 65 mg/m². In patients who require a further dose reduction, a dose of 50 mg/m² is recommended. For cisplatin dosage adjustments, see manufacturers' prescribing information.

Prostate Cancer
*Combination therapy with Docetaxel Injection for hormone-refractory metastatic prostate cancer*
Docetaxel Injection should be administered when the neutrophil count is ≥1,500 cells/mm³. Patients who experience either febrile neutropenia, neutrophils <500 cells/mm³ for more than one week, severe or cumulative cutaneous reactions or moderate neurosensory signs and/or symptoms during Docetaxel Injection therapy should have the dosage of Docetaxel Injection reduced from 75 to 60 mg/m². If the patient continues to experience these reactions at 60 mg/m², the treatment should be discontinued.

Gastric or Head and Neck Cancer
*Docetaxel Injection in combination with cisplatin and fluorouracil in gastric cancer or head and neck cancer*
Patients treated with Docetaxel Injection in combination with cisplatin and fluorouracil must receive antiemetics and appropriate hydration according to current institutional guidelines. In both studies, G-CSF was recommended during the second and/or subsequent cycles in case of febrile neutropenia, or documented infection with neutropenia, or neutropenia lasting more than 7 days. If an episode of febrile neutropenia, prolonged neutropenia or neutropenic infection occurs despite G-CSF use, the Docetaxel Injection dose should be reduced from 75 mg/m² to 60 mg/m². If subsequent episodes of complicated neutropenia occur the Docetaxel Injection dose should be reduced from 60 mg/m² to 45 mg/m². In case of grade 4 thrombocytopenia the Docetaxel Injection dose should be reduced from 75 mg/m² to 60 mg/m². Patients should not be retreated with subsequent cycles of Docetaxel Injection until neutrophils recover to a level >1,500 cells/mm³ and platelets recover to a level >100,000 cells/mm³. Discontinue treatment if these toxicities persist. *[see Warnings and Precautions (5.3)]*.

Recommended dose modifications for toxicities in patients treated with Docetaxel Injection in combination with cisplatin and fluorouracil are shown in **Table 1**.

SANDOZ-TAXO-LABELING-000010

**Table 1 - Recommended Dose Modifications for Toxicities in Patients Treated with Docetaxel Injection in Combination with Cisplatin and Fluorouracil**

| Toxicity | Dosage adjustment |
|---|---|
| Diarrhea grade 3 | First episode: reduce fluorouracil dose by 20%. Second episode: then reduce Docetaxel Injection dose by 20%. |
| Diarrhea grade 4 | First episode: reduce Docetaxel Injection and fluorouracil doses by 20%. Second episode: discontinue treatment. |
| Stomatitis/mucositis grade 3 | First episode: reduce fluorouracil dose by 20%. Second episode: stop fluorouracil only, at all subsequent cycles. Third episode: reduce Docetaxel Injection dose by 20%. |
| Stomatitis/mucositis grade 4 | First episode: stop fluorouracil only, at all subsequent cycles. Second episode: reduce Docetaxel Injection dose by 20%. |

Liver dysfunction:

In case of AST/ALT >2.5 to ≤5 x ULN and AP ≤2.5 x ULN, or AST/ALT >1.5 to ≤5 x ULN and AP >2.5 to ≤5 x ULN, Docetaxel Injection should be reduced by 20%.

In case of AST/ALT >5 x ULN and/or AP >5 x ULN Docetaxel Injection should be stopped.

The dose modifications for cisplatin and fluorouracil in the gastric cancer study are provided below:

Cisplatin dose modifications and delays
Peripheral neuropathy: A neurological examination should be performed before entry into the study, and then at least every 2 cycles and at the end of treatment. In the case of neurological signs or symptoms, more frequent examinations should be performed and the following dose modifications can be made according to NCIC-CTC grade:
• Grade 2: Reduce cisplatin dose by 20%.
• Grade 3: Discontinue treatment.
Ototoxicity: In the case of grade 3 toxicity, discontinue treatment.

Nephrotoxicity: In the event of a rise in serum creatinine ≥grade 2 (>1.5 x normal value) despite adequate rehydration, CrCl should be determined before each subsequent cycle and the following dose reductions should be considered (see **Table 2**).

For other cisplatin dosage adjustments, also refer to the manufacturers' prescribing information.

SANDOZ-TAXO-LABELING-000011

**Table 2 – Dose Reductions for Evaluation of Creatinine Clearance**

| Creatinine clearance result before next cycle | Cisplatin dose next cycle |
|---|---|
| CrCl ≥60 mL/min | Full dose of cisplatin was given. CrCl was to be repeated before each treatment cycle. |
| CrCl between 40 and 59 mL/min | Dose of cisplatin was reduced by 50% at subsequent cycle. If CrCl was >60 mL/min at end of cycle, full cisplatin dose was reinstituted at the next cycle.<br><br>If no recovery was observed, then cisplatin was omitted from the next treatment cycle. |
| CrCl <40 mL/min | Dose of cisplatin was omitted in that treatment cycle only.<br><br>If CrCl was still <40 mL/min at the end of cycle, cisplatin was discontinued.<br><br>If CrCl was >40 and <60 mL/min at end of cycle, a 50% cisplatin dose was given at the next cycle.<br><br>If CrCl was >60 mL/min at end of cycle, full cisplatin dose was given at next cycle |

CrCl = Creatinine clearance

Fluorouracil dose modifications and treatment delays
For diarrhea and stomatitis, see **Table 1.**
In the event of grade 2 or greater plantar-palmar toxicity, fluorouracil should be stopped until recovery. The fluorouracil dosage should be reduced by 20%.

For other greater than grade 3 toxicities, except alopecia and anemia, chemotherapy should be delayed (for a maximum of 2 weeks from the planned date of infusion) until resolution to grade ≤1 and then recommenced, if medically appropriate.

For other fluorouracil dosage adjustments, also refer to the manufacturers' prescribing information.

Combination Therapy with Strong CYP3A4 inhibitors:
Avoid using concomitant strong CYP3A4 inhibitors (e.g., ketoconazole, itraconazole, clarithromycin, atazanavir, indinavir, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin and voriconazole). There are no clinical data with a dose adjustment in patients receiving strong CYP3A4 inhibitors. Based on extrapolation from a pharmacokinetic study with ketoconazole in 7 patients, consider a 50% Docetaxel Injection dose reduction if patients require co-administration of a strong CYP3A4 inhibitor. *[see Drug Interactions (7), Clinical Pharmacology (12.3)].*

SANDOZ-TAXO-LABELING-000012

**2.8   Administration Precautions**

Docetaxel Injection is a cytotoxic anticancer drug and, as with other potentially toxic compounds, caution should be exercised when handling and preparing Docetaxel Injection solutions. The use of gloves is recommended. Please refer to *[see How Supplied/Storage and Handling (16.3)]*.

If Docetaxel Injection or diluted solution for intravenous infusion should come into contact with the skin, immediately and thoroughly wash with soap and water. If Docetaxel Injection or diluted solution for intravenous infusion should come into contact with mucosa, immediately and thoroughly wash with water.

Contact of the Docetaxel Injection with plasticized PVC equipment or devices used to prepare solutions for infusion is not recommended. In order to minimize patient exposure to the plasticizer DEHP (di-2-ethylhexyl phthalate), which may be leached from PVC infusion bags or sets, the final Docetaxel Injection dilution for infusion should be stored in bottles (glass, polypropylene) or plastic bags (polypropylene, polyolefin) and administered through polyethylene-lined administration sets.

Docetaxel Injection requires dilution prior to administration. Please follow the preparation instructions provided below.

**2.9   Preparation and Administration**

**Docetaxel Injection (10 mg/mL) requires NO prior dilution with a diluent and is ready to add to the infusion solution.**
*Dilution for Infusion*

1.   Aseptically withdraw the required amount of Docetaxel Injection solution (10 mg docetaxel/mL) with a calibrated syringe and inject into a 250 mL infusion bag or bottle of either 0.9% Sodium Chloride solution or 5% Dextrose solution to produce a final concentration of 0.3 to 0.74 mg/mL.

If a dose greater than 200 mg of Docetaxel Injection is required, use a larger volume of the infusion vehicle so that a concentration of 0.74 mg/mL Docetaxel Injection is not exceeded.

2.   Thoroughly mix the infusion by manual rotation.

3.   As with all parenteral products, Docetaxel Injection should be inspected visually for particulate matter or discoloration prior to administration whenever the solution and container permit. If the Docetaxel Injection or diluted solution is not clear or appears to have precipitation, these should be discarded.

The Docetaxel Injection diluted solution for infusion should be administered intravenously as a 1-hour infusion under ambient room temperature below 25ºC (77ºF) and lighting conditions.

**2.10 Stability**

Docetaxel Injection infusion solution, if stored between 2°C and 25°C (36°F and 77°F) is stable for 4 hours in either 0.9% Sodium Chloride solution or 5% Dextrose solution. Use within 4 hours including the 1 hour intravenous administration. Do not freeze infusion

SANDOZ-TAXO-LABELING-000013

solution.

3. **DOSAGE FORMS AND STRENGTHS**

**Docetaxel Injection 10 mg/mL is supplied as 20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL.**

Each mL of Docetaxel Injection contains 10 mg docetaxel; 80 mg polysorbate 80; 648 mg polyethylene glycol 300; 275.9 mg alcohol 96% (v/v), and 4 mg citric acid.

4. **CONTRAINDICATIONS**
   - Docetaxel Injection is contraindicated in patients who have a history of severe hypersensitivity reactions to docetaxel or to other drugs formulated with polysorbate 80. Severe reactions, including anaphylaxis, have occurred *[see Warnings and Precautions (5.4)]*.
   - Docetaxel Injection should not be used in patients with neutrophil counts of <1500 cells/mm$^3$.

5. **WARNINGS AND PRECAUTIONS**

**5.1 Toxic Deaths**

Breast Cancer
Docetaxel administered at 100 mg/m$^2$ was associated with deaths considered possibly or probably related to treatment in 2.0% (19/965) of metastatic breast cancer patients, both previously treated and untreated, with normal baseline liver function and in 11.5% (7/61) of patients with various tumor types who had abnormal baseline liver function (AST and/or ALT >1.5 times ULN together with AP >2.5 times ULN). Among patients dosed at 60 mg/m$^2$, mortality related to treatment occurred in 0.6% (3/481) of patients with normal liver function, and in 3 of 7 patients with abnormal liver function. Approximately half of these deaths occurred during the first cycle. Sepsis accounted for the majority of the deaths.

Non-Small Cell Lung Cancer
Docetaxel administered at a dose of 100 mg/m$^2$ in patients with locally advanced or metastatic non-small cell lung cancer who had a history of prior platinum-based chemotherapy was associated with increased treatment-related mortality (14% and 5% in two randomized, controlled studies). There were 2.8% treatment-related deaths among the 176 patients treated at the 75 mg/m$^2$ dose in the randomized trials. Among patients who experienced treatment-related mortality at the 75 mg/m$^2$ dose level, 3 of 5 patients had an ECOG PS of 2 at study entry *[see Dosage and Administration (2.2), Clinical Studies (14)]*.

**5.2 Hepatic Impairment**

Patients with combined abnormalities of transaminases and alkaline phosphatase should not be treated with Docetaxel Injection *[see Boxed Warning, Use in Specific Populations (8.6), Clinical Studies (14)]*.

**5.3 Hematologic Effects**

Perform frequent peripheral blood cell counts on all patients receiving Docetaxel Injection.

SANDOZ-TAXO-LABELING-000014

Patients should not be retreated with subsequent cycles of Docetaxel Injection until neutrophils recover to a level >1500 cells/mm$^3$ and platelets recover to a level > 100,000 cells/mm$^3$.

A 25% reduction in the dose of Docetaxel Injection is recommended during subsequent cycles following severe neutropenia (<500 cells/mm$^3$) lasting 7 days or more, febrile neutropenia, or a grade 4 infection in a Docetaxel Injection cycle *[see Dosage and Administration (2.7)]*.

Neutropenia (<2000 neutrophils/mm$^3$) occurs in virtually all patients given 60 mg/m$^2$ to 100 mg/m$^2$ of docetaxel and grade 4 neutropenia (<500 cells/mm$^3$) occurs in 85% of patients given 100 mg/m$^2$ and 75% of patients given 60 mg/m$^2$. Frequent monitoring of blood counts is, therefore, essential so that dose can be adjusted. Docetaxel Injection should not be administered to patients with neutrophils <1500 cells/mm$^3$.

Febrile neutropenia occurred in about 12% of patients given 100 mg/m$^2$ but was very uncommon in patients given 60 mg/m$^2$. Hematologic responses, febrile reactions and infections, and rates of septic death for different regimens are dose related *[see Adverse Reactions (6.1), Clinical Studies (14)]*.

Three breast cancer patients with severe liver impairment (bilirubin >1.7 times ULN) developed fatal gastrointestinal bleeding associated with severe drug-induced thrombocytopenia. In gastric cancer patients treated with docetaxel in combination with cisplatin and fluorouracil (TCF), febrile neutropenia and/or neutropenic infection occurred in 12% of patients receiving G-CSF compared to 28% who did not. Patients receiving TCF should be closely monitored during the first and subsequent cycles for febrile neutropenia and neutropenic infection *[see Dosage and Administration (2.7), Adverse Reactions (6)]*.

## 5.4 Hypersensitivity Reactions

Patients should be observed closely for hypersensitivity reactions, especially during the first and second infusions. Severe hypersensitivity reactions characterized by generalized rash/erythema, hypotension and/or bronchospasm, or very rarely fatal anaphylaxis, have been reported in patients premedicated with 3 days of corticosteroids. Severe hypersensitivity reactions require immediate discontinuation of the Docetaxel Injection infusion and aggressive therapy. Patients with a history of severe hypersensitivity reactions should not be rechallenged with Docetaxel Injection.

Hypersensitivity reactions may occur within a few minutes following initiation of a Docetaxel Injection infusion. If minor reactions such as flushing or localized skin reactions occur, interruption of therapy is not required. All patients should be premedicated with an oral corticosteroid prior to the initiation of the infusion of Docetaxel Injection *[see Dosage and Administration (2.6)]*.

## 5.5 Fluid Retention

Severe fluid retention has been reported following docetaxel therapy. Patients should be premedicated with oral corticosteroids prior to each Docetaxel Injection administration to reduce the incidence and severity of fluid retention *[see Dosage and Administration (2.6)]*.

SANDOZ-TAXO-LABELING-000015

Patients with pre-existing effusions should be closely monitored from the first dose for the possible exacerbation of the effusions.

When fluid retention occurs, peripheral edema usually starts in the lower extremities and may become generalized with a median weight gain of 2 kg.

Among 92 breast cancer patients premedicated with 3-day corticosteroids, moderate fluid retention occurred in 27.2% and severe fluid retention in 6.5%. The median cumulative dose to onset of moderate or severe fluid retention was 819 mg/m$^2$. Nine of 92 patients (9.8%) of patients discontinued treatment due to fluid retention: 4 patients discontinued with severe fluid retention; the remaining 5 had mild or moderate fluid retention. The median cumulative dose to treatment discontinuation due to fluid retention was 1021 mg/m$^2$. Fluid retention was completely, but sometimes slowly, reversible with a median of 16 weeks from the last infusion of docetaxel to resolution (range: 0 to 42+ weeks). Patients developing peripheral edema may be treated with standard measures, *e.g.,* salt restriction, oral diuretic(s).

### 5.6   Acute Myeloid Leukemia

Treatment-related acute myeloid leukemia (AML) or myelodysplasia has occurred in patients given anthracyclines and/or cyclophosphamide, including use in adjuvant therapy for breast cancer. In the adjuvant breast cancer trial *(TAX316)* AML occurred in 3 of 744 patients who received docetaxel, doxorubicin and cyclophosphamide (TAC) and in 1 of 736 patients who received fluorouracil, doxorubicin and cyclophosphamide *[see Clinical Studies (14.2)]*. In TAC-treated patients, the risk of delayed myelodysplasia or myeloid leukemia requires hematological follow-up.

### 5.7   Cutaneous Reactions

Localized erythema of the extremities with edema followed by desquamation has been observed. In case of severe skin toxicity, an adjustment in dosage is recommended *[see Dosage and Administration (2.7)]*. The discontinuation rate due to skin toxicity was 1.6% (15/965) for metastatic breast cancer patients. Among 92 breast cancer patients premedicated with 3-day corticosteroids, there were no cases of severe skin toxicity reported and no patient discontinued docetaxel due to skin toxicity.

### 5.8   Neurologic Reactions

Severe neurosensory symptoms *(e.g.* paresthesia, dysesthesia, pain) were observed in 5.5% (53/965) of metastatic breast cancer patients, and resulted in treatment discontinuation in 6.1%. When these symptoms occur, dosage must be adjusted. If symptoms persist, treatment should be discontinued *[see Dosage and Administration (2.7)]*. Patients who experienced neurotoxicity in clinical trials and for whom follow-up information on the complete resolution of the event was available had spontaneous reversal of symptoms with a median of 9 weeks from onset (range: 0 to 106 weeks). Severe peripheral motor neuropathy mainly manifested as distal extremity weakness occurred in 4.4% (42/965).

### 5.9   Asthenia

Severe asthenia has been reported in 14.9% (144/965) of metastatic breast cancer patients

SANDOZ-TAXO-LABELING-000016

but has led to treatment discontinuation in only 1.8%. Symptoms of fatigue and weakness may last a few days up to several weeks and may be associated with deterioration of performance status in patients with progressive disease.

**5.10 Use in Pregnancy**

Docetaxel Injection can cause fetal harm when administered to a pregnant woman. Docetaxel caused embryofetal toxicities including intrauterine mortality when administered to pregnant rats and rabbits during the period of organogenesis. Embryofetal effects in animals occurred at doses as low as 1/50 and 1/300 the recommended human dose on a body surface area basis.

There are no adequate and well-controlled studies in pregnant women using Docetaxel Injection. If Docetaxel Injection is used during pregnancy, or if the patient becomes pregnant while receiving this drug, the patient should be apprised of the potential hazard to the fetus. Women of childbearing potential should be advised to avoid becoming pregnant during therapy with Docetaxel Injection *[see Use in Specific Populations (8.1)]*.

**6.   ADVERSE REACTIONS**

The most serious adverse reactions from docetaxel are:
- Toxic Deaths *[see Boxed Warning, Warnings and Precautions (5.1)]*
- Hepatotoxicity *[see Boxed Warning, Warnings and Precautions (5.2)]*
- Neutropenia *[see Boxed Warning, Warnings and Precautions (5.3)]*
- Hypersensitivity *[see Boxed Warning, Warnings and Precautions (5.4)]*
- Fluid Retention *[see Boxed Warning, Warnings and Precautions (5.5)]*

The most common adverse reactions across all docetaxel indications are infections, neutropenia, anemia, febrile neutropenia, hypersensitivity, thrombocytopenia, neuropathy, dysgeusia, dyspnea, constipation, anorexia, nail disorders, fluid retention, asthenia, pain, nausea, diarrhea, vomiting, mucositis, alopecia, skin reactions, and myalgia. Incidence varies depending on the indication.

Adverse reactions are described according to indication. Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

Responding patients may not experience an improvement in performance status on therapy and may experience worsening. The relationship between changes in performance status, response to therapy, and treatment-related side effects has not been established.

**6.1   Clinical Trial Experience**

Breast Cancer

*Monotherapy with docetaxel for locally advanced or metastatic breast cancer after failure of prior chemotherapy*
Docetaxel 100 mg/m$^2$: Adverse drug reactions occurring in at least 5% of patients are compared for three populations who received docetaxel administered at 100 mg/m$^2$ as a

SANDOZ-TAXO-LABELING-000017

1-hour infusion every 3 weeks: 2045 patients with various tumor types and normal baseline liver function tests; the subset of 965 patients with locally advanced or metastatic breast cancer, both previously treated and untreated with chemotherapy, who had normal baseline liver function tests; and an additional 61 patients with various tumor types who had abnormal liver function tests at baseline. These reactions were described using COSTART terms and were considered possibly or probably related to docetaxel. At least 95% of these patients did not receive hematopoietic support. The safety profile is generally similar in patients receiving docetaxel for the treatment of breast cancer and in patients with other tumor types (See **Table 3**).

**Table 3 - Summary of Adverse Reactions in Patients Receiving Docetaxel at 100 mg/m$^2$**

| Adverse Reaction | All Tumor Types Normal LFTs* n=2045 % | All Tumor Types Elevated LFTs** n=61 % | Breast Cancer Normal LFTs* n=965 % |
|---|---|---|---|
| **Hematologic** | | | |
| Neutropenia | | | |
| <2000 cells/mm$^3$ | 96 | 96 | 99 |
| <500 cells/mm$^3$ | 75 | 88 | 86 |
| Leukopenia | | | |
| <4000 cells/mm$^3$ | 96 | 98 | 99 |
| <1000 cells/mm$^3$ | 32 | 47 | 44 |
| Thrombocytopenia | | | |
| <100,000 cells/mm$^3$ | 8 | 25 | 9 |
| Anemia | | | |
| <11g/dL | 90 | 92 | 94 |
| <8 g/dL | 9 | 31 | 8 |
| Febrile Neutropenia*** | 11 | 26 | 12 |
| **Septic Death** | 2 | 5 | 1 |
| **Non-Septic Death** | 1 | 7 | 1 |
| **Infections** | | | |
| Any | 22 | 33 | 22 |
| Severe | 6 | 16 | 6 |
| **Fever in Absence of Infection** | | | |
| Any | 31 | 41 | 35 |
| Severe | 2 | 8 | 2 |
| **Hypersensitivity Reactions** | | | |
| Regardless of Premedication | | | |
| Any | 21 | 20 | 18 |
| Severe | 4 | 10 | 3 |
| With 3-day Premedication | n=92 | n=3 | n=92 |
| Any | 15 | 33 | 15 |

SANDOZ-TAXO-LABELING-000018

| | | | |
|---|---|---|---|
| Severe | 2 | 0 | 2 |
| **Fluid Retention** | | | |
| Regardless of Premedication | | | |
| Any | 47 | 39 | 60 |
| Severe | 7 | 8 | 9 |
| With 3-day Premedication | n=92 | n=3 | n=92 |
| Any | 64 | 67 | 64 |
| Severe | 7 | 33 | 7 |
| **Neurosensory** | | | |
| Any | 49 | 34 | 58 |
| Severe | 4 | 0 | 6 |
| **Cutaneous** | | | |
| Any | 48 | 54 | 47 |
| Severe | 5 | 10 | 5 |
| **Nail Changes** | | | |
| Any | 31 | 23 | 41 |
| Severe | 3 | 5 | 4 |
| **Gastrointestinal** | | | |
| Nausea | 39 | 38 | 42 |
| Vomiting | 22 | 23 | 23 |
| Diarrhea | 39 | 33 | 43 |
| Severe | 5 | 5 | 6 |
| **Stomatitis** | | | |
| Any | 42 | 49 | 52 |
| Severe | 6 | 13 | 7 |
| **Alopecia** | 76 | 62 | 74 |
| **Asthenia** | | | |
| Any | 62 | 53 | 66 |
| Severe | 13 | 25 | 15 |
| **Myalgia** | | | |
| Any | 19 | 16 | 21 |
| Severe | 2 | 2 | 2 |
| **Arthralgia** | 9 | 7 | 8 |
| **Infusion Site Reactions** | 4 | 3 | 4 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN

**Elevated Baseline LFTs: AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN

***Febrile Neutropenia: ANC grade 4 with fever >38°C with intravenous antibiotics and/or hospitalization

SANDOZ-TAXO-LABELING-000019

**Hematologic Reactions**

Reversible marrow suppression was the major dose-limiting toxicity of docetaxel *[see Warnings and Precautions (5.3)]*. The median time to nadir was 7 days, while the median duration of severe neutropenia (<500 cells/mm$^3$) was 7 days. Among 2045 patients with solid tumors and normal baseline LFTs, severe neutropenia occurred in 75.4% and lasted for more than 7 days in 2.9% of cycles.

Febrile neutropenia (<500 cells/mm$^3$ with fever >38°C with intravenous antibiotics and/or hospitalization) occurred in 11% of patients with solid tumors, in 12.3% of patients with metastatic breast cancer, and in 9.8% of 92 breast cancer patients premedicated with 3-day corticosteroids.

Severe infectious episodes occurred in 6.1% of patients with solid tumors, in 6.4% of patients with metastatic breast cancer, and in 5.4% of 92 breast cancer patients premedicated with 3-day corticosteroids.

Thrombocytopenia (<100,000 cells/mm$^3$) associated with fatal gastrointestinal hemorrhage has been reported.

**Hypersensitivity Reactions**

Severe hypersensitivity reactions have been reported *[see Boxed Warning, Warnings and Precautions (5.4)]*. Minor events, including flushing, rash with or without pruritus, chest tightness, back pain, dyspnea, drug fever, or chills, have been reported and resolved after discontinuing the infusion and instituting appropriate therapy.

**Fluid Retention**

Fluid retention can occur with the use of docetaxel *[see Boxed Warning, Dosage and Administration (2.6), Warnings and Precautions (5.5)]*.

**Cutaneous Reactions**

Severe skin toxicity is discussed elsewhere in the label *[see Warnings and Precautions (5.7)]*. Reversible cutaneous reactions characterized by a rash including localized eruptions, mainly on the feet and/or hands, but also on the arms, face, or thorax, usually associated with pruritus, have been observed. Eruptions generally occurred within 1 week after docetaxel infusion, recovered before the next infusion, and were not disabling.

Severe nail disorders were characterized by hypo- or hyperpigmentation, and occasionally by onycholysis (in 0.8% of patients with solid tumors) and pain.

**Neurologic Reactions**

Neurologic reactions are discussed elsewhere in the label *[see Warnings and Precautions (5.8)]*

**Gastrointestinal Reactions**

Nausea, vomiting, and diarrhea were generally mild to moderate. Severe reactions occurred

SANDOZ-TAXO-LABELING-000020

in 3-5% of patients with solid tumors and to a similar extent among metastatic breast cancer patients.

The incidence of severe reactions was 1% or less for the 92 breast cancer patients premedicated with 3-day corticosteroids.

Severe stomatitis occurred in 5.5% of patients with solid tumors, in 7.4% of patients with metastatic breast cancer, and in 1.1% of the 92 breast cancer patients premedicated with 3-day corticosteroids.

**Cardiovascular Reactions**

Hypotension occurred in 2.8% of patients with solid tumors; 1.2% required treatment. Clinically meaningful events such as heart failure, sinus tachycardia, atrial flutter, dysrhythmia, unstable angina, pulmonary edema, and hypertension occurred rarely. Seven of 86 (8.1%) of metastatic breast cancer patients receiving docetaxel 100 mg/m$^2$ in a randomized trial and who had serial left ventricular ejection fractions assessed developed deterioration of LVEF by $\geq$10% associated with a drop below the institutional lower limit of normal.

**Infusion Site Reactions**

Infusion site reactions were generally mild and consisted of hyperpigmentation, inflammation, redness or dryness of the skin, phlebitis, extravasation, or swelling of the vein.

**Hepatic Reactions**

In patients with normal LFTs at baseline, bilirubin values greater than the ULN occurred in 8.9% of patients. Increases in AST or ALT >1.5 times the ULN, or alkaline phosphatase >2.5 times ULN, were observed in 18.9% and 7.3% of patients, respectively. While on docetaxel, increases in AST and/or ALT >1.5 times ULN concomitant with alkaline phosphatase >2.5 times ULN occurred in 4.3% of patients with normal LFTs at baseline. Whether these changes were related to the drug or underlying disease has not been established.

**Hematologic and Other Toxicity: Relation to dose and baseline liver chemistry abnormalities**

Hematologic and other toxicity is increased at higher doses and in patients with elevated baseline liver function tests (LFTs). In the following tables, adverse drug reactions are compared for three populations: 730 patients with normal LFTs given docetaxel at 100 mg/m$^2$ in the randomized and single arm studies of metastatic breast cancer after failure of previous chemotherapy; 18 patients in these studies who had abnormal baseline LFTs (defined as AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN); and 174 patients in Japanese studies given docetaxel at 60 mg/m$^2$ who had normal LFTs (see **Tables 4** and **5)**.

SANDOZ-TAXO-LABELING-000021

**Table 4 - Hematologic Adverse Reactions in Breast Cancer Patients Previously Treated with Chemotherapy Treated at Docetaxel 100 mg/m$^2$ with Normal or Elevated Liver Function Tests or 60 mg/m$^2$ with Normal Liver Function Tests**

| Adverse Reaction | Docetaxel 100 mg/m$^2$ | | Docetaxel 60 mg/m$^2$ |
|---|---|---|---|
| | Normal LFTs* n=730 % | Elevated LFTs** n=18 % | Normal LFTs* n=174 % |
| **Neutropenia** | | | |
| Any       <2000 cells/mm$^3$ | 98 | 100 | 95 |
| Grade 4   <500 cells/mm$^3$ | 84 | 94 | 75 |
| **Thrombocytopenia** | | | |
| Any       <100,000 cells/mm$^3$ | 11 | 44 | 14 |
| Grade 4  <20,000 cells/mm$^3$ | 1 | 17 | 1 |
| **Anemia**   <11 g/dL | 95 | 94 | 65 |
| **Infection*** ** | | | |
| Any | 23 | 39 | 1 |
| Grade 3 and 4 | 7 | 33 | 0 |
| **Febrile Neutropenia**** ** | | | |
| By Patient | 12 | 33 | 0 |
| By Course | 2 | 9 | 0 |
| **Septic Death** | 2 | 6 | 1 |
| **Non-Septic Death** | 1 | 11 | 0 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN
**Elevated Baseline LFTs: AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN
***Incidence of infection requiring hospitalization and/or intravenous antibiotics was 8.5% (n=62) among the 730 patients with normal LFTs at baseline; 7 patients had concurrent grade 3 neutropenia, and 46 patients had grade 4 neutropenia.
****Febrile Neutropenia: For 100 mg/m$^2$, ANC grade 4 and fever >38°C with intravenous antibiotics and/or hospitalization; for 60 mg/m$^2$, ANC grade 3/4 and fever >38.1°C.

**Table 5 - Non-Hematologic Adverse Reactions in Breast Cancer Patients Previously Treated with Chemotherapy Treated at Docetaxel 100 mg/m$^2$ with Normal or Elevated Liver Function Tests or 60 mg/m$^2$ with Normal Liver Function Tests**

Reference ID: 2967585

SANDOZ-TAXO-LABELING-000022

| Adverse Reaction | Docetaxel 100 mg/m$^2$ | | Docetaxel 60 mg/m$^2$ |
|---|---|---|---|
| | Normal LFTs* n=730 % | Elevated LFTs** n=18 % | Normal LFTs* n=174 % |
| **Acute Hypersensitivity Reaction Regardless of Premedication** | | | |
| Any | 13 | 6 | 1 |
| Severe | 1 | 0 | 0 |
| **Fluid Retention*** Regardless of Premedication** | | | |
| Any | 56 | 61 | 13 |
| Severe | 8 | 17 | 0 |
| **Neurosensory** | | | |
| Any | 57 | 50 | 20 |
| Severe | 6 | 0 | 0 |
| **Myalgia** | 23 | 33 | 3 |
| **Cutaneous** | | | |
| Any | 45 | 61 | 31 |
| Severe | 5 | 17 | 0 |
| **Asthenia** | | | |
| Any | 65 | 44 | 66 |
| Severe | 17 | 22 | 0 |
| **Diarrhea** | | | |
| Any | 42 | 28 | NA |
| Severe | 6 | 11 | |
| **Stomatitis** | | | |
| Any | 53 | 67 | 19 |
| Severe | 8 | 39 | 1 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN
** Elevated Baseline Liver Function: AST and/or ALT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN
***Fluid Retention includes (by COSTART): edema (peripheral, localized, generalized, lymphedema, pulmonary edema, and edema otherwise not specified) and effusion (pleural, pericardial, and ascites); no premedication given with the 60 mg/m$^2$ dose

SANDOZ-TAXO-LABELING-000023

NA = not available

In the three-arm monotherapy trial, TAX313, which compared docetaxel 60 mg/m$^2$, 75 mg/m$^2$ and 100 mg/m$^2$ in advanced breast cancer, grade 3/4 or severe adverse reactions occurred in 49.0% of patients treated with docetaxel 60 mg/m$^2$ compared to 55.3% and 65.9% treated with 75 mg/m$^2$ and 100 mg/m$^2$ respectively. Discontinuation due to adverse reactions was reported in 5.3% of patients treated with 60 mg/m$^2$ vs. 6.9% and 16.5% for patients treated at 75 and 100 mg/m$^2$ respectively. Deaths within 30 days of last treatment occurred in 4.0% of patients treated with 60 mg/m$^2$ compared to 5.3% and 1.6% for patients treated at 75 mg/m$^2$ and 100 mg/m$^2$ respectively.

The following adverse reactions were associated with increasing docetaxel doses: fluid retention (26%, 38%, and 46% at 60 mg/m$^2$, 75 mg/m$^2$, and 100 mg/m$^2$ respectively), thrombocytopenia (7%, 11% and 12% respectively), neutropenia (92%, 94%, and 97% respectively), febrile neutropenia (5%, 7%, and 14% respectively), treatment-related grade 3/4 infection (2%, 3%, and 7% respectively) and anemia (87%, 94%, and 97% respectively).

*Combination therapy with docetaxel in the adjuvant treatment of breast cancer*
The following table presents treatment emergent adverse reactions observed in 744 patients, who were treated with docetaxel 75 mg/m$^2$ every 3 weeks in combination with doxorubicin and cyclophosphamide (see **Table 6**).

**Table 6 - Clinically Important Treatment Emergent Adverse Reactions Regardless of Causal Relationship in Patients Receiving Docetaxel in Combination with Doxorubicin and Cyclophosphamide (TAX316).**

| Adverse Reaction | Docetaxel 75 mg/m$^2$+ Doxorubicin 50 mg/m$^2$+ Cyclophosphamide 500 mg/m$^2$ (TAC) n=744 % | | Fluorouracil 500 mg/m$^2$+ Doxorubicin 50 mg/m$^2$+ Cyclophosphamide 500 mg/m$^2$ (FAC) n=736 % | |
|---|---|---|---|---|
| | **Any** | **Grade 3/4** | **Any** | **Grade 3/4** |
| Anemia | 92 | 4 | 72 | 2 |
| Neutropenia | 71 | 66 | 82 | 49 |
| Fever in absence of infection | 47 | 1 | 17 | 0 |
| Infection | 39 | 4 | 36 | 2 |
| Thrombocytopenia | 39 | 2 | 28 | 1 |
| Febrile neutropenia | 25 | N/A | 3 | N/A |
| Neutropenic infection | 12 | N/A | 6 | N/A |
| Hypersensitivity reactions | 13 | 1 | 4 | 0 |
| Lymphedema | 4 | 0 | 1 | 0 |

Reference ID: 2967585

| | | | | |
|---|---|---|---|---|
| **Fluid Retention*** | 35 | 1 | 15 | 0 |
| Peripheral edema | 27 | 0 | 7 | 0 |
| Weight gain | 13 | 0 | 9 | 0 |
| **Neuropathy sensory** | 26 | 0 | 10 | 0 |
| **Neuro-cortical** | 5 | 1 | 6 | 1 |
| **Neuropathy motor** | 4 | 0 | 2 | 0 |
| **Neuro-cerebellar** | 2 | 0 | 2 | 0 |
| **Syncope** | 2 | 1 | 1 | 0 |
| **Alopecia** | 98 | N/A | 97 | N/A |
| **Skin toxicity** | 27 | 1 | 18 | 0 |
| **Nail disorders** | 19 | 0 | 14 | 0 |
| **Nausea** | 81 | 5 | 88 | 10 |
| **Stomatitis** | 69 | 7 | 53 | 2 |
| **Vomiting** | 45 | 4 | 59 | 7 |
| **Diarrhea** | 35 | 4 | 28 | 2 |
| **Constipation** | 34 | 1 | 32 | 1 |
| **Taste perversion** | 28 | 1 | 15 | 0 |
| **Anorexia** | 22 | 2 | 18 | 1 |
| **Abdominal Pain** | 11 | 1 | 5 | 0 |
| **Amenorrhea** | 62 | N/A | 52 | N/A |
| **Cough** | 14 | 0 | 10 | 0 |
| **Cardiac dysrhythmias** | 8 | 0 | 6 | 0 |
| **Vasodilatation** | 27 | 1 | 21 | 1 |
| **Hypotension** | 2 | 0 | 1 | 0 |
| **Phlebitis** | 1 | 0 | 1 | 0 |
| **Asthenia** | 81 | 11 | 71 | 6 |
| **Myalgia** | 27 | 1 | 10 | 0 |
| **Arthralgia** | 19 | 1 | 9 | 0 |
| **Lacrimation disorder** | 11 | 0 | 7 | 0 |
| **Conjunctivitis** | 5 | 0 | 7 | 0 |

* COSTART term and grading system for events related to treatment.

Of the 744 patients treated with TAC, 36.3% experienced severe treatment emergent adverse reactions compared to 26.6% of the 736 patients treated with FAC. Dose reductions due to hematologic toxicity occurred in 1% of cycles in the TAC arm versus 0.1% of cycles in the FAC arm. Six percent of patients treated with TAC discontinued treatment due to adverse reactions, compared to 1.1% treated with FAC; fever in the absence of infection and allergy being the most common reasons for withdrawal among TAC-treated patients. Two patients died in each arm within 30 days of their last study treatment; 1 death per arm was attributed to study drugs.

SANDOZ-TAXO-LABELING-000025

**Fever and Infection**

Fever in the absence of infection was seen in 46.5% of TAC-treated patients and in 17.1% of FAC-treated patients. Grade 3/4 fever in the absence of infection was seen in 1.3% and 0% of TAC- and FAC-treated patients respectively. Infection was seen in 39.4% of TAC-treated patients compared to 36.3% of FAC-treated patients. Grade 3/4 infection was seen in 3.9% and 2.2% of TAC-treated and FAC-treated patients respectively. There were no septic deaths in either treatment arm.

**Gastrointestinal Reactions**

In addition to gastrointestinal reactions reflected in the table above, 7 patients in the TAC arm were reported to have colitis/enteritis/large intestine perforation vs. one patient in the FAC arm. Five of the 7 TAC-treated patients required treatment discontinuation; no deaths due to these events occurred.

**Cardiovascular Reactions**

More cardiovascular reactions were reported in the TAC arm vs. the FAC arm; dysrhythmias, all grades (7.9% vs. 6.0%), hypotension, all grades (2.6% vs. 1.1%) and CHF (2.3% vs. 0.9%, at 70 months median follow-up). One patient in each arm died due to heart failure.

**Acute Myeloid Leukemia (AML)**

Treatment-related acute myeloid leukemia or myelodysplasia is known to occur in patients treated with anthracyclines and/or cyclophosphamide, including use in adjuvant therapy for breast cancer. AML occurs at a higher frequency when these agents are given in combination with radiation therapy. AML occurred in the adjuvant breast cancer trial (TAX316). The cumulative risk of developing treatment-related AML at 5 years in TAX316 was 0.4% for TAC-treated patients and 0.1% for FAC-treated patients. This risk of AML is comparable to the risk observed for other anthracyclines/cyclophosphamide containing adjuvant breast chemotherapy regimens.

Lung Cancer
*Monotherapy with docetaxel for unresectable, locally advanced or metastatic NSCLC previously treated with platinum-based chemotherapy*

Docetaxel 75 mg/m$^2$: Treatment emergent adverse drug reactions are shown in **Table 7.** Included in this table are safety data for a total of 176 patients with non-small cell lung carcinoma and a history of prior treatment with platinum-based chemotherapy who were treated in two randomized, controlled trials. These reactions were described using NCI Common Toxicity Criteria regardless of relationship to study treatment, except for the hematologic toxicities or where otherwise noted.

**Table 7 - Treatment Emergent Adverse Reactions Regardless of Relationship to Treatment in Patients Receiving Docetaxel as Monotherapy for Non-Small Cell Lung Cancer Previously Treated with Platinum-Based Chemotherapy\***

SANDOZ-TAXO-LABELING-000026

| Adverse Reaction | Docetaxel 75 mg/m$^2$ n=176 % | Best Supportive Care n=49 % | Vinorelbine/ Ifosfamide n=119 % |
|---|---|---|---|
| **Neutropenia** | | | |
| Any | 84 | 14 | 83 |
| Grade 3/4 | 65 | 12 | 57 |
| **Leukopenia** | | | |
| Any | 84 | 6 | 89 |
| Grade 3/4 | 49 | 0 | 43 |
| **Thrombocytopenia** | | | |
| Any | 8 | 0 | 8 |
| Grade 3/4 | 3 | 0 | 2 |
| **Anemia** | | | |
| Any | 91 | 55 | 91 |
| Grade 3/4 | 9 | 12 | 14 |
| **Febrile Neutropenia**\*\* | 6 | NA† | 1 |
| **Infection** | | | |
| Any | 34 | 29 | 30 |
| Grade 3/4 | 10 | 6 | 9 |
| **Treatment Related Mortality** | 3 | NA† | 3 |
| **Hypersensitivity Reactions** | | | |
| Any | 6 | 0 | 1 |
| Grade 3/4 | 3 | 0 | 0 |
| **Fluid Retention** | | | |
| Any | 34 | ND†† | 23 |
| Severe | 3 | | 3 |
| **Neurosensory** | | | |
| Any | 23 | 14 | 29 |
| Grade 3/4 | 2 | 6 | 5 |
| **Neuromotor** | | | |
| Any | 16 | 8 | 10 |
| Grade 3/4 | 5 | 6 | 3 |
| **Skin** | | | |
| Any | 20 | 6 | 17 |
| Grade 3/4 | 1 | 2 | 1 |
| **Gastrointestinal** | | | |
| Nausea | | | |
| Any | 34 | 31 | 31 |

SANDOZ-TAXO-LABELING-000027

| | | | |
|---|---|---|---|
| Grade 3/4 | 5 | 4 | 8 |
| Vomiting | | | |
| Any | 22 | 27 | 22 |
| Grade 3/4 | 3 | 2 | 6 |
| Diarrhea | | | |
| Any | 23 | 6 | 12 |
| Grade 3/4 | 3 | 0 | 4 |
| **Alopecia** | 56 | 35 | 50 |
| **Asthenia** | | | |
| Any | 53 | 57 | 54 |
| Severe*** | 18 | 39 | 23 |
| **Stomatitis** | | | |
| Any | 26 | 6 | 8 |
| Grade 3/4 | 2 | 0 | 1 |
| **Pulmonary** | | | |
| Any | 41 | 49 | 45 |
| Grade 3/4 | 21 | 29 | 19 |
| **Nail Disorder** | | | |
| Any | 11 | 0 | 2 |
| Severe*** | 1 | 0 | 0 |
| **Myalgia** | | | |
| Any | 6 | 0 | 3 |
| Severe*** | 0 | 0 | 0 |
| **Arthralgia** | | | |
| Any | 3 | 2 | 2 |
| Severe*** | 0 | 0 | 1 |
| **Taste Perversion** | | | |
| Any | 6 | 0 | 0 |
| Severe*** | 1 | 0 | 0 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN
**Febrile Neutropenia: ANC grade 4 with fever >38°C with intravenous antibiotics and/or hospitalization
***COSTART term and grading system
[†]Not Applicable; [††] Not Done

*Combination therapy with docetaxel in chemotherapy-naïve advanced unresectable or metastatic NSCLC*

**Table 8** presents safety data from two arms of an open label, randomized controlled trial (TAX326) that enrolled patients with unresectable stage IIIB or IV non-small cell lung cancer and no history of prior chemotherapy. Adverse reactions were described using the NCI Common Toxicity Criteria except where otherwise noted.

SANDOZ-TAXO-LABELING-000028

**Table 8 - Adverse Reactions Regardless of Relationship to Treatment in Chemotherapy-Naïve Advanced Non-Small Cell Lung Cancer Patients Receiving Docetaxel in Combination with Cisplatin**

| Adverse Reaction | Docetaxel 75 mg/m$^2$ + Cisplatin 75 mg/m$^2$ n=406 % | Vinorelbine 25 mg/m$^2$ + Cisplatin 100 mg/m$^2$ n=396 % |
|---|---|---|
| **Neutropenia** | | |
| Any | 91 | 90 |
| Grade 3/4 | 74 | 78 |
| **Febrile Neutropenia** | 5 | 5 |
| **Thrombocytopenia** | | |
| Any | 15 | 15 |
| Grade 3/4 | 3 | 4 |
| **Anemia** | | |
| Any | 89 | 94 |
| Grade 3/4 | 7 | 25 |
| **Infection** | | |
| Any | 35 | 37 |
| Grade 3/4 | 8 | 8 |
| **Fever in absence of infection** | | |
| Any | 33 | 29 |
| Grade 3/4 | <1 | 1 |
| **Hypersensitivity Reaction*** | | |
| Any | 12 | 4 |
| Grade 3/4 | 3 | <1 |
| **Fluid Retention**** | | |
| Any | 54 | 42 |
| All severe or life-threatening events | 2 | 2 |
| Pleural effusion | | |
| Any | 23 | 22 |
| All severe or life-threatening events | 2 | 2 |
| Peripheral edema | | |
| Any | 34 | 18 |
| All severe or life-threatening events | <1 | <1 |
| Weight gain | | |
| Any | 15 | 9 |

SANDOZ-TAXO-LABELING-000029

| | | |
|---|---|---|
| All severe or life-threatening events | <1 | <1 |
| **Neurosensory** | | |
| Any | 47 | 42 |
| Grade 3/4 | 4 | 4 |
| **Neuromotor** | | |
| Any | 19 | 17 |
| Grade 3/4 | 3 | 6 |
| **Skin** | | |
| Any | 16 | 14 |
| Grade 3/4 | <1 | 1 |
| **Nausea** | | |
| Any | 72 | 76 |
| Grade 3/4 | 10 | 17 |
| **Vomiting** | | |
| Any | 55 | 61 |
| Grade 3/4 | 8 | 16 |
| **Diarrhea** | | |
| Any | 47 | 25 |
| Grade 3/4 | 7 | 3 |
| **Anorexia\*\*** | | |
| Any | 42 | 40 |
| All severe or life-threatening events | 5 | 5 |
| **Stomatitis** | | |
| Any | 24 | 21 |
| Grade 3/4 | 2 | 1 |
| <mark>Alopecia</mark> | | |
| Any | 75 | 42 |
| Grade 3 | <1 | 0 |
| **Asthenia\*\*** | | |
| Any | 74 | 75 |
| All severe or life-threatening events | 12 | 14 |
| **Nail Disorder\*\*** | | |
| Any | 14 | <1 |
| All severe events | <1 | 0 |
| **Myalgia\*\*** | | |
| Any | 18 | 12 |

SANDOZ-TAXO-LABELING-000030

| | | |
|---|---|---|
| All severe events | <1 | <1 |

\* Replaces NCI term "Allergy"
\*\* COSTART term and grading system

Deaths within 30 days of last study treatment occurred in 31 patients (7.6%) in the docetaxel+cisplatin arm and 37 patients (9.3%) in the vinorelbine+cisplatin arm. Deaths within 30 days of last study treatment attributed to study drug occurred in 9 patients (2.2%) in the docetaxel+cisplatin arm and 8 patients (2%) in the vinorelbine+cisplatin arm.

The second comparison in the study, vinorelbine+cisplatin versus docetaxel+carboplatin (which did not demonstrate a superior survival associated with docetaxel, *[see Clincal Studies (14.3)]*) demonstrated a higher incidence of thrombocytopenia, diarrhea, fluid retention, hypersensitivity reactions, skin toxicity, alopecia and nail changes on the docetaxel+carboplatin arm, while a higher incidence of anemia, neurosensory toxicity, nausea, vomiting, anorexia and asthenia was observed on the vinorelbine+cisplatin arm.

Prostate Cancer
*Combination therapy with docetaxel in patients with prostate cancer*
The following data are based on the experience of 332 patients, who were treated with docetaxel 75 mg/m$^2$ every 3 weeks in combination with prednisone 5 mg orally twice daily (see **Table 9**).

**Table 9 - Clinically Important Treatment Emergent Adverse Reactions (Regardless of Relationship) in Patients with Prostate Cancer who Received Docetaxel in Combination with Prednisone (TAX327)**

| | Docetaxel 75 mg/m$^2$ every 3 weeks + prednisone 5 mg twice daily n=332 % | | Mitoxantrone 12 mg/m$^2$ every 3 weeks + prednisone 5 mg twice daily n=335 % | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any** | **Grade 3/4** | **Any** | **Grade 3/4** |
| Anemia | 67 | 5 | 58 | 2 |
| Neutropenia | 41 | 32 | 48 | 22 |
| **Thrombocytopenia** | 3 | 1 | 8 | 1 |
| **Febrile neutropenia** | 3 | N/A | 2 | N/A |
| **Infection** | 32 | 6 | 20 | 4 |
| **Epistaxis** | 6 | 0 | 2 | 0 |
| **Allergic Reactions** | 8 | 1 | 1 | 0 |
| **Fluid Retention\*** | 24 | 1 | 5 | 0 |
| Weight Gain\* | 8 | 0 | 3 | 0 |
| Peripheral Edema\* | 18 | 0 | 2 | 0 |

SANDOZ-TAXO-LABELING-000031

| | | | | |
|---|---|---|---|---|
| **Neuropathy Sensory** | 30 | 2 | 7 | 0 |
| **Neuropathy Motor** | 7 | 2 | 3 | 1 |
| **Rash/Desquamation** | 6 | 0 | 3 | 1 |
| **Alopecia** | 65 | N/A | 13 | N/A |
| **Nail Changes** | 30 | 0 | 8 | 0 |
| **Nausea** | 41 | 3 | 36 | 2 |
| **Diarrhea** | 32 | 2 | 10 | 1 |
| **Stomatitis/Pharyngitis** | 20 | 1 | 8 | 0 |
| **Taste Disturbance** | 18 | 0 | 7 | 0 |
| **Vomiting** | 17 | 2 | 14 | 2 |
| **Anorexia** | 17 | 1 | 14 | 0 |
| **Cough** | 12 | 0 | 8 | 0 |
| **Dyspnea** | 15 | 3 | 9 | 1 |
| **Cardiac left ventricular function** | 10 | 0 | 22 | 1 |
| **Fatigue** | 53 | 5 | 35 | 5 |
| **Myalgia** | 15 | 0 | 13 | 1 |
| **Tearing** | 10 | 1 | 2 | 0 |
| **Arthralgia** | 8 | 1 | 5 | 1 |

*Related to treatment

Gastric Cancer
*Combination therapy with docetaxel in gastric adenocarcinoma*

Data in the following table are based on the experience of 221 patients with advanced gastric adenocarcinoma and no history of prior chemotherapy for advanced disease, who were treated with docetaxel 75 mg/m$^2$ in combination with cisplatin and fluorouracil (see **Table 10**).

**Table 10 - Clinically Important Treatment Emergent Adverse Reactions Regardless of Relationship to Treatment in the Gastric Cancer Study**

| | Docetaxel 75 mg/m$^2$ + cisplatin 75 mg/m$^2$ + fluorouracil 750 mg/m$^2$ n=221 | | Cisplatin 100 mg/m$^2$ + fluorouracil 1000 mg/m$^2$ n=224 | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any %** | **Grade 3/4 %** | **Any %** | **Grade 3/4 %** |
| **Anemia** | 97 | 18 | 93 | 26 |
| **Neutropenia** | 96 | 82 | 83 | 57 |
| **Fever in the absence of infection** | 36 | 2 | 23 | 1 |

SANDOZ-TAXO-LABELING-000032

| Thrombocytopenia | 26 | 8 | 39 | 14 |
|---|---|---|---|---|
| Infection | 29 | 16 | 23 | 10 |
| Febrile neutropenia | 16 | N/A | 5 | N/A |
| Neutropenic infection | 16 | N/A | 10 | N/A |
| Allergic reactions | 10 | 2 | 6 | 0 |
| Fluid retention* | 15 | 0 | 4 | 0 |
| Edema* | 13 | 0 | 3 | 0 |
| Lethargy | 63 | 21 | 58 | 18 |
| Neurosensory | 38 | 8 | 25 | 3 |
| Neuromotor | 9 | 3 | 8 | 3 |
| Dizziness | 16 | 5 | 8 | 2 |
| Alopecia | 67 | 5 | 41 | 1 |
| Rash/itch | 12 | 1 | 9 | 0 |
| Nail changes | 8 | 0 | 0 | 0 |
| Skin desquamation | 2 | 0 | 0 | 0 |
| Nausea | 73 | 16 | 76 | 19 |
| Vomiting | 67 | 15 | 73 | 19 |
| Anorexia | 51 | 13 | 54 | 12 |
| Stomatitis | 59 | 21 | 61 | 27 |
| Diarrhea | 78 | 20 | 50 | 8 |
| Constipation | 25 | 2 | 34 | 3 |
| Esophagitis/dysphagia/ odynophagia | 16 | 2 | 14 | 5 |
| Gastrointestinal pain/cramping | 11 | 2 | 7 | 3 |
| Cardiac dysrhythmias | 5 | 2 | 2 | 1 |
| Myocardial ischemia | 1 | 0 | 3 | 2 |
| Tearing | 8 | 0 | 2 | 0 |
| Altered hearing | 6 | 0 | 13 | 2 |

Clinically important treatment emergent adverse reactions were determined based upon frequency, severity, and clinical impact of the adverse reaction.
*Related to treatment

Head and Neck Cancer
*Combination therapy with docetaxel in head and neck cancer*

**Table 11** summarizes the safety data obtained from patients that received induction chemotherapy with docetaxel 75 mg/m$^2$ in combination with cisplatin and fluorouracil followed by radiotherapy (TAX323; 174 patients) or chemoradiotherapy (TAX324; 251 patients). The treatment regimens are described in Section 14.6.

**Table 11 – Clinically Important Treatment Emergent Adverse Reactions (Regardless of Relationship) in Patients with SCCHN Receiving Induction Chemotherapy with Docetaxel in Combination with Cisplatin and Fluorouracil Followed by Radiotherapy**

Reference ID: 2967585

SANDOZ-TAXO-LABELING-000033

(TAX323) or Chemoradiotherapy (TAX324)

| Adverse Reaction (by Body System) | TAX323 (n=355) | | | | TAX324 (n=494) | | | |
|---|---|---|---|---|---|---|---|---|
| | Docetaxel arm (n=174) | | Comparator arm (n=181) | | Docetaxel arm (n=251) | | Comparator arm (n=243) | |
| | Any % | Grade 3/4 % | Any % | Grade 3/4 % | Any % | Grade 3/4 % | Any % | Grade 3/4 % |
| Neutropenia | 93 | 76 | 87 | 53 | 95 | 84 | 84 | 56 |
| Anemia | 89 | 9 | 88 | 14 | 90 | 12 | 86 | 10 |
| Thrombocytopenia | 24 | 5 | 47 | 18 | 28 | 4 | 31 | 11 |
| Infection | 27 | 9 | 26 | 8 | 23 | 6 | 28 | 5 |
| Febrile neutropenia* | 5 | N/A | 2 | N/A | 12 | N/A | 7 | N/A |
| Neutropenic infection | 14 | N/A | 8 | N/A | 12 | N/A | 8 | N/A |
| Cancer pain | 21 | 5 | 16 | 3 | 17 | 9 | 20 | 11 |
| Lethargy | 41 | 3 | 38 | 3 | 61 | 5 | 56 | 10 |
| Fever in the absence of infection | 32 | 1 | 37 | 0 | 30 | 4 | 28 | 3 |
| Myalgia | 10 | 1 | 7 | 0 | 7 | 0 | 7 | 2 |
| Weight loss | 21 | 1 | 27 | 1 | 14 | 2 | 14 | 2 |
| Allergy | 6 | 0 | 3 | 0 | 2 | 0 | 0 | 0 |
| Fluid retention** | 20 | 0 | 14 | 1 | 13 | 1 | 7 | 2 |
| Edema only | 13 | 0 | 7 | 0 | 12 | 1 | 6 | 1 |
| Weight gain only | 6 | 0 | 6 | 0 | 0 | 0 | 1 | 0 |
| Dizziness | 2 | 0 | 5 | 1 | 16 | 4 | 15 | 2 |
| Neurosensory | 18 | 1 | 11 | 1 | 14 | 1 | 14 | 0 |
| Altered hearing | 6 | 0 | 10 | 3 | 13 | 1 | 19 | 3 |
| Neuromotor | 2 | 1 | 4 | 1 | 9 | 0 | 10 | 2 |
| Alopecia | 81 | 11 | 43 | 0 | 68 | 4 | 44 | 1 |
| Rash/itch | 12 | 0 | 6 | 0 | 20 | 0 | 16 | 1 |
| Dry skin | 6 | 0 | 2 | 0 | 5 | 0 | 3 | 0 |
| Desquamation | 4 | 1 | 6 | 0 | 2 | 0 | 5 | 0 |
| Nausea | 47 | 1 | 51 | 7 | 77 | 14 | 80 | 14 |
| Stomatitis | 43 | 4 | 47 | 11 | 66 | 21 | 68 | 27 |
| Vomiting | 26 | 1 | 39 | 5 | 56 | 8 | 63 | 10 |
| Diarrhea | 33 | 3 | 24 | 4 | 48 | 7 | 40 | 3 |
| Constipation | 17 | 1 | 16 | 1 | 27 | 1 | 38 | 1 |
| Anorexia | 16 | 1 | 25 | 3 | 40 | 12 | 34 | 12 |
| Esophagitis/dysphagia /Odynophagia | 13 | 1 | 18 | 3 | 25 | 13 | 26 | 10 |
| Taste, sense of smell altered | 10 | 0 | 5 | 0 | 20 | 0 | 17 | 1 |
| Gastrointestinal pain/cramping | 8 | 1 | 9 | 1 | 15 | 5 | 10 | 2 |
| Heartburn | 6 | 0 | 6 | 0 | 13 | 2 | 13 | 1 |

SANDOZ-TAXO-LABELING-000034

| Gastrointestinal bleeding | 4 | 2 | 0 | 0 | 5 | 1 | 2 | 1 |
| Cardiac dysrhythmia | 2 | 2 | 2 | 1 | 6 | 3 | 5 | 3 |
| Venous*** | 3 | 2 | 6 | 2 | 4 | 2 | 5 | 4 |
| Ischemia myocardial | 2 | 2 | 1 | 0 | 2 | 1 | 1 | 1 |
| Tearing | 2 | 0 | 1 | 0 | 2 | 0 | 2 | 0 |
| Conjunctivitis | 1 | 0 | 1 | 0 | 1 | 0 | 0.4 | 0 |

Clinically important treatment emergent adverse reactions based upon frequency, severity, and clinical impact.
*Febrile neutropenia: grade ≥2 fever concomitant with grade 4 neutropenia requiring intravenous antibiotics and/or hospitalization.
**Related to treatment.
*** Includes superficial and deep vein thrombosis and pulmonary embolism

## 6.2 Post-marketing Experiences

The following adverse reactions have been identified from clinical trials and/or post-marketing surveillance. Because they are reported from a population of unknown size, precise estimates of frequency cannot be made.

**Body as a whole:** diffuse pain, chest pain, radiation recall phenomenon.

**Cardiovascular:** atrial fibrillation, deep vein thrombosis, ECG abnormalities, thrombophlebitis, pulmonary embolism, syncope, tachycardia, myocardial infarction.

**Cutaneous:** very rare cases of cutaneous lupus erythematosus and rare cases of bullous eruptions such as erythema multiforme, Stevens-Johnson syndrome, toxic epidermal necrolysis, and Scleroderma-like changes usually preceded by peripheral lymphedema. In some cases multiple factors may have contributed to the development of these effects. Severe hand and foot syndrome has been reported.

**Gastrointestinal:** abdominal pain, anorexia, constipation, duodenal ulcer, esophagitis, gastrointestinal hemorrhage, gastrointestinal perforation, ischemic colitis, colitis, intestinal obstruction, ileus, neutropenic enterocolitis and dehydration as a consequence to gastrointestinal events have been reported.

**Hematologic:** bleeding episodes. Disseminated intravascular coagulation (DIC), often in association with sepsis or multiorgan failure, has been reported. Cases of acute myeloid leukemia and myelodysplasic syndrome have been reported in association with docetaxel when used in combination with other chemotherapy agents and/or radiotherapy.

**Hypersensitivity:** rare cases of anaphylactic shock have been reported. Very rarely these cases resulted in a fatal outcome in patients who received premedication.

**Hepatic:** rare cases of hepatitis, sometimes fatal primarily in patients with pre-existing liver disorders, have been reported.

**Neurologic:** confusion, rare cases of seizures or transient loss of consciousness have been observed, sometimes appearing during the infusion of the drug.

**Ophthalmologic:** conjunctivitis, lacrimation or lacrimation with or without conjunctivitis.

SANDOZ-TAXO-LABELING-000035

Excessive tearing which may be attributable to lacrimal duct obstruction has been reported. Rare cases of transient visual disturbances (flashes, flashing lights, scotomata) typically occurring during drug infusion and in association with hypersensitivity reactions have been reported. These were reversible upon discontinuation of the infusion.

**Hearing:** rare cases of ototoxicity, hearing disorders and/or hearing loss have been reported, including cases associated with other ototoxic drugs.

**Respiratory:** dyspnea, acute pulmonary edema, acute respiratory distress syndrome, interstitial pneumonia. Pulmonary fibrosis has been rarely reported. Rare cases of radiation pneumonitis have been reported in patients receiving concomitant radiotherapy.

**Renal:** renal insufficiency and renal failure have been reported, the majority of these cases were associated with concomitant nephrotoxic drugs.

7.   **DRUG INTERACTIONS**

Docetaxel is a CYP3A4 substrate. *In vitro* studies have shown that the metabolism of docetaxel may be modified by the concomitant administration of compounds that induce, inhibit, or are metabolized by cytochrome P450 3A4.

*In vivo* studies showed that the exposure of docetaxel increased 2.2-fold when it was coadministered with ketoconazole, a potent inhibitor of CYP3A4. Protease inhibitors, particularly ritonavir, may increase the exposure of docetaxel. Concomitant use of Docetaxel Injection and drugs that inhibit CYP3A4 may increase exposure to docetaxel and should be avoided. In patients receiving treatment with Docetaxel Injection, close monitoring for toxicity and a Docetaxel Injection dose reduction could be considered if systemic administration of a potent CYP3A4 inhibitor cannot be avoided *[see Dosage and Administration (2.7) and Clinical Pharmacology (12.3)].*

8.   **USE IN SPECIFIC POPULATIONS**

**8.1   Pregnancy**

Pregnancy Category D *[see 'Warnings and Precautions' section]*
Based on its mechanism of action and findings in animals, Docetaxel Injection can cause fetal harm when administered to a pregnant woman. If Docetaxel Injection is used during pregnancy, or if the patient becomes pregnant while receiving this drug, the patient should be apprised of the potential hazard to the fetus. Women of childbearing potential should be advised to avoid becoming pregnant during therapy with Docetaxel Injection.

Docetaxel Injection can cause fetal harm when administered to a pregnant woman. Studies in both rats and rabbits at doses ≥0.3 and 0.03 mg/kg/day, respectively (about 1/50 and 1/300 the daily maximum recommended human dose on a mg/m$^2$ basis), administered during the period of organogenesis, have shown that docetaxel is embryotoxic and fetotoxic (characterized by intrauterine mortality, increased resorption, reduced fetal weight, and fetal ossification delay). The doses indicated above also caused maternal toxicity.

SANDOZ-TAXO-LABELING-000036

**8.3 Nursing Mothers**

It is not known whether docetaxel is excreted in human milk. Because many drugs are excreted in human milk, and because of the potential for serious adverse reactions in nursing infants from Docetaxel Injection, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**8.4 Pediatric Use**

The safety and effectiveness of docetaxel in pediatric patients have not been established.

**8.5 Geriatric Use**

In general, dose selection for an elderly patient should be cautious, reflecting the greater frequency of decreased hepatic, renal, or cardiac function and of concomitant disease or other drug therapy in elderly patients.

*Non-Small Cell Lung Cancer*

In a study conducted in chemotherapy-naïve patients with NSCLC (TAX326), 148 patients (36%) in the docetaxel+cisplatin group were 65 years of age or greater. There were 128 patients (32%) in the vinorelbine+cisplatin group 65 years of age or greater. In the docetaxel+cisplatin group, patients less than 65 years of age had a median survival of 10.3 months (95% CI: 9.1 months, 11.8 months) and patients 65 years or older had a median survival of 12.1 months (95% CI: 9.3 months, 14 months). In patients 65 years of age or greater treated with docetaxel+cisplatin, diarrhea (55%), peripheral edema (39%) and stomatitis (28%) were observed more frequently than in the vinorelbine+cisplatin group (diarrhea 24%, peripheral edema 20%, stomatitis 20%). Patients treated with docetaxel+cisplatin who were 65 years of age or greater were more likely to experience diarrhea (55%), infections (42%), peripheral edema (39%) and stomatitis (28%) compared to patients less than the age of 65 administered the same treatment (43%, 31%, 31% and 21%, respectively).

When docetaxel was combined with carboplatin for the treatment of chemotherapy-naïve, advanced non-small cell lung carcinoma, patients 65 years of age or greater (28%) experienced higher frequency of infection compared to similar patients treated with docetaxel+cisplatin, and a higher frequency of diarrhea, infection and peripheral edema than elderly patients treated with vinorelbine+cisplatin.

*Prostate Cancer*

Of the 333 patients treated with docetaxel every three weeks plus prednisone in the prostate cancer study (TAX327), 209 patients were 65 years of age or greater and 68 patients were older than 75 years. In patients treated with docetaxel every three weeks, the following treatment emergent adverse reactions occurred at rates ≥10% higher in patients 65 years of age or greater compared to younger patients: anemia (71% vs. 59%), infection (37% vs. 24%), nail changes (34% vs. 23%), anorexia (21% vs. 10%), weight loss (15% vs. 5%) respectively.

SANDOZ-TAXO-LABELING-000037

*Breast Cancer*

In the adjuvant breast cancer trial (TAX316), docetaxel in combination with doxorubicin and cyclophosphamide was administered to 744 patients of whom 48 (6%) were 65 years of age or greater. The number of elderly patients who received this regimen was not sufficient to determine whether there were differences in safety and efficacy between elderly and younger patients.

*Gastric Cancer*

Among the 221 patients treated with docetaxel in combination with cisplatin and fluorouracil in the gastric cancer study, 54 were 65 years of age or older and 2 patients were older than 75 years. In this study, the number of patients who were 65 years of age or older was insufficient to determine whether they respond differently from younger patients. However, the incidence of serious adverse reactions was higher in the elderly patients compared to younger patients. The incidence of the following adverse reactions (all grades, regardless of relationship): lethargy, stomatitis, diarrhea, dizziness, edema, febrile neutropenia/neutropenic infection occurred at rates ≥10% higher in patients who were 65 years of age or older compared to younger patients. Elderly patients treated with TCF should be closely monitored.

*Head and Neck Cancer*

Among the 174 and 251 patients who received the induction treatment with docetaxel in combination with cisplatin and fluorouracil (TPF) for SCCHN in the TAX323 and TAX324 studies, 18 (10%) and 32 (13%) of the patients were 65 years of age or older, respectively.

These clinical studies of docetaxel in combination with cisplatin and fluorouracil in patients with SCCHN did not include sufficient numbers of patients aged 65 and over to determine whether they respond differently from younger patients. Other reported clinical experience with this treatment regimen has not identified differences in responses between elderly and younger patients.

**8.6   Hepatic Impairment**

Patients with bilirubin >ULN should not receive Docetaxel Injection. Also, patients with AST and/or ALT >1.5 x ULN concomitant with alkaline phosphatase >2.5 x ULN should not receive Docetaxel Injection *[see Boxed Warning, Warnings and Precautions (5.2), Clinical Pharmacology (12.3)]*.

**10.   OVERDOSAGE**

There is no known antidote for Docetaxel Injection overdosage. In case of overdosage, the patient should be kept in a specialized unit where vital functions can be closely monitored. Anticipated complications of overdosage include: bone marrow suppression, peripheral neurotoxicity, and mucositis. Patients should receive therapeutic G-CSF as soon as possible after discovery of overdose. Other appropriate symptomatic measures should be taken, as needed.

In two reports of overdose, one patient received 150 mg/m$^2$ and the other received 200 mg/m$^2$ as 1-hour infusions. Both patients experienced severe neutropenia, mild asthenia,

SANDOZ-TAXO-LABELING-000038

cutaneous reactions, and mild paresthesia, and recovered without incident.

In mice, lethality was observed following single intravenous doses that were $\geq 154$ mg/kg (about 4.5 times the human dose of 100 mg/m$^2$ on a mg/m$^2$ basis); neurotoxicity associated with paralysis, non-extension of hind limbs, and myelin degeneration was observed in mice at 48 mg/kg (about 1.5 times the human dose of 100 mg/m$^2$ basis). In male and female rats, lethality was observed at a dose of 20 mg/kg (comparable to the human dose of 100 mg/m$^2$ on a mg/m$^2$ basis) and was associated with abnormal mitosis and necrosis of multiple organs.

## 11.  DESCRIPTION

Docetaxel is an antineoplastic agent belonging to the taxoid family. It is prepared by semisynthesis beginning with a precursor extracted from the renewable needle biomass of yew plants. The chemical name for docetaxel is (2R,3S)-N-carboxy-3-phenylisoserine,N-*tert*-butyl ester, 13-ester with 5β-20-epoxy-1,2α,4,7β,10β,13α-hexahydroxytax-11-en-9-one 4-acetate 2-benzoate. Docetaxel has the following structural formula:



Docetaxel is a white to almost-white powder with an empirical formula of $C_{43}H_{53}NO_{14}$, and a molecular weight of 807.88. It is highly lipophilic and practically insoluble in water.

Docetaxel Injection is a clear, colorless to pale yellow solution. Docetaxel Injection is sterile, non-pyrogenic, and is available in multiple dose vials, supplied as 20 mg/2 mL, 80 mg/8 mL and 160 mg/16 mL.

Each mL of Docetaxel Injection contains 10 mg docetaxel, 275.9 mg alcohol 96% (v/v), 4 mg citric acid, 648 mg polyethylene glycol 300, and 80 mg polysorbate 80.

## 12.  CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Docetaxel is an antineoplastic agent that acts by disrupting the microtubular network in cells that is essential for mitotic and interphase cellular functions. Docetaxel binds to free tubulin and promotes the assembly of tubulin into stable microtubules while simultaneously

SANDOZ-TAXO-LABELING-000039

inhibiting their disassembly. This leads to the production of microtubule bundles without normal function and to the stabilization of microtubules, which results in the inhibition of mitosis in cells. Docetaxel's binding to microtubules does not alter the number of protofilaments in the bound microtubules, a feature which differs from most spindle poisons currently in clinical use.

## 12.3 Human Pharmacokinetics

Absorption: The pharmacokinetics of docetaxel have been evaluated in cancer patients after administration of 20 mg/m$^2$ to 115 mg/m$^2$ in phase 1 studies. The area under the curve (AUC) was dose proportional following doses of 70 mg/m$^2$ to 115 mg/m$^2$ with infusion times of 1 to 2 hours. Docetaxel's pharmacokinetic profile is consistent with a three-compartment pharmacokinetic model, with half-lives for the α, β, and γ phases of 4 min, 36 min, and 11.1 hr, respectively. Mean total body clearance was 21 L/h/m$^2$.

Distribution: The initial rapid decline represents distribution to the peripheral compartments and the late (terminal) phase is due, in part, to a relatively slow efflux of docetaxel from the peripheral compartment. Mean steady state volume of distribution was 113 L. *In vitro* studies showed that docetaxel is about 94% protein bound, mainly to α$_1$-acid glycoprotein, albumin, and lipoproteins. In three cancer patients, the *in vitro* binding to plasma proteins was found to be approximately 97%. Dexamethasone does not affect the protein binding of docetaxel.

Metabolism: *In vitro* drug interaction studies revealed that docetaxel is metabolized by the CYP3A4 isoenzyme, and its metabolism may be modified by the concomitant administration of compounds that induce, inhibit, or are metabolized by cytochrome P450 3A4 *[see Drug Interactions (7)]*.

Elimination: A study of $^{14}$C-docetaxel was conducted in three cancer patients. Docetaxel was eliminated in both the urine and feces following oxidative metabolism of the *tert*-butyl ester group, but fecal excretion was the main elimination route. Within 7 days, urinary and fecal excretion accounted for approximately 6% and 75% of the administered radioactivity, respectively. About 80% of the radioactivity recovered in feces is excreted during the first 48 hours as 1 major and 3 minor metabolites with very small amounts (less than 8%) of unchanged drug.

Effect of Age: A population pharmacokinetic analysis was carried out after docetaxel treatment of 535 patients dosed at 100 mg/m$^2$. Pharmacokinetic parameters estimated by this analysis were very close to those estimated from phase 1 studies. The pharmacokinetics of docetaxel were not influenced by age.

Effect of Gender: The population pharmacokinetics analysis described above also indicated that gender did not influence the pharmacokinetics of docetaxel.

Hepatic Impairment: The population pharmacokinetic analysis described above indicated that in patients with clinical chemistry data suggestive of mild to moderate liver impairment (AST and/or ALT >1.5 times ULN concomitant with alkaline phosphatase >2.5 times ULN), total body clearance was lowered by an average of 27%, resulting in a 38% increase in systemic exposure (AUC). This average, however, includes a substantial

SANDOZ-TAXO-LABELING-000040

range and there is, at present, no measurement that would allow recommendation for dose adjustment in such patients. Patients with combined abnormalities of transaminase and alkaline phosphatase should not be treated with Docetaxel Injection. Patients with severe hepatic impairment have not been studied. *[see Warnings and Precautions (5.2) and Use in Specific Populations (8.6)]*.

Effect of Race: Mean total body clearance for Japanese patients dosed at the range of 10 $mg/m^2$ to 90 $mg/m^2$ was similar to that of European/American populations dosed at 100 $mg/m^2$, suggesting no significant difference in the elimination of docetaxel in the two populations.

Effect of Ketoconazole: The effect of ketoconazole (a strong CYP3A4 inhibitor) on the pharmacokinetics of docetaxel was investigated in 7 cancer patients. Patients were randomized to receive either docetaxel (100 $mg/m^2$ intravenous) alone or docetaxel (10 $mg/m^2$ intravenous) in combination with ketoconazole (200 mg orally once daily for 3 days) in a crossover design with a 3-week washout period. The results of this study indicated that the mean dose-normalized AUC of docetaxel was increased 2.2-fold and its clearance was reduced by 49% when docetaxel was co-administration with ketoconazole *[see Dosage and Administration (2.7) and Drug-Drug Interactions (7)]*.

Effect of Combination Therapies:
- Dexamethasone: Docetaxel total body clearance was not modified by pretreatment with dexamethasone.
- Cisplatin: Clearance of docetaxel in combination therapy with cisplatin was similar to that previously observed following monotherapy with docetaxel. The pharmacokinetic profile of cisplatin in combination therapy with docetaxel was similar to that observed with cisplatin alone.
- Cisplatin and Fluorouracil: The combined administration of docetaxel, cisplatin and fluorouracil in 12 patients with solid tumors had no influence on the pharmacokinetics of each individual drug.
- Prednisone: A population pharmacokinetic analysis of plasma data from 40 patients with hormone-refractory metastatic prostate cancer indicated that docetaxel systemic clearance in combination with prednisone is similar to that observed following administration of docetaxel alone.
- Cyclophosphamide and Doxorubicin: A study was conducted in 30 patients with advanced breast cancer to determine the potential for drug-drug-interactions between docetaxel (75 $mg/m^2$), doxorubicin (50 $mg/m^2$), and cyclophosphamide (500 $mg/m^2$) when administered in combination. The coadministration of docetaxel had no effect on the pharmacokinetics of doxorubicin and cyclophosphamide when the three drugs were given in combination compared to coadministration of doxorubicin and cyclophosphamide only. In addition, doxorubicin and cyclophosphamide had no effect on docetaxel plasma clearance when the three drugs were given in combination compared to historical data for docetaxel monotherapy.

## 13. NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

SANDOZ-TAXO-LABELING-000041

Carcinogenicity studies with docetaxel have not been performed.

Docetaxel was clastogenic in the *in vitro* chromosome aberration test in CHO-K$_1$ cells and in the *in vivo* micronucleus test in mice administered doses of 0.39 to 1.56 mg/kg (about 1/60[th] to 1/15[th] the recommended human dose on a mg/m$^2$ basis). Docetaxel was not mutagenic in the Ames test or the CHO/HGPRT gene mutation assays.

Docetaxel did not reduce fertility in rats when administered in multiple intravenous doses of up to 0.3 mg/kg (about 1/50[th] the recommended human dose on a mg/m$^2$ basis), but decreased testicular weights were reported. This correlates with findings of a 10-cycle toxicity study (dosing once every 21 days for 6 months) in rats and dogs in which testicular atrophy or degeneration was observed at intravenous doses of 5 mg/kg in rats and 0.375 mg/kg in dogs (about 1/3[rd] and 1/15[th] the recommended human dose on a mg/m$^2$ basis, respectively). An increased frequency of dosing in rats produced similar effects at lower dose levels.

## 14.  CLINICAL STUDIES

### 14.1 Locally Advanced or Metastatic Breast Cancer

The efficacy and safety of docetaxel have been evaluated in locally advanced or metastatic breast cancer after failure of previous chemotherapy (alkylating agent-containing regimens or anthracycline-containing regimens).

Randomized Trials

In one randomized trial, patients with a history of prior treatment with an anthracycline-containing regimen were assigned to treatment with docetaxel (100 mg/m$^2$ every 3 weeks) or the combination of mitomycin (12 mg/m$^2$ every 6 weeks) and vinblastine (6 mg/m$^2$ every 3 weeks). Two hundred three patients were randomized to docetaxel and 189 to the comparator arm. Most patients had received prior chemotherapy for metastatic disease; only 27 patients on the docetaxel arm and 33 patients on the comparator arm entered the study following relapse after adjuvant therapy. Three-quarters of patients had measurable, visceral metastases. The primary endpoint was time to progression. The following table summarizes the study results (See **Table 12**).

**Table 12 - Efficacy of Docetaxel in the Treatment of Breast Cancer Patients Previously Treated with an Anthracycline-Containing Regimen (Intent-to-Treat Analysis)**

| Efficacy Parameter | Docetaxel (n=203) | Mitomycin/ Vinblastine (n=189) | p-value |
|---|---|---|---|
| Median Survival | 11.4 months | 8.7 months | |
| Risk Ratio*, Mortality (Docetaxel: Control) | 0.73 | | p=0.01 Log Rank |

SANDOZ-TAXO-LABELING-000042

| 95% CI (Risk Ratio) | 0.58-0.93 | | |
| Median Time to Progression | 4.3 months | 2.5 months | p=0.01 Log Rank |
| Risk Ratio*, Progression (Docetaxel: Control) | 0.75 | | p=0.01 Log Rank |
| 95% CI (Risk Ratio) | 0.61-0.94 | | |
| Overall Response Rate | 28.1% | 9.5% | p<0.0001 Chi Square |
| Complete Response Rate | 3.4% | 1.6% | |

*For the risk ratio, a value less than 1.00 favors docetaxel.

In a second randomized trial, patients previously treated with an alkylating-containing regimen were assigned to treatment with docetaxel (100 mg/m$^2$) or doxorubicin (75 mg/m$^2$) every 3 weeks. One hundred sixty-one patients were randomized to docetaxel and 165 patients to doxorubicin. Approximately one-half of patients had received prior chemotherapy for metastatic disease, and one-half entered the study following relapse after adjuvant therapy. Three-quarters of patients had measurable, visceral metastases. The primary endpoint was time to progression. The study results are summarized below (See **Table 13**).

**Table 13 - Efficacy of Docetaxel in the Treatment of Breast Cancer Patients Previously Treated with an Alkylating-Containing Regimen (Intent-to-Treat Analysis)**

| Efficacy Parameter | Docetaxel (n=161) | Doxorubicin (n=165) | p-value |
|---|---|---|---|
| Median Survival | 14.7 months | 14.3 months | |
| Risk Ratio*, Mortality (Docetaxel: Control) | 0.89 | | p=0.39 Log Rank |
| 95% CI (Risk Ratio) | 0.68-1.16 | | |
| Median Time to Progression | 6.5 months | 5.3 months | |
| Risk Ratio*, Progression (Docetaxel: Control) | 0.93 | | p=0.45 Log Rank |
| 95% CI (Risk Ratio) | 0.71-1.16 | | |
| Overall Response Rate | 45.3% | 29.7% | p=0.004 Chi Square |
| Complete Response Rate | 6.8% | 4.2% | |

*For the risk ratio, a value less than 1.00 favors docetaxel.

In another multicenter open-label, randomized trial (TAX313), in the treatment of patients with advanced breast cancer who progressed or relapsed after one prior chemotherapy regimen, 527 patients were randomized to receive docetaxel monotherapy 60

SANDOZ-TAXO-LABELING-000043

mg/m$^2$ (n=151), 75 mg/m$^2$ (n=188) or 100 mg/m$^2$ (n=188). In this trial, 94% of patients had metastatic disease and 79% had received prior anthracycline therapy. Response rate was the primary endpoint. Response rates increased with docetaxel dose: 19.9% for the 60 mg/m$^2$ group compared to 22.3% for the 75 mg/m$^2$ and 29.8% for the 100 mg/m$^2$ group; pair-wise comparison between the 60 mg/m$^2$ and 100 mg/m$^2$ groups was statistically significant (p=0.037).

Single Arm Studies

Docetaxel at a dose of 100 mg/m$^2$ was studied in six single arm studies involving a total of 309 patients with metastatic breast cancer in whom previous chemotherapy had failed. Among these, 190 patients had anthracycline-resistant breast cancer, defined as progression during an anthracycline-containing chemotherapy regimen for metastatic disease, or relapse during an anthracycline-containing adjuvant regimen. In anthracycline-resistant patients, the overall response rate was 37.9% (72/190; 95% C.I.: 31.0-44.8) and the complete response rate was 2.1%.

Docetaxel was also studied in three single arm Japanese studies at a dose of 60 mg/m$^2$, in 174 patients who had received prior chemotherapy for locally advanced or metastatic breast cancer. Among 26 patients whose best response to an anthracycline had been progression, the response rate was 34.6% (95% C.I.: 17.2-55.7), similar to the response rate in single arm studies of 100 mg/m$^2$.

## 14.2 Adjuvant Treatment of Breast Cancer

A multicenter, open-label, randomized trial (TAX316) evaluated the efficacy and safety of docetaxel for the adjuvant treatment of patients with axillary-node-positive breast cancer and no evidence of distant metastatic disease. After stratification according to the number of positive lymph nodes (1-3, 4+), 1491 patients were randomized to receive either docetaxel 75 mg/m$^2$ administered 1-hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ (TAC arm), or doxorubicin 50 mg/m$^2$ followed by fluorouracil 500 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ (FAC arm). Both regimens were administered every 3 weeks for 6 cycles. Docetaxel was administered as a 1-hour infusion; all other drugs were given as intravenous bolus on day 1. In both arms, after the last cycle of chemotherapy, patients with positive estrogen and/or progesterone receptors received tamoxifen 20 mg daily for up to 5 years. Adjuvant radiation therapy was prescribed according to guidelines in place at participating institutions and was given to 69% of patients who received TAC and 72% of patients who received FAC.

Results from a second interim analysis (median follow-up 55 months) are as follows: In study TAX316, the docetaxel-containing combination regimen TAC showed significantly longer disease-free survival (DFS) than FAC (hazard ratio=0.74; 2-sided 95% CI=0.60, 0.92, stratified log rank p=0.0047). The primary endpoint, disease-free survival, included local and distant recurrences, contralateral breast cancer and deaths from any cause. The overall reduction in risk of relapse was 25.7% for TAC-treated patients. (See **Figure 1**). At the time of this interim analysis, based on 219 deaths, overall survival was longer for TAC than FAC (hazard ratio=0.69, 2-sided 95% CI=0.53, 0.90). (See **Figure 2**). There will be further analysis at the time survival data mature.

SANDOZ-TAXO-LABELING-000044

**Figure 1 - TAX316 Disease Free Survival K-M curve**



**Figure 2 - TAX316 Overall Survival K-M Curve**

The following table describes the results of subgroup analyses for DFS and OS (See **Table 14**).

SANDOZ-TAXO-LABELING-000045

**Table 14 - Subset Analyses-Adjuvant Breast Cancer Study**

| Patient subset | Number of patients | Disease Free Survival | | Overall Survival | |
|---|---|---|---|---|---|
| | | Hazard ratio* | 95% CI | Hazard ratio* | 95% CI |
| **No. of positive nodes** | | | | | |
| Overall | 744 | 0.74 | (0.60, 0.92) | 0.69 | (0.53, 0.90) |
| 1-3 | 467 | 0.64 | (0.47, 0.87) | 0.45 | (0.29, 0.70) |
| 4+ | 277 | 0.84 | (0.63, 1.12) | 0.93 | (0.66, 1.32) |
| **Receptor status** | | | | | |
| Positive | 566 | 0.76 | (0.59, 0.98) | 0.69 | (0.48, 0.99) |
| Negative | 178 | 0.68 | (0.48, 0.97) | 0.66 | (0.44, 0.98) |

*a hazard ratio of less than 1 indicates that TAC is associated with a longer disease free survival or overall survival compared to FAC.

## 14.3 Non-Small Cell Lung Cancer (NSCLC)

The efficacy and safety of docetaxel has been evaluated in patients with unresectable, locally advanced or metastatic non-small cell lung cancer whose disease has failed prior platinum-based chemotherapy or in patients who are chemotherapy-naïve.

Monotherapy with Docetaxel for NSCLC Previously Treated with Platinum-Based Chemotherapy

Two randomized, controlled trials established that a docetaxel dose of 75 mg/m$^2$ was tolerable and yielded a favorable outcome in patients previously treated with platinum-based chemotherapy (see below). Docetaxel at a dose of 100 mg/m$^2$, however, was associated with unacceptable hematologic toxicity, infections, and treatment-related mortality and this dose should not be used *[see Boxed Warning, Dosage and Administration (2.7), Warnings and Precautions (5.3)]*.

One trial (TAX317), randomized patients with locally advanced or metastatic non-small cell lung cancer, a history of prior platinum-based chemotherapy, no history of taxane exposure, and an ECOG performance status ≤2 to docetaxel or best supportive care. The primary endpoint of the study was survival. Patients were initially randomized to docetaxel 100 mg/m$^2$ or best supportive care, but early toxic deaths at this dose led to a dose reduction to docetaxel 75 mg/m$^2$. A total of 104 patients were randomized in this amended study to either docetaxel 75 mg/m$^2$ or best supportive care.

In a second randomized trial (TAX320), 373 patients with locally advanced or metastatic non-small cell lung cancer, a history of prior platinum-based chemotherapy, and an ECOG performance status ≤2 were randomized to docetaxel 75 mg/m$^2$, docetaxel 100 mg/m$^2$ and a treatment in which the investigator chose either vinorelbine 30 mg/m$^2$ days 1, 8, and 15 repeated every 3 weeks or ifosfamide 2 g/m$^2$ days 1-3 repeated every 3 weeks. Forty percent of the patients in this study had a history of prior paclitaxel exposure. The primary endpoint was survival in both trials.

SANDOZ-TAXO-LABELING-000046

The efficacy data for the docetaxel 75 mg/m$^2$ arm and the comparator arms are summarized in **Table 15** and **Figures 3** and **4** showing the survival curves for the two studies.

**Table 15 – Efficacy of Docetaxel in the Treatment of Non-Small Cell Lung Cancer Patients Previously Treated with a Platinum-Based Chemotherapy Regimen (Intent-to-Treat Analysis)**

|  | TAX317 | | TAX320 | |
|---|---|---|---|---|
|  | Docetaxel 75 mg/m$^2$ n=55 | Best Supportive Care n=49 | Docetaxel 75 mg/m$^2$ n=125 | Control (V/I*) n=123 |
| Overall Survival Log-rank Test | p=0.01 | | p=0.13 | |
| Risk Ratio[††], Mortality (Docetaxel: Control) | 0.56 | | 0.82 | |
| 95% CI (Risk Ratio) | (0.35, 0.88) | | (0.63, 1.06) | |
| Median Survival | 7.5 months** | 4.6 months | 5.7 months | 5.6 months |
| 95% CI | (5.5, 12.8) | (3.7, 6.1) | (5.1, 7.1) | (4.4, 7.9) |
| % 1-year Survival | 37%**[†] | 12% | 30%**[†] | 20% |
| 95% CI | (24, 50) | (2, 23) | (22, 39) | (13, 27) |
| Time to Progression | 12.3 weeks** | 7.0 weeks | 8.3 weeks | 7.6 weeks |
| 95% CI | (9.0, 18.3) | (6.0, 9.3) | (7.0,11.7) | (6.7, 10.1) |
| Response Rate | 5.5% | Not Applicable | 5.7% | 0.8% |
| 95% CI | (1.1,15.1) | | (2.3,11.3) | (0.0, 4.5) |

\* Vinorelbine/Ifosfamide
\*\* p≤0.05; [†]uncorrected for multiple comparisons;[††] a value less than 1.00 favors docetaxel.

Only one of the two trials (TAX317) showed a clear effect on survival, the primary endpoint; that trial also showed an increased rate of survival to one year. In the second study (TAX320) the rate of survival at one year favored docetaxel 75 mg/m$^2$.

**Figure 3 - TAX317 Survival K-M Curves - Docetaxel 75 mg/m$^2$ vs. Best Supportive Care**

SANDOZ-TAXO-LABELING-000047



**Figure 4 - TAX320 Survival K-M Curves - Docetaxel 75 mg/m$^2$ vs. Vinorelbine or Ifosfamide Control**



Patients treated with docetaxel at a dose of 75 mg/m$^2$ experienced no deterioration in performance status and body weight relative to the comparator arms used in these trials.

SANDOZ-TAXO-LABELING-000048

Combination Therapy with Docetaxel for Chemotherapy-Naïve NSCLC

In a randomized controlled trial (TAX326), 1218 patients with unresectable stage IIIB or IV NSCLC and no prior chemotherapy were randomized to receive one of three treatments: docetaxel 75 mg/m$^2$ as a 1 hour infusion immediately followed by cisplatin 75 mg/m$^2$ over 30 to 60 minutes every 3 weeks; vinorelbine 25 mg/m$^2$ administered over 6 to 10 minutes on days 1, 8, 15, 22 followed by cisplatin 100 mg/m$^2$ administered on day 1 of cycles repeated every 4 weeks; or a combination of docetaxel and carboplatin.

The primary efficacy endpoint was overall survival. Treatment with docetaxel+cisplatin did not result in a statistically significantly superior survival compared to vinorelbine+cisplatin (see table below). The 95% confidence interval of the hazard ratio (adjusted for interim analysis and multiple comparisons) shows that the addition of docetaxel to cisplatin results in an outcome ranging from a 6% inferior to a 26% superior survival compared to the addition of vinorelbine to cisplatin. The results of a further statistical analysis showed that at least (the lower bound of the 95% confidence interval) 62% of the known survival effect of vinorelbine when added to cisplatin (about a 2-month increase in median survival; Wozniak et al. JCO, 1998) was maintained. The efficacy data for the docetaxel+cisplatin arm and the comparator arm are summarized in **Table 16**.

**Table 16 - Survival Analysis of Docetaxel in Combination Therapy for Chemotherapy-Naïve NSCLC**

| Comparison | Docetaxel+Cisplatin n=408 | Vinorelbine + Cisplatin n=405 |
|---|---|---|
| Kaplan-Meier Estimate of Median Survival | 10.9 months | 10 months |
| p-value[a] | 0.122 | |
| Estimated Hazard Ratio[b] | 0.88 | |
| Adjusted 95% CI[c] | (0.74, 1.06) | |

[a]From the superiority test (stratified log rank) comparing docetaxel+cisplatin to vinorelbine+cisplatin

[b]Hazard ratio of docetaxel+cisplatin vs. vinorelbine+cisplatin. A hazard ratio of less than 1 indicates that docetaxel+cisplatin is associated with a longer survival.

[c]Adjusted for interim analysis and multiple comparisons.

The second comparison in the same three-arm study, vinorelbine+cisplatin versus docetaxel+carboplatin, did not demonstrate superior survival associated with the docetaxel arm (Kaplan-Meier estimate of median survival was 9.1 months for docetaxel+carboplatin compared to 10.0 months on the vinorelbine+cisplatin arm) and the docetaxel+carboplatin arm did not demonstrate preservation of at least 50% of the survival effect of vinorelbine added to cisplatin. Secondary endpoints evaluated in the trial included objective response and time to progression. There was no statistically significant difference between docetaxel+cisplatin and vinorelbine+cisplatin with respect to objective response and time to progression (see **Table 17**).

SANDOZ-TAXO-LABELING-000049

**Table 17 - Response and TTP Analysis of Docetaxel in Combination Therapy for Chemotherapy-Naïve NSCLC**

| Endpoint | Docetaxel+Cisplatin | Vinorelbine+ Cisplatin | p-value |
|---|---|---|---|
| Objective Response Rate (95% CI)[a] | 31.6% (26.5%, 36.8%) | 24.4% (19.8%, 29.2%) | Not Significant |
| Median Time to Progression[b] (95% CI)[a] | 21.4 weeks (19.3, 24.6) | 22.1 weeks (18.1,25.6) | Not Significant |

[a]Adjusted for multiple comparisons.
[b]Kaplan-Meier estimates.

### 14.4 Hormone Refractory Prostate Cancer

The safety and efficacy of docetaxel in combination with prednisone in patients with androgen independent (hormone refractory) metastatic prostate cancer were evaluated in a randomized multicenter active control trial. A total of 1006 patients with Karnofsky Performance Status (KPS) $\geq$60 were randomized to the following treatment groups:

- Docetaxel 75 mg/m$^2$ every 3 weeks for 10 cycles.
- Docetaxel 30 mg/m$^2$ administered weekly for the first 5 weeks in a 6-week cycle for 5 cycles.
- Mitoxantrone 12 mg/m$^2$ every 3 weeks for 10 cycles.

All 3 regimens were administered in combination with prednisone 5 mg twice daily, continuously.

In the docetaxel every three week arm, a statistically significant overall survival advantage was demonstrated compared to mitoxantrone. In the docetaxel weekly arm, no overall survival advantage was demonstrated compared to the mitoxantrone control arm. Efficacy results for the docetaxel every 3 week arm versus the control arm are summarized in **Table 18** and **Figure 5**.

**Table 18 - Efficacy of Docetaxel in the Treatment of Patients with Androgen Independent (Hormone Refractory) Metastatic Prostate Cancer (Intent-to-Treat Analysis)**

| | Docetaxel+ Prednisone every 3 weeks | Mitoxantrone+ Prednisone every 3 weeks |
|---|---|---|
| Number of patients | 335 | 337 |
| Median survival (months) | 18.9 | 16.5 |
| 95% CI | (17.0-21.2) | (14.4-18.6) |
| Hazard ratio | 0.761 | - |
| 95% CI | (0.619-0.936) | - |
| p-value* | 0.0094 | - |

*Stratified log rank test. Threshold for statistical significance = 0.0175 because of 3 arms.

SANDOZ-TAXO-LABELING-000050

**Figure 5 - TAX327 Survival K-M Curves**



### 14.5 Gastric Adenocarcinoma

A multicenter, open-label, randomized trial was conducted to evaluate the safety and efficacy of docetaxel for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who had not received prior chemotherapy for advanced disease. A total of 445 patients with KPS >70 were treated with either docetaxel (T) (75 mg/m$^2$ on day 1) in combination with cisplatin (C) (75 mg/m$^2$ on day 1) and fluorouracil (F) (750 mg/m$^2$ per day for 5 days) or cisplatin (100 mg/m$^2$ on day 1) and fluorouracil (1000 mg/m$^2$ per day for 5 days). The length of a treatment cycle was 3 weeks for the TCF arm and 4 weeks for the CF arm. The demographic characteristics were balanced between the two treatment arms. The median age was 55 years, 71% were male, 71% were Caucasian, 24% were 65 years of age or older, 19% had a prior curative surgery and 12% had palliative surgery. The median number of cycles administered per patient was 6 (with a range of 1 to 16) for the TCF arm compared to 4 (with a range of 1 to 12) for the CF arm. Time to progression (TTP) was the primary endpoint and was defined as time from randomization to disease progression or death from any cause within 12 weeks of the last evaluable tumor assessment or within 12 weeks of the first infusion of study drugs for patients with no evaluable tumor assessment after randomization. The hazard ratio (HR) for TTP was 1.47 (CF/TCF, 95% CI: 1.19 to 1.83) with a significantly longer TTP (p=0.0004) in the TCF arm. Approximately 75% of patients had died at the time of this analysis. Overall survival was significantly longer (p=0.0201) in the TCF arm with a HR of 1.29 (95% CI: 1.04 to 1.61). Efficacy results are summarized in **Table 19** and **Figures 6** and **7.**

SANDOZ-TAXO-LABELING-000051

**Table 19 - Efficacy of Docetaxel in the Treatment of Patients with Gastric Adenocarcinoma**

| Endpoint | TCF n=221 | CF n=224 |
|---|---|---|
| Median TTP (months) (95% CI) | 5.6 (4.86-5.91) | 3.7 (3.45-4.47) |
| Hazard ratio[†] (95% CI) *p-value | 0.68 (0.55-0.84) 0.0004 | |
| Median survival (months) (95% CI) | 9.2 (8.38-10.58) | 8.6 (7.16-9.46) |
| Hazard ratio[†] (95% CI) *p-value | 0.77 (0.62-0.96) 0.0201 | |
| Overall Response Rate (CR+PR) (%) p-value | 36.7 | 25.4 |
| | 0.0106 | |

*Unstratified log-rank test
[†]For the hazard ratio (TCF/CF), values less than 1.00 favor the docetaxel arm.

Subgroup analyses were consistent with the overall results across age, gender and race.

**Figure 6 - Gastric Cancer Study (TAX325) Time to Progression K-M Curve**



Reference ID: 2967585

SANDOZ-TAXO-LABELING-000052

**Figure 7 - Gastric Cancer Study (TAX325) Survival K-M Curve**



## 14.6 Head and Neck Cancer

Induction chemotherapy followed by radiotherapy (TAX323)

The safety and efficacy of docetaxel in the induction treatment of patients with squamous cell carcinoma of the head and neck (SCCHN) was evaluated in a multicenter, open-label, randomized trial (TAX323). In this study, 358 patients with inoperable locally advanced SCCHN, and WHO performance status 0 or 1, were randomized to one of two treatment arms. Patients on the docetaxel arm received docetaxel (T) 75 mg/m$^2$ followed by cisplatin (P) 75 mg/m$^2$ on Day 1, followed by fluorouracil (F) 750 mg/m$^2$ per day as a continuous infusion on Days 1 to 5. The cycles were repeated every three weeks for 4 cycles. Patients whose disease did not progress received radiotherapy (RT) according to institutional guidelines (TPF/RT). Patients on the comparator arm received cisplatin (P) 100 mg/m$^2$ on Day 1, followed by fluorouracil (F) 1000 mg/m$^2$/day as a continuous infusion on Days 1 to 5. The cycles were repeated every three weeks for 4 cycles. Patients whose disease did not progress received RT according to institutional guidelines (PF/RT). At the end of chemotherapy, with a minimal interval of 4 weeks and a maximal interval of 7 weeks, patients whose disease did not progress received radiotherapy (RT) according to institutional guidelines. Locoregional therapy with radiation was delivered either with a conventional fraction regimen (1.8 Gy to 2 Gy once a day, 5 days per week for a total dose of 66 to 70 Gy) or with an accelerated/hyperfractionated regimen (twice a day, with a minimum interfraction interval of 6 hours, 5 days per week, for a total dose of 70 to 74 Gy, respectively). Surgical resection was allowed following chemotherapy, before or after radiotherapy.

The primary endpoint in this study, progression-free survival (PFS), was significantly longer in the TPF arm compared to the PF arm, p=0.0077 (median PFS: 11.4 vs. 8.3 months respectively) with an overall median follow up time of 33.7 months. Median

SANDOZ-TAXO-LABELING-000053

overall survival with a median follow-up of 51.2 months was also significantly longer in favor of the TPF arm compared to the PF arm (median OS: 18.6 vs. 14.2 months respectively). Efficacy results are presented in **Table 20** and **Figures 8** and **9**.

**Table 20 - Efficacy of Docetaxel in the Induction Treatment of Patients with Inoperable Locally Advanced SCCHN (Intent-to-Treat Analysis)**

| ENDPOINT | Docetaxel+ Cisplatin+ Fluorouracil n=177 | Cisplatin+ Fluorouracil n=181 |
|---|---|---|
| Median progression free survival (months) | 11.4 | 8.3 |
| (95% CI) | (10.1-14.0) | (7.4-9.1) |
| Adjusted Hazard ratio (95% CI) *p-value | 0.71 (0.56-0.91) 0.0077 | |
| Median survival (months) (95% CI) | 18.6 (15.7-24.0) | 14.2 (11.5-18.7) |
| Hazard ratio (95% CI) **p-value | 0.71 (0.56-0.90) 0.0055 | |
| Best overall response (CR + PR) to chemotherapy (%) (95% CI) | 67.8 (60.4-74.6) | 53.6 (46.0-61.0) |
| ***p-value | 0.006 | |
| Best overall response (CR + PR) to study treatment [chemotherapy +/- radiotherapy] (%) (95% CI) | 72.3 (65.1-78.8) | 58.6 (51.0-65.5) |
| ***p-value | 0.006 | |

A Hazard ratio of less than 1 favors docetaxel+cisplatin+fluorouracil
* Stratified log-rank test based on primary tumor site
** Stratified log-rank test, not adjusted for multiple comparisons
*** Chi square test, not adjusted for multiple comparisons

**Figure 8 - TAX323 Progression-Free Survival K-M Curve**



SANDOZ-TAXO-LABELING-000054

**Figure 9 - TAX323 Overall Survival K-M Curve**



Induction chemotherapy followed by chemoradiotherapy (TAX324)
The safety and efficacy of docetaxel in the induction treatment of patients with locally advanced (unresectable, low surgical cure, or organ preservation) SCCHN was evaluated in a randomized, multicenter open-label trial (TAX324). In this study, 501 patients, with locally advanced SCCHN, and a WHO performance status of 0 or 1, were randomized to one of two treatment arms. Patients on the docetaxel arm received docetaxel (T) 75 mg/m$^2$ by intravenous infusion on day 1 followed by cisplatin (P) 100 mg/m$^2$ administered as a 30-minute to three-hour intravenous infusion, followed by the continuous intravenous infusion of fluorouracil (F) 1000 mg/m$^2$/day from day 1 to day 4. The cycles were repeated every 3 weeks for 3 cycles. Patients on the comparator arm received cisplatin (P) 100 mg/m$^2$ as a 30-minute to three-hour intravenous infusion on day 1 followed by the continuous intravenous infusion of fluorouracil (F) 1000 mg/m$^2$/day from day 1 to day 5. The cycles were repeated every 3 weeks for 3 cycles.

All patients in both treatment arms who did not have progressive disease were to receive 7 weeks of chemoradiotherapy (CRT) following induction chemotherapy 3 to 8 weeks after the start of the last cycle. During radiotherapy, carboplatin (AUC 1.5) was given weekly as a one-hour intravenous infusion for a maximum of 7 doses. Radiation was delivered with megavoltage equipment using once daily fractionation (2 Gy per day, 5 days per week for 7 weeks for a total dose of 70-72 Gy). Surgery on the primary site of disease and/or neck could be considered at anytime following completion of CRT.

The primary efficacy endpoint, overall survival (OS), was significantly longer (log-rank test, p=0.0058) with the docetaxel-containing regimen compared to PF [median OS: 70.6 versus 30.1 months respectively, hazard ratio (HR)=0.70, 95% confidence interval (CI)= 0.54 to 0.90]. Overall survival results are presented in **Table 21** and **Figure 10**.

SANDOZ-TAXO-LABELING-000055

**Table 21 - Efficacy of Docetaxel in the Induction Treatment of Patients with Locally Advanced SCCHN (Intent-to-Treat Analysis)**

| ENDPOINT | Docetaxel+Cisplatin+ Fluorouracil n=255 | Cisplatin+ Fluorouracil n=246 |
|---|---|---|
| Median overall survival (months) | 70.6 | 30.1 |
| (95% CI) | (49.0-NE) | (20.9-51.5) |
| Hazard ratio: (95% CI) *p-value | 0.70 (0.54-0.90) 0.0058 | |

A Hazard ratio of less than 1 favors docetaxel+cisplatin+fluorouracil
\* un-adjusted log-rank test
NE - not estimable

**Figure 10 - TAX324 Overall Survival K-M Curve**



## 15.REFERENCES

1. NIOSH Alert: Preventing occupational exposures to antineoplastic and other hazardous drugs in healthcare settings. 2004. U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 2004-165.
2. OSHA Technical Manual, TED 1-0.15A, Section VI: Chapter 2. Controlling Occupational Exposure to Hazardous Drugs. OSHA, 1999.
   http://www.osha.gov/dts/osta/otm/otm_vi/otm_vi_2.html
3. American Society of Health-System Pharmacists. (2006) ASHP Guidelines on Handling Hazardous Drugs. *Am JHealth-Syst Pharm.* 2006;63:1172-1193
4. Polovich, M., White, J. M., & Kelleher, L.O. (eds.) 2005. Chemotherapy and biotherapy *guidelines and recomm*endations for practice (2nd. ed.) Pittsburgh, PA: Oncology Nursing Society.

SANDOZ-TAXO-LABELING-000056

16.  **HOW SUPPLIED/STORAGE AND HANDLING**

**16.1 How Supplied**

Docetaxel Injection is supplied in a multiple dose vial as a sterile, pyrogen-free solution. Docetaxel Injection requires NO prior dilution with a diluent and is ready to add to the infusion solution. The following strengths are available:

| Strength | NDC Number | Volume |
|----------|-----------|--------|
| 20 mg/2 mL | 66758-050-01 | Carton of 1 x 2 mL Multiple Dose Vial |
| 80 mg/8 mL | 66758-050-02 | Carton of 1 x 8 mL Multiple Dose Vial |
| 160 mg/16 mL | 66758-050-03 | Carton of 1 x 16 mL Multiple Dose Vial |

**16.2 Storage**

Store between 2°C and 25°C (36°F and 77°F). Retain in the original package to protect from bright light. Freezing does not adversely affect the product.

After initial puncture, Docetaxel Injection multiple dose vials are stable for 28 days when stored between 2°C to 8°C and at room temperature, with or without protection from light.

**16.3 Handling and Disposal**

Procedures for proper handling and disposal of anticancer drugs should be considered. Several guidelines on this subject have been published *[see References (15)]*.

17.  **PATIENT COUNSELING INFORMATION**
     *See FDA-Approved Patient Labeling*
     •   Docetaxel Injection may cause fetal harm.  Advise patients to avoid becoming pregnant while receiving this drug. Women of childbearing potential should use effective contraceptives if receiving Docetaxel Injection *[see Warnings and Precautions (5.10) and Use in Specific Populations (8.1)]*.
     •   Obtain detailed allergy and concomitant drug information from the patient prior to Docetaxel Injection administration.
     •   Explain the significance of oral corticosteroids such as dexamethasone administration to the patient to help facilitate compliance.  Instruct patients to report if they were not compliant with oral corticosteroid regimen.
     •   Instruct patients to immediately report signs of a hypersensitivity reaction.
     •   Tell patients to watch for signs of fluid retention such as peripheral edema in the lower extremities, weight gain and dyspnea.
     •   Explain the significance of routine blood cell counts.  Instruct patients to monitor their temperature frequently and immediately report any occurrence of fever.
     •   Instruct patients to report myalgia, cutaneous, or neurologic reactions.
     •   Explain to patients that side effects such as nausea, vomiting, diarrhea, constipation, fatigue, excessive tearing, infusion site reactions, and hair loss are associated

SANDOZ-TAXO-LABELING-000057

with docetaxel administration.

**Patient Information**

Docetaxel Injection
(Pronounced as doe-se-TAKS-el)

Read this Patient Information before you receive your first treatment with Docetaxel Injection and each time before you are treated. There may be new information. This information does not take the place of talking with your doctor about your medical condition or your treatment.

**What is the most important information I should know about Docetaxel Injection?**
**Docetaxel Injection can cause serious side effects, including death.**

1. **The chance of death in people who receive Docetaxel Injection is higher if you:**
   • have liver problems
   • receive high doses of Docetaxel Injection
   • have non-small cell lung cancer and have been treated with chemotherapy medicines that contain platinum

2. **Docetaxel Injection can affect your blood cells.** Your doctor should do routine blood tests during treatment with Docetaxel Injection. This will include regular checks of your white blood cell counts. If your white blood cells are too low, your doctor may not treat you with Docetaxel Injection until you have enough white blood cells. People with low white blood counts can develop life threatening infections. The earliest sign of infection may be fever. Follow your doctor's instructions for how often to take your temperature while taking Docetaxel Injection. Call your doctor right away if you have a fever.

3. **Serious allergic reactions** can happen in people who take Docetaxel Injection. Serious allergic reactions are medical emergencies that can lead to death and must be treated right away.
   Tell your doctor right away if you have any of these signs of a serious allergic reaction:
   • trouble breathing
   • sudden swelling of your face, lips, tongue, throat, or trouble swallowing
   • hives (raised bumps), rash, or redness all over your body.

5. **Your body may hold too much fluid (severe fluid retention)** during treatment with Docetaxel Injection. This can be life threatening. To decrease the chance of this happening, you must take another medicine, a corticosteroid, before each Docetaxel Injection treatment. You must take the corticosteroid exactly as your doctor tells you. Tell your doctor or nurse before your Docetaxel Injection treatment if you forget to take corticosteroid dose or do not take it as your doctor tells you.

SANDOZ-TAXO-LABELING-000058

**What is Docetaxel Injection?**

**Docetaxel Injection is a prescription anti-cancer medication used to treat certain people with:**

- breast cancer
- non-small cell lung cancer
- prostate cancer
- stomach cancer
- head and neck cancer

The effectiveness of Docetaxel Injection in children has not been established.

**Who should not take Docetaxel Injection?**

Do not take Docetaxel Injection if you:
- have had a severe allergic reaction to:
  - o docetaxel, the active ingredient in Docetaxel Injection, **or**
  - o any other medicines that contain polysorbate 80.  Ask your doctor or pharmacist if you are not sure.

    See "What is the most important information I should know about Docetaxel Injection?" for the signs and symptoms of a severe allergic reaction.
- have a low white blood cell count.

**What should I tell my doctor before receiving Docetaxel Injection?**

Before you receive Docetaxel Injection, tell your doctor if you:

- are allergic to any medicines.  See "Who should not take Docetaxel Injection?"  Also, see the end of this leaflet for a list of the ingredients in Docetaxel Injection.
- have liver problems
- have any other medical conditions
- are pregnant or plan to become pregnant. Docetaxel Injection can harm your unborn baby.
- are breast-feeding or plan to breast-feed. It is not known if Docetaxel Injection passes into your breast milk. You and your doctor should decide if you will take Docetaxel Injection or breast-feed.

Tell your doctor about all the medicines you take including prescription and non-prescription medicines, vitamins, and herbal supplements. Docetaxel Injection may affect the way other medicines work, and other medicines may affect the way Docetaxel Injection works.

Know the medicines you take.  Keep a list of them and show it to your doctor and pharmacist when you get a new medicine.

**How will I receive Docetaxel Injection?**
- Docetaxel Injection will be given to you as an intravenous (IV) injection into your vein, usually over 1 hour.
- Docetaxel Injection is usually given every 3 weeks.

SANDOZ-TAXO-LABELING-000059

- Your doctor will decide how long you will receive treatment with Docetaxel Injection.
- Your doctor will check your blood cell counts and other blood tests during your treatment with Docetaxel Injection to check for side effects of Docetaxel Injection.
- Your doctor may stop your treatment, change the timing of your treatment, or change the dose of your treatment if you have certain side effects while taking Docetaxel Injection.

**What are the possible side effects of Docetaxel Injection?**
**Docetaxel Injection may cause serious side effects including death.**

- See "What is the most important information I should know about Docetaxel Injection?"

- **Acute Myeloid Leukemia (AML),** a type of blood cancer, can happen in people who take Docetaxel Injection along with certain other medicines.  Tell your doctor about all the medicines you take.

- **Other Blood Disorders -** Changes in blood counts due to leukemia and other blood disorders may occur years after treatment with Docetaxel Injection.

- **Skin Reactions** including redness and swelling of your arms and legs with peeling of your skin.

- **Neurologic Symptoms** including numbness, tingling, or burning in your hands and feet.

The most common side effects of Docetaxel Injection include:
- changes in your sense of taste
- feeling short of breath
- constipation
- decreased appetite
- changes in your fingernails or toenails
- swelling of your hands, face or feet
- feeling weak or tired
- joint and muscle pain
- nausea and vomiting
- diarrhea
- mouth or lips sores
- hair loss
- rash
- redness of the eye, excess tearing
- skin reactions at the site of Docetaxel Injection administration such as increased skin pigmentation, redness, tenderness, swelling, warmth or dryness of the skin.
- tissue damage if Docetaxel Injection leaks out of the vein into the tissues

Tell your doctor if you have any side effect that bothers you or does not go away.

These are not all the possible side effects of Docetaxel Injection.   For more information ask your doctor or pharmacist.

SANDOZ-TAXO-LABELING-000060

**Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.**

**General information about Docetaxel Injection**

Medicines are sometimes prescribed for purposes other than those listed in a Patient Information leaflet. This Patient Information leaflet summarizes the most important information about Docetaxel Injection. If you would like more information, talk with your doctor. You can ask your pharmacist or doctor for information about Docetaxel Injection that is written for healthcare professionals.

For more information contact Sandoz Inc., at 1-800-525-8747.

**What are the ingredients in Docetaxel Injection?**
Active ingredient: docetaxel
Inactive ingredients include: ethanol and polysorbate 80

---

**Every three-week injection of Docetaxel Injection for breast, non-small cell lung and stomach, and head and neck cancers**
**Take your oral corticosteroid medicine as your doctor tells you.**

**Oral corticosteroid *dosing*:**

**Day 1** Date:_____  Time: _____AM_____ PM

**Day 2** Date:_____  Time: _____AM_____ PM
**(Docetaxel Injection Treatment Day)**

**Day 3** Date:_____  Time: _____AM_____ PM

---

**Every three week injection of Docetaxel Injection for prostate cancer**
**Take your oral corticosteroid medicine as your doctor tells you.**

*Oral corticosteroid dosing:*

Date:_____  Time:_____

Date:_____  Time:_____
**(Docetaxel Injection Treatment Day)**

Time:_____

---

Manufactured for:        Manufactured by:

⚠ **SANDOZ**             *Ebewe* PHARMA

SANDOZ-TAXO-LABELING-000061

Princeton, NJ 08540       EBEWE Pharma Ges.m.b.H. Nfg.KG
                                   A-4866 Unterach, Austria

June 2011

SANDOZ-TAXO-LABELING-000062

# EXHIBIT U



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

October 14, 2003

Food and Drug Administration
Rockville MD 20857

Katherine M. Sanzo, Esq.
Lawrence S. Ganslaw, Esq.
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

Jeffrey B. Chasnow, Esq.
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

Stephan E. Lawton, Esq.
Gillian R. Woollett, Ph.D.
Vice President and Regulatory Affairs
Biotechnology Industry Organization (BIO)
Suite 400
1225 I Street, N.W.
Washington, DC 20005

William R. Rakoczy, Esq.
Lord, Bissell & Brook LLP
115 South LaSalle Street
Chicago, IL 60603

Re: Dockets Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

Dear Petitioners:

This letter is a consolidated response to the citizen petitions in the dockets referred to above and comments submitted on the petitions.[1] Although each of these petitions has a slightly different focus and concerns different drug products or classes of products, each is, in essence, a challenge to the Food and Drug Administration's (FDA's) interpretation of section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (the FDCA or the Act)(21 U.S.C. 355(b)(2)). For the reasons

---

[1] 2001P-0323/CP1 submitted by Morgan, Lewis & Bockius, LLP, on behalf of Pfizer Inc. and Pharmacia Corporation (2001 Pfizer petition); 2001CP-0323/C5 submitted by the Biotechnology Industry Organization (BIO) (BIO petition); 2002P-0447/CP1 submitted by Morgan, Lewis & Bockius, LLP on behalf of Pfizer Inc. (2002 Pfizer petition); 2003P-0408/CP1, submitted by Lord, Bissell & Brook LLP on behalf of TorPharm (TorPharm petition). The BIO petition contains regulatory and legal arguments challenging FDA's implementation of section 505(b)(2) of the FDCA, as well as scientific and technical arguments as to why biologically derived products, in particular, are not suited for approval under section 505(b)(2). This response addresses the legal and regulatory issues; the unique scientific issues associated with biologically derived products present a separate set of challenges that will be addressed in a response to be issued later. The BIO petition, although designated a citizen petition by BIO, was docketed as a comment. FDA is responding to the document as a petition. The 2002 Pfizer petition contains scientific arguments specific to a pending application. Because this application is not approved, FDA cannot comment on the scientific issues raised in this petition. (See 21 CFR 314.430.)

2003P-0408

PDN 1

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

described below, FDA declines to alter its current interpretation of section 505(b)(2). Accordingly, those portions of the petitions seeking such a change are denied.[2] However, the Agency also grants certain specific portions of the petitions as described below (section IV.M) related to therapeutic equivalence ratings for 505(b)(2) drug products.

## I.    INTRODUCTION

Section 505(b)(2) of the Act was enacted as part of the Drug Price Competition and Patent Term Restoration Act of 1984 (the Hatch-Waxman Amendments). Section 505(b)(2) provides:

> An application [may be] submitted under [section 505(b)(1)] for which the
> [safety and effectiveness] investigations . . . relied upon by the applicant [to
> support] approval of the application were not conducted by or for the applicant
> and for which the applicant has not obtained a right of reference or use from the
> person by or for whom the investigations were conducted [and] shall also include
> [patent certifications for patents on the drug for which investigations were
> conducted or a method of use statement].

The Hatch-Waxman Amendments reflect Congress's attempt to balance the need to encourage innovation with the desire to speed the availability of lower cost alternatives to approved drugs. (*See Eli Lilly and Co. v. Medtronic, Inc.*, 496 U.S. 661 (1990); and *Bristol-Myers Squibb Company v. Royce Laboratories, Inc.*, 69 F.3d 1130, 1132, 1133-34 (Fed. Cir. 1995).) With passage of the Hatch-Waxman Amendments, the Act describes different routes for obtaining approval of two broad categories of drug applications: new drug applications (NDAs), for which the requirements are set out in section 505(b) and (c) of the Act, and abbreviated new drug applications (ANDAs), for which the requirements are set out in section 505(j). These categories can be further subdivided into the following:

- an application that contains full reports of investigations of safety and effectiveness that were conducted by or for the applicant or for which the applicant has a right of reference (section 505(b)(1)) (a stand alone NDA);
- an application that contains full reports of investigations of safety and effectiveness, where at least some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference (section 505(b)(2)) (a 505(b)(2) application);
- an application for a *duplicate*[3] of a previously approved drug that contains information to show that the proposed product is identical in active ingredient(s), dosage form, strength, route of administration, labeling, quality, performance

---

[2] As discussed in greater detail in section IV.N below, FDA is considering whether to commence a public process to examine the narrow question of whether to change our interpretation of section 505(b)(2) as it applies to applications for which the only change from the listed drug is a change in active ingredient.

[3] The informal term *duplicate* is used in this response to refer to an application under section 505(j) describing a product that is the same as the listed drug with respect to active ingredient, dosage form, route of administration, strength, and conditions of use, among other characteristics.

2

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

> characteristics, and intended use, among other things, to a previously approved
> product, and for which clinical studies are not necessary to show safety and
> effectiveness (section 505(j))(an ANDA); and
>
> - an application for a drug that differs from a previously approved drug product in
>   dosage form, route of administration, strength, or active ingredient (in a product with
>   more than one active ingredient), for which FDA has determined, in response to a
>   "suitability petition" submitted under section 505(j)(2)(C), that clinical studies are not
>   necessary to show safety and effectiveness (section 505(j))(a petitioned ANDA).

Each type of application may rely on different sources and types of information to support the safety and effectiveness of the drug product. The statute also provides for drug development incentives in the form of marketing protections and patent extensions. The marketing protections available will depend on the type of application submitted. Similarly, some applications will be subject to the marketing protections and patent rights of other applications.

A 505(b)(2) application shares characteristics of both ANDAs and stand alone NDAs. Like a stand alone NDA, a 505(b)(2) application is submitted under section 505(b)(1) and approved under section 505(c). As such, it must satisfy the requirements for safety and effectiveness information. A 505(b)(2) application is similar to an ANDA as well because it may rely on the FDA finding that the listed drug it references is safe and effective as evidence in support of its own safety and effectiveness. However, although an ANDA is generally required to duplicate the innovator product (with a few limited exceptions) — and an ANDA therefore may not include new clinical safety or effectiveness information to support approval — a 505(b)(2) application often describes a drug with substantial differences from the listed drug it references. Accordingly, it must support those differences with appropriate safety and effectiveness information. For example, a 505(b)(2) application may seek approval for a new dosage form, indication, or new formulation of a previously approved drug. In such cases, the 505(b)(2) application can rely on the finding of safety and effectiveness of the listed drug only to the extent the product seeking approval and the listed drug are the same. To the extent the products are different, the 505(b)(2) application, like a stand alone NDA, must include sufficient data to demonstrate that the product with those different aspects meets the statutory approval standard for safety and effectiveness.

FDA's longstanding interpretation of section 505(b)(2) is intended to permit the pharmaceutical industry to rely to the greatest extent possible under the law on what is already known about a drug. The Agency's approach is to use the 505(b)(2) drug approval pathway to avoid requiring drug sponsors to conduct and submit studies that are not scientifically necessary. The conduct and review of duplicative studies would (1) divert industry resources that could be used to undertake innovative research, (2) increase drug costs, (3) strain FDA review resources, and (4) slow the process for drug approval with no corresponding benefit to the public health.

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

In addition, the conduct of duplicative studies raises ethical concerns because it could subject human beings and animals to medically or scientifically unjustified testing.[4] The 505(b)(2) pathway permits sponsors and FDA to determine what studies are necessary to support the approval of the new aspect of a drug. It then allows sponsors to target drug development resources to studies needed to support the proposed difference or innovation.

FDA's interpretation of section 505(b)(2) is supported by the plain language of that provision, as well as the overall structure and purpose of the Act and, in particular, the Hatch-Waxman Amendments. As discussed below in section III.B, since passage of the Hatch-Waxman Amendments, FDA has approved more than 80 section 505(b)(2) applications for drugs for indications ranging from cancer pain to attention deficit disorder. Many of these drugs would never have reached the market, or would have been significantly delayed, without the 505(b)(2) pathway.

## II.  LEGAL AND REGULATORY BACKGROUND

### A.  Background on NDAs and ANDAs

The petitions challenge FDA's interpretation of section 505(b)(2), not the statutory provisions related to stand alone NDAs, ANDAs for duplicate drugs, or petitioned ANDAs. To understand how the 505(b)(2) application fits into the drug approval landscape, however, it is important to fully appreciate the characteristics of NDAs, ANDAs, and petitioned ANDAs. A 505(b)(2) application is a subset or variation on an NDA, and it is subject to the NDA approval requirements set out in section 505(b) and (c) of the Act. A 505(b)(2) application also shares certain features with an ANDA. As such, it is subject to the patent certification requirements and many of the exclusivity delays that apply to ANDAs.

#### 1.   NDAs

Section 505(b)(1) requires that an applicant submit in an NDA: evidence that the drug is safe and effective; a list of the components of the drug; a statement of the drug's composition; a description of the manufacturing, processing, and packaging of the drug; samples of the drug as necessary; and proposed labeling for the drug. Because 505(b)(2) applications, like stand alone NDAs, are submitted under section 505(b)(1) and approved under section 505(c), 505(b)(2) applications must also satisfy these NDA requirements. FDA's regulations in 21 CFR part 314 describe the NDA approval requirements in detail at § 314.50. Section 314.54 specifically describes how 505(b)(2) applications must satisfy these requirements.

In 1984, with the Hatch-Waxman Amendments, section 505 was amended to require that an NDA applicant (including a 505(b)(2) applicant) submit to FDA information about any patent that (1) claims the drug, or a method of using the drug, for which the applicant submitted the

---

[4] The ethics of duplicative studies was one of the concerns leading to passage of Hatch-Waxman. See House Report 98-857, part 1, 98th Congress 2d. Sess. June 21, 1984 (House Report) at 16: "[S]uch retesting is unethical because it requires that some sick patients take placebos and be denied treatment known to be effective."

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

application and (2) with respect to which a claim for patent infringement could reasonably be asserted if a person not licensed by the patent owner were to engage in the manufacture, sale, or use of the drug (section 505(b)(1) and (c)(2)). Patents that must be submitted include patents on the drug's active ingredient (drug substance), the drug product (formulation or composition), and the use of the drug.[5] Once the drug product has been approved, FDA must publish the patent information in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book). Approved drug products listed in the Orange Book with their relevant patent information are referred to in the statute and regulations as *listed drugs* (section 505(j)(2)(A)(i)). As explained in more detail below, the statute requires that 505(b)(2) and ANDA applicants certify whether their proposed products may infringe the patents on the listed drugs they reference in their applications.

The Hatch-Waxman Amendments also provided different marketing exclusivity periods for drugs approved in NDAs (including drugs approved in 505(b)(2) applications), based on the level of innovation represented by the drug product. While these five- and three-year *exclusivity* periods are in effect, FDA may not accept or approve certain applications that rely on the protected product for approval (section 505(c)(3)(D)(ii)-(iv) and (j)(5)(D)(ii)-(iv)).[6]

Five-year exclusivity is granted to a drug that contains no active ingredient (including any ester or salt of the active ingredient) previously approved under section 505(b) (section 505(c)(3)(D)(ii) and (j)(5)(D)(ii); § 314.108). During this five-year period that begins with approval, FDA may not receive for review any 505(b)(2) or 505(j) application referring to the listed drug with this protection. However, if the NDA holder for the listed drug with five-year exclusivity has submitted a patent for the drug pursuant to section 505(b)(1) or (c)(2), a 505(b)(2) or ANDA applicant wishing to challenge that patent may submit an application referencing the listed drug at the end of four years (section 505(c)(3)(D)(ii) and (j)(5)(D)(ii); § 314.108).

Three-year exclusivity is granted to a drug for which approval of an NDA or NDA supplement requires FDA to review new clinical studies conducted or sponsored by the applicant that are essential to the approval. This exclusivity bars FDA from approving for three years a 505(b)(2) application or ANDA referencing the listed drug (or the change to the listed drug) for which the

---

[5] FDA has recently issued new regulations governing patent submissions, the provision of notice of paragraph IV certifications, and the availability of 30-month multiple stays on ANDA and 505(b)(2) approvals (68 FR 36676, June 18, 2003). These regulations apply to patent submissions made on or after August 18, 2003, and to patent certifications to those patents. The matters addressed by the new regulations are not at issue in these citizen petitions. However, the interpretation of section 505(b)(2) discussed in this response is consistent with both the old and the new regulations.

[6] Title II of the Hatch-Waxman Amendments also establishes a process for the extension of the terms of certain patents for approved innovator drug products. Specifically, subject to certain caps, sponsors can seek a patent extension equal to one-half the drug development time plus the length of time the product was under FDA review. This is to compensate for marketing time lost to the sponsor while the drug product was under development and being reviewed by FDA. The patent term extension provisions are codified in the Patent Code at Title 35, sections 156 and 271.

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

new studies were submitted (section 505(c)(3)(D)(iii) and (iv); 505(j)(5)(D)(iii) and (iv); § 314.108).

As explained further below, 505(b)(2) applications are hybrid applications that receive the benefits of patent listing and marketing exclusivity available to NDAs. They are also subject to the burden of patent certifications and delays in approval to which ANDAs are subject, resulting from the patents and marketing exclusivity protecting the listed drugs they reference.

       2.     *ANDAs*

Before the Hatch-Waxman Amendments were passed, there was no explicit abbreviated statutory pathway to approve duplicates of post-1962 drugs. In 1962, Congress added an effectiveness requirement as a condition of drug approval. After this change, under the Drug Efficacy Study Implementation (DESI) program, the Agency undertook to review all drugs that had been approved based on safety alone (before the 1962 effectiveness requirement was added) to determine whether there was sufficient evidence of effectiveness to warrant their continued approval. To ensure that the largest number of drugs possible came under the Agency's approval provisions, unapproved *generic* versions of pre-1962 drugs were permitted to obtain approval under DESI without showing independent evidence of safety or effectiveness if they were duplicates of drugs that the Agency determined had sufficient evidence of effectiveness to warrant continued approval (as memorialized by a *Federal Register* notice) and contained all other information required in a new drug application (34 FR 2673, February 27, 1969; 35 FR 6574, April 24, 1970). The preamble to FDA's proposed rule implementing the Hatch-Waxman Amendments briefly describes the DESI program (54 FR 28872 at 28872 and 28873, July 10, 1989).

The DESI program and abbreviated route of approval for duplicates did not apply to drugs approved after 1962. For post-1962 duplicates, FDA initially concluded that the statute did not provide an abbreviated pathway for approval. Accordingly, for duplicates of post-1962 drugs, the Agency created the "paper NDA" policy. That policy applied narrowly to permit an applicant to rely on evidence from published scientific literature to satisfy the approval requirements for full reports of safety and effectiveness. (See "Publication of 'Paper NDA' Memorandum," 46 FR 27396, May 19, 1981.) The application of this policy to literature-based duplicates was upheld in *Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221 (4th Cir. 1981). Because so few post-1962 drugs had an adequate quantity of published literature to support the full reports requirement for approval, in 1982 FDA announced that it was reconsidering its initial assessment of the scope of its authority and was contemplating changing its regulations to create an abbreviated pathway for post-1962 drugs similar to the DESI process for pre-1962 drugs (47 FR 1765 at 1767 January 13, 1982). However, the need for such a change was obviated when, in 1984, the Hatch-Waxman Amendments were passed.

Among other things, the Hatch-Waxman Amendments established an abbreviated process to approve duplicates of post-1962 drug products. They also integrated into the drug approval process recognition of the listed drug's patent protections and provided patent extensions, as well as additional periods of market exclusivity, to encourage development of innovative drug

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

products. In creating an explicit regulatory pathway to approve duplicates of post-1962 drugs, the Hatch-Waxman provisions eliminated the need to approve duplicates of post-1962 drugs via the paper NDA route. Specifically, the Hatch-Waxman Amendments established a process, under section 505(j) of the FDCA, to approve duplicates of listed drugs on the basis of chemistry, manufacturing, and bioequivalence[7] data without evidence from literature or clinical data to establish effectiveness and safety. Under these provisions, if an ANDA applicant establishes that its proposed drug product has the same active ingredient, strength, dosage form, route of administration, labeling, and conditions of use as a listed drug, and that it is bioequivalent to that drug, the applicant can rely on the fact that the FDA has previously found the listed drug to be safe and effective. FDA is not permitted to require safety or effectiveness trials to support 505(j) approval (section 505(j)(2)(A)).

The legislation also permitted ANDA applicants to petition for permission to submit ANDAs for products that differ from the listed drug in any of four specified ways — dosage form, route of administration, strength, or active ingredient[8] — where such changes do not require review of clinical data (section 505(j)(2)(C)). If such a petition is granted, the applicant may seek approval for the altered drug product in a petitioned ANDA.[9]

Under section 505(j), the approval of both ANDAs and petitioned ANDAs depends upon the ANDA applicant demonstrating that the proposed product is sufficiently similar to the approved product for which safety and effectiveness have already been established so that no additional evidence of safety and effectiveness need be submitted for review.

Section 505(j) also contains procedures whereby the patents and marketing exclusivity protecting the listed drug are considered by FDA during the approval process for ANDAs, including petitioned ANDAs. The proposed drug described in the ANDA may not be finally approved until the patents and marketing exclusivity have expired or until the NDA holder and patent owners for patents on the listed drug have had an opportunity to defend their patent rights in court. These procedures and requirements to protect the patents and market exclusivity rights of listed drugs are duplicated with respect to approval of 505(b)(2) applications.

With respect to each patent submitted by the sponsor for the listed drug and listed in the Orange Book, the ANDA, petitioned ANDA, or 505(b)(2) applicant must submit to FDA a certification under section 505(j)(2)(A)(vii) or 505(b)(2)(A) stating:

(I) that such patent information has not been filed,
(II) that such patent has expired,

---

[7] Two drugs are considered bioequivalent if, in general, the rate and extent of absorption of the proposed drug do not show a significant difference from the rate and extent of absorption of the listed drug (section 505(j)(8)(B)).

[8] Under FDA regulations, a change in active ingredient is permitted only where "one active ingredient is substituted in for one of the active ingredients in a listed combination drug" (§ 314.93(b)). The petitioned ANDA route is not available for a change in active ingredient in a single active ingredient product.

[9] If such a petition is denied because clinical studies are necessary to demonstrate that the altered drug product is safe and effective, an applicant may submit a 505(b)(2) application.

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

(III) the date on which such patent will expire, or
(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of
the new drug for which the application is submitted.

If an ANDA, petitioned ANDA, or 505(b)(2) applicant does not challenge the listed patents, the
application will not be approved until all the listed patents claiming the listed drug have expired.
If an applicant wishes to challenge the validity of the patent, or to claim that the patent would not
be infringed by the product proposed in the ANDA, petitioned ANDA, or 505(b)(2) application,
the applicant must submit a paragraph IV certification to FDA. The applicant must also provide
a notice to the NDA holder and the patent owner stating that the application has been submitted
and explaining the factual and legal basis for the applicant's opinion that the patent is invalid or
not infringed[10] (section 505(b)(2)(B); 505(j)(2)(B)). Once the NDA holder and patent owner
have received the ANDA, petitioned ANDA, or 505(b)(2) applicant's notice and explanation as
to why the listed patent is invalid or will not be infringed by the proposed drug, they have 45
days within which to sue the applicant for patent infringement and thus trigger a 30-month stay
of FDA approval of the proposed drug (section 505(c)(3)(C); 505(j)(5)(B)). FDA will approve
the proposed drug before the 30-month period expires only if a court finds the patent invalid or
not infringed or the court shortens the period because the parties fail to cooperate in expediting
the litigation (section 505(c)(3)(C); 505(j)(5)(B)).

An ANDA, petitioned ANDA, or 505(b)(2) application will not be approved until all applicable
listed drug product exclusivity has expired and the listed patents have expired, have been
successfully challenged by an applicant, or any applicable 30-month stay has expired
(§ 314.107). ANDAs with paragraph IV certifications to a listed patent may also be subject to
180-day exclusivity held by the first ANDA with a paragraph IV certification to that patent; this
exclusivity does not apply to petitioned ANDAs[11] or 505(b)(2) applications.

## B.    Background on 505(b)(2) Applications

In addition to creating the ANDA approval process, the Hatch-Waxman Amendments also
created a new subset of NDA. Section 505(b)(2) of the FDCA permits the filing of an NDA
where the sponsor does not have a right of reference to all of the studies supporting approval, as
follows:

An application submitted under [section 505(b)(1)] for a drug for which the
investigations described in [section 505(b)(1)(A)] and relied upon by the applicant for
approval of the application were not conducted by or for the applicant and for which the
applicant has not obtained a right of reference or use from the person by or for whom the
investigations were conducted shall also include —

---

[10] See footnote 5.

[11] Because petitioned ANDAs are for a different drug product (different strength, active ingredient, route of
administration, dosage form), they become a separate listed drug and are not subject to the 180-day exclusivity of
the first ANDA applicant for the listed drug.

8

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

> (A) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the drug for which such investigations were conducted or which claims a use for such drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under paragraph (1) or subsection (c) of this section —
>
> (i)    that such patent information has not been filed,
> (ii)   that such patent has expired,
> (iii)  of the date on which such patent will expire, or
> (iv)   that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and
>
> (B) if with respect to the drug for which investigations described in paragraph (1)(A) were conducted information was filed under paragraph (1) or subsection (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

Thus, this section states that an applicant may rely for approval on investigations *not conducted by or for* the applicant and for which the applicant *has not obtained a right of reference*[12] (emphasis added). It also anticipates that the studies on which a 505(b)(2) applicant can rely may be studies on an approved drug product. This is the case because patent certifications apply only to patents on approved drug products listed in the Orange Book. The statute also was amended throughout, as described above, to ensure that the patent and exclusivity bars to approval that apply to ANDAs apply as well to the approval of 505(b)(2) applications. (See, e.g., section 505(c)(3).)

Section 505(b)(2) permits FDA to review applications that are not reviewable under section 505(j) either as duplicates or minor variations of a listed drug and that do not require a full stand alone NDA supported by new scientific studies. Without the 505(b)(2) approval pathway, the available approval routes would be limited to: (1) new studies on all aspects of a drug's safety and efficacy (stand alone NDA) or (2) almost complete reliance on established findings of safety and efficacy (ANDA). For example, a modification to a listed drug (e.g., a novel dosage form) that could not be approved in a petitioned ANDA under section 505(j) because review of new clinical data would be necessary for approval could only be reviewed in a complete new stand alone NDA. This approach is not necessary. Instead, FDA believes that it is reasonable to interpret the statute so that: (1) if a proposed modification may be approved without additional studies, the drug may be reviewed in a 505(j) application that relies *entirely* on the Agency's finding of safety and effectiveness for the listed drug; and (2) if the proposed modification will require additional data for approval, the drug may be reviewed in a 505(b)(2) application that relies *in part* on the Agency's finding of safety and effectiveness for the listed drug.

---

[12] *Right of reference or use* is defined in § 314.3(b) as "the authority to rely upon, and otherwise use, an investigation for the purpose of obtaining approval of an application, including the ability to make available the underlying raw data from the investigation for FDA audit, if necessary."

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

After passage of Hatch-Waxman, FDA explained its interpretation of the new 505(b)(2) provision in a series of public statements, including an open letter to the drug industry in 1987 written by Dr. Paul D. Parkman (the 1987 Parkman letter) (enclosed with this response),[13] the 1989-1994 Hatch-Waxman rulemaking process, and a 1999 draft guidance. In addition, the Agency has responded to many inquiries from industry regarding whether specific drug products could be approved through the 505(b)(2) route.

   *1.    The 1987 Parkman Letter*

The first detailed statement by the Agency explaining the scope of section 505(b)(2) was in the April 10, 1987, letter to industry from Dr. Paul D. Parkman, then Acting Director of the Center for Drugs and Biologics. The 1987 Parkman letter addressed the statutory route by which an applicant "may make modifications in approved drugs when such modifications require submission of clinical data" (1987 Parkman letter at 1). In assessing the various regulatory options, the Agency rejected the idea of requiring a full NDA for such modifications, which would require duplication of the basic safety and effectiveness research. This course, the letter stated, would be inconsistent with the Hatch-Waxman Amendments in that it "would be a disincentive to innovation and require needless duplication of research." The Agency also rejected the option of requiring the submission and approval of an ANDA, followed by a supplement to that ANDA containing the data necessary to support the change. The Agency noted that to generate all of the stability and other data required for ANDA approval, the sponsor would have to take steps to manufacture a product that it had no intention to market. The Agency concluded that the better course was to permit submission of an application under section 505(b)(2) for a change to an already approved drug product *without* requiring that the applicant first obtain approval of an ANDA (the phantom ANDA). The 1987 Parkman letter stated that such changes could include changes in dosage form, strength, route of administration, and active ingredients (for which clinical studies are necessary) as well as new. As described in the 1987 Parkman letter, such applications would rely on the approval of the listed drug together with the clinical data to support the change. The 505(b)(2) applicant "will thus be relying on the approval of the listed drug only to the extent that such reliance would be allowed under section 505(j) to establish the safety and effectiveness of the underlying drug."[14] The letter further noted

---

[13] Much of the initial implementation of the Hatch-Waxman Amendments was explained to the public in a series of letters to industry, which were issued between 1984 and 1988 and were mailed to all known NDA and ANDA applicants and holders. These letters described the Agency's initial views, as it regulated directly from the statute before completion of the rulemaking process.

[14] When FDA approves a stand alone NDA submitted under section 505(b), the approval is based on the data and information submitted in the application. Later approvals under section 505(j) of duplicates or minor modifications to this listed drug will rely on the Agency's conclusions that a drug with those specific characteristics (e.g., active ingredient, strength, dosage form, conditions of use) was previously found to be safe and effective. Similarly, when reviewing a 505(b)(2) application that relies in part on the earlier approval of a listed drug, FDA may rely on its earlier conclusions regarding safety and effectiveness to whatever extent the conclusions are appropriate for the drug under review in the 505(b)(2) application. Although reliance on an FDA finding of safety and effectiveness for an NDA is certainly indirect reliance on the data submitted in the original NDA, reliance on the conclusions supported by that data is not the same as manipulating those data to reach new conclusions not evident from the existing approval. For example, if the NDA for the listed drug contained studies indicating that the drug may be effective for indications X and Y, but the listed drug is not approved for use Y, a 505(b)(2) applicant could not rely on those

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

that the patent certification and exclusivity bars applicable to ANDA approvals would also apply to 505(b)(2) applications.

### 2.   The 1989 Proposed Rule

In 1989, FDA proposed regulations to implement the Hatch-Waxman Amendments, including section 505(b)(2). (*See* "Abbreviated New Drug Application Regulations; Proposed Rule," 54 FR 28872, July 10, 1989.) In proposed § 314.54, FDA laid out the requirements for submission of an application under section 505(b)(2) (54 FR 28919). In the preamble to the proposed regulations, FDA acknowledged that the legislative history referred to "paper NDAs." The paper NDA policy permitted an applicant to rely on evidence derived primarily from scientific literature to demonstrate the safety and effectiveness of duplicates. As noted above, before the enactment of Hatch-Waxman, FDA had used the paper NDA policy to approve literature-based duplicates of certain post-1962 pioneer drug products. FDA noted that despite the reference to paper NDAs in the legislative history, the text of section 505(b)(2) and 505(c)(3)(D) is considerably broader. It does not limit 505(b)(2) applications to applications for literature-supported duplicates of already approved products (54 FR 28890). FDA further explained in the preamble that 505(b)(2) applies to any application that relies on investigations the applicant has not conducted or to which it has not obtained a right of reference "regardless of the similarity or dissimilarity of the drug product to the previously approved drug product" (54 FR 28890). Such applications may be "for variations of approved drug products" or for new chemical entities.

FDA explained that 505(b)(2) applications should be used for never-before-approved changes in approved drug products and that it was "proposing to treat as a 505(b)(2) application *an application for a change in an already approved drug supported by a combination of literature or new clinical investigations and the Agency's finding that a previously approved drug is safe and effective*" (54 FR 28891) (emphasis added). FDA noted, however, that certain applications that were previously approvable under the paper NDA policy would no longer be approvable under section 505(b)(2). Specifically, FDA stated that it would not approve 505(b)(2) applications for literature-based duplicates because it would be inconsistent with Hatch-Waxman purposes to undertake duplicative review of safety and effectiveness data when the abbreviated approval route under section 505(j) is available (54 FR 28890 and 28891). FDA also discussed the patent certification and exclusivity bars for 505(b)(2) applications, emphasizing that they are the same as those that apply to ANDAs (54 FR 28892).

### 3.   The 1992 Final Rule

The regulation proposed in 1989 is, in all relevant respects, the same as the current regulation at § 314.54, which was finalized in 1992.[15]   There were two comments on the proposed provisions

---

studies to get approval for indication Y; it could only rely on the fact that the Agency found the drug to be effective for use X.

[15] Section 314.54 *Procedure for submission of an application requiring investigations for approval of a new indication for, or other change from, a listed drug* provides:

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

regarding 505(b)(2) applications, neither of which addressed FDA's fundamental interpretation of section 505(b)(2). These comments were addressed in the preamble of the final rule that established the regulation at § 314.54 governing the types of applications that could be submitted under section 505(b)(2) (57 FR 17950 at 17954, April 28, 1992).

FDA's regulation at § 314.54 makes clear that FDA interprets section 505(b)(2) to permit approval of an application that relies on the finding of safety and effectiveness of a listed drug to the extent such reliance is scientifically justified. Specifically, it provides that "[a]ny person seeking approval of a drug product that represents a modification of a listed drug . . . and for which investigations other than bioavailability or bioequivalence studies are essential to approval of the changes may . . . submit a 505(b)(2) application. This application need contain only that information needed to support the modification of the listed drug" (§ 314.54(a)). It further requires applicants seeking approval under 505(b)(2) to "[identify] the listed drug for which FDA

---

(a) The act does not permit approval of an abbreviated new drug application for a new indication, nor does it permit approval of other changes in a listed drug if investigations, other than bioavailability or bioequivalence studies, are essential to the approval of the change. Any person seeking approval of a drug product that represents a modification of a listed drug (e.g., a new indication or new dosage form) and for which investigations, other than bioavailability or bioequivalence studies, are essential to the approval of the changes may, except as provided in paragraph (b) of this section, submit a 505(b)(2) application. This application need contain only that information needed to support the modification(s) of the listed drug [including]

(iii) Identification of the listed drug for which FDA has made a finding of safety and effectiveness and on which finding the applicant relies in seeking approval of its proposed drug product by established name, if any, proprietary name, dosage form, strength, route of administration, name of listed drug's application holder, and listed drug's approved application number.

(iv) If the applicant is seeking approval only for a new indication and not for the indications approved for the listed drug on which the applicant relies, a certification so stating.

(v) Any patent information required under section 505(b)(1) of the act with respect to any patent which claims the drug for which approval is sought or a method of using such drug and to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product.

(vi) Any patent certification or statement required under section 505(b)(2) of the act with respect to any relevant patents that claim the listed drug or that claim any other drugs on which investigations relied on by the applicant for approval of the application were conducted, or that claim a use for the listed or other drug.

(vii) If the applicant believes the change for which it is seeking approval is entitled to a period of exclusivity, the information required under § 314.50 (j).

(b) An application may not be submitted under this section for a drug product whose only difference from the reference listed drug is that: (1) The extent to which its active ingredient(s) is absorbed or otherwise made available to the site of action is less than that of the reference listed drug; or (2) The rate at which its active ingredient(s) is absorbed or otherwise made available to the site of action is unintentionally less than that of the reference listed drug.

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

has made a finding of safety and effectiveness and on which finding the applicant relies in
seeking approval of its proposed drug product" (§ 314.54(a)(1)(iii)).

### 4.    The 1994 Final Rule

In 1994, FDA issued regulations governing the patent certification and exclusivity aspects of
505(b)(2) applications ("Abbreviated New Drug Application Regulations; Patent and Exclusivity
Provisions; Final Rule" (59 FR 50338, October 3, 1994)).  Because 505(b)(2) applications are
NDAs submitted under section 505(b) and approved under section 505(c), they are eligible for
the same three-year new clinical study exclusivity and five-year new molecular exclusivity as are
other NDAs (§ 314.108).  The sponsors of 505(b)(2) applications also must submit the same
required information regarding patents that claim the drug, or the use of the drug, described and
approved in the 505(b)(2) application (§ 314.53).  The regulations also addressed the fact that
approval of a 505(b)(2) application is, as with ANDAs, subject to the listed patents, as well as
the three- and five-year exclusivity protecting the listed drug.  A 505(b)(2) application will not
be approved until all applicable listed drug product exclusivity has expired, and the listed patents
have expired, have been successfully challenged by an applicant, or any applicable 30-month
stay has expired. (See §§ 314.50, 314.107, and 314.108.)

### 5.    The 1999 Draft Guidance

In response to many requests from industry and based upon accumulated agency experience in
applying section 505(b)(2), FDA drafted and published in October 1999 a draft guidance for
industry entitled *Applications Covered by Section 505(b)(2)* (1999 draft guidance).  The 1999
draft guidance describes existing practice as well as certain possible uses within the scope of
section 505(b)(2) that had not yet been employed by industry.  It notes that "[s]ection 505(b)(2)
permits approval of applications other than those for duplicate products and permits reliance for
such approvals on literature or on an Agency finding of safety and/or effectiveness for an
approved drug product" (1999 draft guidance, p. 2).  The 1999 draft guidance contains
information for industry regarding the type of information an applicant could rely on for
approval under section 505(b)(2) as well as the types of changes approvable under that section.
The 1999 draft guidance states that an applicant seeking approval under section 505(b)(2) can
rely on a combination of published literature, its own clinical studies, and/or the agency's finding
of safety and effectiveness for a listed drug (1999 draft guidance, p. 3).  The guidance also notes
that a 505(b)(2) application can be submitted for different types of applications, including for a
new chemical entity, or for a change to a previously approved drug such as a new dosage form,
strength, route of administration, substitution of an active ingredient in a combination product,
new formulation, new dosing regimen, new active ingredient, new combination product, a new
indication, or for a naturally derived or recombinant active ingredient.

FDA received a number of comments on the 1999 draft guidance.  Some of the comments stated
that the approach described in the guidance would result in improper use of data in innovator
NDAs.  Other comments supported the guidance as describing an appropriate use of section
505(b)(2) to permit approval of innovative drug products without requiring unnecessary

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

duplication of research, including clinical research. The guidance has not been published in final form.

## III.   ANALYSIS

FDA's long-standing interpretation of section 505(b)(2) permits the Agency to approve drug applications that rely on studies not conducted by or for the applicant and which the applicant has not received permission to use from the sponsor, so long as the 505(b)(2) applicant complies with the applicable statutory requirements regarding patent protection and new drug exclusivity. The 505(b)(2) process permits an applicant seeking approval for a drug product that differs from the approved drug product to obtain approval without conducting new studies to demonstrate to the Agency what has already been demonstrated. This approach is based on the broad statutory language, its historical context, and its place within the Hatch-Waxman statutory scheme, as well as relevant policy and public health considerations.

The linchpin of FDA's interpretation of 505(b)(2) is that a 505(b)(2) applicant may rely on the FDA's finding of safety and effectiveness for a listed drug only to the same extent an ANDA applicant may rely on such a finding under section 505(j). (See 54 FR 28872 at 28892: "The [505(b)(2)] applicant will thus be relying on the approval of the listed drug only to the extent such reliance would be allowed under 505(j) of the act.") In the 505(j) approval process, the ANDA applicant seeking approval of either a duplicate to the listed drug, or a petitioned modification, relies solely on the previous finding of safety and effectiveness for the listed drug; the ANDA must be approvable without additional clinical or preclinical evidence of safety or effectiveness. In the 505(b)(2) process, the applicant also relies on the previous finding of safety and effectiveness for the listed drug. But such reliance will be appropriate only to the extent that the proposed product in the 505(b)(2) application shares characteristics (active ingredient, dosage form, strength, route of administration, indications, and conditions of use) in common with the listed drug. The safety and effectiveness of any differences between the listed drug and the drug proposed in the 505(b)(2) application must be supported by additional data, including clinical or animal data, as appropriate (§ 314.54).

Since the Agency began implementing section 505(b)(2) with the 1987 Parkman letter, FDA's approach to 505(b)(2) applications has been governed by consistent scientific principles. In enacting the Hatch-Waxman Amendments, Congress authorized FDA to rely on information about the safe and effective use of an approved drug product to approve another drug with similar characteristics, because duplicative clinical testing to reestablish what has already been shown is wasteful, unnecessary, and may raise ethical issues. In the 505(b)(2) context, the applicant can rely on established conclusions about the approved drug to the extent these conclusions are applicable to the proposed product. However, the applicant must supply data to support any differences between the two products.

Precisely what additional data will be necessary for approval of a drug will vary from case to case and is generally the subject of discussion between the sponsor and FDA during the drug development process. For example, a 505(b)(2) application for a new dosage form (such as a transdermal patch or a novel drug delivery mechanism) that cannot be approved as a petitioned

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

ANDA — because clinical studies are necessary to demonstrate safety and/or effectiveness — must contain whatever data are necessary to demonstrate that the new dosage form is safe and effective to treat the indications approved for the listed drug. Similarly, approval of a drug product for a new indication with the same strength and dosing regimen as a previously approved drug product will require evidence establishing that the drug is effective for the new indication. But new safety information may not be necessary because the underlying drug has already been shown to be safe at the approved dosing level. Thus, the nature and extent of the reliance on the agency's conclusion of safety and effectiveness for a listed drug are the same for applicants under section 505(b)(2) and 505(j); it is only the amount of *additional* data necessary to support the approval of the proposed drug product that may differ.

Reliance on FDA's conclusion that an approved drug is safe and effective does not involve disclosure to the ANDA or 505(b)(2) applicant — or to the public — of the data in the listed drug's NDA. Instead, it permits the ANDA or 505(b)(2) applicant to rely on the fact that FDA found a drug product with certain characteristics to be safe and effective and, in the case of a 505(b)(2) applicant, to target its studies to prove how changes from this previously approved drug product also meet the FDA's safety and effectiveness standards.

FDA's interpretation is supported by the text of section 505(b)(2), the structure of the Hatch-Waxman Amendments, and the purposes of that legislation. The interpretation is also supported by policy considerations. By permitting appropriate reliance on what is already known about a drug, thereby saving time and resources in the drug development and approval process, FDA's interpretation allows the pharmaceutical industry to target investment on innovative drug development. It avoids the ethical concerns associated with unnecessary duplicative testing that could deny effective treatment to sick patients taking placebos or ineffective dosages. And it allows improved products to reach the market that may not otherwise have been developed, such as modifications to products needed for a small patient population. Thus, FDA's current interpretation is in the interest of the public health.

## A.    Statute and Legislative History

### 1.    *The Language and Legislative History of Section 505(b)(2)*

FDA's interpretation is based on and supported by the plain language of the statute. Section 505(b)(2) permits applicants to rely on studies which "were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use." This provision does not limit the sources of the studies on which 505(b)(2) applicants may rely. The statutory language does not suggest Congress intended to codify the paper NDA policy in effect before the statute's passage or to limit 505(b)(2) approvals to literature-based duplicates or changes that could be approved under an ANDA followed by a supplement. Thus, on its face, the statute goes beyond the old paper NDA policy. Even if the statute were considered ambiguous, however, FDA has reasonably construed the broad language of section 505(b)(2).

The legislative history of the 505(b)(2) provision does not require a contrary interpretation. The House Report defines *paper NDA* as "any application submitted under section 505(b) of the

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

FDCA in which the investigations relied upon by the applicant to show safety and effectiveness were not conducted by or for the applicant and the applicant has not obtained a right of reference or use from the person who conducted the studies or for whom the studies were conducted" (House Report at 32). Notably, this definition makes no mention of either literature or duplicate products, the two hallmarks of the paper NDA under the paper NDA policy in effect when Hatch-Waxman was passed. (See "Publication of 'Paper NDA' Memorandum" (46 FR 27396).) Had Congress intended to use section 505(b)(2) to codify the paper NDA policy then in existence, it presumably would not have defined a 505(b)(2) application or paper NDA in a way that was considerably broader than its preexisting definition. Rather, given that the broad definition of paper NDA in the House Report mirrors the broad statutory language, it is reasonable to presume that Congress intended that section 505(b)(2) extend beyond the literature-based duplicates permissible under the paper NDA policy.[16] This seems especially likely given that when Hatch-Waxman was passed, it was widely recognized that few, if any, additional applications could be approved based on published literature alone, given the state of such literature (House Report at 16: "[Paper NDA policy] is inadequate, however, because FDA estimates that satisfactory reports are not available for 85% of all post-1962 drugs").

In assessing the role of section 505(b)(2) in the drug approval process, it is important to bear in mind that, in the Hatch-Waxman Amendments, Congress created a specific, detailed abbreviated route for approval of duplicates through section 505(j), which permits reliance on the previous finding of safety and effectiveness for a listed drug. Thus, codification of the inadequate and ineffective paper NDA process for literature-based duplicates would have been unnecessary and superfluous. In addition, section 505(b)(2) would have been unnecessary as an approval route for changes to drug products for which a petition can be filed seeking approval as a petitioned ANDA under section 505(j) because no additional safety or effectiveness data are necessary to the approval in that case. Thus, Congress created a new type of application, a 505(b)(2) application, to fill specific gaps left by the other approval pathways: a 505(b)(2) application can be used for approval of those changes that are not so significant that they require a stand alone NDA, but that are significant enough that they may require additional safety or effectiveness data (and, therefore, are not eligible for approval under section 505(j)).

As described in the 1987 Parkman letter, an applicant wishing to make a change to an approved drug could submit an ANDA for a duplicate of the listed drug (or a petitioned ANDA for a petitioned change to that drug). Once the ANDA applicant received approval of the ANDA, that ANDA holder could submit a supplemental application under 505(b) to make a change to the approved drug, and include in that supplement whatever information and studies are needed to approve the change.[17] Although there is no statutory barrier to permitting an ANDA holder to

---

[16] Because Congress specifically defined *paper NDA* in the legislative history in a way that was broader than the definition that FDA had used previously, the presumption that Congress gave the term the same meaning as the Agency had previously does not apply.

[17] FDA has long interpreted the term *application* as used in section 505 to include new NDAs, amendments, and supplements (§§ 314.3(b), 314.50). Thus, for example, when the holder of an approved application seeks approval for a supplement to change that drug, it must submit a supplement that meets the relevant application requirements in § 314.50 (§ 314.71(b)).

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

request approval under section 505(b) for a supplement to that ANDA, as described in the 1987 Parkman letter, the Agency decided that it is not necessary to require that an applicant obtain approval of a phantom ANDA when the applicant seeks to make a change to a listed drug.   In this situation, the section 505(b)(2) mechanism provides an appropriate regulatory pathway that also ensures adequate marketing protections for the listed drug.

The language of the statute does not limit 505(b)(2) approvals to those changes that could be proposed in a supplement to an approved ANDA under section 505(j).   The changes (such as a new indication, new dosage form, new strength or new formulation) that may be submitted in a supplement rather than requiring a separate application (i.e., what products may be bundled) are a matter of FDA administrative policy and practice, not a function of statutory requirements.

Nor does the language of section 505(b)(2) necessarily prohibit approval of a 505(b)(2) application before an ANDA for the listed drug has been or could be approved.   If a 505(b)(2) application could only be approved after an ANDA referencing the listed drug had been approved, or after all patent and exclusivity rights have expired (as some have contended), the independent patent certification obligations that apply under section 505(b)(2) (and the opportunity to challenge a listed patent and obtain approval upon a finding of noninfringement or upon expiration of the 30-month stay) would be superfluous. (See *Gustafson v. Alloyd Co.*, 115 S. Ct. 1061, 1069 (1995) (courts should avoid interpretations that render some words of statute redundant).)  Similarly, if Congress had wanted to impose such a limitation on 505(b)(2) approvals, it likely would have placed the relevant provision in section 505(j) rather than in section 505(b) of the statute or would have otherwise signaled that only this limited subset of applications could be submitted and approved under section 505(b)(2).

2.     *Differences Between Section 505(b)(2) and 505(j)*

The differences between section 505(b)(2) and 505(j) of the statute (and the references to one or the other type of application in other parts of the statute) further support FDA's interpretation. These differences include differences in disclosure and withdrawal provisions, among others, and reflect the fact that drugs approved under 505(b)(2) applications, unlike those approved under 505(j) applications, are not required to be duplicates of listed drugs. [18]

The disclosure provisions of section 505(l) are a case in point.   Under section 505(l)(5), absent extraordinary circumstances, all safety and effectiveness data in an NDA shall be disclosed to the public upon request when an ANDA has been or could have been approved.   There is no comparable provision requiring disclosure, absent extraordinary circumstances, when a 505(b)(2) application is approved.   This difference reflects Congress's understanding that 505(b)(2) applications, in contrast to ANDAs, may rely on some aspects of a listed drug's approval (such as the toxicology profile) but not on others.   Given the possibility that the product under a 505(b)(2) application could have significant differences from the listed drug referenced, approval of a 505(b)(2) application based, in part, on a previous approval of an NDA would not give rise to a

---

[18] In fact, FDA regulations state that section 505(b)(2) is not an appropriate approval pathway for an application for a duplicate eligible for approval under section 505(j).  See §§ 314.54(b), 314.101(d)(9).

17

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

presumption that all of the NDA data cease to retain their value and should be available for public disclosure. In contrast, because an ANDA is for a duplicate of an approved drug, it is logical to presume that once a 505(j) application has been approved, the information in the original application ceases to retain much of its value and thus may be available for public disclosure. This difference explains why section 505(l)(5) uses ANDA approvals as a disclosure trigger, but has no comparable trigger based on 505(b)(2) approval.

Similarly, there are no analogues in section 505(b)(2) to the provisions in section 505(j) requiring that the product under the 505(j) application be bioequivalent to, have the same conditions of use as, and use the same labeling as the listed drug referenced. These differences do not suggest that 505(b)(2) applications cannot rely, in part, on FDA's conclusion that a listed drug is safe and effective. Rather, they support FDA's longstanding interpretation that the products under 505(b)(2) applications, unlike those under ANDAs, need not be duplicates of the listed drugs referenced. If 505(b)(2) applications were limited to literature-based duplicates, surely Congress would have required that, like those approved in ANDAs, products approved in 505(b)(2) applications be bioequivalent to, have the same conditions of use as, and the same labeling as the listed drugs referenced. No such sameness requirement was included, however, because section 505(b)(2) was never intended to be limited to literature-based duplicates.

Furthermore, differences in withdrawal provisions reflect the differences in the two types of applications. Because ANDAs are, by definition, for duplicates (or minor variations) of a reference listed drug, drug products approved in ANDAs are expected to have the same safety and effectiveness profile as the listed drugs they reference. Thus, it is not surprising that ANDAs must be withdrawn when the listed drug is withdrawn for safety or effectiveness reasons (section 505(j)(6)). In contrast, because the product under a 505(b)(2) application can differ significantly from the listed drug referenced, there is no comparable withdrawal requirement when the listed drug is withdrawn for safety or effectiveness reasons.

## B.    Drug Approvals Under Section 505(b)(2)

Since 1984, 505(b)(2) applications have been used by a wide range of sponsors in the pharmaceutical industry (including petitioner Pfizer and members of petitioner BIO) to obtain approval of more than 80 drug products. Over 30 additional 505(b)(2) applications are currently under review by the Agency. Most of these applications have not been solely literature-based 505(b)(2) applications.

The 505(b)(2) approval pathway has been particularly important in certain areas of drug development where a limited or uncertain market warrants maximum leveraging of current knowledge about a drug. The Agency has approved 505(b)(2) applications for drugs for treatment of exposure to radiation and chemical warfare, drugs targeted to pediatric populations, novel dosage forms, and new formulations for antibiotics and cancer drugs, among others. In many of these areas, drug development resources are scarce. Creating an abbreviated pathway that allows sponsors to focus these limited resources to develop data on the innovation has led to the creation of new therapeutic options that otherwise might not have been available. For example, certain patient groups, such as children, may have trouble swallowing capsules or

18

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

tablets. But the size of that patient population may not support the expense of a stand alone NDA to seek approval for a pediatric-friendly dosage form. Section 505(b)(2) provides a more efficient and cost-effective pathway to bring such innovations to market.

The following noncomprehensive list provides some examples of 505(b)(2) applications that the Agency has approved:

1.  *Treatments for Exposure to Radiological or Chemical Terrorism or Warfare*

- The U.S. Army's 505(b)(2) application for pyridostigmine bromide was approved in 2003 as a pretreatment to increase survival after exposure to the nerve agent Soman. This application relied on animal efficacy data to support the effectiveness of pyridostigmine bromide to treat exposure to nerve gas; it relied for safety on the fact that pyridostigmine bromide had been approved and used for many years as Mestinon at a higher dose to treat myesthenia gravis.

- The U.S. Army's 505(b)(2) application for atropine/pralidoxime autoinjectors was approved in 2002 for treatment of poisoning by nerve agents and relied on the previous approvals of atropine and pralidoxime products. Before approval of this 505(b)(2) application, there had been two approved NDAs for the separate autoinjectors, and military personnel were required to carry separate injectors for atropine and pralidoxime. This 505(b)(2) application approved one autoinjector that administers both drugs in a single injection.

- The U.S. Army's 505(b)(2) application for a diazepam autoinjector was approved as an anticonvulsant in December 1990. When the Army entered into discussions with the Agency about approval of an autoinjectable anticonvulsant, the Agency concluded that, because of necessary variations from innovator labeling, such an application would not be appropriate for an ANDA through the suitability petition process. Section 505(b)(2) provided for a prompt approval to meet an immediate need.

- Heyl's 505(b)(2) application for Radiogardase (prussian blue) was approved in 2003 for use in patients with known or suspected exposure to thallium or radioactive cesium, an orphan indication. Prussian blue was approved as new chemical entity (a drug in which no active moiety has been previously approved).

2.  *Pediatrics*

- Mallinckrodt's 505(b)(2) applications for chewable tablet and oral solution forms of methylphenidate were approved in 2002 and 2003, respectively, to treat attention deficit disorder.

- Ascent's 505(b)(2) application for trimethoprim hydrochloride in oral solution was approved in 1995 for treatment of urinary tract infections.

19

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

- Wyeth Consumer Healthcare's 505(b)(2) application for Children's Advil Cold Suspension (ibuprofen and pseudoephedrine) was approved in 2002 for the temporary relief of cold, sinus, and flu symptoms.

    3.   *New Drugs, Alternative Dosage Forms and New Formulations for Antibiotics and Cancer Drugs*

- Bryan Corporation's 505(b)(2) application for Sclerosol (sterile talc powder) was approved in 1997 to treat malignant pleural effusion. Sclerosol was approved as a new chemical entity (a drug in which no active moiety has been previously approved).

- Elan's 505(b)(2) application for Duraclin (clonidine HCl) was approved in 1996 for epidural administration to treat cancer pain.

The 505(b)(2) approach also has been used to approve less toxic formulations of cancer drugs, for example, a chemotherapy agent that is made without a toxic excipient. Use of the 505(b)(2) pathway has allowed some sponsors to avoid using scarce cancer research resources to conduct unnecessary trials to re-demonstrate efficacy for such a product.

    4.   *Other Examples of Section 505(b)(2) Applications*

- Pfizer's 505(b)(2) application for Zyrtec D (certirizine and pseudoephedrine) was approved in 2001 as a new combination for the relief of nasal and non-nasal symptoms associated with seasonal or perennial allergic rhinitis.

- Pfizer's 505(b)(2) application for Rid Mousse (piperonyl butoxide and pyrethins) was approved in 2000 for the treatment of head, pubic, and body lice.

- Andrx's 505(b)(2) application for Altocor (lovastatin) was approved in 2002 as an extended release formulation for lowering cholesterol levels.

- Galderma's 505(b)(2) application for clindamycin phosphate was approved in November 2000 as a once daily gel (others are twice daily) for the treatment of acne.

- Orion Pharma's 505(b)(2) application for Stalevo (carbidopa, levodopa, and entacapone) was approved in 2003 as a new combination product for treatment of Parkinson's disease.

- Novartis Consumer's 505(b)(2) application for Tavist, a new combination of acetaminophen, clemastine, and pseudoephedrine, was approved in 2001 for the temporary relief of symptoms associated with hay fever, allergic rhinitis, and the common cold.

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

- Dey Labs' 505(b)(2) application for Duoneb (albuterol sulfate and ipratropium) was approved in 2001 for the treatment of bronchospasms associated with chronic obstructive pulmonary disease in patients requiring more than one bronchodilator.

- Duramed's Cenestin (synthetic conjugated estrogens) was approved in 1999 for the treatment of moderate-to-severe vasomotor symptoms associated with menopause and the treatment of vulvar and vaginal atrophy.

- Celegene's Thalomid (thalidomide) was approved 1998 to treat erythema nodosum leprosum (leprosy) (an orphan indication).

- OPR's Cafcit (caffeine citrate) was approved in 1999 for treatment of apnea of prematurity (an orphan indication).

The pharmaceutical industry continues to rely on the 505(b)(2) pathway for drug development and innovation. FDA has identified more than 30 pending 505(b)(2) applications, and the Agency is currently in discussions with many additional sponsors about their development and research plans for 505(b)(2) applications.

## IV.   FDA'S RESPONSE TO ARGUMENTS IN THE PFIZER, BIO, AND TORPHARM CITIZEN PETITIONS

### A.   The Language of Section 505(b)(2)

Petitioners argue that FDA's interpretation of section 505(b)(2) is inconsistent with the statutory language. They argue that section 505(b)(2) simply permits a sponsor to rely on studies in the published literature to support approval, or that such approval is limited to duplicate products. They assert that section 505(b)(2) does not permit a sponsor to rely on FDA findings that an approved drug is safe and effective when those findings are based on the listed drug's nonpublic studies (2001 Pfizer petition at 3, TorPharm petition at 8).

**FDA Response:** As explained above, the plain language of 505(b)(2) does not support petitioners' narrow construction. Section 505(b)(2) permits applicants to rely on studies which "were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use." The statute does not limit the sources of the studies on which 505(b)(2) applicants may rely to published literature or other publicly available studies — even though Congress could easily have added such a limitation. Indeed, petitioner Pfizer appears to concede in its April 28, 2003, submission that the broad language of section 505(b)(2) permits more than approval of literature-based duplicates. Specifically, Pfizer acknowledges that the principle expressed in the 1987 Parkman letter is a permissible interpretation of the statute (April 2003 comment at 2).[19]

---

[19] In the 1987 Parkman letter, the Agency explained that section 505(b)(2) allowed submission of an application for a change in an already approved drug product, without requiring that the applicant first obtain approval of an ANDA and then supplement that approval with a 505(b) supplement for the change. However, Pfizer construes the 1987

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

## B.    The Legislative History of Section 505(b)(2)

Petitioners cite to legislative history in which a 505(b)(2) application is referred to as a *paper NDA* to support their argument that the statute codified — rather than expanded on or replaced — the paper NDA policy in effect before the passage of the Hatch-Waxman Amendments. Petitioners TorPharm and BIO assert that section 505(b)(2), like the paper NDA policy, is intended to permit approval of NDAs for duplicates of approved drugs that are fully supported by published literature. In petitioners' views, no reliance on previous approvals or previous findings of safety and effectiveness is contemplated under section 505(b)(2) (TorPharm petition at 9-10; BIO petition at 17). Petitioner BIO notes that court decisions examining FDA's paper NDA policy before the passage of section 505(b)(2) found that FDA could not approve an application in which one manufacturer relied on another's proprietary information. BIO contends that it is "improbable that Congress would have changed the law in this field without an explicit statement in the statute, or, at the very least, the legislative history" (BIO petition at 17).

**FDA Response:** As explained above, petitioners selectively excerpt from the legislative history. Although the House Report uses the phrase *paper NDA* to describe a 505(b)(2) application, the House Report defines paper NDA far more expansively than the then-existing paper NDA policy. Specifically, the House Report defined paper NDA as "any application submitted under section 505(b) of the FDCA in which the investigations relied upon by the applicant to show safety and effectiveness were not conducted by or for the applicant and the applicant has not obtained a right of reference or use from the person who conducted the studies or for whom the studies were conducted" (House Report at 32). This definition does not mention either literature or duplicates, just as the language of section 505(b)(2) does not mention either limitation. Thus, contrary to BIO's contention, the statute and the legislative history indicate a change from existing policy by describing a 505(b)(2) application and defining a paper NDA, respectively, more broadly than the preexisting definition of a paper NDA.

## C.    Limitations on Section 505(b)(2) from Statute as a Whole

Petitioner Pfizer argues that, reading the statute as a whole, there are two important limitations on the subset of approvals that constitute permissible changes to listed drugs under section 505(b)(2). First, according to Pfizer, the opportunity to use section 505(b)(2) to seek approval for a change to a listed drug is only available at or after the time an ANDA for that listed drug has been or could be approved. In Pfizer's view, the Agency may not approve any 505(b)(2) application that relies on the finding of safety and effectiveness for an approved drug before a 505(j) application referencing that drug has been or could be approved (April 2003 comment at 13). Second, Pfizer suggests that, regardless of the timing of approval, a 505(b)(2) application cannot be used for a change to a listed drug that could not be made through submission of an

---

Parkman letter narrowly to sanction use of the 505(b)(2) pathway to approve only limited types of changes and then argues that only this limited use is a permissible statutory interpretation. Thus, in Pfizer's view, changes that would require submission of a separate application under FDA's current bundling policy are not within section 505(b)(2)'s scope and FDA exceeds the authority granted under the statute when it uses section 505(b)(2) as a pathway for approval of such changes.

22

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

ANDA followed by a supplement to that ANDA (April 2003 comment at 13). In this view, the Agency may only rely on the finding of safety or effectiveness for a given drug if the change proposed is one that could be made in a supplement to an ANDA rather than requiring an entirely separate application. In the limited circumstances where an applicant can obtain approval of an ANDA and file a supplement for a change to that ANDA, the applicant may collapse the process and file a single application under section 505(b)(2) (April 2003 comment at 3).

**FDA Response:** There is no temporal language in the statute limiting 505(b)(2) approvals to those occurring after an ANDA has been approved; nor is there any sequential language in the statute that limits changes to those that could be approved under section 505(j) followed by a supplement. As explained above, if a 505(b)(2) application could only be approved after an ANDA referencing the listed drug had been approved, or after all patent and exclusivity rights have expired, the independent patent certification obligations that attach under section 505(b)(2) (and the related opportunity to challenge a listed patent with a paragraph IV certification and obtain approval upon a finding of noninfringement or invalidity, or upon expiration of the 30-month stay) would be superfluous. Similarly, if Congress had wanted to impose either proposed limitation on 505(b)(2) approvals, it likely would have placed the relevant provision in section 505(j), rather than in section 505(b) of the statute, or would have otherwise signaled that only this limited subset of applications could be submitted and approved under section 505(b)(2). Instead, as discussed above, the plain language of section 505(b)(2) is broad, strongly suggesting that Congress intended to create two different pathways for approval, rather than to have section 505(b)(2) function simply as an offshoot of section 505(j).

## D.     Differences Between Section 505(b)(2) and 505(j)

In support of their statutory interpretation arguments that section 505(b)(2) only contemplates reliance on the finding of safety and effectiveness for an approved drug, if at all, in limited circumstances, petitioners cite differences between provisions in section 505(j) and 505(b)(2) and in references to the two sections in other provisions of the statute. Both Pfizer and TorPharm emphasize the differences between section 505(b)(2) and 505(j) to argue that FDA's interpretation of section 505(b)(2) to allow reliance on the finding of safety or effectiveness of a listed drug is unreasonable. TorPharm argues that the language in section 505(j)(2)(A)(i) that requires an ANDA to contain "information to show the conditions of use prescribed, recommended, or suggested in the labeling have been previously approved for a listed drug" permits FDA to rely on a previous finding of safety and effectiveness to approve a 505(j) application. Because section 505(b)(2) contains no comparable provision, TorPharm argues that no such reliance is permitted in the 505(b)(2) context (TorPharm petition at 13). Similarly, Pfizer notes that section 505(j)(6) requires approval of an ANDA to be withdrawn if the listed drug is withdrawn for safety or effectiveness reasons. Pfizer argues that section 505(b)(2) does not contain an analogous withdrawal provision because Congress never intended for 505(b)(2) applicants to rely in whole or part on the finding of safety or effectiveness of a listed drug. Accordingly, a 505(b)(2) application would not be expected to face withdrawal when a listed drug is withdrawn (2001 Pfizer petition at 8).

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

**FDA Response:** As discussed above, the differences in section 505(b)(2) and 505(j) (or in references to one or the other type of application in other parts of the statute) do not indicate that Congress precluded sponsors from relying on the finding of safety or effectiveness of an approved drug in support of a 505(b)(2) approval. These differences merely reflect that 505(b)(2) applications, unlike 505(j) applications, are not required to be duplicates of listed drugs. For example, in response to TorPharm's argument that there is no 505(b)(2) analogue to the provision in section 505(j) requiring that the applicant seek approval for the *same conditions of use* as the listed drug, the difference reflects that 505(b)(2) applications, unlike ANDAs, may seek approval for different conditions of use than the listed drugs they reference. Thus, the 505(b)(2) application may not need information on the same conditions of use; however, FDA may require that other appropriate information be submitted. The differences noted by petitioners do not establish that 505(b)(2) applications may not rely on the finding of safety or effectiveness for a listed drug.

Similarly, the differences in withdrawal provisions noted by Pfizer reflect the differences in the two types of applications. Because ANDAs are, by definition, for duplicates or minor variations of a reference listed drug and are, by definition, approved without submission of clinical or preclinical studies to establish safety or effectiveness, they are statutorily presumed to have the same safety and effectiveness profile as the listed drug they reference. Thus, it is not surprising that an ANDA must be withdrawn when the listed drug it references is withdrawn for safety or effectiveness reasons (section 505(j)(6)). In contrast, because the drug described in a 505(b)(2) application can differ significantly from the listed drug it references, withdrawal of the latter for safety or effectiveness reasons does not necessarily require automatic withdrawal of the former. Under these circumstances, it is appropriate to approach withdrawal of a 505(b)(2) application on a case-by-case basis, even in the face of the withdrawal of the listed drug it references.

**E.    Section 505(l)**

Pfizer contends that the disclosure provision at section 505(l)(5) establishes that ANDA approval (or the expiration of all patents on the listed drug) is a prerequisite to approval of a 505(b)(2) application. Pfizer notes that section 505(l)(5) provides that, absent extraordinary circumstances, safety and effectiveness data in an NDA are available for public disclosure at the time an ANDA has been, or could be approved. Based on this provision, Pfizer contends that it is only after an ANDA has been, or could be, approved that the data in NDA are available for any purpose, including support for a 505(b)(2) approval. Pfizer thus argues that, to give meaning to section 505(l)(5), if no ANDA for a listed drug has been approved (because, for example, the sponsor of the listed drug has a patent on some aspect of the drug that has not been challenged by an ANDA applicant), then no 505(b)(2) application is eligible for approval (2001 Pfizer petition at 9).

Pfizer argues that this interpretation of section 505(l)(5) is consistent with the approval scheme under section 505(j) because section 505(j) "authorizes reliance on data in an innovator company's NDA once other patent and exclusivity rights have expired" to support approval of an ANDA. Pfizer argues that it logically follows that an approval under section 505(j) triggers release of those data under section 505(l). Pfizer opines that there is no comparable disclosure provision that triggers broader disclosure of data in the NDA of a listed drug when a 505(b)(2)

24

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

application is approved because section 505(b)(2), itself, does not authorize reliance on the proprietary data in another company's NDA to support a 505(b)(2) approval. Pfizer contends that FDA's interpretation of section 505(b)(2) — permitting reliance on the finding of safety and effectiveness for an approved NDA before the raw data in the NDA are fully disclosable under section 505(l) — renders section 505(l) meaningless, upsets the settled expectations of NDA holders, and is inconsistent with Congress's intent (2001 Pfizer petition at 9).

**FDA Response:** As noted, section 505(l)(5) is silent as to the effect of 505(b)(2) approval on disclosure of innovator data because applications approved under section 505(b)(2), in contrast to those approved under section 505(j), need not be duplicates. Given that a drug approved under section 505(b)(2) can differ significantly from the listed drug it references, an approval of a 505(b)(2) application does not — and logically cannot — give rise to the presumption that the data in the listed drug's NDA cease to retain commercial value.

Moreover, Pfizer's contention is not supported either by the language of section 505(l) or by its place in the statutory scheme. Section 505(l) provides in relevant part:

> Safety and effectiveness data and information which has been submitted in an application under [section 505](b) for a drug and which has not previously been disclosed to the public shall be made available to the public, upon request, unless extraordinary circumstances are shown . . . (5) upon the effective date of the approval of the first application under [section 505](j) which refers to such drug or upon the date upon which the approval of an application under [section 505](j) which refers to such drug could be made effective if such an application had been submitted.

This provision is exactly what it appears to be — a public disclosure provision stating the outer limits after which public disclosure of safety and effectiveness data must occur absent extraordinary circumstances. It does not provide that FDA may not rely on the finding of safety and effectiveness for an approved drug before this outer limit — in this case 505(j) approval — is reached. Moreover, section 505(l) deals with public disclosure of raw safety and effectiveness data in an application, not with its use by the Agency to support approval of another application. The Agency need not disclose proprietary data for an applicant or FDA to rely on the fact that a particular drug with particular characteristics has been found safe and effective. In fact, FDA routinely approves ANDAs by relying on the safety and effectiveness of a listed drug without triggering full disclosure of raw data under section 505(l)(5).

Pfizer's premise that its reading of section 505(l) makes sense because ANDAs cannot be approved until all patents and exclusivities have expired is also faulty. Approval is possible under section 505(j) even when patent rights are still in force. If, for example, an ANDA applicant were to file a patent challenge, be sued within 45 days, and the patent litigation were ongoing, approval would be possible during the pendency of the litigation if the 30-month stay were to expire. Similarly, an ANDA is eligible for approval during the pendency of patent litigation over a listed patent if that litigation was not commenced within the 45-day period that the statute provides. Furthermore, a patent on a dosage form that prevents approval of a

25

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

duplicate under section 505(j) will not bar approval of a petitioned ANDA for a different, noninfringing dosage form.

In each of these cases, approval under section 505(b)(2) is not correlated with expiration of the innovator's patent rights. Thus, Hatch-Waxman contemplates that some applications referencing a listed drug could be approved while a patent on the listed drug is in force. Like 505(j) applicants, 505(b)(2) applicants are subject to patent certification requirements and patent and exclusivity bars to approval. These are the requirements that protect the listed drug's intellectual property rights, and bar approvals of competitor products, until certain conditions are met.

Section 505(l) cannot bear the weight that Pfizer ascribes to it. Under Pfizer's interpretation, approval of a 505(b)(2) application would be blocked before ANDA approval (or expiration of all patent and exclusivity rights) even if the 505(b)(2) applicant were to describe a drug product that differs significantly from the listed drug, and the 505(b)(2) applicant were to certify to the listed patents as required by the statute and succeed in avoiding a lawsuit or in proving noninfringement. To interpret section 505(l) as placing this additional implicit barrier to 505(b)(2) approval, even after all of the patent and exclusivity bars to 505(b)(2) approval that are explicit in the statute have expired, would unduly stretch the language and structure of the Hatch-Waxman Amendments. Section 505(l) is exactly what it appears to be on its face — a statutory provision governing disclosure of raw safety and effectiveness data in an NDA. It does not create an additional barrier to 505(b)(2) approval.

## F.   Pfizer's Suitability Petition Argument

Petitioners TorPharm and Pfizer each raise distinct and incompatible challenges to FDA's interpretation of section 505(b)(2) based on the relationship of section 505(b)(2) to the suitability petition process described in section 505(j)(2)(c). Pfizer argues that it would be illogical to use section 505(b)(2) as a pathway to approve changes that could not be approved under a suitability petition because the changes raise potential safety or effectiveness issues that require further exploration. Pfizer asserts that the suitability petition process is a public process because Congress recognized the importance of changes that can be approved under a petition and wanted to give the public the opportunity to weigh in before FDA could conclude that those changes are permitted without requiring a full stand alone NDA. Pfizer notes that certain changes, such as a change to a new salt of the approved active ingredient, is not a petitionable change because the particular salt used can have relatively significant effects on the safety or effectiveness of a new product. Pfizer contends it would render the suitability petition process meaningless if FDA were to require a public process for relatively minor changes approvable through a petition, while allowing more significant changes, such as a change to a new salt, to be made through the 505(b)(2) route without the benefit of any formal or public process (2002 Pfizer petition at 6-7).

**FDA Response:** FDA's interpretation of section 505(b)(2) does not undermine and render meaningless the suitability petition process. The suitability petition process described in section 505(j)(2)(C) specifically determines whether a particular change to a listed drug is suitable for approval under section 505(j) *without submission* of any additional studies outside of section

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

505(j)'s scope. If FDA approves a suitability petition, it has concluded that the proposed ANDA can be submitted and approved under section 505(j) without further review of clinical or preclinical studies (other than bioavailability studies). However, because a 505(b)(2) application is a type of NDA, under section 505(b)(1), FDA has the authority to request any and all clinical and nonclinical studies it deems necessary to support approval. Given that the 505(b)(2) pathway gives FDA the flexibility to specify the types and numbers of clinical and preclinical studies necessary to support approval, no public process to determine suitability for approval without additional studies is required. Similarly, no public process is required to determine suitability for approval of a stand alone NDA submitted under section 505(b)(1) because FDA has the opportunity to specify what studies are required for approval and to refuse to approve if those studies do not adequately demonstrate safety and effectiveness.

FDA's interpretation of section 505(b)(2) complements, rather than supplants, the suitability petition process. For example, if a suitability petition for a new dosage form of a previously approved product were denied because FDA believes bioequivalence alone is insufficient to support safety and effectiveness, section 505(b)(2) provides a route for FDA to determine what additional studies may be required for approval.

## G.     TorPharm's Suitability Petition Argument

TorPharm argues that FDA's interpretation of section 505(b)(2) renders the suitability petition process meaningless for entirely different reasons. TorPharm suggests that because a change to a new salt is a change in active ingredient, the suitability petition process established in section 505(j)(2)(C) provides the proper abbreviated pathway for approval of a new salt. According to TorPharm, interpreting section 505(b)(2) to permit approval of a new salt (or other change to an active ingredient in a single ingredient product) renders the petition process superfluous (TorPharm petition at 12).

**FDA Response:** Although TorPharm suggests that a change to a new salt should be reviewed, if at all, in an ANDA submitted through the petition process, FDA does not interpret the statute to permit an applicant to change the active ingredient in a single active ingredient product by this route. Section 505(j)(2)(C) describes in general terms the submission of a petition to change an active ingredient. However, section 505(j)(2)(A)(ii)(I) states that if the listed drug referenced in an ANDA has only one active ingredient, the ANDA must contain information "to show that the active ingredient of the new drug is the same as that of the listed drug." It is only in the provision related to submission of ANDAs referencing a listed drug with "more than one active ingredient" that the ability to use the petitions process in section 505(j)(2)(C) for a change in an active ingredient is referenced (section 505(j)(2)(A)(ii)(III)). The preamble to FDA's proposed rule implementing the Hatch-Waxman Amendments contains a lengthy discussion of FDA's interpretation of these provisions. (*See* 54 FR 28872 at 28878 and 28879, 28881, July 10, 1989.) FDA's regulations implement the statute by permitting the use of a suitability petition for a change in active ingredient only where "one active ingredient is substituted for one of the active ingredients in a listed combination drug" (§ 314.93(b). Thus, a change to a new salt is not a petitionable change unless it is substituted in a combination product where the remaining ingredients remain the same. Because section 505(b)(2) is the only abbreviated route available

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

for approval of such a change in a single ingredient product, it is essential rather than
superfluous.

## H.    Exclusivity

TorPharm contends that use of the 505(b)(2) process to approve a drug product whose only
change from the listed drug is the substitution of a different salt of the approved active ingredient
undercuts the right to 180-day exclusivity under section 505(j)(5)(B)(iv) awarded to the first
ANDA applicant to challenge a listed patent, because 180-day exclusivity does not block
approval of 505(b)(2) applications. TorPharm argues that Congress did not intend that the
505(b)(2) approval process could be used to obtain approval of a bioequivalent drug product
when the 180-day exclusivity would block approval of a 505(j) application for a duplicate
(TorPharm petition at 3).

**FDA Response:** FDA's interpretation of section 505(b)(2) does not undercut the 180-day
exclusivity incentive. The 180-day exclusivity awarded to the first generic applicant to challenge
a patent on a listed drug is not a monopoly that prevents FDA from approving any similar or
potentially competing drug product. The provision has been consistently interpreted to prevent
approval only of another application submitted under section 505(j) for a pharmaceutical
equivalent that relies on the finding of safety and effectiveness for the listed drug and includes a
paragraph IV certification to the listed patent. Put another way, 180-day exclusivity blocks
approval of later-submitted ANDAs for duplicate drug products. An ANDA's 180-day
exclusivity would not block approval of a stand alone NDA for a duplicate of the listed drug. Nor
would it block approval of a pharmaceutical alternative (such as a different dosage form)
approved under a petitioned ANDA, even though these products might be marketplace
competitors to the ANDA with exclusivity. Thus, like these types of applications, a 505(b)(2)
application for a bioequivalent and potentially competing drug product can be approved without
undermining the 180-day exclusivity incentive in ways that Congress did not intend.

In fact, the limitation of 505(b)(2) approvals to literature-based duplicates that petitioners BIO
and TorPharm advocate would undercut 180-day exclusivity significantly more than the
interpretation FDA has adopted. To ensure that section 505(b)(2) is not used to circumvent 180-
day exclusivity, FDA regulations provide in two separate places that section 505(b)(2) may not
be used for duplicates. (See §§ 314.54(b) and 314.101(d)(9).) If section 505(b)(2) were
available for approval of duplicates, including literature-based duplicates, applicants could
circumvent 180-day exclusivity by filing for the approval of a duplicate under section 505(b)(2);
such an application, even if a true duplicate, would not be blocked from approval under the 180-
day exclusivity provisions in section 505(j)(5)(b)(iv).

## I.    Section 314.54 and the 1999 Draft Guidance

Petitioner BIO argues that the 1999 draft guidance improperly created new law. BIO argues on
Administrative Procedure Act grounds that FDA can only adopt a broad interpretation of section
505(b)(2) (such as that spelled out in the 1999 draft guidance), if at all, through notice-and-
comment rulemaking. BIO argues that FDA regulations at § 314.54 do not adequately advise

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

industry that FDA would interpret section 505(b)(2) to permit 505(b)(2) applicants to rely on the finding of safety and effectiveness for an approved application. Specifically, BIO suggests that the broad language of § 314.54, coupled with the 1989 preamble statement that section 505(b)(2) permits FDA to approve an application that "relies on investigations which the applicant has not conducted, sponsored, or obtained a right of reference to, regardless of the similarity or dissimilarity of the drug product to an already approved drug product," did not adequately signal to industry that FDA intended to interpret section 505(b)(2) to extend beyond the paper NDA policy as well as the narrow principle that 505(b)(2) applications can be used to approve modifications to a listed drug that could otherwise be made through submission of an ANDA followed by a supplement. Given this alleged ambiguity in the regulations, BIO argues that the 1999 draft guidance created new law when it made explicit the uses to which section 505(b)(2) had been and could be put. BIO further argues that because it made new law, the 1999 draft guidance should have been promulgated as a regulation and subjected to notice and comment before implementation. In support of its arguments that the regulations at § 314.54 did not inform industry of FDA's broad interpretation of section 505(b)(2), BIO notes that FDA received only two comments after publication of the proposed regulations, neither of which addressed issues as to the provision's scope (BIO petition at 26-39).

**FDA Response:** As discussed above, the 1999 draft guidance is not the first time FDA announced its intention to interpret section 505(b)(2) broadly to extend beyond the paper NDA policy. FDA announced its interpretation of section 505(b)(2) in the 1987 Parkman letter and the 1989 proposed and 1992 final regulations. Although BIO argues that the scope of § 314.54 is unclear and that industry did not understand that section 505(b)(2) would be used in ways that extend beyond literature-based duplicates, industry's extensive use of this provision over time (including use by members of BIO and by Pfizer) belies BIO's assertion. Moreover, the implementing regulations at § 314.54 and their preamble make clear that FDA has long interpreted section 505(b)(2) to permit approval of NDAs that rely on the finding of safety or effectiveness of an approved drug to the extent such reliance is scientifically justified. As discussed above, the regulations provide that, where an application seeks approval under section 505(b)(2) of a "drug product that represents a modification of a listed drug," . . . the "application need contain only that information needed to support the modification(s) of the listed drug" (§ 314.54). Indeed, FDA's preamble to the 1989 proposed rule explicitly revokes the paper NDA policy and states that "section 505(b)(2) has broader applicability [than the paper NDA policy]" (54 FR 28872 at 28875, July 10, 1989). FDA explained in the 1989 preamble that FDA intended to use section 505(b)(2) to approve modifications to listed drugs if they were adequately supported by appropriate data. FDA further stated in the preamble that applications for literature-based duplicates (which would previously have been approved under paper NDAs) should be approved under section 505(j), not section 505(b)(2) (54 FR 28890). Thus, FDA has never relied on the 1999 draft guidance as law; the guidance merely seeks to make explicit and transparent the ways in which FDA has interpreted the law set out in the statute and regulation. The public had the opportunity to comment on the proposed regulations when they were issued and declined to do so; BIO cannot reasonably argue that additional public process is required before this regulation is implemented.

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

**J.    Section 314.54(a)(1)(i)**

TorPharm cites FDA's regulation at § 314.54(a)(1)(i) in support of its argument that section 505(b)(2) does not automatically authorize an applicant to rely on proprietary data from another applicant's NDA. TorPharm notes that § 314.54(a)(1)(i) states that 505(b)(2) applications must comply with § 314.50(g). Because § 314.50(g) states that a reference to information submitted by a person other than the applicant must contain a written and signed statement of authorization by the submitter, TorPharm argues that an applicant submitting an application under section 505(b)(2) cannot reference a listed drug's application (or the finding of safety and effectiveness for a listed drug) without permission of the NDA holder (TorPharm petition at 9).

**FDA Response**: TorPharm's reliance on the language in § 314.54 referencing § 314.50(g) is misplaced. Under § 314.50(g), "[a] reference to information submitted to the agency by a person other than the applicant is required to contain a written statement that authorizes the reference and that is signed by the person who submitted the information." This provision was not intended to refer to situations where a sponsor identified a listed drug and sought to rely on FDA's finding of safety or effectiveness of the listed drug. If the applicant were required to and succeeded in obtaining a right of reference to the application on which it relied to support approval, the application would be a stand alone NDA, not a 505(b)(2) application. Thus, TorPharm's reading of this provision would write section 505(b)(2) out of existence. Instead, the regulation is intended to address the circumstance where certain information about the proposed drug that is needed for FDA to review and approve the specific 505(b)(2) application (e.g., information about the chemistry of the bulk drug substance that the applicant plans to use in manufacturing its drug product) is contained in a place separate from the application (e.g., in a drug master file owned by the supplier of the bulk drug substance). In this case, for FDA to consider this information in approving the application, a right of reference to that external source is required. In other circumstances, when one applicant has received permission from the sponsor of another application for FDA to rely on information (including the raw data) in the applicant's NDA, the regulation describes that such a right of reference must be in writing and signed. (See footnote 12.) As noted above, if such a right of reference is given, the application is a stand alone NDA and none of the patent certification requirements or exclusivity bars will apply.

**K.    Takings**

Petitioners Pfizer and BIO suggest that the statutory language, legislative history, and implementing regulations gave them a reasonable investment-backed expectation that data in an approved NDA would not be used to support approval of a 505(b)(2) application for a change that could not be made through an ANDA and supplemented (and would not be used for any purpose before an ANDA had been or could be approved). Petitioners contend that nothing in the 1987 Parkman letter or in the regulations implementing section 505(b)(2) signaled that FDA would permit 505(b)(2) applicants to rely on a pioneer's NDA data before an ANDA approval or to approve modifications that could not be approved in an ANDA followed by a supplement. Petitioners claim that FDA's suggestion in the 1999 draft guidance that section 505(b)(2) is an appropriate approval route for a new salt or for a follow-on to a biological product submitted

30

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

under section 505(b)(1) was a radical departure from past practice and was directly contrary to the industry's understanding of section 505(b)(2) and congressional intent when enacting that provision. Accordingly, petitioners contend that the policy announced in FDA's 1999 draft guidance (and FDA's approval of a new salt of paroxetine under section 505(b)(2)) amounts to an unconstitutional taking of petitioners' property without adequate compensation (BIO petition at 37; 2001 Pfizer petition at 17).

**FDA Response:** The Supreme Court has established three significant factors as a guide to determining whether a taking has occurred: (1) the character of the Government action; (2) the extent to which it has interfered with reasonable investment-backed expectations; and (3) its economic impact (*Concrete Pipe and Prods. of Calif., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 643-46 (1993)). With regard to the second factor, to be reasonable, expectations must take into account the power of the state to regulate in the public interest (*Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1033 (3d Cir.), *cert. denied*, 482 U.S. 906 (1987)). Reasonable expectations must also take into account the regulatory environment, including the foreseeability of changes in the regulatory scheme. "In an industry that long has been the focus of great public concern and significant government regulation" (*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1008 (1984)), the possibility is substantial that there will be modifications of the regulatory requirements. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end" (*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227 (1986) (citation omitted); *Branch v. United States*, 69 F.3d 1571, 1579 (Fed. Cir. 1995) (same), *cert. denied*, 519 U.S. 810 (1996); *cf. Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027-28 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . .")). Participants in a highly regulated industry are "on notice that [they] might be subjected to different regulatory burdens over time" (*California Housing Secs., Inc. v. United States*, 959 F.2d 955, 959 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 916 (1992)).

Petitioners should have been well aware that the Agency would permit a 505(b)(2) applicant to rely on the finding of safety and effectiveness for an approved NDA, based not only on the broad statutory language first enacted in 1984, but also on the Agency's subsequent publicly announced interpretation and application of section 505(b)(2). FDA's written pronouncements on the statute's scope embodied, among other places, in proposed and final regulations have further provided public notice of that broad scope. Consequently, any purported expectation that the Agency would not permit a 505(b)(2) applicant to rely on the finding of safety and effectiveness for an approved NDA is unreasonable and cannot provide the basis for a takings claim.

## L.    New Salts

Pfizer contends that new salts are traditionally and statutorily beyond the reach of section 505(b)(2). Pfizer relies largely on the 1987 Parkman letter to argue that the 1999 draft guidance went further than ever before in stating that new salts may be appropriate for approval under section 505(b)(2). Pfizer asserts that the 1987 Parkman letter, which discussed section 505(b)(2)

31

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

as a way to shortcut the ANDA approval and supplementation process, represents the outer limits of 505(b)(2) approvals. Given that a drug product containing a new salt cannot be approved through an ANDA and supplement (because an ANDA is required to have the same active ingredient as the listed drug and, under FDA's bundling policy, a change to a different active ingredient requires a separate application), Pfizer argues that the 505(b)(2) route is also unavailable for such a change (April 2003 comment at 14).

**FDA Response:** Pfizer's argument lacks support in the statute, regulations, or FDA's history of implementation. Although Pfizer is correct that the 1987 Parkman letter discussed the specific inefficiency associated with requiring an applicant to obtain approval for an ANDA before seeking a change to a listed drug, and changes to an active ingredient are not changes permitted in a supplement to an ANDA, the 1987 Parkman letter specifically mentioned section 505(b)(2) as an approval route for changes in active ingredients. When read in its entirety, the 1987 Parkman letter stands more generally for the proposition that an applicant seeking any change to a listed drug can rely on the listed drug's approval to establish the safety and effectiveness of the listed drug and need only provide data to support those aspects of the proposed drug that differ from the listed drug. The policy expressed in that letter — to eliminate unnecessary and potentially unethical duplication of research — applies equally to changes that can be approved through an ANDA and a postapproval supplement, as well as to those changes (such as changes to new salts) that have generally been considered to fall outside of the type of changes that may be approved in a supplement.

In addition, in section 735(1)(B)(i) of the statute, as part of the statutory provisions regarding user fees adopted in the Prescription Drug User Fee Act enacted in 1992, Congress explicitly included as examples of the type of applications that could be approved under section 505(b)(2), applications for new active ingredients. Section 735(1)(B)(i) states "the term 'human drug application' means an application for . . . approval of a new drug submitted under section 505(b)(2) after September 30, 1992, which requests approval of a molecular entity which is an active ingredient (including any salt or ester of an active ingredient)... that had not been approved under an application submitted under section 505(b)."

## M.   Therapeutic Equivalence

Pfizer contends that FDA may not assign an "A" therapeutic equivalence code rating to a drug product that — because it differs in salt — is a pharmaceutical alternative to, not a therapeutic equivalent of, the reference listed drug (2001 Pfizer petition at 25).

**FDA Response:** FDA agrees. Because it contains a different salt, Synthon's paroxetine mesylate product will not be "A" rated with respect to either GlaxoSmithKline's Paxil (paroxetine hydrochloride) or to any paroxetine hydrochloride product that is "A" rated to Paxil, including TorPharm's paroxetine hydrochloride product.

Where there is more than one approved application for a particular active ingredient and a particular dosage form, FDA provides therapeutic equivalence evaluations in the Orange Book. Single source products do not receive a therapeutic equivalence code. To obtain an "A"

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

therapeutic equivalence rating from FDA, a sponsor must show that its drug is pharmaceutically equivalent and bioequivalent to a listed drug and that it is expected to have the same clinical safety and effectiveness profile when administered under the conditions of use described in the labeling (Orange Book at viii).

FDA has defined pharmaceutically equivalent drug products as drug products that contain the same amount of the same active ingredient (i.e., the same salt or ester of the same therapeutic moiety) in identical dosage form, but not necessarily containing the same inactive ingredients, and that meet the compendial standards for identity, strength, quality, purity, and potency, and where applicable, content uniformity, disintegration times, and/or dissolution rates. Drug products denoted as pharmaceutical equivalents must be adequately labeled and manufactured under current good manufacturing practice. Different salts of the same active moiety are considered different active ingredients, so that drug products containing different salts are not pharmaceutical equivalents. (See 44 FR 2932 at 2937 and 2938, January 12,1979; § 320.1(c).)

Drug products are considered to be pharmaceutical alternatives if they contain the same therapeutic moiety (or its precursor) but not necessarily in the same amount or dosage form or as the same salt or ester where each drug product individually meets either the same or its own respective compendial or other applicable standard of identity, strength, quality, purity, and potency, and, where applicable, content uniformity, disintegration times, and/or dissolution rates. (See 44 FR 2932 at 2938; § 320.1(d).) Pharmaceutical alternatives are not considered to be therapeutic equivalents even where they have demonstrated bioequivalence (44 FR 2938).

Because Paxil and TorPharm's products both contain the hydrochloride salt of paroxetine and are bioequivalent, they are considered pharmaceutical equivalents and therapeutic equivalents. However, because Synthon's product contains the mesylate salt of paroxetine, it is considered a pharmaceutical alternative, not a pharmaceutical equivalent, to Paxil. As such, Synthon's product is not eligible to obtain an "A" therapeutic equivalence rating to Paxil or to the products to which Paxil is "A" rated.

## N.  Marketplace Confusion and Incentives for Development

Both Pfizer and TorPharm raise challenges to the 505(b)(2) policy in the context of approval of drug products that differ from the innovator product only in active ingredient. Such approvals also raise concerns about inappropriate marketplace substitution of these products for the innovator drug when the drugs have not been rated as therapeutically equivalent by FDA. TorPharm is also concerned that approval of Synthon's paroxetine product will undermine the 180-day generic drug exclusivity TorPharm has earned pursuant to section 505(j)(5)(B)(iv) by virtue of having been one of the first applicants to challenge patents listed for Paxil (TorPharm petition at 5). Finally, this type of application raises questions about whether permitting approval of pharmaceutical alternatives before therapeutically equivalent drugs are approved by FDA will discourage investment in innovative new drug products.

**FDA Response:** The application of section 505(b)(2) to products that differ from the innovator product only in the active ingredient has been very limited. FDA believes that its decisions to

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

date on these applications have been justified by the language of the statute, the legislative history, and the purposes of the Hatch-Waxman Amendments. However, the Agency may wish to consider further whether there is some narrow subset of applications that should be exempted from the scope of section 505(b)(2) in the future.

FDA is particularly interested in examining the use of 505(b)(2) applications to obtain approval of drug products for which the *only* difference from the listed drug is in the form of the active ingredient, such as a change in salt. These are products that have the same dosage form, route of administration, strength, conditions of use, and labeling as the listed drug. The only reason these products may not be reviewed and approved in ANDAs submitted under section 505(j) is that they contain a different active ingredient from the listed drug.

This use of section 505(b)(2) does not result in the approval of an innovative drug product that offers a new therapeutic benefit or alternative, such as a new indication, novel dosage form, or improving administration for a new patient population. Nor do such changes in the active ingredient generally represent an improvement in terms of safety or effectiveness.

FDA is concerned that, in addition to not representing innovative drug development, this use of 505(b)(2) applications may have undesirable policy and public health consequences:

1. It may undermine current incentives for development of promising new active moieties that Congress included in the Hatch-Waxman Amendments.

2. It may lead to proliferation of pharmaceutical alternative drug products, with resulting confusion in the marketplace.

3. It may divert resources, otherwise available for innovative drug research, to the development and patenting of alternative active ingredients, where such patents are used solely either to establish a barrier to competition or to preempt the holder of the listed drug from establishing such a barrier.

Accordingly, FDA is reserving for further review the issues raised by this narrow use of section 505(b)(2), and is considering whether to begin a public process to seek input from interested parties, including the pharmaceutical and health care industries, as well as consumer groups.

## V.   CONCLUSION

FDA's consistent and long-standing interpretation is that section 505(b)(2) permits an applicant to rely on literature and/or the Agency's finding of safety and effectiveness to support approval of a new drug product. FDA's approach is consistent with the text of section 505(b)(2) and the structure of the statute, as well as with the policy balance struck in Hatch-Waxman between protecting innovator pharmaceutical investment and promptly approving ANDAs and 505(b)(2) applications once those protections are no longer barriers. The 1987 Parkman letter, the regulatory preambles, and FDA's regulation at § 314.54 described the types of changes to approved drug products for which approval may be sought under section 505(b)(2). In addition,

34

Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1

in 1999, FDA published its draft guidance, which consolidated and made public detailed information on the types of applications that had been or could be reviewed under section 505(b)(2). As demonstrated by the number and variety of 505(b)(2) approvals over the 19 years since the Hatch-Waxman Amendments were passed, the pharmaceutical industry has been well aware of the scope of section 505(b)(2). Moreover, as is clear from the partial list of drug products approved under section 505(b)(2) included in this petition, the Agency's scientific considerations, and the policy implications for the current and future use of section 505(b)(2), there are substantial public health benefits to the Agency's approach, as it allows for leveraging past research and targeting new research investment on innovative drug products, while at the same time protecting innovator patent rights and marketing exclusivity.

Sincerely yours,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

Enclosure:       April 10, 1987, letter from Dr. Paul D. Parkman, then Acting Director, Center for Drugs and Biologics, to NDA and ANDA holders and applicants.

35

# ENCLOSURE



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

─────────────────────────────────────────────────────────────

                                          Food and Drug Administration
                                          · Rockville MD 20857


To all NDA and ANDA holders and applicants          APR 1 0 1987

Dear Sir or Madam:

This is another in a series of letters intended to provide informal notice to
all affected parties of developments in policy and interpretation of the Drug
Price Competition and Patent Term Restoration Act of 1984.  This letter deals
with an issue about which a number of questions have arisen, namely the
statutory mechanism by which ANDA applicants may make modifications in
approved drugs if the modifications require the submission of clinical data.
For example, an applicant may wish to obtain approval of a new indication for
a listed drug that is only approved for other indications.  If the applicant
has an approved ANDA for the approved indications, agency policy permits the
applicant to submit a supplemental application that contains reports of
clinical investigations needed to support approval of the new indication.
(Because such a supplement would require the review of clinical data, FDA
would process it as a submission under section 505(b) of the Federal Food,
Drug and Cosmetic Act.)

A similar case may arise where an applicant wishes to seek approval of a
modification of an approved product but has no interest in marketing the drug
in its originally approved form.  Assuming that clinical data were required
for approval, the statute could be interpreted to require such an applicant to
first manufacture, and obtain approval of an ANDA for, the listed drug's
approved form and then file a 505(b) supplement to the approved ANDA
containing the clinical data to obtain approval of the modification.  If the
applicant did not first obtain an ANDA for the approved form, the applicant
could be required to submit a full NDA for modification and duplicate the
basic safety and effectiveness studies conducted on the listed drug.

FDA has concluded that such an interpretation is inconsistent with the
legislative purposes of the Drug Price Competition and Patent Term Restoration
Act of 1984 (the 1984 Amendments), because it would serve as a disincentive to
innovation and would require needless duplication of research.

FDA believes that a more consistent and less burdensome interpretation of the
1984 Amendments is to allow a generic applicant to submit a 505(b)
"supplement" (a form of NDA) for a change in an already approved drug that
requires the submission of clinical data, without first obtaining approval of
an ANDA for a duplicate of the listed drug.  This submission would include
data only for those aspects of the proposed drug that differ from the listed
drug.  Changes in already approved drugs for which such applications will be
accepted include changes in dosage form, strength, route of administration,
and active ingredients for which ANDA suitability petitions cannot be approved
because studies are necessary for approval as well as new indications.  Like
similar supplements to approved ANDAs, these applications will rely on the
approval of the listed drug together with the clinical data needed to support
the change.  The applicant will thus be relying on the approval of the listed
drug only to the extent that such reliance would be allowed under section
505(j):  to establish the safety and effectiveness of the underlying drug.

FDA believes that it would be inconsistent with the policies of the 1984 Amendments to allow these applications to rely on the approval of a listed drug without due regard for the listed drug's patent rights and exclusivity. Therefore, an application that relies in part on the approval of a listed drug and in part on new clinical data will, for this purpose, be considered an application described in section 505(b)(2) and must contain a certification as to any relevant patents that claim the listed drug. In addition, the date of submission and effective approval of these applications may, under section 505(c)(3), be delayed to give effect to any patent or period of exclusivity accorded the listed drug.

Because these submissions will be reviewed as applications under section 505(b), they will be subject to the statutory and regulatory requirements applicable to such applications, including the patent filing requirements of sections 505(b) and (c). These submissions also may be eligible for three years of exclusivity under sections 505(c)(3)(D)(iii) and (iv) and 505(j)(4)(D)(iii) and (iv). These applications should be submitted to the appropriate review division in ODRR/OBRR for review and final action.

Sincerely yours,

Paul D. Parkman, M.D.
Acting Director
Center for Drugs and Biologics

# **EXHIBIT V**

Roger Williams, M.D.

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3       -----------------------------X

4       IN RE: TAXOTERE (DOCETAXEL)    MDL No. 2740

5       PRODUCTS LIABILITY LITIGATION  SECTION: "H"

6       -----------------------------X

7       This Document Relates To:

8       -----------------------------X

9       WANDA STEWART,                 JUDGE MILAZZO

10              Plaintiff,        MAG. JUDGE NORTH

11      V.                             Civil Case No.

12      SANDOZ INC.,                   2:17-cv-10817

13              Defendant.

14      -----------------------------X

15             REMOTE VIDEOTAPED DEPOSITION OF

16                 ROGER WILLIAMS, M.D.

17             Tuesday, September 22, 2020

18             11:04 a.m. Eastern Standard Time

19

20

21

22      Reported by:  Denise Dobner Vickery, RMR, CRR

23             GOLKOW LITIGATION SERVICES

              877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com

Roger Williams, M.D.

Page 2

```
 7              Tuesday, September 22, 2020
 8              11:04 a.m. Eastern Standard Time

10      Remote Videotaped Deposition of ROGER
11  WILLIAMS, M.D., conducted in Virginia.

19      Pursuant to notice, before Denise Dobner
20  Vickery, Certified Realtime Reporter, Registered
21  Merit Reporter, and Notary Public in and for the
22  Commonwealth of Virginia.
```

Page 3

```
 1  REMOTE APPEARANCES:

 3  For Plaintiff:
 4      THE GOMEZ LAW FIRM
 5      JOHN GOMEZ, ESQ.
 6      LINDSAY STEVENS, ESQ.
 7      655 West Broadway, Suite 1700
 8      San Diego, CA 92101
 9      619.237.3490
10      john@thegomezfirm.com

13  For SANDOZ INC.:
14      GREENBERG TRAURIG LLP
15      CLIFF MERRELL, ESQ.
16      ANASTASIA A. ANGELOVA, ESQ.
17      DAWN BENNETT PRATHER
18      Terminus 200
19      3333 Piedmont Road NE, Suite 2500
20      Atlanta, GA 30305
21      678.553.2175
22      merrellc@gtlaw.com
23      angelovaa@gtlaw.com
24      pratherd@gtlaw.com
```

Page 4

```
 1  REMOTE APPEARANCES (Continued):

 3  For SANOFI:
 4      SHOOK HARDY & BACON LLP
 5      CHRIS McRAE, ESQ.
 6      MATT DePAZ, ESQ.
 7      2555 Grand Boulevard
 8      Kansas City, MO 64108
 9      816.474.6550
10      cmcrae@shb.com
11      mdepaz@shb.com

15  For HOSPIRA INC. AND PFIZER INC.:
16      ARNOLD & PORTER KAYE SCHOLER LLP
17      DIANA STERK, ESQ.
18      250 West 55th Street
19      New York, NY 10019-9710
20      212.836.8429
21      Diana.Sterk@arnoldporter.com
```

Page 5

```
 1  REMOTE APPEARANCES (Continued):

 3  For ACCORD HEALTHCARE, INC.:
 4      TUCKER ELLIS LLP
 5      JULIE A. CALLSEN, ESQ.
 6      950 Main Avenue, Suite 1100
 7      Cleveland, OH 44113-7213
 8      216.696.2286
 9      julie.callsen@tuckerellis.com

12  ALSO PRESENT:
13      BRIAN ABRAMSON, ESQ., Williams Hart Law Firm,
14      babramson@whlaw.com

16      BRIAN MCGEE, VIDEOGRAPHER
```

Page 6

```
 1        C O N T E N T S
 2  EXAMINATION OF ROGER WILLIAMS, M.D.     PAGE
 3  BY MR. GOMEZ                    9
 4  AFTERNOON SESSION              134
 5
 6        E X H I B I T S
 7  WILLIAMS DEPOSITION EXHIBITS          PAGE
 8  Exhibit 1  Food and Drug Administration:   48
 9    Role in Drug Regulation by Roger Williams
10  Exhibit 2  Table 1. Differences between    92
11    505(b)(2) NDAs and ANDAs
12  Exhibit 3  Table 2. Similarities between   95
13    505(b)(1) and 505 (b)(2) NDAs
14  Exhibit 4  CFR - Code of Federal Regulations 154
15    Title 21 Part 314 Subpart A Section 314.3
16  Exhibit 5  CFR - Code of Federal Regulations 163
17    Title 21 Part 314 Subpart B Section 314.80
18  Exhibit 6  CFR - Code of Federal Regulations 165
19    Title 21 Part 201 Subpart B Section 201.56
20  Exhibit 7  CFR - Code of Federal Regulations 167
21    Title 21 Part 201 Subpart B Section 201.57
22  Exhibit 8  Sandoz Ltd. Docetaxel Ebewe 10 mg 171
23    SANDOZ-TAXO-OUSLABELING-00000534 - 551
24
```

Page 7

```
 1  WILLIAMS DEPOSITION EXHIBITS          PAGE
 2  Exhibit 9  Product Information, Docetaxel   174
 3    Sandoz 20mg & 80mg
 4    SANDOZ-TAXO-OUSLABELING-00000001 and 029
 5  Exhibit 10  Sandoz Global Core Data Sheet on  177
 6    Docetaxel_parenteral_04_2006
 7    SANDOZ-TAXO-PSUR-00002069 and 2078
 8  Exhibit 11  Sandoz Global Core Data Sheet on  178
 9    Docetaxel_parenteral_11_2013
10    SANDOZ-TAXO-PSUR-00000824, 838, 846, 852
11  Exhibit 12  Docetaxel Alopecia 29JUNE2011-  184
12    13APR2017 SANDOZ-TAXO-ARGUS-00000001 - 72
13  Exhibit 13  Table: Statutory Obligation to  186
14    Trigger a Label Update/What Sandoz Knew
15  Exhibit 14  Roger Williams, M.D., Materials  196
16    Provided, Page 1-18
17  Exhibit 15  Notice of Videotaped Deposition  198
18    of Roger Williams, M.D.
19  Exhibit 16  Roger Williams, M.D., Materials  200
20    Provided, Page 1-18, Updated
21
22
23    (Exhibits marked electronically and attached.)
24
```

Page 8

```
 1        P R O C E E D I N G S
 2            - - -
 3        THE VIDEOGRAPHER:  We are now
 4  on the record.
 5        My name is Brian McGee.  I'm a
 6  videographer for Golkow Litigation Services.
 7  Today's date is September 22, 2020 and the
 8  time is 11:04 a.m.
 9        This remote video deposition
10  is being held in the matter of Wanda Stewart
11  V. Sandoz Incorporated for the United States
12  District Court, Eastern District of
13  Louisiana.  The deponent is Roger Williams,
14  Doctor of Medicine.
15        All parties to this deposition
16  are appearing remotely and have agreed to
17  the witness being sworn in remotely.  Due to
18  the nature of remote reporting, please pause
19  briefly before speaking to ensure all
20  parties are heard completely.
21        Will counsel please identify
22  themselves.
23        MR. GOMEZ:  John Gomez for the
24  plaintiffs.
```

Page 9

```
 1        MR. MERRELL:  Cliff Merrell
 2  for defendant, Sandoz Inc.
 3        THE VIDEOGRAPHER:  The court
 4  reporter is Denise Vickery and will now
 5  swear in the witness.
 6            - - -
 7        ROGER WILLIAMS, M.D.,
 8  called for examination, and, after having been
 9  duly sworn, was examined and testified as
10  follows:
11            EXAMINATION
12  BY MR. GOMEZ:
13    Q.    Good morning, Dr. Williams.
14    A.    Good morning, Mr. Gomez.
15    Q.    In this case, you're working as a
16  retained expert; is that right?
17    A.    That's true.
18    Q.    For Sandoz Inc.?
19    A.    Yes, that's correct.
20    Q.    Otherwise you work for NDA Partners;
21  is that right?
22    A.    Yes, I'm a partner in NDA Partners.
23    Q.    And how long have you been with
24  them?
```

Roger Williams, M.D.

Page 10

1    A.    I started towards the end of 2015
2 and have continued to the present.
3    Q.    Thank you so much.
4         I looked at your CV and it listed
5 four service topics that you provide; is that right?
6 being clinical pharmacology; is that right?
7    A.    Yes, I was trained as a clinical
8 pharmacologist.
9    Q.    And do you provide clinical
10 pharmacological services today as a partner with
11 NDA?
12    A.    Yes, I have done that.
13    Q.    Can you describe generally what
14 services you provide in that regard?
15    A.    Maybe the best way to do that is
16 through an example.
17         There was a company we worked with
18 that was studying an oncology drug, and one of
19 their questions related to the information needed
20 in the clinical pharmacology section of their
21 application.
22         Long ago that might have been
23 confined to what I would call ADME, absorption
24 distribution metabolism and excretion, but that

Page 11

1 has certainly expanded over the years to include
2 modeling and simulation, drug/drug interaction,
3 drug effects in special populations, drug effects
4 impacted by special factors such as smoking or
5 obesity, and that was a good consultation where we
6 tried to help them as much as we could,
7 particularly coming to the right dose.  Getting
8 the dose right I would say is a key aspect of
9 clinical pharmacology.
10    Q.    Thank you so much.
11         Another service that you listed that
12 you provide is development strategy?
13    A.    Yes.
14         Should I elaborate on that,
15 Mr. Gomez?
16    Q.    Yeah.  So what does that mean?  What
17 do you do for companies regarding development
18 strategy?
19    A.    Well, again, as an example -- and
20 it's a good example for our discussion today -- in
21 considering a 505(b)(2) application, it behooves a
22 sponsor considering such an application to meet
23 with the agency in a pre-IND meeting.  And
24 typically one of the purposes of that meeting is

Page 12

1 to determine what FDA would like beyond the
2 approved labeling of the Reference Listed Drug.
3 Sometimes it's very -- a lot.  Sometimes it's very
4 little or nothing.
5    Q.    Okay.  And so have you attended
6 these meetings with clients of yours?
7    A.    I have not gone to FDA.  I typically
8 work with clients sort of behind the scenes when I
9 need to.
10    Q.    All right.  And did you say that you
11 would discuss with them, for example, what
12 labeling the FDA would require in a 505(b)(2)
13 application separate and apart from the labeling
14 of the Reference Listed Drug?
15    A.    Yes, I think that's a core
16 discussion that would occur with the agency with
17 regard to these (b)(2) applications.  Because most
18 (b)(2)s rely on the approved labeling of the
19 Reference Listed Drug, so the question before the
20 agency becomes, What more information do you need
21 given the change the sponsor wants to make so that
22 you can adjust the labeling?
23         I would say a goal perhaps of both
24 the agency and the sponsor is not to add more

Page 13

1 studies if the labeling is not going to change.
2    Q.    All right.  And so to be clear, you
3 have not attended one of these pre-application
4 meetings with the FDA.  You consult with clients,
5 as you said, behind the scenes; is that right?
6    A.    I have not gone to Washington for
7 what I would call a Type B meeting, but I've
8 certainly reviewed data related to those meetings,
9 and sometimes FDA doesn't have the meetings.  They
10 respond to the questions in writing and they don't
11 have the meetings.  Sometimes the meetings occur
12 by telephone or in person.
13    Q.    All right.  And in this case, did
14 you learn that Sandoz engaged a professional like
15 you prior to its 505(b)(2) application for its
16 Docetaxel product?
17    A.    I'm not sure I fully understand the
18 question.
19         My understanding is that Sandoz's
20 what I call a Type B pre-meeting occurred in 2008,
21 and I was not involved in that meeting.
22    Q.    Sure.
23         Did you learn, yes or no, whether a
24 professional like you either counseled Sandoz or

Roger Williams, M.D.

Page 14

1 was involved in that meeting with Sandoz?
2     A.     I certainly looked at those meeting
3 notes, and I'd have to look at them again to see
4 if they had a non-Sandoz employee with them.
5     I can add that, actually, the
6 meeting was conducted by -- I hope I'm pronouncing
7 it right -- Ebewe Parente, and I believe that was
8 before Sandoz purchased Ebewe Parente.
9     Q.     Right.  Okay.  Thank you.
10     And so how many companies, roughly,
11 have you consulted with regarding a 505(b)(2)
12 application?
13     A.     I'm not sure off the top of my head
14 I could give you that number.  I could certainly
15 look back at my records, but I can tell you right
16 now, and as part of litigation, I'm working with
17 several companies on what I would call (b)(2)
18 issues.
19     Q.     And when you say "as part of
20 litigation," do you mean as an expert witness?
21     A.     Yes.
22     Q.     And so what kind of work are you
23 doing for those other companies as part of
24 litigation?

Page 15

1     A.     Well, I can give some examples.
2     There's a company dispute now
3 ongoing over a (b)(2) product that's being studied
4 for two indications, and the companies are
5 debating commercially -- commercial -- I'm sorry,
6 I'm having trouble pronouncing it -- commercially
7 reasonable decisions.  And I'm helping them
8 understand what was reasonable in terms of
9 regulatory requirements for these (b)(2)
10 indications which cite a Reference Listed Drug.
11     Q.     All right.  And so how many
12 companies are you working for right now as part of
13 litigation in addition to Sandoz Inc.?
14     A.     Again, I'd have to look at my
15 records, but I would say I, roughly, have four
16 very active companies working with them in
17 litigation, and maybe another five or so where I'm
18 working with them in litigation but things are on
19 hold, and that's probably a good overview of what
20 I'm doing right now in terms of litigation.
21     Q.     All right.  Thanks.
22     And so a third topic on your CV is
23 expert witness and that's what you're doing here.
24     The nine or so products that you

Page 16

1 mentioned involved in litigation, are you acting
2 as an expert witness for those companies?
3     A.     Yes, I think that's a good way to
4 summarize it.  I work in litigation either with
5 plaintiffs or defendants.  I discuss the matter, I
6 create expert reports, and then at their request I
7 provide testimony either at deposition or trial.
8     Q.     All right.  And so have you ever in
9 that capacity as an expert witness with NDA
10 Partners, have you ever worked for an individual
11 alleging they suffered some injury because of a
12 drug or medical device?
13     A.     I'm trying to think of my other
14 cases, and I have to say none come to mind.
15     Q.     As far as you can recall, you've
16 only worked for drug companies; is that right?
17     A.     In my litigation?
18     Q.     Yes.
19     A.     I think for the most part that -- my
20 answer to that would be yes.
21     Q.     All right.  And as you sit here
22 today, it wouldn't be for the most part.  It would
23 be a hundred percent you've only worked for drug
24 companies in litigation; correct?

Page 17

1     A.     Well --
2     MR. MERRELL:  Objection.
3 Sorry.  I'm just going to lodge an objection
4 quickly.  Objection to form.
5     THE WITNESS:  Mr. Gomez, I
6 have my curriculum vitae.  May I look at it?
7 BY MR. GOMEZ:
8     Q.     Of course.
9     A.     My testimony appears in the final
10 pages of my CV, and, again, I think you're
11 correct.  Everything in this listing is for
12 pharmaceutical companies, but there was one
13 time -- that's not always the case.
14     There was one time I worked with a
15 group of lawyers on a medical malpractice claim,
16 and there was another time where I worked with a
17 group of lawyers on a medical malpractice claim
18 that stated that the drug was flawed.
19     So I guess I'd be a little hesitant
20 to say always, but certainly usually I work with
21 pharmaceutical companies.
22     Q.     And in terms of your listed
23 testimony attached to your CV and provided in this
24 case, has all your work been for drug companies?

Roger Williams, M.D.

Page 18

1    A.    I'm looking at it.  It starts on
2  page 28 of my CV.
3         (Reviews document.)
4         And, again, as I look at my CV,
5  Mr. Gomez, I have to acknowledge that sometimes
6  I'm working in connection with drug companies, but
7  I'm working on behalf of plaintiffs, for example,
8  in antitrust suits.  So I would not call them drug
9  companies.
10    Q.    Okay.  In terms of cases that you've
11  worked on involving a claim of injury, is it true
12  that all the cases that are listed in your CV you
13  were working on behalf of pharmaceutical
14  companies?
15    A.    Well, I don't know that there is any
16  injury on my CV, failure to warn types of cases.
17  Of course, there will be after we complete this
18  deposition.
19         And then the medical malpractice
20  matters were certainly patient injury, but I don't
21  think I would -- I'm not sure how I would
22  characterize them right now.  They're not on my CV
23  because they didn't go to deposition or trial.
24    Q.    Okay.  Thank you.

Page 19

1         And so a fourth topic you have
2  listed as a service you provide is regulatory
3  strategy.
4         Is that different than development
5  strategy?
6    A.    You know, I could argue it could be,
7  and I'll give some examples.
8         You know, there's development work
9  that results in data for an application
10  submission, but there may be regulatory strategy
11  separate from that.  For example, exclusivity
12  matters or other regulatory aspects that could be
13  problematic, and included in that I might include
14  patent challenges associated with generic drugs.
15    Q.    Okay.  And so let me ask you this.
16         Have you consulted with companies --
17  have companies come to you and said, Look, we
18  would like to produce a version of this drug
19  already on the market.  Should we go the 505(b)(2)
20  route or the 505(j) route?
21         Have companies come to you and asked
22  for you to provide an opinion as to what would be
23  the better route for them?
24    A.    I'm going to say no to that answer,

Page 20

1  Mr. Gomez.  I think by the time we talk to people,
2  they're already, if I may say so, in the (b)(2)
3  pathway.
4    Q.    Okay.  And so do you consult with
5  manufacturers that apply under 505(j)?
6    A.    We could and I have.  Again, you
7  know, the requirements for a (j) are fairly clear.
8  So I would say generic companies are pretty good
9  at figuring those out; but, yes, we have worked
10  with generic companies who may be having specific
11  problems with figuring out how to develop an
12  application and submit it.
13    Q.    Okay.  And so is it true that drugs
14  approved under 505(j) are often referred to as
15  true generics?
16    A.    No, I wouldn't use that term.  I
17  would say -- I just wouldn't use that term because
18  it implies that there may be something like false
19  generics, and I would like not to think about
20  that.
21    Q.    Me neither.
22         Okay.  Would you -- would you agree
23  that drugs approved under 505(j) are referred to
24  as generics?

Page 21

1    A.    Yes, I think they definitely are
2  referred to as generics.  I actually prefer the
3  term "interchangeable generics."
4    Q.    Interchangeable generics.
5         Was that a term that you used during
6  your employment with the FDA?
7    A.    Yes, I think I published papers
8  where I used that term.
9    Q.    And did you use that -- you use that
10  term to refer to drugs approved under 505(j);
11  correct?
12    A.    Yes.
13    Q.    You don't use that term to refer to
14  drugs approved under 505(b)(2)?
15    A.    No, I would not use that term.
16    Q.    It's fair to say that drugs approved
17  under 505(b)(2) are not generics; correct?
18    A.    Yes, I would not call them generic
19  products based on our regulatory system in the
20  U.S.
21    Q.    And so have you reviewed testimony
22  or reports by other experts hired by Sandoz in
23  this case?
24    A.    Yes, I have.

Roger Williams, M.D.

Page 22

1    Q.    And did you note that they often
2  referred to the Sandoz Docetaxel product as a
3  generic?
4    A.    I can't recall a specific example,
5  but I think I agree with you that that might be a
6  term used, Mr. Gomez.
7    Q.    And just from a regulatory
8  perspective, your history and work with the FDA,
9  that would be an error.  Those are -- the
10  505(b)(2) Sandoz product is not a generic;
11  correct?
12         MR. MERRELL:  Objection to
13    form.
14         THE WITNESS:  It's not a
15    generic according to our regulatory system.
16    So I can see people who aren't familiar with
17    our regulatory system might use that term.
18  BY MR. GOMEZ:
19    Q.    All right.  But that's not a term
20  that you would use to refer to Sandoz's 505(b)(2)
21  product; correct?
22    A.    No, because I have very specific
23  understanding of what a generic has to be to be in
24  the U.S. market.

Page 23

1    Q.    And so are there -- can you describe
2  for us and the jury the various advantages to the
3  505(b)(2) pathway versus the 505(j) pathway for a
4  drug manufacturer?
5    A.    I'm sorry, Mr. Gomez, I have to take
6  a little bit of a deep breath on that one and, as
7  you well know, I certainly covered it in my
8  report, but the way I would summarize it -- and I
9  can certainly elaborate it on -- is that it was
10  created in 1984 a part of the -- I'm going to
11  say -- Drug Price Competition and Patent Term
12  Restoration Amendments to the Food, Drug, and
13  Cosmetic Act -- after that I will use Hatch-Waxman
14  and hope I don't have to say it again -- that
15  allowed two kinds of (b)(2).
16         One I would say is a
17  literature-based (b)(2), and I can give an example
18  of that.  And if we look at the specific wording,
19  you start to see terminology that says "where the
20  sponsor does not have right of reference to the
21  underlying data."
22         And then the other kind of (b)(2),
23  which is in matter here, is where you're relying
24  on the FDA's finding of safety and efficacy for

Page 24

1  the Reference Listed Drug.  And what is that
2  finding?  Well, that finding is expressed in the
3  approved labeling for the Reference Listed Drug,
4  which under the (j) pathway generics can copy.
5    Q.    Did you say under the J pathway
6  generics can copy the Reference Listed Drug label?
7    A.    Yes.  I think the intent of the law
8  and in practice as well over the years is that,
9  for the most part, the generic manufacturers in
10  their (j) application duplicates the labeling of
11  the Reference Listed Drug.
12    Q.    And is it true that they're required
13  to do that under the law?
14    A.    Yes, that's my understanding.  Now,
15  I realize there's some minor exceptions and maybe
16  even sometimes some exceptions you would call
17  major, but as a general statement, what we're
18  talking about is true.
19    Q.    And it's also true that a 505(b)(2)
20  applicant is not required as a matter of law to
21  copy the label of the Reference Listed Drug;
22  correct?
23    A.    You know, I don't know that there's
24  any specific requirement in connection with how a

Page 25

1  (b)(2) evolves.  Sometimes I say a (b)(2) is
2  always case by case, but there certainly is a
3  possibility that a (b)(2) manufacturer can copy
4  most or at times even all of the labeling of the
5  Reference Listed Drug.
6    Q.    And whether a 505(b)(2) applicant
7  copies the label of the Reference Listed Drug is
8  really determined on a case-by-case basis, there's
9  no legal requirement that cuts across the board;
10  correct?
11         MR. MERRELL:  Objection to
12    form.
13         THE WITNESS:  I certainly
14    like your way of describing it as case by
15    case, and remember I described two pathways
16    for the (b)(2).
17         It seems to me that if you're
18    in the pathway where you're relying on some
19    part of FDA's finding of safety and
20    efficacy, you would copy the label.  But if
21    you're not copying any part of the label, I
22    begin to think that you are working in some
23    other aspect of the regulatory system.
24  BY MR. GOMEZ:

Roger Williams, M.D.

Page 26

1    Q.    And so to the degree that an
2 applicant under 505(b)(2) was relying on prior
3 findings in support of their application, then you
4 believe they would copy part or all of the label
5 just as a matter of practice; correct?
6    A.    Yes, as a matter of practice, and it
7 certainly behooves them to do so and it accords
8 with the agency intent and the law to not require
9 unnecessary studies, which, of course, are
10 resource. They utilize resources and they may
11 expose volunteers to unnecessary clinical testing,
12 or not clinical testing as well.
13    Q.    You're not able to point to a
14 particular regulation or law that requires a
15 505(b)(2) applicant to copy the label of the
16 Reference Listed Drug; correct?
17    A.    Do you mean some part of the label?
18 Or all the label? I'm sorry, Mr. Gomez.
19    Q.    Sure. I'll just state it again.
20       I think we've been talking about it,
21 would behoove the applicant, it would be a good
22 practice, it makes sense, but you're not able to
23 point to a particular regulation or law that
24 requires the 505(b)(2) applicant to copy the label

Page 27

1 of a Reference Listed Drug; correct?
2       MR. MERRELL: Objection to
3 form.
4       THE WITNESS: The reason I'm
5 hesitating is, I think I've seen an FDA
6 statement -- and, of course, we can look for
7 them -- the idea that if you're relying on
8 FDA's finding of safety and efficacy in your
9 application for a 505(b)(2), you would
10 necessarily copy some part of that label.
11       So I would say that's a
12 stipulation of that pathway, and maybe I'll
13 stop there and see if I've addressed your
14 question, Mr. Gomez.
15 BY MR. GOMEZ:
16    Q.    Sure.
17       You believe there's an FDA statement
18 out there, but as you sit here today at this time,
19 are you aware of a regulation or law that actually
20 requires that under 505(b)(2) at the time of
21 application?
22       MR. MERRELL: Objection to
23 form.
24       THE WITNESS: Again, I will

Page 28

1 reiterate that if -- remember I've talked
2 about two pathways for (b)(2). One is
3 you're relying in part on the -- one pathway
4 is you're relying in part on the FDA finding
5 of safety or efficacy.
6       And in the law and in the
7 regulations, to me that would mean you would
8 be required to rely on that part of the
9 labeling unless you're doing new clinical
10 studies of some kind, or nonclinical
11 studies.
12       THE VIDEOGRAPHER: I'm sorry
13 to interrupt, but we have two people in the
14 waiting room, a Diana Sterk and we had a
15 Chris in there as well. I'm not sure if
16 they're supposed to be in here or not.
17       Yeah, a Chris McRae and a
18 Diana Sterk.
19       MR. GOMEZ: I don't know.
20 Does anybody know?
21       MR. MERRELL: I don't know
22 either.
23       THE VIDEOGRAPHER: All right.
24 They're on my list. Should I bring them in

Page 29

1 here? All right. You want to go off the
2 record real quick?
3       MR. GOMEZ: Sure. If they're
4 on the list, I imagine the list came from
5 somewhere.
6       MR. MERRELL: Yeah, they're
7 fine to join. I don't -- I don't see an
8 issue.
9       MR. GOMEZ: Yeah, you can just
10 stay on and let them in.
11       THE VIDEOGRAPHER: All right.
12 BY MR. GOMEZ:
13    Q.    Doctor, we'll kind of circle back to
14 this topic later, but are there economic
15 advantages to a company pursuing a 505(b)(2)
16 application to sell a version of a drug already on
17 the market?
18    A.    Yes, I would say so. At least in
19 the sense that the FDA will excuse you, again on a
20 case-by-case basis, of repeating at times very
21 expensive nonclinical or clinical studies and that
22 excuse could take many forms.
23    Q.    All right. Are there patent
24 considerations?

Roger Williams, M.D.

Page 30

1    A.    Yes, indeed.  Just like a 505(j)
2  generic, there's a patent certification process
3  connected with a 505(b)(2) application when you're
4  citing the Reference Listed Drug, and I would say,
5  for the most part, that certification process is
6  generally very similar, if not identical.
7    Q.    And so a 505(b)(2) applicant does
8  not have to repeat expensive clinical studies, and
9  does it enjoy some patent exclusivity, generally
10  speaking, on the market post-approval?
11    A.    Yes, I think a 505(b)(2) applicant
12  can conduct clinical studies such that they
13  themselves would get some kind of exclusivity.
14    Q.    Okay.  And so, hypothetically, if
15  Sandoz had hired you prior to this litigation and
16  come to you and said, you know, Look, Doctor, we
17  have submitted this 505(b)(2) application.  We've
18  been approved.  Going forward, Doctor, do we have
19  any obligation to update our label independent of
20  Sanofi's label?
21        What advice would you give them?
22    A.    The way I would answer that
23  question, Mr. Gomez, is that all applicants --
24  (b)(1), (b)(2), J -- have an independent

Page 31

1  obligation to conduct pharmacovigilance testing,
2  and certainly evidence of that is present in many
3  cases of this record.
4        Certainly if Sandoz found a serious
5  and unlisted adverse event, they would have an
6  obligation to bring that to the attention of FDA.
7    Q.    And is it true that they would have
8  that obligation independent of whether Sanofi
9  first changed its label to warn of that adverse
10  event?
11        MR. MERRELL:  Objection to
12    form.
13        THE WITNESS:  You mean my
14    example of a serious unlisted?  Yes, they --
15    they -- my understanding -- and I don't know
16    exactly what a company would do in this
17    hypothetical -- but if they saw a serious
18    unlisted event, I think they would be
19    required to contact their field office and
20    also their center contact.
21  BY MR. GOMEZ:
22    Q.    And that obligation is independent
23  of whatever Sanofi did or did not do with its
24  label; correct?

Page 32

1    A.    It's an obligation --
2        MR. MERRELL:  Object to form.
3        THE WITNESS:  I'm sorry.
4        It's an obligation that falls
5    to (b)(1), (b)(2), and even generic sponsors
6    with approved applications.
7  BY MR. GOMEZ:
8    Q.    And so each of those drug
9  manufacturers under the subtitles that you gave --
10  (b)(1), (b)(2), and (j) -- is responsible for its
11  own label; correct?
12        MR. MERRELL:  Objection to
13    form.
14        THE WITNESS:  The way I would
15    say it is FDA ultimately is responsible for
16    the label.  And maybe you saw in my report a
17    statement that said -- and it was a Federal
18    Register notice that says FDA thinks of the
19    label as its primary tool for risk
20    management.
21        So I would say it's more a
22    partnership between an applicant and the
23    agency as to what the label says.
24  BY MR. GOMEZ:

Page 33

1    Q.    It's true that a drug manufacturer
2  under (b)(2) has pharmacological duties
3  independent of the label content of the Reference
4  Listed Drug; correct?
5        MR. MERRELL:  Objection to
6    form.
7        THE WITNESS:  You know, in
8    terms of what you're saying, Mr. Gomez, I
9    mean, I think I'm not going to debate it
10    hypothetically, but, of course, we
11    understand and my report certainly said that
12    Sandoz at all times was copying the label of
13    the Reference Listed Drug.
14        Did they have an independent
15    obligation to consider adverse events
16    separate from that label?  And in that case,
17    my answer is yes, which I've already given.
18  BY MR. GOMEZ:
19    Q.    Okay.  Let me just ask some
20  questions and see if you can answer them yes or
21  no.
22        First question:  You agree that the
23  FDA does not bear the primary responsibility for
24  creating or updating a drug's label?  Do you agree

Roger Williams, M.D.

Page 34

1 with that statement?
2    A.    If I'm confined to a yes or no
3 answer, I'm going to say, no, I don't agree with
4 that statement.
5    Q.    So it's your belief that it's the
6 FDA that bears the primary responsibility for
7 creating or updating a drug's label?
8    A.    No, I wouldn't say that.  I would
9 say it's a joint activity between a manufacturer
10 with an approved application and the agency.
11    Q.    Are you unable to point to one that
12 is the drug manufacturer or the FDA and say, This
13 one bears the primary responsibility, the buck
14 stops here?
15    A.    If you -- it's a little hard to give
16 a yes or a no answer, Mr. Gomez, but I would say,
17 the way I try to frame it in my mind, it goes from
18 data to information to knowledge to wisdom.
19       Data comes usually from the
20 manufacturer.  Analysis of that data usually comes
21 from the manufacturer.  And then jointly working
22 with FDA, they create the knowledge that is
23 expressed in the label for the practitioner and/or
24 patient.

Page 35

1       I'm sorry that wasn't yes or no, but
2 it gets to some of the issues that I think are
3 key.
4    Q.    Okay.  And it's true that you
5 disagree with the following statement:
6       It is the drug manufacturer who
7 bears the responsibility for the content of its
8 label.
9    A.    Well, you can see, based on what I
10 just said, I would disagree with that, yes.
11    Q.    You disagree -- well, let me ask you
12 this question.
13       Agree or disagree:  FDA approval
14 does not establish that the warnings provided with
15 the drug were adequate under the law.
16    A.    No, I would disagree with that.  I
17 think that's a primary agency responsibility.
18    Q.    And so you believe that FDA approval
19 means that the warnings provided with the drug
20 were adequate under the law?
21    A.    Yes, certainly at the time of
22 approval and on a continuing basis.
23    Q.    And do you agree or disagree:  Drug
24 manufacturers have a continuing duty to ensure

Page 36

1 that the label remains adequate at all times.
2    A.    I would agree with that statement.
3    Q.    All right.  So prior to your work
4 with NDA, you were the CEO and chair of the
5 Council of Experts of the U.S. Pharmacopeia?
6    A.    Yes, that's correct, Mr. Gomez.
7    Q.    And is it true that the U.S.
8 Pharmacopeia has no role in enforcing its
9 standards; that enforcement is the responsibility
10 of the FDA and other governmental authorities?
11    A.    Yes, I would agree with that
12 statement.
13    Q.    Is it true that you last worked at
14 the FDA in 2000?
15    A.    That's correct.
16    Q.    And it looks like you worked there
17 for 10 years; is that correct?
18    A.    That's correct, Mr. Gomez.
19    Q.    When you left, was Bill Clinton the
20 president or George Bush, or do you remember?
21    A.    I think it was George Bush 2, if I
22 could say it that way.
23    Q.    All right.  And was there a
24 particular reason that you left other than to

Page 37

1 explore new opportunities?
2    A.    I would say I had three
3 opportunities.  At the time I was in my final
4 year, and the one at USP seemed like the best
5 opportunity and that's what I chose.
6    Q.    When you left, were you the deputy
7 center director for the Center for Drug Evaluation
8 and Research?
9    A.    Yes.
10    Q.    And in that capacity, were you
11 responsible either directly or in a supervisory
12 role for 505(b)(2) labeling requirements?
13    A.    I'm going to answer that yes.  And
14 may I give a few more words of explanation,
15 Mr. Gomez?
16    Q.    Sure.
17    A.    If you think of the disciplines that
18 sit around the table -- I'll use that metaphor --
19 in the evaluation of an application, I'm going to
20 name them, recognizing that it's an estimate.
21 Clinical, nonclinical, chemistry manufacturing
22 controls, biopharmaceutics, clinical pharmacology,
23 and microbiology quality.  I had responsibility
24 direct line authority for four of those six

Roger Williams, M.D.

Page 38

1  disciplines.
2        So I would say definitely, yes, my
3  responsibilities contributed directly to labeling
4  of (b)(1), (b)(2), and (j) applications.
5        And then beyond that, I had a lot of
6  policy responsibilities, which you may want to ask
7  me about, that brought me in touch with the
8  nonclinical and clinical aspects of labeling.
9     Q.    And what policy considerations were
10 those?
11    A.    Well, I'll speak very briefly, but
12 as you could see from my report or CV, I
13 championed coordinating committees.  And there
14 were two coordinating committees, nonclinical and
15 clinical medicine coordinating committees, and I
16 believe I was co-chair of the medical coordinating
17 committee that created policies expressed in
18 guidances and other documents for the review of
19 New Drug Applications.
20       And then in addition to that, and it
21 was certainly connected to that, I worked in ICH
22 as FDA's representative to the International
23 Conference on Harmonization.
24    Q.    Thank you.

Page 39

1        You know, can I return to a topic,
2  actually a good explanation that you gave earlier,
3  and that was the role of the FDA and the role of
4  the drug company in pharmacovigilance.
5        And I think you said there was a
6  collection aspect of that and an analysis
7  component, and could you walk me through that one
8  more time?
9     A.    Yeah, I'd be pleased to do so
10 because it creates a framework that helps me
11 understand what everybody is doing.
12       Data, information, knowledge,
13 wisdom.  Data, of course, is primary data.  How
14 you collect it and analyze it is -- creates
15 information.  And then how the agency works with a
16 pharmaceutical manufacturer to put it in labeling,
17 I call that knowledge.
18       And then I didn't mention it before,
19 Mr. Gomez, but I also like the term "wisdom" and
20 wisdom to me speaks more to how a practitioner
21 speaks to a patient.
22       Each of the two individuals in that
23 engagement, both the practitioner and patient,
24 bring their own wisdom, if you will, to the party

Page 40

1  and, hopefully, if everything works well together,
2  the patient gets a safe and effective drug and it
3  benefits them.
4     Q.    All right.  And is it your belief
5  that the label is intended to provide wisdom to
6  the practitioner and the patient that is necessary
7  information?
8     A.    Well, according to my --
9        MR. MERRELL:  Object to form.
10       THE WITNESS:  According to my
11 paradigm or metaphor, whatever you want to
12 call it, I would say the wisdom comes from
13 the practitioner and patient.  It's the
14 agency working with the manufacturer that
15 creates the knowledge and a label.
16 BY MR. GOMEZ:
17    Q.    Okay.  And so in terms of the data
18 collection, that responsibility in your paradigm
19 falls upon the company; correct?
20       MR. MERRELL:  Objection to
21    form.
22       THE WITNESS:  No, I actually
23    -- I don't want to push my analogy too far,
24    but I actually think it's up to the company

Page 41

1  to do the analyses.
2        Data about a drug can come
3  from many sources, which we certainly see in
4  this matter: spontaneous report,
5  publications, labeling in other countries,
6  further clinical trials after approval as
7  well, as all the studies done up to and at
8  the time of approval.
9        So if you want me to give
10 responsibility to the sponsor there, I would
11 say they have a good responsibility to
12 analyze and assess all that information.
13 BY MR. GOMEZ:
14    Q.    All right.  And so the company
15 has -- separate and apart from simply collecting
16 the data and passing that on to the FDA, the
17 company has a responsibility to actually analyze
18 the information; correct?
19    A.    Yes, under certain circumstances
20 and, you know, I've indicated one of those
21 circumstances already, for example, serious
22 unlisted spontaneous reports.
23    Q.    And so in this case, sort of, you
24 know, pointing our attention to the particulars of

Roger Williams, M.D.

Page 42

1 this case, do you believe that Sandoz had an
2 independent responsibility to analyze whether
3 Docetaxel was causing permanent versus temporary
4 alopecia?
5        MR. MERRELL:  Objection to
6    form.
7        THE WITNESS:  The way I would
8    say it is, Sandoz would get spontaneous
9    reports and then would look at labeling, its
10    own labeling and that of Sanofi, and see
11    that those reports were listed under the
12    medical term "alopecia" and alopecia did not
13    specify duration.  It could be one day or it
14    could be for a very extended length of time.
15        So that was always there.  The
16    basis for how they worked with the agency
17    and with the practitioner community.
18 BY MR. GOMEZ:
19    Q.    And so regardless of whether the
20 data was suggesting that Docetaxel was causing
21 permanent or temporary alopecia, Sandoz could
22 simply look at its label, see alopecia and be
23 satisfied that the label was adequate as phrased?
24    A.    They would see that alopecia was a

Page 43

1 listed adverse event, and they would know that in
2 the use of that terminology that it covered both
3 temporary and persistent alopecia.
4    Q.    And one of the data points that you
5 identified that Sandoz would have a responsibility
6 to look at and analyze were foreign labels.
7        Do you recall that?
8    A.    I do.
9    Q.    And so would it matter if the
10 foreign labels made a distinction between
11 persisting and temporary alopecia?
12        MR. MERRELL:  Objection to
13    form.
14        THE WITNESS:  The way I'd
15    answer that, Mr. Gomez, is to point
16    specifically to the European label, which,
17    of course, was adjudicated between Sanofi at
18    the European Medicines Agency, and that
19    label was different and it had different
20    statements compared to the U.S. label as
21    adjudicated between FDA and Sanofi and
22    Sandoz.
23        As you've seen from my report,
24    that's perfectly reasonable and has a logic

Page 44

1 to it.  I would say there's no obligation
2    for Sandoz U.S. either theoretically or
3    practically to copy the European label.
4 BY MR. GOMEZ:
5    Q.    All right.  There was no obligation
6 for Sandoz to copy its European label here in the
7 United States; correct?
8    A.    I would say absolutely not.  They
9 would work out whatever the label should say with
10 FDA and their review division in the FDA.
11    Q.    All right.  Did you speak to anyone
12 from FDA to help you come to your opinions in this
13 case?
14    A.    I did not.
15    Q.    Did you speak to anyone that
16 formerly was employed with the FDA to help you
17 come to your opinions in this case?
18    A.    No.
19    Q.    Did you speak to anyone actually at
20 the company -- that is, Sandoz Inc. -- to help you
21 understand what happened in this case?
22    A.    I did not.
23    Q.    Did you make a request to speak to
24 anyone at Sandoz?

Page 45

1    A.    I did not.
2    Q.    Did you note that there was a person
3 employed by Sandoz who was a medical professional
4 that helped analyze the information?
5    A.    Yes, I am aware of that.
6    Q.    Do you recall that person's name?
7    A.    Dr. Duncan.
8    Q.    And so I take it you never talked to
9 Dr. Duncan to confirm whether or not he believed
10 that the term "alopecia" as used in Sandoz's label
11 adequately warned of both permanent and transient
12 alopecia?
13    A.    No, I didn't, Mr. Gomez.
14    Q.    Do you know anything about
15 Dr. Duncan?
16    A.    Not very much, but I do know his
17 role was at Broomfield in Colorado, and I don't
18 believe he's with the company anymore.
19    Q.    All right.  Do you know whether he's
20 a licensed physician?
21    A.    I don't know that.  Although it
22 might be in some of the materials that were made
23 available to me.
24    Q.    Do you know how much time he spent

Roger Williams, M.D.

Page 46

1  analyzing adverse event reports on behalf of
2  Sandoz?
3      A.    I do not.
4      Q.    Do you know folks over at FDA still?
5      A.    I know the names of people, I know
6  their responsibilities, and some of them I know as
7  colleagues and friends, but I would say we are not
8  in close touch.
9      Q.    Do you know anyone personally that
10 was involved in the approval process from FDA for
11 Sandoz's Docetaxel product?
12     A.    Mr. Gomez, I'm sure the answer to
13 that question is yes, and I can give some
14 examples, but maybe I'll stop there in terms of
15 your question.
16     Q.    Sure.
17           What examples?
18     A.    Well, for example, I looked at a
19 document that came from the clinical pharmacology
20 biopharmaceutics group, and I know the names of
21 the people on that document.
22     Q.    Okay.  Do you know the person at FDA
23 that was ultimately responsible for approving
24 Sandoz's Docetaxel label at the time of initial

Page 47

1  approval?
2      A.    I'm sure I saw the name on the
3  approval letter, which is part of my report.  If I
4  had to guess, I would say it was Anthony Murgo.
5      Q.    All right.  Thank you.
6           Is there -- I don't know, but is
7  there some rule that would prohibit those people
8  from talking to you about their thinking regarding
9  this drug?
10          Like if you called them up and said,
11 Hey, Anthony, you know, I'm working with this
12 company, would he be permitted to talk to you?
13     A.    I think he would not, Mr. Gomez.  He
14 would say, Anything I might say about that is, you
15 know, the business of the Sandoz or Sanofi.
16     Q.    All right.  Have you given lectures
17 regarding the labeling requirements for drugs
18 approved under 505(b)(2)?
19     A.    Certainly when I was at the agency,
20 I would give lectures about the approval process
21 and, as you can see from my report, I wrote an
22 article on 505(b)(2)s.
23     Q.    And was that the article that was a
24 footnote to your report, Footnote 4?

Page 48

1      A.    Yes, coauthored with Mr. Johnston.
2           MR. GOMEZ:  All right.  Let's
3  mark that.  I think my friend Lindsay is
4  going to put these into the folders, but
5  let's mark that article, Lindsay, as Exhibit
6  1 if we can.
7           (Document marked for
8  identification as Williams Exhibit 1.)
9  BY MR. GOMEZ:
10     Q.    And so let me see if I'm able to
11 navigate this.
12          There it goes now it's in the
13 folder.  So step 1 is completely -- is complete,
14 successfully completed.
15          Are you able to find your article
16 there as Exhibit 1, Dr. Williams?
17     A.    I don't see it on my screen.  Of
18 course, I could get it independently.  Do you --
19     Q.    Okay.  Yeah.
20     A.    You -- you tell me what to do,
21 Mr. Gomez.  Should I get it independently or
22 should I wait to see it on my screen?
23     Q.    You can get it independently.
24 That's fine.

Page 49

1           MR. MERRELL:  And just -- I'm
2  sorry to interrupt.  It may be Dr. Williams
3  may be less familiar with the platform.  So
4  at some point he'll probably need to look at
5  documents you're showing.  So I'm sure if
6  you direct him, he probably could do that.
7           MR. GOMEZ:  Okay.
8  BY MR. GOMEZ:
9      Q.    Do you have -- well, let's just have
10 you look at this one independently, and then maybe
11 on a little break we'll coach you up a little.
12          All right.  Do you have your article
13 in front of you?
14     A.    I'm getting close.
15          Yes, now I have it, Mr. Gomez.
16     Q.    All right.  Very good.
17          And so you said that you wrote this
18 article, Exhibit 1, regarding 505(b)(2) companies?
19     A.    Yes, and I'm trying to look at the
20 publication date.  I think it's at the top.  Yes,
21 2002.
22     Q.    And are you able to point us to
23 where in this article you discuss 505(b)(2)
24 companies?

Roger Williams, M.D.

Page 50

1    A.    Companies?
2    Q.    Right.  Or the approval process, I
3  guess.
4    A.    Well, as you can see, the entire
5  article has 505(b)(2) in every paragraph, but I'll
6  skip past regulatory history and then there's some
7  examples.
8          And I would say getting into
9  discussion, Mr. Gomez, is where we talk about what
10  a sponsor would do.  A sponsor, of course, is
11  another term for manufacturer.
12   Q.    And so does this article have 12
13  pages?
14   A.    I'm trying to get to the end of it.
15         323 is the end page and -- no, I
16  wouldn't say it has that many pages.  I'm --
17  one -- 319 to 323 is what I'm seeing.  I may be
18  miscounting.
19   Q.    Okay.  I think what we've pulled up
20  as Exhibit 1 is a different article.  It's
21  entitled "Food and Drug Administration: Role in
22  Drug Regulation."
23   A.    Yes, that's not the article I did
24  with Mr. Johnston.  That's another article.

Page 51

1    Q.    Okay.  So we'll just leave that as
2  Exhibit 1, but with the disclaimer that that is
3  not the article that you did with Mr. Johnston and
4  not the one that you initially referenced;
5  correct?
6    A.    There were two articles.  There's
7  the other one that I wrote that talks about the
8  Food and Drug -- FDA in the context of the Food
9  and Drug Law and then there's (b)(2) I wrote with
10  Mr. Johnston.
11         If that's what you're saying,
12  Mr. Gomez, I agree with you.
13   Q.    All right.  And so that publication,
14  the one that you wrote with Mr. Johnston, is that
15  the only paper that you public -- that you
16  published on the topic of 505(b)(2) approval
17  processes?
18   A.    Yes, I think that would be true.  I
19  may have mentioned it in the other article, but I
20  don't recall doing so.
21   Q.    Okay.  Any other publications
22  authored by you on the topic of the 505(b)(2)
23  process or labeling requirements for drugs
24  approved under 505(b)(2)?

Page 52

1    A.    I don't believe so.
2    Q.    I don't know if it matters, but it
3  looks like your -- I don't know, like, what is the
4  view of the witness at this point?  You look like
5  you're maybe slouched down a little.  I'm only
6  getting half your head but --
7          THE VIDEOGRAPHER:  He just has
8  to move his camera down.
9          THE WITNESS:  Wait a minute.
10  I actually got off the screen.  I'm sorry.
11         MR. GOMEZ:  There you go.
12         THE VIDEOGRAPHER:  There you
13  go.
14         THE WITNESS:  Looking at the
15  paper.  Thank you.
16  BY MR. GOMEZ:
17   Q.    I'm just doing you a favor.  I
18  know -- I know you were intent on that paper.
19         Have you qualified as an expert in
20  any litigation previously regarding the labeling
21  requirements of a company for a drug approved
22  under the 505(b)(2) pathway?
23   A.    I'm not sure what you mean by
24  qualify.  Can you explain that term, Mr. Gomez?

Page 53

1    Q.    Sure.
2          Have you testified in court of law
3  on that topic prior to this case?
4    A.    I'm sorry.  I'm thinking.
5          I would say some of my litigation
6  does relate to (b)(2)s.  So I'm going to say
7  tentatively, yes, Mr. Gomez, subject to checking
8  my CV.
9    Q.    And what about the particular topic
10  of the labeling responsibilities of a 505(b)(2)
11  approved --
12         MR. MERRELL:  Object.
13  BY MR. GOMEZ:
14   Q.    -- product?
15         MR. MERRELL:  Objection to
16  form.
17         THE WITNESS:  Yes, I can think
18  of examples where in my expert report I talk
19  about a (b)(1), (b)(2), and (j), and talk
20  about the distinctions that allow at times
21  the same labeling as Reference Listed Drug
22  for (b)(2) and, depending on certain
23  studies, different labeling.
24  BY MR. GOMEZ:

Roger Williams, M.D.

Page 54

1    Q.    Okay.  And so are you saying that in
2  some of your other cases you've written expert
3  reports that make that distinction?
4    A.    I believe that's true, yes.
5    Q.    And would you be able to look at
6  your CV and identify the cases in which you
7  addressed that topic?
8    A.    I think I could.  I may be able to
9  give you an example right away.
10        There was one by Parr where I gave a
11  deposition on behalf of Parr.
12        Oh, yeah, there it is.  If you look
13  at number 9 on page 32 of my CV, I can explain the
14  story of Parr, which I think for this discussion
15  is an interesting story, Mr. Gomez.
16    Q.    Okay.  Let's hear about Parr.
17    A.    You know, to me, that's the other
18  example of a (b)(2) where it's relying on paper,
19  and if I had to explain that a little bit more,
20  the drug at issue was vasopressin.  Now,
21  vasopressin is a very old drug.  It's been around
22  really before 1962 when the efficacy requirements
23  came in.
24        So a company developed a literature

Page 55

1  search for vasopressin, and then they reviewed it
2  with the correct -- with the appropriate review
3  division in CDER and they got an understanding
4  that, yes, they could bring in an application for
5  that drug and have the label state certain things
6  based on the literature reports.
7        That was done and now vasopressin is
8  an approved NDA, and I believe it's owned by Parr.
9  Now, that is not where they're relying on the
10  agency's decision of safety and efficacy for the
11  Reference Listed Drug.  There was no Reference
12  Listed Drug, but now vasopressin itself is the
13  Reference Listed Drug, according to our regulatory
14  system.
15    Q.    All right.  And in that case, who
16  were you testifying for?  Was it for Parr?
17    A.    Yes, that's correct.
18    Q.    Any other cases in which you believe
19  you address labeling requirements for a drug
20  approved under 505(b)(2)?
21    A.    Let's see.
22        I'm going to say -- I'd have to look
23  specifically at the record for 8, but I was
24  representing ANI as a defendant in that case, and

Page 56

1  I think that had to do with -- I'd have to go back
2  and look at the specifics, but I think it was a --
3  it may have been a (b)(2) product.
4    Q.    Was the dispute there about
5  labeling?
6    A.    No, I don't think it was a dispute
7  about labeling.
8    Q.    Is that a patent case?
9    A.    No, it wasn't a patent case.  There
10  are patent cases on my CV, but I think I better
11  stop there in terms of my litigation, Mr. Gomez.
12    Q.    What do you mean by that?
13    A.    Well, I don't think I have any other
14  examples of (b)(2) and labeling --
15    Q.    Okay.
16    A.    -- on my CV in terms of testimony.
17    Q.    All right.  In terms of a claim by
18  someone that the label was inadequate in its
19  warnings, is this the first time that you've
20  testified as an expert in a case involving a
21  505(b)(2) company?
22    A.    I'm going to say yes.
23    Q.    All right.  Do you agree, Doctor,
24  that a 505(b)(2) applicant holder's regulatory

Page 57

1  responsibilities are the same as those of a
2  505(b)(1) holder?
3        MR. MERRELL:  Objection to
4    form.
5        THE WITNESS:  You -- that was
6    a very broad question.  Are you asking,
7    Mr. Gomez, about all their regulatory
8    responsibilities?
9  BY MR. GOMEZ:
10    Q.    Yes.
11    A.    I think for the sake of continuing
12  the discussion, I'm going to say generally, yes.
13    Q.    All right.  Would you agree that in
14  terms of labeling responsibilities that a
15  505(b)(2) holder's responsibilities are the same
16  as those of a 505(b)(1) holder?
17        MR. MERRELL:  Objection to
18    form.
19        THE WITNESS:  You know, I
20    wouldn't say that in the present instance
21    because the (b)(2) of Sandoz, the basis for
22    it being a (b)(2) was, allowed Sandoz to
23    always copy the labeling of the Reference
24    Listed Drug, Sanofi's Taxotere.

Roger Williams, M.D.

Page 58

1 BY MR. GOMEZ:

2    Q.    And when you say "the basis," do you
3 believe that that basis continued beyond the
4 approval of the Sandoz product, that is, that
5 Sandoz was required to copy the Sanofi label in
6 perpetuity?

7    A.    I think continuing to presence, the
8 basis was such that Sandoz and FDA allowed Sandoz
9 to copy the labeling of the Reference Listed Drug.

10    Q.    And was Sandoz required to copy the
11 Sanofi label in perpetuity for its Docetaxel
12 product?

13        MR. MERRELL:  Objection to
14 form.

15        THE WITNESS:  You know,
16 you're using the term "required."  I prefer
17 my terminology, which alluded to the basis
18 for the approval of the Sandoz product,
19 which had to do with excipients.

20        So I guess I'm hesitating a
21 little bit on the word "required," but
22 overall I would agree with you that starting
23 at the time of its approval and continuing
24 the presence, Sandoz could and FDA agreed

Page 59

1 that it could copy the labeling of the
2 Sanofi Taxotere.

3 BY MR. GOMEZ:

4    Q.    And so "could" sounds like a choice.
5        Would you agree that Sandoz had a
6 choice of whether or not to copy the Sanofi label
7 post-approval?

8        MR. MERRELL:  Objection to
9 form.

10        THE WITNESS:  No, I hesitate
11 on the choice because at the end of the day,
12 Sandoz did no nonclinical or clinical
13 studies or even a bioequivalent study that
14 would allow it to state that it was in any
15 way different compared to the Reference
16 Listed Drug Sanofi's Taxotere.

17 BY MR. GOMEZ:

18    Q.    And so just to be clear, you don't
19 have an opinion about whether or not Sandoz was
20 required to copy the Sanofi label going forward.
21 You -- your opinion simply is that they could and
22 that the FDA allowed them to?

23        MR. MERRELL:  Objection to
24 form.

Page 60

1        THE WITNESS:  No, I think my
2 prior answer, Mr. Gomez, sort of moved a
3 little closer to your mandatory wording.
4 Where I'm saying that in the absence of
5 clinical studies that showed a difference,
6 Sanofi did have -- I'll use the term --
7 imperative to copy the label of Sanofi's
8 Taxotere, and I think I express that in my
9 expert report.

10 BY MR. GOMEZ:

11    Q.    I think you misspoke.  You meant
12 Sandoz copying Sanofi's.  I think you used Sanofi
13 twice just for the record.

14    A.    Oh, I apologize.  I meant Sandoz
15 duplicating Sanofi.

16    Q.    And you -- and it's your opinion
17 that the absence of clinical studies
18 post-approval, that's the reason for your opinion
19 that Sandoz -- well, I don't know what word you're
20 using.

21        Are you saying could, should have,
22 was required to, was imperative?  You know, what's
23 the best way that you would say it?

24    A.    Yeah, that's a good question.

Page 61

1        Let's say it had an imperative to,
2 which FDA agreed, that it could and would copy the
3 labeling of Sanofi's Taxotere.

4    Q.    And when you say "had an
5 imperative," what does that mean to you?

6    A.    I don't want to wax too long on
7 this, but remember, the essence of this (b)(1) --
8 (b)(2) pathway is, you can do clinical studies to
9 show a difference, but Sandoz had no desire to
10 show a difference.  And they did no clinical
11 studies.  They did no nonclinical studies.  They
12 were not required to do a bioequivalent study.

13        So at all points and at all times,
14 their safety and efficacy was the same as Sanofi's
15 Taxotere.  Taking into account, as I say in my
16 report on several places, the difference in
17 concentration.

18    Q.    All right.  Do labels evolve and
19 change over time as companies acquire new
20 information?

21    A.    Yes, they can.

22    Q.    And so you would expect that in the
23 time that passed since Taxotere's original label
24 that both Sanofi and companies like Sandoz would

Roger Williams, M.D.

Page 62

1 acquire additional information regarding the use
2 of the Docetaxel drug; right?
3     A.    Yes.
4            MR. MERRELL:  Object to form.
5            THE WITNESS:  I'm sorry.
6            Yes, that was clearly the case
7     here.
8 BY MR. GOMEZ:
9     Q.    And we talked earlier about the
10 collection and analysis of data; is that right?
11    A.    Yes, that -- that's those four areas
12 that I spoke to.
13    Q.    And it's true that Sandoz, despite
14 the fact that it initially relied upon Sanofi's
15 safety profile, that it had ondoing -- ongoing
16 pharmacovigilance responsibilities, that is, it
17 had an affirmative application or obligation to
18 look at data, analyze it, and make decisions about
19 whether the label remained appropriate; correct?
20            MR. MERRELL:  Objection to
21     form.
22            THE WITNESS:  That was sort
23     of a long question, Mr. Gomez, but overall I
24     think Sandoz did conduct pharmacovigilance

Page 63

1     efforts and was prepared to work with the
2     agency if it saw a need to change its own
3     label, but that never occurred.
4 BY MR. GOMEZ:
5     Q.    And in terms of whether it saw a
6     need to change or didn't see a need to change,
7     that was independent of whether Sanofi did the
8     right thing first, that is, changed its label
9     first; correct?
10            MR. MERRELL:  Objection to
11     form.
12            THE WITNESS:  No, I wouldn't
13     say that.  Because, you know, if we looked
14     at the larger issue, in the years after its
15     approval in 1996, Sanofi added important
16     indications.  To the best of my
17     recollection, those indications were added
18     by the time of the Sandoz approval in 2011.
19            And then there was a change in
20     the Sanofi label in 2010 that was important,
21     and we could certainly discuss if you wish,
22     but it was a recent label and when Sandoz
23     got its approval in 2011, it copied that
24     recent label.

Page 64

1            I'm not sure I'm answering
2     your question, but I'll certainly try again
3     if you wish.
4 BY MR. GOMEZ:
5     Q.    Sure.
6            I think you said that Sandoz had a
7 pharmacovigilance responsibility, conducted
8 pharmacovigilance, and had the ability to change
9 its label if it saw a need to do so; is that fair?
10            MR. MERRELL:  Objection to
11     form.
12            THE WITNESS:  I would say all
13     companies have that obligation working with
14     FDA.
15 BY MR. GOMEZ:
16    Q.    And you would agree that Sandoz's
17 responsibility to change its label if it "saw a
18 need" was independent of whether Sanofi decided to
19 change its label post-approval; correct?
20    A.    Again, I think in this hypothetical
21 I can agree with you, and we could certainly talk
22 about examples, but I see no reason to disagree.
23    Q.    And you agree that if Sandoz looked
24 at the data, looked at its own Core Data Sheet,

Page 65

1 looked at its labeling in other countries and
2 decided, We're going to add a label on our
3 Docetaxel product that warns of persistent
4 alopecia, then it had the ability to do that under
5 the law; correct?
6            MR. MERRELL:  Objection to
7     form.
8            THE WITNESS:  You know, I'm
9     going to say no because we're getting a
10     little bit closer to some of the core issues
11     here.
12            FDA and Sandoz and Sanofi will
13     be aware of the labels in other countries,
14     but Sandoz's responsibility is to work out
15     its label with FDA in the United States, and
16     that was a continuing obligation and always
17     the case.
18 BY MR. GOMEZ:
19    Q.    All right.  Do you agree that -- let
20 me ask it this way.
21            Do you agree that Sandoz at all
22 times had an obligation to update its label if the
23 availability of new scientific information caused
24 the existing label for its product to become

Roger Williams, M.D.

Page 66

1 inaccurate, false, or misleading?
2     A.    That's a hypothetical.  I don't know
3 that it occurred in this instance, but as a
4 general hypothetical, I don't see any reason to
5 disagree, Mr. Gomez.
6     Q.    All right.  You had talked about
7 serious adverse events I think they were called;
8 is that right?
9     A.    Yes.
10     Q.    And I think you said -- correct me
11 if I'm wrong -- that if Sandoz became aware of
12 serious adverse events, it would have an
13 obligation to update its label to warn of those
14 serious adverse events; is that true?
15         MR. MERRELL:  Objection to
16     form.
17         THE WITNESS:  I think I want
18     to say serious unlisted.
19 BY MR. GOMEZ:
20     Q.    Serious unlisted.
21         So serious adverse events that were
22 not in the label; correct?
23     A.    Yes.
24     Q.    Is there something that's called an

Page 67

1 unexpected adverse event?
2     A.    No, I wouldn't surprised to see it
3 written someplace, but I'm not aware of it
4 specifically.
5     Q.    Do you -- as an expert in this case,
6 do you believe that drug companies have a
7 statutory obligation to update labels to warn of
8 unexpected adverse events?
9         MR. MERRELL:  Objection to
10     form.
11         THE WITNESS:  You know,
12     Mr. Gomez, I'm hesitating on the word
13     "unexpected."  I'd like to cling to the word
14     "listed."
15         If you start talking about
16     unexpected, then you get into the issue of,
17     well, who's expecting what?  And it's a
18     little too general for me to comment on.
19 BY MR. GOMEZ:
20     Q.    All right.  What if I provide a
21 definition and that is that unexpected adverse
22 events can include adverse events that are
23 "symptomatically or pathophysiologically related
24 to a listed adverse event but differ because of

Page 68

1 greater severity or specificity"?
2     A.    Mr. Gomez, if you're reading from an
3 agency document, for example, that adverse event
4 guidance, I might request that we put it on the
5 screen and sort of parse the words.
6         It sounds like you're reading from
7 an agency document, and if you are, I certainly
8 wouldn't contest what they're saying.
9     Q.    All right.  Do you believe that a
10 drug manufacturer has an obligation to update its
11 label to warn of adverse events that are listed,
12 but then the manufacturer learns that out in the
13 field the adverse events that are listed are more
14 severe than a user might expect?
15         MR. MERRELL:  Objection to
16     form.
17         THE WITNESS:  As a
18     hypothetical, I could imagine those
19     hypothetical situations.  I don't think I
20     dealt with them in my report, and I don't
21     think they apply to the current
22     circumstance.
23 BY MR. GOMEZ:
24     Q.    And so if you -- hypothetically, if

Page 69

1 a drug manufacturer had as a listed side effect
2 temporary numbness, have you ever seen a drug that
3 causes like temporary numbness?
4     A.    I can't say that I have, but I'll
5 continue with your hypothetical.
6     Q.    All right.  And then learns that, in
7 fact, the drug can cause permanent numbness or
8 sensation of feeling.
9         Under those circumstances, would the
10 drug manufacturer have an obligation to update its
11 label?
12         MR. MERRELL:  Objection to
13     form.
14         THE WITNESS:  Well, I'm trying
15     to apply your hypothetical to the current
16     situation.
17         If the label said numbness and
18     the label didn't specify duration, I would
19     say it was a listed adverse event and the
20     patient should talk to their doctor if the
21     numbness -- if the numbness continued beyond
22     their expectation.
23 BY MR. GOMEZ:
24     Q.    All right.  And so you've got a

Roger Williams, M.D.

Page 70

1 drug. It says it can cause numbness, but then the
2 manufacturer learns that, in fact, the numbness
3 can be permanent.
4          Under those circumstances, you don't
5 think the manufacturer is required to update the
6 label to use the word "permanent"?
7     A.     Again, I'm going back to your use of
8 the term "label," which in most respects is
9 designed to speak to the physician or the
10 healthcare practitioner. I think a label that
11 says talk to your physician if an adverse event
12 doesn't go away or is particularly concerning,
13 that's a very good idea.
14     Q.     And so under those circumstances,
15 you would just say, Numbness, talk to your
16 physician if the symptoms don't go away, and that
17 would be enough?
18          MR. MERRELL: Objection to
19     form.
20          THE WITNESS: I would
21     certainly say that adding duration to a
22     label that has scores of adverse events,
23     many of them serious and life-threatening
24     and that appear in a black-box warning,

Page 71

1     would be extremely difficult. And I'm
2     trying to imagine the kind of data that
3     would even allow such precision, if you
4     will, to the label.
5 BY MR. GOMEZ:
6     Q.     And so let me just give you two more
7 hypotheticals, and then we'll move past this.
8          Side effect or adverse reaction.
9 Users have reported blurred vision and so then
10 that's on the label, blurred vision, and then the
11 company finds out that, in fact, the drug causes
12 vision to become permanently blurred.
13          Under those circumstances, does the
14 manufacturer have responsibility to add the word
15 "permanent"?
16          MR. MERRELL: Objection to
17     form.
18          THE WITNESS: No, I don't
19     think they have an obligation. I think they
20     have an obligation to tell the healthcare
21     professional and the patient what to do if
22     blurred vision is persistent.
23 BY MR. GOMEZ:
24     Q.     And that is, the patient should talk

Page 72

1 to their doctor if they have permanently blurred
2 vision?
3     A.     That's one example. It's a good
4 example.
5     Q.     And then my last example would be
6 drowsiness, and they learn that use of the drug
7 causes a person to become permanently drowsy for
8 the rest of their life.
9          They don't need to update the label
10 to specify permanent. They can just say, Talk to
11 your physician if the symptoms continue?
12     A.     Well, in that hypothetical, I think
13 that communication with the healthcare
14 professional is critical. So I'm glad you said
15 that, Mr. Gomez.
16     Q.     Would the manufacturer have an
17 obligation to specify that the drowsy state, the
18 drowsiness is permanent?
19          MR. MERRELL: Objection to
20     form.
21          THE WITNESS: The way I would
22     answer that question, if you had a drug that
23     caused permanent drowsiness, your first
24     "port of call" in my view would be to talk

Page 73

1     to FDA, and I would say you have a -- you
2     would have a substantial dialogue with the
3     agency on your hypothetical.
4 BY MR. GOMEZ:
5     Q.     Despite the fact that drowsiness was
6 a listed adverse event?
7     A.     Without any of the adverse events
8 being specified as to duration, yes, I think the
9 agency and the sponsor and the application holder
10 would have a very vigorous dialogue about just
11 what that observation meant.
12     Q.     And why is that? Why is permanent
13 drowsiness, in your mind, different than permanent
14 hair loss?
15     A.     It gets back to that, I'll call it,
16 my framework that I developed. Permanent
17 drowsiness is an interesting term, and I would
18 call it data.
19          So then the next step that FDA and
20 the company would work with is, Well, let's talk
21 about what information do we need to talk about
22 permanent drowsiness. Are they taking other
23 drugs? What's permanent? Is it lifelong? Is it
24 two months? Is it six months? What about other

Roger Williams, M.D.

Page 74

1 drugs?  Do they cause permanent drowsiness?  If
2 you stop the drug, do you -- does it never go away
3 or is it only permanent when you're taking the
4 drug?
5        My point here, Mr. Gomez, is not to
6 get into the detail of analytics because we've
7 seen that in a lot of the elements of this case,
8 but to say that in your hypotheticals, the agency
9 is there to discuss with you and make a final
10 decision with you as to how the label should be
11 adjusted.  That's why I give the agency such
12 prominence here.
13        You could put 500 events into the
14 label, and would you be adding information that
15 would help the wisdom of the healthcare
16 practitioner and patient?
17        MR. MERRELL:  Can we take a
18    break at a good point?  We've been going for
19    about an hour and a half.  I don't want to
20    stop you, but at some point.
21        MR. GOMEZ:  Yeah, sure.
22    Let's -- let me just finish this line of
23    question and then we'll stop.
24 BY MR. GOMEZ:

Page 75

1    Q.    And so talking about the wisdom of
2 the practitioner and the patient, have you, as a
3 medical doctor, ever provided clinical care to a
4 person that's suffering from breast cancer?
5    A.    No.
6    Q.    Did you understand well prior to
7 your involvement in this case that chemotherapy
8 causes women to lose their hair temporarily?
9    A.    I understood that many drugs used
10 in -- in chemotherapy, irrespective of the cancer,
11 can cause alopecia.
12    Q.    And have you kind of always
13 understood that?
14    A.    Yes, I would say that's an
15 understanding I have as an internist.
16    Q.    And as an internist, was it your
17 understanding, has it been your understanding
18 before your involvement in this case that once
19 these women get done with the treatment, their
20 hair comes back?
21    A.    I wouldn't --
22        MR. MERRELL:  Objection to
23    form.
24        THE WITNESS:  -- say I

Page 76

1    necessarily have that understanding.  You
2    know, depending on where I was in my career,
3    I might have said, Well, I'm not so sure
4    about that.  Let's look at some information.
5 BY MR. GOMEZ:
6    Q.    All right.  Well, let's take our
7 little break.
8        How long you want to take, Cliff,
9 or, Doctor?
10        MR. MERRELL:  Ten minutes all
11    right?
12 BY MR. GOMEZ:
13    Q.    Is 10 good, Doctor?
14    A.    10 minutes is fine.
15    Q.    Let's try to figure out how you can
16 pull up -- maybe I will talk to the reporter or
17 something about how we can -- you can pull up
18 documents or exhibits.
19    A.    Right.
20    Q.    Let's do that when we come back.
21    A.    You know, Mr. Gomez, if you put it
22 on your screen, I'm sure I can see it.
23    Q.    Yeah, I could do a share screen, I
24 guess.

Page 77

1        THE VIDEOGRAPHER:  The time is
2    12:38 p.m. and we are off the record.
3        (Recess.)
4        THE VIDEOGRAPHER:  The time is
5    12:56 p.m. and we are on the record.
6 BY MR. GOMEZ:
7    Q.    Welcome back, Dr. Williams.
8    A.    Thank you, Mr. Gomez.
9    Q.    Do you agree that a drug company can
10 change a label without prior FDA approval if it
11 will add or strengthen a contraindication,
12 warning, precaution, or adverse reaction based on
13 new safety information that meets a regulatory
14 threshold?
15    A.    Mr. Gomez, I'm going to say no to
16 that because I think ultimately FDA needs to
17 approve all label changes.
18    Q.    What is a Changes Being Effected
19 supplement?
20    A.    I would say there are three kinds of
21 supplements.  One is Changes Being Effected 0 and
22 30, and the numbers at the end of CBE indicate
23 when you can put the change into effect.
24        But, again, to reiterate, I would

Roger Williams, M.D.

Page 78

1  say FDA has to approve all those ultimately after
2  review.
3       Q.     And a CBE-0, it means that the
4  manufacturer is putting -- immediately
5  implementing the label change and essentially
6  notifying the FDA and seeking post-change
7  approval; right?
8       A.     Yes, I think you said it right,
9  Mr. Gomez.
10      Q.     And so is it true that unless a CBE
11 supplement requires review of clinical data
12 unrelated to the safety-related labeling change,
13 that the drug company under those circumstances
14 does not need to pay a user fee for FDA review?
15      A.     You know, actually, I'm not prepared
16 to talk about user fees, but -- I just don't know
17 the answer to that question, Mr. Gomez.
18      Q.     Okay.  So in this case, assuming
19 that Sandoz decided that there was a difference
20 between permanent and temporary alopecia and
21 decided to update its label pursuant to a CBE-0 or
22 30, you don't know whether it would have to pay
23 any kind of fee to do that?
24      A.     No, I'm not prepared to answer that

Page 79

1  question.
2       Q.     All right.  Is it true that the FDA
3  reviews CBE supplements after the manufacturer has
4  implemented the change in the label and has the
5  authority to retroactively reject them?
6       A.     Yes, I would say that's true.
7       Q.     In terms of an order of magnitude or
8  a percentage of cases, how often does the FDA
9  actually do that, that is, reject CBE supplements
10 after the manufacturer has already implemented the
11 label change?
12      A.     You know, I don't have data at hand,
13 but I would say it's unusual.  That most CBE-0s
14 are accepted by the agency.
15      Q.     Right.  And so when you say
16 "unusual," it's true that the FDA accepts more
17 than 90 percent of CBE supplements; correct?
18      A.     Well, as I said, I don't have data
19 at my fingertips.  So if you want to say 90
20 percent, I can agree with that, Mr. Gomez.
21      Q.     You don't have any contrary figure
22 in mind, do you?
23      A.     I don't.
24      Q.     It's true that in terms of what

Page 80

1  actually happens out in the field and out in the
2  world, most manufacturers institute changes
3  pursuant to the CBE supplements without waiting
4  for any feedback from FDA at all; correct?
5            MR. MERRELL:  Objection to
6  form.
7            THE WITNESS:  Well, I think
8  the principle of a CBE-0 is that you can go
9  ahead and make the change.  Now, when
10 companies, in fact, make the change relative
11 to when they tell the FDA about it, I don't
12 know.
13 BY MR. GOMEZ:
14      Q.     You would agree that, at least in
15 theory, if Sandoz believed it was appropriate,
16 they could have used a CBE-0 to add -- to update
17 the label to warn of permanent alopecia; correct?
18            MR. MERRELL:  Objection to
19 form.
20            THE WITNESS:  Well, I don't
21 know specifically about the warning of
22 permanence, but I do know that in 2016
23 Sandoz copied the label change of Sanofi in
24 2015 and that was a CBE-0.

Page 81

1  BY MR. GOMEZ:
2       Q.     All right.  And to be clear, they
3  could have, if they felt it appropriate, used a
4  CBE-0 prior to Sanofi's label change; correct?
5       A.     There was never --
6            MR. MERRELL:  Object to form.
7            THE WITNESS:  There was never
8  any need for them to do that because they
9  were always copying the Sanofi label and
10 they were doing it appropriately, and FDA
11 agreed with what they were doing.
12 BY MR. GOMEZ:
13      Q.     And so if they believed that it was
14 appropriate for them to independently add this
15 further warning to their label of permanence, they
16 could have used a CBE-0 to do it prior to Sanofi
17 changing its own label; correct?
18            MR. MERRELL:  Objection to
19 form.
20            THE WITNESS:  You know,
21 that's a hypothetical that in my report and
22 in the real-world didn't come up, and I
23 don't think it was true for Sandoz.
24 BY MR. GOMEZ:

Roger Williams, M.D.

Page 82

1    Q.    Accepting that it's a hypothetical,
2  hypothetically speaking, and you know you're an
3  expert so I'm permitted to ask these hypothetical
4  questions.
5        Hypothetically, if Sandoz believed
6  that it was appropriate, it could have used a
7  CBE-0 supplement to add a warning of permanence
8  prior to Sanofi doing the same; correct?
9        MR. MERRELL:  Objection to
10  form.
11        THE WITNESS:   You know, one
12  of the reasons I'm hesitating, Mr. Gomez, is
13  if let's say Sanofi, through its own
14  pharmacovigilance efforts, found an unlisted
15  serious event separate from Sanofi, I think
16  the first step there is, you know, we've
17  already reviewed some of those steps, but
18  one of the steps would be to let FDA know,
19  let the field office know.  And then how
20  that would be further entered into the label
21  perhaps for all manufacturers, including
22  Sanofi, would take some deliberation.
23        If you ask me, is it likely
24  that that would happen via a CBE-0?  I would

Page 83

1  say not.
2  BY MR. GOMEZ:
3    Q.    And to be clear, I think, again, you
4  repeated Sanofi twice.  I think you meant to say
5  if Sandoz --
6    A.    Well --
7    Q.    Could you read back the answer?  I
8  think that you just -- the first time you said
9  Sanofi, I think you meant to say Sandoz.
10    A.    Well, perhaps so, Mr. Gomez, but I
11  will also say that if Sandoz found a serious
12  unlisted adverse event via their own efforts, that
13  would likely affect the labeling of all the
14  manufacturers of Docetaxel, including Sanofi.
15    Q.    And so you don't believe that
16  permanent alopecia is a serious unlisted adverse
17  event; correct?
18    A.    No, it's not.  Sandoz always
19  considered it as part of the labeling of alopecia
20  without a distinction as to duration.
21    Q.    And so assume that post-approval
22  Sandoz is finding that this Docetaxel product is
23  causing permanent alopecia.
24        Then does it have any regulatory

Page 84

1  responsibility to either notify FDA of that or to
2  update its label?
3    A.    I think, in fact, what Sandoz did,
4  which I emphasize is appropriate, alopecia was in
5  the label.  They had instructions about talking to
6  your healthcare professional, and it was all based
7  on the FDA-approved label of Taxotere as
8  manufactured by Sanofi.
9    Q.    Are you aware of a case in which the
10  FDA has pursued a civil or criminal action against
11  a sponsor who sought to add a strengthened warning
12  to its drug label via the CBE process?
13    A.    No, I didn't.  I don't think I had
14  any evidence of that in my report or the materials
15  I looked at.
16    Q.    During your 20 years at the FDA, had
17  you ever heard of a case like that in which the
18  FDA pursued civil or criminal action against a
19  drugmaker that tried to bolster its safety
20  warning?
21    A.    As a hypothetical, it seems unusual.
22    Q.    And so here, you know, I know you
23  think that it was unwarranted, but at the very
24  worst that the FDA could do if Sandoz

Page 85

1  independently updated its label to clarify that
2  alopecia was permanent or could be permanent, the
3  very worst that FDA could do would be to say, no,
4  change it back to the way it was; correct?
5        MR. MERRELL:  Objection to
6  form.
7        THE WITNESS:  Well, I don't
8  know if that's the very worst.  I think FDA,
9  if they saw that happening, they -- there
10  might be a dialogue with Sandoz saying,
11  Look, we want the labeling for all the
12  Docetaxel products to be as similar as it
13  can be.
14        I'm staying with your
15  hypothetical.  And if they see manufacturers
16  diverging from that, I think they'd want to
17  know why.
18  BY MR. GOMEZ:
19    Q.    And so you believe that the FDA
20  wanted the labeling for all the Docetaxel products
21  to be the same?
22    A.    I do believe that.
23    Q.    And so you're, of course, familiar
24  with the timeline in this case; right?  Of Sanofi,

Roger Williams, M.D.

Page 86

1 Accord, Sandoz, and Hospira?
2    A.    Yes, I believe I covered some of
3 that in my expert report.
4    Q.    And there was a label change by
5 Sanofi on December -- in December of 2015.
6        Does that sound right?
7    A.    Yes, that's correct.
8    Q.    And then Accord doesn't change its
9 label until eight months later July 2016.
10       Does that sound right?
11   A.    I didn't specifically look at
12 Accord, but I won't debate you, Mr. Gomez.
13   Q.    Well, you looked at Sandoz and their
14 label was not updated for 11 months following
15 Sanofi October 2016.
16       Does that sound right?
17       MR. MERRELL:  Objection to
18 form.
19       THE WITNESS:  No, I'd have to
20 check my report, but I thought it was
21 earlier than that.
22 BY MR. GOMEZ:
23   Q.    Okay.  Did you look at Hospira?
24   A.    I did not specifically look at

Page 87

1 Hospira.
2    Q.    And so I'll represent to you that
3 Hospira waited a year and 10 months to update its
4 label.
5        Do you have any idea why FDA allowed
6 that to happen if FDA wanted all the labeling to
7 be the same?
8    A.    No.  I didn't look at communications
9 between FDA and Hospira.
10   Q.    And did you see -- did FDA
11 independently approach Sandoz while it was having
12 dialogue with Sanofi and say, Hey, Sandoz, we want
13 all the labeling to be the same?
14   A.    No.  I think Sandoz was following
15 its usual practice of copying the label of Sanofi.
16   Q.    Right.  There was no proactive
17 outreach or communication from FDA to any of the
18 505(b)(2) companies after Sanofi changed its
19 label; correct?
20   A.    I can't speak to the other companies
21 because I don't believe I had that information or
22 that I looked at it, but I think in the case of
23 Sandoz, they were following their usual practice
24 of changing their label when the Reference Listed

Page 88

1 Drug label changed.  And there was good reason for
2 that, as I said in my report.
3    Q.    Did FDA have the ability, if it
4 really wanted all the labels to be the same, to
5 require all the labels to be the same at the same
6 time?
7    A.    I would give FDA broad discretion to
8 communicate to all the manufacturers of Docetaxel
9 to have what I might term "class labeling."
10   Q.    And so did you see any such
11 communication in this case -- that is, an
12 affirmative communication by FDA -- to any
13 manufacturer indicating that the FDA was requiring
14 class labeling?
15   A.    There was a prior experience that we
16 can talk about, and I would say it related to
17 FDA's informing all manufacturers about the
18 alcohol impact, but I don't recall any
19 communication between FDA and Sandoz after Sanofi
20 changed its label in December 2016.
21   Q.    Does that suggest to you that the
22 FDA was not requiring class labeling for alopecia
23 related to the use of Docetaxel?
24   A.    No.  It just means I don't have an

Page 89

1 understanding of what FDA was saying or thinking.
2    Q.    And so why is it then that you say
3 that the FDA wanted the labeling for all Docetaxel
4 products to be the same?
5    A.    I think when I do say that, I go
6 back to some of the antecedent evidence that, you
7 know, FDA was working with Sanofi about what the
8 label should change, and that resulted in a label
9 of 2010 that all the subsequent manufacturers, to
10 the best of my knowledge, copied.
11       And then there was the alcohol
12 example, which I think went to all manufacturers
13 and was inserted in the labeling.  And I think if
14 we look now as a practical matter, we see that the
15 labeling for all the manufacturers of Docetaxel is
16 essentially the same except for minor allowed
17 differences.
18   Q.    And so assuming that a 505(b)(2)
19 manufacturer chooses to track the label and copy
20 any label changes to the Reference Listed Drug,
21 then how much time is a reasonable amount of time
22 for them to wait to make changes that the
23 manufacturer of the Reference Listed Drug makes?
24   A.    You know, honestly, I don't have an

Roger Williams, M.D.

Page 90

1 answer to that question. I'm not aware of any
2 specific time, but clearly if FDA thought it were
3 important to do within a specified time period,
4 they would let the companies know.
5     Q.    And you didn't see and you're not
6 aware of any -- you're not aware of any FDA
7 document or regulation that speaks to copying a
8 Reference Listed Drug's label in any way, whether
9 it be in a certain amount of time or whether it's
10 a good thing to do or whether it's a bad thing to
11 do?  You're not aware of any FDA regulation or
12 document that speaks to that discrete topic;
13 correct?
14     A.    Well, what I can --
15         MR. MERRELL:  Objection to
16     form.
17         THE WITNESS:  What I could say
18     is in the case of the December Sanofi
19     change, I don't recall seeing anything.  But
20     if you've got something you want me to look
21     up, I'd be glad to review it with you,
22     Mr. Gomez.
23 BY MR. GOMEZ:
24     Q.    No, I just mean, you know, having

Page 91

1 worked at FDA and being an expert in the field,
2 you're not aware of any document issued by the FDA
3 that says something to the effect of, If we
4 approved your drug under 505(b)(2), then what you
5 should do is just watch the label of the Reference
6 Listed Drug going forward to determine whether you
7 should change your label?
8     A.    I think as a hypothetical, I would
9 say you're being too broad, Mr. Gomez.  For
10 example, if FDA saw a serious unlisted event,
11 which would be communicated both to the field
12 office and to headquarters, FDA would be very
13 proactive.
14         And if you want to show me any
15 documents from the agency about that, I'll be glad
16 to review it with you.
17     Q.    You know, I'm getting at something
18 different and that is this idea of a Safe Harbor,
19 if you will.  That is, 505(b)(2) companies can --
20 can comfortably and reasonably rely upon label
21 changes to the Reference Listed Drug only to
22 determine if they're going to change their label.
23     A.    No, I would say that Safe Harbor
24 doesn't exist, but to the extent you could talk

Page 92

1 about it, it certainly existed for Sanofi because,
2 remember, their product was a solution product
3 that was bioequivalent to Taxotere and, except for
4 a difference in concentration, would deliver the
5 same safety and efficacy, and that's the
6 underlying principle and science base for Sandoz
7 always copying Sanofi's Taxotere.
8         If you want to talk about the
9 universe of (b)(2)s, which, of course, is quite
10 large now -- there are a lot of (b)(2)s that have
11 been approved by the agency -- I wouldn't extend
12 that Safe Harbor in your terminology to them.
13         MR. GOMEZ:  All right.  Thank
14     you.
15         Lindsay, can we move what we
16     have as Exhibit 2 into the exhibit folder,
17     and then I'll pull it up for everyone to
18     look at.
19         (Document marked for
20     identification as Williams Exhibit 2.)
21         MS. STEVENS:  It's marked.
22 BY MR. GOMEZ:
23     Q.    Okay.  And then I'm going to share
24 my screen, Doctor, at least attempt to do so.

Page 93

1         All right.  Oops.  Can you see it?
2     A.    I can.
3     Q.    Okay.  Very good.
4         And so we're now looking at Table 2
5 and it's -- I'm sorry -- Exhibit 2, which is a
6 table, and it's titled "Differences between
7 505(b)(2) NDAs and ANDAs."
8         What are ANDAs?
9     A.    Abbreviated New Drug Applications.
10     Q.    Would those be 5056 generics?
11     A.    505(j).
12     Q.    I'm sorry.  505(j).  My apologies.
13         And so as we look at this -- and
14 we'll go down line by line -- is it true that
15 505(b)(2)s are submitted under Section 505(b)(1)
16 of the Food, Drug, and Cosmetic Act?
17     A.    No.  I would say they're submitted
18 -- I would say they're submitted under 505(b) and
19 then there's a subsection for (b)(1)s and a
20 subsection for (b)(2)s.
21     Q.    Okay.  So submitted under Section
22 505(b); is that right?
23     A.    Yeah, I think that the way you said
24 it is correct.

Roger Williams, M.D.

Page 94

1    Q.    Are ANDAs submitted under 505(b)?
2    A.    No, 505(j).
3    Q.    Is the content and format of a
4 505(b)(2) governed by 21 CFR 314.5?
5    A.    Well, I'm going to answer yes. I
6 saw -- I saw this table in Dr. Ross's report, and
7 I don't want to debate it with, you know, I
8 certainly don't want to go back and check all the
9 regulatory citations.
10    Q.    Okay. Do you have -- are you able
11 to identify anything in this table that based upon
12 your review and preparation that you believe is
13 incorrect?
14    A.    No. I'm looking down. I think the
15 third line is correct. The fourth line is
16 correct. I would say I don't know that I would
17 agree with the fifth line. I think -- I think the
18 fifth one is a little questionable. And then I
19 like the -- I guess it's the sixth line where it
20 says "can" because can means they cannot.
21         And "Demonstration of bioequivalence
22 to a listed drug not required for approval," and I
23 agree it's not required, but it's possible, as was
24 the case for Sandoz and Taxotere.

Page 95

1    Q.    All right. And with an ANDA, it is
2 required for an ANDA; correct?
3    A.    Yeah, we've got a double negative
4 going there. So I like the way you read that.
5    Q.    All right. Thank you so much. I'll
6 put that away.
7         And let's see if we can pull --
8 Table 2 is Exhibit 3, Lindsay.
9         (Document marked for
10    identification as Williams Exhibit 3.)
11         MS. STEVENS: It's marked.
12         THE VIDEOGRAPHER:
13 Dr. Williams, would you mind bringing your
14 camera down a little bit?
15         THE WITNESS: Oh, yes.
16 Sorry.
17         THE VIDEOGRAPHER: Thank you.
18         THE WITNESS: I'm moving my
19 screen to see the document. I'll try to pay
20 attention to the -- my face.
21 BY MR. GOMEZ:
22    Q.    Are you able to see Exhibit 3;
23 Doctor?
24    A.    Yes, I can.

Page 96

1    Q.    Okay.
2    A.    Well, I think, once again, I would
3 say "Submitted under" Section (b), there's a
4 (b)(1) and a (b)(2).
5    Q.    Yes.
6    A.    Section (c) seems right. Third line
7 correct. I think that "full reports" is
8 debatable. Postmarketing specified at, yes, I
9 agree with that. "Other responsibilities," I
10 agree with that.
11    Q.    All right. And why is the line that
12 says "Contain full reports of safety and
13 effectiveness," why is that debatable?
14    A.    Well, if I look at the Sandoz
15 (b)(2), their full reports was the reliance on the
16 FDA's finding of safety and efficacy. So I guess
17 if you say reliance on the labeling of the
18 Reference Listed Drug constitutes full reports, I
19 guess I can agree with it, but it seems a little
20 unusual to state it that way.
21    Q.    All right. Let's see if I can stop
22 sharing my screen here.
23         I'm not seeing that on this Zoom.
24 All right. Here.

Page 97

1         THE VIDEOGRAPHER: On the top
2 of your screen, it should say "Stop share
3 screen."
4         MR. GOMEZ: On the -- on the
5 screen being shown, right?
6         THE VIDEOGRAPHER: Yeah, in
7 the middle, top middle.
8         MR. GOMEZ: Yeah, it's just
9 not. It might be -- it's not showing for
10 some reason. Let me see here.
11         Let me shut that. I think
12 that your screen is larger than mine. Like
13 the settings don't allow me to get to that
14 button.
15         MS. STEVENS: You might have
16 to exit full screen view, John.
17         MR. GOMEZ: Sorry, guys.
18         Exit full screen view. Let me
19 try that.
20         Oh, here we go. Got it. All
21 right. Thanks.
22         Did someone do that for me?
23         THE VIDEOGRAPHER: Yeah, I
24 did. I was able to do it.

Roger Williams, M.D.

---

Page 98

1    MR. GOMEZ:  All right.
2  Thanks.  I appreciate it.
3    THE VIDEOGRAPHER:  I got you.
4    MR. GOMEZ:  For whatever
5  reason, I couldn't -- I couldn't reach the
6  button.
7  BY MR. GOMEZ:
8    Q.    Okay.  So, Doctor, what I'd like to
9  do is turn to your report, if that's okay?
10   A.    Yes.
11   Q.    Do you have that handy?
12   A.    Yes, I do.
13   Q.    All right.  So let's -- I'll fix it.
14  Videographer fix the screen.
15        So start with page 2.
16   A.    Yes.
17   Q.    And the second full paragraph it
18  references a 1990 FDA guidance.
19        Do you see that?
20   A.    Second?
21   Q.    And it's quoted in your footnote,
22  Footnote 1.
23   A.    Oh, I see.
24   Q.    And so --

---

Page 99

1    A.    Yeah.  Yeah, I see it.
2    Q.    Yes.  And so that's a draft
3  guidance; is that right?
4    A.    That's correct.
5    Q.    Was there ever a final guidance that
6  was issued by the FDA?
7    A.    As far as I know, not.
8    Q.    All right.  Would you have included
9  a final guidance in your report if you were aware?
10   A.    Yes.  I would have tried to, yes.
11   Q.    And you would have felt it important
12  to rely upon the final as opposed to a draft
13  guidance to be accurate --
14   A.    Yes.
15   Q.    -- in your report; correct?
16   A.    Yes, I think you should get the
17  latest guidance, whatever it is.  The latest draft
18  or the final.
19   Q.    All right.  Let's turn to page 4 of
20  your report.
21   A.    I'm going to try to keep my pages in
22  order.
23   Q.    It's always a good idea.
24   A.    Okay.  I'm staying with you,

---

Page 100

1  Mr. Gomez.  Thank you.
2    Q.    Yeah, of course.
3        And so I want to turn your attention
4  to bullet point -- I guess it's the third bullet
5  down.
6    A.    Yes.
7    Q.    It says:
8        "FDA approved Sandoz's Docetaxel NDA
9  number 201525 as safe and effective as labeled and
10  has continued to deem it safe and effective as
11  labeled."
12        Do you see that?
13   A.    I do.
14   Q.    And so what is your basis for your
15  opinion that the FDA has continued to deem the
16  drug safe and effective as labeled?
17   A.    There are probably many ways to
18  answer that, but FDA is -- I mean, I'm sorry --
19  Sandoz is marketing their product in the United
20  States without any issue from FDA, and FDA has
21  never withdrawn approval for the Sandoz Docetaxel
22  products for reasons of safety, efficacy, or any
23  other reason.
24   Q.    And so would you say the same for

---

Page 101

1  any drug being legally sold in the United States
2  today that the FDA deems that drug safe and
3  effective as labeled?
4    A.    Well, that's a very broad statement,
5  but one of the ways I might answer it is, you
6  know, prescription drugs in the United States
7  don't have a label that says FDA approved.
8        What they -- what everybody can
9  presume is because they are on the market is that
10  FDA has deemed them acceptable for marketing, and
11  that FDA will take an action if there's any reason
12  to change that opinion.
13   Q.    All right.  And so in this case,
14  your opinion is based upon the fact that Sandoz is
15  legally sold on the market and the FDA has taken
16  no enforcement action regarding that Docetaxel
17  product; is that right?
18   A.    You said "enforcement action."
19  That's a slightly different way of saying it.
20        As far as I know, the Sandoz
21  Docetaxel is listed in the Orange Book as an
22  approved drug product legally marketed in the
23  United States.
24   Q.    And so how did Sanofi come to change

---

Page 102

1 its label to warn of permanent alopecia? Was that
2 through working with FDA?
3     A.    Yes.  My understanding -- and I
4 think I covered this in my report -- is that FDA
5 asked for an analysis of duration of alopecia, and
6 they got a report from Sanofi, as I recall from
7 Dr. Hongyi.  I believe I am pronouncing that
8 correctly.  And then Sanofi proposed, and FDA
9 approved, some labeling changes that added
10 statements about the duration of alopecia to the
11 labeling.
12     Q.    All right.  And the FDA believed
13 that that was appropriate?
14     A.    Yes, they would not have issued an
15 approval if they didn't think that.
16     Q.    And so did the FDA approve Sandoz's
17 Docetaxel product as safe and effective as labeled
18 after Sanofi changed its label and before Sandoz
19 changed its label?
20           MR. MERRELL:  Objection to
21     form.
22           THE WITNESS:  Well, are you --
23     to me, I think you're parsing an interval to
24     say that maybe the follow-on -- I want to

Page 103

1     use the word "generic" -- generics had some
2     time, and I don't know what that time would
3     be, but I do know that Sandoz tried to do it
4     promptly and they did do it promptly via a
5     CBE-0.
6 BY MR. GOMEZ:
7     Q.    Do you have in front of you
8 somewhere by easy reference the date on which
9 Sandoz actually updated its label?
10     A.    If you give me a minute, I think I
11 can find it.
12           You know, I thought it would pop up,
13 Mr. Gomez, but I don't see it.  If you find it
14 before I do, please let me know.
15     Q.    Well, I have it as October 2016, 11
16 months after Sanofi changed its label.
17     A.    All right.  If you affirmatively
18 state that, I'll go along with your date.  I
19 thought it was earlier than that.  I apologize.
20     Q.    And so assuming that there was a gap
21 of 11 months, did the FDA approve of Sandoz's
22 label during those 11 months?
23           MR. MERRELL:  Object to form.
24           THE WITNESS:  Yeah.  Yes, I

Page 104

1 would say they did.  Particularly recalling
2 that the Sandoz label did mention alopecia,
3 and there were indications that
4 communication with healthcare professionals
5 should occur.  So probably FDA felt that the
6 label was adequate but would be improved
7 with the Sanofi change.
8 BY MR. GOMEZ:
9     Q.    I've got it, actually, it's -- I've
10 got the -- the label change actually being in
11 November 2016.
12           So, yeah, that would be 11 months
13 after Sanofi.  My apologies.
14           And so just, you know, in terms of
15 the FDA, you seem to take the position that the
16 FDA is pretty involved in these issues.
17           Do you believe that the FDA was
18 involved in and interested in the question of
19 whether docetaxel products caused permanent
20 alopecia?
21     A.    You know, I think FDA -- I can't, of
22 course, assess their internal thinking.  We can
23 look at the approval letter and we could probably
24 look at the review, too, for Sanofi's Taxotere.

Page 105

1 But one indication of their thinking is what
2 actually got into the Sanofi label and then the
3 Sandoz label.
4           And the way I would characterize it,
5 in my opinion, which I feel has based on my
6 expertise, is it just said cases of permanent
7 alopecia have been reported.  It didn't get into
8 causality.  It didn't get into a lot of, if you
9 will, complicated statistical analyses.
10           It simply indicated that cases of
11 permanent alopecia had been reported, and if I
12 look back at Sandoz's efforts, I would say Sandoz
13 knew that and they always felt that it was in the
14 labeling anyway.
15     Q.    All right.  And so we agree that
16 Sandoz knew prior to Sanofi changing the label
17 that cases of permanent alopecia had been
18 reported; correct?
19           MR. MERRELL:  Objection to
20     form.
21           THE WITNESS:  The way I would
22     say it is, if Sandoz had any evidence about
23     alopecia, the first thing they would do was
24     see that it was listed, and it was listed as

Roger Williams, M.D.

Page 106

1  alopecia and alopecia did not signify
2  duration.  It could be temporary or more
3  persistent.
4  BY MR. GOMEZ:
5      Q.   Sure.
6           But we agree that Sandoz had
7  knowledge and knew that cases of permanent
8  alopecia had been reported with the use of
9  docetaxel before Sanofi changed its label;
10  correct?
11           MR. MERRELL:  Objection to
12      form.
13           THE WITNESS:  You know, that
14      whole question of their understanding was --
15      was much more complicated.  For example, I
16      think in virtually all the cases of alopecia
17      with extended duration, there were
18      concomitant drugs that also caused alopecia.
19  BY MR. GOMEZ:
20      Q.   If -- you would agree that if Sandoz
21  had submitted a CBE-0 or 30 adding the language
22  "cases of permanent alopecia have been reported,"
23  you agree that it's overwhelming likely that the
24  FDA would approve that change?

Page 107

1           MR. MERRELL:  Objection to
2      form.
3           THE WITNESS:  You're using
4      language that I'm just not sure FDA would
5      have approved it or not because I'd have to
6      look at what the Sandoz label ended up to be
7      at the end 2016.
8  BY MR. GOMEZ:
9      Q.   I -- sorry.
10      A.   I prefer not to -- I'm not arguing
11  with you, Mr. Gomez, but I sort of would like to
12  see the labeling to see what, in fact, FDA
13  approved.
14      Q.   Yeah.  Assume that Sandoz had
15  submitted a CBE prior to Sanofi changing its label
16  that changed its label -- that is, the Sandoz
17  label -- to exactly what it is today.
18           You agree that it's highly likely
19  that the FDA would have approved that change?
20           MR. MERRELL:  Objection to
21      form.
22           THE WITNESS:  That's an
23      unusual hypothetical, and if we get back to
24      a basis in fact Sandoz had no reason to do

Page 108

1  that.  They never had evidence in their
2  pharmacovigilance efforts that would have
3  suggested such a change, and when Sanofi
4  changed its label, they followed suit, as
5  they always had.
6  BY MR. GOMEZ:
7      Q.   I want to get away from whether
8  Sandoz had reason or not and focus on the FDA
9  where you used to work.
10           You agree, hypothetically, if Sandoz
11  submitted in a CBE to warn of permanent alopecia
12  prior to Sanofi doing the same, you agree that
13  it's highly likely the FDA would approve that
14  change?
15      A.   No.
16           MR. MERRELL:  Objection to
17      form.
18           THE WITNESS:  I actually
19      don't agree with that.  I think --
20      practically speaking, I think somebody at
21      FDA might have picked up the phone and say,
22      Sandoz, why are you doing this?  You're, for
23      all practical purposes, a generic equivalent
24      to Sanofi.  So why are you not following

Page 109

1      their label?  What is your data that makes
2      you think you have different information
3      compared to us at FDA and also Sanofi?
4  BY MR. GOMEZ:
5      Q.   And so you believe that submission
6  of the CBA -- CBE would cause some dialogue with
7  the FDA at least; correct?
8      A.   Yeah, I think if FDA saw it, they --
9  they would want to know what was going on.  They'd
10  want to see the data.  Because, remember, at the
11  end of the day, for the (b)(2) Sanofi never -- I'm
12  sorry -- Sandoz never submitted safety and
13  efficacy data.
14           So I think somebody would -- at FDA
15  would say, We'd like to see your data that causes
16  you to submit this CBE-0.  What do you know now
17  that you didn't know before?  And what do you know
18  now that you don't think Sanofi knows?
19      Q.   Can you say that with any kind of
20  expert certainty that the FDA would have rejected
21  that CBE attempt by Sandoz to update their label?
22           MR. MERRELL:  Objection to
23      form.
24           THE WITNESS:  Well, that's

Roger Williams, M.D.

Page 110

1  sort of jumping to the end of a hypothetical
2  story.  It's sort of a hypothetical on top
3  of a hypothetical.
4          But, remember, and my position
5  is whatever Sandoz was saying or FDA was
6  concluding, FDA wouldn't be in a position
7  where they would want to have it extend to
8  all the manufacturers of docetaxel
9  injection.
10 BY MR. GOMEZ:
11     Q.    And, again, what -- what is your
12 basis for your belief that FDA wanted the same
13 warnings to apply to all docetaxel products?
14     A.    Well, I'll try to say it simply and
15 then we can certainly go into detail, but my
16 understanding is, all the docetaxel manufacturers
17 were making injection solutions that, in terms of
18 safety, differed only in concentration.  And after
19 taking into account concentration, you would have
20 expected all of them to deliver the same safety
21 and efficacy outcomes across the population.
22          So if there were a divergence, you
23 know, FDA would sort of say, Okay, well, we want
24 to think about this.  We want to talk about it.

Page 111

1          But the company that had the most
2  information, really a lot more information than
3  anybody else, of course, was Sanofi, and that
4  information was not available to the other
5  manufacturers.  That was confidential commercial
6  information.
7          So I'm trying to stay with your
8  hypothetical, Mr. Gomez.  Let's say FDA saw
9  information from one of the non-Sanofi
10 manufacturers.  I would expect them to say, Well,
11 gee, this is very interesting.  Let's look at your
12 data.  What have you found?
13          And they then would be in a position
14 where they might want to say that to all the other
15 docetaxel manufacturers, including Sanofi.
16     Q.    Okay.  And so you believe that if
17 Sandoz had affirmatively applied for a CBE label
18 supplement, then that would prompt a discussion
19 with FDA with all manufacturers of docetaxel?
20     A.    I think it could have done that in
21 the hypothetical and I think FDA, of course, would
22 pay close attention to the need for
23 confidentiality, but it might have led to a very
24 useful discussion.  Along the lines of FDA's

Page 112

1  understanding about the impact of alcohol and how
2  they asked all the manufacturers to add that
3  information in a label change.
4     Q.    All right.  And so in terms of FDA
5  believing that Sandoz's docetaxel product is safe
6  and effective as labeled, I think we talked about
7  that before is the fact that that product is being
8  legally sold and the FDA has allowed it to be
9  legally sold.
10         Is that fair to say?
11     A.    Yes, I think the way you're stating
12 it is correct, Mr. Gomez.
13     Q.    All right.  And so you could make
14 that same statement as to any drug being legally
15 sold with the permission of the FDA in the United
16 States; correct?
17         MR. MERRELL:  Objection to
18     form.
19         THE WITNESS:  That's such a
20     broad statement.  I'm trying to stay with
21     it, but if FDA -- if a company has an
22     approved application -- 505(b)(1), (b)(2),
23     or (j) -- and FDA is not trying to change
24     that approval in any way, I would say they

Page 113

1  have an opportunity to legally market it in
2  the United States.
3  BY MR. GOMEZ:
4     Q.    And that means, in your mind, that
5  the FDA deems that drug safe and effective as
6  labeled; correct?
7     A.    I don't want to quibble with
8  wording.  I think the way you're stating it is
9  okay, Mr. Gomez.  I'm not sure FDA would state it
10 that way.
11     Q.    You state that this approval by the
12 FDA was appropriate -- again, I'm looking at
13 bullet point 3 on page 4 of your report.
14         "This approval by the FDA was
15 appropriate and based on regulatory requirements
16 and principles."
17         Are you able to articulate the
18 applicable regulatory requirements and principles?
19     A.    Yes, I can, I believe.
20     Q.    All right.  And what are those?
21     A.    Well, I'll give an example.  You
22 know, FDA wants to see substantial evidence of
23 effectiveness.  Okay.  That sounds like a simple
24 statement, but, of course, it can be very

Roger Williams, M.D.

Page 114

1  complicated in times in terms of how applicant
2  documents that.
3         But in this case, it was actually
4  quite simple because the documentation came from
5  Sanofi.  That was the approved labeling for
6  Taxotere.  Sandoz relied on it entirely to show
7  substantial evidence of effectiveness, and that's
8  the principle of some, but not all, (b)(2)s.
9      Q.    Okay.  And in terms of labeling that
10  is, have you ever known of a 505(b)(2) company
11  that has provided enhanced safety warnings in its
12  label independent of a Reference Listed Drug doing
13  so?
14      A.    Well, I actually think I cite an
15  example in my report, and that's the Abraxane
16  report where the drug substance is paclitaxel and
17  the Reference Listed Drug is Taxol.  But the
18  company that developed Abraxane changed the
19  formulation in such a way, first of all, it was a
20  safer formulation.  It didn't have a toxic
21  excipient, and the company did, I would say,
22  fairly extensive new clinical and safety and
23  efficacy studies to show its safety and efficacy.
24         If you look at the label for

Page 115

1  Abraxane, it's different from the label for Taxol.
2  So it's sort of another boundary.  You know, this
3  is a boundary where there were substantial
4  differences.
5         And I could say in my own experience
6  with (b)(2)s even now in litigation, I -- would
7  you like some more examples, Mr. Gomez, or should
8  I stop?
9      Q.    Yeah, if you have additional
10  examples.
11      A.    Well, I'm dealing with an opiate use
12  disorder drug now where the (b)(2) product cites
13  Subutex as the Reference Listed Drug.  What's
14  interesting about that citation is, Subutex has
15  been withdrawn from the market.  Well, somebody
16  out there in the real-world would say, Well,
17  what's going on?  How can you cite a drug that's
18  not even available anymore?
19         But FDA -- it's not an issue for FDA
20  because FDA did not withdraw Subutex for reasons
21  of safety and efficacy.  Whatever was known about
22  safety and efficacy of Subutex can be transferred
23  to the new product, subject to FDA's discussion
24  with the applicant on a case-by-case basis.

Page 116

1         I'm sorry that was so complicated,
2  but I found it an interesting example.
3      Q.    Let me ask you this question, and
4  maybe I've asked you already and, you know, I just
5  didn't understand the response but:  Do you have
6  an explanation for the reason that the FDA did not
7  affirmatively reach out to the three 505(b)(2)
8  manufacturers regarding the duration of alopecia
9  issues at the time it was communicating with
10  Sanofi?
11      A.    You know, Mr. Gomez, I don't.  I
12  didn't look at the regulatory record for Accord
13  and Hospira particularly.  I, of course, was
14  focusing on Sandoz and I just did not see an
15  outreach to Sandoz.  I may have missed it, in
16  fact.
17      Q.    Assuming that FDA did not reach out
18  to those three manufacturers or have any proactive
19  engagement with them to ensure that all the labels
20  were the same, do you have any explanation for
21  that?
22      A.    It may have been that FDA in their
23  internal deliberations knew that all these (b)(2)s
24  were, for all practical purposes, generics and

Page 117

1  therefore, they understood that the generics
2  themselves would correspond to the labeling of the
3  Reference Listed Drug.  The only difference was
4  concentration.
5         So I'm trying to put myself in the
6  place of Dr. Murgo or his equivalent.  I would say
7  all the labeling should be the same, and then
8  maybe sometime down in the path they would check
9  to see if that was the case.  Or they would pick
10  up the phone and call the manufacturers.  Or they
11  would have information that I don't see that some
12  of the manufacturers were conducting their own
13  analyses.
14         You know, as we see from this case
15  itself, we can see that there was certainly debate
16  about the analyses about causality and permanent
17  alopecia and duration, etc.
18      Q.    If you go down to the last bullet
19  point on page 4?
20      A.    Yes.
21      Q.    You state:
22         "Sandoz monitored changes in the
23  labeling of Sanofi's docetaxel and changed its own
24  labeling within a reasonable period of time

Roger Williams, M.D.

Page 118

1  following Sanofi changes."
2       Do you have a definition or
3  clarification of what would constitute a
4  reasonable period of time?
5       A.   I don't, actually, and I don't know
6  that I saw anything in the Sandoz record that
7  would tell me that.  Certainly if Sanofi added a
8  new indication, that would occur sooner rather
9  than later.
10      But in brief answer to your
11 question, I don't have a particular answer to
12 reasonable period of time.
13      Q.   Okay.  And let's turn to page 5.
14      Are you there?
15      A.   Yes.
16      Q.   So the first bullet point states:
17      "Sandoz's treatment of the docetaxel
18 labeling is similar to how a manufacturer holding
19 an approved ANDA follows the RLD labeling given
20 the close similarity between Sandoz and Sanofi
21 docetaxel products."
22      And then you go on to say:
23      "This approach was prudent and
24 compliant with the Act, regulations, and guidances

Page 119

1  as well as industry standards."
2       And so I just want to break that
3  down a bit if I can.
4       And you say "prudent."  What do you
5  mean by the use of that term?
6       A.   Well, first of all, one of the ways
7  to think about prudent is that Sandoz itself never
8  generated any new safety and efficacy information
9  on itself by itself, and for that reason the
10 impetus was always to have its label duplicate
11 that of Sanofi's Taxotere.
12      I can also -- should I go to the
13 word "compliant"?
14      Q.   So I just want to, you know, kind of
15 drill down on prudent.
16      And so prudent means they were
17 relying upon clinical studies involving Reference
18 Listed Drug and prior findings of safety and
19 efficacy?  That's what prudent means?
20      A.   The way I would say it is, prudent
21 means they were bioequivalent and had no further
22 information that would allow them to make
23 statements that they were different in terms of
24 labeling compared to Taxotere.

Page 120

1       Q.   What about statements in Sandoz's
2  own internal Core Data Sheet that cases of
3  permanent alopecia have been reported?
4       A.   You know, we can look at --
5           MR. MERRELL:  Objection to
6  form.
7           THE WITNESS:  -- the Core Data
8  Sheets, and I'm glad to discuss that further
9  when we get to that part of my report, but
10 one of the things I'd like to emphasize now
11 is the Core Data Sheets, first of all, were
12 not required for Sandoz U.S.
13      But perhaps as an additional,
14 even more important concept, the Core Data
15 Sheet reflected labeling approved by EMA.
16 And I want to emphasize that Sandoz U.S. had
17 no reason to tell FDA, Well, we want to rely
18 on EMA labeling.
19      You know, that almost gets
20 into the issue of who's in charge here, and
21 FDA would say, No, we're glad to look at EMA
22 labeling with you if it needs to adjust your
23 labeling, but we want to control your
24 labeling via the supplement process.

Page 121

1       Did that address your question
2  about Core Data Sheets?
3  BY MR. GOMEZ:
4       Q.   I guess in a way.  I mean, you said
5  there would be no reason to tell FDA what the
6  label in Europe said, and so I'll play devil's
7  advocate.
8       One reason would be because Sandoz
9  was concerned with the health and welfare of women
10 using its drug and wanted to provide them
11 information that use of that drug could cause
12 permanent hair loss.
13      That would be one reason that Sandoz
14 would want to bring it up with the FDA; right?
15          MR. MERRELL:  Objection to
16 form.
17          THE WITNESS:  No, I wouldn't
18 agree with your characterization there.
19 It's a -- I'm sorry.  My mind is going to
20 many different possibilities, but U.S. has a
21 very strong system of drug regulation, to
22 include the drug label.
23      Sure, FDA wants to know what's
24 going on in other countries of the world and

Roger Williams, M.D.

Page 122

1  FDA does know what's going on in other
2  countries of the world, but FDA and the
3  manufacturers give information to FDA that
4  allows them to adjust or not the label in
5  the United States.
6  BY MR. GOMEZ:
7      Q.    Right.
8      A.    And I would say even from the
9  beginning in the United States, Sanofi and then
10  the follow-on quasi generic manufacturers provided
11  information to practitioners and the patient about
12  alopecia, such that the patients were informed and
13  knew what to do.
14          Contact your healthcare professional
15  if it doesn't go away.  Hair loss generally grows
16  back.
17          And I don't know how much more you
18  want me to say, Mr. Gomez, but, remember, this is
19  in the context of a label with many, many adverse
20  events, some extremely serious.
21      Q.    Sure.
22          In terms of assisting the wisdom of
23  the prescriber/patient conversation, isn't the
24  important time to know whether a chemotherapy drug

Page 123

1  can cause permanent hair loss, isn't the time to
2  have that discussion before the patient chooses a
3  course of chemotherapy?
4          MR. MERRELL:  Objection to
5      form.
6          THE WITNESS:  What I would
7      say is, the issue of alopecia and its
8      duration needs to be considered in the
9      context of the entire label, which is 60
10      pages long; and I would say, for the most
11      part, none of the adverse events listed in
12      that label speak to duration.  Some of the
13      adverse events cause death.  Well, that's a
14      real short duration, in my view.
15          Do you want the label to say:
16      Causes death in five days?  10 days?  60
17      days?
18          I am dealing with some
19      hypotheticals here myself that require very
20      careful consideration, but they didn't need
21      to be considered by Sandoz because Sandoz
22      had no information, even through its
23      pharmacovigilance activities, that would
24      cause its label to be different from

Page 124

1  Taxotere with regard to alopecia.
2  BY MR. GOMEZ:
3      Q.    I mean, in the end, the FDA
4  essentially required there to be an update in
5  labeling, at least with Sanofi, to impose a
6  duration clarification with regard to hair loss.
7          Basically that's what the label says
8  today, that cases of permanent alopecia have been
9  reported; right?
10      A.    Exactly.
11          MR. MERRELL:  Objection to
12      form.
13          THE WITNESS:  And I think it
14      appears in the adverse event section and in
15      the patient counseling section.
16  BY MR. GOMEZ:
17      Q.    So would you agree then that, you
18  know, we really can't argue with the wisdom of
19  making that clarification.  We can only discuss
20  the timing of when it happened and who did it.
21          Because eventually the FDA came down
22  on the side of saying that, yeah, it is important
23  to say that the hair loss is permanent versus
24  temporary; right?  That was the FDA's final

Page 125

1  determination that, yes, that's something
2  important to warn about; correct?
3          MR. MERRELL:  Objection to
4      form.
5          THE WITNESS:  You know, what
6      I'd say, Mr. Gomez, is that FDA allowed it
7      into the labeling, but they didn't even
8      say -- you know, they didn't get into the
9      issue of causation.  I don't think that
10      label says Taxotere necessarily causes
11      permanent hair loss.
12  BY MR. GOMEZ:
13      Q.    It doesn't.
14          It says what it says; right?
15      A.    It says what it says.  And was the
16  label strengthened by that statement compared to
17  what was there before?  I think that's sort of a
18  tossup.
19          Are patients better informed by
20  their practitioners because that statement is
21  there now?
22          I guess I shouldn't be asking you
23  questions.
24      Q.    And so have you conducted some

Roger Williams, M.D.

Page 126

1  survey of treating oncologists to determine
2  whether they believe that information is valuable
3  to them in making the prescription recommendations
4  to their patients?
5      A.    In brief, the answer is no, but I'm
6  not aware of anybody who's done that.  But if you
7  show me something, I'll be glad to look at it,
8  Mr. Gomez.
9      Q.    Well, just we have -- there's actual
10 experts in the case that speak to that that
11 actually counsel breast cancer and other patients
12 every day, and they would tell you that, yes, this
13 is very, very, very important.  We want to know
14 and patients want to know.
15           And so do you have information that
16 is -- that says that's not true?
17           MR. MERRELL:  Objection to
18    form.
19           THE WITNESS:  Well, I'm not
20    speaking as an expert in oncology.
21           Perhaps I will say, no, I
22    don't have any information, just to move the
23    discussion along.
24 BY MR. GOMEZ:

Page 127

1      Q.    Okay.  I always appreciate moving
2  the discussion along.
3           So let's move to bullet point 4 on
4  page 5.  And I want to focus on the last sentence
5  and it says:
6           "Historically, FDA appeared to have
7  some interest in having class or similar labeling
8  for all docetaxel products approved by FDA, given
9  that labeling differences for what were and are
10 essentially identical products could be extremely
11 confusing to healthcare practitioners and
12 patients."
13           And so I wanted to ask you -- and
14 we've talked about, you know, what the FDA did and
15 didn't do, but does the FDA have the ability to
16 define what it wants to consider as a class?  Have
17 you heard the term "pharmacologic class" before?
18     A.    Yes, I have heard that.
19     Q.    And established pharmacologic class?
20     A.    Yes, and I would say here we're
21 dealing with a class called "the taxanes."
22     Q.    And so you believe that the FDA has
23 taken the position that all taxanes should be
24 treated the same with labeling?

Page 128

1      A.    No, I wouldn't agree with that
2  because there are at least two members of the
3  class.  One is Taxol and one is docetaxel.
4      Q.    Do you believe FDA has taken the
5  position that all docetaxel products should be
6  treated as a class for labeling purposes?
7      A.    I think at times I've seen evidence
8  that they would like to communicate and have class
9  labeling for the docetaxel products.
10     Q.    And when you say "at times," are you
11 referring to the alcohol-related issue we talked
12 about earlier?
13     A.    I think that's a good example.
14     Q.    Do you know of any others?
15     A.    Well, for example, when FDA came to
16 the new labeling with Sanofi in 2010, the approval
17 of the Sandoz in 2011 relied -- it duplicated the
18 labeling of the 2010 Taxotere labeling.  So to me,
19 that's an example of sort of automatically
20 achieving class labeling by virtue of, you know,
21 what I call the quasi generic aspect of the Sandoz
22 product.
23     Q.    All right.  Let's turn to one, two,
24 three, four, five, six, seven.  It's actually the

Page 129

1  sixth one.  The sixth bullet point down on page 5.
2  It states:
3           "Sandoz was reasonable in its
4  expectation that changes with respect to alopecia
5  warnings would come from either the FDA or Sanofi
6  which Sandoz would implement."
7           And I want to focus on your use of
8  the term "reasonable" and I'll ask:  Is that a
9  regulatory term "reasonable"?
10     A.    You know, I said I wasn't going to
11 do this, but I've lost -- my pages are now out of
12 order.
13     Q.    Oh, goodness.
14     A.    Let me take a minute to find page 5.
15 And while I'm looking, Mr. Gomez, as I'm sure you
16 know, my justification for these bullets appears
17 subsequently in the report, and it might be better
18 to look at the bullets in the context of the
19 justification.
20           Wait a minute.
21           Could you read that bullet again?
22     Q.    Yes, sir.  Are you on page 5?
23     A.    Well, that's my problem.  I'm having
24 trouble finding page 5, but go ahead.

Roger Williams, M.D.

Page 130

1    Q.    Why don't you find it, like it's
2  about time for another quick one.
3    A.    A break?
4    Q.    Yeah, I mean, I would have a hard
5  time just responding audibly.  I'd like to see
6  with my eyes, so if I were you.
7    A.    Okay.  All right.  Thank you very
8  much.  If we can take a little break.
9    Q.    Do you want to do another 10 or,
10  like, are we going to have -- are you going to
11  have lunch?  What's the deal?  What's --
12          MR. MERRELL:  You know, let's
13  talk about lunch.  It's funny.  We're all on
14  different time zones.  I'm probably going to
15  leave it to -- to the witness, you know,
16  whatever Roger wants.  I don't, you know,
17  I'm already past lunch.  So -- (laugh).
18          MR. GOMEZ:  Sorry.
19          MR. MERRELL:  I missed it.  No
20  big deal.  (Laugh).
21          MR. GOMEZ:  I just came --
22          MR. MERRELL:  Roger, what are
23  you thinking in terms of lunch?  We can take
24  our break, and if you want to do lunch

Page 131

1  later, that's fine.  It's kind of up to you.
2          THE WITNESS:  I have to look
3  at what time it is.  It is now -- it's now
4  12:10.  Is that what everybody has?
5          MR. MERRELL:  In Mountain
6  Time, yes.  (Laugh).
7          THE WITNESS:  12:10.  12:10
8  Mountain Time is --
9          MR. GOMEZ:  It's 11 for me and
10  I think for Cliff it's like 2 but, I mean,
11  if you want to eat something, let's do a
12  little break.  You could eat something.
13  Then we'll reconvene.
14          THE WITNESS:  Well, why don't
15  we take lunch now as a compromise between
16  the West Coast, the Rockies, and the East
17  Coast.  Is that okay, Mr. Gomez?
18          MR. GOMEZ:  Yeah, it's
19  perfect.  Thanks.
20          MR. MERRELL:  Fine with me.
21          THE WITNESS:  All right.  And
22  if we do take lunch, how much time are we
23  going to have?
24          MR. GOMEZ:  Whatever.  Is

Page 132

1  your --
2          MR. MERRELL:  Half an hour?
3  What do you -- what do you think?  Yeah,
4  half an hour.  What do you think, Roger?  Or
5  you can have more.  It's up to you.
6          THE WITNESS:  No, half an hour
7  is fine with me.
8          MR. GOMEZ:  All right.  Let's
9  go back.  Let's just take a break until
10  quarter till whatever the next hour that
11  people are looking at.
12          MR. MERRELL:  All right.
13          THE WITNESS:  Sounds good to
14  me.  And I found -- I found my page 5,
15  Mr. Gomez.
16          MR. GOMEZ:  All right.  Let's
17  just continue then.  No, we'll go eat.
18  Thank you.
19          MR. MERRELL:  Okay.
20          THE VIDEOGRAPHER:  The time is
21  12:11 p.m. Mountain Time is 2:11 time
22  Eastern Standard Time and we are off the
23  record.
24          (Whereupon, at 2:11 p.m. EST,

Page 133

1  a luncheon recess was taken.)

Roger Williams, M.D.

Page 134

1    AFTERNOON SESSION
2         (2:46 p.m. EST)
3    ROGER WILLIAMS, MD
4  called for continued examination and, having been
5  previously duly sworn, was examined and testified
6  further as follows:
7         EXAMINATION (CONTINUED).
8         THE VIDEOGRAPHER:  The time is
9  12:46 p.m. Mountain Time and 2:46 p.m.
10  Eastern Time and we are on the record.
11 BY MR. GOMEZ:
12   Q.    Welcome back, Doctor.
13   A.    Thank you.
14   Q.    Let's turn -- I think you were able
15 to paginate your report again over the lunch hour.
16 So let's turn to page 5 if we could.
17   A.    I apologize and thank you, I will.
18 Okay.
19   Q.    All right.  So if we look at the top
20 bullet point, there was something I forgot to ask
21 you about and that was you say that:
22        "Sandoz's treatment of its docetaxel
23 label complied with industry standards."
24        And so I wondered what industry

Page 135

1  standards you were referring to.
2    A.    I think what I was referring to is
3  the fact that, except for concentration, the
4  Sandoz product was pharmaceutically equivalent and
5  bioequivalent to the Sanofi product of Taxotere.
6  So in a way it was a generic to Taxotere.
7         I wouldn't use the term "generic"
8  formally in terms of FDA definition because the
9  concentration was different, but for all practical
10 purposes, its safety and efficacy was always the
11 same as that of Taxotere.
12        I would go so far as to say it just
13 couldn't be different the way it was formulated
14 and manufactured.  So the industry standard there
15 in the world of generics would be to duplicate the
16 labeling of the Reference Listed Drug.
17   Q.    So by "industry standards" you're
18 referencing the practice of manufacturers with
19 drugs approved pursuant to 505(j)?
20   A.    Yes, I think that's a good way of
21 saying it.  This as a (b)(2) was probably as close
22 to a (j) as I'm ever going to see.
23        And, Mr. Gomez, before I go on, I
24 just want to remark -- and I'm sure you know

Page 136

1  this -- that the basis for my opinions under each
2  of these bullets appears later on in the report
3  relative to the bullet.  So I'll just cite that as
4  part of my report.
5         We don't have to go there unless you
6  want to, but the bullets are all duplicated with
7  my -- the basis for my opinion underneath the
8  bullet.
9    Q.    Great.  Thank you.
10        So I want to just bring you down to
11 one, two, three, four, five, the sixth bullet
12 point down.  And I know that you have the entirety
13 of the basis for that opinion set forth later, but
14 you state:
15        "Sandoz was reasonable in its
16 expectation that changes with respect to alopecia
17 warnings would come from either the FDA or Sanofi
18 which Sandoz would implement."
19        And I wanted to ask you about use of
20 the term "reasonable" and I'll just repeat the
21 question I had before the break and ask:  Is that
22 a regulatory term "reasonable"?
23   A.    I guess the way I would explain it
24 in terms of regulatory terminology is, the

Page 137

1  Reference Listed Drug manufacturer here was
2  responsible for safety and efficacy.  I'll start
3  with that bullet.
4    Q.    Okay.
5    A.    And that was subject to FDA
6  approval.  Now, of course, somebody who
7  understands the FDA and it knows that, and we've
8  already discussed, Mr. Gomez, that Sandoz had an
9  independent obligation to monitor
10 pharmacovigilance for unlisted and serious events.
11        But that was not the case with
12 alopecia as far as Sandoz was concerned and,
13 therefore, it was reasonable in assuming that with
14 regard to this particular adverse event, the
15 change would come from Sanofi with a change in
16 labeling, which would be noticeable to Sandoz
17 either by looking at the changed labeling or FDA's
18 website, and that would be approved by FDA.
19   Q.    All right.  And so would that same
20 analysis apply, in your mind, to any unlisted
21 adverse event that Sandoz could rely upon Sanofi
22 to go first?
23   A.    No.  I think in terms of unlisted
24 events, all the manufacturers, including even the

Roger Williams, M.D.

Page 138

1  generic manufacturers of Taxotere, could find
2  events, maybe rare or unusual or especially
3  dangerous or especially concerning, that they
4  would want to talk to FDA about.  And FDA I think
5  would bring that to the attention of all
6  manufacturers depending on the particular adverse
7  event.
8      Q.     All right.  And so to be clear,
9  there are some events that, if unlisted, Sandoz
10 would have an obligation to bring to the attention
11 of the FDA?
12     A.     And that would be true of all
13 manufacturers, including Sanofi.
14     Q.     And the distinction, in your mind,
15 is that alopecia itself was already a listed side
16 effect; is that right?
17     A.     It was definitely listed.  The
18 further understanding was that it included both
19 short and persistent alopecia.  So it didn't
20 specify duration, but that was true of most, if
21 not all, of the adverse events in the Taxotere
22 label.
23     Q.     Right.  All right.  Let's see here.
24         You have -- it's one, two, three,

Page 139

1  four, five, six, seven, eight, eight bullet point
2  downs it says:
3         "Core Data Sheets are utilized by
4  some drug companies, including Sandoz, to guide
5  labeling outside of the United States, but they
6  are not required by the FDA and they are not
7  typically used to guide U.S. labeling of drugs
8  such as docetaxel."
9         And so I want to explore with you
10 the basis of your statement that Core Data Sheets
11 are not typically used to guide U.S. labeling of
12 drugs.
13     A.     And are we talking now about Sandoz,
14 or is this a more general question, Mr. Gomez?  I
15 apologize.
16     Q.     This is a more general question
17 because you used the modifier "typically."
18     A.     I would say that I really don't know
19 how industry uses Core Data Sheets, but I do know
20 in the case of Sandoz that Sandoz U.S. did not
21 rely on those Core Data Sheets.
22     Q.     But you're not familiar with how
23 other companies use their Core Data Sheets;
24 correct?

Page 140

1      A.     I'm just looking at my sentence.
2         First of all, I say "they are not
3  required by FDA," and I'll stand by that.  I've
4  never seen a document that said FDA is requiring
5  use of Core Data Sheets.
6         And then my further statement is
7  "typically not used to guide U.S. labeling of
8  drugs such as docetaxel."
9         So I think, without quibbling too
10 much about the wording, I was really talking about
11 docetaxel and Sandoz.
12     Q.     Okay.  Do you have -- have you ever
13 seen a Core Data Sheet before this case?
14     A.     Yes, I did look at the Sandoz Global
15 Core Data Sheet fairly closely, and I tracked its
16 changes over time beginning in 2006.
17     Q.     Prior to looking at that, had you
18 ever looked at a company's Core Data Sheet?
19     A.     No, I don't recall doing that,
20 Mr. Gomez.
21     Q.     Had you ever heard of such a thing
22 prior to this case?
23     A.     You know, actually, I don't believe
24 I have.

Page 141

1      Q.     Okay.  You state on the last bullet
2  point:
3         "Sandoz's labeling and Core Data
4  Sheet for docetaxel contained information
5  consistent with the U.S. labeling with respect to
6  alopecia and hair loss."
7         What do you mean by that?  That --
8  well, let me ask you that.  What do you mean by
9  that?
10     A.     I'm trying to think of a way to
11 answer it without prolonging my answer, but if I
12 could say it this way.  I would say Sandoz Global
13 was tracking EMA-approved labeling, and I can come
14 back and expand on that statement if you wish me
15 to, Mr. Gomez.
16         Similarly, Sandoz U.S. was tracking
17 FDA-approved labeling for Taxotere in the United
18 States.  So, and I'm not -- I'm not saying I'm
19 trying to sort of sell this opinion, but I thought
20 it was a nice parallel that you had global looking
21 at EMA and you had U.S. Sandoz looking at FDA, and
22 they're both looking at Taxotere.
23         I'm going to stop in a little bit,
24 but the end result was, for the most part, the

Roger Williams, M.D.

Page 142

1 labeling was very similar, but, of course, you
2 understand, as do I, that after 2010 EMA wanted
3 certain terminology included in the Taxotere
4 labeling in Europe that was tracked in the Core
5 Data Sheet.
6           I apologize if that was such a long
7 answer, but I think it's a complicated parallel
8 situation.
9     Q.    You agree that Sandoz United States
10 had access to the Core Data Sheet and the foreign
11 labels?
12    A.    I'm sure they had access to them,
13 but I know they didn't rely on them.
14    Q.    And how do you know that?
15    A.    It was in Mr. Seitz's testimony.
16    Q.    That the company knew about those
17 items, but did not rely upon them to determine
18 whether their label was appropriate?
19           MR. MERRELL:  Objection to
20    form.
21           THE WITNESS:  Yes.  I think,
22    as I draw my parallel situation, FDA --
23    Sandoz wanted to rely on FDA-approved
24    labeling, not European-approved labeling.

Page 143

1    European approved-labeling as determined by
2    EMA is a different regulatory agency.
3           Perhaps the amazing thing is
4    not that they had some differences, but the
5    amazing thing is that they were so similar.
6 BY MR. GOMEZ:
7    Q.    And as it relates to, you know, the
8 issue that brings rise to this lawsuit, permanent
9 alopecia, eventually the FDA concluded that its
10 European counterparts got it right first; right?
11           MR. MERRELL:  Objection to
12    form.
13           THE WITNESS:  I have to say,
14    speaking as a former FDA employee,
15    Mr. Gomez, FDA would never conclude that.
16 BY MR. GOMEZ:
17    Q.    Well, they ended up adding the same
18 language to the United States label; correct?
19           MR. MERRELL:  Objection to
20    form.
21           THE WITNESS:  I don't know
22    that I would agree with that.  As I say,
23    they were very close together, but I think
24    even now if I looked at the Sandoz-approved

Page 144

1 labeling in the U.S., it would be slightly
2 different compared to the Taxotere labeling
3 in Europe.
4 BY MR. GOMEZ:
5    Q.    The similarity is the providing
6 information that cases of permanent alopecia have
7 been reported; correct?
8           MR. MERRELL:  Objection to
9    form.
10           THE WITNESS:  You know,
11    honestly, I don't know what the European
12    labeling says now about permanent alopecia.
13    I apologize.
14 BY MR. GOMEZ:
15    Q.    It's okay.
16           And so to be clear, though, there's
17 no rule or regulation that prohibited Sandoz from
18 bringing the contents of its Core Data Sheet to
19 the attention of the FDA; correct?
20           MR. MERRELL:  Objection to
21    form.
22           THE WITNESS:  Well, I'm
23    struggling with the word "prohibition."
24           The way I would say it is, for

Page 145

1    all the foreign labeling and all the
2    spontaneous reports and all the literature,
3    Sandoz would see alopecia or hair loss as a
4    listed adverse event that did not specify
5    duration.  It could either be a short-term
6    duration or a long-term duration.
7           I hope that answers your
8    question.  I'm not sure it was in quite the
9    way you stated it, Mr. Gomez.
10 BY MR. GOMEZ:
11    Q.    Sure.
12           I mean, you understand there's a
13 difference between alopecia and permanent
14 alopecia, don't you?  For labeling purposes?
15    A.    That's not --
16           MR. MERRELL:  Object to form.
17           THE WITNESS:  That's not the
18    way Sandoz considered it.  Sandoz considered
19    it alopecia could be either short term or
20    long term in terms of its persistence.
21 BY MR. GOMEZ:
22    Q.    And what about you as an expert?  Do
23 you understand the difference between alopecia and
24 permanent alopecia?

Roger Williams, M.D.

Page 146

1    A.    I would say for purposes of
2  labeling, the label for Taxotere, and then
3  continuing into the label for Sandoz, allowed the
4  possibility for patients to contact their doctor
5  if something continued beyond when they thought it
6  should.
7          And, of course, that shouldn't even
8  need to be in labeling.  You know, it's part of
9  the good doctor/patient relationship, and I'm glad
10 it was in the labeling because there were so many
11 adverse events to Taxotere.
12    Q.    So if the label instructs the
13 patient to contact the doctor if problems persist,
14 by the time they contact their doctor, they've
15 lost their hair forever.  What's the point?
16          MR. MERRELL:  Objection to
17 form.
18          THE WITNESS:  I'm struggling
19 with the way you phrase that question
20 because -- I just couldn't agree with the
21 question.  I'm sure not -- I'm not even sure
22 it was a question.
23          But, you know, patient/doctor
24 relationships are critical here.  I mean,

Page 147

1  that's why I go to my understanding of
2  wisdom.
3          The patients -- the patient
4  brings wisdom to this matter.  Patients
5  aren't ignorant.  They are very
6  knowledgeable people sometimes and, as a
7  matter of fact, I would say all the time.
8  They have their own best interests at heart.
9          And ditto a good caring
10 physician.  That's where the wisdom comes in
11 of a person who can choose a treatment and
12 rely on FDA labeling to understand how to
13 administer that treatment.
14          I don't want to ramble, but I
15 think I got away from your question,
16 Mr. Gomez.
17 BY MR. GOMEZ:
18    Q.    Sure.
19          Do you believe that prescribing
20 physicians/oncologists would want to know whether
21 a certain chemotherapy drug causes permanent
22 versus temporary alopecia at the time they make
23 prescribing decisions along with their patients?
24          MR. MERRELL:  Objection to

Page 148

1  form.
2          THE WITNESS:  I'm trying to
3  put your question in the context of the use
4  of chemotherapeutic agents for the treatment
5  of breast cancer.
6          And if I tried to translate
7  your question a little bit, do I think that
8  Taxotere and the generic labels for the drug
9  were adequate for a prescribing physician?
10          I would say yes, and that was
11 before the addition of permanent reports was
12 added to the Taxotere label.
13 BY MR. GOMEZ:
14    Q.    And so that addition, the addition
15 of permanent reports, you don't believe that that
16 was or is information that prescribing physicians
17 would want to know?
18    A.    I would say a good prescribing
19 physician might already know it, but, remember,
20 the prescribing physician here has to think
21 about -- I haven't counted the adverse events in
22 from Taxotere, but there must be at least 50.
23 Some of them are in a black box.  Some of them are
24 serious and life-threatening.

Page 149

1          So I think a practicing physician
2  would be well-served by the Taxotere label as
3  approved by FDA in 1996.  Could it get better?  I
4  think it did get better in 2010, and maybe it got
5  a little bit better in 2015.
6    Q.    A little bit better with the
7  addition of reports of permanent alopecia?
8    A.    Right.
9          MR. MERRELL:  Objection to
10 form.
11 BY MR. GOMEZ:
12    Q.    Do you believe it got a little bit
13 better for patients in 2015 with the addition of
14 that modifier?
15          MR. MERRELL:  Objection to
16 form.
17          THE WITNESS:  That's probably
18 a more difficult question because at the end
19 of the day, except for the patient
20 counseling section at the end, most of the
21 label is designed to speak to the physician.
22 I have not done any surveys as to whether
23 patients found that modified label after
24 December 2015 more informative.

Roger Williams, M.D.

Page 150

BY MR. GOMEZ:

2    Q.    What I mean to say is:  Would that
3  information you believe to be a little bit better
4  in terms of informing the wisdom of the dialogue,
5  the information that this particular chemotherapy
6  drug can cause permanent alopecia as opposed to
7  another one that may not?
8              MR. MERRELL:  Objection to
9    form.
10             THE WITNESS:  You know, I'm
11  not sure I offered that as an opinion.  As a
12  matter of fact, I'm pretty sure I didn't
13  offer it as an opinion.  But that I think is
14  at the heart of the debate.
15             I mean, I could give a patient
16  a book about Taxotere and its adverse
17  events.  Would that really help them?
18             I mean, you're asking a
19  hypothetical.  That's my answer to the
20  hypothetical.  Where do you stop and provide
21  reasonable amounts of information so people
22  are adequately informed?
23  BY MR. GOMEZ:
24    Q.    Sure.

Page 151

1        You believe that addition of the
2  modifier "permanent" would overwhelm the patient
3  in terms of making his or her choices?
4    A.    I guess my question would be, how
5  did that amplify their understanding compared to
6  the prior label?
7    Q.    Assume that virtually all women that
8  have undergone chemotherapy, including all the
9  plaintiffs in these litigations, were well aware
10  that chemotherapy could cause temporary hair loss,
11  but believed that once a round of chemotherapy was
12  complete that their hair would come back.
13             Assume that was the understanding of
14  the plaintiffs in these cases and the community of
15  breast cancer victims and patients as a whole.
16             And so the addition of the
17  information that this one particular chemotherapy
18  drug has been reported to cause permanent hair
19  loss, that's new information to them that they
20  find of value.
21             And so assuming that all to be true,
22  would you agree that it would be important to
23  provide that information to users of the product?
24             MR. MERRELL:  Objection to

Page 152

1  form.
2              THE WITNESS:  You know,
3    you're using the term "important."  I don't
4    think I used the term "important" in my
5    report.  I could certainly search for it.
6              But what if I say with your
7    hypothetical a woman got this additional
8    information and decided not to get docetaxel
9    and died of her breast cancer.  Is that
10   important?
11  BY MR. GOMEZ:
12    Q.    It's her body her choice; right?
13  She gets to make that decision, nobody else;
14  correct?
15             MR. MERRELL:  Objection to
16    form.
17             THE WITNESS:  She dies
18  because an adverse event was overemphasized?
19  BY MR. GOMEZ:
20    Q.    She chooses to go with the regime
21  that won't cause her to lose her hair forever and
22  that's her choice; correct?
23             MR. MERRELL:  Objection to
24    form.

Page 153

1              THE WITNESS:  Well, you're
2    getting into the issue of how FDA works with
3    companies to adjudicate labeling, and it is
4    a difficult decision.  I'm not minimizing
5    what you're saying.
6              How much information do you
7    provide the doctor and how much information
8    do you provide the patient?
9  BY MR. GOMEZ:
10    Q.    Sure.
11             And I think --
12    A.    And if I had the ultimate answer to
13  all of that, Mr. Gomez, I might not be sitting
14  here.  I might be sitting someplace else.
15    Q.    Well, you agree that patients have a
16  right to make informed choices about their medical
17  care; correct?
18    A.    I would find it hard to deny that.
19  It seems rhetorical.
20             MR. GOMEZ:  So let me pull up
21    -- let's see here.  Can we place Exhibit 4
22    into the folder, Lindsay?  Can we mark
23    Exhibit 4 I guess it would be?
24             And so I'm --

Roger Williams, M.D.

Page 154

1  MS. STEVENS:  Yes, I'm working
2  on it.
3  MR. GOMEZ:  So I'm going to
4  pull it up so you can look at it, Doctor,
5  and, Mr. Videographer, I probably won't be
6  able to hide my screen once I'm done with
7  it, so you're probably going to have to help
8  me again.
9  THE VIDEOGRAPHER:  Yeah, I got
10  you.
11  MS. STEVENS:  It should be
12  marked.
13  (Document marked for
14  identification as Williams Exhibit 4.)
15  MR. GOMEZ:  All right.  Cool.
16  So let's see.
17  MS. STEVENS:  Refresh your
18  screen if it's not in there yet, John.
19  MR. GOMEZ:  Okay.  Exhibit 4,
20  potential exhibits.  Oh, maybe I messed
21  something up again.
22  I want to go to another
23  folder.  There we go.  Marked exhibits.  4.
24  There it is.

Page 155

1  All right.  I'm going to share
2  that screen.  It's over there.  Share.
3  BY MR. GOMEZ:
4  Q.  All right.  So are you seeing my --
5  my screen?  This is Exhibit 4, Doctor.
6  A.  Yes.  I might ask you to enlarge it
7  a little bit if you could.  I think it's a PDF of
8  the CFR.
9  Q.  Correct.
10  How is that?
11  A.  Oh, yeah, that's much better.  Thank
12  you.
13  Q.  (Laugh.)  That's better for me, too.
14  And so here we have CFR 21, 314.3.
15  Are you familiar with these general
16  provisions?
17  A.  Yes, I am.
18  Q.  And so we're going to go down, and
19  do you see this definition of "Newly acquired
20  information"?
21  A.  I see it, Mr. Gomez.
22  Q.  And so what does this refer to?
23  A.  I'm not exactly sure where you are
24  in the CFR, but it's speaking to:

Page 156

1  "Newly acquired information is data,
2  analyses or other information not previously
3  submitted to the Agency, which may include (but is
4  not limited to) data derived from new clinical
5  studies, reports of adverse events" etc. -- we can
6  go back and go over the wordings -- "if the
7  studies, events, or analyses reveal risks of a
8  different type or greater severity or frequency
9  than previously included in submissions to FDA."
10  Yes, I see the wording.  Thank you,
11  Mr. Gomez.
12  Q.  And does this language apply to
13  Sandoz's obligations with regard to its docetaxel
14  product?
15  A.  Yes.  I think it's an independent
16  obligation of any application holder to look at
17  this kind of information and see if the label
18  needs adjusting.  I think that's what we're
19  talking about is the labeling.
20  Q.  Correct.
21  And it states here:
22  "If the studies, events, or analyses
23  reveal risks of a different type or greater
24  severity or frequency than previously included."

Page 157

1  And so in this case, if the studies,
2  events, or analyses revealed risk of permanent
3  alopecia as opposed to transient or temporary
4  alopecia, you would agree that that is a risk of
5  greater severity than previously included?
6  MR. MERRELL:  Objection to
7  form.
8  THE WITNESS:  Recognize the
9  complexity of the data and the analytics, as
10  a hypothetical, I could imagine that it
11  might conform to the wording here.  I don't
12  think it did conform in the matter of Sandoz
13  copying the label of Taxotere.
14  BY MR. GOMEZ:
15  Q.  You agree that permanent alopecia is
16  more severe than temporary alopecia?
17  MR. MERRELL:  Objection to
18  form.
19  THE WITNESS:  You know,
20  that's a question that I didn't consider in
21  my report.  I think the question is, Does
22  Taxotere clearly cause permanent alopecia?
23  THE VIDEOGRAPHER:  Pardon my
24  interruption but, Dr. Williams, could you

Roger Williams, M.D.

Page 158

1  move your camera down, please?
2          THE WITNESS:  Yes.  I'm sorry.
3  I have to change it to see the document.
4  I'll try to keep that in mind.  Thank you.
5          THE VIDEOGRAPHER:  No problem.
6  BY MR. GOMEZ:
7      Q.    And so you said the question is
8  whether docetaxel clearly causes permanent
9  alopecia?  That's the question for you?
10     A.    I think it's a question in my mind.
11     Q.    And do you believe that's the
12 standard that the manufacturer has to have
13 evidence of clear causation before updating the
14 label or providing notice to the FDA?
15     A.    No.  I think FDA allows the
16 possibility that you can have an association
17 without clear documentation of causality.  I think
18 we could look at that in some other FDA wording,
19 but, you know, the issue of causation was
20 difficult here because it was frequently
21 confounded by other drugs that cause alopecia.
22     Q.    But at least, I guess, Sandoz and
23 others were sufficiently convinced to include it
24 in European labels; right?

Page 159

1          MR. MERRELL:  Objection to
2      form.
3          THE WITNESS:  Well, I don't
4      know that at all.  I do know that the EMEA
5      concluded that wording should be in the
6      European label such as it appears now.
7  BY MR. GOMEZ:
8      Q.    Just the question is, to kind of put
9  a bow on it:  You agree that permanent alopecia is
10 more severe than temporary alopecia?
11         MR. MERRELL:  Objection to
12     form.
13         THE WITNESS:  I think that's
14     getting into complex opinions of a medical
15     nature, and I didn't comment on that.  I can
16     think of some hypotheticals where it might
17     not be the case.  I just don't know.
18 BY MR. GOMEZ:
19     Q.    What hypotheticals can you think of
20 in which permanent alopecia would not be more
21 severe than temporary alopecia in a woman?
22     A.    What if you had permanent alopecia
23 that covered only one square inch of the skin
24 surface on the skull compared to complete hair

Page 160

1  loss that lasted three months during active
2  treatment?
3      Q.    Okay.  There's one hypothetical.
4          Can you think of another
5  hypothetical that tracks the facts of these cases?
6          MR. MERRELL:  Objection to
7      form.
8          THE WITNESS:  Well, alopecia
9      is a very comprehensive term covering many
10     different parts of the body.  Maybe alopecia
11     has nothing to do with the scalp and just
12     some other part of the body.
13 BY MR. GOMEZ:
14     Q.    Assume that the data is
15 demonstrating permanent alopecia in the scalp area
16 of women as opposed to temporary alopecia in the
17 scalp area of women.  Would that be more severe in
18 terms of the risk?
19         MR. MERRELL:  Objection to
20     form.
21         THE WITNESS:  Mr. -- I'm
22     sorry.  Mr. Merrell, was that an objection?
23         MR. MERRELL:  Yes.
24         THE WITNESS:  Uh-huh.  Thank

Page 161

1  you.
2          Mr. Gomez, I think what you're
3  getting at is that the degree and duration
4  of any adverse event can be such that the
5  degree and duration, if greater, is more
6  severe and more serious than a lesser degree
7  and duration.  If you want me to state that,
8  I certainly will.
9          For example, Taxotere causes
10 low white cell count.  If it's prolonged and
11 severe, it can cause death.  If it's less
12 prolonged and less severe, patients can ride
13 it out perhaps without needing any treatment
14 at all.  I'll stop there.
15 BY MR. GOMEZ:
16     Q.    All right.  So you agree that under
17 certain circumstances duration of side effects can
18 render the risk more severe?
19         MR. MERRELL:  Objection to
20     form.
21         THE WITNESS:  As a general
22     matter, I would say that's true.
23 BY MR. GOMEZ:
24     Q.    Okay.  And you would agree that

Page 162

1 permanent versus temporary is of a different
2 frequency in terms of a description of the side
3 effects?
4     A.     You know, in terms of the Taxotere
5 label with alopecia, it included both temporary
6 and permanent.
7          I'm not sure what your question is
8 that goes beyond that.  I'm sorry, Mr. Gomez,
9 could you help me?
10     Q.    Sure.
11          Did the previous, that is, the label
12 in place at the time of this plaintiff's use of
13 the Sandoz product use the word "permanent" in
14 terms of describing alopecia?
15     A.    No.  My understanding is it had the
16 more general wording, Contact your healthcare
17 practitioner if certain adverse events don't go
18 away, for example, hair loss.
19          MR. GOMEZ:  Okay.  Got you.
20 All right.  Thanks.
21          I'm going to back out of this.
22 Put it back.
23          And then I'll ask if you
24 could, Lindsay, mark Exhibit 4.  Or --

Page 163

1          MS. STEVENS:  Exhibit 5?
2          MR. GOMEZ:  5.  I'm sorry.
3          MS. STEVENS:  Okay.  One
4 minute.
5          It's marked.
6          (Document marked for
7 identification as Williams Exhibit 5.)
8          MR. GOMEZ:  Thank you.
9 BY MR. GOMEZ:
10     Q.    All right.  Doctor, we're now
11 looking at Exhibit 5, which is more regulations.
12 21 CFR 314.8.
13          Are you familiar with that
14 regulation --
15     A.    Yes, I am, Mr. Gomez.
16     Q.    -- as it applies to Sandoz?
17     A.    It does.
18     Q.    And it applies with regard to
19 Sandoz's obligations regarding its docetaxel
20 product?
21     A.    Yes, and it -- well, I won't answer
22 a question you didn't ask.  Go ahead, Mr. Gomez.
23     Q.    All right.  And so are you familiar
24 with this section that I have up here, which is

Page 164

1 314.8 -- I'm not sure the number -- but "Review
2 of adverse drug experiences"?
3     A.    Yes, I am familiar.  Please
4 continue.
5     Q.    And so this highlighted language,
6 does this apply to Sandoz and its docetaxel
7 product?
8     A.    I haven't read it in detail, but
9 just by virtue of saying it's 314.8 I guess
10 subsection (g), I would say it does apply.
11     Q.    Okay.  Done with that one.  Thank
12 you.
13          You said you were going to say
14 something but then you said, I'm not going to
15 answer a question that you didn't ask.  What did
16 you want to -- what were you thinking about
17 saying, Doctor?
18     A.    Well, actually, I looked at the
19 section recently with regard to generic drugs
20 approved under the 505(j) pathway, and they have a
21 very similar section in the same part of the CFR,
22 if you will, that says, Follow 314.8 if you're a
23 generic drug manufacturer approved under 505(j).
24          So it's a manifestation of FDA

Page 165

1 wanting these rules, these requirements, to apply
2 to all manufacturers, which is what I've been
3 saying throughout this deposition.
4          MR. GOMEZ:  All right.  Thank
5 you.
6          Let's mark as Exhibit 6 next
7 in order, Lindsay, please.
8          MS. STEVENS:  It's marked.
9          (Document marked for
10 identification as Williams Exhibit 6.)
11 BY MR. GOMEZ:
12     Q.    All right.  So here we have, Doctor,
13 21 CFR 201.56.  This is Exhibit 6.
14          Are you familiar with this
15 regulation?
16     A.    I am sure I am.  I feel like I want
17 to tilt my screen to read it better.  Can I do
18 that for a minute now?
19     Q.    Sure.  Yeah.
20     A.    (Reviews document.)
21          Yes.  I think we're talking about
22 the false and misleading part of the labeling?
23     Q.    Correct.
24     A.    Good.  Okay.  I'm prepared to answer

Roger Williams, M.D.

Page 166

1 questions.  Thank you, Mr. Gomez.
2    Q.    Of course.  Thank you.
3         And so does this Section 201.56
4 subsection (2), does this apply to Sandoz and the
5 labeling of its docetaxel product?
6    A.    Yes, I'm sure it does.  With regard
7 to alopecia, Sandoz never felt that it had anymore
8 information.  It was a listed adverse event
9 without specification as to duration, and I'm sure
10 they felt it was not false and misleading nor did
11 FDA ever indicate that to them.
12    Q.    And so the use of the term
13 "alopecia" without the modifier, in your mind,
14 never rendered the label inaccurate, false, or
15 misleading; correct?
16    A.    No, and if I were to sort of claim
17 that, there would probably be 20 or 50 more
18 adverse events in the Taxotere label without a
19 duration statement.
20         MR. GOMEZ:  All right.  Thank
21    you.
22         Done with that one.  Let's see
23    here.
24         What's next in order, Lindsay?

Page 167

1         MS. STEVENS:  Exhibit 7 would
2    be the reasonable evidence causal.
3         MR. GOMEZ:  Oh, yes, I see it
4    now.  Okay.  Can you mark Exhibit 7, please?
5         MS. STEVENS:  It's done.
6         (Document marked for
7    identification as Williams Exhibit 7.)
8 BY MR. GOMEZ:
9    Q.    All right.  I'll figure this out,
10 Doctor, one of these days.
11    A.    Well, I'm glad you're not asking me
12 to.
13    Q.    (Laugh).
14         All right.  Exhibit 7 is 21 CFR
15 201.57.
16         Are you familiar with these
17 regulations, Doctor?
18    A.    Yes, I am, Mr. Gomez.
19    Q.    So we're going to scroll down and it
20 states in the highlighted material:
21         "In accordance with 3.14.70 and
22 601.12 of this chapter, the labeling must be
23 revised to include a warning about a clinically
24 significant hazard as soon as there is reasonable

Page 168

1 evidence of a causal association with a drug; a
2 causal relationship need not have been
3 definitively -- definitely established."
4         And so does this obligation apply to
5 Sandoz and its docetaxel product?
6    A.    Yes, it does, Mr. Gomez.
7    Q.    And so if one assumes or takes the
8 position that there was -- that there is a
9 difference between a warning about permanent
10 alopecia and alopecia generally, then there's a
11 duty to update the label to make that particular
12 warning, even without a definite causation
13 established; correct?
14         MR. MERRELL:  Objection to
15    form.
16         THE WITNESS:  Well, let me
17    talk around this a little bit, and then I
18    think I can get quickly to the core of your
19    question.
20         First of all, when we look at
21    314.70, we're talking about a post-approval
22    change.
23 BY MR. GOMEZ:
24    Q.    Right.

Page 169

1    A.    And so this would allude to (b)(1),
2 (b)(2) NDAs as well as (j) ANDAs.  And then the
3 wording says -- and I think you're saying as well,
4 Mr. Gomez -- that the causality does not have to
5 be definitively established, and I agree with
6 that.
7         Now, getting to the core of it,
8 though, in terms of Sandoz, they felt that they --
9 they believed -- FDA agreed with them, I agreed
10 with them in my opinion -- that they had covered
11 the need for their label statements with regard to
12 alopecia and they met that need by copying the
13 Taxotere label.
14         I don't think they ever saw any
15 evidence to have them adjust their view of what
16 alopecia was in the labeling.
17    Q.    When you say that the "FDA agreed,"
18 you rely upon the FDA's initial approval of the
19 label at the time of approval?
20    A.    Are we talking about Taxotere in
21 1996?
22    Q.    I'm talking about whatever you're
23 talking about.  You said the "FDA agreed."
24    A.    Okay.  The FDA agreed in 2011 that

Roger Williams, M.D.

Page 170

1 Sandoz could copy the Taxotere label and what it
2 said about alopecia. Sanofi and all the other --
3 I hate to use this term -- similarly situated
4 generic manufacturers were also copying the
5 Taxotere label.
6        It was a good system and, without
7 even FDA asking for it, it was creating class
8 labeling to help practitioners and patients
9 understand the benefits and risks of docetaxel
10 injection, no matter whose product they were
11 using.
12        All the labels had information about
13 alopecia in the United States, and there were
14 statements about, Contact your doctor if you're
15 concerned about it, but they did not specify
16 explicitly duration.
17        Alopecia was considered to handle
18 both short-term and long-term alopecia, and that's
19 true of all the adverse events. They did not
20 indicate duration with regard to adverse events.
21        I apologize if my answer went on too
22 long, Mr. Gomez.
23     Q.    No, it's -- I don't -- I don't mind
24 at all. Thank you.

Page 171

1        And so I guess the takeaway,
2 however, is that there is no requirement of a
3 definite causal relationship as a prerequisite to
4 updating a label; correct?
5     A.    I think you're reading that
6 correctly and, if I may add, I think it's a good
7 thing here with regard to Taxotere because I think
8 the causal relationship for permanent alopecia is
9 not that well established.
10        MR. GOMEZ:  And is -- I'll
11 back out. Thank you.
12        And so let's go to home. See
13 what we got here. That was Exhibit 7.
14        So let's go next in order
15 Exhibit 8. Can you please mark Exhibit 8,
16 Lindsay?
17        MS. STEVENS:  It's marked.
18        (Document marked for
19 identification as Williams Exhibit 8.)
20        MR. GOMEZ:  All right. Thank
21 you.
22 BY MR. GOMEZ:
23     Q.    And so do you recognize Exhibit 8,
24 Doctor?

Page 172

1     A.    I generally do. It looks like
2 labeling from Europe for Sandoz's docetaxel.
3     Q.    Correct.
4        And so this date down here,
5 January 12, 2010, do you recognize this to be -- I
6 guess actually we're in Europe. So it might be
7 12/1/2010.
8        But do you recognize this to be the
9 2010 version of Sandoz's Austrian label for its
10 docetaxel product?
11     A.    I would agree with that, Mr. Gomez,
12 and I also see SPC, which to me means Summary of
13 Product Characteristics.
14     Q.    All right. Thank you.
15        And so here we have one case of
16 alopecia nonreversible at the end of the study.
17        Do you see where that's referenced?
18     A.    I do see that.
19     Q.    And so you agree that Sandoz had
20 that information in its possession back in 2010?
21     A.    Are we talking about Sandoz U.S.?
22     Q.    Yes.
23     A.    Yes, I would assume so because --
24 wait a minute. I'm not so sure of that because in

Page 173

1 2010 Sandoz was building their NDA. They didn't
2 get approval till 2011, and their obligation to
3 conduct postmarket pharmacovigilance didn't start
4 till after that.
5     Q.    All right. So by 2011, would you
6 agree that Sandoz had this information?
7     A.    Yeah, without quibbling according to
8 dates, I would say yes. And it was in -- I
9 believe it was in the Sanofi Taxotere label as
10 well.
11     Q.    And here we have:
12        "Alopecia was observed to be ongoing
13 at the median follow-up time of 55 months in 22
14 patients out of the 687 patients with alopecia at
15 the end of the chemotherapy."
16        You agree that Sandoz USA had that
17 information as of 2011?
18     A.    I can't say for sure, but my
19 recollection is this was not in U.S. labeling.
20 Please correct me if I'm wrong.
21     Q.    Correct. This is the Austrian
22 label.
23        I'm just asking you to confirm your
24 belief that this information was available to

Roger Williams, M.D.

Page 174

1  Sandoz USA in 2011.
2      A.    The way I might say it is, it
3  probably was in the Core Data Sheets, but Sandoz
4  U.S. did not use the Core Data Sheets.
5      Q.    They had access to them; correct?
6      A.    You know, it's all one company, but
7  whether they had access or not, they did not rely
8  on them, they did not use them, and I don't think
9  they looked at them.
10         So in answer to your question, I
11 would say, if this was only in the Core Data
12 Sheets, Sandoz U.S. did not -- did not observe it.
13         MR. GOMEZ:  Okay.  We'll back
14 out of that.  That was Exhibit 8.
15         Let's see.  What's next.
16 Exhibit -- let's not do Exhibit 9, Lindsay.
17 Skip to Exhibit 10, please.
18         Sorry, court reporter.
19         MS. STEVENS:  Okay.  It should
20 be marked now.
21         MR. GOMEZ:  Okay.  Thank you.
22         Oh, so this will be Exhibit 9,
23 actually.  Sorry, court reporter.
24         (Document marked for

Page 175

1     identification as Williams Exhibit 9).
2  BY MR. GOMEZ:
3      Q.    So we're going to pull up Exhibit 9
4  now.
5         And do you recognize Exhibit 9,
6  Doctor?
7      A.    I think I do.  This is the
8  Australian label for Sandoz docetaxel?
9      Q.    That's right.  So we'll go down and
10 I'll ask the same questions.
11        Was this information available to
12 Sandoz USA back in 2011?
13     A.    As a general matter, I would say
14 Sandoz had responsibility in its pharmacovigilance
15 activities to know what's happening in foreign
16 labeling.  That would include EMA labeling in
17 Europe and it would include Australian labeling.
18 So I would say Sandoz U.S. would be aware of this.
19     Q.    All right.  And so when you say that
20 Sandoz U.S. has responsibility to know what is
21 happening in foreign labeling, how then can Sandoz
22 say, Oh, we didn't look at the foreign labeling?
23        MR. MERRELL:  Objection to
24    form.

Page 176

1         THE WITNESS:  I think what
2  Sandoz is saying is, they didn't look at the
3  Core Data Sheet.  The Core Data Sheet is
4  sort of a way to keep up with the summary of
5  product characteristics labels in Europe as
6  approved by EMA.  I'm not aware that Sandoz
7  said they weren't aware of foreign labeling.
8  BY MR. GOMEZ:
9      Q.    Okay.  I thought you had said that
10 in response to questions about the last label, but
11 perhaps I misheard you.
12     A.    Well, I might not have stated it
13 clearly.  If I did suggest that they weren't aware
14 of foreign labels, I apologize.
15        MR. GOMEZ:  All right.  Thank
16    you.
17        We'll back out of this.  Let's
18    see.  What's next?
19        THE VIDEOGRAPHER:  Put your
20    camera down again.
21        THE WITNESS:  Yes, I'm sorry.
22        THE VIDEOGRAPHER:  Thank you.
23        MR. GOMEZ:  Let's look at
24    Exhibit 10, Lindsay, please.

Page 177

1         MS. STEVENS:  It's marked.
2         (Document marked for
3     identification as Williams Exhibit 10.)
4  BY MR. GOMEZ:
5      Q.    Okay.  Doctor, we're pulling up
6  Exhibit 10.
7         And so we were talking about these
8  Core Data Sheets, and you recognize this as one of
9  Sandoz's Global Core Data Sheets?
10     A.    Yes, I see that.
11     Q.    Regarding docetaxel; correct?
12     A.    Yes, I see that as well.
13     Q.    We have a date on this one of April
14 2006.
15        Did you look at this document in
16 terms of your preparation for your work in this
17 case?
18     A.    Yes, I did, and I commented on it in
19 my report and I'm glad to ask -- answer your
20 questions, Mr. Gomez, and I would also refer to
21 what I said in my expert report.
22     Q.    Okay.  Well, here in the Core Data
23 Sheet, Sandoz states:
24        "Alopecia was observed in 83 of the

Roger Williams, M.D.

Page 178

1 patients (serious in 67%), but it was completely
2 reversible after the end of treatment."
3        Do you recall that that was the
4 content of the Core Data Sheet in 2006?
5     A.    Well, I look at it at this
6 particular lines 1 and 2, and that's what it says.
7 I don't know what it says in other parts of.
8            MR. GOMEZ:  Well, that's it on
9 that one.
10        So let's pull up Exhibit 11,
11 please, Lindsay.
12            MS. STEVENS:  It's marked.
13            (Document marked for
14 identification as Williams Exhibit 11.)
15            MR. GOMEZ:  Thanks, Lindsay.
16        All right.  Is this 11?
17 Remind me.
18            MS. STEVENS:  Yes, 11.
19            MR. GOMEZ:  Okay.  Thank you.
20 BY MR. GOMEZ:
21     Q.    Okay.  So you recognize this as
22 another Global Core Data Sheet of Sandoz's,
23 Doctor?
24     A.    I do.

Page 179

1     Q.    And this has a date of 2013;
2 correct?
3     A.    Yes.
4     Q.    You reviewed this as part of your
5 preparation for this case and you referenced it in
6 your report; correct?
7     A.    I do.
8     Q.    And with regard to this Core Data
9 Sheet and the previous one, you agree that these
10 Core Data Sheets were available to Sandoz USA at
11 all times relevant to this case?
12            MR. MERRELL:  Object to form.
13            THE WITNESS:  You know, that's
14 a very simple question.  I'd like to answer
15 it a little bit more broadly.
16        First of all, if you look at
17 the structure of the Core Data Sheet, you're
18 looking at the structure of the European
19 label, which is called "Summary of Product
20 Characteristics," SMPC.  It's equivalent but
21 not identical to the USPI.
22        I can give you an interesting
23 example if you'll bear with me for a second.
24        In the structure of the

Page 180

1 European label, it talks about posology.
2 The U.S. does not use that term "posology."
3 As a matter of fact, if I really wanted to
4 know what it meant, I'd have to look it up.
5 I've forgotten, but I think, roughly, it
6 means dosage and administration.
7        Now, what Sandoz Global is
8 doing is tracking the changes in the
9 European approved label by EMA and adding to
10 the structure of the SMPC as more
11 information becomes available.
12        Now, when you showed 2013, I
13 think there were four, Mr. Gomez -- maybe
14 you can confirm that -- and they added
15 information as they added clinical studies,
16 as they got more experience with adverse
17 events, as they did further analyses as
18 requested by European agencies, particularly
19 the French agency.
20        So just to put some structure
21 around what we're looking at, we're looking
22 at the European label, which is very similar
23 to, but not identical to, the U.S. label.
24        So Sandoz had -- it's not that

Page 181

1 they were disinterested in the information
2 in this label, but it was a label that they
3 wouldn't pay attention to because they were
4 paying attention to FDA and the FDA-approved
5 label for Taxotere in the United States, as
6 they would do and could do, and even should
7 do, in the context of their 505(b)(2)
8 approval.
9        Sorry to be so long-winded,
10 but I just want to make sure we're clear
11 about what we're looking at.
12 BY MR. GOMEZ:
13     Q.    Okay.  Thank you.  No, I appreciate
14 it.
15        And so as we go down, we see, again,
16 one case of alopecia nonreversible at the end of
17 the study.
18        We have reference to TAX316 alopecia
19 persisting.
20        And then we have cases of persisting
21 alopecia have been reported.
22        And so my question is:  All this
23 information here was available to Sandoz USA back
24 in 2013; correct?

Roger Williams, M.D.

Page 182

1    A.    Well, I could answer simply and say
2  yes, but the way I would say it more -- perhaps
3  more specifically and accurately is to say, it was
4  the European label for Taxotere, just like there's
5  a European label for Taxotere in the United
6  States.  Labels across the globe are not the same,
7  but they're getting more equivalent and that's a
8  good thing.
9    Q.    And so you believe this Core Data
10  Safety Information sheet is the same as the
11  European label?
12    A.    My understanding from Sandoz Global,
13  listening to Andrea Rau -- or reading her
14  deposition, is that this was tracking the European
15  label SMPC as approved by EMA.
16    Q.    All right.  And just, you know,
17  without getting into sort of where the information
18  came from or what it was used for, my question
19  simply is:  Sandoz USA had access to this
20  information back in 2013; correct?
21    A.    Yes, and they would have it just by
22  looking at the European label or looking at these
23  Core Data Sheets, which was a slightly different
24  way of presenting the label.

Page 183

1    But what Sandoz did not have access
2  to was the underlying data and data analytics that
3  Sanofi would give either to FDA or EMEA that
4  resulted in this -- I'm going to use the term --
5  knowledge that the two agencies allowed to be put
6  in labeling for practitioners and patients.  That
7  is confidential commercial information.
8    Q.    And you have some opinion about what
9  that underlying data was separate and apart from
10  what's referenced here?
11    A.    I do.  Would you like an example?
12    Q.    Yes.
13    A.    Well, Sanofi in Europe with their
14  resources did an analysis I believe of the
15  alopecia by Dr. Palatinsky, and he did not see
16  causality.
17    Q.    And so that's the information you
18  believe the FDA relied upon to determine that the
19  label should be updated to state that cases of
20  permanent alopecia have been reported?
21    A.    No.  I apologize if I'm confusing,
22  but I think we discussed previously that when FDA
23  asks for a similar analysis, they got Dr. Hongyi's
24  and he did see causality.  And it gets to the

Page 184

1  point, you know, there's the data and there's the
2  analytics of the data, and different analytics
3  don't always use -- yield the same conclusion.  It
4  would be nice if they did.
5    Q.    All right.  And we know, however,
6  that there is no requirement of a finding of
7  causation to trigger the obligation of a
8  manufacturer to update its label?
9    A.    I think that's particularly
10  pertinent here because there's certainly a debate
11  about causation, and that's why I'm glad that FDA
12  put very simple statements in the Taxotere
13  labeling in the U.S.  "Cases of permanent alopecia
14  have been reported."  That's about as simple as it
15  gets.
16    MR. GOMEZ:  All right.  Thank
17    you.
18    Let's go to Exhibit 12
19    Lindsay.
20    MS. STEVENS:  It's marked.
21    (Document marked for
22    identification as Williams Exhibit 12.)
23  BY MR. GOMEZ:
24    Q.    All right.  This may take a bit

Page 185

1  because it's larger, but there it goes.
2    And do you recognize generally what
3  Exhibit 12 is, Doctor?
4    A.    I do, Mr. Gomez.
5    Q.    And what is that?
6    A.    As I understand it, it's 72 pages of
7  spontaneous report summaries that came to the
8  pharmacovigilance group in Broomfield between a
9  certain period of time, and I'd like to say I know
10  -- oh, yes, I see the certain period of time up at
11  the top.  29 June 2011 - 13 April 2017.
12    Q.    This up here being the --
13  (indicates)?
14    A.    Yes, that's -- that's what I see in
15  the title.  Please correct me if I'm wrong.
16    Q.    And so this -- these -- what are
17  these?  Case reports?  What would you refer to
18  these as?
19    A.    I would call them spontaneous
20  reports perhaps submitted using FDA's MedWatch
21  form.
22    Q.    And was this information, these
23  spontaneous reports, was this information
24  available to Sandoz at the time that these reports

Roger Williams, M.D.

Page 186

1  came in?
2      A.    Well, my understanding is they came
3  into Sandoz and were analyzed by the
4  pharmacovigilance group in Colorado.
5          MR. GOMEZ: All right. Thank
6  you so much.
7          Let's see what else we have.
8          THE VIDEOGRAPHER:
9  Dr. Williams, could you move your camera
10  down, please?
11          THE WITNESS: Yes, thank you.
12          THE VIDEOGRAPHER: No problem.
13          MR. GOMEZ: All right. Let's
14  pull up Exhibit 13, please, Lindsay.
15          MS. STEVENS: It's marked.
16          (Document marked for
17  identification as Williams Exhibit 13.)
18  BY MR. GOMEZ:
19      Q.    And do you recall that on the --
20  before I go to the next exhibit, do you recall
21  that on the listing of spontaneous reports that
22  there were some reports of persisting alopecia
23  listed, Doctor?
24      A.    Yes, I think I reviewed that. I can

Page 187

1  tell you how I reviewed it, Mr. Gomez. I actually
2  employed the search function. I believe it's a
3  PDF, and I simply looked for "alopecia" because,
4  of course, it's a very dense set of information.
5          In most of the cases, the alopecia
6  was part of another series of adverse events or
7  wasn't clearly specified, but I think there was a
8  very small number where it clearly said alopecia
9  was continuing or permanent.
10      Q.    All right. And that was all, again,
11  information that was received and analyzed by
12  Sandoz; correct?
13      A.    Yes, and they would -- as part of
14  the analysis, they would see it was not serious
15  and then it was listed, and then it would become
16  part of their reports to the agency either three
17  months or annually.
18      Q.    All right. Thank you.
19          I'm going to pull up Exhibit 13 for
20  you, and so this is just a little chart to kind of
21  guide our discussion.
22          I think we already talked about
23  this, but you agree that Sandoz had an obligation
24  to update its label when new information became

Page 188

1  available that caused the labeling to become
2  inaccurate, false, or misleading? Do you agree
3  with that?
4      A.    Mr. Gomez, may I ask you what you're
5  showing me? I don't recall seeing this in any of
6  the material I looked at. Perhaps I missed it.
7      Q.    No. We made it just for you today.
8      A.    Okay.
9      Q.    It's just a little side by side
10  chart.
11          Would you like to look at it for a
12  little bit?
13      A.    I'm trying to think how I can thank
14  you most sincerely.
15      Q.    (Laugh).
16      A.    You know, I really hesitate to
17  comment on it because -- but if you want to -- it
18  seems like we've covered it a lot. How much
19  longer does the chart go on?
20      Q.    It's just this page.
21      A.    Do you want to point out something
22  where I can look at -- I think in the second
23  column you're reprinting words from the CFR; is
24  that correct?

Page 189

1      Q.    Yes. Here? That's correct.
2      A.    Yes, and then over to the right
3  you're asking me to agree what's said on the
4  right?
5      Q.    We've gone through them. These are
6  what we agreed Sandoz had access to in its CFR --
7  I'm sorry -- in its Core Data Sheet and foreign
8  labels.
9      A.    Well, maybe the best way to deal
10  with this, Mr. Gomez, is to say, I stand by my
11  testimony that I've given today and I certainly
12  stand by my report, which you have. If there's
13  any deviation between the words and your third
14  column, I'll be glad to comment.
15      Q.    Sure.
16          I guess my question is: Did
17  Sandoz's knowledge of all the information that
18  we've discussed and is set forth in this third
19  column, in your mind, ever cause the labeling to
20  become inaccurate, false, or misleading when it
21  failed to inform of the risk of permanent
22  alopecia?
23          MR. MERRELL: Objection to
24  form.

Roger Williams, M.D.

Page 190

1    THE WITNESS:  What I would
2  say -- and I'll continue to say it -- is
3  Sandoz with FDA's understanding, and the
4  other manufacturers, always copied the
5  Taxotere label.  In that sense, they were
6  generics taking into account the different
7  concentration.
8    If Sandoz knew something about
9  alopecia, they would see it in their
10  labeling and the Taxotere labeling as a
11  listed adverse event, taking into account
12  both short-term alopecia as well as
13  continuing alopecia.
14    Now, I think what I just said
15  generally probably doesn't conflict with
16  your third column, but if you want me to
17  comment more specifically, I'll be glad to,
18  Mr. Gomez.
19  BY MR. GOMEZ:
20    Q.    Well, let me ask you this.
21    You agree that if Sanofi's label was
22  inaccurate, false, or misleading, then Sandoz's
23  corresponding label was inaccurate, false, or
24  misleading?

Page 191

1    MR. MERRELL:  Objection to
2  form.
3    THE WITNESS:  Let's just call
4  that a hypothetical, and I have never
5  understood in any way, based on my
6  information, that the Sandoz label was false
7  or misleading -- I'm sorry -- the Sanofi
8  label for Taxotere was false and misleading.
9  BY MR. GOMEZ:
10    Q.    Hypothetically, if it was by failing
11  to inform of the risk of permanent alopecia, then
12  likewise Sandoz's label was inaccurate, false, or
13  misleading; correct?
14    MR. MERRELL:  Objection to
15  form.
16    THE WITNESS:  No, I wouldn't
17  agree with that because it sort of gets to
18  your prior questions about, well, what
19  happened to the Sandoz labeling after
20  Taxotere labeling was adjusted in December
21  2015?
22    And a slight digression,
23  Mr. Gomez, I apologize for knowing -- not
24  knowing this before, but Sandoz actually

Page 192

1  adjusted their labeling in March of 2016.
2  That's when they sent in their CBE-0 to
3  bring their labeling in line with Taxotere
4  with regard to permanent alopecia.
5    You were correct in saying
6  that FDA approved it, the CBE-0, in October.
7    Was Sandoz's label between
8  December of 2015 and March of 2016 false and
9  misleading?  I wouldn't say that.  I think
10  that would be a distinct overreach on the
11  part of anybody to say that.
12  BY MR. GOMEZ:
13    Q.    All right.  During the period of
14  time that Sanofi did warn of permanent cases of
15  alopecia having been reported and Sandoz's label
16  failed to report that, at that time was Sandoz's
17  label inaccurate, false, or misleading?
18    A.    No.
19    Q.    And does this information over here,
20  that is, the information available to Sandoz in
21  the right-hand column, does all of that
22  information amount to reasonable evidence of a
23  causal association between docetaxel and permanent
24  alopecia?

Page 193

1    MR. MERRELL:  Objection to
2  form.
3    THE WITNESS:  No.  I've
4  already commented I'm not sure there is a
5  causal association, and I still think it's
6  debatable for several reasons.
7  BY MR. GOMEZ:
8    Q.    Do you believe that there's
9  reasonable evidence of a causal association?
10    A.    I apologize.  I'm taking a little
11  time to think about that.
12    There's certainly a suggestion, and
13  it can be subject to the rules of causal
14  association, and that's the kind of analytics
15  that, if you will, is the second step that I've
16  been talking about.  The information.  But how
17  people conduct those analytics may vary and
18  reasonable people can differ in terms of their
19  conclusions.
20    So I would say there's a signal.  Is
21  there a causal -- a well-documented causal
22  association that people can agree on?  I would say
23  no, and to me, that's why FDA was, if you will, so
24  hesitant about what they put in the label and

Roger Williams, M.D.

Page 194

1  where they put it.
2      Q.    And what is a signal?
3      A.    Well, if you didn't know that
4  docetaxel caused hair loss, you might give it to
5  patients and start seeing people losing their hair
6  and you'd say, Well, gee, that's a signal that
7  docetaxel can cause alopecia.
8      Q.    All right.  Is signal a term -- a
9  term of art used in the regulatory process?
10     A.    No, I wouldn't call it a term of
11 art.  I would say it's an event that exists and
12 then can be subject to an analysis as to in terms
13 of what's causing the event.
14     Q.    All right.  And so do you believe
15 that this information on the right that was
16 available to Sandoz constituted some basis to
17 believe that there is a causal relationship
18 between docetaxel and permanent alopecia?
19         MR. MERRELL:  Objection to
20 form.
21         THE WITNESS:  You know,
22 Mr. Gomez, I am seeing this for the first
23 time, and I wouldn't say this summary
24 relates to a causation analysis that Sandoz

Page 195

1  was aware of.
2         My understanding is Sandoz did
3  not do a causation analysis for FDA.  They
4  simply copied the Taxotere labeling in the
5  United States, and they would not have seen
6  the causation analyses that Sanofi did
7  either for EMA or for the FDA.
8         MR. GOMEZ:  All right.
9  Thanks.  So I'm going to go out of this.
10 Let's see what's next.
11         How about we pull up --
12         MS. STEVENS:  You're in the
13 wrong folder, John.
14         MR. GOMEZ:  I'm in the wrong
15 folder?  Holy cow.  Potential exhibits.
16 Isn't that what I want?
17         MS. STEVENS:  No.
18         MR. GOMEZ:  Jeez, you're with
19 me.
20         MS. STEVENS:  That one right
21 there.
22         MR. GOMEZ:  Okay.  Let's do
23 Exhibit 14.
24         MS. STEVENS:  It's marked.

Page 196

1         (Document marked for
2      identification as Williams Exhibit 14.)
3  BY MR. GOMEZ:
4      Q.    All right.  So, Doctor, this could
5  be an easy one, I think.
6         All right.  So I'm going to scroll
7  through Exhibit 14, which I believe to be your
8  reliance list.  This was the list that was
9  provided to us.
10         You probably have a copy there as
11 part of your report.
12     A.    You know, actually, Mr. Gomez, I do
13 and I received, I believe, yesterday an updated
14 reliance list.  Do you have that?
15         MR. GOMEZ:  I'm not sure.
16         Do I, Lindsay?
17         MS. STEVENS:  We have it.  It
18 isn't in this exhibit.  This was the first
19 produced.
20         MR. GOMEZ:  Okay.
21         MS. STEVENS:  I can pull it if
22 you want.
23 BY MR. GOMEZ:
24     Q.    So the one -- is the one we received

Page 197

1  yesterday, does that contain all of the materials
2  that you relied upon and considered in formulating
3  your opinions?
4      A.    We may want to discuss this in more
5  detail, Mr. Gomez, but I'm glad to say it's cited
6  as "Materials Provided."
7      Q.    Yeah.
8      A.    And I think the list that came in
9  yesterday had some additions that were bolded.
10         MR. GOMEZ:  Okay.  Let's think
11 about if -- do we want to mark that?
12 Lindsay, do you have that?
13         MS. STEVENS:  It will take me
14 a minute but, yeah, I can.
15         MR. GOMEZ:  Let's just like --
16 we'll go off the record.  We'll mark it.
17 We'll stick it back on.  Then we'll just
18 confirm that's the best version.
19         So our exhibit whatever this
20 is.  Our Exhibit 14 is an outdated version,
21 and we have a new version that we'll mark
22 as -- when we come back and so let's just
23 mark as Exhibit 15 what I believe to be the
24 notice of deposition.

Roger Williams, M.D.

Page 198

1    THE VIDEOGRAPHER: Ready to go
2  off the record?
3    MR. GOMEZ: No, not quite yet.
4    THE VIDEOGRAPHER: Okay.
5    MR. GOMEZ: Super, super
6  quick, though.
7    MS. STEVENS: Okay. That's
8  marked now.
9    (Document marked for
10 identification as Williams Exhibit 15.)
11 BY MR. GOMEZ:
12   Q.   All right. And so Exhibit 15 is
13 your notice of deposition, Doctor. Got a whole
14 bunch of names on here and document requests.
15   Did you endeavor to search for and
16 provide all the documents requested in this
17 notice?
18   A.   I did, working with my counsel.
19   Q.   All right. Thank you.
20   Do you believe you provided them all
21 other than -- I think there was an objection
22 filed, but do you believe that you produced all
23 the documents responsive to this request?
24   A.   Yes, I do, subject, as you say, to

Page 199

1  the further objections.
2    Q.   Correct. Okay.
3    So let's do this.
4    Let's -- considering both your
5  testimony today, Doctor, and the report, your
6  comprehensive report that you provided in this
7  case, have we now talked about all the opinions
8  you intend to offer in this case?
9    A.   Yes. If you say what I spoke about
10 in testimony plus the opinions in my report,
11 that's absolutely true.
12   Q.   All right. Great.
13   So let's -- let's go off the record
14 for like take a little break for, like, 15
15 minutes. We'll just make sure we have the -- the
16 best version of the material, the reliance list
17 marked as an exhibit, and then we might be close
18 to done, okay?
19   A.   Thank you, Mr. Gomez.
20   Q.   Cool.
21   THE VIDEOGRAPHER: The time is
22 2:14 p.m. Mountain Time and 4:14 p.m.
23 Eastern Standard Time and we are off the
24 record.

Page 200

1    (Recess.)
2    THE VIDEOGRAPHER: The time is
3  2:31 p.m. Mountain Time and 4:31 p.m.
4  Eastern Standard Time and we are on the
5  record.
6    (Document marked for
7  identification as Williams Exhibit 16.)
8  BY MR. GOMEZ:
9    Q.   Hey, Dr. Williams, as we discussed,
10 I pulled up what has been marked as Exhibit 16,
11 which I believe is your updated reliance list,
12 including some entries in bold, which I believe
13 are new to the list.
14   And so if we look at this -- and you
15 know what you provided us -- does this constitute
16 your complete reliance list?
17   A.   Yes, it does, Mr. Gomez.
18   Q.   And so these are all the materials
19 that you were provided as part of your preparation
20 and work in this case; correct?
21   A.   Yes, subject, as we discussed, to
22 the objections that were provided by my counsel.
23   Q.   All right. Thanks so much.
24   So that's all the questions I have

Page 201

1  for you. Thank you, Doctor.
2    A.   Thank you, Mr. Gomez.
3    THE VIDEOGRAPHER: Do we
4  need --
5    MR. MERRELL: I do not have
6  any -- I do not have any questions.
7    MR. GOMEZ: No questions for
8  you.
9    So that means you're good,
10 Doctor.
11   So do we have anything we have
12 to do on the record before I say adios? I
13 don't know the rules with this litigation.
14   MR. MERRELL: I don't think
15 so.
16   THE VIDEOGRAPHER: Yeah, I
17 don't believe so.
18   THE WITNESS: I'd like to
19 thank Ms. Vickery and the videographer.
20   THE VIDEOGRAPHER: Oh, no
21 problem, guys. It was great working with
22 everybody.
23   MR. GOMEZ: I'd like to do the
24 same. Although I want to give,

Roger Williams, M.D.

Page 202

1   Ms. Vickery -- I like when the videographer
2   said victory, I like that.  I like victory.
3   All right.  Well, thank you.
4            It was nice working with you
5   all, and nice meeting you, Dr. Williams, all
6   the way in Guatemala City and good working
7   with you, counsel.
8            MR. MERRELL:  Thank you.
9            THE WITNESS:   Thank you,
10  Mr. Gomez.
11           THE VIDEOGRAPHER:  It was a
12  pleasure, everybody.
13           MR. GOMEZ:  All right.  Thanks
14  so much, everybody.  Bye.
15           THE VIDEOGRAPHER:  The time is
16  2:33 p.m. Mountain Time and 4:33 p.m.
17  Eastern Standard Time, and we are off the
18  record.
19
20       (Deposition concluded at 4:33 p.m. EST)
21
22               *    *    *
23
24

Page 204

1   DECLARATION UNDER PENALTY OF PERJURY
2
3
4            I declare under penalty of
5   perjury that I have read the entire transcript of
6   my Deposition taken in the captioned matter
7   or the same has been read to me, and
8   the same is true and accurate, save and
9   except for changes and/or corrections, if
10  any, as indicated by me on the DEPOSITION
11  ERRATA SHEET hereof, with the understanding
12  that I offer these changes as if still under
13  oath.
14
15       Signed on the _____ day of
16  _____, 2020.
17
18  _____
19       ROGER WILLIAMS, M.D.
20
21
22
23
24

Page 203

1            ERRATA SHEET
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Page No._____Line No._____Change to:_____
6   _____
7   Page No._____Line No._____Change to:_____
8   _____
9   Page No._____Line No._____Change to:_____
10  _____
11  Page No._____Line No._____Change to:_____
12  _____
13  Page No._____Line No._____Change to:_____
14  _____
15  Page No._____Line No._____Change to:_____
16  _____
17  Page No._____Line No._____Change to:_____
18  _____
19  Page No._____Line No._____Change to:_____
20  _____
21  Page No._____Line No._____Change to:_____
22  _____
23  Page No._____Line No._____Change to:_____
24  _____

Page 205

1        CERTIFICATE OF REPORTER
2   COMMONWEALTH OF VIRGINIA )
3            I, DENISE DOBNER VICKERY, CRR/RMR and
4   Notary Public, hereby certify the witness was by
5   me first duly remotely sworn to testify to the
6   truth; that the said deposition was recorded
7   stenographically by me and thereafter reduced to
8   printing under my direction; and that said
9   deposition is a true record of the testimony
10  given by said witness.
11           I certify the inspection, reading,
12  and signing of said deposition were NOT waived by
13  counsel for the respective parties and by the
14  witness; and that I am not a relative or employee
15  of any of the parties, or a relative or employee
16  of either counsel, and I am in no way interested
17  directly or indirectly in this action.
18
19
20
21           Denise Dobner Vickery, CRR/RMR
             Notary Public in and for the
22           Commonwealth of Virginia
             Notary Registration No. 126014
23
24  My Commission expires:  March 31, 2022

| Page | Line | Change |
|------|------|--------|
| 12 | 20 | "What" to "what" |

Reason:     'what' should not be capitalized

| Page | Line | Change |
|------|------|--------|
| 24 | 9 | "manufacturers" to "manufacturer' |

Reason:     Should be singular

| Page | Line | Change |
|------|------|--------|
| 26 | 10 | Insert "-intensive" after "resource" |

Reason:     Missing word

| Page | Line | Change |
|------|------|--------|
| 26 | 12 | "not" to "no" |

Reason:

Typo

| Page | Line | Change |
|------|------|--------|
| 41 | 4 | "report" to "reports" |

Reason:

Should be plural

| Page | Line | Change |
|------|------|--------|
| 47 | 15 | "the"--delete |

Reason:

Extra word

| Page | Line | Change |
|------|------|--------|
| 54 | 10, 11, 14, 16 | "Parr" to "Par" |

Reason:

Misspelled

| Page | Line | Change |
|------|------|--------|
| 55 | 8, 16 | "Parr" to "Par" |

Reason:

Misspelled

| Page | Line | Change |
|---|---|---|
| 58 | 7, 24 | "Presence" to "present" |

Reason:

Misspelled

| Page | Line | Change |
|---|---|---|
| 59 | 13 | "bioequivalent" to "bioequivalence" |

Reason:

Typo

| Page | Line | Change |
|---|---|---|
| 60 | 6 | "Sanofi" to "Sandoz" |

Reason:

Misspoke

| Page | Line | Change |
|---|---|---|
| 82 | 13 | "Sanofi" to "Sandoz" |

Reason:

Misspoke

| Page | Line | Change |
|---|---|---|
| 91 | 1 | "Sanofi" to "Sandoz" |

Reason:

Misspoke

| Page | Line | Change |
|---|---|---|
| 103 | 19 | add after "that", "in March 2016 when Sandoz filed its CBE-0" |

Reason:

Clarification of record: Sandoz filed CBE-0 March 2016; FDA approved October 2016

| Page | Line | Change |
|---|---|---|
| 103 | 19 | Delete "I apologize" |

Reason:

Unnecessary

| Page | Line | Change |
|------|------|--------|
| 182 | 5 | "European" to "US" |

Reason:

Misspoke


_____
Signature

_____
Date

Roger Williams, M.D.

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3

 4                   I declare under penalty of

 5     perjury that I have read the entire transcript of

 6     my Deposition taken in the captioned matter

 7     or the same has been read to me, and

 8     the same is true and accurate, save and

 9     except for changes and/or corrections, if

10     any, as indicated by me on the DEPOSITION

11     ERRATA SHEET hereof, with the understanding

12     that I offer these changes as if still under

13     oath.

14

15                   Signed on the _____ day of

16     _____, 2020.

17

18     _____

19                   ROGER WILLIAMS, M.D.

20

21

22

23

24
```

**WORD**
**INDEX**

**< 0 >**
**0**  77:21
**029**  7:4
**04**  7:6

**< 1 >**
**1**  6:8, 10, 13
30:24  32:5, 10
38:4  48:6, 8,
13, 16  49:18
50:20  51:2
53:19  57:2, 16
61:7  93:15, 19
96:4  98:22
112:22  169:1
172:7  178:6
**10**  6:22  7:5
36:17  76:13,
14  87:3
123:16  130:9
174:17  176:24
177:3, 6
**10019-9710**
4:19
**11**  7:8, 9
86:14  103:15,
21, 22  104:12
131:9  178:10,
14, 16, 18
**11:04**  1:18
2:8  8:8
**1100**  5:6
**1-18**  7:16, 20
**12**  7:11  50:12
172:5, 7
184:18, 22
185:3
**12:10**  131:4, 7,
7
**12:11**  132:21
**12:38**  77:2
**12:46**  134:9
**12:56**  77:5
**126014**  205:22
**13**  7:13
185:11  186:14,
17  187:19
**134**  6:4

**13APR2017**
7:12
**14**  7:15
195:23  196:2,
7  197:20
**15**  7:17
197:23  198:10,
12  199:14
**154**  6:14
**16**  7:19  200:7,
10
**163**  6:16
**165**  6:18
**167**  6:20
**1700**  3:7
**171**  6:22
**174**  7:2
**177**  7:5
**178**  7:8
**184**  7:11
**186**  7:13
**196**  7:15
**1962**  54:22
**198**  7:17
**1984**  23:10
**1990**  98:18
**1996**  63:15
149:3  169:21

**< 2 >**
**2**  6:10, 11, 12,
13  11:21
12:12, 17, 18
13:15  14:11,
17  15:3, 9
19:19  20:2
21:14, 17
22:10, 20  23:3,
15, 17, 22
24:19  25:1, 1,
3, 6, 16  26:2,
15, 24  27:9, 20
28:2  29:15
30:3, 7, 11, 17,
24  32:5, 10
33:2  36:21
37:12  38:4
47:18, 22
49:18, 23  50:5
51:9, 16, 22, 24
52:22  53:6, 10,

19, 22  54:18
55:20  56:3, 14,
21, 24  57:15,
21, 22  61:8
87:18  89:18
91:4, 19  92:9,
10, 16, 20  93:4,
5, 7, 15, 20
94:4  95:8
96:4, 15  98:15
109:11  112:22
114:8, 10
115:6, 12
116:7, 23
131:10  135:21
166:4  169:2
178:6  181:7
**2:11**  132:21, 24
**2:14**  199:22
**2:17-cv-10817**
1:12
**2:31**  200:3
**2:33**  202:16
**2:46**  134:2, 9
**20**  84:16
166:17
**200**  3:18  7:19
**2000**  36:14
**2002**  49:21
**2006**  7:6
140:16  177:14
178:4
**2008**  13:20
**201**  6:19, 21
**201.56**  6:19
165:13  166:3
**201.57**  6:21
167:15
**2010**  63:20
89:9  128:16,
18  142:2
149:4  172:5, 7,
9, 20  173:1
**2011**  63:18, 23
128:17  169:24
173:2, 5, 17
174:1  175:12
185:11
**2013**  7:9
179:1  180:12
181:24  182:20

**2015**  10:1
80:24  86:5
149:5, 13, 24
191:21  192:8
**201525**  100:9
**2016**  80:22
86:9, 15  88:20
103:15  104:11
107:7  192:1, 8
**2017**  185:11
**2020**  1:17  2:7
8:7  204:16
**2022**  205:24
**2078**  7:7
**20mg**  7:3
**21**  6:15, 17, 19,
21  94:4
155:14  163:12
165:13  167:14
**212.836.8429**
4:20
**216.696.2286**
5:8
**22**  1:17  2:7
8:7  173:13
**250**  4:18
**2500**  3:19
**2555**  4:7
**2740**  1:4
**28**  18:2
**29**  185:11
**29JUNE2011**
7:11

**< 3 >**
**3**  6:12  95:8,
10, 22  113:13
**3.14.70**  167:21
**30**  77:22
78:22  106:21
**30305**  3:20
**31**  205:24
**314**  6:15, 17
**314.3**  6:15
155:14
**314.5**  94:4
**314.70**  168:21
**314.8**  163:12
164:1, 9, 22
**314.80**  6:17

**319**  50:17
**32**  54:13
**323**  50:15, 17
**3333**  3:19

**< 4 >**
**4**  6:14  47:24
99:19  113:13
117:19  127:3
153:21, 23
154:14, 19, 23
155:5  162:24
**4:14**  199:22
**4:31**  200:3
**4:33**  202:16, 20
**44113-7213**  5:7
**48**  6:8

**< 5 >**
**5**  6:16  118:13
127:4  129:1,
14, 22, 24
132:14  134:16
163:1, 2, 7, 11
**50**  148:22
166:17
**500**  74:13
**505**  6:11, 13,
13  11:21
12:12  13:15
14:11  19:19,
20  20:5, 14, 23
21:10, 14, 17
22:10, 20  23:3,
3  24:19  25:6
26:2, 15, 24
27:9, 20  29:15
30:1, 3, 7, 11,
17  37:12
47:18, 22
49:18, 23  50:5
51:16, 22, 24
52:22  53:10
55:20  56:21,
24  57:2, 15, 16
87:18  89:18
91:4, 19  93:7,
11, 12, 15, 15,
18, 22  94:1, 2,
4  112:22
114:10  116:7

Roger Williams, M.D.

135:*19* 164:*20,*
*23* 181:*7*
**5056** 93:*10*
**55** 173:*13*
**551** 6:*23*
**55th** 4:*18*

**< 6 >**
**6** 6:*18* 165:*6,*
*10, 13*
**60** 123:*9, 16*
**601.12** 167:*22*
**619.237.3490**
*3:9*
**64108** 4:*8*
**655** 3:*7*
**67** 178:*1*
**678.553.2175**
*3:21*
**687** 173:*14*

**< 7 >**
**7** 6:*20* 167:*1,*
*4, 7, 14* 171:*13*
**72** 7:*12* 185:*6*

**< 8 >**
**8** 6:*22* 55:*23*
171:*15, 15, 19,*
*23* 174:*14*
**80mg** 7:*3*
**816.474.6550**
*4:9*
**83** 177:*24*
**838** 7:*10*
**846** 7:*10*
**852** 7:*10*
**877.370.3377**
*1:23*

**< 9 >**
**9** 6:*3* 7:*2*
54:*13* 174:*16,*
*22* 175:*1, 3, 5*
**90** 79:*17, 19*
**917.591.5672**
*1:23*
**92** 6:*10*
**92101** 3:*8*
**95** 6:*12*

**950** 5:*6*

**< A >**
**a.m** 1:*18* 2:*8*
8:*8*
**Abbreviated**
93:*9*
**ability** 64:*8*
65:*4* 88:*3*
127:*15*
**able** 26:*13, 22*
48:*10, 15*
49:*22* 54:*5, 8*
94:*10* 95:*22*
97:*24* 113:*17*
134:*14* 154:*6*
**ABRAMSON**
5:*13*
**Abraxane**
114:*15, 18*
115:*1*
**absence** 60:*4,*
*17*
**absolutely**
44:*8* 199:*11*
**absorption**
10:*23*
**acceptable**
101:*10*
**accepted** 79:*14*
**Accepting** 82:*1*
**accepts** 79:*16*
**access** 142:*10,*
*12* 174:*5, 7*
182:*19* 183:*1*
189:*6*
**ACCORD** 5:*3*
86:*1, 8, 12*
116:*12*
**accords** 26:*7*
**account** 61:*15*
110:*19* 190:*6,*
*11*
**accurate**
99:*13* 204:*8*
**accurately**
182:*3*
**achieving**
128:*20*
**acknowledge**
18:*5*

**acquire** 61:*19*
62:*1*
**acquired**
155:*19* 156:*1*
**Act** 23:*13*
93:*16* 118:*24*
**acting** 16:*1*
**action** 84:*10,*
*18* 101:*11, 16,*
*18* 205:*17*
**active** 15:*16*
160:*1*
**activities**
123:*23* 175:*15*
**activity** 34:*9*
**actual** 126:*9*
**add** 12:*24*
14:*5* 65:*2*
71:*14* 77:*11*
80:*16* 81:*14*
82:*7* 84:*11*
112:*2* 171:*6*
**added** 63:*15,*
*17* 102:*9*
118:*7* 148:*12*
180:*14, 15*
**adding** 70:*21*
74:*14* 106:*21*
143:*17* 180:*9*
**addition** 15:*13*
38:*20* 148:*11,*
*14, 14* 149:*7,*
*13* 151:*1, 16*
**additional**
62:*1* 115:*9*
120:*13* 152:*7*
**additions**
197:*9*
**address** 55:*19*
121:*1*
**addressed**
27:*13* 54:*7*
**adequate**
35:*15, 20* 36:*1*
42:*23* 104:*6*
148:*9*
**adequately**
45:*11* 150:*22*
**adios** 201:*12*
**adjudicate**
153:*3*

**adjudicated**
43:*17, 21*
**adjust** 12:*22*
120:*22* 122:*4*
169:*15*
**adjusted**
74:*11* 191:*20*
192:*1*
**adjusting**
156:*18*
**ADME** 10:*23*
**administer**
147:*13*
**Administration**
6:*8* 50:*21*
180:*6*
**advantages**
23:*2* 29:*15*
**adverse** 31:*5,*
*9* 33:*15* 43:*1*
46:*1* 66:*7, 12,*
*14, 21* 67:*1, 8,*
*21, 22, 24* 68:*3,*
*11, 13* 69:*19*
70:*11, 22* 71:*8*
73:*6, 7* 77:*12*
83:*12, 16*
122:*19* 123:*11,*
*13* 124:*14*
137:*14, 21*
138:*6, 21*
145:*4* 146:*11*
148:*21* 150:*16*
152:*18* 156:*5*
161:*4* 162:*17*
164:*2* 166:*8,*
*18* 170:*19, 20*
180:*16* 187:*6*
190:*11*
**advice** 30:*21*
**advocate** 121:*7*
**affect** 83:*13*
**affirmative**
62:*17* 88:*12*
**affirmatively**
103:*17* 111:*17*
116:*7*
**AFTERNOON**
6:*4* 134:*1*
**agencies**
180:*18* 183:*5*

**agency** 11:*23*
12:*16, 20, 24*
26:*8* 32:*23*
34:*10* 35:*17*
39:*15* 40:*14*
42:*16* 43:*18*
47:*19* 63:*2*
68:*3, 7* 73:*3, 9*
74:*8, 11* 79:*14*
91:*15* 92:*11*
143:*2* 156:*3*
180:*19* 187:*16*
**agency's** 55:*10*
**agents** 148:*4*
**ago** 10:*22*
**agree** 20:*22*
22:*5* 33:*22, 24*
34:*3* 35:*13, 23*
36:*2, 11* 51:*12*
56:*23* 57:*13*
58:*22* 59:*5*
64:*16, 21, 23*
65:*19, 21* 77:*9*
79:*20* 80:*14*
94:*17, 23* 96:*9,*
*10, 19* 105:*15*
106:*6, 20, 23*
107:*18* 108:*10,*
*12, 19* 121:*18*
124:*17* 128:*1*
142:*9* 143:*22*
146:*20* 151:*22*
153:*15* 157:*4,*
*15* 159:*9*
161:*16, 24*
169:*5* 172:*11,*
*19* 173:*6, 16*
179:*9* 187:*23*
188:*2* 189:*3*
190:*21* 191:*17*
193:*22*
**agreed** 8:*16*
58:*24* 61:*2*
81:*11* 169:*9, 9,*
*23, 24* 189:*6*
**agreed,** 169:*17*
**ahead** 80:*9*
129:*24* 163:*22*
**alcohol** 88:*18*
89:*11* 112:*1*

Roger Williams, M.D.

alcohol-related
128:11
alleging 16:11
allow 53:20
59:14 71:3
97:13 119:22
allowed 23:15
57:22 58:8
59:22 87:5
89:16 112:8
125:6 146:3
183:5
allows 122:4
158:15
allude 169:1
alluded 58:17
Alopecia 7:11
42:4, 12, 12, 21,
22, 24 43:3, 11
45:10, 12 65:4
75:11 78:20
80:17 83:16,
19, 23 84:4
85:2 88:22
102:1, 5, 10
104:2, 20
105:7, 11, 17,
23 106:1, 1, 8,
16, 18, 22
108:11 116:8
117:17 120:3
122:12 123:7
124:1, 8 129:4
136:16 137:12
138:15, 19
141:6 143:9
144:6, 12
145:3, 13, 14,
19, 23, 24
147:22 149:7
150:6 157:3, 4,
15, 16, 22
158:9, 21
159:9, 10, 20,
21, 22 160:8,
10, 15, 16
162:5, 14
166:7, 13
168:10, 10
169:12, 16
170:2, 13, 17,

18 171:8
172:16 173:12,
14 177:24
181:16, 18, 21
183:15, 20
184:13 186:22
187:3, 5, 8
189:22 190:9,
12, 13 191:11
192:4, 15, 24
194:7, 18
amazing 143:3,
5
Amendments
23:12
amount 89:21
90:9 192:22
amounts
150:21
amplify 151:5
analogy 40:23
analyses 41:1
105:9 117:13,
16 156:2, 7, 22
157:2 180:17
195:6
Analysis 34:20
39:6 62:10
102:5 137:20
183:14, 23
187:14 194:12,
24 195:3
analytics 74:6
157:9 183:2
184:2, 2
193:14, 17
analyze 39:14
41:12, 17 42:2
43:6 45:4
62:18
analyzed
186:3 187:11
analyzing 46:1
ANASTASIA
3:16
ANDA 95:1, 2
118:19
ANDAs 6:11
93:7, 8 94:1
169:2
Andrea 182:13

ANGELOVA
3:16
angelovaa@gtla
w.com 3:23
ANI 55:24
annually
187:17
answer 16:20
19:24 30:22
33:17, 20 34:3,
16 37:13
43:15 46:12
60:2 72:22
78:17, 24 83:7
90:1 94:5
100:18 101:5
118:10, 11
126:5 141:11,
11 142:7
150:19 153:12
163:21 164:15
165:24 170:21
174:10 177:19
179:14 182:1
answering
64:1
answers 145:7
antecedent
89:6
Anthony 47:4,
11
antitrust 18:8
anybody
28:20 111:3
126:6 192:11
anymore
45:18 115:18
166:7
anyway 105:14
apart 12:13
41:15 183:9
apologies
93:12 104:13
apologize
60:14 103:19
134:17 139:15
142:6 144:13
170:21 176:14
183:21 191:23
193:10
appear 70:24

APPEARANCE
S 3:1 4:1 5:1
appeared
127:6
appearing 8:16
appears 17:9
124:14 129:16
136:2 159:6
applicable
113:18
applicant
24:20 25:6
26:2, 15, 21, 24
30:7, 11 32:22
56:24 114:1
115:24
applicants
30:23
application
10:21 11:21,
22 12:13
13:15 14:12
19:9 20:12
24:10 26:3
27:9, 21 29:16
30:3, 17 34:10
37:19 55:4
62:17 73:9
112:22 156:16
applications
12:17 32:6
38:4, 19 93:9
applied 111:17
applies 163:16,
18
apply 20:5
68:21 69:15
110:13 137:20
156:12 164:6,
10 165:1
166:4 168:4
appreciate
98:2 127:1
181:3
approach
87:11 118:23
appropriate
55:2 62:19
80:15 81:3, 14
82:6 84:4

102:13 113:12,
15 142:18
appropriately
81:10
approval
35:13, 18, 22
41:6, 8 46:10
47:1, 3, 20
50:2 51:16
58:4, 18, 23
63:15, 18, 23
77:10 78:7
100:21 102:15
104:23 112:24
113:11, 14
128:16 137:6
169:18, 19
173:2 181:8
approval,
94:22
approve 77:17
78:1 102:16
103:21 106:24
108:13
approved 12:2,
18 20:14, 23
21:10, 14, 16
24:3 30:18
32:6 34:10
47:18 51:24
52:21 53:11
55:8, 20 91:4
92:11 100:8
101:7, 22
102:9 107:5,
13, 19 112:22
114:5 118:19
120:15 127:8
135:19 137:18
149:3 164:20,
23 176:6
180:9 182:15
192:6
approved-labeli
ng 143:1
approving
46:23
April 177:13
185:11
area 160:15, 17
areas 62:11

argue 19:6
124:18
arguing 107:10
ARNOLD 4:16
art 194:9, 11
article 47:22,
23  48:5, 15
49:12, 18, 23
50:5, 12, 20, 23,
24  51:3, 19
articles 51:6
articulate
113:17
asked 19:21
102:5  112:2
116:4
asking 57:6
125:22  150:18
167:11  170:7
173:23  189:3
asks 183:23
aspect 11:8
25:23  39:6
128:21
aspects 19:12
38:8
assess 41:12
104:22
assisting
122:22
associated
19:14
association
158:16  168:1
192:23  193:5,
9, 14, 22
assume 83:21
107:14  151:7,
13  160:14
172:23
assumes 168:7
assuming
78:18  89:18
103:20  116:17
137:13  151:21
Atlanta 3:20
attached 7:23
17:23
attempt 92:24
109:21

attended 12:5
13:3
attention 31:6
41:24  95:20
100:3  111:22
138:5, 10
144:19  181:3,
4
audibly 130:5
Australian
175:8, 17
Austrian
172:9  173:21
authored
51:22
authorities
36:10
authority
37:24  79:5
automatically
128:19
availability
65:23
available
45:23  111:4
115:18  173:24
175:11  179:10
180:11  181:23
185:24  188:1
192:20  194:16
Avenue 5:6
aware 27:19
45:5  65:13
66:11  67:3
84:9  90:1, 6, 6,
11  91:2  99:9
126:6  151:9
175:18  176:6,
7, 13  195:1

< B >
babramson@w
hlaw.com 5:14
back 14:15
29:13  56:1
70:7  73:15
75:20  76:20
77:7  83:7
85:4  89:6
94:8  105:12
107:23  122:16

132:9  134:12
141:14  151:12
156:6  162:21,
22  171:11
172:20  174:13
175:12  176:17
181:23  182:20
197:17, 22
BACON 4:4
bad 90:10
base 92:6
based 21:19
35:9  55:6
77:12  84:6
94:11  101:14
105:5  113:15
191:5
Basically 124:7
basis 25:8
29:20  35:22
42:16  57:21
58:3, 8, 17
100:14  107:24
110:12  115:24
136:1, 7, 13
139:10  194:16
basis, 58:2
bear 33:23
179:23
bears 34:6, 13
35:7
beginning
122:9  140:16
behalf 18:7,
13  46:1  54:11
behoove 26:21
behooves
11:21  26:7
belief 34:5
40:4  110:12
173:24
believe 14:7
26:4  27:17
35:18  38:16
42:1  45:18
52:1  54:4
55:8, 18  58:3
67:6  68:9
83:15  85:19,
22  86:2  87:21
94:12  102:7

104:17  109:5
111:16  113:19
126:2  127:22
128:4  140:23
147:19  148:15
149:12  150:3
151:1  158:11
173:9  182:9
183:14, 18
187:2  193:8
194:14, 17
196:7, 13
197:23  198:20,
22  200:11, 12
201:17
believed 45:9
80:15  81:13
82:5  102:12
151:11  169:9
believing 112:5
benefits 40:3
170:9
BENNETT
3:17
best 10:15
37:4  60:23
63:16  89:10
147:8  189:9
197:18  199:16
better 19:23
56:10  125:19
129:17  149:3,
4, 5, 6, 13
150:3  155:11,
13  165:17
beyond 12:1
38:5  58:3
69:21  146:5
162:8
big 130:20
Bill 36:19
bioequivalence
94:21
bioequivalent
59:13  61:12
92:3  119:21
135:5
biopharmaceuti
cs 37:22  46:20
bit 23:6
54:19  58:21

65:10  95:14
119:3  141:23
148:7  149:5, 6,
12  150:3
155:7  168:17
179:15  184:24
188:12
black 148:23
black-box
70:24
blurred 71:9,
10, 12, 22  72:1
board 25:9
body 152:12
160:10, 12
bold 200:12
bolded 197:9
bolster 84:19
Book 101:21
150:16
Boulevard 4:7
boundary
115:2, 3
bow 159:9
box 148:23
break 49:11
74:18  76:7
119:2  130:3, 8,
24  131:12
132:9  136:21
199:14
breast 75:4
126:11  148:5
151:15  152:9
breath 23:6
BRIAN 5:13,
16  8:5
brief 118:10
126:5
briefly 8:19
38:11
bring 28:24
31:6  39:24
55:4  121:14
136:10  138:5,
10  192:3
bringing
95:13  144:18
brings 143:8
147:4

Roger Williams, M.D.

broad 57:6
88:7 91:9
101:4 112:20
broadly 179:15
Broadway 3:7
Broomfield
45:17 185:8
brought 38:7
buck 34:13
building 173:1
bullet 100:4, 4
113:13 117:18
118:16 127:3
129:1, 21
134:20 136:3,
8, 11 137:3
139:1 141:1
bullets 129:16,
18 136:2, 6
bunch 198:14
Bush 36:20, 21
business 47:15
button 97:14
98:6
Bye 202:14

< C >
CA 3:8
call 10:23
13:7, 20 14:17
18:8 21:18
24:16 39:17
40:12 72:24
73:15, 18
117:10 128:21
185:19 191:3
194:10
called 9:8
47:10 66:7, 24
127:21 134:4
179:19
CALLSEN 5:5
camera 52:8
95:14 158:1
176:20 186:9
cancer 75:4,
10 126:11
148:5 151:15
152:9
capacity 16:9
37:10

captioned
204:6
care 75:3
153:17
career 76:2
careful 123:20
caring 147:9
Case 1:11
9:15 13:13
17:13, 24
21:23 25:2, 2,
14, 15 33:16
41:23 42:1
44:13, 17, 21
53:3 55:15, 24
56:8, 9, 20
62:6 65:17
67:5 74:7
75:7, 18 78:18
84:9, 17 85:24
87:22 88:11
90:18 94:24
101:13 114:3
117:9, 14
126:10 137:11
139:20 140:13,
22 157:1
159:17 172:15
177:17 179:5,
11 181:16
185:17 199:7,
8 200:20
case-by-case
25:8 29:20
115:24
cases 16:14
18:10, 12, 16
31:3 54:2, 6
55:18 56:10
79:8 105:6, 10,
17 106:7, 16,
22 120:2
124:8 144:6
151:14 160:5
181:20 183:19
184:13 187:5
192:14
causal 167:2
168:1, 2 171:3,
8 192:23

193:5, 9, 13, 21,
21 194:17
causality
105:8 117:16
158:17 169:4
183:16, 24
causation
125:9 158:13,
19 168:12
184:7, 11
194:24 195:3,
6
cause 69:7
70:1 74:1
75:11 109:6
121:11 123:1,
13, 24 150:6
151:10, 18
152:21 157:22
158:21 161:11
189:19 194:7
caused 65:23
72:23 104:19
106:18 188:1
194:4
causes 69:3
71:11 72:7
75:8 109:15
123:16 125:10
147:21 158:8
161:9
causing 42:3,
20 83:23
194:13
CBA 109:6
CBE 77:22
78:10 79:3, 9,
17 80:3 84:12
107:15 108:11
109:6, 21
111:17
CBE-0 78:3,
21 80:8, 16, 24
81:4, 16 82:7,
24 103:5
106:21 109:16
192:2, 6
CBE-0s 79:13
CDER 55:3
cell 161:10

center 31:20
37:7, 7
CEO 36:4
certain 41:19
53:22 55:5
90:9 142:3
147:21 161:17
162:17 185:9,
10
certainly 11:1
13:8 14:2, 14
17:20 18:20
23:7, 9 25:2,
13 26:7 31:2,
4 33:11 35:21
38:21 41:3
47:19 63:21
64:2, 21 68:7
70:21 92:1
94:8 110:15
117:15 118:7
152:5 161:8
184:10 189:11
193:12
certainty
109:20
CERTIFICAT
E 205:1
certification
30:2, 5
Certified 2:20
certify 205:4,
11
CFR 6:14, 16,
18, 20 94:4
155:8, 14, 24
163:12 164:21
165:13 167:14
188:23 189:6
chair 36:4
challenges
19:14
championed
38:13
change 12:21
13:1 61:19
63:2, 6, 6, 19
64:8, 17, 19
77:10, 23 78:5,
12 79:4, 11
80:9, 10, 23

81:4 85:4
86:4, 8 89:8
90:19 91:7, 22
101:12, 24
104:7, 10
106:24 107:19
108:3, 14
112:3, 23
137:15, 15
158:3 168:22
203:3, 5, 7, 9,
11, 13, 15, 17,
19, 21, 23
changed 31:9
63:8 87:18
88:1, 20
102:18, 19
103:16 106:9
107:16 108:4
114:18 117:23
137:17
changes 77:17,
18, 21 80:2
89:20, 22
91:21 102:9
117:22 118:1
129:4 136:16
140:16 180:8
204:9, 12
changing
81:17 87:24
105:16 107:15
chapter 167:22
Characteristics
172:13 176:5

Characteristics,
179:20
characterizatio
n 121:18
characterize
18:22 105:4
charge 120:20
chart 187:20
188:10, 19
check 86:20
94:8 117:8
checking 53:7
chemistry
37:21

chemotherapeu
tic 148:*4*
chemotherapy
75:*7, 10*
122:*24* 123:*3*
147:*21* 150:5
151:*8, 10, 11,
17* 173:*15*
choice 59:*4, 6,
11* 152:*12, 22*
choices 151:*3*
153:*16*
choose 147:*11*
chooses 89:*19*
123:2 152:*20*
chose 37:5
CHRIS 4:5
28:*15, 17*
circle 29:*13*
circumstance
68:22
circumstances
41:*19, 21* 69:9
70:*4, 14* 71:*13*
78:*13* 161:*17*
citation 115:*14*
citations 94:9
cite 15:*10*
114:*14* 115:*17*
136:*3*
cited 197:5
cites 115:*12*
citing 30:*4*
City 4:*8* 202:*6*
Civil 1:*11*
84:*10, 18*
claim 17:*15,
17* 18:*11*
56:*17* 166:*16*
clarification
118:*3* 124:*6,
19*
clarify 85:*1*
class 88:*9, 14,
22* 127:*7, 16,
17, 19, 21*
128:*3, 6, 8, 20*
170:7
clear 13:2
20:7 59:*18*
81:2 83:*3*

138:*8* 144:*16*
158:*13, 17*
181:*10*
clearly 62:*6*
90:2 157:*22*
158:*8* 176:*13*
187:*7, 8*
Cleveland 5:*7*
clients 12:*6, 8*
13:*4*
CLIFF 3:*15*
9:*1* 76:*8*
131:*10*
cling 67:*13*
clinical 10:*6, 7,
9, 20* 11:9
26:*11, 12* 28:9
29:*21* 30:*8, 12*
37:*21, 22* 38:*8,
15* 41:*6* 46:*19*
59:*12* 60:*5, 17*
61:*8, 10* 75:*3*
78:*11* 114:22
119:*17* 156:*4*
180:*15*
clinically
167:*23*
Clinton 36:*19*
close 46:*8*
49:*14* 111:22
118:*20* 135:*21*
143:*23* 199:*17*
closely 140:*15*
closer 60:*3*
65:*10*
cmcrae@shb.co
m 4:*10*
coach 49:*11*
Coast 131:*16,
17*
coauthored
48:*1*
co-chair 38:*16*
Code 6:*14, 16,
18, 20*
colleagues 46:7
collect 39:*14*
collecting
41:*15*
collection 39:6
40:*18* 62:*10*

Colorado
45:*17* 186:*4*
column
188:*23* 189:*14,
19* 190:*16*
192:*21*
come 16:*14*
19:*17, 21*
30:*16* 41:2
44:*12, 17*
76:*20* 81:22
101:*24* 129:5
136:*17* 137:*15*
141:*13* 151:*12*
197:22
comes 34:*19,
20* 40:*12*
75:*20* 147:*10*
comfortably
91:*20*
coming 11:7
comment
67:*18* 159:*15*
188:*17* 189:*14*
190:*17*
commented
177:*18* 193:*4*
commercial
15:5 11:*5*
183:*7*
commercially
15:5, 6
Commission
205:*24*
committee
38:*17*
committees
38:*13, 14, 15*
Commonwealth
2:*22* 205:*2, 22*
communicate
88:*8* 128:*8*
communicated
91:*11*
communicating
116:*9*
communication
72:*13* 87:*17*
88:*11, 12, 19*
104:*4*

communication
s 87:*8*
community
42:*17* 151:*14*
companies
11:*17* 14:*10,
17, 23* 15:*4, 12,
16* 16:2, *16, 24*
17:*12, 21, 24*
18:*6, 9, 14*
19:*16, 17, 21*
20:*8, 10* 49:*18,
24* 50:*1* 61:*19,
24* 64:*13* 67:*6*
80:*10* 87:*18,
20* 90:*4* 91:*19*
139:*4, 23*
153:*3*
company
10:*17* 15:2
29:*15* 31:*16*
39:*4* 40:*19, 24*
41:*14, 17*
44:*20* 45:*18*
47:*12* 52:*21*
54:*24* 56:*21*
71:*11* 73:*20*
77:*9* 78:*13*
111:*1* 112:*21*
114:*10, 18, 21*
142:*16* 174:*6*
company's
140:*18*
compared
43:*20* 59:*15*
109:*3* 119:*24*
125:*16* 144:*2*
151:5 159:*24*
Competition
23:*11*
complete
18:*17* 48:*13*
151:*12* 159:*24*
200:*16*
completed
48:*14*
completely
8:*20* 48:*13*
178:*1*
complex
159:*14*

complexity
157:*9*
compliant
118:*24* 119:*13*
complicated
105:*9* 106:*15*
114:*1* 116:*1*
142:*7*
complied
134:*23*
component
39:*7*
comprehensive
160:*9* 199:*6*
compromise
131:*15*
concentration
61:*17* 92:*4*
110:*18, 19*
117:*4* 135:*3, 9*
190:*7*
concept 120:*14*
concerned
121:*9* 137:*12*
170:*15*
concerning
70:*12* 138:*3*
conclude
143:*15*
concluded
143:*9* 159:*5*
202:*20*
concluding
110:*6*
conclusion
184:*3*
conclusions
193:*19*
concomitant
106:*18*
conduct 30:*12*
31:*1* 62:*24*
173:*3* 193:*17*
conducted
2:*11* 14:*6*
64:*7* 125:*24*
conducting
117:*12*
Conference
38:*23*

confidential
111:5  183:7
confidentiality
111:23
confined
10:23  34:2
confirm  45:9
173:23  180:14
197:18
conflict  190:15
conform
157:11, 12
confounded
158:21
confusing
127:11  183:21
connected
30:3  38:21
connection
18:6  24:24
consider  33:15
127:16  157:20
consideration
123:20
considerations
29:24  38:9
considered
83:19  123:8,
21  145:18, 18
170:17  197:2
considering
11:21, 22
199:4
consistent
141:5
constitute
118:3  200:15
constituted
194:16
constitutes
96:18
consult  13:4
20:4
consultation
11:5
consulted
14:11  19:16
contact  31:19,
20  122:14
146:4, 13, 14
162:16  170:14

Contain  96:12
197:1
contained
141:4
content  33:3
35:7  94:3
178:4
contents
144:18
contest  68:8
context  51:8
122:19  123:9
129:18  148:3
181:7
continue  69:5
72:11  132:17
164:4  190:2
Continued  4:1
5:1  10:2  58:3
69:21  100:10,
15  134:4, 7
146:5
continuing
35:22, 24
57:11  58:7, 23
65:16  146:3
187:9  190:13
contraindicatio
n  77:11
contrary  79:21
contributed
38:3
control  120:23
controls  37:22
conversation
122:23
convinced
158:23
Cool  154:15
199:20
coordinating
38:13, 14, 15,
16
copied  63:23
80:23  89:10
190:4  195:4
copies  25:7
copy  24:4, 6,
21  25:3, 20
26:4, 15, 24
27:10  44:3, 6

57:23  58:5, 9,
10  59:1, 6, 20
60:7  61:2
89:19  170:1
196:10
copying  25:21
33:12  60:12
81:9  87:15
90:7  92:7
157:13  169:12
170:4
Core  7:5, 8
12:15  64:24
65:10  120:2, 7,
11, 14  121:2
139:3, 10, 19,
21, 23  140:5,
13, 15, 18
141:3  142:4,
10  144:18
168:18  169:7
174:3, 4, 11
176:3, 3  177:8,
9, 22  178:4, 22
179:8, 10, 17
182:9, 23
189:7
correct  9:19
16:24  17:11
21:11, 17
22:11, 21
24:22  25:10
26:5, 16  27:1
31:24  32:11
33:4  36:6, 15,
17, 18  40:19
41:18  44:7
51:5  55:2, 17
62:19  63:9
64:19  65:5
66:10, 22
79:17  80:4, 17
81:4, 17  82:8
83:17  85:4
86:7  87:19
90:13  93:24
94:15, 16  95:2
96:7  99:4, 15
105:18  106:10
109:7  112:12,
16  113:6

125:2  139:24
143:18  144:7,
19  152:14, 22
153:17  155:9
156:20  165:23
166:15  168:13
171:4  172:3
173:20, 21
174:5  177:11
179:2, 6
181:24  182:20
185:15  187:12
188:24  189:1
191:13  192:5
199:2  200:20
corrections
204:9
correctly
102:8  171:6
correspond
117:2
corresponding
190:23
Cosmetic
23:13  93:16
Council  36:5
counsel  8:21
126:11  198:18
200:22  202:7
205:13, 16
counseled
13:24
counseling
124:15  149:20
count  161:10
counted
148:21
counterparts
143:10
countries  41:5
65:1, 13
121:24  122:2
course  17:8
18:17  26:9
27:6  33:10
39:13  43:17
48:18  50:10
85:23  92:9
100:2  104:22
111:3, 21
113:24  116:13

123:3  137:6
142:1  146:7
166:2  187:4
COURT  1:1
8:12  9:3  53:2
174:18, 23
covered  23:7
43:2  86:2
102:4  159:23
169:10  188:18
covering  160:9
cow  195:15
create  16:6
34:22
created  23:10
38:17
creates  39:10,
14  40:15
creating  33:24
34:7  170:7
criminal  84:10,
18
critical  72:14
146:24
CRR  1:22
205:3, 21
current  68:21
69:15
curriculum
17:6
cuts  25:9
CV  10:4
15:22  17:10,
23  18:2, 4, 12,
16, 22  38:12
53:8  54:6, 13
56:10, 16

< D >
dangerous
138:3
Data  7:5, 8
13:8  19:9
23:21  34:18,
19, 20  39:12,
13, 13  40:17
41:2, 16  42:20
43:4  62:10, 18
64:24, 24  71:2
73:18  78:11
79:12, 18

Roger Williams, M.D.

109:*1*, *10*, *13*,
*15*  111:*12*
120:*2*, *7*, *11*, *14*
121:*2*  139:*3*,
*10*, *19*, *21*, *23*
140:*5*, *13*, *15*,
*18*  141:*3*
142:*5*, *10*
144:*18*  156:*1*,
*4*  157:*9*
160:*14*  174:*3*,
*4*, *11*  176:*3*, *3*
177:*8*, *9*, *22*
178:*4*, *22*
179:*8*, *10*, *17*
182:*9*, *23*
183:*2*, *2*, *9*
184:*1*, *2*  189:*7*
**date**  8:*7*
49:*20*  103:*8*,
*18*  172:*4*
177:*13*  179:*1*
**dates**  173:*8*
**DAWN**  3:*17*
**day**  42:*13*
59:*11*  109:*11*
126:*12*  149:*19*
204:*15*
**days**  123:*16*,
*16*, *17*  167:*10*
**deal**  130:*11*,
*20*  189:*9*
**dealing**  115:*11*
123:*18*  127:*21*
**dealt**  68:*20*
**death**  123:*13*,
*16*  161:*11*
**debatable**
96:*8*, *13*  193:*6*
**debate**  33:*9*
86:*12*  94:*7*
117:*15*  150:*14*
184:*10*
**debating**  15:*5*
**December**
86:*5*, *5*  88:*20*
90:*18*  149:*24*
191:*20*  192:*8*
**decided**  64:*18*
65:*2*  78:*19*, *21*
152:*8*

**decision**  55:*10*
74:*10*  152:*13*
153:*4*
**decisions**  15:*7*
62:*18*  147:*23*
**DECLARATIO
N**  204:*1*
**declare**  204:*4*
**deem**  100:*10*,
*15*
**deemed**  101:*10*
**deems**  101:*2*
113:*5*
**deep**  23:*6*
**Defendant**
1:*13*  9:*2*
55:*24*
**defendants**
16:*5*
**define**  127:*16*
**definite**
168:*12*  171:*3*
**definitely**  21:*1*
38:*2*  138:*17*
168:*3*
**definition**
67:*21*  118:*2*
135:*8*  155:*19*
**definitively**
168:*3*  169:*5*
**degree**  26:*1*
161:*3*, *5*, *6*
**deliberation**
82:*22*
**deliberations**
116:*23*
**deliver**  92:*4*
110:*20*
**demonstrating**
160:*15*
**Demonstration**
94:*21*
**Denise**  1:*22*
2:*19*  9:*4*
205:*3*, *21*
**dense**  187:*4*
**deny**  153:*18*
**DePAZ**  4:*6*
**depending**
53:*22*  76:*2*

138:*6*
**deponent**  8:*13*
**DEPOSITION**
1:*15*  2:*10*  6:*7*
7:*1*, *17*  8:*9*, *15*
16:*7*  18:*18*, *23*
54:*11*  165:*3*
182:*14*  197:*24*
198:*13*  202:*20*
204:*6*, *10*
205:*6*, *9*, *12*
**deps@golkow.c
om**  1:*24*
**deputy**  37:*6*
**derived**  156:*4*
**describe**  10:*13*
23:*1*
**described**
25:*15*
**describing**
25:*14*  162:*14*
**description**
162:*2*
**designed**  70:*9*
149:*21*
**desire**  61:*9*
**despite**  62:*13*
73:*5*
**detail**  74:*6*
110:*15*  164:*8*
197:*5*
**determination**
125:*1*
**determine**
12:*1*  91:*6*, *22*
126:*1*  142:*17*
183:*18*
**determined**
25:*8*  143:*1*
**develop**  20:*11*
**developed**
54:*24*  73:*16*
114:*18*
**development**
11:*12*, *17*  19:*4*,
*8*
**deviation**
189:*13*
**device**  16:*12*
**devil's**  121:*6*

**dialogue**  73:*2*,
*10*  85:*10*
87:*12*  109:*6*
150:*4*
**DIANA**  4:*17*
28:*14*, *18*
**Diana.Sterk@a
rnoldporter.co
m**  4:*21*
**died**  152:*9*
**Diego**  3:*8*
**dies**  152:*17*
**differ**  67:*24*
193:*18*
**differed**  110:*18*
**difference**
60:*5*  61:*9*, *10*,
*16*  78:*19*  92:*4*
117:*3*  145:*13*,
*23*  168:*9*
**Differences**
6:*10*  89:*17*
93:*6*  115:*4*
127:*9*  143:*4*
**different**  19:*4*
43:*19*, *19*
50:*20*  53:*23*
59:*15*  73:*13*
91:*18*  101:*19*
109:*2*  115:*1*
119:*23*  121:*20*
123:*24*  130:*14*
135:*9*, *13*
143:*2*  144:*2*
156:*8*, *23*
160:*10*  162:*1*
182:*23*  184:*2*
190:*6*
**difficult**  71:*1*
149:*18*  153:*4*
158:*20*
**digression**
191:*22*
**direct**  37:*24*
49:*6*
**direction**  205:*8*
**directly**  37:*11*
38:*3*  205:*17*
**director**  37:*7*

**disagree**  35:*5*,
*10*, *11*, *13*, *16*,
*23*  64:*22*  66:*5*
**disciplines**
37:*17*  38:*1*
**disclaimer**
51:*2*
**discrete**  90:*12*
**discretion**  88:*7*
**discuss**  12:*11*
16:*5*  49:*23*
63:*21*  74:*9*
120:*8*  124:*19*
197:*4*
**discussed**
137:*8*  183:*22*
189:*18*  200:*9*,
*21*
**discussion**
11:*20*  12:*16*
50:*9*  54:*14*
57:*12*  111:*18*,
*24*  115:*23*
123:*2*  126:*23*
127:*2*  187:*21*
**disinterested**
181:*1*
**disorder**
115:*12*
**dispute**  15:*2*
56:*4*, *6*
**distinct**  192:*10*
**distinction**
43:*10*  54:*3*
83:*20*  138:*14*
**distinctions**
53:*20*
**distribution**
10:*24*
**DISTRICT**
1:*1*, *2*  8:*12*, *12*
**ditto**  147:*9*
**divergence**
110:*22*
**diverging**
85:*16*
**division**  44:*10*
55:*3*
**Dobner**  1:*22*
2:*19*  205:*3*, *21*

Roger Williams, M.D.

**DOCETAXEL**
1:4  6:22  7:2,
6, 9, 11  13:16
22:2  42:3, 20
46:11, 24
58:11  62:2
65:3  83:14, 22
85:12, 20  88:8,
23  89:3, 15
100:8, 21
101:16, 21
102:17  104:19
106:9  110:8,
13, 16  111:15,
19  112:5
117:23  118:17,
21  127:8
128:3, 5, 9
134:22  139:8
140:8, 11
141:4  152:8
156:13  158:8
163:19  164:6
166:5  168:5
170:9  172:2,
10  175:8
177:11  192:23
194:4, 7, 18
**Doctor**  8:14
29:13  30:16,
18  56:23
69:20  72:1
75:3  76:9, 13
92:24  95:23
98:8  134:12
146:4, 9, 13, 14,
23  153:7
154:4  155:5
163:10  164:17
165:12  167:10,
17  170:14
171:24  175:6
177:5  178:23
185:3  186:23
196:4  198:13
199:5  201:1,
10
**Document**  1:7
18:3  46:19, 21
48:7  68:3, 7
90:7, 12  91:2

92:19  95:9, 19
140:4  154:13
158:3  163:6
165:9, 20
167:6  171:18
174:24  177:2,
15  178:13
184:21  186:16
196:1  198:9,
14  200:6
**documentation**
114:4  158:17
**documents**
38:18  49:5
76:18  91:15
114:2  198:16,
23
**doing**  14:23
15:20, 23  28:9
39:11  51:20
52:17  81:10,
11  82:8
108:12, 22
114:12  140:19
180:8
**dosage**  180:6
**dose**  11:7, 8
**double**  95:3
**downs**  139:2
**Dr**  9:13  45:7,
9, 15  48:16
49:2  77:7
94:6  95:13
102:7  117:6
157:24  183:15,
23  186:9
200:9  202:5
**draft**  99:2, 12,
17
**draw**  142:22
**drill**  119:15
**drowsiness**
72:6, 18, 23
73:5, 13, 17, 22
74:1
**drowsy**  72:7,
17
**Drug**  6:8, 9
10:18  11:2, 2,
3, 3  12:2, 14,
19  15:10

16:12, 16, 23
17:18, 24  18:6,
8  19:18  23:4,
11, 12  24:1, 3,
6, 11, 21  25:5,
7  26:16  27:1
29:16  30:4
32:8  33:1, 4,
13  34:12  35:6,
15, 19, 23  37:7
38:19  39:4
40:2  41:2
47:9  50:21, 22
51:8, 9  52:21
53:21  54:20,
21  55:5, 11, 12,
13, 19  57:24
58:9  59:16
62:2  67:6
68:10  69:1, 2,
7, 10  70:1
71:11  72:6, 22
74:2, 4  77:9
78:13  84:12
88:1  89:20, 23
91:4, 6, 21
93:9, 16  94:22
96:18  100:16
101:1, 2, 22
112:14  113:5
114:12, 16, 17
115:12, 13, 17
117:3  119:18
121:10, 11, 21,
22  122:24
135:16  137:1
139:4  147:21
148:8  150:6
151:18  164:2,
23  168:1
**drugmaker**
84:19
**drugs**  19:14
20:13, 23
21:10, 14, 16
47:17  51:23
73:23  74:1
75:9  101:6
106:18  135:19
139:7, 12

140:8  158:21
164:19
**drug's**  33:24
34:7  90:8
**Due**  8:17
**duly**  9:9
134:5  205:5
**Duncan**  45:7,
9, 15
**duplicate**
119:10  135:15
**duplicated**
128:17  136:6
**duplicates**
24:10
**duplicating**
60:15
**duration**
42:13  69:18
70:21  73:8
83:20  102:5,
10  106:2, 17
116:8  117:17
123:8, 12, 14
124:6  138:20
145:5, 6, 6
161:3, 5, 7, 17
166:9, 19
170:16, 20
**duties**  33:2
**duty**  35:24
168:11

**< E >**
**earlier**  39:2
62:9  86:21
103:19  128:12
**East**  131:16
**EASTERN**
1:2, 18  2:8
8:12  132:22
134:10  199:23
200:4  202:17
**easy**  103:8
196:5
**eat**  131:11, 12
132:17
**Ebewe**  6:22
14:7, 8
**economic**
29:14

**effect**  69:1
71:8  77:23
91:3  138:16
**Effected**  77:18,
21
**effective**  40:2
100:9, 10, 16
101:3  102:17
112:6  113:5
**effectiveness**
113:23  114:7
**effectiveness,**
96:13
**effects**  11:3, 3
161:17  162:3
**efficacy**  23:24
25:20  27:8
28:5  54:22
55:10  61:14
92:5  96:16
100:22  109:13
110:21  114:23,
23  115:21, 22
119:8, 19
135:10  137:2
**efforts**  63:1
82:14  83:12
105:12  108:2
**eight**  86:9
139:1, 1
**either**  13:24
16:4, 7  28:22
37:11  44:2
84:1  129:5
136:17  137:17
145:5, 19
183:3  187:16
195:7  205:16
**elaborate**
11:14  23:9
**electronically**
7:23
**elements**  74:7
**ELLIS**  5:4
**EMA**  120:15,
18, 21  141:21
142:2  143:2
175:16  176:6
180:9  182:15
195:7

Roger Williams, M.D.

**EMA-approved** 141:*13*

**EMEA** 159:*4* 183:*3*

**emphasize** 84:*4* 120:*10, 16*

**employed** 44:*16* 45:*3* 187:2

**employee** 14:*4* 143:*14* 205:*14, 15*

**employment** 21:*6*

**endeavor** 198:*15*

**ended** 107:*6* 143:*17*

**enforcement** 36:*9* 101:*16, 18*

**enforcing** 36:8

**engaged** 13:*14*

**engagement** 39:*23* 116:*19*

**enhanced** 114:*11*

**enjoy** 30:*9*

**enlarge** 155:*6*

**ensure** 8:*19* 35:*24* 116:*19*

**entered** 82:*20*

**entire** 50:*4* 123:9 204:*5*

**entirely** 114:*6*

**entirety** 136:*12*

**entitled** 50:*21*

**entries** 200:*12*

**equivalent** 108:*23* 117:*6* 135:*4* 179:*20* 182:7

**ERRATA** 203:*1* 204:*11*

**error** 22:*9*

**especially** 138:2, *3*

**ESQ** 3:*5, 6, 15, 16* 4:*5, 6, 17* 5:*5, 13*

**essence** 61:*7*

**essentially** 78:5 89:*16* 124:*4* 127:*10*

**EST** 132:*24* 134:2 202:*20*

**establish** 35:*14*

**established** 127:*19* 168:*3, 13* 169:*5* 171:*9*

**estimate** 37:*20*

**Europe** 121:*6* 142:*4* 144:*3* 172:2, *6* 175:*17* 176:*5* 183:*13*

**European** 43:*16, 18* 44:*3, 6* 143:*1, 10* 144:*11* 158:*24* 159:*6* 179:*18* 180:*1, 9, 18, 22* 182:*4, 5, 11, 14, 22*

**European-appr oved** 142:*24*

**Evaluation** 37:*7, 19*

**event** 31:*5, 10, 18* 43:*1* 46:*1* 67:*1, 24* 68:*3* 69:*19* 70:*11* 73:6 82:*15* 83:*12, 17* 91:*10* 124:*14* 137:*14, 21* 138:7 145:*4* 152:*18* 161:*4* 166:8 190:*11* 194:*11, 13*

**events** 33:*15* 66:7, *12, 14, 21* 67:8, *22, 22* 68:*11, 13* 70:22 73:7 74:*13* 122:20 123:*11, 13*

**137:**10, *24* 138:2, *9, 21* 146:*11* 148:*21* 150:*17* 156:*5, 7, 22* 157:2 162:*17* 166:*18* 170:*19, 20* 180:*17* 187:6

**eventually** 124:*21* 143:9

**everybody** 39:*11* 101:8 131:4 201:22 202:*12, 14*

**evidence** 31:2 84:*14* 89:6 105:22 108:*1* 113:22 114:7 128:7 158:*13* 167:2 168:*1* 169:*15* 192:22 193:9

**evolve** 61:*18*

**evolves** 25:*1*

**exactly** 31:*16* 107:*17* 124:*10* 155:23

**EXAMINATIO N** 6:2 9:8, *11* 134:*4, 7*

**examined** 9:9 134:5

**example** 10:*16* 11:*19, 20* 12:*11* 18:7 19:*11* 22:*4* 23:*17* 31:*14* 41:*21* 46:*18* 54:9, *18* 68:*3* 72:3, *4, 5* 89:*12* 91:*10* 106:*15* 113:*21* 114:*15* 116:2 128:*13, 15, 19* 161:9 162:*18* 179:*23* 183:*11*

**examples** 15:*1* 19:7 46:*14, 17* 50:7 53:*18* 56:*14* 64:22 115:7, *10*

**exceptions** 24:*15, 16*

**excipient** 114:*21*

**excipients** 58:*19*

**exclusivity** 19:*11* 30:9, *13*

**excretion** 10:*24*

**excuse** 29:*19, 22*

**Exhibit** 6:*8, 10, 12, 14, 16, 18, 20, 22* 7:*2, 5, 8, 11, 13, 15, 17, 19* 48:5, *8, 16* 49:*18* 50:*20* 51:2 92:*16, 16, 20* 93:5 95:*8, 10, 22* 153:*21, 23* 154:*14, 19* 155:5 162:*24* 163:*1, 7, 11* 165:*6, 10, 13* 167:*1, 4, 7, 14* 171:*13, 15, 15, 19, 23* 174:*14, 16, 16, 17, 22* 175:*1, 3, 5* 176:*24* 177:*3, 6* 178:*10, 14* 184:*18, 22* 185:*3* 186:*14, 17, 20* 187:*19* 195:*23* 196:2, *7, 18* 197:*19, 20, 23* 198:*10, 12* 199:*17* 200:*7, 10*

**EXHIBITS** 6:7 7:*1, 23* 76:*18* 154:*20, 23* 195:*15*

**exist** 91:*24*

**existed** 92:*1*

**existing** 65:*24*

**exists** 194:*11*

**exit** 97:*16, 18*

**expand** 141:*14*

**expanded** 11:*1*

**expect** 61:*22* 68:*14* 111:*10*

**expectation** 69:22 129:*4* 136:*16*

**expected** 110:*20*

**expecting** 67:*17*

**expensive** 29:*21* 30:8

**experience** 88:*15* 115:5 180:*16*

**experiences** 164:2

**expert** 9:*16* 14:*20* 15:*23* 16:2, *6, 9* 52:*19* 53:*18* 54:2 56:*20* 60:9 67:*5* 82:*3* 86:*3* 91:*1* 109:*20* 126:*20* 145:22 177:*21*

**expertise** 105:*6*

**experts** 21:22 36:5 126:*10*

**expires** 205:*24*

**explain** 52:*24* 54:*13, 19* 136:*23*

**explanation** 37:*14* 39:2 116:*6, 20*

**explicitly** 170:*16*

**explore** 37:*1* 139:9

**expose** 26:*11*

**express** 60:8

**expressed** 24:2 34:*23* 38:*17*

**extend** 92:*11* 110:7

**extended** 42:*14* 106:*17*

Roger Williams, M.D.

extensive
114:22
extent 91:24
extremely
71:1 122:20
127:10
eyes 130:6

< F >
face 95:20
fact 62:14
69:7 70:2
71:11 73:5
80:10 84:3
101:14 107:12,
24 112:7
116:16 135:3
147:7 150:12
180:3
factors 11:4
facts 160:5
failed 189:21
192:16
failing 191:10
failure 18:16
fair 21:16
64:9 112:10
fairly 20:7
114:22 140:15
falls 32:4
40:19
false 20:18
66:1 165:22
166:10, 14
188:2 189:20
190:22, 23
191:6, 8, 12
192:8, 17
familiar 22:16
49:3 85:23
139:22 155:15
163:13, 23
164:3 165:14
167:16
far 16:15
40:23 99:7
101:20 135:12
137:12
favor 52:17
fax 1:23

FDA 12:1, 7,
12 13:4, 9
21:6 22:8
27:5, 17 28:4
29:19 31:6
32:15, 18
33:23 34:6, 12,
22 35:13, 18
36:10, 14 39:3
41:16 43:21
44:10, 10, 12,
16 46:4, 10, 22
51:8 58:8, 24
59:22 61:2
64:14 65:12,
15 73:1, 19
77:10, 16 78:1,
6, 14 79:2, 8,
16 80:4, 11
81:10 82:18
84:1, 10, 16, 18,
24 85:3, 8, 19
87:5, 6, 9, 10,
17 88:3, 7, 12,
13, 19, 22 89:1,
3, 7 90:2, 6, 11
91:1, 2, 10, 12
98:18 99:6
100:8, 15, 18,
20, 20 101:2, 7,
10, 11, 15
102:2, 4, 8, 12,
16 103:21
104:5, 15, 16,
17, 21 106:24
107:4, 12, 19
108:8, 13, 21
109:3, 7, 8, 14,
20 110:5, 6, 12,
23 111:8, 19,
21 112:4, 8, 15,
21, 23 113:5, 9,
12, 14, 22
115:19, 19, 20
116:6, 17, 22
120:17, 21
121:5, 14, 23
122:1, 2, 3
124:3, 21
125:6 127:6, 8,
14, 15, 22

128:4, 15
129:5 135:8
136:17 137:5,
7, 18 138:4, 4,
11 139:6
140:4 141:21
142:22 143:9,
14, 15 144:19
147:12 149:3
153:2 156:9
158:14, 15, 18
164:24 166:11
169:9, 17, 23,
24 170:7
181:4 183:3,
18, 22 184:11
192:6 193:23
195:3, 7
FDA, 140:3
FDA-approved
84:7 141:17
142:23 181:4
FDA's 23:24
25:19 27:8
38:22 88:17
96:16 111:24
115:23 124:24
137:17 169:18
185:20 190:3
Federal 6:14,
16, 18, 20
32:17
fee 78:14, 23
feedback 80:4
feel 105:5
165:16
feeling 69:8
fees 78:16
felt 81:3
99:11 104:5
105:13 166:7,
10 169:8
field 31:19
68:13 80:1
82:19 91:1, 11
fifth 94:17, 18
figure 76:15
79:21 167:9
figuring 20:9,
11
filed 198:22

final 17:9
37:3 74:9
99:5, 9, 12, 18
124:24
find 48:15
103:11, 13
129:14 130:1
138:1 151:20
153:18
finding 23:24
24:2, 2 25:19
27:8 28:4
83:22 96:16
129:24 184:6
findings 26:3
119:18
finds 71:11
fine 29:7
48:24 76:14
131:1, 20
132:7
fingertips
79:19
finish 74:22
FIRM 3:4
5:13
first 10:5
31:9 33:22
56:19 63:8, 9
72:23 82:16
83:8 105:23
114:19 118:16
119:6 120:11
137:22 140:2
143:10 168:20
179:16 194:22
196:18 205:5
five 15:17
123:16 128:24
136:11 139:1
fix 98:13, 14
flawed 17:18
focus 108:8
127:4 129:7
focusing
116:14
folder 48:13
92:16 153:22
154:23 195:13,
15

folders 48:4
folks 46:4
Follow 164:22
followed 108:4
following 35:5
86:14 87:14,
23 108:24
118:1
follow-on
102:24 122:10
follows 9:10
118:19 134:6
follow-up
173:13
Food 6:8
23:12 50:21
51:8, 8 93:16
footnote 47:24,
24 98:21, 22
foreign 43:6,
10 142:10
145:1 175:15,
21, 22 176:7,
14 189:7
forever 146:15
152:21
forgot 134:20
forgotten
180:5
form 17:4
22:13 25:12
27:3, 23 31:12
32:2, 13 33:6
40:9, 21 42:6
43:13 53:16
57:4, 18 58:14
59:9, 24 62:4,
21 63:11
64:11 65:7
66:16 67:10
68:16 69:13
70:19 71:17
72:20 75:23
80:6, 19 81:6,
19 82:10 85:6
86:18 90:16
102:21 103:23
105:20 106:12
107:2, 21
108:17 109:23
112:18 120:6

Roger Williams, M.D.

121:16 123:5
124:12 125:4
126:18 142:20
143:12, 20
144:9, 21
145:16 146:17
148:1 149:10,
16 150:9
152:1, 16, 24
157:7, 18
159:2, 12
160:7, 20
161:20 168:15
175:24 179:12
185:21 189:24
191:2, 15
193:2 194:20
**formally** 135:8
**format** 94:3
**former** 143:14
**formerly** 44:16
**forms** 29:22
**formulated**
135:13
**formulating**
197:2
**formulation**
114:19, 20
**forth** 136:13
189:18
**forward** 30:18
59:20 91:6
**found** 31:4
82:14 83:11
111:12 116:2
132:14, 14
149:23
**four** 10:5
15:15 37:24
62:11 128:24
136:11 139:1
180:13
**fourth** 19:1
94:15
**frame** 34:17
**framework**
39:10 73:16
**French** 180:19
**frequency**
156:8, 24
162:2

**frequently**
158:20
**friend** 48:3
**friends** 46:7
**front** 49:13
103:7
**full** 96:7, 12,
15, 18 97:16,
18 98:17
**fully** 13:17
**function** 187:2
**funny** 130:13
**further** 41:6
81:15 82:20
119:21 120:8
134:6 138:18
140:6 180:17
199:1

**< G >**
**GA** 3:20
**gap** 103:20
**gee** 111:11
194:6
**general** 24:17
66:4 67:18
139:14, 16
155:15 161:21
162:16 175:13
**generally**
10:13 30:6, 9
57:12 122:15
168:10 172:1
185:2 190:15
**generated**
119:8
**generic** 19:14
20:8, 10 21:18
22:3, 10, 15, 23
24:9 30:2
32:5 103:1
108:23 122:10
128:21 135:6,
7 138:1 148:8
164:19, 23
170:4
**generics** 20:15,
19, 24 21:2, 3,
4, 17 24:4, 6
93:10 103:1

116:24 117:1
135:15 190:6
**George** 36:20,
21
**Getting** 11:7
49:14 50:8
52:6 65:9
91:17 153:2
159:14 161:3
169:7 182:7,
17
**give** 14:14
15:1 19:7
23:17 30:21
34:15 37:14
41:9 46:13
47:20 54:9
71:6 74:11
88:7 103:10
113:21 122:3
150:15 179:22
183:3 194:4
201:24
**given** 12:21
33:17 47:16
118:19 127:8
189:11 205:10
**glad** 72:14
90:21 91:15
120:8, 21
126:7 146:9
167:11 177:19
184:11 189:14
190:17 197:5
**Global** 7:5, 8
140:14 141:12,
20 177:9
178:22 180:7
182:12
**globe** 182:6
**go** 18:23
19:19 29:1
52:11, 13 56:1
70:12, 16 74:2
80:8 89:5
93:14 94:8
97:20 103:18
110:15 117:18
118:22 119:12
122:15 129:24
132:9, 17

135:12, 23
136:5 137:22
147:1 152:20
154:22, 23
155:18 156:6,
6 162:17
163:22 171:12,
14 175:9
181:15 184:18
186:20 188:19
195:9 197:16
198:1 199:13
**goal** 12:23
**goes** 34:17
48:12 162:8
185:1
**going** 13:1
17:3 19:24
23:10 30:18
33:9 34:3
37:13, 19 48:4
53:6 55:22
56:22 57:12
59:20 65:2, 9
70:7 74:18
77:15 91:6, 22
92:23 94:5
95:4 99:21
109:9 115:17
121:19, 24
122:1 129:10
130:10, 10, 14
131:23 135:22
141:23 154:3,
7 155:1, 18
162:21 164:13,
14 167:19
175:3 183:4
187:19 195:9
196:6
**GOLKOW**
1:23 8:6
**GOMEZ** 3:4,
5 6:3 8:23, 23
9:12, 14 11:15
17:5, 7 18:5
20:1 22:6, 18
23:5 25:24
26:18 27:14,
15 28:19 29:3,
9, 12 30:23

31:21 32:7, 24
33:8, 18 34:16
36:6, 18 37:15
39:19 40:16
41:13 42:18
43:15 44:4
45:13 46:12
47:13 48:2, 9,
21 49:7, 8, 15
50:9 51:12
52:11, 16, 24
53:7, 13, 24
54:15 56:11
57:7, 9 58:1
59:3, 17 60:2,
10 62:8, 23
63:4 64:4, 15
65:18 66:5, 19
67:12, 19 68:2,
23 69:23 71:5,
23 72:15 73:4
74:5, 21, 24
76:5, 12, 21
77:6, 8, 15
78:9, 17 79:20
80:13 81:1, 12,
24 82:12 83:2,
10 85:18
86:12, 22
90:22, 23 91:9
92:13, 22
95:21 97:4, 8,
17 98:1, 4, 7
100:1 103:6,
13 104:8
106:4, 19
107:8, 11
108:6 109:4
110:10 111:8
112:12 113:3,
9 115:7
116:11 121:3
122:6, 18
124:2, 16
125:6, 12
126:8, 24
129:15 130:18,
21 131:9, 17,
18, 24 132:8,
15, 16 134:11
135:23 137:8

Roger Williams, M.D.

139:*14*  140:*20*
141:*15*  143:*6,*
*15*, *16*  144:*4,*
*14*  145:*9*, *10,*
*21*  147:*16*, *17*
148:*13*  149:*11*
150:*1*, *23*
152:*11*, *19*
153:*9*, *13*, *20*
154:*3*, *15*, *19*
155:*3*, *21*
156:*11*  157:*14*
158:*6*  159:*7,*
*18*  160:*13*
161:*2*, *15*, *23*
162:*8*, *19*
163:*2*, *8*, *9*, *15,*
*22*  165:*4*, *11*
166:*1*, *20*
167:*3*, *8*, *18*
168:*6*, *23*
169:*4*  170:*22*
171:*10*, *20*, *22*
172:*11*  174:*13,*
*21*  175:*2*
176:*8*, *15*, *23*
177:*4*, *20*
178:*8*, *15*, *19,*
*20*  180:*13*
181:*12*  184:*16,*
*23*  185:*4*
186:*5*, *13*, *18*
187:*1*  188:*4*
189:*10*  190:*18,*
*19*  191:*9*, *23*
192:*12*  193:*7*
194:*22*  195:*8,*
*14*, *18*, *22*
196:*3*, *12*, *15,*
*20*, *23*  197:*5,*
*10*, *15*  198:*3*, *5,*
*11*  199:*19*
200:*8*, *17*
201:*2*, *7*, *23*
202:*10*, *13*
**Good**  9:*13*, *14*
*11*:*5*, *20*  15:*19*
16:*3*  20:*8*
26:*21*  39:*2*
41:*11*  49:*16*
60:*24*  70:*13*

72:*3*  74:*18*
76:*13*  88:*1*
90:*10*  93:*3*
99:*23*  128:*13*
132:*13*  135:*20*
146:*9*  147:*9*
148:*18*  165:*24*
170:*6*  171:*6*
182:*8*  201:*9*
202:*6*
**goodness**
129:*13*
**governed**  94:*4*
**governmental**
36:*10*
**Grand**  4:*7*
**Great**  136:*9*
199:*12*  201:*21*
**greater**  68:*1*
156:*8*, *23*
157:*5*  161:*5*
**GREENBERG**
3:*14*
**group**  17:*15,*
*17*  46:*20*
185:*8*  186:*4*
**grows**  122:*15*
**Guatemala**
202:*6*
**guess**  17:*19*
47:*4*  50:*3*
58:*20*  76:*24*
94:*19*  96:*16,*
*19*  100:*4*
121:*4*  125:*22*
136:*23*  151:*4*
153:*23*  158:*22*
164:*9*  171:*1*
172:*6*  189:*16*
**guidance**  68:*4*
98:*18*  99:*3*, *5,*
*9*, *13*, *17*
**guidances**
38:*18*  118:*24*
**guide**  139:*4*, *7,*
*11*  140:*7*
187:*21*
**guys**  97:*17*
201:*21*

**< H >**

**hair**  73:*14*
75:*8*, *20*
121:*12*  122:*15*
123:*1*  124:*6,*
*23*  125:*11*
141:*6*  145:*3*
146:*15*  151:*10,*
*12*, *18*  152:*21*
159:*24*  162:*18*
194:*4*, *5*
**half**  52:*6*
74:*19*  132:*2*, *4,*
*6*
**hand**  79:*12*
**handle**  170:*17*
**handy**  98:*11*
**happen**  82:*24*
87:*6*
**happened**
44:*21*  124:*20*
191:*19*
**happening**
85:*9*  175:*15,*
*21*
**happens**  80:*1*
**Harbor**  91:*18,*
*23*  92:*12*
**hard**  34:*15*
130:*4*  153:*18*
**HARDY**  4:*4*
**Harmonization**
38:*23*
**Hart**  5:*13*

**Hatch-Waxman**
23:*13*
**hate**  170:*3*
**hazard**  167:*24*
**head**  14:*13*
52:*6*
**headquarters**
91:*12*
**health**  121:*9*
**HEALTHCAR**
**E**  5:*3*  70:*10*
71:*20*  72:*13*
74:*15*  84:*6*
104:*4*  122:*14*
127:*11*  162:*16*
**hear**  54:*16*

**heard**  8:*20*
84:*17*  127:*17,*
*18*  140:*21*
**heart**  147:*8*
150:*14*
**held**  8:*10*
**he'll**  49:*4*
**help**  11:*6*
44:*12*, *16*, *20*
74:*15*  150:*17*
154:*7*  162:*9*
170:*8*
**helped**  45:*4*
**helping**  15:*7*
**helps**  39:*10*
**hereof**  204:*11*
**hesitant**  17:*19*
193:*24*
**hesitate**  59:*10*
188:*16*
**hesitating**
27:*5*  58:*20*
67:*12*  82:*12*
**Hey**  47:*11*
87:*12*  200:*9*
**hide**  154:*6*
**highlighted**
164:*5*  167:*20*
**highly**  107:*18*
108:*13*
**hired**  21:*22*
30:*15*
**Historically**
127:*6*
**history**  22:*8*
50:*6*
**hold**  15:*19*
**holder**  57:*2,*
*16*  73:*9*
156:*16*
**holder's**  56:*24*
57:*15*
**holding**  118:*18*
**Holy**  195:*15*
**home**  171:*12*
**honestly**  89:*24*
144:*11*
**Hongyi**  102:*7*
**Hongyi's**
183:*23*

**hope**  14:*6*
23:*14*  145:*7*
**hopefully**  40:*1*
**HOSPIRA**
4:*15*  86:*1*, *23*
87:*1*, *3*, *9*
116:*13*
**hour**  74:*19*
132:*2*, *4*, *6*, *10*
134:*15*
**hundred**  16:*23*
**hypothetical**
31:*17*  64:*20*
66:*2*, *4*  68:*18,*
*19*  69:*5*, *15*
72:*12*  73:*3*
81:*21*  82:*1*, *3*
84:*21*  85:*15*
91:*8*  107:*23*
110:*1*, *2*, *3*
111:*8*, *21*
150:*19*, *20*
152:*7*  157:*10*
160:*3*, *5*  191:*4*
**hypothetically**
30:*14*  33:*10*
68:*24*  82:*2*, *5*
108:*10*  191:*10*
**hypotheticals**
71:*7*  74:*18*
123:*19*  159:*16,*
*19*

**< I >**
**ICH**  38:*21*
**idea**  27:*7*
70:*13*  87:*5*
91:*18*  99:*23*
**identical**  30:*6*
127:*10*  179:*21*
180:*23*
**identification**
48:*8*  92:*20*
95:*10*  154:*14*
163:*7*  165:*10*
167:*7*  171:*19*
175:*1*  177:*3*
178:*14*  184:*22*
186:*17*  196:*2*
198:*10*  200:*7*
**identified**  43:*5*

Roger Williams, M.D.

**identify** 8:*21*
54:*6* 94:*11*
**ignorant** 147:*5*
**imagine** 29:*4*
68:*18* 71:*2*
157:*10*
**immediately**
78:*4*
**impact** 88:*18*
112:*1*
**impacted** 11:*4*
**imperative**
60:*7, 22* 61:*1*
**imperative,**
61:*5*
**impetus**
119:*10*
**implement**
129:*6* 136:*18*
**implemented**
79:*4, 10*
**implementing**
78:*5*
**implies** 20:*18*
**important**
63:*15, 20* 90:*3*
99:*11* 120:*14*
122:*24* 124:*22*
125:*2* 126:*13*
151:*22* 152:*3,*
*4, 10*
**impose** 124:*5*
**improved**
104:*6*
**inaccurate**
66:*1* 166:*14*
188:*2* 189:*20*
190:*22, 23*
191:*12* 192:*17*
**inadequate**
56:*18*
**Inc.** 9:*18*
15:*13*
**inch** 159:*23*
**include** 11:*1*
19:*13* 67:*22*
121:*22* 156:*3*
158:*23* 167:*23*
175:*16, 17*
**included**
19:*13* 99:*8*

138:*18* 142:*3*
156:*9, 24*
157:*5* 162:*5*
**including**
82:*21* 83:*14*
111:*15* 137:*24*
138:*13* 139:*4*
151:*8* 200:*12*
**Incorporated**
8:*11*
**incorrect** 94:*13*
**independent**
30:*19, 24* 31:*8,*
*22* 33:*3, 14*
42:*2* 63:*7*
64:*18* 114:*12*
137:*9* 156:*15*
**independently**
48:*18, 21, 23*
49:*10* 81:*14*
85:*1* 87:*11*
**indicate** 77:*22*
166:*11* 170:*20*
**indicated**
41:*20* 105:*10*
204:*10*
**indicates**
185:*13*
**indicating**
88:*13*
**indication**
105:*1* 118:*8*
**indications**
15:*4, 10* 63:*16,*
*17* 104:*3*
**indirectly**
205:*17*
**individual**
16:*10*
**individuals**
39:*22*
**industry** 119:*1*
134:*23, 24*
135:*14, 17*
139:*19*
**inform** 189:*21*
191:*11*
**Information**
7:*2* 10:*19*
12:*20* 34:*18*
39:*12, 15* 40:*7*

41:*12, 18* 45:*4*
61:*20* 62:*1*
65:*23* 73:*21*
74:*14* 76:*4*
77:*13* 87:*21*
109:*2* 111:*2, 2,*
*4, 6, 9* 112:*3*
117:*11* 119:*8,*
*22* 121:*11*
122:*3, 11*
123:*22* 126:*2,*
*15, 22* 141:*4*
144:*6* 148:*16*
150:*3, 5, 21*
151:*17, 19, 23*
152:*8* 153:*6, 7*
155:*20* 156:*1,*
*2, 17* 166:*8*
170:*12* 172:*20*
173:*6, 17, 24*
175:*11* 180:*11,*
*15* 181:*1, 23*
182:*10, 17, 20*
183:*7, 17*
185:*22, 23*
187:*4, 11, 24*
189:*17* 191:*6*
192:*19, 20, 22*
193:*16* 194:*15*
**informative**
149:*24*
**informed**
122:*12* 125:*19*
150:*22* 153:*16*
**informing**
88:*17* 150:*4*
**initial** 46:*24*
169:*18*
**initially** 51:*4*
62:*14*
**injection**
110:*9, 17*
170:*10*
**injury** 16:*11*
18:*11, 16, 20*
**inserted** 89:*13*
**inspection**
205:*11*
**instance** 57:*20*
66:*3*
**institute** 80:*2*

**instructions**
84:*5*
**instructs**
146:*12*
**intend** 199:*8*
**intended** 40:*5*
**intent** 24:*7*
26:*8* 52:*18*
**interaction**
11:*2*

**interchangeable**
21:*3, 4*
**interest** 127:*7*
**interested**
104:*18* 205:*16*
**interesting**
54:*15* 73:*17*
111:*11* 115:*14*
116:*2* 179:*22*
**interests** 147:*8*
**internal**
104:*22* 116:*23*
120:*2*
**International**
38:*22*
**internist** 75:*15,*
*16*
**interrupt**
28:*13* 49:*2*
**interruption**
157:*24*
**interval** 102:*23*
**involved** 13:*21*
14:*1* 16:*1*
46:*10* 104:*16,*
*18*
**involvement**
75:*7, 18*
**involving**
18:*11* 56:*20*
119:*17*
**irrespective**
75:*10*
**issue** 29:*8*
54:*20* 63:*14*
67:*16* 100:*20*
115:*19* 120:*20*
123:*7* 125:*9*
128:*11* 143:*8*
153:*2* 158:*19*

**issued** 91:*2*
99:*6* 102:*14*
**issues** 14:*18*
35:*2* 65:*10*
104:*16* 116:*9*
**items** 142:*17*
**its** 13:*15, 15*
31:*9, 23* 32:*10,*
*19* 35:*7* 36:*8*
42:*9, 22* 44:*6*
56:*18* 58:*11,*
*23* 63:*2, 8, 14,*
*23* 64:*9, 17, 19,*
*24* 65:*1, 15, 22,*
*24* 66:*13*
68:*10* 69:*10*
78:*21* 81:*17*
82:*13* 84:*2, 12,*
*19* 85:*1* 86:*8*
87:*3, 15, 18*
88:*20* 102:*1,*
*18, 19* 103:*9,*
*16* 106:*9*
107:*15, 16*
108:*4* 114:*11,*
*23* 117:*23*
119:*10* 121:*10*
123:*7, 22, 24*
129:*3* 134:*22*
135:*10* 136:*15*
140:*15* 143:*9*
144:*18* 145:*20*
150:*16* 156:*13*
163:*19* 164:*6*
166:*5* 168:*5*
172:*9, 20*
175:*14* 184:*8*
187:*24* 189:*6,*
*7*

**< J >**
**January** 172:*5*
**Jeez** 195:*18*
**JOHN** 3:*5*
8:*23* 97:*16*
154:*18* 195:*13*
**john@thegome**
**zfirm.com** 3:*10*
**Johnston** 48:*1*
50:*24* 51:*3, 10,*

*14*
**join** 29:*7*
**joint** 34:*9*
**jointly** 34:*21*
**JUDGE** 1:*9,*
*10*
**JULIE** 5:*5*
**julie.callsen@tu**
**ckerellis.com**
*5:9*
**July** 86:*9*
**jumping** 110:*1*
**June** 185:*11*
**jury** 23:*2*
**justification**
129:*16, 19*

**< K >**
**Kansas** 4:*8*
**KAYE** 4:*16*
**keep** 99:*21*
158:*4* 176:*4*
**key** 11:*8* 35:*3*
**kind** 14:*22*
23:*22* 28:*10*
29:*13* 30:*13*
71:*2* 75:*12*
78:*23* 109:*19*
119:*14* 131:*1*
156:*17* 159:*8*
187:*20* 193:*14*
**kinds** 23:*15*
77:*20*
**Knew** 7:*14*
105:*13, 16*
106:*7* 116:*23*
122:*13* 142:*16*
190:*8*
**know** 18:*15*
19:*6, 8* 20:*7*
23:*7* 24:*23, 23*
28:*19, 20, 21*
30:*16* 31:*15*
33:*7* 39:*1*
41:*20, 24* 43:*1*
45:*14, 16, 19,*
*21, 24* 46:*4, 5,*
*5, 6, 9, 20, 22*
47:*6, 11, 15*
52:*2, 3, 18, 18*
54:*17* 57:*19*

58:*15* 60:*19,*
*22* 63:*13* 65:*8*
66:*2* 67:*11*
76:*2, 21* 78:*15,*
*16, 22* 79:*12*
80:*12, 21, 22*
81:*20* 82:*2, 11,*
*16, 18, 19*
84:*22, 22* 85:*8,*
*17* 89:*7, 24*
90:*4, 24* 91:*17*
94:*7, 16* 99:*7*
101:*6, 20*
103:*2, 3, 12, 14*
104:*14, 21*
106:*13* 109:*9,*
*16, 17, 17*
110:*23* 113:*22*
115:*2* 116:*4,*
*11* 117:*14*
118:*5* 119:*14*
120:*4, 19*
121:*23* 122:*1,*
*17, 24* 124:*18*
125:*5, 8*
126:*13, 14*
127:*14* 128:*14,*
*20* 129:*10, 16*
130:*12, 15, 16*
135:*24* 136:*12*
139:*18, 19*
140:*23* 142:*13,*
*14* 143:*7, 21*
144:*10, 11*
146:*8, 23*
147:*20* 148:*17,*
*19* 150:*10*
152:*2* 157:*19*
158:*19* 159:*4,*
*4, 17* 162:*4*
174:*6* 175:*15,*
*20* 178:*7*
179:*13* 180:*4*
182:*16* 184:*1,*
*5* 185:*9*
188:*16* 194:*3,*
*21* 196:*12*
200:*15* 201:*13*
**knowing**
191:*23, 24*

**knowledge**
34:*18, 22*
39:*12, 17*
40:*15* 89:*10*
106:*7* 183:*5*
189:*17*
**knowledgeable**
147:*6*
**known** 114:*10*
115:*21*
**knows** 109:*18*
137:*7*

**< L >**
**Label** 7:*14*
24:*6, 21* 25:*7,*
*20, 21* 26:*4, 15,*
*17, 18, 24*
27:*10* 30:*19,*
*20* 31:*9, 24*
32:*11, 16, 19,*
*23* 33:*3, 12, 16,*
*24* 34:*7, 23*
35:*8* 36:*1*
40:*5, 15* 42:*22,*
*23* 43:*16, 19,*
*20* 44:*3, 6, 9*
45:*10* 46:*24*
55:*5* 56:*18*
58:*5, 11* 59:*6,*
*20* 60:*7* 61:*23*
62:*19* 63:*3, 8,*
*20, 22, 24* 64:*9,*
*17, 19* 65:*2, 15,*
*22, 24* 66:*13,*
*22* 68:*11*
69:*11, 17, 18*
70:*6, 10, 22*
71:*4, 10* 72:*9*
74:*10, 14*
77:*10, 17* 78:*5,*
*21* 79:*4, 11*
80:*17, 23* 81:*4,*
*9, 15, 17* 82:*20*
84:*2, 5, 7, 12*
85:*1* 86:*4, 9,*
*14* 87:*4, 15, 19,*
*24* 88:*1, 20*
89:*8, 8, 19, 20*
90:*8* 91:*5, 7,*
*20, 22* 101:*7*

102:*1, 18, 19*
103:*9, 16, 22*
104:*2, 6, 10*
105:*2, 3, 16*
106:*9* 107:*6,*
*15, 16, 17*
108:*4* 109:*1,*
*21* 111:*17*
112:*3* 114:*12,*
*24* 115:*1*
119:*10* 121:*6,*
*22* 122:*4, 19*
123:*9, 12, 15,*
*24* 124:*7*
125:*10, 16*
134:*23* 138:*22*
142:*18* 143:*18*
146:*2, 3, 12*
148:*12* 149:*2,*
*21, 23* 151:*6*
156:*17* 157:*13*
158:*14* 159:*6*
162:*5, 11*
166:*14, 18*
168:*11* 169:*11,*
*13, 19* 170:*1, 5*
171:*4* 172:*9*
173:*9, 22*
175:*8* 176:*10*
179:*19* 180:*1,*
*9, 22, 23* 181:*2,*
*2, 5* 182:*4, 5,*
*11, 15, 22, 24*
183:*19* 184:*8*
187:*24* 190:*5,*
*21, 23* 191:*6, 8,*
*12* 192:*7, 15,*
*17* 193:*24*
**label,** 70:*8*
**labeled** 100:*9,*
*11, 16* 101:*3*
102:*17* 112:*6*
113:*6*
**labeling** 12:*2,*
*12, 13, 18, 22*
13:*1* 24:*3, 10*
25:*4* 28:*9*
37:*12* 38:*3, 8*
39:*16* 41:*5*
42:*9, 10* 47:*17*
51:*23* 52:*20*

53:*10, 21, 23*
55:*19* 56:*5, 7,*
*14* 57:*14, 23*
58:*9* 59:*1*
61:*3* 65:*1*
78:*12* 83:*13,*
*19* 85:*11, 20*
87:*6, 13* 88:*9,*
*14, 22* 89:*3, 13,*
*15* 96:*17*
102:*9, 11*
105:*14* 107:*12*
114:*5, 9* 117:*2,*
*7, 23, 24*
118:*18, 19*
119:*24* 120:*15,*
*18, 22, 23, 24*
124:*5* 125:*7*
127:*7, 9, 24*
128:*6, 9, 16, 18,*
*18, 20* 135:*16*
137:*16, 17*
139:*5, 7, 11*
140:*7* 141:*3, 5,*
*13, 17* 142:*1, 4,*
*24, 24* 144:*1, 2,*
*12* 145:*1, 14*
146:*2, 8, 10*
147:*12* 153:*3*
156:*19* 165:*22*
166:*5* 167:*22*
169:*16* 170:*8*
172:*2* 173:*19*
175:*16, 16, 17,*
*21, 22* 176:*7*
183:*6* 184:*13*
188:*1* 189:*19*
190:*10, 10*
191:*19, 20*
192:*1, 3* 195:*4*
**labels** 43:*6, 10*
61:*18* 65:*13*
67:*7* 88:*4, 5*
116:*19* 142:*11*
148:*8* 158:*24*
170:*12* 176:*5,*
*14* 182:*6*
189:*8*
**language**
106:*21* 107:*4*

Roger Williams, M.D.

143:*18*  156:*12*
164:*5*
**large**  92:*10*
**larger**  63:*14*
97:*12*  185:*1*
**lasted**  160:*1*
**latest**  99:*17, 17*
**laugh**  130:*17,
20*  131:*6*
155:*13*  167:*13*
188:*15*
**LAW**  3:*4*
5:*13*  24:*7, 13,
20*  26:*8, 14, 23*
27:*19*  28:*6*
35:*15, 20*  51:*9*
53:*2*  65:*5*
**lawsuit**  143:*8*
**lawyers**  17:*15,
17*
**learn**  13:*14,
23*  72:*6*
**learns**  68:*12*
69:*6*  70:*2*
**leave**  51:*1*
130:*15*
**lectures**  47:*16,
20*
**led**  111:*23*
**left**  36:*19, 24*
37:*6*
**legal**  25:*9*
**legally**  101:*1,
15, 22*  112:*8, 9,
14*  113:*1*
**length**  42:*14*
**lesser**  161:*6*
**letter**  47:*3*
104:*23*
**LIABILITY**
1:*5*
**licensed**  45:*20*
**life**  72:*8*
**lifelong**  73:*23*
**life-threatening**
70:*23*  148:*24*
**likewise**
191:*12*
**limited**  156:*4*
**LINDSAY**  3:*6*
48:*3, 5*  92:*15*

95:*8*  153:*22*
162:*24*  165:*7*
166:*24*  171:*16*
174:*16*  176:*24*
178:*11, 15*
184:*19*  186:*14*
196:*16*  197:*12*
**line**  37:*24*
74:*22*  93:*14,
14*  94:*15, 15,
17, 19*  96:*6, 11*
192:*3*  203:*3, 5,
7, 9, 11, 13, 15,
17, 19, 21, 23*
**lines**  111:*24*
178:*6*
**list**  28:*24*
29:*4, 4*  196:*8,
8, 14*  197:*8*
199:*16*  200:*11,
13, 16*
**listed**  10:*4*
11:*11*  12:*2, 14,
19*  15:*10*
17:*22*  18:*12*
19:*2*  24:*1, 3, 6,
11, 21*  25:*5, 7*
26:*16*  27:*1*
30:*4*  33:*4, 13*
42:*11*  43:*1*
53:*21*  55:*11,
12, 13*  57:*24*
58:*9*  59:*16*
67:*14, 24*
68:*11, 13*  69:*1,
19*  73:*6*  87:*24*
89:*20, 23*  90:*8*
91:*6, 21*  94:*22*
96:*18*  101:*21*
105:*24, 24*
114:*12, 17*
115:*13*  117:*3*
119:*18*  123:*11*
135:*16*  137:*1*
138:*15, 17*
145:*4*  166:*8*
186:*23*  187:*15*
190:*11*
**listening**
182:*13*

**listing**  17:*11*
186:*21*
**literature**
54:*24*  55:*6*
145:*2*

**literature-based**
23:*17*
**LITIGATION**
1:*5, 23*  8:*6*
14:*16, 24*
15:*13, 17, 18,
20*  16:*1, 4, 17,
24*  30:*15*
52:*20*  53:*5*
56:*11*  115:*6*
201:*13*
**litigation,**
14:*20*
**litigations**
151:*9*
**little**  12:*4*
17:*19*  23:*6*
34:*15*  49:*11,
11*  52:*5*  54:*19*
58:*21*  60:*3*
65:*10*  67:*18*
76:*7*  94:*18*
95:*14*  96:*19*
130:*8*  131:*12*
141:*23*  148:*7*
149:*5, 6, 12*
150:*3*  155:*7*
168:*17*  179:*15*
187:*20*  188:*9,
12*  193:*10*
199:*14*
**LLP**  3:*14*  4:*4,
16*  5:*4*
**lodge**  17:*3*
**logic**  43:*24*
**long**  9:*23*
10:*22*  61:*6*
62:*23*  76:*8*
123:*10*  142:*6*
145:*20*  170:*22*
**longer**  188:*19*
**long-term**
145:*6*  170:*18*
**long-winded**
181:*9*

**look**  14:*3, 15*
15:*14*  17:*6*
18:*4*  19:*17*
23:*18*  27:*6*
30:*16*  42:*9, 22*
43:*6*  49:*4, 10,
19*  52:*4*  54:*5,
12*  55:*22*  56:*2*
62:*18*  76:*4*
85:*11*  86:*11,
23, 24*  87:*8*
89:*14*  90:*20*
92:*18*  93:*13*
96:*14*  104:*23,
24*  105:*12*
107:*6*  111:*11*
114:*24*  116:*12*
120:*4, 21*
126:*7*  129:*18*
131:*2*  134:*19*
140:*14*  154:*4*
156:*16*  158:*18*
168:*20*  175:*22*
176:*2, 23*
177:*15*  178:*5*
179:*16*  180:*4*
188:*11, 22*
200:*14*
**looked**  10:*4*
14:*2*  46:*18*
63:*13*  64:*23,
24*  65:*1*  84:*15*
86:*13*  87:*22*
140:*18*  143:*24*
164:*18*  174:*9*
187:*3*  188:*6*
**looking**  18:*1*
52:*14*  93:*4*
94:*14*  113:*12*
129:*15*  132:*11*
137:*17*  140:*1,
17*  141:*20, 21,
22*  163:*11*
179:*18*  180:*21,
21*  181:*11*
182:*22, 22*
**looks**  36:*16*
52:*3*  172:*1*
**lose**  75:*8*
152:*21*
**losing**  194:*5*

**loss**  73:*14*
121:*12*  122:*15*
123:*1*  124:*6,
23*  125:*11*
141:*6*  145:*3*
151:*10, 19*
160:*1*  162:*18*
194:*4*
**lost**  129:*11*
146:*15*
**lot**  12:*3*  38:*5*
74:*7*  92:*10*
105:*8*  111:*2*
188:*18*
**LOUISIANA**
1:*2*  8:*13*
**low**  161:*10*
**lunch**  130:*11,
13, 17, 23, 24*
131:*15, 22*
134:*15*
**luncheon**
133:*1*

**< M >**
**M.D**  1:*16*
2:*11*  6:*2*  7:*15,
18, 19*  9:*7*
204:*19*
**MAG**  1:*10*
**magnitude**
79:*7*
**Main**  5:*6*
**major**  24:*17*
**making**
110:*17*  124:*19*
126:*3*  151:*3*
**malpractice**
17:*15, 17*
18:*19*
**management**
32:*20*
**mandatory**
60:*3*
**manifestation**
164:*24*
**manufactured**
84:*8*  135:*14*
**manufacturer**
23:*4*  25:*3*
33:*1*  34:*9, 12,*

Roger Williams, M.D.

20, 21   35:6
39:16   40:14
50:11   68:10,
12   69:1, 10
70:2, 5   71:14
72:16   78:4
79:3, 10   88:13
89:19, 23
118:18   137:1
158:12   164:23
184:8
**manufacturers**
20:5   24:9
32:9   35:24
80:2   82:21
83:14   85:15
88:8, 17   89:9,
12, 15   110:8,
16   111:5, 10,
15, 19   112:2
116:8, 18
117:10, 12
122:3, 10
135:18   137:24
138:1, 6, 13
165:2   170:4
190:4
**manufacturing**
37:21
**March**   192:1,
8   205:24
**mark**   48:3, 5
153:22   162:24
165:6   167:4
171:15   197:11,
16, 21, 23
**marked**   7:23
48:7   92:19, 21
95:9, 11
154:12, 13, 23
163:5, 6   165:8,
9   167:6
171:17, 18
174:20, 24
177:1, 2
178:12, 13
184:20, 21
186:15, 16
195:24   196:1
198:8, 9

199:17   200:6,
10
**market**   19:19
22:24   29:17
30:10   101:9,
15   113:1
115:15
**marketed**
101:22
**marketing**
100:19   101:10
**material**
167:20   188:6
199:16
**Materials**   7:15,
19   45:22
84:14   197:1, 6
200:18
**MATT**   4:6
**matter**   8:10
16:5   23:23
24:20   26:5, 6
41:4   43:9
89:14   147:4, 7
150:12   157:12
161:22   170:10
175:13   180:3
204:6
**matters**   18:20
19:12   52:2
**MCGEE**   5:16
8:5
**McRAE**   4:5
28:17
**MD**   134:3
**mdepaz@shb.c**
**om**   4:11
**MDL**   1:4
**mean**   11:16
14:20   26:17
28:7   31:13
33:9   52:23
56:12   61:5
90:24   100:18
119:5   121:4
124:3   130:4
131:10   141:7,
8   145:12
146:24   150:2,
15, 18

**means**   35:19
78:3   88:24
94:20   113:4
119:16, 19, 21
172:12   180:6
201:9
**meant**   60:11,
14   73:11   83:4,
9   180:4
**median**   173:13
**medical**   16:12
17:15, 17
18:19   38:16
42:12   45:3
75:3   153:16
159:14
**Medicine**   8:14
38:15
**Medicines**
43:18
**MedWatch**
185:20
**meet**   11:22
**meeting**   11:23,
24   13:7, 21
14:1, 2, 6
202:5
**meetings**   12:6
13:4, 8, 9, 11,
11
**meets**   77:13
**members**
128:2
**mention**   39:18
104:2
**mentioned**
16:1   51:19
**Merit**   2:21
**MERRELL**
3:15   9:1, 1
17:2   22:12
25:11   27:2, 22
28:21   29:6
31:11   32:2, 12
33:5   40:9, 20
42:5   43:12
49:1   53:12, 15
57:3, 17   58:13
59:8, 23   62:4,
20   63:10
64:10   65:6

66:15   67:9
68:15   69:12
70:18   71:16
72:19   74:17
75:22   76:10
80:5, 18   81:6,
18   82:9   85:5
86:17   90:15
102:20   103:23
105:19   106:11
107:1, 20
108:16   109:22
112:17   120:5
121:15   123:4
124:11   125:3
126:17   130:12,
19, 22   131:5,
20   132:2, 12,
19   142:19
143:11, 19
144:8, 20
145:16   146:16
147:24   149:9,
15   150:8
151:24   152:15,
23   157:6, 17
159:1, 11
160:6, 19, 22,
23   161:19
168:14   175:23
179:12   189:23
191:1, 14
193:1   194:19
201:5, 14
202:8
**merrellc@gtlaw**
**.com**   3:22
**messed**   154:20
**met**   169:12
**metabolism**
10:24
**metaphor**
37:18   40:11
**mg**   6:22
**microbiology**
37:23
**middle**   97:7, 7
**MILAZZO**   1:9
**mind**   16:14
34:17   73:13
79:22   95:13

113:4   121:19
137:20   138:14
158:4, 10
166:13   170:23
189:19
**mine**   97:12
**minimizing**
153:4
**minor**   24:15
89:16
**minute**   52:9
103:10   129:14,
20   163:4
165:18   172:24
197:14
**minutes**   76:10,
14   199:15
**miscounting**
50:18
**misheard**
176:11
**misleading**
66:1   165:22
166:10, 15
188:2   189:20
190:22, 24
191:7, 8, 13
192:9, 17
**missed**   116:15
130:19   188:6
**misspoke**
60:11
**MO**   4:8
**modeling**   11:2
**modified**
149:23
**modifier**
139:17   149:14
151:2   166:13
**monitor**   137:9
**monitored**
117:22
**months**   73:24,
24   86:9, 14
87:3   103:16,
21, 22   104:12
160:1   173:13
187:17
**morning**   9:13,
14

**Mountain**
131:5, 8
132:21 134:9
199:22 200:3
202:16
**move** 52:8
71:7 92:15
126:22 127:3
158:1 186:9
**moved** 60:2
**moving** 95:18
127:1
**Murgo** 47:4
117:6

**< N >**
**name** 8:5
37:20 45:6
47:2
**names** 46:5,
20 198:14
**nature** 8:18
159:15
**navigate** 48:11
**NDA** 9:20, 22
10:11 16:9
36:4 55:8
100:8 173:1
**NDAs** 6:11, 13
93:7 169:2
**NE** 3:19
**necessarily**
27:10 76:1
125:10
**necessary** 40:6
**need** 12:9, 20
49:4 63:2, 6, 6
64:9, 18 72:9
73:21 78:14
81:8 111:22
123:20 146:8
168:2 169:11,
12 201:4
**needed** 10:19
**needing** 161:13
**needs** 77:16
120:22 123:8
156:18
**negative** 95:3
**neither** 20:21

**never** 45:8
63:3 74:2
81:5, 7 100:21
108:1 109:11,
12 119:7
140:4 143:15
166:7, 14
191:4
**New** 4:19
28:9 37:1
38:19 61:19
65:23 77:13
93:9 114:22
115:23 118:8
119:8 128:16
151:19 156:4
187:24 197:21
200:13
**Newly** 155:19
156:1
**nice** 141:20
184:4 202:4, 5
**nine** 15:24
**nonclinical**
28:10 29:21
37:21 38:8, 14
59:12 61:11
**nonreversible**
172:16 181:16
**non-Sandoz**
14:4
**non-Sanofi**
111:9
**NORTH** 1:10
**Notary** 2:21
205:4, 21, 22
**note** 22:1 45:2
**notes** 14:3
**notice** 2:19
7:17 32:18
158:14 197:24
198:13, 17
**noticeable**
137:16
**notify** 84:1
**notifying** 78:6
**November**
104:11
**number** 14:14
54:13 100:9

164:1 187:8
**numbers** 77:22
**numbness**
69:2, 3, 7, 17,
21, 21 70:1, 2,
15
**NY** 4:19

**< O >**
**oath** 204:13
**obesity** 11:5
**Object** 32:2
40:9 53:12
62:4 81:6
103:23 145:16
179:12
**Objection**
17:2, 3, 4
22:12 25:11
27:2, 22 31:11
32:12 33:5
40:20 42:5
43:12 53:15
57:3, 17 58:13
59:8, 23 62:20
63:10 64:10
65:6 66:15
67:9 68:15
69:12 70:18
71:16 72:19
75:22 80:5, 18
81:18 82:9
85:5 86:17
90:15 102:20
105:19 106:11
107:1, 20
108:16 109:22
112:17 120:5
121:15 123:4
124:11 125:3
126:17 142:19
143:11, 19
144:8, 20
146:16 147:24
149:9, 15
150:8 151:24
152:15, 23
157:6, 17
159:1, 11
160:6, 19, 22
161:19 168:14

175:23 189:23
191:1, 14
193:1 194:19
198:21
**objections**
199:1 200:22
**Obligation**
7:13 30:19
31:1, 6, 8, 22
32:1, 4 33:15
44:1, 5 62:17
64:13 65:16,
22 66:13 67:7
68:10 69:10
71:19, 20
72:17 137:9
138:10 156:16
168:4 173:2
184:7 187:23
**obligations**
156:13 163:19
**observation**
73:11
**observe** 174:12
**observed**
173:12 177:24
**occur** 12:16
13:11 104:5
118:8
**occurred**
13:20 63:3
66:3
**October** 86:15
103:15 192:6
**offer** 150:13
199:8 204:12
**offered** 150:11
**office** 31:19
82:19 91:12
**OH** 5:7 54:12
60:14 95:15
97:20 98:23
129:13 154:20
155:11 167:3
174:22 175:22
185:10 201:20
**Okay** 12:5
14:9 18:10, 24
19:15 20:4, 13,
22 30:14
33:19 35:4

40:17 46:22
48:19 49:7
50:19 51:1, 21
54:1, 16 56:15
78:18 86:23
92:23 93:3, 21
94:10 96:1
98:8, 9 99:24
110:23 111:16
113:9, 23
114:9 118:13
127:1 130:7
131:17 132:19
134:18 137:4
140:12 141:1
144:15 154:19
160:3 161:24
162:19 163:3
164:11 165:24
167:4 169:24
174:13, 19, 21
176:9 177:5,
22 178:19, 21
181:13 188:8
195:22 196:20
197:10 198:4,
7 199:2, 18
**old** 54:21
**once** 75:18
96:2 151:11
154:6
**oncologists**
126:1 147:20
**oncology**
10:18 126:20
**ondoing** 62:15
**ongoing** 15:3
62:15 173:12
**Oops** 93:1
**opiate** 115:11
**opinion** 19:22
59:19, 21
60:16, 18
100:15 101:12,
14 105:5
136:7, 13
141:19 150:11,
13 169:10
183:8
**opinions** 44:12,
17 136:1

159:*14*  197:*3*
199:*7, 10*
**opportunities**
37:*1, 3*
**opportunity**
37:*5*  113:*1*
**opposed**  99:*12*
150:*6*  157:*3*
160:*16*
**Orange**  101:*21*
**order**  79:*7*
99:*22*  129:*12*
165:*7*  166:*24*
171:*14*
**original**  61:*23*
**outcomes**
110:*21*
**outdated**
197:*20*
**outreach**
87:*17*  116:*15*
**outside**  139:*5*
**overall**  58:*22*
62:*23*

**overemphasized**
152:*18*
**overreach**
192:*10*
**overview**  15:*19*
**overwhelm**
151:*2*
**overwhelming**
106:*23*
**owned**  55:*8*

**< P >**
**p.m**  77:*2, 5*
132:*21, 24*
134:*2, 9, 9*
199:*22, 22*
200:*3, 3*
202:*16, 16, 20*
**paclitaxel**
114:*16*
**PAGE**  6:*2, 7*
7:*1, 16, 20*
18:*2*  50:*15*
54:*13*  98:*15*
99:*19*  113:*13*
117:*19*  118:*13*

127:*4*  129:*1,
14, 22, 24*
132:*14*  134:*16*
188:*20*  203:*3,
5, 7, 9, 11, 13,
15, 17, 19, 21,
23*
**pages**  17:*10*
50:*13, 16*
99:*21*  123:*10*
129:*11*  185:*6*
**paginate**
134:*15*
**Palatinsky**
183:*15*
**paper**  51:*15*
52:*15, 18*
54:*18*
**papers**  21:*7*
**paradigm**
40:*11, 18*
**paragraph**
50:*5*  98:*17*
**parallel**
141:*20*  142:*7,
22*
**Pardon**  157:*23*
**Parente**  14:*7, 8*
**parenteral**  7:*6,
9*
**Parr**  54:*10, 11,
14, 16*  55:*8, 16*
**parse**  68:*5*
**parsing**  102:*23*
**Part**  6:*15, 17,
19, 21*  14:*16,
19, 23*  15:*12*
16:*19, 22*
23:*10*  24:*9*
25:*19, 21*  26:*4,
17*  27:*10*  28:*3,
4, 8*  30:*5*  47:*3*
83:*19*  120:*9*
123:*11*  136:*4*
141:*24*  146:*8*
160:*12*  164:*21*
165:*22*  179:*4*
187:*6, 13, 16*
192:*11*  196:*11*
200:*19*

**particular**
26:*14, 23*
36:*24*  53:*9*
118:*11*  137:*14*
138:*6*  150:*5*
151:*17*  168:*11*
178:*6*
**particularly**
11:*7*  70:*12*
104:*1*  116:*13*
180:*18*  184:*9*
**particulars**
41:*24*
**parties**  8:*15,
20*  205:*13, 15*
**partner**  9:*22*
10:*10*
**Partners**  9:*20,
22*  16:*10*
**partnership**
32:*22*
**parts**  160:*10*
178:*7*
**party**  39:*24*
**passed**  61:*23*
**passing**  41:*16*
**patent**  19:*14*
23:*11*  29:*23*
30:*2, 9*  56:*8, 9,
10*
**path**  117:*8*
**pathophysiologi
cally**  67:*23*
**pathway**  20:*3*
23:*3, 3*  24:*4, 5*
25:*18*  27:*12*
28:*3*  52:*22*
61:*8*  164:*20*
**pathways**
25:*15*  28:*2*
**patient**  18:*20*
34:*24*  39:*21,
23*  40:*2, 6, 13*
69:*20*  71:*21,
24*  74:*16*  75:*2*
122:*11, 23*
123:*2*  124:*15*
146:*9, 13, 23*
147:*3*  149:*19*
150:*15*  151:*2*
153:*8*

**patients**
122:*12*  125:*19*
126:*4, 11, 14*
127:*12*  146:*4*
147:*3, 4, 23*
149:*13, 23*
151:*15*  153:*15*
161:*12*  170:*8*
173:*14, 14*
178:*1*  183:*6*
194:*5*
**pause**  8:*18*
**pay**  78:*14, 22*
95:*19*  111:*22*
181:*3*
**paying**  181:*4*
**PDF**  155:*7*
187:*3*
**PENALTY**
204:*1, 4*
**people**  20:*1*
22:*16*  28:*13*
46:*5, 21*  47:*7*
132:*11*  147:*6*
150:*21*  193:*17,
18, 22*  194:*5*
**percent**  16:*23*
79:*17, 20*
**percentage**
79:*8*
**perfect**  131:*19*
**perfectly**  43:*24*
**period**  90:*3*
117:*24*  118:*4,
12*  185:*9, 10*
192:*13*
**PERJURY**
204:*1, 5*
**permanence**
80:*22*  81:*15*
82:*7*
**permanent**
42:*3, 21*  45:*11*
69:*7*  70:*3, 6*
71:*15*  72:*10,
18, 23*  73:*12,
13, 16, 22, 23*
74:*1, 3*  78:*20*
80:*17*  83:*16,
23*  85:*2, 2*
102:*1*  104:*19*

105:*6, 11, 17*
106:*7, 22*
108:*11*  117:*16*
120:*3*  121:*12*
123:*1*  124:*8,
23*  125:*11*
143:*8*  144:*6,
12*  145:*13, 24*
147:*21*  148:*11,
15*  149:*7*
150:*6*  151:*2,
18*  157:*2, 15,
22*  158:*8*
159:*9, 20, 22*
160:*15*  162:*1,
6, 13*  168:*9*
171:*8*  183:*20*
184:*13*  187:*9*
189:*21*  191:*11*
192:*4, 14, 23*
194:*18*
**permanently**
71:*12*  72:*1, 7*
**permission**
112:*15*
**permitted**
47:*12*  82:*3*
**perpetuity**
58:*6, 11*
**persist**  146:*13*
**persistence**
145:*20*
**persistent**
43:*3*  65:*3*
71:*22*  106:*3*
138:*19*
**persisting**
43:*11*  181:*19,
20*  186:*22*
**person**  13:*12*
45:*2*  46:*22*
72:*7*  75:*4*
147:*11*
**personally**
46:*9*
**person's**  45:*6*
**perspective**
22:*8*
**pertinent**
184:*10*

Roger Williams, M.D.

**PFIZER** 4:*15*
**ph** 1:*23*
**pharmaceutical** 17:*12*, 21 18:*13* 39:*16*
**pharmaceutically** 135:*4*
**pharmacologic** 127:*17*, *19*
**pharmacological** 10:*10* 33:2
**pharmacologist** 10:*8*
**pharmacology** 10:*6*, *20* 11:*9* 37:22 46:*19*
**Pharmacopeia** 36:*5*, 8
**pharmacovigilance** 31:*1* 39:*4* 62:*16*, *24* 64:*7*, 8 82:*14* 108:2 123:*23* 137:*10* 173:3 175:*14* 185:8 186:*4*
**phone** 108:*21* 117:*10*
**phrase** 146:*19*
**phrased** 42:*23*
**physician** 45:*20* 70:*9*, *11*, *16* 72:*11* 147:*10* 148:*9*, *19*, *20* 149:*1*, *21*
**physicians** 147:*20* 148:*16*
**pick** 117:*9*
**picked** 108:*21*
**Piedmont** 3:*19*
**place** 117:*6* 153:*21* 162:*12*
**places** 61:*16*
**Plaintiff** 1:*10* 3:*3*
**plaintiffs** 8:*24* 16:*5* 18:*7* 151:9, *14*
**plaintiff's** 162:*12*

**platform** 49:*3*
**play** 121:*6*
**please** 8:*18*, *21* 103:*14* 158:*1* 164:*3* 165:*7* 167:*4* 171:*15* 173:20 174:*17* 176:*24* 178:*11* 185:*15* 186:*10*, *14*
**pleased** 39:*9*
**pleasure** 202:*12*
**plus** 199:*10*
**point** 26:*13*, *23* 34:*11* 43:*15* 49:*4*, *22* 52:*4* 74:*5*, *18*, *20* 100:*4* 113:*13* 117:*19* 118:*16* 127:*3* 129:*1* 134:*20* 136:*12* 139:*1* 141:2 146:*15* 184:*1* 188:*21*
**pointing** 41:*24*
**points** 43:*4* 61:*13*
**policies** 38:*17*
**policy** 38:*6*, 9
**pop** 103:*12*
**population** 110:*21*
**populations** 11:*3*
**port** 72:*24*
**PORTER** 4:*16*
**position** 104:*15* 110:*4*, 6 111:*13* 127:*23* 128:*5* 168:*8*
**posology** 180:*1*, 2
**possession** 172:*20*
**possibilities** 121:*20*
**possibility** 25:*3* 146:*4*

158:*16*
**possible** 94:*23*
**post-approval** 30:*10* 59:*7* 60:*18* 64:*19* 83:*21* 168:*21*
**post-change** 78:*6*
**postmarket** 173:*3*
**Postmarketing** 96:*8*
**potential** 154:*20* 195:*15*
**practical** 89:*14* 108:*23* 116:*24* 135:*9*
**practically** 44:*3* 108:*20*
**practice** 24:*8* 26:*5*, *6*, *22* 87:*15*, *23* 135:*18*
**practicing** 149:*1*
**practitioner** 34:*23* 39:*20*, *23* 40:*6*, *13* 42:*17* 70:*10* 74:*16* 75:*2* 162:*17*
**practitioners** 122:*11* 125:*20* 127:*11* 170:*8* 183:*6*
**PRATHER** 3:*17*
**pratherd@gtlaw.com** 3:*24*
**pre-application** 13:*3*
**precaution** 77:*12*
**precision** 71:*3*
**prefer** 21:*2* 58:*16* 107:*10*
**pre-IND** 11:*23*
**pre-meeting** 13:*20*

**preparation** 94:*12* 177:*16* 179:*5* 200:*19*
**prepared** 63:*1* 78:*15*, *24* 165:*24*
**prerequisite** 171:*3*
**prescriber** 122:*23*
**prescribing** 147:*19*, *23* 148:*9*, *16*, *18*, *20*
**prescription** 101:*6* 126:*3*
**presence** 58:*7*, *24*
**PRESENT** 5:*12* 10:2 31:*2* 57:*20*
**presenting** 182:*24*
**president** 36:*20*
**presume** 101:*9*
**pretty** 20:*8* 104:*16* 150:*12*
**previous** 162:*11* 179:*9*
**previously** 52:*20* 134:*5* 156:*2*, *9*, *24* 157:*5* 183:*22*
**Price** 23:*11*
**primary** 32:*19* 33:*23* 34:*6*, *13* 35:*17* 39:*13*
**principle** 80:*8* 92:*6* 114:*8*
**principles** 113:*16*, *18*
**printing** 205:*8*
**prior** 13:*15* 26:2 30:*15* 36:*3* 53:*3* 60:2 75:*6* 77:*10* 81:*4*, *16* 82:*8* 88:*15* 105:*16* 107:*15* 108:*12* 119:*18*

140:*17*, 22
151:*6* 191:*18*
**proactive** 87:*16* 91:*13* 116:*18*
**probably** 15:*19* 49:*4*, 6 100:*17* 104:*5*, *23* 130:*14* 135:*21* 149:*17* 154:*5*, 7 166:*17* 174:*3* 190:*15* 196:*10*
**problem** 129:*23* 158:*5* 186:*12* 201:*21*
**problematic** 19:*13*
**problems** 20:*11* 146:*13*
**process** 30:*2*, 5 46:*10* 47:*20* 50:2 51:*23* 84:*12* 120:*24* 194:*9*
**processes** 51:*17*
**produce** 19:*18*
**produced** 196:*19* 198:22
**Product** 7:*2* 13:*16* 15:*3* 22:*2*, *10*, *21* 46:*11* 53:*14* 56:*3* 58:*4*, *12*, *18* 65:*3*, *24* 83:22 92:*2*, 2 100:*19* 101:*17*, *22* 102:*17* 112:*5*, 7 115:*12*, *23* 128:22 135:*4*, 5 151:*23* 156:*14* 162:*13* 163:*20* 164:*7* 166:*5* 168:*5* 170:*10* 172:*10*, *13* 176:*5* 179:*19*
**PRODUCTS** 1:*5* 15:*24*

21:*19* 85:*12,*
*20* 89:*4*
100:*22* 104:*19*
110:*13* 118:*21*
127:8, *10*
128:5, *9*
**professional**
13:*14, 24* 45:*3*
71:*21* 72:*14*
84:*6* 122:*14*
**professionals**
104:*4*
**profile** 62:*15*
**prohibit** 47:7
**prohibited**
144:*17*
**prohibition**
144:*23*
**prolonged**
161:*10, 12*
**prolonging**
141:*11*
**prominence**
74:*12*
**prompt** 111:*18*
**promptly**
103:*4, 4*
**pronouncing**
14:*6* 15:*6*
102:7
**proposed**
102:8
**provide** 10:*5,*
*9, 14* 11:*12*
16:7 19:*2, 22*
40:*5* 67:*20*
121:*10* 150:*20*
151:*23* 153:*7,*
*8* 198:*16*
**Provided** 7:*16,*
*20* 17:*23*
35:*14, 19* 75:*3*
114:*11* 122:*10*
196:*9* 197:*6*
198:*20* 199:*6*
200:*15, 19, 22*
**providing**
144:*5* 158:*14*
**provisions**
155:*16*

**prudent**
118:*23* 119:*4,*
*7, 15, 16, 19, 20*
**Public** 2:*21*
51:*15* 205:*4,*
*21*
**publication**
49:*20* 51:*13*
**publications**
41:*5* 51:*21*
**published**
21:7 51:*16*
**pull** 76:*16, 17*
92:*17* 95:7
153:*20* 154:*4*
175:*3* 178:*10*
186:*14* 187:*19*
195:*11* 196:*21*
**pulled** 50:*19*
200:*10*
**pulling** 177:*5*
**purchased**
14:8
**purposes**
11:*24* 108:*23*
116:*24* 128:*6*
135:*10* 145:*14*
146:*1*
**Pursuant** 2:*19*
78:*21* 80:*3*
135:*19*
**pursued** 84:*10,*
*18*
**pursuing** 29:*15*
**push** 40:*23*
**put** 39:*16*
48:*4* 68:*4*
74:*13* 76:*21*
77:*23* 95:*6*
117:*5* 148:*3*
159:*8* 162:*22*
176:*19* 180:*20*
183:*5* 184:*12*
193:*24* 194:*1*
**putting** 78:*4*

**< Q >**
**qualified** 52:*19*
**qualify** 52:*24*
**quality** 37:*23*
**quarter** 132:*10*

**quasi** 122:*10*
128:*21*
**question** 12:*19*
13:*18* 27:*14*
30:*23* 33:*22*
35:*12* 46:*13,*
*15* 57:*6* 60:*24*
62:*23* 64:*2*
72:*22* 74:*23*
78:*17* 79:*1*
90:*1* 104:*18*
106:*14* 116:*3*
118:*11* 121:*1*
136:*21* 139:*14,*
*16* 145:*8*
146:*19, 21, 22*
147:*15* 148:*3,*
*7* 149:*18*
151:*4* 157:*20,*
*21* 158:*7, 9, 10*
159:*8* 162:*7*
163:*22* 164:*15*
168:*19* 174:*10*
179:*14* 181:*22*
182:*18* 189:*16*
**questionable**
94:*18*
**questions**
10:*19* 13:*10*
33:*20* 82:*4*
125:*23* 166:*1*
175:*10* 176:*10*
177:*20* 191:*18*
200:*24* 201:*6,*
*7*
**quibble** 113:7
**quibbling**
140:*9* 173:7
**quick** 29:*2*
130:*2* 198:*6*
**quickly** 17:*4*
168:*18*
**quite** 92:*9*
114:*4* 145:*8*
198:*3*
**quoted** 98:*21*

**< R >**
**ramble** 147:*14*
**rare** 138:*2*
**Rau** 182:*13*

**reach** 98:*5*
116:7, *17*
**reaction** 71:*8*
77:*12*
**read** 83:7
95:*4* 129:*21*
164:*8* 165:*17*
204:*5, 7*
**reading** 68:*2,*
*6* 171:*5*
182:*13* 205:*11*
**Ready** 198:*1*
**real** 29:*2*
123:*14*
**realize** 24:*15*
**really** 25:*8*
54:*22* 88:*4*
111:*2* 124:*18*
139:*18* 140:*10*
150:*17* 180:*3*
188:*16*
**Realtime** 2:*20*
**real-world**
81:*22* 115:*16*
**reason** 27:*4*
36:*24* 60:*18*
64:*22* 66:*4*
88:*1* 97:*10*
98:*5* 100:*23*
101:*11* 107:*24*
108:*8* 116:*6*
119:*9* 120:*17*
121:*5, 8, 13*
**reasonable**
15:7, *8* 43:*24*
89:*21* 117:*24*
118:*4, 12*
129:*3, 8, 9*
136:*15, 20, 22*
137:*13* 150:*21*
167:*2, 24*
192:*22* 193:*9,*
*18*
**reasonably**
91:*20*
**reasons** 82:*12*
100:*22* 115:*20*
193:*6*
**recall** 16:*15*
22:*4* 43:7
45:*6* 51:*20*

88:*18* 90:*19*
102:*6* 140:*19*
178:*3* 186:*19,*
*20* 188:*5*
**recalling** 104:*1*
**received**
187:*11* 196:*13,*
*24*
**Recess** 77:*3*
133:*1* 200:*1*
**Recognize**
157:*8* 171:*23*
172:*5, 8* 175:*5*
177:*8* 178:*21*
185:*2*
**recognizing**
37:*20*
**recollection**
63:*17* 173:*19*
**recommendatio**
**ns** 126:*3*
**reconvene**
131:*13*
**record** 8:*4*
29:*2* 31:*3*
55:*23* 60:*13*
77:*2, 5* 116:*12*
118:*6* 132:*23*
134:*10* 197:*16*
198:*2* 199:*13,*
*24* 200:*5*
201:*12* 202:*18*
205:*9*
**recorded** 205:*6*
**records** 14:*15*
15:*15*
**reduced** 205:*7*
**refer** 21:*10, 13*
22:*20* 155:*22*
177:*20* 185:*17*
**Reference**
12:*2, 14, 19*
15:*10* 23:*20*
24:*1, 3, 6, 11,*
*21* 25:*5, 7*
26:*16* 27:*1*
30:*4* 33:*3, 13*
53:*21* 55:*11,*
*11, 13* 57:*23*
58:*9* 59:*15*
87:*24* 89:*20,*

Roger Williams, M.D.

23  90:8  91:5,
21  96:18
103:8  114:12,
17  115:13
117:3  119:17
135:16  137:1
181:18
**referenced**
51:4  172:17
179:5  183:10
**references**
98:18
**referencing**
135:18
**referred**  20:14,
23  21:2  22:2
**referring**
128:11  135:1,
2
**reflected**
120:15
**Refresh**  154:17
**regard**  10:14
12:17  124:1, 6
137:14  156:13
163:18  164:19
166:6  169:11
170:20  171:7
179:8  192:4
**regarding**
11:17  14:11
47:8, 17  49:18
52:20  62:1
101:16  116:8
163:19  177:11
**regardless**
42:19
**regime**  152:20
**Register**  32:18
**Registered**
2:20
**Registration**
205:22
**Regulation**
6:9  26:14, 23
27:19  50:22
90:7, 11
121:21  144:17
163:14  165:15
**Regulations**
6:14, 16, 18, 20

28:7  118:24
163:11  167:17
**regulatory**
15:9  19:2, 10,
12  21:19  22:7,
15, 17  25:23
50:6  55:13
56:24  57:7
77:13  83:24
94:9  113:15,
18  116:12
129:9  136:22,
24  143:2
194:9
**reiterate**  28:1
77:24
**reject**  79:5, 9
**rejected**
109:20
**relate**  53:6
**related**  10:19
13:8  67:23
88:16, 23
**Relates**  1:7
143:7  194:24
**relationship**
146:9  168:2
171:3, 8
194:17
**relationships**
146:24
**relative**  80:10
136:3  205:14,
15
**relevant**
179:11
**reliance**  96:15,
17  196:8, 14
199:16  200:11,
16
**relied**  62:14
114:6  128:17
183:18  197:2
**rely**  12:18
28:8  91:20
99:12  120:17
137:21  139:21
142:13, 17, 23
147:12  169:18
174:7

**relying**  23:23
25:18  26:2
27:7  28:3, 4
54:18  55:9
119:17
**remained**
62:19
**remains**  36:1
**remark**  135:24
**remember**
25:15  28:1
36:20  61:7
92:2  109:10
110:4  122:18
148:19
**Remind**
178:17
**REMOTE**
1:15  2:10  3:1
4:1  5:1  8:9,
18
**remotely**  8:16,
17  205:5
**render**  161:18
**rendered**
166:14
**repeat**  30:8
136:20
**repeated**  83:4
**repeating**
29:20
**report**  23:8
32:16  33:11
38:12  41:4
43:23  47:3, 21,
24  53:18  60:9
61:16  68:20
81:21  84:14
86:3, 20  88:2
94:6  98:9
99:9, 15, 20
102:4, 6
113:13  114:15,
16  120:9
129:17  134:15
136:2, 4  152:5
157:21  177:19,
21  179:6
185:7  189:12
192:16  196:11
199:5, 6, 10

**Reported**  1:22
71:9  105:7, 11,
18  106:8
120:3  124:9
144:7  151:18
181:21  183:20
184:14  192:15
**reported,**
106:22
**Reporter**  2:20,
21  9:4  76:16
174:18, 23
205:1
**reporting**  8:18
**reports**  16:6
21:22  41:22
42:9, 11  46:1
54:3  55:6
96:7, 12, 15, 18
145:2  148:11,
15  149:7
156:5  185:17,
20, 23, 24
186:21, 22
187:16
**represent**  87:2
**representative**
38:22
**representing**
55:24
**reprinting**
188:23
**request**  16:6
44:23  68:4
198:23
**requested**
180:18  198:16
**requests**
198:14
**require**  12:12
26:8  88:5
123:19
**required**
24:12, 20  28:8
31:19  58:5, 10,
16  59:20
60:22  61:12
70:5  94:22, 23
95:2  120:12
124:4  139:6
140:3

**required,**
58:21
**requirement**
24:24  25:9
171:2  184:6
**requirements**
15:9  20:7
37:12  47:17
51:23  52:21
54:22  55:19
113:15, 18
165:1
**requires**  26:14,
24  27:20
78:11
**requiring**
88:13, 22
140:4
**Research**  37:8
**resource**  26:10
**resources**
26:10  183:14
**respect**  129:4
136:16  141:5
**respective**
205:13
**respects**  70:8
**respond**  13:10
**responding**
130:5
**response**
116:5  176:10
**responsibilities**
38:3, 6  46:6
53:10  57:1, 8,
14, 15  62:16
**responsibilities,**
96:9
**responsibility**
33:23  34:6, 13
35:7, 17  36:9
37:23  40:18
41:10, 11, 17
42:2  43:5
64:7, 17  65:14
71:14  84:1
175:14, 20
**responsible**
32:10, 15
37:11  46:23
137:2

Roger Williams, M.D.

responsive 198:23
rest 72:8
Restoration 23:12
result 141:24
resulted 89:8 183:4
results 19:9
retained 9:16
retroactively 79:5
return 39:1
reveal 156:7, 23
revealed 157:2
reversible 178:2
review 38:18 44:10 55:2 78:2, 11, 14 90:21 91:16 94:12 104:24 164:1
reviewed 13:8 21:21 55:1 82:17 179:4 186:24 187:1
Reviews 18:3 79:3 165:20
revised 167:23
rhetorical 153:19
ride 161:12
right 9:16, 21 10:6 11:7, 8 12:10 13:2, 5, 13 14:7, 9, 15 15:11, 12, 20, 21 16:8, 16, 21 18:22 22:19 23:20 28:23 29:1, 11, 23 36:3, 23 40:4 41:14 44:5, 11 45:19 47:5, 16 48:2 49:12, 16 50:2 51:13 54:9 55:15 56:17, 23 57:13 61:18

62:2, 10 63:8 65:19 66:6, 8 67:20 68:9 69:6, 24 76:6, 11, 19 78:7, 8 79:2, 15 81:2 85:24 86:6, 10, 16 87:16 92:13 93:1, 22 95:1, 5 96:6, 11, 21, 24 97:5, 21 98:1, 13 99:3, 8, 19 101:13, 17 102:12 103:17 105:15 112:4, 13 113:20 121:14 122:7 124:9, 24 125:14 128:23 130:7 131:21 132:8, 12, 16 134:19 137:19 138:8, 16, 23, 23 143:10, 10 149:8 152:12 153:16 154:15 155:1, 4 158:24 161:16 162:20 163:10, 23 165:4, 12 166:20 167:9, 14 168:24 171:20 172:14 173:5 175:9, 19 176:15 178:16 182:16 184:5, 16, 24 186:5, 13 187:10, 18 189:2, 4 192:13 194:8, 14, 15 195:8, 20 196:4, 6 198:12, 19 199:12 200:23 202:3, 13
right-hand 192:21
rise 143:8

risk 32:19 157:2, 4 160:18 161:18 189:21 191:11
risks 156:7, 23 170:9
RLD 118:19
RMR 1:22 205:3, 21
Road 3:19
Rockies 131:16
ROGER 1:16 2:10 6:2, 9 7:15, 18, 19 8:13 9:7 130:16, 22 132:4 134:3 204:19
Role 6:9 36:8 37:12 39:3, 3 45:17 50:21
room 28:14
Ross's 94:6
roughly 14:10 15:15 180:5
round 151:11
route 19:20, 20, 23
rule 47:7 144:17
rules 165:1 193:13 201:13

< S >
safe 40:2 91:18, 23 92:12 100:9, 10, 16 101:2 102:17 112:5 113:5
safer 114:20
safety 23:24 25:19 27:8 28:5 55:10 61:14 62:15 77:13 84:19 92:5 96:12, 16 100:22 109:12 110:18, 20 114:11, 22, 23 115:21, 22

119:8, 18 135:10 137:2 182:10
safety-related 78:12
sake 57:11
San 3:8
SANDOZ 1:12 3:13 6:22 7:3, 5, 8, 14 8:11 9:2, 18 13:14, 24 14:1, 8 15:13 21:22 22:2, 10 30:15 31:4 33:12 42:1, 8, 21 43:5, 22 44:2, 6, 20, 24 45:3 46:2 47:15 57:21, 22 58:4, 5, 8, 8, 10, 18, 24 59:5, 12, 19 60:12, 14, 19 61:9, 24 62:13, 24 63:18, 22 64:6, 23 65:12, 21 66:11 78:19 80:15, 23 81:23 82:5 83:5, 9, 11, 18, 22 84:3, 24 85:10 86:1, 13 87:11, 12, 14, 23 88:19 92:6 94:24 96:14 100:19, 21 101:14, 20 102:18 103:3, 9 104:2 105:3, 12, 16, 22 106:6, 20 107:6, 14, 16, 24 108:8, 10, 22 109:12, 21 110:5 111:17 114:6 116:14, 15 117:22 118:6, 20 119:7 120:12, 16 121:8, 13

123:21, 21 128:17, 21 129:3, 6 135:4 136:15, 18 137:8, 12, 16, 21 138:9 139:4, 13, 20, 20 140:11, 14 141:12, 16, 21 142:9, 23 144:17 145:3, 18, 18 146:3 157:12 158:22 162:13 163:16 164:6 166:4, 7 168:5 169:8 170:1 172:19, 21 173:1, 6, 16 174:1, 3, 12 175:8, 12, 14, 18, 20, 21 176:2, 6 177:23 179:10 180:7, 24 181:23 182:12, 19 183:1 185:24 186:3 187:12, 23 189:6 190:3, 8 191:6, 19, 24 192:20 194:16, 24 195:2
Sandoz-approved 143:24
Sandoz's 13:19 22:20 45:10 46:11, 24 64:16 65:14 100:8 102:16 103:21 105:12 112:5 118:17 120:1 134:22 141:3 156:13 163:19 172:2, 9 177:9 178:22 189:17 190:22 191:12 192:7, 15, 16
SANDOZ-TAXO-ARGUS-000 00001 7:12

SANDOZ-TAX
O-OUSLABEL
ING-00000001
7:4
SANDOZ-TAX
O-OUSLABEL
ING-00000534
6:23
SANDOZ-TAX
O-PSUR-00000
824  7:10
SANDOZ-TAX
O-PSUR-00002
069  7:7
SANOFI  4:3
31:8, 23  42:10
43:17, 21
47:15  58:5, 11
59:2, 6, 20
60:6, 12, 15
61:24  63:7, 15,
20  64:18
65:12  80:23
81:9, 16  82:8,
13, 15, 22  83:4,
9, 14  84:8
85:24  86:5, 15
87:12, 15, 18
88:19  89:7
90:18  92:1
101:24  102:6,
8, 18  103:16
104:7, 13
105:2, 16
106:9  107:15
108:3, 12, 24
109:3, 11, 18
111:3, 15
114:5  116:10
118:1, 7, 20
122:9  124:5
128:16  129:5
135:5  136:17
137:15, 21
138:13  170:2
173:9  183:3,
13  191:7
192:14  195:6
Sanofi's  30:20
57:24  59:16
60:7, 12  61:3,

14  62:14  81:4
92:7  104:24
117:23  119:11
190:21
satisfied  42:23
save  204:8
saw  31:17
32:16  47:2
63:2, 5  64:9,
17  85:9  91:10
94:6, 6  109:8
111:8  118:6
169:14
saying  33:8
51:11  54:1
60:4, 21  68:8
85:10  89:1
101:19  110:5
124:22  135:21
141:18  153:5
164:9, 17
165:3  169:3
176:2  192:5
says  23:19
32:18, 23  70:1,
11  91:3  94:20
96:12  100:7
101:7  124:7
125:10, 14, 14,
15, 15  126:16
127:5  139:2
144:12  164:22
169:3  178:6, 7
scalp  160:11,
15, 17
scenes  12:8
13:5
SCHOLER
4:16
science  92:6
scientific  65:23
scores  70:22
screen  48:17,
22  52:10  68:5
76:22, 23
92:24  95:19
96:22  97:2, 3,
5, 12, 16, 18
98:14  154:6,
18  155:2, 5
165:17

scroll  167:19
196:6
search  55:1
152:5  187:2
198:15
second  98:17,
20  179:23
188:22  193:15
SECTION  1:5
6:15, 17, 19, 21
10:20  93:15,
21  96:3, 6
124:14, 15
149:20  163:24
164:19, 21
166:3
see  14:3
22:16  23:19
27:13  29:7
33:20  35:9
38:12  41:3
42:10, 22, 24
47:21  48:10,
17, 22  50:4
55:20  63:6
64:22  66:4
67:2  76:22
85:15  87:10
88:10  89:14
90:5  93:1
95:7, 19, 22
96:21  97:10
98:19, 23  99:1
100:12  103:13
105:24  107:12,
12  109:10, 15
113:22  116:14
117:9, 11, 14,
15  130:5
135:22  138:23
145:3  153:21
154:16  155:19,
21  156:10, 17
158:3  166:22
167:3  171:12
172:12, 17, 18
174:15  176:18
177:10, 12
181:15  183:15,
24  185:10, 14

186:7  187:14
190:9  195:10
seeing  50:17
90:19  96:23
155:4  188:5
194:5, 22
seeking  78:6
seen  27:5
43:23  69:2
74:7  128:7
140:4, 13
195:5
Seitz's  142:15
sell  29:16
141:19
sensation  69:8
sense  26:22
29:19  190:5
sent  192:2
sentence  127:4
140:1
separate  12:13
19:11  33:16
41:15  82:15
183:9
September
1:17  2:7  8:7
series  187:6
serious  31:4,
14, 17  41:21
66:7, 12, 14, 18,
20, 21  70:23
82:15  83:11,
16  91:10
122:20  137:10
148:24  161:6
178:1  187:14
service  10:5
11:11  19:2
SERVICES
1:23  8:6
10:10, 14
SESSION  6:4
134:1
set  136:13
187:4  189:18
settings  97:13
seven  128:24
139:1
severe  68:14
157:16  159:10,

21  160:17
161:6, 11, 12,
18
severity  68:1
156:8, 24
157:5
share  76:23
92:23  97:2
155:1, 2
sharing  96:22
Sheet  7:5, 8
64:24  120:2,
15  140:13, 15,
18  141:4
142:5, 10
144:18  176:3,
3  177:23
178:4, 22
179:9, 17
182:10  189:7
203:1  204:11
Sheets  120:8,
11  121:2
139:3, 10, 19,
21, 23  140:5
174:3, 4, 12
177:8, 9
179:10  182:23
SHOOK  4:4
short  123:14
138:19  145:19
short-term
145:5  170:18
190:12
show  61:9, 10
91:14  114:6,
23  126:7
showed  60:5
180:12
showing  49:5
97:9  188:5
shown  97:5
shut  97:11
side  69:1
71:8  124:22
138:15  161:17
162:2  188:9, 9
signal  193:20
194:2, 6, 8
Signed  204:15

significant
167:24
signify 106:1
signing 205:12
similar 30:6
85:12 118:18
127:7 142:1
143:5 164:21
180:22 183:23
Similarities
6:12
similarity
118:20 144:5
Similarly
141:16 170:3
simple 113:23
114:4 179:14
184:12, 14
simply 41:15
42:22 59:21
105:10 110:14
182:1, 19
187:3 195:4
simulation
11:2
sincerely
188:14
sir 129:22
sit 16:21
27:18 37:18
sitting 153:13,
14
situated 170:3
situation
69:16 142:8,
22
situations
68:19
six 37:24
73:24 128:24
139:1
sixth 94:19
129:1, 1
136:11
skin 159:23
skip 50:6
174:17
skull 159:24
slight 191:22
slightly 101:19

144:1 182:23
slouched 52:5
small 187:8
smoking 11:4
SMPC 179:20
180:10 182:15
sold 101:1, 15
112:8, 9, 15
solution 92:2
solutions
110:17
somebody
108:20 109:14
115:15 137:6
someplace
67:3 153:14
soon 167:24
sooner 118:8
sorry 15:5
17:3 23:5
26:18 28:12
32:3 35:1
49:2 52:10
53:4 62:5
93:5, 12 95:16
97:17 100:18
107:9 109:12
116:1 121:19
130:18 158:2
160:22 162:8
163:2 174:18,
23 176:21
181:9 189:7
191:7
sort 12:8
41:23 60:2
62:22 68:5
107:11 110:1,
2, 23 115:2
125:17 128:19
141:19 166:16
176:4 182:17
191:17
sought 84:11
sound 86:6, 10,
16
sounds 59:4
68:6 113:23
132:13
sources 41:3
SPC 172:12

speak 38:11
44:11, 15, 19,
23 70:9 87:20
123:12 126:10
149:21
speaking 8:19
30:10 82:2
108:20 126:20
143:14 155:24
speaks 39:20,
21 90:7, 12
special 11:3, 4
specific 20:10
22:4, 22 23:18
24:24 90:2
specifically
43:16 55:23
67:4 80:21
86:11, 24
182:3 190:17
specification
166:9
specificity 68:1
specifics 56:2
specified 73:8
90:3 96:8
187:7
specify 42:13
69:18 72:10,
17 138:20
145:4 170:15
spent 45:24
spoke 62:12
199:9
sponsor 11:22
12:21, 24
23:20 41:10
50:10, 10 73:9
84:11
sponsors 32:5
spontaneous
41:4, 22 42:8
145:2 185:7,
19, 23 186:21
square 159:23
stand 140:3
189:10, 12
Standard 1:18
2:8 132:22
135:14 158:12

199:23 200:4
202:17
standards
36:9 119:1
134:23 135:1,
17
start 23:19
67:15 98:15
137:2 173:3
194:5
started 10:1
starting 58:22
starts 18:1
state 26:19
55:5 59:14
72:17 96:20
103:18 113:9,
11 117:21
136:14 141:1
161:7 183:19
stated 17:18
145:9 176:12
statement
24:17 27:6, 17
32:17 34:1, 4
35:5 36:2, 12
101:4 112:14,
20 113:24
125:16, 20
139:10 140:6
141:14 166:19
statements
43:20 102:10
119:23 120:1
169:11 170:14
184:12
STATES 1:1
8:11 44:7
65:15 100:20
101:1, 6, 23
112:16 113:2
118:16 122:5,
9 129:2 139:5
141:18 142:9
143:18 156:21
167:20 170:13
177:23 181:5
182:6 195:5
stating 112:11
113:8

statistical
105:9
Statutory 7:13
67:7
stay 29:10
111:7 112:20
staying 85:14
99:24
stenographicall
y 205:7
step 48:13
73:19 82:16
193:15
steps 82:17, 18
STERK 4:17
28:14, 18
STEVENS 3:6
92:21 95:11
97:15 154:1,
11, 17 163:1, 3
165:8 167:1, 5
171:17 174:19
177:1 178:12,
18 184:20
186:15 195:12,
17, 20, 24
196:17, 21
197:13 198:7
STEWART
1:9 8:10
stick 197:17
stipulation
27:12
stop 27:13
46:14 56:11
74:2, 20, 23
96:21 97:2
115:8 141:23
150:20 161:14
stops 34:14
story 54:14,
15 110:2
strategy 11:12,
18 19:3, 5, 10
Street 4:18
strengthen
77:11
strengthened
84:11 125:16
strong 121:21

Roger Williams, M.D.

**structure**
179:*17, 18, 24*
180:*10, 20*
**struggling**
144:*23* 146:*18*
**studied** 15:*3*
**studies** 13:*1*
26:*9* 28:*10, 11*
29:*21* 30:*8, 12*
41:*7* 53:*23*
59:*13* 60:*5, 17*
61:*8, 11, 11*
114:*23* 119:*17*
156:*5, 7, 22*
157:*1* 180:*15*
**study** 59:*13*
61:*12* 172:*16*
181:*17*
**studying** 10:*18*
**subject** 53:*7*
115:*23* 137:*5*
193:*13* 194:*12*
198:*24* 200:*21*
**submission**
19:*10* 109:*5*
**submissions**
156:*9*
**submit** 20:*12*
109:*16*
**submitted**
30:*17* 93:*15,*
*17, 18, 21* 94:*1*
96:*3* 106:*21*
107:*15* 108:*11*
109:*12* 156:*3*
185:*20*
**Subpart** 6:*15,*
*17, 19, 21*
**subsection**
93:*19, 20*
164:*10* 166:*4*
**subsequent**
89:*9*
**subsequently**
129:*17*
**substance**
114:*16*
**substantial**
73:2 113:22
114:*7* 115:*3*
**subtitles** 32:*9*

**Subutex**
115:*13, 14, 20,*
*22*
**successfully**
48:*14*
**suffered** 16:*11*
**suffering** 75:4
**sufficiently**
158:*23*
**suggest** 88:*21*
176:*13*
**suggested**
108:*3*
**suggesting**
42:*20*
**suggestion**
193:*12*
**suit** 108:*4*
**Suite** 3:*7, 19*
5:*6*
**suits** 18:*8*
**summaries**
185:*7*
**summarize**
16:*4* 23:*8*
**Summary**
172:*12* 176:*4*
179:*19* 194:*23*
**Super** 198:*5, 5*
**supervisory**
37:*11*
**supplement**
77:*19* 78:*11*
82:*7* 111:*18*
120:*24*
**supplements**
77:*21* 79:*3, 9,*
*17* 80:*3*
**support** 26:*3*
**supposed**
28:*16*
**sure** 13:*17, 22*
14:*13* 18:*21*
26:*19* 27:*16*
28:*15* 29:*3*
37:*16* 46:*12,*
*16* 47:*2* 49:*5*
52:*23* 53:*1*
64:*1, 5* 74:*21*
76:*3, 22* 106:*5*
107:*4* 113:*9*

121:*23* 122:*21*
129:*15* 135:*24*
142:*12* 145:*8,*
*11* 146:*21, 21*
147:*18* 150:*11,*
*12, 24* 153:*10*
155:*23* 162:*7,*
*10* 164:*1*
165:*16, 19*
166:*6, 9*
172:*24* 173:*18*
181:*10* 189:*15*
193:*4* 196:*15*
199:*15*
**surface** 159:*24*
**surprised** 67:*2*
**survey** 126:*1*
**surveys** 149:*22*
**swear** 9:*5*
**sworn** 8:*17*
9:*9* 134:*5*
205:*5*
**symptomaticall**
**y** 67:*23*
**symptoms**
70:*16* 72:*11*
**system** 21:*19*
22:*15, 17*
25:*23* 55:*14*
121:*21* 170:*6*

**< T >**
**Table** 6:*10, 12*
7:*13* 37:*18*
93:*4, 6* 94:*6,*
*11* 95:*8*
**take** 23:*5*
29:*22* 45:*8*
74:*17* 76:*6, 8*
82:*22* 101:*11*
104:*15* 129:*14*
130:*8, 23*
131:*15, 22*
132:*9* 184:*24*
197:*13* 199:*14*
**takeaway**
171:*1*
**taken** 101:*15*
127:*23* 128:*4*
133:*1* 204:*6*
**takes** 168:*7*

**talk** 20:*1*
47:*12* 50:*9*
53:*18, 19*
64:*21* 69:*20*
70:*11, 15*
71:*24* 72:*10,*
*24* 73:*20, 21*
76:*16* 78:*16*
88:*16* 91:*24*
92:*8* 110:*24*
130:*13* 138:*4*
168:*17*
**talked** 28:*1*
45:*8* 62:*9*
66:*6* 112:*6*
127:*14* 128:*11*
187:*22* 199:*7*
**talking** 24:*18*
26:*20* 47:*8*
67:*15* 75:*1*
84:*5* 139:*13*
140:*10* 156:*19*
165:*21* 168:*21*
169:*20, 22, 23*
172:*21* 177:*7*
193:*16*
**talks** 51:*7*
180:*1*
**TAX316**
181:*18*
**taxanes**
127:*21, 23*
**Taxol** 114:*17*
115:*1* 128:*3*
**TAXOTERE**
1:*4* 57:*24*
59:*2, 16* 60:*8*
61:*3, 15* 84:*7*
92:*3, 7* 94:*24*
104:*24* 114:*6*
119:*11, 24*
124:*1* 125:*10*
128:*18* 135:*5,*
*6, 11* 138:*1, 21*
141:*17, 22*
142:*3* 144:*2*
146:*2, 11*
148:*8, 12, 22*
149:*2* 150:*16*
157:*13, 22*
161:*9* 162:*4*

166:*18* 169:*13,*
*20* 170:*1, 5*
171:*7* 173:*9*
181:*5* 182:*4, 5*
184:*12* 190:*5,*
*10* 191:*8, 20*
192:*3* 195:*4*
**Taxotere's**
61:*23*
**telephone**
13:*12*
**tell** 14:*15*
48:*20* 71:*20*
80:*11* 118:*7*
120:*17* 121:*5*
126:*12* 187:*1*
**temporarily**
75:*8*
**temporary**
42:*3, 21* 43:*3,*
*11* 69:*2, 3*
78:*20* 106:*2*
124:*24* 147:*22*
151:*10* 157:*3,*
*16* 159:*10, 21*
160:*16* 162:*1,*
*5*
**Ten** 76:*10*
**tentatively**
53:*7*
**term** 20:*16, 17*
21:*3, 5, 8, 10,*
*13, 15* 22:*6, 17,*
*19* 23:*11*
39:*19* 42:*12*
45:*10* 50:*11*
52:*24* 58:*16*
60:*6* 70:*8*
73:*17* 88:*9*
119:*5* 127:*17*
129:*8, 9* 135:*7*
136:*20, 22*
145:*19, 20*
152:*3, 4* 160:*9*
166:*12* 170:*3*
180:*2* 183:*4*
194:*8, 9, 10*
**terminology**
23:*19* 43:*2*
58:*17* 92:*12*

136:*24* 142:*3*
**Terminus** 3:*18*
**terms** 15:*8, 20*
17:*22* 18:*10*
33:*8* 40:*17*
46:*14* 56:*11,*
*16, 17* 57:*14*
63:*5* 79:*7, 24*
104:*14* 110:*17*
112:*4* 114:*1, 9*
119:*23* 122:*22*
130:*23* 135:*8*
136:*24* 137:*23*
145:*20* 150:*4*
151:*3* 160:*18*
162:*2, 4, 14*
169:*8* 177:*16*
193:*18* 194:*12*
**testified** 9:*9*
53:*2* 56:*20*
134:*5*
**testify** 205:*5*
**testifying**
55:*16*
**testimony**
16:*7* 17:*9, 23*
21:*21* 56:*16*
142:*15* 189:*11*
199:*5, 10*
205:*9*
**testing** 26:*11,*
*12* 31:*1*
**Thank** 10:*3*
11:*10* 14:*9*
18:*24* 38:*24*
47:*5* 52:*15*
77:*8* 92:*13*
95:*5, 17* 100:*1*
130:*7* 132:*18*
134:*13, 17*
136:*9* 155:*11*
156:*10* 158:*4*
160:*24* 163:*8*
164:*11* 165:*4*
166:*1, 2, 20*
170:*24* 171:*11,*
*20* 172:*14*
174:*21* 176:*15,*
*22* 178:*19*
181:*13* 184:*16*
186:*5, 11*

187:*18* 188:*13*
198:*19* 199:*19*
201:*1, 2, 19*
202:*3, 8, 9*
**Thanks** 15:*21*
97:*21* 98:*2*
131:*19* 162:*20*
178:*15* 195:*9*
200:*23* 202:*13*
**theoretically**
44:*2*
**theory** 80:*15*
**thing** 63:*8*
90:*10, 10*
105:*23* 140:*21*
143:*3, 5* 171:*7*
182:*8*
**things** 15:*18*
55:*5* 120:*10*
**think** 12:*15*
16:*3, 13, 19*
17:*10* 18:*21*
20:*1, 19* 21:*1,*
*7* 22:*5* 24:*7*
25:*22* 26:*20*
27:*5* 30:*11*
31:*18* 33:*9*
35:*2, 17* 36:*21*
37:*17* 39:*5*
40:*24* 47:*13*
48:*3* 49:*20*
50:*19* 51:*18*
53:*17* 54:*8, 14*
56:*1, 2, 6, 10,*
*13* 57:*11* 58:*7*
60:*1, 8, 11, 12*
62:*24* 64:*6, 20*
66:*7, 10, 17*
68:*19, 21* 70:*5,*
*10* 71:*19, 19*
72:*12* 73:*8*
77:*16* 78:*8*
80:*7* 81:*23*
82:*15* 83:*3, 4,*
*8, 9* 84:*3, 13,*
*23* 85:*8, 16*
87:*14, 22* 89:*5,*
*12, 13* 91:*8*
93:*23* 94:*14,*
*17, 17* 96:*2, 7*
97:*11* 99:*16*

102:*4, 15, 23*
103:*10* 104:*21*
106:*16* 108:*19,*
*20* 109:*2, 8, 14,*
*18* 110:*24*
111:*20, 21*
112:*6, 11*
113:*8* 114:*14*
119:*7* 124:*13*
125:*9, 17*
128:*7, 13*
131:*10* 132:*3,*
*4* 134:*14*
135:*2, 20*
137:*23* 138:*4*
140:*9* 141:*10*
142:*7, 21*
143:*23* 147:*15*
148:*7, 20*
149:*1, 4*
150:*13* 152:*4*
153:*11* 155:*7*
156:*15, 18*
157:*12, 21*
158:*10, 15, 17*
159:*13, 16, 19*
160:*4* 161:*2*
165:*21* 168:*18*
169:*3, 14*
171:*5, 6, 7*
174:*8* 175:*7*
176:*1* 180:*5,*
*13* 183:*22*
184:*9* 186:*24*
187:*7, 22*
188:*13, 22*
190:*14* 192:*9*
193:*5, 11*
196:*5* 197:*8,*
*10* 198:*21*
201:*14*
**thinking** 47:*8*
53:*4* 89:*1*
104:*22* 105:*1*
130:*23* 164:*16*
**thinks** 25:*4*
**third** 15:*22*
94:*15* 96:*6*
100:*4* 189:*13,*
*18* 190:*16*

**thought** 86:*20*
90:*2* 103:*12,*
*19* 141:*19*
146:*5* 176:*9*
**three** 37:*2*
77:*20* 116:*7,*
*18* 128:*24*
136:*11* 138:*24*
160:*1* 187:*16*
**threshold**
77:*14*
**till** 132:*10*
173:*2, 4*
**tilt** 165:*17*
**Time** 1:*18*
2:*8* 8:*8* 17:*13,*
*14, 16* 20:*1*
27:*18, 20*
35:*21* 37:*3*
39:*8* 41:*8*
42:*14* 45:*24*
46:*24* 56:*19*
58:*23* 61:*19,*
*23* 63:*18* 77:*1,*
*4* 83:*8* 88:*6*
89:*21, 21* 90:*2,*
*3, 9* 103:*2, 2*
116:*9* 117:*24*
118:*4, 12*
122:*24* 123:*1*
130:*2, 5, 14*
131:*3, 6, 8, 22*
132:*20, 21, 21,*
*22* 134:*8, 9, 10*
140:*16* 146:*14*
147:*7, 22*
162:*12* 169:*19*
173:*13* 185:*9,*
*10, 24* 192:*14,*
*16* 193:*11*
194:*23* 199:*21,*
*22, 23* 200:*2, 3,*
*4* 202:*15, 16,*
*17*
**timeline** 85:*24*
**times** 25:*4*
29:*20* 33:*12*
36:*1* 53:*20*
61:*13* 65:*22*
114:*1* 128:*7*

179:*11*
**times,** 128:*10*
**timing** 124:*20*
**Title** 6:*15, 17,*
*19, 21* 185:*15*
**titled** 93:*6*
**to:** 203:*3, 5, 7,*
*9, 11, 13, 15, 17,*
*19, 21, 23*
**today** 10:*10*
11:*20* 16:*22*
27:*18* 101:*2*
107:*17* 124:*8*
188:*7* 189:*11*
199:*5*
**Today's** 8:*7*
**tool** 32:*19*
**top** 14:*13*
49:*20* 97:*1, 7*
110:*2* 134:*19*
185:*11*
**topic** 15:*22*
19:*1* 29:*14*
39:*1* 51:*16, 22*
53:*3, 9* 54:*7*
90:*12*
**topics** 10:*5*
**tossup** 125:*18*
**touch** 38:*7*
46:*8*
**toxic** 114:*20*
**track** 89:*19*
**tracked**
140:*15* 142:*4*
**tracking**
141:*13, 16*
180:*8* 182:*14*
**tracks** 160:*5*
**trained** 10:*7*
**transcript**
204:*5*
**transferred**
115:*22*
**transient**
45:*11* 157:*3*
**translate** 148:*6*
**TRAURIG**
3:*14*
**treated** 127:*24*
128:*6*
**treating** 126:*1*

Roger Williams, M.D.

treatment
75:19 118:17
134:22 147:11,
13 148:4
160:2 161:13
178:2
trial 16:7
18:23
trials 41:6
tried 11:6
84:19 99:10
103:3 148:6
Trigger 7:14
184:7
trouble 15:6
129:24
true 9:17
18:11 20:13,
15 24:12, 18,
19 31:7 33:1
35:4 36:7, 13
51:18 54:4
62:13 66:14
78:10 79:2, 6,
16, 24 81:23
93:14 126:16
138:12, 20
151:21 161:22
170:19 199:11
204:8 205:9
truth 205:6
try 34:17
64:2 76:15
95:19 97:19
99:21 110:14
158:4
trying 16:13
49:19 50:14
69:14 71:2
111:7 112:20,
23 117:5
141:10, 19
148:2 188:13
TUCKER 5:4
Tuesday 1:17
2:7
turn 98:9
99:19 100:3
118:13 128:23
134:14, 16

twice 60:13
83:4
two 15:4
23:15 25:15
28:2, 13 38:14
39:22 51:6
71:6 73:24
128:2, 23
136:11 138:24
183:5
Type 13:7, 20
156:8, 23
types 18:16
typically
11:24 12:7
139:7, 11, 17
140:7

< U >
U.S. 21:20
22:24 36:5, 7
43:20 44:2
120:12, 16
121:20 139:7,
11, 20 140:7
141:5, 16, 21
144:1 173:19
174:4, 12
175:18, 20
180:2, 23
184:13
U.S. 172:21
Uh-huh 160:24
ultimate
153:12
ultimately
32:15 46:23
77:16 78:1
unable 34:11
undergone
151:8
underlying
23:21 92:6
183:2, 9
underneath
136:7
understand
13:17 15:8
33:11 39:11
44:21 75:6
116:5 142:2

145:12, 23
147:12 170:9
185:6
understanding
13:19 22:23
24:14 31:15
55:3 75:15, 17,
17 76:1 89:1
102:3 106:14
110:16 112:1
138:18 147:1
151:5, 13
162:15 182:12
186:2 190:3
195:2 204:11
understands
137:7
understood
75:9, 13 117:1
191:5
unexpected
67:1, 8, 13, 16,
21
UNITED 1:1
8:11 44:7
65:15 100:19
101:1, 6, 23
112:15 113:2
122:5, 9 139:5
141:17 142:9
143:18 170:13
181:5 182:5
195:5
universe 92:9
unlisted 31:5,
14, 18 41:22
66:18, 20
82:14 83:12,
16 91:10
137:10, 20, 23
138:9
unnecessary
26:9, 11
unrelated
78:12
unusual 79:13
84:21 96:20
107:23 138:2
unusual, 79:16
unwarranted
84:23

Update 7:14
30:19 65:22
66:13 67:7
68:10 69:10
70:5 72:9
78:21 80:16
84:2 87:3
109:21 124:4
168:11 184:8
187:24
Updated 7:20
85:1 86:14
103:9 183:19
196:13 200:11
updating
33:24 34:7
158:13 171:4
USA 173:16
174:1 175:12
179:10 181:23
182:19
use 20:16, 17
21:9, 9, 13, 15
22:17, 20
23:13 37:18
43:2 60:6
62:1 70:6, 7
72:6 88:23
103:1 106:8
115:11 119:5
121:11 129:7
135:7 136:19
139:23 140:5
148:3 162:12,
13 166:12
170:3 174:4, 8
180:2 183:4
184:3
useful 111:24
user 68:14
78:14, 16
Users 71:9
151:23
uses 139:19
USP 37:4
USPI 179:21
usual 87:15, 23
usually 17:20
34:19, 20
utilize 26:10

utilized 139:3

< V >
valuable 126:2
value 151:20
various 23:2
vary 193:17
vasopressin
54:20, 21 55:1,
7, 12
version 19:18
29:16 172:9
197:18, 20, 21
199:16
versus 23:3
42:3 124:23
147:22 162:1
Vickery 1:22
2:20 9:4
201:19 202:1
205:3, 21
victims 151:15
victory 202:2,
2
video 8:9
VIDEOGRAPH
ER 5:16 8:3,
6 9:3 28:12,
23 29:11 52:7,
12 77:1, 4
95:12, 17 97:1,
6, 23 98:3, 14
132:20 134:8
154:5, 9
157:23 158:5
176:19, 22
186:8, 12
198:1, 4
199:21 200:2
201:3, 16, 19,
20 202:1, 11,
15

VIDEOTAPED
1:15 2:10
7:17
view 52:4
72:24 97:16,
18 123:14
169:15
vigorous 73:10

Roger Williams, M.D.

Virginia 2:11,
22 205:2, 22
virtually
106:16 151:7
virtue 128:20
164:9
vision 71:9, 10,
12, 22 72:2
vitae 17:6
volunteers
26:11

< W >
wait 48:22
52:9 89:22
129:20 172:24
waited 87:3
waiting 28:14
80:3
waived 205:12
walk 39:7
WANDA 1:9
8:10
want 29:1
38:6 40:11, 23
41:9 61:6
66:17 74:19
76:8 79:19
85:11, 16
87:12 90:20
91:14 92:8
94:7, 8 100:3
102:24 108:7
109:9, 10
110:7, 23, 24
111:14 113:7
119:2, 14
120:16, 17, 23
121:14 122:18
123:15 126:13,
14 127:4
129:7 130:9,
24 131:11
135:24 136:6,
10 138:4
139:9 147:14,
20 148:17
154:22 161:7
164:16 165:16
181:10 188:17,
21 190:16

195:16 196:22
197:4, 11
201:24
wanted 85:20
87:6 88:4
89:3 110:12
121:10 127:13
136:19 142:2,
23 180:3
wanting 165:1
wants 12:21
113:22 121:23
127:16 130:16
warn 18:16
31:9 66:13
67:7 68:11
80:17 102:1
108:11 125:2
192:14
warned 45:11
warning 70:24
77:12 80:21
81:15 82:7
84:11, 20
167:23 168:9,
12
warnings
35:14, 19
56:19 110:13
114:11 129:5
136:17
warns 65:3
Washington
13:6
watch 91:5
wax 61:6
way 10:15
16:3 23:8
25:14 30:22
32:14 34:17
36:22 42:7
43:14 59:15
60:23 65:20
72:21 85:4
90:8 93:23
95:4 96:20
101:19 105:4,
21 112:11, 24
113:8, 10
114:19 119:20
121:4 135:6,

13, 20 136:23
141:10, 12
144:24 145:9,
18 146:19
174:2 176:4
182:2, 24
189:9 191:5
202:6 205:16
ways 100:17
101:5 119:6
website 137:18
Welcome 77:7
134:12
welfare 121:9
Well 11:19
15:1 17:1
18:15 23:7
24:2, 8 26:12
28:15 35:9, 11
38:11 40:1, 8
41:7 46:18
49:9 50:4
56:13 60:19
67:17 69:14
72:12 73:20
75:6 76:3, 6
79:18 80:7, 20
83:6, 10 85:7
86:13 90:14
94:5 96:2, 14
101:4 102:22
103:15 109:24
110:14, 23
111:10 113:21
114:14 115:11,
15, 16 119:1, 6
120:17 123:13
126:9, 19
128:15 129:23
131:14 141:8
143:17 144:22
151:9 153:1,
15 159:3
160:8 163:21
164:18 167:11
168:16 169:2,
3 171:9
173:10 176:12
177:12, 22
178:5, 8 182:1
183:13 186:2

189:9 190:12,
20 191:18
194:3, 6 202:3
well-documente
d 193:21
well-served
149:2
went 89:12
170:21
we're 24:17
65:2, 9 93:4
120:21 127:20
130:13 155:18
156:18 163:10
165:21 167:19
168:21 172:6
175:3 177:5
180:21, 21
181:10, 11
West 3:7
4:18 131:16
we've 26:20
30:17 50:19
74:6, 18 82:16
95:3 127:14
137:7 188:18
189:5, 18
white 161:10
WILLIAMS
1:16 2:11
5:13 6:2, 7, 9
7:1, 15, 18, 19
8:13 9:7, 13
48:8, 16 49:2
77:7 92:20
95:10, 13
134:3 154:14
157:24 163:7
165:10 167:7
171:19 175:1
177:3 178:14
184:22 186:9,
17 196:2
198:10 200:7,
9 202:5
204:19
wisdom 34:18
39:13, 19, 20,
24 40:5, 12
74:15 75:1
122:22 124:18

147:2, 4, 10
150:4
wish 63:21
64:3 141:14
withdraw
115:20
withdrawn
100:21 115:15
witness 8:17
9:5 14:20
15:23 16:2, 9
17:5 22:14
25:13 27:4, 24
31:13 32:3, 14
33:7 40:10, 22
42:7 43:14
52:4, 9, 14
53:17 57:5, 19
58:15 59:10
60:1 62:5, 22
63:12 64:12
65:8 66:17
67:11 68:17
69:14 70:20
71:18 72:21
75:24 80:7, 20
81:7, 20 82:11
85:7 86:19
90:17 95:15,
18 102:22
103:24 105:21
106:13 107:3,
22 108:18
109:24 112:19
120:7 121:17
123:6 124:13
125:5 126:19
130:15 131:2,
7, 14, 21 132:6,
13 142:21
143:13, 21
144:10, 22
145:17 146:18
148:2 149:17
150:10 152:2,
17 153:1
157:8, 19
158:2 159:3,
13 160:8, 21,
24 161:21
168:16 176:1,

Roger Williams, M.D.

21 179:13
186:11 190:1
191:3, 16
193:3 194:21
201:18 202:9
205:4, 10, 14
**woman** 152:7
159:21
**women** 75:8,
19 121:9
151:7 160:16,
17
**wondered**
134:24
**word** 58:21
60:19 67:12,
13 70:6 71:14
103:1 119:13
144:23 162:13
**wording** 23:18
60:3 113:8
140:10 156:10
157:11 158:18
159:5 162:16
169:3
**wordings**
156:6
**words** 37:14
68:5 188:23
189:13
**work** 9:20
12:8 14:22
16:4 17:20, 24
19:8 22:8
36:3 44:9
63:1 65:14
73:20 108:9
177:16 200:20
**worked** 10:17
16:10, 16, 23
17:14, 16
18:11 20:9
36:13, 16
38:21 42:16
91:1
**working** 9:15
14:16 15:12,
16, 18 18:6, 7,
13 25:22
34:21 40:14
47:11 64:13

89:7 102:2
154:1 198:18
201:21 202:4,
6
**works** 39:15
40:1 153:2
**world** 80:2
121:24 122:2
135:15
**worst** 84:24
85:3, 8
**writing** 13:10
**written** 54:2
67:3
**wrong** 66:11
173:20 185:15
195:13, 14
**wrote** 47:21
49:17 51:7, 9,
14

**< Y >**
**Yeah** 11:16
28:17 29:6, 9
39:9 48:19
54:12 60:24
74:21 76:23
93:23 95:3
97:6, 8, 23
99:1, 1 100:2
103:24 104:12
107:14 109:8
115:9 124:22
130:4 131:18
132:3 154:9
155:11 165:19
173:7 197:7,
14 201:16
**year** 37:4
87:3
**years** 11:1
24:8 36:17
63:14 84:16
**yesterday**
196:13 197:1,
9
**yield** 184:3
**York** 4:19

**< Z >**

**zones** 130:14
**Zoom** 96:23

# **EXHIBIT W**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

**Case No. MDL 2740**

**Expert Report of David Ross, M.D., Ph.D., M.B.I.**

**CONFIDENTIAL**

## I.    INTRODUCTION

### A.    Consultation questions

1.    I have been retained by the In Re: TAXOTERE (DOCETAXEL), MDL 2740, Plaintiffs' Steering Committee to serve as an expert witness in connection with three trials currently scheduled in the multi-district litigation consolidated in the US District Court for the Eastern District of Louisiana: (i) Alice Hughes (2:17-cv-11769); (ii) Dora Sanford (2:17-cv-09417); and (iii) Wanda Stewart (2:17-cv-10817).[1]  In connection with these three trials, and more broadly with the Taxotere (docetaxel) Multi-District Litigation, I have been asked to provide opinions regarding the regulatory obligations of drug manufacturers for products approved under Section 505(b)(2) of the Food, Drug, and Cosmetic Act (FDCA), including those related to pharmacovigilance and safety reporting; whether such manufacturers have labeling obligations, particularly with respect to safety and label updates, independent of the holder of the NDA on which their approval relies; and whether the actions of the defendants herein in these three trials (Accord, Sandoz, and Hospira) met those regulatory obligations with respect to labels for their respective docetaxel products marketed in the United States.  I offer the following opinions based on my regulatory, scientific and clinical training, knowledge, and experience in reviewing and evaluating drugs, labels, and compliance with the applicable regulations.

### B.    Professional background and qualifications

2.    I am a physician whose medical career, research, and publications have centered on public health and patient safety.  I served as a medical officer at the FDA from 1996 to 2006 in various positions of increasing responsibility, as more fully outlined in my attached curriculum vitae.  My duties during this time included determining whether products regulated by the FDA that were marketed or proposed for marketing in the United States met the scientific and regulatory standards required for marketing.  They also included recommending, and in some cases, deciding on regulatory actions, including enforcement, based on such determinations.

---

[1] The opinions set forth in this report relate only to these three cases.  I reserve the right to review these consultation questions in the context of other cases at both earlier and later dates.  I also reserve the right to supplement this report should additional documents or information be made available.

**CONFIDENTIAL**

3.      I have lectured, written, and presented extensively regarding the approval of new drugs, regulatory issues related to safety and effectiveness, clinical trial design, conduct, analysis and interpretation, safety and effectiveness, and risk/ benefit analysis.  I have also testified before the U.S. Congress on these issues.

4.      I began my tenure as a medical officer at the FDA in 1996, serving as a primary medical reviewer in the Division of Anti-Infective Drug Products (DAIDP) within FDA's Center for Drug Evaluation and Research (CDER). I subsequently advanced to the position of Senior Medical Reviewer in DAIDP, and then was promoted in 2000 to Medical Team Leader in DAIDP, while continuing to hold the title of Senior Medical Reviewer. In 2004, I became Deputy Director of the Office of Drug Evaluation VI (ODE VI) in CDER. In this role, I became a member of the Senior Leadership Team within the Office of New Drugs (OND) within CDER. Following the planned decommissioning of ODE VI in 2005, I served as the Associate Director for Regulatory Science in CDER's Office of Oncology Drug Products (OODP).

5.      As a primary medical reviewer, my major duties and responsibilities focused on clinical review of Investigational New Drug Applications (INDs) and New Drug Applications (NDAs), including NDAs submitted under Section 505(b)(2) of the Food, Drug, and Cosmetic Act (FDCA), as well as INDs for drug development programs anticipated to result in submission of a 505(b)(2) NDA.  Such reviews included both the initial documents submitted to the FDA as part of a regulatory docket, and subsequent filings.  With respect to NDAs, such filings included prior approval supplemental NDAs (sNDAs) seeking approval for a new indication or other changes to the approved labeling, as well as Changes Being Effected (CBE) sNDAs, which most often concerned changes implemented by the holder of an NDA, including those submitted under Section 505(b)(2), to safety-related information in the approved label prior to formal FDA review.

6.      My responsibilities included regulation of approved, marketed drug products, primarily with respect to post-marketing surveillance of adverse events. These responsibilities included review of reports required of NDA holders, such as annual NDA reports, periodic safety update reports, initial and follow-up reports of serious and unexpected adverse events, and clinical study reports. They also included analysis of data in FDA's Adverse Event Reporting System

CONFIDENTIAL

(FAERS), which I performed on my own as well as in collaboration with pharmacoepidemiologists and other scientists in CDER.

7.     As Medical Team Leader and Senior Medical Reviewer in DAIDP, Deputy Director of ODE VI, and Associate Director for Regulatory Science in OODP, my responsibilities broadened to include secondary, and in some instances tertiary, reviews of findings, conclusions, and recommendations from primary reviewers regarding NDAs, Biologics Licensing Applications (BLAs), and supplements to such applications. I was also responsible for synthesizing findings from the primary multi-disciplinary review team into an integrated written summary of the basis for the regulatory action taken.  Both as a primary medical reviewer and a more senior review official, I was responsible for understanding and incorporating non-clinical review findings and recommendations into my reviews, including reviews in the disciplines of chemistry, manufacturing, and controls; microbiology; toxicology; clinical pharmacology; and statistics.

8.     My regulatory expertise is based on my FDA training, broad experience in applying regulatory concepts to specific submissions, including 505(b)(2) NDAs, and contributions to regulatory science.  As a primary medical reviewer, I received extensive didactic training covering the spectrum of products regulated by FDA, as well as mentorship by more experienced primary and senior reviewers. My practical training involved detailed discussions with senior FDA officials during reviews of specific products to ensure that I was applying regulatory principles correctly, as well as consultation with reviewers in other disciplines.  Such discussions frequently involved FDA staff with experience specific to a particular regulatory issue, which on multiple occasions included 505(b)(2) NDAs. My written reviews were considered by a supervisory reviewer, with unresolved differences in opinion regarding regulatory and scientific issues generally addressed through a written secondary regulatory review. This training and experience also involved participating in discussions and debates regarding applications being reviewed by other FDA staff.

9.     As a more senior review official, I became responsible for providing regulatory and scientific guidance to reviewers whom I was now supervising. As a medical team leader, I routinely gave tutorials to my review staff on a range of regulatory topics, covering topics such as the regulatory requirements for NDA approval and electronic labeling.  As a practical matter, I was now responsible for secondary review of NDAs, including 505(b)(2) NDAs; for such

situations, I was responsible for providing guidance to the primary review team on issues such as the distinctions between traditional NDAs, 505(b)(2) NDAs, and abbreviated NDAs.

10.     In addition, my tenure as Deputy Director for ODE VI provided additional experience directly relevant to 505(b)(2) NDAs, because of the complex differences between regulation of drugs and therapeutic biologics. At that time, there was no approval pathway for therapeutic biologics equivalent to either the 505(b)(2) NDA or ANDA (505(j)) pathways. However, the concept of "generic" or "follow-on" biologics had been introduced at this time, and as a senior review official in the office that handled therapeutic biologics, with experience in both drug regulation and biochemistry, I participated in discussions about the practical barriers to such pathways. As an example of the relevance of my role, I participated in analyzing why a therapeutic biologic could not be approved through a 505(b)(2) pathway.

11.     I acquired additional regulatory expertise by leading development of FDA guidance in areas such as antimicrobial resistance and medical countermeasures against diseases such as anthrax. This work involved issues closely related to regulation of 505(b)(2) NDAs, particularly use of studies not conducted by an applicant to support NDA approval. It also required presentations at FDA Advisory Committee meetings, including both closed and open sessions, to solicit advice and recommendations from outside scientific experts.

12.     My ability to execute these duties and responsibilities at a high performance standard was based on my clinical and scientific training and experience prior to and during my tenure at FDA; the extensive didactic and pragmatic training and experience during my time at FDA, as described above; progressive increases during my tenure at FDA in the complexity of regulatory submissions assigned to me; and as discussed above, experience in supervising and mentoring less experienced FDA scientists.

13.     I continue to focus on public health and patient safety as the Director of HIV, Hepatitis, and Related Conditions Programs for the United States Department of Veterans Affairs (VA), a position I have held since leaving the FDA in 2006.[2] I supervise the VA's National Human

---

[2] This report was prepared in my personal capacity and outside of my tour of duty.  It does not necessarily represent the views of the United States Government (USG) or the U.S. Department of Veterans Affairs.  In addition, because

Immunodeficiency Virus (HIV) program and its National Viral Hepatitis program, the two largest clinical programs in the U.S. for individuals living with or at risk of these disorders. My duties and responsibilities continue to involve recommendations and decisions regarding drug safety and effectiveness. They also involve close coordination and collaboration in the area of clinical pharmacy. In addition, I provide guidance on policy programs and products related to issues involving clinical public health, that is, public health matters that are relevant to clinical providers within the VA.

14. Since moving from the FDA to my current position, I have maintained my knowledge and other qualifications related to regulation of drugs, biologics, and other products under the FDA's jurisdiction. Doing so has been motivated in part by the repeated need to address such regulatory issues in my current position. I have remained current on such issues through researching and reviewing specific regulatory issues; membership in appropriate professional societies; and through work done as part of my forensic consulting practice.

15. I have been a faculty member at the George Washington University School of Medicine and Health Sciences since 2000, holding the rank of Associate Clinical Professor of Medicine since 2008. I also continue working as an active clinician; since 1998, I have served as an attending physician at the Washington D.C. Veterans Affairs Medical Center, regularly delivering primary and specialty care to Veterans enrolled in care there. I am a Diplomate of the American Board of Internal Medicine in Infectious Diseases.

16. I received a Bachelor of Science in Molecular Biophysics and Biochemistry from Yale University in 1980. I received Master of Science and Doctor of Philosophy degrees in Biochemistry from New York University in 1985 and 1988, respectively. In 1988, I received a Doctor of Medicine degree from New York University School of Medicine. I completed a categorical internal medicine residency at New York University Medical Center from 1988 to 1991, and subsequently completed an infectious disease fellowship at Yale University from 1991 to 1994, which included clinical training in both adult and pediatric infectious disease. I subsequently served on the medical staffs of Yale-New Haven Hospital and the West Haven, CT

---

the USG does not have a direct and substantial interest in this matter, my service as an expert witness in this matter is permitted under 5 CFR 2635.805.

Department of Veterans Affairs Medical Center, before joining the FDA in 1996.  In 2012, I received a Master's degree in Biomedical Informatics from Oregon Health and Sciences University.

17.     A copy of my curriculum vitae is attached as Exhibit A to this report.  It contains more information relating to my professional background and qualifications.

18.     A list of cases in which I have testified as an expert in the last four years is attached as Exhibit B.

19.     The materials I considered in reaching the opinions and conclusions set forth below are cited herein and listed in Exhibit C.  This list includes, among other things, relevant scientific literature, FDA guidance documents, and published standards. My review also included depositions and documents/exhibits provided to me, labels of docetaxel products, and the reports of expert witnesses identified in this consolidated litigation listed in Exhibit C. Finally, the report cites relevant statutes, regulations, and guidance documents relied upon.

20.     My opinions represent regulatory conclusions but not conclusions of law.

21.     I am being compensated for time spent working on this matter at a rate of $550 per hour.  My compensation is not related to the outcome of this litigation.

22.     I reserve the right to offer rebuttal testimony to any evidence or argument advanced by Defendants, to comment on any expert reports submitted by Defendants, and to supplement this report as appropriate or necessary.  Further, this report is based upon evidence that is currently available. It is my understanding that discovery is ongoing and that witnesses for Defendant Hospira have yet to be completed, including witnesses in the areas of pharmacovigilance and safety, and I reserve the right to amend my opinions and bases as further information and evidence become available.

C.     **Summary of opinions**

23.     A 505(b)(2) NDA holder's regulatory responsibilities are the same as those for a 505(b)(1) NDA holder.  Importantly, a 505(b)(2) NDA holder's regulatory responsibilities are

independent of those held by a 505(b)(1) NDA holder, regardless of the extent to which the 505(b)(2) NDA relies on one or more 505(b)(1) NDA(s) for evidence of safety and effectiveness.

24.     A 505(b)(2) NDA holder's regulatory responsibilities include, but are not limited to, post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA.  In addition, a 505(b)(2) NDA holder is responsible for ensuring that the label for its product is not false and misleading, and this obligation is not fulfilled merely by imitating the label approved as part of a 505(b)(1) application.  A 505(b)(2) NDA holder has the ability and obligation to change its product's label and propose product label changes in the same way that 505(b)(1) NDA holders do.

25.     In other words, unlike a generic drug approved under Section 505(j) of the FDCA, the label for a 505(b)(2) NDA can substantively differ from the label for an NDA relied on for initial approval.

26.     The holders of the 505(b)(2) NDAs for the docetaxel products involved in this litigation – Sandoz, Hospira, and Accord – have independent regulatory obligations for their respective docetaxel products independent of those owed by Sanofi, the manufacturer and holder of the NDA for Taxotere, the docetaxel formulation initially approved for marketing in the U.S. The responsibilities of these 505(b)(2) NDA holders include updating the labels of their respective docetaxel products if the availability of new scientific information causes the label(s) for those product(s) to become inaccurate, false or misleading.  This responsibility for the adequacy of the labeling for Sandoz, Hospira, and Accord's respective docetaxel products is governed by the same regulations as those governing Sanofi's responsibility to update the Taxotere label, but are independent of Sanofi's regulatory obligations. In other words, actions or omissions by Sanofi with regard to the Taxotere labeling do not affect the independent responsibility of Sandoz, Hospira, and Accord to ensure the adequacy of the labeling for their respective products.

27.     Specifically, the obligation to update a drug product label is triggered when there is new safety information, or analysis available to these NDA holders that provides either:

     a.   "some basis to believe there is a causal relationship" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(7)

**CONFIDENTIAL**

or

   b.   "reasonable evidence of a causal association" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(6)

28.   Each of these 505(b)(2) NDA holders – Sandoz, Hospira and Accord – knew or had reason to know that sufficient evidence existed to warrant a label change under 21 CFR 201.57(c)(6) and/or 21 CFR 201.57(c)(7) at the time their respective products were used by the plaintiffs to whom this report applies.[3]

29.   Submissions by these 505(b)(2) NDA holders – Sandoz, Hospira and Accord – to foreign regulatory authorities demonstrate they knew or had reason to know of the increased risk of permanent chemotherapy induced alopecia (PCIA)[4] and the need for inclusion of a warning, precaution, and/or adverse event listing in the label, communicating the nature, duration, and severity of the risk of PCIA.

30.   Deposition testimony provided by employees or representatives of Sandoz, Hospira and Accord demonstrate that they did not comply with their regulatory responsibilities regarding post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA during the relevant time period.

31.   Likewise, deposition testimony provided by employees or representatives of Sandoz, Hospira and Accord demonstrate that they did not comply with their regulatory responsibilities to ensure that their products' labeling in the U.S. was at all times not false and misleading.

---

[3] I have not reviewed the individual medical records of any Plaintiff in this MDL. Instead, I have been asked to assume the use of the products occurred as stated herein.

[4] There is no consistent definition of PCIA. The definitions vary in the medical literature, ranging from six months to over two years. For purposes of my report, I do not utilize a single definition of PCIA nor does my analysis require me to do so.

**CONFIDENTIAL**

## II.     METHODS

32.     In analyzing FDA regulatory issues, I take the same approach that I employed as an FDA reviewer charged with making recommendations regarding a regulatory decision.  This approach is based on documented best practices within CDER, which are formally referred to as Good Review Practices (GRPs).  GRPs, which were introduced during my tenure at the FDA, are published as sections of CDER's Manual of Policy and Procedures (MAPP), and are publicly available.[5]  As explained in MAPP 6025.1, *Good Review Practices,* GRPs "improve efficiency, clarity, and transparency of the review process and review management."[6]

33.     Unless otherwise indicated, the terms "regulation" and "regulatory" refer to the FDA, as opposed to another Executive Branch agency.  The terms "drug" and "new drug" are used as defined in the Food, Drug, and Cosmetic Act (FDCA) at 21 USC 321(g) and 21 USC 321(p); they do not necessarily refer to a product that is the subject of an NDA or BLA.  Unless otherwise indicated, the term "505(b)(2) NDA holders" refers to the three Defendants, Sandoz, Hospira and Accord.

34.     Regulatory analyses in this report generally rely on FDA guidances, the default regulatory and technical standards used by FDA reviewers.[7],[8]  Draft and Final Guidances published in the *Federal Register* under FDA's Good Guidance Practices regulation[9] reflect the FDA's current thinking at a given point of time on a particular regulatory or technical issue. Although technically not legally binding,[10] Guidances represent a safe harbor for FDCA compliance, and manufacturers who choose an approach different from that described in a relevant Guidance must

---

[5] "CDER Manual of Policies & Procedures (MAPP)," *available at* https://www.fda.gov/about-fda/center-drug-evaluation-and-research/cder-manual-policies-procedures-mapp.

[6]     CDER     MAPP     6025.1:     *Good     Review     Practices* (February     2017),     *available     at* https://www.fda.gov/media/72747/download.

[7] 21 CFR 10.115(d)(3).

[8] 21 CFR 10.115(b)(1).

[9] 21 CFR 10.115.

[10] 21 CFR 10.115(b)(2).

still comply with the FDCA.[11]  In addition, Guidances carry sufficient weight that Congress has frequently directed the FDA, through appropriate legislation, to develop Guidances on specific topics.[12]

## III.    REGULATION OF DRUG MARKETING IN THE UNITED STATES

### A.    Historical perspective

35.    Drugs are meant to help people live longer, better, or both.  In addition to potential benefits, however, all drugs have risks.  No drug is completely safe, and for some drugs (*e.g.*, agents used in cancer chemotherapy), virtually all patients receiving the drug will suffer unwanted side effects, also known as adverse events.  Thus, in assessing benefits and risks, a drug should do more good than harm.  From a regulatory perspective, whether a drug is considered "safe" is tied inextricably to the benefit provided by the drug.  Even when associated with severe toxicities, a drug may be considered "safe" if it provides a substantial clinical benefit.  Conversely, a drug that has less benefit, especially when compared to other treatments or to other drugs for the same condition, must have little if any significant toxicity to be considered safe.

36.    In addition, information about the relative balance between drug benefits and harms is critical not only for health care providers choosing between different options for patients, but also for patients themselves. It is a bedrock principle of medical ethics that patients cannot provide meaningful consent to a treatment offered to them by a provider unless they have sufficient information to exercise agency.

### B.    The Food, Drug, and Cosmetic Act

#### 1.    General provisions

37.    The United States has a sophisticated system for regulating drug development and marketing, based primarily on the Food, Drug, and Cosmetic Act of 1938, as amended (FDCA; 21 USC 301 *et seq.*) and its implementing regulations in Title 21 of the Code of Federal Regulations (CFR).  The FDCA defines a "drug" as an article recognized in two official drug compendia, the

---

[11] 21 CFR 10.115(d)(2).

[12] E.g., Food and Drug Amendments Act of 2007 § 911, 21 USC 360a.

**CONFIDENTIAL**

United States Pharmacopeia (USP) and the National Formulary (NF).  21 USC 321(g).  The United States Pharmacopeial Convention, a private non-profit organization, publishes these two references in combination annually as the USP-NF.  Outside of drugs contained in the USP and NF, the FDCA's definition of a drug also includes "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" and "non-food articles intended to affect the structure or any function of the body of man or other animals." 21 USC 321(g)(1).[13]

38.    A drug that is not generally recognized as safe and effective (GRASE) is referred to as a "new drug." 21 USC 321(p)(1). Marketing new drugs requires FDA approval, as discussed below.

39.    The FDCA is enforced by the U.S. Food and Drug Administration, an Executive Branch agency located within the U.S. Department of Health and Human Services.  The FDA's regulatory authority and responsibilities cover a broad range of medical products, including human drugs, veterinary drugs, vaccines, blood products, medical devices.  The FDA is organized into several centers, which have responsibility for individual aspects of the agency's mission.  The largest of these is the Center for Drug Evaluation and Research (CDER), which regulates human drugs.

### 2.    New Drug Applications

40.    To market a new drug in the United States, a company must obtain FDA approval of a New Drug Application (NDA)[14] containing relevant data on the chemistry, manufacturing processes, toxicology, clinical pharmacology, clinical effectiveness, and risks connected with the drug.  The data contained in an NDA are generally obtained from studies conducted under an Investigational New Drug Application (IND). The IND holder is generally referred to as a *sponsor*.

---

[13]  The FDCA also defines a drug as any article contained in the Homoeopathic Pharmacopeia of the United States, or National Formulary, or any supplement to these official compendia, or any article intended for use as a component of another article meeting these various definitions of a drug. 21 USC 321(g).

[14] These requirements also apply to biologics, which require submission of a Biologics Licensing Application (BLA) and are also regulated under Section 351 of the Public Health Service Act (42 USC 262).

41.     When submitting an NDA to market a drug in the US., a sponsor must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 USC 505(b)(1). FDA approval of an NDA requires that these "full reports" demonstrate that the drug described in the NDA is safe and effective for its proposed use. 21 USC 355(d); 21 CFR 314.125.  Failure to include such "full reports" in an NDA can result in the FDA summarily rejecting the application through a refuse-to-file action. 21 CFR 314.101(d)(3).

42.     An NDA under § 505(b)(1) must include detailed reports on the subject drug's chemistry and manufacturing; results of animal studies; results of pharmacokinetic studies in humans; and results from controlled studies in humans, along with other clinical data collected during the drug development program. To garner FDA approval, the data in the NDA must demonstrate the drug's safety and effectiveness.[15]

43.     The sponsor of an NDA has the burden of demonstrating safety.  Under 21 USC 355(d)(1), it is not enough for the sponsor to find an absence of risk; the sponsor must affirmatively demonstrate the safety of a drug.  In practical terms, this means excluding the occurrence of particular drug risks at frequencies greater than a threshold level that would impact the balance of the magnitude of a drug's benefit compared to its risks.

### 3.     Post-approval NDA regulatory obligations

44.     After NDA approval, the sponsor of the application (the NDA holder) has continuing regulatory responsibilities. For purposes of this report, the most important of these responsibilities are evaluating and reporting available safety information to the FDA and ensuring that the product's label remains accurate by incorporating new safety information regarding the drug that has become available to the NDA holder.

45.     The FDCA broadly defines new safety information as "information derived from a clinical trial, an adverse event report, a post-approval study . . .  or peer-reviewed biomedical literature; . . .  or other scientific data . . .  about a serious risk or an unexpected serious risk associated with use of the drug that the Secretary has become aware of (that may be based on a

---

[15] 21 CFR 314.50(c)

**CONFIDENTIAL**

new analysis of existing information) since the drug was approved . . ." 21 USC 355-1(b). The definition also includes FDA analyses of AE reports submitted to the FDA Adverse Event Reporting System (FAERS).

46.     An NDA holder's post-marketing regulatory responsibilities focus in large part on serious adverse events (SAEs) and unexpected AEs.  The FDA classifies an AE as serious if it results in death, a life-threatening AE, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect. However, the governing regulation at 21 CFR 314.80(a) explains that an AE can be considered serious even if it does not result in one of these outcomes.

47.     An "unexpected AE" is one that is not listed in the current labeling for the drug. The governing regulation at 21 CFR 314.80(a) explains that this definition includes AEs that are "symptomatically and pathophysiologically related" to a listed AE, but differ because of greater severity or specificity.

48.     One of an NDA holder's most important post-approval regulatory obligation concerns unexpected SAEs, i.e., those not listed in the current drug label. An NDA holder is required to report all such events to the FDA within 15 calendar days after receipt, investigate them, and provide follow-up information.

49.     More generally, an NDA holder is required to promptly review all AEs, evaluate them, and report the results of its analyses to the FDA, both in periodic safety update reports and annual reports.

50.     Lastly, the NDA holder must develop written procedures for the surveillance, receipt, evaluation, and reporting of post-marketing AEs to the FDA.

51.     Taken together, these activities are termed *pharmacovigilance* and represent critical post-marketing regulatory obligations for NDA holders.  Pharmacovigilance plays an essential role in monitoring drug safety post-marketing because of the enormous difference between the limited power of pre-approval clinical trials to detect adverse events, particularly SAEs, and the number of patients in the real world who may be exposed to a drug once it enters the marketplace.

**CONFIDENTIAL**

52.     Because of the broad range of pharmacoepidemiologic data sources and methods developed over the last quarter-century, an NDA holder that passively counts up adverse events and dutifully transmits tallies to the FDA cannot be regarded as meaningful review or "evaluation" of AEs as required under 21 CFR 314.80(b). The statistical power of large adverse event datasets, combined with sophisticated analytic techniques and increased computing capabilities that allow identification of safety signals for further exploration.

53.     For example, as of 2014, FDA's Adverse Event Reporting System (FAERS) contained over 7,000,000 adverse event reports, with over 750,000 new reports added annually.[16]

54.      Two decades ago, the limitations of passive voluntary surveillance databases, such as incomplete information in individual reports and population-level under-reporting of adverse events, had been regarded as barriers to meaningful use of these datasets as a source of new safety information. However, the introduction of techniques such as Bayesian data mining (e.g., disproportionality analysis of an excess of adverse events occurring in reports for a particular drug than would be expected by chance alone), in combination with the very large number of individual reports available, have made FAERS and similar data sources flexible, powerful tools for pharmacovigilance. For example, data mining of adverse event databases has been used to predict in advance addition of new safety information to drug labels.[17]

55.     The details and application of such methods are explained at greater length in Dr. David Madigan's report, which I refer to below.

56.     The FDA has issued multiple detailed Guidances to Industry on how drug manufacturers can meet their pharmacovigilance obligations with respect to surveillance of drug AEs; analyzing aggregated AE data and identifying potential safety signals; analyzing and evaluating such signals; and taking appropriate actions.

---

[16] Duggirala HJ, *et al*. Use of data mining at the Food and Drug Administration. J Am Med Inform Assoc. 2016 Mar;23(2):428-34.

[17] Gurulingappa H, *et al*. Automatic detection of adverse events to predict drug label changes using text and data mining techniques. Pharmacoepidemiol Drug Saf. 2013 Nov;22(11):1189-94.

**CONFIDENTIAL**

57.     For example, a 2005 Pharmacovigilance Guidance issued by FDA[18] provides recommendations to NDA holders on good pharmacovigilance practices, such as prospectively constructing a pharmacovigilance plan for a drug; use of a standardized controlled terminology for AEs, such as the Medical Dictionary for Regulatory Activities (MedDRA); use of active and passive AE surveillance; and data mining of large AE datasets, such as the FDA's Adverse Event Reporting System (FAERS), to identify safety signals.

58.     Pharmacovigilance is a critical foundation for another major post-marketing regulatory obligation of NDA holders, ensuring that the label for a marketed drug is at all times accurate and  is not false or misleading in any particular. 21 CFR 314.125(b)(6). Maintaining the accuracy and completeness of the safety information in a drug's label is an essential component for meeting this obligation, particularly since a drug's toxicity profile will change as more patients are exposed to it.

59.     As discussed above, it is the NDA holder's responsibility to ensure that a drug's label is not false and misleading, and the sponsor's responsibility to demonstrate safety. An NDA holder can propose a change in a drug's label by submitting a supplemental NDA. Many labeling changes (e.g., adding a new indication to the label) require prior approval by the FDA. However, an NDA holder can change a label without prior FDA approval if it will "add or strengthen a contraindication, warning, precaution, or adverse reaction," based on new safety information that meets a regulatory threshold. Such a change is implemented by submitting a *Changes Being Effected (CBE)* supplement (sometimes referred to as a *labeling supplement*) to the FDA at least 30 days prior to the change. Unless a CBE supplement requires review of clinical data unrelated to the safety-related labeling change, the NDA holder does not need to pay a user fee for FDA's review.

---

[18] Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (March 2005), *available at* https://www.fda.gov/media/71546/download.

**CONFIDENTIAL**

60.     The FDA reviews CBE supplements after the NDA holder has implemented the changes in the label, and in theory, has the authority to retroactively reject them.  However, this rarely, if ever occurs.

61.     FDA's perspective on CBE supplements was well-expressed by Dr. Robert Temple (Excerpts from Deposition of Robert Temple, M.D. 2004). When asked if the FDA would regard a drug as being misbranded if the sponsor added language to strengthen a warning even without a scientific basis, Dr. Temple, stated that *"I mean, the fact is that the company strongly wants labeling. . . . Even if we think it's a little flimsy, we would probably defer. We would have to be quite persuaded to that it really was, uh, without merit."*[19]

### 4.     Abbreviated NDAs and 505(b)(2) NDAs

62.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act (Public Law 98-417), often referred to as the Hatch-Waxman Act or the Hatch-Waxman amendments to the FDCA, to promote competition in the pharmaceutical marketplace, while encouraging innovation in drug development.

63.     The Hatch-Waxman Act allows a generic drug to be approved by relying on the "Agency's findings of safety and efficacy" (AFSE) for a previously approved new drug (the *Reference Listed Drug*, or RLD). 21 USC 355(j). FDA approval of a generic drug only requires a generic drug manufacturer to submit an abbreviated NDA (ANDA) showing that its copy of the RLD is chemically the same as and is bioequivalent to the RLD, along with acceptable data on drug manufacturing.

64.     From a review perspective, one key difference between an NDA and an ANDA is the requirement for "full reports" of safety and effectiveness. Unlike an NDA, which the FDA will refuse to file for review without such reports, an ANDA does not need to contain such "full reports"

---

[19] Deposition of Robert Temple, MD. In Re Paxil Products Liability Litigation CV 01-07937 MRP. 7 December 2004.

**CONFIDENTIAL**

of safety and effectiveness.[20] The bioequivalence and other similarity data submitted in the ANDA act as a bridge to the AFSE for the RLD.

65.     One other key difference between an NDA and an ANDA is that under the Hatch-Waxman Act, the proposed label for a generic ANDA drug must be identical to that for the RLD.[21] 21 USC 355(j)(v); 21 CFR 314.94(a)(8)(iv). If it is not, the FDA will refuse to review the ANDA.[22] As discussed below, there is no such statutory or regulatory requirement for an NDA.

66.     The Hatch-Waxman Act also allowed a new NDA category by adding Section 505(b)(2) to the FDCA. 505(b)(2) NDAs are true NDAs that, like traditional NDAs submitted under Section 505(b)(1), must contain "full reports of investigations" of safety and effectiveness for approval. They differ from traditional NDAs in that the "full reports" of safety and effectiveness rely, at least in part, on studies that the applicant did not conduct or have a right of reference to. Such studies may consist of information from published papers in the biomedical literature. Alternatively, it can include safety and efficacy studies used for approval of an original NDA submitted by another applicant. In other words, a 505(b)(2) NDA may rely on the AFSE of a previously approved drug, in essence, incorporating the AFSE by reference.

67.     However, unlike a generic drug manufacturer submitting an ANDA, the sponsor of a 505(b)(2) NDA may still need to conduct additional studies, depending on its development program. For example, if the scientific standards in use when the NDA being relied on was approved have changed significantly, the sponsor of the 505(b)(2) NDA may need to perform new clinical and/or non-clinical studies to ensure that the AFSE for the first NDA can still be relied on.

68.     In addition, unlike ANDAs, 505(b)(2) NDAs are not subject to the statutory and regulatory requirement that the product label be identical to the RLD.

### 5.     ANDAs and 505(b)(2) NDAs are not the same

---

[20] In fact, an ANDA cannot contain such reports; if it does, the FDA may direct the applicant to refile the submission as a true NDA.

[21] Some differences between the RLD label and the generic label may be acceptable, e.g., if a generic version is manufactured by a different manufacturer producing the RLD versus the generic drug. 21 CFR 314.94(a)(8).

[22] This is termed a refuse-to-receive action, rather than a refuse-to-file action.

CONFIDENTIAL

69.     Although they are distinct regulatory pathways, ANDAs and 505(b)(2) NDAs are sometimes confused. This confusion arises from both pathways owing their creation to the same legislation (Hatch-Waxman Act); the similarity of patent provisions in the FDCA applicable to ANDAs and 505(b)(2) NDAs; the reliance on studies contained in the NDA for an innovator drug to demonstrate safety and effectiveness for all ANDAs and many (but not all) 505(b)(2) NDAs; and the seemingly analogous relationships between   i) the labelling for a generic drug approved under an ANDA and the labeling for its RLD, and ii) the labeling for a drug approved under a 505(b)(2) NDA that relies on safety and effectiveness studies for an innovator drug approved under a 505(b)(1) NDA, and the labeling for the innovator drug.

70.     The differences between these two approval pathways, however, are far more important than these surface similarities. In summary, applicants for and holders of 505(b)(2) NDAs are subject to the same regulatory requirements and post-market surveillance and labeling obligations as those for traditional NDAs approved under § 505(b)(1), rather than the ANDA requirements.

71.     First, by definition, 505(b)(2) NDAs must contain "full reports of investigations of safety and effectiveness." In contrast, ANDAs do not need to contain such reports. In fact, as discussed above, the FDA is prohibited from requesting more information for ANDAs than is statutorily permitted.

72.     Second, the general requirements for NDAs described in Section 505(b)(1) of the FDCA apply to 505(b)(2) NDAs, which are defined as a subset of NDAs as follows:

"An application submitted under paragraph (1) for a drug for which the investigations described in clause (A) of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted . . ."

73.     Of note, the preamble to the proposed implementing regulations for the Hatch-Waxman Act states that

**CONFIDENTIAL**

"Applications described in section 505(b)(2) of the act are submitted under section 505(b)(1) of the act. They are therefore subject to the same statutory provisions that govern full new drug applications."[23]

74.     Furthermore, the same NDA approval requirements applicable to traditional § 505(b)(1) NDAs are used by FDA for review of 505(b)(2) NDAs. 21 USC 355(d).  Of note, 505(b)(2) NDAs are reviewed in the same division in CDER's Office of New Drugs as the corresponding innovator drug, while ANDAs are reviewed exclusively in CDER's Office of Generic Drugs.

75.     Importantly, unlike generic drugs approved under an ANDA, which must have the same labeling as the RLD,[24] there is no statutory or regulatory requirement that the label for a drug approved under 505(b)(2) be the same as the label for an innovator drug on which the former relies for evidence of safety and effectiveness. For a 505(b)(2) NDA that relies on full reports of safety and effectiveness from a 505(b)(1)  NDA, similarities between the labels of the two drugs are due entirely to the similarity between the scientific evidence underlying approval of both NDAs. In other words, the drug labels are similar because they both make use of the same "full reports," not because of statutory and/or regulatory dictates.

76.     In fact, unlike a generic drug approved under an ANDA, a drug approved under a 505(b)(2) NDA can have a label that differs significantly from the innovator drug used to support approval.  In the present instance, each of the § 505(b)(2) NDA holders – Sandoz, Hospira and Accord – initial labels included language that was not included in Sanofi's label until months later. Additionally, the § 505(b)(2) NDA holders here – Sandoz, Hospira and Accord – did not uniformly or timely adopt Sanofi's December 11, 2015, label change. [25]

---

[23] 54 FR 28875.

[24] 21 USC 505(j)(v).

[25] Accord's adoption of Sanofi's December 11, 2015 label change approval was approved July 2016, seven months later; Hospira's adoption of Sanofi's December 11, 2015 label change approval was approved September 2017, nearly 2 years later; and Sandoz's adoption of Sanofi's December 11, 2015 label change approval was approved October 2016, ten months later.  See https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process.

**CONFIDENTIAL**

77.     Finally, the FDA itself has issued Guidance for Industry distinguishing between ANDAs and 505(b)(2) NDAs.[26] First, the FDA will not review a drug that is eligible for approval under Section 505(j) as a 505(b)(2) NDA. Second, while limited confirmatory data can be submitted as part of an ANDA, submission of extensive clinical investigations as part of an ANDA is considered to go beyond the scope of information that can be relied on for ANDA approval.

78.     The differences between 505(b)(2) NDAs and ANDAs relevant to this litigation are summarized in Table 1. Similarities between 505(b)(1) and 505(b)(2) NDAs are summarized in Table 2.

| Table 1. Differences between 505(b)(2) NDAs and ANDAs | | |
|---|---|---|
| | 505(b)(2) NDAs | ANDAs[27] |
| Submitted under Section 505(b)(1) of the FDCA | Yes | No[28] |
| Content and format governed by 21 CFR 314.50 | Yes | No[29] |
| Approved under Section 505(c) of the FDCA | Yes | No[30] |
| Regulated by CDER's Office of New Drugs | Yes | No[31] |
| Contain full reports of safety and effectiveness | Yes | No |
| Can contain clinical studies of safety and effectiveness | Yes | No |
| Demonstration of bioequivalence to a listed drug not required for approval | Yes | No |

| Table 2.  Similarities between 505(b)(1) and 505(b)(2) NDAs | | |
|---|---|---|
| | 505(b)(1) NDAs | 505(b)(2) NDAs |
| Submitted under Section 505(b)(1) | Yes | Yes |
| Approved under Section 505(c) | Yes | Yes |
| Regulated by CDER's Office of New Drugs | Yes | Yes |

[26] Guidance for Industry: Determining Whether to Submit an ANDA or a 505(b)(2) Application, May 2009, *available at* https://www.fda.gov/media/124848/download.

[27] This does not include petitioned ANDAs.

[28] ANDAs are submitted under Section 505(j) of the FDCA.

[29] The content and format of an ANDA are specified in 21 CFR 314.94.

[30] ANDAs are approved under Section 505(j) of the FDCA.

[31] ANDAs are regulated by CDER's Office of Generic Drugs.

| Contain full reports of safety and effectiveness | Yes | Yes |
|---|---|---|
| Post-market reporting specified in 21 CFR 314.80 | Yes | Yes |
| Other responsibilities (e.g., annual reports) specified in 21 CFR 314.81 | Yes | Yes |

## IV.    Regulatory and Scientific Background

### A.    Regulatory Background

79.    The original Taxotere (docetaxel) NDA was submitted on July 24, 1994 by Rhone-Poulenc-Roher. The FDA issued an Approvable letter on October 27, 1995, requiring additional data prior to approval. The sponsor amended and resubmitted the NDA on December 1, 1995, with an Approval letter issued on May 14, 1996 for the treatment of women with advanced or metastatic breast cancer.

80.    The FDA's approval of the original Taxotere NDA was made under the accelerated approval regulations (21 CFR 314.500), which allow provisional approval on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity.

81.    Accelerated approval requires that the sponsor submit post-marketing data to describe and verify the benefit of the drug. The sponsor submitted the required data as a sNDA, which was approved on June 22, 1998, converting the accelerated approval to a traditional approval.

82.    In 2004, the sponsor submitted an efficacy sNDA, seeking approval to add the indication of treatment of operable, node-positive breast cancer to the label. The sNDA received accelerated approval on August 18, 2004.

83.    The regulatory history of relevant 505(b)(2) NDAs for docetaxel is summarized in Table 2.

| Applicant | NDA # | Date submitted | Date approved |
|---|---|---|---|
| Hospira | 22234 | 7/9/2007 | 3/8/2011 |
| Accord | 201195 | 7/21/2009 | 6/8/2011 |
| Sandoz | 201525 | 9/16/2010 | 6/29/2011 |

### B.    Scientific Background

84.    To understand the scientific evidence available to the 505(b)(2) NDA holders, I have reviewed the following data sources that were available to the 505(b)(2) NDA holders before and after approval of their docetaxel-based products: (1) publicly available medical literature; (2) reporting from the FDA's Adverse Event Reporting Database ("FAERS"); (3) information made available by Sanofi in their worldwide Taxotere labeling; and (4) information set forth by the 505(b)(2) NDA holders in worldwide labeling of their docetaxel products, and other foreign public data.

85.    My understanding and opinions are supported by the analyses and opinions of Plaintiffs' expert witnesses Dr. Ellen Feigal, Dr. David Madigan, and Dr. Laura Plunkett.  I have reviewed their expert reports, and I accept and consider their assessments valid.[32]

86.    By way of background, 21 CFR 201.57(c)(6), which describes the required content of the WARNINGS AND PRECAUTIONS section of the label, provides that this section should contain

> "clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards (including those that are expected for the pharmacological class or those resulting from drug/drug interactions), limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification)."

87.    The regulation further requires that "the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."

88.    FDA's Guidance for Industry on the WARNINGS AND PRECAUTIONS section explains that

---

[32] *See* Expert Reports of Dr. Ellen Feigal, dated 3/15/2020; Dr. David Madigan, dated 3/9/2020; and Dr. Laura Plunkett, dated 3/13/2020.

CONFIDENTIAL

"Some factors to consider in assessing whether there is reasonable evidence of a causal relationship include: (1) the frequency of reporting; 2) whether the adverse event rate in the drug treatment group exceeds the rate in the placebo and active-control group in controlled trials; (3) evidence of a dose-response relationship; (4) the extent to which the adverse event is consistent with the pharmacology of the drug; (5) the temporal association between drug administration and the event; (6) existence of dechallenge and rechallenge experience; and (7) whether the adverse event is known to be caused by related drugs."[33]

89.     21 CFR 201.57(c)(7), which describes the required content of the ADVERSE REACTIONS section of the label, provides that this section "must describe the overall adverse reaction profile of the drug based on the entire safety database." It limits the content to "only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."

90.     FDA's Guidance for Industry on the ADVERSE REACTIONS section explains that

"Serious, low-frequency adverse events generally will be listed when there is reason to suspect that the drug may have caused the event. Typical reasons to suspect causality for an event include (1) timing of onset or termination with respect to drug use, (2) plausibility in light of the drug's known pharmacology, (3) occurrence at a frequency above that expected in the treated population, and (4) occurrence of an event typical of drug-induced adverse reactions (e.g., liver necrosis, agranulocytosis, Stevens-Johnson syndrome). For serious events that are typical of drug-induced adverse reactions, the occurrence of even a single event could be a basis for inclusion in the list."[34]

---

[33] Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products — Content and Format (October 2011),  *available at* https://www.fda.gov/media/71866/download.

[34] Guidance for Industry: Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products — Content and Format (January 2006),  *available at* https://www.fda.gov/media/72139/download.

**CONFIDENTIAL**

91.     With respect to publicly available medical literature regarding an increased risk of PCIA in patients receiving docetaxel, compared to control patients, as Dr. Feigal notes in her expert report, there was a 6.4 to 8 times increased number of reported cases of PCIA in docetaxel-containing regimens compared to non-docetaxel-containing regimens across the 19 published studies she reviewed.[35] Dr. Madigan analyzed the results from four observational studies[36] (Crown 2017, Kang 2019, Martin 2018, and Sedlacek 2006), and concluded that there was a statistically significant increased risk of PCIA in the docetaxel-containing regimens versus the non-docetaxel-containing regimens when analyzed cumulatively and, for three of them (including Sedlacek 2006), on their own.[37]

92.     Dr. Plunkett reviewed the medical literature and found, among other opinions, that a causal relationship between PCIA and Taxotere is biologically plausible.[38]

93.     There are several studies published both before and after approval of the 505(b)(2) NDAs in 2011 that provide evidence of a causal relationship between docetaxel-containing regimens and PCIA.  These include a retrospective study published in March 2011 reviewing records of 8,430 patients who attended a hair clinic during the previous 7 years with non-scarring alopecia, which identified seven cases of PCIA, 5 of which occurred after administration of docetaxel-containing regimens.[39]  A retrospective clinicopathological study published in June 1011 found that 6 of 10 cases of post-chemotherapy PCIA cases occurred in breast cancer patients treated with docetaxel-containing regimens.[40]  A retrospective study published in May 2012

---

[35] Feigal Report at § VIII(D), Table 2, notes; § IX.

[36] Crown J *et al.* Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer. *Annals of Oncology* 2017; 28(suppl 5): Abstract 206P; Kang D, *et al.* Permanent Chemotherapy-Induced Alopecia in Patients with Breast Cancer: A 3-Year Prospective Cohort Study. Oncologist. 2019 Mar;24(3):414-420. Martín M, *et al.* Persistent major alopecia following adjuvant docetaxel for breast cancer: incidence, characteristics, and prevention with scalp cooling. Breast Cancer Res Treat. 2018 Oct;171(3):627-634. Erratum at pp. 635-6; Sedlacek, S. Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer. Breast Cancer Research and Treatment 2006; 100 (suppl 1): S116.

[37] Madigan Report at § 6, Irreversible Alopecia and Observational Studies.

[38] Plunkett Report at ¶ 33.

[39] Palamaras I, et al. Permanent chemotherapy-induced alopecia: a review. J Am Acad Dermatol. 2011 Mar; 64(3):604-6.

[40] Miteva M, *et al.* Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am J Dermatopathol. 2011 Jun; 33(4):345-50.

---

**CONFIDENTIAL**

described 20 breast cancer patients suffering PCIA after receiving docetaxel-containing regimens.[41]

94.     These studies were published on the heels of several other studies published before or during review, but before approval, of the 505(b)(2) NDAs that are the subject of this report. These included a study published in October 2010 involving 108 cases of persistent alopecia; in 104 of these, the patient had received a docetaxel-containing regimen.[42] Other available information regarding PCIA after treatment with a docetaxel-containing regimen including PCIA case reports in 2009 and 2010[43,44,45].

95.     With respect to the FAERS database, as Dr. Madigan noted in his report, there was a proportional reporting rate (PRR) signal for docetaxel from as early as 2000, a permanent empirical Bayes' geometric mean (EBGM) signal by the middle of 2008, and signal for SEB05, an EBGM-related metric by the middle of 2012.[46] Moreover, Dr. Madigan's lasso logistic regression and exponentiated lasso logistic regression analyses evidenced a signal crossing the EBGM threshold level of 2 in 2010.[47] As discussed above, FAERS data are publicly available for download, meaning that the 505(b)(2) NDA holders could have performed such analyses prior to submission of their NDAs.

---

[41] Kluger N, *et al*. Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients. Ann Oncol. 2012 Nov; 23(11):2879-84.

[42] Bourgeois H *et al*., Long Term Persistent Alopecia and Suboptimal Hair Regrowth after Adjuvant Chemotherapy for Breast Cancer: Alert for Emerging Side Effect: French ALOPERS Observatory. Ann Oncol 2010; 21(8) Viii83-84 (2010).

[43] Prevezas C, *et al*. Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer. Br J Dermatol. 2009 Apr; 160(4):883-5.

[44] Tallon B, *et al*. Permanent chemotherapy-induced alopecia: case report and review of the literature. J Am Acad Dermatol. 2010 Aug; 63(2):333-6.

[45] Masidonski P, Mahon SM. Permanent alopecia in women being treated for breast cancer. Clin J Oncol Nurs. 2009 Feb;13(1):13-4.

[46] Madigan Report at ¶¶ 42-43.

[47] Madigan Report at ¶¶ 44-47.

**CONFIDENTIAL**

96.     Moreover, Sanofi's worldwide labeling (but not US labeling) provided the 505(b)(2) NDA holders with publicly available information regarding the events of ongoing alopecia from Sanofi's TAX 316 clinical trial.  Specifically, Sanofi's 2010 Summary of Product Characteristics provided information regarding the interim PCIA data from the TAX316 clinical trial.[48]  In 2012, Sanofi's SPC for Taxotere was updated to provide information regarding the final clinical trial data in which 29 out of 687 TAC patients had ongoing alopecia as of the end of the 10-year follow-up period, and a statement that cases of persisting alopecia have been reported was added to the SPC.[49]

97.     It's clear that the 505(b)(2) NDA holders not only should have known about this new scientific information, but did in fact know and were on notice of this additional information. This evidence supporting this is described more fully below, but generally, each of the 505(b)(2) NDA holders were on notice and not only knew of the availability of the results regarding ongoing alopecia at the end of chemotherapy in Sanofi's TAX 316 clinical trial, but actually had the relevant data.  Specifically, each of the 505(b)(2) NDA holders communicated TAX 316 clinical trial data to prescribers and patients outside of the US well before any such information was ever provided in their US labels.  And non-US labels for these 505(b)(2) NDA holders demonstrate that they possessed this new scientific information regarding the risk of PCIA.

98.     For example, Hospira's 2012 labels in Israel, Hungary, and UK (among others) stated: "*Skin and subcutaneous tissue disorders:* Alopecia was observed to be ongoing at the median follow-up time of 55 months in 22 patients out of the 687 patients with alopecia at the end of the chemotherapy."[50]  This statement in Hospira labels shows that Hospira possessed new scientific information regarding PCIA in the TAX 316 clinical trial and, had Hospira reviewed Sanofi's SPC for Taxotere at that time, Hospira would have had access to the final clinical trial

---

[48] Sanofi_00727021 (2010 Sanofi Summary of Product Characteristics).

[49] Sanofi_00726237 (2012 Sanofi Summary of Product Characteristics).

[50] Hospira Docetaxel 2012 Israeli Label.

**CONFIDENTIAL**

data and additional statements regarding the risk of PCIA.  Hospira did not add any information regarding the risk of PCIA to its US label until September 2017.[51]

99.    Accord's[52] 2012 labeling approved by the European Commission stated: "*Skin and subcutaneous tissue disorders:*  In study TAX316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 TAC patients and 645 FAC patients.[53]  At the end of the follow-up period, alopecia was observed to be ongoing in 29 TAC patients (4.2%) and 16 FAC patients (2.4%)."[54]  Moreover, Accord's 2012 European label stated in Section 4.8 that "Cases of persisting alopecia have been reported."[55]  Like with Hospira, these foreign regulatory submissions show that Accord was on notice of information regarding PCIA in the TAX 316 clinical trial.  Accord is different than Hospira, however, in that Accord elected to include the TAX 316 final clinical trial data and additional statements regarding the risk of PCIA into foreign labeling.  Despite this, Accord Healthcare, Inc. did not add any information regarding the risk of PCIA to its US label until July 2016.[56]

100.    Sandoz's 2011 Australian label provided interim data regarding PCIA from the TAX316 study.[57]  Sandoz's labels in Austria, Germany, and Australia, along with the company's core data sheet, were all updated in 2013 to provide detailed information regarding the final TAX316 clinical trial data and, like Accord, warn that cases of persisting alopecia have been

---

[51] Hospira Docetaxel 2017 US Label.

[52] Accord is a globally integrated company.  Accord Healthcare, Inc. is the US marketing entity according to Accord's website.  Accord's 2012 EC label is attached to a regulatory implementing decision that references Accord's June 2011 authorization application for its docetaxel medicinal product.

[53] Accord Docetaxel 2012 European Label.

[54] Accord Docetaxel 2012 European Label.

[55] Accord Docetaxel 2012 European Label.

[56] Accord Docetaxel 2016 US Label.

[57] Sandoz Docetaxel 2011 Australian Label.

**CONFIDENTIAL**

reported.[58]  Like Hospira and Accord, Sandoz did not add any information regarding the risk of PCIA to its US label until October 2016.[59]

## V.     REGULATORY ANALYSIS

### A.     505(b)(2) NDA holders have the same regulatory obligations with respect to post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA as 505(b)(1) NDA holders

101.    A 505(b)(2) NDA holder's regulatory responsibilities are the same as those for a 505(b)(1) NDA holder.  Importantly, a 505(b)(2) NDA holder's regulatory responsibilities are independent of those held by a 505(b)(1) holder of an NDA

102.    After NDA approval, sponsors are required under the FDCA to continuously assess the safety of their products (a process known as pharmacovigilance), report their findings to the FDA, and take appropriate actions to warn providers and patients about serious or unexpected adverse events associated with the use of their drugs. This is particularly important because the randomized controlled trials used for drug approval not only have limited power to detect adverse events, but also exclude many patients from enrollment to avoid confounding assessment of safety or efficacy. However, when a drug is approved and marketed, such patients are not excluded from receiving the drug, and this results in exposure of patient populations in which the drug's safety and efficacy were never studied.

103.    As I discussed above, the FDA has issued Guidance on Good Pharmacovigilance Principles.  This Guidance represents a "safe harbor" for compliance with the FDCA and its implementing regulations, which are legally binding. The principles include definition of safety signals, potential techniques for evaluating signals, and discussion of the limitations of specific methods, particularly spontaneous case reports. While the approach outlined in this guidance is not legally binding, compliance with the underlying statute and regulations is, specifically the requirements described at 21 CFR 314.80 and 314.81.

104.    A 505(b)(2) NDA holder's regulatory responsibilities include, but are not limited to, post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA.  In addition,

---

[58] Sandoz Docetaxel 2013 Austria, Germany, and Australian Labels.

[59] Sandoz Docetaxel 2016 US Label.

CONFIDENTIAL

a 505(b)(2) NDA holder is responsible for ensuring that the label for their product is not false and misleading, and this obligation is not fulfilled merely by imitating the label approved as part of a 505(b)(1) application.

105.    As I noted above, unlike a generic drug approved under Section 505(j) of the FDCA, the label for a 505(b)(2) NDA may differ from the label for an NDA relied on for initial approval.

**B.    A 505(b)(2) NDA holder's responsibilities for ensuring that the label for their product is not false and misleading are the same as those for a 505(b)(1) NDA holder**

106.    505(b)(2) NDA holders have the same regulatory obligations as 505(b)(1) NDA holders with respect to updating their label with new safety information.

107.    The required format and content of labeling are set forth in Title 21 of the Code of Federal Regulations (CFR); the format was substantially revised in 2006 with the publication of the Physician Labeling Rule (PLR), a regulatory change intended to improve the readability and accessibility of important information, particularly safety information, contained in drug labels.

108.    The obligation to update a drug product label is triggered when there is new safety information or analysis available to these NDA holders that provides either:

    a.    "some basis to believe there is a causal relationship" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(7)

          or

    b.    "reasonable evidence of a causal association" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(6).

**C.    505(b)(2) NDA holders have the same authority as 505(b)(1) NDA holders to submit Changes Being Effected Label Supplements.**

109.    A drug manufacturer may, on its own initiative, update a drug label to a contraindication, warning, precaution, or adverse reaction where evidence of a causal association has been met in accordance with 21 CFR 201.57(c).

**CONFIDENTIAL**

110.     Under the Changes Being Effected regulation, the manufacturer must notify the FDA that it intends to do so.  Such notices are referred to as "changes being effected" (CBE) supplements to an NDA.[60]

111.     The FDA has the authority to retroactively block such CBE supplements, but based on my background, education, training, and experience, in practice rarely does so.  Indeed, most manufacturers generally institute such changes without waiting for FDA feedback.

112.     On the other hand, manufacturers may consult with the FDA before submitting a CBE supplement. Based on my background, education, training, and experience, such prior consultation is unusual. In fact, a manufacturer is not required to consult with the review division before submitting any supplement to an NDA – even an efficacy supplement – or even an original NDA. An FDA analysis of over a hundred 505(b)(2) NDAs submitted between 2010 and 2012 found pre-submission interactions between an applicant and the FDA for less than 60% of the NDAs in the analysis.[61]

113.     Concerns over a drug being deemed "misbranded" because of a manufacturer's decision to add <u>strengthened</u> warnings about a drug's association with a serious adverse event are specious, based on the history of FDA enforcement actions.  Misbranding cases are typically triggered by the opposite behavior, namely a sponsor's <u>failure</u> to include relevant risk information. Furthermore, based on my background, education, training and experience, I am unfamiliar with a single instance in which FDA has pursued a civil or criminal action against a sponsor who sought to add a strengthened warning to its drug label.

**D.     Evidence of Knowledge of 505(b)(2) NDA holders Sandoz, Accord and Hospira**

114.     As an initial matter, the earliest date on which any of the 505(b)(2) NDA holders that are the subject of the opinions offered herein made a change to its United States label to reflect any information concerning the risk of PCIA associated with the use of docetaxel was on July 2016, when Accord changed its label.  Thus, at the time the relevant docetaxel products were used by Plaintiffs Hughes, Sanford and Stewart, none of the 505(b)(2) NDA holders warned or

---

[60] 21 CFR 314.70.

[61] Agarwal S, Qiu W, Sahajwalla C. Overview of recently approved 505(b)(2) new drug applications (2010-2012): role of clinical pharmacology. J Clin Pharmacol. 2014 Dec;54(12):1330-6.

**CONFIDENTIAL**

communicated in any way the nature, severity or duration of PCIA.  That is, neither Sandoz, Hospira nor Accord warned the Plaintiffs or their treating/prescribing physicians of the risk of PCIA.  I will address the available evidence known or reasonably knowable to the 505(b)(2) NDA holders at the time of each Plaintiff's use of each respective product.

### 1.   Sandoz

115.    Sandoz marketing of docetaxel dates back to 2003.[62]  Sandoz utilizes a document referred to as a "Core Data Sheet" that tracks the minimum safety information that is to be listed in the labels used in the countries where Sandoz markets docetaxel.[63]  Sandoz's 2006 Core Data Sheet for docetaxel does not mention the risk of PCIA as a side effect of the company's product.[64]  Sandoz did not the amend its Core Data Sheet with respect to PCIA and docetaxel until November 2013.[65]

116.    Sandoz did not amend the docetaxel Core Data Sheet or update its US label for docetaxel despite providing the following information about PCIA in its October 2010 docetaxel label in Austria:

- "One case of alopecia non-reversible at the end of the [docetaxel 100 mg/m2 single agent] study."

- "Alopecia was observed to be ongoing at the median follow-up time of 55 months in 22 patients out of the 687 patients with alopecia at the end of chemotherapy." This reports the interim follow up results of the TAX316 study.[66]

117.    Further, Sandoz' global regulatory affairs group was aware of the information contained in this October 2010 Austrian docetaxel label.[67]  This demonstrates that Sandoz had

---

[62] SANDOZ-TAXO-PSUR-00001976.

[63] Rau Dep. 90:15-91:8; 94:13-18.  Rau, Sandoz' FRCP, Rule 36(b) designee on, among other topics, interaction among and between Sandoz global units and Sandoz US, is the Global Head of Safety Label Management for Sandoz. From January 2013 – December 2017 Ms. Rau was the Core Data Sheet and Signal Detection Manager.  responsibility for understanding and communicating the contents of the Core Data Sheet within Sandoz, including what was to be implemented in the countries where the company marketed docetaxel. Rau dep. Ex. 2.

[64] B. Watson Dep., 212:23-215:18.

[65] Rau Dep. at 149:14-20.

[66] Rau Dep. Ex. 11.

[67] Rau Dep. 205:23 – 206:4; 209:19-210:8.

notice of this information prior to obtaining market approval in the United States.  This is further confirmed by Sandoz's inclusion of the same language in its German docetaxel label in February 2011.[68]  And in April 2011, Sandoz included the following information in the docetaxel label in Australia: ""[t]he following events were observed to be ongoing at the median follow-up time of 55 months: alopecia, amenorrhea, neurosensory and peripheral oedema."[69] All of these labels were updated to include information on PCIA prior to Sandoz being approved to market docetaxel in the United States on June 29, 2011.[70]

118.    In November 2013,[71] Sandoz updated its Core Data Sheet for docetaxel to reflect the company's current state of knowledge. Rau Dep., 183:11 – 184:7; see Rau Dep. Ex.  9. The changes to its Core Safety Information included the following:[72]

-   It deleted the prior sentence about the complete reversibility of alopecia.

-   It added "One case of alopecia non-reversible at the end of the [docetaxel 100 mg/m2 single agent] study."

-   It added the final TAX316 data regarding alopecia: "In study TAX316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 TAC patients and 645 FAC patients. At the end of the following period, alopecia was observed to be ongoing in 29 TAC patients (4.2%), and 16 FAC patients (2.4%)."

-   It added "Cases of persisting alopecia have been reported."

Ms. Rau again stated that the changes to the CDS were consistent with the best available scientific data, and serves to guarantee the adequate and safe use of docetaxel.[73]  This updated Core Data Sheet was provided to Sandoz affiliates around the world, including U.S. Regulatory Affairs.[74] No

---

[68] Rau Dep. 210:9-215:19; Rau Dep. Ex. 12.

[69] Rau Dep. 200:10 – 209:7; Rau Dep. Ex. 13.

[70] Rau Dep. 216:23-217:9.

[71]  In 2012, Sandoz formed a task force to address the issue of its Core Data Sheets not being timely updated, and Sandoz labels for its drugs in countries around the world not being consistently updated to be in line with the Core Data Sheets. Rau Dep. 229:11 – 232:8; 248:15-20; see also Rau Dep. Ex. 16.

[72] See Rau Dep. Ex. 8 at 15, 23, 29; Rau Dep. Ex. 9 at 39, 50, 58. See also, Rau Dep. 169:1-170:18; 174:6-176:11; 178:21-179:18; see Rau Dep. Ex. 8 at 15, 23, 29; Rau Dep. Ex. 9 at 39, 50, 58.

[73] Rau Dep. 187:24-191:15.

[74] Rau Dep. 187:24-188:6.

**CONFIDENTIAL**

one from Sandoz U.S. Regulatory Affairs looked at the updated Core Data Sheet or used it for any purpose, and Sandoz did not request a label change in the United States until October 2016.[75]

119.    On November 29, 2013, within several weeks of receiving the updated Core Data Sheet for docetaxel, Sandoz Australia requested to change its docetaxel label to be in line with the updated Core Data Sheet.[76] Specifically, Sandoz stated "The change is in response to a Global CDS update."  Even though the Sandoz docetaxel label in Australia already contained some information about persisting alopecia dating back to 2011, Sandoz changed its label to add the following statement to ensure consistency with the Sandoz updated Core Data Sheet: "Cases of persisting alopecia have been reported."

120.    In addition to the above, as evidenced by the multiple recitations of the body of scientific literature outlined in the prior reports of Drs. Feigal, Plunkett, and Madigan, the growing signal in the FAERS database, and the like, in keeping with its post marketing pharmacovigilance obligations as a 505(b)(2) holder, Sandoz is responsible for understanding the science impacting its product.

     a.   Based on the above, Sandoz had knowledge of the risk of PCIA prior to Ms. Stewart's use of its product in June 2014. The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or,  the evidence that existed provided Sandoz with reasonable evidence of a causal association between its docetaxel product and PCIA in as early as October 2010. As discussed above, this triggered Sandoz's obligation to update the label for its docetaxel product. "some basis to believe there is a causal relationship" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(7)

                  or

     b.   "reasonable evidence of a causal association" between docetaxel and the occurrence of irreversible alopecia, as provided in 21 CFR 201.57(c)(6).

---

[75] Seitz Dep. (rough), 61:6-7.

[76] Rau Dep., 217:15-228:8; see Rau Dep. Ex. 14, 15.

## 2.    Accord

121.    Accord Healthcare, Inc. ("Accord US") obtained approval to market its formulation of Taxotere in June 2011.[77]   Accord US is the commercial arm of Intas Pharmaceuticals, a biopharmaceutical company operating in Ahmedabad, India.[78]   According to its corporate overview, Accord US had nine employees on staff as of November 2011.[79]

122.    Accord US's former President, Dr. Samir Mehta, testified that he never saw Intas and Accord as separate companies and that there was "definitely collaboration" between Accord regulatory affairs and Intas regulatory affairs.[80]   Gerald Price elaborated on the relationship and testified that Accord has access to Intas' regulatory experts directly.[81]

123.    According to the deposition testimony of Accord US's Vice President of Regulatory Affairs, Dr. Sabita Nair, Accord U.S. contracted with a third-party clinical research organization named Lambda Therapeutic, Ltd. to conduct "certain pharmacovigilance activities, including literature surveillance, case processing, aggregate reporting, signal detection, and risk evaluation" for docetaxel,[82] and  "to perform its safety evaluation as part of its pharmacovigilance responsibilities."[83]   More specifically, Dr. Nair testified that "all safety information that Accord Healthcare, Inc. receives is from Lambda. Lambda creates the safety information for all of Accord Healthcare Inc.'s products."[84]   Dr. Nair further explained that Lambda provides ***all*** of the pharmacovigilance for Accord,[85] and Lambda provides all safety information for Accord U.S. based on the information that Lambda collects in their global safety database.[86]

---

[77] Approval Letter, ACC00012697-00012770.

[78] *See* Accord Website – Company Profile.

[79] *See* Overview of Accord USA at a15.

[80] *See* Depo. of Dr. Samir Mehta at 14:22-15:1 and 50:20-51:2.

[81] Depo of Gerald Price at 27:3-16.

[82] *See also* Accord Responses to Interrogatories No. 14.

[83] Sabita Nair July 8, 2019 30(b)(1) testimony, 20:1 – 20:4.

[84] Sabita Nair Oct. 7, 2019 30(b)(6) testimony 33:7 – 33:11.

[85] *Id*. at 38:2 – 38:4 (emphasis added).

[86] *Id*. at 25:11 – 25:17; 47:17 – 47:23.

CONFIDENTIAL

124.    Unlike Sandoz, Accord U.S. does not maintain a Core Data Sheet or similar document for docetaxel.

125.    Despite not maintaining a docetaxel Core Data Sheet or similar document, Accord Healthcare Ltd. (Accord's global entity) provided the information about PCIA ongoing in TAX 316 in its May 2012 docetaxel label for the European Union. [87]

126.    Accord Healthcare Ltd. submitted its application to market in the European Union, attaching its label to the application, on June 22, 2011[88]—just 14 days after Accord gained approval in the United States.  This statement demonstrates Accord's knowledge of both the risk of PCIA generally, and Sanofi's TAX316 clinical trial data demonstrating the risk of PCIA.

127.    This knowledge is likewise consistent with the European Medicines Agency's published "Taxotere: Procedural steps taken and scientific information after authorization."[89]  That document lists all updates to the product information (SmPC) on Taxotere, the referenced drug for Accord's docetaxel product. On pages 8-9 of the exhibit is a line listing for "II/0100, SmPC section regarding the risk of renal dysfunction, respiratory disorders, persisting alopecia. . ."  Moreover, in Accord's 2012 label for docetaxel, there is a statement that "Cases of persisting alopecia have been reported." This statement again evidences Accord's knowledge of the final TAX 316 clinical trial data demonstrating a causal association between docetaxel and PCIA. This is also "some evidence of a potential causal relationship" between docetaxel and PCIA.

128.    In addition to the above, as evidenced by the multiple recitations of the body of scientific literature outlined in the prior reports of Drs. Feigal, Plunkett, and Madigan, the growing signal in the FAERS database, and the like, in keeping with its post marketing pharmacovigilance obligations as a 505(b)(2) holder, Accord US is responsible for understanding the science impacting its product.[90]

---

[87] European Union Accord Docetaxel SmPC, p. 19.

[88] European Union Accord Docetaxel SmPC ("[having] regard to the application submitted by Accord Healthcare Limited, on 22 June 2011, under article 4(1), . . ." The Commission's decision attaches Accord's Summary of Product Characteristics (SmPC)).

[89] EMA Taxotere SmPC Overview.

[90] According to Dr. Nair, as Accord US's designated representative for pharmacovigilance, Accord's obligation to "update[s] the labels as soon as FDA requires it to do so, or as soon as there is a labeling change in the [Reference Listed Drug, e.g. Taxotere]." Nair Dep. 89:7 – 89:22, Oct. 7, 2019.  Accord only "rel[ies] upon the RLD's labeling" in updating and maintaining its own label.[90]  This is incorrect.  As a 505(b)(2) NDA holder, Accord US has the same

129.     Based on the above, Accord US had knowledge of the risk of PCIA at the time of approval of its docetaxel product in the United States, and thereafter prior to the Plaintiff's use of its product in June 2011.  The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or  the evidence that existed provided Accord with reasonable evidence of a causal association between its docetaxel product and PCIA prior to June 22, 2011.  As discussed above, this triggered Accord's obligation to update the label for its docetaxel product.

### 3.     Hospira.

130.     Hospira received authorization to market its US docetaxel product on March 8, 2011.[91]  Similar to Sandoz, Hospira utilizes a Core Safety Information – "a company controlled document" that sets forth the minimum safety information to be listed in the labels used in the countries where Hospira markets docetaxel.[92]

131.     Hospira is unique in its knowledge of docetaxel, and particularly concerning drug safety and side effect profile, because of a high-ranking employee that had specific experience with the pharmacovigilance of Taxotere/docetaxel at both Sanofi and Hospira.  Juergen Schmider was the Sanofi Vice President of Safety Surveillance and Product Safety with the department of Epidemiology, with responsibilities for Taxotere, from March 2011 through April 2013.[93]  After leaving Sanofi in April 2013, Dr. Schmider became the Global Vice President of Pharmacovigilance and Product Safety for Hospira, again with responsibilities for Taxotere.[94]

132.     While at Sanofi, Dr. Schmider dealt directly with pharmacovigilance and drug safety, and during his tenure, Sanofi submitted to the European Medicines Agency an application

---

labeling obligations as a 505(b)(1) innovator NDA holder – including to update its label to include or modify a contraindication, warning, precaution, or adverse reaction where evidence of a causal association or causal relationship has been met in accordance with 21 CFR 201.57(c).

[91] NDA APPROVAL - HOS01400256285 - Record No. 572206 and Original New Drug Application - HOS00200007762 - Record No. 463130.

[92] Schmider 30(b)(6) depo, 69:16 – 71:3.

[93] J. Schmider dep., 48:1-3.

[94] J. Schmider dep., 48:23-49:8.

to update its label concerning, among other safety issues, persistent alopecia.[95]  Specifically, the EMA stated that "Given the serious psychological consequences of this adverse effect in, often young, patients treated mainly in an adjuvant scheme, health care professionals and patients should be informed of the possible irreversibility of alopecia. Therefore, the CHMP requested the MAH to update the SmPC [label] in this respect in order to address this risk more clearly."

133.    In addition, when Dr. Schmider was deposed in this case, he brought with him documents marked "property of the sanofi-aventis group - strictly confidential."   One of these documents was Sanofi's Core Data Sheet for Taxotere dated June 28, 2011 date, which included information regarding PCIA from TAX 316.[96]

134.    Based on these documents and his experience while at Sanofi, Dr. Schmider—and in turn, Hospira—knew or should have known of the risk of PCIA with docetaxel.

135.    According to Dr. Schmider, Hospira did not follow up on reports of alopecia, however, because alopecia is a known side effect of chemotherapy.[97]  Due to the lack of follow up, and despite having knowledge of EMA's report statement concerning the "the serious psychological consequences of this adverse effect" Hospira did not capture or assess the nature, duration or severity of persistent alopecia events, despite the growing body of scientific knowledge.

136.    Hospira claims that its pharmacovigilance department periodically performed literature searches for all of its products.  There was adequate scientific literature available prior to Ms. Sanford's initial infusion date.  Had Hospira performed an adequate literature search and signal detection analytics prior to market approval, it would have seen the same literature and safety signal demonstrated in the reports of Drs. Feigal and Madigan. This is true for all manufacturers addressed in this report.

137.    All of these events are underscored by an inspection by the British Medicines & Healthcare products Regulatory Agency.[98]  Also, in 2013 the Belgian Federal Agency for Medicines and Health Products issued a Pharmacovigilance Inspection Report finding a number

---

[95] Schmider dep., Ex. 9, p. 2, 6-7.

[96] Schmider dep. Ex. 7 and 5, respectively.

[97] Schmider dep., 79:15-18; Mir dep., 128 (rough).

[98]  01 - MHRA - HOS01400019056.

of critical shortcomings, including a lack of risk based audits, procedures for pharmacovigilance operations, lack of training, deficient receipt and management of suspected adverse events, and an incomplete master pharmacovigilance file.[99]

138.     As noted above, Hospira's 2012 label in Israel, Hungary, the United Kingdom, and other countries referenced a summary of Sanofi's TAX 316 clinical trial data, including ongoing (permanent) alopecia. In July 2013, Hospira changed at least five of its European labels to include additional information regarding the TAX316 data and permanent alopecia.

139.     In addition, after Hospira was purchased by Pfizer and after Pfizer became aware of the Sanofi December 2015 label change, Pfizer conducted a clinical overview. As part of the clinical overview, a search of the safety database was performed in September 2016. That search revealed 146 cases of alopecia, of which 29% were described as "permanent" or "irreversible."[100] The results of the clinical overview, including the results of the safety database search, led to Hospira seeking a label change in March 2017 to state "cases of permanent alopecia have been reported."[101]

> Based on the above, Hospira had knowledge of the risk of PCIA prior to the Plaintiff's use of its product in March 2011. The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or the evidence that existed provided Hospira with reasonable evidence of a causal association between its docetaxel product and PCIA in as early as 2011, and as evidenced in its own 2012. labels in Israel, Hungary, and the United Kingdom, among other countries Hospira's label was not changed to reflect the change Sanofi received approval for in December 2011, until nearly 2 years later – in 2017.  Prior to this Hospira never warned of the risk PCIA in its label.

140.     As discussed above, this triggered Hospira's obligation to update the label for its docetaxel product.

141.     I state all of my opinions herein to a reasonable degree of professional regulatory certainty.

---

[99] Benelux - No markup - HOS01400186232, see also Mir dep., 64-93 (rough).  It is important to note that this report from outside the United States is relevant to this opinion because a large majority of the pharmacovigilance operations for Hospira were conducted from outside the United States.  Mir dep. p. 24-26, 30-28 and 81 (rough).

[100] March 2017 - HOS00200030958.

[101] Docetaxel Oct. 2019 Label - HOS02100035549.

**CONFIDENTIAL**

Dated: June 8, 2020.

_____
David B. Ross, M.D., Ph.D., M.B.I.

CONFIDENTIAL