# EXHIBIT A

Page 1

```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
    * * * * * * * * * * * * * * * * * * * * * * * *
    IN RE: TAXOTERE (DOCETAXEL)   MDL NO. 2740
    PRODUCT LIABILITY
    LITIGATION                    SECTION "N" (5)
                                  JUDGE MILAZZO

    This Document Relates to:
                                  MAG. JUDGE NORTH
    Audrey Plaisance vs.
    Hospira, Inc., et al.,
    No. 2:18-cv-08086

    * * * * * * * * * * * * * * * * * * * * * * * *

                       Deposition of
                    LAURA CHAUVIN, M.D.

                 taken on October 15, 2020
                 commencing at 3:08 p.m.
                         at the
                       offices of

                   Thibodaux, Louisiana
```

1    Q.    And Mrs. Plaisance and her husband
2    expressed those sentiments to you that day?
3    A.    They what?
4    Q.    Mrs. Plaisance and her husband expressed
5    those sentiments to you --
6    A.    Yes.
7    Q.    -- that day?
8    A.    Yes.  Yes.
9    Q.    And you spent -- I believe the record
10   notes a total of at least 70 minutes with
11   Mrs. Plaisance and her husband that day?
12   A.    Yes.
13   Q.    Including 50 minutes on counseling?
14   A.    Yes.
15   Q.    And after that counseling,
16   Mrs. Plaisance told you she wanted to follow that
17   recommendation and proceed with Taxotere and Cytoxan
18   chemotherapy?
19   A.    Yes.
20   Q.    And you understood that she wanted to do
21   that because she wanted to pursue all available
22   treatment options to beat her cancer?
23   A.    Yes.
24   Q.    And you also noted on the last page of
25   that record of page ending 118 that -- just the

1    paragraph there, the full paragraph, that:  We will
2    proceed with adjuvant chemotherapy quickly?
3         A.    Yes.
4         Q.    And why did you want to pursue
5    chemotherapy quickly?
6         A.    There is some data if you wait too long,
7    you lose efficacy.  They have softened those
8    criteria over the years.  She was in a time frame
9    that was adequate to begin, but she was already five
10   weeks out.  So we don't like to waste time if the
11   surgeon has cleared her for chemo.
12        Q.    And in addition to chemotherapy, did
13   your treatment plan for Mrs. Plaisance include
14   radiotherapy and an aromatase inhibitor?
15        A.    Yes.
16        Q.    And as of 2014, I believe you testified
17   earlier that you had already had experience treating
18   breast cancer with docetaxel; is that right?
19        A.    Yes.
20        Q.    And before you first prescribed
21   docetaxel, did you review the prescribing
22   information and the drug labeling?
23        A.    Yes.
24        Q.    And had you also had discussions over
25   the years with colleagues about docetaxel?

1      A.     Yes.
2      Q.     And were you also familiar with the
3   medical literature that supported its use in
4   treating breast cancer?
5      A.     Yes.
6      Q.     And based on your care and treatment of
7   your patients, was there a good body of evidence to
8   support the products used for adjuvant early breast
9   cancer treatment?
10     A.     Yes.
11     Q.     And it was a standard of care for
12  adjuvant breast cancer treatment at the time?
13     A.     Yes.
14     Q.     And I believe you've testified today
15  that you do not feel that there was another
16  treatment option for Mrs. Plaisance that would have
17  been a better treatment option for her; is that
18  right?
19     A.     Right.
20     Q.     And during your visit on
21  January 15, 2014, you also provided Mrs. Plaisance
22  information on potential risks and side effects of
23  the chemotherapy that you were prescribing for her?
24     A.     Yes.
25     Q.     And is it fair to say at that time you

1    knew those risks could be serious, up to and
2    including death?
3         A.    Yes.
4         Q.    And did you understand at the time that
5    you prescribed TC for Mrs. Plaisance that there was
6    a risk that she would experience persistent or even
7    permanent hair loss from chemotherapy treatment.
8              MR. ROCKSTAD:  Object to form.
9         A.    I'll admit I didn't -- what was that?
10   Someone else spoke.  Was that an objection?  Do I
11   answer?
12   BY MS. GONZALEZ:
13        Q.    You can answer.
14             MR. ROCKSTAD:  Yeah, I just objected
15             to the form, but you can answer, Doctor.
16        A.    Back then, I didn't really have an
17   understanding that it had a high risk of the
18   permanent hair loss.  And I didn't -- really didn't
19   discuss permanent hair loss frequently with patients
20   at all with that regimen or any other one.  I just
21   had not have people have permanent hair loss or --
22   well, just really hadn't.  I don't know if I was
23   lucky or I changed jobs too quickly and didn't
24   follow people long enough to where they said I'm not
25   happy with my hair.

Page 109

1    inhibitor.
2              There are plenty of people that we treat
3    only with aromatase inhibitors, and significant hair
4    loss, again, I've not seen. But them again I hadn't
5    seen permanent hair loss from Taxotere either, so.
6         Q.   But you've had patients on Femara who
7    have experienced hair loss or thinning hair?
8         A.   Usually when they were preceded with the
9    use of chemotherapy. So already gone on, already
10   there, and then, you know, how we do drugs in
11   America, if you have a symptom, it's listed as a
12   side effect where there's -- really, cause and
13   effect is not always clear.
14             Especially, you know, you'll look at
15   aromatase inhibitor, and it will list every side
16   effect of chemotherapy. It even lists low white
17   blood cell account when that's just left over from
18   previous chemotherapy.
19        Q.   And you agree that listings of adverse
20   event reports do not represent a determination on
21   causation?
22        A.   They don't, necessarily.
23        Q.   Did you speak with Mrs. Plaisance about
24   hair loss as a potential risk or adverse effect of
25   Femara?

```
 1        A.    No.
 2        Q.    And Mrs. Plaisance agreed to take on the
 3   risks listed in this informed consent form for her
 4   aromatase inhibitor and followed your recommendation
 5   to proceed with it --
 6        A.    Yes.
 7        Q.    -- is that right?
 8              And for how long did you recommend that
 9   Mrs. Plaisance take Femara?
10        A.    Five years.
11        Q.    And is that something she was to take
12   orally every day?
13        A.    Yes.
14        Q.    And as far as you know, was she
15   compliant with taking Femara for the five years that
16   you prescribed it for her?
17        A.    Yes.
18        Q.    And do you know when she -- has she
19   stopped taking Femara?
20        A.    Yes.
21        Q.    Do you know when she completed her
22   therapy with it?
23        A.    Well, it was pretty much at five years.
24   It was probably in there that says exactly when she
25   had that date.
```

1    Q.   Okay.  I ask just because she testified
2  that she thought she had discontinued it in 2020,
3  this year.  I think the records suggest it was 2019,
4  so I just --
5    A.   It was 2019.
6    Q.   It would have been 2019?
7    A.   Yep.  I can make sure of that, if you
8  want me to look at the records.  But I know she
9  completed her five years.  That's what my notes
10 said.
11   Q.   Would you have extended the time for her
12 for any reason beyond the five years?
13   A.   Only if she had quit for six months or
14 so, I usually try to make it up.  But I don't think
15 she quit.
16   Q.   And Mrs. Plaisance also completed the
17 radiation therapy that was prescribed for her by her
18 radiation oncologist, Dr. Dunn; is that right?
19   A.   Yes.  Yes.
20   Q.   And you've continued to treat
21 Mrs. Plaisance in 2014 with your regular follow-up
22 visits; is that right?
23   A.   Yes.
24   Q.   And she's had no recurrence of cancer
25 during that time?

Page 112

1  A. Yes.
2  Q. And was her five-year anniversary after
3  completing chemotherapy a significant milestone for
4  her to be cancer-free after five years?
5  A. I think so. People get to feel pretty
6  positively when they get to quit taking the
7  aromatase inhibitor and have a sense of job well
8  done, job complete.
9  Q. And was that true for Mrs. Plaisance?
10 A. Well, I think so, but you'd have to ask
11 her how she feels.
12 Q. Sure.
13    Dr. Chauvin, could we take about a
14 ten-minute break and I will come back and complete
15 my questions with you?
16 A. Okay.
17 Q. Thank you.
18    THE VIDEOGRAPHER: The time is
19    5:53 p.m. and we are off the record.
20    (A 14-minute break was taken from 5:53
21    until 6:07 p.m.)
22    THE VIDEOGRAPHER: The time is
23    6:07 p.m. This begins Media Unit
24    Number 3, and we are back on the record.
25 EXAMINATION

1      recurrence of breast cancer?
2           A.    Right.
3           Q.    And on the next page ending in 07, at
4      the very bottom before Dr. Landry's name there's a
5      note that she had questions about breast cancer
6      recurrence years later as she has a friend who she
7      thinks recurred with Stage IV disease.
8                 What questions did she have for you?
9           A.    Well, I'm sure a general question was:
10     How likely is it, is that going to happen to me?
11                And it unfortunately happen sometimes up
12     to 25 years, and I probably had that kind of
13     discussion with her.  But probably reiterated she
14     had a pretty low-stage breast cancer node-negative
15     and that she's doing all the right things of
16     exercising and eating low fat which can help prevent
17     recurrence.
18          Q.    And at the top of the page of that same
19     page, it looks like you noted that she had completed
20     aromatase inhibitor May 2019?
21          A.    Yes.
22          Q.    And that's consistent with your
23     recollection?
24          A.    Yes.
25          Q.    And you didn't examine her hair that

```
 1    day; correct?  Or her scalp?
 2         A.    I probably didn't exactly palpate it or
 3    pay much attention to it if she had hair.
 4               Nope, I didn't note her hair that day.
 5         Q.    And I think you testified earlier that
 6    before you prescribed docetaxel, at least for the
 7    first time, you would have reviewed the prescribing
 8    information or the label; is that right?
 9         A.    Generally, yeah.  I don't read the label
10    of every medicine right before I prescribe it but...
11         Q.    Do you know when you would have reviewed
12    the prescribing information for docetaxel?
13         A.    No, I don't remember exactly when I
14    looked at the PDR on it.  Looking up dose adjustment
15    for toxicity all the time, but I might have looked
16    at it specifically for alopecia indications.
17         Q.    And did you review Hospira's docetaxel
18    label before prescribing docetaxel for
19    Mrs. Plaisance?
20         A.    Not specifically.
21         Q.    And so you didn't rely on Hospira's
22    label in prescribing it for her; is that right?
23               MR. ROCKSTAD:  Object to form.
24         A.    No.  I can't tell you whose label I last
25    looked at.  I can put it that way.
```

Page 132

1  BY MS. GONZALEZ:
2       Q.   Did you rely on any information from
3  Hospira in prescribing docetaxel for Mrs. Plaisance?
4       A.   When I look up information on chemo
5  medicines, I go to UpToDate, and I don't think it
6  really notes who -- I don't pay any attention to who
7  the manufacturer is.
8       Q.   And when you prescribed docetaxel,
9  you're not prescribing a particular manufacturer's
10 docetaxel; is that correct?
11      A.   I prescribed the one with which the
12 cancer center has a contract.  I am employed.  They
13 negotiate the drug and the prices and that's what we
14 use.  And I'm not included in those choices.
15      Q.   You prescribe the medicine and then it's
16 administered by the pharmacy; is that right?
17      A.   Yeah --
18      Q.   Sorry, let me ask a better question.
19      A.   -- and it's administered by the chemo
20 nurses, yes.
21      Q.   So when you prescribe docetaxel, you
22 don't know which manufacturer's product will be
23 administered to the patient?
24      A.   The one we have now is what we call the
25 generic one.  And if y'all are the only

Page 133

1    manufacturer, that's the one -- of the generic,
2    that's what we have.
3         Q.    Okay.  And you don't know whether or not
4    Hospira --
5         A.    I can probably maybe find out.  I don't
6    know.  We'd have to talk with the director.
7         Q.    Sure.
8               And I'm just asking you, when you make
9    your decision, you're not prescribing a particular
10   -- you're not choosing to prescribe --
11        A.    Brand?  No.  No.
12        Q.    So just to be clear, because I think we
13   just spoke over one another, when you're prescribing
14   docetaxel, you're not prescribing that a particular
15   manufacturer's product be used?
16        A.    No.
17        Q.    Is that right?
18        A.    Correct.
19              (Off-record discussion)
20   BY MS. GONZALEZ:
21        Q.    Thank you, Doctor.  I'm just trying to
22   wrap this up as quickly as possible.  Just give me a
23   couple of minutes --
24        A.    Take your time.
25        Q.    -- to flip through.  Thank you.

Page 134

1  And are you familiar with what the
2  labeling for docetaxel said about hair loss or
3  alopecia in 2014 when you prescribed it for
4  Mrs. Plaisance?
5       A.   Yes.
6            MR. ROCKSTAD: Object to form.
7  BY MS. GONZALEZ:
8       Q.   And what did it say?
9       A.   A range of percentage of risk of
10 alopecia. It didn't discuss permanent versus
11 temporary.
12      Q.   And so it warned of a potential risk of
13 hair loss or alopecia generally?
14      A.   Yes.
15      Q.   And that could include temporary or
16 permanent hair loss?
17      A.   I would think so.
18           MR. ROCKSTAD: Object to form.
19 BY MS. GONZALEZ:
20      Q.   And would you agree that the -- strike
21 that.
22           You -- I think you mentioned earlier
23 that there can be different cause -- many different
24 causes or risk factors for hair loss; is that fair?
25      A.   I don't know about many, but there are

1    other things that can cause hair loss.
2       Q. And we had talked about your awareness
3    of the risk of hair loss as a risk of chemotherapy.
4    Did the information you had about docetaxel at the
5    time you prescribed it for Mrs. Plaisance provide
6    sufficient information for you to do an appropriate
7    risk-benefit analysis for her?
8            MR. ROCKSTAD: Object to form.
9       A. You're asking about a risk-benefit as it
10   relates to hair loss?
11   BY MS. GONZALEZ:
12       Q. In general for the product.
13       A. For treatment of the cancer?
14       Q. Yes.
15       A. Yes. I think it was the right treatment
16   for her cancer.
17       Q. If there had been an additional
18   statement in the labeling for docetaxel that there
19   have been reports, cases, of permanent alopecia had
20   been reported, would that have changed your decision
21   to prescribe TC for Mrs. Plaisance?
22       A. Well, if the percentage of that risk was
23   included and it was, you know, less than 0.5 percent
24   or something, probably not, but I would discuss with
25   people that it could be permanent.

Page 136

1           It depends on the percentage risk.
2      Q.   And if it had been a statement in the
3   post-marketing adverse events section that simply
4   said that there had been cases of permanent alopecia
5   that had been reported, would that change your
6   prescribing decision?
7      A.   Again, it would have to do with the
8   percentage risk of that, how frequently that was
9   seen.
10     Q.   And we talked earlier about how the
11  risks of the chemotherapy medications that you
12  prescribed included potentially serious risks,
13  including death; right?
14     A.   Correct.
15     Q.   And those were risks that you took on
16  and Mrs. Plaisance took on in proceeding with her
17  chemotherapy regimen in 2014?
18     A.   Yes.
19     Q.   And what -- I'm sorry.
20          I think you said that you would have
21  discussed with a patient permanent hair loss if the
22  labeling had included a reference to cases of
23  permanent hair loss; is that right?
24     A.   Yes.
25     Q.   And what would you have -- what would

```
                                                        Page 145
 1              REPORTER'S CERTIFICATE
 2         This certification is valid only for a
    transcript accompanied by my original signature and
 3  original required seal on this page.
            I, EVANGELINE A. LANGSTON, Certified Court
 4  Reporter in and for the State of Louisiana, as the
    officer before whom this testimony was administered,
 5  do hereby certify that Laura Chauvin, M.D., after
    having been duly sworn by me upon authority of R.S.
 6  37:2554, did testify as hereinbefore set forth in
    the foregoing 144 pages;
 7
            That this testimony was reported by me in the
 8  stenotype reporting method; was prepared and
    transcribed by me or under my personal direction and
 9  supervision, and is a true and correct transcript to
    the best of my ability and understanding;
10          That the foregoing transcript has been
    prepared in compliance with transcript format
11  guidelines required by statute or by the Rules of
    the Louisiana Certified Shorthand Reporter Board;
12  and that I am informed about the complete
    arrangement, financial or otherwise, with the person
13  or entity making arrangement for deposition
    services; that I have acted in compliance with the
14  prohibition on contractual relationships, as defined
    by the Louisiana Code of Civil Procedure Article
15  1434 and in rules and advisory opinions of the
    board;
16          That I have no actual knowledge of any
    prohibited employment or contractual relationship,
17  direct or indirect, between a court reporting firm
    and any party litigant in this matter, nor is there
18  any such relationship between myself and a party
    litigant in this matter;
19          That I am not of counsel, not related to
    counsel or the parties herein, nor am I otherwise
20  interested in the outcome of this matter.
21
22
23                          _____
                            EVANGELINE A. LANGSTON, FCRR
24                          CCR #27019, RPR #31609
25
```