UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION          MDL NO. 2740

SECTION "H" (5)

THIS DOCUMENT RELATES TO:
*Plaisance v. Hospira, Inc.*, *et al.*, Case No. 2:18-cv-08086

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT HOSPIRA'S MOTION TO EXCLUDE
EXPERT TESTIMONY OF DAVID MADIGAN, PH.D.

**I. INTRODUCTION**

Dr. David Madigan is an exceedingly qualified expert whose opinions on biostatistical, statistical, and pharmacovigilance issues have been admitted by the Court in the *Earnest* and *Kahn* trials. Here, Hospira seeks to exclude or limit Dr. Madigan from testifying on two issues: (1) notice to Hospira of a safety signal for permanent alopecia with docetaxel (as a component of Ms. Plaisance's failure to warn case) and (2) general causation. Specifically, Hospira seeks to exclude: (1) Dr. Madigan's opinion that docetaxel causes permanent or irreversible alopecia; (2) any regulatory or labeling opinions offered by Dr. Madigan; (3) Dr. Madigan's analysis of the FDA's adverse event report database ("FAERS"); (4) Dr. Madigan's analysis of reports of permanent alopecia in Sanofi's internal adverse event database for Taxotere; (5) Dr. Madigan's meta-analysis of "ongoing" alopecia in Sanofi's clinical studies (TAX 301 and TAX 316) for Taxotere; and (6) Dr. Madigan's meta-analysis of four observational studies regarding permanent alopecia with docetaxel.

Plaintiff does not intend to offer Dr. Madigan as an expert to address 505(b)(2) drug labeling regulation issues. However, Dr. Madigan's expert opinions on the statistical evidence that supports a causal association between docetaxel and permanent/irreversible alopecia are

1

supported by his education, training, and experience, and will undoubtedly assist the trier of fact in this case.  For the reasons set forth herein, Dr. Madigan's expert opinions are admissible, and Hospira's motion should be denied.

## II.     STANDARD OF REVIEW

Under Federal Rule of Evidence 702, a witness who is qualified as an expert may testify if (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702.  The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for assessing whether an expert's testimony is admissible under Rule 702 by determining whether the testimony is both reliable and relevant. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).

Relevancy is "determined on the basis of assisting the trier." Fed. R. Evid. 702 Advisory Comm. Note. Under Rule 401, evidence is "relevant" if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Reliability of expert testimony "is determined by assessing 'whether the reasoning and methodology underlying the testimony is scientifically valid.'"  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (internal citation omitted).  A nonexclusive set of factors for determining reliability has been developed and include: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's

operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain "flexible" as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). A trial judge has "considerable leeway in … determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006).

"The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to 'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the basis and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *Nagle v. Gusman*, 2016 WL 560688 at *4 (E.D. La. Feb. 12, 2016) (internal citation omitted). As such, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes (2000).

**III.   ARGUMENT**

    **A.   Dr. Madigan will not offer general causation or drug labeling opinions.**

Hospira seeks the exclusion of opinions not offered by Dr. Madigan. Like in the *Earnest* and *Kahn* trials, Dr. Madigan intends to opine on the statistical evidence that supports a causal association between docetaxel and permanent/irreversible alopecia. This Court has ruled that "Dr. Madigan cannot tell the jury that there is evidence 'that docetaxel causes irreversible alopecia,' as he states in his report. Instead, he must take care to state only that evidence shows an association between the two." (Doc. 12098 at 5). Plaintiff intends for Dr. Madigan to provide statistical analyses in support of the general causation inquiry within the confines of this Court's previous

determination. Also, Plaintiff does not intend to offer Dr. Madigan as an expert to address 505(b)(2) drug labeling regulation issues.

> **B.    Dr. Madigan's safety signal analysis using case reports located in the FAERS database is reliable and relevant to Hospira's notice of a safety signal for permanent alopecia with docetaxel.**

Hospira repeats Sanofi's argument in *Earnest* and *Kahn* that Dr. Madigan's safety signal analysis using case reports located in the FAERS database is deficient because he did not review the individual, underlying case reports. Hospira, like Sanofi in *Kahn*, directs the Court's attention to Section 7 of FDA's draft guidance titled "Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff" issued for comment purposes in November 2019. The Court previously rejected Sanofi's identical criticisms of Dr. Madigan's analysis of case reports in the FAERS database after the issuance of the FDA's draft guidance. (Doc. 12098 at 13-14).

Hospira now attempts to circumvent the Court's holding by claiming Dr. Madigan admitted he is not following the FDA's draft guidance, and this "admission" destroys the admissibility of Dr. Madigan's safety signal analysis because the Court is only willing to accept limitations in Dr. Madigan's methodologies when Dr. Madigan's statistical analysis "is accepted in the industry" and "used by drug companies and the FDA." For the reasons explained below, Hospira's argument is wholly without merit.

The Court's language cited by Hospira that Dr. Madigan's statistical analysis "is accepted in the industry" and "used by drug companies and the FDA" originated in the Court's Order in *Earnest* in relation to the key words Dr. Madigan used to search both the FAERS database and Sanofi's internal database. (Doc. 8094 at 8-9). The Court did not consider the effect of the FDA's draft guidance on the reliability of Dr. Madigan's methodology in *Earnest*. While the Court referenced its earlier language in its Order in *Kahn* concerning Dr. Madigan's inability to review

*every* case report contemplated in the entire FAERS database (Doc. 12098 at 13 n.50), Plaintiff respectfully does not interpret the Court's Order in *Kahn* to require that her biostatistician expert must duplicate the methodology of FDA safety officers according to the FDA's draft guidance that is only a draft distributed for comment purposes.[1] Indeed, the Court previously held that Dr. Madigan was not required to conduct the second step of the process titled signal evaluation in the FDA's draft guidance in order for his opinion to be reliable. (Doc. 12098 at 13-14). Accordingly, Hospira is attempting to create a hurdle that is not required under *Daubert* or the Court's previous orders.

While Dr. Madigan agreed that the FDA's draft guidance suggests safety officers for the FDA look at the narrative reports, he did not agree that the FDA's draft guidance would suggest that he look at the narrative reports for his analysis: "I think you're overstating it there. They are saying matter of factly, this is what reviewers attempt to do. You are characterizing it as they are stating this is best practice. This is what reviewers do."[2] Dr. Madigan further testified:

> I think the spirit of this is more they are seeing reports coming in, they see accumulating evidence or accumulating reports of a particular adverse event, and they may then look at all reports for those adverse events, they might pull reports and look at those. I understand that's what this is saying.[3]

In other words, if Dr. Madigan was a safety officer for the FDA, "these reports are flowing in, sure, I should look at them."[4] But Dr. Madigan is not a safety officer for the FDA: "…I'm not a

---

[1] Def. Ex. D, FDA Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff *DRAFT*, Nov. 2019; Def. Ex A, Deposition of Dr. David Madigan, Sept. 17, 2021 ("Madigan Dep.") at 109:19 ("I don't think it's been finalized.").
[2] *Id.* at 115:1-10.
[3] *Id.* at 116:14-20.
[4] *Id.* at 118:2-5.

5

safety reviewer. I don't do what safety reviewers do. I did a statistical analysis – I'm a statistician…"[5]

Reviewing individual, underlying case reports is not contemplated as part of FAERS disproportionality analysis because the methodology inherently centers on a review of this FDA database without access to the underlying case reports. Dr. Madigan's methodology has not changed since the *Kahn* trial in which the Court determined Dr. Madigan's opinions were admissible. Neither the FDA's draft guidance nor Dr. Madigan's explanation on the differences between his analysis and the processes described therein are bases for the Court to reverse its prior determination on admissibility. Accordingly, whether FDA safety officers look at the underlying case reports in the FAERS database is a topic for cross examination.

The same type of FAERS analysis Dr. Madigan performed in this case has been routinely admitted by other courts and used by the FDA. *See, e.g.*, *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-CV-144, 2015 WL 13022172, at *12–13 (S.D. Ohio Oct. 2, 2015), *aff'd*, No. 16-3347, 2017 WL 680349 (6th Cir. Feb. 21, 2017); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 6302573, at *17 (S.D. Ill. Dec. 16, 2011); *see also In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242–43 (W.D. Wash. 2003) (allowing experts' testimony taking into consideration all lines of evidence, including FAERS data and one epidemiology study). Dr. Madigan's FAERS methodology is reliable and generally accepted in the scientific community. *Rheinfrank*, 2015 WL 13022172, at *13; *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig.*, No. CIV.A. 08-08, 2013 WL 1558690, at *8–9 (D.N.J. Apr. 10, 2013).

---

[5] *Id.* at 117:8-13; *see also id.* at 118:6-8, 119:2-25.

Hospira additionally argues that Dr. Madigan's FAERS analysis is irrelevant in this case because it identifies a safety signal too early. Hospira's docetaxel label was approved in March 2011.[6] Dr. Madigan opined that a clear safety signal emerged as early as 2000 that became permanent in 2008.[7] But if Hospira first identified the safety signal in 2012 as part of its post-marketing obligations, it would be "newly acquired information" under the FDA's Changes Being Effected ("CBE") procedure despite that it started in the early 2000s.[8] Pharmacovigilance standards certainly don't allow Hospira to turn a blind eye to a permanent safety signal simply because it may have started prior to market approval.

The Supreme Court has made clear that because risks associated with a drug may accumulate over time, previously submitted data can be the basis of "newly acquired information" justifying a CBE change. *See Wyeth v. Levine*, 555 U.S. 555, 569 (2009) (quoting, in part, 73 Fed. Reg. 49607) (internal cites omitted). Indeed, "newly acquired information could be an increasing body of data of an inherent risk with the drug." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 42 (1st Cir. 2015) (internal quotations omitted) (citing *Levine*, 555 U.S. at 571). Accordingly, "if a manufacturer submits adverse event information to the FDA, then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, this meets the requirement for 'newly acquired information.'" *Id.* at 84 (quoting *Levine*, 555 U.S. at 569) (internal quotations omitted).

---

[6] Def. Ex. G, Expert Report of Dr. David Ross, June 8, 2020 ("Ross Report") at ¶83.
[7] Def. Ex. B, Expert Report of Dr. David Madigan, March 23, 2020 ("Madigan Report") at ¶¶42-43 (There was a proportional reporting rate (PRR) signal for docetaxel from as early as 2000, a permanent empirical Bayes' geometric mean (EBGM) signal by the middle of 2008, and a signal for SEB05, an EBGM-related metric by the middle of 2012).
[8] Def. Ex. G, Ross Report at ¶59; *see also* 21 C.F.R. § 314.39(b).

The Court has adopted—and applied—this principle from *Levine* repeatedly in this MDL, for instance, in ruling in *Kahn* that "Sanofi 'could have analyzed the accumulating data' prior to [her] treatment and used the CBE process to unilaterally strengthen its label." *In re Taxotere (Docetaxel) Prod. Liab. Litig. [Kahn]*, 508 F. Supp. 3d 71, 84 (E.D. La. 2020) (quoting *Levine*, 555 U.S. at 569–70 ("In later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug.").). Here too, Hospira *could have analyzed the accumulating data* and added a stronger warning as the injury continued to occur in docetaxel patients. *See id.* at 83.

Analysis of the FAERS database illustrates accumulating data regarding the risk of permanent alopecia associated with docetaxel. Indeed, both Dr. Madigan's lasso logistic regression and L2 logistic regression analyses evidence an increased reporting rate of docetaxel against all other drugs exceeding the standard statistical threshold of 2 as of the end of 2010 and remaining above that threshold at the end of 2011 and beyond. In *Levine*, the Court concluded that adverse event reporting could provide a basis to update the label, even after given to the FDA in periodic reporting. *See Demahy v. Actavis, Inc.*, 593 F.3d 428, 447 (5th Cir. 2010) (discussing *Levine*), *rev'd sub nom. PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011). As such, the evidence is both reliable and relevant to whether Hospira should have updated its docetaxel label prior to Plaintiff's docetaxel use.

      **C.**      **Dr. Madigan's safety signal analysis using case reports located in the FAERS database is reliable and relevant to causation.**

Hospira next argues that Dr. Madigan's FAERS disproportionality analysis identifying a safety signal is unreliable or irrelevant because it is not sufficient, standing alone, to establish general causation. In doing so, Hospira contradicts its argument that Dr. Madigan cannot testify on the second prong of general causation. Dr. Madigan concluded that "the nature of the [FAERS]

8

database does not permit definitive causal inferences, but the evidence therein nonetheless forms an important component of any drug safety investigation [detecting a safety signal]."[9]  As noted in his report, while these safety signals, in and of themselves, do not imply causation, the FDA guidelines explain that such signals necessitate communication and further investigation.[10]  It is appropriate to consider this type of evidence in assessing causation, and Dr. Madigan's opinions are in conformity with the Court's order that Dr. Madigan can only state that evidence shows an association between docetaxel and permanent alopecia.  (Doc. 12098 at 5).

Hospira further argues that Dr. David Kessler's absence from Plaintiff's expert designations should alter the Court's previous decision to admit Dr. Madigan's safety signal analysis using the FAERS database.  Dr. Kessler, a regulatory expert designated by certain Plaintiffs in this litigation but not Ms. Plaisance, confirmed that the search terms used by Dr. Madigan in his analysis of the FAERS database were the most reasonable to capture the injury at issue.[11]  Hospira now complains that it is prejudiced without "typical safeguards of disclosure and deposition allowed for expert discovery" because Dr. Kessler has not been designated as an expert in the case at issue.  However, Dr. Madigan clearly defines the search terms that he used in his expert report and has been extensively questioned about the appropriateness of such terms during his depositions in the MDL.[12]  Moreover, Hospira exaggerates Dr. Kessler's role in defining the outcome for his analysis.  Dr. Madigan did not blindly rely on Dr. Kessler's support to define the outcome.  For example, Dr. Madigan previously testified as follows:

> So the outcome I defined in this case was, as we've discussed at length, the higher level term alopecias and then an outcome of

---

[9] Def. Ex. B, Madigan Report at ¶48.
[10] *Id.* at ¶17.
[11] Def. Ex. A, Madigan Dep. at 81:18-82:4.
[12] Def. Ex. B, Madigan Report at ¶40.  Dr. Madigan's testimony on the same FAERS analysis also was admissible in the recent *Kahn* trial.

9

> disability or permanent damage. So I chose that. And then I basically asked Dr. Kessler, formed FDA commissioner, if he, you know, if he though that was reasonable. And he did. But that was supported. But I chose it based on, you know, I've been doing these kinds of analysis for two decades.[13]

As such, Dr. Madigan's consultation with Dr. Kessler on search terms is by no means dispositive, and Dr. Madigan's methodology is sound.

> D. **Dr. Madigan's analyses of Sanofi's internal safety database is reliable and relevant to causation, and Sanofi's TAX 316 and TAX 301 clinical trial data is reliable and relevant to notice and causation.**

Hospira next moves to exclude Dr. Madigan's analysis of Sanofi's internal safety database and TAX 316 and TAX 301 clinical trial data. Hospira erroneously argues that Dr. Madigan's opinions are unreliable and irrelevant because he relied on Sanofi's internal adverse event database rather than Hospira's internal adverse event database. Hospira further takes issue with Dr. Madigan's reliance on Sanofi's TAX 316 and TAX 301 clinical trial.

Dr. Madigan admitted that he does not know whether manufacturers like Hospira have access to Sanofi's internal pharmacovigilance database.[14] Likewise, Dr. Madigan admitted that he does not know whether there is published literature that found a statistically significant risk of permanent alopecia when TAX 316 and TAX 301 are combined; he does not know whether Hospira had access to Sanofi's raw clinical trial data or study reports; and he is not aware of any publicly available information about the Sanofi clinical trial data that was available to Hospira that it could have used to do the same meta-analysis.[15] Nevertheless, the results of Sanofi's studies are publicly available in published literature, and updates to foreign labeling show that Hospira was on notice of (and had access to) information regarding permanent alopecia in the TAX 316 clinical

---

[13] Ex. 1, Deposition of Dr. David Madigan, August 24, 2020 at 197:19-198:4.
[14] Def. Ex. A, Madigan Dep. at 143:20-144:23.
[15] *Id.* at 66:9-67:5, 70:1-13, 68:1-69:25.

trial. For examples, as far back as 2012, Hospira's docetaxel labels in Israel, Hungary, and the United Kingdom (among other countries) included persistent alopecia data from Sanofi's TAX 316 clinical trial.[16] And in July 2013, Hospira changed at least five of its European labels with additional TAX 316 data.[17] These regulatory moves show that Hospira possessed new scientific information regarding PCIA from Sanofi's clinical trial and that, had Hospira reviewed Sanofi's Summary of Product Characteristics (SPC) for Taxotere at that time, Hospira would have had access to the final clinical trial data and additional statements regarding the risk of PCIA.[18] In addition, Hospira is unique in its knowledge of docetaxel and access to Sanofi's internal clinical trials because Dr. Juergen Schmider, the Vice President of Safety Surveillance and Product Safety with the department of Epidemiology for *Sanofi* from March 2011 through April 2013 with responsibilities over Taxotere, became the Global Vice President of Pharmacovigilance and Product Safety for Hospira in April 2013, again with responsibilities over Taxotere.[19] When Dr. Schmider was deposed in a 30(b)(6) deposition for Hospira, he brought Sanofi's internal and confidential documents to his deposition, including Sanofi's Core Data Sheet for Taxotere dated June 28, 2011, which included information regarding permanent alopecia from TAX 316.[20] As such, Dr. Madigan's analysis of Sanofi's clinical trial data is relevant to when the risk of permanent alopecia was knowable to Hospira.

Moreover, both Sanofi's internal database and clinical trial data properly support causation. Hospira's argument that such evidence does not "fit" this case because Sanofi made an admission about causation does not carry weight. Dr. Madigan performed his own analysis of Sanofi's

---

[16] Def. Ex. G, Ross Report at ¶98.
[17] *Id.* at ¶138.
[18] *Id.* at ¶98.
[19] *Id.* at ¶131.
[20] *Id.* at ¶133.

internal database in addition to Sanofi's analyses in 2011 and 2015 that led it to conclude that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia."[21] Dr. Madigan mentions Sanofi's conclusion to support his conclusion that Sanofi's internal database reveals a statistical association between docetaxel and permanent alopecia.

Finally, Hospira's renewed arguments that Dr. Madigan's analysis of TAX 316 and TAX 301 clinical trial data is unreliable because the results do not show statistical significance and is based on the inaccurate premise that patients with "ongoing" alopecia had permanent alopecia should be rejected just as Sanofi's identical arguments were rejected in *Earnest* and *Kahn*.

### E. Dr. Madigan's Meta-Analysis Based on Observational Studies

The Court previously found Dr. Madigan's meta-analysis based on observational studies to be inadmissible in *Kahn*. (Docs. 12098 and 12403). Here, Plaintiff Ms. Plaisance renews and adopts the arguments in Ms. Kahn's motion for reconsideration. (Doc.12195).

### IV. CONCLUSION

For the reasons discussed above, the Court should deny, in its entirety, Hospira's Motion to Exclude Expert Testimony of Dr. Madigan.

Dated: December 7, 2021                                    Respectfully submitted,

/s/ *Christopher L. Coffin*                                /s/ *Karen B. Menzies*
Christopher L. Coffin (#27902)                             Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                           GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225                            6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                               Los Angeles, California 90045
Phone: (504) 355-0086                                      Telephone: 510-350-9700
Fax: (504) 355-0089                                        Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                                     kbm@classlawgroup.com

                                                           *Plaintiffs' Co-Lead Counsel*

---

[21] Def. Ex. B, Madigan Report at ¶¶49-50.

*Plaintiffs' Co-Lead Counsel*

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717

13

Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 7, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

　　　　　　　　　　　　　　　　　　　*/s/ M. Palmer Lambert*
　　　　　　　　　　　　　　　　　　　M. PALMER LAMBERT