UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)          MDL NO. 2740
      PRODUCTS LIABILITY
      LITIGATION
                                   SECTION "H" (5)
THIS DOCUMENT RELATES TO:

Audrey Plaisance, Case No. 2:18-cv-08086

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. LAURA PLUNKETT

INTRODUCTION

Dr. Laura Plunkett has been accepted as an expert in this MDL and in litigation across the country based on her qualifications and methodology. This Court largely rejected *Daubert* challenges in *Earnest* and *Kahn* to Dr. Plunkett's toxicology and pharmacology opinions and should again do so here.

Hospira has moved to exclude certain opinions of Dr. Plunkett regarding her proposed testimony on 1) docetaxel carrying an independent risk and substantial contributing factor of PCIA, 2) "disclaimed opinions", 3) the toxicity of docetaxel and Taxol, 4) the biological plausibility that docetaxel can cause PCIA, and 5) the differences in drug-induced alopecia and permanent chemotherapy-induced alopecia.

Dr. Plunkett is an experienced pharmacologist and toxicologist. She has performed countless risk and toxicity assessments over her career. Utilizing well-recognized tools commonly employed by pharmacologists and toxicologists, including a "weight-of-the-evidence" assessment, Dr. Plunkett evaluated and examined the available scientific information for the product at issue, docetaxel, which included information from multiple sources of documents produced during this litigation, studies, literature, and regulatory documents to reach her conclusions in this case.

1

Again, Defendants attack Dr. Plunkett's opinions based on disagreements with her ultimate conclusions, which disagreements simply are not grounds for exclusion. Defendants take issue with Dr. Plunkett's opinions but Dr. Plunkett conducted her pharmacology/toxicology risk assessment through scientifically valid and accepted methodologies, employing sufficient scientific research and factual information, to reach those opinions. Indeed, the Court previously found those opinions to be helpful and accepted Dr. Plunkett as an expert "in pharmacology, toxicology and risk assessment" based upon identical opinions and methodologies contained in her Expert Report."[1] All of Hospira's complaints go to the weight of Dr. Plunkett's testimony, and not its admissibility.  Hospira's present motion also mischaracterizes Dr. Plunkett's opinions and inexplicably seeks the exclusion of opinions not offered by this witness.

For the reasons set forth herein, Dr. Plunkett's opinions are admissible, and the Court should deny Hospira's motion to exclude Dr. Plunkett's testimony.[2]

## LEGAL STANDARDS

A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Moreover, in order to be admissible, expert testimony must be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).  In order to allow an expert's testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology

---

[1] Ex. 1, Trial Tr. 802:9-11, Sept. 18, 2019; Ex. 2, Plaintiff Disclosure of Expert Witnesses for Trial 5.
[2] *See Moore v. Ashland Chemical, Inc*., 151 F.3d 269, 276 (5th Cir. 1998); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 590-591.

properly can be applied to the facts in issue." 509 U.S. 579, 592-93 (1993) 592–93. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Id*. at 594.

The purpose of a *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 150.  "[W]hether an expert's testimony is reliable is a fact-specific inquiry." *Burleson v. Texas Dep't of Criminal Justice,* 393 F.3d 577, 584 (5th Cir. 2004) (citation omitted). Additionally, testimony is admissible when "the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case." *Tripkovich v. Ramirez*, No. 13-6389, 2015 WL 3849392, at * (E.D. La. June 22, 2015) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993)).  Expert testimony can be classified as relevant if "the reasoning or methodology 'fits' the facts of the case and will thereby assist the trier of fact to understand the evidence." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

ARGUMENTS

I.   DR. PLUNKETT'S EXPERT REPORT DOES NOT PROVIDE DISCLAIMED REGULATORY OPINIONS

Hospira inexplicably seeks to exclude opinions that were made clear at the outset of Dr. Plunkett's deposition that she would not be offering.  Admittedly, Dr. Plunkett is no stranger when it comes to drug labeling or the regulations pertaining to drugs; however, she is not offering regulatory or labeling opinions in the Plaisance matter.

Having said that, Hospira further contends that based on these allegedly disclaimed opinions, the Court should exclude three opinions that it contends are "causation" based opinions.

3

**A.    DR. PLUNKETT'S PREVIOUSLY ACCEPTED OPINION THAT DOCETAXEL CARRIES AN INDEPENDENT RISK OF PCIA SHOULD NOT BE EXCLUDED**

Hospira is clearly engaging in a battle of semantics. First, Dr. Plunkett's opinion that Taxotere carries an independent risk of PCIA and that the risk is not rare are given from a toxicology standpoint which demonstrates toxicity and independent risk. Those statements are not medical causation opinions; these statements are derived from a review of the available data that indicate that docetaxel has been associated with irreversible hair loss (a particular and identifiable toxicity) to a greater extent than other chemotherapeutic drugs and is not a rare event based on evidence from controlled clinical trial data, epidemiological data and individual case reports.[3] As such, a causation analysis was not and is not necessary for Dr. Plunkett to offer her toxicological opinions. Second, this Court found this opinion relevant and allowed testimony on same in both *Earnest* and *Kahn*.[4] The Court should do the same here and allow similar testimony that the literature supports that Taxotere is associated with an independent risk of PCIA.

**B.    DR. PLUNKETT'S "SUBSTANTIAL CONTRIBUTING FACTOR" STATEMENT IS NOT AN IMPROPER LEGAL CONCLUSION**

Plaintiffs contend that Dr. Plunkett's "substantial contributing factor" statement does not "invade the province of a jury". Dr. Plunkett is not offering causation opinions and has only ever asserted that her opinions are limited to her experience as a toxicologist and pharmacologist. Those statements are not medical causation opinions; these statements are derived from a review of the available data that indicate that docetaxel has been associated with irreversible hair loss (a particular and identifiable toxicity) to a greater extent than other chemotherapeutic drugs and is not a rare event based on evidence from controlled clinical trial data, epidemiological data and

---

[3] Ex. 3, Plunkett Report ("Plunkett Report"), June 3, 2020 at 14-31.
[4] In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn) (Jan. 13, 2021), ECF No. 11823, at 5 ("Kahn").

individual case reports.[5] As such, a causation analysis was not and is not necessary for Dr. Plunkett to offer toxicological statements.

As Dr. Plunkett has explained, when she uses the words "substantial contributing factor", it is in relation to describing combination therapy and identifies something in that therapy that has an independent risk to state that factor as contributing to that experience.[6] Dr. Plunkett specifically stated that "I'm talking about it as a toxicologist. In other words, when something can be seen independently, I believe that that independent risk based on, then, the experience in the published literature about the fact that Taxotere was one of the more commonly reported drugs… that's linked to that."[7] Dr. Plunkett has clearly defined her definition of "substantial contributing factor". Dr. Plunkett further explained that, "I'm dealing with some aspects that relate to an analysis for causation but I am not doing a full causation analysis."[8] Dr. Plunkett is using the same accepted weight-of-the-evidence methodology accepted in *Earnest* and *Kahn* and summarizes conclusions drawn in the medical literature and case studies made subject of this motion, none of which requires a causation analysis.

In prior bellwether trials in this MDL, the Sanofi defendants have been allowed to suggest to the jury, through their experts, that other chemotherapy drugs and hormone therapy are associated with persistent alopecia.  All defendants in this MDL have put forth experts who opine, without conducting Bradford Hill analyses, that it is impossible to determine which drug in a combination regimen was the scientific cause of permanent alopecia.  Defendants should not be allowed to make such arguments, through identification of case reports alone, when Dr. Plunkett has employed appropriate pharmacology and toxicology methodology to isolate Taxotere as being

---

[5] Ex. 3, Plunkett Report at 14-31.
[6] Ex. 4, Deposition of Laura M. Plunkett. Ph.D. ("Plunkett Dep."), April 27, 2020 at 127:17-25.
[7] *Id.* at 128:2-11.
[8] Ex. 5, Deposition of Laura M. Plunkett. Ph.D. ("Plunkett Dep. II"), Sept. 3, 2020 at 63:25-64:4.

associated with an independent (and unique) toxicity, that is permanent chemotherapy induced alopecia.   Accordingly, this Court should not exclude Dr. Plunkett's testimony regarding "substantial contributing factor."   Alternatively, should the Court have concerns given its prior opinion (Doc. 11823), Dr. Plunkett should be allowed to explain, without using the term "substantial contributing factor" why it is scientifically appropriate to find Taxotere is the likely culprit in combination regimens based on her evaluation the totality of the scientific evidence from a pharmacology/toxicology perspective.

### C.   DR. PLUNKETT SHOULD AGAIN BE ALLOWED TO PROVIDE TOXICOLOGY OPINIONS

Defendants again are asserting implications that are just not there. Dr. Plunkett is not offering general causation opinions and has only ever asserted that her opinions are limited to her experience as a toxicologist and pharmacologis. Those statements are not medical causation opinions; these statements are derived from a review of the available data that indicate that Taxotere has been associated with irreversible hair loss (a particular and identifiable toxicity) to a greater extent that other chemotherapeutic drugs and is not a rare event based on evidence from controlled clinical trial data, epidemiological data and individual case reports.[9] As such, a two-part test using a methodology like the Bradford-Hill criteria was not and is not necessary for Dr. Plunkett to offer her toxicological opinions.  She is *not* offering causation opinions. Also, if anyone is engaging in "verbal semantics" its Defendants; Dr. Plunkett has never testified that she would only use the phrase "can cause" if she is providing a causation opinion.[10] Dr. Plunkett merely stated that "If I'm doing a full causation analysis, I will use 'caused' or 'can cause'." Nothing in science

---

[9]  Ex. 3, Plunkett Report at 15-18.
[10] Rec. Doc. 10918-1 at 9.

or the law limits the use of that phrase to just causation opinions. Dr. Plunkett uses the phrase in describing her toxicology opinion.

Further, Dr. Plunkett's opinions here do not include  general causation opinions; her current opinions are limited to the pharmacology and toxicology of Taxotere and Taxol, and are based upon, but not limited to, scientific literature, FDA documents, testimony from individuals involved in the litigation, and Defendants' employees, former employees and  documents produced in this litigation.[11] Hospira appears to criticize Dr. Plunkett for not offering any new evidence or support on matters she has testified about previously. Yet, Dr. Plunkett was very forthright in explaining that while she has maintained her opinions about comparative toxicity over the course of the litigation, given ongoing scientific discovery "there have been documents added" concerning comparisons of the toxicities of docetaxel and Taxol and additional research in June of 2020 that simply further confirmed her previously provided opinions, they would not necessarily be added to her reliance list.[12] Dr. Plunkett's opinions relate to docetaxel and are not specific to any one manufacturer.

Further, Dr. Plunkett's "more toxic" opinion is reliable and the product of a scientifically valid reasoning and methodology. She reached this conclusion as part of pharmacological and toxicological analysis of the data available as outlined in her report which supports admissibility of her opinions.  Plaintiff acknowledges the Court's prior rulings with regard to the "more toxic" opinion (*e.g.* Doc. 11823), as she has adopted the Trial 3 expert report of Dr. Plunkett served in the Stewart, Hughes and Sanford cases.  However, the science, toxicology, pharmacology and history of development of the Taxanes support Dr. Plunkett's opinion that docetaxel is more toxic than paclitaxel.

---

[11] Ex. 3, Plunkett Report at 3.
[12] Ex. 5, Plunkett Dep II at 106:8-107:18.

### D.   DR. PLUNKETT'S METHODOLOGY IS RELIABLE

While Hospira attacks Dr. Plunkett's methodology, its contentions are nothing more than disagreements with her conclusions. Dr. Plunkett's Expert Report describes in detail, as summarized herein, the process by which she gathered the evidence in this case. She reviewed all of the scientific literature available on permanent hair loss and the toxicities of docetaxel in relation to same. Dr. Plunkett has also explained how the "pieces of evidence", the scientific literature, the case reports and case studies and Defendants' own witness testimony and confidential documents all considered together lead her to her conclusions in this case. There is no evidence that Dr. Plunkett has substituted her personal judgment for sound toxicology opinions. There is, however, evidence of Dr. Plunkett explaining the weight of the evidence and why it is scientifically valid on multiples occasions:

> A.   So often with many of the other things that you may look at in this body of literature, you have to consider, obviously, whether or not the doctors or the individuals describing the cases are looking at the experience of a patient, and based on what they took. Which is why I find some of those case reports informative, where the physician in the paper actually may have a combination of drugs, but indeed, has attributed causation to docetaxel in some of those.[13]

> A.   Which is why the clinical trial was so important. That is correct. The clinical trial

> Q.   When you say "the clinical trial," are you referring to TAX 316?

> A.   Yes, in the clinical trial, that's where – I think you and I discussed it before -- that number would indicate that this particular adverse -- this particular adverse event, or this particular type of toxicity would not be rare, based upon the results of their own clinical study.[14]

> A.   I have looked across all of that information; and for Taxotere, I have the clinical data, which is an important -- as I've been saying over and over, is

---

[13] Ex. 4, Plunkett Dep. at 50:5-15.
[14] *Id.* at 59:21-60:5.

a really important piece of the puzzle that allows you to say something about comparative risk.[15]

Q.      Dr. Plunkett, is there a hierarchy of evidence?

A.      So certainly as a pharmacologist and a toxicologist, yes; there is certain information -- not so much a hierarchy, but that's more relevant than others. And that's -- what I've applied in my analysis. So that evidence would be looking for human data in particular that was discussing the specific end point of concern for my analysis. So looking at persistent or irreversible alopecia, and what data was available in humans to be able to make that comparison.[16]

A.      In other words, I'm not just pulling this out of the air. I have clinical studies, where they report the existence of or the -- or so many percentage of patients that are reported to have persistent alopecia. Or I have an analysis from a case report, where a qualified physician has gone through and described his experience with a patient. Or I have the pharmacokinetic data, where I see a study that was either described in the literature or in the labeling for the drug, for example.[17]

Q.      Did you somehow put them in some order as to what was the most important to your opinions to the least important?

A.      To some extent, yes. I do do that in any of my weight of the evidence analysis. So for example, if I'm looking at something like this, permanent alopecia, which is something that I wouldn't be able to see that specific endpoint demonstrated in animal studies -- instead I would be replying-- I would be looking for human data and human experience, absolutely. That would be information that would be -- would be of importance to forming that opinion with permanent alopecia.[18]

Dr. Plunkett used accepted and recognized principles of pharmacology and toxicology to make reasoned determinations in this case. Dr. Plunkett did exactly what pharmacologists and toxicologists do in these types of real-world risk analyses: she examined and evaluated the scientific literature and data that was available to her and was able to reach a conclusion to a reasonable degree of scientific certainty.  Dr. Plunkett is not regurgitating the conclusions of

---

[15] *Id.* at 131:18-22.
[16] *Id.* at 136:18 – 137:15.
[17] *Id.* at 140:13-24.
[18] Ex. 6, Deposition of Laura Plunkett, Ph.D., Dec. 10, 2018 at 196:3-23.

another—she reached her own conclusions based on her evaluation of the scientific information and data available.  As Judge Stengel opined regarding similar opinions offered by Dr. Plunkett in *In re: Tylenol (Aceminophen) Marketing, Sales Practices, and Prods. Liab. Litig.*, "I see nothing unreliable about Dr. Plunkett's explanations. . . She is a toxicologist who specializes in studying how the body processes drugs.  She has reviewed the medical literature and interpreted it based on her knowledge of toxicity, pharmacology, and pharmacokinetics."  2016 WL 4039329 (E.D. Pa. July 28, 2016) (Stengel, J.)   This is precisely what Dr. Plunkett has done in the present case.

Moreover, this is the same methodology used to support her opinions in *Earnest* and *Kahn* and Dr. Plunkett should again be allowed to provide all her opinions here.  Hospira offers no new line of attack on the opinions offered by Dr. Plunkett.  Instead, Hospira attempts to reframe the issue, the reliability of her methodology, as an argument that her opinions that have been previously accepted are unreliable because she did not consider an article that Hospira feels is relevant. This is an argument that goes to the weight of the evidence but not a reason to exclude her as an expert.

## II.   DR. PLUNKETT'S OPINIONS INCLUDE MEDICAL LITERATURE THAT DISTINGUISHES BETWEEN DIA AND PCIA AND IS ADMISSIBLE

It is true that Dr. Plunkett expanded her discussion of the differences between DIA and PCIA in her most recent Expert Report, but explaining the distinction is necessary and appropriate.[19] That discussion includes a definition of PCIA that is taken from a review of the scientific literature and the descriptions given for PCIA in that material.[20] Dr. Plunkett uses the definitions the authors of the literature use; she does not create definitions.   As such, Dr. Plunkett is not offering any expert opinion on what it takes to meet a diagnosis of PCIA, yet the discussion

---

[19] "DIA" is an acronym for "drug-induced alopecia" and "PCIA" is an acronym for "permanent-chemotherapy-induced alopecia".

[20] Ex. 7, Appendix B to Plunkett Expert Report, June 3, 2020, (Reliance Materials) and materials cited in her report.

of how published articles define PCIA is permissible and within her expertise. More importantly, this Court has recognized Dr. Plunkett's ability to rely upon this literature, and previously rejected Defendants' arguments in the context of Dr. Plunkett's risk opinions concerning toxicities like DIA and PCIA.   The assessment of toxicities is within Dr. Plunkett's expertise.

First, it is within Dr. Plunkett's expertise in pharmacology and toxicology to discuss toxicities like DIA and PCIA, and the differences between the two conditions, which are separate and distinct toxicities.[21] Dr. Plunkett is not providing a causation opinion on the parameters of two medical conditions and so it is not necessary for her to have conducted a study, written or published literature on the forms of alopecia. Dr. Plunkett is, however, summarizing the distinctions made in the scientific literature to describe these different conditions/toxicities, which is within her purview.[22]

Second, Dr. Plunkett's limited discussion of DIA and PCIA is helpful to the trier of fact. The definitions given are not Dr. Plunkett's definitions and are not in any way vague. Dr. Plunkett specifically testified that:

A.      I have opined before and I talk about this in my report, that there is a difference between alopecia, versus persistent or permanent alopecia.

Q.      What you call drug-induced alopecia, versus irreversible alopecia. Is that correct?

A.      Yes, and I spent some time in my report going through that. And you and I have had the discussion, I believe at a deposition, where I told you that I do believe that just saying the word "alopecia" is not descriptive of permanent or irreversible alopecia.[23]

Q.      And so if someone took an anthracycline-based regiment, there is a chance that they're going to lose their hair during chemotherapy. Would you agree with that?

---

[21] Ex. 3, Plunkett Report at 14.
[22] Id. at 14-15.
[23] Ex. 4, Plunkett Dep. at 35:16-36:2.

> A.      Again, when you're talking about the initial drug – induced alopecia? Yes, that's true.[24]

Moreover, Dr. Plunkett has testified that she can distinguish between DIA and PCIA:

> Q.      Can you define for me "drug-induced" alopecia?
>
> A.      I'm not a clinician/physician that diagnoses. However, certainly being a toxicologist and a pharmacologist, I see drug-induced alopecia as hair loss; whereas, the issue of the persistent alopecia, irreversibility, is a different injury; it's the inability to regrow. So to me, as a toxicologist, they are two different things.
>
> Q.      Would you define for me permanent chemotherapy-induced alopecia?
>
> A.      I defined it in my report as being reported by clinicians as alopecia that is something that is seen more than six months after treatment with the drug. I'm not a clinician, I'm not redefining it. I'm using it in the way that the clinical literature describes it and how I read that as a pharmacologist and a toxicologist.[25]

These descriptions are grounded in science, distinguishable based upon that science and are helpful to understanding the toxicities at issue in this case.   It would be helpful for a jury to understand that there are experts in the field of toxicology that look at how drugs are associated with particular events. The Reference Manual on Scientific Evidence describes toxicology as "identifying and understanding the adverse effects of external chemical and physical agents on biological systems."[26]  This is precisely what Dr. Plunkett's opinions address.

Further, and as discussed above, the difference between DIA and PCIA are not "new opinions." Those are terms used throughout the scientific and medical literature to discuss medical conditions/toxicities associated with hair regrowth, or the lack of regrowth. Defendants' attempts to characterize Dr. Plunkett's use of these terms as "disease parameters" and her "opinions" is misleading. As stated herein, while Defendants have an issue with Dr. Plunkett's conclusions that

---

[24] Ex. 4, Plunkett Dep. at 95:23-96:4.
[25] *Id.* at 110:20-112:8.
[26] Reference Manual on Scientific Evidence, 3rd Ed. (2011), Reference Guide on Toxicology, 633, *et seq.*

is not grounds for admissibility. The discussion of the terms is clearly relevant to the issue of permanent hair loss and should not be excluded.

## III.   DR. PLUNKETT'S BIOLOGIC PLAUSIBILITY OPINION IS ADMISSIBLE

Contrary to Hospira's contention, Dr. Plunkett's opinions that docetaxel is associated with a greater risk of permanent hair loss compared to Taxol, are predicated on the scientific literature demonstrating biologic plausibility for the proposition that docetaxel causes permanent hair loss and carries an independent risk of permanent hair loss are limited to her experience as a pharmacologist and toxicologist and, as such, certainly "fit" in this litigation. Those opinions are not medical causation opinions; they are derived from her review of the available data that indicate docetaxel has been associated with irreversible hair loss (a particular and identifiable toxicity) to a greater extent than other chemotherapeutic drugs and is not a rare event based on evidence from controlled clinical trial data, epidemiological data and individual case reports.[27] As such, a two-part test utilizing the Bradford-Hill or similar criteria was not necessary for Dr. Plunkett to reach her toxicological opinions.

Additionally, how another court analyzed an expert's opinions under different circumstances is not a consideration under *Daubert*. Dr. Plunkett's opinions here simply do not include general causation opinions. They are limited to the pharmacology and toxicology of docetaxel and Taxol, and are based upon her education, experience, training, scientific literature, FDA documents, testimony from individuals involved in the litigation, and documents produced in this litigation.[28] This Court previously accepted Dr. Plunkett as an expert and allowed the same opinions in the *Earnest* trial, and the Court should do the same in this case.

---

[27] Ex. 3, Plunkett Report at 14-31.
[28] *Id.* at 3.

Further, Dr. Plunkett's opinions are based on sufficient facts and data and are the product of a scientifically valid reasoning and methodology.  To reach her opinions, Dr. Plunkett used the standard methods she applies in her work as a pharmacologist and toxicologist in litigation and non-litigation contexts.   This involved using her training and experience to review, examine, and evaluate studies, scientific literature relating to the pharmacology and toxicology of taxanes (docetaxel and Taxol),  product labeling for docetaxel and Taxol, publicly available documents related to docetaxel's and Taxol's approval by the FDA, regulatory submissions that describe the pharmacology and toxicology of docetaxel, and  documents produced during this litigation.

The particular method that Dr. Plunkett used, of which Hospira complains, is a "weight-of-the-evidence" assessment.[29]   The weight-of-the-evidence analysis performed by Dr. Plunkett is described in the *Reference Manual on Scientific Evidence* as a tool used by experts in the process of evaluating a body of data or studies.[30]

As outlined in her report, Dr. Plunkett reviewed all pertinent data that was available and conducted her assessment in the same fashion she would in conducting her work as a pharmacologist and toxicologist for companies outside the litigation context.[31] Using her knowledge, experience and training as a pharmacologist and toxicologist, Dr. Plunkett was able to review, examine and evaluate this information (along with all of the other information she identified in her report), assess and weigh-the-evidence and make her conclusions. This is the same standard technique she uses in both her litigation and non-litigation work and is a recognized method of risk assessment in her field.

---

[29] *Id.* at 3-4 (¶¶ 10-11).
[30] *Id.* at 4 (¶ 11).
[31] *Id.* at 3 (¶ 10).

Moreover, the Court has previously allowed Dr. Plunkett to state that "Taxotere has been associated with an independent risk of permanent hair loss,"[32] and this opinion also should not be excluded.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion to Exclude Expert Testimony of Dr. Laura Plunkett. Dr. Plunkett is qualified to render the opinions at issue, the opinions are based upon sufficient data and facts, they are the product of a scientifically valid reasoning and methodology, and they will assist the jury in understanding the facts at issue in this case.

Dated: December 7, 2021                          Respectfully submitted,


/s/ Christopher L. Coffin                        /s/ Karen B. Menzies
Christopher L. Coffin (#27902)                   Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                 GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225                  6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                     Los Angeles, California 90045
Phone: (504) 355-0086                            Telephone: 510-350-9700
Fax: (504) 355-0089                              Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                           kbm@classlawgroup.com

Plaintiffs' Co-Lead Counsel                      Plaintiffs' Co-Lead Counsel

/s/M. Palmer Lambert                             /s/Dawn M. Barrios
M. Palmer Lambert (#33228)                       Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                        BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                         701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street          New Orleans, LA 70139
New Orleans, LA 70163-2800                       Phone: 504-524-3300
Phone: 504-522-2304                              Fax: 504-524-3313
Fax: 504-528-9973                                barrios@bkc-law.com
plambert@gainsben.com

---

[32] Hospira's Motion to Exclude Expert Testimony of Dr. Laura Plunkett at 11.

*Plaintiffs' Co-Liaison Counsel*

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638

adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT