# EXHIBIT 4

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2              CASE NO. 2:16-cv-17039
 3
 4    ELIZABETH KAHN,                    ) VIDEOCONFERENCE
                                         ) VIDEOTAPED
 5                                       ) DEPOSITION OF:
                     Plaintiff,          )
 6                                       )
         v.                              ) LAURA M.
 7                                       ) PLUNKETT,
                                         ) Ph.D., DABT
 8                                       )
      SANOFI S.A., SANOFI-AVENTIS        )
 9    U.S. L.L.C., SANOFI US SERVICE,    )
      INC., and AVENTIS-PHARMA S.A.,     )
10                                       )
                     Defendants.         )
11    _____    )
12
13              TRANSCRIPT of the stenographic notes of
14    the proceedings in the above-entitled matter, as
15    taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,
16    held via Zoom videoconference from multiple
17    locations, with the witness located at 13923 Carriage
18    Walk Lane, Houston, Texas, on Monday, April 27, 2020,
19    commencing at 2:59 p.m.
20
21
22
23
24
25
```

Page 35

1  the context of the label, but you and I have
2  discussed that in the context of other information
3  and studies.  So I would be prepared to talk about
4  that word, in the context of some of the other
5  studies you and I have been through.
6       Q.   Well, I guess I want to -- I understand
7  that, Dr. Plunkett.  We can go there if we need to.
8  But just as it relates to what is in the label, are
9  you going --
10      A.   I'm going -- I'm sorry.
11      Q.   Are you going to give testimony that
12 "alopecia," as used in the Adverse Reaction section
13 of the Taxotere label, means reversible alopecia?
14      A.   I do not believe I would be asked that,
15 to do that, because I'm not the person to talk about
16 the specifics of the label.  However, I have opined
17 before, and I talk about this in my report, that
18 there is a difference between alopecia, versus
19 persistent or permanent alopecia.
20      Q.   What you call drug-induced alopecia,
21 versus irreversible alopecia.  Is that correct?
22      A.   Yes, and I spent some time in my report
23 going through that.  And you and I have had the
24 discussion, I believe at a deposition, where I told
25 you that I do believe that just saying the word

Page 36

1   "alopecia" is not descriptive of permanent or
2   irreversible alopecia.
3       Q.   Okay.  But my question is:  Do you
4   intend to give testimony, as it relates to the word
5   "alopecia" as used in the Taxotere label, as to
6   whether that means reversible or temporary?
7       A.   I have not been asked to give labeling
8   opinions, so no; I don't think I would be prepared
9   to do that, or even asked to do that.
10      Q.   Okay.  And then just one other thing,
11  so we're on the same page, Dr. Plunkett.  If you
12  look under "Indications," to the left-hand side,
13  where it says "Indications and Usage"?
14      A.   Yes, I see that.
15      Q.   Okay.  And then the area that we're
16  interested in, correct, is the breast cancer.
17  Correct?
18      A.   Yes, that's my understanding.  These
19  cases are all about breast cancer.
20      Q.   All right.  And so for breast cancer,
21  the indication is "Single agent for locally advanced
22  or metastatic BC after chemotherapy failure."
23           Do you see that?
24      A.   That's the first one, yes.
25      Q.   And your understanding is that would be

Page 50

1     one variable being different, the presence of
2     Taxotere or the presence of 5FU.  So you have a --
3     you're able to, in that study, look at the effect of
4     one variable at a time.
5          So, often, with many of the other
6     things that you may look at in this body of
7     literature, you have to consider, obviously, whether
8     or not the doctors or the individuals describing the
9     cases are looking at the experience of a patient,
10    and based on what they took.
11         Which is why I find some of those case
12    reports informative, where the physician in the
13    paper actually may have a combination of drugs, but
14    indeed, has attributed causation to docetaxel in
15    some of those --
16    Q.    So for this article right here -- at
17    least the way I'm understanding it is -- you're
18    saying you don't know whether the paclitaxel
19    patients were on a SERM or Tamoxifen; or the
20    docetaxel patients were on anastrozole or letrozole;
21    and those confounding factors add additional
22    variables?
23         MR. MICELI:  Object to the form.
24    A.    Well, I don't know if that's what you
25    and I exactly said.  I think what I was pointing to

Page 59

1   statement here, no.  I don't see that in this
2   section.
3        Q.   Okay.  And Dr. Plunkett, under the
4   World Health Organization guidelines that you refer
5   to in paragraph 34 of your report, what would
6   30 percent represent?
7             MR. MICELI:  Excuse me.  Object to the
8   form.  I'm trying to -- you said 34 of her report?
9             MR. RATLIFF:  Paragraph 34 of her
10  report.
11       A.   This 30 percent would represent
12  nothing; because this is not an incidence rate, in
13  this paper.  Whereas the WHO is talking about
14  incidence rate; where you have both a denominator
15  and a numerator that you have specifically
16  quantified.
17       Q.   So is your position that the only way
18  the World Health Organization guidelines that you
19  refer to are applicable, is if you have a numerator
20  and a denominator?
21       A.   Which is why the clinical trial was so
22  important.  That is correct.  The clinical trial --
23       Q.   When you say "the clinical trial," are
24  you referring to TAX 316?
25       A.   Yes, in the clinical trial, that's

Page 60

1      where -- I think you and I discussed it before --
2      that number would indicate that this particular
3      adverse -- this particular adverse event, or this
4      particular type of toxicity would not be rare, based
5      upon the results of their own clinical study.
6           Q.    Okay.  And so in TAX 316, it's your
7      opinion that there were three -- well, strike that.
8                 In TAX 316, 3.9 percent of the patients
9      in the Taxotere, Adriamycin, and cyclophosphamide
10     regimen were reported with ongoing alopecia.
11                Does that sound right?
12          A.    I think that's correct, but if you want
13     me to clarify exactly that percent, let me look real
14     quick.  I believe that's true.
15          Q.    It's in paragraph 56 of your report.
16          A.    Yes, that's correct.
17          Q.    Okay.  And under the WHO guidelines
18     that you employ, 3.9 percent would make that a
19     common adverse event.  Correct?
20          A.    Yes, that's correct.
21          Q.    Okay.  And with the FAC regimen, the
22     non-Taxotere regimen, 5FU, Adriamycin and
23     cyclophosphamide in combination, the number was
24     2.2 percent of the patients who are listed as having
25     ongoing alopecia in TAX 316.  Is that correct?

Page 95

1  consistent with the discussion that I had with you
2  in my last deposition.
3       Q.    And you also agree that it's not always
4  going to be the case that it's reversible.
5            MR. MICELI:  Object to the form.
6       A.    Are you asking me for Taxol, or for
7  paclitaxel -- I'm sorry, are you asking me for
8  Taxol, or for Taxotere, or for taxanes generally?
9       Q.    Well, I'm asking you with a Taxol-based
10 regimen?
11      A.    With Taxol, there are indications that
12 it may not always be reversible, but it doesn't
13 carry the same amount of information to show that
14 it's something that would be seen repeatedly in
15 patients, because you don't have that clinical trial
16 data that allows you to look at those differences
17 between the two.
18            So that's why I have not formed the
19 same opinions -- or that's why I have been very
20 careful, when I describe my opinions, to talk about
21 the basis of -- the basis being in more than just a
22 case report, for example.
23      Q.    Gotcha.  Okay.  And so if someone took
24 an anthracycline-based regimen, there is a chance
25 that they're going to lose their hair during

Page 96

1 chemotherapy. Would you agree with that?
2     A.    Again, when you're talking about the
3 initial drug -- drug-induced alopecia? Yes, that's
4 true.
5     Q.    And you'd also agree that typically,
6 that alopecia is going to be reversible. Correct?
7     MR. MICELI: Object to the form.
8     A.    I haven't done a separate assessment of
9 anthracycline. But on the information I have seen,
10 I would -- it appears to be different, as compared
11 to Taxotere. So yes, typically it appears to be --
12 to be reversible.
13     Q.    But you'd also agree that might not
14 always be the case. It might not come back with an
15 anthracycline-based regimen. Correct?
16     MR. MICELI: Object to the form.
17     A.    No, I don't think that's what I said.
18 I think what I've said -- what we discussed is that
19 the inability to regrow is a different -- different
20 consideration than the hair loss itself.
21     Q.    I'm just asking you, Dr. Plunkett, that
22 if someone takes an anthracycline regimen, although
23 their hair typically will grow back, you'll agree
24 that is not always the case?
25     MR. MICELI: Object to the form.

1      Q.     Are you giving -- are you giving the
2    same opinion that you gave before?
3      A.     Well, I mean, I am saying -- I am
4    saying that -- I guess the opinion is that Taxotere
5    is more toxic than Taxol was in my previous report.
6    So that opinion is there.
7             I think that the discussion is very
8    similar.  I -- maybe -- I don't believe I changed
9    that part of my report that much.  So I would say
10   that this should be consistent with that.
11     Q.     Okay.  And Dr. Plunkett, you're not
12   going to appear at trial and testify that, as it
13   relates to Elizabeth Kahn, that Taxotere would be
14   more toxic to her specifically.  Correct?
15     A.     No, because I'm not case-specific.
16     Q.     Okay.  And you go on to say,
17   "Irreversible alopecia is not the same as
18   drug-induced alopecia."  Is that correct?
19     A.     Yes, that is my opinion, yes.
20     Q.     Can you define for me "drug-induced
21   alopecia"?
22     A.     It's alopecia that is --
23            MR. MICELI:  Objection -- object --
24   object to the form.
25            But go ahead.

Page 111

1   A.    In my -- I think I define it for you
2   specifically, early in my report, as a type of
3   alopecia that is caused by exposure to drugs; in
4   particular, I'm focusing on chemotherapy drugs.
5   Q.    And is chemotherapy- or drug-induced
6   alopecia always reversible?
7           MR. MICELI:  Object to the form.
8   A.    There are descriptions that
9   drug-induced alopecia is typically reversible, yes.
10  Different people describe it in different ways.  But
11  I'm not a clinician; so instead, what I have
12  described it as there being a difference between --
13  here.
14          (A discussion is held off the record.)
15          MR. RATLIFF:  Hey, Palmer, I think
16  you're off mute.  Get on mute, perhaps.
17          MR. LAMBERT:  Right.
18  A.    I'm not a clinician/physician that
19  diagnoses.  However, certainly being a toxicologist
20  and a pharmacologist, I see drug-induced alopecia as
21  hair loss; whereas, the issue of the persistent
22  alopecia, irreversibility, is a different injury;
23  it's the inability to regrow.  So to me, as a
24  toxicologist, they are two different things.
25  Q.    Would you define for me permanent

1      chemotherapy-induced alopecia?
2            A.     I defined it in my report as being
3      reported by clinicians as alopecia that is something
4      that is seen more than six months after treatment
5      with the drug.  I'm not a clinician, I'm not
6      redefining it.  I'm using it in the way that the
7      clinical literature describes it, and how I read
8      that as a pharmacologist and a toxicologist.
9            Q.     If a person takes chemotherapy and
10     loses their hair, and then it grows back, would that
11     be drug-induced alopecia, or would that be permanent
12     chemotherapy-induced alopecia?
13                  MR. MICELI:  Object to the form.
14           A.     That's a diagnosis, so I don't do that.
15     I can't answer that for you.  I can tell you how
16     it's been described in the literature, and what I
17     have relied upon, but I don't -- I can't -- I don't
18     diagnose patients, so I can't tell you.
19           Q.     Yeah, I'm not asking you to diagnose
20     anybody, Dr. Plunkett.  I'm just asking you -- let
21     me ask you this.  If someone takes a chemotherapy,
22     and loses her hair, and then their hair grows back;
23     based on what you've seen in the literature, which
24     bucket would that fall into?
25                  MR. MICELI:  Object to the form.

1    someone else, a clinician, couldn't do something
2    different.
3         Q.    Okay.
4         A.    In terms of diagnosing patients. They
5    may describe it a different way.
6         Q.    So do you intend to give an opinion
7    that, as it relates to Ms. Kahn's specific
8    chemotherapy regimen, that Taxotere was an
9    independent risk to her of developing permanent
10   chemotherapy-induced alopecia?
11        A.    I'm not --
12              MR. MICELI:  Object to the form.
13              THE WITNESS:  I'm sorry, David.
14        A.    I'm not case-specific, so I don't
15   believe that I would be forming that opinion or
16   providing that opinion, no.
17        Q.    Okay.  And then would you define
18   "substantial contributing factor" for me?
19        A.    So we -- this is another thing we spent
20   a lot of time on last time.  Essentially, when I use
21   the words "substantial contributing factor," that is
22   in relationship that when you use it as combination
23   therapy, for something that has an independent risk,
24   we can identify Taxotere as contributing to that
25   particular experience.

1      So "substantial contributing factor"
2 can have a legal term, but I'm not a lawyer. I'm
3 talking about it as a toxicologist. In other words,
4 when something can be seen independently, I believe
5 that that independent risk based on, then, the
6 experience in the published literature about the
7 fact that Taxotere was one of the more commonly
8 reported --
9      (Court reporter clarification.)
10     A.   Commonly reported drugs that's linked
11 to that; that is part of my -- how I am defining
12 "substantial contributing factor." I'm not giving
13 it a specific percentage, though.
14     Q.   Okay. If -- could you point me,
15 Dr. Plunkett, to what would you consider the -- the
16 leading medical dictionary for a pharmacologist,
17 where these terms would be defined?
18     A.   Well, it's not just for
19 pharmacologists. There's medical dictionaries. I
20 would say this would probably be defined, not within
21 a medical dictionary, but probably within my
22 textbooks that talk about factors that contribute to
23 exposure response.
24          I don't know that I could find you that
25 exact -- an exact definition. But it is described.

1  drugs.  I have the clinical study.  But if you want
2  to just focus on an individual case series, or an
3  individual document, there were some documents where
4  you and I read, where people are reporting so many
5  cases of this one or so many cases of that one.
6           Yes, those numbers exist.  But I'm
7  talking about looking across the evidence that
8  includes, importantly, more than just the case
9  reports.
10      Q.   When you say "those numbers exist,"
11  what do you mean by that?
12      A.   We can find a number reported for
13  individual drugs in individual papers.  So and
14  we've done -- you and I have done that, I've agreed
15  with you; that number is in that column for that
16  drug or this drug.
17           But that's not the analysis I have
18  done.  I have looked across all of that information;
19  and for Taxotere, I have the clinical data, which is
20  an important -- as I've been saying over and over,
21  is a really important piece of the puzzle that
22  allows you to say something about comparative risk.
23      Q.   Yes.  So I'm asking, though,
24  Dr. Plunkett, about just this:  Are there more
25  reports with taxane-based therapies than

Page 136

1      Q.    I'll withdraw the question.  That's
2    fine.
3           MR. RATLIFF:  We'll take a quick break,
4    and we'll finish this up.
5           MR. MICELI:  I'll probably have a few
6    follow-ups, but when we come back, maybe we can find
7    out how much time is left.
8           THE VIDEOGRAPHER:  Thank you.  This is
9    the videographer.  Please stand by.
10          The time is 6:06 p.m. Eastern.  We're
11   going off the record.  This is the end of Media
12   File 4.
13          (A brief recess takes place.)
14          THE VIDEOGRAPHER:  Okay.  The time is
15   6:14 p.m. Eastern Time.  We're back on the record.
16   This is the beginning of Media File 5.
17   BY MR. RATLIFF:
18      Q.    Okay. Dr. Plunkett, is there a
19   hierarchy of evidence?
20      A.    So are you asking for scientific
21   studies, such as in causation analysis, or are you
22   asking me -- is there a specific area?
23   Pharmacology, toxicology, what?
24      Q.    I'm just asking you what your answer
25   is; is there a hierarchy of evidence that you have

1    employed in this report?
2         A.    Well, that's a different question.  So
3    certainly as a pharmacologist and a toxicologist,
4    yes; there is certain information -- not so much a
5    hierarchy, but that's more relevant than others.
6    And that's --
7         Q.    What would those be?
8         A.    -- that's what I've applied in my
9    analysis.  So that evidence would be looking for
10   human data in particular that was discussing the
11   specific end point of concern for my analysis.  So
12   looking at persistent or irreversible alopecia, and
13   what data was available in humans to be able to make
14   that comparison.  Because that is a disease or a
15   condition that is a human condition.
16        Q.    Is there a hierarchy of evidence in --
17   do you have a hierarchy of evidence when you do a
18   general causation assessment?
19        A.    That's a different question.  So
20   certainly if I was doing one, then there is often --
21   I wouldn't call it a hierarchy; I would call it an
22   assessment of the certainty that you can draw from
23   certain types of data versus others, when you're
24   doing causation.
25              Do you want me to explain?

1  question being asked; what word you may use could be
2  more appropriate than another.
3  In my report, as a pharmacologist and a
4  toxicologist, I'm using words such as "linked,"
5  "relationship," "related to," "linked to,"
6  "associated with;" it means I have evidence to show
7  that one thing and the other have actually been
8  shown to happen, based upon a piece of data or
9  evidence.
10  Q.   You said one thing has been shown to
11  happen based on a piece of evidence.  Can you
12  explain that to me?
13  A.   In other words, I'm not just pulling
14  this out of the air.  I have clinical studies, where
15  they report the existence of or the -- or so many
16  percentage of patients that are reported to have
17  persistent alopecia.  Or I have an analysis from a
18  case report, where a qualified physician has gone
19  through and described his experience with a patient.
20  Or I have the pharmacokinetic data,
21  where I see a study that was either described in the
22  literature or in the labeling for the drug, for
23  example.  Some of the pharmacokinetic information
24  comes from the drug labeling.
25  Q.   So as it relates to TAX 316, in the FAC