## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                        MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                           SECTION "H" (5)

THIS DOCUMENT RELATES TO
*Audrey Plaisance v. Hospira*, Case No. 2:18-cv-08086

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. CURTIS THOMPSON

MAY IT PLEASE THE COURT:

Hospira claims that the opinions of Curtis Thompson, M.D. were not reliably formed and should be excluded. However, this Court has already confirmed the medical diagnostic work of Dr. Thompson in terms of methodology and expertise. Dr. Thompson's opinions track all relevant standards for medical diagnostic work in terms of dermatopathology and thus may be presented to a jury. He is a respected scientist experienced in the diagnosis of hair disorders in general and permanent chemotherapy-induced alopecia (PCIA) in particular through dermatopathological work pre-dating this case. For the reasons set forth below, Dr. Thompson's opinions and conclusions are admissible, and the Court should deny Defendants' motion to exclude Dr. Thompson's testimony.[1]

### BACKGROUND

Dr. Thompson is board-certified in dermatopathology and anatomic pathology who specializes in alopecia and has experience diagnosing PCIA prior to his retention in this MDL.[2] He maintains regular academic research study projects with students and residents and delivers

---

[1] *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 590-91.

[2] *See* Rec. Doc. 13381-5, Ex. B to Defendant's Motion to Exclude Expert Testimony of Dr. Curtis Thompson, Expert Report of Curtis T. Thompson, M.D., August 2, 2021 ("Thompson Report") at p. 8-24 (Curriculum Vitae).

presentations worldwide at conferences such as the World Congress for Hair Research and the American Academy of Dermatology.[3]

Dr. Thompson issued a pathology report regarding Plaintiff Audrey Plaisance on June 2, 2021 based on two biopsy specimens of Ms. Plaisance's scalp that were submitted by Plaintiff's dermatology expert, Dr. Antonella Tosti.[4] Dr. Tosti clinically examined Plaintiff Audrey Plaisance herself on May 7, 2021.[5] Dr. Tosti took a detailed clinical history of Ms. Plaisance and examined her scalp both with a "pull test" – a standardized procedure for diagnosing various kinds of alopecia – and with a dermatoscope (or "dermoscope" or "trichoscope"), which magnifies a patient's scalp 10–20 times.[6] Dr. Tosti implemented the accepted standard of a differential diagnosis to exclude all other possible types and causes as the substantial contributing factor of Ms. Plaisance's alopecia.[7] Dr. Tosti came to her conclusions independent of, and prior to, dermatopathology review by Dr. Thompson.[8] Dr. Tosti also took two scalp biopsies during her clinical examination of Ms. Plaisance and sent them to Dr. Thompson for pathological analysis and evaluation.[9]

Dr. Thompson performed a differential diagnosis from the pathology specimens of Audrey Plaisance; biopsy A was taken from the frontal scalp, and biopsy B was taken from the vertex scalp.[10] For each biopsy specimen, Dr. Thompson counted the total number of hair follicles and classified them as either terminal anagen, catagen/telogen, or vellus/miniaturized.[11] He analyzed

---

[3] *Id.* at p. 8.

[4] *Id.* at p. 2; *see also* Ex. 1, Dermatopathology Report of Curtis T. Thompson, M.D., June 2, 2021 ("Thompson Dermatopathology Report").

[5] *See* Rec. Doc. 13384-4, Ex. A to Defendant's Motion to Exclude Expert Testimony of Dr. Antonella Tosti, Expert Report of Dr. Antonella Tosti, M.D., August 2, 2021 ("Tosti Report") at pp. 19-37.

[6] *Id.* at pp. 19-37.

[7] *See* Ex. 2, Deposition of Antonella Tosti, M.D., Sept. 20, 2021 ("Tosti Depo") at p. 16:23-18:24; 87:24-89:22; 103:5-111:24.

[8] *Id.*; *see also* Ex. 3, In-Person Evaluation by Antonella Tosti, M.D., May 7, 2021 ("Tosti Evaluation"); *see also* Ex. 1, Thompson Dermatopathology Report.

[9] *See* Rec. Doc. 13384-4, Tosti Report at pp. 23-24.

[10] Ex. 1, Thompson Dermatopathology Report at 1-2.

[11] *Id.* at 2.

dermatopathology slides cut and stained at his lab to determine if they showed follicular fibrosis or compound follicles.[12] Dr. Thompson ruled out chronic telogen effluvium (CTE), which can result from a dietary or iron deficiency, because CTE would not cause the permanent follicular loss he saw in both specimens.[13] Both biopsies showed a catagen/telogen shift, evidenced by telogen bodies, which can be seen in PCIA and trichotillomania; however, Dr. Thompson was able to rule out trichotillomania due to the absence of other features of trichotillomania, such as fractured hair shafts, melanin casts, and superimposed lichen simplex chronicus or epidermal changes suggesting excoriation.[14] In addition, Dr. Thompson found no evidence of primary scarring alopecia such as lichen planopilaris or central centrifugal cicatricial alopecia ("CCCA").[15] Dr. Thompson concluded that findings in both biopsies are consistent with PCIA.[16]

Dr. Thompson provided a comprehensive analysis of his differential diagnosis and diagnostic conclusions in his Rule 26 expert report.[17] To prepare his expert report, Dr. Thompson reviewed and appended the May 7, 2021 clinical evaluation by Dr. Tosti.[18]

## LEGAL STANDARD

Fed. R. Evid. 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge **will help the trier of fact to understand the evidence or to determine a fact in issue**;

(b) the testimony is **based on sufficient facts or data**;

---

[12] *Id.*
[13] Def. Ex. B, Thompson Report at 2.
[14] *Id.* at 2-3.
[15] *Id.* at 3.
[16] Ex.1, Thompson Dermatopathology Report at 1-2.
[17] Def. Ex. B,Thompson Report at pp. 1-4.  Hospira also seeks exclusion, as in other contemporaneously filed motions, on opinions that the expert has not set forth in his expert report.  Dr. Thompson is not a clinical dermatologis and will be limiting his opinions to dermatopathology and diagnosis of PCIA based on his training, experience, and performance of dermatopathology review of biopsies in this case.
[18] *Id.* at p. 3; see also Ex. 3, Tosti Evaluation.

(c) the testimony is the product of **reliable principles and methods**;

(d) and the expert has **reliably applied the principles and methods to the facts of the case**.[19]

This version of Rule 702 "reflects the United States Supreme Court decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)." *Stephens v. Florida Marine Transporters, Inc.*, Case No. 12-1873, 2013 WL 11257508, at *2 (E.D. La. Sept. 3, 2013). Under *Daubert*, in order to allow an expert's testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Id*. at 594.

A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, in order to be admissible, expert testimony must be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipaitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kumho*, 526 U.S. at 147).

A district court has broad discretion in deciding whether particular expert testimony is reliable. *Daubert* itself lists a "non-exhaustive list of guideposts" for assessing reliability, such as (1) whether the technique in question has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has

---

[19] FED. R. EVID. 702 (emphasis added).

been generally accepted in the scientific community. *U.S. v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94). The purpose of a *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 150. "[W]hether an expert's testimony is reliable is a fact-specific inquiry." *Burleson v. Texas Dep't of Criminal Justice,* 393 F.3d 577, 584 (5th Cir. 2004) (citation omitted). Determining reliability under *Daubert* necessarily requires a flexible approach. *Moore v. Ashland Chem. Inc.*, 151 F. 3d 269, 276 (5th Cir. 1998) (en banc). In fact, the Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 138.

Additionally, testimony is admissible when "the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case." *Tripkovich v. Ramirez*, No. 13-6389, 2015 WL 3849392, at * (E.D. La. June 22, 2015) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993)). Expert testimony can be classified as relevant if "the reasoning or methodology 'fits' the facts of the case and will thereby assist the trier of fact to understand the evidence." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

Beyond Rule 702's standard, Fed. R. Evid. 703 provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if: (1) they are of the kind reasonably relied upon by experts in the particular field; and (2) the testimony's probative value substantially outweighs its prejudicial effect. Fed. R. Evid. 703; *see Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004) ("The information upon which an expert bases his testimony must be reliable, and

the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes.").

The proposed testimony of Plaintiff's expert, Dr. Thompson, meets the standards for admissibility under Rule 702 and *Daubert*. Plaintiff, therefore, requests that the Court deny Defendant's motion to exclude his proposed testimony.

## ARGUMENT

Plaintiff cannot say it better than the Court already has. Therefore, a portion of the Court's Order and Reasons related to Barbara Earnest's case is appended below:

> In arguing that Dr. Thompson's opinions are unhelpful, Defendants point to testimony from Dr. Thompson in which he said that he cannot offer an opinion on which specific chemotherapy drug caused Plaintiff's hair loss. Defendants emphasize again that Dr. Thompson was not provided with Plaintiff's medical history or any information about her background. As the Court has explained, Dr. Thompson conducted his work as part of Dr. Tosti's division of labor. He provided an "objective read" of the tissue samples and then shared his findings with Dr. Tosti, who then conducted a differential diagnosis. It was Dr. Tosti who considered Plaintiff's medical history and other pertinent information. Accordingly, the Court rejects Defendant's argument that Dr. Thompson's opinions are unhelpful and therefore inadmissible. His work served a purpose for Dr. Tosti, and this is permissible under Rule 703.[20]

As the Court previously determined, Dr. Thompson is abundantly qualified to testify on specific causation concerning PCIA. Dr. Thompson employed a reliable methodology in determining that Ms. Plaisance has PCIA.

## I. DR. THOMPSON EMPLOYED RELIABLE METHODOLOGY IN DETERMINING THAT MS. PLAISANCE HAS PCIA

### A. Dr. Thompson's Opinion that Ms. Plaisance Has PCIA Is Based on Accepted and Consistent Inclusion Criteria.

---

[20] *See* Rec. Doc. 8095 at p. 7 of Earnest Order and Reasons on Motion to Exclude Expert Testimony on Specific Causation (this Court's finding that Dr. Thompson met the burden of specific causation in the *Earnest* case).

6

In its erroneous contention that Dr. Thompson's opinion that Ms. Plaisance has PCIA is based on cherry-picked and inconsistent inclusion criteria, Hospira begins by contending that there is no generally accepted set of histological criteria for PCIA within the medical community.[21] Hospira bases this contention on cherry-picked testimony from Dr. Thompson that there is "scant" scientific literature describing the histological characteristics of PCIA.[22] In cherry picking Dr. Thompson's testimony, Hospira omits its own attorney's next two questions and Dr. Thompson's responses:

> Q: Are the histopathological findings of PCIA well-defined?
>
> A: Yes, I believe, yes, they are.
>
> Q: And are they well-defined in the scientific and medical literature?
>
> A: They are mostly defined by – well, yes, I think so. I think the Miteva article is really nicely – talks about the features. This was a good article. A lot of the list criteria, the specific criteria comes out of experience of people like me that read these biopsies and see them again and again and a lot of that is out of professional experience. We don't sit down and write an article [about] that. I haven't been asked to. That's not the center of my research. But we know these – the criteria based on experience, professional experience.[23]

Although there are fewer articles on the histopathology of PCIA compared to the robust literature on the dermatology of PCIA, Dr. Thompson concludes that the histopathological findings of PCIA are well-defined, and he cites to 3 peer-reviewed articles in the medical literature, 2 continuing medical education ("CME") articles, and professional experience for this proposition.[24]

The three peer-reviewed articles that Dr. Thompson cites to that articulate the histopathological findings of PCIA are:

1) Christos Prevezas et al., *Irreversible and Severe Alopecia Following Docetaxel or*

---

[21] *See* Rec. Doc. 13381-1, Defendant's Motion to Exclude Expert Testimony of Dr. Curtis Thompson, at 3.

[22] *See Id.* at 3, *citing* Ex. 4, Deposition of Dr. Thompson (Sept. 15, 2021) ("Thompson Dep.") at 30:20-31:23.

[23] *Id.* at 31:24-32:16 (form objections omitted).

[24] Id. at 29:14-30:14 and 31:24-32:16.

*Paclitaxel Cytotoxic Therapy for Breast Cancer*, 160 BRIT. J. DERMATOL. 881 (2009).[25]

2)   Ben Tallon, MBChC et al., *Permanent Chemotherapy-Induced Alopecia: Case Report and Review of the Literature*, 63(2) J. AM. ACAD. DERMATOL. 333 (2010).[26]

3)   Mariya Miteva, MD et al., *Permanent Alopecia After Systemic Chemotherapy: A Clinicopathological Study of 10 Cases*, 33(4) AM. J. DERMATOPATHOL. 345 (2011).[27]

These studies are not the first to report on the histopathological features of PCIA; however, they are the first studies to report on the pathology of PCIA outside the context of bone marrow transplantation. As explained in the Tallon Study:

> Permanent alopecia occurring after chemotherapy is rare. The existing reports of permanent alopecia typically follow high-dose chemotherapy and subsequent bone marrow transplantation (BMT). To our knowledge, there is only one recent report of permanent alopecia in the absence of BMT [citing to the Prevezas Study]. We describe a case of permanent hair loss following standard dose chemotherapy with docetaxel, carboplatin, and trastuzumab for the treatment of breast carcinoma and report unique histologic findings.[28]

All three studies had the following histological findings in common: decreased total number of hair follicles, low number of anagen follicles (with corresponding increase in percentage of telogen follicles), and lack of significant inflammation or fibrosis.[29] Both the Prevezas Study and the Miteva Study also reported histological findings of an increased percentage of vellus hairs (miniaturization).[30] These four criteria—reduced number of hair follicles, increase in percentage of telogen follicles, lack of significant inflammation or fibrosis, and increase in the percentage of miniaturized hairs—are the exact criteria Dr. Thompson uses in analyzing the histopathology of

---

[25] Ex. 5, ("Prevezas Study").
[26] Ex. 6, ("Tallon Study").
[27] Ex. 7, ("Miteva Study").
[28] Ex. 6, Tallon Study at 333.
[29] Ex. 5, Prevezas Study at 884; Ex. 6, Tallon Study at 334; Ex. 7, Miteva Study at 346.
[30] Ex. 5 Prevezas Study at 884; Ex. 7, Miteva Study at 346.

Ms. Plaisance.[31] These same four criteria are cited to in a textbook by Leonard Sperling, *An Atlas of Hair Pathology with Clinical Correlations*, to which Dr. Thompson cites in his expert report.[32]

Dr. Thompson does not include preservation of sebaceous glands as a histopathological criterion of PCIA. Of the three aforementioned studies, only the Tallon Study discusses the preservation of sebaceous glands—and this is not listed as a "dominant finding" such as reduced number of hair follicles and increase in percentage of telogen follicles.[33]  And although the Sperling *Atlas* publication lists preservation of sebaceous glands as a factor to consider in analyzing pathology for PCIA, it is not listed as one of the main criteria: decreased total number of follicles, marked increase in the percentage of miniaturized hairs, and increase in the percentage of telogen follicles.[34] Dr. Thompson's testimony is consistent with the literature on the histopathology of PCIA: while the preservation of sebaceous glands is a factor that can be considered in the pathological analysis, it is not an element that is dispositive to diagnosing PCIA:

> [Preservation of sebaceous glands is] sort of a light factor in this but not one of the big elements of it, because the elements are the evidence of follicular dropout usually by the decreased total number, the marked increase percentage of the telogen bodies and then the profound miniaturization. For me the sebaceous gland change is very secondary to this. And I don't believe it's useful. It's not always there either. So it's not one of the – in my opinion, in my professional opinion, it's not one of the big features there. You can even see in [Dr. Sperling's] chapter, on these photomicrographs from Doctor David Whiting, like Figure 35.3, there's some sebaceous lobules there but maybe only in half of those remaining follicles. So I'm not entirely sure – to me that's a really soft criteria. Even the photos in [Dr. Sperling's] own chapter kind of call that into question as being a real, you know, important element in this.[35]

---

[31] Def Ex. B, Thompson Report at 1-2.
[32] Ex. 8, Leonard C. Sperling et al., An Atlas of Hair Pathology with Clinical Correlations 197 (2nd ed.) (2012) ("Sperling Atlas"); Def Ex. B, Thompson Report at 2, footnote 2.
[33] Ex. 6, Tallon Study at 334.
[34] Ex. 8, Sperling Atlas at 197.
[35] Ex. 4, Thompson Dep. at 121:1-18.

The key histological findings for PCIA from the Sperling *Atlas*, Prevezas Study, Tallon Study, and Miteva Study are the exact criteria Dr. Thompson uses in his analysis of Ms. Plaisance's pathology.

**B. Dr. Thompson Obtained All of the Information That Is Critical in Diagnosing Biopsies.**

Hospira next criticizes Dr. Thompson's dermatopathological methodology by incorrectly asserting that he did not know whether Ms. Plaisance's hair loss was "diffuse" or "patchy" at the time of his pathological evaluation. Directly contrary to Hospira's assertion, Dr. Thompson reviewed and appended to his expert report Dr. Tosti's clinical evaluation of Ms. Plaisance, which describes "[d]iffuse hair thinning" of the scalp.[36] Further, although Dr. Tosti did not explicitly write "diffuse hair loss" on the requisition form Dr. Thompson reviewed in advance of his pathology report, the fact that she made a diagnosis of PCIA necessarily meant that Ms. Plaisance's hair loss was diffuse. In her expert report for Ms. Plaisance, Dr. Tosti explains, "Patients with PCIA have moderate to very severe hair thinning, with short miniaturized hairs. **Hair thinning is diffuse but often more prominent on androgen-dependent scalp regions.**"[37] Dr. Tosti examined the pattern of hair loss on Ms. Plaisance's scalp and concluded: "Mrs. Audrey Plaisance had **diffuse hair thinning with prominent involvement of the androgen dependent scalp**."[38]

**C. Dr. Thompson Used a Valid Methodology for Counting Ms. Plaisance's Hair Follicles.**

Hospira concludes that Dr. Thompson's methodology for counting Ms. Plaisance's hair follicles cannot be validated or tested by incorrectly asserting that Dr. Thompson always electronically marks each hair follicle in a biopsy specimen outside of litigation. To the contrary,

---

[36] Def. Ex. B, Thompson Report at 4. Ex. 3, Tosti Evaluation at 3.
[37] Def. Ex. A, Expert Report of Antonella Tosti, MD, August 2, 2021 ("Tosti Report") at 14 (emphasis added).
[38] *Id.* at 25 (emphasis added).

Dr. Thompson testified that he only "[s]ometimes" marks hair follicles in his usual practice.[39] Dr. Thompson further testified that it is not his practice to mark hair follicles when they are easy to count.[40] In addition, Dr. Thompson testified that even in the instances where he marks hair follicles, such markings are not routinely saved on the digital pathology images and are never saved on the glass slides.[41]

### D. Dr. Thompson's "Constellation" of Ms. Plaisance's Biopsies is Proper and Will Assist the Trier of Fact

Hospira incorrectly claims that Dr. Thompson mixes and matches Ms. Plaisance's biopsies to conclude that she has PCIA. If Hospira's contention were taken to its logical conclusion, then Dr. Thompson must read each biopsy in a vacuum in order to come to an accurate conclusion. To the contrary, Dr. Thompson always reads biopsy samples in conjunction with each other to provide essential diagnostic context: "[Y]ou can't read a case like this without taking in the context of both biopsies . . . [W]e use all the evidence we have, which is both biopsies."[42] Dr. Thompson further explained the importance of analyzing the "constellation" of findings in ruling in and ruling out conditions through a differential diagnosis:

Q. So by looking at the constellation of the characteristics between A and B, isn't that another way of saying that neither one of them meet the definition of PCIA?

A. No.

Q. Why not?

A. Because the main criteria of evidence of follicular loss, regardless of what the number is, the presence of these very, very abnormal number of telogen bodies, and then the profound miniaturization together in this clinical context is diagnostic of PCIA. You know, if you take any one of these findings and put it entirely alone, then we have a differential diagnosis. So we have a differential diagnosis for miniaturization that includes more things than PCIA. We have a differential

---

[39] Ex. 4, Thompson Dep. at 88:14-18.
[40] *Id.* at 88:19-20.
[41] *Id.* at 87:23-88:13.
[42] *Id.* at 126:5-11.

diagnosis just for a catagen/telogen shift that is more than PCIA. And we have a differential diagnosis for follicular dropout or empty stela. And that is more than PCIA. But when you put all these three together, that's how you come up with the diagnosis.[43]

For the foregoing reasons, Dr. Thompson employed reliable methodology in determining

that Ms. Plaisance has PCIA.

## CONCLUSION

For these reasons, the Court should deny Hospira's motion to exclude expert testimony of

Dr. Thompson.

Dated: December 7, 2021                            Respectfully submitted,


/s/ Christopher L. Coffin                          /s/ Karen B. Menzies
Christopher L. Coffin (#27902)                     Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                   GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225                    6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                       Los Angeles, California 90045
Phone: (504) 355-0086                              Telephone: 510-350-9700
Fax: (504) 355-0089                                Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                             kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                      *Plaintiffs' Co-Lead Counsel*


/s/M. Palmer Lambert                               /s/Dawn M. Barrios
M. Palmer Lambert (#33228)                         Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                          BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                           701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street            New Orleans, LA 70139
New Orleans, LA 70163-2800                         Phone: 504-524-3300
Phone: 504-522-2304                                Fax: 504-524-3313
Fax: 504-528-9973                                  barrios@bkc-law.com
plambert@gainsben.com

                                                   *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

---

[43] *Id.* at 127:19-128:16 (form objection omitted).

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street

Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2021, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all

counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT