**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


In Re: TAXOTERE (DOCETAXEL)                              MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                         SECTION "H" (5)

THIS DOCUMENT RELATES TO:
*Plaisance v. Hospira, Inc., et al.*, Case No. 2:18-cv-08086

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**HOSPIRA'S MOTION FOR SUMMARY JUDGMENT**
**BASED ON STATUTE OF LIMITATIONS**

     Plaintiff, Audrey Plaisance, respectfully submits this memorandum of law in opposition to

Defendants Hospira, Inc.'s and Hospira Worldwide, LLC's ("Hospira") motion for summary

judgment based on statute of limitations.  Hospira's motion should be denied because the evidence

before the Court shows that Mrs. Plaisance reasonably believed that her chemotherapy-related hair

loss was only temporary and would re-grow after completion of chemotherapy.  Moreover, Mrs.

Plaisance reasonably investigated her continuing hair loss with both her oncologist and

dermatologist, without being informed that she might have permanent hair loss or that docetaxel

carried a risk of permanent hair loss.  Mrs. Plaisance only became aware of such a risk when she

saw a television commercial about it sometime in 2018.

     Furthermore, Mrs. Plaisance has alleged, through the common allegations set forth in the

Second Amended Master Long Form Complaint (Doc. 4407), including paragraphs 5-7, 9-11, 150-

162, 164, 183-187, and 267-276, that Hospira's actions in concealing the association between

permanent hair loss and docetaxel prevented her and her treating physicians from knowing of (and

choosing to consider, recommend, and accept or reject) docetaxel's risk of causing permanent hair

loss.

For the reasons more fully outlined below, and under the Court's prior holdings in this MDL applying the Louisiana law of liberative prescription and *contra non valentem*, Mrs. Plaisance's claims are not prescribed.

## I.   INTRODUCTION AND BACKGROUND

Mrs. Plaisance was diagnosed with breast cancer on December 2, 2013.   Plaintiff's Response to Hospira's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment Based on Statute of Limitations ("PRHSUMF") at ¶1.   Mrs. Plaisance underwent surgery for a right partial mastectomy on December 11, 2013.  PRHSUMF at ¶2.  Mrs. Plaisance received chemotherapy for breast cancer from January 17, 2014 to March 20, 2014.  PRHSUMF at ¶3.  Mrs. Plaisance's chemotherapy regimen prescribed by her oncologist, Dr. Laura Chauvin, consisted of docetaxel and another drug called Cytoxan.   PRHSUMF at ¶3.   After chemotherapy, Mrs. Plaisance underwent radiation treatment.  Plaintiff's Statement of Additional Uncontroverted Material Facts (PSAUMF) at ¶1.   In addition, Dr. Chauvin prescribed an aromatase inhibitor for her called Femara, to be taken for five years.  PSAUMF at ¶2.

As part of her informed consent process, Dr. Chauvin reviewed the side effects of chemotherapy generally, as well as the side effects of docetaxel specifically, with Mrs. Plaisance. PSAUMF at ¶3.  Dr. Chauvin's office also provided Mrs. Plaisance with educational materials on chemotherapy treatment. PRHSUMF at ¶5.  However, Dr. Chauvin did not inform Mrs. Plaisance that permanent hair loss was a potential risk when she prescribed and administered docetaxel to her, because "permanent hair loss is unusual" and she "hadn't had any patient with permanent hair loss since 1991."  PSAUMF at ¶4; *see also* PRHSUMF at ¶5.  Instead, if she had been asked about permanent hair loss, Dr. Chauvin "would have said it probably can happen but I haven't seen it." PSAUMF at ¶4; *see also* PRHSUMF at ¶5.  This is consistent with Mrs. Plaisance's recollection

that Dr. Chauvin did not mention a risk of permanent hair loss when she discussed the risks of chemotherapy with her.  PRHSUMF at ¶5.  The consent form and educational materials that Dr. Chauvin's office gave to Mrs. Plaisance also did not call out a risk of permanent hair loss. PRHSUMF at ¶¶4-5.  Instead, Dr. Chauvin told Mrs. Plaisance "that [her hair] would come back. I would probably lose my hair, but that it would come back", and Mrs. Plaisance "understood that [hair loss] would be temporary."  PRHSUMP at ¶6.

So, while Mrs. Plaisance expected temporary hair loss during chemotherapy, she also expected that it would not be permanent and that her hair would re-grow following chemotherapy. PRHSUMF at ¶6. When her hair failed to re-grow completely following chemotherapy, she brought it to Dr. Chauvin's attention at her follow-up appointments, without Dr. Chauvin indicating that she might have permanent hair loss or that docetaxel could cause permanent hair loss. PRDSUMF at ¶¶9-10.  During a visit with Dr. Chauvin on May 5, 2014, following completion of chemotherapy treatment, Mrs. Plaisance reported that her hair was not fully regrowing as she expected.  PRHSUMF at ¶9.  And during a visit with Dr. Chauvin on May 19, 2014, following completion of chemotherapy treatment, Mrs. Plaisance reported incomplete recovery of her hair. PRHSUMF at ¶10.  Each time Dr. Chauvin informed Mrs. Plaisance that her hair regrowth was normal. PRHSUMF at ¶¶9-10.  On May 19, 2014, Dr. Chauvin told Mrs. Plaisance "it was premature to be worried that [her hair] wouldn't [regrow]."  PRHSUMF at ¶10.

In approximately 2015, Mrs. Plaisance also asked Dr. Chauvin's nurse to ask Dr. Chauvin why she had lost her eyebrows, and Dr. Chauvin's nurse told Mrs. Plaisance that Femara could have caused two percent of her loss of eyebrows, but she did not say whether her loss of eyebrows was temporary or permanent.  PRHSUMF at ¶20.  Mrs. Plaisance began treating with dermatologist Dr. Ryan Matherne in March 2016, for hair loss, among other dermatological

conditions.  PSAUMF ¶¶ 8-15, ¶18-19.  Dr. Matherne is admittedly not an expert on chemotherapy induced hair loss, and usually advises patients suffering from hair loss after chemotherapy to "be patient", as the hair loss is "most likely reversible." PRHSUMF at ¶15, ¶17.  Mrs. Plaisance only became aware of the potential for permanent hair loss from docetaxel in 2018 when she first saw a television commercial about it.  PRHSUMF at ¶23.  She filed this timely action on August 23, 2018. PRHSUMF at ¶24.

## II.   LEGAL STANDARD

Summary judgment is not warranted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "[A]ll the evidence and factual inferences are viewed in a light most favorable to the non-moving party, resolving all reasonable doubts accordingly." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). "Even thin contrary evidence can be sufficient to create a fact issue" for purposes of defeating summary judgment. *Crochet v. Bristol-Myers Squibb Co.*, 804 F. App'x 249, 255 (5th Cir. 2020) (internal quotation marks and citations omitted) (reversing grant of summary judgment because genuine issue of fact remained as to whether *contra non valentem* could preserve patient's claim against drug manufacturer under Louisiana Products Liability Act).

"[T]he summary judgment procedure is insufficient to resolve the issue of prescription when the question cannot be resolved on the face of the pleadings or other undisputed facts, but instead requires a fact-based inquiry." *Boudreaux v. Sanders*, No. CIV.A.02-3515, 2003 WL 21983219, at *2 (E.D. La. Aug. 18, 2003). This is because "a motion for summary judgement is

rarely appropriate for a determination based on subjective facts such as intent, motive, malice, knowledge, or good faith." *Brownell Land Co. v. Oxy USA Inc*., No. CIV.A.05-225, 2007 WL 3138638, at *3 (E.D. La. Oct. 17, 2007); *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgement or for a directed verdict.").

Accordingly, the fact finder generally should resolve exceptions to liberative prescription because the determination of when a prescriptive period accrues is an inquiry dependent on the testimony of the plaintiff and her healthcare providers. *See Chiasson v. Medtronic Inc.*, Nos. 16-789, 16-3552, 16-3721, 2016 WL 4191837, at *6 (E.D. La. August 9, 2016) ("In cases of medical products liability, the accrual of a case and the reasonableness of delay in filing suit often hinge on the testimony of the plaintiff and his or her doctor."); *see also Body by Cook v. Ingersoll-Rand Co*., 39 F. Supp. 3d 827, 838 (E.D. La. 2014) (The application of "contra non valentem is generally a question of fact that may go to the jury for resolution."). This is so even where the Plaintiff's testimony on the issue is seemingly vague, inconsistent, confusing, or at times out-right contradictory. *Crochet*, 804 F. App'x at 254-55 and n.9 (noting that courts do not resolve factual inconsistencies in testimony on summary judgment because that is fact finder's role).

## III.    ARGUMENT AND AUTHORITIES

In Louisiana, the applicable statute of limitations—otherwise known as the prescriptive period—for actions under the Louisiana Product Liability Act ("LPLA") is one year from the day injury or damage is sustained. *See* La Civ. Code art. 3492; *Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 12-270 (La. App. 3 Cir. 2012), 99 So.3d 739, 741 (noting that La. Civ. Code art. 3492 applied to claims under the LPLA). "Damage is sustained, for prescription purposes, only when it has

manifested itself with sufficient certainty to be susceptible to proof in a court of justice." *Landry v. Blaise, Inc.*, 774 So. 2d 187, 190 (La. App. 4 Cir. 2002); *see also Cameron Parish School Board v. ACandS, Inc.*, 687 So. 2d 84, 88 (La. 1997) ("Damage is considered to have been sustained only when it has manifested itself with sufficient certainty to support accrual of a cause of action").

 "When the issue of prescription is raised, '[t]he burden of proof generally rests on the party asserting prescription. When a complaint reveals on its face that the prescriptive period has lapsed, however, the plaintiff bears the burden of establishing a suspension or interruption of the prescriptive period.'" *Becnel v. Mercedes-Benz USA, LLC*, No. 14-0003, 2014 WL 1918468, at *4 (E.D. La. May 13, 2014) (quoting *Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 842 (E.D. La. 2011)); *see also Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So.2d 502, 508.

For a claim to be facially prescribed, the defendant bears the burden of proving that a plaintiff knew, or should have known, of the causal connection between his or her injuries and the defendant's tortious conduct for more than one year before the plaintiff filed his or her lawsuit. *See, e.g., Reddick v. Medtronic, Inc.*, No. 18-8568, 2020 WL 2759077, at *8 (E.D. La. Apr. 14, 2020). If such information is not discernable from the face of the complaint or is nonetheless disputed, the burden remains on the defendant to prove prescription. *See In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, No. MDL 07-1873, 2009 WL 1683289, at *5 (E.D. La. June 15, 2009); *Landry*, 774 So. 2d at 190–91.

In evaluating whether a claim is prescribed, "prescriptive statutes are to be strictly construed against prescription and in favor of the claim that is said to be extinguished. Of the two possible constructions, the one that maintains enforcement of the claim or action, rather than the one that bars enforcement, should be adopted." *Louisiana Health Serv. & Indem. Co. v. Tarver*, 635 So. 2d 1090, 1098 (La. 1994). *Accord, Crochet*, 804 F. App'x at 255 ("Our decision here is

6

further bolstered by Louisiana's mandate that prescription statutes are to be strictly construed against prescription and in favor of the claim sought to be extinguished."). In other words, "[a] court should resolve doubts about a prescription question in favor of giving the litigant his day in court." *Hunter v. Tensas Nursing Home*, 743 So. 2d 839, 841–42 (La. App. 2 Cir. 1999).

The Fifth Circuit in *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 995 F.3d 384, 389-90 (5th Cir. 2021) stated "the injury of 'an absence of or incomplete hair regrowth beyond the completion of chemotherapy' is sustained when, six months after the completion of chemotherapy, a person has an absence of or incomplete hair regrowth" based on an allegation in the PSC's Second Amended Master Long Form Complaint.    Even if the hindsight definition of how the medical community interprets a medical condition in a complaint can be interpreted as an allegation of knowledge at the time the injury was being suffered, the Louisiana Supreme Court recognizes the doctrine of *contra non valentem*, "which is a judicially created exception to the general rules of prescription that is applied to ameliorate the sometimes harsh consequences resulting from the strict interpretation of prescription statutes." *Morgan v. Entergy New Orleans, Inc.*, 234 So. 3d 113, 116 (La. App. 4 Cir. 2017). The doctrine underscores the Louisiana high court's view that the "fundamental purpose of prescription statutes is only to afford a defendant economic and psychological security if no claim is made timely, and to protect him from stale claims and from the loss of non-preservation of relevant proof." *Giroir v. S. Louisiana Med. Ctr., Div. of Hosps.*, 475 So. 2d 1040, 1045 (La. 1985).

This doctrine protects tort victims from their claims becoming stale, by tolling the prescriptive period when the plaintiff is prevented from acting under one of four scenarios, including "where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant" and "where the defendant has done some

act effectually to prevent the plaintiff from availing himself of his cause of action." *Id*. As discussed below, both scenarios are applicable to toll the prescriptive period of Mrs. Plaisance's claims against Hospira.

### A. GENUINE ISSUES OF MATERIAL FACT EXIST CONCERNING WHEN MRS. PLAISANCE DISCOVERED HER INJURIES AND THE RELATIONSHIP TO DOCETAXEL.

Under the doctrine of *contra non valentem*, prescription is suspended "[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010). Just as with a "discovery rule," prescription is tolled until "a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is a victim of a tort." *Campo*, 828 So. 2d at 510; *see also In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017).

### 1. Mrs. Plaisance reasonably believed her hair would grow back until she saw a television advertisement in 2018.

Constructive knowledge is defined as "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Campo*, 828 So. 2d at 510-11. But constructive knowledge "requires more than a mere apprehension that something might be wrong. Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable." *Griffin v. Kinberger*, 507 So.2d 821, 823 (La. 1987) (citing *Cardova v. Hardford Accident & Indemnity Co.*, 387 So.2d 571 (La. 1980)). *Accord, Crochet*, 804 F. App'x at 254, n.7 (also noting that mere apprehension that something might be wrong is insufficient to commence running of prescription under Louisiana law).

Here, Mrs. Plaisance did not know she had suffered permanent hair loss — much less that docetaxel could cause permanent hair loss — until she saw a television advertisement in 2018 regarding litigation about Taxotere (docetaxel) and permanent hair loss.  PRHSUMF at ¶23. Before then, she reasonably believed that her hair loss was only temporary and that her hair eventually would grow back.  PRHSUMF at ¶6, ¶8, ¶22.

The evidence before the Court supports the reasonableness of her belief.  Among other things, Mrs. Plaisance does not recall her oncologist, Dr. Chauvin, ever mentioning a risk of permanent hair loss when she discussed the risk of hair loss from chemotherapy with her. PRHSUMF at ¶5.  Rather, Mrs. Plaisance recalls Dr. Chauvin told her "that [her hair] would come back.  I would probably lose my hair, but that it would come back", and Mrs. Plaisance "understood that [hair loss] would be temporary."  PRHSUMF at ¶6.

Mrs. Plaisance's recollection is consistent with the information that Dr. Chauvin provided during the informed consent process.  Dr. Chauvin did not know of the risk of permanent hair loss associated with docetaxel at the time she prescribed docetaxel to Mrs. Plaisance.  PSAUMF at ¶5. Consistent with her own lack of knowledge about this risk, Dr. Chauvin did not warn Mrs. Plaisance about the possibility of permanent hair loss when she administered docetaxel to her because "permanent hair loss is unusual" and she "hadn't had any patient with permanent hair loss since 1991."  PSAUMF at ¶4.  In addition, none of the documents that Dr. Chauvin provided to Mrs. Plaisance during the informed consent process called out a risk of permanent hair loss from docetaxel.  *See* PRHSUMF at ¶¶4-5.

Mrs. Plaisance's ignorance of her specific medical injury, permanent chemotherapy induced alopecia, also is consistent with both the science that has developed in this MDL and certainly reasonable in light of the general and specific causation defenses lodged by the MDL

9

defendants.[1]  In *Sharkey*, a Louisiana state court of appeals properly recognized that a defendant's causation challenges are relevant to the jury's consideration of whether the cause of a plaintiff's injury was sufficiently known or knowable to require the filing of a lawsuit under Louisiana law. *See Sharkey v. Sterling Drug*, 600 So.2d 701, 714 (La. App. 1 Cir. 1992). This Court similarly recognized the same in denying serial challenges to the timeliness of Ms. Kahn's matter:

> In document 12805, I previously outlined the legal standard on interlocutory judgments, and I'm going to adopt that standard for today. Before me is the second motion to reconsider and the third time that I look at Ms. Kahn's case. I am reminded early on in this litigation Judge Engelhardt, when he was presented with an open prescriptive motion that all of these cases were prescribed, said no. Prescription, under Louisiana law, is a factually intensive basis. I think there's still factual issues for the jury to consider, and this is what my thought process is. I specifically note that throughout this litigation the defendant has pointed to multiple causes of alopecia. Most are not tort related. Of interest is age-related alopecia. What we hear from countless experts is there are reasons that have nothing to do with improper conduct that cause alopecia in women. That is a plausible cause of alopecia.

Ex. 1, Transcript of July 29, 2021 Hearing at 15.  The complexity of diagnosis of permanent chemotherapy induced alopecia is something this Court is well aware from the causation challenges advanced by Hospira and previously by other MDL defendants.

Under the circumstances, a reasonable jury could conclude that Mrs. Plaisance reasonably did not know, nor could not have known, that she had been a victim of a tort prior to seeing a television advertisement.

---

[1] *See, e.g.,* Hospira's Motion for Summary Judgment Regarding General and Specific Causation (Doc. 13375); Motion to Exclude or Limit Opinions of Dr. Curtis Thompson (Doc. 13381); Hospira's Motion to Exclude or Limit the Opinions of Dr. Antonella Tosti (Doc. 13384); Hospira's Motion to Exclude or Limit Opinions of Dr. Ellen G. Feigal (Doc. 13377); Hospira's Motion to Exclude or Limit Opinions of Dr. David Madigan (Doc. 13378); Hospira's Motion to Exclude or Limit Opinions of Dr. Laura Plunkett (Doc. 13379).

**2. Even if Mrs. Plaisance had constructive knowledge six months after completion of chemotherapy with docetaxel that she had suffered a discernable injury (which Mrs. Plaisance denies), she undertook a reasonable investigation that tolled the running of prescription under the doctrine of c*ontra non valentem*.**

"[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes may be reasonable for the specific injury, and when a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant." *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010) (internal citations omitted). "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Campo*, 828 So 2d at 511 (internal citations omitted). "Courts have summarized the contra non valentem doctrine as an inquiry into the 'reasonableness' of the victim's behavior in light of his perceived injuries." *Jenkins v. Bristol-Myers Squibb*, 2016 WL 10100281, at *6 (E.D. La. July 8, 2016) (internal citations omitted).

Here, Mrs. Plaisance acted reasonably and investigating her hair loss through consultations with her treating doctors in accordance with the Fifth Circuit's decision in *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 995 F.3d at 392.[2]  She brought her continuing hair loss to her oncologist, Dr. Chauvin's, attention at follow-up appointments after completing chemotherapy, without Dr. Chauvin suggesting that her hair loss could be permanent.  *See* PRHSUMF at ¶¶9-10, ¶20.  During a visit with Dr. Chauvin on May 5, 2014, following completion of her chemotherapy, Mrs. Plaisance reported that her hair was not regrowing as she expected.  PRHSUMF at ¶9.  And during a visit with Dr. Chauvin on May 19, 2014, following completion of her chemotherapy, Mrs.

---

[2] The Fifth Circuit stated: "we interpret Louisiana law to require that once hair loss persisted after six months, contra non valentem **tolled the prescription period** until the point when a prospective plaintiff through the exercise of reasonable diligence should have 'considered [Taxotere] as a potential root cause of' her injury." *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F.3d 384, 392–93 (5th Cir. 2021) (citing *Oil Ins. Ltd.*, 977 So. at 23.) (emphasis added).

11

Plaisance again reported that she was frustrated with the little hair regrowth she had experienced. PRHSUMF at ¶10.  Despite these complaints, Dr. Chauvin did not inform Mrs. Plaisance that her condition might be permanent or that permanent hair loss was a risk of docetaxel use.  Instead, Dr. Chauvin told Mrs. Plaisance that her hair regrowth was normal and that it was premature to be worried that her hair would not fully regrow.  *See* PRHSUMF at ¶¶9-10.  In approximately 2015, Mrs. Plaisance asked Dr. Chauvin's nurse to ask Dr. Chauvin why she had lost her eyebrows, and Dr. Chauvin's nurse told Mrs. Plaisance that Femara could have caused two percent of her loss of eyebrows, but she did not say whether her loss of eyebrows was temporary or permanent. PRHSUMF at ¶20.

Hospira erroneously cites this Court's order in *Hughes* in support of its claims that the May 2014 conversations between Mrs. Plaisance and Dr. Chauvin cannot toll prescription because they occurred before her injury was realized at six months after completion of chemotherapy.  But the conversations between Ms. Hughes and her oncologist about whether her hair would grow back occurred before beginning any treatment.  (Doc. 12805 at 6).  The May 2014 conversations between Mrs. Plaisance and Dr. Chauvin occurred two months after chemotherapy treatment was complete.  This Court has similarly rejected Sanofi's arguments that conversations between Ms. Kahn and her oncologist that took place only five and a half months after completion of chemotherapy were irrelevant to the *contra non valentem* analysis.  (Doc. 12805 at 5). Accordingly, conversations between Mrs. Plaisance and Dr. Chauvin in May 2014 about her hair loss are relevant to the *contra non valentem* analysis.

Mrs. Plaisance also brought her continuing hair loss to her dermatologist's attention in March 2016.  PRHSUMF at ¶18; PSAUMF at ¶8.  Hospira takes issue with the amount of time between Mrs. Plaisance inquiring about her hair loss with her oncologist, Dr. Chauvin, and Mrs.

Plaisance inquiring about her hair loss with her dermatologist, Dr. Matherne. But Mrs. Plaisance had been told earlier by Dr. Chauvin that it was premature to be worried that her hair would not regrow. Moreover, consulting with her dermatologist earlier would not have shed light on the permanent nature of her condition because Dr. Matherne believed Mrs. Plaisance could experience hair regrowth. PSAUMF at ¶¶9-19. Hospira complains that Mrs. Plaisance did not specifically ask Dr. Matherne about a connection between permanent hair loss and docetaxel. However, since Dr. Matherne gave Mrs. Plaisance every indication that her hair loss was reversible, *and thus that it was not permanent*, this would have been an reasonable inquiry. Further, according to his own testimony, Dr. Matherne would have told Mrs. Plaisance to "be patient" and that her hair loss was "most likely reversible." PSAUMF at ¶17.

In March 2016, Dr. Matherne diagnosed Mrs. Plaisance with telogen effluvium and discussed some causes of the condition such as stress, illness, iron deficiency, thyroid disease, and medications. PSAUMF at ¶9. Dr. Matherne contemplated that Mrs. Plaisance's hair loss could be caused by thyroid disfunction. PRHSUMF at ¶19. He prescribed shampoo, scalp injections, and pills to Mrs. Plaisance to alleviate inflammation and regrow her hair. PRHSUMF at ¶19; PSAUMF at ¶¶9-12. In May 2017, Dr. Matherne diagnosed Mrs. Plaisance with alopecia, but he did not believe her hair loss was permanent. PSAUMF at ¶¶13-14; PRHSUMF at ¶18. Dr. Matherne believed Mrs. Plaisance's hair loss was temporary due to the underlying condition of seborrheic dermatitis. *See* PSAUMF at ¶9-19; PRHSUMF at ¶18.

Mrs. Plaisance respectfully submits that her case is like those where other courts have applied the doctrine of *contra non valentem*. For example, in *Hoerner v. Wesley–Jensen, Inc*., 684 So.2d 508 (La. App. 4 Cir. 1996), the plaintiff did not know of the link between her corneal infection and her extended wear contacts until she read about it in "People" magazine, despite the

existence of medical literature on the subject.  684 So. 2d at 514.  The court rejected the argument that the plaintiff – who had a bachelor's degree in medical technology and worked in a doctor's office as a receptionist and payroll assistant --, *id*. at 511, could have learned of the connection between her injuries and the product had she investigated earlier, holding that "[e]ven had she inquired further, it was unlikely that Mrs. Hoerner would have been told in 1987 that extended-wear contact lenses significantly increased the likelihood of eye infections. It was only in 1989 that the medical community recognized the increased risk associated with extended wear contact lenses." *Id.* at 514. The Court concluded that "the knowledge that contact lens use in general could cause infection is not sufficient to put [the plaintiff] on notice that her infection and ensuing injury resulted from wearing the extended-wear contact lenses."  *Id*.

In *Cortez v. DePuy Orthopaedics, Inc*., No. 15-617, 2016 WL 633665, at *1 (E.D. La. Feb. 17, 2016), the plaintiff began experiencing pain in her knee in March 2012 and was notified by her orthopedic surgeon that she required revision surgery because the tibial component of her prosthetic knee had loosened in November 2013. But the plaintiff's orthopedic surgeon testified that loosening of a prosthetic knee could stem from multiple causes. *Id*. at *3. Indeed, the plaintiff's orthopedic surgeon suspected that a knee infection caused the loosening, and neither the plaintiff nor her orthopedic surgeon knew that the cement had not integrated until he performed the revision surgery in February 2014. *Id*. at *1. As such, the court rejected the defendant's argument that prescription commenced in November 2013 because the plaintiff did not have actual or constructive notice that the defendant's bone cement caused the loosening until February 2014. *Id*. at *4. Judge Feldman explained the underlying reasons:

> Cortez knew that something went wrong with her surgery, but she had no way of knowing who, if anyone, to blame. Applying the defendant's theory, Cortez would be required to sue her doctors, the hospital, the manufacturers of the prosthetic knee and its component

> parts, and any other possible tortfeasor before even knowing
> whether a tort was committed. The purpose of contra non valentem
> is precisely to avoid this absurdity.

*Id.* at *3.

Mrs. Plaisance also respectfully submits that the facts of her case are akin to those in the

*Kahn* (Docs. 9885 and 12805) and *Earnest* (Doc. 7571 at 8-9) cases in which this Court ruled that

issues of material fact remain regarding the application of *contra non valentem* based on evidence

that those plaintiffs similarly investigated their injuries and discussed their ongoing hair loss with

their doctors, without being informed that their injuries could be permanent. Like in *Earnest*, Mrs.

Plaisance's oncologist led her to believe that she had no actionable injury. (Doc. 7571 at 8). And,

like in *Kahn*, Mrs. Plaisance had reason to believe that something other than Hospira's conduct

caused her injury. (Doc. 9885 at 7). Her dermatologist, Dr. Matherne, told her that something

other than her chemotherapy caused her hair loss. It was even more reasonable for Mrs. Plaisance

to believe that her hair loss was temporary and caused by an underlying condition because she had

previously experienced hair loss unrelated to chemotherapy treatment starting in 2003. PSAUMF

at ¶20. As such, the Court, like in *Kahn*, should not charge Mrs. Plaisance with knowledge of the

information available on the internet as discussed by the Fifth Circuit in *In re Taxotere (Docetaxel)*

*Prods. Liab. Litig.*, 995 F.3d 384. Doc. 12805 at 7; *see also* Ex. A at 15-16.[3]

Although Hospira tries to muddy the waters by suggesting that Mrs. Plaisance failed to ask

her doctors about the cause of her hair loss, this argument does not withstand scrutiny. Mrs.

Plaisance did not avoid asking Drs. Chauvin and Matherne about her hair loss. Rather, Mrs.

---

[3] In denying the second motion for reconsideration in Kahn, the Court also said:

> Here, the plaintiff sought and investigated a cause for ongoing alopecia and was advised by her
> gynecologist that she was not the victim of a tort, but rather the aging process, and according to plaintiff
> she dropped it. Now, did she take vitamins? Did she use other products to try to facilitate hair growth? She
> did that, but she dropped it. Whether or not that was reasonable, to accept the opinion of one physician, I
> think is for the jury to decide, so the motion is denied.

Plaisance actually brought her hair loss to her treating doctors' attention on multiple occasions following chemotherapy, as discussed above, and her treating doctors told her it was too early to worry that her hair would not regrow or that her hair loss was temporary and caused by something other than chemotherapy. PRHSUMF at ¶¶9-10, ¶¶18-19; PSAUMF ¶¶7-19.  This is reflected not only in her memory but in Drs. Chauvin's and Matherne's records.  PSAUMF at ¶¶9-10, ¶¶9, 13. Mrs. Plaisance reasonably relied on the information provided by her doctors in response to her investigation and held out hope that her hair would fully regrow.  PRHSUMP at ¶8.

### B.  A FACTUAL DISPUTE EXISTS AS TO WHETHER HOSPIRA PREVENTED MRS. PLAISANCE FROM AVAILING HERSELF OF HER CAUSE OF ACTION IN A WAY THAT TOLLED THE RUNNING OF PRESCRIPTION UNDER THE DOCTRINE OF *CONTRA NON VALENTEM*.

The doctrine of *contra non valentem* also provides an exception to Louisiana's one-year liberative prescription in cases "where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action." *Morgan*, 234 So. 3d at 116. Here, Hospira did not, but had sufficient information that required them to, inform the medical community and patients of the risk of permanent hair loss with docetaxel with a label change.

In addition to knowledge of scientific articles, which mounted over time, Defendant Hospira knew, or should have known, of foreign labels of Taxotere (docetaxel) that were required to include a warning of irreversible alopecia. PSAUMF ¶25, ¶¶27-31.  For example, as of 2011, both Sanofi's label in Europe and Sandoz's label in Australia informed patients of the risk of irreversible alopecia. PSAUMF at ¶27.  Yet, Hospira did not seek to update its label until March 2017.  PSAUMF at ¶32.

As shown above, and in Mrs. Plaisance's separate statement of material facts ¶¶21-32, the discovery process has supplied evidence of what Hospira knew, should have known, deliberately ignored and/or failed to share about permanent hair loss during the same period of time in which

Hospira claims Mrs. Plaisance should have realized she should bring an action against it.  This Court has found similar concealment evidence was sufficient to allow a fraud claim for Plaintiff Jacqueline Mills to proceed under Georgia law, because Sanofi failed to include any reference to permanent hair loss in its label until 2015.  *See* Order (Doc. 7571 at 18-19).

Here too, the portion of the Louisiana Supreme Court's test for application of *contra non valentem* based on conduct by Hospira strongly weighs in favor of finding Mrs. Plaisance's claims are timely. Due to Hospira's active concealment of its true knowledge of the potential risk of permanent hair loss associated with docetaxel, Mrs. Plaisance was unable to discover that her hair loss was in fact permanent and had been caused by docetaxel until she saw an advertisement regarding lawsuits alleging Taxotere (docetaxel) could cause permanent hair loss.  These disputed material facts regarding concealment preclude a finding that this case is prescribed as a matter of law.

## IV.    CONCLUSION

Under this Court's prior rulings applying Louisiana law on liberative prescription and *contra non valentem*, Mrs. Plaisance's case is not prescribed. The record before the Court shows that Mrs. Plaisance reasonably believed her hair would grow back until she saw the 2018 television commercial linking Taxotere to permanent hair loss and that she reasonably investigated her injury by following up with her doctors after the completion of chemotherapy; in none of many discussions with (and physical examinations by) her doctors over the course of her continuing cancer treatment was she ever informed of doxetaxel's risk of permanent hair loss, or that she may have permanent hair loss, or that she suffered injury as a result of docetaxel specifically, or that her hair condition was attributable to docetaxel. Given this evidence and the evidence demonstrating Hospira's concealment of, or conscious disregard for, the risk permanent hair loss

17

associated with docetaxel, genuine issues of material fact remain for the jury to evaluate regarding liberative prescription that preclude summary judgment.

Dated: December 7, 2021                    Respectfully submitted,


_/s/ Christopher L. Coffin_                  _/s/ Karen B. Menzies_
Christopher L. Coffin (#27902)               Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.            GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225              6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                 Los Angeles, California 90045
Phone: (504) 355-0086                        Telephone: 510-350-9700
Fax: (504) 355-0089                          Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                       kbm@classlawgroup.com

_Plaintiffs' Co-Lead Counsel_                _Plaintiffs' Co-Lead Counsel_

_/s/M. Palmer Lambert_                       _/s/Dawn M. Barrios_
M. Palmer Lambert (#33228)                   Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                    BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                     701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street      New Orleans, LA 70139
New Orleans, LA 70163-2800                   Phone: 504-524-3300
Phone: 504-522-2304                          Fax: 504-524-3313
Fax: 504-528-9973                            barrios@bkc-law.com
plambert@gainsben.com
                                             _Plaintiffs' Co-Liaison Counsel_
_Plaintiffs' Co-Liaison Counsel_

### PLAINTIFFS' STEERING COMMITTEE

Anne Andrews                                 Abby E. McClellan
Andrews Thornton Higgins Razmara, LLP        Stueve Siegel Hanson LLP
2 Corporate Park, Suite 110                  460 Nichols Road, Suite 200
Irvine, CA 92606                             Kansas City, MO 64112
Phone: (800) 664-1734                        Phone: (816) 714-7100
aa@andrewsthornton.com                       Fax: (816) 714-7101
                                             mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202

Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT