# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In Re: TAXOTERE (DOCETAXEL)**
**PRODUCTS LIABILITY LITIGATION**

**Case No. MDL 2740**

**Expert Report of David Ross, M.D., Ph.D., M.B.I.**

**CONFIDENTIAL**

41.     When submitting an NDA to market a drug in the US., a sponsor must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 USC 505(b)(1). FDA approval of an NDA requires that these "full reports" demonstrate that the drug described in the NDA is safe and effective for its proposed use. 21 USC 355(d); 21 CFR 314.125.  Failure to include such "full reports" in an NDA can result in the FDA summarily rejecting the application through a refuse-to-file action. 21 CFR 314.101(d)(3).

42.     An NDA under § 505(b)(1) must include detailed reports on the subject drug's chemistry and manufacturing; results of animal studies; results of pharmacokinetic studies in humans; and results from controlled studies in humans, along with other clinical data collected during the drug development program. To garner FDA approval, the data in the NDA must demonstrate the drug's safety and effectiveness.[15]

43.     The sponsor of an NDA has the burden of demonstrating safety.  Under 21 USC 355(d)(1), it is not enough for the sponsor to find an absence of risk; the sponsor must affirmatively demonstrate the safety of a drug.  In practical terms, this means excluding the occurrence of particular drug risks at frequencies greater than a threshold level that would impact the balance of the magnitude of a drug's benefit compared to its risks.

### 3.     Post-approval NDA regulatory obligations

44.     After NDA approval, the sponsor of the application (the NDA holder) has continuing regulatory responsibilities. For purposes of this report, the most important of these responsibilities are evaluating and reporting available safety information to the FDA and ensuring that the product's label remains accurate by incorporating new safety information regarding the drug that has become available to the NDA holder.

45.     The FDCA broadly defines new safety information as "information derived from a clinical trial, an adverse event report, a post-approval study . . .  or peer-reviewed biomedical literature; . . .  or other scientific data . . .  about a serious risk or an unexpected serious risk associated with use of the drug that the Secretary has become aware of (that may be based on a

---

[15] 21 CFR 314.50(c)

new analysis of existing information) since the drug was approved . . ." 21 USC 355-1(b). The definition also includes FDA analyses of AE reports submitted to the FDA Adverse Event Reporting System (FAERS).

46.     An NDA holder's post-marketing regulatory responsibilities focus in large part on serious adverse events (SAEs) and unexpected AEs.  The FDA classifies an AE as serious if it results in death, a life-threatening AE, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect. However, the governing regulation at 21 CFR 314.80(a) explains that an AE can be considered serious even if it does not result in one of these outcomes.

47.     An "unexpected AE" is one that is not listed in the current labeling for the drug. The governing regulation at 21 CFR 314.80(a) explains that this definition includes AEs that are "symptomatically and pathophysiologically related" to a listed AE, but differ because of greater severity or specificity.

48.     One of an NDA holder's most important post-approval regulatory obligation concerns unexpected SAEs, i.e., those not listed in the current drug label. An NDA holder is required to report all such events to the FDA within 15 calendar days after receipt, investigate them, and provide follow-up information.

49.     More generally, an NDA holder is required to promptly review all AEs, evaluate them, and report the results of its analyses to the FDA, both in periodic safety update reports and annual reports.

50.     Lastly, the NDA holder must develop written procedures for the surveillance, receipt, evaluation, and reporting of post-marketing AEs to the FDA.

51.     Taken together, these activities are termed *pharmacovigilance* and represent critical post-marketing regulatory obligations for NDA holders.  Pharmacovigilance plays an essential role in monitoring drug safety post-marketing because of the enormous difference between the limited power of pre-approval clinical trials to detect adverse events, particularly SAEs, and the number of patients in the real world who may be exposed to a drug once it enters the marketplace.

**CONFIDENTIAL**

52.     Because of the broad range of pharmacoepidemiologic data sources and methods developed over the last quarter-century, an NDA holder that passively counts up adverse events and dutifully transmits tallies to the FDA cannot be regarded as meaningful review or "evaluation" of AEs as required under 21 CFR 314.80(b). The statistical power of large adverse event datasets, combined with sophisticated analytic techniques and increased computing capabilities that allow identification of safety signals for further exploration.

53.     For example, as of 2014, FDA's Adverse Event Reporting System (FAERS) contained over 7,000,000 adverse event reports, with over 750,000 new reports added annually.[16]

54.      Two decades ago, the limitations of passive voluntary surveillance databases, such as incomplete information in individual reports and population-level under-reporting of adverse events, had been regarded as barriers to meaningful use of these datasets as a source of new safety information. However, the introduction of techniques such as Bayesian data mining (e.g., disproportionality analysis of an excess of adverse events occurring in reports for a particular drug than would be expected by chance alone), in combination with the very large number of individual reports available, have made FAERS and similar data sources flexible, powerful tools for pharmacovigilance. For example, data mining of adverse event databases has been used to predict in advance addition of new safety information to drug labels.[17]

55.     The details and application of such methods are explained at greater length in Dr. David Madigan's report, which I refer to below.

56.     The FDA has issued multiple detailed Guidances to Industry on how drug manufacturers can meet their pharmacovigilance obligations with respect to surveillance of drug AEs; analyzing aggregated AE data and identifying potential safety signals; analyzing and evaluating such signals; and taking appropriate actions.

---

[16] Duggirala HJ, *et al*. Use of data mining at the Food and Drug Administration. J Am Med Inform Assoc. 2016 Mar;23(2):428-34.

[17] Gurulingappa H, *et al*. Automatic detection of adverse events to predict drug label changes using text and data mining techniques. Pharmacoepidemiol Drug Saf. 2013 Nov;22(11):1189-94.

**CONFIDENTIAL**

57.     For example, a 2005 Pharmacovigilance Guidance issued by FDA[18] provides recommendations to NDA holders on good pharmacovigilance practices, such as prospectively constructing a pharmacovigilance plan for a drug; use of a standardized controlled terminology for AEs, such as the Medical Dictionary for Regulatory Activities (MedDRA); use of active and passive AE surveillance; and data mining of large AE datasets, such as the FDA's Adverse Event Reporting System (FAERS), to identify safety signals.

58.     Pharmacovigilance is a critical foundation for another major post-marketing regulatory obligation of NDA holders, ensuring that the label for a marketed drug is at all times accurate and  is not false or misleading in any particular. 21 CFR 314.125(b)(6). Maintaining the accuracy and completeness of the safety information in a drug's label is an essential component for meeting this obligation, particularly since a drug's toxicity profile will change as more patients are exposed to it.

59.     As discussed above, it is the NDA holder's responsibility to ensure that a drug's label is not false and misleading, and the sponsor's responsibility to demonstrate safety. An NDA holder can propose a change in a drug's label by submitting a supplemental NDA. Many labeling changes (e.g., adding a new indication to the label) require prior approval by the FDA. However, an NDA holder can change a label without prior FDA approval if it will "add or strengthen a contraindication, warning, precaution, or adverse reaction," based on new safety information that meets a regulatory threshold. Such a change is implemented by submitting a *Changes Being Effected (CBE)* supplement (sometimes referred to as a *labeling supplement*) to the FDA at least 30 days prior to the change. Unless a CBE supplement requires review of clinical data unrelated to the safety-related labeling change, the NDA holder does not need to pay a user fee for FDA's review.

---

[18] Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (March 2005), *available at* https://www.fda.gov/media/71546/download.

69.     Although they are distinct regulatory pathways, ANDAs and 505(b)(2) NDAs are sometimes confused. This confusion arises from both pathways owing their creation to the same legislation (Hatch-Waxman Act); the similarity of patent provisions in the FDCA applicable to ANDAs and 505(b)(2) NDAs; the reliance on studies contained in the NDA for an innovator drug to demonstrate safety and effectiveness for all ANDAs and many (but not all) 505(b)(2) NDAs; and the seemingly analogous relationships between  i) the labelling for a generic drug approved under an ANDA and the labeling for its RLD, and ii) the labeling for a drug approved under a 505(b)(2) NDA that relies on safety and effectiveness studies for an innovator drug approved under a 505(b)(1) NDA, and the labeling for the innovator drug.

70.     The differences between these two approval pathways, however, are far more important than these surface similarities. In summary, applicants for and holders of 505(b)(2) NDAs are subject to the same regulatory requirements and post-market surveillance and labeling obligations as those for traditional NDAs approved under § 505(b)(1), rather than the ANDA requirements.

71.     First, by definition, 505(b)(2) NDAs must contain "full reports of investigations of safety and effectiveness." In contrast, ANDAs do not need to contain such reports. In fact, as discussed above, the FDA is prohibited from requesting more information for ANDAs than is statutorily permitted.

72.     Second, the general requirements for NDAs described in Section 505(b)(1) of the FDCA apply to 505(b)(2) NDAs, which are defined as a subset of NDAs as follows:

"An application submitted under paragraph (1) for a drug for which the investigations described in clause (A) of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted . . ."

73.     Of note, the preamble to the proposed implementing regulations for the Hatch-Waxman Act states that

**CONFIDENTIAL**

B.      **Scientific Background**

84.     To understand the scientific evidence available to the 505(b)(2) NDA holders, I have reviewed the following data sources that were available to the 505(b)(2) NDA holders before and after approval of their docetaxel-based products: (1) publicly available medical literature; (2) reporting from the FDA's Adverse Event Reporting Database ("FAERS"); (3) information made available by Sanofi in their worldwide Taxotere labeling; and (4) information set forth by the 505(b)(2) NDA holders in worldwide labeling of their docetaxel products, and other foreign public data.

85.     My understanding and opinions are supported by the analyses and opinions of Plaintiffs' expert witnesses Dr. Ellen Feigal, Dr. David Madigan, and Dr. Laura Plunkett. I have reviewed their expert reports, and I accept and consider their assessments valid.[32]

86.     By way of background, 21 CFR 201.57(c)(6), which describes the required content of the WARNINGS AND PRECAUTIONS section of the label, provides that this section should contain

> "clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards (including those that are expected for the pharmacological class or those resulting from drug/drug interactions), limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification)."

87.     The regulation further requires that "the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."

88.     FDA's Guidance for Industry on the WARNINGS AND PRECAUTIONS section explains that

---

[32] *See* Expert Reports of Dr. Ellen Feigal, dated 3/15/2020; Dr. David Madigan, dated 3/9/2020; and Dr. Laura Plunkett, dated 3/13/2020.

CONFIDENTIAL

described 20 breast cancer patients suffering PCIA after receiving docetaxel-containing regimens.[41]

94.     These studies were published on the heels of several other studies published before or during review, but before approval, of the 505(b)(2) NDAs that are the subject of this report. These included a study published in October 2010 involving 108 cases of persistent alopecia; in 104 of these, the patient had received a docetaxel-containing regimen.[42] Other available information regarding PCIA after treatment with a docetaxel-containing regimen including PCIA case reports in 2009 and 2010[43,44,45].

95.     With respect to the FAERS database, as Dr. Madigan noted in his report, there was a proportional reporting rate (PRR) signal for docetaxel from as early as 2000, a permanent empirical Bayes' geometric mean (EBGM) signal by the middle of 2008, and  signal for SEB05, an EBGM-related metric by the middle of 2012.[46]  Moreover, Dr. Madigan's lasso logistic regression and exponentiated lasso logistic regression analyses evidenced a signal crossing the EBGM threshold level  of 2 in 2010.[47]  As discussed above, FAERS data are publicly available for download, meaning that the 505(b)(2) NDA holders could have performed such analyses prior to submission of their NDAs.

---

[41]  Kluger N, *et al*. Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients. Ann Oncol. 2012 Nov; 23(11):2879-84.

[42]  Bourgeois H *et al*.,  Long Term Persistent Alopecia and Suboptimal Hair Regrowth after Adjuvant Chemotherapy for Breast Cancer: Alert for Emerging Side Effect: French ALOPERS Observatory. Ann Oncol 2010; 21(8) Viii83-84 (2010).

[43]  Prevezas C, *et al.* Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer. Br J Dermatol. 2009 Apr; 160(4):883-5.

[44]  Tallon B, *et al*. Permanent chemotherapy-induced alopecia: case report and review of the literature. J Am Acad Dermatol. 2010 Aug; 63(2):333-6.

[45]  Masidonski P, Mahon SM. Permanent alopecia in women being treated for breast cancer. Clin J Oncol Nurs. 2009 Feb;13(1):13-4.

[46]  Madigan Report at ¶¶ 42-43.

[47]  Madigan Report at ¶¶ 44-47.

**CONFIDENTIAL**

96.     Moreover, Sanofi's worldwide labeling (but not US labeling) provided the 505(b)(2) NDA holders with publicly available information regarding the events of ongoing alopecia from Sanofi's TAX 316 clinical trial.  Specifically, Sanofi's 2010 Summary of Product Characteristics provided information regarding the interim PCIA data from the TAX316 clinical trial.[48]  In 2012, Sanofi's SPC for Taxotere was updated to provide information regarding the final clinical trial data in which 29 out of 687 TAC patients had ongoing alopecia as of the end of the 10-year follow-up period, and a statement that cases of persisting alopecia have been reported was added to the SPC.[49]

97.     It's clear that the 505(b)(2) NDA holders not only should have known about this new scientific information, but did in fact know and were on notice of this additional information.  This evidence supporting this is described more fully below, but generally, each of the 505(b)(2) NDA holders were on notice and not only knew of the availability of the results regarding ongoing alopecia at the end of chemotherapy in Sanofi's TAX 316 clinical trial, but actually had the relevant data.  Specifically, each of the 505(b)(2) NDA holders communicated TAX 316 clinical trial data to prescribers and patients outside of the US well before any such information was ever provided in their US labels.  And non-US labels for these 505(b)(2) NDA holders demonstrate that they possessed this new scientific information regarding the risk of PCIA.

98.     For example, Hospira's 2012 labels in Israel, Hungary, and UK (among others) stated: "*Skin and subcutaneous tissue disorders:* Alopecia was observed to be ongoing at the median follow-up time of 55 months in 22 patients out of the 687 patients with alopecia at the end of the chemotherapy."[50]  This statement in Hospira labels shows that Hospira possessed new scientific information regarding PCIA in the TAX 316 clinical trial and, had Hospira reviewed Sanofi's SPC for Taxotere at that time, Hospira would have had access to the final clinical trial

---

[48] Sanofi_00727021 (2010 Sanofi Summary of Product Characteristics).

[49] Sanofi_00726237 (2012 Sanofi Summary of Product Characteristics).

[50] Hospira Docetaxel 2012 Israeli Label.

**CONFIDENTIAL**

data and additional statements regarding the risk of PCIA.  Hospira did not add any information regarding the risk of PCIA to its US label until September 2017.[51]

99.    Accord's[52] 2012 labeling approved by the European Commission stated: "*Skin and subcutaneous tissue disorders:*  In study TAX316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 TAC patients and 645 FAC patients.[53]  At the end of the follow-up period, alopecia was observed to be ongoing in 29 TAC patients (4.2%) and 16 FAC patients (2.4%)."[54]  Moreover, Accord's 2012 European label stated in Section 4.8 that "Cases of persisting alopecia have been reported."[55]  Like with Hospira, these foreign regulatory submissions show that Accord was on notice of information regarding PCIA in the TAX 316 clinical trial.  Accord is different than Hospira, however, in that Accord elected to include the TAX 316 final clinical trial data and additional statements regarding the risk of PCIA into foreign labeling.  Despite this, Accord Healthcare, Inc. did not add any information regarding the risk of PCIA to its US label until July 2016.[56]

100.    Sandoz's 2011 Australian label provided interim data regarding PCIA from the TAX316 study.[57]  Sandoz's labels in Austria, Germany, and Australia, along with the company's core data sheet, were all updated in 2013 to provide detailed information regarding the final TAX316 clinical trial data and, like Accord, warn that cases of persisting alopecia have been

---

[51] Hospira Docetaxel 2017 US Label.

[52] Accord is a globally integrated company.  Accord Healthcare, Inc. is the US marketing entity according to Accord's website.  Accord's 2012 EC label is attached to a regulatory implementing decision that references Accord's June 2011 authorization application for its docetaxel medicinal product.

[53] Accord Docetaxel 2012 European Label.

[54] Accord Docetaxel 2012 European Label.

[55] Accord Docetaxel 2012 European Label.

[56] Accord Docetaxel 2016 US Label.

[57] Sandoz Docetaxel 2011 Australian Label.

**CONFIDENTIAL**

129.    Based on the above, Accord US had knowledge of the risk of PCIA at the time of approval of its docetaxel product in the United States, and thereafter prior to the Plaintiff's use of its product in June 2011.  The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or  the evidence that existed provided Accord with reasonable evidence of a causal association between its docetaxel product and PCIA prior to June 22, 2011.  As discussed above, this triggered Accord's obligation to update the label for its docetaxel product.

### 3.    Hospira.

130.    Hospira received authorization to market its US docetaxel product on March 8, 2011.[91]  Similar to Sandoz, Hospira utilizes a Core Safety Information – "a company controlled document" that sets forth the minimum safety information to be listed in the labels used in the countries where Hospira markets docetaxel.[92]

131.    Hospira is unique in its knowledge of docetaxel, and particularly concerning drug safety and side effect profile, because of a high-ranking employee that had specific experience with the pharmacovigilance of Taxotere/docetaxel at both Sanofi and Hospira.  Juergen Schmider was the Sanofi Vice President of Safety Surveillance and Product Safety with the department of Epidemiology, with responsibilities for Taxotere, from March 2011 through April 2013.[93]  After leaving Sanofi in April 2013, Dr. Schmider became the Global Vice President of Pharmacovigilance and Product Safety for Hospira, again with responsibilities for Taxotere.[94]

132.    While at Sanofi, Dr. Schmider dealt directly with pharmacovigilance and drug safety, and during his tenure, Sanofi submitted to the European Medicines Agency an application

---

labeling obligations as a 505(b)(1) innovator NDA holder – including to update its label to include or modify a contraindication, warning, precaution, or adverse reaction where evidence of a causal association or causal relationship has been met in accordance with 21 CFR 201.57(c).

[91] NDA APPROVAL - HOS01400256285 - Record No. 572206 and Original New Drug Application - HOS00200007762 - Record No. 463130.

[92] Schmider 30(b)(6) depo, 69:16 – 71:3.

[93] J. Schmider dep., 48:1-3.

[94] J. Schmider dep., 48:23-49:8.

CONFIDENTIAL

to update its label concerning, among other safety issues, persistent alopecia.[95]  Specifically, the EMA stated that "Given the serious psychological consequences of this adverse effect in, often young, patients treated mainly in an adjuvant scheme, health care professionals and patients should be informed of the possible irreversibility of alopecia. Therefore, the CHMP requested the MAH to update the SmPC [label] in this respect in order to address this risk more clearly."

133.    In addition, when Dr. Schmider was deposed in this case, he brought with him documents marked "property of the sanofi-aventis group - strictly confidential."  One of these documents was Sanofi's Core Data Sheet for Taxotere dated June 28, 2011 date, which included information regarding PCIA from TAX 316.[96]

134.    Based on these documents and his experience while at Sanofi, Dr. Schmider—and in turn, Hospira—knew or should have known of the risk of PCIA with docetaxel.

135.    According to Dr. Schmider, Hospira did not follow up on reports of alopecia, however, because alopecia is a known side effect of chemotherapy.[97]  Due to the lack of follow up, and despite having knowledge of EMA's report statement concerning the "the serious psychological consequences of this adverse effect" Hospira did not capture or assess the nature, duration or severity of persistent alopecia events, despite the growing body of scientific knowledge.

136.    Hospira claims that its pharmacovigilance department periodically performed literature searches for all of its products.  There was adequate scientific literature available prior to Ms. Sanford's initial infusion date.  Had Hospira performed an adequate literature search and signal detection analytics prior to market approval, it would have seen the same literature and safety signal demonstrated in the reports of Drs. Feigal and Madigan. This is true for all manufacturers addressed in this report.

137.    All of these events are underscored by an inspection by the British Medicines & Healthcare products Regulatory Agency.[98]  Also, in 2013 the Belgian Federal Agency for Medicines and Health Products issued a Pharmacovigilance Inspection Report finding a number

---

[95] Schmider dep., Ex. 9, p. 2, 6-7.

[96] Schmider dep. Ex. 7 and 5, respectively.

[97] Schmider dep., 79:15-18; Mir dep., 128 (rough).

[98]  01 - MHRA - HOS01400019056.

of critical shortcomings, including a lack of risk based audits, procedures for pharmacovigilance operations, lack of training, deficient receipt and management of suspected adverse events, and an incomplete master pharmacovigilance file.[99]

138.    As noted above, Hospira's 2012 label in Israel, Hungary, the United Kingdom, and other countries referenced a summary of Sanofi's TAX 316 clinical trial data, including ongoing (permanent) alopecia. In July 2013, Hospira changed at least five of its European labels to include additional information regarding the TAX316 data and permanent alopecia.

139.    In addition, after Hospira was purchased by Pfizer and after Pfizer became aware of the Sanofi December 2015 label change, Pfizer conducted a clinical overview. As part of the clinical overview, a search of the safety database was performed in September 2016. That search revealed 146 cases of alopecia, of which 29% were described as "permanent" or "irreversible."[100] The results of the clinical overview, including the results of the safety database search, led to Hospira seeking a label change in March 2017 to state "cases of permanent alopecia have been reported."[101]

> Based on the above, Hospira had knowledge of the risk of PCIA prior to the Plaintiff's use of its product in March 2011. The company therefore had some basis to believe that there was a causal relationship between its docetaxel product and PCIA, and/or the evidence that existed provided Hospira with reasonable evidence of a causal association between its docetaxel product and PCIA in as early as 2011, and as evidenced in its own 2012. labels in Israel, Hungary, and the United Kingdom, among other countries Hospira's label was not changed to reflect the change Sanofi received approval for in December 2011, until nearly 2 years later – in 2017.  Prior to this Hospira never warned of the risk PCIA in its label.

140.    As discussed above, this triggered Hospira's obligation to update the label for its docetaxel product.

141.    I state all of my opinions herein to a reasonable degree of professional regulatory certainty.

---

[99] Benelux - No markup - HOS01400186232, see also Mir dep., 64-93 (rough).  It is important to note that this report from outside the United States is relevant to this opinion because a large majority of the pharmacovigilance operations for Hospira were conducted from outside the United States.  Mir dep. p. 24-26, 30-28 and 81 (rough).

[100] March 2017 - HOS00200030958.

[101] Docetaxel Oct. 2019 Label - HOS02100035549.

CONFIDENTIAL

Dated: June 8, 2020.

_____
David B. Ross, M.D., Ph.D., M.B.I.