**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to**<br><br>***Audrey Plaisance v. Hospira, Inc. et al.*** <br>**Case No. 2:18-cv-08086** | **MDL No. 2740** |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
HOSPIRA'S MOTION FOR SUMMARY JUDGMENT
<u>BASED ON THE LEARNED INTERMEDIARY DOCTRINE</u>**

Dated: December 7, 2021

## I.     INTRODUCTION

Hospira has moved for summary judgment on causation under the learned intermediary doctrine arguing that there is no reasonable dispute that a change to its label would have affected the decision of Audrey Plaisance's doctor to prescribe her docetaxel.  In so moving, Hospira ignores the patient's role in deciding the treatment she ultimately receives for her breast cancer. As this Court has recognized, a healthcare provider does not act alone in the context of breast cancer treatment –there is typically a comprehensive discussion of possible options, including risks and benefits of each, and an interactive conversation of which treatment option(s) is best for the patient receiving the treatment. Here, Hospira discounts the critical nature of this decision-making process in the oncologist/patient context thereby foreclosing the reasonable possibility that, had Hospira provided an adequate warning regarding permanent alopecia associated with docetaxel, Mrs. Plaisance's oncologist would have changed her risk-benefit patient counseling and that change could have ultimately resulted in a different course of treatment for Mrs. Plaisance. Hospira's motion fails because: (1) *Even if* Mrs. Plaisance's oncologist never read the Hospira label for docetaxel (of which she testified she cannot be certain), there is sufficient evidentiary support for a jury to conclude any updated warning regarding permanent hair loss from Hospira would have reached her oncologist through the alternative means she uses to stay current on safety labeling; and (2) *Even if* Plaintiff's oncologist's prescribing *recommendation* of docetaxel would not have changed in the face of an additional permanent alopecia warning, she *would have discussed the warning* in her counseling of her patient and this would have ultimately impacted Mrs. Plaisance's consent to chemotherapy treatment with docetaxel.  Since all reasonable factual

inferences are required at the Rule 56 stage to be drawn in Mrs. Plaisance's favor,[1] the standard for summary judgment is not met here.

The testimony of Mrs. Plaisance's oncologist, Dr. Laura Chauvin, was clear and unwavering that if she had been made aware of the risk of permanent hair loss when she treated Mrs. Plaisance, she would have "definitely warned the patient of it" as "that could be emotionally devastating."[2] Dr. Chauvin does not recall specifically reviewing Hospira's docetaxel label before prescribing docetaxel to Mrs. Plaisance (though she cannot recall which manufacturer's label she last looked at).[3] However, she testified that it is her regular and frequent practice to review information in articles, email updates from various sources of sentinel findings, as well as UpToDate, an electronic subscription service, to learn about the chemotherapy drugs she prescribes and also to inform her prescribing decisions.[4] In fact, Dr. Chauvin reviews UpToDate in relation to chemotherapy drugs at least every other day.[5] Dr. Chauvin's practice is the industry standard, as oncologists typically stay current on labeled warning materials for the drugs they prescribe through electronic means, like UpToDate, rather than by reviewing a physical package insert from a medication that they rarely, if ever, would administer themselves.[6] Further, as this Court has acknowledged and was the case with Mrs. Plaisance, the treatment of breast cancer is a patient-driven process, involving detailed discussions between a patient and her oncologist about the various treatment options and a patient's consideration of the attending risks and benefits. *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Kahn*"), 2020 WL 1819668, at *1 (E.D. La. Apr. 7,

---

[1] *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 255 (1986); *Johnson v. World All. Fin. Corp.*, 830 F.3d 192, 195 (5th Cir. 2016).
[2] Def. Ex. E (Chauvin Dep.) at 46:20-47:6.
[3] Def. Statement of Undisputed Material Facts ("Def. SOF") at ¶18. Dr. Chauvin testified when asked if she relied on Hospira's label in prescribing docetaxel for Mrs. Plaisance, "No. I can't tell you whose label I last looked at. I can put it that way." Def. Ex. E (Chauvin Dep.) at 131:21-25.
[4] Plaintiff's Response to Def. SOF ("Pl. Res. Def. SOF") at ¶18, Def. Ex. E (Chauvin Dep.) at 30:13-33:4.
[5] *Id*.
[6] Declaration of Dr. Linda Bosserman ("Bosserman Dec."), attached as Exhibit 1, at ¶35.

2020). Mrs. Plaisance was a vigilant,[7] vocal and self-reliant patient and would have requested her doctor explore other treatment options with her, had she known that docetaxel carried an increased risk of permanent hair loss.[8] If Mrs. Plaisance refused a docetaxel regimen, Dr. Chauvin testified she "probably would have given her AC [Adriamycin Cytoxan]."[9]

The evidence here establishes that a warning "would have changed the doctor's actions and avoided or lessened Plaintiffs' injuries," *Frischertz v. SmithKline Beecham Corp.*, 2012 WL 2952427, at *2-3 (E.D. La. July 19, 2012).At the very least, viewing the facts in a light most favorable to Mrs. Plaisance, the factual circumstances present a triable issue on this question.

## II.        FACTUAL BACKGROUND

### A.  Hospira manufactured the docetaxel administered to Plaintiff Audrey Plaisance

Hospira, Inc. and Hospira Worldwide, LLC, formerly doing business as Hospira Worldwide, Inc. ("Hospira") manufactured the docetaxel administered to Plaintiff from January 17, 2014 until March 20, 2014.[10]

The FDA approved Hospira's 505(b)(2) NDA application for docetaxel on March 8, 2011.[11] Since its approval and until September of 2017, Hospira's docetaxel label did not contain any language or warning about the risk of alopecia or hair loss being a potential ***permanent*** side effect.[12]

---

[7] Def. Ex. E (Chauvin Dep.) at 85:12-16.

[8] Def. Ex. E (Chauvin Dep.) at 127:15-22, Def. SOF at ¶¶13-14, Def. Ex. C (Plaisance Dep.) at 268:3-15, 269:14-270:22.

[9] Def. SOF at ¶23, Def. Ex. E (Chauvin Dep.) at 83:2-3.

[10] *See* Def. Def. Ex. A Plaintiff Audrey Plaisance's Third Amended Plaintiff Fact Sheet (PFS) at 6, 12; Def. Ex. B Plaintiff Audrey Plaisance's First Amended Short Form Complaint (ASFC) at ¶ 10.

[11] 2d Am. Master Compl. ("AMC"). ¶71, ECF No. 4407.

[12] *Id*. at ¶¶ 73-74.

**B.  At the time of Plaintiff's cancer treatment, Plaintiff and her treating oncologist were unaware that docetaxel carried a risk of permanent hair loss.**

Mrs. Plaisance testified that the written materials she received from her oncologist's office explained side effects including *temporary* hair loss.[13]  On January 15, 2014, at the initial chemotherapy consultation visit, Dr. Chauvin spent a total of at least 70 minutes with Mrs. Plaisance and her husband, including 50 minutes on counseling.[14]

Dr. Chauvin testified that she was unaware at the time that she prescribed docetaxel for Mrs. Plaisance that there was a risk that she would experience persistent or even permanent hair loss from her chemotherapy treatment.  Specifically, Dr. Chauvin testified:

> Q:    And did you understand at the time that you prescribed TC for Mrs. Plaisance that there was a risk that she would experience persistent or even permanent hair loss from chemotherapy treatment.
> . . .
> A:    Back then, *I didn't really have an understanding that it had a high risk of the permanent hair loss. And I didn't – really didn't discuss permanent hair loss frequently with patients at all with that regimen or any other one.* I just had not have people have permanent hair loss or – well, just really hadn't. I don't know if I was lucky or I changed jobs too quickly and didn't follow people long enough to where they said I'm not happy with my hair. *But permanently, I didn't discuss significantly back then.* If patients would ask me a question, I would answer that I had not had someone have that happen before.[15]

Dr. Chauvin also testified that she had never had patients with unsatisfactory hair regrowth after chemotherapy prior to treating Mrs. Plaisance:

> Q:    At that time had you had other patients who had had what they considered unsatisfactory hair regrowth after chemotherapy?
>
> A:    No.
>
> Q:    All of your patients had full hair regrowth that they were – returning?

---

[13] Def. Ex. C (Plaisance Dep.) at 190:25-191:21 (emphasis added).
[14] Def. Ex. E (Chauvin Dep.) at 84:14-22, 87:9-19.
[15] Def. Ex. E (Chauvin Dep.) at 90:4-91:4 (objections omitted) (emphasis added).

5

> A:     Well, sometimes they would be upset that it was curly when it used to be straight or straight when it used to be curly or a different color, but the problem had not been how much hair.[16]

Dr. Chauvin describes her patient, Mrs. Plaisance, as a vigilant,[17] self-reliant, outspoken patient who hasn't been shy or hesitant in raising her concerns during her oncological consultations:

> Q:     . . . Based on your treatment of Mrs. Plaisance over this last six or seven years, she hasn't been shy or hesitant in raising concerns with you at her visits with you, has she?
>
> A:     No. *She's very self-reliant. Has always spoken out for her wishes*.
>
> Q:     And you've encouraged that?
>
> A:     Sure.[18]

## C.  After treatment with Hospira-manufactured docetaxel, Plaintiff suffers from permanent alopecia.

On December 2, 2013, Plaintiff Audrey Plaisance was diagnosed with breast cancer.[19] Mrs. Plaisance's tumor pathology indicated that she was ER-positive, PR-positive and HER2-negative.[20] Mrs. Plaisance underwent a right partial mastectomy on December 11, 2013.[21] Her treatment consisted of four rounds of docetaxel and Cytoxan chemotherapy, every three weeks.[22] At the time that Mrs. Plaisance's oncologist prescribed this chemotherapy regimen, neither she nor her doctor was aware that docetaxel carried a risk of permanent hair loss.[23]

---

[16] *Id*. at 122:23-123:7.
[17] Def. Ex. E (Chauvin Dep.) at 85:12-16.
[18] *Id*. at 127:15-22 (emphasis added).
[19] Def. SOF at ¶4.
[20] Pl. Res. Def. SOF at ¶4, Def. Ex. A (PFS) at 13-14; Def. Ex. C (Plaisance Dep.) at 183:7-10, Def. Ex. E (Chauvin Dep.) at 41:3-16.
[21] Def. SOF at ¶5.
[22] *Id.* at ¶6.
[23] Pl. Res. Def. SOF at ¶12, Def. Ex. C (Plaisance Dep.) at 187:1-12, Def. Ex. E (Chauvin Dep.) at 90:4-91:4.

Years after her chemotherapy treatment and following numerous attempted hair loss treatments, Mrs. Plaisance has lost all hope that her hair will ever return. She believes she has permanent hair loss, since after various treatments, her hair has not grown back to its regular thickness:

> Q:      And is it your belief that you have permanent hair loss?
>
> A:      Yes.
> . . .
> Q:      And what is that belief based on?
>
> A:      Well I've tried injections.  I've tried the pills that have worked for other people.  The injections have worked for other people.  And I always had the hope that my hair would grow back to what it was before, at least in thickness, and it has not.  And when I heard that commercial of Taxotere for permanent hair loss, I said – that's when I lost all hope that my hair would grow back.[24]

After her incomplete hair regrowth following chemotherapy treatment with docetaxel, Mrs. Plaisance consulted with medical professionals for hair loss treatment, though none have been successful.[25] She continues to experience permanent alopecia to date.[26]

**D.  If Dr. Chauvin had been aware of docetaxel's risk of permanent hair loss, she would definitely have discussed that risk with her patient and would have likely prescribed AC if Mrs. Plaisance refused treatment with Docetaxel.**

Since learning of the increased risk of permanent alopecia associated with docetaxel, Dr. Chauvin now discusses the risk with her patients.[27] Dr. Chauvin also would have discussed the risk with Mrs. Plaisance at the time of her treatment, had Defendants provided her with an adequate warning. At her deposition, Dr. Chauvin was asked: "If [Hospira] had provided you with information prior to January 2014 related to a risk of permanent hair loss, is that information you

---

[24] Def. Ex. C (Plaisance Dep.) at 220:3-15.
[25] *Id.*
[26] *Id.*, Pl. Res. Def SOF at ¶7, Def. Ex. A (PFS) at 17-18, Def. Ex. C (Plaisance Dep.) at 271:9-23, 277:10-15.
[27] Def. Ex. E (Chauvin Dep.) at 138:10-139:12.

7

would have taken into consideration in your prescribing decisions?" to which she responded: "*I would have definitely warned the patient of it, certainly that could be emotionally devastating. And frankly, I don't want them mad at me later. And, you know, that's a – that's a big one psychologically. So yeah, definitely would have discussed it*."[28] With the benefit of the knowledge of the risk of permanent hair loss, Dr. Chauvin is less than definitive as to whether she would still recommend prescribing docetaxel for Mrs. Plaisance.  She testified: "If [Mrs. Plaisance] came in today, a person without a history of unusual hair loss known to me in that stage of disease, I would probably still *consider* Taxotere Cytoxan. *However*, we've all been paying attention to the advertisements about permanent hair loss and we're reviewing that with patients."[29]

Dr. Chauvin testified that a patient's involvement in the decision-making related to the cancer treatment they receive is "*very important*" and that she "*usually involve[s] them in everything*" regarding their chemotherapy choices.[30] Dr. Chauvin also testified that if Mrs. Plaisance had told her she was not comfortable receiving docetaxel, she would have discussed the alternative regimen of Adriamycin and Cytoxan, along with its risks, though she would not have recommended it.[31] If Mrs. Plaisance had "absolutely refused" the recommended regimen of TC, Dr. Chauvin stated that she "probably would have given her AC."[32]

**E.  Mrs. Plaisance would have requested her oncologist to look into another chemotherapy option if she was aware of the risk of permanent hair loss associated with docetaxel and would take on other risks over the risk of permanent hair loss.**

Plaintiff Audrey Plaisance testified that "hair means a lot to a woman, at least to me…" and testified that had her informed consent counseling with Dr. Chauvin included a warning of the

---

[28] *Id.* at 46:20-47:6 (emphasis added).
[29] Def. Ex. E (Chauvin Dep.) at 138:10-139:12 (emphasis added).
[30] Pl. Res. Def. SOF at ¶23, Def. Ex. E (Chauvin Dep.) at 48:21-49:14.
[31] Pl. Res. Def. SOF at ¶23, Def. Ex. E (Chauvin Dep.) at 49:18-50:2.
[32] Def. SOF at ¶23, Def. Ex. E (Chauvin Dep.) at 83:2-3.

risk of permanent hair loss, she would have requested that she "look into" and discuss alternative treatments:[33]

> Q:      So *you agreed to take on the risk of death with chemotherapy*, but is it your testimony that if the word "permanent" had been added before "hair loss" there that you would have said, nope, wait a minute, I don't want to take these medicines?
>
> A:      *I would have said let's look into another option.*
>
> Q:      So the addition – you see – sorry, go ahead.
>
> A:      *Death can occur with anything, but had I known that I could have had permanent hair loss, I would have asked Dr. Chauvin to look into another option that wouldn't have caused permanent hair loss.* I have nothing against the drug except that. *There was no warning for me to be able to have – to be able to choose – the right to choose something else.*
>
> Q:      And do you see there that on the list of warnings of potential risks, there is the risk of hair loss is listed there; right?
>
> A:      Yes, sir, but it doesn't say *permanent*.
>
> Q:      And it doesn't say temporary either, does it?
>
> A:      Right. But reading this, I would have never thought – I would have never, never thought of permanent – permanent hair loss.
>
> Q:      And if that word had been added here, do you think that would have changed your course of treatment?
>
> A:      I'm pretty sure I would have asked let's look into something else.
>
> Q:      Even with the other risks here that you did agree to take on, including infection and bleeding?
>
> A:      Yes, because I did have the – I did have an –well, I didn't have the infection, but I had the potential for an infection. *Yes, because trust me, lost of hair permanent for a woman is hard. It's hard. It's hard for me. It's hard for this woman (sic)*.[34]

**F.  Dr. Chauvin *did* review the docetaxel label and maintains currency with chemotherapy labeling through alternative means than review of the package labeling and insert, as is standard industry practice.**

---

[33] Def. SOF at ¶13, Def. Ex. C (Plaisance Dep.) at 268:3-15.
[34] Pl. Res. Def. SOF at ¶13, Def. Ex. C (Plaisance Dep.) at 269:14-271:6 (emphasis added).

It is not at issue whether Dr. Chauvin actually reviewed the prescribing information and the drug labeling for docetaxel before first prescribing it.[35] However, Hospira claims that Dr. Chauvin never read the Hospira label because when she wrote her prescription, she did not know which manufacturer would fill the order.[36] She was, however, never asked that question, she was asked only if she remembered reviewing the Hospira label specifically with respect to Mrs. Plaisance's treatment.[37] In fact, Dr. Chauvin testified:

> Q.    And did you review Hospira's docetaxel label before prescribing docetaxel for Mrs. Plaisance?
>
> A.    *Not specifically*.

Dr. Chauvin was not able to recall which manufacturer's label she reviewed last and testified, "I can't tell you whose label I last looked at. I can put it that way."[38]

Moreover, Dr. Chauvin testified that she learns about chemotherapy drugs before prescribing them from sources such as journal articles, UpToDate and associated emails, and the NCCN guidelines – not just from review of the labeling.  Dr. Chauvin testified that UpToDate alerts her to new sentinel findings in relation to a drug.  Additionally, she testified that she has subscribed to UpToDate for "more than ten years," and looks at UpToDate in relation to chemotherapy drugs *at least every other day*. Dr. Chauvin also testified that she uses UpToDate and these other sources to inform her prescribing decisions:

> Q:    What influences –strike that.  Doctor, how do you learn about chemotherapy drugs before you prescribe them?
>
> A:    Well, I read them – about them in articles, not just from those journals but UpToDate is a thing I use a lot.  And then I get emails. I signed up for email – different email sources of new [sentinel] findings. So I read information on those emails.  Certainly I refer to the NCCN guidelines on almost every new patient.

---

[35] Def. SOF at ¶18.
[36] Def. SOF at ¶19, Def. Ex. E (Chauvin Dep.) at 132:21-133:18.
[37] Def. SOF at ¶18, Def. Ex. E (Chauvin Dep.) at 131:17-25.
[38] *Id*.

Well, really, essentially, every patient that we see at this time in life. . .So there are a lot of ways I keep up.

…

Q.      Does UpToDate – and this may be obvious from the name, but does it send you updates on new information that's added to a drug label?

A.      They have started in the last couple of years sending alerts by email of new things. And then if you research a drug or a disease and treatment thereof, sentinel thing, there's a pop-up that tells you the most recent sentinel new thing.

Q.      How long have you been using UpToDate?

A.      Probably more than ten years. I've been here ten years, and I'm sure I started using it before that.

. . .

Q.      Do you believe you would have been using UpToDate in 2014 when you treated Mrs. Plaisance?

A.      Yes.

Q.      And do you use the information that you review in UpToDate and some of these other sources that you've described to inform your prescribing decisions?

A.      Yes.[39]

## III.      LEGAL STANDARD

Summary judgment is only appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

---

[39] Pl. Res. Def. SOF at ¶18, Def. Ex. E (Chauvin Dep.) at 30:13-33:4.

The party seeking summary judgment bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party may not rest upon the pleadings. *Id.* at 325. Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial. *Id.* All reasonable inferences are drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby*, Inc. 477 U.S. 242, 255 (1986); *Crawford v. Formosa Plastics Corp., Louisiana*, 234 F.3d 899, 902 (5th Cir. 2000). Ultimately, this Court's concern is to ascertain "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## IV.      ARGUMENT

**A.  A plaintiff establishes causation under the learned intermediary doctrine by showing that the lack of an adequate warning proximately caused the plaintiff's injury.**

This Court, when applying Louisiana law, has denied summary judgment motions based on the learned intermediary doctrine where there is evidence that a warning "would have changed the doctor's actions and avoided or lessened Plaintiffs' injuries." *Frischertz v. SmithKline Beecham Corp.*, 2012 WL 2952427, at *2-3 (E.D. La. July 19, 2012); *In Re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1393480, at *3 (E.D. La. April 17, 2017). The Louisiana Products Liability Act (the "LPLA") defines an adequate warning:

> "Adequate warning" means a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.

La. R.S. § 9:2800.53.

The learned intermediary doctrine permits a drug manufacturer to discharge its duty to warn consumers by adequately warning the plaintiff's physician. "The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the treating physician." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 268 (5th Cir. 2002) (original emphasis). Thus, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient." *Id.* at 267 (quoting *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999)). There is a two-prong test in the Fifth Circuit governing inadequate warning claims under the LPLA when the learned intermediary doctrine is applicable:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.
>
> Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.

*Id.* at 265–66 (internal citation omitted). Louisiana further recognizes the read-and-heed presumption that "when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions." *Gauthier v. McDonough Power Equip., Inc.*, 608 So. 2d 1086, 1089 (La. App. 3d Cir. 1992). The presumption applies in prescription drug cases. *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, 2017 WL 1393480, at *3 (E.D. La. Apr. 17, 2017). A defendant can defeat the presumption by "persuad[ing] the trier of fact that an adequate warning or instruction would have been futile under the circumstances." *Gauthier* at 608 So. 2d at 1089.

13

In this case, defendants argue that a different warning regarding permanent hair loss would not have resulted in a different prescribing decision by Dr. Chauvin – since she testified that she would still recommend a docetaxel-containing regimen for Mrs. Plaisance. However, as this Court has previously held:

> Because the chemotherapy decision-making process is unique, the application of the learned intermediary analysis in this context is not as simple as Defendants suggest.  The question is not simply "what would the doctor have prescribed" but whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere, whether the patient would have inquired about other options, what the doctor would have recommended, and what decision the plaintiff would have ultimately made…While a doctor may testify that his or her recommendation would not have changed, the issue is whether the plaintiff's ultimate decision would have changed.

Order and Reasons, *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Mills*"), 2019 WL 2995897, at *5 (E.D. La. July 9, 2019). The Fifth Circuit similarly found that the ultimate prescribing decision is a shared decision:

> [C]ertainly, under Louisiana law, "[t]he decision to use a drug in a particular circumstance rests with [both] the doctor and the patient."  But, as we have established, a causation analysis in a failure-to-warn claim asserted against a drug's manufacturer (the only claim at issue here) is focused on the prescribing physician's decision to prescribe the drug. So, to the extent that patient choice is relevant, that relevance is cabined to helping us decide whether [plaintiff's] evidence—including that of other available treatments and the importance she places on her appearance—is sufficient to introduce a genuine dispute of material fact as to whether [the prescriber's] prescribing decision would have been different had he known that Taxotere's associated risk of alopecia was potentially permanent rather than temporary.

In re Taxotere (Docetaxel) Prod. Liab. Litig., 994 F.3d 704, 708–09 (5th Cir. 2021).

The application of the facts of Mrs. Plaisance's case to the Court's reasoning above clearly establishes that the causation chain is not broken here: (1) Dr. Chauvin *would have* advised Mrs. Plaisance of the risk of permanent alopecia associated with docetaxel, (2) Mrs. Plaisance *would have* inquired about other options, (3) Dr. Chauvin would have recommended a TC regimen but

14

*discussed* the alternative preferred AC regimen and its risks and (4) Mrs. Plaisance, seeking to avoid the risk of permanent hair loss, *may have* elected the alternative regimen.  At a minimum, the evidence is such that there is a question of fact for a jury to determine and the learned-intermediary doctrine cannot be resolved on summary judgement in this case.

**B.  The facts in this case put it in line with this Court's past decisions denying summary judgment on causation.**

Hospira argues that Mrs. Plaisance cannot make a showing under the second prong. However, the facts in this case put it squarely in line with this Court's past rulings denying summary judgment on causation. *See In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Kahn*"), 2020 WL 1819668, at *1 (E.D. La. Apr. 7, 2020) (holding there was a triable issue of fact on causation where the treating physician had only read the label once because he sometimes reviewed or referred back to drug labels); *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Durden*"), 2020 WL 4228387, at *2 (E.D. La. July 23, 2020) (holding that there was a triable issue of fact on causation where the treating physician was generally familiar with the prescribing information for docetaxel and changed her treatment protocol after learning of the risk of permanent hair loss); *Mills,* 2019 WL 2995897, at *5 (E.D. La. July 9, 2019) (finding a triable issue of fact on causation when a stronger warning regarding the risk of permanent hair loss would have changed the treating oncologist's counseling of her patient, even though the oncologist maintained that a docetaxel regimen would still be her recommendation.) In *Mills*, for example, the Court rejected summary judgment where the defendant argued that the plaintiff's oncologist would have recommended treatment with docetaxel even with the knowledge of the risk of permanent hair loss that a stronger warning would have provided. The fact pattern here and that in *Mills* are similar in the following ways:

First, in *Mills*, much like in the present case, the treating doctor testified that her treatment recommendation would not have been different had she known of the risk of permanent alopecia. *Mills,* 2019 WL 2995897, at *5. Second, the doctor in *Mills* testified she would have respected her patient's wishes, had she expressed a desire to try an alternative treatment to avoid the risk of permanent hair loss. *Id.* Third, in *Mills*, the plaintiff, Ms. Mills, was a patient involved in the decision-making regarding her treatment and a vocal advocate for her wishes. *Id* at *7.  As Dr. Chauvin testified about her patient, Mrs. Plaisance, "[s]he's very self-reliant.  Has always spoken out for her wishes."[40]

## C.  The facts in this case are distinguishable from those cases Hospira cites.

Hospira rests its argument on a set of cases involving fact patterns where treating physicians testified that they did not recall *ever* having read the prescribed drug's warning label, or where treating physicians testified their patient counseling has not changed since their knowledge of the risk of permanent alopecia associated with docetaxel.  These cases are inapposite to the present case as Hospira has already conceded that Dr. Chauvin *did review* the prescribing information and the drug labeling for docetaxel before first prescribing it.[41]  Additionally, as a 505(b)(2) NDA holder of docetaxel, Hospira's initial safety labeling would have been and was the same as Sanofi brand Taxotere when Hospira docetaxel was approved by the FDA.  If additional safety information or warning was added, such a change would have sounded the megaphone about this sentinel information through electronic and subscription means, not just through the paper label and package insert.[42]

---

[40] Def. Ex. E (Chauvin Dep.) at 122:23-123:7.
[41] Def. SOF at ¶18 (emphasis added).
[42] Ex. 1 (Bosserman Dec.) at ¶¶25, 37, 39.

16

In *Pustejovsky*, plaintiff brought a failure-to-warn claim under Texas law, where the court did not need to recognize the read-and-heed presumption.[43] The doctor "did not recall ever reading the package insert for the drug or consulting the Physician's Desk reference." *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010). In *Hall v. Sinn, Inc.*, the Fifth Circuit likewise held that because the doctor's "affidavit acknowledge[d] that he never read the warning and that he was aware of the risks of the drug", a warning label incorporating information of which he was already aware would not change his decision to prescribe the drug. *Hall v. Sinn, Inc.*, 102 F. App'x 846, 849 (5th Cir. 2004). There is a significant difference between physician testimony indicating: (1) lack of recall of *ever* having read a warning label (as was the case in *Pustejovsky* and *Hall*); (2) definitive recall of having *not* reviewed a particular warning label; and (3) lack of recall of having read and relied on a warning label before making treatment decisions for an individual patient. *See Bell v. Ethicon Inc.*, No. 4:20-CV-3678, 2021 WL 1111071, at *3 (S.D. Tex. Mar. 23, 2021) (denying a motion for summary judgment on causation and discussing this difference). As noted, Dr. Chauvin's testimony only fits into the third category. She was not able to remember reviewing the *Hospira label* when she treated Mrs. Plaisance.[44]

This Court recently cited *Pustejovsky* in granting summary judgment for a Taxotere plaintiff on causation. *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Stewart*"), 2021 WL 1534481 (E.D. La. Apr. 19, 2021). In *Stewart*, the treating physician did not recall ever having seen the docetaxel label and testified that he was certain that he had not recently reviewed it, and that "because he was familiar with the Taxotere label, he would not have reviewed the Sandoz

---

[43] Texas, unlike Louisiana, does not recognize the heeding presumption in cases involving prescription medical products. *Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 212-13 (5th Cir. 2008). ("But neither Texas nor federal courts applying Texas law have applied the read-and-heed presumption to pharmaceutical cases involving learned intermediaries. In fact, Texas has explicitly rejected the RESTATEMENT (SECOND) OF TORTS § 402A, Comment j's "read-and-heed" presumption for policy reasons and because it has been superseded by RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2.").

[44] Def. SOF at ¶18, Def. Ex. E, Chauvin Dep. at 131:17-25.

label or docetaxel."[45] He further testified that he "counsels patients on hair loss the same way he did" when he treated the plaintiff, and that "he still would have presented the docetaxel regimen as Plaintiff's 'best chance.'"[46] This Court also relied on the plaintiff's testimony in *Stewart* that "she would not have chosen a less effective chemotherapy for the sake of avoiding permanent hair loss."[47] Based on these considerations, this Court concluded that the plaintiff could not establish proximate causation.[48]

Plaintiff's case differs from *Stewart* in critical respects. <u>First</u>, as in *Kahn*, *Durden*, and *Mills*, Dr. Chauvin testified that, had she received an adequate warning of the risk of permanent hair loss, *she would have counseled the Plaintiff on the risk involved*.[49] <u>Second</u>, Mrs. Plaisance testified that avoiding the side effect of permanent hair loss was so important to her that she would have wanted to investigate an alternative chemotherapy regimen that did not carry the risk of permanent hair loss, albeit over Dr. Chauvin's recommendation.[50]  There were in fact, two preferred alternative regimens available to Mrs. Plaisance under the NCCN guidelines (Adriamycin Cytoxan and a Taxol containing regimen).[51]  Dr. Chauvin testified that the alternative AC regimen was the only other preferred regimen that she would consider, but she would have discussed with her patient the 2 percent risk of acute leukemia.[52] The risks associated with AC do not foreclose the real possibility that Mrs. Plaisance would have chosen this alternative regimen over her doctor's recommendation.  In fact, the risk of permanent hair loss was so significant to Mrs. Plaisance, she testified she would have consented to risks of death, bleeding and infection

---

[45] *Stewart* at *3.
[46] *Id.* at *4.
[47] *Id.* *5.
[48] *Id.*
[49] Def. Ex. E (Chauvin Dep.) at 46:20-47:6 (emphasis added).
[50] Pl. Res. Def. SOF at ¶13, Def. Ex. C (Plaisance Dep.) at 269:14-271:6.
[51] Def. Ex. E (Chauvin Dep.) at 56:12-58:5.
[52] Def. SOF at ¶23, Def. Ex. E (Chauvin Dep.) at 49:18-50:2.

over the risk of permanent hair loss.[53] This also creates a question of fact as to whether Mrs. Plaisance would have elected an AC regimen. In sum, the factual differences relating to the crucial informed consent discussion between oncologist and patient in the *Stewart* case make it clearly distinguishable from the present facts.

As Dr. Chauvin's testimony makes clear, her knowledge of the risk of permanent hair loss associated with docetaxel has changed the direction of her patient counseling, and she would have counseled Mrs. Plaisance about permanent hair loss at the time of her informed consent to treatment. As this Court has acknowledged, the informed consent discussion between oncologist and patient is a back-and-forth dialogue. Dr. Chauvin reviews the risks of medications with patients and even discusses the Taxotere lawsuit commercials with her patients. In her initial counseling session with Mrs. Plaisance and her husband she spent a total of at least 70 minutes with them, including 50 minutes on counseling.[54] Dr. Chauvin values her patient's involvement in the decision-making process related to their treatment, and Mrs. Plaisance was an involved patient who spoke up for her wishes.

With or without Louisiana's heeding presumption that a warning "will be read and heeded," Dr. Chauvin's testimony that she cannot recall which manufacturer's labeling she last reviewed, and that she reviews journal articles to learn about chemotherapy medications and reviews UpToDate "at least every other day" presents a triable issue of fact and defeats summary judgment on causation.

The Fifth Circuit recently held in this multidistrict litigation that while "the Supreme Court of Louisiana's guidance that reasonableness is assessed 'in light of [the plaintiffs'] education [and] intelligence,'" the court could impute knowledge of "the medical literature linking Taxotere to

---

[53] Pl. Res. Def. SOF at ¶13, Def. Ex. C (Plaisance Dep.) at 269:14-271:6 (emphasis added).
[54] Def. Ex. E (Chauvin Dep.) at 84:14-22, 87:9-19.

permanent hair loss" to plaintiffs in order to determine their reasonable date of discovery under Louisiana law. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2021 WL 1560724, at *7 (5th Cir. Apr. 21, 2021) (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002)). If breast cancer survivors suffering from permanent hair loss can be charged with knowledge of the medical literature potentially implicating one of their chemotherapy medications, there is—at a minimum—a reasonable inference that a doctor whose career mostly concerns treatment of breast cancer and who was in the practice of regularly prescribing docetaxel and reviewing FDA-approved labels would have noticed a label change from one of the principal manufacturers.[55]

On these facts and viewed in the light most favorable to Mrs. Plaisance, there is a material dispute that Dr. Chauvin would have seen an update to Hospira's warning label for a drug that was a staple of a treatment regimen she routinely prescribed. The totality of the evidence in Mrs. Plaisance's case establishes that a warning "would have changed the doctor's actions and avoided or lessened Plaintiffs' injuries," and, pursuant to *In Re: Xarelto* and *Frischertz*, more than sufficient evidence exists to deny Hospira's Motion for Summary Judgment.

## V.      CONCLUSION

For these reasons, Hospira has failed to meet its burden for summary judgment based on warnings causation. Accordingly, summary judgment should be denied.

Dated: December 7, 2021                          Respectfully submitted,


*/s/ Christopher L. Coffin*                          */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.        GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225               6701 Center Drive West, Suite 1400

---

[55] As Dr. Bosserman outlined in her declaration, the medical field has evolved over the years and, like the legal profession, relies heavily on technology. The years of case law requiring review of paper warning labels as a condition precedent to an inadequate warnings case simply is outdated and no longer reflects the realities of 21st century medicine. Prescribers don't look at paper labels each time the recommend a drug, nor do oncologists attend the actual chemotherapy infusion appointments. They properly rely, within the applicable standard of care, on electronic sources to provide updated drug labeling and warnings information.

New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139

Phone: (405) 607-8757                    Phone: (504) 524-3300
Fax: (405) 607-8749                      Fax: (504) 524-3313
dmarkoff@amalaw.com                      zwool@bkc-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2021, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all

counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT
