UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)　　　　　　　　　MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　　　SECTION "H" (5)

THIS DOCUMENT RELATES TO
*Audrey Plaisance v. Hospira, Inc. et al.*
Case No. 2:18-cv-08086

**PLAINTIFF'S RESPONSE TO HOSPIRA'S STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
BASED ON THE LEARNED INTERMEDIARY DOCTRINE**

　　　　Pursuant to Local Rule 56.2, the Plaintiffs' Steering Committee submits the following Responses to Defendant's Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment Based on the Learned Intermediary Doctrine:

| | Hospira's Undisputed Facts and Supporting Evidence | Plaintiff's Response and Supporting Evidence |
|---|---|---|
| | **I.　　Background** | |
| 1. | Plaintiff Audrey Plaisance is a Louisiana resident.<br><br>Ex. A (PFS[1]) at 2;<br>Ex. B (ASFC[2]) at ¶ 4;<br>Ex. C (Plaisance Dep.) at 12:21-13:4 | Undisputed. |
| 2. | Ms. Plaisance was prescribed and administered her docetaxel treatment in Louisiana.<br><br>Ex. A (PFS) at 12-13;<br>Ex. B (ASFC) at ¶ 11 | Undisputed. |

---

[1] "PFS" refers to Plaintiff Audrey Plaisance's Third Amended Plaintiff Fact Sheet, which is attached as Exhibit A.
[2] "ASFC" refers to Plaintiff Audrey Plaisance's First Amended Short Form Complaint, which is attached as Exhibit B.

1

| **Hospira's Undisputed Facts and Supporting Evidence** | **Plaintiff's Response and Supporting Evidence** |
|---|---|
| 3. Ms. Plaisance's alleged injury occurred in Louisiana.<br><br>Ex. B (ASFC) at ¶ 5 | Admitted. |
| **II.     Ms. Plaisance's Cancer Diagnosis and Treatment** ||
| 4. Ms. Plaisance was diagnosed with breast cancer on December 2, 2013.<br><br>Ex. A (PFS) at 12;<br><br>Ex. C (Plaisance Dep.) at 164:5-17 | Admitted, but incomplete. Ms. Plaisance was diagnosed with early-stage breast cancer, specifically Stage IA breast carcinoma, T1, M0, N0, hormone receptor positive, HER2 negative.<br><br>Def. Ex. A (PFS) at 13-14;<br><br>Def. Ex. C. (Plaisance Dep.) at 183:7-10;<br><br>Def. Ex. E (Chauvin Dep.) at 41:3-16 |
| 5. Ms. Plaisance underwent surgery for a right partial mastectomy on December 11, 2013.<br><br>Ex. A (PFS) at 12 | Admitted. |
| 6. Ms. Plaisance received chemotherapy treatments from January 17, 2014 to March 20, 2014, and her regimen consisted of four cycles of docetaxel and Cytoxan administered approximately every three weeks.<br><br>Ex. A (PFS) at 12;<br><br>Ex. B (ASFC) at ¶ 10 | Admitted. |
| 7. Ms. Plaisance's treatment was successful, and she is currently cancer-free.<br><br>Ex. A (PFS) at 16;<br><br>Ex. C (Plaisance Dep.) at 33:17-19 | Denied.  Though Plaintiff believes that her cancer has not recurred, she now suffers from permanent hair loss as a result of her chemotherapy treatments.  She misses her hair, is embarrassed and self-conscious about her appearance.<br><br>Def. Ex. A (PFS) at 17-18;<br><br>Def. Ex. C (Plaisance Dep.) at 271:9-23, 277:10-15 |
| 8. Ms. Plaisance trusted her doctors' medical judgment and followed the advice of her doctors who treated her for breast cancer.<br><br>Ex. C (Plaisance Dep.) at 29:13-30:3. | Admitted as to the accuracy of the referenced portion of Plaintiff's testimony, but incomplete. Additionally, Ms. Plaisance testified that she trusts the advice of her doctors "as far as the knowledge that they have at the moment."<br><br>Def. Ex. C (Plaisance Dep.) at 29:13-30:3. |

| Hospira's Undisputed Facts and Supporting Evidence | Plaintiff's Response and Supporting Evidence |
|---|---|
| 9. Ms. Plaisance's primary goal in treatment was to beat her cancer, and she wanted to receive the best treatment:<br><br>Q: And how did you feel about your diagnosis when you first learned about it?<br>A: I was kind of shocked. You know, you -- you don't expect to hear it, you know, that you have cancer and I was just hoping for the very, very best. And I just wanted them, you know, as soon as possible to have them to do what they had to do.<br><br>Q: Is it fair to say that your primary goal was to beat the cancer?<br>A: Oh, definitely.<br><br>Q: And you wanted to receive the best treatment for it?<br>A: Yes.<br><br>Ex. C (Plaisance Dep.) at 165:16-166:3 | Admitted. |
| 10. Ms. Plaisance credits chemotherapy with helping her beat breast cancer.<br><br>Ex. C (Plaisance Dep.) at 212:8-11 | Admitted as to the accuracy of the referenced portion of Plaintiff's testimony, but incomplete. Plaintiff received a chemotherapy regimen in addition to radiation, a right partial mastectomy and aromatase inhibitor treatments. Plaintiff and her oncologist, Dr. Laura Chauvin, believe there is no evidence of disease recurrence.<br><br>Def. Ex. A (PFS) at 12;<br><br>Def. Ex. C (Plaisance Dep.) at 30:10-12, 32:12-14, 33:1-19;<br><br>Def. Ex. E (Chauvin Dep.) at 40:7-11; 51:25-52:3, 111:16-19, |
| 11. Ms. Plaisance began losing hair after receiving the first cycle of docetaxel and Cytoxan, and given the amount of hair loss, she shaved her head before receiving the second cycle of treatment.<br><br>Ex. C (Plaisance Dep.) at 215:24-216:22 | Admitted. |

3

| | **Hospira's Undisputed Facts and Supporting Evidence** | **Plaintiff's Response and Supporting Evidence** |
|---|---|---|
| 12. | Ms. Plaisance testified that when her prescribing oncologist spoke with her about the potential risks of chemotherapy, hair loss was not something she was concerned about at the time:<br><br>Q: And did Dr. Chauvin speak with you about potential risks of Taxotere and cytoxan?<br>A: Are you talking about the side effects? Yes, she did.<br>…<br>Q: And did you ask Dr. Chauvin any questions about the potential risk of hair loss?<br>A: No. I just understood that it would be temporary.<br><br>Q: Did you tell her that you were concerned about hair loss?<br>A: No. I was not concerned about my hair loss at the time.<br><br>Ex. C (Plaisance Dep.) at 186:17-20, 187:9-16 (emphasis added). | Admitted as to the accuracy of the referenced portion of Plaintiff's testimony, but incomplete. Ms. Plaisance and her oncologist, Dr. Chauvin, both testified that Dr. Chauvin discussed temporary hair loss, not permanent, as part of her informed consent discussion with Ms. Plaisance:<br><br>Q: Okay. And what did your doctor—what did Dr. Chauvin tell you about hair loss?<br>A: Permanent hair loss. No, no, no. Temporary hair loss. Yeah, temporary.<br>Q: Did she say anything else about a risk of hair loss?<br>A: No, that it would come back. I would probably lose my hair, but that it would come back.<br>Q: And did you ask Dr. Chauvin any questions about the potential risk of hair loss?<br>A: No. I just understood it would be temporary.<br><br>Def. Ex. C (Plaisance Dep.) at 187:1-12;<br><br>Q: And what side effects was it your practice at that time to discuss with patients?<br>A: . . . I talk about the fact that hair is going to fall out and talk about the timing of it. And I tell them –and I'm sure I told her in the majority of the cases, they're happy six months after their chemo and their hair comes back. And I usually tell them, you know, permanent hair loss is unusual now. Back then I don't know if I really would have focused on a discussion of permanent hair loss. I think prior to that time [time of Plaintiff's treatment in 2014] I hadn't had any patient with permanent hair loss since 1991.<br><br>Def. Ex. E (Chauvin Dep.) at 45:16-46:10;<br><br>Q: Did you tell her it was possible that her hair might grow back differently after chemotherapy?<br>A: Yes. I talk about the fact that sometimes it comes back curlier or a different color. I usually tell people by six months they usually have enough hair to be happy with it.<br><br>Def. Ex. E (Chauvin Dep.) at 95:20-25 |

4

| 13. | Ms. Plaisance believes she should have been warned of the risk of permanent hair loss, and states that had she been warned, she would have asked to look into another treatment option. Specifically, Ms. Plaisance testified:<br><br>Q: And what do you want to get out of this lawsuit?<br>A: I think I would want people to be made more aware because hair means a lot to a woman, at least to me, and *maybe if I would have -- I was told that it could be permanent, maybe I would have said, wait, let's look at something else*. You know, I want to keep my hair. And that would maybe for my doctor to have been advised that she could have advised me and then we could have *maybe* looked into another type of treatment without the risk of permanent hair loss.<br><br>Ex. C (Plaisance Dep.) at 268:3-15 (emphasis added). | Admitted as to the accuracy of the referenced portion of Ms. Plaisance's testimony, but incomplete. In fact, Ms. Plaisance's testimony indicates she would have taken on the risks of death, infection and bleeding but not permanent hair loss. Specifically, Ms. Plaisance's testimony reads:<br><br>Q: So you agreed to take on the risk of death with chemotherapy, but is it your testimony that if the word "permanent" had been added before "hair loss" there that you would have said, nope, wait a minute, I don't want to take these medicines?<br>A: *I would have said let's look into another option.*<br><br>Q: So the addition – you see – sorry, go ahead.<br>A: *Death can occur with anything, but had I known that I could have had permanent hair loss, I would have asked Dr. Chauvin to look into another option that wouldn't have caused permanent hair loss.* I have nothing against the drug except that. *There was no warning for me to be able to have – to be able to choose – the right to choose something else.*<br><br>Q: And do you see there that on the list of warnings of potential risks, there is the risk of hair loss is listed there; right?<br>A: Yes, sir, but it doesn't say permanent.<br><br>Q: And it doesn't say temporary either, does it?<br>A: Right. But reading this, I would have never thought – I would have never, never thought of permanent – permanent hair loss.<br><br>Q: And if that word had been added here, do you think that would have changed your course of treatment?<br>A: I'm pretty sure I would have asked let's look into something else.<br><br>Q: Even with the other risks here that you did agree to take on, including infection and bleeding?<br>A: Yes, because I did have the – I did have an –well, I didn't have the infection, but I had the potential for an infection. *Yes, because trust me, lost of hair permanent for a woman is hard.* |

5

| Hospira's Undisputed Facts and Supporting Evidence | Plaintiff's Response and Supporting Evidence |
|---|---|
|  | *It's hard. It's hard for me. It's hard for this woman (sic).*<br><br>Def. Ex. C (Plaisance Dep.) at 269:14-271:6. |

| | | |
|---|---|---|
| 14. | She testified that she would have asked Dr. Chauvin to "look into" other options:<br><br>Q: So you agreed to take on the risk of death with chemotherapy, but it is your testimony that if the word "permanent" had been before "hair loss" there that you would have said, nope, wait a minute, I don't want to take these medicines?<br><br>MR. HARDESTIEN: Object to form.<br>A: *I would have said let's look into another option.*<br><br>Q: So the addition -- you see -- sorry, go ahead.<br>A: Death can occur with anything, but had I known that I could have had permanent hair loss, *I would have asked Dr. Chauvin to look into another option that wouldn't have caused permanent hair loss*. I have nothing against<br>the drug except that. There was no warning for me to be able to have -- to be able to choose -- the right to choose something else.<br><br>Q: And do you see there that on the list of warnings of potential risks, there is<br>the risk of hair loss is listed there; right?<br>A: Yes, sir, but it doesn't say permanent.<br><br>Q: And it doesn't say temporary either, does it?<br>A: Right. But reading this, I would have never thought -- I would have never, never thought of permanent -- permanent hair loss.<br><br>Q: And if that word had been added here, do you think that would have changed your course of treatment?<br>A: *I'm pretty sure I would have asked let's look into something else.*<br><br>Ex. C (Plaisance Dep.) at 269:14-270:22 (emphasis added) | Admitted. |

7

| **Hospira's Undisputed Facts and Supporting Evidence** | **Plaintiff's Response and Supporting Evidence** |
|---|---|
| **III.    FDA Approval of Hospira's docetaxel** ||
| 15.    The FDA approved Hospira's version of docetaxel in March 2011 under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, which permits follow-on medications to gain FDA approval through an abbreviated pathway based on the safety and efficacy data of the branded or reference drug. Ex. D (FDA Approval Letter). Hospira's docetaxel was based on Taxotere, the branded docetaxel product developed by Sanofi US Services Inc. and Sanofi-Aventis U.S. LLC., and approved by the FDA in 1996.<br><br>Ex. D (FDA Approval Letter);<br><br>2d Am. Master Compl. ("AMC"). ¶¶ 121-24, ECF No. 4407 | Denied as incomplete and misleading as to the phrase "follow-on medications," which is without evidentiary support.  Hospira has held its own New Drug Application (NDA) for docetaxel, NDA 022234, since March 2011.<br><br><br>Def. Ex. D (FDA Approval Letter);<br><br>2d Am. Master Compl. ("AMC"). ¶¶ 121-24, ECF No. 4407 |
| **IV.    Dr. Chauvin's Testimony** ||
| 16.    Ms. Plaisance's prescribing oncologist, Dr. Laura Chauvin, testified that she first began prescribing docetaxel right when it came out—shortly after Taxol came out:<br><br>Q: Do you recall when you first would have begun prescribing docetaxel?<br>A: I think that came out rather quickly in just a year or two after Taxol came out. So the minute it was out, I'm sure I started using it.<br><br>Ex. E (Chauvin Dep.) at 33:8-12. | Admitted. |
| 17.    Taxol was approved by the FDA for the treatment of metastatic breast cancer in 1994. | Admitted, though without evidentiary support. |

8

| | | | |
|---|---|---|---|
| 18. | | Dr. Chauvin also testified that before she first prescribed docetaxel, she reviewed the prescribing information and the drug labeling. Ex. E (Chauvin Dep.) at 88:16-23. However, she did "not specifically" review Hospira's docetaxel label before prescribing docetaxel to Ms. Plaisance:<br><br>Q: And did you review Hospira's docetaxel label before prescribing docetaxel for Mrs. Plaisance?<br>A: *Not specifically.*<br><br>Q: And so you didn't rely on Hospira's label in prescribing it for her; is that right?<br><br>MR. ROCKSTAD: Object to form.<br>A: *No. I can't tell you whose label I last looked at.* I can put it that way.<br><br>Ex. E (Chauvin Dep.) at 131:17-25 (emphasis added). | Admitted, though incomplete. Dr. Chauvin testified that she learns about chemotherapy drugs before prescribing them from sources such as journal articles, UpToDate and associated emails, and the NCCN guidelines. Dr. Chauvin testified that UpToDate alerts her to new sentinel findings in relation to a drug. Moreover, she testified that she has subscribed to UpToDate for "more than ten years," and looks at UpToDate in relation to chemotherapy drugs *at least every other day*. Dr. Chauvin also testified that *she uses UpToDate and these other sources to inform her prescribing decisions*:<br><br>Q: What influences –strike that. Doctor, how do you learn about chemotherapy drugs before you prescribe them?<br><br>A: Well, I read them – about them in articles, not just from those journals but UpToDate is a thing I use a lot. And then I get emails. I signed up for email –different email sources of new [sentinel] findings. So I read information on those emails. Certainly I refer to the NCCN guidelines on almost every new patient. Well, really, essentially, every patient that we see at this time in life. . .So there are a lot of ways I keep up.<br>…<br>Q. Does UpToDate – and this may be obvious from the name, but does it send you updates on new information that's added to a drug label?<br>A. They have started in the last couple of years sending alerts by email of new things. And then if you research a drug or a disease and treatment thereof, sentinel thing, there's a pop-up that tells you the most recent sentinel new thing.<br>Q. How long have you been using UpToDate?<br>A. Probably more than ten years. I've been here ten years, and I'm sure I started using it before that.<br>. . .<br>Q. Do you believe you would have been using UpToDate in 2014 when you treated Mrs. Plaisance?<br>A. Yes.<br>Q. And do you use the information that you review in UpToDate and some of these other sources that you've described to inform your prescribing decisions?<br>A. Yes. |

9

| | **Hospira's Undisputed Facts and Supporting Evidence** | **Plaintiff's Response and Supporting Evidence** |
|---|---|---|
| | | Def. Ex. E (Chauvin Dep.) at 30:13-33:4 |
| 19. | When Dr. Chauvin prescribes docetaxel, she does not prescribe a particular manufacturer's product, and she does not know which manufacturer's product will be administered to the patient. Ex. E (Chauvin Dep.) at 132:21-133:18. Dr. Chauvin is not involved in the decisions regarding which drug will be used by the cancer center.<br><br>Ex. E (Chauvin Dep.) at 132:8-14. | Admitted. |
| 20. | Although Dr. Chauvin uses a service known as "UpToDate," she is unaware if whether, by using that service, she relied on any information from Hospira when prescribing docetaxel for Ms. Plaisance. Specifically, she testified:<br><br>Q: Did you rely on any information from Hospira in prescribing docetaxel for Mrs. Plaisance?<br>A: When I look up information on chemo medicines, I go to UpToDate, and I don't think it really notes who -- I don't pay any attention to who the manufacturer is.<br><br>Ex. E (Chauvin Dep.) at 132:2-7. | Admitted, though incomplete and misleading. Safety updates on UpToDate about docetaxel is not specific to manufacturer, and is disseminated generally about the docetaxel molecule itself. Oncologists maintain currency with labeled warning materials for the active ingredient molecules for drugs that they regularly prescribe, in this case docetaxel, through electronic means rather than by pulling the physical package insert from a medication that thy rarely, if ever, would physically touch or actually administer. A change to Hospira's docetaxel label would have alerted doctors not only when they re-read the entire pharmaceutical product's label but, more importantly, dissemination of the updated labeling information through electronic channels would have quickly alerted prescribing oncologist to a new warning regarding permanent chemotherapy inducted alopecia.<br><br>Ex. 1 (Declaration of Dr. Linda Bosserman) at ¶¶¶¶¶24, 35, 36, 37, 39. |
| 21. | Dr. Chauvin testified that she believes the docetaxel regimen prescribed to Ms. Plaisance "was the right treatment for her cancer."<br><br>Ex. E (Chauvin Dep.) at 135:9-16 | Admitted. |

10

| Hospira's Undisputed Facts and Supporting Evidence | Plaintiff's Response and Supporting Evidence |
|---|---|
| 22. Dr. Chauvin testified:<br><br>Q: And I believe you've testified today that you do not feel that there was another treatment option for Mrs. Plaisance that would have been a better treatment option for her; is that correct?<br>A: Right.<br><br>Ex. E (Chauvin Dep.) at 89:14-19. | Admitted as to the accuracy of the referenced portion of Dr. Chauvin's testimony. However, Dr. Chauvin also testified that if the docetaxel labeling had included a statement that cases of permanent alopecia have been reported, the percentage of that risk could affect her prescribing decision:<br><br>Q: If there had been an additional statement in the labeling for docetaxel that there have been reports, cases, of permanent alopecia had been reported, would that have changed your decision to prescribe TC for Mrs. Plaisance?<br>A. Well, if the percentage of that risk was included and it was, you know, less than 0.5 percent or something, probably not, but I would discuss with people that it could be permanent. It depends on the percentage risk.<br>Q: And if it had been a statement in the post-marketing adverse events section that simply said that there had been case of permanent alopecia that had been reported, would that change your prescribing decision?<br>A. Again, it would have to do with the percentage of risk of that, how frequently that was seen.<br><br>Def. Ex. E (Chauvin Dep.) at 135:17-136:9<br><br>In fact, publicly available studies, including a study entitled "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer" presented by Dr. Scot Sedlacek noted 6.3 percent of the patients treated with doxorubicin plus docetaxel experienced persistent significant alopecia.<br><br>2d Am. Master Compl. ("AMC"). ¶ 150, ECF No. 4407 |

11

| | **Hospira's Undisputed Facts and Supporting Evidence** | **Plaintiff's Response and Supporting Evidence** |
|---|---|---|
| 23. | Dr. Chauvin testified that if Ms. Plaisance had "absolutely refused TC," she "probably would have given her AC," Ex. E (Chauvin Dep.) at 83:2-3, but Dr. Chauvin "would have noted the 2 percent risk of deadly acute leukemia from Adriamycin and recommended against that," *id*. at 49:25-50:2 | Admitted, though incomplete. Dr. Chauvin also testified that a patient's involvement in the decision-making related to the cancer treatment they receive is *"very important"* and that she usually involves her patients *"in everything"* regarding their chemotherapy choices. Def. Ex. E (Chauvin Dep.) at 48:21-49:14 (emphasis added); Dr. Chauvin also testified that if Ms. Plaisance had told her she was not comfortable receiving docetaxel, *she would have discussed the alternative regimen of Adriamycin and Cytoxan*, though she would not have recommended it. *Id*. at 49:18-50:2 |
| 24. | Dr. Chauvin also testified that she would not have prescribed Taxol to Ms. Plaisance in part because of "the rate of neuropathy that Taxol-containing regimens have." Ex. E (Chauvin Dep.) at 81:24-25, 83:8-10. Comparatively, the "neuropathy risk from Taxotere is relatively low." Id. at 83:10-11. Diabetes "plays into [the] risk of neuropathy," and thus, Dr. Chauvin factored Ms. Plaisance's history of diabetes into her prescribing decision. *Id.* at 83:14-15 | Admitted. |
| 25. | Dr. Chauvin noted that although she has changed her counseling to include the risk of permanent hair loss, she still continues to prescribe docetaxel for breast cancer today. Ex. E (Chauvin Dep.) at 138:24-139:15. | Admitted. |

| Hospira's Undisputed Facts and Supporting Evidence | Plaintiff's Response and Supporting Evidence |
|---|---|
| **V.    Ms. Plaisance's Lawsuit** | |
| 26. Ms. Plaisance asserts a claim for failure to warn under Louisiana law. Ex. B (ASFC) at ¶ 13. She concedes that "Louisiana product liability law should govern in her case, except as to her punitive damages claim." Audrey Plaisance's Mem. in Opp. to Hospira's Mot. For Summ. Judg. on Claims Under Illinois Law, ECF 12495 at 1 n.1. Ms. Plaisance alleges that Hospira did not adequately warn of the risk of permanent alopecia and that she developed permanent alopecia because of this failure to warn.<br><br>AMC ¶¶ 221-32; Ex. B (ASFC) at ¶ 13. | Admitted. |

Dated: December 7, 2021

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

13

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396

john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on December 7, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

                                        */s/ M. Palmer Lambert*
                                        M. PALMER LAMBERT