UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                                      MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                                                                         SECTION "H" (5)

THIS DOCUMENT RELATES TO:
*Plaisance v. Hospira, Inc., et al.*, Case No. 2:18-cv-08086

PLAINTIFF'S OPPOSITION TO DEFENDANT HOSPIRA'S
MOTION TO EXCLUDE OR LIMIT OPINIONS OF DAVID ROSS, M.D., PH.D., M.B.I.

### I.     INTRODUCTION

Hospira's Motion to Exclude argues that Dr. Ross, M.D. Ph.D., M.B.I.'s failed to make a "meaningful review" of the regulatory record submitted by Hospira to the FDA prior to the FDA's approval of Hospira's docetaxel product in March 2011. According to Hospira, this completely undermines Dr. Ross's opinion that sufficient newly acquired information existed to warrant Hospira updating its docetaxel label through the CBE process before January 2014 to warn prescribers about the risk of PCIA. Hospira's argument is a red herring and its Motion should be denied.

Dr. Ross is an extremely well-credentialed and experienced board-certified physician who served for more than 10 years as a medical officer at the Center for Drug Evaluation and Research (CDER) in the U.S. Food and Drug Administration (FDA), and has studied, practiced, lectured, written, testified before Congress, and presented extensively regarding the evaluation and approval of new drugs, post-marketing drug surveillance and compliance, and the federal regulatory scheme governing the safety and effectiveness of drugs.

This litigation involves claims by Ms. Plaisance that 505(b)(2) NDA holder Hospira failed to warn prescribers about the risk of PCIA with its docetaxel product, and a learned intermediary defense. Based on his regulatory, scientific, and clinical training, knowledge, and experience in reviewing and evaluating drugs, labels, and compliance with application regulations, Dr. Ross has been designated to provide opinions regarding:

(1) the regulatory obligations of drug manufacturers for products approved under Section 505(b)(2) of the Food, Drug, and Cosmetic Act (FDCA); and

(2) whether Hospira met those regulatory obligations with respect to the warnings, precautions, and/or adverse event listings in its U.S. docetaxel labels about the risk of permanent chemotherapy induced alopecia (PCIA) at the time its docetaxel was administered to Plaintiff Plaisance in January 2014.

Dr. Ross reached his conclusions after performing an independent assessment, employing the same reliable methodology he did as a medical reviewer at the FDA charged with making recommendations regarding regulatory decisions. As fully set forth in his Expert Report and throughout his deposition testimony, Dr. Ross opined that, based on his training, knowledge, and experience, and a comprehensive review of relevant FDA Guidance, documented best practices within CDER, relevant statutes and regulations, scientific literature and clinical trial data, Hospira docetaxel labels in the U.S. and worldwide, internal documents, deposition testimony, and his reasonable reliance on reports and analyses from experts in epidemiology, biostatistics, pharmacology and toxicology:

(1) as a 505(b)(2) NDA holder, Hospira has regulatory obligations for its docetaxel label independent of Sanofi, including an obligation to update its label when there is new safety information or analysis available to Hospira that provides either "some basis to believe there is a causal relationship" (21 CFR 201.57(c)(7)) or "reasonable evidence of a causal association" (21 CFR 201.57(c)(6)) between docetaxel and PCIA; and

(2) Hospira knew or had reason to know that sufficient evidence existed regarding the risk of PCIA with docetaxel to warrant a label change under 21 CFR 201.57(c)(7)

2

and/or 21 CFR 201.57(c)(6) prior to the time its docetaxel was administered to Plaintiffs.

Dr. Ross is qualified to render the opinions at issue, he reached his opinions by way of proper methodology, and his opinions are relevant to the issues involved in this litigation. The fact that Dr. Ross did not fully review Hospira's pre-March 2011 regulatory submission to the FDA prior to rendering his opinion does not warrant exclusion of his testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Dr. Ross reviewed various data sources, including publicly available medical literature, reporting from the FDA's Adverse Event Reporting Database (FAERS), information made available by Sanofi in their worldwide Taxotere labeling, and information set forth by Hospira in worldwide labeling of its docetaxel products and other foreign data. Moreover, Dr. Ross reviewed and reasonably relied on reports and analyses from experts in epidemiology (Dr. Feigal), biostatistics (Dr. Madigan), pharmacology and toxicology (Dr. Plunkett) to support his independent assessment of the guiding factors set forth by FDA when considering whether there is reasonable evidence to support a label change under 201.57(c)(7) (Adverse Events) and/or 21 CFR 201.57(c)(6) (Warnings and Precautions).

Further, Hospira's arguments completely sidestep the body of data available to Hospira regarding the link between docetaxel and permanent hair loss had increased from the time of approval in 2011 until 2014, with mounting evidence in the medical literature, a growing number of reports of permanent alopecia with docetaxel in its safety database, and a new Global Vice President of Pharmacovigilance and Product Safety who had worked closely with Taxotere as a pharmacovigilance executive at Sanofi. *See* 21 C.F.R. § 314.80(b) (identifying sources for post-market safety data surveillance). Indeed, during this timeframe, Hospira updated its docetaxel label in foreign countries to include information about the risk of permanent alopecia.

3

"The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Dr. Ross's opinions are relevant and reliable and contain the same level of intellectual rigor that characterized his practice in the field. Hospira's Motion to Exclude Dr. Ross should be denied

## II.     LEGAL STANDARD

Rule 702 and *Daubert* govern the admission of expert testimony. Under this framework, the district court acts as a "gatekeeper" to ensure a proposed expert is qualified as such, and his or her testimony is both reliable and relevant. *Daubert*, 509 U.S. at 596-97; *Williams v. Manitowac Cranes*, L.L.C. 898 F.3d 607, 623 (5th Cir. 2018); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1352860 at *1 (E.D. La. Apr. 12, 2017) (Fallon, J.).

One can be qualified as an expert on the basis of "knowledge, skill, experience, training or education." FED. R. EVID. 702. "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). "Although an expert's qualifications may be less-than-sterling, she may still be certified." *Williams*, 898 F.3d at 623. "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571 F.3d at 452.

The reliability inquiry is a flexible one that focuses on the reasoning or methodology underlying the testimony. *See Daubert*, 509 U.S. at 592-94. This inquiry is not concerned with whether the expert's testimony is correct. *MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015). The focus is on whether the testimony is based upon reasoning and

methodology that is "scientifically valid." *Daubert*, 509 U.S. at 595; *MM Steel L.P.*, 806 F.3d at 850-51. "The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (*citing Daubert*, 509 U.S. at 590).

The Court's relevancy determination focuses on whether the proposed testimony "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. 592; *see also Puga v. RCX Solutions, Inc.*, 914 F.3d 976, 985 (5th Cir. 2019). To be relevant, "the expert's 'reasoning or methodology [must] be properly applied to the facts at issue.'" *Puga*, 914 F.3d at 985 (*quoting Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Jones v. Blue Cross Blue Shield of Louisiana*, No. 16-CV-340-JWD-RLB, 2018 WL 585543, at *2 (M.D. La. Jan. 29, 2018) citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997)

A court's gatekeeper role, while essential, "is not intended to supplant the adversary system or the role of the jury; rather, vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[T]he court's role . . . is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role …" *Puga*, 914 F.3d at 985. Under this system, "'[r]ejection of expert testimony is the exception rather than the rule.'" *Id*. (quoting FED. R. EVID. 702 advisory committee notes).

### III.   ARGUMENT

**A.   Dr. Ross is well-qualified to render the regulatory opinions at issue.**

Dr. Ross graduated from Yale University *cum laude* with degrees in Molecular Biophysics and Biochemistry. He then received his Master of Science degree in Biochemistry, his Ph.D. in

Biochemistry, and his Doctor of Medicine from New York University. He later received a Master's Degree in Biomedical Informatics. He has held teaching positions at the NYU School of Medicine, the Yale University School of Medicine, the Yale University Department of Molecular Biophysics, and at the George Washington University School of Medicine. He is a licensed physician who has been Board Certified in both Internal Medicine and Infectious Diseases.

Dr. Ross worked at the FDA from 1996 through 2006. During this time, Dr. Ross was promoted from a primary medical reviewer within the FDA's Center for Drug Evaluation and Research, to Senior Medical Reviewer in DAIDP, to a Medical Team Leader in DAIDP, to Deputy Director of the Office of Drug Evaluation, and ultimately became the *Associate Director for Regulatory Science in CDER's Office of Oncology Drug Products.*

In these roles, Dr. Ross was responsible for reviewing New Drug Applications (NDAs) under Sections 505(b)(1) and 505(b)(2) of the FDCA.[1] Dr. Ross is intimately familiar with the pharmacovigilance responsibilities of drug manufacturers. He was responsible for determining the safety of proposed clinical trials, providing scientific comments, reviewing safety and efficacy data presented in NDAs, and making specific recommendations about the approvability of an application and a sponsor's proposed labeling.[2] As part of this work, Dr. Ross was also tasked with reviewing post-marketing data for already-approved NDAs and making recommendations about regulatory action, including labeling changes.[3] This work included preparing and delivering presentations and briefing packages to multiple FDA Advisory Committees.[4] While at the FDA, as part of his work within the agency, Dr. Ross completed numerous FDA-sponsored regulatory training courses specifically designed to teach the methods and procedures of the FDA review

---

[1] Def. Ex. E, Ross Rep. at para. 4-7.
[2] *Id.* at para. 4-12.
[3] *Id.*
[4] *Id.*

6

process.[5] Dr. Ross has lectured, written, and presented extensively regarding the approval of new drugs, regulatory issues related to safety, clinical trials, risk/benefit analysis, and has specifically testified before Congress on these important issues.

Dr. Ross's academic training and practical experience fall precisely in the field in which he will testify in this case. *In re: Tylenol (Acetaminophen) Marketing, Sales Practices, and Prods. Liab. Litig.*, 2016 WL 4039329 at *4 (E.D. Pa. July 28, 2016) ("Overall, the court will consider both academic training and practical experience to determine if the expert has more knowledge than the average lay person on the subject.") (internal citations omitted). Other courts have found Dr. Ross qualified to testify as a regulatory expert based on his education, training, and work in the field of drug regulation at the FDA. For example, in denying a motion to exclude Dr. Ross in *Dolin v. SmithKline Beecham Corp.*, 2015 U.S. Dist. LEXIS 156877 at *14-15 (N.D. Ill. 2015), the court held:

> Dr. Ross clearly has the necessary qualifications and expertise to testify as an expert. Dr. Ross is a medical doctor who holds a Ph.D. in Biochemistry. He worked extensively at the FDA reviewing NDAs, safety data, and proposed labeling associated with pharmaceutical products. Dr. Ross has extensive experience reviewing safety data, applying FDA regulations to that data, and reviewing the sufficiency of drug labeling. For all these reasons, Dr. Ross is qualified to offer opinions about drug labeling and regulatory compliance. Dr. Ross is fully qualified to review a drug company's regulatory submissions, the relevant safety data, and draw conclusions about the adequacy of a proposed label, whether that data is related to an antidepressant or some other drug.

**B.      Dr. Ross's opinions are reliable.**

Hospira contests the reliability of Dr. Ross's opinions on two bases: (1) he did not review the pre-March 2011 Hospira submission to see if it included information that was published after March 2011, and (2) he relies on other experts' conclusions to an improper extent.[6]

---

[5] *Id*.
[6] Hospira premises its reliability arguments on the same misguided arguments set forth in its Motion for Summary Judgment on Preemption Grounds; namely, there is no evidence of "newly acquired information" regarding the risk

1. **Hospira's criticism that Dr. Ross failed to adequately review Hospira's pre-March 2011 regulatory submission is not dispositive of Dr. Ross's opinion that there was "newly acquired evidence" warranting an update to Hospira's docetaxel label.**

Notwithstanding Dr. Ross's comprehensive analysis, Hospira takes issue with Dr. Ross's alleged failure to review Hospira's pre-March 2011 FDA submissions regarding labeling and docetaxel. Dr. Ross's methodology was based on his education, training, knowledge, and experience and documented best practices within CDER, and conformed to the approach he employed as a medical reviewer at FDA charged with making independent assessments and recommendations regarding regulatory decisions.[7] In doing so, Dr. Ross performed a comprehensive review of relevant FDA Guidance, statutes, and regulations to assess the obligations of NDA holders, including 505(b)(2) NDA holders like Hospira, regarding issues of pharmacovigilance, post-marketing surveillance, safety reporting, and labeling.[8]

Dr. Ross concluded that as a 505(b)(2) NDA holder, Hospira has regulatory obligations for its docetaxel label independent of Sanofi.[9] These independent obligations include updating its label pursuant to the CBE process when there is newly acquired information or analysis available to Hospira that provides either "some basis to believe there is a causal relationship" (21 CFR 201.57(c)(7)) or "reasonable evidence of a causal association" (21 CFR 201.57(c)(6)) between docetaxel and PCIA.[10]

Dr. Ross concluded that Hospira knew or had reason to know that sufficient evidence existed regarding the risk of PCIA with docetaxel to warrant a label change under 21 CFR

---

of PCIA with docetaxel sufficient to warrant Hospira seeking an update of its docetaxel label pursuant to the FDA's "changes-being-effected" (CBE) process.
[7] Def. Ex. E, Ross Rep. at para. 32-34.
[8] *Id.* at para. 35-78.
[9] *Id.* at para. 23-26, 62-78.
[10] *Id.* at para. 26-27, 106-113.

201.57(c)(7) (Adverse Events) and/or 21 CFR 201.57(c)(6) (Warnings and Precautions) prior to the time its docetaxel was administered to Ms. Plaisance in January 2014.[11] In reaching this determination, Dr. Ross utilized his expertise and applied the relevant regulatory framework to the available and pertinent facts.

He reviewed various data sources, including publicly available medical literature, reporting from the FDA's Adverse Event Reporting Database (FAERS), information made available by Sanofi in their worldwide Taxotere labeling, and information set forth by Hospira in worldwide labeling of its docetaxel products and other foreign data.[12] Moreover, Dr. Ross reviewed and reasonably relied on reports and analyses from experts in epidemiology (Dr. Feigal), biostatistics (Dr. Madigan), pharmacology and toxicology (Dr. Plunkett) to support his independent assessment of the guiding factors set forth by FDA when considering whether there is reasonable evidence to support a label change under 201.57(c)(7) (Adverse Events) and/or 21 CFR 201.57(c)(6) (Warnings and Precautions).[13]

Hospira implies that Dr. Ross's alleged failure to review Hospira's cherry-picked list of "pertinent information" somehow undermines his opinions that sufficient newly acquired information existed to warrant Hospira updating its docetaxel label through the CBE process before January 2014 to warn prescribers about the risk of PCIA. This is a red herring.

First, "[n]ewly acquired information" for a CBE change is not limited to "new data." *See Wyeth v. Levine*, 555 U.S. 555, 569 (2009) (quoting, in part, 73 Fed. Reg. 49607) (internal cites omitted). Rather, because information on the risks associated with a drug may accumulate over time, "newly acquired information could be an increasing body of data of an inherent risk with the

---

[11] *Id.* at para. 28-31, 100, 115-120.
[12] *Id.* at para. 84.
[13] *Id.* at para. 85-100.

drug." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 42 (1st Cir. 2015) (internal quotations omitted) (*citing Levine*, 555 U.S. at 571).

Moreover, noticeably absent from Hospira's laundry list of allegedly "pertinent information" is a reference to any document or communication demonstrating that Hospira actually provided the FDA with any of the newly acquired information cited by Dr. Ross in his Expert Report, including the publicly available medical literature, FAERS reports, available clinical trial data, or information contained in Hospira's foreign docetaxel labeling. More striking, Hospira makes no argument that it ever proposed—or that the FDA formally disapproved of—an update to its docetaxel label through the CBE process (or otherwise) prior to January 2014 to warn prescribers about the risk of PCIA.

As explained in Plaintiff's Opposition to Hospira's Motion for Summary Judgment on Preemption Grounds, merely providing the FDA with information in a communication or submission (which, as noted, Hospira does not even identify) would in no way inhibit Hospira's ability (or absolve Hospira from its obligation) to update its docetaxel label through the CBE process.[14] Rather, a drug manufacturer like Hospira must present "clear evidence that the FDA would not have approved a change to [the drug]'s label." *Levine*, 555 U.S. at 571. The "clear evidence" needed is "evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed

---

[14] Even so, with respect to Hospira's 'newly required information' argument, Hospira places far too much importance on whether or not the FDA has been provided certain data. Though this is one factor to consider, Hospira's insistence that this is somehow dispositive of the whole case is consistent with Hospira's naked attempt to shift the responsibility for maintaining the safety of its drug to someone else (*e.g.*, the FDA, Sanofi or another 505(b)(2) NDA holder). As an NDA holder for docetaxel, Hospira is responsible to ensure that the information contained in the label is accurate and contains up to date safety information at all times. Ross Expert Report at ¶¶ 26, 59. Simply forwarding volumes of data to the FDA, or hoping another drug manufacturer did, does not magically satisfy Hospira's pharmacovigilance responsibility. Hospira is required to gather **and analyze** information available to it and update its label accordingly. *Id.*

the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019).

Accordingly, even if Hospira (or Sanofi or some other 505(b) NDA holder) provided the FDA with a reference to any or all of the "newly acquired information" cited by Dr. Ross, without clear evidence that Hospira proposed, and the FDA disapproved of, labeling that warns of PCIA, the allegedly "pertinent information" cited by Hospira bears little, if any, relevance to Dr. Ross's opinions about Hospira's independent obligations and failure to update its docetaxel label. To the extent Hospira deems this information relevant, it can be addressed through cross-examination.

Moreover, Hospira's argument rests on the presumption that it is only responsible for monitoring the safety profile of its drug based on new data arising between 2011, when its NDA was approved, and Plaintiff's injury in January 2014, almost three years later. But federal law does not sanction such an approach to pharmacovigilance—in which a drug maker may disregard safety data once it has been handed over to the FDA as part of an NDA submission. *See in re Taxotere (Docetaxel) Prod. Liab. Litig.*, 508 F. Supp. 3d 71, 84–85 (E.D. La. 2020) ("It is not enough for [defendant] to show that the adverse event reports had been submitted to the FDA. [Defendant] had an obligation to analyze those reports for the FDA.").

Further, the body of data available to Hospira regarding the link between docetaxel and permanent hair loss had increased from the time of approval in 2011 until 2014, with mounting evidence in the medical literature, a growing number of reports of permanent alopecia with docetaxel in its safety database, and a new Global Vice President of Pharmacovigilance and Product Safety who had worked closely with Taxotere as a pharmacovigilance executive at Sanofi. *See* 21 C.F.R. § 314.80(b) (identifying sources for post-market safety data surveillance). Indeed,

11

during this timeframe, Hospira updated its docetaxel label in foreign countries to include information about the risk of permanent alopecia.

Hospira was in a unique position among 505(b)(2) NDA-holders with respect to new information about docetaxel's safety risks because in 2013 the company hired Dr. Juergen Schmider, Sanofi's former Vice President of Safety Surveillance and Product Safety from 2011 to 2013, as its new Global Vice President of Pharmacovigilance and Product Safety.[15] At both companies, Dr. Juergen was responsible for Taxotere/docetaxel, and he brought knowledge obtained from those years at Sanofi to his new position with Hospira.[16] This includes his dealings with the European Medicines Agency (EMA) over changes to Taxotere's label to highlight safety issues—including persistent alopecia—the EMA's insistence that "health care professionals should be informed of the possible irreversibility of alopecia" because the condition had potential for "serious psychological consequences."[17] Dr. Schmider was also apparently in possession of Sanofi's 2011 Core Data Sheet for Taxotere containing PCIA information from Taxotere's major clinical trial.[18]

The body of medical literature highlighting the risk of PCIA with docetaxel was growing, too, after Hospira's drug was approved in the U.S., with six new articles published between then and Plaintiff's use of the drug in January 2014.[19] For example, an article published by Miteva *et al.* in the American Journal of Dermatopathology discussed "the histological features of 10 cases of permanent alopecia after systematic chemotherapy with taxanes (docetaxel)," including 6 cases in which the patients took docetaxel for breast cancer. Another article by Kluger *et al.* in the Annals

---

[15] Def. Ex. E, Ross Rep. at para.131.
[16] *Id.*
[17] *Id.* at para. 132.
[18] *Id.* at para. 133.
[19] *Id.* at para. 93.

12

of Oncology reported 6 cases of permanent alopecia among docetaxel patients in retrospective study evaluating patients that had taken docetaxel or paclitaxel in combination with other chemotherapy agents. Also in 2012, Bourgeois *et al.* published their research on cases of irreversible alopecia reported in among French patients using docetaxel. The following year, two articles were published regarding reports of permanent alopecia associated with docetaxel, including an article published by Plaintiff's Expert Dr. Antonella Tosti.[20]

In addition to medical literature, analysis of the FDA's Adverse Event database illustrates accumulating data regarding the risk of permanent alopecia associated with docetaxel. Indeed, both Dr. Madigan's lasso logistic regression and L2 logistic regression analyses evidence an increased reporting rate of docetaxel against all other drugs exceeding the standard statistical threshold of 2 as of the end of 2010 and remaining above that threshold at the end of 2011 and beyond. In *Levine*, the Court concluded that adverse event reporting could provide a basis to update the label, even after given to the FDA in periodic reporting. *See Demahy v. Actavis, Inc.*, 593 F.3d 428, 447 (5th Cir. 2010) (discussing Levine), *rev'd sub nom. PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011). Just as in *Levine*, the drug manufacturer here "could have analyzed the accumulating data and added a stronger warning." 555 U.S. at 570. But the evidence shows Hospira did no such thing, and instead *declined* to follow up on PCIA reports because it considered "alopecia" a known side effect of chemotherapy.[21]

Despite Hospira's claims that it periodically performed literature searches for its entire product line, these were inadequate as they failed to detect safety signals arising both pre- and post-approval, including from the standard analyses employed by Plaintiff's expert statistician, Dr.

---

[20] In his report, Dr. Ross goes not to note that there are other studies that were published during review of the Hospira regulatory submission, but before the approval of the Hospira docetaxel product, that support a causal relationship between docetaxel and PCIA. Def. Ex. E, Ross Rep. at para. 94.
[21] *Id.* at para.135.

Madigan.[22] Indeed, Hospira's deficiencies in pharmacovigilance during this period were noted in regulatory inspections by multiple European health authorities. This is illustrated by Pfizer's clinical overview of the available data on PCIA after it acquired Hospira, which included a 2016 search of its safety database.[23] That search revealed 146 cases of alopecia, 29% of which were described as "permanent" or "irreversible."[24] The results of the clinical overview, which included the database search, led to Hospira's seeking a U.S. label change in March 2017 to state that "cases of permanent alopecia have been reported."[25]

Finally, as far back as 2012, Hospira's docetaxel labels in Israel, Hungary, and the United Kingdom (among other countries) included persistent alopecia data from Sanofi's TAX 316 clinical trial.[26] And in July 2013, Hospira changed at least five of its European labels with additional TAX 316 data.[27] These regulatory moves show that Hospira possessed new scientific information regarding PCIA from Sanofi's clinical trial and that, had Hospira reviewed Sanofi's Summary of Product Characteristics (SPC) for Taxotere at that time, Hospira would have had access to the final clinical trial data and additional statements regarding the risk of PCIA.[28]

It is unreasonable to criticize Dr. Ross for not fully reviewing the regulatory submission submitted well before March 2011 to determine whether information made available after March 2011 constituted newly acquired information warranting a change to Hospira's docetaxel label.

Further, at his deposition, Dr. Ross explained that there was "truly new" information after the March 2011 FDA approval date that was "enough of a signal" whereby Hospira should have conducted a signal analysis and assessed(.)"

---

[22] *Id.* at para.136.
[23] *Id*. at para. 139.
[24] *Id*. at para.139.
[25] *Id.* at para.139.
[26] *Id.* at para. 98.
[27] *Id.* at para. 98.
[28] *Id.* at para. 98.

> Okay. First off, if a company does not do an analysis that would constitute new safety information, it will never exist. That's number one. Number two -- and I pointed this out -- the Kluger article, the label changes that are described in my report, those certainly did not, you know, appear.[29]

Hospira's argument that Dr. Ross's opinion is unsupported by analysis of "new information" is a mischaracterization of Dr. Ross's report and Dr. Ross's deposition. Hospira's motion should be denied.

> **2. Dr. Ross reasonably relied on Drs. Feigal, Madigan, and Plunkett to support his independent regulatory assessment of Hospira's duty to warn and its failure to do so.**

Dr. Ross reviewed and analyzed a broad scope of scientific information available to Hospira. Additionally, just as he did throughout his FDA tenure, Dr. Ross made his independent regulatory assessment by, in part, reasonably relying on a multi-disciplinary team of experts, including experts in epidemiology (Dr. Feigal), biostatistics (Dr. Madigan), pharmacology, and toxicology (Dr. Plunkett). Dr. Ross is admittedly not an expert in epidemiology, biostatistics, pharmacology, or toxicology, and is not providing an expert opinion on these specific topics.

Contrary to Hospira's argument, Dr. Ross reliance was not "uncritical." As Dr. Ross noted in his Expert Report: "My understanding and opinions are supported by the analyses and opinions of [these experts]. I reviewed their expert reports, and I accept and consider their assessments valid."[30] Further, during his deposition, Dr. Ross confirmed that he did not automatically accept what these experts stated, but instead applied the same level of rigor in analyzing these expert reports as he did when he was working at the FDA.[31] Dr. Ross did not "assess" whether or not Dr. Madigan was in "compliance" with FDA guidance for medical officer review because doing so

---

[29] *See* Ex. 1, Deposition of Dr. Ross, September 30, 2021 ("9/30/2021 Ross Dep."), at 184-185.
[30] *See* Def. Ex. E, Ross Rep. at para. 85; 91-95.
[31] *See* Ex. 1, 9/30/2021 Ross Dep. at pg. 187-190.

would potentially be wrong.[32]  Dr. Ross treated used the expert reports in this matter in the same way he used expert information while working as a primary medical review for the FDA.[33]

As the Court previously recognized in *Earnest*, it is quite appropriate and common for an expert to utilize an analysis of another expert as part of the facts and data he considers in reaching his own opinions.  Order and Reasons, Rec. Doc. 8153, at 7.  Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. . . .

FED. R. EVID. 703; *see also* Order and Reasons, Rec. Doc. 8153, at 7 (citing *Tajonera v. Black Elk Energy Offshore Operations, LLC*, 2016 WL 3180776, at *10 (E.D. La. June 7, 2016)).

Regulatory decision makers like Dr. Ross routinely and reasonably rely upon the analysis and conclusions of experts in epidemiology, biostatistics, pharmacology, and toxicology.  *See, e.g.*, *In re Actos (Pioglitazone) Products Liab. Litig.*, 2014 WL 120973 at *17 (W.D. La., 2014); *In re Vioxx Products Liab. Litig.* 2016 WL 8711273 at *8 (E.D. La. 2016) ("Under Federal Rule of Evidence 703, an expert may base opinions on facts or data he has been made aware of during the case. . .Thus, Dr. Egilman's conclusions based on Dr. Madigan's report are admissible."); *Christopherson v. Allied Signal Corp.*, 939 F.2d 1106, 1111 (5th Cir. 1991), abrogated on other grounds by Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1320-22 (Fed. Cir. 2014), overruled on other grounds by *Williamson v. Citrix Online*, LLC, 792 F.3d 1339 (Fed. Cir. 2015) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field. . . Rule 703

---

[32] *Id.* at pg. 200-201.
[33] *See* Def. Ex. E, Ross Rep. at para. 32 and 85.

explicitly allows an expert to rely on information he has been made aware of "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." This Rule does not predicate admissibility on the source of the facts or data or, in particular, on whether the source is employed by either of the parties.") (internal citations omitted); *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("[N]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("Xerox's primary argument is that plaintiffs' experts failed to conduct their own tests and relied only on data provided by Xerox's own experts and the DEC. However, an expert may rely on data that she did not personally collect."). Moreover, as demonstrated in his Expert Report and depositions, Dr. Ross considered the methodologies of these other experts, and expanded upon their opinions by applying them to the applicable regulatory framework and factors used by FDA.[34]

      Dr. Ross analyzed the work of Drs. Feigal, Madigan, and Plunkett, recognized that they used an appropriate methodology, and used their analysis as part of the data he used to reach his own, independent regulatory opinions. This is exactly what Dr. Ross did as an FDA medical reviewer, and it is standard for regulatory experts.

---

[34] *See, e.g.*, Def. Ex. E, Ross Rep. at para. 84-100, 115-120; Ex. 1, 9/30/2021 Ross Dep. at 18:9-17, 185:12-190:1, 193:2-8, 196:19-201:1.

Dated: December 7, 2021                          Respectfully submitted,

*/s/ Christopher L. Coffin*                      */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                   Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                 GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2505                  6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                     Los Angeles, California 90045
Phone: (504) 355-0086                            Telephone: 510-350-9700
Fax: (504) 355-0089                              Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                           kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                    *Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*                           */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                       Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                        BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                         701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street          New Orleans, LA 70139
New Orleans, LA 70163-2800                       Phone: 504-524-3300
Phone: 504-522-2304                              Fax: 504-524-3313
Fax: 504-528-9973                                barrios@bkc-law.com
plambert@gainsben.com

                                                 *Plaintiffs' Co-Liaison Counsel*

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews                                     Abby E. McClellan
Andrews & Thornton                               Stueve Siegel Hanson LLP
4701 Von Karman Ave., Suite 300                  460 Nichols Road, Suite 200
Newport Beach, CA 92660                          Kansas City, MO 64112
Phone: (800) 664-1734                            Phone: (816) 714-7100
aa@andrewsthornton.com                           Fax: (816) 714-7101
                                                 mcclellan@stuevesiegel.com


J. Kyle Bachus                                   Karen Barth Menzies
Bachus & Schanker, LLC                           Gibbs Law Group LLP
101 W Colfax Ave, Suite 650                      6701 Center Drive West, Suite 1400
Denver, CO 80202                                 Los Angeles, CA 90045 Phone:
Phone: (303) 222-2222                            510-350-9700
Fax: (303) 893-9900                              Fax: 510-350-9701
kyle.bachus@coloradolaw.net                      kbm@classlawgroup.com

18

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

| | |
|---|---|
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904 15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Daniel P. Markoff<br>Atkins & Markoff Law Firm<br>9211 Lake Hefner Parkway, Suite 104<br>Oklahoma City, OK 73120<br>Phone: (405) 607-8757<br>Fax: (405) 607-8749<br>dmarkoff@atkinsandmarkoff.com | Zachary Wool<br>Barrios Kingsdorf & Casteix, LLP<br>701 Poydras Street, Suite 3650<br>New Orleans, LA 70139<br>Phone: (504) 524-3300<br>Fax: (504) 524-3313<br>zwool@bkc-law.com |

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ Dawn M. Barrios
DAWN M. BARRIOS