# EXHIBIT 1

Page 1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2                    MDL NO. 16-2740
3
4
       * * * * * * * * * * * * * * * *
5                                     *
         IN RE:  TAXOTERE (DOCETAXEL) *
6                                     *
         PRODUCTS LIABILITY LITIGATION *
7                                     *
        This pertains to:             *
8       Clare Guilbault,              *
           Case No. 2:16-cv-17061     *
9       Audrey Plaisance,             *
           Case No. 2:18-cv-08068     *
10                                    *
                                      *
11     * * * * * * * * * * * * * * * *
12
13         REMOTE VIDEOTAPE VIDEOCONFERENCE DEPOSITION OF
                   DAVID ROSS, M.D., Ph.D.
14
15
16            TRANSCRIPT of the stenographic notes of
17    the proceedings in the above-entitled matter, as
18    taken by and before LINDA M. JORRITSMA, a Certified
19    Registered Professional Reporter and Certified Court
20    Reporter and Notary Public, held via ZOOM
21    VIDEOCONFERENCE at various locations with the witness
22    located at 212 Stony Run Lane, Baltimore, Maryland,
23    on Thursday, September 30, 2021, commencing at 9:42
24    a.m.
25

Page 18

1 quite confident in saying that if I was asked that as
2 a general proposition without referencing a
3 litigation, I would have said yes, which is, you
4 know, obviously when asked to look at the details.
5 But I think it's not that I, you know, was unaware of
6 these issues, it's just that specific question on
7 docetaxel 505(b)(2) applications, I had never been
8 asked before.
9          But if -- and just if this were to have
10 come up in a discussion when I was at FDA, for
11 example, I -- I and other reviewers and review
12 officials would have said yes.
13          So I don't mean that there's no way I
14 would ever say anything but that.  Again, I have to
15 look at what the specific facts are because they may
16 involve other issues.  So I know that's quite a long
17 answer but I --
18     Q.   Quite a long answer, Doctor, but I got
19 you.  I got you.  And I appreciate that.  And you and
20 I have gone back and forth about your tendency to
21 give long answers and so we'll try and --
22     A.   If I -- if I may say, Mr. Horowitz, I
23 will try and do all of us a favor and be more
24 succinct.
25     Q.   I appreciate that.  Thank you, Doctor.

Page 184

1   of existing information since the drug was approved."
2               That's the definition that I'm using.
3       Q.      Is that the whole definition?
4       A.      There's ellipses in there.
5       Q.      What did you leave out, Doctor?
6       A.      You know what?  If we can pull up the
7   statute, I could do it right now and read the whole
8   thing, if you'd like.  But it's not -- it's things
9   that -- the words did not substantively change the
10  meaning of this.  But if you'd like, I'll pull it up
11  right now and we can read it and I'm sure you've got
12  it.
13      Q.      You wouldn't want to leave anything out
14  that was important to the accuracy of your
15  definition, would you?
16      A.      No.
17      Q.      So was -- was there any particular truly
18  new piece of data or event that occurred in 2012 that
19  you can point to that you think was enough of a
20  signal that with respect to permanent alopecia that
21  you think Hospira should have conducted a signal
22  analysis and assessed?
23              MR. CENTOLA:  Objection to form.
24      A.      So you used the term, "truly new."
25      Q.      Correct.

1    A.    Okay.
2    Q.    That didn't exist in 2012.  I'll define
3  it for you.  That didn't exist before 2012.
4          MR. CENTOLA:  Objection, form.
5    A.    Okay.  First off, if a company does not
6  do an analysis that would constitute new safety
7  information, it will never exist.  That's number one.
8          Number two -- and I pointed this
9  out -- the Kluger article, the label changes that are
10 described in my report, those certainly did not, you
11 know, appear.
12   Q.    You talked about Dr. Madigan and your
13 review and reliance on the report.  Are you relying
14 on Dr. Madigan's report for your opinions in this
15 case?
16         MR. CENTOLA:  Object to form.
17   A.    If I can --
18         MR. HOROWITZ:  What's the objection?
19         MR. CENTOLA:  Sure.  You said, "Are you
20 relying on his report?"  The question is are you
21 relying on data in his report?  Are you relying on
22 the entire report?  Did you use some of the
23 information in the report to impart his opinion
24 or -- you're -- it is an imprecise question.
25         MR. HOROWITZ:  I got you.

1          MR. CENTOLA:  That's why there's a form
2     objection.  If you want to ask a precise question,
3     that's fine, but you can't say are you relying --
4     which part --
5          MR. HOROWITZ:  Objection, imprecise.
6     I'm with you, Larry.  I appreciate your explaining.
7          Q.    Doctor, are you relying upon
8     Dr. Madigan's report in forming your opinions in this
9     case?
10         MR. CENTOLA:  Objection to form.
11         A.    So the role of these reports is
12    described in paragraph 85.  "My understanding and
13    opinions are supported by the analyses and opinions
14    of the Plaintiffs' expert witnesses, Dr. Feigal,
15    Dr. Madigan, and Dr. Plunkett.  I have reviewed their
16    expert reports and I accept and consider their
17    assessments."
18         Q.    And to be clear, just so when you say
19    Plaintiffs' expert witnesses, Drs. Feigal and Madigan
20    and Plunkett are -- are witnesses such as yourself
21    who have been retained by Plaintiffs' counsel to
22    offer their opinions in these cases.  Is that right?
23         A.    That's my understanding.
24         Q.    And just as yourself, they are
25    compensated for the time they devote to preparing

Page 187

1  reports and giving depositions and providing these
2  opinions in this litigation.  Right?
3       A.    That's my understanding from their
4  reports.
5       Q.    And do you know how much money either
6  of -- or any of the three of them have been paid with
7  respect to this litigation?
8       A.    I have no idea.
9       Q.    Do you know how frequently these folks
10 testify on behalf of plaintiffs' lawyers and how much
11 of their income comes from providing reports for
12 plaintiffs' lawyers in litigations like this?
13      A.    I have no idea.
14      Q.    And when you were at FDA, and I saw
15 something in your report about the internal processes
16 at FDA when you function as a medical officer,
17 sometimes you -- and not infrequently, you would rely
18 upon subject matter experts for their reports that
19 were outside of your direct area.  Correct?
20      A.    I think it might be more accurate to say
21 I would take their analyses and conclusions and
22 recommendations into consideration.
23      Q.    Correct.  And when you did that at FDA,
24 it seems to me that you're suggesting you might be
25 skeptical sometimes of their -- of the experts that

1  sent you reports in areas outside of your own
2  expertise and you would do your own sort of
3  assessment or -- or -- or due diligence with respect
4  to the conclusions and recommendations they were
5  making.  Right?
6           A.    I don't think "skeptical" is the right
7  word in the sense that -- that, you know, I would
8  read their reports.  The reports might be something I
9  completely agreed with or I'd agree with in a narrow
10 way but there was a broader context for viewing their
11 conclusions.  Certainly I didn't feel, you know,
12 like, I must accept what they're saying.  But I don't
13 think I -- skeptical?  I didn't automatically accept
14 what they would say.  You know, I read it and
15 evaluate it accordingly.
16          Q.    And did you apply the same level of
17 rigor here when you looked at the retained
18 compensated expert reports from Dr. Feigal, Madigan,
19 and Plunkett?
20          A.    Yes.
21          Q.    Okay.
22                What exactly did you do to assess the
23 quality of their reports?
24          A.    The quality of their reports?
25          Q.    Let me ask that differently.  What

1  exactly did you do to get yourself comfortable with
2  the -- the conclusions or whatever -- whatever it was
3  that you were relying upon from each of their
4  reports?  What did you do?
5       A.    So what I would say as to -- you know,
6  first off, the areas that they were offering opinions
7  on I certainly have some knowledge of.  It's not that
8  I know nothing about it.
9             So, you know, what I would do with any
10 report -- and, honestly, it doesn't matter whether
11 they're compensated or not or even what side they're
12 on, I have to make up my own mind.  I'm not -- you
13 know, if I'm reading -- there's reports that I've
14 looked at from -- retained by opposing counsel,
15 not -- not talking just limited to this case, and I
16 don't say, well, they're retained by the other side,
17 they must be wrong.  That's not how science works.
18            You say, okay, from what I know of
19 methodology in this -- and some of this is
20 general about the things that lead to incorrect
21 conclusions and not specific to any field -- are
22 there any obvious errors here?  Can I understand what
23 they're saying?  Are their methods supported by
24 previous work in the field?  And if there's a
25 regulatory aspect or -- regulatory implications, do I

```
 1   have the information I need to apply it.
 2        Q.    Take a look at -- let's go back to your
 3   report, Exhibit 1, paragraph 91.
 4              You talk about how Dr. Madigan analyzed
 5   the results of four observational studies.  Do you
 6   see that?
 7        A.    Yes.
 8        Q.    And concluded that there was a
 9   significantly increased risk of PCIA in
10   docetaxel-containing regimens versus the
11   non-docetaxel containing regimens when analyzed
12   cumulatively, and, for three of them (including
13   Sedlacek 2006) on their own.  Do you see that?
14        A.    Yes.
15        Q.    That was a metaanalysis, right, that he
16   conducted?
17        A.    Well, I think -- I'm not sure.  It
18   depends on the exact definition of metaanalysis that
19   one is using.  But essentially in terms of pooling
20   the data here, I'm not sure that -- I prefer to refer
21   to it as a pooled analysis.
22        Q.    Okay.
23        A.    But at any rate.
24        Q.    Dr. Madigan performed what you would
25   call a pooled analysis.  Right?
```

Page 193

1  that in front of me.  But I guess --
2       Q.    I'm talking about a different order, Dr.
3  Ross.
4       A.    Okay.  That's fine.  I guess what I
5  would say is there are two different -- you're
6  talking about the legal system versus looking at it
7  as a -- from a regulatory science perspective.  Those
8  are two different things.
9       Q.    Well, not -- not exactly, Doctor.
10 You -- you cited Daubert yourself.  Right?  You just
11 mentioned you understand that there are Daubert
12 decisions, and you know what that is, that the
13 Court's gatekeeping role on the reliability of the
14 methodology used --
15             MR. CENTOLA:  We're not here to argue
16 law, are we?  We're going to stick to science?
17      Q.    Doctor, you used the word "Daubert."
18 Right?  Can you answer my question?  You understand
19 what that is.
20      A.    I know it's a legal -- it's a case that
21 was applied in from -- in terms of expert witness.
22 It's not a regulatory concept, however.
23      Q.    It's a reliability of methodology
24 concepts.  Right?
25             MR. CENTOLA:  Objection to form.

```
 1        A.      That is also not what I said.
 2        Q.      Okay.  Because what you're saying,
 3   honestly, Doctor, doesn't make any sense.  I mean,
 4   you know, you're saying, "I've got an opinion and
 5   they agree with it but I'm not relying upon them."
 6                So if you have an opinion and they agree
 7   with it but that's all you're doing, then they've got
 8   nothing to do with your report.
 9                MR. CENTOLA:  There's no question on the
10   table.  Can we ask questions?
11                MR. HOROWITZ:  There is a question.
12        Q.      Which is it, Doctor, are you relying
13   upon them or are you not?  That is the question.
14                MR. CENTOLA:  Well, that's a question
15   after a soliloquy.  Can we ask a question without
16   arguing with the witness.
17                MR. HOROWITZ:  I'm not arguing.  I'm
18   trying to understand.
19        Q.      You have to help me out here, Doctor,
20   because I really don't understand what you're saying.
21                I don't understand the role that you
22   think these reports play with respect to your report.
23   Could you explain that to me.
24        A.      So I'm trying to answer your question,
25   which is in terms of I don't need their report.  I
```

Page 197

1  did not conduct the exercise of saying, well, let's
2  pretend I never saw these, would I still reach the
3  same conclusion?  I haven't done that nor would I do
4  that.  I mean, that's not the way that science works.
5  You don't say, well, what can I exclude here?  I
6  understand that exclusion or inclusion of evidence in
7  law in extremely important and I understand that, but
8  I'm not a lawyer and that's -- I'm a regulatory
9  expert.
10              Secondly, I don't -- in terms of "rely
11 on," I'm -- again, I use this wording and I don't say
12 that from my understanding and opinions I rely on the
13 analyses.  I also don't say I don't rely on them.  I
14 do say that my opinions are supported by the analyses
15 and opinions of plaintiffs' expert witnesses.  And,
16 again, I'm afraid I'm going -- that's the best I can
17 do to explain it.
18      Q.    Doctor, did you yourself do a pooled
19 analysis of the four articles that Dr. Madigan
20 analyzed, the four observational studies?
21      A.    No.
22      Q.    Did you, yourself, do an analysis of the
23 FAERS database that Dr. Madigan looked at?
24      A.    No.  I also paused because there was a
25 previous question in which you had posited that I,

```
 1   quote, agree with them.  What I said was --
 2        Q.    Let's not go back to a previous
 3   question, Doctor.  Answer the question in front of
 4   you, please.
 5        A.    I'm sorry, no.
 6        Q.    Mr. Centola can ask you questions at the
 7   end if you think there's something you want to go
 8   back to.
 9              And with respect to -- well -- and you
10   certainly didn't analyze the methodology that
11   Dr. Madigan used to conduct his FAERS analysis, did
12   you?
13        A.    I reviewed it.  If there had been
14   something that I did not find acceptable, I wouldn't
15   have written, "I accept and consider their
16   assessments valid. "
17              So I don't know if analyze it is what
18   you would say, but I -- I -- it was -- I did not
19   simply read the last paragraph of their -- either
20   reports, I guess I would say.  So --
21        Q.    I'm sorry.
22        A.    Please go ahead.
23        Q.    Sorry.  Did you verify whether or not
24   Dr. Madigan followed the same FDA guidance and best
25   practices that drug manufacturers should follow?
```

Page 199

1    A.   Which specific guidance are you -- or
2 best practices are you referring to?
3    Q.   Can you answer my question?  I mean, did
4 you do any sort of assessment as compared to any
5 particular guidance?
6    A.   There are hundreds of guidances that FDA
7 has issued including a large number on biometrics and
8 analysis, so I can't answer that question unless you
9 say did you look to see if you followed this or that
10 or the other thing.  So if you can do that, I can
11 answer your question; otherwise, I mean,
12 there's -- besides the guidances, there's -- you
13 know, I -- I can't answer that unless you say here's
14 what I'm talking about.
15    Q.   Did you look at any of them in
16 comparison to -- not in comparison, but when you were
17 assessing Dr. Madigan's analysis, did you look at any
18 of the guidances with respect to best practices on
19 post-marketing surveillance to see where his
20 methodology stacked up?
21    A.   So guidances and
22 scientific -- statistical, rather, and clinical trial
23 issues come first and foremost out of the underlying
24 science.  So if something is consistent with not just
25 the guidance but starting with the science, that's

Page 200

1  what I'm looking for.
2       Q.    I'm not asking --
3       A.    If I could -- if I could finish.
4       Q.    You're not answering my question.
5       A.    Well, the answer is these are guidances
6  for industry, so I'm not going to look at that with
7  respect to Dr. Madigan.  What the --
8       Q.    What about guidances -- oh, I'm sorry.
9  I thought you were done.
10      A.    I'm going to say, I, you know, did not
11 consult a whole slew of reference works that weren't
12 applicable.  There's a whole universe of those.  So,
13 no, I would not look at that because it wouldn't help
14 me.
15      Q.    What about any -- there are -- there are
16 maps and internal processes and procedures and
17 guidances within FDA for medical officer reviewers.
18 Right?  Are you familiar with those?
19      A.    Yes.
20      Q.    Did you look at any of those and make an
21 assessment as to whether Dr. Madigan was in
22 compliance with any of those guidances or protocols?
23      A.    That was not only -- it would be not
24 only irrelevant but potentially the wrong thing to
25 do.  So, again, it's -- he's not an FDA employee, was

Page 201

1   not doing this as a regulatory expert; so, no.
2        Q.   Are you offering an opinion that Hospira
3   was required to conduct an analysis of all of the
4   FAERS data regarding docetaxel before it submitted
5   it's 505(b)(2) application?
6        A.   Again -- again, I've not offered and I
7   do not anticipate offering any opinions about what
8   Hospira did prior to approval to get approval.
9        Q.   Paragraphs 91 to 94 you discuss the
10  medical literature that you cite.  Do you see that?
11       A.   I'm sorry.  Please go ahead.  I'm sorry.
12  I knocked over a cup.  Can you repeat the question?
13       Q.   I'm sorry.  Do you need a second, Doc?
14       A.   No, there was nothing in it.  I'm sorry.
15  Can you just repeat the question?
16       Q.   Yeah, sure.
17            Paragraphs 91 to 94 you discuss medical
18  literature.  Correct?
19       A.   Yes, that's correct.
20       Q.   Did you do your own independent review
21  of that literature or are you simply relying upon
22  what Dr. Feigal or Plunkett did?
23            MR. CENTOLA:  Objection, form.
24       A.   So, again, I reviewed their reports, and
25  I'm excerpting from those reports studies that I