UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                          MDL NO. 2740
PRODUCTS LIABILITY LITIGATION


                                                     SECTION "H" (5)

THIS DOCUMENT RELATES TO
*Audrey Plaisance v. Hospira*, Case No. 2:18-cv-08086

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF
DR. ANTONELLA TOSTI

MAY IT PLEASE THE COURT:

Hospira claims that the opinions of Antonella Tosti, M.D. were not reliably formed and

should be excluded. However, this Court has already confirmed the medical diagnostic work of

Dr. Tosti in terms of methodology and expertise. Dr. Tosti's opinions track all relevant standards

for medical diagnostic work and thus may be presented to a jury. She is a respected expert

experienced in the diagnosis and treatment of permanent chemotherapy-induced alopecia (PCIA)

through clinical work pre-dating this case. For the reasons set forth below, Dr. Tosti's opinions

and conclusions are admissible by a preponderance of evidence, and the Court should deny

Defendants' motion to exclude Dr. Tosti's testimony.[1]

BACKGROUND

Dr. Tosti is a world-renowned clinical dermatologist who specializes in hair and has

studied PCIA for years.[2]  She sees and treats many women suffering from hair loss disorders,

---

[1] *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 590-91.

[2] *See* Ex. A to Defendants' Motion to Exclude Expert Testimony of Dr. Antonella Tosti*, Expert Report of Dr. Antonella Tosti, M.D., August 2, 2021 ("Tosti Report") at pp. 1-2.

particularly including PCIA, and has made important contributions to the medical literature on the condition.[3] Dr. Tosti clinically examined Plaintiff Audrey Plaisance herself on May 7, 2021.[4]

Dr. Tosti took a detailed clinical history of Ms. Plaisance and examined her scalp both with a "pull test" – a standardized procedure for diagnosing various kinds of alopecia – and with a dermatoscope (or "dermoscope" or "trichoscope"), which magnifies a patient's scalp 10–20 times.[5] Contrary to Defendant's assertions, Dr. Tosti was aware of Ms. Plaisance's prior history of temporary alopecia, as Ms. Plaisance self-reported it to Dr. Tosti during the course of her examination, and Dr. Tosti considered it and ruled it out in reaching her differential diagnosis.[6] Dr. Tosti implemented the accepted standard of a differential diagnosis to exclude all other possible types and causes as the substantial contributing factor of Ms. Plaisance's alopecia.[7] Dr. Tosti came to her conclusions independent of, and prior to, dermatopathology review by Dr. Curtis Thompson.[8] Dr. Tosti also took two scalp biopsies during her clinical examination of Ms. Plaisance for analysis.[9]  Those scalp biopsies were sent to Dr. Thompson for pathological evaluation.

Dr. Tosti often relies on pathology in diagnosing alopecia and confirming her conclusions.[10]  Dr. Thompson is a board-certified dermatopathologist with additional expertise in alopecic disease.[11]  Dr. Thompson performed a differential diagnosis from that pathology, determining that findings in both biopsies are consistent with PCIA.[12]  Dr. Tosti considered the

---

[3] *Id.* at pp. 12-19; *see* Ex. 1, Dr. Antonella Tosti, M.D. CV.
[4] *See* Def. Ex. A, Tosti Report, at pp. 20-37.
[5] *Id.* at pp. 20-37.
[6] *See* Ex. O to Defendants' Motion to Exclude Expert Testimony of Dr. Antonella Tosti, Deposition of Antonella Tosti, M.D., Sept. 20, 2021 ("Tosti Dep.") at p. 16:23-18:24; 87:24-89:22; 103:5-111:24.
[7] *Id.*
[8] *Id. see also* Ex. 2, In-Person Evaluation by Antonella Tosti, M.D., May 7, 2021 ("Tosti Exam"); *see also* Ex. 3, Dermatopathology Report of Curtis T. Thompson, M.D., June 2, 2021 ("Thompson Dermatopathology Report).
[9] *See* Def. Ex. A, Tosti Report at pp. 27-28.
[10] *See* Def. Ex. O, Tosti Dep. at p. 13-25:14:7; 151:1-12: 158:8-159:13.
[11] *See* Ex. 4, Expert Report of Curtis T. Thompson, M.D., August 2, 2021 ("Thompson Report") at p. 1.
[12] *Id.* at 1-3.

pathology findings of Dr. Thompson and concluded that docetaxel was the substantial contributing factor to causing Ms. Plaisance's permanent, irreversible alopecia.[13] Dr. Tosti provides a comprehensive analysis of her differential diagnosis and diagnostic conclusions in her Rule 26 expert report.[14]

## LEGAL STANDARD

Fed. R. Evid. 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge **will help the trier of fact to understand the evidence or to determine a fact in issue**;
>
> (b) the testimony is **based on sufficient facts or data**;
>
> (c) the testimony is the product of **reliable principles and methods**;
>
> (d) and the expert has **reliably applied the principles and methods to the facts of the case**.[15]

This version of Rule 702 "reflects the United States Supreme Court decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)." *Stephens v. Florida Marine Transporters, Inc.*, Case No. 12-1873, 2013 WL 11257508, at *2 (E.D. La. Sept. 3, 2013). Under *Daubert*, in order to allow an expert's testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Id*. at 594.

---

[13] *See* Def. Ex. A, Tosti Report, at pp. 20-37.
[14] *Id.* at pp. 20-37.
[15] FED. R. EVID. 702 (emphasis added).

A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702.  Moreover, in order to be admissible, expert testimony must be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipaitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kumho*, 526 U.S. at 147).

A district court has broad discretion in deciding whether particular expert testimony is reliable.  *Daubert* itself lists a "non-exhaustive list of guideposts" for assessing reliability, such as (1) whether the technique in question has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community. *U.S. v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).  The purpose of a *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 150.  "[W]hether an expert's testimony is reliable is a fact-specific inquiry." *Burleson v. Texas Dep't of Criminal Justice,* 393 F.3d 577, 584 (5th Cir. 2004) (citation omitted).  Determining reliability under *Daubert* necessarily requires a flexible approach. *Moore v. Ashland Chem. Inc*., 151 F. 3d 269, 276 (5th Cir. 1998) (en banc).  In fact, the Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 138.

Additionally, testimony is admissible when "the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific

testimony and the specific facts of the case." *Tripkovich v. Ramirez*, No. 13-6389, 2015 WL

3849392, at \* (E.D. La. June 22, 2015) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579, 593 (1993)).  Expert testimony can be classified as relevant if "the reasoning or methodology

'fits' the facts of the case and will thereby assist the trier of fact to understand the evidence."  *Burst*

*v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

Beyond Rule 702's standard, Fed. R. Evid. 703 provides that an expert may offer opinions

based on otherwise inadmissible facts or data, but only if: (1) they are of the kind reasonably relied

upon by experts in the particular field; and (2) the testimony's probative value substantially

outweighs its prejudicial effect.  Fed. R. Evid. 703; *see Crowley v. Chait*, 322 F. Supp. 2d 530,

542 (D.N.J. 2004) ("The information upon which an expert bases his testimony must be reliable,

and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703,

which, in addition to Rule 702, must be considered by a court for *Daubert* purposes.").

The proposed testimony of Plaintiff's expert, Dr. Tosti, meets the standards for

admissibility under Rule 702 and *Daubert*.  Plaintiff, therefore, requests that the Court deny

Defendant's motion to exclude her proposed testimony.

## ARGUMENT

Plaintiff cannot say it better than the Court already has.  Therefore, a portion of the

Court's Order and Reasons related to Ms. Kahn's case is appended below:

> In the instant case, Plaintiff Kahn has offered evidence excluding
> the possibility that she suffered from permanent hair loss unrelated
> to her chemotherapy.  As previously noted, Dr. Tosti ruled out
> several conditions in her report before diagnosing Kahn with PCIA.
> Dr. Tosti also considered the chemotherapy drugs that Kahn took,
> and she ruled out Xeloda and Avastin.  She similarly gave due
> consideration to Adriamycin and Cytoxan, and while she may not
> have ruled them out with the same certainty as she did the other
> possible causes, she nevertheless ruled them out and pointed to
> Taxotere as the cause of Ms. Kahn's PCIA….If accepted by the jury,

Dr. Tosti's opinions are enough to carry Plaintiff's burden on specific causation."[16]

As the Court previously determined, Dr. Tosti is abundantly qualified to testify on specific causation concerning PCIA. Dr. Tosti employed a reliable methodology in determining that Ms. Plaisance has PCIA and in determining Ms. Plaisance's PCIA was substantially caused by docetaxel.

## I.     DR. TOSTI EMPLOYED A RELIABLE METHODOLOGY IN DETERMINING THAT MS. PLAISANCE HAS PCIA

### A.  Dr. Tosti Ruled Out Alternative Causes of Ms. Plaisance's Irreversible Alopecia

Hospira's argument that Dr. Tosti failed to rule out alternative causes of Ms. Plaisance's irreversible alopecia, namely endocrine induced alopecia, ignores the comprehensive differential diagnosis contained in Dr. Tosti's Rule 26 expert report and her specific consideration and ruling out of endocrine induced alopecia as an alternative cause.[17] Appropriately, Dr. Tosti refers to this robust analysis of her differential diagnosis and diagnostic conclusions as the "Diagnostic Ladder."[18]

As Hospira concedes, the standard method for assessing specific causation begins with a differential diagnosis that rules in all plausible causes and then rules those which are not the most likely cause out.[19] That is precisely what Dr. Tosti did in this case, and it is the exact same methodology that this Court has previously deemed reliable in both the *Earnest* and *Kahn* cases.[20]

---

[16] *See* Rec. Doc. 12401 at p. 12-13 of Kahn Order and Reasons on Tosti (internal citations omitted) *see also* Rec. Doc. 8095 (internal citations omitted) (this Court's finding that Dr. Tosti met the burden of specific causation in the Earnest case).

[17] *See* Def. Ex. A, Tosti Report, at pp. 20-37.

[18] *Id.* at pp. 20-37.

[19] *See* Rec. Doc. 13384 at p. 7.

[20] *See* Rec. Doc. 12401 at pp. 12-13 of Kahn Order and Reasons on Tosti (internal citations omitted) *see also* Rec. Doc. 8095 (internal citations omitted) (this Court's finding that Dr. Tosti met the burden of specific causation in the Earnest case).

Dr. Tosti began by taking a detailed clinical history from Ms. Plaisance in which Ms. Plaisance self-reported that she had experienced temporary alopecia in the past, prior to taking chemotherapy.[21] Dr. Tosti then conducted a clinical examination of Ms. Plaisance's scalp which revealed reduced hair density across the entire scalp, but more prominent on the androgen dependent portion of the scalp.[22] Ms. Plaisance's alopecia was found to be diffuse with the frontal, mid scalp and vertex displaying severe thinning without evidence of scarring.[23] Ms. Plaisance also suffered almost complete alopecia of her eyebrows and short and sparse eyelashes.[24] She had a negative pull test.[25] Furthermore, Dr. Tosti examined Ms. Plaisance's entire scalp with her dermoscope, which showed a lack of scarring and reduced follicular density with thin hairs.[26]

After her clinical examination of Ms. Plaisance, as described above, Dr. Tosti "ruled in" the potential conditions that could have caused Ms. Plaisance's alopecia based on her diffuse pattern of alopecia including: scarring alopecia, telogen effluvium, alopecia areata, anagen effluvium, androgenetic alopecia/endocrine therapy induced alopecia, and PCIA.[27] Her report details why she rules out all alternative causes and types of alopecia except PCIA in the course of her differential diagnosis.[28] As this Court noted in *Kahn*, Dr. Tosti is not assuming that because the Plaintiff has permanent hair loss, Taxotere/docetaxel must have caused it.[29] Rather, as this Court has previously recognized, Dr. Tosti conducts a differential diagnosis, and in doing so, considers and rules out the possibility that Plaintiff has permanent hair loss due to endocrine

---

[21] *See* Def. Ex. A, Tosti Report, at p.20-21.
[22] *Id.* at pp. 22-26.
[23] *Id.*
[24] *Id.*
[25] *Id.* at p. 26.
[26] *Id.* at pp. 26-27.
[27] *Id.* at pp. 29-36.
[28] *Id* at pp. 20-37.
[29] *See* Rec. Doc. 12401 at p. 5-13 of Kahn Order and Reasons on Tosti (internal citations omitted)

therapy, scarring alopecia, telogen effluvium, alopecia areata, anagen effluvium and androgenetic alopecia.[30]  This method is consistent with the same standard Hospira admits is proper.

In the instant case, Dr. Tosti first considered scarring alopecia as a cause of Ms. Plaisance's irreversible alopecia.[31]  Based on her dermoscopy images of Ms. Plaisance's scalp, Dr. Tosti was able to easily rule out scarring alopecia.  A scalp affected by scarring alopecia would show loss of follicular openings, but Ms. Plaisance's images were very different from this diagnostic feature because her images revealed the follicular openings were present with reduced follicular density.[32] There was also no pathological finding of fibrosis, which ruled out scarring alopecia in the areas of biopsy.[33]  Moreover, Ms. Plaisance's almost complete alopecia of eyebrows and short and sparse eyelashes are inconsistent with scarring alopecia.[34]  As such, Dr. Tosti properly "ruled out" scarring alopecia as an alternative cause of Ms. Plaisance's permanent alopecia.

Dr. Tosti next considered telogen effluvium, a condition characterized by excessive shedding, as a cause of Ms. Plaisance's alopecia.[35] The fact that Ms. Plaisance self-reported a prior episode of telogen effluvium and medical records noted a potential telogen effluvium episode prior to chemotherapy, was adequately considered by Dr. Tosti and ruled out as the ongoing cause of Ms. Plaisance's permanent alopecia.[36] Dr. Tosti ruled out this condition because Ms. Plaisance did not complain of excessive shedding and had a negative pull test at the time of examination.[37] Moreover, trichoscopy images of Ms. Plaisance's scalp reveal absence of regrowing hairs as compared to numerous short regrowing hairs of normal thickness that would be indicative of this

---

[30] *See* Def. Ex. A, Tosti Report, at pp. 20-37.
[31] *Id.* at pp. 29-30.
[32] *Id.*
[33] *Id.* at p. 30.
[34] *Id.*
[35] *Id.* at pp. 30-31.
[36] *See* Def. Ex. O, Tosti Dep. at p. 16:23-18:24; 87:24-89:22; 103:5-111:24.
[37] *See* Def. Ex. A, Tosti Report, at pp. 30-31.

condition.[38]  Dr. Tosti noted that although Ms. Plaisance is taking medication that can be associated

with telogen effluvium, and has a history of telogen effluvium in the past, telogen effluvium

resolved prior to chemotherapy.[39]  As a result, Dr. Tosti ruled out telogen effluvium due to Ms.

Plaisance's clinical presentation, including that her hair was lost during chemotherapy and never

returned to normal, she was not currently shedding more than normal, she had a negative pull test,

and her dermoscopy images were inconsistent with the diagnosis of telogen effluvium.[40]

Dr. Tosti next considered the condition of alopecia areata as a cause of Ms. Plaisance's

alopecia.[41]  She easily ruled out this condition after considering the many stark differences between

the hallmarks of alopecia areata and Ms. Plaisance's clinical presentation given that Ms.

Plaisance's hair loss was not in round areas, did not leave smooth patches completely devoid of

hair, and did not show broken and exclamation mark hairs.[42]  Additionally, Ms. Plaisance's pull

test was negative, whereas alopecia areata would present with a positive pull test.[43]

Dr. Tosti next considered the condition of anagen effluvium, which is caused by a number

of chemotherapy agents and scalp radiation.[44]  But anagen effluvium does not involve the loss of

hair follicles and would result in a very strong positive pull test.[45]  Accordingly, Dr. Tosti ruled

out anagen effluvium given Ms. Plaisance's loss of hair follicles, negative pull test, and long period

of lack of hair regrowth following treatment with chemotherapy.[46]

Here, much like in *Earnest* and *Kahn*, Dr. Tosti considered endocrine induced alopecia as

a part of her differential diagnosis in assessing whether the substantial contributing factor to Ms.

---

[38] *Id.*
[39] *Id.*
[40] *Id.*; *see also* Def. Ex. O, Tosti Dep. at p. 16:23-18:24; 87:24-89:22; 103:5-111:24.
[41] *See* Def. Ex. A, Tosti Report, at pp. 32-33.
[42] *Id.*
[43] *Id.*
[44] *Id* at p. 33.
[45] *Id.*
[46] *Id.*

Plaisance's hair loss is androgenetic alopecia.[47]  Importantly, Dr. Thompson determined that Ms.

Plaisance's biopsies were both positive for PCIA and did not find evidence of

androgenetic/endocrine induced alopecia.[48]  Dr. Thompson's findings are consistent with the same

conclusion reached by Dr. Tosti, which ruled out androgenetic alopecia and ruled in PCIA through

her clinical examination.

Hospira's allegations that Dr. Tosti employs a novel methodology for assessing endocrine

induced alopecia based solely on a definition of that such alopecia must occur after complete

regrowth after chemotherapy ignores the entirety of Dr. Tosti's differential diagnosis and extensive

testimony within the Taxotere/docetaxel MDL.  Although androgenetic alopecia can be caused by

endocrine therapy, many factors exclude this diagnosis for Ms. Plaisance, despite Hospira's claims

to the contrary.  First, androgenetic alopecia is patterned alopecia (at the top of scalp), not diffuse

alopecia, does not affect the eyebrows and eyelashes, and does not cause loss of hair follicles as

seen in Ms. Plaisance.[49]  Dr. Tosti further explained that Ms. Plaisance's clinical presentation does

not comport with androgenetic alopecia caused by endocrine therapy because the chronology is

not consistent with the condition, and neither is the presentation of the pattern.[50]

Although Hospira cites to trial testimony by Dr. Tosti during the course of the *Kahn* trial,

Hospira fails to point out testimony given by Dr. Tosti in relation to endocrine induced alopecia.

As Dr. Tosti testified at trial, it is important to consider whether a patient's hair condition improved

after stopping use of endocrine therapy as hair loss from endocrine therapy should resolve upon

---

[47] *Id* at pp. 34-35.
[48] Ex. 3, Thompson Dermatopathology Report.
[49] *Id.*; *see also* Def. Ex. A, Tosti Report at pp.34-35.
[50] *See* Def. Ex. A, Tosti Report at pp.34-35; *see also* Def. Ex. O, Tosti Dep. at 16:23-18:24; 87:24-89:22; 103:5-111:24; 222:1-1; 226:11-229:6; 242:6-243:3.

discontinuation.[51] Here, much like in Ms. Kahn's case, Ms. Plaisance has been off of hormone therapy for approximately three years, and her hair loss has not resolved.

Given these differences, Dr. Tosti ruled out androgenetic alopecia/endocrine induced alopecia as the substantial contributing factor in causing Ms. Plaisance's permanent alopecia.

### B. Dr. Tosti's Opinions Are Based on Sound Methodology and Remain Consistent Even in Light of Additional Medical Records.

Hospira attempts to have Dr. Tosti's conclusions in this case improperly excluded for an oversight of missing the review of a small subset of medical records prior to authoring her report. However, as Dr. Tosti testified to at length, the information contained within the medical records is consistent with the information Ms. Plaisance reported during the patient history of her clinical exam (although the years may be slightly off), and nothing within those medical records alters Dr. Tosti's conclusion that Ms. Plaisance suffers from PCIA as a result of her use of docetaxel. First and foremost, Dr. Tosti notes in her Rule 26 report that Ms. Plaisance had a history of excessive hair shedding (telogen effluvium) which resolved prior to undergoing chemotherapy treatment.[52] This self-reported history is consistent with information contained in Ms. Plaisance's medical records and does not alter the conclusions reached in this case regarding the ultimate cause of Ms. Plaisance's ongoing permanent alopecia.[53]

Furthermore, the alternative cause set forth in those medical records, that of telogen effluvium, is one which Dr. Tosti considered in her differential diagnosis and ruled out for the reasons stated above.

---

[51] Ex. 5, Trial Transcript of Dr. Tosti at the Elizabeth Kahn trial p. 654:12-22.
[52] *See* Def. Ex. A, Tosti Report at p. 21 and 31.
[53] Def. Ex. O, Tosti Dep. at pp. 193:14-194:6; 284:3-286:11.

### C. Dr. Tosti Was Able to Rule in – and Unable to Rule out – a Diagnosis of PCIA for Ms. Plaisance.

Dr. Tosti was able to rule in – and unable to rule out – a diagnosis of PCIA.[54] Ms. Plaisance exhibits all the features of PCIA. She lost her hair during chemotherapy and experienced incomplete hair regrowth.[55] She had reduced density over her whole scalp.[56] She had non-patchy loss of eyebrows and eyelashes.[57] Also, the dermoscopy examination of Ms. Plaisance showed a lack of scarring and reduced follicular density throughout the scalp.[58] Importantly, pathology evaluated by Dr. Thompson confirms the diagnosis of PCIA.[59]

Dr. Tosti therefore established specific causation through a complete differential diagnosis of "ruled in" conditions. She then meticulously "ruled out" the least plausible causes until the most probable cause, PCIA, remained. Dr. Tosti's methodology was comprehensive and reliable in concluding that Ms. Plaisance has PCIA as has been previously recognized by this Court in both *Earnest* and *Kahn*.

### II.    DR. TOSTI EMPLOYED A RELIABLE METHODOLOGY IN DETERMINING MS. PLAISANCE'S PCIA WAS CAUSED BY DOCETAXEL.

Contrary to Hospira's suggestion, Dr. Tosti performed all necessary work to exclude alternative causes and identified docetaxel as the cause of Ms. Plaisance's irreversible alopecia using reliable methodology. Furthermore, Dr. Tosti does not offer a general causation opinion of her own, but rather adopts the findings of Plaintiff's other experts, and issues her conclusions in this case in relation to specific causation alone.

---

[54] *See* Def. Ex. A, Tosti Report, at pp. 35-37.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*

**A. Dr. Tosti Performed a Full Differential Diagnosis Ruling out Other Forms and Causes of Alopecia for Ms. Plaisance.**

As described, *supra*, Dr. Tosti performed a comprehensive differential diagnosis in which she ruled out alternative causes of Ms. Plaisance's irreversible alopecia and ruled in PCIA.

**B. Dr. Tosti's Testimony Is Clear: Docetaxel Is the Most Likely Cause of Ms. Plaisance's PCIA and Methodology is Reliable.**

Based on her examination of Ms. Plaisance, Dr. Thompson's component pathology findings, Dr. Tosti's own extensive experience within the field, and the weight of scientific literature Dr. Tosti specifically identified docetaxel as the substantial contributing factor in causing the Plaintiff's PCIA. She did so on the basis of her education, the weight of the medical literature, her own research, and her own decades of clinical experience in the area of hair disorders, and PCIA specifically.

Despite this Court's clear prior rulings, Hospira nonetheless attempts to exclude Dr. Tosti's conclusions by characterizing them as general causation rather than specific causation opinions. To be clear, Dr. Tosti is not offering general causation opinions, nor has she ever held herself out as doing so. Thus, Dr. Tosti need not conduct a Bradford Hill analysis to offer a specific causation opinion, rather Dr. Tosti needs only to perform a differential diagnosis ruling in and ruling out alternate causes.[60] Dr. Tosti has clearly undertaken this process and her methodology meets the appropriate Daubert standard as previously recognized by this Court for specific causation.[61]

Dr. Tosti clearly explained her basis for attributing Ms. Plaisance's PCIA to docetaxel and not the cyclophosphamide that she took as part of her chemotherapy treatment. Dr. Tosti outlined

---

[60] *In re Taxotere*, No. 16-2740, 2019 WL 4007783, at *2 (E.D. La. Aug. 23, 2019) (citing *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 804 (E.D. La. 2011)).

[61] *See* Rec. Doc. 12401 at p. 12-13 of Kahn Order and Reasons on Tosti (internal citations omitted) *see also* Rec. Doc. 8095 (internal citations omitted) (this Court's finding that Dr. Tosti met the burden of specific causation in the Earnest case).

the histories of the chemotherapy drugs that Ms. Plaisance received and noted that prior to Taxotere/docetaxel coming to the market there were no reports of PCIA in breast cancer patients attributed to the use of cyclophosphamide.[62]   Next Dr. Tosti examined the literature in detail for reports of PCIA associated with any chemotherapy drugs used in early-stage breast cancer. Her results were alarming. The factor that substantially contributed to causing PCIA was the use of Taxotere (docetaxel) within a regimen.[63]  As Dr. Tosti concluded, cyclophosphamide was not the cause of Ms. Plaisance's PCIA – independent of docetaxel.[64]  Dr. Tosti explains that although there are case reports of PCIA with cyclophosphamide in the absence of docetaxel, they are very rare in nature compared to docetaxel regimens.[65]

Hospira attempts to denigrate Dr. Tosti's extensive review of the literature and her own clinical experience by misconstruing Dr. Tost's trial testimony in *Kahn*.[66]  However, a review of the trial transcript in that matter makes clear that Dr. Tosti did not arbitrarily count cases up and make her own determination as to which chemotherapy drug should be attributed as the causal agent. As she made clear, the determination of which chemotherapy drug caused the PCIA reported in each case report was determined by the authors of the paper and was subject to the rigors of peer review.[67] Dr. Tosti was unequivocal that she did not look through studies for reports of PCIA and then attribute them to Taxotere/docetaxel herself.[68]  Rather, it was the study authors who saw each patient and evaluated the patients' conditions and other risk factors; and it was the study authors who attributed causation to Taxotere/docetaxel—not Dr. Tosti.[69]  In fact, Dr. Tosti was very clear

---

[62] *See* Def. Ex. A, Tosti Report, at pp. 35-37.
[63] *Id*.
[64] *Id.*
[65] *Id.*
[66] *See* Rec. Doc. 13384 at 17-19.
[67] Ex. 5 *Kahn* trial transcript at 671:11-21; 678:19-679:1; 689:20-25; 693:9-694:8; 695:2-19; 703:12-19; 704:9-25; 883:6-884:6.
[68] *Id.*
[69] *Id.*

that the methodology Hospira suggests was used was not the methodology she implored, yet for

some reason Hospira fails to cite such language in its briefing.[70]  Dr. Tosti did not just report cases

of PCIA attributed to Taxotere/docetaxel—she reported *all* cases of PCIA attributed to *any*

chemotherapy drug in the early stage breast cancer setting.[71]

Dr. Tosti used reliable methodology to determine that docetaxel was the most likely case

of Ms. Plaisance's permanent alopecia. As this Court eloquently articulated in *Kahn*:

> After ruling out these [other] conditions and diagnosing Kahn with
> PCIA, Dr. Tosti then resorted to her experience and the literature to
> isolate Taxotere from the other chemotherapy drugs that Kahn took
> during treatment…She explained that Adriamycin and Cytoxan have
> been on the market since 1974 and 1959, yet the first cases of PCIA were
> described in 2011, when Taxotere was introduced in combination
> chemotherapy regimens.  In addition to this, Dr. Tosti relied on the work
> of Plaintiff's other experts to isolate Taxotere from other chemotherapy
> drugs.  Unlike the expert in *Comardelle*, Dr. Tosti considers the facts of
> Kahn's case and the properties of the chemotherapies to which Kahn was
> exposed.  The Court, therefore, will not exclude Dr. Tosti's testimony.
> Instead, Sanofi can raise challenges to her opinions before the jury.[72]

The Court need not veer from its reasoned judgment in this matter.  Dr. Tosti employed the

same methodology in Plaisance as this Court deemed reliable and admissible in *Kahn.*  Any issues

that Hospira may have regarding Dr. Tosti's conclusions in this case should be challenged before

the jury.  Just at this Court previously denied Sanofi's motions to exclude Dr. Tosti's expert

testimony on specific causation in the *Earnest* and *Kahn* matters, Hospira's motion to exclude her

testimony should likewise be denied.

## CONCLUSION

For these reasons, the Court should deny Hospira's motion to exclude expert testimony of

Dr. Tosti.

---

[70]  *Id* at 704:9-25.
[71] *Id.* at 711:5-12.
[72] *See* Rec. Doc. 12401 at p. 11 of Kahn Order and Reasons on Tosti (internal citations omitted)

Dated: December 7, 2021

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton
4701 Von Karman Ave.
Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2021, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all

counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS