# EXHIBIT 5

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

****************************************************************
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                         Civil Action No. 16-MD-2740
                         Section "H"(5)
                         New Orleans, Louisiana
                         November 10, 2021

THIS CASE RELATES TO ELIZABETH KAHN 16-CV-17039
****************************************************************

                    TRANSCRIPT OF JURY TRIAL
          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                  UNITED STATES DISTRICT JUDGE
                     DAY 3 AFTERNOON SESSION
```

<u>APPEARANCES:</u>

FOR THE PLAINTIFF:

                              MATTHEW PALMER LAMBERT
                              GAINSBURGH BENJAMIN DAVID MEUNIER
                              & WARSHAUER
                              1100 POYDRAS STREET
                              SUITE 2800
                              NEW ORLEANS, LA 70163


                              CHRISTOPHER COFFIN
                              PENDLEY BAUDIN & COFFIN
                              1515 POYDRAS STREET
                              NEW ORLEANS, LA 70112


                              KAREN BARTH MENZIES
                              GIBBS LAW GROUP
                              400 CONTINENTAL BOULEVARD
                              EL SUGUNDO, CA 90245


                              DARIN L. SCHANKER
                              BACHUS & SCHANKER
                              1899 WYNKOOP STREET
                              SUITE 700
                              DENVER, CO 80202

| | | |
|---|---|---|
| 02:07:27PM | 1 | occurs in women taking endocrine treatment after chemotherapy |
| 02:07:36PM | 2 | usually for the treatment of breast cancer, okay.  And there |
| 02:07:41PM | 3 | are two types of endocrine therapies.  One are aromatase |
| 02:07:48PM | 4 | inhibitor and that's excluded; she was not taking those drug, |
| 02:07:52PM | 5 | and the other one is called tamoxifen.  So these medications |
| 02:07:58PM | 6 | can cause alopecia, which is very similar to androgenetic |
| 02:08:06PM | 7 | alopecia.  So an alopecia that affects the top of the scalp, |
| 02:08:12PM | 8 | and it's a gradual alopecia, usually it develops, the average |
| 02:08:21PM | 9 | time after starting the treatment is 16 months.  And she was |
| 02:08:26PM | 10 | taking tamoxifen, which is a medication that can cause these |
| 02:08:31PM | 11 | endocrine alopecia. |
| 02:08:33PM | 12 | Q.  So, Doctor, do you believe that Elizabeth Kahn |
| 02:08:36PM | 13 | suffers from endocrine-induced alopecia from the tamoxifen |
| 02:08:43PM | 14 | that she took for that nine-year -- nine-and-a-half-year |
| 02:08:47PM | 15 | period of time? |
| 02:08:47PM | 16 | A.  Okay.  That was definitely 100 percent not her first |
| 02:08:54PM | 17 | problem.  I believe her problem is persistent alopecia after |
| 02:08:58PM | 18 | chemotherapy.  It's impossible to tell if there was also a |
| 02:09:01PM | 19 | part of that in the situation because this is a complicated |
| 02:09:07PM | 20 | situation.  But what's important is she didn't improve after |
| 02:09:12PM | 21 | stopping the tamoxifen, which is what usually occurs with |
| 02:09:16PM | 22 | this type of treatment. |
| 02:09:17PM | 23 | Q.  So based on the totality of the evidence you looked |
| 02:09:20PM | 24 | at and what you shared with the jury, does -- is it more |
| 02:09:24PM | 25 | likely true than not, does Elizabeth Kahn suffer from |

02:38:22PM 1    **A.**   Okay.

02:38:23PM 2    **Q.**   And that's been provided to the court and counsel.

02:38:26PM 3    Is this the notes that you scratched out --

02:38:26PM 4    **A.**   Yes --

02:38:30PM 5    **Q.**   -- to speed it up?

02:38:31PM 6    **A.**   -- I did that.  You know, I did fast, so there is

02:38:34PM 7    also some mistakes in the name, but it's my note.

02:38:37PM 8    **Q.**   Okay.  So what were your findings then with regard to

02:38:44PM 9    Martíne?

02:38:44PM 10   **A.**   So --

02:38:45PM 11   **Q.**   What did -- now, is this you reporting this or

02:38:50PM 12   Martíne?

02:38:51PM 13   **A.**   No.  All these cases are reported by the authors.

02:38:57PM 14   **Q.**   By who?

02:38:58PM 15   **A.**   By the person who saw the patients and wrote the

02:39:00PM 16   paper.  Not by me.

02:39:02PM 17   **Q.**   So what does Dr. Martíne attribute -- in those

02:39:08PM 18   patients that he looked at, what does he attribute the PCIA

02:39:10PM 19   to?

02:39:10PM 20   **A.**   He attribute 37 cases to Taxotere, including 36 cases

02:39:18PM 21   of Grade 2.

02:39:20PM 22   **Q.**   Okay.  And I represent that we counted out these

02:39:25PM 23   balls, 37 of these.

02:39:28PM 24   **A.**   Okay.  37 is the old Taxotere.

02:39:33PM 25   **Q.**   So this is the -- so that's all grades, meaning,

02:49:08PM **1**   one in A and C?

02:49:09PM **2**        A.   One in A and C, and the next one is two.

02:49:15PM **3**        Q.   They specifically broke it out as Grade 2?

02:49:18PM **4**        A.   Yes, yes, yes.

02:49:19PM **5**        Q.   Doctor, did you consider Fonia?

02:49:33PM **6**        A.   Yes, eight Taxotere.

02:49:36PM **7**        Q.   All grades?

02:49:37PM **8**        A.   All grades, eight.  Grade 2, two.

02:49:42PM **9**        Q.   Any other findings in Fonia?

02:49:52PM **10**       A.   No.

02:49:53PM **11**       Q.   Did you consider the Kang article, Doctor?

02:49:58PM **12**       A.   Yes.

02:49:59PM **13**       Q.   And what were the findings in Kang?

02:50:03PM **14**       A.   23 Taxotere.

02:50:12PM **15**       Q.   And is that all grades?

02:50:14PM **16**       A.   Yes, it's not divided.  We don't know.

02:50:19PM **17**       Q.   Not divided?

02:50:22PM **18**       A.   We don't know how many one, or how many two.

02:50:24PM **19**       Q.   Could you explain to the jury why, on some occasions,

02:50:26PM **20**   it's not divided out between grades?

02:50:30PM **21**       A.   I cannot tell that.  That's -- you have to ask the

02:50:36PM **22**   authors why they decided not to include this information.

02:50:40PM **23**       Q.   Now, is this your decision as how to attribute these?

02:50:45PM **24**       A.   No, no.  All the decision is from who saw the

02:50:49PM **25**   patients and published the paper.  So I don't know why they

02:50:53PM  1    didn't split.

02:50:53PM  2        **Q.**   Okay.

02:51:01PM  3        **A.**   Are you still on Kang?

02:51:02PM  4        **Q.**   Yes, we are.

02:51:03PM  5        **A.**   Because there are three A and C.

02:51:05PM  6        **Q.**   Three A and C.  And, Doctor, I skipped the Freites

02:51:12PM  7    map.  Do you see that?

02:51:13PM  8        **A.**   I don't understand what you ask me.

02:51:13PM  9        **Q.**   Freites-Martinez.

02:51:13PM  10       **A.**   Okay.

02:51:27PM  11       **Q.**   I apologize.  Pronunciation.  You speak Spanish?

02:51:30PM  12       **A.**   I do a little bit.  Living in Miami, you need.

02:51:33PM  13       **Q.**   Freites-Martinez.  Did you always that, and --

02:51:33PM  14       **A.**   Yeah.

02:51:39PM  15       **Q.**   -- did that break it out?

02:51:39PM  16       **A.**   So, yes, 38 Taxotere.

02:51:39PM  17       **Q.**   Okay.

02:51:45PM  18       **A.**   Not divided -- so we don't know the information about

02:51:49PM  19    Grade 1 and Grade 2.

02:51:52PM  20       **Q.**   And Freites-Martinez had --

02:51:56PM  21       **A.**   47 Taxol and 13 A and C.

02:52:10PM  22       **Q.**   Now, Doctor, do you have particular knowledge of

02:52:16PM  23    Freites-Martinez?

02:52:16PM  24       **A.**   Of course.  I know Freites-Martinez because we

02:52:21PM  25    published an article together.  I don't think I've even ever

03:09:00PM  1    is a treatment that doctors utilize for many disease but can

03:09:06PM  2    definitely improve.  I don't think that in her case, it would

03:09:12PM  3    have made a real big change but could have cause some

03:09:19PM  4    improvement.  What's the negative part?  That, of course,

03:09:22PM  5    it's something that you have to put on your hair every day,

03:09:27PM  6    either in a solution twice a day or in a foam once a day.

03:09:32PM  7    And it's sticky and that, of course, make your hair more

03:09:37PM  8    difficult to style, so if you already have, you know, sparse

03:09:42PM  9    hair, it's not going to help to hide that problem.

03:09:47PM  10        Q.  Doctor, could you -- can you quantify the improvement

03:09:54PM  11   that someone with Grade 2 PCIA would get from using Rogaine?

03:10:00PM  12        A.  To be honest, I cannot, because everybody respond to

03:10:05PM  13   treatment differently.  Even if you look at the studies,

03:10:09PM  14   there were patients who had moderate improvement and even

03:10:14PM  15   great improvement and patients who had no improvement.  So

03:10:18PM  16   that is something you cannot tell without doing the

03:10:21PM  17   medication.  But what I think, if the question is, could

03:10:26PM  18   Elizabeth Kahn, after using Rogaine, going out without her

03:10:32PM  19   scalp being seen, I think not.

03:10:36PM  20        Q.  And, Doctor, just so we're clear, were there any in

03:10:43PM  21   your literature search with regard to Avastin or Xeloda, were

03:10:49PM  22   there any that you found in the literature that the authors

03:10:52PM  23   attributed PCIA to either of these two chemotherapy drugs

03:10:55PM  24   that Elizabeth Kahn --

03:10:56PM  25        A.  Not that I found.

03:28:10PM 1   over the literature on this topic.

03:28:12PM 2      Q.  Okay.  Let me go back to my question.  I just want to

03:28:17PM 3   get on the same page as you here, okay?

03:28:20PM 4      A.  Yes.

03:28:20PM 5      Q.  You did a comprehensive review of the medical

03:28:24PM 6   literature, correct?

03:28:24PM 7      A.  Yes.  I did a comprehensive review of the medical

03:28:28PM 8   literature.

03:28:28PM 9      Q.  Okay.  And when you did that comprehensive review of

03:28:32PM 10  the medical literature, you were specifically looking for

03:28:35PM 11  reports for cases of permanent chemotherapy-induced alopecia,

03:28:45PM 12  correct?

03:28:45PM 13     A.  No, this is not correct.  I look for studies on this

03:28:49PM 14  chemotherapy, permanent alopecia after chemotherapy.

03:28:49PM 15     Q.  Yes?

03:28:52PM 16     A.  So not just two reports.  It's very different.  I

03:28:55PM 17  want to clarify the jury.  You know, we said that before,

03:29:00PM 18  there are reports and when it's just a few cases, there are

03:29:04PM 19  studies.  Well, the authors specifically look at the problem.

03:29:12PM 20  So I did a comprehensive review that include studies,

03:29:16PM 21  retrospective, prospective, and case report.

03:29:20PM 22     Q.  Okay.  Doctor, I'm asking something really super

03:29:24PM 23  simple and maybe we're just misunderstanding each other here

03:29:28PM 24  at the outset.  All I'm saying to you, Dr. Tosti, is when you

03:29:33PM 25  looked through these studies, okay, and if you saw that there

03:29:36PM 1  was a report, which I think is what one of these pom-poms is

03:29:41PM 2  supposed to represent, a person who reported permanent

03:29:45PM 3  chemotherapy-induced alopecia, you counted that, right?

03:29:50PM 4      A.   No, because the authors counted that.  So that's not

03:29:56PM 5  what I did.  I just review what other scientists did and then

03:30:01PM 6  I, like, summarize the results of other scientists, which is

03:30:07PM 7  different from me going in a paper and picking out cases.  I

03:30:11PM 8  just review the paper and summarize the results.

03:30:15PM 9      Q.   Okay.  Maybe I'm not being quite articulate enough.

03:30:19PM 10  Let me see if I can ask the right question.  So you looked at

03:30:23PM 11  the studies or the papers, and then you looked for what were

03:30:29PM 12  the number of cases of permanent chemotherapy-induced

03:30:35PM 13  alopecia in that study, correct, whatever was reported by the

03:30:39PM 14  authors?

03:30:40PM 15      A.   Yes.  What was reported by the authors.

03:30:42PM 16      Q.   Thank you.

03:30:43PM 17      A.   That was not I choose.  That was their work.  I

03:30:46PM 18  summarize their work.

03:30:48PM 19      Q.   Ma'am, I understand.  You did not recount the cases,

03:30:51PM 20  you looked at what the authors reported.  I mean, ma'am, you

03:30:54PM 21  just sat here for 30 minutes as plaintiff counsel poured

03:30:59PM 22  pom-poms into containers and you read him numbers from

03:31:03PM 23  studies, correct?  Yes?

03:31:04PM 24      A.   I checked the numbers from studies, yes.

03:31:07PM 25      Q.   You read him numbers from studies, true?

03:31:08PM 1     **A.**   Yes.  That's why I think this is clear, yes.

03:31:10PM 2     **Q.**   Okay.  So we're making a little progress.  Every one

03:31:16PM 3  of those numbers that you read from a study when he'd say,

03:31:20PM 4  oh, the Kang study, or the Martin study, or whatever they

03:31:24PM 5  were, you would give him a number, you would say 15, 22,

03:31:29PM 6  right?  Yes?

03:31:29PM 7     **A.**   Yes.  That's what the authors reported for that

03:31:31PM 8  study.  Now, I think this is different because the jury has

03:31:35PM 9  to understand that it's not me that attributed that case to a

03:31:39PM 10  drug; is that doctor who saw the patient, who evaluated

03:31:43PM 11  everything, who took that decision.  So my decision is a

03:31:48PM 12  reviewer decision.

03:31:50PM 13     **Q.**   Okay.

03:31:51PM 14          THE COURT:  You just have to answer the question,

03:31:53PM 15  Dr. Tosti.

03:31:55PM 16          THE WITNESS:  Yes, I answer the question.  Yes.  But

03:31:56PM 17  I didn't pick out -- I want to clarify, I was not the one who

03:32:00PM 18  choose.  You know, the authors were the one who attributed

03:32:05PM 19  the cases to the drug.

03:32:08PM 20  BY MS. SASTRE:

03:32:08PM 21     **Q.**   Okay.  All right.  And so again, if I understand

03:32:10PM 22  correctly, for example, this red, I guess this is a pom-pom,

03:32:16PM 23  right?

03:32:16PM 24     **A.**   To be honest, I don't know exactly because I don't --

03:32:20PM 25  that I didn't touch.  It may be a ball.  I don't know,

03:40:40PM **1**    Q.  Now, Dr. Tosti, I know we just talked a moment ago

03:40:45PM **2**  about the idea of you counted the number of cases that had

03:40:49PM **3**  been reported and then you added them up and let's just stick

03:40:53PM **4**  to Taxotere for a moment, okay.  And that's something that

03:40:56PM **5**  you just said that you did, correct?

03:40:57PM **6**    A.  I did review the literature and summarize what the

03:41:02PM **7**  authors reported.

03:41:05PM **8**    Q.  Doctor, you wrote down the number that had been

03:41:10PM **9**  reported for cases of Taxotere chemotherapy-induced hair loss

03:41:15PM **10**  and then you added them up, right?

03:41:17PM **11**    A.  Yes, I reviewed and added them.

03:41:18PM **12**    Q.  Very good.  But, Doctor, you would agree with me that

03:41:20PM **13**  you can just not count reports in a paper and make a

03:41:24PM **14**  conclusion as to which one of the drugs in that paper has a

03:41:28PM **15**  greater risk, true?

03:41:30PM **16**    A.  That's why I didn't do that.  I just reported what

03:41:35PM **17**  the authors -- authors concluded.  I didn't look at the

03:41:39PM **18**  papers and add the cases with myself deciding what's -- which

03:41:47PM **19**  was the cause, you know.  That's not what I did.

03:41:52PM **20**    MS. SASTRE:  So, Your Honor, I would ask that I get

03:41:54PM **21**  an answer first and then, of course, the witness may explain.

03:41:57PM **22**    MR. SCHANKER:  Your Honor, it's been asked and

03:41:59PM **23**  answered multiple times.

03:42:01PM **24**    THE COURT:  Well, I think that -- you do need to get

03:42:04PM **25**  an answer.  I think -- Dr. Tosti, I think the question is,

03:42:15PM 1    did the authors -- maybe that's --

03:42:21PM 2          MS. SASTRE:  Could I try one more time, Your Honor?

03:42:23PM 3          THE COURT:  Why don't you try one more time?

03:42:25PM 4    BY MS. SASTRE:

03:42:26PM 5      Q.   Okay.  Dr. Tosti, my question is with regard to the

03:42:29PM 6    method that you've employed here of counting reports and

03:42:34PM 7    adding them up, okay?

03:42:34PM 8      A.   No.

03:42:35PM 9      Q.   So wait, let me ask a question, okay?  And my

03:42:38PM 10   question is, you would agree with me that you cannot just

03:42:42PM 11   count the reports in a paper and make a conclusion on which

03:42:46PM 12   one of the drugs in that paper has a greater risk, right?

03:42:51PM 13     A.   Yes.  But this is not what I did.  And this should be

03:42:57PM 14   very clear to the jury because I want to clarify.  I didn't

03:43:00PM 15   go and pick out cases and -- I just summarize what the

03:43:06PM 16   authors of the papers, the scientist reported in their work.

03:43:12PM 17     Q.   And that's because, Doctor, you would also agree that

03:43:15PM 18   you cannot determine the risk for chemotherapies just by

03:43:21PM 19   counting the number of reports or in this case pom-poms,

03:43:26PM 20   right?

03:43:27PM 21     A.   I did -- I didn't do that.  I agree that's not the

03:43:32PM 22   right methodology.

03:43:32PM 23     Q.   Okay.

03:43:33PM 24     A.   But that's not the methodology that was used, so

03:43:37PM 25   maybe we agree, that's not what I did.

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3      *****************************************************************

 4      IN RE:  TAXOTERE
        (DOCETAXEL) PRODUCTS
 5      LIABILITY LITIGATION

 6                                    CIVIL ACTION NO. 16-MD-2740 "H"
                                      NEW ORLEANS, LOUISIANA
 7                                    NOVEMBER 12, 2021, 8:00 A.M.

 8      THIS CASE RELATES TO
        ELIZABETH KAHN,
 9      CASE NO. 16-CV-17039

10      *****************************************************************

11

12                         DAY 4  MORNING SESSION
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                   UNITED STATES DISTRICT JUDGE

14

        APPEARANCES:
15

16

17      FOR THE PLAINTIFFS:        GAINSBURGH BENJAMIN DAVID
                                   MEUNIER & WARSHAUER
18                                 BY:  M. PALMER LAMBERT, ESQ.
                                   1100 POYDRAS STREET, SUITE 2800
19                                 NEW ORLEANS, LOUISIANA 70163

20                                 PENDLEY BAUDIN & COFFIN
                                   BY:  CHRISTOPHER L. COFFIN, ESQ.
21                                      JESSICA A. PEREZ, ESQ.
                                   1515 POYDRAS STREET, SUITE 1400
22                                 NEW ORLEANS, LOUISIANA 70112

23

                                   GIBBS LAW GROUP
24                                 BY:  KAREN B. MENZIES, ESQ.
                                   400 CONTINENTAL BOULEVARD
25                                 6TH FLOOR
                                   EL SUGUNDO, CALIFORNIA 90245
```

*OFFICIAL TRANSCRIPT*

07:37:44

10:57:54  1          THE COURT:  All right.  Thank you.

10:57:54  2          (WHEREUPON, at this point in the proceedings, the bench

10:58:10  3   conference concluded.)

10:58:10  4          THE COURT:  Please proceed.

10:58:11  5   EXAMINATION BY MR. SCHANKER:

10:58:12  6   Q.   Doctor, as you sit here today, do you believe that the

10:58:17  7   exercise that we did on Wednesday fairly attributes the state

10:58:23  8   of the scientific literature?

10:58:24  9   A.   Yes, absolutely.  I think what we did is to review the

10:58:32 10   scientific literature and attribute each of those jars to one

10:58:39 11   of the medication that were considered the cause of the

10:58:48 12   androgenetic alopecia by the authors of the publications.

10:58:51 13   Q.   And thank you, Doctor.

10:58:55 14          And just to be clear, because Sanofi lawyer asked you

10:59:00 15   many questions about this on Wednesday, who made the decision

10:59:04 16   about where to attribute -- rather, what drug to attribute the

10:59:10 17   cause of PCIA to in these -- in your analysis?  Was that you

10:59:17 18   who made that decision?

10:59:17 19          MS. SASTRE:  Objection.

10:59:18 20   A.   No.

10:59:19 21          THE COURT:  Wait.  Wait.  Theirs is an objection.

10:59:21 22          MS. SASTRE:  Yes, Your Honor.  This is beyond the

10:59:24 23   scope.  I did not ask Dr. Tosti a single question about what

10:59:27 24   those authors attributed, whether there was any attribution of

10:59:33 25   that study of --

                          *OFFICIAL TRANSCRIPT*

10:59:33  1          THE COURT:  I'm going to overrule it.

10:59:35  2          MR. SCHANKER:  You can go ahead and answer.

10:59:38  3          THE WITNESS:  So the doctors who saw the patient and

10:59:43  4   then wrote the publication were the ones who attributed the

10:59:49  5   alopecia to the specific medications.

10:59:53  6          MR. SCHANKER:  Thank you.

10:59:53  7   EXAMINATION BY MR. SCHANKER:

11:00:24  8   Q.   Doctor, the Sanofi lawyer asked you a lot of questions

11:00:31  9   concerning what was referred to as your "study,"

11:00:40  10  "Freites-Martinez study."  Do you recall those questions?

11:00:42  11  A.   I remember we discussed this at --

11:00:45  12  Q.   Okay.  I want to talk to you about that.  This is the

11:00:56  13  study in which you're an author, correct?

11:00:59  14  A.   Yes.

11:00:59  15  Q.   This assessment of quality of life.

11:01:03  16  A.   Yes.

11:01:03  17  Q.   And you were explaining -- when asked questions by the

11:01:09  18  defense attorney, you were explaining that this was not a

11:01:12  19  prevalence study.  I want to ask you about that.  Okay?

11:01:16  20         MS. SASTRE:  Objection.  Your Honor, Counsel continues

11:01:18  21  to testify by what she said.

11:01:19  22         MR. SCHANKER:  Your Honor, I'm simply --

11:01:22  23         THE COURT:  I think you can frame the area that we're

11:01:24  24  going to and ask a question, but it can't be leading.  Thank

11:01:28  25  you.

                              *OFFICIAL  TRANSCRIPT*