## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL)**<br>**PRODUCTS LIABILITY LITIGATION** | **MDL No. 2740** |
| | **SECTION: "H"** |
| *Hilda Adams,*<br>**Case No. 2:16-cv-17583** | **JUDGE MILAZZO** |
| *Gloria J. Cooper,*<br>**Case No. 2:18-cv-00194** | **MAG. JUDGE NORTH** |
| *Carol Woodson,*<br>**Case No. 2:17-cv-12674** | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT ACCORD'S MOTION FOR SUMMARY JUDGMENT ON PREEMPTION GROUNDS

### INTRODUCTION

In this state law failure-to-warn suit, Defendants Accord Healthcare, Inc. and Accord, Inc. (collectively "Accord") seek federal immunity on the theory that Accord's drug is by and large a copy of Sanofi's Taxotere, and thus (the theory goes) Accord's drug labeling must follow Taxotere's. So, the theory concludes, as long as Accord follows Sanofi, Accord cannot be held liable under state law for the injuries its drug causes — even if Sanofi can be held liable for the injuries its drug causes — because Accord's federal "follow the leader" obligation supersedes any state-law duty to provide a different warning.

If this theory sounds familiar, it's because it's the theory behind federal preemption for duplicate (or "generic") drugs. "Follow the leader" is just another way of saying there is an ongoing federal duty of "sameness" that prevents Accord from unilaterally strengthening its warning label through the Food and Drug Administration's (FDA's) "changes-being-effected" (CBE) process.

But Accord didn't seek generic drug (i.e., 505(j)) approval. Accord sought and obtained approval for a new drug application ("NDA") (hence, their status in this MDL as a "505(b)(2)" defendant). And that makes all the difference preemption-wise. *Carter v. APP Pharmaceuticals, LLC*, 2013 WL 5532767, at *5 (D. Ariz. Aug. 13, 2013) (rejecting 505(b)(2) drug manufacturer's argument that its product was a generic drug subject to *PLIVA v. Mensing*'s preemption test). Under federal law, an NDA holder *is* responsible for the accuracy and adequacy of its label at all times, and the CBE process *is* available to it. Because "the CBE regulation permits [labeling] changes, … a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with both." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019).

Accord's contrary view represents a serious category error that the FDA itself has rejected. Accord draws a false equivalency between generic (or duplicate) drugs approved under Section 505(j) of the Food, Drug and Cosmetics Act (FDCA), and new drug applications approved under Section 505(b)(2), such as Accord's drug, claiming *both* must always follow the labeling actions of the manufacturer that originally submitted a new drug application under Section 505(b)(1) — here, Sanofi. But "there are *no analogues* in section 505(b)(2) to the provisions in section 505(j)" establishing Accord's purported sameness requirement. *See* FDA's Consolidated Response to Citizen Petitions at 18, Docket Nos. FDA-2001-P-0369 and FDA-2003-P-0274 (Oct. 14, 2003) (rejecting manufacturers' challenges to FDA's implementation of Section 505(b)(2)) (emphasis added) (attached as Pl.'s Ex. 1) (hereinafter, "Woodcock Letter"). "[Un]like those approved in ANDAs, products approved in 505(b)(2) applications [need not] be bioequivalent to, have the same conditions of use as, *and the same labeling* as the listed drugs referenced." *Id.* (emphasis added). Still more, "ANDAs must be withdrawn when the listed drug is withdrawn for safety or

effectiveness reasons (section 505(j)(6))." *Id.* (citation omitted). But for 505(b)(2) drugs, "there is no comparable withdrawal requirement when the listed drug is withdrawn for safety or effectiveness reasons." *Id.*

Accord's other preemption arguments are not predicated on its status as a 505(b)(2); rather, they merely rehash Sanofi's preemption position. Like Sanofi, Accord doesn't even attempt to satisfy the Supreme Court's demanding, two-part test for "impossibility" preemption, which this Court faithfully applied in *Earnest* and *Kahn*. *See In re Taxotere (Docetaxel) Prod. Liab. Litig.* [*Earnest*], No. 16-17144, 2019 WL 11660424, at \*4 (E.D. La. Aug. 14, 2019); *In re Taxotere (Docetaxel) Prods. Liab. Litig.* [*Kahn*], 508 F. Supp. 3d 71, 84 (E.D. La. 2021). Instead, Accord proposes (just as Sanofi did, unsuccessfully) a convoluted, burden-shifting test that places the onus of disproving preemption largely on Plaintiff. That is not the law — and this Court has already rejected this burden-shifting approach. *See In re Taxotere* [*Earnest*], 2018 WL 11660424, at \*7 ("Like the manufacturer in *Levine*, 'Sanofi misapprehends both the federal drug regulatory scheme and its burden in establishing a pre-emption defense.'") (brackets and citation omitted).

To show an actual conflict between federal and state law, a drug manufacturer must demonstrate that (1) "it fully informed the FDA of the justifications for the warning required by state law" and (2) "the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning." *Albrecht*, 139 S. Ct. at 1678. Accordingly, it is not enough for Accord to argue, as it does here, that *if it had submitted* a new label with additional warnings to the FDA, the FDA would have rejected the warning. The "possibility of impossibility is not enough" to establish an actual, irreconcilable conflict between federal labeling duties and state-law duties to warn. *Id.* at 1679 (citation omitted). What's more, preemption is further limited to where the FDA has *actually* rejected a proposed labeling change

through action "taken pursuant to the FDA's congressionally delegated authority." *Id*. Nothing of the sort occurred here.

For these reasons and more, the Court should deny Accord's motion for summary judgment based on preemption.

## STATUTORY AND REGULATORY BACKGROUND

The Federal Food, Drug and Cosmetic Act (FDCA), ch. 675, 52 Stat. 10440, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (Hatch-Waxman Amendment),[1] describes two broad categories for approval of drug applications: new drug applications, or NDAs, the requirements of which are set forth in Section 505(b) and (c) of the FDCA; and abbreviated new drug applications, or ANDAs, the requirements of which are set forth in Section 505(j).

The FDA's interpretation of these drug approval pathways and their corresponding regulatory obligations is set forth in great detail in the FDA's 2003 consolidated response to various citizen petitions, and that response reflects the FDA's current interpretation of Section 505(b)(2). *See* Pl.'s Ex. 2, *CDER*, Guidance for Industry, Determining Whether to Submit an ANDA or a 505(b)(2) Application 2 n.4 & 5 n.17 (May 2019) (citing Woodcock Letter). "The FDA's views are 'controlling unless plainly erroneous or inconsistent with the regulation[s]' or there is any other reason to doubt that they reflect the FDA's fair and considered judgment." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 461, 462 (1997)).

---

[1] To simplify, we cite Title 21 of the United States Code rather than the FDCA, except for Section 505(b)(1) and 505(b)(2) NDAs, and Section 505(j) ANDAs, which are commonly referred to by their FDCA designation.

Page **4** of **22**

As the FDA summarizes there, the Hatch-Waxman Amendments established an explicit regulatory pathway to approve duplicates of post-1962 drugs — Section 505(j). Woodcock Letter 6. This law also "created a new subset of NDA" — Section 505(b)(2) — which "permits an applicant seeking approval for a drug product that differs from the approved drug product to obtain approval without conducting new studies to demonstrate to the Agency what has already been demonstrated." Woodcock Letter 14.

Although a 505(b)(2) application may rely on a safety-and-effectiveness determination for a listed drug to the same extent as an ANDA, FDA regulations make clear that Section 505(b)(2) is not an appropriate pathway for a copycat drug eligible for approval under Section 505(j). Woodcock Letter 17 & n.18 (citing 21 C.F.R. §§ 314.54(b), 314.101(d)(9)). As such, and relevant here, there are important differences between 505(b)(2) new drugs and generic drugs.

For one, "there are no analogues in section 505(b)(2) to the provisions in section 505(j) requiring that the product under the 505(j) application be bioequivalent to, have the same conditions of use as, *and use the same labeling as the listed drug referenced*." Woodcock Letter 18 (emphasis added). For another, because ANDAs are duplicates of a reference listed drug (albeit sometimes with minor variations), and therefore are expected to have the same safety and effectiveness profile as a listed drug, an ANDA must be withdrawn when the listed drug is withdrawn because it is not safe or effective. Woodcock Letter 18 (citing Section 505(j)(6)). There is no comparable withdrawal requirement for products approved under Section 505(b)(2). *Id*.

The FDA prohibits the sale of a prescription drug in interstate commerce unless the FDA has given its approval. 21 U.S.C. §355(a). The FDCA, however, does not prohibit a manufacturer from changing the label of a brand-name drug post-approval, provided the label does not render

the drug "misbranded." *See id*. §§ 331(a), 352(a) (drug is misbranded "[i]f its labeling is false or misleading in any particular").

Under the current "changes being effected" or "CBE" regulation, a manufacturer may make "[c]hanges in the labeling to reflect newly acquired information" *without* prior FDA approval, if the change is "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under [21 C.F.R.] §201.57(c)." 21 C.F.R. § 314.70(c)(6)(iii).[2] This provision explicitly authorizes "***the holder of an approved NDA***" to unilaterally make such a label change. *Id*. § 314.70(c)(6) (emphasis added).

"Newly acquired information" is defined to include "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses)." *Id.* § 314.3. A manufacturer making such a label change must submit a supplement to the FDA regarding the change. If the FDA disapproves the CBE supplement, "it may order the manufacturer to cease distribution of the drug product(s) made with the ... change." *Id.* § 314.70(c)(6)(iii), (c)(7). A manufacturer can also apply for FDA approval to update the label through a "Prior Approval Supplement" ("PAS"), which requires prior approval by the FDA. *Id.* § 314.70(b)(2)(v)(A).

FDA regulations establish the format for drug labeling. Relevant here are two sections called "Adverse Reactions" and "Warnings and Precautions." The Adverse Reactions section includes a listing of all "undesirable effect[s], reasonably associated with use of a drug." 21 C.F.R.

---

[2] Before September 22, 2008, the CBE regulation did not contain a requirement that the label change "reflect newly acquired information," nor did it require that the change meet any threshold of evidence of causal association. *See* 21 C.F.R. § 314.70(c)(6)(iii) (2008); 73 Fed. Reg. 49,603 (2008) (amending regulation).

§ 201.57(c)(7). A manufacturer must list an adverse reaction if "there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id.* The Warnings and Precautions section, in turn, describes "clinically significant adverse reactions," and "limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification)." *Id.* § 201.57(c)(6)(1). This section "must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." *Id.* Since 2008, those standards also have applied to warnings added through a CBE supplement. *Id.* § 314.70(c)(6)(iii)(A).

If the FDA "determines that [it] will not approve" either an NDA or a labeling supplement "in its present form," it will "send the applicant a complete response letter." *Id.* § 314.110(a). The complete response letter "will describe all of the specific deficiencies that the agency has identified in an application." *Id.* § 314.110(a)(1). Complete response letters, however, merely "infor[m] sponsors of changes that must be made before an application can be approved, with no implication as to the ultimate approvability of the application." 73 Fed. Reg. 39588 (2008). A drug manufacturer who has received a complete response letter can "[r]esubmit the application ... , addressing all deficiencies identified in the complete response letter"; "[w]ithdraw the application"; or request a hearing at which FDA will make a final determination whether to approve or reject the application. 21 C.F.R. § 314.110(b).

Before 2007, FDA lacked authority to mandate that manufacturers change prescription drug labels. *Albrecht*, 139 S. Ct. at 1677. "[W]hen Congress granted the FDA this authority, in the 2007 Amendments to the FDCA, Congress simultaneously reaffirmed the manufacturer's obligations and referred specifically to the CBE regulation, which both reflects the manufacturer's

ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval." *Id.* (internal quotation marks and citation omitted).

## ARGUMENT

**I.      Accord fails to establish that the FDA would treat its drug like a generic drug product.**

There is no dispute that Accord is an NDA holder of the drug that injured Plaintiffs. And NDA holders using the 505(b)(2) approval pathway are not required to "use the same labeling as the listed drug referenced." Woodcock Letter 18 (emphasis added). Drug manufacturers like Accord, then, may use the CBE regulation to make "[c]hanges in the labeling to reflect newly acquired information" *without* prior FDA approval, if the change is "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under [21 C.F.R.] §201.57(c)." 21 C.F.R. § 314.70(c)(6)(iii). There is no distinction in the law between RLDs and 505(b)(2) drugs as to the availability of CBEs to provide safety information. The CBE provision explicitly authorizes "**the holder of an approved NDA**" to unilaterally make such a label change. *Id.* § 314.70(c)(6) (emphasis added).

Accord's status as an NDA holder thus defeats its main theory for "impossibility" of a label change. In *Carter v. APP Pharmaceuticals, LLC*, 2013 WL 5532767, at *5, a defendant drug manufacturer whose drug was approved via the 505(b)(2) pathway argued that its drug qualified as a generic for purposes of "impossibility" preemption analysis. The *Carter* court disagreed, holding:

> Plaintiff's claims are not preempted based on [*PLIVA v.*] *Mensing*. B.Braun has not shown based on clear authority that its heparin flush product is a generic drug or that it was required to "match" the Baxter Healthcare label in all respects regarding

its product. Defendants are not entitled to summary judgment based on preemption of Plaintiff's claims.

*Id*.

So too here, Accord is an NDA holder that availed itself of the 505(b)(2) pathway. It did not seek approval of its drug as a duplicate pursuant to Section 505(j). Drugs approved pursuant to Section 505(b)(2) are not subject to the "sameness" requirements that are imposed on generic drugs. Woodcock Letter 18; *see* Def.'s Ex. V, Rule 26 Expert Report of Dr. David Ross ("Ross Rep."), June 8, 2020. Labeling for drugs approved via the 505(b)(2) pathway that point to the same listed drug may even differ from one another. *See Takeda Pharm., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 108 (D.D.C. 2015) (rejecting challenge to FDA decision to approve different labeling for two substantially similar 505(b)(2) drugs), *aff'd in part, vacated in part*, No. 15-5021, 2016 WL 4098633 (D.C. Cir. July 15, 2016). What's more, the CBE regulation authorizes "the holder of an approved NDA" to unilaterally update its label to warn of a safety risk. *Id*. § 314.70(c)(6) (emphasis added). That regulation *does not* distinguish between types of NDAs. *See id*.

Accord was therefore required to update its label with warnings of an "undesirable effect," like permanent alopecia, that is "reasonably associated with use of [its] drug." 21 C.F.R. §201.57(c)(7). And this obligation arose as soon as "there [was] some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id.*

Nothing that occurred in 2016 alters these conclusions or establishes Accord's "need . . . to match the Taxotere label." (*See* Mot. at 11.) In 2016, Accord sought to update the adverse reactions section of its label to warn of permanent alopecia, just as Sanofi had updated the Taxotere label in 2015. But when Accord asked the FDA to update its label, it also added new language advising women not to become pregnant and to seek birth control. Def.'s Ex. S at 66. The FDA,

in response, *recommended* that Accord should not make those changes, which is unsurprising given that they were unsupported. *Id.* In any event, the FDA's commentary on birth control has no bearing on whether Accord, as an NDA holder, could update its label through CBE to warn of permanent alopecia.

Accord could have—and should have—made this change through a CBE submission, which it has failed to show was impossible under the circumstances, as set forth below.

## II.     Accord fails to establish preemption under *Albrecht*.

Under *Wyeth v. Levine* and *Merck v. Albrecht*, "[t]he underlying question for this type of impossibility pre-emption defense is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding *any and all* warnings to the drug label that would satisfy state law." *Albrecht*, 139 S. Ct. at 1678 (emphasis added); *see Levine*, 555 U. S. 555, 571 (2009). "And, of course, in order to succeed with that defense *the manufacturer* must show that the answer to this question is yes." *Albrecht*, 139 S. Ct. at 1678 (emphasis added).

To prove impossibility, a drug manufacturer like Accord must present "clear evidence that the FDA would not have approved a change to [the drug]'s label." *Levine*, 555 U.S. at 571. The "clear evidence" needed is "evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning." *Albrecht*, 139 S. Ct. at 1672.

To "show[ ] that federal law prohibited [a] drug manufacturer from adding a warning that would satisfy state law," the drug manufacturer must demonstrate that

> (1) "it fully informed the FDA of the justifications for the warning required
> by state law" and

> (2) "the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning."

*Id.* at 1678; *accord In re Avandia Mktg., Sales & Prod. Liab. Litig*., 945 F.3d 749, 758 (3d Cir. 2019).

In applying these factors, *see Albrecht*, 139 S. Ct. at 1680 (holding this preemption defense is for the judge not jury), courts must keep two important limitations in mind. *In re Avandia*, 945 F.3d at 758-59; *Crockett v. Luitpold Pharm., Inc.*, 2020 WL 433367, *7 (E.D. Pa. Jan. 28, 2020); *see also Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 890 (7th Cir. 2020).   First, "it is not sufficient for the proponent to contend that if it had submitted a new label—with additional warnings—to the FDA, the FDA *would have* rejected the warning." *Crockett*, 2020 WL 433367, at *7. As *Albrecht* explained, there must be an actual, irreconcilable conflict between federal and state law, "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." 139 S. Ct. at 1679 (quoting *Rice v. Norman Williams Co*., 458 U.S. 654, 659 (1982)). Simply put, the "possibility of impossibility [is] not enough." *Albrecht*, 139 S. Ct. at 1678 (quoting *Mensing*, 564 U. S. at 625, n.8 (internal quotation marks omitted)).

"Preemption is further limited in state law failure-to-warn situations [to] where the FDA has *actually* rejected a proposed labeling change through action 'taken pursuant to the FDA's congressionally delegated authority.'" *Crockett*, 2020 WL 433367, at *7. As the Third Circuit recently explained in *In re Avandia*, "the upshot of [*Albrecht*] is that a drug manufacturer must show that *the FDA made a fully informed decision to reject a change* to a drug's label in order to establish the 'demanding defense' of impossibility preemption." 945 F.3d at 759 (emphasis added) (citing *Albrecht*, 139 S. Ct. at 1678).

Accord cannot meet that demanding test.

## A. Accord cannot establish as a matter of law that it fully informed the FDA of the justifications for a stronger warning.

Accord argues that it is only responsible for monitoring the safety profile of its drug based on new data that existed between 2011, when its NDA was approved, and Plaintiffs' injuries in 2013 and 2014.[3] But federal law does not sanction Accord's blinkered approach to pharmacovigilance, which essentially presupposes that it can discharge this responsibility blind to whatever medical literature or data may have existed before 2011. To the contrary, although its post-marketing pharmacovigilance obligations began upon FDA approval, nothing in federal law allows Accord to ignore all evidence arising before then when evaluating drug safety. Such an approach would, by definition, lead to incomplete safety assessments. Accord's argument is wrong, and the company cannot get around this Court's ruling that "[t]he [2006] Sedlacek presentation … was enough to support a CBE change." *In re Taxotere*, 508 F. Supp. 3d at 85.

Had Accord performed proper post-marketing pharmacovigilance, it would have arrived at the conclusion that the low threshold for a label change — "some basis to believe" there exists an "undesirable effect, reasonably associated with use of a drug," 21 C.F.R. §201.57(c)(7) — had been met. And it would have done so shortly after its NDA was approved, based on the strength of the pre-2011 evidence of a causal association. But even notwithstanding that, this Court has held that, for purposes of preemption analysis, information on the risks associated with a drug may continue to accumulate over time. Indeed, "newly acquired information could be an increasing body of data of an inherent risk with the drug." *In re Celexa & Lexapro Mktg. & Sales Practices*

---

[3] As to what data was available to the company when Plaintiffs were injured, Accord does not attempt to distinguish between Plaintiffs Adams' and Woodson's 2013 injury dates and Plaintiff Cooper's 2014 injury date.

*Litig.,* 779 F.3d 34, 42 (1st Cir. 2015) (internal quotations omitted) (*citing Levine*, 555 U.S. at 571). And, as Plaintiffs' expert has opined, the data points kept adding up after Accord's NDA approval.

The question then is not, as Accord frames it, whether *individual* pieces of data, including medical papers and clinical trial data, constitute "newly acquired information." Rather, the relevant information is the safety signal Accord should have gleaned from the entire body of evidence, which only increased after 2011 with new medical literature supporting a causal association with permanent alopecia. Indeed, Accord and other 505(b)(2) manufacturers admitted knowledge of such associations in their foreign labels during these relevant years. It is an implausible argument that Accord had *no reason* to believe in a causal association when its competitors (and Sanofi's RDL) were acknowledging one in foreign labels. *See* Pl.'s Ex. 17; Pl.'s Ex. 18; Def.'s Ex. V; *see* 21 § CFR 314.80(b) (identifying sources for post-market safety data surveillance).

Nonetheless, the medical literature from 2011 to 2014 alone provides such a reason to believe. An article by Palamaras *et al.*[4] that was published in March 2011 (while Accord's NDA for docetaxel was pending) not only discusses additional patients with docetaxel-induced permanent alopecia, but also ties together pre-2011 articles examining the association between docetaxel and permanent hair loss. Likewise, following approval but prior to all three Plaintiffs' administration of docetaxel, an article published by Miteva *et al.*[5] in June 2011 in the American Journal of Dermatopathology discussed "the histological features of 10 cases of permanent

---

[4] Pl's Ex. 15, Palamaras I., *et al*. Permanent chemotherapy-induced alopecia: a review. J. Am. Acad. Dermatol. 2011 March; 604-606.

[5] Pl.'s Ex. 14, Miteva M., *et al*. Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am. J. Dermatopathol. 2011 June; 33(4): 345-350.

alopecia after systematic chemotherapy with taxanes (docetaxel)," including 6 cases in which the patients took docetaxel for breast cancer.

Next, Accord makes much of the fact that it was not privy to Sanofi's internal adverse event database before or after its NDA was approved. But analyses of the FDA's public Adverse Event database (FAERS) illustrate the accumulating signal of the risk of permanent alopecia associated with docetaxel at all relevant times. Dr. David Madigan's lasso logistic regression and L2 logistic regression analyses evidence an ***increased*** reporting rate of docetaxel against all other drugs at the end of 2011 and beyond.[6]  This publicly available data alone, if properly analyzed under industry-accepted methods, supports a causal association between docetaxel and permanent alopecia—Accord just didn't perform any such analysis. Just as in *Levine*, the drug manufacturer here "could have analyzed the accumulating data and added a stronger warning." 555 U.S. at 570.

In addition, there is Accord's docetaxel application to the European Union, which was submitted just *14 days* after Accord's U.S. approval. This application, with attached labeling, contained the 10-year follow up data from Sanofi's TAX 316 clinical trial demonstrating the risk of PCIA.[7]  Even though this submission was made by a different Accord entity—namely, Accord Healthcare, Ltd.[8], the submission itself demonstrates the public availability of this information. Moreover, it was made by Accord's global safety contractor, Lambda, which provides ***all*** of the pharmacovigilance for all of the Accord entities worldwide.[9]  Again, Accord's 1st quarterly

---

[6] Pl.'s Ex. 16, Madigan Rep., June 7, 2020, ¶¶ 39-48; Def.'s Ex. V, Ross Rep. ¶ 95.

[7] *See* Pl.'s Ex. 19, European Union Accord Docetaxel SmPC, 2 (acknowledging submission of application); *id.* at 19 (identifying TAX 316 data regarding persistent alopecia); *see also* Def.'s Ex. V, Ross Rep. ¶ 126.

[8] Accord Healthcare, Inc. and Accord Healthcare, Ltd are both subsidiaries under the same parent company, Intas Pharmaceuticals. *See* Accord U.S. Website at https://www.accordhealthcare.us/company-profile ("Accord is the commercial arm of Intas Pharmaceuticals…") (last visited Nov. 11, 2020).

[9] *See* Pl.'s Ex. 6, Dep. of Sabita Nair Oct. 7, 2019, 33:7-11, 33:21-34:2, 38:2-4, 47:17-23.

Periodic Adverse Event Reports ("PADERs") does not include follow-up data from TAX 316.[10] However, as a U.S. NDA holder for docetaxel, whose U.S. label included preliminary data from TAX 316, Accord should have included the final data as a part of the docetaxel molecule's safety profile and its 1st PADER. The final data was available to Lambda—it would have been discovered in foreign labeling surveillance and pharmacovigilance monitoring—and thus it was available to Accord.

Finally, Accord argues that there can be no newly acquired evidence because its PADERs did not identify any new adverse event reports. But Accord's failure to report the newly available information in its PADERs as described above does not negate its existence. (Def.'s Br. 10 and Accord SUMF ¶ 24.) As such, Accord's contention that there is zero evidence in the record that could have made such a difference is wholly without support.

### B. Accord fails to show that the FDA disapproved a state-law-required labeling change to warn of permanent hair loss.

Accord cannot establish the "demanding defense" of impossibility preemption for the separate and independent reason that the FDA never actually rejected a stronger warning for Taxotere concerning permanent hair loss. As *Crockett* explains, "it is not sufficient for the proponent to contend that if it *had* submitted a new label—with additional warnings—to the FDA, the FDA *would have* rejected the warning." *Crockett*, 2020 WL 433367, at *7. The "possibility of impossibility" is not enough to establish an actual, irreconcilable conflict between federal labeling obligations and state duties to warn. *Albrecht*, 139 S. Ct. at 1678 (citing *Mensing*, 564 U. S. at 625, n.8). To establish an actual conflict, a drug manufacturer must point to final agency action that prohibits it from complying with state-law duties. *Id*. at 1679.

---

[10] *See* Def.'s Ex. L, Accord PADERs 1st & 2nd Quarterly Reports (2011).

Accord's motion identifies nothing of the sort—nor does it attempt to. It claims only in passing (mem. at 23) that except for a few "rare instances" its label must follow Sanofi's lead. But as explained *supra*, because Accord is an NDA holder under the 505(b)(2) pathway (and not an ANDA holder under Section 505(j)), its docetaxel is not subject to the "sameness" requirements that are imposed on generic drugs and its label may even differ from other NDA holders' labels. Woodcock Letter 18; *see* Def.'s Ex. V, Ross Rep.; *see Takeda Pharm., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 108 (D.D.C. 2015) (rejecting challenge to FDA decision to approve different labeling for two substantially similar 505(b)(2) drugs), *aff'd in part, vacated in part*, No. 15-5021, 2016 WL 4098633 (D.C. Cir. July 15, 2016). The CBE regulation plainly authorized Accord, as "the holder of an approved NDA," to unilaterally update its label to warn of the risk of permanent alopecia. *Id*. § 314.70(c)(6) (emphasis added).

In sum, the FDA never disapproved a state-law-required labeling change to warn of permanent hair loss or any other stronger warning of such a risk, such as the warning adopted in 2015. Thus, Accord cannot establish preemption as a matter of law.

### C. Accord's arguments that Plaintiff bears the burden of disproving preemption should be rejected again.

Accord's attempt to shift the burden to Plaintiff to disprove preemption is contrary to law — and indeed, law of this case.

In *Earnest*, this Court applied *Albrecht*'s two-prong test and declined to find preemption when Earnest's use of Taxotere was in 2011. *In re Taxotere*, 2019 WL 11660424, at *4. There, as here, defendant argued that "the plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulation without prior FDA approval.'" *Id.* at *3. The Court rejected the argument and

recognized that, under Supreme Court precedent, the defendant bears the burden of showing by clear evidence that the FDA would have prohibited a warning. *Id.* at *3-4 ( "Like the manufacturer in *Levine*, '[Sanofi] misapprehends both the federal drug regulatory scheme and its burden in establishing a pre-emption defense.'") (quoting *Levine*, 555 U.S. at 569). The Court explained that "'newly acquired information' is not limited to new data, but also encompasses 'new analyses of previously submitted data.'" *Id.* at *3 (citing *Levine*, 555 U.S. at 569, and 73 Fed. Reg. 49604). Further, and most importantly, the Court held that it could not find preemption absent clear evidence that the FDA would have prohibited a warning. *Id.* at *4. The Court then placed the burden on Sanofi to present such clear evidence, which it could not then and Accord likewise cannot now.

The Court's ruling in *Earnest* is entirely consistent with federal decisions post-*Albrecht*. The Third Circuit in *In re Avandia* squarely placed the burden on the drug manufacturer to prove both parts of *Albrecht*'s two-part preemption test. 945 F.3d at 758-59. Likewise, the federal district court in *Crockett* rejected a drug manufacturer's attempt to shift the burden to Plaintiff to plead or prove that the FDA lacked knowledge of scientific data that would have supported a label change:

> Having failed to meet their burden, Defendants attempt to shift it to Plaintiff by suggesting that because "Plaintiff pled no facts supporting a reasonable inference that the FDA lacked knowledge of the existing scientific data when it approved Injectafer," her claims must be dismissed on impossibility preemption grounds. But preemption is an affirmative defense, and it is thus Defendants' burden, not Plaintiff's, to demonstrate that it applies. *See Wyeth*, 555 U.S. at 573.

2020 WL 433367, at *8.

More recently still, the court in *Evans v. Gilead Scis., Inc*., No. 20-CV-00123-DKW-KJM, 2020 WL 5189995 (D. Haw. Aug. 31, 2020), rejected the same arguments Accord makes here, concluding that the argument "misapprehends … [defendant's] burden in establishing its

preemption defense." *Id*. at *10. "[E]ven if there was little or no "newly acquired information" relevant to Evans' claims, that did not make it *impossible* for Gilead to change its Truvada label." *Id*. at *11. "The notion that perhaps there was not sufficient 'newly acquired information' or 'evidence of a causal association' between Truvada and the risk of injuries alleged here, 21 C.F.R. § 314.70(c)(6)(iii)(A), are merely two of any number of reasons for the FDA to reject the label changes after Gilead had made them. But federal law did not preclude Gilead from making a label change in the interim." *Id*.

Accord instead relies principally on a recent decision from the Fourth Circuit, which does not support disregarding the Supreme Court, the law of this case, or the persuasive decisions of other federal courts of appeals and district courts.[11]   Nor can the Court disregard Fifth Circuit precedent holding that "[f]ederal preemption is an affirmative defense that a defendant must plead and prove." *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012); *see also Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 802 (5th Cir. 2011) ("The party asserting federal preemption has the burden of persuasion.").

In any event, *Albrecht* is the death knell of Accord's burden-shifting approach to preemption. The Supreme Court explicitly stated that "in order to succeed with that defense the *manufacturer* must show" that it fully informed the FDA and that the FDA, in turn, informed the drug manufacturer that it would not approve a label change. 139 S. Ct. at 1678 (emphasis added).

---

[11] Accord also relies on cases dismissing failure to warn suits on the pleadings, several involving Gadolinium and several citing *Utts*, but those courts found no medical evidence and only conclusory allegations to support additional warnings. *See, e.g., McGrath v. Bayer HealthCare Pharm. Inc.*, 393 F. Supp. 3d 161, 171 (E.D.N.Y. 2019) (faulting "Plaintiff's own conclusory allegations, unsupported by medical evidence"); *Gayle v. Pfizer Inc.*, No. 19CV3451, 2020 WL 1685313, at *5 (S.D.N.Y. Apr. 7, 2020) (similar; granting judgment on the pleadings). These cases are factually far afield from this case. Further, Sanofi cites *Roberto v. Boehringer Ingelheim Pharm.*, Inc., No. CPLHHDCV166068484S, 2019 WL 5068452 (Conn. Super. Ct. Sept. 11, 2019), presumably because it cited *Utts*, but the court there concluded that "the plaintiff's GERD claim is not preempted." *Id*. at *24.

The Court also reiterated that "impossibility preemption is a demanding defense" that drug manufacturers will have difficulty meeting because they can unilaterally update labeling based on reasonable evidence of a serious drug hazard. *Id.* (quoting *Levine*, 555 U.S. at 573) (brackets removed). Thus, because of CBE, "a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with both." *Id.* Summary judgment based on impossibility preemption, then, is the exception not the rule. *See id.*

In the end, Accord's burden-shifting approach gets the law exactly backwards because it presumes that there is preemption unless a plaintiff can prove otherwise. To the contrary, there is a presumption *against* preemption based on the notion that "Congress does not cavalierly pre-empt state-law causes of action." *Levine*, 555 U.S. at 678 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Congress has long been aware of state drug litigation but has neither enacted a preemption clause nor a federal right of action; this is "powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring safety and effectiveness." *Id*. at 575.

For these reasons, the Court should put the burden squarely on Accord to prove the affirmative defense of preemption, which it cannot do.

## **<u>CONCLUSION</u>**

Presumably Accord made a business decision to seek an NDA for their version of docetaxel under Section 505(b)(2) (rather than an ANDA under 505(j)) of the FDCA. Because Accord's docetaxel is not a 505(j) generic drug, Accord cannot avail itself of *Mensing* generic preemption nor sidestep *Albrecht*'s demanding preemption test. Further, like Sanofi, Accord cannot prove impossibility preemption: It does not point to any attempted CBE change nor has it presented "clear evidence" that the FDA would not have approved a change to its drug label. Accord has

not proven entitlement to this demanding defense, and, therefore, Accord's motion for summary judgment based on preemption should be denied.

Dated: December 17, 2021                    Respectfully submitted,

/s/ Christopher L. Coffin                    /s/ Karen B. Menzies
Christopher L. Coffin (#27902)               Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.             GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225              6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                 Los Angeles, California 90045
Phone: (504) 355-0086                        Telephone: 510-350-9700
Fax: (504) 355-0089                          Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                       kbm@classlawgroup.com

Plaintiffs' Co-Lead Counsel                  Plaintiffs' Co-Lead Counsel

/s/M. Palmer Lambert                         /s/Dawn M. Barrios
M. Palmer Lambert (#33228)                   Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                    BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                     701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street      New Orleans, LA 70139
New Orleans, LA 70163-2800                   Phone: 504-524-3300
Phone: 504-522-2304                          Fax: 504-524-3313
Fax: 504-528-9973                            barrios@bkc-law.com
plambert@gainsben.com

                                             Plaintiffs' Co-Liaison Counsel
Plaintiffs' Co-Liaison Counsel

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2021, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all

counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT