# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                   **MDL NO. 2740**
**PRODUCTS LIABILITY LITIGATION**

                                        **SECTION "H" (5)**

**THIS DOCUMENT RELATES TO:**

*Alice D. Hughes, Case No. 2:17-cv-11769*

### DECLARATION OF DAVID B. ROSS, M.D., PH.D., M.B.I. IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO ACCORD'S MOTION FOR SUMMARY JUDGMENT ON PREEMPTION GROUNDS

I, Dr. David Ross, hereby declare:

1.     I am an expert retained by the Plaintiff in this litigation.  I have knowledge of the facts set forth in this declaration.  I submit this declaration in support of Plaintiff's Opposition and Response to Defendant's Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment and in support of Plaintiff's Opposition to Accord's Motion for Summary Judgment on Preemption Grounds.

2.     I am a licensed, board-certified physician who served for more than 10 years as a medical officer at the Center for Drug Evaluation and Research (CDER) in the U.S. Food and Drug Administration (FDA).  This declaration is made based on my knowledge, training, and experience.

3.     My qualifications, as reflected by my education, training, and experience, are described in ¶¶ 2 – 19 of my Expert Report of June 8, 2020, hereinafter referred to as "Ross Report."

**Terminology**

4.     In this declaration, the following abbreviations are used as follows:

1

    i.    AFSE, Agency's Finding of Safety and Effectiveness

    ii.    ANDA, Abbreviated New Drug Application

    iii.    CDER, FDA Center for Drug Evaluation and Research

    iv.    CFR, Code of Federal Regulations

    v.    FDA, United States Food and Drug Administration

    vi.    FDCA, Federal Food, Drug, and Cosmetic Act

    vii.    FR, Federal Register

    viii.    IND, Investigational New Drug Application

    ix.    MaPP, CDER Manual of Policy and Procedures

    x.    NDA, New Drug Application

    xi.    OGD, CDER Office of Generic Drugs

    xii.    OND, CDER Office of New Drugs

    xiii.    RLD, Reference Listed Drug

    xiv.    SMG, Staff Manual Guide

    xv.    USC, United States Code

5.    In this Declaration, the following terms are used as follows:

    i.    "Publicly available" means information that is readily accessible to the public, including information available through the FDA or the Government Printing Office, without the need to submit a request under the Freedom of Information Act (FOIA).

    ii.    "Drug" means an article defined as a drug under 21 USC 321(g).

    iii.    "Generic drug" is defined in the Generic Drug User Fee Act of 2012[1] and its renewal in 2017[2] as a drug approved under Section 505(j) of the FDCA.[3]

---

[1] The term "generic drug" is not defined; however, closely related terms, e.g., "generic drug submission," refer exclusively to ANDAs. PL 112-144, Sec 744A (7).

iv.   "Ross Report" means my Expert Report of June 8, 2020.

**Methodology**

6.   Based on my knowledge, training, and experience, when analyzing a FDA regulatory question, reaching correct regulatory conclusions requires use of appropriate methodology.

7.   Based on my knowledge, training, and experience, when analyzing a FDA regulatory question, failure to use appropriate methodology, or failure to use any methodology at all, will, more likely than not, result in reaching an invalid regulatory conclusion.

8.   My expert report describes the methodology used in performing my analyses.[4] Ross Report, ¶¶ 32 – 34.

9.   This Declaration describes the methodology in more detail, based on my knowledge, training, and experience.

10.   Based on my knowledge, training, and experience, the primary components of FDA regulatory methodology include FDA regulatory structures, processes, and outcomes.[5]

11.   Based on my knowledge, training, and experience, FDA regulatory methodology consists of the following steps:

i.   Identification of one or more FDA regulatory questions;

ii.   Determination of the regulatory structure(s) applicable to the questions(s);

---

[2] The term "generic drug" is explicitly defined in Sec. 809(c)(2) of PL 115-52 for purposes of a GAO study ordered under this act.

[3] See also definition of "generic drug" for purposes of Federal Trade Commission review in PL 108-173, Sec. 1111; also, PL 102-282, the Generic Drug Enforcement Act of 1992 refers exclusively to ANDAs.

[4] The reports submitted by Defense Experts (Roger Williams, M.D. and Dr. Agrawal) do not describe the methodology used to reach their regulatory conclusions. Similarly, the Statement of Undisputed Material Facts and the Memorandum of Law submitted in support of Defendant Inc.'s Motion for Summary Judgement do not describe the methodology used to reach regulatory conclusions.

[5] Ayanian JZ, Markel H. Donabedian's Lasting Framework for Health Care Quality. N Engl J Med. 2016 Jul 21;375(3):205-7. #

iii.    Application of relevant regulatory processes to relevant regulatory structures to generate regulatory conclusions;

iv.    Based on regulatory conclusions, deciding on one or more regulatory outcomes.

**FDA regulatory questions**

12.    For purposes of this Declaration, FDA regulatory questions concern actions or processes, i.e.:

   i.    What regulatory action should FDA take regarding a specific FDA-regulated product?

   ii.    What regulatory processes should FDA employ to decide on the regulatory action to take regarding a specific FDA-regulated product?

13.    Examples of action-related FDA regulatory questions include the following:

   i.    Should the FDA issue an approval letter or a complete response letter to an applicant who has submitted an NDA?

   ii.    Should the FDA accept an ANDA for review or issue a refuse-to-receive letter?

14.    Examples of process-related FDA regulatory questions include:

   i.    Is a specific FDA-regulated product a generic drug?

   ii.    Can the manufacturer of a generic drug, i.e., a drug approved under an ANDA, change the drug's label without prior approval from the FDA?

   iii.    Can the manufacturer of a drug approved under an NDA change the drug's label without prior approval from the FDA?

4

15.   FDA regulatory questions may be explicit, as with Question-based Reviews (QbRs) used by different offices within the FDA's Center for Drug Evaluation and Research (CDER), or implicit.[6]

16.   Answering a FDA regulatory question frequently requires answering a large number of subordinate regulatory questions, e.g., answering the regulatory question of whether the information in an NDA demonstrates a drug's effectiveness requires answering the subordinate regulatory question of whether the NDA contains "substantial evidence" of effectiveness,[7] which requires in turn answering the subordinate question of whether the NDA contains "adequate and well-controlled" investigations.[8]

FDA Regulatory structures

17.   Based on my knowledge, training, and experience, the primary regulatory structures are the hierarchies of regulatory principles applicable to the FDA; definitions of regulatory terms contained in these hierarchies; and data sources.

Regulatory principles

18.   Based on my knowledge, training, and experience, the highest level of the hierarchy of regulatory principles contains publicly available written principles binding on both FDA and pharmaceutical manufacturers. In order of descending authority, these are:

     i.    The U.S. Constitution;

     ii.   Federal statutes;

---

[6] E.g., in determining whether an ANDA is substantially complete meaning "an ANDA that on its face is sufficiently complete to permit a substantive review" as required under 21 CFR 314.101(b), explicit FDA regulatory questions are contained in Attachment 1 of CDER MaPP 5200.14, *Filing Review of Abbreviated New Drug Applications* (https://www.fda.gov/media/107325/download), while corresponding implicit questions are contained in FDA's *Guidance for Industry – ANDA Submissions – Refuse-to-Receive Standards* (https://www.fda.gov/media/86660/download).

[7] 21 USC 355(d)(5)

[8] 21 USC 355(d)

5

    iii.    Case law;

    iv.    Federal regulations;

    *v.*    Written administrative procedures.

19.    Based on my knowledge, training, and experience, the second highest level contains publicly available written regulatory principles binding on FDA and advisory to pharmaceutical manufacturers. In order of descending authority, these include:

    i.    Final versions of FDA Level 1 and Level 2 guidance documents;

    ii.    Draft versions of FDA Level 1 and Level 2 guidance documents.

20.    Although guidance documents are not legally binding on FDA, "FDA employees may depart from guidance documents only with appropriate justification and supervisory concurrence." 21 CFR § 10.115(d)(3). Thus, the FDA expects FDA scientists and reviewers to follow guidances in the absence of a compelling scientific and/or regulatory rationale to the contrary.

21.    The Good Guidance Practice (GGP) regulation at 21 CFR § 10.115 explains that while a sponsor is not required to comply with recommendations in a guidance, it must comply with the underlying statute(s) and regulation(s).  If a sponsor chooses not to comply with a guidance, it should explain how it intends to comply with the FDCA through an alternative approach.

22.    Based on my knowledge, training, and experience, the lowest level contains publicly available written principles advisory to both FDA and pharmaceutical manufacturers. These include:

    i.    Regulatory precedents;

    ii.    Conclusions from FDA Advisory Committee meetings;

       iii.     Presentations at FDA workshops;

       iv.     Presentations at scientific meetings.

23.     The GGP regulation also explains that "[t]he agency may not use documents or other means of communication that are excluded from the definition of guidance document to informally communicate new or different regulatory expectations to a broad public audience for the first time. These GGP's must be followed whenever regulatory expectations that are not readily apparent from the statute or regulations are first communicated to a broad public audience." 21 CFR § 10.115(e).

**Definitions of FDA regulatory terms**

24.     Based on my knowledge, training, and experience, definitions of FDA regulatory terms are publicly available written statements of the meanings of words or phrases used by the FDA in executing and enforcing the FDCA and other statutes for which it is responsible.

25.     Based on my knowledge, training, and experience, definitions of regulatory terms are generally provided in one of the sets of regulatory principles described above in ¶¶ 18-23. In interpreting the meaning of an FDA regulatory term, FDA reviewers and staff generally rely on the highest regulatory principle level document containing a definition of the term.

26.     For example, the highest level at which the term "generic drug" is defined is the Generic Drug User Fee Act of 2012 and its re-authorization in 2017.

27.     Based on my knowledge, training, and experience, the definition used by the FDA for an FDA regulatory term is not necessarily the same definition that would be employed in common, clinical, or scientific usage.

i.  For example, in common usage, the term "interchangeability" means "The quality of being interchangeable; interchangeableness."[9]

ii.  However, the FDA regulatory definition of "interchangeability" **refers exclusively** to a "biological product [that] may be substituted for the reference product without the intervention of the health care provider." 42 USC 262(k).

iii.  Thus, under the FDA regulatory definition, "interchangeability" has a very specific meaning applying only to therapeutic biologic products, i.e., approved under a Biologics Licensing Application (BLA), but not to drugs approved under Section 505(b)(2) under an NDA or to generic drugs approved under Section 505(j) under an ANDA.

28.  Data sources include NDAs, ANDAs, BLAs, and other regulatory submissions; published scientific and biomedical studies, analyses, and reviews; scientific and biomedical texts; and scientific abstracts and lectures presented at scientific meetings. Data sources may also include public and non-public information from foreign drug regulatory activities, non-public internal FDA data, documents, and presentations, as well as publicly available FDA databases, documents, and presentations.

**FDA regulatory processes**

29.  Based on my knowledge, training, and experience, regulatory processes involve assignment of a regulatory submission; filing review of the submission; substantive review of the submission; and making a decision on which of one or more possible regulatory outcomes is indicated.

---

[9] OED Online. September 2020. Oxford University Press. https://www-oed-com.proxygw.wrlc.org/view/Entry/97602?redirectedFrom=interchangeability (accessed November 11, 2020

30.   Assignment of a submission means designation of a specific office within a specific FDA center, e.g., the Office of Generic Drugs (OGD)[10] within FDA's Center for Drug Evaluation and Research (CDER), as having primary responsibility for review of the submission and executing any response resulting from the review.

31.   Filing review means initial review of a submission, such as an NDA or ANDA, to determine if it is substantially complete and should be accepted for substantive review.

32.   Substantive review of a submission involves examination by FDA scientists, clinicians, and other review staff, including supervisory reviewers, of the submission's content; critical evaluation and analysis of the data and methodology contained in the submission; appraisal of the validity and strength of assertions based on data in the submission regarding a product's safety and effectiveness; construction of independent conclusions based on the review; and formulation of recommendations to supervisory FDA reviewers regarding regulatory actions.

33.   Based on my knowledge, training, and experience, determination of the appropriate regulatory processes for a submission depends on use of appropriate regulatory structures, particularly regulatory principles and definitions.

**FDA regulatory outcomes**

34.   Based on my knowledge, training, and experience, review outcomes consist of a hierarchy of kinds of written documentation that communicate:

  i.   Conclusions drawn and decisions made by FDA with respect to a submission

---

[10] OGD is responsible for determinations involving therapeutic equivalence, which are publicly available in FDA's compendium *Approved Drug Products With Therapeutic Equivalence Evaluations* (more commonly known as the Orange Book). However, such determinations are not related to decisions about drug approval. The Orange Book preface states that "[t]herapeutic equivalence evaluations in this publication are not official FDA actions affecting the legal status of products under the FD&C Act." (https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface).

   ii.  Information from FDA

   iii.  both i. and ii.

35. Based on my knowledge, training, and experience, review outcomes include the following kinds of documents, in order of descending authority:

   i.  Action letters;

   ii.  Final reviews by the primary review division;

   iii.  Consultative reviews requested by the primary review division;

   iv.  Regulatory process communications.

36. Action letters for NDAs and ANDAs include approval (AP) letters and complete response (CR letters).[11]

37. Action letters are constructed from templates containing standardized language that has been reviewed extensively by FDA regulatory policy experts and legal counsel to ensure that the action letter unambiguously distinguishes between regulatory requirements that applicants **must** follow and recommendations that applicants **may** follow, if they so choose.[12]

## Definitions

38. An NDA is defined as "the application described under §314.50" of Title 21 of the Code of Federal Regulations (CFR), and "refers to "stand-alone" applications submitted under section 505(b)(1) of the Federal Food, Drug, and Cosmetic Act and to 505(b)(2) applications." 21 CFR 314.3(b). Section 505(c) of the FDCA describes the standards for NDA approval.

---

[11] CDER MaPP 6020.8 Rev. 1, *NDAs/BLAs/Efficacy Supplements: Action Packages and Taking Regulatory Actions* (https://www.fda.gov/media/72739/download)

[12] Senak M. Potayto-Potahto? The Meaning of the FDA's "Complete Response" Letters. Am Health Drug Benefits. 2008 Sep;1(7):30-1.

39.     An NDA must contain "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1).

40.     CDER's Office of New Drugs (OND) reviews both 505(b)(1) and 505(b)(2) NDAs, including supplements to original NDAs, and issues action letters regarding approval to NDA applicants. FDA Staff Manual Guide (SMG) 1263.1 at 1, ¶ 1C (https://www.fda.gov/media/83043/download), and SMG 1410.104 at 1, ¶ 1A (https://www.fda.gov/media/84863/download).

41.     An ANDA is defined as "the application described under § 314.94" of Title 21 of the CFR 21 CFR § 314.3(b). Section 505(j) of the FDCA describes the standards for ANDA approval.

42.     OGD reviews ANDAs, including amendments of and supplements to original ANDAs, and determines their approvability. FDA SMG 1290.1a (https://www.fda.gov/media/122644/download).

43.     Therapeutic equivalents (TEs) are "approved drug products that are pharmaceutical equivalents for which bioequivalence has been demonstrated, and that can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling." 21 CFR § 314.3(b).

**505(b)(2) NDAs and generic drugs**

44.     As explained in ¶ 5. iii., a "generic drug" is defined as a drug product that is the subject of an ANDA.

45.     Of note, FDA's Web page on different kinds of drug applications states that "[a]n Abbreviated New Drug Application (ANDA) contains data that, when submitted to

11

FDA's Center for Drug Evaluation and Research, Office of Generic Drugs, provides for the review and ultimate approval of a generic drug product."[13]

46.     Determinations regarding whether an approved product is a TE are not related to determinations as to whether an approved product is a generic drug.

47.     Not all generic drugs are determined to be TE, and not all TEs are generics.

48.     Thus, a 505(b)(2) NDA is not the same as an ANDA.

49.     In addition, defining a drug approved through a 505(b)(2) NDA as a "generic drug" because it is a TE represents highly flawed regulatory methodology leading to incorrect regulatory conclusions. The defects in use of such an erroneous definition are illustrated by the following real-world examples, which would not exist if the definition of a generic drug was based on therapeutic equivalence :

  i.     A 505(b)(2) drug determined to be a TE does not require an RLD.[14] A generic drug does.

  ii.    A 505(b)(2) drug determined to be a TE can serve as the RLD for a generic drug.[15] A generic drug cannot.

  iii.   A 505(b)(2) drug determined to be a TE can be approved for a new indication that the RLD does not have.[16] A generic drug cannot.

50.     In summary, a drug approved under a 505(b)(2) NDA is <u>not</u> a generic drug.

51.     Since Accord's docetaxel was approved under a 505(b)(2) NDA, it is *not* a generic equivalent of Taxotere®.

**Differences in labeling regulations between approved NDAs and ANDAs**

---

[13] https://www.fda.gov/drugs/how-drugs-are-developed-and-approved/types-applications, accessed 11/1/2020.

[14] E.g., Cafcit® (caffeine citrate for injection), NDA 020793

[15] E.g., Methylin® (methylphenidate hydrochloride), NDA 021419, which. serves as the RLD for multiple ANDAs

[16] E.g., Trilipix® (fenofebric acid), NDA 022224

52.     NDAs and ANDAs differ in their statutory bases: sections 505(b)(1) and 505(b)(2) of the FDCA for NDAs, and section 505(j) for ANDAs.

53.     NDAs and ANDAs also differ in the statutory standards for approval: section 505(c) for NDAs and section 505(j) for ANDAs.

54.     Consequently, overlapping but non-identical sets of regulations govern NDAs and ANDAs.

55.     In other words, some regulations in Part 314 of Title 21 CFR apply to both NDAs and ANDAs; some apply only to NDAs; and some apply only to ANDAs.

56.     For example, post-marketing reporting requirements at 21 CFR 314.80 and 314.81 apply to both NDA holders and ANDA holders.

57.     In particular, some labeling requirements apply to ANDAs but not NDAs.

58.     In general, both the FDCA and implementing regulations provide that the label of a drug approved under an ANDA <u>must</u> be the same as the label of the RLD.

59.     Section 505(j) and its implementing regulations in 21 CFR 314.92 – 314.99 allow only two categories of differences between the label for a generic drug approved under an ANDA and the label of its RLD:

      i.     The first consists of differences due to production or distribution by different manufacturers. 21 USC § 355(j)(4)(G), 21 CFR § 314.94(j)(a)(8)(iv).

      ii.     The second consists of characteristics explicitly described in published regulations, e.g., "differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity . . .).

13

60.     FDA allows label differences due to such factors only after review and prior approval of

a petition submitted by the generic drug manufacturer. 21 CFR 314.93(c).

61.      However, these regulations do **not** apply to NDAs.

62.     Thus, a drug marketed under an approved NDA is not constrained by regulations

published in the CFR to match drug labeling approved under a different NDA.

63.     While FDA may require the holder of an NDA to include language found in another

NDA (e.g., class labeling), in general, such requirements are <u>not</u> based on labeling

regulations published in the CFR, and which carry the force and effect of law, but on

lower precedence regulatory principles such as FDA guidances or applicable precedents,

which carry far less weight, and which an applicant may be exempted from depending on

relevant scientific data and analyses.[17]

**Changes to the label of a drug marketed under an approved NDA or ANDA**

64.     In addition, while some regulations governing changes to the label of an approved drug

apply to both NDAs and ANDAs, some regulations governing such changes apply only to

NDAs but not ANDAs, while others apply to ANDAs but not NDAs.

65.     An NDA holder "must notify FDA about each change in each condition established in an

approved NDA beyond the variations already provided for in the NDA." 21 CFR §

314.70(a). The same requirement applies to ANDA holders.  21 CFR § 314.97(a).

66.     Such notification generally involves submission of a supplemental NDA (more

commonly referred to as a supplement) by the NDA holder to the FDA, although some

minor changes only require documentation in the annual report the NDA holder is

required to make to the FDA. 21 CFR 314.70(a), 21 CFR 314.81(b)(2).

---

[17] This statement does not apply to Safety Labeling Changes ordered by FDA under 21 USC 505(o)(4)

67.   NDA supplements are divided into two categories. The first, termed "prior approval" supplements, require FDA review and approval prior to putting the proposed changes described into effect. 21 CFR 314.70(b).

68.   In contrast, the second category includes what are termed Changes Being Effected (CBE) supplements, which do not require FDA review and approval prior to the manufacturer putting the described changes described into effect. 21 CFR §314.70(c).

69.   Some label changes allowed under the CBE regulations require FDA receipt of the supplement at least 30 days prior to distribution of the drug product made using the change; these are termed CBE-30 supplements and most often involve changes to NDA chemistry, manufacturing, and controls (CMC). 21 CFR § 314.70(c)(1)-(2).

70.   Unless the FDA informs the manufacturer that it is converting a CBE-30 supplement to a prior approval supplement (21 CFR 314.70(c)(5)), "distribution of the drug product made using the change may begin not less than 30 days after receipt of the supplement by FDA." 21 CFR § 314.70(c)(4) (emphasis added).

71.   Other changes allowed under the CBE regulations do not require any waiting period for implementation after FDA receipt of the supplement. Supplements containing such changes are referred to as CBE-0 supplements; the changes in such a supplement can be implemented by the drug's manufacturer as soon as the CBE-0 has been received by the FDA.

72.   Most safety-related changes to the label for a drug marketed under an approved NDA can be submitted in a CBE-0 supplement, permitting an NDA holder on its own initiative to add safety information to the drug's label in a straightforward and relatively rapid manner. 21 CFR § 314.70(c)(6)(iii).   The NDA holder can distribute the drug with the

revised label as soon as it has been submitted to the FDA. Although the FDA will review a CBE supplement within a 6-month time frame defined by a project management control called an "Action Goal Date," the NDA holder does <u>not</u> have to wait for the FDA to perform this review. 21 CFR § 314.70(c)(6).

 i. Once FDA reviews and approves a CBE-0 labeling supplement, it posts the approved revised label on its Web site, where it is publicly accessible through a searchable database known as Drugs@FDA that is available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

 ii. However, the FDA cannot review CBE supplements instantaneously. Because of workload considerations, FDA's review may not be completed for weeks or even months.

 iii. During this time, the NDA holder is permitted under the CBE regulations to use the revised label in conjunction with its distribution of its, meaning that the revised label may be in circulation for an extended period of time before FDA formally approves the revisions and posts the new label on its Web site. FDA.

 iv. To avoid confusion from this lag, on receipt (not approval) of a CBE-0 supplement, FDA transmits the labeling changes in the CBE-0 supplement to the DailyMed Office at the National Library of Medicine for public posting, before the FDA has reviewed it. See September 2006 draft guidance at www.fda.gov/media/71848/download, attached as **Exhibit A** to this declaration.

73. Based on my knowledge, training, and greater than 10 year experience reviewing CBE supplements at CDER, NDA holders decidedly **<u>do</u>** utilize the CBE process to implement

immediate and unilateral label changes, prior to FDA completion of its review and approval of the change.

74. While an NDA holder may choose to wait until the FDA review of a CBE-0 supplement is complete before implementing the label changes, there is no legal or regulatory requirement that they do so, absent an FDA communication that a CBE supplement has been converted to a prior approval supplement. Based on my knowledge, training, and experience, such conversions are uncommon.

75. Based on my knowledge, training, and experience, it is also uncommon for NDA holders to wait until the FDA review of a CBE-0 supplement is complete to implement the labeling changes, particularly since on submission the changes in the supplement will be made publicly available, as explained above in ¶ 72. iv.

76. Furthermore, based on my knowledge, training, and  greater than 10 year experience reviewing CBE supplements at CDER, I cannot recall a single instance in which an NDA holder that had changed a drug label through a CBE-0 supplement was compelled to reverse the changes as a result of FDA's review, much less recall a drug because of concerns over misbranding.

77. In contrast, the CBE regulations do not apply to ANDAs.

78. In general, the labeling for a generic drug, that is, a drug approved through an ANDA submitted under Section 505(j) of the FDCA, must be identical to the labeling for the RLD on which approval of the ANDA is based.

79. Any differences in labeling must receive prior approval from the FDA before the generic drug can be distributed, with a small number of limited and very minor exceptions.

17

80. In contrast, as explained above in ¶¶ 71-76, the manufacturer of a drug approved through a NDA submitted under Section 505(b) of the FDCA can update safety information in the drug's labeling and distribute the drug with the revised labeling without prior approval by the FDA.

81. Accord's version of docetaxel was not approved through an ANDA submitted under Section 505(j) of the FDCA.

82. Accord's version of docetaxel was approved through an NDA submitted under Section 505(b)(2) of the FDCA.

83. An NDA holder can update the drug label with safety information via a CBE-0 Supplement. Ross Report ¶59.

84. 505(b)(2) NDAs are, by definition, NDAs.

85. Therefore, a 505(b)(2) NDA holder can update the drug label with safety information via a CBE-0 supplement.

86. There are no Federal statutes, regulations, FDA guidances, or other regulatory requirements that prevented Accord Healthcare, Inc. from submitting a CBE-0 supplement at any time after approval of its version of docetaxel in June 2011.

87. In particular, there is no such thing as the non-existent "follow the leader obligation" cited in Defendant's Memorandum of Law that FDA would ostensibly subject any 505(b)(2) NDA holder to, including Accord Healthcare, Inc. There is no such phrase or concept applicable to NDAs in the FDCA, in Title 21 of the CFR, in FDA Final or Draft Written Guidances, or on the FDA Web site.

88. To the contrary, as explained in my report and above, the FDA, through published regulations and Guidances, explicitly permits and encourages updates to safety

information in the label of a drug marketed under an approved NDA, including those marketed under an approved 505(b)(2) NDA.

89.     In fact, Accord Healthcare, Inc. has submitted and received FDA approval of multiple CBE supplements for its version of docetaxel (Supplements 006, 009, and 015). One of these (supplement 006, approved July 3, 2014) was approved 4 months <u>before</u> a similar CBE supplement was approved by the FDA for Taxotere®, the docetaxel formulation relied on by Accord Healthcare, Inc. for the original approval of its version of docetaxel.

**Pharmacovigilance standards**

90.     My report of June 8, 2020 discusses NDA holders' regulatory obligations regarding pharmacovigilance. Ross Report ¶¶ 44 – 61, 101 – 105.

91.     Based on my knowledge, training, and experience, the FDA is dependent on the completeness and quality of the safety information submitted by sponsors in making regulatory decisions.   The manufacturer of a drug has primary responsibility for the completeness of the label, not the FDA.

92.     Based on my knowledge, training, and experience, Accord's pharmacovigilance program was completely inadequate to detect unexpected adverse events potentially associated with use its docetaxel product, including unexpected serious adverse events.

93.     Based on my knowledge, training, and experience, Accord Healthcare, Inc. did not meet the applicable standard required under the FDCA, its implementing regulations, particularly at 21 CFR 201.57 and 314.70(c)(6)(iii), and FDA's written guidances on pharmacovigilance, as reflected by the following:

i.     From its first PADER onward, there is no evidence that Accord Healthcare, Inc. or its agent, Lambda, systematically examined and analyzed any <u>publicly available FAERS data;</u>

ii.    From its first PADER onward, there is no evidence that Accord Healthcare, Inc., or its agent, Lambda, systematically collected, reviewed, and analyzed adverse event data from all available sources and for all marketed versions of docetaxel, not just its own.

iii.   From its first PADER onward, there is no evidence that Accord Healthcare, Inc., or its agent, Lambda, systematically reviewed and analyzed all available published literature regarding adverse events potentially associated with docetaxel.

94.   Of note, pharmaceutical industry specialists in 505(b)2 NDAs have indicated that FDA expects holders of these NDAs to follow the same pharmacovigilance standards as those used by holders of 505(b)(1) NDAs.[18]

95.   As discussed below in ¶¶ 96-129, Accord Healthcare, Inc. should have been aware of "newly acquired information" available during the relevant timeframe.

96.   With regard to an NDA holder's regulatory obligations, the terms "newly acquired information" and "new safety information" are not significantly different.

97.   The FDA regulatory definition of "newly acquired information" is "data, analyses, or other information not previously submitted to the agency, which may include (but are not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or

---

[18] See, e.g., Allera E (2019) "The 505(b)(2) New Drug Application Safety Paradox," https://www.505b2.org/publications/the-505b2-new-drug-application-safety-paradox - /; Crose L (2016), "Leveraging Postmarketing Safety Data in 505(b)(2) Drug Development Programs," https://camargopharma.com/resources/blog/leveraging-postmarketing-safety-data-505b2-drug-development-programs/.

analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 § CFR 314.3.

98.    As discussed above in ¶¶ 27. i-iv, the regulatory definition of this term differs from its meaning in common usage. It does not mean "newly acquired" by the manufacturer."

99.    The preamble to the proposed rule clarifying this definition clearly indicates that the defining features of "newly acquired information" are that such information has not been previously submitted to the FDA, and that it "provides novel information about the product, such as a risk that is different in type or severity than previously known risks about the product." 73 FR 2848-2850 (Jan. 16, 2008).

100.   It also clearly indicates that "newly acquired" should be interpreted in the context of whether such information has been submitted to the FDA by the manufacturer of a specific product, not whether it may have been submitted to the FDA by at least one manufacturer. 73 FR 2848-2850 (Jan. 16, 2008

101.   Furthermore, the definition of "newly acquired information" indicates that "new analyses" of previously submitted data can represent "newly acquired information."

102.   Simply put, defining "newly acquired" as meaning "acquired by the manufacturer" would completely defeat the purpose of FDA's pharmacovigilance requirements by lowering the standard that the FDA expects NDA holders to meet, especially given well-described organizational disincentives regarding pharmacovigilance.[19]

103.   Thus, as discussed above, erroneous use of a common usage definition of "newly acquired," as opposed to use of the appropriate regulatory definition, resulted in a seriously mistaken regulatory conclusion regarding Accord's regulatory obligations.

---

[19] McGoey L. The logic of strategic ignorance. Br J Sociol. 2012 Sep;63(3):553-76.

21

104. My Expert Report of June 8, 2020 cites multiple sources of data that individually or taken together would constitute "newly acquired information." Ross Report ¶¶ 84 – 100.

105. These included data from:

    i. Case reports;

    ii. Prospective clinical cohort studies;

    iii. Prospective comparative clinical trials;

    iv. Relevant reports in the published scientific literature;

    v. Adverse event reports submitted to FAERS;

    vi. Changes to the approved labeling for docetaxel formulations marketed in other countries.

106. The last item is extremely significant. For purposes of updating the US label for a drug marketed under an NDA, it is immaterial whether the NDA holder has any legal or corporate relationship with the entity holding marketing authorization for the same product in other countries. The relevant issue is whether the foreign label is available to the US NDA holder.

107. In addition, differences between US and foreign drug regulations are not material to whether such changes can be regarded as "newly acquired information" supporting a label change. While such differences may affect the degree to which such changes represent evidence supporting updating the label, they do not inherently exclude foreign label changes from being considered.

108. In fact, in the annual report that NDA holders are required to submit to the FDA, they are required to report safety-related regulatory actions in other countries related to the drug being marketed in the US by the NDA holder, because these potentially constitute

"significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product." 21 CFR § 314.81(b)(2)(i).

109.  Moreover, the regulations governing Investigational New Drug Applications (INDs) explicitly require reporting of "foreign marketing developments" in the annual report that an IND is required to file with the FDA. 21 CFR § 312.33(a)(7)(f).

110.  Accord Healthcare, Inc. developed its version of docetaxel under IND 101,194; thus, it would have been obligated to report labeling changes for versions of docetaxel marketed outside the U.S. to the FDA in its annual report on this IND, including the addition of "permanent alopecia" to docetaxel labeling in Australia and several European countries, as described in my report.

111.  Based on my knowledge, training, and experience, the "newly acquired information" cited in my report – and available to Accord Healthcare, Inc. when its 505(b)(2) NDA for docetaxel was approved in June 2011 – was more than sufficient to support updating Accord's docetaxel label by adding "permanent alopecia" to the WARNINGS Section of the label, the ADVERSE EVENTS Section of the label, or both.

112.  An NDA holder's pharmacovigilance obligations begin as soon as its product receives FDA approval, as evidenced by the standard language used in NDA approval letters issued by the FDA.

113.  For example, the FDA approval letter for Accord's version of docetaxel, issued June 8, 2011, states that "[w]e remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81)."

114.  Based on my knowledge, training, and experience, just as NDA applicants have manufacturing facilities and operations in place allowing them to begin producing a drug

as soon as possible after FDA approval, in a manner compliant with regulatory requirements and FDA's Good Manufacturing Practices guidances, they will also have pharmacovigilance capabilities and procedures in place allowing them to initiate post-marketing pharmacovigilance  as soon as possible after FDA approval, in a manner compliant with regulatory requirements and FDA's pharmacovigilance guidances.

115. Under these requirements, holders of an approved NDA – including a 505(b)(2) NDA – must review adverse drug experiences as follows:

"Each applicant having an approved application under § 314.50 or, in the case of a 505(b)(2) application, an effective approved application, shall promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience, post-marketing clinical investigations, post-marketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers. Applicants are not required to resubmit to FDA adverse drug experience reports forwarded to the applicant by FDA; however, applicants must submit all follow-up information on such reports to FDA. Any person subject to the reporting requirements under paragraph (c) of this section shall also develop written procedures for the surveillance, receipt, evaluation, and reporting of post-marketing adverse drug experiences to FDA." 21 § CFR 314.80(b).

116.    For three reasons, the obligation of an NDA holder under 21 § CFR 314.80(b) <u>cannot</u> be satisfied by the holder of an approved 505(b)(2) NDA simply by relying on the AFSE for the listed drug relied on for the original approval.

    i.    First, an NDA submitted under Section 505(b)(2) may rely on the AFSE for its original approval. However, this section does not provide <u>any</u> authority for a 505(b)(2) NDA holder to rely totally, or even in part, on the AFSE to support continued demonstration of its products safety <u>after</u> approval.

    ii.    Second, there is absolutely no provision in the implementing regulations for Section 505(b) or in applicable FDA guidances allowing a 505(b)(2) NDA holder to rely totally, or even in part, on the AFSE to support continued demonstration of its product's safety <u>after</u> approval.

    iii.    Third, positing such reliance completely ignores the well-established reality that appropriate pharmacovigilance invariably reveals new safety information, either in the form of toxicities newly recognized to be associated with a product's use in a larger and different population than that studied in clinical trials, or increased frequency or severity of a known toxicity, or increased susceptibility of particular populations to a known risk.

117.    There is no scientific basis for either assuming or believing that the adverse event profile for a drug approved under a 505(b)(2) NDA will be the same or even similar to that for a listed drug relied on for approval. In fact, if utilization of the innovator drug decreases significantly in the face of increased utilization of a therapeutically drug (either a generic drug or a 505(b)(2) NDA drug), such false reliance would prevent any new risks from being recognized.

118.    Of note, the requirements for post-market reporting under 21 CFR 314.80(b) include
        "reports in the scientific literature, and unpublished scientific papers." Unless a 505(b)(2)
        NDA holder knows that the holder of the NDA relied on for approval has reviewed
        relevant reports in the scientific literature and unpublished scientific papers – <u>including</u>
        <u>those published before approval of the 505(b)(2) NDA</u> – the 505(b)(2) NDA holder is
        obligated to review such reports under 21 CFR § 314.80(b).

119.    Thus, in the absence of detailed information that Sanofi had already reviewed and
        submitted information on existing literature on docetaxel's toxicity to the FDA, Accord
        Healthcare, Inc. had an obligation to look back independently itself at such literature as
        part of its post-marketing safety reporting responsibilities.

120.    As noted in my Expert Report, by the time Accord's 505(b)(2) NDA was approved,
        multiple published studies were available demonstrating that docetaxel was associated
        with permanent alopecia. Ross Report ¶¶ 93-4.

121.    Of particular significance with regard to Accord's lookback obligations, the FDA did not
        approve the 505(b)(2) NDA that Accord Healthcare, Inc. initially submitted on December
        22, 2009.  Instead, it issued a Complete Response Letter to Accord on October 22, 2010
        listing deficiencies in the NDA that Accord Healthcare, Inc. was required to cure through
        an amended NDA to garner approval.

122.    The Complete Response letter instructed Accord Healthcare, Inc. to include as part of the
        NDA amendment a safety update, stating:

        "When you respond to the above deficiencies, include a safety update as
        described at 21 CFR 314.50(d)(5)(vi)(b). The safety update should include

data from all nonclinical and clinical studies/trials of the drug under consideration regardless of indication, dosage form, or dose level.

"1. Describe in detail any significant changes or findings in the safety profile.

"2. When assembling the sections describing discontinuations due to adverse events, serious adverse events, and common adverse events, incorporate new safety data as follows:

- "Present new safety data from the studies/clinical trials for the proposed indication using the same format as the original NDA submission.

- "Present tabulations of the new safety data combined with the original NDA data.

- "Include tables that compare frequencies of adverse events in the original NDA with the retabulated frequencies described in the bullet above.

- "For indications other than the proposed indication, provide separate tables for the frequencies of adverse events occurring in clinical trials.

"3. Present a re-tabulation of the reasons for premature trial discontinuation by incorporating the drop-outs from the newly completed trials. Describe any new trends or patterns identified.

"4. Provide case report forms and narrative summaries for each patient who died during a clinical trial or who did not complete a trial because of

an adverse event. In addition, provide narrative summaries for serious
adverse events.

"5. Describe any information that suggests a substantial change in the
incidence of common, but less serious, adverse events between the new
data and the original NDA data.

"6. Provide updated exposure information for the clinical studies/trials
(e.g., number of subjects, person time).

"7. Provide a summary of worldwide experience on the safety of this drug.
Include an updated estimate of use for drug marketed in other countries.

"8. Provide English translations of current approved foreign labeling not
previously submitted."[20]

123.   Thus, under ¶¶ 1, 7, and 8 of the required elements of the Safety Update, Accord
Healthcare, Inc. would have been obligated to examine and review, among other data
sources, adverse event data from FAERS and literature reporting toxicities occurring
during clinical studies, as well as foreign labeling. Any of these would have yielded the
safety information regarding permanent alopecia.

124.   For example, analysis of the quarterly FAERS data files would have readily revealed
adverse event reports of permanent alopecia in breast cancer patients receiving docetaxel.
Of note, even a single report of an adverse event could meet the criteria under 21 § CFR
201.57 for updating safety information in the label.

---

[20] Complete Response Letter for NDA 201195, dated October 22, 2010, from Anthony J. Murgo, Acting Deputy
Director, Division of Drug Oncology Products, Office of Oncology Drug Products, CDER to Samir Mehta, Ph.D.,
President, Accord Healthcare, Inc.. Accessed 11/10/20 at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/201195Orig1s000OtherActionLetters.pdf.

I declare under penalty of perjury under the laws of the State of Maryland that the foregoing is true and correct.  Executed on November 11, 2020 at Baltimore, Maryland.


**David B. Ross, M.D., Ph.D., M.B.I.**

# EXHIBIT A

# Guidance for Industry
## Public Availability of Labeling Changes in "Changes Being Effected" Supplements

### *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted within 60 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance. Submit comments to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document contact (CDER) Meredith Francis 301-594-2041.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**September 2006**
**Labeling**

# Guidance for Industry
## Public Availability of Labeling Changes in "Changes Being Effected" Supplements

*Additional copies are available from:*

*Office of Training and Communications*
*Division of Drug Information, HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD  20857*
*(Tel) 301-827-4573*
*http://www.fda.gov/cder/guidance/index.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**September 2006**
**Labeling**

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

TABLE OF CONTENTS

I.    INTRODUCTION................................................................................................................ 1

II.   BACKGROUND................................................................................................................. 1

III.  DISCUSSION ................................................................................................................... 2

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

# Guidance for Industry[1]
# Public Availability of Labeling Changes
# in "Changes Being Effected" Supplements

---

This draft guidance, when finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

---

## I.    INTRODUCTION

This guidance announces to holders of a new drug application (NDA), an abbreviated new drug application (ANDA), or a biologics license application (BLA), who intend to submit a "Changes Being Effected" supplement (CBE supplement) to make a postapproval labeling change, that FDA will make labeling revisions identified in a CBE supplement publicly available upon receipt of the supplement by FDA.[2] This guidance does not have any bearing on supplements that relate to chemistry, manufacturing, and controls changes.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.    BACKGROUND

FDA has begun an initiative to facilitate computerized access to drug information by consumers, pharmacists, and healthcare providers so that they will have faster and more comprehensive

---

[1] This guidance has been prepared by the Center for Drug Evaluation and Research (CDER) at the Food ad Drug Administration.

[2] While the FDA will make labeling revisions submitted via a CBE supplement publicly available when they are received by the FDA, this action should not be construed as an endorsement of the revised labeling by the FDA. As noted in section III, after revised labeling is submitted, the FDA carefully reviews the proposed change and then either approves it or sends a letter identifying the deficiencies with the proposed change. Of particular note, the Agency will not permit a labeling change that would misbrand the product (see footnote 4).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

access to drug information.  As part of this initiative, the Agency has been involved in an initiative known as *DailyMed*.  DailyMed is a computerized repository of a broad array of drug information, which is maintained by the National Library of Medicine.  Among other things, DailyMed contains the information referred to as "content of labeling," which includes all the information found in prescription drug labeling and over-the-counter (OTC) drug facts labeling, including all text, tables, and figures (see 21 CFR 314.50(l)(i)).  To maximize its ability to serve as a useful resource to consumers, pharmacists, and healthcare providers, DailyMed must contain the most up-to-date and comprehensive drug information available.  This guidance discusses FDA policy with regard to the timing of our release of revised drug labeling information.

Sections 314.70 and 601.12 (21 CFR 314.70 and 601.12) of FDA's regulations describe the types of supplemental applications that must be submitted to FDA to effect a labeling change to approved NDAs, ANDAs, and BLAs.  Certain types of changes to labeling must receive FDA approval before the changes are implemented.  These include all labeling changes that do not fall under § 314.70(c)(6)(iii), (d)(2)(ix), or (d)(2)(x), or under § 601.12(f)(2) or (f)(3).  Other changes may be implemented by a sponsor upon the Agency's receipt of a CBE supplement (§§ 314.70(c)(6)(iii) and 601.12(f)(2)(i)).  Under §§ 314.70(c)(6)(iii) and 601.12(f)(2)(i), the labeling changes appropriate for CBE supplements are those that:  (1) add or strengthen a contraindication, warning, precaution, or adverse reaction; (2) add or strengthen a statement about abuse, dependence, psychological effect, or overdosage; (3) add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the product; (4) delete false, misleading, or unsupported indications for use or claims for effectiveness; or (5) normally require a supplement submission and approval before distribution of the product and that FDA specifically requests be submitted under these provisions.[3]

## III.   DISCUSSION

After a CBE supplement is submitted, FDA reviews the proposed change and either approves it or sends a letter identifying the deficiencies with the proposed change.[4]  Historically, most sponsors have implemented the proposed labeling changes at the time of, or shortly after, the Agency's receipt of the CBE supplement.  However, some have delayed implementation until they receive FDA feedback before implementing any change.

In the past, FDA has not made any labeling change proposed in a CBE supplement publicly available until it has been approved.  However, this policy could lead to situations where a

---

[3] As explained in the final rule, "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products," that we published in the *Federal Register* on January 24, 2006 (71 FR 3922), a sponsor may not use a CBE supplement to change the "Highlights of Prescribing Information" section except for editorial or similar minor changes.  For a more complete discussion on this point, see 71 FR at 3932 and 3934.

[4] Congress has charged FDA with ensuring, among other things, that drugs sold in the United States are not misbranded (21 U.S.C. 331(a), (b), and (k); 321(n); 352; and 355(c) and (d)(7)).  Consistent with the Federal Food, Drug, and Cosmetic Act, FDA will not permit a change to labeling that would misbrand the product.  For example, FDA would not allow a change to labeling to add a warning in the absence of reasonable evidence of an association between the product and an adverse event.

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

company, in compliance with the regulations, is distributing labeling that contains updated safety information while FDA is not making the updated version of the labeling available.

To avoid this situation and to facilitate the DailyMed initiative, FDA wants to make the most current labeling submitted to FDA available to healthcare practitioners and the public. Therefore, FDA is announcing its intention to change its practice with regard to making labeling changes submitted in CBE supplements -- but not in prior approval supplements -- publicly available.

This guidance announces that the Agency will make the revised labeling proposed in a CBE supplement publicly available on its Web site and through the DailyMed shortly after the CBE supplement is received and before FDA has necessarily reviewed or approved it. If, after reviewing the CBE supplement, FDA decides it should not be approved, FDA will either (1) remove the labeling submitted with the CBE supplement from the FDA Web site and from the DailyMed and replace that labeling with the previous labeling or (2) recommend the sponsor amend its labeling and, after the sponsor submits the amended labeling, post this amended labeling on FDA's Web site and provide it to the DailyMed promptly.[5]

Given this new procedure, we recommend that a sponsor not submit a CBE supplement to FDA until the sponsor is ready to distribute the labeling that it proposes in that CBE supplement. FDA will consider the submission of a CBE supplement to be consent by the sponsor to post the proposed labeling on FDA's Web site and on the DailyMed. The Agency welcomes discussions with sponsors before they submit a CBE supplement.

---

[5] Nothing in this guidance is intended to expand the circumstances in which an applicant may effect labeling changes via a CBE supplement, and particularly, those pertaining to generic drugs.