# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | : : : | MDL NO. 2740 |
| | : | SECTION "H" (5) |
| THIS DOCUMENT RELATES TO ALL CASES | : : : : | |

## DEFENDANT ACCORD HEALTHCARE, INC.'S ANSWERS TO FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Accord Healthcare, Inc. ("Accord") submits the following Answers and Objections to these Interrogatories in accordance with Case Management Order No. 7 (Doc. 915) and the Protective Order entered in MDL 2740 (Pretrial Order No. 50, Doc. 612).

Accord objects to the "DEFINITIONS" set forth in Nos. 1 through 18 to the extent such definitions exceed the scope of applicable discovery as set forth in the Federal Rules of Civil Procedure and are not proportional to the needs of this litigation with respect to Accord. Further, certain definitions do not encompass terms utilized in the regular course of Accord's business and thus, Accord's answers are based upon its interpretation and use of such terms. Also the "Relevant Time Period," defined as back to January 1, 2006 to the present, is unreasonable and not consistent with the claims set forth in this litigation with respect to Accord. The definition of the terms "Alopecia" and "Hair Loss" are objectionable to the extent they are not consistent with the claims alleged by the plaintiffs in this MDL litigation, overbroad in scope, and vague.

Accord further objects to the definitions of the terms "You," "Your," and "Defendant" to include "all parents, subsidiaries, affiliates, partners, directors, officers, employees, servants, agents, attorneys, joint ventures, third-party contractors, or other representatives, including all

corporations and affiliated entities" and will limit its responses to Defendant, Accord Healthcare, Inc., consistent with the applicable law. Also, Accord objects that the definition of "COMMUNCATION" is overly broad to the extent it seeks information or material that is protected from disclosure by the attorney-client privilege, work-product doctrine, consulting expert privilege or protection, or any other applicable privilege or protection. Moreover, any documents identified in Accord's Answers have been or will be produced according to the ESI Protocol set forth in Pretrial Order No. 49 (Doc. 611).

As to the "INSTRUCTIONS" set forth by the plaintiffs directed to defendants, Accord objects to the extent the plaintiffs seek knowledge from Accord's attorneys as protected by the work-product doctrine and/or attorney-client privilege. As to any withholding of information on the grounds of privilege, Accord refers plaintiffs to the ESI protocol detailed above as negotiated by the parties and entered by the Court.

Accord provides the following background information in support of its Objections and Answers stated herein. Accord is a licensed pharmaceutical company focused on generic pharmaceutical formulations. On December 21, 2009, Accord submitted a New Drug Application ("NDA") pursuant to Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("Act") for Docetaxel, which was approved by the Food and Drug Administration ("FDA") for use as recommended in the agreed-upon product labeling. In its Section 505(b)(2) application, Accord advised FDA that since the proposed formulation submitted for Docetaxel was identical to the Reference Listed Drug (Taxotere®), and both products were intended for intravenous administration and contain the same active ingredients in the same concentration, it intended to rely upon the FDA's previous findings of safety and effectiveness for the Reference

Listed Drug. Accord received approval from the FDA on June 8, 2011. Therefore, the Answers stated below are based upon Accord's status as a Section 505(b)(2) NDA holder of Docetaxel.

## ANSWERS TO INTERROGATORIES

1. Identify and describe the circumstances under which YOU became aware of TAXOTERE and its potential as a BLOCKBUSTER TAXANE and the potential financial viability of DOCETAXEL under FDCA Section 505(b)(2).

**ANSWER:** Objection to the use of the term "BLOCKBUSTER TAXANE" as not being used in the regular course of business and therefore ambiguous in the context of this Interrogatory. Accordingly, Accord is unable to provide a responsive answer as to its relationship to the potential financial viability of Docetaxel.

2. Describe in detail the circumstances and process by which YOU considered and decided to enter the market for the manufacture or sale of DOCETAXEL, including considerations of whether to market DOCETAXEL as 505(b)(2) or as a generic.

**ANSWER:** Objection to the overbroad and burdensome nature of this Interrogatory and the relevancy of the circumstances considered to enter the market for any particular pharmaceutical product including Docetaxel, to the claims in this litigation. Accord further objects to this Interrogatory because it is not proportional to the needs of this litigation with respect to Accord. Notwithstanding, in general, Accord considers some of the following factors in deciding whether to enter the market for the manufacture and sale of any pharmaceutical product: the size of the commercial market, whether Accord has the internal capabilities to manufacture the product both from a research and development as well as capacity standpoint, and intellectual property considerations. Accord would have chosen to pursue a 505(b)(2) application to take into account any patent issues.

3. Identify each product YOU currently have and historically have had approval through the 505(j) process and through the 505(b)(2) process.

**ANSWER:** Objection on the basis that such information is irrelevant to the claims being made in this litigation and not proportional to the needs of this litigation with respect to Accord. Notwithstanding, Accord refers the PSC to its publicly available website as well as the FDA's publicly available website, which are equally accessible to plaintiffs, for its pharmaceutical products and the statutory basis for such approval.

4. Identify every person, department, unit, affiliated entity, and third party involved with or for YOU or on YOUR behalf in the consideration or decision making to enter the market for the sale of DOCETAXEL.

**ANSWER:** Objection on the basis that such information is irrelevant to the claims being made in this litigation and not proportional to the needs of this litigation with respect to Accord.

3

Notwithstanding, departments involved in making the decision to enter the market for the manufacture of any pharmaceutical product would include manufacturing, research and development, regulatory, and marketing and portfolio.

5. State YOUR total expense and financial investment (cost to market) from the time YOU considered entry into the DOCETAXEL market to the time YOU entered that market.

**ANSWER:** Objection on the basis that such information is irrelevant to the claims being made in this litigation and not proportional to the needs in the litigation with respect to Accord. Notwithstanding, Accord does not maintain such information in the regular course of business as to any one product, but rather maintains such information on an aggregate basis. Further, certain costs in bringing a product to market would not be reflected in standard aggregate compilations.

6. Itemize and describe in detail the breakdown of each element of YOUR cost to market identified in response to Interrogatory No. 5 above.

**ANSWER:** See answer to No. 5 above.

7. Identify all COMMUNICATIONS, agreements, or payments between YOU and SANOFI regarding DOCETAXEL, both before submission of your NDA and thereafter.

**ANSWER:** As to any communications after submission of the NDA, objection to the extent this Interrogatory seeks communications subject to protection under the work-product doctrine, attorney-client privilege, or other applicable privilege. Notwithstanding, as to any communications prior to the submission of the NDA, Accord would have made the required regulatory notification to Sanofi as the Reference Listed Drug holder pursuant to 21 C.F.R. § 314.52(a)(2). Accord is not aware of any agreements it has entered into nor any exchange of payments with SANOFI regarding Docetaxel.

8. Identify all COMMUNICATIONS between YOU and any other party in this litigation regarding DOCETAXEL, both before submission of your NDA and thereafter.

**ANSWER:** As to any communications after submission of the NDA, objection to the extent this Interrogatory seeks communications subject to protection under the work-product doctrine, attorney-client privilege, or other applicable privilege. Notwithstanding, as to any communications prior to the submission of the NDA, in general Accord does not communicate in the regular course of business with its competitors.

9. Describe in detail YOUR knowledge of SANOFI's finances or financial success with respect to TAXOTERE during YOUR decision-making process with regard to entering the DOCETAXEL market.

**ANSWER:** Objection to this Interrogatory as phrased, which assumes the "financial success" of Sanofi is factored into such decision-making process. See Answer to No. 2 above. Accordingly, Accord is unable to provide a responsive answer.

10. Identify and describe the circumstances and source under which YOU became aware of the possible or suspected connection, relationship, or link between DOCETAXEL and ALOPECIA, including temporary and persistent.

**ANSWER:** Objection as vague and ambiguous as to the meaning of "persistent." Notwithstanding, alopecia is a commonly known side effect of Docetaxel, as with numerous other chemotherapeutic medications, that has been well documented in clinical trials performed and documented in the NDA submitted by the Reference Listed Drug manufacturer for Taxotere®, as well as the product labeling since Taxotere® was approved in 1996. As stated above, Accord advised the FDA in submitting its NDA that it intended to rely upon the FDA's previous findings of safety and effectiveness for the Reference Listed Drug. These sources form the basis for Accord's awareness of the link between Docetaxel use and alopecia.

11. Describe in detail every way YOU COMMUNICATED the possible or suspected connection, relationship, or link between DOCETAXEL and ALOPECIA to YOUR customers, and the users (patients and physicians) of DOCETAXEL.

**ANSWER:** Accord communicated the risk of alopecia with the use of Docetaxel to physicians and patients through its Full Prescribing Information and Patient Information, which was initially approved by the FDA in conjunction with its review and approval of the NDA submitted by the Reference Listed Drug manufactured for Taxotere® and incorporated into Accord's NDA application pursuant to 505(b)(2). Accord's Full Prescribing Information and Patient Information have previously been produced to the PSC in an electronic, searchable format and is also publicly available on the FDA's website.

12. Describe in detail every COMMUNICATION of the possible or suspected connection, relationship, or link between DOCETAXEL and ALOPECIA with FDA or a FOREIGN REGULATORY BODY.

**ANSWER:** Objection as any communications with a foreign regulatory body are irrelevant to Plaintiffs' claims, who allegedly received their Docetaxel in the United States. Notwithstanding, Accord is not involved with any foreign regulatory body communications.

13. Identify the PERSONS involved and describe in detail YOUR compliance with 21 CFR 314.80(b).

**ANSWER:** Objection as vague and ambiguous as to the meaning of "describe in detail YOUR compliance." In addition, this Interrogatory is overbroad as it is not limited to pharmacovigilance for Docetaxel. Notwithstanding, Sabita Nair, Senior Director of Regulatory Affairs, is involved with Accord's pharmacovigilance compliance. The details of Accord's

5

pharmacovigilance compliance with FDA regulations are set forth in Accord's pharmacovigilance standard operating procedures ("SOPs"), which have been produced in response to the Request for Production of Documents, and the burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same for the PSC as it is for Accord. Accord's pharmacovigilance SOPs were produced to Plaintiffs' counsel in an electronic and searchable format. Examples of such documents include ACC.00005817-ACC.00005913 and ACC.00005922-ACC.00006097.

14. Describe in detail and identify all agreements by which responsibility for compliance with a part of the regulation identified in Interrogatory No. 13 is outsourced and delegated.

**ANSWER:** Accord is ultimately responsible for pharmacovigilance compliance related to its marketed products. Accord does contract with Lambda Therapeutic Ltd., a clinical research organization, for certain pharmacovigilance activities, including literature surveillance, case processing, aggregate reporting, signal detection, and risk evaluation. Many of the pharmacovigilance activities are shared between Accord and Lambda.

15. Identify the PERSONS involved and describe what YOU did in response to the possible or suspected connection, relationship, or link between DOCETAXEL and ALOPECIA, including contacting SANOFI or other DOCETAXEL manufacturers, initiation of independent studies, literature searches (national or worldwide), adverse events databases, third party data, research, FOIA requests, risk management, notice to customers, notice to the public, and other follow up.

**ANSWER:** Objection to the extent this Interrogatory seeks information about Accord's attorneys' efforts to direct an investigation of the claims made by plaintiffs in Docetaxel lawsuits, as such efforts and investigations are protected by the work-product doctrine and attorney-client privilege. Notwithstanding, alopecia is a commonly known side effect of chemotherapeutic medications such as Docetaxel that has been well documented in the medical literature. Consistent with its regulatory responsibilities pursuant to 505(b)(2), Accord also reported adverse events relating to alopecia along with any other adverse events reported with Docetaxel use.

16. Identify and describe in detail the factual and medical basis for every alternative cause of HAIR LOSS that YOU may offer at a hearing or trial of this matter.

**ANSWER:** Objection to the extent this Interrogatory seeks information protected from disclosure by the attorney-client privilege, work-product doctrine, or any other applicable privilege. Notwithstanding, at this time, Accord has not made any specific contention as to alternative causes as such information can only be obtained through the work-up of an individual case. Pursuant to FRCP 8(c), Affirmative Defenses must be stated in response to an initial pleading and may be later withdrawn or amended as to any individual action as applicable.

17. Identify and describe in detail the factual and medical basis for every alternative cause of HAIR LOSS suffered by Christine Kinderdine that YOU may offer at a hearing or trial of this matter.

**ANSWER:** Objection to the extent this Interrogatory seeks information protected from disclosure by the attorney-client privilege, work-product doctrine, or any other applicable privilege. Further responding, the factual and medical bases for any alternative causes specific to Plaintiff Christine Kinderdine are subject to expert discovery, thus making this Interrogatory premature. Notwithstanding, at this time, Accord has not made any specific contention as to alternative causes related to Plaintiff Christine Kinderdine as such information can only be obtained through the work-up of her individual case, which is still in progress. Pursuant to FRCP 8(c), Affirmative Defenses must be stated in response to an initial pleading and may be later withdrawn or amended as to any individual action as applicable.

18. Describe in detail the date, source, and your knowledge, understanding, reliance, tracking, or suspicion of adverse events, studies (including TAX316 and GEICAM 9805), or other pharmacovigilance with respect to TAXOTERE and ALOPECIA after receiving YOUR NDA approval.

**ANSWER:** Accord objects to this Interrogatory as phrased as it is vague and confusing. Notwithstanding, as a 505(b)(2) applicant Accord sought approval to market Docetaxel under the Hatch-Waxman Amendments to the Food, Drug & Cosmetic Act. The primary purpose of the Hatch-Waxman Amendments was to bring drugs to market at a lower cost by permitting 505(b)(2) applicants to rely on information already known, including information from clinical trials, by the NDA holder for the Reference Listed Drug. Studies such as TAX316 and GEICAM 9805 were completed as to the Reference Listed Drug, Taxotere®, before Accord's 505(b)(2) application for Docetaxel. In addition, as a 505(b)(2) applicant, Accord is not required to conduct pharmacovigilance activities for adverse events that were reported to specifically involve "TAXOTERE" as defined by Plaintiffs in their definitions to these Interrogatories. Following NDA approval, Accord complied with its post-marketing pharmacovigilance responsibilities pursuant to the applicable FDA regulations and the SOPs identified in response to Interrogatory No. 13.

19. Identify the studies and published scientific and medical literature on which YOU relied in entering the DOCETAXEL market and the due diligence YOU conducted to verify the validity of each such study in placing such reliance.

**ANSWER:** Objection as overbroad and implying that Accord had a duty to "verify the validity" of any study; rather, as a 505(b)(2) applicant Accord sought approval to market Docetaxel under the Hatch-Waxman Amendments to the Food, Drug & Cosmetic Act. The primary purpose of the Hatch-Waxman Amendments was to bring drugs to market at a lower cost by permitting 505(b)(2) applicants to rely on information already known, including information from clinical trials, by the NDA holder for the Reference Listed Drug. Any efforts to verify the validity of

clinical studies already completed would require needless clinical trials and risk to patients in contravention of the stated policy reasons and FDA guidance. In its Section 505(b)(2) application, Accord advised the FDA that the proposed formulation submitted for Docetaxel was identical to the Reference Listed Drug, Taxotere®, and that both products were intended for intravenous administration and contain the same active ingredients in the same concentration. *See* ACC.00003736-ACC.00003737. In accordance with 21 C.F.R. § 320.22(b)(1), Accord requested that FDA waive the requirement that Accord conduct any in vivo bioequivalence studies of its Docetaxel Injection because the active ingredient, route of administration, dosage form, and strength of the drug were the same as those of the Reference Listed Drug, and the FDA granted Accord's request.

20. In addition to the above, identify every STUDY that YOU commissioned, participated in, or are aware of with respect to the efficacy, safety, or side effects of DOCETAXEL, or the comparison between DOCETAXEL and paclitaxel, during the time that YOU were considering entering the market and thereafter.

**ANSWER:** Objection as overbroad, vague, and confusing, in implying that Accord had a duty to perform safety and efficacy studies for Docetaxel; rather, as a 505(b)(2) applicant Accord sought approval to market Docetaxel under the Hatch-Waxman Amendments to the Food, Drug & Cosmetic Act. The primary purpose of the Hatch-Waxman Amendments was to bring drugs to market at a lower cost by permitting 505(b)(2) applicants to rely on information already known, including information from safety studies and other clinical trials, by the NDA holder for the Reference Listed Drug. Any efforts to re-do safety and efficacy studies already completed would require needless clinical trials and risk to patients in contravention of the stated policy reasons and FDA guidance.

21. Describe in detail YOUR knowledge, understanding, or awareness of foreign labeling with respect to DOCETAXEL, including label changes, and the reasons behind such labeling or change in labeling.

**ANSWER:** Objection as Plaintiffs' claims in this MDL relate to Docetaxel use in the United States and thus, such knowledge or awareness is irrelevant and not proportional to the needs of this litigation with respect to Accord. Notwithstanding, Accord is not involved in foreign labeling in the regular course of business.

22. At the time YOU decided to and then actually entered the market for the sale of DOCETAXEL, describe in detail YOUR knowledge of any suspected connection, relationship, or link between permanent or persistent ALOPECIA and the use of TAXOTERE.

**ANSWER:** Objection as vague and ambiguous as to the meaning of "persistent." Notwithstanding, Accord markets Docetaxel as a 505(b)(2) applicant, and as such, derived information about safety from the Reference Listed Drug, Taxotere®. Accord was accordingly

"aware" during the relevant time period of the medical literature and clinical trials for Taxotere®, some of which involved reports of alopecia with use of Taxotere® either alone or in combination with other drugs.

23. At the time YOU decided to and then actually entered the market for the sale of DOCETAXEL, describe in detail YOUR knowledge of a suspected connection, relationship, or link between any form of ALOPECIA and the use of TAXOTERE.

**ANSWER:** Accord objects to this Interrogatory as vague and ambiguous as to the meaning of "any form of alopecia." Notwithstanding, Accord markets Docetaxel as a 505(b)(2) applicant, and as such, derived information about safety from the Reference Listed Drug, Taxotere®. Accord was accordingly aware during the relevant time period that alopecia is a commonly known side effect of Docetaxel that has been well documented in clinical trials performed before Taxotere® was approved by FDA and continued thereafter, the medical literature, as well as the labeling for Docetaxel since Taxotere® was approved in 1996.

24. Describe how YOU define or have defined ALOPECIA during the Relevant Time Period, stating the location and use of each such definition.

**ANSWER:** Accord objects to this Interrogatory as vague. Notwithstanding, Accord does not define and has not defined alopecia during the Relevant Time Period in its Full Prescribing Information or Patient Information. Pursuant to Accord's pharmacovigilance obligations, reports of hair loss and/or alopecia are interpreted consistent with the Medical Dictionary for Regulatory Activities (MedDRA).

25. Describe in detail your awareness of marketing, sales, physician, patient or nurse brochures or other information regarding TAXOTERE at the time that YOU entered the DOCETAXEL market and the use YOU made of such material.

**ANSWER:** Accord objects to this Interrogatory as vague regarding its "awareness" of the information described. Notwithstanding, as to "use", Accord – a Section 505(b)(2) NDA holder – does not market, advertise, promote, or provide promotional materials directly to healthcare providers. As such, Accord did not "use" any marketing, sales, physician, patient or nurse brochures or other information regarding Taxotere® at the time it entered the Docetaxel market. Further responding, Accord refers the PSC to its NDA, previously produced in an electronic and searchable format, that contains the "information" regarding Taxotere® that Accord relied upon in submitting its NDA pursuant to 505(b)(2).

26. Describe in detail how YOU offered or marketed DOCETAXEL for sale to YOUR customers or potential customers during the Relevant Time Period.

**ANSWER:** Pursuant to CMO 7 Section 4(b) and Federal Rules of Civil Procedure 33(a)(1), a party is limited to no more than 25 written interrogatories and accordingly, no Answer is required to Nos. 26 through 36.

27. Identify YOUR customers for DOCETAXEL.

**ANSWER:** See Answer to Interrogatory No. 26.

28. Identify and describe YOUR contracts with each customer for DOCETAXEL.

**ANSWER:** See Answer to Interrogatory No. 26.

29. Identify whether and describe how YOU represented YOUR DOCETAXEL as beneficial over TAXOTERE.

**ANSWER:** See Answer to Interrogatory No. 26.

30. Identify YOUR employees or representatives who attended a San Antonio Breast Cancer Symposium or ASCO symposium or conference between 2006 and 2017.

**ANSWER:** See Answer to Interrogatory No. 26.

31. Identify every PERSON involved in the initial labeling decision and those involved in decisions to request or change YOUR label for DOCETAXEL from its initial release to the present.

**ANSWER:** See Answer to Interrogatory No. 26.

32. Identify and describe all co-promotions in which YOU have participated regarding DOCETAXEL.

**ANSWER:** See Answer to Interrogatory No. 26.

33. Identify and describe in detail the process by which YOU are notified or become aware of adverse events or reports for DOCETAXEL manufactured by YOU, the process by which YOU are notified or become aware of adverse events or reports for DOCETAXEL manufactured by others.

**ANSWER:** See Answer to Interrogatory No. 26.

34. Describe in detail YOUR pharmacovigilance for DOCETAXEL and for TAXOTERE, whether manufactured by YOU or by others.

**ANSWER:** See Answer to Interrogatory No. 26.

35. Explain all actions taken by YOU to investigate the connection, relationship, or link between DOCETAXEL and ALOPECIA.

**ANSWER:** See Answer to Interrogatory No. 26.

36. Identify and describe the factors and process that led to YOUR label change or proposed label change of YOUR DOCETAXEL product.

**ANSWER:** See Answer to Interrogatory No. 26.

Accord is continuing to investigate many of the matters sought in the Interrogatories and therefore, the answers are believed to be accurate based upon the current information and materials available. Accordingly, Accord reserves the right to amend, supplement, modify, or change its Answers as investigation and discovery continue, should same be warranted.

Dated: October 1, 2018

Respectfully submitted,

*/s/ Julie A. Callsen*
Julie A. Callsen (0062287)
Brandon D. Cox (0089815)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113-7213
Telephone: 216-592-5000
Facsimile: 216-692-5009
julie.callsen@tuckerellis.com
brandon.cox@tuckerellis.com

*Attorneys for Defendant*
*Accord Healthcare, Inc.*

## **CERTIFICATE OF SERVICE**

  I hereby certify that a copy of the foregoing has been served on counsel for Plaintiffs' Liaison Counsel via electronic mail this 1st day of October, 2018.

              /s/*Julie A. Callsen*
              Attorney for Accord Healthcare, Inc.

## VERIFICATION

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

Emily M. King, being first duly sworn, deposes and says:

I am the Vice President & General Counsel of Accord Healthcare, Inc., a defendant in the above-entitled action. The foregoing Answers to Interrogatories were prepared with the assistance and advice of counsel for Accord Healthcare, Inc., upon whose advice Accord Healthcare, Inc. and I relied. Further, it was necessary to obtain information to prepare the answers from various sources. Many of the Interrogatories are vague and ambiguous and reasonably susceptible to numerous interpretations. Accordingly, Accord Healthcare, Inc. reserves the right to supplement its answers. Subject to these qualifications, the foregoing answers are true and correct to the best of my knowledge, information and belief.

_____
Emily M. King

Dated: October 1, 2018

Sworn to and subscribed before me this 1st day of October, 2018.

_____
Notary Public