**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL No. 2740 |
| | SECTION: "H" |
| *Arquise Conley,* *Case No. 2:18-cv-09799* | JUDGE MILAZZO |
| | MAG. JUDGE NORTH |

**PLAINTIFF'S OPPOSITION TO DEFENDANT SANDOZ'S**
**MOTION FOR SUMMARY JUDGMENT ON PREEMPTION GROUNDS**

**INTRODUCTION**

In this state law failure-to-warn suit, Defendant Sandoz Inc. seeks federal immunity on the theory that its drug is by and large a copy of Sanofi's Taxotere, and thus (the theory goes) Sandoz's drug labeling must always be the same as Taxotere's. So, the theory concludes, as long as Sandoz follows Sanofi, Sandoz cannot be held liable under state law for the injuries its drug causes — even if Sanofi can be held liable for the injuries its drug causes — because Sandoz's federal "follow the leader" obligation supersedes any state-law duty to provide a different warning.

If this theory sounds familiar, it's because it's the theory behind federal preemption for generic (or duplicate) drugs. "Follow the leader" is just another way of saying there is an ongoing federal duty of "sameness" that prevents Sandoz from unilaterally strengthening its warning label through the Food and Drug Administration's (FDA's) "changes-being-effected" (CBE) process.

But Sandoz didn't seek generic drug (i.e., 505(j)) approval. Sandoz sought and obtained approval for a new drug application (NDA) (hence, their status in this MDL as a "505(b)(2)" defendant). And that makes all the difference preemption-wise. *Carter v. APP Pharmaceuticals, LLC*, 2013 WL 5532767, at *5 (D. Ariz. Aug. 13, 2013) (rejecting 505(b)(2) drug manufacturer's

argument that its product was a generic drug subject to the *Mensing*'s preemption test). Under federal law, an NDA holder *is* responsible for the accuracy and adequacy of its label at all times, and the CBE process *is* available to it. Because "the CBE regulation permits [labeling] changes, … a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with both." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019).

Sandoz's contrary view represents a serious category error that the FDA itself has rejected. Sandoz couches its argument with a false equivalency between generic (or duplicate) drugs approved under Section 505(j) of the Food, Drug and Cosmetics Act (FDCA), and new drug applications approved under Section 505(b)(2), such as Sandoz's drug, claiming *both* must always follow the labeling actions of the manufacturer that originally submitted a new drug application under Section 505(b)(1) — here, Sanofi. But "there are *no analogues* in section 505(b)(2) to the provisions in section 505(j)" establishing Sandoz's purported sameness requirement. *See* FDA's Consolidated Response to Citizen Petitions at 18, Docket Nos. FDA-2001-P-0369 and FDA-2003-P-0274 (Oct. 14, 2003) (rejecting manufacturers' challenges to FDA's implementation of Section 505(b)(2)) (emphasis added) (attached as Pl.'s Ex. 1) (hereinafter, "Woodcock Letter"). "[Un]like those approved in ANDAs, products approved in 505(b)(2) applications [need not] be bioequivalent to, have the same conditions of use as, *and the same labeling* as the listed drugs referenced." *Id*. (emphasis added). Still more, "ANDAs must be withdrawn when the listed drug is withdrawn for safety or effectiveness reasons (section 505(j)(6))." *Id*. (citation omitted). But for 505(b)(2) drugs, "there is no comparable withdrawal requirement when the listed drug is withdrawn for safety or effectiveness reasons." *Id*.

Sandoz's other preemption arguments are *not* predicated on its status as a 505(b)(2) label holder; rather, its arguments merely rehash Sanofi's preemption position. Like Sanofi, Sandoz doesn't even attempt to satisfy the Supreme Court's demanding, two-part test for "impossibility" preemption, which this Court faithfully applied in *Earnest* and *Kahn*. *See In re Taxotere (Docetaxel) Prod. Liab. Litig.* [*Earnest*], No. 16-17144, 2019 WL 11660424, at *4 (E.D. La. Aug. 14, 2019); *In re Taxotere (Docetaxel) Prods. Liab. Litig.* [*Kahn*], 508 F. Supp. 3d 71, 84 (E.D. La. 2021). Instead, Sandoz proposes (just as Sanofi did, unsuccessfully) a convoluted test with shifting burdens that places the onus of disproving preemption largely on Plaintiff. That is not the law — and this Court has already rejected this burden-shifting approach. *See In re Taxotere* [*Earnest*], 2018 WL 11660424, at *7 ("Like the manufacturer in *Levine*, 'Sanofi misapprehends both the federal drug regulatory scheme and its burden in establishing a pre-emption defense.'") (brackets and citation omitted).

The Supreme Court was clear that a drug manufacturer asserting a preemption defense must demonstrate that (1) "it fully informed the FDA of the justifications for the warning required by state law" and (2) "the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning." *Albrecht*, 139 S. Ct. at 1678. Accordingly, it is not enough for Sandoz to argue, as it does here, that if it had submitted a new label with additional warnings to the FDA, the FDA would have rejected the warning. The "possibility of impossibility is not enough" to establish an actual, irreconcilable conflict between federal labeling duties and state-law duties to warn. *Id*. at 1679 (citation omitted). What's more, preemption is further limited to where the FDA has *actually* rejected a proposed labeling change through action "taken pursuant to the FDA's congressionally delegated authority." *Id*. Nothing of the sort occurred here.

For these reasons and more, the Court should deny Sandoz's motion for summary judgment based on preemption.

## STATUTORY AND REGULATORY BACKGROUND

The Federal Food, Drug and Cosmetic Act (FDCA), ch. 675, 52 Stat. 10440, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (Hatch-Waxman Amendment),[1] describes two broad categories for approval of drug applications: new drug applications, or NDAs, the requirements of which are set forth in Section 505(b) and (c) of the FDCA; and abbreviated new drug applications, or ANDAs, the requirements of which are set forth in Section 505(j).

The FDA's interpretation of these drug approval pathways and their corresponding regulatory obligations is set forth in great detail in the FDA's 2003 consolidated response to various citizen petitions, and that response reflects the FDA's current interpretation of Section 505(b)(2). *See* Pl.'s Ex. 2, *CDER*, Guidance for Industry, Determining Whether to Submit an ANDA or a 505(b)(2) Application 1 n.4 & 5 n.17 (May 2019) (citing Woodcock Letter). "The FDA's views are 'controlling unless plainly erroneous or inconsistent with the regulation[s]' or there is any other reason to doubt that they reflect the FDA's fair and considered judgment." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 461, 462 (1997)).

As the FDA summarizes there, the Hatch-Waxman Amendments established an explicit regulatory pathway to approve duplicates of post-1962 drugs — Section 505(j). Woodcock Letter 6. This law also "created a new subset of NDA" — Section 505(b)(2) — which "permits an applicant seeking approval for a drug product that differs from the approved drug product to obtain

---

[1] To simplify, we cite Title 21 of the United States Code rather than the FDCA, except for Section 505(b)(1) and 505(b)(2) NDAs, and Section 505(j) ANDAs, which are commonly referred to by their FDCA designation.

approval without conducting new studies to demonstrate to the Agency what has already been demonstrated." Woodcock Letter 14. Although a 505(b)(2) application may rely on a safety-and-effectiveness determination for a listed drug to the same extent as an ANDA, FDA regulations make clear that Section 505(b)(2) is not an appropriate pathway for a copycat drug eligible for approval under Section 505(j). Woodcock Letter 17 & n.18 (citing 21 C.F.R. §§ 314.54(b), 314.101(d)(9)). As such, and relevant here, there are important differences between 505(b)(2) new drugs and generic drugs.

For one, "there are no analogues in section 505(b)(2) to the provisions in section 505(j) requiring that the product under the 505(j) application be bioequivalent to, have the same conditions of use as, *and use the same labeling as the listed drug referenced*." Woodcock Letter 18 (emphasis added). For another, because ANDAs are duplicates of a reference listed drug (albeit sometimes with minor variations), and therefore are expected to have the same safety and effectiveness profile as a listed drug, an ANDA must be withdrawn when the listed drug is withdrawn because it is not safe or effective. Woodcock Letter 18 (citing Section 505(j)(6)). There is no comparable withdrawal requirement for products approved under Section 505(b)(2). *Id.*

The FDA prohibits the sale of a prescription drug in interstate commerce unless the FDA has given its approval. 21 U.S.C. §355(a). The FDCA, however, does not prohibit a manufacturer from changing the label of a brand-name drug post-approval, provided the label does not render the drug "misbranded." *See id*. §§ 331(a), 352(a) (drug is misbranded "[i]f its labeling is false or misleading in any particular").

Under the current "changes being effected" or "CBE" regulation, a manufacturer may make "[c]hanges in the labeling to reflect newly acquired information" *without* prior FDA approval, if the change is "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction

for which the evidence of a causal association satisfies the standard for inclusion in the labeling under [21 C.F.R.] § 201.57(c)." 21 C.F.R. § 314.70(c)(6)(iii).[2] This provision explicitly authorizes "*the holder of an approved NDA*" to unilaterally make such a label change. *Id*. § 314.70(c)(6) (emphasis added).

"Newly acquired information" is defined to include "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses)." *Id.* § 314.3. A manufacturer making such a label change must submit a supplement to the FDA regarding the change. If the FDA disapproves the CBE supplement, "it may order the manufacturer to cease distribution of the drug product(s) made with the ... change." *Id.* § 314.70(c)(6)(iii), (c)(7). A manufacturer can also apply for FDA approval to update the label through a "Prior Approval Supplement" ("PAS"), which requires prior approval by the FDA. *Id.* § 314.70(b)(2)(v)(A).

FDA regulations establish the format for drug labeling. Relevant here are two sections called "Adverse Reactions" and "Warnings and Precautions." The Adverse Reactions section includes a listing of all "undesirable effect[s], reasonably associated with use of a drug." 21 C.F.R. § 201.57(c)(7). A manufacturer must list an adverse reaction if "there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id.* The Warnings and Precautions section, in turn, describes "clinically significant adverse reactions," and "limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification)." *Id.* § 201.57(c)(6)(1). This section "must be revised to include a warning about a clinically significant hazard as soon as there is reasonable

---

[2] Before September 22, 2008, the CBE regulation did not contain a requirement that the label change "reflect newly acquired information," nor did it require that the change meet any threshold of evidence of causal association. *See* 21 C.F.R. § 314.70(c)(6)(iii) (2008); 73 Fed. Reg. 49,603 (2008) (amending regulation).

evidence of a causal association with a drug; a causal relationship need not have been definitely established." *Id.* Since 2008, those standards also have applied to warnings added through a CBE supplement. *Id.* § 314.70(c)(6)(iii)(A).

If the FDA "determines that [it] will not approve" either an NDA or a labeling supplement "in its present form," it will "send the applicant a complete response letter." *Id.* § 314.110(a). The complete response letter "will describe all of the specific deficiencies that the agency has identified in an application." *Id.* § 314.110(a)(1). Complete response letters, however, merely "infor[m] sponsors of changes that must be made before an application can be approved, with no implication as to the ultimate approvability of the application." 73 Fed. Reg. 39588 (2008). A drug manufacturer who has received a complete response letter can "[r]esubmit the application ... , addressing all deficiencies identified in the complete response letter"; "[w]ithdraw the application"; or request a hearing at which FDA will make a final determination whether to approve or reject the application. 21 C.F.R. § 314.110(b).

Before 2007, FDA lacked authority to mandate that manufacturers change prescription drug labels. *Albrecht*, 139 S. Ct. at 1677. "[W]hen Congress granted the FDA this authority, in the 2007 Amendments to the FDCA, Congress simultaneously reaffirmed the manufacturer's obligations and referred specifically to the CBE regulation, which both reflects the manufacturer's ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval." *Id.* (internal quotation marks and citation omitted).

## ARGUMENT

### I.    Sandoz fails to establish that its drug is a generic drug product.

There is no dispute that Sandoz is an NDA holder of the drug that injured Plaintiff Conley. And NDA holders using the 505(b)(2) approval pathway are not required to "use the same labeling

as the listed drug referenced." Woodcock Letter 18 (emphasis added). Drug manufacturers like Sandoz, then, may use the CBE regulation to make "[c]hanges in the labeling to reflect newly acquired information" without prior FDA approval, if the change is "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under [21 C.F.R.] §201.57(c)." 21 C.F.R. § 314.70(c)(6)(iii). There is no distinction in the law between RLDs and 505(b)(2) drugs as to the availability of CBEs to provide safety information. The CBE provision explicitly authorizes "the holder of an approved NDA" to unilaterally make such a label change. Id. § 314.70(c)(6) (emphasis added).

Here, Sandoz's status as an NDA holder dictates its responsibilities under federal law. In *Carter v. APP Pharmaceuticals, LLC*, No. CV-10-02573-PHX-ROS, 2013 WL 5532767, at *5 (D. Ariz. Aug. 13, 2013), a defendant drug manufacturer whose drug was approved via the 505(b)(2) pathway argued that its drug qualified as a generic for purposes of "impossibility" preemption analysis. The *Carter* court disagreed, holding:

> Plaintiff's claims are not preempted based on *Mensing*. B.Braun has not shown based on clear authority that its heparin flush product is a generic drug or that it was required to "match" the Baxter Healthcare label in all respects regarding its product. Defendants are not entitled to summary judgment based on preemption of Plaintiff's claims.

*Id.*

So too here, Sandoz is an NDA holder that availed itself of the 505(b)(2) pathway. It did not seek approval of its drug as a duplicate pursuant to Section 505(j). Drugs approved pursuant to Section 505(b)(2) are not subject to the "sameness" requirements that are imposed on generic drugs. Woodcock Letter 18; *see* Def's Ex. W, Ross Report, June 8, 2020. Labeling for drugs approved via the 505(b)(2) pathway that point to the same listed drug may even differ from one

another. *See Takeda Pharm., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 108 (D.D.C. 2015) (rejecting challenge to FDA decision to approve different labeling for two substantially similar 505(b)(2) drugs), *aff'd in part, vacated in part*, No. 15-5021, 2016 WL 4098633 (D.C. Cir. July 15, 2016). What's more, the CBE regulation authorizes "the holder of an approved NDA" to unilaterally update its label to warn of a safety risk. *Id.* § 314.70(c)(6) (emphasis added). That regulation *does not* distinguish between types of NDAs. *See id.*

Sandoz was therefore required to update its label with warnings of an "undesirable effect," like permanent alopecia, that is "reasonably associated with use of [its] drug." 21 C.F.R. §201.57(c)(7). And this obligation arose as soon as "there [was] some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id.*

For these reasons, the Court should reject Sandoz's attempt to evade *Albrecht*'s preemption test by recasting its drug as a generic.

## II. Sandoz fails to establish preemption under *Albrecht*.

Under *Wyeth v. Levine* and *Merck v. Albrecht*, "[t]he underlying question for this type of impossibility pre-emption defense is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding *any and all* warnings to the drug label that would satisfy state law." *Albrecht*, 139 S. Ct. 1678 (emphasis added); *see Levine*, 555 U. S. 555, 571 (2009). "And, of course, in order to succeed with that defense *the manufacturer* must show that the answer to this question is yes." *Albrecht*, 139 S. Ct. at 1678 (emphasis added).

To prove impossibility, a drug manufacturer like Sandoz must present "clear evidence that the FDA would not have approved a change to [the drug]'s label." *Levine*, 555 U.S. at 571. The "clear evidence" needed is "evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in

turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning." *Albrecht*, 139 S. Ct. at 1672.

Nowhere in *Albrecht* did the Supreme Court state, as Sandoz falsely asserts, that whether there was "reasonable evidence" sufficient for a manufacturer to "propose a change" through a CBE supplement is "a matter of law for the judge to decide" as part of a preemption analysis. (Mot. at 3.) Indeed, the only evidence the *Albrecht* Court was concerned with was the "clear evidence" through which a defendant must establish that an FDA decision made it impossible to comply with both federal and state obligations. *See Albrecht*, 139 S. Ct. at 1679 ("[T]he judge must simply ask himself or herself whether the relevant federal and state laws "irreconcilably conflict.").

*Albrecht* held that, in order to "show[ ] that federal law prohibited [a] drug manufacturer from adding a warning that would satisfy state law," the drug manufacturer must demonstrate that

> (1) "it fully informed the FDA of the justifications for the warning required by state law" and
>
> (2) "the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning."

*Id.* at 1678; *accord In re Avandia Mktg., Sales & Prod. Liab. Litig.*, 945 F.3d 749, 758 (3d Cir. 2019).

In applying these factors, *see Albrecht*, 139 S. Ct. at 1680 (holding this preemption defense is for the judge not jury), courts must keep two important limitations in mind. *In re Avandia*, 945 F.3d at 758-59; *Crockett v. Luitpold Pharm., Inc.*, 2020 WL 433367, *7 (E.D. Pa. Jan. 28, 2020); *see also Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 890 (7th Cir. 2020). First, "it is not sufficient for the proponent to contend that if it had submitted a new label—with additional warnings—to the FDA, the FDA *would have* rejected the warning." *Crockett*, 2020 WL 433367, at *7. As *Albrecht* explained, there must be an actual, irreconcilable conflict between federal and state law, "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-

emption of the state statute." 139 S. Ct. at 1679 (quoting *Rice v. Norman Williams Co*., 458 U. S. 654, 659 (1982)). Simply put, the "possibility of impossibility [is] not enough." *Albrecht*, 139 S. Ct. at 1678 (quoting *Mensing*, 564 U.S. at 625, n.8) (internal quotation marks omitted).

"Preemption is further limited in state law failure-to-warn situations where the FDA has *actually* rejected a proposed labeling change through action 'taken pursuant to the FDA's congressionally delegated authority.'" *Crockett*, 2020 WL 433367, at *7. As the Third Circuit recently explained in *In re Avandia*, "the upshot of [*Albrecht*] is that a drug manufacturer must show that *the FDA made a fully informed decision to reject a change* to a drug's label in order to establish the 'demanding defense' of impossibility preemption." 945 F.3d at 759 (emphasis added) (citing *Albrecht*, 139 S. Ct. at 1678).

Sandoz cannot meet that demanding test.

### A.  Sandoz cannot establish as a matter of law that it fully informed the FDA of the justifications for a stronger warning.

Sandoz argues that it is only responsible for monitoring the safety profile of its drug based on new data that existed between 2011, when its NDA was approved, and Plaintiff's injury. But federal law does not sanction Sandoz's blinkered approach to pharmacovigilance, which essentially presupposes that it can discharge this responsibility blind to whatever medical literature or data may have existed before 2011. To the contrary, although its post-marketing pharmacovigilance obligations begin upon FDA approval, nothing in federal law allows Sandoz to ignore all evidence arising before that time when evaluating drug safety. Such an approach would, by definition, lead to incomplete safety assessments. Sandoz's argument is wrong, and the company cannot get around this Court's ruling that "[t]he [2006] Sedlacek presentation … was enough to support a CBE change." *In re Taxotere*, 508 F. Supp. 3d at 85.

Had Sandoz performed proper post-marketing pharmacovigilance, it would have arrived at the conclusion that the low threshold for a label change — "some basis to believe" there exists an "undesirable effect, reasonably associated with use of a drug," 21 C.F.R. §201.57(c)(7) — had been met. And it would have done so shortly after its NDA was approved, based on the strength of the pre-2011 evidence of a causal association. But even notwithstanding that, this Court has held that, for purposes of preemption analysis, information on the risks associated with a drug may continue to accumulate over time. Indeed, "newly acquired information could be an increasing body of data of an inherent risk with the drug." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.,* 779 F.3d 34, 42 (1st Cir. 2015) (internal quotations omitted) (*citing Levine,* 555 U.S. at 571). And, as Plaintiff's expert has opined, the data points on the link between docetaxel and permanent hair loss kept adding up after Sandoz's NDA approval—with new medical literature, reports to Sandoz from patients experiencing permanent hair loss, additional adverse events indicating a stronger causation signal, and information provided in foreign regulatory documents. *See* 21 § CFR 314.80(b) (identifying sources for post-market safety data surveillance). Indeed, during this timeframe, Sandoz updated the docetaxel label in foreign countries to include information about the risk of permanent alopecia.

The question then is not, as Sandoz frames it, whether *individual* pieces of data, including medical papers and clinical trial data, constitute "newly acquired information." Rather, the relevant information is the safety signal the company should have gleaned from the entire body of evidence, which only increased after 2011 with new medical literature from Miteva *et al.*[3] and Palamaras *et*

---

[3] Ex. 11, Miteva M., *et al.* Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am. J. Dermatopathol. 2011 June; 33(4): 345-350.

*al.*[4] supporting a causal association with permanent alopecia. In the American Journal of Dermatopathology, Miteva and colleagues discussed "the histological features of 10 cases of permanent alopecia after systematic chemotherapy with taxanes (docetaxel)," including 6 cases in which the patients took docetaxel for breast cancer.[5]  Another paper, written by Palamaras and colleagues, described seven patients at the authors' dermatology practice who treated for permanent alopecia after chemotherapy. Five of these seven patients had docetaxel exposure, and the authors linked their condition to that observed in docetaxel patients by Prevezas *et al.*[6] two years earlier. Importantly, these papers drawing attention to an association between docetaxel and permanent alopecia were only building on earlier scholarship highlighting the same in the medical literature.

Likewise, analysis of the FDA's Adverse Event database illustrates accumulating data regarding the risk of permanent alopecia associated with docetaxel. Indeed, both Dr. Madigan's lasso logistic regression and L2 logistic regression analyses evidence an ***increased*** reporting rate of docetaxel against all other drugs exceeded the standard statistical threshold of 2 as of the end of 2010 and remained above this threshold at the end of 2011 and beyond.[7]  This publicly available data alone, if properly analyzed under industry-accepted methods, supports a causal association between docetaxel and permanent alopecia—Sandoz just didn't perform any such analysis. Just as

---

[4] Ex. 12, Palamaras I, et al. *Permanent chemotherapy-induced alopecia: a review*. J Am Acad Dermatol. 2011 Mar; 64(3):604-6.

[5] Ex. 11, Miteva M., *et al*. Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am. J. Dermatopathol. 2011 June; 33(4): 345-350.

[6] Ex. 7, Prevezas C, *et al. Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer*. Br J Dermatol. 2009 Apr; 160(4):883-5.

[7] Def's Ex. W, Ross Rep., June 8, 2020, ¶ 95, Ex. 13, Madigan Rep., June 6, 2020, ¶¶ 39-49.

in *Levine*, the drug manufacturer here "could have analyzed the accumulating data and added a stronger warning." 555 U.S. at 570.

Not least, in 2010 and 2011, Sandoz's foreign labeling docetaxel labels in Austria, Germany, and Australia included persistent alopecia data from Sanofi's TAX 316 clinical trial. *See* Def's Ex. W, Ross Rep. ¶¶ 100, 117; *see, e.g.*, Pl.'s Ex. 15, Sandoz Docetaxel 2011 Australian Label.  These regulatory moves show that Sandoz possessed new scientific information regarding PCIA from Sanofi's clinical trial and that, had Sandoz reviewed Sanofi's Summary of Product Characteristics (SPC) for Taxotere at that time, Sandoz would have had access to the final clinical trial and data and additional statements regarding the risk of permanent alopecia. *Id.*

For these reasons, Sandoz's contention that there is zero evidence in the record that could have made such a difference is wholly without support.

### B.  Sandoz fails to show that the FDA disapproved a state-law-required labeling change to warn of permanent hair loss.

Sandoz cannot establish the 'demanding defense' of impossibility preemption for the separate and independent reason that the FDA never actually rejected a stronger warning for docetaxel concerning permanent hair loss. As *Crockett* explained, "it is not sufficient for the proponent to contend that if it *had* submitted a new label—with additional warnings—to the FDA, the FDA *would have* rejected the warning." *Crockett*, 2020 WL 433367, at *7. The "possibility of impossibility" is not enough to establish an actual, irreconcilable conflict between federal labeling obligations and state duties to warn. *Albrecht*, 139 S. Ct. at 1678 (citing *Mensing*, 564 U. S. 604, 625, n.8 (2011)). To establish an actual conflict, a drug manufacturer must point to final agency action that prohibits it from complying with state-law duties. *Id*. at 1679.

Sandoz's motion identifies nothing of the sort—nor does it attempt to. As explained *supra*,

because Sandoz is an NDA holder under 505(b)(2) pathway (and not an ANDA holder under Section 505(j)), its docetaxel is not subject to the "sameness" requirements that are imposed on generic drugs and may even differ from other NDA holders' labels. Woodcock Letter 18; *see* Def's Ex. W, Ross Report, June 8, 2020; *see Takeda Pharm., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 108 (D.D.C. 2015) (rejecting challenge to FDA decision to approve different labeling for two substantially similar 505(b)(2) drugs), *aff'd in part, vacated in part*, No. 15-5021, 2016 WL 4098633 (D.C. Cir. July 15, 2016). The CBE regulation plainly authorized Sandoz, as "the holder of an approved NDA," to unilaterally update its label to warn of the risk of permanent alopecia. *Id*. § 314.70(c)(6) (emphasis added).

In sum, the FDA never disapproved a state-law-required labeling change to warn of permanent hair loss or any other stronger warning of such a risk, such as the warning adopted in 2016. (*See* Mot. 8-9.) Thus, Sandoz cannot establish preemption as a matter of law.

## C. Sandoz's arguments that Plaintiff bears the burden of disproving preemption should be rejected again.

Sandoz's attempt to shift the burden to Plaintiff to disprove preemption are contrary to law — and indeed, law of this case.

In *Earnest*, this Court applied *Albrecht*'s two-prong test and declined to find preemption when Earnest's use of Taxotere was in 2011. *In re Taxotere*, 2019 WL 11660424, at *4. There, as here, defendant argued "that 'the plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulation without prior FDA approval.'" *Id.* at *3.

The Court rejected the argument and recognized that, under Supreme Court precedent, the defendant bears the burden of showing by clear evidence that the FDA would have prohibited a warning. *Id.* at *3-4. The Court noted the proper standard, "Like the manufacturer in *Levine*,

'[Sanofi] misapprehends both the federal drug regulatory scheme and its burden in establishing a pre-emption defense.'" *Id*. at *3 (quoting *Levine*, 555 U.S. at 569). The Court explained that "'newly acquired information' is not limited to new data, but also encompasses 'new analyses of previously submitted data.'" *Id*. (citing *Levine*, 555 U.S. at 569, and 73 Fed. Reg. 49604). Further, and most importantly, the Court held that it could not find preemption absent clear evidence that the FDA would have prohibited a warning. *Id*. at *4. The Court then placed the burden on Sanofi to present such clear evidence, which it could not then and Sandoz likewise cannot now.

The Court's ruling in *Earnest* is entirely consistent with federal decisions post-*Albrecht*. The Third Circuit in *In re Avandia* squarely placed the burden on the drug manufacturer to prove both parts of *Albrecht*'s two-part preemption test. 945 F.3d at 758-59. Likewise, the federal district court in *Crockett* rejected a drug manufacturer's attempt to shift the burden to plaintiff to plead or prove that the FDA lacked knowledge of scientific data that would have supported a label change:

> Having failed to meet their burden, Defendants attempt to shift it to Plaintiff by suggesting that because "Plaintiff pled no facts supporting a reasonable inference that the FDA lacked knowledge of the existing scientific data when it approved Injectafer," her claims must be dismissed on impossibility preemption grounds. But preemption is an affirmative defense, and it is thus Defendants' burden, not Plaintiff's, to demonstrate that it applies. *See Wyeth*, 555 U.S. at 573.

2020 WL 433367, at *8.

More recently still, the court in *Evans v. Gilead Scis., Inc*., No. 20-CV-00123-DKW-KJM, 2020 WL 5189995 (D. Haw. Aug. 31, 2020), rejected the same arguments Sandoz makes here, concluding that the argument "misapprehends … [defendant's] burden in establishing its preemption defense." *Id*. at *10. "[E]ven if there was little or no "newly acquired information" relevant to Evans' claims, that did not make it *impossible* for Gilead to change its Truvada label." *Id*. at *11. "The notion that perhaps there was not sufficient 'newly acquired information' or 'evidence of a causal association' between Truvada and the risk of injuries alleged here, 21 C.F.R.

§ 314.70(c)(6)(iii)(A), are merely two of any number of reasons for the FDA to reject the label changes after Gilead had made them. But federal law did not preclude Gilead from making a label change in the interim." *Id.*

Sandoz instead relies on non-binding and distinguishable decisions that do not support disregarding the Supreme Court, the law of this case, or the persuasive decisions of other federal courts of appeals and district courts.[8]  Nor can the Court disregard Fifth Circuit precedent holding that "[f]ederal preemption is an affirmative defense that a defendant must plead and prove." *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012); *see also Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 802 (5th Cir. 2011) ("The party asserting federal preemption has the burden of persuasion.").

In any event, *Albrecht* is the death knell of Sandoz's burden-shifting approach to preemption. The Court explicitly stated that "in order to succeed with that defense the *manufacturer* must show" that it fully informed the FDA and that the FDA, in turn, informed the drug manufacturer that it would not approve a label change. 139 S. Ct. at 1678 (emphasis added). The Court also reiterated that "impossibility preemption is a demanding defense" that drug manufacturers will have difficulty meeting because they can unilaterally update labeling based on reasonable evidence of a serious drug hazard. *Id.* (quoting *Levine*, 555 U.S. at 573) (brackets removed). Thus, because of CBE, "a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with

---

[8] Sandoz also relies on cases dismissing failure to warn suits on the pleadings, several involving Gadolinium and several citing *Utts* (Mot. at 14), but those courts found no medical evidence and only conclusory allegations to support additional warnings. *See, e.g., McGrath v. Bayer HealthCare Pharm. Inc.*, 393 F. Supp. 3d 161, 171 (E.D.N.Y. 2019) (faulting "Plaintiff's own conclusory allegations, unsupported by medical evidence"); *Gayle v. Pfizer Inc.*, No. 19CV3451, 2020 WL 1685313, at *5 (S.D.N.Y. Apr. 7, 2020) (similar; granting judgment on the pleadings). These cases are factually far afield from this case. Further, Sandoz cites *Roberto v. Boehringer Ingelheim Pharm.*, Inc., No. CPLHHDCV166068484S, 2019 WL 5068452 (Conn. Super. Ct. Sept. 11, 2019), presumably because it cited *Utts*, but the court there concluded that "the plaintiff's GERD claim is not preempted." *Id.* at *24.

both." *Id.* Summary judgment based on impossibility preemption, then, is the exception not the rule. *See id*.

In the end, Sandoz's burden-shifting approach gets the law exactly backwards because it presumes that there is preemption unless a plaintiff can prove otherwise. To the contrary, there is a presumption *against* preemption based on the notion that "Congress does not cavalierly pre-empt state-law causes of action." *Levine*, 555 U.S. at 678 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Congress has long been aware of state drug litigation but has neither enacted a preemption clause nor a federal right of action; this is "powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring safety and effectiveness." *Id*. at 575.

For these reasons, the Court should put the burden squarely on Sandoz to prove the affirmative defense of preemption, which it cannot do.

### D.  Sandoz's other arguments fail regardless of who carries the burden.

Despite failing to meet its clear burden under *Levine* and *Albrecht*, Sandoz makes ancillary arguments about what *Plaintiff* has not shown. Even if Plaintiff carried the burden to *disprove* preemption (which she does not), each of Sandoz's arguments would nonetheless fail.

First, Sandoz claims that in order to defeat its preemption defense, Plaintiff must show not only that new information supporting a label change was available to Sandoz, but also that Sandoz in fact acquired that information before the date of Plaintiff's injury. For instance, Sandoz argues that Plaintiff's claims fail unless she can show Sandoz actually performed the signal analysis that Dr. Madigan says constituted responsible pharmacovigilance practices and revealed a causal association with permanent alopecia.  (Mot. at 20.)  This is contrary to *Levine*, in which the Supreme Court rejected Wyeth's preemption defense in part because it "*could have analyzed* the accumulating data and added a stronger warning…." *Levine*, 129 S. Ct. 1197; *see also In re*

*Taxotere [Kahn]*, 508 F. Supp. 3d (E.D. La. 2020) ("Plaintiff has shown that if Sanofi *had analyzed* the information available … the information would have revealed the risk of permanent alopecia.") (emphasis added). Further, adoption of Sandoz's proposed preemption standard would reward drug manufacturers who have poor pharmacovigilance practices with successful preemption defenses. Federal law, however, is clear that the NDA holder has responsibility for post-marketing surveillance of drug safety, *see* 21 C.F.R. § 314.80(b), and Sandoz cannot claim preemption from its own purported ignorance.

Next, Sandoz argues that any new information on permanent alopecia simply repeated previously known risks—and did not "reveal[ ] risks of a different type, severity, or frequency that those previously considered by FDA." (Mot. at 21-22.)   But as the Court held in *Kahn*, this argument "misses the point" because in order to establish preemption, it is "not enough to show that the adverse event reports had been submitted to the FDA." *In re Taxotere*, 508 F. Supp. 3d at 85. The Court has specifically held that reported incidents of permanent alopecia from Sanofi's clinical trial do *not* obviate the need to consider subsequent reports of that adverse event. *Id.* This is because the "objective of TAX 316 was to evaluate survival rates, not the occurrence of alopecia." *In re Taxotere*, 508 F. Supp. 3d at 85 (noting "the limitations of the data Sanofi provided to the FDA in 2004"). Sandoz likewise argues that it had no obligation to report on the accumulating evidence of permanent alopecia with docetaxel, both in the medical literature and adverse event reporting, because that side effect had been observed prior to the approval of its NDA. (Mot. at 21.) Notwithstanding the fact that the Court, following *Levine*, has held that analysis of accumulating data is a basis for a CBE submission (*see* Part II.A, *supra*), Sandoz's argument is wholly inconsistent. Sandoz claims that the risk of permanent alopecia with docetaxel was "known and identified" in the medical literature and from "2000, 2008, and 2010 FAERs signal" detection,

while admitting it never undertook any such signal detection efforts and denying that the medical literature provides any evidence of a casual association. (Mot. at 20, 25.) Accordingly, it too should be rejected.

Last, Sandoz claims that a warning of permanent alopecia would have been "impossible" because the risk of PCIA with docetaxel was, and remains, only "speculative or hypothetical"— and for that reason the FDA would have rejected its CBE. (Mot. at 24-25.) But even if this argument had any bearing on the question of preemption under *Albrecht* (it does not), it directly conflicts with multiple rulings from the Court in this MDL and the history of docetaxel's labeling. For instance, the Court has ruled that Sanofi's 2015 label, stating that "[c]ases of permanent alopecia have been reported," "clearly and consistently explain[s] that the drug carrie[s] a risk of permanent hair loss," *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 462 F. Supp. 3d 650, 653 (E.D. La. 2020) (2015 fence-post order). This warning, which appeared in the Adverse Reactions section of the label, necessarily required a finding that the "undesirable effect [is] reasonably associated with use of a drug," 21 C.F.R. § 201.57(c)(7). In March 2016, Sandoz submitted a CBE to add the same warning to its own label. (Mot. at 9.) Sandoz cannot now claim there is no evidence of a causal association with permanent alopecia after asking the FDA to add a warning on that very basis. Further, the Court has also found—repeatedly—that there was sufficient scientific evidence to support such an association, *see e.g. In re Taxotere*, 508 F. Supp. 3d at 85 ("The [2006] Sedlacek presentation … was enough to support a CBE change."), or to otherwise put the question to a jury, *In re Taxotere*, 2021 WL 3006897, at *2 (noting that Drs. Ross and Plunkett may rely on Dr. Madigan's signal identification through FAERs analysis in their assessments "whether there is 'some basis to believe there is a causal relationship."); *see also In re Taxotere*, 462 F. Supp. 3d at

654 (E.D. La. 2020) (pre-label change claims may generally proceed to trial).[9]  Sandoz's causation-related argument not only lacks support in the factual record, but is contrary to the law of this case.

## **CONCLUSION**

Presumably Sandoz made a business decision to seek an NDA for their version of docetaxel under Section 505(b)(2) (rather than an ANDA under 505(j) of the FDCA.  Because Sandoz's docetaxel is not a generic, Sandoz cannot avail itself of *Mensing* generic preemption nor sidestep *Albrecht*'s demanding preemption test.  Further, like Sanofi, Sandoz cannot prove impossibility preemption: It does not point to any attempted CBE change nor has it presented "clear evidence" that the FDA would not have approved a change to its drug label. In the end, it is alarming that Sandoz would argue (at 25) that "[it] was dependent on FDA to approve any new warnings." The Supreme Court has rejected this blame-the-FDA argument time and again, and there is no basis to reach a different conclusion here.

Accordingly, the Court should thus deny Sandoz's motion for summary judgment based on preemption.


Dated: December 17, 2021                              Respectfully submitted,


*/s/ Christopher L. Coffin*                           */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                        Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                      GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225                       6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                          Los Angeles, California 90045
Phone: (504) 355-0086                                 Telephone: 510-350-9700
Fax: (504) 355-0089                                   Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                                kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                          *Plaintiffs' Co-Lead Counsel*

---

[9] *See also In re Taxotere*, 995 F.3d at 393–94 (holding that, as a matter of law, the 2011 – 2013 medical articles associating docetaxel with permanent alopecia provided notice to plaintiffs that docetaxel could have caused their injuries).

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*