UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 16-2740<br><br>*This document relates to:*<br>Audrey Plaisance, Case No. 2:18-cv-08086 |

**REPLY IN SUPPORT OF HOSPIRA'S MOTION TO
EXCLUDE OR LIMIT OPINIONS OF DR. DAVID ROSS**

Plaintiff's Opposition[1] only accentuates Dr. Ross's fundamental methodological failing. In order to opine that Hospira should have submitted a CBE labeling change to warn that "[c]ases of permanent alopecia have been reported," it was necessary for Dr. Ross to review the regulatory record and do the essential analytical work of explaining how the information in Hospira's possession between March 2011 (when the FDA approved Hospira's docetaxel labeling) and January 2014 (when Plaintiff began treatment) was "newly acquired information" under the CBE regulations—more specifically, how it was information that both "reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA" and reflected "evidence of a causal association" between the drug and the risk.  21 C.F.R. §§ 314(b), 314.70(c)(6)(iii).  Dr. Ross did not provide that explanation in his report—as Hospira detailed in its opening Memorandum[2]—and Plaintiff's Opposition merely paraphrases the report.  The Opposition does not dispute that:

- Dr. Ross does not cite the regulatory definition for "newly acquired information" in his report, indeed, does not even cite the CBE regulation;

- Of the three criteria for "newly acquired information," Dr. Ross does not mention in his report that such information must reveal risks of "a different type or greater severity or frequency than previously included in submissions to FDA" and reflect "evidence of a causal association" between the drug and the risk;

---

[1]  Pl.'s Mem. Opp. Hospira's Mot. Exclude or Limit Opinions of Dr. David Ross ("Opp."), ECF No. 13505.

[2]  Hospira's Mem. Supp. Mot. Exclude or Limit Opinions of Dr. David Ross ("Br.") at 7-13, ECF No. 11380-1.

1

- Dr. Ross did not review what information was submitted to the FDA; and

- Dr. Ross therefore does not analyze and explain how the information allegedly known to Hospira between March 2011 and January 2014 was "newly acquired information."

Nor, tellingly, does the Opposition dispute, or even attempt to explain away, Dr. Ross's concession that "really, between the time frame that I'm talking about and when they actually updated [the labeling], there was nothing new. There was nothing—it was just—I mean … it was not, like, oh my God, here's a new 2014 paper."[3] Absent any analysis on his part of how the then-available information "fit" the CBE criteria for "newly acquired information," Dr. Ross's opinion that Hospira should have unilaterally submitted a labeling change is *ipse dixit*. The Opposition is the same *ipse dixit* compounded. And no one can dispute that *Daubert* requires the exclusion of opinions that are *ipse dixit*.

### I. DR. ROSS'S FAILURE TO ANALYZE THE "NEWLY ACQUIRED INFORMATION" CRITERIA

Not until page 12 does the Opposition address the information that Dr. Ross identified in his report as requiring a labeling change, and, even then, the Opposition dodges the issue: Did that information (i) reveal risks of "a different type or greater severity or frequency than previously included in submissions to FDA" and (ii) reflect "evidence of a causal association" between the drug and the risk? The Opposition refers to "Dr. Ross's alleged failure to review Hospira's cherry-picked list of 'pertinent information.'" Opp. at 9. But Hospira did not cherry-pick what information might possibly constitute "newly acquired information": Hospira addressed (1) the 19 publications listed by Drs. Feigal and Madigan; (2) the foreign labeling; (3) the purported knowledge of Dr. Schmider; and (4) the adverse event reports submitted to Hospira because that is the information—the only information—identified in the brief three-page section of Dr. Ross's report devoted to "Evidence of Knowledge of 505(b)(2) NDA holders Sandoz, Accord and Hospira" (section V.D) / "Hospira" (section V.D.3).

---

[3] Br. Ex. C, ECF No. 13380-6 (Deposition of Dr. Ross (Sept. 30, 2021) ("Ross Dep.")), at 181.

The Opposition only repeats what Dr. Ross said in his report; it does not address the facts and arguments that demonstrate how he failed altogether to analyze and explain why those four categories of information are not "newly acquired information":

**The scientific literature**. Without discussing any particular publication, Dr. Ross purported to rely generally on the 19 publications listed in their reports by Drs. Feigal and Madigan. The Opposition does not dispute that 14 of the 19 publications either *pre*-date FDA approval of Hospira's docetaxel or *post*-date Plaintiff's use of the drug and therefore cannot constitute "newly" acquired information. Nor does the Opposition dispute that (i) of the five publications dated between March 2011 and January 2014, *none* reported permanent hair loss that was more frequent than reported in the pre-March 2011 scientific literature; (ii) three indeed reported permanent hair loss that occurred *less* frequently; and (iii) two reported that the prevalence rate was *unknown*.[4]

The Opposition notes about one study that it reported six cases of permanent hair loss and, about another, that it also reported six cases. Opp. at 12-13. But the relevant criterion under the CBE regulation is whether the purportedly "new" information reveals risks of "a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314(b). Merely noting the number of cases of permanent hair loss tells nothing about type, severity or frequency. The unavoidable fact—although the Opposition tries to avoid it—is that there were published articles before March 2011 that reported an incidence rate of

---

[4] At one point, the Opposition refers to "six new articles published between [FDA approval] and Plaintiff's use of the drug in January 2014." Opp. at 12. It then proceeds in the same paragraph to identify only five (Miteva, Kluger, Bourgeois, and Tosti (2)). The Opposition also refers to all five as "articles," although one is a letter to the editor and, a second, a note to the editor.

As one of the five publications, the Opposition mistakenly refers to a 2012 abstract by Bourgeois. But that abstract concerned an ongoing "prospective clinical trial … to evaluate tolerance of cooling scalp during docetaxel treatment." Ex. K, Bourgeois (2012) at 1. It reported no statistics for permanent hair loss, but only referred to another study that reported "persisting alopecia for *3%* of patients"—a fourth reference in the relevant period to permanent hair loss being *less frequent* than previously reported. *Id.*

3

permanent hair loss as high as 6 percent (e.g., the 2006 Sedlacek study), but the three publications between March 2011 and January 2014 that addressed the frequency of permanent hair loss reported rates of 0.059, ~2 and 3.9 percent.

There was no signal in these publications, and neither Dr. Ross nor the Opposition has explained how they could constitute a signal under the CBE criteria. There is only Dr. Ross's say-so, and *Daubert* requires the exclusion of opinions that are nothing more than the expert's own say-so. *See, e.g.*, *Konrick v. Exxon Mobil Corp.*, 2016 WL 439361, at *5 (E.D. La. Feb. 4, 2016) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)), *aff'd*, 670 F. App'x 222 (5th Cir. 2016).

**Foreign labeling**. The Opposition echoes Dr. Ross in stating that Hospira's docetaxel labeling in Israel, Hungary, and the United Kingdom included persistent alopecia. Opp. at 14. So it did, but the Opposition acknowledges that this statement in the foreign labeling was based on "data from Sanofi's TAX 316 clinical trial." *Id*. The critical fact—not disputed by the Opposition—is that Sanofi submitted the TAX 316 study data to the FDA *before* March 2011. *See* Br. at 10 & n.22. Thus, the data that supported the foreign labeling was information "previously submitted" to the FDA—therefore, information that did not satisfy the threshold requirement for a CBE submission.

**Purported knowledge of Dr. Schmider**. Again merely repeating what Dr. Ross said in his report, the Opposition argues that Hospira was in a "unique" position among 505(b)(2) NDA-holders because it hired Dr. Schmider, who "brought knowledge obtained from those years at Sanofi to his new position at Hospira," specifically Sanofi's dealings with the European Medicines Agency ("EMA") concerning the addition of a warning about persistent alopecia. Opp. at 12. But the Opposition does not offer a word of rebuttal to Hospira's three reasons why Dr. Ross's speculation about Dr. Schmider's "knowledge" is unreliable.

First, Dr. Ross opines that Hospira had sufficient information to make a CBE labeling change "sometime in 2012."[5] But Dr. Schmider did not begin working at Hospira until 2013, so his knowledge cannot explain what "newly acquired information" Hospira supposedly had a year earlier.

Second, Dr. Schmider did not gain secret knowledge from any interaction with the EMA. As the Opposition acknowledges, the persistent-alopecia warning statement by the EMA was based on Sanofi's TAX-316 data—data submitted to the FDA three times in 2004. Opp. at 14 ("Hospira's docetaxel labels in Israel, Hungary, and the United Kingdom … included persistent alopecia data from Sanofi's TAX 316 clinical trial."). Thus, this data was neither "unique" to Dr. Schmider nor "newly acquired information."

Third, the Opposition cites Dr. Ross's speculation that Dr. Schmider was in possession of Sanofi's Core Data Sheet for Taxotere "containing PCIA information from Taxotere's major clinical trial." Opp. at 12. Again, however, it is undisputed that the Sanofi clinical trial data had been submitted to FDA. Br. at 10 & n.22. Moreover, Dr. Schmider testified that he was not involved in the creation of the Core Data Sheet or European labeling changes and was not aware of permanent hair loss as an issue while at Sanofi. *See id.* at 11 & nn.27-28. The Opposition simply ignores Dr. Schmider's testimony, as did Dr. Ross in his report, and reiterates his speculation. Opp. at 11 (stating, "Dr. Schmider was apparently in possession of Sanofi's 2011 Core Data Sheet," and citing as support Dr. Ross's report).

In short, Dr. Ross could point to nothing Dr. Schmider knew that constituted "newly acquired information," and the Opposition is only an echo chamber for Ross's unsupported assertions.

**Adverse event reports**. The Opposition cites Dr. Madigan's lasso logistic regression and L2 regression analyses as evidencing "an increased reporting rate" of permanent hair loss. But, once again, the Opposition (like Dr. Ross) evades the critical point: Dr. Madigan admitted

---

[5] Br. Ex. C (Ross Dep.) at 177:1-16.

that there was no safety signal in 2012 that was not present since the early 2000s. Br. at 12 & n.32. Moreover, because Dr. Ross did not review the adverse event reports sent to Hospira—not disputed—he did not see that Hospira received only two reports of permanent hair loss where docetaxel was the sole suspect drug. *See id.* at 12. Necessarily, therefore, he did not explain how two reports (out of 161,000 women treated with Hospira's docetaxel) could signal that permanent hair loss occurred more frequently than reported before March 2011. The Opposition just overlooks the problem and ventures no response.

Absent analysis by Dr. Ross that connects the facts (i.e., the 2011-2014 scientific literature, the TAX 316 data, what Dr. Schmider allegedly knew or the number of adverse event reports) to the CBE criteria, his bottom-line opinion that Hospira should have submitted a labeling change leaves the very kind of "analytical gap," according to the Supreme Court, that warrants exclusion under *Daubert*. *Joiner*, 522 U.S. at 146.

## II.  THE OPPOSITION'S STRAW MAN ARGUMENTS

The first eleven pages of the Opposition are a parade of irrelevant, unresponsive arguments:[6]

**Pages 1-3**. These pages state that Dr. Ross is "well-credentialed," that he reached his conclusions after "performing an independent assessment," and that he reviewed "various sources." But Hospira's *Daubert* motion does not challenge Dr. Ross's credentials or his independence. The motion challenges Dr. Ross's failure to conduct a proper review of the regulatory record and to analyze the information that he points to as "new" and to explain how that information meets the criteria for "newly acquired information" under the CBE regulations. His qualifications are irrelevant to that issue.

---

[6]  Straw man arguments are also the *modus operandi* of Plaintiff's opposition to Hospira's summary judgment motion based on preemption. That opposition, like this one, never addresses the CBE criteria and never comes to terms with the regulatory rule that a manufacturer cannot unilaterally change the labeling unless all three criteria for "newly acquired information" are met. *See* Pl.'s Opp. Mem. Hospira's Mot. Summ. J. Re Preemption, ECF No. 13576.

**Pages 4-5**. These pages provide a boilerplate outline of the *Daubert* legal standard, but this outline omits any mention of the case most relevant to Dr. Ross's failure—the Supreme Court's decision in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997). In that seminal elaboration of the *Daubert* standard, the Supreme Court held that an expert's failure to explain how the evidence upon which he relies supports his conclusion can be the kind of methodological flaw that warrants exclusion of the conclusion. In *Joiner*, the plaintiffs' experts relied on animal studies to support his conclusion that PCBs cause cancer. But "[n]o study demonstrated that adult mice developed cancer after being exposed to PCB's," and the experts failed to "explain[] how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies." *Id*. at 144. The experts also drew causation conclusions from four epidemiological studies that did not themselves draw such conclusions. The Supreme Court rejected the argument that GE's *Daubert* challenge to the experts' reliance on the studies was a challenge to the experts' conclusions, not their methodology. "[C]onclusions and methodology are not entirely distinct from one another," the Court said, and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id*. at 146. Accordingly, because "there is simply too great an analytical gap between the data and the opinion proffered," the Court upheld the District Court's exclusion of the expert testimony. *Id*.; *accord Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012) (per curiam) ("[C]ourts are free to reject a theory based on extrapolation" in these circumstances (citing *Joiner*, 522 U.S. at 146)).

**Pages 5-7**. These pages again recite that Dr. Ross is "well-qualified" because he has degrees from Yale and NYU and worked at the FDA for ten years—facts that are irrelevant because Hospira does not challenge his qualifications.

**Pages 8-11**. These few pages contain five straw-man arguments:

- that "Hospira has regulatory obligations for its docetaxel label independent of Sanofi." Opp. at 8. Hospira never said otherwise.

- that "Hospira implies that Dr. Ross's alleged failure to review Hospira's cherry-picked list of 'pertinent information' somehow undermines his opinions that sufficient newly acquired information existed." *Id.* at 9. But the list is Dr. Ross's own, as set forth at paragraphs 130-139 of his report,[7] and what Hospira challenges is not his failure to review this information, but his failure to explain how it constitutes "newly acquired information," in particular how it revealed that permanent hair loss occurs more frequently than reported before March 2011.

- that "'newly acquired information' for a CBE change is not limited to 'new data.'" *Id.* at 9. Hospira never said it was, but there must be something "new" that gives reason to reexamine what is known already. Clearly, scientific literature that reported *lower* rates of permanent hair loss cannot be such a trigger.

- that "noticeably absent from Hospira's laundry list of allegedly 'pertinent information' is a reference to any document … demonstrating that Hospira actually provided the FDA with any of the newly acquired information cited by Dr. Ross." *Id.* at 10. Having laid this charge, Plaintiff then says the opposite in the next paragraph, arguing (i) that "merely providing the FDA with information in a communication or submission" does not satisfy Hospira's obligation (Hospira never said it does) and (ii) that "Hospira places far too much importance on whether or not the FDA has been provided certain data." *Id.* at 10 & n.14. In any event, the Opposition is wrong: Hospira did, in fact, demonstrate that the pertinent information was submitted to the FDA.[8]

- that "providing the FDA with information … would in no way inhibit Hospira's ability … to update its docetaxel label through the CBE process." *Id.* at 10. Hospira never said it would. What "inhibit[ed]" Hospira's ability to submit a CBE labeling change was that it did not have "newly acquired information."

---

[7] Br. Ex. E, ECF No. 13380-8 (Expert Report of David Ross (June 8, 2020)) ¶¶ 130-139.

[8] Plaintiff concedes that the TAX 316 data, which constituted Dr. Schmider's supposed knowledge and provided the basis for the foreign labeling change, was submitted to the FDA. *See* Br. at 10 & n.22. The FAERS data (i.e., adverse event reports), *see* Opp. at 10, was obviously submitted to the FDA, because FAERS is the FDA's own database.

Finally, it is simply not true that "Hospira's argument rests on the presumption that it is only responsible for monitoring the safety profile of its drug based on new data arising between 2011 … and … 2014." *Id.* at 11. The cornerstone of Hospira's argument is that it cannot submit a CBE labeling change unless it has "newly acquired information," meaning, *inter alia*, information showing that permanent hair loss occurred more frequently than previously indicated. The information on which Dr. Ross relied in his report showed that permanent hair loss occurred, if anything, less frequently. No reliable methodology connects those facts to his conclusion.

It is Plaintiff's burden to show that Dr. Ross employed a reliable methodology in reaching his conclusions. It is not enough for him to declare in conclusory fashion that there was sufficient new information by "sometime in 2012,"[9] and for Plaintiff then to claim it is Hospira's burden to disprove that assertion. As Plaintiff's regulatory expert, Dr. Ross was required to review (i) the regulatory record that led to the FDA's approval of Hospira's docetaxel and (ii) whatever new information was available to Hospira from March 2011 to January 2014—then assess whether there was "newly available information."[10] But having dismissed the regulatory record as "irrelevant," Opp. at 2, Dr. Ross cannot possibly reach a reliable opinion as to the existence of "newly available information."

## III. DR. ROSS'S "UNBLINKING RELIANCE" ON OTHER EXPERTS

Of course, as a general rule, one expert may rely on another, *if* his reliance is not "unblinking reliance." *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Feb. 1, 2021),

---

[9] Br. Ex. C (Ross Dep.) at 177:1-16.

[10] The suggestion that Hospira was required to show "clear evidence" that the FDA would have rejected a labeling change puts the cart before the horse. Opp. at 10. If there was no "newly available information," then there was no basis to submit a labeling change, and one never reaches the question of what the FDA would have done. *See In re Incretin-Based Therapies*, 524 F. Supp. 3d 1007, 1029 (S.D. Cal. 2021) ("Because Defendants do not have newly acquired information to support a CBE label change, they cannot unilaterally change their product label. … Consequently, the relevant federal and state laws in this case 'irreconcilably conflict.'" (citation omitted)).

9

ECF No. 12109, at 9 ("*Kahn*"). But Dr. Ross's reliance on Dr. Madigan was just that, for four reasons. *See* Br. at 14-16. The Opposition does not address three of those reasons: that (1) Dr. Madigan admitted there was no new signal after March 2011; (2) Dr. Madigan's analysis was incomplete, and Dr. Ross did not finish it; and (3) Dr. Ross relies on Dr. Madigan's meta-analysis that the Court has ruled inadmissible. About the fourth reason—that Dr. Ross did not apply to Dr. Madigan's analysis the same standards he applies as an expert outside the courtroom—the Opposition says only that Dr. Ross did not apply FDA guidance "because doing so would potentially be wrong." Opp. at 15-16. The Opposition does not explain why it would be wrong, only citing Dr. Ross's curious statement that Dr. Madigan could not be held to the standards set forth in FDA guidance because he is not an FDA employee. But Dr. Ross also excused Dr. Madigan from compliance with industry best practices, *see* Br. at 15 & n.44, such that he held Dr. Madigan to no standard at all. This is the very kind of unblinking reliance rejected by the Court in *Kahn*.

## IV.   PLAINTIFF'S CONCESSION RE POST-APPROVAL REGULATORY RESPONSIBILITIES

The Opposition does not respond to the argument that Dr. Ross's opinion that Hospira did not comply with its post-approval regulatory responsibilities is nothing more than a restatement of the opinion that Hospira should have submitted a CBE labeling change. The failure to respond is a tacit concession.

## CONCLUSION

Dr. Ross did not connect the dots. He made a leap from certain information to the conclusion that Hospira should have submitted a CBE labeling change without ever showing that the information was "newly acquired information," specifically, information reflecting that permanent hair loss occurs more frequently than shown by the pre-March 2011 scientific literature. The Opposition wholly fails to demonstrate that Dr. Ross made this connection, which is essential to establishing that Dr. Ross employed a reliable methodology.

| | |
|---|---|
| Date: December 21, 2021 | Respectfully submitted, |

/s/ Heidi K. Hubbard
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Phone: 202-434-5000
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Phone: 504-858-7000
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., Hospira Worldwide, LLC, and Pfizer Inc.*

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 21st day of December 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

                                               /s/ *Heidi K. Hubbard*