UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br>Audrey Plaisance, Case No. 2:18-cv-08086 |

**REPLY IN SUPPORT OF**
**HOSPIRA'S MOTION FOR SUMMARY JUDGMENT BASED ON PREEMPTION**

The Opposition is a dodge.[1]  Hospira's summary judgment motion makes one central claim—that Hospira did not have "newly acquired information" before January 2014.  If that claim is true, then (i) Hospira could not have submitted a CBE labeling change before Plaintiff was treated with docetaxel and (ii) federal law barred Hospira from providing the warning about permanent hair loss that state law (according to Plaintiff) requires.  In her Opposition, however, Plaintiff does not address a single one of the facts and arguments advanced by Hospira in explanation of why the information relied upon by Dr. David Ross is not "newly acquired information" within the meaning of the CBE regulations.  *See* ECF No. 13385-1 ("Br.") at 15-23.  Not one.

The dodge is so complete that the Opposition does not quote or even cite the FDA's full definition of "newly acquired information."  When Plaintiff purports to address the regulation, she quotes the purpose of a changes-being-effected labeling revision—"[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction …"—but nowhere does she acknowledge that information is not "newly acquired" unless it is information (i) "not previously submitted" to the FDA and that (ii) reveals "risks of a different type or greater severity or frequency."  Plaintiff neither does so when she sets forth the "Statutory and Regulatory Background," Opp. at 5-7, nor when she sets forth the "Legal Standard" for preemption, *id.* at 7-9.  To read the Opposition, one would think that a manufacturer was free unilaterally to change the labeling if there was some reason to believe there is a causal association between the drug and an adverse reaction—without more.  That is not the law.

Plaintiff's series of evasions constitute a tacit concession that there was no new information available to Hospira between March 2011 and January 2014 that revealed "risks of a … greater severity or frequency."  To the contrary, the information available to Hospira reflected that the risk of permanent hair loss was *less* frequent than previously reported in the scientific literature—and known to the FDA years before its approval of Hospira's docetaxel in March

---

[1] ECF No. 13576 ("Opp.").

2

2011.  The information from March 2011 to January 2014 continued to show that only a small number of patients reported permanent hair loss, and confounding factors (typically, treatment with other chemotherapeutic agents and radiation that cause hair loss) were present in almost every case.

For this reason, "whether federal and state laws irreconcilably conflict entails the threshold inquiry of whether there is 'newly acquired information' to support a CBE submission," and, "[i]f the answer is no, then the state law claim is preempted." *In re Incretin-Based Therapies*, 524 F. Supp.3d 1007, 1018 (S.D. Cal 2021).[2]  Because the answer here is no, the Court should grant summary judgment to Hospira.

I. **HOSPIRA DID NOT HAVE "NEWLY ACQUIRED INFORMATION"**

Regardless of who has the burden of proof on the issue, the undisputed evidence is that Hospira did not have "newly acquired information" before January 2014, when Plaintiff received treatment with docetaxel.  Without "newly acquired information," Hospira could not unilaterally change the labeling to say, "Cases of permanent alopecia have been reported."  And, because the CBE regulations did not permit Hospira to change the docetaxel labeling, Plaintiff's state-law failure-to-warn claim is preempted.

**Plaintiff's concessions**.  Consider all that Plaintiff concedes by her silence.  She does not dispute that: (1) the default rule is that a manufacturer must secure FDA approval for a proposed

---

[2]  *See also Knight v. Boehringer Ingelheim Pharms.*, 984 F.3d 329, 332, 338-40 (4th Cir. 2021) (ruling that the threshold question was "did Boehringer have 'newly acquired information' as defined in the CBE regulation that could have justified a unilateral change in the Pradaxa physician label?" and holding that Boehringer did not); *Javens v. GE Healthcare*, 2020 WL 2783581 at *4-5 (D. Del. May 29, 2020) (holding that if "the requirements to invoke the CBE regulation are not met, … [T]he court need not reach the analysis of whether Defendants have shown 'clear evidence' that the FDA would not have approved a change to the drug's label"); *Drescher v. Bracco Diagnostics*, 2020 WL 699878, at *4 (D. Ariz. Jan. 31, 2020) (agreeing that "the stringent standard set forth in [*Albrecht* and *Wyeth*] applies only if a label change is permitted under the CBE regulations"); *McGrath v. Bayer Healthcare Pharms.*, 393 F. Supp.3d 161, 171 (E.D.N.Y. 2019) ("[B]ecause Bayer could not have amended the warning under the CBE regulation, this Court need not even consider whether there is clear evidence the FDA would not have approved a change to Magnevist's label.").

3

labeling change; (2) the FDA's close control of labeling serves to prevent "over-warning" and dilution of the most serious adverse reactions; and (3) the one exception is the CBE vehicle for labeling changes that strengthen a warning. *Compare* Br. at 8-9 *with* Opp. at 5-6. Nor does Plaintiff dispute that the CBE regulations only permit a unilateral labeling change if the manufacturer has "newly acquired information," defined *inter alia* as information (i) "not previously submitted" to the FDA and that (ii) reveals "risks of a different type or greater severity or frequency." Plaintiff elides these pre-conditions to submission of a CBE labeling change and, in so doing, leapfrogs the threshold question whether Hospira had "newly acquired information" that would have allowed it to change the labeling.

**Plaintiff's straw-man argument**. Plaintiff is wrong that Hospira's argument presumes "that it is only responsible for monitoring the safety profile of its drug based on new information arising between 2011 … and Plaintiff's injury in January 2014" and that it can discharge its responsibility "blind to whatever medical literature or data may have existed before 2011." Opp. at 11. To the contrary (as elaborated below), Hospira's argument is based on an explicit comparison of the pre-2011 scientific literature with the 2011-2014 literature (five publications, according to Dr. Ross), which reflects that, in the "new" literature, the incidence of permanent hair loss was less frequent than previously reported. Thus, far from being blind to the pre-2011 literature, Hospira relies on it. In light of that literature, it is clear that the five publications from the 2011-2014 period do not evidence "risks of a … greater severity or frequency," but the opposite.

**Plaintiff's failure to address the evidence**. Dr. Ross, in a conclusory way, pointed to four categories of information that he opined should have led Hospira to submit a CBE labeling change regarding permanent hair loss. Hospira addressed each category and explained in detail why the information did not qualify as "newly acquired information." The Opposition does not respond to a single argument regarding the evidence, Br. at 14-23, but merely paraphrases Dr. Ross's generalities. Opp. at 13-15.

4

**The FDA-approved 2011 labeling**.  As a matter of law, the Hospira labeling was adequate at the time the FDA approved it in March 2011.  Plaintiff does not dispute this, nor that Dr. Ross was not asked to form an opinion (and did not) about the adequacy of the labeling as of March 2011.  Br. at 14.  The question is whether, after that date, there was "newly acquired information."  It is a question that Plaintiff repeatedly ducks.

**The scientific literature**.  Dr. Ross identified only five publications in the March 2011-January 2014 period, none of which, individually or together, reveals a greater incidence of permanent hair loss.  If anything, the publications cited by Dr. Ross report a lower incidence of permanent hair loss than the pre-2011 literature.[3]  It matters what the publications actually say, and Plaintiff does not dispute that none of the five publications reported an incidence of permanent hair loss as great as Nabholtz in 2001 (7.4%) or Sedlacek in 2006 (6.3%).  They reported instead a significantly lower incidence rate (0.059 %, ~2 %, and 3.9%) or that the rate was unknown.[4]

About the Miteva publication, Plaintiff says only that it reported six cases of permanent hair loss, not contesting that it does not give a denominator (the total number of women who used docetaxel) and not acknowledging that it concluded that "[t]he cause of permanent alopecia due to chemotherapy" and "[t]he real prevalence" of permanent alopecia are unknown.  Opp. at 13.  Similarly, Plaintiff says that the Kluger publication reported six cases of permanent hair loss, but fails to acknowledge that Kluger spoke of "the relatively low incidence of this side-effect" and concluded that "the incidence of this side-effect in this patient population is ~2%."  *Id*. at 14.  Plaintiff says nothing at all about the Palamaras publication (reporting an incidence rate of

---

[3]  Dr. Ross referred generally to the publications listed in the reports of Drs. Madigan and Feigal.  Plaintiff does not dispute that 14 of the 19 publications either pre-date FDA approval of Hospira's docetaxel or post-date Plaintiff's treatment.  *See* Br. at 16-17.

[4]  *See Ridings v. Maurice*, 444 F. Supp.3d 973, 992 (W.D. Mo. 2020) ("[S]tudies concluding that it 'remains unknown' whether a drug is linked to a particular adverse reaction or risk … do not constitute reasonable or well-grounded scientific evidence of "clinically significant adverse effects' under the CBE regulation.").

5

0.059%) or the Bertrand poster abstract (3.9% incidence rate). And, about the Tosti publication, she says only that "two articles were published regarding reports of permanent alopecia associated with docetaxel …," *id*., although there is only one publication by Tosti in the relevant period (a note to the editor, not an "article"), and it stated that "[t]he real prevalence of this devastating long-term side effect of docetaxel is unknown. …"[5]

**Hospira's European labeling**. Plaintiff merely asserts that Hospira's changing of its labeling in five European countries "shows[s] that Hospira possessed new scientific information regarding PCIA from Sanofi's clinical trial." Opp. at 15. But, as Plaintiff notes, Hospira's foreign labeling simply included "data from Sanofi's TAX 316 clinical trial." *Id*. Again, Plaintiff does not dispute the critical fact—the TAX316 data was not new. Dr. Ross admits that fact. Br. Ex. JJ at 346:14-347:25 (admitting that the data had been available to the FDA "for years" before 2011). Plaintiff also does not dispute that the TAX316 data reflected an incidence rate of 3.9% (according to Dr. Feigal)—a lesser, not greater, frequency—and therefore could not constitute "newly acquired information."[6]

**Dr. Schmider's alleged knowledge**. Plaintiff parrots Dr. Ross's claim that Hospira had "unique" knowledge because it hired Dr. Schmider, who brought to Hospira his knowledge from working at Sanofi. But Plaintiff fails to address the facts concerning just what Dr. Schmider did and did not know. Dr. Schmider testified that he was not involved in the creation of the Sanofi Core Data Sheet or Sanofi's European labeling changes for Taxotere and that he had no

---

[5] Plaintiff states that Bourgeois "published their research on cases of irreversible alopecia" in 2012, but Dr. Ross did not mention a publication by Bourgeois, and neither Dr. Madigan nor Dr. Feigal lists a 2012 publication by Bourgeois. In any event, Plaintiff does not cite any evidence from the publication that the incidence rate of permanent hair loss was greater than reported before 2011. Nor could she, because that abstract cited the 3 percent incidence rate from the Sanofi TAX 316 trial. Pl. Ex. 12 (Plunkett Rep.) at 20.

[6] Plaintiff argues that Sanofi's European labeling (Statement of Product Characteristics) contained "additional statements regarding the risk of PCIA," Opp. at 15, but do not identify any such statements. That is because Sanofi's SPC reported, at most, the 3 percent rate from the clinical trials. Pl. Ex. 15 ("Alopecia was observed to be ongoing in 25 patients out of the 736 patients with alopecia at the end of the chemotherapy.").

6

recollection of permanent hair loss as an issue while at Sanofi. Br. at 21 n.41. Plaintiff does not dispute that this was Dr. Schmider's testimony, and she offers no other evidence to support Dr. Ross's assertions. Moreover, Plaintiff does not identify any information in the Sanofi Core Data Sheet that would be the basis for a labeling change; rather, she alleges that it contains information from "Taxotere's major clinical trial" (i.e., TAX316). Opp. at 13; Br. Ex. I (Ross Rep.) ¶ 133 (Core Data Sheet "included information regarding PCIA from TAX 316."). As explained above, that information was known to FDA and did not show a greater risk.

**Adverse event reports**. Plaintiff refers to FDA's Adverse Event Reporting System ("FAERS") database as "publicly available data" and blithely asserts that, "if properly analyzed under industry-accepted standards, [this data] supported a causal association between docetaxel and permanent alopecia in 2011." Opp. at 14. Plaintiff's only support is Dr. Madigan's FAERS analysis, but Dr. Madigan (i) has admitted that his FAERS method does ***not*** follow FDA Best Practices or any other "industry-accepted" methods, ECF No. 13638 at 5-7, and (ii) has testified that there was no safety signal in 2012 that was not already present before FDA's approval of Hospira's docetaxel, *id.* at 7-8; Br. at 21 n.43—a dispositive concession about which the Opposition says nothing. Thus, just as with the medical literature, the post-approval FAERS data did not contain any "accumulating data," Opp. at 14, that revealed a risk of permanent hair loss that was "of a different type or greater severity or frequency" than the pre-approval data.

As for the adverse event information reported ***to Hospira***, Plaintiff has nothing to say, effectively conceding that: (1) of 43 cases of permanent hair loss reported to Hospira/Pfizer (through 2016), at most 10 (and likely only two**)** involved treatment with docetaxel alone, not confounding drugs or radiation; (2) 10 cases over a five-year period reflected a prevalence one-third that reported in the scientific literature before March 2011; and (3) 10 cases out of 161,000 women treated with Hospira's docetaxel represented an incidence rate of 0.03%.[7] Br. at 21-23.

---

[7] This estimate overstates the incidence rate reflected by the adverse event reports because the numerator (10) reflects reports received from 2011 to 2016 while the denominator (161,000) reflects the number of women treated with docetaxel from 2011 to 2014.

Yet again the evidence reflects that Hospira did not have information that permanent hair loss occurred with "greater severity or frequency."

**Dr. Plunkett's irrelevance**.  Although Dr. Ross did not mention Dr. Laura Plunkett's report in listing the information that should have prompted Hospira to submit a labeling change, the Opposition now cites it.  Opp. at 14.  But Plaintiff has represented to the Court that "Dr. Plunkett is not offering regulatory or labeling opinions in the Plaisance matter."  ECF No. 13498 at 3; *see also* ECF No. 13379 at 7 (citing Dr. Plunkett's agreement that she not "going to offer any opinion at trial that the scientific information that became available after March 2011 contained new information that, for the first time, provided a basis to believe there is a causal relationship between docetaxel and permanent alopecia"). This attempt to rely on Dr. Plunkett's disclaimed opinions speaks for itself about the opinions of Plaintiff's only actual regulatory expert—Dr. Ross.

**Dr. Ross's admission**.  Pressed at his deposition to identify the "newly acquired information" that should have prompted Hospira to re-analyze the available data and/or submit a labeling change, Dr. Ross confessed, "between the time frame that I'm talking about and when they actually updated it, *there was nothing new*."[8]  Plaintiff's attempt to explain away this admission—that he was not talking about the relevant period from 2011 to 2014, but about developments after 2014—does not wash.  Opp. at 12 n.2.[9]

\* \* \*

Plaintiff says, without offering specifics, that "the data points kept adding up after Hospira's NDA approval."  *Id.* at 12.  But as the discussion above demonstrates, the data points

---

[8]   Br. Ex. AA at 180:5-182:2.  In this Reply, all emphases are added unless otherwise indicated.

[9]   That explanation makes no sense for two reasons: (1) because the three pages of questioning that preceded Dr. Ross's admission were directed solely at eliciting an answer to the question of what "newly acquired information" supposedly became known to Hospira from FDA approval in 2011 to Plaintiff's treatment in January 2014; and (2) Dr. Ross could not possibly have been saying that there was "nothing new" (including no "new" scientific papers) from 2014 to 2017 because his expert report he claimed to rely on 13 articles post-dating 2014.

available to Hospira from 2011 to 2014 added up to the conclusion that permanent hair loss had been reported in a very small number of patients, almost all of whom used other drugs that cause permanent hair loss, and that permanent hair loss, if anything, occurred *less frequently* than previously reported. Data that adds up in this way does meet the definition of "newly acquired information."

## II. PLAINTIFF IGNORES THE PRECONDITIONS FOR A CBE CHANGE

It is telling that that the Opposition does not quote or even cite the FDA's full definition of "newly acquired information." To read the definition is to recognize that having "newly acquired information" is a legal precondition to submitting a CBE change. Thus, Plaintiff misses the mark in arguing that "the defendant bears the burden of showing by clear evidence that *the FDA would have prohibited a warning*." Opp. at 9. That is not the question here. A court never reaches the question whether there is "clear evidence" that the FDA would have prohibited a labeling change unless it is first established that the manufacturer could have satisfied the precondition of having "newly acquired information." *Javens v. GE Healthcare*, 2020 WL 2783581, at *5 (D. Del. May 29, 2020) ("If this preliminary showing [of "newly acquired information"] is not made, the court need not reach a determination of whether the defendant has shown clear evidence that the FDA would have rejected the proposed label change."); *In re Incretin-Based Therapies*, 524 F. Supp.3d at 1018 (distinguishing *Albrecht* because the manufacturer conceded the CBE regulation permitted it to submit a labeling change); *Knight*, 984 F.3d at 332, 338-40.[10]

For this reason, Plaintiff's reliance on this Court's rulings in *Kahn* and *Earnest* is misplaced. The Court applied the "clear evidence" test only *after* the Court first determined that Sanofi had "newly acquired information." *Kahn*, 508 F. Supp. 3d at 82 ("[T]he Court agrees that

---

[10] *Evans v. Gilead Scis., Inc.*, relied upon by Plaintiff, was wrongly decided. When it stated that "even if there was **little or no** 'newly acquired information' relevant to [plaintiff's] claims, that did not make it *impossible* for Gilead to change its Truvada label," the court ignored the plain language of the CBE regulations. 2020 WL 5189995, at *11 (D. Haw. Aug. 31, 2020) (plain italics in original).

9

the existence of 'newly acquired information' is the appropriate question …."); *id.* at 85 ("The Sedlacek presentation … constituted 'newly acquired information,' and it was enough to support a CBE change"). Hospira's position is entirely consistent with "the law of the case." Opp. at 9.

## III.   THE 2015 LABELING CHANGE WAS BASED ON SANOFI'S DATA

Plaintiff's argument ignores the practical reality that it was information from Sanofi that triggered the labeling change. That Hospira had an independent duty to provide adequate labeling is not disputed. Nor is it disputed, however, that there is an industry practice regarding the initiation of labeling changes. It is "highly unusual" for 505(b)(2) holders, like Hospira, to initiate a labeling change that departs from the FDA-approved labeling for the Reference Listed Drug unless information comes to the 505(b)(2) holder's attention specific to its formulation. Br. at 25. There are sound scientific reasons for that practice: the RLD holder conducted the clinical trials that supported FDA approval and has years of post-approval, real-world experience with the drug during the period that it enjoys a monopoly. Thus, here, when patient advocates lobbied the FDA to reconsider whether there should be a warning about permanent hair loss, the FDA turned to *Sanofi*—and Sanofi alone—for an analysis of the available scientific data. When the FDA analyzed the data and decided to mandate a labeling change, it did so based on adverse event data from *Sanofi's* database. *Id.* This reality is important because it reflects that Hospira, as a 505(b)(2) defendant, did not have access to the same "newly acquired evidence" as Sanofi—notably, Sanofi's internal database. It was that information that eventually persuaded the FDA to add the statement about permanent hair loss (albeit a statement that made no claim about causal association of any kind).[11] Without that information, Hospira did not have "newly acquired information," and there was no basis for it to change its labeling.

## CONCLUSION

For the reasons stated above, the Court should grant summary judgment.

---

[11]   The FDA medical officer concluded, "[T]he sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data." Br. SOF ¶ 28.

Dated: January 6, 2022                    Respectfully submitted,

*/s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani

**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Phone: (202) 434-5000
Fax: (202) 434-5029
hhubbard@wc.com

John F. Olinde (Bar No. 1515)
Peter J. Rotolo (Bar No. 21848)

**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 858-7000
Fax: (504) 585-7075
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., and Hospira Worldwide, LLC, formerly doing business as Hospira Worldwide, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Heidi K. Hubbard*