UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*****************************************************************

IN RE:  TAXOTERE
(DOCETAXEL) PRODUCTS
LIABILITY LITIGATION

                              CIVIL ACTION NO. 16-MD-2740 "H"
                              NEW ORLEANS, LOUISIANA
07:29:02                      MONDAY, NOVEMBER 8, 2021, 8:30 A.M.

THIS CASE RELATES TO
ELIZABETH KAHN,
CASE NO. 16-CV-17039

*****************************************************************

                    DAY 1 MORNING SESSION
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:



FOR THE PLAINTIFFS:        GAINSBURGH BENJAMIN DAVID
                           MEUNIER & WARSHAUER
                           BY:  M. PALMER LAMBERT, ESQ.
                           1100 POYDRAS STREET, SUITE 2800
                           NEW ORLEANS, LOUISIANA 70163


                           PENDLEY BAUDIN & COFFIN
                           BY:  CHRISTOPHER L. COFFIN, ESQ.
                                JESSICA A. PEREZ, ESQ.
                           1515 POYDRAS STREET, SUITE 1400
                           NEW ORLEANS, LOUISIANA 70112


                           GIBBS LAW GROUP
                           BY:  KAREN B. MENZIES, ESQ.
                           400 CONTINENTAL BOULEVARD
                           6TH FLOOR
                           EL SUGUNDO, CALIFORNIA 90245

*OFFICIAL TRANSCRIPT*

```
 1   APPEARANCES CONTINUED:

 2

 3                              SIMMONS HANLY CONROY
                               BY:  DAVID F. MICELI, ESQ.
 4                             ONE COURT STREET
                               ALTON, ILLINOIS 62002
 5

 6                              BACHUS & SCHANKER
                               BY:  J. KYLE BACHUS, ESQ.
 7                             1899 WYNKOOP STREET
                               SUITE 700
 8                             DENVER, COLORADO 80202

 9

10                              BACHUS SCHANKER
                               BY:  DARIN L. SCHANKER, ESQ.
11                             101 W COLFAX AVE, SUITE 650
                               DENVER, COLORADO 80202

12

13                              MARTZELL BICKFORD & CENTOLA
                               BY:  LAWRENCE J. CENTOLA, ESQ.
14                             338 LAFAYETTE STREET
                               NEW ORLEANS, LOUISIANA 70130

15
     FOR SANOFI-AVENTIS U.S.,|
16   LLC AND SANOFI US
     SERVICES, INC.:          IRWIN FRITCHIE URQUHART & MOORE
17                             BY:  DOUGLAS J. MOORE, ESQ.
                               KELLY E. BRILLEAUX, ESQ.
18                             400 POYDRAS STREET, SUITE 2700
                               NEW ORLEANS, LOUISIANA 70130.
19

20                              SHOOK, HARDY & BACON
                               BY:  HARLEY V. RATLIFF, ESQ.
21                                  JON A. STRONGMAN, ESQ.
                               2555 GRAND BOULEVARD
22                             KANSAS CITY, MISSOURI 64108

23

24                              SHOOK HARDY & BACON, LLP
                               BY:  HILDY M. SASTRE, ESQ.
                               201 BISCAYNE BOULEVARD
25                             SUITE 3200
                               MIAMI, FLORIDA 33131
```

*OFFICIAL TRANSCRIPT*

1    APPEARANCES CONTINUED:

2

3

4    OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
5                                REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B-275
6                                NEW ORLEANS, LOUISIANA 70130
                                 (504) 589-7779
7                                Cathy_Pepper@laed.uscourts.gov

8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         *OFFICIAL  TRANSCRIPT*

1 **I N D E X**

2 <u>PAGE</u>

3 JURY SELECTION....................................... 119

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

M O R N I N G   S E S S I O N

MONDAY, NOVEMBER 8, 2021

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  Would you raise your right hands.
Do you solemnly swear that you will make true and perfect
answers to all questions that shall be propounded to you
touching on your qualification and competency to sit as a juror
in this case, so help you God?

THE PROSPECTIVE JURORS:  I do.

THE DEPUTY CLERK:  Thank you.  All rise.

THE COURT:  Good morning.

THE DEPUTY CLERK:  This is Civil Action 16-17039,
Elizabeth Kahn versus Sanofi S.A. et al.  Counsel, please make
your appearance for the record.

MR. SCHANKER:  Thank you, Your Honor.  Darin Schanker
on behalf of my client, Elizabeth Kahn.

MS. SASTRE:  Good morning, Your Honor.  Hildy Sastre on
behalf of Sanofi.

THE COURT:  Thank you.  Are we ready to proceed?

MS. SASTRE:  We are, Your Honor.

THE COURT:  Okay.  Good morning.  I'm going to speak to
all of you potential jurors, and then my comments will be

*OFFICIAL TRANSCRIPT*

08:54:04 1   directed to the 15 that we call "in the box."  And as I've

08:54:09 2   instructed counsel, when they approach the podium, they should

08:54:13 3   take off their mask so that you can hear what they are saying,

08:54:18 4   as I am doing as well.

08:54:20 5            Good morning.

08:54:22 6        VOICES:  Good morning.

08:54:24 7        THE COURT:  I do recognize that your being here is an

08:54:27 8   inconvenience to you and your families.  So I want you to know

08:54:29 9   that your service is appreciated.

08:54:31 10            The first thing we're going to do this morning is

08:54:34 11  select an eight-person jury that will sit for a civil matter

08:54:38 12  that we anticipate will last 10 days.  As I mentioned, this is

08:54:43 13  a civil case.  The plaintiff, the person who filed this

08:54:47 14  lawsuit, is Elizabeth Kahn.  The defendant is a company named

08:54:51 15  Sanofi.  Elizabeth Kahn took a chemotherapy drug called

08:54:57 16  Taxotere as part of her treatment for breast cancer.  Ms. Kahn

08:55:02 17  contends that Taxotere prevented her hair from growing back,

08:55:06 18  and now she has permanent hair loss on her head and eyebrows

08:55:10 19  that was caused by Taxotere.

08:55:11 20            Ms. Kahn also asserts that Sanofi, the

08:55:15 21  manufacturer of Taxotere, did not warn her doctor about the

08:55:20 22  risk of permanent hair loss associated with Taxotere.  Ms. Kahn

08:55:24 23  seeks damages for her injuries from Sanofi.  Sanofi denies

08:55:30 24  these allegations and contends that it provided adequate

08:55:36 25  warnings to Ms. Kahn's doctor.  Sanofi contends that Taxotere

*OFFICIAL TRANSCRIPT*

08:55:37 1    did not cause Ms. Kahn's alleged injury and contends that the

08:55:40 2    approved prescribing information contained accurate

08:55:45 3    science-based information that enabled Ms. Kahn's doctors to

08:55:48 4    make informed decisions about the benefits and risks of using

08:55:52 5    Taxotere.

08:55:52 6         Both the plaintiffs and the defendant are

08:55:57 7    entitled to have this case tried by qualified, fair, and

08:56:01 8    impartial jurors.  A qualified and impartial jury is one which

08:56:05 9    is responsible and capable, and which will objectively, without

08:56:10 10   fear, favor, bias, prejudice, sympathy, or passion, hear and

08:56:16 11   decide the issues to be tried, and one which will render its

08:56:20 12   verdict based solely on the evidence presented at this trial

08:56:24 13   and the law applicable to the case as given to the jury by the

08:56:28 14   Court.

08:56:28 15        The law requires that we inquire into a juror's

08:56:33 16   qualifications and impartiality.  This inquiry, which is about

08:56:37 17   to be made, is known as the *voir dire examination*.  Its purpose

08:56:43 18   is to develop the whole truth concerning the competency of each

08:56:47 19   prospective juror, his or her frame of mind, and ability to do

08:56:52 20   his or her sworn duty in accordance with the juror's oath.

08:56:56 21        The answers to the questions you are asked will

08:56:59 22   not only enable the Court to determine whether any of you

08:57:02 23   should be excused for cause, either on the Court's own motion

08:57:06 24   or when challenged for cause by any party, but will also allow

08:57:13 25   counsel for the parties to make intelligent use of peremptory

*OFFICIAL TRANSCRIPT*

08:57:15 1   challenges.  Those are challenges which the law gives the

08:57:18 2   parties and which may be exercised without assigning any reason

08:57:22 3   therefore.

08:57:22 4          You should understand, therefore, that each of

08:57:26 5   you is expected to provide complete and truthful answers.  Each

08:57:31 6   juror is under compulsion to disclose, upon a general question,

08:57:36 7   any matters which might tend to disqualify him or her for any

08:57:40 8   reason from sitting on the case.

08:57:43 9          False or misleading answers may result in the

08:57:46 10  seating of a juror who might have been discharged by the Court

08:57:50 11  for cause or stricken through the exercise of peremptory

08:57:54 12  challenges, which could in turn result in a miscarriage of

08:57:58 13  justice.

08:57:59 14         Some of the questions will be addressed to you

08:58:02 15  individually, however, most will such addressed to the jury

08:58:05 16  collectively.  For those questions addressed to the jury

08:58:09 17  collectively, I ask that each of you consider the question as

08:58:13 18  though directed to you individually and that you answer the

08:58:17 19  question truthfully.  If you feel that the response to any of

08:58:22 20  the questions that I ask is of a personal nature, you should

08:58:26 21  feel free to request permission to approach the bench and

08:58:30 22  discuss this matter directly with the attorneys and me.

08:58:34 23         As I told you earlier, it is anticipated that the

08:58:39 24  trial of this case may require 10 days to complete.  At the end

08:58:44 25  of each trial day, the members of the jury will be permitted to

*OFFICIAL TRANSCRIPT*

08:58:48 1   return to their homes.  So what I'm about to say should not be

08:58:52 2   construed as an invitation for any of you to capriciously or

08:58:58 3   without good cause seek to be excused from the jury merely to

08:59:04 4   avoid discharging your legal and civic duty to serve as jurors.

08:59:08 5           Because this trial may require 10 days to

08:59:11 6   complete, if any of you honestly and conscientiously believe

08:59:14 7   that you would be subjected to serious hardship or would

08:59:19 8   otherwise be seriously inconvenienced if you are selected to

08:59:23 9   serve as a juror due to the estimated length of the trial, I

08:59:27 10  request that you raise your hands, and we will one by

08:59:32 11  one discuss the basis of your request.

08:59:38 12          Okay.  All right.  Juror Number 7, is it of a

08:59:47 13  private nature?

08:59:50 14          PROSPECTIVE JUROR 7:  No.

08:59:51 15          THE COURT:  All right.  When you're just talking, you

08:59:53 16  may take it down so that the court reporter and I can hear you.

08:59:56 17          This is Juror Number 7?

09:00:00 18          PROSPECTIVE JUROR 7:  Yes, ma'am.  It is just a long

09:00:03 19  time, and to say that it's possible that it's, you know, going

09:00:09 20  to -- I don't know.  I can't say definitively that it's going

09:00:13 21  to, you know, destroy my family or whatever the case may be,

09:00:16 22  but it is definitely a financial hardship.  10 days is a lot of

09:00:23 23  days to miss from work.

09:00:23 24          THE COURT:  What do you do, sir?

09:00:25 25          PROSPECTIVE JUROR 7:  I work at Mele Printing in

*OFFICIAL TRANSCRIPT*

09:00:27 1   Covington, and so it is just a lot of days.  I have an 11- and

09:00:31 2   12-year-old -- I'm sorry, 12- and 13-year-old -- just had

09:00:34 3   birthdays -- and so, for no other reason except financially, it

09:00:41 4   does seem like it's a lot.

09:00:43 5        THE COURT:  Okay.  Thank you, sir.  That's Mr. Harms?

09:00:46 6        PROSPECTIVE JUROR 7:  Yes, ma'am.

09:00:46 7        THE COURT:  Okay.  Is there anyone else?  I believe --

09:00:49 8   yes, ma'am.  You are Ms. Andry?

09:00:53 9        PROSPECTIVE JUROR 10:  Yes.  I work at a funeral home,

09:00:55 10   and I deal with a lot of deaths and stuff.  And I do all the

09:00:59 11   death certificates and stuff, and 10 days would be extremely

09:01:02 12   long for me to be here because it would be holding up the

09:01:05 13   families with a lot of hardships that they have to live with.

09:01:10 14        THE COURT:  Ms. Andry, is there no one else at the

09:01:14 15   funeral home that does that?

09:01:17 16        PROSPECTIVE JUROR 10:  Not that does that.  But I do a

09:01:19 17   lot of other stuff in there, too, that 10 days would be

09:01:21 18   extremely hard for me and the funeral home.

09:01:25 19        THE COURT:  Okay.  Thank you, ma'am.  Please sit down.

09:01:28 20   Anyone else?  Yes, sir.  Mr. Pisciotta?

09:01:31 21        PROSPECTIVE JUROR 9:  Pisciotta.

09:01:31 22        THE COURT:  Pisciotta.

09:01:34 23        PROSPECTIVE JUROR 9:  I'm one of three welders for my

09:01:36 24   company, and if I'm gone for that long, they'd have to shut

09:01:40 25   down a couple crews.  And they would probably be out of work,

*OFFICIAL TRANSCRIPT*

09:01:44 1    the good men on those crews, until I come back.

09:01:49 2              THE COURT:  Who do you work for, sir?

09:01:51 3              PROSPECTIVE JUROR 9:  System Services Pipeline.  We're

09:01:57 4    subcontractors for Atmos natural gas.

09:02:01 5              THE COURT:  Okay.  Thank you.

09:02:05 6                   Yes, ma'am.  Ms. Vail.

09:02:06 7              PROSPECTIVE JUROR 11:  Just a quick question.  10 days

09:02:10 8    is the maximum?  Because I made a whole bunch of doctor's

09:02:14 9    appointments for the 22nd.

09:02:15 10             THE COURT:  I think you'll be fine.

09:02:15 11             PROSPECTIVE JUROR 11:  Okay.

09:02:16 12             THE COURT:  Thank you.

09:02:19 13                  Yes, sir.  Mr. Smith.

09:02:23 14             PROSPECTIVE JUROR 15:  Yes.  I'm self-employed, and 10

09:02:25 15   days is a long time.  And, I mean, I don't mind doing this

09:02:32 16   early, but a lot of people that I'm working for, they could get

09:02:36 17   somebody else.  I'm a painter.

09:02:38 18             THE COURT:  Thank you, Mr. Smith.  Okay.

09:02:42 19                  Number 17.  Yes, sir.  If any of this is of a

09:02:47 20   private nature, please feel free to approach.

09:02:50 21             PROSPECTIVE JUROR 17:  Permission to approach?

09:02:50 22             (WHEREUPON, at this point in the proceedings, there was

09:02:50 23   a conference held at the bench.)

09:03:19 24             PROSPECTIVE JUROR 17:  So two things.  I've got a

09:03:21 25   lifelong problem with alcohol.  Second of all, I used to work

*OFFICIAL TRANSCRIPT*

09:03:24  1    for Broadmoor at the Superdome renovation right down the

09:03:29  2    street.  I worked there from October 2019 to April 21st, and my

09:03:35  3    alcohol abuse finally overtook me, and I got fired.  So I'm in

09:03:41  4    recovery right now from alcoholism, and I have a new job at a

09:03:44  5    company in Baton Rouge.  And just taking me out of my routine

09:03:48  6    and stuff and making me drive past the Superdome every day is

09:03:55  7    like a really a traumatic event in my life.

09:03:59  8            THE COURT:  Where do you live, Mr. Pickens?

09:04:02  9            PROSPECTIVE JUROR 17:  I live in Hammond.

09:04:04 10            THE COURT:  Where are you working now?

09:04:06 11            PROSPECTIVE JUROR 17:  Yes.  I'm working at a

09:04:08 12    renovation on the LSU campus at the Huey P. Long Field House.

09:04:10 13    I work for R. Kell Constructors.  That's a new job I started in

09:04:14 14    July.  But just being taken from my new job and my routine --

09:04:19 15            THE COURT:  How long have you been sober?

09:04:21 16            PROSPECTIVE JUROR 17:  Since May 14th.

09:04:24 17            THE COURT:  Okay.  And you think that if you were

09:04:30 18    selected, this would affect your ability?

09:04:33 19            PROSPECTIVE JUROR 17:  This is my old route to work at

09:04:36 20    the Superdome.  And to pass the Superdome every day, it is a

09:04:41 21    traumatic event for me and my family.

09:04:46 22            THE COURT:  Yes, sir.  Thank you.  You may go back.

09:04:49 23    Counsel, stay.  Mr. Schanker, stay up.

09:05:00 24            I'm going to excuse Mr. Pickens, Juror Number 17.  He

09:05:10 25    appears to be very fragile.  I think, very frankly, these

*OFFICIAL TRANSCRIPT*

09:05:14  1    people that are from in the box I'm not prepared to excuse any

09:05:20  2    of them.  I think it's problematic.  I think Mr. Pickens is

09:05:25  3    different.

09:05:26  4        MR. SCHANKER:  I agree, Your Honor.  No objection from

09:05:28  5    plaintiffs.

09:05:29  6        MS. SASTRE:  No objection.

09:05:30  7        THE COURT:  Thank you.

09:05:30  8        (WHEREUPON, at this point in the proceedings, the bench

09:05:30  9    conference concluded.)

09:05:49 10        THE COURT:  I believe there was someone else.  Yes,

09:05:51 11    ma'am.  You are?

09:05:59 12        Juror Number 14, and I think you need the mike.  Ma'am,

09:05:59 13    if you can move your mask.  Oh, you want to come up.  Yes,

09:05:59 14    ma'am.

09:05:59 15        (WHEREUPON, at this point in the proceedings, there was

09:06:34 16    a conference held at the bench.)

09:06:34 17        PROSPECTIVE JUROR 14:  First, my English is not that

09:06:41 18    good.  And second, I've been bleeding, and I need to go see the

09:06:46 19    doctor.

09:06:47 20        THE COURT:  Okay.

09:06:51 21        PROSPECTIVE JUROR 14:  It's abnormal.

09:06:53 22        THE COURT:  Is it abnormal bleeding?

09:06:57 23        PROSPECTIVE JUROR 14:  Yeah, been bleeding like a

09:06:59 24    month.

09:06:59 25        THE COURT:  And you have a doctor's appointment?

**OFFICIAL TRANSCRIPT**

09:07:01  1          PROSPECTIVE JUROR 14:  They gave me, so I need to see

09:07:04  2     it.

09:07:05  3          THE COURT:  Is this what you feel like is an emergency

09:07:08  4     situation?

09:07:08  5          PROSPECTIVE JUROR 14:  Yes.

09:07:10  6          THE COURT:  And you are going to go this week?

09:07:12  7          PROSPECTIVE JUROR 14:  Yes, I need to go probably

09:07:16  8     today.

09:07:17  9          THE COURT:  Do you have any questions?

09:07:19 10          MR. SCHANKER:  I do need to go --  call them today.

09:07:20 11          MS. SASTRE:  Is this Ms. Andrade?  No.

09:07:24 12          THE COURT:  You may return to your seat.

09:07:34 13               I think I'll let her go.  It sounds like she has

09:07:38 14     physical problems that requires her excuse.  We're going to

09:07:41 15     excuse Ms. Andrade.  Okay.  I think there were a couple other

09:07:44 16     people that wanted to come.

09:08:12 17          PROSPECTIVE JUROR 18:  I was just wondering just with

09:08:14 18     10 days, I would love to do this for a week.  But 10 days, I

09:08:17 19     work as the executive assistant for Holy Cross High School.

09:08:21 20     We're currently going a head master search.  We don't have a

09:08:24 21     master right now.  This week is fine.  But next week we start

09:08:27 22     all of our focus group meetings with the board of directors.

09:08:31 23     I'm organizing, like, ten different groups to meet with them

09:08:35 24     virtually and our search firm, Carney and Sandoe, so that's

09:08:38 25     going to be a little bit of work, but I could figure that out.

*OFFICIAL TRANSCRIPT*

09:08:41  1          I also have a son who is eight.  My husband is

09:08:45  2   the primary breadwinner, so I get off at 3:00, and I pick him

09:08:49  3   up and take him.  My mother-in-law has agreed to help me, and I

09:08:52  4   have some friends that can help me for 10 days.  That would be

09:08:55  5   very stressful for my mother-in-law to begin to take on the

09:08:58  6   role of homework and tests and picking up --

09:09:00  7          THE COURT:  You understand, this Thursday is

09:09:03  8   Veterans Day, so we'll take this Thursday off.

09:09:03  9          PROSPECTIVE JUROR 18:  Okay.

09:09:05 10          THE COURT:  So that will give her a break.  Then next

09:09:09 11   week -- and we are going to finish next week.

09:09:12 12          PROSPECTIVE JUROR 18:  Okay.  You think by

09:09:14 13   Thanksgiving?

09:09:20 14          THE COURT:  Oh, God, yes.

09:09:20 15          PROSPECTIVE JUROR 18:  Okay.  It's just that week he's

09:09:20 16   off.  Sorry.  Okay.

09:09:22 17          THE COURT:  No, no, no.  You're good.  You're good.

09:09:22 18          PROSPECTIVE JUROR 18:  Okay.  Okay.  Okay.  Thank you.

09:09:22 19          THE COURT:  Thank you.

09:09:47 20              Yes, ma'am.  What's your number?

09:09:47 21          PROSPECTIVE JUROR 13:  13.  I work in the oil refinery

09:09:50 22   and my turnaround actually started today, and I don't work all

09:09:54 23   the time.  And I don't mind serving.  Can I postpone my jury

09:10:03 24   duty for another trial after my turnaround time?

09:10:05 25          THE COURT:  Your turnaround started today?

**OFFICIAL TRANSCRIPT**

09:10:10  1          PROSPECTIVE JUROR 13:  Yes, ma'am.

09:10:11  2          THE COURT:  And how long is it going to be?

09:10:13  3          PROSPECTIVE JUROR 13:  Two weeks.  I am at Valero and

09:10:17  4  turnaround is two weeks.  And I don't know when the next one

09:10:20  5  will be.  But I don't mind serving, I just didn't know if y'all

09:10:24  6  postpone --

09:10:25  7          THE COURT:  What do you do?

09:10:26  8          PROSPECTIVE JUROR 13:  I am an office clerk on this

09:10:29  9  one.

09:10:30 10          THE COURT:  Okay.  So you'll be working how many hours?

09:10:32 11          PROSPECTIVE JUROR 13:  I work 12 hours and will be

09:10:34 12  pulling 14 days straight.

09:10:34 13          THE COURT:  Okay.

09:10:36 14          PROSPECTIVE JUROR 13:  We only get one day off.

09:10:37 15          THE COURT:  Okay.  Thank you, ma'am.

09:10:41 16          PROSPECTIVE JUROR 13:  Thank you very much.

09:10:43 17          THE COURT:  That's when they make all their money.

09:10:49 18          MS. SASTRE:  She won't get paid if she's not there.

09:10:53 19          THE COURT:  No, certainly.  No.  This is what I'm

09:10:57 20  talking about by personal.  They make a lot of money because

09:11:02 21  it's all overtime, and it will be a significant financial

09:11:06 22  hardship for her.  I think it's appropriate to excuse her.

09:11:13 23          MR. SCHANKER:  No objection from plaintiffs,

09:11:16 24  Your Honor.

09:11:16 25          MS. SASTRE:  No objection.

                                    *OFFICIAL TRANSCRIPT*

09:11:18  1          THE COURT:  Okay.  Here we go.

09:11:37  2          PROSPECTIVE JUROR 16:  My name is Albert Leaber.  I am

09:11:40  3   a CPA in public practice.  We have deadlines.  Also too, when I

09:11:46  4   filled out the questionnaire and I listed the name of the

09:11:49  5   attorneys, I think we may have a conflict with one of the

09:11:52  6   attorneys who is a client of ours.

09:11:54  7          THE COURT:  Who is that?

09:11:56  8          PROSPECTIVE JUROR 16:  Chris Coffin.

09:11:58  9          THE COURT:  And you work with Mr. Coffin?

09:12:00 10          PROSPECTIVE JUROR 16:  I have worked with him in the

09:12:01 11   past.  I've done work with his client.

09:12:04 12          THE COURT:  Now, I'm going to ask you, Mr. Leaber,

09:12:06 13   knowing that Mr. Coffin is an associated worker, would this

09:12:12 14   affect your ability to be fair and impartial in this?

09:12:16 15          PROSPECTIVE JUROR 16:  I'm not exactly sure about that

09:12:19 16   exact question.  It could affect it.  It could affect it.

09:12:23 17          THE COURT:  Well, if at the conclusion of the case you

09:12:28 18   were selected as a juror, and at the conclusion of the case you

09:12:32 19   determined that Mr. Coffin's client had not proved their case,

09:12:38 20   by a preponderance of the evidence, could you render a verdict

09:12:42 21   against Mr. Coffin?

09:12:44 22          PROSPECTIVE JUROR 16:  If it looks that way, yes.  Yes.

09:12:47 23          THE COURT:  Well, let me ask this, would you give

09:12:50 24   Mr. Coffin's argument more credence than the other side?

09:12:56 25          PROSPECTIVE JUROR 16:  I don't think so, no.

                              *OFFICIAL  TRANSCRIPT*

09:12:59  1          THE COURT:  So you think you could?

09:13:00  2          PROSPECTIVE JUROR 16:  Right.  Right.  I think -- I

09:13:04  3   don't think I would give it any more, but it's just, I don't

09:13:09  4   know how the optics of it looks.

09:13:11  5          THE COURT:  Well, the optics are going to be

09:13:14  6   determined.  Do you have any questions?

09:13:15  7          MS. SASTRE:  Sure.  Can I ask him one?

09:13:15  8          THE COURT:  Yeah.

09:13:16  9          MS. SASTRE:  Okay.  Good morning, sir.  I appreciate

09:13:26 10   you coming up here and sharing this with us.  So I understand

09:13:29 11   that you know Mr. Coffin.  What is the professional

09:13:32 12   relationship you have with him?

09:13:34 13          PROSPECTIVE JUROR 16:  He's a client of our firm.

09:13:36 14          MS. SASTRE:  Do you spend time with him essentially?

09:13:39 15          PROSPECTIVE JUROR 16:  No.

09:13:40 16          MS. SASTRE:  You've never done that?

09:13:42 17          PROSPECTIVE JUROR 16:  No, never have.

09:13:44 18          MS. SASTRE:  How much time do you think you've spent

09:13:47 19   with him through your professional relationship?

09:13:49 20          PROSPECTIVE JUROR 16:  I've worked with his clients and

09:13:52 21   done some work with him.

09:13:53 22          MS. SASTRE:  Have you ever met him?

09:13:55 23          PROSPECTIVE JUROR 16:  No, not actually.

09:13:57 24          MS. SASTRE:  You wouldn't know who he is here today?

09:14:00 25          PROSPECTIVE JUROR 16:  I may know.  But the thing is,

*OFFICIAL TRANSCRIPT*

09:14:01  1   he had a lot of cases with BP claims, and I oversaw all of

09:14:07  2   those BP claims, and I worked on those extensively.  He had a

09:14:11  3   litigation matter where he used your firm as an expert witness,

09:14:14  4   and I worked on that.  I was not the expert, but I did work on

09:14:18  5   the case.

09:14:20  6        MS. SASTRE:  Would you be concerned if you were seated

09:14:22  7   as a juror?  Do you feel like you might be leaning toward his

09:14:29  8   client's fair, or do you think you could be fair and impartial?

09:14:32  9        PROSPECTIVE JUROR 16:  I hope I could be fair and

09:14:34 10   honest.  I hope I could be.

09:14:36 11        MS. SASTRE:  And would you be concerned at all if you

09:14:42 12   were seated as a juror and you came back with a verdict in

09:14:47 13   favor of the defense, or you feel at all that that might

09:14:50 14   negatively impact your ongoing professional relationship with

09:14:54 15   Mr. Coffin?

09:14:55 16        PROSPECTIVE JUROR 16:  It could affect our firm.  I

09:14:58 17   think that that could be a possibility.

09:14:59 18        MS. SASTRE:  Would that be something on your mind here?

09:15:02 19        PROSPECTIVE JUROR 16:  Yes, it would.

09:15:03 20        MS. SASTRE:  Thank you, sir.

09:15:04 21        THE COURT:  Thank you.

09:15:07 22             I didn't ask you if you have any questions.

09:15:12 23        MR. SCHANKER:  I think it's obvious no objection to

09:15:15 24   excusing Mr. Leaber.

09:15:18 25        MS. SASTRE:  No objection.

*OFFICIAL TRANSCRIPT*

09:15:19  1          THE COURT:  One more.  Yes, sir.

09:15:38  2          PROSPECTIVE JUROR 21:  The reason why I don't believe I

09:15:42  3  could handle it is because about 15 years ago, I fell out of a

09:15:48  4  scaffold and broke my back and my neck.  I've got three broken

09:15:51  5  vertebrae in my back and three in my neck, and sitting down a

09:15:56  6  long time, it just don't work.

09:15:57  7          THE COURT:  Now, what's your name?

09:16:00  8          PROSPECTIVE JUROR 21:  Raymond.  Raymond Prejean.

09:16:01  9          THE COURT:  Mr. Prejean.  You're from Assumption

09:16:01 10  Parish?

09:16:01 11          PROSPECTIVE JUROR 21:  Yes.

09:16:05 12          THE COURT:  So am I.

09:16:07 13          PROSPECTIVE JUROR 21:  You are?

09:16:09 14          THE COURT:  I'm Jane Triche.

09:16:12 15          PROSPECTIVE JUROR 21:  Yeah, I'm from Paincourtville.

09:16:19 16          THE COURT:  Paincourtville.

09:16:21 17  P-A-I-N-C-O-U-R-T-V-I-L-L-E.

09:16:28 18          PROSPECTIVE JUROR 21:  Yeah, I know your family well.

09:16:29 19          THE COURT:  We can accommodate that because we will

09:16:32 20  take regular breaks, and I will -- I allow jurors, because I

09:16:36 21  have a bad back, not as bad as yours, but I allow people to

09:16:43 22  stand up and stretch.  And if we did that, would that

09:16:46 23  accommodate you?

09:16:47 24          PROSPECTIVE JUROR 21:  Yes, ma'am.  No problem.

09:16:50 25          THE COURT:  Okay.  All right.  Now, let me ask this,

**OFFICIAL TRANSCRIPT**

09:16:51  1   Mr. Prejean, because I know you have significant back issues.

09:16:56  2   Do you take pain medication?

09:16:58  3          PROSPECTIVE JUROR 21:  No, ma'am.  I'm not taking pain

09:17:01  4   medication.

09:17:01  5          THE COURT:  Okay.  So you wouldn't have trouble

09:17:01  6   standing?

09:17:02  7          PROSPECTIVE JUROR 21:  No, I don't have no problem.

09:17:04  8   It's just, you know, sometimes I have to stand up.

09:17:05  9          THE COURT:  And we can absolutely 100 percent

09:17:08 10   accommodate that.

09:17:09 11          PROSPECTIVE JUROR 21:  I always wanted to do this, but,

09:17:11 12   you know, I don't want to do something I can't do.

09:17:13 13          THE COURT:  No, and you should not.  But we can

09:17:16 14   accommodate that.  And if we allowed you to stand up and

09:17:19 15   stretch and walk around, you would be okay?

09:17:21 16          PROSPECTIVE JUROR 21:  No problem.

09:17:22 17          THE COURT:  Okay.  Thank you, sir.

09:17:53 18          PROSPECTIVE JUROR 21:  Thank you.

09:17:53 19          PROSPECTIVE JUROR 30:  Good morning.

09:17:53 20          THE COURT:  Good morning.  Your number, sir?

09:17:53 21          PROSPECTIVE JUROR 30:  Number 30.

09:17:53 22          THE COURT:  Your name, sir?

09:17:53 23          PROSPECTIVE JUROR 30:  My name is Eddie Smith.  I'm a

09:17:59 24   business owner.  I own several properties.  I'm in the process

09:18:02 25   of signing some contracts for HANO residents.  And once you

**_OFFICIAL TRANSCRIPT_**

09:18:08  1   sign a contract, you got to schedule the appointment to inspect

09:18:12  2   it.  Friday inspection, what I'm going to do is go through and

09:18:17  3   inspect with preinspection and check out what's wrong and

09:18:20  4   what's right.  The things that are wrong, I correct it.  So

09:18:23  5   it's a time-consuming process.  And also, in addition, I'm in

09:18:28  6   the process of fixing properties, getting them online from the

09:18:33  7   hurricane, so it takes time for me to do that.  So 10 days

09:18:36  8   would be a hardship for me.

09:18:39  9        THE COURT:  Mr. Smith, are you in New Orleans?

09:18:41 10        PROSPECTIVE JUROR 21:  Yes.

09:18:42 11        THE COURT:  And you have time limits after those HANO

09:18:46 12   contracts are signed?

09:18:48 13        PROSPECTIVE JUROR 30:  Well, once you sign them, what

09:18:50 14   you try to do is schedule an appointment to have the inspection

09:18:53 15   from HANO because normally that's done within a 10- to 15-day

09:18:57 16   period.  So prior to the inspection, you want to go in there

09:19:01 17   and fix whatever is wrong, whatever they may see that they say

09:19:06 18   is wrong, so that's...

09:19:08 19        THE COURT:  Now, do you have anybody that helps you in

09:19:09 20   that business?

09:19:11 21        PROSPECTIVE JUROR 30:  Sometimes I hire other folks but

09:19:13 22   right now, the other folks are so tied up with additional work,

09:19:17 23   it causes me to have to do a lot of stuff on my own.

09:19:22 24        THE COURT:  Do you want to ask him a few questions?

09:19:24 25        MS. SASTRE:  Yes.  So I do have a couple of questions

*OFFICIAL TRANSCRIPT*

09:19:28 1   for you.  So, first thank you.  I appreciate you coming up here

09:19:33 2   and sharing a little bit about what's going on in your life.

09:19:36 3   You told us that you were here, that you were not able to work?

09:19:42 4          PROSPECTIVE JUROR 30:  Right.  Right.  Right.  Correct.

09:19:44 5          MS. SASTRE:  If you're not able to work, does that mean

09:19:46 6   you're not going to get paid, sir?

09:19:49 7          PROSPECTIVE JUROR 30:  Yes, ma'am.  That's what it

09:19:50 8   really means, yes, correct.

09:19:52 9          MS. SASTRE:  Okay.  Would that be something that would

09:19:52 10  financially --

09:19:57 11         PROSPECTIVE JUROR 30:  That would create an extremely

09:19:59 12  difficult financial situation and it would prolong the process

09:20:01 13  as far as me getting the property to rent.  Because if it's

09:20:04 14  already a rented property, that should be available through the

09:20:08 15  HANO process and I try to basically rent to HANO tenants.

09:20:13 16         MS. SASTRE:  And that would be a financial burden?

09:20:16 17         PROSPECTIVE JUROR 30:  Yes, ma'am.

09:20:16 18         MS. SASTRE:  A just couple of questions just while we

09:20:18 19  have you here.  We know that you filled out a questionnaire and

09:20:21 20  I know that it was a few months ago now, but I did want to ask

09:20:25 21  you.  You said if there that you heard about some litigation --

09:20:32 22         PROSPECTIVE JUROR 30:  Yes.

09:20:32 23         MS. SASTRE:  -- about Taxotere and hair loss; is that

09:20:32 24  true?

09:20:35 25         PROSPECTIVE JUROR 30:  Yes.

**OFFICIAL TRANSCRIPT**

09:20:35 1          MS. SASTRE:  How did you hear about it?

09:20:38 2          PROSPECTIVE JUROR 30:  I have a sister-in-law that

09:20:41 3     experienced breast cancer, and when she was going through the

09:20:43 4     chemotherapy and I don't know the medication process.  She lost

09:20:47 5     some hair and I believe, I don't know for certain for sure,

09:20:51 6     that she -- she had some kind of a class action suit dealing

09:20:57 7     with that.

09:20:57 8          MS. SASTRE:  So your sister-in-law, you think, may have

09:20:59 9     a lawsuit against the manufacturer of Taxotere?

09:21:04 10         PROSPECTIVE JUROR 30:  Right.  I don't know if it's

09:21:05 11    Taxotere but it's some type of lawsuit dealing with a class

09:21:09 12    action as a result of treatment for breast cancer.

09:21:12 13         MS. SASTRE:  And you think that what happened to your

09:21:17 14    sister-in-law was that she lost her hair.  Is that what the

09:21:19 15    lawsuit is about?

09:21:20 16         PROSPECTIVE JUROR 30:  Yes, ma'am.

09:21:21 17         MS. SASTRE:  Okay.  So in this case, you'll hear if you

09:21:30 18    were seated as a juror that the lady who is suing, she did take

09:21:33 19    Taxotere and she's also claiming an injury of permanent hair

09:21:37 20    loss.  Do you think the fact that your sister-in-law is

09:21:41 21    involved in litigation, do you think that might impact in any

09:21:45 22    sort or shape your views on things?

09:21:48 23         PROSPECTIVE JUROR 30:  I would hope it wouldn't, but

09:21:49 24    I'm predisposed to information and you're in the process of

09:21:53 25    making a decision, you try to be as objective as you possibly

09:21:57 1    can but sometimes your predisposition to certain information

09:22:01 2    will cause you to lean one way or the other way.

09:22:06 3        MS. SASTRE:  Do you feel like you're leaning a little

09:22:08 4    bit right now?

09:22:11 5        PROSPECTIVE JUROR 30:  Right now, this is my position

09:22:12 6    that most people that have chemo for treatment for cancer, you

09:22:20 7    basically lose your hair.  That's how I feel.  I don't know if

09:22:25 8    that's right or wrong.

09:22:26 9        MS. SASTRE:  Sure.  Let me ask you this, sir.  Just

09:22:30 10   going back to the claim that your sister-in-law has, my

09:22:35 11   question is do you feel like you would be leaning a little bit

09:22:38 12   in favor of the lady here that's suing because of the situation

09:22:41 13   that your sister-in-law in having a claim like this?

09:22:44 14       PROSPECTIVE JUROR 30:  Yes.

09:22:45 15       MS. SASTRE:  Might it be difficult for you -- I know

09:22:47 16   you tried, sir, but would it be difficult for you to remain

09:22:54 17   fair and impartial in the case because of that?

09:22:56 18       PROSPECTIVE JUROR 30:  It could be.

09:22:58 19       MS. SASTRE:  And then just very briefly, just one or

09:23:01 20   two other questions.  On your questionnaire, when that you said

09:23:07 21   that you knew something about this litigation, you said, "I'll

09:23:10 22   Google it tonight."  You might not remember writing that --

09:23:15 23       PROSPECTIVE JUROR 30:  Yeah, I never did Google it.

09:23:18 24       MS. SASTRE:  You never did.

09:23:20 25       PROSPECTIVE JUROR 30:  No, I didn't.  I really didn't.

*OFFICIAL TRANSCRIPT*

09:23:21  1    Because I've been so busy -- I've been working.  I put a deck

09:23:27  2    down over the weekend that was 8x22.  Had me sore my legs and

09:23:31  3    my back.  Do you know what I'm saying?  But it still made me

09:23:35  4    feel good doing it.

09:23:36  5          MS. SASTRE:  Let me ask you, Mr. Smith, so have you at

09:23:41  6    any time gone on the Internet and done any research on the

09:23:44  7    litigation, like, for example, your sister-in-law is involved

09:23:48  8    with?

09:23:48  9          PROSPECTIVE JUROR 30:  No, I haven't.  And I don't know

09:23:49 10    where it was, but it was somewhere, I read something about the

09:23:54 11    impact of certain types of medication to individuals.  This was

09:23:59 12    prior to even my sister-in-law dealing with this situation.

09:24:03 13          MS. SASTRE:  And was that chemotherapy medication you

09:24:06 14    read about?

09:24:09 15          PROSPECTIVE JUROR 30:  I believe it was.

09:24:10 16          MS. SASTRE:  Did it talk about hair loss or permanent

09:24:12 17    hair loss?

09:24:14 18          PROSPECTIVE JUROR 30:  I'm not sure.  I can't say for

09:24:16 19    certain, but it was negative.

09:24:19 20          MS. SASTRE:  About the drug?

09:24:21 21          PROSPECTIVE JUROR 30:  Yes, ma'am.

09:24:21 22          MS. SASTRE:  Okay.  And then the last thing I wanted to

09:24:23 23    ask you, sir, was I believe that you also indicated you said

09:24:27 24    that you have some negative views of the legal system?

09:24:31 25          PROSPECTIVE JUROR 30:  Yes, I did say that, right.

*OFFICIAL TRANSCRIPT*

09:24:33  1          MS. SASTRE:  Okay.  I know it's a little weird --

09:24:33  2          PROSPECTIVE JUROR 30:  Right.

09:24:34  3          MS. SASTRE:  -- so I promise, you're not going to hurt

09:24:36  4     my feelings no matter what you say.  Would you tell us a little

09:24:40  5     bit about why you feel that way -- and be super honest.

09:24:45  6          PROSPECTIVE JUROR 30:  I feel like the judicial system

09:24:47  7     is in existence to unfairly treat minorities.

09:24:54  8          MS. SASTRE:  Because of that, does it make you

09:24:55  9     uncomfortable to be a juror in the case?

09:24:58  10          PROSPECTIVE JUROR 30:  Yes, it does.

09:24:59  11          MS. SASTRE:  Would that bother you if you were seated

09:25:01  12     as a juror?

09:25:02  13          PROSPECTIVE JUROR 30:  The reason I feel that way is

09:25:05  14     because I have another sister-in-law that is involved with the

09:25:08  15     Gordon Plaza toxic waste dump, and they have been fighting for

09:25:14  16     that for years and years.  Now, when they had Love Canal, they

09:25:23  17     paid all them folk out.  They weren't minority people.  The

09:25:28  18     people that's fighting for Gordon Plaza are minority.  Them

09:25:33  19     people still on that dump site.  I mean, I would have left but

09:25:36  20     I'm just saying when I look at different cases and I evaluate

09:25:43  21     them, that's the way it looks to me.  The judicial system is

09:25:48  22     negatively slanted to hurt minorities.  That's the way I feel.

09:25:57  23          MS. SASTRE:  Thank you, Mr. Smith.  I very much

09:25:59  24     appreciate you sharing your true feelings with us.  Thank you.

09:26:04  25          PROSPECTIVE JUROR 30:  Okay.

**OFFICIAL TRANSCRIPT**

09:26:04  1          THE COURT:  Mr. Smith, while we're here, there are few

09:26:04  2   questions that we're going to have.  Just few comments from

09:26:04  3   you.

09:26:04  4          PROSPECTIVE JUROR 30:  Okay.

09:26:09  5          MR. SCHANKER:  Thank you, Mr. Smith.  My name is

09:26:11  6   Darin Schanker.  Thanks for sharing with us.  How are you.

09:26:14  7          PROSPECTIVE JUROR 30:  I'm fine.

09:26:15  8          MR. SCHANKER:  Just to kind explore this a little

09:26:17  9   bit -- thanks for sharing.  You indicated -- you used the word

09:26:20 10   that -- you were asked if you would be "uncomfortable" with

09:26:24 11   sitting on this jury because of what you described as your

09:26:27 12   "feelings."  Do you think those are feelings that you can set

09:26:30 13   aside and listen to the evidence, in this case, and make a

09:26:33 14   decision on that evidence?

09:26:36 15          PROSPECTIVE JUROR 30:  I would hope so and I would try

09:26:38 16   to, to the best of my ability.  I would try to.

09:26:43 17          MR. SCHANKER:  Okay.  And let me follow up with that.

09:26:46 18   Do you feel in good faith that you could assure Judge Milazzo

09:26:50 19   that you could set those feelings aside and just listen to the

09:26:53 20   evidence and make a decision?

09:26:54 21          PROSPECTIVE JUROR 30:  I would try to, yes.  I feel in

09:27:01 22   good faith I could do that.

09:27:04 23          MR. SCHANKER:  And you had indicated your work

09:27:07 24   schedule.  Just so I'm clear, do you have work that's scheduled

09:27:12 25   in those next two weeks that you would flat-out lose income if

**OFFICIAL TRANSCRIPT**

09:27:17  1   you were seated on this jury, or is there nothing scheduled yet

09:27:22  2   and you could --

09:27:24  3          PROSPECTIVE JUROR 30:  Yeah.  I was supposed to sign a

09:27:26  4   contract today.  I forgot about the jury duty.  I had scheduled

09:27:33  5   with the lady, the case worker, to meet with her Section 8

09:27:33  6   client to sign this HANO contract.

09:27:37  7          I've got another contract I was signing in the

09:27:39  8   process of two bedroom I'm trying to rent from last week, so I

09:27:44  9   do have things becoming available.  Then I have another tenant

09:27:47  10  that should have been out, may be out now, but once she's out I

09:27:53  11  can get in there and straighten it out and get it out online

09:27:55  12  also.

09:27:56  13         Like I said, I'm in the process of also operating

09:27:59  14  a couple of Airbnbs and I wound up -- I had -- my contractor

09:28:05  15  was scheduled to start today to put a deck in.  But I didn't

09:28:09  16  want him to prolong the process because I had people looking

09:28:12  17  online and renting the place so I wound up putting the deck in

09:28:18  18  this past week.

09:28:19  19         I had to pick up the wood from Dash Monday or

09:28:23  20  Tuesday, rip the porch up Tuesday, Wednesday, Thursday, Friday

09:28:28  21  start putting it down.  Saturday then I had to complete the top

09:28:31  22  deck and I have to go back and do the landing, probably

09:28:34  23  sometime this week.  I'm figuring in this process of coming

09:28:37  24  here for the jury duty.

09:28:40  25         MR. SCHANKER:  Just a couple more questions.  You

*OFFICIAL TRANSCRIPT*

09:28:42  1  talked about your sister-in-law.  You think she may have some

09:28:47  2  kind of claim but is it fair to say you don't really know the

09:28:50  3  details of that?

09:28:52  4          PROSPECTIVE JUROR 30:  I don't really know the details

09:28:53  5  of it, other than it's dealing with the hair.

09:28:57  6          MR. SCHANKER:  Based on what you do know, you haven't

09:28:59  7  made up your mind about anything about with this case?

09:29:03  8          PROSPECTIVE JUROR 30:  No.  Because I don't know the

09:29:05  9  specifics other than it's dealing with medication and resulting

09:29:09 10  from dealing with the illness.

09:29:12 11          MR. SCHANKER:  Would you wait and listen to the

09:29:14 12  evidence, in this case, if you were on the jury?

09:29:17 13          PROSPECTIVE JUROR 30:  Yes.

09:29:17 14          MR. SCHANKER:  You wouldn't make a decision before you

09:29:21 15  heard all of the evidence?

09:29:25 16          PROSPECTIVE JUROR 30:  Correct.

09:29:25 17          MS. SASTRE:  Objection, leading.

09:29:27 18          THE COURT:  Okay.  Stop.  Ask your question.

09:29:31 19          MR. SCHANKER:  That's a no.  Thank you so much.

09:29:33 20          THE COURT:  I just have a couple of follow-up

09:29:36 21  questions.  You indicated earlier that you have a lot of

09:29:39 22  questions about the judicial system, and I appreciate your

09:29:42 23  honesty.

09:29:43 24          Could you participate as a juror in the judicial

09:29:51 25  system?

**OFFICIAL TRANSCRIPT**

09:29:52  1          PROSPECTIVE JUROR 30:  I have.  I have.  I've done

09:29:54  2     several -- I've been on a jury with a criminal trial.  I was

09:30:00  3     serving as a national juror at least two or three times on the

09:30:02  4     phone.

09:30:02  5          THE COURT:  So you've been a juror and you have

09:30:05  6     performed your duty with an open mind.

09:30:08  7          PROSPECTIVE JUROR 30:  Yes, ma'am.

09:30:09  8          THE COURT:  If you were selected, in this case, could

09:30:12  9     you do that again?  Could you have an open mind and put

09:30:12 10     aside --

09:30:16 11          PROSPECTIVE JUROR 30:  Yes.  To the best of my ability.

09:30:16 12          THE COURT:  Yes, sir.

09:30:21 13          PROSPECTIVE JUROR 30:  Within the parameters of the

09:30:23 14     rules and regulations.

09:30:25 15          THE COURT:  Thank you, sir.

09:30:27 16          MS. SASTRE:  Your Honor, could I ask a question?

09:30:31 17          THE COURT:  Okay but we've got to move on.

09:30:32 18          MS. SASTRE:  Okay.  Sir, I just wanted to ask you:  If

09:30:34 19     the evidence supported it, if you were seated as a juror in

09:30:38 20     this case and the evidence supported it, could you send the

09:30:44 21     plaintiff in this case away without any money, even though your

09:30:45 22     family member has a similar lawsuit, could you do that, sir?

09:30:49 23     Do you know whether you could do that or would that be

09:30:51 24     difficult for you?

09:30:54 25          PROSPECTIVE JUROR 30:  It would be the difficult.  It

*OFFICIAL TRANSCRIPT*

09:30:56 1  would be difficult.  But I, you know, would listen to the

09:31:00 2  evidence to the best of my ability.

09:31:01 3      MS. SASTRE:  Do you feel like even though, based upon

09:31:06 4  the little bit that you've heard, that be something that would

09:31:07 5  be hard for you to do?  Would that be fair?

09:31:10 6      PROSPECTIVE JUROR 30:  I would try to listen to the

09:31:12 7  evidence.  I would do more than try to listen to the evidence

09:31:15 8  of the case put before me.  Prior to, you know, my work job, I

09:31:22 9  was a union steward, a union rep.  I was a VP for the State

09:31:30 10 with the union.  Then I went into management.  I was a labor

09:31:32 11 rep.  I was an advocate for the union and for the Postal

09:31:35 12 Service, so hearing cases is something that I kind of came up

09:31:40 13 on.  It was based on contract law.  So, it's slightly

09:31:47 14 different.

09:31:48 15     THE COURT:  I think the question, sir, you said that it

09:31:53 16 may be difficult but could you?  At the conclusion of the --

09:31:57 17     PROSPECTIVE JUROR 30:  To the best of my ability, I

09:31:59 18 would try, yes.

09:32:00 19     THE COURT:  No, that's not question, sir.  The question

09:32:02 20 is at the conclusion of the evidence you say I don't think the

09:32:07 21 plaintiff has proved her case by a preponderance of the

09:32:10 22 evidence.

09:32:10 23     PROSPECTIVE JUROR 30:  Yes.

09:32:11 24     THE COURT:  Can you render a verdict against the

09:32:15 25 plaintiff?

*OFFICIAL TRANSCRIPT*

09:32:16  1          PROSPECTIVE JUROR 30:  By the preponderance of the

09:32:17  2   evidence, if it goes in that direction, yes.

09:32:22  3          THE COURT:  Okay.  Thank you.  You may step down.  You

09:32:29  4   can go back.  Thank you.

09:32:31  5          MR. SCHANKER:  Your Honor, Ms. Sastre knows darn well

09:32:35  6   there is no such thing as an objection to a leading question

09:32:39  7   during jury selection.  This is her first trial.  She knows

09:32:47  8   it's improper to object.  We just don't need that kind of

09:32:59  9   gamesmanship.

09:33:08 10          MS. SASTRE:  So, Your Honor, I'm looking through the

09:33:10 11   transcript last time.  There were objections that were

09:33:12 12   sustained to the leading questions.

09:33:15 13          MR. SCHANKER:  Not during jury selection.

09:33:17 14          MS. SASTRE:  Actually, yes.  But anyway...

09:33:19 15          THE COURT:  Stop.  We've got to move on.

09:33:21 16          MS. SASTRE:  Understood, Your Honor.  I just wanted to

09:33:23 17   make --

09:33:30 18          MR. SCHANKER:  She's misrepresenting to the Court.

09:33:33 19          THE COURT:  I am moving on.  I don't have time.  We can

09:33:37 20   do this at a recess.

09:33:41 21          Is there something you want to say about Mr. Smith?

09:33:44 22          MS. SASTRE:  Yes, a couple things on Mr. Smith.  I

09:33:48 23   would first say that I believe that he has demonstrated that

09:33:50 24   this would be a financial hardship for him.  He said he would

09:33:53 25   not get paid and if he was here, he would not work for two

                                **OFFICIAL TRANSCRIPT**

weeks so I think on these grounds alone, particularly when we look at other jurors who just came up here and said the very same thing.  Very same thing.  He must be excused on these grounds.

He also did say that he thinks it would be difficult for him to send the plaintiff, in this case, away without any money because of the fact that his sister-in-law, in fact, does have -- I don't think there is any question in his mind, the Taxotere lawsuit and she's claiming that she lost her hair.  And I'm very concerned about the fact -- I understand he doesn't have issue to jurors, but we have to accept the fact that there is a chance that he may mention to somebody in his family the kind of case that he's on and he did say, at first in response to my question, that he thought he would have trouble coming back with the verdict in the defense's favor and sending their plaintiff home with no money because of his personal family connection to this very same piece of litigation.

He also expressed some very negative sentiments, obviously, about the legal system but I think that those are the two primary reasons.  I believe the totality of the circumstances absolutely demonstrates that he cannot be a fair and impartial juror and I believe that he also has a hardship. We ask that he be excused with cause.

MR. SCHANKER:  I believe the record is clear that

*OFFICIAL TRANSCRIPT*

09:35:18  1    Juror Number 30, Mr. Smith, has indicated that he can follow

09:35:21  2    the law by the preponderance of the evidence and so he should

09:35:25  3    not be excused for cause.

09:35:27  4         THE COURT:  I'm going to excuse Mr. Smith for cause.

09:35:32  5    My concern is that his sister-in-law -- I don't believe there

09:35:38  6    are any other cases out there -- class action type cases of

09:35:43  7    dealing with hair loss as a result of breast cancer than this

09:35:47  8    one.  I believe he would attempt to follow the law but that's a

09:35:57  9    closer relationship than I am comfortable with so I'm going to

09:36:00 10    excuse him for cause.

09:36:02 11         MR. SCHANKER:  Thank you, Your Honor.

09:36:03 12         THE COURT:  Is there anybody else?

09:36:03 13         MR. SCHANKER:  No.

09:36:03 14         (WHEREUPON, at this point in the proceedings, the bench

09:36:05 15    conference concluded.)

09:36:05 16         THE COURT:  Thank you, all.  This process sometimes

09:36:29 17    just takes a bit of time.  I have other questions that I would

09:36:31 18    like for you to raise your hand if you have an answer to, and

09:36:34 19    this is directed to all parties.  Each of you filled out a

09:36:37 20    questionnaire before today.  Did you answer the questions

09:36:42 21    honestly and completely?  And if there is someone here that

09:36:46 22    has realized that they answered the questionnaire and there was

09:36:53 23    something that they didn't include that was asked or if there

09:36:57 24    was something that was not honest?

09:37:04 25         If your answers to the questionnaire have changed

**OFFICIAL TRANSCRIPT**

09:37:07  1    since completing it, please raise your hand.

09:37:11  2                Have any of you discussed your answers with

09:37:19  3    anyone before or after completing the questionnaire?  Please

09:37:24  4    raise your hand.

09:37:29  5                Thank you.  Those of you that are seated in the

09:37:33  6    back, I'm going to ask you to continue listening because we may

09:37:37  7    have to bring in another panel, but for our purposes now, we're

09:37:40  8    going to direct the questions to the 15 that I've referred to

09:37:44  9    in the box.

09:37:49 10                I'm going to ask -- and we're going to begin with

09:37:51 11    Juror Number 1.  I'm going to ask you to rise, state your name,

09:38:02 12    the area of the district in which you reside, your

09:38:05 13    occupation -- if you're retired, your former occupation -- your

09:38:09 14    marital status, and how many children you have, if any.  Please

09:38:12 15    also state the occupation of anyone living in your household.

09:38:18 16    I'm going to give you an example -- I'm going to do it for you.

09:38:21 17    Oh, and your favorite TV show.

09:38:23 18                My name is Jane Milazzo.  I am a judge.  I live

09:38:26 19    in New Orleans.  I'm originally from Napoleonville.  I'm

09:38:31 20    married.  My husband is a retired banker and we have six

09:38:36 21    children between us and they are all outside of the house.  God

09:38:40 22    is good.  My favorite TV show is, "Call The Midwife."

09:38:47 23                With that, I'm going to start with you,

09:38:51 24    Mr. Wallace -- and I'll prompt you if you forget something.

09:38:54 25    When you stand to speak, you may remove your mask so that we

*OFFICIAL TRANSCRIPT*

09:38:58  1    can hear you.

09:39:00  2         PROSPECTIVE JUROR 1:  Yes, my name is Willie Wallace.

09:39:03  3    I am from LaPlace, Louisiana, in St. John Parish.  I'm single.

09:39:08  4    I have four children, two sons that live with me.  One is a

09:39:12  5    carpenter, one works in fast food retail business.  I work at

09:39:19  6    Bollero St. Charles.  I'm a console operator.

09:39:23  7         THE COURT:  What's your favorite TV show?

09:39:26  8         PROSPECTIVE JUROR 1:  Oh, gee.  I liked the NCIS:  New

09:39:34  9    Orleans before it went off.  Yeah.

09:39:36 10         THE COURT:  Thank you, sir.  Mr. Williams.

09:39:42 11         PROSPECTIVE JUROR 2:  Hi, my name is Kent Williams.  I

09:39:46 12    live in Mount Herman, Louisiana.  I'm retired.  I worked for

09:39:50 13    Chevron on the oil production platform as the automation tech.

09:39:55 14    I'm married.  I have one child.  He moved out of the house.

09:39:58 15    He's on his own.  He lives in Fort Worth, Texas at this time.

09:40:03 16    TV show, I guess, "Last Man Standing."

09:40:07 17         THE COURT:  Thank you, sir.  Mr. Allen.

09:40:10 18         PROSPECTIVE JUROR 3:  My name is Terrell Allen.  I work

09:40:14 19    for Brink's armored service.  I deliver the money.  Two kids.

09:40:19 20    I stay in Orleans Parish and I don't have a favorite TV show.

09:40:24 21    Thank you.

09:40:25 22         THE COURT:  Thank you.  All right.  Ms. Abel.

09:40:28 23         PROSPECTIVE JUROR 4:  Rebecca Abel.  I live in Hammond,

09:40:32 24    Louisiana.  It's in Tangipahoa Parish.  I'm the executive

09:40:37 25    director of a small nonprofit that does substance abuse

*OFFICIAL TRANSCRIPT*

09:40:43 1    prevention to youth.  I'm single, no children, and my favorite

09:40:47 2    TV show is, "Grey's Anatomy."

09:40:50 3         THE COURT:  Thank you.  Mr. New.  I think you should

09:40:52 4    have a mic in your row.  Thank you.

09:40:56 5         PROSPECTIVE JUROR 5:  Yeah.  My name is Dwayne New.  I

09:41:02 6    work for an inspection company.  Been with them for 36 years.

09:41:06 7    I have one son.  I'm married.  And my favorite show would have

09:41:10 8    to be any western.

09:41:13 9         THE COURT:  Thank you, sir.

09:41:16 10             Ms. Miksovic-Anderson.

09:41:20 11        PROSPECTIVE JUROR 6:  Hi, my name is

09:41:24 12   Emily Miksovic-Anderson.  It's a tough name, I know.  I'm

09:41:28 13   married.  My husband is a truck driver for General Mills and we

09:41:33 14   live in Ama, Louisiana.  That's in St. Charles Parish.  And my

09:41:37 15   favorite TV show is, "The Rifleman."

09:41:41 16        THE COURT:  Ma'am, quick question.  Do you work outside

09:41:44 17   the home?

09:41:45 18        PROSPECTIVE JUROR 6:  No, I'm a housewife.

09:41:48 19        THE COURT:  Thank you, ma'am.

09:41:48 20             Mr. Harms.

09:41:49 21        PROSPECTIVE JUROR 7:  Yes, ma'am.  My name is

09:41:51 22   Mike Harms, and I am married for 25 years.  I have two kids, 12

09:41:56 23   and 13.  I live in Covington, Louisiana, on the North Shore.  I

09:42:00 24   work at Mele Printing and my favorite TV show, I guess, Magnum,

09:42:07 25   P.I.

*OFFICIAL TRANSCRIPT*

09:42:10  1          THE COURT:  Thank you.  Mr. Autin.

09:42:12  2          PROSPECTIVE JUROR 8:  My name Austin Autin.  I live in

09:42:15  3   Napoleonville.  I work at CF Industries as a process operator.

09:42:18  4   Single, no kids, and I would say, "Yellowstone."

09:42:24  5          THE COURT:  Thank you.  Mr. Pisciotta.

09:42:28  6          PROSPECTIVE JUROR 9:  I'm Christian Pisciotta.  I live

09:42:33  7   in Tickfaw, Louisiana, that's in Tangipahoa Parish.  I'm single

09:42:39  8   and I love it.  And I don't watch TV.

09:42:42  9          THE COURT:  You don't watch TV at all?  Okay.  Thank

09:42:42 10   you.

09:42:43 11              Ms. Andry.

09:42:45 12          PROSPECTIVE JUROR 10:  Hi, my name is Karen Andry.  I

09:42:47 13   live in Metairie, Louisiana.  Jefferson Parish.  I'm a single

09:42:50 14   mother of two.  One lives with me; one on her own.  I work at a

09:42:55 15   funeral home as administrator assistant and custodian and I

09:43:00 16   don't watch TV too much so I don't have a favorite show.

09:43:03 17          THE COURT:  Thank you, ma'am.  Ms. Vail.

09:43:07 18          PROSPECTIVE JUROR 11:  Hi, Maite Vail.  I retired from

09:43:09 19   Murphy Oil as a planning analyst.  My husband is semi-retried

09:43:14 20   lawyer and engineer before that.  I have two kids, and I kind

09:43:17 21   of like the midwives so don't tell me what happened last night.

09:43:21 22          THE COURT:  I missed it, too.  Ms. Vail, I have a quick

09:43:24 23   question.  You said your husband was a lawyer?

09:43:28 24          PROSPECTIVE JUROR 11:  Yeah.  He went to law school at

09:43:30 25   50.

*OFFICIAL TRANSCRIPT*

09:43:31 1          THE COURT:  Does he still practice?

09:43:33 2          PROSPECTIVE JUROR 11:  Part -- he's a counsel.

09:43:34 3          THE COURT:  Can you tell us what type of law he

09:43:37 4   practiced?

09:43:38 5          PROSPECTIVE JUROR 11:  Both patent and environmental.

09:43:41 6          THE COURT:  Thank you, ma'am.

09:43:41 7          PROSPECTIVE JUROR 11:  Okay.

09:43:41 8          THE COURT:  Ms. Thomas.

09:43:43 9          PROSPECTIVE JUROR 12:  My name is Gaile Thomas.  I'm

09:43:46 10  retired from Tulane University, a library technician.  I have

09:43:49 11  three sons and I'm a widow.  I live in New Orleans.

09:43:53 12         THE COURT:  Yes, ma'am.  Do you have a favorite TV

09:43:56 13  show, Ms. Thomas?

09:43:58 14         PROSPECTIVE JUROR 12:  Yes, ma'am.  "Married To

09:43:59 15  Medicine."

09:44:01 16         THE COURT:  Erica Miller.  Ms. Miller.

09:44:02 17         PROSPECTIVE JUROR 13:  Yes, ma'am.  My name is

09:44:05 18  Erica Miller.  I live in Ponchatoula.  I work at ETS and I'm

09:44:10 19  doing a turnaround at Valero St. Charles Refinery.  Engaged, no

09:44:17 20  kids, got a cat.  My favorite TV show is "Forensic Files."

09:44:22 21         THE COURT:  Ms. Andrade.

09:44:24 22         PROSPECTIVE JUROR 14:  My name is Maria Andrade.  I'm

09:44:28 23  from Gretna, Louisiana, and I'm married and I have three

09:44:31 24  children.

09:44:32 25         THE COURT:  Do you have a --

                                **_OFFICIAL TRANSCRIPT_**

09:44:36 1          PROSPECTIVE JUROR 14:  I don't watch TV.

09:44:38 2          THE COURT:  Thank you, ma'am.

09:44:39 3               Yes, sir.  Mr. Smith.

09:44:43 4          PROSPECTIVE JUROR 15:  Good morning.  My name is

09:44:44 5     Louis Smith.  I'm from Gretna, Louisiana.  I'm a painter by

09:44:48 6     occupation.  At this point in time, I'm working as

09:44:53 7     self-employed.  I don't watch much TV.

09:44:58 8          THE COURT:  Okay.  Thank you, Mr. Smith.

09:45:00 9          I'm now going to ask that the lawyers who have an

09:45:05 10    opportunity to question just this 15 panel.  Mr. Schanker,

09:45:10 11    please.

09:45:20 12         MR. SCHANKER:  Thank you, Your Honor.

09:45:20 13    DIRECT EXAMINATION BY MR. SCHANKER:

09:45:24 14    Q.   Good morning, folks.  So the first question for you --

09:45:27 15    and, again, my name is Darin Schanker, and I represent

09:45:31 16    Elizabeth Kahn, and you'll notice that Ms. Kahn is not in here

09:45:36 17    right now.  She stepped out because I want to make sure you

09:45:40 18    guys are as comfortable as possible sharing your opinions in

09:45:44 19    this case.  And if you may have an opinion that you're afraid

09:45:49 20    or not comfortable sharing because she's here, well, you don't

09:45:52 21    have to worry about that because she stepped out; is that okay?

09:45:58 22         So first question, how many of you when you woke up

09:46:01 23    this morning kind of oriented yourself to what day it was and

09:46:04 24    said, oh, good, I get to go down there and -- downtown to

09:46:08 25    federal court, fight the traffic, and go to jury selection.

*OFFICIAL  TRANSCRIPT*

09:46:08  1    Raise your hand high if that's how you felt.  Why is there

09:46:14  2    only -- it was kind of one half hand.

09:46:21  3         PROSPECTIVE JUROR 6:  I was dreading the traffic and

09:46:23  4    going downtown.

09:46:26  5         MR. SCHANKER:  Well, tell me this,

09:46:29  6    Ms. Miksovic-Anderson -- am I pronouncing that right?

09:46:29  7         PROSPECTIVE JUROR 6:  Uh-huh (affirmative response).

09:46:29  8         MR. SCHANKER:  How bad -- was the traffic too bad or

09:46:31  9    not?

09:46:31  10         PROSPECTIVE JUROR 6:  Yeah, it was bad.  The traffic

09:46:38  11    was bad.

09:46:39  12         THE COURT:  Okay.  But you made it.

09:46:41  13         PROSPECTIVE JUROR 6:  Yeah.

09:46:42  14         MR. SCHANKER:  I think you were in line right in front

09:46:44  15    of me.

09:46:45  16         And so, folks, the purpose for us being here is

09:46:55  17    to share.  And what I'd like to do is talk about some subjects

09:46:56  18    that I ask you to just be brutally honest about those, even if

09:46:59  19    it's something that you think I don't want to hear.  And so,

09:47:03  20    you know, different topics here.  The whole idea is, is this

09:47:07  21    the right case for you to be sitting on or not.  That's what

09:47:12  22    this is about; time for brutal honesty and just sharing what

09:47:16  23    you feel.

09:47:16  24         We had an opportunity to read your questionnaires

09:47:24  25    that you filled out, in this case, and I want to jump right

*OFFICIAL TRANSCRIPT*

09:47:26  1    into that.  I know that was a while ago when you filled those

09:47:28  2    out -- a couple -- few months ago, I think -- but there was a

09:47:32  3    topic on clinical trials.  Does anybody remember at all?  You

09:47:35  4    probably don't, it's been so long.  Clinical trials.  And some

09:47:39  5    of you filled out some answers to questions on clinical trials,

09:47:43  6    and I just kind of want to go back to that.

09:47:45  7             But just to frame that issue, without getting

09:47:50  8    into the evidence, you'll hear that my client was on a

09:47:53  9    clinical trial.  And my question to you is, do any of you feel

09:47:57 10    that if the treatment involved a clinical trial, that you just

09:48:02 11    have a problem, even if it's just a little bit, of bringing in

09:48:05 12    some kind of lawsuit, or bringing some kind of claim arising

09:48:09 13    out of that?  Anybody willing to volunteer, be a brave soul, if

09:48:15 14    you feel that way?  And I'm going to call on some folks based

09:48:15 15    on some of the responses that you have.

09:48:15 16             But anyone in the box?

09:48:15 17        PROSPECTIVE JUROR 11:  (Indiscernible.)

09:48:25 18        MR. SCHANKER:  Yeah.  And, thanks.  And, Ms. Vail, that

09:48:26 19    if you agree to participate in a clinical trial that, in a way,

09:48:29 20    it's sort of an experiment.  Anyone have thoughts like that at

09:48:34 21    all?  And we have -- could everybody raise your hands high, see

09:48:41 22    who we've got here.  Okay.  And I'll come back to you.  I want

09:48:44 23    to talk to you.  But, Mr. Harms, you spoke up.  And can we hand

09:48:47 24    that microphone to Mr. Harms.

09:48:52 25        PROSPECTIVE JUROR 7:  Yes, sir.

*OFFICIAL TRANSCRIPT*

09:48:54  1          THE COURT:  Are you comfortable sharing with us what

09:48:55  2     your thoughts are on this?

09:48:58  3          PROSPECTIVE JUROR 7:  Just basically, you described it

09:48:59  4     that if it's clinical, there is some type of, for lack of a

09:49:03  5     better word, trial or error, and it's -- or at least in my

09:49:07  6     concept of what it is.  And with that, if there's some mistake,

09:49:13  7     that's, to some degree, part of what is signed up for.

09:49:18  8          THE COURT:  Okay.  Share with me a little more about

09:49:22  9     where you're going with that.  I think I know where you're

09:49:25 10     heading, but...

09:49:26 11          PROSPECTIVE JUROR 7:  Just that it's not something --

09:49:28 12     I'm assuming that it's not something that's maybe FDA-approved

09:49:33 13     or, you know, a complete understanding of what this medicine

09:49:35 14     does.  And so because of that, there is some risk involved in

09:49:38 15     it.  And, again, there's assumption on my part that the client,

09:49:43 16     to some degree, knows what's going on with that.

09:49:47 17          MR. SCHANKER:  Okay.  And this isn't the time to talk

09:49:49 18     about the evidence, and so I can't comment on that.  But with

09:49:54 19     regard to a clinical trial, do you think that your feelings

09:50:00 20     that you expressed to us might enter into your decision-making

09:50:07 21     in this case potentially?  And what I mean by that is, the

09:50:10 22     Judge has read to us that you're supposed to base your decision

09:50:14 23     on the evidence in this case.

09:50:15 24          PROSPECTIVE JUROR 7:  No.  To say that I'll never be

09:50:20 25     influenced by feelings, I don't think that's the case.  But I

*OFFICIAL TRANSCRIPT*

1  think I'm able to look at evidence and make a decision based

2  off of that.

3  MR. SCHANKER:  Right.  So, how about just kind of

4  building off a clinical trial, just this issue?  From your

5  questionnaire, you probably gathered, Mr. Harms, that this

6  involves our client who was undergoing treatment for cancer,

7  and now she's bringing a lawsuit against the pharmaceutical

8  company.  Any opinions or feelings on that that you're

9  comfortable sharing?

10  PROSPECTIVE JUROR 7:  Sure.  I think on both sides of

11  the aisle, there's, in my mind -- I'll just be honest.  I think

12  on the company side, I think they're going to do what they have

13  to do to try and cover themselves.  And I think, though, there

14  may be -- there may be good intentions as far as, you know,

15  wanting to develop a medicine that helps people.  But I also

16  think that there is a lot of money involved, and,

17  unfortunately, I also think -- and with all due respect to you

18  and your company -- that I think that there is, unfortunately,

19  there's sometimes -- there's lawyers who take advantage of

20  situations and sometimes get people to agree to lawsuits that

21  may not be completely valid.

22  MR. SCHANKER:  Sure.  Thank you for sharing that.

23  Anything about -- you covered a whole bunch there.  Any

24  opinions that you have, as you've expressed to us, that you

25  feel may enter into your decision-making process?  As the Judge

**OFFICIAL TRANSCRIPT**

09:52:10 1    said, you're supposed to consider the evidence and really only

09:52:13 2    the evidence in your decision-making.  But you said you can't

09:52:16 3    leave your feelings outside, right?  You can't leave those

09:52:20 4    opinions outside.

09:52:22 5          PROSPECTIVE JUROR 7:  Well, it's in there, so I can't

09:52:24 6    ignore it.  But at the same time, I do think I can look at the

09:52:27 7    evidence and make a decision based on that.

09:52:30 8          MR. SCHANKER:  Okay.  Thank you, Mr. Harms, for

09:52:32 9    sharing.  Anyone on any of these issues that Mr. Harms touched

09:52:35 10   on?  He touched on a few of them.  He touched on the

09:52:39 11   clinical trials, right?  He talked about cancer, bringing a

09:52:44 12   case where you're receiving -- against the pharmaceutical

09:52:48 13   company that provided you some treatment for the cancer.

09:52:51 14   Anybody have feelings or opinions on that that they're

09:52:55 15   actually -- I know it's kind of hard to say, you may not want

09:52:58 16   to speak in front of everyone, but anyone comfortable enough to

09:53:01 17   say, you know, based on what I'm hearing, we should have a

09:53:04 18   conversation?  Ms. Vail.

09:53:04 19          Could you hand Ms. Vail the microphone.

09:53:17 20          PROSPECTIVE JUROR 11:  I do understand what sort of

09:53:18 21   this case is about.  But the feelings that you have, and you've

09:53:22 22   already -- it's been brought up, it's hard to divorce from.  My

09:53:26 23   father was in the pharmaceutical industry his whole life.  He

09:53:30 24   was a very good man.  It's going to take -- you know, could I

09:53:35 25   say to you right now, yes, I'll look at the evidence, but it

*OFFICIAL TRANSCRIPT*

09:53:38  1   will have to be a very, very hard evidence.  My son's a

09:53:42  2   physician.  I mean, there's a lot of externalities that come

09:53:49  3   into it.  We're not robots.

09:53:49  4         MR. SCHANKER:  Sure.

09:53:51  5         PROSPECTIVE JUROR 11:  So to say that this is only

09:53:54  6   evidence, I wish I could shut my mind off that way.

09:53:58  7         MR. SCHANKER:  Thank you for sharing honestly with us.

09:54:00  8   And if I could follow up on a couple of those things, is that

09:54:04  9   okay?

09:54:06 10         PROSPECTIVE JUROR 11:  Sure.

09:54:06 11         MR. SCHANKER:  So you talked about sort of -- it would

09:54:08 12   have to be hard evidence, I believe, is what you said.  So let

09:54:12 13   me ask you some questions about that.  We're going to hear

09:54:14 14   about the burden of proof.  Everyone's heard that term, the

09:54:17 15   burden of proof, and this is not a criminal case.  A criminal

09:54:19 16   case, the burden is beyond a reasonable doubt, beyond a

09:54:23 17   reasonable doubt.  In a civil case, it's -- the word is, the

09:54:26 18   big legal word is, preponderance, preponderance of the

09:54:29 19   evidence, and more likely true than not.

09:54:33 20             And in that situation, Ms. Vail, as you shared

09:54:38 21   your feelings and your opinions on that, how do you feel about

09:54:43 22   that being the amount of evidence that's necessary to find in

09:54:46 23   favor of the plaintiff?

09:54:48 24         PROSPECTIVE JUROR 11:  I would have to also say that --

09:54:52 25   trying to figure out what the plaintiff's responsibility in

**OFFICIAL TRANSCRIPT**

09:54:54  1    this whole thing, of her needing to assess the risk that she

09:55:00  2    was getting into.  So, I can't tell you one thing until you

09:55:08  3    present it all to me.  So --

09:55:08  4            MR. SCHANKER:  Sure.

09:55:10  5            PROSPECTIVE JUROR 11:  -- I don't know if that answers

09:55:11  6    your question.

09:55:12  7            MR. SCHANKER:  No, I think that's a good response.  You

09:55:15  8    want to hear the evidence, right?

09:55:17  9            PROSPECTIVE JUROR 1:  Yes.

09:55:17 10            MR. SCHANKER:  So, if I may, can I follow up on that?

09:55:21 11            THE DEPUTY CLERK:  You're right at 10 minutes.

09:55:22 12            MR. SCHANKER:  Okay.  Thank you.  So then my question,

09:55:26 13    Ms. Vail, is, based on the way you feel right now and those

09:55:29 14    opinions that you've been honest enough to share with us, would

09:55:37 15    it be fair to say that you would have trouble, or that even,

09:55:39 16    quite frankly, that you can't assure this court that those

09:55:41 17    feelings can be set aside and you can make a decision solely on

09:55:45 18    the evidence; would that be fair to say?

09:55:50 19            PROSPECTIVE JUROR 11:  Yes.  If you asked me that right

09:55:52 20    now, yes.

09:55:52 21            MR. SCHANKER:  Okay.

09:55:52 22            PROSPECTIVE JUROR 11:  I haven't seen it, so, I mean...

09:55:55 23            MR. SCHANKER:  Fair enough.  And there's nothing that I

09:55:58 24    can say or the Judge can say that would change the way you feel

09:56:02 25    about your opinions right now; is that fair?

                            *OFFICIAL TRANSCRIPT*

09:56:04  1          PROSPECTIVE JUROR 11:  Pretty much.  That's kind of how

09:56:06  2     I came into this.

09:56:08  3          MR. SCHANKER:  Okay.  Thank you, Ms. Vail.

09:56:11  4              Now, I want to shift gears here, folks, and talk

09:56:15  5     to you.  Judge Milazzo, Her Honor, also said that you're to

09:56:18  6     follow the law as she gives it to you.  And, obviously, you

09:56:21  7     haven't heard any of the law, and there's going to be a whole

09:56:24  8     bunch of them if you're sitting on this jury.  But I have a

09:56:27  9     question about one of those, and that's, if you find that the

09:56:30 10     defendant's conduct -- and you'll have to hear the evidence --

09:56:32 11     was such that they're at fault, then you have to decide whether

09:56:36 12     that conduct caused the injury.  I want to ask you about that

09:56:42 13     because the law talks about whether it's a cause or the cause,

09:56:50 14     the sole cause.  So let me explain this a little bit, if I

09:56:54 15     could, because I want to follow up on this.

09:56:58 16              Think about the football.  There's football down

09:57:01 17     the street yesterday, and was there --

09:57:05 18          THE COURT:  Mr. Schanker, I think you need to ask a

09:57:07 19     question.

09:57:08 20          MR. SCHANKER:  Yes.  Thank you, Your Honor.

09:57:09 21              With regard to the cause in the victory or loss,

09:57:15 22     was it one player, or was it a group of players?  Because the

09:57:18 23     law in this case is going to say that the defendant, if you're

09:57:22 24     sitting on the jury, was -- was the defendant a substantial

09:57:26 25     factor in causing the injury.  Was it a cause?  There could be

*OFFICIAL TRANSCRIPT*

09:57:31 1    multiple causes.

09:57:32 2            THE COURT:  Is there a question?

09:57:34 3            MR. SCHANKER:  Yes, Your Honor.

09:57:35 4            THE COURT:  Please ask it.

09:57:36 5            MR. SCHANKER:  My question to you is, is that a law

09:57:38 6    that you feel you can follow, that there could be multiple,

09:57:43 7    multiple factors that cause it, or do you feel that it should

09:57:48 8    just be one cause?

09:57:52 9            PROSPECTIVE JUROR 11:  I think that you have to present

09:57:55 10   it.  Because, like you said, the football game, there's lots of

09:57:59 11   things, although one person can cause the biggest problem at

09:58:04 12   one particular time.  But I don't follow much football, either,

09:58:08 13   so...

09:58:08 14           MR. SCHANKER:  Sure.

09:58:08 15           PROSPECTIVE JUROR 11:  So, again, a trial has some

09:58:23 16   risks and rewards.  I think the defendant needs to be sure that

09:58:28 17   she took all precautions about breast cancer, about hair loss,

09:58:34 18   and everything else, which we've known for a very long time

09:58:38 19   that chemotherapy causes hair loss.  For a very long time.

09:58:45 20   Whether it's worth fighting breast cancer for, which my mother

09:58:50 21   died of, that's something that needs to be considered.  I think

09:58:56 22   the risks of losing some hair is okay.

09:59:02 23           MR. SCHANKER:  Thank you for sharing.

09:59:04 24           The question I have, anyone else, based on what

09:59:06 25   we've talked about so far, feel that they agree with what

*OFFICIAL TRANSCRIPT*

09:59:15  1   Ms. Vail said concerning this issue of cancer and a treatment

09:59:20  2   therapy and then bringing a lawsuit?  Anyone have thoughts that

09:59:24  3   they --

09:59:27  4        PROSPECTIVE JUROR 6:  Yeah, I agree.  I think they --

09:59:33  5   if they are undergoing chemotherapy, their hair can fall out.

09:59:37  6   So it might not necessarily be from the medicine.

09:59:42  7        MR. SCHANKER:  Okay.  Thank you.

09:59:48  8        PROSPECTIVE JUROR 7:  I'll just say, again, that --

09:59:49  9   well, not again -- but my dad had cancer a couple of times, and

09:59:52 10   that was just understood.  I kind of agree with the lady right

09:59:55 11   there, that that was just part of what it is, to some degree,

09:59:58 12   that you lose your hair.  And that's part of fighting cancer.

10:00:04 13   And so I kind of agree with that as well.

10:00:08 14        MR. SCHANKER:  Okay.  Last question, folks.  The -- in

10:00:10 15   this case, if the evidence supports it, this may be a case

10:00:16 16   where we will be asking for compensation for what's been taken

10:00:20 17   from our clients in the amount of over a million dollars.  Is

10:00:26 18   there anybody that hears that and says, I don't know if this is

10:00:30 19   the right case for me to be on?  Just based on that, if you

10:00:36 20   could raise your hand.  Okay.  If we could speak to Mr. New.

10:00:48 21        PROSPECTIVE JUROR 5:  Just like they were saying, my

10:00:53 22   mom had cancer, and the same thing happened to my mom.  She

10:00:55 23   didn't lose all her hair, but it thinned out.  But I agree with

10:01:00 24   everything that they're saying because everybody has been told

10:01:02 25   that you can possibly lose your hair.  So I don't see how

**OFFICIAL TRANSCRIPT**

10:01:05  1   somebody can try to do a lawsuit knowing that.  I'm sure they

10:01:10  2   were fully told about the hair loss.  Like he said, chemo does

10:01:17  3   it, some medications do it.  So I would have to say that I feel

10:01:22  4   that they would have been told about the hair loss.

10:01:28  5          MR. SCHANKER:  Mr. New, thanks for sharing with us.

10:01:30  6   Can I follow up and ask you --

10:01:30  7          PROSPECTIVE JUROR 5:  Yeah.

10:01:31  8          MR. SCHANKER:  -- some questions on that?

10:01:36  9          So it sounds like you have some pretty strong opinions

10:01:39 10   on that issue.

10:01:40 11          PROSPECTIVE JUROR 5:  Yes.

10:01:42 12          MR. SCHANKER:  Okay.  And those opinions that you've

10:01:44 13   expressed, do you feel like you'll be able to listen to the

10:01:46 14   evidence and decide the case just on the evidence, or do you

10:01:50 15   think that you may have real trouble assuring the Judge that

10:01:53 16   you can set those opinions aside, that they're going to

10:01:57 17   actually influence your decision in the case?  Just based on

10:02:01 18   what you know right now.

10:02:03 19          PROSPECTIVE JUROR 5:  It would have to be proved

10:02:05 20   that -- you would have to prove to me that they -- that person

10:02:07 21   was not explained about the hair loss.

10:02:07 22          MR. SCHANKER:  Okay.

10:02:07 23          THE COURT:  Okay.

10:02:11 24          PROSPECTIVE JUROR 5:  And to me, I find that hard to

10:02:13 25   believe because I'm sure the doctors had that conversation.

*OFFICIAL TRANSCRIPT*

10:02:18  1          MR. SCHANKER:  Right.  And so you'd want to hear the

10:02:20  2   evidence on that?

10:02:21  3          PROSPECTIVE JUROR 5:  Yes.

10:02:22  4          MR. SCHANKER:  Based on what you know right now, do you

10:02:24  5   think you can set those opinions aside as you've expressed them

10:02:28  6   to us, or are they going to -- in good faith, can you not

10:02:34  7   assure the Court that you can do that?

10:02:35  8          PROSPECTIVE JUROR 5:  It's hard for me to say.

10:02:38  9          THE COURT:  Okay.

10:02:38 10          MR. SCHANKER:  Okay.

10:02:39 11          THE COURT:  Mr. Schanker --

10:02:40 12          PROSPECTIVE JUROR 5:  It would have to be overwhelming

10:02:45 13   proof.

10:02:46 14          MR. SCHANKER:  Thank you, Mr. New.

10:02:50 15          PROSPECTIVE JUROR 12:  Yeah.  I think that the patient

10:02:53 16   is told that the medicine will take out your hair,

10:02:58 17   chemotherapy, because I am a cancer survivor, and I took chemo.

10:03:02 18   It took my hair out.  I lost all my hair.  My niece was also a

10:03:06 19   cancer patient.  She died from cancer, but she was also on a

10:03:10 20   trial medication that strained the mass a little bit.  But, you

10:03:15 21   know, she still died from it.

10:03:17 22          MR. SCHANKER:  Okay.

10:03:19 23          THE COURT:  All right.  Thank you.  Your time is up.

10:03:24 24          MR. SCHANKER:  Your Honor, could I approach for one

10:03:25 25   moment?

*OFFICIAL TRANSCRIPT*

10:03:45 1        THE COURT:  Yes.

10:03:45 2        MR. SCHANKER:

10:03:47 3        (WHEREUPON, at this point in the proceedings, there was

10:03:50 4    a conference held at the bench.)

10:03:50 5        MR. SCHANKER:  Your Honor, just for the record, I want

10:03:51 6    to make a request for additional voir dire time.  There were

10:03:55 7    several jurors who raised their hands.  They clearly had

10:03:58 8    opinions on the issue of clinical trials in this case, and I

10:04:02 9    would request the opportunity to ask them questions.  And then

10:04:05 10   we had several jurors who raised their hands concerning this

10:04:09 11   issue of cancer and whether or not they could set those

10:04:12 12   opinions aside to be fair and impartial to the jurors in this

10:04:15 13   the case, Your Honor.  So, we would request additional time to

10:04:19 14   follow up on that with this panel.

10:04:21 15       THE COURT:  I'm going to deny that request.  You were

10:04:26 16   told earlier that we were going to do 15 minutes.  And so the

10:04:31 17   record is clear, there was a great deal of time talking about

10:04:34 18   other things, and, I think, perhaps you should have been more

10:04:38 19   focused.  Request denied.

10:04:40 20       MR. SCHANKER:  Thank you, Your Honor.

10:04:41 21       MS. SASTRE:  Thank you, Your Honor.

10:04:41 22       (WHEREUPON, at this point in the proceedings, the bench

10:04:59 23   conference concluded.)

10:04:59 24       THE COURT:  Ms. Sastre?

10:05:01 25       MS. SASTRE:  Yes, Your Honor.

*OFFICIAL TRANSCRIPT*

DIRECT EXAMINATION BY MS. SASTRE:

Q.   Good morning, ladies and gentlemen.  Now, my name is Hildy Sastre, and I represent the defendant, Sanofi, in this case.  And I just want to start again.  I know you've been thanked, but I do want to personally thank each and every one of you for being here with us today.  Now, I know that none of you came in here today a blank slate, right?  So everybody has opinions, and everyone has certain ways that they feel about things based upon experiences that they've had.

          Now, I'm not going to get a chance, unfortunately, because of the amount of time I have to talk to each and every one of you.  But for those of you that I do have a few questions for, I want to ask you at the outset, please tell me your true feelings, and I can promise you in advance, no matter what you say to me, there's no way you're going to hurt my feelings, okay?  Can everybody do that?  Okay.  Thank you.

          So, Ms. Abel?  Good morning, ma'am.

          PROSPECTIVE JUROR 4:  Good morning.

          MS. SASTRE:  How are you doing today?

          PROSPECTIVE JUROR 4:  I'm doing all right.

          MS. SASTRE:  Okay.  Good.  So, I have a few questions for you.

          PROSPECTIVE JUROR 4:  Okay.

          MS. SASTRE:  So, I know you filled out your questionnaire.  It was a couple months ago now.

*OFFICIAL TRANSCRIPT*

10:06:12   1          PROSPECTIVE JUROR 4:  Right.

10:06:14   2          MS. SASTRE:  But you did express some views about

10:06:17   3    attorneys who advertise, and you expressed some views about

10:06:23   4    personal injury cases and whether you thought they were filed

10:06:27   5    out of greed or an abuse of the civil justice system.  And I

10:06:31   6    just wanted to ask you about that for a moment, okay?

10:06:37   7          PROSPECTIVE JUROR 4:  Okay.

10:06:38   8          MS. SASTRE:  Yes.  So, first, let me ask you, you told

10:06:38   9    us in your questionnaire that you have somewhat positive views

10:06:42  10    of lawyers that advertise, and you that said you disagree that

10:06:45  11    personal injury cases are filed out of greed, and you disagree

10:06:50  12    that most people are abusing the civil justice system, this

10:06:54  13    system, to make money.  So I just wanted to ask you a little

10:06:57  14    bit about that.  Can you tell us why you have those feelings?

10:07:00  15          PROSPECTIVE JUROR 4:  As far as the advertising, I'm a

10:07:03  16    marketing major.  That's my background, so I believe that

10:07:06  17    anybody putting your name out there is a positive thing.  And

10:07:13  18    could you expand on the other question --

10:07:16  19          MS. SASTRE:  Sure.  Let me sort of go back.

10:07:21  20          PROSPECTIVE JUROR 4:  -- what you're asking me?  I'm

10:07:22  21    not sure.

10:07:23  22          MS. SASTRE:  Yeah.  So, there was a question that said,

10:07:24  23    do you think that most personal injury cases are filed out of

10:07:29  24    greed or are an abuse of this system, the civil justice system,

10:07:33  25    and you said that you strongly disagreed with that.  So the

*OFFICIAL TRANSCRIPT*

10:07:35 1   question is just really, how do you feel about personal injury

10:07:39 2   cases like this being filed?

10:07:40 3          PROSPECTIVE JUROR 4:  I mean, I think there is

10:07:44 4   instances where it does -- people do file personal injury cases

10:07:49 5   on greed.  I mean, everyone kind of -- you want to get what you

10:07:55 6   think you deserve in life.  So, if you think you've been harmed

10:08:00 7   by some way, I understand going to a personal injury attorney

10:08:10 8   to take your case and see if there's any compensation you can

10:08:13 9   get to compensate you for your losses that you may have

10:08:17 10  experienced.

10:08:18 11         MS. SASTRE:  Okay.  Do you think that -- do you think

10:08:21 12  that when a case even gets to this point, right, and it hasn't

10:08:26 13  been settled and we're here in trial, do you think, because of

10:08:29 14  your views, that that must mean that there must be some merit

10:08:34 15  to the case?

10:08:37 16         PROSPECTIVE JUROR 4:  Not necessarily.  Like some of

10:08:40 17  the other jurors have said in their earlier questioning, the

10:08:45 18  feelings that you have, I don't know that necessarily every

10:08:50 19  case that would go to trial like this is warranted for personal

10:08:59 20  injury --

10:09:05 21         MS. SASTRE:  Sure.

10:09:05 22         PROSPECTIVE JUROR 4:  -- clients.

10:09:05 23         MS. SASTRE:  So, let me just follow up a little bit.

10:09:05 24         PROSPECTIVE JUROR 4:  Sure.

10:09:05 25         MS. SASTRE:  And I appreciate your candor.  So, you

*OFFICIAL TRANSCRIPT*

10:09:08   1    said, "Not necessarily."  Do you think that in some instances,

10:09:10   2    when a lawsuit gets all the point to this point, all the way to

10:09:13   3    trial, do you think really that that means to you there may be

10:09:16   4    some merit to it?  Is that kind of the way you feel about this?

10:09:22   5             PROSPECTIVE JUROR 4:  I really don't know.

10:09:29   6             MS. SASTRE:  Sure.  Okay.  And so, your feelings about

10:09:35   7    cases like this, do you feel like -- do you feel like that

10:09:45   8    there are instances where people are abusing --

10:09:45   9             PROSPECTIVE JUROR 4:  Oh, absolutely.

10:09:47  10             MS. SASTRE:  -- the justice system to make money?  You

10:09:50  11    do.

10:09:50  12             PROSPECTIVE JUROR 4:  Absolutely.

10:09:51  13             MS. SASTRE:  Tell us a little bit about why you feel

10:09:54  14    that way.

10:09:55  15             PROSPECTIVE JUROR 4:  I mean, I've been in a car

10:09:57  16    accident before where my insurance has been sued for an injury,

10:10:00  17    and I remember seeing the person get out of the vehicle, walk

10:10:05  18    around, and no injuries to -- that were visible, and it seemed

10:10:11  19    like they took advantage of that situation.

10:10:15  20             MS. SASTRE:  Okay.  Based upon personal experiences

10:10:17  21    you've had?

10:10:19  22             PROSPECTIVE JUROR 4:  Right.  Based upon personal

10:10:19  23    experience.

10:10:19  24             MS. SASTRE:  Okay.  All right, ma'am.  Thank you very

10:10:20  25    much.  I appreciate your time this morning.  If you could pass

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:10:23 1 | the mike down to Mr. Allen. |
| 10:10:26 2 | Good morning, sir.  How are you? |
| 10:10:27 3 | PROSPECTIVE JUROR 3:  Good morning. |
| 10:10:30 4 | MS. SASTRE:  Okay.  Great.  So it's nice to see you |
| 10:10:31 5 | today, sir, and I just have a couple questions for you.  So, in |
| 10:10:34 6 | your questionnaire, you told us, you said that you didn't feel |
| 10:10:39 7 | it was your place to be a juror in this case, and you said that |
| 10:10:44 8 | you don't think this was for you.  And if you're comfortable |
| 10:10:48 9 | talking about that, I just wanted to ask you a little bit, |
| 10:10:51 10 | would it make you uncomfortable to be on the jury? |
| 10:10:54 11 | PROSPECTIVE JUROR 3:  No.  I just, I mean, I feel right |
| 10:11:00 12 | is right and wrong is wrong.  I don't know how to explain it. |
| 10:11:12 13 | MS. SASTRE:  Okay.  Let me follow up for a moment.  So |
| 10:11:14 14 | you told us that you disagreed with the idea that personal |
| 10:11:20 15 | injury lawsuits are filed out of greed, and you disagreed that |
| 10:11:26 16 | most people are abusing the justice system to make money.  And |
| 10:11:31 17 | can you just tell me why you feel that way, sir? |
| 10:11:33 18 | PROSPECTIVE JUROR 3:  To be honest, it was a while. |
| 10:11:35 19 | I'm not really, like, enlightened on what I wrote or put down. |
| 10:11:39 20 | I'm going to just be honest. |
| 10:11:39 21 | MS. SASTRE:  Okay. |
| 10:11:43 22 | PROSPECTIVE JUROR 3:  But I feel people do take |
| 10:11:45 23 | advantage of situations, and I also feel like people get messed |
| 10:11:49 24 | over in situations where something maybe did happen. |
| 10:11:52 25 | MS. SASTRE:  Okay. |

*OFFICIAL TRANSCRIPT*

10:11:52  1          PROSPECTIVE JUROR 3:  So, I guess it's like a mixed

10:11:55  2    feeling.

10:11:56  3          MS. SASTRE:  Sure.  Do you have -- and, again, tell me

10:11:59  4    in all candor and all honesty -- do you have negative views of

10:12:03  5    large corporations or pharmaceutical companies like the

10:12:08  6    defendant, my client, in this case?

10:12:10  7          PROSPECTIVE JUROR 3:  Can you repeat it.  I'm sorry.

10:12:12  8          MS. SASTRE:  Yeah.  Yes, sir.  Of course.  How do you

10:12:13  9    feel about large pharmaceutical companies?

10:12:16 10          PROSPECTIVE JUROR 3:  To be honest, I feel like

10:12:21 11    sometimes information is not accurate.

10:12:25 12          MS. SASTRE:  When you say, "Information is not

10:12:27 13    accurate," do you mean the warnings that are on drugs and

10:12:31 14    medications?

10:12:32 15          PROSPECTIVE JUROR 3:  Yes.

10:12:34 16          MS. SASTRE:  Okay.  Any other feelings about

10:12:37 17    pharmaceutical companies or large corporations besides that?

10:12:42 18          PROSPECTIVE JUROR 3:  No.

10:12:43 19          MS. SASTRE:  Okay.  Do you think, like, they put

10:12:47 20    profits ahead of safety?

10:12:48 21          PROSPECTIVE JUROR 3:  I just sometimes don't feel like

10:12:57 22    the information is accurate.

10:13:00 23          MS. SASTRE:  Okay.  Okay.  Well, let me ask you this,

10:13:02 24    Mr. Allen.  So, if one of the issues in this case is whether

10:13:05 25    the defendant, Sanofi, provided an adequate warning about a

                        *OFFICIAL TRANSCRIPT*

10:13:12  1    risk of Taxotere, do you think that the beliefs that you have,

10:13:18  2    that a lot of times pharmaceutical companies don't give good

10:13:23  3    warnings, do you think that might shape how you hear the

10:13:27  4    evidence and view the evidence in this case?

10:13:31  5         PROSPECTIVE JUROR 3:  No.  If the evidence is accurate,

10:13:34  6    then I agree to it.

10:13:40  7         MS. SASTRE:  Okay.  You think that -- well, let me ask

10:13:44  8    you this, the view that you have that you've expressed with us,

10:13:47  9    that sometimes warnings aren't very good, you'd agree with me

10:13:53 10    it sounds like it's a negative view, right, sort of a negative

10:13:56 11    feeling you have about some pharmaceutical companies?

10:13:58 12         PROSPECTIVE JUROR 3:  I mean, not necessarily.  I

10:14:01 13    believe everything has an effect to it.  So, I mean, if it's

10:14:04 14    reasonable, I can believe it.  But I believe everything comes

10:14:07 15    with an effect.

10:14:10 16         MS. SASTRE:  I think what you're saying is that all

10:14:13 17    drugs have risks, right?

10:14:15 18         PROSPECTIVE JUROR 3:  Yes.

10:14:24 19         MS. SASTRE:  Okay.  All right.  All right.  Thank you

10:14:24 20    very much, sir.  I appreciate your candor.  All right.

10:14:25 21         Ms. Thomas.  Good morning, ma'am.  How are you?

10:14:31 22         PROSPECTIVE JUROR 12:  I'm good.

10:14:33 23         MS. SASTRE:  Good.  We'll get you a microphone.  Thank

10:14:34 24    you, Ms. Vail.  Ma'am, so I just have a few questions for you.

10:14:36 25    I did want to ask you first, I know you shared a personal story

*OFFICIAL TRANSCRIPT*

10:14:40  1   with us about yourself, and I believe you told us about your

10:14:43  2   daughter; is that correct?

10:14:44  3           PROSPECTIVE JUROR 12:  My niece.

10:14:50  4           MS. SASTRE:  Your niece.  Okay.  Thank you.  So, If I

10:14:51  5   heard you correctly, you're a breast cancer survivor?

10:14:51  6           PROSPECTIVE JUROR 12:  Yes.

10:14:55  7           MS. SASTRE:  Okay.  Very good.  Congratulations.  I'm

10:14:57  8   glad to hear that.  If I could ask you, ma'am, did you have

10:14:58  9   chemotherapy?

10:14:59  10          PROSPECTIVE JUROR 12:  Yes, I did.

10:15:02  11          MS. SASTRE:  Okay.  So, you know, one of the things

10:15:04  12  that you'll learn if you become a juror in this case is that

10:15:08  13  the plaintiff, Ms. Kahn, had breast cancer, and she had

10:15:12  14  chemotherapy.  And one of the issues is a risk or a

10:15:18  15  complication that she's saying she's developed from taking

10:15:23  16  chemotherapy.  And I just want to know from you, look, it's

10:15:25  17  natural for all of us to feel sympathy for someone who's had

10:15:32  18  cancer and gone through chemotherapy, but do you think there's

10:15:34  19  anything about your personal experience that might make you

10:15:39  20  sympathetic to Ms. Kahn?

10:15:42  21          PROSPECTIVE JUROR 12:  Well, the part of her losing her

10:15:44  22  hair, you know, that's something that you get from chemo.

10:15:44  23          MS. SASTRE:  Okay.

10:15:46  24          PROSPECTIVE JUROR 12:  So I'm not understanding,

10:15:49  25  really, what the side effects was on her.

                          *OFFICIAL TRANSCRIPT*

10:15:49  1          MS. SASTRE:  Okay.

10:15:53  2          PROSPECTIVE JUROR 12:  But with chemo, it's always a

10:15:56  3  side effect.

10:15:56  4          MS. SASTRE:  Okay.

10:15:57  5          PROSPECTIVE JUROR 12:  Like I said, my niece did the

10:15:59  6  trial.  She also had breast cancer.  The trial medicine that

10:16:03  7  she had, it reduced her cyst a little bit.  It looked like

10:16:08  8  there was progress working for her --

10:16:08  9          MS. SASTRE:  Yes, ma'am.

10:16:10 10          PROSPECTIVE JUROR 12:  -- and then it stopped.  She

10:16:12 11  developed it, you know, it went to her lungs, and she passed.

10:16:15 12  So, and I have several members in my family that's also

10:16:21 13  breast cancer survivors.

10:16:25 14          MS. SASTRE:  Okay.

10:16:25 15          THE DEPUTY CLERK:  Ms. Sastre, you're at 11 minutes.

10:16:27 16          MS. SASTRE:  11 minutes.  Very good.  Thank you so

10:16:30 17  much.

10:16:30 18               All right, ma'am.  So I think what you're saying

10:16:33 19  to us is that you don't feel like you'd be particularly

10:16:36 20  sympathy to Ms. Kahn just because of your history?

10:16:40 21          PROSPECTIVE JUROR 12:  Right.

10:16:41 22          MS. SASTRE:  Okay.  Now, one question I did want to ask

10:16:43 23  you, I think that you said that you had a hardship and you were

10:16:49 24  asking to be excused because of your age.

10:16:54 25          PROSPECTIVE JUROR 12:  Yes.

*OFFICIAL TRANSCRIPT*

10:16:56 1          MS. SASTRE:  Okay.  Are you still asking for that,
10:16:57 2     ma'am?
10:16:58 3          PROSPECTIVE JUROR 12:  Yes.  I have arthritis in my
10:17:01 4     back, which I'm scheduled to get an injection on Friday, the
10:17:05 5     19th of this month.
10:17:05 6          MS. SASTRE:  Okay.
10:17:07 7          PROSPECTIVE JUROR 12:  So, the sitting is kind of hard
10:17:11 8     for me.
10:17:12 9          MS. SASTRE:  Okay.  And, Your Honor, may I inquire the
10:17:14 10    juror's age for the record, or is that not necessary?
10:17:18 11         THE COURT:  Yeah.  I think it's in the record already.
10:17:20 12         MS. SASTRE:  Yeah.  Okay.  All right.  Thank you very
10:17:22 13    much, Ms. Thomas.
10:17:28 14         PROSPECTIVE JUROR 12:  You're welcome.
10:17:28 15         MS. SASTRE:  All right.  Ms. Vail.
10:17:28 16         PROSPECTIVE JUROR 11:  Yes.
10:17:29 17         MS. SASTRE:  Good morning, ma'am.  How are you?
10:17:29 18         PROSPECTIVE JUROR 11:  (Indiscernible).
10:17:33 19         MS. SASTRE:  Good.  So, I just have a couple questions
10:17:35 20    for you.  So, I know that you've shared with us, and we thank
10:17:37 21    you for all of your candor this morning, that your dad worked
10:17:40 22    in the pharmaceutical industry.
10:17:44 23         PROSPECTIVE JUROR 11:  Yes.
10:17:45 24         MS. SASTRE:  Okay.  And I understand he's passed away.
10:17:45 25         PROSPECTIVE JUROR 1:  Yes.

*OFFICIAL TRANSCRIPT*

10:17:45  1        MS. SASTRE:  I'm very sorry to hear that.

10:17:48  2        PROSPECTIVE JUROR 11:  Well, I'm getting up there, too.

10:17:50  3        MS. SASTRE:  We all are.  Believe me, I understand.

10:17:53  4  So, your father never worked for Sanofi, right?

10:17:57  5        PROSPECTIVE JUROR 11:  No.

10:17:59  6        MS. SASTRE:  Okay.  I wanted to make sure I understood

10:18:01  7  because you said something that I thought was very interesting.

10:18:05  8  You said that to Mr. Schanker, the plaintiffs' lawyer, you said

10:18:11  9  that, you know, you would have to present it to me and I think

10:18:13 10  what you meant is you would have to see the evidence; is that

10:18:15 11  fair?

10:18:16 12        PROSPECTIVE JUROR 11:  Correct.

10:18:17 13        MS. SASTRE:  Okay.  So, ma'am, in this case, do you

10:18:19 14  think, really, that you could keep an open mind, do you think

10:18:24 15  you could listen to the evidence, and do you think that you

10:18:27 16  could follow the law that's given to you by Judge Milazzo?

10:18:34 17        PROSPECTIVE JUROR 11:  You know -- I mean, there is one

10:18:36 18  thing I've learned about lawyers and the law, is that there is

10:18:39 19  a lot of wiggle room.  So I mean, again, I am not an algorithm.

10:18:45 20  I cannot tell you given that -- my preponderance, my feelings

10:18:49 21  right now is, I do think this is a waste of time, but if I'm

10:18:56 22  here, I am a rational human being and I would try to put my

10:19:01 23  feelings aside.

10:19:02 24        MS. SASTRE:  Okay.  Because you haven't heard any of

10:19:05 25  the evidence yet.

*OFFICIAL TRANSCRIPT*

1       PROSPECTIVE JUROR 11:  I haven't heard any yet.

2       MS. SASTRE:  And you need to hear it.

3       PROSPECTIVE JUROR 11:  But we do hear from everything,

4  risks are taken for clinical trials.  That's how the world goes

5  on.  That's how medicines get made.

6       MS. SASTRE:  Understood.  Okay.  Thank you so much,

7  ma'am.

8           Mr. New, sir, I just have a question or two for

9  you.  So I know you've expressed some beliefs to us.  And I

10  just wanted to ask you, sir, can you sit here if you were

11  selected as a juror in this case, can you keep an open mind

12  when you listen to the evidence and follow the law given to you

13  by the Court?

14      PROSPECTIVE JUROR 5:  Yes.

15      MS. SASTRE:  Okay.  Is that something that you're

16  certain you can do, sir?

17      PROSPECTIVE JUROR 5:  Yes.

18      MS. SASTRE:  Okay.  And, again, you don't come in here

19  without any opinions, we understand that.  No one walks through

20  that door without an opinion, you're allowed to have opinions,

21  sir.  We expect you to have opinions.  The question is, do you

22  think you can listen to the evidence, follow the law, and be a

23  fair and impartial juror in the case?

24      PROSPECTIVE JUROR 5:  Yes.

25      MS. SASTRE:  Okay.  Thank you very much, Mr. New.  I

*OFFICIAL TRANSCRIPT*

10:20:00  1    think I'm out of time.

10:20:00  2              THE COURT:  Thank you.

10:20:01  3              MS. SASTRE:  Thank you very much, ladies and gentlemen.

10:20:01  4    I appreciate your time.

10:20:04  5              THE COURT:  I just have a couple of follow-up

10:20:06  6    questions, Mr. New.  Keep your mask on.  I prefer talking.

10:20:09  7    When you were talking earlier, you said I would need

10:20:15  8    overwhelming proof.  Now, when we start this case and when we

10:20:22  9    end this case, I will talk to you about the burden of proof and

10:20:25 10    what it means.  And my question is, can you follow my

10:20:36 11    instruction?  Because my instruction is not going to be

10:20:38 12    overwhelming proof, just more likely than not.

10:20:42 13              Now, can you take that and accept that?

10:20:47 14              PROSPECTIVE JUROR 5:  Yeah, I think so.

10:20:49 15              THE COURT:  Well, I need more than "I think so."

10:20:51 16              PROSPECTIVE JUROR 5:  I know.  I understand.

10:20:53 17              THE COURT:  I'm not asking you to render a verdict

10:20:55 18    right now because you haven't heard a thing.

10:20:55 19              PROSPECTIVE JUROR 5:  I haven't heard anything.

10:20:56 20              THE COURT:  So you don't know what the case is about

10:20:59 21    other than the couple of sentences I gave you.  But we'll be

10:21:06 22    here for a couple of weeks and we'll listen to this.  And so my

10:21:09 23    question is, can you listen to the evidence with an open mind

10:21:11 24    and say more likely than not, one way or the other, on or is it

10:21:16 25    do you have a certain expectation of what you're going to

*OFFICIAL TRANSCRIPT*

10:21:19  1    personally require.

10:21:21  2         PROSPECTIVE JUROR 5:  I think it would be are hard for

10:21:23  3    you.  Overwhelming, proof, I think would be almost impossible.

10:21:30  4         THE COURT:  So that's what you would expect to hear?

10:21:33  5         PROSPECTIVE JUROR 5:  Yes.

10:21:34  6         THE COURT:  And you could not put that aside and

10:21:36  7    follow --

10:21:36  8         PROSPECTIVE JUROR 5:  Like I said, my mom went through

10:21:39  9    this cancer thing and I sat with her with the doctors and they

10:21:42  10   explained everything.

10:21:42  11        THE COURT:  I understand that.  I understand that, but

10:21:44  12   can you listen to this case?

10:21:46  13        PROSPECTIVE JUROR 5:  Yes.  I have a problem with the

10:21:49  14   pharmaceutical companies, too.  Because --

10:21:53  15        THE COURT:  Well, let me ask you this:  So --

10:21:55  16        PROSPECTIVE JUROR 5:  No.  I know everybody has got

10:21:57  17   problems.  But what I'm saying is just like if you was going to

10:22:00  18   go take an aspirin, I take blood pressure medicine.  If I was

10:22:04  19   to sit there and read everything on that list that it tells me

10:22:07  20   it could possibly do to me -- well, it seems to me, they put

10:22:11  21   that on everything that they do, that way they are not

10:22:14  22   responsible.  So if anything was to happen, oh, we're not

10:22:18  23   responsible.  We got it on this paper right here.

10:22:18  24        THE COURT:  Okay.

10:22:20  25        PROSPECTIVE JUROR 5:  Like I said, even aspirin do it

*OFFICIAL  TRANSCRIPT*

10:22:23  1    to you.

10:22:24  2         THE COURT:  Okay.  Mr. New, we're going to try this

10:22:28  3    case, and I'm certainly not going to try this case.  I have a

10:22:29  4    different job.  My concern, is solely that you would be able to

10:22:35  5    listen to the evidence and follow the instructions that I give

10:22:39  6    you even on the burden of proof.

10:22:43  7         PROSPECTIVE JUROR 5:  And I will do my best.

10:22:47  8         THE COURT:  Okay.  Thank you.

10:22:48  9         Okay.  I'm going to ask some questions to the 15

10:22:54 10    of you here.  If one of you was one of the parties to this case

10:23:00 11    and if you were either Ms. Kahn or Sanofi, is there any way you

10:23:06 12    would not be content to have this case tried by someone with

10:23:09 13    your frame of mind?  If you were one of the parties, would you

10:23:15 14    be okay with a person with your frame of mind listening to the

10:23:19 15    case?

10:23:19 16         PROSPECTIVE JUROR 11:  I --

10:23:22 17         THE COURT:  Okay.  Yes, ma'am.  Thank you.

10:23:23 18         And that is, Mr. Smith?

10:23:28 19         PROSPECTIVE JUROR 15:  Yes.

10:23:28 20         THE COURT:  You will feel like you could not listen to

10:23:28 21    the evidence?

10:23:34 22         PROSPECTIVE JUROR 15:  Not the fact that I could not

10:23:36 23    listen to the evidence.  But I have something that was personal

10:23:40 24    to me that if I was -- like you said, either the client or

10:23:49 25    the -- my mom, I watched my mom for over most of my life.  She

*OFFICIAL TRANSCRIPT*

10:23:58 1    was on high blood pressure medicines and diabetes medicine and

10:24:04 2    when she got older, I feel, I feel very -- I can't think of the

10:24:12 3    word, like heartfelt about that she faithfully -- she carried a

10:24:19 4    bag of medicine.  She faithfully took her high blood pressure

10:24:25 5    medicine and diabetes medicine.  And when she got older, she,

10:24:33 6    from taking, I think it was the diabetes medicine, it messed up

10:24:38 7    her kidneys and she had to get on dialysis.

10:24:42 8          My mom just died on the 7th of August.  And as

10:24:52 9    she made the transition to get on to dialysis, I just thought

10:24:59 10   about all the health -- it was supposed to be for her to take

10:25:09 11   her medicine, she used to carry a bag of medicine around.  And

10:25:13 12   for that to take her to the stage where at the end of her life

10:25:17 13   from her doing the right thing and taking her medicines that

10:25:20 14   she would -- that would actually do something that was not

10:25:24 15   written.

10:25:25 16         Like this gentleman was saying, they have so much

10:25:28 17   stuff that's written on there, you might read some of it, you

10:25:31 18   might not.  But just knowing that, you know, she lost her

10:25:37 19   kidneys because she was taking care of herself, that's kind of

10:25:43 20   making me feel a certain way.

10:25:45 21     THE COURT:  Yes, sir.  Now, I can tell you comfortably,

10:25:49 22   Mr. Smith, this case is not about high blood pressure or

10:25:53 23   diabetes or any of that.  And so my question is, can you,

10:25:56 24   though, listen to the facts of this case and render a fair

10:26:03 25   verdict based upon what you hear in this courtroom and not

**OFFICIAL TRANSCRIPT**

10:26:06 1   outside?  And I know you lost your mom and that's a very, very

10:26:15 2   difficult transition in life, but I'm wondering if you could be

10:26:20 3   fair and impartial in this case?  Or do you have certain

10:26:25 4   notions that you feel like I cannot put these aside?

10:26:29 5       PROSPECTIVE JUROR 15:  It's not that I can't be fair.

10:26:36 6   Yeah, I could listen to the case.  I was just asking a question

10:26:41 7   that you were asking me.

10:26:44 8       THE COURT:  Sure.  Sure.  And it's something in your

10:26:46 9   frame of mind that you're worried about, but can you put that

10:26:51 10  aside?  That's the question.

10:26:53 11      PROSPECTIVE JUROR 15:  Yes, yes.

10:26:55 12      THE COURT:  Thank you, Mr. Smith.

10:27:00 13          If you're selected to sit as a juror in this

10:27:03 14  case, will you be unable or unwilling to render a verdict

10:27:08 15  solely on the evidence presented at the trial and the law as I

10:27:12 16  give it to you in any instructions, disregarding any other

10:27:17 17  ideas, notions, or beliefs about the law you may have

10:27:22 18  encountered outside the trial?

10:27:23 19          Now, let me tell you something, in the beginning

10:27:29 20  of the case, I'm going to give you instructions on what the law

10:27:32 21  is and how you should apply the law to this case.  Now, I know

10:27:35 22  that sometimes over your cup of coffee in the morning with

10:27:39 23  somebody you talk about what you think the law should be, and

10:27:42 24  that's fine.  That's fine.  But we're Americans and we have a

10:27:47 25  right to have different opinions about what we think the law

*OFFICIAL TRANSCRIPT*

10:27:52  1    should be.  But my question is, in this case, I need a

10:27:55  2    commitment that you will follow the law as I give it to you

10:28:00  3    whether you like it or not and can you do that?  Can you do

10:28:05  4    that?

10:28:06  5            Would you be unable or unwilling to firmly put

10:28:10  6    aside any feelings of sympathy or compassion for the plaintiff

10:28:14  7    or the defendant and decide this case solely too merits and

10:28:19  8    according to law as I will explain it to you.  Can you do that?

10:28:23  9            Is there any reason why you could not sit on this

10:28:28 10    case and render a just, fair, honest, and impartial verdict?

10:28:35 11            Is there any reason why you couldn't do that?

10:28:39 12            Yes, ma'am, Ms. Abel.

10:28:46 13        PROSPECTIVE JUROR 4:  I just know I'm a very empathetic

10:28:49 14    person.  I feel for other people.  I feel empathy, and I truly

10:28:54 15    don't think I could leave that to be an impartial judge.

10:28:57 16        THE COURT:  Okay.  Well, let me ask you this:  I

10:29:00 17    understand that you're an empathetic person and that's not a

10:29:04 18    bad thing.

10:29:04 19        PROSPECTIVE JUROR 4:  Okay.

10:29:04 20        THE COURT:  Okay.  But my question is, at the

10:29:05 21    conclusion of the case, if you've heard all of the evidence and

10:29:09 22    you realize they just haven't been able to prove it, could you

10:29:15 23    render a verdict for the defendant?

10:29:20 24        PROSPECTIVE JUROR 4:  Maybe.  I can't say definitively.

10:29:24 25        THE COURT:  Do you think regardless of what you hear

*OFFICIAL TRANSCRIPT*

10:29:28  1   that you would have to render a verdict for the plaintiff?

10:29:32  2           I mean, I know you haven't heard anything --

10:29:33  3           PROSPECTIVE JUROR 4:  No, no.

10:29:33  4           THE COURT:  All right.

10:29:35  5           PROSPECTIVE JUROR 4:  But I do have other personal

10:29:37  6   biases against like larger corporations and their ability,

10:29:41  7   their financial resources to obtain better -- to obtain legal

10:29:46  8   counsel that may be able to fight it from personal experience

10:29:50  9   with my family.  We did -- got tied up in a lawsuit with a

10:29:54 10   hospital and eventually it got tied up in litigation for so

10:29:58 11   long we eventually just dropped it.  And because of that, I do

10:30:01 12   have biases for that, and I just don't know that I could be

10:30:07 13   impartial.

10:30:07 14           THE COURT:  All right.  So are you telling me that as

10:30:16 15   you listen to the evidence in this case, you could not put that

10:30:21 16   aside?  So you would be --

10:30:24 17           PROSPECTIVE JUROR 4:  I can't guarantee that I could

10:30:26 18   put it aside.  That's what I'm saying.  But I'm not saying yes

10:30:37 19   or no necessarily, but I can't -- it would likely influence me.

10:30:46 20           THE COURT:  And you don't feel like you could just

10:30:48 21   listen to the evidence in this case and render a verdict solely

10:30:52 22   on what you hear in the courtroom?  Is that what you're telling

10:30:55 23   me?

10:30:55 24           PROSPECTIVE JUROR 4:  If I'm being honest, probably

10:30:58 25   not.

*OFFICIAL TRANSCRIPT*

10:30:59   1          THE COURT:  Thank you, ma'am.

10:31:03   2                  Does anyone have anything else on their mind

10:31:08   3   which would affect your ability to serve on this jury that we

10:31:10   4   have not already covered?

10:31:15   5                  Okay.  We're going to be at recess for a few

10:31:22   6   minutes.  I'm going to give you a couple of minutes and then

10:31:25   7   we'll be at recess for a couple of minutes.  If you need to

10:31:28   8   stand and stretch, you may do so.  But I'm asking stay where

10:31:33   9   you are, but stretch if you need to.

10:31:33  10          (WHEREUPON, at this point in the proceedings, there was

10:31:34  11   a conference held at the bench.)

10:35:14  12          MR. SCHANKER:  Your Honor, could we start on just

10:35:17  13   confirming that I have those that you have excused?

10:35:20  14          THE COURT:  I have excused Number 13, Ms. Miller, and

10:35:25  15   Number 14, Ms. Andrade from this round.  Those are excused.

10:35:31  16                  Okay.  Any additional challenges for cause,

10:35:35  17   Mr. Schanker?

10:35:36  18          MR. SCHANKER:  Yes, Your Honor.

10:35:40  19          THE COURT:  Let's go each one at a time.

10:35:53  20          MR. SCHANKER:  Okay.  So Mr. New, Number 5.  And

10:36:01  21   Mr. New seemed like he was being as honest as he could, and I

10:36:06  22   believe, as you know, he said that he would need overwhelming

10:36:10  23   proof.  You asked if he could listen to the evidence, he said I

10:36:15  24   would think so.  He told you it would almost be impossible.

10:36:18  25   And hard to say that he could set his feelings aside.  I think

**OFFICIAL TRANSCRIPT**

10:36:23  1    he made it clear, Your Honor, that his -- he would have great
10:36:32  2    difficulty setting his opinions aside and would require a
10:36:35  3    higher burden of proof.  And pursuant to U.S. v. Nell, 526 F.2d
10:36:56  4    1223 discusses excusing based on opinions that you cannot set
10:37:00  5    aside, I feel that he should be excused for cause.
10:37:05  6              THE COURT:  Any objection?
10:37:08  7              MR. MOORE:  Yes, Your Honor.  Mr. New was rehabbed by
10:37:13  8    Ms. Sastre.  When he was asked the more pointed questions, he
10:37:15  9    ultimately saying that he would do his best to apply the law
10:37:20 10    and be honest and be a fair juror.  That's all any of them can
10:37:24 11    do is their best.  We don't agree with Mr. Schanker that he
10:37:28 12    could not be fair.  He did not say he could not follow the law.
10:37:33 13    He did not say he could not be a fair and impartial juror.  So
10:37:37 14    we think that on this record that he shouldn't be excused for
10:37:40 15    cause.
10:37:43 16              THE COURT:  I'm going to grant it.  I thought that in
10:37:46 17    his demeanor he begrudgingly said yes, I could do that.  But
10:37:51 18    apparently, it was clear to this court that he would require
10:37:55 19    something more than a preponderance of the evidence.  And so
10:37:58 20    I'm going to grant that for cause objection.
10:38:04 21                   Any others?
10:38:07 22              MR. SCHANKER:  Yes, Your Honor.  Ms. Vail,
10:38:11 23    Juror Number 11.
10:38:13 24              THE COURT:  Any objection?
10:38:15 25              MR. MOORE:  No:

*OFFICIAL TRANSCRIPT*

10:38:20  1    THE COURT:  Vail.

10:38:23  2     Any others?

10:38:24  3    MR. SCHANKER:  And, Your Honor, Mr. Harms,

10:38:25  4 Juror Number 7.  Your Honor, we do request hardship for

10:38:29  5 financial.  But with regard to Your Honor excusing him for

10:38:35  6 cause, he indicated that if a drug is not FDA approved, and

10:38:40  7 said that the client should know that something could happen to

10:38:43  8 them and he was trying to take advantage and bring a lawsuit

10:38:48  9 that aren't valid and there is feelings in there that he could

10:38:52 10 not ignore.

10:38:53 11    MR. MOORE:  We would object to excusing Mr. Harms on

10:38:56 12 cause.  And in response to Mr. Schanker's questions, he

10:39:00 13 unequivocally said he could listen to the evidence, keep an

10:39:03 14 open mind, and render a fair verdict.  There was none of the

10:39:09 15 concerns that Mr. New raised or Ms. Vail raised that came from

10:39:10 16 Mr. Harms and we think he should not be excused for cause.

10:39:14 17    THE COURT:  I'm going to deny the request for cause.

10:39:16 18 He did indicate it was that he was troubled on both sides of

10:39:20 19 this case, so pretty apparent to me that he's skeptical as to

10:39:29 20 both sides.  But he said he could be fair and impartial.  I'm

10:39:36 21 going to deny that.

10:39:37 22     Any others?

10:39:38 23    MR. SCHANKER:  No, Your Honor.

10:39:39 24    THE COURT:  Okay.  Ms. Sastre.  Mr. Moore.

10:39:43 25    MR. MOORE:  We would move to strike for cause Ms. Abel,

*OFFICIAL TRANSCRIPT*

10:39:47  1    Juror Number 4.  I think that the comments she made prior to

10:39:51  2    Your Honor's questions clearly establish that she's biased.

10:39:58  3            MR. SCHANKER:  Your Honor, no objection.

10:40:02  4            THE COURT:  Okay.  Are there any others?

10:40:06  5            MR. MOORE:  Yes, Number 12, Ms. Thomas.

10:40:11  6            THE COURT:  She asked about her age and I expected

10:40:14  7    that.

10:40:16  8            MR. SCHANKER:  Are you going to excuse her?

10:40:17  9            THE COURT:  Yes, that's just an age thing.

10:40:20  10                Okay.  Any others?

10:40:20  11            MR. MOORE:  Yes, Juror Number 15, Mr. Louis Smith.  He

10:40:27  12    expressed a hardship and indicated that he would not get paid.

10:40:32  13    He's self-employed as a parent.  And, therefore, we believe he

10:40:37  14    should be excused on those grounds.

10:40:41  15            MR. SCHANKER:  Your Honor, we don't believe that rises

10:40:43  16    to the legal standard, and your record speaks for itself.  At

10:40:50  17    this point in time, he should not be excused for hardship in

10:40:53  18    this case.

10:40:55  19            MR. MOORE:  We think this is no different than the

10:40:58  20    employee who got excused to worked at the Valero Gas Company.

10:41:02  21            THE COURT:  I think there is a difference and I'm going

10:41:04  22    to say it on the record.  Mr. Smith is a self-employed paint.

10:41:09  23    It's quite a different thing for somebody who has a turnover

10:41:14  24    that's has a two-week turnaround beginning today that results

10:41:16  25    in a 12 hours a day, 14 days a week and substantial amount of

10:41:23 1   income that comes from working a turnaround.  I'm going to deny

10:41:26 2   that.

10:41:28 3              Okay.  So who we have excused for cause is Juror

10:41:32 4   Number 4, Ms. Abel; Mr. Juror 5, Mr. New; Juror Number 11,

10:41:37 5   Ms. Vail; Juror Number 12, Ms. Thomas; Juror Number 13,

10:41:41 6   Ms. Miller; and Juror Number 14, Ms. Andrade.  Okay.  So I'm

10:41:46 7   going to ask you now to make changes.  And so we have how many?

10:41:50 8              MS. SASTRE:  Nine.  I have nine.

10:41:56 9              THE COURT:  Nine.

10:41:57 10             MR. SCHANKER:  Can we also confirm just those -- make

10:42:00 11  sure we have -- we excused some folks from the second group.  I

10:42:05 12  just want to make sure how many.

10:42:19 13             THE COURT:  Mr. Pickens was excused, Juror 17.  And

10:42:23 14  Mr. Smith was excused, Number 30.  Did we excuse Mr. Coffin's

10:42:34 15  CPA?

10:42:34 16             MS. SASTRE:  Pickens, Eddie Smith, and Leaber.

10:42:41 17             THE COURT:  Okay.  16, 17, and 30.  But we only need

10:42:45 18  five more.

10:42:45 19             MR. SCHANKER:  So then these folks will still be

10:42:48 20  seated?

10:42:48 21             THE COURT:  They will be seated for the reasons that I

10:42:53 22  told you.  It's going to take a minute.  Erin has got to move

10:43:03 23  these people around.  It's a little bit of a logistical

10:43:07 24  nightmare and so you can take a quick break.

10:43:09 25             MS. SASTRE:  Okay.  Thank you, Your Honor.

*OFFICIAL TRANSCRIPT*

10:43:09 1          (WHEREUPON, at this point in the proceedings, the bench

10:43:29 2     conference concluded.)

10:43:29 3          THE COURT:  Okay.  I am going to ask the 15 of you that

10:43:33 4     are in the box now, Erin is going to move you and we're going

10:43:34 5     to take another 15 to be placed in the box, if you will, so

10:43:41 6     that's going to take a little while and she'll place you.  If

10:43:42 7     your number is 31, you may take a 10-minute recess because it's

10:43:50 8     going to take us a little while to do this.  Court will be at

10:43:53 9     recess for 10 minutes while this change is being made.

10:44:01 10         THE DEPUTY CLERK:  All rise.

10:59:27 11         (WHEREUPON, at 10:44 a.m., the Court took a recess.)

11:16:20 12         THE DEPUTY CLERK:  All rise.

11:16:33 13         THE COURT:  Court is in session.  You may be seated.

11:16:36 14    Fortunately for you, you you've had an opportunity to see how

11:16:39 15    this process works.  I'm going to have you introduce yourself

11:16:43 16    like we did with the first group and then we'll go through the

11:16:47 17    questions with each counsel.

11:16:48 18          So, Mr. Leaber, we'll start with you.

11:16:51 19         PROSPECTIVE JUROR 16:  My name is Albert Leaber.  I'm a

11:16:55 20    CPA.  I practice in public accounting.  I'm married.  My wife

11:16:59 21    is retired.  We have no kids.  I only have a dog and a cat and

11:17:06 22    we're getting a new puppy next week so I'm wife says I'm an

11:17:10 23    expecting daddy.  I don't really watch TV other than to watch

11:17:15 24    sports, and fox noose and that's it.

11:17:18 25         THE COURT:  Thank you, Mr. Leaber.  Mr. Pick whence.

**OFFICIAL TRANSCRIPT**

11:17:23  1          PROSPECTIVE JUROR 17:  My name is William Pickens.  My
11:17:27  2   never always called me by my middle name him Tyler.  I am a
11:17:34  3   native of Texas but I are currently live in the neighborhood of
11:17:38  4   Hammond if.  I'm a construction superintendent for
11:17:42  5   Arco Constructors.  My current project is the Huey P. Long
11:17:47  6   Field House renovation on the LSU campus.  I have a wife and
11:17:49  7   one daughter.  And, yeah, I haven't watched TV in, like,
11:17:54  8   20 years.
11:17:55  9          THE COURT:  Thank you Ms. Miller.
11:17:58 10          PROSPECTIVE JUROR 18:  Hi.  I'm Wendy Miller.  I live
11:18:00 11   in Metairie.  I'm an executive assistant at Holy Cross High
11:18:06 12   School.  I have an eight-year-old son.  I have a husband.
11:18:10 13   Currently married.  And he works for -- he's a billing manager
11:18:15 14   at Adams & Reese law firm.  And my favorite TV show is
11:18:20 15   Ted Lasso.
11:18:21 16          THE COURT:  Thank you.  Ms. Fleetwood.
11:18:23 17          PROSPECTIVE JUROR 19:  My name is Sharon Fleetwood.  I
11:18:26 18   reside in Chalmette, St. Bernard Parish.  I am an assistant
11:18:32 19   administrator for the New Orleans Employers ILA, AFL-CIO
11:18:38 20   Pension Welfare and Holiday Fund.  I have three grown kids
11:18:45 21   between my husband and myself.  My husband is a former plumber.
11:18:51 22   And my favorite show is Big Bang Theory.
11:18:59 23          THE COURT:  Mr. Young.
11:19:01 24          PROSPECTIVE JUROR 20:  My name is David Young.  I live
11:19:04 25   in Houma, Louisiana.  I am single.  I have one grown adult son.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:19:10 1 | And I'm semiretired from the restaurant business, and I like |
| 11:19:17 2 | the Andy Griffin Show. |
| 11:19:20 3 | THE COURT:  I still watch that too, Mr. Young. |
| 11:19:24 4 | Mr. Prejean. |
| 11:19:26 5 | PROSPECTIVE JUROR 21:  Hello.  I'm Raymond Prejean Jr. |
| 11:19:30 6 | I from Assumption Parish.  I'm married for 45 years.  I got two |
| 11:19:36 7 | kids.  One 43 and one is 40.  And my favorite show, yeah, my |
| 11:19:43 8 | favorite show is Street Outlaws, racing. |
| 11:19:47 9 | THE COURT:  Mr. Prejean, you're retired but what did |
| 11:19:50 10 | you do before requirement? |
| 11:19:53 11 | PROSPECTIVE JUROR 21:  I'm disabled, ma'am.  I'm a |
| 11:19:56 12 | fabricator/welder.  That's all I did. |
| 11:19:59 13 | THE COURT:  Thank you. |
| 11:20:01 14 | Ms. Wynder. |
| 11:20:02 15 | PROSPECTIVE JUROR 22:  My name is Yvonne Wynder.  I'm a |
| 11:20:06 16 | CNA and a manager at Peristyle Independent Living.  I have |
| 11:20:11 17 | three children of my own and three daughters that I raised with |
| 11:20:14 18 | my children.  I'm divorced.  My favorite show is The Nanny. |
| 11:20:20 19 | THE COURT:  Mr. Becho Resendiz. |
| 11:20:27 20 | JUROR PROSPECTIVE JUROR 23:  My name is |
| 11:20:25 21 | Gilberto Resendiz.  I'm married.  I've got four kids.  I'm |
| 11:20:32 22 | currently a stay-at-home dad.  I really don't watch much TV.  I |
| 11:20:37 23 | would say my favorite show is Cocoa Melon right now. |
| 11:20:43 24 | THE COURT:  Mr. Tran. |
| 11:20:45 25 | PROSPECTIVE JUROR 24:  My name is Quang Tran.  I'm a |

*OFFICIAL TRANSCRIPT*

11:20:49  1   working for the USPS.  Mail carrier.  I'm from

11:20:53  2   Jefferson Parish.  I'm married.  My first child making one

11:20:59  3   years old next week.  And my wife is a stay at home, so she

11:21:05  4   unemployed right now.

11:21:07  5          THE COURT:  Okay.  Do you watch TV?

11:21:09  6          PROSPECTIVE JUROR 24:  No.

11:21:10  7          THE COURT:  Thank you.

11:21:11  8             Mr. Haynes.

11:21:12  9          PROSPECTIVE JUROR 25:  Peck Hayne.  Live here in

11:21:17 10   New Orleans, married.  We have two kids, one in high school and

11:21:21 11   one lives in Nashville.  And I'm a lawyer here in town.

11:21:26 12          THE COURT:  Mr. Hayne, could you tell us a little bit

11:21:28 13   about your practice?

11:21:30 14          PROSPECTIVE JUROR 25:  Yes.  I'm a transactional

11:21:32 15   practice, mostly in the energy field.

11:21:35 16          THE COURT:  Okay.  And do you have a TV show?

11:21:38 17          PROSPECTIVE JUROR 25:  Oh, I guess Seinfeld.

11:21:41 18          THE COURT:  Okay.  Mr. Neumeyer.

11:21:45 19          PROSPECTIVE JUROR 26:  Yes, Jeff Neumeyer.  I live in

11:21:48 20   Metairie.  I adopted late in life, so I have a 14 and an

11:21:53 21   18-year-old from China, adopted from China.  My wife is an

11:21:56 22   attorney for the New Orleans Saints and the Pelicans and other

11:21:59 23   of Mrs. Benson's ventures.

11:22:03 24          THE COURT:  Okay.  Do you have a favorite TV show, sir?

11:22:05 25          PROSPECTIVE JUROR 26:  The only thing I watched as a

*OFFICIAL TRANSCRIPT*

11:22:09 1    kid in the last couple of years was Zoey's Extraordinary

11:22:12 2    Playlist, and I thought it was good.

11:22:15 3            THE COURT:  Ms. Ewens.

11:22:18 4            PROSPECTIVE JUROR 27:  Hi, my name is the Shauna Ewens.

11:22:21 5    I work at Folgers.  I live in New Orleans.  I have two kids.

11:22:26 6    One is a senior this year, woo-hoo.  And my favorite TV show is

11:22:33 7    Barney Miller.

11:22:34 8            THE COURT:  Thank you, ma'am.  Mr. Robért.

11:22:36 9            PROSPECTIVE JUROR 28:  Good morning.  I'm

11:22:40 10   Jordan Robért.  I live in LaPlace.  I work for Lowe's Home

11:22:44 11   Improvement.  I'm the operations manager for my store.  My

11:22:47 12   favorite TV show is The Originals.

11:22:49 13           THE COURT:  Mr. Robért, are you married?

11:22:53 14           PROSPECTIVE JUROR 28:  I'm divorced, and I have three

11:22:56 15   kids.

11:22:57 16           THE COURT:  Okay.  Thank you.  Mr. Braswell.

11:23:02 17           PROSPECTIVE JUROR 29:  I'm John Braswell.  I live in

11:23:05 18   Marrero.  I work for Jefferson Parish.  I work in Lafayette

11:23:10 19   Park as a maintenance supervisor.  I listen to TV in the

11:23:13 20   morning to see what traffic and weather would be like.

11:23:16 21           THE COURT:  Thank you.

11:23:18 22           PROSPECTIVE JUROR 29:  I have one kid and two dogs.

11:23:20 23           THE COURT:  Thank you.  Mr. Smith.

11:23:22 24           PROSPECTIVE JUROR 30:  Good morning.  My name is

11:23:26 25   Eddie Smith.  I've been married 41 years.  I have five kids;

*OFFICIAL TRANSCRIPT*

11:23:29  1   two girls, three boys.  I have a daughter that's a dentist.  A

11:23:35  2   son that's a software engineer.  Another one that's a cyber

11:23:40  3   security engineer.  A son that's an accountant.  A daughter

11:23:43  4   that's a stay-at-home mom.  I did 37 years with the Postal

11:23:47  5   Service.  I finished up as a manager, labor relations, in the

11:23:51  6   Louisiana District.

11:23:52  7          THE COURT:  Do you have a favorite TV show, Mr. Smith?

11:23:56  8          PROSPECTIVE JUROR 29:  I watch First Take when I get up

11:23:59  9   in the morning.

11:24:00 10          THE COURT:  Okay.  Thank you.  Okay.  I'm now going to

11:24:04 11   allow counsel to ask you questions.

11:24:06 12              Mr. Schanker.

11:24:08 13          MR. SCHANKER:  Thank you, Your Honor.

11:24:09 14   DIRECT EXAMINATION BY MR. SCHANKER:

11:24:15 15   Q.   Good morning, folks.  I looked up at that clock and

11:24:18 16   thought it was afternoon, but it's still an hour behind here.

11:24:25 17   So, following up on some of the questions, you may or may not

11:24:28 18   have heard before, but anything based on the conversations that

11:24:36 19   the folks were having with the Judge and with the lawyers,

11:24:40 20   anything anybody feel they want to share, just right off the

11:24:44 21   bat?  Anybody feeling brave?  Mr. Braswell?

11:24:52 22          PROSPECTIVE JUROR 29:  I have a few questions, please.

11:24:55 23          MR. SCHANKER:  Yes, sir.

11:24:57 24          THE COURT:  I don't know if -- well, let's hear what

11:25:00 25   you have to say, Mr. Braswell.  But, generally, the questions

**OFFICIAL TRANSCRIPT**

11:25:04  1    are asked to you.

11:25:06  2            PROSPECTIVE JUROR 29:  I live a simple life, and, to

11:25:08  3    me, life is about choices.  And my mom and dad both passed

11:25:12  4    away; my dad with cancer, my mom, her liver failed, her kidney,

11:25:18  5    from taking medicine.  My dad chose not to take any medicine or

11:25:25  6    be treated for cancer.  My momma chose to take medicine.  Us as

11:25:30  7    a family, stood behind their decision.  And my question is, is

11:25:40  8    the cancer that this lady fought in remission?  Did she -- did

11:25:46  9    the medicine take care of the cancer?

11:25:49 10            THE COURT:  Okay.  Mr. Braswell, I know it's very

11:25:54 11    difficult to be a potential juror, and you hear this in

11:25:59 12    snippets --

11:25:59 13            PROSPECTIVE JUROR 29:  Yes, ma'am.

11:26:01 14            THE COURT:  -- and we're just trying to find out if you

11:26:04 15    can have an open mind as to the evidence you will hear.

11:26:08 16            We can't have this full conversation at this

11:26:12 17    point.  That would be part of the evidence you would hear

11:26:16 18    during the course of the trial.  But I'm going to now turn it

11:26:19 19    back over to Mr. Schanker.  And I can understand your

11:26:27 20    curiosity, but we're not there yet.  Thank you, sir.

11:26:30 21            MR. SCHANKER:  Thank you, Mr. Braswell.  I think that's

11:26:32 22    a great question, and let me kind of use that to turn back to

11:26:35 23    the rest of the group here.  Mr. Braswell mentioned the fact

11:26:39 24    that this is cancer.  And we can't get into the facts of the

11:26:41 25    case, the details of the evidence, but just based on the fact

*OFFICIAL TRANSCRIPT*

11:26:44 1  that this was a cancer drug, and that a woman, my client, is

11:26:51 2  suing the pharmaceutical company that provided her with the

11:26:55 3  chemotherapy, anybody have feelings with regard to that issue

11:26:59 4  that they think that this might not be the right case for them

11:27:03 5  to sit on?  Anyone at all?

11:27:08 6          We've got some folks up here -- let me see.

11:27:15 7  Ms. Fleetwood, I saw you raise your hand.  Are you comfortable

11:27:16 8  sharing with us?

11:27:22 9          PROSPECTIVE JUROR 19:  Yes, sir.  I wouldn't go as far

11:27:24 10  as saying that I would not follow the rules and I would not

11:27:26 11  keep an open mind, but you're asking -- from what we heard

11:27:29 12  before, basically, I do have a bias, and the bias would be

11:27:32 13  against your client --

11:27:32 14          MR. SCHANKER:  Sure.

11:27:35 15          PROSPECTIVE JUROR 19:  -- for seeking treatment to save

11:27:37 16  and extend the quality of her life, for having cancer and

11:27:42 17  relying on what's available to her today through her doctor's

11:27:47 18  choices and the pharmaceuticals that are available to do a

11:27:53 19  clinical.  Because nothing else was working for her, to turn

11:27:57 20  around and sue those people who were doing their best to treat

11:28:02 21  her, give her a better quality of life, a little bit of a

11:28:06 22  longer time to get her life together and do things over

11:28:10 23  something as vain, and I say that very strongly, over a

11:28:17 24  permanent hair loss.

11:28:19 25          Because we all know that chemotherapy, radiation

*OFFICIAL TRANSCRIPT*

11:28:25  1    treatments, and things like that will bring your body and your

11:28:29  2    immunity system all the way down to where you're barely

11:28:32  3    functioning, and you're relying on these medicines to pull you

11:28:36  4    back up.  Hormones will make your hair fall out, medicine will

11:28:41  5    make your hair fall out, a lot of things make your hair fall

11:28:45  6    out.  But to sue because your hair and your body, your

11:28:52  7    chromosomes, the way it treated you was not going to give you a

11:28:57  8    full head of hair back after a period of time, I have a strong

11:29:04  9    bias against it, this suit, as far as, you have to follow

11:29:13 10    directions.

11:29:13 11            I'm an administrative assistant.  I follow

11:29:17 12    directions every day, whether I like it or not.  There are

11:29:19 13    rules that are applied to my office that I have to follow,

11:29:22 14    whether I like it or not.  There are things that go on in life

11:29:25 15    there, at home, everywhere, as the law is written, whether I

11:29:30 16    would like to see it another way or not.  That's normal.  I

11:29:36 17    don't think that -- I'm not saying I'm not good for a jury

11:29:43 18    selection.  I'm just going to be honest and say right now, I do

11:29:46 19    have a bias, and that's what my bias is.

11:29:50 20            MR. SCHANKER:  Thank you.  Thanks for sharing that.

11:29:53 21    Let me, if I could, follow-up on that.  Is that okay?

11:29:57 22            PROSPECTIVE JUROR 19:  Uh-huh (affirmative response).

11:29:59 23            MR. SCHANKER:  So, I'm assuming, based on what you've

11:30:01 24    explained, you would consider the evidence that's presented in

11:30:04 25    this case, right?

**OFFICIAL TRANSCRIPT**

11:30:04 1                    PROSPECTIVE JUROR 19:   Absolutely.

11:30:06 2                    MR. SCHANKER:   And you would do your best to make your

11:30:10 3      decision based on the evidence?

11:30:13 4                    PROSPECTIVE JUROR 19:   On the evidence, yes.

11:30:14 5                    MR. SCHANKER:   I thank you again for acknowledging you

11:30:16 6      have a bias.   So the question really becomes, as the Judge has

11:30:20 7      sort of framed it, you've seen how she's done this, is whether

11:30:22 8      that bias that you have, is that -- those opinions that you

11:30:25 9      have, are those opinions that you could lay aside and then

11:30:29 10     really make the decision just on the evidence that's presented

11:30:33 11     here, or is the fact of the matter that that bias, as you

11:30:40 12     called it, those opinions, are going to come into the

11:30:43 13     decision-making process and it's not just going to be based on

11:30:48 14     the evidence?

11:30:49 15                   PROSPECTIVE JUROR 19:   And as a human being, I saw

11:30:51 16     another gentleman up here answer the same question, the lady

11:30:55 17     said the same thing, that's something I can't guarantee because

11:30:58 18     it's always in the back of my mind that this just seems to me

11:31:03 19     of a vain and greedy thing.   And the -- as others have said,

11:31:10 20     you have a large team, so there must be some merit.   There must

11:31:14 21     be something going on that we'll find out if we're picked as a

11:31:19 22     juror.   And I would do my best to not carry that bias with me,

11:31:25 23     but it's going to be there.   Much.

11:31:28 24                   MR. SCHANKER:   Right.   Thank you for sharing, and I'm

11:31:30 25     certainly, I'm not trying to berate you but you're providing

*OFFICIAL TRANSCRIPT*

11:31:34 1    such good information here.  Can I shop U.

11:31:37 2            PROSPECTIVE JUROR 19:  Sure.

11:31:39 3            MR. SCHANKER:  Let's think about it this way.  These

11:31:41 4    opinions, can you, in good faith, tell the Judge that you can

11:31:48 5    set those opinions aside and make your decision as she said,

11:31:53 6    solely on the evidence or is that something you just can't in

11:31:59 7    good faith say because of your feelings as you've expressed

11:32:03 8    them here.

11:32:04 9            PROSPECTIVE JUROR 19:  My feelings won't override.  I'm

11:32:08 10   not locked into, I just won't hear anything because of how I

11:32:12 11   feel, but, again, you're asking a human being to kind of

11:32:17 12   guarantee whether or not that shade of bias is actually going

11:32:22 13   to come into play after everything is done is put out.  I'm

11:32:28 14   just not locked into saying no, that I just could not go

11:32:35 15   forward and listen to anything that, I'm that locked in so I

11:32:40 16   would do my best, again, I can't guarantee that it's not going

11:32:43 17   to affect.  I don't know.

11:32:46 18           MR. SCHANKER:  Is it fair to say, and correct me if I'm

11:32:49 19   wrong, that the plaintiff, might client, would start the trial

11:32:54 20   out behind, just based on what you've acknowledged, and that

11:32:58 21   you would listen to the evidence.

11:33:00 22           PROSPECTIVE JUROR 19:  That's basically it, she's

11:33:03 23   already behind in my mind, and, you know, I see the team, I see

11:33:08 24   some boxes and I see it's going to be 10 days, so I'm very

11:33:12 25   curious the amount of story and evidence and how it unfolds for

*OFFICIAL TRANSCRIPT*

11:33:21   1   her, but she is behind already in any mind.

11:33:25   2       MR. SCHANKER:   Okay.   And thank you, thank you,

11:33:28   3   Ms. Fleetwood for sharing.   As others who are listening there

11:33:31   4   and Mr. Prejean.

11:33:38   5       PROSPECTIVE JUROR 21:   Yeah, I got one.   My

11:33:40   6   mother-in-law had cancer a while back -- after she had a

11:33:48   7   treatment and everything, her hair came back better than what

11:33:51   8   it was before, you know, fuller, pretty your, and my wife, she

11:33:55   9   is on medicine, all kind of different medicines and her fair is

11:34:00  10   falling out, you know, it's getting thinner, so, it's got to be

11:34:04  11   the medicine that is doing it or whatever, you know.   But the

11:34:08  12   thing about the whole thing is, you got the defendant, and the

11:34:14  13   plaintiffs, it's like a book, I want to see what's in the

11:34:17  14   middle of this book.   You know, you got the start than the

11:34:22  15   ending such that's what you want to see.   The whole book.   And

11:34:26  16   that's what I think.

11:34:28  17       MR. SCHANKER:   And you'll wait to see that book be wait

11:34:30  18   until all of those pages get opened up.

11:34:34  19       PROSPECTIVE JUROR 21:   Right.   You got to have a reason

11:34:38  20   for it.

11:34:39  21       MR. SCHANKER:   Thank you, sir.   Go going back to what

11:34:43  22   Ms. Fleetwood said, this conversation about the plaintiff, my

11:34:46  23   client starting behind at this point, is there anyone else, if

11:34:51  24   they are being honest with themselves is comfortable sharing,

11:34:53  25   is that how you feel even if it's just a little bit?   We have

**OFFICIAL TRANSCRIPT**

11:34:59  1    some folks here that feel that way.

11:35:01  2              Let me ask you a question, with Mr. Young, what

11:35:04  3    are your thoughts on that?  Are you comfortable sharing?

11:35:09  4         PROSPECTIVE JUROR 20:  I wrote down.  I wrote down.

11:35:19  5    I've been through the chemo, and I didn't lose very much hair,

11:35:29  6    but I can, I can sit and here the evidence and is judge it.

11:35:43  7         MR. SCHANKER:  Any other issues, anything else that

11:35:46  8    we've talked about here that you feel is important that we've

11:35:49  9    discussed?

11:35:50 10         PROSPECTIVE JUROR 20:  No.

11:35:52 11         MR. SCHANKER:  Thank you, sir.

11:35:56 12              How about this issue that we talked about the

11:35:59 13    fact that it was a clinical trial?  Does anyone have feelings

11:36:02 14    about the fact that this is a clinical trial?  Anyone at all?

11:36:08 15    Let's see.  Mr. Leaber.

11:36:12 16         PROSPECTIVE JUROR 16:  I believe somebody had mentioned

11:36:17 17    that in the first group.  I kind of agree with it is that if

11:36:20 18    it's clinical, there is obviously going to be some issues, and

11:36:24 19    you're willing to the take those risks in order for the reward,

11:36:29 20    so you're going to go in there and if you agree to it, you're

11:36:34 21    agreeing to whatever the outcomes could be.

11:36:38 22         MR. SCHANKER:  Shifting gears here real quick, folks.

11:36:43 23    The standard, the burden of proof in this case, we discussed

11:36:49 24    with other folks who were sitting up here previously, and that

11:36:53 25    you may recall and the judge explained some of this to the

**OFFICIAL TRANSCRIPT**

11:36:57  1      prospective jurors and that's the burden of proof is not a
11:37:01  2      criminal case beyond a reasonable doubt, instead, this case is
11:37:05  3      the word preponderance.  The judge explained more likely true
11:37:09  4      than not true.  People define that different ways, but more
11:37:14  5      likely true than not true.  Is there anybody here that is not
11:37:19  6      comfortable with that, that feels especially if it's a case
11:37:22  7      where if the evidence supports it, that we will ask you for
11:37:26  8      over a million dollars in this case, and you haven't heard any
11:37:30  9      evidence, I understand that, does anybody feels they are just
11:37:34 10      not comfortable, they think there should be a higher, hire
11:37:37 11      burden with that kind of situation?  Any thoughts on that at
11:37:42 12      all?
11:37:43 13           How about this idea of money for pain and
11:37:52 14      suffering?  Money for pain?  Some folks are comfortable with
11:37:58 15      the idea of compensating, we not talking about medical bills
11:38:03 16      and those sorts of things and lost wages but the pain people
11:38:07 17      are going through.  Some people are comfortable with money for
11:38:10 18      pain and others are not?  Mr. Prejean, I saw, you looked like
11:38:15 19      you were reacting there.  Are you comfortable with sharing with
11:38:17 20      us?
11:38:19 21           PROSPECTIVE JUROR 21:  I don't know how to say this
11:38:25 22      because in 2006, I fell out of a scaffold and broke my back and
11:38:33 23      neck, and that was an accident, and the work force now, you
11:38:40 24      can't sue this one, you can't sue that one, you can't do this,
11:38:44 25      you can't do that because it's partially my fault, but it

11:38:49  1   wasn't all my fault, so I couldn't get nothing out of it.  I

11:38:53  2   had, I had, the lawyers told me I had a million dollars

11:38:56  3   lawsuit.  I couldn't get nothing out of it.  Just, just they

11:39:01  4   paid for my doctor bills and everything, but for opinion and

11:39:04  5   suffering, I couldn't get nothing.

11:39:06  6          In this, if she knew she was, this could have

11:39:13  7   made all her hair fall out or whatever, you know, it got to be

11:39:20  8   everything that a, you can do this, you can do that and

11:39:23  9   everything, so she knew this, I don't believe she could get

11:39:27  10  that much money.  There is no way.  That's my feeling, anyway.

11:39:33  11       MR. SCHANKER:  And Ms. Ledlie Prejean Mr. Prejean, is

11:39:38  12  it a situation where if the evidence supported it you could

11:39:41  13  award, compensate for what's been taken from our client, an

11:39:46  14  amount of money or would you say no matter what, no matter what

11:39:49  15  the evidence supports there is a certain amount of money I'm

11:39:52  16  not comfortable going over?

11:39:54  17       PROSPECTIVE JUROR 21:  Well, like I said before, she

11:39:58  18  knew what the, you know, what it could have done to her, you

11:40:03  19  know.  Like, before, take medicine and live and not take

11:40:12  20  medicine and pass away.  You know, I don't know what, I believe

11:40:17  21  I would want to take the medicine and live if it would help me.

11:40:21  22  Hell on hair.  I'm losing mine's.  It's falling out.  It's age.

11:40:27  23       MR. SCHANKER:  Thank you, sir.  If you could hand the

11:40:31  24  microphone forward Mr. Hayne.  I know you had raised your hand

11:40:35  25  earlier.  What were -- you have something to hair?

*OFFICIAL TRANSCRIPT*

11:40:43  1          PROSPECTIVE JUROR 25:  I thought you were looking at

11:40:46  2     me.

11:40:48  3          MR. SCHANKER:  Go to Mr. Neumeyer.  I thought you did

11:40:53  4     it.

11:40:53  5          PROSPECTIVE JUROR 26:  I think my views are pretty much

11:40:56  6     like Ms. Fleetwood said is it quite well, I have had my

11:41:01  7     mother-in-law and all of my motors and all of my wife's sisters

11:41:06  8     die of breast cancer.  And I think they all certainly knew that

11:41:13  9     hair loss was going to be part of that and didn't think a lot

11:41:16 10     of it.  It's not a major bias but the first thing comes up is

11:41:22 11     we all know that that's jaws what I wanted to say.

11:41:26 12          MR. SCHANKER:  You indicated it's not a major bias, is

11:41:28 13     that one when we kind of think about this as the junk said

11:41:32 14     decide on the evidence, is that a bias or opinion, you said

11:41:35 15     it's not a major one, is that one that you could set aside or

11:41:39 16     lay aside when you're making your decision on the evidence in

11:41:42 17     this case?  Or not?  What are your thoughts?

11:41:48 18          PROSPECTIVE JUROR 26:  Yes, I guess if somebody shows

11:41:53 19     something different it seems to me, we all know about these

11:41:56 20     drugs if someone is represented as different than that I guess,

11:42:00 21     then, yeah.

11:42:04 22          MR. SCHANKER:  Thank you, folks.  Thank you,

11:42:05 23     Your Honor.

11:42:06 24          THE COURT:  Thank you.

11:42:17 25              Ms. Sastre.

                              ***OFFICIAL  TRANSCRIPT***

11:42:18  1          MS. SASTRE:  Thank you, Your Honor.

11:42:19  2   DIRECT EXAMINATION BY MS. SASTRE:

11:42:25  3   Q.    Still morning.  Good morning, ladies and gentlemen.  My

11:42:30  4   name is Hildy Sastre and I represent the defendant, Sanofi in

11:42:35  5   this case.

11:42:35  6          Now, as you've probably seen, I have a limited amount

11:42:38  7   of time to ask questions and talk with you all.  I wish I had a

11:42:42  8   chance to speak with every one of you but I'm not going to

11:42:46  9   unfortunately.  But for the couple of you that I to have some

11:42:49 10   questions for, I do want to ask you at the beginning, please,

11:42:52 11   please, please, just let me know what your truest, realest

11:42:57 12   feelings are, and I can promise you in advance there is no way

11:43:00 13   you're going to say to go that's going to hurt my feelings.

11:43:04 14   Everyone agree to do that?  Okay.  Great.  Thank you.

11:43:06 15          So, Ms. Wynder, Winder, I'm sorry, ma'am, did I say

11:43:14 16   that correctly?  It's nice to see you this morning, ma'am.  Do

11:43:17 17   you have a microphone?  Thank you.

11:43:25 18          So, ma'am, I think you told us that you are you work

11:43:29 19   as a CNA?

11:43:30 20          PROSPECTIVE JUROR 22:  Yes.

11:43:33 21          MS. SASTRE:  So you provide care to patients?

11:43:36 22          PROSPECTIVE JUROR 22:  Yes.

11:43:37 23          MS. SASTRE:  What kind of patients?

11:43:38 24          PROSPECTIVE JUROR 22:  Elderly, middle age.

11:43:43 25          MS. SASTRE:  Have you ever taken care of a cancer

*OFFICIAL TRANSCRIPT*

11:43:45  1    patient?

11:43:46  2            PROSPECTIVE JUROR 22:  Yes.

11:43:47  3            MS. SASTRE:  And so, in this case, you've heard a

11:43:51  4    little bit already that the plaintiff, Ms. Kahn, had

11:43:54  5    breast cancer?

11:43:55  6            PROSPECTIVE JUROR 22:  Him uh-huh (affirmative

11:43:57  7    response).

11:43:57  8            MS. SASTRE:  And she went through chemotherapy.  Do you

11:44:00  9    think because you're working as sort of a nurse's assistant and

11:44:05 10    having cared for are cancer patients, do you think that that

11:44:09 11    might be something that maybe this case is a little too close

11:44:13 12    to home for you and maybe you might feel some sympathy for

11:44:17 13    Ms. Kahn?

11:44:17 14            PROSPECTIVE JUROR 22:  No.  I don't think so.

11:44:21 15            MS. SASTRE:  Now, I think you also told us that your

11:44:26 16    father had lung cancer?

11:44:30 17            PROSPECTIVE JUROR 22:  My father?

11:44:32 18            MS. SASTRE:  Yes.

11:44:33 19            PROSPECTIVE JUROR 22:  Yes.

11:44:34 20            MS. SASTRE:  Did he rougher from that?

11:44:36 21            PROSPECTIVE JUROR 22:  No, he didn't, he passed away.

11:44:38 22            MS. SASTRE:  I'm sorry.  That was from the cancer?

11:44:40 23            PROSPECTIVE JUROR 22:  Yes.  It spread into his brain.

11:44:43 24            MS. SASTRE:  I'm sorry to hear that, ma'am.  Did he

11:44:45 25    have chemotherapy; do you know?

                              *OFFICIAL TRANSCRIPT*

11:44:47  1          PROSPECTIVE JUROR 22:  He had radiation.

11:44:49  2          MS. SASTRE:  Okay.  And so, again, Ms. Wynder, here in

11:44:55  3     this case, with this case we'll be talking about cancer a lot

11:45:01  4     and chemotherapy and other treatment, really every single day,

11:45:06  5     do you think it might be a situation where it may bring up

11:45:09  6     feelings that would be natural, of course, that you might be

11:45:12  7     thinking about your father and you might be feeling some

11:45:15  8     sympathy for the patient you're --

11:45:18  9          PROSPECTIVE JUROR 22:  I do feel sympathy for the

11:45:20 10     patient, but I can -- I can -- I'll okay.

11:45:28 11          MS. SASTRE:  Do you think you can listen to the

11:45:29 12     evidence?

11:45:30 13          PROSPECTIVE JUROR 22:  Yes, I can.

11:45:32 14          MR. HODGES:  Would you be able to put your feelings for

11:45:34 15     your father, do you think you could put them aside when listen

11:45:37 16     to the evidence?

11:45:38 17          PROSPECTIVE JUROR 22:  Yes.

11:45:39 18          MS. SASTRE:  Are you sure about that?

11:45:41 19          PROSPECTIVE JUROR 22:  The positive.

11:45:42 20          MS. SASTRE:  Let me ask you about one other thing while

11:45:45 21     I'm talking you.  I'm not pick oncologist you.  You told us in

11:45:50 22     your questionnaire, you said that you strongly felt that the

11:45:56 23     warnings companies put on their products, you said I think

11:45:59 24     they're not strong enough.  That's how you feel, right?

11:46:02 25          PROSPECTIVE JUROR 22:  Yeah.  That's only my opinion.

*OFFICIAL TRANSCRIPT*

11:46:05 1    Because sometimes when it works and sometimes it don't so you

11:46:11 2    can't really blame medications for anything, because if with

11:46:15 3    all medications it's a side effect.  One can be hair loss,

11:46:19 4    weight loss it can be different things:

11:46:22 5         MS. SASTRE:  Okay.  So, one of the issues that you're

11:46:26 6    going to hear, and you all have heard a little bit about it

11:46:28 7    already, but you'll hear that the claim that's being made in

11:46:31 8    this case is that the warning that was given to the medication

11:46:34 9    that was used, the chemotherapy drug that was used by Ms. Kahn

11:46:39 10   the plaintiff, there is a claim that it just wasn't adequate.

11:46:43 11   And so, do you think because of the way that you feel, this

11:46:47 12   belief that you already have, this strong belief, that you

11:46:52 13   think warnings that pharmaceutical companies give on drugs that

11:46:57 14   they are inadequate, that something that you might shape the

11:47:02 15   way you hear the evidence when you're listening to it?

11:47:04 16        PROSPECTIVE JUROR 22:  No.

11:47:05 17        MS. SASTRE:  So those are feelings that can you tell

11:47:07 18   with us some confidence that they are not going to come into

11:47:10 19   play when you're listening to this case?

11:47:11 20        PROSPECTIVE JUROR 22:  I have no feelings.  My dad that

11:47:15 21   be dead since 96.

11:47:19 22        MS. SASTRE:  The last thing I was going to ask you,

11:47:22 23   ma'am, will you get paid if you're here with us?

11:47:24 24        PROSPECTIVE JUROR 22:  Yes.

11:47:26 25        MS. SASTRE:  You will.  So that won't be any sort of

*OFFICIAL TRANSCRIPT*

11:47:29 1   distraction at all?

11:47:30 2          PROSPECTIVE JUROR 22:  Unh-unh (negative response).

11:47:31 3          MS. SASTRE:  Thank you, Ms. Winder, I appreciate your

11:47:34 4   time this morning.  Actually, if you could go to the other way

11:47:37 5   to the gentleman that's on your left.

11:47:40 6              Mr. Becho Resendiz.  Did I say that correctly?  I

11:47:46 7   got lucky with.  So nice to see you this morning, sir.

11:47:49 8              So, let me ask you just a couple questions.  And

11:47:54 9   I just want to start and ask you about your father, as well.

11:47:57 10  You shared some information with us about him.  I believe your

11:48:01 11  father had cancer and chemotherapy?

11:48:04 12         PROSPECTIVE JUROR 23:  Yes, he had breast cancer.

11:48:07 13         MS. SASTRE:  How is he doing, sir?

11:48:09 14         PROSPECTIVE JUROR 23:  He's still battling it.

11:48:12 15         MS. SASTRE:  Is he being treated now?

11:48:15 16         PROSPECTIVE JUROR 23:  Yes, he's taking medication.

11:48:16 17  I'm just not sure what he's taking.

11:48:19 18         MS. SASTRE:  Did your father have side effects from

11:48:24 19  chemotherapy?

11:48:24 20         PROSPECTIVE JUROR 23:  He had hair loss.  He still has

11:48:27 21  not hair growth back yet.

11:48:31 22         MS. SASTRE:  Okay.  So do you think that your father

11:48:33 23  having had the very same disease, breast cancer that the

11:48:36 24  plaintiff had in this case, had chemotherapy, has, as you said

11:48:44 25  hair loss, which is the claim in this lawsuit, do you feel that

*OFFICIAL TRANSCRIPT*

11:48:48  1    it might be that you sort of might identify or feel sympathy

11:48:52  2    for the plaintiff here in all honestly?

11:48:55  3              PROSPECTIVE JUROR 23:  Honestly, no.  No.

11:48:57  4              MS. SASTRE:  Why not?

11:48:59  5              PROSPECTIVE JUROR 23:  Because my dad, like he's been

11:49:03  6    looking for his treatments and he had his own, make his own

11:49:07  7    research, so he did what he had to do a to get his treatment so

11:49:12  8    I feel like she could have done her own thing now if she wanted

11:49:19  9    to go to clinical trial that was her own choice.

11:49:21 10              MS. SASTRE:  Okay.  Do you think because of the

11:49:23 11    situation with your father and his struggle which is still

11:49:27 12    going on and I imagine that has to be emotional for you, right?

11:49:31 13              PROSPECTIVE JUROR 23:  It is.

11:49:32 14              MS. SASTRE:  Do you think hearing about a struggle in

11:49:35 15    this case with cancer and treatment and chemotherapy that that

11:49:38 16    could be something that you would be thinking about your

11:49:41 17    father?

11:49:41 18              PROSPECTIVE JUROR 23:  Probably so yes.

11:49:43 19              MS. SASTRE:  And in thinking about your dad, do you

11:49:46 20    think that's something that could come into play when you're

11:49:49 21    deciding about a side effect that's been alleged to have

11:49:53 22    caused, be caused by chemotherapy here in the case?  Could that

11:49:57 23    influence you, sir; do you think?

11:49:59 24              PROSPECTIVE JUROR 23:  I'm not sure.  Like I said, I

11:50:02 25    would be open to hearing everything.

*OFFICIAL TRANSCRIPT*

11:50:08 1          MS. SASTRE:  Thank you for that.  I appreciate it.

11:50:10 2               Let me ask you about something else you told us

11:50:13 3     in your questionnaire.  You said that you have negative views

11:50:17 4     of large companies.  Right.

11:50:21 5          PROSPECTIVE JUROR 23:  I do.

11:50:22 6          MS. SASTRE:  So like I said you're not going to hurt my

11:50:24 7     feelings, I promise you.

11:50:26 8          PROSPECTIVE JUROR 23:  It's a multimillion-dollar

11:50:28 9     business.  Cancer is itself.  I just feel like that's what it

11:50:31 10    is.  I feel like there is natural treatments behind it that

11:50:33 11    people should actually start research go on it.  It's just like

11:50:37 12    it's all out there.  So, to rely on a pharmaceutical company, I

11:50:43 13    just, I don't believe in that.

11:50:46 14         MS. SASTRE:  You think pharmaceutical companies, the

11:50:49 15    profits or money safety?

11:50:55 16         PROSPECTIVE JUROR 23:  Possibility because I know the

11:50:56 17    first time he got treated, I went away.  And the same thing, he

11:51:01 18    kept taking the same medication and everything that he was on,

11:51:04 19    it kept coming back so I feel like that medicine was basically

11:51:08 20    was for nothing.

11:51:09 21         MS. SASTRE:  So you have negative views, tell me if I

11:51:11 22    understand you correctly sir, you have some negative opinions

11:51:15 23    about pharmaceutical companies in particular that make cancer

11:51:19 24    drugs and now because of that very personal experience you had

11:51:24 25    with your father and as you said that the treatment didn't

*OFFICIAL TRANSCRIPT*

11:51:26  1    really work for him, right?

11:51:28  2          PROSPECTIVE JUROR 23:  That's right.

11:51:29  3          MS. SASTRE:  If I was asking do you think

11:51:31  4    pharmaceutical companies are greedy, how would you answer that

11:51:33  5    in your heart of hearts?

11:51:35  6          PROSPECTIVE JUROR 23:  Yes.

11:51:36  7          MS. SASTRE:  Okay.  And that sounds like something that

11:51:39  8    you probably felt that way for a while?

11:51:43  9          PROSPECTIVE JUROR 23:  Yes.  Because he has struggled

11:51:46 10    just to be able to take medication for that.

11:51:51 11          MS. SASTRE:  These feels that you have, these negative

11:51:54 12    views that you have about drug manufacturers, right, drug

11:51:58 13    companies, and I know you would agree, I understand sir that

11:52:01 14    you would try but despite your best efforts to put the entire

11:52:05 15    situation with your father, the treatment that didn't work on

11:52:08 16    him, and battling the same cancer as the plaintiff in this case

11:52:13 17    that the negative views that you have about the pharmaceutical

11:52:16 18    industry?

11:52:17 19          PROSPECTIVE JUROR 23:  I could put them to the side

11:52:19 20    because it's a different case than what my father is going

11:52:22 21    through and stuff.

11:52:23 22          MS. SASTRE:  Let me ask you this way, so plaintiff's

11:52:27 23    counsel asked some of you, you know is my client starting a

11:52:29 24    little bit behind and I'll ask you I guess a variation of that

11:52:32 25    question, are you leaning at the outset just from the bit that

*OFFICIAL TRANSCRIPT*

11:52:35 1   you heard a little bit towards the plaintiff's side or the

11:52:39 2   patient's side.

11:52:40 3          PROSPECTIVE JUROR 23:  No, because I feel like she

11:52:43 4   chose to go through that and she chose to take medication that

11:52:46 5   she had no idea how it would work.

11:52:49 6          MS. SASTRE:  Thank you very much, sir.  Thank you.  I

11:52:54 7   very much appreciate it.

11:52:56 8              Mr. Tran.  Good morning, sir.  Excuse me.  The

11:53:04 9   microphone down to you, please.  Thank you, folks.  Good

11:53:13 10  morning, sir.

11:53:15 11         PROSPECTIVE JUROR 24:  Good morning.

11:53:16 12         MS. SASTRE:  Just a couple questions for you.  And I'm

11:53:20 13  going back to the questionnaire that you completed a couple

11:53:22 14  months ago.  But you said you had some difficulty with English?

11:53:27 15         PROSPECTIVE JUROR 24:  Yeah, just that I --

11:53:35 16         THE COURT:  I'm sorry, can you take your mask off.

11:53:38 17         PROSPECTIVE JUROR 24:  Yeah, because my knowledge is

11:53:41 18  not really, I guess most of my education is going to learning

11:53:48 19  DSL's, so that's why I'm having, like, not A problem but kind

11:53:52 20  of understanding like words, so that's why, that's the reason I

11:53:58 21  put that.

11:53:59 22         MS. SASTRE:  Do you have a hard time understanding

11:54:01 23  sometimes following what's being said?

11:54:04 24         PROSPECTIVE JUROR 24:  Yes.

11:54:05 25         MS. SASTRE:  And have you felt that even a little bit

*OFFICIAL TRANSCRIPT*

11:54:07 1    here this morning, you have a hard time a bit?

11:54:11 2         PROSPECTIVE JUROR 24:  Not quite somebody explaining

11:54:15 3    like kind of like put an example, I mean, like, so, if somebody

11:54:24 4    explain the problems, I will understand.

11:54:27 5         MS. SASTRE:  In this case, we will be talking about a

11:54:32 6    lot of medical issues, and medications, some issues related to

11:54:37 7    science, there will be some I had guess underground say

11:54:41 8    technical terms and issues.

11:54:44 9         PROSPECTIVE JUROR 24:  Yes.

11:54:44 10        MS. SASTRE:  Do you think in a case like this with this

11:54:47 11   level of complexity sir, with all due respect, do you think

11:54:51 12   that it might be difficult to follow.

11:54:56 13        PROSPECTIVE JUROR 24:  Yes.

11:54:56 14        MS. SASTRE:  Complicated words that you're unfamiliar

11:54:59 15   with and the subject matter?

11:55:02 16        PROSPECTIVE JUROR 24:  Yes.

11:55:02 17        MS. SASTRE:  So maybe this might not be the best trial

11:55:05 18   for you.  Is that fair?

11:55:07 19        PROSPECTIVE JUROR 24:  Yes.

11:55:07 20        MS. SASTRE:  Thank you very much, Mr. Tran.  I

11:55:10 21   appreciate that.

11:55:11 22             One, second, I want to talk with my partner for a

11:55:28 23   moment.

11:55:33 24             Okay.  Ms. Miller, how are you?  Ma'am, just a

11:55:42 25   couple questions for you:  So, I think you said in your

**OFFICIAL TRANSCRIPT**

11:55:45  1    questionnaire, and again, I know it's a couple months ago so

11:55:48  2    I'll sort of refresh your memory a bit, but tell me if this is

11:55:52  3    how you feel:  You said that you strongly agree that the

11:55:57  4    warnings that drug companies have are not strong enough?  Is

11:56:02  5    that how you feel or tell me what are your feelings on that

11:56:04  6    subject.

11:56:06  7         PROSPECTIVE JUROR 18:  Your question is do I feel that

11:56:11  8    they are strong enough or they are not strong enough?

11:56:14  9         MS. SASTRE:  Well, you told us that us that it was your

11:56:18 10    strong belief that warnings that are pharmaceutical and drug

11:56:21 11    companies have some medications are not strong enough.

11:56:25 12         PROSPECTIVE JUROR 18:  I feel you go to the pharmacy

11:56:28 13    and get prescriptions and it's three pages of all of the

11:56:31 14    different possible side effects.  I feel that sometimes they'll

11:56:34 15    have something in bold that will, you know, catch your eye, but

11:56:38 16    I feel, like if I read everything every time, I wouldn't take

11:56:41 17    any of the medicines.  That kind of how I feel about it is what

11:56:45 18    I meant.

11:56:46 19         MS. SASTRE:  It sounds like what you're saying sort of

11:56:48 20    like if you hear a commercial and it runs through a list of

11:56:51 21    side effects?

11:56:52 22         PROSPECTIVE JUROR 18:  I think to myself why would

11:56:56 23    anyone take that.

11:56:57 24         MS. SASTRE:  I think that maybe they provide too much

11:57:01 25    information sometimes?

                              *OFFICIAL TRANSCRIPT*

11:57:02 1          PROSPECTIVE JUROR 18:  Yes.  Yes.

11:57:10 2          MS. SASTRE:  Last question.  And lawyers are famous for

11:57:16 3    saying that, so, ma'am, I know you said your husband works at a

11:57:20 4    law firm and he has like an administrative Barrett.

11:57:27 5          PROSPECTIVE JUROR 18:  Billing manager.

11:57:29 6          MS. SASTRE:  And despite the fact that your husband

11:57:31 7    works as a law firm, I recognize that he's not a lawyer, but do

11:57:35 8    you think that you could serve as arrest juror in the case,

11:57:38 9    keep an open mind when you listen to the law given by the Court

11:57:44 10   and be arrest fair and impartial juror?

11:57:46 11         PROSPECTIVE JUROR 18:  I mean, I've never done anything

11:57:49 12   before, a little nervous about the whole thing but I mean, I

11:57:52 13   think so.

11:57:53 14         MS. SASTRE:  My question is really the fact that your

11:57:56 15   husband works as a law firm, it wouldn't if how you view the

11:58:01 16   evidence?

11:58:03 17         PROSPECTIVE JUROR 18:  No, it wouldn't.

11:58:05 18         MS. SASTRE:  Thank you very, ladies and gentlemen, for

11:58:07 19   your time this morning.  I appreciate it.

11:58:12 20         THE COURT:  I just have a couple of follow-up

11:58:14 21   questions.  Is it Mr. Becho?

11:58:26 22         PROSPECTIVE JUROR 23:  Becho.

11:58:28 23         THE COURT:  It sounds like you have ideas and I know

11:58:31 24   you have not heard one bit of evidence, but you have some ideas

11:58:37 25   about both sides from what you've heard.  Can you be fair to

*OFFICIAL TRANSCRIPT*

11:58:41  1    both sides in this case?

11:58:43  2            PROSPECTIVE JUROR 23:  Yeah, I feel like I could be

11:58:45  3    fair to both sides.

11:58:46  4            THE COURT:  Okay.  Can you render a verdict solely from

11:58:50  5    both what you hear in this courtroom?

11:58:53  6            PROSPECTIVE JUROR 23:  Definitely.

11:58:56  7            THE COURT:  Okay.  Thank you.

11:58:56  8                 Mr. Tran, and I hate to belabor the point, did

11:59:02  9    you have any difficulty this morning following what we were

11:59:04 10    doing here?

11:59:08 11            PROSPECTIVE JUROR 24:  Not really difficult but some of

11:59:10 12    the big words, I couldn't explain it, I mean, I couldn't

11:59:14 13    understand it.  But once somebody tell me what's that word

11:59:20 14    meant, then I understand.  Yeah.

11:59:23 15            THE COURT:  Thank you, sir.

11:59:35 16            PROSPECTIVE JUROR 24:  You're welcome.

11:59:38 17            THE COURT:  I'm going to ask you the same questions

11:59:40 18    that I asked the prior panel.  If you were one of the parties

11:59:44 19    in this case, is there any reason you would not be content to

11:59:49 20    have the case tried by someone with your frame of mind?  So

11:59:53 21    physical examination, if you were the plaintiff or the

11:59:55 22    defendant, is there anything that would cause you concern about

11:59:59 23    your frame of mind?

12:00:02 24                 Thank you.

12:00:06 25                 If you were selected to sit as a juror in this

**_OFFICIAL TRANSCRIPT_**

12:00:10  1   case, will you be unable to are or unwilling to be verdict solo

12:00:17  2   on the evidence presented at trial and the law as I give you in

12:00:20  3   my instructions disregarding go any ideas, notions or beliefs

12:00:24  4   about the law you may have encountered outside of this trial

12:00:27  5   or, you know, your idea that this should not be a law, can you

12:00:31  6   follow the law as I give it to you, whether you agree with it

12:00:33  7   or not?  Can you do that?

12:00:35  8           Would you be unable or unwilling to firmly put

12:00:41  9   aside any feelings of sympathy or compassion or if for the

12:00:46  10  plaintiff or the defendant and decide this case solely on its

12:00:51  11  merits and decide at this time solely on the law as I will

12:00:55  12  explain it to you?

12:00:55  13          Does anyone else have anything else on their mind

12:01:00  14  which would affect your ability to sit on their jury which has

12:01:04  15  not been covered by the questions previously asked?  Thank you.

12:01:11  16          If you all need to stand up and stretch, this is

12:01:18  17  a good time to do so.  And then we'll move.

12:04:50  18          Before we get started on this panel, I have

12:04:53  19  already excused three people, which is Juror Number 16,

12:04:56  20  Mr. Leaber, Juror Number 17 Pickens, and Juror Number 3

12:05:02  21  Mr. Smith, so there is no reason for anyone to discuss those

12:05:04  22  people.

12:05:05  23          Mr. Schanker, any challenges for cause?

12:05:07  24      MR. SCHANKER:  Yes, Your Honor, Juror Number 19,

12:05:17  25  Ms. Fleetwood.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 12:05:22 1 | THE COURT:  I don't think there is an objection.  She |
| 12:05:24 2 | used pretty strong language. |
| 12:05:26 3 | MS. SASTRE:  Seems okay to me. |
| 12:05:29 4 | THE COURT:  Any others? |
| 12:05:31 5 | MR. SCHANKER:  Yes.  One second, Your Honor. |
| 12:05:41 6 | Ms. Juror Number 21, Mr. Prejean.  He indicated he has a |
| 12:05:46 7 | problem with money for pain and showed real difficulty |
| 12:05:51 8 | considering the idea that compensating for pain and suffering |
| 12:05:56 9 | indicating that his own personal experience with a claim in |
| 12:05:59 10 | which he was not entitled to it would bias him.  And the |
| 12:06:05 11 | overall facts of the case, he said that if she knew it could |
| 12:06:09 12 | cause her hair loss, there is no way that she should get that |
| 12:06:13 13 | much money.  So we would move to excuse Juror Number 21 for |
| 12:06:20 14 | cause, Mr. Prejean. |
| 12:06:22 15 | MR. MOORE:  We would oppose a cause for Mr. Prejean. |
| 12:06:27 16 | This was the gentleman who said he indicated that he wanted to |
| 12:06:32 17 | see what's in the middle of the book because there is two sides |
| 12:06:36 18 | to every story.  When he was talking about bias he showed |
| 12:06:41 19 | damages, what he was saying if they don't prove damages, I |
| 12:06:44 20 | wouldn't award it because that's what the law is going to be. |
| 12:06:48 21 | THE COURT:  I have to tell you, I listened to |
| 12:06:51 22 | Mr. Prejean and what he said, a book, that unfortunately |
| 12:06:58 23 | because his was a Workers' Comp injury, he was not entitled to |
| 12:07:03 24 | that, but he said if she knew this would happen, I don't know |
| 12:07:09 25 | why I would give her that.  That's the crux of this case is the |

*OFFICIAL TRANSCRIPT*

12:07:13  1  allegation is she didn't know because you didn't tell her.  And

12:07:16  2  so, I just don't -- I'm going to deny that challenge for cause.

12:07:24  3          Any others?

12:07:25  4          MR. SCHANKER:  No, Your Honor.  Thank you.

12:07:27  5          THE COURT:  Anything from the defendant.

12:07:28  6          MR. MOORE:  Yes, Your Honor.  We would move on cause

12:07:31  7  for Mr. Becho.  There is no case for him.  His father had

12:07:39  8  breast cancer.  He was suffering the very injury that's at

12:07:42  9  issue in the case.  It sounds like his father has metastatic

12:07:46 10  disease.  And that he may have significant sympathy for the

12:07:49 11  plaintiff.  He also indicated that he felt pharmaceutical

12:07:52 12  companies were greedy.  We think he's said more than enough to

12:08:07 13  want to cause challenge for him.  This is way too close to

12:08:11 14  home.  We think the statements about pharmaceuticals being

12:08:15 15  greedy we think more than enough establishes a basis for a

12:08:18 16  cause claim.

12:08:20 17          MR. SCHANKER:  We think the record is clear with regard

12:08:22 18  to Mr. Becho.  He specifically said he won't be sympathetic for

12:08:27 19  plaintiff.  And, Your Honor, I don't even think you needed to

12:08:33 20  rehab him but he answered those questions clearly that when

12:08:38 21  asked these are feelings he could not set aside.  He said, no,

12:08:43 22  I could set them aside.  I think the record is clear.

12:08:47 23          THE COURT:  I have to tell you, I don't think Mr. Becho

12:08:51 24  likes either side.  And I think probably that's he appears to

12:08:58 25  be skeptical to both sides, so I don't think that he appeared

*OFFICIAL TRANSCRIPT*

12:09:02 1   to have some strong sympathy to the plaintiff or to the

12:09:08 2   defendant.  I think he has equal skepticism.  I don't think

12:09:13 3   anybody is starting behind the eight ball with Mr. Becho.  I'm

12:09:19 4   going to deny that challenge.

12:09:21 5        MR. MOORE:  We would also move, Your Honor, on Mr. Tran

12:09:24 6   for the reasons it sounds to be a language barrier on that.

12:09:30 7        MR. SCHANKER:  Your Honor, we would object to that.  I

12:09:35 8   think everybody may have trouble understanding, and I think

12:09:38 9   based on the conversations, Mr. Tran was able to understand the

12:09:42 10  questions that were asked of him and respond to them.  He may

12:09:45 11  not speak perfect English but that isn't grounds for being

12:09:49 12  excused.

12:09:50 13       THE COURT:  I would tell you, we don't need Mr. Tran.

12:09:53 14  We need five more, we have Ms. Miller, Mr. Young, Mr. Prejean,

12:09:59 15  Ms. Wynder, and Mr. Mitchell.

12:10:03 16       MR. MOORE:  I skipped over Ms. Miller.  The concern we

12:10:07 17  have with Ms. Miller is her husband works at Adams & Reese.

12:10:11 18  Adams & Reese is representing a defendant in this litigation

12:10:14 19  and we're concerned about her talking to him or him finding

12:10:17 20  out.  He looks at all of their bills and invoices and we're

12:10:21 21  worried about her saying something during the trial that might

12:10:25 22  cause a problem.

12:10:26 23            We would think that it wouldn't be necessarily

12:10:29 24  appropriate to have someone who is married to a person who

12:10:33 25  works in a law firm who is in this case, Your Honor.

**OFFICIAL TRANSCRIPT**

12:10:36  1          MR. SCHANKER:  Who are we talking about?  I'm sorry.

12:10:39  2          THE COURT:  Ms. Miller, Number 18.  She's the Holy

12:10:39  3   Cross administrator.  Let me call her up.

12:10:50  4              Ms. Miller, could I get you to come up here,

12:10:56  5   please.

12:11:06  6          PROSPECTIVE JUROR 18:  Y'all make me so nervous.

12:11:15  7          THE COURT:  You work in a high school.  It's a bit like

12:11:18  8   being called to the principal's office.

12:11:20  9              Ms. Miller you indicated that your husband works

12:11:23 10   as Adams & Reese, and is he is a lawyer?

12:11:28 11          PROSPECTIVE JUROR 18:  He's not a lawyer.  No.  He's

12:11:29 12   used to be accounts receivable manager and he just got promoted

12:11:33 13   and is a billings manager now.

12:11:36 14          THE COURT:  What does that entail?

12:11:37 15          PROSPECTIVE JUROR 18:  He does work very closely with

12:11:39 16   attorneys and their clients as far as who has -- I know a lot

12:11:43 17   more about his last job but he just got promoted.  You know,

12:11:46 18   like if they haven't paid their bill.  Like, you know, if this

12:11:48 19   client didn't pay.  The lawyer charged them wrong, you know,

12:11:51 20   things like that.

12:11:52 21          THE COURT:  Sure.  Does he ever talk about clients?

12:11:55 22          PROSPECTIVE JUROR 18:  No.

12:11:56 23          THE COURT:  Do you know who his clients are?

12:11:58 24          PROSPECTIVE JUROR 18:  No.  He only, like I talked to

12:12:02 25   Frank today, I'm going back and forth with him.  But not like

*OFFICIAL TRANSCRIPT*

12:12:05  1    details about it.

12:12:06  2         THE COURT:  All right.  Would you know if his clients

12:12:08  3    were, you know, was --

12:12:11  4         PROSPECTIVE JUROR 18:  No.  No.  He doesn't, no.

12:12:13  5    It's -- he doesn't even talk to the clients.  The attorney --

12:12:16  6    he will talk to the attorney, any discrepancies they have, and

12:12:22  7    the attorney will go talk to their client.  So he really

12:12:24  8    shouldn't have any contact.  Like I said I think this was his

12:12:27  9    last job.  I'm not really sure what billing manager entails so

12:12:30 10    much.

12:12:31 11         THE COURT:  If you were selected as a juror in this

12:12:35 12    case, and this is a question you need to be perfectly frank

12:12:39 13    with me about, I'm going to instruct you throughout that you

12:12:42 14    should not discuss this case with your family.  Is that going

12:12:46 15    to be a problem?

12:12:48 16         PROSPECTIVE JUROR 18:  No.

12:12:49 17         THE COURT:  I have coffee with my husband every

12:12:51 18    morning, we talk when I get home from work, you're get in bed

12:12:55 19    and then you have further conversations about what happens

12:12:58 20    every day, do you talk about work or can you put this aside and

12:13:02 21    say, listen, I can't even talk about what this case is about?

12:13:07 22         PROSPECTIVE JUROR 18:  Yeah.  I don't think we talk

12:13:09 23    about this at all.  Honestly, like we're going to be so busy

12:13:12 24    and so crazy.

12:13:17 25         THE COURT:  What do you talk about at home?

**OFFICIAL TRANSCRIPT**

12:13:19 1          PROSPECTIVE JUROR 18:  Me and my husband or me?

12:13:22 2          THE COURT:  Yes.

12:13:22 3          PROSPECTIVE JUROR 18:  When we get five minutes to talk

12:13:26 4   to each other after all of the activities of the day and me

12:13:28 5   working, we sit down and watch a TV show together.  Honestly,

12:13:32 6   that's kind of our thing.

12:13:34 7          THE COURT:  Would it be a problem for you not discuss

12:13:36 8   this case with him?

12:13:37 9          PROSPECTIVE JUROR 18:  No, it wouldn't be a problem at

12:13:39 10  all.

12:13:40 11         THE COURT:  Okay.

12:13:41 12         PROSPECTIVE JUROR 18:  No, I don't see any reason why I

12:13:43 13  bring this up to him.

12:13:45 14         THE COURT:  Would you like to ask further questions?

12:13:47 15         MS. SASTRE:  Please.  Ma'am, just a couple questions.

12:13:49 16  So, I'm married with kids and busy too, I get all that, being

12:13:58 17  too busy to talk.  Don't you think you might go home and have a

12:14:02 18  conversation, hey, did you get picked for that jury?

12:14:05 19         PROSPECTIVE JUROR 18:  Yeah, he definitely has that.

12:14:09 20         MS. SASTRE:  Next thing I would imagine is something

12:14:11 21  like, what kind of case is it?  Again, without going into

12:14:15 22  detail, do you think you might, say, have a conversation with

12:14:19 23  him?

12:14:20 24         PROSPECTIVE JUROR 18:  If you all say, no, I would say

12:14:24 25  we can't talk about it at all, not until it's over.

*OFFICIAL TRANSCRIPT*

12:14:27  1          MS. SASTRE:  You can assure us?

12:14:29  2          PROSPECTIVE JUROR 18:  That's what I would tell him.

12:14:31  3          MS. SASTRE:  You can assure us it you wouldn't say it

12:14:34  4     involves Taxotere and chemotherapy drug or this lady is suing?

12:14:37  5          PROSPECTIVE JUROR 18:  I would really try not to.  I

12:14:43  6     would feel like I would get in trouble.

12:14:44  7          MS. SASTRE:  Do you have any doubts you would not be

12:14:46  8     able to -- the reason we're asking you --

12:14:49  9          PROSPECTIVE JUROR 18:  Where he works.

12:14:50 10          MS. SASTRE:  I don't want to put this incredible with

12:14:52 11     weight or burden on you.

12:14:54 12          PROSPECTIVE JUROR 18:  I would feel like I would really

12:14:56 13     try not to.  Just because you're only because you're saying it,

12:15:00 14     no, I would never only because you're saying it, like if I came

12:15:05 15     home at the end of the day, God, I don't want to hear about

12:15:08 16     cancer, the possibly, I don't know.

12:15:11 17          MS. SASTRE:  That you might share.

12:15:12 18          PROSPECTIVE JUROR 18:  But I don't -- yes, I don't feel

12:15:15 19     like I would ever sit down and say this happened or this

12:15:18 20     happened, like give him a run through of what happened at the

12:15:21 21     day, may something slip out or we heard from this doctor all

12:15:25 22     day.  Now you're making me think that.  That's the only reason

12:15:29 23     you're putting that in my head.

12:15:30 24          MS. SASTRE:  We're not saying your answers or response

12:15:33 25     won't get you into any trouble.  I'm asking you because you

*OFFICIAL TRANSCRIPT*

12:15:36  1    would understand it would seem natural, your conversation, so

12:15:41  2    what's different, though, if you were asking, again, because of

12:15:44  3    where he works and what he does.

12:15:46  4            PROSPECTIVE JUROR 18:  Because of where he works.

12:15:47  5            MS. SASTRE:  And your involvement, see, that's the

12:15:51  6    concern again you might have a --

12:15:53  7            PROSPECTIVE JUROR 18:  If something comes out very

12:15:56  8    occasionally.

12:15:56  9            MS. SASTRE:  You can assure us with certainty?

12:15:59 10            PROSPECTIVE JUROR 18:  Right.  I can say I try my very

12:16:02 11    best.

12:16:03 12            MS. SASTRE:  Thank you.  Very much appreciate it.

12:16:07 13            THE COURT:  I don't think this rises to a level of

12:16:15 14    concern for a cause challenge:

12:16:20 15            MR. MOORE:  I wasn't -- I think we skipped over -- we

12:16:25 16    denied Becho?

12:16:27 17            MR. SCHANKER:  Yes.

12:16:28 18            MR. MOORE:  So that makes Tran a moot point.

12:16:30 19            THE COURT:  It makes him a moot point, yes.  One, two,

12:16:35 20    three, four, five.  We've got our 14.  I'll give and you couple

12:16:39 21    of minutes.

12:16:39 22            MR. SCHANKER:  How do you guys -- how do you handle the

12:16:42 23    back and forth?

12:16:43 24            THE COURT:  She's going to hand them back and forth.

12:16:47 25            THE DEPUTY CLERK:  I'll handle plaintiffs first strike

*OFFICIAL  TRANSCRIPT*

12:16:49 1   and go back and forth.

12:16:52 2             (WHEREUPON, at this point in the proceedings, the bench

12:16:52 3   conference concluded.)

12:16:52 4             (WHEREUPON, at this point in the proceedings, there was

12:17:31 5   a conference held at the bench.)

12:17:31 6             MR. SCHANKER:  Your Honor, Counsel has attempted to

12:26:05 7   execute a peremptory on Juror Number 15, Louis Smith and a

12:26:14 8   *Batson* challenge.

12:26:16 9             THE COURT:  On.  This is the first strike.

12:26:19 10            MR. SCHANKER:  Yes, Your Honor.  That's what I would

12:26:23 11  ask.  I don't need your protocol --

12:26:26 12            THE COURT:  No, no, I think a *Batson* has to be

12:26:29 13  systematic exclusion.  And I think on the first strike, I'm

12:26:34 14  going to give them flexibility to make their first strike.

12:26:37 15  Now, if it becomes a pattern, then I'll take it up with the

12:26:42 16  *Batson* challenge, so perhaps we need to wait and see what

12:26:45 17  happens next, and if there is there was a systematic exclusion

12:26:51 18  of a certain race, then we'll take it up.

12:26:51 19            (WHEREUPON, at this point in the proceedings, the bench

12:33:09 20  conference concluded.)

12:33:09 21            THE COURT:  If I call your name, you're going to be

12:33:12 22  called for jury service.  If I don't, remain seated.  Those

12:33:17 23  whose names are not called, can leave.  You need to return to

12:33:22 24  jury so you can I don't know what they do, but he you need to

12:33:27 25  do something down there.  And I want to thank you all.

*OFFICIAL TRANSCRIPT*

1    Mr. Schanker?

2    MR. SCHANKER:  I'm sorry, Your Honor.  Just that issue

3  that I had raised at sidebar.

4    THE COURT:  Come back up.

5    (WHEREUPON, at this point in the proceedings, there was

6  a conference held at the bench.)

12:33:32  7    MR. SCHANKER:  I'm sorry, just that issue that I had

12:33:34  8  raised sidebar.  I just want to make sure preserve the record

12:33:38  9  that it's our renewed position.

12:33:41 10    THE COURT:  Wait.  Come back up here.

12:33:41 11    (WHEREUPON, at this point in the proceedings, there was

12:33:59 12  a conference held at the bench.)

12:33:59 13    MR. SCHANKER:  Okay.  Your Honor, we at this time make

12:34:09 14  a *Batson* challenge based on the what appear to be systemic

12:34:13 15  peremptory strikes based on race.

12:34:17 16    THE COURT:  Okay.  I think that defendants have excused

12:34:21 17  Mr. Smith.  I would like to hear your response.

12:34:28 18    MR. MOORE:  During voir dire he indicated that his wife

12:34:35 19  passed away from side effects caused by her diabetes medicine.

12:34:41 20  That's the reason to exclude him.

12:34:42 21    THE COURT:  And Ms. Wynder.

12:34:44 22    MR. MOORE:  Ms. Wynder from the questionnaire that she

12:34:51 23  strongly believed that companies don't do enough to warn about

12:34:54 24  their products.  Also, a CNA that works with cancer patients

12:34:58 25  and her father died of lung cancer.

**OFFICIAL TRANSCRIPT**

12:35:01   1        THE COURT:  The Court is satisfied that there is

12:35:06   2   sufficient race-neutral reasons for the exclusion and denies

12:35:11   3   the *Batson* challenge.

12:35:11   4        (WHEREUPON, at this point in the proceedings, the bench

12:35:11   5   conference concluded.)

12:35:31   6                         JURY SELECTION

12:35:31   7        THE COURT:  Again, if I call your name, I'm going to

12:35:33   8   ask you to remain seated.  That means that you've been selected

12:35:37   9   for jury service and those of you whose names are not called

12:35:42  10   should go to jury and they'll do whatever they do.

12:35:46  11             Jury selection -- Mr. Willie Wallace you have

12:35:51  12   been selected, Mr. Terrell Allen, Ms. Emily Miksovic-Anderson,

12:35:57  13   Mr. Austin Autin, Mr. Christian Pisciotta, Ms. Karen Andry,

12:36:04  14   Ms. Wendy Miller, and Mr. David Young.

12:36:07  15             The rest of you may leave.  I'm going to ask

12:36:11  16   those of you whose names have not been called to remain seated.

12:36:18  17   And you can leave your plastic number just on the chair.

          18        THE DEPUTY CLERK:  Would you raise your right hands.

          19   Do you solemnly swear that you will well and truly try the

          20   issues joined between plaintiff and defendant and a true

          21   verdict render according to the evidence and the law as it

          22   shall be given you by the Court, so help you God?

12:40:01  23        VOICES:  I do.

12:40:01  24        THE COURT:  You may be seated.  Members of the Jury,

12:40:10  25   it's a little past lunchtime.  I'm were usually out at noon.

                         ***OFFICIAL  TRANSCRIPT***

12:40:15  1    Let me give you an idea how we're going to proceed today him

12:40:17  2    I'm going to give you some very brief preliminary instructions

12:40:22  3    to guide you through your time as a juror, and then following

12:40:26  4    that we're going to take a lunch break.  And I will give you a

12:40:32  5    little longer for lunch today simply because I know you need to

12:40:36  6    make phone calls to tell family employers that you have been

12:40:41  7    selected for jury service and I wanted to give you an

12:40:44  8    opportunity to do this.

12:40:46  9           I also want to advise you and let you know that

12:40:49 10    are Thursday this week is Veterans Day, and that is a federal

12:40:54 11    holiday and so we will meet Monday, Tuesday and Wednesday.

12:40:59 12    We'll have Thursday off to honor Veterans and then we will

12:41:02 13    return Friday and then next week.  So I'm going to give you

12:41:05 14    some preliminary instructions and then we will break for lunch.

12:41:08 15           All right.  Members of the Jury, now that you

12:41:14 16    have been sworn in, I will give you some preliminary

12:41:17 17    instructions to guide your participation in this trial.  It

12:41:20 18    will be your duty to find the facts based on the evidence

12:41:24 19    presented at trial.  You, and you alone, are the judges of the

12:41:28 20    facts.  You will then have to apply those facts to the law as

12:41:33 21    the Court will give it to you.  You must follow that law

12:41:36 22    whether you agree with it or not.  Nothing the Court may say or

12:41:41 23    do during the course of the trial is intended to indicate or

12:41:45 24    should be taken by you as indicating what your verdict should

12:41:49 25    be.  The evidence from which you will find the facts will

**OFFICIAL TRANSCRIPT**

consist of the testimony of witnesses, documents and other things received into the record as exhibits and any facts that the lawyers stipulate to or that the Court may instruct you to find.

Certain things are not evidence and must not be considered by you.  I will list those for you now.  Statements, arguments and questions by lawyers are not evidence. Objections to questions are not evidence.  Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the Rules of Evidence.  You should not be influenced by the objection or by the Court's ruling.  If the objection is sustained, ignore the question.  If the objection is overruled, treat the answer like any other.  If you are instructed that some item of evidence is received for a limited purpose on me, you must follow that instruction.

Testimony that the Court has excluded or told you to disregard is not evidence and should not be considered. Anything you may have seen or heard outside of the courtroom is not evidence and must be disregarded.  You are to decide the case solely on the evidence and solely on the evidence presented here in the courtroom.

There are two kinds of evidence -- direct and circumstantial.  Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  Circumstantial

*OFFICIAL TRANSCRIPT*

12:43:30  1    evidence is proof from facts from which you may infer or

12:43:36  2    conclude that other facts exist.  I will give you further

12:43:40  3    instructions on the two types of evidence as well as other

12:43:43  4    matters at the end of the case, but please keep in mind that

12:43:46  5    you may consider both kinds of evidence.

12:43:49  6              It will be up to you to decide which witnesses to

12:43:55  7    believe, which witnesses not to believe, and how much of any

12:43:58  8    witness' testimony to accept or reject.  I will give you some

12:44:03  9    guidelines for determining the credibility of witnesses at the

12:44:06  10   end of the case.

12:44:07  11             This is a civil case.  The plaintiff has the

12:44:13  12   burden of proving its case by what's called *a preponderance of*

12:44:16  13   *the evidence*.  That means that the plaintiff has to produce

12:44:19  14   evidence which, when considered in light of all of the evidence

12:44:23  15   presented at trial, leads you to believe that what the

12:44:28  16   plaintiff claims is more likely true than not.  To put it

12:44:32  17   differently, if you were to put the plaintiffs and the

12:44:36  18   defendant's evidence on opposite sides of the scale, the

12:44:39  19   plaintiff would have to make the scale tip somewhat on its

12:44:44  20   side.  If the plaintiff fails to meet this burden, the verdict

12:44:48  21   must be for the defendant.

12:44:51  22             Those of you who have sat as jurors in criminal

12:44:56  23   cases may have heard of proof beyond a reasonable doubt.  That

12:44:59  24   requirement does not apply in a civil case such as this one;

12:45:02  25   therefore, you should put it out of your mind.

*OFFICIAL TRANSCRIPT*

12:45:06  1          As I mentioned, the plaintiff is Elizabeth Kahn

12:45:09  2     and the defendant is Sanofi.  Elizabeth Kahn took a

12:45:13  3     chemotherapy drug called *Taxotere* as part of her treatment for

12:45:16  4     breast cancer.  Ms. Kahn contends that Taxotere prevented her

12:45:21  5     hair from growing back and that she now has permanent hair loss

12:45:25  6     on her head and eyebrows that was caused by Taxotere.  Ms. Kahn

12:45:31  7     also asserts that Sanofi, the manufacturer of Taxotere, did not

12:45:35  8     warn her doctor about the risk of permanent hair loss

12:45:38  9     associated with Taxotere.  Ms. Kahn seeks damages for her

12:45:43 10     injuries from Sanofi.

12:45:44 11          Sanofi denies these allegations and contends that

12:45:48 12     it provided adequate warnings to Ms. Kahn's doctor.  Sanofi

12:45:53 13     contends that Taxotere did not cause Ms. Kahn's alleged

12:45:56 14     injuries.  Sanofi contends that the approved prescribing

12:46:00 15     information contained accurate science-based information that

12:46:05 16     enabled Ms. Kahn's doctor to make an informed decision about

12:46:09 17     the benefits and risks of using Taxotere.

12:46:12 18          Now, a few words about your conduct as jurors.

12:46:18 19     First, during the course of the trial, you are not to discuss

12:46:22 20     the case with anyone or permit anyone to discuss it with you.

12:46:27 21     Until you retire to the jury room at the end of the case to

12:46:31 22     deliberate about your verdict, you are not to talk about this

12:46:33 23     case.  You are prohibited from using any form of communication

12:46:37 24     over the Internet, such as email, instant messaging web sites

12:46:42 25     and blogs, the use of cell phones for text messaging or video

*OFFICIAL TRANSCRIPT*

12:46:46  1   or audio recording and the use of any other recording or

12:46:50  2   transmitting devices to talk about this case is strictly

12:46:55  3   prohibited.

12:46:55  4         Second, do not read or listen to anything

12:47:00  5   relating to this case.  If anyone tries to talk to you about

12:47:04  6   the case, please notify the Court immediately.

12:47:07  7         Third, do not do any research or make any

12:47:12  8   investigation about the case on your own.

12:47:16  9         Fourth, do not talk to any of the people involved

12:47:18 10   in this case, including the attorneys, parties or witnesses.

12:47:23 11         While it is customary that we exchange

12:47:27 12   pleasantries with people with whom we come into contact,

12:47:30 13   especially those that have been raised in south Louisiana, I

12:47:34 14   ask that you do not do so while serving on this jury.  It is

12:47:39 15   important that you not only be fair and impartial, but also

12:47:44 16   that you appear to be fair and impartial.

12:47:47 17         Finally, do not form an opinion about this case

12:47:51 18   until all of the evidence has been presented.  Keep an open

12:47:55 19   mind until you start your deliberations at the end of this

12:47:58 20   case.

12:47:59 21         If you want to take notes during the course of

12:48:02 22   the trial, you may do so.  However, it is difficult to take

12:48:06 23   detailed notes and pay attention to what the witnesses are

12:48:08 24   saying at the same time.  If you do take notes, be sure that

12:48:13 25   your note taking does not interfering with your listening to

**OFFICIAL TRANSCRIPT**

12:48:17 1    and consideration of all of the evidence.

12:48:18 2            Also, if you do intake notes, do not discuss them

12:48:22 3    with anyone before you begin your deliberations.  At the end of

12:48:26 4    the day, you are to leave your notes on the seat of your chair.

12:48:31 5    They will be gathered by my staff and stored overnight and

12:48:34 6    placed on your chairs before we convene in the morning.  Your

12:48:38 7    notes will not be disturbed in any fashion.

12:48:41 8            If you choose not to take notes, remember that it

12:48:45 9    is your own individual responsibility to listen carefully to

12:48:48 10   the evidence.  You cannot give this responsibility to someone

12:48:52 11   who is taking notes.  We depend on the judgment of all of the

12:48:56 12   members of the jury.

12:48:58 13           During the course of the trial, there will

12:49:02 14   undoubtedly be occasions where the attorneys and I will have

12:49:06 15   bench conferences.  Those are conversations that take place at

12:49:10 16   the bench and outside of your hearing.  On some occasions we

12:49:14 17   will ask that you return to the jury room.  Please understand

12:49:17 18   that matters come up during the course of the trial that do not

12:49:21 19   involve the jury.  Please feel free to stand and stretch during

12:49:24 20   those conferences.

12:49:26 21           This trial will begin after the noon recess after

12:49:30 22   the conclusion of my opening instruction.  Here is a brief

12:49:33 23   outline of the course of the trial:  First, each side may make

12:49:37 24   an opening statement.  An opening statement is neither evidence

12:49:41 25   nor argument.  It is an outline of what the party intends to

**OFFICIAL TRANSCRIPT**

12:49:45 1    prove and is offered to help you follow the evidence.  Next,

12:49:48 2    the plaintiff will present its witnesses and the defendant may

12:49:52 3    cross-examine them.  Then the defendant will present his

12:49:56 4    witnesses and the plaintiff may cross-examine them.

12:49:59 5              After all of the evidence is in, the parties will

12:50:02 6    present their closing arguments to summarize and to interpret

12:50:05 7    the evidence for you.  The arguments are intended to present to

12:50:09 8    you the contentions of the respective parties as to what the

12:50:15 9    parties have shown and what inferences may be drawn from the

12:50:17 10   evidence.  As with the opening statements, the closing

12:50:20 11   arguments are not evidence.

12:50:21 12             After the closing arguments, I will instruct on

12:50:24 13   you the applicable law and you will then retire to deliberate

12:50:28 14   and consider your verdict, which must be unanimous.

12:50:31 15             We will now take a recess to give you an

12:50:34 16   opportunity to make phone calls and get lunch.  And we will

12:50:38 17   reconvene at ten after 2:00 and hear opening statements at that

12:50:49 18   time.  Court is in recess until ten after 2:00.

12:50:49 19       (WHEREUPON, at 12:50 p.m., the jury leaves the

12:50:57 20   courtroom.)

12:50:57 21             THE DEPUTY CLERK:  All rise.

12:51:36 22             THE COURT:  Just a quick preliminary matter.  I was

12:51:39 23   concerned about the makeup of the jury and whether we would

12:51:41 24   have sufficient representation throughout the course of the

12:51:44 25   district.  I will tell you, I was a bit surprised that we had

*OFFICIAL TRANSCRIPT*

12:51:53  1   very little falloff from the jurors that were subpoenaed.

12:52:00  2         I see, and unless there is some objection, I

12:52:05  3   think we have a very fair representation of the district.  We

12:52:11  4   talked about this in conference, and so that the record is

12:52:14  5   clear and some other court that may read this is wondering,

12:52:19  6   this is actually the first jury trial since the Delta variant

12:52:26  7   ravaged the State of Louisiana and it follows hurricane Ida,

12:52:34  8   and I believe we talked often as status conferences, we were

12:52:38  9   concerned that there would be such a falloff of jurors actually

12:52:44 10   appearing today or just not appearing, that frankly, I'm

12:52:53 11   pleasantly surprised to report on the record that that has not

12:52:57 12   been an issue, but if somebody wants to say something on the

12:53:00 13   record at this time it is fine to do so.

12:53:02 14      MR. SCHANKER:  Your Honor, the plaintiffs agree with

12:53:04 15   you and have no objection.

12:53:06 16      MS. SASTRE:  Your Honor, we understand that we had

12:53:10 17   about 80 folks that were left after we met with the Court and

12:53:14 18   we understand it we had 72 appear today, so based upon that

12:53:19 19   high turnout, we would agree, Your Honor, you were we don't

12:53:21 20   have an objection.

12:53:23 21      THE COURT:  I was very excited.  Very pleasantly

12:53:29 22   surprised.  Court is recessed until ten after 2:00.

12:53:34 23      (WHEREUPON, at 12:53 p.m., the proceedings were

          24   concluded.)

          25                  *   *   *

***OFFICIAL TRANSCRIPT***

1                       REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4     Merit Reporter, Certified Court Reporter in and for the State

5     of Louisiana, Official Court Reporter for the United States

6     District Court, Eastern District of Louisiana, do hereby

7     certify that the foregoing is a true and correct transcript to

8     the best of my ability and understanding from the record of the

9     proceedings in the above-entitled and numbered matter.

10

11                                    *s/Cathy Pepper*
                                      _____

12                                    Cathy Pepper, CRR, RMR, CCR
                                      Certified Realtime Reporter
13                                    Registered Merit Reporter
                                      Official Court Reporter
14                                    United States District Court
                                      Cathy_Pepper@laed.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25

                        ***OFFICIAL TRANSCRIPT***