UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                        Civil Action No. 16-MD-2740
                        Section "H"(5)
                        New Orleans, Louisiana
                        November 8, 2021

THIS CASE RELATES TO ELIZABETH KAHN 16-CV-17039
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF STATUS CONFERENCE
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE
DAY 1 AFTERNOON SESSION

APPEARANCES:

FOR THE PLAINTIFF:

                   DARIN L. SCHANKER
                   BACHUS & SCHANKER
                   1899 WYNKOOP STREET
                   SUITE 700
                   DENVER, CO 80202

                   MATTHEW PALMER LAMBERT
                   GAINSBURGH BENJAMIN DAVID MEUNIER
                   & WARSHAUER
                   1100 POYDRAS STREET
                   SUITE 2800
                   NEW ORLEANS, LA 70163

                   CHRISTOPHER COFFIN
                   PENDLEY BAUDIN & COFFIN
                   1515 POYDRAS STREET
                   NEW ORLEANS, LA 70112

                   KAREN BARTH MENZIES
                   GIBBS LAW GROUP
                   400 CONTINENTAL BOULEVARD
                   EL SUGUNDO, CA 90245

APPEARANCES CONTINUED:

                        DAVID F. MICELI
                        SIMMONS HANLY CONROY
                        ONE COURT STREET
                        ALTON, ILLINOIS 62002

                        LAWRENCE J. CENTOLA
                        MARTZELL BICKFORD & CENTOLA
                        338 LAFAYETTE STREET
                        NEW ORLEANS, LOUISIANA 70130

                        ZACHARY WOOL
                        BARRIOS KINGSDORF & CASTEIX
                        701 POYDRAS STREET
                        SUITE 3650
                        NEW ORLEANS, LA 70139

                        ROBIN MYERS
                        MURRAY LAW FIRM
                        650 POYDRAS STREET
                        SUITE 2150
                        NEW ORLEANS, LA 70130


FOR SANOFI S.A.:        HILDY M. SASTRE
                        SHOOK HARDY & BACON, LLP
                        201 BISCAYNE BOULEVARD
                        SUITE 3200
                        MIAMI, FLORIDA 33131


                        DOUGLAS MOORE
                        KELLY E. BRILLEAUX
                        IRWIN FRITCHIE URQUHART & MOORE
                        400 POYDRAS STREET
                        SUITE 2700
                        NEW ORLEANS, LA 70130


                        JON STRONGMAN
                        SHOOK, HARDY & BACON
                        1155 F STREET NW, SUITE 200
                        WASHINGTON, DC 20004

APPEARANCES CONTINUED:

                    HARLEY V. RATLIFF
                    SHOOK HARDY & BACON
                    2555 GRAND BOULEVARD
                    KANSAS CITY, MS 64108

Official Court Reporter:     Nichelle N. Drake, RPR, CRR
                             500 Poydras Street, B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7775

   Proceedings recorded by mechanical stenography,
transcript produced via computer.

I N D E X

|  | **Page** |
|---|---|
| **OPENING STATEMENTS** | |
| BY MR. SCHANKER | 133 |
| BY MS. SASTRE | 161 |

E X A M I N A T I O N S

| **Witness via Videotaped Deposition** | **Page** |
|---|---|
| AMY FREEDMAN | 59 |
| FRANCES POLIZZANO | 85 |

**1**               P R O C E E D I N G S

02:17:44PM  **2**               (Call to order of the court.)

02:17:44PM  **3**          THE COURT:  Are you all ready?

02:17:46PM  **4**          MR. SCHANKER:  Yes, ma'am.

02:17:47PM  **5**          THE COURT:  Okay.  Thank you.

02:17:47PM  **6**          MS. SASTRE:  Yes, Your Honor.

02:17:48PM  **7**          THE COURT:  Please bring in the jury.

02:18:10PM  **8**               (Jury enters courtroom.)

02:18:39PM  **9**          THE COURT:  All jurors are present.  Court's back in

02:18:42PM  **10** session.  You may be seated.

02:18:48PM  **11**          Members of the jury, I'm going to ask that you

02:18:51PM  **12** maintain your mask on during the course of these proceedings.

02:18:56PM  **13** But I will tell you, because we have -- we have worked with a

02:19:02PM  **14** very strong protocol associated with the trial teams, I've

02:19:07PM  **15** allowed the attorneys to take off their masks so that they

02:19:10PM  **16** can communicate with one another.  And so -- and we've taken

02:19:17PM  **17** COVID very, very seriously, but I'm going to allow the people

02:19:21PM  **18** at counsel table to take off their masks so that that can

02:19:23PM  **19** help with their communication.

02:19:25PM  **20**          And with that, we're now going to have the opening

02:19:29PM  **21** statements.  Mr. Schanker, you're ready to proceed?

02:19:32PM  **22**          MR. SCHANKER:  Yes, Your Honor.  Thank you.

02:19:32PM  **23**          THE COURT:  Okay.

02:19:32PM  **24**                    OPENING STATEMENTS

02:20:10PM  **25**          MR. SCHANKER:  Good afternoon, folks.  I can only

02:20:15PM **1** imagine the hardships that you are having being here.  But

02:20:20PM **2** this is important to my client, and she is thankful for your

02:20:25PM **3** service.  But the good news, ladies and gentlemen, is that

02:20:29PM **4** you're going to see that this is a simple case.  You're going

02:20:33PM **5** to see it's about a drug company that knows that its drug

02:20:37PM **6** causes a permanent side effect.  And somehow, the result of

02:20:43PM **7** that is that you have an unaware patient who must live with

02:20:48PM **8** the side effect forever.

02:20:50PM **9** So how does that happen?  That space right there that

02:20:56PM **10** we see, that's why we're here today.  And colleagues -- my

02:21:02PM **11** colleagues on the other side of the aisle, they're going to

02:21:06PM **12** tell you something different.  But, ladies and gentlemen,

02:21:07PM **13** we're going to show you with overwhelming evidence what goes

02:21:11PM **14** in that space right there.  You're going to see that the drug

02:21:17PM **15** company does not disclose this new side effect.  So let's go

02:21:27PM **16** ahead and kick things off here, folks.  Cancer -- obviously a

02:21:32PM **17** scary word to hear from your doctor.  We all understand that

02:21:36PM **18** cancer is serious business, right?  We all also understand

02:21:42PM **19** there's all different types of cancer.  And this case

02:21:46PM **20** involves early stage breast cancer.

02:21:50PM **21** And early stage breast cancer is that the -- has not

02:21:55PM **22** spread outside of the breast.  The woman has caught it early,

02:22:02PM **23** fortunately.  It's not metastatic.  It's not a death

02:22:07PM **24** sentence.  It's not that kind of cancer.  Just to be clear,

02:22:10PM **25** metastatic versus early stage breast cancer; metastatic is

02:22:13PM  **1**   when it has spread outside of the breast.  Metastatic breast

02:22:18PM  **2**   cancer, the primary treatment goal, is to delay death, and,

02:22:22PM  **3**   unfortunately, has a low survival rate.  That's not what's

02:22:25PM  **4**   involved in this case.  This case is about the early stage

02:22:31PM  **5**   breast cancer where the primary treatment goal is to cure.

02:22:35PM  **6**   Early stage is curable.

02:22:37PM  **7**        Well, in this case, you're going to hear from several

02:22:40PM  **8**   cancer doctors, oncologists.  You're going to hear from

02:22:45PM  **9**   Ms. Kahn's treating oncologist, and you'll also hear from

02:22:48PM  **10**  oncologists from both sides of the aisle.  And all of them

02:22:51PM  **11**  agree with this point, that is, that early stage breast

02:22:58PM  **12**  cancer is curable.  Well, how is early stage breast cancer

02:23:03PM  **13**  cured?  The goal is, indeed, to cure it, and there's various

02:23:07PM  **14**  treatments for early stage breast cancer.  You have

02:23:08PM  **15**  chemotherapy, surgery, radiation, hormone therapy.  The

02:23:12PM  **16**  chemotherapy is often used before the surgery to shrink the

02:23:15PM  **17**  tumor in order to preserve the breast tissue.  Surgery is

02:23:20PM  **18**  then used to remove the tumor, because if the tumor is still

02:23:23PM  **19**  there, the cancer's still there.  Localized radiation is used

02:23:29PM  **20**  to kill any other remaining cancer cells that may be there,

02:23:32PM  **21**  and then hormone therapy is often used to help prevent

02:23:36PM  **22**  recurrence.

02:23:39PM  **23**       I found this interesting.  With regard to those

02:23:43PM  **24**  treatments, what contribution does each make to curing a

02:23:49PM  **25**  woman's cancer -- early stage breast cancer case like this,

02:23:52PM  **1**  and you'll see that the survivability studies show that if

02:23:55PM  **2**  you took 100 women, 93 of them are saved because of the

02:24:01PM  **3**  surgery, 2 percent because of the hormone therapy, 1 percent

02:24:05PM  **4**  because of the chemotherapy, and then 4 percent don't make it

02:24:10PM  **5**  because of recurrence or for some other reason, like being in

02:24:15PM  **6**  a car crash or something.  But importantly, obviously all of

02:24:20PM  **7**  these treatments in the curability of cancer is important,

02:24:24PM  **8**  but you'll see that the surgery is really the MVP.

02:24:29PM  **9**       So, ladies and gentlemen, with the early stage breast

02:24:31PM  **10**  cancer, what you have is, you have many different

02:24:34PM  **11**  chemotherapy drugs that are used for it, and you have drug

02:24:38PM  **12**  companies competing to provide that 1 percent cancer benefit.

02:24:45PM  **13**  Well, this case involves a particular type of chemotherapy

02:24:49PM  **14**  class, and they're called taxanes.  And you're going to learn

02:24:54PM  **15**  about that in this case.  You're going to, like, look at the

02:24:57PM  **16**  game film on these taxanes, and the defendant's drug,

02:24:59PM  **17**  Taxotere, is one of those.  And there's two taxanes that

02:25:04PM  **18**  you'll learn about in this case.  There's Taxol, which is not

02:25:07PM  **19**  the defendant drug, and then you've got Taxotere, the

02:25:09PM  **20**  defendant's drug.

02:25:11PM  **21**       And you're going to learn the history of these drugs.

02:25:15PM  **22**  First, you'll see Taxol, not the defendant's drug, has a

02:25:17PM  **23**  generic name, paclitaxel, manufactured by Bristol Myers

02:25:25PM  **24**  Squibb.  Taxol was first approved for any use in 1992,

02:25:26PM  **25**  metastatic breast cancer in 1994, and then in 1999, Taxol was

02:25:34PM   1   approved for early stage breast cancer.  It was the first

02:25:35PM   2   taxane, and then in 1999, when it gained that approval,

02:25:38PM   3   you'll hear that it became the gold standard for chemotherapy

02:25:42PM   4   treatment in early stage breast cancer.

02:25:44PM   5        Taxotere, the defendant's drug -- generic name,

02:25:49PM   6   docetaxel -- first gained approval for metastatic in 1996.

02:25:55PM   7   Then in 2004, Taxol gained approval for early stage breast

02:26:02PM   8   cancer.  And so you can see from this, the defendant drug,

02:26:05PM   9   Taxotere, from the opening kickoff was playing behind in that

02:26:11PM  10   competition to provide that 1 percent chemotherapy benefit.

02:26:15PM  11   Well, ladies and gentlemen, both sides of the aisle, the

02:26:18PM  12   cancer doctors, agree with this, that Taxol and the defendant

02:26:23PM  13   drug, Taxotere, that they're both equally effective.  Because

02:26:30PM  14   Taxol and Taxotere are equally effective, you'll also hear

02:26:34PM  15   the cancer doctors on both sides of the aisle say what?

02:26:37PM  16   They're going to agree that then, as a doctor, they make

02:26:41PM  17   prescription decisions which drug to use between these two

02:26:44PM  18   based on the side effects.  That's how they make the choice.

02:26:50PM  19   So understandably, side effects become very important.

02:26:56PM  20        This system, you'll hear -- there's a system that's

02:26:59PM  21   set up, then, to ensure that patients are informed because

02:27:03PM  22   they want to know what the side effects are.  And it's all

02:27:06PM  23   based on the drug label.  The label is the primary tool,

02:27:09PM  24   you'll see, to disclose these side effects, and you'll see

02:27:13PM  25   that the drug company is the one who owns that label.

02:27:16PM **1**   So this system, how does it work?  Well, when the

02:27:22PM **2**   drug company updates the label, it sets off a chain of

02:27:27PM **3**   events.  Once that label is updated with new information on

02:27:31PM **4**   side effects, information that would be important to

02:27:34PM **5**   patients, here's what happens -- all of these opportunities

02:27:38PM **6**   occur.  Sales representatives then can talk about it, the new

02:27:42PM **7**   information, the updated information, promotional materials

02:27:44PM **8**   are updated, communications to doctors go out to let them

02:27:48PM **9**   know, and then patient pamphlets get updated with the new

02:27:53PM **10**  information that's contained in the label.

02:27:54PM **11**       That then is uniformly distributed to doctors so they

02:27:58PM **12**  know.  And then what can doctors do?  They can tell their

02:28:01PM **13**  patients.  And understand, this situation we're talking

02:28:05PM **14**  about, this conversation specifically concerning

02:28:08PM **15**  chemotherapy, is different than when we go fill a

02:28:10PM **16**  prescription for some sort of medication at the local CVS,

02:28:14PM **17**  right?  You don't have that kind of conversation.  You just

02:28:18PM **18**  go pick up your drug.  But this is much different.  You'll

02:28:22PM **19**  learn in the early stage breast cancer setting, the

02:28:26PM **20**  conversation between the oncologist, the cancer doctor, and

02:28:27PM **21**  the patient, this decision on what combination chemotherapy

02:28:31PM **22**  drugs to use because of side effects.

02:28:34PM **23**       So chemotherapy and alopecia, or hair loss.  Well,

02:28:41PM **24**  first of all, let's talk about that term, "alopecia."  Fancy

02:28:46PM **25**  scientific word.  It just means hair loss.  That's it.  It's

02:28:49PM **1**   like a substitute word.  Well, what are you going to learn

02:28:53PM **2**   about in this trial?  Some things that you already knew.

02:28:55PM **3**   Alopecia or hair loss with chemotherapy, that was always

02:28:58PM **4**   thought before all of this to be a common, yet temporary

02:29:01PM **5**   condition.  We heard talk in the jury selection about hair,

02:29:05PM **6**   but I want you to listen closely in this case.  And what you

02:29:08PM **7**   will learn is that it used to be that many chemotherapy drugs

02:29:12PM **8**   cause this common, yet temporary condition.  But this case,

02:29:18PM **9**   ladies and gentlemen, this case is about something totally

02:29:21PM **10**  different.  A totally different ball game.

02:29:23PM **11**      Permanent chemotherapy-induced alopecia, PCIA, is a

02:29:29PM **12**  different condition.  With PCIA, some or all of the hair

02:29:35PM **13**  never grows back.  And you'll learn in this case that there

02:29:38PM **14**  are two types of PCIA.  There's Grade 1, which is loss of

02:29:44PM **15**  volume of hair.  That's what you can't see with the naked

02:29:48PM **16**  eye.  If a woman had this and you walked by her on the

02:29:52PM **17**  street, you wouldn't notice it.  She might know, but others

02:29:55PM **18**  wouldn't notice it.  And then you've got the Grade 2 PCIA.

02:30:00PM **19**  This is the PCIA that you can clearly see with the naked eye

02:30:05PM **20**  and the scalp is visible.  It's what you may call double-take

02:30:10PM **21**  hair loss, when you notice it and then you may look again.

02:30:14PM **22**      And that's an image from the scientific journals of a

02:30:17PM **23**  woman with the Grade 2 PCIA.  Well, prior to Taxotere coming

02:30:22PM **24**  on the market, hair loss with this early stage breast cancer

02:30:26PM **25**  treatment was always considered reversible.  After Taxotere

02:30:30PM   1    came on the market for early stage breast cancer, patients

02:30:35PM   2    began experiencing PCIA.  The Grade 2 PCIA, which you're

02:30:40PM   3    going to see, ladies and gentlemen, is the signature injury

02:30:44PM   4    of Taxotere.

02:30:45PM   5         So put it all together here and what do you see?  You

02:30:51PM   6    see that Sanofi knew that Taxotere causes PCIA.  Sanofi did

02:30:56PM   7    not disclose the risk of PCIA, and as a result, Ms. Kahn must

02:31:01PM   8    live with PCIA forever.  And in this case, I ask you just to

02:31:05PM   9    listen carefully when we hear the terms "hair loss" and

02:31:10PM   10   "permanent hair loss," "temporary hair loss," different

02:31:14PM   11   things, "alopecia," "temporary," "permanent."  Just listen

02:31:19PM   12   carefully to those because it's important, the distinction

02:31:23PM   13   between those in this case, and you'll see why.

02:31:26PM   14        So if we break this down, what will the evidence show

02:31:29PM   15   you in this case?  First, that Sanofi knew that Taxotere

02:31:33PM   16   causes PCIA.  Well, let's go back to 2006, which is a big

02:31:40PM   17   year in this case.  Ladies and gentlemen, we think about it

02:31:45PM   18   as a big year for the New Orleans Saints.  That's the year

02:31:49PM   19   that Payton and Brees first teamed up, 2006, right?  Well, in

02:31:54PM   20   this case, that's a big year.  You're going to hear from this

02:31:59PM   21   woman, her testimony.  She's the global safety officer for

02:32:03PM   22   Taxotere -- one of the two global safety officers -- works

02:32:07PM   23   for the defendant company, Amy Freedman.  And Dr. Freedman

02:32:12PM   24   admits that by 2006, Sanofi knew that Taxotere causes PCIA.

02:32:18PM   25   It's important.  By '06, she knew.  Sanofi knew.

02:32:25PM  1          Dr. Freedman goes on to admit that "temporary" and

02:32:28PM  2     "permanent" are clearly different hair loss outcomes, and

02:32:32PM  3     she's going to testify that Sanofi is required to disclose

02:32:36PM  4     up-to-date safety information on Taxotere's label.  And this

02:32:40PM  5     is important.  You remember the system that we talked about

02:32:43PM  6     and how it's based, and that the patients count on this

02:32:46PM  7     information.  And what you'll see in this case, ladies and

02:32:49PM  8     gentlemen, is that the company has the obligation to update

02:32:52PM  9     the label.  What the company knows, it must disclose in the

02:32:57PM 10     label.  You'll see that's the golden rule of labeling.  And

02:33:01PM 11     right here, Amy Freedman acknowledges that requirement.  And

02:33:05PM 12     you'll hear about that in this case.

02:33:08PM 13          By the way, you'll hear from Dr. Freedman on a video.

02:33:13PM 14     It's a video of testimony that will be brought to you

02:33:16PM 15     recorded because she is far away from here.  But we

02:33:19PM 16     determined that you need to hear from her.  She's a Sanofi

02:33:23PM 17     employee, and there's several employees that will be

02:33:26PM 18     presented via video.  And those can sometimes be taxing to

02:33:31PM 19     watch, but we're doing that because it's important.  So we

02:33:34PM 20     ask that you do your best to pay attention to those.  We

02:33:37PM 21     tried to trim those down for you.

02:33:41PM 22          But you'll hear from Dr. Freedman.  2006; that's when

02:33:44PM 23     they knew.  And that's important because Elizabeth Kahn

02:33:47PM 24     received her chemotherapy in 2008, two full years later.  So

02:33:51PM 25     Sanofi knew that Taxotere causes Grade 2 PCIA.  Sanofi did

| | |
|---|---|
| 02:33:57PM | **1** |
| 02:34:06PM | **2** |
| 02:34:09PM | **3** |
| 02:34:13PM | **4** |
| 02:34:18PM | **5** |
| 02:34:24PM | **6** |
| 02:34:29PM | **7** |
| 02:34:32PM | **8** |

02:33:57PM **1** not disclose the risk of PCIA.  You're going to hear from

02:34:06PM **2** this gentleman.  He's the other global safety officer for

02:34:09PM **3** Sanofi, Dr. Palatinsky.  And Dr. Palatinsky is going to tell

02:34:13PM **4** you that he knew about Taxotere and permanent hair loss as

02:34:18PM **5** well.  And he admits that no label disclosed the risk of

02:34:24PM **6** irreversible hair loss for the seven years that he was the

02:34:29PM **7** global safety officer.  So the label was never updated with

02:34:32PM **8** that information.

02:34:34PM **9**        Now, 2006, as we sit, is a big year in this case.  It

02:34:39PM **10** was a big year for your football team too, right?  That's the

02:34:42PM **11** year the Saints came back to the dome after being away for

02:34:48PM **12** Katrina.  2006, a big year in this case.  You'll see that

02:34:52PM **13** this meeting took place.  This is a confidential meeting on

02:34:55PM **14** this very topic.  Sanofi met and discussed updating the

02:34:59PM **15** Taxotere label disclosures in '06, and at that confidential

02:35:03PM **16** meeting, they discussed different ways to disclose this new

02:35:07PM **17** condition, this nonreversible hair loss in the Taxotere

02:35:11PM **18** label.  So what happened?  After the meeting, Sanofi did not

02:35:15PM **19** update the label to disclose what they knew.  Remember, when

02:35:20PM **20** a company knows, it must disclose in a label.  The golden

02:35:26PM **21** rule of labeling.

02:35:27PM **22**        So 2006, you also have this happening -- and this is

02:35:31PM **23** going to be important, folks -- you have an oncology

02:35:35PM **24** abstract.  That's just a one-pager that a doctor puts

02:35:38PM **25** together.  And this Denver doctor, cancer doctor, had noticed

02:35:41PM  1    something interesting in his patient population.  And

02:35:44PM  2    remember, this is '06 -- two full years before Ms. Kahn

02:35:47PM  3    receives the Taxotere.  Dr. Sedlacek, on his own, notices

02:35:54PM  4    something.  And he writes in the abstract that he always told

02:35:59PM  5    the female patients that, don't worry, it'll come back.  He's

02:36:03PM  6    talking about their hair, right?  This last statement may not

02:36:06PM  7    be true, and he looked at the combination chemotherapy that

02:36:10PM  8    he provides to his patients.  And you'll learn in this case

02:36:14PM  9    that when these folks received the chemotherapy for early

02:36:19PM 10    stage breast cancer, they don't just receive one

02:36:20PM 11    chemotherapy, they receive several different drugs.

02:36:23PM 12         But he was able to isolate these drugs and figure out

02:36:29PM 13    that the Taxotere was resulting in something, and what it was

02:36:32PM 14    was this.  And you see the photographs there on the right.

02:36:36PM 15    And we know now that that's the Grade 2 PCIA.  At that time,

02:36:41PM 16    they didn't even have a name for it yet.  Dr. Sedlacek goes

02:36:46PM 17    on to explain that such a devastating, emotional, long-term

02:36:51PM 18    toxicity -- emotionally devastating long-term toxicity must

02:36:56PM 19    be taken into account when these women will likely be cured

02:37:00PM 20    of their breast cancer.  Well, this abstract, we know that

02:37:06PM 21    Sanofi knew about this in 2006.  They knew Grade 2 in 2006,

02:37:11PM 22    two years before Elizabeth Kahn received her chemotherapy,

02:37:15PM 23    her Taxotere.  And how do we know that?

02:37:17PM 24         Well, you're going to hear from this woman.  This is

02:37:20PM 25    the sales representative, Ruth Avila.  And Ruth Avila's job

02:37:27PM  1    in this case specifically was to call on doctors and inform

02:37:31PM  2    them about this very drug, Taxotere, as a Sanofi sales rep.

02:37:36PM  3    And she was originally told by Sanofi that hair loss was

02:37:39PM  4    temporary.  That's what everybody thought.  But she was at a

02:37:43PM  5    meeting with other sales representatives, and the Sedlacek

02:37:48PM  6    study and permanent hair loss were brought up.  At that

02:37:54PM  7    meeting, Sanofi directed her and other sales reps not to

02:37:59PM  8    disclose the Sedlacek study with doctors.  She was prevented

02:38:01PM  9    from sharing this information with the very doctors that she

02:38:04PM  10   was talking to and speaking with about Taxotere.

02:38:08PM  11        And the reason that she couldn't tell any of them was

02:38:12PM  12   because the label had not been updated.  And if the label's

02:38:16PM  13   not updated, then the sales representatives couldn't talk

02:38:20PM  14   about it.  The megaphone had not been activated because the

02:38:24PM  15   label wasn't updated.  And who did she call on, who was one

02:38:27PM  16   of the doctors that she would go and visit?  It was

02:38:30PM  17   Dr. Kardinal.  And so this information didn't make it through

02:38:33PM  18   the system.  This document, 2006, alopecia tear sheet.  Now,

02:38:43PM  19   I can't wait for you to see this document, folks, because

02:38:46PM  20   it's important.  And what you're going to see is, this is an

02:38:48PM  21   educational material that is to explain -- it's made by

02:38:52PM  22   Sanofi, and it's there to explain what the label means

02:38:55PM  23   because sometimes the label can be confusing, and it's for

02:38:58PM  24   doctors and patients.  It's designed by Sanofi.

02:39:02PM  25        And look how it defines alopecia.  And this is '06.

02:39:06PM **1**   Defines it as "A common, yet temporary side effect."  Goes on

02:39:12PM **2**   to say, "If you lose your hair, it will usually grow back

02:39:15PM **3**   after the treatments are over.  It may grow back while you're

02:39:18PM **4**   still having treatments."  It's referring right there to when

02:39:22PM **5**   your hair will grow back.  But specifically, folks, look how

02:39:26PM **6**   it defines alopecia; "As a common, yet temporary side

02:39:29PM **7**   effect."

02:39:30PM **8**        And Ruth Avila will testify that she distributed

02:39:34PM **9**   these on a regular basis to doctor's offices to Ochsner,

02:39:37PM **10**   which is where Dr. Kardinal was.  So at the same time

02:39:41PM **11**   Sanofi's preventing her from disclosing what the company

02:39:45PM **12**   knows about the Grade 2 PCIA, she's handing out these

02:39:50PM **13**   documents that say that alopecia is temporary.  So if we

02:39:59PM **14**   think about it here, we've got -- in the years before

02:40:02PM **15**   Elizabeth Kahn took the Taxotere, what do we know?  We know

02:40:07PM **16**   Sanofi knew the side effect, the side effect of PCIA, right?

02:40:11PM **17**   They knew Grade 2.  They knew it was devastating to women --

02:40:16PM **18**   not my words, but the doctor's words, this permanent Grade 2

02:40:21PM **19**   PCIA.  And they knew that what a company knows it must

02:40:23PM **20**   disclose in the label.  They knew all those things.  So what

02:40:26PM **21**   did they do with that information they had?  Did they make

02:40:29PM **22**   any change in the label with respect to this?

02:40:32PM **23**        Well, let's go back to the first label, the 1996

02:40:36PM **24**   label, metastatic cancer.  Remember, that's when it first --

02:40:39PM **25**   Taxotere came out in 1996.  What did Sanofi know, and what

02:40:43PM   1   did they disclose?  And you'll hear from this Sanofi

02:40:45PM   2   employee, Jean-Philippe Aussel.  He's a 20-year employee with

02:40:49PM   3   Sanofi.  He's like the seasoned coach.  Worked on Taxotere.

02:40:53PM   4   And he'll tell you that Taxotere was only approved for

02:40:56PM   5   metastatic breast cancer when it came on the market, so there

02:40:59PM   6   were no long-term studies.  So it comes on the market for

02:41:02PM   7   metastatic breast cancer.  It's not used for early stage

02:41:05PM   8   breast cancer.  They don't know that it causes the PCIA at

02:41:07PM   9   this time because the women who got it weren't surviving or

02:41:12PM  10   would be on chemotherapy regimens for the rest of their

02:41:16PM  11   lives.  So they didn't know back in 1996.  And because of

02:41:20PM  12   that, that language that they used in '96 could not have been

02:41:24PM  13   a warning about permanent hair loss because you can't warn

02:41:31PM  14   about something you don't know about.

02:41:32PM  15        So what did Sanofi change, if anything, in the label

02:41:35PM  16   over the years?  Well, that's the very first Sanofi label for

02:41:39PM  17   metastatic.  It says, "Once you have completed all your

02:41:41PM  18   treatments, hair generally grows back."  Mr. Aussel, Sanofi

02:41:45PM  19   employee, will testify that that was not a warning for

02:41:48PM  20   permanent hair loss.  2006, you have the global safety

02:41:53PM  21   officer, Amy Freedman, acknowledging that at that point in

02:41:55PM  22   time, Sanofi knew of the PCIA.  Dr. Palatinsky, the other

02:42:01PM  23   global safety officer, will tell you there's no change in the

02:42:03PM  24   label with regard to that in 2006.  2007, you'll hear

02:42:08PM  25   Dr. Palatinsky, no change in the label concerning that.  Same

02:42:12PM  **1**   in 2008.  2008, and that's when Ms. Kahn meets with Dr.

02:42:23PM  **2**   Kardinal, her oncologist, to have a conversation about the

02:42:26PM  **3**   side effects and which chemotherapy regimen she should take.

02:42:31PM  **4**        No change in the label.  So step back and look at the

02:42:34PM  **5**   system and how it's supposed to work and what happens when

02:42:37PM  **6**   you don't disclose what you know in the label.  Well, the

02:42:41PM  **7**   label gets -- the update doesn't happen.  It gets muted.

02:42:47PM  **8**   None of these sources are blasting the information out, which

02:42:51PM  **9**   means doctors don't uniformly receive it.  And so patients

02:42:55PM  **10**  such as Ms. Kahn aren't informed and don't have the ability

02:42:59PM  **11**  to make an informed decision.

02:43:03PM  **12**       So the result of this, folks, is Ms. Kahn takes the

02:43:09PM  **13**  Taxotere, not knowing about this side effect of Grade 2 PCIA

02:43:15PM  **14**  and gets the signature injury that she has to live with

02:43:20PM  **15**  forever.  So you're going to get to know Elizabeth Kahn in

02:43:28PM  **16**  this case.  You'll see that she is born and raised here.

02:43:31PM  **17**  She's a librarian for middle school and high school.  She's

02:43:37PM  **18**  been married to her husband for 25 years.  And she discovered

02:43:40PM  **19**  this cancerous lump back in 2008, and she and her oncologist,

02:43:45PM  **20**  Dr. Kardinal, came together, and came up with a plan.  And

02:43:49PM  **21**  you'll see that the plan was to use a Phase III clinical

02:43:52PM  **22**  trial.  And this is important, folks.

02:43:54PM  **23**       I want to make sure that there's no confusion that

02:43:56PM  **24**  the evidence is clear in this, that all doctors say that that

02:44:00PM  **25**  is the most effective, this plan that she picked, and all of

**OFFICIAL TRANSCRIPT**
Page 147

02:44:04PM  1   the drugs were FDA-approved.  This is a Phase III clinical

02:44:08PM  2   trial.  This is not a last-ditch metastatic, no-other-hope

02:44:13PM  3   type of clinical trial Phase I.  The evidence is clear on

02:44:16PM  4   that, and everybody agrees.  You'll see that all clinical

02:44:22PM  5   trials are off-label -- you've heard that term and you're

02:44:26PM  6   going to be educated on that, that all the best ESBC cancer

02:44:32PM  7   combination chemotherapies are off-label.  So you'll learn

02:44:35PM  8   about what those words really mean.

02:44:37PM  9          And understand that Ms. Kahn did not give up her

02:44:40PM 10   rights because she chose the clinical trial that she did.

02:44:44PM 11   Now, that's why she's allowed to be here in court right now.

02:44:48PM 12   But Dr. Kardinal and Ms. Kahn walked through the informed

02:44:51PM 13   consent in this case.  Informed consent is when you sit down

02:44:56PM 14   and go through all the side effects and those sorts of things

02:45:00PM 15   with the doctor, and you'll see this was not a quickie sign

02:45:03PM 16   here, sign here, sign here kind of informed consent.  Cancer

02:45:06PM 17   and chemotherapy are serious, and it's a serious situation,

02:45:11PM 18   folks, not to be taken lightly, obviously.

02:45:13PM 19          And the informed consent, I look forward to you

02:45:17PM 20   seeing it in this case.  29 pages long.  Nowhere in there

02:45:20PM 21   does it say "Permanent hair loss" or "PCIA."  It says "Hair

02:45:25PM 22   loss."  That's it.  And the reason it doesn't say anything

02:45:27PM 23   about that is because Sanofi did not update the label.  And

02:45:32PM 24   so the megaphone wasn't activated to get this information

02:45:36PM 25   into this informed consent.  Well, the informed consent goes

02:45:40PM 1   on to talk about other side effects that cannot be predicted.

02:45:45PM 2   Well, what will you see in this case?  You're going to see

02:45:49PM 3   that this was a known predictable side effect, because two

02:45:54PM 4   years earlier, we know that Sanofi knew about PCIA.

02:45:57PM 5            Informed consent also talks about other serious

02:46:00PM 6   risks, right, including death.  Well, cancer and chemotherapy

02:46:05PM 7   are serious.  Anyone who undergoes chemotherapy can have the

02:46:10PM 8   risk of a reaction that can cause death.  That's why every

02:46:13PM 9   chemotherapy drug has in it that risk.  You can't do

02:46:16PM 10  chemotherapy without taking that risk, but you can do

02:46:19PM 11  chemotherapy without taking the risk of Grade 2 PCIA.

02:46:27PM 12           So thinking that she knew about the side effects,

02:46:30PM 13  Ms. Kahn started her chemotherapy, and her hair fell out

02:46:34PM 14  after her first treatment of Taxotere.  Little did she know

02:46:37PM 15  that Taxotere was permanently destroying her follicles at

02:46:41PM 16  that point in time, her hair follicles.  Now, the surgery was

02:46:45PM 17  necessary because the cancer wasn't eradicated.  They did the

02:46:51PM 18  chemotherapy first to shrink the cancer, which was, when she

02:46:54PM 19  started out, probably about the size of a walnut, and it

02:46:59PM 20  shrunk down to the size of a pea.  What you're going to hear,

02:47:02PM 21  folks, is that pea can still kill you.  When her hair was not

02:47:06PM 22  returning, Ms. Kahn expressed her frustration in a blog

02:47:09PM 23  comparing herself to her bald father.  She said, "Did you

02:47:12PM 24  know that I come by baldness naturally?"  And she says she's

02:47:15PM 25  working on her hair, but it's not a quick process.  Folks,

02:47:19PM  1   little did she know that this was going to be her fate.

02:47:22PM  2        When her hair growth stopped, we know now that that's

02:47:27PM  3   because of this follicular destruction.  She spoke to her

02:47:31PM  4   gynecologist about it, and you're going to see, folks, that

02:47:33PM  5   the medical community was in the dark on this at the time

02:47:36PM  6   because the megaphone had not been activated with a label

02:47:40PM  7   change.  And so the doctor told her that it must be

02:47:45PM  8   age-related.  Wasn't aware of PCIA with early stage breast

02:47:50PM  9   cancer.

02:47:51PM  10       Today, ladies and gentlemen, Ms. Kahn has the Grade 2

02:47:55PM  11  PCIA.  She has the forever hair loss.  Well, in this case,

02:47:58PM  12  you're going to hear about the treating doctors, you're going

02:48:02PM  13  to meet Dr. Kardinal, who was the Ochsner oncologist who

02:48:07PM  14  advised Ms. Kahn, made the recommendations, was the only

02:48:11PM  15  doctor who walked her through the informed consent, walked

02:48:15PM  16  her through the side effects, took her through all of these

02:48:18PM  17  treatment choices.  Ms. Kahn started the Taxotere with

02:48:23PM  18  Dr. Kardinal before he left Ochsner.  She had her first

02:48:25PM  19  treatment with chemotherapy with the Taxotere in that part of

02:48:30PM  20  the first stage of the regimen.  And then Dr. Kardinal left,

02:48:33PM  21  and then Ms. Kahn's hair fell out before she started treating

02:48:37PM  22  with her next oncologist, who is Dr. Larned, who finished the

02:48:43PM  23  treatment course that was started by Dr. Kardinal.

02:48:46PM  24       You're going to see that neither of these two

02:48:49PM  25  doctors -- first of all, no one says they did anything wrong.

02:48:53PM 1  But neither of these two doctors told Ms. Kahn of the risk of

02:48:54PM 2  the PCIA -- remember, the megaphone had not been activated,

02:48:59PM 3  so that information wasn't out there.  Neither Kardinal nor

02:49:02PM 4  Larned knew what Sanofi knew.  Remember, Ruth Avila called on

02:49:06PM 5  both of these doctors, but wasn't permitted to tell them

02:49:09PM 6  about the Grade 2.  Instead, distributed the pamphlet that

02:49:17PM 7  said that alopecia was what?  Was temporary.

02:49:19PM 8      You'll see in this case, and you'll get to learn all

02:49:23PM 9  of this, this is the treatment regimen that Ms. Kahn

02:49:27PM 10  received, the rounds of chemotherapy, the different

02:49:29PM 11  combination drugs she received, and then a tamoxifen is a

02:49:34PM 12  pill, a hormone pill that patients with this sort of early

02:49:39PM 13  stage breast cancer take for this period of time.  So that

02:49:40PM 14  was her treatment regimen.  And importantly, Dr. Larned will

02:49:46PM 15  testify that Ms. Kahn's PCIA never fully resolved after her

02:49:50PM 16  first dose of Taxotere.

02:49:52PM 17      So ladies and gentlemen, on this issue, Ms. Kahn took

02:49:56PM 18  the multiple drugs, as you can see here.  Does that mean you

02:49:59PM 19  can't figure out which one was a substantial factor in

02:50:02PM 20  causing it?  Does that mean you can't figure it out?  It

02:50:07PM 21  reminds me of the little text message you receive with the

02:50:11PM 22  little emoji that's kind of like, "who knows."  Is that the

02:50:15PM 23  answer to this?  No, it's not.  And you'll see that it can be

02:50:18PM 24  figured out, and it was in this case.

02:50:20PM 25      We're going to bring to you Dr. Tosti who knows as

02:50:23PM **1** much about the causes of hair loss as anybody in the world.

02:50:26PM **2** She was one of the first to identify and report this new

02:50:30PM **3** condition 15 years ago, PCIA, in the literature.  Ms. Kahn

02:50:35PM **4** gave Tosti access to all of her medical records, all of her

02:50:39PM **5** photographs -- by the way, she gave access to the defense all

02:50:44PM **6** of this stuff, as well.  She was an open book in this case.

02:50:47PM **7** And you're going to see that Tosti examined Ms. Kahn in

02:50:52PM **8** person, looked at her scalp under the microscope, did a

02:50:55PM **9** biopsy, and here's what you're going to see.

02:50:57PM **10** Ladies and gentlemen, to determine cause she looks at

02:51:00PM **11** all these combination therapies.  And what she does is, she

02:51:02PM **12** looks at those that used Taxotere in the combination, and

02:51:05PM **13** that same combination removing Taxotere.  You put the

02:51:08PM **14** Taxotere in the combination, you take the Taxotere out of the

02:51:14PM **15** combination, and what you see is, with the Taxotere in, you

02:51:18PM **16** get the Grade 2 PCIA.  And so the evidence will show you that

02:51:22PM **17** you put the Taxotere in, you take the Taxotere out.  You put

02:51:27PM **18** the Taxotere in, you get the Grade 2 on the scalp.

02:51:33PM **19** And they do that with all of these drugs, and that's

02:51:38PM **20** how they determined that the common factor with Grade 2 PCIA

02:51:43PM **21** is Taxotere.  Ladies and gentlemen, the question is Taxotere

02:51:47PM **22** a substantial factor?  Is it the player that contributes

02:51:51PM **23** substantially to causing PCIA?  You're going to see it's like

02:51:56PM **24** asking the question was Drew Brees a substantial factor?

02:52:01PM **25** It's a no-brainer, folks.

02:52:04PM **1**      All of our experts agree that there were a handful of

02:52:09PM **2** case reports of PCIA for some of the chemotherapy drugs that

02:52:15PM **3** Ms. Kahn took, but all PCIA is not the same.  Remember, you

02:52:19PM **4** have Grade 1, which is the not visible to a naked eye, loss

02:52:24PM **5** of volume of hair and you have the Grade 2, which is the

02:52:29PM **6** scalp being visible.  This case is about Grade 2.  Ms. Kahn

02:52:35PM **7** would not be here if this was a Grade 1 case.  The evidence

02:52:39PM **8** is overwhelming, ladies and gentlemen, that you'll see that

02:52:42PM **9** the Taxotere is a substantial factor in causing the Grade 2

02:52:47PM **10** PCIA.

02:52:49PM **11**      You're going to see the history of these drugs -- of

02:52:52PM **12** these chemotherapy drugs that Ms. Kahn took and you'll see

02:52:56PM **13** that throughout history for decades, these other drugs --

02:53:00PM **14** you'll get to hear all of this -- there were no reported

02:53:03PM **15** cases of PCIA for these other drugs including the Taxol,

02:53:11PM **16** which was the competing drug -- that first in class -- the

02:53:15PM **17** taxane -- until 1996.

02:53:19PM **18**      And what happens in 1996?  Taxotere comes on the

02:53:21PM **19** market, 2004, approved for early-stage breast cancer and

02:53:24PM **20** you're going to see the explosion of PCIA cases.  The bottom

02:53:27PM **21** line, ladies and gentlemen, you're going to see the evidence

02:53:30PM **22** that Taxotere is a substantial factor in causing Ms. Kahn's

02:53:35PM **23** Grade 2 PCIA.

02:53:36PM **24**      So, Dr. Tosti did the investigation here.  She

02:53:39PM **25** determined Taxotere, substantial factor; she ruled out all

02:53:44PM   **1**   these chemotherapy drugs as being substantial factors.

02:53:48PM   **2**   Tamoxifen was that pill that you take, the 20-milligram pill

02:53:52PM   **3**   that you take for nine years, and you're going to hear that

02:53:55PM   **4**   when you stop taking that, if you have hair loss from it --

02:53:57PM   **5**   which you don't always.  It's rare.  But if you have hair

02:54:00PM   **6**   loss from it, you stop taking the pill, your hair grows back.

02:54:03PM   **7**   Well, there hasn't been any hair regrowth for Elizabeth Kahn.

02:54:07PM   **8**   Nobody's going to tell you that.

02:54:09PM   **9**        Ladies and gentlemen, Dr. Tosti's analysis didn't

02:54:13PM   **10**   stop there.  We anticipate we're going to see in this case

02:54:15PM   **11**   that the defense is going to point the finger at everything

02:54:19PM   **12**   in Ms. Kahn's life but the Taxotere, the "everything but"

02:54:24PM   **13**   defense.  This is a two-week trial.  We know that

02:54:27PM   **14**   Dr. Freedman, the global safety officer for Sanofi, knew back

02:54:29PM   **15**   in 2006 about PCIA, but you're going to see the defendant is

02:54:35PM   **16**   denying in this trial that Taxotere causes it.

02:54:40PM   **17**        We're going to present you with everything in this

02:54:42PM   **18**   case to rule out the other causes -- blood pressure

02:54:47PM   **19**   medication, anti-fungal medication, anti-nausea, a steroid

02:54:53PM   **20**   that she took for a period of time, menopause, vitamin D

02:54:58PM   **21**   deficiency, she had a weight issue for a period of time --

02:55:02PM   **22**   rule it out.  Testosterone gel, hereditary issues.  You're

02:55:08PM   **23**   going to see female members of her family -- that's her

02:55:12PM   **24**   mother that's passed away in the last few years, but that's

02:55:14PM   **25**   her in her 90s and her sister.  You're going to see that

02:55:18PM   1   that's not an issue, family history.

02:55:23PM   2           THE CASE MANAGER:  You have 10 minutes.

02:55:26PM   3           MR. SCHANKER:  Thank you.  Ladies and gentlemen,

02:55:28PM   4   you'll have an opportunity to see what Ms. Kahn looked like

02:55:31PM   5   before -- pictures, photographs -- you're going to see that,

02:55:34PM   6   as I said, she's been an open book; we have over a thousand

02:55:38PM   7   photos.  You can take the time to look at all of them if you

02:55:41PM   8   wish to.  And these pictures were taken in the 2 to 3 years

02:55:44PM   9   prior to this occurring.  Well, Dr. Tosti is going to explain

02:55:47PM   10   to -- you and I think it may be interesting for some of us

02:55:50PM   11   because, man, I didn't know this -- the natural aging process

02:55:54PM   12   and what happens to hair with women.  Not just men lose their

02:55:59PM   13   hair over their lifetime.  Women lose hair volume too, just

02:56:04PM   14   not nearly as dramatically and the result is so mild that

02:56:08PM   15   women keep a reserve of hair so you don't notice it.

02:56:12PM   16           Well, this condition, we're going to hear this

02:56:16PM   17   condition that is described, what I just told you, it's

02:56:19PM   18   called "androgenetic alopecia" and that's something else that

02:56:24PM   19   Dr. Tosti looked at and you'll see that 50 percent of women

02:56:28PM   20   -- 50 percent of women Ms. Kahn's age have this condition but

02:56:33PM   21   we don't see 50 percent of women walking around with the

02:56:36PM   22   Grade 2, do we?  And you'll see that's because they have

02:56:38PM   23   their reserves.  Dr. Tosti will explain to you that prior to

02:56:42PM   24   chemotherapy, Ms. Kahn had normal hair for a woman her age.

02:56:45PM   25   She was aging gracefully.  The Grade 2 PCIA took away her

02:56:50PM **1**  reserves and now the reality is the natural aging process is

02:56:55PM **2**  only going to make it worse.  Androgenetic is ruled out,

02:57:01PM **3**  you'll see, as a substantial factor.

02:57:03PM **4**       Well, you'll see a lot of pictures in this case --

02:57:07PM **5**  before pictures, after pictures -- and I want you to ask

02:57:11PM **6**  yourself what stories they tell.  You're going to see, ladies

02:57:16PM **7**  and gentlemen, that from the time she took the Taxotere until

02:57:20PM **8**  today that Ms. Kahn has had the Grade 2 PCIA.  We've all

02:57:25PM **9**  heard that a picture is worth a thousand words and Ms. Kahn

02:57:29PM **10** turned over nearly a thousand pictures -- and they're all

02:57:32PM **11** going to be available to you if you want them.  You'll also

02:57:37PM **12** see that Ms. Kahn developed what she calls her "signature

02:57:42PM **13** pose" for the photographs.  You can see in most all these

02:57:47PM **14** pictures, her head is just tilted a perfect way and she

02:57:50PM **15** developed that signature pose to hide the signature injury

02:57:54PM **16** when she was photographed.

02:57:55PM **17**      Ladies and gentlemen, in this case you're going to

02:57:57PM **18** see that you can't trust the photos to tell you a complete

02:58:00PM **19** story.  The evidence will show you that if you cherry-pick

02:58:05PM **20** the photos, you can tell just about any story you want.  You

02:58:10PM **21** could tell the story that Ms. Kahn's hair grew back following

02:58:17PM **22** the Taxotere in 2009 and then that she had the Grade 2 in

02:58:24PM **23** 2014 up until the present.  You could tell the story, if you

02:58:28PM **24** wanted to, that Ms. Kahn got the Grade 2 and had it all the

02:58:34PM **25** way up until 2019 and then her hair grew back in 2020.  Or,

02:58:44PM  **1**   ladies and gentlemen, you could tell the story, if you wanted

02:58:47PM  **2**   to, that her hair grew back following the Taxotere in 2009

02:58:52PM  **3**   and she had it all the way up until 2020 and then her hair

02:58:57PM  **4**   fell out.  Or, you could tell the story with the pictures, if

02:59:01PM  **5**   you wanted to, that she had the Grade 2, her hair grew back

02:59:06PM  **6**   in 2010, she got the Grade 2 again in 2011 but in 2012, her

02:59:12PM  **7**   hair grew back again and then in 2014 she went to a

02:59:17PM  **8**   wedding -- these two pictures are taken at the same event.

02:59:20PM  **9**   She went to a wedding with her hair and then she got the

02:59:25PM  **10**  Grade 2 while she was at the wedding and then she had it for

02:59:28PM  **11**  a couple of years and then her hair grew back again for two

02:59:31PM  **12**  years and then she got the Grade 2 again in 2018 and then her

02:59:35PM  **13**  hair grew back in 2019.  But in 2021, she got the Grade 2

02:59:41PM  **14**  again just in time for this trial.  Ladies and gentlemen,

02:59:47PM  **15**  it's like a "choose your own adventure" story.  So how do you

02:59:53PM  **16**  know what happened if you can't trust the pictures?

02:59:57PM  **17**       You're going to have to hear for yourself.  You're

03:00:01PM  **18**  going to have to see all of the evidence, folks.  You will

03:00:07PM  **19**  see that Taxotere caused this signature injury, Grade 2 PCIA,

03:00:11PM  **20**  and the worst of it is, it was all unnecessary.  You had

03:00:17PM  **21**  Taxol, the equally effective alternative, the original gold

03:00:21PM  **22**  standard.  Taxol, you'll see, is not a substantial factor in

03:00:27PM  **23**  causing Grade 2 PCIA, what this case is about.

03:00:31PM  **24**       THE CASE MANAGER:  Five minutes, Mr. Schanker.

03:00:34PM  **25**       MR. SCHANKER:  Thank you.  Ladies and gentlemen, I

03:00:37PM **1**   can't wait for you to hear the rest of our case and to hear

03:00:40PM **2**   what the defense has to say, and I'd ask Ms. Sastre, who's an

03:00:46PM **3**   excellent lawyer, and I'll leave a pad up here and a pen.

03:00:50PM **4**   I'd like her to jot down the defenses in this case --

03:00:53PM **5**        THE COURT:  Mr. Schanker, move on.

03:00:59PM **6**        MR. SCHANKER:  Because we want to go through these

03:01:01PM **7**   defenses, ladies and gentlemen.  We want to make sure that we

03:01:03PM **8**   have them and we go through them in this case and the

03:01:05PM **9**   evidence will show you that these defenses don't hold water.

03:01:09PM **10**  Look at this note.  Nurse Breaux was an oncology nurse for

03:01:19PM **11**  Elizabeth Kahn, and you'll see this note in January of 2009.

03:01:24PM **12**  It says "Alopecia resolved."  And we looked at that and were

03:01:28PM **13**  curious, and we looked at the photographs that had been

03:01:31PM **14**  disclosed -- and both sides agree that this very photo was

03:01:34PM **15**  taken on July 25th of 2009.  And, ladies and gentlemen,

03:01:38PM **16**  you're going to see that there is no way that the alopecia

03:01:43PM **17**  resolved in five days there, that that record is, just plain

03:01:49PM **18**  and simple, wrong.  It's in error.

03:01:53PM **19**       Well, ladies and gentlemen, are we going to hear the

03:01:55PM **20**  defense that Ms. Kahn's alopecia resolved?  Well, let's look

03:02:00PM **21**  and see and we'll address it in the case.  What else will we

03:02:05PM **22**  hear in this case, folks, as far as defense?  Will we hear

03:02:10PM **23**  that Ms. Kahn should've used Rogaine?  Or, we'll put it on

03:02:14PM **24**  the list, folks, and we'll talk about it and you'll see that

03:02:18PM **25**  Rogaine doesn't cure Grade 2.  What about the fact that Ms.

03:02:21PM 1    Kahn is here without a wig on?  Put it on the list.  We'll

03:02:25PM 2    talk about it.  Ms. Kahn will explain to you why she doesn't

03:02:28PM 3    and what's been taken from her.  What about this -- a

03:02:31PM 4    condition called "neuropathy," which is a risk with both

03:02:36PM 5    Taxol and Taxotere?  Are we going to hear that as a defense

03:02:39PM 6    in this case?  Let's put it on the list.  We'll talk about

03:02:43PM 7    it.  Anything else?  Anything we haven't covered here, we

03:02:43PM 8    want to put it on the list and we're going to go through it.

03:02:49PM 9    You're going to see, ladies and gentlemen, that --

03:02:49PM 10           MS. SASTRE:  I'm sorry, Your Honor.

03:02:50PM 11           THE COURT:  I think we need to move on, what the

03:02:57PM 12   evidence will show.

03:02:57PM 13           MR. SCHANKER:  Ladies and gentlemen, as I said, we

03:02:59PM 14   can't wait to present this case to you and you're going to

03:03:02PM 15   see at the end of it, that it's just as we said -- it's a

03:03:07PM 16   simple case.  It's one that you'll see that Sanofi knew that

03:03:13PM 17   Taxotere causes Grade 2 PCIA, that Sanofi did not disclose

03:03:19PM 18   the risk of PCIA, and that as a result, Ms. Kahn must live

03:03:25PM 19   with PCIA forever.

03:03:28PM 20           Thank you for your attention, folks, and I look

03:03:32PM 21   forward to sharing our case with you.

03:03:37PM 22           Thank you, Your Honor.

03:03:38PM 23           THE COURT:  Thank you.  Ms. Sastre.

03:04:14PM 24           MS. SASTRE:  Yes, thank you, Your Honor.

03:04:14PM 25           THE COURT:  Your defense.

03:04:17PM  1          MS. SASTRE:  We'll just need a minute to set up,

03:04:18PM  2   please.

03:04:52PM  3          Your Honor, we're going to have two boards and we

03:04:58PM  4   were planning on putting them I guess this way so the jury

03:05:01PM  5   can see them.  Is that okay with the Court?

03:05:03PM  6          THE COURT:  That's fine, but you're going to be here,

03:05:06PM  7   right?

03:05:07PM  8          MS. SASTRE:  I'm sorry?

03:05:08PM  9          THE COURT:  You're going to be at the podium?

03:05:11PM  10         MS. SASTRE:  Yes.  But I might come out to point to a

03:05:13PM  11  thing or two.  If not, I can put them back there by me.

03:05:18PM  12         THE COURT:  Why don't we do it a little further

03:05:20PM  13  because I don't want us roving.

03:05:26PM  14         MS. SASTRE:  You tell me where, Judge.

03:05:28PM  15         THE COURT:  Maybe right there.

03:05:32PM  16         THE LAW CLERK:  Maybe in front of me.  I don't know

03:05:34PM  17  if that would work for you.

03:05:36PM  18         MS. SASTRE:  Okay.

03:05:40PM  19         THE COURT:  We just need to stay by the mic.

03:05:47PM  20         MS. SASTRE:  I wonder if this would be a little bit

03:05:49PM  21  closer, is that all right?

03:05:50PM  22         THE COURT:  That's fine.

03:05:53PM  23         MS. SASTRE:  My colleagues don't mind being obscured,

03:05:58PM  24  so thank you.

03:05:58PM  25         THE CASE MANAGER:  Hildy, if you're stepping away,

03:06:03PM  **1**   though, from the microphone, can you grab this?  Or it won't

03:06:05PM  **2**   be picked up by the court reporter.

03:06:09PM  **3**              MS. SASTRE:  Okay.  I'm all set.

03:06:37PM  **4**              THE COURT:  Please proceed.

03:06:39PM  **5**              MS. SASTRE:  Thank you very much.  May it please the

03:06:41PM  **6**   Court.  Good afternoon, ladies and gentlemen.  Now as you

03:06:43PM  **7**   know, I'm Hildy Sastre.  I'd like to introduce you though to

03:06:47PM  **8**   a couple of folks you haven't met.  My trial partner and

03:06:51PM  **9**   colleague, Jon Strongman, and my trial partner and colleague,

03:06:57PM  **10**  Doug Moore.  And you'll see us here every day here in court

03:07:02PM  **11**  with you and we'll be trying this case together for Sanofi.

03:07:04PM  **12**  Now, there's one lady I would like to introduce who's sitting

03:07:06PM  **13**  at our table, Jen Buso.  You see she's got the computer in

03:07:13PM  **14**  front of her and she'll be here every day helping us as well,

03:07:15PM  **15**  putting up, basically, documents and evidence -- helping us

03:07:17PM  **16**  with the technology so you can see the evidence as we

03:07:20PM  **17**  proceed.

03:07:21PM  **18**             Now, ladies and gentlemen, I'm very pleased to be

03:07:26PM  **19**  here with you today and pleased to be representing the men

03:07:28PM  **20**  and women of Sanofi.  And let me start -- I know I thanked

03:07:34PM  **21**  you this morning -- but now, you are the jury and you're

03:07:37PM  **22**  going to be here with us for maybe, you've heard, as long as

03:07:40PM  **23**  two weeks.  So let me start by thanking you again because we

03:07:44PM  **24**  know that you being here with us, we know that that is a

03:07:47PM  **25**  sacrifice.  And everyone very much appreciates you taking the

03:07:52PM  1  time to decide this case because, ladies and gentlemen, this

03:07:58PM  2  case, it's important to both sides -- both of the parties.

03:08:04PM  3      Now, I promise you at the outset that we are going to

03:08:08PM  4  do our very, very best to bring you the evidence that you

03:08:12PM  5  need to reach your verdict.  And we're not going to waste

03:08:16PM  6  your time on issues that, just simply, are not important.

03:08:20PM  7  And I will also tell you that we're going to try hopefully --

03:08:27PM  8  hopefully to at least keep things a little bit interesting

03:08:29PM  9  for you, okay?

03:08:30PM  10      Now, you just heard Mr. Schanker give you the

03:08:33PM  11  plaintiff's opening statement and one of the things he said

03:08:35PM  12  to you over and over was he said, Sanofi didn't warn.  He

03:08:39PM  13  said Sanofi didn't warn doctors about the risks.  But what

03:08:43PM  14  you will see in this trial from the evidence is something

03:08:48PM  15  very, very different.  Now, let me just give you a couple of

03:08:53PM  16  quick examples right now.  Mr. Schanker talked with you about

03:08:58PM  17  several publications -- and you may recall those -- and he

03:09:02PM  18  said, well, they talked about the risk of permanent hair loss

03:09:04PM  19  and Sanofi didn't share this information.  But let me be

03:09:09PM  20  clear:  Every one of those publications and articles, they

03:09:14PM  21  were made publicly available to doctors and the entire

03:09:18PM  22  medical community.  And you will see during this trial that

03:09:22PM  23  each of them was out in the bright light of day.

03:09:26PM  24      Now, you're also going to see, ladies and gentlemen,

03:09:29PM  25  the Taxotere label, and you're going to see it many times

03:09:32PM **1**   during the course of this trial.  And what you will see are

03:09:37PM **2**   the words "hair loss" and "alopecia" 12 times in the Taxotere

03:09:44PM **3**   label.

03:09:46PM **4**        Now, plaintiff's counsel told you, well, the label

03:09:49PM **5**   doesn't say "permanent" when it talks about hair loss.  It

03:09:52PM **6**   doesn't say "temporary" either, and it doesn't say "short

03:09:57PM **7**   term."  And that's because, ladies and gentlemen, when it

03:10:01PM **8**   comes to the side effects of chemotherapy, there are no

03:10:08PM **9**   guarantees.  The Taxotere label didn't make a guarantee that

03:10:13PM **10**  a patient's hair would grow back, and it didn't make a

03:10:18PM **11**  guarantee that it grow back exactly the same.  And, in fact,

03:10:22PM **12**  as you've heard this afternoon already, what the label said

03:10:26PM **13**  when it comes to hair loss is that hair "generally" grows

03:10:32PM **14**  back.

03:10:34PM **15**       Now, importantly you will learn what the words "hair

03:10:39PM **16**  generally grows back" meant to Ms. Kahn's cancer doctors, the

03:10:45PM **17**  doctors that prescribed Taxotere to her.  And you'll hear

03:10:49PM **18**  both of the prescribing doctors in this case who gave Ms.

03:10:52PM **19**  Kahn chemotherapy and they are going to testify and tell you,

03:10:55PM **20**  ladies and gentlemen, that the label told them in most cases

03:10:59PM **21**  hair grows back but not every time.

03:11:03PM **22**       Now, plaintiff's counsel showed you this document.

03:11:07PM **23**  It's called a tear sheet and I know you've been presented

03:11:10PM **24**  with a lot of information this morning but this is something

03:11:13PM **25**  that you just saw.  And, ladies and gentlemen, what you

03:11:15PM 1   didn't hear is that this document, which talks about hair

03:11:20PM 2   loss, first of all, it doesn't have anything to do with Mrs.

03:11:25PM 3   Kahn -- the evidence will prove that.  She never saw it, she

03:11:27PM 4   never read it, and neither did her doctors.  There's no

03:11:32PM 5   evidence that they received it.  But if they had read it,

03:11:36PM 6   this is what Ms. Kahn would have read.  "Will my hair grow

03:11:39PM 7   back?  Usually.  It will usually go {sic} back after

03:11:45PM 8   treatments are over."  Remember the label we just talked

03:11:48PM 9   about that says hair "generally" grows back?  That is the

03:11:53PM 10  information that Sanofi was sharing.  It wasn't hiding

03:11:59PM 11  information on hair loss.  It was telling patients and

03:12:02PM 12  doctors, you will lose your hair.  And it "generally" or

03:12:09PM 13  "usually" grows back.

03:12:13PM 14       So, ladies and gentlemen, what is this case -- the

03:12:18PM 15  case of Elizabeth Kahn?  What is it really about?  You're

03:12:24PM 16  going to learn that Mrs. Kahn, at the age of 50 in 2008, was

03:12:31PM 17  told she had a life-threatening disease.  Cancer is as

03:12:38PM 18  serious as it gets and, as you know, Mrs. Kahn had breast

03:12:42PM 19  cancer.  Now, this case is about Mrs. Kahn's desire to fight

03:12:46PM 20  and it is about her desire to live the rest of her life

03:12:50PM 21  cancer free, even if doing so meant that she would have to

03:12:53PM 22  accept many serious side effects and many serious potential

03:12:59PM 23  risks.  Now, look, it's a simple truth.  All medications have

03:13:04PM 24  risks.  And with chemotherapy, that's especially true.  If a

03:13:13PM 25  patient wants to get the benefit of the treatment, if they

03:13:16PM   1   want to fight cancer, and if they want to live, they have to

03:13:22PM   2   accept the risks.  And that, ladies and gentlemen, is the

03:13:26PM   3   reality of cancer treatment.

03:13:29PM   4        Now, I note at the outset, it seems like there's a

03:13:33PM   5   lot of things in dispute, but we tried to think, folks, how

03:13:38PM   6   we could really streamline the issues for you and really kind

03:13:43PM   7   of respect you with your job as jurors.  So we've tried to

03:13:47PM   8   divide up the presentation into just three periods of time,

03:13:51PM   9   and I'd really like to spend the rest of my time with you

03:13:55PM  10   this afternoon talking about Mrs. Kahn and I think, really,

03:13:57PM  11   what can best be described as her journey to fight and beat

03:14:03PM  12   cancer.

03:14:03PM  13        Now, you will first learn that Mrs. Kahn enrolled in

03:14:06PM  14   an investigative clinical trial.  Second, before Mrs. Kahn

03:14:12PM  15   had any treatment for her cancer, her doctors and nurses went

03:14:19PM  16   through her consent form with her in great detail.  You will

03:14:24PM  17   learn that they answered all of her questions so that Mrs.

03:14:29PM  18   Kahn knew and willingly accepted the risks of this clinical

03:14:34PM  19   study or clinical trial, including the risk of losing her

03:14:39PM  20   hair.

03:14:40PM  21        And the third period of time, ladies and gentlemen,

03:14:43PM  22   and you will see it with your own eyes, is that Ms. Kahn's

03:14:49PM  23   hair generally grew back after her chemotherapy was complete.

03:14:54PM  24   So with that preview of these three periods, let's go back to

03:14:59PM  25   where this all started -- or, begin at the beginning, as they

03:15:07PM 1  say.

03:15:07PM 2       14 years ago, ladies and gentlemen, in 2008, on

03:15:14PM 3  April 14th, Mrs. Kahn was told that she had hormone positive

03:15:20PM 4  infiltrating invasive carcinoma.  She was told she had breast

03:15:26PM 5  cancer.  Now, at this time in 2008, there were about

03:15:34PM 6  2.6 million women with a history of breast cancer in the

03:15:37PM 7  United States and over 180 thousand new cases of breast

03:15:44PM 8  cancer just that year.  And to put that in perspective for

03:15:48PM 9  you folks, that's nearly the same number of people living in

03:15:51PM 10 Lafayette.  Now, in that very same year of Mrs. Kahn's

03:15:57PM 11 diagnosis, more than 40 thousand women were expected to die

03:16:01PM 12 from breast cancer -- and that's 109 women per day, ladies

03:16:06PM 13 and gentlemen, that would die from breast cancer at the time

03:16:10PM 14 of Mrs. Kahn's diagnosis.

03:16:14PM 15      Now, unfortunately the Kahn family was all too

03:16:17PM 16 familiar with cancer.  Both Mrs. Kahn's sister and Mrs.

03:16:21PM 17 Kahn's mother had a history of breast cancer.  Mrs. Kahn also

03:16:26PM 18 had aunts, cousins, grandparents who fought cancer and you

03:16:32PM 19 will learn during this trial, ladies and gentlemen, some of

03:16:35PM 20 them lost that fight.  So it's against this backdrop -- this

03:16:41PM 21 family history, if you will -- that Mrs. Kahn learned, you

03:16:45PM 22 too now have cancer.

03:16:47PM 23      Now, you will hear testimony that after Mrs. Kahn

03:16:51PM 24 received this news of her cancer, she wanted to have the best

03:16:55PM 25 treatment.  She wanted to know what she needed to do to beat

03:17:01PM   1   breast cancer.  She wanted to know what were the best

03:17:04PM   2   treatment options available to her.  And she wanted to know

03:17:08PM   3   if there was a way -- if there was a way, she wanted to try

03:17:13PM   4   and save her breast but still get the most effective

03:17:17PM   5   treatment.

03:17:18PM   6        Now, you will ultimately learn that based upon her

03:17:22PM   7   oncologist's advice, Mrs. Kahn decided to be part of a

03:17:27PM   8   clinical trial.  Now, let me just pause here for a moment and

03:17:31PM   9   I just want to talk to you about clinical trials in general.

03:17:36PM  10   Clinical trials are a type of research.  They are

03:17:40PM  11   investigative and the outcomes of clinical trials are

03:17:47PM  12   unknown, which is why they are being done in the first place.

03:17:51PM  13   Now, clinical trials are used to develop new drugs, new

03:17:55PM  14   treatments, and they are used to test for unknown side

03:17:59PM  15   effects and potential risks.  Now, the study that Mrs. Kahn

03:18:04PM  16   enrolled in was being done by an independent cancer research

03:18:08PM  17   organization and I do want to be very, very clear on this

03:18:12PM  18   point -- this is important -- Sanofi did not have anything to

03:18:16PM  19   do with the clinical trial that Mrs. Kahn was in.

03:18:20PM  20        Now, importantly, ladies and gentlemen -- and we'll

03:18:25PM  21   take a look at this in a moment -- the group of drugs in this

03:18:28PM  22   clinical trial, it was different than the standard

03:18:31PM  23   chemotherapy patients that -- excuse me, it was different

03:18:36PM  24   than the standard chemotherapy treatment that patients like

03:18:40PM  25   Mrs. Kahn would receive.  And you will also learn that this

03:18:44PM   1   was in fact one of the first times that this combination of

03:18:49PM   2   drugs was ever studied.  Now, this is critical for a couple

03:18:53PM   3   of reasons.  First, because Mrs. Kahn was part of a clinical

03:18:58PM   4   trial, she did not know which combination of drugs she would

03:19:03PM   5   be getting until she already agreed to be part of the study.

03:19:09PM   6   And second, Mrs. Kahn was willing to accept the risks and

03:19:13PM   7   unknown risks of taking a combination of medications that had

03:19:18PM   8   not been tested and a combination of medications that was not

03:19:24PM   9   approved by the FDA.

03:19:26PM  10         Now, let's take a closer look at the chemotherapy

03:19:30PM  11   treatment that Mrs. Kahn took.

03:19:32PM  12         And I'm going to put the boards up, Your Honor.

03:19:52PM  13         Is everyone able to see that okay?  Yes?  Okay.

03:19:57PM  14   Perfect, perfect.  Let me put the other one up.

03:20:10PM  15         Is that okay, folks?  Okay.  Great.

03:20:13PM  16         Okay.  So, ladies and gentlemen, as you can see --

03:20:21PM  17   I'm just going to come over this way a bit -- if you look all

03:20:25PM  18   the way to what's your left, Phase I, you can see that

03:20:29PM  19   Taxotere is in the first group of medications that Mrs. Kahn

03:20:34PM  20   received.  Now, Taxotere was not the medicine being studied

03:20:40PM  21   in this trial.  And you're going to hear from multiple

03:20:43PM  22   witnesses and they're going to tell you that Taxotere is

03:20:47PM  23   highly effective, FDA approved, and that when Mrs. Kahn's

03:20:52PM  24   doctors prescribed her Taxotere in 2008, that doctors knew

03:20:57PM  25   that adding a drug like this to a chemotherapy or patient's

03:21:02PM **1** regimen could reduce the risk of cancer returning by as much

03:21:05PM **2** as 20 to 30 percent.

03:21:10PM **3** Now, is this on?  Yes?  Okay.

03:21:21PM **4** Can y'all hear me?  Yes?  Okay.

03:21:24PM **5** So, in Phase I, ladies and gentlemen, you see

03:21:28PM **6** Taxotere with a box around it -- hello?  There we go.  There

03:21:37PM **7** we go.  So, let me start over.

03:21:39PM **8** So, Taxotere, with the box around it, along with

03:21:44PM **9** Adriamycin and Cytoxan, both also with the boxes around them,

03:21:49PM **10** are what was the proven standard treatment that patients in

03:21:55PM **11** the study received no matter which group they were put in.

03:21:59PM **12** So those three drugs, you can reference them throughout the

03:22:03PM **13** trial with those boxes around them.  Now, you can see, ladies

03:22:08PM **14** and gentlemen, that what Mrs. Kahn received was very

03:22:11PM **15** different than the standard treatment of just those three

03:22:16PM **16** medications.  Now, in the first phase of the clinical trial,

03:22:21PM **17** Mrs. Kahn was given Taxotere, but she was given Taxotere with

03:22:24PM **18** two different drugs, not the standard drugs.  She was given

03:22:30PM **19** Taxotere with the two drugs being studied.  The first drug

03:22:37PM **20** being studied was Avastin, and you can see that on top of

03:22:44PM **21** Phase I.  The other drug being studied in the trial was

03:22:49PM **22** called Xeloda.  Now, Xeloda was not approved for the

03:22:55PM **23** treatment of the kind of breast cancer that Mrs. Kahn had.

03:22:58PM **24** And Avastin was not approved to treat any type of breast

03:23:03PM **25** cancer.  And that's why they were being studied, ladies and

03:23:05PM **1**  gentlemen, to see if they made the standard treatment more

03:23:08PM **2**  effective and to see if there were additional risks or side

03:23:13PM **3**  effects from these medications.

03:23:15PM **4**      Now, the first phase of Mrs. Kahn's treatment, as you

03:23:19PM **5**  can see, was in May of 2008.  Importantly, Mrs. Kahn took

03:23:25PM **6**  Taxotere in May of 2008 -- 13 years ago -- four times.  Four

03:23:33PM **7**  times.  And then in August of 2008, Mrs. Kahn started Phase

03:23:40PM **8**  II of her treatment, this time taking Avastin -- again, the

03:23:46PM **9**  drug being studied -- but now with the chemotherapy drugs

03:23:49PM **10** Adriamycin and Cytoxan.  Now, after all of this treatment,

03:23:54PM **11** more than would have been given to a patient in this standard

03:23:58PM **12** treatment, you can see Mrs. Kahn had surgery in December of

03:24:01PM **13** 2008.  Now, you'd heard that Mrs. Kahn wanted to save her

03:24:06PM **14** breast, if possible.  And what you are going to learn is that

03:24:12PM **15** after receiving that first group of chemotherapy, the

03:24:15PM **16** Taxotere regimen, Mrs. Kahn's breast cancer tumor shrunk so

03:24:23PM **17** that her surgeon was allowed to save her breast and just

03:24:27PM **18** remove the tumor.

03:24:30PM **19**     Now, after the surgery in January and February of

03:24:34PM **20** 2009, you will see that Mrs. Kahn then had two months of

03:24:37PM **21** radiation and then she had a third phase of treatment.  And

03:24:43PM **22** Phase III, you can see, is all Avastin.  And I do just want

03:24:47PM **23** to point out, Avastin was part of the clinical trial in the

03:24:50PM **24** treatment plan, but you'll learn it's not a chemotherapy

03:24:55PM **25** drug, but it is an anti-cancer agent and it was used in this

03:25:00PM 1    case in this trial.

03:25:01PM 2         Now, ladies and gentlemen, you can also see that Mrs.

03:25:05PM 3    Kahn took a drug called tamoxifen and that's on both boards,

03:25:09PM 4    this line.  Now, Mrs. Kahn took tamoxifen every single day

03:25:16PM 5    for nine years and a known risk of tamoxifen, ladies and

03:25:22PM 6    gentlemen, is hair loss and hair thinning.  And one other

03:25:27PM 7    thing that you will hear in this trial is that the reason

03:25:31PM 8    this initial plan -- this initial cancer treatment for Mrs.

03:25:37PM 9    Kahn was so important was because if a patient's cancer

03:25:41PM 10   returns, if it comes back after treatment, that patient's

03:25:47PM 11   chance of survival goes down dramatically.

03:25:52PM 12        So what happens, ladies and gentlemen, if treatment

03:25:55PM 13   fails and if breast cancer comes back?  So you will see that

03:26:00PM 14   only 16 percent of patients will live five years if their

03:26:05PM 15   breast cancer returns and only 6 percent will live 10 years

03:26:09PM 16   if their breast cancer returns.  So when it came to beating

03:26:15PM 17   breast cancer, Mrs. Kahn's first chance was her best chance.

03:26:20PM 18   And she wanted a highly effective treatment, one that would

03:26:23PM 19   allow her to preserve and keep her breast and you will hear

03:26:29PM 20   from her directly on this, ladies and gentlemen, that that

03:26:33PM 21   was one of the reasons why she decided to enroll in this

03:26:37PM 22   clinical trial.

03:26:39PM 23        But just like in this trial, ladies and gentlemen,

03:26:43PM 24   the results of a clinical trial, it is unknown what the

03:26:49PM 25   result will be until it is completed or until it is finished.

03:26:53PM 1   Whether a certain combination of drugs which is being studied

03:26:58PM 2   will be more effective at treating breast cancer than the

03:27:01PM 3   standard treatment is unknown.  Whether patients will suffer

03:27:05PM 4   new or additional side effects from the drugs being studied

03:27:09PM 5   is unknown.  And that's what clinical trials like the one

03:27:14PM 6   Mrs. Kahn was in are trying to find out.

03:27:17PM 7        Now, what is known for certain is that when a patient

03:27:22PM 8   agrees to be part of a study, they have to accept known and

03:27:27PM 9   unknown risks, many of which may be serious and many of which

03:27:33PM 10  may be permanent.  Now, that brings us to the second part of

03:27:37PM 11  Mrs. Kahn's care and treatment, and that's her acceptance of

03:27:41PM 12  these risks.

03:27:42PM 13       Now, ladies and gentlemen, you will learn from the

03:27:47PM 14  evidence that Mrs. Kahn's doctors provided her with detailed

03:27:54PM 15  information, both verbally and in writing, concerning the

03:27:57PM 16  risks of the clinical trial.  Now, here's Mrs. Kahn's

03:28:03PM 17  informed consent form.  You can see it's dated May 14th of

03:28:08PM 18  2008.  It is the one that Mrs. Kahn read and the one that she

03:28:11PM 19  signed, and it told her in detail, ladies and gentlemen,

03:28:15PM 20  about the risks of this treatment, many of which were serious

03:28:19PM 21  risks, some of which were life threatening risks, and it

03:28:23PM 22  certainly included the risk of hair loss.

03:28:28PM 23       Now, here is a summary of some of the risks taken

03:28:32PM 24  directly from the informed consent form signed by Ms. Kahn.

03:28:36PM 25  Now, while I did not include everything on this list, ladies

03:28:40PM   1    and gentlemen, you can see the sort of risks that Ms. Kahn

03:28:43PM   2    accepted when she agreed to take these medications to treat

03:28:47PM   3    her breast cancer in this clinical trial.  Ms. Kahn accepted

03:28:51PM   4    the risk of heart attack, fatal blood clot, GI or

03:28:56PM   5    gastrointestinal bleeding.  She accepted the risk of liver

03:29:02PM   6    failure, lung damage, decreased ability of the heart to pump

03:29:06PM   7    blood, severe infections, and life-threatening blood clots.

03:29:13PM   8    These are the risks of getting chemotherapy, and as I said,

03:29:17PM   9    this is the reality of cancer treatment.

03:29:21PM   10         Now, you'll also see on the bottom of this page, for

03:29:25PM   11   every one of the chemotherapy drugs that Ms. Kahn took, she

03:29:28PM   12   accepted there was a hair loss too.  Now, I'd like to talk

03:29:32PM   13   about Avastin for a moment.  Avastin, you'll remember, was a

03:29:36PM   14   drug that Ms. Kahn took in all three phases of the clinical

03:29:41PM   15   trial, and Avastin was a drug that was not approved by the

03:29:44PM   16   FDA for the treatment of any breast cancer.  Now, Avastin had

03:29:49PM   17   some very serious and specific risks associated with it.

03:29:53PM   18   Now, these are risks -- and I want to be clear here.  These

03:29:56PM   19   are risks for a drug being studied that Ms. Kahn accepted

03:30:00PM   20   without even knowing Avastin would give her any benefit.

03:30:06PM   21   Ms. Kahn accepted the risk of blood clots in the arteries,

03:30:10PM   22   which may cause stroke or heart attack, bleeding that could

03:30:14PM   23   lead to disability or death, perforation of the bowels or

03:30:17PM   24   other organs, leakiness of the blood vessels in the brain,

03:30:22PM   25   fatal severe high blood pressure.  And, again, ladies and

03:30:27PM  1   gentlemen, these are risks taken directly from Ms. Kahn's

03:30:31PM  2   informed consent form.

03:30:32PM  3       Now, one of the other drugs that Ms. Kahn took is

03:30:38PM  4   considered so toxic, ladies and gentlemen, that it has earned

03:30:41PM  5   the nickname of the "Red Devil."  Now, Ms. Kahn will tell you

03:30:47PM  6   that she remembers her doctors telling her about this drug

03:30:50PM  7   and that that was its nickname.  Now, there's a reason that

03:30:54PM  8   Adriamycin is known as the Red Devil.  For starters, as you

03:30:58PM  9   can see, it is actually red.  But here's the label for

03:31:01PM  10  Adriamycin.  And remember, this is a drug that Ms. Kahn took

03:31:05PM  11  in Phase II.  The label for Adriamycin warns of myocardial or

03:31:11PM  12  heart toxicity, manifested in its most severe form by

03:31:18PM  13  potentially fatal congestive heart failure.  So what the

03:31:23PM  14  label is saying is that you can take Adriamycin, beat or

03:31:26PM  15  survive breast cancer, but then die of congestive heart

03:31:31PM  16  failure.

03:31:32PM  17      Now, ladies and gentlemen, in addition to the serious

03:31:36PM  18  and life-threatening risks, Ms. Kahn also repeatedly accepted

03:31:41PM  19  the risk of hair loss.  This is from her informed consent.

03:31:44PM  20  It was the very first risk listed, and, ladies and gentlemen,

03:31:47PM  21  it was listed four times, four times.  And you can see, it

03:31:53PM  22  doesn't say "temporary," and it doesn't say "short-term."  In

03:31:59PM  23  order to get the benefit of her treatment, Ms. Kahn accepted

03:32:05PM  24  the risk of losing her hair.

03:32:08PM  25      Now, what else did Ms. Kahn's informed consent tell

03:32:13PM  1    her?  It said, "In some cases, side effects may be very

03:32:17PM  2    serious, long-lasting, or may never go away."  The evidence

03:32:21PM  3    will show that this language was specifically discussed with

03:32:26PM  4    Ms. Kahn by her doctors, and that she knew side effects,

03:32:32PM  5    which might occur from the drugs that she took in this

03:32:36PM  6    clinical trial, she knew that those side effects might never

03:32:39PM  7    go away.

03:32:42PM  8         Now, this informed consent -- you heard a comment

03:32:45PM  9    about this earlier -- it's not like getting a piece of paper

03:32:48PM  10   at the pharmacy.  And that's because this document was

03:32:52PM  11   discussed in painstaking detail with Ms. Kahn, page by page

03:32:58PM  12   by page, discussed with her by her doctors and her nurses,

03:33:03PM  13   and Ms. Kahn will tell you in this case, she will testify

03:33:07PM  14   that she was sure she knew what she was signing.

03:33:11PM  15        Now, here's a medical record from this case, ladies

03:33:15PM  16   and gentlemen.  This is Ms. Kahn's medical record, and you

03:33:19PM  17   can see it states, "Consent was given, reviewed, and

03:33:22PM  18   discussed in great lengths with Ms. Kahn and her husband.

03:33:27PM  19   All questions answered to both Ms. Kahn and her husband's

03:33:32PM  20   satisfaction, and both verbalized understanding."  So when

03:33:37PM  21   Ms. Kahn signed her informed consent to be part of this

03:33:41PM  22   clinical trial, what did it mean?  This is what Ms. Kahn

03:33:45PM  23   affirmed:  I have been informed of this study's purpose,

03:33:49PM  24   procedure, possible benefits, possible benefits, and risks.

03:33:57PM  25   All of my questions about the study have been answered.  I

03:34:03PM  1    freely consent to participate in this research study.  And

03:34:08PM  2    that is Ms. Kahn's signature, her nurse, and her doctor.

03:34:14PM  3    They all signed on the same day.

03:34:16PM  4        Now, not only did Ms. Kahn sign the informed consent,

03:34:19PM  5    ladies and gentlemen, she initialed every single page of it,

03:34:24PM  6    including the four pages that told her about losing her hair,

03:34:30PM  7    and including the page that told her, "Side effects may never

03:34:33PM  8    go away."  This is the information that Ms. Kahn had in her

03:34:41PM  9    hands before she ever took any chemotherapy.  Now, at the

03:34:47PM 10    same time, ladies and gentlemen, what information did

03:34:51PM 11    Ms. Kahn's doctors have when it came to chemotherapy and

03:34:54PM 12    Taxotere specifically?

03:34:56PM 13        The evidence will show that Ms. Kahn's cancer

03:34:59PM 14    doctors, the ones that prescribed Taxotere and these

03:35:02PM 15    medications to her, that they read the label, the one that

03:35:07PM 16    says hair generally grows back.  They'd read the label before

03:35:12PM 17    they prescribed this medication to her, and you will learn in

03:35:15PM 18    this trial that since 1996, when Taxotere came onto the

03:35:19PM 19    market, until 2008, when it was prescribed to Ms. Kahn, the

03:35:23PM 20    label always included the risk of hair loss.  And here is the

03:35:28PM 21    Taxotere label that was in place at the time Ms. Kahn was

03:35:35PM 22    treated.  It warned of alopecia, which you now know means

03:35:39PM 23    hair loss.  It warned of alopecia and hair loss 12 different

03:35:43PM 24    times, and it never once said "temporary" or "short-term."

03:35:49PM 25        Now, here's the label that we spoke about earlier,

03:35:53PM  1    Taxotere label.  This is the hair loss section.  This was the

03:35:57PM  2    information Ms. Kahn's doctors had in their hands:  "Loss of

03:36:02PM  3    hair occurs in most patients using Taxotere.  Hair loss will

03:36:06PM  4    begin after the first few treatments, and it varies from

03:36:10PM  5    patient to patient.  Once you have completed all of your

03:36:16PM  6    treatments, hair generally grows back."

03:36:22PM  7            Now, this is one of Ms. Kahn's cancer doctors, and

03:36:26PM  8    you'll hear her testify, Dr. Larned.  And she's an

03:36:30PM  9    oncologist.  And you'll learn from Dr. Larned that she

03:36:35PM 10    understood that language, "Hair generally grows back."  She

03:36:39PM 11    understood that that meant that hair may not grow back.

03:36:43PM 12    You'll hear that from her directly.  And she never told or

03:36:48PM 13    guaranteed to a patient that their hair would grow back after

03:36:52PM 14    chemotherapy.  And one of the reasons, ladies and gentlemen,

03:36:55PM 15    that Dr. Larned will tell you that she knows she's never made

03:36:58PM 16    that sort of guarantee to a patient is because she will tell

03:37:02PM 17    you she has seen, in her very practice, treating cancer

03:37:07PM 18    patients who developed permanent hair loss after

03:37:12PM 19    chemotherapy, including patients, you will hear, that took

03:37:15PM 20    Adriamycin and Cytoxan; both medications you know prescribed

03:37:22PM 21    to Ms. Kahn.

03:37:23PM 22            Now, Dr. Kardinal is Ms. Kahn's other cancer doctor

03:37:28PM 23    or oncologist.  And you will hear that Dr. Kardinal

03:37:31PM 24    prescribed Taxotere to Ms. Kahn.  He will tell you that that

03:37:35PM 25    label that we just looked at, those words, "Hair generally

| | | |
|---|---|---|
| 03:37:39PM | **1** | grows back," he will tell you that doesn't mean always. |
| 03:37:43PM | **2** | Dr. Kardinal never told a patient that their hair was going |
| 03:37:46PM | **3** | to come back or come back exactly the same, and he certainly |
| 03:37:50PM | **4** | didn't tell that to Ms. Kahn.  Now, like Dr. Larned, you will |
| 03:37:57PM | **5** | also hear -- and Dr. Kardinal's experience with his patients, |
| 03:38:03PM | **6** | that he had patients with significant persistent thinning |
| 03:38:08PM | **7** | hair after taking Adriamycin.  That's what he saw with his |
| 03:38:11PM | **8** | own eyes, ladies and gentlemen.  He knew of the risks. |
| 03:38:15PM | **9** | Now, it won't just be the prescribing doctors who |
| 03:38:18PM | **10** | treated Ms. Kahn for her cancer that you'll hear this from. |
| 03:38:23PM | **11** | You will hear that there are cases of permanent hair loss |
| 03:38:27PM | **12** | with other chemotherapy drugs.  And you're going to hear |
| 03:38:32PM | **13** | that, ladies and gentlemen -- and I want to be really clear |
| 03:38:35PM | **14** | on this -- you're going to hear that from three separate |
| 03:38:40PM | **15** | experts hired by the plaintiff's attorneys, not us.  And |
| 03:38:45PM | **16** | these experts hired by the plaintiff, they're going to come |
| 03:38:49PM | **17** | in here and tell you, ladies and gentlemen, that the other |
| 03:38:52PM | **18** | chemotherapy drugs Ms. Kahn took, Adriamycin and Cytoxan, |
| 03:38:56PM | **19** | have reports of permanent hair loss as well. |
| 03:39:01PM | **20** | Now, let me talk about a different medication for a |
| 03:39:04PM | **21** | moment.  You heard a little bit about it.  It's called Taxol. |
| 03:39:08PM | **22** | Now, plaintiff's counsel talked with you a little bit about |
| 03:39:12PM | **23** | Taxol, and described that as sort of an option for Ms. Kahn |
| 03:39:17PM | **24** | if she didn't take Taxotere.  But what you're going to hear |
| 03:39:20PM | **25** | in this case, ladies and gentlemen, especially because |

03:39:23PM  1   Ms. Kahn wanted to save her breast, she needed chemotherapy.

03:39:29PM  2   And she needed what's called a taxane.  And that's a very

03:39:34PM  3   small class of drugs that really just has Taxotere and this

03:39:39PM  4   other drug called Taxol in it.

03:39:42PM  5        Now, if Ms. Kahn decided not to go into this clinical

03:39:47PM  6   trial -- and she could have.  She could have made that

03:39:50PM  7   decision -- she had two sets of options.  Option 1, Taxotere

03:39:55PM  8   plus the two drugs in the standard treatment, Adriamycin and

03:39:58PM  9   Cytoxan, or Taxol and Adriamycin and Cytoxan.  But

03:40:06PM  10  Dr. Kardinal, Ms. Kahn's prescribing doctor, her cancer

03:40:11PM  11  doctor, is going to testify that Taxol, this alternative or

03:40:17PM  12  option that Ms. Kahn had, it carries a greater risk of

03:40:22PM  13  something called neuropathy.  And you will learn in this

03:40:27PM  14  trial, ladies and gentlemen, that neuropathy is a condition

03:40:30PM  15  where you suffer nerve damage in your hands and your feet,

03:40:34PM  16  and you will learn that it can be very painful, and it can be

03:40:39PM  17  permanent.

03:40:39PM  18       Now, because of that risk with Taxol, Dr. Kardinal

03:40:41PM  19  will tell you that he preferred to give his patients Taxotere

03:40:46PM  20  over Taxol.  And ladies and gentlemen, just like you heard

03:40:50PM  21  that plaintiff's experts will come in here and tell you that

03:40:54PM  22  Adriamycin and Cytoxan have reports of permanent hair loss,

03:40:57PM  23  they'll tell you the same thing about Taxol.  They're going

03:41:01PM  24  to tell you the same thing about Taxol.

03:41:03PM  25       So ladies and gentlemen, when it came to

03:41:06PM  1   chemotherapy, there were no risk-free options for Ms. Kahn.

03:41:14PM  2   And the evidence will show you, ladies and gentlemen, that

03:41:17PM  3   Ms. Kahn and her doctors were aware not just of the risk of

03:41:20PM  4   hair loss, they were aware of the risks of serious

03:41:26PM  5   life-threatening conditions.  These risks were discussed with

03:41:32PM  6   Ms. Kahn.  You'll see that from the evidence, ladies and

03:41:36PM  7   gentlemen.  The risks were discussed with her verbally; the

03:41:40PM  8   risks were discussed at length in writing.  You will see the

03:41:44PM  9   words in great detail.

03:41:46PM  10      Ms. Kahn accepted these risks.  She agreed to proceed

03:41:51PM  11  with treatment.  Because as I have said, ladies and

03:41:55PM  12  gentlemen, you cannot get the benefit of the treatment if you

03:41:59PM  13  are unwilling to accept the risks.  And here in this case,

03:42:04PM  14  that included the risk of Ms. Kahn losing her hair.

03:42:10PM  15      Now, I'd like to move to the third period of time

03:42:13PM  16  with you, ladies and gentlemen, and that is, Ms. Kahn's hair

03:42:19PM  17  grew back after chemotherapy was complete.  Now, plaintiff's

03:42:25PM  18  counsel just told you that Ms. Kahn believed when she took

03:42:30PM  19  her chemotherapy that she would lose her hair, but then it

03:42:33PM  20  was all going to come back -- something like that.  But

03:42:38PM  21  ladies and gentlemen, the photos that you will see with your

03:42:43PM  22  own eyes, they prove that that's exactly what happened.  That

03:42:48PM  23  is what happened.  Ms. Kahn's hair did regrow after she

03:42:54PM  24  completed chemotherapy.

03:42:57PM  25      Now, here's two photos, before and after.  The photo

03:43:02PM 1   on the left, ladies and gentlemen, from 2008 is Ms. Kahn

03:43:05PM 2   about a week before she started chemotherapy, before she ever

03:43:10PM 3   took Taxotere.  And on the right is about nine months after

03:43:15PM 4   she completed chemotherapy.  Before chemotherapy, the photo

03:43:20PM 5   on the left, you can see Ms. Kahn's hair is thin in front and

03:43:27PM 6   on top.  Now, this was when Ms. Kahn was 50 years old.  Her

03:43:35PM 7   hair was thinning.  About nine months after her hair had a

03:43:39PM 8   chance to regrow, after she had completed all of her

03:43:44PM 9   chemotherapy, ladies and gentlemen, you can see from the

03:43:47PM 10  photo on the right that Ms. Kahn's hair grew back to look

03:43:53PM 11  very much the same as it did before she ever took any

03:43:57PM 12  chemotherapy.  Still a bit thin on the front and the top, but

03:44:00PM 13  Ms. Kahn's hair regrew.

03:44:02PM 14       Now, her side-by-side photos you can see from before

03:44:07PM 15  chemotherapy on the left.  And, again, you can see thinning,

03:44:11PM 16  you can see through her hair to her scalp, ladies and

03:44:14PM 17  gentlemen, from the photo on the left.  Now, if you go to the

03:44:17PM 18  photo on the right, about 18 months after she finished

03:44:20PM 19  chemotherapy, you can, again, see with your own eyes her hair

03:44:24PM 20  grew back.  Ladies and gentlemen, Taxotere did not cause

03:44:33PM 21  permanent hair loss to Ms. Kahn.  Her hair grew back after

03:44:36PM 22  Taxotere, and it looked very much the same as it did before

03:44:40PM 23  she took it.

03:44:42PM 24       Now, I showed you all of this because you really

03:44:46PM 25  heard counsel say that Ms. Kahn, you know, she looks the way

03:44:51PM **1**   she does today because of what Taxotere did to her.  But one

03:44:54PM **2**   thing you're going to learn during this trial, ladies and

03:44:57PM **3**   gentlemen, is that if a patient's hair grows back after

03:45:02PM **4**   chemotherapy like Ms. Kahn's did, and then it later, over

03:45:07PM **5**   time, falls out, that's not permanent hair loss from

03:45:11PM **6**   chemotherapy.  And again, you will hear from another expert

03:45:15PM **7**   hired by the plaintiff's lawyers -- not us, hired by the

03:45:19PM **8**   plaintiff's lawyers, and she's a hair loss expert.  She's

03:45:22PM **9**   going to come to trial probably later this week, ladies and

03:45:26PM **10**   gentlemen, and she's going to tell you and explain to you

03:45:28PM **11**   that if hair grows back after chemotherapy like Ms. Kahn's

03:45:31PM **12**   did, and then it thins out over time, that's not permanent

03:45:36PM **13**   hair loss caused by chemotherapy.  And ladies and gentlemen,

03:45:39PM **14**   this brings me to my last point about Ms. Kahn's hair.  Now,

03:45:43PM **15**   let's go back to the timeline board -- or boards for a

03:45:46PM **16**   moment.

03:45:47PM **17**        Now, you can see in 2009 -- I mentioned this drug

03:45:52PM **18**   tamoxifen before -- you can see Ms. Kahn began to take it.

03:45:56PM **19**   Now, tamoxifen was part of Ms. Kahn's cancer treatment, and

03:46:00PM **20**   it essentially decreases female hormones.  But it also has,

03:46:05PM **21**   as I mentioned, a risk of hair loss and thinning.  Now,

03:46:09PM **22**   Ms. Kahn took tamoxifen over 3,000 times from 2009 all the

03:46:16PM **23**   way straight into 2018.  And ladies and gentlemen, while

03:46:21PM **24**   Ms. Kahn is on tamoxifen, there's a slow progression of hair

03:46:28PM **25**   loss that takes place.  Now, when it comes to tamoxifen,

03:46:32PM 1 you'll hear from the same three experts hired by the

03:46:34PM 2 plaintiffs, and they will tell you there's permanent hair

03:46:37PM 3 loss reports with tamoxifen too.

03:46:41PM 4     And here you can see that evolution with your own

03:46:47PM 5 eyes.  So the two photos we looked at before in the blue on

03:46:52PM 6 the left before chemotherapy, that's what Ms. Kahn's hair

03:46:55PM 7 looked like.  The pictures in the middle in green, ladies and

03:47:01PM 8 gentlemen, as you just saw, are shortly after chemotherapy

03:47:04PM 9 was completed.  Ms. Kahn's hair had a chance to regrow, and

03:47:08PM 10 it did just that.  By 2009 and 2010, her hair looked pretty

03:47:15PM 11 much the same as it did before she ever had chemotherapy.

03:47:19PM 12 But then you can see, if we go to the right, in 2017 and

03:47:27PM 13 2020, after years and years and years of tamoxifen use, you

03:47:33PM 14 can see that Ms. Kahn's hair became thinner and thinner, all

03:47:38PM 15 while she was taking tamoxifen and as she aged.  You can see

03:47:41PM 16 that with your own eyes from the photos on the right.

03:47:45PM 17     Now, you will also learn that there are available

03:47:48PM 18 treatments for the type of hair loss that Ms. Kahn has been

03:47:52PM 19 diagnosed with.  And in fact, there's a specific medication

03:47:57PM 20 called minoxidil.  And you'll learn in this case that it's

03:48:00PM 21 for the very type of thinning that Ms. Kahn has experienced

03:48:05PM 22 over the course of these years.  Three different

03:48:09PM 23 dermatologist have recommended this treatment to Ms. Kahn,

03:48:12PM 24 but you will learn that she still has not tried any treatment

03:48:17PM 25 for her hair.

03:48:18PM   **1**       Now, ladies and gentlemen, the last thing that I'd

03:48:21PM   **2**   like to discuss with you this afternoon is Ms. Kahn's breast

03:48:25PM   **3**   cancer tumor.  And you are going to see exactly why doctors

03:48:30PM   **4**   like Dr. Kardinal used Taxotere as their go-to chemotherapy

03:48:34PM   **5**   medication.  You will learn that after being treated with the

03:48:39PM   **6**   Taxotere regimen, the Phase I of her treatment, that

03:48:47PM   **7**   Ms. Kahn's tumor shrunk by about 98 percent.  Before

03:48:55PM   **8**   Taxotere -- and I think this will put it in perspective for

03:48:59PM   **9**   you, ladies and gentlemen.  Before Taxotere, Ms. Kahn's tumor

03:49:04PM   **10**   was 4 centimeters large.  Now, this slide, this is directly

03:49:08PM   **11**   from a scale that's created by the National Cancer Institute.

03:49:11PM   **12**   And it's a scale that they use for sizing tumors, and it

03:49:16PM   **13**   actually has this on it -- a pea and a walnut and a grape and

03:49:21PM   **14**   a peanut -- you can see those things for yourself.

03:49:23PM   **15**       So ladies and gentlemen, according to the National

03:49:26PM   **16**   Cancer Institute, this, this walnut, is about the size of the

03:49:33PM   **17**   mass, the cancerous mass that Ms. Kahn had in her breast.

03:49:38PM   **18**   And after her treatment, ladies and gentlemen, with the

03:49:41PM   **19**   Taxotere regimen, Ms. Kahn's tumor measured less than 1

03:49:51PM   **20**   centimeter.  So that's after Phase I -- Phase I, the Taxotere

03:49:55PM   **21**   regimen, this was about the size of -- about the size of a

03:49:58PM   **22**   pea, the size of Ms. Kahn's tumor.

03:50:05PM   **23**       And because her tumor shrunk so much, as I mentioned,

03:50:11PM   **24**   it allowed Ms. Kahn to save her breast.  Now, meaning that

03:50:15PM   **25**   instead of getting a mastectomy, which is a surgery where

03:50:19PM  1   they remove a woman's entire breast, Ms. Kahn was able

03:50:24PM  2   instead to have something called a lumpectomy.  And her

03:50:28PM  3   surgeon went in, and he removed just that small tumor that

03:50:31PM  4   remained.  And that happened, in part, because of Taxotere.

03:50:38PM  5       Now, ladies and gentlemen, where does this leave us?

03:50:43PM  6   Ms. Kahn is a breast cancer survivor.  In the last 13 years,

03:50:50PM  7   Ms. Kahn has not had a return of her cancer.  She's alive

03:50:55PM  8   today, 63 years old, living cancer-free, teaching, working,

03:51:02PM  9   spending time with her friends, her family, her loved ones,

03:51:07PM 10   traveling, and enjoying her life.  Now, ladies and gentlemen,

03:51:11PM 11   when it comes to treating breast cancer, there are simply no

03:51:15PM 12   guarantees.  There's no guarantee that a treatment will work.

03:51:20PM 13   There's no guarantee as to how long a patient may live.  And

03:51:24PM 14   there is no guarantee what side effects a patient will

03:51:28PM 15   experience, how severe they will be, or how long those side

03:51:32PM 16   effects may last.

03:51:34PM 17       And ladies and gentlemen, there are no guarantees

03:51:37PM 18   when it comes to hair loss.  No doctor can tell a patient

03:51:42PM 19   what the outcome will be.  The evidence will show that Ms.

03:51:48PM 20   Kahn had no risk-free chemotherapy options, and certainly no

03:51:55PM 21   risk-free options when it came to hair loss.

03:51:58PM 22       Now, ladies and gentlemen, we are going to bring you

03:52:01PM 23   the evidence that you need to decide this case.  And after

03:52:06PM 24   you have seen all of the evidence, we are going to ask you to

03:52:11PM 25   return a verdict for Sanofi.  On behalf of Sanofi, my

03:52:15PM 1    partners, Doug and Jon, we thank you very, very much for your

03:52:22PM 2    attention this afternoon.  Thank you.

03:52:24PM 3         THE COURT:  Thank you.  Now might be time for our

03:52:27PM 4    afternoon break.  Court will be at recess for 15 minutes.

03:52:33PM 5    It's about 10 to 4:00, so let's say 4:10.  We'll return at

03:52:42PM 6    4:10.  Thank you.

03:52:45PM 7         MS. SASTRE:  Thank you, Your Honor.

03:52:45PM 8         THE CASE MANAGER:  All rise.

03:52:58PM 9         THE COURT:  Thank you.  Court's at recess.

04:08:18PM 10                    (Recess taken.)

04:13:24PM 11                    (In open court.)

04:13:28PM 12        THE COURT:  We ready to proceed?

04:13:30PM 13        Please bring in the jury.

04:13:46PM 14                   (Jury enters courtroom.)

04:13:50PM 15        THE COURT:  All jurors are present.  Court's back in

04:13:53PM 16   session.  You may be seated.

04:13:59PM 17        Mr. Schanker.

04:14:01PM 18        MR. SCHANKER:  Thank you, Your Honor.  Plaintiffs

04:14:02PM 19   call as their first witness former Taxotere global safety

04:14:09PM 20   officer, Dr. Amy Freedman.  And, Your Honor, this testimony

04:14:11PM 21   is by video deposition of approximately 35 minutes.

04:14:15PM 22        THE COURT:  Okay.  Members of the jury, you are about

04:14:19PM 23   to see a video testimony that was given during the

04:14:23PM 24   deposition.  At a deposition, a witness answers questions

04:14:26PM 25   under oath in advance of trial.  Under some circumstances, a

04:14:29PM  1   witness cannot be present to testify from the witness stand,

04:14:32PM  2   and that witness's testimony will be presented to you in the

04:14:35PM  3   form of a deposition.  As I said, sometime before this trial,

04:14:40PM  4   attorneys representing the parties in this case questioned

04:14:43PM  5   this witness under oath.  A court reporter was present and

04:14:47PM  6   recorded the testimony, and a videographer was present as

04:14:52PM  7   well.  The questions and answers will now be presented to you

04:14:56PM  8   by video.  This deposition testimony is entitled to the same

04:15:01PM  9   consideration, and is to be judged by you as to credibility

04:15:07PM  10  as if the witness has been present and had testified from the

04:15:09PM  11  witness stand in court.  Because this testimony is being

04:15:12PM  12  presented by video, it may appear choppy.  The parties have

04:15:18PM  13  edited the videos and deleted portions of it due to time

04:15:22PM  14  constraints.

04:15:24PM  15          With that, let's proceed.

04:15:24PM  16          (WHEREUPON, the videotaped deposition of AMY FREEDMAN

04:15:24PM  17  was played.)

04:15:36PM  18      Q.  Could you state your full name for the record,

04:15:38PM  19  please.

04:15:38PM  20      A.  Amy Freedman.

04:15:39PM  21      Q.  And when did you start working for Sanofi?

04:15:40PM  22      A.  November 2002.

04:15:43PM  23      Q.  And when did you stop working for Sanofi?

04:15:47PM  24      A.  March 20th -- what am I talking -- 2013.

04:15:53PM  25      Q.  When you first went to work at Sanofi, what was the

04:15:56PM 1   job title that you held?

04:15:59PM 2       A.   Global safety officer.

04:16:01PM 3       Q.   What is a global safety officer?

04:16:03PM 4       A.   It's a physician who is responsible for the oversight

04:16:09PM 5   of the safety profile of their assigned products within the

04:16:13PM 6   global organization.

04:16:14PM 7       Q.   And when you went to work for Sanofi as a global

04:16:19PM 8   safety officer in 2002, over what drugs were you to be the

04:16:26PM 9   global safety officer over?

04:16:27PM 10      A.   I had a number of drugs that I was responsible for,

04:16:34PM 11  some in more marketed areas, marketed in more countries than

04:16:42PM 12  others.  So Taxotere is obviously one of the oncology

04:16:44PM 13  products.  I also worked on developmental products.  I worked

04:16:47PM 14  on marketed products in -- some of them in neuroscience, some

04:16:51PM 15  in infectious disease.

04:16:53PM 16      Q.   So by sometime in --

04:16:56PM 17      A.   The first quarter.

04:16:57PM 18      Q.   The first quarter of 2003, you would have --

04:16:59PM 19      A.   Yeah.

04:17:00PM 20      Q.   -- assumed the responsibilities associated with being

04:17:03PM 21  the global safety officer responsible for the safety profile

04:17:05PM 22  for Taxotere?

04:17:07PM 23      A.   Right.

04:17:09PM 24      Q.   And when did you stop working as the global safety

04:17:17PM 25  officer responsible for the safety profile of Taxotere?

04:17:21PM   1      A.   March 2010.

04:17:24PM   2      Q.   Can you -- so Taxotere had more than one global

04:17:31PM   3   safety officer?

04:17:31PM   4      A.   It transitioned from a unified organization to the

04:17:38PM   5   Sanofi model, which was a -- a split by postmarketing and

04:17:45PM   6   clinical trials.

04:17:45PM   7      Q.   Can you explain that to me.

04:17:48PM   8      A.   There are marketed products, and there are products

04:17:58PM   9   that are in development, and there are products that span

04:18:02PM  10   both active clinical trials and marketed use.  The Sanofi

04:18:06PM  11   model was to have two global safety officers per product.

04:18:14PM  12      Q.   One global safety officer on the postmarketing side,

04:18:21PM  13   one on the clinical trials side?

04:18:22PM  14      A.   That's what I said, yes.

04:18:24PM  15      Q.   And when -- when -- when we talked about the first

04:18:29PM  16   quarter of 2003 when you became the global safety officer, or

04:18:33PM  17   assumed the responsibilities of the global safety officer

04:18:35PM  18   role for the safety profile of Taxotere, at that point, were

04:18:39PM  19   there two GSOs or just one?

04:18:44PM  20      A.   There was -- it's -- there -- I was, in name, the

04:18:49PM  21   global safety officer for Taxotere.  However, there were two

04:18:52PM  22   other physicians working actively on the submissions that

04:18:56PM  23   were going on.

04:19:00PM  24      Q.   Okay.  And then in 2006 when Dr. Palatinsky became a

04:19:10PM  25   GSO for Taxotere, you also held the title?

04:19:15PM **1**    A.   I was the -- yes, the GSO for postmarketing.

04:19:19PM **2**    Q.   And Dr. Palatinsky was the GSO for...

04:19:23PM **3**    A.   Clinical development.

04:19:25PM **4**    Q.   And I understand the distinction by title, but tell

04:19:30PM **5** me what the distinction is by -- or was by substantive job

04:19:35PM **6** duty.

04:19:36PM **7**    A.   Taxotere in an active clinical development program,

04:19:40PM **8** and Emanuel was working on the safety of the -- monitoring of

04:19:44PM **9** the safety of the clinical trials, as well as preparing the

04:19:48PM **10** regulatory submissions for new indications.  The division

04:19:58PM **11** continued up to the higher levels, so our managers were also

04:20:02PM **12** different.

04:20:02PM **13**    Q.   From an importance perspective, it's important to --

04:20:06PM **14** from a global safety officer, a safety profile examiner

04:20:11PM **15** perspective, you're looking for, are there new safety issues

04:20:15PM **16** that we have not previously identified, or are there new

04:20:20PM **17** characteristics of adverse events that we know exist, true?

04:20:24PM **18**    A.   Well, I would say I would be more concerned with a

04:20:27PM **19** new event that was reasonably suspected to be related or

04:20:32PM **20** caused by the drug.  I would be more concerned -- if I had to

04:20:35PM **21** prioritize my resources, I would look at issues that impact

04:20:40PM **22** public health.  And those are the regulatory requirements.

04:20:47PM **23** We have -- today, there is responsibility to monitor.  But I

04:20:53PM **24** guess what you were alluding to is the change in the nature

04:20:58PM **25** of the listed event.  And we do that.

04:21:02PM **1**  Q.  Right.

04:21:03PM **2**  A.  But we do have to prioritize to be able to

04:21:06PM **3**  communicate the impactful safety information to physicians

04:21:10PM **4**  and patients so we can keep them safe and have safe use of

04:21:15PM **5**  the drug.

04:21:17PM **6**  Q.  But when you say "pharmacovigilance," with respect

04:21:23PM **7**  to --

04:21:23PM **8**  A.  That's the definition of pharmacovigilance, is

04:21:26PM **9**  monitoring that.

04:21:27PM **10** Q.  That's the responsibility, though, of the company who

04:21:29PM **11** is putting the drug on the market, correct, to engage in the

04:21:34PM **12** pharmacovigilance that you just defined?

04:21:36PM **13** A.  The company does that, as well as head authorities.

04:21:40PM **14** They monitor as well.

04:21:41PM **15** Q.  As part of the safety issue or safety signal

04:21:46PM **16** detection process, when it comes to the review of ICSRs, that

04:22:00PM **17** is a routine practice inside the company; is that right?

04:22:04PM **18** A.  Every company reviews ICSRs.

04:22:06PM **19** Q.  Well, every drug company, right?

04:22:08PM **20** A.  Right.  Drug company.

04:22:10PM **21** Q.  Right.  I'm going to hand you what I have marked as

04:22:14PM **22** Exhibit 2 to the deposition.

04:22:16PM **23** A.  I saw the document.

04:22:17PM **24** Q.  And it looks like it's dated March -- Friday, March

04:22:23PM **25** 3, 2006.  Do you see that?

04:22:23PM  1     A.   Yes.

04:22:24PM  2     Q.   All right.  And do you know, or did you know Heidi

04:22:30PM  3  Filtenborg?

04:22:33PM  4     A.   I don't remember the name.

04:22:39PM  5     Q.   All right.

04:22:41PM  6     A.   She's in Denmark, DK.

04:22:44PM  7     Q.   And so Heidi is in Denmark, and it says "PH" in front

04:22:49PM  8  of her name.  Do you see that?

04:22:50PM  9     A.   Yes.

04:22:51PM  10    Q.   And does that tell you from what department she

04:22:53PM  11  worked?

04:22:54PM  12    A.   No, just pharmaceuticals.

04:22:58PM  13    Q.   And this is an e-mail from Heidi, and she sent it to

04:23:04PM  14  Global Pharmacovigilance, correct?

04:23:07PM  15    A.   That's what it says, "BRW Global Pharmacovigilance."

04:23:11PM  16    Q.   All right.  And the subject matter is "Reversibility

04:23:17PM  17  of alopecia after Taxotere treatment."  Do you see that?

04:23:19PM  18    A.   I see it.

04:23:19PM  19    Q.   All right.  And Heidi writes that she has received a

04:23:27PM  20  question from a Danish physician.  Do you see that?

04:23:31PM  21    A.   Yes.

04:23:31PM  22    Q.   And the question is "Is there any

04:23:34PM  23  documentation/knowledge about the reversibility of alopecia

04:23:39PM  24  after Taxotere treatment."  And then there's in parens,

04:23:43PM  25  "Expected time frame."  Do you see that?

| | | |
|---|---|---|
| 04:23:44PM | 1 | **A.** Uh-huh. |
| 04:23:45PM | 2 | **Q.** Yes? |
| 04:23:45PM | 3 | **A.** Yes, sorry. |
| 04:23:46PM | 4 | **Q.** Heidi Filtenborg's e-mail says that "The patient has |
| 04:23:53PM | 5 | had alopecia since 2004."  Do you see that? |
| 04:23:56PM | 6 | **A.** I see it. |
| 04:23:56PM | 7 | **Q.** And if you move forward to the first page of Exhibit |
| 04:24:02PM | 8 | Number 2, there is an e-mail chain.  And we'll start from the |
| 04:24:06PM | 9 | time stamp perspective with the bottom of page 1 of |
| 04:24:12PM | 10 | Exhibit 1.  And that, do you see, is an e-mail from |
| 04:24:18PM | 11 | Marina Velez.  Do you see that? |
| 04:24:21PM | 12 | **A.** I see. |
| 04:24:21PM | 13 | **Q.** Do you know who Marina Velez is? |
| 04:24:26PM | 14 | **A.** I forget what role she was in.  She was in the |
| 04:24:29PM | 15 | Bridgewater group. |
| 04:24:31PM | 16 | **Q.** And -- |
| 04:24:32PM | 17 | **A.** It says here, "Case data manager."  I can read. |
| 04:24:35PM | 18 | **Q.** And her e-mail is to Steven Nybert.  Do you see that? |
| 04:24:41PM | 19 | **A.** I see that. |
| 04:24:42PM | 20 | **Q.** Who is Steven Nybert? |
| 04:24:45PM | 21 | **A.** He was a global safety officer. |
| 04:24:47PM | 22 | **Q.** A global safety officer for what drug? |
| 04:24:49PM | 23 | **A.** I guess other oncology products. |
| 04:24:54PM | 24 | **Q.** All right.  And she says -- Marina to Steve says, "I |
| 04:25:01PM | 25 | understand Emanuel is not here today, so I'm forwarding you |

04:25:04PM **1**   this e-mail from our affiliate in Denmark."  Do you see that?

04:25:07PM **2**      **A.**  Yes.

04:25:08PM **3**      **Q.**  Then the e-mail above that is an e-mail that appears

04:25:12PM **4**   to be from you.  Do you see that at the top?

04:25:15PM **5**      **A.**  Well, the e-mail above is from Steve.

04:25:18PM **6**      **Q.**  Oh, I'm sorry.  The e-mail above that is from Steve

04:25:23PM **7**   and is cc'ing you, correct?

04:25:25PM **8**      **A.**  Correct.

04:25:26PM **9**      **Q.**  And that e-mail is March -- Friday, March the 3rd at

04:25:30PM **10**  4:44 p.m.?

04:25:31PM **11**     **A.**  Uh-huh.

04:25:31PM **12**     **Q.**  Yes?

04:25:32PM **13**     **A.**  Yes.

04:25:32PM **14**     **Q.**  And Steve asks of Emanuel, "Please address this

04:25:38PM **15**  matter on your return.  Apparently this is an inquiry, not an

04:25:42PM **16**  SAE."  Do you see that?

04:25:44PM **17**     **A.**  I see that.

04:25:45PM **18**     **Q.**  And then before -- below that it says, "In addition

04:25:48PM **19**  to providing the information requested, we may need to enter

04:25:51PM **20**  an AE and of course inquire about the event, illness,

04:25:54PM **21**  concomitant medications, and other therapies," right?

04:25:59PM **22**     **A.**  Right.

04:25:59PM **23**     **Q.**  And then the last sentence says, "Perhaps Amy might

04:26:03PM **24**  know if we have a file on this topic."  Do you see that?

04:26:06PM **25**     **A.**  I see that.

04:26:08PM 1     Q.   And, again, this is March the 3rd of 2006, right?

04:26:14PM 2     A.   That's what it says.

04:26:15PM 3     Q.   All right.  Did you maintain files regarding safety

04:26:18PM 4     issues related to Docetaxel treatment outside of a PSUR?

04:26:25PM 5     A.   I'm not sure what he means by "file."  I'm putting

04:26:28PM 6     air quotes because I didn't keep "files."  I think he just

04:26:34PM 7     meant if there was some additional information I was aware

04:26:37PM 8     of.

04:26:37PM 9     Q.   Well, what he actually, though, says is that "You may

04:26:40PM 10    have a file on this topic," right?

04:26:42PM 11    A.   He does say "file."  But I don't know if he means --

04:26:45PM 12    meant literally -- you know, I didn't have a file on the

04:26:51PM 13    topic.

04:26:51PM 14    Q.   All right.

04:26:51PM 15    A.   That's why I answered as I did.

04:26:53PM 16    Q.   All right.  So you responded to Steven Nybert's March

04:27:02PM 17    3rd, 2006, e-mail in an e-mail that you wrote on March

04:27:05PM 18    the 5th, 2006, correct?

04:27:07PM 19    A.   That's the date.

04:27:08PM 20    Q.   And this e-mail was an e-mail that you would have

04:27:12PM 21    written in the course of your employment and in the scope of

04:27:16PM 22    your work at Sanofi, correct?

04:27:18PM 23    A.   It came from Sanofi e-mail, yes.

04:27:21PM 24    Q.   Okay.  And it was an e-mail that you would have

04:27:25PM 25    written as an employee of Sanofi in the course and scope of

04:27:27PM **1** your employment with Sanofi, correct?

04:27:28PM **2**     **A.**  Yes.

04:27:29PM **3**     **Q.**  As a part of your regular doing business at Sanofi,

04:27:33PM **4** you participated in e-mails like this, correct?

04:27:36PM **5**     **A.**  I respond to e-mails that are addressed to me.

04:27:38PM **6**     **Q.**  And so on Sunday, March the 5th, 2006, at 2:17 p.m.,

04:27:44PM **7** you wrote back to Steven Nybert and to Emanuel Palatinsky and

04:27:53PM **8** you indicate, "Only peripheral knowledge," correct?

04:27:57PM **9**     **A.**  That's the wording.

04:27:58PM **10**     **Q.**  And what you meant is you only had peripheral

04:28:02PM **11** knowledge as the global safety officer over Taxotere; you

04:28:05PM **12** only had peripheral knowledge regarding the topic of

04:28:11PM **13** reversibility of alopecia after Taxotere treatment, correct?

04:28:14PM **14**     **A.**  I didn't have a file on it, that's correct.  I had

04:28:22PM **15** therefore peripheral knowledge -- indirect knowledge through

04:28:24PM **16** the labeling and the IB.

04:28:26PM **17**     **Q.**  You -- in your e-mail of March 5th, 2006, state that,

04:28:32PM **18** "I know that there were some irreversible cases of alopecia

04:28:37PM **19** as documented in the clinical trials," and then in parens it

04:28:40PM **20** says, "See IB and CDS wording."  Do you see that?

04:28:44PM **21**     **A.**  Yes.

04:28:46PM **22**     **Q.**  The IB is the Investigators --

04:28:50PM **23**     **A.**  Brochure.

04:28:54PM **24**     **Q.**  Brochure.  And the CDS is what?

04:28:57PM **25**     **A.**  That's the safety data sheet.

04:28:57PM **1**     Q.   All right.

04:28:59PM **2**     A.   The core safety data sheet.

04:29:01PM **3**     Q.   When you looked at the Investigator's Brochure and

04:29:06PM **4**   the CDS wording, was that the sole source of your peripheral

04:29:15PM **5**   knowledge?

04:29:17PM **6**     A.   I can't recall what I did in 2006 at the time.  I

04:29:25PM **7**   don't know.  I'm -- all I can say is just, looking -- reading

04:29:32PM **8**   this, I must -- I looked at the IB and the CDS and wrote this

04:29:36PM **9**   response.

04:29:36PM **10**     Q.   You then go on to say, "I'm sorry that I do not have

04:29:39PM **11**   more to offer."  Do you see that?

04:29:41PM **12**     A.   I see it.

04:29:42PM **13**     Q.   And then you say, "This is the kind of thing that a

04:29:46PM **14**   non-company physician would review in their practice and

04:29:49PM **15**   possibly report in the literature."  Do you see that?

04:29:51PM **16**     A.   I'm reading.

04:29:53PM **17**     Q.   Am I reporting accurately to the jury what you've

04:29:55PM **18**   stated in your e-mail?

04:29:56PM **19**     A.   I am reading with you this e-mail, yes.

04:29:59PM **20**     Q.   All right.  And then it says, "However, I am not" --

04:30:03PM **21**   in all caps -- "advising a lit search for this topic,"

04:30:09PM **22**   exclamation point.  Do you see that?

04:30:10PM **23**     A.   I see that.

04:30:10PM **24**     Q.   All right.  When you write things in all caps and

04:30:13PM **25**   conclude a sentence with an exclamation point?

04:30:16PM  1      A.   Right.  This e-mail was sent to me in Emanuel's

04:30:21PM  2   absence.  It is not my responsibility, my role, my place to

04:30:25PM  3   start directing additional activities by other members of the

04:30:29PM  4   safety group.  We were waiting for Emanuel's return.

04:30:33PM  5      Q.   What we do know with great certainty is that Heidi

04:30:38PM  6   Filtenborg forwarded the request from the Danish physician to

04:30:51PM  7   Global Pharmacovigilance to get an answer, correct?

04:30:54PM  8      A.   From this e-mail, it looks like she wants additional

04:30:58PM  9   information.  Maybe what she's provided to the Danish

04:31:00PM 10   physician was -- was limited, and wanted to -- and the

04:31:06PM 11   physician wanted more information.

04:31:08PM 12      Q.   What we do know with great certainty is that Heidi

04:31:12PM 13   Filtenborg forwarded the request from the Danish physician to

04:31:16PM 14   Global Pharmacovigilance to get an answer, correct?

04:31:18PM 15      A.   She forwarded her summary of the Danish physician's

04:31:24PM 16   request, not the Danish -- there's no contact -- direct

04:31:27PM 17   contact with the Danish physician.

04:31:28PM 18      Q.   Well, "I have received this question from a Danish

04:31:31PM 19   physician," dash, "is there any documentation/knowledge about

04:31:36PM 20   the reversibility of alopecia after Taxotere treatment, e.g.,

04:31:43PM 21   expected time frame?"

04:31:44PM 22      A.   Right.  Then she translated his request and put it

04:31:49PM 23   into an e-mail.

04:31:50PM 24      Q.   And she wanted an answer, correct?

04:31:52PM 25      A.   And she wanted that information if it was available.

04:31:54PM  1      Q.   And she wanted an honest answer, correct?

04:31:56PM  2      A.   Always.

04:31:57PM  3      Q.   And we can presume that Heidi Filtenborg was going to

04:32:02PM  4  take that information provided by Global Pharmacovigilance

04:32:06PM  5  back to the Danish doctor to answer the question, correct?

04:32:10PM  6      A.   I would think so.

04:32:13PM  7      Q.   And if you as a global safety officer been asked to

04:32:18PM  8  help respond to the question, if you only have peripheral

04:32:22PM  9  knowledge and you see that there's this concern being raised

04:32:27PM  10  by this Danish doctor about the reversibility of alopecia,

04:32:32PM  11  don't you want to further educate yourself on the topic?

04:32:35PM  12      A.   I looked at the IB.  I looked at the CCDS.  There's

04:32:43PM  13  information in those documents.  There are listed events.  I

04:32:50PM  14  wasn't sure what was available in Denmark.

04:32:56PM  15      Q.   Right.

04:32:57PM  16      A.   And ultimately, I didn't -- I wasn't the one

04:33:00PM  17  responding to the Danish physician.

04:33:04PM  18      Q.   I think my question was a little bit different, and

04:33:07PM  19  maybe, again, inartfully worded, so I'll try to re-ask it.

04:33:11PM  20  When you, as one of the global safety officers over Taxotere,

04:33:19PM  21  received word of this request from this Danish physician

04:33:23PM  22  indicating that the physician is concerned about reversible

04:33:31PM  23  alopecia -- or the irreversibility of alopecia in a patient

04:33:36PM  24  that has had alopecia since 2004, don't you, in 2006, as a

04:33:44PM  25  global safety officer, want to educate yourself about this

04:33:52PM 1   problem?

04:33:52PM 2       A.   I did.   I went to the clinical trial data that was

04:33:54PM 3   summarized in these two documents.

04:33:57PM 4       Q.   You weren't going to have one done to help answer the

04:34:00PM 5   question for the Danish doctor, true?   That's what you said

04:34:04PM 6   here.

04:34:05PM 7       A.   I wasn't going to do it.

04:34:06PM 8       Q.   Right.   Your understanding of the issue of

04:34:10PM 9   irreversible alopecia back in March of 2006, although you

04:34:15PM 10  weren't able to -- you're not able to recall what the numbers

04:34:18PM 11  were, the magnitude of its occurrence was sufficient enough

04:34:23PM 12  that you were aware of it yourself peripherally?

04:34:29PM 13      A.   Alopecia is a listed event.   I saw them in the line

04:34:34PM 14  listings for the PSURs.

04:34:37PM 15      Q.   You understand I'm talking about irreversible

04:34:40PM 16  alopecia?

04:34:40PM 17      A.   Irreversible -- if there were irreversible cases,

04:34:43PM 18  they were covered by the labeling.

04:34:44PM 19      Q.   Your understanding and recollection is that, back in

04:34:47PM 20  March of 2006, that the characterization of alopecia as

04:34:50PM 21  either irreversible or persisting was contained in the

04:34:54PM 22  wording of the USPI, correct?

04:34:57PM 23      A.   That was my understanding.

04:34:58PM 24      Q.   Okay.   With -- with regard to your March 5th, 2006,

04:35:11PM 25  e-mail, do you recall receiving any further word from Steven

04:35:17PM  1    Nybert asking you to do anything further?

04:35:20PM  2        **A.**   No.

04:35:22PM  3        **Q.**   Outside of isolated review of individual reports that

04:35:32PM  4    might come in, who at the company, if not the global safety

04:35:40PM  5    officers, would be looking and -- proactively looking in

04:35:45PM  6    aggregate at what these reports are all -- the picture being

04:35:50PM  7    painted by these reports as an aggregate?

04:35:54PM  8        **A.**   So I have two parts to this -- to the answer for you.

04:35:58PM  9    Is -- one is, we're always looking to see whether the label

04:36:01PM  10   is reflecting the information as we're receiving additional

04:36:05PM  11   information over the marketed use of the product and as

04:36:08PM  12   patient use grows for this product.  So this wasn't

04:36:12PM  13   necessarily new information, even if those -- even if

04:36:16PM  14   individual cases were read.  The other piece I wanted to say

04:36:20PM  15   was -- back to the clinical trial information, is that this

04:36:23PM  16   information is looked in aggregate in those clinical trials

04:36:28PM  17   looking at how frequently alopecia occurs and what the

04:36:32PM  18   outcome is.

04:36:32PM  19        So just let me be clear about what the word

04:36:36PM  20   "aggregate" means.  The aggregate doesn't mean that I'm going

04:36:40PM  21   to go take, you know, these 44 cases, or if I'm looking at

04:36:44PM  22   neutropenia, I'm going to look at 2,000 cases or 10,000 cases

04:36:49PM  23   and look at every single one of those cases.  The whole point

04:36:50PM  24   of aggregate review is that you have to kind of harmonize and

04:36:55PM  25   codify the entry of those cases.  That's what line lists are

04:36:58PM **1**     for; that's what case counts are for.  So we have MedDRA

04:37:03PM **2**     dictionary coding.  MedDRA dictionary coding is alopecia for

04:37:06PM **3**     every single one of these cases.  That was the term.  When

04:37:08PM **4**     you aggregate, you can do counts on alopecia.  You're not

04:37:12PM **5**     drilling into every single case.  So if you see a listed

04:37:15PM **6**     event, and you say, we have pretty much the same number of

04:37:18PM **7**     cases from interval to interval, PSUR to PSUR, you know,

04:37:23PM **8**     reporting frequency, there's nothing suggesting that

04:37:27PM **9**     something has changed about the nature of that listed event.

04:37:27PM **10**         Q.  All right.

04:37:32PM **11**         A.  And the company is doing their job.  It's not that

04:37:34PM **12**     they're not doing their job.  It's absolutely they're

04:37:37PM **13**     following the process.  And that's what we're supposed to do,

04:37:39PM **14**     and we're doing it.

04:37:41PM **15**         Q.  I'll hand you what's been marked as Exhibit 11.

04:37:44PM **16**     Exhibit Number 11 is, for purposes of the record, Sanofi

04:37:51PM **17**     05364125.  And this is a meeting invite with attachments.

04:38:08PM **18**     And this is dated April the 25th, 2006.  Do you see that?

04:38:16PM **19**         A.  Yes.

04:38:18PM **20**         Q.  There's a list of required attendees, and you appear

04:38:22PM **21**     to be one of them.  Do you agree with me?

04:38:24PM **22**         A.  My name is on the list, yes.

04:38:27PM **23**         Q.  It indicates that there's going to be a meeting

04:38:31PM **24**     Tuesday, April 25th, 2006, from 8:00 to 9:00 a.m. Eastern

04:38:42PM **25**     time.  Do you see that?

04:38:43PM 1      A.  I see it.

04:38:45PM 2      Q.  And again, regarding this meeting, it indicates in

04:38:52PM 3  bold, "Please do not respond to this message by e-mail or

04:38:55PM 4  otherwise in writing."  Do you see that?

04:38:58PM 5      A.  I see it.

04:38:59PM 6      Q.  Do you know why the attendees of this meeting are not

04:39:05PM 7  supposed to respond by e-mail or otherwise in writing

04:39:10PM 8  regarding this labeling discussion?

04:39:13PM 9      A.  I don't know what the particular topic is, but it

04:39:16PM 10  seems like it's the same as Doris' signature.

04:39:22PM 11      Q.  You're listed as an attendee and a recipient of these

04:39:26PM 12  documents, correct?

04:39:27PM 13      A.  Yes.

04:39:28PM 14      Q.  And the patient leaflet, that's the information -- a

04:39:32PM 15  portion of the labeling information that's supposed to be

04:39:34PM 16  given to the patient; is that right?

04:39:36PM 17      A.  Yes.

04:39:37PM 18      Q.  And again, this is -- time frame is April 2006.  And

04:39:42PM 19  the first one I want to discuss with you is the natively

04:39:47PM 20  produced file that's numbered 05364128.

04:39:47PM 21      A.  Okay.

04:39:59PM 22      Q.  And if you go beyond the cover sheet that says "File

04:40:03PM 23  produced natively" to the actual document, the top of page 1

04:40:09PM 24  of the document is -- says "Draft Proposal 1."

04:40:13PM 25          Do you see that?

04:40:14PM **1**    **A.**  Uh-huh.

04:40:14PM **2**    **Q.**  Yes?

04:40:15PM **3**    **A.**  Yes.

04:40:18PM **4**    **Q.**  Okay.

04:40:17PM **5**    **A.**  Sorry.

04:40:18PM **6**    **Q.**  All right.  And the one, two, three -- the fourth

04:40:23PM **7**   bullet point down on "Very Common" has to do with hair loss.

04:40:30PM **8**   Do you see that?

04:40:31PM **9**    **A.**  I see it.

04:40:31PM **10**   **Q.**  And it says "Short-term hair loss," and then in

04:40:36PM **11**  parens, "After treatment, normal hair growth should return."

04:40:39PM **12**  Do you see that?

04:40:40PM **13**   **A.**  I see it.

04:40:42PM **14**   **Q.**  And then if you go to the second page of the draft

04:40:46PM **15**  proposal under "Rare," under "Rare," there's also a bullet

04:40:50PM **16**  point that addresses hair loss.  And it says "Alopecia," in

04:40:54PM **17**  parens, "Hair loss that did not reverse at the end of the

04:40:59PM **18**  study."  I'm going to say that again because there was a

04:41:01PM **19**  cough.  "Alopecia that did not reverse at the end of the

04:41:06PM **20**  study."  Do you see that?

04:41:07PM **21**   **A.**  I see it.

04:41:07PM **22**   **Q.**  All right.  So this proposed draft contains two kinds

04:41:15PM **23**  of alopecia.  Do you agree with me?

04:41:15PM **24**       UNIDENTIFIED COUNSEL:  Object to form.

04:41:21PM **25**       THE WITNESS:  Yes.

04:41:21PM **1**      **Q.**  One is very common.  And under "Very Common," it

04:41:24PM **2**  says, "Experienced in more than one in ten patients."  Do you

04:41:28PM **3**  see that?

04:41:28PM **4**      **A.**  I'm reading it, yes.

04:41:29PM **5**      **Q.**  All right.  And the very common is the "Short-term

04:41:33PM **6**  hair loss.  After treatment, normal hair growth should

04:41:35PM **7**  return."  Do you see that?

04:41:36PM **8**      **A.**  Yes.

04:41:37PM **9**      **Q.**  And then listed as "Rare" is the irreversible hair

04:41:45PM **10**  loss, alopecia hair loss that did not reverse at the end of

04:41:48PM **11**  the study, correct?

04:41:48PM **12**      **A.**  Yes, we've read that.

04:41:48PM **13**      **Q.**  All right.

04:41:50PM **14**      **A.**  Yes.

04:41:50PM **15**      **Q.**  I want to next turn to Draft Proposal Number II,

04:41:56PM **16**  which is Bates-labeled 05364127.  And again, if you look

04:42:06PM **17**  beyond the cover page at the top, it says "Draft Proposal

04:42:10PM **18**  Number II."  Do you see that?

04:42:11PM **19**      **A.**  Yes.

04:42:13PM **20**      **Q.**  Here, if you go to the second page of Draft Proposal

04:42:19PM **21**  Number II, and you go up one, two, three, four, five

04:42:23PM **22**  paragraphs from the bottom, with the sentence starting, "Skin

04:42:27PM **23**  and subcutaneous issue," and it says "Hair loss."  Do you see

04:42:32PM **24**  that?

04:42:32PM **25**      **A.**  I see it.

04:42:35PM **1**      Q.   And it says "Hair loss; alopecia," and it's listed as

04:42:40PM **2**  very common.  Do you see that?

04:42:46PM **3**      A.   Where is --

04:42:49PM **4**      Q.   In the second line.  It gives a list of -- it has a

04:42:53PM **5**  colon, and then it has "Hair loss," semicolon, and goes

04:42:58PM **6**  through and says, "Very common."  Are you not seeing that?

04:43:02PM **7**      A.   Oh, very -- okay.  After all of these.  Okay.  Yes.

04:43:09PM **8**  So all of those terms, then, are very common.

04:43:12PM **9**      Q.   And then towards the bottom of that same paragraph,

04:43:18PM **10** it says, "Alopecia; hair loss that did not reversible" -- I

04:43:24PM **11** don't know.  But it says --

04:43:25PM **12**     A.   It's a draft.

04:43:26PM **13**     Q.   -- "That did not reversible at the end of the study."

04:43:29PM **14** Do you see that?

04:43:30PM **15**     A.   I see it.

04:43:31PM **16**     Q.   So again, this Proposal Number 2 also includes a

04:43:35PM **17** description of two types of alopecia, correct?

04:43:39PM **18**     A.   One is actually subsumed under the other, but...

04:43:44PM **19**     Q.   Well, it --

04:43:45PM **20**     A.   One is the top -- the common is going to be all

04:43:48PM **21** alopecia cases, and the second one you talked about is going

04:43:51PM **22** to be a specific subset of those alopecia cases.

04:43:54PM **23**     Q.   That are going to be irreversible, right?

04:43:57PM **24**     A.   That are not reversible, yes.

04:43:59PM **25**     Q.   Not reversible.  And the Draft 1 that we discussed

04:44:06PM  1   previously and this Draft 2 described for patients in detail

04:44:12PM  2   that there can be alopecia that is not reversible at the end

04:44:17PM  3   of the study, correct?

04:44:17PM  4          UNIDENTIFIED COUNSEL:  Objection, form.

04:44:20PM  5          THE WITNESS:  Let me just -- I'm going to make some

04:44:21PM  6   clarifications.  You keep saying Draft 1 and 2.  They're

04:44:25PM  7   Proposal 1.  They're not related to one another.  So there's

04:44:28PM  8   a Proposal 1, 2, and 3, it looks like.

04:44:28PM  9      Q.   Yes.

04:44:30PM  10     A.   There wasn't draft iterations.

04:44:33PM  11     Q.   Fair enough.

04:44:33PM  12     A.   Okay.  Let's make that clear.

04:44:33PM  13     Q.   Let me rephrase the question so I have a clean

04:44:35PM  14  record.

04:44:35PM  15     A.   Okay.  Yes.

04:44:36PM  16     Q.   That's a good point that you make, and I will be

04:44:37PM  17  clear.

04:44:37PM  18     A.   It's a different format.  It's information presented

04:44:40PM  19  in three different formats.

04:44:41PM  20     Q.   Yes, I understand it.  I just didn't articulate it

04:44:45PM  21  well --

04:44:45PM  22     A.   Okay.

04:44:45PM  23     Q.   -- for the record, so let me clean it up.  And I

04:44:47PM  24  appreciate your request for clarification.  We discussed

04:44:50PM  25  Draft Proposal Number I, and now we're discussing Draft

04:44:56PM  1   Proposal Number II.  Draft Proposal Number II also includes a

04:44:59PM  2   description of two types of alopecia that could be

04:45:03PM  3   experienced with the use of the drug, one of which is

04:45:08PM  4   nonreversible alopecia, correct?

04:45:09PM  5       A.   Typically -- if you're saying it's a "type," I don't

04:45:12PM  6   know if it's a type.  But it's telling you about the outcome.

04:45:17PM  7       Q.   Let's look at Draft Proposal Number III.  Draft

04:45:26PM  8   Proposal Number III is Sanofi 05364130.  And if you go beyond

04:45:39PM  9   the cover page, you see at the top, it says, Draft Proposal

04:45:44PM  10  Roman numeral III.

04:45:46PM  11      A.   Yes.

04:45:47PM  12      Q.   And at the top, it has very common side effects

04:45:51PM  13  listed as equal to or greater than 10 percent of the

04:45:57PM  14  patients.

04:45:57PM  15      A.   That's what it says, yes.

04:46:00PM  16      Q.   And then common side effects affecting 1 to 10

04:46:03PM  17  percent of the patients, right?

04:46:05PM  18      A.   Yes.

04:46:05PM  19      Q.   And then uncommon side effects, less than 1 percent?

04:46:08PM  20      A.   Yes.

04:46:10PM  21      Q.   But more than none?

04:46:12PM  22      A.   Right.

04:46:13PM  23      Q.   And if you go to page 2 of Draft Proposal Roman

04:46:20PM  24  Numeral III, you'll see the third box down on the left has

04:46:26PM  25  "Skin and subcutaneous tissue disorders."  Do you see that?

04:46:30PM  1      A.  Yes.

04:46:30PM  2      Q.  And it describes hair loss as being very common in

04:46:36PM  3   the first box.  Do you see that?

04:46:37PM  4      A.  Yes.

04:46:39PM  5      Q.  And then the third box over describes alopecia

04:46:43PM  6   "nonreversible" at the end of the study as being an uncommon

04:46:48PM  7   side effect, do you see that?

04:46:49PM  8      A.  I see that.

04:46:50PM  9      Q.  And so, again, in addition to Draft Proposals Number

04:46:58PM  10   I and Draft Proposal Number II, Draft Proposal Number III

04:47:05PM  11   categorizes two different outcomes for alopecia; one that's

04:47:08PM  12   temporary and affects a large number of people, and the other

04:47:11PM  13   that is nonreversible at the end of the study that is

04:47:15PM  14   characterized as an uncommon side effect, correct?

04:47:18PM  15      A.  That's what I see, yes.

04:47:21PM  16      Q.  All right.  Do you -- first of all, do you have an

04:47:26PM  17   independent recollection of the meeting when these issues

04:47:29PM  18   were discussed that are contained within Exhibit Number 11?

04:47:35PM  19      A.  Not specifically.

04:47:36PM  20      Q.  This occurrence in April of 2006 is just a few weeks

04:47:43PM  21   after the request for information came in from the Danish

04:47:48PM  22   physician that we discussed at length earlier, correct?  This

04:47:53PM  23   is April of 2006 --

04:47:55PM  24      A.  All right.  Well, I'll take your word for it.  I

04:47:58PM  25   don't remember the date.

04:47:58PM **1**   **Q.**   Well, you don't have to take my word.

04:48:00PM **2**   **A.**   You said the Danish was March.   Okay.

04:48:02PM **3**   **Q.**   Yeah.   I think we discussed the Danish and the

04:48:04PM **4**   exhibits related to those e-mails were in early March of

04:48:07PM **5**   2006.

04:48:08PM **6**   **A.**   March.   Okay.

04:48:09PM **7**   **Q.**   Clearly, Sanofi knew that Taxotere could cause

04:48:14PM **8**   irreversible alopecia in 2006, right?

04:48:15PM **9**   **A.**   It's in the label.

04:48:23PM **10**   **Q.**   Okay.   And when you refer to the label, which label

04:48:25PM **11**   are you referring to?

04:48:26PM **12**   **A.**   Any.   Pick one.

04:48:29PM **13**   **Q.**   USPI?

04:48:32PM **14**   **A.**   SMPC, the patient leaflet of the USPI, if I remember

04:48:37PM **15**   correctly, has it in it.   The IB, the core safety data sheet.

04:48:41PM **16**   **Q.**   Just going back to -- my question was, to make sure

04:48:43PM **17**   I've got the question actually answered on the record --

04:48:49PM **18**   from -- based upon your knowledge at Sanofi in 2006, Sanofi

04:48:56PM **19**   knew Taxotere could cause irreversible alopecia in 2006,

04:49:02PM **20**   correct?

04:49:02PM **21**        UNIDENTIFIED COUNSEL:   Objection.

04:49:03PM **22**        THE WITNESS:   Yes.   Well, they were listed events.

04:49:06PM **23**   They were certainly considered listed events.

04:49:09PM **24**   **Q.**   You agree with me that "irreversible" is different

04:49:14PM **25**   than "temporary"?

04:49:16PM  1      **A.**  Irreversible and temporary have -- you know, there's

04:49:22PM  2    a gradation, there's a nuisance, there's a spectrum.

04:49:26PM  3      **Q.**  Not in my question.

04:49:29PM  4      **A.**  Yeah.

04:49:29PM  5      **Q.**  Not in my question.  You might be applying some

04:49:32PM  6    context to it.

04:49:33PM  7      **A.**  If I --

04:49:34PM  8      **Q.**  No, let's not speak over one another.  I know it's

04:49:38PM  9    difficult, but just for purposes of -- do you agree with me

04:49:43PM  10   that, by definition, something that is temporary is not the

04:49:48PM  11   same as something that is permanent?

04:49:51PM  12     **A.**  By definition, yes.  I'm sorry.  I think I

04:49:55PM  13   misunderstood you.  I thought you were saying temporary and

04:49:58PM  14   reversible.

04:50:00PM  15     **Q.**  From an outcome perspective, if you have something

04:50:10PM  16   that is permanent in outcome that's different, by definition,

04:50:16PM  17   it's something that is temporary in outcome, right?

04:50:19PM  18     **A.**  The outcome, yes.  We collect outcomes on reports

04:50:23PM  19   when we can get it, and permanent would be not recovered.

04:50:28PM  20     **Q.**  And temporary would be?

04:50:29PM  21     **A.**  Recovered.

04:50:30PM  22     **Q.**  And those aren't the same thing, are they?

04:50:33PM  23     **A.**  Not recovered is not the same as recovered.

04:50:35PM  24     **Q.**  Say it again.

04:50:36PM  25     **A.**  Not recovered is not the same as recovered, right,

04:50:40PM  1   because there's a "not" in front of one of the words.

04:50:50PM  2                    (End of video deposition.)

04:50:50PM  3          (WHEREUPON, the following proceedings were held at

04:50:50PM  4   the bench.)

04:50:50PM  5          THE COURT:  You want to approach real quick?

04:50:50PM  6          MR. SCHANKER:  Yes, Your Honor.

04:51:20PM  7          THE COURT:  Thank you.  This is just logistics.  I'm

04:51:22PM  8   just trying to find out where we are in time.

04:51:24PM  9          MR. SCHANKER:  The next video that we can show is

04:51:26PM  10  only ten minutes, if you would like to do that.

04:51:29PM  11         THE COURT:  Okay.

04:51:29PM  12         MS. SASTRE:  Who is that?

04:51:30PM  13         MR. SCHANKER:  Polizzano.

04:51:32PM  14         THE COURT:  Okay.  That would be perfect.  I thought

04:51:34PM  15  we had another 30-minute one, and I was worried about it.

04:51:34PM  16         MR. SCHANKER:  Okay.

04:51:34PM  17         THE COURT:  Okay.

04:51:50PM  18         MR. SCHANKER:  Very good.  Thank you.

04:51:50PM  19                    (In open court.)

04:51:50PM  20         THE COURT:  Mr. Schanker.

04:51:52PM  21         MR. SCHANKER:  Yes, Your Honor.  We would like to

04:51:55PM  22  call the Sanofi regulatory affairs employee Frances Polizzano

04:51:59PM  23  by video deposition.  And it's approximately ten minutes,

04:52:01PM  24  Your Honor.  By the way, I did not move into evidence the

04:52:03PM  25  exhibits from that deposition.  Would you like me to do that

04:52:05PM  1   right now?

04:52:06PM  2           THE COURT:  Yes, please.

04:52:08PM  3           MR. SCHANKER:  Plaintiffs wish to move into evidence

04:52:10PM  4   Exhibits P21 and P28.

04:52:15PM  5           MR. MOORE:  Subject to our objections in the motions

04:52:18PM  6   and the designations.

04:52:19PM  7           THE COURT:  Let them be admitted.

04:52:21PM  8           (Exhibit No. P21 and P28 admitted into evidence.)

04:52:21PM  9           MR. SCHANKER:  Now we would like to call

04:52:24PM  10  Ms. Polizzano, Your Honor.

04:52:25PM  11          THE COURT:  Okay.  Ladies and gentlemen of the jury,

04:52:27PM  12  as I indicated to you before, this is going to be a video

04:52:30PM  13  deposition.  You should consider this testimony like you do

04:52:33PM  14  any other.  Please proceed.

04:52:33PM  15          (WHEREUPON, the video deposition of FRANCES POLIZZANO

04:52:33PM  16  was played.)

04:52:42PM  17      Q.  Could you state your name for the record, please?

04:52:44PM  18      A.  Fran Polizzano.

04:52:46PM  19      Q.  And are you currently employed?

04:52:48PM  20      A.  Yes.

04:52:48PM  21      Q.  And by whom are you currently employed?

04:52:50PM  22      A.  By Sanofi.

04:52:52PM  23      Q.  All right.  And in what capacity are you employed

04:52:54PM  24  there currently?

04:52:56PM  25      A.  I'm in regulatory affairs, and currently I'm in the

04:53:01PM  1   labeling department working on consumer health products.

04:53:06PM  2       Q.   Do you have a title?

04:53:08PM  3       A.   Associate director.

04:53:10PM  4       Q.   Do you have a full title of your job?

04:53:14PM  5       A.   That's -- it's associate director, labeling manager.

04:53:21PM  6       Q.   Okay.  Are you a senior manager on oncology products?

04:53:28PM  7       A.   I was.  Not now, but I was.

04:53:34PM  8       Q.   Okay.  When were you a senior manager for oncology

04:53:39PM  9   products at Sanofi in the US regulatory affairs department?

04:53:45PM 10       A.   From June of 2013 until probably October of 2016.

04:53:57PM 11       Q.   And then in October of 2016 your job changed?

04:54:05PM 12       A.   Within my department, I moved to support

04:54:09PM 13   cardiovascular products.

04:54:10PM 14       Q.   Okay.  And how long have you been with the company?

04:54:14PM 15       A.   Since 2000.  May of 2000.

04:54:18PM 16       Q.   And you have a doctorate degree?

04:54:20PM 17       A.   A PharmD, yes.

04:54:23PM 18       Q.   All right.  Do you agree that a drug manufacturer

04:54:25PM 19   must provide informative and accurate information in its

04:54:29PM 20   label to effectively communicate with doctors?

04:54:33PM 21       A.   Yes.  And they do that --

04:54:33PM 22       Q.   All right.

04:54:35PM 23       A.   -- by constant monitoring of the product.  It's a --

04:54:38PM 24   you know, the label is a living document that is constantly

04:54:43PM 25   changing over its life cycle.

04:54:45PM  **1**      **Q.**   Good evening, Fran, how are you?

04:54:48PM  **2**      **A.**   Good.

04:54:49PM  **3**      **Q.**   Tell me what you mean by the label being a "living

04:54:52PM  **4**  document."

04:54:54PM  **5**      **A.**   Well, as the drug develops, obviously, we have

04:54:58PM  **6**  several indications for it.  So over time as those studies

04:55:03PM  **7**  were being submitted to the agency, we were evolving not only

04:55:10PM  **8**  from an efficacy perspective but we were also continually

04:55:15PM  **9**  monitoring the safety profile of the products.  So as safety

04:55:20PM  **10** signals came up, we would also address those from a, like,

04:55:26PM  **11** postmarketing perspective, as well.

04:55:28PM  **12**     **Q.**   In terms of the duration of alopecia, do you think

04:55:36PM  **13** that the women who are provided Taxotere have a right to know

04:55:43PM  **14** what the estimated duration of hair loss will be if the

04:55:48PM  **15** company has information about that aspect of the adverse

04:55:56PM  **16** event?

04:55:57PM  **17**     **A.**   That question, you would have to ask to safety or

04:55:59PM  **18** somebody that has more familiarity with the product and these

04:56:04PM  **19** events that you're referring to.

04:56:06PM  **20**     **Q.**   You, based upon your experience working for the

04:56:10PM  **21** pharmaceutical industry for the last 17 years, are aware of

04:56:14PM  **22** the different ways that a pharmaceutical company has

04:56:17PM  **23** available to it to promote the use of its products, correct?

04:56:27PM  **24** That's it.

04:56:29PM  **25**     **A.**   There are many avenues, I suppose.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 04:56:31PM | 1  | Q.  Let's move on then to this exhibit, Number 23.  23 is |
| 04:56:41PM | 2  | a patient pamphlet that was produced by and delivered by |
| 04:56:48PM | 3  | Sanofi-Aventis.  And you can see here on page 3 of the |
| 04:56:54PM | 4  | document, Sanofi Bates label number 01038472.  Do you see |
| 04:56:59PM | 5  | that? |
| 04:56:59PM | 6  | A.  Where are you, page 3? |
| 04:57:01PM | 7  | Q.  This just tells you what this is.  This is a letter |
| 04:57:04PM | 8  | to, you know, oncology nurses, to healthcare providers.  Do |
| 04:57:10PM | 9  | you see that?  And they provide 13 -- if you see on the |
| 04:57:20PM | 10 | second bullet point down in the middle of the letter, They |
| 04:57:22PM | 11 | have 13 individual tear sheets that you can print out and |
| 04:57:26PM | 12 | give to your patients depending on the side effects that they |
| 04:57:29PM | 13 | experience during treatment.  Each tear sheet explains an |
| 04:57:32PM | 14 | individual side effect of chemotherapy with tips to help your |
| 04:57:35PM | 15 | patient better understand and cope with these changes.  The |
| 04:57:38PM | 16 | side effects that are covered include -- and then there's a |
| 04:57:41PM | 17 | list.  Do you see that? |
| 04:57:42PM | 18 | A.  Yes. |
| 04:57:43PM | 19 | Q.  And one of the side effects that is listed in the |
| 04:57:46PM | 20 | third group of side effects, the second down is alopecia.  Do |
| 04:57:50PM | 21 | you see that? |
| 04:57:51PM | 22 | A.  Yes, I do. |
| 04:57:52PM | 23 | Q.  Okay.  If you'll turn to the last page.  I provided |
| 04:58:02PM | 24 | you with a copy of that tear out and you see it says |
| 04:58:07PM | 25 | "Alopecia hair loss"? |

04:58:10PM **1**      A.  Yes.

04:58:10PM **2**      Q.  Now, under "what is alopecia?"  Can you read the --

04:58:23PM **3**  well, I'll read it to you if you'd like.  "What is alopecia?

04:58:27PM **4**  Alopecia is another word for hair loss or thinning of hair."

04:58:31PM **5**  Next sentence, "It is a common, yet temporary side effect of

04:58:37PM **6**  some cancer medicines."  Do you see that?

04:58:40PM **7**      A.  Yes.

04:58:42PM **8**      Q.  Do you know the definition of temporary?

04:58:47PM **9**      A.  Yes.

04:58:48PM **10**      Q.  What is it?

04:58:49PM **11**      A.  That the hair would return.

04:58:57PM **12**      Q.  Yet -- created this leaflet that told women that

04:59:07PM **13**  "alopecia is a common yet temporary side effect."  Do you see

04:59:14PM **14**  that?

04:59:14PM **15**      A.  But I also see that it says, "Will my hair grow

04:59:17PM **16**  back?"  And it says, "If you do lose your hair, it will

04:59:21PM **17**  usually grow back after the treatments are over."

04:59:24PM **18**      Q.  Right.  So we'll talk about that section if you'd

04:59:26PM **19**  like to.  But the first section you see, by your own

04:59:31PM **20**  definition, temporary means it's coming back, right?  That's

04:59:34PM **21**  what you testified to a minute ago, right?

04:59:39PM **22**      A.  I don't have the context -- I mean, it says, "What is

04:59:42PM **23**  alopecia?"  And it says -- I would have to see these

04:59:48PM **24**  references that they're referring to to understand if the --

04:59:52PM **25**  these statements.

04:59:52PM  1      Q.   Okay.

04:59:54PM  2      A.   I can't valid these statement.

04:59:58PM  3      Q.   What I'm asking you is, you're a woman.  You're going

05:00:01PM  4    to use this drug.  You get this leaflet.  You're being told

05:00:05PM  5    that alopecia, the definition of alopecia -- "What is

05:00:07PM  6    alopecia?  It is a common yet temporary side effect," right?

05:00:11PM  7    That's what it says.  Can't dispute that's what it says,

05:00:15PM  8    Doctor.  That's what it says, correct?

05:00:17PM  9      A.   But it also says, "If you do lose your hair, it will

05:00:21PM 10    usually grow back after the treatments are over."

05:00:21PM 11      Q.   Okay.

05:00:24PM 12      A.   That doesn't imply that it's always coming back.

05:00:28PM 13      Q.   If you want -- if you want to talk about that section

05:00:31PM 14    now we'll talk about it --

05:00:33PM 15      A.   I'm just saying --

05:00:33PM 16      Q.   Okay.

05:00:34PM 17      A.   -- because you have to --

05:00:34PM 18      Q.   On the left side, the column says, "What is

05:00:38PM 19    alopecia?"  It says that it's temporary, correct?  And on the

05:00:42PM 20    right side, it tells you when it's going to grow back.  And

05:00:45PM 21    what it says is, "If you lose your hair, it will usually grow

05:00:49PM 22    back after the treatment is over, but it may grow back while

05:00:53PM 23    you are still having treatment."

05:00:56PM 24      A.   But it's not definitive.  It doesn't say -- it's not

05:01:01PM 25    guaranteeing.  It's not saying that for sure you're going to

05:01:04PM  1   have hair grow back.

05:01:05PM  2       Q.  And then the next part says, "When my hair grows

05:01:09PM  3   back."  Do you see that?

05:01:10PM  4       A.  It's very difficult for me to comment on this

05:01:21PM  5   document.  I've never seen this document.

05:01:27PM  6                   (End of video deposition.)

05:01:31PM  7           MR. SCHANKER:  Your Honor, plaintiffs move into

05:01:36PM  8   evidence Exhibit P1.

05:01:40PM  9           MR. MOORE:  Subject to the positions stated on the

05:01:45PM 10   motion in limine and designations.

05:01:47PM 11           THE COURT:  Let it be admitted.

05:01:47PM 12           (Exhibit No. P1 admitted into evidence.)

05:01:49PM 13           THE COURT:  Members of the jury, it's 5 o'clock even

05:01:53PM 14   though the clock says 6:00.  It is 5 o'clock.  It's a good

05:01:56PM 15   time to take a recess.  We will be adjourned until -- we will

05:02:01PM 16   be at recess until 8:30 tomorrow morning.  Now, let me remind

05:02:06PM 17   you of the conversation we had earlier this morning in my

05:02:09PM 18   instructions.  You should not discuss this case amongst

05:02:13PM 19   yourselves or anyone else.  Let me tell you what I know, when

05:02:16PM 20   you get home tonight, your spouse, your mom, your dad,

05:02:21PM 21   whoever is in the house with you, your neighbor next door is

05:02:25PM 22   going to want to know, tell me about the case and you're

05:02:27PM 23   going to have to tell them the judge was very emphatic that I

05:02:33PM 24   could not discuss the case, so I will not discuss this case;

05:02:38PM 25   and perhaps when it's over, you'll hear about it but not

05:02:42PM   1   during the course of the trial, okay?  Don't do any

05:02:45PM   2   independent research.  You know, tomorrow morning, the jury

05:02:49PM   3   room will be open early.  It's better that you not congregate

05:02:54PM   4   in the hall.  Just come into the jury room, we'll have coffee

05:02:58PM   5   and whatnot.  I know people in South Louisiana have a great

05:03:01PM   6   deal of difficulty not telling people, hi, hey, how are you?

05:03:07PM   7   How about them Saints?  You know, whatever.  If you see

05:03:10PM   8   anybody associated with this case, you should not do that and

05:03:13PM   9   you need to, just for the time being, not talk to people, not

05:03:22PM  10   look at them, and it's because you don't want anyone to think

05:03:27PM  11   you're having a -- an inappropriate conversation.  So you

05:03:30PM  12   want to not only be impartial, you want to appear impartial.

05:03:36PM  13   So I'm going to ask you not to discuss, not to talk to anyone

05:03:39PM  14   here, not to even exchange those pleasantries that we're all

05:03:47PM  15   accustomed to doing, okay?

05:03:47PM  16           With that, court's at recess until 8:30 tomorrow

05:03:51PM  17   morning.

05:03:52PM  18           THE CASE MANAGER:  All rise.

05:03:56PM  19                  (Jury exits courtroom.)

05:04:40PM  20           MR. SCHANKER:  Thank you, Your Honor.

05:04:40PM  21           MS. SASTRE:  Your Honor, can I put something on the

05:04:42PM  22   record before we adjourn, please?

05:04:44PM  23           THE COURT:  Sure.

05:04:45PM  24           MS. SASTRE:  On the record, please.  So it's with

05:04:46PM  25   regard to plaintiff's opening.  So I would like to take the

05:04:49PM  **1**   court back to earlier this morning, I had one objection I

05:04:52PM  **2**   said leading in response, we were at sidebar with a juror.

05:04:57PM  **3**   And you may remember that Mr. Schanker, he said, "Oh, this is

05:05:05PM  **4**   gamesmanship.  Ms. Sastre has tried lots of cases and she

05:05:08PM  **5**   should know better."  And I said, "Well, I read through the

05:05:11PM  **6**   transcript from last time more than once, so I looked at it

05:05:15PM  **7**   last night."  There were, in fact, objections sustained to

05:05:18PM  **8**   leading.  I just say that as background because, really,

05:05:20PM  **9**   there was a moment when counsel appeared incredibly indignant

05:05:26PM  **10**  and said, "She knows the rules, she is just willfully

05:05:31PM  **11**  violating them."  That was the idea or -- one word,

05:05:34PM  **12**  "leading."

05:05:34PM  **13**         And then we were in court with Your Honor last week

05:05:37PM  **14**  and we talked about the opening statements and you made it

05:05:45PM  **15**  very clear that unless it's incredibly egregious -- you

05:05:48PM  **16**  looked right at us very sternly if you will, Your Honor, and

05:05:50PM  **17**  said, "You better not object unless you have a really good

05:05:53PM  **18**  reason."  And I will tell you, I exercised as much restraint

05:05:57PM  **19**  as I have to not get up about ten times today asking my trial

05:06:01PM  **20**  partners what should I do.  Because I was put in the

05:06:09PM  **21**  unenviable awkward position before I've even spent a moment

05:06:11PM  **22**  in front this jury.  I should have popped up about 15 times.

05:06:14PM  **23**  And so if you want to talk about a situation where somebody

05:06:16PM  **24**  knew what they were doing and did it repeatedly and what I

05:06:19PM  **25**  believe happened, Your Honor, is that because of that

| | | |
|---|---|---|
| 05:06:22PM | 1 | admonition from the court, candidly, that was taken as a free |
| 05:06:27PM | 2 | pass card by plaintiff's counsel.  And I'd like to just put |
| 05:06:32PM | 3 | on the record some of the things I'm talking about.  No, I |
| 05:06:36PM | 4 | did object.  And you did tell counsel to move on.  But things |
| 05:06:40PM | 5 | that I did not object to, putting aside the shameless |
| 05:06:45PM | 6 | pampering and talking about the Saints and Drew Brees and |
| 05:06:47PM | 7 | moving the ball, I could live with that.  But let's get to |
| 05:06:51PM | 8 | some of the argument that was made, almost a closing |
| 05:06:54PM | 9 | argument.  It was pretty similar to things I heard back in |
| 05:06:57PM | 10 | September 2019 right here in this courtroom.  It was, "The |
| 05:06:59PM | 11 | megaphones not activated, you have to get out the megaphone. |
| 05:07:04PM | 12 | If the company knows, it must disclose; voices were muted, |
| 05:07:08PM | 13 | the megaphones not blasting.  The evidence" -- he said, |
| 05:07:13PM | 14 | excuse me -- he says, "When the megaphone is not" -- "the |
| 05:07:18PM | 15 | megaphone was not activated because there was not a label |
| 05:07:21PM | 16 | change."  There was talk about -- you know, it reminds me |
| 05:07:24PM | 17 | again this, inappropriate reference to the text emoji, who |
| 05:07:28PM | 18 | knows.  He said -- he dared me to come up here and write a |
| 05:07:32PM | 19 | list -- and Your Honor did sustain that objection but the |
| 05:07:36PM | 20 | words came out -- to write a list to what our defenses were. |
| 05:07:39PM | 21 | THE COURT:  Counsel -- |
| 05:07:40PM | 22 | MS. SASTRE:  Mr. Schanker knew that was |
| 05:07:41PM | 23 | inappropriate. |
| 05:07:42PM | 24 | THE COURT:  -- I think I -- |
| 05:07:43PM | 25 | MS. SASTRE:  You asked him to move on. |

05:07:45PM **1**      THE COURT:  Prior to your saying anything.

05:07:48PM **2**      MS. SASTRE:  You did, Your Honor.  And I do

05:07:50PM **3** appreciate that.  He said -- referencing what's been produced

05:07:55PM **4** in this case, he says, oh, we gave these photos to the

05:08:00PM **5** defense.  He said a thousand photos that are all -- you can

05:08:04PM **6** look at all of them.  They're not even in evidence, Your

05:08:07PM **7** Honor.  This was supposed to be what the evidence would show.

05:08:11PM **8** He said, oh, Mrs. Kahn, she's an open book.  I'm not getting

05:08:14PM **9** it all quite exactly right.  He said, well -- he actually

05:08:18PM **10** made a reference, he said, you know, she was Grade 1.  We

05:08:21PM **11** wouldn't be here.  Basically telling them that if her hair

05:08:24PM **12** loss was perhaps less than what it is that they wouldn't have

05:08:29PM **13** filed this suit.  That has nothing to do with the evidence in

05:08:32PM **14** this case or anything that they ought to have heard.

05:08:34PM **15**      So he -- then at the end, it got worse.  He said,

05:08:40PM **16** well, you can -- the last few minutes were questions and then

05:08:45PM **17** answered by argumentative statements saying, you can't trust

05:08:48PM **18** the pictures.  The worst of it was all of this was

05:08:53PM **19** unnecessary, referring to her hair loss.  That is a closing

05:08:56PM **20** argument if I have ever heard one.  And he said you can

05:09:01PM **21** choose your own story when he had the photo timeline up,

05:09:05PM **22** popping up these postage stamp photos, and this one came up

05:09:09PM **23** and that one came up.  And he was like, well, you could just

05:09:11PM **24** tell any story you want from the photos.  And then as I said,

05:09:13PM **25** the last thing was the invitation to come up here and write

05:09:18PM  1   the defenses down.  So I wanted to get that on the record.

05:09:20PM  2   And, again, I just think it was highly inappropriate and

05:09:26PM  3   counsel knew I was going to be in a position where there

05:09:30PM  4   wasn't much I could do about it.  I do think that it should

05:09:33PM  5   be something that -- with all due respect to Your Honor, it

05:09:37PM  6   just should be something that the court shouldn't tolerate.

05:09:39PM  7   And I'll tell you, I'm raising it primarily because if this

05:09:41PM  8   is an indication of what we're going to see in this case, it

05:09:45PM  9   really does trouble me.  So I'm sorry, Your Honor, but I did

05:09:48PM  10  feel like I did need to say that to the court.

05:09:50PM  11          THE COURT:  Mr. Schanker.

05:09:53PM  12          MR. SCHANKER:  Yes, Your Honor.

05:09:53PM  13          THE COURT:  It was argument.  It was argument.

05:09:56PM  14          MR. SCHANKER:  Your Honor, we believe the evidence

05:09:58PM  15  will support each and every thing that we stated in the

05:10:01PM  16  opening.

05:10:01PM  17          THE COURT:  It was argument.  It was argument.  And I

05:10:09PM  18  was incredulous that we kept talking about Drew Brees and

05:10:15PM  19  2006.  Everybody in this city knew that was a magical year

05:10:20PM  20  for the Saints after there was a motion *in limine* to preclude

05:10:23PM  21  just that sort of thing.  And I thought, well, this is silly.

05:10:26PM  22  I don't have to do this; you know you shouldn't do that.  And

05:10:28PM  23  if it's one-off that's the -- it was argument.  Now, some of

05:10:33PM  24  it was opening.  And then at the point where you started to

05:10:41PM  25  list, I'm going to write down -- that's when I -- before

05:10:45PM  **1**  Ms. Sastre stood up, I said move on, because I thought now we

05:10:49PM  **2**  have really gone off the cliff, okay?

05:11:00PM  **3**        I don't need to hear anything.  I know what I heard.

05:11:05PM  **4**  All right.  I need to go talk to the jury.

05:11:05PM  **5**        (WHEREUPON, the proceedings were adjourned.)

05:11:05PM  **6**        (WHEREUPON, the following proceedings were held

05:11:05PM  **7**  without the jury.)

05:14:59PM  **8**        THE COURT:  I just want to put something quickly on

05:15:02PM  **9**  the record.  When Erin went into the back to visit with the

05:15:07PM  **10**  jury, Mr. Allen --

05:15:12PM  **11**        THE CASE MANAGER:  Juror No. 2.

05:15:14PM  **12**        THE COURT:  -- No. 2, asked -- he said, I think -- I

05:15:17PM  **13**  didn't say anything.  I think I might recognize Ms. Kahn.  He

05:15:24PM  **14**  said, I went to Lusher.  I think she was a librarian at my

05:15:30PM  **15**  school.  And Erin said, do you know her?  And he said, I

05:15:35PM  **16**  think she was a librarian at my school.

05:15:37PM  **17**        You know, I would be happy to talk -- have you all

05:15:44PM  **18**  come in and talk to him, you know, to question him further

05:15:49PM  **19**  tomorrow.  I will tell you, from Erin's view, he wasn't even

05:15:55PM  **20**  sure it was her and I think having seen her today, I think

05:15:59PM  **21**  she was a librarian at my school.

05:16:02PM  **22**        MR. COFFIN:  I don't know if she was at Lusher, but

05:16:05PM  **23**  she was at Patrick, you know, a really good high school.

05:16:09PM  **24**        MR. MOORE:  Something Avondale, I don't know the

05:16:13PM  **25**  name, but it was in Bridge City.

05:16:15PM   **1**        THE COURT:  Did she ever teach at Lusher?  Does

05:16:18PM   **2**   anybody know?

05:16:18PM   **3**        MR. SCHANKER:  I think she may have.

05:16:20PM   **4**        MR. COFFIN:  I don't know.

05:16:21PM   **5**        THE COURT:  He was not -- I will tell you this, he

05:16:24PM   **6**   was not certain it was even her.  He said that was my school,

05:16:28PM   **7**   I think she was the librarian.  It didn't sound like -- but

05:16:35PM   **8**   Erin didn't ask him anything.  She just said, I'll tell the

05:16:39PM   **9**   Judge, so I don't know.

05:16:42PM   **10**        MR. MOORE:  First thing to find out is if she ever

05:16:47PM   **11**   worked at Lusher.

05:16:48PM   **12**        THE COURT:  Right.  But he went to Lusher and he

05:16:50PM   **13**   wants to find out.  But she is a librarian.

05:16:54PM   **14**        MR. SCHANKER:  She's a librarian.

05:16:56PM   **15**        MR. COFFIN:  She's definitely a librarian.

05:16:59PM   **16**        THE COURT:  So it could very well be --

05:16:59PM   **17**        MR. MOORE:  If she did work there.

05:17:01PM   **18**        THE COURT:  Unless he took a class with her, seeing

05:17:04PM   **19**   her in school, knowing her as an instructor --

05:17:08PM   **20**        MR. COFFIN:  You mind if I make a call, Judge?

05:17:10PM   **21**        THE COURT:  Of course.  I would rather find out.

05:17:15PM   **22**        THE CASE MANAGER:  Judge, I have his cell phone, so I

05:17:17PM   **23**   can ask him to come earlier tomorrow.

05:17:20PM   **24**        THE COURT:  He's from New Orleans, right, so that

05:17:24PM   **25**   shouldn't be --

05:17:24PM **1**          THE LAW CLERK:  He's Orleans Parish.

05:17:26PM **2**          THE COURT:  We can get him to come in for 8:15 to

05:17:30PM **3** question him.

05:17:47PM **4**          MR. COFFIN:  He didn't pick up.

05:17:49PM **5**          MS. SASTRE:  Can we deal with it in the morning?

05:17:52PM **6**          THE COURT:  We can deal with it in the morning.  I'll

05:17:54PM **7** deal with it at 8:15 unless we determine that she did not

05:17:59PM **8** ever work at Lusher.

05:18:02PM **9**          MS. COFFIN:  She did.

05:18:06PM **10**          THE COURT:  She was there.  Okay.  8:15.  Ask her to

05:18:09PM **11** be here at 8:15 and would -- well, Cathy's going to be here

05:18:14PM **12** at 8:15.

05:18:14PM **13**          MR. COFFIN:  She did.

05:18:17PM **14**          THE COURT:  Thank you.

**15**                            *  *  *  *

**16**          (WHEREUPON, the proceedings were adjourned.)

**17**                            *  *  *  *

**18**                       REPORTER'S CERTIFICATE

**19**          I, Nichelle N. Wheeler, RPR, CRR, Official Court
Reporter, United States District Court, Eastern District of
**20** Louisiana, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and
**21** understanding, from the record of the proceedings in the
above-entitled and numbered matter.

**22**

**23**                         /s/ Nichelle N. Wheeler
                         Official Court Reporter
**24**

**25**

**OFFICIAL TRANSCRIPT**