1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3        ****************************************************************

4        IN RE:  TAXOTERE
         (DOCETAXEL) PRODUCTS
5        LIABILITY LITIGATION

6                              CIVIL ACTION NO. 16-MD-2740 "H"
                               NEW ORLEANS, LOUISIANA
7                              TUESDAY, NOVEMBER 9, 2021, 8:15 A.M.

8        THIS CASE RELATES TO
         ELIZABETH KAHN,
9        CASE NO. 16-CV-17039

10       ****************************************************************

11
                              DAY 2  MORNING SESSION
12                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                    UNITED STATES DISTRICT JUDGE

14
         APPEARANCES:
15

16

17       FOR THE PLAINTIFFS:       GAINSBURGH BENJAMIN DAVID
                                   MEUNIER & WARSHAUER
18                                 BY:  M. PALMER LAMBERT, ESQ.
                                   1100 POYDRAS STREET, SUITE 2800
19                                 NEW ORLEANS, LOUISIANA 70163

20                                 PENDLEY BAUDIN & COFFIN
                                   BY:  CHRISTOPHER L. COFFIN, ESQ.
21                                      JESSICA A. PEREZ, ESQ.
                                   1515 POYDRAS STREET, SUITE 1400
22                                 NEW ORLEANS, LOUISIANA 70112

23
                                   GIBBS LAW GROUP
24                                 BY:  KAREN B. MENZIES, ESQ.
                                   400 CONTINENTAL BOULEVARD
25                                 6TH FLOOR
                                   EL SUGUNDO, CALIFORNIA 90245

                         *OFFICIAL TRANSCRIPT*

```
1    APPEARANCES CONTINUED:

2

3                             DAVID F. MICELI, LLC
                              BY:  DAVID F. MICELI, ESQ.
4                             P.O. BOX 2519
                              CARROLLTON, GEORGIA 30112
5

6                             BACHUS & SCHANKER
                              BY:  J. KYLE BACHUS, ESQ.
7                             1899 WYNKOOP STREET
                              SUITE 700
8                             DENVER, COLORADO 80202

9

10                            BACHUS SCHANKER
                              BY:  DARIN L. SCHANKER, ESQ.
11                            101 W. COLFAX AVE, SUITE 650
                              DENVER, CO 80202

12

13                            MARTZELL BICKFORD & CENTOLA
                              BY:  LAWRENCE J. CENTOLA, ESQ.
14                            338 LAFAYETTE STREET
                              NEW ORLEANS, LOUISIANA 70130

15    FOR SANOFI-AVENTIS U.S.,
16    LLC AND SANOFI US
      SERVICES, INC.:          IRWIN FRITCHIE URQUHART & MOORE
17                             BY:  DOUGLAS J. MOORE, ESQ.
                                   KELLY E. BRILLEAUX, ESQ.
18                            400 POYDRAS STREET, SUITE 2700
                              NEW ORLEANS, LOUISIANA 70130.
19

20                            SHOOK, HARDY & BACON
                              BY:  HARLEY V. RATLIFF, ESQ.
21                                 JON A. STRONGMAN, ESQ.
                              2555 GRAND BOULEVARD
22                            KANSAS CITY, MISSOURI 64108

23

24                            SHOOK HARDY & BACON, LLP
                              BY:  HILDY M. SASTRE, ESQ.
                              201 BISCAYNE BOULEVARD
25                            SUITE 3200
                              MIAMI, FLORIDA 33131
```

*OFFICIAL TRANSCRIPT*

1    APPEARANCES CONTINUED:

2

3

     OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
4                                CERTIFIED REALTIME REPORTER
                                 REGISTERED MERIT REPORTER
5                                500 POYDRAS STREET, ROOM B-275
                                 NEW ORLEANS, LOUISIANA 70130
6                                (504) 589-7779
                                 Cathy_Pepper@laed.uscourts.gov
7

8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         *OFFICIAL  TRANSCRIPT*

1                                **I N D E X**

2

3                                                              <u>PAGE</u>

4

5      **RUTH AVILA........................................ 239**

6      **DIRECT EXAMINATION BY MR. BACHUS..................... 240**

7      **DIRECT EXAMINATION BY MR. STRONGMAN.................. 336**

8      **REDIRECT EXAMINATION BY MR. BACHUS................... 382**

9      **LUNCHEON RECESS...................................... 389**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         *OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

M O R N I N G   S E S S I O N

TUESDAY, NOVEMBER 9, 2021

08:26:24    (WHEREUPON, at this 8:26 a.m., there was a conference
08:26:27    in chambers with Judge Milazzo, Hildy Sastre, Darin Schanker,
08:34:17    and Juror Terrell Allen that commenced as follows:)

08:26:47    THE COURT:  Hi, Mr. Allen.  We're all fully vaccinated
08:26:55    and tested.  You may take your mask off.

08:26:57      Before we get started, I want to remind you that
08:26:59    you're under oath.  You know you were sworn in yesterday to
08:27:03    give truthful answers during jury selection.

08:27:07      All right.  Now, my case manager, Erin, that
08:27:09    you've gotten to know, indicated that you told her yesterday
08:27:12    afternoon that you thought you might recognize the plaintiff.

08:27:15    THE JUROR:  Yes.

08:27:17    THE COURT:  Would you please tell me --

08:27:18    THE JUROR:  I was noticing that when the pictures came
08:27:21    up, like the younger pictures, it looks like my librarian from
08:27:25    elementary school.

08:27:26    THE COURT:  Okay.

08:27:27    THE JUROR:  -- and I wasn't sure.  That's why I asked
08:27:28    her if she happened to be at Lusher Elementary, that was my
08:27:34    librarian.

*OFFICIAL TRANSCRIPT*

08:27:34 1          THE COURT:  How long were you at Lusher Elementary?

08:27:37 2          THE JUROR:  It was years.

08:27:39 3          THE COURT:  During that time, was Ms. Kahn -- did you

08:27:44 4     have a class with her?

08:27:46 5          THE JUROR:  She was just the librarian of the school.

08:27:49 6          THE COURT:  How often were you in the library?

08:27:52 7          THE JUROR:  Not much.  I mean, just when studying.

08:27:56 8          THE COURT:  Okay.  Did you have a relationship with

08:27:58 9     her?

08:27:59 10         THE JUROR:  No.  No.  Not outside the school.

08:28:02 11         THE COURT:  And I mean, even in school, sometimes

08:28:06 12    people become, like, a mentor to you.

08:28:08 13         THE JUROR:  To get help get a book, maybe to find a

08:28:11 14    book, but it wasn't, like, you know, a big thing or anything.

08:28:16 15         THE COURT:  Since you left Lusher Elementary, have you

08:28:19 16    had any contact with Ms. Kahn?

08:28:21 17         THE JUROR:  No.

08:28:21 18         THE COURT:  Another question.  Would the fact that you

08:28:25 19    knew her for that period of time in elementary school in any

08:28:28 20    way affect your ability to be a fair and impartial juror?

08:28:31 21         THE JUROR:  No.

08:28:32 22         THE COURT:  Okay.  Thank you.

08:28:34 23             Mr. Schanker, any questions?

08:28:35 24         MR. SCHANKER:  Just a couple questions.  Thanks for

08:28:38 25    sharing this, obviously.  Did -- did you -- as you sit here

*OFFICIAL TRANSCRIPT*

08:28:41 1  today, did you ever recall having, like, a specific interaction

08:28:45 2  with Ms. Kahn?

08:28:46 3      THE JUROR:  No.

08:28:47 4      MR. SCHANKER:  Do you have any bad or uncomfortable

08:28:53 5  feelings about her?

08:28:54 6      THE JUROR:  No.

08:28:56 7      MR. SCHANKER:  Do you have any particularly good or

08:28:58 8  positive memories of interactions with her?

08:29:02 9      THE JUROR:  Just being my librarian teacher.

08:29:06 10     MR. SCHANKER:  And just for the record, you all aren't

08:29:08 11 acquaintances or friends or anything like that?

08:29:12 12     THE JUROR:  No.

08:29:13 13     MR. SCHANKER:  How many years ago roughly?

08:29:15 14     THE JUROR:  Years ago, I was in elementary school with

08:29:17 15 her, maybe '96 or '98 -- '98, something like that.  A long

08:29:22 16 time.

08:29:22 17     MR. SCHANKER:  Would you have any problem finding for

08:29:30 18 the plaintiff because -- for her, would you have any problem,

08:29:35 19 if the evidence supported it, finding in favor of Ms. Kahn

08:29:38 20 because of your relationship with her?

08:29:40 21     THE JUROR:  With fairness, it doesn't matter.

08:29:44 22     MR. SCHANKER:  On the other side of the coin, would you

08:29:46 23 have any problem finding for the defendant, Sanofi, if the

08:29:52 24 evidence supports it, even though you had this --

08:29:55 25     THE JUROR:  No.  I said right is right and wrong is

*OFFICIAL TRANSCRIPT*

08:30:02 1  wrong.  No favoritism.

08:30:04 2        MR. SCHANKER:  So just one more question.  If the

08:30:08 3  defendant could kind of crawl inside your head and really

08:30:12 4  understand your true feelings in this situation, should the

08:30:16 5  defendant be comfortable with you on this jury?

08:30:19 6        THE DEFENDANT:  Yes.

08:30:20 7        MR. SCHANKER:  Okay.  Thank you.

08:30:22 8        THE COURT:  Ms. Sastre.

08:30:25 9        MS. SASTRE:  Just a few questions.  How are you doing,

08:30:27 10 sir?  I appreciate you telling us about this.  You could

08:30:31 11 imagine, in my position representing the defendant and then

08:30:37 12 hearing that you recognized or knew the plaintiff, it's very

08:30:42 13 important that you told us, so thank you so much.  We

08:30:44 14 appreciate it.

08:30:45 15        Just a couple follow-up questions for you.  So

08:30:48 16 tell me again when were you in elementary school.

08:30:52 17        THE JUROR:  Between '95 and '98 at Lusher.

08:30:57 18        THE COURT:  So it was Lusher.  '95 to '98.

08:31:02 19        THE JUROR:  Yes.

08:31:02 20        MS. SASTRE:  And I guess when I think back, I have to

08:31:06 21 tell you, I can't remember any of my school librarians.  So I

08:31:09 22 just wanted to get a feel for, like, how often do you think

08:31:13 23 that you had a chance to be around Ms. Kahn at that age that

08:31:16 24 even now, as an adult, you're able to recognize her?

08:31:22 25        THE JUROR:  Like I said, it was only when I needed to

*OFFICIAL TRANSCRIPT*

08:31:24 1    get a book, so it was very seldom.

08:31:27 2         MS. SASTRE:  And you don't remember any specific

08:31:29 3    conversations with her?

08:31:30 4         THE JUROR:  No.  Just I just recognized her.  That's

08:31:33 5    how I recognized her.

08:31:35 6         MS. SASTRE:  I got you.  Okay.  So nothing stands out

08:31:44 7    like sometime she might have been particularly kind to you or

08:31:47 8    maybe unpleasant?

08:31:48 9         THE JUROR:  Just helpful.  Helping me get a book, find

08:31:52 10   a book.

08:31:52 11        MS. SASTRE:  If I asked you before you came to this

08:31:55 12   trial, if you just met Ms. Kahn and it wasn't really in this

08:32:01 13   setting and you remembered her as your librarian, would you

08:32:05 14   have fond memories of her, pleasant memories?

08:32:08 15        THE JUROR:  No.  Just that she was the librarian.

08:32:12 16        MS. SASTRE:  Let me ask you this:  So one of the issues

08:32:18 17   in the trial, a trial like this, and it's for every witness, is

08:32:22 18   credibility, and there may be times where there may be a

08:32:30 19   situation at the end of this case where, and the judge will

08:32:33 20   tell you it's your job as a juror to judge whether their

08:32:40 21   testimony is truthful and accurate.  If we were to argue that

08:32:44 22   there were aspects of Ms. Kahn's testimony was not credible,

08:32:48 23   would it make it more difficult for you to believe that?

08:32:53 24        THE JUROR:  No.  As I say, it's how it's presented.  If

08:32:56 25   I feel it's right, I'm going to do what's right no matter what

*OFFICIAL TRANSCRIPT*

08:33:00  1    the situation is.

08:33:01  2         MS. SASTRE:  So if at the end of the case, and I talked

08:33:10  3    about this a little bit in opening statement yesterday, sir,

08:33:13  4    but if at the end of the case I will ask you to return a

08:33:17  5    verdict for my client, which means Ms. Kahn is to go home and

08:33:22  6    leave here without one penny, does the fact that you know her,

08:33:25  7    would it make it a little bit more difficult to do that if you

08:33:29  8    believe the evidence would support it?

08:33:32  9         THE JUROR:  No, it doesn't make it difficult at all.

08:33:34 10         MS. SASTRE:  Not at all.  Okay.  Thank you very much.

08:33:37 11    We appreciate it.

08:33:37 12         THE COURT:  Thank you, Mr. Allen.  I really appreciate

08:33:41 13    it.  Thank you for telling Erin that you thought you remembered

08:33:46 14    her from elementary school.  It's very important that jurors be

08:33:51 15    open and honest with us, and so I very much appreciate your

08:33:57 16    candor and respect you for doing that.

08:34:00 17         Okay.  Thank you.  You can now return to the jury

08:34:02 18    room, and I'll stay with the lawyers for just a little bit.

08:34:17 19         (WHEREUPON, at this point in the proceedings,

08:34:18 20    Terrell Allen leaves the chambers.)

08:34:34 21         THE COURT:  I frankly believe what occurred, Mr. Allen

08:34:42 22    came in for the questionnaire, did not recognize her name, did

08:34:46 23    not recognize her until opening statement when he saw a

08:34:49 24    photograph and it was a face that he was familiar with.

08:34:53 25         I, frankly, find no reason to excuse him from

*OFFICIAL TRANSCRIPT*

08:34:56  1    this jury.  I think he just remembered a face from elementary

08:34:59  2    school and doesn't have feelings about her one way or the

08:35:03  3    other.

08:35:04  4              Is there any objection?

08:35:05  5         MR. SCHANKER:  No objection from the plaintiff,

08:35:08  6    Your Honor.  There is an excellent Fifth Circuit case that kind

08:35:11  7    of deals with a similar situation with screen cite 116 F.3d

08:35:16  8    1066, *United States v. Wilson*.  I won't get into the details.

08:35:22  9         MS. SASTRE:  No objection.

08:35:24 10         THE COURT:  Frankly, there is just no there there.

08:35:28 11    Thank you.

08:35:48 12         MS. SASTRE:  Thank you, Judge, I appreciate it.

08:35:48 13         (WHEREUPON at this point in the proceedings, the

08:42:21 14    following was held in open court:)

08:42:21 15         THE DEPUTY CLERK:  All rise.

08:42:22 16         THE COURT:  Court is in session; you may be seated.

08:42:37 17    Just so the record is clear, every morning prior to actually

08:42:46 18    taking testimony, the parties have a meet and confer regarding

08:42:50 19    any exhibits that they intend to use at that time; and during

08:42:56 20    the course of that meeting, we have an opportunity to review

08:42:59 21    any objections.  In an effort not to hold up the jury any

08:43:09 22    further, we're going to put any objections that need to be on

08:43:12 23    the record during our first recess this morning.

08:43:19 24              With that, is there anything we need to do prior

08:43:22 25    to bringing in the jury?

*OFFICIAL  TRANSCRIPT*

08:43:23  1          MR. SCHANKER:  Nothing from our side, Your Honor.

08:43:25  2          MR. STRONGMAN:  Nothing from our side.

08:43:28  3          THE COURT:  Please bring in the jury.  He's getting

08:43:34  4    them lined up.

08:43:35  5          THE DEPUTY CLERK:  I can go check.

08:43:57  6          (WHEREUPON, at 8:43 a.m. the jury panel enters the

08:44:17  7    courtroom.)

08:44:17  8          THE COURT:  All jurors are present.  Court is back in

08:44:21  9    session; you may be seated.

08:44:24 10              Mr. Bachus, please call your next witness.

08:44:31 11          MR. BACHUS:  All right.  Thank you, Your Honor.  The

08:44:31 12    plaintiffs will call Ruth Avila.

08:44:55 13          THE DEPUTY CLERK:  Would you please raise your right

        14    hand.

        15              Do you solemnly swear that the testimony which

        16    you are about to give will be the truth, the whole truth, and

        17    nothing but the truth, so help you God?

        18          THE WITNESS:  Yes, I do.

        19                        **RUTH AVILA**

        20     was called as a witness and, after being first duly sworn by

08:45:03 21     the Clerk, was examined and testified on her oath as follows:

08:45:03 22          THE DEPUTY CLERK:  You can have a seat.

08:45:05 23          THE COURT:  Ms. Avila, you may remove your mask.

08:45:08 24          THE WITNESS:  Okay.  Thank you.

08:45:08 25          THE DEPUTY CLERK:  Please state and spell your name for

                              *OFFICIAL TRANSCRIPT*

08:45:11  1     the record.

08:45:13  2             THE WITNESS:  My name is Ruth Mora Avila.  R-U-T-H,

08:45:17  3     M-O-R-A, A-V-I-L-A.

08:45:17  4             THE COURT:  Please proceed.

08:45:25  5             MR. BACHUS:  Thank you, Your Honor.

08:45:25  6     DIRECT EXAMINATION BY MR. BACHUS:

08:45:26  7     Q.    And just briefly, I'm Kyle Bachus and I'm part of

08:45:30  8     Ms. Kahn's trial team, okay?

08:45:34  9             Good morning.

08:45:34  10    A.    Good morning.

08:45:35  11    Q.    Are you familiar with the company, Sanofi?

08:45:37  12    A.    Yes, I am.

08:45:37  13    Q.    And how are you familiar with Sanofi?

08:45:40  14    A.    I worked at Sanofi-Aventis from 2004 to 2009 as a sales

08:45:47  15    executive.

08:45:50  16    Q.    And when did Sanofi allow you as a sales representative to

08:46:01  17    discuss permanent hair loss with doctors?

08:46:02  18             MR. STRONGMAN:  Leading.

08:46:02  19    A.    They never allowed me to discuss permanent hair loss.

08:46:08  20             THE COURT:  Wait.  There was an objection.  Stop.

08:46:15  21               Overruled.  Okay.

08:46:20  22             MR. BACHUS:  Need me to repeat the question,

08:46:21  23    Your Honor?

08:46:22  24             THE COURT:  No, she's got it.  Please proceed.

08:46:24  25             THE WITNESS:  They never allowed me to discuss

*OFFICIAL TRANSCRIPT*

08:46:28  1    permanent hair loss.

08:46:28  2    EXAMINATION BY MR. BACHUS:

08:46:30  3    Q.    Why not?

08:46:31  4    A.    Because they never put it in the prescribing information

08:46:33  5    or label.

08:46:35  6    Q.    Are you currently employed?

08:46:37  7    A.    Yes, I am currently employed.

08:46:38  8    Q.    And what is the name of the company that you currently

08:46:42  9    work for?

08:46:43 10    A.    I work for a company called Astellas Pharmaceuticals.

08:46:48 11    Q.    And what do they do?

08:46:51 12    A.    I sell a drug called enzalutamide or Xtandi for prostate

08:46:58 13    cancer.

08:46:58 14    Q.    How long have you been in that position?

08:47:00 15    A.    I've been in this job for eight years -- approximately

08:47:06 16    eight years.

08:47:06 17    Q.    Very briefly, just what are your current job duties?  What

08:47:10 18    do you do?

08:47:11 19    A.    I sell the prostate cancer drug across the geography that

08:47:18 20    spans from Ponchatoula to Baton Rouge, Houma, Thibodaux, over

08:47:25 21    to the Northshore/Southshore.  And my job is to increase the

08:47:27 22    sales of the Xtandi prostate cancer medication to urologists

08:47:35 23    and oncologists.

08:47:35 24    Q.    Where did you work before you went to work for Astellas?

08:47:40 25    A.    Before I went to go work for Astellas, I worked for a

*OFFICIAL TRANSCRIPT*

08:47:43  1    company called Dendreon.

08:47:46  2    Q.    Approximately, how long did you work there?

08:47:47  3    A.    Approximately four years.

08:47:48  4    Q.    What did you do for work -- what kind of company is that?

08:47:51  5    A.    It's a -- it was a pharmaceutical -- it was a biotech

08:47:55  6    company, really.  And we launched the first-in-class

08:48:02  7    immunotherapy treatment for prostate cancer.  It was very

08:48:05  8    novel.  Nothing like this was ever done before.  And so it was

08:48:10  9    immunotherapy drug for prostate cancer where we actually

08:48:14 10    collected the patient's own blood cells and made a customized

08:48:18 11    immune system drug that would help their body recognize the

08:48:22 12    prostate cancer cells and kill them.  So it was a very complex

08:48:27 13    sale.

08:48:27 14    Q.    And where did you work before you worked for Dendreon?

08:48:31 15    A.    I worked for a company called Genzyme Genetics for about

08:48:36 16    ten months selling pathology tests, G-E-N-Z-Y-M-E.

08:48:43 17    Q.    And what about before that?

08:48:46 18    A.    Sanofi-Aventis.  For five years.

08:48:49 19    Q.    What year did you start working for Sanofi?

08:48:53 20    A.    2004.

08:48:54 21    Q.    And then five years later, when did you leave?

08:48:57 22    A.    October 2009.

08:48:58 23    Q.    What was your last job title at Sanofi?

08:49:06 24    A.    Senior sales executive.

08:49:09 25    Q.    All right.  Before we talk about your work at Sanofi,

*OFFICIAL TRANSCRIPT*

08:49:13  1    just, if I could get some background information, where were

08:49:16  2    you born?

08:49:17  3    A.    I was born at Baptist Hospital in New Orleans.

08:49:20  4    Q.    Where were you raised?

08:49:23  5    A.    I was raised in Airline Park in Metairie, on the wrong

08:49:28  6    side of the tracks.

08:49:31  7    Q.    Can you tell the jury about your educational background?

08:49:34  8    A.    Yeah.  I got a sports scholarship to a very elite high

08:49:39  9    school in Metairie called St. Martin's Episcopal High School so

08:49:45 10    I was afforded a nice, good education.

08:49:48 11    Q.    Can you tell the jury about your education after high

08:49:50 12    school?

08:49:50 13    A.    Yeah.  I went to a little college in Mississippi called

08:49:54 14    Mississippi University for Women.  I got a scholarship there,

08:49:58 15    as well.  And I got my bachelor's of science degree in nursing.

08:50:01 16    I went to work straight out of nursing school, initially

08:50:05 17    oncology.  I really loved it.  And I decided later on to go

08:50:10 18    back to school and get my master's degree and my

08:50:13 19    nurse practitioner degree.  And I don't know how much more you

08:50:19 20    want.  I can keep going --

08:50:19 21    Q.    That's good.

08:50:21 22          You said that you went to work in oncology right

08:50:24 23    after graduating from nursing school?

08:50:25 24    A.    Yes.  When I was in nursing school, there was a girl --

08:50:29 25    there was two tracks in the nursing school, either a two-year

*OFFICIAL TRANSCRIPT*

08:50:34 1    degree or a four-year degree.  And I was in student government.
08:50:38 2    And there was a girl while I was in student government and she
08:50:38 3    got inflammatory breast cancer while I was in school.  And she
08:50:42 4    died before we even got out of school and it freaked me out.  I
08:50:47 5    didn't know anything about cancer.  I was young.  I was, you
08:50:49 6    know, 19.  I was in college.  And I'm thinking, what the heck
08:50:51 7    is this cancer thing?  How did this girl die?  Like, she didn't
08:50:54 8    even get out of school.  And so I asked my instructors to
08:50:59 9    please start giving me cancer patients so I could learn about
08:51:02 10   this thing.
08:51:02 11            And I wound up being a nanny for an oncologist in
08:51:09 12   town while I was in school.  That's how I earned money.  And he
08:51:11 13   set me up to do a preceptorship at the end of my college to go
08:51:16 14   at work at Emory University in Atlanta.  So I did that for a
08:51:19 15   couple -- like, a month or two or something and so when I got
08:51:22 16   out of school, based on all of that, East Jefferson gave me the
08:51:26 17   opportunity to go work straight on their oncology unit right
08:51:29 18   out of school.  So that's what I did and I really had a passion
08:51:32 19   for it.  I loved it.  I was moved by that whole thing that
08:51:35 20   happened with her, and so that's what I did --
08:51:38 21   Q.   And what is oncology?
08:51:41 22   A.   Oncology is the care of cancer patients.
08:51:44 23   Q.   Now, you stated that you went back to school?
08:51:44 24   A.   Yeah.
08:51:51 25   Q.   You became a nurse and you were working as a nurse?

*OFFICIAL TRANSCRIPT*

08:51:54  1    A.    Yeah.  I worked for a nurse.  I had that job at
08:51:57  2    East Jefferson for about a year full time, and then they
08:52:04  3    decided to shut down their dedicated oncology unit, which was
08:52:08  4    kind of like a bummer to me because I was just, like, rolling
08:52:11  5    and I really liked it, and so I went and decided -- I didn't
08:52:14  6    quit there.  I went part-time -- or, like, part-time when
08:52:18  7    needed and I transferred over to Ochsner full-time.  They gave
08:52:22  8    me this really cool job, and I was able to stay dedicated to
08:52:27  9    oncology.  I don't want to mix in med-surg.  I knew that that's
08:52:31 10    the field I wanted to stay in.  So I went to Ochsner and I
08:52:35 11    worked there for, I think, five years before I moved away.  And
08:52:39 12    when I moved away is when I decided to go back and get my
08:52:42 13    master's in nurse practitioner.
08:52:43 14    Q.    So during the five years that you worked at the Ochsner,
08:52:48 15    is it the Ochsner Cancer Clinic, or what was it?
08:52:50 16    A.    It's called Ochsner Cancer Institute, the umbrella, but
08:52:55 17    what's underneath that umbrella consisted of the research
08:53:00 18    department, ligation oncology, medical oncology, surgical
08:53:02 19    oncology, all of these things -- thoracic oncology.  There was
08:53:06 20    definitely several different compartments that comprised the
08:53:09 21    umbrella of the cancer institute.
08:53:11 22    Q.    Briefly, just during that five years, what were you doing
08:53:16 23    day-to-day as an employee there?  As a nurse?
08:53:19 24    A.    The first position that I held there was a unique role.
08:53:24 25    It was at that brand-new role that they just are created.  And

*OFFICIAL TRANSCRIPT*

08:53:27  1    back then, it was called "communications nurse" and it was

08:53:30  2    really cool because it's what's called today the modern-day

08:53:34  3    nurse navigator, but they had, kind of like, foresight and

08:53:38  4    vision and so that job was every single cancer patient that

08:53:41  5    came into the Ochsner medical system came through me.  And so,

08:53:47  6    I was afforded the luxury of you go and interview every doctor

08:53:51  7    in this hospital that takes care of cancer patients and you

08:53:55  8    find out exactly what they need so that when a cancer patient

08:53:58  9    comes to them, we're not saying, oh, we need this, this, and

08:54:02 10    that.  We want to be taking the best care of them and so when

08:54:06 11    they come to us, your job is to make sure they have X, Y, and

08:54:06 12    Z.

08:54:10 13          So you go talk to every single doctor in this

08:54:14 14    hospital and find out exactly what they need based on what

08:54:17 15    their potential diagnosis was.  So it was, like -- it was candy

08:54:20 16    to me, like, really, I get to do this?  I get to go talk to all

08:54:24 17    of these doctors and learn all this cool stuff, like -- and so,

08:54:27 18    it was -- it was wonderful.  So, I got to do that.  That was

08:54:30 19    one of the things, but Dr. Kardinal, who was head of the cancer

08:54:37 20    institute at the time, had the foresight to understand that if

08:54:40 21    there wasn't -- they weren't short of funding, this job was

08:54:43 22    going to continue.  It was kind of a cush-cush thing that

08:54:47 23    Ochsner was trying to give customer service to the patients.

08:54:51 24          So he said -- he called me in his office after I

08:54:55 25    first started there and it was going really well and they were

*OFFICIAL TRANSCRIPT*

08:54:57  1    tracking how many calls -- I had to make spreadsheets and track
08:55:00  2    how many patients and everything.  He said, look, we're going
08:55:03  3    to give you four protocols and we want you to be the CRA and
08:55:08  4    we're going to train you to be the clinical research associate
08:55:09  5    on these four protocols and teach you that stuff because we
08:55:13  6    don't know what's going to happen at the end of this year.

08:55:15  7         We only have funding for this job for one year, and
08:55:17  8    so we don't want to leave you in the lurches, and we don't want
08:55:21  9    to lose you after this.  So that was part of my job, and I did
08:55:24 10    the CRA part of that job.  So that was kind of a combination
08:55:27 11    thing.  And then they also asked me to create a patient
08:55:31 12    education tool that could be used for the entire cancer
08:55:39 13    institute, so I made a binder.  It was called the Northstar,
08:55:43 14    and it was comprised into different sections that the patient
08:55:49 15    could add patient education pieces that each department would
08:55:53 16    put in, like, depending on what they needed with their drugs,
08:55:56 17    or radiation therapy, stuff like that.

08:55:58 18    Q.   Thank you.

08:56:01 19         At some point, you decided to leave that job?

08:56:06 20    A.   That job ended after a year, and I transferred to

08:56:08 21    radiation oncology for the rest of my time.

08:56:11 22    Q.   But I think you said after five years you went back to

08:56:13 23    school, and I'm thinking --

08:56:14 24    A.   I did.  I moved away.  I left New Orleans.

08:56:17 25    Q.   And what did you go back to school for?

*OFFICIAL TRANSCRIPT*

08:56:20 1   A.   I went back for my nurse practitioner degree.  I did a

08:56:23 2   family nurse practitioner program.  There was no oncology nurse

08:56:27 3   practitioner program that I could find anywhere in the country,

08:56:31 4   so I did a family nurse practitioner program, and I got a CNS,

08:56:36 5   a clinical nurse specialty.  I spent an extra year in school in

08:56:40 6   oncology doing that.  And so I got that about a year after I

08:56:43 7   got my FNP degree.

08:56:47 8        So my family nurse practitioner degree gave me

08:56:49 9   prescriptive authority and the ability to take care of

08:56:53 10   patients, and my CNS oncology gave me the credibility that I

08:56:57 11   needed to go to people and say, I could be an oncology

08:56:59 12   nurse practitioner.

08:56:59 13   Q.   So, just briefly, what is a nurse practitioner, and how is

08:57:06 14   that different from a nurse?

08:57:09 15   A.   A nurse practitioner is a midlevel care provider.  So in

08:57:13 16   lieu of seeing a doctor, you would see the nurse practitioner.

08:57:16 17   And they are different from a regular nurse in the fact that

08:57:20 18   they can actually have prescriptive authority and can give you

08:57:23 19   prescriptions just like your doctor can.  And a lot of times,

08:57:26 20   patients want to see the nurse practitioner because, usually,

08:57:29 21   they have more time in their schedule, and they spend more time

08:57:32 22   with their patients, and their approach to the patient is from

08:57:36 23   a nursing perspective rather than a medical one.

08:57:39 24   Q.   And when you graduated and became a nurse practitioner,

08:57:44 25   where did you go to work?

*OFFICIAL TRANSCRIPT*

08:57:47  1   A.    I was working while I was getting my degree at a hospital

08:57:51  2   called Skagit Valley Hospital in their oncology unit as their

08:57:56  3   education coordinator, and I stayed on there with those same

08:58:00  4   positions.  They created a position for me, and that's where I

08:58:04  5   worked.

08:58:07  6   Q.    As a medical professional, what licenses or certifications

08:58:16  7   did you hold?

08:58:19  8   A.    At the time, I held an ARNP license, which is the advanced

08:58:25  9   registered nurse practitioner license, and also an AOCN,

08:58:31 10   advanced oncology certified nurse license.  And I also held an

08:58:35 11   ANCC, and an A -- what's the other one -- AR -- no.  Anyway,

08:58:42 12   two different certifications from my FNP through the

08:58:47 13   credentialing bodies.

08:58:48 14   Q.    Have you been a member of any nurse associations?

08:58:52 15   A.    Yes.  I was member -- well, I am a member of the Oncology

08:59:00 16   Nursing Society, and I was a member of the National

08:59:03 17   Nurse Practitioner Society.

08:59:05 18   Q.    How long did you continue to work as a nurse practitioner?

08:59:10 19   A.    I was still working as a nurse practitioner when I was at

08:59:15 20   Sanofi-Aventis.  I kept up my license and continued to work on

08:59:18 21   the side probably through 2010, maybe.

08:59:25 22   Q.    When did you first decide to go to work for a drug

08:59:29 23   company?

08:59:34 24   A.    I moved back to New Orleans in 2002, and I was working as

08:59:45 25   a nurse practitioner for East Jefferson Hospital in Parish

*OFFICIAL TRANSCRIPT*

Anesthesia, and I was doing pre-op physicals.  There were no

oncology nurse practitioners when I moved back here, and I went

to Ochsner.  And I went and I saw all of my doctor friends -- I

moved back to town, I went and saw all of my oncology doctor

friends and talked to them about working as a

nurse practitioner, getting a job down here, and they all

wanted to hire me.  They were like, yes, we would love to have

you.  We will create a position.

       I've been through that process in Washington when I

lived there and worked there.  And it's a while.  It takes a

hot minute to create a position in a hospital system and get

funding in their job.  I was seven-and-a-half months pregnant,

and I didn't have time to wait for them to create a position.

I needed to get off COBRA insurance and have my baby and get a

job.  So I went to work for Parish Anesthesia at East

Jefferson, and I was doing pre-op physicals.  And I was bored

to tears.  Really.  I was, like, so bored.

       And one of the drug reps that used to call on me when

I was a nurse practitioner heard of an opening here in town

with a company called Amgen as an oncology clinical specialist.

It was not a sales role; it was a role for a clinician.  And

they educated people, they didn't sell any product.  And she

called me and said, "Do you think you might be interested?"  I

said, "I don't know."  I mean, this was literally three weeks

before I was about to have my baby.  I'm like, just call.  Tell

09:01:28   1    the lady to call me.

09:01:30   2          And so she called me, and they literally hired me

09:01:34   3    three weeks before I had my baby.  They couldn't ask me when I

09:01:38   4    was in the interview, but she asked me as soon as she hired me.

09:01:42   5    She was like, "When are you due?"  And I was, like, "Three

09:01:44   6    weeks," and she was like, "Oh, my god."  It was pretty funny,

09:01:47   7    but -- so that's how I started.

09:01:47   8          THE COURT:  I think the question was:  When did you

09:01:48   9    first decide to go to work for a drug company?

09:01:52  10          THE WITNESS:  2002.

09:01:52  11          THE COURT:  Okay.  Thank you.

09:01:56  12    EXAMINATION BY MR. BACHUS:

09:01:56  13    Q.   You said that you were working as a clinical specialist

09:02:06  14    for Amgen.  Why did you stop working that job, and what did you

09:02:12  15    do next?

09:02:16  16    A.   In that role, I learned that you covered a way larger

09:02:24  17    geography than a sales rep did.  I had an infant baby, and I

09:02:29  18    watched all of the sales reps in the geographies that I

09:02:34  19    covered, which was three states at the time; go home at the end

09:02:38  20    of the day.  And meanwhile, I was traveling, and I had an

09:02:40  21    infant baby at home.  And I thought to myself, I could do what

09:02:43  22    they do.  All they do is talk to doctors.  I'm not afraid of

09:02:46  23    that.  Why can't I be a salesperson?  So I pursued being a

09:02:51  24    salesperson so that I could have a smaller geography and a

09:02:55  25    better quality of life.

                                    *OFFICIAL TRANSCRIPT*

09:02:56  1    Q.    And how did you make that happen?

09:02:58  2    A.    Well, I wanted to make it happen at Amgen, and I spoke to

09:03:03  3    my boss, and it just wasn't going to.  Nobody was leaving and

09:03:07  4    everybody was happy, and she helped me, supported me, like,

09:03:12  5    leaving.  Like, she understood that if I had to go outside the

09:03:15  6    company, then I had to go outside the company.  And I actually

09:03:21  7    didn't look too hard at -- you know, God kind of provides, and

09:03:24  8    this guy was leaving Sanofi, and he called me, and he said,

09:03:26  9    "Hey, I'm leaving this role, and I heard you might be looking

09:03:29 10    for a sales job, and I want you to apply for my position."  And

09:03:33 11    he supported me for the job.

09:03:35 12    Q.    And what job were you hired to perform for Sanofi?

09:03:38 13    A.    I was hired to sell Taxotere chemotherapy for

09:03:41 14    breast cancer.

09:03:42 15    Q.    What was your job title when you first went to work for

09:03:48 16    Sanofi?

09:03:49 17    A.    Oncology sales specialist.

09:03:51 18    Q.    Now, when you first went to work for Sanofi, what was your

09:03:56 19    understanding of what a Taxotere sales specialist job would

09:04:03 20    entail?

09:04:04 21    A.    It would entail me taking my geography and increasing the

09:04:12 22    sales of Taxotere within that geography.  I was to use my

09:04:21 23    skills to do that, and my relationships with the physicians to

09:04:25 24    do that, and the tools that the company gave me to do that.

09:04:28 25    Q.    Again, briefly, what initial training do you recall Sanofi

*OFFICIAL TRANSCRIPT*

09:04:34  1    providing to you?

09:04:36  2    A.    Initially, we had to go through the home study course, and

09:04:43  3    take tests at the end of each course.  And you had to pass the

09:04:47  4    whole entire home study course.  Once you completed that and

09:04:51  5    passed it, you were sent to Bridgewater, New Jersey to do

09:04:56  6    training in person.  That was -- I believe it was two weeks

09:04:59  7    long because I recall a week in between.  But it was long.  It

09:05:06  8    was about two weeks long, I believe.  And then you passed the

09:05:09  9    test at the end of that, and that was certification.  So then

09:05:11 10    you were certified to sell the drug.  So that was initial

09:05:15 11    training.  But then we had ongoing training all the time.  That

09:05:19 12    was part of the job.

09:05:19 13    Q.    Can you briefly describe what ongoing training that you

09:05:26 14    recall Sanofi providing to you?

09:05:27 15    A.    So we had conference calls, updates.  The year is divided

09:05:36 16    into, like, half year, then semesters and quarters, and so we

09:05:42 17    would have plan of action meetings, we have our national sales

09:05:47 18    meetings at the beginning of the year, and then, like, plan of

09:05:49 19    action meetings.  So that -- those meetings were meant to keep

09:05:52 20    you motivated and keep you trained on what the marketing team

09:05:56 21    wanted you to focus on for that quarter in terms of your sales.

09:06:00 22    Like, what were the messages that they wanted you to highlight

09:06:05 23    that quarter to try to get your sales up.  So, that's what we

09:06:10 24    trained on.  If there was any new data that came out, they

09:06:14 25    would review that, or if there were, you know, any specific

*OFFICIAL TRANSCRIPT*

09:06:17 1   things that they wanted you to highlight out of the data, we

09:06:19 2   always had something we had to train on.

09:06:21 3   Q.   All right.  What impact did your previous background as a

09:06:27 4   nurse practitioner and oncology nurse before that have on your

09:06:32 5   ability to do your job at Sanofi?

09:06:34 6   A.   Oh, it helped me a lot.  I feel like it gave me a leg up,

09:06:40 7   made me valuable to my team.  I was always, like, the clinical

09:06:44 8   person on the team.  Whenever we had these POA meetings, there

09:06:48 9   was always some scenario that they would give.  Like, you know,

09:06:51 10  Dr. X in clinic ABC has, you know, this share of breast cancer

09:06:58 11  patients.  They would give some scenario, and they were always

09:07:02 12  like, Ruth, do the homework and share it with the team, you

09:07:05 13  know, and what are the clinical points.  Like, I was the one

09:07:08 14  everybody, you know, cheated off of kind of thing.  And I

09:07:11 15  always spoke up on regional calls and national calls, so I was

09:07:15 16  always getting, you know, perk points from my manager for

09:07:18 17  making our team look good.

09:07:20 18        I was definitely, like, the clinical resource in my

09:07:23 19  district and my region.  And as far as with physicians, like,

09:07:28 20  it was really great because I could always understand where

09:07:31 21  they were going when they brought something up.  Like, it

09:07:33 22  didn't take me, you know, a second to realize when they brought

09:07:37 23  up a patient, you know, where they wanted me to go in terms of

09:07:40 24  the data.  So it was very advantageous to me.

09:07:44 25  Q.   Were you ever promoted while you worked for Sanofi?

*OFFICIAL TRANSCRIPT*

09:07:47 1   A.   I was promoted in 2006 to a senior sales rep.

09:07:52 2   Q.   What was your understanding of the purpose or goal of the

09:08:01 3   Taxotere sales representative job that you were hired to

09:08:05 4   perform?

09:08:05 5   A.   Can you repeat the question.

09:08:09 6   Q.   Sure.

09:08:10 7        What was the goal?  What were you trying to

09:08:12 8   accomplish in this position?

09:08:13 9   A.   Oh, I mean, I was trying to sell more Taxotere.  My goal

09:08:17 10  was to increase the sales of Taxotere.  Like, I'm a sales rep

09:08:22 11  now.

09:08:22 12  Q.   Is Taxotere a prescription drug or an over-the-counter

09:08:27 13  drug?

09:08:27 14  A.   It's a prescription drug.

09:08:28 15  Q.   So, if it's a prescription drug, who are you supposed to

09:08:34 16  be selling to?

09:08:35 17  A.   I'm selling the drug to the physicians.

09:08:38 18  Q.   What were you taught, if anything, about why Sanofi had

09:08:46 19  sales representatives out selling their drug to doctors'

09:08:53 20  offices?

09:08:54 21  A.   I don't know if I was taught it, but we're the face of the

09:09:00 22  company.  In oncology, there's drugs approved every week and

09:09:08 23  new drugs in different cancers, different states.  Community

09:09:13 24  oncology is a super difficult space for an oncologist to live

09:09:18 25  in, and it's hard for them to keep everything straight.

*OFFICIAL TRANSCRIPT*

09:09:21 1          I've been in this field now for 19 years, and I tell

09:09:25 2   you what, the doctors have my cell phone numbers, I have

09:09:29 3   theirs, and they use it.  They rely on us for up-to-date

09:09:34 4   information on the drug, and I get calls all the time.  What

09:09:39 5   drug can I use your drug with?  You know, I mean, they rely on

09:09:43 6   us for the most up-to-date current information on the products,

09:09:47 7   and, you know, the company relied on us to disseminate the

09:09:53 8   information about our product to help increase their sales.

09:09:56 9   Q.   Was there a main indication for Taxotere that you were

09:10:02 10  hired to focus on for Sanofi?

09:10:04 11  A.   I was hired for adjuvant breast and gastric GE junction.

09:10:11 12  I also did metastatic breasts, and, eventually, I wound up

09:10:16 13  launching in prostate.

09:10:17 14  Q.   Just from a general standpoint, what is metastatic

09:10:21 15  breast cancer?

09:10:23 16  A.   Metastatic breast cancer is cancer that has already spread

09:10:28 17  to other organs in the body.

09:10:30 18  Q.   You used the word "adjuvant."  What is adjuvant treatment

09:10:34 19  for breast cancer?

09:10:37 20  A.   Adjuvant treatment for breast cancer is treatment that is

09:10:40 21  used after definitive treatment for cure.  So, someone comes

09:10:45 22  in, and they go and they get their mastectomy.  Well, the

09:10:51 23  mastectomy is the part that got the cancer out.  So the cancer

09:10:55 24  is treated and cured by the mastectomy, but we're going to add

09:10:59 25  on something else to help it not come back, to just give some

*OFFICIAL TRANSCRIPT*

09:11:04 1   insurance that we've gotten it all.  And so, if we've got a
09:11:09 2   hormone-positive patient, you know, that insurance treatment
09:11:12 3   might be taking a hormone blocker medication for five years, or
09:11:17 4   it could also be, if it's a hormone-negative patient or someone
09:11:21 5   else, it could be chemo.  You know, so it's an additive
09:11:24 6   treatment.
09:11:29 7           MR. STRONGMAN:  Objection.
09:11:29 8           THE COURT:  Sustained.
09:11:30 9               Ma'am, you need to listen to the question.  Just
09:11:32 10  answer the question.  Thank you.
09:11:34 11  EXAMINATION BY MR. BACHUS:
09:11:35 12  Q.   Are you familiar with the term "early-stage
09:11:38 13  breast cancer"?
09:11:38 14  A.   Yes, I am.
09:11:39 15  Q.   Again, just briefly, what is your understanding of what is
09:11:43 16  early-stage breast cancer?
09:11:44 17  A.   Early-stage breast cancer is cancer that has not spread
09:11:48 18  past one lymph node.
09:11:53 19  Q.   What's the difference between metastatic breast cancer and
09:11:57 20  early-stage breast cancer?
09:11:58 21  A.   The difference between metastatic breast cancer and
09:12:02 22  early-stage breast cancer is, early-stage breast cancer has not
09:12:07 23  spread past one lymph node, and it can be cured.  And
09:12:11 24  metastatic breast cancer has spread into other organs, and is
09:12:17 25  generally not curable.  It's only controllable.

*OFFICIAL TRANSCRIPT*

09:12:19  1    Q.   What's your understanding of the difference between how an

09:12:27  2    early stage breast cancer patient might be treated for cancer

09:12:30  3    versus a metastatic breast cancer patient?

09:12:35  4    A.   An early stage breast cancer treatment patient that's

09:12:39  5    going to get chemotherapy is going to have a defined regimen of

09:12:46  6    chemo that they're prescribed that the doctor is going to hope

09:12:50  7    to get them through, like, six cycles or four cycles.  Like,

09:12:56  8    they are not going to get the effect of it if they don't get

09:13:00  9    those four or six cycles, depending on what they prescribe

09:13:05  10   them.

09:13:06  11        Whereas, lymphatic breast cancer is more what the

09:13:09  12   patient can tolerate because they are not going to cure the

09:13:12  13   cancer.

09:13:13  14   Q.   Early-stage breast cancer is a curable cancer?

09:13:20  15   A.   Yes, it is.

09:13:21  16   Q.   But between the -- when you're working sales or promotion,

09:13:32  17   between the early-stage breast cancer patient population and

09:13:36  18   the metastatic breast cancer population, was there a primary

09:13:41  19   sales target for you at Sanofi?

09:13:43  20   A.   Yes.

09:13:43  21   Q.   All right.  Explain that, if you would.

09:13:50  22   A.   In order for me to get the sales numbers where I wanted

09:13:54  23   them to be, it was more advantageous for me to get sales in

09:13:59  24   early-stage breast cancer than it was metastatic breast cancer

09:14:04  25   because the regimen that was utilized the most in the early

*OFFICIAL TRANSCRIPT*

09:14:07  1   stage breast cancer patients at the time was the six-cycle

09:14:10  2   regimen.  So if I got an early stage breast cancer patient to

09:14:14  3   use Taxotere, I was getting six cycles of Taxotere.  Versus the

09:14:17  4   metastatic breast cancer patients, I might get one or two,

09:14:21  5   maybe three cycles.

09:14:22  6            So, adjuvant early-stage breast cancer patients were

09:14:26  7   my primary target for increasing my sales.

09:14:29  8   Q.    How did you identify the doctors' offices that you would

09:14:36  9   be promoting or selling to?

09:14:39 10   A.    Well, I had a geography that I had to cover, but I used my

09:14:46 11   own judgment a lot in terms of who was treating.  I used my

09:14:53 12   sales numbers.  I used guidance from my manager.  I used

09:14:58 13   accessibility as a guide, as well.  There were a lot of

09:15:03 14   different factors that went into what I -- how I chose who I

09:15:09 15   targeted.

09:15:09 16   Q.    And what information was available to you in terms of

09:15:14 17   which doctors were prescribing what quantities?

09:15:18 18   A.    Well, we had sales reports, and we also had -- like, they

09:15:24 19   would tell us share of voice.  Like, that would always be

09:15:32 20   reported back to us.

09:15:33 21   Q.    I'm sorry, what is a "share of voice"?  What does that

09:15:36 22   mean?

09:15:37 23   A.    Like, when we're at a meeting, and they're saying, you

09:15:39 24   know, we did a poll, and so many doctors heard that -- the

09:15:49 25   Taxotere message.  60 percent of the doctors are hearing it in

*OFFICIAL TRANSCRIPT*

09:15:55  1    your territory, what have you.  You know, I really didn't put

09:15:57  2    that much stock in that, but the sales reports were the biggest

09:16:01  3    guides for me.

09:16:02  4    Q.   When you say "sales reports," what are you referring to?

09:16:05  5    A.   We had a sales reporting system that showed us our own

09:16:10  6    numbers on our computer that we were able to access to look at

09:16:13  7    to help us, guide us.

09:16:16  8    Q.   And just to be clear, when you say "your own numbers," you

09:16:20  9    mean how many doctors issued how many prescriptions of your

09:16:23 10    drug?

09:16:24 11    A.   And which doctors issued the prescriptions in my

09:16:27 12    territory.  I couldn't see somebody else's territory, but I

09:16:31 13    could see all the doctors in my territory.

09:16:33 14    Q.   Briefly, what were your day-to-day job duties in

09:16:42 15    fulfilling this role at Sanofi?

09:16:45 16    A.   A big one would be to look at those reports and

09:16:51 17    strategize, and see who am I going to call on.  And then I

09:16:59 18    would have to arrange to do all of that.  So I would have to go

09:17:02 19    to all of those clinics and get on their calendars to see them.

09:17:10 20    And you want meaningful interactions with them, so that meant

09:17:12 21    that you would need to get on their lunch calendar.  So I would

09:17:15 22    book lunch appointments and do lunches at all of those places.

09:17:20 23         I would also make appointments with -- I would have

09:17:24 24    to identify the people in the clinic that were the right nurses

09:17:27 25    to call on that would be giving the supportive care information

*OFFICIAL TRANSCRIPT*

09:17:34 1    to get the patients through the side effects of the drug.

09:17:37 2    Because if they were not successful in getting through the

09:17:41 3    drug, then it doesn't matter how many times you get the doctor

09:17:44 4    to write it.  If everybody fails it, then you're not really

09:17:47 5    doing your job.  So, I was being a nurse, I was really good

09:17:50 6    about being in tune to that.

09:17:54 7              MR. STRONGMAN:  Objection.

09:17:54 8              THE COURT:  I think it's a bit of a narrative.

09:17:56 9              Ma'am, listen to the question, and just answer

09:17:58 10   the question.

09:17:59 11             THE WITNESS:  It's a long answer because --

09:17:59 12             THE COURT:  Okay.

09:18:00 13             THE WITNESS:  -- it's a big job.

09:18:03 14   EXAMINATION BY MR. BACHUS:

09:18:10 15   Q.   How would you know whether your sales efforts were having

09:18:13 16   an impact in your geographic territory?

09:18:16 17   A.   Because my sales numbers would go up.

09:18:17 18   Q.   Did you receive training on building relationships?

09:18:26 19   A.   We did.

09:18:27 20   Q.   What were you taught about building relationships with

09:18:33 21   doctors?

09:18:34 22   A.   We were taught about listening, asking questions,

09:18:44 23   different sales techniques, things like that.  We were given

09:18:48 24   books.

09:18:50 25   Q.   At Sanofi, was your success or failure in your job

*OFFICIAL TRANSCRIPT*

09:18:56  1    measured in some way by Sanofi?

09:19:00  2    A.    It was measured in your sales numbers, primarily.  It was

09:19:07  3    measured in whether or not you could access your clinics.  Your

09:19:12  4    manager came and were with you all the time.  It was measured

09:19:15  5    in his field reports.  That's documented.

09:19:21  6    Q.    Did Sanofi have any employee incentive programs in place?

09:19:27  7    A.    Yes.  We had a bonus program, and they also had special

09:19:34  8    contacts and a special deferred annual bonus program that they

09:19:41  9    were in when I was employed there as well.

09:19:42 10    Q.    What was the basis for determining eligibility for these

09:19:45 11    incentives?

09:19:47 12    A.    Well, you had to be employed there and in good standing.

09:19:50 13    Q.    And what would -- other than being employed there, what

09:19:57 14    would dictate whether you qualified or didn't qualify for an

09:20:00 15    incentive?

09:20:01 16    A.    Your sales numbers.

09:20:02 17    Q.    And when you say "sales numbers," what are you referring

09:20:08 18    to?

09:20:08 19    A.    My sales of Taxotere.

09:20:09 20    Q.    And prescriptions written by doctors?

09:20:12 21    A.    Correct.

09:20:12 22    Q.    And you mentioned a few moments ago something called "perk

09:20:19 23    points."

09:20:19 24          What are perk points?

09:20:20 25    A.    Perk points are points that your manager has the

*OFFICIAL TRANSCRIPT*

09:20:24 1    discretion to give you that have monetary value in a catalog
09:20:28 2    where you can pick out prices, like furniture and cutlery and
09:20:33 3    stuff like that.  They give it to you for doing something good.
09:20:36 4    Q.   Were you ever recognized by Sanofi for any professional
09:20:42 5    achievements in your job?
09:20:43 6    A.   Yes, I was.
09:20:44 7    Q.   What professional achievements were you -- what do you
09:20:49 8    recall that you were recognized for?
09:20:51 9    A.   Well, I got a lot of perk points every single year I was
09:20:54 10   there.
09:20:54 11   Q.   I'm sorry, I didn't hear that.
09:20:56 12   A.   I said I got a ton of perk points every year I was there.
09:21:00 13   I was promoted in 2006.  I won Regional Champion in 2006.  In
09:21:08 14   2007, I won Race to the Finish.  In 2008, I was a Regional
09:21:13 15   Champion.  What else?  Let me see if there was anything else.
09:21:20 16   Q.   I think that's fine.
09:21:21 17   A.   A lot.
09:21:22 18   Q.   Did Taxotere have any major competitors in the adjuvant
09:21:28 19   treatment, early-stage breast cancer market?
09:21:30 20   A.   Yes, it did.
09:21:31 21   Q.   What drug was Taxotere's biggest competitor when you were
09:21:36 22   promoting Taxotere?
09:21:38 23   A.   Taxol.
09:21:38 24   Q.   As a Taxotere sales specialist, when you're competing with
09:21:54 25   other drugs like you mentioned, Taxol, how would you approach

*OFFICIAL TRANSCRIPT*

09:21:58  1   promoting Taxol -- I mean, Taxotere over Taxol?

09:22:08  2          I guess let me make it an easier question.

09:22:12  3   A.   It would be a narrative, and I talk a lot.

09:22:12  4   Q.   Yes, I understand.

09:22:14  5   A.   You got me nervous.

09:22:15  6   Q.   Were there any major components that you would

09:22:19  7   characterize as being important from approaching the sale of

09:22:26  8   Taxotere?

09:22:31  9   A.   We would -- or I would specifically look at

09:22:39 10   differentiating the drug from its side effects profile.  So

09:22:45 11   that would be a way of getting to, like, if you're going to use

09:22:51 12   this drug, you got to worry about this, but if you use our

09:22:55 13   drug, it could go -- you know, it could be easier because you

09:22:57 14   only have to worry about this.

09:22:59 15   Q.   So as part of your role in promoting the sale of Taxol,

09:23:04 16   would you be familiar with your competitors' label?

09:23:09 17   A.   Yes.

09:23:09 18   Q.   And you were trained on your own label, right?

09:23:15 19   A.   Yes.

09:23:15 20   Q.   And so you mentioned that -- differentiating side effects.

09:23:25 21   What are you talking about?

09:23:28 22   A.   That's what I'm talking about exactly, what I just said.

09:23:30 23   Like, you know, so, you have two drugs, and let's say they work

09:23:37 24   exactly the same.  And so, you want to look at the side effects

09:23:41 25   of them, and you're going to say, well, this drug causes, you

*OFFICIAL TRANSCRIPT*

09:23:46  1   know, terrible diarrhea, but this one doesn't, but they work
09:23:52  2   exactly the same.  So which drug would you like to take; the
09:23:55  3   drug that causes the terrible diarrhea, or the one that
09:23:58  4   doesn't?  I think I want the one that doesn't.  So that's how
09:24:01  5   you differentiate the side effects.
09:24:03  6   Q.   And you said that, as a sales rep, you were kind of the
09:24:14  7   face of the company.  Can you explain that?
09:24:17  8   A.   Yeah, I can explain it.  Sanofi-Aventis is in Bridgewater,
09:24:32  9   New Orleans -- Sanofi-Aventis is in Bridgewater, New Jersey.
09:24:33 10   Oh, I said New Orleans.  I meant New Jersey.
09:24:37 11         And Ms. Avila is in New Orleans, Louisiana, and I
09:24:39 12   covered a lot of Mississippi and a lot of Louisiana.  And all
09:24:44 13   of the physicians down here know Sanofi-Aventis as, at the
09:24:51 14   time, Ruth Avila and the other couple of reps that worked it.
09:24:55 15   So I was the face of it.  So if they had an issue or had a
09:24:58 16   problem or needed something with my drug, they didn't call
09:25:02 17   Sanofi-Aventis in Bridgewater.  They called me, and they still
09:25:06 18   do.  Well, not with Sanofi.  I'm not with Sanofi anymore, but
09:25:10 19   with my current company.
09:25:12 20         And so that's what I mean when I say I'm the face of
09:25:15 21   the company.  And it's with every company that I've ever worked
09:25:18 22   for.  That's how it works.
09:25:20 23   Q.   What did you expect from Sanofi in terms of informing you
09:25:27 24   about known Taxotere side effects?
09:25:31 25   A.   I expected them to be honest and forthcoming so that I

*OFFICIAL TRANSCRIPT*

09:25:35  1   could uphold my integrity in the field about any known side

09:25:41  2   effects.

09:25:41  3   Q.   When you were working for Sanofi, was your promotion or

09:25:58  4   sale of Taxotere successful?

09:26:01  5   A.   Yes, it was.  That's why I won all those awards.

09:26:05  6   Q.   In the industry, is there something called a "blockbuster

09:26:13  7   drug"?

09:26:15  8          MR. STRONGMAN:  Objection.  Relevance.  Prejudicial.

09:26:24  9          MR. BACHUS:  Do you want us to approach?

09:26:25 10          THE COURT:  Yes.  I think I need you all to approach.

09:26:25 11          (WHEREUPON, at this point in the proceedings, there was

09:27:36 12   a conference held at the bench.)

09:27:36 13          THE COURT:  I guess I was a bit perplexed.  I'm not

09:27:40 14   sure where we're going with blockbuster, and I don't know why I

09:27:42 15   think it's prejudicial.

09:27:45 16          MR. STRONGMAN:  Sure.  So, my objection is, Ms. Avila

09:27:49 17   has already testified, I think, numerous times clearly in a way

09:27:53 18   about target sales, increasing sales.  So, as Your Honor knows,

09:28:05 19   we had had a *Motion in Limine* to exclude anything regarding the

09:28:05 20   financial aspect of the drug, so this is exactly the

09:28:07 21   implication.

09:28:07 22          I've let it go quite a bit here, but I think

09:29:00 23   we're going right into a territory where the implication is one

09:29:00 24   that we're trying to make a bunch of money.  As you know,

09:29:00 25   punitive damages are not relevant in the case.

**OFFICIAL TRANSCRIPT**

09:29:00  1          And specifically, our *Motion in Limine* addressed

09:29:00  2     the blockbuster drug.  That *Motion in Limine*, as we know, was

09:29:00  3     granted, so I feel like we're entering into territory here

09:29:00  4     where it's clearly an effort to back door all of this money,

09:29:00  5     profits, revenue issues, through this witness.

09:29:00  6          MR. BACHUS:  Your Honor, to be clear on that, we need

09:29:00  7     factual testimony, not speculative testimony, factual testimony

09:29:01  8     regarding information that might go to a motive or intent,

09:29:08  9     etcetera, and so the blockbuster drug, we believe, falls into

09:29:14 10     this.  This is also a representative that worked with the

09:29:16 11     company that has specific knowledge and it is clear that a

09:29:22 12     blockbuster drug is a financial goal for a particular drug.

09:29:26 13          THE COURT:  So, that's where you're going.

09:29:30 14          MR. BACHUS:  That's why I said maybe we should approach

09:29:33 15     and we talk about it later instead of talking about it in open

09:29:35 16     court.

09:29:35 17          THE COURT:  I have problems with this witness being

09:29:39 18     offered to go there.  I think what we have is a sales rep.

09:29:46 19     Yes.  Her job is to sell the drug and she's going to have

09:29:49 20     incentives for as much as she says, and I think that's enough.

09:29:53 21     But I think to move her into marketing and say we care about

09:29:59 22     nothing else but financial gain is problematic.  Frankly, when

09:30:03 23     you said this is a blockbuster drug, I thought does this change

09:30:07 24     the game for chemotherapy?  That's what I thought initially for

09:30:11 25     me, but if are you saying we intend to make --

                          *OFFICIAL TRANSCRIPT*

09:30:19  1          MR. BACHUS:  She was -- reach this goal and be a

09:30:22  2   blockbuster drug, this is what we're doing out there, this is

09:30:25  3   why we're selling this product.  We believe, with --

09:30:29  4   understanding, you're the --

09:30:30  5          THE COURT:  We're not going to go there with this

09:30:33  6   witness.  I think we've had enough that she was instructed to

09:30:37  7   sell this drug and she was incentivized to sell it.  I think

09:30:41  8   that's enough.

09:30:41  9          MR. BACHUS:  There is one other just while we're here.

09:30:50 10   Eventually, we're going to get to the fact that she was fired

09:30:52 11   by the company --

09:30:52 12          THE COURT:  Yes.

09:30:53 13          MR. BACHUS:  -- as you might recall.  And from her

09:30:57 14   perspective, one of the things that led to her firing, she had

09:31:00 15   around a $30,000 incentive that was in a deferred compensation

09:31:05 16   fund and she was to receive that over the course of three

09:31:09 17   years.  She got fired after they made the first payment and

09:31:12 18   then the lawsuit Mr. Strongman brought up last year had to do

09:31:17 19   with the fact that she sued to try to recover that $26,000,

09:31:22 20   so -- I just wanted you to know there is a piece where we will

09:31:26 21   go --

09:31:26 22          THE COURT:  Fine.  That's different.  I thought it's

09:31:28 23   very strange it was a blockbuster drug -- a blockbuster drug is

09:31:33 24   a drug that changes the landscape.  So, this is why --

09:31:38 25          MR. BACHUS:  So I just wanted to have

**OFFICIAL TRANSCRIPT**

09:31:41 1   that understanding -- later instead of talking about incentive

09:31:44 2   programs that has to do with that issue.

09:31:46 3        THE COURT:  That's fine, but we're going to limit it to

09:31:48 4   that.  We've covered enough.

09:31:50 5        MR. BACHUS:  I understand your order.

09:31:51 6        THE COURT:  Thank you.

09:31:51 7        (WHEREUPON, at this point in the proceedings, the bench

09:31:51 8   conference concluded.)

09:31:51 9        THE COURT:  Mr. Bachus, please proceed.

09:32:11 10       MR. BACHUS:  Thank you.

09:32:11 11  EXAMINATION BY MR. BACHUS:

09:32:12 12  Q.   Were you trained by Sanofi on what key messages you were

09:32:14 13  supposed to use when you were promoting Taxotere to doctors?

09:32:18 14  A.   Yes.

09:32:19 15  Q.   Did Sanofi provide sales representatives with tools to use

09:32:25 16  in communicating with doctors?

09:32:27 17  A.   Yes.

09:32:36 18  Q.   What tools did Sanofi provide for you to communicate with

09:32:40 19  doctors?

09:32:40 20  A.   They provided a lot of different tools for us.  We had a

09:32:50 21  sales aid that was our primary tool that was utilized to convey

09:32:53 22  the data.  We had clinical reprint carriers that we could use

09:32:57 23  to convey the data, as well as leave the actual article.  We

09:33:00 24  had patient geared pieces that we could leave at the clinic

09:33:10 25  that -- with the nurses and the doctors to give to the patients

*OFFICIAL TRANSCRIPT*

09:33:15  1    that we could use to convey the data.  We had leave-behind

09:33:21  2    pieces that we could -- that were smaller pieces that had the

09:33:25  3    data that we could leave at the clinic because you never left

09:33:29  4    your sales aids at the clinic.  It was too big and too

09:33:33  5    expensive to produce to leave with the physicians.  They didn't

09:33:38  6    mass produce that in enough quantities to leave with the

09:33:41  7    physician so you used it and you left smaller pieces of

09:33:46  8    materials behind that had the data within it.

09:33:50  9             I don't want to go too long.

09:33:52  10   Q.   What rules did Sanofi have regarding sales specialists and

09:33:58  11   their communications with doctors and their staff about

09:34:02  12   Taxotere?

09:34:04  13   A.   Our rules were that our discussions with the physician had

09:34:07  14   to be "on-label discussions," meaning that -- "on-label"

09:34:13  15   meaning that the information that we discussed with the

09:34:14  16   physician had to be information that was held within the

09:34:19  17   package insert, and that's what I mean when I say "on-label" --

09:34:25  18   package insert/label is the same terminology.  So everything

09:34:28  19   that the marketing department created for us was on-label, or

09:34:33  20   information that came out of the package insert.

09:34:36  21   Q.   For the jury, can you explain to the jury what is a

09:34:45  22   package insert for a prescription drug?

09:34:47  23   A.   A package insert is the -- it's the place where all of the

09:34:53  24   information is housed on how to use the drug.  All the side

09:34:58  25   effects of the drug, how it's supposed to be dosed, and the

*OFFICIAL TRANSCRIPT*

09:35:04  1    studies that gave that information that were FDA-approved, so

09:35:08  2    all of that is housed.  It's put out there a bunch of different

09:35:17  3    ways.  A lot of times with prescriptions, it's a little -- tiny

09:35:20  4    little folded up piece of paper, but it can be found in

09:35:23  5    different forms, but that's what it is.

09:35:25  6    Q.   Most of us have gone to the pharmacy and picked up a

09:35:35  7    prescription.  Can you give some -- get some context of what

09:35:39  8    this package insert looks like in the various forms, just so we

09:35:44  9    might have some familiarity with it?

09:35:46 10    A.   It most often looks like a square that's folded up into a

09:35:50 11    thousand little things and you open it up and it's really thin

09:35:55 12    and it has words that nobody can read on it because they're,

09:35:59 13    like, so tiny.  Even a magnifying glass can't see it.  That's

09:36:03 14    what you most often see it as, but it can, like I said, be in

09:36:07 15    other forms.

09:36:07 16    Q.   You've used the word "package insert" and we just

09:36:13 17    described that.

09:36:13 18              What's a drug label?

09:36:16 19    A.   In my world, label is another word for package insert.

09:36:19 20    Q.   Okay.  So those two terms mean the same thing.  When you

09:36:23 21    hear package insert, we talk about label, it's the same thing?

09:36:27 22    A.   For me, yes.  Those two words, if I use them, it means the

09:36:30 23    same thing -- package insert is label, label is package insert.

09:36:34 24    Q.   Well, because I think when we first think of the word

09:36:37 25    "label," we think about what's stuck on the side of a bottle.

*OFFICIAL TRANSCRIPT*

09:36:41  1    A.    Yeah.

09:36:41  2    Q.    That's not what you're referring to?

09:36:44  3    A.    No.  I'm referring to the entire package insert as the

09:36:47  4    label because it houses all of the instructions, all of the

09:36:51  5    side effects, all of every -- all the precautions, all the

09:36:53  6    warnings, everything that the FDA deems is important to know

09:36:57  7    about the drug is in there.

09:36:59  8    Q.    I think you used another -- "prescribing information."  Is

09:37:04  9    that the same?

09:37:04 10    A.    Yes.  Prescribing information, PI.  Prescribing

09:37:09 11    information/label.

09:37:12 12    Q.    So just when we hear "package insert," "label,"

09:37:16 13    "prescribing information" --

09:37:17 14    A.    All the same thing.

09:37:18 15    Q.    All the same thing that you've described?

09:37:20 16    A.    All the same thing.

09:37:31 17    Q.    What is the significance of the package insert?

09:37:33 18    A.    The significance of the package insert is the information

09:37:37 19    contained within it and the fact that we were not allowed to

09:37:41 20    proactively speak of any information that is not contained

09:37:44 21    within it.  That was against our rules.

09:37:49 22    Q.    Were you trained by Sanofi on the information contained in

09:37:59 23    the Taxotere package insert?

09:38:01 24    A.    Yes.

09:38:01 25    Q.    And how were you directed by Sanofi to use the Taxotere

*OFFICIAL TRANSCRIPT*

09:38:13  1    package insert in your job as a sales rep?

09:38:21  2    A.    Whenever we gave anything to a clinic, we had to report to

09:38:27  3    a person in the clinic; we had to give it with a copy of the

09:38:32  4    package insert.  We were not necessarily trained to detail or

09:38:36  5    give a call off of the package insert -- that was pretty

09:38:41  6    cumbersome and bulky and difficult to see.  I'm not saying I

09:38:45  7    never used it.  There were instances where a question was asked

09:38:48  8    of me and I had to pull out the package insert to get the

09:38:52  9    answer, because it wasn't in my marketing materials.  However,

09:38:58 10    really how I used it mainly on a day-to-day basis was if I left

09:39:02 11    something behind, it always came with a copy of the package

09:39:06 12    insert.

09:39:08 13    Q.    When you say "left something behind," you're not saying

09:39:11 14    you left something in your car?

09:39:12 15    A.    No.  I mean, like, when I gave it to a clinic.  So, like,

09:39:15 16    we had tear sheet pads, like when you tear a sheet off and give

09:39:20 17    it to the patient for the instruction and it was wrapped in

09:39:23 18    cellophane and it had in the back of it -- I don't know if

09:39:25 19    there were 60 pieces of tear sheet paper in it -- there were 60

09:39:30 20    package inserts in the back of it that went along with the tear

09:39:36 21    sheet pad.  Like, you could not, like -- so, they intended that

09:39:41 22    if the nurse tore it off, that she would be giving them the

09:39:44 23    tear sheet pad and one package insert.  Now, I don't know if

09:39:48 24    the nurse did that once I left it, but I left her the pack with

09:39:51 25    the cellophane wrapped -- with all of the package inserts in

*OFFICIAL TRANSCRIPT*

09:39:55 1    there because that's what we were supposed to do.

09:39:57 2    Q.    What training did you receive from Sanofi regarding the

09:40:02 3    use of information not also in the package insert?

09:40:09 4    A.    We're not supposed to talk to them about information

09:40:11 5    that's not in the package insert.  We're not allowed.

09:40:15 6    Q.    I'm sorry?

09:40:15 7    A.    It's not allowed.

09:40:16 8    Q.    Okay.  So, would you be allowed to communicate with

09:40:29 9    doctors or their staff about side effects that are not in the

09:40:33 10   Taxotere package insert?

09:40:36 11   A.    No.

09:40:36 12   Q.    You had mentioned some of the ways that you were permitted

09:40:58 13   to communicate with doctors and a few moments ago you said

09:41:04 14   "call" on a doctor.  Can you explain what you meant by "call"

09:41:10 15   or "calling" on a doctor.

09:41:12 16   A.    Calling on a doctor would be my interaction with the

09:41:17 17   physician.  So it would be when I actually talked to the

09:41:22 18   physician, when I gave them the information about the product

09:41:28 19   or the data, whatever I was giving to them, however that

09:41:31 20   happened, whether it be in a lunch, whether it be in the

09:41:35 21   hallway, whether it be at breakfast, whether it be at the end

09:41:39 22   of the day when I caught him walking out the clinic, it doesn't

09:41:44 23   matter where the call took place.  But what I mean by "call" is

09:41:48 24   that I actually had a clinical discussion with the physician

09:41:50 25   about some of my data.

*OFFICIAL TRANSCRIPT*

09:41:52  1    Q.    What does it mean to "detail" a doctor?

09:41:58  2    A.    Detailing a doctor is basically the same thing as calling

09:42:04  3    on a doctor.  It's another way to say it.  You know, I think

09:42:10  4    maybe detailing may be more like in a lunch or a breakfast

09:42:16  5    setting because you get more quality time with a physician in

09:42:19  6    those interactions and you actually get to sit with them and

09:42:23  7    have a little bit more time so you probably get to go through

09:42:27  8    more of the sales pieces with them and not have such a short

09:42:30  9    hallway call or what have you, but they really essentially are

09:42:34  10   kind of like the same thing.

09:42:36  11   Q.    Is "calling on" or "detailing" a doctor a method used by

09:42:44  12   Sanofi to communicate to doctors about Taxotere and its side

09:42:49  13   effects?

09:42:49  14   A.    It's one of the primary methods used by Sanofi -- we're --

09:42:58  15   to communicate with the physicians.

09:43:00  16   Q.    You also said something about a "sales aid."  What is a

09:43:04  17   sales aid?

09:43:06  18   A.    A sales aid is where all of our primary data that we could

09:43:11  19   utilize with the physician to get our sales messages across is

09:43:17  20   housed.  It's usually a spiral-bound notebook divided by

09:43:24  21   indications, and it has the highlights of the data within

09:43:28  22   there.  And it's usually set up pretty easily to where even if

09:43:33  23   you kind of don't remember or know it by heart.  You could kind

09:43:37  24   of read the highlights and still get it right.  And marketing

09:43:41  25   has definitely got it laid out to where whatever they want you

*OFFICIAL TRANSCRIPT*

09:43:45  1    to focus on in that edition of the sales aid, because they

09:43:50  2    updated it all the time.  With each time they updated their

09:43:53  3    marketing messages, you would be able to follow it.

09:43:56  4    Q.   Are sales aids a method or a tool used by Sanofi to

09:44:02  5    communicate with doctors about Taxotere and its side effects?

09:44:05  6    A.   Yes, with -- in conjunction with us.

09:44:08  7    Q.   In other words, you need the rep there with the

09:44:13  8    information that's in the sales aid?

09:44:16  9    A.   Yes.

09:44:17 10         MR. STRONGMAN:  Objection.  Leading.

09:44:19 11         THE COURT:  It was leading.  Just watch it.

09:44:23 12    EXAMINATION BY MR. BACHUS:

09:44:24 13    Q.   Were you allowed to make your own sales aids?

09:44:27 14    A.   No.

09:44:32 15    Q.   Are you familiar with a phrase "homemade bread"?

09:44:35 16    A.   Yes, I am.

09:44:36 17    Q.   What is "homemade bread"?

09:44:39 18    A.   That's what they called it when people actually made their

09:44:44 19    own sales aids or whatever, where they did it themselves.  It's

09:44:49 20    called "homemade bread" and you couldn't do it.  You got in

09:44:52 21    trouble for it.

09:44:53 22    Q.   During your testimony, you also used the phrase or acronym

09:45:00 23    "POA"?

09:45:03 24    A.   POA.  Plan of action meeting.

09:45:06 25    Q.   What is a "plan of action meeting"?

*OFFICIAL TRANSCRIPT*

09:45:09  1    A.    A plan of action meeting would be where the marketing team

09:45:13  2    outlined what their plan of your action for the next upcoming

09:45:17  3    quarter or semester, whatever the timeframe would be, in terms

09:45:21  4    of what the marketing messages would be.  That was a plan of

09:45:27  5    action meeting.

09:45:27  6    Q.    And when you say "marketing message," what are you

09:45:32  7    referring to?

09:45:32  8    A.    I'm referring to the marketing teams, whether they be the

09:45:36  9    breast team or the gastric team or the prostate team.  Their

09:45:40 10    job was to help us sell the drug.  So, each quarter, they

09:45:44 11    would, you know, look at everything and conduct their market

09:45:47 12    research and figure out what's the best way that we could

09:45:51 13    position the data to possibly get more increased sales.  And so

09:45:56 14    they would present to us, we think if you do it this way and

09:46:00 15    use these messages, you'll sell better and so here is the plan

09:46:05 16    of automatics for you guys to do it and here's the tools that

09:46:09 17    we've created for you guys to do it.

09:46:11 18    Q.    And what -- what are the marketing pieces you mentioned?

09:46:17 19    A.    Well, it's different every time, but it always centered

09:46:21 20    around the sales aid.

09:46:23 21    Q.    Would you explain that, please.

09:46:28 22    A.    So --

09:46:30 23    Q.    Maybe an example?

09:46:31 24    A.    A supportive example, like, in terms of just supporting us

09:46:40 25    of is hype, like Breast Cancer Month -- Awareness Month.  They

*OFFICIAL TRANSCRIPT*

09:46:45 1  would always create a Breast Cancer Awareness campaign to help

09:46:48 2  us in the clinics to, you know, show that Sanofi-Aventis cared

09:46:53 3  about Breast Cancer Awareness Month and so we had little pins

09:46:57 4  that we could give out to the nurses, the little pink pins.  We

09:47:03 5  had pins that had a pink thing on it.  You know, just -- and

09:47:07 6  that was, like, you know, really nice that we could go give

09:47:10 7  these things to the clinic and say, you know, Sanofi-Aventis

09:47:14 8  loves Breast Cancer Awareness Month.  It may not have been some

09:47:18 9  big change or something to the data but that was just

09:47:21 10 supportive of us being in the field during that month and that

09:47:24 11 was, you know, us marketing campaign.

09:47:32 12          MR. STRONGMAN:  Objection.

09:47:33 13          THE COURT:  Sustained.

09:47:33 14              Move to your next question.

09:47:33 15          MR. BACHUS:  Yes, Your Honor.

09:47:33 16 EXAMINATION BY MR. BACHUS:

09:47:35 17 Q.   Were any of the marketing pieces tools that you used to

09:47:39 18 communicate with doctors about Taxotere and its side effects?

09:47:43 19 I mean, you described a pin.  That's not really communicating

09:47:43 20 side effects, I don't think.

09:47:49 21 A.   We had a ton of pieces that we used with doctors to

09:47:52 22 communicate side effects to patients.  We had patient Ed books,

09:47:55 23 we had patient tear sheets, we had a whole patient chemotherapy

09:47:58 24 care kit that we -- which was a CD-ROM and a USB port for the

09:48:02 25 patients.  We had, you know, all of that.  Those didn't

*OFFICIAL TRANSCRIPT*

09:48:08  1    necessarily change every single semester and that's why, you

09:48:11  2    know, sometimes it's just a hoorah campaign about what we

09:48:14  3    already have.

09:48:15  4         The things that changed more so were, like, just,

09:48:19  5    you're messaging in the sales aid and then possibly some

09:48:25  6    leave-behinds that were data leave-behinds.

09:48:27  7    Q.   Now, you also mentioned something called a "reprint."

09:48:32  8    A.   Clinical reprint carrier.

09:48:33  9    Q.   What is a reprint?

09:48:34  10   A.   A reprint would be like the article of the data.  Like --

09:48:40  11   so, if I'm highlighting in my sales aid the data that was

09:48:45  12   printed in the Journal of Clinical Oncology in December of

09:48:50  13   2006, which is when our data was published, I'm just showing

09:48:54  14   pictures and words of that data, but what if the doctor

09:48:57  15   actually wants to see that data?  Well, there is a clinical

09:49:01  16   reprint carrier that has that data in it and it's usually

09:49:06  17   housed in a folder and on the front of the folder it says the

09:49:09  18   name of it and has some highlights of the data.  You open it

09:49:14  19   up, there's more highlights and within it is the actual article

09:49:20  20   with our PI right behind it, because you have to give out the

09:49:21  21   PI every time, and you can detail the doctor with the front

09:49:25  22   cover and with the inside cover and actually leave him the data

09:49:29  23   so that he can read the article himself and come to his own

09:49:33  24   conclusion after you've had a little discussion with him about

09:49:35  25   it.  Academic physicians liked those.

**OFFICIAL TRANSCRIPT**

09:49:38  1   Q.    Is a reprint carrier a tool that Sanofi used to
09:49:45  2   communicate with doctors about Taxotere and its side effects?
09:49:49  3   A.    Yes.
09:49:49  4   Q.    Are you familiar with the term "lunch and learn"?
09:49:55  5   A.    Yes.
09:49:55  6   Q.    What's a lunch and learn?
09:49:58  7   A.    A lunch and learn is similar to a breakfast and learn.  We
09:50:04  8   did breakfast and lunches and these are appointments that we
09:50:07  9   booked to get extra time so that we could have meaningful
09:50:11 10   clinical discussions with physicians to go over the data and
09:50:14 11   it's how we, you know, made sure that we had good time with the
09:50:18 12   physicians to discuss the data.
09:50:19 13   Q.    And who would organize a lunch and learn?
09:50:24 14   A.    I would.
09:50:24 15   Q.    And who would be invited to a lunch and learn?
09:50:29 16   A.    The physicians and the nurses in the clinic, as well as
09:50:32 17   the MAs.
09:50:32 18   Q.    And who would pay for the lunch and learn?
09:50:35 19   A.    Sanofi-Aventis.
09:50:36 20   Q.    What's a "dinner program"?
09:50:39 21   A.    A dinner program or a speaker program was an opportunity
09:50:46 22   for the physicians to get out of the clinic and hear from a
09:50:54 23   peer, so it was actually a physician speaker that would give
09:50:57 24   them the information about our drug.  It was a promotional
09:51:01 25   program, meaning that it was on-label.  So the physician that

*OFFICIAL TRANSCRIPT*

09:51:06 1  was giving the information to the physicians that attended the
09:51:12 2  dinner program did not create the slides.  Sanofi-Aventis
09:51:17 3  created the slides and gave them and trained them on the slides
09:51:22 4  to present them.  But it was an opportunity for the physicians
09:51:28 5  to hear from another peer about the drug.
09:51:32 6  Q.    And who would organize dinner programs?
09:51:34 7  A.    I would.
09:51:34 8  Q.    And who would be invited to dinner programs?
09:51:38 9  A.    The physicians in my geography that I wanted to hear from
09:51:42 10  another peer about the drug.  I liked dinner programs.  I did
09:51:48 11  them a lot.
09:51:48 12  Q.    Is a dinner program a method used by Sanofi to communicate
09:51:52 13  with doctors about Taxotere and about what's in the package
09:51:57 14  insert?
09:51:57 15  A.    Yes.  Yes, definitely.
09:51:58 16  Q.    Are you familiar with the term "physicians speakers
09:52:05 17  bureau"?
09:52:06 18  A.    Yes.
09:52:06 19  Q.    What is a physicians speakers bureau?
09:52:11 20  A.    So you need physicians to speak at these dinner programs,
09:52:15 21  and so physician speaker bureau was reps around the country
09:52:24 22  nominated physicians from their territories to actually be a
09:52:26 23  part of the speakers bureau and talk for the company.  They got
09:52:30 24  paid to speak for the company to do these promotional talks at
09:52:35 25  these dinner programs.  Not everybody got accepted but most of

*OFFICIAL TRANSCRIPT*

09:52:38  1    them did, and you had to do a certain amount every year.  But

09:52:42  2    the physicians that got accepted to do these programs got sent

09:52:45  3    to the company for training on the slides, and if they did a

09:52:49  4    certain amount every year, they got invited to come back and be

09:52:52  5    on the speakers bureau for the following year.  But they were

09:52:57  6    the pool of physicians that we were able to pick from to

09:53:01  7    actually do our speaker programs in our territories.

09:53:05  8    Q.    And who paid the doctors who were part of the speakers

09:53:09  9    bureau?

09:53:09 10    A.    Sanofi-Aventis.

09:53:10 11    Q.    Is a speaker -- a physician speaker bureau a method that

09:53:17 12    Sanofi used to communicate with doctors about Taxotere and the

09:53:20 13    side effects?

09:53:21 14    A.    Yes, absolutely.

09:53:21 15    Q.    Are you familiar with the term "convention"?

09:53:30 16    A.    Yes.

09:53:31 17    Q.    What's a convention?

09:53:34 18    A.    A convention is a medical society we use, so, like, the

09:53:39 19    Oncology Nursing Society or the American Society of Clinical

09:53:44 20    Oncology, which is the doctors' -- oncologists' big meeting.

09:53:50 21    They would hold their medical conventions and they would give

09:53:53 22    drug companies the opportunity to rent space in their exhibit

09:53:57 23    hall and to display their products and to have their company

09:54:03 24    personnel stand in their displays and have exhibit hall hours

09:54:10 25    to where the attendees of the meeting could walk through the

**OFFICIAL TRANSCRIPT**

09:54:15  1   exhibit hall and interact with the people at their booths.  So

09:54:19  2   the companies would buy the booth space to potentially have the

09:54:23  3   time with the attendees.

09:54:25  4   Q.   And what did Sanofi sales specialists like yourself do for

09:54:30  5   the company at these conventions?

09:54:31  6   A.   We would work the booths in shift and basically, we would

09:54:37  7   detail physicians that came to our booth.  We would give them

09:54:40  8   information, do clinical reprints.  Hopefully, we would get to

09:54:46  9   do a good little call on them.  You know, if we had little

09:54:49 10   knickknacks, trinkets at our booths, we would give them to

09:54:53 11   them.  Mainly our job was to detail the physicians that came to

09:54:57 12   the booth.

09:54:58 13   Q.   Now, are conventions a method or a tool that would be used

09:55:01 14   by Sanofi to communicate with doctors about Taxotere and its

09:55:04 15   side effects?

09:55:05 16   A.   Yes.

09:55:05 17   Q.   Are you familiar with the term "fellows conference"?

09:55:11 18   A.   Yes.

09:55:11 19   Q.   What is a fellow conference?

09:55:16 20   A.   A fellow conference is -- fellows are physicians that are

09:55:23 21   studying to be oncologists.  They call them fellows.  They are

09:55:27 22   in the fellowship program, and they have conferences where they

09:55:34 23   are going over journal articles.  And so they always wanted a

09:55:39 24   drug company to sponsor their meeting when they were going over

09:55:45 25   these journal articles so that it afforded us an opportunity to

**OFFICIAL TRANSCRIPT**

09:55:50  1    have quality time with the fellows and teach them about our
09:55:54  2    products and it offered them the opportunity to have their
09:55:57  3    conference sponsored and have a meal provided for their
09:56:01  4    conference.  So, we definitely took advantage of that
09:56:05  5    opportunity.
09:56:06  6    Q.   Is a fellow's conference a method or a tool that was used
09:56:12  7    by Sanofi to communicate with doctors about Taxotere and about
09:56:17  8    what's in the package insert?
09:56:19  9    A.   Yes, it is.
09:56:19 10    Q.   Are you familiar with something called a "preceptorship"?
09:56:26 11    A.   Yes, I am.
09:56:27 12    Q.   What is a preceptorship?
09:56:31 13    A.   A preceptorship was -- I don't think it's done any more,
09:56:36 14    but back in the day, it was when a rep would want to go work
09:56:41 15    with a certain physician, and say, you know, I want to go spend
09:56:46 16    four hours with Dr. Blue in his clinic and see how he works and
09:56:52 17    get a better understanding of how he takes care of patients and
09:56:56 18    it will help me and it will help him.  So the company would pay
09:56:59 19    the physician so that the drug rep would get to go spend a
09:57:04 20    couple hours in clinic with him and learn how they worked and
09:57:07 21    how they treat patients.  It also was a good relationship
09:57:11 22    builder for the rep.
09:57:12 23    Q.   Who would organize a preceptorship?
09:57:18 24    A.   The rep would.
09:57:18 25    Q.   And how were doctors chosen to be paid for these

*OFFICIAL TRANSCRIPT*

09:57:24 1    preceptorships?

09:57:26 2    A.    Well, the rep would pick them and then would get them

09:57:29 3    approved by the company.

09:57:32 4    Q.    And is a preceptorship a method used by Sanofi to

09:57:36 5    communicate with doctors about Taxotere and about the side

09:57:36 6    effects on the package insert?

09:57:41 7         MR. STRONGMAN:  Objection, leading.

09:57:42 8         THE COURT:  Sustained.  Rephrase your question.

09:57:46 9    EXAMINATION BY MR. BACHUS:

09:57:49 10   Q.    What was the purpose of a preceptorship in terms of

09:57:54 11   communicating?

09:57:57 12   A.    We were able to communicate our information to the doctor

09:58:00 13   with that time that we had with them.

09:58:02 14   Q.    Are you familiar with the term "advisory board"?

09:58:06 15   A.    Yes.

09:58:07 16   Q.    And what is an advisory board?

09:58:12 17   A.    An advisory board is a meeting that's sponsored by the

09:58:17 18   company.  It's either sponsored by the marketing department --

09:58:22 19   usually sponsored by the marketing department.  And it's where

09:58:26 20   they got physicians from across the country to come into a

09:58:35 21   meeting and it could be -- I don't know, they did them

09:58:39 22   regionally, sometimes nationally.  It just depended where but

09:58:43 23   they would ask the physicians to come in and give them their

09:58:48 24   opinions on stuff.  They would show them data and do surveys

09:58:54 25   with them all weekend long, but they would fly them to a nice

*OFFICIAL TRANSCRIPT*

1    hotel and have this meeting on Saturday and half the day on

2    Sunday and get their advice about, you know, like, messages

3    that they wanted to give, how did they land, you know, and just

4    whatever other things that they wanted the physicians' opinions

5    on.

6                MR. STRONGMAN:  Objection, narrative.

7                THE COURT:  Okay.  Ma'am, I know it's -- I just need

8    you to just answer the question.

9                THE WITNESS:  I'm sorry.

10   EXAMINATION BY MR. BACHUS:

11   Q.   Are you familiar with the term "key opinion leader"?

12   A.   Yes.

13   Q.   What's a key opinion leader?

14   A.   A key opinion leader is a physician who is considered to

15   be a -- the forefront -- a forefront physician in their

16   consumer type.  So, like, if they are an expert in

17   breast cancer, they are considered a key opinion leader in

18   breast cancer.  If they are an expert in prostate cancer, they

19   are a key opinion leader in prostate cancer.

20   Q.   What was the purpose or role of having key opinion

21   leaders?

22   A.   Key opinion leaders were important to your territory

23   because, you know, if your state -- if your -- if my -- if I'm

24   selling in breasts, I need to know who my thought leaders and

25   my key opinion leaders were in breasts in terms of, you know,

*OFFICIAL TRANSCRIPT*

10:00:27 1    how to sell my drugs, like, you know, your targets and things

10:00:31 2    like that.  Like, they were very important.

10:00:33 3    Q.    Is having key opinion leaders a method used by Sanofi to

10:00:43 4    communicate with doctors about Taxotere?

10:00:47 5    A.    Yeah.  They kept a log of who were the key opinion

10:00:51 6    leaders.  They asked us who we thought our key opinion leaders

10:00:54 7    were in our territories.

10:00:55 8    Q.    Are you familiar with the term "Dear Healthcare Provider

10:01:00 9    Letters"?

10:01:00 10   A.    Yes.

10:01:00 11   Q.    What is that?

10:01:05 12   A.    It's a letter that's sent out to all of the physicians in

10:01:11 13   the database when needed to buy the company or directed by the

10:01:19 14   company from the FDA to alert them to, like, a change in the PI

10:01:24 15   or some problem with anything that we're messaging or doing

10:01:31 16   wrong.

10:01:32 17   Q.    Well, is a Dear Healthcare Provider Letter a method used

10:01:40 18   to communicate with doctors?

10:01:41 19   A.    Yes.

10:01:42 20   Q.    Are you familiar with the term "objection handling"?

10:01:46 21   A.    Yes.

10:01:46 22   Q.    Can you explain what objection handling is?

10:01:53 23   A.    Objection handling is -- it is how we were trained on

10:02:00 24   dealing with the physicians when they would tell us that they

10:02:08 25   didn't want to use our product because of A, B, or C.  And we

*OFFICIAL TRANSCRIPT*

10:02:14  1   were trained on how to handle A, B, and C, those objections.

10:02:17  2   Q.   Was your training on objection handling and the use of

10:02:26  3   objection handling methods a strategy used by Sanofi to

10:02:31  4   communicate with doctors?

10:02:33  5          MR. STRONGMAN:  Objection.  Leading.

10:02:35  6          THE COURT:  I'm going to overrule that objection.

10:02:42  7          THE WITNESS:  Yes.

10:02:44  8   EXAMINATION BY MR. BACHUS:

10:02:44  9   Q.   Are you familiar with the term "elite program"?

10:02:46  10  A.   Yes.

10:02:47  11  Q.   And what was the elite program?

10:02:50  12  A.   The elite program was --

10:02:55  13         MR. STRONGMAN:  Objection.  Your Honor, may we approach

10:02:56  14  briefly?

10:02:57  15         THE COURT:  Yes.

10:02:57  16         (WHEREUPON, at this point in the proceedings, there was

10:02:57  17  a conference held at the bench.)

10:03:17  18         MR. STRONGMAN:  So, my objection is, we are so far

10:03:20  19  beyond the scope with regard to anything in this case.

10:03:25  20  Dr. Kardinal and Dr. Larned indicated they never relied on

10:03:33  21  sales reps at all, and all of these items that Mr. Bachus is

10:03:38  22  going through simply has no connection to the case.  It's

10:03:41  23  irrelevant.  And at this point, it's cumulative, prejudicial,

10:03:45  24  and obviously, the witness is providing narrative after

10:03:51  25  narrative answers, and is just simply not controllable at this

*OFFICIAL TRANSCRIPT*

1    point.

2         MR. BACHUS:  Your Honor, first, let me address the

3    first point, and that is, this is absolutely relevant.  This is

4    a very important case, and seeing something in the label is not

5    the end of the game in terms of providing the adequate warning

6    and disseminating information in marketing.  The Court has

7    already provided an order with respect to Dr. Bosserman, the

8    methods by which a company has any information about the label

9    is completely relevant, and this part at the top of the whole

10   megaphone that is a key component of our case.  And so I'm

11   almost done.

12         The elite program, let me just tell you what it

13   is, so you might rule on that.  This is last one that I'm going

14   to discuss.  But the elite program is a program where, when

15   doctors write a certain number of prescriptions, the company

16   would give him a rebate, and that is a method --

17         THE COURT:  But this is not information about the

18   benefits of certain drugs.  That's just -- an incentive to

19   write, but that's not disseminating information from the label.

20         MR. BACHUS:  I'll move on.

21         THE COURT:  I think I've got to tell you, she's a

22   witness that is not controllable, of course, and I am very

23   concerned she's going off, and I don't know if -- I'll be frank

24   with you.  I don't know if there is some agenda here, and I'm

25   getting very concerned about that.  She's going to have to --

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 10:05:35 | 1 |
| 10:05:39 | 2 |
| 10:05:43 | 3 |
| 10:05:47 | 4 |
| 10:05:49 | 5 |
| 10:05:53 | 6 |
| 10:05:57 | 7 |
| 10:05:57 | 8 |
| 10:06:00 | 9 |
| 10:06:03 | 10 |
| 10:06:08 | 11 |
| 10:06:10 | 12 |
| 10:06:13 | 13 |
| 10:06:14 | 14 |
| 10:06:16 | 15 |
| 10:06:20 | 16 |
| 10:06:23 | 17 |
| 10:06:25 | 18 |
| 10:06:28 | 19 |
| 10:06:32 | 20 |
| 10:06:35 | 21 |
| 10:06:35 | 22 |
| 10:06:40 | 23 |
| 10:06:42 | 24 |
| 10:06:45 | 25 |

1  and I've stopped her a few times because I don't want -- I'm
2  very concerned about the jury thinking I'm harassing this
3  witness, so I'm trying to keep -- to just --
4          MR. BACHUS:  I'm doing my best here.
5          THE COURT:  I know.  But she's not -- I think this
6  elite physician program, I think that has no bearing in this
7  case.
8          MR. BACHUS:  I'll withdraw that question.
9          THE COURT:  You need to withdraw the question.  I need
10  to know where she's going.  She's been on the stand for an hour
11  and a half.
12          MR. BACHUS:  If we need to take a break, I have another
13  hour with her.  And we understand the time restraint.
14          THE COURT:  I'm trying to figure out what can you
15  possibly have with this sales rep?  I know she was a sales rep
16  during this time, but Dr. Kardinal and Dr. Larned?
17          MR. BACHUS:  I have the benefit of some of the things
18  that were discussed on cross-examination that I'm going to go
19  over with her on direct.  So, I've got the benefit of some of
20  that information, and so I need to handle some of the issues.
21  If he's going to agree not to cross her, I'll be much shorter.
22          THE COURT:  Okay.
23          MR. BACHUS:  I'm working through it.  As you see, I'm
24  trying to work through as efficiently as I can.  I agree with
25  you.

*OFFICIAL TRANSCRIPT*

10:06:46  1          THE COURT:  You know, leading, no.

10:06:52  2          MR. BACHUS:  Well, I can ask more leading questions to

10:06:55  3    direct the examination as well and try to get more yes or no

10:06:59  4    questions.

10:07:00  5          THE COURT:  I'm going to start.  I'm very concerned

10:07:03  6    with the jury thinking this is a witness that the Judge is

10:07:07  7    picking on.  That's where I'm trying to --

10:07:09  8          MR. STRONGMAN:  May I just say, I don't want to be

10:07:12  9    picking on her either.  And the way that -- in my view, I've

10:07:20 10    seen -- this examination go is that they're trying to use her

10:07:23 11    as an expert, to be honest.

10:07:25 12          THE COURT:  That's what I'm afraid of.

10:07:27 13          MR. STRONGMAN:  I would just further say that my

10:07:29 14    objection relates to the fact that warning all doctors is a

10:07:36 15    legal issue, or a factual issue.  It's warning doctors, and we

10:07:40 16    haven't mentioned her doctors yet.

10:07:42 17          MR. BACHUS:  It's about getting the message out in an

10:07:46 18    adequate way to the medical community, to the doctors, and the

10:07:49 19    patients and the people involved.

10:07:50 20          THE COURT:  Some of it was okay, but I think now you

10:07:53 21    are using her as an expert.  And so, you need to talk to her a

10:08:00 22    whole lot, Mr. Bachus, or we're going to have problems.

10:08:05 23          MR. BACHUS:  Yes, I'm doing my part.

10:08:07 24          THE COURT:  No.  You're going to expand what the scope

10:08:11 25    of her testimony should be beyond what she actually knows about

**OFFICIAL TRANSCRIPT**

10:08:17  1    the chemotherapy drug that was administered to Ms. Kahn.  And

10:08:24  2    that's what I'm going to talk about.

10:08:28  3            THE DEPUTY CLERK:  Should we take a break -- should we

10:08:31  4    take a break, or do you still have an hour with her?

10:08:41  5            THE COURT:  No, let's keep going.

10:08:41  6            (WHEREUPON, at this point in the proceedings, the bench

10:09:03  7    conference concluded.)

10:09:03  8            THE COURT:  Do the jurors need a break?  Court will be

10:09:06  9    at recess for ten minutes.

10:09:09 10            THE DEPUTY CLERK:  All rise.

10:09:17 11            (WHEREUPON, at 10:09 a.m. the jury panel leaves the

10:24:52 12    courtroom and then a brief recess was taken.)

10:24:52 13            THE COURT:  Court is in session; you may be seated.  Is

10:24:55 14    there anything we need to address before we bring the jury back

10:24:57 15    in?

10:24:57 16            MR. STRONGMAN:  I don't think so at this time.

10:25:02 17            THE COURT:  Okay.  All right.  Let's bring in the jury.

10:25:51 18    Thank you.

10:25:51 19            (WHEREUPON, at 10:25 a.m. the jury panel enters the

10:25:54 20    courtroom.)

10:25:54 21            THE COURT:  All jurors are present.  Court's back in

10:25:56 22    session; you may be seated.

10:25:58 23                Ms. Avila, I remind you, you're under oath.

10:26:04 24                Mr. Bachus, please proceed.

10:26:06 25            MR. BACHUS:  Thank you, Your Honor.  Your Honor, while

*OFFICIAL TRANSCRIPT*

10:26:11 1    we were taking the testimony, I was making a list of the

10:26:17 2    various communications, and I didn't realize that the light

10:26:19 3    wasn't on.

10:26:20 4              Do I have permission to turn the light on for the

10:26:23 5    camera?

10:26:25 6              THE DEPUTY CLERK:  I can do that.  I didn't realize you

10:26:28 7    were ready.

10:26:28 8              MR. BACHUS:  Oh, I'm sorry.

10:26:28 9              THE COURT:  Okay.  Yes.

10:26:28 10             MR. BACHUS:  Okay.  Thank you.

10:26:28 11   EXAMINATION BY MR. BACHUS:

10:26:52 12   Q.    Ms. Avila, what are -- well, are you familiar with the

10:26:55 13   term "patient education books"?

10:26:57 14   A.    Yes.

10:26:58 15   Q.    What are patient education books?

10:27:01 16   A.    Patient education books are booklets that provide

10:27:06 17   information to the physicians in a reading level that would be

10:27:13 18   tailored down to generally like the sixth grade reading level.

10:27:22 19   So it would take hard-to-understand medical information and put

10:27:25 20   it in easy-to-understand format so that the patient could

10:27:27 21   better digest what -- the side effect information that the PI

10:27:32 22   was trying to convey.

10:27:37 23   Q.    Have you heard of tear sheets?

10:27:39 24   A.    Yes, I have.

10:27:39 25   Q.    Briefly, what are tear sheets?

**OFFICIAL TRANSCRIPT**

10:27:42  1    A.    Tear sheets would be the same thing, but they would be

10:27:46  2    specific to one side effect each tear sheet.  So one on

10:27:52  3    hair loss, one on nausea and vomiting, one on diarrhea.

10:27:56  4    Q.    And are tear sheets a method used to communicate

10:27:59  5    information about Taxotere and its side effects?

10:28:02  6    A.    Yes.

10:28:02  7    Q.    All right.

10:28:08  8          MR. BACHUS:  Thank you, Your Honor.

10:28:09  9                We can turn this off now.  I appreciate it.

10:28:09 10    EXAMINATION BY MR. BACHUS:

10:28:16 11    Q.    You testified that you worked for Sanofi from 2004 to

10:28:21 12    2009.  What was your understanding during that time about

10:28:26 13    Taxotere and the side effect of alopecia or hair loss?

10:28:32 14          MR. STRONGMAN:  Objection, calls for a conclusion.

10:28:37 15          THE COURT:  What was the question?  What was her

10:28:43 16    understanding?

10:28:44 17          MR. BACHUS:  What was her understanding?  And I could

10:28:47 18    add in from her training.

10:28:47 19    EXAMINATION BY MR. BACHUS:

10:28:48 20    Q.    What was your understanding from your training during the

10:28:52 21    time that you worked for Sanofi about Taxotere and the side

10:28:56 22    effect in that package insert, alopecia?

10:29:02 23          THE COURT:  Overruled.  I'll allow the question.

10:29:04 24          THE WITNESS:  That it was a temporary side effect, and

10:29:07 25    that everybody's hair would grow back.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:29:09 1 | EXAMINATION BY MR. BACHUS: |
| 10:29:10 2 | Q.    Are you familiar with the term "PCIA"? |
| 10:29:14 3 | A.    Yes. |
| 10:29:14 4 | Q.    What is PCIA? |
| 10:29:18 5 | A.    Permanent chemotherapy-induced alopecia. |
| 10:29:22 6 | Q.    Did Sanofi ever inform you that a known side effect of |
| 10:29:28 7 | Taxotere use is PCIA? |
| 10:29:29 8 | A.    No. |
| 10:29:29 9 | Q.    Aside from using the specific term PCIA, did Sanofi ever |
| 10:29:46 10 | inform you that Taxotere causes permanent hair loss? |
| 10:29:50 11 | A.    No. |
| 10:29:51 12 | Q.    What were you trained to tell doctors and their staff |
| 10:30:01 13 | about the hair loss caused by Taxotere? |
| 10:30:04 14 | A.    I was trained to tell them that it was temporary, that it |
| 10:30:09 15 | would grow back, that the hair, when it grew back, generally |
| 10:30:12 16 | would grow back sometimes different, like curly, wavy -- it may |
| 10:30:20 17 | not grow back the same.  Sometimes during treatment, sometimes |
| 10:30:22 18 | after, sometimes longer, but that it would grow back. |
| 10:30:25 19 | Q.    When you worked for Sanofi, were the words "alopecia" or |
| 10:30:38 20 | "hair loss" included in the Taxotere package insert? |
| 10:30:41 21 | A.    Yes. |
| 10:30:50 22 |       MR. BACHUS:  Your Honor, at this time, I intend to |
| 10:30:53 23 | refer to the exhibit that's been previously marked as Exhibit |
| 10:30:58 24 | P280 for identification.  Your Honor, could I approach the |
| 10:31:05 25 | witness with a copy of that exhibit? |

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:31:07 1 | THE COURT:  Yes. |
| 10:31:14 2 | EXAMINATION BY MR. BACHUS: |
| 10:31:27 3 | Q.   Ms. Avila, I've handed you what's been marked as P280 for |
| 10:31:33 4 | identification purposes. |
| 10:31:34 5 | Do you recognize this document? |
| 10:31:35 6 | A.   Yes. |
| 10:31:36 7 | Q.   Is it a document that you're familiar with? |
| 10:31:41 8 | A.   Yes. |
| 10:31:41 9 | Q.   And how are you familiar with this document? |
| 10:31:45 10 | A.   It is the Taxotere PI. |
| 10:31:47 11 | Q.   Now, when you say PI, again -- |
| 10:31:50 12 | A.   Package insert. |
| 10:31:51 13 | Q.   And what are the other names that this can be called? |
| 10:31:56 14 | A.   Label, PI. |
| 10:31:59 15 | Q.   On the first page of Plaintiff's Exhibit 280, down towards |
| 10:32:09 16 | the middle bottom right, do you see a revision date? |
| 10:32:14 17 | A.   Yes. |
| 10:32:15 18 | Q.   And what is the revision date shown on the first page of |
| 10:32:20 19 | this document? |
| 10:32:22 20 | A.   9/28/07. |
| 10:32:23 21 | Q.   And if you turn to the last page of this document, |
| 10:32:32 22 | page 57, who created this document? |
| 10:32:38 23 | A.   Sanofi-Aventis U.S., LLC. |
| 10:32:41 24 | Q.   Who copyrighted this document? |
| 10:32:43 25 | A.   Sanofi-Aventis U.S., LLC. |

*OFFICIAL TRANSCRIPT*

10:32:46  1    Q.   And who's responsible for its content?

10:32:48  2    A.   Sanofi-Aventis U.S., LLC.

10:32:55  3    Q.   While you worked at Sanofi, was it a regular practice of

10:32:58  4    Sanofi to maintain these package inserts for the drugs that

10:33:03  5    they were marketing in the United States?

10:33:04  6    A.   Yes.

10:33:04  7    Q.   And did this document appear to be a printed photocopy of

10:33:12  8    one of the Taxotere package inserts that you would have used as

10:33:14  9    part of your job?

10:33:15 10    A.   Yes.

10:33:17 11         MR. BACHUS:  Your Honor, at this time, plaintiffs would

10:33:19 12    offer Exhibit Number P280 into evidence.

10:33:23 13         MR. STRONGMAN:  No objection.

10:33:25 14         THE COURT:  Let it be admitted.

10:33:25 15         (WHEREUPON, at this point in the proceedings,

10:33:25 16    Exhibit Number P280 was admitted into evidence.)

10:33:29 17         MR. BACHUS:  Your Honor, at this time, do I have your

10:33:33 18    permission to publish P280 to the members of the jury?

10:33:41 19         THE COURT:  Every page?

10:33:41 20         MR. BACHUS:  No.

10:33:41 21         THE COURT:  Okay.  Thank you.

10:33:41 22         MR. BACHUS:  Scott's going to assist us --

10:33:41 23         THE COURT:  Okay.  All right.  Thank you.

10:33:43 24         MR. BACHUS:  -- in going through some of the pages.

10:33:45 25         THE COURT:  Yes, you may publish it.

**OFFICIAL TRANSCRIPT**

10:33:47  1          MR. BACHUS:  Thank you, Your Honor.

10:33:51  2              Scott, if we could just start with page 1 of

10:33:54  3   Exhibit 280, please.  Thank you.

10:33:57  4   EXAMINATION BY MR. BACHUS:

10:34:02  5   Q.   Ms. Avila, can you describe for the jury how this package

10:34:06  6   insert was utilized in your job?

10:34:09  7   A.   Well, as I said before, we didn't use it to detail off of

10:34:14  8   very often.  However, it was utilized as a resource.  If I was

10:34:19  9   ever asked questions that I couldn't find the answer to in my

10:34:22 10   marketing pieces, I would always have the package insert to

10:34:26 11   refer to, and that did happen sometimes.  I would have to pull

10:34:31 12   the PI out and look up the answer to the question.

10:34:34 13              And it was given to the physicians and the nurses

10:34:38 14   with everything that I gave to them in the clinic.

10:34:42 15   Q.   Were you trained by Sanofi to understand the message to

10:34:49 16   doctors and nurses about the contents of this package insert?

10:34:53 17   A.   Yes.

10:34:53 18   Q.   I'd like to draw your attention to page 20.

10:34:57 19          MR. BACHUS:  Scott, if you would please publish page 20

10:35:05 20   of P280.

10:35:05 21   EXAMINATION BY MR. BACHUS:

10:35:10 22   Q.   And, Ms. Avila, if you would look at line 17 of P280 on

10:35:21 23   page 20, do you see where it says:  "Combination therapy with

10:35:28 24   Taxotere in the adjuvant treatment of breast cancer"?

10:35:30 25   A.   Yes.

*OFFICIAL TRANSCRIPT*

10:35:31   1   Q.   Is this the portion of the package insert that relates to
10:35:45   2   treatment for breast cancer of Taxotere in the adjuvant
10:35:50   3   setting?
10:35:51   4   A.   Correct.  This is the *TAC versus FAC* trial.
10:35:55   5   Q.   Now, if you look just below at the top of table 7 on
10:36:03   6   line 22, can you see where it says on table 7:  "Clinically
10:36:13   7   important treatment emergent adverse reactions"?
10:36:22   8   A.   Yes.
10:36:22   9   Q.   Is this the table of the known adverse reactions, this
10:36:31  10   table 7?
10:36:32  11   A.   Yes, yes.
10:36:32  12   Q.   Now, if you look at the table as listed on page 20,
10:36:43  13   beginning with the term "adverse reaction," and then there's a
10:36:48  14   list underneath it.
10:36:49  15        Do you see that?
10:36:49  16   A.   Yes.
10:36:50  17   Q.   When you look at this left column, do you find PCIA, or
10:36:58  18   permanent hair loss, listed as an adverse reaction on page 20
10:37:00  19   of Exhibit 280?
10:37:03  20   A.   No.
10:37:03  21   Q.   Okay.  This table continues on to page 21.
10:37:12  22        MR. BACHUS:  Thank you, Scott.
10:37:12  23   EXAMINATION BY MR. BACHUS:
10:37:15  24   Q.   With additional adverse reactions.  Ms. Avila, when you
10:37:22  25   look at this, do you find PCIA listed as a potential adverse

*OFFICIAL TRANSCRIPT*

10:37:28  1   reaction on page 21 of Plaintiff's Exhibit 280?

10:37:33  2   A.    No.

10:37:33  3   Q.    All right.  Now, do you find the word "alopecia"?  I think

10:37:39  4   it's six down from the top.

10:37:41  5   A.    Yes.

10:37:41  6   Q.    Now, does the word "alopecia" mean hair loss?

10:37:49  7   A.    Yes.

10:37:50  8   Q.    In the second column next to the word "alopecia," what

10:37:57  9   percentage of users are stated to have experienced the side

10:38:01 10   effect that Sanofi is describing here?

10:38:04 11   A.    97.8.

10:38:05 12   Q.    97.8 percent?

10:38:08 13   A.    Percent, yes.

10:38:09 14   Q.    Thank you.

10:38:12 15          Do you see any warning or advisement for PCIA or

10:38:19 16   permanent hair loss in this table 7?

10:38:25 17          MR. STRONGMAN:  Objection, cumulative, and asks --

10:38:25 18          THE WITNESS:  No.

10:38:27 19          MR. STRONGMAN:  -- for opinion.

10:38:28 20          THE COURT:  Sustained.

10:38:33 21   EXAMINATION BY MR. BACHUS:

10:38:33 22   Q.    Thank you.

10:38:34 23          Now, I'd like to draw your attention to page 54 of

10:38:38 24   Plaintiff's Exhibit 280.  Are you there?

10:38:57 25   A.    Uh-huh (affirmative response).

*OFFICIAL TRANSCRIPT*

10:38:58  1    Q.    Okay.  If you look at the top of page 54, do you see where

10:39:04  2    it says:  "Patient counseling information"?

10:39:06  3    A.    Yes.

10:39:07  4    Q.    All right.  Is this the "Patient Counseling Information"

10:39:11  5    section of the Taxotere --

10:39:13  6    A.    Yes.

10:39:14  7    Q.    -- package insert?

10:39:15  8    A.    Patient information leaflet.

10:39:16  9    Q.    I want to draw your attention to page 55 now of this

10:39:27 10    document and line 18.

10:39:32 11         Do you see where it says:  "What are the possible

10:39:35 12    side effects of Taxotere?"

10:39:35 13    A.    Yes.

10:39:37 14    Q.    And when you look at page 55, line 18, do you see there's

10:39:44 15    a list that begins with "Low white blood cell count," and

10:39:49 16    continues down to the bottom of page 55?

10:39:51 17    A.    Yes.

10:39:51 18    Q.    Okay.  Do you see PCIA listed on this page, 55, of

10:40:03 19    Exhibit 280?

10:40:05 20    A.    No.

10:40:05 21    Q.    This -- this continues on to page 56.  Ms. Avila, do you

10:40:22 22    find where it says, "Hair loss"?

10:40:25 23    A.    Yes.

10:40:26 24    Q.    On the top of page 56?

10:40:29 25    A.    Yes.

**OFFICIAL TRANSCRIPT**

10:40:30  1    Q.   And again, does hair loss here mean the same thing as

10:40:34  2    alopecia?

10:40:34  3    A.   Yes.

10:40:35  4    Q.   Do you see this second sentence where it says:  "Hair loss

10:40:44  5    will begin after the first few treatments and varies from

10:40:47  6    patient to patient.  Once you've completed all your treatments,

10:40:52  7    hair generally grows back."

10:40:53  8         Do you see that?

10:40:53  9    A.   Yes.

10:40:54 10    Q.   What were you trained by Sanofi to tell doctors' offices

10:40:58 11    about the hair loss that's described on page 56 of this package

10:41:03 12    insert?

10:41:05 13    A.   We were trained to tell them that the patient's hair would

10:41:08 14    grow back.

10:41:13 15    Q.   We talked about educational tools.  Were there specific

10:41:18 16    educational tools that Sanofi provided to you to explain this

10:41:22 17    particular side effect that's in their package insert?

10:41:24 18    A.   Yes.

10:41:25 19    Q.   Okay.

10:41:26 20         MR. BACHUS:  Thank you, Scott.  You can take that down.

10:41:28 21         Your Honor, at this point, I intend to refer to

10:41:35 22    the exhibit that has been marked as Exhibit D570 for

10:41:41 23    identification purposes.

10:41:44 24         Do I have your permission to approach the

10:41:46 25    witness?

**OFFICIAL TRANSCRIPT**

10:41:48  1          THE COURT:  Yes.

10:41:48  2          (WHEREUPON, at this point in the proceedings,

10:42:01  3   Exhibit Number D570 was admitted into evidence.)

10:42:01  4   EXAMINATION BY MR. BACHUS:

10:42:12  5   Q.   Ms. Avila, I've handed you what has been marked as

10:42:15  6   Exhibit D570 for identification.

10:42:19  7          Do you recognize this document?

10:42:20  8   A.   Yes.

10:42:21  9   Q.   And are you familiar with it?

10:42:24 10   A.   Very familiar with it.

10:42:26 11   Q.   I'm sorry?

10:42:28 12   A.   I'm very familiar with it.

10:42:30 13   Q.   And how are you familiar with this document?

10:42:32 14   A.   We gave it a lot to the nurses in the clinics to help them

10:42:36 15   manage their patients that were on Taxotere.

10:42:45 16   Q.   Can you please describe for the jury what this document

10:42:51 17   is.

10:42:52 18   A.   It's a nursing care kit, and it's a CD-ROM USB port.  It

10:43:07 19   was given to them in two different ways, either a USB port or a

10:43:11 20   CD-ROM, and it housed individual -- they called them tear

10:43:15 21   sheets, but you just printed them off -- of all of the side

10:43:21 22   effects of the drug, as well as all the premedication regimens

10:43:25 23   for the drug.  Because each different type of patient had a

10:43:30 24   premedication regimen that they had to take, and it was a lot

10:43:32 25   for the nurses to keep all of that straight.  So it was a

                        *OFFICIAL TRANSCRIPT*

10:43:35  1     really important piece for the nurses because they are busy.

10:43:40  2     It's a lot for them.

10:43:41  3             So they could just go to the computer and print out

10:43:45  4     the instructions for how to take the premedications for the

10:43:49  5     breast cancer patients, as well as, okay, you're going to be

10:43:52  6     faced with alopecia, you're going to be faced with neutropenia,

10:43:56  7     you're going to be faced with whatever, and just, you know,

10:43:59  8     print off those sheets and give them to the patient and say,

10:44:01  9     this is what's coming.  Let's sit here and let's go over this.

10:44:05 10     And they would do what they -- a lot of times in the clinics,

10:44:07 11     they call them "chemo schools" --

10:44:09 12             THE COURT:  Okay.

10:44:09 13             MR. BACHUS:  Thank you.

10:44:10 14             THE COURT:  I think we got -- you answered the

10:44:13 15     question.

10:44:14 16             THE WITNESS:  I'm doing it again.

10:44:14 17             THE COURT:  Thank you.

10:44:16 18             THE WITNESS:  I'm sorry.

10:44:16 19     EXAMINATION BY MR. BACHUS:

10:44:16 20     Q.    While you worked at Sanofi, was it the regular practice of

10:44:19 21     Sanofi to prepare documents like this for your use as a sales

10:44:25 22     representative?

10:44:25 23     A.    Yes.

10:44:26 24     Q.    And were you trained by Sanofi on the use and messaging

10:44:32 25     for these chemotherapy care kits?

                        *OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:44:34 | 1 | A.    Yes. |
| 10:44:35 | 2 | Q.    And did the document that you have before you, does this |
| 10:44:40 | 3 | appear to be a photocopy of one of the Sanofi chemotherapy |
| 10:44:46 | 4 | patient care kits that was provided to you during the time that |
| 10:44:49 | 5 | you worked for Sanofi? |
| 10:44:50 | 6 | A.    It looks like it to me. |
| 10:44:54 | 7 | Q.    Okay. |
| 10:44:55 | 8 | MR. BACHUS:  Your Honor, plaintiffs will now offer |
| 10:44:58 | 9 | Exhibit D570 into evidence. |
| 10:45:00 | 10 | THE COURT:  I thought -- |
| 10:45:04 | 11 | MR. STRONGMAN:  Object to a prior objection. |
| 10:45:05 | 12 | THE COURT:  Yeah, but wasn't it yesterday? |
| 10:45:08 | 13 | MR. BACHUS:  Yes, Your Honor. |
| 10:45:09 | 14 | THE COURT:  It's already in evidence, right? |
| 10:45:10 | 15 | MR. STRONGMAN:  Yeah, a version of it. |
| 10:45:12 | 16 | THE COURT:  Okay. |
| 10:45:12 | 17 | MR. BACHUS:  Some of the pages of it are in evidence |
| 10:45:16 | 18 | from yesterday.  This, we're asking for the entry of the |
| 10:45:19 | 19 | entirety of the document.  That's the only difference. |
| 10:45:20 | 20 | THE COURT:  Sustained. |
| 10:45:25 | 21 | I'm going to sustain the objection because -- and |
| 10:45:28 | 22 | maybe we need to talk on the side. |
| 10:45:28 | 23 | (WHEREUPON, at this point in the proceedings, there was |
| 10:45:48 | 24 | a conference held at the bench.) |
| 10:45:48 | 25 | THE COURT:  Perhaps I'm at a loss, but yesterday -- and |

**OFFICIAL TRANSCRIPT**

1   this is going to clear up the record from yesterday.  I had

2   granted a *Motion in Limine* as to this document.  This was

3   conditionally granted, and I allowed it in the deposition

4   testimony because I found those portions related to alopecia

5   were basically offered as impeachment where prior witnesses

6   said, we've always meant that.  Alopecia meant that it was --

7   it could be permanent, or it could be temporary.

8            And I thought this document provided some

9   impeachment, as it was another statement against Sanofi that

10  appeared to indicate that the hair loss was temporary.  But

11  since I conditionally granted it, I allowed that portion that's

12  related to what I thought was impeachment because there's no

13  evidence that Dr. Kardinal actually used this document or that

14  Ms. Kahn received a version of this document.

15       MR. BACHUS:  Your Honor, yesterday morning in your

16  chambers, I brought a full copy of this to the meeting.  We

17  discussed this in your office, in your chambers, and the -- you

18  said it was -- I explained to you that, in the previous case,

19  Ms. Menzies used the first few pages, and Mr. Strongman got up

20  and criticized her for not giving the witness the whole

21  document.  And I intended to use the whole document.  And you

22  approved that in our meeting yesterday, and that is all that

23  I'm doing.  I'm going to focus on those pages that were already

24  admitted into evidence.  I'm just providing the entirety of the

25  document so that Mr. Strongman can't get up and say, well,

*OFFICIAL TRANSCRIPT*

10:47:41  1    Mr. Bachus didn't give her the whole document.  That's what we

10:47:43  2    are --

10:47:47  3              THE COURT:  No, I know we talked about yesterday.  I

10:47:48  4    was very concerned because I have conditionally granted the

10:47:51  5    *Motion in Limine*.  But as I said, the reason I allowed it in

10:47:55  6    the deposition testimony was because we went to those sections

10:47:58  7    that I thought contradicted the testimony of the physicians and

10:48:02  8    was a statement against interests.

10:48:05  9              MR. BACHUS:  That's the exact section I'm going to use.

10:48:09 10    All she's going to do is say that they worked together with the

10:48:13 11    package insert.  Just like Your Honor said yesterday, this is

10:48:15 12    important information that I cited to you about 801(d)(2).

10:48:15 13              THE COURT:  No, I understand.

10:48:20 14              MR. STRONGMAN:  My position is that, certainly,

10:48:24 15    Mr. Bachus can't use this document to impeach Ms. Avila, right?

10:48:29 16    This is not connected to the fabrication of this case, and

10:48:32 17    Your Honor allowed that with regard to the deposition yesterday

10:48:36 18    consistent with your ruling.  But we're now into the territory

10:48:38 19    with the conditionally granted *Motion in Limine* where this has

10:48:41 20    no connection to this case at this point.  It is cumulative as

10:48:45 21    well.  The jury saw it yesterday.  It's just having her bring

10:48:48 22    it up shows yet again no connection to the case.

10:48:51 23              THE COURT:  It may be that Mr. Strongman makes the

10:48:54 24    argument that you haven't seen the whole thing then maybe --

10:48:58 25              MR. BACHUS:  Just use the first pages that we already

*OFFICIAL TRANSCRIPT*

```
10:49:00  1   approved.
10:49:01  2           THE COURT:  The first pages are already in evidence and
10:49:03  3   I thought that was a statement against the interest in that it
10:49:08  4   contradicted a prior statement of the witness.
10:49:09  5           MR. BACHUS:  I was confused, Your Honor, because if he
10:49:14  6   was going to use a few pages I wanted to show what the whole
10:49:16  7   document is.
10:49:20  8           MR. STRONGMAN:  My objection would simply be that you
10:49:22  9   used the document consistent with a Motion in Limine, has no
10:49:27 10   bearing on the case with this witness.  Ms. Avila was impeached
10:49:32 11   with it and now we're showing the same document again.
10:49:34 12           MR. BACHUS:  Sanofi's position in the case is
10:49:38 13   repeatedly alopecia means both.  This witness will testify that
10:49:41 14   this document is Sanofi's document.  This document was created
10:49:46 15   to explain the language in the package insert and she was
10:49:50 16   taught that this is temporary and that's what the document
10:49:52 17   says, which is directly against your entire position in the
10:49:55 18   case, including an opening that was put up and disclosed to her
10:50:00 19   17 times.  So you can't get away from making a statement and
10:50:03 20   saying -- and by the way, multiple witnesses in your deposition
10:50:07 21   testimony who are also Sanofi employees, you asked them, Harley
10:50:11 22   asked them, over and over again.
10:50:13 23           MR. STRONGMAN:  Right.  My objection is just only on
10:50:16 24   the entirety of the document.  If he's going to put up all
10:50:19 25   couple of pages on alopecia, then I have no objection to the
```

**OFFICIAL TRANSCRIPT**

10:50:19 1    rest of it.

10:50:19 2            THE COURT:  Okay.

10:50:23 3            MR. STRONGMAN:  It's using it at all at this point with

10:50:26 4    this witness.  That's my objection.

10:50:28 5            THE COURT:  Okay.  All right.  Well, then I'm going to

10:50:32 6    let the document in.  Since you've changed your mind since the

10:50:35 7    objection has changed.  My concern is I don't want to go

10:50:38 8    through this entire document with this witness and you can ask

10:50:42 9    her one or two questions and that's enough.  I think she has

10:50:48 10   gone far afield of what's relevant in the case.  And I'm very

10:50:51 11   concerned.  I think you're using her as an expert witness

10:50:57 12   and --

10:50:57 13           MR. BACHUS:  I understand.  Just for the record, I

10:50:59 14   would like to state there is nothing more relevant than this

10:51:02 15   witness and this document to our case.

10:51:04 16           THE COURT:  No, I understand.  And I'm going to allow

10:51:06 17   you a couple of questions.  We're not going to beat the

10:51:09 18   proverbial dead horse.

10:51:09 19           (WHEREUPON, at this point in the proceedings, the bench

10:56:51 20   conference concluded.)

10:56:51 21           THE COURT:  Please be seated.  Please proceed.

10:56:54 22           MR. BACHUS:  Thank you, Your Honor.

10:56:57 23            At this time, may I publish Exhibit D570 to

10:57:03 24   members of the jury, beginning with page 3?

10:57:06 25           THE COURT:  Yes, you may.

                                  *OFFICIAL TRANSCRIPT*

10:57:10  1          MR. BACHUS:  If you stop.  Would you publish page 3.

10:57:10  2  EXAMINATION BY MR. BACHUS:

10:57:16  3  Q.   Ms. Avila, do you see page 3 in front of you?  It is the

10:57:22  4  document that's -- it's the cover letter.

10:57:24  5  A.   Yes.

10:57:25  6  Q.   And do you see the date at the top, October 2006?

10:57:30  7  A.   Yes.

10:57:30  8  Q.   All right.  If you go down to the second paragraph, there

10:57:41  9  is a mention that says:  "Inside the package, you'll find a

10:57:44 10  CD-ROM and the USB port key."

10:57:49 11          Do you see that?

10:57:49 12  A.   Yes.

10:57:50 13  Q.   And then it says:  "Each with identical contents

10:57:56 14  containing electronic versions of the following essential

10:58:04 15  tools."

10:58:04 16          Do you see that?

10:58:04 17  A.   Yes.

10:58:04 18  Q.   And there are bullet points after, "Essential tools"?

10:58:09 19  A.   Yes.

10:58:09 20  Q.   And then the second bullet point, can you tell the jury

10:58:14 21  what the 13 individual tear sheets are?  I think you may have

10:58:19 22  already spoken about this briefly, but what is this referring

10:58:25 23  to in this patient kit?

10:58:25 24  A.   "13 individual tear sheets that you can print out and give

10:58:31 25  your patients depending on the" --

                         *OFFICIAL  TRANSCRIPT*

10:58:31  1    Q.    I don't want you to read it.  I just want you to tell the

10:58:34  2    jury what it is.

10:58:35  3    A.    Okay.  They're 13 individual tear sheets -- tear sheets

10:58:40  4    that they can give to the patients that are related to each of

10:58:44  5    the side effects to help them better understand and cope with

10:58:47  6    the changes.

10:58:47  7    Q.    All right.  And then the last bullet under the, "Essential

10:58:52  8    items" where it says, "Prescribing information," is that the

10:58:55  9    package insert on the label?

10:58:57 10    A.    Taxotere prescribing information.

10:58:59 11    Q.    Okay.  In terms of these essential tools, how are the tear

10:59:14 12    sheets used with the prescribing information?

10:59:16 13    A.    The tear sheets were, as I said earlier in language that

10:59:25 14    was better tailored for the patient to understand, generally,

10:59:27 15    it was in a sixth-grade reading level and it transferred

10:59:32 16    information from the PI that was at a level that was up here to

10:59:35 17    a level that was down here.  It was better for the patient to

10:59:38 18    understand.

10:59:38 19    Q.    Okay.

10:59:39 20    A.    And it was about the side effects and how to manage them.

10:59:44 21    Q.    Are the side effects listed in the tear sheets the same

10:59:49 22    side effects for some of the side effects listed in the package

10:59:52 23    insert?

10:59:52 24    A.    Yes.

10:59:53 25    Q.    Now, do you see among these 13, one of the tear sheets

*OFFICIAL TRANSCRIPT*

11:00:00 1    identified as, "Alopecia"?

11:00:02 2    A.    Yes.

11:00:02 3    Q.    If you could look at page 5, so two pages back.  You

11:00:11 4    understand they're not numbered at the bottom, Ms. Avila, but

11:00:13 5    two pages.

11:00:13 6            Do you recognize this document?

11:00:23 7    A.    Yes.

11:00:23 8    Q.    What is it?

11:00:24 9    A.    It's the "Alopecia Hair Loss Sheet."

11:00:27 10   Q.    Is it the hair loss sheet that's described on the cover

11:00:30 11   page under that "Essential Tool" section?

11:00:36 12   A.    Yes.

11:00:37 13   Q.    Let's start at the top.  Do you see where in big letters

11:00:43 14   it says, "Alopecia" then, parens, "hair loss"?

11:00:48 15   A.    Yes.

11:00:48 16   Q.    And again, is this -- alopecia and hair loss are the same

11:00:50 17   thing?

11:00:50 18   A.    Yes.

11:00:50 19   Q.    And then going down, it says -- see right there, it says:

11:00:57 20   "What is alopecia?"

11:00:58 21   A.    Yes.

11:00:59 22   Q.    And then under there, it says:  "It is a common yet

11:01:03 23   temporary side effect."

11:01:03 24   A.    Yes.

11:01:04 25   Q.    Do you see that?

**OFFICIAL TRANSCRIPT**

11:01:08  1    A.   Yes.

11:01:08  2    Q.   What does Sanofi teach you to inform here about alopecia

11:01:17  3    or hair loss after Taxotere use?

11:01:20  4    A.   This sheet was designed to teach the patient how to cope

11:01:24  5    with the temporary side effect of hair loss so how did they

11:01:31  6    deal with it while it was going on.  It talked about when it

11:01:35  7    would grow back, how to prepare for it to go -- to lose it.

11:01:35  8    Did you want to cut it short before you lost it or did you want

11:01:43  9    to shave it?  You know, those type of things.  It said it was

11:01:47 10    going to happen, it was going to be temporary, and here are

11:01:50 11    some ways to help you deal with it until it grows back.  And if

11:01:53 12    it grows back, it may grow back a different color or texture.

11:01:56 13    It was how to deal with that temporary side effect.

11:02:00 14    Q.   Now, if you look to the top or the right where it says:

11:02:03 15    "Will my hair grow back?"  Do you see that section?

11:02:06 16    A.   Yes.

11:02:07 17    Q.   And then afterwards, it says:  "If you do lose your hair,

11:02:11 18    it will usually grow back after treatment is over.  It may grow

11:02:15 19    back while you're still having treatment.  Your hair may grow

11:02:17 20    back a different color or texture."

11:02:19 21         Do you see that?

11:02:19 22    A.   Yes.

11:02:20 23    Q.   What did Sanofi train you to inform providers about this

11:02:23 24    section of the tear sheet?

11:02:26 25    A.   Again, like I said, we were trained that the hair was

*OFFICIAL TRANSCRIPT*

11:02:29  1   going to grow back.  So this section -- this whole entire sheet

11:02:34  2   was trained (verbatim) to help us teach them how to cope, how

11:02:38  3   to help the patient cope with the hair loss that they were

11:02:41  4   going to be having until it grows back and to prepare them that

11:02:45  5   when it grew back, it may not be the same.

11:02:48  6   Q.   Were you taught that it usually grows back once treatment

11:02:56  7   is over but it may grow back while you're still having

11:02:59  8   treatment?

11:03:00  9        MR. STRONGMAN:  Objection.  Leading.  Cumulative.

11:03:00 10        THE COURT:  Sustained.  Cumulative.  Move on.

11:03:06 11   EXAMINATION BY MR. BACHUS:

11:03:11 12   Q.   Is page 5 of Exhibit D570, this alopecia tear sheet, is

11:03:21 13   this important in terms of understanding what is stated

11:03:26 14   regarding hair loss in the package insert?

11:03:29 15        MR. STRONGMAN:  Objection.  Also, opinion, relevance.

11:03:31 16        THE COURT:  Sustained.  Opinion.

11:03:42 17   EXAMINATION BY MR. BACHUS:

11:03:42 18   Q.   What were you directed to tell doctors about the hair loss

11:03:42 19   described in education tear sheets?

11:03:47 20        MR. STRONGMAN:  Same objection.

11:03:47 21        THE COURT:  It's been asked and answered.

11:03:53 22   EXAMINATION BY MR. BACHUS:

11:03:55 23   Q.   Ms. Avila, is the statement in the tear sheet that

11:03:57 24   alopecia is a temporary side effect consistent with what you

11:04:00 25   were taught by Sanofi?

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 11:04:03 | 1 | MR. STRONGMAN:  Same objection.  Asked and answered. |
| 11:04:06 | 2 | THE COURT:  It's been asked and answered.  This is |
| 11:04:08 | 3 | cumulative testimony. |
| 11:04:14 | 4 | EXAMINATION BY MR. BACHUS: |
| 11:04:15 | 5 | Q.   What's your understanding about whether Taxotere sales |
| 11:04:18 | 6 | representatives throughout the United States use the same |
| 11:04:23 | 7 | educational materials? |
| 11:04:25 | 8 | MR. STRONGMAN:  Objection.  It's speculation. |
| 11:04:27 | 9 | THE COURT:  I think you're going to have to rephrase |
| 11:04:28 | 10 | your question. |
| 11:04:29 | 11 | MR. BACHUS:  Okay. |
| 11:04:31 | 12 | EXAMINATION BY MR. BACHUS: |
| 11:04:32 | 13 | Q.   What was your understanding about whether Taxotere sales |
| 11:04:35 | 14 | representatives in the state of Louisiana were using the same |
| 11:04:38 | 15 | educational and marketing materials? |
| 11:04:42 | 16 | MR. STRONGMAN:  The same objection. |
| 11:04:45 | 17 | THE COURT:  It's -- I think it gets to relevance. |
| 11:04:47 | 18 | MR. BACHUS:  Do you want me to speak? |
| 11:04:51 | 19 | THE COURT:  No, let's go to the side. |
| 11:04:51 | 20 | (WHEREUPON, at this point in the proceedings, there was |
| 11:05:13 | 21 | a conference held at the bench.) |
| 11:05:13 | 22 | THE COURT:  And I'll tell you what my thought is.  It |
| 11:05:17 | 23 | doesn't matter what the sales rep in Monroe was telling the |
| 11:05:22 | 24 | doctor.  What's important is she was calling on Ochsner.  She |
| 11:05:29 | 25 | said Ochsner was her go-to clinic, so I'm a bit at a loss as to |

*OFFICIAL TRANSCRIPT*

11:05:35 1    how this is relevant.

11:05:36 2         MR. BACHUS:  So, the fact sheet produced by the

11:05:41 3    defendant, in this case, state with respect to the patients

11:05:44 4    they indicate that they were in addition to Ms. Avila.  There

11:05:46 5    were six other sales reps who called on Ochsner during the time

11:05:50 6    frame of between 2006 and 2008 and that they touched this

11:05:53 7    clinic more than 104 times in that period of time.  So, I'm

11:05:58 8    just trying to elicit that they were, in fact -- that they were

11:06:01 9    all using the same sales materials that there wouldn't be some

11:06:05 10   other message being given inconsistent with this message.

11:06:08 11        MR. STRONGMAN:  This is a fact witness testifying about

11:06:10 12   the specifics of this case, and we haven't even gotten to the

11:06:15 13   specifics of this case at this point.  So, what Ms. Avila would

11:06:19 14   speculate about what other sales reps are doing is just -- it

11:06:23 15   calls for speculation, it's irrelevant, and I certainly think

11:06:30 16   at this point it's beyond the scope of what should be

11:06:34 17   permissible for her fact testimony relating to any issue that

11:06:38 18   she had which Dr. Kardinal and Dr. Larned have in terms of any

11:06:40 19   interaction with Ms. Avila and when, in fact, we know the

11:06:49 20   answer is zero.  So that's where we were at.

11:06:52 21        THE COURT:  I don't think she can speak about other

11:06:54 22   sales representatives.  She has already talked about what she

11:06:56 23   was trained and you can ask what she can speak, too.  I'm not

11:07:00 24   going to let her speculate as to what other sales reps were

11:07:02 25   doing.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:07:02 1 | MR. BACHUS:  Just for the record, all questions are -- |
| 11:07:03 2 | maybe I didn't lay enough foundation.  They all attended the |
| 11:07:10 3 | same sales meetings -- |
| 11:07:11 4 | THE COURT:  You already said that. |
| 11:07:11 5 | MR. BACHUS:  -- and so the fact that foundation is |
| 11:07:12 6 | going to be laid, I'm just asking her to confirm the previous |
| 11:07:17 7 | discussions.  That's all I'm asking.  I understand the order. |
| 11:07:17 8 | I'm just making a record. |
| 11:07:17 9 | THE COURT:  Okay. |
| 11:07:17 10 | (WHEREUPON, at this point in the proceedings, the bench |
| 11:07:17 11 | conference concluded.) |
| 11:07:37 12 | MR. BACHUS:  Could I ask you to turn this light back |
| 11:07:43 13 | on?  This camera.  Just for a moment. |
| 11:07:48 14 | THE COURT:  Mr. Bachus, please proceed. |
| 11:07:52 15 | MR. BACHUS:  Thank you, Your Honor. |
| 11:07:54 16 | EXAMINATION BY MR. BACHUS: |
| 11:07:54 17 | Q.   Ms. Avila, if Sanofi had included PCIA as a side effect in |
| 11:08:02 18 | the package insert and in a tear sheet like Exhibit 570, in |
| 11:08:15 19 | addition to the tear sheet, is this list some of the ways that |
| 11:08:18 20 | they could've communicated PCIA to doctors? |
| 11:08:26 21 | MR. STRONGMAN:  Objection.  Cumulative. |
| 11:08:26 22 | THE COURT:  Sustained. |
| 11:08:26 23 | MR. BACHUS:  You can turn that off now.  I appreciate |
| 11:08:30 24 | it very much. |
| 11:08:30 25 | EXAMINATION BY MR. BACHUS: |

***OFFICIAL TRANSCRIPT***

| | |
|---|---|
| 11:08:39 | 1 |
| 11:08:43 | 2 |
| 11:08:46 | 3 |
| 11:08:48 | 4 |
| 11:08:50 | 5 |
| 11:08:53 | 6 |
| 11:08:56 | 7 |
| 11:08:58 | 8 |
| 11:08:58 | 9 |
| 11:09:04 | 10 |
| 11:09:14 | 11 |
| 11:09:22 | 12 |
| 11:09:26 | 13 |
| 11:09:31 | 14 |
| 11:09:37 | 15 |
| 11:09:46 | 16 |
| 11:09:53 | 17 |
| 11:09:56 | 18 |
| 11:10:00 | 19 |
| 11:10:00 | 20 |
| 11:10:05 | 21 |
| 11:10:05 | 22 |
| 11:10:08 | 23 |
| 11:10:08 | 24 |
| 11:10:16 | 25 |

Q.   Ms. Avila, what happens in terms of dissemination of information if a side effect is not listed in the package insert?

        MR. STRONGMAN:  Objection, calls for speculation.

        THE COURT:  I think this has already been asked and answered.

        MR. BACHUS:  Okay.  I'll move on.

EXAMINATION BY MR. BACHUS:

Q.   Ms. Avila, how did you first hear about Taxotere and PCIA?

A.   I first heard about it at a national meeting.  It was in January of 2006.  We had our big hoorah meeting and there was a session where a girl -- it was where you can ask questions. The marketing and higher-ups were conducting an open session where you can ask questions of the company, and a girl got up and brought to the attention of the company that she had heard at San Antonio Breast Conference that an abstract on permanent hair loss was presented at that conference and that her physician had also called medical information with a report of permanent hair loss and also that she knew that the guy who wrote the abstract had reported it and she wanted to know what the company was doing about it.

        MR. STRONGMAN:  Objection, narrative.  Also, (indiscernible).

        THE COURT:  Okay.  All right.

        THE WITNESS:  That's when I first heard about it, was

*OFFICIAL TRANSCRIPT*

11:10:18  1    at that meeting from that question that that girl asked.

11:10:18  2         THE COURT:  Okay.

11:10:18  3    EXAMINATION BY MR. BACHUS:

11:10:23  4    Q.   And the abstract, was that the Sedlacek abstract?

11:10:27  5    A.   Yes.

11:10:27  6    Q.   And this was a meeting that you attended?

11:10:32  7    A.   Yes.

11:10:35  8    Q.   What happened next?  How did management react to the

11:10:40  9    question?

11:10:43 10    A.   It was kind of strange.  There were -- it was a little

11:10:47 11    uncomfortable, like, oh, we're investigating.  You know, but

11:10:51 12    what they didn't say was, you guys are trained that Taxotere

11:10:55 13    causes permanent hair loss, so it's not a big deal.

11:10:57 14         MR. STRONGMAN:  Objection.

11:10:59 15         THE COURT:  I think the question is:  "What did they

11:11:02 16    say?"

11:11:02 17         MR. BACHUS:  Thank you, Your Honor.

11:11:02 18    EXAMINATION BY MR. BACHUS:

11:11:07 19    Q.   What was the reaction or statement that came from

11:11:10 20    management when PCIA was brought up by a sales rep at this

11:11:15 21    national meeting?

11:11:15 22    A.   That we could not talk about it because it's not in our

11:11:20 23    package insert.

11:11:31 24    Q.   How, if at all, would your ability to communicate with

11:11:39 25    doctors about PCIA have been different had the information been

                              *OFFICIAL TRANSCRIPT*

11:11:45  1    included after Sedlacek in the package insert?

11:11:52  2          MR. STRONGMAN:  Objection.  We covered all of this

11:11:54  3    already.  It's cumulative and speculative as well.

11:11:58  4          THE COURT:  It's cumulative.

11:12:03  5    EXAMINATION BY MR. BACHUS:

11:12:03  6    Q.   You mentioned a medical science liaison.  Just in your

11:12:08  7    answer a moment ago, you mentioned something about medical

11:12:12  8    information?

11:12:12  9    A.   Yes.

11:12:13 10    Q.   Can you explain -- what is that?  What is "medical science

11:12:16 11    liaison"?

11:12:16 12    A.   It's a position within the company that is allowed to

11:12:21 13    speak to physicians about off-label information.

11:12:26 14    Q.   So, as a sales rep, you can't talk about what's not in the

11:12:31 15    label.  Medical science liaison is a different group?

11:12:34 16    A.   Yes.

11:12:35 17    Q.   And how did the role of the medical science liaison

11:12:40 18    interface with the role of a sales rep?

11:12:43 19    A.   We were -- since we were the face of the company and the

11:12:48 20    medical science liaisons often didn't have the relationships,

11:12:53 21    we were allowed to introduce the medical sales liaisons to the

11:12:58 22    physicians and facilitate their meetings, but then we would

11:13:00 23    have to step out when they were talking about the off-label

11:13:03 24    information.

11:13:03 25    Q.   You were not privy or participating in those

                              *OFFICIAL TRANSCRIPT*

11:13:07  1    communications?

11:13:08  2    A.    No.

11:13:08  3    Q.    Did you enjoy working for Sanofi?

11:13:16  4    A.    Yes.

11:13:16  5    Q.    And when did you leave?

11:13:19  6    A.    2009, October.

11:13:19  7    Q.    And what were the circumstances that led to your leaving?

11:13:25  8    A.    I was fired.

11:13:25  9    Q.    Can you tell the jury what happened?

11:13:31 10    A.    Well, it's quite the story but I keep talking too much.  I

11:13:37 11    got fired because there is a rule in pharma that you cannot

11:13:41 12    provide a meal to a clinic unless you are in attendance and I

11:13:46 13    forgot to cancel a meal on a day that we were traveling to

11:13:50 14    Dallas for a convention -- some kind of meeting that we were

11:13:54 15    having for our company, and I didn't cancel it.  And I got

11:13:57 16    fired for that.

11:13:58 17    Q.    What was the meal?

11:14:01 18    A.    Pizza.  $86 worth of pizza.

11:14:05 19    Q.    I'm sorry?

11:14:05 20    A.    $86 worth of pizza.

11:14:07 21    Q.    And where did you send this pizza?

11:14:10 22    A.    Dr. Butler and Smith in Hattiesburg.

11:14:12 23    Q.    And what was wrong with the pizza that you sent?

11:14:18 24    A.    No.  I have to be there when the meal is provided,

11:14:21 25    providing a clinical discussion or else it's not legal to give

**OFFICIAL TRANSCRIPT**

11:14:25  1    the meal.  So that's a violation of the company policy and
11:14:29  2    that's why I got fired.  There were other things when HR
11:14:33  3    approached me that were violations of policy, but they were not
11:14:37  4    why I was fired.  This is why I was fired.
11:14:40  5    Q.   What were the circumstances going on from your perspective
11:14:45  6    outside the pizza that you believe --
11:14:50  7    A.   Well, I knew I was going to be fired.  We were going to
11:14:53  8    have layoffs, and the layoffs indicated that I wasn't going to
11:14:57  9    be laid off.
11:14:57 10    Q.   Explain that.
11:14:58 11    A.   There was an algorithm, like -- kind of like this is who
11:15:04 12    can stay, who is not going to stay; some points.  And it
11:15:07 13    clearly showed, at least to me and my boss, that I was probably
11:15:11 14    going to stay.  But he didn't want me to stay.  I had gotten
11:15:15 15    married in January and at that same sales meeting, the first
11:15:18 16    thing he asked me when I got married was, I supposed you're
11:15:22 17    going to be getting pregnant now.  And he was just a good old
11:15:25 18    boy and I wasn't a part of the good old boy network.
11:15:28 19            MR. STRONGMAN:  Objection, Your Honor.
11:15:29 20            THE COURT:  Sustained.
11:15:31 21    EXAMINATION BY MR. BACHUS:
11:15:33 22    Q.   Now, at the time that you were fired and you were -- this
11:15:39 23    pizza incident was brought to your attention, were you
11:15:43 24    pregnant?
11:15:43 25    A.   Yes.  I got fired when I was pregnant.

***OFFICIAL TRANSCRIPT***

11:15:46  1    Q.   At the time that this pizza incident occurred, were you

11:15:53  2    owed money by Sanofi?

11:15:55  3    A.   I had earned in 2008, when I won Regional Champion, a

11:16:00  4    deferred annual bonus of $40,000, and the company was paying it

11:16:05  5    out yearly as part of an incentive to stay employed with them

11:16:09  6    and I had gotten $13,333, so I was still owed $26,000.  And I

11:16:17  7    had actually already consulted a lawyer before I got fired

11:16:19  8    because I knew it was coming and I was kind of, like, scared of

11:16:24  9    the whole thing.

11:16:25 10         So, anyway, I got a lawyer and there was, like, do

11:16:34 11    you file, a, like, wrongful -- I don't know the word -- like,

11:16:41 12    firing lawsuit, which is a big old thing and I was pregnant and

11:16:47 13    I didn't want that mojo on my baby.  Or, the lawyer was, like,

11:16:50 14    "This is Louisiana; there's a statute.  If you get paid for it,

11:16:53 15    you have to get it paid and we could go that route and just try

11:16:57 16    to get your money back, and we'll probably just have to write a

11:17:00 17    letter and blah, blah, blah."  I'm like, "Well, that sounds

11:17:01 18    much better and easier and I really don't care and I'm going to

11:17:04 19    get another job.  I'm a nurse.  I'm a nurse practitioner, blah,

11:17:07 20    blah, blah."  And, so, I was like, "Do that."  Plus, I didn't

11:17:09 21    have to pay him any money.

11:17:12 22         MR. STRONGMAN:  Objection.

11:17:12 23         THE COURT:  I think we need to ask very pointed

11:17:15 24    questions.

11:17:15 25         MR. BACHUS:  Can I lead the witness, Your Honor?

**OFFICIAL TRANSCRIPT**

```
11:17:17  1            THE COURT:  A little bit.
11:17:18  2            MR. BACHUS:  Okay.
11:17:21  3   EXAMINATION BY MR. BACHUS:
11:17:26  4   Q.    Did you pursue a claim to recover the $26,000?
11:17:31  5   A.    I did.  I pursued the wage claim route.
11:17:35  6   Q.    And did you get the $26,000?
11:17:38  7   A.    No, I didn't.
11:17:38  8   Q.    What is your understanding as to why you didn't get the
11:17:42  9   $26,000?
11:17:43 10   A.    Norman said that Louisiana didn't uphold the statute and
11:17:47 11   he felt so convicted about it.  He took it to the
11:17:51 12   Supreme Court.  He was aghast and he was like, "Do you mind if
11:17:52 13   I do it?"  And I'm like, "I don't care."
11:17:54 14   Q.    Did you bring any claim related to the pregnancy issues?
11:17:58 15   A.    No.  I chose not to go that route.
11:18:01 16   Q.    Did you get another job?
11:18:06 17   A.    I was working three days later.
11:18:08 18   Q.    Okay.  And in addition to the pizza, was there an
11:18:18 19   accusation made about a dinner -- a dinner program?
11:18:23 20   A.    Yes.
11:18:23 21   Q.    A problem with the dinner program?
11:18:25 22   A.    Yes, there was.
11:18:26 23   Q.    Okay.  Can you -- with the dinner program --
11:18:36 24            MR. BACHUS:  Am I doing okay?
11:18:37 25            THE COURT:  So far, yes.
```

*OFFICIAL TRANSCRIPT*

EXAMINATION BY MR. BACHUS:

Q.   With the dinner program, did you -- can you just briefly explain, please, what happened with the dinner program and then I can follow up.

A.   Yes, there was a dinner program.  We had these dinner programs -- you have to guarantee with the restaurant how many people are going to come.  So, for example, if you guarantee ten people, and two people show up, well, you've guaranteed, let's say, a thousand dollars, two people show up, you only use 200, what happens to the other $800, okay?  There is no guidance in our book as to what happens with that leftover money.  A lot --

THE COURT:  Ma'am, why don't you just tell us what happened.

THE WITNESS:  That's what I'm doing.

THE COURT:  Was there a dinner program?

THE WITNESS:  Yes.  There was a dinner program and there was leftover money and I didn't know --

THE COURT:  What did you do?

THE WITNESS:  I took the gift card leftover money and I took the two physicians that didn't come to the program out to that same restaurant on a different night.

THE COURT:  Okay.

THE WITNESS:  And gave them the clinical information that they missed from the dinner program, with the knowledge

*OFFICIAL TRANSCRIPT*

11:19:57  1   and blessing of my superior who was with me that evening.
11:20:01  2   EXAMINATION BY MR. BACHUS:
11:20:02  3   Q.   So, you didn't take the $800 home to your family?
11:20:08  4   A.   It wasn't 800.
11:20:09  5   Q.   Whatever it was.
11:20:09  6   A.   Yeah.
11:20:10  7   Q.   You didn't take it home to your family?
11:20:11  8   A.   No.  Which was a very common practice with some reps.
11:20:17  9   Q.   You didn't get a --
11:20:19 10        MR. STRONGMAN:  Objection.
11:20:19 11        THE COURT:  Sustained.
11:20:22 12        THE WITNESS:  No.
11:20:22 13   EXAMINATION BY MR. BACHUS:
11:20:28 14   Q.   When you took the other doctors out on a different night,
11:20:31 15   was the problem that you didn't have a speaker with you?  Is
11:20:35 16   that -- was that the problem from the company's perspective?
11:20:38 17   A.   Yeah.  It wasn't deemed a bona fide speaker program.  We
11:20:43 18   weren't doing dinners on our own anymore.  We had stopped doing
11:20:46 19   that.
11:20:46 20   Q.   Okay.  So what was the problem -- what was the problem
11:20:50 21   with the fact that you took the money and you on another date
11:20:55 22   took the doctors who missed it to the same restaurant and
11:20:58 23   provided them the same food?  What was the problem?
11:21:01 24        MR. STRONGMAN:  Objection.
11:21:02 25        THE WITNESS:  There wasn't a speaker there.

*OFFICIAL TRANSCRIPT*

11:21:02 1          THE COURT:  There wasn't a speaker?  Okay.  We got

11:21:04 2     that.

11:21:04 3     EXAMINATION BY MR. BACHUS:

11:21:05 4     Q.    That there wasn't a speaker there?

11:21:07 5     A.    That there wasn't a speaker there.  That I provided the

11:21:10 6     clinical information versus the speaker.

11:21:14 7     Q.    But was this dinner program part of why you got fired?

11:21:19 8     A.    It was a violation of the policy.  From what I understand

11:21:21 9     from the company, it wasn't why I was fired.  It's because I

11:21:24 10    was with another person who worked for my company who was

11:21:27 11    superior to me.  He has a position called an oncology

11:21:32 12    therapeutic specialist.  And he would have been fired as well

11:21:35 13    because I did this --

11:21:37 14          THE COURT:  All right.  I think the question was if

11:21:39 15    that's the reason you were fired.

11:21:41 16          THE WITNESS:  No.

11:21:42 17          THE COURT:  Thank you.

11:21:43 18    EXAMINATION BY MR. BACHUS:

11:21:44 19    Q.    Thank you.

11:21:46 20          Was Ochsner Cancer Institute one of your accounts or

11:21:50 21    targets when you worked for Sanofi?

11:21:51 22    A.    Yes.

11:21:52 23    Q.    Who were your primary targets within that account for

11:21:58 24    breast cancer?

11:22:01 25    A.    Dr. John Cole, Dr. Zoe Larned, Dr. Carl Kardinal, maybe

*OFFICIAL TRANSCRIPT*

11:22:31  1   Dr. Floria (spelled phonetically).

11:22:31  2   Q.   I'm sorry.  I couldn't hear you either, that last one.

11:22:31  3   A.   Dr. Floria.

11:22:32  4   Q.   And how would you access this account at Ochsner?

11:22:37  5   A.   I would access it through all of the normal channels that

11:22:43  6   other reps accessed it through, which would be, make the

11:22:48  7   appointments for lunches or breakfasts, things like that.  But

11:22:51  8   I also used to work there, so I accessed it through the cancer

11:22:58  9   institute, which is where the research associates are housed.

11:23:02 10   And so I would text the secretary in there, ask if I could see

11:23:06 11   the doctors in their offices within the research center, and

11:23:11 12   often had great success seeing them there.  That's usually

11:23:15 13   where I saw Dr. Kardinal.

11:23:16 14   Q.   Now, Dr. Kardinal was the prescribing physician for

11:23:22 15   Ms. Kahn.

11:23:23 16        Did you have a relationship with Dr. Kardinal?

11:23:25 17   A.   Yes, I did.  I worked for him in the cancer institute.

11:23:31 18   Q.   I know we've been going at this quite a bit of time this

11:23:35 19   morning.  Just to make sure we're understanding, earlier this

11:23:38 20   morning, you said you worked for five years at the Ochsner

11:23:42 21   Cancer Clinic, correct?  Yes?

11:23:44 22   A.   Yes.

11:23:50 23   Q.   Okay.  This same place where you were calling on

11:23:52 24   Dr. Kardinal as a sales rep is the same place you worked?

11:23:55 25   A.   Yes.

                           *OFFICIAL TRANSCRIPT*

11:24:04  1    Q.    All right.  Can you tell the jury about your relationship
11:24:06  2    with Dr. Kardinal.
11:24:06  3    A.    Yeah, I had a great --
11:24:07  4    Q.    Briefly.
11:24:11  5    A.    -- relationship.  I had a great relationship with him.  I
11:24:12  6    considered him a mentor and a friend.
11:24:14  7    Q.    Why did you consider him a mentor?
11:24:17  8    A.    Because he gave me a lot of advice.  I was very young when
11:24:20  9    I worked there.  I was 22 years old, and I felt like he guided
11:24:24 10    my career path.
11:24:24 11    Q.    Did you respect him as a doctor?
11:24:27 12    A.    Absolutely.
11:24:27 13    Q.    And would you call on Dr. Kardinal?
11:24:34 14    A.    Yes.
11:24:37 15    Q.    And when you finished calling Dr. Kardinal, would you also
11:24:45 16    generally call on the clinic and the other staff?
11:24:46 17    A.    Yes.  I would be inside, which is half the battle, because
11:24:52 18    I would text Melissa and go see Dr. Kardinal, and then I would
11:24:56 19    go upstairs to the clinic and see his nurses to do the nurse
11:24:58 20    education and to give the patient education books and pieces
11:25:02 21    that I needed to give to the clinic.
11:25:04 22    Q.    And what would a call look like with Dr. Kardinal?
11:25:10 23    A.    It would look like sitting at his desk inside of the
11:25:15 24    cancer institute talking to him for 15 or 20 minutes.  Melissa
11:25:19 25    would set it up for me.

**OFFICIAL TRANSCRIPT**

11:25:21 1    Q.    Now, what about Dr. Larned also?

11:25:25 2    A.    Dr. Larned, I saw -- I could text her and see her if I

11:25:30 3    needed to.  I didn't pull that card too much with her because

11:25:32 4    she wasn't as hard to see through the regular channels that we

11:25:35 5    used back then at the time.  It's totally different now, but --

11:25:39 6    so I saw her at lunches and breakfasts and stuff like that, and

11:25:42 7    if I needed to, I could text her and see her.

11:25:44 8    Q.    Would calling on Dr. Kardinal or Dr. Larned be the only

11:25:48 9    time that you would see or interact with these doctors?

11:25:52 10   A.    No.  We see them a lot at meetings.  There's a big Ochsner

11:25:58 11   meeting tomorrow and Friday where we will see them all and

11:26:01 12   interact with them all, all day long, tomorrow and Friday.

11:26:04 13   There are other meetings that are held here that aren't

11:26:06 14   sponsored by Ochsner, like the one that's going to be tomorrow.

11:26:10 15   We see them sometimes when they go to ASCO and stuff and we

11:26:15 16   work them.  I mean --

11:26:15 17   Q.    Okay.

11:26:15 18   A.    -- we see them at cancer functions throughout the city

11:26:18 19   because we all participate in all of those things, and they're

11:26:22 20   our friends, peers, and colleagues.

11:26:25 21   Q.    What does it mean as a drug sales representative to

11:26:28 22   "touch" a doctor's office?

11:26:31 23         MR. STRONGMAN:  Objection, cumulative.

11:26:33 24         THE COURT:  Yeah.  I think we need to move on.

11:26:40 25   EXAMINATION BY MR. BACHUS:

***OFFICIAL TRANSCRIPT***

| | | |
|---|---|---|
| 11:26:40 | 1 | Q.    Did you use your sales aids and marketing pieces when you |
| 11:26:44 | 2 | were calling on Dr. Kardinal and Dr. Larned's office at the |
| 11:26:48 | 3 | Ochsner Cancer Center? |
| 11:26:48 | 4 | A.    Yes. |
| 11:26:49 | 5 | Q.    When you called on Dr. Kardinal and Dr. Larned, did you |
| 11:26:59 | 6 | have discussions with them about Taxotere? |
| 11:27:01 | 7 | A.    Yes. |
| 11:27:02 | 8 | Q.    As you sit here today, do you recall the specifics of |
| 11:27:05 | 9 | those communications? |
| 11:27:07 | 10 | A.    No. |
| 11:27:07 | 11 | Q.    Now, notes, detailed notes provided under oath by Sanofi |
| 11:27:19 | 12 | show 104 documented in-person visits to Ochsner Cancer Clinic |
| 11:27:24 | 13 | between 2006 and -- |
| 11:27:26 | 14 | THE COURT:  Wait.  Wait.  I think we need to approach. |
| 11:27:49 | 15 | MR. STRONGMAN:  Yeah. |
| 11:27:49 | 16 | (WHEREUPON, at this point in the proceedings, there was |
| 11:27:52 | 17 | a conference held at the bench.) |
| 11:27:52 | 18 | THE COURT:  All right. |
| 11:27:59 | 19 | MR. STRONGMAN:  My objection would be that there are |
| 11:28:02 | 20 | specifically call notes with regard to Dr. Larned and |
| 11:28:04 | 21 | Dr. Kardinal.  There were three visits with Dr. Kardinal, |
| 11:28:08 | 22 | 14 years ago, and there were a handful with Dr. Larned.  104 to |
| 11:28:13 | 23 | some facility, not relevant, prejudicial, and I believe that |
| 11:28:21 | 24 | Mr. Bachus should stick to the facts of the case and the |
| 11:28:25 | 25 | relevant cases of anything we did to Ms. Kahn's case. |

*OFFICIAL TRANSCRIPT*

11:28:31  1          MR. BACHUS:  Sanofi provided, under oath, responses to

11:28:39  2    written discovery in the form of Defense Fact Sheets, wherein

11:28:43  3    they disclosed, with respect to Ms. Kahn, that during the

11:28:49  4    timeframe, they touched that office as far as they could touch

11:28:52  5    it.  They touched that office 104 times and disclosed to us.

11:28:56  6    I'm simply going to ask her one question about that -- those

11:28:59  7    touches, and whether or not those were opportunities to

11:29:04  8    communicate with the doctors about their document.

11:29:07  9          THE COURT:  I think the problem is, what did she do?

11:29:13 10          MR. STRONGMAN:  Correct.

11:29:13 11          THE COURT:  Did she visit with him?  Because she's not

11:29:15 12    a representative of the marketing department at Sanofi.  She's

11:29:18 13    out taking this mantle of being an expert on all related to

11:29:27 14    physician contacts, and I think she's gone far afield of her

11:29:32 15    personal fact testimony in this case.  And I think that she's

11:29:37 16    not an expert.

11:29:38 17          So she can testify.  If you had an expert, maybe

11:29:42 18    they could say that this is how this works.  So I've given her

11:29:46 19    a great deal of latitude to talk about what she did, but I

11:29:50 20    think now we're talking about 104 touches, and we don't know

11:29:54 21    who they are.

11:29:55 22          MR. BACHUS:  Oh, we actually do.  She does.

11:29:59 23          THE COURT:  Well, are you going to call those people?

11:30:02 24          MR. BACHUS:  I don't think any of us want us to do

11:30:04 25    that.

                        *OFFICIAL  TRANSCRIPT*

11:30:04  1          THE COURT:  I don't.  You know, but I think -- I think
11:30:08  2   she can talk about how many times she visited with them.
11:30:12  3          MR. BACHUS:  Okay.
11:30:13  4          THE COURT:  If she remembers.
11:30:15  5          MR. BACHUS:  She doesn't know that.
11:30:17  6          THE COURT:  Okay.  Thank you.
11:30:17  7          (WHEREUPON, at this point in the proceedings, the bench
11:30:46  8   conference concluded.)
11:30:46  9          THE COURT:  Please proceed.
11:30:47 10          MR. BACHUS:  Thank you, Your Honor.
11:30:49 11   EXAMINATION BY MR. BACHUS:
11:30:49 12   Q.    Ms. Avila, how many times have we met?
11:30:50 13   A.    Two or three.
11:30:55 14   Q.    And how many times have you met with Sanofi's counsel?
11:31:02 15   A.    Only once, and that was the last time.
11:31:04 16   Q.    I'm sorry?
11:31:05 17   A.    Only once, and that was the last time.
11:31:07 18   Q.    Is there a reason that you met with me more?
11:31:12 19   A.    Yes.
11:31:13 20   Q.    And what is that reason?
11:31:19 21          MR. STRONGMAN:  Objection, it's not relevant.
11:31:20 22          THE COURT:  Sustained.
11:31:21 23          MR. BACHUS:  I have no further questions, Your Honor.
11:31:23 24   Thank you.
11:31:28 25          THE COURT:  Okay.  Mr. Strongman?

                            *OFFICIAL TRANSCRIPT*

```
11:31:57   1              All right.  I have a logistical question.  I
11:31:57   2    think we need to have a quick break, but the issue is, do we
11:32:00   3    want to do -- do you have idea the time frame?
11:32:00   4              MR. STRONGMAN:  Do you want to talk about it briefly?
11:32:00   5              THE COURT:  Yeah.
11:32:00   6              (WHEREUPON, at 11:32 a.m., there was a bench conference
11:32:58   7    held outside the presence of the court reporter.)
11:32:58   8              THE COURT:  All right.  We're going to be at recess for
11:33:01   9    ten minutes, and then we'll return at that time.
11:33:07  10              THE DEPUTY CLERK:  All rise.
11:33:08  11              (WHEREUPON, at 11:33 a.m. the jury panel leaves the
11:34:59  12    courtroom and then a brief recess was taken.)
11:45:10  13              MR. STRONGMAN:  I just wanted to put on the record, I
11:45:14  14    did not permanently witness any of this, but the folks in the
11:45:18  15    gallery noticed that we were up here talking.  Ms. Avila
11:45:22  16    exchanged some communication with jurors.  I don't know what,
11:45:25  17    but there was a back and forth.  So I don't know what that was
11:45:28  18    or what -- so, I'm just raising it.  So...
11:45:34  19              THE COURT:  All right.  I think the thing for me to do
11:45:41  20    is to ask Ms. Avila what occurred.  I'm hesitant to bring it to
11:45:48  21    the jury.
11:45:48  22              MR. STRONGMAN:  I have no idea, honestly.
11:45:56  23              THE COURT:  Okay.  I'll ask.  Thank you.
11:46:16  24              Ms. Avila, I remind you you're under oath, but I
11:46:19  25    do have some questions to ask you.  There were a couple of
```

*OFFICIAL TRANSCRIPT*

```
11:46:27  1    times during the course of your testimony that we were brought
11:46:31  2    on the side and had a bench conference with counsel.  Do you
11:46:35  3    remember those occasions?
11:46:37  4              THE WITNESS:  (Witness nods head affirmatively.)
11:46:39  5              THE COURT:  Okay.  Did you communicate, in any way,
11:46:41  6    with jurors during that time?
11:46:43  7              THE WITNESS:  I don't think I did.
11:46:43  8              THE COURT:  Okay.  Why don't you take your mask off so
11:46:43  9    we can hear you.
11:46:55 10              THE WITNESS:  I don't think that I did.
11:46:56 11              THE COURT:  Okay.  Okay.  I guess, yesterday is -- you
11:47:02 12    know, it hasn't been that long ago.  Did you say anything --
11:47:10 13              THE WITNESS:  I looked at the jurors.
11:47:11 14              THE COURT:  No.  I understand during the course of your
11:47:12 15    testimony.  And you looked at the jurors, perhaps, during the
11:47:15 16    break.  Did you say anything to the jurors or communicate in
11:47:19 17    any way?  I mean, sometimes --
11:47:22 18              THE WITNESS:  No, I communicated to Bob.  Him, with the
11:47:27 19    man right there.
11:47:28 20              THE COURT:  Oh, the gentleman in the --
11:47:33 21              THE WITNESS:  Yes.
11:47:33 22              THE COURT:  -- back of the courtroom?
11:47:34 23              THE WITNESS:  Standing up right there.
11:47:35 24              THE COURT:  Okay.  You communicated with him?
11:47:38 25              THE WITNESS:  About, I'm hungry.
```

***OFFICIAL TRANSCRIPT***

11:47:41  1          THE COURT:  Okay.  You told him you were hungry?

11:47:43  2          THE WITNESS:  I'm hungry.

11:47:45  3          THE COURT:  Okay.  Was that it?

11:47:47  4          THE WITNESS:  Yes.

11:47:47  5          THE COURT:  Okay.  Are there any further questions?

11:47:50  6  Okay.  Good.  We just wanted to make sure that there was no

11:47:53  7  communication with the jurors.  Okay.

11:47:54  8              Let's bring the jury back in.

11:48:23  9          (WHEREUPON, at 11:48 a.m. the jury panel enters the

11:48:26 10  courtroom.)

11:48:26 11          THE COURT:  All jurors are present.  The Court's back

11:48:30 12  in session.  You may be seated.

11:48:32 13              Mr. Strongman, please proceed.

11:48:36 14          MR. STRONGMAN:  Thank you.  May it please the Court.

11:48:36 15  DIRECT EXAMINATION BY MR. STRONGMAN:

11:48:41 16  Q.   Good morning, Ms. Avila.

11:48:43 17  A.   Good morning.

11:48:43 18  Q.   Good morning, ladies and gentlemen of the jury.  My name

11:48:45 19  is Jon Strongman, and this is the first time I've had an

11:48:48 20  opportunity to talk in front of you, so I wanted to introduce

11:48:52 21  myself.

11:48:53 22          MR. STRONGMAN:  May I approach, Your Honor?

11:48:54 23          THE COURT:  Yes, you may.

11:49:02 24  EXAMINATION BY MR. STRONGMAN:

11:49:04 25  Q.   Ms. Avila, I'm going to hand you just a notebook with a

*OFFICIAL TRANSCRIPT*

11:49:06  1    few things that we may be referring to, okay?

11:49:06  2    A.    Okay.

11:49:12  3    Q.    You don't have to open the notebook just yet.

11:49:23  4          THE COURT:  He'll tell you when to open it.  Thank you.

11:49:26  5    EXAMINATION BY MR. STRONGMAN:

11:49:29  6    Q.    Thank you.  Are you ready to proceed?

11:49:32  7    A.    Uh-huh (affirmative response).

11:49:32  8    Q.    Now, Ms. Avila, when you were answering questions this

11:49:36  9    morning, you talked about a moment that you had -- I think you

11:49:41 10    said you were in school.  Were you in college -- and you talked

11:49:47 11    about -- that there was a fellow student that had, I think, you

11:49:51 12    called it invasive breast cancer.

11:49:51 13          Do you recall that?

11:49:52 14    A.    It was inflammatory breast cancer, not invasive.  It's a

11:49:56 15    specific type of very aggressive breast cancer.

11:49:58 16    Q.    Yeah.  And I think, as you were talking about

11:50:00 17    breast cancer this morning, in that moment, that was a

11:50:05 18    career-altering moment for you, in some ways, when you saw that

11:50:09 19    a fellow student had breast cancer and died from that disease,

11:50:13 20    right?  That was a life-changing event for you in terms of your

11:50:16 21    career; is that fair?

11:50:20 22    A.    It guided me to oncology and I've now since had my own

11:50:26 23    breast cancer diagnosis even further.

11:50:28 24    Q.    And, Ms. Avila, we know that breast cancer is serious; is

11:50:32 25    that fair?

**OFFICIAL TRANSCRIPT**

11:50:32  1    A.    Yes, it's very serious.

11:50:33  2    Q.    Yeah.  And you certainly know that the doctors that you

11:50:39  3    interact with in oncology when you were at Sanofi, they took

11:50:42  4    breast cancer very seriously, correct?

11:50:44  5    A.    The doctors take breast cancers very seriously.

11:50:47  6    Q.    And when doctors are trying to decide on what treatment

11:50:54  7    options to give their patients, that's a serious conversation

11:50:57  8    and a serious decision, isn't it?

11:51:01  9    A.    The doctors take that decision very seriously, yes.

11:51:03 10    Q.    And you know from your experience that the doctors, when

11:51:06 11    they're treating breast cancer and they're trying to make

11:51:08 12    decisions with their patients, they want to do what's going to

11:51:11 13    give their patient the best chance at survival, correct?

11:51:16 14    A.    They would want to make the best decision in conjunction

11:51:19 15    with their patient, correct.

11:51:20 16    Q.    And you talked about metastatic cancer and early-stage

11:51:27 17    breast cancer.  Do you remember that?

11:51:28 18    A.    Yes, I do.

11:51:28 19    Q.    And, Ms. Avila, you understand as well that every single

11:51:35 20    case of metastatic breast cancer, at one point, was early-stage

11:51:41 21    breast cancer that wasn't caught and treated, correct?

11:51:44 22    A.    Yes.

11:51:44 23    Q.    And you know that when you have cancer that moves from

11:51:50 24    early-stage breast cancer to metastatic breast cancer, the hope

11:51:56 25    and chance at survival changes dramatically, correct?

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 11:52:02 | 1 | A.   Yes. |
| 11:52:02 | 2 | Q.   And that's why treatments like chemotherapy are really |
| 11:52:05 | 3 | important.  And you understand that in your role, correct? |
| 11:52:10 | 4 | A.   I understand that chemotherapy has a place in every stage |
| 11:52:14 | 5 | of breast cancer.  If it's a different place and a different |
| 11:52:18 | 6 | setting of cancer.  It has a different place -- |
| 11:52:18 | 7 | Q.   And during your -- |
| 11:52:22 | 8 | A.   -- and a different role. |
| 11:52:23 | 9 | Q.   Are you good?  Are you ready? |
| 11:52:23 | 10 | A.   Yeah. |
| 11:52:27 | 11 | Q.   I didn't mean to cut you off. |
| 11:52:29 | 12 |       During your time at Sanofi, do you believe that all |
| 11:52:31 | 13 | your interactions with physicians and healthcare professionals |
| 11:52:36 | 14 | were professional and responsible? |
| 11:52:39 | 15 | A.   I believe that they were, yes. |
| 11:52:40 | 16 | Q.   And during the time that you worked at Sanofi and were |
| 11:52:47 | 17 | working on Taxotere, you believed Taxotere was a good drug, |
| 11:52:51 | 18 | correct? |
| 11:52:51 | 19 | A.   I still believe that Taxotere is a good drug.  However, I |
| 11:52:54 | 20 | believe that all of its side effects should have been |
| 11:52:58 | 21 | disclosed. |
| 11:52:58 | 22 | Q.   Now, you also mentioned a medical science liaison one |
| 11:53:05 | 23 | time.  Do you remember that -- |
| 11:53:05 | 24 | A.   Yes. |
| 11:53:08 | 25 | Q.   -- Mr. Bachus asked you questions? |

***OFFICIAL TRANSCRIPT***

11:53:10  1   A.   Yes.

11:53:10  2   Q.   And a medical science liaison is an entirely different job

11:53:13  3   than a sales representative; is that fair?

11:53:16  4   A.   It's a different position, correct.

11:53:16  5   Q.   Yeah.  And --

11:53:18  6   A.   You have to have the titles behind your name to have that

11:53:21  7   job.

11:53:21  8   Q.   And a medical science liaison would deal with things

11:53:26  9   like -- you mentioned off-label use.

11:53:29 10        Do you remember that?

11:53:29 11   A.   Yes.

11:53:30 12   Q.   And if a doctor had a question about a study about

11:53:37 13   off-label use, that would have to go to a medical science

11:53:42 14   liaison, correct?

11:53:43 15   A.   It would come to me first, and then I would funnel it to

11:53:47 16   the medical department.  But it would generally come to me

11:53:50 17   first.

11:53:51 18   Q.   But you were unable to answer those questions?

11:53:54 19   A.   Correct.

11:53:54 20   Q.   And the medical science liaison, they were in medical

11:54:00 21   affairs, correct?

11:54:01 22   A.   Correct.

11:54:02 23   Q.   They were not in sales; is that correct?

11:54:03 24   A.   Correct.

11:54:03 25   Q.   And medical and sales were kept separate; is that true?

*OFFICIAL TRANSCRIPT*

11:54:08  1    A.    In general.

11:54:09  2    Q.    And you know that if there were, say, information floating

11:54:17  3    around about a study involving ten patients, or doctors were

11:54:21  4    having X result or Y result and that came up with the doctor,

11:54:24  5    you'd have to pass that kind of question on to a medical

11:54:29  6    science liaison to answer, correct?

11:54:31  7    A.    Yes, and that's what we did.

11:54:32  8    Q.    And I think you would agree -- and in your depositions,

11:54:36  9    you were asked questions about the difference between medical

11:54:40 10    science folks and medical affairs and sales.

11:54:42 11         Do you remember that?

11:54:43 12    A.    Yes.

11:54:43 13    Q.    And if an idea came up, like a poster presentation about

11:54:50 14    seven patients, that's something you couldn't touch with a

11:54:55 15    10-foot pole, correct, I think were the words you used?  You

11:54:58 16    had to give that to the medical affairs department, correct?

11:55:02 17    A.    Yes.

11:55:02 18         MR. BACHUS:  Your Honor, that's an improper use of a

11:55:07 19    prior statement.  You need to ask a question, not tell her what

11:55:12 20    she said previously.

11:55:12 21         THE COURT:  I'm going to overrule it at this point.

11:55:15 22    Just, please, proceed.

11:55:16 23    EXAMINATION BY MR. STRONGMAN:

11:55:16 24    Q.    And I know that you indicated, Ms. Avila, that you

11:55:20 25    believed you were the face of Sanofi with the doctors that you

*OFFICIAL TRANSCRIPT*

11:55:23  1    called on.

11:55:24  2              Do you remember that?

11:55:24  3    A.    Yes.

11:55:26  4    Q.    And I think you said that a few times.  The reality is,

11:55:30  5    there is a medical science liaison in medical affairs that is

11:55:36  6    assigned specifically to interface with the doctors here in

11:55:40  7    New Orleans, correct?

11:55:40  8    A.    Yes.

11:55:42  9    Q.    So, there is actually a medical person in the medical

11:55:48 10    affairs department who is the face of Sanofi to the doctors as

11:55:53 11    well, correct?

11:55:54 12    A.    Exactly.  And she got to me the doctors because I

11:55:58 13    introduced her to them.

11:55:58 14    Q.    Well -- and, Ms. Avila, you talked about off-label a

11:56:05 15    little bit, and we'll get into the details of this a little bit

11:56:08 16    more when we look at the label.  But when you have a

11:56:12 17    prescription drug, you have the package insert, there's an

11:56:17 18    indication, correct?  That's one of the pieces of information

11:56:19 19    in there, right?

11:56:20 20    A.    Correct.

11:56:21 21    Q.    And that would be, like, this drug is indicated to treat

11:56:25 22    adjuvant breast cancer.  That's one example, correct?

11:56:28 23    A.    That is an example of an indication.

11:56:29 24    Q.    And so, if you have a drug approved to treat breast cancer

11:56:34 25    but there's a conversation about, say, pancreatic cancer,

*OFFICIAL TRANSCRIPT*

11:56:39 1    that's something that you're unable to talk about, correct?

11:56:41 2    A.    The guidance from the company would be to ask, why?  Do

11:56:47 3    you have a pancreatic cancer patient?  Because they would want

11:56:52 4    us to find out why the doctor is asking about that.  Like, so

11:56:55 5    we would -- we actually have detailed training about this.

11:56:59 6    They would want us to probe and find out, is there a patient.

11:57:03 7    So we actually have a little bit of guidance as to how far we

11:57:07 8    can go.  But then at some point, yes, we would have to refer

11:57:11 9    that on to medical.

11:57:12 10   Q.    So a medical science liaison, off-label includes

11:57:17 11   indications, it includes dose; is that correct?  There's an

11:57:19 12   on-label dose and an off-label dose, correct?

11:57:22 13   A.    It's whatever's not in the PI.

11:57:24 14   Q.    Correct.

11:57:24 15         And then there's an on-label regimen of medications

11:57:29 16   that are given together, and then there's the possibility of an

11:57:32 17   off-label regimen of medications, correct?

11:57:35 18   A.    Correct.

11:57:35 19   Q.    And a medical science liaison could talk to doctors about

11:57:42 20   off-label issues and off-label studies, but a salesperson could

11:57:46 21   not, correct?

11:57:47 22   A.    Correct.

11:57:47 23   Q.    And a medical science liaison could talk to doctors about

11:57:51 24   clinical trials going on in their hospitals, but a sales

11:57:56 25   representative could not, correct?

*OFFICIAL TRANSCRIPT*

11:58:00  1    A.    It depends on what trials you're talking about.  Like, if

11:58:04  2    a doctor talked to me about trials that he was doing at, like,

11:58:07  3    Tulane, he could talk to me about that.  I could have a

11:58:09  4    conversation with him about that.  Like, I don't know what

11:58:12  5    you're asking -- what you're saying when you're referring to

11:58:15  6    trials in his hospital.

11:58:16  7    Q.    You would never been allowed to talk to a doctor, like,

11:58:20  8    say, Dr. Kardinal, about off-label clinical trials that he was

11:58:25  9    putting patients into, correct?

11:58:35  10   A.    If you were talking about -- like, if he said, I'm doing

11:58:38  11   such and such trial here, and if there was an off-label trial,

11:58:42  12   and he told me he was doing it, yeah, he could tell me that.

11:58:45  13   Like, if he was going to tell me details about the trial and

11:58:48  14   say, I'm in -- you know, go further into it than that, yeah, I

11:58:54  15   would shut the conversation down just to be safe.

11:58:57  16   Q.    Yeah.  Because the role of the medical affairs department

11:59:01  17   to have those conversations, not the role of the salesperson,

11:59:04  18   correct?

11:59:04  19   A.    Correct.

11:59:05  20   Q.    Now, medical science liaisons, again, in medical affairs,

11:59:11  21   could discuss the substance of, say, an abstract that was

11:59:15  22   presented at a conference that a doctor raised a question

11:59:18  23   about, correct?

11:59:20  24   A.    Can you repeat the question.

11:59:21  25   Q.    Sure.  Sure.

**OFFICIAL TRANSCRIPT**

11:59:23 1                A medical science liaison could address the substance

11:59:27 2     of, say, like an abstract that was presented at a conference

11:59:32 3     that a doctor raised a question about.  That's something a

11:59:36 4     medical science liaison could do, correct?

11:59:39 5     A.    Yes.

11:59:39 6     Q.    You as a sales representative were not allowed to answer

11:59:43 7     any questions about any abstracts like that involving off-label

11:59:47 8     regimens, correct?

11:59:48 9     A.    Yes.  I said that, yes.

11:59:49 10    Q.    And you were asked some questions about Dr. Sedlacek's

11:59:55 11    abstracts.

11:59:56 12          Do you remember that?

11:59:57 13    A.    I mean, yes.

11:59:58 14    Q.    Okay.  And you said that there was a meeting in January of

12:00:04 15    2006.

12:00:06 16    A.    It was the meeting after the San Antonio Breast Conference

12:00:10 17    where that abstract was presented.  So, whatever January that

12:00:12 18    was, whenever that was presented, that's when I heard about

12:00:15 19    that abstract.

12:00:17 20    Q.    And I want to give a little bit of context.  So, the

12:00:22 21    San Antonio Breast Conference is -- you've been to it, correct?

12:00:26 22    A.    I've been -- the company sent me to work that meeting

12:00:30 23    twice out of the five years that I was there.

12:00:31 24    Q.    And it's one of the biggest conferences for oncologists

12:00:36 25    treating breast cancer in the country, correct?

*OFFICIAL TRANSCRIPT*

12:00:39   1    A.    Correct.

12:00:39   2    Q.    And there are thousands of oncologists that come to that

12:00:45   3    conference, true?

12:00:46   4    A.    Yes.  So, that abstract was a big deal.

12:00:49   5    Q.    And that abstract was public, correct?

12:00:52   6    A.    Yes, it was public.

12:00:53   7    Q.    And that abstract was not hidden, correct?

12:00:57   8    A.    No.

12:00:58   9    Q.    And that abstract was presented in front of thousands of

12:01:01  10    oncologists, correct?

12:01:01  11    A.    The ones that were at the meeting, correct.

12:01:03  12    Q.    Did you know that from time to time Dr. Kardinal goes to

12:01:06  13    the San Antonio Breast Conference?

12:01:07  14    A.    From time to time, he goes, correct.

12:01:09  15    Q.    Did you know that the San Antonio Breast Conference was

12:01:13  16    actually started by a friend of Dr. Kardinal's, Dr. Salmon,

12:01:17  17    that he went to medical school with?

12:01:18  18    A.    No, I did not know that information.

12:01:21  19    Q.    Did you ever talk to Dr. Kardinal about whether or not he

12:01:24  20    was at the San Antonio Breast Conference where Dr. Sedlacek's

12:01:29  21    poster was presented?

12:01:30  22    A.    I did not talk to him about whether or not he was at that

12:01:33  23    meeting.

12:01:34  24    Q.    And Dr. Sedlacek's poster involved off-label doses and

12:01:37  25    off-label regimens of chemotherapy, correct?

**OFFICIAL TRANSCRIPT**

12:01:41  1    A.    Correct.

12:01:42  2    Q.    And when you testified about Dr. Sedlacek's abstracts

12:01:55  3    today, did you know that all seven patients that Dr. Sedlacek

12:02:03  4    mentioned having persist hair loss, that all seven of them

12:02:07  5    received a higher dose of chemotherapy than what's approved by

12:02:10  6    the FDA?

12:02:11  7    A.    Yes, I knew that.

12:02:12  8    Q.    And did you know that all seven of them received a regimen

12:02:17  9    that was different than what was approved by the FDA?

12:02:20 10    A.    Yes, I knew that.

12:02:22 11    Q.    And knowing that Dr. Sedlacek's poster involved those

12:02:28 12    pieces of information, there is no way a sales representative

12:02:34 13    could discuss it because it was off-label, correct?

12:02:37 14    A.    I never said that I discussed it.  What I'm saying is that

12:02:40 15    that's the first time that I had heard about it in conjunction

12:02:43 16    with her saying that she had her own physician reporting it in

12:02:47 17    her territory in conjunction with the fact that I saw a bunch

12:02:51 18    of reports to the company in my deposition of people reporting

12:02:55 19    hair loss to the company --

12:02:58 20    Q.    Ms. Avila, please focus on my question.

12:03:03 21          Mr. Bachus asked you some questions about whether you

12:03:06 22    were allowed to talk to doctors about Dr. Sedlacek's abstract.

12:03:11 23    Do you remember that?

12:03:12 24    A.    Not really at this moment, but I believe you.  And, no, I

12:03:15 25    was not allowed to talk about the abstract.

*OFFICIAL TRANSCRIPT*

12:03:16 1    Q.   And the reality is, if there's some insinuation that you

12:03:21 2    were allowed to talk about all kinds of off-label abstracts,

12:03:27 3    that was fine, but for some reason, you weren't allowed to talk

12:03:31 4    about Sedlacek's.  That's just not true, correct?  You couldn't

12:03:34 5    talk about any off-label abstracts, correct?

12:03:37 6    A.   I never said I was.

12:03:39 7         THE COURT:  I think --

12:03:45 8    EXAMINATION BY MR. STRONGMAN:

12:03:50 9    Q.   You also know that Dr. Sedlacek's abstract, when we called

12:04:02 10   it a poster presentation, it literally is a poster, correct?

12:04:06 11   Like, it's presented on a poster at the conference, correct?

12:04:08 12   A.   Correct.

12:04:09 13   Q.   And you had mentioned reprint carriers and reprints

12:04:14 14   earlier and you said they were journal articles.  And you

12:04:17 15   understand there is a difference between a journal article and

12:04:19 16   a poster, correct?

12:04:20 17   A.   Correct.

12:04:20 18   Q.   And you know that a poster presentation doesn't go through

12:04:27 19   the same peer review kind of process that a medical article

12:04:31 20   does, you know that?

12:04:31 21   A.   Correct.

12:04:32 22   Q.   And you know that a poster presentation given at a

12:04:34 23   conference, even if it had seven patients with a miracle cure,

12:04:38 24   you couldn't talk about it, correct?

12:04:41 25   A.   Correct.

*OFFICIAL TRANSCRIPT*

12:04:41  1    Q.    Good, bad, indifferent, you couldn't talk about it?  The

12:04:46  2    medical affairs people could talk about it, correct?

12:04:50  3    A.    Correct, Mr. Bachus (verbatim).  I never said I could talk

12:04:54  4    about it -- or Mr. Strongman, whatever.  How long have I been

12:05:00  5    up here?

12:05:00  6    Q.    Now, I want to talk a little bit about this case.  You had

12:05:04  7    an opportunity, I assume, to learn a little bit about this case

12:05:09  8    from Mr. Bachus; is that correct?

12:05:11  9    A.    I have learned a lot about this case because I've been

12:05:14 10    involved with this case for a long time, several years.

12:05:17 11    Q.    And I'm talking about Ms. Kahn.

12:05:21 12    A.    I don't really know much about Ms. Kahn's specific case at

12:05:24 13    all.

12:05:24 14    Q.    Did you meet with the lawyers to go over and prepare for

12:05:28 15    your testimony today, Mr. Bachus or any of the --

12:05:31 16    A.    I met with Mr. Bachus.

12:05:33 17    Q.    Okay.  And I assume he told you a little bit about the

12:05:36 18    facts of Ms. Kahn's case, right?

12:05:39 19    A.    Not really specifically about Ms. Kahn, no.

12:05:43 20          THE COURT:  All right.  I think --

12:05:43 21          (WHEREUPON, at this point in the proceedings, there was

12:05:43 22    a conference held at the bench.)

12:06:21 23          THE COURT:  I anticipated because I think he's going to

12:06:25 24    blurt out that there are multiple other players.  And I would

12:06:31 25    like to have an opportunity, if you don't mind, to just tell

*OFFICIAL TRANSCRIPT*

12:06:33   1   her, ma'am, you cannot discuss the scope of this litigation.

12:06:41   2   That's the only case we're going to have.

12:06:43   3           MR. STRONGMAN:  Sure.  I understand.

12:06:45   4           THE COURT:  I could see it and it's coming.

12:06:49   5           MR. BACHUS:  Your Honor, the one thing I could tell you

12:06:50   6   is that I agree with you and I have no problem with giving her

12:06:54   7   an instruction, but if she's going to tell the truth and the

12:06:58   8   whole truth and nothing but the truth and he is going to ask a

12:07:04   9   question that elicits an answer that nobody likes.  I mean...

12:07:09  10           THE COURT:  I understand that, Mr. Bachus.  But he's

12:07:11  11   asking, do you know about Ms. Kahn's case?  Well, I know and

12:07:15  12   this is what's coming.

12:07:18  13           MR. BACHUS:  I hear.

12:07:19  14           THE COURT:  And I think he's entitled to cross-examine

12:07:21  15   this witness as to her knowledge vis-à-vis this case, which I'm

12:07:25  16   not going to allow this witness to blurt out.  I don't know

12:07:29  17   about this but I know about the 12,000 others.

12:07:38  18           MR. BACHUS:  He just needs to be careful about what he

12:07:41  19   asks.  You're right, if it's a nonresponsive.  What you're

12:07:44  20   talking about is a nonresponsive answer.

12:07:46  21           THE COURT:  I think she's been nonresponsive.  Those

12:07:49  22   last two answers were nonresponsive.  He was saying, what do

12:07:53  23   you know about -- were you asked about Ms. Kahn's case?  I

12:07:55  24   don't know about Ms. Kahn's case but I've been involved in this

12:07:57  25   litigation.

*OFFICIAL TRANSCRIPT*

12:07:59  1          MR. BACHUS:  I would also just caution the Court not

12:08:01  2    just, I don't have an experience with this witness but I don't

12:08:04  3    know that they understand what is this case versus what's not

12:08:08  4    another case.  Because people always say, oh, yeah, that is a

12:08:10  5    class action, no, it's -- it's not a class action.

12:08:13  6          THE COURT:  But I think I'm not concerned about -- I'll

12:08:15  7    be honest with you, I'm not concerned about the experts.  They

12:08:21  8    understand exactly what they are doing.  I am concerned about

12:08:24  9    this witness and what I would like is to be able to pull her

12:08:28 10    aside and tell her, ma'am, you should not reference any case

12:08:33 11    other than Ms. Kahn and so you should not speak of the scope of

12:08:39 12    this litigation.

12:08:40 13          MR. BACHUS:  I understand.

12:08:45 14          THE COURT:  But I'm going to do that and I'm going to

12:08:48 15    have to just basically whisper it in ears so I want to make

12:08:52 16    sure there is no objection to me doing that.

12:09:34 17          (Conferring with the witness.)

12:09:34 18          (WHEREUPON, at this point in the proceedings, the bench

12:09:41 19    conference concluded.)

12:09:41 20          THE COURT:  Okay.  Thank you.

12:09:42 21            Please proceed, Mr. Strongman.

12:09:44 22          MR. STRONGMAN:  Thank you.

12:09:46 23    EXAMINATION BY MR. STRONGMAN:

12:09:46 24    Q.   Ms. Avila, I had asked you a question about whether or not

12:09:49 25    Mr. Bachus had told you anything about Ms. Kahn's specific

*OFFICIAL TRANSCRIPT*

12:09:53   1    case.

12:09:53   2              Do you remember that?

12:09:53   3    A.    Yes.

12:09:54   4    Q.    Okay.  And did Mr. Bachus tell you that Ms. Kahn was

12:10:00   5    actually participating in a clinical trial?

12:10:02   6    A.    No, he did not.

12:10:04   7    Q.    So, when you came in here and testified, you were unaware

12:10:07   8    that Ms. Kahn was participating in a clinical trial called

12:10:10   9    NSABP B-40, correct?

12:10:14  10    A.    I did not know that she was in a NSABP 40.  I did not know

12:10:21  11    that.

12:10:21  12    Q.    And you would have never called on Dr. Kardinal or

12:10:27  13    Dr. Larned regarding the NSABP B-40 clinical trial, correct?

12:10:35  14    A.    No.

12:10:35  15    Q.    You would have never talked with Dr. Kardinal about

12:10:39  16    enrolling patients in NSABP clinical study, correct?

12:10:45  17    A.    No.

12:10:45  18    Q.    And you would have never talked to Dr. Kardinal about the

12:10:48  19    consent form for the NSABP clinical trial, correct?

12:10:54  20    A.    No.

12:10:54  21    Q.    And you would have never, certainly not been in the room

12:10:57  22    when any of Ms. Kahn's physicians discussed the risks and the

12:11:01  23    benefits of that clinical trial with her, correct?

12:11:05  24    A.    No.

12:11:05  25    Q.    And, in fact, if there were any questions about a

*OFFICIAL TRANSCRIPT*

12:11:11  1   clinical trial that involved off-label use like the NSABP B-40

12:11:19  2   clinical trial, those would all have to go to medical affairs,

12:11:19  3   correct?

12:11:24  4   A.    Correct.

12:11:24  5   Q.    Mr. Bachus never told you that?

12:11:26  6   A.    That she was in NSABP B-40?

12:11:31  7   Q.    Correct.

12:11:32  8   A.    No, he did not.

12:11:34  9   Q.    You walked through with Mr. Bachus the partnering with

12:11:39 10   your patient's tear sheets.

12:11:40 11          Do you remember that?

12:11:41 12   A.    Yes.

12:11:41 13   Q.    Did Mr. Bachus tell you that Dr. Kardinal testified he

12:11:48 14   never saw this document?  Did he tell you that?

12:11:52 15   A.    No, he did not.

12:11:53 16   Q.    Did Mr. Bachus tell you during your meeting that

12:12:00 17   Dr. Larned was shown this in her deposition and she said she

12:12:03 18   has never seen this document before?

12:12:06 19   A.    No.  He did not tell me that but I know she's seen it.

12:12:10 20   Q.    And the jury will hear Dr. Larned themselves.

12:12:15 21   A.    That's fine.

12:12:15 22   Q.    Did Mr. Bachus tell you that Nurse Thomas was shown this

12:12:21 23   in her deposition and that Nurse Thomas testified she never

12:12:26 24   recalled seeing this or giving this to patients?

12:12:28 25          Did he tell you that?

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 12:12:28 | 1 | A.   No.  Michelle Thomas?  No. |
| 12:12:32 | 2 | Q.   And did Mr. Bachus ever tell you that Dr. Kardinal was |
| 12:12:38 | 3 | asked, "Do you know any of the Sanofi sales reps by name?"  And |
| 12:12:47 | 4 | he said "No." |
| 12:12:48 | 5 | Did he tell you that? |
| 12:12:49 | 6 | A.   No, he didn't tell me that. |
| 12:12:50 | 7 | Q.   And did Mr. Bachus tell you that Dr. Kardinal testified he |
| 12:12:54 | 8 | never relies on sales reps? |
| 12:12:57 | 9 | A.   No.  He did not tell me that. |
| 12:12:59 | 10 | Q.   What about Dr. Larned?  Did Mr. Bachus tell you that |
| 12:13:03 | 11 | Dr. Larned could not name a single Sanofi sales rep including |
| 12:13:09 | 12 | yourself? |
| 12:13:10 | 13 | A.   No.  He did not tell me that. |
| 12:13:12 | 14 | Q.   And did Mr. Bachus also tell you that Dr. Larned never |
| 12:13:19 | 15 | relied on sales representatives according to her sworn |
| 12:13:24 | 16 | testimony? |
| 12:13:25 | 17 | Did he tell you that? |
| 12:13:26 | 18 | A.   Mr. Bachus did not give me information that was privy to |
| 12:13:30 | 19 | their depositions or testimony whatsoever, and I did not ask |
| 12:13:35 | 20 | for that information.  And Dr. Larned is actually the person |
| 12:13:39 | 21 | who told me that Ms. Kahn was on her trial. |
| 12:13:44 | 22 | Q.   And with regard to Dr. Kardinal, did you know that you |
| 12:13:54 | 23 | called on Dr. Kardinal three times, 14 years ago, according to |
| 12:14:00 | 24 | the records? |
| 12:14:01 | 25 | Do you know that? |

***OFFICIAL TRANSCRIPT***

12:14:01 1    A.    I don't know what the records say.  I saw the records.  I

12:14:06 2    can't remember exactly what they say.

12:14:06 3    Q.    And with regard to Dr. Kardinal, your visits with him, I

12:14:12 4    think you said, were minutes, correct?

12:14:16 5    A.    About 15, 20 minutes at his desk at the Cancer Institute.

12:14:20 6    Q.    And you certainly are not in here testifying about any

12:14:24 7    specific memory that you had about any conversation with

12:14:28 8    Dr. Kardinal over those 45 minutes, 14 years ago, correct?

12:14:35 9    A.    No, I'm not.

12:14:35 10   Q.    You talked to him about the label as well, the prescribing

12:14:47 11   information in the label.

12:14:48 12          Do you remember that?

12:14:49 13   A.    Yes, I do.

12:14:51 14   Q.    Did Mr. Bachus tell you how Dr. Larned testified regarding

12:14:58 15   what the label meant to her?  Did he discuss that with you?

12:15:02 16   A.    As I said earlier, Mr. Bachus did not give me any

12:15:05 17   information about Ms. Larned's testimony.

12:15:10 18   Q.    So you don't know, sitting here, that Dr. Larned

12:15:14 19   understood that when the label said "hair generally grows

12:15:19 20   back," it didn't mean always; you didn't know that, correct?

12:15:22 21   A.    No.  I did not understand that she thought that.

12:15:26 22   Q.    And did Mr. Bachus tell you that Dr. Larned knew -- knew,

12:15:35 23   that with lots of medications, there is a risk that your hair

12:15:40 24   will not come back?

12:15:44 25          MR. BACHUS:  I object.  She's indicated the scope of my

*OFFICIAL TRANSCRIPT*

12:15:49  1    conversation with her and I wasn't preparing her --

12:15:51  2              THE COURT:  Okay.  I got it.

12:15:53  3                   Sustained.  Let's move on.

12:15:55  4    EXAMINATION BY MR. STRONGMAN:

12:16:06  5    Q.    And just a couple of brief questions about

12:16:10  6    clinical trials.

12:16:10  7                   Are you familiar with just what NSABP is?

12:16:14  8    A.    Uh-huh (affirmative response).

12:16:14  9    Q.    And NSABP and Sanofi, those are not the same, correct?

12:16:22 10    A.    Correct.

12:16:22 11    Q.    So the NSABP is a separate clinical research organization;

12:16:28 12    is that correct?

12:16:28 13    A.    Correct.

12:16:28 14    Q.    And so Sanofi does not put together the informed consent,

12:16:34 15    for example, for the NSABP clinical trial, correct?

12:16:40 16    A.    They don't but they would have input into it.

12:16:42 17    Q.    Now, if we could shift gears just a little bit to what was

12:17:07 18    entered into evidence as Defendant's Exhibit 570, and do you

12:17:13 19    have that in front of you, Ms. Avila?  It's not in the

12:17:16 20    notebook.

12:17:16 21    A.    No, I gave it back.

12:17:17 22    Q.    You gave it back.  I'll get you a copy of it.

12:17:22 23              MR. STRONGMAN:  May I approach, Your Honor?

12:17:29 24              THE COURT:  Yes, you may.

12:17:31 25    EXAMINATION BY MR. STRONGMAN:

                              *OFFICIAL  TRANSCRIPT*

12:17:41  1    Q.    Ms. Avila, I want to go back to -- I think it was page 3

12:17:44  2    that Mr. Bachus was showing you.

12:17:52  3               MR. STRONGMAN:  Can you bring that up?

12:17:52  4    EXAMINATION BY MR. STRONGMAN:

12:17:54  5    Q.    And this was the same page that you went over with

12:17:57  6    Mr. Bachus; is that correct?

12:17:58  7    A.    Correct.

12:17:59  8    Q.    And he pointed out that -- it listed at the bottom of

12:18:01  9    those bullet points, "Taxotere prescribing information."

12:18:03 10               Do you see that?

12:18:04 11    A.    Yes.

12:18:04 12    Q.    And so, we talked about how the prescribing information is

12:18:10 13    included with all of these materials; is that right?  And you

12:18:14 14    said so this morning, correct?

12:18:16 15    A.    Yes.

12:18:16 16    Q.    And there is a specific tab in this document for the

12:18:20 17    prescribing information if you look.  It was like a notebook

12:18:26 18    and it has tabs.

12:18:27 19               Do you know what I'm talking about?

12:18:28 20    A.    Yes.

12:18:29 21    Q.    So, I want to make it clear, the prescribing information

12:18:32 22    that's attached to this document, it's the label, and it's not

12:18:37 23    folded up in teeny-tiny squares, correct?

12:18:42 24    A.    Correct.

12:18:42 25    Q.    It's full pages --

*OFFICIAL  TRANSCRIPT*

12:18:42  1    A.    Correct.

12:18:44  2    Q.    -- provided to the doctors, correct?  Yes?

12:18:53  3    A.    I said correct.

12:18:53  4    Q.    Okay.

12:18:53  5    A.    Correct.  Sorry.

12:18:55  6    Q.    And if you could skip forward to me -- with me to the page

12:19:02  7    that ends in 490 at the bottom.

12:19:12  8    A.    Yes.

12:19:12  9    Q.    And this is one of the pages that you would have gone over

12:19:15 10    with doctors or nurses that you were talking to about this

12:19:20 11    document, correct?

12:19:21 12    A.    Correct.

12:19:21 13    Q.    And one of the things that this page provides for is some

12:19:26 14    information on how to dose steroids because you're going to

12:19:29 15    have to take steroids at times if you're going to take

12:19:33 16    chemotherapy; is that fair?

12:19:34 17    A.    Correct.

12:19:35 18    Q.    Okay.  And if you look up on the right, there is a section

12:19:38 19    that says, "Important safety information for Taxotere."

12:19:41 20          Do you see that?

12:19:41 21    A.    Yes.

12:19:42 22    Q.    And it says:  "Warning, Taxotere treatment can cause

12:19:46 23    serious, physically limiting, and potentially life-threatening

12:19:51 24    side effects, such as infection, low blood cell counts,

12:19:54 25    allergic reaction, and retention of excess fluid."

*OFFICIAL TRANSCRIPT*

12:19:58  1              Did I read that correctly?

12:19:59  2    A.    Correct.

12:19:59  3    Q.    And these are life threatening and serious side effects

12:20:04  4    that you would talk to doctors about with regard to Taxotere,

12:20:04  5    correct?

12:20:08  6    A.    Yes.  I would talk to them about this.

12:20:10  7    Q.    And if you go down, there is another bullet point that

12:20:13  8    says, "Treatment related to acute myeloid thyroid leukemia."

12:20:19  9              Do you see that?

12:20:20 10    A.    Yes.

12:20:20 11    Q.    And it says that:  "AML has occurred in patients given

12:20:26 12    anthracycline and cyclophosphamide including use with Taxotere

12:20:32 13    and adjuvant therapy for breast cancer."

12:20:32 14              Did I read that correctly?

12:20:33 15    A.    Yes, you did.

12:20:33 16    Q.    And so what this is indicating is that there is -- even

12:20:37 17    with chemotherapy -- there is a chance, a risk of secondary

12:20:42 18    cancer, correct?

12:20:42 19    A.    Yes, there is.

12:20:44 20    Q.    And these are the kinds of serious risks that you did talk

12:20:47 21    to doctors about, correct?

12:20:48 22    A.    Yes.

12:20:48 23    Q.    And then if you go down, there's other common side effects

12:20:51 24    listed.  Do you see that?

12:20:52 25    A.    Yes.

**OFFICIAL TRANSCRIPT**

12:20:53 1  Q.   And it includes hair loss specifically, correct?

12:20:57 2  A.   Yes.

12:20:57 3  Q.   Okay.  And I want to look very briefly at the tear sheet

12:21:01 4  that you went over with Mr. Bachus on alopecia.  Let me know

12:21:16 5  when you're there.

12:21:16 6  A.   I'm there.

12:21:17 7  Q.   And we've seen this, but the question is posed:  "Will my

12:21:22 8  hair grow back?"  And it states:  "If you do lose your hair, it

12:21:25 9  will usually grow back after the treatments are over."

12:21:28 10           Did I read that correctly?

12:21:30 11 A.   Yes.

12:21:30 12 Q.   And, Ms. Avila, if I were to pull out a dictionary and

12:21:34 13 look up the word "usually," it's not going to say "always,"

12:21:34 14 correct?

12:21:40 15 A.   In the context of this document, usually means always.

12:21:43 16 Because on the other side:  "It's a common, yet temporary side

12:21:46 17 effect."  And what this section is meant to do is it's meant to

12:21:50 18 explain how the hair will grow back.

12:21:53 19 Q.   And, Ms. Avila, I just asked you, if I were to pull out a

12:21:58 20 dictionary and look up the word "usually" it's not going to

12:22:02 21 define it as "always," correct?

12:22:03 22 A.   I'm answering your question in the context of this

12:22:06 23 document.  The word "usually," is saying that this hair is

12:22:09 24 going to grow back.

12:22:11 25 Q.   So, I just want an answer to my question.  If you were to

**OFFICIAL TRANSCRIPT**

12:22:11  1   pull out a dictionary --

12:22:17  2            MR. BACHUS:  She's not going to answer, Your Honor.

12:22:18  3            THE COURT:  Okay.  I think she was answering the

12:22:19  4   question.

12:22:19  5            MR. STRONGMAN:  All right.

12:22:20  6            THE COURT:  I think the word is "usually."

12:22:24  7            THE WITNESS:  Right.  It will usually grow back.  It's

12:22:29  8   going to back.

12:22:29  9   EXAMINATION BY MR. STRONGMAN:

12:22:31 10   Q.    My question was just usually doesn't mean always, right?

12:22:31 11   A.    In this document --

12:22:31 12            THE COURT:  Yes.

12:22:39 13            THE WITNESS:  -- usually means always.

12:22:39 14            THE COURT:  Okay.

12:22:47 15   EXAMINATION BY MR. STRONGMAN:

12:22:47 16   Q.    And at the top of that bullet point, there's a bold title.

12:22:51 17   Do you see that?  And it says, "Will my hair grow back?"

12:22:53 18   Correct?

12:22:53 19   A.    Correct.

12:22:54 20   Q.    It doesn't say when will my hair grow back, does it?

12:22:58 21   A.    No.  It talks about when your hair grows back in the next

12:23:02 22   bullet point.  "When my hair grows back, how should I take care

12:23:06 23   of it?"

12:23:06 24   Q.    I understand.

12:23:08 25            And, Ms. Avila, my question is just -- the title of

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 12:23:12 | 1 | the section you're looking at says:  "Will my hair grow back?" |
| 12:23:17 | 2 | Question mark, correct? |
| 12:23:19 | 3 | A.   Correct. |
| 12:23:19 | 4 | Q.   And what it says is "usually," correct? |
| 12:23:26 | 5 | A.   Uh-huh (affirmative response). |
| 12:23:26 | 6 | Q.   Now, with regard to the labeling, you also looked at that. |
| 12:23:44 | 7 | Do you have a copy of the label up there still, Ms. Avila? |
| 12:23:47 | 8 | A.   It's in the back of this thing.  I mean, is it not in this |
| 12:23:53 | 9 | book? |
| 12:23:54 | 10 | Q.   It is. |
| 12:23:55 | 11 |        MR. STRONGMAN:  May I approach, Your Honor? |
| 12:23:56 | 12 |        THE COURT:  Yes, you may. |
| 12:23:58 | 13 | EXAMINATION BY MR. STRONGMAN: |
| 12:23:58 | 14 | Q.   I'm just going to give you a copy of the exhibit |
| 12:24:01 | 15 | Mr. Bachus marked -- |
| 12:24:01 | 16 | A.   Okay. |
| 12:24:01 | 17 | Q.   -- and showed you earlier, okay? |
| 12:24:16 | 18 |        MR. STRONGMAN:  And if you could bring up that exhibit, |
| 12:24:20 | 19 | please, that's in evidence.  I think it was Plaintiff's 280. |
| 12:24:20 | 20 | EXAMINATION BY MR. STRONGMAN: |
| 12:24:21 | 21 | Q.   And when you look at this document we already covered, |
| 12:24:26 | 22 | alopecia is right on the front page under "Adverse Reactions"; |
| 12:24:31 | 23 | is that correct, Ms. Avila? |
| 12:24:31 | 24 | A.   Where are you talking about? |
| 12:24:35 | 25 | Q.   Please look at the screen, too. |

*OFFICIAL TRANSCRIPT*

12:24:37  1    A.    Okay.

12:24:42  2    Q.    So, alopecia is right on the first page, correct?

12:24:49  3    A.    I'm still looking.  Hold on.  Okay.  Yeah, I see it now.

12:24:52  4    It's there under "adverse reactions," alopecia.

12:24:55  5    Q.    Okay.  And the word "temporary" is not, correct?

12:24:58  6    A.    No.

12:24:59  7    Q.    And, Ms. Avila, do you know how many times the word

12:25:03  8    "alopecia" or "hair loss" appears in this exhibit?

12:25:07  9    A.    No, I do not.

12:25:08 10    Q.    Would you be surprised to know that alopecia or hair loss

12:25:11 11    appears in this exhibit 12 times?

12:25:15 12    A.    No, I'm not surprised by that.

12:25:17 13    Q.    Well, and then I want to look again at the language toward

12:25:21 14    the back in the patient counseling information that you went

12:25:24 15    over, right on the next to last page.  Let me know when you're

12:25:29 16    there.  And it has the title "Hair Loss," correct?

12:25:37 17          Just let me know when you're there.  Sorry.

12:25:42 18    A.    I am here.

12:25:44 19    Q.    All right.  And so this is the language that you looked at

12:25:46 20    with Mr. Bachus.  And it indicates that:  "Hair loss will begin

12:25:52 21    after the first few treatments and varies from patient to

12:25:56 22    patient.  Once you've completed all of your treatments, hair

12:25:59 23    generally grows back," correct?

12:26:01 24    A.    Yes.

12:26:01 25    Q.    And, again, if I were to pull out a dictionary and look up

*OFFICIAL TRANSCRIPT*

12:26:05  1    "generally," it's not going to be defined as "always," correct?

12:26:12  2    A.    In the context of this document, generally means always,

12:26:17  3    because we were trained that hair loss was temporary.  Nowhere

12:26:22  4    in the PI does hair loss say permanent hair loss.  It does not

12:26:26  5    say permanent induced alopecia, chemotherapy permanent induced

12:26:33  6    hair loss.  12 times it says hair loss, but never does it say

12:26:37  7    permanent hair loss.  We were trained that it was temporary

12:26:40  8    hair loss.

12:26:41  9        THE COURT:  Ma'am, the question was:  Does generally

12:26:45 10    mean permanent?

12:26:47 11        THE WITNESS:  I don't have a Webster's Dictionary.

12:26:50 12    Generally, in the context of this document, it means always.

12:26:53 13    EXAMINATION BY MR. STRONGMAN:

12:27:11 14    Q.    Ms. Avila, can we agree that "generally grows back" does

12:27:15 15    not mean "always grows back"?

12:27:19 16        MR. BACHUS:  I object to the form.  Asked and answered.

12:27:21 17        THE COURT:  It was a separate question.  I'm going to

12:27:23 18    allow him to ask his question.

12:27:26 19        THE WITNESS:  I do not agree to that in the context of

12:27:28 20    this document.

12:27:30 21    EXAMINATION BY MR. STRONGMAN:

12:27:31 22    Q.    And, Ms. Avila, the notebook that you have in front of

12:27:33 23    you, can you turn, if you can, to the document June 27, 2018.

12:27:41 24        Do you see that?

12:27:42 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

| 12:27:43 | 1 | Q.   And there is a page -- I want you to go to page 372, and |

Q.   And there is a page -- I want you to go to page 372, and
let me know when you're there.
A.   Yeah, I'm there.
Q.   All right.  And, Ms. Avila, what you're looking at is a
deposition that you gave; is that correct?
A.   Yes.  It looks like that's what this is, a deposition
taken -- oh, my gosh.
Q.   I'll help walk you through it, okay, Ms. Avila.  So this
is a deposition that you gave under oath, correct?
A.   Correct.
Q.   And what that means is that you're asking --
     THE COURT:  Wait.  Excuse me.
     MR. BACHUS:  This is an objection.  This is
inappropriate.  He's asking her a question about her testimony
from a deposition.  This is an improper method for using a
prior statement.  The proper method is --
     THE COURT:  Wait.  Wait.  Wait.
     MR. BACHUS:  We can approach.  This is completely
inappropriate.
     (WHEREUPON, at this point in the proceedings, there was
a conference held at the bench.)
     MR. BACHUS:  I object to the use of the deposition in
the manner.  This is a completely inappropriate way to impeach
a witness with a deposition.  What you're supposed to do --
what the rules require is you ask a question.  If you get an

***OFFICIAL TRANSCRIPT***

12:29:41  1    answer different than the answer that you got previously, then
12:29:43  2    you can use the deposition in that fashion.  That is not what
12:29:47  3    happened here.  That's not what happened.
12:29:49  4         MR. STRONGMAN:  That's exactly what happened here,
12:29:50  5    Your Honor.
12:29:51  6         THE COURT:  I mean, I don't have the deposition in
12:29:52  7    front of me.
12:29:54  8         MR. STRONGMAN:  I asked, can we agree that "generally
12:29:57  9    grows back" does not mean "always grow back"?  And she said, "I
12:30:00 10    do not agree."
12:30:01 11              In her deposition answer, "I guess yes."  That
12:30:04 12    seems to be pretty ripe for impeachment.  This is exactly what
12:30:08 13    a deposition transcript is allowed for.
12:30:10 14         MR. BACHUS:  I do not think that's what she answered.
12:30:12 15    Let them ask her to look at the document and ask her a
12:30:15 16    question.  What you're imposing is there's some relationship
12:30:18 17    between your question and the document and she's simply
12:30:21 18    clarifying to you in the context of this document this is what
12:30:24 19    it means.
12:30:25 20         THE COURT:  No, he asked her --
12:30:27 21         MR. BACHUS:  She said, "I don't have a Webster's
12:30:27 22    Dictionary."
12:30:27 23         THE COURT:  No, no, overruled.  He asked her that.
12:30:29 24    Now, you need to tell him what page.
12:30:33 25         MR. STRONGMAN:  Okay.  I will.  I did.  And if I could

*OFFICIAL TRANSCRIPT*

12:30:36  1    just request that when we have speaking objections, keep it to

12:30:40  2    a minimum.

12:30:41  3              MR. BACHUS:  I agree with that.

12:30:42  4              THE COURT:  But the reality is he asked her the

12:30:47  5    question.  He directed her to her deposition testimony.  I

12:30:51  6    think it's absolutely appropriate.

12:30:51  7              (WHEREUPON, at this point in the proceedings, the bench

12:30:51  8    conference concluded.)

12:30:51  9              THE COURT:  Please proceed.

12:31:22 10    EXAMINATION BY MR. STRONGMAN:

12:31:22 11    Q.    And, Ms. Avila, are you ready to proceed?

12:31:28 12              MR. STRONGMAN:  And, Mr. Bachus, I'm on page 372 of the

12:31:33 13    transcript.

12:31:33 14    EXAMINATION BY MR. STRONGMAN:

12:31:33 15    Q.    And, Ms. Avila, as I said, this is a sworn testimony that

12:31:35 16    you gave under oath, correct?

12:31:36 17    A.    Correct.

12:31:37 18    Q.    And I want you to look at page 372, starting on line 21.

12:31:41 19    Let me know when you're there.

12:31:43 20    A.    Okay.

12:31:44 21    Q.    And the question is asked of you under oath:  "Can we

12:31:47 22    agree that generally grows back does not mean always grows

12:31:51 23    back?"

12:31:52 24              Your answer, under oath:  "I guess, yes."

12:31:56 25              Did I read that correctly?

**_OFFICIAL TRANSCRIPT_**

| | | |
|---|---|---|
| 12:32:01 | 1 | A.   I have, "I believe that it was understood that hair would |
| 12:32:05 | 2 | come back."  That's what the nurses told the patients all the |
| 12:32:05 | 3 | time. |
| 12:32:07 | 4 | Q.   Ms. Avila -- |
| 12:32:07 | 5 | THE COURT:  Ms. Avila. |
| 12:32:07 | 6 | (WHEREUPON, at this point in the proceedings, there was |
| 12:32:12 | 7 | simultaneous speaking.) |
| 12:32:12 | 8 | EXAMINATION BY MR. STRONGMAN: |
| 12:32:13 | 9 | Q.   I want you to look at page 372, lines 21 going on to page |
| 12:32:19 | 10 | 373, line 1.  It goes to the top of the next page. |
| 12:32:25 | 11 | A.   Oh, oh, I'm sorry. |
| 12:32:32 | 12 | Q.   Okay.  You're all right.  Just let me know when you're |
| 12:32:36 | 13 | oriented. |
| 12:32:36 | 14 | A.   (Indiscernible).  After all of that, I said, "I guess, |
| 12:32:39 | 15 | yes." |
| 12:32:41 | 16 | Q.   Okay. |
| 12:32:41 | 17 | MR. BACHUS:  Your Honor, for completeness, we'll ask |
| 12:32:43 | 18 | that additional testimony be read into the record in context. |
| 12:32:46 | 19 | THE COURT:  Okay.  I need the deposition testimony. |
| 12:33:07 | 20 | What page? |
| 12:33:07 | 21 | MR. STRONGMAN:  Your Honor, this is page 372 going on |
| 12:33:12 | 22 | to 373. |
| 12:33:34 | 23 | MR. BACHUS:  Your Honor, can we read the lines and page |
| 12:33:36 | 24 | number that we believe -- |
| 12:33:39 | 25 | THE COURT:  He's entitled to complete his -- what line? |

*OFFICIAL TRANSCRIPT*

12:33:40  1       MR. BACHUS:  I'm sorry.  Do you want me to approach --

12:33:40  2       THE COURT:  Yes.

12:33:43  3       MR. BACHUS:  -- or do you want me to say out loud the

12:33:46  4  page and line numbers?

12:33:47  5       THE COURT:  Just give me a page.

12:33:47  6       MR. BACHUS:  All right.

12:33:51  7       THE WITNESS:  371 where I accidentally --

12:33:53  8       THE COURT:  Ma'am, I think Mr. Bachus is going to give

12:33:55  9  us the page.

12:33:56 10       MR. BACHUS:  Yes, Your Honor.  It would be page 371,

12:33:58 11  beginning with, I think, line 5 -- line 4, maybe line 9, line 9

12:34:11 12  through page 373, line 8.  So, beginning with the statement

12:34:23 13  that the witness was referring to.

12:34:23 14       (WHEREUPON, at this point in the proceedings, there was

12:34:28 15  a conference held at the bench.)

12:34:28 16       THE COURT:  Other than the rules, you're entitled to

12:34:51 17  completeness and require that.  The problem I have is, you

12:34:58 18  would not interpret that to mean that hair would always grow

12:35:01 19  back.  I believe it was understood that your hair would come

12:35:04 20  back.  I mean, that's what the nurses told the patients all the

12:35:07 21  time.  That's what the doctors told the patients all the time

12:35:10 22  that's what I told the patients when I was a nurse.

12:35:13 23       The problem I have is that it's what she's

12:35:24 24  understanding.  She's not saying that's what the product, the

12:35:28 25  package insert said.  She said:  "Do you ever recall

*OFFICIAL TRANSCRIPT*

12:35:36  1    discussions with any doctors or nurses about that specific

12:35:39  2    statement?  Not from the package insert.  Do I recall

12:35:44  3    discussing whether or not hair grows back?  Yes.  It was

12:35:46  4    generally understood that, yes, it did."

12:35:52  5          MR. BACHUS:  My concern is she's being asked

12:35:55  6    specifically in quotes about how hair generally grows back and

12:35:58  7    what she understands from that and this is what she said, just

12:36:01  8    what I said.  How would you interpret -- this is her -- this is

12:36:07  9    page 371, beginning on line 9, is a continuing conversation in

12:36:17 10    the deposition about what this language that he's asking her

12:36:21 11    about means.  And so -- and I think that the same context,

12:36:25 12    frankly, than what she provided a substantive response while on

12:36:28 13    the stand.

12:36:35 14          THE COURT:  I think just for completeness, you can

12:36:37 15    require that they complete it.  I'm just --

12:36:49 16          MR. STRONGMAN:  Did you want me to read the notes for

12:36:51 17    331 and 332 up to her answer?  I can do that.

12:36:54 18          THE COURT:  I think that's what we're going to have to

12:36:56 19    do.  Okay.  That's -- and I think it would start here, on line

12:37:01 20    9 of 37.

12:37:02 21          MR. STRONGMAN:  Yes.

12:37:02 22          THE COURT:  Okay.  Thank you.

12:37:02 23          (WHEREUPON, at this point in the proceedings, the bench

12:37:02 24    conference concluded.)

12:37:30 25    EXAMINATION BY MR. STRONGMAN:

*OFFICIAL TRANSCRIPT*

12:37:30   1   Q.    Ms. Avila, I want to read with you your testimony under

12:37:35   2   oath starting on page 371, line 9.

12:37:37   3         Do you see that?

12:37:38   4   A.    Yes.

12:37:39   5   Q.    Okay.  It says:

12:37:41   6         "Question:  And hair generally grows back.  What do

12:37:45   7   you understand that term to mean?  What do you understand that

12:37:47   8   term to mean?

12:37:48   9         "Just what it says.

12:37:52  10         "Question -- answer:  Yes, just what it says.  Hair

12:37:54  11   generally grows back.

12:37:55  12         "Question:  You would not interpret that to mean that

12:37:58  13   your hair would always grow back?"

12:37:59  14         Your answer:  "I believe it was understood that

12:38:01  15   hair" -- "your hair would come back.  I mean, that is what

12:38:03  16   nurses told patients all the time.  That is what doctors told

12:38:06  17   patients all the time.  That is what I told patients when I was

12:38:09  18   a nurse.

12:38:10  19         "Question:  But you weren't present when any doctors

12:38:12  20   were there" -- "when any doctors met with their patients?

12:38:15  21         "Answer:  I wasn't there.

12:38:17  22         "Question:  You were not" -- "you were not present

12:38:22  23   when the nurses met with their patients?

12:38:24  24         "Answer:  No, but I had discussions with nurses about

12:38:28  25   how to counsel on Taxotere, and that is where those discussions

                              *OFFICIAL TRANSCRIPT*

12:38:31  1    would -- especially new nurses to oncology.

12:38:35  2         "Question:  See, I'm cutting you off.  I'm sorry.

12:38:37  3    But would you not counsel them in a manner inconsistent with

12:38:41  4    the package insert, right?

12:38:44  5         "Answer:  No.

12:38:45  6         "Question:  And if the package insert says,

12:38:48  7    'Generally grows back,' that would be your message, right?

12:38:52  8         "Answer:  Yes.

12:38:53  9         "Question:  Can we agree that generally grows back

12:38:57 10    does not mean always grows back?

12:38:59 11         "Answer:  I guess, yes."

12:39:02 12         Did I read that correctly?

12:39:04 13    A.   You read that correctly.  And that was an eight-hour

12:39:09 14    deposition.

12:39:11 15         MR. STRONGMAN:  I move to strike.

12:39:13 16         THE COURT:  So ordered.

12:39:14 17              You should disregard that remark.  Please

12:39:16 18    proceed.

12:39:19 19    EXAMINATION BY MR. STRONGMAN:

12:39:26 20    Q.   Ms. Avila, we talked about it briefly, but you know that

12:39:31 21    Taxotere can have some very serious side effects, correct?

12:39:34 22    A.   Yes.

12:39:34 23    Q.   And when you were talking with doctors about Taxotere and

12:39:38 24    the side effect profile, the primary discussion points were

12:39:41 25    those side effects that had the potential to be serious, if not

**OFFICIAL TRANSCRIPT**

12:39:47 1    life-threatening, correct?

12:39:49 2    A.    Correct.

12:39:49 3    Q.    Now, a couple of other questions.  When we talk about

12:40:11 4    on-label and off-label, Ms. Avila, do you know that the

12:40:17 5    on-label dosage and regimen for Taxotere for adjuvant

12:40:24 6    breast cancer would be Taxotere, Adriamycin, and

12:40:28 7    cyclophosphamide given together, correct?

12:40:31 8    A.    Correct.

12:40:33 9    Q.    Okay.  And you would receive the Taxotere at a dose of

12:40:37 10   75 milligrams per meters squared; is that correct?

12:40:42 11   A.    Correct.

12:40:43 12   Q.    And you would receive the cyclophosphamide at 500; is that

12:40:47 13   correct?

12:40:47 14   A.    Correct.

12:40:47 15   Q.    And you would receive the Adriamycin at 50; is that

12:40:53 16   correct?

12:40:55 17   A.    It was 60.

12:40:56 18   Q.    And you can look at the document, and I think it's 50.

12:41:00 19   A.    Okay.  Okay.  All right.

12:41:00 20   Q.    Yeah.

12:41:00 21   A.    It might be 50.

12:41:01 22   Q.    Sure.

12:41:02 23         And so, with Taxotere, the approved regimen was that

12:41:06 24   T, that A, and that C given together at the same time, correct?

12:41:09 25   A.    Correct.

*OFFICIAL TRANSCRIPT*

12:41:09 1    Q.    Okay.  And in those doses that we just discussed, right?

12:41:16 2    Correct?

12:41:16 3    A.    Correct.

12:41:17 4    Q.    And did you know that in the Sedlacek abstract that you

12:41:22 5    discussed, not one patient that received Taxotere on the

12:41:28 6    on-label regimen and with the on-label dose had permanent hair

12:41:33 7    loss?  Did you know that?

12:41:37 8          MR. BACHUS:  Object to the form.

12:41:39 9          THE COURT:  Overruled.

12:41:42 10          THE WITNESS:  Ask the question again.

12:41:45 11    EXAMINATION BY MR. STRONGMAN:

12:41:45 12    Q.    Are you aware of any patient in the Sedlacek abstract that

12:41:51 13    reported permanent hair loss when they received the on-label

12:41:54 14    regimen and the on-label dose?

12:41:59 15          MR. BACHUS:  Your Honor, I'll object to foundation.

12:42:01 16    He's not established that she ever read this abstract document.

12:42:06 17          THE COURT:  Okay.  Just direct him to --

12:42:06 18          MR. STRONGMAN:  Fair enough.

12:42:12 19    EXAMINATION BY MR. STRONGMAN:

12:42:12 20    Q.    Have you ever read this Sedlacek abstract?

12:42:15 21    A.    Yes, I read the Sedlacek abstract.

12:42:17 22    Q.    And do you know, then, that not one patient who received

12:42:20 23    an on-label dose and regimen had permanent hair loss?

12:42:25 24    A.    No, I did not know that.  But that's not the point.  There

12:42:35 25    were several people that called into our company that reported

**OFFICIAL TRANSCRIPT**

12:42:39  1    permanent hair loss.

12:42:39  2    Q.    Well, Ms. Avila --

12:42:40  3    A.    And the company never put it in the label.

12:42:41  4          MR. STRONGMAN:  I move to strike as nonresponsive.

12:42:45  5          THE COURT:  Sustained.

12:42:47  6            Ma'am, you need to answer the questions.

12:42:47  7    EXAMINATION BY MR. STRONGMAN:

12:42:49  8    Q.    And, Mr. Avila, the Sedlacek abstract dealt with something

12:42:51  9    called "anecdotal information," correct?

12:42:54 10    A.    Yes.

12:42:54 11    Q.    And you know that anecdotal information is something that

12:42:58 12    a sales rep cannot talk to doctors about, correct?

12:43:00 13    A.    Correct.  And I did not talk about this information.

12:43:04 14    Q.    So even if you have information about a good result with

12:43:08 15    your drug that's anecdotal, the rules say you can't talk about

12:43:14 16    it with doctors, correct?  That's not the role of a sales rep,

12:43:14 17    correct?

12:43:18 18    A.    Correct.  And I did not do that.

12:43:27 19    Q.    Now, Ms. Avila, with regard to Taxotere, you didn't just

12:43:33 20    work in New Orleans, did you?

12:43:34 21    A.    No, I worked in Mississippi as well.

12:43:36 22    Q.    And so you had a territory that covered something in the

12:43:40 23    neighborhood of 19 cities in two different states; is that

12:43:40 24    fair?

12:43:47 25    A.    Yes, probably.

**OFFICIAL  TRANSCRIPT**

12:43:48  1    Q.    And you called on that territory for several years; is

12:43:52  2    that correct?

12:43:52  3    A.    Yes.

12:43:53  4    Q.    And during all of those visits to the very oncology

12:43:58  5    practices, you would have conversations with those doctors

12:44:02  6    about Taxotere; is that correct?

12:44:03  7    A.    Correct.

12:44:03  8    Q.    And during those conversations, you felt like doctors were

12:44:06  9    open and up front with you, didn't you, in your meetings?

12:44:09 10    A.    Correct.

12:44:10 11    Q.    And those doctors, during those conversations, would

12:44:13 12    discuss side effects with you, correct?

12:44:15 13    A.    Correct.

12:44:16 14    Q.    And there would be times when, during those conversations,

12:44:19 15    a doctor might tell you that they're seeing something

12:44:22 16    unexpected with the medication; is that correct?

12:44:24 17    A.    Correct.

12:44:25 18    Q.    And if they did that, you'd have to report that up through

12:44:29 19    a very specific procedure in the company, correct?

12:44:33 20    A.    Correct.

12:44:33 21    Q.    Okay.

12:44:35 22    A.    They knew how to report side effects to my company with or

12:44:38 23    without me.

12:44:39 24    Q.    And during your time working on Taxotere while you were at

12:44:48 25    Sanofi, you do not recall a single doctor relaying to you any

*OFFICIAL TRANSCRIPT*

12:44:57  1    concern about the side effects of permanent hair loss, correct?

12:45:03  2    A.    No, I do not.

12:45:03  3    Q.    Thank you.

12:45:06  4    A.    That doesn't mean that they didn't turn it into the

12:45:08  5    company without my knowledge.  That did not come back to us.

12:45:12  6    Q.    Ms. Avila, if you could focus on my question.

12:45:15  7    A.    I said, no.

12:45:15  8    Q.    Thank you.

12:45:18  9          Ms. Avila, last topic.  You were terminated by Sanofi

12:45:46 10    for misconduct, correct?

12:45:48 11    A.    Correct.

12:45:48 12    Q.    And I think you told Mr. Bachus that you were fired for

12:45:54 13    having a lunch delivered to a doctor's office while you were

12:45:58 14    not present.

12:45:59 15          Do you remember that?

12:46:00 16    A.    Correct.

12:46:00 17    Q.    Now, Sanofi has a Code of Conduct for how you interact

12:46:04 18    with physicians, correct?

12:46:06 19    A.    Correct.

12:46:06 20    Q.    You knew that code?

12:46:08 21    A.    Yes, I did.  And we were traveling that day, and I forgot

12:46:12 22    to cancel that lunch.

12:46:13 23    Q.    Ms. Avila, my question was:  You knew and understood the

12:46:16 24    Code for --

12:46:17 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

12:46:17 1    Q.    -- interacting with physicians, correct?

12:46:19 2    A.    Yes.

12:46:20 3    Q.    And you know that code is taken very seriously, don't you?

12:46:23 4    A.    Yes.

12:46:23 5    Q.    Now, in addition to the pizza incident, you also mentioned

12:46:31 6    something about a dinner program.

12:46:32 7          Do you remember that?

12:46:33 8    A.    Yes, I do.

12:46:34 9    Q.    And specifically, you had dinner -- I think you said you

12:46:39 10   really liked dinner programs earlier, and you had one in 2009,

12:46:43 11   and you received a gift card from a restaurant after the dinner

12:46:46 12   program; is that correct?

12:46:47 13   A.    Correct.

12:46:47 14   Q.    And you took a doctor and a nurse out to dinner with that

12:46:53 15   gift card, correct?

12:46:54 16   A.    Correct.

12:46:54 17   Q.    And it was an expensive dinner; wasn't it?

12:46:59 18   A.    It was within the company guidelines for what we spent on

12:47:01 19   a physician at a dinner program.  I didn't go over.  I didn't

12:47:05 20   spend more money on them than I would at a dinner program.

12:47:09 21   Q.    Well, Ms. Avila, you've given sworn testimony about that

12:47:15 22   dinner, haven't you?

12:47:16 23   A.    Yes, I have.

12:47:17 24   Q.    And you know at that dinner there was expensive alcohol

12:47:21 25   purchased by yourself with the gift card, correct?

*OFFICIAL  TRANSCRIPT*

12:47:25 1    A.    Yes.

12:47:25 2    Q.    There were --

12:47:26 3    A.    I've given sworn testimony to that.

12:47:28 4    Q.    There were Grey Goose Cosmopolitans purchased by you with

12:47:32 5    the gift card for yourself and --

12:47:33 6    A.    I don't drink Grey Goose.

12:47:35 7    Q.    Well, there was Grey Goose purchased that --

12:47:37 8    A.    I don't drink that.

12:47:42 9         MR. BACHUS:  Objection.

12:47:43 10        THE COURT:  I think the question was:  "Was it

12:47:44 11   purchased?"  Do you know?

12:47:45 12        THE WITNESS:  I don't know.  I don't drink that.  Maybe

12:47:47 13   one of the doctors drank it.  I don't drink that.  I drink

12:47:51 14   whiskey.  I mean, if there was a whiskey on there, it was mine.

12:47:53 15   If it was Grey Goose, it was probably Dr. Hamilton's.  It

12:48:00 16   wasn't mine.

12:48:00 17   EXAMINATION BY MR. STRONGMAN:

12:48:00 18   Q.    What about the bottles of wine?  Who were those for?

12:48:03 19   A.    I don't know.  What is the relevance of all this?

12:48:05 20        THE COURT:  Okay.  Ma'am, you're going to have to

12:48:07 21   answer the question.

12:48:09 22        THE WITNESS:  I did.

12:48:10 23   EXAMINATION BY MR. STRONGMAN:

12:48:11 24   Q.    Ms. Avila, Sanofi certainly believed that what you did

12:48:15 25   with that gift card was a violation of the company's

**OFFICIAL TRANSCRIPT**

12:48:19  1    prohibition for using funds for anything like that, correct?

12:48:26  2    A.    Mr. Strongman, it was a violation of the policy.  I have

12:48:32  3    sworn testimony here today that I violated the policy.  Was it

12:48:37  4    the reason that they told me I was fired, no.  But, yes, I

12:48:41  5    violated the policy doing that.

12:48:43  6    Q.    Ms. Avila, you ultimately filed a lawsuit against Sanofi;

12:48:48  7    is that correct?

12:48:48  8    A.    Correct.

12:48:48  9    Q.    And that lawsuit was not successful, correct?

12:48:53 10    A.    No, it was not.

12:48:55 11    Q.    And you appealed that lawsuit, and that appeal was not

12:48:59 12    successful?

12:48:59 13    A.    No, it was not.

12:49:00 14    Q.    And then you appealed that again --

12:49:03 15    A.    No, I did not.

12:49:04 16    Q.    -- to the Supreme Court, and that was not successful?

12:49:07 17    A.    No, it was appealed once.  It was sued, and appealed once.

12:49:15 18    That's what I understand.  If it was appealed beyond that, I

12:49:19 19    don't know.  Was it appealed twice?  That's how much I don't

12:49:25 20    even know about it.  Norman did it.  I'm clueless.  Was it

12:49:30 21    appealed twice?

12:49:31 22           THE COURT:  Ma'am, you have to answer the questions.

12:49:33 23    If you don't know, that's an answer.

12:49:37 24           THE WITNESS:  Okay.  Well, I don't know that it was

12:49:38 25    appealed.  I have no clue.  I know it was appealed once.

*OFFICIAL TRANSCRIPT*

12:49:43  1   EXAMINATION BY MR. STRONGMAN:

12:49:43  2   Q.   Ms. Avila, isn't it fair to say that you might just have a

12:49:50  3   grudge against Sanofi here today?

12:49:54  4   A.   Mr. Strongman, I knew you were going to ask me that

12:50:01  5   question today.

12:50:03  6         THE WITNESS:  And, Judge, you're going to have to

12:50:04  7   forgive me because I do have a long-winded answer to that

12:50:08  8   question.

12:50:10  9         THE COURT:  I think the question is --

12:50:11 10         THE WITNESS:  Hopefully, it's the last question and

12:50:13 11   it's going to answer his questions because --

12:50:15 12         THE COURT:  Ma'am.  Ma'am, the question is:  "Do you

12:50:17 13   have a grudge against Sanofi?"  And you may say "yes" or "no,"

12:50:21 14   and you may explain your answer.  But first, you have to say

12:50:25 15   "yes" or "no."

12:50:29 16         THE WITNESS:  In regards to being fired from

12:50:35 17   Sanofi-Aventis, no, I do not have a grudge against them.

12:50:44 18              In regards to being a sales professional that has

12:50:49 19   a reputation to uphold in the community and it's the face of a

12:50:54 20   company who is out there selling their drug as hard as I can

12:50:59 21   for them and not knowing that this drug caused permanent hair

12:51:03 22   loss and getting prescription after prescription for them --

12:51:03 23         MR. STRONGMAN:  Your Honor --

12:51:06 24         THE WITNESS:  -- yes, I do have a little bit of a

12:51:08 25   grudge to hold to them.

*OFFICIAL TRANSCRIPT*

12:51:10  1              And in regard to being a breast cancer patient --

12:51:10  2         MR. STRONGMAN:  Your Honor --

12:51:10  3         THE COURT:  Ma'am.  Ma'am --

12:51:10  4         MR. STRONGMAN:  Your Honor --

12:51:13  5         THE WITNESS:  -- who could have received the drug and

12:51:15  6    lost her hair, I have a grudge to hold against them.

12:51:15  7         THE COURT:  Ma'am -- okay.

12:51:19  8         THE WITNESS:  So, yes, the answer for the question.

12:51:22  9         THE COURT:  Okay.

12:51:22 10         MR. STRONGMAN:  Your Honor, I move to strike.  No other

12:51:24 11    questions.

12:51:25 12         THE COURT:  Sure.  Okay.

12:51:31 13              Redirect, Mr. Bachus.

12:51:40 14    REDIRECT EXAMINATION BY MR. BACHUS:

12:51:42 15    Q.   When the Sedlacek abstract came up at the national

12:52:01 16    conference, did the company say, don't worry about it, we're

12:52:11 17    already warning about PCIA in our label?

12:52:14 18         MR. STRONGMAN:  Objection, leading.  And it's already

12:52:17 19    asked and answered.

12:52:18 20         THE COURT:  It has.  You've asked -- that information

12:52:23 21    was covered in direct.  Sustained.

12:52:31 22    EXAMINATION BY MR. BACHUS:

12:52:33 23    Q.   If the company were already warning about PCIA in the

12:52:39 24    label when the Sedlacek abstract came up at the convention,

12:52:47 25    what would you have expected the company to say in response --

*OFFICIAL TRANSCRIPT*

12:52:52  1          MR. STRONGMAN:  Objection.

12:52:52  2    EXAMINATION BY MR. BACHUS:

12:52:52  3    Q.    -- different than what they did say?

12:52:52  4          MR. STRONGMAN:  Objection.

12:52:53  5          THE COURT:  Sustained.

12:53:00  6    EXAMINATION BY MR. BACHUS:

12:53:01  7    Q.    Ms. Avila, did anything -- does anything that

12:53:05  8    Mr. Strongman asked you about change the fact that you

12:53:12  9    personally were trained as a sales rep by Sanofi on the package

12:53:17 10    insert to understand that the language in the package insert

12:53:23 11    meant temporary hair loss?

12:53:24 12          MR. STRONGMAN:  Objection.  Objection.

12:53:24 13    EXAMINATION BY MR. BACHUS:

12:53:27 14    Q.    Did anything that he said change that?

12:53:28 15    A.    No.

12:53:28 16          THE COURT:  That was direct testimony.  She testified

12:53:31 17    extensively about what she was trying --

12:53:33 18          MR. BACHUS:  Well, that was before he asked the

12:53:35 19    questions.  I'm asking whether anything he said changed that

12:53:37 20    fact.

12:53:38 21          THE COURT:  We're not changing fact.  Sustained.

12:53:42 22    EXAMINATION BY MR. BACHUS:

12:53:44 23    Q.    When did Sanofi tell you that the company has known since

12:53:49 24    2006 that --

12:53:51 25          MR. STRONGMAN:  Objection, outside the scope.  And,

                                *OFFICIAL TRANSCRIPT*

12:53:53  1   again, this is an inappropriate question.

12:53:57  2         MR. BACHUS:  He asked multiple questions about --

12:54:21  3         THE COURT:  Wait.

12:54:21  4         (WHEREUPON, at this point in the proceedings, there was

12:54:21  5   a conference held at the bench.)

12:54:22  6         THE COURT:  I just want to make sure that we understand

12:54:24  7   the ground rules.  I'm not going to let you redirect this

12:54:27  8   witness.  We've offered you that through direct, and I don't

12:54:30  9   think it's appropriate to say, did this change your mind as to

12:54:34 10   what the facts are.  She testified to facts, and he

12:54:38 11   cross-examined her.  Now, I don't remember what your last

12:54:40 12   question was.

12:54:40 13         MR. BACHUS:  My last question was:  When did the

12:54:44 14   company tell you that they've known since 2006 that Taxotere

12:54:51 15   causes PCIA?  That's my question.

12:54:53 16         MR. STRONGMAN:  The second question of his

12:54:56 17   cross-examination.

12:54:56 18         MR. BACHUS:  No, it wasn't.

12:54:57 19         THE COURT:  No, no, no, no, no, no.  But the deal is,

12:55:00 20   did you cover that?

12:55:01 21         MR. STRONGMAN:  No.

12:55:02 22         MR. BACHUS:  Yeah.  He covered what the company was

12:55:04 23   telling her from his perspective through the label, and I'm

12:55:07 24   asking, when did they tell her that the company -- that they've

12:55:11 25   known since 2006.

                          *OFFICIAL TRANSCRIPT*

12:55:13 1        THE COURT:  He never covered what he knows that what

12:55:16 2    they've known since 2006.  And I think you're making an

12:55:22 3    insinuation that they knew since 2006.

12:55:26 4        MR. BACHUS:  I think that's the insinuation.

12:55:32 5        THE COURT:  I'm sorry?

12:55:34 6        MR. STRONGMAN:  Me, too.

12:55:36 7        THE COURT:  And that's inappropriate because he never

12:55:41 8    insinuated that they knew since 2006, not with this witness.

12:55:45 9    So I think that's an inappropriate --

12:55:50 10        MR. BACHUS:  I'll move on to the next question.

12:55:50 11        THE COURT:  Okay.

12:55:50 12        (WHEREUPON, at this point in the proceedings, the bench

12:56:24 13    conference concluded.)

12:56:24 14        THE COURT:  Please proceed.

12:56:27 15    EXAMINATION BY MR. BACHUS:

12:56:27 16    Q.    Thank you.

12:56:28 17         You were asked several questions by Mr. Strongman

12:56:30 18    about what Dr. Kardinal remembers.  Do you know what -- what do

12:56:42 19    you know about Dr. Kardinal and dementia?

12:56:46 20    A.    Well, Dr. Kardinal was already in aging back then, and he

12:56:52 21    now has dementia.  I'm not surprised that he doesn't remember a

12:56:56 22    lot.  It's really sad.

12:56:58 23    Q.    How do you know that Dr. Larned, in her office, saw the

12:57:06 24    tear sheets?

12:57:10 25        MR. STRONGMAN:  Objection.

**OFFICIAL TRANSCRIPT**

12:57:07 1          THE WITNESS:  Because I personally gave them to her.

12:57:10 2          THE COURT:  Overruled.  Overruled.

12:57:10 3  EXAMINATION BY MR. BACHUS:

12:57:13 4  Q.    I'm sorry?

12:57:14 5  A.    Because I personally gave them to her and to her nurses.

12:57:18 6  Q.    Did you consider Dr. Larned to be a friend of yours?

12:57:22 7  A.    Absolutely.  I just had dinner with her two weeks ago.

12:57:29 8  Q.    You were asked a lot of questions about off-label use.

12:57:36 9  Can you explain to the jury your experience as a sales rep with

12:57:40 10  off-label use in personalized medicine regarding Taxotere?

12:57:45 11  A.    Off-label use of medication is common in oncology.

12:57:55 12  Personalized medicine is the future, and so, therefore, you

12:57:59 13  have to have off-label use tailored to patients to get there.

12:58:06 14  It's -- I mean, it's so common.  Like, I don't even know how to

12:58:10 15  describe that.  Like, I mean, every patient can't get the same.

12:58:15 16  It's -- it's not something that people drop their jaws at and

12:58:23 17  go, oh, my God, you're not giving 75 milligrams per meters

12:58:30 18  squared of Taxotere?  Like, it happens.  Sometimes that patient

12:58:30 19  is not in the condition where they can get that dose, so they

12:58:32 20  go a different label.  I mean, you know, or they want to

12:58:33 21  start -- I mean, it's just not something that we freak out

12:58:37 22  about.

12:58:37 23  Q.    What is your understanding as a sales specialist for

12:58:45 24  Sanofi about whether the only side effects that matter in a --

12:58:50 25  from a postmarketing perspective are those that are on-label?

*OFFICIAL TRANSCRIPT*

12:58:55  1          MR. STRONGMAN:  Objection, outside the scope.

12:58:57  2          THE COURT:  Overruled.

12:59:02  3          THE WITNESS:  What I understand, postmarketing --

12:59:05  4    Sanofi had the control.  They could put anything in the label

12:59:07  5    that they wanted to postmarketing.  They could say, we are

12:59:11  6    experiencing two patients that had permanent

12:59:16  7    chemotherapy-induced alopecia, so we want to add this to our

12:59:18  8    label.

12:59:19  9          MR. STRONGMAN:  Objection, Your Honor.

12:59:20 10          THE COURT:  Sustained.  Sustained.

12:59:21 11          MR. STRONGMAN:  That's not accurate, and I'd move to

12:59:25 12    strike that.

12:59:26 13          THE COURT:  So ordered.

12:59:29 14    EXAMINATION BY MR. BACHUS:

12:59:34 15    Q.   Does the fact that Ms. Kahn participated in a

12:59:41 16    clinical trial that was the TAC regimen, plus one other

12:59:46 17    medication, okay, TAC regimen -- by the way, TAC regimen is

12:59:51 18    on-label, correct?  Yes?  You have to speak.

12:59:54 19    A.   Yes.

12:59:54 20    Q.   Okay.  TAC regimen plus one other additional medication,

01:00:01 21    does -- does that change, in any way, whether Taxotere causes

01:00:10 22    PCIA --

01:00:11 23          MR. STRONGMAN:  Objection.

01:00:16 24          THE COURT:  I think it's outside the scope of -- that

01:00:22 25    would require expert testimony.

                              *OFFICIAL TRANSCRIPT*

```
01:00:25  1    EXAMINATION BY MR. BACHUS:
01:00:28  2    Q.    I understood from Mr. Strongman that if you add another
01:00:35  3    medication to Taxotere, it no longer causes PCIA; is that your
01:00:35  4    understanding?
01:00:39  5            MR. STRONGMAN:  Objection.  This is totally
01:00:43  6    inappropriate, Your Honor.
01:00:43  7            THE COURT:  Sustained.
01:00:49  8    EXAMINATION BY MR. BACHUS:
01:00:50  9    Q.    You know, is there anything about the regimen that would
01:00:53 10    change your ability to tell a provider that Taxotere causes
01:00:58 11    PCIA if it were in the label?
01:01:02 12    A.    If it was in the label, no.
01:01:04 13            MR. STRONGMAN:  Objection.
01:01:05 14            THE WITNESS:  If anything, it just makes the --
01:01:05 15            THE COURT:  Overruled.
01:01:05 16            THE WITNESS:  -- injustice greater because the patient
01:01:05 17    is helping other patients --
01:01:05 18            THE COURT:  Okay.  All right.
01:01:05 19            THE WITNESS:  -- in the company.
01:01:11 20            MR. STRONGMAN:  Move to strike.
01:01:12 21            THE COURT:  So ordered.
01:01:12 22    EXAMINATION BY MR. BACHUS:
01:01:16 23    Q.    Were any of the risks that Mr. Strongman discussed with
01:01:21 24    you, all the risks, were any of those risks side effects that
01:01:27 25    were different between Taxotere and Taxol?
```

*OFFICIAL TRANSCRIPT*

01:01:30  1    A.    I don't remember the whole entire list to say that --

01:01:39  2    like, to answer that confidently.

01:01:41  3    Q.    Taxotere and Taxol have the same risk of death, for

01:01:47  4    instance.  That's not a differentiating side effect?

01:01:50  5    A.    Correct.

01:01:50  6    Q.    A differentiating side effect is what's different when you

01:01:50  7    take --

01:01:55  8         MR. STRONGMAN:  This is outside the scope in its

01:01:56  9    entirety.  Objection.

01:01:57 10         THE COURT:  Sustained.

01:02:00 11         MR. BACHUS:  Just one moment, Your Honor.

01:02:00 12         THE COURT:  Yes.

01:02:05 13         MR. BACHUS:  I have no further questions.

01:02:05 14         THE COURT:  Thank you.

01:02:07 15         MR. BACHUS:  Thank you, Your Honor.

01:02:08 16         THE COURT:  You may step down, Ms. Avila.

01:02:12 17         THE WITNESS:  Oh, Amen.  Thank you.

01:02:14 18         THE COURT:  It's now 1 o'clock.  Court's going to be at

01:02:18 19    recess until 2:15.  Members of the Jury, let me remind you,

01:02:22 20    don't discuss the case amongst yourselves or with anyone else,

01:02:25 21    nor should you do any research or even acknowledge anybody's

01:02:29 22    presence in the hallway if you run into them.  Thank you.

01:02:33 23         Court will be at recess until 2:15.

01:03:25 24         (WHEREUPON, at 1:02 p.m., the jury panel leaves the

         25    courtroom, and the Court was in luncheon recess.)

**_OFFICIAL TRANSCRIPT_**

1        (WHEREUPON, at 1:03 p.m., the proceedings were

2    concluded.)

3                          *    *    *

4

5                    REPORTER'S CERTIFICATE

6

7        I, Cathy Pepper, Certified Realtime Reporter, Registered

8    Merit Reporter, Certified Court Reporter in and for the State

9    of Louisiana, Official Court Reporter for the United States

10   District Court, Eastern District of Louisiana, do hereby

11   certify that the foregoing is a true and correct transcript to

12   the best of my ability and understanding from the record of the

13   proceedings in the above-entitled and numbered matter.

14

15                              s/Cathy Pepper

16                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
17                              Registered Merit Reporter
                                Official Court Reporter
18                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
19

20

21

22

23

24

25

                    **OFFICIAL TRANSCRIPT**