```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3     ******************************************************************

4     IN RE:   TAXOTERE
      (DOCETAXEL) PRODUCTS
5     LIABILITY LITIGATION

6                               CIVIL ACTION NO. 16-MD-2740 "H"
                                NEW ORLEANS, LOUISIANA
7                               WEDNESDAY, NOVEMBER 10, 2021, 8:30 A.M.

8     THIS CASE RELATES TO
      ELIZABETH KAHN,
9     CASE NO. 16-CV-17039

10    ******************************************************************

11
                            DAY 3  MORNING SESSION
12                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                   UNITED STATES DISTRICT JUDGE

14
      APPEARANCES:
15

16
      FOR THE PLAINTIFFS:      GAINSBURGH BENJAMIN DAVID
17                             MEUNIER & WARSHAUER
                               BY:  M. PALMER LAMBERT, ESQ.
18                             1100 POYDRAS STREET, SUITE 2800
                               NEW ORLEANS, LOUISIANA 70163
19

20                             PENDLEY BAUDIN & COFFIN
                               BY:  CHRISTOPHER L. COFFIN, ESQ.
21                                  JESSICA A. PEREZ, ESQ.
                               1515 POYDRAS STREET, SUITE 1400
22                             NEW ORLEANS, LOUISIANA 70112

23
                               GIBBS LAW GROUP
24                             BY:  KAREN B. MENZIES, ESQ.
                               400 CONTINENTAL BOULEVARD
25                             6TH FLOOR
                               EL SUGUNDO, CALIFORNIA 90245
```

*OFFICIAL TRANSCRIPT*

```
 1    APPEARANCES CONTINUED:

 2

 3                              DAVID F. MICELI, LLC
                               BY:  DAVID F. MICELI, ESQ.
 4                              P.O. BOX 2519
                               CARROLLTON, GEORGIA 30112
 5

 6                              BACHUS & SCHANKER
                               BY:  J. KYLE BACHUS, ESQ.
 7                              1899 WYNKOOP STREET
                               SUITE 700
 8                              DENVER, COLORADO 80202

 9

10                              BACHUS SCHANKER
                               BY:  DARIN L. SCHANKER, ESQ.
                               101 W COLFAX AVE, SUITE 650
11                              DENVER, CO 80202

12

                               MARTZELL BICKFORD & CENTOLA
13                              BY:  LAWRENCE J. CENTOLA, ESQ.
                               338 LAFAYETTE STREET
14                              NEW ORLEANS, LOUISIANA 70130

15
      FOR SANOFI-AVENTIS U.S.,
16    LLC AND SANOFI US
      SERVICES, INC.:           IRWIN FRITCHIE URQUHART & MOORE
17                              BY:  DOUGLAS J. MOORE, ESQ.
                                    KELLY E. BRILLEAUX, ESQ.
18                              400 POYDRAS STREET, SUITE 2700
                               NEW ORLEANS, LOUISIANA 70130.
19

20                              SHOOK, HARDY & BACON
                               BY:  HARLEY V. RATLIFF, ESQ.
21                                   JON A. STRONGMAN, ESQ.
                               2555 GRAND BOULEVARD
22                              KANSAS CITY, MISSOURI 64108

23

                               SHOOK HARDY & BACON, LLP
24                              BY:  HILDY M. SASTRE, ESQ.
                               201 BISCAYNE BOULEVARD
25                              SUITE 3200
                               MIAMI, FLORIDA 33131
```

*OFFICIAL TRANSCRIPT*

1    APPEARANCES CONTINUED:

2

3

     OFFICIAL COURT REPORTER:      CATHY PEPPER, CRR, RMR, CCR
4                                  CERTIFIED REALTIME REPORTER
                                   REGISTERED MERIT REPORTER
5                                  500 POYDRAS STREET, ROOM B-275
                                   NEW ORLEANS, LOUISIANA 70130
6                                  (504) 589-7779
                                   Cathy_Pepper@laed.uscourts.gov
7

8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          *OFFICIAL  TRANSCRIPT*

1                          **I N D E X**

2

3                                                        <u>PAGE</u>

4

5  **DR. LINDA BOSSERMAN (CONTINUED)**...................... 519

6  CROSS-EXAMINATION (CONTINUED) BY MR. MOORE........... 520

7  REDIRECT EXAMINATION BY MS. PEREZ.................... 574

8  **DR. ANTONELLA TOSTI**.................................. 582

9  VOIR DIRE EXAMINATION BY MR. SCHANKER................ 583

10  DIRECT EXAMINATION BY MR. SCHANKER................... 599

11  LUNCHEON RECESS...................................... 619

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    *OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

M O R N I N G   S E S S I O N

WEDNESDAY, NOVEMBER 10, 2021

(COURT CALLED TO ORDER)


THE COURT:  Before we bring in the jury, at the
conclusion of yesterday's court session, there was some
questions posed to Dr. Bosserman about her billing, her rate of
pay, and that she indicated that she was only involved in one
case, and then it was posed to her that she had billed
$250,000.  As I indicated to the parties in chambers, they
certainly have a right to explore bias under the Rules of
Evidence, but it is not appropriate for it to be misleading.

In light of that, though we have operated under
the assumption that we would not allow the jurors to understand
the scope of this litigation, I feel like that door has been
opened.  So I will allow plaintiffs to question Dr. Bosserman.
I am going to instruct her -- Dr. Bosserman is in the
courtroom.  I think this is probably okay, unless there is an
objection.

MR. MOORE:  It's fine, Judge.

THE COURT:  I am going to allow plaintiff's counsel to
question Dr. Bosserman about that.  I will not allow testimony
that this litigation -- the scope of this litigation was 12,500

*OFFICIAL TRANSCRIPT*

08:37:24  1    plaintiffs, more or less.  But I will allow them to explore

08:37:29  2    that the litigation was related -- refer to it as the Taxotere

08:37:34  3    litigation.  I will allow them to explore that in that capacity

08:37:40  4    she sat for however many depositions it was and had to prepare

08:37:44  5    for those depositions, and reviewed medical records for

08:37:50  6    those -- that litigation.  That's the extent of the scope.

08:37:57  7         I feel that this is -- as I've indicated

08:38:01  8    throughout this entire thing, it is my responsibility to be

08:38:08  9    fair.  Fundamental fairness requires that the jury understands

08:38:15 10    that Dr. Bosserman was not paid $250,000 to appear for

08:38:20 11    Ms. Kahn's trial.  But it was -- the scope of the work was

08:38:25 12    more.  And if the parties may put any objections on the record,

08:38:29 13    I think there was an extensive meeting yesterday afternoon at

08:38:36 14    the conclusion, and --

08:38:40 15         MR. BACHUS:  Thank you, Your Honor.  And, yes,

08:38:42 16    Your Honor is accurate.  We had a long discussion back in

08:38:45 17    chambers.  I just want to briefly state on the record the

08:38:47 18    relief that we had requested, although your relief is somewhat

08:38:51 19    different than that.  And I think you've accurately stated, we

08:38:55 20    believe that there is extreme prejudice that's been created by

08:38:58 21    this -- eliciting this testimony.

08:39:03 22         We provided a letter brief to Your Honor that

08:39:08 23    detailed our position, but just to cut to the chase, what we

08:39:12 24    have requested is that the plaintiffs be permitted to elicit

08:39:16 25    testimony from Dr. Bosserman on redirect examination that her

**OFFICIAL TRANSCRIPT**

08:39:20 1    fees, in this case, actually encompass work done in other

08:39:25 2    bellwether trial selections and also for the common benefit of

08:39:29 3    approximately 12,500 other MDL plaintiffs.

08:39:32 4           And we've asked alternatively for you to direct

08:39:36 5    the issue of curative instruction to the same effect.  We

08:39:40 6    understand the limitations, we understand that from the order

08:39:41 7    that you presented orally to us in chambers, that we're not

08:39:46 8    allowed to use a word like "many," but we are allowed to talk

08:39:51 9    about the fact that she has had her deposition taken seven

08:39:54 10   different times and she's provided opinions in nine different

08:39:57 11   cases.  But we're precluded from using the word "many," as well

08:40:01 12   as the numerosity that we've requested.

08:40:04 13        THE COURT:  Right.  And she can refer -- the Taxotere

08:40:06 14   litigation, I think, is the term that we decided on.  I think

08:40:14 15   it's not just seven depositions; it's reviewing records and

08:40:17 16   that sort of thing.  But that's the relief.  And I've also

08:40:20 17   indicated that during direct examination, I will allow

08:40:26 18   Ms. Perez to lead so that we don't find ourselves asking a

08:40:33 19   question that results in the witness spitting it out that --

08:40:40 20   and it's where I don't want to go.

08:40:42 21        MR. BACHUS:  Now, yesterday, you cautioned

08:40:44 22   Dr. Bosserman that she was still precluded from having any

08:40:48 23   communication with counsel, which she has adhered to.  I think

08:40:51 24   it would be beneficial, perhaps, for a two-minute conversation

08:40:55 25   just to make sure that it --

**_OFFICIAL TRANSCRIPT_**

08:40:55 1          THE COURT:  Mr. Bachus, Dr. Bosserman's sitting right

08:40:59 2     there.

08:40:59 3          MR. BACHUS:  Oh, she is.

08:40:59 4          THE COURT:  And I told everybody, Dr. Bosserman is

08:41:02 5     right there.  So I think she's hearing, and she understands the

08:41:05 6     limits of her examination and the curative nature of this line

08:41:10 7     of questioning.

08:41:10 8          MR. BACHUS:  Okay.

08:41:10 9          THE COURT:  Okay.

08:41:11 10          MR. BACHUS:  That amounts to our record at the present

08:41:14 11     time.  Thank you.

08:41:15 12          THE COURT:  Thank you.

08:41:15 13              Mr. Moore, anything?

08:41:16 14          MR. MOORE:  Nothing from me, Your Honor.  Thank you.

08:41:19 15          THE COURT:  Okay.  Thank you.  Do you want to file this

08:41:22 16     in the record?  I want to make sure they refer to it.  Okay.

08:41:33 17              Are we ready?

08:42:32 18          (WHEREUPON, at 8:42 a.m., the jury panel enters the

08:42:44 19     courtroom.)

08:42:44 20          THE COURT:  All jurors are present.  Court's back in

08:42:46 21     session; you may be seated.

08:42:48 22              Dr. Bosserman, I'm going to ask you to return to

08:42:49 23     the witness stand.

08:42:49 24              **DR. LINDA BOSSERMAN (CONTINUED)**

08:42:49 25     was called as a witness and, after being previously duly sworn

                              *OFFICIAL TRANSCRIPT*

08:42:49  1    by the Clerk, was examined and testified on her oath as

08:43:17  2    follows:

08:43:17  3         THE COURT:  Dr. Bosserman, I remind you, you're under

08:43:20  4    oath.

08:43:21  5         THE WITNESS:  Thank you.

08:43:21  6         THE COURT:  Thank you.

08:43:23  7           Mr. Moore?

08:43:24  8         MR. MOORE:  Thank you, Your Honor.

08:43:24  9              CROSS-EXAMINATION (CONTINUED)

08:43:24  10   BY MR. MOORE:

08:43:26  11   Q.   Good morning, Dr. Bosserman.

08:43:30  12   A.   Good morning.

08:43:30  13   Q.   I wanted to ask you a question about something you said in

08:43:33  14   your testimony during direct examination yesterday that I think

08:43:37  15   might have just been a mistake.  You were talking about

08:43:40  16   Adriamycin and its nickname, the Red Devil.

08:43:42  17        Do you remember that?

08:43:43  18   A.   Yes.

08:43:43  19   Q.   And you said, in your testimony, "Back in the 1970s -- or

08:43:49  20   strike that.

08:43:49  21        "Back when I started in the 1970s, it would be

08:43:53  22   typical to give people Adriamycin."  And the reason I was

08:43:57  23   confused is because you graduated medical school in 1981,

08:43:57  24   correct?

08:44:01  25   A.   True.  I started in '77.

                              *OFFICIAL TRANSCRIPT*

08:44:02  1    Q.    Okay.  You started medical school in '77?

08:44:05  2    A.    Yes.

08:44:05  3    Q.    Okay.  So you weren't a medical doctor until '81, correct?

08:44:09  4    A.    That is correct.  But I treated patients in the oncology

08:44:13  5    clinic as a medical student.

08:44:14  6    Q.    Okay.  So, when you're referring to this, you're not

08:44:17  7    talking about as a medical doctor writing prescriptions

08:44:17  8    yourself, you're talking about something you observed --

08:44:17  9    A.    Completely.

08:44:20 10    Q.    -- when you were in medical school?

08:44:22 11    A.    Exactly.

08:44:22 12    Q.    Okay.  All right.  I want to pivot, if we can, and first

08:44:27 13    cover the subject of the Green Lady.

08:44:27 14    A.    Who?

08:44:34 15    Q.    Do you remember this demonstrative?

08:44:36 16    A.    Yeah.

08:44:37 17    Q.    This is something that you created.

08:44:38 18    A.    Yes.

08:44:39 19    Q.    And this demonstrative is in the -- from modifications

08:44:44 20    that are in there.  They're based on a tool that's on the

08:44:48 21    Internet; is that right?

08:44:49 22    A.    It's freely available, Predict Breast, yes.

08:44:52 23    Q.    Right.  So any person can go on to the Internet to the

08:44:56 24    Predict tool and type in the information, and it spits out the

08:45:01 25    percentages that you have on the Green Lady, right?

*OFFICIAL TRANSCRIPT*

08:45:03  1   A.    Yes.

08:45:04  2   Q.    Okay.  And prior to running those calculations in your

08:45:10  3   expert report, did you make any effort to review the algorithm

08:45:17  4   or formula that that model uses to spit out those numbers?

08:45:20  5   A.    I reviewed it in detail.  And I believe in my report, I

08:45:24  6   put all the foundation information, how it was developed, the

08:45:28  7   years, and I said, it's truly based on the early breast cancer

08:45:31  8   trial as clinical trials, and they go into detail in the

08:45:33  9   program all of the trials that they use.

08:45:37 10   Q.    Right.  But what I'm trying to understand is, in order to

08:45:41 11   prepare the statistics that you put in your report and that you

08:45:44 12   talked to the jury about yesterday, did you make any effort in

08:45:48 13   conjunction with those calculations to verify or validate the

08:45:52 14   algorithm or formula, whatever it is, that spits out those

08:45:56 15   numbers?

08:45:56 16   A.    Yeah.  I reviewed the early breast cancer trial list.  I

08:46:00 17   reviewed the papers that are on my review list that go into

08:46:04 18   those details.

08:46:04 19   Q.    Okay.  And so --

08:46:05 20   A.    And I have years of experience actually treating patients

08:46:07 21   and seeing their outcomes.

08:46:08 22   Q.    Okay.  But so the jury is clear, though, the Predict tool

08:46:14 23   that you used did not exist in 2008, when Ms. Kahn was meeting

08:46:19 24   with Dr. Kardinal and Dr. Larned?

08:46:20 25   A.    Predict wasn't available.  The doctors could use the

**OFFICIAL TRANSCRIPT**

08:46:24  1  primary literature, or there was an *Adjuvant! Online* equivalent

08:46:29  2  in the United States at that time.

08:46:30  3  Q.   Okay.  And the *Adjuvant! Online* doesn't exist today,

08:46:35  4  correct?

08:46:35  5  A.   Right.  They pulled that down from the website, and

08:46:37  6  Predict became the major one used.  They were both used for a

08:46:39  7  while, overlapping, and then the *Adjuvant! Online* went offline.

08:46:42  8  Q.   And you mentioned the trials that the Predict tool was

08:46:48  9  based upon.

08:46:48  10           Are those clinical trials?

08:46:49  11  A.   Yes.

08:46:51  12  Q.   And are those clinical trials of patients who underwent

08:46:55  13  adjuvant chemotherapy?

08:46:57  14  A.   There are many different people -- many different trials

08:47:01  15  that went into those.  They are each specified in the Predict

08:47:06  16  for what you're looking at.  So you could go look at all of

08:47:10  17  them --

08:47:10  18  Q.   Okay.

08:47:10  19  A.   -- specifically.

08:47:10  20  Q.   But, to your knowledge, do any of those trials involve a

08:47:14  21  patient who underwent neoadjuvant chemotherapy?

08:47:20  22  A.   Offhand, I'd have to look.  But if you look at the NCCN,

08:47:24  23  neoadjuvant and adjuvant are considered to have the same

08:47:27  24  treatment options and the same outcomes.  Neoadjuvant lets you

08:47:31  25  see immediately whether there was shrinkage.  But as far as the

*OFFICIAL TRANSCRIPT*

08:47:36  1    expected outcomes, those are not different.

08:47:37  2    Q.   Right.  But my question was:  The data that the Predict

08:47:40  3    model was based on, does it include any patients who went

08:47:44  4    through neoadjuvant chemotherapy like Ms. Kahn?

08:47:47  5    A.   I believe it's based only on adjuvant, but they have a

08:47:51  6    caveat, which I put in my report, about a caution about

08:47:55  7    neoadjuvant as well.

08:47:56  8    Q.   Okay.  You mentioned your report.  Let me just check on

08:48:06  9    that quickly.

08:48:28 10          Do you still have your report in front of you?

08:48:31 11    A.   I do.

08:48:31 12    Q.   Okay.  And on page 11, I think you indicated that the

08:48:38 13    Predict tool is not intended for use prior to surgery.

08:48:45 14          Oh, wait.  Not page 11.  I'm sorry, page 34.  I've

08:48:52 15    been corrected by Mr. Nickels.

08:49:06 16          Okay.  Are you with me on page 34?

08:49:08 17    A.   It was developed to use in adjuvant, as I fully explained

08:49:11 18    in my report, and put in the new adjuvant model from the M.D.

08:49:14 19    Anderson.

08:49:15 20    Q.   Right.  So, what you say in the report is:  "The Predict

08:49:18 21    model is not intended for use prior to surgery."  Is that

08:49:21 22    because the underlying data that it's based upon is based on

08:49:25 23    clinical trials that involve surgery first and then

08:49:28 24    chemotherapy?

08:49:29 25    A.   Right.

*OFFICIAL TRANSCRIPT*

08:49:29  1    Q.    Okay.

08:49:29  2    A.    And so if you had given her the chemo after surgery with

08:49:34  3    those parameters, that's what you would expect, and -- yeah.

08:49:37  4    Q.    And the Green Lady graphic that we saw, this one, this is

08:49:46  5    based on the five-year model?

08:49:52  6    A.    Right.

08:49:53  7    Q.    Okay.  But the Predict model also can run the numbers for

08:49:59  8    ten-year survival, correct?

08:50:01  9    A.    I provided 10 and 15 years for you.

08:50:03  10   Q.    Okay.  I only saw ten in the expert report in that

08:50:07  11   paragraph.  And it's true that in the ten-year survival model,

08:50:13  12   the contribution of chemotherapy to survival increases by 2 or

08:50:20  13   300 percent; is that right?

08:50:21  14   A.    It increases by a couple people per 100, and the hormonal

08:50:27  15   therapy increases by more than that as well.  And I could go

08:50:29  16   over the exact numbers.

08:50:30  17   Q.    That's okay.

08:50:32  18          In the report, do you see, is there any numbers for

08:50:34  19   the 15-year model?

08:50:38  20   A.    If I didn't put them in, I thought I provided all the

08:50:40  21   three levels.  They're all available.

08:50:43  22   Q.    Okay.  But there's only two, you agree with me, on page

08:50:46  23   34, the five-year and the ten-year?

08:50:48  24   A.    Yes.

08:50:49  25   Q.    Okay.  And certainly, Ms. Kahn has survived longer than

*OFFICIAL TRANSCRIPT*

08:50:53  1    five years at this point in time, yes?

08:50:55  2    A.    Yes.

08:50:56  3    Q.    And she certainly wanted to survive longer than

08:51:00  4    five years, I would expect; would you agree?

08:51:02  5    A.    All patients are interested in survival, which is why it's

08:51:06  6    so important in early stage of breast cancer they have choices

08:51:09  7    so then they have to live with the side effects.

08:51:11  8    Q.    Okay.  And one of the choices that you talked about

08:51:13  9    yesterday was the decision of whether to undertake chemotherapy

08:51:18 10    before or after surgery.

08:51:20 11          Do you recall that discussion?

08:51:21 12    A.    I do.

08:51:21 13    Q.    And the jury has heard these terms, that chemotherapy

08:51:28 14    before surgery is neoadjuvant chemotherapy, right?

08:51:33 15    A.    That's how we call it, yes.

08:51:35 16    Q.    And then chemotherapy after surgery is adjuvant

08:51:39 17    chemotherapy, correct?

08:51:40 18    A.    That's how we call it.

08:51:41 19    Q.    Okay.  And one of the things that you talked about

08:51:43 20    yesterday that factors into the clinical decision that a

08:51:46 21    patient and an oncologist must make is whether the patient

08:51:52 22    wants to undertake a mastectomy or a lumpectomy.

08:51:56 23          Do you remember that discussion?

08:51:57 24    A.    I do remember that, yes.

08:51:57 25    Q.    Okay.

*OFFICIAL TRANSCRIPT*

08:51:59  1    A.    That's an important part of the discussion with women.

08:52:01  2    Q.    And it's an important part because the mastectomy can be a

08:52:04  3    traumatizing procedure for a woman, yes?

08:52:07  4    A.    Well, a lumpectomy can, too.

08:52:09  5          So, I mean, having breast cancer has a challenge to

08:52:11  6    find the best balance of the options for patients.

08:52:15  7    Q.    And part of that balancing would factor in the

08:52:21  8    disfigurement that might occur through a mastectomy?

08:52:25  9    A.    Disfigurement is always an issue with lumpectomy,

08:52:29 10    radiation or a mastectomy, and that's why it's important to

08:52:32 11    talk to the patients if they have a preference.  Some prefer

08:52:35 12    one, some prefer another.

08:52:37 13    Q.    For a mastectomy, they remove the entire breast, correct?

08:52:40 14    A.    Yes.  In a mastectomy, they remove the breast, and can do

08:52:45 15    immediate reconstruction or delayed reconstruction.  So some

08:52:46 16    patients come out with an outcome they prefer from mastectomy.

08:52:50 17    It's really an individual choice.

08:52:51 18    Q.    Right.  And that example that you're giving, it would

08:52:55 19    require another cosmetic surgery and artificial implants and

08:53:00 20    those sorts of things?

08:53:01 21    A.    There are many ways to do plastic surgery.  There can be

08:53:06 22    expanders, there can be implants, there can be tissues.  So it

08:53:10 23    could be done at one surgery, several surgeries.

08:53:12 24    Q.    But there's risks with those type of surgeries, correct?

08:53:15 25    A.    There's risk with everything in life.

*OFFICIAL TRANSCRIPT*

08:53:17  1    Q.    I agree with that.

08:53:21  2          And if a patient, because of her clinical

08:53:25  3    circumstances, was not able to undergo breast-sparing surgery,

08:53:31  4    like a lumpectomy, would their only option for breast-sparing

08:53:38  5    surgery be to undergo neoadjuvant chemotherapy to shrink the

08:53:38  6    tumor?

08:53:38  7    A.    Okay.  There's a lot in there.  Could you explain that

08:53:44  8    again.

08:53:44  9    Q.    So, my point is, is if someone -- if a patient, because of

08:53:47 10    their clinical circumstances -- the characteristics of their

08:53:50 11    tumor -- if a surgical oncologist does not believe he can

08:53:55 12    successfully perform breast-sparing surgery, that patient would

08:53:59 13    still have the option to do chemo first to have a better

08:54:04 14    cosmetic result if they wanted?

08:54:05 15    A.    The patient has several options.  The patient could do

08:54:07 16    hormone therapy first, they can do chemotherapy first, they can

08:54:10 17    have reconstruction with a partial mastectomy.  So there is

08:54:15 18    many options.

08:54:16 19    Q.    But if a patient made the decision to undergo neoadjuvant

08:54:26 20    therapy in order to preserve as much breast tissue as they

08:54:31 21    could, that wouldn't be the only benefit of neoadjuvant

08:54:35 22    chemotherapy, right?

08:54:36 23    A.    Well, as we talked about yesterday, if a patient's going

08:54:40 24    to have chemotherapy, they can have it first or second.  We

08:54:42 25    know those have equal outcomes.

                          *OFFICIAL TRANSCRIPT*

08:54:44  1    Q.   Okay.  And the purpose of having any systemic therapy,
08:54:54  2    would you agree, Doctor, is to address the possibility that
08:55:00  3    cancer cells may have broken off of the primary tumor, and be,
08:55:07  4    for lack of a better phrase, laying in wait somewhere in the
08:55:11  5    body?
08:55:11  6    A.   That's what I explain to patients.  There's always a
08:55:14  7    chance there are microscopic cells somewhere, and those may
08:55:17  8    come back later.  As we know from the demonstrative, that's a
08:55:21  9    very rare event in early-stage breast cancer.  So you have to
08:55:24 10    decide what kind of treatment you want to accept to try to
08:55:29 11    reduce that, and what the realistic option is to reduce that.
08:55:33 12    Q.   Right.  And what you told us in your expert report on
08:55:36 13    page 11 is that:  "The reason to give any type of systemic
08:55:40 14    therapy after surgery for early breast cancer is to destroy any
08:55:44 15    microscopic, or currently undetectable cells, that might have
08:55:48 16    broken off the breast cancer and landed somewhere in the body,
08:55:53 17    such as the bones, the liver, or the lungs."
08:55:55 18         Is that what you're talking about?
08:55:56 19    A.   As I said, that's what I tell my patients.  That is the
08:55:59 20    reason for hormone therapy or chemotherapy, either before or
08:56:03 21    after surgery.  It's part of the treatment.
08:56:06 22    Q.   And the concept that you're expressing here on page 11,
08:56:09 23    that would be consistent with the idea of first chance, best
08:56:14 24    chance, right?
08:56:16 25    A.   Consistent with the first chance, best chance to tell the

*OFFICIAL TRANSCRIPT*

08:56:19  1    truth about the benefits and the risks, and the known risks.

08:56:23  2    Q.   And the concept of first chance, best chance, what that

08:56:28  3    means is that if the cancer cells have broken off of that

08:56:33  4    primary tumor and they do come back, then the prognosis is much

08:56:39  5    worse for the patient, correct?

08:56:40  6    A.   No, that's not what that means.  That means the first

08:56:43  7    chance is the chance to really review the patient's case, their

08:56:48  8    details, and to elicit from them in an honest way what their

08:56:53  9    values are, and for you to tell them what the actual benefits

08:56:57 10    and risks are of any treatment.

08:56:59 11    Q.   Okay.  But you agree, the first chance to eliminate cancer

08:57:05 12    from the patient's body is the best chance for their survival?

08:57:09 13    A.   Not necessarily.

08:57:10 14    Q.   Okay.

08:57:12 15    A.   I could explain why.

08:57:14 16    Q.   You can do that on redirect if Ms. Reynolds --

08:57:14 17    A.   Okay.

08:57:19 18    Q.   -- wants you to.  I just want to keep this moving, if we

08:57:21 19    can.

08:57:22 20         All right.  Let's pivot to the NCCN Guidelines.

08:57:25 21         MR. MOORE:  And if -- Jen, if you could pull that up,

08:57:32 22    this will be Defense Exhibit 1286.

08:57:32 23    EXAMINATION BY MR. MOORE:

08:57:35 24    Q.   And I think you have a page ready for me to explain.  Do

08:57:38 25    you need a copy?

*OFFICIAL TRANSCRIPT*

08:57:40  1   A.   No, I can see it here.  Thank you.

08:57:42  2   Q.   Okay.  All right.  What you have on the screen, which

08:57:45  3   we've marked as Defendant Exhibit 1286, are -- these are the

08:57:52  4   NCCN Clinical Practice Guidelines in Oncology for Breast

08:57:55  5   Cancer, version February 2008.

08:57:57  6   A.   Correct.

08:57:58  7   Q.   Okay.  And this is the source that you referenced in your

08:58:02  8   report and talked about yesterday during your direct

08:58:07  9   examination?

08:58:07  10  A.   I believe so.

08:58:08  11  Q.   Okay.

08:58:12  12       MR. MOORE:  And, Jen, if we could, please, go to the

08:58:13  13  page that we talked about yesterday.  Yeah, there you go.

08:58:13  14  EXAMINATION BY MR. MOORE:

08:58:17  15  Q.   What I wanted to do is focus on this section,

08:58:20  16  Dr. Bosserman, that I think you told us applies to patients who

08:58:24  17  are HER2-negative, right?

08:58:31  18  A.   Correct.

08:58:31  19  Q.   Okay.

08:58:31  20  A.   On the left side.

08:58:31  21  Q.   So that's the left side of the list of chemotherapy

08:58:35  22  options, right?

08:58:36  23  A.   Correct.

08:58:39  24  Q.   Okay.  And you told us yesterday, we talked about the

08:58:41  25  concept, I believe, about first generation, second generation,

*OFFICIAL TRANSCRIPT*

08:58:47　1　and third-generation chemotherapies within the category that's

08:58:51　2　listed here, Category 1, right?

08:58:53　3　A.    I talked about the different regimens and where they were

08:58:57　4　considered in the levels, yes.

08:58:58　5　Q.    Okay.  Ms. Reynolds highlighted the various chemotherapy

08:59:04　6　levels and different colors, but I just wanted to focus on the

08:59:09　7　third generation chemotherapies.

08:59:09　8　　　　　You with me?

08:59:10　9　A.    I hear that, yes.

08:59:10　10　Q.    Okay.  Do I have them correctly highlighted here?

08:59:13　11　A.    Yes.  And as I said, TC is in some groups looked at as

08:59:18　12　second.  If you read the Early Breast Cancer Trials Group, they

08:59:24　13　question whether that's really third generation.  It's a very

08:59:26　14　technical issue.  Generally, things with taxanes will be

08:59:30　15　considered third generation, or very high-dose anthracycline

08:59:36　16　without taxanes, which is not listed here.

08:59:38　17　Q.    Okay.  I noticed that on the first two regimens there,

08:59:40　18　there's a Footnote Number 6.

08:59:43　19　　　　　Do you see that?

08:59:43　20　A.    I do.

08:59:43　21　Q.    Okay.

08:59:44　22　　　　　MR. MOORE:  Jen, if you could pull up Footnote 6,

08:59:49　23　please.

08:59:49　24　EXAMINATION BY MR. MOORE:

08:59:52　25　Q.    Okay.  Footnote 6 reads:  "Randomized clinical trials

*OFFICIAL TRANSCRIPT*

08:59:58 1    demonstrate that the addition of a taxane to

09:00:04 2    anthracycline-based chemotherapy provides an improved outcome."

09:00:06 3          Did I read that correctly?

09:00:08 4    A.    That's correct.  It applies to extensive trials with many

09:00:13 5    types of early-stage breast cancer.

09:00:15 6    Q.    Okay.  And randomized clinical trials, those are the gold

09:00:19 7    standard of evidence for determining efficacy for a

09:00:22 8    chemotherapy agent?

09:00:24 9    A.    Randomized trials are considered the best way to look at

09:00:28 10   outcomes for patients, as well as toxicities.

09:00:28 11   Q.    Okay.  All right.

09:00:34 12          MR. MOORE:  Jen, if you could put that down.  Well, no,

09:00:38 13   put back up the document; just put down that callout.  Okay.

09:00:42 14   All right.  If you could pull back up the highlighted regimens,

09:00:45 15   please.

09:00:45 16   EXAMINATION BY MR. MOORE:

09:00:48 17   Q.    Okay.  As we look at the regimens here, if a patient

09:00:51 18   wanted to undertake anthracycline chemotherapy with the

09:00:56 19   addition of a taxane to get the improved outcome, that's

09:01:02 20   referenced in Footnote 6, they would be choosing between a

09:01:06 21   regimen that has either Taxotere or Taxol, correct?

09:01:10 22   A.    Correct.  On this sheet, yes.

09:01:11 23   Q.    And you've told us in your testimony before that there are

09:01:17 24   cases of persistent alopecia associated with the use of Taxol,

09:01:22 25   correct?

**OFFICIAL TRANSCRIPT**

09:01:23   1   A.    I haven't discussed that, that I remember here.

09:01:25   2   Q.    Okay.  I don't mean --

09:01:30   3         MS. PEREZ:  Your Honor, may we approach?

09:01:32   4         THE COURT:  Yes.

09:01:32   5         (WHEREUPON, at this point in the proceedings, a bench

09:01:55   6   conference was held.)

09:01:55   7         MS. PEREZ:  Your Honor, Dr. Bosserman has not been

09:01:57   8   offered for any opinions related to PCIA or any case reports of

09:02:04   9   persistent alopecia associated with any chemotherapy drugs and

09:02:06  10   it's outside the scope of direct.  It's also not something

09:02:09  11   that's ever listed or discussed in her -- report.

09:02:13  12         MR. MOORE:  It was discussed in her --

09:02:13  13         MS. PEREZ:  (Speaking simultaneously) This file.

09:02:15  14         MR. MORE:  The *Daubert* ruling indicated that she can

09:02:18  15   talk about the risks and benefits of the available medicines

09:02:21  16   for Ms. Kahn.  That was the parameters you put when you struck

09:02:26  17   her opinion that Taxotere has a greater risk than Taxol.

09:02:30  18   That's what she can't say.  But she's talked at length about

09:02:34  19   the benefits and risks of the various medicines that were

09:02:37  20   available to Ms. Kahn that were in the consent form and we

09:02:41  21   think this is a fair question for her.

09:02:43  22         THE COURT:  You opened the door for her to talk about

09:02:47  23   persistent alopecia because she didn't say anything about it

09:02:50  24   yesterday.  She talked about you measure risks and benefits.

09:02:54  25         MR. MOORE:  But she was asked questions about her

*OFFICIAL TRANSCRIPT*

09:02:56  1    understanding of hair loss associated with Taxotere.

09:03:00  2         MS. PEREZ:  She was not asked any questions about Taxol

09:03:02  3    or any other medications.  She wasn't even taken on an

09:03:02  4    exploratory journey of all --

09:03:02  5         THE COURT:  She wasn't even taken what?

09:03:02  6         MS. PEREZ:  On an exploratory journey of all the

09:03:11  7    different side effects associated with all of the different

09:03:13  8    chemotherapy medications are far outside of the bounds of her

09:03:17  9    expert report and I don't think it's permissible, especially in

09:03:20 10    light of the fact that I was not allowed to even question her

09:03:23 11    on what the language in the label meant to her.  Again, it's

09:03:26 12    just a backdoor attempt to try to get in case reports with an

09:03:30 13    expert that isn't being offered for that issue.

09:03:33 14         MR. MOORE:  But the issue that the witness is being

09:03:35 15    offered for is to talk about the risks and benefits of the

09:03:39 16    medicines that were available to Ms. Kahn.  That was the

09:03:42 17    confines of her *Daubert* ruling.  She talked extensively about

09:03:46 18    those exact regimens that were in this exact document yesterday

09:03:50 19    and the different types of therapy.

09:03:53 20         MS. PEREZ:  She never discussed, like, alopecia.

09:03:57 21         THE COURT:  She didn't talk about alopecia, but I guess

09:04:04 22    she can now.  She didn't.  She talked about a doctor's

09:04:11 23    assessment of risks and benefits.  She talked about nausea

09:04:14 24    associated with the Red Devil and how she's been able to

09:04:20 25    confront that.  And I don't think she talked about persistent

*OFFICIAL TRANSCRIPT*

09:04:28 1   alopecia.

09:04:29 2        MR. MOORE:  She did it in the reverse.

09:04:33 3        She did it in the reverse.  They asked her what is her

09:04:36 4   understanding of hair loss associated with Taxotere.  That

09:04:38 5   question was asked of her yesterday.

09:04:41 6        MS. PEREZ:  And she said nothing about permanent hair

09:04:43 7   loss.  Her response was it was temporary.  She said nothing

09:04:47 8   about permanent in conjunction with any drug.

09:04:49 9        MR. MOORE:  It's the same thing.  It's the same thing.

09:04:52 10  She wasn't warned about it.  She didn't know about it.  Her

09:04:54 11  testimony -- her sworn testimony is that -- she testified

09:04:56 12  yesterday that she thinks it's temporary with Taxotere.

09:05:06 13       MS. PEREZ:  It was limited to 2008.  The question that

09:05:08 14  I asked and her response was temporary hair loss.  She said

09:05:13 15  nothing about permanent hair loss.  I didn't go into a series

09:05:18 16  of questions and asked her to describe the risks and benefit

09:05:21 17  profile of the differences between Taxotere and Taxol, which is

09:05:21 18  exactly what Mr. Moore is attempting to elicit.

09:05:25 19            And the witness has never discussed this and,

09:05:30 20  frankly, we have multiple other experts, and one of them today

09:05:34 21  is going to discuss this exact issue.  It's creating a very

09:05:37 22  unnecessary focus with a witness for which it's not even proper

09:05:41 23  testimony.

09:05:46 24       MR. MOORE:  Dr. Tosti is not going to talk about the

09:05:48 25  risks and benefits from the perspective -- Dr. Tosti is their

*OFFICIAL TRANSCRIPT*

09:05:48  1    other witness who is going to talk about risks and benefits of

09:05:50  2    oncology.

09:06:35  3            MS. PEREZ:  For me, it's an attempt to go into a

09:06:38  4    general causation-type analysis with her or a specific

09:06:40  5    causation when she's not been offered on either of those

09:06:43  6    premises, Your Honor.  The question I asked yesterday was very

09:06:47  7    clear and exceptionally limited and it was not a discussion of

09:06:50  8    risks and benefits as it relates to hair loss associated with

09:06:56  9    any of the drugs in comparison --

09:06:56 10            THE COURT:  There was nothing about

09:06:59 11    androgenetic alopecia that I recall in the transcript.  I don't

09:07:03 12    think any of that was discussed.  But it was a general

09:07:13 13    discussion which is what I indicated you could talk about with

09:07:17 14    Dr. Bosserman.  It was a general discussion how a doctor

09:07:23 15    reviews that with a patient, how they assess those things but

09:07:25 16    there was no discussion about persistent alopecia.  I'm going

09:07:29 17    to sustain the objection.

09:07:30 18            MS. PEREZ:  Thank you, Your Honor.

09:07:30 19            (WHEREUPON, at this point in the proceedings, the bench

09:07:30 20    conference concluded.)

09:07:30 21            THE COURT:  Mr. Moore, please proceed.

09:07:56 22            MR. MOORE:  Thank you, Judge.

09:07:56 23    EXAMINATION BY MR. MOORE:

09:07:57 24    Q.   I have one more question on this line, Dr. Bosserman, and

09:08:02 25    it has to do with the regimen that's listed right above -- let

*OFFICIAL TRANSCRIPT*

09:08:07  1    me see if this works.  No, it disappeared there.  Oh, there it

09:08:24  2    goes.  All right.  So I wanted to ask you about this regimen

09:08:27  3    here, the CMF regimen.

09:08:32  4          Is that a first-generation chemotherapy regimen?

09:08:36  5    A.   That is considered a first generation, yes.

09:08:39  6    Q.   Okay.  And in the Predict tool that we talked about

09:08:44  7    earlier, is a first-generation medicine a therapy that can be

09:08:50  8    entered into the Predict tool?

09:08:51  9    A.   A Predict tool only allows second and third generation to

09:08:57  10   be entered for those calculations.  You have to go back to the

09:09:00  11   original papers to get other information.

09:09:00  12   Q.   Okay.  All right.  Great.

09:09:02  13        MR. MOORE:  We can put that down, Jen.

09:09:02  14   EXAMINATION BY MR. MOORE:

09:09:07  15   Q.   All right.  Let's pivot for a second and I want to talk to

09:09:12  16   you about the informed consent process.

09:09:15  17          Do you remember talking about that yesterday?

09:09:16  18   A.   Yes.

09:09:17  19   Q.   Okay.  And during that discussion, you talked about the

09:09:26  20   importance not only of the informed consent discussion but also

09:09:30  21   the informed consent form, right?

09:09:33  22   A.   As I said, it's a process and the form is part of that,

09:09:37  23   yes.

09:09:37  24   Q.   Okay.  And you had made some statements about medical

09:09:42  25   ethics of the doctor and trust with the physician and even

*OFFICIAL TRANSCRIPT*

09:09:50  1    referenced the Tuskegee experiment.

09:09:52  2         Do you recall that testimony?

09:09:52  3    A.   I was trying to explain to you and the jurors how we got

09:09:56  4    to this process that we have now.

09:09:57  5    Q.   Okay.  And then you were shown the actual consent form

09:10:00  6    from Ms. Kahn's clinical trial, right?

09:10:03  7    A.   I believe I saw part of that.

09:10:04  8    Q.   Okay.  But I want to make something clear just so that

09:10:08  9    there is no confusion.  The consent form that Ms. Kahn was

09:10:13 10    provided during her informed consent, that was not a consent

09:10:17 11    form that was prepared by Dr. Kardinal?

09:10:22 12    A.   I think we can clarify that.  When you're part of a

09:10:25 13    National Adjuvant Breast and Bowel Project (verbatim), that's

09:10:30 14    what the NSABP group stands for, that group has a model

09:10:35 15    informed consent that they provide based on their own ethics

09:10:38 16    reviews.  And then each local physician or their hospital or

09:10:43 17    their group reviews it, either accept it as is or modifies it,

09:10:48 18    and then submits it and then uses it.  So there could be a

09:10:52 19    variation, but it's a standard consent form.  There can be some

09:10:56 20    alterations in the wording based on local preferences of an

09:11:01 21    investigational review board that reviews it.

09:11:02 22    Q.   Okay.  But the content of the form, I think what you're

09:11:09 23    telling us, comes in sort of a standard set of information from

09:11:13 24    the organization that's sponsoring the clinical trial?

09:11:16 25    A.   Yes.  A standard form -- you have the right to modify, to

**OFFICIAL TRANSCRIPT**

09:11:23 1    add information.  It also has to be cleared by the large

09:11:26 2    national group of experts.

09:11:28 3    Q.   And the national group of experts in relationship to

09:11:35 4    Ms. Kahn's clinical trial is the NSABP?

09:11:37 5    A.   Yes.  And I believe we have to go look at their -- they

09:11:41 6    have, I believe, their own investigational review board

09:11:44 7    oversight group that actually oversees and ensures that the

09:11:47 8    consent form is in a lay language and explains things at a

09:11:51 9    level of detail available of what's known to those drugs.

09:11:55 10   Q.   Right.  But the group running this clinical trial, B-40,

09:12:01 11   was the National Surgical Adjuvant Breast and Bowel Project?

09:12:04 12   A.   Correct.

09:12:04 13   Q.   Okay.  And you've done clinical trials for that outfit,

09:12:07 14   yes?

09:12:07 15   A.   For that respected national group, yes.

09:12:11 16   Q.   Okay.  And you said "respected national group"?

09:12:13 17   A.   Yes.

09:12:13 18   Q.   Okay.  So these would be the type of individuals who are

09:12:16 19   putting this together that would be up-to-date on the medical

09:12:18 20   and scientific literature for the medicines that they are

09:12:20 21   putting in the clinical trial?

09:12:21 22   A.   They would know what has been disclosed by the

09:12:24 23   manufacturers on the label.  They would consider that in

09:12:29 24   putting that in the trial, absolutely.

09:12:30 25   Q.   Okay.  Would they also consider information that's

*OFFICIAL TRANSCRIPT*

09:12:34 1 available in the medical and scientific literature as it

09:12:39 2 relates to the medicines they are putting in the trial?

09:12:40 3 A.   Again, as we talked the day before, the system we have is

09:12:45 4 the manufacturers in their pharmacovigilance and their

09:12:51 5 biostatisticians collate lots of information, decide what is

09:12:53 6 significant, and it's their job to report that.  That's the

09:12:57 7 primary foundation.  They wouldn't put anecdotal information

09:13:00 8 in.

09:13:01 9 Q.   Okay.

09:13:01 10      MR. MOORE:  All right.  Your Honor, before I forget, I

09:13:04 11 wanted to offer, file, and introduce Defendant's 1286 with the

09:13:08 12 NCCN Guidelines.

09:13:09 13      THE COURT:  Any objection?

09:13:12 14      MS. PEREZ:  No objection, Your Honor.

09:13:13 15      THE COURT:  Let it be admitted.

09:13:13 16      (WHEREUPON, at this point in the proceedings,

09:13:14 17 Defendant's Exhibit Number 1286 was admitted into evidence.)

09:13:14 18      MR. MOORE:  Did I give you a copy or do you have a

09:13:14 19 copy?

09:13:16 20 EXAMINATION BY MR. MOORE:

09:13:16 21 Q.   Okay.  And yesterday when you talked to the jury about the

09:13:28 22 consent process, you talked about information, I believe, that

09:13:36 23 you believed would be important to be included in the consent

09:13:39 24 form, yes?

09:13:41 25 A.   I don't recall specifically that it isn't.  I think I

*OFFICIAL TRANSCRIPT*

09:13:44  1    discussed what goes into a consent form, the elements.

09:13:46  2    Q.   Right.  And so -- and I think what you told us was that it

09:13:54  3    is important that the patient understands what the options are,

09:13:58  4    whether they are getting the standard treatment plus something

09:14:01  5    additional, what additional risks we might expect, what risks

09:14:05  6    we might know about the standard arm and any additional

09:14:08  7    treatments what the schedule would be.

09:14:10  8              Do you recall that?

09:14:11  9    A.   I recall that.  I think, if I didn't make it clear, it's

09:14:14 10    also important -- I think I did say, whether they don't go into

09:14:17 11    a clinical trial, they'll still be offered appropriate

09:14:22 12    treatment in their discussion; they don't only have a trial

09:14:27 13    option.

09:14:27 14    Q.   Right.  So, a clinical trial is not mandatory; it's a

09:14:30 15    voluntary decision by the patient?

09:14:31 16    A.   Yes.

09:14:32 17    Q.   Okay.  And what I wanted to do, since you looked at the

09:14:37 18    consent form yesterday, was just ask you some questions about

09:14:41 19    some of the information in there to see if it's consistent with

09:14:44 20    what you were describing yesterday in terms of the schedule,

09:14:48 21    the medicines, the standard treatment, and some of the risk

09:14:52 22    information; is that okay?

09:14:54 23    A.   I would be happy to review the consent form with you, yes.

09:14:56 24    Q.   Okay.  And so what I would like to do is put up

09:14:59 25    Defendant's 2035.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 09:15:04 | 1 | Do you want me to bring you a copy? |
| 09:15:07 | 2 | A.   Yes.  I don't have one with me, unless I can see it on the |
| 09:15:10 | 3 | screen. |
| 09:15:10 | 4 | Q.   It will be on the screen. |
| 09:15:13 | 5 | A.   Oh, I think the screen is fine.  Thank you. |
| 09:15:53 | 6 | Q.   All right. |
| 09:15:53 | 7 | (WHEREUPON, at this point in the proceedings, there was |
| 09:15:53 | 8 | a discussion off the record.) |
| 09:15:53 | 9 | MR. MOORE:  Sorry, a little sidebar there. |
| 09:15:56 | 10 | Okay.  Jen, if we could pull that up on the |
| 09:15:58 | 11 | screen. |
| 09:15:59 | 12 | Do you have any problem publishing it to the |
| 09:16:01 | 13 | jury? |
| 09:16:01 | 14 | THE COURT:  Any objection with publication? |
| 09:16:04 | 15 | MS. PEREZ:  There is an objection subject to the |
| 09:16:07 | 16 | discussion that Mr. Moore and I just had as it relates to a |
| 09:16:10 | 17 | potential redaction on one of the pages, but he's assured me |
| 09:16:11 | 18 | it's not going to be an issue. |
| 09:16:13 | 19 | MR. MOORE:  We're not going to show that page. |
| 09:16:16 | 20 | THE COURT:  Okay.  All right.  Then you may. |
| 09:16:21 | 21 | MR. MOORE:  Jen, if you could pull up this second |
| 09:16:23 | 22 | paragraph right here, where it says:  "Your study doctor will |
| 09:16:30 | 23 | explain the clinical trial to you." |
| 09:16:30 | 24 | EXAMINATION BY MR. MOORE: |
| 09:16:31 | 25 | Q.   Okay.  And do you see here, Doctor, in the second sentence |

*OFFICIAL TRANSCRIPT*

09:16:33  1    where it says:  "Clinical trials include only people who may

09:16:37  2    choose to take part"?

09:16:38  3              Do you see that?

09:16:39  4    A.    I can see that sentence, yes.

09:16:40  5    Q.    Okay.  And that's the kind of information that you were

09:16:42  6    discussing to make sure the patient knows that it's a voluntary

09:16:48  7    decision by the patient?

09:16:49  8    A.    That's part of the information.  The doctors generally

09:16:51  9    make that very clear as well.

09:16:52 10    Q.    Okay.  And this would be the type of information you would

09:16:55 11    expect to see in an NSABP consent form?

09:17:00 12    A.    Language like that, I believe, is often included, yes.

09:17:04 13    Q.    And you see in the last sentence, it says:  "You could

09:17:06 14    also discuss it with your healthcare team.  If you have any

09:17:10 15    questions, you can ask your study doctor for more information."

09:17:12 16              Do you see that?

09:17:13 17    A.    That's how it reads, yes.

09:17:14 18    Q.    And that's an important part of the informed consent

09:17:17 19    process to make sure the patient knows that she can ask

09:17:20 20    whatever questions she wants of the doctor and discuss things

09:17:20 21    with him?

09:17:23 22    A.    Informed consent is a process; it's often multiple

09:17:25 23    discussions.

09:17:26 24              MR. MOORE:  Okay.  We can put that down, Jen.

09:17:26 25    EXAMINATION BY MR. MOORE:

*OFFICIAL TRANSCRIPT*

09:17:33 1    Q.    Okay.  And if you look at that paragraph right below.

09:17:35 2           MR. MOORE:  If you could pull that one up.  It starts:

09:17:38 3    "The consent form may..."

09:17:38 4    EXAMINATION BY MR. MOORE:

09:17:41 5    Q.    You talked yesterday about the fact that the consent form

09:17:44 6    needs to be written in lay terms.

09:17:45 7           Do you recall that?

09:17:46 8    A.    The idea is to be in lay terms and often they have

09:17:50 9    specific school levels that are targets.  And they do the best

09:17:57 10   they can to achieve those targets.

09:17:58 11   Q.    Okay.  And what this consent form indicates is that there

09:18:04 12   may be words that you do not understand, and it encourages the

09:18:08 13   patient to talk to the study doctor and staff to explain it if

09:18:12 14   they don't understand something?

09:18:13 15   A.    Yes.  This is meant to really reinforce the process as you

09:18:16 16   read it at home to make sure people are not coerced into

09:18:20 17   signing any trial documents.

09:18:20 18   Q.    Okay.

09:18:23 19          MR. MOORE:  All right.  And if we could go to the

09:18:23 20   second page, Jen, please.

09:18:23 21   EXAMINATION BY MR. MOORE:

09:18:30 22   Q.    All right.  And there is a question posed in the middle of

09:18:33 23   the document right here.  It says:  "Why is this research study

09:18:37 24   being done?"

09:18:37 25          Do you see that?

*OFFICIAL  TRANSCRIPT*

09:18:38   1    A.    Yes, I see that.

09:18:40   2    Q.    Okay.

09:18:40   3          MR. MOORE:  And, Jen, if you could highlight the first

09:18:43   4    bullet point for me.  Just the first paragraph of that.

09:18:43   5    EXAMINATION BY MR. MOORE:

09:18:47   6    Q.    Okay.  And what it says here -- well, let me back up for a

09:18:50   7    second.  Is informing the patient about why the study is being

09:18:55   8    done, is that an important part of the consent process?

09:18:59   9    A.    I believe so.  I think most patients want to know why they

09:19:04  10    might participate, what their own benefit would be, and

09:19:08  11    sometimes just what the overall study would get.  I mentioned,

09:19:12  12    sometimes the studies not necessarily benefit patients,

09:19:16  13    sometimes clearly here it was to hopefully benefit patients as

09:19:19  14    well.

09:19:19  15    Q.    Right.  This was what you call a Phase III clinical trial?

09:19:22  16    A.    A Phase III trial, yes.

09:19:24  17    Q.    Okay.  And what it indicates in this paragraph, I think,

09:19:28  18    is something that you talked about in your direct examination,

09:19:31  19    it says -- beginning in the second paragraph --

09:19:33  20          MR. MOORE:  Jen, if you could highlight as we go along.

09:19:33  21    EXAMINATION BY MR. MOORE:

09:19:35  22    Q.    -- "Three of the chemotherapy drugs, used in this" --

09:19:41  23    whoops, we lost it.

09:19:43  24          There we go.  Okay.  Starting right here is where I'm

09:19:52  25    going to go along.  It says:  "Three of the chemotherapy drugs

*OFFICIAL  TRANSCRIPT*

09:19:55  1    used in this study are docetaxel" -- that's Taxotere, right?

09:20:01  2    A.    It's the generic name, yes.

09:20:03  3    Q.    Yeah, "Followed by doxorubicin."  That's the Adriamycin.

09:20:10  4    A.    Adriamycin is doxorubicin.

09:20:11  5    Q.    Okay.  And then cyclophosphamide, that's Cytoxan, right?

09:20:17  6    A.    Cytoxan, that's the brand name, yes.

09:20:18  7    Q.    Okay.  And it identifies those three medicines as a

09:20:23  8    standard treatment for breast cancer, right?

09:20:24  9    A.    I think we've established that the docetaxel AC from those

09:20:28 10    regimens are one of the standards.

09:20:30 11    Q.    Right.  And what you told us yesterday, though, was that

09:20:33 12    the regimen for this clinical trial for both docetaxel,

09:20:40 13    Adriamycin, and cyclophosphamide was something called an

09:20:45 14    "off-label regimen," right?

09:20:47 15    A.    I don't believe I used those words.  I said the order that

09:20:50 16    they were done were not a specific one identified on the NCCN

09:20:58 17    panel.  But the principals AC after or before a taxane had been

09:21:00 18    well established as equal and is why they chose this as a

09:21:03 19    standard regimen.

09:21:04 20    Q.    Right.  But just so that we're clear on that concept, the

09:21:09 21    regimen that is being employed in the clinical trial is

09:21:12 22    different than the regimen that's specified in the NCCN

09:21:17 23    Guidelines for Taxotere in combination with Adriamycin and

09:21:21 24    cyclophosphamide?

09:21:23 25    A.    You asked about the label.  The label you asked me about

**OFFICIAL TRANSCRIPT**

09:21:26 1    was TAC is what they got a label for adjuvant in.  This is

09:21:31 2    using docetaxel AC that wasn't on the label for it but it was

09:21:37 3    accepted as a standard therapy.

09:21:38 4    Q.    Right.  I think I was referring to the NCCN Guidelines

09:21:43 5    where the regimen was the same as the label that said TAC.

09:21:43 6          Recall that?

09:21:48 7    A.    TAC was on the NCCN Guidelines at that time, yes.

09:21:52 8    Q.    Okay.  And the doses that are specified in the NCCN

09:21:56 9    Guidelines for that TAC regimen, those doses are different than

09:22:00 10   the doses that were used in this clinical trial for the

09:22:04 11   medicines?

09:22:04 12   A.    TAC is a different regimen than Taxotere followed by AC or

09:22:11 13   AC followed by Taxotere.  It's different dosing; it's a

09:22:17 14   different regimen.

09:22:17 15   Q.    Right.  And I just wanted to specify that not only is the

09:22:22 16   sequencing of the medicines different but the doses of the

09:22:23 17   medicines are different?

09:22:23 18   A.    The doses are different as we established in

09:22:26 19   clinical trials had equal efficacy.

09:22:29 20   Q.    Right.  Okay.  But the doses per administration of the

09:22:33 21   Adriamycin and cyclophosphamide in the clinical trial were

09:22:37 22   higher amount per administration than what was specified in the

09:22:42 23   NCCN Guidelines, right?

09:22:42 24   A.    The AC is the standard AC in that phase for all of the AC

09:22:48 25   with or without taxane regimens.  In TAC, because you're giving

*OFFICIAL TRANSCRIPT*

09:22:51  1   all three at the same time, you give lesser doses of them

09:22:56  2   because you can't give the doses.  That's why the sequential

09:23:01  3   regimen is the dominant regimen to this day.

09:23:06  4   Q.   Okay.  So, spreading them out you can give a stronger dose

09:23:06  5   of Adriamycin and cyclophosphamide each time?

09:23:08  6   A.   You can give doses that have been proven effective in

09:23:11  7   clinical trials.

09:23:11  8   Q.   All right.  Okay.

09:23:12  9        MR. MOORE:  And then, Jen, if you could highlight the

09:23:15 10   next sentence.

09:23:16 11   EXAMINATION BY MR. MOORE:

09:23:16 12   Q.   It says:  "This study will add the drug capecitabine."

09:23:16 13   What's the name?

09:23:33 14   A.   Capecitabine.

09:23:33 15   Q.   Capecitabine.

09:23:34 16        I was asking what is the --

09:23:36 17   A.   The branded name at that time was Xeloda.

09:23:39 18   Q.   Xeloda.

09:23:41 19        Okay.  "And the drug gemcitabine."  Did I get that

09:23:41 20   one right?  Close?

09:23:52 21   A.   Gemcitabine.

09:23:52 22   Q.   Gemcitabine.  Okay.

09:23:52 23   A.   Gemzar.  Or patients call it Gemzar.

09:23:52 24   Q.   Gemzar, okay.

09:23:54 25        And they are adding those medicines to see if either

*OFFICIAL TRANSCRIPT*

09:23:57 1  drug improves the effectiveness of the standard drugs at

09:24:03 2  killing all of the tumor cells in the breast and nearby

09:24:06 3  lymph nodes.  Do you see that?

09:24:07 4  A.    That was one point of the study.

09:24:09 5  Q.    Right.  And we're going to talk about that in a second,

09:24:12 6  the concept of primary endpoint and secondary endpoint.  But in

09:24:17 7  terms of the one of the principal endpoints of the study, one

09:24:20 8  of the goals was to see if adding Xeloda, since that was the

09:24:24 9  medicine that Ms. Kahn got, actually improved the

09:24:24 10 effectiveness, correct?

09:24:28 11 A.    That was one of the goals of the study.

09:24:31 12 Q.    Okay.

09:24:32 13       MR. MOORE:  All right.  And if we could go to the next

09:24:34 14 paragraph, Jen.

09:24:34 15 EXAMINATION BY MR. MOORE:

09:24:41 16 Q.    All right.  And this is referring to Xeloda and Gemzar

09:24:48 17 again, correct?

09:24:55 18 A.    Yes, capecitabine and gemcitabine, yes.

09:24:55 19 Q.    Okay.

09:24:55 20       MR. MOORE:  If we highlight the last paragraph -- I'm

09:24:58 21 sorry, the last sentence, Jen, if you could.

09:24:58 22 EXAMINATION BY MR. MOORE:

09:25:01 23 Q.    It indicates in this paragraph that those medicines are

09:25:08 24 considered investigational because they are still being

09:25:12 25 researched and have not yet received approval from FDA for use

*OFFICIAL TRANSCRIPT*

09:25:16  1    in treating early-stage breast cancer.  Is this the kind of

09:25:20  2    information that's important to convey to the patients during

09:25:24  3    the informed consent process that the regulatory status of the

09:25:29  4    medicines that they are going to be taking?

09:25:31  5    A.    It's very important.  These drugs, as you said, they were

09:25:35  6    approved in metastatic disease.  And as in the tradition of

09:25:40  7    development, once something is shown effective in metastatic

09:25:44  8    breast cancer, then they were using it here in early-stage

09:25:48  9    breast cancer.  But they made it clear that it has not yet been

09:25:51 10    proven efficacious which is why they were doing the study.

09:25:55 11    Q.    Right.  And at this point in time, FDA had not approved it

09:25:58 12    for use in this setting, right?

09:25:58 13    A.    Correct.

09:25:59 14         MR. MOORE:  Okay.  And if we could drop that down, Jen.

09:26:02 15    And highlight the next bullet point that starts:  "The second

09:26:07 16    main purpose..."

09:26:07 17    EXAMINATION BY MR. MOORE:

09:26:10 18    Q.    Okay.  This talks about a medicine -- I'm going to try and

09:26:14 19    get it, you're going to correct me, I know it -- bevacizumab?

09:26:17 20    A.    Perfect.

09:26:17 21    Q.    Got it, okay.

09:26:19 22         And bevacizumab, that is Avastin, yes?

09:26:22 23    A.    Avastin was the brand name.

09:26:24 24    Q.    Okay.  And it indicates here in the last sentence of this

09:26:28 25    section that Avastin is considered investigational because it

*OFFICIAL TRANSCRIPT*

09:26:32  1    is still being researched and has not yet received approval

09:26:36  2    from the FDA for the use in treating breast cancer.

09:26:39  3              Is that also important information to convey to the

09:26:41  4    patient during the informed consent process?

09:26:44  5    A.    It's important.  And if you look, this protocol version

09:26:47  6    was February of 2008.  That was actually the month that Avastin

09:26:51  7    was approved for use in metastatic breast cancer.

09:26:51  8    Q.    Okay.

09:26:57  9    A.    So, at the time they wrote this, obviously, before this

09:26:59 10    version, it hadn't yet been approved for any use in

09:27:03 11    breast cancer --

09:27:03 12    Q.    (Speaking simultaneously).  Okay.

09:27:06 13    A.    -- actually the first metastatic approval came.

09:27:09 14    Q.    So, by the time Ms. Kahn had the medicine, it was approved

09:27:12 15    for metastatic breast cancer, right?

09:27:13 16    A.    And, therefore, being used in early breast cancer to see

09:27:15 17    if it was effective.  And, of course, the people writing this

09:27:19 18    know that research is coming.

09:27:20 19    Q.    Right.  But at this point in time, even when Ms. Kahn

09:27:23 20    started the medicine, Avastin had not been approved for

09:27:26 21    early-stage breast cancer, correct?

09:27:28 22    A.    That's why it was being studied in this clinical trial.

09:27:31 23    Q.    Okay.  And that is also important information to convey to

09:27:36 24    the patient that the fact that some of the medicines have not

09:27:41 25    been approved by the regulatory agency for use in their

*OFFICIAL TRANSCRIPT*

09:27:45  1    particular setting?

09:27:45  2    A.    That is always stated in the trial because that's been

09:27:47  3    very important.

09:27:49  4         MR. MOORE:  Okay.  And, Jen, if you could highlight the

09:27:50  5    next bullet point.  The first paragraph that starts:  "Another

09:27:51  6    purpose of the study..."

09:27:59  7    EXAMINATION BY MR. MOORE:

09:27:59  8    Q.    All right.  It indicates in this paragraph that:  "Another

09:28:04  9    purpose of the study is to learn more about the side effects of

09:28:09 10    the combination of the drugs used in this study."

09:28:12 11         Would you agree that a secondary endpoint for a

09:28:17 12    Phase III clinical trial, where they are looking first to see

09:28:21 13    if there is any improvement, a secondary endpoint can also be

09:28:25 14    whether there is any increased toxicity?

09:28:29 15    A.    It depends on what's specified.  A trial was specified,

09:28:33 16    the primary and the secondary endpoints.  A registration

09:28:37 17    Phase III trial is very different than other Phase III trials.

09:28:42 18    A registration trial has other requirements for those

09:28:43 19    toxicities to be collected long-term.  Other trials have

09:28:49 20    different rules depending on the trial, on the collection of

09:28:53 21    those, and the follow up.  So, you have to look at the details

09:28:56 22    of the protocol, what they are following.

09:28:58 23    Q.    Okay.  But in any event, in this paragraph, what's being

09:29:03 24    indicated here in the second sentence when talking about

09:29:06 25    whether there is more side effects of the combination of the

**OFFICIAL TRANSCRIPT**

09:29:09  1   drugs used in the study, it says:  "Included in what we will
09:29:13  2   learn about side effects will be whether or not adding,
09:29:18  3   bevacizumab" -- that's Avastin, right -- "to chemotherapy" --
09:29:21  4   okay, sorry -- "to chemotherapy for breast cancer will affect
09:29:24  5   the heart."
09:29:25  6            Do you see that?
09:29:26  7   A.   I see that.  That was the specific side effect they called
09:29:29  8   out.
09:29:29  9   Q.   Okay.  And what the specific side effect they are looking
09:29:38 10   at here is whether the medicine, Avastin, will affect the
09:29:41 11   heart, yes?
09:29:42 12   A.   That's what it says.
09:29:44 13   Q.   Okay.
09:29:45 14        MR. MOORE:  All right.  Jen, if you could go to the
09:29:46 15   next page, please.
09:29:47 16        THE WITNESS:  You just skipped the second part, whether
09:29:50 17   it would impact the surgery.  There were two parts of that.
09:29:52 18   EXAMINATION BY MR. MOORE:
09:29:52 19   Q.   Okay.  So, whether it will affect the heart and whether it
09:29:56 20   will affect the surgery.
09:29:57 21   A.   Yes.
09:29:57 22   Q.   Okay.  The specific side effects for Avastin that they're
09:30:03 23   looking at in the trial.
09:30:03 24   A.   That's what they specified.
09:30:04 25   Q.   Okay.  Thank you for adding that.

*OFFICIAL TRANSCRIPT*

09:30:05  1          MR. MOORE:  Okay.  Let's go to the next page, Jen.

09:30:05  2   EXAMINATION BY MR. MOORE:

09:30:07  3   Q.    And if we look on Section 3, do you see where it says:

09:30:12  4   "During the study"?

09:30:17  5   A.    Section 3.  I'm sorry I don't see it.  Okay.  "During the

09:30:19  6   study," yes, I see that.

09:30:20  7   Q.    Okay.  What it indicates here is that this is a randomized

09:30:27  8   clinical trial, correct?

09:30:28  9   A.    That's what it explains.

09:30:29 10   Q.    And what "randomized" means is that the patient and the

09:30:35 11   doctor don't know precisely what regimen they are going to get

09:30:40 12   at the time that they decide to enroll in the study, correct?

09:30:44 13   A.    When you enroll in the study and agree to be randomized,

09:30:48 14   it says:  "After they look at all of your information, then

09:30:50 15   they decide under randomization which of the six options you

09:30:56 16   will be receiving if you continue as part of the study."

09:30:58 17   Q.    Okay.  But when you say "they decide," what it indicates

09:31:00 18   in this paragraph is that a computer program will place you in

09:31:05 19   one of the groups, right?

09:31:06 20   A.    That's the centralized data cited, so you're right.

09:31:10 21   That's a formal program of the trial that assigns the arm of

09:31:16 22   the study for an individual patient.

09:31:18 23   Q.    Right.  But the point being is, the patient has to agree

09:31:20 24   to sign up for this not knowing ahead of time exactly what

09:31:25 25   medicines they're going to get, correct?

                        *OFFICIAL TRANSCRIPT*

09:31:26  1    A.    The patient signs the consent, hopefully willing to accept

09:31:29  2    any of the options.  They have the full right and occasionally

09:31:33  3    do withdraw if they get an option they don't like.

09:31:36  4    Q.    Okay.  And we can maybe go a little faster.  I was just

09:31:41  5    asking about the one point, so -- but let's flip ahead to

09:31:51  6    page 10, if we could.  Okay.  And there's section here that

09:32:00  7    says -- it's posed as a question -- "How long will I be on the

09:32:05  8    study?"

09:32:06  9              Do you see that?

09:32:07 10    A.    I see that, yes.

09:32:08 11    Q.    Okay.  And the answer is:  "You will be in this study for

09:32:13 12    about ten years."

09:32:14 13              Do you see that?

09:32:15 14    A.    I see that.  That, of course --

09:32:15 15    Q.    Okay.

09:32:17 16    A.    -- assumes the patient agrees to continue being part of

09:32:21 17    the study.

09:32:21 18    Q.    Right.

09:32:21 19    A.    They can withdraw at any time.

09:32:22 20    Q.    And is that important information to convey to the

09:32:25 21    patient, the duration of the commitment that they're making at

09:32:28 22    the time that they're entering a clinical trial?

09:32:29 23    A.    I think that's important for patients to know what's

09:32:32 24    expected so that -- we'd like the patients that sign up to be

09:32:35 25    able to participate that long.

*OFFICIAL TRANSCRIPT*

09:32:37 1   Q.   Okay.

09:32:37 2        MR. MOORE:  And, Jen, you can put that down.

09:32:41 3   All right.  And then if you could pull up this section here,

09:32:47 4   Jen, entitled "Risks."  Okay.  Let me clear the line off.

09:32:47 5   EXAMINATION BY MR. MOORE:

09:32:57 6   Q.   Okay.  It indicates in this section, Dr. Bosserman -- a

09:33:02 7   question is posed again.  And I noticed that that sorts of how

09:33:06 8   they start each of these sections; they begin it by sort of

09:33:10 9   posing a question.  Is that part of the effort to make it sort

09:33:12 10  of in layman's terms to think of what a patient might -- a

09:33:15 11  question the patient might have and try and order the

09:33:18 12  information in that structure?

09:33:19 13  A.   Well, I wasn't a part of the decision making at NSABP for

09:33:24 14  this, but I think that this is an attempt to make it readable

09:33:28 15  for patients as opposed to our general medical literature,

09:33:28 16  which is --

09:33:28 17  Q.   (Speaking simultaneously) Right.  Okay.

09:33:33 18  A.   -- more difficult.

09:33:33 19  Q.   The question is:  "What side effects or risks can I expect

09:33:37 20  from being in the study?"

09:33:38 21       Do you see that?

09:33:38 22  A.   That's how it starts, yes.

09:33:40 23  Q.   Okay.  And the second sentence reads:  "Most of these are

09:33:44 24  listed here, but there may be other side effects that we cannot

09:33:47 25  predict.  Side effects will vary from person to person."

*OFFICIAL TRANSCRIPT*

09:33:53  1            Do you see that?

09:33:53  2   A.    That's part of the consent information.  I see that.

09:33:57  3   Q.    And it's important to convey, as part of the consent

09:33:59  4   process, that there is an element of the unknown when it comes

09:34:04  5   to a clinical trial, right?

09:34:06  6   A.    Most clinical trials have language, and I think this one

09:34:10  7   has that language in it, saying --

09:34:10  8   Q.    Okay.

09:34:14  9   A.    -- side effects may vary.

09:34:15  10  Q.    Right.

09:34:15  11           MR. MOORE:  And, Jen, if you could highlight the last

09:34:18  12  two sentences for me.

09:34:18  13  EXAMINATION BY MR. MOORE:

09:34:28  14  Q.    It indicates in this highlighted section, it says:  "In

09:34:37  15  some cases, side effects may be very serious, long-lasting, or

09:34:41  16  may never go away."  And then it says:  "There is also a risk

09:34:46  17  of death."

09:34:47  18            Do you see that?

09:34:48  19  A.    I see they stated that to patients.  That's certainly not

09:34:52  20  what they expect, to die, but we do make people aware that

09:34:57  21  there can be side effects in this section that could cause

09:35:00  22  death.

09:35:01  23  Q.    The sentence, "There is also a risk of death" is

09:35:04  24  italicized.  Do you see that?

09:35:06  25  A.    They did put that in italics, yes.

*OFFICIAL TRANSCRIPT*

09:35:09 1    Q.    The purpose of putting it in italics is to emphasize that
09:35:14 2    point to the reader, correct?
09:35:15 3    A.    Well, I didn't write this.  I don't know what their
09:35:17 4    purpose was.
09:35:17 5    Q.    Could there be any purpose, other than emphasizing it to
09:35:21 6    the reader?
09:35:21 7    A.    It may be that it stands out differently.  I don't know
09:35:24 8    their purpose.  I didn't write this.
09:35:25 9    Q.    Certainly, italicizing it is not meant to de-emphasize the
09:35:32 10   risk of death?
09:35:32 11   A.    I said I don't know the purpose.  It's skinnier.  You
09:35:35 12   know, some people say they want to see it bolded.  I just think
09:35:39 13   it's an important part of the consent process.
09:35:41 14   Q.    Okay.  All right.  But the impact of --
09:35:43 15   A.    Italicized, bolded, or less plain.
09:35:47 16   Q.    Do you think it's possible that the persons at the NSABP
09:35:52 17   who are responsible for drafting this paragraph meant to
09:35:55 18   de-emphasize "There is also a risk of death" by italicizing it?
09:36:00 19         MS. PEREZ:  Asked and answered.
09:36:02 20         THE COURT:  Sustained.
09:36:03 21   EXAMINATION BY MR. MOORE:
09:36:03 22   Q.    Okay.  Let's go forward, then.
09:36:19 23         MR. MOORE:  And, Jen, if we could go to page 17.
09:36:19 24   EXAMINATION BY MR. MOORE:
09:36:29 25   Q.    Okay.  And on page 17, I'll represent to you, Doctor, that

*OFFICIAL TRANSCRIPT*

09:36:34  1   this is a section that's describing the risks and side effects

09:36:41  2   related to bevacizumab.  That's one of the medicines that

09:36:43  3   they're studying in this study, correct?

09:36:45  4   A.    Bevacizumab is one of the drugs that -- I see it's out of

09:36:50  5   context, but I --

09:36:51  6   Q.    Okay.  Right.  It's just, the title starts on the

09:36:53  7   preceding page.  So I just -- in the interest of time, would

09:36:57  8   just represent to you that this is a paragraph that applies to

09:37:01  9   bevacizumab.  And bevacizumab is Avastin, yes?

09:37:03 10   A.    Bevacizumab Avastin is one type of bevacizumab, yes.  That

09:37:09 11   is the generic name; Avastin is the brand name.

09:37:14 12   Q.    Okay.

09:37:15 13        MR. MOORE:  Jen, if you could pull up the bullet point

09:37:18 14   that starts, "Blood clots."  Okay.  And if you could highlight

09:37:26 15   the sentence that begins here at "problems."

09:37:26 16   EXAMINATION BY MR. MOORE:

09:37:36 17   Q.    Okay.  So yesterday, one of the things that you told us

09:37:39 18   during your direct examination is, it's important in the

09:37:41 19   informed consent process to explain to the patient whether

09:37:45 20   there are any additional risks they might be taking on as a

09:37:49 21   result of adding the study medications, the additional

09:37:52 22   medications.

09:37:52 23        Do you recall that?

09:37:54 24   A.    I do.  But the point is that when there are known risks to

09:37:58 25   a drug in the label, it's important that you disclose those.

*OFFICIAL TRANSCRIPT*

09:37:58  1    Q.   Okay.  Do you recall --

09:38:04  2    A.   It's a known risk of bevacizumab.

09:38:05  3    Q.   Right.  And what I'm referring to here is, the Avastin,

09:38:10  4    what's described here is that there are problems due to blood

09:38:15  5    clots in arteries -- "are seen in about 2 percent of patients

09:38:20  6    receiving chemotherapy alone and about 4-and-a-half percent of

09:38:23  7    patients receiving bevacizumab with chemotherapy," yes?

09:38:25  8    A.   They're disclosing that fully, yes.

09:38:27  9    Q.   Yes.  And so that's one of the things that is part of the

09:38:29  10   informed consent process.  And when you're adding these

09:38:31  11   unapproved study medications, it's important to tell the

09:38:35  12   patient what those additional risks might be for adding that,

09:38:39  13   correct?

09:38:39  14   A.   Whether the drug is approved or unapproved, it's

09:38:43  15   unimportant.  It's important to disclose the known risks of a

09:38:48  16   drug you're proposing using in a study.  Doesn't matter if it's

09:38:51  17   approved or not.  These are the known risks of bevacizumab.

09:38:54  18   Q.   Okay.

09:38:55  19        MR. MOORE:  And if we flip to the next page, page 18 --

09:39:06  20   let me erase my mark -- under the section that starts,

09:39:13  21   "Reversible."  Down here, Jen.  If you could pull that up.

09:39:20  22        THE WITNESS:  Can I ask if this is still just regarding

09:39:23  23   the Avastin?

09:39:23  24   EXAMINATION BY MR. MOORE:

09:39:24  25   Q.   Yes, same thing.

**OFFICIAL TRANSCRIPT**

09:39:24  1    A.    Thank you.

09:39:25  2    Q.    Yeah.  So, what's being described here is something

09:39:29  3    as reversible posterior leukoencephalopathy syndrome.  It's a

09:39:34  4    medical condition related to leakiness of blood vessels in the

09:39:37  5    brain.

09:39:37  6          Do you see that?

09:39:38  7    A.    That is one of the disclosed risks I see here.

09:39:42  8    Q.    Okay.  And that's the kind of thing that you would want to

09:39:45  9    have in the informed consent when discussing it with a patient,

09:39:48  10   the risks of the particular medicines that they're studying,

09:39:51  11   yes?

09:39:51  12   A.    I think I've been clear that the known risks of the drug

09:39:55  13   are important to disclose.

09:39:56  14   Q.    Okay.  All right.  And it's also --

09:39:59  15         MR. MOORE:  Jen, if we could take that down and go to

09:40:02  16   page 19.

09:40:02  17   EXAMINATION BY MR. MOORE:

09:40:03  18   Q.    All right.  If we look at the section that's entitled

09:40:25  19   "Benefits."  Do you see that?

09:40:28  20   A.    I see that, yes.

09:40:29  21   Q.    Okay.  And this one is also posed as a question:  "Are

09:40:32  22   there benefits to taking part in this study?"

09:40:39  23         Do you see that?

09:40:39  24   A.    I see that, yes.

09:40:40  25   Q.    And it indicates -- the first sentence says:  "Taking part

*OFFICIAL TRANSCRIPT*

09:40:44  1   in this study may or may not make your health better."

09:40:47  2           Do you see that?

09:40:47  3   A.   That's very important, yes.

09:40:49  4   Q.   And what's being conveyed there to the patient is,

09:40:52  5   essentially, there may be some benefit, there may not, we don't

09:40:56  6   know?

09:40:57  7   A.   That's been a standard part of all the trial development

09:41:01  8   that women have entered in clinical trials to bring us to the

09:41:04  9   point --

09:41:04 10   Q.   Right.

09:41:04 11   A.   -- that we are and knowing about drugs and their side

09:41:08 12   effects and the --

09:41:08 13   Q.   And it's --

09:41:09 14   A.   -- efficacy and impacts.

09:41:10 15   Q.   But the standard part is that they do not know whether or

09:41:16 16   not participating in the clinical trial will be of any benefit,

09:41:16 17   correct?

09:41:19 18   A.   To them personally, yes.

09:41:20 19   Q.   Okay.  And if we go down to the next section, that says,

09:41:26 20   "Alternatives."  All right.  In this section, the question

09:41:35 21   that's posed is:  "What other choices do I have if I do not

09:41:41 22   take part in this study?"

09:41:43 23           Do you see that?

09:41:44 24   A.   I see that.

09:41:44 25   Q.   And it gives four options, yes?

*OFFICIAL TRANSCRIPT*

09:41:47   1   A.   Yes.

09:41:47   2   Q.   And one of the options is getting no treatment at all?

09:41:53   3   A.   And there's four options, yes --

09:41:53   4   Q.   Okay.

09:41:54   5   A.   -- getting no treatment.

09:41:55   6   Q.   And what this is conveying to the patient is what you

09:41:58   7   talked about yesterday, to make sure the patients know that

09:42:01   8   it's their choice to enroll in a clinical trial or not,

09:42:01   9   correct?

09:42:06   10   A.   That's not what that means.  This says you can get

09:42:10   11   treatment off the study, you could have surgery first, you

09:42:13   12   could be in another study, or you could choose no chemotherapy,

09:42:18   13   is how I read that.

09:42:18   14   Q.   Okay.  But the question is:  "What other choices do I have

09:42:23   15   if I do not take part in the study?"  Right?

09:42:24   16   A.   That's what this section addresses --

09:42:24   17   Q.   Right.

09:42:26   18   A.   -- and they gave four options.

09:42:27   19   Q.   But the question and the choice is whether or not to take

09:42:30   20   part in the study, yes?

09:42:31   21   A.   No, they had four other options.

09:42:31   22   Q.   Right.

09:42:33   23   A.   They could enter the study, they could get treatment

09:42:36   24   off-study, go on another study, they could have no treatment,

09:42:39   25   or have surgery first and then make a decision.  I think that

*OFFICIAL TRANSCRIPT*

09:42:43  1   gave them five options.

09:42:44  2   Q.   Okay.  And it's up to the patient which one to do,

09:42:47  3   ultimately, yes?

09:42:48  4   A.   The patient makes the decision.

09:42:51  5   Q.   Okay.  All right.  Last subject matter --

09:43:01  6        MR. MOORE:  You can take that down, Jen.  Okay.

09:43:21  7        Your Honor, could we approach real quick?

09:43:24  8        THE COURT:  Yes.

09:43:24  9        (WHEREUPON, at this point in the proceedings, a bench

09:43:24 10   conference was held.)

09:43:50 11        MR. MOORE:  The consent form, I would -- since we used

09:43:54 12   it with this witness, it's something she looked at, part of her

09:43:58 13   reference in her expert report, and I just examined her on it,

09:44:01 14   I would normally move into evidence.  It within the medical

09:44:03 15   records to which there is a stipulation that there is no issues

09:44:05 16   of authenticity or foundation or hearsay or anything, but the

09:44:10 17   issue that she raised was that the last page had some

09:44:14 18   sentences, I didn't even read what it was, that in our version

09:44:16 19   of the exhibit, it hadn't been redacted.

09:44:19 20        And so, what I want to do is just offer --

09:44:23 21        THE COURT:  What's redacted?

09:44:27 22        MS. PEREZ:  I think the portion that goes

09:44:28 23   with compensation makes it look like there is an issue, like a

09:44:31 24   potential legal issue, so when we used the document yesterday,

09:44:35 25   we made sure that we redacted that out so there weren't any

**OFFICIAL TRANSCRIPT**

09:44:38 1    issues for the jury.

09:44:40 2            I also disagree that there's not any issues about

09:44:43 3    laying a foundation for the admissibility.  While I agree it's

09:44:48 4    an authentic medical record, it's not her medical record.  She

09:44:52 5    testified she didn't draft it.  She hasn't reviewed it with

09:44:52 6    Ms. Kahn.  I just don't think she's the proper witness to move

09:44:58 7    it in.

09:44:58 8            THE COURT:  Do you really think we're going to proceed,

09:45:00 9    in this case without having this in evidence?

09:45:02 10           MS. PEREZ:  No, ma'am.  I --

09:45:04 11           THE COURT:  Well, can't you just agree to put it in?

09:44:43 12           MR. MOORE:  We'll make sure whatever goes back to the

09:44:50 13   jury is redacted.

09:44:53 14           THE COURT:  Yeah.

09:44:53 15           MR. MOORE:  She raised it.  I just wanted to make sure.

09:44:54 16           THE COURT:  That's all right.  That's fine.  Okay.

09:44:58 17   That's fine.  We'll just put it into evidence and redact it

09:45:01 18   before.  That's fine.

09:45:02 19           MS. PEREZ:  I think we already have an electronic

09:45:05 20   redacted copy, so which should be pretty easy.

09:45:09 21           THE COURT:  Okay.  Thank you very much.

09:45:09 22           (WHEREUPON, at this point in the proceedings, the bench

09:45:45 23   conference concluded.)

09:45:45 24           MR. MOORE:  At this time, Your Honor, we would offer,

09:45:51 25   file, and introduce Defendant's Exhibit D-2035, subject to the

*OFFICIAL TRANSCRIPT*

09:45:56  1    discussion of a redaction for the jury book.

09:46:00  2            THE COURT:  Let it be admitted.

09:46:01  3            (WHEREUPON, at this point in the proceedings,

09:45:51  4    Defendant's Exhibit D-2035 was admitted into evidence.)

09:45:51  5    EXAMINATION BY MR. MOORE:

09:46:09  6    Q.   Okay.  Yesterday, Doctor, you talked about the impact that

09:46:21  7    Ms. Kahn's treatment had on her tumor along the way during her

09:46:25  8    chemotherapy.  Do you recall that?

09:46:26  9    A.   I believe I talked about the measurements that the doctors

09:46:31 10    reported after each cycle of treatment and then the surgical

09:46:34 11    results.

09:46:35 12    Q.   Okay.  And what I wanted to ask you about were some of the

09:46:40 13    processes for reporting that information in a clinical trial.

09:46:46 14    Based on your experience as a principal investigator in

09:46:50 15    clinical trials, would you agree that there is a process

09:46:54 16    whereby the tumor is measured before and after each segment of

09:47:01 17    treatment?

09:47:03 18    A.   There are forms and there are forms in her records

09:47:07 19    showing -- call it "tumor measurement."  It's really whatever

09:47:11 20    lump you can measure.  We don't know that that is all tumor.

09:47:14 21    In fact, often it is or isn't.  But we do use that as our best

09:47:19 22    clinical guide each time in the same way we enter that on the

09:47:24 23    report.

09:47:25 24    Q.   Okay.  And you mentioned that they had some of those

09:47:27 25    reports in Ms. Kahn's medical records that you've seen?

*OFFICIAL TRANSCRIPT*

09:47:27 1    A.    Yes.

09:47:30 2    Q.    Okay.  What I would like to show you is what's been marked

3    as Defense Exhibit 3876.

4          THE COURT REPORTER:  I'm sorry, Judge.  My feed has

5    stopped working here.

6          THE COURT:  This is a good time for us to take our

7    morning break.  Court will be in recess for 10 minutes.

8          (WHEREUPON, at 9:47 a.m., the jury panel left the

09:57:02 9    courtroom, and the Court was in recess.)

09:57:02 10         THE DEPUTY CLERK:  All rise.

10:05:36 11         (WHEREUPON, at 10:05 a.m., the jury panel enters the

10:05:57 12   courtroom.)

10:05:57 13        THE COURT:  All jurors are present.  Court is back in

10:06:01 14   session; you may be seated.

10:06:03 15             Mr. Moore.

10:06:06 16        MR. MOORE:  Thank you, Your Honor.

10:06:12 17   EXAMINATION BY MR. MOORE:

10:06:07 18   Q.    Okay.  Dr. Bosserman, just a couple more questions.

10:06:13 19   Before we had the technical issue, we were talking about your

10:06:18 20   testimony yesterday about Ms. Kahn's -- her tumor's response to

10:06:21 21   the therapy that she underwent in the NSABP clinical trial.

10:06:28 22   And one of the things that you mentioned is that in her medical

10:06:31 23   records that you've seen, there are forms that kind of record

10:06:34 24   that information along the way, right?

10:06:37 25   A.    There are forms that have the doctor measure what they can

**OFFICIAL TRANSCRIPT**

10:06:43  1   feel, and enter it into those forms, yes.

10:06:45  2   Q.   Okay.  All right.  Let's go over a couple of those.

10:06:47  3        MR. MOORE:  What I'd like to pull up, Jen, is

10:06:49  4   Defendant's 3876.  Okay.

10:06:49  5   EXAMINATION BY MR. MOORE:

10:07:00  6   Q.   And Dr. Bosserman, do you see here on the bottom, it has

10:07:06  7   Elizabeth Kahn's name?

10:07:07  8   A.   I see that.

10:07:07  9   Q.   Okay.

10:07:10 10        MR. MOORE:  And you can put that down, Jen.

10:07:10 11   EXAMINATION BY MR. MOORE:

10:07:12 12   Q.   Okay.  And it indicates the date of randomization up here

10:07:19 13   at the top as May 21st, 2008, yes?

10:07:25 14   A.   That's what it indicates.

10:07:26 15   Q.   Okay.  And that's the date that Ms. Kahn would have been

10:07:28 16   under the computer system, put into whatever arm of the study

10:07:32 17   she was put into, yes?

10:07:33 18   A.   It's the date entered for the date of randomization.

10:07:36 19   Q.   Okay.  All right.

10:07:36 20        MR. MOORE:  And, Jen, if we could flip to page 3.

10:08:22 21   Okay.  Hold on.  Put it down, Jen.  Oh, it's the third page of

10:08:22 22   the document, but it's page 4.  Okay.

10:08:22 23        We can put it back up.  Thank you.

10:08:22 24   EXAMINATION BY MR. MOORE:

10:08:23 25   Q.   Okay.  And it indicates here that there is a baseline

*OFFICIAL TRANSCRIPT*

10:08:28  1    clinical tumor assessment, and the date of that assessment is

10:08:34  2    May 21st, 2008.

10:08:35  3             Do you see that?

10:08:36  4    A.    That's what was entered, yes.

10:08:40  5    Q.    Okay.

10:08:40  6             MR. MOORE:  And you can put it back up, Jen.

10:08:40  7    EXAMINATION BY MR. MOORE:

10:08:43  8    Q.    Okay.  And it indicates that the longest diameter of

10:08:47  9    lesions, it says, 4.0.

10:08:50 10             Do you see that?

10:08:50 11    A.    I do.

10:08:51 12    Q.    Okay.  And that would be in centimeters, right?

10:08:53 13    A.    Well, it doesn't state that, but I know from reading the

10:08:57 14    medical records, it's 4 centimeters.

10:09:00 15    Q.    Okay.  Perfect.  Thank you.  All right.

10:09:02 16             MR. MOORE:  You can put that down, Jen.  And what I

10:09:04 17    want to do is move to the next visit.  Okay.  All right.  Jen,

10:09:25 18    if you could flip to page 55 of the document.  Okay.

10:09:25 19    EXAMINATION BY MR. MOORE:

10:09:40 20    Q.    All right.  Looking at this document, it's titled, "NSABP

10:09:48 21    Protocol B-40 Tumor Response Form."

10:09:50 22             Do you see that?

10:09:51 23    A.    This is one of the trial documents, not the notes from the

10:09:56 24    physician.  But they get transcribed by a research assistant.

10:09:59 25    Q.    Okay.  But my question was:  Do you see that?

                            *OFFICIAL TRANSCRIPT*

10:10:01 1    A.   I see that title, yes.

10:10:03 2    Q.   All right.

10:10:04 3         MR. MOORE:  And if we flip to the next page, Jen, and

10:10:12 4    if we pull up that box on the bottom that says, "Reason form

10:10:17 5    submitted" -- yeah, just go from there.

10:10:17 6    EXAMINATION BY MR. MOORE:

10:10:24 7    Q.   Okay.  And it indicates in this box, does it not, "Reason

10:10:29 8    form submitted; required assessment at the end of the docetaxel

10:10:34 9    regimen before starting the A and the C."

10:10:37 10        Do you see that?

10:10:38 11   A.   I see that.  As you know, the correct statement is

10:10:41 12   docetaxel, Avastin, capecitabine, because she got all three for

10:10:47 13   each of these cycles.

10:10:48 14   Q.   Right.  But what this document says is, "Docetaxel

10:10:51 15   regimen," right?

10:10:51 16   A.   That's what's written there.  But actually, what's entered

10:10:53 17   is the basis of all three treatments.

10:10:56 18   Q.   Okay.  But my question was:  Do you see that?  That was

10:10:58 19   all.

10:10:58 20   A.   I do see what --

10:10:58 21   Q.   Okay.

10:10:59 22   A.   -- you have pointed out.

10:11:00 23   Q.   All right.  And the smallest sum of the longest diameter

10:11:04 24   of all target lesions is listed as 1 centimeter.

10:11:06 25        Do you see that?

*OFFICIAL TRANSCRIPT*

10:11:07  1    A.    I see that.

10:11:08  2    Q.    Okay.  All right.  So, after the treatment with the

10:11:11  3    docetaxel regimen, the tumor, according to these forms, went

10:11:17  4    from 4 centimeters to 1 centimeter, correct?

10:11:20  5    A.    After docetaxel, capecitabine, Avastin.  It's very

10:11:24  6    important because Avastin in the study was the main impact to

10:11:29  7    read the trial results.

10:11:30  8    Q.    My question was:  This was the assessment after what is

10:11:34  9    described as the docetaxel regimen in this document, yes?

10:11:39  10   A.    That's not what's indicated.  This was --

10:11:39  11   Q.    I'm asking you what the document says.

10:11:42  12   A.    -- four cycles of docetaxel --

10:11:42  13   Q.    She can ask you --

10:11:45  14   A.    -- capecitabine, Avastin.

10:11:48  15          THE COURT:  Doctor.  I think, Doctor, the question is:

10:11:50  16   Is that what the words say?

10:11:54  17          THE WITNESS:  The words say that.

10:11:57  18   EXAMINATION BY MR. MOORE:

10:11:57  19   Q.    Okay.  And the size is 1 centimeter, yes?

10:11:59  20   A.    Yes.

10:11:59  21   Q.    And that, on the chart you showed yesterday, would have

10:12:02  22   been the size of a pea, correct?

10:12:06  23   A.    I have to remember which one was the pea and the walnut --

10:12:08  24   the pea and the peanut.

10:12:09  25   Q.    Okay.  All right.

**OFFICIAL TRANSCRIPT**

10:12:11  1          MR. MOORE:  We can put it down.  And if we can go to

10:12:18  2    the end of the chemotherapy, this will be page 87, and look at

10:12:25  3    the next tumor report form -- response form -- I'm sorry.

10:12:40  4    Okay.  Let's flip to the next page.  Here we are.  If we could

10:12:44  5    highlight that same section at the bottom of this document.

10:12:44  6    EXAMINATION BY MR. MOORE:

10:12:50  7    Q.    Okay.  Do you see the date here is November 13th, 2008?

10:12:53  8    A.    I do.

10:12:53  9    Q.    And you see that this is the required assessment of the

10:12:56 10    end of the AC cycles?

10:12:57 11    A.    Yes.  It declared it's AC, Avastin.

10:13:02 12    Q.    And the measurement that's made here is 00.0.  Do you see

10:13:08 13    that?

10:13:08 14    A.    They could not feel a mass, yes.

10:13:10 15    Q.    Okay.  So after completion of chemotherapy during this

10:13:15 16    assessment, the clinician could not even find the tumor

10:13:19 17    anymore, correct?

10:13:20 18    A.    They could not feel it by exam.  That's correct.

10:13:22 19    Q.    Okay.  All right.  Would you agree that that is a positive

10:13:30 20    clinical response from the chemotherapy?

10:13:33 21    A.    I would agree it's a positive response to the

10:13:36 22    chemotherapy, the Avastin, the capecitabine, the AC.

10:13:36 23    Q.    All right.

10:13:44 24          MR. MOORE:  I have no further questions.  Thank you,

10:13:46 25    Dr. Bosserman.

*OFFICIAL TRANSCRIPT*

10:13:47 1          THE COURT:  Thank you.  Ms. Perez.

10:14:02 2          MR. MOORE:  Oh, wait.  Sorry.  Before I step away,

10:14:05 3  Your Honor, we would propose to move into evidence Defendant's

10:14:10 4  3876 subject to some redactions we have to make for PII.

10:14:16 5          THE COURT:  Any objections?

10:14:16 6          MS. PEREZ:  No objections pursuant to the needed PII

10:14:21 7  redactions.

10:14:22 8          THE COURT:  Let it be admitted.

10:14:22 9          (WHEREUPON, at this point in the proceedings,

10:14:22 10 Defendant's Exhibit Number 3876 was admitted into evidence.)

10:14:22 11 REDIRECT EXAMINATION BY MS. PEREZ:

10:14:25 12 Q.   Good morning, Dr. Bosserman.

10:14:27 13 A.   Good morning.

10:14:27 14 Q.   Yesterday, you were asked some questions by Mr. Moore

10:14:31 15 regarding how much you have been paid, and I just wanted to

10:14:34 16 clarify a few things with you about that, if that's okay.

10:14:36 17 A.   Yes.

10:14:36 18 Q.   You worked in the Taxotere litigation for several years,

10:14:36 19 correct?

10:14:42 20 A.   Correct.

10:14:42 21 Q.   And during the course of your work in the Taxotere

10:14:46 22 litigation, you worked on approximately nine different cases;

10:14:46 23 is that fair?

10:14:54 24 A.   At least nine, yes.

10:14:55 25 Q.   And you've been deposed at least seven different times in

**OFFICIAL TRANSCRIPT**

10:14:59  1   the Taxotere litigation; is that right?

10:15:01  2   A.    That is correct.

10:15:01  3   Q.    And in preparation for each one of those seven

10:15:07  4   depositions, did you spend multiple hours reviewing medical

10:15:10  5   records and preparing for your testimony?

10:15:12  6   A.    Yes, including detailed written reports.

10:15:15  7   Q.    So, would it be fair to say that the figure we heard

10:15:21  8   yesterday from Mr. Moore of $250,000, was that for all of your

10:15:26  9   work in the entire Taxotere litigation and not solely just

10:15:31 10   Ms. Kahn's case?

10:15:31 11   A.    Yes.

10:15:32 12   Q.    And so yesterday, when you told the jury that you had only

10:15:37 13   worked on one case, just to be clear, you were referring to the

10:15:41 14   Taxotere litigation as a whole, correct?

10:15:45 15   A.    Correct.

10:15:45 16   Q.    Mr. Moore also asked you yesterday some questions on costs

10:15:52 17   about a letter you had received from the FDA.  And I believe

10:15:55 18   you were attempting to provide a full response as to what

10:15:59 19   ultimately happened, but, unfortunately, you weren't permitted

10:16:03 20   to do so.  So I would just like you to briefly explain what

10:16:08 21   ultimately happened in that situation, Dr. Bosserman.

10:16:10 22   A.    So when you're an investigator, you oversee the

10:16:13 23   clinical trial and all the elements, all the regulatory

10:16:16 24   documents, as we just saw some examples of.  And we were doing

10:16:20 25   a trial for a drug, and for the first time in my career, had a

*OFFICIAL TRANSCRIPT*

10:16:27  1    two-week consent form time frame.  It was an error in how it

10:16:30  2    got drafted by the central group at UCLA.  And so the patient

10:16:34  3    who had signed the consent form 14 days earlier, the drug

10:16:38  4    hadn't been -- it would be delivered, and the consent form

10:16:42  5    technically expired.  It actually did expire.  And we had her

10:16:46  6    come in to sign it, and the -- I saw her, we reviewed

10:16:49  7    everything again.  She had metastatic disease.  This was the

10:16:56  8    PARP inhibitor, the only drug thought to be of benefit.  It was

10:16:57  9    her only last option, and she'd taken three buses to come for

10:17:01 10    that additional review.

10:17:02 11            Unfortunately, when she left, the trial administrator

10:17:07 12    didn't have her re-sign the consent form.  And that

10:17:10 13    administrator, who is a wonderful employee, had found out she

10:17:14 14    was five months pregnant while having a six-month-old at home

10:17:18 15    as a single mother.  She really had a bad few weeks about

10:17:22 16    asking for help, and she took the old consent form, whited out

10:17:26 17    the original date two weeks earlier, and put in the date the

10:17:32 18    patient was going to re-consent.  But worse, she had to have

10:17:34 19    another EKG.  And instead of having that other office, which we

10:17:37 20    had freely available, she took another patient and put the name

10:17:39 21    on it.

10:17:39 22            And only because I knew this was a Medi-Cal patient

10:17:44 23    who we had worked so hard to get on the trial, did I know she

10:17:48 24    could not have had an EKG at that hospital.  And when I found

10:17:52 25    that, that's just unacceptable of any falsified document in a

*OFFICIAL TRANSCRIPT*

10:17:56  1    research trial.  And my reputation is very important.  We

10:17:59  2    self-reported to the FDA in February of 2010.  They sent

10:18:03  3    somebody in December that next year.  And probably like having

10:18:06  4    an IRS audit, they reviewed every trial we had, and they found

10:18:10  5    other things that either an EKG was done at the wrong time.  As

10:18:15  6    I explained, half the patients were supposed to have it one

10:18:18  7    hour after treatment.  It was done in exactly two hours, and we

10:18:22  8    figured out the EKG machine provided by the trial sponsor

10:18:26  9    didn't adjust to Daylight Savings Time, and, in fact, was

10:18:31 10    correct.

10:18:31 11         Other times, a couple patients hadn't had a special

10:18:36 12    investigational blood draw; they hadn't wanted it done.  And

10:18:39 13    another time, a questionnaire hadn't been done.  Each of the

10:18:44 14    trial sponsors were contacted.  There was no impact on any

10:18:46 15    trials.  And, unfortunately, because I was the licensed person,

10:18:49 16    I got the letter in my name as opposed to the person who,

10:18:54 17    obviously, was terminated after this event.

10:18:56 18         I wrote an 11-page single-spaced response to every

10:19:02 19    issue where they thought something had not been done

10:19:05 20    regulatorily, and sent 100 pages of documents.  And they

10:19:09 21    responded that everything we had done had addressed the issue.

10:19:12 22         That really wasn't enough for us, and we requested a

10:19:16 23    re-audit.  It took them two years to come back.  They came back

10:19:20 24    for a surprise audit, and they did that in 2013 and fully

10:19:24 25    certified our program.  And I'm an active investigator.  So

*OFFICIAL TRANSCRIPT*

10:19:27  1    that was, you know, a really unfortunate episode.  I was

10:19:32  2    responsible as the doctor overseeing the program, but,

10:19:36  3    obviously, I didn't do that.  And we put even more oversight in

10:19:41  4    place and more regulations and standard procedures in place to

10:19:46  5    make sure that every single thing in a trial would be done

10:19:50  6    correctly because, as we've heard, the results are so

10:19:52  7    important.

10:19:52  8    Q.   Dr. Bosserman, speaking about results, I believe on cross

10:19:56  9    you were asked about the first chance and best chance for

10:20:01 10    survival when it deals with breast cancer.  And in response to

10:20:05 11    one of Mr. Moore's questions, you answered "no" to that, and

10:20:11 12    you asked if you could explain.  I know Mr. Moore was not able

10:20:14 13    to permit you that time, but invited me to do so.  So could you

10:20:17 14    please explain to the jury what you mean by first chance, last

10:20:23 15    chance.

10:20:23 16    A.   It's really important to get the right treatment plan in

10:20:26 17    place for a patient.  And as we've heard, it's all about all

10:20:28 18    those personalized factors; the patient's values, what they

10:20:31 19    think of side effects, schedule, costs, the potential benefit

10:20:35 20    and risk.  And that's our best time to explain all that in an

10:20:40 21    honest fashion and tell them everything that is known that is

10:20:43 22    relevant to them about the treatment.  That's the only time to

10:20:47 23    tell them about long-term side effects.

10:20:50 24         Short-term side effects, you can adjust along the way

10:20:55 25    the dose adjustments or stopping the treatment.  But long-term

*OFFICIAL TRANSCRIPT*

10:20:59 1    side effects, when you have those treatments, then you didn't

10:21:01 2    have a chance to tell them, oh, I forgot to tell you.  And

10:21:04 3    that's so important.  Your first chance is the time when you're

10:21:09 4    focused with them to tell them the truth of what is known about

10:21:13 5    drugs and drug side effects.

10:21:14 6    Q.    And also, Dr. Bosserman, on cross, you were asked about

10:21:21 7    patients enrolling in the same clinical trial as Ms. Kahn, not

10:21:25 8    knowing what drugs they would receive.  But based upon your

10:21:29 9    review of the records, what chemotherapy regimen was every

10:21:34 10   patient to be enrolled in the trial Ms. Kahn enrolled in going

10:21:38 11   to receive?

10:21:39 12   A.    Every patient would get the standard therapy, including a

10:21:46 13   taxane and the AC regimen, docetaxel and the AC regimen.  That

10:21:52 14   was thought to be equal to whether you got Taxol, Taxotere, or

10:21:55 15   one of the other third generation regimens.  She would get that

10:22:00 16   no matter which of the six arms.  There was no placebo for the

10:22:04 17   standard arm.  You might only get the standard arm, you might

10:22:07 18   only get the standard arm with the bevacizumab in chemotherapy,

10:22:12 19   or otherwise, as we looked at those six options.  But at a

10:22:14 20   minimum, every patient was given a proven effective regimen.

10:22:18 21   Q.    And you were also asked some questions on cross by

10:22:23 22   Mr. Moore related to Ms. Kahn's informed consent.

10:22:26 23         Do you recall that?

10:22:26 24   A.    Yes.

10:22:27 25   Q.    And I'd like to just show that passage just one more time

*OFFICIAL TRANSCRIPT*

10:22:31  1   as it relates to the risk.

10:22:33  2          MS. PEREZ:  I believe that's page 10 of 26 of that

10:22:36  3   document, Mr. Moore.

10:22:36  4   EXAMINATION BY MS. PEREZ:

10:22:38  5   Q.   And I just briefly highlighted this language here, but

10:22:46  6   "There may be other side effects that we cannot predict."  And

10:22:49  7   I wanted to discuss that with you.  Looking at that language,

10:22:54  8   what about known side effects -- is this language in this

10:23:01  9   section intended to speak to that?

10:23:02 10   A.   No.  It's not intended to say that if we know things, we

10:23:07 11   couldn't disclose them.  I think the bevacizumab was a really

10:23:10 12   good example.  They went through every possible potential

10:23:13 13   serious side effect, and when they knew it, they put the

10:23:15 14   percentages in.  So, this is not a blanket to avoid things you

10:23:18 15   don't want people to know about that --

10:23:18 16   Q.   Dr. Bosserman --

10:23:21 17   A.   -- are known.

10:23:21 18   Q.   I'm sorry.  I didn't mean to speak over you.  Were you

10:23:24 19   finished with your --

10:23:24 20   A.   I said it's not to avoid known side effects that you don't

10:23:30 21   want to talk about.

10:23:30 22   Q.   And why is it important for a patient to be fully informed

10:23:35 23   about known side effects, Dr. Bosserman?

10:23:38 24   A.   Because the patient lives with the side effects.  The

10:23:42 25   doctors care for patients, but the patients walk it, live it

10:23:46  1    the rest of their lives.  They have the right, especially when
10:23:50  2    there are so many choices of effective therapy, to be part of
10:23:54  3    that discussion of which side effects they accept.
10:23:59  4    Q.   Thank you very much for your time here today,
10:24:02  5    Dr. Bosserman.
10:24:03  6              MS. PEREZ:  At this time, Your Honor, the plaintiff has
10:24:05  7    no more questions for this witness.
10:24:08  8              THE COURT:  Thank you.  You may step down.
10:24:18  9              THE WITNESS:  Thank you.
10:24:18 10              MR. BACHUS:  May we approach?
10:24:20 11              THE COURT:  Yes.
10:24:25 12              (WHEREUPON, at this point in the proceedings, there was
10:24:25 13    a conference held at the bench.)
10:24:40 14              MS. PEREZ:  I don't know how we want to proceed on the
10:24:41 15    issue.
10:24:42 16              THE COURT:  All right.  Are you all ready to talk about
10:24:43 17    it?
10:24:43 18              MR. BACHUS:  Yeah.
10:24:43 19              MS. PEREZ:  I've got to ask Mr. Schanker, but I
10:24:43 20    believe --
10:24:51 21              THE COURT:  Yeah.  But I want everybody ready to talk
10:24:53 22    about it.  I'm going to give you --
10:24:53 23              MS. PEREZ:  Yes, Your Honor.
10:24:53 24              THE COURT:  -- a five-minute break.
10:24:53 25              MS. PEREZ:  Okay.

                                        *OFFICIAL  TRANSCRIPT*

10:24:53  1          THE COURT:  All right.

10:24:53  2          MR. BACHUS:  Sure.  Thank you.

10:24:53  3          (WHEREUPON, at this point in the proceedings, the bench

10:24:58  4     conference concluded.)

10:24:58  5          THE COURT:  Members of the Jury, we're going to take a

10:25:01  6     five-minute break so that we can prepare for the next witness.

10:25:04  7     Court will be in recess for five minutes.

10:25:19  8          (WHEREUPON, at 10:25 a.m., the jury panel leaves the

10:49:52  9     courtroom and the Court took a recess.)

10:49:52 10          THE DEPUTY CLERK:  All rise.

10:49:53 11          (WHEREUPON, at 10:49 a.m., the jury panel enters the

10:50:06 12     courtroom.)

10:50:06 13          THE COURT:  All jurors are present.  Court's back in

10:50:09 14     session; you may be seated.

10:50:10 15              Mr. Schanker, please call your next witness.

10:50:18 16          MR. SCHANKER:  Thank you, Your Honor.  Let me take my

10:50:27 17     mask off up here.  Your Honor, we would like to call

10:50:29 18     Dr. Antonella Tosti to the stand.

10:51:29 19          THE DEPUTY CLERK:  Would you please raise your right

         20     hand.

         21              Do you solemnly swear that the testimony which

         22     you are about to give will be the truth, the whole truth and

         23     nothing but the truth, so help you God?

         24          THE WITNESS:  Yes, I swear.

         25                    **DR. ANTONELLA TOSTI**

                              *OFFICIAL TRANSCRIPT*

 1    was called as a witness and, after being first duly sworn by

 2    the Clerk, was examined and testified on her oath as follows:

 3              THE DEPUTY CLERK:  Okay.  Please have a seat.  Okay.

 4    If you'd like, remove your mask.

 5              THE WITNESS:  Can I do?

 6              THE DEPUTY CLERK:  Yes.

 7              THE WITNESS:  Okay.  Thank you.

 8              THE DEPUTY CLERK:  Please state and spell your full

 9    name for the record.

10:51:37 10          THE WITNESS:  Okay.  Antonella Tosti.

10:51:56 11          MR. SCHANKER:  Can you go ahead and spell your last

10:51:56 12    name for the record.

10:51:56 13          THE WITNESS:  Last is T-O-S-T-I.  First name is

10:52:06 14    Antonella, A-N-T-O-N-E-L-L-A.

10:52:06 15                        VOIR DIRE EXAMINATION

10:52:06 16    BY MR. SCHANKER:

10:52:07 17    Q.    Thank you, Dr. Tosti.  Good afternoon.

10:52:10 18    A.    Good afternoon.

10:52:11 19    Q.    Could you go ahead and introduce yourself to the jury.

10:52:16 20    And by that, I mean, could you tell them where you're from.

10:52:19 21    A.    So my name is, as I said, Antonella Tosti.  I'm Italian.

10:52:25 22    And I'm sorry about my, you know, language because sometimes it

10:52:32 23    can be difficult for you to completely understand me, I know

10:52:36 24    about that.  So I'm a medical doctor, and I'm in dermatology.

10:52:42 25    And I was working in Italy for many years as being a medical

                              *OFFICIAL TRANSCRIPT*

10:52:48  1    doctor for more than 30 years.  And then I moved to the

10:52:53  2    United States in 2010.  And since then, I'm working at the

10:53:00  3    University of Miami.  So I'm a dermatologist, and I am a

10:53:03  4    professor of dermatology in Miami.  So I see patients, and I

10:53:10  5    teach students, and I teach medical doctors.  And so that's my

10:53:14  6    job.

10:53:14  7    Q.    Thank you, Dr. Tosti.

10:53:15  8          We'll get into some of those things that you touched

10:53:18  9    on.  You're here to testify about some scientific issues in

10:53:22  10   this case?

10:53:23  11   A.    Yes, I am.

10:53:24  12   Q.    Okay.  And we'll go through that.  But first, if you

10:53:29  13   could -- and you did already a little bit -- but as we move

10:53:31  14   through this, your professional background for the jury, could

10:53:35  15   you just make sure that these folks understand exactly what you

10:53:40  16   do for a living.

10:53:41  17   A.    So what I do for a living being a medical doctor is seeing

10:53:46  18   patients.  So I see patients on a daily basis, and, you know,

10:53:51  19   I'm specialized in hair disorders.  So I am, you know, seeing

10:53:59  20   all types of patients, but I would say at least 95 percent of

10:54:05  21   the patients I see are patients coming to see me because of

10:54:09  22   hair loss problems.

10:54:09  23   Q.    Okay.

10:54:12  24   A.    And I see patients in Miami, but I still kept my practice

10:54:17  25   in Italy, and -- because I have a very good practice that was a

                          *OFFICIAL TRANSCRIPT*

10:54:23  1    private practice I had.  So I keep going to Italy, usually

10:54:27  2    three times a year, three, four times a year.  Now, with the

10:54:32  3    COVID, it's been a little bit different, of course.

10:54:35  4         In Miami, I see patients.  But, you know, I'm a

10:54:40  5    professor at university, so as a professor of the university,

10:54:44  6    I'm also paid by the university to teach the medical students,

10:54:49  7    to teach the residents that are -- the doctors that want to

10:54:56  8    become dermatologists.  And I also teach people, doctors,

10:55:01  9    dermatologists, let's say, from all around the world that want

10:55:05 10    to get, you know, super specialized in hair disorders.  And

10:55:10 11    they come to the university and spend maybe one month, maybe

10:55:14 12    three months, maybe one year with me.

10:55:16 13    Q.   Dr. Tosti, let's talk about your specialty as a

10:55:23 14    dermatologist.  Before we do that, could you explain what the

10:55:26 15    field of dermatology is to the jury.

10:55:29 16    A.   So dermatology is the doctors that diagnose and treat

10:55:36 17    diseases of the skin, of the nails, and of the hair.  Okay.

10:55:42 18    Then, you know, also, some dermatologists also specialize,

10:55:46 19    maybe in the mouth.  There are areas that are maybe not just

10:55:50 20    dermatological, overlapping with other specialties.

10:55:54 21    Q.   And then those areas you described that make up

10:55:59 22    dermatology, do you have a specialty in one or more of those

10:56:04 23    areas?

10:56:05 24    A.   You know, I have, like, say, subspecialties, okay?  And

10:56:12 25    these are hair disorders, as I explained to you from the

*OFFICIAL TRANSCRIPT*

10:56:15  1   beginning.  I'm also an expert in nail disorders, so disorders

10:56:18  2   of the nails, and I'm also an expert in allergies, skin

10:56:25  3   allergy.

10:56:25  4   Q.    Okay.  Doctor, did you attend medical school?

10:56:30  5   A.    I did my medical school in Bologna.  Also, my high school,

10:56:35  6   which is Italy.

10:56:37  7   Q.    Doctor, why did you go to medical school?

10:56:42  8   A.    I went to medical school.  I wanted to be a doctor since I

10:56:46  9   was young.  My father was a doctor.  My father was a

10:56:48 10   dermatologist.  Maybe that's part of why.  And, you know, as I

10:56:53 11   said, I was in Bologna.  Bologna has the oldest university of

10:56:59 12   the world.  People also don't know this is the oldest one.  And

10:57:03 13   now it's still one of the best universities of the world, so I

10:57:07 14   did my medical school there.  I did my dermatology residency,

10:57:12 15   the residency there.  And then I was professor at The

10:57:19 16   University of Bologna for many years until I moved to the

10:57:23 17   United States.

10:57:23 18   Q.    Dr. Tosti, would you share with the jurors why you decided

10:57:26 19   to specialize in dermatology and in hair in particular.

10:57:31 20   A.    You know, dermatology, I think I like.  And, you know, my

10:57:37 21   father was a dermatologist.  That might be a reason.  I

10:57:40 22   honestly think that one reason, to really be honest, is to show

10:57:48 23   him that I was good enough.  And then for hair, you know, I was

10:57:54 24   interested in the biology of hair since I was in high school

10:57:59 25   because I met this scientist -- not a doctor.  He was just a

*OFFICIAL TRANSCRIPT*

scientist -- from Italian origin.  His name was Bill Montagna.
I was visiting in Italy, and we had conversations just at the
level of, like -- yeah, I was probably 14 -- about how hair is
interesting from the biological point of view.  Bill, like,
William, Montagna, M-O-N-T-A-G-N-A.

        And then I was saying, so -- but I became to --
interested in hair disorders when I was, you know, in my
residency.  So a long time later.  Because I had a patient -- I
had a patient with CVL in alopecia who came to see me.  And,
you know, I wanted to do something for that patient.  And so at
that time, I learned that there was not so much about hair.
Because now, there are many experts in the world.  But at that
time, nobody wanted even to look at the hair because they felt
it was, like, something cosmetic, and so a kind of trivial
problem as compared with cancer, as compared with many other
problems.

        And so, instead with this patient, I understood that
hair may be a very big problem for the patient.  You know, for
him, this was devastating.  And so, I started looking for
possible treatments and that's how I started to get interested.
But I know I did everything by myself.  Sometimes I will say to
my students, you're lucky that you are here and that you can be
taught about how to start, what to look for.  You know, at that
time, there was nobody.  I just learned from the books, from my
experience and by myself.

                        *OFFICIAL TRANSCRIPT*

11:00:04 1    Q.   Dr. Tosti, could you please describe your experience with

11:00:07 2    treating patients with hair loss or alopecia?  And before you

11:00:12 3    do that, just since I loaded that in the question, could you

11:00:17 4    explain what alopecia means?

11:00:18 5    A.   So the term "alopecia" comes from the Greek, from alopex,

11:00:27 6    which is the fox because the fox loses the hair.  Okay.  That's

11:00:31 7    how the term is.  But alopecia is a very broad term.  Let's say

11:00:37 8    it's a kind of like fever.  So, it means that you have

11:00:42 9    hair loss, but maybe then you have to qualify the alopecia.

11:00:47 10   So, there are many, many type of alopecia.  You have

11:00:49 11   alopecia areata, for instance.  You have androgenetic alopecia.

11:00:56 12   So, you have different types of alopecia.  So, alopecia is just

11:00:59 13   a generic term to include all possible types of hair loss.

11:01:04 14   Q.   And, Dr. Tosti, then, my question:  Can you describe

11:01:09 15   briefly for the jury your experience treating patients with

11:01:13 16   alopecia or hair loss?

11:01:15 17   A.   You know, the first thing for treating these patients but

11:01:20 18   maybe for treating any patient is to understand why the

11:01:25 19   patients come to see you, which are the needs of the patients

11:01:29 20   because their needs are very important.  And which are the

11:01:34 21   expectations because expectations are very important.  And so,

11:01:38 22   you have to understand, if somehow you can help this patient

11:01:45 23   and how much you can help because not every time I can help a

11:01:50 24   patient.  Sometimes unfortunately, I'm not able to help.

11:01:54 25        And so, I speak with a patient and then I make the

*OFFICIAL TRANSCRIPT*

11:02:02 1   diagnosis depending on all of the clinical exam, the history,

11:02:09 2   and the final complicate (verbatim), you know, way to put

11:02:13 3   everything together, but this is for hair, as far as for any

11:02:18 4   other medical problems and then I discuss the possibilities

11:02:23 5   that are there to improve the patient's needs.

11:02:29 6   Q.    Dr. Tosti, could you just share with the jury some of the

11:02:34 7   major areas of your research?

11:02:37 8   A.    You know, my major area of research -- you know, that's

11:02:42 9   probably one of the most important.  I wanted just to help the

11:02:50 10  patient to get the proper diagnosis, to be able to look at the

11:02:55 11  scalp more closely.  You know, because at that time, you know

11:03:01 12  the patient is coming, you just look at the patient maybe

11:03:04 13  through the table and you didn't really look to what's going

11:03:07 14  on.  So, I developed a technique that allow you to look at the

11:03:14 15  scalp, like zoom in the scalp with a special instrument and see

11:03:19 16  very closely what's happening at the scalp level.  And so, this

11:03:23 17  was an idea to something that is not invasive, meaning --

11:03:28 18  invasive means doesn't cause pain to the patient, doesn't

11:03:33 19  require anesthesia, doesn't require any surgery, so it's

11:03:37 20  something that is like a camera that you put on the scalp, and

11:03:43 21  have all of this information.  So, I started to develop this

11:03:45 22  technique, maybe -- you know, I started 20 years ago and then I

11:03:50 23  publish ed it on peer-review articles and then I published a

11:03:56 24  book and then the book was very well accepted so I did a second

11:04:00 25  edition, and this was translated in many languages.  And then

*OFFICIAL TRANSCRIPT*

11:04:06  1   I'm proud to say that, you know, thanks to me, dermatologists

11:04:11  2   around the world learn how to utilize this instrument, that was

11:04:16  3   already there because it was -- I think if you go to

11:04:19  4   dermatologist to show him mole, the dermatologist look at the

11:04:23  5   mole with this instrument, so it's an instrument that it's

11:04:28  6   unexpensive (verbatim) and that can really make a big change in

11:04:32  7   their evaluation of patients.

11:04:34  8   Q.    Dr. Tosti, the question concerning unique -- with regard

11:04:42  9   to your background, unique cases or situations with regard to

11:04:46 10   hair that you have researched, could you share some of those

11:04:51 11   with the jury?

11:04:53 12   A.    Okay.  I missed that from the last one.  Okay.  What I'm

11:04:56 13   working now is on hair loss and COVID-19 because this is

11:05:02 14   something that, of course, that is happening now, and it's

11:05:06 15   important to look at.  And so, we were able to associate men,

11:05:12 16   to notice that men who are bald have more severe disease than

11:05:21 17   men who are not with hair at all.  So this disease is more

11:05:26 18   common and more severe in bald men.

11:05:31 19          And so, we wanted first to understand why, and so we

11:05:34 20   understood that androgen somehow play a role in the implants of

11:05:42 21   their vellus into their cells.  And then we are now working on

11:05:45 22   seeing if antiandrogen drugs that block androgen can help in

11:05:54 23   the disease.  That's my last research.  But, you know, I've

11:05:57 24   done many other things.  Something that I think -- I think was

11:06:04 25   important, we were able to -- you know, I was able, first, to

*OFFICIAL TRANSCRIPT*

11:06:11 1    detect a condition that is a very important contraindication to

11:06:18 2    hair transplantation.  You know, people who are losing hair now

11:06:25 3    often get a transplant, which is now not so expensive and may

11:06:30 4    give very good -- result.

11:06:31 5              And so, I found that something from a patient.  This

11:06:34 6    patient start losing all the hair that have been to have it

11:06:38 7    transplanted, which is a problem because the transplant is

11:06:41 8    expensive.  So, I start looking into this problem together with

11:06:46 9    my colleague, who did transplant and with other doctors who

11:06:54 10   specialize with hair disorders around the world and we were

11:06:57 11   able to find a new disease that can cause this problem.  So

11:07:04 12   now, for instance, they called me, they had transplants meeting

11:07:07 13   to teach the doctor who wants to do the transplant to recognize

11:07:11 14   this disease because it is something you can be recognized it

11:07:15 15   with my little instrument.

11:07:16 16   Q.    And, Doctor, you've given us your résumé in this case; is

11:07:16 17   that right?

11:07:24 18   A.    My CV, yes.

11:07:25 19   Q.    Your curriculum vitae, and that lists several things about

11:07:30 20   your professional background; is that right?

11:07:32 21   A.    Yes, everything is in there.

11:07:34 22   Q.    And I just want to go through a few things.

11:07:38 23        MR. SCHANKER:  And, Counsel -- have we given counsel

11:07:41 24   their notebook in this case?

11:07:50 25        MS. SASTRE:  Great.  Thank you.

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 11:07:54 1 | EXAMINATION BY MR. SCHANKER: |
| 11:08:04 2 | Q.   All right.  This is really thick and we're not going to go |
| 11:08:09 3 | through this, but let's just go through just a few things, |
| 11:08:12 4 | Dr. Tosti, that I think we can highlight here.  Dr. Tosti, what |
| 11:08:25 5 | is this that I'm highlighting here just so the jury |
| 11:08:28 6 | understands?  Just briefly, the current academic rank, |
| 11:08:33 7 | Fredric Brandt, just briefly explain what that is, please. |
| 11:08:38 8 | A.   Yes.  Briefly, it's -- I'm a professional dermatologist. |
| 11:08:41 9 | Okay.  So a professional is the high grade you can get at |
| 11:08:45 10 | academic level. |
| 11:08:46 11 | Q.   And then, Dr. Tosti, under your "Experience," you see from |
| 11:08:52 12 | November of 1999 to 2005, describe what that -- what I |
| 11:08:56 13 | highlighted, what that means for the jury, if you could. |
| 11:09:00 14 | A.   I don't see anything highlighted. |
| 11:09:02 15 | Q.   Oh, you know what, you are right.  Thank you. |
| 11:09:07 16 | A.   Okay.  Yes.  At that time, I directed the school for the |
| 11:09:12 17 | residency.  The doctors who want to become dermatologists in |
| 11:09:20 18 | Bologna. |
| 11:09:20 19 | Q.   And, Dr. Tosti, approximately how many articles have you |
| 11:09:27 20 | published or have been listed on as one of the authors? |
| 11:09:31 21 | A.   You know, more than six hundred. |
| 11:09:32 22 | Q.   Just highlight a few of those that can be relevant to this |
| 11:09:40 23 | case.  Could you just -- can you see that, Dr. Tosti, Number |
| 11:09:54 24 | 822, could you just let the jury know what the subject matter |
| 11:09:57 25 | of that highlight is? |

*OFFICIAL TRANSCRIPT*

11:09:59 1    A.    This is an article.  I was one of the authors and this

11:10:03 2    article wanted to assess the quality of life of patients who

11:10:08 3    have persistent alopecia after chemotherapy, meaning, those

11:10:14 4    patients whose hair don't grow back completely after

11:10:18 5    chemotherapy.

11:10:18 6    Q.    Okay.  Doctor, what is that article that I've highlighted?

11:10:40 7    A.    This is an article where we evaluated a disease called

11:10:51 8    "frontal fibrosing alopecia."  This frontal fibrosing alopecia

11:10:58 9    is a kind of new emerging problem, meaning that it's a disease

11:11:03 10   that is becoming more and more common among women.  And so, in

11:11:07 11   this paper, we look at the eyebrows to understand because this

11:11:12 12   disease affects the scalp but also the eyebrows and the

11:11:18 13   eyelashes as well.  And so we did a study on the eyebrows to

11:11:25 14   discuss the detection you can see using my little instrument.

11:11:27 15   Q.    And, Dr. Tosti, have you written either books or chapters

11:11:33 16   in books in this field of expertise that you've described for

11:11:37 17   the jury?

11:11:38 18   A.    Yes.  I've written chapters, but I also wrote my own

11:11:42 19   books.  I have at least six books on the topic.  And the last

11:11:46 20   book is called *Treatment of Hair and Scalp Disorders*

11:11:52 21   (verbatim), and it's a book that is a simple guide for doctors

11:11:58 22   on how to approach the patients and do the best treatment.

11:12:04 23   This was published two years ago and has been translated in

11:12:08 24   many, many languages including Chinese, Russian.  You know, I'm

11:12:13 25   proud of this book.  And in this book, there is a chapter I

*OFFICIAL TRANSCRIPT*

11:12:18  1    really love that tells you how to answer the questions of your

11:12:24  2    patients.  I think this is ultra-important because doctors

11:12:28  3    sometimes don't know maybe to answer simple questions because I

11:12:33  4    think this is maybe a trivial question.  Instead, it's not

11:12:38  5    because if a patient ask a question, there is always a reason.

11:12:42  6    So, it's a kind of list of all the questions that I collected,

11:12:46  7    like, in my life and I have the answer for all of that.

11:12:49  8    Q.    And one I have noted in particular, I'll highlight it, if

11:12:56  9    you could just share.  What is this, Number 26 that I've

11:13:00 10    highlighted for the jury?

11:13:02 11    A.    Again, Number 26, we're not going to see it.

11:13:05 12    Q.    Thank you.

11:13:06 13    A.    Okay.  This is a book that I wrote together with

11:13:12 14    Dr. Fabbrocini, who is the chief of the dermatological school

11:13:20 15    in Napoli, and Dr. Lacouture, who is the chief of the oncology

11:13:28 16    dermatology at the lung cancer center in New York.

11:13:31 17    Q.    Just about through this document.  Doctor, I want to ask

11:13:38 18    you about a couple of things that are under "Professional."

11:13:45 19    Under "Editorial Board and Committee Membership," what is *JAMA

11:13:52 20    Dermatology*?  Could you explain that to the jury?

11:13:54 21    A.    *JAMA Dermatology* is a journal that the doctors utilize to

11:14:01 22    keep them updated.  Okay.  So -- and it's peer review.

11:14:04 23    Meaning, that if you send an article to this journal, there are

11:14:08 24    at least three people who don't know you, they may not even

11:14:15 25    have the name of -- of the authors of the article that read the

*OFFICIAL TRANSCRIPT*

11:14:22  1    article and give a critical evaluation.  And so, that's a very

11:14:26  2    good, quality journal and it is one of the most read journals

11:14:34  3    by dermatologists.

11:14:35  4    Q.    And then last on this, I want to make sure to understand,

11:14:47  5    Doctor, with regard to awards, just explain to the jury, if you

11:14:57  6    could, what -- I note that there is this 2007 listed under

11:15:01  7    awards, what is that?

11:15:03  8    A.    It is called "Maria Duran Medal."  So, Maria Duran was a

11:15:10  9    dermatologist in Columbia that literally works a lot for

11:15:13 10    diseases of women and children.  And so, this is an award that

11:15:21 11    the International Society of Dermatology made in her honor

11:15:25 12    because she died of cancer when she was young.  And this is for

11:15:29 13    women that excel in -- you know, in teaching and taking care of

11:15:35 14    other women and children.

11:15:36 15    Q.    And you talked about teaching and I know that under the

11:15:42 16    awards list, there is also something called "Best Teaching

11:15:46 17    Clinic Award."  Briefly, what is that?

11:15:49 18    A.    You know, that's something that every year the residents

11:15:53 19    pick up.  You know, the doctors they want to give an award

11:15:58 20    because they feel they learn a lot from those doctors,

11:16:03 21    basically.

11:16:04 22    Q.    Now, Doctor, you indicated that I believe that you have

11:16:10 23    been practicing for give or take 30 years; is that right?

11:16:13 24    A.    More.

11:16:14 25    Q.    Okay.  And how long have you had the specialty that you've

*OFFICIAL TRANSCRIPT*

11:16:19 1   described, the hair specialty within your field of dermatology?

11:16:22 2   A.   From the very beginning.  You know, before becoming a

11:16:28 3   dermatologist, when I was a resident, I got interested.  You

11:16:31 4   know, I was really one of the few people at that time.  I

11:16:36 5   founded the European Hair Research Society, which was the

11:16:40 6   society of all the few doctors in Europe that was interested in

11:16:44 7   hair.  And then, you know, I was president of that -- at that

11:16:51 8   time, and now I'm the president of the American Hair Research

11:16:56 9   Society.

11:16:56 10  Q.   Doctor, I just want the jury to understand, how much time

11:17:00 11  in your work on a weekly basis do you spend on patients or

11:17:07 12  issues or research with -- concerning hair?

11:17:11 13  A.   You know, most of my time.  You know, I would say that

11:17:15 14  that work at least eight hours a day.  I would say -- you know,

11:17:20 15  I don't work all Saturdays and Sundays, you know, I try to keep

11:17:25 16  those days for my family, if possible.  But on the other days,

11:17:29 17  I work eight to ten hours a day.

11:17:32 18  Q.   And has that been consistent throughout your 30 years in

11:17:39 19  dermatology and hair?

11:17:39 20  A.   Yes, very consistent.  You know, I've been doing -- I

11:17:45 21  didn't change a lot, except for country.  I didn't change a lot

11:17:49 22  in my life in terms of hours of working.

11:17:52 23  Q.   And just so we're clear, during one of those weeks when

11:17:56 24  you described how much you worked, how much of that week is

11:17:59 25  spent on hair versus other areas of your practice?

*OFFICIAL TRANSCRIPT*

11:18:04  1    A.    Let's say 80 percent, maybe more.

11:18:08  2    Q.    Now, in addition to your practice in seeing patients, you

11:18:13  3    indicated you do research?

11:18:15  4    A.    Of course.  Because being a professor, part of your work

11:18:19  5    is doing research because, of course, you have to teach.

11:18:24  6    Because the reason of the research -- of -- my research is

11:18:29  7    clinical research is mainly to teach, doing my research to

11:18:33  8    doctors what new things.  Because some doctors can come and

11:18:39  9    spend some time with me or maybe to attend meetings, but there

11:18:44 10    are other doctors that cannot.  And so, the idea is through

11:18:49 11    research, you can reach all the doctors around for them to

11:18:53 12    learn what's important, new that they have to know to treat

11:18:59 13    their patients the best.  And so, that's my clinical research.

11:19:03 14    And then I teach, meaning, every time I have a clinic, I have a

11:19:07 15    resident.  Now, because of the COVID -- before I had more than

11:19:11 16    one, I had students, I had fellows.  Now, because of the COVID,

11:19:20 17    we have restrictions and we cannot have as many people in the

11:19:24 18    room with the patient.

11:19:25 19    Q.    Dr. Tosti, I just want to make sure the jury understands

11:19:30 20    this teaching that you do.  Who are your pupils, are they

11:19:35 21    students?  Are they licensed medical doctors?

11:19:39 22    A.    They are all of them.  So, I have even -- I also had high

11:19:44 23    school students come in to see if they want to understand, if

11:19:50 24    they want to do medicine at college.  So, I have high school

11:19:54 25    students.  I have medical students.  I have dermatologists,

*OFFICIAL TRANSCRIPT*

11:19:59 1    and, you know -- so, many different types of people will come

11:20:06 2    to learn.

11:20:06 3    Q.   And, Dr. Tosti, where do you teach?

11:20:12 4    A.   I teach at the university.  So, I -- you know, teaching is

11:20:20 5    practical teaching, you teach when you see the patients, you

11:20:24 6    teach through lectures, so you give -- you know, like discuss a

11:20:31 7    topic and then explain the topic to the doctors.  You teach --

11:20:38 8    you know, we may have an exchange on the clinical cases that

11:20:46 9    the residents have and they want to have feedback.  You know,

11:20:50 10   it's many ways.

11:20:50 11   Q.   Okay.  And, Dr. Tosti, shifting gears to your -- where you

11:20:57 12   are licensed to practice, could you share with the jury -- did

11:21:02 13   we tell the jury where -- you teach at university you said,

11:21:08 14   what school?

11:21:08 15   A.   University of Miami School of Medicine.

11:21:12 16   Q.   Okay.  Thank you.  I apologize for that.

11:21:14 17        Moving on then, where are you licensed to practice?

11:21:18 18   A.   I'm licensed in Europe because being licensed in Italy

11:21:22 19   means being licensed in Europe.  And I've been licensed in

11:21:26 20   Florida.

11:21:26 21   Q.   Doctor, could you explain to the jury your background and

11:21:39 22   experience specifically in regards to the condition permanent

11:21:48 23   chemotherapy-induced alopecia?

11:21:48 24   A.   So, this is a condition I first got interested maybe

11:21:54 25   20 years ago.  Again, starting from a patient, from a child who

*OFFICIAL TRANSCRIPT*

1    developed this severe alopecia after chemotherapy and the hair

2    didn't grow back.  And this child had a bone marrow transplant

3    for leukemia.  And so, that was unusual for me because, you

4    know, you expect, when the hair to fall down for chemotherapy,

5    to grow back and so I was very surprised to see this.

6            You know, then I saw another case, and then I

7    contacted my colleague in Bologna.  There was a very strong

8    department for blood disease because they're working somebody

9    with leukemia.  And so, together, we figure out that the

10   problem was this medication called "busulfan," which was used

11   in the bone marrow transplantation section and that's when I

12   got interested.

13           MR. SCHANKER:  Your Honor, at this time, we wish to

14   offer, for your pleasure, Dr. Tosti as an expert in the field

15   of dermatology and hair disorders.

16           THE COURT:  Any questions?

17           MS. SASTRE:  No objection.

18           THE COURT:  The Court is going to accept Dr. Tosti as

19   an expert in the field of dermatology and hair disorders,

20   qualified to render opinions in this area.

21           Please proceed.

22                    DIRECT EXAMINATION

23   BY MR. SCHANKER:

24   Q.   Dr. Tosti, you were just sharing with the jury a little

25   bit about some of your background concerning permanent

*OFFICIAL TRANSCRIPT*

11:23:41  1   chemotherapy-induced alopecia.

11:23:44  2          Can we refer to that as PCIA here today?

11:23:46  3   A.   Yes.  Even if I don't like to say "PCIA" because I don't

11:23:51  4   like these acronyms, it always make it difficult for people to

11:23:57  5   understand, we can.

11:23:57  6   Q.   Okay.  Now, you mentioned your experience with PCIA and

11:24:06  7   bone marrow transplantation.  Do you have experience beyond

11:24:12  8   bone marrow transplantation with PCIA?

11:24:14  9   A.   Yes.  Let's say that five years, you know, after I -- I

11:24:21 10   describe that -- that the problem with busulfan, I saw a

11:24:29 11   patient with a very similar presentation, but this patient

11:24:33 12   didn't have a bone marrow transplant.

11:24:38 13   Q.   Dr. Tosti, let me stop you there.

11:24:40 14          Just orient all of us here, you said five years after

11:24:44 15   you saw a patient with busulfan, when was that?  Just so we all

11:24:49 16   understand what are period is that?

11:24:50 17   A.   I believe it was 2005.  Busulfan was the -- in the 2000,

11:24:55 18   and the other one was 2005, 2006, I cannot say exactly at that

11:25:01 19   time.  Okay.

11:25:02 20   Q.   I apologize for interrupting.

11:25:02 21   A.   No problem.

11:25:05 22   Q.   So, we're talking '05, '06?

11:25:07 23   A.   Yes.

11:25:08 24   Q.   Okay.  Go ahead, please.

11:25:08 25   A.   And so, I say this patient again, didn't grow the hair but

*OFFICIAL TRANSCRIPT*

this patient had breast cancer and not bone marrow

transplantation.  And so, again, you know, I was surprised and

I started to study.  Because sometimes when I see something

that is unusual, it reminds me of the other one but I started

to study and then, you know, that was the first of other

patients.  And so, I -- I published some papers on the topic, I

believe, between 2011 and 2013.

Q.   I want to ask you about that.  So -- and thank you for

bringing that up.  Just so we understand, have you published in

this area of PCIA, and if so, when?

A.   I didn't understand the question.  I'm sorry.

Q.   I apologize.  That was a bad one.  Have you written any

articles on PCIA?

A.   Yes, I did.  I did wrote, I think, three articles between

2011 and 2013.

Q.   Okay.  Now, just so the jury understands, why did you

write those articles?

A.   Again, the purpose is always to teach other doctors that

there is something that they have to look at.  Okay.  That's

basically it.  So, when I see something that I didn't know, and

I didn't expected, so it's new for me, I work to understand

what it is.  And then I really want other doctors to know

because it's just me that knows; it's not going to help the

people.  So, everybody has to know and be able to recognize it.

Q.   Now, did you publish these articles before you were

*OFFICIAL TRANSCRIPT*

11:27:07  1    involved in this legal matter?

11:27:08  2    A.   Yes.  Absolutely right, yes.  Because that was at least

11:27:15  3    six years before this legal matter -- you know, I believe it

11:27:24  4    was at least five, six years before the beginning of this legal

11:27:31  5    matter.

11:27:31  6    Q.   Now, why did you publish in this area on PCIA?  Why did

11:27:37  7    you write articles on this?

11:27:39  8    A.   Because it was something new, that it was not in the books

11:27:44  9    that doctors couldn't learn about.  That's the main reason.

11:27:49 10    So, at that time, nobody knew and so I thought if nobody knows,

11:27:54 11    if it's not going to be -- people are not going to be diagnosed

11:27:59 12    and possibly helped.  And also, because I believe that when we

11:28:05 13    know there is a new problem, everybody is going to start

11:28:10 14    studying the problem.  And so, from that can come out maybe a

11:28:15 15    treatment, maybe a -- something to help the real patients, that

11:28:21 16    is my final goal.

11:28:23 17    Q.   Dr. Tosti, in this case, did you reach a conclusion that

11:28:30 18    you can share with the jury with regard to Ms. Kahn and her

11:28:34 19    PCIA?

11:28:34 20    A.   Yes.  My conclusion is that she has permanent alopecia

11:28:42 21    after chemotherapy.  You can also call it "persistent alopecia

11:28:45 22    after chemotherapy," and that the substantial causative factor

11:28:52 23    was Taxotere that was in her chemotherapy regimen.

11:28:56 24    Q.   Dr. Tosti, can we give the jury some basic hair facts?

11:29:02 25    Can we go through that?

*OFFICIAL TRANSCRIPT*

11:29:03 1   A.   Absolutely, yes.

11:29:06 2   Q.   Thank you.

11:29:37 3        MR. SCHANKER:  Your Honor, would you like a copy?

11:29:39 4        THE COURT:  If you have an extra.

11:29:40 5        MR. SCHANKER:  May I approach?

11:29:42 6        THE COURT:  Yes.

11:29:42 7        MR. SCHANKER:  Okay.  May I continue, Your Honor?

11:30:09 8        THE COURT:  Yes, you may.

11:30:11 9        MR. SCHANKER:  Thank you.

11:30:11 10  EXAMINATION BY MR. SCHANKER:

11:30:18 11  Q.   Dr. Tosti, if you notice I don't have this Elmo right,

11:30:21 12  just let me know, okay?

11:30:21 13  A.   Okay.

11:30:23 14  Q.   Thank you.

11:30:24 15  A.   So, I believe this is important.

11:30:24 16  Q.   Let me ask you.

11:30:24 17  A.   Oh, sorry.

11:30:25 18  Q.   The way the judge wants this to work is I have to ask the

11:30:29 19  questions, okay?

11:30:29 20  A.   Okay.  Sorry.

11:30:35 21  Q.   So, Doctor -- so we're all on the same page, could you

11:30:37 22  just familiarize the jury with this diagram and what we're

11:30:40 23  looking at?

11:30:40 24  A.   Yeah.  This is a schematic drawing of the hair follicle,

11:30:45 25  which is the organ that produce the hair.  Okay.  So, you see

*OFFICIAL TRANSCRIPT*

11:30:50  1    the hair follicle down here, down in the lower part of the

11:30:55  2    drawing.

11:30:59  3            THE COURT:  Dr. Tosti, if it would help, there is a

11:31:02  4    pencil that you can use to mark on here.

11:31:06  5            THE WITNESS:  Oh, okay.

          6                But I am not doing that.  We know it is part of

          7    the -- of the --

          8            MR. SCHANKER:  Be nice to the Judge, please.

          9            THE WITNESS:  Sorry.

         10            THE COURT:  That's okay.

11:31:15 11            THE WITNESS:  And so, that's in the lower portion of

11:31:18 12    the follicle and then you can see the hair coming out of the

11:31:21 13    skin of the scalp, okay.

11:31:21 14    EXAMINATION BY MR. SCHANKER:

11:31:24 15    Q.   Coming out right here?

11:31:24 16    A.   Yes, that's the hair coming out.  So, at the bottom here

11:31:30 17    where I put this blue line, this is where there are the cells

11:31:33 18    that produce the hair.  So, this is called the "hair matrix"

11:31:39 19    (verbatim).

11:31:39 20    Q.   Hair matrix?

11:31:40 21    A.   Matrix.  These are cells that are very, very active,

11:31:46 22    meaning, they duplicate very, very, very fast.  And that's

11:31:50 23    because the hair grows continuously.  So, these cells have to

11:31:57 24    replicate to make always the new hairs coming -- the new parts

11:32:01 25    of the hair coming out.

                            *OFFICIAL TRANSCRIPT*

11:32:02 1   Q.   Okay.  Now, Doctor, as we go through this explanation and

11:32:08 2   you obviously understand what issues are important for this

11:32:11 3   jury, correct?

11:32:14 4   A.   Yes.  That's why I'm not going very deep.  I'm just

11:32:18 5   explaining the most important thing that they have to

11:32:22 6   understand because, otherwise, we could spend half an hour on

11:32:25 7   this.

11:32:25 8   Q.   Yes.  Doctor, before we get into more depth about some of

11:32:30 9   these issues, obviously, human beings, we have different colors

11:32:35 10  of hair.  Can you explain that to us?

11:32:38 11  A.   Yes.  The color of the hair is due to genetic factors,

11:32:43 12  okay.  And, you know, also people have different density of the

11:32:50 13  hair, so --

11:32:51 14  Q.   Density?

11:32:52 15  A.   Density, meaning, the hair per square centimeters.  The

11:32:57 16  number of hairs in a given area is not identical for all of us.

11:33:02 17  We are born with a number, okay?  And this number is lower

11:33:07 18  for -- is -- for blonde people, okay.  And is, you know --

11:33:12 19  sorry, no, the thickness is lower for blonde people, meaning

11:33:20 20  that people who have blonde hair, they are fine, they are more

11:33:26 21  fine and the density is higher for blonde people.  So, people

11:33:31 22  who are blonde, they have many, many hairs that are a little

11:33:34 23  bit finer.  People with dark hair, they have very thick single

11:33:42 24  hair but they have less in the number.  Okay.  Because what's

11:33:47 25  important is the coverage of the scalp and the coverage depend

*OFFICIAL TRANSCRIPT*

11:33:52  1    on the number and on the thickness.

11:33:53  2    Q.    Okay.  How many -- if you can answer this question, how

11:34:03  3    many follicles are there on an adult human's head?

11:34:07  4    A.    So, on the whole head is one million, but in the scalp is

11:34:11  5    one hundred thousand.  So, meaning that you have less hair in

11:34:15  6    the scalp where you see than in your face where you don't see.

11:34:21  7    Q.    And I wanted to go there, so I'm glad you did.  It may

11:34:27  8    sound like an obvious question but what parts of our body are

11:34:31  9    covered with -- or have hair?  Have hair?

11:34:32 10    A.    You know, all our bodies covered with hair, with the

11:34:37 11    exceptions of palms and soles.  So, those are the only areas

11:34:42 12    where we do not have hair.

11:34:44 13    Q.    And what are the types of hair that cover our body?

11:34:48 14    A.    There are two types of hair that -- these are called the

11:34:55 15    "terminal hair" and the "vellus hair."  I think we have a

11:34:59 16    diagram to explain that and you can see it here.  So, on the

11:35:04 17    left, you see the vellus hair.  The vellus hair is thin,

11:35:11 18    usually is unpigmented and it's short.  And these vellus hair

11:35:17 19    is produced by a small follicle.  You see how small is that

11:35:25 20    follicle as compared with the one on the right, which is called

11:35:28 21    "vellus follicle."  Terminal hair instead are thick, are

11:35:36 22    pigmented, but they can become white with aging, and are

11:35:41 23    long -- longer.  And the terminal hair -- and the scalp hair,

11:35:46 24    the eyebrows, and the eyelashes, those are terminal hair.

11:35:51 25    Q.    Doctor, does this -- do these images help you explain?

*OFFICIAL TRANSCRIPT*

11:35:55  1    A.    Exactly.  You see the difference.  You know, you have all
11:35:59  2    these vellus hair.  In fact, you have more of those than of the
11:36:03  3    other ones, but we don't see the vellus hair if we don't look
11:36:08  4    closely.  Okay.  And then in the eyebrows, in the eyelashes,
11:36:13  5    and in the scalp, of course, we have the terminal hair.
11:36:16  6    Q.    Dr. Tosti, does puberty impact hair?
11:36:24  7    A.    You know, vellus hair, yes.  Yes.  Vellus hair and
11:36:29  8    terminal hair are not two completely separate entities.  So,
11:36:35  9    that means a vellus can become a terminal and vice versa.  So,
11:36:40 10    that's why the hair follicle is so interesting because it can
11:36:43 11    make big changes.  And here you see how vellus hair, facial
11:36:50 12    hair in men, they even become terminal hairs at puberty.  You
11:36:56 13    know, and this is very typical, normal effect of androgen.
11:37:06 14    Because androgen are the main hormones act on hair of certain
11:37:09 15    parts of the body, not everywhere, and make those hair
11:37:15 16    different.  So, it can make these, can make the vellus hair to
11:37:20 17    become terminal but they can even make the opposite.  So, in
11:37:27 18    bald men, the terminal hair become vellus.
11:37:34 19    Q.    Dr. Tosti, can you explain to the jury the hair cycle
11:37:37 20    as -- is important for them to understand in this case.
11:37:41 21    A.    Yes.
11:37:45 22    Q.    What is the hair cycle?
11:37:48 23    A.    So, the hair follicle doesn't grow the hair continuously.
11:37:54 24    Let's say the hair follicle is the factory.  This factory
11:37:58 25    doesn't work all the time.  Sometimes take a rest, okay?

*OFFICIAL TRANSCRIPT*

11:38:00  1   People go to rest, so they go to rest.  So, normally, the

11:38:05  2   hair follicle produce the hair -- we're talking about terminal

11:38:11  3   follicles because the hair have died in the scalp -- ranging

11:38:18  4   from five to seven years.  You know, even if we try to grow our

11:38:22  5   hair as much as possible, not everybody can grow the hair very,

11:38:26  6   very long.  This, again, depends on genetics.

11:38:29  7            But, you know, there is a maximum that people can

11:38:34  8   usually grow their hair, okay?  And that's the duration of

11:38:39  9   anagen; the duration of the space where the hair follicle

11:38:46 10   produces the hair.  After that, the hair follicle goes to rest,

11:38:48 11   and it doesn't produce hair for about three months.

11:38:53 12   Q.    Doctor, let me interrupt you because I want to show an

11:38:56 13   image to the jury.  But to get there, I want to make sure that

11:39:00 14   we lay a proper foundation, okay?

11:39:00 15   A.    Sure.

11:39:03 16   Q.    Could you give us the names of those -- the phases of the

11:39:10 17   hair cycle first, and then we can briefly go through them --

11:39:12 18   A.    Yeah.  I already told them anagen is the growing phase.

11:39:17 19   Q.    Yes.

11:39:17 20   A.    Okay.  Now, we're going to the resting phase.

11:39:17 21   Q.    Could you tell us the names of those phases first.

11:39:19 22   A.    Okay.  The growing phase is anagen, A-N-A-G-E-N.

11:39:27 23   Q.    Okay.  And what's next?

11:39:28 24   A.    Then we have a very, very short condition phase that is

11:39:33 25   not really important for density because -- it's not so

**OFFICIAL TRANSCRIPT**

11:39:36 1    important, which is called "catagen," C-A-T-A-G-E-N.

11:39:41 2    Q.    Okay.

11:39:42 3    A.    And then we have the resting phase, okay, which is called

11:39:50 4    "telogen," T-E-L-O-G-E-N, okay?  And during telogen, as we

11:39:55 5    said, the follicles rest.  As we can see in this drawing, at

11:40:01 6    the end of telogen, the follicle goes back to work.  And what's

11:40:05 7    very interesting, we seem to know how.  We seem to know what

11:40:06 8    makes the follicle to start working again.  That's part of the

11:40:13 9    biology we need still to understand.  But when the follicles

11:40:18 10   start working again, produces a hair -- and you can see there's

11:40:23 11   more hair in the drawing -- and this hair grow and push out the

11:40:29 12   older hair.

11:40:30 13          So when you see the hair falling down, this is the

11:40:35 14   end of telogen.  So when do we lose our hair, there is already

11:40:41 15   new hair growing in normal situations, okay?  So, normally --

11:40:44 16   so everybody lose some hair every day.  Why?  Because the

11:40:50 17   follicles are not synchronized.  So, in our scalp, let's say

11:40:55 18   that 80 percent of follicles are producing hair, so are anagen,

11:41:00 19   and 12 percent of follicles are resting.  And that's why we

11:41:05 20   lose every day normally 80 hairs.  That's what we say, between

11:41:10 21   80 and 100.  That's the normal number that you can find in your

11:41:16 22   shower all from combing your hair and stuff.

11:41:20 23   Q.    Okay.  Dr. Tosti, just as I listen to what you're

11:41:24 24   explaining, I think of my dog or my cat.  Is there hair in this

11:41:31 25   system that you've described of the hair cycle, is it the same

*OFFICIAL TRANSCRIPT*

11:41:34 1    or different than human beings?

11:41:36 2    A.    No, it's a little bit different.  I can say that because

11:41:40 3    I'm a dog-lover.  I have a dog, and I know how much it takes

11:41:44 4    you to remove the hair from the dog.  So the reason is that

11:41:47 5    they -- the hair follicles are synchronized.  So they go all to

11:41:53 6    rest basically together.  So, dogs and cats have a time of the

11:41:58 7    year when they lose all the coat, you know, and you really have

11:42:02 8    to work to remove it.

11:42:04 9    Q.    Doctor, let's shift gears here from talking about

11:42:10 10   hair-to-hair loss.  Is that okay?

11:42:11 11   A.    Yes.

11:42:13 12   Q.    Can we discuss that?  So, let's start to educate the jury

11:42:20 13   on this.  Hair loss.  What do we mean by hair loss?

11:42:24 14   A.    You know, again, it's a kind of generic term.  So I would

11:42:29 15   say what the patients usually mean.  So, patients can come to

11:42:33 16   see you and say, I have hair loss.  Some of these patients,

11:42:37 17   they just find a lot of hair in the shower or in their pillow,

11:42:42 18   and so they are shedding more than normal.  They are losing

11:42:46 19   more hair than normal.  Other people come to tell you, I have

11:42:51 20   hair loss, because they can see the scalp through the hair,

11:42:55 21   which may not be together with the excessive loss.  It may be

11:43:07 22   separated, these two things.

11:43:10 23            And so then that's the first thing usually to figure

11:43:15 24   out, that -- what's going on, if it's just excessive loss, or

11:43:21 25   if it's thinning.  So the hair thins for many reasons.  So you

**OFFICIAL TRANSCRIPT**

11:43:29  1   have alopecia; when you see the scalp through the hair, that's

11:43:34  2   called "alopecia."  So as I said before, there are different

11:43:37  3   types of alopecia.  So this is not a simple thing because

11:43:44  4   alopecia can be, you know, scarring, cicatricial.  That means

11:43:51  5   that once it's lost, the hair cannot grow back.  Or it can be

11:43:57  6   temporary, meaning that the hair can grow back.

11:44:00  7            And so depending on that, that is the clarification

11:44:05  8   between scarring and no scarring alopecia.  That, of course, is

11:44:09  9   very important.  And then you have a classification depending

11:44:14 10   on the pattern.  Some alopecia may be patchy, meaning you have

11:44:21 11   patches of hair loss.  Other alopecia may be diffused.  You may

11:44:26 12   lose the hair all around your scalp.  Other alopecia may be

11:44:30 13   more prominent on the top of the scalp or on the back of the

11:44:34 14   scalp.  And other alopecias may affect the hairline, okay?

11:44:34 15   Q.   Yeah.

11:44:42 16   A.   So, that's the differential between partial alopecia,

11:44:46 17   diffused alopecia, pattern alopecia, or, you know, marginal

11:44:52 18   alopecia.  So there are classifications that doctors use.

11:44:57 19   Q.   Sure.

11:44:57 20            Dr. Tosti -- and we'll get into some of that here in

11:45:01 21   just a few moments -- but shifting gears to set us up for that,

11:45:07 22   did you perform a clinical evaluation of Elizabeth Kahn in this

11:45:12 23   case?

11:45:12 24   A.   Yes, I did.

11:45:14 25   Q.   Okay.  And did you put together a report based on that

*OFFICIAL TRANSCRIPT*

11:45:19  1    evaluation?

11:45:19  2    A.    Yes, I did.

11:45:22  3    Q.    And do you have a notebook there that we've given you?

11:45:25  4    A.    Yes.

11:45:25  5    Q.    Okay.  And let's -- would it assist as far as walking the

11:45:30  6    jury through your clinical evaluation if you looked at your

11:45:33  7    report or had it in front of you?

11:45:35  8    A.    Okay.

11:45:35  9    Q.    Okay.

11:45:44 10          MR. SCHANKER:  Your Honor, may I approach with a

11:45:47 11    notebook including that evaluation?

11:45:48 12          THE COURT:  Yes.

11:45:48 13          MR. SCHANKER:  Thank you.

11:45:48 14    EXAMINATION BY MR. SCHANKER:

11:46:09 15    Q.    Doctor, before we get to the clinical evaluation that you

11:46:13 16    performed on Elizabeth Kahn, could you just educate the jury on

11:46:18 17    what a clinical evaluation is?

11:46:21 18    A.    A clinical evaluation is what the doctor does when you go

11:46:27 19    to see a doctor.  So, the doctor looks at -- after he sees, you

11:46:34 20    know, why you're going there and what happened, he look at if

11:46:40 21    you have with you medical records from previous visits, and

11:46:45 22    then evaluates the area of the body that is affected.  And for

11:46:54 23    dermatology, the skin or scalp.  And in case of hair, evaluates

11:46:57 24    the scalp.  So, look at the scalp.  And when I have a patient

11:47:04 25    with a hair disorder, as I said before, I want to understand if

*OFFICIAL TRANSCRIPT*

11:47:09 1     that patient is losing more hair than normal or not, so I do a

11:47:14 2     test, which is called the "pull test."  So, where I pull a tuft

11:47:22 3     of hair to see if it is losing more hair than normal.

11:47:26 4               And then I use my instrument, a microscope, to look

11:47:35 5     closer at the scalp.  And then -- you know, and sometimes I

11:47:36 6     need to take a biopsy.  So I take a small piece of skin to send

11:47:41 7     to the lab so I have more information.  Not every time.

11:47:45 8     Sometimes I order blood tests, you know.  Especially blood

11:47:51 9     tests as a result of when patients shed more than -- have

11:47:55 10    excessive hair loss.

11:47:56 11    Q.   Now, Doctor, in this case, you indicated you performed a

11:48:02 12    clinical evaluation of Elizabeth Kahn.

11:48:05 13              Do you recall approximately when that took place?

11:48:10 14    A.   I didn't understand the question.

11:48:11 15    Q.   When did you examine Ms. Kahn?

11:48:13 16    A.   It was September 2020, here in my -- in my --

11:48:21 17    Q.   Okay.  That's good enough.  Thank you.

11:48:22 18    A.   Uh-huh (affirmative response).

11:48:24 19    Q.   So where did that examination take place?

11:48:27 20    A.   It took place at University of Miami Hospital, okay?  So,

11:48:33 21    the hospital inside the university for outpatients, meaning,

11:48:38 22    for patients coming from -- not for inpatients, outpatients

11:48:45 23    that require hospitalization.  It's a separate building where

11:48:48 24    we see outpatients.

11:48:49 25    Q.   And why was the examination there at your hospital in

**_OFFICIAL TRANSCRIPT_**

Miami?

A.    Because in Miami, I practice just at university.  So, how can I see a patient in Miami, I see a patient at university.  I don't have a private practice, and I don't want to have a private practice in Miami.

Q.    And are you licensed to practice in Louisiana?

A.    No, I'm just licensed in Florida.

Q.    Okay.  So the exam needed to take place there?

A.    It took place, yes, in Miami, Florida.

Q.    Now, this was September of 2020?

A.    Yes, this was September 2020.

Q.    What protocols did your hospital observe with regard to that examination?  Obviously, the -- with COVID?

A.    You know, we had to have very strict protocols with COVID -- we still have -- which is very similar to what you have here.  So we measure the temperature of the patients.  The patients can only come alone.  We don't allow, you know, relatives, except for children.  I am allowed only to have one resident and my medical assistant.  Of course, we sanitize the hands, we sanitize the room.  I can only wear scrubs.  I cannot wear a coat anymore.  You know, there are many things that the hospital and university try to do to avoid problems.  But we never had even one case of transmission in our offices.

Q.    Now, Dr. Tosti, the steps for the clinical evaluation here, the first of that is history.  Did you take a history of

*OFFICIAL TRANSCRIPT*

11:50:46  1   Elizabeth Kahn in this case?

11:50:48  2   A.   Yes, of course, I took a history.  And, you know, I look

11:50:55  3   at her medical records before the visit because there were a

11:50:59  4   lot of documents, and I analyzed one hour for her visit.  I

11:51:05  5   couldn't do that during the visit, so I look at the medical

11:51:08  6   records before.

11:51:09  7   Q.   Why do you look at the medical records before the visit

11:51:12  8   with Ms. Kahn?

11:51:13  9   A.   Because it was a big amount of information, and I thought

11:51:21  10  we would have time to go through all the medical records during

11:51:26  11  the visit that was there.

11:51:28  12  Q.   In addition to medical records, what other materials -- I

11:51:34  13  don't mean -- I don't ask you to list all of them, but did you

11:51:36  14  have any other materials that you reviewed at that time?

11:51:40  15  A.   I think I reviewed basically the medical records and

11:51:43  16  the -- some pictures, because, again, there were a big, very,

11:51:50  17  very big number of pictures, and I didn't have the time to

11:51:53  18  review all of them.  But I reviewed the images, and that's it.

11:51:58  19  Q.   Now, in this case, do you know approximately how many

11:52:04  20  photographs of Ms. Kahn you've reviewed?

11:52:07  21  A.   You know, there are maybe 800, but many of those

11:52:12  22  photographs wearing hats, so photographs that were not very

11:52:18  23  useful.  Many were out of focus.  It was not very helpful from

11:52:25  24  the photographic point of view.

11:52:27  25  Q.   Now, as part of this history, the first step of your

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 11:52:31 | 1 |

clinical evaluation, do you speak with Ms. Kahn?

A.   Of course.  You know, I first asked her about the problem, and then I asked her questions, you know.  And I wanted to ask the questions that I usually ask my hair patients.  So, when the problem started, how did it started, and what the medications she was taking.  You know, because I have to confirm in any case with her.  And, you know, I also did a kind of hair history, you know, to know about her hair and what happened to the hair.

Q.   Could you share that with the jury.

A.   Yes.  So, I can read -- or I explain.

So, her hair history was that she had normal hair before chemotherapy.  And then at the end of chemotherapy, the hair grow back, but didn't grow back as before.  So, it grow back, but very sparse, so was not covering the scalp properly.  And that's basically hair history.  And she had the chemotherapy in 2008.  So, basically, she had four types of the chemotherapy starting from July -- starting from May until July 2008.  And in those types, she had Taxotere and another medication, which is called "Xeloda."

And then she had a second round, you know, from end of July to October, when she took cyclophosphamide and Adriamycin.  So, basically, she had this combination chemotherapy, where they give you multiple drugs, okay?  Then she also took these other medications, which is Avastin, that

**OFFICIAL TRANSCRIPT**

11:55:02  1    she took in the long-term, basically, almost one year.  And

11:55:07  2    then she also started the -- another drug, which is important

11:55:13  3    to consider, which is tamoxifen.  So this is a drug that is

11:55:20  4    given basically to all women with hormone-positive

11:55:27  5    breast cancer who are not in menopause.

11:55:29  6            So this is a medication that is very, very largely

11:55:33  7    utilized.  And these started with tamoxifen the beginning of

11:55:37  8    April of 2009 until 2018.  So you usually take this treatment

11:55:46  9    for ten years, and that's what she did.

11:55:50 10    Q.    Now, Dr. Tosti, as part of your experience that you've

11:55:54 11    described to this jury, had you encountered any of these drugs

11:56:00 12    that Elizabeth Kahn was taking for her cancer treatment in your

11:56:08 13    study of PCIA before you met with Ms. Kahn?

11:56:14 14    A.    As I explained in the beginning, this Taxotere was the

11:56:18 15    drug I found, yes, the goal responsible for the permanent

11:56:27 16    alopecia or persistent alopecia after chemotherapy.  So she

11:56:32 17    took the drug that is considered responsible for that in most

11:56:36 18    of the cases of this condition.

11:56:44 19    Q.    Dr. Tosti, moving through your clinical evaluation, what's

11:56:49 20    the next -- let me ask you this.  Did we -- I don't want to cut

11:56:52 21    you off.  Did we cover everything?  When you see this Number 1,

11:56:56 22    "History," have you explained to the jury everything that you

11:56:59 23    did with regard to Ms. Kahn and that point, history?

11:57:03 24    A.    Maybe not, because I probably ask about, you know, the

11:57:07 25    family history.  I ask about the family history because this is

11:57:11 1   important for all hair disorders.  And I ask her about the

11:57:18 2   other disease she may have because that's also important.  So,

11:57:25 3   like, she has a high blood pressure, so I ask for all these

11:57:31 4   associated disease.

11:57:31 5   Q.   Okay.  So, that's the point where you gather all this

11:57:34 6   information?

11:57:35 7   A.   Yes.

11:57:35 8   Q.   Anything else regarding history, or should we move on?

11:57:41 9   A.   You know, what's important from the history is that she

11:57:46 10  said that her hair was normal before starting the chemotherapy,

11:57:50 11  and the hair didn't regrow as before after the end of the

11:57:57 12  chemotherapy.  And another important point is that she stopped

11:58:05 13  tamoxifen in 2018, and the hair did not improve after stopping

11:58:14 14  that tamoxifen.  I think these are two points that are

11:58:18 15  important.  And then I ask her, you didn't complain with

11:58:21 16  anybody about this problem.  And she explained me that she

11:58:27 17  reported it to the oncologist the problem, because I didn't see

11:58:32 18  any doctor, meaning the medical records, saying she came to me

11:58:40 19  for the problem.  But she told me, I discussed with the

11:58:42 20  oncologist, and the oncologist told it was maybe growing, maybe

11:58:50 21  it was more slowly than normal --

11:58:51 22           MS. SASTRE:  Your Honor, objection.

11:58:54 23           THE COURT:  Sustained.

11:58:56 24           MR. SCHANKER:  Thank you, Your Honor.

11:58:58 25               So, Your Honor, if you see fit, this would be a

**OFFICIAL TRANSCRIPT**

11:59:05  1   good time to break.

11:59:06  2        THE COURT:  Okay.  This is a good time for us to take

11:59:08  3   our noon break.  It's right at 12:00.  Court will be at recess

11:59:13  4   until 1:15.  Let me remind you, don't discuss the case amongst

11:59:17  5   yourselves or with anyone else.  And, please, if you come into

11:59:19  6   contact with anyone associated with this case, just please do

11:59:24  7   not acknowledge them at all.  Thank you.  Please keep your

11:59:28  8   tablets on the chairs.  They will not be disturbed.  Thank you.

11:59:31  9        Court is at recess until 1:15.

12:04:43  10       (WHEREUPON, at 11:59 a.m., the jury panel leaves the

11   courtroom, and the Court was in luncheon recess.)

12                            *   *   *

13

14                   REPORTER'S CERTIFICATE

15       I, Cathy Pepper, Certified Realtime Reporter, Registered
     Merit Reporter, Certified Court Reporter in and for the State
16   of Louisiana, Official Court Reporter for the United States
     District Court, Eastern District of Louisiana, do hereby
17   certify that the foregoing is a true and correct transcript to
     the best of my ability and understanding from the record of the
18   proceedings in the above-entitled and numbered matter.

19                            s/Cathy Pepper
                              _____
                              Cathy Pepper, CRR, RMR, CCR
20                            Certified Realtime Reporter
                              Registered Merit Reporter
21                            Official Court Reporter
                              United States District Court
22                            Cathy_Pepper@laed.uscourts.gov

23

24

25

                        *OFFICIAL TRANSCRIPT*