```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3      ****************************************************************

 4      IN RE:   TAXOTERE
        (DOCETAXEL) PRODUCTS
 5      LIABILITY LITIGATION

 6                                 CIVIL ACTION NO. 16-MD-2740 "H"
                                   NEW ORLEANS, LOUISIANA
 7                                 NOVEMBER 12, 2021, 8:00 A.M.

 8      THIS CASE RELATES TO
        ELIZABETH KAHN,
 9      CASE NO. 16-CV-17039

10      ****************************************************************

11

12                         DAY 4  MORNING SESSION
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
13            HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                     UNITED STATES DISTRICT JUDGE

14

15      APPEARANCES:

16

17      FOR THE PLAINTIFFS:       GAINSBURGH BENJAMIN DAVID
                                   MEUNIER & WARSHAUER
18                                 BY:  M. PALMER LAMBERT, ESQ.
                                   1100 POYDRAS STREET, SUITE 2800
19                                 NEW ORLEANS, LOUISIANA 70163

20                                 PENDLEY BAUDIN & COFFIN
                                   BY:  CHRISTOPHER L. COFFIN, ESQ.
21                                      JESSICA A. PEREZ, ESQ.
                                   1515 POYDRAS STREET, SUITE 1400
22                                 NEW ORLEANS, LOUISIANA 70112

23

24                                 GIBBS LAW GROUP
                                   BY:  KAREN B. MENZIES, ESQ.
                                   400 CONTINENTAL BOULEVARD
25                                 6TH FLOOR
                                   EL SUGUNDO, CALIFORNIA 90245
```

07:37:44

*OFFICIAL TRANSCRIPT*

1    APPEARANCES CONTINUED:

2

3                              DAVID F. MICELI, LLC
                               BY:  DAVID F. MICELI, ESQ.
4                              P.O. BOX 2519
                               CARROLLTON, GEORGIA 30112
5

6                              BACHUS & SCHANKER
                               BY:  J. KYLE BACHUS, ESQ.
7                              1899 WYNKOOP STREET
                               SUITE 700
8                              DENVER, COLORADO 80202

9

10                             BACHUS SCHANKER
                               BY:  DARIN L. SCHANKER, ESQ.
                               101 W COLFAX AVE, SUITE 650
11                             DENVER, CO 80202

12

13                             MARTZELL BICKFORD & CENTOLA
                               BY:  LAWRENCE J. CENTOLA, ESQ.
                               338 LAFAYETTE STREET
14                             NEW ORLEANS, LOUISIANA 70130

15
     FOR SANOFI-AVENTIS U.S.,
16   LLC AND SANOFI US
     SERVICES, INC.:          IRWIN FRITCHIE URQUHART & MOORE
17                             BY:  DOUGLAS J. MOORE, ESQ.
                                    KELLY E. BRILLEAUX, ESQ.
18                             400 POYDRAS STREET, SUITE 2700
                               NEW ORLEANS, LOUISIANA 70130.
19

20                             SHOOK, HARDY & BACON
                               BY:  HARLEY V. RATLIFF, ESQ.
21                                  JON A. STRONGMAN, ESQ.
                               2555 GRAND BOULEVARD
22                             KANSAS CITY, MISSOURI 64108

23

24                             SHOOK HARDY & BACON, LLP
                               BY:  HILDY M. SASTRE, ESQ.
                               201 BISCAYNE BOULEVARD
25                             SUITE 3200
                               MIAMI, FLORIDA 33131
                         *OFFICIAL TRANSCRIPT*

 1    APPEARANCES CONTINUED:

 2


 3

      OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
 4                                CERTIFIED REALTIME REPORTER
                                  REGISTERED MERIT REPORTER
 5                                500 POYDRAS STREET, ROOM B-275
                                  NEW ORLEANS, LOUISIANA 70130
 6                                (504) 589-7779
                                  Cathy_Pepper@laed.uscourts.gov
 7

 8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
      PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         *OFFICIAL  TRANSCRIPT*

1                              **I N D E X**

2

3       <u>EXAMINATIONS</u>                                        <u>PAGE</u>

4

5       **DR. ANTONELLA TOSTI (CONTINUED)**...................... 783

6       CROSS-EXAMINATION (CONTINUED) BY MS. SASTRE.......... 783

7       REDIRECT EXAMINATION BY MR. SCHANKER................. 863

8       **EMANUEL PALATINSKY**................................... 897

9       DIRECT EXAMINATION BY MR. BACHUS..................... 897

10      CROSS-EXAMINATION BY MR. RATLIFF..................... 922

11      LUNCHEON RECESS...................................... 936

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          *OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

M O R N I N G   S E S S I O N

NOVEMBER 12, 2021

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  All rise.

(WHEREUPON, at 8:01, the jury panel enters the courtroom.)

THE COURT:  All jurors are present.  Court is back in session; you may be seated.

Dr. Tosti, I remind you you're under oath.

**DR. ANTONELLA TOSTI  (CONTINUED)**

was called as a witness and, after being previously duly sworn by the Clerk, was examined and testified on her oath as follows:

MS. SASTRE:  May it please the Court, Counsel.  Good morning, everybody.  Happy Friday.

Your Honor, may I approach Dr. Tosti just to give her a set of materials that we'll be taking through today?

THE COURT:  Yes, ma'am.

MS. SASTRE:  It will save me a couple trips up here this morning, all right, Doctor?  Okay.  There you go, ma'am.

CROSS-EXAMINATION (CONTINUED)

BY MS. SASTRE:

***OFFICIAL TRANSCRIPT***

08:02:28  1    Q.   All right.  Dr. Tosti, let me just start by saying that we

08:02:31  2    appreciate you being here with us this morning.  I know on

08:02:36  3    Wednesday, I was trying to move through some things very

08:02:39  4    quickly, understanding that you needed to get back to Miami.

08:02:46  5    You might have seen me even turn and talk to my colleagues here

08:02:48  6    a couple times to see if there was just anything I could do to

08:02:52  7    shorten the length of my exam and get you home.  And of course,

08:02:55  8    get our jurors home -- we were here quite late.  But

08:02:58  9    unfortunately, it just wasn't possible, ma'am.  So, anyway,

08:03:01 10    thank you for being here with us.  We appreciate that, okay?

08:03:03 11         All right.  So, just to sort of reorient everybody,

08:03:08 12    Dr. Tosti.  You may remember when we broke on Wednesday, late

08:03:13 13    afternoon, we were talking about a record from a Dr. Larned.

08:03:19 14         Do you recall that?

08:03:19 15    A.   Yes.

08:03:21 16    Q.   So, Dr. Larned is Mrs. Kahn's -- he was her oncologist or

08:03:32 17    cancer doctor, correct?

08:03:33 18    A.   Yes.

08:03:33 19    Q.   And you have in front of you Dr. Larned's record.  It's

08:03:38 20    D3879, 1295.  That's a document you're familiar with, correct?

08:03:45 21    The medical record.

08:03:45 22    A.   Yes.

08:03:46 23    Q.   Okay.  And you see it's dated August 13th of 2009, right?

08:03:54 24    A.   Yes.

08:03:54 25    Q.   Okay.  Very good.

**OFFICIAL TRANSCRIPT**

08:03:54  1          MS. SASTRE:  Would you go ahead and pull this up,

08:03:56  2     please?  Thank you.

08:03:56  3     EXAMINATION BY MS. SASTRE:

08:03:59  4     Q.    Okay.  Now, the date of the record, just to sort of orient

08:04:05  5     everybody after the day off, August 13th of 2009, would be

08:04:11  6     about ten months after Mrs. Kahn completed chemotherapy, true?

08:04:18  7     A.    Yes.

08:04:18  8     Q.    Okay.  And what we can see from this record, Doctor,

08:04:28  9     created ten months after the completion of chemotherapy, is

08:04:31 10     that Mrs. Kahn reported to her cancer doctor that she was

08:04:38 11     pleased that her hair was growing back.

08:04:41 12          Do you see that?

08:04:43 13     A.    I see that, but to clarify, "were growing back."  She

08:04:48 14     doesn't say she was pleased that her hair had "grown" back,

08:04:54 15     which should be at that time.

08:04:55 16     Q.    So, my question was -- Doctor, was, in fact, using the

08:05:01 17     word "growing."  And if we look at the record, Mrs. Kahn

08:05:06 18     reported she is pleased that her hair is "growing" back, right?

08:05:12 19          Can we agree upon that?

08:05:13 20     A.    Yes, I agree.  But this isn't pleasing because "growing"

08:05:18 21     doesn't mean "growing."  Growing is something that is still

08:05:22 22     growing.  It's not that her hair had grown back.  So this means

08:05:28 23     that at that time, the hair had not completely grown back.

08:05:32 24     Q.    Okay.

08:05:35 25          MS. SASTRE:  Your Honor, everything after "yes," I

**OFFICIAL TRANSCRIPT**

08:05:37 1   would move to strike.

08:05:39 2          THE COURT:  I'm going to allow it but I'm going to

08:05:41 3   direct Dr. Tosti to please --

08:05:44 4          THE WITNESS:  I answered "yes" but it is misleading.

08:05:44 5          MS. SASTRE:  Okay.

08:05:48 6          THE WITNESS:  And I wanted to explain to the jurors

08:05:51 7   that there was growing --

08:05:52 8          THE COURT:  Okay.  Please proceed, Ms. Sastre.

08:05:57 9   EXAMINATION BY MS. SASTRE:

08:05:58 10  Q.    You think that the record created by an oncologist,

08:06:02 11  Mrs. Kahn's cancer specialist, where she wrote -- Dr. Larned

08:06:07 12  wrote -- based upon her meeting with Mrs. Kahn and what

08:06:13 13  Mrs. Kahn said to her, and when Dr. Larned wrote:  "Mrs. Kahn

08:06:17 14  is pleased that her hair is growing back," you think that

08:06:21 15  that's a misleading statement created by Dr. Larned?

08:06:25 16  A.    No.  I think the statement is correct.  What is misleading

08:06:31 17  is that you used the word "growing" as a meaning of hair

08:06:36 18  growing, which is not the meaning of that word.

08:06:39 19          THE COURT:  Okay.  Let's proceed.

08:06:43 20          MS. SASTRE:  Okay.

08:06:43 21  EXAMINATION BY MS. SASTRE:

08:06:46 22  Q.    Okay.  The only word I used was "growing," which was from

08:06:50 23  the record, right?  I never used the word "grown."

08:06:55 24  A.    It's growing.

08:06:58 25  Q.    And that's what I stated, Dr. Tosti, right?  That is the

*OFFICIAL  TRANSCRIPT*

08:07:00  1   only word I've used this morning.  That the record states,

08:07:04  2   "Mrs. Kahn is pleased her hair is growing back," right?

08:07:08  3   A.   I agree she wrote that.  And I want to explain is that

08:07:13  4   when you say "is growing back," don't --

08:07:17  5        THE COURT:  Okay.  Dr. Tosti, I think we need to move

08:07:19  6   on.  Thank you.

08:07:20  7   EXAMINATION BY MS. SASTRE:

08:07:22  8   Q.   Well, let me ask you this, ma'am.  So, you said on direct

08:07:30  9   exam a day ago you were provided with hundreds and hundreds of

08:07:35 10   photographs of Mrs. Kahn, right?

08:07:38 11   A.   Yes.

08:07:38 12   Q.   Okay.  And those were photographs -- it's very important,

08:07:42 13   I want everyone to be clear -- those were photographs, these

08:07:45 14   hundreds of photographs of Mrs. Kahn, they were provided to you

08:07:47 15   by plaintiff's counsel, right?

08:07:50 16   A.   Yes.

08:07:50 17   Q.   Okay.  And they were photographs that you had in your

08:07:55 18   possession long before you ever issued your report or arrived

08:08:01 19   at your final conclusions in this case, true?

08:08:04 20   A.   True.

08:08:04 21   Q.   Okay.  And, in fact, you indicated them -- you listed them

08:08:09 22   on a list of materials, "What I've reviewed in preparation for

08:08:14 23   preparing my opinions and reports," one of the things that you

08:08:17 24   listed are all the photographs that have been produced,

08:08:19 25   correct?

*OFFICIAL TRANSCRIPT*

08:08:20  1   A.   Yes.  I'm not sure all of them at that time.  You know,

08:08:24  2   the photographs that were produced because there were hundreds

08:08:28  3   and I've seen photographs afterwards.  I'm not sure I have seen

08:08:32  4   it before.

08:08:32  5   Q.   Well, let me make sure I understand.  You just said all of

08:08:38  6   the photographs were given to you by plaintiff's counsel before

08:08:41  7   you signed off on your report, right?

08:08:43  8   A.   Yeah.  But I didn't count when a big amount of photographs

08:08:48  9   but I cannot say under oath that they were all the photographs.

08:08:53 10   That I cannot say.

08:08:54 11   Q.   Okay.  Now, my question is simply this:  All of the

08:09:01 12   photographs that were produced to you by plaintiff's counsel,

08:09:05 13   you would have reviewed those photographs given to you before

08:09:10 14   you signed off on your report, in this case, and reached your

08:09:14 15   final opinions in this matter, true?

08:09:15 16   A.   Yes.  Yes.

08:09:16 17   Q.   Okay.  Very good, Dr. Tosti.

08:09:18 18         So, my question now is more specific.  When you

08:09:22 19   looked at this record from August of 2009, and you see this

08:09:28 20   language that Mrs. Kahn reported that she was "pleased that her

08:09:34 21   hair was growing back," did you ever go and try to find a

08:09:39 22   picture of Mrs. Kahn from August of 2009, to see what her hair

08:09:46 23   loss looked like on that date?

08:09:49 24   A.   Honestly, I think I did.  Maybe there was nothing really

08:09:53 25   useful.

*OFFICIAL TRANSCRIPT*

08:09:54  1    Q.    Okay.  Dr. Tosti, you have your depositions in front of

08:09:59  2    you?

08:10:01  3    A.    Uh-huh (affirmative response).

08:10:01  4    Q.    And I would like you to take a look at a transcript from

08:10:06  5    September 29th, 2020, please.  And when you have that

08:10:26  6    transcript, Doctor, I would like you to go to page 166, line

08:10:34  7    11, please.  Let me know when you're there, ma'am.

08:10:44  8    A.    Okay.

08:10:44  9    Q.    Very good.

08:10:45 10          And you were under oath in this deposition, correct?

08:10:48 11    A.    Yes, that's true.

08:10:50 12    Q.    Very good.  Doctor, you were asked, "Question:  Did you go

08:10:56 13    and specifically look up a picture from August of 2009?"

08:11:02 14    A.    I'm sorry.  I'm not probably on the right page.

08:11:04 15    Q.    Not on the right page, okay.

08:11:06 16    A.    Not the right deposition.  So this deposition is

08:11:08 17    November --

08:11:09 18    Q.    September 29th of 2020.

08:11:13 19    A.    September 29th.  And I'm in this deposition.

08:11:15 20    Q.    Page 166.

08:11:18 21    A.    166.  Okay.

08:11:33 22    Q.    Okay.  Very good.  And you were asked, ma'am, under oath:

08:11:38 23    "Did you go and specifically look up a picture from August of

08:11:44 24    2009, to see what Mrs. Kahn's hair looked like at that time?"

08:11:51 25    And your answer in your deposition was:  "I don't think there

*OFFICIAL TRANSCRIPT*

08:11:58 1    are pictures at that time without a hat."

08:12:02 2              That was your testimony, correct?

08:12:04 3    A.    Yes.

08:12:04 4    Q.    Okay.  Now, ma'am, you know from having looked through the

08:12:21 5    hundreds of photographs, including all of the photographs that

08:12:24 6    were given to you by plaintiff's counsel from 2009, that there

08:12:31 7    are lots of pictures of Mrs. Kahn without a hat on in 2009,

08:12:35 8    that were available to you, correct?

08:12:39 9    A.    Yes, there were.  But I don't think there were any useful

08:12:45 10   that were done.

08:12:46 11   Q.    Okay.  But when you said, "I don't think that there are

08:12:49 12   pictures without a hat," you didn't say you didn't think there

08:12:53 13   were any useful ones, you said, "I don't think there were any

08:12:56 14   without a hat."

08:12:57 15             And as a matter of fact, that is an incorrect

08:12:58 16   statement, true?

08:12:59 17   A.    Maybe it is incorrect but the final meaning is the same.

08:13:04 18   Q.    Okay.

08:13:08 19        MS. SASTRE:  Your Honor, may I approach?

08:13:09 20        THE COURT:  Yes, you may.

08:13:11 21   EXAMINATION BY MS. SASTRE:

08:13:12 22   Q.    So, Dr. Tosti, I'm going to come up and hand you a

08:13:19 23   printout of all of the pictures that were produced to you by

08:13:22 24   plaintiff's counsel for a variety of years -- and they have

08:13:26 25   tabs divided by years -- and I want you to go to 2009, and I

*OFFICIAL TRANSCRIPT*

08:13:30 1     want you to count how many pictures you had in your possession

08:13:34 2     from 2009 before you issued your opinions, in this case, where

08:13:38 3     Mrs. Kahn is not wearing a hat.

08:13:40 4           Can you do that for me?

08:13:42 5     A.   Absolutely.

08:13:42 6     Q.   Okay.  Very good.

08:13:52 7           MR. SCHANKER:  Your Honor, I just request a

08:13:54 8     clarification.

08:13:56 9           THE COURT:  You need to take off your mask, but go

08:13:58 10    ahead.  I can't hear you.

08:14:04 11          THE DEPUTY CLERK:  Mr. Schanker, you need a microphone

08:14:06 12    by you.

08:14:08 13          THE COURT:  Just move your microphone.  Thank you.

08:14:11 14          MR. SCHANKER:  Your Honor, I object.  These are not all

08:14:19 15    the photographs that were provided or even close.  It may have

08:14:21 16    just been a misstatement by Ms. Sastre.  These are just through

08:14:25 17    2012.

08:14:26 18          MS. SASTRE:  I said these are the photographs for

08:14:28 19    various years.  I want you to look at all of the photographs

08:14:31 20    that were provided from 2009.

08:14:37 21          THE COURT:  I need a clarification.  Is it August of

08:14:42 22    2009?

08:14:44 23          MS. SASTRE:  The date of the visit is August of 2009.

08:14:47 24          THE COURT:  No.  But I'm looking at the question.

08:14:50 25          MS. SASTRE:  No.  The date of the question is, "How

*OFFICIAL TRANSCRIPT*

08:14:54 1    many photographs were provided to you by plaintiff's counsel

08:14:56 2    from 2009?"

08:14:58 3          THE COURT:  I think y'all need to approach real

08:15:00 4    quickly.

5          (WHEREUPON, at this point in the proceedings, there was

6    a conference held at the bench.)

7          MS. SASTRE:  Maybe I asked the question wrongly.

8          THE COURT:  Well, it's a question in the deposition.

9          MS. SASTRE:  She said there weren't any pictures from

10   around that time without a hat.  And what I did was I just gave

08:15:22 11   her the notebook --

08:15:22 12         THE COURT:  My concern is that the deposition

08:15:28 13   testimony -- so I want to ask you specifically:  Were there

08:16:06 14   pictures in August of 2009 without a hat?

08:16:06 15         MR. SCHANKER:  Correct.

08:16:06 16         THE COURT:  And so --

08:16:06 17         MS. SASTRE:  Yes.

08:16:06 18         THE COURT:  -- those are two separate questions.

08:16:06 19         MS. SASTRE:  Yes.  And she said, "Around that time" --

08:16:06 20   around that time were the words she used -- "I don't think

08:16:06 21   there's any photographs of Mrs. Kahn without a hat."

08:16:06 22         THE COURT:  She didn't say that in the deposition.

08:16:06 23         MS. SASTRE:  In the deposition she said that, yes,

08:16:06 24   ma'am.  That's exactly what she said.

08:16:06 25         THE COURT:  Okay.

*OFFICIAL TRANSCRIPT*

08:16:06  1          MS. SASTRE:  Are you with me?  So now, I'm just giving

08:16:06  2    her 2009 and saying, "Here is the whole year.  Can you tell?"

08:16:06  3                Thank you, Judge.

08:16:06  4          (WHEREUPON, at this point in the proceedings, the bench

08:16:06  5    conference concluded.)

08:16:19  6    EXAMINATION BY MS. SASTRE:

08:16:19  7    Q.    So, Dr. Tosti, did you have an opportunity to count

08:16:28  8    through the stack of photographs that were provided to you by

08:16:32  9    plaintiff's counsel before you issued your report and arrived

08:16:35 10    at your final opinions in this matter, and can you tell us how

08:16:39 11    many of the photographs from 2009 that were in your possession

08:16:44 12    are photos of Mrs. Kahn without a hat?

08:16:48 13    A.    I didn't count the photographs.  I know there were around

08:16:53 14    800, but I didn't count the photographs by year.

08:16:56 15    Q.    Okay.  Well, let me see if I can ask a little bit of a

08:17:01 16    better question.  The notebook you have in front of you, you

08:17:04 17    see it has a tab from 2009?

08:17:07 18    A.    I see this.

08:17:08 19    Q.    Okay.  And the way that the photographs were produced to

08:17:12 20    you in this litigation by Counsel, is they came in folders, and

08:17:16 21    those folders had a year on them.

08:17:19 22    A.    No, that's not true.  The photos came all together,

08:17:25 23    without being divided by year --

08:17:25 24    Q.    Okay.

08:17:33 25    A.    -- without being divided year by year.

                              *OFFICIAL TRANSCRIPT*

08:17:35   1    Q.   Okay.  Well, let me ask you this, ma'am.  Looking at the
08:17:40   2    notebook you have in front of you, and you can see that there
08:17:43   3    are photographs which have dates that have been stipulated to
08:17:46   4    by the parties, count how many photographs are within the
08:17:50   5    section entitled, "2009" where Mrs. Kahn doesn't have a hat on,
08:17:55   6    please.
08:17:55   7    A.   Do you want me to do that now?
08:17:57   8    Q.   Yes, please.  Thank you.
08:18:05   9         MR. SCHANKER:  Just to clarify, Your Honor, was it
08:18:08  10    August of 2009 she's to be counting or the entire year of 2009?
08:18:12  11    It seems like the question is changing.
08:18:14  12         THE COURT:  I think it's the year 2009.
08:18:16  13         MR. SCHANKER:  Thank you.
08:18:39  14    EXAMINATION BY MS. SASTRE:
08:18:40  15    Q.   Just let me know when you're done, ma'am.
08:18:42  16    A.   From the top is 45 but the only few in August.  Only a few
08:19:46  17    of them are from August, which was the question they asked me
08:19:49  18    in the deposition.
08:19:51  19    Q.   Okay.  Yeah, my question was different.  My question was
08:19:54  20    simply -- and maybe I can speed things along.  When you just
08:19:57  21    went through those 40 some-odd photographs of Mrs. Kahn taken
08:20:02  22    of her in 2009, you would agree with me that there were a
08:20:05  23    little over 25 photos of Mrs. Kahn taken of her in 2009, where
08:20:10  24    she did not have a hat on, true?
08:20:13  25    A.   Yes.  But to clarify the hat regarding my deposition was

*OFFICIAL TRANSCRIPT*

08:20:17  1    in August.  If you read the sentence, it was August.  And these

08:20:23  2    47 photos, most of them are before.

08:20:27  3    Q.    Yes.

08:20:28  4    A.    That's the only thing I want to clarify.

08:20:30  5    Q.    And I'm glad you said that because I think what you're

08:20:34  6    making it sound like is that if there was a photo from August

08:20:40  7    of 2009, that's something that you would have looked at, right?

08:20:45  8    A.    Absolutely, yes.

08:20:46  9    Q.    Okay.  Well, let's take a look, then, at D- -- excuse me,

08:20:54  10   D3155.

08:20:56  11         MS. SASTRE:  Let's go ahead and pull that up, please.

08:20:56  12   EXAMINATION BY MS. SASTRE:

08:20:59  13   Q.    And you have that in front of you as well, Dr. Tosti.  I'm

08:21:02  14   going to go through some pictures in order but we're going to

08:21:05  15   bring them up on the screen for everybody to see.

08:21:08  16         Now, to orient everybody, the date of Dr. Larned's

08:21:14  17   visit where Mrs. Kahn said she was pleased that her hair was

08:21:20  18   growing back is August 13th, right?  Correct?

08:21:23  19   A.    I have to go back because --

08:21:25  20   Q.    Go ahead.

08:21:27  21   A.    Just a second.  Can I close the -- this folder for --

08:21:35  22   Q.    Sure.

08:21:37  23   A.    I want to go back here and I check.  And yes, it was

08:21:41  24   August 13th.

08:21:42  25   Q.    August 13th, okay.

*OFFICIAL TRANSCRIPT*

08:21:44  1      And you see, Dr. Tosti, what you have in front of you

08:21:47  2   is a photograph of Mrs. Kahn taken on August 13th, the same

08:21:56  3   exact day of the visit with Mrs. Kahn.  And this was within the

08:22:02  4   group of photographs produced to you by plaintiff's counsel

08:22:05  5   before your report was issued, true?

08:22:09  6   A.    Absolutely true, but you cannot see the hair in this

08:22:11  7   photo.

08:22:12  8   Q.    I didn't ask you that question, ma'am.  With all due

08:22:15  9   respect, I need to get answers to my questions.

08:22:19 10   A.    I answered immediately, yes, but you don't see the hair in

08:22:22 11   this photo.

08:22:24 12   Q.    Okay.  So what you told us a moment ago is, first, there

08:22:28 13   weren't any pictures without a hat and then you said there

08:22:31 14   weren't any pictures from August of 2009.

08:22:32 15   A.    No.  I said there weren't any pictures --

08:22:34 16         THE COURT:  Wait.  Wait.

08:22:35 17   A.    -- that were useful.

08:22:37 18         THE COURT:  Now ask your question, Ms. Sastre.

08:22:44 19         MS. SASTRE:  The small screens aren't working; is that

08:22:47 20   right?  Okay.  You've got to give me a sign or something, guys.

08:22:54 21         THE DEPUTY CLERK:  All of them are off?

08:23:01 22         THE COURT:  Is it from you, Erin, or is it IT?

08:23:10 23         MS. SASTRE:  Thank you.

08:23:10 24         THE COURT:  Call Brandon -- Brandon with IT.

08:24:05 25         I have IT coming up, if you want to just work

*OFFICIAL TRANSCRIPT*

08:25:15  1    from this.

08:25:17  2            MS. SASTRE:  May I approach?

08:25:19  3            THE COURT:  Yes.  Are your screens working?  Court will

08:25:48  4    be at recess for as long as it takes, but hopefully two

08:25:53  5    minutes.  You may return to the jury room.

08:26:01  6            (WHEREUPON, at 8:26 a.m., the jury panel leaves the

08:34:14  7    courtroom and then a brief recess was taken.)

08:34:14  8            (WHEREUPON, at 8:34 a.m., the jury panel enters the

08:34:14  9    courtroom.)

08:34:15 10            THE COURT:  All jurors are present.  Court is back in

08:34:19 11    session; you may be seated.

08:34:20 12            MS. SASTRE:  All right.  Our technical difficulties

08:34:22 13    have been resolved.

08:34:24 14                 Thank you, Your Honor.

08:34:24 15    EXAMINATION BY MS. SASTRE:

08:34:26 16    Q.   Dr. Tosti, let me just go back to a comment you made a

08:34:29 17    moment ago about all of the photos that you were given, okay?

08:34:32 18    You said you were provided with hundreds of photos, right?

08:34:35 19    A.   Yes.

08:34:35 20    Q.   Okay.  And is it your testimony under oath today that when

08:34:39 21    you were provided these hundreds of photos by plaintiff's

08:34:43 22    counsel, did they just give them to you in a way that was

08:34:45 23    completely disorganized so you would have no idea what photo

08:34:51 24    was even from what year, or were they divided up by year?

08:34:56 25    A.   They were disorganized.

                         *OFFICIAL TRANSCRIPT*

08:34:56  1    Q.    Disorganized, okay.

08:34:58  2    A.    Not organized by year.  I had the photo provided by the

08:35:02  3    husband.  The photo provided --

08:35:05  4    Q.    Okay.  And did you go back to the lawyers that hired you,

08:35:13  5    that are paying you to offer an opinion here today in this

08:35:17  6    trial and say, listen, you've given me all of those photos, but

08:35:23  7    I need to know the dates of the photos, because if I don't know

08:35:27  8    the date of the photo, I don't, like, really know what I'm

08:35:30  9    looking at, right?

08:35:31 10    A.    Yes.  I asked them to have the photos in the -- in the

08:35:34 11    folders by year, but I never received the photos by year so I

08:35:39 12    had to go myself through the photos.

08:35:41 13    Q.    Okay.  So even though you asked, plaintiff's counsel never

08:35:46 14    organized the photos for you and your testimony is that you

08:35:50 15    never got the photos handed to you or provided to you by year?

08:35:55 16    A.    Yes.  My testimony is I received all the photos but not in

08:35:59 17    a folder divided by years.

08:36:00 18    Q.    Okay.  And let me ask you this:  I know that you have

08:36:04 19    reviewed Mrs. Kahn's depositions in the case, right?

08:36:07 20    A.    I did.

08:36:09 21    Q.    Okay.  And you would have seen then that there were many,

08:36:13 22    many photos that Mrs. Kahn testified to under oath as to what

08:36:17 23    date they were taken.

08:36:18 24          Did you see that?

08:36:19 25    A.    Yes, I did.

**_OFFICIAL TRANSCRIPT_**

08:36:20  1    Q.    Okay.  So that would have been one thing that would have

08:36:24  2    helped you determine the date of the photos, right?

08:36:27  3    A.    Yes.  But I determine for myself the date of most of the

08:36:30  4    photos, but, of course, it's different to determine by yourself

08:36:36  5    than having them divided by year in the folder.  Took me a lot

08:36:42  6    of time and maybe I missed some years.

08:36:44  7    Q.    How did you determine the dates of hundreds of photos?

08:36:52  8    A.    Some of them had the date.

08:36:52  9    Q.    Okay.

08:36:55 10    A.    Some not.  And I, you know, read Mrs. Kahn's deposition

08:37:01 11    before my expert report.  I read the deposition after I already

08:37:09 12    provided my expert report.  I read her deposition before my

08:37:14 13    deposition.  I didn't have her deposition when I wrote my

08:37:18 14    expert report.

08:37:19 15    Q.    Okay.  Because you understand, Counsel asked you a lot of

08:37:22 16    questions on direct exam and he would throw up a photo and he'd

08:37:27 17    say, Dr. Tosti, look at photo X, the parties have stipulated

08:37:30 18    the date of this photo.

08:37:31 19          Do you remember those questions?

08:37:32 20    A.    Yes, I do.

08:37:33 21    Q.    Okay.  And so, really, I'm just trying to make sure that I

08:37:37 22    understand the situation here.  You never went back to the

08:37:39 23    lawyers and said, listen, can you please speak with your client

08:37:43 24    and on all of these photos, I need them back with a date on

08:37:47 25    each photo.

**OFFICIAL TRANSCRIPT**

08:37:48  1        You never did that?

08:37:50  2   A.   I did get back photos with dates but not all the 800

08:37:55  3   photos.  And I never got all the photos divided by folder.

08:38:02  4   That's the question you asked me.

08:38:02  5   Q.   Okay.

08:38:04  6   A.   So, I have the date for many photos but not all of them

08:38:10  7   because they were not divided by folders.

08:38:12  8   Q.   And did you ask the lawyers then?

08:38:16  9   A.   Yes.

08:38:16 10   Q.   Hold on.  Let me ask the question, please.

08:38:20 11        Did you ask the lawyers that are -- that hired you,

08:38:24 12   that are paying you for your expert work in this matter?  Did

08:38:29 13   you say, listen, divide these photos up by year and send them

08:38:33 14   back to me so at least I know which of the photos from each

08:38:36 15   year?  Did you ever specifically ask for that?

08:38:39 16   A.   I said, yes, I asked.

08:38:41 17   Q.   And did you get it?

08:38:43 18   A.   I did not.

08:38:44 19   Q.   You did not, okay.

08:38:46 20        Well, then, so let me ask you this:  Does it come as

08:38:49 21   a surprise to you, sitting here now in this trial, that there

08:38:52 22   is, in fact, a photo of Mrs. Kahn -- which I would like to

08:38:56 23   bring it up, please, D3155, which is not only from August of

08:39:02 24   2009, and not only of Mrs. Kahn without a hat, it also,

08:39:09 25   Dr. Tosti, was a photograph taken of Mrs. Kahn on the exact day

*OFFICIAL TRANSCRIPT*

08:39:13 1  that she saw Dr. Larned and said, I am pleased that my hair is

08:39:18 2  growing back.

08:39:19 3        Did you know that, ma'am?

08:39:21 4  A.   I did know.  I think I saw that photo but what I told you

08:39:26 5  five minutes ago before the interruption, that I didn't see any

08:39:30 6  photo that was useful, and I don't think this photo is useful

08:39:35 7  because you don't see the scalp.  I think we discussed that on

08:39:40 8  Wednesday deeply.  So to evaluate hair loss, you have to see

08:39:45 9  the scalp.

08:39:46 10 Q.   Okay.  All right.  Ma'am, I didn't ask you -- I just want

08:39:48 11 to make sure we're really getting on the same page here so that

08:39:52 12 my questions of you don't take longer than necessary.

08:39:55 13       I didn't ask you whether you saw any useful photos.

08:40:00 14 I'm not asking you that at all, ma'am.  My question is:  Did

08:40:03 15 you know before you came into trial to testify here on

08:40:06 16 Wednesday and today, that there was a photograph of Mrs. Kahn

08:40:10 17 taken from the very same date that Dr. Larned created the

08:40:13 18 record saying:  "Mrs. Kahn is pleased her hair is growing

08:40:17 19 back."

08:40:17 20       Did you know that?

08:40:18 21       MR. SCHANKER:  Your Honor, objection, asked and

08:40:20 22 answered.

08:40:21 23       THE COURT:  I'm going to allow it and then this is it.

08:40:24 24       THE WITNESS:  I knew and I still say this is unuseful

08:40:28 25 (verbatim) photo but is there.

                     ***OFFICIAL TRANSCRIPT***

08:40:30  1          THE COURT:  Okay.

08:40:30  2   EXAMINATION BY MS. SASTRE:

08:40:32  3   Q.   Okay.  Well, we can agree, I think, from looking at the

08:40:37  4   photo and in terms of what the record said that Mrs. Kahn was

08:40:41  5   pleased her hair is growing back.  She looks pretty happy in

08:40:44  6   the picture, right?

08:40:46  7   A.   She looks happy to me, yes.

08:40:49  8   Q.   Yeah.  She has a nice smile, right?

08:40:52  9   A.   Yes.  But that's what you usually do when you take a

08:40:55 10   picture.

08:40:55 11   Q.   Okay.  And we can agree, without getting into all of the

08:40:59 12   details, Dr. Tosti, that we can see Mrs. Kahn's hair has at

08:41:04 13   least, from the one picture that I've looked at with you so far

08:41:07 14   which was February of 2009, about six months before this, that

08:41:11 15   Mrs. Kahn's hair has been growing, true?

08:41:19 16   A.   "Been growing," yeah.

08:41:19 17   Q.   Very good, okay.

08:41:21 18          And, you know, one thing I wanted to ask you is --

08:41:28 19   well, I'll withdraw that.  Okay.  Thank you, Doctor.

08:41:31 20          Okay.  Let's change gears a little bit, okay?

08:41:37 21   A.   Sure.

08:41:37 22   Q.   Okay.  Now, I want you to go back to the time, September

08:41:44 23   of 2020, on that one occasion that you had to see Mrs. Kahn at

08:41:52 24   your offices down in Miami, okay?

08:41:55 25   A.   Yes.

**OFFICIAL TRANSCRIPT**

08:41:56 1   Q.   Okay.  Now, when you visited with Mrs. Kahn down in Miami,

08:42:04 2   you told us one of the things you did is you took a clinical

08:42:07 3   history, right?

08:42:07 4   A.   Yes.

08:42:08 5   Q.   Okay.  And you asked her -- you asked her questions about

08:42:14 6   her history with regards to her hair and she gave you answers,

08:42:18 7   right?

08:42:18 8   A.   Yes.

08:42:18 9   Q.   Okay.  And isn't it true, Dr. Tosti, that Mrs. Kahn told

08:42:23 10  you that before she started chemotherapy, she had normal hair

08:42:28 11  density?

08:42:29 12  A.   Yes.

08:42:30 13  Q.   Okay.  And you would agree that that was something that

08:42:35 14  was so important to you that in your medical record from the

08:42:38 15  date of this visit, that you put that statement in your record,

08:42:43 16  stating:  "Patient reports she's had normal hair density before

08:42:47 17  chemotherapy and cancer," correct?

08:42:49 18  A.   Yes.  But that's a patient's report, it's part of the

08:42:53 19  history.

08:42:53 20  Q.   Correct.  And I don't want to go back over what we talked

08:42:57 21  about before, but there has been, you know, a day that's

08:43:02 22  passed, so I just want to make sure that we're still clear.

08:43:06 23  Getting an accurate clinical history is really important, true?

08:43:09 24  A.   Absolutely, yes.

08:43:10 25  Q.   All right.  Now, let's take a look at a photograph of

*OFFICIAL TRANSCRIPT*

08:43:20  1   Mrs. Kahn from before chemotherapy and let's talk about it in

08:43:26  2   terms of the history that she gave to you, which was that she

08:43:28  3   had normal hair density before chemotherapy.

08:43:34  4        Can you do that with me?

08:43:36  5   A.   Sure.

08:43:36  6   Q.   Very good.

08:43:36  7        MS. SASTRE:   Okay.  Let's bring up D3085, please.

08:43:42  8   Thanks, Jen.

08:43:42  9   EXAMINATION BY MS. SASTRE:

08:43:44  10  Q.   Now, this is a photograph that the jury has seen already.

08:43:47  11  You've had it up on direct exam when plaintiff's counsel came

08:43:52  12  up here and asked you some questions the other day, right?

08:43:55  13  A.   I recognize this image.

08:44:02  14  Q.   Okay.  And this is an image from May of 2008, correct?

08:44:07  15  A.   Yes.

08:44:07  16  Q.   And to be very specific, Doctor, this image is different

08:44:14  17  than the hundreds of others, and that's because this is a

08:44:17  18  photograph, Number 1, taken of Mrs. Kahn.

08:44:21  19        You agree the photograph is taken outside, right?

08:44:23  20  A.   Yes.

08:44:23  21  Q.   Okay.  And during the day, true?

08:44:26  22  A.   Yes.  What you see is, again, the sun, so she have to keep

08:44:32  23  her eyes closed and so I have her reflection.

08:44:35  24  Q.   Okay.  I just asked, was the photograph taken outside or

08:44:39  25  inside?

**OFFICIAL TRANSCRIPT**

08:44:39  1    A.    It's a photo taken outside.  But when you are outside, you

08:44:44  2    can --

08:44:44  3          THE COURT:  Dr. Tosti, I think the question was just if

08:44:47  4    it was --

08:44:49  5          THE WITNESS:  Outside.

08:44:50  6    EXAMINATION BY MS. SASTRE:

08:44:51  7    Q.    Thank you.  And you would agree that on this day that this

08:44:54  8    photograph was taken outdoors of Mrs. Kahn, this would have

08:44:58  9    been exactly seven days, just one week before she was going to

08:45:05 10    begin chemotherapy, right?

08:45:06 11    A.    Yes.

08:45:07 12    Q.    All right.  Now, on direct exam on Wednesday, this was a

08:45:17 13    photograph that you discussed with the plaintiff's attorneys,

08:45:22 14    right?

08:45:22 15    A.    Yes.

08:45:23 16    Q.    Okay.  And what you testified to, what you told the ladies

08:45:29 17    and gentlemen of the jury under oath is that when you look at

08:45:34 18    this photograph, Mrs. Kahn, one week before chemotherapy, that

08:45:39 19    you could see thinning of her hair in the front, right?

08:45:44 20    A.    I said a little bit different.  I said maybe there is some

08:45:48 21    thinning, I think.  Because -- maybe.  I can't say 100 percent,

08:45:54 22    but maybe there is some thinning.  I agree now, but it's not a

08:45:59 23    good picture.

08:45:59 24    Q.    Okay.  You don't like the picture?

08:46:03 25    A.    No, because of the light.  You know, the opposite as you

*OFFICIAL TRANSCRIPT*

08:46:08  1   have to take a picture outside.  You know, not with the sun

08:46:12  2   going in the eye of the person but on the others.

08:46:14  3   Q.   Some of the photos you said, oh, they were taken inside

08:46:17  4   and that wasn't good, right?

08:46:19  5   A.   I agree.

08:46:19  6   Q.   Yeah.  And some of the photos, you said, you know, they

08:46:22  7   were taken inside but they were taken with a flash and that's

08:46:24  8   not good, either, right?

08:46:26  9   A.   I agree.

08:46:26 10   Q.   Okay.

08:46:27 11   A.   So most of these photos were not good.

08:46:29 12   Q.   Okay.  And then there is photos like this taken outside in

08:46:34 13   the bright light of day and as far as you're concerned, too,

08:46:38 14   Dr. Tosti, they aren't good either, right?

08:46:41 15   A.   I don't think -- it's not clear.  I believe the jurors

08:46:45 16   also know that when you take a picture, it's important to --

08:46:47 17   the sun looking at you because in that case, as you see, you

08:46:52 18   close your eyes so it's not the way to normally take a picture

08:46:58 19   outside.  That's something that I think everybody taking

08:47:00 20   pictures can agree.  But definitely, I said, there is maybe

08:47:06 21   some thinning on the front, I said that and I still say that

08:47:11 22   now.  This is a question -- your question.

08:47:14 23   Q.   Okay.  You know, it's interesting, you looked at and we

08:47:23 24   counted about 27 photos or so that you went through with the

08:47:27 25   plaintiff's lawyer on Wednesday.

*OFFICIAL TRANSCRIPT*

08:47:29  1          Do you remember that?

08:47:30  2    A.    I remember photos but I didn't count.

08:47:34  3    Q.    The plaintiff's counsel came up here on Wednesday and he

08:47:38  4    put up picture after picture and he would say to you,

08:47:41  5    "Dr. Tosti, can you tell us what you see here with regard to

08:47:44  6    Mrs. Kahn's hair?"

08:47:44  7          Do you remember those questions?

08:47:46  8    A.    I remember.

08:47:46  9    Q.    Okay.  Well, I'm going to ask you the same questions,

08:47:49 10    ma'am, okay?

08:47:52 11    A.    Yes.

08:47:52 12    Q.    Okay.  Very good.

08:47:54 13          Now, you've told us now that you can see thinning in

08:48:03 14    the top and the front of Mrs. Kahn's scalp in this photo from

08:48:07 15    one week before chemotherapy, true?

08:48:09 16    A.    No.  I can see thinning in the front but not in the top.

08:48:12 17    Q.    Thinning in the front.

08:48:12 18          MS. SASTRE:  Okay.  Jen, can you zoom in?

08:48:22 19          THE WITNESS:  I don't even see the top here.

08:48:25 20          MS. SASTRE:  Go down a little lower on the photo.

08:48:25 21    Yeah, perfect.

08:48:25 22    EXAMINATION BY MS. SASTRE:

08:48:39 23    Q.    Okay.  Okay.  So now, it's blown up.  Because of the

08:48:42 24    lighting, it's not as crisp on this screen.

08:48:45 25    A.    I can see now the thinning in the --

**_OFFICIAL TRANSCRIPT_**

08:48:45 1          (WHEREUPON, at this point in the proceedings, there was

08:48:45 2    simultaneous speaking.)

08:48:47 3    EXAMINATION BY MS. SASTRE:

08:48:47 4    Q.    Let me ask you a question, please.

08:48:49 5    A.    Sorry.

08:48:49 6    Q.    If we talk at the same time, this nice lady who is

08:48:53 7    typing --

08:48:53 8    A.    I apologize.

08:48:54 9          THE COURT:  Okay.  Ask a question, please.

08:48:56 10         MS. SASTRE:  Very good, yes.  Thank you, Your Honor.

08:49:00 11   EXAMINATION BY MS. SASTRE:

08:49:00 12   Q.    So, Dr. Tosti, do you agree with me now, if you look at

08:49:04 13   the screen in front of you, what that the jurors have up in

08:49:06 14   front of them, when you look at the front of Mrs. Kahn's hair

08:49:13 15   and her head, isn't it true that you can see through to her

08:49:19 16   scalp?

08:49:23 17   A.    I can see thinning of the front, but I cannot see thinning

08:49:26 18   on the side or thinning on the top.

08:49:26 19   Q.    Okay.

08:49:28 20   A.    But, yes, I can see thinning of the front.

08:49:31 21   Q.    And you can see thinning of the front so significant that

08:49:35 22   you can -- where you're looking at her hair where it's thin,

08:49:41 23   Dr. Tosti, you can see through to her scalp, right?

08:49:44 24   A.    Just in the front a little bit, yes.

08:49:46 25   Q.    Okay.  So when Mrs. Kahn told you -- when you took that

**OFFICIAL TRANSCRIPT**

08:49:54  1   history of her, that was important and important in terms of

08:49:58  2   you making a diagnosis, when she said to you at that visit, I

08:50:02  3   have had normal hair density since before I started

08:50:10  4   chemotherapy, you would agree with me now, based upon the

08:50:14  5   testimony you just gave to the jury, that that was an incorrect

08:50:18  6   statement?

08:50:23  7   A.   I do agree my statement wasn't correct because I wrote

08:50:27  8   "she reports."  That's what she reported.

08:50:30  9   Q.   Okay.  And my question is a little different.  Mrs. Kahn's

08:50:35  10  statement, her report to you that she had normal hair density

08:50:40  11  before she started chemotherapy, was an incorrect or inaccurate

08:50:45  12  statement, true?

08:50:47  13  A.   I think she probably didn't notice but, yes, it may be

08:50:52  14  true.

08:50:52  15  Q.   You think Mrs. Kahn didn't notice that her hair was thin

08:50:57  16  in front and she could see through to her scalp?

08:51:00  17  A.   I think this is a picture when the sun goes through and

08:51:03  18  sometimes under the light, you see the scalp; in normal

08:51:10  19  condition, you do not.

08:51:10  20  Q.   Well, putting aside what Mrs. Kahn may have noticed or

08:51:15  21  not -- and let me say this -- let me go back.

08:51:18  22        You're sitting here today, I mean, whether Mrs. Kahn

08:51:21  23  noticed it or not, that's just -- you're purely guessing,

08:51:24  24  you're speculating, you don't know that?

08:51:27  25  A.   I agree.  You told me she gave me something wrong, and I

*OFFICIAL TRANSCRIPT*

08:51:32 1    cannot say she lied to me.  Maybe that was her feeling of the

08:51:37 2    problem.

08:51:38 3    Q.    I never asked you whether she lied.

08:51:44 4    A.    No.  She gave me an incorrect statement.

08:51:46 5    Q.    That's right.  She gave you an incorrect statement.  And

08:51:49 6    that was an incorrect statement that you put into her clinical

08:51:53 7    history and that statement then, as repeated by you from the

08:51:57 8    mouth of Mrs. Kahn went into your medical record, in this case,

08:52:01 9    as part of the clinical history, and that statement is wrong,

08:52:06 10   true?

08:52:06 11   A.    That statement is correct because that statement is what

08:52:10 12   the patient reports.  And when you write history you ask the

08:52:14 13   patient, and you write down what the patient tells you and

08:52:18 14   that's your job.  It is not to evaluate the -- and criticize

08:52:25 15   the patient -- what the patient reports.

08:52:26 16   Q.    Okay.  But if we were to make your report accurate, we

08:52:30 17   would not allow it to continue to state that Mrs. Kahn had

08:52:35 18   normal hair density before chemotherapy, true?

08:52:40 19   A.    I said Mrs. Kahn reported she had normal hair density

08:52:45 20   before chemotherapy.  And that's what I wrote in my clinical

08:52:52 21   examination.

08:52:52 22   Q.    Okay.  But you now know that that's incorrect, what she

08:52:55 23   told you, right?

08:52:56 24   A.    Maybe possibly incorrect, yes.

08:52:59 25   Q.    Okay.  And so your report would need to be corrected.

**OFFICIAL TRANSCRIPT**

08:53:04  1   Because, again, this was a photograph that you had in your

08:53:06  2   possession, Dr. Tosti, long before you wrote your report and

08:53:10  3   reached your final opinions in this case, true?

08:53:14  4   A.   True.  But at that time -- yes, true.

08:53:18  5   Q.   Okay.  And do you have any intention, as you sit here now,

08:53:22  6   to make your report accurate and make a notation in that

08:53:26  7   clinical history that there are photographs that you have look

08:53:29  8   at from a day before chemo where you see thinning and that it's

08:53:34  9   your opinion that she did not have normal hair density before

08:53:37 10   she started chemotherapy, are you going to amend your report to

08:53:40 11   say that?

08:53:40 12   A.   I think there were many other photos where there was no

08:53:43 13   thinning at all.  And so -- because what I said in the

08:53:48 14   beginning about photos, I don't use photos to make clinical

08:53:55 15   diagnosis ever.

08:53:55 16   Q.   Okay.  I would like an answer to my question.  With all

08:53:59 17   due respect, that's not what I asked you about other photos or

08:54:02 18   diagnosis.

08:54:02 19   A.   So, I don't change my diagnosis and my opinion based on a

08:54:07 20   photo.

08:54:07 21   Q.   That's not my question either, ma'am.

08:54:09 22        My question is:  Are you going to amend your report

08:54:12 23   to account for this inaccurate information provided to you by

08:54:17 24   Mrs. Kahn?  Just please, "yes" or "no," Doctor.  It's not a

08:54:23 25   hard question.

*OFFICIAL TRANSCRIPT*

08:54:24  1    A.    I can, if you think it's useful.  I can amend my report

08:54:27  2    saying that I saw one photo where she was -- maybe was showing

08:54:30  3    some thinning of the front.

08:54:32  4          THE COURT:  I think, Dr. Tosti, the question is:  Are

08:54:34  5    you going to do that?

08:54:37  6          THE WITNESS:  I did not.

08:54:38  7          THE COURT:  Okay.

08:54:38  8    EXAMINATION BY MS. SASTRE:

08:54:41  9    Q.    And you have no plans to?

08:54:46 10    A.    The counsel never tell me you can amend a report, but now

08:54:50 11    I know.

08:54:51 12    Q.    Okay.  And isn't it true, this photograph -- this

08:55:09 13    photograph was shown to you at your deposition in this case,

08:55:12 14    right?

08:55:12 15    A.    I think so, but I don't remember it, to be honest, because

08:55:15 16    in the deposition, they showed me several photos.

08:55:20 17    Q.    Yes.  But if I told you that this was marked as

08:55:22 18    Exhibit Number 21 to your deposition, would you have any reason

08:55:24 19    to dispute that?

08:55:25 20    A.    No.  But I don't think it was a large -- put the photo

08:55:31 21    back, and if you put the photo back without enlarging, that is

08:55:37 22    how you see a photo in a deposition.

08:55:41 23          MS. SASTRE:  Your Honor, may I approach?

08:55:42 24          THE COURT:  You may.

08:55:49 25          THE WITNESS:  Yes, you gave me.

*OFFICIAL TRANSCRIPT*

08:55:49  1    EXAMINATION BY MS. SASTRE:

08:55:49  2    Q.    Okay.  So, Dr. Tosti, I just handed what you can see is

08:55:54  3    marked as Exhibit 21 to your deposition.

08:55:56  4            Do you see that?

08:55:57  5    A.    Yes.

08:55:58  6    Q.    Okay.  And do you agree with me it's the same exact photo

08:56:01  7    we're looking at, right?

08:56:02  8    A.    I agree but much smaller.

08:56:04  9    Q.    Very good.

08:56:04 10            And, Dr. Tosti, isn't it true that you don't know if

08:56:09 11    you even reviewed this photograph before you prepared your

08:56:14 12    report and opinions in this case?

08:56:18 13    A.    I reviewed 800 photographs.  I cannot say I reviewed this

08:56:23 14    photograph.  I didn't review another photograph.  You know, I'm

08:56:26 15    not an elephant.  I don't remember all the single photographs I

08:56:31 16    reviewed.  I remember some, but I don't remember all of them.

08:56:34 17    I think I did, but I'm not 100 percent sure.

08:56:38 18    Q.    Okay.  Well, I'm asking you with regard to this

08:56:43 19    photograph, ma'am.  With all due respect, I'm not asking about

08:56:45 20    the hundreds of others.

08:56:47 21            Isn't it true that you don't know if you ever

08:56:52 22    reviewed this photograph before you prepared your report, true?

08:56:56 23    A.    No, it's not true.  Because I review all the photographs.

08:57:00 24    I don't remember each photograph in particular.

08:57:03 25            THE COURT:  I think, Dr. Tosti, the question is:  Do

*OFFICIAL TRANSCRIPT*

08:57:05  1    you remember reviewing this photograph?

08:57:08  2         THE WITNESS:  This particular one, I don't remember,

08:57:11  3    but I possibly did.

08:57:13  4    EXAMINATION BY MS. SASTRE:

08:57:13  5    Q.   Okay.  Doctor, if you can take your deposition out again,

08:57:16  6    please, from September 29, 2020.  And I would like you to turn

08:57:31  7    to page 160, please.  160, "Question" -- or excuse me -- line

08:57:53  8    23, okay?

08:58:12  9         Doctor, are you there?

08:58:13 10    A.   I'm looking, sorry.  There are many depositions inside.

08:58:17 11    September, I found it.

08:58:18 12    Q.   Yes, ma'am.  September 20th (verbatim), 2020.

08:58:18 13    A.   I'm sorry if I --

08:58:25 14    Q.   It's okay.

08:58:25 15    A.   160, I'm here.  Line?

08:58:27 16    Q.   Yes, ma'am.  Page 160, line 23.

08:58:29 17         Under oath, you were asked -- referring to

08:58:37 18    Exhibit 21 -- Exhibit 21 to your deposition:  "You don't have

08:58:42 19    any specific memory of studying the picture that we've marked

08:58:46 20    as Exhibit 21; is that fair?"  Your answer under oath, "No."

08:58:49 21         Did I read that correctly?

08:58:52 22         MR. SCHANKER:  Your Honor, pursuant to the rule of

08:58:55 23    completeness, we request that lines 1 through 13 of page 161 be

08:59:01 24    read.

08:59:05 25         THE COURT:  Please proceed, Ms. Sastre, 1 through 13.

*OFFICIAL TRANSCRIPT*

08:59:11 1          MS. SASTRE:  Okay.  Let me take a look, Your Honor.

08:59:20 2   What lines, Counsel?

08:59:21 3          MR. SCHANKER:  161.

08:59:28 4          MS. SASTRE:  Okay.

08:59:29 5          MR. SCHANKER:  Yes.  Right after what you just read.

08:59:31 6          MS. SASTRE:  Okay.  161, line 1 to what?

08:59:39 7          MR. SCHANKER:  Through 13.

08:59:39 8          MS. SASTRE:  13.  Okay.

08:59:39 9   EXAMINATION BY MS. SASTRE:

08:59:45 10  Q.   Okay.  All right.  "Question:  Would you agree with me

08:59:50 11  that you can see Ms. Kahn's hair extending from her frontal

08:59:54 12  scalp in the picture we marked as Exhibit 21?"  Your answer:

08:59:59 13  "I'm not so sure."

09:00:00 14          Do you see that?

09:00:03 15  A.   Line?  Sorry, because it -- which line?

09:00:08 16  Q.   Line 1, page 161.

09:00:12 17  A.   161?

09:00:12 18  Q.   Yes.

09:00:12 19  A.   Yes.

09:00:13 20  Q.   Okay.  And then you said:  "It depends on how the hair is

09:00:18 21  combed, so maybe that's just her forehead and just a part of

09:00:22 22  her forehead.  Again, it's very difficult to judge from the

09:00:25 23  picture.  To judge, I want a picture that I see the top of the

09:00:28 24  scalp."

09:00:29 25          Did I read that correctly?

                          *OFFICIAL TRANSCRIPT*

09:00:30  1   A.   Yes.

09:00:30  2   Q.   Okay.  But we know today that you've said here in court

09:00:34  3   that you can see through into her scalp, correct?

09:00:38  4   A.   Yes, correct.

09:00:38  5   Q.   Okay.

09:00:39  6   A.   But please show the small picture I saw, not this

09:00:43  7   enlargement because this make difference, you know.  The

09:00:46  8   picture, if you can disenlarge (verbatim) the picture that

09:00:53  9   would be fair, otherwise, it's not.

09:00:54 10   Q.   And did anything prevent you from taking these

09:00:58 11   photographs, which were produced to you electronically and on

09:01:01 12   your computer enlarging it?

09:01:05 13   A.   But not at the deposition, I could not enlarge the

09:01:08 14   pictures at the deposition.

09:01:09 15   Q.   No, no, Doctor.  My question is not at the deposition.

09:01:14 16   But by the time we got to the deposition, you had already

09:01:16 17   reached your opinions in this case, right?

09:01:19 18   A.   No.  But the question you're asking me is about the

09:01:21 19   deposition.  You're reading me a statement of the deposition.

09:01:24 20   Q.   Let me see if I can go back.  And again, Doctor, truly I'm

09:01:29 21   asking very specific questions, and I would like to get through

09:01:33 22   this exam with you.

09:01:33 23   A.   Yes.  We are not reading the deposition anymore.  That's

09:01:36 24   my question.

09:01:38 25        THE COURT:  No.  She's asking you a separate question,

*OFFICIAL TRANSCRIPT*

09:01:42  1   Dr. Tosti.  Please answer the question.

09:01:42  2              THE WITNESS:  A separate question?

09:01:42  3              THE COURT:  Yes.

09:01:42  4              MS. SASTRE:  Yes, ma'am.

09:01:43  5              THE WITNESS:  Not to refer to the deposition?

09:01:46  6   EXAMINATION BY MS. SASTRE:

09:01:47  7   Q.   I can guarantee you, if you listen to my question, it will

09:01:53  8   be very clear to you what I'm asking.

09:01:53  9   A.   Very good.

09:01:56 10   Q.   This photograph was produced to you by plaintiff's counsel

09:02:03 11   electronically, and nothing prevented you at any time from

09:02:07 12   opening this photograph up on a computer and zooming in on the

09:02:11 13   top of her head, correct?

09:02:13 14   A.   Yes.

09:02:14 15   Q.   Thank you.

09:02:15 16              Now, you know, we understand, even though you're an

09:02:30 17   expert witness, in this case, hired by these lawyers, hired by

09:02:33 18   the plaintiff's lawyers, you would agree with me, Dr. Tosti, it

09:02:37 19   is your duty, your duty as an expert, to consider all of the

09:02:42 20   relevant information in the case; isn't that true?

09:02:44 21   A.   Yes, it's true.

09:02:44 22   Q.   Okay.

09:02:46 23   A.   And I believe I did.

09:02:48 24   Q.   Okay.  And that would include information that might help

09:02:53 25   Mrs. Kahn's case, right?

*OFFICIAL TRANSCRIPT*

09:02:56  1    A.    I don't follow.  The information that?

09:02:59  2    Q.    That would include information that might help Mrs. Kahn's

09:03:02  3    case, true?

09:03:02  4    A.    Yes.

09:03:03  5    Q.    And it would also include information, Dr. Tosti, that

09:03:08  6    might not help Mrs. Kahn's case, right?

09:03:11  7    A.    I agree.

09:03:11  8    Q.    And, in fact, the hallmark -- one of the hallmarks of

09:03:16  9    good, reliable science is to look at that information which

09:03:21 10    disagrees with or is inconsistent with your opinions or

09:03:24 11    conclusions, correct?

09:03:26 12    A.    I agree.

09:03:27 13    Q.    Okay.  Because if you don't do that, if you only look at

09:03:31 14    when you're developing an opinion, the things that you like, I

09:03:34 15    mean, that's what we call cherry picking, right?

09:03:38 16    A.    I absolutely agree on that.

09:03:39 17    Q.    Okay.  Now -- all right.  Let's go forward in time about a

09:03:50 18    year from this photograph, so we're at one week before

09:03:53 19    chemotherapy.  Let's go forward in time a year.  All right.

09:03:59 20    So, we're -- now, we're going to be in October of 2009.

09:04:02 21          MS. SASTRE:  If we can bring up 31 --

09:04:06 22          THE WITNESS:  2010.

09:04:06 23    EXAMINATION BY MS. SASTRE:

09:04:06 24    Q.    '09.  2009.

09:04:08 25    A.    I think that was 2009.

                                   *OFFICIAL TRANSCRIPT*

09:04:12   1    Q.   Well, I'll ask a question.  You let me know if I got

09:04:17   2    something wrong, fair enough?

09:04:17   3    A.   Okay.  Sorry.

09:04:19   4    Q.   Okay.  Very good.

09:04:22   5         So, if we take a look at D3157, please.  All right.

09:04:28   6    So, Dr. Tosti, we're looking at a photograph of Mrs. Kahn,

09:04:32   7    right?

09:04:32   8    A.   Yes.

09:04:35   9    Q.   And this is a photograph that the parties have stipulated

09:04:37  10    was taken of Mrs. Kahn on October 10th of 2009, okay?

09:04:41  11    A.   Yes.

09:04:42  12    Q.   And so, Mrs. Kahn completed her chemotherapy in October of

09:04:46  13    2008, this is about one year after the completion of

09:04:50  14    chemotherapy, true?

09:04:51  15    A.   True.

09:04:51  16    Q.   Okay.  Very good.  And -- I mean, the visit we were

09:05:00  17    talking about before was in August, right, of 2009?  And -- I

09:05:05  18    mean, I'm just asking you, you can agree this is another photo

09:05:08  19    of Mrs. Kahn around that time, again, there is no hat, right?

09:05:13  20    A.   No hat.

09:05:13  21    Q.   No hat, okay.

09:05:16  22         And is this a photograph, also, ma'am, that you

09:05:18  23    discussed with the plaintiff's lawyer on direct exam.

09:05:23  24         You remember that, right?

09:05:25  25    A.   I think so.

                              *OFFICIAL TRANSCRIPT*

09:05:25  1    Q.   Okay.  But what you testified to one year after

09:05:34  2    chemotherapy, what you told these lawyers that hired you --

09:05:38  3    they put this picture up and said, what do you see here,

09:05:43  4    Dr. Tosti?  And you had no qualms or reservations about telling

09:05:48  5    them what were your observations about Mrs. Kahn's hair, right?

09:05:53  6    A.   Yes.  But I don't understand what's the question.

09:05:57  7    Q.   Well, my question is, first, when counsel asked you how

09:06:02  8    does Mrs. Kahn's hair look in this picture, which he did many

09:06:07  9    times, spent 30 minutes on photographs, I never heard you say

09:06:11 10    to him, well, I can't comment on that picture because I can't

09:06:14 11    make a diagnosis from a picture, right?  You answered his

09:06:18 12    questions about what you saw.

09:06:19 13    A.   I think I cannot make a diagnosis.  Looks like bald but I

09:06:23 14    don't see the top of the scalp which -- when the problem is.

09:06:25 15    Q.   That's not my question, ma'am.  My question was that when

09:06:31 16    Mr. Schanker was up here asking you questions about the photos,

09:06:34 17    you answered his questions and you told him what you saw in

09:06:38 18    these photos with when it comes to Mrs. Kahn's hair, true?

09:06:41 19    A.   Yes, true.

09:06:42 20    Q.   Okay.  And what you said about this photograph one year

09:06:45 21    post chemotherapy, you said -- I want to get it right -- you

09:06:54 22    said, "She looks normal."

09:06:56 23    A.   That's what I'm saying now.

09:07:01 24    Q.   I'm sorry, ma'am.

09:07:03 25    A.   That's what I just said.

**OFFICIAL TRANSCRIPT**

09:07:04  1    Q.   Okay.  So your testimony under oath today to this jury in

09:07:07  2    terms of looking at a photograph, obviously, and being

09:07:10  3    particularly focused on Mrs. Kahn's hair, your under oath

09:07:16  4    testimony is that one year post chemotherapy, Mrs. Kahn looked

09:07:19  5    normal, true?

09:07:22  6    A.   That's inaccurate and misleading.  I said, "Looks normal,"

09:07:26  7    but I don't see the part of the scalp that are important to

09:07:30  8    make a diagnosis.  That's I think what I answer.

09:07:34  9    Q.   Okay.  But from what you can see, your testimony under

09:07:39  10   oath to the jury -- I understand it's not a 360-degree view of

09:07:43  11   her entire head, it's a photograph of the front --

09:07:46  12   A.   That's why her hair loss --

09:07:48  13   Q.   You have to let me finish, Dr. Tosti.

09:07:48  14        THE COURT:  Let her finish.

09:07:52  15        THE WITNESS:  Oh, I understand.  But I didn't

09:07:55  16   understand was not finished.

09:07:55  17        THE COURT:  All right.

09:07:56  18   EXAMINATION BY MS. SASTRE:

09:07:56  19   Q.   Please.  This photograph, taken one year after

09:08:00  20   chemotherapy, shows the front of Mrs. Kahn's hair, very much

09:08:07  21   like the last photograph we looked at a week before

09:08:14  22   chemotherapy where you said you could see thinning in the front

09:08:15  23   here.  And, again, your sworn under oath testimony to this jury

09:08:19  24   today is this photograph from one year after chemotherapy, from

09:08:22  25   what you can see, Mrs. Kahn's hair looks normal in this photo,

*OFFICIAL TRANSCRIPT*

09:08:25  1    true?

09:08:26  2    A.    True, but this photo doesn't show the part of the scalp

09:08:33  3    that are important to see if it's normal or abnormal, which is

09:08:38  4    the main thing that you have to have.

09:08:41  5    Q.    Okay.  So, now, let's take a look.  Let's do a

09:08:49  6    side-by-side, okay?

09:08:51  7          MS. SASTRE:  So let's go ahead and pull up D3085, which

09:08:57  8    the jury has seen, and this photograph D3157, okay?

09:09:06  9          THE WITNESS:  Yeah.

09:09:06 10    EXAMINATION BY MS. SASTRE:

09:09:06 11    Q.    Okay.  So, now, these are the two photos we have just gone

09:09:09 12    over together, and it's a side-by-side comparison so everyone

09:09:13 13    is very clear of the dates underneath.

09:09:16 14          Do you see that?

09:09:17 15    A.    I see.

09:09:17 16    Q.    Okay, ma'am.  And, Doctor, under oath today, in all

09:09:28 17    honesty -- in all honesty, Dr. Tosti, you would agree with me

09:09:34 18    that Mrs. Kahn's hair, one year after chemotherapy, which is

09:09:43 19    the photo on the right, looks much like it did just one week

09:09:48 20    before chemotherapy, the photo on the left, true?

09:09:53 21    A.    I agree that from what you can see in these pictures may

09:09:58 22    even look better, and that shows very well why pictures like

09:10:02 23    this cannot be utilized because the first picture is a

09:10:09 24    different inclination than the second picture which is a main

09:10:14 25    problem when evaluating pictures.  And that really shows, you

*OFFICIAL TRANSCRIPT*

09:10:18  1   know, how you cannot use picture to follow patients because

09:10:22  2   here are bad pictures.  So can you believe she was better after

09:10:27  3   chemotherapy?  I cannot.

09:10:28  4   Q.   Okay.  So I think you said if I understood it, that you

09:10:33  5   agree Mrs. Kahn's hair looked much the same as it did before

09:10:39  6   chemo except, I think, you added on that from these photos, it

09:10:43  7   actually looks better, right?

09:10:47  8   A.   Yes, that's what I did.  But I want to clarify -- that's

09:10:51  9   the reason why you cannot rely on pictures.  This is a very

09:10:57  10  good example of that.

09:10:57  11  Q.   Okay.  In fact, this photograph that's on the right of

09:11:04  12  Mrs. Kahn in the pink T-shirt, one year after chemotherapy, you

09:11:10  13  were shown this photograph at your deposition, too.

09:11:13  14       You remember that?

09:11:16  15  A.   I don't remember.  I remember that I was shown very small

09:11:22  16  photos but I don't know if this photo was there.

09:11:24  17  Q.   Okay.  And do you remember mistakenly identifying this

09:11:30  18  photograph on the right, one year after chemotherapy, as one

09:11:32  19  that you believed was before chemotherapy.

09:11:34  20       Do you remember that?

09:11:37  21  A.   I don't remember it but I'll agree.  I would say the same

09:11:41  22  now because she looks better than before, you see here, but --

09:11:44  23  because pictures are misleading.

09:11:46  24  Q.   That's right.  So, from these pictures, you would agree

09:11:49  25  with me that Mrs. Kahn's hair one year after chemotherapy looks

*OFFICIAL TRANSCRIPT*

09:11:55 1   so much like it did one week before chemotherapy, that you

09:12:00 2   incorrectly believed that it was a photo from before she lost

09:12:04 3   her hair, right?

09:12:06 4   A.   I agree.  But this is just a way that everybody should

09:12:11 5   understand how pictures are misleading, but I absolutely agree.

09:12:16 6   Q.   Okay.  Let's go to another photograph.

09:12:27 7        MS. SASTRE:  D3054, please.  If you could bring that

09:12:31 8   up, Jen.  Thank you.

09:12:31 9   EXAMINATION BY MS. SASTRE:

09:12:32 10  Q.   All right.  Now -- so, here is another photograph that you

09:12:36 11  discussed with plaintiff's counsel on your direct exam.

09:12:39 12       Do you recall that testimony you gave on Wednesday?

09:12:41 13  A.   Yes, I do.

09:12:43 14  Q.   Okay.  And this is a photograph, we can agree, it's of the

09:12:50 15  side of Mrs. Kahn, right?

09:12:51 16  A.   I agree.

09:12:52 17  Q.   Okay.  And this is a photograph from December of 2006, so

09:12:59 18  before chemotherapy, correct?

09:13:01 19  A.   Yes.

09:13:01 20  Q.   And to be very specific for the jury, this is a

09:13:06 21  photograph?

09:13:06 22  Of the side of Mrs. Kahn.  It's about one-and-a-half years

09:13:11 23  before she began chemotherapy, right?

09:13:15 24  A.   Yes.

09:13:15 25  Q.   Okay.

*OFFICIAL TRANSCRIPT*

09:13:18  1            MS. SASTRE:  Now, let's take a look at D3176, please.

09:13:24  2     Okay.

09:13:24  3     EXAMINATION BY MS. SASTRE:

09:13:25  4     Q.    And this is a photograph you've seen as well, correct?

09:13:28  5     A.    Yes.

09:13:29  6     Q.    Okay.  Now, this photograph is from June 21st of 2010, so

09:13:35  7     this is one-and-a-half years after chemotherapy, okay?

09:13:39  8                Are you with me?

09:13:40  9     A.    Yes, yes.  I remember very well this photo.

09:13:42 10     Q.    Okay.  So, the first photo is a year-and-a-half before

09:13:46 11     chemotherapy.  This photo is a year-and-a-half after

09:13:51 12     chemotherapy, right?

09:13:51 13     A.    Yes.

09:13:53 14     Q.    Let's take a look at a side-by-side comparison of these

09:13:58 15     photos, please.

09:14:04 16            MS. SASTRE:  Hold on a second.  Very good.  Thank you,

09:14:13 17     Jen.

09:14:13 18     EXAMINATION BY MS. SASTRE:

09:14:13 19     Q.    Okay, ma'am.  So, these are the two photos that we just

09:14:17 20     looked at.  So, here on the left, December 2006 is Mrs. Kahn

09:14:22 21     one-and-a-half years before chemo and on the right -- similar

09:14:28 22     side-view, same side of Mrs. Kahn's head taken one-and-a-half

09:14:34 23     years after chemotherapy, right?

09:14:39 24     A.    Yes.

09:14:39 25     Q.    Okay.  And you would agree with me, Dr. Tosti, that

*OFFICIAL TRANSCRIPT*

09:14:45  1    Mrs. Kahn's hair one-and-a-half years after chemotherapy looked

09:14:52  2    much like it did before chemotherapy, true?

09:14:59  3    A.    I didn't understand the end of the question.  You were far

09:15:01  4    from the microphone.  I'm sorry.

09:15:02  5    Q.    My apologies.

09:15:04  6          You would agree with me that Mrs. Kahn's hair

09:15:09  7    one-and-a-half years after chemotherapy looked much like

09:15:15  8    Mrs. Kahn's hair before chemotherapy?

09:15:20  9    A.    Yes.  If you look at these pictures, looks better, which,

09:15:25 10    of course, is impossible.  So, again, this is an example on how

09:15:29 11    pictures are misleading and should be not used in this way.

09:15:34 12    Q.    So you believe that not only does Mrs. Kahn's hair after

09:15:42 13    chemotherapy look much like it did before, your testimony under

09:15:46 14    oath again was just that you actually believe it looks better,

09:15:49 15    true?

09:15:50 16    A.    In this picture.

09:15:51 17    Q.    In these pictures.

09:15:52 18    A.    In these pictures --

09:15:52 19    Q.    Okay.

09:15:54 20    A.    I think it should be clear because these pictures are

09:15:56 21    misleading, and so pictures should not be used for this purpose

09:16:01 22    because in any case, we cannot believe she's improved after

09:16:06 23    chemotherapy.  This is impossible.

09:16:07 24    Q.    I mean, Dr. Tosti, if pictures are so misleading, why did

09:16:12 25    you go through 30 photos with plaintiff's counsel and comment

*OFFICIAL TRANSCRIPT*

09:16:15  1    on every single one of them?  Dr. Tosti, what do you see in

09:16:19  2    this photo?  Tell the jury.  Oh, this is what I see about her

09:16:21  3    hair.  Why are the photos suddenly misleading now but they

09:16:25  4    weren't for the 30 minutes you spent discussing photos with

09:16:30  5    Mr. Schanker?

09:16:31  6              Can you tell me that?

09:16:31  7    A.   I think it's the same I told during my deposition with

09:16:33  8    him.  I just said I cannot make a diagnosis from this photo.

09:16:39  9    Photos are useless.  And when you put them side-by-side, they

09:16:43  10   become misleading.

09:16:46  11   Q.   Okay.  All right, ma'am.  Well, the jury will recall your

09:16:51  12   testimony.

09:16:52  13            Now, let's go back for a moment.  Again, I want to

09:17:01  14   focus on some information that Mrs. Kahn provided directly to

09:17:07  15   you when you were putting together your clinical history,

09:17:10  16   which, as you told us, is a very important part of you making

09:17:14  17   your diagnosis, okay?

09:17:15  18   A.   Yes.

09:17:16  19   Q.   And what happened when Mrs. Kahn saw you in September of

09:17:23  20   2020 is that she said to you that:  "Once her hair grew back in

09:17:31  21   2009" -- and I have your report.  I'm holding it in my hand,

09:17:35  22   okay?  So I'm reading from your report -- Ms. Kahn states:

09:17:38  23   "When her hair grew back in 2009, it has the appearance that it

09:17:44  24   has today," right?

09:17:46  25            Isn't that what she represented to you?

*OFFICIAL TRANSCRIPT*

09:17:47 1   A.   That's what she told me.

09:17:49 2   Q.   Okay.  And you put that in the history section of your

09:17:51 3   report?

09:17:52 4   A.   Yes.

09:17:53 5   Q.   And your opinions, in this case, are in part based upon

09:17:58 6   that information provided by Mrs. Kahn?

09:18:01 7   A.   Yes, correct.

09:18:02 8   Q.   Right?  Because if after Mrs. Kahn's hair fell out when

09:18:09 9   she was taking chemo and then her hair grew back and slowly

09:18:15 10  fell out later --

09:18:17 11       THE COURT:  Ms. Sastre, you really --

09:18:19 12       MS. SASTRE:  Sorry.  I'll stay put, Your Honor.

09:18:21 13  EXAMINATION BY MS. SASTRE:

09:18:21 14  Q.   And slowly fell out years later, that would have been a

09:18:27 15  very, very different history than what Mrs. Kahn reported to

09:18:30 16  you, true?

09:18:33 17  A.   I want you to clarify what's the question.

09:18:35 18  Q.   Okay.  Well --

09:18:38 19  A.   It may be long and I lost it.

09:18:40 20  Q.   That's fair.  Let me ask it better, okay?

09:18:44 21       What Mrs. Kahn told you when she came to see you, she

09:18:49 22  said, look, the way I look today in 2020, when she walked into

09:18:54 23  your office at the University of Miami, she says, this is how

09:18:57 24  my hair has looked since 2009, right?

09:19:00 25  A.   Yes, that's what she said.

*OFFICIAL TRANSCRIPT*

09:19:03  1    Q.    And it was your belief, Dr. Tosti, that, in fact,

09:19:08  2    Mrs. Kahn's hair has looked the same from 2009 all the way

09:19:12  3    until the day when she arrived at your office, right?

09:19:17  4    A.    Yes, roughly the same.

09:19:19  5    Q.    Of course.  And that is an important piece of information

09:19:23  6    provided to you by Mrs. Kahn which you based your opinion on in

09:19:29  7    this case?

09:19:29  8    A.    Part of the information I based my opinion, yes.

09:19:32  9    Q.    And like we talked about before, like if you had a stool

09:19:37  10   with three legs, right, if that clinical history part -- one of

09:19:44  11   the legs -- if the clinical history you got is wrong and you

09:19:47  12   knock it out, that stool falls over with that missing leg,

09:19:51  13   right?

09:19:51  14   A.    Yes.

09:19:52  15   Q.    Okay.  And when you have an incorrect clinical history --

09:19:57  16   an inaccurate clinical history, it can lead to an unreliable or

09:20:01  17   incorrect diagnosis, true?

09:20:02  18   A.    Yes, partially true.

09:20:02  19   Q.    Okay.

09:20:05  20   A.    It's not the only thing I base my opinion, but the

09:20:17  21   clinical history is very important.

09:20:19  22   Q.    Yeah.  Okay.  So, and because of what Mrs. Kahn told you,

09:20:29  23   that my hair has been the same since 2009, it has been your

09:20:35  24   opinion, in this case, that Mrs. Kahn did not progressively

09:20:43  25   lose hair from 2009 until the present, right?

*OFFICIAL TRANSCRIPT*

09:20:47 1    A.    Let's say not consistently, no.  Everybody aging gets

09:20:53 2    worse.  We get wrinkles, we get a little bit thinning.  That's

09:20:58 3    the process of aging but not consistent.  My question

09:21:03 4    (verbatim) is, yes, not consistently.

09:21:05 5    Q.    Not significant?

09:21:07 6    A.    Not significant.

09:21:07 7    Q.    Okay.  She might have lost a few hairs here and there like

09:21:12 8    the rest of us, we're all getting older --

09:21:15 9    A.    Yes, unfortunately.

09:21:17 10   Q.    That's right.  But no significant changes in Mrs. Kahn's

09:21:22 11   hair from 2009 all the way to when she walks into your office

09:21:27 12   at the University of Miami in 2020, right?

09:21:31 13   A.    Yes.

09:21:31 14   Q.    Okay.  Very good.

09:21:33 15         So, Doctor, we've just spent time this morning

09:21:43 16   looking at photos from 2009, right?

09:21:45 17   A.    Yes.

09:21:45 18   Q.    Okay.  For example -- okay.  So the October 10th, 2009,

09:22:06 19   photo, Mrs. Kahn's in the pink shirt, right?

09:22:09 20   A.    I think it's (indiscernible) but I think you just showed,

09:22:12 21   yes.

09:22:12 22   Q.    Okay.  We looked at this photo a few times, right?

09:22:15 23   A.    Yes.

09:22:15 24   Q.    And, Doctor, you would agree with me that by the time you

09:22:20 25   saw Mrs. Kahn in 2020, down in Miami, Mrs. Kahn didn't look

*OFFICIAL TRANSCRIPT*

09:22:27  1   anything like she looked in this photo in 2009, right?

09:22:32  2   A.    Yes, I agree.  But there is a photo on the same day with

09:22:35  3   the same t-shirt that shows some thinning, you know.  Again,

09:22:43  4   photos cannot be used.  And even photos from the same day, they

09:22:47  5   look different.

09:22:51  6   Q.    You had no qualms about using photos on direct exam,

09:22:55  7   right?

09:22:56  8   A.    No.  On direct exam, they say the same.  Photos are not

09:23:02  9   something that any good dermatologist uses for diagnosis.

09:23:06  10  Q.    Yeah.  And you've said that a lot as well, and let me see

09:23:12  11  if I can be really, really clear on that.  I'm not going to use

09:23:16  12  the word "diagnosis."  I haven't used the word "diagnosis."

09:23:20  13  I'm not asking you if you could give a diagnosis from the

09:23:23  14  photos.  Is that something you can understand and follow?

09:23:27  15  A.    You ask me to give a diagnosis because you ask me if the

09:23:31  16  hair is normal or abnormal, and this is already a diagnosis.

09:23:36  17  Distinguish normality from abnormality, for me, is part of the

09:23:41  18  diagnosis.

09:23:41  19  Q.    Okay.  I'm asking you what you can see with regard to

09:23:45  20  Mrs. Kahn's hair from the photos.  I am not asking you for a

09:23:48  21  diagnosis.  You know that, Dr. Tosti.

09:23:49  22  A.    Diagnosis is something you see.

09:23:53  23  Q.    Okay.  Well, you know it's funny.  Again, when plaintiff's

09:23:58  24  counsel asked you what you saw in the photograph the week

09:24:00  25  before chemo, you did not hesitate to tell him and say, well,

**OFFICIAL TRANSCRIPT**

09:24:04 1   her hair is thin there, right?

09:24:07 2   A.    What you said?

09:24:08 3   Q.    You didn't hesitate to tell them that her hair looked

09:24:13 4   thin, right?

09:24:13 5   A.    In some pictures, I did.  Also, with you.

09:24:13 6   Q.    Okay.  Okay.

09:24:16 7   A.    But both of them are not good, but in some of them, I can

09:24:21 8   say these are abnormal.

09:24:21 9   Q.    Okay.

09:24:24 10   A.    That's why the most you can say in a picture, it's normal

09:24:29 11   or it's abnormal.

09:24:30 12   Q.    Let's see.  Let's keep going, okay?

09:24:35 13         MS. SASTRE:  Let's take a look at D3157 and 3795,

09:24:41 14   please, Jen.

09:24:41 15   EXAMINATION BY MS. SASTRE:

09:24:43 16   Q.    Okay.  So, Dr. Tosti, we're looking at the same photo from

09:24:48 17   October of 2009, one year after chemotherapy.  You've just told

09:24:53 18   us Mrs. Kahn's hair looks normal in this photo.  You've told us

09:24:59 19   it actually, from what you can see, looks like she has better

09:25:02 20   hair or more hair than even before chemotherapy.  So that's the

09:25:05 21   picture on the left, okay?

09:25:06 22   A.    Yes.

09:25:07 23   Q.    All right.  Now, again, to orient the jury, you saw

09:25:11 24   Mrs. Kahn in 2020, right?

09:25:15 25   A.    Yes.

*OFFICIAL TRANSCRIPT*

09:25:15 1   Q.    Okay.  The photograph on the right, ma'am, is from 2020,

09:25:19 2   okay?

09:25:19 3   A.    Yes.

09:25:19 4   Q.    And, Doctor, you would agree with me, Mrs. Kahn's hair

09:25:29 5   didn't remain the same from 2009 -- from 2009 until the time

09:25:35 6   she came in to see you in 2020.  It's not the same.

09:25:39 7   A.    Looking at these pictures, I absolutely agree.  She looks

09:25:43 8   definitely abnormal in the right and she looks pretty normal on

09:25:51 9   the left, but we don't see the top of the scalp and the back of

09:25:53 10  the scalp in the right and we don't see in the left.  But,

09:25:57 11  again, this picture on the right I define as normal.

09:26:01 12  Q.    I understand.

09:26:04 13         So you would agree with me from what you can see,

09:26:07 14  that Mrs. Kahn's hair from 2009 after it grew back after

09:26:13 15  chemotherapy did not continue to look the same when she saw you

09:26:17 16  in 2020.  Her hair had changed dramatically, true?

09:26:21 17  A.    No.  I agree that from these pictures, she looks much

09:26:25 18  worse, but on the picture on that 2009, she had, like, hair, it

09:26:32 19  was parted and she had hair covering her forehead.  In this

09:26:37 20  picture, she is not and that makes a big difference.  So that's

09:26:42 21  why you need to see the top of the scalp to judge.

09:26:46 22  Q.    I understand you can't see the top or the back.  It may be

09:26:51 23  that there is even less there hair (verbatim), right, or, less

09:26:54 24  hair in those places, true?

09:26:56 25  A.    I agree but you also showed me a picture before

*OFFICIAL TRANSCRIPT*

09:27:00  1    chemotherapy where she had some thinning hair and in the

09:27:03  2    picture after chemotherapy of October, you don't see that

09:27:07  3    thinning.  So that's very clear how pictures are misleading.

09:27:11  4    Q.    Do you ever hear the phrase "a picture is worth a thousand

09:27:16  5    words"?  You ever hear that?

09:27:17  6    A.    Not for hair.

09:27:18  7    Q.    Have you ever heard that?

09:27:22  8    A.    I have, but not for hair.  For hair it's the opposite.

09:27:25  9    Q.    Okay, Doctor.  I mean, when patients come to your office,

09:27:31 10    you take pictures of them?

09:27:32 11    A.    I take standardized, which are very, very different.

09:27:32 12    Q.    Okay.  All right.

09:27:32 13    A.    Standardized.

09:27:42 14          And if you look at every hair textbook, everybody

09:27:46 15    underline how important for the pictures to be taken under

09:27:51 16    standard light, standard position.

09:27:53 17    Q.    Doctor, you know, if somebody was trying to remember, you

09:28:04 18    know, it's 2020, I'm here with Dr. Tosti, and, like, I'm really

09:28:09 19    trying to remember what did my hair look like 11 years ago or

09:28:14 20    12 years ago, probably the best thing that that person could do

09:28:19 21    if they really wanted to know what their hair looked like over

09:28:22 22    a decade ago, would be to go look at a few pictures, right?

09:28:29 23    A.    Sometimes patients would come with pictures to show me how

09:28:33 24    their hair were fantastic before.

09:28:38 25    Q.    That's not my question.  I didn't ask you what your

*OFFICIAL TRANSCRIPT*

09:28:42  1    patients would do.

09:28:43  2    A.    What was your question?  It needs to be short for me to

09:28:46  3    understand.  Hard to understand because my English is my second

09:28:50  4    language.  So if you ask me the question, I will answer the

09:28:53  5    question.

09:28:53  6    Q.    Okay.  If someone wanted to know what their hair might

09:29:00  7    have looked like 11 or 12 years earlier, one of the best things

09:29:06  8    that person could do would be to go back and look at some

09:29:11  9    photos to see what their hair looked like at that time, right?

09:29:15 10    A.    I don't know.  I cannot answer yes or no.

09:29:17 11    Q.    You don't think as you're sitting here today under oath

09:29:23 12    testifying to this jury, that -- let's say me, if I wanted to

09:29:26 13    remember, what did my hair look like 12 years ago, don't you

09:29:33 14    think one of the best places I could go -- one of the most

09:29:37 15    important sources of information to help me answer that

09:29:40 16    question on how my hair looked 12 years ago, would be to go

09:29:44 17    back and look at some photos?

09:29:48 18    A.    I never went back to look at my photos to look at how my

09:29:52 19    hair was doing.

09:29:52 20    Q.    I didn't ask if you ever looked at old photos of your

09:29:57 21    hair.

09:29:58 22          I'll ask it again.  If I wanted to have an

09:30:02 23    understanding of what my hair looked like 12 years earlier,

09:30:07 24    what is -- one of the best things I could do would be to go

09:30:11 25    back and look at some old pictures of my hair.

                              *OFFICIAL TRANSCRIPT*

09:30:13 1    A.    Not for a doctor.  For someone who is not a doctor, maybe,

09:30:16 2    okay.  Maybe.  That's what you do.  I don't.  That's not

09:30:21 3    something doctors do.

09:30:24 4    Q.    Why did he send you 800 photographs then?

09:30:34 5    A.    You have to ask them.

09:30:35 6    Q.    I'm asking you, ma'am.  Why?

09:30:38 7    A.    I believe they had to send all the photos they had.  They

09:30:43 8    couldn't select.

09:30:51 9    Q.    Okay.  All right, Dr. Tosti.  So, in looking at Mrs. Kahn

09:30:56 10   one year after chemotherapy in her pink shirt and then in 2020,

09:31:02 11   the same year that she saw you, you would agree with me that by

09:31:09 12   2020, we can see the front of Mrs. Kahn's scalp clearly,

09:31:09 13   correct?

09:31:14 14   A.    Yes.  I thought I already said that.  I answered this

09:31:18 15   question already.

09:31:18 16   Q.    Okay.  And that her hair looks dramatically different in

09:31:24 17   these two photos from what we can see, true?

09:31:27 18   A.    It looks different but the hair is combed differently so

09:31:31 19   these photos are not comparable, okay?  That's why it's

09:31:36 20   important when you do an evaluation to evaluate a photo that

09:31:40 21   are taken under the same light, on the same position, on the

09:31:44 22   same style, and so on.  But if you want me looking at this

09:31:52 23   picture to the other picture, I say, yes.  But as I said, this

09:31:55 24   gives you misleading results again.

09:31:57 25   Q.    Okay.  But the fact of the matter is, ma'am, when

*OFFICIAL TRANSCRIPT*

09:32:02  1   Mrs. Kahn told you when you were taking a clinical history from

09:32:05  2   her, that her hair had not changed since 2009 from 2020, that

09:32:12  3   was an inaccurate statement, true?

09:32:17  4   A.   I -- I -- I don't think so.  I don't think it was an

09:32:20  5   inaccurate statement.  It's a statement that it is not

09:32:25  6   substantiated completely by pictures.  But there are pictures

09:32:28  7   you are not showing me that show that the back was thin, that

09:32:34  8   she had problems.

09:32:34  9   Q.   Yes.

09:32:41 10   A.   They come from picture selections as well.

09:32:41 11   Q.   Correct.  But what I'm saying to you, ma'am, is that you

09:32:43 12   told us earlier that it was your belief that Mrs. Kahn's hair

09:32:46 13   from 2009 to 2020 remained basically the same.  You just said

09:32:50 14   that.

09:32:52 15   A.   Basically.

09:32:52 16   Q.   Yes.  And you would agree with me when you look at

09:32:55 17   Mrs. Kahn's hair in these two photos, Doctor, it doesn't look

09:33:00 18   basically the same?

09:33:01 19   A.   I agree with you.  And that's why --

09:33:03 20        MR. SCHANKER:  This has been --

09:33:06 21        THE COURT:  Asked and answered.  Yeah, we can move on.

09:33:09 22        MS. SASTRE:  Thank you, Your Honor.

09:33:11 23   EXAMINATION BY MS. SASTRE:

09:33:13 24   Q.   And based upon your definition, Doctor, of PCIA --

09:33:19 25   permanent chemotherapy-induced alopecia -- based upon the

*OFFICIAL TRANSCRIPT*

09:33:22 1  Dr. Tosti definition, permanent chemotherapy-induced alopecia

09:33:31 2  is not a condition about hair that grows back after

09:33:35 3  chemotherapy and then falls out years later down the road,

09:33:38 4  correct?

09:33:38 5  A.    Correct.  It's not my definition.  That's the definition

09:33:42 6  of the disease listed in textbooks, in papers, it is not a

09:33:49 7  disease I described.  This is a disease that is well known.

09:33:52 8  Q.    Okay.  Let's change topics, all right, Doctor?

09:34:01 9  A.    Sure.

09:34:01 10  Q.    Okay.  Very good.  I'm going to try and move through this,

09:34:10 11  okay, so we can get to our afternoon break, okay?

09:34:15 12  A.    Okay.

09:34:15 13  Q.    All right.  So I would like to talk with you about a

09:34:21 14  condition that you talked about on direct exam called

09:34:25 15  "androgenetic alopecia."

09:34:25 16           Do you remember talking about that?

09:34:27 17  A.    Yes.

09:34:28 18  Q.    Okay.  And you would agree with me, androgenetic alopecia

09:34:32 19  is a kind of hair loss, right?

09:34:35 20  A.    Yes, it's a type of alopecia.

09:34:36 21  Q.    Right.  And the probability of experiencing this type of

09:34:41 22  hair loss, androgenetic alopecia, that's something that the

09:34:47 23  probability of it occurring increases as a woman ages, true?

09:34:52 24  A.    Yes.

09:34:53 25  Q.    Okay.  And, in fact, Doctor, isn't it true that 50 percent

*OFFICIAL TRANSCRIPT*

09:34:57 1   of women may develop androgenetic alopecia after the age of 50,

09:34:57 2   right?

09:35:03 3   A.    That's what's recent in books.

09:35:06 4   Q.    Yes.  And we know that Mrs. Kahn is over 50, right?

09:35:11 5   A.    Right.

09:35:11 6   Q.    Okay.  And, in fact, Mrs. Kahn was 50 years old when she

09:35:18 7   was diagnosed with breast cancer some 13 years ago, right?

09:35:21 8   A.    Right.

09:35:21 9   Q.    So, today, Mrs. Kahn is 63, you'll agree with that?

09:35:26 10  A.    Yes.

09:35:26 11  Q.    All right.  And you would agree with me that the changes

09:35:32 12  in a woman's hormone levels are also a risk factor for the

09:35:37 13  development of androgenetic alopecia, right?

09:35:42 14  A.    Mostly for young women.

09:35:44 15  Q.    Okay.  Dr. Tosti, if you can please go to a transcript you

09:35:50 16  have in front of you.  I'm going to give you the date --

09:35:57 17  September 19th, 2019, please.

09:36:08 18  A.    I have September 29th.  I have September 29th.  I don't

09:36:14 19  have September 19th.  Oh, I found it.  Sorry.

09:36:20 20  Q.    Very good.  Thank you.

09:36:21 21          So, September 19th, 2019, page 1078, and about line

09:36:39 22  19, Doctor.  Are you with me?

09:36:41 23  A.    Yes.

09:36:46 24  Q.    Okay.  Very good.  And this is testimony that you're

09:36:47 25  looking at from September of 2019, that was given under oath,

*OFFICIAL TRANSCRIPT*

09:36:47  1    correct?

09:36:47  2    A.    Yes.

09:36:53  3    Q.    All right.  And you were asked, "Changes in a woman's

09:36:55  4    hormone level are also --

09:36:56  5    A.    I'm not in the right place.  107?

09:37:01  6          MR. SCHANKER:  We're having trouble finding it.

09:37:04  7          THE COURT:  I can't find it, Ms. Sastre.

09:37:10  8          MS. SASTRE:  Okay.  Let me just have a second.

09:37:14  9          THE COURT:  Oh, I see.

09:37:16  10         MS. SASTRE:  Okay, yeah.  It's actually -- so there is,

09:37:18  11   like, two transcript pages, Your Honor.  So you could either go

09:37:23  12   by 1078 in the middle or in the top right-hand corner, it will

09:37:27  13   say 55.

09:37:28  14         THE WITNESS:  I have page 55?

09:37:30  15         MS. SASTRE:  Yes, ma'am.

09:37:32  16         THE COURT:  Yes, ma'am.

09:37:32  17         MR. SCHANKER:  Which line?

09:37:33  18         THE COURT:  It's the second tab, September 19th.

09:37:42  19   EXAMINATION BY MS. SASTRE:

09:37:42  20   Q.    Have you found it, Doctor?

09:37:44  21   A.    I found page 55.  What line?

09:37:49  22   Q.    Yes, ma'am.  Line 19.

09:37:50  23   A.    Line 19.  Okay.

09:37:51  24   Q.    And you were asked under oath, "Changes in a woman's

09:37:56  25   hormone level are also a risk factor for

*OFFICIAL TRANSCRIPT*

09:37:59 1    androgenetic alopecia."  Your answer, "Yes."

09:38:01 2              Did I read that correctly?

09:38:02 3    A.    Yes.

09:38:03 4    Q.    Okay.  Now, one of the main points in a woman's life where

09:38:11 5    her hormone levels change is menopause?

09:38:15 6    A.    That's not the main.  Puberty is the main change in

09:38:20 7    hormone levels.

09:38:21 8    Q.    Okay.  Staying in the same transcript from 9/19/2019 and

09:38:27 9    actually the same page.  It's either 1078 or 55, please.  Let

09:38:32 10   me know when you're there.

09:38:33 11   A.    I'm there.

09:38:34 12   Q.    Okay.  Line 22, "Question:  One of the main points in a

09:38:43 13   woman's life where her hormone levels change is menopause,

09:38:47 14   right?"  Dr. Tosti's answer was, "Yes."

09:38:49 15             Did I read that correctly?

09:38:51 16   A.    Yes.

09:38:51 17   Q.    Okay.  Now, you know, ma'am, based upon your review of

09:38:58 18   Mrs. Kahn's depositions given, in this case, that she became

09:39:04 19   menopausal in March of 2009, true?

09:39:07 20   A.    True.

09:39:08 21   Q.    Okay.  And March of 2009, just so we're all oriented, was

09:39:15 22   about five months after Mrs. Kahn finished chemotherapy,

09:39:18 23   correct?

09:39:18 24   A.    Yes.

09:39:18 25   Q.    Okay.  And it would have been also about one month before

*OFFICIAL TRANSCRIPT*

09:39:23  1   Mrs. Kahn was going to start to take tamoxifen, which as we
09:39:29  2   know she took for nine straight years, correct?
09:39:32  3   A.    Yes.
09:39:33  4   Q.    Now, you would agree with me that the severity of
09:39:36  5   hair loss that's seen with androgenetic alopecia can vary
09:39:41  6   widely?
09:39:42  7   A.    Yes.
09:39:43  8   Q.    Then you would agree with me, Dr. Tosti, as you sit here
09:39:51  9   today under oath, you cannot rule out androgenetic alopecia as
09:39:59  10  a cause of Mrs. Kahn's hair loss, true?
09:40:04  11  A.    That's not accurate.  I believe that she may have some
09:40:08  12  component of androgenetic alopecia, but her main problem is
09:40:13  13  persistent alopecia after chemotherapy.
09:40:15  14  Q.    Well, ma'am, I appreciate that but, again, my questions
09:40:19  15  are really, really specific.  I'll be honest with you, I
09:40:22  16  thought a long time about what I was going to ask you, and they
09:40:27  17  are very specific questions.  I didn't ask you what the main
09:40:33  18  component was.  My question is different.
09:40:37  19          You would agree with me, as you sit here today under
09:40:41  20  oath, in front of this jury, you cannot rule out
09:40:43  21  androgenetic alopecia as a cause of Mrs. Kahn's hair loss,
09:40:46  22  true?
09:40:47  23  A.    It's not true because as a cause, it's not the right
09:40:51  24  question.  If you ask if it's part, I would answer yes.
09:40:57  25  Q.    So it's your opinion that it's playing a part, right?

*OFFICIAL TRANSCRIPT*

09:41:04 1    A.    Played a possible but small part.

09:41:08 2    Q.    Okay.  Playing a possible part, true?

09:41:11 3    A.    I said a small.  But, you know, I'm post-menopausal and I

09:41:18 4    probably have some grade of androgenetic alopecia.  I know

09:41:22 5    women in this place are post-menopausal and may have some

09:41:26 6    minimal androgenetic alopecia.

09:41:27 7            THE COURT:  Dr. Tosti, that wasn't the question.

09:41:27 8            THE WITNESS:  Okay.

09:41:32 9            MS. SASTRE:  Thank you, Your Honor.

09:41:32 10   EXAMINATION BY MS. SASTRE:

09:41:34 11   Q.    So, Dr. Tosti, it's your opinion under oath today is that

09:41:38 12   you believe that androgenetic alopecia has played a part, a

09:41:41 13   role -- let me finish -- you believe that Mrs. Kahn's

09:41:45 14   androgenetic alopecia is playing a part in her hair loss, what

09:41:51 15   that means is, in fact, that you cannot rule it out as being a

09:41:54 16   contributor, true?

09:41:56 17           MR. SCHANKER:  Objection, Your Honor.  The question is

09:41:58 18   misstating the testimony.

09:42:00 19           THE COURT:  Overruled.

09:42:04 20           THE WITNESS:  You have to repeat the question, if

09:42:08 21   possible short.

09:42:09 22   EXAMINATION BY MS. SASTRE:

09:42:16 23   Q.    Since it is your opinion to this jury that

09:42:23 24   androgenetic alopecia is playing a role when it comes to

09:42:27 25   Mrs. Kahn's hair loss, you would agree with me that you cannot

**OFFICIAL TRANSCRIPT**

09:42:31  1  rule it out as contributing to her hair loss?

09:42:36  2  A.   I would say that it might.  We don't know, but I agree it

09:42:41  3  could.

09:42:41  4  Q.   Right.  And my question is:  You can't rule it out because

09:42:47  5  it might and it could and you think it may have something to do

09:42:52  6  with it, you can't rule it out, right?

09:42:54  7  A.   No.  I rule it out as a primary diagnosis, 100 percent.

09:42:59  8  So she is not here because of androgenetic alopecia.  She may

09:43:05  9  have some components.  I cannot rule it out.

09:43:08 10  Q.   Thank you.  Thank you.

09:43:11 11       Okay.  Now, when you saw Mrs. Kahn in September of

09:43:22 12  2020, you took two biopsies of her scalp, right?

09:43:25 13  A.   Right.

09:43:25 14  Q.   You took one in the front, correct?

09:43:27 15  A.   Yes.

09:43:28 16  Q.   And one in what's called the "vertex," more towards the

09:43:32 17  back of the head?

09:43:33 18  A.   Yes.

09:43:33 19  Q.   But both on the top, true?

09:43:35 20  A.   Yes.

09:43:36 21  Q.   Okay.  And these biopsies -- I mean, look, the University

09:43:42 22  of Miami, it's a big hospital in South Florida, right?

09:43:45 23  A.   Yes.

09:43:45 24  Q.   Okay.  I mean, you didn't send them down the hall to some

09:43:48 25  doctor at the University of Miami Hospital.  You took these

*OFFICIAL TRANSCRIPT*

09:43:52  1    biopsies and you flew them all the way across the country out

09:43:54  2    to Oregon to a doctor named "Dr. Curtis Thompson," true?

09:44:00  3    A.    True.

09:44:01  4    Q.    Okay.  And, in fact, Dr. Curtis Thompson is someone who

09:44:07  5    has been hired by the plaintiff's lawyers just like you have in

09:44:10  6    this case, right?

09:44:12  7    A.    Right.

09:44:12  8    Q.    And, in fact, Dr. Tosti, isn't it true that you

09:44:17  9    recommended to plaintiff's counsel that they hire Dr. Thompson?

09:44:24 10    A.    I recommended them at least 12, maybe 15 pathologists and

09:44:31 11    then they ended hiring Dr. Thompson.  But he was one of the

09:44:38 12    pathologists I recommended.

09:44:42 13    Q.    Okay.  And you understand that Dr. Thompson issued a

09:44:49 14    pathology report in this case, right?

09:44:51 15    A.    Yes.

09:44:51 16    Q.    Okay.  So just so everyone understands, so Dr. Thompson

09:44:55 17    took the specimens that you took from Mrs. Kahn's scalp, the

09:44:59 18    biopsies.  And then he's a dermatologist-pathologist, called a

09:45:05 19    "dermatopathologist" and he looks at them microscopically; is

09:45:15 20    that fair?

09:45:15 21    A.    Yes.

09:45:15 22    Q.    Okay.  All right.  And then you reviewed the pathology

09:45:19 23    report that Dr. Thompson, one of the plaintiff's experts

09:45:24 24    prepared in this case, true?

09:45:25 25    A.    Yes, I did.

*OFFICIAL TRANSCRIPT*

09:45:25  1    Q.    Okay.  And, in fact, you even attached it to your expert
09:45:28  2    report as an exhibit, right?
09:45:30  3    A.    Yes.
09:45:30  4    Q.    Okay.  Let's go ahead and take a look at the path report.
09:45:36  5    It's D2036.  And I believe --
09:45:47  6          MS. SASTRE:  Your Honor, may I approach?
09:45:48  7          THE COURT:  Yes, you may.
09:45:50  8          MS. SASTRE:  Thank you.
09:45:50  9    EXAMINATION BY MS. SASTRE:
09:45:51 10    Q.    All right.  Dr. Tosti, there you are.
09:45:53 11    A.    Thank you.
09:45:55 12    Q.    Okay.  So, you're familiar with this document.  You know
09:46:03 13    that this is the dermatopathology report as created by
09:46:09 14    Dr. Thompson, true?
09:46:10 15    A.    Yes.  I think we went through this document yesterday.
09:46:12 16    Q.    Okay.  It feels like a long time since yesterday, but I
09:46:17 17    have a few questions for you, okay?
09:46:17 18    A.    Oh, maybe it was not yesterday.  It was Wednesday.  You
09:46:20 19    were right.
09:46:20 20    Q.    Okay.  The day before.
09:46:22 21          Okay, Doctor.  So, this is a report, again, that you
09:46:26 22    reviewed and it was something you would have looked at,
09:46:30 23    importantly, before you reached your final opinions and
09:46:33 24    conclusions in the matter as to Mrs. Kahn, true?
09:46:35 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

09:46:37 1  Q.   Okay.  And you understand that Dr. Thompson, the

09:46:42 2  pathologist, who was looking at the specimen you sent him,

09:46:46 3  looking at it microscopically, you understand that for the

09:46:52 4  biopsy you took for Mrs. Kahn's head, you know that he made a

09:46:56 5  diagnosis there, true?

09:46:56 6  A.   I -- you know -- but the most important thing of --

09:46:59 7  Q.   No, excuse me.

09:47:00 8       MS. SASTRE:  Your Honor, I need an answer.

09:47:00 9       (WHEREUPON, at this point in the proceedings, there was

09:47:00 10 simultaneous speaking.)

09:47:00 11      THE WITNESS:  Yes, I know this.  I know this.

09:47:00 12 EXAMINATION BY MS. SASTRE:

09:47:04 13 Q.   Thank you very much.

09:47:05 14      And you know that the diagnosis that Dr. Thompson,

09:47:08 15 the pathologist made for the biopsy you took for the front of

09:47:12 16 Mrs. Kahn's head was androgenetic alopecia and it's right up

09:47:18 17 there in his path report, true?

09:47:20 18 A.   True.

09:47:21 19 Q.   Okay.  Now, you also had an opportunity to read

09:47:28 20 Dr. Thompson's deposition in the case, right?

09:47:29 21 A.   To be honest with the jurors, I think they have -- he also

09:47:34 22 had.

09:47:34 23      (WHEREUPON, at this point in the proceedings, there was

09:47:34 24 simultaneous speaking.)

09:47:34 25      MS. SASTRE:  Your Honor --

*OFFICIAL TRANSCRIPT*

09:47:34  1          THE COURT:  Wait.  Wait.  Dr. Tosti, you have to answer
09:47:39  2     the question she's asking.
09:47:42  3          THE WITNESS:  Okay.
09:47:43  4     EXAMINATION BY MS. SASTRE:
09:47:43  5     Q.   Okay.  You had an opportunity to read Dr. Thompson's
09:47:48  6     deposition in the case?
09:47:49  7     A.   Yes.
09:47:49  8     Q.   Okay.  And, in fact, when you read Dr. Thompson's
09:47:53  9     deposition, there wasn't anything that he testified to that you
09:47:57 10     disagreed with, correct?
09:48:01 11     A.   Correct.
09:48:01 12     Q.   Very good.
09:48:02 13     A.   You know, I didn't read it yesterday, but I don't think I
09:48:07 14     disagreed on anything.
09:48:07 15     Q.   Okay.  And, in fact, Dr. Thompson testified when you read
09:48:12 16     his deposition, that with regard to biopsy B, in the back of
09:48:19 17     the head, that it would be impossible for him to rule out that
09:48:21 18     Mrs. Kahn had some component of androgenetic alopecia even from
09:48:25 19     that biopsy, true?  You saw that testimony in his deposition.
09:48:29 20     A.   No.  Again, it's very misleading because --
09:48:33 21     Q.   No, no, no.  Ma'am, did you see?
09:48:35 22     A.   I see that.  But I think that we have to explain what he
09:48:40 23     said, otherwise, this is out of a context, okay.
09:48:44 24          THE COURT:  I think, Dr. Tosti, in redirect,
09:48:49 25     Mr. Schanker will have an opportunity to refute.  But you need

*OFFICIAL TRANSCRIPT*

09:48:49  1    to answer the question.

09:48:56  2          THE WITNESS:  Okay.  I will answer the question, yes.

09:48:58  3    EXAMINATION BY MS. SASTRE:

09:48:58  4    Q.    Okay.  And you would have seen, when you read his

09:49:00  5    deposition, where Dr. Thompson, the pathologist was asked:

09:49:02  6    "Would it be possible for you to rule out that Ms. Kahn has

09:49:08  7    some component of female pattern hair loss" -- which we agree

09:49:11  8    is another term for androgenetic alopecia, right?  Yes?

09:49:14  9    A.    Yes.

09:49:15  10   Q.    Okay.

09:49:16  11         -- "has some component of either female pattern hair

09:49:18  12   loss or androgenetic alopecia occurring in biopsy B?"

09:49:24  13         Dr. Thompson's answer, "Yes."

09:49:26  14         He testified that it would be impossible for him to

09:49:29  15   rule out androgenetic alopecia when it came to the biopsy from

09:49:35  16   the back of her head, correct?

09:49:38  17   A.    No.  He identified it would be impossible to say there

09:49:43  18   wasn't some component.  Some component is very different than a

09:49:48  19   diagnosis of female pattern hair loss.  So, what he said is

09:49:53  20   basically what I say that she may have also some component.

09:49:59  21   Q.    Right.  A component of androgenetic alopecia, right?

09:50:04  22   A.    Component.  Yes, it was.  I agree with the word

09:50:08  23   "component."

09:50:08  24   Q.    Okay.  But, ma'am, what Dr. Thompson said was that it was

09:50:14  25   impossible for him to rule out androgenetic alopecia when it

09:50:18 1    came to biopsy B, correct?

09:50:20 2    A.    No.  He said "some component," which is different.

09:50:26 3    Q.    Okay.  Well, let me ask you this:  And I'll read you the

09:50:40 4    question.  Let me try and do it this way.  Dr. Thompson

09:50:44 5    testified that it would be impossible for him to rule out that

09:50:48 6    Mrs. Kahn has some component of androgenetic alopecia for the

09:50:53 7    biopsy taken from the back of her head; is that fair?

09:50:56 8    A.    Yes.

09:50:57 9    Q.    Very good.  Okay.  Thank you, Doctor.

09:50:59 10            And, in fact, when you conducted your clinical exam

09:51:03 11   in your office in September of 2020 of Mrs. Kahn's head, what

09:51:07 12   you found personally from looking with your own trained eyes,

09:51:12 13   what you found is that Mrs. Kahn's hair density was more

09:51:17 14   pronounced on the androgenic dependent scalp -- excuse me --

09:51:26 15   her alopecia was more pronounced on the androgen-dependent

09:51:33 16   scalp, correct?

09:51:33 17   A.    Correct.

09:51:34 18   Q.    Okay.  And when I say that -- because I goofed up the

09:51:37 19   question a little bit.  When you say that her alopecia is more

09:51:40 20   pronounced on the androgen-dependent scalp, what you're saying

09:51:46 21   is that her hair loss or alopecia is more prominent on this

09:51:49 22   area on top of her head, right?

09:51:51 23   A.    Yes.

09:51:51 24   Q.    Okay.

09:51:52 25   A.    But it's more prominent.

*OFFICIAL TRANSCRIPT*

09:51:52  1    Q.    Yes?

09:51:54  2    A.    Because I write "diffuse alopecia."

09:51:54  3    Q.    That's right.

09:51:58  4    A.    So, you can see the scalp all over, more on the top of the

09:52:01  5    scalp, yes.

09:52:02  6    Q.    That's right.  And again, just to be clear --

09:52:03  7    A.    That's correct.

09:52:04  8    Q.    -- this area on the top of the head, the

09:52:07  9    androgen-dependent area where you said the hair loss was more

09:52:10 10    pronounced, the biopsy from that site was the one that

09:52:14 11    Dr. Thompson, the pathologist, said, when I look at that I see

09:52:18 12    androgenetic alopecia, right?

09:52:19 13    A.    No.  Because also the biopsy on the vertex is

09:52:25 14    androgen-dependent scalp.  So, all the top of the scalp is

09:52:28 15    androgen-dependent starting from the temples going back to

09:52:32 16    here.  So, she had one biopsy here, which was also the

09:52:36 17    androgen-dependent scalp.

09:52:38 18    Q.    That wasn't what I asked you.

09:52:42 19    A.    Maybe I misunderstood the question.  Can you redo the

09:52:47 20    question?

09:52:47 21    Q.    Sure.

09:52:47 22          So you found that Mrs. Kahn's alopecia or hair loss

09:52:59 23    was more prominent on the top of her head on the

09:53:05 24    androgen-dependent region, correct?

09:53:06 25    A.    It's the top and back.

**OFFICIAL TRANSCRIPT**

09:53:08  1    Q.   Very good.  And the biopsy that you took and sent to your

09:53:14  2    colleague, Dr. Thompson out in Oregon, when he looked at the

09:53:19  3    biopsy from the top of Mrs. Kahn's head, his diagnosis was

09:53:23  4    androgenetic alopecia, true?

09:53:26  5    A.   True.

09:53:27  6              But the one from the vertex is diagnosed as permanent

09:53:32  7    alopecia.

09:53:36  8    Q.   The one where he couldn't rule a component of

09:53:41  9    androgenetic, right?

09:53:42 10    A.   A component.

09:53:42 11    Q.   Okay.  Thank you, Doctor.

09:53:44 12              Now -- okay.  Let's talk about tamoxifen for a

09:53:51 13    moment, okay?

09:53:51 14    A.   Sure.

09:53:51 15    Q.   And, again, you know that's a drug that Mrs. Kahn took for

09:53:56 16    nine years from 2009 to 2018, true?

09:53:58 17    A.   Yes.  Now, she's out of tamoxifen for about three years, I

09:54:05 18    think.

09:54:05 19    Q.   Okay.  And, again, I'm going to ask you really specific

09:54:09 20    questions.  We're almost at the end, okay?

09:54:11 21    A.   Yes.

09:54:11 22    Q.   So you would agree with me that tamoxifen can cause

09:54:16 23    hair loss?

09:54:17 24    A.   I agree with you that tamoxifen can cause a specific type

09:54:22 25    of hair loss, which is named "endocrine alopecia."  So, doesn't

**OFFICIAL TRANSCRIPT**

09:54:27 1    cause increased shedding.  You know, it's a very specific type.

09:54:30 2    Q.   All right.  I'll move on.

09:54:35 3         You would also agree that tamoxifen can specifically

09:54:41 4    cause androgenetic alopecia, true?

09:54:43 5    A.   No.  It's called "androgenetic-like alopecia."  The

09:54:48 6    endocrine alopecia looks similar to androgenetic alopecia but

09:54:52 7    is named "endocrine alopecia."

09:54:55 8    Q.   Okay.  We have to go to one of your depositions.

09:54:55 9    A.   Yes.

09:54:59 10   Q.   December 4th, 2018.  I would like to look at your sworn

09:55:07 11   testimony, please.

09:55:07 12   A.   What is the date?  December?

09:55:08 13   Q.   December, ma'am.  December 4th, 2018.

09:55:12 14   A.   December 4th, 2018.

09:55:38 15   Q.   Yes.

09:55:38 16   A.   Okay.  Page?

09:55:39 17   Q.   230, line 2.  Line 3 actually to begin with the question.

09:55:49 18   Okay.  And the question to you was under oath at that time:

09:55:53 19   "Tamoxifen and nonsteroidal aromatase inhibitors utilized for

09:56:01 20   the therapy of hormone sensitive breast cancer, can also cause

09:56:03 21   or worsen androgenetic alopecia?"  Your answer under oath,

09:56:08 22   "absolutely agree."

09:56:08 23        Did I read that correctly?

09:56:10 24   A.   Yes, you read that correctly.  Today, I was specifying the

09:56:16 25   meaning.

*OFFICIAL TRANSCRIPT*

09:56:16  1    Q.    Okay.  The bottom line is, just so it's clear:  "Tamoxifen

09:56:20  2    can cause or even worsen androgenetic alopecia," right?

09:56:25  3    A.    That's not correct.  We know now it can cause, like,

09:56:30  4    another alopecia, but it's very similar to

09:56:30  5    androgenetic alopecia.  But, you know, I believe that that an

09:56:37  6    advantage for what you want to know, yes.  Looks like

09:56:40  7    androgenetic alopecia, but it's not because it's caused by

09:56:44  8    tamoxifen.

09:56:44  9    Q.    Ma'am, didn't you testify in response to this question

09:56:47  10   that tamoxifen can cause androgenetic alopecia?

09:56:50  11   A.    At that time, I didn't specify that "endocrine alopecia"

09:56:55  12   is the name, the correct name.  I just wanted to make it

09:56:58  13   clearer but it doesn't change the bigger of the problem.  Looks

09:57:04  14   like androgenetic alopecia.  It's called "endocrine alopecia."

09:57:09  15   Q.    Okay.  Now, you know that in addition to causing endocrine

09:57:16  16   or androgenetic alopecia, tamoxifen can cause Grade 2 alopecia,

09:57:16  17   right?

09:57:27  18   A.    Grade 2 alopecia, yes, if you use that grading, you can

09:57:32  19   grade some of the tamoxifen alopecia Grade 2.

09:57:35  20   Q.    Okay.  And that Grade 2, that's something that you talked

09:57:39  21   a lot about on direct exam, right?  Grade 1 and Grade 2?

09:57:44  22   A.    I think we did.

09:57:44  23   Q.    Okay.

09:57:45  24   A.    If you want, I explain again.

09:57:47  25   Q.    Okay.  And Grade 2 alopecia, according to your

*OFFICIAL TRANSCRIPT*

09:58:08 1    definitions -- the definitions you use is over 50 percent

09:58:10 2    hair loss, correct?

09:58:10 3    A.   Yes.  Basically, you can see the scalp through the hair.

09:58:14 4    Q.   And you had diagnosed Mrs. Kahn with Grade 2 alopecia,

09:58:19 5    true?

09:58:19 6    A.   Yes.

09:58:20 7    Q.   Okay.  All right, ma'am.  And as you sit here today, you

09:58:47 8    cannot rule out tamoxifen as a potential contributing cause of

09:58:52 9    Mrs. Kahn's alopecia, true?

09:58:56 10   A.   I can say maybe.  It also was past or worsening the

09:59:01 11   problem; it wasn't the main cause.  But maybe a component.

09:59:04 12   Q.   Very good.  Thank you.

09:59:09 13          Dr. Tosti, just a couple more things, quickly,

09:59:11 14   all right?

09:59:11 15   A.   Sure.

09:59:12 16   Q.   So, I want to talk a little bit about work that you do

09:59:16 17   that the jury really hadn't heard about at all that you do in

09:59:21 18   the consulting context for the cosmetic industry, okay?

09:59:26 19   A.   Yes.

09:59:27 20   Q.   All right.  So, we know that you, you know, have some work

09:59:31 21   here with a -- plaintiff's attorney, right?

09:59:33 22   A.   Yes.

09:59:33 23   Q.   And we know you're busy working back at the University of

09:59:39 24   Miami, true, seeing patients?

09:59:40 25   A.   Yes.

*OFFICIAL TRANSCRIPT*

09:59:40 1   Q.   And then you do a fair amount of work where you partner up

09:59:44 2   with really -- I guess I'd call them cosmetics companies,

09:59:48 3   companies that make products that are promoted as products

09:59:52 4   which make you have healthier and better hair and help you with

09:59:57 5   your hair regrowing, right?

09:59:59 6   A.   Yes, they are cosmetic.  Cosmetic -- yeah, you regrow

10:00:06 7   hair.  But I consult for several cosmetics companies.

10:00:09 8   Q.   Okay.  And one of the companies that you're currently

10:00:11 9   working with as their scientific advisor is a company by the

10:00:16 10  name of MONATE (verbatim), true?

10:00:22 11  A.   It's called "MONAT."

10:00:24 12  Q.   Say that again.

10:00:26 13  A.   MONAT, M-O-N-A-T.

10:00:26 14  Q.   MONAT?

10:00:26 15  A.   Yes.

10:00:27 16  Q.   Okay.  Very good.

10:00:28 17          So you are right now, as you're sitting on the stand,

10:00:31 18  if I pulled up notice MONAT's website, I'm going to see a

10:00:36 19  picture of you and it says:  "Dr. Tosti, scientific advisor to

10:00:42 20  MONAT," right?

10:00:42 21  A.   Yes.

10:00:42 22  Q.   Now, you know, ma'am -- let me ask you this:  You've been

10:00:51 23  the scientific advisor for MONAT for a couple of years at

10:00:55 24  least, right?

10:00:56 25  A.   Yes, I think so.

**OFFICIAL TRANSCRIPT**

10:00:57 1    Q.    Okay.  And they are using your name, right, and using your

10:01:03 2    image on their website, true?

10:01:07 3    A.    I didn't know exactly how much.  But if you tell me, I

10:01:13 4    believe you.

10:01:13 5    Q.    Okay.  And you have some statements on their websites

10:01:19 6    where they have attributed very nice statements that you're

10:01:22 7    making about these hair products that MONAT, right?

10:01:26 8    A.    No.  I advise them basically on safety.  So, I advise them

10:01:31 9    on which studies they have to do to have their products not to

10:01:37 10   cause allergies or breakage of the hair, that's my job with

10:01:42 11   them.

10:01:42 12   Q.    Okay.  And isn't it true that right now, there is a major

10:01:48 13   safety issue at MONAT when it comes to consumers, men and

10:01:55 14   women, using these super expensive shampoos and products and

10:02:00 15   what we're actually finding out is that it's making their hair

10:02:04 16   fall out; isn't that true?

10:02:06 17   A.    Yes.  That's why they hired me to do a job on improving

10:02:11 18   the safety of their products.

10:02:12 19   Q.    Okay.  And so, the products are still being sold, true?

10:02:22 20   A.    I don't know.  Because I'm not -- I don't work for them.

10:02:26 21   I consult, which is a very different matter.  I think they are

10:02:31 22   still being sold.

10:02:32 23   Q.    Yeah.  And they pay you to consult.  I mean, you don't do

10:02:34 24   it just for free, out of the goodness of your heart.  You're

10:02:40 25   being compensated.

**OFFICIAL TRANSCRIPT**

| 10:02:41 | 1 | A.   Yes, of course, I get compensated.  Because I went all |
| 10:02:45 | 2 | through the safety tests they had me to do, and I did those |
| 10:02:49 | 3 | safety tests because they had the problems.  They had the |
| 10:02:52 | 4 | ingredients that were not good and should be taken away.  It |
| 10:02:57 | 5 | was a process that involved my knowledge and then contact |
| 10:03:04 | 6 | allergies, which is something I said was other part of my |
| 10:03:08 | 7 | expertise.  And so, I helped them to improve the product. |
| 10:03:11 | 8 | Q.   And are you an investor in this company? |
| 10:03:14 | 9 | A.   Absolutely not. |
| 10:03:15 | 10 | Q.   Okay.  And how much do you think you've been compensated |
| 10:03:19 | 11 | by them, to date, to work as a scientific advisor and to try |
| 10:03:24 | 12 | and figure out why their products were making them lose their |
| 10:03:27 | 13 | hair? |
| 10:03:27 | 14 | MR. SCHANKER:  Your Honor, we're getting far afield |
| 10:03:29 | 15 | here. |
| 10:03:30 | 16 | THE COURT:  Ms. Sastre? |
| 10:03:32 | 17 | MS. SASTRE:  Yes, ma'am. |
| 10:03:33 | 18 | THE COURT:  Maybe we should walk over here. |
| 10:03:36 | 19 | MS. SASTRE:  I can move on. |
| 10:03:37 | 20 | THE COURT:  I think you need to move on.  It's not |
| 10:03:37 | 21 | litigation. |
| 10:03:40 | 22 | MS. SASTRE:  Yeah, you got it.  I'll move on. |
| 10:03:41 | 23 | EXAMINATION BY MS. SASTRE: |
| 10:03:41 | 24 | Q.   And my question is, ma'am, that the specific complaints, |
| 10:03:50 | 25 | if you will, or problems that consumers are having, and I'm |

*OFFICIAL TRANSCRIPT*

10:03:53 1    sure that you've seen pictures of these, they are claiming that

10:03:57 2    after using these products they are literally having, in some

10:04:01 3    cases, clumps of hair that have come out of their head, right?

10:04:06 4    A.    The truth is that -- what the problem is --

10:04:09 5    Q.    Could you answer the question first?

10:04:11 6    A.    I want to explain.  People complain of hair loss and the

10:04:18 7    reason is that these products cause allergies on the scalp and

10:04:22 8    that's why I was hired.  Because I'm an expert in scalp

10:04:25 9    allergies and I help them to change the ingredients that could

10:04:32 10   cause this problem.

10:04:32 11   Q.    Okay.  And does it bother you that you were affiliated

10:04:40 12   with a company as a hair loss expert who is actually making a

10:04:44 13   product where folks have claimed that this product, instead of

10:04:47 14   helping my hair, which is what it was described to do, that

10:04:51 15   it's actually causing hair to fall out?

10:04:54 16            MR. SCHANKER:  Your Honor, again, this is ridiculous.

10:04:56 17            THE COURT:  I think we need to move on, okay?

10:04:59 18            MS. SASTRE:  All right, ma'am.

10:05:01 19            THE COURT:  Sustained.

10:05:01 20            THE WITNESS:  You know, I also work for Procter &

10:05:04 21   Gamble.

10:05:04 22            THE COURT:  Wait.  Wait.  Dr. Tosti, we're going to

10:05:07 23   move on.  Thank you.

10:05:10 24            THE WITNESS:  Okay.

10:05:10 25   EXAMINATION BY MS. SASTRE:

***OFFICIAL TRANSCRIPT***

10:05:10  1    Q.    Okay.  Doctor, just a few more questions, okay?

10:05:17  2    A.    Sure.

10:05:17  3    Q.    So, when a patient, a normal patient, comes to see you for

10:05:26  4    persistent hair loss, one of the things that you do is that you

10:05:29  5    often recommend treatment to them, right?

10:05:31  6    A.    Yes.

10:05:32  7    Q.    Okay.  And for you to talk about that a little more

10:05:38  8    specifically, what you usually recommend to your patients for

10:05:41  9    treatment is something called "minoxidil," true?

10:05:45 10    A.    True.

10:05:46 11    Q.    And, you know, I went back last night to the paper that

10:05:54 12    you wrote in 2019, it was the one where we spent a lot of time

10:06:01 13    on your table talking about hair loss, the jury may remember.

10:06:04 14    But in that paper from 2019, you stated:  "After treatment with

10:06:11 15    topical minoxidil as a single agent in part or in combination

10:06:17 16    with spironolactone, mild to moderate improvement was observed

10:06:17 17    in both groups."

10:06:25 18            That's directly from your paper, correct?

10:06:25 19    A.    Correct.

10:06:28 20    Q.    And that's your paper, Dr. Tosti, 2019, commenting on the

10:06:32 21    improvement that you had observed between the two groups,

10:06:39 22    meaning, the group that had permanent chemotherapy-induced

10:06:44 23    alopecia and the group that had hormone therapy induced

10:06:47 24    alopecia, both groups improved after treatment, right?

10:06:51 25    A.    Both groups, some patients had moderate or mild

**OFFICIAL TRANSCRIPT**

10:06:56  1    improvement.  Not everybody, because not all patients improved.

10:07:04  2    Some patients had mild to moderate improvement.

10:07:08  3    Q.    Yeah.  And, in fact, you noted that 36 out of 54 patients

10:07:13  4    had moderate to significant improvement who had permanent

10:07:18  5    chemotherapy-induced alopecia, right?

10:07:20  6    A.    Yes.  I think I discussed that on Wednesday.

10:07:22  7    Q.    Okay.  So that's 67 patients after using these medications

10:07:27  8    who had a diagnosis of permanent chemotherapy-induced alopecia

10:07:31  9    had improvement, true?

10:07:33  10   A.    Yes, but including a mild improvement.

10:07:36  11   Q.    I'm sorry?

10:07:38  12   A.    That includes mild improvement.

10:07:41  13   Q.    Oh, okay, I understand.  And to be clear, just since we

10:07:44  14   talked about it in terms of permanent chemotherapy-induced

10:07:48  15   alopecia, when it comes to endocrine induced or hormone therapy

10:07:53  16   induced drugs like tamoxifen, in your paper, you found that 32

10:07:57  17   out of 42 patients with hormone therapy or hormone therapy

10:08:05  18   alopecia, had moderate to significant improvement after

10:08:07  19   treatment, true?

10:08:08  20   A.    Yes.

10:08:09  21   Q.    And if we did the percentages, that would be 76 percent of

10:08:13  22   the group that had hair loss as a result of taking tamoxifen or

10:08:21  23   other hormone therapy drugs, 76 percent of those women had

10:08:24  24   improvement with the medications, true?

10:08:25  25   A.    Yes.

*OFFICIAL TRANSCRIPT*

10:08:26  1    Q.    Okay.  Very good.  Now, I just want to very briefly ask

10:08:32  2    you, when it came to your visit, the one time that you had an

10:08:35  3    opportunity to see Mrs. Kahn in September of 2020, and, really,

10:08:39  4    just a question or two here, but you would agree with me,

10:08:43  5    Mrs. Kahn did not ask you for a prescription of minoxidil,

10:08:48  6    true?

10:08:49  7    A.    The minoxidil is over-the-counter.

10:08:49  8    Q.    Okay.

10:08:52  9    A.    There is no prescription.

10:08:54 10    Q.    Did she ask you to provide her with minoxidil?

10:09:00 11    A.    I don't provide minoxidil, the university doesn't sell

10:09:04 12    products.

10:09:04 13    Q.    Okay.  Did you make a recommendation to Mrs. Kahn that she

10:09:08 14    should try minoxidil?

10:09:09 15    A.    I discussed with her that the only possible treatment

10:09:12 16    could be minoxidil.  I did.

10:09:16 17    Q.    And to your knowledge, as you are sitting here today, you

10:09:18 18    have no information to indicate that Mrs. Kahn has ever tried

10:09:21 19    minoxidil, true?

10:09:23 20    A.    True.

10:09:27 21        MS. SASTRE:  Thank you.  I have nothing further.

10:09:29 22    Doctor, I appreciate you being with us here today.  I pass the

10:09:32 23    witness.

10:09:33 24        THE COURT:  Okay.  Thank you.

10:09:33 25            It's 10 after 10:00.  It's a good time for our

*OFFICIAL TRANSCRIPT*

10:09:37  1   ten-minute morning recess.  We'll be at recess for ten minutes,

10:09:42  2   10:20.  Thank you.

10:09:43  3          (WHEREUPON, at 10:09 a.m., the jury panel leaves the

10:10:00  4   courtroom and then a brief recess was taken.)

10:25:42  5          THE COURT:  Mr. Schanker, redirect.

10:25:42  6          Dr. Tosti, I remind you you're still under oath.

10:25:42  7   Please proceed.

10:25:42  8          MR. SCHANKER:  Thank you, Your Honor.

10:25:44  9          Good morning, ladies and gentlemen.

10:25:44 10   REDIRECT EXAMINATION BY MR. SCHANKER

10:25:58 11   Q.   Dr. Tosti, good morning.

10:25:59 12   A.   Good morning.

10:26:00 13   Q.   Can I take an opportunity to ask you some questions about

10:26:04 14   just a few of the topics that the Sanofi lawyer covered with

10:26:07 15   you?

10:26:10 16   A.   Yes.

10:26:10 17   Q.   Thank you.

10:26:13 18          First of all, you recall you were asked a lot of

10:26:16 19   questions about photographs in this case.  You recall that?

10:26:16 20   A.   Yes.

10:26:24 21   Q.   I want to briefly go through just a few of those

10:26:24 22   photographs.

10:26:26 23          MR. SCHANKER:  Scott, could you pull up 2898, please.

10:26:26 24   EXAMINATION BY MR. SCHANKER:

10:26:39 25   Q.   Dr. Tosti, you see this photograph that we spent a lot of

*OFFICIAL TRANSCRIPT*

10:26:39  1    time talking about.  We heard the Sanofi lawyer ask you a lot
10:26:45  2    of questions about this photograph, right?
10:26:46  3    A.    Yes.
10:26:46  4    Q.    Okay.  And just to orient, this was taken eight days prior
10:26:52  5    to the chemotherapy.
10:26:53  6          You understand that?
10:26:54  7    A.    Yes.
10:26:58  8    Q.    Okay.  And I'd like to look at some other photographs that
10:27:00  9    were taken in the immediate time prior to the chemotherapy and
10:27:03 10    then just ask you a few questions about those, okay?
10:27:06 11    A.    Okay.
10:27:08 12          MR. SCHANKER:  Scott, if you could pull up the montage
10:27:14 13    of photographs 2892, 2896, 2898, 2899.
10:27:14 14    EXAMINATION BY MR. SCHANKER:
10:27:27 15    Q.    Dr. Tosti, these are photographs that you recall reviewing
10:27:30 16    these in the case?
10:27:31 17    A.    Yes.  But I read more now altogether, but, yes.
10:27:37 18    Q.    Okay.  And I'll represent to you can see the dates on
10:27:41 19    these photographs.  Starting in the top left, we have March 3rd
10:27:45 20    of 2008, which would be about three months before chemotherapy.
10:27:49 21          Do you see that photograph?
10:27:51 22    A.    Yes.
10:27:52 23    Q.    And then you see the photograph March 27th of 2008?
10:27:54 24    A.    Yes.
10:27:55 25    Q.    You see that photograph?

*OFFICIAL TRANSCRIPT*

10:27:57  1   A.   Yes.

10:27:57  2   Q.   And then do you see the photograph from, what is that,

10:28:03  3   eight days -- actually, the day of chemotherapy itself.

10:28:07  4        Do you see that?  May 29th of 2008?

10:28:09  5   A.   Yes.

10:28:11  6   Q.   So, Doctor, just to be clear, because you were asked a lot

10:28:17  7   of questions about it, what should the jury be gleaning from

10:28:22  8   these -- gaining from these photographs in your medical

10:28:28  9   opinion?

10:28:28 10        MS. SASTRE:  Objection, Your Honor.  As to "what the

10:28:33 11   jury."

10:28:34 12        THE COURT:  I think just rephrase your question.

10:28:34 13   EXAMINATION BY MR. SCHANKER:

10:28:37 14   Q.   Doctor, what do you glean or learn from these photographs?

10:28:41 15   A.   You know, these photographs teach very well how her loss

10:28:47 16   cannot be evaluated by photographs because, for instance, the

10:28:52 17   photo of May, as we saw before, can give you the idea that

10:28:57 18   there is some thinning of the front of the scalp and there is,

10:29:01 19   for instance, no thinning at all in the photo of May 29th.  So,

10:29:07 20   May 21st and May 29th show different situation.  That's because

10:29:14 21   what you see depends on how the hair is parted by the

10:29:21 22   inclination because, of course, if you see something from here,

10:29:25 23   it's different than you see something from here and if you see

10:29:28 24   something from here (indicating).  That's why it's good thing

10:29:31 25   that, you know, doctors takes photo in a standardized way.

*OFFICIAL TRANSCRIPT*

10:29:36  1   Q.   And when you explain "standardized way," could you -- you

10:29:39  2   use that phrase and you use that when the Sanofi lawyer was

10:29:44  3   asking you questions.  Can you explain to the jury what you

10:29:47  4   mean by "standardized way"?

10:29:49  5   A.   You know, "standardized" mean that they have been taken

10:29:52  6   all with the same light -- we usually have a room with a light

10:29:59  7   that cannot be changed -- and with the same magnification at

10:30:07  8   the same distance, with the same type of light, and the

10:30:14  9   patient -- the hair should be parted so in this way because

10:30:18 10   like here, I can take cover what I have so it should be

10:30:23 11   uncovered so you have to see the front of scalp, you have to

10:30:29 12   see the top of the scalp, the back of the scalp.

10:30:31 13   Q.   Now, why do you take those photographs in the standardized

10:30:36 14   way that you've described?

10:30:39 15   A.   Because as I explained yesterday, we take photographs more

10:30:43 16   to compare before and after than for evaluating at that moment.

10:30:49 17   If I evaluate the patient, I don't need photograph.  I see the

10:30:54 18   patient.  But I take the photograph because when the patient

10:30:58 19   comes back after months, I cannot remember exactly that

10:31:03 20   patient, and so I cannot say, oh, your hair is better just by

10:31:10 21   remembering so I want to be -- tell the patient the truth and

10:31:13 22   so I have to compare them of good quality.

10:31:18 23   Q.   Doctor, do the three before photographs that you see,

10:31:24 24   including the graduation picture there that a lot of time has

10:31:27 25   been spent on, do those photographs, in any way, change the

*OFFICIAL TRANSCRIPT*

10:31:34 1    conclusions that you shared with the jury on Wednesday?

10:31:37 2    A.    No, they don't.

10:31:38 3    Q.    And share why is it that they do not change your

10:31:42 4    conclusions in this case?

10:31:44 5    A.    Because I believe that even photo on the same day show you

10:31:50 6    different normality and because you cannot rely on photo to

10:32:01 7    establish that there is something wrong except if it's

10:32:06 8    something very, very wrong and then you see that.

10:32:10 9    Q.    Doctor, did you just say -- I had trouble hearing --

10:32:15 10   photos on the same day?  Did you reference that?

10:32:17 11   A.    Photo which is practically the same day, ranging one, two,

10:32:23 12   three days, I don't think the hair can be changed.  It's just

10:32:27 13   the hairstyle or maybe how much -- something I didn't discuss,

10:32:33 14   how much the hair is clean, because the day of shampoo we all

10:32:39 15   know the hair covers the scalp better and after a few days is

10:32:44 16   different.

10:32:44 17   Q.    Doctor, concerning photos taken on the same day, I want to

10:32:49 18   pull up a photograph that the Sanofi lawyer showed you and

10:32:55 19   compare that to another photograph that was taken on the same

10:32:57 20   day.

10:32:59 21        MR. SCHANKER:  Scott, could you first pull up 2966 for

10:33:03 22   us?

10:33:03 23   EXAMINATION BY MR. SCHANKER:

10:33:04 24   Q.    Do you recall seeing this photo this morning shown to you

10:33:13 25   by the Sanofi lawyer?

**_OFFICIAL TRANSCRIPT_**

10:33:14  1    A.    Yep.

10:33:15  2    Q.    And I represent to you that this photograph was taken on

10:33:20  3    October 10th of 2009.

10:33:23  4          MR. SCHANKER:  Scott, could you pull up, as well,

10:33:26  5    photograph 2968.

10:33:26  6    EXAMINATION BY MR. SCHANKER:

10:33:32  7    Q.    Doctor, do you see there that Ms. Kahn has the same shirt

10:33:38  8    on -- pink shirt.

10:33:41  9          Do you see that?

10:33:42 10    A.    Yes.

10:33:43 11    Q.    Do you see that she's actually posing with the same group

10:33:45 12    of individuals?

10:33:46 13    A.    Yes.

10:33:46 14    Q.    As a matter of fact, doesn't it look like that photo was

10:33:50 15    maybe -- those two photos were almost snapped at the exact same

10:33:54 16    time?

10:33:54 17          MS. SASTRE:  Objection, Your Honor.  Leading.

10:33:56 18          THE COURT:  Sustained.  Rephrase.

10:33:56 19    EXAMINATION BY MR. SCHANKER:

10:34:00 20    Q.    Doctor, let's focus on the photo on the right, 2968.

10:34:06 21          MR. SCHANKER:  And, Scott, could you zero in on -- I

10:34:08 22    know it's not the greatest picture, but could you zero in on

10:34:12 23    Ms. Kahn there.  Go in a little bit closer, if you could,

10:34:17 24    Scott, please.

10:34:17 25    EXAMINATION BY MR. SCHANKER:

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:34:20 | 1 | Q.   And, Doctor, what do you see, if anything, in that photo |
| 10:34:24 | 2 | that would be helpful for the jury with regard to this issue? |
| 10:34:28 | 3 | A.   I still think this is a bad photo to evaluate hair loss |
| 10:34:34 | 4 | because the area is not in focus, but you can see probably the |
| 10:34:41 | 5 | scalp through the hair in this photo.  I say "probably" because |
| 10:34:48 | 6 | it's not a good photo to evaluate. |
| 10:34:50 | 7 | Q.   Doctor, would you agree if someone just showed you the |
| 10:34:55 | 8 | photo from the left and not the photo from the right, that |
| 10:34:58 | 9 | would be an example of "cherry picking"? |
| 10:35:01 | 10 | MS. SASTRE:  Leading. |
| 10:35:02 | 11 | THE COURT:  Sustained. |
| 10:35:03 | 12 | EXAMINATION BY MR. SCHANKER: |
| 10:35:05 | 13 | Q.   Doctor, what is "cherry picking" in this context?  You |
| 10:35:08 | 14 | were asked about it by the Sanofi lawyer, weren't you? |
| 10:35:11 | 15 | Do you recall that? |
| 10:35:13 | 16 | A.   This is a new word, but what I think it means is trying to |
| 10:35:18 | 17 | manipulate the data -- |
| 10:35:18 | 18 | Q.   Right. |
| 10:35:21 | 19 | A.   -- correct? |
| 10:35:23 | 20 | Q.   Would it be wrong to try to manipulate data in front of |
| 10:35:26 | 21 | this jury? |
| 10:35:28 | 22 | MS. SASTRE:  Objection, Your Honor. |
| 10:35:29 | 23 | THE COURT:  Sustained. |
| 10:35:31 | 24 | EXAMINATION BY MR. SCHANKER: |
| 10:35:31 | 25 | Q.   Doctor, would it be wrong for anyone, including you, or |

*OFFICIAL TRANSCRIPT*

10:35:35 1    anyone else, to try to manipulate the data?

10:35:38 2            MS. SASTRE:  Objection, Your Honor.

10:35:41 3            THE COURT:  I think we need to move on.

10:35:43 4            MR. SCHANKER:  Thank you, Your Honor.

10:35:47 5    EXAMINATION BY MR. SCHANKER:

10:35:48 6    Q.   Let's look at some -- we're talking about these

10:35:52 7    photographs in this case.  I want to look at another set of

10:35:54 8    photos.  Let's look at some photos, 3142.

10:36:09 9            MR. SCHANKER:  Scott, can you pull that up, please.  Do

10:36:11 10   we have a little bell going on?  Are we okay, Your Honor?

10:36:18 11           THE COURT:  I don't know what it is.  Please proceed.

10:36:21 12           MR. SCHANKER:  Thank you.

10:36:24 13   EXAMINATION BY MR. SCHANKER:

10:36:25 14   Q.   Ms. Kahn's in this photo.  Can you see her, Dr. Tosti?

10:36:29 15   A.   Yes, I do.

10:36:30 16   Q.   And you were asked by the Sanofi lawyer about photos over

10:36:36 17   the years, correct?

10:36:38 18   A.   Yes.

10:36:38 19   Q.   And I'll represent to you that this is a photo taken from

10:36:46 20   2014.

10:36:48 21           MR. SCHANKER:  And, Scott, if you could put up, as

10:36:54 22   well, photo 3141.

10:36:54 23   EXAMINATION BY MR. SCHANKER:

10:37:04 24   Q.   Dr. Tosti, do you see these photographs and Ms. Kahn in

10:37:08 25   these photographs?  Do you see her?

                          *OFFICIAL TRANSCRIPT*

10:37:11 1    A.    Yes.  I think we saw this photograph on Wednesday.

10:37:18 2    Q.    Yes.  And I'll let you know the parties have stipulated

10:37:22 3    that these photographs are taken on the same day.  What, if

10:37:26 4    anything, does looking at these photographs together tell you

10:37:29 5    about the reliability of using photos in your work?

10:37:35 6    A.    You know, this is something I was already explaining

10:37:39 7    several times, that you need photo from different area of the

10:37:43 8    scalp to do a proper evaluation.  So this photo are, of course,

10:37:49 9    not standardized but you at least see the vertex.  And in this

10:37:55 10   case, you can see the vertex is definitely abnormal.

10:38:02 11   Q.    Now, Doctor, you were asked a lot of questions, in this

10:38:09 12   case, about the materials that you've reviewed, obviously.

10:38:14 13   Now, based on those materials and your knowledge of this case,

10:38:19 14   do you believe that Ms. Kahn has gone through the natural aging

10:38:23 15   process from 2008 to today?

10:38:30 16   A.    No, absolutely not.

10:38:32 17        MS. SASTRE:  Objection.  Your Honor.

10:38:34 18        THE COURT:  Overruled.

10:38:34 19   EXAMINATION BY MR. SCHANKER:

10:38:37 20   Q.    Doctor, let me go ahead and ask the question again.  In

10:38:42 21   the last 13 years, has Ms. Kahn gone through the natural aging

10:38:47 22   process that people go through?

10:38:51 23   A.    I didn't understand the question, sorry.

10:38:52 24   Q.    Okay.  Let me just move on, Doctor.  We'll keep this

10:38:56 25   moving, thank you.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:38:57 | 1 | With regard to the photographs, Doctor, and those |
| 10:39:06 | 2 | that were shown you by the Sanofi lawyer, have they, in any |
| 10:39:11 | 3 | way, changed your conclusions that you shared with the jury on |
| 10:39:15 | 4 | Wednesday in this case? |
| 10:39:16 | 5 | MS. SASTRE:  Objection.  Asked and answered. |
| 10:39:19 | 6 | THE COURT:  Overruled. |
| 10:39:19 | 7 | EXAMINATION BY MR. SCHANKER: |
| 10:39:21 | 8 | Q.   You can go ahead and answer for the jury. |
| 10:39:23 | 9 | A.   No, I didn't change my conclusion. |
| 10:39:38 | 10 | Q.   Now, you were asked about your clinical trial on |
| 10:39:41 | 11 | cross-examination -- I'm sorry -- your clinical examination. |
| 10:39:45 | 12 | Do you recall that? |
| 10:39:46 | 13 | A.   Yes. |
| 10:39:47 | 14 | Q.   And you indicated to the Sanofi lawyer that you took |
| 10:39:52 | 15 | photographs during that examination. |
| 10:39:55 | 16 | Do you recall that testimony? |
| 10:39:55 | 17 | A.   Yes. |
| 10:39:57 | 18 | Q.   Can I show you just a few of those photos then and ask |
| 10:40:01 | 19 | some questions based on that? |
| 10:40:02 | 20 | A.   Yes. |
| 10:40:03 | 21 | Q.   Thank you. |
| 10:40:14 | 22 | MR. SCHANKER:  Let me back this up a little. |
| 10:40:14 | 23 | MS. SASTRE:  Do you have a copy? |
| 10:40:20 | 24 | MR. SCHANKER:  Yes, I do. |
| 10:40:20 | 25 | EXAMINATION BY MR. SCHANKER: |

*OFFICIAL TRANSCRIPT*

10:40:37  1    Q.    Doctor, do you recognize this photograph as one that you

10:40:41  2    took?

10:40:41  3    A.    Yes.

10:40:45  4    Q.    And based upon your evaluation and investigation, in this

10:40:54  5    case, what did you determine then was the cause of what we're

10:40:58  6    looking at here?

10:41:02  7    A.    I determined, but not just based on this photo, that

10:41:06  8    Mrs. Kahn has permanent or persistent alopecia after

10:41:12  9    chemotherapy.

10:41:12 10    Q.    Okay.  Also, we referred to that acronym, "PCIA"?

10:41:18 11    A.    Yes.

10:41:19 12    Q.    And what then did you determine, if anything, was a

10:41:30 13    substantial factor in causing the PCIA?

10:41:34 14    A.    I determined that Taxotere was the key substantial factor.

10:42:10 15    Q.    Doctor, there was also some discussion about -- with

10:42:15 16    regard to the different locations on Ms. Kahn's scalp, and I

10:42:20 17    just want to make -- Ms. Sastre asked you about that, and I

10:42:25 18    want to make sure we're perfectly clear with regards to this.

10:42:34 19          You recognize this is another photo that you took in

10:42:38 20    the clinical examination?

10:42:39 21    A.    Yes.

10:42:40 22    Q.    Now, describe for the jury which parts of the -- how do

10:42:45 23    you define the different parts of the scalp here that we can

10:42:49 24    see?

10:42:49 25    A.    So, this one is called the "frontal scalp," okay?  This is

**OFFICIAL TRANSCRIPT**

10:42:54  1    the mid scalp and this is the vertex.

10:43:00  2    Q.    So, Doctor --

10:43:01  3    A.    In a simple way.

10:43:03  4    Q.    Okay.  So with regard to the other photo we looked at the

10:43:05  5    really more the frontal, but with regards to the middle and the

10:43:09  6    back of the scalp, Doctor, did you determine what the cause of

10:43:15  7    the condition that we see in this photograph was in this case?

10:43:20  8    A.    I determined that her condition is permanent alopecia

10:43:29  9    after chemotherapy.

10:43:29 10    Q.    And that acronym PCIA?

10:43:33 11          MS. SASTRE:  Excuse me, Your Honor?

10:43:33 12          THE COURT:  Yes.

10:43:34 13          MS. SASTRE:  This is just cumulative testimony that

10:43:35 14    she's given on direct.

10:43:36 15          THE COURT:  Sustained.  We're going to have to move

10:43:38 16    on --

10:43:39 17          MR. SCHANKER:  Okay.  Thank you, Your Honor.

10:43:42 18    EXAMINATION BY MR. SCHANKER:

10:43:48 19    Q.    Doctor, you were asked about eyebrows by Ms. Sastre, do

10:43:53 20    you recall that?  In the cross-examination last week.  Can I

10:43:57 21    ask you about eyebrows?

10:43:59 22    A.    Yes.

10:43:59 23    Q.    Okay.  Doctor, is this one of the photographs you took in

10:44:06 24    your clinical evaluation?

10:44:09 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

10:44:11  1    Q.    And, Doctor, did you determine what you believed was the
10:44:17  2    cause of the eyebrow condition that we are looking at here?
10:44:22  3          MS. SASTRE:  Objection.  This is cumulative,
10:44:24  4    Your Honor.  This was testified to on direct.
10:44:26  5          THE COURT:  Overruled.
10:44:27  6          MR. SCHANKER:  Thank you, Your Honor.
10:44:27  7    EXAMINATION BY MR. SCHANKER:
10:44:28  8    Q.    You can go ahead and answer.
10:44:31  9    A.    I determined that the loss of the eyebrows -- partial loss
10:44:35  10   of the eyebrows was due to permanent alopecia after
10:44:40  11   chemotherapy.
10:44:42  12   Q.    That acronym, PCIA?
10:44:44  13   A.    Yes.
10:44:44  14   Q.    And then, Doctor, did you determine what you believe was
10:44:48  15   the substantial factor in causing that condition of the
10:44:54  16   chemotherapy drugs?
10:44:55  17   A.    I determined it was Taxotere.
10:44:56  18   Q.    Doctor, you were asked by the Sanofi lawyer about this
10:45:34  19   condition, "androgenetic alopecia."
10:45:38  20   A.    Yes.
10:45:38  21   Q.    And just so we're clear, because there has been a lot of
10:45:42  22   testimony about it, do you believe that androgenetic alopecia
10:45:48  23   plays any role at all in Ms. Kahn's condition?
10:45:55  24   A.    As I already said, she may have a minor component of
10:45:59  25   androgenetic alopecia.

*OFFICIAL TRANSCRIPT*

10:46:01  1    Q.    Now, when you say "a minor component," do you believe,

10:46:08  2    Doctor, that androgenetic is a substantial factor in

10:46:15  3    Elizabeth Kahn's condition as we see it here in the courtroom?

10:46:19  4    A.    I exclude that androgenetic is a substantial factor.

10:46:28  5    Q.    Thank you.

10:46:28  6          Doctor, this morning, you were asked about

10:46:34  7    Dr. Thompson's pathology report.  Do you recall that testimony?

10:46:39  8    A.    Yes.

10:46:40  9    Q.    I want to ask you just a few questions about that to make

10:46:47 10    sure we're clear.  And I actually want to show you that

10:46:52 11    pathology report.  Is that okay?

10:46:55 12    A.    Sure.

10:46:55 13    Q.    You do have a copy of it up there, but I don't believe it

10:46:59 14    was put on the ELMO.

10:47:03 15    A.    I do, I think.  But --

10:47:03 16    Q.    Do you still have that copy there?

10:47:06 17    A.    You can show me but do whatever you think is best.

10:47:10 18    Q.    Okay.  So this is the pathology report that you were

10:47:19 19    talking about with the Sanofi lawyer this morning?

10:47:22 20    A.    Yes.

10:47:22 21    Q.    Now, just briefly, so that we're all on the same page,

10:47:27 22    what is this report and how does it come about?

10:47:31 23    A.    I sent the pathology lab two pieces of tissue; one from

10:47:36 24    the front of the scalp and one from the vertex.  And the

10:47:43 25    pathology lab processed the tissue and Dr. Thompson read the

*OFFICIAL TRANSCRIPT*

10:47:50  1   slides.  He described the slides -- the two different specimens

10:47:58  2   he received -- and then he makes a final comment, so putting

10:48:05  3   everything together, about his final thoughts on the diagnosis.

10:48:10  4   Q.   And Dr. Thompson -- who is Dr. Thompson so the jury

10:48:15  5   understands?

10:48:16  6   A.   Dr. Thompson is a pathologist who specialized in scalp and

10:48:24  7   hair disorders.  I would say there are maybe ten pathologists

10:48:29  8   in the United States that are just specialized in that field.

10:48:32  9   Like, there are pathologists specialize in moles, pathologists

10:48:37 10   who specialize in inflammatory disease, and there are some

10:48:41 11   cancer.  He is specialized on hair and scalp.

10:48:44 12   Q.   Okay.  And why did you -- how did Dr. Thompson come to be

10:48:50 13   used in this case?

10:48:53 14   A.   You know, I was asked many years ago -- I don't remember

10:48:58 15   when honestly -- to provide some names of pathologists in the

10:49:03 16   United States who were specialized in hair and scalp disorders,

10:49:09 17   and I provided his, and I introduced the counsels to each of

10:49:17 18   these pathologists.

10:49:18 19   Q.   And why did you put Dr. Thompson's name on that list?

10:49:22 20   A.   Because it was one of the experts in the field.  And he is

10:49:28 21   the only one who accepted.

10:49:30 22   Q.   And, Doctor, if you could just take us through this

10:49:34 23   briefly and explain this to us.  Do you see where it says,

10:49:38 24   "Diagnosis," and then it has part A?  Do you read what it says,

10:49:44 25   "Skin, frontal scalp biopsy"?

*OFFICIAL TRANSCRIPT*

A.   Yes.

Q.   And then could you take us through the points there.  It says, "Increased telogen bodies."  Could you explain that?

A.   I'm sorry.  So this Number 1, the increased telogen bodies.  So some people believe telogen bodies are a feature of PCIA.  I honestly don't.  But that's probably -- he wrote down this, okay?  Two.

Q.   Go ahead.

A.   Female pattern hair loss.

Q.   That's what we discussed.

A.   Androgenetic alopecia is what we discussed.  And three, seborrheic dermatitis, which is identified.  So seborrheic dermatitis is an inflammatory scalp disorder that affects most of the population, so probably they take a biopsy from me, they will find some seborrheic dermatitis.

Q.   Doctor, do you believe that in any way is a cause of -- substantial factor in what we're seeing with Elizabeth Kahn here today?

A.   No.

Q.   Okay.  So then I see that you've got the Biopsy B.  Could you take the jury through that, please?

A.   So, first, he described permanent chemotherapy-induced alopecia, first diagnosis.  And then he writes, again, seborrheic dermatitis, with each form identified.

Q.   And then if you could read the comment to the jury,

**OFFICIAL TRANSCRIPT**

10:51:31 1  please?

10:51:31 2  A.    Okay.  The comment is, "Given the features diagnostic of

10:51:39 3  permanent chemotherapy-induced alopecia in Part B, the

10:51:43 4  increased number of telogen bodies seen in Part A most likely

10:51:49 5  also represent permanent chemotherapy-induced alopecia."

10:51:55 6  Q.    And do you agree with that?

10:52:00 7  A.    Yes.  I agree that that's permanent chemotherapy-induced

10:52:31 8  alopecia.

10:52:31 9  Q.    Doctor, moving on, I want to talk about this and the

10:52:33 10 manner in which you provided this information on Wednesday.  Is

10:52:36 11 that okay?

10:52:36 12 A.    Yes.

10:52:36 13 Q.    And you recall that the Sanofi lawyer had a lot of

10:52:39 14 questions for you about these -- the "palms" as they are

10:52:44 15 called, the little balls.  And I believe you were trying to

10:52:49 16 explain to her why the balls were placed in the different

10:52:54 17 containers.  Do you recall that exchange that you had?

10:52:56 18         THE COURT:  Wait.  Ms. Sastre?

10:52:58 19         MS. SASTRE:  Yes, I'm sorry, Your Honor.  Counsel is

10:53:00 20 testifying about, I believe, you were trying to explain and

10:53:02 21 it's just --

10:53:03 22         THE COURT:  Okay.  Ask a question.

10:53:04 23         MR. SCHANKER:  Yes.

10:53:04 24 EXAMINATION BY MR. SCHANKER:

10:53:06 25 Q.    Do you recall the questions that you were asked by the

*OFFICIAL TRANSCRIPT*

10:53:09  1    Sanofi lawyer about placing the balls?

10:53:13  2    A.    Yes, I do.

10:53:14  3    Q.    Okay.  Well, I want to ask you about that.  And do you

10:53:20  4    remember when the balls were dumped into this container on

10:53:27  5    Wednesday afternoon?

10:53:28  6    A.    I don't remember exactly.  I have to be honest.

10:53:31  7    Q.    Okay.  I just want to make sure, is there anything that

10:53:37  8    you heard from the Sanofi lawyer in this case that would change

10:53:40  9    your mind in any way about the fact that these balls should be

10:53:45 10    placed back in the container where they were?

10:53:49 11          MS. SASTRE:  Objection, Your Honor.

10:53:50 12          THE COURT:  Sustained.  You need to ask a question.

10:53:50 13    EXAMINATION BY MR. SCHANKER:

10:54:00 14    Q.    Doctor, was there anything in the questioning from the

10:54:02 15    Sanofi lawyer that made you decide that you were incorrect in

10:54:06 16    your assessment as to how the medical doctors in the various

10:54:13 17    studies had determined where to attribute the cause of the

10:54:22 18    PCIA?

10:54:22 19    A.    No.

10:54:23 20          MS. SASTRE:  Objection.  The --

10:57:53 21          THE COURT:  I think we need to come to the side.

10:57:53 22          (WHEREUPON, at this point in the proceedings, there was

10:57:53 23    a conference held at the bench.)

10:57:53 24          THE COURT:  You can state your objection for the record

10:57:53 25    and I'm going to rule.  I think my concern is, her questions

*OFFICIAL TRANSCRIPT*

10:57:53  1     are not evidence.  If you want to review the data from some of

10:57:53  2     those reports and that, I guess my problem is whatever

10:57:53  3     Ms. Sastre asked is not evidence, so that question itself would

10:57:53  4     not -- should not change her answer, and it would not be

10:57:53  5     something that she could consider in the answer.  The issue is

10:57:53  6     what the report said and her response.  Do you understand what

10:57:53  7     I'm saying?

10:57:53  8            MR. SCHANKER:  Sure.

10:57:53  9            MS. SASTRE:  You're talking about the reports that she

10:57:53 10     read off the numbers from --

10:57:53 11            THE COURT:  Yeah.

10:57:53 12            MS. SASTRE:  -- from what I understand, okay, that led

10:57:53 13     to the 380 balls.

10:57:53 14            THE COURT:  Yeah.  I think it's the phrasing of the

10:57:54 15     question that I found really troubling:  Do you think

10:57:54 16     Ms. Sastre changed her opinion, and I think that's the trouble.

10:57:54 17            MS. SASTRE:  Yeah, I agree with that.

10:57:54 18             Go ahead.  Go ahead.

10:57:54 19            MR. SCHANKER:  I'm sorry.  Your Honor, I was going to

10:57:54 20     ask that if she, based on everything that she's been through

10:57:54 21     here today, you know, up to this point in time, Your Honor, is

10:57:54 22     it still her conclusion at this point in time that these --

10:57:54 23            THE COURT:  No.  I think the issue was in the

10:57:54 24     questioning.  There was some deviation between her report and

10:57:54 25     what occurred in court and I think you can clear that up.  I

*OFFICIAL TRANSCRIPT*

think you can -- I don't want to tell you where to go.  There was something about her study.  I mean, if you want to go into that to explain it, that's fine, but I don't think you can ask her did Ms. Sastre change your mind?

MS. SASTRE:  Thank you, Your Honor.

The only thing that I would add to that so just to make sure we're on the same page here, those 15 or so studies that he would just say -- for example, the marketing study -- and she would get her list out, no one ever saw the list, no one ever saw the study.  More importantly, I didn't ask any questions about those studies.

THE COURT:  I think you asked where the difference was.

MS. SASTRE:  Well, I said there was a difference.  I said, how many balls were in there?  She told me about 380, and her number in her report, as I told Your Honor, I knew that it was higher than that.  And so I said there are studies that you reviewed that were not included in this.  She said yes.  I did not go into any further detail, Your Honor.

THE COURT:  I think he can ask about that, though, that there were 440 in the report and only 380 here because I think that's fair game.

MS. SASTRE:  Sure.  All I'm saying is that I didn't go into what this study said or that study and that -- Okay.

THE COURT:  Except hers.

MS. SASTRE:  Oh, hers, yes.  For sure hers.

*OFFICIAL TRANSCRIPT*

10:57:54  1          THE COURT:  All right.  Thank you.

10:57:54  2          (WHEREUPON, at this point in the proceedings, the bench

10:58:10  3   conference concluded.)

10:58:10  4          THE COURT:  Please proceed.

10:58:11  5   EXAMINATION BY MR. SCHANKER:

10:58:12  6   Q.    Doctor, as you sit here today, do you believe that the

10:58:17  7   exercise that we did on Wednesday fairly attributes the state

10:58:23  8   of the scientific literature?

10:58:24  9   A.    Yes, absolutely.  I think what we did is to review the

10:58:32 10   scientific literature and attribute each of those jars to one

10:58:39 11   of the medication that were considered the cause of the

10:58:48 12   androgenetic alopecia by the authors of the publications.

10:58:51 13   Q.    And thank you, Doctor.

10:58:55 14          And just to be clear, because Sanofi lawyer asked you

10:59:00 15   many questions about this on Wednesday, who made the decision

10:59:04 16   about where to attribute -- rather, what drug to attribute the

10:59:10 17   cause of PCIA to in these -- in your analysis?  Was that you

10:59:17 18   who made that decision?

10:59:17 19          MS. SASTRE:  Objection.

10:59:18 20   A.    No.

10:59:19 21          THE COURT:  Wait.  Wait.  Theirs is an objection.

10:59:21 22          MS. SASTRE:  Yes, Your Honor.  This is beyond the

10:59:24 23   scope.  I did not ask Dr. Tosti a single question about what

10:59:27 24   those authors attributed, whether there was any attribution of

10:59:33 25   that study of --

**OFFICIAL TRANSCRIPT**

10:59:33  1          THE COURT:  I'm going to overrule it.

10:59:35  2          MR. SCHANKER:  You can go ahead and answer.

10:59:38  3          THE WITNESS:  So the doctors who saw the patient and

10:59:43  4   then wrote the publication were the ones who attributed the

10:59:49  5   alopecia to the specific medications.

10:59:53  6          MR. SCHANKER:  Thank you.

10:59:53  7   EXAMINATION BY MR. SCHANKER:

11:00:24  8   Q.    Doctor, the Sanofi lawyer asked you a lot of questions

11:00:31  9   concerning what was referred to as your "study,"

11:00:40 10   "Freites-Martinez study."  Do you recall those questions?

11:00:42 11   A.    I remember we discussed this at --

11:00:45 12   Q.    Okay.  I want to talk to you about that.  This is the

11:00:56 13   study in which you're an author, correct?

11:00:59 14   A.    Yes.

11:00:59 15   Q.    This assessment of quality of life.

11:01:03 16   A.    Yes.

11:01:03 17   Q.    And you were explaining -- when asked questions by the

11:01:09 18   defense attorney, you were explaining that this was not a

11:01:12 19   prevalence study.  I want to ask you about that.  Okay?

11:01:16 20          MS. SASTRE:  Objection.  Your Honor, Counsel continues

11:01:18 21   to testify by what she said.

11:01:19 22          MR. SCHANKER:  Your Honor, I'm simply --

11:01:22 23          THE COURT:  I think you can frame the area that we're

11:01:24 24   going to and ask a question, but it can't be leading.  Thank

11:01:28 25   you.

                              *OFFICIAL  TRANSCRIPT*

11:01:28  1          MR. SCHANKER:  Thank you.  Yeah.  Thank you.  Yeah.

11:01:29  2  BY MR. SCHANKER:

11:01:29  3  Q.   Do you recall a conversation about prevalence?

11:01:31  4  A.   I remember, yes.

11:01:31  5  Q.   Could you please explain -- as you were attempting to on

11:01:37  6  Wednesday, go ahead and get your opportunity to explain what

11:01:39  7  you mean by that.

11:01:40  8  A.   So this was an -- to evaluate -- an article -- a study.

11:01:49  9  Let's say a study to evaluate quality of life of two groups of

11:01:55 10  patients.  Patients who have a permanent alopecia after

11:02:03 11  chemotherapy who were one group, and patients with endocrine

11:02:07 12  alopecia were the other group.

11:02:10 13          So we didn't see the patients before starting the

11:02:15 14  chemotherapy.  That study included patients who already at the

11:02:22 15  problem.  Okay?  Each of the two problems.

11:02:28 16  Q.   Now, did this study include Taxol and Taxotere patients?

11:02:32 17  A.   Yes.  The study involved multiple chemotherapy, including

11:02:42 18  Taxotere, Taxol, and other combinations.

11:02:44 19  Q.   Doctor, do you know why there were more Taxol patients

11:02:48 20  than Taxotere patients in that study?

11:02:52 21          MS. SASTRE:  Objection, Your Honor.  May we approach,

11:02:55 22  please?

11:02:55 23          (WHEREUPON, at this point in the proceedings, there was

11:02:55 24  a conference held at the bench.)

11:03:16 25          MS. SASTRE:  So first of all, I object.  I do think

                              *OFFICIAL  TRANSCRIPT*

11:03:19  1    it's beyond the scope to get into why were there more Taxol

11:03:24  2    patients versus Taxotere patients.  The real reason for the

11:03:28  3    objection and my popping up before it went any further is there

11:03:32  4    were three centers where they drew patients from for

11:03:36  5    Dr. Tosti's paper.

11:03:37  6              And what she's about to say, because you heard

11:03:39  7    her say it in *Earnest* but we jumped up too late, is she says,

11:03:43  8    Oh, there were more because Sloan Kettering doesn't make you do

11:03:49  9    Taxotere anymore because that artificially brought those

11:03:51 10    numbers down, and obviously, it's a very, very, very

11:03:53 11    prejudicial and negative reference.  It's absolutely

11:03:56 12    unnecessary.  There are virtually no pro -- and I'd ask that

11:04:04 13    she not get to say that here.

11:04:04 14         THE COURT:  That line I agree with.  I think this is an

11:04:07 15    appropriate line of questioning because the inference in the

11:04:11 16    questioning was that it was a prevalence study as opposed to

11:04:15 17    what they were doing.  I think it's appropriate for you to go

11:04:18 18    through it, but I'm not going to allow this testimony that

11:04:23 19    Sloan Kettering doesn't use Taxotere anymore.

11:04:25 20              And I will instruct the witness, because I do

11:04:27 21    think it is more prejudicial than probative.  But I think the

11:04:32 22    scope of the study is important that -- again, to describe it

11:04:35 23    as not a prevalence study --

11:04:38 24         MR. SCHANKER:  Your Honor, just for the record, and

11:04:40 25    practically, the defense counsel is the one that asked these

*OFFICIAL TRANSCRIPT*

11:04:45  1    questions and insinuated.  And basically, there was a

11:04:48  2    prevalence study --

11:04:48  3            THE COURT:  Well, I know.

11:04:50  4            MR. SCHANKER:  -- with the question -- certainly this

11:04:52  5    is fair ground, and fact that one of the centers does not use

11:04:55  6    Taxotere -- rather -- yes, does not use the Taxotere.  The

11:04:59  7    reason why, I understand, you can instruct the doctor on that,

11:05:07  8    but the fact that one does not use -- because that's just a

11:05:09  9    clear explanation.

11:05:09 10            THE COURT:  No, no.  I'm not going -- unless you got

11:05:12 11    people from Sloan Kettering to come in and say.

11:05:16 12            MR. SCHANKER:  She was involved in the study.

11:05:18 13            THE COURT:  I've ruled.  We can spend -- waste more

11:05:20 14    time here.

11:05:21 15            MR. SCHANKER:  Yes.  Respectfully, can -- just so that

11:05:24 16    the jury is clear, can she testify that there were no -- from

11:05:27 17    one of the centers there were no participants that were

11:05:30 18    submitted that had taken that --

11:05:32 19            THE COURT:  I think it's the same thing.  I think

11:05:35 20    what's important is it was intimated that it was a prevalence

11:05:42 21    study.  And I think you need to clear that up.  Whether or not

11:05:45 22    one of the facilities does or does not use Taxotere, I think is

11:05:50 23    too prejudicial because we don't know why.  We don't know why.

11:05:54 24    It could be.  I don't know why.  It could be a variety of

11:06:00 25    reasons.

*OFFICIAL TRANSCRIPT*

11:06:00  1              MR. SCHANKER:  Thank you.

11:06:01  2              THE COURT:  So I'm going to tell her that.

11:06:02  3              MS. SASTRE:  Thank you.

11:06:02  4              (WHEREUPON, at this point in the proceedings, the bench

11:06:34  5    conference concluded.)

11:06:34  6              THE COURT:  Please proceed.

11:06:36  7    EXAMINATION BY MR. SCHANKER.

11:06:37  8    Q.    Thank you, Your Honor.  Now, in this particular study,

11:06:42  9    Doctor, your study, are any of the cases of Grade 2 in this

11:06:47 10    paper specifically attributed to Taxol?

11:06:51 11    A.    No.  Because I don't think the paper divided between the

11:06:59 12    difference.

11:06:59 13    Q.    And when we went through this with the is jury on

11:07:03 14    Wednesday, we -- did we properly place the -- those in the

11:07:08 15    proper buckets --

11:07:09 16    A.    Yes.  Absolutely.

11:07:11 17    Q.    -- from the study?  Okay.

11:07:38 18              Just a couple more topics, Doctor.  Do you recall you

11:07:55 19    were asked questions about tamoxifen and hair loss by

11:08:09 20    Ms. Sastre?

11:08:09 21    A.    Yes.  Tamoxifen and alopecia to be clear.

11:08:13 22    Q.    Yes.  Tamoxifen and alopecia, thank you.  And if I could

11:08:21 23    reference for you the Martin study.  You're familiar with

11:08:25 24    Martin, right?

11:08:25 25    A.    Yes, I am.

**_OFFICIAL TRANSCRIPT_**

11:08:27  1          MS. SASTRE:  Objection, Your Honor.  Beyond the scope

11:08:29  2     of cross.  I did not discuss the study with Dr. Tosti.

11:08:33  3          MR. SCHANKER:  Okay.  Your Honor, this study goes

11:08:35  4     directly to the topic which was covered with regard to

11:08:38  5     tamoxifen and temporary hair loss.

11:08:40  6          THE COURT:  I'm going to allow it.  Overruled.

11:08:42  7          MS. SASTRE:  Your Honor, may we come up for a moment,

11:08:44  8     please?  Thank you.

11:08:45  9          THE COURT:  Yes.

11:08:45 10          (WHEREUPON, at this point in the proceedings, there was

11:09:04 11     a conference held at the bench.)

11:09:04 12          MS. SASTRE:  So, Your Honor, I asked some general

11:09:08 13     opinion questions about tamoxifen and hair loss.  I did not use

11:09:12 14     a single piece of literature with this witness by reference

11:09:16 15     directly except the one paper she's authored that I went back

11:09:19 16     to only once for one proposition at the end.  I didn't put the

11:09:23 17     table back up or any of that, and that is true for the course

11:09:25 18     of this entire exam since I started it from beginning to end.

11:09:32 19          For counsel to insert a brand-new piece of

11:09:32 20     medical literature into this examination without my having an

11:09:34 21     opportunity to ask questions about it, that is unfair.  As a

11:09:38 22     matter of fact, it exceeds the scope, Your Honor.  I stand on

11:09:40 23     the literature for that reason.

11:09:42 24          MR. SCHANKER:  It's not brand new, Your Honor.  We've

11:09:44 25     covered it in her examination, and clearly Ms. Sastre is trying

*OFFICIAL TRANSCRIPT*

11:09:49  1  to --

11:09:49  2          THE COURT:  I don't know what this is.

11:09:50  3          MR. SCHANKER:  This deals with --

11:09:52  4          THE COURT:  We covered that.  I think you've already

11:09:54  5  done that.

11:09:57  6          MR. SCHANKER:  Your Honor, in her questions, she

11:10:02  7  clearly asked questions to try to get the jury to infer that

11:10:07  8  tamoxifen can cause permanent hair loss.

11:10:09  9          THE COURT:  Then ask that.

11:10:10 10          MR. SCHANKER:  This study goes directly to refute that.

11:10:12 11          THE COURT:  Okay.  All right.  Then I think you can ask

11:10:19 12  her if her research and her experience and -- her research and

11:10:20 13  her experience whether or not tamoxifen causes permanent hair

11:10:07 14  loss is a fair question.  We've already done this in her direct

11:10:08 15  testimony.  I mean, we're not going to provide another direct

11:10:47 16  on this.  This is just redirect to cover those matters.

11:10:47 17          MR. SCHANKER:  I'm not permitted to go back to this

11:10:47 18  study?

11:10:47 19          THE COURT:  No, you've already done that.

11:10:47 20          MS. SASTRE:  Thank you.

11:10:47 21          (WHEREUPON, at this point in the proceedings, the bench

11:11:03 22  conference concluded.)

11:11:03 23          THE COURT:  Please proceed.

11:11:05 24  EXAMINATION BY MR. SCHANKER:

11:11:05 25  Q.   Doctor, based on your review of the literature and your

                        *OFFICIAL TRANSCRIPT*

11:11:08  1   experience, is it your conclusion that you don't see Grade 2

11:11:12  2   PCIA from tamoxifen?

11:11:16  3   A.   Yes, absolutely.  Maybe you don't see PCIA with tamoxifen.

11:11:21  4   Q.   Doctor, I want to ask you about a couple of articles from

11:11:46  5   the '90s that the Sanofi lawyer showed you on Wednesday

11:11:52  6   afternoon.  Can we go to those briefly?

11:11:55  7   A.   Yes, I remember those articles.

11:11:56  8   Q.   Okay.  The first of those -- and I'll go ahead and put it

11:12:01  9   here on the overhead.

11:12:05 10        MS. SASTRE:  Let me object, Your Honor.  I think we

11:12:07 11   need to approach sidebar again.

11:12:07 12        THE COURT:  Okay.

11:12:07 13        (WHEREUPON, at this point in the proceedings, there was

11:12:07 14   a conference held at the bench.)

11:12:28 15        THE COURT:  Okay.  Were these specific articles

11:12:30 16   addressed in her cross?

11:12:31 17        MR. SCHANKER:  Yeah.

11:12:32 18        THE COURT:  Did she talk about -- did she title it --

11:12:34 19        MR. SCHANKER:  Yeah.  They were shown to her by defense

11:12:36 20   counsel, and they were asked about it to try to show that there

11:12:40 21   were cases of PCIA that were reported prior to when Dr. Tosti

11:12:45 22   said they were.

11:12:46 23        And so we took -- the opportunity to clarify and

11:12:50 24   look at these articles and see what they were actually about,

11:12:53 25   because if you do that, we see that they were involving a

*OFFICIAL TRANSCRIPT*

different kind cancer not end-stage breast cancer.  And so it's clearly relevant and it's within the scope of redirect, and that's exactly what they are, Your Honor.

THE COURT:  Okay.  I understand.

MS. SASTRE:  Go ahead.

THE COURT:  No.  I remember -- you know, I didn't read the cross, what happened Wednesday.  I just -- I remember them.  They were reported cases prior to 2004 with other drugs that caused persistent alopecia.  I don't know -- what's the objection?

MS. SASTRE:  So the objection is, Your Honor, that it was a study that I did hand Dr. Tosti, and I said, Are you familiar with it?  And she just said to me, Oh, this is for metastatic breast cancer.  And I didn't ask her any questions about it.  I didn't ask her any questions about it.  She had already said to me -- I said earlier, Look, there are cases of reports of PCIA before Taxotere came onto the market.

And she gave me some answer and I gave this to her.  And she just said, Well, this is metastatic.  And I, because of the lateness of the hour, wasn't very clear in my mind.  And I was just -- are you finished?  Are you -- you asked me how much longer, and I said, I can't finish.  And you said, You're going to finish.

I had never in my life turned to my colleague during a cross and was, like, I need to think about what I'm

*OFFICIAL TRANSCRIPT*

11:14:23  1   going to do here.  And I -- hold on.  Just let me finish.  My

11:14:26  2   point is just to say that I got out of Dodge and I dropped all

11:14:30  3   literature.  I didn't even ask her a question about it.  I

11:14:33  4   handed to it her, she said, Metastatic, and I said, Okay.

11:14:36  5   Let's move on to a different topic.  There was nothing.

11:14:40  6           THE COURT:  All right.  Okay.  All right.  I think she

11:14:40  7   can answer because I do remember the line of questioning -- and

11:14:42  8   I could put the studies on highlight.  And you can answer if

11:14:51  9   the studies show a chemotherapy-induced alopecia prior to such

11:14:52 10   and such a date, have you ever dealt with early-stage

11:14:56 11   breast cancer, and with what cancers did they do deal.  Okay?

11:14:56 12   Let's keep it there.

11:15:02 13           MR. SCHANKER:  Okay.

11:15:02 14           MS. SASTRE:  How many are there?  There's just four of

11:15:05 15   them.

11:15:06 16           MR. SCHANKER:  Right here.

11:15:07 17           MS. SASTRE:  Okay.  Are there any others?  Because you

11:15:11 18   said studies.  So while we're here.

11:15:12 19           MR. SCHANKER:  I'm going to follow the Court's order.

11:15:14 20               (Indiscernible.)

11:15:14 21           MS. SASTRE:  All right.  Okay.

11:15:14 22           THE COURT:  That sounds good.

11:15:14 23           (WHEREUPON, at this point in the proceedings, the bench

11:15:14 24   conference concluded.)

11:15:14 25   BY MR. SCHANKER:

                          *OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 11:16:04 | 1 | Q.   Dr. Tosti, just to orient us, we were talking -- I was |
| 11:16:07 | 2 | asking a question about a study you were shown by the Sanofi |
| 11:16:11 | 3 | lawyer from the 1990s about hair loss and permanent hair loss. |
| 11:16:20 | 4 | Do you recall that conversation? |
| 11:16:21 | 5 | A.   Yes, I do. |
| 11:16:22 | 6 | Q.   And could you go ahead and explain what that study, if |
| 11:16:27 | 7 | anything, means? |
| 11:16:28 | 8 | A.   Those were -- we already discussed that.  Those were |
| 11:16:36 | 9 | studies in women with metastatic breast cancer because at that |
| 11:16:42 | 10 | time that was the only approval for Taxotere.  Okay?  And in |
| 11:16:49 | 11 | metastatic and also for other medications, those studies that |
| 11:16:51 | 12 | were areas, so that was the cyclophosphamide. |
| 11:16:57 | 13 | And so in those studies, women were treated with |
| 11:17:03 | 14 | medication forever because it was metastatic, and so they |
| 11:17:11 | 15 | evaluated the side effect -- like, chronic side effect -- and |
| 11:17:16 | 16 | alopecia was among those chronic side effect.  But you can see |
| 11:17:22 | 17 | that the women that were treated because they also -- in the |
| 11:17:27 | 18 | same table they also reported typical side effects that you see |
| 11:17:33 | 19 | during chemotherapy, like gastro, like vomit, like other side |
| 11:17:39 | 20 | effects. |
| 11:17:39 | 21 | So that was alopecia occurring still on chemotherapy. |
| 11:17:46 | 22 | Which is a different permanent alopecia after chemotherapy, |
| 11:17:53 | 23 | when you finish the chemotherapy and the hair do not grow back. |
| 11:17:58 | 24 | Q.   Thank you, Dr. Tosti. |
| 11:18:00 | 25 | A.   I hope I was clear. |

**OFFICIAL TRANSCRIPT**

11:18:01  1    Q.    Thank you.  And I don't have any further questions for

11:18:03  2    you.  Thank you, Your Honor.

11:18:05  3             THE COURT:  You may step down, Dr. Tosti.

11:18:07  4             THE WITNESS:  Thank you very much.

11:18:18  5             THE COURT:  Ms. Perez, call your next witness.

11:18:23  6             MS. PEREZ:  Yes, Your Honor.  I think before that

11:18:26  7    Mr. Schanker may have one item --

11:18:29  8             MR. SCHANKER:  Your Honor, can we just move into

11:18:31  9    evidence?  The photos and her medical records as P 2785 and P

11:18:40 10    2784, that which is the clinical note of Dr. Tosti as well.

11:18:43 11             THE COURT:  Any objection?

11:18:45 12             MS. SASTRE:  No objection.  And, Your Honor, we'll have

11:18:46 13    things to move into.  I -- during break.

11:18:50 14             THE COURT:  Let it be admitted.

11:18:51 15             MS. SASTRE:  Thank you so much, Your Honor.

11:18:53 16             MR. SCHANKER:  Thank you.

11:18:56 17             MS. PEREZ:  Your Honor, at this time the plaintiff will

11:18:59 18    now call by video deposition, Dr. Emanuel Palatinsky, a Sanofi

11:19:08 19    global safety officer in charge of Taxotere, and the video is

11:19:11 20    approximately 54 minutes in length, Your Honor.

11:19:13 21             MR. SCHANKER:  Can we briefly approach?

11:19:13 22             THE COURT:  Yes.

11:19:13 23             (WHEREUPON, at this point in the proceedings, there was

11:19:52 24    a conference held at the bench.)

11:19:52 25             MR. SCHANKER:  We just want to confirm with the other

                                *OFFICIAL  TRANSCRIPT*

11:20:01 1    side that your counter designations that are being played are

11:20:05 2    not opening any doors.  We had conversations about that door

11:20:10 3    and the preparation of it, and we asked for confirmation of

11:20:12 4    that.  And we were -- it was sort of, like, we've discussed

11:20:16 5    this, and we -- opens any doors, let us know before --

11:20:23 6         MR. LAMBERT:  Our position is, Judge, there have been

11:20:35 7    rulings made on the deposition cuts over both parties'

11:20:39 8    objections and that if you designate something, you're

11:20:42 9    designating it at your own risk and it may open some doors.

11:20:46 10        With respect to Dr. Palatinsky, we don't have any

11:20:48 11   particular issue with it opening any doors; however, there are

11:20:54 12   some questions about the FDA and adverse event reporting that

11:21:04 13   get very close, and so if we have objections during

11:21:12 14   Dr. Plunkett's testimony to that type of issue, we are going to

11:21:15 15   argue that similar testimony is elicited from Dr. Palatinsky.

11:21:33 16        MR. DEPAC:  If that's the case, we're not going to be

11:21:33 17   able to withdraw --

11:21:33 18        THE COURT:  No, no, wait.

11:21:38 19        MR. DEPAC:  Well, he just told me this on November 8,

11:21:40 20   Monday.

11:21:40 21        MR. LAMBERT:  He withdrew it immediately.  It won't

11:21:42 22   take more than two seconds.

11:21:44 23        THE COURT:  All right.

11:21:45 24        MR. LAMBERT:  Five minutes.  He'll do it.

11:21:45 25        (WHEREUPON, at this point in the proceedings, the bench

*OFFICIAL TRANSCRIPT*

11:22:14 1    conference concluded.)

11:22:14 2         THE COURT:  You're now going to hear a videotaped

11:22:17 3    deposition, and earlier I told you you should consider this

11:22:20 4    testimony as you would any other testimony.  Additionally,

11:22:23 5    because the depositions were longer in length when they were

11:22:26 6    initially taken, it has been edited so that only those areas

11:22:30 7    that the parties deem to be critical for the jury will be

11:22:33 8    played.  So there are occasions where it appears choppy, and

11:22:38 9    that should not affect your evaluation of the credibility of

11:22:41 10   this witness.  Thank you.

11:22:41 11        (Whereupon, at this point in the proceeding, a video is

11:24:04 12   played as follows:)

11:24:05 13        THE DEPUTY CLERK:  Would you please raise your right

14    hand.  Do you solemnly swear that the testimony which you are

15    about to give will be the truth, the whole truth, and nothing

16    but the truth, so help you God?

17        THE WITNESS:  I do.

18                          **EMANUEL PALATINSKY**

19     was called as a witness and, after being first duly sworn by

20      the Clerk, was examined and testified on his oath as follows:

21                          DIRECT EXAMINATION

22    BY MR. BACHUS:

11:24:07 23   Q.   Good morning.  I'm Kyle Bachus.  We had a chance to make

11:24:09 24   introductions off the record this morning.  Could you statute

11:24:09 25   your full name for the record?

                              *OFFICIAL TRANSCRIPT*

11:24:10  1   A.   I'm Emanuel Palatinsky.

11:24:13  2   Q.   Should I refer to you as "Dr. Palatinsky"?

11:24:16  3   A.   You can call me "Emanuel."

11:24:19  4   Q.   I think I'll stick with Dr. Palatinsky for now.

11:24:26  5   Dr. Palatinsky, are you currently employed?

11:24:31  6   A.   Yes, I am.

11:24:32  7   Q.   And by whom are you employed?

11:24:34  8   A.   I'm employed with Sanofi U.S.

11:24:36  9   Q.   And how long have you been employed by Sanofi U.S.?

11:24:41  10   A.   A little bit over 12 -- I would say almost 13 years.

11:24:44  11   Q.   And in what capacity are you employed by Sanofi U.S.?

11:24:49  12   A.   As a global safety officer.

11:24:51  13   Q.   And how long have you been employed as global safety

11:24:53  14   officer?

11:24:54  15   A.   Since the beginning.

11:24:54  16   Q.   All 13 years?

11:24:57  17   A.   All 13 years.

11:24:58  18   Q.   Have your job duties changed in any significant way over

11:25:02  19   the course of the 13 years?

11:25:03  20   A.   No, no.  They have not changed.

11:25:06  21   Q.   For what period of time were you the global safety officer

11:25:09  22   regarding docetaxel?

11:25:14  23   A.   I was the global safety officer for Taxotere from May 2006

11:25:17  24   until December 2013.

11:25:27  25   Q.   What would be a -- what are the occupational duties of the

*OFFICIAL TRANSCRIPT*

11:25:30  1    global safety officer?

11:25:31  2    A.    The main occupational duty of the global safety officer is

11:25:34  3    to identify safety signals and to monitor them, to characterize

11:25:39  4    them, to have them described, to have them part of the

11:25:42  5    risk-management plan.

11:25:43  6    Q.    And when you indicate that the main occupational duty is

11:25:47  7    to identify safety signals, you're referring to safety signals

11:25:53  8    arising from the -- whatever pharmaceutical product that you're

11:26:02  9    responsible for.  So between 2006 -- May 2006 and December of

11:26:09 10    2013, one of your primary duties was to seek and identify

11:26:15 11    safety signals related to docetaxel?

11:26:17 12    A.    It was cer- --

11:26:17 13    Q.    I'm sorry, what was the answer?

11:26:21 14    A.    It was certainly my duty to -- as I just explained, to

11:26:26 15    characterize and analyze safety signals for any projects that I

11:26:31 16    had assigned.

11:26:31 17    Q.    If and when a safety signal were identified, as part of

11:26:36 18    your occupational duties, did you have further occupational

11:26:40 19    duties in terms of what to do once one was identified?

11:26:43 20    A.    Yes.  The characterization of the safety signal includes

11:26:49 21    an analysis of what are the characteristics of the safety

11:26:53 22    signal, what is the role of the drug, and what to do in regards

11:26:58 23    to minimizing the particular risk, and how to communicate it to

11:27:02 24    the medical community.

11:27:04 25    Q.    What role would you play as a global safety officer in

*OFFICIAL TRANSCRIPT*

11:27:10 1    determining the communication?

11:27:17 2    A.   Determining the communication is not the role of the

11:27:19 3    global safety officer.  The global safety officer provides the

11:27:21 4    scientific evidence that establishes where -- whether there is

11:27:24 5    a causal relationship between the exposure to a particular drug

11:27:28 6    and the onset of a particular adverse event.

11:27:32 7          But the reality, how to communicate it, it's a much

11:27:35 8    more complex process in the real world that requires

11:27:38 9    participation of different groups within the company, and

11:27:41 10   interactions that sometimes are very complex and repeated over

11:27:45 11   time with regulatory authorities.

11:27:47 12   Q.   What I'd like to understand from you is at what point in

11:27:53 13   the process of the communication -- of an identified safety

11:28:01 14   risk, at what point in the process does the role of the

11:28:05 15   global safety officer end, and that role of communication is

11:28:12 16   picked up by somebody else?  Whether it's in regulatory or

11:28:15 17   someplace -- other place inside the company.

11:28:18 18   A.   As soon as the signal is medically characterized, that's

11:28:22 19   what -- the place where the role of the GSO as the single actor

11:28:26 20   in this process usually stops.

11:28:28 21   Q.   When you use the terminology "medically characterized,"

11:28:39 22   what are you referring to?

11:28:42 23   A.   Well, the global safety officer, you have to understand,

11:28:45 24   is the medical expert within the company.  In other words,

11:28:51 25   there are no other functions outside of pharmacovigilance in

*OFFICIAL TRANSCRIPT*

11:28:56  1   the line management of the global safety officer who can really

11:28:59  2   help frame the question in regards to do we have a safety

11:29:04  3   signal that represents a new risk?  And how do we monitor

11:29:08  4   for that period and how do we manage it?

11:29:10  5          So all that is done within the framework of medical

11:29:14  6   expertise, for which the global safety officer is the main

11:29:18  7   responsible person.

11:29:20  8   Q.   But you used this term, "medically characterized."  And

11:29:33  9   I'm trying to better understand what you intended to convey by

11:29:38  10  the use of that term.

11:29:45  11  A.   Yeah.  When you establish the role of your drug as it

11:29:48  12  might be related or not to the onset of an adverse event, the

11:29:52  13  first thing that you have to do is to characterize the safety

11:29:57  14  concern in regards to what the drug might be actually causing,

11:30:01  15  what could be the mechanism, and what is the evidence that

11:30:10  16  there is a correlation.  All of that is considered medical

11:30:14  17  characterization of the safety signal.

11:30:15  18  Q.   Can you outline for me what the subsequent steps would be

11:30:21  19  after the medical characterization is done by the GSO and how

11:30:25  20  the process may involve other subsets?

11:30:29  21  A.   Yeah.  The subsequent steps involve the consideration by

11:30:34  22  the teams within Sanofi, whether the new safety signal

11:30:39  23  represents a new unprecedented risk, or if it's already present

11:30:44  24  in the labeling information and in our communication with the

11:30:49  25  health authorities.

*OFFICIAL TRANSCRIPT*

11:30:50  1    Q.    You said that after the medical -- after the safety risk

11:30:58  2    is medically characterized, then the global safety officer

11:31:03  3    participates in the subsequent process.  But it involves other

11:31:09  4    subsets of employees, correct?

11:31:11  5    A.    Yes.

11:31:11  6    Q.    What subsets would become involved?

11:31:15  7    A.    These functions are involving the regulatory department,

11:31:19  8    the clinical department, and biostatistics mostly.

11:31:24  9    Q.    By what function are these other subsets -- whether it's

11:31:30  10   regulatory, clinical, or biostatisticians -- are brought into

11:31:34  11   the process?

11:31:34  12   A.    Immediately afterwards.  Immediately after the medical

11:31:38  13   expert has provided an assessment of the safety concerns, these

11:31:45  14   functions start contributing their own expertise.

11:31:54  15   Q.    What is the document that has been marked -- that has now

11:31:58  16   been marked as Exhibit 1?

11:31:59  17   A.    This is a printout of material that I have presented to

11:32:17  18   the safety team as part of ongoing activities to bring up

11:32:18  19   topics of educational value and of general interest within my

11:32:22  20   team.

11:32:22  21   Q.    This is a PowerPoint presentation of some sort?

11:32:26  22   A.    It is PowerPoint, yes.

11:32:27  23   Q.    If you could look at page 6.  On page 6 there's -- the

11:32:35  24   title of page 6 is:  "Rationale for Understanding AEs."  What

11:32:45  25   is AEs?

*OFFICIAL TRANSCRIPT*

11:32:46  1    A.    Adverse events.

11:32:47  2    Q.    All right.  And there's three bullet points here.  The

11:32:55  3    third bullet point, it starts with -- it says:  "Knowledge in

11:32:59  4    PV."  Is PV pharmacovigilance?

11:33:00  5    A.    PV is pharmacovigilance.

11:33:04  6    Q.    All right.  Okay.  It says:  "Knowledge in

11:33:07  7    pharmacovigilance of how adverse events come about and which

11:33:11  8    ones can be prevented/minimized is key."  Do you agree with

11:33:15  9    that statement?

11:33:15 10    A.    Yes, it's a valid statement.

11:33:17 11    Q.    And are you -- what are you intending to convey to the

11:33:22 12    safety personnel through this statement?

11:33:25 13    A.    The -- this slide presents, in a very summary form, what

11:33:29 14    is the reason for understanding adverse events.  Why should we

11:33:37 15    be concerned about side effects.  And these three points are

11:33:42 16    telling us why is it -- why it is important to invest time and

11:33:49 17    effort in characterizing these side effects.  So it's not just

11:33:58 18    one bullet, it's an entire logic that is behind it.

11:33:58 19    Q.    All right.

11:34:01 20    A.    Why do we have this effort ongoing?

11:34:03 21    Q.    If you could turn to page 15; and for the record, still

11:34:07 22    Exhibit 1, page 15.

11:34:08 23    A.    Yes.

11:34:10 24    Q.    This page is titled:  "Postmarketing surveillance."  Do

11:34:18 25    you see that?

**OFFICIAL TRANSCRIPT**

11:34:18  1    A.    Yes, I see.

11:34:19  2    Q.    And the first bullet indicates that -- or states that:

11:34:23  3    "At time of licensing, not all ADRs may have been identified."

11:34:30  4          Do you see that?

11:34:30  5    A.    That's what I see, yeah.

11:34:32  6    Q.    Part of the job of the drug company, and more

11:34:36  7    specifically, the pharmacovigilance unit of the drug company,

11:34:43  8    is postmarketing surveillance, correct?

11:34:46  9    A.    It's -- it's a big part of it.

11:34:48 10    Q.    And postmarketing surveillance means what?  What's

11:34:56 11    postmarketing?

11:34:58 12    A.    In pharmacovigilance, we have thorough close monitoring of

11:35:04 13    the adverse events or side effects, if you will, during

11:35:06 14    clinical trials.  And those are usually called -- they are

11:35:09 15    collected meticulously by the company and they're called

11:35:14 16    "safety reports," and specifically they are solicited safety

11:35:17 17    reports.

11:35:17 18          After a drug receives approval to be sold on the

11:35:20 19    market, you keep receiving adverse events or safety reports and

11:35:24 20    you'll still continue collecting them.  Those are qualified as

11:35:28 21    unsolicited reports.

11:35:32 22          So, the assessment of the safety profile is a

11:35:36 23    continuous dynamic ongoing process that never stops and follows

11:35:41 24    the drug from the entry in -- first in human use, the first

11:35:45 25    clinical trial that you ever do, until the end of the life

*OFFICIAL TRANSCRIPT*

11:35:48  1    cycle.

11:35:48  2            The life cycle of the drug when it ends -- when the

11:35:52  3    drug is withdrawn from the market because it has no more

11:35:55  4    commercial value or for other reasons.

11:35:57  5            So, throughout the entire time, you may have a number

11:36:00  6    of years of postmarketing use and this is what this slide is

11:36:05  7    referring to.

11:36:06  8    Q.    The postmarketing surveillance includes solicited and

11:36:11  9    unsolicited reports?

11:36:13 10    A.    That is correct.  It includes much more than that but it's

11:36:17 11    correct.

11:36:17 12    Q.    What are some of the other items, by category, that would

11:36:20 13    be included in postmarketing surveillance?

11:36:22 14    A.    Postmarketing surveillance, like, also during

11:36:27 15    clinical trials, includes also the review, the systematic

11:36:30 16    review of the literature, the medical literature, publications

11:36:35 17    and abstracts that are published.

11:36:40 18    Q.    But the key point being made by the first bullet in your

11:36:44 19    PowerPoint on page 15 of Exhibit 1 is that we don't know

11:36:49 20    everything about a drug the moment it is licensed?

11:36:53 21    A.    That's our assumption at Sanofi.  You don't know anything,

11:37:02 22    even after it's been licensed.

11:37:04 23    Q.    That --

11:37:05 24    A.    Until you discover one year later or two years later, so

11:37:10 25    there is no formal end.

                           *OFFICIAL TRANSCRIPT*

11:37:11  1    Q.    Accumulating information over time --

11:37:13  2    A.    Yes.

11:37:13  3    Q.    -- will help pharmacovigilance identify potential adverse

11:37:18  4    events or safety signals, correct?

11:37:22  5    A.    Yes, this is a continuous process.

11:37:24  6    Q.    I've handed you what's been marked as Exhibit 2.

11:37:27  7    A.    Yes.

11:37:27  8    Q.    What is it?

11:37:27  9    A.    It's a presentation that I made to the same team, I

11:37:33 10    believe, and I brought some examples of -- again, what is the

11:37:37 11    value of what to do every day?  How can this be put in

11:37:43 12    perspective?

11:37:43 13    Q.    And the title is:  "Safety Signal Detection Management and

11:37:52 14    GPE."

11:37:52 15    A.    Yes.

11:37:53 16    Q.    What does "GPE" stand for?

11:37:55 17    A.    Global Pharmacovigilance and Epidemiology.

11:38:03 18    Q.    If you turn to page 12.  Page 12 of Exhibit 2 is titled:

11:38:10 19    "Identify Source of Signal."

11:38:12 20              Do you see that?

11:38:12 21    A.    Yes, I see it.

11:38:12 22    Q.    And what are you trying to convey through this slide?

11:38:19 23    A.    These are the sources of safety signals as they reside

11:38:22 24    specifically in safety databases.  And they could be internal

11:38:28 25    to the company or external.  That's what the slide says.

*OFFICIAL TRANSCRIPT*

11:38:31 1   Q.   The source of a safety signal could be any of those

11:38:36 2   sources that we previously discussed on page 4?

11:38:40 3   A.   Yeah.  There are more sources than that, yeah.

11:38:43 4   Q.   There are more sources than...

11:38:45 5   A.   There are more sources than what resides in safety

11:38:49 6   databases.

11:38:50 7   Q.   If you turn to the next page, page 13.  This slide on page

11:38:56 8   13 is titled:  "Identify Nature of Signal."

11:39:03 9        Do you see that?

11:39:03 10  A.   Yes.

11:39:03 11  Q.   And it discusses "unlisted AE and listed AE."  Listed AE,

11:39:11 12  that -- and it says -- I think it's a typo there, but it says:

11:39:15 13  "That" -- "but with unprecedented," maybe, is that -- do you

11:39:20 14  see that where it says "listed AE"?

11:39:25 15  A.   There is an extra word.

11:39:27 16  Q.   Which word is extra?

11:39:29 17  A.   It's "that."

11:39:29 18  Q.   Okay.  So the -- when you say:  "Identify the nature of

11:39:35 19  the signal," and you use the word "unlisted," what do you mean?

11:39:38 20  A.   Unlisted is a common terminology that we use in the

11:39:42 21  industry and regulatory authorities use when an adverse event

11:39:45 22  is either present or not present in the labeling of the drug.

11:39:51 23  Q.   And the labeling --

11:39:53 24  A.   So --

11:39:53 25  Q.   And the labeling information?

***OFFICIAL TRANSCRIPT***

11:39:55  1    A.    I have not finished, yeah.

11:39:56  2    Q.    Okay.

11:39:58  3    A.    So an unlisted adverse event is not present in the

11:40:00  4    labeling information.   A listed adverse event is present.

11:40:02  5    Q.    I've now handed you what's been marked as Exhibit 4 to the

11:40:07  6    deposition.   Have you had an opportunity to review this?

11:40:11  7    A.    No.

11:40:12  8    Q.    Would you like to take an opportunity to review it?

11:40:16  9    A.    Yes.   I would like a few minutes.   Okay.   You can ask.

11:40:20 10    Q.    If you go to page 3 -- at the bottom of page 3, this is

11:40:25 11    Bates label Number 2293594.

11:40:27 12          Do you see that?

11:40:28 13    A.    Yes.

11:40:29 14    Q.    And it says:   "Temporary hair loss."

11:40:30 15          Do you see that?

11:40:31 16    A.    Yes.

11:40:31 17    Q.    "Or temporary loss of hair," is what it says.

11:40:35 18    A.    Uh-huh (affirmative response).

11:40:36 19    Q.    You see that?   Yes?

11:40:36 20    A.    I can see that.

11:40:37 21    Q.    All right.   Do you agree with me that the U.S. -- that the

11:40:40 22    user package leaflet for Taxotere from -- that is Exhibit 4 to

11:40:46 23    the deposition indicates to the end user of the product that

11:40:53 24    temporary hair loss is a side effect?

11:41:03 25    A.    Yes.

***OFFICIAL TRANSCRIPT***

Q.   Temporary hair loss is different than irreversible hair loss, correct?

A.   Temporary seems to be different.

Q.   Than irreversible?

A.   Yeah, yes.

Q.   All right.  In 1996, it appears that the known safety profile for Taxotere was that it causes temporary loss of hair, correct?

A.   It says "temporary loss of hair.  After your treatment, normal hair growth should return," that's what was known at that time.

Q.   Yeah.  I've handed you what's been marked as Exhibit 5.  I'll represent to you this is not the complete document.  Are you familiar with this document?

A.   Yes.

Q.   Who prepared this document?

A.   This is prepared within the global pharmacovigilance department.

Q.   By whom?

A.   By a number of people.  There are people within the safety surveillance team, which includes the global safety officer and the pharmacovigilance scientist.  And there are people within the pharmacovigilance operations group which take care of the extractions, tabulation, publication, and submission of this report.

*OFFICIAL TRANSCRIPT*

11:42:22  1    Q.    This was -- this is self-identified as PSUR 27.

11:42:36  2    A.    Yes, they have a progressive number.

11:42:38  3    Q.    And it indicates that it follows a period of December 1,

11:42:42  4    2009, to May 31, 2010?

11:42:44  5    A.    Yes.  That's the period covered by this report.

11:42:53  6    Q.    And who determines the period of time covered by the

11:42:56  7    report?

11:42:57  8    A.    It's the regulatory team.

11:42:58  9    Q.    You were personally involved in the preparation of the

11:43:00  10   materials contained in PSUR 27?

11:43:03  11   A.    Of the medical review, yes.

11:43:05  12   Q.    Of the medical review?

11:43:07  13   A.    Yes.

11:43:07  14   Q.    Okay.

11:43:08  15   A.    Of each report.  The medical content of the periodic

11:43:13  16   safety report.

11:43:14  17   Q.    Now, you have -- with each of these submissions, you're

11:43:19  18   providing analysis of the seriousness, the listedness, and the

11:43:34  19   causal relationship?

11:43:35  20   A.    Not exactly.  The analysis is done on a case-by-case basis

11:43:43  21   as the cases are received.  This document analyzes what has

11:43:46  22   been received by the company.  It does not recategorize them.

11:43:50  23   Q.    And listedness is examining whether the adverse event

11:43:56  24   being reported is already described in the labeling

11:44:14  25   information; is that right?

                              *OFFICIAL TRANSCRIPT*

11:44:14  1    A.    Yes.

11:44:15  2    Q.    And on page 19 of Exhibit 5, there is a section with a

11:44:25  3    bullet point that is "Listedness."

11:44:30  4          Do you see that?

11:44:31  5    A.    Yes, I do.

11:44:31  6    Q.    All right.  And it says -- if you go to, like, the second

11:44:42  7    sentence -- I think it's the second sentence.  It's after

11:44:42  8    the -- in parenthesis "(See Section 4)."  It says:  "An adverse

11:44:47  9    event is considered listed when its nature, severity,

11:44:53 10    specificity, and outcome are consistent."

11:44:57 11          Do you see that?

11:44:57 12    A.    Yes.

11:44:58 13    Q.    And so who is it that's making the listedness

11:45:02 14    determination?

11:45:03 15    A.    The case medical evaluator.

11:45:05 16    Q.    All right.  I think we already covered this, but I want to

11:45:20 17    be clear about it.  Do you agree with me that temporary

11:45:22 18    alopecia or hair loss is not consistent in outcome with

11:45:48 19    irreversible alopecia or hair loss, correct?

11:45:51 20    A.    It depends on a case-by-case basis.

11:45:53 21    Q.    Let me make sure I'm clear.  Irreversible is not

11:45:56 22    consistent in outcome with temporary, is it?

11:46:01 23    A.    They are two different adjectives, so one would not be

11:46:11 24    similar to the other.

11:46:11 25    Q.    The outcome of "forever" is different than the outcome of

*OFFICIAL TRANSCRIPT*

11:46:16  1    "temporary"?

11:46:18  2    A.    If they are reported as outcomes, they are different.

11:46:20  3    Q.    And the -- by Sanofi describing alopecia as listed in this

11:46:26  4    table, the information being given to regulators reviewing it

11:46:45  5    that the 67 reports of alopecia, whether they were temporary or

11:46:50  6    whether they were irreversible, is an adverse event that was

11:46:54  7    listed in the label information during the period of

11:47:05  8    December 1, 2009, to May 31, 2010, correct?

11:47:13  9    A.    It was listed, yes.

11:47:14  10   Q.    What the page actually says is the word "listed," right?

11:47:20  11   A.    Yes.

11:47:20  12   Q.    And what the table actually says is the preferred term,

11:47:24  13   "alopecia" --

11:47:25  14   A.    Yes.

11:47:25  15   Q.    -- correct?   What does it say then?

11:47:29  16   A.    It says that "Alopecia is listed based on the reference

11:47:34  17   safety information that was valid at the time of receipt of any

11:47:37  18   case received during this period, between the 1st of

11:47:39  19   December 2009 until six months later, 31st of May, 2010."

11:47:45  20   That's what the page says.

11:47:47  21   Q.    That -- the term alopecia --

11:47:49  22   A.    Yes.

11:47:49  23   Q.    -- that term --

11:47:51  24   A.    The condition alopecia is listed.

11:47:52  25   Q.    -- is listed?

                              *OFFICIAL TRANSCRIPT*

11:47:53 1    A.    Yes.

11:47:53 2    Q.    By representing in this table that all 67 of the reports,

11:48:08 3    the side effects that those women were reporting, were listed,

11:48:13 4    what you're saying is that all 67 women had either temporary

11:48:23 5    alopecia, all of them, or all of them had irreversible

11:48:32 6    alopecia?

11:48:33 7    A.    I'm not -- I'm not getting into saying what happened to

11:48:37 8    each one or all of them.  Most likely, every single case of

11:48:42 9    these 67 had differences with the other ones.  So I cannot

11:48:46 10   tell -- I cannot even pretend to tell the regulatory

11:48:51 11   authorities that all 67 had temporary or all 67 had permanent

11:48:55 12   alopecia.

11:48:56 13   Q.    It's what they are reporting, correct?

11:48:59 14   A.    Each one reports a different adverse event.  For each one,

11:49:03 15   I would have different information.  What I'm telling the

11:49:07 16   authorities is that in 67 cases received from -- from

11:49:13 17   December 1st to the 31st of May, received, the referenced

11:49:18 18   safety information had alopecia as listed, as a listed adverse

11:49:23 19   event.

11:49:23 20   Q.    Only that word, "alopecia"?

11:49:26 21   A.    Alopecia is a condition, right, yes.

11:49:28 22   Q.    Not irreversible alopecia?

11:49:31 23   A.    That -- that accounts as alopecia.

11:49:33 24   Q.    That accounts as alopecia?

11:49:35 25   A.    Yeah.

*OFFICIAL TRANSCRIPT*

11:49:35 1   Q.   Alopecia -- the word "alopecia" accounts for irreversible

11:49:43 2   alopecia?

11:49:44 3   A.   It includes also irreversible.

11:49:46 4   Q.   Under your data entry protocols, correct, listed or

11:49:56 5   unlisted protocols?

11:50:04 6   A.   Under the data entry rules.

11:50:08 7   Q.   Because they all have consistent outcomes, correct?

11:50:19 8   A.   Because their outcomes are included in what is represented

11:50:23 9   in the label.

11:50:24 10   Q.   Looking back at your testimony a moment ago, you said --

11:50:30 11   when I asked you whether "alopecia," the word, accounts for

11:50:39 12   irreversible alopecia, you said:  "Because their outcomes are

11:50:52 13   included in what is represented in the label."

11:50:54 14   A.   Yeah.

11:50:54 15   Q.   Where is irreversible alopecia represented in the label?

11:51:00 16   A.   In the label, we don't have irreversibility or

11:51:04 17   reversibility for any adverse event.

11:51:06 18   Q.   For the seven years that you were the global safety

11:51:08 19   officer --

11:51:09 20   A.   Yes.

11:51:09 21   Q.   -- irreversible alopecia was not warned about in the

11:51:13 22   label?

11:51:13 23   A.   Yeah, I believe that's true.

11:51:15 24   Q.   Okay.  When -- when did it become expected at Sanofi that

11:51:19 25   some patients would suffer irreversible hair loss after taking

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 11:51:23 | 1 | Taxotere? |
| 11:51:24 | 2 | A.   I don't know. |
| 11:51:24 | 3 | Q.   Well, was it expected before -- was it expected at Sanofi |
| 11:51:31 | 4 | at the time that you took over as global safety officer? |
| 11:51:41 | 5 | A.   I cannot recall.  It's 13 years ago. |
| 11:51:45 | 6 | Q.   I've handed you what's been marked as Exhibit Number 19 -- |
| 11:51:49 | 7 | is that what it is?  Can you look on the front of that, sir, |
| 11:51:53 | 8 | and let me know what the Exhibit number is? |
| 11:51:55 | 9 | A.   It's 19. |
| 11:51:55 | 10 | Q.   Do you recognize this email and the attachment? |
| 11:51:58 | 11 | A.   I do not recall this email, but, obviously, I read through |
| 11:52:01 | 12 | it. |
| 11:52:01 | 13 | Q.   This is an email -- on the first page of Exhibit 19, is an |
| 11:52:07 | 14 | email that is -- the document indicates it's from you, dated |
| 11:52:13 | 15 | Friday, January 26th, the year 2007; is that correct? |
| 11:52:16 | 16 | A.   Yes. |
| 11:52:16 | 17 | Q.   And it's an email to Penny Kegg?  Yes? |
| 11:52:26 | 18 | A.   Yes.  It's what the document says. |
| 11:52:30 | 19 | Q.   I know.  I need to make a record of the document. |
| 11:52:34 | 20 | A.   Yes. |
| 11:52:34 | 21 | Q.   Who is Penny Kegg? |
| 11:52:37 | 22 | A.   I cannot recall who she is. |
| 11:52:39 | 23 | Q.   All right.  Below the email that is from you is an email |
| 11:52:43 | 24 | from Penny Kegg to you, dated January 26, 2007, at 12:05 p.m. |
| 11:52:54 | 25 | Do you see that at the bottom of page 1 of Exhibit 19? |

*OFFICIAL TRANSCRIPT*

11:52:54  1    A.    I see it.

11:52:55  2    Q.    And that email indicates that Dr. Mackey's site in

11:53:02  3    Canada -- do you know a Dr. Mackey?

11:53:04  4    A.    I know that he was one of the investigators, but I don't

11:53:08  5    recall more about him.

11:53:09  6    Q.    One of the investigators in Canada?

11:53:13  7    A.    Yes, of that particular study.

11:53:15  8    Q.    That Dr. Mackey's site in Canada has revised the risk

11:53:24  9    section of ICF for docetaxel 713.

11:53:29  10         Do you see that?

11:53:30  11   A.    Yes.

11:53:30  12   Q.    What does the ICF mean?

11:53:32  13   A.    The informed consent form.

11:53:33  14   Q.    So, this is an email indicating that Dr. Mackey in Canada

11:53:40  15   has revised the informed consent form for the docetaxel 713

11:53:45  16   study, correct?

11:53:45  17   A.    That's what the message says.

11:53:47  18   Q.    And it asks of you:  "Do you approve?"  Correct?

11:53:50  19   A.    Yes, that's the question to me.

11:53:53  20   Q.    And you respond later that same day, about eight hours

11:53:58  21   later, according to the email, right?

11:54:04  22   A.    Yes, I responded sometime later.

11:54:07  23   Q.    And you indicate to Penny that you looked at the content

11:54:12  24   of docetaxel section on page 8, correct?

11:54:16  25   A.    Yes.

*OFFICIAL TRANSCRIPT*

11:54:16  1    Q.   And can you turn to page 8 of...

11:54:20  2    A.   I have page 8 in front of me.

11:54:23  3    Q.   And I was directing you to page 6, now page 6 of 19.

11:54:35  4         And do you see where it says:  "What are the side

11:54:38  5    effects?"

11:54:38  6    A.   Yes.

11:54:38  7    Q.   And then below where it says:  "What are the effects?"  In

11:54:47  8    the last paragraph, above the table, where it says:  "The

11:54:51  9    following are side effects of each drug used in this study."

11:54:55 10         Do you see that?

11:54:56 11    A.   Yes.

11:54:56 12    Q.   And then it says:  "These side effects may or may not be

11:55:00 13    more severe when the drugs are taken together."

11:55:03 14         Do you see that?

11:55:03 15    A.   Yes.

11:55:03 16    Q.   And then it says:  "These are the side effects we know

11:55:06 17    about at present."  Do you see that?

11:55:07 18    A.   Yes.

11:55:08 19    Q.   And then if you go to page 8, the docetaxel side effects

11:55:16 20    are listed in draft form on page 8, would you agree with that?

11:55:20 21    A.   Yes.

11:55:20 22    Q.   And on the left-hand column where it says, "hair loss,"

11:55:30 23    that is stricken through?

11:55:31 24    A.   Yes.

11:55:32 25    Q.   And if you move to the right-hand side of the column, it

*OFFICIAL TRANSCRIPT*

11:55:38  1    says:  "Permanent hair loss."

11:55:39  2          Do you see that?

11:55:40  3    A.    I see it.

11:55:41  4    Q.    Going back to page 1 of Exhibit 19, your email dated

11:55:53  5    Friday, January 26, 2007, you indicate that you have looked

11:55:57  6    only at the content of the docetaxel section on page 8 and you

11:56:05  7    have a few comments.

11:56:07  8          Do you see that?

11:56:07  9    A.    That's wasn't wrote -- that is what I wrote.

11:56:09 10    Q.    And the third bullet point down in terms of your comments,

11:56:17 11    you say:  "Hair loss is repetitive."  And then in parens, you

11:56:24 12    say:  "(Permanent HI is sufficient once)."

11:56:34 13    A.    HL.

11:56:34 14    Q.    HL.  I'm sorry.

11:56:35 15    A.    Hair loss.

11:56:35 16    Q.    H -- yeah, is sufficient once.

11:56:35 17    A.    Yes.

11:56:35 18    Q.    And HL meant hair loss?

11:56:38 19    A.    Hair loss, right.

11:56:38 20    Q.    So what you were saying is that hair loss is repetitive,

11:56:42 21    permanent hair loss is sufficient once, correct?

11:56:45 22    A.    Yes.

11:56:45 23    Q.    And so in the draft, you have maintained permanent hair

11:56:52 24    loss in the informed consent form related to docetaxel but have

11:57:01 25    removed the term "hair loss"?

*OFFICIAL TRANSCRIPT*

11:57:03  1    A.    Yeah, because it was a duplicate.

11:57:05  2    Q.    When I asked you a few moments ago about when, in time,

11:57:10  3    Sanofi expected that some portion of the users would experience

11:57:22  4    permanent hair loss, because time has passed, you were unable

11:57:25  5    to definitively provide a time table, correct?

11:57:29  6    A.    Yes, I cannot recall.

11:57:30  7    Q.    And here, at least, when you were making a determination

11:57:34  8    as to what was the best warning of that potential side effect,

11:57:37  9    you, as the global safety officer, in this document made the

11:57:46 10    decision to delete the word "hair loss" and leave in "permanent

11:57:51 11    hair loss," correct?

11:57:52 12    A.    Yes, I did.

11:57:52 13    Q.    I've handed you what's been marked as Exhibit Number 23.

11:57:59 14    For the record purposes, this is Sanofi 05059757 and 9758.

11:58:07 15          Have you seen this email before?

11:58:15 16    A.    I do not recall having seen that.

11:58:16 17    Q.    Who is Noel Quinn?

11:58:21 18    A.    Noel Quinn is a pharmacovigilance scientist within Sanofi.

11:58:25 19    Q.    This is an email from Noel Quinn to multiple individuals

11:58:30 20    identified on this document.

11:58:31 21          Do you see that?

11:58:32 22    A.    Yes, I can see the distribution list.

11:58:34 23    Q.    It's dated Monday, December 20th, 2010.  Do you see that?

11:58:40 24    A.    Yes, I see the date.

11:58:42 25    Q.    And it says:  "Hi, all.  I have an Excel spreadsheet with

*OFFICIAL TRANSCRIPT*

1  1620 cases involving alopecia and docetaxel."

2          Do you see that?

3  A.   Yeah, I can see that.

4  Q.   It says:  "Alopecia is a listed event for docetaxel."  Do

5  you see that?

6  A.   Yes.

7  Q.   And then it says:  "However, the clinical overview" -- CO,

8  is that clinical overview?

9  A.   Clinical overview, yeah.

10  Q.   "The CO or clinical overview should focus on" -- and then

11  she writes in bold -- "persistent alopecia."

12          Do you see that?

13  A.   Yes.

14  Q.   And then in parens she says:  "(Unlisted event.)"  Do you

15  see that?

16  A.   Yes.

17  Q.   And so, she says:  "However, the clinical overview should

18  focus on persistent alopecia, an unlisted event defined by the

19  company as, 'unresolved' after 12 months from the end of

20  chemotherapy."

21          Do you see that?

22  A.   Yes.

23  Q.   So Noel Quinn, in assisting in preparing your clinical

24  overview documents in this email that the term "persistent

25  alopecia" is an unlisted event.

*OFFICIAL TRANSCRIPT*

11:59:53   1                    Do you see that?

11:59:54   2   A.   I can see that.  And I can see that it doesn't document

11:59:56   3   the listedness or unlistedness of alopecia.

11:59:59   4   Q.   It only documents the listedness or unlistedness of the

12:00:05   5   term "persistent alopecia," correct?

12:00:07   6   A.   No, it's not correct.  As I explained, it's only the

12:00:10   7   personal opinion that was written in an email by Noel Quinn.

12:00:16   8   It does not reflect the status of persistent alopecia being

12:00:21   9   considered listed or unlisted.

12:00:23  10   Q.   Noel Quinn was an employee of Sanofi?

12:00:25  11   A.   Yes.

12:00:26  12   Q.   What was her title at the company?

12:00:27  13   A.   Pharmacovigilance scientist.

12:00:29  14   Q.   And so, she's a scientist in the field of

12:00:32  15   pharmacovigilance, correct?

12:00:32  16   A.   Yes.

12:00:33  17   Q.   You don't know whether Noel Quinn had prior experience

12:00:36  18   with docetaxel?

12:00:37  19   A.   I assume that she did, but I'm not sure.

12:00:39  20   Q.   And as a pharmacovigilance scientist, she was supposed to

12:00:43  21   understand the difference between listed and unlisted, correct?

12:00:46  22   A.   Not in context of this email.

12:00:48  23   Q.   As an employee, as a pharmacovigilance scientist for

12:00:52  24   Sanofi in 2010, was it not the expectation of the company that

12:00:58  25   Noel understood the difference between listed and unlisted?

                              *OFFICIAL TRANSCRIPT*

12:01:02 1    A.   Certainly, Noel understood.  But this is different from

12:01:04 2    stating that persistent alopecia was an unlisted adverse event.

12:01:08 3    Q.   I didn't ask that.  I asked you whether she was expected

12:01:11 4    to understand the difference between listed and unlisted?  She

12:01:14 5    was, wasn't she?

12:01:15 6    A.   She was expected to know, but this is not what the email

12:01:18 7    says.  Unlisted adverse event, it's not intended here in the

12:01:22 8    regulatory sense.

12:01:23 9    Q.   So, Noel Quinn, who was a pharmacovigilance scientist who

12:01:28 10   is supposed to know the difference between listed and unlisted,

12:01:31 11   has placed in this email, the term "persistent alopecia" and

12:01:35 12   has identified it as unlisted, correct?

12:01:38 13   A.   She wrote that without the regulatory implication of

12:01:41 14   unlisted adverse event.

12:01:42 15   Q.   And she wrote that email again in December of 2010,

12:01:47 16   correct?

12:01:48 17   A.   That email is dated 2010.

12:01:56 18   CROSS-EXAMINATION BY MR. RATLIFF:

12:01:57 19   Q.   Good morning, Dr. Palatinsky.

12:01:57 20   A.   Good morning.

12:01:57 21   Q.   How are you?

12:01:58 22   A.   I'm feeling fine.  Thank you.

12:02:00 23   Q.   Okay.  What I would like to do, Dr. Palatinsky, is --

12:02:00 24   there will be some ladies and gentlemen in New Orleans,

12:02:00 25   Louisiana who are going to see this testimony.  Could you

*OFFICIAL TRANSCRIPT*

12:02:00  1    introduce yourself again for the ladies and gentlemen of the

12:02:15  2    jury.  And start with your name.

12:02:17  3    A.    Yes.  I'm Dr. Emanuel Palatinsky, and I was born in Italy.

12:02:24  4    I went to medical school in Rome to become a doctor.  And

12:02:30  5    immediately after that, I served for a year and a half in the

12:02:35  6    Italian Air Force as a safety officer, medical officer.  And

12:02:41  7    after that, I went on to a five-year program of residency that

12:02:47  8    was of great interest to me, and I specialized in neurological

12:02:52  9    surgery.  So that's a branch of medicine that is absolutely

12:02:57 10    fascinating.  We usually deal with life-and-death type of

12:03:02 11    conditions.  And it really got me used to see the entire

12:03:07 12    perspective of medicine and healthcare from the perspective of

12:03:11 13    the patients.

12:03:11 14    Q.    What do you mean by that?

12:03:13 15    A.    These patients usually have brain tumors or blood vessel

12:03:21 16    malformations that threaten their lives, so they know that they

12:03:25 17    might not even survive surgery if they come under my care, and

12:03:30 18    yet they have trust.  They have some hope that medical events

12:03:37 19    can actually provide them with life-saving techniques.  And

12:03:41 20    that's what I used to do.

12:03:41 21    Q.    How many --

12:03:44 22    A.    I used to treat these patients.

12:03:45 23    Q.    How many years were you a brain surgeon?

12:03:49 24    A.    I practiced for nine years.

12:03:50 25    Q.    How many patients do you think you operated on?

*OFFICIAL TRANSCRIPT*

12:03:53  1  A.    I cannot tell you the number.  Every patient is different.

12:03:55  2  Every patient is just one memory.  And that remains with me.

12:04:00  3  Q.    And in your particular department at Sanofi

12:04:03  4  pharmacovigilance global safety, if you will, you're not the

12:04:09  5  only medical doctor in that department, are you?

12:04:12  6  A.    No, I'm not.  We have quite a large team, and we

12:04:15  7  communicate very often about specific issues like small

12:04:19  8  problems, issues, crisis, and also generic issues on how to

12:04:24  9  look at pharmacovigilance today in a more systematic fashion.

12:04:29 10  So they're like educational sessions that we spoke about.

12:04:33 11  Q.    So you're not just one man in isolation in the

12:04:40 12  pharmacovigilance department who has a medical degree?

12:04:42 13  A.    No, no.  Definitely.  I'm surrounded by many other

12:04:47 14  physicians.  They all have different experiences but we have

12:04:49 15  shared the same values.

12:04:50 16  Q.    Do you rely on their input and their knowledge as medical

12:04:56 17  professionals to help form your opinions about particular drugs

12:05:00 18  and particular side effects?

12:05:01 19  A.    Yes, I do.

12:05:03 20  Q.    Is medicine perfect?

12:05:05 21  A.    No, no.  Every drug or every surgery has side effects, we

12:05:09 22  know that.  So, the alternative is either you provide a

12:05:14 23  treatment or you don't.  Sometimes not to provide a treatment

12:05:16 24  is a good strategy as well, like, active observation.  But when

12:05:21 25  we treat a patient, whether surgically or with drugs or with

*OFFICIAL TRANSCRIPT*

12:05:26  1   medical devices, we always know that there is a possibility of

12:05:29  2   side effects.

12:05:29  3   Q.   So why can't you eliminate risks from drugs?

12:05:39  4   A.   It's impossible.  It's impossible.

12:05:40  5   Q.   Why is that?

12:05:42  6   A.   It's -- the reasons for those side effects are so many,

12:05:45  7   and that's the first consideration.  You really cannot predict

12:05:50  8   if a side effect will occur.

12:05:53  9          You can tell that there is a chance that it might

12:05:57 10   occur but you cannot prevent that.  It's impossible.  The other

12:05:59 11   thing is that you have to offer a treatment.  Remember, you are

12:06:02 12   not giving drugs just because the patient feels like getting

12:06:06 13   them.  You're giving drugs because the patient needs to fight

12:06:09 14   cancer.

12:06:09 15   Q.   And explain to me just briefly, what is the risk/benefit

12:06:14 16   analysis with a pharmaceutical drug, and in particular an

12:06:22 17   oncology drug?

12:06:23 18   A.   That is fundamental.  And as we know, every drug has side

12:06:28 19   effects.  And you give drugs because you want to provide a

12:06:33 20   chance for a benefit to a particular patient.  So your

12:06:36 21   justification of giving a particular drug to patients is that

12:06:40 22   you have to know, based on facts, based on clinical evidence --

12:06:44 23   and that's where the medical science comes in -- that the

12:06:48 24   benefit that you're providing is overwhelmingly or clearly

12:06:52 25   superior to the risks.

*OFFICIAL TRANSCRIPT*

12:06:55  1    Q.    Okay.  Let's talk about Taxotere or docetaxel.

12:07:00  2    A.    Yes.

12:07:00  3    Q.    Now, as a global safety officer, you would also be -- both

12:07:07  4    before Sanofi and at Sanofi, you would be familiar, would you

12:07:11  5    not, with the general regulatory framework surrounding a

12:07:15  6    prescription pharmaceutical drugs?

12:07:19  7    A.    We're very much aware of that.

12:07:20  8    Q.    Explain that to me.

12:07:22  9    A.    We know that we have to submit for approval only the drugs

12:07:27 10    that have a positive benefit balance -- benefit/risk balance,

12:07:32 11    which is what we were talking about.  And also, during the

12:07:36 12    lifetime of this drug, as it's been used in the market, we are

12:07:41 13    obligated to follow very closely the safety profile as it might

12:07:46 14    change from early clinical trials to postmarketing throughout

12:07:49 15    the years.

12:07:51 16          There are many different adverse events that are

12:07:54 17    reported to us, and we have to analyze them.  And this allows

12:07:58 18    us to keep what we call the surveillance on the safety profile

12:08:03 19    of the particular drugs.

12:08:04 20    Q.    So you've got Exhibit 2 in front of you.  And this was a

12:08:06 21    PowerPoint that was -- you were asked a number of questions

12:08:08 22    about.  I just want to turn to page 4, please.

12:08:12 23    A.    Yes, I have it.

12:08:13 24    Q.    And this was a -- page 4 was a table of various -- what's

12:08:18 25    called "various pathways" for signal detection.  Is that a fair

*OFFICIAL TRANSCRIPT*

12:08:23  1   way to put it?

12:08:23  2   A.   Yes.

12:08:24  3   Q.   Okay.  Dr. Palatinsky, explain to me the importance of

12:08:30  4   signal detection generally and the importance of signal

12:08:35  5   detection to you in particular.

12:08:38  6   A.   That's a very important activity for a global safety

12:08:41  7   officer.  Only by doing meticulous, constant, proactive,

12:08:45  8   continuous signal detection, you really can see whether the

12:08:52  9   drug is performing as you anticipated or if there are new --

12:08:56  10  for example, in my case, new safety signals that should be of

12:08:59  11  concern.

12:08:59  12  Q.   And with the goal always being to try to find if there is

12:09:04  13  a new safety signal; is that right?

12:09:07  14  A.   Yes.  The goal is constantly to keep a finger on the

12:09:10  15  pulse, as I would say.

12:09:11  16  Q.   Okay.  And what -- what I really want to know, though,

12:09:16  17  Dr. Palatinsky, as we've seen this chart, which is very nice

12:09:19  18  and very informative, when you were the global safety officer,

12:09:24  19  and in particular for Taxotere, just explain to the ladies and

12:09:28  20  gentlemen of the jury, what -- what was your process in

12:09:30  21  evaluating safety information, whether it was on a daily,

12:09:33  22  weekly, quarterly basis and how you went about evaluating that

12:09:38  23  information for the process of signal detection and certainly

12:09:41  24  for the process of ensuring patient safety.

12:09:43  25  A.   What I used to do was to watch very carefully about

*OFFICIAL TRANSCRIPT*

12:09:48  1    reports from clinical trials on a day-by-day basis.  So, I

12:09:55  2    would receive them in realtime, and then I will tell you what I

12:09:57  3    would do with that.

12:09:58  4          On a larger scale, on a weekly basis, I got outputs

12:10:03  5    from the safety database that would tell me the key

12:10:07  6    characteristics of the adverse event reports that I would

12:10:09  7    receive.  And then on a longer scale, let's say at the most

12:10:13  8    every six months, I would review all of the safety information

12:10:16  9    that was received during that particular interval, whether a

12:10:21 10    periodic safety report was to be submitted or not.

12:10:25 11          And the key questions that I had or responsibility

12:10:31 12    that I had were:  Do I have enough information?  So, if not, we

12:10:38 13    should go back to the reporter and ask for better detail.

12:10:40 14          If I do have better information, does this represent

12:10:44 15    a new safety signal that I did not know about before?

12:10:48 16          And then the third step was:  What to do next.  Like,

12:10:54 17    for example, sometimes we would make investigations about a

12:10:56 18    particular adverse event to find out more extensively, more in

12:10:59 19    detail, whether this was, in fact, a new safety signal.

12:11:04 20    Q.    So you were essentially evaluating safety information

12:11:07 21    related to Taxotere on a daily basis?

12:11:08 22    A.    On an ongoing basis, yes.

12:11:10 23    Q.    Okay.  And tell me -- in terms of making causation

12:11:14 24    assessments, meaning, does a particular product, a particular

12:11:18 25    drug, cause a particular side effect, what's the -- what's the

*OFFICIAL  TRANSCRIPT*

12:11:21  1    role or importance of confounding factors?

12:11:26  2    A.    It's capital.  It's central to that.

12:11:29  3          If you have other elements that are in the picture

12:11:32  4    that are known to either cause or to contribute -- to

12:11:36  5    contribute to the adverse event that you're looking for, it's

12:11:39  6    very difficult to isolate, especially in oncology, to isolate

12:11:45  7    the effect of one particular drug versus other drugs that are

12:11:47  8    given in combination.

12:11:49  9    Q.    Okay.  And simply because you have a number of reports

12:11:51 10    about a particular side effect, there's not like a threshold

12:11:55 11    number where you say, We received this many reports, there must

12:11:59 12    be a causal relationship?

12:12:01 13    A.    No, no.

12:12:01 14    Q.    Why is that?

12:12:02 15    A.    Because -- a causal relationship analysis is not based on

12:12:06 16    numbers of cases.  You might have a single well-documented

12:12:09 17    case, and that's sufficient.

12:12:11 18          This is because of the reason that I said, We have

12:12:15 19    the confounding role of, for example, preexisting conditions

12:12:19 20    that the patient already has.  So the adverse event might be

12:12:24 21    present before the patient took, for the first time, the drug

12:12:27 22    that you are investigating about.

12:12:30 23          And there are things that, and as I said before, you

12:12:35 24    cannot separate when you have a combination of drugs that are

12:12:37 25    given simultaneously.  You really cannot separate the effect of

12:12:40  1    one particular drug versus another one.

12:12:43  2         So if you establish the causal relationship between

12:12:47  3    the chemotherapy combination and the onset to the adverse

12:12:50  4    event, that's -- that's pretty much as far as you can go.  But

12:12:54  5    in terms of which drug singularly contributed, it's virtually

12:12:58  6    impossible.

12:12:58  7    Q.   Is it your experience as a global safety officer, who is

12:13:01  8    in charge of Taxotere for the better part of six or

12:13:05  9    seven years, that with most people who take Taxotere, they will

12:13:09 10    only have temporary hair loss?

12:13:11 11    A.   Yes.  It is my recollection with Taxotere that that's --

12:13:15 12    that's my experience.

12:13:16 13    Q.   Dr. Palatinsky, I'm handing you what's been marked as

12:13:19 14    Exhibit 29.

12:13:21 15    A.   Thank you.

12:13:21 16    Q.   Well, I'm going to hand you what was the actual approved

12:13:25 17    patient leaflet for Taxotere on May 29, 1996.

12:13:29 18    A.   Oh, okay.

12:13:30 19    Q.   And then in -- you'll see the section at the bottom says:

12:13:35 20    "What are the possible side effects of Taxotere?"

12:13:37 21    A.   Yes, I can see that.

12:13:39 22    Q.   And, Dr. Palatinsky, I know you're not in regulatory, but

12:13:42 23    what is your understanding as to what a patient information

12:13:45 24    leaflet is?

12:13:48 25    A.   Oh, the patient information leaflet is documentation

*OFFICIAL TRANSCRIPT*

12:13:52  1    attached to the U.S. label.

12:13:54  2              So the general part -- or the general component of

12:13:58  3    the U.S. label is that's sent to doctors, to the pharmacists or

12:14:03  4    nurses, healthcare providers.

12:14:06  5              And the product information leaflet is pretty much

12:14:09  6    the top language that is most important for the patient to know

12:14:13  7    in a form that the patient can actually understand, not in

12:14:19  8    strict medical terms.

12:14:21  9    Q.    Okay.  And then if you'll turn to the next page, you'll

12:14:25 10    see there is a list of the possible side effects with Taxotere.

12:14:25 11    A.    Yes.

12:14:27 12    Q.    Turn to the next page.  You'll see the section on

12:14:29 13    hair loss.

12:14:29 14              Do you see that?

12:14:30 15    A.    Yes, I can see that.

12:14:31 16    Q.    Okay.  And it says:  "Loss of hair occurs in most patients

12:14:34 17    taking Taxotere, including hair on your underarm, pubic hair,

12:14:39 18    eyebrows, and eyelashes."  And then it goes on to state:

12:14:42 19    "Hair loss will begin after the first few treatments and varies

12:14:44 20    from patient to patient.  Once you have completed all your

12:14:46 21    treatments, hair generally" -- "generally grows back."

12:14:50 22              What does that statement mean to you as a

12:14:52 23    global safety officer and as a doctor and a medical

12:14:55 24    professional?

12:14:55 25    A.    It tells me that this document is communicating to the

*OFFICIAL TRANSCRIPT*

12:15:01 1   reader that in a majority of patients, the hair loss will

12:15:04 2   recover and in a minority of patients, it may not.

12:15:08 3   Q.   And is that statement -- is that statement true the entire

12:15:18 4   time that you were the global safety officer for Taxotere?

12:15:21 5   A.   I think the statement is -- yeah, is valid.  Was

12:15:24 6   demonstrated to be true.

12:15:25 7   EXAMINATION BY MR. SCHANKER:

12:15:25 8   Q.   It was never a promise that after taking Taxotere your

12:15:29 9   hair would regrow back exactly as it was?

12:15:32 10  A.   Right.  I've never seen that.

12:15:34 11  Q.   Has Sanofi ever made, in your knowledge, a promise or

12:15:37 12  guarantee to patients that if they take Taxotere, certainly in

12:15:41 13  combination with other chemotherapies, that their hair will

12:15:45 14  always grow back exactly as it was before they went to

12:15:48 15  chemotherapy?

12:15:49 16  A.   I've never seen such a thing.

12:15:50 17  Q.   And I have another question, too, it says:  "TAX316 was a

12:15:56 18  comparison between two different arms.  Taxotere, Adriamycin,

12:15:59 19  and cyclophosphamide, in one arm."

12:16:02 20  A.   Yes.

12:16:03 21  Q.   "And fluorouracil, Adriamycin, cyclophosphamide" --

12:16:11 22  A.   In the control arm.

12:16:12 23  Q.   -- "in the control arm."

12:16:12 24       And at least according to this document, there was

12:16:14 25  also ongoing alopecia reported in the nonTaxotere arm?

*OFFICIAL TRANSCRIPT*

12:16:18 1    A.    Yes.

12:16:19 2    Q.    Is that correct?

12:16:20 3    A.    Yes.

12:16:20 4           (WHEREUPON, at this point in the proceeding, the video

12:16:20 5    is concluded.)

12:16:20 6           THE COURT:  Okay.  Thank you very much.

12:16:34 7                   Ladies and gentlemen of the jury, it's 12:15.

12:16:35 8    Court will be at recess for one hour today at 1:15.  Let me

12:16:40 9    caution you during this recess that you should not discuss

12:16:43 10   amongst yourselves or with anybody else anything you've heard

12:16:47 11   here and nor should you even acknowledge the presence of any of

12:16:50 12   these people associated with this case.

12:16:52 13                   With that, court is at recess for one hour.

12:16:57 14          (WHEREUPON, at 12:16 p.m., the jury panel leaves the

12:17:18 15   courtroom.)

12:17:18 16          MS. PEREZ:  Do you have some exhibits from

12:17:21 17   Dr. Palatinsky's deposition to move into evidence?  When would

12:17:23 18   you us like to handle that matter?

12:17:23 19          THE COURT:  Why don't we do that now?  I think there

12:17:25 20   was something this morning about Dr. Tosti.

12:17:34 21          MS. PEREZ:  Yes, Your Honor.  I believe it was her

12:17:35 22   clinical exam photos and her clinical notes.  It would not be

12:17:39 23   her report but her medical records she created.

12:17:42 24          THE COURT:  I think that's already in.  I think there

12:17:43 25   was something the defendants have not moved.

                           *OFFICIAL  TRANSCRIPT*

12:17:46  1          MS. PEREZ:  The pathology report, perhaps?

12:17:50  2          THE COURT:  I don't know.

12:17:50  3          MS. SASTRE:  Yes.

12:17:50  4          THE COURT:  Go ahead.

12:17:51  5          MS. SASTRE:  Yes, Your Honor.

12:17:51  6          THE COURT:  Sure.

12:17:51  7          MS. SASTRE:  So, the photographs, the path report, my

12:17:56  8   understanding is that there is conversations taking place with

12:17:59  9   counsel.  And candidly, there may already be an agreement that

12:18:03 10   I haven't heard about, but there are a lot of photos that both

12:18:05 11   sides would like to have admitted.  We've already stipulated to

12:18:08 12   the date to them.

12:18:08 13          THE COURT:  Okay.

12:18:09 14          MS. SASTRE:  So, I think we're inclined to send a group

12:18:11 15   back.

12:18:11 16          THE COURT:  Okay.

12:18:12 17          MS. SASTRE:  And so, I think we can resolve that issue

12:18:14 18   that way.

12:18:14 19          THE COURT:  Okay.  Sure.

12:18:14 20          MS. SASTRE:  All right.

12:18:15 21          MS. PEREZ:  And then I have a list of the exhibits from

12:18:19 22   Dr. Palatinsky's deposition that the parties would request

12:18:23 23   respectively go into the record based on the deposition.

12:18:26 24   That's going to be Plaintiff's Exhibit 22, Plaintiff's

12:18:31 25   Exhibit 23, Plaintiff's Exhibit 33, Plaintiff's Exhibit 422,

                          *OFFICIAL TRANSCRIPT*

12:18:37  1    and then Defense Exhibit 573, and I believe it's .1.

12:18:37  2            THE COURT:  Okay.

12:18:43  3            MS. PEREZ:  Is that accurate?

12:18:44  4                Okay.

12:18:44  5            MR. MOORE:  Yes.  Subject to whatever was said in the

12:18:48  6    designations in terms of objections.  And I think the 573.1 was

12:18:54  7    moved in during our moving our exhibits in.

12:18:57  8            THE COURT:  Anything further?

12:19:00  9            MR. STRONGMAN:  And, Your Honor, Jon Strongman.

12:19:01 10            I know that we talked about some exhibits with

12:19:04 11    Dr. Plunkett, and I believe Dr. Plunkett is the next witness.

12:19:07 12    I know Mr. Miceli is not here.  We have to find a time to deal

12:19:08 13    with that briefly.

12:19:08 14            THE COURT:  Okay.

12:19:09 15            MR. STRONGMAN:  And in the other -- just small request

12:19:12 16    is at least during my examination of the witness, I would like

12:19:16 17    to put a flip chart here and if possible, could we have the

12:19:22 18    containers taken down to that?

12:19:23 19            THE COURT:  Yes.  The containers need to be taken down.

12:19:25 20            MR. SCHANKER:  Thank you.

12:19:27 21            MR. STRONGMAN:  Thank you.

12:19:27 22            THE COURT:  Thank you.

12:19:27 23                No problem.

12:19:35 24            Mr. Miceli is not here.  Are you doing

12:19:38 25    Dr. Plunkett?

**OFFICIAL TRANSCRIPT**

12:19:38   1          MR. STRONGMAN:  Yes, Your Honor.

12:19:41   2          MR. SCHANKER:  Would you like us to get him?

12:19:43   3          THE COURT:  Is he right out there?

12:19:48   4              Why don't we do this.  Why don't you we have you

12:19:51   5     all in here for 1:00, and then we'll deal with it.

           6              (WHEREUPON, at 12:19 p.m., and the Court was in

           7     luncheon recess.)

           8                         *    *    *

           9

          10                    REPORTER'S CERTIFICATE

          11

          12          I, Cathy Pepper, Certified Realtime Reporter, Registered

          13     Merit Reporter, Certified Court Reporter in and for the State

          14     of Louisiana, Official Court Reporter for the United States

          15     District Court, Eastern District of Louisiana, do hereby

          16     certify that the foregoing is a true and correct transcript to

          17     the best of my ability and understanding from the record of the

          18     proceedings in the above-entitled and numbered matter.

          19

          20                         *s/Cathy Pepper*
                                     _____

          21                         Cathy Pepper, CRR, RMR, CCR
                                     Certified Realtime Reporter
          22                         Registered Merit Reporter
                                     Official Court Reporter
          23                         United States District Court
                                     Cathy_Pepper@laed.uscourts.gov
          24

          25

                              *OFFICIAL  TRANSCRIPT*