UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                         Civil Action No. 16-MD-2740
                         Section "H"(5)
                         New Orleans, Louisiana
                         November 12, 2021

THIS CASE RELATES TO ELIZABETH KAHN 16-CV-17039
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF JURY TRIAL
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE
DAY 4 AFTERNOON SESSION

APPEARANCES:

FOR THE PLAINTIFF:

                    MATTHEW PALMER LAMBERT
                    GAINSBURGH BENJAMIN DAVID MEUNIER
                    & WARSHAUER
                    1100 POYDRAS STREET
                    SUITE 2800
                    NEW ORLEANS, LA 70163


                    CHRISTOPHER COFFIN
                    PENDLEY BAUDIN & COFFIN
                    1515 POYDRAS STREET
                    NEW ORLEANS, LA 70112


                    KAREN BARTH MENZIES
                    GIBBS LAW GROUP
                    400 CONTINENTAL BOULEVARD
                    EL SUGUNDO, CA 90245


                    DARIN L. SCHANKER
                    BACHUS & SCHANKER
                    1899 WYNKOOP STREET
                    SUITE 700
                    DENVER, CO 80202

APPEARANCES CONTINUED:

                          DAVID F. MICELI
                          DAVID F. MICELI, LLC
                          P.O. BOX 2519
                          CARROLTON, GA 30112

                          LAWRENCE J. CENTOLA
                          MARTZELL BICKFORD & CENTOLA
                          338 LAFAYETTE STREET
                          NEW ORLEANS, LA 70130

                          DAWN BARRIOS
                          ZACHARY WOOL
                          BARRIOS KINGSDORF & CASTEIX
                          701 POYDRAS STREET
                          SUITE 3650
                          NEW ORLEANS, LA 70139

                          ROBIN MYERS
                          MURRAY LAW FIRM
                          650 POYDRAS STREET
                          SUITE 2150
                          NEW ORLEANS, LA 70130


FOR SANOFI S.A.:          HILDY M. SASTRE
                          SHOOK HARDY & BACON, LLP
                          201 BISCAYNE BOULEVARD
                          SUITE 3200
                          MIAMI, FL 33131


                          DOUGLAS MOORE
                          KELLY E. BRILLEAUX
                          IRWIN FRITCHIE URQUHART & MOORE
                          400 POYDRAS STREET
                          SUITE 2700
                          NEW ORLEANS, LA 70130


                          JON STRONGMAN
                          SHOOK, HARDY & BACON
                          1155 F STREET NW, SUITE 200
                          WASHINGTON, DC  20004

APPEARANCES CONTINUED:

                        HARLEY V. RATLIFF
                        SHOOK HARDY & BACON
                        2555 GRAND BOULEVARD
                        KANSAS CITY, MS 64108

Official Court Reporter:     Nichelle N. Drake, RPR, CRR
                             500 Poydras Street, B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7775

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

I N D E X


E X A M I N A T I O N S

**Witness**                                                    **Page**
LAURA MASSEY PLUNKETT
   DIRECT EXAMINATION BY MR. MICELI                      942
   CROSS-EXAMINATION BY MR. STRONGMAN                   1031
   REDIRECT EXAMINATION BY MR. MICELI                   1082

**1**             **P R O C E E D I N G S**

01:25:11PM **2**                    (Call to order of the court.)

01:25:11PM **3**        THE COURT:  All right.  We just need a second and

01:25:13PM **4**   then we're going to call in the jury.  And we should have

01:25:15PM **5**   taken an hour and 15 minutes.

01:26:03PM **6**        MR. MICELI:  I forgot my mask downstairs, Your Honor,

01:26:06PM **7**   and I'm fine without it because I'm going to be doing the

01:26:11PM **8**   talking.  But if it's okay with you, I'll start without it

01:26:13PM **9**   and then I'll put it back on after.

01:26:16PM **10**        THE COURT:  That sounds good.

01:26:17PM **11**        We're ready.

01:26:34PM **12**                    (Jury enters courtroom.)

01:26:50PM **13**        THE COURT:  All jurors are present.  Court's back in

01:26:52PM **14**   session.  You may be seated.

01:26:55PM **15**        Mr. Miceli, please call your next witness.

01:26:58PM **16**        MR. MICELI:  Thank you.

01:27:00PM **17**        Dr. Laura Plunkett, please.

01:27:10PM **18**        THE CASE MANAGER:  Can you raise your right hand,

01:27:13PM **19**   please?

01:27:15PM **20**                    (Witness administered oath.)

01:27:17PM **21**        THE CASE MANAGER:  Thank you.  And you can have a

01:27:18PM **22**   seat.  You can remove your mask for questioning.

01:27:28PM **23**        State and spell your full name for the record,

01:27:29PM **24**   please.

01:27:31PM **25**        THE WITNESS:  Laura Massey Plunkett, L-a-u-r-a,

01:27:36PM  1   M-a-s-s-e-y, P-l-u-n-k-e-t-t.

01:27:43PM  2           THE COURT:  You may proceed.

01:27:43PM  3           MR. MICELI:  Thank you, Your Honor.  I've not been in

01:27:43PM  4   the courtroom before the jury.  Should I introduce myself?

01:27:43PM  5           THE COURT:  Yes, you may.

01:27:50PM  6           MR. MICELI:  Hi, I'm Dave Miceli.

01:27:50PM  7                   LAURA MASSEY PLUNKETT,

01:27:50PM  8   called as a witness, being first duly sworn, examined and

01:27:50PM  9   testifies as follows:

01:27:50PM  10                  DIRECT EXAMINATION

01:27:50PM  11  BY MR. MICELI:

01:27:55PM  12      Q.  Dr. Plunkett, please introduce yourself to the jury

01:27:57PM  13  and provide them a brief description of your education and

01:28:00PM  14  work history.

01:28:01PM  15      A.  Sure.  My name is Dr. Laura Plunkett.  I have a

01:28:07PM  16  doctoral degree in pharmacology.  I'm board certified in

01:28:09PM  17  toxicology.  I live in Houston, Texas.  And I own my own

01:28:12PM  18  consulting firm.  And my educational background, in addition

01:28:15PM  19  to the doctoral degree, I started out with a bachelor's

01:28:19PM  20  degree, both of those from the University of Georgia.

01:28:37PM  21      Q.  Dr. Plunkett, do you maintain a current curriculum

01:28:42PM  22  vitae or CV?

01:28:44PM  23      A.  Yes, I do.

01:28:45PM  24      Q.  Would it help us to march through your qualifications

01:28:47PM  25  and your background if I showed that to you?

01:28:50PM    1    **A.**   Yes.

01:28:52PM    2         MR. MICELI:  Is that okay, Your Honor?

01:28:53PM    3         THE COURT:  Yes.

01:28:55PM    4         MR. STRONGMAN:  No objection.

01:28:58PM    5    BY MR. MICELI:

01:28:58PM    6    **Q.**   See if we can do that.  We're not going to go through

01:29:00PM    7    this page by page.  I think we have 18 or so pages.  But just

01:29:05PM    8    explain to us a little bit about your background, and how do

01:29:07PM    9    you go about getting a Ph.D. in pharmacology or toxicology?

01:29:13PM   10    **A.**   So pharmacology -- my pharmacology degree started

01:29:17PM   11    after I obtained my bachelor's degree.  And at the University

01:29:23PM   12    of Georgia, it was granted through the College of Pharmacy.

01:29:27PM   13    In order to do that, it was, for me, a four-year program and

01:29:30PM   14    it involves doing your own -- coming up with your own

01:29:33PM   15    research project, performing that basic research.  You have

01:29:36PM   16    to take qualifying exams, both oral and written, usually

01:29:40PM   17    after your second year.  I was allowed to proceed directly to

01:29:44PM   18    the doctorate, not stop for a master's, so that's why I was

01:29:49PM   19    able to get through in four years.  Whereas, for some people

01:29:52PM   20    it can take five or six.  And then after the end of

01:29:56PM   21    completion of my research, I have to do something called

01:30:00PM   22    "defense."  I defend my project with a group, a board of

01:30:03PM   23    advisors, other faculty members within the College of

01:30:09PM   24    Pharmacy.  And once I complete that defense, I was granted my

01:30:12PM   25    degree.

01:30:12PM **1**    **Q.** And after you finished your degree, did you go to the

01:30:16PM **2**  National Institutes of Health?

01:30:18PM **3**    **A.** Yes, I did.  Yes, I did.

01:30:20PM **4**    **Q.** Okay.  Can you tell us what that -- what you did

01:30:22PM **5**  there?

01:30:23PM **6**    **A.** So after I -- many people after they get their

01:30:27PM **7**  doctoral degree, will do something called a postdoctoral

01:30:31PM **8**  fellowship.  So that's additional training beyond my academic

01:30:35PM **9**  training and my research training.  I went to -- I applied

01:30:38PM **10**  for a fellowship program that was administered at the

01:30:42PM **11**  National Institutes of Health, and I was lucky to be accepted

01:30:48PM **12**  for that.  And the beauty of that fellowship was, I could

01:30:50PM **13**  choose one of 200 laboratories within the National Institutes

01:30:55PM **14**  of Health where I wanted to work.  And it's a two-year

01:30:58PM **15**  appointment.  And during that two years, you're paid a salary

01:31:01PM **16**  with the lab that you go to is given a stipend for the

01:31:04PM **17**  research that you're doing, and I had a great experience.  It

01:31:08PM **18**  gave me two years of intensive additional training in another

01:31:11PM **19**  area of pharmacology.  I started out as a cardiovascular

01:31:17PM **20**  pharmacology, study of drugs that affect the heart and I

01:31:19PM **21**  added the expertise in neuropharmacology, which is the way

01:31:24PM **22**  that different drugs interact and treat different diseases of

01:31:27PM **23**  the brain, psychiatric disorders, for example.  So that

01:31:33PM **24**  two-year period was done, and then I applied for what I call

01:31:35PM **25**  my first real job where I went out into the real world.

01:31:38PM  1      Q.   Okay.  And where was that?

01:31:39PM  2      A.   So my first job after my post-doc was a faculty

01:31:45PM  3   position.  I taught -- I was accepted as an assistant

01:31:48PM  4   professor at the medical school at the University of Arkansas

01:31:52PM  5   in Little Rock, Arkansas.  And there, I was appointed both to

01:31:56PM  6   the department of pharmacology, but also to the department of

01:31:59PM  7   toxicology.  And there, I do what most academic researchers

01:32:03PM  8   do; I had my own laboratory.  I had to apply for grant

01:32:06PM  9   funding.  I taught medical students in the second year.  The

01:32:11PM 10   courses were around pharmacology and toxicology.  I also

01:32:14PM 11   taught graduate student courses, and I supervised graduate

01:32:19PM 12   students in the lab.  So that's kind of basically what an

01:32:23PM 13   academic scientist does in their daily job.  And my job, in

01:32:27PM 14   academic was to do my research, help with the training and

01:32:30PM 15   the teaching of future doctors and scientists.

01:32:33PM 16      Q.   Okay.  Do you hold any certifications or other

01:32:36PM 17   licenses?

01:32:37PM 18      A.   Yes.

01:32:38PM 19      Q.   Can you tell the jury about that?

01:32:39PM 20      A.   So I already mentioned that I'm board certified in

01:32:42PM 21   toxicology, so that's an exam that I took in 1993.  And it

01:32:47PM 22   was because I had changed out of academics to a different

01:32:52PM 23   career, and I think we'll talk about in a minute.  It's what

01:32:55PM 24   I do today.  In order to do that, that certification helped

01:32:59PM 25   me in terms of my credentials in attracting work in the area

01:33:04PM **1**    of consulting.  So it was an exam you sit for I think for two

01:33:10PM **2**    full days and once you pass that, you get a certification

01:33:12PM **3**    called a DABT, Diplomate American Board of Toxicology.  And

01:33:18PM **4**    so that certification is specific around the issue of toxic

01:33:23PM **5**    effects of things like drugs and chemicals on humans and the

01:33:27PM **6**    environment.  I'm also a patent agent.  So in the late 1990s,

01:33:32PM **7**    my sister is a patent attorney and she invited me to come and

01:33:37PM **8**    do some work with her firm if I wanted to on a part-time

01:33:41PM **9**    basis.

01:33:41PM **10**   And so what I had to do there is I had to actually

01:33:44PM **11**   sit for something called the patent bar exam.  So I go into a

01:33:48PM **12**   room with a bunch of people, many were lawyers coming out of

01:33:53PM **13**   law school, but you don't have to be a lawyer at a law school

01:33:56PM **14**   to get this agent certification if you pass the bar exam.  So

01:34:00PM **15**   I did that.  And that job, that certification is important

01:34:03PM **16**   because I can actually work with people that are trying to

01:34:07PM **17**   take their ideas and put them out into the world,

01:34:12PM **18**   commercialize them.

01:34:13PM **19**   So the practice that I work in with my sister's law

01:34:17PM **20**   firm is we work with a lot of inventors from the universities

01:34:20PM **21**   that they have an idea that they want to patent, we

01:34:23PM **22**   facilitate that.  And then we also work with the next phase,

01:34:26PM **23**   which is taking those inventors' ideas, helping them either

01:34:30PM **24**   license it to another company who will buy that idea and then

01:34:34PM **25**   commercialize it, or helping the inventors set up their own

01:34:39PM **1**  companies and we work with them on strategies to

01:34:42PM **2**  commercialize products.  Pretty much all of the inventions

01:34:48PM **3**  that we work with in my sister's firm are medical products.

01:34:50PM **4**  So I work with a lot of people that are working in the area

01:34:51PM **5**  of either drugs, devices, or other types of products

01:34:54PM **6**  regulated by -- that have medical applications.

01:34:56PM **7**  BY MR. MICELI:

01:34:56PM **8**      Q.  All right.  I want to move up this page a little bit.

01:35:00PM **9**  I highlighted your professorship at the University of

01:35:06PM **10**  Arkansas.  And the next thing you list is ENVIRON, and I

01:35:08PM **11**  think that you had mentioned that was consulting?

01:35:12PM **12**      A.  Yes.  That's after I left academics, yes.

01:35:15PM **13**      Q.  Okay.  Before we talk about ENVIRON, you do

01:35:18PM **14**  consulting now as well?

01:35:19PM **15**      A.  Yes.  Ever since I left academics, my job would be

01:35:22PM **16**  considered as a consultant.  So I've either worked within

01:35:26PM **17**  another company or I've had a company of my own.

01:35:29PM **18**      Q.  Well, to make it simpler, rather than going through

01:35:31PM **19**  each entry, can you just sort of bring us forward with your

01:35:35PM **20**  consulting work as it was done at ENVIRON, what type of work

01:35:40PM **21**  you did to what you do today?

01:35:40PM **22**      A.  So I basically did some of the same basic types of

01:35:43PM **23**  work.  As a consultant, I apply my skills as a pharmacologist

01:35:48PM **24**  and a toxicologist to problems or issues that clients come --

01:35:51PM **25**  came to the company with.  They tended many of them to be

01:35:54PM **1**    companies with a product that is regulated by the Food and

01:35:57PM **2**    Drug Administration.  So, for example, at ENVIRON, a lot of

01:36:02PM **3**    their clients were large drug companies, a company like

01:36:04PM **4**    Sanofi.  And they would hire the consultants to participate

01:36:09PM **5**    in either getting -- working with the FDA to obtain some type

01:36:14PM **6**    of approval or answer a question raised by the FDA about

01:36:18PM **7**    their product.  Sometimes we worked on litigation projects

01:36:21PM **8**    like this at ENVIRON as well.  But essentially, the --

01:36:26PM **9**    every -- kind of the core thing, all the work I do as a

01:36:30PM **10**   consultant is looking at whether or not certain things that

01:36:32PM **11**   you're supposed to in your daily life be it a drug, the

01:36:37PM **12**   water, the soil, a food product, whether or not it could have

01:36:41PM **13**   an adverse effect on your health.  And if it had that effect

01:36:44PM **14**   on your health, what can you do about it.  And when I deal

01:36:47PM **15**   with these projects, if they're projects with -- products

01:36:50PM **16**   that are regulated by the Food and Drug Administration, I

01:36:53PM **17**   have to apply my skills in science around what is required by

01:36:58PM **18**   the companies that are marketing these products here in the

01:37:00PM **19**   United States.

01:37:02PM **20**       Q.  Okay.  In doing that, do you work with pharmaceutical

01:37:07PM **21**   companies?

01:37:07PM **22**       A.  Yes.

01:37:07PM **23**       Q.  Do you work with nonpharmaceutical companies?

01:37:09PM **24**       A.  Yes, all kinds of companies.

01:37:11PM **25**       Q.  Okay.  If you could let us know a little bit more

01:37:16PM  1   about your regulatory work.  Tell me -- tell us, you know,

01:37:19PM  2   over the course of -- it says here that you started with

01:37:22PM  3   ENVIRON in 1989 through 1992.  Have you been doing consulting

01:37:32PM  4   working in the area of pharmaceuticals and regulatory since

01:37:36PM  5   that time?

01:37:37PM  6       A.   Yes.  In fact, when I joined ENVIRON in 1989, I was

01:37:42PM  7   hired specifically because they didn't have expertise in

01:37:46PM  8   pharmacology and they had a lot of projects that dealt with

01:37:49PM  9   issues around drugs.  So that was one of the skills that they

01:37:53PM  10  sought when they hired me into the company and at that time

01:37:56PM  11  period.

01:37:56PM  12      Q.   Okay.  And how long have you been doing work in

01:37:59PM  13  toxicology and pharmacology?

01:38:01PM  14      A.   Well, since I -- well, since I started with my degree

01:38:05PM  15  in 1980.  I guess you could say officially, when I graduated

01:38:07PM  16  in '84.  So that's been quite a while, decades, dates me in

01:38:14PM  17  my age, I guess.

01:38:15PM  18      Q.   We're not going to ask that.  You're under oath, we

01:38:18PM  19  don't want to -- so how long have you been doing work in the

01:38:22PM  20  regulatory affairs and regulatory compliance arena?

01:38:26PM  21      A.   So even when I was in my graduate degree -- in a

01:38:32PM  22  pharmacology program in a pharmacy school, we're introduced

01:38:35PM  23  into the regulations, but I didn't really practice as a

01:38:38PM  24  regulatory consultant or what I call a regulatory

01:38:41PM  25  professional until 1989 when I joined ENVIRON.  And that's

01:38:45PM  1    where I began my work where I was actually trying to help

01:38:49PM  2    people or clients deal with issues around how the regulations

01:38:53PM  3    set forth kind of the rules that they have to operate under

01:38:57PM  4    in order to market their products.

01:38:59PM  5        Q.   Okay.  And you talk about the rules.  What rules are

01:39:02PM  6    those?

01:39:02PM  7        A.   So that's something called the Code of Federal

01:39:07PM  8    Regulations.  Sometimes it's abbreviated, the CFR.  And

01:39:11PM  9    essentially, it's a set of regulations that are written and

01:39:14PM  10   put into place and FDA, the Food and Drug Administration, is

01:39:18PM  11   the group for the ones we're going to talk about here that

01:39:23PM  12   implements them, make sure those rules are met, make sure

01:39:27PM  13   companies comply with those rules.  And those are the -- that

01:39:32PM  14   CFR document sets forth the very specific definitions, the

01:39:37PM  15   very specific requirements that a company, such as a drug

01:39:40PM  16   company, has to comply with or meet in order to not only get

01:39:44PM  17   the product approved for the first time, but also what they

01:39:47PM  18   have to do once the product is on the market the entire time

01:39:50PM  19   it's on the market.

01:39:52PM  20       Q.   Okay.  Now, you said the Code of Federal Regulation

01:39:56PM  21   {sic}, whose job is it to comply with the Code of Federal

01:40:00PM  22   Regulation?

01:40:01PM  23       A.   It's the company's job, whoever the company may be.

01:40:04PM  24   So in the case of a drug company, it would be a

01:40:06PM  25   pharmaceutical company that would need to comply with those

01:40:09PM 1   regulations, and there's very specific parts of the

01:40:13PM 2   regulations that apply to them as a company.

01:40:15PM 3       Q.   Okay.  Have you received training in how to review

01:40:20PM 4   and apply those regulations?

01:40:21PM 5       A.   Yes.

01:40:22PM 6       Q.   Can you tell the jury about that, please?

01:40:24PM 7       A.   So when I joined ENVIRON, there was two things that

01:40:29PM 8   happened in terms of training in this area.  One, is the

01:40:33PM 9   company was founded by several former FDA employees.  And so

01:40:39PM 10  those, what we call principals, higher-ups in the company

01:40:42PM 11  that we worked under, would -- would, you know, teach us,

01:40:46PM 12  essentially on projects, what it is that the clients had to

01:40:50PM 13  worry about.  Here's the regulatory process and this is what

01:40:53PM 14  this client has to do.  But all of the new hires at my level

01:40:58PM 15  that came into the company were also required to take courses

01:41:02PM 16  in the regulations.

01:41:03PM 17      And there's a -- I was located at this time in

01:41:06PM 18  Washington, D.C. and there's a group called the Food and Drug

01:41:12PM 19  Law Institute, and at that time, they put on courses we had

01:41:17PM 20  to attend in person.  So luckily, I was in D.C.  That was

01:41:22PM 21  easy to do.  Today, I continue to take these kinds of courses

01:41:23PM 22  as I need to update myself my training.  But you can now do

01:41:26PM 23  it on the Internet through the web, so it's much more

01:41:30PM 24  convenient than it used to be to have to do that.

01:41:32PM 25  BY MR. MICELI:

01:41:32PM **1**     Q.   Okay.  What we have -- I think everybody in the

01:41:34PM **2**   courtroom has heard about labeling, are there CFRs related to

01:41:38PM **3**   labeling?

01:41:39PM **4**     A.   Yes.  And even one specific to prescription drug

01:41:43PM **5**   labeling, which is the issue here in this case.

01:41:45PM **6**     Q.   Okay.  Are there specific Code of Federal Regulation

01:41:50PM **7**   labeling guidelines or labeling rules -- you called them

01:41:53PM **8**   rules before; is that what I should refer to them as?

01:41:55PM **9**     A.   That's a -- yeah, just rules.  I mean, we can say it

01:41:59PM **10**   any way you want.  But it's probably easier instead of saying

01:42:02PM **11**   regulations, just say the rules that they have to comply

01:42:06PM **12**   with.

01:42:06PM **13**     Q.   Okay.  For lack of a better term, the rules of the

01:42:09PM **14**   road that pharmaceutical companies have to go by.

01:42:11PM **15**     A.   Yes.  I sometimes use that when I teach students.  I

01:42:12PM **16**   will call them the rules of the road.

01:42:16PM **17**     Q.   Okay.  Are there specific sections of those rules or

01:42:18PM **18**   rules of the road that we're going to be talking about today

01:42:21PM **19**   that you're familiar with?

01:42:22PM **20**     A.   Yes.  There is certain sections that I believe are

01:42:25PM **21**   important to the issues I was asked to address in the case.

01:42:29PM **22**   So, for example, with labeling, it would be the section

01:42:32PM **23**   201.57, which is a section within the regulations that deal

01:42:35PM **24**   with the content and the format, what goes into a label and

01:42:39PM **25**   how you put it there and what are the standards for where you

01:42:42PM 1   decide where things go.

01:42:44PM 2       Q.   Okay.  What other regulations did you come here

01:42:49PM 3   prepared to talk about?

01:42:49PM 4       A.   Yes.  The other section that I think is relevant to

01:42:52PM 5   my opinions is there's a section, 314.80 and that's another

01:42:57PM 6   section within the same rule book.  But it deals with what

01:43:00PM 7   companies in the drug world are supposed to do after the drug

01:43:03PM 8   is marketed, so it's postmarketing.  And I think I watched

01:43:08PM 9   Dr. Palatinsky's deposition that went to the jury a little

01:43:13PM 10  while ago and I believe he mentioned postmarketing.  So

01:43:16PM 11  that's the period after the drug has already entered the

01:43:22PM 12  marketplace.

01:43:22PM 13      Q.   And are you familiar with the regulations that

01:43:24PM 14  pertain to promotional materials or materials used with

01:43:28PM 15  physicians?

01:43:28PM 16      A.   Yes.  That's another section that I talked about in

01:43:32PM 17  my report and I also I think I formed some opinions around

01:43:36PM 18  for this case.

01:43:37PM 19      Q.   And what section is that?

01:43:38PM 20      A.   Oh, I'm sorry.  It's 202.1.  So that section deals

01:43:43PM 21  with advertising and promotion.

01:43:45PM 22      Q.   Okay.  Now, we're going to come back to those.  I

01:43:48PM 23  just wanted to understand if you're familiar with them.  Now,

01:43:51PM 24  are you affiliated with any universities currently?

01:43:53PM 25      A.   Yes, I am.

01:43:54PM **1**   **Q.** Okay. Which ones?

01:43:55PM **2**   **A.** So I have an adjunct position at Baylor University.

01:44:00PM **3**   As I said, I live in Texas so Baylor is in Waco, Texas about

01:44:05PM **4**   two and a half hours north of where I live. And I sought

01:44:07PM **5**   that affiliation because I really like to teach and work with

01:44:11PM **6**   students and it gives me an opportunity to do that.

01:44:13PM **7**   Although, unfortunately, for the last two years, those kinds

01:44:17PM **8**   of interactions have been limited. I'm hoping now with COVID

01:44:20PM **9**   restrictions lifting, I'll be able to get back to that.

01:44:23PM **10**   **Q.** Okay. And what type of topics and areas do you teach

01:44:27PM **11**   in?

01:44:27PM **12**   **A.** At Baylor, in the department I'm working in, which is

01:44:31PM **13**   the department of environmental sciences, I deal with either

01:44:37PM **14**   risk assessment which is essentially the process by which you

01:44:40PM **15**   determine whether or not an exposure to a chemical produces a

01:44:46PM **16**   risk to humans or risk to the environment. I also teach

01:44:50PM **17**   regulations or that's one of the -- one of the reasons they

01:44:53PM **18**   were interested in hiring me. It's being able to explain to

01:44:57PM **19**   students what types of things are out there in the regulatory

01:45:00PM **20**   world, kind of those rules that companies may have to deal

01:45:03PM **21**   with. So I apply that also and that's one of the things that

01:45:07PM **22**   I've been working on with them is developing a course work in

01:45:10PM **23**   that area.

01:45:11PM **24**   **Q.** Okay. Have you published in your areas of

01:45:13PM **25**   expertise -- or in your areas of interests, toxicology,

01:45:16PM  1    pharmacology, regulatory?

01:45:17PM  2        A.   Yes.   When I first started out, it was actually

01:45:20PM  3    required that I do that.   I still do it because based on most

01:45:26PM  4    of my work that I do -- a lot of the work that I do -- I'll

01:45:29PM  5    say most -- a lot of it is a science issue that would be of

01:45:33PM  6    interest to other scientists.   So when I can, and when my

01:45:37PM  7    clients permit it because some things I do are confidential,

01:45:40PM  8    but if they're not, I attempt to publish and I still try to

01:45:44PM  9    do that at least once a year if I can.

01:45:45PM  10       Q.   And it looks like you have -- I'm just going to flip

01:45:49PM  11   through here, but it looks like you have roughly 50 or so

01:45:52PM  12   publications -- 37 or so publications?

01:45:56PM  13       A.   Yes, that's correct.

01:45:56PM  14       Q.   Okay.   And what areas do you publish in?   Is it the

01:46:01PM  15   areas you have already mentioned to us?

01:46:02PM  16       A.   Yeah.   They tend to be either pharmacology and

01:46:06PM  17   toxicology or risk assessment or regulatory standards,

01:46:10PM  18   putting those -- often putting those two things together, the

01:46:14PM  19   issues of toxicity and risk along with what the regulations

01:46:20PM  20   require.

01:46:21PM  21       Q.   Okay.   And I think we may have heard about some of

01:46:25PM  22   this already, but are your articles that you publish

01:46:28PM  23   peer-reviewed?

01:46:28PM  24       A.   Yes.   The ones that -- the 37 that you're looking at

01:46:31PM  25   here, yes, those are something that I would call

01:46:34PM  1    peer-reviewed articles.

01:46:35PM  2         Q.   And can you just briefly explain to the jury what

01:46:38PM  3    peer-review is and what its purpose is?

01:46:41PM  4         A.   So you may have already heard it, so I'll be very

01:46:44PM  5    brief.  But essentially, peer-review is the process whereby

01:46:49PM  6    I, as a scientist, if I write an article, I choose a journal

01:46:52PM  7    that I'm going to submit it to, I send it.  And the editorial

01:46:56PM  8    board and other scientists will look at my paper.  They will

01:46:59PM  9    decide if it has the quality to be put into the journal.

01:47:02PM  10   They sometimes will make comments back to me, things I have

01:47:05PM  11   to change or add.  And the goal is, hopefully, to be able to

01:47:08PM  12   get your article published in that journal.  But not every

01:47:12PM  13   article that you send in gets published, and not every

01:47:15PM  14   journal will accept the -- an article.  So sometimes you go

01:47:18PM  15   to a journal, they reject it.  You may try a different

01:47:22PM  16   journal because the rejection may not be on the reliability

01:47:25PM  17   of your information, but it may be that the audience isn't

01:47:29PM  18   appropriate.  So this is something that you do in

01:47:31PM  19   peer-review.  I do this as well, I serve as a peer-reviewer

01:47:35PM  20   for some journals.  They'll send me the article, I review it.

01:47:38PM  21   I write comments back and then make a recommendation, would

01:47:41PM  22   this be a good fit?  Should this be published or not?

01:47:44PM  23        Q.   What is the purpose of doing that?

01:47:45PM  24        A.   It's to make sure that the science that gets put out

01:47:49PM  25   there into the literature that's publicly available for other

01:47:52PM  1  scientists has a basic level of quality.  It's the idea that

01:47:57PM  2  you want people to follow good scientific methods when they

01:48:02PM  3  put together their information and write their paper.  You

01:48:05PM  4  want to make sure that the information that they described

01:48:07PM  5  makes sense in terms of the science that is known at the

01:48:10PM  6  time.  So it is a quality control process to make sure that

01:48:13PM  7  the reliability of the data is there and that the studies

01:48:17PM  8  that are published can then be relied upon by other

01:48:21PM  9  scientists in terms of the kind of the work that they do,

01:48:25PM  10  like I do when I go to the literature and pull articles out.

01:48:28PM  11  If they're from the peer-reviewed literature, that gives them

01:48:32PM  12  a level of reliability that I can then use in the work that I

01:48:35PM  13  do.

01:48:35PM  14      Q.  Okay.  Now, to be very clear, what you're doing here

01:48:38PM  15  today is working as a consultant in a case, right?

01:48:40PM  16      A.  Yes, that's correct.

01:48:41PM  17      Q.  Now, is this sort of thing peer-reviewed?

01:48:44PM  18      A.  That I do here?

01:48:45PM  19      Q.  Right.

01:48:46PM  20      A.  No.  I don't seek peer-review of my opinions, but I

01:48:49PM  21  base my opinions on peer-reviewed information.

01:48:51PM  22      Q.  Okay.

01:48:52PM  23      A.  Because I always address these cases or the work that

01:48:56PM  24  I do in litigation based on science.

01:48:58PM  25      Q.  Okay.  Now, have you published abstracts as well?

01:49:01PM  1        A.   Yes, I do.

01:49:02PM  2        Q.   Okay.  And what are -- what is an abstract?

01:49:06PM  3        A.   So an abstract is a very short description of a piece

01:49:11PM  4   of work that you do.  And you -- typically you're then going

01:49:15PM  5   to go and present it at a scientific meeting.  And often, an

01:49:19PM  6   abstract will start out as a presentation at a meeting and

01:49:22PM  7   then you watch them develop it into a full paper that goes

01:49:25PM  8   into the literature but not always.  But it gives you an

01:49:28PM  9   opportunity, as a scientist, to discuss your findings with

01:49:33PM 10   other scientists.  And I do this -- I go to at least one or

01:49:37PM 11   two scientific meetings a year.  I don't always present, but

01:49:40PM 12   again, I try to present once a year if I can when I go and

01:49:43PM 13   I'll submit an abstract.

01:49:45PM 14        Q.   Okay.  I'm going to draw your attention to abstracts

01:49:48PM 15   numbers 15 and 16.  And they are what every technology

01:50:03PM 16   manager needs to know about FDA law, which leads to my next

01:50:05PM 17   question.  Do you speak about FDA regulation in your

01:50:07PM 18   abstracts?

01:50:08PM 19        A.   Yes, I do.  In fact, the other author, that's my

01:50:11PM 20   sister, Jane Licata.  So this Association of University

01:50:16PM 21   Technology Managers is annual meetings.  They're held every

01:50:20PM 22   year, and it is other people that work in this area of patent

01:50:24PM 23   law or patent regulations.  And they need to understand in

01:50:27PM 24   order to work with their inventors how to -- how to navigate

01:50:32PM 25   the world of the regulatory world if the client -- if that

01:50:35PM   1   inventor wants to put it out there for commercialization.  So

01:50:39PM   2   we've gone into these meetings with these talks and talked

01:50:43PM   3   about the Food and Drug Administration, what the regulations

01:50:44PM   4   are for products like drugs.  We mainly focus on drugs and

01:50:50PM   5   devices for these talks and kind of set forth what companies

01:50:54PM   6   that want to develop have to do, what are the rules that you

01:50:58PM   7   have to comply with, what are the roadblocks that might be in

01:51:01PM   8   your -- put out there that you have to consider if you're

01:51:06PM   9   going to go ahead and try to commercialize something.

01:51:09PM   10      Q.   And I notice that you also list presentations on your

01:51:12PM   11   CV.  What are those?

01:51:14PM   12      A.   So they're separated from abstracts because abstracts

01:51:18PM   13   do undergo some level of peer-review because you submit an

01:51:22PM   14   abstract to a meeting, and they may or may not accept it.

01:51:26PM   15   Presentations are places where I was either invited as a

01:51:28PM   16   speaker, or it may be a lecture that I've given in the

01:51:32PM   17   teaching area.  So it's a little different and those are

01:51:35PM   18   listed here.  I try to give you a flavor for the kinds of

01:51:38PM   19   things that I have done over the years where I have either

01:51:42PM   20   taught or lectured.

01:51:43PM   21      Q.   And I'm going to draw your attention to Presentation

01:51:47PM   22   No. 7.  Do you teach on strategies for reducing drug

01:51:55PM   23   reactions?

01:51:56PM   24      A.   Yes.  That has been an interest of mine.  Because of

01:51:59PM   25   my consulting work, that topic comes up, adverse drug

01:52:06PM 1  reactions.  And so I was talking about the pharmacy students

01:52:08PM 2  about the way that the FDA, and this was of interest to the

01:52:12PM 3  FDA and is this still is today, it -- ways that you can use

01:52:15PM 4  what they call "personalize medicine."  You can find the

01:52:19PM 5  people that are most likely to benefit and reduce the risks

01:52:23PM 6  and have people have less toxicities by looking at the people

01:52:27PM 7  before you actually give them the drug.  There's certain

01:52:31PM 8  patient characteristics, so there's certain kinds of things

01:52:35PM 9  that you can do in order to make sure that when you're

01:52:38PM 10 targeting people with a drug, you're going to give them a

01:52:41PM 11 drug that you're giving it to people in the safest way

01:52:45PM 12 possible.  So it's a way to reduce that side effects by

01:52:47PM 13 looking at some things ahead of time.  And so it's -- some

01:52:51PM 14 people call it genotyping.  Some people go in and take blood

01:52:58PM 15 samples, if you -- like 21andMe {sic} or Ancestry.  You can

01:53:02PM 16 send your blood sample in and get a health report back.  Some

01:53:05PM 17 of those kind of strategies are things that the Food and Drug

01:53:07PM 18 Administration has looked at for certain kinds of drugs in

01:53:10PM 19 development.

01:53:11PM 20     Q.  And lastly going through your CV, you published book

01:53:16PM 21 chapters as well?

01:53:17PM 22     A.  Yes, I do.  I have a few.

01:53:19PM 23     Q.  I'm going to have to roll through to the next page

01:53:23PM 24 because I wanted to ask you about your book chapters and

01:53:27PM 25 particularly numbers 3 and 4.  You published in

01:53:33PM 1    pharmacovigilance and postmarket surveillance?

01:53:36PM 2        A.  Yes.  Well, that's the title of my chapter.  The book

01:53:39PM 3    is on -- on pharmacovigilance around the world and I wrote a

01:53:44PM 4    chapter about the process here in the US.  And this is a book

01:53:48PM 5    that is being distributed to -- around the world so it's the

01:53:52PM 6    idea of having other people in other countries that practice

01:53:55PM 7    understanding what the role -- the rules are here in the US

01:53:59PM 8    for pharmacovigilance, and I think that's already been

01:54:02PM 9    described for the jury by Dr. Palatinsky.

01:54:05PM 10       Q.  I think so.  Yeah.  Have you ever testified in court

01:54:14PM 11   before?

01:54:14PM 12       A.  Yes, I have.

01:54:15PM 13       Q.  Okay.  Do you do that on a regular basis?

01:54:17PM 14       A.  Yes.  In my practice, in my job, in my company, I

01:54:22PM 15   have three practice areas.  One of them is what I called

01:54:25PM 16   "litigation support."  That would be doing the things like I

01:54:28PM 17   do here today, coming into a court to testify.  Sometimes I'm

01:54:31PM 18   doing it behind the scenes; I'm not actually in court.  The

01:54:35PM 19   other two things are my patent work and my regulatory

01:54:38PM 20   practice.

01:54:39PM 21       Q.  And what is the division of that labor in your

01:54:42PM 22   consulting business?

01:54:43PM 23       A.  I try to keep it at about a third, a third, a third,

01:54:47PM 24   so I spend about a third of my time with my

01:54:51PM 25   patent/intellectual property work, about a third of my time

01:54:55PM   1   with regulatory consultants -- or, regulatory clients or

01:54:59PM   2   regulatory issues outside of litigation, and I try to spend

01:55:01PM   3   about a third of my time in litigation projects.  And it --

01:55:05PM   4   you know, it can vary.  And actually for the last two years,

01:55:07PM   5   it's been almost all regulatory patent because the courts

01:55:12PM   6   have been closed.  But I think now I'm back to where that

01:55:15PM   7   balance would be a third, a third, a third.

01:55:17PM   8        Q.   Okay.  And do you testify for both plaintiffs and

01:55:19PM   9   defendants?

01:55:19PM   10       A.   I do.

01:55:20PM   11       Q.   Okay.  Have you ever testified in other contexts

01:55:25PM   12   outside of a courtroom?

01:55:26PM   13       A.   Yes, I have.  I was invited to provide testimony for

01:55:30PM   14   the Senate several years ago on an issue where they were

01:55:36PM   15   looking to rewrite one of the regulations -- one of the laws

01:55:39PM   16   about the -- that dealt with chemicals that we use in our

01:55:43PM   17   daily life.

01:55:45PM   18       Q.   And have you ever consulted for a pharmaceutical

01:55:48PM   19   company?

01:55:49PM   20       A.   I do.  I'm doing so right now.

01:55:52PM   21       Q.   Okay.  Is it one of those -- can you explain what you

01:55:56PM   22   do?

01:55:57PM   23       A.   So I can tell you what I do, yeah.  The company that

01:56:01PM   24   I started now, we have a confidentiality with most of my

01:56:09PM   25   clients.  I can't share the name but I can tell what I do and

01:56:12PM  1    what the sectors are, for example.

01:56:14PM  2        Q.  Okay.  What are they?

01:56:15PM  3        A.  So right now I'm working with a company that is

01:56:17PM  4    developing a biotechnology biologics product.  So it's a lot

01:56:28PM  5    of words but essentially it's something that would be used

01:56:33PM  6    therapeutically to treat diseases in people.  But it's being

01:56:34PM  7    produced -- because it's a product of nature -- that's what a

01:56:36PM  8    biologic is -- it's not like the drug here we're talking

01:56:41PM  9    about.  Even though Taxotere was -- Taxotere is similar to

01:56:45PM  10   things from nature, it is chemically synthesized.  And so

01:56:51PM  11   these biologic products are one that are made a different

01:56:53PM  12   way.  They're actually made out of cells that -- natural

01:56:59PM  13   cells and things like that.  So, that's one of the projects

01:57:01PM  14   I'm working on.  And there I'm doing regulatory strategy --

01:57:04PM  15   what are the -- they're early stage, so what are the kinds of

01:57:08PM  16   barriers and then what are the kinds of specific safety test

01:57:12PM  17   do -- can you develop in order to make sure that before you

01:57:15PM  18   go to the step of putting this in people, that you understand

01:57:18PM  19   all of the potential risks that could -- could -- come about

01:57:23PM  20   because of the nature of the product itself.  So that's an

01:57:26PM  21   example of one thing we're doing right now.

01:57:28PM  22       Q.  Okay.  In the course of your consulting work, do you

01:57:34PM  23   ever have to review internal documents to companies and

01:57:37PM  24   assess them for how they meet or do not meet federal

01:57:40PM  25   regulations?

01:57:41PM **1**      A.   Yes.   In my regulatory practice I do that.   Of

01:57:44PM **2**  course, I have done that in litigation as well.   But, yeah,

01:57:46PM **3**  in my regulatory practice, I have -- I am providing -- I'm

01:57:50PM **4**  provided with documents that the company, for example, may

01:57:52PM **5**  have had interactions with the FDA already.   Or I may be

01:57:56PM **6**  drafting documents or things that are going to be submitted

01:57:59PM **7**  to FDA.   So those would all be internal company information

01:58:02PM **8**  data I look at, documents that I look at, and they're used to

01:58:07PM **9**  form the basis of either advice I'm giving to the client or

01:58:10PM **10**  maybe they're being used to form the base of an argument that

01:58:14PM **11**  we're going to make before the FDA.   Sometimes we'll go to

01:58:17PM **12**  the FDA and make a presentation about an issue -- a safety

01:58:22PM **13**  issue, for example, or a development issue during, you know,

01:58:26PM **14**  representing them on what they're doing to develop the

01:58:29PM **15**  product.

01:58:30PM **16**      Q.   Okay.   So you've actually presented to the FDA?

01:58:32PM **17**      A.   Yes.   The last couple of years it's all been by Zoom

01:58:36PM **18**  but, yes, we've been doing that.

01:58:38PM **19**      Q.   All right.   And for how long over the course of your

01:58:43PM **20**  consulting career have you had to do that where you review

01:58:46PM **21**  documents either internal or external to a company and apply

01:58:53PM **22**  them against a standard from a rules-of-the-road-type thing,

01:58:55PM **23**  like the Code of Federal Regulations?

01:58:59PM **24**      A.   So, the first time I did that would have been when I

01:59:02PM **25**  joined ENVIRON because there we had a number of companies

01:59:06PM   1    that were either prescription drug manufacturers or food

01:59:09PM   2    companies or medical device companies -- those are all kinds

01:59:12PM   3    of products regulated by the FDA.  And we would see their

01:59:17PM   4    internal documents -- their e-mail exchanges, their letters

01:59:21PM   5    at the time actually.  Early on, it would have been mostly

01:59:23PM   6    letter correspondence -- or internal documents that describe

01:59:27PM   7    information or data.

01:59:28PM   8        Q.   Okay.  And so said you've been doing that since you

01:59:35PM   9    were with ENVIRON and you joined ENVIRON in?

01:59:37PM  10        A.   November of 1989.

01:59:40PM  11        Q.   Okay.  So for over 30 years you've been doing that.

01:59:43PM  12        A.   Yes.  You're dating me but, yes, that's correct.

01:59:45PM  13        Q.   Let me ask you:  For 30 years you've been reviewing

01:59:48PM  14    documents internal and external to companies to apply them

01:59:51PM  15    against the standard?

01:59:52PM  16        A.   Yes.  It is a routine part I do as a consultant.  And

01:59:56PM  17    most consultants I know, it's a routine part of their job

01:59:59PM  18    when they work with industry and regulatory matters.

02:00:01PM  19        Q.   Okay.  When I say "standard," I was referring to the

02:00:03PM  20    Code of Federal Regulations.

02:00:04PM  21        A.   Oh, I'm sorry.  Yes.

02:00:05PM  22        Q.   Okay.

02:00:05PM  23        A.   Well, that's actually a tool I use every day.  Every

02:00:09PM  24    project that I do pretty much right now in my practice has

02:00:12PM  25    some relationship to a CFR regulation, be it complying with

02:00:17PM  1    something we have to do to submit -- getting ready to submit

02:00:21PM  2    something to the FDA, complying with something post-market or

02:00:25PM  3    in litigation cases, obviously, I do a lot of cases where the

02:00:29PM  4    issues are around the Code of Federal Regulations and

02:00:32PM  5    explaining to a jury, for example, like I'm here today to

02:00:35PM  6    talk about how the regulations apply to a prescription drug

02:00:38PM  7    and how that impacts issues in the case.

02:00:41PM  8        Q.  Okay.  Do you get compensated for the work you're

02:00:44PM  9    doing like you are today?

02:00:45PM  10       A.  Yes, this is my job.  This is what I do every day,

02:00:48PM  11   yes.

02:00:48PM  12       Q.  Testify in court every day or just being a

02:00:52PM  13   consultant?  I want to make sure we're clear.

02:00:54PM  14       A.  I get paid for both --

02:00:54PM  15       Q.  Okay.

02:00:56PM  16       A.  So, yes.  When I come to court -- I don't do this

02:00:58PM  17   every day -- but, yes, I get paid for my time, yes.

02:01:00PM  18       Q.  Okay.  At what rate do you bill us?

02:01:02PM  19       A.  So, I bill at $300 an hour for the work I do, and

02:01:07PM  20   it's the same rate for my regulatory clients as well.

02:01:09PM  21       Q.  Okay.

02:01:17PM  22           MR. MICELI:  Your Honor, at this time I would like to

02:01:19PM  23   tender Dr. Plunkett as an expert in the area of regulatory

02:01:23PM  24   compliance as it concerns labeling according to the CFR --

02:01:28PM  25   Code of Federal Regulations -- and particularly concerning

02:01:31PM  **1**   the product Taxotere.

02:01:33PM  **2**        MR. STRONGMAN:  No objections at this time.

02:01:35PM  **3**        THE COURT:  Okay.  The Court's going to accept Dr.

02:01:37PM  **4**   Plunkett as an expert in the field of regulatory compliance

02:01:41PM  **5**   as it concerns prescription drugs --

02:01:50PM  **6**        MR. MICELI:  And I just said, and particularly with

02:01:52PM  **7**   regard to the label of Taxotere.  Perhaps I shouldn't have

02:01:57PM  **8**   tendered her at that specificity.

02:01:59PM  **9**        THE COURT:  Court's going to accept Dr. Plunkett as

02:02:01PM  **10**  an expert in the field of regulatory compliance and labeling.

02:02:05PM  **11**       MR. MICELI:  Thank you.

02:02:07PM  **12**       THE COURT:  Qualified to render opinions.

02:02:10PM  **13**       MR. MICELI:  Okay.

02:02:12PM  **14**       THE COURT:  Please proceed.

02:02:13PM  **15**       MR. STRONGMAN:  You may proceed.

02:02:14PM  **16**       MR. MICELI:  Thank you.

02:02:14PM  **17**  BY MR. MICELI:

02:02:14PM  **18**       **Q.**   Okay.  Dr. Plunkett, at my request, did you

02:02:17PM  **19**  investigate the issue of the adequacy of Sanofi's Taxotere

02:02:22PM  **20**  label concerning an adverse reaction of permanent

02:02:27PM  **21**  chemotherapy-induced alopecia?

02:02:29PM  **22**       **A.**   Yes, I did.

02:02:31PM  **23**       **Q.**   And have you formed opinions as to whether or not

02:02:33PM  **24**  Sanofi's label for Taxotere was adequate in its adverse

02:02:34PM  **25**  reactions warning for that issue, permanent

02:02:37PM **1**   chemotherapy-induced alopecia?

02:02:39PM **2**       **A.**   Yes, I did.

02:02:40PM **3**       **Q.**   And what is your opinion?

02:02:41PM **4**       **A.**   My opinion is that the label does not -- is not

02:02:44PM **5**   adequate with its description of alopecia, specifically not

02:02:48PM **6**   having a warning at the time period I looked, which is for

02:02:53PM **7**   this case, before 2008.

02:02:56PM **8**       **Q.**   Okay.  Let's step back just a moment and start, as

02:03:02PM **9**   they say, at the beginning.  What is an "adequate label"?

02:03:07PM **10**      **A.**   So the FDA regulations and guidance on labeling, as

02:03:13PM **11**  well -- documents I deal with every day -- set forth the

02:03:15PM **12**  standard being that in order to be adequate a label must be

02:03:18PM **13**  truthful, tell the truth, be accurate, and not misleading.

02:03:23PM **14**  So that means that the label has to set forth what the

02:03:27PM **15**  company knows about the drug and when it knows it.  So that's

02:03:33PM **16**  another part of the kind of the rules of the road.  You have

02:03:36PM **17**  to be truthful about what you know and you have to let the --

02:03:39PM **18**  let the doctors and the patients know about it when it

02:03:43PM **19**  occurs.  So you find something out, it's not in the label, it

02:03:47PM **20**  meets the labeling standard -- and I think we'll talk about

02:03:50PM **21**  that in a minute, about how you know when it has to go in --

02:03:50PM **22**      **Q.**   Right.

02:03:53PM **23**      **A.**   But once you determine it does and you know about it

02:03:55PM **24**  as a company, you're required to do that.

02:03:57PM **25**      **Q.**   Okay.  I'm going to try to put that in plain English.

| | | |
|---|---|---|
| 02:04:03PM | 1 | Are you saying what the company knows it must disclose? |
| 02:04:07PM | 2 | A.  Yes.  You have to tell the company -- you have to |
| 02:04:09PM | 3 | tell doctors and their patients what you know, when you know |
| 02:04:12PM | 4 | it. |
| 02:04:12PM | 5 | Q.  Okay.  Did you look at the Taxotere -- or, where did |
| 02:04:22PM | 6 | your investigation begin? |
| 02:04:23PM | 7 | A.  So, I started, as I would in this kind of a case, |
| 02:04:26PM | 8 | with the label itself.  And I was looking at the label that |
| 02:04:28PM | 9 | pertains in this case, so it would be the label that was in |
| 02:04:31PM | 10 | effect at the time that Ms. Kahn started her therapy.  That |
| 02:04:36PM | 11 | would be a September 2007 label, I believe. |
| 02:04:43PM | 12 | MR. MICELI:  Your Honor, can I show -- I believe this |
| 02:04:45PM | 13 | is already in evidence.  Can I show it to the witness on the |
| 02:04:49PM | 14 | ELMO? |
| 02:04:50PM | 15 | THE COURT:  Yes. |
| 02:04:51PM | 16 | MR. STRONGMAN:  No objection, Your Honor. |
| 02:04:52PM | 17 | MR. MICELI:  And Jon, I highlighted the area that |
| 02:04:57PM | 18 | says "alopecia."  Do you mind? |
| 02:04:59PM | 19 | MR. STRONGMAN:  No problem. |
| 02:05:00PM | 20 | MR. MICELI:  Your Honor, I have an agreement I can |
| 02:05:01PM | 21 | show this? |
| 02:05:02PM | 22 | THE COURT:  Yes.  Please proceed. |
| 02:05:04PM | 23 | MR. MICELI:  Okay.  Thank you.  It will make it a |
| 02:05:05PM | 24 | whole lot quicker. |
| 02:05:06PM | 25 | BY MR. MICELI: |

02:05:08PM  1     Q.   Dr. Plunkett, does the Taxotere label in September of

02:05:16PM  2   2007 -- let me back up.  September of 2007 was the last label

02:05:20PM  3   prior to May 2008 when Ms. Kahn received her Taxotere?

02:05:24PM  4     A.   Yes.  Based on the research I did, it was.

02:05:27PM  5     Q.   Okay.  And is this the first page of the label?  See

02:05:36PM  6   if I can get it out.  There we go.  Is this the label you

02:05:43PM  7   reviewed?

02:05:44PM  8     A.   Yes.  And you can see the date down there right above

02:05:49PM  9   the line, yeah.  So it tells you that's the date of the

02:05:52PM  10  label.

02:05:52PM  11    Q.   I'm going to try to -- maybe it's not -- there we go.

02:05:57PM  12  All righty.  And how many times -- have you looked at this

02:05:59PM  13  label to count the number of times "alopecia" is stated?

02:06:02PM  14    A.   I did.  And I believe it's 10 or 12 times.  Maybe 13.

02:06:08PM  15    Q.   Well --

02:06:09PM  16    A.   Well, either alopecia or the term "hair loss."

02:06:12PM  17    Q.   Well, that was my next question.  Did you look for

02:06:14PM  18  just "alopecia"?

02:06:15PM  19    A.   No.  I looked for both "alopecia" and "hair loss"

02:06:19PM  20  because hair loss is a word that's used in some parts of the

02:06:23PM  21  label.

02:06:23PM  22    Q.   Have you formed an opinion -- we'll get to the rest

02:06:25PM  23  of your testimony -- but have you formed an opinion as

02:06:28PM  24  whether just saying "alopecia" is a sufficient warning for

02:06:32PM  25  permanent chemotherapy-induced alopecia?

02:06:34PM 1   A.   I have and in my opinion, it is not.

02:06:36PM 2   Q.   Okay.  So I'm going to walk through this label with

02:06:39PM 3   you.  On the front page under a section called "Adverse

02:06:43PM 4   Reactions," it says "Alopecia."  Is that a warning for

02:06:46PM 5   permanent alopecia?

02:06:47PM 6   A.   No.  It is not, based upon the evidence I have seen.

02:06:50PM 7   Q.   Okay.  And on page 8 of this label, there's another

02:07:01PM 8   time where it just says the word "Alopecia" in a sentence.

02:07:04PM 9   Is that a warning for permanent chemotherapy-induced

02:07:09PM 10  alopecia?

02:07:09PM 11  A.   No, it's not.  There is a specific -- there is a

02:07:14PM 12  specific condition of permanent alopecia and it was known at

02:07:17PM 13  this time.

02:07:18PM 14  Q.   Okay.  We're going to get to that.  I just want to

02:07:23PM 15  ask:  In this chart, there's the word "Alopecia."  Is that a

02:07:29PM 16  warning for permanent chemotherapy-induced alopecia?

02:07:32PM 17  A.   No, it is not.

02:07:33PM 18  Q.   How about this word in this chart, "Alopecia."  Is

02:07:43PM 19  that a warning for permanent chemotherapy-induced alopecia?

02:07:47PM 20  A.   Again, no, it is not.

02:07:49PM 21  Q.   All right.  When we go through each one of these -- I

02:07:57PM 22  think you see where I'm going -- but is this word,

02:07:59PM 23  "Alopecia," because it's in this label, a warning for

02:08:02PM 24  permanent alopecia?

02:08:02PM 25  A.   No, it's not.

02:08:03PM 1    Q.  There's two on one page.  I apologize.  Is the word,

02:08:14PM 2    "Alopecia" in this paragraph at the top of page 27, is that a

02:08:19PM 3    warning for permanent alopecia?

02:08:22PM 4    A.  No, it's not.  And actually, I thought that's what

02:08:25PM 5    you were referring to.

02:08:25PM 6    Q.  Oh.

02:08:26PM 7    A.  It's in the table below.  Is that where the other one

02:08:28PM 8    is?

02:08:28PM 9    Q.  There were two places.  I apologize if I jumped

02:08:33PM 10   ahead.  Is the word "Alopecia" in this chart a warning for

02:08:37PM 11   permanent alopecia?

02:08:37PM 12   A.  No, it's not.

02:08:39PM 13   Q.  I think that's the last one.  Excuse me.  Is the word

02:08:50PM 14   "hair loss" alone a warning for permanent

02:08:58PM 15   chemotherapy-induced alopecia?

02:08:59PM 16   A.  No, it's not.

02:09:01PM 17   Q.  And is a statement that says, "Once you have

02:09:04PM 18   completed all of your -- all your treatments, hair generally

02:09:09PM 19   grows back."  Is that a warning for permanent alopecia?

02:09:13PM 20   A.  No, it's not.  Again, applying the regulatory

02:09:16PM 21   standard for what a warning would be, it is not.

02:09:21PM 22   Q.  Okay.  Thank you.  What did you do after reviewing

02:09:37PM 23   the label of September 26th, 2007?

02:09:45PM 24   A.  So, once I knew what was in the label at the time

02:09:48PM 25   period of interest, I then looked for the evidence that

02:09:51PM 1  would -- could be referred to in terms of understanding when

02:09:55PM 2  the label should have been updated.

02:09:58PM 3      Q.   Okay.  And how did you do that?

02:10:00PM 4      A.   So, it started with asking two questions because

02:10:06PM 5  the -- the responsibility for the label and the language in

02:10:09PM 6  the label is the company's.  So, you start with what did the

02:10:14PM 7  company know and understand when they knew that, and then you

02:10:17PM 8  also ask the question if you don't -- if you're having a hard

02:10:21PM 9  time finding evidence or information about statements about

02:10:29PM 10 what they knew, then you can look at could they have known or

02:10:29PM 11 should they have known as well.  So those, kind of, two

02:10:32PM 12 buckets of evidence.  What did they know first?  And then

02:10:35PM 13 once you know what they knew about this toxicity and the

02:10:38PM 14 occurrence of this toxicity in their patients, then the

02:10:41PM 15 question would be look at that, compare that to the labeling

02:10:45PM 16 standard.  But then the second question would be, what could

02:10:48PM 17 they have known or should they have known as well.

02:10:51PM 18      Q.   So you start with what they did know, and then you

02:10:54PM 19 move to what they could or should have known?

02:10:56PM 20      A.   Yes, that's correct.  That's how I typically will do

02:11:00PM 21 it.

02:11:00PM 22      Q.   Okay.  If -- if evidence meets the standard --

02:11:04PM 23 labeling standard for a label change or a label update simply

02:11:09PM 24 with what the company knows, do you still go on and look at

02:11:12PM 25 what the company could have or should have known?

02:11:15PM **1**      **A.**   So, you don't have to.  If you have enough

02:11:19PM **2**   information based on the evidence, and I think we're going to

02:11:21PM **3**   talk about in this case, that shows that the company knew and

02:11:25PM **4**   understood that something -- a toxicity or this adverse

02:11:29PM **5**   reaction -- was occurring and it met the labeling standard

02:11:33PM **6**   for addition to the adverse reaction section, then that alone

02:11:37PM **7**   would be reason to add it to the warning without -- add it to

02:11:40PM **8**   the label without going -- without me having to go to the

02:11:44PM **9**   next step.  But I did go to the next step, as well, in this

02:11:48PM **10**   case looking at some of the other information.

02:11:49PM **11**      **Q.**   Okay.  So if you look at what they did or could or

02:11:55PM **12**   should have known, after you gather that information, what do

02:11:58PM **13**   you then do?

02:11:59PM **14**      **A.**   So then you compare it and determine whether or not

02:12:03PM **15**   it meets the standard.  So that's where we're going -- we

02:12:06PM **16**   need to talk about what is the standard -- what is the rule

02:12:09PM **17**   under the FDA regulations for when something gets added to

02:12:13PM **18**   the adverse reaction section of the label.  That was the

02:12:17PM **19**   question that I was addressing with my work.

02:12:21PM **20**      **Q.**   Okay.  And we talked briefly a little while ago about

02:12:28PM **21**   the three code sections that you mentioned, 201.57, 314.80 --

02:12:36PM **22**      **A.**   Yes.

02:12:37PM **23**      **Q.**   -- and 202.1?

02:12:39PM **24**      **A.**   Yes.

02:12:39PM **25**      **Q.**   Okay.  Would it help you explain these to the jury if

02:12:42PM **1**   you could see those?

02:12:43PM **2**       A.   Yeah, I think it might help the jury to actually see

02:12:47PM **3**   the language so when I use the words, you'll see that it

02:12:49PM **4**   matches with the actual rule that is set forth by FDA.

02:12:53PM **5**       Q.   Okay.  I'm going to try -- there is a specific

02:12:58PM **6**   section in the code, Section 21 CFR 201.57, but for ease can

02:13:07PM **7**   we just go by the last numbers, 201.57?

02:13:10PM **8**       A.   Yes, oh no, absolutely.  There's even a subsection

02:13:13PM **9**   that we can look at that deals with adverse reaction section

02:13:17PM **10**  of the label.

02:13:17PM **11**      Q.   Right.  Okay.  I want to turn to that.  Excuse me.  I

02:13:38PM **12**  need to find -- first, I want to show the front page.  This

02:13:44PM **13**  is what we're talking about right here, correct?  21 CFR

02:13:49PM **14**  201.57 but we're going to go with just that number there,

02:13:51PM **15**  correct?

02:13:52PM **16**      A.   Yes, that's correct.

02:13:53PM **17**      Q.   And you mentioned that there's a section that deals

02:13:56PM **18**  with adverse reactions?

02:13:58PM **19**      A.   Yes, it's further down.

02:13:59PM **20**      Q.   Yes.  I went too far across that line.  Is that the

02:14:08PM **21**  section you're referring to?

02:14:09PM **22**      A.   Yes.  That's the subsection where it's talking

02:14:12PM **23**  about -- I don't know -- does the jury understand that it's

02:14:16PM **24**  broken -- the label is broken into sections?

02:14:18PM **25**      Q.   Why don't you explain that to them.

02:14:24PM **1**          A.   I'm sorry.

02:14:26PM **2**               THE COURT:   I think you need to ask questions.

02:14:26PM **3**               MR. MICELI:   Okay.  All right.

02:14:28PM **4**               THE WITNESS:   I apologize.

02:14:29PM **5**     BY MR. MICELI:

02:14:29PM **6**          Q.   What does 201.57 explain?

02:14:34PM **7**          A.   The -- it explains that document we just showed a few

02:14:38PM **8**     minutes ago that was multiple pages, and it was the first

02:14:42PM **9**     page of the label.  So it explains what needs to go into each

02:14:47PM **10**    of those sections in the label, and that first page we showed

02:14:50PM **11**    was sort of a table of contents, here's the different

02:14:53PM **12**    sections.  I just wanted to make sure that the jury

02:14:55PM **13**    understands there is a specific section of the label called

02:14:58PM **14**    "Adverse Reactions," and that's what this regulatory language

02:15:01PM **15**    deals with.  So this is the rule that I compare to the label

02:15:08PM **16**    itself when I look at the adverse reaction section.

02:15:10PM **17**         Q.   Okay.  And in forming your opinions in this case,

02:15:18PM **18**    what is relevant to you about this section of 201.57?

02:15:23PM **19**         A.   It would be the standard that's sort of the

02:15:28PM **20**    definition of what is an adverse reaction and then at some

02:15:32PM **21**    point down here, it talks about what you list and how you

02:15:36PM **22**    list it and what are the decisions you make in terms of what

02:15:39PM **23**    the standard is for something that goes into this section.

02:15:42PM **24**         Q.   And what is that language that you're referring to

02:15:45PM **25**    there?

02:15:45PM **1**     A.   So an adverse -- well, the first thing you have to

02:15:50PM **2**  understand is an adverse reaction is a side effect or a

02:15:52PM **3**  toxicity or an undesirable effect of a drug.  And then the

02:15:56PM **4**  next thing you need to understand, in order to put something

02:15:59PM **5**  into this section of the label, you have to have, the

02:16:02PM **6**  language is "Some basis to believe."  So you have to have

02:16:05PM **7**  some evidence to point to -- some basis to believe -- that

02:16:09PM **8**  there is a causal relationship between exposure to the drug

02:16:14PM **9**  and the event you're looking at.  So that would be some basis

02:16:17PM **10**  to believe, in this case, that PCIA or permanent or

02:16:22PM **11**  irreversible alopecia had been caused by or can be caused by

02:16:26PM **12**  the drug.  But it's not a full causation analysis.  It's

02:16:31PM **13**  truly just looking for information that, again, meets that

02:16:35PM **14**  standard of "some basis to believe."  So it's a lesser

02:16:37PM **15**  standard than other sections of the label.

02:16:40PM **16**     Q.   Okay.  Do you need to prove definitive cause that an

02:16:47PM **17**  event is related to the drug before it goes into the adverse

02:16:50PM **18**  reactions section?

02:16:51PM **19**     A.   No, you do not.  Absolutely not.  That is what

02:16:55PM **20**  this -- the language of this part of the regulation talks

02:16:57PM **21**  about.

02:16:57PM **22**     Q.   And I believe you said the language here, "Some basis

02:17:06PM **23**  to believe there is a causal relationship between the drug

02:17:11PM **24**  and the occurrence of the adverse event"?

02:17:14PM **25**     A.   Yes, that's exactly right.  Because you don't put

02:17:17PM  1   every adverse event that occurs.  You put ones that meet this

02:17:20PM  2   criteria.

02:17:21PM  3       Q.  And how do you go about deciding what meets that

02:17:24PM  4   criteria?

02:17:25PM  5       A.  Well, there is -- that's why I had pointed to

02:17:30PM  6   Section 314.80, another section of the regulations that deals

02:17:34PM  7   with, sort of, defining for you what are the characteristics

02:17:40PM  8   of adverse events that might lead to the need to include them

02:17:43PM  9   in the label.  Because, as Dr. Palatinsky described, after

02:17:49PM  10  marketing, there's new things that can happen and so that's

02:17:53PM  11  what we're talking about here.  What can happen after the

02:17:55PM  12  drug goes on the market and what are the rules or the

02:17:58PM  13  standards that apply to how you would make the decision that

02:18:02PM  14  something needs to be put into the label.

02:18:05PM  15      Q.  Okay.  So how -- how is the interplay between those

02:18:09PM  16  two code sections -- those two rules of the road?

02:18:12PM  17      A.  So this section tells you the standard, there has to

02:18:16PM  18  be "some basis to believe" about an adverse event.  The other

02:18:23PM  19  section explains to you or gives you the rules for how to

02:18:26PM  20  identify these adverse events to start with.  And it has to

02:18:29PM  21  do with the fact that they are adverse events that are either

02:18:32PM  22  new adverse events you haven't seen before that you've seen

02:18:36PM  23  post-market, or ones that have different characteristics.

02:18:39PM  24  And that's what really applies here.  It's understanding that

02:18:42PM  25  even though the original experience with the drug may have

02:18:46PM  1   been hair loss or alopecia, that we now have a different type

02:18:50PM  2   of event.  It's not just temporary alopecia but it's

02:18:54PM  3   permanent alopecia.

02:18:55PM  4       Q.  Okay.  And would it help you to demonstrate that if I

02:19:00PM  5   showed 314.80?

02:19:02PM  6       A.  Yes.  I think if you want to show the language.  I

02:19:08PM  7   don't know if it needs a lot of time, but --

02:19:21PM  8       Q.  All righty.  Dr. Plunkett, is this Section 314.80?

02:19:26PM  9       A.  Yes.

02:19:31PM  10      Q.  Okay.  Which section of this defines what an

02:19:41PM  11  unexpected -- well, does this define what an unexpected drug

02:19:47PM  12  experience is?

02:19:47PM  13      A.  Yes.  This first section has definitions and if you

02:19:50PM  14  go down to -- I can barely just see it on the bottom of my

02:19:54PM  15  screen.

02:19:55PM  16      Q.  Sorry.  There we go.

02:19:55PM  17      A.  Yeah.

02:19:56PM  18      Q.  Is that what you're referring to?

02:19:57PM  19      A.  Yes.  Because this is speaking to adverse drug

02:20:01PM  20  events -- toxicities that are not listed in the current

02:20:04PM  21  labeling, and that's what we're talking about.  We're talking

02:20:06PM  22  about an adverse experience, an event, a type of toxicity --

02:20:12PM  23  permanent alopecia -- that is not currently listed in the

02:20:15PM  24  labeling.

02:20:15PM  25      Q.  Okay.  And you mentioned something in your -- earlier

02:20:19PM   1   about the difference between permanent and temporary

02:20:22PM   2   alopecia?

02:20:22PM   3       A.   Yes.

02:20:22PM   4       Q.   How does that relate to this rule of the road?

02:20:25PM   5       A.   So, it describes this specifically for you.  It talks

02:20:29PM   6   about what is -- what is this adverse drug experience that's

02:20:36PM   7   unexpected and it gives an example.  It talks about the fact

02:20:40PM   8   if you read down -- maybe you want to highlight it -- first

02:20:41PM   9   off, it's "Something that's not listed in the current

02:20:44PM  10   labeling."  And then if you go down further -- I don't know

02:20:47PM  11   if -- we can read the whole thing or just go for sections of

02:20:50PM  12   it.  Essentially it's telling you that these events can be

02:20:54PM  13   "Symptomatically and pathophysiologically."  That just means

02:20:59PM  14   they could be similar by the way they develop and the -- what

02:21:04PM  15   the symptoms look like -- so they're both hair loss but one

02:21:06PM  16   is temporary, one is permanent -- to an event listed in the

02:21:09PM  17   labeling, but they differ because of -- and they list,

02:21:12PM  18   "Greater severity or specificity."  And that's what applies

02:21:15PM  19   here.

02:21:15PM  20       Q.   So you're saying that temporary hair loss and

02:21:18PM  21   permanent hair loss are different?

02:21:19PM  22       A.   Yes, they are.  In my view, they are and I think that

02:21:23PM  23   there is other scientists' work that I have relied on that

02:21:27PM  24   indeed say the same thing.

02:21:28PM  25       Q.   Okay.  Is there a Code of Federal Regulation or rule

02:21:31PM **1** of the road that says that a drug company has to guarantee

02:21:36PM **2** that an event is going to happen before they have to warn

02:21:39PM **3** about it?

02:21:41PM **4**     MR. STRONGMAN:  Objection, leading.

02:21:44PM **5**     THE COURT:  Sustained.

02:21:44PM **6**     MR. MICELI:  Okay.

02:21:45PM **7**     THE COURT:  Rephrase your question.

02:21:46PM **8** BY MR. MICELI:

02:21:48PM **9**     Q.  Doctor, what, if any, Code of Regulation deals with

02:21:52PM **10** guarantees?

02:21:53PM **11**     A.  There is no guarantee in the Code of Federal

02:21:57PM **12** Regulation.  It's a set of rules to follow, but there's no

02:22:00PM **13** guarantees in that.

02:22:01PM **14**     Q.  Okay.  And so how does -- can you explain to the jury

02:22:10PM **15** how this code section relates to your opinions in this case?

02:22:15PM **16**     A.  So this code section, because it's talking with

02:22:20PM **17** postmarket drug events and that's what we're talking about

02:22:23PM **18** here, I'm looking at events that occurred after the drug was

02:22:26PM **19** approved but before Ms. Kahn's use of the drug in, I think,

02:22:31PM **20** May of 2008.  And looking at what was known within the

02:22:35PM **21** company, about whether or not there was an existence of such

02:22:39PM **22** an unexpected event.  And the understanding that there indeed

02:22:44PM **23** was a different kind of alopecia.  There were people that

02:22:48PM **24** lost their hair and grew it back, and that there were people

02:22:52PM **25** whose hair that did not regrow after they lost it.  And

02:22:56PM  1   that's what makes this different, the severity and

02:23:00PM  2   specificity.  It's specifically different because it doesn't

02:23:03PM  3   grow back and it is more severe as well because it could be a

02:23:06PM  4   permanent injury or in some people, it is a permanent injury.

02:23:09PM  5       Q.   Okay.  And the last Code of Federal Regulation that

02:23:17PM  6   you mentioned is one -- it was 202.1, can you explain how

02:23:22PM  7   that's important for drug labeling?

02:23:24PM  8       A.   So that part of the -- of the Code of Federal

02:23:30PM  9   Regulations deals with advertising and promotion of

02:23:33PM  10  prescription drugs.  And the reason the one I'm pointing to

02:23:36PM  11  is important is everybody may think about a label for a drug

02:23:41PM  12  as being either what's on a bottle, for example, or what's on

02:23:45PM  13  a package.  For example, this kind of a drug that you receive

02:23:48PM  14  in a hospital setting or an outpatient setting, it might have

02:23:52PM  15  a listing on the package.  And it may, indeed, also have a

02:23:56PM  16  piece of paper that could accompany it that the physician can

02:24:00PM  17  look at that's a one-page -- sometimes called the patient --

02:24:04PM  18  could be called the physician leaflet; it could be called the

02:24:09PM  19  product insert, the package insert.  Those are all names.

02:24:12PM  20  It's a long document.  It's what we looked at a minute ago,

02:24:15PM  21  that label, that would fit that.

02:24:16PM  22       But labeling by the Code of Federal Regulations in

02:24:21PM  23  202, indicates that labeling is not just that document.  It

02:24:24PM  24  also includes any brochures or handouts or any kinds of

02:24:30PM  25  materials that a sales representative, for example, can leave

02:24:34PM   1   in a doctor's office or any conversational-type pieces that

02:24:39PM   2   could be put out on the Internet or put out there for the

02:24:42PM   3   public to consume.  Those kinds of things are all actually

02:24:46PM   4   called labeling.

02:24:47PM   5        So when we talk about labeling for drugs, what is in

02:24:51PM   6   one piece of labeling has to be consistent across other

02:24:54PM   7   pieces of labeling.  So that's often something that I have to

02:24:58PM   8   deal with.  In this case, I have seen documents in evidence

02:25:02PM   9   that deals with labeling outside of just the label itself.

02:25:05PM  10   That long document we looked at.

02:25:09PM  11   BY MR. MICELI:

02:25:09PM  12        Q.  Yeah.  And is that what you said about what is

02:25:11PM  13   labeling, is that part of this Code of Federal Regulation 201

02:25:18PM  14   or 202.1?

02:25:18PM  15        A.  Yes, that's correct.

02:25:18PM  16        Q.  Would you like me to show that to the jury as well?

02:25:22PM  17        A.  Yes, so they can see it.

02:25:24PM  18        MR. MICELI:  You know what, Jon, I apologize.  I

02:25:28PM  19   already have some highlighting on it.  Excuse me.

02:25:57PM  20        Sorry, Your Honor, there we go.  Two-sided copying.

02:26:07PM  21   I apologize.

02:26:12PM  22        THE WITNESS:  It's Section L I think, isn't it?

02:26:13PM  23   BY MR. MICELI:

02:26:13PM  24        Q.  Excuse me?

02:26:14PM  25        A.  I think were you looking for L, right?

02:26:16PM   1        Q.   (L)(2), yes, ma'am.   And what is the importance of

02:26:20PM   2   202.1, (L)(2).

02:26:24PM   3        A.   So it lists the kinds of --

02:26:25PM   4             THE COURT:   Mr. Miceli, you might want to pull it up

02:26:31PM   5   a little.

02:26:31PM   6             MR. MICELI:   I apologize.   Thank you, Your Honor.

02:26:31PM   7             THE COURT:   Okay.   Thank you.

02:26:31PM   8             MR. MICELI:   I should be able to see it right here.

02:26:31PM   9   Thank you.

02:26:33PM  10             THE WITNESS:   It's essentially -- it's actually,

02:26:34PM  11   setting the rule that I just described to you, it says that

02:26:37PM  12   labeling includes all these other things that are listed here

02:26:37PM  13   in 2.

02:26:44PM  14   BY MR. MICELI:

02:26:44PM  15        Q.   Is that what you're referring to there?

02:26:45PM  16        A.   Yes, exactly.

02:26:46PM  17        Q.   Okay.   And so if materials are provided to doctors or

02:26:50PM  18   to patients, that is labeling?

02:26:53PM  19        A.   That is labeling, that's correct.

02:26:55PM  20        Q.   Okay.   And so if a piece of labeling says that

02:27:02PM  21   alopecia is a common yet temporary condition, what does that

02:27:07PM  22   mean with regard to this code section?

02:27:10PM  23        A.   That means that if that statement is made, the

02:27:14PM  24   question is, is it a truthful statement or is it misleading?

02:27:19PM  25   You have to apply those same kinds of characterizations to

02:27:23PM  1    it.  So it's the idea that that information has to be

02:27:26PM  2    accurate.  In this case, that is an issue because of the fact

02:27:32PM  3    that there are actually two kinds of alopecia, not just

02:27:35PM  4    alopecia that is temporary.

02:27:37PM  5        Q.  Thank you.

02:27:41PM  6            Now, we've talked about the standard.  You've talked

02:27:44PM  7    about how you go about doing your work.  How do you go

02:27:49PM  8    about -- or what did you review in gathering information for

02:27:52PM  9    facts to apply against your standard?

02:27:55PM  10       A.  So as I told you, I went -- started with what the

02:27:58PM  11   company knows, so I went to depositions.  There's about 20

02:28:03PM  12   different depositions, I believe, of corporate employees or

02:28:06PM  13   company employees that I reviewed as well as exhibits to

02:28:10PM  14   those depositions.  And I looked for information in those

02:28:12PM  15   depositions about what the company knew about the

02:28:18PM  16   relationship between Taxotere use and permanent alopecia.

02:28:22PM  17       Q.  Okay.  And can you tell us what you found?

02:28:25PM  18       A.  I found that there were actually admissions by

02:28:31PM  19   corporate employees, global safety officers that made

02:28:35PM  20   statement -- they understood or they knew or they actually

02:28:39PM  21   made statements in depositions that Taxotere use was -- could

02:28:46PM  22   cause, in some people, permanent alopecia.

02:28:48PM  23       Q.  Okay.

02:28:49PM  24       A.  That's an example.

02:28:50PM  25       Q.  Who said that?

02:28:51PM  1      A.   So that was Amy Freedman who was a global safety

02:28:55PM  2   officer for Taxotere.

02:28:56PM  3      Q.   Did she indicate when she said Sanofi knew that?

02:29:00PM  4      A.   Yes.   She's talking about 2006, there's questions in

02:29:04PM  5   the deposition about that time period.

02:29:06PM  6      Q.   Okay.

02:29:06PM  7      A.   So in 2006, that evidence shows me that the company

02:29:10PM  8   knew that there was a relationship, some basis to believe,

02:29:15PM  9   that Taxotere could -- had been associated or was -- had a

02:29:22PM  10  causal relationship with permanent alopecia.

02:29:25PM  11     Q.   Okay.   Was there anything else that you saw?

02:29:28PM  12     A.   Yes, there's more than that.   That sort of was a

02:29:30PM  13  starting point for the depositions.

02:29:31PM  14     Q.   What's the next piece of evidence that you saw?

02:29:35PM  15     A.   Also, in 2006, I believe April, there was an internal

02:29:38PM  16  meeting among global safety officers and others in the

02:29:43PM  17  company about labeling for Taxotere.   And they discussed

02:29:47PM  18  adding information into the adverse reaction section for

02:29:53PM  19  Taxotere labeling, and it distinguishes between temporary

02:29:57PM  20  hair loss and permanent hair loss.   So it's a recognition of

02:30:04PM  21  that difference.

02:30:06PM  22     Q.   Okay.

02:30:06PM  23          MR. MICELI:   Can I approach, Your Honor?

02:30:08PM  24          THE COURT:   Yes, you may.

02:30:10PM  25          MR. MICELI:   Okay.   Dr. Plunkett, I'll just hand it

02:30:11PM 1    to you now and I'll get back to the microphone.

02:30:17PM 2    BY MR. MICELI:

02:30:18PM 3        Q.  Dr. Plunkett, do you recognize this document?

02:30:20PM 4        A.  Yes, this is another document.

02:30:22PM 5        Q.  Okay.  What is this document?

02:30:24PM 6        A.  So this document -- oh, I'm sorry.  This isn't that

02:30:31PM 7    document.  I apologize.  Yes.  This is the document that is

02:30:32PM 8    showing an invitation to this internal meeting that happened

02:30:37PM 9    in April of 2006.

02:30:38PM 10       Q.  Okay.  And did you learn from reading this document

02:30:41PM 11   what the purpose of the meeting was for?

02:30:43PM 12       A.  Yes.  It was discussing changes to the labeling

02:30:47PM 13   within the adverse reaction section of Taxotere.

02:30:49PM 14       Q.  Okay.  I'm going to put --

02:30:51PM 15           THE COURT:  I think we have an objection.

02:31:02PM 16           (WHEREUPON, the following proceedings were held at

02:31:05PM 17   the bench:)

02:31:05PM 18           THE COURT:  All right.  I thought we had decided we

02:31:07PM 19   would not talk about this meeting as a meeting to change a

02:31:10PM 20   label because it now it sounds like there was an internal

02:31:14PM 21   meeting about changing this label.

02:31:16PM 22           MR. STRONGMAN:  Correct.

02:31:17PM 23           THE COURT:  And this is a foreign label.

02:31:17PM 24           MR. MICELI:  Okay.

02:31:19PM 25           THE COURT:  So how are we going to fix that?

02:31:22PM **1**          MR. MICELI:  I can ask her.

02:31:27PM **2**          THE COURT:  And would you like me to give an

02:31:29PM **3** instruction?  How do you want to do it?  Because when it came

02:31:34PM **4** out of her mouth, I thought you had agreed.

02:31:37PM **5**          MR. STRONGMAN:  We did.

02:31:40PM **6**          MR. MICELI:  I was not expecting to hear that myself.

02:31:48PM **7**          MR. STRONGMAN:  I'm thinking.

02:31:51PM **8**          THE COURT:  You think --

02:31:53PM **9**          MR. MICELI:  I would just say it's a discussion.  We

02:31:56PM **10** don't say anything about a label.

02:31:58PM **11**          THE COURT:  Well, the problem is it's already spit

02:32:00PM **12** out of her mouth.

02:32:01PM **13**          MR. MICELI:  I can say I misspoke or she misspoke,

02:32:04PM **14** that it was just an internal discussion.

02:32:07PM **15**          THE COURT:  What you could say and I want to be

02:32:10PM **16** clear, if she says the wrong thing.  To be clear, we're not

02:32:16PM **17** talking about changing this label, about the American label

02:32:22PM **18** with the FDA; this was just a conversation.

02:32:25PM **19**          MR. STRONGMAN:  I'm --

02:32:26PM **20**          MR. MICELI:  If you don't mind, we can say what you

02:32:30PM **21** said.  This is not a --

02:32:33PM **22**          THE COURT:  I don't know.  I mean, I could do it to

02:32:36PM **23** be -- I would just want to be clear, that this was not a

02:32:41PM **24** discussion about changing the label with FDA but this -- in

02:32:46PM **25** this discussion, they were able to differentiate between

02:32:49PM  1  temporary and permanent.

02:32:51PM  2       MR. STRONGMAN:  One of my concerns is that she's

02:32:54PM  3  talking about the adverse reaction section and things like

02:32:56PM  4  that like it's --

02:32:59PM  5       THE COURT:  Well, she's spitting --

02:33:06PM  6       MR. MICELI:  Not showing --

02:33:06PM  7       THE COURT REPORTER:  I can't hear you, Mr. Miceli.

02:33:07PM  8       MR. MICELI:  I'm sorry.

02:33:08PM  9       MR. STRONGMAN:  I think not showing the document with

02:33:09PM  10  the clarification that this is not a conversation about

02:33:13PM  11  changing the label.  It's not changing the label at issue in

02:33:18PM  12  this case.  Just to clarify.

02:33:21PM  13       MR. MICELI:  Well, before the label in this case, it

02:33:25PM  14  couldn't have been.  I can say, to be clear, this is not a

02:33:28PM  15  conversation, not changing the label in April of 2006.

02:33:35PM  16       MR. STRONGMAN:  It's not a conversation about

02:33:37PM  17  changing the label at all at any point.

02:33:40PM  18       MR. MICELI:  Want to say US label?  I mean, if I say

02:33:44PM  19  relevant label, it's going to --

02:33:45PM  20       MR. STRONGMAN:  You understand what I mean?

02:33:46PM  21       MR. MICELI:  Yeah, I do understand.

02:33:46PM  22       THE COURT:  I think we're all on the same page.

02:33:48PM  23  We're just trying to figure out how to fix this.

02:33:52PM  24       MR. STRONGMAN:  So we don't show the document and I

02:33:55PM  25  think if you either say this was just -- I want to clarify,

02:33:58PM   1   this isn't a conversation about changing the FDA-approved

02:34:02PM   2   label.

02:34:03PM   3        THE COURT:  Right.

02:34:03PM   4        MR. MICELI:  The FDA-approved label in April of 2006.

02:34:07PM   5        THE COURT:  That this was a conversation about

02:34:08PM   6   alopecia and they were able to clearly distinguish between

02:34:14PM   7   permanent, persistent, and temporary.

02:34:15PM   8        MR. MICELI:  Thank you.  Okay.  If I don't say it

02:34:18PM   9   right, you can hit me in the back of the head and I'll change

02:34:21PM  10   it.

02:34:22PM  11        THE COURT:  I'll interrupt you.

02:34:22PM  12        MR. MICELI:  Thank you.

02:34:24PM  13        MR. STRONGMAN:  Thank you.

02:34:28PM  14                  (In open court.)

02:34:38PM  15   BY MR. MICELI:

02:34:38PM  16     Q.  Okay.  I'm not going to put it on there.

02:34:40PM  17   Dr. Plunkett, I just want to confirm what we were discussing

02:34:43PM  18   over there.  This was not a discussion about changing the --

02:34:50PM  19   April 2006 US label, correct?

02:34:51PM  20     A.  That's correct.

02:34:52PM  21     Q.  Okay.  That's all I need to ask you.  Thank you.

02:34:57PM  22        MR. MICELI:  Is that right, Your Honor?

02:34:59PM  23        THE COURT:  Yes.

02:34:59PM  24        MR. MICELI:  Okay.  Thank you.

02:35:03PM  25        THE COURT:  I think we're okay.

02:35:04PM  1   BY MR. MICELI:

02:35:04PM  2       Q.   Okay.   What is important from a regulatory standpoint

02:35:08PM  3   for your regulatory opinions, in this case, about the content

02:35:12PM  4   of the discussion, not about the document, just the content

02:35:16PM  5   of the discussion?

02:35:16PM  6       A.   So I told you that I was interested in knowing what

02:35:21PM  7   did the company know.   So the content of the discussion here

02:35:24PM  8   is the company individuals who are -- there's information in

02:35:28PM  9   here that shows that the company was aware that there was a

02:35:31PM  10  difference between temporary hair loss, alopecia, and there

02:35:36PM  11  was such a thing with Taxotere as a permanent hair loss or

02:35:40PM  12  irreversible or something that did not recover.   So it's the

02:35:43PM  13  understanding that there were two different side effects or

02:35:46PM  14  two different adverse reactions; it wasn't just alopecia.   It

02:35:51PM  15  was two different kinds.   And that was what was important to

02:35:54PM  16  my opinions.

02:35:54PM  17      Q.   Okay.   You can set Plaintiff's P28 aside.

02:36:08PM  18           Okay.   We've talked about two pieces or two items of

02:36:12PM  19  evidence that you found.   What else did you see?

02:36:16PM  20      A.   So there was a publication of an abstract in 2006 by

02:36:27PM  21  a -- at breast cancer meeting.   The author was Dr. Sedlacek,

02:36:32PM  22  and I think that's the next, if you go chronologically, the

02:36:37PM  23  piece of evidence that I had at this time frame.

02:36:40PM  24           MR. MICELI:   Can I show her Sedlacek?   I think it's

02:36:47PM  25  already in there.

02:36:51PM  **1**          (Conversation between attorneys.)

02:36:54PM  **2**   BY MR. MICELI:

02:36:54PM  **3**       Q.  All right.  Do you need a copy or would you like me

02:36:56PM  **4**   to just put one on the --

02:36:56PM  **5**       A.  You can just put that on the screen.  I think I

02:36:59PM  **6**   remember.

02:37:00PM  **7**          MR. MICELI:  Can I do that, Your Honor?

02:37:02PM  **8**          THE COURT:  Yes, you may.

02:37:02PM  **9**          MR. MICELI:  Thank you.

02:37:04PM  **10**          THE COURT:  There's no objection?

02:37:05PM  **11**          MR. STRONGMAN:  No objection, Your Honor.

02:37:08PM  **12**          MR. MICELI:  Okay.  And I checked with Mr. Strongman.

02:37:11PM  **13**          THE COURT:  I saw you talking.

02:37:14PM  **14**          MR. MICELI:  Yes, thank you.

02:37:15PM  **15**          THE COURT:  Thank you.

02:37:15PM  **16**   BY MR. MICELI:

02:37:15PM  **17**       Q.  Okay.  Is this the publication you were talking

02:37:17PM  **18**   about?

02:37:17PM  **19**       A.  Yes.

02:37:18PM  **20**       Q.  Okay.  Or that you mentioned.  And this is the

02:37:24PM  **21**   "Persistent significant alopecia, PSA, from adjuvant

02:37:31PM  **22**   docetaxel after doxorubicin/cyclophosphamide, paren, (AC),

02:37:34PM  **23**   close paren, chemotherapy in women with breast cancer,"

02:37:37PM  **24**   correct?

02:37:37PM  **25**       A.  Yes, that's correct.

02:37:38PM **1**      **Q.**  All right.  And I apologize, I closed something here

02:37:41PM **2**  and I need to get back to my script.  What is significant

02:37:51PM **3**  from your forming your regulatory opinion about the Sedlacek

02:37:55PM **4**  article?

02:37:56PM **5**      **A.**  So there's three different things in this that I

02:37:59PM **6**  believe are important to my regulatory opinions.  First,

02:38:03PM **7**  you'll find in the title, the author is talking about a

02:38:08PM **8**  condition called persistent significant alopecia.  So it's a

02:38:16PM **9**  recognition that there is something that persists so it's not

02:38:19PM **10**  temporary.  But more importantly for me in the regulatory

02:38:23PM **11**  opinion area, is the issues in the first paragraph and then

02:38:27PM **12**  in the last paragraph, and that is what the author describes

02:38:30PM **13**  about the -- about his work.  And so starting with the

02:38:35PM **14**  sentence, "unfortunately," I found the next, I think, three

02:38:41PM **15**  sentences important.

02:38:41PM **16**      **Q.**  Right here?

02:38:42PM **17**      **A.**  Yes.

02:38:42PM **18**      **Q.**  And where do I go to?

02:38:43PM **19**      **A.**  "Unfortunately, the one side effect possibly most

02:38:47PM **20**  dreaded by the patient is alopecia.  Yet, we have always told

02:38:51PM **21**  our female patients don't worry, it will always come back."

02:38:55PM **22**  And then his statement that "this last statement may not be

02:38:59PM **23**  true."

02:39:01PM **24**      **Q.**  And what is important from a regulatory opinion about

02:39:03PM **25**  that statement?

02:39:04PM  1      **A.**   It shows me that at least in the case of a

02:39:09PM  2    physician -- this is a physician, by the way, if you read

02:39:11PM  3    this abstract, he's treating a number of breast cancer

02:39:14PM  4    patients.  This is what he does in his practice on a routine

02:39:18PM  5    basis.  He is not aware of the fact that there is such a

02:39:23PM  6    thing as permanent alopecia at this time.

02:39:26PM  7         MR. STRONGMAN:  Objection.  Commenting on what the

02:39:28PM  8    doctor is or scientist --

02:39:31PM  9         MR. MICELI:  Your Honor, can we approach?

02:39:33PM 10         THE COURT:  Yes, you may.

02:39:41PM 11         (WHEREUPON, the following proceedings were held at

02:39:42PM 12    the bench:)

02:39:42PM 13         MR. MICELI:  She said that she has to read the

02:39:45PM 14    scientific articles to make her regulatory decision.  She

02:39:48PM 15    reads it and it says that -- it is docetaxel after AC, and

02:39:58PM 16    she reads it.  And one of the arguments that Sanofi is making

02:40:01PM 17    in this case that everybody knew this.  This is -- hair

02:40:03PM 18    generally grows back is as a warning and everybody knows it.

02:40:08PM 19    Well, here's a person who went to the trouble of looking at

02:40:10PM 20    11 years of data from his patients who are saying, we all

02:40:12PM 21    told them that their hair would grow back and this may not be

02:40:16PM 22    true.  It demonstrates what this gentleman is saying from a

02:40:19PM 23    clinical standpoint.  Now, she's not a clinician, but from a

02:40:21PM 24    clinical significant standpoint, it's important for a

02:40:25PM 25    regulatory opinion.

02:40:26PM  1    MR. STRONGMAN:  He read the statement.  Now, we're

02:40:28PM  2    getting into what Dr. Sedlacek was thinking and what he knew.

02:40:33PM  3    She read the statement.  That's enough.  That's what the

02:40:37PM  4    learned treatise is for.  You can read it.

02:40:40PM  5        THE COURT:  How does she know anything beyond that,

02:40:43PM  6    what's in the abstract?

02:40:46PM  7        MR. MICELI:  What she is doing, is she's not saying

02:40:49PM  8    what Dr. Sedlacek knows.  She's giving her impression and

02:40:53PM  9    we -- I can ask the question and ask her to directly state,

02:40:56PM  10   how do you interpret this from as a regulatory position and

02:41:00PM  11   what does it mean?

02:41:01PM  12       THE COURT:  She can talk about her interpretation,

02:41:02PM  13   her analysis of where this fits into her work.  But for her

02:41:06PM  14   to say, I think this is what Sedlacek was doing and this is

02:41:11PM  15   what he felt like, I think improper.  His statement is

02:41:14PM  16   already in.  But I think she can say now from my perspective,

02:41:18PM  17   this is how it's pertinent.

02:41:20PM  18       MR. MICELI:  Right.  And I thought that's what I

02:41:22PM  19   asked her about.  I'll go back and ask her that again.

02:41:25PM  20       MR. STRONGMAN:  Yes, and she --

02:41:26PM  21       THE COURT:  She started going on, but this is what he

02:41:29PM  22   was thinking, he was thinking -- he does this --

02:41:29PM  23       MR. STRONGMAN:  This is what's going on, he does

02:41:30PM  24   this, this is clearly --

02:41:31PM  25       MR. MICELI:  My question will include the instruction

02:41:34PM **1**   not to include that in an answer.

02:41:40PM **2**        THE COURT:  Yes, thank you.

02:41:41PM **3**             (In open court.)

02:41:46PM **4**   BY MR. MICELI:

02:41:47PM **5**    **Q.**   Okay.  Dr. Plunkett, without telling us what

02:41:50PM **6**   Dr. Sedlacek was thinking, can you tell us what -- what is

02:41:54PM **7**   pertinent about this document to you under the statement I've

02:41:57PM **8**   highlighted in forming your regulatory opinion?

02:42:02PM **9**    **A.**   That the understanding of -- that they're telling

02:42:09PM **10**  patients that it will always come back.  Questioning whether

02:42:13PM **11**  that's true or not, indicates that there is an importance to

02:42:19PM **12**  conveying to a physician that there is something different

02:42:22PM **13**  than just temporary alopecia.  I mean, that's how I view this

02:42:26PM **14**  document.  Looking in context of what the company knew and we

02:42:30PM **15**  just talked about a couple of pieces of that evidence and

02:42:32PM **16**  then this is showing what a physician at that same time

02:42:36PM **17**  period is stating as far as his understanding of the risks of

02:42:41PM **18**  the use of these drugs, one of which is Taxotere; docetaxel

02:42:48PM **19**  is Taxotere.

02:42:49PM **20**    **Q.**   Okay.  And you had mentioned that the last paragraph

02:42:52PM **21**  had some importance to you in your regulatory -- in forming

02:42:55PM **22**  your regulatory opinions.  What is relevant in the last

02:42:58PM **23**  paragraph of this abstract about -- strike that.

02:43:02PM **24**        What is relevant to your regulatory opinions in the

02:43:07PM **25**  last paragraph of this abstract?

02:43:09PM **1**    **A.**  So it would be in the last paragraph, Dr. Sedlacek is

02:43:15PM **2**  identifying this -- what he's reporting on, this persistent

02:43:25PM **3**  alopecia as being an emotionally devastating injury, alopecia

02:43:29PM **4**  is to patients and so not growing back.  Is it a long-term

02:43:32PM **5**  toxicity that he's identifying as something that would be

02:43:36PM **6**  consistent with the discussion in 314.80 about permanent

02:43:41PM **7**  severe effects.  So he's calling it emotionally devastating

02:43:45PM **8**  long-term toxicity.

02:43:46PM **9**    **Q.**  And how is that relevant to your regulatory

02:43:49PM **10**  decisions -- or excuse me, to your regulatory opinions?

02:43:52PM **11**    **A.**  So it's important context for how it -- how important

02:43:58PM **12**  it is to distinguish between temporary hair loss and

02:44:02PM **13**  permanent hair loss in the clinical setting.

02:44:05PM **14**    **Q.**  Okay.

02:44:18PM **15**     THE COURT:  All the jurors need to get awake.  Thank

02:44:20PM **16**  you.

02:44:20PM **17**     MR. MICELI:  Am I putting them to sleep already?

02:44:22PM **18**  BY MR. MICELI:

02:44:22PM **19**    **Q.**  Okay.  Is there anything else that you reviewed or

02:44:29PM **20**  found that is pertinent to your -- and relevant to your

02:44:32PM **21**  regulatory opinions?

02:44:33PM **22**    **A.**  Yes.  There's a document from January of 2007 that

02:44:41PM **23**  is -- was -- actually, I think mentioned in Dr. Palatinsky's

02:44:46PM **24**  deposition, it has to do with an informed consent form.

02:44:51PM **25**    **Q.**  Okay.

02:44:58PM  **1**              MR. MICELI:  Your Honor, may I show this -- or have

02:45:00PM  **2**  her identify it?

02:45:01PM  **3**              THE COURT:  Yes, you may.

02:45:03PM  **4**              MR. MICELI:  All right.  Well, do I need to approach

02:45:05PM  **5**  to have her identify it or put it on the ELMO?

02:45:10PM  **6**              THE COURT:  Wait.  Approach.  I didn't know if it was

02:45:12PM  **7**  in.

02:45:13PM  **8**              MR. MICELI:  Thank you, Your Honor.

02:45:13PM  **9**  BY MR. MICELI:

02:45:15PM  **10**     **Q.**  Can you identify this document?

02:45:18PM  **11**     **A.**  Yes, this is the document.  It's an e-mail and then

02:45:21PM  **12**  it has behind it a section where Dr. Palatinsky marked up the

02:45:27PM  **13**  document.

02:45:30PM  **14**     **Q.**  Okay.  And what is relevant about --

02:45:32PM  **15**              MR. MICELI:  Your Honor, now may I show it to her?

02:45:34PM  **16**              THE COURT:  Yes.

02:45:35PM  **17**  BY MR. MICELI:

02:45:35PM  **18**     **Q.**  Okay.  What is relevant -- let's start with the front

02:45:38PM  **19**  of this document.

02:45:42PM  **20**              THE CASE MANAGER:  What exhibit is this?

02:45:43PM  **21**              MR. MICELI:  This is Exhibit Number P23.

02:45:49PM  **22**  BY MR. MICELI:

02:45:49PM  **23**     **Q.**  Did you review this document in forming your

02:45:51PM  **24**  opinions?

02:45:51PM  **25**     **A.**  I did.

02:45:52PM **1**      **Q.**  Okay.  And what is relevant about this e-mail?

02:45:54PM **2**      **A.**  Well, first the timing.  We're in January 2007, so

02:45:59PM **3** we're within less than a year from that discussion in 2006 of

02:46:07PM **4** the issue of looking at -- distinguishing the difference

02:46:11PM **5** between permanent and temporary alopecia within the company.

02:46:15PM **6** And then this is Dr. Palatinsky at this time, why it's

02:46:19PM **7** relevant, is he's actually then taking a document as a global

02:46:23PM **8** safety officer for Taxotere and he is amending a document to

02:46:28PM **9** add the words "permanent alopecia."

02:46:30PM **10**      **Q.**  Okay.  Now, you said this is -- you mentioned

02:46:33PM **11** Dr. Palatinsky?

02:46:34PM **12**      **A.**  Yes.

02:46:34PM **13**      **Q.**  Okay.  And which bullet point are you referring to in

02:46:43PM **14** this e-mail?

02:46:44PM **15**      **A.**  Well, first off, you can start out -- he says, he

02:46:47PM **16** "looked at the content of the docetaxel section."  So he's

02:46:52PM **17** specifically speaking to that issue.  And then in hair loss,

02:46:56PM **18** he talks about hair loss down here.  "Hair loss is

02:47:00PM **19** repetitive, permanent" -- that's HL -- "hair loss is

02:47:03PM **20** sufficient once."  And there's -- back in the document, he's

02:47:06PM **21** actually marked it up to add the word "permanent" and -- to

02:47:12PM **22** that phrase within the document.

02:47:13PM **23**      **Q.**  Okay.  Let me --

02:47:15PM **24**      MR. STRONGMAN:  Objection, that misstates the

02:47:16PM **25** document.

02:47:22PM  **1**          THE COURT:  Wait.  Maybe we need to just put it back

02:47:29PM  **2**  up.

02:47:29PM  **3**          MR. MICELI:  I was going to put it up at the point

02:47:32PM  **4**  where -- first of all, --

02:47:33PM  **5**          THE COURT:  Let's go back.

02:47:35PM  **6**          MR. MICELI:  -- let me just back up just a little

02:47:37PM  **7**  bit, Your Honor, if I may, to help.

02:47:38PM  **8**          THE COURT:  That may help.

02:47:40PM  **9**  BY MR. MICELI:

02:47:40PM  **10**     Q.  I believe you stated that Dr. Palatinsky said, "I

02:47:43PM  **11**  looked at the content of the docetaxel section, and I have a

02:47:47PM  **12**  few comments"?

02:47:48PM  **13**     A.  Yes, that's correct.  And he did not draft -- I

02:47:51PM  **14**  apologize.  I wasn't trying to say that he drafted the

02:47:53PM  **15**  document in the back.  This is something he was commenting on

02:47:57PM  **16**  and he talks about changes to that document.

02:47:59PM  **17**     Q.  And is --

02:48:00PM  **18**     A.  So I apologize.  I didn't mean to mischaracterize.

02:48:02PM  **19**     Q.  And you mentioned that the "hair loss is repetitive,

02:48:08PM  **20**  permanent hair loss is sufficient once."

02:48:09PM  **21**     A.  Yes.  And there's a page back there that shows that

02:48:13PM  **22**  marked up under the Taxotere/docetaxel section.

02:48:25PM  **23**     Q.  Is this the section you're referring to, Doctor?

02:48:27PM  **24**     A.  Yes, that's correct.

02:48:28PM  **25**     Q.  Okay.  And for, just ease of time, are you referring

02:48:36PM   1   to hair loss and permanent hair loss?

02:48:39PM   2       A.  Yes.

02:48:40PM   3       Q.  And how is hair loss depicted on that document?

02:48:43PM   4       A.  I apologize.  Well, the first one is struck through.

02:48:48PM   5   That's what you're asking me?  Yes.

02:48:49PM   6       Q.  And the first one is what?

02:48:51PM   7       A.  And the first one, it says "hair loss" has a strike

02:48:53PM   8   out.

02:48:53PM   9       Q.  Okay.

02:48:53PM  10       A.  And then permanent hair loss is listed here on -- in

02:48:57PM  11   this.  And this is a listing of side effects.  There's

02:49:01PM  12   another piece of the document as well that deals with that.

02:49:04PM  13       Q.  Okay.  And when we flip back a few pages in this

02:49:09PM  14   document, excuse me, I'm going to take you to page 6 of 19.

02:49:27PM  15   Did you read this page as well?

02:49:29PM  16       A.  Yes.  This explains what the table is about, yes.

02:49:32PM  17       Q.  Okay.  It says, "What are side effects?"

02:49:35PM  18       A.  Yes.  And then down further there, it says that --

02:49:39PM  19   the paragraph right above the table, "What's important to

02:49:42PM  20   me?"  It says that "these are the side effects we know about

02:49:45PM  21   at present."

02:49:45PM  22       Q.  Okay.  And then it has permanent hair loss?

02:49:49PM  23       A.  Yes.

02:49:50PM  24       Q.  Okay.  What is significant to you for your regulatory

02:49:52PM  25   opinions about the statement on page 6?  And, Doctor -- well,

02:50:00PM   1   and the edits discussed by Dr. Palatinsky in the e-mail on

02:50:06PM   2   page 8?

02:50:06PM   3       A.   This is important because it shows that although the

02:50:11PM   4   label, at this time, in 2007 for doctors and patients has no

02:50:17PM   5   listing of permanent hair loss or distinguishing hair loss in

02:50:23PM   6   any way by being temporary versus permanent, it was being

02:50:30PM   7   acknowledged in this document by the company that such a

02:50:33PM   8   thing existed and then in this informed consent form, at

02:50:38PM   9   least, that information would be provided to people that are

02:50:40PM  10   going to be taking the drug.

02:50:42PM  11       Q.   Okay.  And from a review of the documents we've

02:50:47PM  12   talked about thus far, is Dr. Palatinsky's comment consistent

02:50:51PM  13   or inconsistent with what the information -- other

02:50:55PM  14   information you have found?

02:50:56PM  15       A.   It's consistent.  In other words, this is the --

02:51:00PM  16   another of the pieces of evidence about what the -- to me,

02:51:02PM  17   what the company knew and it shows me that the company

02:51:06PM  18   understood that there was a difference between temporary hair

02:51:10PM  19   loss and permanent hair loss, and that permanent hair loss

02:51:12PM  20   was indeed an injury that had been shown to occur with use of

02:51:17PM  21   Taxotere.  There was some basis to believe -- the adverse

02:51:21PM  22   reaction standard -- that there was a causal relationship.

02:51:24PM  23       Q.   Do you have -- have you formed an opinion as to

02:51:28PM  24   whether or not a global safety officer for Sanofi would amend

02:51:34PM  25   or edit or suggest edits to an informed consent to include

02:51:39PM   1   permanent hair loss if there were not?

02:51:41PM   2        MR. STRONGMAN:  Objection.

02:51:42PM   3        MR. MICELI:  I'm asking an opinion question.  I'm

02:51:45PM   4   asking if she's formed an opinion.

02:51:48PM   5        MR. STRONGMAN:  It's on its way to being a leading

02:51:51PM   6   question.

02:51:52PM   7        THE COURT:  As to what?

02:51:52PM   8        MR. MICELI:  I have to ask her if she has the

02:51:56PM   9   opinion.

02:52:00PM   10        THE COURT:  I'm going to allow it.  Overruled.

02:52:04PM   11        MR. MICELI:  Thank you.

02:52:04PM   12        THE COURT:  It's an opinion question.

02:52:07PM   13   BY MR. MICELI:

02:52:08PM   14        Q.  Dr. Plunkett, have you formed an opinion as to

02:52:10PM   15   whether or not Sanofi's global safety officer would be

02:52:15PM   16   suggesting edits to an informed -- a draft informed consent

02:52:21PM   17   form to include permanent alopecia or permanent hair loss if

02:52:25PM   18   there was not some basis to believe there was a causal

02:52:29PM   19   relationship between that injury -- permanent hair loss --

02:52:33PM   20   and Taxotere?

02:52:34PM   21        A.  I do have an opinion.

02:52:36PM   22        Q.  And what is that?

02:52:37PM   23        A.  That he would not.  And I think if you listened to

02:52:40PM   24   his deposition testimony, you understood that.

02:52:48PM   25        Q.  And, Dr. Plunkett, at this point this time we've gone

02:52:51PM  1    over five different pieces of evidence, I think.  Amy

02:52:57PM  2    Freedman -- I can flip back through.  Let's see.

02:53:04PM  3         A.   Yes, five.

02:53:08PM  4         Q.   Amy Freedman's comment?

02:53:11PM  5         A.   Yes.

02:53:11PM  6         Q.   I'm going to go back through this.  The meeting where

02:53:14PM  7    they differentiated?

02:53:15PM  8         A.   Yes, in April of 2006.

02:53:17PM  9         Q.   The Sedlacek article?

02:53:19PM  10        A.   Yes, also 2006.

02:53:21PM  11        Q.   And Emanuel Palatinsky's e-mail and suggested edits,

02:53:30PM  12   correct?

02:53:30PM  13        A.   Yes.

02:53:30PM  14        Q.   I guess that's four so far.  Is there anything else

02:53:33PM  15   you've reviewed?

02:53:34PM  16        A.   Yes.

02:53:34PM  17        Q.   What is that?

02:53:36PM  18        A.   So in addition to this, there is information

02:53:38PM  19   documents that I have reviewed that have showed that within

02:53:41PM  20   the pharmacovigilance database of Sanofi -- it's one of the

02:53:47PM  21   requirements of being a prescription drug manufacturer.  You

02:53:50PM  22   have to collect internally reports that are sent to you about

02:53:55PM  23   adverse events -- and within this pharmacovigilance database

02:53:58PM  24   up to the time looking at events that were in the database

02:54:03PM  25   before Ms. Kahn took the drug, it shows that there were

02:54:08PM 1   reports where the word verbatim is used, either "permanent"

02:54:13PM 2   or "irreversible alopecia" when it's describing the events.

02:54:16PM 3   So in other words, there were events being identified in

02:54:19PM 4   their own database showing adverse events of permanent or

02:54:28PM 5   irreversible alopecia.

02:54:29PM 6       Q.  Okay.  And how far back did these go?

02:54:33PM 7       A.  I believe the first ones are -- first one is maybe

02:54:36PM 8   1999.

02:54:37PM 9       Q.  Okay.  And you looked through, what, 2007?

02:54:42PM 10      A.  Yes.  I stopped -- well, I looked at the -- in the

02:54:47PM 11  pharmacovigilance database, the numbering system allows you

02:54:50PM 12  to see the year, so I looked through the year 2007.  I didn't

02:54:54PM 13  go any further because I didn't want to include something

02:54:56PM 14  that may not have been reported until after Ms. Kahn had --

02:55:00PM 15  was exposed in, I guess, May of 2008.

02:55:03PM 16      Q.  It's important for me to ask this I think.  Are you

02:55:06PM 17  the person that categorized those reports within Sanofi's

02:55:11PM 18  pharmacovigilance database as permanent or irreversible,

02:55:13PM 19  using those words?

02:55:14PM 20      A.  No.  These were actually in the documents in the

02:55:17PM 21  database.  I don't categorize it; that's what is listed.  So,

02:55:21PM 22  again, in my view, it is more evidence for what the company

02:55:25PM 23  knew based upon the evidence they had.

02:55:27PM 24      Q.  Okay.  Now we're at five pieces of evidence.  So at

02:55:34PM 25  this point, did you need to go any further to find evidence

02:55:41PM 1   that -- that there was some basis to believe -- let me back

02:55:46PM 2   up.  Strike that.

02:55:47PM 3        You had said before that you first looked to what the

02:55:49PM 4   company knew?

02:55:50PM 5        A.  Yes.

02:55:50PM 6        Q.  And then if you needed to, you would go to look to

02:55:53PM 7   what the company could have or should have known?

02:55:56PM 8        A.  Yes.

02:55:56PM 9        Q.  Okay.  Did you find it necessary to go beyond

02:56:00PM 10  the "what the company knew" bucket of information to make

02:56:04PM 11  your determinations on your regulatory opinions for this

02:56:07PM 12  case?

02:56:07PM 13       A.  No, I didn't.  Based upon the very specific

02:56:12PM 14  statements by company global safety officers about the fact

02:56:18PM 15  that there were -- was -- that they had evidence or they saw

02:56:23PM 16  or they stated that Taxotere can cause permanent alopecia.

02:56:29PM 17  The recognition of the need to segregate those terms when

02:56:35PM 18  they're having discussions internally.  And then

02:56:38PM 19  Dr. Palatinsky's recognition that permanent alopecia --

02:56:42PM 20  permanent hair loss, I apologize -- was an appropriate term

02:56:46PM 21  to be putting in that informed consent.  So to me, that's

02:56:49PM 22  information that shows what they knew at that point in time

02:56:52PM 23  and up to 2007.

02:56:53PM 24       Q.  Have you formed an opinion as to whether or not it

02:56:56PM 25  was appropriate to strike out hair loss when they added in

02:57:00PM  1  permanent hair loss?

02:57:01PM  2      **A.**  Yes, I have.

02:57:01PM  3      **Q.**  What is that opinion?

02:57:02PM  4      **A.**  So I --

02:57:04PM  5          MR. STRONGMAN:  Objection.  This is -- may we

02:57:08PM  6  approach very briefly on this?

02:57:10PM  7          THE COURT:  Yes.

02:57:15PM  8          (WHEREUPON, the following proceedings were held at

02:57:18PM  9  the bench:)

02:57:18PM  10         MR. STRONGMAN:  It's as if he's asking about the

02:57:22PM  11 adequacy of the Canadian informed consent where they had

02:57:26PM  12 struck out hair loss and left in permanent hair loss.  It's

02:57:28PM  13 very misleading.

02:57:30PM  14         MR. MICELI:  Well, she's already talked about 314.80.

02:57:35PM  15 And 314.80 says if there are different outcomes, there have

02:57:37PM  16 to be different warnings.  I can ask that generally.

02:57:40PM  17         MR. STRONGMAN:  Asking her about the adequacy of

02:57:42PM  18 what -- of a Canadian --

02:57:46PM  19         MR. MICELI:  I didn't use the word adequacy.  I asked

02:57:48PM  20 her if it's appropriate.

02:57:50PM  21         THE COURT:  I think you can ask her generally.

02:57:51PM  22         MR. MICELI:  All right.  I'll change it to generally.

02:57:54PM  23         THE COURT:  Change it to generally.

02:58:02PM  24         MR. MICELI:  Okay.  Thank you.

02:58:02PM  25                         (In open court.)

02:58:02PM  1   BY MR. MICELI:

02:58:04PM  2       Q.   Dr. Plunkett, if a drug company is aware of different

02:58:12PM  3   outcomes like temporary and permanent hair loss, should they

02:58:18PM  4   warn separately or does one subsume the other?

02:58:22PM  5       A.   In my opinion, they should warn separately because

02:58:25PM  6   they're two different conditions -- different severity,

02:58:28PM  7   different time and duration.

02:58:30PM  8       Q.   Okay.  And is there a rule of the road, one of those

02:58:33PM  9   regulations, that states that?

02:58:35PM 10       A.   Yes.  Yeah.  If you look at, again, the -- when I

02:58:38PM 11   talked -- we talked about 314.80 in looking at the issue

02:58:43PM 12   about an unexpected adverse event and it talks about

02:58:50PM 13   describing that specifically based upon the specificity of

02:58:53PM 14   the adverse event.  So to me, it's different.  If your hair

02:58:56PM 15   grows back, that's a temporary hair loss.  If your hair

02:58:59PM 16   doesn't, that's a permanent hair loss.  Those are two

02:59:02PM 17   different adverse events that the company was actually

02:59:05PM 18   tracking.

02:59:06PM 19       Q.   Okay.  And how does that impact with the warning

02:59:10PM 20   should say?

02:59:10PM 21       A.   I believe that as a result of that, that the label

02:59:13PM 22   should be including a description of both.  So the fact that

02:59:16PM 23   the label has alopecia in it, it should be describing that

02:59:20PM 24   there's a temporary hair loss and there's a permanent hair

02:59:24PM 25   loss.

02:59:24PM **1**      **Q.**  Okay.  And we went through the label.  We went

02:59:37PM **2**  through, I think, ten "alopecias" and two "hair losses."  Did

02:59:43PM **3**  we ever find a "permanent hair loss"?

02:59:45PM **4**      **A.**  No, we did not.

02:59:48PM **5**      **Q.**  Okay.  And I know I may have asked this question, but

02:59:53PM **6**  it's sort of the one I have to ask, but have you formed an

02:59:57PM **7**  opinion to a reasonable degree of scientific and regulatory

03:00:02PM **8**  certainty whether or not Sanofi's Taxotere label in 2008

03:00:05PM **9**  adequately warned of the adverse reaction of permanent

03:00:11PM **10**  chemotherapy-induced alopecia?

03:00:13PM **11**      **A.**  I have.

03:00:13PM **12**      **Q.**  And what is that?

03:00:14PM **13**      **A.**  It does not.

03:00:16PM **14**      **Q.**  Okay.  Now, there's just going to be a few other

03:00:20PM **15**  questions and I promise just a few but does -- and we talked

03:00:27PM **16**  about the Sedlacek article.  The fact that an article can be

03:00:40PM **17**  in the public domain, does that equate to Sanofi offering a

03:00:46PM **18**  label to people who prescribe and/or use their product?

03:00:50PM **19**      **A.**  No, not at all.  I mean, the article -- well, this is

03:00:54PM **20**  an abstract.  An abstract from public domain is not something

03:00:59PM **21**  that is widely available every time that drug is used,

03:01:02PM **22**  whereas the labeling, that's what it's supposed to do.  It's

03:01:07PM **23**  supposed to provide doctors and their patients with that very

03:01:10PM **24**  specific information at the time that they're using the drug.

03:01:13PM **25**      **Q.**  Okay.

03:01:15PM    1        A.   So it's not a warning.

03:01:16PM    2        Q.   And so is there any code of federal regulation that

03:01:20PM    3    says that -- that you're aware of, that says that the

03:01:24PM    4    publication by somebody other than Sanofi of a full-length

03:01:30PM    5    article or an abstract is in fact Sanofi's warning?

03:01:33PM    6        A.   No.  The company has a responsibility to take their

03:01:41PM    7    label and make sure it continues to be up-to-date and

03:01:45PM    8    accurate with what they know.  And that is regardless of

03:01:47PM    9    whether there's a paper in the literature, they have their

03:01:50PM   10    duty for their label.

03:01:51PM   11        Q.   And is the word -- are the words "generally grows

03:01:57PM   12    back" clear and unambiguous in warning about permanent

03:02:03PM   13    chemotherapy-induced alopecia?

03:02:03PM   14        A.   Applying it as a regulatory person and looking at

03:02:06PM   15    what the regulations would require, no, it is not.

03:02:08PM   16        Q.   Okay.  Are companies' obligations under the federal

03:02:24PM   17    regulations to warn of a known adverse reaction limited to

03:02:32PM   18    the use that is specifically stated in the label?

03:02:35PM   19        A.   No.  The company is required to collect all their

03:02:38PM   20    post-marketing events and experience and analyze that in

03:02:42PM   21    order to determine whether or not labeling changes need to be

03:02:46PM   22    made, regardless of whether it's a specific listing within

03:02:50PM   23    the label.  Indications are the -- the indications drive some

03:02:55PM   24    of this, but certainly within the label, the adverse events

03:03:00PM   25    and things I've looked at, those fall within what would make

03:03:04PM  1   sense to be looking at and collecting, and they have a duty

03:03:08PM  2   to do that.

03:03:09PM  3       Q.   Okay.  And you said that you looked at the reports in

03:03:11PM  4   the pharmacovigilance database?

03:03:13PM  5       A.   Yes.

03:03:14PM  6       Q.   Okay.  Did those reports include what regimen was

03:03:18PM  7   used with the patients?

03:03:19PM  8       A.   Yes.  In the information I have seen, it did.

03:03:22PM  9       Q.   Okay.  Were all of those patients that they reported

03:03:26PM  10  as irreversible or permanent alopecia ones that you used the

03:03:31PM  11  TAC regimen?

03:03:33PM  12      A.   They all used AC with Taxotere, but they may have

03:03:38PM  13  used it in a different order.

03:03:39PM  14      Q.   Okay.  So, why is having an accurate and truthful

03:03:45PM  15  label important from a regulatory standpoint?

03:03:50PM  16      A.   Because it's the only way that the physician can make

03:03:56PM  17  the proper judgment or an informed decision on what to do for

03:04:00PM  18  their patients.  The label is the resource for the physician;

03:04:03PM  19  the company is the expert on their drug.  They -- the

03:04:08PM  20  regulations require the company to provide physicians with

03:04:12PM  21  accurate, truthful information that is not misleading so that

03:04:16PM  22  the -- they can make proper decisions for their patients.

03:04:19PM  23      Q.   Is that the golden rule I mentioned earlier?  What

03:04:23PM  24  the company knows it must disclose?

03:04:24PM  25      A.   Yes.  Again, if you know it, you have to disclose it.

03:04:28PM 1   And you need to disclose it when you know it, not waiting for

03:04:32PM 2   years.

03:04:32PM 3        Q.   Yeah.  And do you know whether -- or, do you have an

03:04:35PM 4   opinion as to whether or not if Sanofi put an adverse

03:04:41PM 5   reaction warning in the label for permanent

03:04:45PM 6   chemotherapy-induced alopecia if their sales representatives

03:04:47PM 7   would have been allowed to speak to physicians about it?

03:04:50PM 8        MR. STRONGMAN:  Objection.  Inappropriate.  Leading.

03:04:56PM 9        THE COURT:  Sustained.

03:04:57PM 10  BY MR. MICELI:

03:04:57PM 11       Q.   Dr. Plunkett, finally, can you just help me do one

03:05:00PM 12  thing?  Can you help me just sort of walk through those

03:05:03PM 13  pieces of evidence you talked about and when they occurred?

03:05:06PM 14       A.   Sure.  Like a little timeline?

03:05:08PM 15       Q.   Yes.

03:05:09PM 16       A.   Yes.

03:05:14PM 17       Q.   What is the first thing we talked about?

03:05:16PM 18       MR. STRONGMAN:  Your Honor, this is cumulative.

03:05:18PM 19  We've already walked through these.

03:05:18PM 20       MR. MICELI:  It's just summarizing what we've talked

03:05:22PM 21  about.

03:05:22PM 22       THE COURT:  I'm going to allow her to just summarize.

03:05:22PM 23       MR. MICELI:  Okay.

03:05:24PM 24       THE WITNESS:  So, 2006 you can put on there for the

03:05:27PM 25  first individual piece.

03:05:28PM 1  BY MR. MICELI:

03:05:28PM 2      Q.  Right?

03:05:28PM 3      A.  And that would be the Amy Freedman.

03:05:30PM 4      Q.  Okay.  Amy Freedman admission?

03:05:32PM 5      A.  Admission that Taxotere causes PCIA or can cause

03:05:38PM 6  PCIA.

03:05:40PM 7      Q.  I apologize for my writing.  Okay.  What is the next

03:05:49PM 8  thing we talked about?

03:05:50PM 9      A.  April 2006, and that was the internal meeting

03:05:58PM 10 discussing language that distinguishes temporary from

03:06:06PM 11 permanent alopecia in terms of adverse events.

03:06:20PM 12     Q.  Okay.  What's is next?

03:06:21PM 13     A.  December 2006 was the Sedlacek article that we went

03:06:25PM 14 over.

03:06:27PM 15     Q.  Okay.  I'm just going to put PSA -- that's

03:06:36PM 16 persistent, significant alopecia, right?

03:06:39PM 17     A.  He gave it a different name, that's correct.

03:06:41PM 18     Q.  Right.  And what's the next thing?

03:06:44PM 19     A.  And the next thing would be January 2007, which would

03:06:45PM 20 be Emanuel Palatinsky's -- the e-mail, and the listing in the

03:06:51PM 21 informed consent form of permanent alopecia -- or, permanent

03:06:59PM 22 hair loss, I apologize.

03:07:00PM 23     Q.  Someone's going to send me back to third grade to

03:07:08PM 24 learn how to print.  And then we talked about the

03:07:18PM 25 pharmacovigilance --

03:07:18PM   1        A.   Pharmacovigilance.

03:07:20PM   2        Q.   -- database and they span what time frame?

03:07:21PM   3        A.   If you maybe just put an arrow on the bottom, they go

03:07:26PM   4    before 2006 up until I stopped looking at the end of -- well,

03:07:30PM   5    I included ones going through the end of 2007.

03:07:34PM   6        Q.   And those were the internal --

03:07:37PM   7        A.   Internal.

03:07:39PM   8        Q.   -- pharmacovigilance database?

03:07:43PM   9        A.   For adverse events.

03:07:46PM  10        Q.   For permanent/irreversible alopecia.

03:07:57PM  11        A.   Yes.

03:07:58PM  12        Q.   Is that an accurate summary of what you looked at?

03:08:00PM  13        A.   Yes, that lays it out.

03:08:02PM  14        Q.   Did you find that to be a sufficient basis to find

03:08:05PM  15    there's some evidence of -- there was some basis to believe

03:08:09PM  16    there's a causal association?

03:08:11PM  17        A.   Yes, in my opinion, yes.

03:08:12PM  18        Q.   Now, is that all you looked at in your workforce?

03:08:15PM  19        A.   No.

03:08:16PM  20        Q.   How many depositions have you reviewed?

03:08:18PM  21        A.   So, I think I said maybe close to 20 depositions by

03:08:21PM  22    company employees and thousands of pages of documents.

03:08:24PM  23        Q.   Thousands of pages of company documents?

03:08:27PM  24        A.   Yes.

03:08:27PM  25        Q.   Okay.

03:08:29PM  1        MR. MICELI:  Can I just have one moment to talk to my

03:08:32PM  2   co-counsel?

03:08:33PM  3        THE COURT:  Yes.

03:08:33PM  4   BY MR. MICELI:

03:08:41PM  5   Q.   And in your professional regulatory opinion, with all

03:08:45PM  6   of this information available to them -- known to them --

03:08:50PM  7   should they have included the words "permanent alopecia" in

03:08:53PM  8   the adverse reaction section in 2008 before Ms. Kahn received

03:08:58PM  9   her first dose of Taxotere?

03:08:59PM  10  A.   Yes.  They absolutely should have done that.

03:09:02PM  11       MR. MICELI:  Okay.  Thank you, Your Honor.  I have

03:09:04PM  12  nothing further at this time.

03:09:05PM  13       THE COURT:  It's ten after 3:00.  It might be a good

03:09:08PM  14  time for us to take our afternoon break.  Court will be at

03:09:13PM  15  recess until 3:20.

03:09:16PM  16       THE CASE MANAGER:  All rise.

03:09:19PM  17                   (Jury exits courtroom.)

03:09:38PM  18                   (Recess taken.)

03:09:53PM  19       MR. STRONGMAN:  I wanted to just state a couple

03:09:59PM  20  things, just to try to get a few things kind of on the

03:10:06PM  21  same -- one of the things that we talked about during the --

03:10:08PM  22  during the conversation on documents was Dr. Plunkett talking

03:10:12PM  23  about the internal database.  And so what Dr. Plunkett has

03:10:18PM  24  done is given just this comment that there's cases without a

03:10:23PM  25  number and I'm -- I would like to at least be able to ask her

03:10:30PM   1   what that number is.  The problem is, I'm not entirely sure

03:10:35PM   2   based on what's in her report, based on what Mr. Miceli was

03:10:40PM   3   saying she looked at more recently, I don't know what that's

03:10:43PM   4   going to be.  And I don't want some surprise.  So if we can

03:10:49PM   5   come up with some sort of way that we avoid that problem,

03:10:55PM   6   because with -- with all due respect to Dr. Plunkett, the

03:11:02PM   7   opinion that she offered today while in conclusion was what

03:11:05PM   8   was in her report, it wasn't even remotely close to the bases

03:11:12PM   9   she stated in her report.  So this is not the opinion that

03:11:16PM  10   was evaluated under Daubert and ruled on.  This was a very

03:11:21PM  11   different opinion.  So there was nothing about Dr. Madigan's

03:11:26PM  12   affairs, there was nothing about Dr. Madigan's internal

03:11:29PM  13   database, there was nothing about Nabholtz, which those are

03:11:34PM  14   were three of the four most important items in the report.

03:11:40PM  15   So, I just wanted to make a record of that.

03:11:42PM  16        But then on this particular point, which is this

03:11:45PM  17   "there's reports."  It could be a thousand; it could be two.

03:11:49PM  18   It's not clear.  And so I think I am -- I want to clarify

03:11:53PM  19   that, but I want to know what I'm going to get.

03:11:58PM  20        MR. MICELI:  May I respond?

03:11:59PM  21        MR. STRONGMAN:  Because I don't know.

03:12:00PM  22        MR. MICELI:  I didn't ask her a question about

03:12:03PM  23   reports and that was on purpose.  I asked her -- she has

03:12:06PM  24   essentially said, Your Honor, her opinion is that there

03:12:09PM  25   should have been an adverse reactions label change based

03:12:14PM   1   solely upon four pieces of evidence that were internal to

03:12:19PM   2   Sanofi and the Sedlacek study.  They have made two

03:12:24PM   3   admissions.  We're going to be able to argue this -- there's

03:12:29PM   4   sufficient evidence for us to argue Amy Freedman and Emanuel

03:12:31PM   5   Palatinsky have made two admissions about permanent hair loss

03:12:34PM   6   before in 2006 and in January of 2007.  I haven't said -- I

03:12:40PM   7   did not -- I purposely did not ask her purposely for Rule 611

03:12:46PM   8   purposes and because I tried to keep it shorter.  I went

03:12:50PM   9   longer than anticipated.  I always do.  Who does -- what

03:12:54PM   10  attorney doesn't?  Or, I should say, hasn't yet?  I will

03:12:58PM   11  promise to do it at least once this week or next.  But that

03:13:03PM   12  testimony was purposeful and for purposes of Rule 611, I'll

03:13:11PM   13  be making the appropriate objections if he goes outside of

03:13:14PM   14  the scope of what we asked her for.  The fact that she gave a

03:13:18PM   15  report on toxicology and pharmacology is not necessary.  I

03:13:24PM   16  don't have to put that up.

03:13:26PM   17       THE COURT:  Fair enough.  But it was the basis for

03:13:29PM   18  her regulatory opinions.  He had to be able to rely on the

03:13:33PM   19  report and --

03:13:37PM   20       MR. MICELI:  And everything that she testified to,

03:13:39PM   21  the -- and I know we talked about it before, the -- before

03:13:44PM   22  court came back in session.

03:13:46PM   23       THE COURT:  But I didn't --

03:13:48PM   24       MR. MICELI:  You know, I'm not trying to pull a fast

03:13:50PM   25  one here.  I'm just -- the Emanuel Palatinsky --

03:13:54PM 1        THE COURT:  We talked about that.  We talked about

03:13:57PM 2   all those things that they were mentioned in her report.  But

03:14:04PM 3   it didn't -- I guess -- I felt like maybe, I'll be honest

03:14:12PM 4   with you, I thought maybe I hadn't read the report carefully

03:14:15PM 5   enough because it just seemed like that was not the clear

03:14:20PM 6   underpinnings of her report.  I thought her report relied

03:14:25PM 7   primarily on Madigan's work and then some other work that she

03:14:28PM 8   had done and then mentioned these things in a side.  We

03:14:31PM 9   didn't hear about Dr. Madigan.  We didn't hear anything about

03:14:35PM 10  --

03:14:35PM 11       MR. MICELI:  We'll hear from him on Monday.

03:14:37PM 12       THE COURT:  I got that.  But, you know, her report --

03:14:43PM 13  report relied a great deal on Madigan's analysis.  And I know

03:14:49PM 14  we'll hear from him, but that's not what she said today.  She

03:14:54PM 15  didn't even mention him, not even on an aside.  And then -- I

03:15:00PM 16  don't know what to tell you, Mr. Strongman, I just --

03:15:05PM 17       MR. MICELI:  He should just forego his cross is what

03:15:08PM 18  my opinion was, Your Honor.

03:15:10PM 19       THE COURT:  I always find it interesting that y'all

03:15:12PM 20  have really clear ideas about what the other side should do

03:15:15PM 21  in their cases.  But there was nothing in her report about

03:15:26PM 22  the number of --

03:15:29PM 23       MR. MICELI:  Which number of reports -- the

03:15:31PM 24  pharmacovigilance database is in her reports and it's in

03:15:33PM 25  Madigan's report.  And I did not ask her the number before

03:15:41PM  1    2008.

03:15:43PM  2         MR. STRONGMAN:  And I think Your Honor understands

03:15:45PM  3    what I'm trying to get at, is that there is a number that I

03:15:49PM  4    could decipher from Dr. Madigan.  I could pull out

03:15:55PM  5    Dr. Madigan's report and go through the table with her and

03:15:57PM  6    decipher a number, but that's not what she relied on.  She

03:16:00PM  7    said just the internal database, which I know from our

03:16:03PM  8    conversations was based on the clinical overviews -- the

03:16:07PM  9    number counted up in the clinical overviews.  But no number

03:16:11PM  10   was given and so I'm just saying I think we kind of had an

03:16:16PM  11   agreement on what the number was, but if I ask this witness

03:16:20PM  12   what's that number, I don't know what's going to come out and

03:16:25PM  13   that's my concern.  And so I think that's an unfair

03:16:29PM  14   proposition to be put in when the assumption really is

03:16:35PM  15   limitless, that could be drawn from what the witness said.

03:16:39PM  16        MR. MICELI:  Your Honor, I didn't get a number -- and

03:16:43PM  17   the number's 39.

03:16:45PM  18        MR. STRONGMAN:  It's 32.

03:16:46PM  19        MR. MICELI:  32.  I think we -- well, I'll trust your

03:16:49PM  20   count.  It's 32, I thought --

03:16:52PM  21        THE COURT:  All right.  We got Dr. Plunkett here.

03:16:54PM  22        MR. MICELI:  Oh, please --

03:16:58PM  23        THE COURT:  Dr. Plunkett, would you stand out in the

03:17:02PM  24   hallway, please.

03:17:04PM  25        MR. MICELI:  I didn't ask a number because as I told

03:17:07PM   1   you and Mr. Strongman in chambers, I wasn't going to pull out

03:17:11PM   2   the 2015 -- the numbers all over -- 2015 is on every page.

03:17:18PM   3           THE COURT:  Right.

03:17:18PM   4           MR. MICELI:  I didn't want to say one, two, three,

03:17:21PM   5   four, five and go through the number that's in there.

03:17:24PM   6   Madigan's number I think -- not promising anything, but if

03:17:30PM   7   you look at his report, he had used some other terms and

03:17:35PM   8   searched electronically in the database and his number was

03:17:39PM   9   larger because he's general causation and his numbers go from

03:17:43PM   10  first day.

03:17:44PM   11          THE COURT:  All the way to then.

03:17:46PM   12          MR. MICELI:  It's just -- his is a different thing.

03:17:49PM   13  And I'm trying to keep her regulatory opinions before 2008

03:17:55PM   14  because I didn't want to tread in the water that was off

03:17:59PM   15  limits.

03:18:03PM   16          MR. STRONGMAN:  Her regulatory opinions as expressed

03:18:07PM   17  in her report were before 2008 and she had a foundation

03:18:11PM   18  stated for them and she came into Court today and said

03:18:16PM   19  something different.

03:18:18PM   20          THE COURT:  This was my concern, that the report did

03:18:24PM   21  have a fundamental basis and it was -- the way I read it was

03:18:31PM   22  it was the Madigan analysis and then, you know, what I

03:18:35PM   23  thought we'd hear, that would be confirmed by these other

03:18:39PM   24  admissions, but if it came today, the admissions were the

03:18:45PM   25  regulatory report.  So it kind of turned it all on its head

03:18:50PM  1    and -- Mr. Strongman, what do you want me to do?

03:18:57PM  2         MR. STRONGMAN:  I want you to exclude Dr. Plunkett's

03:18:59PM  3    opinion as being unreliable as stated in court as compared to

03:19:03PM  4    the opinion that was evaluated under Daubert and

03:19:07PM  5    appropriately subject to motion practice in a hearing

03:19:13PM  6    already.  That would be my requested relief.

03:19:28PM  7         MR. MICELI:  In her deposition, Mr. Lambert asked her

03:19:37PM  8    the question, "Would it be fair to say that looking at the

03:19:40PM  9    cumulative picture that included, for example, Nabholtz

03:19:46PM  10   Sedlacek and the statements by Ms. Richard-Cassin and

03:19:50PM  11   Mr. Palatinsky, all of that in combination could be

03:19:53PM  12   considered newly acquired evidence and that's what goes into

03:20:01PM  13   changing the label.  Yes.  Yes.  You could apply that

03:20:05PM  14   definition if you wanted to do that, yes."  So -- so this is

03:20:12PM  15   not -- this is not something that they haven't heard before.

03:20:16PM  16        MR. STRONGMAN:  Did you hear the word Nabholtz out of

03:20:19PM  17   Dr. Plunkett's mouth?  I did not and there's a reason for it

03:20:22PM  18   as well, but I really do believe that the opinion that was

03:20:27PM  19   expressed in this courtroom does not satisfy the requirements

03:20:31PM  20   of Rule 702 and is inconsistent with what was expressed in

03:20:37PM  21   the report and allowed by this Court.

03:20:41PM  22        MR. MICELI:  We disagree wholeheartedly.  It is

03:20:44PM  23   entirely within her report what we talked to her about and we

03:20:44PM  24   talked to the Court about what we're going to be using with

03:20:52PM  25   her for her basis.  And Mr. Strongman hasn't even attempted

03:20:55PM   1   to cross-examine her.  I think what the problem is is we have

03:20:59PM   2   put her up for a very limited purpose, compared to what the

03:21:02PM   3   various reports --

03:21:02PM   4        THE COURT:  I think the problem I have is this newly

03:21:06PM   5   acquired information is admissions made in this -- as I hear

03:21:11PM   6   it, Sedlacek, which was that presentation.

03:21:18PM   7        MR. MICELI:  Amy Freedman.

03:21:20PM   8        THE COURT:  Two statements against interest in this

03:21:22PM   9   litigation, a meeting on foreign regulatory label.

03:21:33PM  10        MR. STRONGMAN:  And some unknown, perhaps two --

03:21:37PM  11        THE COURT:  Unknown number.

03:21:38PM  12        MR. STRONGMAN:  -- report -- internal database

03:21:41PM  13   reports.

03:21:43PM  14        THE COURT:  This is -- you know, this is -- it's 3:20

03:21:48PM  15   on Friday afternoon.  I really need to look at this.  I need

03:21:58PM  16   to look at this.  I'm going to let you proceed and I'm just

03:22:03PM  17   going to look at it over the weekend.

03:22:05PM  18        MR. STRONGMAN:  Thank you, Your Honor.

03:22:54PM  19                         (Recess taken.)

03:27:51PM  20                         (In open court.)

03:27:58PM  21        THE COURT:  Please be seated.

03:28:02PM  22        MR. STRONGMAN:  Your Honor, I've been sitting here

03:28:05PM  23   thinking and my wheels are turning as I look at my

03:28:10PM  24   cross-examination and the entire scope of my

03:28:14PM  25   cross-examination is impacted by what just happened.  And on

03:28:24PM  1    top of the fact that there are -- you're just left in a

03:28:35PM  2    position where what is my choice?  Do I cross-examine her on

03:28:39PM  3    things that I don't know the answers to because they just

03:28:42PM  4    simply weren't the foundation of her opinion, getting unknown

03:28:46PM  5    answers which we all know are uncontrollable.  The bottom

03:28:50PM  6    line is when you talk about trial by surprise, that's what

03:28:57PM  7    happened.  They put Dr. Plunkett up and they took all of the

03:29:01PM  8    legs out from under opinion except one, Sedlacek.  And, yes,

03:29:07PM  9    she had a few of these other things mentioned but they took

03:29:11PM  10   all of the other foundational pieces away and even have the

03:29:15PM  11   nerve to say, oh, I can't cross-examine about any of that.

03:29:19PM  12   She didn't talk about it.

03:29:21PM  13       There are things in our opening statement based on

03:29:26PM  14   what Dr. Plunkett's opinions were that they're going to say

03:29:29PM  15   oh, you can't talk about that because she didn't talk about

03:29:32PM  16   it on direct, it's outside the scope.  It just puts us in a

03:29:38PM  17   very difficult position to cross-examine her in a way without

03:29:42PM  18   just, honestly, being prejudiced in how to proceed with it.

03:29:48PM  19       MR. MICELI:  Your Honor, we're not obligated to walk

03:29:52PM  20   through her entire reports -- both of her reports so that

03:29:55PM  21   when Ms. Sastre said in her opening statement, can be

03:30:00PM  22   questioned on a witness that they don't know what we're going

03:30:03PM  23   to call her for.  We have an absolute right to put our

03:30:06PM  24   witness up and question her and ask her opinions and if she

03:30:10PM  25   gives opinions in three areas to only use her for one, and

03:30:14PM **1**    that's what we've done.  And I'm sure that they thought we

03:30:17PM **2**    were going to do the same thing with Dr. Plunkett that we did

03:30:21PM **3**    the last time, including all the pharmacology and all the

03:30:24PM **4**    toxicology.  They filed a Daubert motion on her.  She's not

03:30:27PM **5**    coming in to talk about pharmacology and toxicology.

03:30:30PM **6**         THE COURT:  I don't have a problem with that.  I

03:30:32PM **7**    think what is troubling to me is my recollection -- and

03:30:37PM **8**    that's why I just said I need a little time to read her

03:30:41PM **9**    report again -- was that the Madigan analysis formed the

03:30:44PM **10**   basis -- the primary underpinnings of her opinion as to label

03:30:52PM **11**   changing.

03:30:54PM **12**        MR. MICELI:  I think we have a disagreement on that,

03:30:57PM **13**   Your Honor.  I don't believe that Madigan is the basis for

03:31:00PM **14**   it.

03:31:00PM **15**        THE COURT:  Not the basis, but it was a primary

03:31:05PM **16**   focus.  I mean, so what we have now -- Okay.  Go ahead.

03:31:08PM **17**        MR. MICELI:  If a defendant comes in in any case, not

03:31:11PM **18**   just this case, and makes admissions and they're before the

03:31:14PM **19**   jury and the jury gets to weigh whether or not those

03:31:17PM **20**   admissions are sufficient to meet the standard for a label

03:31:20PM **21**   change, then we don't have to -- we shouldn't even have to

03:31:23PM **22**   call the regulatory person other than to say the admissions

03:31:27PM **23**   suffice, which is precisely what we did, with the exception

03:31:32PM **24**   of Madigan and their pharmacovigilance database and they know

03:31:37PM **25**   the source.  I handed them a document before I went up to the

03:31:41PM  1    podium that demonstrates the number of case -- the number of

03:31:45PM  2    reports within the pharmacovigilance database.  This has been

03:31:49PM  3    a huge, huge area that we've all seen throughout this case.

03:31:56PM  4    She offered her opinions based on admissions that have

03:32:00PM  5    already been heard before the jury, before she took the stand

03:32:03PM  6    and they're in her report as a basis for her opinions.

03:32:06PM  7         So, you know, I'm sorry that we did not -- I did not

03:32:11PM  8    get a memo or a letter or an e-mail memo from defense counsel

03:32:15PM  9    asking me to please make sure I check these boxes for them so

03:32:18PM  10   they can say things in their opening --

03:32:20PM  11        THE COURT:  No.  No.  No.  No.  No.

03:32:22PM  12        MR. STRONGMAN:  Can I read, just for the record, a

03:32:24PM  13   portion of Dr. Plunkett's report, just so it's clear where

03:32:28PM  14   I'm coming from when I talk about these four things.  So, if

03:32:32PM  15   you look at paragraph 96 of Dr. Plunkett's report, she has a

03:32:38PM  16   long discussion in paragraph about Nabholtz and about

03:32:41PM  17   Sedlacek and then she says at the bottom of that paragraph on

03:32:46PM  18   page 18 of her supplemental report, "Considering these two

03:32:50PM  19   papers" -- so Nabholtz and Sedlacek -- "in conjunction with

03:32:55PM  20   Dr. Madigan's analysis of the FAERS database and Sanofi's

03:33:01PM  21   pharmacovigilance database, Sanofi had some basis to believe

03:33:04PM  22   a causal relationship between Taxotere use and CIPAL/PCIA

03:33:11PM  23   existed by at least 2006."  And so of the items that she

03:33:16PM  24   listed there, we got Sedlacek, she talked about that.  She

03:33:22PM  25   didn't talk about Nabholtz, she didn't talk about

03:33:26PM **1** Dr. Madigan's FAERS analysis, and she didn't talk about Dr.

03:33:32PM **2** Madigan's Sanofi's pharmacovigilance analysis.

03:33:35PM **3**          THE COURT:  She did.

03:33:37PM **4**          MR. STRONGMAN:  Not Dr. Madigan's.

03:33:39PM **5**          THE COURT:  No, not Dr. Madigan's.

03:33:41PM **6**          MR. STRONGMAN:  She didn't put any opinion in this

03:33:43PM **7** report on her own search of Sanofi's pharmacovigilance

03:33:50PM **8** database.  What she said was, "I looked at Dr. Madigan's

03:33:52PM **9** Sanofi database and that's what I relied on."  Now

03:33:55PM **10** Dr. Madigan's Sanofi internal database search has some

03:33:59PM **11** problems -- that's why they're not talking about it.  So we

03:34:04PM **12** have a situation where I just don't know how to cross-examine

03:34:08PM **13** this witness based on what has been put out there as the

03:34:13PM **14** foundation, which is an entirely different shifting

03:34:17PM **15** foundation than was put out originally.

03:34:20PM **16**          MR. MICELI:  Your Honor, let him cross her on her

03:34:23PM **17** regulatory report.  She didn't offer anything out of her --

03:34:27PM **18** out of her toxicology pharmacology report.

03:34:30PM **19**          THE COURT:  Oh no.  I understand that.

03:34:30PM **20**          MR. MICELI:  Okay.

03:34:32PM **21**          THE COURT:  I understand that.  It's just the

03:34:34PM **22** regulatory --

03:34:35PM **23**          MR. MICELI:  Let Mr. Strongman point out that she

03:34:37PM **24** didn't use -- she didn't say this that was in your report --

03:34:48PM **25** other evidence.  And this is in her report at paragraph 25,

03:34:51PM  1   she refers to the FAERS analysis but other evidence including

03:34:56PM  2   the Sedlacek findings, Sanofi's internal pharmacovigilance

03:35:00PM  3   database, no reference to Dr. Madigan.  "I have formed the

03:35:05PM  4   opinion that toxicity should be included in the Taxotere

03:35:08PM  5   label.  It is my opinion to a reasonable degree or scientific

03:35:14PM  6   certainty," and she goes on.  So it's there.  If the concern

03:35:17PM  7   is about the regulatory report, let him cross her on the

03:35:21PM  8   entire regulatory report.  That's -- striking her is, one,

03:35:26PM  9   draconian, but it's absolutely not -- it's not reasonable

03:35:31PM  10  given that she has everything she talks about in her report.

03:35:34PM  11          THE COURT:  She just cut some of it out.

03:35:37PM  12          MR. MICELI:  Yeah.  Because it wasn't needed.  If --

03:35:41PM  13  if a defendant admits to something, do we have to prove it

03:35:44PM  14  any further?  That's really the lowdown of the question.  If

03:35:46PM  15  they admit it once, twice, three times an admission.  You

03:35:51PM  16  know, '06 Amy Freedman, Emanuel Palatinsky, then he edits the

03:35:59PM  17  draft informed consent.  I don't know what else we have to do

03:36:03PM  18  to show an admission to this jury and that is sufficient to

03:36:06PM  19  get us over the hump.  She's already explained what the

03:36:10PM  20  standard is.

03:36:12PM  21          MR. STRONGMAN:  And, Your Honor, I'm not saying this

03:36:14PM  22  to get the last word.  I wanted to point out when you look at

03:36:18PM  23  paragraph 98 for example, this is, again, trying to create

03:36:24PM  24  something that didn't exist out of the case, to be honest,

03:36:30PM  25  but Dr. Plunkett specifically in this instance.  So 98,

03:36:34PM  1    "Sanofi should have known about based on the fact that their

03:36:38PM  2    own pharmacovigilance database contained adverse reports

03:36:42PM  3    before 2006.  Parentheses, see report by Dr. Madigan."  So

03:36:47PM  4    this idea that she did some analysis on her own, it's just

03:36:53PM  5    made up in terms of what happened.  So -- so I think I made

03:36:59PM  6    it clear.  I'm just having trouble figuring out -- the last

03:37:03PM  7    thing I want to do is cross her on a bunch of things she

03:37:06PM  8    didn't talk about at the peril of saying well, now, you've

03:37:16PM  9    talked about it.

03:37:17PM  10        MR. MICELI:  Your Honor, again, admissions are

03:37:20PM  11   sufficient, period, for them.  She's testified to this

03:37:23PM  12   standard.  She's testified that she's seen and she located

03:37:26PM  13   the admissions.  You know, what I'm hearing is, we don't get

03:37:30PM  14   to have it the way we wanted it.  And we don't have to put up

03:37:34PM  15   everything that's in her report.  We have provided the jury

03:37:40PM  16   with sufficient testimony from her and others that

03:37:45PM  17   demonstrate those admissions.  Dr. Plunkett said those

03:37:49PM  18   admissions are sufficient to meet the standard.  Technically,

03:37:52PM  19   we could have gone with Dr. Nabholtz, the e-mail, the

03:37:58PM  20   informed consent, Amy Freedman, and sat down and that would

03:38:02PM  21   be sufficient.  But we would still be here listening to the

03:38:06PM  22   same argument.

03:38:08PM  23        THE COURT:  All right.

03:38:12PM  24        MR. MICELI:  And, you know, it's now --

03:38:14PM  25        THE COURT:  I am not prepared to strike this witness

| | | |
|---|---|---|
| 03:38:16PM | 1 | this afternoon.  I'm going to look at it this weekend.  We're |
| 03:38:20PM | 2 | going to proceed with cross-examination and we're just going |
| 03:38:23PM | 3 | to see what I do over the weekend.  And I think the reality |
| 03:38:28PM | 4 | is, there was lots of things that she relied on in her report |
| 03:38:32PM | 5 | that she did not rely on today.  I don't know what it means. |
| 03:38:37PM | 6 | It will be interesting to know what the analysis in the |
| 03:38:42PM | 7 | pharmacovigilance database looked like, but you know -- |
| 03:38:47PM | 8 | MR. STRONGMAN:  And that's the -- |
| 03:38:48PM | 9 | THE COURT:  No, I understand.  But -- |
| 03:38:51PM | 10 | MR. MICELI:  Your Honor, I -- I don't think that she |
| 03:38:53PM | 11 | even has to say that she did an analysis. |
| 03:38:55PM | 12 | THE COURT:  No, I get what you think. |
| 03:38:57PM | 13 | MR. MICELI:  Okay.  All we're saying is, look, we |
| 03:38:59PM | 14 | don't do -- nobody on our side has done anything in that |
| 03:39:04PM | 15 | pharmacovigilance database as far as Dr. Plunkett's |
| 03:39:07PM | 16 | testimony.  And I'm talking about -- when I say "we haven't |
| 03:39:10PM | 17 | done anything," I mean we are not the party that evaluates |
| 03:39:14PM | 18 | and -- or reports that come into the company and categorize |
| 03:39:18PM | 19 | them as permanent and irreversible.  All she said was, there |
| 03:39:21PM | 20 | are a number -- and I stayed away from the number -- there |
| 03:39:23PM | 21 | are a number that Sanofi categorizes as permanent and |
| 03:39:28PM | 22 | irreversible.  They exist.  They know it's there for years -- |
| 03:39:33PM | 23 | from 1999 to 2008, they've been collecting and they've on |
| 03:39:38PM | 24 | using those terms -- verbatim terms. |
| 03:39:42PM | 25 | MR. STRONGMAN:  That's a new lawyer argument basis |

03:39:46PM   1    for the adequacy of the label and her opinion.  It wasn't her

03:39:52PM   2    opinion in her report that was subject to deposition and

03:39:58PM   3    motion practice and this Court's ruling.

03:40:02PM   4         MR. MICELI:  Your Honor, my colleague just handed me

03:40:04PM   5    Rule 705.  "The expert may state an opinion and give the

03:40:07PM   6    reasons for it without first testifying to the underlying

03:40:10PM   7    facts or data, but the expert may be required to disclose

03:40:14PM   8    those facts or data on cross-examination."  I think it's 20

03:40:18PM   9    until 4:00.  We need to get going with the cross-examination.

03:40:21PM   10        THE COURT:  All right.  We're going to talk.

03:40:21PM   11        MR. MICELI:  Okay.

03:40:23PM   12        THE COURT:  Nobody go anywhere when we finish trial

03:40:26PM   13   this afternoon.

03:40:27PM   14        MR. STRONGMAN:  And just on scheduling, setting all

03:40:30PM   15   that aside, I will move quickly.  I -- I'm trying to decide

03:40:37PM   16   the implication of me saying I'm done in light of this

03:40:42PM   17   context and turning it back over to redirect, if I should get

03:40:47PM   18   there.  So that's the -- part of the quandary.  I don't

03:40:53PM   19   intend to take a long time, like, I'm not -- but I have that

03:40:57PM   20   concern of there's some things that sitting right here today

03:41:01PM   21   I'm not sure what I want to ask her or how and so saying I'm

03:41:07PM   22   done is the challenge.

03:41:08PM   23        THE COURT:  We'll cross that bridge when we get to

03:41:10PM   24   it.

03:41:11PM   25        MR. STRONGMAN:  Thank you, Your Honor.

03:41:12PM  **1**        THE COURT:  Bring the jury in.

03:42:03PM  **2**                    (Jury enters courtroom.)

03:42:16PM  **3**        THE COURT:  All jurors are present.  Court's back in

03:42:18PM  **4**  session.  You may be seated.  Dr. Plunkett, I remind you

03:42:21PM  **5**  you're under oath.  Mr. Strongman.

03:42:24PM  **6**        MR. STRONGMAN:  Thank you, Your Honor.  May it please

03:42:26PM  **7**  the Court.  Good afternoon.  And good afternoon, Dr.

03:42:28PM  **8**  Plunkett.  My name is Jon Strongman and I've got some

03:42:31PM  **9**  questions for you today.

03:42:33PM  **10**       THE COURT:  You may take off your mask, Dr. Plunkett,

03:42:35PM  **11** so that we can hear you.

03:42:37PM  **12**                    CROSS-EXAMINATION

03:42:39PM  **13** BY MR. STRONGMAN:

03:42:40PM  **14**       Q.  You ready to proceed?

03:42:40PM  **15**       A.  Yes.

03:42:41PM  **16**       Q.  Now, Dr. Plunkett, you are no stranger to the

03:42:43PM  **17** courtroom; is that correct?

03:42:44PM  **18**       A.  That's correct.

03:42:44PM  **19**       Q.  In your career, you've testified many, many times.

03:42:47PM  **20** Isn't that right?

03:42:47PM  **21**       A.  Yes, that's correct.

03:42:49PM  **22**       Q.  And, in fact, your job regularly requires you to do

03:42:54PM  **23** exactly what you're doing here today and that's to serve as a

03:42:57PM  **24** professional, testifying expert witness for plaintiff's

03:43:01PM  **25** lawyers; is that correct?

03:43:02PM **1**     A.   Well, my job doesn't require me to do that, but I

03:43:05PM **2** choose to do that based on the cases I take, yes.

03:43:08PM **3**     Q.   And I want to talk a little bit more about that

03:43:10PM **4** litigation experience that you mentioned very briefly with

03:43:15PM **5** Mr. Miceli, and I want to do it -- let's talk about your work

03:43:18PM **6** and I want you to set aside this case -- set aside Taxotere,

03:43:21PM **7** okay?  I want to talk about all your litigation work that

03:43:24PM **8** you've done outside of this, okay?  Does that make sense?

03:43:27PM **9**     A.   Yes.  You want to go back to the beginning?

03:43:30PM **10**     Q.   And what I want to know, Doctor, how many times have

03:43:35PM **11** you gone under oath and offered expert testimony in a case on

03:43:42PM **12** behalf of the plaintiff's lawyer?

03:43:43PM **13**     A.   So, I don't have an exact number.  I've been doing

03:43:47PM **14** testimony since 1992, I believe, is my first case.  But in

03:43:53PM **15** product liability, which would be a case like this, which is

03:43:57PM **16** the majority of the plaintiffs' work that I've done -- in

03:44:04PM **17** trial, several dozen times and in depositions overall,

03:44:09PM **18** probably over 100 times.

03:44:11PM **19**     Q.   Dr. Plunkett, the truth of the matter is, as an

03:44:13PM **20** expert witness for plaintiffs you've testified hundreds of

03:44:16PM **21** times in your career, correct?

03:44:16PM **22**     A.   I --

03:44:18PM **23**     Q.   You have sworn under oath and offered opinions on

03:44:22PM **24** behalf of plaintiffs' lawyers hundreds of times in your

03:44:24PM **25** career, correct?

03:44:25PM  1     **A.**   I have certainly probably done it hundreds of times,

03:44:29PM  2   but I can't give an exact number.  And, again, it's not all

03:44:34PM  3   for plaintiffs' attorneys, but in product liability it is,

03:44:39PM  4   yes.

03:44:40PM  5     **Q.**   And if I were to just go back, Doctor -- let's look

03:45:00PM  6   at the last 15 years.  In the last 15 years, if I were to

03:45:07PM  7   make a list of all the cases where you testified for a

03:45:11PM  8   pharmaceutical company in a case brought by a plaintiff's

03:45:14PM  9   lawyer, it would be zero, right?

03:45:17PM 10     **A.**   Yes.  In the last 15 years in product liability, I

03:45:22PM 11   have only been approached by plaintiffs for cases, that is

03:45:26PM 12   true.

03:45:26PM 13     **Q.**   In fact, in the last 15 years, you have never

03:45:29PM 14   testified for a manufacturer in a product liability case,

03:45:32PM 15   correct?

03:45:32PM 16     **A.**   That is correct; that's what I said.  And it was in

03:45:37PM 17   plaintiffs' work for the last 15 years, for sure.

03:45:39PM 18     **Q.**   And in the last 15 years, just so we're clear,

03:45:42PM 19   virtually all the cases where you have testified have been

03:45:46PM 20   for plaintiffs' lawyers, correct?

03:45:48PM 21          MR. MICELI:  I want to object.  This is the third

03:45:50PM 22   time.

03:45:50PM 23          THE COURT:  Sustained.

03:45:51PM 24   BY MR. STRONGMAN:

03:45:51PM 25     **Q.**   Can you put a percentage on it?

03:45:53PM  1    **A.**   I don't have an exact percentage.  I've tried to give

03:45:56PM  2    you a breakdown based upon what I think is fair and I would

03:45:59PM  3    say in product liability, that would be true, it's been for

03:46:03PM  4    plaintiffs.  But I do other types of litigation work outside

03:46:06PM  5    of that that is for defense at times.  In fact, the majority

03:46:10PM  6    of the impairment work I do is for defense.

03:46:12PM  7        **Q.**   It would be 99 percent though, wouldn't it?

03:46:15PM  8        **A.**   I have no idea.  I don't have a number.  I can't tell

03:46:18PM  9    you.  I can just tell you that certainly I have done -- I

03:46:22PM  10   have a lot of experience in product liability work as a

03:46:25PM  11   pharmacologist, toxicologist, risk assessor, and also

03:46:29PM  12   regulatory.

03:46:29PM  13       **Q.**   Let's talk about the last few years alone.  In 2018,

03:46:33PM  14   you gave -- went under oath, gave depositions in cases for

03:46:35PM  15   plaintiffs' lawyers 25 times.

03:46:38PM  16       **A.**   I'm sorry.  What year?

03:46:39PM  17       **Q.**   2018.

03:46:40PM  18       **A.**   I don't know.  I mean, you have a trial list if you

03:46:42PM  19   want to count it.  I don't recall the exact number, but

03:46:45PM  20   that's possible.

03:46:46PM  21       **Q.**   Well, if you testified 25 times in a year on behalf

03:46:49PM  22   of plaintiffs' lawyers, that's once every other week on

03:46:52PM  23   average, right?  Almost.

03:46:53PM  24       **A.**   So, it certainly wasn't once every other week, but

03:46:56PM  25   certainly there were periods of time where I had several in a

03:47:01PM **1**  month.  That is true.  Some of those cases, though, that

03:47:04PM **2**  you're looking at are the same case, one being a deposition

03:47:06PM **3**  and one being a trial.

03:47:08PM **4**     Q.  And, Doctor, if I go ahead to 2019, you testified on

03:47:13PM **5**  average every other week in 2019 for plaintiffs' lawyers,

03:47:16PM **6**  correct?

03:47:16PM **7**     A.  I don't have -- don't have a count for you, but

03:47:19PM **8**  certainly I did do about a third of my time in litigation

03:47:22PM **9**  work, yes.

03:47:23PM **10**     Q.  And even during the last 18 months, you still managed

03:47:30PM **11**  to keep an active litigation business; is that correct?

03:47:34PM **12**     A.  I had some, yes.  It was nowhere near the amount of

03:47:38PM **13**  times based on the courts being closed.

03:47:41PM **14**     Q.  In fact, you've testified in cases on behalf of

03:47:44PM **15**  plaintiffs' lawyers three times in the last few months,

03:47:47PM **16**  correct?

03:47:47PM **17**     A.  I have.  They have all been in litigation that was

03:47:49PM **18**  backed up for two years, so all the trials came at the same

03:47:53PM **19**  time, but that is true.

03:47:54PM **20**     Q.  And, Doctor, having done this hundreds of times,

03:47:59PM **21**  you're very familiar with how this litigation process works.

03:48:02PM **22**  Is that fair?

03:48:03PM **23**     A.  From the perspective of an expert witness, yes, I

03:48:07PM **24**  think I am.

03:48:08PM **25**     Q.  And the first thing you do is you create an expert

03:48:10PM   1   report; is that correct?

03:48:11PM   2        A.   Yes, I do.

03:48:12PM   3        Q.   And when you do that -- when you decide to go and

03:48:16PM   4   take a case and create an expert report, do you do that as an

03:48:20PM   5   independent scientist?

03:48:23PM   6        A.   Yes.  I come to all of my work -- in fact, even

03:48:27PM   7   before -- first I have to decide whether I'll take a case --

03:48:31PM   8   I do turn cases down.  If I do take the case, I approach it

03:48:36PM   9   with the same scientific rigor as I would any project I work

03:48:42PM   10  on, which would be my independent opinion or my independent

03:48:46PM   11  analysis.

03:48:46PM   12       Q.   And, Doctor, let me just be clear.  Do you consider

03:48:47PM   13  yourself an independent scientist?  Yes or no.

03:48:51PM   14       A.   I consider myself a scientist.  I don't think I've

03:48:54PM   15  ever called myself an independent scientist, but I work

03:48:57PM   16  independently and form my own opinions based on my work and

03:48:59PM   17  my research, yes.

03:48:59PM   18       Q.   Do you consider it to be an advocacy process?  Do you

03:49:04PM   19  consider your forming of your opinions and offering your

03:49:06PM   20  report to be an advocacy process?

03:49:09PM   21       A.   Typically, no.  In expert witnessing, it's not.  The

03:49:13PM   22  lawyers I work for obviously are advocates for their

03:49:17PM   23  individual that they're working for.  I consider myself to be

03:49:21PM   24  someone who has agreed based on the science to provide my

03:49:24PM   25  testimony.

03:49:25PM **1**      **Q.**  And, Doctor, you would certainly agree with me that

03:49:29PM **2**  when you form your opinions in a case, you can't just pick

03:49:32PM **3**  and choose which information you want to rely on; is that

03:49:35PM **4**  correct?

03:49:35PM **5**      **A.**  Well, I pick and choose information based upon the

03:49:38PM **6**  reliability of it, but certainly, no, I don't -- I don't set

03:49:42PM **7**  out to ignore information.  I look for everything that I can

03:49:46PM **8**  find, gather it, and then weigh it and assess it based on the

03:49:49PM **9**  quality or the reliability of the information.

03:49:51PM **10**      **Q.**  And you certainly would agree that you can't just

03:49:54PM **11**  look at the information that helps one side of the case and

03:49:57PM **12**  ignore information that hurts that side of the case, correct?

03:50:01PM **13**      **A.**  No.  I don't think I do that and that's why I review

03:50:07PM **14**  company depositions so that I can get an understanding when I

03:50:11PM **15**  look at a document -- if there is a deposition -- what was

03:50:14PM **16**  said about that document by the company themselves.

03:50:16PM **17**      **Q.**  And, Doctor, I want you to focus on my question a

03:50:19PM **18**  little bit more.  I'm asking you a specific question and I

03:50:23PM **19**  want a specific answer, if you can.  You would agree that in

03:50:29PM **20**  a world of science, it would be inappropriate to prejudge an

03:50:32PM **21**  issue just because of who hired you, correct?

03:50:35PM **22**      **A.**  I would agree that I would not prejudge an issue

03:50:38PM **23**  based on who the person was.  I make my own judgment.

03:50:42PM **24**      **Q.**  And the reality is though, even though you should

03:50:46PM **25**  never prejudge, the reality is, every single time, Dr.

03:50:52PM  1    Plunkett, that you've walked into a courtroom as a scientist

03:50:59PM  2    to testify about warnings on a product, your opinions have

03:51:05PM  3    been every single time that the warning's inadequate,

03:51:12PM  4    correct?

03:51:12PM  5        A.   No, that's not true.  I'm not always asked to look at

03:51:16PM  6    adequacy.  When I am -- in product liability when I'm working

03:51:22PM  7    for plaintiffs, that would be common to be a conclusion I

03:51:25PM  8    might draw.  But, again, I don't take every case.  I take

03:51:27PM  9    cases that I believe the science and the information allows

03:51:30PM  10   me to make that opinion.

03:51:31PM  11       Q.   Dr. Plunkett, you've never walked into a courtroom

03:51:34PM  12   and offered an opinion in a products case that the warning

03:51:37PM  13   that the manufacturer put on the product was adequate,

03:51:39PM  14   correct?

03:51:40PM  15       A.   It is true that based on the cases that I have worked

03:51:42PM  16   on and where I provided that opinion, that would probably be

03:51:45PM  17   true, yes.  Again, each case has its own facts and own

03:51:50PM  18   science, and I believe it supports those findings.

03:51:53PM  19       Q.   And, Doctor, I know it's Friday, and I want you to

03:51:55PM  20   focus on my question, if you can, okay?

03:51:58PM  21            MR. MICELI:  Your Honor, she doesn't need

03:52:00PM  22   instruction.

03:52:00PM  23            THE COURT:  Okay.  Thank you.  Please have a seat.

03:52:04PM  24   Please proceed, Mr. Strongman.

03:52:06PM  25   BY MR. STRONGMAN:

03:52:07PM 1      Q.   Dr. Plunkett, you understand this is a case about

03:52:08PM 2   Ms. Kahn; is that correct?

03:52:10PM 3      A.   I'm sorry?

03:52:10PM 4      Q.   You understand this is a case about Ms. Kahn,

03:52:13PM 5   correct?

03:52:13PM 6      A.   About her -- about her injury, yes.

03:52:16PM 7      Q.   And you have been on the stand now several hours and

03:52:20PM 8   you haven't mentioned her once, correct?

03:52:21PM 9      A.   No.  I believe I used her name several times when I

03:52:24PM 10  said Ms. Kahn's use, and I talked about when she was exposed

03:52:29PM 11  so I did there, yes.

03:52:30PM 12     Q.   The truth of the matter is, Dr. Plunkett, when you

03:52:34PM 13  formed your opinions in this case and when you wrote your

03:52:39PM 14  expert report, you didn't know much of anything about Ms.

03:52:44PM 15  Kahn, correct?

03:52:44PM 16     A.   So you need to be more specific.  What do you mean

03:52:47PM 17  "not knowing much of anything"?  If you're asking -- if what

03:52:50PM 18  you mean by that is have I reviewed her medical records, no.

03:52:53PM 19  I'm not a physician.  That isn't my role.

03:52:56PM 20     Q.   You didn't read her medical records; is that correct?

03:52:58PM 21     A.   Yes.  I just said that because I'm not doing

03:53:02PM 22  causation.

03:53:03PM 23          MR. MICELI:  Your Honor, can we approach for one

03:53:04PM 24  moment?

03:53:04PM 25          THE COURT:  Yes.

03:53:05PM  1          (WHEREUPON, the following proceedings were held at

03:53:14PM  2     the bench:)

03:53:14PM  3          MR. MICELI:  They didn't object to her qualifications

03:53:18PM  4     -- excuse me Jon, I'm gonna let you stand over there.  I

03:53:22PM  5     don't want to push -- they didn't object to her

03:53:23PM  6     qualifications and she did not give case-specific opinions

03:53:27PM  7     and he's --

03:53:29PM  8          THE COURT:  I'm not sure -- she's testifying as to

03:53:33PM  9     adequacy of the label, not Ms. Kahn.  I'm --

03:53:38PM  10         MR. MICELI:  Right.

03:53:39PM  11         MR. STRONGMAN:  I think it's relevant that she knows

03:53:42PM  12    about it and that she was given no particulars about Ms.

03:53:45PM  13    Kahn.  I think it shows something about her role --

03:53:45PM  14         THE COURT REPORTER:  I can't hear you, Mr. Strongman.

03:53:53PM  15         MR. STRONGMAN:  And so that's my point is that I

03:53:56PM  16    think it is relevant that she's offering absolutely no

03:54:00PM  17    opinions about Ms. Kahn at all.  She didn't read the -- she's

03:54:04PM  18    offering an opinion on labeling.

03:54:04PM  19         THE COURT:  Yes.

03:54:06PM  20         MR. STRONGMAN:  She didn't look at what their own

03:54:08PM  21    doctors said about labeling.

03:54:10PM  22         THE COURT:  That's a different matter.  She testified

03:54:12PM  23    as to the adequacy of the label, not whether or not Ms. Kahn

03:54:16PM  24    read it or Dr. Kardinal read it or anybody else.  That's a

03:54:21PM  25    different matter.  This one is adequacy -- is it adequate on

03:54:25PM  1    the label.

03:54:26PM  2         MR. MICELI:  This is absolutely outside the scope.

03:54:29PM  3         MR. STRONGMAN:  I think Mr. Miceli showed a consent

03:54:31PM  4    form -- I'm not going to show the consent form --

03:54:33PM  5         MR. MICELI:  I didn't show her a consent form.

03:54:36PM  6         MR. STRONGMAN:  A Canadian consent form.

03:54:38PM  7         MR. MICELI:  I showed her Ms. Kahn's consent form.

03:54:40PM  8         MR. STRONGMAN:  That's not my point.  I'm not going

03:54:43PM  9    to show it, but that's my point.

03:54:44PM  10        THE COURT:  Okay.  I think we need to move on.

03:54:47PM  11        MR. STRONGMAN:  I got a couple of questions on that

03:54:48PM  12   and say you have no opinions -- you talk about consent form.

03:54:52PM  13   You are being shown two --

03:54:52PM  14        THE COURT:  You can ask her that one.

03:54:55PM  15        MR. STRONGMAN:  And that you're offering no opinions

03:54:57PM  16   about Ms. Kahn's --

03:54:57PM  17        MR. MICELI:  I understand, Your Honor.  I'm not going

03:54:59PM  18   to object to --

03:54:59PM  19        THE COURT:  I am so frustrated.

03:54:59PM  20        MR. MICELI:  I understand.

03:55:01PM  21        THE COURT:  You can ask about Ms. Kahn's consent

03:55:04PM  22   form.  But I think the fact that she didn't read her medical

03:55:08PM  23   records, why would she?  All she knows is when she got it.

03:55:10PM  24   Whether or not the label at that time was adequately

03:55:14PM  25   reported.  She's not talking about whether or not

```
03:55:16PM   1    Dr. Kardinal had read it.  She's not talking about any of

03:55:18PM   2    that, it's just this.

03:55:20PM   3             MR. MICELI:  Correct.

03:55:21PM   4             MR. STRONGMAN:  So to clarify all that, can I ask two

03:55:24PM   5    questions?  You got the consent form, you can offer no

03:55:26PM   6    opinions on Ms. Kahn --

03:55:28PM   7             THE COURT:  You can ask her that.

03:55:29PM   8             MR. MICELI:  Okay.

03:55:29PM   9                         (In open court.)

03:55:35PM  10    BY MR. STRONGMAN:

03:55:36PM  11        Q.  You ready to proceed, Doctor?

03:55:37PM  12        A.  Yes.

03:55:37PM  13        Q.  You talked to Mr. Miceli about a consent form, I

03:55:44PM  14    think, from Canada; is that correct?

03:55:47PM  15        A.  The informed consent form, Dr. Palatinsky exhibit,

03:55:51PM  16    yes.

03:55:52PM  17        Q.  And when you wrote your report, in this case, when

03:55:55PM  18    you formed your opinions in this case, you never even looked

03:55:58PM  19    at Ms. Kahn's informed consent, correct?

03:56:01PM  20        A.  I did not review her informed consent because I,

03:56:05PM  21    again, am not -- not attempting to form any opinions about

03:56:12PM  22    Ms. Kahn's actions or those particular issues that might be

03:56:15PM  23    involved.

03:56:15PM  24        Q.  And the bottom line is, you're offering no opinions

03:56:19PM  25    about Ms. Kahn at all in this case, correct?
```

03:56:22PM   1          MR. MICELI:  Your Honor, object to scope and it's --

03:56:24PM   2   we'll stipulate to that.

03:56:25PM   3          THE COURT:  Okay.

03:56:27PM   4          Sustained.

03:56:38PM   5   BY MR. STRONGMAN:

03:56:38PM   6      Q.  I want to talk about a few things that I hopefully

03:56:41PM   7   can move through kind of quickly and agree on, okay,

03:56:44PM   8   Dr. Plunkett?

03:56:44PM   9      A.  We can try.

03:56:45PM  10      Q.  So let's start with the FDA, okay?  You're not here

03:56:51PM  11   speaking on behalf of the FDA, correct?

03:56:53PM  12      A.  That is correct, I'm not.

03:56:54PM  13      Q.  And, in fact, you've never spoken on behalf of the

03:56:56PM  14   FDA; is that correct?

03:56:57PM  15      A.  Yes.  Because I'm not -- I've never been an employee

03:57:00PM  16   of the FDA, which is typically who would speak on behalf.

03:57:02PM  17      Q.  And the opinions that you're offering today are

03:57:05PM  18   purely your opinions, they're not the opinions of the FDA,

03:57:08PM  19   correct?

03:57:08PM  20      A.  No.  These are my opinions that I formed

03:57:11PM  21   independently.

03:57:12PM  22      Q.  And you would certainly agree that in order for a

03:57:16PM  23   drug to get approved in the United States, a company has to

03:57:20PM  24   submit something called a "New Drug Application," correct,

03:57:23PM  25   you're familiar with that?

03:57:24PM 1    A.  Yes.  That's typically -- maybe the second step.

03:57:28PM 2  They usually start with an IND and then a New Drug

03:57:32PM 3  Application.

03:57:32PM 4    Q.  And as part of that application, there's a lot of

03:57:34PM 5  information that's provided; is that right?

03:57:36PM 6    A.  Yes, there's certain required rules.  The rules of

03:57:39PM 7  the road.  There's also information on what has to go into an

03:57:44PM 8  application.

03:57:44PM 9    Q.  And you know at FDA there's many dedicated

03:57:47PM 10  professionals, correct?

03:57:48PM 11    A.  I'm aware that they have many employees within the

03:57:52PM 12  drug group, yes.

03:57:53PM 13    MR. MICELI:  Your Honor, I have to object to scope.

03:57:53PM 14  We did not talk about broad base FDA.

03:57:56PM 15    THE COURT:  Where are we going?  Where are we going?

03:58:00PM 16    MR. STRONGMAN:  I'm going -- do we need to approach

03:58:04PM 17  for me to explain?

03:58:05PM 18    THE COURT:  Probably.

03:58:12PM 19    (WHEREUPON, the following proceedings were held at

03:58:14PM 20  the bench:)

03:58:14PM 21    MR. STRONGMAN:  I just didn't want to start talking.

03:58:17PM 22  I think it's fair to go into the fact that the drug goes

03:58:20PM 23  through a process to get approved.  I'm not going into

03:58:23PM 24  through strikethrough or anything like that.  We can agree to

03:58:27PM 25  get on the market the drug has to be approved and that

03:58:29PM  1   includes the FDA having looked at the submission and

03:58:33PM  2   approving it.  I'm not going through the strikethrough or

03:58:36PM  3   anything like that.

03:58:37PM  4           MR. MICELI:  Your Honor, it's --

03:58:39PM  5           MR. STRONGMAN:  It's a totally fair question when

03:58:41PM  6   she's talking about the FDA regulations and how they apply to

03:58:43PM  7   the product and all of that.  It's a totally fair thing to

03:58:48PM  8   ask as an FDA expert.

03:58:50PM  9           MR. MICELI:  Your Honor, I don't want to be popping

03:58:52PM  10  up and down all afternoon.  And I don't really mean to

03:58:56PM  11  interrupt here, but the -- we tendered her as an expert in

03:59:01PM  12  label adequacy at the time, 2008.  We do not contest that

03:59:05PM  13  Taxotere was approved.  It was on the market.  We don't

03:59:08PM  14  contest that it should stay on the market.  All we argue

03:59:11PM  15  about, in this case, is in the warning.

03:59:13PM  16          THE COURT:  I know.  I'm just trying to figure out

03:59:17PM  17  where you're going with this.  Because I think everybody I

03:59:20PM  18  don't think it's -- I think her opinions are as to adequacy

03:59:26PM  19  of the warning, that's it, of the adverse effects.

03:59:30PM  20          MR. MICELI:  That's all we put her up for, Your

03:59:33PM  21  Honor.

03:59:33PM  22          MR. STRONGMAN:  And certainly the fact that the

03:59:34PM  23  FDA -- that the product starts out as an approved label is a

03:59:38PM  24  relevant fact.  It then has to have information that comes

03:59:42PM  25  out when she's talking about postmarket surveillance that

03:59:47PM **1**  then creates some trigger under the regulation, that you then

03:59:51PM **2**  have to change it.  So the fact that it's approved, and she's

03:59:54PM **3**  not offering --

03:59:55PM **4**      THE COURT:  All right.  I'm going to give you about,

03:59:57PM **5**  like, this much space to wiggle.  And so that the record is

04:00:00PM **6**  clear, it's about an eighth of an inch.  You know, I think

04:00:05PM **7**  just a couple of minor, minor points that once it's approved

04:00:12PM **8**  then it go into postmarket analysis and that's the focus of

04:00:16PM **9**  your work.  I don't have a problem with that.

04:00:18PM **10**      MR. MICELI:  Right.

04:00:19PM **11**      THE COURT:  But I don't want to get into and then the

04:00:21PM **12**  FDA does this and FDA does that, you know.  Because that was

04:00:24PM **13**  not covered in direct.

04:00:25PM **14**      MR. STRONGMAN:  All I'm going to say is for a product

04:00:29PM **15**  to get on the market has to be FDA approved through this

04:00:31PM **16**  process.

04:00:31PM **17**      MR. MICELI:  We'll stipulate that it was approved and

04:00:33PM **18**  it was on the market.  We're not saying it wasn't.

04:00:36PM **19**      MR. STRONGMAN:  I understand.  I'm allowed to ask

04:00:38PM **20**  some questions.

04:00:39PM **21**      THE COURT:  I think I'm going to let him to develop

04:00:41PM **22**  it.

04:00:41PM **23**      MR. STRONGMAN:  So my question is just going to be,

04:00:43PM **24**  to get on the market, the FDA has to approve a drug as safe

04:00:47PM **25**  and effective?

| | | |
|---|---|---|
| 04:00:47PM | **1** | THE COURT:  And then these regulations vis-a-vis. |
| 04:00:57PM | **2** | Okay. |
| 04:00:57PM | **3** | (In open court.) |
| 04:01:01PM | **4** | THE COURT:  Please proceed. |
| 04:01:02PM | **5** | BY MR. STRONGMAN: |
| 04:01:02PM | **6** | Q.  You ready, Dr. Plunkett? |
| 04:01:03PM | **7** | A.  Yes. |
| 04:01:04PM | **8** | Q.  So we were talking about FDA and here's my question, |
| 04:01:08PM | **9** | we can agree, that at the end of the day, before the FDA |
| 04:01:13PM | **10** | approves a medication, it must determine that the medication |
| 04:01:16PM | **11** | is safe and effective, correct? |
| 04:01:18PM | **12** | A.  Yes.  Based on the data that is supplied by the |
| 04:01:21PM | **13** | company, they will make a determination.  And if it's |
| 04:01:23PM | **14** | approved, they will have made that decision. |
| 04:01:26PM | **15** | Q.  And, Dr. Plunkett, I want to talk a little bit more |
| 04:01:34PM | **16** | about you, about your training, and about your work.  You're |
| 04:01:38PM | **17** | not a medical doctor; is that correct? |
| 04:01:40PM | **18** | A.  That's correct, I'm not a physician. |
| 04:01:42PM | **19** | Q.  And you've never been to medical school; is that |
| 04:01:44PM | **20** | right? |
| 04:01:44PM | **21** | A.  No.  I've taught medical students, but I've not been |
| 04:01:47PM | **22** | to medical school. |
| 04:01:48PM | **23** | Q.  And you don't treat patients, correct? |
| 04:01:50PM | **24** | A.  I do not. |
| 04:01:51PM | **25** | Q.  And as you can't prescribe a medication, you've never |

04:01:53PM   1   been in that room where you've had to navigate the decision

04:01:57PM   2   on whether or not to use a chemotherapy with a patient,

04:02:00PM   3   correct?

04:02:00PM   4         MR. MICELI:  I want to object to the scope.

04:02:01PM   5         THE COURT:  Sustained.

04:02:04PM   6   BY MR. STRONGMAN:

04:02:05PM   7   Q.   Your current company is called -- what is it called,

04:02:08PM   8   Dr. Plunkett?

04:02:08PM   9   A.   Currently, my company is Biopolicy Solution; that's a

04:02:12PM  10   new company I formed in 2020 with a business partner.

04:02:15PM  11   Q.   And it's just you and one other partner; is that

04:02:17PM  12   correct?

04:02:18PM  13   A.   So we have three employees, it's myself and her and

04:02:20PM  14   then we have an employee that's an administrator, yes.

04:02:24PM  15   Q.   And before that, for the previous 19 years or so,

04:02:27PM  16   your company was called Integrative Biostrategies; is that

04:02:32PM  17   correct?

04:02:32PM  18   A.   Yes, that's correct.

04:02:33PM  19   Q.   And that's a very similar business to the one you

04:02:36PM  20   currently have, it was a consulting business, correct?

04:02:38PM  21   A.   In terms of being consulting, it was.  We have a

04:02:40PM  22   different mix of work now, but, yes, it was a consulting

04:02:43PM  23   business.

04:02:43PM  24   Q.   And we established earlier that when you testify,

04:02:48PM  25   it's through that consulting business or those consulting

04:02:51PM  1   businesses over the years; is that correct?

04:02:53PM  2       A.   Yes.   I -- that is who -- who is billing is the

04:02:57PM  3   company is billing and I'm an employee of that company.

04:02:59PM  4       Q.   And the reality is, Doctor, over the years, as a

04:03:04PM  5   testifying expert for plaintiffs' lawyers you made millions

04:03:07PM  6   and millions of dollars, correct?

04:03:10PM  7       A.   I --

04:03:10PM  8            MR. MICELI:  I object, relevance.

04:03:12PM  9            THE COURT:  I'm going to allow it, but...

04:03:16PM 10            THE WITNESS:  I wouldn't say millions and millions of

04:03:21PM 11   dollars in testifying.  I certainly have testified a good

04:03:23PM 12   deal in the last, I guess, 18 years or so.  And my company

04:03:27PM 13   certainly has brought in revenues that are probably several

04:03:30PM 14   million dollars over those years, yes.

04:03:33PM 15   BY MR. STRONGMAN:

04:03:33PM 16       Q.   Doctor, the kind of money we're talking about, and I

04:03:38PM 17   said it's a large sum of money that you've been paid, we're

04:03:43PM 18   talking about millions of dollars, correct?

04:03:45PM 19            MR. MICELI:  Object to the form.

04:03:46PM 20            THE COURT:  Sustained.

04:03:48PM 21   BY MR. STRONGMAN:

04:03:49PM 22       Q.   And, Doctor, you also work, you said, for your

04:03:51PM 23   sister's law firm; is that correct?

04:03:53PM 24       A.   Yes, that's correct.

04:03:55PM 25       Q.   And when you look up your sister's law firm website,

04:03:58PM 1    it has a biography of you; is that correct?

04:04:02PM 2        A.   I believe it does, yes.

04:04:02PM 3        Q.   Okay.  And you said you do patent work for them; is

04:04:05PM 4    that right?

04:04:06PM 5        A.   Yes, and regulatory work as well.

04:04:07PM 6        Q.   And specifically, on the biography of your sister's

04:04:13PM 7    website, it says that after your time at the University of

04:04:16PM 8    Arkansas ended, you turned your focus to working with

04:04:18PM 9    pharmaceutical and biotech companies on FDA and patent

04:04:23PM 10   matters; is that correct?

04:04:24PM 11       A.   Yes.  I did a -- well, in FDA matters at ENVIRON and

04:04:28PM 12   then when I obtained my patent agent in 1997, that's correct.

04:04:33PM 13       Q.   And nowhere in that website biography does it say

04:04:40PM 14   anything about the fact that you spent years testifying

04:04:43PM 15   against pharmaceutical companies, does it?

04:04:45PM 16       A.   It doesn't, but that's because I don't do litigation

04:04:48PM 17   work through my sister's firm.

04:04:50PM 18       Q.   I know.

04:04:51PM 19       A.   So the bio she has written, relates to her putting me

04:04:57PM 20   out as someone that who works within her company.

04:05:00PM 21       Q.   The reality is if you were a company and you looked

04:05:03PM 22   at your sister's website and you were looking at whether or

04:05:06PM 23   not you wanted to hire you, you'd have no idea that you spent

04:05:10PM 24   every other week for years testifying against the industry,

04:05:13PM 25   correct?

04:05:14PM   1          MR. MICELI:  Object to form and relevance.

04:05:16PM   2          THE COURT:  Sustained.

04:05:18PM   3   BY MR. STRONGMAN:

04:05:19PM   4      Q.  Doctor, do you believe -- I think you call yourself a

04:05:25PM   5   regulatory specialist, I think that's what you call yourself

04:05:29PM   6   in your report, an FDA regulatory specialist?

04:05:31PM   7      A.  Yes.  I have listed that as expertise when I'm

04:05:34PM   8   drafting reports that deal with FDA regulatory matters.

04:05:38PM   9      Q.  And you certainly didn't take any kind of test to

04:05:40PM   10  become an FDA specialist, correct?

04:05:42PM   11     A.  No.  I don't have a degree, no.  Again, it's an

04:05:46PM   12  expertise that I have gained through the training that I have

04:05:50PM   13  had and the work that I've done over the years.

04:05:52PM   14     Q.  And you didn't receive some sort of certification to

04:05:54PM   15  become an FDA specialist, correct?

04:05:56PM   16     A.  No, I did not.  I worked in this area well before

04:06:00PM   17  there were any certifications available.

04:06:01PM   18     Q.  And you certainly -- I think you have never worked at

04:06:04PM   19  the FDA, correct?

04:06:05PM   20     A.  No.  I've never been an employee of the FDA.

04:06:09PM   21     Q.  And the FDA has certainly never come to you and asked

04:06:13PM   22  for your opinion about how to apply regulations to a drug

04:06:16PM   23  label; is that correct?

04:06:17PM   24     A.  No.  And I would be surprised if they did, but that's

04:06:21PM   25  correct, they have not.

04:06:22PM **1**    **Q.**  And the US Government and its agencies do have

04:06:27PM **2**  something called a scientific advisory committee from time to

04:06:32PM **3**  time on various topics; isn't that true?

04:06:36PM **4**        MR. MICELI:  Your Honor, I object, relevance.

04:06:36PM **5**        THE COURT:  Sustained.

04:06:44PM **6**  BY MR. STRONGMAN:

04:06:44PM **7**    **Q.**  Doctor, have you ever tried to get onto a scientific

04:06:52PM **8**  advisory committee with a governmental agency to provide any

04:06:55PM **9**  opinion, scientific advice and had your credentials evaluated

04:07:00PM **10**  by your peers?

04:07:02PM **11**        MR. MICELI:  Same objection.  I'm sorry.

04:07:04PM **12**        THE COURT:  Overruled.

04:07:04PM **13**        I don't know if we're going somewhere.

04:07:07PM **14**        THE WITNESS:  I'm sorry?

04:07:08PM **15**        THE COURT:  Please answer the question.

04:07:09PM **16**        THE WITNESS:  Not for the FDA, I have not.  I've

04:07:11PM **17**  never attempted to do that for the FDA.  I did apply for a

04:07:15PM **18**  science advisory panel, an external panel in 2020, I believe,

04:07:20PM **19**  for -- at EPA advisory panel.

04:07:24PM **20**  BY MR. STRONGMAN:

04:07:24PM **21**    **Q.**  And it was specifically called the Scientific

04:07:26PM **22**  Advisory Committee on Chemicals; is that correct?

04:07:29PM **23**    **A.**  I believe that's correct, yes.

04:07:30PM **24**    **Q.**  And the way the process works for an independent

04:07:33PM **25**  scientific advisory committee like this is that they put out

04:07:36PM   1    a notice and, like, a federal register is called or you could

04:07:40PM   2    either nominate yourself or someone else could nominate you

04:07:43PM   3    for this independent committee, true?

04:07:45PM   4        A.   It can.  I heard about it a different way.  I heard

04:07:50PM   5    about it through a solicitation from the EPA to the Society

04:07:52PM   6    for Toxicology, and they were looking for individuals to

04:07:54PM   7    self-nominate, which is what I did.

04:07:56PM   8        Q.   And as part of the process, you submit your

04:07:58PM   9    credentials and the federal agency puts a description of

04:08:00PM  10    those credentials out to the public; isn't that correct?

04:08:03PM  11        A.   They can, yes.

04:08:04PM  12        Q.   And they did in this instance with you, correct?

04:08:06PM  13        A.   Yes.  I provided them with a short biosketch.

04:08:10PM  14        Q.   And that gave other scientists and other peers and

04:08:13PM  15    other doctors the opportunity to review your nomination and

04:08:18PM  16    submit comments, correct?

04:08:19PM  17             MR. MICELI:  Your Honor, object to the form,

04:08:21PM  18    relevance, and hearsay.

04:08:24PM  19             THE COURT:  It's sustained.

04:08:27PM  20    BY MR. STRONGMAN:

04:08:27PM  21        Q.   Doctor, were you ever put on any kind of scientific

04:08:33PM  22    advisory committee that you applied for?

04:08:36PM  23             MR. MICELI:  Same objection, Your Honor.  I

04:08:37PM  24    apologize.

04:08:38PM  25             THE COURT:  I think we need to come here.

04:08:46PM  1          (WHEREUPON, the following proceedings were held at

04:08:48PM  2     the bench:)

04:08:48PM  3          MR. MICELI:  Your Honor, is he going to bring in

04:08:50PM  4     people -- applications or papers that say something -- that's

04:08:54PM  5     just ridiculous.

04:08:55PM  6          THE COURT:  How's it relevant to what she's doing

04:08:57PM  7     here and is it that they found she defrauded the paperwork or

04:09:03PM  8     is it she just didn't get the nomination?

04:09:04PM  9          MR. STRONGMAN:  There were comments made, public

04:09:06PM  10    comments made by groups of organizations --

04:09:09PM  11         MR. MICELI:  You mean hearsay?

04:09:11PM  12         MR. STRONGMAN:  -- as impeachment material we

04:09:14PM  13    submitted to the court.  There were comments made about her

04:09:16PM  14    scientific integrity.

04:09:19PM  15         MR. MICELI:  Well, Your Honor, that is hearsay.

04:09:21PM  16         THE COURT:  That is hearsay.

04:09:24PM  17         MR. MICELI:  That's hearsay.

04:09:24PM  18         MR. STRONGMAN:  It goes to her credibility.

04:09:25PM  19         MR. MICELI:  No.  It doesn't go to her credibility.

04:09:27PM  20    It goes to hearsay.

04:09:28PM  21         THE COURT:  You know a lot people post comments about

04:09:30PM  22    me, I guess that's my problem.

04:09:36PM  23         MR. MICELI:  My Facebook Marketplace comments are all

04:09:38PM  24    good, Your Honor.

04:09:39PM  25         THE COURT:  No.  Stop.  Stop.

04:09:41PM   **1**          MR. STRONGMAN:  Can I just end then by saying --

04:09:42PM   **2**          MR. MICELI:  I don't want to negotiate what hearsay

04:09:46PM   **3**   he can --

04:09:46PM   **4**          THE COURT:  It's done.

04:09:47PM   **5**          MR. MICELI:  Thank you, Your Honor.

04:09:47PM   **6**          MR. STRONGMAN:  Can I ask one thing, have you ever

04:09:51PM   **7**   been selected for a scientific advisory committee?

04:09:51PM   **8**          THE COURT:  You can ask her if she was selected for a

04:09:56PM   **9**   scientific advisory committee.  That's fair.

04:09:59PM   **10**                      (In open court.)

04:10:03PM   **11**   BY MR. STRONGMAN:

04:10:03PM   **12**      Q.  Dr. Plunkett, were you ever selected for this

04:10:07PM   **13**   independent EPA scientific advisory committee that you

04:10:12PM   **14**   self-nominated for?

04:10:13PM   **15**      A.  No.  There were 60 some applicants and I believe only

04:10:19PM   **16**   three or four were chosen, and I was not chosen.

04:10:23PM   **17**      Q.  And, Dr. Plunkett, with regard to what you're calling

04:10:35PM   **18**   permanent alopecia, I want to talk a little bit more about

04:10:37PM   **19**   your opinions on Taxotere, okay?

04:10:38PM   **20**      A.  Sure.

04:10:39PM   **21**      Q.  You would agree with me that what you call permanent

04:10:43PM   **22**   alopecia is defined as hair loss lasting longer than six

04:10:47PM   **23**   months, true?

04:10:48PM   **24**      A.  That is a definition that I've discussed in my

04:10:52PM   **25**   report.  But certainly depending upon the source of the

| | | |
|---|---|---|
| 04:10:55PM | 1 | information, there are others that describe it as being up to |
| 04:10:58PM | 2 | one year, up to two years; there's different definitions in |
| 04:11:02PM | 3 | the literature. |
| 04:11:03PM | 4 | Q.  And as part of your work in this case, you did look |
| 04:11:07PM | 5 | into the medical literature about permanent hair loss with |
| 04:11:12PM | 6 | chemotherapy, correct? |
| 04:11:13PM | 7 | MR. MICELI:  Your Honor, objection, outside the |
| 04:11:15PM | 8 | scope. |
| 04:11:21PM | 9 | THE COURT:  Sustained. |
| 04:11:27PM | 10 | MR. STRONGMAN:  Dr. Sedlacek's article is medical |
| 04:11:29PM | 11 | literature. |
| 04:11:30PM | 12 | THE COURT:  All right.  Overruled. |
| 04:11:34PM | 13 | THE WITNESS:  I'm sorry.  Could you repeat the |
| 04:11:35PM | 14 | question?  I apologize. |
| 04:11:36PM | 15 | BY MR. STRONGMAN: |
| 04:11:36PM | 16 | Q.  As part of forming your opinions in this case, you |
| 04:11:39PM | 17 | reviewed medical literature regarding permanent hair loss and |
| 04:11:43PM | 18 | chemotherapy, correct? |
| 04:11:44PM | 19 | A.  In working in this litigation, yes, I did perform a |
| 04:11:49PM | 20 | literature search.  For this particular case, that isn't what |
| 04:11:52PM | 21 | I did. |
| 04:11:52PM | 22 | Q.  And you know from looking the literature including |
| 04:11:58PM | 23 | specifically even Dr. Sedlacek's study that not every patient |
| 04:12:04PM | 24 | that takes Taxotere has permanent hair loss, true? |
| 04:12:06PM | 25 | A.  Yes, that is true. |

04:12:08PM **1**      **Q.** And you would certainly agree that it's your opinion

04:12:15PM **2** that after you take Taxotere, hair loss is generally

04:12:22PM **3** reversible, correct?

04:12:24PM **4**      MR. MICELI:  Object to the form, outside of the

04:12:26PM **5** scope.  If we're talking medical terms, Your Honor.

04:12:31PM **6**      THE COURT:  Overruled.  I'm going to allow her to

04:12:38PM **7** testify.

04:12:38PM **8**      MR. MICELI:  Okay.

04:12:39PM **9**      THE WITNESS:  So depends on whether you're asking

04:12:41PM **10** that opinion of me as a regulatory expert or whether you're

04:12:45PM **11** asking me that opinion to me as a -- someone who is dealing

04:12:49PM **12** with just the science behind it.  Someone who is defining

04:12:53PM **13** things as a toxicologist or a pharmacologist, it's different.

04:12:56PM **14** Regulatory standards are different in terms of definitions

04:12:59PM **15** and descriptions.  You want me to explain further?

04:13:05PM **16** BY MR. STRONGMAN:

04:13:05PM **17**      **Q.** Doctor, my question is, it's your opinion that hair

04:13:09PM **18** loss after Taxotere use is generally reversible, true?

04:13:15PM **19**      **A.** And I said to you, I can't answer that unless you

04:13:18PM **20** tell me whether you want me to answer that in terms of the

04:13:21PM **21** regulatory requirements of what a regulatory definition would

04:13:24PM **22** be and how you would apply it.  But if you're talking about

04:13:28PM **23** the standard English meaning or the -- the general

04:13:33PM **24** literature, I can answer it that way.  So I'm asking you just

04:13:35PM **25** to be specific.  Because today I've been speaking to the

04:13:39PM   1   issues related to the application of the regulatory

04:13:42PM   2   requirements and the rules for that, which are different than

04:13:47PM   3   how you might use plain English.

04:13:51PM   4         MR. STRONGMAN:  May I approach the witness, Your

04:13:57PM   5   Honor?

04:13:57PM   6         THE COURT:  Yes, you may.

04:14:01PM   7         MR. STRONGMAN:  Would you like a copy, Your Honor?

04:14:03PM   8         THE COURT:  I would like a copy, please.

04:14:21PM   9   BY MR. STRONGMAN:

04:14:21PM   10     Q.   And, Doctor, there's dates along the side there.

04:14:24PM   11   I'll refer to the transcripts there by dates.  And if you

04:14:28PM   12   could open up to 12/10/18.

04:14:34PM   13         MR. MICELI:  Excuse me?

04:14:35PM   14         MR. STRONGMAN:  12/10/18.

04:14:36PM   15         MR. MICELI:  Okay.  Now, we've got to approach, Your

04:14:38PM   16   Honor.

04:14:39PM   17         (WHEREUPON, the following proceedings were held at

04:14:53PM   18   the bench:)

04:14:53PM   19         MR. MICELI:  He's pulling out a deposition to try to

04:14:56PM   20   impeach her at a time before -- and it's a strange thing on

04:15:00PM   21   how it had to come because of Dr. Kessler.  And this is a

04:15:04PM   22   deposition from before she provided a regulatory report and

04:15:09PM   23   it is wholly irrelevant.  He's going to pull out a 2018 to

04:15:15PM   24   impeach her on opinions that she formed in 2021.

04:15:20PM   25         MR. STRONGMAN:  She's offered opinions, she

04:15:22PM 1   incorporated those opinions into her report.  I am working

04:15:26PM 2   here in a situation where it is clear that there is an effort

04:15:37PM 3   to try to even prevent an adequate cross-examination of this

04:15:40PM 4   witness by limiting what was relied on to a degree that it

04:15:45PM 5   makes it almost impossible to do and that's clearly what's

04:15:52PM 6   going on.  And so I think it's perfectly fair for me to ask

04:15:57PM 7   questions such as this one and she's giving clear answers to,

04:16:03PM 8   they're relevant to her opinions.  They were opinions that

04:16:06PM 9   she expressed in a report that she then incorporated in the

04:16:10PM 10  report that she's used in this case.

04:16:12PM 11          MR. MICELI:  I disagree.  That's a 2018 report.  Her

04:16:16PM 12  report for the Taxotere from a pharmacology/toxicology was

04:16:21PM 13  done on March 23rd of 2019.  So he's pulling out a 2018

04:16:26PM 14  report or thing.  Her report is somewhat different than the

04:16:31PM 15  second go around than it was on the first --

04:16:32PM 16          THE COURT:  Then you got to clear it up on redirect.

04:16:35PM 17          MR. MICELI:  Okay.  But it's still outside the scope

04:16:38PM 18  because this is going into pharmacology and toxicology.

04:16:46PM 19                    (In open court.)

04:16:54PM 20          THE COURT:  What page, please?

04:16:55PM 21          MR. STRONGMAN:  287.

04:16:57PM 22  BY MR. STRONGMAN:

04:16:58PM 23      Q.  And, Doctor, let me know when you're at 287.

04:17:03PM 24      A.  I'm there.

04:17:04PM 25      Q.  And, Dr. Plunkett, if you look at page 287, line 6,

04:17:23PM **1** the question was asked, and this is under oath testimony,

04:17:26PM **2** correct, Dr. Plunkett?

04:17:27PM **3**     **A.**  This is.  It was a deposition I gave, yes.

04:17:29PM **4**     **Q.**  And you were asked, "So it's your opinion that hair

04:17:34PM **5** loss after Taxotere use is generally reversible, true?

04:17:41PM **6**         "Answer:  It is generally reversible.  But it is more

04:17:45PM **7** common to have it permanent with Taxotere as compared to

04:17:48PM **8** other drugs."

04:17:49PM **9**         Did I read that correctly?

04:17:50PM **10**     **A.**  You read that correctly.  But, Mr. Strongman, that is

04:18:05PM **11** not my opinion in this case as it applies to labeling.  Those

04:18:08PM **12** words mean something.

04:18:09PM **13**     **Q.**  And, Doctor, the word "reversible" would mean that

04:18:16PM **14** hair grows back, correct?

04:18:17PM **15**     **A.**  If you're asking for the plain English definition.

04:18:22PM **16**     **Q.**  Yes, yes, Doctor.

04:18:22PM **17**     **A.**  You define from -- that can be misleading in terms of

04:18:27PM **18** the way you use it in a label.

04:18:28PM **19**     **Q.**  Doctor, I'm asking --

04:18:30PM **20**         MR. MICELI:  I'm sorry.  I've stood up enough for

04:18:33PM **21** this already, but my binder doesn't have that deposition and

04:18:34PM **22** I'm just wondering if it was a 2018.

04:18:37PM **23**         THE COURT:  It was a December 2018, yes.

04:18:41PM **24**         MR. MICELI:  Thank you.

04:18:44PM **25**         MR. STRONGMAN:  You want another one?

04:18:46PM   1            MR. MICELI:  Thank you.

04:18:48PM   2   BY MR. STRONGMAN:

04:18:49PM   3      Q.  Dr. Plunkett, my question was reversible means that

04:18:53PM   4   the hair grows back, correct?

04:18:55PM   5      A.  And I answered that.  I said by the definition, plain

04:18:59PM   6   English terms, yes.  But I explained to you -- and I hope

04:19:02PM   7   this was clear earlier today that in -- with rules of

04:19:06PM   8   labeling, words matter.  So using a word "generally

04:19:09PM   9   reversible" to subsume permanent -- permanence would be

04:19:14PM  10   misleading.  And I just want to make that clear.

04:19:20PM  11      Q.  And when we were talking about something being

04:19:23PM  12   generally reversible, what we're saying is most of the time,

04:19:30PM  13   but not always, correct?

04:19:31PM  14      A.  I would disagree if you're talking about a labeling

04:19:34PM  15   statement, but if you're talking about, again, a basic

04:19:39PM  16   definition, I can agree we can go to a dictionary and find

04:19:46PM  17   the term of reversible and it would indicate that reversible

04:19:49PM  18   means it can change back.  So, that would make some sense.

04:19:50PM  19   But I'll just -- again, when I have talked about this

04:19:54PM  20   today -- I don't want it to be misleading to the jury -- that

04:19:57PM  21   the issue of language in a label is very important and

04:20:00PM  22   "permanent" is not "generally reversible."

04:20:02PM  23      Q.  I want to talk about plain language -- plain English,

04:20:05PM  24   okay, Doctor?

04:20:05PM  25      A.  I understand.  That's why I answered your question

04:20:08PM 1    first with that.

04:20:08PM 2        Q.   And so in plain English, the word "generally" here

04:20:14PM 3    means "most of the time but not always," correct?

04:20:18PM 4        A.   You could define it that way but, again, in terms of

04:20:22PM 5    labeling, that would be misleading when you know something

04:20:28PM 6    can also be permanent.

04:20:29PM 7        Q.   And, Doctor, let's look at the label briefly.  I want

04:20:56PM 8    to orient ourselves to a couple of things.  Do you have that

04:21:01PM 9    before you?  And I think it was Plaintiff's Exhibit 280.

04:21:04PM 10       A.   I think he only put it on the screen so I don't have

04:21:08PM 11   it.  I think he just put that up.

04:21:33PM 12       Q.   All right.  Dr. Plunkett, I think it was Exhibit 280,

04:21:37PM 13   and we'll bring it up for you.

04:21:39PM 14            MR. STRONGMAN:  Plaintiff's 280, the label.  I think

04:21:40PM 15   it's also D5, Jen.  Thank you.

04:21:40PM 16   BY MR. STRONGMAN:

04:21:49PM 17       Q.   And I think you actually asked Mr. Miceli a question

04:21:52PM 18   at one point and you said, should we orient ourselves to the

04:21:56PM 19   label.  And I kind of want to spend a little bit of time

04:22:00PM 20   doing that ourselves, okay?

04:22:01PM 21       A.   Can I ask a question?  If you're going to ask me

04:22:04PM 22   about specific sections, I'm going to need it a little larger

04:22:07PM 23   because I don't have it in front of me.

04:22:09PM 24       Q.   When we get there, absolutely.  So, Doctor, when you

04:22:11PM 25   look at this label on the very front page, there's something

04:22:14PM 1     called a "black box."  Do you see that?

04:22:16PM 2         A.  I do.

04:22:17PM 3         Q.  And the black box is what's reserved for the most

04:22:24PM 4     significant warning information; is that correct?

04:22:25PM 5         A.  That affect the prescribing bio physician, yes, that

04:22:30PM 6     is true.

04:22:30PM 7         Q.  And when you look down at the label, there's other

04:22:34PM 8     sections as well, correct?

04:22:35PM 9         A.  Yes.

04:22:35PM 10         Q.  So you have "Indications in Dosage," correct?

04:22:39PM 11         A.  Yes.  These are all sections that I talked about as

04:22:42PM 12     being required under the content and format of the label.

04:22:48PM 13         Q.  When you go down, there's something called

04:22:51PM 14     "Section 5."  Do you see that?

04:22:52PM 15         MR. MICELI:  Your Honor, can we approach on the side

04:22:54PM 16     bar again?

04:23:00PM 17         (WHEREUPON, the following proceedings were held at

04:23:04PM 18     the bench:)

04:23:04PM 19         MR. MICELI:  We're not allowed to talk about

04:23:09PM 20     Section 5 but they're going to bring it up and talk about

04:23:12PM 21     Section 5 and the different burdens.  It is not fair.  It is

04:23:16PM 22     fundamentally unfair.  They filed a preemption motion that

04:23:20PM 23     requires us to limit this case to Section 6 language and now

04:23:24PM 24     he wants to cross-examine her on Section 5.  That's

04:23:28PM 25     absolutely ridiculous.

04:23:30PM **1**        MR. STRONGMAN:  My question is, she keeps calling it

04:23:32PM **2**  a "warning."  It's going in the warnings, it's going in the

04:23:35PM **3**  warnings, it's going in the warnings.  It's not.  It's going

04:23:36PM **4**  in Section 6 which is called "Adverse Reactions."  So my

04:23:39PM **5**  point is, there's a Section 5 called "Warnings"; you were

04:23:41PM **6**  talking about Section 6.

04:23:43PM **7**        MR. MICELI:  Every time I said it, I said "adverse

04:23:45PM **8**  event" -- or "adverse reactions warnings."

04:23:47PM **9**        MR. STRONGMAN:  You may have; she did not.  I know

04:23:50PM **10**  she knows it's Section 6 but she likes to use the word

04:23:57PM **11**  "warning" on a regular basis to describe what she's talking

04:23:58PM **12**  about.

04:23:59PM **13**        THE COURT:  I really don't want us to get outside of

04:24:02PM **14**  the bounds of what her testimony should be and get -- and get

04:24:08PM **15**  into any other matters that would be problematic.  I've

04:24:13PM **16**  already done that work.  So get there and quickly.

04:24:17PM **17**        MR. STRONGMAN:  I'm just saying Section 5 that's

04:24:20PM **18**  here, that's called this, Section 6 is what you were talking

04:24:24PM **19**  about, "Adverse Reactions."

04:24:24PM **20**        MR. MICELI:  Every time we have a volitive issue we

04:24:26PM **21**  get to negotiate up here.  And I'm just making objections --

04:24:26PM **22**        MR. STRONGMAN:  I'm just --

04:24:32PM **23**        MR. MICELI:  -- that get sustained.

04:24:32PM **24**        MR. STRONGMAN:  I can't express my --

04:24:36PM **25**        THE COURT:  Is everybody okay?

| | | |
|---|---|---|
| 04:24:38PM | 1 | MR. MICELI:  Yeah, I think somebody dropped a box. |
| 04:24:39PM | 2 | THE COURT:  Kelly Brilleaux. |
| 04:24:40PM | 3 | MR. MICELI:  She's all right.  She's tough. |
| 04:24:41PM | 4 | THE COURT:  Okay. |
| 04:24:42PM | 5 | (In open court.) |
| 04:24:47PM | 6 | BY MR. STRONGMAN: |
| 04:24:48PM | 7 | Q.  You ready to proceed, Doctor? |
| 04:24:50PM | 8 | A.  I am. |
| 04:24:50PM | 9 | Q.  Put the label back up.  I said, when you look down |
| 04:24:53PM | 10 | you see there's something called "Section 5."  Do you see |
| 04:24:55PM | 11 | that? |
| 04:24:55PM | 12 | A.  At the bottom, yes, I do. |
| 04:24:58PM | 13 | Q.  Yeah.  No.  Just generally in the label, right?  You |
| 04:25:01PM | 14 | look at the table of contents, if you will.  There's |
| 04:25:06PM | 15 | something called Section 5 and it's titled "Warnings and |
| 04:25:09PM | 16 | Precautions"; is that right? |
| 04:25:10PM | 17 | A.  That is correct -- |
| 04:25:11PM | 18 | Q.  Okay.  And you keep going down and there's another |
| 04:25:13PM | 19 | called "Section 6," which is "Adverse Reactions"; is that |
| 04:25:16PM | 20 | correct? |
| 04:25:16PM | 21 | A.  Yes, that's correct.  That's the section that I've |
| 04:25:19PM | 22 | been talking about. |
| 04:25:19PM | 23 | Q.  Correct.  And to be clear, the opinion you offered in |
| 04:25:23PM | 24 | court today is that there should have been some additional |
| 04:25:27PM | 25 | information in Section 6, correct? |

04:25:28PM 1      A.  Should have been a specific warning for permanent

04:25:32PM 2  alopecia in Section 6, yes.

04:25:37PM 3      Q.  And if you look, Section 6 of the label -- where does

04:25:44PM 4  Section 6 of the label begin?  Are you able --

04:25:46PM 5          MR. STRONGMAN:  May I approach, Your Honor, with a

04:25:48PM 6  copy of it so she can flip through the pages on her own?

04:25:53PM 7          THE COURT:  Sure.

04:25:56PM 8          MR. STRONGMAN:  That way you don't have to --

04:26:04PM 9          THE WITNESS:  Begins on page 14 and goes through --

04:26:07PM 10  you want to where it ends or starts on 14?

04:26:15PM 11  BY MR. STRONGMAN:

04:26:15PM 12      Q.  All right.  And specifically, Doctor, the Section 6

04:26:19PM 13  is then broken up into two different categories, right?  You

04:26:22PM 14  have "Clinical Trial Adverse Reactions" and then you have

04:26:26PM 15  "Post-Market Adverse Reactions"; is that correct?

04:26:30PM 16      A.  Yes.  And it's typical for drugs that have been on

04:26:33PM 17  the market for a while.  They have that post-marketing

04:26:37PM 18  experience to add as well.

04:26:38PM 19      Q.  And specifically what we're looking at here is

04:26:41PM 20  "Post-Marketing Experiences," which is Section 6.2; is that

04:26:44PM 21  correct?  Is that what you're talking about today?

04:26:46PM 22      A.  Yes.  Because I was talking about post-marketing

04:26:49PM 23  additions to the label.

04:26:50PM 24      Q.  And so specifically the section that you're saying

04:26:53PM 25  should have had another word in it starts on page 31 of the

04:26:58PM **1**   label; is that correct?

04:26:59PM **2**       **A.**  It does.

04:27:00PM **3**       **Q.**  And just so it's clear, it's your opinion that the

04:27:05PM **4**   word "permanent" should have been added to alopecia in

04:27:10PM **5**   Section 6.2 on page 31 or 32 of the label; is that correct?

04:27:14PM **6**       **A.**  Well, I think there should have been both a listing

04:27:17PM **7**   for temporary as well as permanent because both occur.

04:27:19PM **8**       **Q.**  And we can certainly agree -- you went over it with

04:27:23PM **9**   Mr. Miceli -- that the word "alopecia" is in the label,

04:27:25PM **10**   correct?

04:27:26PM **11**       **A.**  Yes, it is.

04:27:26PM **12**       **Q.**  And you would agree that the word "alopecia" means

04:27:29PM **13**   hair loss, correct?

04:27:30PM **14**       **A.**  Yes.  And that's the other term that you find in the

04:27:33PM **15**   label, yes, that's correct.

04:27:34PM **16**       **Q.**  And when you move forward to the other section that

04:27:49PM **17**   you went over with Mr. Miceli, which is all the way back on

04:27:59PM **18**   page 56, which is in the "Patient Counseling" section.  Are

04:28:03PM **19**   you there?

04:28:04PM **20**       **A.**  Yes.  It starts on 54, but I think we were looking at

04:28:10PM **21**   or identifying things that are listed by hair loss on page

04:28:13PM **22**   56, yes.

04:28:13PM **23**       **Q.**  Great.  And so if you go to 56, we have hair loss.

04:28:17PM **24**   And this is information intended to be written at the level

04:28:21PM **25**   so patients can understand it; is that correct?  I think

04:28:24PM  1    that's what you said.

04:28:24PM  2        A.   Yes.   It still needs to be an accurate description of

04:28:29PM  3    what is happening, but, yes, it's supposed to be written for

04:28:32PM  4    patients, not for physicians.

04:28:33PM  5        Q.   And I know the jury has seen this a number of times

04:28:37PM  6    but what the information says in the label is, "Once you have

04:28:41PM  7    completed all your treatments, hair generally grows back,"

04:28:44PM  8    correct?

04:28:44PM  9        A.   I agree that is stated there.   I believe that's not

04:28:49PM  10   an accurate description of what they knew at the time before

04:28:52PM  11   Ms. Kahn took her treatment.

04:28:53PM  12       Q.   And what we know, Dr. Plunkett, is that it's your

04:28:56PM  13   opinion that with Taxotere, hair is generally reversible --

04:29:00PM  14   "reversible" means "it grows back," "generally" means "most

04:29:05PM  15   of the time," so the fact of the matter is, Dr. Plunkett,

04:29:08PM  16   using plain English, you know that the Taxotere label has

04:29:17PM  17   information in it saying that hair comes back most of the

04:29:23PM  18   time but not always, correct?

04:29:26PM  19            MR. MICELI:   Objection, Your Honor.   Misstates and

04:29:28PM  20   for the purposes we stated at side bar the 2018 deposition.

04:29:35PM  21            THE COURT:   Overruled.   I'm going to allow her to

04:29:38PM  22   answer the question.

04:29:39PM  23            THE WITNESS:   I disagree that that is my opinion of

04:29:43PM  24   the language as it relates to this section of the label.

04:29:45PM  25   That's why I asked you when you first started this line of

04:29:49PM  **1**   questioning whether or not you were talking about what the

04:29:52PM  **2**   requirement would be to put in the label versus what a

04:29:58PM  **3**   dictionary definition would be --

04:29:59PM  **4**   BY MR. STRONGMAN:

04:29:59PM  **5**      **Q.**  I'm asking for the plain English.

04:30:02PM  **6**         MR. MICELI:  Can she finish her answer, Your Honor?

04:30:04PM  **7**         THE COURT:  I'm going to allow her to finish her

04:30:07PM  **8**   answer.

04:30:07PM  **9**         THE WITNESS:  I just wanted to point out that those

04:30:08PM  **10**  statements you've written there under Dr. Plunkett are not my

04:30:10PM  **11**  statements about the language for the label and how it should

04:30:14PM  **12**  be described.

04:30:14PM  **13**  BY MR. STRONGMAN:

04:30:14PM  **14**     **Q.**  They're just your statements on facts.  They're your

04:30:17PM  **15**  statements on the science.  They're your statements on the

04:30:21PM  **16**  plain English meaning of the words, right, Dr. Plunkett?

04:30:24PM  **17**        MR. MICELI:  Objection, Your Honor.  Objection, Your

04:30:26PM  **18**  Honor.

04:30:26PM  **19**        THE COURT:  Sustained.  Sustained.

04:30:40PM  **20**  BY MR. STRONGMAN:

04:30:40PM  **21**     **Q.**  Dr. Plunkett, here's my question.  I want you to

04:30:44PM  **22**  answer this:  What does "hair generally grows back" mean to

04:30:49PM  **23**  you in plain English?

04:30:52PM  **24**     **A.**  In plain English, without being a regulatory expert,

04:30:56PM  **25**  you can go to a dictionary, but this is not what I'm here to

04:31:01PM  1   talk about.  And it's very misleading for the jury to make it

04:31:04PM  2   sound like I believe that "generally grows back" would be

04:31:08PM  3   sufficient for a label.  It is not based on the knowledge of

04:31:11PM  4   the company.  That's my problem.  I do believe,

04:31:15PM  5   Mr. Strongman, that you're trying to mislead the jury on that

04:31:18PM  6   issue.

04:31:19PM  7           MR. STRONGMAN:  I move to strike.

04:31:21PM  8           THE COURT:  So ordered.

04:31:22PM  9   BY MR. STRONGMAN:

04:31:23PM  10      Q.  Dr. Plunkett, my question was, what does "hair

04:31:29PM  11  generally grows" back mean to you in plain English?

04:31:34PM  12          MR. MICELI:  Your Honor, objection.

04:31:37PM  13          MR. STRONGMAN:  You haven't answered the question.

04:31:39PM  14          THE COURT:  Sustained.  It's been asked and answered.

04:32:16PM  15  BY MR. STRONGMAN:

04:32:16PM  16      Q.  Dr. Plunkett, I have a couple more topics.  Hopefully

04:32:20PM  17  I can be brief.  One thing, when you look at the label that

04:32:33PM  18  you've got in front of you, there's something called "The

04:32:36PM  19  Dosage and Administration" and that indicates what we would

04:32:41PM  20  consider to be the approved dose and regimen; is that

04:32:44PM  21  correct?

04:32:44PM  22          MR. MICELI:  Object to form.  Outside the scope.

04:32:46PM  23  She's not a medical doctor.

04:32:48PM  24          MR. STRONGMAN:  It's relevant to my questions on

04:32:50PM  25  Dr. Sedlacek's study.

04:32:53PM   1          THE COURT:  I'll allow it for that limited purpose.

04:32:57PM   2          THE WITNESS:  Could you repeat the question?  I'm

04:32:57PM   3   sorry.

04:32:59PM   4   BY MR. STRONGMAN:

04:32:59PM   5      Q.  Sure.  In the label there's a section on "Dosage and

04:33:04PM   6   Administration," and it sets out what the approved dose and

04:33:07PM   7   regimen is for the medication for a particular purpose.  Do

04:33:13PM   8   you see that?

04:33:13PM   9      A.  I see that, but I wouldn't state it that way.  I

04:33:16PM  10   would say, if you read the FDA regulations about this

04:33:19PM  11   section, it's the recommended dosage and administration, and

04:33:21PM  12   it reflects the dosage and administration that was given

04:33:26PM  13   within the study upon which the drug was approved.  So that's

04:33:29PM  14   how I would describe it.  I think that's more accurate.

04:33:32PM  15          MR. STRONGMAN:  And if you could just zoom in, Jen,

04:33:34PM  16   at the "Dosage and Administration" down at the bottom of that

04:33:38PM  17   front page.

04:33:42PM  18   BY MR. STRONGMAN:

04:33:42PM  19      Q.  I'm just going to read this and see if I can read it

04:33:45PM  20   correctly, okay, Dr. Plunkett.  "For adjuvant cancer, breast

04:33:52PM  21   cancer, the dosage and administration is 75 milligrams per

04:33:56PM  22   meter squared administered one hour after doxorubicin,

04:34:01PM  23   50 milligrams per meter squared, and cyclophosphamide

04:34:06PM  24   500 milligrams per meter squared every three weeks for six

04:34:12PM  25   cycles."  Did I get that correct?

04:34:14PM  **1**       **A.**  You read that correctly, yes, you did.

04:34:17PM  **2**            MR. STRONGMAN:  Now if you could bring up the ELMO

04:34:24PM  **3**   for me, is that possible?

04:34:24PM  **4**   BY MR. STRONGMAN:

04:34:28PM  **5**       **Q.**  And this is the Sedlacek study that you talked about,

04:34:43PM  **6**   correct?

04:34:44PM  **7**       **A.**  Yes.  This is what we showed to the jury.

04:34:46PM  **8**       **Q.**  And with the Sedlacek study, this was a poster

04:34:52PM  **9**   presentation; is that correct?

04:34:52PM  **10**      **A.**  Yes, that's correct.  At a breast cancer meeting.

04:34:55PM  **11**      **Q.**  And we've heard a little bit about that.  But

04:34:57PM  **12**   sometimes, poster presentations get turned into full

04:35:03PM  **13**   manuscripts and submitted and published through a full

04:35:06PM  **14**   peer-review process in a journal, correct?

04:35:08PM  **15**      **A.**  I can't say "most of the time" for this meeting, so I

04:35:11PM  **16**   can't answer that.  I would say to you that that can happen,

04:35:14PM  **17**   and I think I said that in my testimony -- in my -- not

04:35:16PM  **18**   always but sometimes, yes.

04:35:18PM  **19**      **Q.**  And we know that Dr. Sedlacek's abstract was never

04:35:21PM  **20**   turned into a full-blown article that went through a full

04:35:25PM  **21**   peer-review process, correct?

04:35:27PM  **22**      **A.**  I have not found one.  I did do a literature search

04:35:30PM  **23**   on his name and I did not find one.

04:35:31PM  **24**      **Q.**  You did not find one, correct?

04:35:33PM  **25**      **A.**  That is correct.  I did not.

04:35:35PM 1    **Q.**  And as we established, Dr. Sedlacek's abstract was

04:35:43PM 2    public, correct?

04:35:44PM 3    **A.**  I'm sorry.  It was --

04:35:45PM 4    **Q.**  It was public.

04:35:46PM 5    **A.**  Yes.  It was presented at a -- well, it was public in

04:35:49PM 6    that if you attended the meeting and paid the fees to come in

04:35:52PM 7    it was public, yes.

04:35:53PM 8    **Q.**  And so looking at a few of the details that Mr.

04:35:59PM 9    Miceli did not highlight, what you see is that in this

04:36:03PM 10   abstract, there were seven patients that had what he termed

04:36:07PM 11   in his abstract "persistent, significant alopecia."  Do you

04:36:11PM 12   see that?

04:36:11PM 13   **A.**  I believe that's the right number.  I'm looking for

04:36:14PM 14   the sentence, but, yes, he does, I believe, have seven, yes.

04:36:18PM 15   **Q.**  And what Dr. Sedlacek says in his abstract was that

04:36:29PM 16   all seven of these women with PSA had received "AC times

04:36:36PM 17   four, 60/600 milligrams per meter squared every three weeks

04:36:43PM 18   followed by docetaxel" -- that's Taxotere -- "100 milligrams

04:36:48PM 19   per meter squared every three weeks."  Did I read that

04:36:51PM 20   correctly?

04:36:52PM 21   **A.**  You did read that correctly, yes.

04:36:54PM 22   **Q.**  And so looking at the label that we just looked at,

04:37:00PM 23   the regimen of all seven of those patients was different than

04:37:08PM 24   what is in the FDA-approved labeling, correct?

04:37:11PM 25   **A.**  I agree that the regimen is different, but the dose

04:37:14PM  1    is not necessarily when you look at total dose.  So --

04:37:19PM  2        Q.  And, Doctor, I want you to focus on my question.  The

04:37:22PM  3    regimen was different than what's in the FDA approved --

04:37:24PM  4            MR. MICELI:  Can we --

04:37:26PM  5    BY MR. STRONGMAN:

04:37:26PM  6        Q.  -- labeling, correct?

04:37:27PM  7            MR. MICELI:  Can she answer the question?

04:37:29PM  8            THE COURT:  Well, I think she has to answer the

04:37:32PM  9    question, and then she may explain it.

04:37:36PM  10           THE WITNESS:  Yes.  And as I said, I said, yes, the

04:37:37PM  11   regimen was different, but when you look at the total dose of

04:37:40PM  12   docetaxel, when you compare those two, it was not.

04:37:43PM  13   BY MR. STRONGMAN:

04:37:43PM  14       Q.  And you can agree with me that there's a difference

04:37:47PM  15   between an "acute" dose and a "cumulative" dose, correct?

04:37:52PM  16       A.  Acute dose generally and a cumulative dose --

04:37:52PM  17       Q.  Yes.

04:37:56PM  18       A.  Yes, that's true.

04:37:56PM  19       Q.  And what you can see in this paper is that these

04:38:00PM  20   patients received -- when they received the A and the C, it

04:38:05PM  21   was at 60 and 600, not 50 and 500, correct?

04:38:15PM  22       A.  Yes.  But, again, you have to look at the -- in --

04:38:19PM  23   the reason I'm pointing this out, Mr. Strongman, in breast

04:38:22PM  24   cancer therapy, dose of patients is looked at as a cumulative

04:38:27PM  25   dose because the way it is put in.  It's a dose over the

04:38:30PM 1   entire treatment period, but I don't disagree with you that

04:38:33PM 2   there is a different number there for each time it was given.

04:38:36PM 3       Q.   And you certainly know that if you were to look at

04:38:38PM 4   the cumulative dose and you say, oh, I give it all at one

04:38:41PM 5   time, your cumulative dose may be the same but that can have

04:38:47PM 6   different effects if you give it all at once, true?

04:38:49PM 7       A.   Yes.  But that doesn't happen in either of these.  I

04:38:54PM 8   would agree that acute high dose versus shorter term doses

04:38:59PM 9   broken up could have a different toxicity response, yes.

04:39:02PM 10      Q.   And, Dr. Plunkett, the people that received Taxotere

04:39:05PM 11  in Dr. Sedlacek's study all received it in an acute dose of

04:39:10PM 12  100 milligrams per meter squared, correct?

04:39:14PM 13      A.   No.  They received 100 milligrams per meter squared

04:39:18PM 14  every three weeks.  They got it three different times.  So --

04:39:18PM 15      Q.   Correct.

04:39:22PM 16      A.   -- So if you're asking me -- is what you're asking

04:39:23PM 17  me, Mr. Strongman -- I'm not trying to be difficult -- if

04:39:24PM 18  you're asking me is 75 from the label lower than 100, I would

04:39:30PM 19  agree it is, but the issue on toxicity of these drugs is

04:39:34PM 20  tracked by what they've gotten over the cumulative period of

04:39:37PM 21  the dosing.  And that's what's important for both safety and

04:39:40PM 22  efficacy.

04:39:40PM 23      Q.   And you're certainly familiar with what the

04:39:44PM 24  difference is between "on-label" and "off-label" use,

04:39:46PM 25  correct?

04:39:46PM 1    A.  Yes.

04:39:46PM 2    Q.  And all seven patients in Dr. Sedlacek's abstract

04:39:48PM 3  received off-label use of Taxotere, correct?

04:39:54PM 4    A.  If -- I would agree that it's off label if what

04:39:58PM 5  you're stating is they gave it in a different order and with

04:40:02PM 6  different spacing, yes.  But they certainly were getting the

04:40:08PM 7  three-drug regimen just as in the label.

04:40:10PM 8    Q.  And, Doctor, if you look at Dr. Sedlacek's abstracts,

04:40:14PM 9  how many patients had persistent alopecia that received TAC

04:40:20PM 10  in the manner and in the dose as approved by the FDA in the

04:40:28PM 11  labeling?  How many?

04:40:28PM 12    A.  So, I didn't opine on that in forming my opinions,

04:40:31PM 13  but I would agree with you that it is a different order of

04:40:34PM 14  dosing and different cycling, so that is true.  And, again,

04:40:38PM 15  I'm not doing causation, though.  I'm doing it based upon

04:40:40PM 16  what that information says as far as the -- Dr. Sedlacek's --

04:40:40PM 17    Q.  Doctor --

04:40:49PM 18    A.  A line from one of my opinions.

04:40:49PM 19    Q.  -- my question, if you do remember what my question

04:40:52PM 20  was?

04:40:52PM 21    A.  Yes.  And I thought I answered it to start with.  I

04:40:56PM 22  try to do that.  I'm sorry.

04:40:56PM 23    Q.  My question was, how many patients in Dr. Sedlacek's

04:40:59PM 24  abstract had persistent alopecia that received Taxotere with

04:41:02PM 25  the same regimen and the same dose as set out precisely in

04:41:09PM   1   the FDA-approved labeling?

04:41:11PM   2         MR. MICELI:  Object to the form.  Outside the scope

04:41:13PM   3   of the questions of Sedlacek.

04:41:16PM   4         THE COURT:  Actually, it's been asked and answered.

04:41:20PM   5   Several times.  Let's move on.

04:41:42PM   6   BY MR. STRONGMAN:

04:41:43PM   7      Q.  And when you look at Dr. Sedlacek abstracts, there's

04:41:46PM   8   seven -- I think seven different types of combinations used

04:41:51PM   9   in Group C.  Do you see that if you look at the abstract?

04:41:55PM  10      A.  It's not on the screen anymore.  I'm sorry.

04:41:57PM  11         THE COURT:  Put it back up.

04:41:58PM  12         MR. STRONGMAN:  Sorry.  That's my fault.

04:41:58PM  13   BY MR. STRONGMAN:

04:42:02PM  14      Q.  So if you look at Group C, there were seven different

04:42:05PM  15   combinations of regimens used.  Do you see that?

04:42:07PM  16      A.  Seven different things are listed here, yes, that's

04:42:12PM  17   true.

04:42:12PM  18      Q.  And so what we're looking at is Group C right here

04:42:17PM  19   and everything that follows -- the different types of

04:42:22PM  20   regimens that were included in that group, correct?

04:42:25PM  21      A.  Those were the patients -- those are what the

04:42:30PM  22   patients had received, yes.

04:42:31PM  23      Q.  Okay.  And when you look at it in the discussion at

04:42:33PM  24   the end it says, "It appears from this data set that when

04:42:39PM  25   docetaxel is administered after four doses of AC, there's a

04:42:44PM   1   small but significant possibility of poor hair regrowth."

04:42:49PM   2   Did I read that correctly?

04:42:51PM   3       A.  You did.

04:42:52PM   4       Q.  And the reality is, there were a whole bunch of other

04:42:55PM   5   regimens involving Taxotere that Dr. Sedlacek identified no

04:43:00PM   6   risk of persistent hair loss in his abstract, correct?

04:43:05PM   7       A.  You're asking me about his Group A and Group B --

04:43:08PM   8       Q.  All the other ones in Group C, other than A times

04:43:15PM   9   four with C every three weeks followed by Taxotere later?

04:43:21PM   10      A.  I agree.  But the importance of the study is not the

04:43:25PM   11  number of people or that issue that you're describing.  As I

04:43:30PM   12  use this study, what this study shows is that at the time

04:43:33PM   13  that this was published, the company was aware of the fact

04:43:38PM   14  that permanent alopecia was an adverse event that had been

04:43:43PM   15  associated with a drug --

04:43:44PM   16      Q.  Doctor, I understand you.  I understand your

04:43:46PM   17  opinions --

04:43:47PM   18          MR. MICELI:  Your Honor --

04:43:48PM   19          THE COURT:  Wait.

04:43:49PM   20          MR. MICELI:  Object to the failing to allow her to

04:43:52PM   21  answer.

04:43:56PM   22          THE WITNESS:  That's fine.

04:43:57PM   23          THE COURT:  Let's proceed.

04:44:24PM   24  BY MR. STRONGMAN:

04:44:25PM   25      Q.  All right, Doctor.  We've got just one last kind of

04:44:31PM 1  series of questions and we'll get to the weekend.  So when

04:44:34PM 2  you were looking at your opinions in this case, one of the

04:44:37PM 3  things you have to consider is the fact that Taxotere in the

04:44:40PM 4  label that you were evaluating is given along with Adriamycin

04:44:43PM 5  and cyclophosphamide, correct?

04:44:46PM 6      A.  Not when it came to the issues of what Sanofi was

04:44:50PM 7  responsible for Taxotere, but are you asking me -- am I aware

04:44:53PM 8  that it's given as a regimen, yes, I am.

04:44:57PM 9      Q.  And you know there are case reports of permanent

04:44:59PM 10 alopecia with Adriamycin?

04:45:01PM 11     MR. MICELI:  Objection, Your Honor.  Outside the

04:45:03PM 12 scope.

04:45:07PM 13     THE COURT:  Sustained.

04:45:09PM 14 BY MR. STRONGMAN:

04:45:09PM 15     Q.  And, Doctor, I think you said at one point that there

04:45:20PM 16 are no guarantees in the Code of Federal Regulations.  Did I

04:45:27PM 17 get that right?

04:45:28PM 18     A.  I said that they are not a guarantee or a promise.

04:45:31PM 19 The federal regulations are rules that companies operate

04:45:35PM 20 under.  It's not a guarantee of anything.  Because I think

04:45:37PM 21 that's what -- the question that Mr. Miceli asked me.

04:45:41PM 22     Q.  And you know that when it comes to pharmaceutical

04:45:44PM 23 products, they all have risks, correct?

04:45:47PM 24     A.  Yes.  Pretty much any drug you take will have some

04:45:51PM 25 type of risk, yes.  But you have to tell people what those

04:45:54PM  1   risks are.

04:45:55PM  2       Q.  And you understand that when it comes to cancer,

04:45:58PM  3   there are no guarantees, correct?

04:46:00PM  4       A.  I don't understand what you're asking me.  No

04:46:03PM  5   guarantees on toxicity or are you asking me no guarantees

04:46:06PM  6   on -- what are you asking me, Mr. Strongman?

04:46:09PM  7       Q.  There's no guarantees on outcomes when you're dealing

04:46:12PM  8   with a serious condition like cancer, correct?

04:46:15PM  9           MR. MICELI:  Object to the form.  Outside the scope.

04:46:18PM  10          THE COURT:  Sustained.

04:46:29PM  11          MR. STRONGMAN:  Can we just approach on the end?

04:46:33PM  12          THE COURT:  Okay, sure.

04:46:34PM  13          MR. STRONGMAN:  The timing.

04:46:40PM  14          (WHEREUPON, the following proceedings were held at

04:46:42PM  15   the bench:)

04:46:42PM  16          MR. STRONGMAN:  This is just the issue.  I'm done for

04:46:45PM  17   the day.  I just don't want to be prejudiced by turning it

04:46:49PM  18   back to Mr. Miceli in terms of the arguments we've stated

04:46:54PM  19   earlier about how I feel like the opinion that was given

04:46:57PM  20   today was very different than the one expressed and explored

04:47:00PM  21   in her expert report, and so I just --

04:47:04PM  22          THE COURT:  Okay.  I'm not sure I can give you any

04:47:08PM  23   relief because as I'm thinking about it and I'm looking at

04:47:11PM  24   the rule, she offered multiple opinions.  They didn't have to

04:47:17PM  25   offer her for all of those opinions.  And she identified this

| | | |
|---|---|---|
| 04:47:21PM | 1 | information in her report.  She just didn't feel like she |
| 04:47:25PM | 2 | needed to talk about the other information.  Now, it is |
| 04:47:28PM | 3 | disconcerting -- |
| 04:47:31PM | 4 | MR. STRONGMAN:  And I know we need to -- |
| 04:47:35PM | 5 | THE COURT:  I think this is something -- I think this |
| 04:47:35PM | 6 | is something we're going to have to discuss in detail. |
| 04:47:39PM | 7 | MR. STRONGMAN:  Very good. |
| 04:47:40PM | 8 | THE COURT:  Okay. |
| 04:47:41PM | 9 | MR. STRONGMAN:  Thank you. |
| 04:47:47PM | 10 | MR. MICELI:  Jon, excuse me, you've already said you |
| 04:47:49PM | 11 | don't know what you can do for relief, but we would obviously |
| 04:47:52PM | 12 | object -- if we're done today, we're done today.  That would |
| 04:47:56PM | 13 | be our position at this point.  I know we have to revisit -- |
| 04:47:58PM | 14 | THE COURT:  I know.  I understand.  I understand. |
| 04:47:58PM | 15 | And you're going to do redirect. |
| 04:48:00PM | 16 | MR. MICELI:  Yes, just briefly, very briefly. |
| 04:48:05PM | 17 | THE COURT:  Okay.  Thank you. |
| 04:48:05PM | 18 | (In open court.) |
| 04:48:05PM | 19 | MR. STRONGMAN:  I don't have any other questions. |
| 04:48:07PM | 20 | Thank you, Dr. Plunkett. |
| 04:48:08PM | 21 | THE COURT:  Thank you. |
| 04:48:08PM | 22 | Mr. Miceli, any redirect? |
| 04:48:10PM | 23 | MR. MICELI:  Yes, Judge, very, very briefly. |
| 04:48:23PM | 24 | Trying to see if I have another clean copy of -- yes, |
| 04:48:27PM | 25 | here we go. |

<u>REDIRECT EXAMINATION</u>

BY MR. MICELI:

Q.   Dr. Plunkett, I promise everybody I'm going to try to be very quick.  I want to talk about Sedlacek because we talked about it and then Mr. Strongman brought up some issues about it and I just want to follow up on something he said. He had noted about off-label use.  Now, does off-label use mean that Sanofi doesn't have to warn?

A.   No, absolutely not.  That's an important concept to remember.

Q.   Okay.  He talked about the regimen that was used in the seven people who received the Taxotere regimen and had persistent significant alopecia.  But two of those patients, is it true, only received one dose of Taxotere and had to discontinue because of unacceptable toxicity?

A.   Yes, that's what is stated there.  So of those seven, he's saying two of them had to stop, yes.

Q.   Okay.  And that dose could be, what, 100?

A.   Be 100, be much lower.

Q.   Okay.  Yet, they still suffered the injury?

A.   That's what he is reporting, yes.

Q.   Okay.  How many people in Dr. Sedlacek's study, if you know or if you can tell, received Adriamycin and Cytoxan as well and did not suffer PSA as defined by Dr. Sedlacek?

A.   Are you asking me in combination with Taxotere?

04:50:02PM 1    Q.  No, just --

04:50:04PM 2    A.  Oh, zero with AC by itself.  That's why he has these

04:50:08PM 3    three groups and that's what you do with this data, you can

04:50:12PM 4    look at the effect with or without Taxotere.

04:50:13PM 5    Q.  Okay.  So in Group A, there were 258 people?

04:50:16PM 6    A.  Yes, that's correct.

04:50:17PM 7    Q.  What did all of them receive?

04:50:18PM 8    A.  They received AC.

04:50:20PM 9    Q.  Okay.  And how many of them are noted as having PSA,

04:50:24PM 10   persistent significant alopecia?

04:50:26PM 11   A.  Zero.

04:50:26PM 12   Q.  And in the second group, the group that received AC

04:50:29PM 13   plus paclitaxel, how many people in that group received AC?

04:50:32PM 14   A.  Zero.

04:50:33PM 15   Q.  Excuse me.  How many received AC?

04:50:36PM 16   A.  Oh, I'm sorry.  Zero had PSA, and they all received

04:50:40PM 17   AC.

04:50:41PM 18   Q.  Okay.

04:50:41PM 19   A.  I'm sorry.

04:50:43PM 20   Q.  So if my addition is correct, we have so far 404

04:50:45PM 21   people who received AC and did not have PSA?

04:50:50PM 22   A.  That's correct.

04:50:51PM 23   Q.  Okay.  And then you had the 7 out of 112, correct?

04:50:56PM 24   A.  Yes, that's correct.

04:51:06PM 25   Q.  Okay.  All right.  Now, Mr. Strongman asked some

04:51:07PM 1  questions about the original Taxotere label and it had to be

04:51:10PM 2  determined to be safe and effective.  Do you recall what year

04:51:13PM 3  Taxotere was approved?

04:51:13PM 4      A.  I believe it was in 1996.

04:51:15PM 5      Q.  And how many -- did you review label changes in the

04:51:23PM 6  course of all --

04:51:24PM 7          MR. STRONGMAN:  Objection, beyond the scope.

04:51:26PM 8          THE COURT:  Sustained.

04:51:26PM 9          MR. MICELI:  Okay.  Thank you.  All right.

04:51:35PM 10 BY MR. MICELI:

04:51:37PM 11     Q.  Doctor, how many times have you been retained by a

04:51:39PM 12 plaintiffs' firm where you found that the label was adequate,

04:51:43PM 13 but they called you to establish that the label was adequate

04:51:46PM 14 when they were trying to say the label was inadequate in a

04:51:51PM 15 lawsuit?

04:51:51PM 16         MR. STRONGMAN:  Objection.

04:51:52PM 17         THE WITNESS:  I think I understand what you're

04:51:54PM 18 asking.

04:51:54PM 19         THE COURT:  Overruled.

04:51:56PM 20         MR. MICELI:  Okay.  Thank you.  That's all I have.

04:52:01PM 21         THE COURT:  All right.  Members of the jury, it's 10

04:52:04PM 22 to 5:00, we're going to recess for the weekend.  I really

04:52:13PM 23 think because we got held up over the first couple of days

04:52:18PM 24 that we need to work to get here, moving early, so I'd like

04:52:26PM 25 to reconvene at eight o'clock Monday morning.  Now, let me

04:52:31PM  1    remind you, you're going home for the weekend and people are

04:52:34PM  2    going to ask you about your jury duty.  I'm going to remind

04:52:36PM  3    you again you should abstain from any conversation at all

04:52:40PM  4    related to this litigation.  People are going to ask you and

04:52:42PM  5    you're going to have to tell them that the judge has strictly

04:52:45PM  6    enjoined me from speaking about it.  Additionally, do no

04:52:53PM  7    research.  You can leave your tablets on your chairs.  I can

04:52:56PM  8    assure you, they will not be disturbed.  They will be

04:53:00PM  9    gathered and picked up so that no one can see them.  Don't

04:53:04PM  10   discuss the case amongst yourselves or with anyone else and

04:53:09PM  11   please ignore anybody you see in the hallway related to this

04:53:16PM  12   case.  With that, have a very nice weekend.

04:53:19PM  13               (Jury exits courtroom.)

04:53:35PM  14        THE COURT:  Okay.  Dr. Plunkett, thank you.

04:53:38PM  15        THE WITNESS:  Thank you.

04:53:44PM  16        MR. MICELI:  Your Honor, can Ms. Kahn --

04:53:48PM  17        THE COURT:  Yes, ma'am.

04:53:49PM  18        MR. MICELI:  We're going to stick around.  Thank you.

04:54:16PM  19        MR. STRONGMAN:  Your Honor, may I speak?

04:54:18PM  20        THE COURT:  Yes.

04:54:19PM  21        MR. STRONGMAN:  Thank you.  May it please the court.

04:54:22PM  22   So, Your Honor, I feel like -- I feel like what we just saw

04:54:26PM  23   was in part a result of the fact that when you have an expert

04:54:31PM  24   report, you build a foundation.  You -- in essence, it's like

04:54:37PM  25   an architectural drawing, you show this is the foundation,

04:54:42PM  1   this is the way this is going to be built.  And then that's

04:54:46PM  2   evaluated according to the rules.  And it's explored under

04:54:50PM  3   deposition and then motions are filed and you look at that

04:54:56PM  4   drawing, you look at that architecture and you say, is this

04:55:00PM  5   sound?  Does it hold?  And the court makes its judgment and

04:55:05PM  6   allows the witness, in this instance, to move forward.  Then

04:55:07PM  7   you come and you build the house according to those

04:55:11PM  8   architectural plans but you leave out three-fourths,

04:55:16PM  9   80 percent of the foundation and you come and you say the

04:55:21PM  10  person cross-examining this witness can't even get into that

04:55:27PM  11  80 percent because it's beyond the scope, but somehow this

04:55:33PM  12  expert opinion is still allowed to stand even though that

04:55:38PM  13  foundation, this small foundation that was actually laid was

04:55:42PM  14  never explored.  It was never looked at by the court under

04:55:47PM  15  Daubert and was never the subject of a particular motion

04:55:51PM  16  practice.

04:55:52PM  17          So the result is A, a whole lot of sidebars trying to

04:55:58PM  18  figure out how -- how to navigate this witness, both on

04:56:03PM  19  cross-examination and then with regard to even how to proceed

04:56:12PM  20  without opening doors that are closed.  So it is -- it is

04:56:18PM  21  certainly, you know, my request for what Dr. Plunkett came in

04:56:24PM  22  here and did cannot stand, the foundation does not hold and

04:56:28PM  23  it crumbles based on one abstract, one internal dialogue

04:56:37PM  24  about a European label.  Some unknown number of

04:56:42PM  25  pharmacovigilance reports that was unstated and some edit to

04:56:49PM  1    a consent form that isn't even Sanofi's consent form when

04:56:56PM  2    permanent hair loss was already in it.  I mean, it just

04:56:58PM  3    doesn't make sense, it doesn't pass mustard.

04:57:01PM  4         And you can't, again, provide architectural drawings

04:57:06PM  5    of a house with a foundation that gets approved and then

04:57:09PM  6    build it with totally different foundations that don't meet

04:57:13PM  7    the standards and this cross-examine was the result of that,

04:57:19PM  8    and so that's the basis of our request.  And we think that

04:57:23PM  9    this witness, certainly what happened today and how she

04:57:28PM  10   approached it, should be excluded.  Thank you.

04:57:30PM  11        THE COURT:  Thank you.

04:57:32PM  12        MR. MICELI:  Thank you, Your Honor.  There are three

04:57:38PM  13   points and then there are a couple of cases I want to talk

04:57:40PM  14   about.  First, everything that she relied upon is in her --

04:57:44PM  15   pardon me -- is in her report and in her reliance material.

04:57:50PM  16   Secondly, Your Honor, Dr. Plunkett agrees with and relied

04:57:55PM  17   upon your ruling.  We, in preparing this today, relied upon

04:57:59PM  18   your ruling in the preemption opinion that you issued, that's

04:58:05PM  19   number -- Document 11680 --

04:58:09PM  20        THE COURT:  I remember it.

04:58:10PM  21        MR. MICELI:  Okay.  Where you said that Sedlacek

04:58:12PM  22   presentation constituted newly acquired information and was

04:58:17PM  23   enough to support a CBE.  So we have given so much more than

04:58:24PM  24   simply Sedlacek.

04:58:25PM  25        THE COURT:  Wait.  That was not a --

04:58:28PM   1          MR. MICELI:  That's a conclusion of one paragraph,

04:58:30PM   2   Your Honor.

04:58:30PM   3          THE COURT:  Yeah.  Yeah.  Okay.  I don't want it to

04:58:34PM   4   be --

04:58:34PM   5          MR. MICELI:  I'm not saying we rely on your ruling

04:58:37PM   6   and, therefore, we need to tell everybody to go home and have

04:58:40PM   7   a good weekend.  I'm just saying that's part of your ruling,

04:58:43PM   8   and we acted upon it.

04:58:46PM   9          The other thing is, while I was doing the exam and

04:58:50PM  10   laying the foundation regardless of how thin or flimsy

04:58:56PM  11   defense thinks it is, nobody objected.  Nobody said there's

04:59:02PM  12   no foundation for this.  They waited until after and then

04:59:05PM  13   they did a cross-examination that I invited them at

04:59:08PM  14   sidebar -- or not at sidebar, from table to question,

04:59:12PM  15   cross-examine her on the entire supplemental report for her

04:59:23PM  16   regulatory opinions.  Instead, he wanted to talk to her about

04:59:27PM  17   an online application for participation in a scientific

04:59:31PM  18   advisory board and there -- Rule 705 favors us.  Also there

04:59:38PM  19   are two cases that my colleagues have brought to me where it

04:59:42PM  20   explains that the operation of 702, 703, and 705 all allow

04:59:49PM  21   what was done on this direct.  The expert provided her

04:59:51PM  22   opinions.  If they wanted to question her, they could have

04:59:55PM  23   gone into the bases in cross-examination.

05:00:00PM  24          They didn't endorse a pharmacologist or toxicologist

05:00:04PM  25   in their own expert reports, so if they did it, they would

```
05:00:08PM   1   have to do it on direct.  They came here expecting to do one
05:00:13PM   2   cross-examination and we have tried a very different case.
05:00:15PM   3   We have tried a very different case because that's the way we
05:00:19PM   4   planned it, and they're upset they didn't get to use their
05:00:22PM   5   full notebook to cross-examine Dr. Plunkett.  But everything
05:00:27PM   6   she did is supported by the record, by this court's prior
05:00:34PM   7   rulings, and Fifth Circuit precedent.  As a general rule,
05:00:38PM   8   questions relating to basis and sources of an expert's
05:00:41PM   9   opinion affect the weight.  The proper remedy is vigorous
05:00:46PM  10   cross-examination that he did not go into.  He did not object
05:00:48PM  11   to my foundational questions, Sanofi, I don't want to put it
05:00:53PM  12   on Mr. Strongman.  I have a lot of respect for Jon.
05:00:56PM  13        There were no objections to the foundation when the
05:01:01PM  14   examination was going on.  And then when he had the
05:01:03PM  15   opportunity to cross, there was no substance.  It talked
05:01:07PM  16   about how much money she made, and that's fine.  You want to
05:01:09PM  17   talk about prejudice that a witness brings into a courtroom.
05:01:12PM  18   This is not the first time we've seen it and it's not going
05:01:15PM  19   to be the last.  But everything was done appropriately.  He
05:01:18PM  20   did not attempt to cross on the regulatory report.  Instead,
05:01:23PM  21   the only opportunity he availed himself of was to try to get
05:01:29PM  22   her to agree to language that she provided in a deposition
05:01:33PM  23   three years -- two and a half years prior to issuing her
05:01:38PM  24   regulatory report.  There's -- we've seen the proper remedy,
05:01:44PM  25   cross-examination.  Thank you, Your Honor.
```

| | | |
|---|---|---|
| 05:01:47PM | 1 | THE COURT:  Okay. |
| 05:01:48PM | 2 | MR. STRONGMAN:  And, Your Honor, one thing I would |
| 05:01:53PM | 3 | request is perhaps an opportunity to brief this issue. |
| 05:01:56PM | 4 | THE COURT:  Well, that's what I was going to say. |
| 05:01:59PM | 5 | You know, this -- |
| 05:01:59PM | 6 | MR. STRONGMAN:  That may be a way that -- we could |
| 05:02:01PM | 7 | argue about it until the cows come home. |
| 05:02:03PM | 8 | THE COURT:  Until the cows come home, yeah.  You |
| 05:02:05PM | 9 | know, and this is -- and I think I would like letter briefing |
| 05:02:11PM | 10 | is sufficient for me by four o'clock tomorrow afternoon and |
| 05:02:17PM | 11 | then I'll go to church. |
| 05:02:30PM | 12 | MR. MOORE:  I'll have to go on Sunday. |
| 05:02:34PM | 13 | MS. SASTRE:  After this trial, I'll go on Saturday |
| 05:02:38PM | 14 | and Sunday. |
| 05:02:39PM | 15 | THE COURT:  Okay.  But we have other things to |
| 05:02:41PM | 16 | discuss.  I don't want to sit up here. |
| 05:02:47PM | 17 | Nichelle, I'm done.  Thank you. |
| 05:02:54PM | 18 | MR. MOORE:  There was an exhibit we were going to |
| 05:03:02PM | 19 | admit for Tosti's -- |
| 05:03:02PM | 20 | THE COURT:  Oh, wait. |
| 05:03:02PM | 21 | MR. MOORE:  I just need to give the numbers.  I can |
| 05:03:02PM | 22 | do that on the record. |
| 05:03:03PM | 23 | THE COURT:  Do that on the record, please. |
| 05:03:06PM | 24 | MR. MICELI:  Who needs to -- |
| 05:03:09PM | 25 | THE COURT:  I don't know.  Everybody's got a hundred |

05:03:12PM  1   people.

05:03:13PM  2           MR. MOORE:  We have a stipulation in the pretrial

05:03:16PM  3   order of what was used during the examination.

05:03:53PM  4           Okay.  In accordance with the cross-examination of

05:03:58PM  5   Dr. Tosti, defendant offers, files, and introduce Exhibit

05:04:03PM  6   D3879.1233, 3879.1295, D2036, D3115, D3155, D3085, D3157,

05:04:31PM  7   D3054, D3176, and D3795; those were displayed during the

05:04:41PM  8   witness's testimony.

05:04:42PM  9           And then the exhibits that were photographs in the

05:04:47PM 10   binder for the tab for 2009 are as follows:  Defense 3112

05:04:54PM 11   through 3114, D3116 and 3117, D3120 through 3124, D3126

05:05:08PM 12   through 3128, Defense 3130, Defense 3132 through 3147, D3149

05:05:17PM 13   through 3159, and D3161 through 3165.  Thank you.

05:05:39PM 14           MS. PEREZ:  Just for the record -- I apologize.

05:05:44PM 15   You're almost close to getting out of here.  The plaintiffs

05:05:45PM 16   did ask that some documents from Dr. Tosti's direct be moved

05:05:53PM 17   into evidence before the break.  I'm not sure if those were

05:05:55PM 18   recorded or not.  And I apologize.  I don't have that handy,

05:05:56PM 19   so if it's okay with the Court, we'll check the transcripts

05:05:59PM 20   and if we need to readdress any of that on Monday, perhaps we

05:06:04PM 21   could do it then rather than spending any more time this

05:06:09PM 22   afternoon.  If that's okay?

23                           *  *  *  *

24           (WHEREUPON, the proceedings were adjourned.)

25                           *  *  *  *

1                        REPORTER'S CERTIFICATE

2              I, Nichelle N. Wheeler, RPR, CRR, Official Court
     Reporter, United States District Court, Eastern District of
3    Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
4    understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

5

6                          /s/ Nichelle N. Wheeler
                           Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25