<pre>
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3   *****************************************************************

     IN RE:  TAXOTERE (DOCETAXEL)
 4   PRODUCTS LIABILITY LITIGATION

 5                                      Docket No. 16-MD-2740
                                       Section H
 6                                      New Orleans, LA
                                       Monday, November 15, 2021
 7   Relates to:  Elizabeth Kahn
                  16-CV-17039
 8

 9   *****************************************************************

                     TRANSCRIPT OF TRIAL PROCEEDINGS
10       HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                   UNITED STATES DISTRICT JUDGE
11                     DAY 5, MORNING SESSION

12

     APPEARANCES:
13

     FOR THE PLAINTIFF:            BACHUS & SCHANKER, LLC
14                                 BY:  DARIN L. SCHANKER, ESQ.
                                        J. KYLE BACHUS, ESQ.
15                                 101 W. Colfax Ave., Suite 650
                                   Denver, CO 80202
16
                                   GIBBS LAW GROUP, LLP
17                                 BY:  KAREN B. MENZIES, ESQ.
                                   6701 Center Drive West, 14th Floor
18                                 Los Angeles, CA 90045

19                                 DAVID F. MICELI, LLC
                                   BY:  DAVID F. MICELI, ESQ.
20                                 P.O. Box 2519
                                   Carrollton, GA 30112-0046
21
                                   PENDLEY BAUDIN & COFFIN
22                                 BY:  CHRISTOPHER L. COFFIN, ESQ.
                                        JESSICA A. PEREZ, ESQ.
23                                 2505 Energy Centre
                                   1100 Poydras St.
24                                 New Orleans, LA 70163

25
</pre>

```
 1                                GAINSBURGH BENJAMIN DAVID
                                  MEUNIER & WARSHAUER
 2                                BY:  M. PALMER LAMBERT, ESQ.
                                  2800 Energy Centre
 3                                1100 Poydras St.
                                  New Orleans, LA 70163
 4
                                  MARTZELL, BICKFORD & CENTOLA
 5                                BY:  LAWRENCE J. CENTOLA, III, ESQ.
                                  338 Lafayette St.
 6                                New Orleans, LA 70130

 7

 8   FOR THE DEFENDANT:           SHOOK HARDY & BACON
                                  BY:  HILDY M. SASTRE, ESQ.
 9                                201 Biscayne Blvd., Suite 3200
                                  Miami, FL 33131
10
                                  SHOOK HARDY & BACON
11                                BY:  JON A. STRONGMAN, ESQ.
                                       HARLEY V. RATLIFF, ESQ.
12                                2555 Grand Blvd.
                                  Kansas City, MO 64108
13
                                  IRWIN FRITCHIE URQUHART & MOORE
14                                BY:  DOUGLAS J. MOORE, ESQ.
                                       KELLY E. BRILLEAUX, ESQ.
15                                400 Poydras St., Suite 2700
                                  New Orleans, LA 70130
16

17   Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
                                  500 Poydras Street, B-275
18                                New Orleans, Louisiana 70130
                                  (504) 589-7776
19

20     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

OFFICIAL TRANSCRIPT

<u>I N D E X</u>

<u>WITNESSES FOR THE PLAINTIFF</u>:                    <u>PAGE/LINE</u>:


<u>JEAN-PHILIPPE AUSSEL</u>

  (By video deposition)                          1102/18


<u>DR. ELLEN FEIGAL</u>

  Voir Dire Examination by Mr. Miceli            1146/9

  Direct Examination by Mr. Miceli               1157/10

  Cross-Examination by Mr. Strongman             1193/21

<u>P R O C E E D I N G S</u>

(MONDAY, NOVEMBER 15, 2021)

(MORNING SESSION)

07:48:48   (OPEN COURT.)

07:48:48       THE COURT:  On Friday, at the conclusion of
07:48:54   Dr. Plunkett's direct testimony, there was a motion that I exclude
07:48:59   her testimony.  Subsequent to that, I denied it at that time and we
07:49:04   proceeded with cross-examination.  That motion to exclude her
07:49:11   testimony was re-urged at the conclusion of cross-examination and
07:49:15   redirect.  I invited the parties at that time to file a letter
07:49:19   briefing with the court that I would address this morning.  Those
07:49:23   briefs have been received.  I have reviewed them.

07:49:28       Just so that the record is clear, I am going to deny the
07:49:31   motion to exclude Dr. Plunkett.  I want the record to be clear that
07:49:38   it was a very, very close call.  As I noted at the conclusion of
07:49:43   her testimony the underpinnings of Dr. Plunkett's opinions were
07:49:51   based, in my view of her report, primarily on the analysis of
07:49:57   Dr. Madigan.  She did not mention his review of the FAERS database,
07:50:06   nor his review of Sanofi's pharmacovigilance database.  She instead
07:50:14   relied on the Sedlacek article, statements against interests made
07:50:20   by two Sanofi employees, and her review of the pharmacovigilance
07:50:24   database.

07:50:26       To be clear, I read her report again and it appears that
07:50:30   she relied on Dr. Madigan's review and the pharmacovigilance

07:50:35 1   database but in another area it was ambiguous at best as to whether

07:50:39 2   or not it was done by herself personally.

07:50:49 3        There was no objection raised during her testimony as to

07:50:54 4   the admissibility of those statements against that interest and her

07:50:59 5   review of the pharmacovigilance database.  There was no

07:51:03 6   contemporaneous objection as to those pieces of evidence.

07:51:08 7   Considering Rule 705, the offering party need not present all of

07:51:19 8   the basis for opinion but rather may leave it to cross-examination.

07:51:24 9   There was an area where Mr. Strongman asked about her -- whether or

07:51:31 10  not the medications included Adriamycin and there was an objection

07:51:36 11  that it was outside the scope, which was sustained.  On further

07:51:41 12  thought, I am not sure that that objection should have been

07:51:44 13  sustained in light of the presentation made by the plaintiffs.

07:51:53 14       However, there is -- it was the one objection and so I

07:52:02 15  will -- so with that in mind, as I indicated, it was a very close

07:52:06 16  call but I am going to deny the defendant's motion.

07:52:09 17       Now, I will say, just so that the record -- I am inviting

07:52:13 18  the parties because this is in the middle of trial and I know

07:52:16 19  letter briefing is very difficult while you're preparing for

07:52:21 20  follow-up witnesses, I am going to direct the parties to file

07:52:25 21  perhaps post-trial motions on this very issue and we will deal with

07:52:30 22  it at that time when you have an opportunity to further brief the

07:52:35 23  issue.

07:52:38 24       MR. STRONGMAN:  And, Your Honor, may I add just a couple

07:52:41 25  of comments very briefly.  Thank you.  Obviously, we've made our

07:52:44 1   points clear and our letter brief.  One thing that I wanted to

07:52:47 2   articulate perhaps in a more direct way was that what Dr. Plunkett

07:52:51 3   did in -- the new opinion that Dr. Plunkett gave was that this

07:53:00 4   isolated collection of things was alone enough to generate a

07:53:06 5   requirement for a label change.  That was obviously opinion she had

07:53:10 6   never given before.  Had she disclosed that opinion, the

07:53:13 7   deposition, the motion practice, and then ultimately, the

07:53:16 8   cross-examination would have been much different.  And so that is

07:53:23 9   kind of a further point on our objections.  And as a result, we

07:53:28 10   also feel that the cross-examination then was limited in a way that

07:53:32 11   prejudiced Sanofi in part because as this Court -- from my

07:53:40 12   perspective -- doing discovery of an opinion with a witness like

07:53:45 13   Dr. Plunkett in front of a jury is impossible.  And so that's just

07:53:50 14   the final point on it.  We've made our arguments, believe that

07:53:54 15   they're valid and understand the Court's ruling.  Thank you.

07:53:57 16           THE COURT:  Thank you.

07:53:58 17           MR. MICELI:  Nothing further, Your Honor.

07:54:00 18           THE COURT:  Okay.  Are we all here?

07:54:03 19           MR. MICELI:  I'm sorry, Your Honor, I misspoke.  I think

07:54:05 20   Mr. Lambert had something.

07:54:08 21           MR. LAMBERT:  May it please the Court, Your Honor.

07:54:19 22           On behalf of plaintiff, we did want to respond in

07:54:24 23   addition to the letter briefing on this issue.  And I would just

07:54:27 24   say, Your Honor, that this is not trial by ambush; this is an MDL

07:54:31 25   where we've been working for five years.  Dr. Plunkett prepared a

07:54:35  1   supplemental expert report following which Sanofi had an adequate

07:54:40  2   opportunity to conduct her deposition, to explore her

07:54:43  3   qualifications, methodology and facts underlying her opinion.

07:54:49  4        On Sanofi's own motion, Document 13131, the Court limited

07:54:56  5   her opinions in limine.  Following that, Dr. Plunkett gave

07:55:03  6   particular testimony at trial on the bases for her opinion that

07:55:08  7   were unchanged from documentation that she cited in her expert

07:55:14  8   report.  And the foundation for the opinion being the particular

07:55:19  9   FDA regulations that she cited in the opinion that require a

07:55:24 10   finding of some basis to believe that a causal association exists.

07:55:29 11   Indeed these pieces of evidence were evaluated by the Court in

07:55:34 12   denying the plaintiff's motion for partial summary judgment on

07:55:37 13   affirmative defenses.  That was Document 10704, where the Court

07:55:43 14   commented specifically about Dr. Palatinsky's e-mail,

07:55:48 15   Dr. Sedlacek's findings, and case reports.  The Court commented in

07:55:52 16   that order that that evidence gave the Court pause when evaluating

07:55:58 17   whether there was no genuine issue of material fact as to whether

07:56:02 18   Sanofi had knowledge of Taxotere's alleged risk of permanent

07:56:08 19   alopecia.

07:56:08 20        In denying Sanofi's motion for summary judgment on

07:56:12 21   preemption, the Court said the Sedlacek presentation, however,

07:56:16 22   focused on alopecia and this presentation was in 2006, the same

07:56:22 23   year that Sanofi was internally avoiding a quote, "lit search," on

07:56:30 24   investigation of permanent alopecia.  The Court continued,

07:56:32 25   considering the limitations of the data Sanofi provided to the FDA

OFFICIAL TRANSCRIPT

07:56:36  1    in 2004, the Sedlacek presentation which centered around the risk

07:56:41  2    of permanent alopecia would have, quote, "revealed risks of a

07:56:45  3    different type or greater severity or frequency than previously

07:56:51  4    included in submission to the FDA," end quote.

07:56:54  5         The Sedlacek presentation therefore constituted, quote,

07:56:58  6    "newly acquired information," end quote, and it was enough to

07:57:01  7    support a CVE change.  These statements of the Court over the years

07:57:06  8    are important because they're based on the very information that

07:57:09  9    Plunkett relies on to support her opinions.  And furthermore, in

07:57:13 10    granting Sanofi's summary judgment on the 2006 fence post, the

07:57:19 11    Court emphasized the Court -- the importance of Sedlacek vis-a-vis

07:57:24 12    Dr. Kessler's testimony.

07:57:26 13         In sum, Dr. Plunkett relied on evidence already admitted

07:57:31 14    in trial, cited in her expert report, discussed in advance of her

07:57:35 15    trial testimony in chambers, and examined in her deposition.

07:57:39 16    Sanofi has its own regulatory expert who they may call to contrast

07:57:44 17    Dr. Plunkett's opinions or suggest that the factual support somehow

07:57:50 18    is insufficient.  However, the information cited by Dr. Plunkett

07:57:55 19    goes beyond some basis to believe.  It shows that Sanofi actually

07:58:00 20    knew about a risk of permanent alopecia with this drug.

07:58:05 21         Thank you, Your Honor.

07:58:05 22         THE COURT:  Thank you.  With that, I think we just need

07:58:10 23    to wait for our jurors to arrive.

07:59:06 24         MR. MOORE:  Your Honor, on the issue as it relates to

07:59:10 25    Dr. Plunkett, we had requested that our letter brief be filed into

07:59:14 1   the record.  We can provide Erin with an electronic copy of that.

07:59:20 2            THE DEPUTY CLERK:  Judge, we're just missing one juror.

07:59:23 3            THE COURT:  Okay.  Thank you.

07:59:25 4        (WHEREUPON, A RECESS WAS TAKEN.)

08:08:00 5            MR. STRONGMAN:  Your Honor, may I put something up?  Ten

08:08:01 6   seconds.

08:08:01 7            THE COURT:  Yes.

08:08:02 8            MR. STRONGMAN:  Thank you.  The one thing I wanted to

08:08:04 9   also add that I had left out on Dr. Plunkett was with regard to the

08:08:08 10  exhibits that Dr. Plunkett raised.  We exchange objections and go

08:08:12 11  over those in chambers on those documents.  And so I just wanted to

08:08:16 12  make it clear we had objected to the use of documents with

08:08:20 13  Dr. Plunkett and dealt with that in chambers.  So as it relates to

08:08:23 14  the contemporaneous objection point that were just documented, we

08:08:27 15  did raise objections.  Thank you.

08:08:27 16           THE COURT:  Thank you.

08:08:33 17           MR. SCHANKER:  And briefly, Your Honor, also just very

08:08:33 18  briefly.  What would be a good time for us to talk about the Larned

08:08:37 19  deposition, at some point, along the way today just so we can make

08:08:40 20  some final progress?

08:08:42 21           THE COURT:  Five o'clock.

08:08:44 22           MR. SCHANKER:  Five o'clock?  Okay.  Thank you.

08:09:26 23           THE COURT:  Thank you.  All jurors are present.  Court's

08:09:28 24  back in session.  You may be seated.  Happy Monday.  I hope you all

08:09:33 25  enjoyed the beautiful weekend, the nice weather.  And we're going

08:09:37  1   to move through this.

08:09:38  2          Are we ready to call the next witness, Mr. Bachus?

08:09:43  3          MR. BACHUS:  Thank you, Your Honor.  The plaintiffs will

08:09:46  4   call Sanofi employee Jean-Philippe Aussel, who is the medical

08:09:49  5   director of oncology at Global Medical Affairs.  This will be

08:09:52  6   presented by videotaped deposition and this video lasts

08:09:56  7   approximately 15 minutes, Your Honor.

08:10:00  8          THE COURT:  All right.  Ladies and gentlemen of the jury,

08:10:01  9   as I've indicated to you before, this testimony will be presented

08:10:06  10  by deposition.  The witness is unavailable to appear live in court.

08:10:11  11  This was taken at a date prior to today, and the witness was under

08:10:16  12  oath, and the testimony was transcribed.  Because there were parts

08:10:22  13  that needed to be deleted for a variety of purposes, some of the

08:10:26  14  deposition testimony may appear choppy but you should consider this

08:10:30  15  testimony as you would any other.  Please proceed.

08:10:34  16          (WHEREUPON, THE VIDEO DEPOSITION OF JEAN-PHILIPPE AUSSEL

08:10:38  17  WAS PLAYED AS FOLLOWS:)

08:10:38  18                          EXAMINATION

08:10:40  19  Q.  My name is Zachary Wool, and I represent the plaintiffs in this

08:10:41  20  matter and we're here today for your deposition.

08:10:45  21          Do your colleagues call you Dr. Aussel or Mr. Aussel?

08:10:50  22  A.  Mr. Aussel -- I'm sorry.  I prefer Mr. Aussel because I am not

08:10:52  23  a medical doctor.  In France, we don't use to call people doctor if

08:10:57  24  they are not a medical doctor.

08:10:59  25  Q.  So I'll refer to you as Mr. Aussel, then, throughout the

08:11:02  1   deposition.

08:11:02  2          Have you given a deposition before?

08:11:04  3   A.  No, never.

08:11:04  4   Q.  Are you familiar with the safety management committee?

08:11:07  5   A.  I know that such a committee exists.

08:11:09  6   Q.  Okay.  When did you start with Sanofi or one of its predecessor

08:11:12  7   companies?

08:11:13  8   A.  So I first joined Sanofi in '96.  Actually, I was working for

08:11:18  9   Sanofi as a contractor for one year before, and I was hired by

08:11:23  10  Sanofi in January '96 in the oncology R&D department.

08:11:28  11  Q.  And what did you do in the oncology R&D department starting in

08:11:33  12  1996?

08:11:33  13  A.  I was a CRA, clinical research associate.  I was a CRA,

08:11:39  14  clinical research associate.  I was mostly monitoring the studies.

08:11:46  15  Monitoring means going on-site, visiting the investigative sites,

08:11:52  16  looking at the sort documents, meaning the patient charts, and

08:11:56  17  comparing whether the information contained in those documents is

08:11:59  18  consistent to the information the investigators report in the case

08:12:04  19  report forms, in the questionnaires that they are supposed to fill

08:12:08  20  in, and to correlate the investigator.  And then bring back this

08:12:13  21  information, the case report forms in Sanofi, make sure it is

08:12:17  22  properly entered in the database, and then relegating the data

08:12:24  23  things to the various things, to different tools, checks that we do

08:12:28  24  with the data.  And that's mostly it at that time.

08:12:32  25  Q.  At that time in 1996, were you a clinical research associate in

08:12:36  1    France or in the United States?

08:12:37  2    A.  It was in France.  And I was in charge of monitoring two sites

08:12:42  3    in Paris, Institut Curie and Hôpital Paul-Brousse, so two oncology

08:12:48  4    sites for one of the studies.

08:12:50  5    Q.  And when you started working in the oncology R&D department,

08:12:53  6    did your responsibilities include studies that involved Taxotere?

08:12:56  7    A.  Yeah.

08:12:57  8    Q.  Okay.  And at any point since you've been working at Sanofi

08:13:01  9    until recently, has there been a time that you were not working on

08:13:06  10   Taxotere?

08:13:07  11   A.  Well, there was some times where I wasn't working Taxotere

08:13:11  12   because I was in the departments or in a team which -- for which

08:13:15  13   the main responsibility was not to work on specific Taxotere

08:13:18  14   studies.  As you may see in my résumé, I mean, I moved from R&D to

08:13:24  15   medical affairs.  So depending whether all the studies belong to

08:13:28  16   this area within Sanofi, I did or did not work on Taxotere.

08:13:34  17   Q.  And about how long were you a clinical research associate when

08:13:39  18   you started?

08:13:40  19   A.  For this specific job, meaning monitoring the study within the

08:13:44  20   sites, I would say for two, three years.  Then I became what we

08:13:51  21   call an international coordinator, so meaning approximately the

08:13:55  22   same job conceptually, but more making sure the job is done in the

08:14:01  23   countries because it was international studies.  So the site -- the

08:14:06  24   investigative sites were all over the world, and so my role was to

08:14:10  25   coordinate the Sanofi affiliates, our local offices, and to make

08:14:16  1   sure the job is properly done by the local country-based monitors.

08:14:23  2   Q.  And how long were you an international coordinator?

08:14:26  3   A.  Until approximately -- with different roles, but I would say

08:14:34  4   within this umbrella term until 2004 when I moved at the end of

08:14:42  5   2004 to medical affairs to do something different.  So between the

08:14:46  6   early 2000s and 2004, I was an international coordinator.  We dealt

08:14:54  7   directly managing studies and country-based monitors, or other

08:14:59  8   high -- more senior level, in a more senior position, managing and

08:15:04  9   watching the team of the corporate staff with people and/or myself

08:15:10  10  who are managing themselves in the countries.  So I got the

08:15:16  11  higher-up position called program coordinator, so in charge of the

08:15:19  12  overall project.

08:15:20  13  Q.  And that was before you moved to medical affairs, correct?

08:15:24  14  A.  Before I moved to medical affairs.

08:15:25  15  Q.  And what was your role when you moved to medical affairs?

08:15:28  16  A.  When I moved to medical affairs, actually after ten years of

08:15:32  17  R&D, I chose to remain in the oncology area but to see oncology

08:15:36  18  from a different window, we'll say.  And I had the opportunity to

08:15:41  19  integrate the clinical operation team to medical affair studies,

08:15:47  20  meaning late-phase studies, and to be the oncology scientific

08:15:54  21  director in this team.

08:15:56  22  Q.  And as the -- when you were the oncology scientific director,

08:16:02  23  was that -- was Taxotere one of your responsibilities?

08:16:06  24  A.  It was one of my responsibilities indeed, although we had also

08:16:10  25  other products.  And, yeah, it was one of my products, yes.

08:16:16  1    Q.  And how long were you a scientific director in medical affairs?

08:16:24  2    A.  If I recall, for four years, until in 2008 or so, maybe

08:16:35  3    slightly later, I can't recall very well.  But there was a huge

08:16:38  4    transformation within Sanofi and they created several new

08:16:41  5    departments in the organization internally, and especially they

08:16:45  6    created a huge clinical operation platform, gathering everyone

08:16:50  7    doing clinical operation, regardless R&D, medical affairs.  And

08:16:55  8    then I departed during this huge platform to become the so-called

08:16:59  9    project leader for oncology, medical affair studies.  So it was

08:17:06  10   slightly different roles; it was more project direction than

08:17:10  11   anything really scientific.

08:17:13  12   Q.  And was that dealing with clinical trials still?

08:17:16  13   A.  It was still dealing with clinical studies, yes, correct.

08:17:19  14   Q.  And that still involved Taxotere?

08:17:21  15   A.  It still, although less and less, because there were less and

08:17:24  16   less studies in Taxotere due to the maturity of the product, and it

08:17:27  17   was not one of the main focus of oncology at that time.

08:17:30  18   Q.  And then when did you stop being a project leader in Global

08:17:35  19   Medical Affairs?

08:17:36  20   A.  Four months ago.

08:17:39  21   Q.  And what role did you take over then?

08:17:41  22   A.  So I changed completely.  I'm not a person working in clinical

08:17:47  23   operations or R&D anymore.  I went to the department which is

08:17:51  24   called global health to be a project director in malaria, actually.

08:17:57  25   So this department's objective is to provide access to medicines to

08:18:03  1   people in need, especially in the low or middle-income countries,

08:18:07  2   Africa, for example.  So I am in charge of the malaria programs.

08:18:13  3   Q.  Can you just explain in basic terms what a clinical trial is?

08:18:16  4   A.  We do clinical trials to assess the effect, either efficacy or

08:18:28  5   safety of new products that are not yet on the market, meaning that

08:18:36  6   are not yet prescribed and authorized.  So we do clinical trials

08:18:41  7   with different phases.  So the first phase is what you call

08:18:46  8   Phase I, is we try to find the right dose and define the toxicities

08:18:51  9   of the brand new drugs that we have with us that were never tested

08:18:54 10   in humans.  And then when this is clarified, we go to step two,

08:19:00 11   which is Phase II studies.  We try to investigate what best

08:19:03 12   indication, the oncology, for example, the product may work best,

08:19:08 13   is it in lung cancer, in breast cancer.

08:19:12 14        So we do some studies with the dose defined in Phase I

08:19:17 15   but with more patients and we want to better assess the activity of

08:19:21 16   the drug, in this case, and to continue to define the safety

08:19:24 17   profile.  And then when we have promising results and good results

08:19:29 18   in terms of efficacy, safety for the drug in the specific

08:19:33 19   indication, in the specific population, we move to what we call

08:19:37 20   Phase III.  And Phase III is the big trials where we compare our

08:19:40 21   drug to the existing standard of care usually.  In some cases, not

08:19:44 22   in oncology, but in some cases it also versus placebo.  But in

08:19:50 23   oncology, there is almost never a placebo.  And we have conducted

08:19:54 24   large international, because large first-rate trials with many

08:19:58 25   patients, and those trials usually are meant to support our

08:20:03 1   registration dossier with the health authorities to assure the

08:20:07 2   benefit/risk of the product.

08:20:10 3   Q.  We talked a little bit about the clinical study protocol.  That

08:20:15 4   delivers the objectives of a study, correct?

08:20:16 5   A.  Yes, correct.

08:20:17 6   Q.  And it includes how the data will be collected, correct?

08:20:19 7   A.  Yes, correct.

08:20:20 8   Q.  And how the data will be documented, right?

08:20:22 9   A.  Yes, correct.

08:20:22 10  Q.  And part of your role early on was to oversee the documentation

08:20:26 11  of data, correct?

08:20:27 12  A.  Yes, that was what I explained.

08:20:30 13  Q.  And then the clinical trial protocol also says how data is

08:20:34 14  going to be reported; is that right?

08:20:36 15  A.  Yes.  It says that there will be a study report.  It does not

08:20:40 16  insist on the content of the study report because we cannot predict

08:20:43 17  what will be in the report at that time.  But it says that the

08:20:47 18  study will be reported.  It's our intention to report the results

08:20:50 19  of the trial anyway.

08:20:51 20  Q.  Now, when patients enroll in a clinical trial, they sign a

08:20:55 21  document called an informed consent; is that correct?

08:20:58 22  A.  Yes, it is.

08:21:01 23  Q.  And what is your understanding of what informed consent is?

08:21:03 24  A.  This is a document that is provided to the patients.  It has to

08:21:10 25  be provided in a language that the patient can understand.  And it

08:21:15  1   is to explain to the patient what all the objectives of the study

08:21:19  2   they will be participating, what will be the procedures that he

08:21:26  3   will to follow, blood samples, CT scans, whatever, what are the

08:21:31  4   expectations from this trial, why we are doing this trial, and what

08:21:36  5   also the risks the patient may face when taking the drug based on

08:21:42  6   the knowledge we have about the drug at that time.

08:21:44  7   Q.  And because a clinical trial is effectively an experiment --

08:21:51  8   you're agreeing with that statement?

08:21:52  9   A.  Yes.  It is clearly an experiment, yes.

08:21:54  10  Q.  Can you briefly explain what a clinical study report is?

08:21:59  11  A.  A clinical study report's objective is to report the results of

08:22:07  12  the study.  There is typically a long introduction, a long section

08:22:13  13  reminding what the protocol was, especially if there were any

08:22:16  14  amendments to the protocol during the course of the study for

08:22:20  15  whatever reasons.  And then there's a section, of course, on the

08:22:23  16  results, demographic results, meaning the type of patients that are

08:22:29  17  included, efficacy results, safety results, whatever are the

08:22:34  18  endpoints, quality of life, social, economic, whatever, is

08:22:38  19  collected in the study.

08:22:40  20  Q.  And earlier you talked about -- when I asked you about clinical

08:22:45  21  trials, you mentioned that these trials are often conducted to get

08:22:48  22  an indication for use for a product in a country before a product

08:22:51  23  is on the market, correct?

08:22:53  24  A.  Yes, correct.  This is what we call internally the R&D trials

08:22:57  25  or in R&D we conduct trials mostly for this goal, trying to find an

08:23:02  1  indication to get the registration dossier, a market of

08:23:05  2  authorization, correct.

08:23:06  3  Q.  And so then a health authority like the FDA will look at one of

08:23:10  4  those studies and then approve a drug for use, like Taxotere,

08:23:13  5  correct?

08:23:13  6  A.  Yes.

08:23:14  7  Q.  And when they do that approval, the drug contains a label,

08:23:17  8  correct?

08:23:18  9  A.  It does, yes.

08:23:20  10  Q.  In your years working at Sanofi, have you ever worked in a

08:23:23  11  regulatory role and negotiated a label?

08:23:26  12  A.  No, never.

08:23:27  13  Q.  I'll hand you what I'll mark as Exhibit 5.  Have you seen this

08:23:32  14  document before?

08:23:33  15  A.  I don't recall specifically this one.  I know I -- don't know.

08:23:38  16  Q.  So at the top, it says, Taxotere XRP6976, correct?

08:23:43  17  A.  Yes, correct.

08:23:44  18  Q.  And then if you look about halfway down the page, it has

08:23:48  19  Taxotere submissions and approvals.

08:23:49  20       Do you see that?

08:23:50  21  A.  Yeah.  Okay.

08:23:51  22  Q.  And then it has approved indications?

08:23:54  23  A.  Yeah.

08:23:54  24  Q.  It was 1996 that it was approved in the United States, correct?

08:23:57  25  A.  Yeah, correct.

08:23:58  1    Q.  Now, this original indication, it's for metastatic breast

08:24:02  2    cancer, correct?

08:24:03  3    A.  Yes.  This is one for what we call second-line metastatic

08:24:07  4    breast cancer, meaning the patient had to have, in this case, an

08:24:11  5    anthracycline-containing regimen first for metastatic disease and

08:24:15  6    then after relapse they had to receive Taxotere, yeah.

08:24:17  7    Q.  Can you please explain for me the difference between metastatic

08:24:20  8    breast cancer and early-stage breast cancer?

08:24:22  9    A.  Yes.  When the patient typically developed cancer -- so let's

08:24:29 10    take the example of breast cancer -- there's usually a tiny tumor

08:24:33 11    cancer cells in the breast.  This is what you call early stages.

08:24:38 12    The tumor is located in the breast only.  And then later on when

08:24:44 13    the tumor tends to, what we call metastasize, meaning spread the

08:24:51 14    beyond breast and touch other organs, that is called metastatic

08:24:56 15    stage.

08:24:57 16    Q.  Is it fair to call it advanced breast cancer?

08:24:59 17    A.  Yeah.  There are some technical classifications for breast

08:25:03 18    cancer, depending on which lymph nodes are involved, which organ.

08:25:11 19    And so, they may call it advanced, locally advanced, or metastatic.

08:25:14 20    But it's all about the spread of the cancer in the body.

08:25:16 21    Q.  So for metastatic breast cancer, then, to get away from that

08:25:21 22    terminology, then, it's cancer that's spread from the breast,

08:25:24 23    correct?

08:25:24 24    A.  Yes, correct.

08:25:25 25    Q.  And women who have metastatic breast cancer, what is generally

08:25:30  1    the prognosis for them?

08:25:32  2    A.  Well, each woman is different so difficult to generalize.  But

08:25:37  3    if you ask me to generalize, metastatic breast cancer at that time

08:25:41  4    was known as an incurable -- as a non-curable disease.  So the

08:25:47  5    treatment given was more for prolonging life and not, technically

08:25:52  6    speaking, saving life.

08:25:56  7    Q.  Sanofi had not done any long-term studies on the safety of

08:26:01  8    Taxotere; is that correct?

08:26:02  9    A.  Yes, this is correct.  Because the disease itself did not

08:26:08  10   allow, unfortunately, due to the long-term studies -- because of

08:26:12  11   the short life of the patients.

08:26:17  12   Q.  But there have been some studies since Taxotere came on the

08:26:20  13   market that were long-term studies that had a long-term follow-up,

08:26:23  14   correct?

08:26:24  15   A.  There were long-term studies in a research setting, yes.

08:26:28  16   Because in that setting, patients have a better prognosis so can

08:26:33  17   live longer, I guess.

08:26:34  18   Q.  One of the studies is TAX316, correct?

08:26:36  19   A.  One of them is 316.

08:26:38  20   Q.  And you had involvement with TAX316, right?

08:26:40  21   A.  Yes.  I had some involvement, yes.

08:26:41  22   Q.  Another one is called GEICAM 9805 or TAX 301; is that correct?

08:26:44  23   A.  Yes, correct.

08:26:45  24   Q.  And as we've talked about, Taxotere came on the market in the

08:26:48  25   United States in 1996, correct?

1113

08:26:49  1    A.  Yes, that's what we said before.

08:26:52  2    Q.  And that was for the treatment of metastatic breast cancer,

08:26:55  3    women who had metastatic breast cancer, correct?

08:26:58  4    A.  Yes, it is correct.

08:26:59  5    Q.  And the women with metastatic breast cancer are women who are

08:27:02  6    likely going to die, correct?

08:27:04  7    A.  Well, it's not 100 percent correct, but this is the general

08:27:09  8    idea, yes.

08:27:10  9    Q.  And the general idea of giving Taxotere with metastatic breast

08:27:13  10   cancer is to prolong a woman's life by a new months or a year

08:27:17  11   before she passes away, correct?

08:27:19  12   A.  Yes.

08:27:20  13   Q.  So why don't we look at that first label which was for

08:27:26  14   metastatic breast cancer, correct?

08:27:27  15   A.  Yes.

08:27:28  16   Q.  Now, at the time that Sanofi -- or that Taxotere came on the

08:27:33  17   market in the United States in 1996, no long-term studies had been

08:27:38  18   done about the safety of the Taxotere; is that correct?

08:27:39  19   A.  To my knowledge, yes.

08:27:41  20   Q.  And that's because women with metastatic breast cancer

08:27:44  21   generally don't live very long, unfortunately; is that correct?

08:27:46  22   A.  Unfortunately, yes.

08:27:47  23   Q.  But Sanofi at that time would have no idea to know, then, that

08:27:50  24   there was a permanent alopecia problem, would there?

08:27:52  25   A.  No, I don't think so.

08:27:53  1   Q.  You're generally familiar with drug labels, correct?

08:27:57  2   A.  No, I'm not.

08:27:58  3   Q.  So if you look at the bottom of Exhibit 8, it is Sanofi 00001.

08:28:05  4        Do you see that?

08:28:05  5   A.  Yes, I can see that.

08:28:06  6   Q.  And according to our labeling chronology, this is the first

08:28:12  7   label for Taxotere, correct?

08:28:13  8   A.  Yes, correct.

08:28:14  9   Q.  All right.  And if you see the top here, it's a little hard to

08:28:19 10   read because; it's an old document.  It says, "Patient information

08:28:21 11   leaflet."

08:28:22 12        Do you see that?

08:28:22 13   A.  Okay.  All right.  Yes, I can see that.

08:28:24 14   Q.  Are you familiar with what a "patient information leaflet" is?

08:28:28 15   A.  I have a good idea of what it could be, yes.

08:28:31 16   Q.  Okay.

08:28:31 17   A.  It's information to the patient in a lay language the patient

08:28:35 18   can understand.

08:28:35 19   Q.  Okay.  So let's turn to page 3 then.  Do you see at the top

08:28:41 20   there's a section that says, "Hair loss"?

08:28:44 21   A.  Yes, I can see that.

08:28:45 22   Q.  And it says, "Hair loss.  The loss of hair occurs in most

08:28:49 23   patients taking Taxotere, including the hair on your head, underarm

08:28:53 24   hair, pubic hair, eyebrows, and eyelashes"; is that correct?

08:28:57 25   A.  Yes, correct.

08:28:58  1    Q.  It then says, "hair loss begin after the first few treatments

08:29:02  2    and varies from patient to patient," correct?

08:29:04  3    A.  Yes.

08:29:05  4    Q.  And then it says, "Once you have completed all of your

08:29:07  5    treatment, hair generally grows back," correct?

08:29:09  6    A.  Yes.

08:29:10  7    Q.  And then it says, "Your doctor or nurse can refer you to a

08:29:13  8    store that carries wigs, hair pieces, and turbans for patients with

08:29:18  9    cancer," correct?

08:29:19  10   A.  Yes.

08:29:19  11   Q.  So this language describing hair loss, this is language that

08:29:24  12   Sanofi is using in 1996 when there have been no studies of

08:29:28  13   long-term side effects related to Taxotere, correct?

08:29:32  14   A.  Yes, I see that.

08:29:33  15   Q.  So Sanofi then had no way to know if the hair loss was

08:29:36  16   permanent, correct?

08:29:38  17   A.  This is my understanding.

08:29:39  18   Q.  And not knowing if the hair loss was permanent, because there

08:29:42  19   was no study of it, Sanofi chose to use the language "hair

08:29:46  20   generally grows back"; is that correct?

08:29:48  21   A.  Yeah.  I wonder whether that was a question, yes.

08:29:52  22   Q.  Then when using the term "hair generally grows back," is Sanofi

08:29:59  23   warning about permanent hair loss in 1996?

08:30:02  24   A.  I don't think so, not with this language.

08:30:05  25   Q.  Okay.  Let's do it this way.  So, is it fair to say, then, that

08:30:10  1   this statement is saying hair generally grows back before you die,

08:30:13  2   and you may die with alopecia?

08:30:16  3   A.  I am not sure that's the kind of language that can be put in a

08:30:20  4   document like this, but that's the data generated by the studies.

08:30:29  5   Again, some patients don't die, they are sometimes put in other

08:30:33  6   treatments.  So, again, third line, fourth line treatments for

08:30:37  7   treatment of cancer, and they may carry on alopecia, because

08:30:42  8   chemotherapy drugs cause alopecia, most of them, so they continue

08:30:48  9   to have alopecia because of the other chemotherapies.

08:30:52  10  Q.  What study are you referring to when you say that a study

08:30:55  11  followed patients for two years and they still had alopecia?

08:30:58  12  A.  No particular study, in general.  But all studies in metastatic

08:31:04  13  breast cancer, the ones supporting the initial report of Taxotere,

08:31:10  14  for what I can recall, were of short-lasting follow-up.  I assume a

08:31:17  15  couple of years, but I cannot --

08:31:22  16  Q.  Well, maybe we can agree on this.  With the studies that had

08:31:25  17  the short-lasting follow-up, some patients had alopecia when they

08:31:30  18  died, and that, when they died, would have been in the

08:31:32  19  short-lasting follow-up, correct?

08:31:33  20  A.  Yes, correct.

08:31:34  21        But there could be also some patients who were either a

08:31:39  22  longer follow-up but in-between their further chemotherapies or

08:31:43  23  hormone therapies or whatever other therapies, and so the patients

08:31:47  24  were discontinued as far as the clinical study is concerned when

08:31:56  25  the protocol defined that the study is over.

08:32:00  1   Q.  Let's keep looking at this page 3.  Do you see that there's a

08:32:04  2   section called, "Rash"?

08:32:05  3   A.  Rash.  Okay, yes.

08:32:07  4   Q.  And it says, "This side effect occurs commonly but is severe in

08:32:10  5   about 5 percent"; is that right?

08:32:12  6   A.  Yes.

08:32:13  7   Q.  "You may develop a rash that looks like a blotchy hive-like

08:32:16  8   reaction," correct?

08:32:18  9   A.  Yes.

08:32:18 10   Q.  Then it says, "This usually occurs on the hands and feet, but

08:32:21 11   may also appear on the arms, face, and body," correct?

08:32:24 12   A.  Yeah.

08:32:25 13   Q.  And then can you read with me what the next sentence is?

08:32:29 14   A.  "Generally, it will appear between treatments and will go away

08:32:32 15   before the next treatment.  Inform your doctor or nurse if you

08:32:37 16   experience a rash.  They can help you avoid discomfort."

08:32:40 17   Q.  Okay.  Does that statement that begins with "generally," does

08:32:43 18   that tell people that they may permanently have a rash?

08:32:47 19   A.  Here, this intent is all about the onset of the rash, saying

08:32:54 20   that it will appear generally after a chemotherapy course and then

08:33:02 21   disappear before you receive the next course.  So it's all about

08:33:08 22   the onset of the rash.  This is how I understand the sentence.

08:33:12 23   Q.  Okay.  Let's look at section called, "Odd Sensations."

08:33:17 24       Do you see that?

08:33:17 25   A.  Odd sensations, yes.

1118

08:33:18  1    Q.  And it says, "About half of patients getting Taxotere will feel

08:33:22  2    numbness, tingling, or burning sensations in their hand and feet";

08:33:25  3    is that correct?

08:33:26  4    A.  Yes.

08:33:27  5    Q.  It then says, "If you do experience this, tell your doctor or

08:33:30  6    nurse," correct?

08:33:31  7    A.  Uh-huh, yes.

08:33:32  8    Q.  And then it says, "Generally, these go away within a few weeks

08:33:35  9    or months after your treatments are completed."

08:33:37  10        Does that tell patients that they may permanently have

08:33:41  11   odd sensations?

08:33:43  12   A.  Generally doesn't say so.  It says that "generally," so I

08:33:47  13   translate into most of the cases these symptoms disappear after a

08:33:55  14   few weeks or months after completion of the treatment.  That's what

08:33:59  15   it says.  Again, I think it is substantiated by the data gathered

08:34:07  16   in the clinical studies.  That's what I can say.

08:34:09  17   Q.  And then the next section says, "Nail Changes."

08:34:13  18        Do you see that?

08:34:13  19   A.  Yes.

08:34:13  20   Q.  And it says, "Color changes to your fingernails or toenails may

08:34:17  21   occur while taking Taxotere"; is that correct?

08:34:18  22   A.  Yes.

08:34:19  23   Q.  And then it says, "In extreme but rare cases, nails may fall

08:34:23  24   off," correct?

08:34:24  25   A.  Yes.

08:34:25  1    Q.  And it says, "After you have finished Taxotere treatments, your

08:34:29  2    nails will generally grow back."

08:34:32  3         Did I read that right?

08:34:32  4    A.  Yes, you're correct.

08:34:33  5    Q.  Are they talking about permanent or no --

08:34:36  6    A.  They are not talking about permanent.

08:34:39  7    Q.  Okay.  So they're not talking about permanent nail changes, are

08:34:42  8    they?

08:34:42  9    A.  No, they are not.  They just say that generally this condition

08:34:45 10    recovers.

08:34:47 11    Q.  Okay.  They're not talking about permanent odd sensations, are

08:34:50 12    they?

08:34:50 13    A.  No, they are not.  As it's written here, they are not talking

08:34:55 14    about permanent.

08:34:56 15    Q.  Okay.  They're not talking about permanent rash, are they?

08:34:58 16    A.  No, they are not.

08:34:59 17    Q.  And they're not talking about permanent hair loss, are they?

08:35:02 18    A.  They're not either.

08:35:03 19    Q.  And if you look at the -- page 10, there's an "Adverse

08:35:13 20    Reaction" section, if you see about halfway down on the left side.

08:35:17 21         Do you see that?

08:35:18 22    A.  Okay, yeah.  Before the table?

08:35:19 23    Q.  Yeah.  And then the table represents at the top; it says,

08:35:21 24    "Summary of adverse events in patients receiving Taxotere at 100

08:35:26 25    milligrams," correct?

08:35:27  1    A.  Yes, correct.

08:35:27  2    Q.  And then it says, "Alopecia," correct?  It's about

08:35:31  3    three-fourths of the way down.

08:35:32  4    A.  Oh, yeah, I got it.  Alopecia, yeah, okay.

08:35:42  5    Q.  It just says the word "alopecia," correct?

08:35:45  6    A.  Yes, correct.

08:35:46  7    Q.  And then if you look at the top of the next column.

08:35:49  8    A.  Yes.

08:35:50  9    Q.  There's a section that says, "Cutaneous," correct?

08:35:53 10    A.  Yes.

08:35:54 11    Q.  What does "cutaneous" mean for the jury?

08:35:57 12    A.  It is the skin.  It's called skin toxicity, so pruritus rash.

08:36:09 13    Q.  And so alopecia would generally fall under the skin section,

08:36:12 14    right?

08:36:12 15    A.  Based on how it is presented here, I think alopecia is a

08:36:18 16    category by itself.

08:36:19 17    Q.  Well, let's look at the "Cutaneous" section, the last sentence

08:36:23 18    of that.  Do you see that it says, "Alopecia occurred in 80 percent

08:36:28 19    of patients and was severe in 61.8 percent of patients," correct?

08:36:33 20    A.  I don't see -- where is it?

08:36:35 21    Q.  Yes, in the right column.  Just the last sentence of that.

08:36:38 22    A.  Okay.  Got it.

08:36:48 23            "Alopecia occurred in 80 percent of patients and was

08:36:52 24    severe in 61.8."  Okay.  Got it.  Yes, okay.

08:36:56 25    Q.  And at this time, as we discussed before, Sanofi is not

08:36:59 1  referring to permanent hair loss here, because no long-term studies

08:37:04 2  have been done to assess the safety of Taxotere; is that correct?

08:37:08 3  A.  This is correct.

08:37:10 4  Q.  And, Mr. Aussel, I am going to hand you what I've marked as

08:37:15 5  Exhibit 9.  If you look at this, this appeared to be an informed

08:37:19 6  consent, correct?

08:37:19 7  A.  Yes, this is correct.

08:37:20 8  Q.  For a study that appears to be 3501?

08:37:23 9  A.  Yes, correct.

08:37:24 10  Q.  And this is a study of the use of Taxotere for prostate cancer,

08:37:28 11  correct?

08:37:28 12  A.  Correct.

08:37:29 13  Q.  And the date of issue at the bottom says, May 24th, 2005,

08:37:35 14  correct?

08:37:35 15  A.  Correct.

08:37:37 16  Q.  All right.  And then if you flip to the -- where it says page 3

08:37:42 17  at the bottom, there's a section that says, "What are the Risks of

08:37:44 18  the Study."

08:37:45 19        Do you see that?

08:37:45 20  A.  Yes, I see that.

08:37:46 21  Q.  All right.  And then if you flip to the next page -- let me

08:37:51 22  take a step back.  This is a study that had -- it was a combination

08:37:54 23  drug study, correct?

08:37:55 24  A.  Yes, this is correct.  This is kind of a sophisticated design,

08:37:59 25  because there are several arms, what we call "two-by-two design,"

1122

08:38:03  1   meaning the study wants to answer two questions in one clinical

08:38:08  2   trial.

08:38:08  3   Q.  Right.  And so an informed consent like this, you would list

08:38:13  4   the side effects of all the drugs that would be given possibly to

08:38:16  5   the patient, correct?

08:38:17  6   A.  That's correct.

08:38:17  7   Q.  Okay.  And so in here, then, it's not surprising that there's a

08:38:22  8   section that lists the side effects of Taxotere; is that correct?

08:38:24  9   A.  That's correct.

08:38:25 10   Q.  Okay.  And do you see that section on the top of page 4?

08:38:27 11   A.  Yes.

08:38:27 12   Q.  Where it says, "With Taxotere"?

08:38:29 13   A.  Yes.

08:38:29 14   Q.  And then there's a second paragraph under that that says, "The

08:38:33 15   following events have also been reported."

08:38:38 16   A.  Okay.

08:38:38 17   Q.  Do you see that?

08:38:39 18   A.  Yeah, I can see that.

08:38:39 19   Q.  And it starts off with, "Elevation of liver enzymes," correct?

08:38:43 20   A.  Yes.

08:38:44 21   Q.  And then it has, "Fatigue," right?

08:38:46 22   A.  Yes.

08:38:46 23   Q.  And it lists, "Reversible pins and needles sensation in hands

08:38:50 24   or feet," correct?

08:38:51 25   A.  Yes.

1123

08:38:51  1   Q.  And then it says, "Pain in the joints or the muscles," correct?

08:38:54  2   A.  Yes.

08:38:54  3   Q.  And it says, "Reversible hair loss," correct?

08:38:58  4   A.  Yes.

08:38:58  5   Q.  So this informed consent is telling patients that reversible

08:39:03  6   hair loss has been reported following use of Taxotere, correct?

08:39:07  7   A.  Yes.

08:39:09  8   Q.  And this document is dated May 24th, 2005, correct?

08:39:13  9   A.  Yes.

08:39:14  10  Q.  And you testified earlier that the informed consents, because

08:39:18  11  they're signed by patients, are written in a language that patients

08:39:22  12  can understand, correct?

08:39:23  13  A.  This is correct, yes.

08:39:26  14  Q.  And so there's not the use of the word "alopecia," instead the

08:39:29  15  informed consent used the nonmedical term, "reversible hair loss,"

08:39:33  16  correct?

08:39:34  17  A.  That's my understanding, yes.

08:39:36  18  Q.  I'm going to hand you what I'll mark as Exhibit Number 10.  And

08:39:41  19  it has a label that's effective from January 6th, 2005, to

08:39:46  20  August 10th of 2005, correct?

08:39:47  21  A.  Yes.

08:39:48  22  Q.  And that's a time period from this informed consent, correct?

08:39:51  23  A.  Informed consent, May -- yes, correct.

08:39:56  24  Q.  And that's the document we have in front of us.  So this

08:40:00  25  appears to be the label that was in effect in the United States at

08:40:03 1    the time that this informed consent was written, correct?

08:40:05 2    A.  Yes.

08:40:07 3    Q.  And if we turn to page 2, at the bottom, there's a "Hair Loss"

08:40:16 4    section.

08:40:16 5              Do you see that?

08:40:17 6    A.  I can see that, yes.

08:40:18 7    Q.  And it says, "Loss of hair occurs in most patients taking

08:40:22 8    Taxotere, including the hair on your head, underarm hair, pubic

08:40:27 9    hair, eyebrows, and eyelashes, correct?

08:40:31 10   A.  Yes.

08:40:31 11   Q.  And it says, "Hair will begin after the first few treatments

08:40:34 12   and varies from patient to patient," correct?

08:40:36 13   A.  Yes.

08:40:36 14   Q.  And then it says, "Once you have completed all of your

08:40:39 15   treatments, hair generally grows back," correct?

08:40:42 16   A.  Yes.

08:40:44 17   Q.  That's the same language that we saw in the original 1996

08:40:49 18   label, isn't it?

08:40:50 19   A.  Yes.

08:40:50 20   Q.  Okay.  And you testified that this section is not talking about

08:40:56 21   permanent hair loss, correct?

08:40:57 22   A.  Yes.  I mean, I can hardly interpret what the people in charge

08:41:02 23   of labeling meant here, but that's my interpretation.

08:41:07 24   Q.  And then if we look at the informed consent, that confirms our

08:41:18 25   understanding, because it warns of reversible hair loss as a

08:41:22 1  reported side effect of Taxotere, correct?

08:41:24 2  A.  Yes.

08:41:24 3  Q.  The same terminology that would be used in a label, correct?

08:41:27 4  A.  Well, I'm not sure it was the exact same terminology because,

08:41:32 5  again, I'm not a person specialized in labeling and I've never been

08:41:37 6  involved in labeling, but I assume my colleagues in charge of

08:41:40 7  labeling takes the language of the study report and translate it

08:41:45 8  into the labeling.

08:41:46 9  Q.  And if we look back at the informed consent that's written in

08:41:50 10  language that patients can understand, Sanofi chose to use the

08:41:55 11  term, in patient language, "reversible hair loss," correct?

08:42:00 12  A.  Hair loss, yes, correct.

08:42:01 13  Q.  Reversible hair loss, correct?

08:42:03 14  A.  Yes.

08:42:04 15  Q.  Okay.  So is it fair then to say that when we translate from

08:42:08 16  language that patients can understand, "reversible hair loss," to

08:42:12 17  "alopecia," what we're seeing here in this chart is the percentage

08:42:15 18  of people who had reversible hair loss?

08:42:20 19          MR. RATLIFF:  Object to form.

08:42:23 20          THE WITNESS:  That's what is not shown -- I mean, here in

08:42:25 21  the chart -- in the table, the numbers are the percentage of

08:42:31 22  patients who experienced once alopecia during the course of the

08:42:38 23  study.  It doesn't have any qualifier without this short-lasting,

08:42:45 24  long-lasting, partial, or total.

08:42:45 25  BY MR. WOOL:

08:42:47 1   Q.  And if we go through the label, if you go to page 28, there's

08:42:51 2   another chart, and this is study TAX316, correct?

08:42:56 3   A.  Yes.

08:42:56 4   Q.  And here it lists "alopecia" about halfway down -- just the

08:43:00 5   term "alopecia," correct?

08:43:01 6   A.  Okay.  Got it.

08:43:02 7   Q.  And so for doctors, Sanofi is telling the doctors about

08:43:09 8   alopecia, and they're telling the patients that that alopecia is

08:43:13 9   reversible hair loss, correct?

08:43:15 10  A.  Correct.

08:43:16 11  Q.  And this informed consent we've been looking at from this time

08:43:21 12  period is an informed consent for a prostate cancer study, right?

08:43:24 13  A.  Yes, correct.

08:43:25 14        TAX 327 is a study in metastatic prostate cancer.  3501

08:43:31 15  is a study in the earlier stages of prostate cancer, correct.

08:43:34 16  Q.  Is it your belief, Mr. Aussel, that when Sanofi tells doctors

08:43:38 17  alopecia, that they are telling doctors about both permanent and

08:43:43 18  reversible alopecia?

08:43:45 19  A.  I don't know.  I mean, the label says, "Alopecia."  I don't

08:43:49 20  know what was agreed with the health authorities about the details

08:43:53 21  to be provided regarding alopecia.  I don't know what was the --

08:44:00 22  what the specialists in labeling meant when listing this specific

08:44:05 23  adverse event.  As it is, I can't really comment.  But the form of

08:44:11 24  alopecia -- I mean, the incidence of alopecia, there's no specific

08:44:14 25  qualifier.

08:44:15  1    Q.  And that's -- we've seen a section for hair loss in all of the

08:44:20  2    patient information leaflets that we've looked at going back to

08:44:26  3    1996, correct?

08:44:26  4    A.  Uh-huh.  Yes, correct.

08:44:28  5    Q.  And here we have -- we see the same language that we saw

08:44:32  6    before, don't we?

08:44:33  7    A.  Yeah, okay.  I recognize the wording, yeah, correct.

08:44:37  8    Q.  And so it says what we've seen before, "Once you have completed

08:44:41  9    all of your treatments, hair generally grows back," correct?

08:44:43 10    A.  Yes.

08:44:44 11    Q.  We have an informed consent and we have a patient leaflet?

08:44:47 12    A.  Correct.

08:44:47 13    Q.  And the informed consent says, "Hair loss reversible," correct?

08:44:51 14    A.  Yes.

08:44:51 15    Q.  And I understand, I asked you earlier and you said you've never

08:44:55 16    participated in any discussions with a health authority about a

08:44:58 17    label, correct?

08:44:58 18    A.  Correct.

08:44:59 19          Difficult for me to interpret and to make the direct

08:45:01 20    relationship between the detailed tables that we provide to the

08:45:05 21    investigators -- to the professional oncologists and the lay

08:45:10 22    language we use to inform the patients.  I can only say that

08:45:15 23    compared to the patient leaflet, there is no inconsistency with the

08:45:18 24    informed consent.

08:45:19 25    Q.  Mr. Aussel, I'm going to hand you what I've marked as

08:45:23 1  Exhibit 14.  And this appears to be a letter from Sanofi to the FDA

08:45:28 2  dated June 12th, 2006, correct?

08:45:32 3  A.  Yes.

08:45:33 4  Q.  I'm going to guess you haven't seen this letter before,

08:45:36 5  correct?

08:45:36 6  A.  No, I've never seen it before.

08:45:39 7  Q.  If you look at the last paragraph of that first page, it says,

08:45:43 8  "Enclosed please find a new protocol," correct?

08:45:45 9  A.  Yes.

08:45:46 10  Q.  And can you read the protocol title for me?

08:45:49 11  A.  "Phase 2-B Randomized Multicenter Non-Comparative Pilot Study

08:45:55 12  of the Safety and Efficacy of Three Docetaxel-Based Chemotherapy

08:46:00 13  Regimens Plus Bevacizumab plus/minus Trastuzumab for the Adjuvant

08:46:04 14  Treatment of Patients with Node Positive and High Risk Node

08:46:08 15  Negative Breast Cancer, Sanofi study DOCEFL007714."

08:46:15 16  Q.  And this is how the document was produced to us by Sanofi and

08:46:18 17  the folder has Attachment I, or 1, "New Protocol for Study 714,"

08:46:23 18  correct?

08:46:23 19  A.  Okay.

08:46:24 20  Q.  And that's the protocol that the cover letter indicates was

08:46:27 21  being sent to the FDA, correct?

08:46:28 22  A.  Okay.

08:46:29 23  Q.  So if you turn the page, we have the, "Clinical Study

08:46:33 24  Protocol," correct?

08:46:33 25  A.  Yes.

08:46:34  1   Q.  And it's date of issue is May 8th, 2006, correct?

08:46:39  2   A.  May 8th -- yes, correct.

08:46:41  3   Q.  You know a lot more about clinical trials than I do.  Let me

08:46:45  4   make sure I understand.  If we look back -- and to be fair,

08:46:48  5   actually -- if we look back at a prior page, I didn't read the

08:46:50  6   parentheticals where they have N100 and N50; is that correct?

08:46:54  7   A.  I am not familiar at all with the general study, which is quite

08:46:58  8   complex.  I think because there is -- there are many study drugs --

08:47:03  9   there is bevacizumab, there is trastuzumab, there is a plus/minus,

08:47:07 10   so I'd need to understand better, if needed, what are the actual

08:47:13 11   treatment arms, but this is basically -- and the Herceptin is a

08:47:17 12   drug that can be used only in HER2-positive patients, so that's why

08:47:23 13   you also try to then pay attention to make sure that the

08:47:27 14   HER2-negative patients don't receive Herceptin because it is not

08:47:31 15   ethical.  So it's a complex design that I will need a few minutes

08:47:35 16   to understand, but go ahead with your question.

08:47:36 17   Q.  It -- so if we turn to page 17, and it's turned sideways in

08:47:44 18   your packet.  We see a study schedule.

08:47:47 19   A.  Uh-huh.

08:47:48 20   Q.  Right?

08:47:50 21        Okay.  And the first thing listed on the study schedule

08:47:53 22   is the informed consent, correct?

08:47:54 23   A.  Yes.

08:47:55 24   Q.  And then it indicates that needs to be completed prior to the

08:47:58 25   study entry, correct?

08:47:59  1    A.  Yes.

08:48:00  2    Q.  And that means before the patient begins taking the drugs,

08:48:03  3    correct?

08:48:04  4    A.  Yes.  Even before the patient is on the medicine.

08:48:07  5    Q.  And there's an, "Appendix D."

08:48:09  6            Do you see that?

08:48:10  7    A.  Yes.

08:48:11  8    Q.  And it says, "Sample research subject and informed consent,

08:48:14  9    page 89," correct?

08:48:15 10    A.  Yes.

08:48:16 11    Q.  All right.  Let's turn to Appendix D.

08:48:23 12    A.  Yes.

08:48:23 13    Q.  And do you see that the Appendix D contains the sample informed

08:48:33 14    consent?

08:48:33 15    A.  Correct.

08:48:34 16    Q.  And this appears to have been submitted to the FDA as part of

08:48:37 17    the protocol, correct?

08:48:37 18    A.  Correct.

08:48:38 19    Q.  If you turn to page 91, you'll see there's a section that

08:48:44 20    begins with a question, "What are the possible risks and

08:48:46 21    inconveniences of being in the study," correct?

08:48:48 22    A.  Correct.

08:48:49 23    Q.  And then if you turn to the next page, it begins with a section

08:48:54 24    entitled, "Non-Cardiovascular Risks of Doxorubicin,

08:49:02 25    Cyclophosphamide, Docetaxel, and/or Carboplatin," correct?

08:49:06  1    A.  Correct.

08:49:06  2    Q.  And the doxorubicin, cyclophosphamide, and the docetaxel are

08:49:11  3    commonly referred to as "TAC," correct?

08:49:13  4    A.  Correct.

08:49:15  5    Q.  And, here, Sanofi is reporting the side effects that it knows

08:49:19  6    about for the combination of drugs doxorubicin, cyclophosphamide,

08:49:24  7    and docetaxel, correct?

08:49:26  8    A.  And carboplatin, yeah, correct.

08:49:27  9    Q.  And here we're reporting what Sanofi knows about the TAC

08:49:30 10    regimen and its side effects, correct?

08:49:31 11    A.  Correct.

08:49:31 12    Q.  Two lines under that, it lists, "Reversible hair loss" as a

08:49:36 13    reported side effect, correct?

08:49:38 14    A.  Correct.

08:49:39 15    Q.  Do you see anything in that paragraph about permanent hair loss

08:49:42 16    being reported?

08:49:43 17    A.  No.

08:49:44 18    Q.  And like the other informed consents we looked at, this

08:49:49 19    informed consent is written in language that a non-doctor can

08:49:53 20    understand, correct?

08:49:55 21    A.  Yes, this is the objective.

08:49:57 22    Q.  Okay.  So here in this informed consent, we have Sanofi telling

08:50:01 23    patients that are participating in the clinical trial for Sanofi

08:50:07 24    that a reported side effect of the TAC regimen is reversible hair

08:50:13 25    loss, correct?

08:50:14   1   A.  Yes.

08:50:14   2   Q.  All right.  And then if we look at the label that was in effect

08:50:19   3   at this time, we have the "Hair Loss Section," which has the

08:50:23   4   language we've seen before, "Hair generally grows back," correct?

08:50:26   5   A.  Yes.

08:50:27   6   Q.  And you had testified that, you know, since the informed

08:50:30   7   consent and the patient leaflet or patient information section are

08:50:33   8   written in language that patients can understand, "Hair generally

08:50:38   9   grows back," is a warning for reversible hair loss, correct?

08:50:42  10   A.  Yes.

08:50:43  11   Q.  There's nothing in the label that says anything about permanent

08:50:46  12   alopecia, is there?

08:50:47  13   A.  Correct.

08:50:48  14   Q.  Okay.  So we agree, then, that reversible hair loss as used in

08:50:53  15   the informed consent is what Sanofi is warning about when it says,

08:50:57  16   "Hair generally grows back," correct?

08:50:59  17   A.  That's my understanding, yes.

08:51:01  18   Q.  And the "hair generally grows back" that's in this patient

08:51:05  19   information leaflet that was in effect in 2006, is the same

08:51:09  20   language that we saw all the way back in the original label in

08:51:14  21   1996, correct?

08:51:14  22   A.  Yes.

08:51:14  23   Q.  But you were in charge of clinical trials that had informed

08:51:19  24   consents, correct?

08:51:20  25   A.  Correct.

08:51:20  1    Q.  And to your knowledge, did any of those informed consents warn

08:51:24  2    about permanent hair loss?

08:51:25  3    A.  Not those I had in charge.

08:51:29  4    Q.  Have you ever worked in pharmacovigilance?

08:51:32  5    A.  I'm sorry?

08:51:33  6    Q.  Have you ever worked in pharmacovigilance?

08:51:35  7    A.  Never.

08:51:35  8    Q.  Okay.  Did you ever take part in any discussions when you were

08:51:38  9    working on clinical trials about discussing or warning doctors

08:51:42  10   about two different kinds of alopecia?

08:51:47  11   A.  No.  In my role -- I mean, again, we were conducting studies,

08:51:53  12   making sure that we collect information about alopecia, that the

08:51:57  13   studies are run in an appropriate way.  And we collect data, and we

08:52:04  14   contribute to feed the evidence that are then interpreted --

08:52:09  15   discussed by the different labeling regulatory teams with Sanofi.

08:52:16  16   I was not specifically -- I didn't have the specific mission to

08:52:24  17   inform the health authorities about the different types of

08:52:28  18   alopecia.  I relied on what was written in the informed consent

08:52:33  19   based on -- as we discussed before, based on what is in the patient

08:52:37  20   leaflet.  And this is what is officially approved both by health

08:52:42  21   authorities and Sanofi persons of labeling.  I mean, my

08:52:47  22   responsibility was to provide the data for each clinical trial so

08:52:54  23   that those persons within Sanofi and these bodies -- health

08:53:00  24   authorities -- can make an appropriate judgment on what is the

08:53:04  25   safety profile of Taxotere, and that's it.

1134

08:53:07 1    Q.  And for the jury's benefit, paclitaxel is also known as

08:53:12 2    "Taxol," correct?

08:53:13 3    A.  That's correct, yes.

08:53:14 4    Q.  And I think I asked you this earlier, but you are not aware of

08:53:18 5    any studies that compared Taxol to Taxotere in the early-stage

08:53:23 6    breast cancer setting, are you?

08:53:24 7    A.  Not that I recall now.

08:53:26 8    Q.  Do you know what "SABCS" stands for?

08:53:29 9    A.  It's a symposium for breast cancer that occurs once a year in

08:53:34 10   San Antonio, Texas.  It is the San Antonio Breast Cancer Symposium,

08:53:39 11   SABCS.

08:53:40 12                           EXAMINATION

08:53:40 13   Q.  Good afternoon, Jean-Philippe.  How are you?

08:53:43 14   A.  I'm fine.  Thank you.

08:53:44 15   Q.  Jean-Philippe, you were asked, if you remember, say, an

08:53:48 16   hour-and-a-half or several hours of questions about a variety of

08:53:52 17   Taxotere labels.

08:53:55 18          Do you recall that?  It was kind of at the beginning of

08:53:58 19   the day?

08:53:58 20   A.  Okay.  Yeah, okay.

08:54:00 21   Q.  Okay.  And all of the questions that you had were related to

08:54:03 22   what's known as the "U.S. package insert" or the Taxotere label

08:54:08 23   that's used in the United States.

08:54:09 24          Does that sound about right?

08:54:11 25   A.  Yeah.

08:54:11  1   Q.  At any time at Sanofi, have you been involved or part of any

08:54:15  2   type of labeling group or labeling working committee, or labeling

08:54:21  3   review committee?

08:54:21  4   A.  No.  I've never been part of these kind of committees.

08:54:24  5   Q.  Have you ever drafted or provided input as to what should go in

08:54:29  6   a particular label?

08:54:30  7   A.  No, I did not.

08:54:31  8   Q.  Have you ever been given a label to -- a proposed label to

08:54:37  9   review or provide comment on as it relates to Taxotere?

08:54:40 10   A.  No, I have not.

08:54:41 11   Q.  Okay.  Do you know who is responsible within Sanofi generally,

08:54:47 12   for reviewing and preparing and updating drug labels?

08:54:54 13   A.  Yes.  There is a labeling department whose responsibility it is

08:54:58 14   to do this kind of activity.  I think they do it with the support

08:55:03 15   of regulatory affairs, medical doctors, pharmacovigilance.

08:55:08 16   Q.  And would you have any personal knowledge as to what was meant

08:55:12 17   or intended by particular language in a label, whether that be the

08:55:19 18   label in the U.S. or whether that be the label in Europe?

08:55:22 19   A.  No.  I'm not knowledgeable about these technical labeling

08:55:28 20   details.  I don't know the meaning of the wording, and what is

08:55:32 21   supporting the decisions.

08:55:33 22   Q.  Okay.  If you will grab Exhibit Number 8.  Exhibit Number 8 was

08:55:42 23   the Taxotere label from, I believe, 1996, when the drug was first

08:55:48 24   approved in the United States.

08:55:50 25              Does that sound about right, once you've had a chance to

08:55:53 1   look over that document?

08:55:54 2   A.  It doesn't seem there's any date here but could be.

08:56:03 3   Q.  Okay.  I'll represent to you that this was during the

08:56:07 4   examination earlier today, the Taxotere label from 1996.  And if

08:56:11 5   you'll turn to Sanofi 000003 of that document.

08:56:21 6   A.  Okay.

08:56:21 7   Q.  I apologize, Jean-Philippe, I believe this was -- the relevant

08:56:27 8   section, it was both the label -- the FDA-approved label, as well

08:56:31 9   as the FDA approved patient leaflet.

08:56:31 10   A.  Yes.

08:56:33 11   Q.  Part of the discussion was about the patient leaflet.

08:56:36 12   A.  Okay.

08:56:36 13   Q.  Will you look at the section that's called, "Hair Loss"?

08:56:42 14       Do you see that section?

08:56:43 15   A.  I see it, yes.

08:56:45 16   Q.  Okay.  And do you recall that you were asked a number of

08:56:47 17   questions about that particular section?

08:56:48 18   A.  Yes, I do.

08:56:49 19   Q.  And is it also fair to say, to kind of move things along, that

08:56:54 20   you were asked about the language in this section as it related to

08:56:58 21   a number of other -- a number of other labels, including Exhibit 10

08:57:03 22   and I believe Exhibit 12?

08:57:06 23   A.  Yes, I do.

08:57:07 24   Q.  So just to be clear for the record and for the ladies and

08:57:11 25   gentlemen of the jury, you would not have prepared or been involved

08:57:19  1   in the drafting of this label, the submission to FDA, or what FDA's

08:57:23  2   feedback may have been related to this particular section; is that

08:57:26  3   correct?

08:57:27  4   A.  That is correct.  I was not aware.

08:57:29  5   Q.  Okay.  And you'll see the section on "Hair Loss," the last

08:57:32  6   sentence in the first paragraph, it says, "Once you have completed

08:57:36  7   all your treatments, hair generally grows back."

08:57:39  8          Do you see that?

08:57:39  9   A.  I see it, yeah.

08:57:42  10  Q.  And I know you're not in pharmacovigilance, but at least in

08:57:45  11  your experience in helping to run a number of breast cancer trials

08:57:52  12  involving Taxotere, would you say that statement is accurate?

08:57:57  13  A.  I think it is a correct statement indeed, yes.  Hair generally

08:58:04  14  grows back.

08:58:05  15  Q.  Okay.  That once you take Taxotere, you may lose your hair and

08:58:08  16  that it generally grows back?

08:58:10  17  A.  Correct.

08:58:11  18  Q.  In your experience, you would say that's an accurate statement?

08:58:13  19  A.  Yes, it is.

08:58:15  20  Q.  Okay.  And does that statement say that once you've taken

08:58:22  21  Taxotere, that your hair will "always" grow back?

08:58:25  22  A.  No.  It is written that "the hair generally grows back."

08:58:27  23  Q.  Does it say, we're giving you 100 percent guarantee that your

08:58:32  24  hair will grow back exactly as it was before?

08:58:35  25  A.  No, it doesn't say so.

08:58:36 1    Q.  Okay.  And does it make any promises or assurances that in

08:58:40 2    every single instance when a woman takes Taxotere, that her hair

08:58:43 3    will grow back?

08:58:44 4    A.  No, it doesn't.

08:58:45 5    Q.  But, but the term "hair generally grows back," you would say

08:58:49 6    that is an accurate statement then and it's an accurate statement

08:58:52 7    now.

08:58:52 8            Do you agree with that?

08:58:52 9            MR. RATLIFF:  Object to form.

08:58:53 10           THE WITNESS:  Yes, it is.

08:58:54 11   BY MR. WOOL:

08:58:54 12   Q.  Okay.  Jean-Philippe, will you turn to Exhibit Number 9?  This

08:59:22 13   was one of, I believe, a number of informed consents that you were

08:59:25 14   provided?

08:59:26 15   A.  Yes, correct.

08:59:27 16   Q.  And this is a -- this particular exhibit is an informed consent

08:59:32 17   from a -- I think a prostate cancer clinical trial; is that

08:59:39 18   correct?

08:59:39 19   A.  Yes, correct.

08:59:40 20   Q.  So not a breast cancer trial, correct?

08:59:42 21   A.  No.  It's a trial of early-stage prostate cancer.

08:59:45 22   Q.  And not an adjuvant breast cancer trial?

08:59:47 23   A.  Not an adjuvant cancer.

08:59:49 24   Q.  Jean-Philippe, are you the person at Sanofi who is responsible

08:59:54 25   for drafting and preparing and approving what goes in an informed

09:00:00  1  consent?

09:00:01  2  A.  No, I'm not.

09:00:02  3  Q.  Who, in your experience, would be the individuals that are

09:00:06  4  responsible for drafting and preparing and approving what goes in a

09:00:11  5  particular informed consent for a clinical trial?

09:00:15  6  A.  At that time, it was prepared -- drafted by the trial manager

09:00:18  7  itself, him or herself, and especially for the so-called

09:00:24  8  administrative sections.  But for the safety sections, for example,

09:00:28  9  the risks, it was prepared together by the medical director and

09:00:33 10  pharmacovigilance.

09:00:34 11  Q.  So you said the "medical director."  Would that be a medical

09:00:39 12  doctor?

09:00:40 13  A.  Yeah, a medical doctor; oncologist.

09:00:43 14  Q.  Okay.  So at least in your recollection that the informed

09:00:46 15  consent and the safety information that goes in an informed

09:00:49 16  consent, that's something that would be drafted, prepared, and

09:00:52 17  finalized by an oncologist or a medical doctor?

09:00:56 18  A.  Yes, correct.

09:00:58 19  Q.  And if you'll go to page 3 of this particular informed consent

09:01:03 20  from May 24th, 2005, and you look down at, "What Are The Risks of

09:01:08 21  The Study."

09:01:09 22       Do you see that section?

09:01:10 23  A.  Uh-huh, I see it.

09:01:11 24  Q.  Just to be clear, this, again, is not something that

09:01:15 25  Jean-Philippe Aussel would have prepared, reviewed, signed off on;

09:01:19 1   is that correct?

09:01:20 2   A.   This is correct, yes.

09:01:21 3   Q.   Okay.   And it goes on to state, "Every treatment can have side

09:01:27 4   effects."

09:01:28 5             Do you agree with that?

09:01:29 6   A.   Yes, sure.

09:01:30 7   Q.   Okay.   And if you look further down, it says, "There also may

09:01:35 8   be other side effects that cannot be predicted.   Other drugs will

09:01:39 9   be given to make the side effects less serious and make them less

09:01:42 10  uncomfortable.   Many side effects go away shortly after Taxotere or

09:01:46 11  Eligard are stopped, but in some cases, side effects can be

09:01:49 12  serious, long-lasting, or permanent."   Just to be clear, "In some

09:01:54 13  cases side effects can be serious, long-lasting, or permanent."

09:01:58 14            Do you see that?

09:01:59 15  A.   I see, yes.

09:02:00 16  Q.   What does that mean to you?

09:02:02 17  A.   It means that at the time the protocol and the informed consent

09:02:06 18  are written, we are providing the list of the potential side

09:02:13 19  effects for all the drugs of the protocol, but we are informing the

09:02:18 20  patients that there may be other side effects that may be

09:02:25 21  discovered in this particular trial, and that some of them can have

09:02:32 22  different characteristics than the characteristics that we know

09:02:35 23  today.

09:02:36 24  Q.   Okay.   And some of those characteristics may be that the side

09:02:41 25  effect could be permanent?

09:02:42  1    A.  That's what is written here.

09:02:44  2    Q.  Okay.  If you'll turn to the next page, page 4, this was a

09:02:51  3    section that plaintiffs' counsel asked you a number of questions

09:02:54  4    about.  It's the paragraph that starts with, "The following events

09:02:58  5    have also been reported."

09:02:59  6    A.  Okay.

09:03:00  7    Q.  Do you see that?

09:03:00  8    A.  Yeah, yeah.

09:03:01  9    Q.  It says, "The following events have also been reported," and

09:03:04  10   then there's a big long list of events that have been reported.

09:03:08  11   And the one that plaintiffs' counsel was focused on was,

09:03:11  12   "Reversible hair loss."

09:03:12  13        Do you see that?

09:03:12  14   A.  Yeah, I see that.

09:03:14  15   Q.  Is it fair to say, or is it accurate that one of the events

09:03:17  16   that had been reported with Taxotere was reversible hair loss?

09:03:20  17   A.  Yes.  This is correct, yes.

09:03:21  18   Q.  Okay.  And is it also fair to say that in your experience that

09:03:25  19   it's true then, is it true now, that most, if not all, patients who

09:03:31  20   take a Taxotere regimen will have reversible hair loss?

09:03:34  21   A.  That's what you're observing in the clinical trials, yes.

09:03:37  22   Q.  Who prepares, say, the safety information that might go in an

09:03:41  23   investigational brochure?

09:03:42  24   A.  Typically, the pharmacovigilance team, because they are in

09:03:45  25   charge of safety for the company for all products, and they are the

09:03:48  1   most knowledgeable of what should be in these documents.

09:03:51  2   Q.  And within Sanofi's pharmacovigilance team, are there medical

09:03:56  3   professionals?

09:03:56  4   A.  Yes, there are.  Especially the group of safety officers -- the

09:04:00  5   ones who are the lead -- they are medical doctors, yes.

09:04:03  6   Q.  Including oncologists?

09:04:05  7   A.  Including oncologists, pharmacology, yes.

09:04:07  8   Q.  Okay.  And so you rely on those medical professionals, those

09:04:11  9   oncologists, those trained physicians to prepare, update, include

09:04:17  10  the information that they believe should go in an investigational

09:04:21  11  brochure or that should go in an informed consent.

09:04:23  12          Would you agree with that?

09:04:24  13  A.  Yes, I do.

09:04:25  14  Q.  Jean-Philippe, we talked about a number of adjuvant breast

09:04:44  15  cancer clinical trials.

09:04:47  16          Do you recall that?

09:04:48  17  A.  Yes, I do.

09:04:49  18  Q.  For TAX316, that was one of the trials we talked about, right?

09:04:53  19  A.  Yep.

09:04:54  20  Q.  And I know you had involvement with TAX316?

09:04:57  21  A.  That's correct.

09:04:58  22  Q.  Can you just give me -- or give us sort of a time frame when

09:05:02  23  you had responsibilities for TAX316 and when you no longer had

09:05:07  24  responsibilities for TAX316?

09:05:09  25  A.  Yes.  I had responsibilities for TAX316 from about 2001

09:05:20  1    maybe -- very beginning of 2001 until 2004 when I changed the

09:05:31  2    department.

09:05:31  3    Q.  Okay.  So you weren't involved with TAX316 when the study

09:05:35  4    started, and you weren't involved with TAX316 when the study ended;

09:05:39  5    is that correct?

09:05:39  6    A.  This is correct.  I came into TAX316 actually between the first

09:05:44  7    and the second interim analysis.

09:05:46  8    Q.  And can you give us a little bit of background in terms of when

09:05:55  9    you were involved with BCIRG 005, which is one of the studies we

09:05:59  10   talked about?

09:06:00  11   A.  Okay.  When I joined the medical affair group after the ten

09:06:04  12   years in R&D, so it was at the end of 2004 -- so let's say

09:06:10  13   January 2005 -- then I had to take care of BCIRG 005 that was the

09:06:15  14   medical affair trial.

09:06:18  15   Q.  And when you say -- I apologize, when you say you stopped

09:06:21  16   having responsibility for 00 --

09:06:23  17   A.  The beginning was in January 2005, and then I stopped my

09:06:27  18   responsibility in approximately 2010 when the clinical operation

09:06:34  19   platform was created with Sanofi and then when I became the project

09:06:37  20   leader for all oncology medical affairs studies.  But I was not at

09:06:41  21   that time directly managing the 005 study.

09:06:43  22   Q.  So you weren't involved with 005 at the beginning of the study,

09:06:47  23   the set up of the protocol?

09:06:49  24   A.  No.

09:06:49  25   Q.  The set up of the informed consent?

09:06:51  1    A.  Not at all.

09:06:51  2    Q.  Nor were you involved at the -- or responsible for at the end

09:06:54  3    of 005; is that correct?

09:06:56  4    A.  No.  Yes, correct.

09:06:57  5    Q.  Okay.  And then, can you just tell us the same thing for 006?

09:07:01  6    A.  These are -- I can call parallel studies, so they are

09:07:06  7    approximately the same timing, so I took over 006 in January 2005,

09:07:11  8    and I also was not involved anymore on 006 approximately in 2010.

09:07:20  9    Q.  And then what about with TAX315 -- just the same set of

09:07:24 10    questions -- when did you have kind of a direct role and

09:07:27 11    responsibility for that particular adjuvant trial?

09:07:28 12    A.  So, again, I was responsible from time to time when my own

09:07:34 13    scope -- meaning either R&D or medical affairs -- fit the

09:07:40 14    positioning of the study within the company, either in medical

09:07:44 15    affairs or R&D.  So when the study was in R&D, so in the early

09:07:51 16    2000 years, I was overseeing the team of trial managers taking care

09:07:56 17    of the study, and -- but then, the study moved to medical affairs

09:08:03 18    while I was still in R&D, it was at the time of the TAX316

09:08:08 19    submission, for example.  But then when I moved to medical affairs

09:08:12 20    in January 2005, then I again under my scope to oversee TAX315.

09:08:20 21    Again, I was not directly in charge of the study itself.  There was

09:08:25 22    a trial manager in charge specifically, but I was -- it was part of

09:08:29 23    my portfolio, I would say, of studies.

09:08:32 24    Q.  Okay.  And just to be clear, you have a doctorate but you are

09:08:36 25    not a medical doctor; is that correct?

1145

09:08:37 1   A.  I am not a medical doctor, correct, yes.

09:08:39 2   Q.  And is it fair to say that you rely on the medical

09:08:42 3   professionals and medical doctors and the oncologists, whether

09:08:46 4   within Sanofi or in these research organizations, to make analyses

09:08:51 5   and determinations about safety data?

09:08:53 6   A.  We have to, yes.

09:08:56 7        (WHEREUPON, THE VIDEO DEPOSITION WAS CONCLUDED.)

09:08:59 8             THE COURT:  Thank you.  Please call your next witness.

09:09:05 9             MR. BACHUS:  Your Honor, Mr. Miceli is going to call

09:09:12 10  Dr. Feigal.

09:09:12 11            THE COURT:  Okay.  Thank you.

09:09:23 12            MR. MICELI:  Did they announce who we're calling next,

09:09:25 13  Your Honor?

09:09:26 14            THE COURT:  Yes, sir, Mr. Miceli.  Dr. Feigal.

09:09:28 15            MR. MICELI:  She stepped down the hall and she will be

09:09:31 16  here in just a moment.

09:09:32 17            THE COURT:  Thank you.

09:09:34 18            MR. MICELI:  It will give me time to set up.

09:09:49 19            THE COURT:  Come forward, Dr. Feigal.  You can come

09:09:58 20  forward right now.  Thank you.  We've called you.  And once you get

09:10:00 21  settled behind, you may take off your mask.

09:10:03 22            THE DEPUTY CLERK:  Doctor, can I have you raise your

09:10:05 23  right hand?

09:10:07 24        (WHEREUPON, ELLEN GWEN FEIGAL WAS SWORN IN AND TESTIFIED AS

09:10:09 25        FOLLOWS:)

09:10:09  1          THE DEPUTY CLERK:  Thank you.  You can have a seat.

09:10:12  2   Please state and spell your full name for the record.

09:10:16  3          THE WITNESS:  Ellen Gwen Feigal.  Do you want me to spell

09:10:21  4   it?  E-l-l-e-n.  Gwen is G-w-e-n.  Feigal is F-e-i-g-a-l.

09:10:32  5          THE COURT:  Mr. Miceli, are you ready to proceed?

09:10:34  6          MR. MICELI:  Yes, Your Honor.  Thank you very much.  Good

09:10:37  7   morning.

09:10:37  8                   VOIR DIRE EXAMINATION

09:10:39  9   BY MR. MICELI:

09:10:40 10   Q.  Good morning, Dr. Feigal.

09:10:41 11   A.  Good morning.

09:10:41 12   Q.  I am going to turn this towards you.  Can you please introduce

09:10:45 13   yourself to the jury?

09:10:46 14   A.  My name is Ellen Gwen Feigal.

09:10:48 15   Q.  And could you give us, please, just a -- tell us a little bit

09:10:52 16   about your educational background and your work experience, on a

09:10:56 17   high level?

09:10:56 18   A.  Okay.  My educational background, I did an undergraduate degree

09:11:00 19   in biology at the University of California Irvine and then I

09:11:05 20   received a master's degree in molecular biology and biochemistry at

09:11:10 21   the University of California Irvine.  After that, I went to medical

09:11:13 22   school.  And after four years of medical school at the University

09:11:17 23   of California Davis School of Medicine, I did an internal medicine

09:11:21 24   residency, which is an internship and two years of residency and I

09:11:26 25   finished my residency at Stanford University.  After that, I then

09:11:31  1  did a specialty training in hematology-oncology at the University

09:11:36  2  of California San Francisco.

09:11:38  3  Q.  Okay.  Did you provide me with a CV that summarizes your

09:11:42  4  education and experiences?

09:11:44  5  A.  I did.

09:11:46  6          MR. MICELI:  Your Honor, may I show it to the witness to

09:11:48  7  go through it with her?

09:11:50  8          THE COURT:  Yes.  Yes, you may.

09:11:51  9          MR. MICELI:  Thank you.

09:11:52  10  BY MR. MICELI:

09:11:53  11  Q.  You just told us a little bit about your education -- there we

09:12:08  12  go.  I want to make sure I get the whole page on here -- and I want

09:12:12  13  to march through a few things that highlight some things in your

09:12:14  14  past.

09:12:14  15          And this is your educational experience?

09:12:16  16  A.  Yes, it is.

09:12:20  17  Q.  Okay.  I am just going to flip through some pages that we can

09:12:23  18  highlight for the jury your work history.  And is this a

09:12:29  19  summarization of your work history?

09:12:31  20  A.  It is.

09:12:31  21  Q.  Okay.  I really only want to highlight a few things.  You have

09:12:35  22  some, it appears to be professorships in here?

09:12:39  23  A.  Yes, that's correct.

09:12:40  24  Q.  Can you bring us up to speed on your teaching experience?

09:12:42  25  A.  Well, I've been on the faculty at several universities --

09:12:47  1  University of California San Francisco, University of California

09:12:51  2  San Diego, Arizona State University, the Sandra Day O'Connor

09:12:58  3  College of Law, where I am still an adjunct professor and teaching

09:13:02  4  two courses.  And I also started an educational course in drug

09:13:08  5  development and regulatory science that I started and founded in

09:13:11  6  2007 and that continues to this day.

09:13:14  7  Q.  And what is the name of that course?

09:13:16  8  A.  It's the "American Course on Drug Development and Regulatory

09:13:20  9  Sciences," and it's collaborative effort with the Food & Drug

09:13:24 10  Administration of the United States, the university in Basel,

09:13:28 11  Switzerland, and the University of California San Francisco.

09:13:31 12  Q.  Okay.  And how often do you teach that course?

09:13:33 13  A.  Well, I started that course while I also was working in other

09:13:39 14  jobs, so it wasn't a full-time job.  But I very much believe in

09:13:43 15  education, and so I started this course in 2007 and I continued

09:13:50 16  teaching that course, organizing 120 faculty, the hundreds of

09:13:54 17  students, taught it on both the West Coast and the East Coast.  On

09:13:58 18  the East Coast it was in Washington, D.C., on the West Coast it was

09:14:01 19  in San Francisco, California -- different types of companies and

09:14:06 20  investigators who come to that.

09:14:08 21          And then in 2011, I had to drop my position as director

09:14:13 22  because I started another position where they thought it might be a

09:14:16 23  conflict of interest to have a professorship at a university while

09:14:21 24  I was also working in this other position.  So another colleague

09:14:25 25  took on that position but I am invited as a speaker and I guess as

09:14:30  1    Emeritus to come back to teach in that course.

09:14:32  2    Q.  Thank you.

09:14:33  3        I want to highlight a couple of things here, and it says

09:14:38  4    here that you worked at the National Cancer Institute.  Can you

09:14:44  5    first tell us, what is the National Cancer Institute?

09:14:46  6    A.  So the National Cancer Institute is sort of what it sounds

09:14:51  7    like.  It's the nation's -- the United States' premier research

09:14:57  8    institute for funding and for the conduct of research.  And it's 27

09:15:02  9    different institutes.  It was started in the 1950s.  And I probably

09:15:09  10   worked in the largest institute at the National Institutes of

09:15:11  11   Health, which is the National Cancer Institute.

09:15:14  12   Q.  And it says you held a couple of positions, including deputy

09:15:18  13   director and acting director.

09:15:20  14       What were you acting director of?

09:15:22  15   A.  Well, I was acting director of the entire division and that had

09:15:26  16   a $5 billion budget.  But basically, what it is is different -- for

09:15:34  17   the -- actually, for the National Cancer Institute, my budget was a

09:15:37  18   little bit smaller than that.  But basically, it was covering the

09:15:42  19   realms of cancer therapy, evaluation program, which is all the

09:15:47  20   nation's clinical trials networks where we enroll over 25,000

09:15:52  21   patients a year in large clinical trials and then several thousand

09:15:59  22   patients a year in what we call the "first-in-human" or the Phase I

09:16:03  23   clinical trials.

09:16:03  24       And then as part of that work on clinical trial design,

09:16:09  25   evaluating the design and objectives of studies, looking at

09:16:13   1   interpretation of data from those studies, and helping inform the

09:16:17   2   investigators and the sponsors of those studies, providing them

09:16:22   3   comments and feedback on how perhaps they can improve the design of

09:16:26   4   their study.  And then sometimes we held what's called the "IND" to

09:16:31   5   actually run the study.

09:16:32   6        The other parts -- so that's the cancer therapy

09:16:35   7   evaluation program.  The other parts of that division also include

09:16:39   8   the developmental therapeutics program, which is actually where the

09:16:44   9   taxanes were developed while, you know, I was at the National

09:16:49  10   Cancer Institute, as well as probably about 80 percent of the drugs

09:16:53  11   that were on the market at that time, at some point, had some

09:16:57  12   interactions with the National Cancer Institute, either with the

09:17:02  13   drug therapy evaluation -- with the cancer therapy evaluation

09:17:05  14   program or perhaps with some preclinical work that needed to be

09:17:09  15   done or even it could be some manufacturing issues.  But at any

09:17:13  16   rate, that's the developmental therapeutics program.

09:17:17  17        The other major programs in the division included the

09:17:20  18   cancer imaging program.  For example, mammography, which is

09:17:25  19   utilized in the detection of breast cancer is evaluated there, and

09:17:29  20   actually, I helped launch the breast cancer screening program, the

09:17:33  21   50,000-person clinical trial to evaluate digital versus the

09:17:37  22   standard film imaging for patients with breast cancer.  And that

09:17:42  23   won approval from the FDA for the new imaging technologies.

09:17:47  24        But the imaging program works on a broad array of

09:17:51  25   standard, conventional imaging that you might be familiar with --

09:17:55  1    CT scans, MRIs -- but also has very novel imaging.

09:18:00  2           In addition, we developed very small imaging devices that

09:18:05  3    can be used in animals so that before the study got to humans, the

09:18:11  4    manufacturer could evaluate their product in those studies --

09:18:17  5    Q.  Let me ask you -- I hate to interrupt on that because I want to

09:18:19  6    try to stay with the human stuff, but you said something taxanes

09:18:23  7    were developed.

09:18:24  8           Which taxane was developed the first at NCI?

09:18:27  9    A.  Oh, Taxol.

09:18:27  10   Q.  Okay.  And are you familiar with the taxanes from your work

09:18:30  11   there?

09:18:30  12   A.  I am.  I actually wrote a chapter in a book on --

09:18:30  13   Q.  Okay.

09:18:33  14   A.  -- on taxanes.

09:18:34  15   Q.  Are you familiar with other drugs used in breast cancer, like

09:18:39  16   Adriamycin and cyclophosphamide?

09:18:40  17   A.  Yeah.  I'm a board-certified medical oncologist as well as

09:18:44  18   board-certified in internal medicine, and I have 30 years of

09:18:47  19   experience in clinical trials, clinical research, taking care of

09:18:52  20   patients, been involved with clinical trials, and also am now

09:18:59  21   actively involved in product development, particularly in therapies

09:19:02  22   for cancer.

09:19:02  23   Q.  Okay.  And while you were at NCI, did you have any clinical

09:19:07  24   component to your work?

09:19:07  25   A.  Yes.  I worked in the clinical center at the National Cancer

1152

09:19:12  1   Institute between 1992 and 2004, which is when I left the National

09:19:17  2   Cancer Institute.

09:19:17  3   Q.   Okay.  And have you prescribed A and C?

09:19:22  4   A.   Have I prescribed A and C?

09:19:24  5   Q.   Excuse me -- Adriamycin and cyclophosphamide?

09:19:27  6   A.   Yes.  As part of the practice of medicine for cancer patients,

09:19:30  7   yes.  Particularly breast cancer patients.  Yes.

09:19:32  8   Q.   And you've been a licensed board-certified oncologist for how

09:19:36  9   long?

09:19:36 10   A.   I have been -- I believe the date is 1989 for oncology and 1984

09:19:42 11   for internal medicine.

09:19:44 12   Q.   Okay.

09:19:44 13   A.   So quite a few years.

09:19:46 14   Q.   And have Adriamycin -- has Adriamycin been around as long as

09:19:52 15   you've been practicing oncology?

09:19:54 16   A.   Oh, yes.

09:19:55 17   Q.   And has cyclophosphamide been around as long as you've been

09:19:59 18   practicing oncology or licensed to practice oncology?

09:20:01 19   A.   Yes.

09:20:01 20   Q.   Okay.

09:20:04 21   A.   Those drugs were discovered and developed quite early, decades

09:20:09 22   ago.

09:20:11 23   Q.   Okay.  I think I got a little off track -- I want to keep

09:20:15 24   marching through your CV.  It says on page 4 that you serve on some

09:20:23 25   company boards?

09:20:24  1   A.  I do serve on company boards.

09:20:26  2   Q.  Or a company board -- excuse me.  It says on your CV that -- I

09:20:30  3   apologize.

09:20:31  4        This CV was provided, I know last year, so are there any

09:20:36  5   other boards that you serve on?

09:20:37  6   A.  Yes.  I also am on the board of directors for a company called

09:20:41  7   NextCure.

09:20:42  8   Q.  Okay.  And did you start that when?

09:20:45  9   A.  2021.

09:20:50  10  Q.  Okay.  NextCure.

09:20:51  11       And what type products do those two companies where

09:20:55  12  you're sitting on the board of directors?  What do they develop?

09:20:58  13  A.  So they develop products for oncology and some of them also are

09:21:02  14  looking into other disease areas.

09:21:05  15  Q.  Okay.  When did -- do you know when the taxanes became

09:21:15  16  marketable or available medicines?

09:21:16  17  A.  Yes.

09:21:17  18  Q.  When was that?

09:21:18  19  A.  Well, I believe Taxol was first approved for metastatic breast

09:21:24  20  cancer 1994, and then was approved for the adjuvant use of earlier

09:21:30  21  stage breast cancer in 1999.

09:21:33  22  Q.  And what about Taxotere?

09:21:35  23  A.  And Taxotere was approved for metastatic breast cancer in 1996

09:21:40  24  by accelerated approval and then received standard approval in

09:21:45  25  1998.  In 2004, it received FDA approval in the treatment of

09:21:50  1   early-stage breast cancer as an adjuvant treatment.

09:21:53  2   Q.  Okay.  Thank you.

09:21:58  3       I want to keep looking through your CV for a moment.  Do

09:22:05  4   you still stay involved to this day with cancer research?

09:22:07  5   A.  Do I stay involved in cancer research?

09:22:10  6   Q.  Yes.

09:22:10  7   A.  Yes.  I have to stay involved in cancer research.  Part of my

09:22:13  8   work right now is advising companies and working individually with

09:22:18  9   companies to help develop their medical products.  So I have to be

09:22:21  10  involved with the underlying research, the science where the

09:22:27  11  interesting targets might be.

09:22:29  12  Q.  Okay.  I got a little bit off track again.  After you left

09:22:32  13  National Institute -- or, excuse me, National Cancer Institute,

09:22:36  14  where did you go?

09:22:36  15  A.  I went to head up clinical sciences and also to be a deputy

09:22:42  16  director of science at the Translational Genomics Research

09:22:47  17  Institute in Phoenix, Arizona.  And that institute was founded by

09:22:50  18  Jeff Trent, Dr. Trent, who is a colleague of Dr. Francis Collins.

09:22:55  19  So he's well-known in the genomics fields.  Francis Collins is

09:23:00  20  well-known for deciphering the human genome and Jeff Trent was his

09:23:05  21  colleague and started an institute in Phoenix and he asked me to

09:23:09  22  head up the clinical component of that institute.

09:23:12  23  Q.  Have you ever worked in the pharmaceutical industry?

09:23:14  24  A.  I have worked in the pharmaceutical industry.

09:23:16  25  Q.  And where was that?

09:23:17  1    A.  I was chief medical officer for one year at a company called

09:23:21  2    Insys, which was the first company to come to Phoenix, Arizona.  I

09:23:26  3    was their first medical officer and was involved in their initial

09:23:30  4    evaluation of their drug for cancer pain -- patients who had cancer

09:23:35  5    and intractable pain from the cancer.

09:23:37  6    Q.  Okay.  Have you ever worked at Amgen?

09:23:40  7    A.  And then I worked in a much larger global pharmaceutical

09:23:46  8    company, Amgen, as executive director in global development on --

09:23:49  9    primarily on oncology products, but also on some bone products as

09:23:54  10   well.

09:23:54  11   Q.  Okay.  I am just going to flip through sort of generally, but

09:23:58  12   it appears that you've been an invited speaker internationally?

09:24:07  13   A.  Yeah, sorry.

09:24:08  14   Q.  No, go ahead.  You have been?

09:24:10  15   A.  I have been invited as speaker nationally and internationally.

09:24:16  16   In 2013, I should note, I stopped writing down all of the speaking

09:24:21  17   engagements because it was just getting too tedious to update my

09:24:26  18   CV.

09:24:27  19   Q.  Okay.  And you mentioned something about being at the Sandra

09:24:33  20   Day O'Connor College of Law.  What do you do there?

09:24:35  21   A.  Since 2015, I've been on -- I am an adjunct professor at the

09:24:42  22   Sandra Day O'Connor College of Law where I teach two courses, one

09:24:46  23   on research ethics and the law, and the other on FDA drug law.

09:24:51  24   Q.  Okay.  And again, I am just going to go through sort of in a

09:24:57  25   summary fashion, but starting on page 15 you list your

09:25:02  1   publications?

09:25:03  2   A.   That's correct.

09:25:05  3   Q.   Okay.   And do you publish in peer-review literature?

09:25:08  4   A.   Yes, I do.

09:25:10  5   Q.   Okay.   And could you just explain briefly what peer review is

09:25:14  6   and what its purpose is?

09:25:15  7   A.   Well, peer review in the context of writing a paper or a

09:25:22  8   poster, an abstract for a conference, is where colleagues with

09:25:27  9   scientific expertise review the material that's been submitted, to

09:25:31  10  look at it for scientific content, for design, and, you know, the

09:25:35  11  rigger of how it was put together.   And often they can provide,

09:25:41  12  particularly with book chapters or papers, they can provide

09:25:45  13  feedback and comments.   Sometimes they can say, looks great.   Other

09:25:51  14  times they have a laundry list of suggestions that would make it a

09:25:55  15  better fit for publication.   And other times they may reject it

09:26:01  16  because it doesn't meet their standards.

09:26:04  17  Q.   Okay.   To me that sounded like a scientist's explanation and I

09:26:10  18  would like to try to put the cookies on a lower shelf.   Can you

09:26:13  19  tell us in layman's terms what is peer review for?

09:26:16  20  A.   Peer review is to check the credibility and the work that's

09:26:23  21  been submitted to them to see whether it rises to the top to be

09:26:29  22  published.

09:26:33  23          MR. MICELI:   Okay.   At this time, I would like to tender

09:26:35  24  Dr. Ellen Feigal as an expert in clinical research, study design,

09:26:38  25  and interpretation in general causation.

09:26:41  1            THE COURT:  Any objection?

09:26:45  2            MR. STRONGMAN:  Just the ones previously raised.

09:26:47  3            THE COURT:  Okay, thank you.  The Court is going to

09:26:48  4    accept Dr. Ellen Feigal as an expert in clinical research, study

09:26:52  5    design, and interpretation.  Study design and interpretation and,

09:26:55  6    in general, causation qualify to render opinions in those fields.

09:27:01  7    Please proceed.

09:27:01  8            MR. MICELI:  Thank you, Your Honor.

09:27:03  9                          DIRECT EXAMINATION

09:27:04  10   BY MR. MICELI:

09:27:04  11   Q.  Dr. Feigal, at my request, did you investigate the chemotherapy

09:27:07  12   drug Taxotere to determine if scientific evidence demonstrates that

09:27:11  13   Taxotere can cause or causes permanent hair loss?

09:27:14  14   A.  Yes.  I was asked to investigate and review the issue and make

09:27:19  15   a conclusion regarding that.

09:27:21  16   Q.  Just again at sort of a high level, what did your investigation

09:27:26  17   include?

09:27:26  18   A.  Well, my investigation included looking at the literature as we

09:27:31  19   just talked a second ago about peer review.  I looked at

09:27:35  20   publications, I looked at abstracts, I looked at posters using -- I

09:27:42  21   did a search of the worldwide literature with a software program to

09:27:46  22   pick up the articles that would be relevant to my review.  And the

09:27:50  23   relevant review issues I wanted to look at is the types of

09:27:56  24   chemotherapy that patients with early-stage breast cancer receive,

09:28:01  25   whether or not there was evidence in the paper that they looked at

09:28:07  1    persistent, permanent, or irreversible alopecia, and also that it

09:28:12  2    was in patients with early-stage breast cancer.

09:28:15  3    Q.  Okay.  Did you look at anything internal to Sanofi?

09:28:19  4    A.  I looked at several documents internal to Sanofi, including

09:28:23  5    the -- what's called a clinical study report of their randomized

09:28:29  6    clinical trials.

09:28:31  7         Do you want me to explain what that is?

09:28:33  8    Q.  Yes, please explain.

09:28:33  9    A.  So a clinical trial, I don't know how much you've already

09:28:37  10   heard, particularly a pivotal clinical trial that a manufacturer

09:28:41  11   like Sanofi would take into consideration is careful planning,

09:28:48  12   design of the appropriate objectives, make sure it's executed by

09:28:52  13   what we call a protocol according to what the protocol defines, and

09:28:59  14   analyze by what, when and how they said they were going to analyze

09:29:03  15   the data that came from that trial.  And then communicated the

09:29:09  16   results in an accurate and truthful way.  And the analysis is

09:29:14  17   prespecified in that -- by that I mean, they have to put in a plan

09:29:20  18   about how they're going to analyze the data, when they're going to

09:29:24  19   analyze it, what they're going to analyze.  And that has to be

09:29:28  20   decided before the results of the study are known.

09:29:32  21   Q.  Okay.  And did you look at anything else with regard to the

09:29:36  22   clinical studies?

09:29:37  23   A.  Yes.  So in addition to the randomized clinical studies, I also

09:29:41  24   looked at their pharmacovigilance database.  And that contains

09:29:47  25   safety reporting.  And I was particularly interested in the safety

09:29:51  1  reporting as it pertains to permanent or persistent alopecia.

09:29:56  2  Q.  Okay.  And which clinical studies did you review?

09:30:00  3  A.  The clinical studies that I reviewed was the TAX316 study,

09:30:07  4  which is the randomized clinical trial in early-stage breast cancer

09:30:13  5  that have lymph node involvement, where they were randomized to a

09:30:17  6  Taxotere containing arm and a non-Taxotere containing arm.

09:30:20  7  Q.  Okay.  I just want to know -- we're going to get into that in a

09:30:23  8  minute.  I want to know which ones you looked at.  So you looked at

09:30:28  9  TAX316.

09:30:29 10       What else did you look at, Doctor?

09:30:30 11  A.  I looked at -- that was going to be my very next sentence.  I

09:30:33 12  looked at what's called TAX301, which is the randomized clinical

09:30:39 13  trial using the exact same chemotherapy regimens except this time

09:30:42 14  it was looking at early-stage breast cancer patients who did not

09:30:46 15  have lymph node involvement.

09:30:48 16  Q.  Okay.  And did you look at them in a combined fashion as well?

09:30:50 17  A.  I looked at both studies and then -- yes, I looked at the

09:30:58 18  results from both studies.

09:31:00 19  Q.  Okay.  Did you look at a meta-analysis of the studies?

09:31:03 20  A.  I looked at a meta-analysis of the study that was conducted by

09:31:09 21  Dr. Madigan.

09:31:10 22  Q.  Okay.  I want to talk to you a little bit about that.  You said

09:31:14 23  randomized controlled trials.  And I want to try to use TAX316 as

09:31:20 24  an example of what that is.  Can you tell us what a randomized --

09:31:24 25  using TAX316 as an example, what is a randomized controlled trial?

09:31:34  1    A.  Do you want me to start?

09:31:36  2    Q.  Yeah.  I want you to tell us -- let me ask you this.  Let me

09:31:39  3    break it down.

09:31:40  4         What is randomization?

09:31:43  5    A.  Randomization in simple terms is you're at random.  You're

09:31:48  6    enrolled in one arm of your study or the other end, the other arm

09:31:53  7    of the study in a two-arm study.  So it's like a flip of a coin,

09:31:58  8    except, you know, heads you go to arm one, tails you go to arm two.

09:32:04  9    Except in a clinical trial there's a computer algorithm, not a flip

09:32:09 10    of a coin.

09:32:10 11    Q.  Okay.  And so how many arms were there in TAX316?

09:32:13 12    A.  There were two, what I call, parallel arms in TAX316.  They

09:32:19 13    were running at the same time.

09:32:21 14    Q.  All right.  So if there are two arms, would it be accurate to

09:32:25 15    put them like this, where you go to one side or the other?

09:32:27 16    A.  Yes, that would be accurate.

09:32:29 17    Q.  Okay.  And what were the two arms -- excuse me.  What

09:32:33 18    medications were received in those two arms?

09:32:35 19    A.  So in one of the arms, Taxotere was included.

09:32:41 20    Q.  And I mean, is it just Taxotere alone?

09:32:43 21    A.  No.  I was going to explain in a slightly different way.  So if

09:32:46 22    you write down Taxotere in arm one and then 5-FU in arm two, and

09:32:52 23    then both arms had what's called AC.  That was common across both

09:32:57 24    arms.

09:32:58 25    Q.  When you say AC, you're referring to what?

1161

09:33:00  1    A.   The AC are the standard chemotherapy drugs.  As I said, they've

09:33:05  2    been around for decades, like 40 years.  A is Adriamycin and C is

09:33:11  3    cyclophosphamide.

09:33:13  4    Q.   To save time and to not demonstrate my poor penmanship, I am

09:33:17  5    just going to use TAC and FAC; is that okay?

09:33:19  6    A.   Of course.

09:33:29  7    Q.   Okay.  Okay.  What's the significance of having two arms like

09:33:35  8    this in a randomized controlled -- well, you know, we talked about

09:33:39  9    randomization.

09:33:40  10             What is control?

09:33:42  11   A.   Well, this is a randomized control where you actually have a

09:33:45  12   standard arm -- what we do often in oncology is we don't use

09:33:52  13   placebos.  Because it wouldn't be ethical when there's a standard

09:33:56  14   chemotherapy that's available to the patient.  So the control arm

09:34:01  15   would be the FAC.

09:34:05  16   Q.   Okay.  What would you call the A and C in both of these?

09:34:10  17   A.   The A and C are the common denominator in both of them.  And

09:34:15  18   then the standard regimen, what often you do in oncology is you

09:34:18  19   add-on your investigational product to standard therapy.

09:34:25  20   Q.   Okay.  You said investigational product.  Which is the

09:34:27  21   investigational product in the TAX316 study?

09:34:31  22   A.   Taxotere.

09:34:31  23   Q.   Okay.  I am going to put a diamond around Taxotere.  What would

09:34:38  24   you call the 5-FU, the F?

09:34:42  25             What is that drug?

09:34:43  1   A.  Well, that's part of the standard therapy.  But that's the

09:34:46  2   difference.  AC is common across both arms, F is the variable.

09:34:52  3   Q.  Okay.  So --

09:34:54  4   A.  In the control arm.  But it's part of standard chemotherapy.

09:34:57  5   Q.  Okay.  You said AC is common in both arms?

09:35:00  6   A.  Yes.  There's AC -- every single patient gets Adriamycin and

09:35:06  7   cyclophosphamide.  And because -- well, do you want me to stop

09:35:11  8   there?

09:35:11  9   Q.  Well, tell us what the significance is of AC being given in

09:35:15 10   both arms?

09:35:16 11   A.  The significance is that this is Sanofi's well-designed trial

09:35:22 12   that they were using as a pivotal trial to get approval of their

09:35:27 13   drug Taxotere.  So they wanted to isolate the contribution of

09:35:31 14   Taxotere to standard chemotherapy.  And this is a perfect way to do

09:35:37 15   it, is you control all of the variables except the drug, their drug

09:35:42 16   that they want to get approved for this indication.

09:35:45 17   Q.  Okay.  So are you saying that they're really comparing T to F?

09:35:50 18   A.  Basically.

09:35:51 19   Q.  Okay.  Would it be appropriate to call F the comparator drug?

09:35:56 20   A.  Yes, you could.

09:35:58 21   Q.  Okay.  So I am going to put a circle around F.  And so it's T

09:36:02 22   versus F and because AC is common in both, can you attribute the

09:36:08 23   cause of either benefit or risk to AC in TAX316?

09:36:12 24   A.  Not at all.

09:36:13 25   Q.  Okay.  If you can't do it, is it appropriate to just X them

09:36:18  1   out?

09:36:19  2   A.  It's fine because it's common in both arms.  You don't learn

09:36:23  3   anything about A and C from that trial.

09:36:25  4   Q.  Okay.  What are you trying to learn in this trial?

09:36:28  5   A.  Whether Taxotere improves disease-free survival or overall

09:36:34  6   survival in patients with early-stage breast cancer and you're also

09:36:37  7   trying to isolate whether there's any differences in safety,

09:36:40  8   including the ongoing alopecia.

09:36:43  9   Q.  Okay.  Now, we used TAX316 as an example.  Was TAX 301 or the

09:36:52  10  GEICAM study done the same way?

09:36:53  11  A.  The TAX301 or also what we call GEICAM 9805 is the identical

09:37:01  12  design, the identical chemotherapy regimens, the only difference is

09:37:07  13  that the patients with early-stage breast cancer do not have lymph

09:37:12  14  node involvement.

09:37:12  15  Q.  And I think you may have already answered this for us, but what

09:37:18  16  is the benefit of doing a randomized controlled trial in the

09:37:24  17  context of clinical research?

09:37:26  18  A.  You're trying to do comparisons.  And in this instance, you're

09:37:31  19  trying to show the superiority of Taxotere.

09:37:35  20  Q.  Over --

09:37:36  21  A.  As a manufacturer, over the conventional therapy.

09:37:39  22  Q.  So would that be the T versus the F we were talking about?

09:37:43  23  A.  Yes.

09:37:44  24  Q.  Okay.  Now, does this mean -- well, let me back up a little

09:37:53  25  bit.  I think I got a little bit ahead of myself.  You said you

09:38:02   1   conducted an investigation.  And did you reach any conclusions in

09:38:07   2   your investigation?

09:38:08   3   A.  Yeah.  Based on my education, my training, my over 30 years of

09:38:14   4   experience in product development in oncology, I reached a

09:38:20   5   reasonable degree of certainty that Taxotere can indeed cause

09:38:24   6   permanent chemotherapy-induced alopecia in patients with

09:38:29   7   early-stage breast cancer.

09:38:29   8   Q.  Now, does that mean that every woman that takes Taxotere is

09:38:33   9   going to get permanent alopecia?

09:38:35  10   A.  No.  It -- no.  It doesn't mean that every woman gets it, only

09:38:42  11   a proportion can get it.  The issue we have is that we don't know

09:38:46  12   up front who is at risk to get the side effect.

09:38:49  13   Q.  Okay.  You might have answered my next question.  Is there any

09:38:55  14   way to tell who is at risk for permanent alopecia before they

09:38:58  15   receive it -- before they receive Taxotere?

09:39:01  16   A.  I mean, in terms of the permanent chemotherapy-induced

09:39:06  17   alopecia, there is no way to identify a patient at baseline whether

09:39:10  18   they will be at increased risk for developing this particular side

09:39:15  19   effect.  So essentially, every woman who takes the regimen is

09:39:19  20   potentially at risk, because we aren't able to identify

09:39:23  21   specifically who is going to get it out of the population that

09:39:28  22   might be exposed to the drug.

09:39:29  23   Q.  Okay.  Now, before we get into how you conducted this, I want

09:39:34  24   to ask you:  Are you familiar with an expert that plaintiffs

09:39:39  25   retained by the name of Antonella Tosti?

09:39:42  1    A.  Yes.

09:39:43  2    Q.  What is your understanding of the difference of what we asked

09:39:46  3    you to do and what you did and what Dr. Tosti did?

09:39:49  4    A.  So what I did is look at whether Taxotere can cause permanent

09:40:00  5    chemotherapy-induced alopecia.

09:40:01  6            What Dr. Tosti did is look at the question:  Did Taxotere

09:40:06  7    cause permanent chemotherapy-induced alopecia in Ms. Kahn?

09:40:14  8    Q.  Okay.

09:40:15  9    A.  So very different activities.  I was looking at can it do it,

09:40:20  10   she was looking at did it do it in this particular patient.

09:40:23  11   Q.  In the work that you did of trying to determine or determining

09:40:25  12   whether Taxotere can cause permanent chemotherapy-induced alopecia,

09:40:31  13   was it necessary for you to review medical records for Mrs. Kahn or

09:40:37  14   Ms. Kahn?

09:40:38  15   A.  I reviewed no medical records of Mrs. Kahn and it wasn't

09:40:43  16   necessary to do so.

09:40:44  17   Q.  Do you offer any plaintiff or patient-specific opinions in this

09:40:50  18   case?

09:40:50  19   A.  I am not offering any patient-specific opinions or conclusions

09:40:57  20   in this case.

09:40:57  21   Q.  Okay.  Now, let's get to the other stuff.  What did you do to

09:41:04  22   investigate whether or not Taxotere is causally related to

09:41:11  23   permanent chemotherapy-induced alopecia?

09:41:11  24   A.  Well, I reviewed the world literature on the topic with the

09:41:17  25   items that we talked about, whether the endpoint of permanent,

───OFFICIAL TRANSCRIPT───

09:41:21 1 persistent, or irreversible alopecia was part of the publications,

09:41:26 2 whether or not it was in early-stage breast cancer, and also sort

09:41:30 3 of a litany -- not litany, but a list of the different chemotherapy

09:41:35 4 agents are used in early-stage breast cancer.  They included

09:41:39 5 Taxotere, but it also included Taxol, Adriamycin, cyclophosphamide,

09:41:44 6 all of the drugs that Ms. Kahn may have been exposed to in her

09:41:51 7 NSABP-40 trial.  But I only did that to make sure.  I picked up all

09:41:55 8 the different drugs that a patient with early-stage breast cancer

09:41:59 9 might get.  And those were the papers I pulled to investigate, in

09:42:06 10 addition to the Sanofi's documents that we just spoke about.

09:42:08 11 Q.  Okay.  I was just going to ask about Sanofi's documents.  Did

09:42:13 12 you review any of Sanofi's employees' or former employees'

09:42:15 13 depositions?

09:42:16 14 A.  Yes.  I did review particularly the global safety officer

09:42:21 15 deposition.

09:42:21 16 Q.  Okay.

09:42:41 17         MR. MICELI:  Can I approach the witness, Your Honor?

09:42:43 18         THE COURT:  Yes, you may.

09:42:47 19 BY MR. MICELI:

09:42:51 20 Q.  Can you identify -- Doctor, can you identify Plaintiff's

09:43:01 21 Exhibit 626?

09:43:03 22 A.  Yeah.  This is the -- this appears to be the TAX316 set

09:43:09 23 protocol.

09:43:10 24 Q.  Okay.  And did you review this in preparation for giving

09:43:12 25 opinions?

09:43:13  1    A.   Yes.   I did review the protocol TAX316.

09:43:17  2    Q.   I want to ask you to turn to the page that ends at the bottom

09:43:22  3    here in 6585.

09:43:29  4    A.   6585?

09:43:30  5    Q.   Yes, ma'am.   The Bates number down at the bottom right corner?

09:43:33  6    A.   Yeah, I see that.

09:43:34  7    Q.   Are you there with me?

09:43:36  8    A.   Rationale?

09:43:37  9    Q.   Yes, ma'am.

09:43:38 10    A.   Yes, I am there.

09:43:39 11    Q.   Thank you, Dr. Feigal.

09:43:41 12         At the bottom of that page, the protocol, the third

09:43:45 13    paragraph from the bottom describes some of the study.   Can you

09:43:52 14    read that and just -- not out loud -- but just interpret that for

09:43:58 15    us what the study authors or the study investigators were

09:44:03 16    describing when they say, "The simplicity of design is with one

09:44:08 17    appropriate question, is the essence of good adjuvant trials"?

09:44:12 18    A.   Well, in English, I think what it's referring to is the ability

09:44:16 19    to isolate the contribution of Taxotere, which is the drug that

09:44:22 20    Sanofi wants to get approved.   You're able to isolate the effects

09:44:27 21    of that contribution on both efficacy and safety by the design of

09:44:32 22    this clinical trial.

09:44:33 23    Q.   Okay.   And I think you referred earlier that it was well

09:44:36 24    designed and randomization was done well?

09:44:40 25    A.   Yes.   It appeared to be what I call well executed

09:44:46  1    randomization.

09:44:56  2              MR. MICELI:  Okay.  I apologize for one moment.

09:44:56  3    BY MR. MICELI:

09:45:01  4    Q.  What are the purpose of protocols like we have in front of you?

09:45:04  5    A.  Well, in a clinical trial, the purpose of the protocol is this

09:45:08  6    has been defined by the company, presumably in collaboration in

09:45:13  7    talking with their investigators who will have to conduct the

09:45:16  8    protocol, and it has very specific items that have to be followed

09:45:20  9    in terms of the dosing, the administration, when you can change the

09:45:25 10    dosing or the frequency administration.  It has the objectives, it

09:45:30 11    has the design, it has how we're going to analyze it, it has a

09:45:34 12    statistical section, and it has -- it's very specific in terms of

09:45:38 13    what an investigator needs to follow in order to be compliant with

09:45:43 14    following the protocol.

09:45:44 15    Q.  Okay.  If someone were to suggest that it were impossible to

09:45:50 16    determine that a single drug in a regimen caused an injury like

09:45:54 17    PCIA, what would your response be?

09:45:56 18    A.  Well, what I would say is this trial formed the basis of

09:46:00 19    approval for Taxotere.  So you can use it for efficacy but you can

09:46:07 20    also use it for safety to look to see if there's any differences in

09:46:12 21    the safety profile as compared to the comparator.

09:46:16 22    Q.  Is there any reason why a study would be randomized and

09:46:26 23    controlled properly enough to demonstrate efficacy to a point of

09:46:28 24    getting a drug approved but be somehow insufficient to demonstrate

09:46:32 25    other perhaps adverse effects of the drug?

09:46:37  1  A.  There's no reason that you can't look at the comparison between

09:46:42  2  the investigational regimen and the comparator.  I think the main

09:46:49  3  issue is most trials are powered to look at the primary endpoint of

09:46:55  4  efficacy but you still are able to look at safety issues and, in

09:46:59  5  some instances, find statistical significance, particularly when

09:47:03  6  you use the meta-analysis to combine identically designed clinical

09:47:10  7  trials with the exact same regimen.

09:47:11  8  Q.  Okay.  You used a term there "adequately powered."  Just so

09:47:16  9  we're clear, when you're talking about power in a clinical study or

09:47:20 10  meta-analysis, what are you referring to?

09:47:22 11  A.  I am referring really to the number of patients you need to see

09:47:26 12  X number of events.  And so that helps guide the -- I am not a

09:47:31 13  biostatistician, but it helps -- but I am certainly familiar with

09:47:35 14  the types of issues they need to deal with.  And so this is --

09:47:38 15  actually helps inform how big you need to make the trial and how

09:47:43 16  many looks you can have at the data.  And actually for TAX316, I

09:47:49 17  believe they actually had to add an additional look at the data to

09:47:54 18  check their assumptions about the clinical size.

09:48:13 19      MR. MICELI:  Counsel agrees I can show Table 1 from the

09:48:16 20  Mackey study.

09:48:16 21      THE COURT:  Please proceed.

09:48:20 22  BY MR. MICELI:

09:48:21 23  Q.  I am going to ask you to look at this chart with us.  And I'll

09:48:25 24  represent to you it comes from a publication of the TAX316 study

09:48:30 25  we've agreed with counsel.  And the table is titled "Baseline

09:48:37 1   Patient and Tumor Characteristics."

09:48:40 2           Do you see that?

09:48:41 3   A.  Yes, I do see that.

09:48:42 4   Q.  Okay.  I want to go over with you just a couple of things.

09:48:47 5   Randomization of TAX316.  And you see it lists the TAC and the FAC

09:48:51 6   groups -- arms?

09:48:52 7   A.  Yes.  I see the two different arms.

09:48:54 8   Q.  When you look at a table like this and you see that both arms

09:48:59 9   had an average age of 49, and the premenopausal populations are

09:49:07 10  within two percentage points, and the numbers that had mastectomies

09:49:13 11  are within one point of each other.  I am going to stop there for a

09:49:16 12  moment.

09:49:16 13          What does that tell you about the quality of

09:49:19 14  randomization?

09:49:20 15  A.  So when you randomize, the reason is you're trying to get an

09:49:27 16  equal distribution on both arms, that it's not weighted one way or

09:49:33 17  the other, and that you're looking at comparable populations of

09:49:37 18  patients with early-stage breast cancer.

09:49:40 19          In the particular instance, he's looking at the age.  So

09:49:43 20  these are characteristics of the patient, whether or not they're

09:49:46 21  premenopausal or postmenopausal.  And these are characteristics of

09:49:51 22  the patients and they can be variables that impact on outcome.  So

09:49:57 23  what you want to do with randomization is control all those

09:50:00 24  variables.

09:50:02 25  Q.  Okay.  I want to move down a little bit.  And note that there's

09:50:06  1   a line for tamoxifen that 68 percent of the women in the TAC arm

09:50:12  2   and -- excuse me -- 68 percent of the women in the TAC arm and

09:50:20  3   69 in the FAC arm received tamoxifen.

09:50:23  4            Is that good randomization and balance?

09:50:26  5   A.  Yes, that's good balance.  So what you're seeing is the

09:50:29  6   relatively equal numbers of -- so one of the things you look at is

09:50:34  7   the patient themselves.  The other thing you look at is maybe other

09:50:38  8   medications they needed to be on that might be important as a

09:50:42  9   variable.  And here you can see it's equal on both arms.

09:50:46 10   Q.  Okay.  And I want to move down just a little bit farther.

09:50:52 11   Hormone receptor positive, both arms, the Taxotere arm and the 5-FU

09:50:58 12   arm both had 76 percent of their patients were hormone receptor

09:51:05 13   positive.

09:51:05 14            Is that demonstration of good randomization?

09:51:08 15   A.  Yeah.  So what he's talking about here, so we talked about the

09:51:11 16   patient characteristics, we talked about other concomitant meds

09:51:16 17   relevant to breast cancer, and here we're talking about the tumor

09:51:19 18   itself.  Because if a tumor has hormone markers on it, then they're

09:51:25 19   eligible to receive the endocrine therapy or the anti-endocrine

09:51:30 20   therapy tamoxifen.

09:51:32 21   Q.  Okay.  And up top, we just went over, tamoxifen was one point

09:51:36 22   difference in the groups, correct?

09:51:38 23   A.  Correct.

09:51:39 24   Q.  Okay.  All right.  Now, having looked at sort of how TAX --

09:51:48 25   A.  Can I add one more comment on that table?

09:51:51  1              THE COURT:  Wait.  I think you need to ask a question.
09:51:54  2   BY MR. MICELI:
09:51:55  3   Q.  Would you like to make another comment on this table?
09:51:57  4   A.  I don't have to.  It's fine.
09:51:58  5   Q.  Okay.  Thank you.
09:51:59  6   A.  Okay.
09:52:02  7   Q.  With regard to the TAX316 study and the meta-analysis you
09:52:10  8   discussed, what did you find?
09:52:12  9   A.  That there was a statistic -- well, first of all, the drug did
09:52:19 10   get approval for the efficacy endpoint.  But the issue I was
09:52:22 11   looking at is the permanent, persistent chemotherapy-induced
09:52:27 12   alopecia -- perhaps for the purpose of this trial, I'll just say
09:52:31 13   PCIA, that there was a statistically significant difference.  So
09:52:35 14   there was an increased risk in the Taxotere-containing regimen
09:52:40 15   versus the standard chemotherapy.
09:52:43 16   Q.  Okay.  Now, aside from the --
09:52:50 17              THE COURT:  Is this a good break point?
09:52:52 18              MR. MICELI:  It could be, yes, Your Honor.
09:52:54 19              THE COURT:  Okay.  It's about time for our morning break.
09:52:57 20   Court will be at recess for ten minutes.
09:53:04 21              THE DEPUTY CLERK:  All rise.
09:53:06 22     (WHEREUPON, THE JURY EXITED THE COURTROOM.)
09:53:30 23              THE COURT:  You just can't discuss your testimony.
09:53:33 24              MR. MICELI:  Right.  You don't have to sit there and
09:53:36 25   wait.

09:53:37 1          THE WITNESS:  Shall I leave all of this here?

09:53:39 2          THE COURT:  Yes.

09:53:40 3      (WHEREUPON, A RECESS WAS TAKEN.)

10:05:44 4      (OPEN COURT.)

10:05:45 5          THE COURT:  All jurors are present.  Court's back in

10:05:47 6  session.  You may be seated.

10:05:49 7          Mr. Miceli, please proceed.

10:05:51 8          MR. MICELI:  Thank you, Your Honor.

10:05:52 9          THE COURT:  Excuse me, Dr. Feigal.  I remind you you're

10:05:55 10  under oath.

10:05:56 11          THE WITNESS:  Yes, thank you.

10:05:57 12          MR. MICELI:  Thank you.

10:05:58 13  BY MR. MICELI:

10:06:00 14  Q.  Dr. Feigal, before we broke, we just finished talking about

10:06:05 15  clinical trial and meta-analysis.  And I want to ask, aside from

10:06:09 16  the randomized controlled trials and the meta-analysis, you'd

10:06:14 17  mentioned earlier about a literature review or a literature search

10:06:17 18  you performed?

10:06:18 19  A.  Yes.

10:06:18 20  Q.  Can you briefly explain how you did that?

10:06:21 21  A.  Yeah.  As I briefly explained earlier, I did a literature

10:06:26 22  search doing a PubMed search engine and basically used

10:06:32 23  different search terms that are relevant for the issue at hand, the

10:06:35 24  different types of chemotherapy that are used, and patients with

10:06:40 25  early-stage breast cancer, the topic early-stage breast cancer and

10:06:45  1    then whether or not there were the words permanent, persistent, or

10:06:50  2    irreversible alopecia.

10:06:52  3    Q.   Okay.  And what did you learn from conducting your search in

10:06:55  4    reviewing the articles?

10:06:57  5    A.   It pulled up a number of articles that were relevant to the

10:07:01  6    topic that I was investigating.  And then I reviewed each of the

10:07:05  7    articles and deciphered information -- gleaned information from

10:07:12  8    each of the publications that I reviewed.

10:07:15  9    Q.   Okay.  And, you know, we talked about randomized controlled

10:07:20 10    trials.  Are these articles written about randomized controlled

10:07:24 11    trials, or are they something different?

10:07:25 12    A.   So there's a different hierarchy of evidence when you look at

10:07:29 13    studies in the literature.  There can be -- there can be randomized

10:07:35 14    controlled trials, they can be prospectively controlled clinical

10:07:40 15    trials that are not randomized, there can be case series, case

10:07:45 16    reports, and then there's different types of what I call

10:07:48 17    observational studies.  And these are the case studies, the case

10:07:53 18    series.  And what I had -- and I hope I'm still answering your

10:07:59 19    question and tell me if I am --

10:08:01 20    Q.   Let me ask it a little differently.  How many articles did you

10:08:05 21    find?

10:08:05 22    A.   There were 19 articles that were relevant to the topic at hand.

10:08:08 23    Q.   Were any of them from randomized trials?

10:08:11 24    A.   None of them were from randomized clinical trials, as I recall.

10:08:15 25    There may have been -- actually, the King article might have

10:08:20  1    been -- no, those were all observational studies, as I recall.

10:08:24  2    There was one controlled clinical trial by an investigator named

10:08:28  3    Nabholtz.

10:08:29  4    Q.  Okay.  Did you -- in these observational studies, did they ever

10:08:36  5    have comparator arms?

10:08:37  6    A.  Yeah.  Several of the studies did have comparator arms in their

10:08:41  7    studies.

10:08:41  8    Q.  And what does an observational study with a comparative arm

10:08:45  9    allow you to do?

10:08:45 10    A.  Well -- I'm sorry, what was the last part of your question?

10:08:48 11    Q.  Let me withdraw that.  I want to see if I can't educate myself

10:08:52 12    a little bit better.

10:08:54 13         When you have an observational study that has a

10:08:58 14    comparator arms, can you describe what that would look like?

10:09:01 15    A.  Yeah.  So an observational study that has a comparator arm

10:09:05 16    means the intervention is given.  In this particular instance,

10:09:10 17    there's not an -- the investigator assigns the intervention, okay.

10:09:19 18    And there are -- there can be different patient -- there can be

10:09:24 19    patient populations all with early-stage breast cancer, but I'll

10:09:28 20    give you an example because it's easier to explain with an example

10:09:32 21    than hypothetical.

10:09:33 22         In the Sedlacek article from 2006, there's an arm that

10:09:37 23    contains Taxotere regimen, and then there are two arms that don't

10:09:42 24    have any Taxotere in the regimen.  We called them non-Taxotere

10:09:47 25    regimens.  One was an AC, Adriamycin and cyclophosphamide arm

1176

10:09:53  1  without any taxanes at all, and the other arm was Adriamycin and

10:09:59  2  cyclophosphamide with one of the other taxanes we discussed

10:10:04  3  earlier, a drug called Taxol.

10:10:06  4  Q.  Okay.  And --

10:10:09  5  A.  To get to your question, though --

10:10:11  6  Q.  We'll talk about Sedlacek later, I promise you.  I want to just

10:10:14  7  sort of get the description of what it allows you to do if you have

10:10:17  8  two arms or more that you can compare.

10:10:20  9  A.  Yeah.  So you know the denominator of who was exposed to the

10:10:24 10  drug of the interest, in this case, Taxotere.  And then you have

10:10:28 11  the comparators of the non-Taxotere containing regimens, and you

10:10:33 12  have the denominator of those people who were exposed.  Not to

10:10:38 13  Taxotere but to non-Taxotere regimens.

10:10:41 14          And then those are followed prospectively to see how many

10:10:47 15  patients developed permanent chemotherapy-induced alopecia.  So

10:10:53 16  it's great for looking at risk.  Is there an increased risk in the

10:10:59 17  Taxotere -- or, you know, in one of the arms compared to the other

10:11:02 18  arms.

10:11:03 19  Q.  Okay.  Now, after conducting your literature search and

10:11:06 20  reviewing the articles, did you come to any conclusions about what

10:11:08 21  the literature showed you?

10:11:10 22  A.  Yeah.  The literature showed there were at least four articles

10:11:14 23  in which there was a Taxotere-containing regimen and also

10:11:19 24  non-Taxotere regimens.  And the reason why that's important, or

10:11:24 25  would you rather me wait?

10:11:26  1   Q.  No.  I mean, I must have asked a poor question.  I'll just want

10:11:30  2   to ask you generally about all of the articles in the 19 you

10:11:30  3   mentioned.

10:11:32  4            After you reviewed them and analyzed them, did you reach

10:11:35  5   any conclusions?

10:11:36  6   A.  Yes.

10:11:37  7   Q.  And what conclusions did you reach?

10:11:39  8   A.  Well, I looked at -- to reach my --

10:11:45  9   Q.  What did the literature tell you?

10:11:46 10   A.  The literature told me -- an item that we haven't brought up

10:11:53 11   yet is a Bradford Hill criteria.

10:11:56 12   Q.  We'll talk about that in a second, I promise you, Dr. Feigal.

10:11:59 13            I just want to -- you said you looked at the clinical

10:12:03 14   trial information?

10:12:03 15   A.  Correct.

10:12:04 16   Q.  And then you did your literature search.  Was your literature

10:12:07 17   search consistent or inconsistent with what you saw in the

10:12:11 18   randomized control trial data?

10:12:13 19   A.  The literature search was consistent, I would say, reproducible

10:12:20 20   with what I saw in the clinical trials data.

10:12:25 21   Q.  Okay.  All right.  Now, after reviewing and considering

10:12:27 22   Sanofi's clinical trial and conducting your literature search, what

10:12:30 23   did you do?

10:12:35 24            Did you do a Bradford Hill?

10:12:37 25   A.  Yes.

10:12:37  1   Q.   Okay.   Please explain what Bradford Hill is.

10:12:39  2   A.   So Bradford Hill is actually an epidemiologist who, many years

10:12:45  3   ago, published a paper on criteria to help look at the causation

10:12:50  4   between exposure to something and an outcome of interest.   And I

10:12:55  5   use the scientific methodology of Bradford Hill criteria which

10:13:01  6   consists of nine different criteria --

10:13:03  7   Q.   Okay.

10:13:03  8   A.   -- to look at causation.

10:13:05  9   Q.   Okay.   Did you and I work together to create a demonstrative

10:13:11 10   aid to assist in explaining these nine criteria?

10:13:14 11   A.   Yeah.   We developed a demonstrative because we thought it could

10:13:18 12   be helpful to you, the jury, to see what we're talking about.

10:13:22 13   Because sometimes just having me talk, people sometimes learn

10:13:26 14   better by looking at something than just listening.

10:13:31 15          MR. MICELI:   May I put it up, Your Honor?

10:13:33 16          THE COURT:   Yes, there was no objection.   Please put it

10:13:35 17   up.

10:13:36 18          MR. MICELI:   We've already gone over that.   Thank you,

10:13:39 19   Your Honor.

10:13:39 20   BY MR. MICELI:

10:13:40 21   Q.   Is this the demonstrative that you and I put together?

10:13:44 22   A.   Yes, it is.   The demonstrative that we put together.   Looking

10:13:47 23   sort of at it as a puzzle with each of the different pieces of the

10:13:51 24   puzzle that represent the criteria.

10:13:55 25   Q.   So the nine puzzle pieces represent the nine criteria?

10:13:58   1   A.  Yes.

10:14:01   2   Q.  Okay.  Let's walk through those, if we can.  I want to start in

10:14:06   3   the upper left corner with "Strength of Association."

10:14:09   4         Can you explain what strength of association is?

10:14:12   5   A.  Yeah.  Well, strength of association is really can be

10:14:17   6   qualitative looking at totality of information and can be

10:14:22   7   quantitative in which case there's a statistical assessment to look

10:14:25   8   at the quantity of the strength.

10:14:28   9   Q.  Okay.  And did you -- in evaluating the evidence that we

10:14:31  10   discussed thus far, the literature and the randomized controlled

10:14:37  11   trial information, did you find evidence of strength of association

10:14:39  12   in the relationship between Taxotere and permanent

10:14:43  13   chemotherapy-induced alopecia?

10:14:43  14   A.  Yes.  I found strength -- that criteria of Bradford Hill was

10:14:48  15   satisfied both -- I can say how it was satisfied, or I could just

10:14:55  16   stop.

10:14:56  17   Q.  No, I'll ask.

10:14:58  18         How was it satisfied?

10:14:59  19   A.  The criteria was satisfied by the meta-analysis of the two

10:15:04  20   randomized clinical trials that were conducted by Sanofi in which

10:15:08  21   long-term alopecia was looked at.  It's one of the evaluated

10:15:13  22   prespecified evaluation endpoints in the protocol, and they were

10:15:17  23   found to be statistically significant.

10:15:20  24         The other articles that are relevant for strength of

10:15:24  25   association are those articles in which I had a comparator arm so

10:15:27  1   that I could look at the relative risk or what's called the odds of

10:15:32  2   having the event, PCIA if I was exposed to Taxotere versus not

10:15:38  3   being exposed.  And the four studies are Crown, Sedlacek, Martin,

10:15:47  4   and King.

10:15:48  5   Q.  Okay.  We'll talk about some of those in a moment.  But this is

10:15:51  6   satisfied?

10:15:51  7   A.  Yes.

10:15:52  8   Q.  Okay.  What is "specificity"?

10:15:55  9   A.  Specificity means the ability to tie it to the Taxotere.

10:16:02  10  Q.  Okay.  And how do you do that?  I know we've talked this

10:16:05  11  morning, but how did you do that?

10:16:06  12  A.  Well, part of it by -- well, certainly, the randomized

10:16:10  13  controlled clinical trials, you can isolate the effect for efficacy

10:16:14  14  in a very analogous manner.  If you isolate the effect for safety

10:16:19  15  information of importance.

10:16:21  16  Q.  Was that criteria met?

10:16:23  17  A.  Yes.

10:16:24  18  Q.  What is "consistency"?

10:16:28  19  A.  Consistency is something that we briefly touched on, is that

10:16:34  20  all needles of the compass are pointing in the same direction.

10:16:37  21  You're looking at different pieces of evidence, different pieces of

10:16:40  22  data, and they're all pointing in the same direction, which is

10:16:44  23  toward Taxotere.

10:16:45  24  Q.  Okay.  Now, I want to stop there just for a second because we

10:16:48  25  talked about the randomized control trials and we talked about the

10:16:52  1    literature.

10:16:52  2              Is there anything else you reviewed that also feeds into

10:16:55  3    the consistency element?

10:16:57  4    A.  Well, the consistency is that it's all -- well, there's the

10:17:05  5    pharmacovigilance data, that certainly is supportive; there's

10:17:07  6    clinical overview, that's certainly highly consistent.

10:17:12  7    Q.  Okay.  What is "temporality"?

10:17:18  8    A.  Temporality is basically timing.  And that means the exposure,

10:17:25  9    in this case, Taxotere, and you can only be exposed to Taxotere if

10:17:31 10    it's in the regimen that you received and when the PCIA occurs.

10:17:38 11    Temporality can also be referred to the fact that Adriamycin,

10:17:44 12    cyclophosphamide, many of these drugs were on the market in

10:17:48 13    widespread use for 40 years before Taxotere hit the market, and

10:17:55 14    there were no reports of permanent chemotherapy-induced alopecia

10:18:00 15    with any of these agents.

10:18:03 16    Q.  Okay.  Is temporality met in your assessment --

10:18:06 17    A.  Oh, absolutely.

10:18:06 18    Q.  -- of the Bradford Hill criteria?

10:18:09 19    A.  Yes.

10:18:10 20    Q.  Okay.  What about dose response?  What does dose response imply

10:18:16 21    or mean?

10:18:17 22    A.  So dose response means, if you get more of it, you might expect

10:18:22 23    more of the outcome to happen.  So if you get a drug that causes a

10:18:28 24    side effect, you might expect that you get more of that drug, you

10:18:31 25    might see more of the side effect.  It doesn't mean, however, that

10:18:36  1   there's a minimum threshold that you have to be above before you

10:18:40  2   get the event.  It's sort of like a dimmer on a light switch, it's

10:18:45  3   not an on and off.  It's -- there's different gradations of seeing

10:18:50  4   the outcome of them.

10:18:53  5   Q.  Okay.

10:18:54  6   A.  And in this instance, there were two articles; the Crown

10:18:57  7   article and the Martin article, where there is evidence of

10:19:01  8   increased PCIA with increased dosing.  But we also saw with really

10:19:06  9   very small doses, you could still see PCIA.  So it wasn't a

10:19:12  10  requirement but you just saw more of it if you got more of the

10:19:15  11  drug.

10:19:15  12  Q.  Okay.  When you say the small dose, did you review anything

10:19:19  13  that demonstrated a small dose in somebody still having PCIA?

10:19:23  14  A.  Yeah, Sedlacek.  There was 100 milligrams per meter squared

10:19:29  15  receiving one dose.

10:19:29  16  Q.  Okay.  Was dose response satisfied in your analysis of the

10:19:32  17  Bradford Hill criteria?

10:19:33  18  A.  Yes, I believe it was satisfied.

10:19:35  19  Q.  Okay.  Biologic plausibility.  What is "biologic plausibility"?

10:19:42  20  A.  That means you have a plausible mechanism of action for why the

10:19:47  21  outcome might occur.  We all know -- I mean, we don't, but

10:19:52  22  chemotherapy commonly causes what we know is reversible alopecia

10:19:59  23  because chemotherapy attacks; this particular chemotherapy attacks

10:20:02  24  rapidly dividing cells.  And unfortunately, in addition to cancer,

10:20:07  25  some of the rapidly developing cells in your body is in your hair.

10:20:13  1    So it attack -- it can attack the hair.  But that's reversible.

10:20:18  2         The other yet unproven but plausible mechanism of action

10:20:26  3    is that it permanently impacts on the hair follicle, on the hair

10:20:32  4    stem cell, on the hair matrix or on signaling between the hair

10:20:38  5    follicle.  So it's not necessarily on the mother cell, the stem

10:20:41  6    cell; it could be how they signal to each other and that's what's

10:20:46  7    interrupted.

10:20:48  8    Q.  In order to satisfy biologic plausibility, do you have to prove

10:20:51  9    what is actually happening at that cellular level?

10:20:53 10    A.  No, it just has to be plausible.  It doesn't have to be proven.

10:20:56 11    Q.  Okay.  Did the evidence you reviewed satisfy the element of

10:21:02 12    biologic plausibility in the Bradford Hill analysis?

10:21:05 13    A.  Yes, I believe it did.

10:21:06 14    Q.  Okay.  What is "coherence"?

10:21:13 15    A.  Coherence is really -- it's -- there's nothing about how this

10:21:20 16    might occur or what happens with breast cancer that would put it in

10:21:25 17    conflict with the proposed process it's taking on here.  I'll just

10:21:32 18    tell you an example.

10:21:34 19         We know that Taxotere gets -- it's administered

10:21:39 20    intravenously into a vein, into your arm -- at least most times,

10:21:46 21    into the arm -- and then it can reach the blood vessels in the

10:21:50 22    scalp and that's where hair follicles are.  So if, for some strange

10:21:56 23    reason, we found that maybe it doesn't get to the bloodstream to

10:22:02 24    the scalp, well, then, that would be, you know, sort of scratch

10:22:04 25    your head, how does that happen that it makes the hair on your head

10:22:07 1   fall out.

10:22:08 2          So there's no evidence that that occurs.  But that would

10:22:12 3   be where there was something different that didn't fit with the

10:22:15 4   mechanism of action of hair falling out.

10:22:18 5   Q.  Okay.  Based upon your review of the evidence that you've

10:22:21 6   discussed so far, the literature and the randomized controlled

10:22:25 7   trials, does the element of -- does the evidence support the

10:22:29 8   Bradford Hill criteria for coherence?

10:22:31 9   A.  Yes, it does.

10:22:32 10  Q.  Okay.  Now, the next one is "experiment."

10:22:36 11         Can you explain what experiment is?

10:22:37 12  A.  Well, in the Bradford Hill example, often what I think about is

10:22:42 13  a challenge or a dechallenge.  With a toxic drug -- and all

10:22:50 14  chemotherapy has, you know, a variety of toxicity, but basically

10:22:54 15  with a drug contains toxicity, it's really not ethical to, you

10:23:00 16  know -- to impose the effect and then rechallenge you with that.

10:23:05 17  There are other instances, for example, a person might be lactose

10:23:09 18  intolerant, can't take milk, and so you might give them a dairy

10:23:14 19  product and rechallenge them.  You know, that would be something

10:23:17 20  safe to do.  You could rechallenge them with that type of product

10:23:21 21  to see if elicited the adverse effects.

10:23:24 22  Q.  So is it possible to do an experiment with a drug like

10:23:28 23  Taxotere?

10:23:29 24  A.  You can't do a challenge -- a dechallenge experiment.  But as

10:23:34 25  you've already heard earlier, we did do -- there were two

10:23:36  1   scientific experiments that were conducted, they're called clinical

10:23:40  2   trials to look at this issue, but there was no

10:23:44  3   challenge/dechallenge.

10:23:48  4   Q.  Okay.  I'm going to put and X and a small green check because

10:23:52  5   you said we did have the randomized controlled trial.

10:23:55  6   A.  Correct.  So you can put a regular check, yeah.

10:23:58  7   Q.  All right.  And then what is "analogy"?

10:24:00  8   A.  Analogy -- you know, this is PCIA in early-stage breast cancer

10:24:05  9   patients who received conventional doses of chemotherapy.  There is

10:24:12 10   no analogy of a similar event occurring.  So I don't have an

10:24:17 11   analogous model for this.

10:24:20 12   Q.  Okay.  So that was not present?

10:24:22 13   A.  Sometimes if you have something related that, you know, you can

10:24:25 14   point to that, but I don't have that here.

10:24:29 15   Q.  Okay.  Now, is it necessary to have all nine factors positively

10:24:35 16   present in order to make a determination of a causal relationship

10:24:39 17   under the Bradford Hill criteria?

10:24:42 18   A.  No.  It's not required to have all nine pieces.  So unlike a

10:24:46 19   puzzle piece where you don't want to have a missing piece, this one

10:24:51 20   you can have missing pieces.  So it's really looking at the

10:24:53 21   totality of the data and the strength of association.

10:24:56 22   Q.  Is there a magic number that you must have?

10:24:59 23   A.  There is no magic number.

10:25:01 24   Q.  Is it possible to prove -- conduct a Bradford Hill criteria

10:25:07 25   where only one element of this is present?

10:25:09  1   A.  It's possible with a very compelling case.

10:25:12  2   Q.  Okay.  Based upon your application of the Bradford Hill

10:25:16  3   criteria to the evidence you reviewed, did you reach any

10:25:19  4   conclusions as to whether or not Taxotere causes permanent

10:25:25  5   chemotherapy-induced alopecia?

10:25:25  6   A.  Yes.  I reached the conclusion based on all of the things that

10:25:30  7   I reviewed in applying the Bradford Hill causation, that Taxotere

10:25:34  8   causes permanent chemotherapy-induced alopecia in patients who have

10:25:41  9   early-stage breast cancer and are exposed to Taxotere.

10:25:44  10  Q.  Did you provide a report setting out all of these opinions for

10:25:49  11  us?

10:25:49  12  A.  Yes, I did.

10:25:50  13  Q.  And did you include the listing of all of the studies and all

10:25:53  14  of the articles that you reviewed?

10:25:54  15  A.  Yes.  I listed all of the studies, the methods, and what I've

10:25:59  16  reviewed.

10:26:00  17  Q.  And did you provide which of the Bradford Hill criteria each

10:26:03  18  individual piece applied to or, if there are multiple, which ones

10:26:07  19  they applied to?

10:26:07  20  A.  Yes.  I did put down the criteria next to the various articles.

10:26:14  21  Q.  Okay.  Did you reach your conclusions about the causal

10:26:21  22  relationship based upon your education, training, and experience?

10:26:25  23  A.  Yes.  I reached -- you know, I have education, training, and

10:26:30  24  30 years of experience, and I applied those to looking at the

10:26:34  25  information that I obtained, reviewing it, interpreting it, and to

10:26:39  1   a reasonable degree of scientific and medical certainty reached the

10:26:43  2   conclusion that I did.

10:26:44  3   Q.   Okay.  That was a long answer.  I just want to know, what is

10:26:51  4   your ultimate conclusion?

10:26:52  5   A.   My ultimate conclusion is that Taxotere can cause permanent

10:26:58  6   chemotherapy-induced alopecia in patients with early-stage breast

10:27:03  7   cancer.

10:27:03  8   Q.   Okay.  Now, you mentioned something earlier about a

10:27:08  9   pharmacovigilance database.

10:27:10  10  A.   Yes.

10:27:10  11  Q.   Did you review that as well?

10:27:11  12  A.   Yes, I reviewed the pharmacovigilance database.

10:27:15  13  Q.   Okay.  I don't want to talk about when, but did you review some

10:27:21  14  clinical overviews?

10:27:22  15  A.   Yes, I reviewed clinical overviews.

10:27:26  16  Q.   And who were the authors of the clinical overviews?

10:27:29  17  A.   The authors of the clinical overviews were Dr. Nanae Hangai and

10:27:35  18  Dr. Palatinsky.

10:27:37  19  Q.   Okay.  And based on your review of those -- let's just talk

10:27:42  20  about Nanae Hangai's clinical overview.  Focusing just on what she

10:27:50  21  did.

10:27:51  22       Categorically, what type of information did she review

10:27:54  23  compared to what you reviewed?

10:27:56  24  A.   Well, she did a worldwide literature search.  And she looked at

10:28:01  25  the data that was available to her from the Sanofi clinical trials.

1188

10:28:05  1            MR. STRONGMAN:  Your Honor, can we just approach?

10:28:09  2            THE COURT:  Yes.

10:28:09  3         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10:28:18  4            MR. STRONGMAN:  This is just the clinical overview that

10:28:20  5   we discussed and I feel like Mr. Miceli's going into more detail

10:28:24  6   into this document than we discussed.

10:28:26  7            MR. MICELI:  Can we just go right to the benchmark with

10:28:30  8   her?

10:28:30  9            THE COURT:  Yeah.  I think you could ask, was her

10:28:32  10  methodology consistent, and then the punch line.

10:28:32  11           MR. MICELI:  Okay.

10:28:36  12           THE COURT:  I don't think she can go into the various

10:28:39  13  parts of that stuff.

10:28:40  14           MR. MICELI:  Okay.  I wasn't going to ask when it

10:28:44  15  happened.  I'll ask her for methodology.  I won't go to the

10:28:47  16  elements of the methodology.

10:28:48  17           THE COURT:  Correct.

10:28:50  18           MR. MICELI:  Okay.  And then I'll ask the ultimate

10:28:52  19  question.

10:28:52  20           THE COURT:  Okay.  That's fine.  Thank you.

10:28:52  21           MR. STRONGMAN:  Thank you.

10:28:54  22         (OPEN COURT.)

10:28:54  23  BY MR. MICELI:

10:29:25  24  Q.  Dr. Feigal, you mentioned Nanae Hangai.  Do you know what her

10:29:29  25  position is, first?

10:29:30 1   A.  Her position at the company, I believe, she is a medical

10:29:33 2   officer and she -- a medical physician and a global safety officer

10:29:39 3   for Sanofi.

10:29:40 4   Q.  Okay.  Now, without going into the detail of it, can you tell

10:29:49 5   us whether there were differences in the methodology that were

10:29:51 6   employed by Dr. Hangai and yourself?

10:29:53 7   A.  The differences that I was able to discern is that I had more

10:29:59 8   articles that were explicitly noted.

10:30:03 9   Q.  Okay.

10:30:03 10  A.  She actually based it on a few articles.

10:30:06 11  Q.  Okay.  And do you recall what her conclusion was?

10:30:09 12  A.  Yes, I do.

10:30:10 13  Q.  What was her conclusion?

10:30:12 14  A.  Her conclusion was that the cumulative weighted evidence is

10:30:16 15  sufficient to support a causal association between Taxotere and

10:30:26 16  permanent irreversible alopecia in patients who received Taxotere.

10:30:30 17  So that was an internal Sanofi global safety officer.

10:30:34 18  Q.  Okay.  All right.

10:30:48 19          And I want to go through a couple of other items.  Now,

10:30:52 20  you've mentioned some articles and the first one, I think, you

10:30:57 21  mentioned today was Sedlacek, and just want to look at that

10:31:00 22  momentarily.

10:31:24 23          I am going to have to use a real powerful scope here.

10:31:30 24  Not that way.  Doctor, can you read the title of the -- well, first

10:31:44 25  of all, you talked about comparator arms.

10:31:47  1          Can you read the breakout of the comparator arms in this

10:31:49  2   article.

10:31:50  3   A.  Yeah.  It might be easier to read in my report.  Do you want me

10:31:56  4   to read them from the screen?

10:31:57  5   Q.  Well, if you don't mind.  I thought I had a better copy and I

10:32:01  6   apologize.  But what I really want -- I can try to get --

10:32:03  7   A.  No.  I know what the numbers are, if you would like me to read

10:32:06  8   the different arms and --

10:32:07  9   Q.  Well, I wanted to ask it in a particular way.

10:32:11  10  A.  Okay.

10:32:14  11  Q.  I think what I am going to do is -- so I can get it on here --

10:32:18  12  A.  Maybe if you have an extra copy, I can just look at it

10:32:22  13  directly.

10:32:23  14  Q.  I don't think your copy is going to look any better because I

10:32:26  15  have to blow this up.

10:32:27  16  A.  I mean, I can see it.

10:32:29  17  Q.  Okay.  All right.  What I want to ask about Sedlacek and these

10:32:33  18  comparator arms is, do you know which group was Group A?

10:32:37  19  A.  Yeah.

10:32:39  20  Q.  What is Group A?

10:32:42  21  A.  Group A is the non-taxane doxorubicin regimen, so there's no

10:32:49  22  taxane at all.

10:32:50  23  Q.  Okay.  And what is Group B?

10:32:51  24  A.  Group B is the regimen of doxorubicin plus a Taxol, not the

10:33:01  25  Taxotere but the other taxane, Taxol.

10:33:04  1    Q.   Okay.  And how many events for a persistent significant

10:33:08  2    alopecia did Dr. Sedlacek note in his study in the Groups A and B?

10:33:15  3    A.   There were zero patients in Group A that had that outcome, and

10:33:20  4    zero patients in Group B who had that outcome.

10:33:24  5    Q.   And what about Group C is which group?

10:33:27  6    A.   Group C is the Taxotere containing arm.

10:33:27  7    Q.   Okay.

10:33:30  8    A.   That also has doxorubicin.

10:33:35  9    Q.   And how many events were in Group C?

10:33:37  10   A.   There were seven events in Group C out of, I believe, 126

10:33:42  11   patients.

10:33:42  12   Q.   Okay.  Do you know whether or not these findings were

10:33:45  13   statistically significant?

10:33:47  14   A.   Those findings Dr. Madigan performed an odds ratio that was

10:33:52  15   clearly significant, and the odds ratio was 54.

10:33:57  16   Q.   When you say "it's clearly significant," what do you mean by

10:34:00  17   that?

10:34:00  18   A.   Well, whenever you have zero in an arm and you have seven in

10:34:05  19   the other, that's going to be -- I would have anticipated it would

10:34:10  20   be highly significant.

10:34:11  21   Q.   Okay.  Because my colleagues have done that.  I want to ask:

10:34:18  22   You put the Taxotere in --

10:34:20  23   A.   When you're not by the microphone, it's hard to hear you.  Are

10:34:24  24   you asking --

10:34:24  25   Q.   I am just trying to say when you put the -- the Taxotere arm

10:34:27  1    has seven?

10:34:28  2    A.  Yes.

10:34:29  3    Q.  And you take the Taxotere out and you get?

10:34:32  4    A.  Zero.

10:34:39  5    Q.  Now, you've told us about your Bradford Hill analysis with

10:34:45  6    regard to Taxotere and the evidence related to Taxotere and its

10:34:50  7    relationship with permanent chemotherapy-induced alopecia.

10:34:53  8         Does your report include a Bradford Hill analysis for any

10:34:56  9    other drug?

10:34:56 10    A.  Well, I looked at --

10:34:59 11    Q.  Just "yes" or "no" first.

10:35:02 12    A.  No.  Because I would like to explain that.

10:35:03 13    Q.  Well, please explain why.

10:35:05 14    A.  Okay.  A Bradford Hill wasn't conducted because there was so

10:35:09 15    little evidence of the other drugs with -- where I was able to

10:35:15 16    locate -- or actually, where the author attributed the PCIA to the

10:35:21 17    non-Taxotere arms.

10:35:22 18    Q.  Okay.  Did you look for information on the other drugs in your

10:35:27 19    literature search?

10:35:28 20    A.  Oh, I absolutely did.

10:35:28 21    Q.  Okay.

10:35:29 22    A.  And in part of my search terms.

10:35:32 23    Q.  If there was reason to conduct a Bradford Hill analysis on any

10:35:35 24    other drug, would you have done so?

10:35:37 25    A.  Yes, I would have.

10:35:37  1    Q.   Okay.

10:35:41  2    A.   I think I may have said in earlier comments testimony that I

10:35:45  3    didn't need to but that was based on the fact that the numbers were

10:35:48  4    so small.  If I actually had adequate numbers, I could have done

10:35:52  5    it.

10:35:55  6              MR. MICELI:  Your Honor, can I just have a moment to talk

10:35:57  7    to Mr. Lambert?

10:35:58  8              THE COURT:  Yes.

10:35:59  9              MR. MICELI:  Thank you.

10:36:09 10              We have nothing further at this time.

10:36:10 11              THE COURT:  Thank you.

10:36:10 12              Mr. Strongman.  Cross.

10:36:51 13              MR. STRONGMAN:  May I approach?

10:36:52 14              THE COURT:  Yes, you may.

10:37:02 15              THE WITNESS:  Should I keep all of this up here?

10:37:04 16              MR. STRONGMAN:  You can set it to the side.

10:37:06 17              THE COURT:  You can just slip it down there, ma'am.

10:37:09 18              THE WITNESS:  Thank you.

10:37:09 19              MR. STRONGMAN:  You're welcome.

10:37:27 20                        CROSS-EXAMINATION

10:37:27 21    BY MR. STRONGMAN:

10:37:28 22    Q.   Good morning, Dr. Feigal.  How are you?

10:37:30 23    A.   Good morning.  I'm good.  How are you?

10:37:32 24    Q.   Good to see you.

10:37:33 25              I want to start with just a little bit more background on

10:37:37  1   your experience, okay?

10:37:38  2           You are an oncologist by training; is that correct?

10:37:41  3   A.  I am a hematologist oncologist by training, that's correct.

10:37:44  4   Q.  And Mr. Miceli was asking you some questions about your

10:37:49  5   experience with Adriamycin and cyclophosphamide.

10:37:51  6           Do you remember that?

10:37:52  7   A.  Yes.  I remember him asking about my experience and I said I

10:37:57  8   had experience.

10:37:57  9   Q.  And, Dr. Feigal, you haven't treated a breast cancer patient

10:38:01 10   since 1991 or 1992; is that correct?

10:38:05 11   A.  I have not personally treated an individual patient, but I've

10:38:10 12   certainly been actively involved using my medical experience in

10:38:13 13   designing clinical trials and helping companies design trials for

10:38:17 14   breast cancer patients.

10:38:18 15   Q.  But actually in terms of treating patients in a clinic, that's

10:38:23 16   not something that you have done for a breast cancer patient since

10:38:27 17   1991 or 1992, correct?

10:38:29 18   A.  No.  But I would like to provide a fuller answer to that

10:38:33 19   because I think that --

10:38:34 20           THE COURT:  Wait, wait.

10:38:34 21           THE WITNESS:  -- it can be misleading to the jury.

10:38:37 22           THE COURT:  Dr. Feigal, no, you have not or -- I just

10:38:42 23   want to make sure I understand.

10:38:43 24           THE WITNESS:  No, I have not.  But I would like to

10:38:45 25   further explain.

10:38:46  1          THE COURT:  Okay.

10:38:47  2   BY MR. STRONGMAN:

10:38:47  3   Q.  Well, Dr. Feigal, we can agree that 1991 or 1992, that's about

10:38:52  4   30 years ago; is that fair?

10:38:53  5   A.  Yes, that math is correct.  I agree it's a while ago.  But --

10:38:59  6   Q.  And --

10:39:00  7   A.  Go ahead.

10:39:01  8   Q.  And, Dr. Feigal, as we know, Mr. Miceli pointed out that

10:39:05  9   Taxotere came on the market in 1996, correct?

10:39:09 10   A.  Yes, Taxotere came on the market.  And as I think you also

10:39:14 11   know, clinical trials -- investigational trials go on well before,

10:39:19 12   and I certainly was involved with investigational evaluation.  But

10:39:25 13   I didn't specifically prescribe it because it wasn't on the market.

10:39:28 14   Q.  Doctor, my simple question was:  Taxotere came on the market in

10:39:33 15   1996, correct?

10:39:34 16   A.  That -- yes, Taxotere came on the market in 1996.

10:39:38 17   Q.  And we can agree that 1996 is after 1991 or 1992, correct?

10:39:45 18   A.  That -- yes, 1996 is after 1991; yes, that statement is

10:39:55 19   correct.

10:39:56 20   Q.  And so, Doctor, it is fair to say that you never prescribed

10:40:03 21   Taxotere to a breast cancer patient, correct?

10:40:05 22   A.  The answer is no, but I would like to further explain because I

10:40:11 23   think this is misleading to the jury about my experience with

10:40:14 24   Taxotere.

10:40:15 25   Q.  And, Dr. Feigal, I am just asking --

| | | |
|---|---|---|
| 10:40:18 | 1 | THE COURT:  Dr. Feigal, you're going to have to answer |
| 10:40:21 | 2 | the question -- |
| 10:40:22 | 3 | THE WITNESS:  I did.  I said -- I did answer that |
| 10:40:23 | 4 | question. |
| 10:40:23 | 5 | THE COURT:  Thank you. |
| 10:40:24 | 6 | BY MR. STRONGMAN: |
| 10:40:25 | 7 | Q.  And I want to talk a little bit more about some of the work |
| 10:40:31 | 8 | that you did, in this case, that you talked about with Mr. Miceli. |
| 10:40:36 | 9 | First of all, you would agree that there are a number of |
| 10:40:40 | 10 | chemotherapy drugs that cause alopecia, correct? |
| 10:40:44 | 11 | A.  You will have to be clearer when you say "alopecia."  Are you |
| 10:40:48 | 12 | talking about the reversible alopecia that commonly occurs, or are |
| 10:40:52 | 13 | you talking about the very rare permanent chemotherapy-induced |
| 10:40:56 | 14 | alopecia? |
| 10:40:56 | 15 | Q.  I am saying if you were to go and you were to look at the risk |
| 10:41:00 | 16 | information for a whole host of chemotherapy drugs, you would see |
| 10:41:03 | 17 | alopecia listed as a risk, correct? |
| 10:41:05 | 18 | A.  It depends on what you're talking about.  It -- reversible |
| 10:41:13 | 19 | transient alopecia commonly occurs with chemotherapy agents. |
| 10:41:19 | 20 | Permanent chemotherapy alopecia does not. |
| 10:41:21 | 21 | Q.  And, Doctor, I guess my question I just want you to focus in |
| 10:41:26 | 22 | on, if you can, is that if I were to put out, let's just say, the |
| 10:41:29 | 23 | risk information for Adriamycin, okay?  Can we focus on that for |
| 10:41:32 | 24 | one second?  Are you with me? |
| 10:41:34 | 25 | A.  Is that a question? |

10:41:35  1    Q.  If you were to look up the risk information for Adriamycin,
10:41:39  2    alopecia would be noted as a risk, correct?
10:41:41  3    A.  Alopecia reversible has been noted as a risk for the past 40,
10:41:48  4    50 years, that's correct.
10:41:49  5    Q.  And, Doctor, in this case, you're talking about something that
10:41:53  6    you are calling "permanent chemotherapy-induced alopecia"; is that
10:41:56  7    correct?
10:41:56  8    A.  Well, it's not me calling it, it's what the community has
10:42:01  9    called it, investigators who are looking at the field call it.
10:42:04  10   Q.  Well, Doctor, the definition that you're operating on for what
10:42:08  11   you're calling "PCIA" is the absence or incomplete hair growth
10:42:14  12   after six months beyond chemotherapy; is that correct?
10:42:17  13   A.  Well, in the literature you can find at least six months, in
10:42:21  14   other studies that I've referenced it may be a year,
10:42:24  15   year-and-a-half.  I think the Sedlacek, it was a year, in Martin it
10:42:29  16   was a year-and-a-half, and then the King article, I believe, it was
10:42:33  17   up to three years even.
10:42:35  18   Q.  And what we know, and you've explained, is the chemotherapy
10:42:38  19   regimens that treat breast cancer are almost always given -- or the
10:42:42  20   drugs are almost always given in a regimen, correct?
10:42:45  21   A.  In early-stage breast cancer, I would say the vast majority of
10:42:53  22   chemotherapy drugs are indeed given in a regimen.
10:42:56  23   Q.  And, Doctor, you would agree that based on your knowledge, that
10:43:04  24   there have been cases of permanent hair loss reported with
10:43:07  25   Adriamycin, correct?

| | | |
|---|---|---|
| 10:43:10 | 1 | A.  I'm sorry.  Say your question again? |
| 10:43:12 | 2 | Q.  You would agree that there have been cases of permanent hair |
| 10:43:17 | 3 | loss reported with Adriamycin, correct? |
| 10:43:18 | 4 | A.  There have been -- well, even in the studies that I put in |
| 10:43:25 | 5 | Table 2 "Anecdotal Cases," which does not equal causation, have |
| 10:43:31 | 6 | been reported. |
| 10:43:33 | 7 | Q.  And, Doctor, I've got up there a notebook and it's got |
| 10:43:37 | 8 | materials organized by date, okay? |
| 10:43:40 | 9 | A.  Uh-huh. |
| 10:43:41 | 10 | Q.  And if you can turn to the date of 9/20/2019 for me. |
| 10:43:49 | 11 | A.  9/20/2019, okay. |
| 10:43:53 | 12 | Q.  Correct. |
| 10:43:55 | 13 | Tell me when you're there and I'll give you a specific |
| 10:43:58 | 14 | page.  And if you can turn to page 1219? |
| 10:44:11 | 15 | MR. MICELI:  Your Honor, can we approach just for one |
| 10:44:13 | 16 | moment.  I want to ask a question about this. |
| 10:44:15 | 17 | THE COURT:  Sure. |
| 10:44:16 | 18 | (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:) |
| 10:44:27 | 19 | MR. MICELI:  I think this one's from *Thibodaux* or maybe |
| 10:44:29 | 20 | from the other trial; I am not even sure.  But if we're going to go |
| 10:44:33 | 21 | into different testimonies, he is going to open up the door for ne |
| 10:44:36 | 22 | about what were you testifying about, what you were testifying in |
| 10:44:39 | 23 | relation to, which case was it?  And if he wants to, he is going to |
| 10:44:42 | 24 | open the door. |
| 10:44:43 | 25 | THE COURT:  No.  I don't think that opens the door.  This |

10:44:45  1   is testimony given under oath and it's just general causation.  She

10:44:48  2   is not dealing with Ms. Kahn with specificity.  She is not talking

10:44:53  3   about Ms. Thibodaux individually, so, no.

10:44:56  4           MR. MICELI:  Okay.  If the questions go there, we'll

10:44:59  5   revisit it?

10:44:59  6           THE COURT:  If he asks her a question specific to

10:45:04  7   Ms. Thibodaux, but not general causation.

10:45:08  8           MR. MICELI:  Okay.  Thank you.

10:45:09  9           THE COURT:  Thank you.

10:45:11  10          (OPEN COURT.)

10:45:19  11  BY MR. STRONGMAN:

10:45:19  12  Q.  And, Doctor, are you on page 1219?  I want you to look at --

10:45:24  13  A.  Oh, I'm sorry.  I thought -- 1219?

10:45:26  14  Q.  Well, the page 1219.  The date is September 20th, 2019, page --

10:45:33  15  A.  I see it.  I see it.

10:45:35  16  Q.  All right.  And I want you to look at line 7.  Are you there?

10:45:37  17  A.  Yes.

10:45:37  18  Q.  And, Doctor, this was testimony that you gave under oath,

10:45:41  19  correct?

10:45:41  20  A.  I gave under oath but there was some extenuating circumstances

10:45:46  21  for that.  But I did give this under oath, that's correct.

10:45:49  22  Q.  And if you look at this line, line 7, "Question:  Would you

10:45:54  23  agree with me that there have been cases of permanent hair loss

10:45:57  24  reported with Adriamycin?  Answer:  Correct."

10:46:02  25          Did I read that accurately?

10:46:04 1   A.  I think that's consistent with what I just said -- anecdotal

10:46:07 2   cases have been seen.

10:46:09 3   Q.  And, Doctor, would you agree with me that there have been cases

10:46:14 4   of permanent hair loss reported with cyclophosphamide?

10:46:15 5   A.  As I will agree, anecdotal cases which do not equal causation

10:46:21 6   have been reported.

10:46:22 7   Q.  And you would also agree with me that there have been cases of

10:46:26 8   permanent hair loss reported with Taxol, correct?

10:46:28 9   A.  There have been anecdotal cases primarily from one publication

10:46:34 10   that anecdotal cases have been seen.

10:46:37 11   Q.  And you would also agree with me that there's a risk of

10:46:40 12   persisting alopecia with endocrine therapy, correct?

10:46:44 13   A.  Are you reading from the transcript now?

10:46:48 14   Q.  No.  I was just asking you a question.

10:46:51 15   A.  Oh, you were just asking me a question.

10:46:53 16           THE COURT:  He is just asking you a question, yes, ma'am.

10:46:55 17           THE WITNESS:  There have been descriptions of endocrine

10:46:58 18   alopecia during the endocrine therapy, but that's not an issue that

10:47:01 19   I looked into.

10:47:03 20   BY MR. STRONGMAN:

10:47:03 21   Q.  Okay.  So you didn't look into the endocrine therapy issue as

10:47:07 22   it relates to the opinions that you're offering today; is that

10:47:10 23   fair?

10:47:10 24   A.  No.  That is not fair and not accurate.  Many of my studies

10:47:14 25   have endocrine therapy as part of the regimen and many of them

10:47:19  1    controlled for the endocrine therapy and still saw permanent

10:47:24  2    chemotherapy-induced alopecia with the Taxotere regimen.

10:47:26  3    Q.  And I guess going back to my question -- it was simple -- there

10:47:29  4    is a risk of persisting alopecia with endocrine therapy, yes?

10:47:34  5    A.  I am going to go back to my answer.  The answer is yes and that

10:47:39  6    was controlled for in many of the studies that I looked at that

10:47:42  7    still showed the risk with Taxotere.

10:47:45  8    Q.  And as you explained, there's obviously reports of permanent

10:47:49  9    hair loss with Taxotere as well.

10:47:50 10            You discussed that with Mr. Miceli, correct?

10:47:52 11    A.  You're going to have to repeat your question to me.

10:47:56 12    Q.  There are obviously reports of permanent hair loss with

10:48:01 13    Taxotere as well.  That's what you discussed with Mr. Miceli,

10:48:04 14    correct?

10:48:06 15            MR. MICELI:  Object to form.  It mischaracterizes.

10:48:09 16            THE COURT:  Overruled.

10:48:10 17            THE WITNESS:  No.  That would be a misinterpretation of

10:48:16 18    my whole dialogue with Mr. Miceli.  What I was talking about was

10:48:20 19    the criteria to address causation with the Taxotere regimens.  And

10:48:26 20    we went through, I think, a lengthy discussion about it, so I think

10:48:30 21    you would be mischaracterizing my discussion with Mr. Miceli by

10:48:34 22    just stating it like that.

10:48:34 23    BY MR. STRONGMAN:

10:48:36 24    Q.  Well, Dr. Feigal, with Taxotere you went and you looked at the

10:48:40 25    clinic study reports; is that right?

10:48:43  1    A.  With Taxotere, I looked at the randomized clinical studies 316

10:48:49  2    and 301.

10:48:50  3    Q.  And you also went, as you described, and looked at the internal

10:48:53  4    database for Sanofi; is that correct?

10:48:55  5    A.  In addition to publications that I searched and had 19

10:49:00  6    articles, I did look at the pharmacovigilance database Sanofi

10:49:05  7    provided.

10:49:06  8    Q.  And then, as you described, you went through the puzzle pieces.

10:49:10  9    You did what you called a "full Bradford Hill analysis" on

10:49:13  10   Taxotere, correct?

10:49:14  11   A.  Well, I think an accurate description of what I did is look at

10:49:19  12   the Bradford Hill criteria for causation and went through the

10:49:23  13   different components.

10:49:24  14   Q.  Well, Doctor, did you go and look at any of the clinical study

10:49:28  15   reports for Adriamycin?

10:49:30  16   A.  I -- the answer is no.  I would not have access to those

10:49:37  17   reports and that's actually a separate topic altogether than what

10:49:42  18   we're discussing at the trial today.

10:49:44  19   Q.  Well -- and, Doctor, did you go look at the clinic study

10:49:47  20   reports for cyclophosphamide?

10:49:49  21   A.  The answer is no.  I did not.  But I think as I stated earlier,

10:49:53  22   there have been 40 years of treatment before taxanes ever came on

10:50:00  23   the market and there were no reports.

10:50:04  24   Q.  Doctor --

10:50:05  25         THE COURT:  I think you need to listen to the question,

10:50:08 1    Doctor.  And it was:  Did you look at the clinic study reports for

10:50:13 2    Adriamycin and then cyclophosphamide?

10:50:16 3              THE WITNESS:  No, the short answer is no.  The longer

10:50:20 4    answer, which I think would be helpful to the jury, is lengthier

10:50:24 5    and I would like to be able to explain it if possible.

10:50:28 6    BY MR. STRONGMAN:

10:50:28 7    Q.  And just to be clear, too, when I say "cyclophosphamide,"

10:50:34 8    that's sometimes called "Cytoxan," correct?

10:50:36 9    A.  Cytoxan is another name for cyclophosphamide, that's correct.

10:50:39 10   Q.  And did you look at any of the clinic study reports for Taxol?

10:50:43 11   A.  I did not look at internal company documents for -- did not

10:50:48 12   have access to internal company documents for these other

10:50:51 13   chemotherapy agents you're asking me about.

10:50:54 14   Q.  Did you go and look at any internal safety database for

10:50:58 15   Adriamycin?

10:50:58 16   A.  The short answer is no.  I would not have had access because

10:51:03 17   they're not under litigation on the pharmacovigilance database for

10:51:09 18   these other chemotherapy agents.

10:51:11 19   Q.  So did you go look at any safety database for Cytoxan?

10:51:15 20   A.  The answer is the same.

10:51:19 21   Q.  What about any database for Taxol?

10:51:22 22   A.  The answer is the same.

10:51:24 23   Q.  And as part of your work, you've not done any causation

10:51:36 24   analysis using the Bradford Hill factors for Adriamycin, correct?

10:51:40 25   A.  No, that is not correct.  As I stated earlier to a somewhat

10:51:45 1   similar question, there was not sufficient information in the

10:51:48 2   public -- in the literature, worldwide literature to do that kind

10:51:53 3   of analysis.  So it didn't even rise to the level of needing to do

10:51:57 4   it.

10:51:58 5   Q.  Doctor, can you turn in your notebook to the tab with the date

10:52:02 6   9/1/20.

10:52:07 7   A.  Yes.  (WITNESS COMPLIES.)

10:52:11 8   Q.  I want you to go to page 138.

10:52:19 9   A.  (WITNESS COMPLIES.)

10:52:23 10  Q.  Line 3.

10:52:31 11          "Question:  So you have not done a causation analysis

10:52:35 12  using the Bradford Hill factors for Adriamycin, correct?

10:52:40 13          "Answer:  That is correct?"

10:52:41 14          Did I read that accurately?

10:52:43 15  A.  I think what I just -- you read it accurately and I think I was

10:52:47 16  consistent in my response to you just now.

10:52:51 17  Q.  And in reaching your conclusion on whether Taxotere is capable

10:52:55 18  of causing PCIA, you didn't determine whether cyclophosphamide or

10:53:01 19  Cytoxan is capable of causing PCIA, correct?

10:53:05 20  A.  No, that is not correct.  There are many studies where there

10:53:11 21  was a comparator arm where the only exposure was the

10:53:15 22  cyclophosphamide with the Adriamycin and it did not -- there was no

10:53:18 23  study that I looked at where there was an increased risk for the

10:53:23 24  standard chemotherapy agents that did not have Taxotere.

10:53:27 25  Q.  Doctor, can you turn in your notebook to tab with the date

```
10:53:31   1    4/10/20?

10:53:36   2    A.  (WITNESS COMPLIES.)

10:53:38   3    Q.  And I want you to turn to page 83.

10:53:42   4    A.  (WITNESS COMPLIES.)

10:53:59   5    Q.  And on page 83, line 19.

10:54:02   6          "Question:  In reaching your conclusion on whether

10:54:05   7    Taxotere is capable of causing PCIA, did you determine whether

10:54:09   8    cyclophosphamide is capable of causing PCIA?

10:54:13   9          "Answer:  I did not do a Bradford Hill analysis on

10:54:17  10    cyclophosphamide."

10:54:18  11          Did I read that correctly?

10:54:20  12    A.  Yes.  And my response to you was consistent --

10:54:26  13          MR. MICELI:  I have to object.  Improper attempts to

10:54:29  14    impeach.  These are not improper statements.  He is just reading

10:54:33  15    her former testimonies.

10:54:34  16          THE COURT:  I think we need to have an inconsistent

10:54:37  17    statement before we proceed with impeachment.

10:54:40  18    BY MR. STRONGMAN:

10:54:40  19    Q.  And, Doctor, did you do a Bradford Hill analysis on Taxol?

10:54:45  20    A.  As I previously said, there wasn't sufficient information to do

10:54:50  21    a Bradford Hill analysis on Taxol and, therefore, I did not do

10:54:57  22    that.

10:54:59  23    Q.  And, Dr. Feigal, so are you saying that a Bradford Hill or

10:55:03  24    causation analysis would not be relevant to what you were asked to

10:55:06  25    do when it comes to the other chemotherapies outside of the
```

10:55:09  1    Taxotere?

10:55:09  2    A.  I am saying that the data that I had in hand did not merit a

10:55:18  3    further investigation of that.  I would have done it if it rose to

10:55:22  4    the level that it evoked a concern in me.

10:55:25  5    Q.  Here is my question:  Is a causation analysis involving

10:55:31  6    chemotherapy drugs other than Taxotere relevant to what you were

10:55:35  7    asked to do in this case?

10:55:37  8    A.  Whether or not other drugs can cause permanent

10:55:45  9    chemotherapy-induced alopecia is indeed relevant and, if I could

10:55:49 10    fully answer the question, the randomized clinical trials which

10:55:53 11    Sanofi, the manufacturer of Taxotere conducted, addressed

10:55:58 12    confounding in their randomized clinical trial.

10:56:02 13    Q.  And, Doctor, can you turn in your notebook to September 1 --

10:56:07 14    this is back to the one we were in -- September 1, 2020?

10:56:14 15    A.  Oh, 2020.  (WITNESS COMPLIES.)  Okay.

10:56:20 16    Q.  Are you there?

10:56:22 17             THE COURT:  We need the page.

10:56:23 18             THE WITNESS:  I have the tab.  I don't know the page.

10:56:25 19    BY MR. STRONGMAN:

10:56:25 20    Q.  Page 136.

10:56:27 21    A.  Okay.  (WITNESS COMPLIES.)

10:56:29 22    Q.  Line 10.  "Question:  --

10:56:33 23    A.  I -- just let me get there.

10:56:37 24    Q.  Let me know when you get there.  Sorry.  I didn't mean to rush

10:56:41 25    you.

1207

| | | |
|---|---|---|
| 10:56:41 | 1 | A.  I'm there. |
| 10:56:42 | 2 | Q.  Okay.  Line 10. |
| 10:56:44 | 3 | "Question:  Did you do a separate assessment of whether |
| 10:56:46 | 4 | those drugs are capable of causing permanent hair loss, |
| 10:56:50 | 5 | chemotherapy medications other than docetaxel? |
| 10:56:55 | 6 | "Answer:  Did I do not relevant to what I was asked to |
| 10:56:58 | 7 | do, no?" |
| 10:56:59 | 8 | Did I read that correctly? |
| 10:57:02 | 9 | A.  Well, I think you're missing the context.  Do you want to read |
| 10:57:05 | 10 | the rest of that paragraph? |
| 10:57:07 | 11 | Q.  Doctor, my question is, did I -- |
| 10:57:09 | 12 | MR. MICELI:  Your Honor, object.  He is not impeaching |
| 10:57:12 | 13 | her on an inconsistent statement. |
| 10:57:14 | 14 | THE COURT:  Is that the objection? |
| 10:57:15 | 15 | MR. MICELI:  Yes, Your Honor.  Objection. |
| 10:57:18 | 16 | MR. STRONGMAN:  It is inconsistent. |
| 10:57:19 | 17 | THE COURT:  We are not going to have this fight.  The |
| 10:57:21 | 18 | jury can make that determination. |
| 10:57:27 | 19 | MR. MICELI:  Can we approach on the side, Your Honor.  I |
| 10:57:29 | 20 | think we need -- |
| 10:57:30 | 21 | THE COURT:  Yes. |
| 10:57:36 | 22 | (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:) |
| 10:57:36 | 23 | THE COURT:  What you were asking me was completeness. |
| 10:57:39 | 24 | MR. MICELI:  Well, it's completeness but this is -- he is |
| 10:57:41 | 25 | not asking her questions.  He is reading her deposition.  If she |

10:57:46  1    were a party, he could do this.  She needs to demonstrate an

10:57:48  2    inconsistent statement and --

10:57:48  3              MR. STRONGMAN:  It --

10:57:48  4              MR. MICELI:  Excuse me.

10:57:50  5         And then impeach properly for each statement.  He's

10:57:53  6    saying, did you say this, you said this things, did you say this,

10:57:55  7    and he is reading.

10:57:56  8              THE COURT:  Okay.  Stop.

10:57:56  9              MR. MICELI:  Yes.

10:57:59  10             THE COURT:  All right.  The reality is I haven't heard a

10:58:01  11   real inconsistent statement yet.  Now, if you were asking me

10:58:05  12   completeness because she finishes that line and she says exactly

10:58:10  13   what she just said, you're entitled to have that portion read

10:58:14  14   during the course of the impeachment.

10:58:16  15             MR. STRONGMAN:  And my question to her was, is that

10:58:18  16   relevant to what you were asked to do, and she said yes, it is

10:58:22  17   relevant to what I was asked to do.  So that is an inconsistent

10:58:25  18   statement to what she said in that deposition.

10:58:27  19             And my concern is with regard to how questions are

10:58:32  20   answered, there are certain things for which explanations are

10:58:35  21   appropriate and there are certain things for which the answer is

10:58:38  22   pretty straightforward.

10:58:39  23             THE COURT:  I agree.

10:58:39  24             MR. STRONGMAN:  And so to me, when you give an answer to

10:58:41  25   a direct question that involves a lengthy explanation --

10:58:44  1          THE COURT:  I agree.

10:58:45  2          MR. STRONGMAN:  -- it's still, in my view, is

10:58:46  3    inconsistent.

10:58:48  4          THE COURT:  And I think in this particular question she

10:58:53  5    said it was relevant and then you read into the question but then

10:59:00  6    she explained why it wasn't relevant -- it was the same thing she

10:59:05  7    just said.  So when you stood up I thought it was going to be

10:59:07  8    completeness and she could finish her statement.

10:59:11  9          MR. STRONGMAN:  And I am done with this section, Your

10:59:14 10    Honor.

10:59:14 11          MR. MICELI:  Well, she still hasn't had her opportunity

10:59:18 12    to explain.  She asked for the opportunity and he cut her off.  Can

10:59:20 13    she complete it?  And the other thing is, Your Honor --

10:59:24 14          THE COURT:  There are two things going on here.  The

10:59:26 15    question is whether or not it's inconsistent, and I understand your

10:59:29 16    concern about the word games.  But there is -- when you read a

10:59:33 17    portion of the deposition, you're entitled to have that complete so

10:59:39 18    that the answer is completely answered in the deposition.

10:59:42 19          MR. MICELI:  And we've seen that with what we've done to

10:59:46 20    Sanofi witnesses, where we've designated 16 minutes and it's an

10:59:48 21    hour of video.

10:59:49 22          THE COURT:  Okay.  That's not the issue before me now.

10:59:51 23          MR. MICELI:  No.  But it's an option for completeness

10:59:55 24    issue, isn't it?

10:59:55 25          THE COURT:  I just said that.  I don't know how many

10:59:57 1   times I have to say it.

10:59:57 2         MR. MICELI:  Yes, Your Honor.  Yes, Your Honor.

10:59:58 3         THE COURT:  Well, if you want to, because I think the

11:00:00 4   next paragraph of her statement is exactly what she just said, and

11:00:04 5   I think pursuant to the rule of completeness, you're entitled to

11:00:07 6   have that portion read, but you need to ask.

11:00:09 7         MR. MICELI:  Well, we'll go back and I'll ask for it in

11:00:12 8   open court, if you like.

11:00:13 9         MR. STRONGMAN:  No, I'll just keep reading.

11:00:16 10        MR. MICELI:  No.  I want to ask for it, Your Honor.  If

11:00:17 11  it's something that can be done, we need to have it read.

11:00:20 12        THE COURT:  Well, the rules allow you to do it at the

11:00:23 13  time.

11:00:23 14        MR. MICELI:  Thank you.

11:00:26 15     (OPEN COURT.)

11:00:26 16        MR. MICELI:  Your Honor, before we continue then, I would

11:00:28 17  like to ask that the witness be allowed to place it in context and

11:00:32 18  read it for completeness.

11:00:34 19        THE COURT:  Okay.  And that would be line 16 through --

11:00:40 20        THE WITNESS:  What page are you on?

11:00:42 21        THE COURT:  136 through line 1 on 137.

11:00:51 22  BY MR. STRONGMAN:

11:00:51 23  Q.  So the question following:  So -- are you there, Dr. Feigal?

11:00:59 24  Are you following?

11:01:00 25  A.  Yes.  I see it right in front of me.  You want me to read it?

11:01:04  1        THE COURT:  No, ma'am, just listen.

11:01:05  2        MR. STRONGMAN:  No, I am going to read it.

11:01:05  3  BY MR. STRONGMAN:

11:01:05  4  Q.  So the next question you were asked is, "So you are not in a

11:01:08  5  position to opine whether factors of the Bradford Hill analysis

11:01:12  6  that you applied to docetaxel could be satisfied with regard to

11:01:15  7  cyclophosphamide, correct?"  And your answer, "No.  That's not what

11:01:19  8  I am saying.  There is no evidence for causality of any of the

11:01:21  9  other drugs in all of the papers, the clinical studies, and

11:01:25 10  information that I reviewed.  There's nothing to suggest increased

11:01:28 11  risk for those other drugs."

11:01:29 12        Did I read that correctly?

11:01:31 13  A.  You read that correctly.  And that's the context I was asking

11:01:35 14  about.

11:01:36 15        THE COURT:  Okay.  Thank you.

11:01:37 16  BY MR. STRONGMAN:

11:01:37 17  Q.  And, Dr. Feigal, I want to switch gears and talk a little bit

11:01:42 18  more about alopecia.

11:01:43 19        Now, you understand what a "background rate" is in terms

11:01:50 20  of your training and experience as a medical doctor, correct?

11:01:53 21  A.  I am aware of what the term is.  Do you want me to close this

11:01:58 22  depo book, or are you --

11:01:59 23  Q.  You may.

11:02:03 24  A.  Okay.

11:02:03 25  Q.  And you would certainly agree that chemotherapy is not the only

11:02:06  1   cause of permanent alopecia in the population; is that correct?

11:02:10  2   A.  Well, now you're changing terms on me.

11:02:17  3   Q.  And we'll get to --

11:02:19  4   A.  You're talking about permanent alopecia, whatever the cause.

11:02:23  5   Q.  Permanent alopecia happens in the general population of people

11:02:26  6   that don't take chemotherapy, correct?

11:02:29  7   A.  Well, it's very different, particularly in terms of the timing.

11:02:33  8   I mean, permanent chemotherapy-induced alopecia has a varied

11:02:40  9   exposure.  Other things are -- yes.  There are other causes of

11:02:45  10  permanent non-chemotherapy-induced alopecia.  So to directly answer

11:02:51  11  your question, yes.

11:02:52  12  Q.  Okay.  And as part of your work, in this case, what is the

11:02:55  13  background rate of permanent hair loss or hair thinning in the

11:03:00  14  population of women aged 50 and over?

11:03:02  15          MR. MICELI:  Object, Your Honor.  Outside of the scope.

11:03:05  16          THE COURT:  Sustained.  I think you need to move on.

11:03:10  17  BY MR. STRONGMAN:

11:03:11  18  Q.  Doctor, I want to talk a little bit more about the literature

11:03:14  19  that you went through and go through a few of the articles.

11:03:23  20          MR. STRONGMAN:  May I approach, Your Honor?

11:03:25  21          THE COURT:  Yes, you may.

11:03:31  22          THE WITNESS:  Do you want me to keep this here?

11:03:33  23          THE COURT:  Yes, please keep it there.

11:03:34  24          THE WITNESS:  Okay.  I'll set it down.  Do some weight

11:03:37  25  lifting.

11:03:42   1    BY MR. STRONGMAN:

11:03:42   2    Q.   And, Doctor, this is an article that we've talked a little bit

11:03:45   3    about with the jury that was authored by Dr. Freites-Martinez and

11:03:50   4    Dr. Tosti among others; is that correct?

11:03:52   5    A.   This is an article on quality of life with persistent

11:03:58   6    post-chemotherapy alopecia and Freites-Martinez is the first author

11:04:04   7    and Dr. Tosti is one of multiple authors on this paper, that is

11:04:09   8    correct.

11:04:10   9    Q.   Okay.   And if we could go -- this is one of the papers that you

11:04:13  10    considered, one of the 19, correct?

11:04:16  11    A.   This is one of the papers that I captured, I reviewed, and I --

11:04:21  12    yes.

11:04:21  13    Q.   Okay.   And if we could go to the table that puts out the

11:04:28  14    details of the patients in this study.   And it's on -- there we go.

11:04:34  15          Do you see that in front of you, Doctor?

11:04:37  16    A.   Well, I have the article.   Is this page 726?

11:04:40  17    Q.   Yeah.   And it's also on the screen in front of you.

11:04:43  18    A.   Actually, my vision is pretty good; I can see this.   Thank you.

11:04:46  19    Q.   Okay.   And we can tell in Dr. Tosti's paper is that with regard

11:04:52  20    to what is termed as "PCIA," there were 80 patients included that

11:04:56  21    were on taxanes; is that correct?

11:04:58  22    A.   Well, I want to first correct you.   This is not Dr. Tosti's

11:05:02  23    paper.   This is Dr. Freites-Martinez's paper.   Dr. Tosti is a

11:05:08  24    coauthor and there's -- I don't know -- nine or ten other people on

11:05:11  25    this.   And when I look at the attribution of their contributions,

11:05:18 1   Dr. Tosti was not involved in the interpretation or the analysis.

11:05:18 2   Q.  Okay.

11:05:21 3   A.  So just with that caveat now I will answer your question

11:05:24 4   because the way you asked it wasn't totally accurate and I just

11:05:28 5   wanted to correct that.

11:05:30 6   Q.  Are you ready to look at the table?

11:05:32 7   A.  Now, I am ready to answer your question, yeah.

11:05:35 8   Q.  And when you look at this table, this article included 80

11:05:38 9   individuals that they had in the PCIA category that had taken

11:05:43 10  taxanes; is that correct?

11:05:45 11  A.  No.  But I need to more fully explain the study.

11:05:48 12  Q.  I'm just asking you, if you can, to answer my questions.

11:05:52 13          THE COURT:  Ma'am -- Dr. Feigal, you need to just answer

11:05:55 14  the question.

11:05:56 15          THE WITNESS:  I answered the question, but I think it's

11:05:58 16  misleading to the jury to say out of 80 patients who took taxane --

11:06:03 17  this is an outcome study.  This is not-

11:06:06 18          MR. STRONGMAN:  Doctor, if you could --

11:06:08 19          THE COURT:  Dr. Feigal, I think there will be an

11:06:08 20  opportunity for you to explain that perhaps at a later date.  I

11:06:13 21  think the question just was were there 80 patients that took

11:06:15 22  taxanes.

11:06:16 23          THE WITNESS:  In this outcome study where alopecia was

11:06:19 24  the outcome, of those who had the outcome, 80 had taken taxane,

11:06:24 25  that's correct.

11:06:25  1    BY MR. STRONGMAN:

11:06:27  2    Q.   And all I had asked, Doctor, was in the PCIA category there

11:06:31  3    were 80 patients that took taxanes, correct?

11:06:34  4    A.   I am saying, correct.   In this outcome study where alopecia was

11:06:40  5    the event, 80 of those who had the event had taken a taxane.   We

11:06:46  6    didn't know the denominator of those who were exposed.

11:06:51  7    Q.   And let me put that aside for just one second and say -- well,

11:06:56  8    let me ask you this:   Is the denominator important information for

11:07:00  9    you when you're evaluating this outcome study?

11:07:03 10    A.   You can't possibly look at incidence in an outcome study

11:07:07 11    because you don't know how many patients were exposed.   This is

11:07:11 12    a -- may I be allowed to explain fully what this study is?

11:07:14 13    Q.   I'll ask you questions and if you can answer them.

11:07:17 14    A.   That's fine.   I won't explain.

11:07:20 15    Q.   And Doctor, when you look at this study, of the 80 patients

11:07:24 16    that were included that had PCIA, 47 of them took paclitaxel or

11:07:34 17    Taxol, correct?

11:07:36 18    A.   In this outcome study where we have no idea, how many were

11:07:39 19    exposed to either Taxol or paclitaxel --

11:07:44 20           THE COURT:   Doctor, you need to answer the question.

11:07:46 21           THE WITNESS:   There were 47 where it was found they had

11:07:52 22    paclitaxel.   That is correct.

11:07:52 23    BY MR. STRONGMAN:

11:07:52 24    Q.   And the number for Taxotere or docetaxel was 31, correct?

11:07:56 25    A.   Yes.   In this outcome study, 31 of those who had the outcome

11:08:00  1    had taken Taxotere.

11:08:03  2    Q.  And so at least for this study that you did consider, this had

11:08:08  3    more reports of PCIA in patients that had Taxol than in patients

11:08:16  4    that had Taxotere, correct?

11:08:20  5    A.  It's hard to answer this "yes or no" because I think it's very

11:08:24  6    misleading.  I could have one patient with the outcome of alopecia

11:08:29  7    and call it 100 percent.

11:08:33  8    Q.  Doctor, I just want a very basic response on this.  We can

11:08:39  9    agree that 47 Taxol patients is more than 31 Taxotere patients,

11:08:46 10    correct?

11:08:47 11    A.  47 is a bigger number than 31, I'll agree to that.

11:08:52 12    Q.  And, Doctor, you would agree that a patient couldn't take a

11:08:59 13    Taxol regimen without at least some risk of permanent hair loss,

11:09:04 14    correct?

11:09:07 15            MR. MICELI:  Object to the form.  It's outside the scope

11:09:10 16    of -- outside of the scope.

11:09:13 17            THE COURT:  I am going to allow the question.

11:09:18 18            THE WITNESS:  Could you repeat your question?

11:09:20 19            MR. STRONGMAN:  Sure.

11:09:21 20    BY MR. STRONGMAN:

11:09:21 21    Q.  Doctor, you would agree that a patient cannot take a Taxol

11:09:25 22    regimen without some risk of permanent hair loss, correct?

11:09:27 23    A.  You can't say anything about risk in an outcome study because

11:09:36 24    you've already chosen the outcome.

11:09:39 25    Q.  And, Doctor, I want you to just focus on my question.

11:09:43  1    A.  I am.  And risk is a -- you have to know what the denominator

11:09:54  2    is that was exposed to the drug.  And I don't have any -- I don't

11:09:56  3    have any idea of how many were exposed, so I can't calculate risk.

11:10:00  4              THE COURT:  I have a question, Mr. Strongman.  Are you

11:10:03  5    asking in reference to this study or just in reference to people

11:10:09  6    anywhere being administered Taxol?

11:10:10  7              MR. STRONGMAN:  I asked a general question.

11:10:12  8              THE COURT:  Okay.  That's what I thought.

11:10:14  9              THE WITNESS:  Okay.  So the general question, I don't

11:10:17 10    have information from my review of the worldwide literature where

11:10:22 11    over 90 percent of the Taxol is in the Freites-Martinez study and

11:10:27 12    not in any of the other 18 studies that a patient would experience

11:10:32 13    an increased risk of PCIA, if they took Taxol.

11:10:36 14    BY MR. STRONGMAN:

11:10:37 15    Q.  Doctor, I didn't ask you about an increased risk, okay?  My

11:10:41 16    specific question to you was that you would agree that a patient

11:10:49 17    could not take a Taxol regimen without some risk of permanent hair

11:10:55 18    loss, correct?

11:10:56 19    A.  No.  I don't have any evidence to suggest that that would be an

11:11:02 20    adverse event that would be seen in those patients.  That's based

11:11:07 21    on what I've seen about data with Taxol.

11:11:09 22    Q.  And, Doctor, when you talk about the evidence that you've seen,

11:11:15 23    that would include the article we're looking at where 47 patients

11:11:22 24    that took Taxol were diagnosed as having PCIA, correct?

11:11:27 25              MR. MICELI:  Object to the form.  Asked and answered.

11:11:31  1          THE COURT:  Overruled.  I am going to allow this one

11:11:33  2   question.

11:11:33  3          THE WITNESS:  So the problem I am having when you speak

11:11:36  4   about risk is you have -- whether it's relative risk or it's any

11:11:40  5   risk, you can't even calculate an incidence for this.  Let me

11:11:45  6   explain.  You need to know how many -- you need to know how many

11:11:49  7   patients were exposed before you can talk about risk.

11:12:02  8   BY MR. STRONGMAN:

11:12:03  9   Q.  Doctor, I was simply asking you a question that you did see in

11:12:06 10   the literature that there were patients that were exposed to Taxol

11:12:13 11   that were diagnosed with PCIA, correct?

11:12:15 12          MR. MICELI:  Objection to the form.

11:12:17 13          THE COURT:  Overruled.

11:12:19 14          THE WITNESS:  In the Freites-Martinez article, he reports

11:12:28 15   apparently antidotal cases, no other paper has done, in his article

11:12:34 16   of PCIA with Taxol.

11:12:37 17   BY MR. STRONGMAN:

11:12:38 18   Q.  So the answer is yes, correct?

11:12:40 19   A.  I think I answered it, multiple times.

11:12:50 20          MR. STRONGMAN:  May I approach?

11:12:51 21          THE COURT:  Yes, you may.

11:13:04 22   BY MR. STRONGMAN:

11:13:05 23   Q.  And what we've got here, Doctor, is a poster presentation by

11:13:08 24   Dr. Crown.

11:13:12 25          MR. STRONGMAN:  And that's T1086, Jen.

11:13:12  1    BY MR. STRONGMAN:

11:13:15  2    Q.  And you reviewed the information from Dr. Crown as part of your

11:13:19  3    work in this case; is that correct?

11:13:20  4    A.  That is correct.

11:13:23  5            And Crown was very relevant for dose response for

11:13:26  6    Taxotere.

11:13:27  7    Q.  And, Doctor, I wanted to look through the results section,

11:13:33  8    right there in the middle.

11:13:35  9            Do you see it?

11:13:35  10   A.  Yes, I do.

11:13:36  11   Q.  And according to this poster presentation that you reviewed as

11:13:45  12   part of forming your opinions, in this case, the highest overall

11:13:51  13   incidence of permanent alopecia was for patients receiving

11:13:59  14   anthracyclines, correct?

11:14:00  15   A.  Actually, I am not interpreting it that way.  I am looking at

11:14:04  16   the overall incidence -- he is including in anthracyclines,

11:14:11  17   apparently, patients who are also exposed to docetaxel.

11:14:17  18   Q.  Doctor, if you could look with me, it's on your screen.

11:14:19  19   A.  I am, yeah.

11:14:19  20   Q.  It says, "The overall incidence of permanent alopecia for

11:14:22  21   patients receiving anthracyclines was 19 percent," correct?

11:14:26  22            Did I read that correctly?

11:14:27  23   A.  You are reading that correctly, yes.

11:14:29  24   Q.  And then it says "The overall incidence of permanent alopecia

11:14:32  25   for patients receiving docetaxel was 15 percent."

1220

11:14:35  1         Did I read that correctly?

11:14:37  2  A.  You're reading this correctly.  But I think there's an issue

11:14:41  3  with what I would call "bologna slicing" in terms of how they're

11:14:47  4  subsetting these percentages.  But, yes, you read it correctly.

11:14:50  5  Q.  And, Doctor, it says "the overall incidence of permanent

11:14:52  6  alopecia for patients receiving paclitaxel or Taxol was

11:14:56  7  13 percent," correct?

11:14:57  8  A.  Once again, you're reading the poster correctly.

11:15:01  9  Q.  Okay.  And then it breaks it down by grades, Grade 1 and Grade

11:15:06 10  2, correct?

11:15:09 11  A.  They break down toxicity by grade, one and two.

11:15:13 12  Q.  And so if you look at the Grade 2 alopecia, you see the highest

11:15:20 13  number is for Taxol with 9 percent, correct?

11:15:27 14  A.  You're looking at the table in the middle, or what are you

11:15:31 15  looking at right now?

11:15:32 16  Q.  It's highlighted right on your screen there.

11:15:34 17  A.  Oh, on the screen, I'm sorry.

11:15:35 18  Q.  It's on the table in your hand and it's also right on the

11:15:39 19  screen there.

11:15:39 20         Do you see that, Doctor?

11:15:40 21  A.  I see that, yes.

11:15:42 22  Q.  Okay.  And it says that the percentage of Grade 2 for

11:15:47 23  anthracyclines was 6 percent.

11:15:48 24         Do you see that?

11:15:50 25  A.  Yeah.  I do have an issue with how they're slicing the numbers,

11:15:56  1   but you're reading that correctly.

11:15:57  2   Q.  And then with regard to docetaxel, the percentage of Grade 2 is

11:16:02  3   3 percent, correct?  Did I read that correctly?

11:16:10  4   A.  You're reading that line correctly and it depends on how

11:16:14  5   they're slicing the numbers because I think you'll see the

11:16:19  6   20 percent in the other table.

11:16:20  7   Q.  And, Doctor --

11:16:21  8   A.  For Taxol.

11:16:22  9   Q.  And, Doctor, you would agree with me that 3 percent is less

11:16:26 10   than 6 percent, correct?

11:16:27 11   A.  We sort of do these simple math questions and I think it's

11:16:35 12   misleading how you're doing it.  But you are correct.  The number

11:16:37 13   three is less than the number six.

11:16:38 14   Q.  And we can agree that the number three is less than nine,

11:16:41 15   correct?

11:16:42 16   A.  Yeah.  As I said, these are artificially slicing the subsets.

11:16:51 17   Scientifically, I have a problem with how this data is being

11:16:54 18   presented because if you just go to the next table in the identical

11:16:59 19   poster we're looking at, you see the incidence is 25 percent --

11:17:03 20               THE COURT:  Doctor, the question was:  Is the number

11:17:05 21   three less than the number nine?

11:17:08 22               THE WITNESS:  I answered that.

11:17:09 23               THE COURT:  Okay.  Thank you.

11:17:10 24   BY MR. STRONGMAN:

11:17:10 25   Q.  And, Doctor, the Crown study and poster that we're looking at,

11:17:15 1    reported cases of permanent alopecia with patients that took Taxol

11:17:24 2    and Adriamycin together, correct?

11:17:30 3    A.  Please state your questions again.

11:17:32 4    Q.  The Crown poster that we're looking at --

11:17:35 5    A.  Yeah.

11:17:35 6    Q.  -- reported cases of permanent alopecia for patients that took

11:17:42 7    Taxol and Adriamycin together, correct?

11:17:44 8    A.  Yeah, 23 patients.

11:17:49 9    Q.  Okay.  And, Doctor, for a patient that took Adriamycin and

11:17:55 10   Taxol together and had permanent chemotherapy-induced alopecia,

11:18:01 11   what was the cause in that patient?

11:18:05 12   A.  It's an antidotal.

11:18:07 13          MR. MICELI:  Object, it's outside the scope.  She is not

11:18:10 14   here to do specific causation.

11:18:15 15          MR. STRONGMAN:  It's not specific causation.

11:18:18 16          MR. MICELI:  You're asking what caused it in people.

11:18:27 17          THE COURT:  I am going to allow the question.  Overruled.

11:18:30 18   BY MR. STRONGMAN:

11:18:31 19   Q.  Do you need me to repeat it, Doctor?

11:18:33 20   A.  No, I heard the question.  And the way I was going to answer it

11:18:37 21   is, these are antidotal cases.  I can't say anything about

11:18:42 22   causation.

11:18:43 23   Q.  Okay.  So I just want to make sure I understand your testimony.

11:18:47 24   So if you have a patient that took an anthracycline like Adriamycin

11:18:54 25   and they also took Taxol together and that patient had an outcome

11:19:00  1    of permanent chemotherapy-induced alopecia, like we have in the

11:19:04  2    Crown study, your testimony is that you can't say anything about

11:19:09  3    what caused the PCIA in that patient; that is correct?

11:19:13  4             MR. MICELI:  Your Honor, again, it's outside the scope.

11:19:16  5    This is specific causation.

11:19:20  6             THE COURT:  Overruled again.  The witness can answer if

11:19:25  7    she can.

11:19:27  8             THE WITNESS:  Yeah.  So my answer is:  I think earlier in

11:19:31  9    this testimony -- and I am explaining my answer because it's not a

11:19:35 10    yes or no answer -- is that I spoke about the Bradford Hill

11:19:39 11    criteria that you need to do to assess causation.  This does not

11:19:43 12    satisfy that.  I can agree it's an antidotal case.  I can't agree

11:19:49 13    that it causes permanent chemotherapy-induced alopecia.

11:19:55 14    BY MR. STRONGMAN:

11:19:56 15    Q.  Can we agree that in a patient that took the Adriamycin and the

11:20:00 16    Taxol and had permanent chemotherapy-induced alopecia there was a

11:20:06 17    cause of the condition?  Can we agree to that?

11:20:08 18             MR. MICELI:  Same objection, Your Honor, outside of the

11:20:10 19    scope.

11:20:10 20             THE COURT:  I think we've covered this ground enough.

11:20:14 21    It's time to move on.

11:20:15 22    BY MR. STRONGMAN:

11:20:15 23    Q.  And, Doctor, you talked a lot about numerators and denominators

11:20:22 24    just a minute ago.  And you talked about the reports that you

11:20:28 25    looked up in the literature.  And I think you would agree, you said

11:20:33  1    the exposure is important; is that correct?  The overall exposure

11:20:38  2    when we were talking about Freites-Martinez and Tosti article, you

11:20:43  3    said it's really important to know the exposure.

11:20:46  4         Do you remember that?

11:20:47  5    A.  Well, I remember that and I remember I needed to provide some

11:20:55  6    context for why I was saying that.  Because you can't get the event

11:20:58  7    unless you have the exposure.

11:21:02  8    Q.  And as part of forming your opinions, in this case, you didn't

11:21:07  9    offer any opinions on the overall exposure of patients who took

11:21:13 10    Taxotere, correct?

11:21:17 11         MR. MICELI:  Object again.  Outside of the scope, Your

11:21:22 12    Honor.

11:21:22 13         THE COURT:  Sustained.

11:21:24 14         THE WITNESS:  I'm sorry.  I couldn't hear what your

11:21:26 15    ruling was.

11:21:27 16         THE COURT:  Okay.  I think we need to move on.

11:21:30 17    BY MR. STRONGMAN:

11:21:30 18    Q.  Doctor, I want to look at another article that you looked at.

11:21:53 19         MR. STRONGMAN:  May I approach, Your Honor?

11:21:55 20         THE COURT:  Yes, you may.

11:22:05 21    BY MR. STRONGMAN:

11:22:06 22    Q.  Doctor, this is a letter to the editor by a Dr. Palamaras.  Did

11:22:13 23    I read that correctly?

11:22:16 24    A.  Is this the permanent chemotherapy-induced alopecia review

11:22:20 25    letter to the editor?

11:22:21   1   Q.  Correct.  Do you see that --

11:22:21   2   A.  I see it.

11:22:23   3   Q.  And if you turn the page it is written by a Dr. Palamaras.  Do

11:22:28   4   you see that?

11:22:29   5   A.  Yes, I see that.

11:22:36   6           MR. STRONGMAN:  And this is D1306, Jen.

11:22:36   7   BY MR. STRONGMAN:

11:22:45   8   Q.  And this was an article that you reviewed; isn't that correct?

11:22:49   9   A.  Yes.  This is a letter to the editor that I reviewed and I

11:22:52  10   believe included in my table.

11:22:54  11   Q.  And with regard to your commentary on denominators, I wanted to

11:23:00  12   look at the third paragraph down and it says, "We reviewed."

11:23:06  13           Do you see that, Doctor?

11:23:07  14   A.  Yeah.  Let me just look at this.  Well, yeah, this is an

11:23:13  15   outcome study.

11:23:14  16   Q.  Yeah.  And it says --

11:23:16  17   A.  There's no -- yeah.

11:23:18  18   Q.  Doctor, if you can focus on my question, okay?

11:23:21  19           So this paragraph reads:  "We reviewed 8,430 records of

11:23:27  20   patients with non-scarring alopecia.  Of these, seven cases of

11:23:31  21   CIPAL were identified (.083 percent), two following chemotherapy

11:23:43  22   with busulfan and five following treatment with taxanes."

11:23:49  23           Did I read that correctly?

11:23:50  24   A.  Yes.  You read the outcome study correctly.

11:23:53  25   Q.  And we can agree that providing context like the fact that the

11:23:58 1   seven cases reported in this Palamaras article was .083 percent of

11:24:06 2   the patients that they looked at.  That's important context,

11:24:09 3   correct?

11:24:10 4   A.  No.

11:24:10 5   Q.  You don't think that's important at all?

11:24:12 6   A.  No.  I mean, if you look, this appears to be a dermatology

11:24:18 7   clinic and the outcome non-scarring alopecia is why they're being

11:24:25 8   referred to the dermatology clinic.  You know, nothing about the

11:24:29 9   numbers that actually got exposed.  Some of these may not even be

11:24:35 10  chemotherapy-induced.  Many -- most of them are not.

11:24:38 11  Q.  Well, the authors of this letter to the editor thought it was

11:24:41 12  important to point out that it was .083 percent of the records of

11:24:46 13  patients that they reviewed where they found chemotherapy-induced

11:24:51 14  permanent alopecia, correct?

11:24:53 15  A.  Correct.  For a dermatology clinic whose business is to see

11:24:58 16  patients who have alopecia.

11:25:02 17  Q.  And, Doctor --

11:25:03 18  A.  -- of all types.

11:25:03 19  Q.  And, Doctor, I want to talk about biological plausibility for a

11:25:08 20  moment, okay?

11:25:08 21  A.  Are you done with this?

11:25:09 22  Q.  You may set Palamaras aside.

11:25:09 23  A.  Okay.

11:25:13 24  Q.  You were asked some questions about biologic plausibility.

11:25:16 25          Do you remember that?

11:25:17  1   A.  Yes, I do.

11:25:17  2   Q.  It was one of your puzzle pieces, correct?

11:25:20  3   A.  Correct.

11:25:20  4   Q.  And you would agree that you talked about biological

11:25:23  5   plausibility in terms of -- one of the things that you described

11:25:28  6   was how chemotherapy or how Taxotere specifically impacted rapidly

11:25:33  7   dividing cells.

11:25:34  8          Do you remember that?

11:25:35  9   A.  Yeah.  In terms of the explanation for reversible, temporary

11:25:40 10   alopecia.

11:25:40 11   Q.  And you could certainly agree that in all fairness, most all of

11:25:45 12   the chemotherapies that we've talked about have an effect on

11:25:48 13   rapidly dividing cells, correct?

11:25:50 14   A.  Yes.  And the impact on reversible alopecia, I agree.

11:25:55 15   Q.  And you would certainly agree that there is no proven mechanism

11:26:00 16   of action with regard to how chemotherapy may cause permanent hair

11:26:04 17   loss, correct?

11:26:05 18   A.  What I said is there was a plausible mechanism and I think I am

11:26:13 19   consistent with what you're saying -- I agree it has not been

11:26:17 20   proven.

11:26:17 21   Q.  Okay.  There's a hypothesis, correct?

11:26:21 22   A.  There is a plausible mechanism of action for how it may occur

11:26:24 23   and people have written about it.

11:26:27 24   Q.  And, Doctor, you've done nothing yourself to try to prove this

11:26:31 25   hypothesis on biologic plausibility, correct?

11:26:37 1          MR. MICELI:  Objection, Your Honor.  Misstates.  She

11:26:39 2    never said it was a hypothesis.

11:26:39 3          MR. STRONGMAN:  Can we keep the speaking objections down,

11:26:45 4    please?

11:26:45 5          THE COURT:  Objection is sufficient.  I'm going to

11:26:49 6    overrule the objection as an expert.

11:26:52 7          THE WITNESS:  I am not sure what you're asking.  Am I in

11:26:55 8    the lab looking at laboratory mechanisms of action?  Is that what

11:26:59 9    you're asking?

11:27:00 10   BY MR. STRONGMAN:

11:27:01 11   Q.  Have you yourself done any research to try to prove the

11:27:06 12   mechanism of action for how chemotherapy could cause permanent

11:27:11 13   chemotherapy-induced alopecia?

11:27:11 14   A.  Have I personally conducted --

11:27:13 15   Q.  Correct --

11:27:16 16   A.  -- laboratory research on this?  The answer is, no.

11:27:20 17   Q.  And you talked about dose response and I want to talk about

11:27:25 18   that just for a minute.  And if you could pull Crown back up, do

11:27:29 19   you still have that up there?

11:27:31 20   A.  The poster?

11:27:32 21   Q.  Yes, Doctor.

11:27:32 22   A.  Yes, I have the poster.

11:27:35 23         MR. STRONGMAN:  And that's D1086, Jen.

11:27:35 24   BY MR. STRONGMAN:

11:27:39 25   Q.  And when you talked about dose response, Mr. Miceli said that

11:27:43  1    when you wrote your report, you provided a table of the studies

11:27:47  2    that you looked at.

11:27:48  3              Do you remember that?

11:27:49  4    A.  Yes.

11:27:50  5    Q.  And you had a column where you identified what studies went to

11:27:55  6    what puzzle piece.

11:27:57  7              Do you remember that?

11:27:59  8    A.  Yes.

11:28:00  9    Q.  And so for dose response, you identified two studies; is that

11:28:05 10    correct?

11:28:05 11    A.  I identified Martin and Crown.

11:28:07 12    Q.  Very good.

11:28:08 13              And so with regard to the first one, and we're going to

11:28:11 14    look at both of them, okay?  So Crown is the first one I want to

11:28:14 15    look at because you have it up there already.  And what we see in

11:28:19 16    Crown is if you look over at the results on the far right, it

11:28:27 17    states that, "The incidence of alopecia was significantly

11:28:32 18    docetaxel-dose dependent?"

11:28:33 19              Did I read that correctly?

11:28:36 20    A.  You read that correctly on the poster, that's correct.

11:28:39 21    Q.  Okay.  And it says, "For dose 300, seven percent all Grade 1."

11:28:46 22              Did I read that correctly?

11:28:51 23    A.  Yes, you read that correctly.  That Grade 1 dose of 300.

11:28:56 24    Q.  And I want you to assume that Ms. Kahn received a cumulative

11:29:00 25    dose of 285, okay?  I just want you to assume that, okay?

11:29:05   1    A.   Yeah.   And I think as you recall I stated, there's no minimum

11:29:08   2    threshold below which you don't see this.

11:29:13   3    Q.   I am just asking you to make that assumption with me, okay?

11:29:16   4    A.   Yeah, no, I hear it.

11:29:17   5    Q.   And if you look at the Crown, one of the articles that you

11:29:20   6    identified as being important to dose response --

11:29:23   7    A.   Yes.

11:29:25   8    Q.   -- there is nobody in the Crown study that received a

11:29:30   9    cumulative dose 300 or less that had Grade 2 alopecia, correct?

11:29:38  10    A.   In this particular study, the way they presented the data -- I

11:29:45  11    am just looking.   It looks like, no, that's not accurate.   If you

11:29:51  12    look at the other table -- not that table, but the one under,

11:29:55  13    "Results," when you look at Grade 2 percentage for all docetaxel,

11:30:00  14    it says there was 3 percent Grade 2.

11:30:05  15    Q.   Doctor --

11:30:06  16    A.   I mean, it's the same poster.

11:30:08  17    Q.   Doctor, what we're looking at right here, it says, D300 7

11:30:12  18    percent".

11:30:13  19            Do you see that?

11:30:14  20    A.   No, I see what you're saying.

11:30:16  21    Q.   Did I read that correctly?

11:30:18  22    A.   You're reading that part of the poster correctly.

11:30:21  23    Q.   And it says that, "All Grade 1."

11:30:24  24            Did I read that part of the poster correctly?

11:30:26  25    A.   You read that part of the poster correctly.   There's just

11:30:30 1   another part of the poster you're not reading.

11:30:34 2           MR. MICELI:  Your Honor, can we ask for completeness.

11:30:36 3           THE COURT:  I think we're going to cover all of this on

11:30:40 4   redirect, is my guess.

11:30:44 5           MR. MICELI:  Thank you.

11:30:56 6           MR. STRONGMAN:  May I approach, Your Honor?

11:30:58 7           THE COURT:  Yes, you may.

11:31:09 8           MR. STRONGMAN:  This is D1259, Jen.

11:31:20 9   BY MR. STRONGMAN:

11:31:21 10  Q.  And, Doctor, this was one of the studies that you considered in

11:31:24 11  forming your opinions in this case; is that correct?

11:31:26 12  A.  I actually don't see this article.  Let me just check my table.

11:31:45 13  Oh, is this the study in Spain?  Yes, I do have this study.  I was

11:31:50 14  just a little bit -- didn't recognize the title but, absolutely, I

11:31:54 15  have this study and this is one of the dose-response criteria I was

11:32:01 16  looking at.

11:32:02 17  Q.  All right.  And what I wanted to point out -- again, if you

11:32:05 18  want to look with me at page 630, which is about four pages in

11:32:10 19  under the table there, there's a paragraph that says, "Taking

11:32:15 20  together."

11:32:16 21          Do you see that?

11:32:18 22  A.  I am getting there.  I am just trying to bookmark a few things

11:32:23 23  without post-its.  Page 630?

11:32:26 24  Q.  Correct.

11:32:27 25  A.  Okay.  And where?

11:32:29  1   Q.  There's a paragraph that says, "Taking together."

11:32:33  2           Do you see that?  It's in the first column.

11:32:41  3   A.  Yeah, yeah.  I was on the wrong page.

11:32:43  4   Q.  And it's on the screen if you need it.

11:32:45  5   A.  Got it.

11:32:45  6   Q.  Okay.  It says, "Taking together the three institutions,

11:32:48  7   Grade 2 permanent alopecia was seen in patients receiving docetaxel

11:32:52  8   regimens with a cumulative dose greater than 400 milligrams per

11:32:58  9   meter squared," -- and then it gives some numbers -- "But not in 59

11:33:03 10   patients with docetaxel regimens reaching lower cumulative dose of

11:33:08 11   the drug 300 milligrams per meter squared, or chemotherapy regimens

11:33:12 12   not containing docetaxel."

11:33:14 13           Did I read that correctly?

11:33:16 14   A.  Yes, you read that correctly.

11:33:18 15   Q.  And so based on your other dose response article, are there any

11:33:24 16   patients in the Martin article that are reporting Grade 2 alopecia

11:33:30 17   that receive a cumulative dose of 300 or less?

11:33:34 18   A.  Yeah, because it's in black and white, I am trying to decipher

11:33:41 19   the color coding here.

11:33:43 20   Q.  If you can, I think the language in the paragraph answers that

11:33:47 21   question, too.  But take your time.

11:33:50 22   A.  Well, it would appear that there's no Grade 2 with the lower

11:33:56 23   cumulative dose, but they do have Grade 1.

11:34:00 24   Q.  Okay.  And paclitaxel has Grade 1 in this study as well,

11:34:06 25   correct?

11:34:09 1    A.  Yeah.  That's the lighter bar.  Yes, that's correct.

11:34:12 2    Q.  Now, Doctor, I want to talk briefly about TAX316.  In TAX316,

11:34:30 3    you talked about that with Mr. Miceli and you talked about how

11:34:33 4    there was patients with what was termed in the study as "ongoing

11:34:38 5    alopecia" in the study.  Do you remember that?

11:34:40 6    A.  Yeah.  Ongoing alopecia at the end of the ten year follow-up

11:34:45 7    period.

11:34:45 8    Q.  And, Dr. Feigal, you would agree with me that at the end of the

11:35:01 9    follow-up period, there were cases of ongoing alopecia in both arms

11:35:05 10   of the study; is that correct?

11:35:07 11   A.  That is correct.  It was just almost double in the other arm,

11:35:12 12   but that is correct.

11:35:12 13   Q.  And specifically, there were 29 cases of ongoing alopecia in

11:35:19 14   the TAC arm, correct?

11:35:20 15   A.  There were 29 in the Taxotere-containing arm.

11:35:23 16   Q.  And then there were 16 in the FAC arm, correct?

11:35:28 17   A.  There were 16 in the fluorouracil/AC arm.

11:35:34 18   Q.  Okay.  And so with regard to those numbers, that's 45 patients

11:35:39 19   total; is that correct?

11:35:40 20   A.  Not at all.

11:35:41 21   Q.  Well, 29 and 16 equals 45, correct?

11:35:44 22   A.  You don't scramble up arms that way.  As I tried to explain,

11:35:51 23   the scientifically valid way to look at a randomized controlled

11:35:57 24   clinical trial is you analyze them by the arm that they're

11:36:01 25   randomized to.  You don't mix them up.

11:36:03 1   Q.  Well, Doctor, I want to focus on my question.

11:36:06 2   A.  I am focusing on your question, but you're basing it on an

11:36:10 3   invalid scientific exercise.

11:36:12 4         THE COURT:  Okay.  But you need to answer his question in

11:36:16 5   and then in redirect you can --

11:36:18 6         THE WITNESS:  I'm trying.

11:36:20 7   BY MR. STRONGMAN:

11:36:21 8   Q.  Doctor, in the TAX316 study, there was a total of 45 patients

11:36:26 9   that were identified as having ongoing alopecia, correct?

11:36:31 10  A.  Say your question again.  You're just saying PCIA was

11:36:36 11  identified in a total of 45 patients?

11:36:38 12  Q.  I am saying that ongoing alopecia, as described in the study,

11:36:42 13  was identified in 45 patients, correct?

11:36:45 14  A.  That statement is correct.

11:36:46 15  Q.  Okay.  And of those 45 patients, 45 received Adriamycin,

11:36:53 16  correct?

11:36:54 17  A.  That is not a valid way to present information accurately to

11:37:00 18  the jury, and I am not going to say that's correct.

11:37:04 19        MR. STRONGMAN:  I am going to request that she answer the

11:37:05 20  question.

11:37:06 21        THE COURT:  You need to answer the question.  If it's yes

11:37:10 22  or no --

11:37:10 23        THE WITNESS:  It's not a "yes" or "no" answer.

11:37:16 24  BY MR. STRONGMAN:

11:37:16 25  Q.  Doctor, it's a simple question.  Of those --

1235

11:37:20   1   A.  But it's based on an invalid manipulation of the data, and I am

11:37:26   2   concerned it's misleading the jury.

11:37:29   3          THE COURT:  You still need to answer the question,

11:37:32   4   Dr. Feigal.

11:37:34   5          MR. MICELI:  I understand the Court's instruction, Your

11:37:36   6   Honor, but I am going to object to badgering here in a moment

11:37:39   7   because he has to give her the opportunity --

11:37:41   8          THE COURT:  Okay.  But I think the question is whether or

11:37:45   9   not those 45 patients contained Adriamycin and that's a "yes" or

11:37:51  10   "no" and then you may explain it.

11:37:54  11   BY MR. STRONGMAN:

11:37:55  12   Q.  So my question is:  Of those 45 patients that had ongoing

11:37:59  13   alopecia, 45 of them received Adriamycin as part of their regimen,

11:38:06  14   correct?

11:38:07  15   A.  Well, the correct answer is 1491 patients received Adriamycin

11:38:14  16   and cyclophosphamide.

11:38:16  17   Q.  Doctor, that wasn't my question.

11:38:18  18   A.  I know that wasn't your question.  Okay.  Yes.

11:38:21  19          45 is less than 1491 and 45 received AC.

11:38:27  20   Q.  Okay.  And so when you say "AC," that means 45 also received

11:38:33  21   Cytoxan, correct?

11:38:35  22   A.  45 received the regimen of AC.

11:38:38  23   Q.  Okay.  And then you also had patients that received the 5-FU,

11:38:46  24   correct?  And that was in the group that had 16, correct?

11:38:53  25   A.  The 5-FU -- so I am trying to answer your question.  There were

11:38:57  1    only two arms in the trial.

11:38:59  2    Q.  Correct.

11:38:59  3    A.  So the 5-FU containing arm had a 16 with ongoing alopecia.

11:39:08  4    Q.  And, Doctor, what I think is important is that even in TAX316,

11:39:16  5    there were cases of what you are calling permanent

11:39:21  6    chemotherapy-induced alopecia in the group of patients that never

11:39:23  7    received Taxotere, correct?

11:39:26  8    A.  There are anecdotal cases seen, I agree.

11:39:30  9    Q.  And, Doctor, you would agree with me that in TAX316 in the 16

11:39:40 10    FAC patients that it was either the A or C or both that caused the

11:39:51 11    permanent alopecia, correct?

11:39:52 12    A.  I think we've been over this.  Cases does not equal causation.

11:39:59 13    There are anecdotal cases that have been seen.  I have to do a

11:40:04 14    causation analysis to establish causation.

11:40:09 15    Q.  Doctor, sitting here today, can you tell me yes or no whether

11:40:22 16    it was the A that caused the permanent alopecia in those 16

11:40:25 17    patients?

11:40:25 18    A.  It's not a "yes" or "no" answer.

11:40:29 19            MR. MICELI:  Object to the scope.

11:40:37 20    BY MR. STRONGMAN:

11:40:37 21    Q.  Doctor --

11:40:38 22            THE COURT:  Sustained.

11:40:41 23            MR. MICELI:  Thank you.

11:40:41 24    BY MR. STRONGMAN:

11:40:42 25    Q.  Doctor, you would agree with me that it could be the A, the C,

11:40:46 1  or both, correct?

11:40:47 2  A.  I would say -- I don't know how many times I can say this.

11:40:56 3  Anecdotal cases are seen in the control arm.  That does not equal

11:41:02 4  causation.

11:41:03 5  Q.  And, Doctor, can you turn with me to the 9/20/2019 tab in your

11:41:12 6  book?

11:41:13 7  A.  Sure.  2019?

11:41:19 8  Q.  Yes, Doctor.

11:41:20 9  A.  Okay.

11:41:41 10         THE COURT:  What page?

11:41:43 11         THE WITNESS:  I'm there.

11:41:44 12         MR. STRONGMAN:  I want you to turn to page 1236.

11:41:53 13         THE WITNESS:  I'm there.

11:41:54 14  BY MR. STRONGMAN:

11:42:01 15  Q.  And you can see -- and just for completeness, I'll read

11:42:03 16  starting on line 12.  Tell me when you're there.  Are you there?

11:42:09 17  A.  Yeah, I'm here.

11:42:10 18  Q.  "Question:  Doctor, sitting here today, can you tell me that it

11:42:15 19  was the F that caused the permanent alopecia in 16, yes or no?

11:42:21 20         "Answer:  Highly unlikely because there's nothing in the

11:42:23 21  literature about the 5-FU.

11:42:26 22         "Doctor, sitting here today can you tell me yes or no

11:42:31 23  whether it was the A that caused the permanent alopecia in those 16

11:42:34 24  patients?

11:42:35 25         "Answer:  It could be either A or C or both.

11:42:40  1          "And so you would agree with me that it could have been

11:42:43  2  the A, the C or both, correct?

11:42:47  3          "Answer:  It could have been both, right."

11:42:52  4          Did I read that correctly?

11:42:53  5  A.  You read it right.  But later in the testimony, it's corrected.

11:42:59  6  Q.  Doctor, did I read that correctly?

11:43:01  7  A.  You read that part of the transcript correctly, yes.

11:43:10  8  Q.  Doctor, last topic.  You talked about the peer-review process

11:43:15  9  with Mr. Miceli.

11:43:16 10          Do you remember that?

11:43:17 11  A.  Yes, I'm sorry.  I'm nodding my head.

11:43:22 12  Q.  And the reality is that prior to being hired, in this case, you

11:43:29 13  had never written or published or presented -- are you okay?

11:43:34 14  A.  Oh, sorry.  It fell off.  I was replacing it.  I was trying to

11:43:38 15  be appropriate.

11:43:39 16  Q.  No problem.  I'll reask my question.

11:43:41 17          Prior to being retained, in this case, you had never

11:43:44 18  written, published, or presented on Taxotere use in early-stage

11:43:48 19  breast cancer, correct?

11:43:49 20  A.  I can't say that is correct.  You're talking about -- I am an

11:43:58 21  oncologist.  I may have talked about taxanes -- I wrote a chapter

11:44:01 22  about taxanes, so I surely published on some of this and may have

11:44:07 23  presented it.  Are you asking -- well, anyway, in breast cancer,

11:44:11 24  yes, I probably have presented.

11:44:13 25  Q.  Doctor, let me just ask the question and make sure you and I

11:44:16 1   are on the same page, okay?

11:44:18 2   A.  Okay.

11:44:18 3   Q.  Just so it is clean, you have not written, researched,

11:44:22 4   published, or presented on Taxotere or docetaxel to treat

11:44:27 5   early-stage breast cancer; is that correct?

11:44:33 6   A.  I can't say offhand because I am an oncologist who does a lot

11:44:38 7   of presentations.  I may have presented on it and I wrote a chapter

11:44:42 8   on taxanes.

11:44:43 9   Q.  And your chapter that you wrote on taxanes had nothing to do

11:44:46 10  with breast cancer specifically?

11:44:47 11  A.  It wasn't specifically to breast cancer, that's correct.

11:44:49 12  Q.  And prior to being hired, in this case, you had never written

11:44:52 13  or published or presented on permanent chemotherapy-induced

11:44:56 14  alopecia, correct?

11:44:58 15  A.  No.  As an oncologist for -- the answer is no.  But I am very

11:45:04 16  aware of the alopecia that occurs in cancer patients, including

11:45:09 17  breast cancer patients.

11:45:10 18  Q.  Doctor, you know, Mr. Miceli held up your CV and you talked

11:45:14 19  about your publications.  Do you remember that?

11:45:16 20  A.  Oh, were you only talking about publications?

11:45:21 21  Q.  And I am saying, Doctor, if I go through your CV and I look at

11:45:24 22  your publications, I am not going to find one that has PCIA as a

11:45:27 23  topic, correct?

11:45:28 24  A.  Oh, I'm sorry, okay.  That is correct.  I haven't published on

11:45:32 25  PCIA.  Yes, that's correct.

11:45:34 1   Q.  And the fact of the matter is, prior to coming into court

11:45:41 2   today, you had never published any kind of paper where you took the

11:45:46 3   Bradford Hill criteria, applied them to Taxotere, and submitted

11:45:51 4   that to peer review, correct?

11:45:53 5   A.  Well, to tell you -- the answer is, no.  But to tell you the

11:46:00 6   truth, I didn't -- I wasn't aware of the magnitude of the problem

11:46:03 7   until they engaged me in the litigation.

11:46:05 8   Q.  And, Doctor, my question is:  Reality -- sitting here today --

11:46:11 9   you have never published any article in the real world -- outside

11:46:17 10  of the litigation world -- in the real world, you have never

11:46:21 11  published any article through the peer review process where you

11:46:25 12  have stated that Taxotere causes PCIA, correct?

11:46:29 13              MR. MICELI:  Object to the form.  Asked and answered.

11:46:32 14              THE COURT:  Asked and answered.  Let's move on.

11:46:39 15  BY MR. STRONGMAN:

11:46:39 16  Q.  And, Doctor, just so it is clear, you are talking about

11:46:42 17  causation; is that correct?

11:46:44 18  A.  Yes.

11:46:44 19  Q.  And you are not coming into this courtroom and offering any

11:46:49 20  opinions that Taxotere caused Ms. Kahn any injury, correct?

11:46:52 21  A.  I think I said earlier, I am not -- I am not answering any

11:46:57 22  patient-- I am not providing any patient-specific opinions; that is

11:47:02 23  correct.

11:47:02 24              MR. STRONGMAN:  Thank you.  I have no other questions.

11:47:05 25  Thank you.

| | | |
|---|---|---|
| 11:47:06 | 1 | THE COURT:  Thank you. |
| 11:47:07 | 2 | MR. MICELI:  I am going to be a little, I think, Your |
| 11:47:10 | 3 | Honor, on redirect.  I don't know if you want to take the lunch |
| 11:47:13 | 4 | break early. |
| 11:47:14 | 5 | THE COURT:  Maybe we'll just break early for lunch.  It's |
| 11:47:17 | 6 | 11:45.  Court will be at recess until 1 o'clock. |
| 11:47:25 | 7 | THE DEPUTY CLERK:  All rise. |
| 11:47:28 | 8 | (WHEREUPON, THE JURY EXITED THE COURTROOM.) |
| 11:47:57 | 9 | MR. MICELI:  What time did we say to be back? |
| 11:48:00 | 10 | THE COURT:  1 o'clock.  I am going to try to get through |
| 11:48:06 | 11 | to this for you. |
| 11:48:14 | 12 | MR. MICELI:  Yeah, there's one -- |
| 11:48:14 | 13 | THE COURT:  I know.  I just didn't look at the page |
| 11:48:14 | 14 | before the page after and I need to do that before I do that. |
| 11:48:14 | 15 | Everyone is excused until 1 o'clock. |
| 11:48:20 | 16 | Dr. Feigal, you should not discuss your testimony with |
| 11:48:22 | 17 | anyone.  You're still on the stand, so you can't review redirect at |
| 11:48:30 | 18 | all.  Thank you. |
| 11:48:30 | 19 | MR. LAMBERT:  Your Honor, with regard to the videotaped |
| 11:48:34 | 20 | testimony of Jean-Philippe Aussel, plaintiffs would move into |
| 11:48:39 | 21 | evidence Plaintiff's Exhibits 2, 3 -- |
| 11:48:43 | 22 | THE COURT:  Wait. |
| 11:48:44 | 23 | (WHEREUPON, THE JUROR ENTERED THE COURTROOM.) |
| 11:49:06 | 24 | (WHEREUPON, THE JUROR EXITED THE COURTROOM.) |
| 11:49:06 | 25 | THE COURT:  Okay. |

11:49:08  1              MR. LAMBERT:  With regard to the Aussel testimony,

11:49:11  2      plaintiffs move into evidence Exhibits 2, 3, 4, 5, and 30.  Those

11:49:17  3      are P2, P3, P4, P5, and P30.

11:49:25  4              MR. MOORE:  Subject to the objections that we stated in

11:49:27  5      the designations and also in the e-mail submission that was

11:49:31  6      transmitted to counsel and in light of the Court's comments this

11:49:38  7      morning in addressing the issue with Dr. Plunkett, we're realizing

11:49:42  8      that it may be necessary to memorialize those e-mail objections

11:49:46  9      that we addressed in chambers.

11:49:48  10             THE COURT:  You know, I realized that this morning.  I

11:49:51  11     thought the e-mails were coming into the record.

11:49:57  12             MR. MOORE:  So I don't know if they aren't or are, but we

11:50:00  13     think that they should be.

11:50:01  14             THE COURT:  They need to be.  And just so that the record

11:50:03  15     is clear.

11:50:04  16             You can leave, Dr. Feigal, thank you.

11:50:08  17             MR. MICELI:  I want Dr. Feigal to understand we're not

11:50:11  18     allowed to talk and so I don't want her to think I am being rude.

11:50:14  19             THE COURT:  I just told her that.

11:50:19  20             So that the record is clear, in order to be efficient in

11:50:23  21     the presentation of evidence, the Court has directed the parties to

11:50:29  22     file their exhibit list on the evening before and then we review

11:50:35  23     them at a conference.  It was my intention that the e-mails would

11:50:38  24     come into the record and then the rulings, we would discuss them in

11:50:45  25     chambers prior to Court.

| | | |
|---|---|---|
| 11:50:51 | 1 | As to Dr. Plunkett, what occurred is there was some |
| 11:50:57 | 2 | objections as to certain exhibits that she would use and there was |
| 11:51:02 | 3 | a concern whether or not those exhibits were found within her |
| 11:51:07 | 4 | actual report.  And I directed plaintiffs' counsel to find those |
| 11:51:14 | 5 | specific areas where that evidence was submitted within her report, |
| 11:51:19 | 6 | and we then reviewed it again at lunch and found that those items |
| 11:51:24 | 7 | that had been objected to at that time were included in the report, |
| 11:51:32 | 8 | albeit not in any main paragraph of the report. |
| 11:51:40 | 9 | MR. LAMBERT:  And, Your Honor just to add to that, the |
| 11:51:43 | 10 | nurse tear sheet I believe was not in there and we withdrew that as |
| 11:51:48 | 11 | part of the demonstratives of Dr. Plunkett's presentation. |
| 11:51:53 | 12 | THE COURT:  That's correct. |
| 11:51:53 | 13 | MR. MOORE:  We just want to make sure it was on the |
| 11:51:55 | 14 | record because you did make the comment this morning about their |
| 11:51:58 | 15 | being a lack of a contemporaneous objection to those exhibits, that |
| 11:52:02 | 16 | the record was clear that there were objections to the use of those |
| 11:52:05 | 17 | exhibits that were not discussed substantively in the report and |
| 11:52:09 | 18 | that was memorialized in our e-mail submission and wanted to make |
| 11:52:13 | 19 | sure it was part of the record. |
| 11:52:14 | 20 | THE COURT:  So ordered. |
| 11:52:20 | 21 | MR. MOORE:  We'll gather them all and get them to you. |
| 11:52:23 | 22 | THE COURT:  This is so we can efficiently proceed with |
| 11:52:26 | 23 | the amount of -- the voluminous number of documents and getting |
| 11:52:31 | 24 | this thing done in two weeks. |
| 11:52:32 | 25 | MR. LAMBERT:  One more housekeeping, Your Honor. |

OFFICIAL TRANSCRIPT

11:52:36  1    Plaintiffs would ask that their letter brief that was sent to the

11:52:41  2    Court 4 o'clock on Saturday also be a part of the record.  I

11:52:44  3    believe Mr. Moore sent their letter already.

11:52:48  4           THE COURT:  I think I did that and I wanted to give the

11:52:52  5    parties an opportunity to even supplement that, if necessary.

11:52:58  6           MR. LAMBERT:  And we may want to respond to each other's

11:53:01  7    submission.  We've done somewhat of that on the record, but we

11:53:10  8    may --

11:53:11  9           THE COURT:  Okay.  And what I indicated on the record

11:53:13  10   this morning was this took place Friday night after a very grueling

11:53:19  11   week and I think lots of people are operating on minimal sleep, so

11:53:25  12   I thought since I had made the decision that the testimony would

11:53:30  13   not be stricken from the record, that I would give you an

11:53:36  14   opportunity in post trial to brief it, if necessary.

11:53:42  15          MR. LAMBERT:  Thank you, Your Honor.

11:53:45  16          THE COURT:  Off the record.

11:53:54  17          (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

          18

          19                      *  *  *  *  *  *

          20

          21

          22

          23

          24

          25

1

2

3                     REPORTER'S CERTIFICATE

4

5          I, Karen A. Ibos, CCR, Official Court Reporter, United

6     States District Court, Eastern District of Louisiana, do hereby

7     certify that the foregoing is a true and correct transcript, to the

8     best of my ability and understanding, from the record of the

9     proceedings in the above-entitled and numbered matter.

10

11

12               /s/ Karen A. Ibos

13               Karen A. Ibos, CCR, RPR, CRR, RMR

14               Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25