1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  TAXOTERE (DOCETAXEL)      *      16-MD-2740
     PRODUCTS LIABILITY LITIGATION    *
5                                     *      Section H
                                      *
6    Relates to:  Elizabeth Kahn      *      November 15, 2021
             16-CV-17039
7    * * * * * * * * * * * * * * * * *

8

9                    DAY 5 - AFTERNOON SESSION
                  TRANSCRIPT OF JURY TRIAL BEFORE
10                 THE HONORABLE JANE T. MILAZZO
                  UNITED STATES DISTRICT JUDGE
11

12   Appearances:

13

14   For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                                   & Warshauer, LLC
15                              BY:  M. PALMER LAMBERT, ESQ.
                                1100 Poydras Street, Suite 2800
16                              New Orleans, Louisiana 70163

17   For the Plaintiffs:        Barrios Kingsdorf & Casteix, LLP
                                BY:  DAWN M. BARRIOS, ESQ.
18                                   ZACHARY L. WOOL, ESQ.
                                701 Poydras Street, Suite 3650
19                              New Orleans, Louisiana 70139

20
21   For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                                BY:  CHRISTOPHER L. COFFIN, ESQ.
21                              1100 Poydras Street, Suite 2225
22                              New Orleans, Louisiana 70163

23
     For the Plaintiffs:        Pendley Baudin & Coffin, LLP
24                              BY:  JESSICA PEREZ REYNOLDS, ESQ.
                                24110 Eden Street
25                              Post Office Drawer 71
                                Plaquemine, Louisiana 70765

1    APPEARANCES:

2
      For the Plaintiffs:          Gibbs Law Group, LLP
3                                  BY:  KAREN BARTH MENZIES, ESQ.
                                   6701 Center Drive West, Suite 1400
4                                  Los Angeles, California 90045

5
      For the Plaintiffs:          Bachus & Schanker, LLC
6                                  BY:   J. KYLE BACHUS, ESQ.
                                         DARIN L. SCHANKER, ESQ.
7                                  101 W. Colfax Avenue, Suite 650
                                   Denver, Colorado 80202
8

9     For the Plaintiffs:          DAVID F. MICELI, LLC
                                   BY:  DAVID F. MICELI, ESQ.
10                                 Post Office Box 2519
                                   Carrollton, Georgia 30112
11

12    For the Plaintiffs:          Martzell Bickford & Centola
                                   BY:  LAWRENCE J. CENTOLA, ESQ.
13                                 338 Lafayette Street
                                   New Orleans, Louisiana 70130
14

15    For the Sanofi               Irwin Fritchie Urquhart
      Defendants:                      & Moore, LLC
16                                 BY:  DOUGLAS J. MOORE, ESQ.
                                        KELLY E. BRILLEAUX, ESQ.
17                                 400 Poydras Street, Suite 2700
                                   New Orleans, Louisiana 70130
18

19    For the Sanofi               Shook Hardy & Bacon, LLP
      Defendants:                  BY:  HARLEY V. RATLIFF, ESQ.
20                                      JON A. STRONGMAN, ESQ.
                                   2555 Grand Boulevard
21                                 Kansas City, Missouri 64108

22
      For the Sanofi               Shook Hardy & Bacon, LLP
23    Defendants:                  BY:  HILDY M. SASTRE, ESQ.
                                   201 Biscayne Boulevard, Suite 3200
24                                 Miami, Florida 33131

25

1   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
2                                   500 Poydras Street, Room B-275
                                    New Orleans, Louisiana 70130
3                                   (504) 589-7778
4
5
6   Proceedings recorded by mechanical stenography using
    computer-aided transcription software.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        **<u>INDEX</u>**

2                                                        <u>Page</u>

3    Ellen Feigal, M.D.
          Redirect Examination By Mr. Miceli        1250
4

5    Carl Kardinal, M.D. (Video Depo)               1266

6
     Steven Seebol
7        Direct Examination By Mr. Schanker         1315
         Cross-Examination By Mr. Moore             1336
8        Redirect Examination By Mr. Schanker       1360

9    David Madigan, Ph.D.
          Voir Dire By Mr. Miceli                   1362
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**AFTERNOON SESSION**

**(November 15, 2021)**

**THE COURT:**  All jurors are present.  Court is back in session.  You may be seated.

Dr. Feigal, I remind you you are under oath.

Mr. Miceli.

**ELLEN FEIGAL, M.D.,**

having been duly sworn, testified as follows:

**THE DEPUTY CLERK:**  Thank you.  You may be seated. Please state and spell your name for the record.

**REDIRECT EXAMINATION**

BY MR. MICELI:

**Q.**   Dr. Feigal, I have a few things I would like to clean up on some of the cross-examination.

In response to some of Mr. Strongman's questions, on cross-examination you said anecdotal cases does not equal causation.  What does that mean?

**A.**   Well, what that means is what I've been talking about throughout the trial, that, in addition, it's not just counting cases, but it's actually applying the scientific method, the criteria for causation, and evaluating whether or not a drug can cause PCIA.  So that's what I meant.

**Q.**   When you say causal analysis, you're talking about the process you explained earlier about how you do general causation?

**ELLEN FEIGAL, M.D. - REDIRECT**

01:02   1   A.   Correct.

01:02   2   Q.   Okay.  The other thing you did in response to several

01:02   3   questions, I think, you mentioned Dr. Madigan.  Who is

01:02   4   Dr. Madigan?

01:02   5   A.   Dr. Madigan is a biostatistician that performed the

01:02   6   statistical analysis, the meta-analysis for the randomized

01:02   7   clinical trials and also conducted the statistical analysis of

01:03   8   the four comparative studies that I mentioned earlier.

01:03   9   Q.   Okay.  You were shown an article by Dr. Freites-Martinez.

01:03   10   Do you recall answering some questions about this article?

01:03   11   A.   Yeah.  I'm just seeing if I still have it up here.

01:03   12   Q.   I just want to make sure.  I'm not going to leave it up

01:03   13   there for long.

01:03   14   A.   I have it still.

01:03   15   Q.   Okay.  You, in providing a report in this case, had to

01:03   16   provide a list of materials reviewed, correct?

01:04   17   A.   That's correct.

01:04   18   Q.   Dr. Azael Freites-Martinez is on that list, correct, of

01:04   19   materials?

01:04   20   A.   That's correct.

01:04   21   Q.   Did you review his report?

01:04   22   A.   Yes.

01:04   23   Q.   Do you know what his role is in this case?

01:04   24   A.   Please refresh my memory.

01:04   25   Q.   Well, do you know who he serves as an expert for?

ELLEN FEIGAL, M.D. - REDIRECT

01:04  1   **A.**   Yes.

01:04  2   **Q.**   Who is that?

01:04  3   **A.**   He serves as an expert for Sanofi.

01:04  4   **Q.**   Okay.  And you read his report?

01:04  5   **A.**   Correct.

01:04  6   **Q.**   You were asked some questions about whether or not you

01:04  7   could tell incidence rates or risks from that study?

01:04  8   **A.**   Correct.

01:04  9   **Q.**   Do you recall what Dr. Freites-Martinez says about whether

01:04  10  his article can be used?

01:04  11              **MR. STRONGMAN:**  Objection.  Outside of the scope.

01:04  12              **MR. MICELI:**  It's not outside the scope.

01:04  13              **THE COURT:**  Come here.

01:04  14              (The following proceedings were held at the bench.)

01:04  15              **MR. MICELI:**  That article ran quite a bit making it

01:05  16  look like you could take those 80 and make it look like it's a

01:05  17  study that you can calculate an incidence rate.  She has

01:05  18  reviewed it.  He doesn't say it.  He doesn't say it at all.

01:05  19  They are trying to pull the wool over --

01:05  20              **THE COURT:**  I think you can ask her about the study,

01:05  21  what the study is.

01:05  22              **MR. MICELI:**  Okay.

01:05  23              **THE COURT:**  But I think it's different to go in and

01:05  24  pull in Dr. Martinez' report and say, "Did he discuss it in his

01:05  25  report?"

ELLEN FEIGAL, M.D. - REDIRECT

1    **MR. STRONGMAN:**  That's our objection.

2    **THE COURT:**  I think you can ask him about the study.

3    **MR. MICELI:**  Okay.

4    (End of bench conference.)

5    BY MR. MICELI:

6    **Q.**   When answering questions from Mr. Strongman about this

7    study, you repeatedly offered to explain why you can't glean

8    certain things from it.  Do you recall that?

9    **A.**   Yes, I do recall that.

10   **Q.**   Can you explain now what you were attempting or trying to

11   explain earlier.

12   **A.**   What I was trying to explain -- not just for this article

13   but other papers that look at outcome as the selection for who

14   gets into their study.  So these patients have already been

15   selected for having PCIA.  That's who gets into the study.

16       And then they look backwards to see, of those that

17   they selected from the outcome, how many were on X or Y

18   chemotherapy.  What you can't do with that is an incidence

19   rate, and you can't look at risk in something like that.  What

20   you can do is -- there are events.  You can look at them, you

21   can look backwards, but you can't calculate incidence rates

22   from them.  So that's what I was trying to get across.

23       There are different types of observational studies,

24   and this is the one where it's already selected for the outcome

25   of interest.  You don't know how many patients were exposed to

ELLEN FEIGAL, M.D. - REDIRECT

01:07 1   the agent who developed the outcome.  You just start with the

01:07 2   outcome and then look backwards.

01:07 3   **Q.**   Okay.  What usefulness, then, is this study, standing

01:07 4   alone, trying to establish that Taxol causes more PCIA than

01:07 5   Taxotere?

01:07 6   **A.**   Nothing.

01:07 7   **Q.**   Is it useful at all?

01:07 8   **A.**   Well, it's just useful for cases --

01:07 9   **Q.**   Is it useful at all in trying to determine causation?

01:07 10  **A.**   In and of itself, no.

01:07 11  **Q.**   Okay.

01:07 12  **A.**   It's supportive of what we have done with looking at

01:07 13  causation issues for Taxotere.

01:07 14  **Q.**   I'm asking, just in and of itself, can you look at that

01:07 15  study and draw conclusions about causation compared with Taxol?

01:07 16         **MR. STRONGMAN:**  Asked and answered.

01:07 17         **THE COURT:**  Sustained.

01:07 18  BY MR. MICELI:

01:07 19  **Q.**   I want to go over the Crown article with you or the Crown

01:08 20  poster.

01:08 21  **A.**   I still have it.

01:08 22  **Q.**   I want to show it to you.  Is this the entire poster that

01:08 23  was shown to you?

01:08 24  **A.**   Yes, that's the entire poster.

01:08 25  **Q.**   When you were asked questions, Mr. Strongman showed you

**ELLEN FEIGAL, M.D. - REDIRECT**

1  this, correct?

2  **A.**   Correct.  That's part of the poster.

3  **Q.**   Is this what you were shown?

4  **A.**   I was shown at different times different parts of the

5  poster.

6  **Q.**   Okay.  You were shown that?

7  **A.**   But I was shown that.

8  **Q.**   You were shown this, correct?

9  **A.**   Yeah.  I must say this white on light blue is a little

10  hard to read, but I was shown this.

11  **Q.**   What was it about this poster that you were offering to

12  explain to Mr. Strongman that you didn't have the opportunity

13  earlier?

14  **A.**   What I was trying to explain to him, this is a

15  prospectively -- this is a study looking at exposure to

16  Taxotere-containing and non-Taxotere containing regimens.  So

17  it is possible to look at this study and try and glean useful

18  information from it.

19        What I was also not able to describe is that the arms

20  are extremely different in terms of their size.

21  **Q.**   Right.

22  **A.**   There are 300 patients in the study, and over 90 percent

23  received Taxotere, 265 patients.  The other arms are quite

24  small, at least ten- or twentyfold smaller.  It's hard to do a

25  comparison on something like that.

**ELLEN FEIGAL, M.D. - REDIRECT**

1      Both of the other arms I'm going to describe to you

2  are non-Taxotere, but one of the arms, with anthracycline, no

3  Taxol, that was 12 patients out of 300.  The other arm was an

4  anthracycline plus Taxol.  That was 23 patients.

5      So one of the issues that, you know, caught my

6  concern is just the fact that these are very disproportionately

7  different comparative arms.  I can still glean information from

8  it.  It's just much more challenging.  You can still look at

9  incidence rates, but you have to look at it as the question

10  that's being addressed.  And the question is -- you can see the

11  arms and the numbers in each of the arms.

12      What I could glean from this is a dose-response for

13  the Taxotere-containing regimen, and that's what I was pointing

14  out.

15      Now, for causation I look at Grade 1 and Grade 2.  I

16  don't distinguish whether it's just Grade 2.  So what you can

17  see is that you have more PCIA in patients who get more of the

18  Taxotere.

19      And just as a reminder, there's no minimum threshold

20  above which you have to reach before you can get PCIA.  It's

21  like that dimmer switch I talked to you about earlier.  It's

22  gradation.  You will see less at a lesser dose; you will see

23  more at a higher dose.

24  **Q.**  Which part of this poster were you referring to when you

25  had mentioned that it's something about how they were slicing

**ELLEN FEIGAL, M.D. - REDIRECT**

1   the baloney?

2   **A.**   Well, to be fair, it was the authors who were doing the

3   slicing.  They were just reading what the poster said.  But the

4   point is, if you actually look at it in terms of what's the

5   incidence for docetaxel-Taxotere-containing-regimens, the

6   incidence is 15 percent.

7           If you look at it for the anthracycline non-taxane,

8   which is a grand total of 12 patients, the incidence rate, I

9   believe, is about 8 percent.  If you look at it for

10  anthracycline plus Taxol, a grand total of 23 patients, I

11  believe the incidence rate is 13 percent.

12          So, actually, the docetexal-containing arm has the

13  highest incidence of PCIA if you keep them in the arms that

14  they were described.  So that was the point.

15          We actually did do -- I had Dr. Madigan do an odds

16  ratio on the data from this poster because you could do a --

17  use a statistical test to evaluate what's called an odds ratio.

18  It's like a risk of those exposed versus those nonexposed.  And

19  he did have an odds ratio of 1.37.  So it was greater than 1,

20  which means it's going in the same direction.  It's not as

21  strong as some of the other studies that I used to talk about

22  strength of association, but it's going in the same direction,

23  and that's all I was trying to get across.

24  **Q.**   Okay.  Thank you.  I think we are done with that one.

25          Since we are talking about dose-response, I wanted to

**ELLEN FEIGAL, M.D. - REDIRECT**

01:13  1    draw your attention back to the Martin article that

01:13  2    Mr. Strongman used with you.

01:13  3            Do you remember this one?

01:14  4    A.   Yeah, I remember it.  I'm just seeing if I still kept it

01:14  5    up here.  Can you just hang on.

01:14  6    Q.   I'm going to show you a different one.  I can give you a

01:14  7    copy if you like.

01:14  8    A.   I may have it.  Just give me a second to look.  I do have

   9    it.  I'm trying to save trees.

01:14  10   Q.   Well, you know, what?

01:14  11           MR. MICELI:  Can I approach?  I'm going to show a

01:14  12   different version.

01:14  13           THE COURT:  Yes, you may.

01:14  14   BY MR. MICELI:

01:14  15   Q.   Let's make sure that's the same one Mr. Strongman used.

01:14  16   A.   It is the same one.  Well, it appears to be.  Let me just

01:14  17   check.

01:14  18   Q.   He produced his to you in black-and-white, and he

01:14  19   highlighted this language here in the paragraph beginning

01:14  20   "Taking together the three institutions."

01:14  21           Do you see that?

01:14  22   A.   If you can hang on one moment.

01:14  23   Q.   Okay.

01:14  24   A.   I'm just checking to see.  Just for my own edification, I

01:15  25   just want to see if it was identical.  It appears to me.

**ELLEN FEIGAL, M.D. - REDIRECT**

01:15  1       Ask your question now.  Sorry.

01:15  2  **Q.**   Okay.  Mr. Strongman pointed out to you the paragraph that

01:15  3  begins "Taking together the three institutions."  He talks

01:15  4  about Grade 2 permanent alopecia, PA, correct?

01:15  5  **A.**   Yeah.  I see it.

01:15  6  **Q.**   If you follow that paragraph down to the parenthetical

01:15  7  that has "and equals 306" -- well, first of all, what we have

01:15  8  is a colored version.

01:15  9       What you have is language that says "weekly

01:15  10  paclitaxel" -- that's Taxol, correct?

01:15  11  **A.**   Correct.

01:15  12  **Q.**   -- "was not associated with Grade 2 permanent alopecia,"

01:15  13  correct?

01:15  14  **A.**   Correct.

01:15  15  **Q.**   It says:  "The incidence of docetaxel-induced Grade 2

01:16  16  permanent alopecia was similar in patients with and without

01:16  17  hormonal therapy."  Correct?

01:16  18  **A.**   That is correct.  We are controlling for hormone therapy.

01:16  19  **Q.**   You had mentioned that, I believe, earlier in your --

01:16  20  **A.**   I did.

01:16  21  **Q.**   This up top here, when you talk about Grade 2, this is

01:16  22  where, if you put the Taxotere in, you see the Grade 2,

01:16  23  correct?

01:16  24  **A.**   That is correct.

01:16  25  **Q.**   You take the Taxotere out, and what do you see?

ELLEN FEIGAL, M.D. - REDIRECT

01:16  1   **A.**   You do not see Grade 2.

01:16  2   **Q.**   What do you see with Tamoxifen?

01:16  3   **A.**   No, no permanent alopecia.

01:16  4   **Q.**   Thank you.

01:16  5          I want to go back to that Crown article for just one

01:16  6   moment.

01:16  7   **A.**   The Crown?

01:17  8   **Q.**   Yes, the poster.

01:17  9   **A.**   Okay.

01:17  10  **Q.**   If you, instead of breaking out the non-Taxotere, the

01:17  11  non-Taxotere arms and put them into one group so it's

01:17  12  Taxotere v. non-Taxotere arms, which one shows more risk?

01:17  13         **THE COURT:**  Is it supposed to be up here?

01:17  14         **MR. MICELI:**  Excuse me?  Oh, I'm sorry.

01:17  15         You know what?  Your Honor, you are absolutely

01:17  16  correct.  I apologize.

01:17  17         **THE WITNESS:**  The one with Taxotere.

01:17  18  BY MR. MICELI:

01:17  19  **Q.**   Okay.  Now, you were also asked some questions about

01:17  20  cyclophosphamide, or Cytoxan, causing permanent alopecia,

01:17  21  correct?

01:17  22  **A.**   That question was asked, yes.

01:17  23         **MR. MICELI:**  May I approach the witness with an

01:18  24  article, Your Honor?

01:18  25         **THE COURT:**  Yes, you may.

ELLEN FEIGAL, M.D. - REDIRECT

BY MR. MICELI:

**Q.**   Dr. Feigal, do you recognize this de Jonge article?

**A.**   Yes, I do.

**Q.**   Does this appear to be from the peer-reviewed medical literature?

**A.**   Yes, it is.

**Q.**   If you could flip with me to the second page, under the treatment arm or in the treatment paragraph.  And you look at the level of cyclophosphamide that is given in this article, 1500 milligrams per meters squared?

**A.**   (Nods head.)

**Q.**   Is that a yes?

**A.**   Yes.

**Q.**   Thank you.  I'm sorry.

I believe when we were talking earlier today, in the TAX 316 study, the amount of cyclophosphamide that was given to the patients in that study was 600 milligrams per meters squared.

**A.**   Correct.

**Q.**   So this is 250 percent greater dose, correct?

**A.**   I haven't calculated the percentage, but, yes, it's much higher.

**Q.**   Thank you.  If we turn two more pages over, there's a paragraph that begins --

**A.**   Can you just say what page you are on?

ELLEN FEIGAL, M.D. - REDIRECT

01:19 1  **Q.**   Sure.  I'm sorry.  596.

01:19 2  **A.**   596.

01:19 3  **Q.**   Yes.  Then there's a paragraph that begins "According to

01:19 4  Koppel, et al."?

01:19 5  **A.**   I see it.

01:19 6  **Q.**   About halfway down that paragraph there's two footnotes,

01:19 7  20 and 22.  Then there's a sentence that begins "In spite."  Do

01:19 8  you see that?

01:19 9  **A.**   Yes, I see that.

01:19 10  **Q.**   Can you read that sentence, please.

01:19 11  **A.**   "In spite of its high potential for inducing reversible

01:19 12  alopecia, no relationship between cyclophosphamide or

01:20 13  4-hydroxycyclophosphamide exposure and permanent alopecia was

01:20 14  observed in our study."

01:20 15  **Q.**   So at 250 percent higher dose, these authors in this

01:20 16  peer-reviewed medical literature are saying cyclophosphamide

01:20 17  doesn't cause permanent alopecia, correct?

01:20 18          **MR. STRONGMAN:**  Objection.  Leading.

19          **THE COURT:**  Leading.

01:20 20  BY MR. MICELI:

01:20 21  **Q.**   What does this article tell us?

01:20 22  **A.**   In this article, in this patient population, in the

01:20 23  transplant setting, they conducted studies that show that they

01:20 24  did not attribute the cyclophosphamide to the PCIA.

01:20 25  **Q.**   Okay.  Thank you.

**ELLEN FEIGAL, M.D. - REDIRECT**

01:20  1          Doctor, in your causation analysis, did you determine

01:20  2  or find any evidence regarding whether or not endocrine therapy

01:21  3  can cause permanent or persistent alopecia that lasts after

01:21  4  or -- excuse me -- that causes alopecia that lasts after the

01:21  5  patient is off of the endocrine therapy?

01:21  6  A.   Not in the materials that I reviewed.

01:21  7          THE COURT:  Wait.

01:21  8               Mr. Strongman.

01:21  9          MR. STRONGMAN:  Objection.  This is beyond the scope

01:21  10 of cross.

01:21  11         MR. MICELI:  He asked about endocrine therapy.

01:21  12         THE COURT:  Overruled.

01:21  13         THE WITNESS:  I answered, but you may not have heard

01:21  14 it.  Not that I have read about this persisting beyond stopping

01:21  15 hormone therapy.

01:21  16 BY MR. MICELI:

01:21  17 Q.   Okay.  My final topic I want to discuss with you.

01:21  18 Mr. Strongman asked you questions on cross about mixing the

01:21  19 permanent chemotherapy-induced alopecia patients in 316, the 29

01:21  20 and the 16 into one group to make them 45.

01:21  21         Do you remember that series?

01:21  22 A.   I do remember that series of questions, yes.

01:21  23 Q.   As a scientist with more than 30 years of experience in

01:22  24 clinical studies, do you have an opinion as to whether or not

01:22  25 it's appropriate to mix patients from a randomized controlled

**ELLEN FEIGAL, M.D. - REDIRECT**

1  trial from separate arms into one group to analyze adverse

2  reactions?

3  **A.**   No, and that's why I was having problems answering his

4  question, because it was such a scientifically inappropriate

5  thing to do.

6  **Q.**   When you say it's scientifically inappropriate, what's a

7  layman's term for that?

8  **A.**   Wrong.

9  **Q.**   How about junk science?

10         **MR. STRONGMAN:**  Objection.

11         **THE COURT:**  Sustained.

12         **MR. MICELI:**  Thank you.

13  **BY MR. MICELI:**

14  **Q.**   Now, if you were presenting or if you were peer-reviewing

15  at a conference of scientists and someone suggested mixing the

16  adverse reactions from two arms to demonstrate causation of a

17  drug, what would you say to your peers?

18         **MR. STRONGMAN:**  Objection.  Cumulative of what's been

19  covered on this topic.

20         **THE COURT:**  Sustained.

21         **MR. MICELI:**  Okay.

22  **BY MR. MICELI:**

23  **Q.**   In all of the material you have reviewed in this case --

24  and we have gone over with Mr. Strongman four or five

25  depositions, and you have talked about records you have

ELLEN FEIGAL, M.D. - REDIRECT

1    reviewed -- have you reviewed any documents internal to Sanofi
2    wherein they have analyzed the TAX 316 study -- randomized
3    control trial data by mixing data from the separate arms to
4    come up with either an event rate for efficacy or safety?
5              MR. STRONGMAN:  Beyond the scope.
6              THE COURT:  Overruled.
7              THE WITNESS:  The answer is, no, I can't imagine that
8    Sanofi's scientists would do that.
9    BY MR. MICELI:
10   Q.   Have you reviewed anything that was presented to a
11   regulatory authority on behalf of Sanofi where they have done
12   so?
13   A.   No, I haven't seen any evidence that Sanofi has done that.
14   Q.   Have you ever seen documents internal to Sanofi wherein
15   they represent the 29 events in the TAC arm and the 16 in the
16   FAC arm as representing permanent or persistent alopecia?
17             MR. STRONGMAN:  Objection.
18             THE COURT:  Sustained.  We can move on.
19             MR. MICELI:  That's all I have.  Thank you.
20             THE COURT:  Thank you.
21             You may step down, Dr. Feigal.
22             THE WITNESS:  Should I bring all the stuff with me?
23             THE COURT:  You can leave it.  We will gather it up.
24   Thank you.
25             Please call your next witness.

CARL KARDINAL, M.D. - EXAMINATION

01:24  1        MR. MICELI:  We are going to call Dr. Carl Kardinal

01:25  2  by videotape.  He is the prescribing oncologist.

01:25  3        THE COURT:  Members of the jury, you will be shown

01:25  4  another video deposition, by Dr. Carl Kardinal.  As I've

01:25  5  indicated to you before, you must judge his testimony as you

01:25  6  would any other witness.  It may appear choppy because we have

01:25  7  had to cut out portions of that testimony.

01:25  8                    CARL KARDINAL, M.D.,

01:25  9  having been duly sworn, testified by video deposition as

01:25 10  follows:

01:25 11                         EXAMINATION

01:26 12  Q.   Dr. Kardinal, could you please state your full name for

01:26 13  the record.

01:26 14  A.   Middle name also?

01:26 15  Q.   Yes, please, sir.

01:26 16  A.   Carl Gustav Kardinal.

01:26 17  Q.   Dr. Kardinal, you heard me introduce myself, but I'm Kelly

01:26 18  Bieri, and I represent Sanofi.

01:26 19  A.   All right.

01:26 20  Q.   You are here to talk about your treatment of Elizabeth

01:26 21  Kahn?

01:26 22  A.   Yes.

01:26 23  Q.   Do you understand you are not a defendant in the case?

01:26 24  A.   Correct.

01:26 25        You also need to understand that I am retired.  I've

**CARL KARDINAL, M.D. - EXAMINATION**

1  been retired for seven-plus years, and my memory of detail on

2  these cases may not be too good.  I'll do the best I can.

3  Q.   I appreciate that, Dr. Kardinal.

4       I have brought with me a packet of what I think are

5  your notes related to plaintiff, so I will give those to you.

6  A.   Oh, good.

7  Q.   Do you have any independent recollection of

8  Elizabeth Kahn?

9  A.   No.

10  Q.   So any testimony you would give, would that be based on

11  the medical records that --

12  A.   Right.

13  Q.   -- you review?

14  A.   Correct.

15  Q.   Dr. Kardinal, I've been told that you've had some

16  communications with counsel for plaintiff in advance of this

17  deposition.  Is that accurate?

18  A.   Yes.

19  Q.   Okay.  Save any informal conversations this morning before

20  the deposition began, can you tell me how many times you've

21  spoken to or met with an attorney that represents plaintiff?

22  A.   Just once.

23  Q.   One meeting?

24  A.   Yes.

25  Q.   Did plaintiff's counsel tell you that any lawyer from

CARL KARDINAL, M.D. - EXAMINATION

01:27  1   Sanofi was prohibited from talking to you prior to this

01:27  2   deposition?

01:27  3   A.   I don't think so.

01:27  4   Q.   Did plaintiff's counsel show you any literature reporting

01:27  5   cases of permanent hair loss with Taxol?

01:28  6   A.   With Taxol, no.

01:28  7   Q.   Did they tell you about literature demonstrating reported

01:28  8   cases of permanent or persistent hair loss with Taxol?

01:28  9   A.   No.

01:28  10  Q.   Did plaintiff's counsel show you any documents about

01:28  11  reported cases of persistent or permanent hair loss with

01:28  12  doxorubicin, cyclophosphamide, or other --

01:28  13  A.   No.

01:28  14  Q.   -- chemotherapy drugs?

01:28  15  A.   No.

01:28  16  Q.   Did plaintiff's counsel show you any photographs of

01:28  17  Ms. Elizabeth Kahn?

01:28  18  A.   No.

01:28  19  Q.   Either before or after chemotherapy?

01:28  20  A.   No.

01:28  21  Q.   Plaintiff's counsel showed you a Taxotere label, correct?

01:28  22  A.   As I recall, yes.

01:29  23  Q.   I'm going to hand you what has been marked as deposition

01:29  24  Exhibit 1.  Here you are, sir.

01:29  25       Do you remember anything you said to plaintiff's

CARL KARDINAL, M.D. - EXAMINATION

01:29 1 counsel during your meeting with them?
01:29 2 **A.** That hair loss was common with multiple chemotherapy
01:29 3 drugs. Over the years, hair loss was rarely permanent. It
01:29 4 came back -- very often came back a little different than it
01:29 5 was originally: Sometimes more wavy, sometimes more full. But
01:30 6 other than that, nothing specific.
01:30 7 **Q.** So you said over the years hair loss was rarely permanent.
01:30 8 Have you seen cases of permanent hair loss after the
01:30 9 use of a chemotherapy drug or chemotherapy regimen?
01:30 10 **A.** I don't know that I've ever -- that I've definitely seen
01:30 11 that. I've had some patients that have -- particularly with
01:30 12 Adriamycin, who have had some thinning that has never -- I
01:30 13 guess you could say was permanent, but it was not that they
01:30 14 were bald. They just had some thinning.
01:30 15 **Q.** It wasn't complete, no-hair baldness?
01:30 16 **A.** Correct.
01:30 17 **Q.** But it was a loss of volume of hair; is that correct?
01:30 18 **A.** Correct.
01:30 19 **Q.** And you had few patients?
01:30 20 **A.** Well, particularly with Adriamycin. Well, Adriamycin was
21 around for a long time, and so I had considerably more
22 experience with Adriamycin.
01:31 23 **Q.** Dating back, how far do you think you saw the first
01:31 24 Adriamycin patient who had thinning -- permanent thinning of
01:31 25 their hair?

CARL KARDINAL, M.D. - EXAMINATION

01:31  1   **A.**   The first time I ever used Adriamycin, whenever that was,
01:31  2   which went back probably to the 1970s.
01:31  3   **Q.**   Let me direct you to the second-to-last page of the
01:31  4   document.  It's marked with a 56 in the bottom middle.
01:31  5          Can you read the last sentence of that paragraph that
01:31  6   starts with the word "once," please?
01:31  7   **A.**   Okay.  "Once you have completed all your treatments, hair
01:31  8   generally grows back."
01:31  9   **Q.**   Do you have any recollection of seeing Exhibit 1, the
01:31  10  Taxotere label, at any time prior to meeting with plaintiff's
01:31  11  counsel last month?
01:32  12  **A.**   I'm going to have to give you a probably on that.  I've
01:32  13  been using new drugs that we relied heavily on the package
01:32  14  insert in terms of the action of the drug and the potential
01:32  15  toxicity of the drug.
01:32  16  **Q.**   Are you saying that when a new drug came out on to the
01:32  17  market, you would look to the drug's label?
01:32  18  **A.**   Package insert, yes.
01:32  19  **Q.**   When, to your recollection, did Taxotere come on to the
01:32  20  market?
01:32  21  **A.**   Oh my God.  Certainly in the 1980s, 1990s we were using
01:32  22  Taxol and Taxotere in clinical trials, and we were doing a lot
01:32  23  of clinical trials.  I don't think it became commercially
01:32  24  available until 1990 or so.
01:33  25  **Q.**   Maybe the late 1990s?

CARL KARDINAL, M.D. - EXAMINATION

01:33  1   **A.**   Yeah.

01:33  2   **Q.**   How often did you reread labels after you first started

01:33  3   prescribing a drug?

01:33  4   **A.**   If something unexpected happened, I would refer back to

01:33  5   it.

01:33  6   **Q.**   Do you have any recollection of reviewing the Taxotere

01:33  7   label after the mid 2000s?

01:33  8   **A.**   Of course not.

01:33  9   **Q.**   Do you have any recollection of reviewing the Taxotere

01:33  10  label at all?

01:33  11  **A.**   Yes.  I reviewed it at the time that we started using

01:34  12  Taxotere.

01:34  13  **Q.**   Do you have any memory of reviewing it after the time when

01:34  14  you started prescribing and using Taxotere?

01:34  15  **A.**   Not specifically.

01:34  16  **Q.**   Based on what you said, Dr. Kardinal -- I think I know the

01:34  17  answer to this, but I'm going to ask you the question anyway --

01:34  18  have you spoken with Ms. Elizabeth Kahn --

01:34  19  **A.**   No.

01:34  20  **Q.**   -- since your treatment ended?

01:34  21  **A.**   No, no.

01:34  22  **Q.**   Dr. Kardinal, I'm going to hand you what's being marked as

01:34  23  Deposition Exhibit 4.  I will represent to you that these are

01:34  24  some of the provider notes -- well, are the provider notes that

01:34  25  I have related to your treatment of Ms. Kahn.

CARL KARDINAL, M.D. - EXAMINATION

01:34   1    **A.**    Uh-huh.

01:34   2    **Q.**    Generally speaking, would you categorize the documents

01:34   3    that are in Exhibit 4 as your provider notes or office notes

01:34   4    related to Plaintiff Ms. Kahn?

01:35   5    **A.**    Yes.

01:35   6    **Q.**    I'm going to hand you what's been marked as Deposition

01:35   7    Exhibit Number 6.

01:35   8         Doctor, I'm not going to ask you any questions about

01:35   9    Deposition Exhibit Number 6 at this exact moment, beyond the

01:35   10    basic question.

01:35   11         Is it your understanding that that is the informed

01:35   12    consent signed by Elizabeth Kahn and yourself related to

01:35   13    Ms. Kahn's participation in clinical trial NSABP B-40?

01:35   14    **A.**    Yes.

01:35   15    **Q.**    Did you sign Exhibit 6 on May 14, 2008?

01:35   16    **A.**    Correct.

01:35   17    **Q.**    Dr. Kardinal, I want to spend a little bit of time

01:35   18    understanding your medical background.  I understand you're an

01:35   19    oncologist, but I'm going to get a little bit more detail on

01:35   20    that.

01:36   21         Can you walk me through in broad strokes your

01:36   22    educational background after undergraduate, where you went to

01:36   23    medical school?

01:36   24    **A.**    I went to medical school in St. Louis, at Washington

01:36   25    University School of Medicine.

CARL KARDINAL, M.D. - EXAMINATION

01:36  1   **Q.**   After that, did you do any internship or residency?

01:36  2   **A.**   I interned in the United States Navy and did a medical

01:36  3   residency also under the sponsorship of the United States Navy.

01:36  4   **Q.**   Did the internship focus on any particular area?

01:36  5   **A.**   No.  It was a rotating internship.

01:36  6   **Q.**   Was your residency at Portsmouth naval hospital?

01:36  7   **A.**   Correct, in internal medicine.

01:36  8   **Q.**   Did you do any fellowship?

01:36  9   **A.**   I did that fellowship in hematology/oncology at the Navy

01:36  10  hospital in Philadelphia.  That was a two-year program.

01:37  11  **Q.**   Dr. Kardinal, are you board-certified?

01:37  12  **A.**   I'm board-certified in internal medicine and medical

01:37  13  oncology and in hematology.

01:37  14  **Q.**   Are you currently licensed to practice medicine?

01:37  15  **A.**   Yes.

01:37  16  **Q.**   Are you licensed to practice in the state of Louisiana?

01:37  17  **A.**   Yes.

01:37  18  **Q.**   Were you first licensed in Louisiana in 1980?

01:37  19  **A.**   In Louisiana in 1980, yes.

01:37  20  **Q.**   Do you agree that the manufacturing, testing, and

01:37  21  marketing of pharmaceutical products is regulated by the

01:37  22  federal Food and Drug Administration?

01:37  23  **A.**   Yes.

01:37  24  **Q.**   Do you agree that you're not an expert in the regulatory

01:37  25  process as it pertains to prescription drugs?

CARL KARDINAL, M.D. - EXAMINATION

1  **A.**   Correct.

2  **Q.**   Do you think that you're someone who could provide medical

3  testimony to a reasonable degree of medical certainty regarding

4  like -- for example, like a dermatologist might regarding the

5  causes of alopecia?

6  **A.**   With regard to chemotherapy, the answer would be yes with

7  regard to general causes of alopecia.

8  **Q.**   Are you talking about based on your experience and that

9  you've seen cases of alopecia following the administration of

10  certain chemotherapy drugs?

11  **A.**   Yes.

12  **Q.**   Would it be based on anything else?

13  **A.**   No.

14  **Q.**   Do you agree that you are not an expert in the FDA

15  labeling or warnings regarding to prescription drugs?

16  **A.**   Right.   Yes.

17  **Q.**   Did you retire immediately after you left Ochsner?

18  **A.**   No.   I worked for the University of Missouri here for one

19  or two years.   Then I became 80 and it was time to quit.

20  **Q.**   What did you do for the University of Missouri?

21  **A.**   Oncology.

22  **Q.**   I'll represent to you that based on the records that I

23  have seen, you left Ochsner in approximately the summer of

24  2008.

25  **A.**   Yes.

CARL KARDINAL, M.D. - EXAMINATION

01:39  1   **Q.**   How many years were you at Ochsner?

01:39  2   **A.**   Oh, almost 25, I think.  22 maybe.  I got -- let's see.  I

01:39  3   got there in 1980 and I left about -- so about 25 years.

01:39  4   **Q.**   Would you consider your area of specialization medical

01:39  5   oncology?

01:39  6   **A.**   Absolutely.

01:39  7   **Q.**   So you were practicing medical oncology for how many years

01:39  8   total?

01:39  9   **A.**   Let's see.  It seems to me I got my boards in hematology

01:40  10  around 1971 and the boards in oncology about 1972, I think.  So

01:40  11  from then.

01:40  12  **Q.**   So from approximately 1972 until --

01:40  13  **A.**   Yeah.

01:40  14  **Q.**   -- approximately 2011?

01:40  15  **A.**   Yeah.

01:40  16  **Q.**   Were you treating breast cancer patients for the entire

01:40  17  duration of your career?

01:40  18  **A.**   Yes.

01:40  19  **Q.**   Including when you were in the Navy?

01:40  20  **A.**   Yes, because we treated dependents.

01:40  21  **Q.**   I'm trying to get a broader sense of -- over the course of

01:40  22  your career, what percentage of your patients do you think were

01:41  23  breast cancer patients?

01:41  24  **A.**   Oh, well, greater than half.

01:41  25  **Q.**   When you were at Ochsner --

CARL KARDINAL, M.D. - EXAMINATION

1  A.   Right.

2  Q.   -- what percentage of your patients were breast cancer

3  patients?

4  A.   Oh, probably at least 70 percent.

5  Q.   Did you primarily work on clinical trials when you were at

6  Ochsner?

7  A.   I did a lot of clinical trials while I was at Ochsner, but

8  I did not do that primarily.

9  Q.   What would you say you did primarily?

10 A.   I was the -- in terms of clinical trials, I was the

11 principal investigator at Ochsner for clinical trials in the

12 NSABP, which is this here, what stands for the National

13 Surgical Adjuvant Breast Project.  I was also the principal

14 investigator for clinical trials for the North Central Cancer

15 Treatment Group, which was home-based at Mayo.  I saw patients

16 also who were not on clinical trials.

17 Q.   Would you be considered the principal investigator for any

18 oncology clinical trial through the NSABP or the NCC --

19 A.   TG.

20 Q.   -- TG?

21 A.   Yes.

22 Q.   Generally speaking, can you explain what a clinical trial

23 is.

24 A.   A clinical trial is where we are investigating -- well,

25 there are several types.  A Phase 3 trial, which we

CARL KARDINAL, M.D. - EXAMINATION

1    participated in primarily, is a randomized trial, which is

2    comparing a standard treatment to a new treatment that we have

3    reason to think should be better.  Well, I mean the patients

4    are assigned to that type of clinical trial on a random basis.

5  Q.    Was NSABP B-40 a Phase 3 clinical trial?

6  A.    As I recall, yes.

7  Q.    B-40.

8  A.    We actually started out with B-01.

9  Q.    Do you believe that clinical trial work is important?

10 A.    It's critical to finding out what's better.  Not all of

11 them are successful, which is, you know -- I mean not every one

12 of them proves that the treatment arm is better.  Very few of

13 them show that the treatment arm is worse, fortunately.

14 Q.    Is this your CV?

15 A.    Yeah.  This is just the first couple of pages.  It's sort

16 of an abbreviated CV.

17 Q.    Is it your understanding that everything on Exhibit 8 is

18 current through the time of your retirement in 2012?

19 A.    Correct.

20 Q.    Forgive me for reaching.

21       We talked a bit about your academic appointments at

22 the University of Missouri School of Medicine.  Your résumé

23 also lists some other academic appointments.

24       For example, this indicates that from 1992 until

25 2008, you were a clinical associate professor of medicine at

CARL KARDINAL, M.D. - EXAMINATION

1    Tulane.  Is that accurate?

2    **A.**    Correct.

3    **Q.**    Did you do any classroom teaching, or was it all clinical?

4    **A.**    It was all clinical.

5    **Q.**    Okay.  Let's talk about prior to retiring.

6              How did you keep yourself current on medical issues

7    regarding breast cancer or breast cancer treatment?

8    **A.**    Medical journals and conferences.

9    **Q.**    Did you ever attend the San Antonio Symposium?

10   **A.**    Yes.

11   **Q.**    Was that one that you attended frequently?

12   **A.**    I attended it from time to time.  Syd Salmon and I, who

13   was the founder of that, were in medical school together at

14   Wash U.

15   **Q.**    Any other seminars that you attended with regularity?

16   **A.**    Well, we were very involved in clinical trials,

17   particularly with the Mayo Clinic, and we met with a group at

18   Mayo twice a year and did that over a period of many years.

19   **Q.**    To talk about clinical trials?

20   **A.**    Talk about the currently active clinical trials.

21   **Q.**    Did you have journals that you regularly subscribed to?

22   **A.**    Sure.  The *Journal of Clinical Oncology* was the primary

23   one.  Also the *Annals of Internal Medicine*.

24   **Q.**    Annals of Oncology?

25   **A.**    Oh, there's no such publication.  There's an *Annals of*

## CARL KARDINAL, M.D. - EXAMINATION

01:46 1    *Clinical Oncology*, yes, yes.

01:46 2    **Q.**   Is this something you would consider authoritative?

01:46 3    **A.**   Yeah.

01:46 4    **Q.**   What about *The New England Journal of Medicine*?

01:47 5    **A.**   Oh, absolutely.

01:47 6    **Q.**   Absolutely something that you would consider

01:47 7    authoritative?

01:47 8    **A.**   Yes.  It comes out weekly or twice monthly.

01:47 9    **Q.**   Are you a member of any professional medical

01:47 10   organizations?

01:47 11   **A.**   Well, I was a member of ASCO, American Society of Clinical

01:47 12   Oncology, for many years.

01:47 13   **Q.**   From approximately what year until what year?

01:47 14   **A.**   From probably 1974 through 2010.  Many years.

01:47 15   **Q.**   Outside of the context of clinical trials, did you

01:47 16   generally follow the guidelines or recommendations of any

01:47 17   organizations in providing care for your breast cancer

01:47 18   patients?

01:47 19   **A.**   Certainly the American Society of Clinical Oncology.

01:48 20   **Q.**   Are you familiar with the National Comprehensive Cancer

01:48 21   Network?

01:48 22   **A.**   I was not part of that.  We worked with the Comprehensive

01:48 23   Cancer Center at Mayo Clinic but not the entire comprehensive

01:48 24   network.

01:48 25   **Q.**   So if you weren't -- if you weren't dealing with a patient

CARL KARDINAL, M.D. - EXAMINATION

01:48  1    who was in that clinical trial, did you look to any guidelines
01:48  2    to help establish what you were going to prescribe to them?
01:48  3    A.    Sure.
01:48  4    Q.    Like for a chemotherapeutic regimen?
01:48  5    A.    In the currently active journals such as the *Journal of*
01:48  6    *Clinical Oncology.*
01:48  7    Q.    We talked about the fact that you have published a lot.
01:48  8    A.    Yes.
01:48  9    Q.    Do you have numerous publications on the topic of
01:48  10   chemotherapy?
01:48  11   A.    Yes.
01:48  12   Q.    Do you have any on the potential long-term side effects of
01:49  13   a cancer treatment drug?
01:49  14   A.    No.
01:49  15   Q.    Any on the topic of chemotherapy side effects at all?
01:49  16   A.    No.  I mean, they would be included in the discussions of
01:49  17   it but not a specifically related topic.
01:49  18   Q.    Did you serve as the author of a chapter of a textbook?
01:49  19   A.    Yes.
01:49  20   Q.    Is the name of the book *The Chemotherapy Source Book*?
01:49  21   A.    Oh, yes.
01:49  22   Q.    Did you author chapters for multiple editions of that
01:49  23   book?
01:49  24   A.    For at least two or three.
01:49  25   Q.    Okay.  I'm going to take you back to 2008 when you were in

CARL KARDINAL, M.D. - EXAMINATION

01:49   1   New Orleans.
01:49   2   **A.**   Okay.
01:49   3   **Q.**   Was Ochsner the only hospital at which you had privileges?
01:50   4   **A.**   Yes.
01:50   5   **Q.**   From 1980 until approximately 2008, were you employed by
01:50   6   Ochsner?
01:50   7   **A.**   Correct.
01:50   8   **Q.**   Generally speaking, from the time that you started
01:50   9   practicing until the time that you stopped, would you say that
01:50   10  breast cancer survival rates have increased?
01:50   11  **A.**   That's a long time span, but the answer is yes.  Yes.
01:50   12  **Q.**   You would agree with me that while docetaxel and
01:50   13  paclitaxel are structurally similar, they are not the same
01:50   14  drug?
01:50   15  **A.**   Yeah, that's correct.
01:50   16  **Q.**   Would you agree that they carry different risks and
01:50   17  different benefits?
01:50   18  **A.**   They are very similar, but they're slightly different
01:50   19  toxicity.
01:51   20  **Q.**   You said they have different toxicities?
01:51   21  **A.**   Yes.
01:51   22  **Q.**   You would agree that neuromuscular toxicity was
01:51   23  considerably less common with docetaxel than with paclitaxel?
01:51   24  **A.**   Well, I'll agree to that, yeah.
01:51   25  **Q.**   Can you --

CARL KARDINAL, M.D. - EXAMINATION

01:51  1    **A.**   Neurotoxicity with paclitaxel was a big concern.

01:51  2    **Q.**   Tell me a little bit more about the neurotoxicity that was

01:51  3    associated with paclitaxel.  What would that look like for a

01:51  4    patient or what could that look like for a patient?

01:51  5    **A.**   Well, there was sensory neuropathy, which -- you know that

01:51  6    people would have abnormal sensation on their hands and feet.

01:51  7    May be severe enough to interfere with their gait.  There

01:51  8    appeared to be less neurotoxicity with docetaxel than there was

01:52  9    with paclitaxel, which was one of the reasons I tended to use

01:52  10   docetaxel in preference to paclitaxel.

01:52  11   **Q.**   Are you familiar with cases of long-lasting neuropathy --

01:52  12   **A.**   Yes.

01:52  13   **Q.**   -- with paclitaxel?

01:52  14   **A.**   With paclitaxel yes.  Perhaps less so with docetaxel.

01:52  15   **Q.**   Would you dispute that in the chapter of *The Chemotherapy*

01:52  16   *Source Book*, you wrote "Neuromuscular toxicity is considerably

01:52  17   less common with docetaxel"?

01:52  18   **A.**   If I said it then, I believe it now.

01:52  19   **Q.**   Were there concerns with infusion reaction related to

01:52  20   paclitaxel?

01:52  21   **A.**   Yes.

01:52  22   **Q.**   So what things did you consider when choosing

01:52  23   Taxotere/docetaxel over other chemotherapeutic agents?

01:53  24   **A.**   Well, mostly I was comparing taxanes, and the neuropathy

01:53  25   with paclitaxel was greater than it was with docetaxel.

CARL KARDINAL, M.D. - EXAMINATION

01:53  1   Q.   I also saw language:  "Docetaxel is the most active agent

01:53  2   yet available for the treatment of advanced breast cancer.

01:53  3   Docetaxel may have some activity in paclitaxel-resistant breast

01:53  4   cancer."

01:53  5   A.   If I said it, it must be true.

01:53  6   Q.   Are you aware that some studies have found that docetaxel

01:53  7   molecule twice as potent at inhibiting mitosis?

01:53  8   A.   It may be, but that doesn't tell me anything specific

01:53  9   about its activity.  It may be more potent in inhibiting

01:54  10  mitosis, but that doesn't mean it's more effective in

01:54  11  treatment.

01:54  12  Q.   Necessarily to you?

01:54  13  A.   Not necessarily.  Maybe but not necessarily.

01:54  14  Q.   You prescribed Taxotere during your practice, correct?

01:54  15  A.   Yeah.

01:54  16  Q.   Did you prescribe it because you thought that it was a

01:54  17  good drug that gave patients the best chance of survival when

01:54  18  you prescribed it?

01:54  19  A.   Okay.  I'll give you a yes.

01:54  20  Q.   Do you agree with that?

01:54  21  A.   It was an active drug, and whether -- the superiority over

01:54  22  Taxol was probably marginal, but it was probably better than

01:54  23  not using a taxane.

01:54  24  Q.   So let me make sure I understand.  You believe using

01:54  25  Taxotere was better than not using a taxane, and you believe

CARL KARDINAL, M.D. - EXAMINATION

1  that there was some level of superiority over Taxol; is that

2  correct?

3  A.   My main reason for selecting Taxotere over Taxol was the

4  toxicity, neuropathy.

5  Q.   When you were prescribing chemotherapy drugs to patients,

6  did you go over every possible side effect that the patient

7  could experience?

8  A.   I do the best I can.  There are always unforeseen side

9  effects that come up that you don't -- that are rare or

10  whatever.  Certainly all common side effects are discussed with

11  the patient.  I would usually throw in a comment that there are

12  other side effects that are not necessarily frequent or known.

13  Q.   In a general way you would say that?

14  A.   Yeah.  You'd have to write a telephone book on every drug

15  you prescribed.

16  Q.   Did you ever see any cases of permanent or persistent hair

17  loss associated with chemotherapy?

18  A.   Who knows?  Perhaps, you know, but I cannot specifically

19  recall permanent hair loss.

20  Q.   If you can't recall it, is it fair to say that if it

21  happened, it would be something that happened rarely?

22  A.   Well, it would be something that did not happen commonly.

23  Q.   So you would not have warned about the risk of -- you're

24  saying you're not sure if you ever saw permanent or persistent

25  hair loss, and if you did, it was something that didn't happen

CARL KARDINAL, M.D. - EXAMINATION

1  commonly?

2  A.   It was not common.

3  Q.   Do you remember telling me that you warned of common side

4  effects?

5  A.   Yeah.

6  Q.   Okay.  So would you have warned of the risk of persistent

7  hair loss?

8  A.   Not unless it was in the package insert.  If it was in the

9  package insert, I would have warned about it.

10  Q.   Tell me a drug for which the package insert says that

11  there's a risk of permanent or persistent hair loss?

12  A.   Can't do that.  I don't know.

13  Q.   For what drugs did you warn of a risk of permanent or

14  persistent hair loss?

15  A.   I did not warn about permanent or persistent hair loss

16  because, in my experience, hair came back.

17  Q.   So for no chemotherapy drug at any time, did you ever warn

18  about the risk of permanent or persistent hair loss?

19  A.   No.

20  Q.   That was based on your experience that you did not see

21  that?

22  A.   Correct.

23  Q.   Have you ever seen any literature at all regarding any

24  chemotherapy drug regarding reporting cases of permanent or

25  persistent hair loss?

CARL KARDINAL, M.D. - EXAMINATION

01:58  1    **A.**   Not during the time I was practicing.

01:58  2    **Q.**   Do you know when you first assisted a patient who was

01:58  3    enrolled in NSABP B-40?

01:58  4    **A.**   Do I know when I first --

01:58  5    **Q.**   (Nods head.)

01:58  6    **A.**   -- enrolled a patient in that?  Probably would have been

01:58  7    sometime in 2007 or '08.  I thought very strongly that if a

01:59  8    clinical trial was available for a given patient, that we

01:59  9    should try to enroll the case because -- for two reasons:  One,

01:59  10   they were all state-of-the-art treatment; and, secondly, we

01:59  11   would be able to answer a question with regard to the treatment

01:59  12   of breast cancer, whether one treatment was preferable to

01:59  13   another.

01:59  14   **Q.**   How did you learn about clinical trials such as

01:59  15   NSABP B-40?

01:59  16   **A.**   I was a member of NSABP.

01:59  17   **Q.**   So who at Ochsner decided if doctors at Ochsner

01:59  18   participated in certain clinical trials?  So a clinical --

01:59  19   **A.**   Was it me?

01:59  20   **Q.**   Was it you?  I don't know.  Was it?

02:00  21   **A.**   I was the principal investigator for Ochsner for NSABP.  I

02:00  22   guess the answer to that is yeah.

02:00  23   **Q.**   Okay.  So in NSABP --

02:00  24   **A.**   I made these trials available.  We discussed them.  If

02:00  25   another physician had a suitable patient, they would sometimes

CARL KARDINAL, M.D. - EXAMINATION

1  discuss it with me or sometimes just discuss it directly with
2  the patient.  But I couldn't dictate that they would put a
3  patient on a clinical trial.
4  Q.   Okay.  Let me ask you a more general question.
5          Typically when going over clinical trial consent
6  forms with your patients, did you have a practice on how you
7  would do that?
8  A.   I would try to go through the potential risks and benefits
9  of a clinical trial.  I would also let the patient know that
10  she did not have to participate in the clinical trial, that we
11  would certainly treat the patient anyway.  I don't know whether
12  that answers your question or not.
13  Q.   Generally speaking, when you talk to patients about
14  clinical trials, would you review the risks listed for each of
15  the drugs as identified in the informed consent?
16  A.   I tried to, yeah --
17  Q.   Would you -- I'm so sorry.
18  A.   Yes.  I tried to be as comprehensive as possible.  That
19  doesn't mean I succeeded every single time because patients
20  often didn't quite understand but didn't let you know that --
21  embarrassed to let you know that they didn't quite understand.
22  Q.   But just because a patient didn't understand doesn't mean
23  you didn't say it, correct?
24  A.   Correct.
25  Q.   Okay.  You said you felt strongly that patients should be

CARL KARDINAL, M.D. - EXAMINATION

1  in clinical trials if available?

2  **A.**    Correct.

3  **Q.**    Do you mean that you would recommend a trial for a patient

4  even if you might otherwise prescribe a slightly different

5  regimen?

6  **A.**    The answer to that is I wouldn't prescribe a slightly

7  different regimen.  If I didn't think that the clinical trial

8  was equal to or whatever the standard therapy was, I wouldn't

9  recommend the trial.  I mean, that doesn't mean that the

10  results of the clinical trials were always superior.  But you

11  had to have a reason for asking the question, but the question

12  was answered by the clinical trial.

13  **Q.**    So in looking at Exhibit 6, on the second page, I'm

14  looking at the second sentence.  It says:  "Three of

15  chemotherapy drugs used in this study are docetaxel followed by

16  the combination of doxorubicin and cyclophosphamide AC" --

17  **A.**    Yes.

18  **Q.**    -- "a standard treatment for breast cancer."

19  **A.**    Right.

20  **Q.**    Was this study NA --

21  **A.**    NSABP.

22  **Q.**    Yes.  NSABP B-40, looking at the addition of bevacizumab,

23  gemcitabine, and capecitabine?

24  **A.**    Capecitabine.

25  **Q.**    Thank you.

CARL KARDINAL, M.D. - EXAMINATION

1    Dr. Kardinal, when you were deciding what
2    chemotherapy drugs or regimen to prescribe for a patient, what
3    factors do you consider?
4    **A.**   Obviously what disease she has, what stage of the disease
5    does she have, and is she relatively newly diagnosed or is this
6    a recurrence.  These are all factors that come in.
7    **Q.**   What factors about Ms. Kahn did you consider when you
8    decided to recommend NSABP B-40?
9    **A.**   Well, she had, you know, a mass in her breast that was
10   fairly large, and it was one that was going to require
11   preoperative chemotherapy.  And we had a very good clinical
12   trial which was comparing, you know, all good treatment versus
13   the test arm which was felt to be possibly better, and this is
14   why we considered her for that clinical trial.
15   **Q.**   So you said that you prescribed or recommended NSABP B-40
16   to patients because you thought it was the standard of care or
17   more, right?
18   **A.**   Correct.
19   **Q.**   Did you talk to patients enrolled in NSABP B-40 about the
20   possibility of hair loss during chemotherapy?
21   **A.**   It's difficult to remember what you said back multiple
22   years ago, but I'm sure I did.
23   **Q.**   Can Adriamycin cause alopecia?
24   **A.**   Absolutely.
25   **Q.**   Can cyclophosphamide cause alopecia?

CARL KARDINAL, M.D. - EXAMINATION

1  **A.**   Yes.

2  **Q.**   Can Taxotere cause alopecia?

3  **A.**   Sure, yes.

4  **Q.**   Even outside of the clinical trial when you were

5  prescribing those medications -- Adriamycin, cyclophosphamide,

6  and Taxotere -- did you talk to your patients about hair loss?

7  **A.**   Yeah.

8  **Q.**   And what would you say?

9  **A.**   I'd generally say that the probabilities are such that she

10  would probably have hair loss with the use of this drug.  And

11  perhaps it was naive of me, but I would generally say that the

12  hair would come back.

13  **Q.**   You would say the hair would generally come back?

14  **A.**   Yes.

15  **Q.**   Let me rephrase it.  Would you guarantee to a patient that

16  her hair would return after chemotherapy?

17  **A.**   No, that it probably would come back.  You always want to

18  leave the door open, you know, but at that point in time when I

19  was using Adriamycin and so forth, the hair basically

20  inevitably came back.

21  **Q.**   You did talk to me earlier in the deposition about some

22  instances on Adriamycin where patients had significant hair

23  thinning.  Do you remember that?

24  **A.**   Yes.

25  **Q.**   Persistent significant hair thinning, correct?

CARL KARDINAL, M.D. - EXAMINATION

02:07  1   A.   Persistent, right.

02:07  2   Q.   And is it fair to say that you -- did you ever

02:07  3   specifically warn Adriamycin patients of the risk of

02:07  4   significant persistent hair thinning?

02:08  5   A.   It was in my -- again, your personal experience is not

02:08  6   statistically significant, but it does influence what you do.

02:08  7   And at that point in time with the use of Adriamycin, I had not

02:08  8   seen a patient where it did not come back.  It's a double

02:08  9   negative, I know.

02:08  10  Q.   Are you talking about not come back at all?

02:08  11  A.   Correct.

02:08  12  Q.   Do you distinguish persistent significant hair thinning

02:08  13  from persistent alopecia?

02:08  14  A.   I'm not sure I really did.

02:08  15  Q.   Is alopecia something different to you than significant

02:08  16  hair thinning?

02:08  17  A.   If you have significant hair thinning, that would be part

02:08  18  of alopecia, yeah, but it's not total alopecia.

02:09  19  Q.   And you had seen patients who had significant hair

02:09  20  thinning with Adriamycin, correct?

02:09  21  A.   Yes.

02:09  22  Q.   Because the incidence of significant hair thinning that

02:09  23  you saw in patients with Adriamycin, it was rare, you didn't

02:09  24  specifically warn them of the risk of persistent significant

02:09  25  hair thinning, correct?

CARL KARDINAL, M.D. - EXAMINATION

02:09   1   A.   Correct.

02:09   2   Q.   If Ms. Kahn had said to you, "I don't know if I want to be

02:09   3   in NSABP B-40," what, if anything, would you offer her as an

02:09   4   alternative?

02:09   5   A.   I would have treated her very similarly.

02:09   6   Q.   And what does that mean?

02:09   7   A.   Meaning I would have used Adriamycin and cyclophosphamide

02:10   8   followed by a taxane.

02:10   9   Q.   Followed by Taxotere?

02:10   10   A.   Taxane.  Either.  Usually Taxotere is what I would do.

02:10   11   Q.   You typically used Taxotere?

02:10   12   A.   I used Taxotere because of the -- has lesser neurological

02:10   13   toxicity than Taxol.

02:10   14   Q.   So then would you have recommended Taxotere over Taxol?

02:10   15   A.   Yes.

02:10   16   Q.   Do you agree that saying "hair generally grows back" is

02:10   17   not the same as saying "hair always grows back"?

02:10   18   A.   They're not exactly the same.  To say "it generally grows

02:10   19   back," that doesn't necessarily mean "always."

02:10   20   Q.   If the Taxotere label had said, "In most cases normal hair

02:11   21   growth should return.  In some cases, frequency not known,

02:11   22   permanent hair loss has been observed," would that change your

02:11   23   recommendation that Ms. Kahn participate in NSABP B-40?

02:11   24   A.   No.

02:11   25   Q.   Can you say to a reasonable degree of medical certainty

CARL KARDINAL, M.D. - EXAMINATION

1  that Ms. Kahn would survive -- would have survived if she

2  didn't participate in NSABP B-40?

3  A.   Well, she would have been treated essentially the same.

4  Q.   We know Ms. Kahn was treated with NSABP B-40, right?

5  A.   Uh-huh.

6  Q.   And we know that she survived, correct?  Can you --

7  A.   Wouldn't be talking here if she hadn't survived.

8  Q.   Can you say that you know to a reasonable degree of

9  medical certainty what her outcome would have been if she had

10  been on some other chemotherapy regimen --

11  A.   We would probably have treated her the same, as I said, or

12  very similarly.

13  Q.   With AC-T, correct?

14  A.   Right.

15  Q.   And you believe she would have survived on AC-T?

16  A.   Same risk.

17  Q.   And you don't know -- do you know the reported rate of

18  persistent or permanent hair loss with Taxol?

19  A.   Do I personally know that?

20  Q.   Uh-huh.

21  A.   No.

22  Q.   Can you say to a reasonable degree of medical certainty

23  that Ms. Kahn's hair would look different today if she took

24  Taxol instead of Taxotere?

25  A.   I don't know if there wasn't any difference at all.

CARL KARDINAL, M.D. - EXAMINATION

1  **Q.**   Forgive me for pointing.  In the first paragraph on the

2  second page, that's Bates-numbered 861, you wrote:  "I had a

3  long discussion lasting 20 or more minutes with the patient and

4  her husband with regard to neoadjuvant chemotherapy."

5          Do you have any recollection of what you would have

6  discussed with her?

7  **A.**   The risks and benefits of the treatment.

8  **Q.**   Let me direct you to a page in Exhibit 4 that's

9  Bates-labeled 953.  So the numbers in the bottom right-hand

10  corner are 953.  "This will be her first course of treatment.

11  We discussed risks and benefits as well as side effects of each

12  of the individual medications."

13  **A.**   Right.

14  **Q.**   Sure.  Do you have any reason to believe that what you

15  discussed with Ms. Kahn was different than your typical

16  discussion of hair loss that you have already told us about in

17  this deposition?

18  **A.**   No, it would have been the same.

19  **Q.**   One other question about the informed consent.  The

20  informed consent states:  "You may have side effects while on

21  this study.  Most of these are listed here, but there may be

22  other side effects that we cannot predict.  Side effects will

23  vary from person to person.  Everyone taking part in the study

24  will be carefully watched for any side effects.  However,

25  doctors do not know all of the side effects that may happen."

## CARL KARDINAL, M.D. - EXAMINATION

1   And it goes on.  It also says:  "In some cases side
2   effects may be very serious, long lasting, or may never go
3   away.  There's also a risk of death."
4   And is that consistent with what you would tell your
5   patients who participated in NSABP B-40?
6   **A.**   Yeah.
7   **Q.**   I'm sorry?
8   **A.**   Yes.
9   **Q.**   Are you aware of Ochsner's policy concerning sales
10   representative contacts for doctors involved with clinical
11   trials?
12   **A.**   I have never talked to a pharmaceutical representative
13   with reference to a clinical trial.
14   **Q.**   With regard to Taxotere, do you recall having any contacts
15   with Sanofi sales representatives?
16   **A.**   Not specifically.
17   **Q.**   So could you identify by name any sales representative for
18   Sanofi that you spoke to?
19   **A.**   (Shakes head.)
20   **Q.**   To your recollection, Sanofi sales representatives acted
21   professionally, in your experience?
22   **A.**   I have no negative reactions on that.  As a rule, I -- I
23   did speak to sales representatives, but I didn't really place
24   much weight in what they said.
25   **Q.**   So is it fair to say that you didn't rely on any

CARL KARDINAL, M.D. - EXAMINATION

1    representation from a Sanofi sales representative in your
2    decision to prescribe Taxotere to Elizabeth Kahn?
3    A.    Right.
4    Q.    I'm David Miceli.  We have met once before, if you recall?
5    A.    Yes.
6    Q.    Okay.  Thank you, Doctor.
7          Now, I put quotes around a couple of comments you
8    made this morning, and I want to see if I heard you correctly.
9    Tell me if I did.
10         When you were asked about whether or not Adriamycin
11   caused persistent thinning and asked how you could see it, you
12   said that, "It was visible with close observation."
13         Do you recall saying that?
14   A.    Not exactly.  Hair loss is usually just visible --
15   Q.    Sure.
16   A.    -- if you take a look.
17   Q.    And I think you also said that you thought that the cases
18   that you saw of Adriamycin hair thinning, the hair grew back?
19   A.    Correct.
20   Q.    Okay.  Now, when you were speaking earlier today with
21   Sanofi's counsel about the regrowth of hair after the use of
22   Adriamycin --
23   A.    Yes.
24   Q.    -- is that something that you just -- as you sit here
25   today, you recall, or is it something that you actually

1297

CARL KARDINAL, M.D. - EXAMINATION

02:17 1    documented some sort of pattern that people that have -- take

02:17 2    Adriamycin have a certain level of hair loss?

02:17 3    A.   I don't specifically remember my answer, but with patients

02:17 4    who receive Adriamycin, in my experience, all of them have hair

02:17 5    loss.  And also, in my own personal experience, the hair came

02:17 6    back.

02:17 7    Q.   Okay.  Do you recall Sanofi's counsel reviewing with you

02:17 8    the label product insert dated or revised September 28, 2007?

02:18 9    A.   I don't specifically recall that.

02:18 10   Q.   You don't recall reviewing the exhibit during your

02:18 11   deposition?

02:18 12   A.   You mean just a few minutes ago?

02:18 13   Q.   Yes.

02:18 14   A.   Oh, yeah, yeah.

02:18 15   Q.   Well, a few minutes ago and I think earlier this morning

02:18 16   as well.

02:18 17   A.   Yeah, today, in any event.

02:18 18   Q.   Right.  And Ms. Bieri directed your attention to page 56,

02:18 19   which is -- if you flip over to the very back and then flip one

02:18 20   page in -- I think you have your hand on it right there.

02:18 21   A.   Yeah.

02:18 22   Q.   At the top under the section of hair loss --

02:18 23   A.   Right.

02:18 24   Q.   -- she had directed your attention to lines 4 and 5 in the

02:18 25   reference to the statement that "hair generally grows back."

CARL KARDINAL, M.D. - EXAMINATION

1  A.   Right.

2  Q.   Anywhere in that paragraph under hair loss, do you see the

3  words "permanent hair loss"?

4  A.   No.

5  Q.   Okay.  So I want to ask you, just generally speaking -- we

6  are going to get into this a little bit deeper in a moment --

7  but I believe you talked to Sanofi's counsel earlier today

8  about when you would review the product insert.

9        Do you recall that?

10  A.   Yes.

11  Q.   And then I think you said that you would recall it when it

12  was first on the market?

13  A.   Right.

14  Q.   Now, have you over the course of your career received

15  letters from pharmaceutical companies alerting you to label

16  changes?

17  A.   Yes.

18  Q.   Have you received letters from time to time from

19  pharmaceutical companies alerting you to new indications for

20  usage of their chemotherapy products?

21  A.   Yeah.

22  Q.   Okay.  And when you receive that new information about

23  indications for usage, do they send you a new label as well?

24  A.   I don't recall.

25  Q.   When they send you letters directing you to new

CARL KARDINAL, M.D. - EXAMINATION

02:19  1    indications of usage for their products, do you read the letter

02:20  2    to learn about the new indications for the use of their

02:20  3    products?

02:20  4    A.   Yeah, but we are usually way ahead of them, you know,

02:20  5    because we gotten the clinical trials.

02:20  6    Q.   Concerning paclitaxel or Taxol --

02:20  7    A.   Yes.

02:20  8    Q.   -- and it having more neurotoxic -- or neurotoxic

02:20  9    neuropathy effects than docetaxel, is that something that you

02:20  10   have just seen in your clinical experience?

02:20  11   A.   No.  I think that this has been generally reviewed and

02:20  12   that Taxol is more neurotoxic than Taxotere.

02:20  13   Q.   There was a series of questions that Ms. Bieri went over

02:20  14   with you concerning any potential superiority that Taxotere or

02:20  15   Taxol has one over the other, and I wrote down that you can't

02:20  16   say one way or the other whether one is superior.

02:20  17        Is that a fair statement?

02:20  18   A.   I think -- they both have activity in breast cancer.  I

02:21  19   think they seem fairly equivalent, but I don't know that one is

02:21  20   clearly superior.

02:21  21   Q.   I want to make sure I understood you correctly earlier

02:21  22   when you were discussing with Ms. Bieri what you would warn

02:21  23   about with a patient.  I've written down here that you would

02:21  24   not warn of permanent hair loss unless it were in the label.

02:21  25        Did I get that correct?

CARL KARDINAL, M.D. - EXAMINATION

1   A.   That's correct.

2   Q.   And that to flip that around, if the words "permanent hair

3   loss" were associated with the use of Taxotere, would you

4   discuss that with your patient?

5   A.   Yes, and it should be included in the consent form.

6   Q.   Did you say earlier that you were not aware of any

7   chemotherapy label that lists permanent alopecia or permanent

8   hair loss as an adverse event?

9   A.   Permanent hair loss?

10   Q.   Correct.

11   A.   All right.  You know, the answer is I don't recall

12   reviewing one that ever listed permanent hair loss.

13   Q.   Okay.

14   A.   They -- it may possibly have been there, but --

15   Q.   Okay.  But you're not -- as we sit here today, you don't

16   recall one?

17   A.   I don't recall --

18   Q.   Okay.

19   A.   -- a specific one that says "permanent."

20   Q.   And you've practiced medicine for 40-some-odd years?

21   A.   Yes.

22   Q.   So based on the fact, as we sit here, you can't recall the

23   product insert or product label that listed permanent hair loss

24   as a potential side effect, would it be a fair statement to say

25   that if you received a letter from a pharmaceutical company

CARL KARDINAL, M.D. - EXAMINATION

02:22  1    updating you on their label, that they were changing it to
02:22  2    include permanent hair loss as an adverse event associated with
02:23  3    the use of their drug, would that be news to you?
02:23  4    A.   Yeah.
02:23  5    Q.   And would that change what you discussed with your patient
02:23  6    concerning that drug?
02:23  7    A.   It would be something that would have to be included in
02:23  8    the discussion.
02:23  9    Q.   Okay.
02:23  10   A.   I may perhaps still recommend the use of the drug.
02:23  11   Q.   And if after discussing it with your patient, your patient
02:23  12   told you because of that they did not wish to take that drug --
02:23  13   A.   Correct.
02:23  14   Q.   -- and asked you for other options, would you discuss
02:23  15   other options with them?
02:23  16   A.   Correct.
02:23  17   Q.   Okay.  And is paclitaxel an adequate alternative to
02:23  18   docetaxel?
02:23  19   A.   In terms of its efficacy?
02:23  20   Q.   Yes.
02:23  21   A.   They're very similar.
02:23  22   Q.   Okay.  And are there other adjuvant therapies that do not
02:23  23   include taxanes that are also within the standard of care for
02:23  24   use in patients?
02:23  25   A.   Yes.

CARL KARDINAL, M.D. - EXAMINATION

02:23  1   Q.   Now, in Exhibit 6 to your deposition -- I believe that was

02:24  2   one of the informed consents.  I'm going to do my best to

02:24  3   locate it for us, Doctor.

02:24  4            On page 2 there was some discussion -- I think it was

02:24  5   in this first paragraph -- I apologize for pointing there --

02:24  6   about what standard of care was.  Do you remember that?

02:24  7   A.   Well, they talk in this that AC, which is Adriamycin and

02:24  8   Cytoxan, is a standard treatment for breast cancer.

02:24  9   Q.   With docetaxel, correct?

02:25  10  A.   With docetaxel?

02:25  11  Q.   If you look at that, "three of the chemotherapy drugs used

02:25  12  in this study are docetaxel followed by the combination of

02:25  13  doxorubicin and cyclophosphamide" --

02:25  14  A.   Okay.

02:25  15  Q.   -- "AC, a standard treatment for breast cancer" -- do you

02:25  16  see that?

02:25  17  A.   Yeah, that is the standard treatment.

02:25  18  Q.   Okay.  Okay.  Now, are you familiar with the treatment

02:25  19  option FAC?

02:25  20  A.   Right.

02:25  21  Q.   And that's --

02:25  22  A.   5-FU.

02:25  23  Q.   -- 5-FU, doxorubicin, and cyclophosphamide?

02:25  24  A.   Right.

02:25  25  Q.   And is that a standard of care -- or is that a treatment

CARL KARDINAL, M.D. - EXAMINATION

1  option within the applicable standard of care for adjuvant

2  therapy?

3  A.   That was an old treatment, and it probably doesn't have

4  the potency or efficacy of TAC.

5  Q.   Okay.

6  A.   It would not be something I would choose.

7  Q.   How about AC only without docetaxel?  Is that within the

8  standard of care?

9  A.   I think in selected cases of multinode-positive breast

10  cancer, AC by itself is not adequate.

11  Q.   How about doxorubicin, paclitaxel, and cyclophosphamide?

12  Is that an adequate standard of care treatment option?

13  A.   Paclitaxel, I would think that would be an adequate --

14  fairly equivalent treatment.

15  Q.   Assuming that you had been warned about the use -- or the

16  permanent alopecia being associated with the use of

17  docetaxel/Taxotere, and your client -- and you advised your

18  client of that association -- or your patient of that

19  association and she informed you she did not wish to use that

20  product, would the combination of paclitaxel, cyclophosphamide,

21  and doxorubicin be an adequate treatment option for that

22  person?

23  A.   Well, it should be fairly equivalent.

24  Q.   Okay.  And with neoadjuvant treatment for --

25  A.   Yes.

CARL KARDINAL, M.D. - EXAMINATION

1  **Q.**   Right.  And I believe Ms. Bieri reviewed this with you,

2  that there was a -- that the tumor -- before the lumpectomy the

3  tumor was shrunk from 5 by 5 centimeters to -- I believe you

4  said 1 by 1 centimeter?

5  **A.**   Yeah.

6  **Q.**   And the neoadjuvant therapy that was undertaken included

7  the doxorubicin, cyclophosphamide, and Taxotere, correct?

8  **A.**   Yes.

9  **Q.**   And is there any way for you or any doctor to determine

10  the relative contributions of shrinking that tumor among those

11  three neoadjuvant therapies?

12  **A.**   No.

13  **Q.**   And you were asked a series of questions earlier today

14  about whether or not the same outcome would have occurred had

15  other therapies been used instead of the neoadjuvant therapy

16  that was actually used.

17          Do you recall that series of questions?

18  **A.**   Well, other therapy could have been used, perhaps equally

19  effective.

20  **Q.**   Okay.  And there's no real way to know that, is there?

21  **A.**   Well, you can't treat a patient and have her go back to

22  where she was before.

23  **Q.**   Exactly.  And by the same line of thinking, you can't

24  credit one of those neoadjuvant therapies to the exclusion of

25  another one?

CARL KARDINAL, M.D. - EXAMINATION

02:28  1    **A.**   Correct.
02:28  2    **Q.**   I apologize.  Have you ever conducted a clinical trial
02:29  3    that was funded by Sanofi?
02:29  4    **A.**   No.
02:29  5    **Q.**   Have you ever conducted a clinical trial that was funded
02:29  6    by any pharmaceutical company?
02:29  7    **A.**   No.
02:29  8    **Q.**   You yourself have been a principal investigator for
02:29  9    clinical trials before, correct?
02:29  10   **A.**   Correct.
02:29  11   **Q.**   Sure.  Who knows more about Taxotere's design, you or the
02:29  12   people at Sanofi?
02:29  13   **A.**   Well, clearly the people at Sanofi.
02:29  14   **Q.**   Who knows more about their overall clinical trial program
02:29  15   for Taxotere, you or the people at Sanofi?
02:29  16   **A.**   Oh, I know everything.
02:29  17   **Q.**   Now, I want to make sure you're joking there, that you
02:29  18   know everything, Doctor.
02:29  19   **A.**   Clearly Sanofi.
02:29  20   **Q.**   Okay.  And who has the best access to all of their
02:29  21   clinical trial data and the analysis of that trial data, you or
02:29  22   the people at Sanofi?
02:29  23   **A.**   Sanofi, of course.
02:29  24   **Q.**   Okay.  And I apologize for asking it this way, but do you
02:29  25   rely upon companies such as Sanofi to keep you informed and

CARL KARDINAL, M.D. - EXAMINATION

02:29 1  updated as to the newly discovered adverse events related to
02:30 2  their drug products?
02:30 3  A.   Yes.
02:30 4  Q.   And this may be the most basic question and I should have
02:30 5  known the answer to if you had been asked it -- if you had
02:30 6  answered it before, but at any point in time while you were in
02:30 7  the active practice of medical oncology, were you ever informed
02:30 8  by Sanofi, by any means, that use of Taxotere in women for
02:30 9  adjuvant -- whether neoadjuvant or just straight adjuvant care
02:30 10 for breast cancer was associated with the increased risk of
02:30 11 permanent alopecia?
02:30 12 A.   No.
02:30 13 Q.   Now, I asked you before and you answered me, but -- that
02:30 14 you would have discussed with the patients the adverse event of
02:30 15 permanent hair loss being associated with the use of Taxotere
02:30 16 as adjuvant care for breast cancer, and that if that patient --
02:31 17 your patient decided not to use it for that reason, you would
02:31 18 give an alternative medicine, correct?
02:31 19 A.   Correct.
02:31 20 Q.   Okay.  Is that because ultimately the patient has the say
02:31 21 in what product they take when they learn of the risks?
02:31 22 A.   The patient doesn't do their own prescribing.
02:31 23 Q.   No, but they --
02:31 24 A.   We would certainly make a strong recommendation on what we
02:31 25 think is best.

## CARL KARDINAL, M.D. - EXAMINATION

1 **Q.**   But, in your experience and in your practice, did you
2 encourage the patient to be an active participant in their
3 health care?
4 **A.**   Well, that's open ended.  I think the answer to that is
5 yes.
6 **Q.**   Okay.
7 **A.**   But I was not an idle bystander.
8 **Q.**   Now, Doctor, I appreciate your sense of humor, but I asked
9 you earlier who had superior knowledge about the clinical
10 trials, the design of the product, the adverse event related to
11 the product, and you agreed with me that it was the drug
12 company.
13        Do you still agree with that?
14 **A.**   Okay.
15 **Q.**   Is that a yes?
16 **A.**   Yeah.
17 **Q.**   I mean, Doctor, if the drug company doesn't warn you about
18 the risks associated with the use of their product, how are you
19 supposed to adequately inform your patient?
20 **A.**   Okay.
21 **Q.**   Can you?
22 **A.**   No.  I have to have a reliable source of information.
23 **Q.**   Okay.  I'm going to hand you Plaintiff's Exhibit 14 to
24 your deposition.  This is a document titled "Partnering with
25 Your Patients Along Their Journey."

CARL KARDINAL, M.D. - EXAMINATION

02:32   1           Do you see that?

02:32   2   A.   Yes.

02:32   3   Q.   If you go to the third page, the one that ends in 472 on

02:33   4   the Bates number.

02:33   5   A.   Yeah.

02:33   6   Q.   Do you see that this is a letter that's dated

02:33   7   October 2006?

02:33   8   A.   Yes.

02:33   9   Q.   The letter starts out "Dear Oncology Nursing

02:33  10   Professional," which is clearly not your title, correct?

02:33  11   A.   No.

02:33  12   Q.   Did you hire professionals within your office to handle

02:33  13   those discussions with patients?

02:33  14   A.   No.

02:33  15   Q.   Excuse me?

02:33  16   A.   No, I did not hire.

02:33  17   Q.   I'm sorry.  Did you have people employed at your office to

02:33  18   assist in educating your patients concerning their treatment?

02:33  19   A.   Yes.

02:33  20   Q.   All right.  Let's go back to the "Partnering with Your

02:33  21   Patients Along Their Journey."  The first paragraph of this

02:33  22   states that "At Sanofi-Aventis, we recognize that you are an

02:33  23   integral part of your patient's health care team.  Moreover, we

02:33  24   admire your passion for keeping your patient apprised of the

02:34  25   latest information about their treatment options.  To assist

## CARL KARDINAL, M.D. - EXAMINATION

1  you in your efforts, we have developed this comprehensive

2  Chemotherapy Patient Care Kit to keep you and your patients --

3  to help you and your patients manage treatment."

4       Do you see that?

5  A.   Yes.

6  Q.   Then if you go down to the second bullet point, it states:

7  "Thirteen individual tear sheets that you can print out and

8  give your patients, depending on the side effects they

9  experience during treatment.  Each tear sheet explains an

10 individual side effect of chemotherapy with tips to help your

11 patients better understand and cope with these changes."

12      Do you see that?

13 A.   Yes.

14 Q.   In the listing of the side effects included, alopecia is

15 listed in the middle of the third column.

16 A.   Yeah.  I see it.

17 Q.   Okay.  If you flip with me to the page that ends in 474.

18 A.   474?

19 Q.   Yes.

20 A.   Okay.

21 Q.   Are you there with me?

22 A.   Yeah.

23 Q.   It has "alopecia" and in parentheses, "hair loss"?

24 A.   Right.

25 Q.   It says:  "What is alopecia?  'Alopecia' is another word

CARL KARDINAL, M.D. - EXAMINATION

1    for hair loss or thinning of the hair.  It is a common yet

2    temporary side effect of some cancer medicines.  Alopecia can

3    occur anywhere on the body and may happen after a few

4    treatments.  Currently there are no medicines that can prevent

5    hair loss during treatment."

6         Did I read that correctly?

7    A.   Yeah.

8    Q.   Okay.  So this Sanofi document -- well, Doctor, do you --

9    in reading what we have read thus far in this document, does it

10   appear this is information provided by Sanofi for communication

11   to your patients?

12   A.   Yes.

13   Q.   Okay.  In informing -- Sanofi, in informing your patient

14   about hair loss, they note that it is a common yet temporary

15   side effect of some cancer medicines, correct?

16   A.   Correct.

17   Q.   Now, you're welcome to read this entire section on

18   alopecia or you can skim the whole document if you like and see

19   if you see any -- let me ask you first about the alopecia page.

20        Do you see any mention on here about permanent hair

21   loss associated with Taxotere?

22   A.   No.

23   Q.   Similarly we talked about -- I should have asked you this

24   before when we were talking about alopecia, but explaining that

25   alopecia is a common yet temporary side effect of some cancer

CARL KARDINAL, M.D. - EXAMINATION

1    medications, is that consistent with how you advised your

2    patients about hair loss related to Taxotere?

3    A.    Yes.

4    Q.    That is in parentheses underneath "nerve and muscle side

5    effects," correct?

6    A.    Right.

7    Q.    Is that a side effect that you discussed -- or an adverse

8    event or side effect that you discussed with patients for whom

9    you prescribed Taxotere?

10   A.    I'm sure I did, but I don't specifically remember.

11   Q.    Okay.  Most of the time patients recover from these

12   problems; however, there is a chance that full recovery can

13   take up to a year?

14   A.    Uh-huh.

15   Q.    Is that consistent with how you would have advised your

16   patients concerning neuropathy and myalgia?

17   A.    Again, you get your own personal experience and neuropathy

18   sometimes hung on longer than a year.

19   Q.    Okay.

20   A.    Which is one of the reasons I tended not to use Taxol and

21   tended to use Taxotere.

22   Q.    Doctor, now, concerning your understanding of more

23   neurotoxicity with Taxol --

24   A.    Yes.

25   Q.    -- where would you have gained that understanding?

CARL KARDINAL, M.D. - EXAMINATION

1 A.   Clinical impression.

2 Q.   Do you have any knowledge of what the FDA guidance is to

3 manufacturers about "Dear Doctor" letters?

4 A.   I don't.  No.

5 Q.   Do you know what the FDA guidance is to manufacturers

6 about when such letters can be issued?

7 A.   No.

8 Q.   Prior to today, have you ever seen what is marked as

9 Plaintiff's Exhibit 13?

10 A.   No.

11 Q.   Prior to today, have you ever seen what was marked as

12 Plaintiff's Exhibit 14?

13 A.   No.

14 Q.   Did you tell Mr. Miceli that you provided patients with

15 information that you received from drug companies?

16 A.   I provided patients with information that -- not directly

17 from drug companies, but we belonged to the Mayo Clinic study

18 group that went to the meetings at Mayo twice a year.

19 Materials that we learned in scientific sessions, we would

20 provide to patients.

21 Q.   Not materials directly from the manufacturer, correct?

22 A.   Not at all.

23 Q.   Regarding Exhibit 14, you've told me you had never seen

24 that before today.

25        Do you know who this document was distributed to?

CARL KARDINAL, M.D. - EXAMINATION

02:39  1   **A.**   Not to me.

02:39  2   **Q.**   Okay.  Can you please look at the right-hand column.

02:39  3   **A.**   The right-hand column.

02:39  4   **Q.**   Correct.  Where it says:  "Will my hair grow back?"

02:39  5   **A.**   Right.

02:39  6   **Q.**   If you do lose your hair, it will usually go back after

02:40  7   the treatments are over?

02:40  8   **A.**   Correct.

02:40  9   **Q.**   Was that language consistent with how you counseled your

02:40  10  patients?

02:40  11  **A.**   Absolutely.

02:40  12  **Q.**   With regard to *The Chemotherapy Source Book* --

02:40  13  **A.**   Yes.

02:40  14  **Q.**   -- that you authored a chapter of?

02:40  15  **A.**   On breast cancer, yes.

02:40  16  **Q.**   Yes.

02:40  17          We have marked that as Exhibit 21.

02:40  18          Will you agree that that was published in 2008,

02:40  19  Exhibit 21?

02:40  20  **A.**   Yes.  Correct.

02:40  21  **Q.**   I'm looking at page 372.

02:40  22  **A.**   All right.

02:40  23  **Q.**   In the last sentence of the first paragraph -- can you

02:40  24  read the last sentence of the first paragraph, please?

02:40  25  **A.**   I said:  "Docetaxel may have some activity in

CARL KARDINAL, M.D. - EXAMINATION

02:40  1    paclitaxel-resistant breast cancer."  I give a reference.

02:41  2            THE COURT:  Thank you.  I'm just looking to see if we

02:41  3    should take our afternoon break now or -- let's call your next

02:41  4    witness.  Mr. Lambert.

02:41  5            MR. LAMBERT:  It may be a good time to take a break.

02:41  6    The next witness will be Steve Seebol, the plaintiff's husband.

02:41  7            THE COURT:  Is it a good time for you to take a

02:41  8    break?

02:41  9            MR. LAMBERT:  It is.

02:41  10           THE COURT:  The Court will be at recess for

02:41  11   10 minutes.  We will return at 10 minutes to 3:00.

02:41  12           THE DEPUTY CLERK:  All rise.

02:41  13           (The jury exited the courtroom.)

02:42  14           MR. LAMBERT:  All of the exhibits with the Kardinal

02:42  15   deposition are already in the record.

02:42  16           THE COURT:  Thank you.

02:42  17           (Recess.)

02:55  18           THE COURT:  All jurors are present.  Court is back in

02:55  19   session.  You may be seated.

02:55  20               Mr. Schanker, please call your first witness.

02:55  21           MR. SCHANKER:  Your Honor, we wish to call

02:55  22   Steve Seebol.

02:55  23                       STEVEN SEEBOL,

02:55  24   having been duly sworn, testified as follows:

02:55  25           THE DEPUTY CLERK:  Thank you.  You may be seated.

STEVEN SEEBOL - DIRECT

02:55  1    Please state and spell your name for the record.

02:56  2              THE WITNESS:  Steven, S-T-E-V-E-N, Seebol,

02:56  3    S-E-E-B-O-L.

02:56  4              MR. SCHANKER:  Thank you, Your Honor.

02:56  5                      DIRECT EXAMINATION

02:56  6    BY MR. SCHANKER:

02:56  7    Q.   Mr. Seebol, if you could pull that microphone up in front.

02:56  8    A.   How is this?

02:56  9    Q.   We will see.

02:56 10    A.   Okay.

02:56 11    Q.   Good afternoon.  Could you go ahead and just introduce

02:56 12    yourself to the jury.

02:56 13    A.   My name is Steven Seebol.  I am the husband of

02:56 14    Elizabeth Kahn.

02:56 15    Q.   Sir, how does it make you feel to be here today?

02:56 16    A.   Pretty nervous.  I'm way out of my comfort zone, but I'm

02:56 17    doing what I think I need to do in order to help my wife.

02:57 18    Q.   Could you briefly describe your wife for the jury.

02:57 19    A.   She is a very sweet woman.  She has very, very good

02:57 20    energy.  She talks a lot.  I think that kind of sums her up.

02:57 21    Q.   Sir, what do you do for a living?

02:57 22    A.   I'm currently retired.

02:57 23    Q.   Prior to retiring, share with the jury what you did.

02:57 24    A.   The job I had before I retired, I was the textbook manager

02:57 25    at Tulane University bookstore.  Earlier than that, I was the

STEVEN SEEBOL - DIRECT

1    photo lab technician/manager of ColorPix.

2    **Q.**   How long have you and Elizabeth been married?

3    **A.**   25 years.

4    **Q.**   I want to ask you upfront:  Did your wife's hair grow back

5    after chemotherapy and then fall out again?

6    **A.**   Absolutely not.

7    **Q.**   Mr. Seebol, did your wife's eyebrows grow back after

8    chemotherapy and then fall out again?

9    **A.**   Absolutely not.

10   **Q.**   You could briefly describe for the jury -- I want to talk

11   about the early-stage breast cancer journey.

12           Were you with your wife on that?

13   **A.**   Yes, I was.

14   **Q.**   Why was it important that you do it together?

15   **A.**   Well, I think we have a supportive relationship, and I try

16   to support her as much as I possibly can.  I knew how difficult

17   it was going to be for her.  If there was anything I could do

18   for her, I wanted to do it.

19   **Q.**   What were your expectations, yours and Elizabeth's, when

20   she was diagnosed with early-stage breast cancer?

21   **A.**   Our expectation was that she would be cured.  We knew a

22   lot of people who had breast cancer, and every single one of

23   them has been cured.

24   **Q.**   Do you remember the oncologist you first met with?

25   **A.**   Yes.

STEVEN SEEBOL - DIRECT

| | | |
|---|---|---|
| 02:59 | 1 | **Q.**   Who was that? |
| 02:59 | 2 | **A.**   Carl Kardinal. |
| 02:59 | 3 | **Q.**   Can you move the microphone a little closer to you?  I |
| 02:59 | 4 | would just ask you if you raise your voice a little bit. |
| 02:59 | 5 | **A.**   I'll try. |
| 02:59 | 6 | **Q.**   Thank you. |
| 02:59 | 7 | If you could say that name one more time. |
| 02:59 | 8 | **A.**   Carl Kardinal. |
| 02:59 | 9 | **Q.**   Now, have you heard of an informed consent? |
| 02:59 | 10 | **A.**   Yes, I have. |
| 02:59 | 11 | **Q.**   In this case, did, review the informed consent?  Did you |
| 02:59 | 12 | review and sign that informed consent? |
| 02:59 | 13 | **A.**   I did not. |
| 02:59 | 14 | **Q.**   When you were with Elizabeth and Dr. Kardinal, were there |
| 02:59 | 15 | verbal conversations that took place about the side effects of |
| 02:59 | 16 | chemotherapy? |
| 02:59 | 17 | **A.**   Yes, there were. |
| 02:59 | 18 | **Q.**   What were your understandings regarding the type of hair |
| 03:00 | 19 | loss that your wife would experience as a result of |
| 03:00 | 20 | chemotherapy? |
| 03:00 | 21 | **A.**   Temporary hair loss.  We expected it to grow back. |
| 03:00 | 22 | **Q.**   Now, did you ask if your wife might develop permanent hair |
| 03:00 | 23 | loss? |
| 03:00 | 24 | **A.**   We did not, and it never occurred to us that that would |
| 03:00 | 25 | happen. |

STEVEN SEEBOL - DIRECT

**Q.**   Sir, could you share with the jury some of the other side effects that Elizabeth experienced as she went through the chemotherapy?

**A.**   Nausea, diarrhea, at one point she had sores on her hands, feet, and mouth, and she lost her hair.

**Q.**   The cancer blog.  I understand that Elizabeth did a cancer blog in this case.  Can you share with the jury what that was about?

**A.**   Actually, we both did it.  It was to keep our family and friends, people living out of town, keep them informed about what was happening.  What we found was every time she had a treatment, we would receive, like, 20 phone calls.  It was very disruptive.  We thought it was much easier to write about it and then anybody could look at it when they wanted.

**Q.**   Let's take a look at some of the blog posts.

          **MR. SCHANKER:**  Scott, could you pull up P2649?

          **MR. MOORE:**  There's no objection to the blog, Your Honor.

          **THE COURT:**  Thank you.

          **MR. SCHANKER:**  Specifically, if you could go to May 24, 2008, Scott.  Scott, if you have trouble with that, I can just put one on the overhead.  You got it?  Thank you.

          Everybody can see that okay?  Let's specifically look at the one that's down the page, Scott, that's entitled "It's War."

STEVEN SEEBOL - DIRECT

1   BY MR. SCHANKER:

03:02  2   Q.   Do you see that?

03:02  3   A.   Yes.

03:02  4   Q.   Who entered this blog?  Who typed this out?

03:02  5   A.   That was mine.

03:02  6   Q.   Okay.  If you could just begin taking us through --

03:02  7   reading us through this blog, and I will interrupt you and ask

03:02  8   you some questions.

03:02  9   A.   "It's war.  A war has been declared.  It's us against the

03:02  10  tumor that has invaded Elizabeth's body.  We have a plan of

03:02  11  attack on Thursday, May 29.  We are going to begin."

03:03  12  Q.   Let me stop up there.

03:03  13       What was going to happen on May 29?

03:03  14  A.   I would assume that the chemo began.

03:03  15  Q.   If you can go ahead.

03:03  16  A.   "Our goal is to make Elizabeth cancer free and save as

03:03  17  much tissue as possible.  We expect to shrink the tumor to the

03:03  18  point where a lumpectomy will be all that's needed."

03:03  19  Q.   What were you explaining there?

03:03  20  A.   Well, our goal at this point was to save the breast tissue

03:03  21  as much as possible.  A lumpectomy, we knew was going to

03:03  22  happen.  It would take out this tissue around where the tumor

03:03  23  was.

03:03  24  Q.   If you could continue on, please.

03:03  25  A.   "To reach this goal, we have enrolled in a chemotherapy

STEVEN SEEBOL - DIRECT

1    clinical trial at Ochsner Hospital.  The trial gives us access
2    to cutting-edge drugs and a higher degree of care.  There is no
3    placebo.  All the drugs are FDA-approved for cancer treatment."
4  Q.   Let me stop you there.
5         Why did you make note of that?
6  A.   Well, what we are trying to do is -- was explain to, like
7    I said, our parents and friends that she was getting very, very
8    good care.  It wasn't a test.  It wasn't just an off-the-wall
9    random trial that we were doing.  It was actually something
10   that was FDA-approved.  They said there was no placebo.  You
11   didn't have to worry about, oh, my goodness, they're not
12   getting any drugs.  They're not getting her what she needs.
13 Q.   Now, was this a last ditch no-other-hope type of clinical
14   trial?
15 A.   Not the way we understood it.  It was just an additional
16   drug to see how it worked.
17 Q.   Okay.  If you could go ahead and continue on, please.
18 A.   "The trial is designated NSABP B-40.  The link will give
19   you the specifics.  We are in the group 2B.  It will be a long
20   process; there are many bumps along the way.  We feel that the
21   final outcome, crushing the tumor and winning the war, will be
22   worth all the trouble."
23 Q.   Now, if I could have you look at a blog dated June 1st of
24   2008, specifically the one entitled "Chemo Good, Cancer Bad."
25        Do you see that?

STEVEN SEEBOL - DIRECT

03:05  1  **A.**   Yes.

03:05  2  **Q.**   Is that a blog that you authored?

03:05  3  **A.**   Yes, it is.

03:05  4  **Q.**   Can you take us through that?  Again, I will ask you some

03:05  5  questions as we work through it.

03:05  6  **A.**   Okay.  "Chemo Good, Cancer Bad.  I had a revelation of

03:05  7  sorts while waiting for Elizabeth in the chemo room.  I looked

03:05  8  over at her sitting in the chair with these powerful drugs

03:05  9  dripping into her body and realized that chemo isn't evil.

03:05  10  Chemo is good.  Chemo is a dreaded experience, one that most

03:05  11  people will avoid at any cost.  The negative side effects are

03:05  12  discussed over and over."

03:05  13  **Q.**   Let me stop you there.

03:05  14        In all the conversations that you had, did anyone

03:06  15  warn you of the permanent risk of hair loss?

03:06  16  **A.**   It never came up, no.

03:06  17  **Q.**   Okay.

03:06  18        **MR. SCHANKER:**  Okay.  Scott, could you go to the

03:06  19  overhead for me.

03:07  20        **MR. MOORE:**  Your Honor, could we approach briefly?

03:07  21        **THE COURT:**  Yes.

03:07  22        (The following proceedings were held at the bench.)

03:07  23        **MR. MOORE:**  So we have a concern about what's being

03:07  24  written on the screen at this point with this witness on the

03:07  25  grounds that while the patient may have some role in terms of a

STEVEN SEEBOL - DIRECT

1    learned intermediary question and warnings causation, the

2    husband does not.  We have some concerns that this is going to

3    give the impression that there was some responsibility on

4    Sanofi's fault to have warned the husband as well.  So that's

5    our concern.

6         MR. SCHANKER:  Mr. Seebol is a witness, and as a

7    witness he is testifying to his observations from his

8    interactions specifically with the different employees,

9    including learned intermediaries, as far what was discussed

10   concerning permanent hair loss.  It's clearly relevant.

11        MR. MOORE:  It sounded like the question was:  Did

12   anybody warn you?

13        MR. SCHANKER:  Did you hear anything?

14        THE COURT:  He can testify about what he heard.  I

15   don't know why we need to write all this stuff down.

16        MR. SCHANKER:  Well, Your Honor --

17        THE COURT:  If he is sitting there with his wife, "I

18   was privy to the conversations, I heard my wife's conversations

19   with the doctor," I think that's important.

20        MR. SCHANKER:  I'm not going to do a whole bunch of

21   writing.  I promise.

22        THE COURT:  Okay.  Sanofi had no obligation -- and at

23   the end of the day, it's always Ms. Kahn's decisions, not her

24   husband's, regardless.  Even if he begged her to do something,

25   at the end of the day it's her decision.  He can say, "I was

1323

**STEVEN SEEBOL - DIRECT**

| | |
|---|---|
| 03:08 | 1 |
| 03:09 | 2 |
| 03:09 | 3 |

there.  This is what I heard," if he heard anyone talk to his
wife about her informed consent.  It was never his informed
consent.

       **MR. SCHANKER:**  The question was did he ever hear
anyone from --

       **THE COURT:**  No, that wasn't the question.

       **MR. SCHANKER:**  I'll clarify that he didn't sign it.
It wasn't him --

       **THE COURT:**  Okay.  You need to clarify that because
it was a little confusing.

       **MR. MOORE:**  We do have a concern with the paper on
the screen that he is writing right now --

       **THE COURT:**  What does it say?

       **MR. SCHANKER:**  Do you want me to get it for you?

       **THE COURT:**  Yes, go get it for me.

       **MR. SCHANKER:**  This is his testimony.

          Did anyone warn of permanent hair loss?  Did he
overhear it at any time?  And he said no.

          It's just summarizing his testimony.  There's
nothing inappropriate with the writing.

       **THE COURT:**  This is the problem.  It is misleading to
the extent the question was -- I think first we have to
establish that he was with her, that he was in the room at the
time, did he hear the doctor and his wife engaging in a
conversation, and what did he hear the doctor say to his wife.

STEVEN SEEBOL - DIRECT

03:10   1   Nobody had to warn him about anything.  I think you might need
03:10   2   to clean it up.
03:10   3           MR. SCHANKER:  Okay.
03:10   4           THE COURT:  I just don't want it to be what anybody
03:10   5   was warning Mr. Seebol about because it doesn't matter.
03:10   6           MR. SCHANKER:  Sure.  What he overheard.
03:10   7           THE COURT:  Yes, what he was privy to, what he was
03:10   8   witness to.
03:10   9           I don't want to spend much time writing all of
03:10   10  this nonsense.  I will just be honest with you.
03:10   11          MR. SCHANKER:  Thank you.
03:10   12          (End of bench conference.)
03:10   13          THE COURT:  Mr. Schanker.
03:10   14          MR. SCHANKER:  Thank you, Your Honor.
03:10   15          Scott, could you pull back up the blog, the
03:10   16  June 1 blog we were looking at.
03:11   17  BY MR. SCHANKER:
03:11   18  Q.   Mr. Seebol, you were explaining this to the jury.
03:11   19          Could you pick up where you had left off.  You see
03:11   20  "everyone" there?
03:11   21  A.   "Everyone is aware of them.  Every doctor and every nurse
03:11   22  we talk to is constantly warning us about the problems that may
03:11   23  develop."
03:11   24  Q.   Let me stop you there.
03:11   25          In your involvement with -- let's establish this for

**STEVEN SEEBOL - DIRECT**

1  the jury.

2          Did you go with your wife to the doctors'

3  appointments for her chemotherapy?

4  A.   Yes, I did.

5  Q.   How many of those did you go to?

6  A.   I went to every one.

7  Q.   Okay.  With the doctors' appointments that you went to,

8  did you ever hear a doctor or nurse warn of permanent hair

9  loss?

10  A.   I never heard it.

11  Q.   Okay.  Thank you.

12          Could you continue on.

13  A.   "No one has spent any time telling us about all the good

14  that will be done.  We never hear how these drugs attack the

15  fast-growing cancer cells and destroy them, how the tumor

16  inside her body will be eaten away.  I find it very odd that

17  chemo is looked upon so negatively.  It needs some positive PR.

18  Chemotherapy:  Happily killing cancer cells 24/7."

19  Q.   You wrote that?

20  A.   Yes, I did.

21  Q.   Now, once your wife began her treatment, do you recall

22  when she lost her hair?

23  A.   I think it was about three or four weeks after the first

24  infusion.

25  Q.   Now, did a new oncologist begin monitoring the clinical

STEVEN SEEBOL - DIRECT

1  trial treatment plan that had been chosen by Elizabeth and

2  Dr. Kardinal?

3  **A.**   Yes.  Dr. Kardinal was retiring.

4  **Q.**   Who was that new oncologist?

5  **A.**   Her name was Zoe Larned.

6  **Q.**   Do you recall how much hair your wife had at the time she

7  came under Dr. Larned's care?

8  **A.**   No hair.

9  **Q.**   How many visits were you present for between your wife and

10  Dr. Larned?

11  **A.**   I'm not exactly sure of the number.  Somewhere around 10.

12  **Q.**   Now, did Dr. Larned go back through the informed consent

13  form with you and your wife?

14  **A.**   She did not.

15  **Q.**   Did Dr. Larned ever have a discussion concerning permanent

16  hair loss with you and your wife while you were present?

17  **A.**   She did not.

18  **Q.**   Now, I want to shift gears here just for a second.

19        Before Elizabeth underwent to chemotherapy, could you

20  share with the jury what her hair was like?

21  **A.**   It was just regular, normal hair.

22        **MR. SCHANKER:**  Scott, could you pull up the photo

23  montage with the four pictures, please.

24  **BY MR. SCHANKER:**

25  **Q.**   You see the photos that we have here with the dates on

STEVEN SEEBOL - DIRECT

1  those?

2  A.   Yes.

3  Q.   Are those photographs that were all taken before

4  chemotherapy?

5  A.   As far as I know, yes.

6  Q.   Do those photos appear to accurately reflect the condition

7  of your wife's hair before chemotherapy?

8  A.   Yes.

9  Q.   Before chemotherapy, was there anything unusual about your

10  wife's hair that made it stand out in a crowd?

11  A.   No, not really.

12  Q.   Now, since chemotherapy, what has Elizabeth's hair been

13  like, her scalp?

14  A.   It's very fine.  You can see through it.  You can see her

15  scalp.

16  Q.   Just to be clear, how long has it been that way?

17  A.   Since, I guess, the third or fourth week after chemo.

18  Q.   I'm sorry.  Just to be clear?

19  A.   It was three or four weeks after her first chemo infusion.

20  Q.   Where is Elizabeth's scalp most noticeable?

21  A.   The top front and the back.

22  Q.   Has it been that way since the time you described?

23  A.   Yes, it has.

24  Q.   Now, since her scalp has been visible since the

25  chemotherapy, have you been able to do something for your wife

STEVEN SEEBOL - DIRECT

03:16 1 to enhance the way she appears in photographs?

03:16 2 **A.**   We have sort of worked out a way of doing it.  We always

03:16 3 shoot front on and we always shoot just a little bit low.  And

03:16 4 she has a way of posing.  She sort of lifts her head up a

03:16 5 little bit because the hair loss is further back.  And by

03:16 6 putting her head up a little ways, you can't see it when you

03:16 7 photograph it.

03:16 8 **Q.**   What happens if she is caught off guard or surprised in a

03:16 9 photograph?

03:16 10 **A.**   When she looks at a photograph, she is very unhappy that

03:16 11 somebody has caught her with these big bald spots on her head.

03:17 12         **MR. SCHANKER:**   Scott, could you pull up

03:17 13 Plaintiff's 2966, please.

03:17 14 **BY MR. SCHANKER:**

03:17 15 **Q.**   Now, this is a photograph that the jury has seen in this

03:17 16 case.

03:17 17         Do you recognize this photograph?

03:17 18 **A.**   Yes, I do.

03:17 19 **Q.**   Describe what you see in this photograph in relation to

03:17 20 what you talked about with how you have Elizabeth poses.

03:17 21 **A.**   It's a front-on photograph, and it's shot from a little

03:17 22 bit below.

03:17 23         **MR. SCHANKER:**   Scott, if you could pull up P2968.

03:17 24         If you could put the previous photo and this one

03:17 25 next to each other.

STEVEN SEEBOL - DIRECT

03:17 1 BY MR. SCHANKER:

03:17 2 Q.   Now, what do you see here when you look at these two

03:17 3 photographs in general?  Go ahead and describe it to us.

03:17 4 A.   The one on the left was shot from -- we were standing in

03:18 5 the bleachers.  So it was shot --

03:18 6 Q.   I'm sorry?

03:18 7 A.   The person who shot this photograph was in the bleachers.

03:18 8 This was in a gymnasium.  There were bleachers in front of it.

03:18 9 Q.   Let me stop you there.  The parties have stipulated that

03:18 10 this photograph was taken October of 2009.  Were you at this

03:18 11 event?

03:18 12 A.   I was at this event.

03:18 13 Q.   Do you know what it was?

03:18 14 A.   It was some sort of volleyball game that had something to

03:18 15 do with breast cancer.  That's what it was.

03:18 16 Q.   Did you take the photograph on the left?

03:18 17 A.   I did not.

03:18 18 Q.   Do you know who did?

03:18 19 A.   I'm thinking it was her mother, but I'm not sure.

03:18 20 Q.   I interrupted you.  You were describing the photograph on

03:18 21 the left.

03:18 22 A.   It was shot from above, looking down at her, so you could

03:18 23 definitely see more scalp.

03:18 24         MR. SCHANKER:  Could you zero in on that, on Ms. Kahn

03:19 25 in that photograph, please, Scott, the one on the left.

STEVEN SEEBOL - DIRECT

03:19   1           THE WITNESS:  At that time it appears she was wearing

03:19   2   her hair a little bit longer, so it was basically in a

03:19   3   comb-over.

03:19   4             The other thing that was happening, especially

03:19   5   on the one on the right, we were getting a lot of shadowing.

03:19   6   So you can't really see, the one on the right, what the hair

03:19   7   looks like.  It's mostly shadow.

03:19   8   BY MR. SCHANKER:

03:19   9   Q.   Why do you say that?

03:19   10   A.   Because that's one of the things that a digital camera

03:19   11   will do.

03:19   12   Q.   I'm sorry?

03:19   13   A.   It's something a digital camera will do.  It adjusts the

03:19   14   contrast.  It's basically trying to expose her face, and by

03:19   15   doing that, sometimes it darkens the shadows.  It appears in

03:19   16   this case that's what's going on.

03:19   17           MR. SCHANKER:  Scott, could you pull up P3104,

03:19   18   please.

03:20   19   BY MR. SCHANKER:

03:20   20   Q.   Do you recall this photograph?

03:20   21   A.   Yes.

03:20   22   Q.   Okay.  The parties have stipulated that this was a

03:20   23   photograph from 2013.  Could you tell the jury who took this

03:20   24   photograph?

03:20   25   A.   I took that photograph.

STEVEN SEEBOL - DIRECT

03:20  1   **Q.**   Where was this?

03:20  2   **A.**   It was in Chicago, at something called The Bean, B-E-A-N.

03:20  3   It's a large metal sculpture, very reflective.

03:20  4   **Q.**   Are you something of a photographer?

03:20  5   **A.**   Something of one.  More amateur, yes.

03:20  6   **Q.**   You took this photo of Ms. Kahn?

03:20  7   **A.**   Yes, I did.

03:20  8          **MR. SCHANKER:**  Scott, could you zero in on the

03:20  9   photograph and keep the reflection in the back.

03:20  10  BY MR. SCHANKER:

03:20  11  **Q.**   Tell us about this photograph.

03:20  12  **A.**   This is one of the few times you can see her from the

03:21  13  front and from the back.  She probably -- we probably weren't

03:21  14  even aware that the back part was being taken.  It's just

03:21  15  something that happens in a situation like this.  In the back

03:21  16  part, you can definitely see the loss of hair.

03:21  17  **Q.**   Thank you.

03:21  18          Scott, if you could pull up P3142.

03:21  19          Mr. Seebol, do you recognize this photograph?

03:21  20  **A.**   Yes, I do.

03:21  21  **Q.**   Share with the jury when this or what this reflects.

03:21  22  **A.**   This was at a wedding of a son of a friend of ours.

03:21  23  **Q.**   The parties have stipulated that this is a March of 2014

03:21  24  photograph.  Does that seem right to you?

03:21  25  **A.**   It's around there, yes.

STEVEN SEEBOL - DIRECT

03:21  1   **Q.**   Were you in attendance at this event?

03:21  2   **A.**   Yes, I was.

03:21  3   **Q.**   Describe the pose that your wife has in this photograph.

03:22  4   **A.**   That's her typical photo pose.  It's looking up a little

03:22  5   bit and straight on.

03:22  6         **MR. SCHANKER:**  Then, Scott, if you could put up 3141,

03:22  7   please.

03:22  8   **BY MR. SCHANKER:**

03:22  9   **Q.**   Is this the same event?

03:22  10  **A.**   Yes, it is.

03:22  11  **Q.**   You were in attendance at this event?

03:22  12  **A.**   I was.

03:22  13  **Q.**   What do we see here?

03:22  14  **A.**   The back of Elizabeth's hair, you can definitely see the

03:22  15  bald spot at the top of her head.

03:22  16  **Q.**   That spot and what we see there, has that always been

03:22  17  visible since the chemotherapy?

03:22  18  **A.**   Yes, it has.

03:22  19        **MR. SCHANKER:**  Thank you, Scott.

03:22  20  **BY MR. SCHANKER:**

03:22  21  **Q.**   Shifting gears, I want to talk to you about a pill that

03:22  22  your wife took as part of her treatment.  Do you recall that?

03:23  23  **A.**   I think it's Tamoxifen.

03:23  24  **Q.**   Do you know for how long your wife took Tamoxifen?

03:23  25  **A.**   I think she took it for ten years.

STEVEN SEEBOL - DIRECT

03:23  1   **Q.**   Did you notice any changes in your wife's hair during the
03:23  2   time when she was on the Tamoxifen?
03:23  3   **A.**   There were no changes.
03:23  4   **Q.**   Now, how long has your wife been off the Tamoxifen?
03:23  5   **A.**   Three years, I think.
03:23  6   **Q.**   Have you seen any difference in her hair since she stopped
03:23  7   taking the Tamoxifen?
03:23  8   **A.**   No.  It's about the same.
03:23  9   **Q.**   Mr. Seebol, I want to ask you how this has impacted
03:23  10  Elizabeth as a human being.  Can you share with the jury,
03:23  11  please.
03:23  12  **A.**   Well, it's taken away a little bit -- well, it's
03:23  13  definitely taken away some of her -- it's taken away a little
03:23  14  bit of her humanity.
03:23  15  **Q.**   I'm sorry?
03:23  16  **A.**   It's taken some of her humanness, her humanity.  Hair is a
03:24  17  very important part, the way people look at themselves and
03:24  18  think about themselves.  In certain situations where you want
03:24  19  to dehumanize a person, one of the first things you do is take
03:24  20  off their hair.  Let's say if you are a recruit in the Army,
03:24  21  they shave your hair off.  If you go to prison, a lot of times
03:24  22  they shave your hair off.  In the Holocaust, they shaved their
03:24  23  hair off.  Because it's a way of taking your humanity away, and
03:24  24  part of that was done with her.
03:24  25  **Q.**   Right now, despite obviously everything she has been

STEVEN SEEBOL - DIRECT

03:24 1  through, share with the jury how you feel about Elizabeth.

03:24 2  **A.**   Oh, I still love her, but I have also come to respect her

03:24 3  a lot more because I realize how strong she is to be able to

03:24 4  deal with what she deals with.

03:24 5  **Q.**   How do you know this has impacted her?

03:24 6  **A.**   You can just look at her.  You can look and see what she

03:24 7  looks like, the way her hair is.  And she has to face the world

03:24 8  like that every day.  It's a very difficult thing.

03:25 9            **MR. SCHANKER:**  Thank you.

03:25 10            **MR. MOORE:**  Your Honor, may we approach?

03:25 11            **THE COURT:**  Yes.

03:25 12            (The following proceedings were held at the bench.)

03:25 13            **MR. MOORE:**  Your Honor, I didn't get the objection in

03:25 14  because he just blurted it out, but the testimony about the

03:25 15  Holocaust and taking away your humanity was incredibly

03:25 16  inflammatory, incredibly inappropriate, incredibly prejudicial.

03:25 17  To suggest what Sanofi did to his wife was tantamount to what

03:25 18  happened at Auschwitz, or something like that, is just simply

03:25 19  improper.  I did not jump up and object because he had already

03:25 20  blurted it out.  The question did not call for that answer.

03:25 21            We do want to put on the record that we

03:25 22  strenuously object to that sort of inflammatory testimony

03:26 23  coming from this witness in response to that question.  We

03:26 24  would request that the testimony be stricken.

03:26 25            **MR. SCHANKER:**  I think it's proper testimony.  That's

STEVEN SEEBOL - DIRECT

1    how he --

2            THE COURT:  What do you want me to do with the jury?

3            MR. MOORE:  Instruct the jury to disregard

4    Mr. Seebol's comments about the Holocaust and about what the

5    German Nazis did to those people.

6            MR. SCHANKER:  Your Honor, if I recall exactly what

7    Mr. Seebol said, he said that losing your hair is dehumanizing.

8    He gave several examples of how it is dehumanizing.  I think it

9    was completely appropriate testimony.  It's the way he sees it,

10   and he related it in that manner.  I don't think that there's

11   any reason for instruction to the jury on this issue.

12           THE COURT:  I think it's one thing to say what they

13   do in the military, but there is something about the Holocaust

14   that crosses the line.  I think it's one thing to say it's what

15   they do in the military in certain service groups.

16               I will tell the jury -- I'm just trying to

17   figure out how to phrase it.  I'm just trying to figure out how

18   to do this without giving it more credence.  That's what my

19   concern is.

20           MR. SCHANKER:  I will note for the record, number

21   one, I wasn't aware he was going to say that.

22           THE COURT:  I didn't think you asked for that answer.

23           MR. SCHANKER:  I will note for the record I believe,

24   although I'm not sure, he is of Jewish descent.

25           THE COURT:  He is, as is his wife.  As is his wife.

STEVEN SEEBOL - CROSS

03:28  1   So there is something very personal there, and it's probably

03:28  2   part of their family history.

03:28  3          I could just tell the jury that any reference to

03:28  4   the Holocaust cannot be considered evidence.

03:28  5          Tell me what to do.  I'm really trying to figure

03:28  6   out how to word this in a way that does not make it worse.

03:28  7          MR. MOORE:  I think that's fine to say it's not

03:28  8   evidence against Sanofi.  I think the reference to the

03:29  9   Holocaust or what was taken from Holocaust survivors is not

03:29  10  evidence of liability, something to that effect.  The word he

03:29  11  used was "taken."

03:29  12         THE COURT:  All right.

03:29  13         (End of bench conference.)

03:29  14         THE COURT:  Members of the jury, I caution you that

03:29  15  comments -- that testimony regarding what was taken from

03:29  16  victims of the Holocaust is not evidence as to Sanofi, and you

03:29  17  should disregard that.

03:29  18         Mr. Moore.

03:29  19         MR. MOORE:  Thank you, Judge.

03:29  20                    CROSS-EXAMINATION

03:29  21  BY MR. MOORE:

03:29  22  Q.   Good afternoon, Mr. Seebol.

03:29  23  A.   Good afternoon.

03:29  24  Q.   You and I haven't met before, have we?

03:30  25  A.   No, we have not.

STEVEN SEEBOL - CROSS

03:30  1   **Q.**   Okay.  I think you said at the beginning of your
03:30  2   examination you were a little bit nervous up there at the
03:30  3   stand?
03:30  4   **A.**   A little bit.  It's uncomfortable.
03:30  5   **Q.**   I know that you're not a professional witness.  This isn't
03:30  6   what you do.  So I want to tell you at the beginning, I'm not
03:30  7   coming up here to argue with you.  I'm not dumb enough to argue
03:30  8   with a man about his wife.  But I do have some questions that I
03:30  9   have to ask you.  If for any reason I ask you a question that
03:30  10  makes you feel uncomfortable, just tell me that.  If I ask you
03:30  11  a question and you think I need to rephrase, just tell me.
03:30  12          I'm just going to ask you questions about some of the
03:30  13  subject matters you spoke about during your direct examination.
03:30  14  Is that okay?
03:30  15  **A.**   Sure.
03:30  16  **Q.**   I want to take you back to when you first learned that
03:30  17  Elizabeth was diagnosed with Stage 2 breast cancer.  Do you
03:30  18  recall that that was in the spring of 2008?
03:31  19  **A.**   Yes, I do recall that.
03:31  20  **Q.**   At that time how long had you been married to Ms. Kahn?
03:31  21  **A.**   About 12 years.  I have to do the math.
03:31  22  **Q.**   The pause won't be reflected on the record.
03:31  23          At that time you cared for her deeply, yes?
03:31  24  **A.**   Yes.
03:31  25  **Q.**   She was your wife, and you wanted her to be safe and

STEVEN SEEBOL - CROSS

1    healthy, right?

2    A.    Yes.  I think that's what anyone would want.

3    Q.    You were concerned when you learned that she had Stage 2

4    breast cancer, were you not?

5    A.    Well, I was concerned, but we know a lot of people who

6    have gone through breast cancer.  We have known a lot of people

7    who have gone through chemo, most people we knew survived.  So

8    we were more angry than concerned.  It was something we wanted

9    to deal with.

10   Q.    You knew it had to be dealt with, right?

11   A.    Yes, we did know it had to be dealt with.

12   Q.    You didn't expect it to go away by itself?

13   A.    It would not go away.

14   Q.    If Elizabeth didn't get treatment, you understood that her

15   cancer would ultimately take her life, correct?

16   A.    Yes, ultimately we did.

17   Q.    You knew it was serious at that time, correct?

18   A.    Yes, we knew it was serious.

19   Q.    Okay.  That's the point in time that you made this

20   declaration of war that you were shown in your direct

21   examination.  Do you recall that?

22   A.    Yes, I do.

23   Q.    I actually have a different exhibit.  It's the same thing

24   you were shown.  It's just a single page as opposed to the

25   whole packet.

STEVEN SEEBOL - CROSS

03:32  1            Jen, if you could pull up 2382.  If you could
03:32  2    highlight the entry for "It's war."
03:33  3            Okay.  Great, thank you, Jen.
03:33  4            I wanted to ask you a couple things that are
03:33  5    indicated here in this entry.  You testified you typed this.
03:33  6    These are your words, right?
03:33  7    A.   Yes.
03:33  8    Q.   It starts off in the second or third sentence, that begins
03:33  9    "Our goal."  What I want to do is read that to you while Jen
03:33  10   highlights it here and ask you some questions about it.
03:33  11           It says:  "Our goal is to make Elizabeth cancer-free
03:33  12   and save as much tissue as possible."
03:33  13           Do you see that?
03:33  14   A.   Yes, I do.
03:33  15   Q.   That's really two goals that you have there, right?  First
03:33  16   is to make Elizabeth cancer-free, right, that's the first
03:33  17   thing.  And then the second thing is to save as much tissue as
03:33  18   possible.
03:33  19           Do you see that?
03:33  20   A.   I do see that.
03:33  21   Q.   Then it says in the second sentence or the sentence right
03:33  22   after that:  "We expect to shrink the tumor to the point where
03:33  23   a lumpectomy will be all that's needed."
03:33  24           Do you see that?
03:34  25   A.   Yes, I do.

STEVEN SEEBOL - CROSS

03:34  1   **Q.**   Okay.  Were you present with Elizabeth when they had

03:34  2   discussions with her about the size of her tumor and how the

03:34  3   size may impact the surgical options she has to treat her

03:34  4   breast cancer?

03:34  5   **A.**   Yes, I think I was there for those meetings.

03:34  6   **Q.**   I'm sorry.  Did you understand from those meetings that a

03:34  7   mastectomy -- if she required one, a mastectomy would be

03:34  8   disfiguring and at times traumatizing to Elizabeth?

03:34  9   **A.**   Yes, I did understand that.

03:34  10  **Q.**   It was important to Elizabeth at that time to be able to

03:34  11  shrink the tumor in order to have what's called breast-sparing

03:34  12  surgery, or a lumpectomy?

03:34  13  **A.**   Yes.

03:34  14  **Q.**   That was the second concern, the first piece being

03:34  15  survival, correct, make sure she's cancer-free; is that right?

03:35  16  **A.**   Yes, it is.

03:35  17  **Q.**   Do you recall the doctors talking to Elizabeth about

03:35  18  something called micrometastatic disease?

03:35  19  **A.**   I do not.

03:35  20  **Q.**   Do you recall gaining the understanding that if tumor

03:35  21  cells or a piece of the tumor had broken off and circulated

03:35  22  somewhere else in her body, that that tumor could ultimately

03:35  23  result in metastatic breast cancer?

03:35  24  **A.**   I do not remember hearing that.

03:35  25  **Q.**   Did you gain an understanding from the meetings with the

STEVEN SEEBOL - CROSS

1  doctors that you were present for that one of the ways that

2  chemotherapy helps breast cancer patients survive is by killing

3  any cancer cells that are not removed during the surgery?

4  A.   Can up repeat that question?

5  Q.   Sure.  So did you gain the understanding at any of the

6  meetings that you were present for with Elizabeth that one of

7  the purposes of chemotherapy, whether it's neoadjuvant or

8  adjuvant chemotherapy, is to kill any cancer cells that are in

9  the body that are not removed by the surgery?

10  A.   I'm finding it very difficult to follow what you are

11  asking.

12  Q.   What was your expectation -- strike that.

13       You understood that the purpose of the chemotherapy

14  was to kill the cancer cells, right?

15  A.   Yes, that would be the purpose.

16  Q.   If there are any cancer cells beyond the tumor, it was

17  your hope and expectation that the chemotherapy would kill

18  those cells so that Elizabeth did not develop metastatic breast

19  cancer?

20  A.   I don't think we thought that at the time.

21  Q.   Okay.

22       All right, Jen.  We can put that one down.  Oh, wait.

23  I'm not done with that one.  Sorry.

24  BY MR. MOORE:

25  Q.   It indicates -- right after the length at Ochsner

STEVEN SEEBOL - CROSS

1   Hospital, it says:  "The trial gives us access to cutting edge

2   drugs and a higher degree of care."  Do you see that?

3   A.   Yes.

4   Q.   How did the trial enable Elizabeth to have a higher degree

5   of care?  What did that involve?

6   A.   I think what I was talking about at this time was there

7   was a chemo nurse, that there was a trial nurse, she actually

8   had a nurse who she could contact and deal with things.

9   Q.   She had her own nurse as part of being --

10  A.   Well, she was -- yes.

11  Q.   -- in the clinical trial?

12  A.   Yes.

13  Q.   Sorry.  We have to be kind of robotic.  I know we kind of

14  get going here.

15        It indicates in the next sentence:  "All the drugs

16  are FDA approved for cancer treatment."  Do you see that?

17  A.   Yes, I do.

18  Q.   Was that something you believe you learned when you were

19  present with Elizabeth during the discussions about the

20  clinical trial?

21  A.   Probably, because I don't know how I would be able to do

22  it any other way.

23  Q.   The last sentence reads:  "We feel that the final outcome,

24  crushing the tumor and winning the war, will be worth all the

25  trouble."

STEVEN SEEBOL - CROSS

03:38 1          Do you see that?

03:38 2   A.   Yes, I do.

03:38 3   Q.   That's how you felt at that time?

03:38 4   A.   Yes, it is.  But I did not realize at that time, because I

03:38 5   learned only a few things, that permanent hair loss would have

03:38 6   been one of the outcomes of going through this process.

03:38 7   Q.   Sitting here today, you still support Elizabeth's decision

03:38 8   to join the NSABP B-40 clinical trial, correct?

03:38 9   A.   Yes, I guess I do.

03:39 10          MR. MOORE:  All right, Jen.  You can put that one

03:39 11   down.

03:39 12   BY MR. MOORE:

03:39 13   Q.   All right.  You indicated during your direct examination

03:39 14   that you were present with your wife during some of the initial

03:39 15   visits -- all of the initial visits, correct?

03:39 16   A.   As far as I can remember, yes.

03:39 17          MR. MOORE:  What I would like to pull up is Defense

03:39 18   Exhibit 3879 at page 876.

03:39 19          Jen, this one is a small font.  If we could pull

03:39 20   that up.  There we go.

03:39 21   BY MR. MOORE:

03:39 22   Q.   All right.  You were asked some questions about the B40

03:39 23   consent form, the consent form for the chemotherapy during your

03:39 24   direct examination.  Do you recall that?

03:39 25   A.   Yes, I do.

STEVEN SEEBOL - CROSS

03:40    1          **MR. MOORE:**  Jen, if you could highlight this -- I
03:40    2    guess it's the third sentence of the paragraph, the second
03:40    3    paragraph, where it starts "The B-40 consent."
03:40    4    **BY MR. MOORE:**
03:40    5    **Q.**   What I'm referring you to here, just for identification,
03:40    6    Mr. Seebol, is a medical record from Elizabeth's chart from
03:40    7    Ochsner.  This is something that was signed by a nurse,
03:40    8    Shevonda Thomas.
03:40    9          Do you remember Ms. Thomas?
03:40   10    **A.**   Vaguely, yes.
03:40   11    **Q.**   It says:  "The B-40 consent was given, reviewed, and
03:40   12    discussed in great lengths with both patient and husband."  Do
03:40   13    you see that?
03:40   14    **A.**   I do.
03:40   15    **Q.**   Do you recall -- strike that.
03:40   16          Do you have any reason to disagree with what's put
03:40   17    down in this medical record?
03:40   18    **A.**   As far as I know, I do not remember having gone over that
03:40   19    with her.
03:40   20    **Q.**   Okay.
03:41   21    **A.**   So -- I did not sign it.  I do not remember having seen
03:41   22    it.
03:41   23    **Q.**   But certainly the medical record indicates that it was
03:41   24    given, reviewed, and discussed in great lengths with both
03:41   25    Elizabeth and yourself, correct?

STEVEN SEEBOL - CROSS

03:41 1   **A.**   That's what it says.  Personally, I think she can put

03:41 2   anything in there she wants.  I don't remember having done

03:41 3   that.

03:41 4   **Q.**   The next sentence reads:  "Patient and husband both had

03:41 5   plenty of questions.  All questions answered to both patient

03:41 6   and husband's satisfaction.  Both verbalized understanding."

03:41 7          Do you see that?

03:41 8   **A.**   Yes, I do.

03:41 9   **Q.**   Is that statement in the medical record by Shevonda Thomas

03:41 10  consistent with your recollection?

03:41 11  **A.**   No, it's not.  I really don't remember, but I have to tell

03:41 12  you that the dynamic between me and my wife is she asks the

03:41 13  questions.  So if somebody wrote that I asked a lot of

03:41 14  questions, it's highly unlikely that happened.

03:41 15  **Q.**   Do you think you asked any questions while you were there?

03:41 16  **A.**   I personally don't remember.  It's been a long time ago.

03:42 17  **Q.**   So maybe you did; you just don't remember?

03:42 18  **A.**   Possibly.  I do not remember.

03:42 19  **Q.**   You were asked about the consent form during your direct

03:42 20  examination.  Do you recall learning that the medicines in the

03:42 21  NSABP B-40 clinical trial had risks of leukemia, liver damage,

03:42 22  heart damage, blood clots, and death?

03:42 23  **A.**   As far as I know, basically every chemo drug has things

03:42 24  like that, kinds of side effects.  So I don't think it's that

03:42 25  unusual.

STEVEN SEEBOL - CROSS

03:42  1          I personally don't remember having seen this.

03:42  2   **Q.**   When you heard about the side effects that might be

03:42  3   associated with the medicines in this clinical trial, did your

03:42  4   wife ask for any different chemotherapy options?

03:43  5   **A.**   So I'm confused by what the question is.  Did she ask for

03:43  6   options?

03:43  7   **Q.**   Yes.  Like leukemia, that sounds really bad.  Do you have

03:43  8   anything else?

03:43  9   **A.**   Well, again, as far as we know, every chemo drug has the

03:43  10  list of horrible things that could happen.  So at that point,

03:43  11  no, we did not ask for anything else.

03:43  12  **Q.**   Did you learn during the consent process -- strike that.

03:43  13         Did you overhear during the consent process, when

03:43  14  your wife was there, signing the consent form and asking

03:43  15  whatever questions that she would ask, that there were some

03:43  16  side effects that may be long lasting and may never go away?

03:43  17  **A.**   I did not hear that.

03:44  18  **Q.**   Was there any expression by Elizabeth at the consent

03:44  19  discussion about any concerns of her physical appearance as it

03:44  20  might relate to the side effects associated with the

03:44  21  chemotherapy?

03:44  22  **A.**   Well, definitely she was concerned with hair loss.  But

03:44  23  the other things that we have been experiencing, she thought,

03:44  24  okay, I'll have it for a while and then my hair will come back.

03:44  25  So the hair loss was definitely one big one.

STEVEN SEEBOL - CROSS

**Q.**   But my question to you is a little more specific.  When you were at this meeting, do you recall her saying to any of the staff or doctors at Ochsner, "Look, my physical experience is super important to me, and I really want chemotherapy that's going to give me the best outcome physically"?  Do you recall that happening?

**A.**   Are you talking about hair?

**Q.**   I'm talking about her physical appearance.  That was my question.

**A.**   I think she expected the hair loss, and that was something that was going to happen pretty much any drug she was given. So I do not remember her asking about that.

**Q.**   That was my question.  I got that.

You were shown some pictures -- during your direct examination, you were asked some questions about -- you were asked some questions about your wife's appearance prior to chemotherapy, and you were shown kind of a montage of photographs.  Do you remember that?

**A.**   Yes, I do.

**Q.**   Then you were shown some photographs from October of 2009 where Elizabeth was wearing a pink shirt.  Do you recall those?

**A.**   I do.

**Q.**   You had some testimony about those photos and the angles that they were taken at and so forth?

**A.**   Yes.

STEVEN SEEBOL - CROSS

03:46  1  **Q.**   I want to take you back a little bit and show you some

03:46  2  photos that are a little closer in proximity to when Elizabeth

03:46  3  completed her chemotherapy.

03:46  4          Are you with me?

03:46  5  **A.**   Trying to.

03:46  6  **Q.**   I'm trying to get it to where there's not so much glare.

03:46  7          **MR. MOORE:**  Why don't we just pull it up.  Can you

03:47  8  pull up Defense Exhibit 3143.

03:47  9  **BY MR. MOORE:**

03:47  10  **Q.**   This photograph was taken June 30, 2009.  That's the date

03:47  11  that your wife told us this was taken.

03:47  12          First of all, where is this photo?

03:47  13  **A.**   It is the house of a friend of ours in Upstate New York.

03:47  14  I can't remember the town.

03:47  15  **Q.**   These are friends of yours?

03:47  16  **A.**   Yes.

03:47  17  **Q.**   Are these their friends' kids or grandkids?

03:47  18  **A.**   They are the children.

03:47  19          **MR. MOORE:**  Let's flip to 3145, Jen, if we could.

03:48  20  **BY MR. MOORE:**

03:48  21  **Q.**   This is a different picture.

03:48  22          Do you recognize it to be the same place, your

03:48  23  friends' house in Upstate New York?

03:48  24  **A.**   Yes, it is.

03:48  25          **MR. MOORE:**  How about 3144, Jen.  If we could flip to

STEVEN SEEBOL - CROSS

1    that one.
2    **BY MR. MOORE:**
3    **Q.**   Another picture.
4          Same place.  On the steps with your friends' kids?
5    **A.**   Yes.
6    **Q.**   You were shown a photograph during your direct
7    examination.  I think it was one of the photos in the collage.
8    It was at a graduation.
9          Give me just a second to get organized.  Sorry.  Let
10   me see if I can just orient ourselves.
11         Do you recall during your direct examination you were
12   shown a photograph where Elizabeth was outside and it was
13   before chemotherapy?
14   **A.**   Yes.
15         **MR. MOORE:**  There it is.  Thank you, Jen.
16   **BY MR. MOORE:**
17   **Q.**   This photograph.  Do you recall this photograph?
18   **A.**   Yes, I do.
19   **Q.**   This photograph, I'll represent to you, was taken
20   May 21st, 2008.
21         That's about a week before you wrote the "It's War"
22   blog post, correct?
23   **A.**   If you say so.  I don't really remember.
24   **Q.**   Sitting here today is -- what's depicted in this
25   photograph, is this consistent with your recollection of what

STEVEN SEEBOL - CROSS

1  Elizabeth's hair looked like before chemotherapy?

2  **A.**   Possibly.  It's hard to say from this picture.  I'm not

3  exactly sure it looked like this, but it might have.

4  **Q.**   And you mentioned --

5       **MR. MOORE:**  You can take that down, Jen.

6  **BY MR. MOORE:**

7  **Q.**   You mentioned that Elizabeth kind of has a signature pose

8  where her head's tilted a certain way and the camera angle is

9  such that -- at a certain angle or whatever.

10      Do you recall that testimony?

11 **A.**   Yes.

12 **Q.**   Let me show you another photograph.  It's 3142.

13      **MR. MOORE:**  Defense Exhibit 3142, Jen.

14 **BY MR. MOORE:**

15 **Q.**   This picture was taken June 29, 2009.  That's the date

16 just before the photographs that I showed you a moment ago

17 where you were sitting on the steps with Elizabeth and your

18 friends' kids?

19      Do you recall that?

20 **A.**   Yes, I do.

21 **Q.**   Is this also in Upstate New York?

22 **A.**   It appears to be, yes.

23 **Q.**   Is this consistent with what Elizabeth's hair looked like

24 on June 29, 2009?

25 **A.**   I really can't tell from this picture.

STEVEN SEEBOL - CROSS

03:51  1           MR. MOORE:  Let's pull up 3143, if we could.

03:51  2   BY MR. MOORE:

03:51  3   Q.   Let me ask you this question:  You testified a couple

03:51  4   times that your wife's hair has looked the same since she

03:51  5   completed chemotherapy until today.

03:51  6           Do you recall that testimony?

03:51  7   A.   Yes, I do.

03:51  8   Q.   If you and Elizabeth went back to Upstate New York and sat

03:52  9   on these steps, put on the exact same clothes, and took a

03:52  10  picture with the same lighting and the exact same camera, is it

03:52  11  your testimony her hair would look like this?

03:52  12  A.   I don't really think I could tell you.  I really don't

03:52  13  know.

03:52  14  Q.   Would you agree with me that the person depicted in this

03:52  15  photograph -- well, strike that.

03:52  16          It's Elizabeth in this photograph, right?

03:52  17  A.   Oh, yes.

03:52  18  Q.   Would you agree that in this picture of Elizabeth, the

03:52  19  person depicted there has more hair than Elizabeth has now?

03:52  20  A.   I can't really do that.  I really don't know.  It appears

03:52  21  that -- I think there's shadowing on it.  I don't really think

03:52  22  you can see the hair that good.

03:52  23  Q.   Is there anything that Elizabeth can do now with the

03:53  24  hairbrush and some hair products to make her hair look like it

03:53  25  looks in this photograph?

STEVEN SEEBOL - CROSS

03:53  1   **A.**   I really don't know.  I can't answer that.

03:53  2            MR. MOORE:  All right.  You can take that one down,

03:53  3   Jen.

03:53  4   **BY MR. MOORE:**

03:53  5   **Q.**   The pink shirt photographs, as I call them, the

       6   photographs that were taken at the event, the basketball game,

       7   do you recall those?

03:53  8   **A.**   Yes.

03:53  9   **Q.**   That was in October of 2009, right?

03:53  10  **A.**   Yes.

03:53  11  **Q.**   You also talked in your direct examination about the

03:53  12  medicine tamoxifen.

03:53  13           Do you recall that?

03:53  14  **A.**   Yes.

03:53  15  **Q.**   Did you understand that the medicine tamoxifen was

03:53  16  suppressing Elizabeth's estrogen?

03:53  17  **A.**   I do not.

03:53  18  **Q.**   Do you recall that she started the estrogen suppressant in

03:53  19  April of 2009?

03:53  20  **A.**   Sometime around that time.

03:54  21  **Q.**   When you were present for the visits with Elizabeth's

03:54  22  doctors, do you recall there being any discussion about how

03:54  23  many months it would take before there would be any physical

03:54  24  manifestations of the suppression of her estrogen?

03:54  25  **A.**   I do not know.

STEVEN SEEBOL - CROSS

03:54   1   **Q.**   I want to shift gears a little bit and talk to you about

03:54   2   the impact that your wife's breast cancer and treatment has had

03:54   3   on your life.

03:54   4        I have read your sworn testimony in the case.  You

03:54   5   gave a deposition.

03:54   6        Do you recall that?

03:54   7   **A.**   Yes, I do.

03:54   8   **Q.**   It wasn't me.  It was somebody else probably more pleasant

03:55   9   than me, I'm sure.

03:55   10        I learned from reading that that some of the things

03:55   11   you liked to do before chemotherapy was to go out to

03:55   12   restaurants and eat out pretty frequently?

03:55   13   **A.**   Yes.

03:55   14   **Q.**   You liked to visit friends and family?

03:55   15   **A.**   Yes.

03:55   16   **Q.**   And you also are pretty frequent attendees of the

03:55   17   Jazz Fest?

03:55   18   **A.**   Yes.

03:55   19   **Q.**   I think you had a streak going up until the pandemic?

03:55   20   **A.**   I think so, yes.

03:55   21   **Q.**   How many years?

03:55   22   **A.**   I couldn't tell you.

03:55   23   **Q.**   And Mardi Gras?  You guys live pretty close to the parade

03:55   24   route?

03:55   25   **A.**   Yes, but all these things, they don't change the reality

STEVEN SEEBOL - CROSS

1    that she has to deal with every day.

2    **Q.**   I understand.

3    **A.**   It's the reality of the hair loss.  She does these things

4    and do things, but the hair loss is still there.

5    **Q.**   You're a smart man, so you're getting ahead of me.

6            THE COURT:  Mr. Seebol, let Mr. Moore ask the

7    questions.

8            THE WITNESS:  Okay.

9            THE COURT:  Thank you.

10   **BY MR. MOORE:**

11   **Q.**   You knew where I was going, though.

12           My question was:  Those things that you did before

13   breast cancer and breast cancer treatment -- eating out,

14   traveling -- I don't think I mentioned traveling.

15           You go on vacations, yes?

16   **A.**   Sometimes.

17   **Q.**   You've gone on vacations since Elizabeth underwent her

18   treatment?

19   **A.**   Yes.

20   **Q.**   Those other activities, Mardi Gras, Jazz Fest, visiting

21   with friends and family, going to restaurants, those are all

22   things that you have been able to do since her breast cancer

23   treatment?

24   **A.**   Yes.

25   **Q.**   The reason that you are able to do those things is because

STEVEN SEEBOL - CROSS

03:56  1  her breast cancer treatment was successful, correct?

03:56  2  A.   Well, she is still alive because of it.  That's for sure.

03:56  3       Again, we have to deal with it every day.  It's

03:57  4  something that's -- the reality that she lives in is the

03:57  5  reality of having very, very thin hair, so that's something we

03:57  6  deal with.  Yes, she can have a certain amount of pleasure and

03:57  7  do a certain amount of things, but we still have to deal with

03:57  8  this hair loss -- or she does -- every day.

03:57  9  Q.   But those activities, she still does them, right?

03:57 10  A.   She still does them.

03:57 11  Q.   That's part of the strength that you talked about during

03:57 12  your direct examination that you now respect, correct?

03:57 13  A.   I guess you could say that, yes.

03:57 14       MR. MOORE:  If we could go back to the document

03:57 15  camera.

03:57 16  BY MR. MOORE:

03:57 17  Q.   I want to ask you about just some photographs of some

03:57 18  activities since Ms. Kahn's breast cancer treatment.

03:57 19       What I'm showing you here is a picture -- all I know

03:57 20  about this is what's written on my binder that says "Newman

03:57 21  lunch, April 2010."

03:57 22       Do you know what the "Newman lunch" is?

03:57 23  A.   I think she -- these are people she went to high school

03:57 24  with.

03:58 25  Q.   So Newman High School is what it refers to?

STEVEN SEEBOL - CROSS

1   A.   Yes.

2   Q.   That's an activity that Elizabeth is still able to do

3   following her breast cancer treatment?

4   A.   Yes, it doesn't change the reality that she has to live

5   with, which is having this hair loss every day.

6   Q.   But that's her there on the left side of the photograph

7   smiling?

8   A.   That is her.

9   Q.   The date I have on this photograph is March 19, 2011.

10        Where is this photograph taken?

11  A.   I have no idea.

12  Q.   Is it in your backyard maybe?

13  A.   No, it's definitely not in the backyard.

14  Q.   Let me show you another photograph.  This is November 22,

15  2013.

16        Can you tell me what you and Elizabeth are doing in

17  this photograph?

18  A.   We are visiting the family.  I don't know where it is.

19  Actually, it might have been after my father's funeral, so it

20  would be in South Florida, Delray Beach.  But, again, it

21  doesn't change the fact -- she is doing these things, but it

22  doesn't change the fact that she has to deal with this hair

23  loss every day.

24  Q.   But she is able to go out and participate with you in

25  family events like this?

STEVEN SEEBOL - CROSS

| | | |
|---|---|---|
| 03:59 | 1 | **A.**   Sometimes it's difficult. |
| 03:59 | 2 | **Q.**   But she does it, yes? |
| 03:59 | 3 | **A.**   She forces her way through it.  She has to live life |
| 03:59 | 4 | somewhat. |
| 03:59 | 5 | **Q.**   Let's talk about vacation. |
| 03:59 | 6 | You still are able to travel with Elizabeth?  Get on |
| 03:59 | 7 | an airplane and go to some destination? |
| 03:59 | 8 | **A.**   Yes. |
| 03:59 | 9 | **Q.**   Elizabeth is gone and enjoys herself with you on vacations |
| 04:00 | 10 | since her cancer treatment? |
| 04:00 | 11 | **A.**   Somewhat.  Somewhat enjoy, yes. |
| 04:00 | 12 | **Q.**   Let me show you a photo from June 16, 2017. |
| 04:00 | 13 | My understanding is -- this is Colorado? |
| 04:00 | 14 | **A.**   It appears to be, yes. |
| 04:00 | 15 | **Q.**   You guys took a trip to Colorado in 2017? |
| 04:00 | 16 | **A.**   Yes. |
| 04:00 | 17 | **Q.**   Was that an enjoyable trip for you and Elizabeth? |
| 04:00 | 18 | **A.**   It was, but, again, she still has to deal with this hair |
| 04:00 | 19 | loss.  It's the reality that she has to live in.  So it's never |
| 04:00 | 20 | quite as enjoyable as it was. |
| 04:00 | 21 | **Q.**   How does she deal with it sometimes?  Does she ever wear a |
| 04:00 | 22 | hat or hairpiece, anything like that? |
| 04:00 | 23 | **A.**   Well, she does wear a hat.  She has decided not to wear a |
| 04:00 | 24 | hairpiece.  That's her decision. |
| 04:01 | 25 | **Q.**   I understand in 2019 -- in the summer of 2019, you went to |

STEVEN SEEBOL - CROSS

1    Nova Scotia?

2    **A.**    Yes.

3    **Q.**    Where is Nova Scotia compared to New Orleans?  Like, how

4    far away is it?

5    **A.**    It's a ways.  It's in Canada.  It's above Maine.

6    **Q.**    Is this a picture of Elizabeth in Nova Scotia in 2019?

7    **A.**    It appears to be.

8    **Q.**    I think you also went to Washington, D.C. and New York

9    that same year, correct?

10   **A.**    Yes, it was the first year that I was retired, so we took

11   a few extra trips.

12   **Q.**    Last couple of questions, Mr. Seebol.

13            You feel, do you not, that Ms. Kahn's -- Elizabeth's

14   treatment was successful in curing her cancer, yes?

15   **A.**    It was successful, but it left her with a scar -- a

16   permanent scar, which is the hair loss, and it's something she

17   deals with every day.

18   **Q.**    But even with the challenges and the troubles along the

19   way, like you mentioned in your blog post, you, to this day, do

20   not regret supporting your wife's decision to participate in

21   the clinical trial, correct?

22   **A.**    Well, I wish I had known then what I know now, that one of

23   the drugs causes permanent hair loss.  And if we had known it

24   at the time, we would have looked for an option.

25   **Q.**    The way you know that now is because the lawyers told you?

STEVEN SEEBOL - CROSS

A.   Well, I've been involved in this case for over five years, and in that time I've learned Taxotere can cause permanent hair loss.

Q.   But, still, sitting here today, the most important goals that you identified in your blog post -- it's four -- were to ensure that she was cancer-free and she preserved enough tissue to have breast-sparing surgery, correct?

A.   From what I understand, there were options to the Taxotere --

Q.   That wasn't my question.

        THE COURT:   Listen to the question, Mr. Seebol.

BY MR. MOORE:

Q.   The two goals from your blog, survival, right, cancer-free?

        Yes, that was the first?

A.   Yes.

Q.   And she's cancer-free, yes?

A.   Yes.

Q.   And the second was to preserve enough tissue to prevent her from having to have a mastectomy, correct?

A.   That is correct.

Q.   She didn't have to have a mastectomy, correct?

A.   She did not, but we have since learned that there were other drug options --

        MR. MOORE:   This is not responsive to my question,

STEVEN SEEBOL - REDIRECT

04:04  1    Your Honor.

04:04  2              THE COURT:  That's enough.  Are you finished?

04:04  3              MR. MOORE:  Thank you, Judge.

04:04  4              THE COURT:  Any redirect?

04:04  5              MR. SCHANKER:  Real brief, Your Honor.

04:04  6                        REDIRECT EXAMINATION

04:04  7    BY MR. SCHANKER:

04:04  8    Q.   Mr. Seebol, you were just shown a lot of photos by

04:04  9    Mr. Moore from after your wife's chemotherapy.

04:04  10             Do you recall those?

04:04  11   A.   I do.

04:04  12   Q.   Did a single one of those photographs show the top or back

04:04  13   of her head?

04:04  14   A.   They did not.

04:04  15   Q.   You were asked about the tamoxifen.

04:04  16             Do you recall that?

04:04  17   A.   I do.

04:04  18   Q.   And your knowledge of the physical manifestation of that

04:04  19   drug?

04:04  20   A.   I'm not exactly sure what you mean by "physical

04:05  21   manifestation."

04:05  22   Q.   Are you aware that the physical manifestation of tamoxifen

04:05  23   takes 16 months?

04:05  24   A.   I am not.

04:05  25             MR. MOORE:  Objection, Your Honor.  It's leading.

STEVEN SEEBOL - REDIRECT

04:05  1          THE COURT:  Sustained.

04:05  2   BY MR. SCHANKER:

04:05  3   Q.   You know that she took the tamoxifen starting in April of

04:05  4   2009?

04:05  5          MR. MOORE:  Same objection.

04:05  6          THE COURT:  I'm going to allow this one.  Overruled.

04:05  7          THE WITNESS:  I think that's when it is.

04:05  8          MR. SCHANKER:  Thank you, Your Honor.  No further

04:05  9   questions.

04:05 10          THE COURT:  Thank you.  You may step down.

04:05 11          THE WITNESS:  Thank you.

04:05 12          MR. MICELI:  We call Dr. David Madigan to the stand.

04:05 13                    DAVID MADIGAN, Ph.D.,

04:05 14   having been duly sworn, testified as follows:

04:05 15          THE DEPUTY CLERK:  Thank you.  You may be seated.

04:05 16              Please state and spell your name for the record.

04:06 17          THE WITNESS:  David Madigan, M-A-D-I-G-A-N.

04:06 18          MR. MICELI:  Judge, would you like to tell them what

04:06 19   our plan is for Dr. Madigan?

04:06 20          THE COURT:  Okay.  For the jury?

04:06 21          MR. MICELI:  For the jury, just so they know that --

04:06 22          THE COURT:  We are going to begin Dr. Madigan's

04:06 23   testimony -- I have discussed it with the lawyers -- and have

04:06 24   him present his qualifications, and then we will complete his

04:06 25   testimony tomorrow morning.  I don't want you to think that we

DAVID MADIGAN, PH.D. - VOIR DIRE

04:06  1    are going to start a long witness that will keep you here late
04:06  2    into the evening.  Thank you.
04:06  3              With that, please proceed, Mr. Miceli.  If you
04:06  4    could, take off your mask so we can hear you.  Thank you.
04:06  5                              **VOIR DIRE**
04:07  6    BY MR. MICELI:
04:07  7    **Q.**   Hello, Dr. Madigan.
04:07  8    **A.**   Hello, Mr. Miceli.
04:07  9    **Q.**   Just introduce yourself to the jury.  Tell them who you
04:07 10    are and where you are from.
04:07 11    **A.**   My name is David Madigan.  I'm a professor and an
04:07 12    administrator at Northeastern University in Boston.  I hail
04:07 13    originally from Ireland.
04:07 14    **Q.**   Dr. Madigan, I'm going to ask you some questions about
04:07 15    your educational history, your background.  It's not a time to
04:07 16    be modest.
04:07 17              You said you're a professor and an administrator at a
04:07 18    university.  What university are you affiliated with?
04:07 19    **A.**   Northeastern University in Boston.
04:07 20    **Q.**   What is your technical position at that university?
04:07 21    **A.**   I'm what's called the provost and senior vice president
04:07 22    for academic affairs.
04:07 23    **Q.**   Now, looking at a totem pole, at Northeastern University,
04:07 24    above the provost and the executive vice president, who is
04:08 25    above you?

DAVID MADIGAN, PH.D. - VOIR DIRE

04:08  1   **A.**   The president.

04:08  2   **Q.**   Anybody above him?

04:08  3   **A.**   I report to the president.  I suppose he, in turn, reports

04:08  4   to the board of trustees.

04:08  5   **Q.**   How long have you been at Northeastern?

04:08  6   **A.**   I've been there about a year and a half.

04:08  7   **Q.**   Where were you before that?

04:08  8   **A.**   Before that I was at Columbia University in New York City

04:08  9   for about 13 years.

04:08  10  **Q.**   Could you just -- well, I'll tell you what.  You have

04:08  11  provided me with a CV, correct?

04:08  12  **A.**   Yes, I did.

04:08  13          **THE COURT:**  Is there any objection, Mr. Strongman?

04:08  14          **MR. STRONGMAN:**  No objection.

04:08  15          **THE COURT:**  Thank you.

04:08  16              Please proceed.

04:08  17          **MR. MICELI:**  Thank you.

04:09  18  BY MR. MICELI:

04:09  19  **Q.**   Dr. Madigan, I have put your CV on the overhead.  It shows

04:09  20  your education at Trinity College in Dublin.

04:09  21              When did you graduate there?

04:09  22  **A.**   I graduated with an undergraduate degree in 1984 and with

04:09  23  a Ph.D. in 1990.

04:09  24  **Q.**   I don't want to overstate things, but people are familiar

04:09  25  with schools in the United States.

DAVID MADIGAN, PH.D. - VOIR DIRE

04:09    1            Is Dublin well-recognized -- excuse me, is Trinity a
04:09    2    well-recognized school in Ireland?
04:09    3    A.    It is.
04:09    4    Q.    It's sort of like the Harvard of Ireland, isn't it, or
04:09    5    maybe I should say the Northeastern of Ireland?
04:09    6    A.    It's a fine university in Ireland.
04:09    7    Q.    Thank you.
04:09    8            Could you just walk us through what we see here.
04:09    9    There are a number of positions at a number of different
04:09   10    universities.  I would like you to summarize them.  I don't
04:09   11    want to belabor it too much, but I do want to let the jury know
04:10   12    what you've done.
04:10   13    A.    I grew up in a small town in Ireland and went to Dublin,
04:10   14    which is the capital city, for my undergraduate degree and then
04:10   15    worked for a while and then came back and did a doctorate.
04:10   16            After I completed the doctorate, I came to this
04:10   17    country and had a position as an assistant professor at the
04:10   18    University of Washington in Seattle.  And the standard ranks in
04:10   19    universities in this country and in many countries, you start
04:10   20    as an assistant professor, and then some years later, five or
04:10   21    six years later, all going well, you get promoted to associate
04:10   22    professor.  And then some years after that, again, all going
04:10   23    well, you are promoted to full professor.  So I became -- I was
04:10   24    an assistant professor and then an associate professor at the
04:10   25    University of Washington.

1365

DAVID MADIGAN, PH.D. - VOIR DIRE

04:10  1    Q.   Can I stop you there for one second because on your CV, it
04:10  2    says that you were at the Fred Hutchinson Cancer Research
04:11  3    Center.
04:11  4         What is that?
04:11  5    A.   So my -- I'm a statistician.  My Ph.D. is in statistics.
04:11  6    And throughout my career I have worked namely in health care,
04:11  7    so issues related to the study of health care regimens like
04:11  8    drugs and devices and so on.
04:11  9         So while I was at the University of Washington, much
04:11  10   of my work related to cancer and I -- there's a world-renowned
04:11  11   cancer research institute in Seattle called the Fred Hutchinson
04:11  12   Cancer Research Center.  So I had appointments at both the
04:11  13   university and at the cancer center during the time I was
04:11  14   there.
04:11  15   Q.   You mentioned you are a statistician.  What type of work
04:11  16   does a statistician do at a place like -- do you call it
04:11  17   "The Hutch"?
04:11  18   A.   They do.
04:11  19   Q.   What type of work did you do at The Hutch?
04:11  20   A.   So I was involved with cancer pain studies, so designing
04:12  21   studies related to pain and associated with cancer and cancer
04:12  22   treatment -- cancer and cancer treatment.
04:12  23   Q.   After you left Washington, where did you go?
04:12  24   A.   So I then left the academy, so to speak.  I took a
04:12  25   position at AT&T.  Then I stayed there for a while and I took a

DAVID MADIGAN, PH.D. - VOIR DIRE

04:12  1   position at a startup company in New York City.  I did that for

04:12  2   a while.  And then in 2001 I returned to a university position

04:12  3   and took a position as a full professor at Rutgers University

04:12  4   in New Jersey.

04:12  5   Q.   From Rutgers where did you go?

04:12  6   A.   So from Rutgers I stayed there for six years.  And then in

04:12  7   2007 I took a faculty position at Columbia University in

04:12  8   New York City.  I took a position as a department chair.  So in

04:13  9   universities, the faculty and the programs are particularly

04:13 10   organized by department, so you have the department of

04:13 11   mathematics, a department of psychology, and so on.  So I --

04:13 12   those departments have heads, I suppose you'd call them,

04:13 13   typically called chairs.  I went to Columbia to chair the

04:13 14   department of statistics at Columbia.

04:13 15   Q.   Okay.  What did it entail to be the executive

04:13 16   vice president for the college of arts and sciences?

04:13 17   A.   So from 2013 for a period of about five and a half years,

04:13 18   I was the dean of the faculty of arts and sciences at Columbia,

04:13 19   so it's more than administrative role.  So if you are a student

04:13 20   at Columbia University, you're either in one of the

04:13 21   professional schools like business or law or you're in what's

04:14 22   called the arts and sciences, which is the 27 academic

04:14 23   departments.  It covers a range of disciplines, the humanities,

04:14 24   the social sciences, the natural sciences.  So I led that unit.

04:14 25   I was in charge of that unit for five and a half years.  It was

DAVID MADIGAN, PH.D. - VOIR DIRE

04:14  1   about 800 faculty.

04:14  2   Q.   I want to sort of roll all of the academic appointments or

04:14  3   academic experience into one.

04:14  4         Were you always working in statistics while you were

04:14  5   doing that?

04:14  6   A.   Absolutely.  So all this time, I taught statistics and I

04:14  7   conducted statistical research.

04:14  8   Q.   The nonacademic jobs that you had, were they in the health

04:14  9   care field?

04:14  10  A.   Some yes, some no.

04:14  11  Q.   Did you remain active in practicing statistics?

04:14  12  A.   Oh, yes.

04:14  13  Q.   Okay.  I want to just point to the honors on your CV.  We

04:14  14  don't need to go through each one of them, but what type of

04:15  15  honors -- let's go to the elected fellow of the American

04:15  16  Statistical Association.

04:15  17        What is that?

04:15  18  A.   So the American Statistical Association is a professional

04:15  19  association of -- I don't know -- 6,000 or 7,000 members, I

04:15  20  think, something like that, who are professional statisticians.

04:15  21  It's a society that publishes journals, organizes conferences,

04:15  22  and promotes the discipline of the profession of statistics.

04:15  23        So the American Statistical Association honors a

04:15  24  small subset of their members with the title of "fellow."  It's

04:15  25  purely honorary.  So somebody might nominate you to be a

DAVID MADIGAN, PH.D. - VOIR DIRE

1    fellow.  Then they go through a process of getting letters of

2    recommendation.  There's a committee that reviews these and

3    each year gives this honor to a few dozen statisticians each

4    year.

5    Q.  Then you have "refereed publications."  We have heard

6    about in this trial some peer-reviewed medical literature.

7           What's the difference between peer-reviewed and

8    refereed?

9    A.  The same -- they're interchangeable.  I mean them in the

10   same way.

11   Q.  I just wanted to make sure that we are not entering

12   something new.

13          It appears that you have pages and pages of

14   peer-reviewed literature.  Is this all in the realm of

15   statistics?

16   A.  It's either statistical methodology or the application of

17   statistical methodology, typically in health care.  So many of

18   my publications are in health publications, publications

19   related to medicine.

20   Q.  Okay.  Now, I'm sort of just skimming over statistical

21   analysis and such.  About as far as I ever get with that is

22   batting averages.

23          Can you explain to us -- we are talking about the

24   substance of your opinions tomorrow, but can you explain to the

25   jury what the role is of a statistician when it comes to things

DAVID MADIGAN, PH.D. - VOIR DIRE

1    like clinical trial research.

2    A.    So the discipline of statistics, which has been around

3    since at least the 1800s, maybe a little bit before that, is

4    focused on data, gathering of data, designing of studies to --

5    to produce data in such a way that you can use statistical

6    methods to then draw what are called inferences from those

7    data.

8           So you can -- if you can gather the data in a way

9    that once you have gathered it, you can use statistical

10   analysis to make statements about the world.  Say, as a

11   consequence of this study, we now know that whatever it might

12   be.  It might be a causal inference or it might be a predictive

13   inference.  A causal inference would be you design the study to

14   ascertain whether, for example, a particular drug causes a

15   particular outcome.  So statistical methods -- a well-designed

16   study with appropriate statistical methods enables you to make

17   in fairly formal kinds of ways inferences about the world from

18   those data.

19   Q.    And you had mentioned the other -- I think in the

20   predictive inferences?

21   A.    Right.

22   Q.    What's an example of that that we might all understand?

23   A.    And so predicting election outcomes, for example, is

24   there -- a lot of statisticians work in predictive analytics

25   related to politics.  Another example would be Amazon.  So when

DAVID MADIGAN, PH.D. - VOIR DIRE

1  Amazon is recommending a product to you, that's a
2  statistical -- there are statistics underlying that statistical
3  analysis that is predicting that -- you know, from Amazon's
4  point of view, they want you to buy a product, so it is
5  predicting if they put this in front of you, that you might --
6  you are likely to buy it.
7  Q.  You buy a pair of tennis shoes on Amazon and for the next
8  year you are getting advertisements for socks?
9  A.  You got it.
10 Q.  Okay.  So when you're talking about -- that's not what you
11 are going to be here to talk about tomorrow, correct?
12 A.  It is not.
13 Q.  The predictive?
14 A.  Correct.
15 Q.  We are going to be talking about the analytical
16 statistics?
17 A.  That --
18 Q.  When I say "analytical," the running of statistics for a
19 clinical trial?
20 A.  That's primarily what we will be talking about.
21 Q.  I'm going to move through your CV.  You have letters to
22 editors and commentaries in other publications.  Can you just
23 summarize what that meant on your CV?
24 A.  So the peer-reviewed publications are original research
25 that you submit and is subject to peer review.  And then if

DAVID MADIGAN, PH.D. - VOIR DIRE

04:19   1   it's considered worthy, a journal will publish it.

04:19   2          There are other publications which are typically

04:19   3   commentaries, and so it's, again, very common for -- to

04:19   4   write -- say a paper appears in a journal and you have opinions

04:20   5   about it that you write a letter to the editor that they might

04:20   6   publish alongside the paper.  Or it might be some journals

04:20   7   actually have, you know, commentary sections where you can

04:20   8   submit a commentary that doesn't go through the same level of

04:20   9   peer review.  It's more like an op ed type piece.

04:20   10  Q.   Well, we have asked all of our experts this and we want to

04:20   11  ask you as well.  What is the purpose of peer review?

04:20   12  A.   The purpose of peer review is to ensure quality and to

04:20   13  ensure that what goes into the mainstream scientific

04:20   14  literature, you know, is solid science and is -- you know, it

04:20   15  can be trusted and the decision makers like patients and

04:20   16  providers, for example, can rely on it, can take the -- what's

04:20   17  in a peer-reviewed paper and use it to make decisions, real

04:20   18  decisions that affect, you know, real people.

04:21   19  Q.   I noticed in your CV, I'm going to flip to page 17, you

04:21   20  have some research grants listed where you are a principal

04:21   21  investigator.  Now, we have heard about some clinical studies

04:21   22  and heard about some investigators, just what an investigator

04:21   23  may be, but what does it mean to be a principal investigator?

04:21   24  A.   Maybe if I back up a little bit and just say what grants

04:21   25  are?

DAVID MADIGAN, PH.D. - VOIR DIRE

Q.   Right.

A.   Research grants.  So to conduct research you need
resources.  The exact resources you need depend on the nature
of the research.  So if you are a bench scientist, you might
need a fancy microscope or whatever.  For statisticians the
resources that you need to conduct research are typically
manpower so you need graduate students.  You need postdocs.
And in some cases the university will provide those resources.

Q.   What you say "postdocs," can you explain to the jury what
you mean?

A.   Sorry.  So when you get a doctorate, you know, it's a
five-year process or a six-year process, or something like
that, and at the end of that process people pursue different
paths.  You know, they might go work for a company.  They might
go directly to be an assistant professor somewhere.  But
increasingly it's common to do something that's kind of in
between, just called a postdoc, a postdoctoral appointment.  So
it's -- you're still kind of in training.  You're still kind of
an apprentice.

        So it's, you know, common for -- when conducting
research, you typically need a team, so it's common for that
team to include Ph.D. students, postdoctoral associates, as
they are called, and possibly research scientists.

Q.   And you're talking about how that plays into the research
grants that are listed on your CV?

DAVID MADIGAN, PH.D. - VOIR DIRE

A.   Right.  So you need money to pay these people to work on
research projects.  And there are federal funding agencies
which provide large amounts of funding to stimulate research
and stimulate the economy in this country, so the National
Science Foundation, for example, or the National Institutes of
Health fund research.

          And so people like me -- they don't just hand it out
willy-nilly.  So people like me write proposals, so you write,
in a fairly formal way -- there's forms that you have to fill
in and so on, but you basically say to the National Science
Foundation, which is what that first one there is, you know, "I
intend to do the following research.  To do this I'm going to
need the following resources.  Please give them to me," is what
it amounts to.  And that's actually -- that is also subject to
peer review, so they send those proposals out to peers and the
peers score them.  And the agency then gives funding to the top
scoring proposals.

Q.   Okay.  And I want to go through a couple.  I notice the
first one is with UCLA.  How does somebody from -- I think at
the time you were at Columbia, how does someone from Columbia
in New York City become a principal investigator of a study
done out of UCLA?

A.   So research in the kinds of areas I study are -- it's not
a solo sport, so I am -- you know, I have collaborators that I
work with on a constant basis.  So one of my main collaborators

**DAVID MADIGAN, PH.D. - VOIR DIRE**

04:24  1   over the last 15 years is at UCLA, and so the two of us have

04:24  2   written many grant -- written many papers together.  We have

04:24  3   also written many grant proposals together.

04:24  4          So in this particular case the contract was with

04:25  5   UCLA, that's where the National Science Foundation sent the

04:25  6   money, but then UCLA in turn sent some of the money to Columbia

04:25  7   to fund my piece of the project.

04:25  8   Q.   Okay.  And if we move through your research grants, I

04:25  9   noted that you had several grants from the National Institutes

04:25  10  of Health.

04:25  11  A.   Correct.

04:25  12  Q.   What does it mean when you get the National Institutes of

04:25  13  Health grant?  How do you apply for those?

04:25  14  A.   So you -- like I -- you know, like I described to you, you

04:25  15  write a proposal.  So it -- typically the NIH or the National

04:25  16  Science Foundation, or whoever, they put out calls for

04:26  17  proposals.  So they say to the research world, We are

04:26  18  interested in receiving proposals to study pediatric trauma,

04:26  19  for example, is the one that Mr. Miceli highlighted.  And so

04:26  20  then I, along with collaborators, submitted a proposal that was

04:26  21  responsive to that call.  In that case it was funded.

04:26  22  Q.   Okay.  And one of the ones that I have highlighted here

04:26  23  is, you were principal investigator on a subcontract from FDA?

04:26  24  A.   Right.  So I have worked extensively with the FDA over the

04:26  25  years in all kinds of capacities.

DAVID MADIGAN, PH.D. - VOIR DIRE

1    **Q.**   As a statistician?

2    **A.**   As a statistician.

3    **Q.**   Do you work -- I mean, when you were working with the FDA,

4    were you analyzing clinical trials?

5    **A.**   Sometimes, yes.

6    **Q.**   Have you ever worked with CDC?

7    **A.**   I've worked extensively with CDC.

8    **Q.**   And what type of work have you done with the CDC?

9    **A.**   So with the CDC, for about ten years I was engaged quite a

10   lot with the CDC in matters related to anthrax.  So there's a

11   vaccine -- you know a lot more about vaccines than we used to,

12   but there was a vaccine for anthrax that would stop you from

13   getting seriously ill if you were exposed to anthrax, that had

14   been around since the 1950s.  But after 9/11, when there was

15   the anthrax attacks, there was significant renewed interest in

16   the anthrax vaccine, but the question was:  Was it safe?  It

17   was a very old vaccine.  You know, was it safe?  So I worked

18   for about ten years with the CDC on the anthrax vaccine.

19   **Q.**   Were you analyzing the anthrax data?

20   **A.**   Yes, so clinical -- older clinical trials and then animal

21   studies and laboratory studies related to the anthrax vaccine.

22   **Q.**   Okay.  I want to look at -- just talk for a moment about

23   this right here, computational and mathematical epidemiology

24   grant when you were at Rutgers University.  Do you often work

25   with epidemiological studies as a statistician?

DAVID MADIGAN, PH.D. - VOIR DIRE

04:28  1   **A.**   I do.  Much of my work in the last 20 years is related to
04:28  2   epidemiology.
04:28  3   **Q.**   Okay.  And then I'm just going to continue to walk through
04:28  4   this with you.  You list several selected invited
04:28  5   presentations.  Have you done that regularly throughout your
04:28  6   career?
04:28  7   **A.**   Yes.
04:28  8   **Q.**   Well, at the bottom here, this IQVIA Research Institute
04:28  9   Forum, "Honest Inference from Observational Studies," have you
04:28  10  worked frequently in observational studies?
04:28  11  **A.**   I have, yes.
04:28  12  **Q.**   And have you written on observational studies?
04:29  13  **A.**   Yes, I have.
04:29  14  **Q.**   And where have you written on it?
04:29  15  **A.**   And so I'm not sure if the jury has heard about
04:29  16  observational studies.
04:29  17  **Q.**   We are going to tomorrow.
04:29  18  **A.**   Yes, we are going to talk about that tomorrow.  So there's
04:29  19  a particular genre of study and, for example, it's an
04:29  20  observational study, I guess we can talk about it tomorrow.
04:29  21  But it's -- there -- it's a type of study that's very widely
04:29  22  deployed, very widely used.  And a lot of my work over the last
04:29  23  15 years has been focused on methods for conducting
04:29  24  observational studies, so trying to find better ways to --
04:29  25  improved ways of doing observational studies.

DAVID MADIGAN, PH.D. - VOIR DIRE

04:29  1   **Q.**   And have you written on criticisms of observational

04:29  2   studies?

04:29  3   **A.**   I've written extensively on, yeah, limitations of

04:29  4   observational studies.

04:29  5   **Q.**   And the reason I am bringing that up is maybe -- well,

04:29  6   let's just -- are you familiar with randomized controlled

04:29  7   trials?

04:29  8   **A.**   I am.

04:29  9   **Q.**   Okay.  I suspect we will be discussing some tomorrow.  And

04:30  10  on the hierarchy of investigation, can you tell us where

04:30  11  randomized controlled trials and observational studies land?

04:30  12  **A.**   So there's a general acceptance in the scientific world

04:30  13  that there are, you know -- there are different types of

04:30  14  studies.  You know, they don't all -- they vary in terms of the

04:30  15  quality of the evidence that they generate.  And, you know,

04:30  16  at -- most people would agree -- most scientists would agree

04:30  17  that randomized studies or meta-analysis of randomized studies

04:30  18  are at the top, and then observational studies are a notch

04:30  19  below that in terms of the -- if you will, the umph of the

04:30  20  evidence that they generate, that they produce.

04:30  21  **Q.**   And do observational studies have limitations?

04:30  22  **A.**   Yes.

04:30  23  **Q.**   And because they have limitations -- strike that.

04:30  24       In spite of the fact that they may have limitations

04:30  25  are they still useful?

DAVID MADIGAN, PH.D. - VOIR DIRE

04:30  1   **A.**   Oh, yes.

04:31  2   **Q.**   Okay.  And in what circumstances are observational studies

04:31  3   either useful or even preferred?

04:31  4   **A.**   That's hard to answer in generality, but there are many

04:31  5   situations in which you can't do randomized studies and there's

04:31  6   no choice but to do observational studies, but I guess we still

04:31  7   haven't really defined.

04:31  8         But -- so an example would be smoking, for instance.

04:31  9   So supposing you wanted to study something to do with smoking,

04:31  10  some effect of smoking, you cannot conduct a randomized study

04:31  11  where a toss of a coin decides whether somebody smokes or

04:31  12  doesn't smoke.  No institutional review board is ever going to

04:31  13  approve that in this day and age.  So you can't do randomized

04:31  14  studies, so in that case you would go down a notch and you try

04:31  15  and do a good observational study.

04:31  16  **Q.**   Okay.  Are there ways to do, as you just said, good

04:32  17  observational studies?

04:32  18  **A.**   Yes.

04:32  19  **Q.**   All right.  I want to move through just a little bit more

04:32  20  on your CV.  I'm going to try to find the page.  I have it

04:32  21  tabbed out on one copy and not on another.  You have scholarly

04:32  22  activities and scholarly journals.  Can you just explain what

04:32  23  this is?

04:32  24  **A.**   So we talked earlier, a few minutes ago, about the

04:32  25  peer-review process.  We talked a little about it.  And so

**DAVID MADIGAN, PH.D. - VOIR DIRE**

04:32  1  there are journals out there that publish scientific research

04:32  2  and that goes through the peer-review process and sent out to

04:32  3  other scientists for review.  That process is managed by

04:32  4  editors, so journals have editors, and then associate editors

04:32  5  who manage that process and actually make decisions.

04:32  6       The editor at the end of the day looks at the paper,

04:32  7  looks at the peer reviews, and says -- and makes a decision as

04:33  8  to whether it's good enough to publish in the journal or not.

04:33  9  And so over the years I have served as a peer reviewer

04:33  10  hundreds, maybe thousands of times.  But I've also been on the

04:33  11  editorial side, so I've been the editor-in-chief of some

04:33  12  journals and I've been the associate editor of a bunch of

04:33  13  journals.

04:33  14  Q.   I notice on some you have dates of start and stop and then

04:33  15  there are some that are just open ended where you have a date

04:33  16  and it leaves it open.  Are you still serving on these

04:33  17  editorial boards?

04:33  18  A.   Yes.

04:33  19  Q.   And have you done this type of work throughout your entire

04:33  20  career since the University of Washington?

04:33  21  A.   Yes.

04:33  22  Q.   Okay.  Have you ever testified before?

04:33  23  A.   I have.

04:33  24  Q.   Okay.  And do you get paid for your services when you

04:33  25  offer your testimony?

DAVID MADIGAN, PH.D. - VOIR DIRE

04:33  1  **A.**    I do.  I do.

04:33  2  **Q.**    Okay.  And what do you charge as a rate?

04:33  3  **A.**    $700 an hour.

04:33  4  **Q.**    Okay.  And for how many years have you provided or offered

04:34  5  your services as a statistician in the context of a litigation?

04:34  6  **A.**    Something like 17 or 18 years.

04:34  7  **Q.**    Okay.  And over that time how many times have you

04:34  8  testified in the deposition or in court?

04:34  9  **A.**    A hundred times maybe.

04:34  10  **Q.**    Okay.  And I'm going to go to -- just flip through a

04:34  11  little bit farther.  Under the heading of "Government" it has

04:34  12  you listed several times as a consultant or a member of an FDA

04:34  13  advisory committee, NIH panel, science advisory committee.  Can

04:34  14  you just tell us what this type of activity entails.

04:34  15  **A.**    So these are -- they are kind of heterogenous.  So let me

04:35  16  focus on the FDA advisory committee.  So the FDA maintains a

04:35  17  set of advisory committees with different specialties that

04:35  18  are -- that give them advice.  So when the FDA is trying to

04:35  19  decide what to do about a drug safety issue or whether to

04:35  20  license or authorize a new drug or issues related to the COVID

04:35  21  vaccine, they convene their advisory committee and seek the

04:35  22  advisory committee's opinion.

04:35  23          And so these advisory committees are outsiders.  They

04:35  24  are not FDA employees.  So I served on one of those advisory

04:35  25  committees for a term, the drug safety and risk management

DAVID MADIGAN, PH.D. - VOIR DIRE

04:35  1    advisory committee.

04:35  2    **Q.**   What about the listing for NIH?  What does that relate to?

04:35  3    **A.**   That's actually peer review for grant proposals.  So the

04:35  4    NIH and other agencies they bring together panels of expert

04:35  5    peers to review proposals.

04:36  6    **Q.**   Okay.  And it appears you have been doing that for a

04:36  7    number of years as well?

04:36  8    **A.**   I have.

04:36  9          **MR. MICELI:**  Your Honor, at this time I would like to

04:36  10   tender Dr. Madigan as an expert in statistics, biostatistics,

04:36  11   and drug safety.

04:36  12         **THE COURT:**  Any questions?

04:36  13         **MR. STRONGMAN:**  No objection.

04:36  14         **THE COURT:**  The Court is going to accept Dr. Madigan

04:36  15   as an expert in the field of statistics, biostatistics, and

04:36  16   drug safety, qualified to render opinions in that regard.

04:36  17         **MR. MICELI:**  I think that's a wrap-up for the day

04:36  18   today.

04:36  19         **THE COURT:**  Okay.  Thank you.

04:36  20              Members of the jury, it's 4:35, so we are going

04:36  21   to get out a little bit early today.  We are going to be at

04:36  22   recess until 8:00 tomorrow morning.  Let me remind you, you

04:36  23   should not discuss the case amongst yourselves or with anyone

04:36  24   else.  You should do no independent research or contact anyone

04:36  25   in any way.

1    Please leave your tablets on your chairs.  They

2  will be gathered by my staff and will not be disturbed in any

3  way.

4    Also, if you should see anyone associated with

5  this litigation either in the hall or anywhere, please just

6  completely ignore them.  Thank you.

7    (Off the record.)

8    **THE COURT:**  I know you are going to be very

9  disappointed, Jurors, but we are going to start up at 8:30

10  tomorrow.  So you get another half hour in bed, and we will be

11  at recess until 8:30 tomorrow morning.  Thank you.

12    (The jury exited the courtroom.)

13    **THE COURT:**  Dr. Madigan, you are excused.  I have to

14  remind you, you are on the witness stand.  I know you have done

15  this before so you understand that you cannot visit with

16  anybody associated with this case.

17    **THE WITNESS:**  Yes.

18    **THE COURT:**  Thank you.

19    **MS. SASTRE:**  As Your Honor was aware, during

20  Mr. Schanker's direct exam of Mr. Steve Seebol, the husband of

21  the plaintiff Mrs. Elizabeth Kahn, in this case, he was asked a

22  question about how her hair loss has impacted her, and he went

23  on and gave what seemed to be, from our perspective, with all

24  due respect, an answer that he did not come up with for the

25  first time off the top of his head sitting in that witness

1    stand.  And essentially what he said, Your Honor, is that she

2    has been robbed of her humanity and compared her losing her

3    hair to victims of the Holocaust, which is --

4              **THE COURT:**  Ms. Kahn is in here.

5              **MS. SASTRE:**  Okay.

6              **THE COURT:**  I don't know if we wanted to excuse her

7    for this because we took this up at the bench.  I think it is

8    best --

9              **MS. SASTRE:**  That would be fine, Your Honor.  Yes,

10   thank you.

11             That comparison of the plaintiff Mrs. Elizabeth

12   Kahn to a victim of the Holocaust was essentially comparing

13   what plaintiff is claiming that Sanofi has done to her to what

14   the Nazis did to Jews and other victims of the Holocaust.  It

15   came as probably one of the most shocking, stunning, disturbing

16   things I have heard since I've been trying cases, so much so

17   that Mr. Moore couldn't even pop up in time.

18             Of course, he did come up and approach.  He

19   raised the issue.  Your Honor did instruct the jury to ignore

20   it, candidly telling them to ignore it, and we appreciate

21   Your Honor's instruction.  It put us, you know, in the position

22   and Your Honor, candidly, in the position of really even -- of

23   course, it's the net effect.  It's reminding them of what was

24   said again.

25             So, Your Honor, what we would like to do, we

1  believe that this is grounds for a mistrial.  We believe it is

2  a significant prejudice, candidly, that cannot be cured by the

3  Court's instruction.  I would also say again at the end, I am

4  personally very firmly convinced that that answer was not news

5  to plaintiff's counsel.

6            I do not believe that Mr. Seebol, that

7  gentleman, thought of that off the top of his head for the

8  first time, Your Honor.  So it was intentional.  It's highly

9  prejudicial.  We do not think it could be cured through the

10  Court's instruction.  Thank you.

11        **MR. MICELI:**  Your Honor, Darin Schanker should be the

12  one to argue this.  Do you want to take it up first thing in

13  the morning?  Not that I want to come in any earlier.  But, you

14  know, it was a blurt -- it was news to me when I heard it.  In

15  fact, I didn't really understand what he had said until I heard

16  or saw the group talking at sidebar.  I think the Court's

17  curative instruction probably brought more attention to it than

18  the jurors gave to it here.

19            I mean, this is not a case where anybody -- I

20  don't want to name any companies that may have been involved at

21  that time in the world in the world's history that sometimes

22  have a very strong position when something like this pops up

23  because their companies were involved.  I don't believe that

24  Sanofi is one of those companies.  I don't think that it is one

25  of these -- it does not justify a mistrial.

04:42  1           The curative instruction probably, as I said,

04:42  2  brought more attention to it than the comment itself.  I would

04:42  3  ask the Court allow argument -- if Ms. Sastre wants to reargue

04:42  4  it, but I think because Mr. Schanker had put the witness up, he

04:43  5  should be the one discussing this.  I'm happy to answer any

04:43  6  questions or bring him to you, but it's just not --

04:43  7           THE COURT:  I will allow further argument tomorrow

04:43  8  morning.  I will tell you that my concern at sidebar -- and I

04:43  9  conveyed that to Mr. Moore, I conveyed that to Mr. Schanker --

04:43  10  I thought a curative instruction was appropriate at that time.

04:43  11  I was very concerned about bringing more attention to the fact

04:43  12  that the comment was made.  But we will argue the motion for a

04:43  13  mistrial tomorrow morning.  We should plan to take that up at

04:43  14  our conference, let's say, 8:00 tomorrow morning to make this

04:43  15  argument.  We will see what I need to talk to you about

04:44  16  tomorrow morning at our group meeting.

04:44  17           We didn't have the holdup this morning.  I am

04:44  18  hoping, since we are just dealing with Dr. Madigan tomorrow and

04:44  19  not multiple experts, that it should not take us a great deal

04:44  20  of time that way.  I know we'll have Ms. Kahn tomorrow and

04:44  21  Dr. Madigan and then a deposition.

04:44  22           MR. MICELI:  We exchanged the exhibits and went over

04:44  23  them and I think we're in agreement, so there's not much to

04:44  24  talk about with Dr. Madigan.

04:44  25           THE COURT:  We will have this argument at

1   8:00 tomorrow morning.

2            MR. MICELI:  Thank you, Your Honor.

3            THE COURT:  I think there's something to deal with

4   Dr. Larned's deposition?  Does this have to be on the record?

5            MR. BACHUS:  Kyle Bachus.

6            THE COURT:  I need to see something.  I don't know

7   what you're talking about.  If somebody has something for me to

8   look at, that would be very beneficial.

9            Do you have a copy of the deposition?

10           MR. MOORE:  I don't know what the issue is.

11           MR. BACHUS:  Judge, I asked them to print one off and

12  bring it upstairs.  They not here quite yet.

13           THE COURT:  What's the problem?

14           MR. BACHUS:  So, generally speaking, Your Honor --

15  and thank you.  I know we just got this yesterday.  I think

16  both sides have worked very hard since receiving this.  We

17  obviously did not have this at the time we had our deposition

18  status conference and appreciate the opportunity at that time.

19           In reviewing the transcript, run report of the

20  transcript, there are a couple of issues that I wanted to bring

21  to the Court's attention and bring to the attention of the

22  record before this is played.  I don't want to hold up any of

23  the proceedings obviously.

24           The first concern that I have -- again, I'm

25  going to talk about these in kind of a broad stroke.  If we

1    look at page 63, line 14, the testimony that begins in this
2    area asks this witness to identify sources that she would use
3    to identify a potential side effect risk associated with
4    Taxotere, and they asked her what does she rely upon.
5           The problem with this area of the testimony,
6    Your Honor, is that unfortunately Sanofi's counsel did not ask
7    a question that gave any sort of time frame limitations.  In
8    fact, if you read the witness' answers -- and, again, just for
9    the record, noting that the treatment in this case occurred in
10   the year 2008 -- related to chemotherapy medications.
11          And there's even a comment on line 23:  "Now we
12   have an oncology pharmacist on-site."
13          She then continues to go through various sources
14   without defining what time period she is talking about in terms
15   of the reference to these tools.
16          Then, if you -- as part of the plaintiff's
17   designations to cross-examine on this topic, pages 148,
18   line 11, to 150, line 15, you might recall that we had endorsed
19   some testimony on the "up-to-date."  I think you struck that
20   up-to-date because it was outside of the time frame that was
21   pertinent to the litigation.
22          But we think that either Sanofi's testimony with
23   respect to the unlimited time frame that this witness was
24   looking at these sources should be out or should certainly be
25   in but certainly not an unlimited discussion about what sources

04:48   1   are available now through Sanofi's counsel and then have us not

04:48   2   being able to present the testimony there.  That's one area.

04:48   3                 If it's okay, I can jump to the next.

04:48   4          THE COURT:  You can jump to the next.

04:48   5          MR. BACHUS:  The next area, Your Honor, if you were

04:48   6   to turn to --

04:48   7          THE COURT:  I think I have already ruled on these.

04:48   8          MR. BACHUS:  I understand.

04:48   9          THE COURT:  The odds of me changing my mind absent

04:48   10  something egregious are like slim and none.  You have got to

04:48   11  look back.  It's not just that one question.  It starts out

04:49   12  "Let's talk about the risks for a minute, all of those you're

04:49   13  talking about" -- I'm starting on line 3, page 63:  "Let's talk

04:49   14  about the risks that are contained in Exhibit 1, on the

04:49   15  timeline."

04:49   16                 So they are talking about the risks at that

04:49   17  time.  Then you get into, "Well -- and in terms of learning

04:49   18  about the potential risks associated with the medicines that

04:49   19  you have prescribed, what information do you have" -- they are

04:49   20  looking at a timeline, and she is talking about those risks at

04:49   21  that time.

04:49   22                 It's quite one thing to say maybe there was a

04:49   23  misunderstanding there, to just go into actually a product that

04:49   24  was not available at that time.  I guess that's where I saw it.

04:49   25          MR. BACHUS:  Yes, Your Honor.  I think that the most

1    pertinent line, to the understanding of what the witness was

2    answering --

3            THE COURT:  Of course, that wasn't the objection you

4    made either.

5            MR. BACHUS:  -- says "Now we have an oncology

6    pharmacist on-site."

7            THE COURT:  I know, but that was not the objection

8    that was raised.

9            MR. BACHUS:  I'll move on to my next --

10           THE COURT:  I think.  Yes.

11           MR. BACHUS:  The next issue, Your Honor, has to do

12    with the issue of causation.  And this is beginning -- if you

13    look at page 66, line 9 through 12.

14           Now, the witness here is being asked whether or

15    not the medications in question could result in permanent hair

16    loss.  And our concern, Your Honor, is that this is a causation

17    opinion that the witness later in the deposition very clearly,

18    on page 114 -- actually, it's 115, line 8 through 12.  The

19    witness very clearly testifies that she is not qualified to

20    offer causation opinions with respect to the cause of

21    alopecia -- of persistent and permanent alopecia, yet she's

22    being asked on page 66, line 9 and continuing -- it's actually

23    this entire section, page 65, line 14, to page 66, line 15.

24           What's concerning, Your Honor, is that she

25    admits she is not qualified, but we then in our

1  cross-examination as, you know, got that admission from her and

2  also endorsed other testimony that showed just how unqualified

3  she is with respect to offering opinions about whether

4  Taxotere, Cytoxan, or Adriamycin can cause permanent or

5  persistent hair loss.  She goes through this all and says that

6  they do but then says she is not qualified to do so.

7           Our cross-examination showing how unqualified

8  she is was stricken except for just the one, little short

9  question.

10           Frankly and maybe most importantly, this

11  witness' testimony on the topic of causation is irrelevant

12  because she also admits under oath that she had no discussion

13  whatsoever with the plaintiff with respect to permanent hair

14  loss.

15           So -- and really in order, as the Court knows,

16  to offer opinions on causation, she would have to have done a

17  Bradford Hill analysis, which she admitted she did not engage

18  in.  That testimony was also stricken.

19           We are very concerned about this witness who

20  after -- once she testifies under oath, "I never spoke to

21  Ms. Kahn about hair loss, about permanent hair loss.  I never

22  had that conversation with her.  I am not qualified to give an

23  opinion about what can cause or what drugs cause PCIA" -- is

24  doing exactly that on line 65, line 14, through 66, line 15.

25  And our defense attack against that has been neutered to some

04:52  1  significant degree.  So we would ask, Your Honor --

04:53  2          THE COURT:  No.  I'm not changing my mind, and I will

04:53  3  tell you why.  Dr. Larned was a treating physician of Ms. Kahn.

04:53  4  Now, I am acutely aware that Ms. Kahn -- she did not get a

04:53  5  informed consent from Ms. Kahn.  She did prescribe the initial

04:53  6  regimen that Ms. Kahn was under, but she did have to sign the

04:53  7  various prescriptions for her medications.  She followed the

04:53  8  regimen of Dr. Kardinal.  Everybody agrees.  None of that is

04:53  9  contested.

04:53  10          I'm going to allow this treating physician to

04:53  11  say what she knows.

04:53  12          Now, I did allow the question that says you're

04:54  13  not an expert and you would defer to a dermatologist vis-à-vis

04:54  14  hair loss.  I did not think it was appropriate to subject her

04:54  15  to cross-examination about how many things she doesn't know

04:54  16  about hair loss.  I did not, because she said, "I'm not a

04:54  17  dermatologist.  That is not what I do.  I'm an oncologist."

04:54  18  She was Ms. Kahn's treating oncologist.  I think those things

04:54  19  were pertinent.

04:54  20          Then I gave a great deal of latitude in

04:54  21  plaintiff's cross-examination, if you will, of Dr. Larned

04:54  22  regarding the fact that she did not obtain the informed consent

04:54  23  from Ms. Kahn and that she followed the directions of

04:54  24  Dr. Kardinal.

04:54  25          I think the jury -- this is not a witness that

1  was brought here -- she is not Dr. Glaspy; she is not

2  Dr. Bosserman; she is not any of those other oncologists that

3  we have heard from or will hear from.  So I reviewed this

4  deposition testimony, and I think it's appropriate for her to

5  say what she said, what her experience was with the drug.

6             I allowed extensive cross-examination.  I did

7  not delete any of the cross -- or sustain any of the objections

8  regarding Dr. Kardinal's role and how she continued with that

9  regimen that he prescribed.

10             I think the jury is entitled to all of that.

11        MR. BACHUS:  I think we are concerned -- I hear you,

12  Your Honor, but just for the record, I think we are concerned

13  about this elevated person who is not a specially retained

14  expert who has testified under oath she is not qualified to

15  make a diagnosis with respect to what causes permanent alopecia

16  or which drugs cause permanent alopecia.

17             And yet at the same time she has offered

18  testimony that the other drugs that were taken cause PCIA when

19  she has no basis that would certainly pass 702 or if there's

20  any other worthiness to be making those statements in these

21  proceedings.

22             We are extremely concerned about the prejudice

23  that brings upon the plaintiff, to allow that sort of

24  testimony.

25        THE COURT:  Okay.

1   **MR. BACHUS:**  Thank you, Your Honor.

2   **THE COURT:**  Anything else?

3   **MR. MOORE:**  I assume you don't need to hear from me.

4   **THE COURT:**  No.  Thank you.

5          See you-all tomorrow at 7:30.

6   **MS. PEREZ REYNOLDS:**  Jessica Perez Reynolds, for the

7   record.  I apologize, Judge.  We have just a very brief

8   housekeeping matter on some exhibits from Dr. Tosti that we

9   want to make sure officially made it into the record.  I did

10  speak with Mr. Moore and Mr. Strongman.  I don't believe there

11  are any objections.

12          So if Your Honor is so inclined, I will read

13  those into the record.

14  **THE COURT:**  Let's do that.

15  **MS. PEREZ REYNOLDS:**  Plaintiffs would move into the

16  record, in light of the Dr. Antonella Tosti's testimony, P2852,

17  2680, 2867, 2878, 2892, 2898, 2899, 2924, 2953, 2966, 2967,

18  2968, 2972, 3028, 3030, 3037, 3067, 3104, 3141, 3142, 3542, and

19  then 2784, 2785, and 2786.

20          Thank you, Your Honor.

21  **MR. MOORE:**  Your Honor, I would have the same sort of

22  exercise tomorrow morning on Mr. Seebol's testimony.

23          (Proceedings adjourned.)

24                      *  *  *

25

1    **<u>CERTIFICATE</u>**

2         I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                  */s/ Toni Doyle Tusa*
                                   Toni Doyle Tusa, CCR, FCRR
10                                 Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25