```
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA

   ****************************************************************

   IN RE:  TAXOTERE (DOCETAXEL)
   PRODUCTS LIABILITY LITIGATION

                                    Docket No. 16-MD-2740
                                    Section H
                                    New Orleans, LA
                                    Tuesday, November 16, 2021
   Relates to:  Elizabeth Kahn
                16-CV-17039

   ****************************************************************

                  TRANSCRIPT OF TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
                     DAY 6, MORNING SESSION
```

APPEARANCES:

```
FOR THE PLAINTIFF:              BACHUS & SCHANKER, LLC
                                BY:  DARIN L. SCHANKER, ESQ.
                                     J. KYLE BACHUS, ESQ.
                                101 W. Colfax Ave., Suite 650
                                Denver, CO 80202

                                GIBBS LAW GROUP, LLP
                                BY:  KAREN B. MENZIES, ESQ.
                                     ANDRE MURA, ESQ.
                                6701 Center Drive West, 14th Floor
                                Los Angeles, CA 90045

                                DAVID F. MICELI, LLC
                                BY:  DAVID F. MICELI, ESQ.
                                P.O. Box 2519
                                Carrollton, GA 30112-0046

                                PENDLEY BAUDIN & COFFIN
                                BY:  CHRISTOPHER L. COFFIN, ESQ.
                                     JESSICA A. PEREZ, ESQ.
                                2505 Energy Centre
                                1100 Poydras St.
                                New Orleans, LA 70163
```

```
 1                                    GAINSBURGH BENJAMIN DAVID
                                      MEUNIER & WARSHAUER
 2                                    BY:  M. PALMER LAMBERT, ESQ.
                                      2800 Energy Centre
 3                                    1100 Poydras St.
                                      New Orleans, LA 70163
 4
                                      MARTZELL, BICKFORD & CENTOLA
 5                                    BY:  LAWRENCE J. CENTOLA, III, ESQ.
                                      338 Lafayette St.
 6                                    New Orleans, LA 70130

 7

 8    FOR THE DEFENDANT:              SHOOK HARDY & BACON
                                      BY:  HILDY M. SASTRE, ESQ.
 9                                    201 Biscayne Blvd., Suite 3200
                                      Miami, FL 33131
10
                                      SHOOK HARDY & BACON
11                                    BY:  JON A. STRONGMAN, ESQ.
                                           HARLEY V. RATLIFF, ESQ.
12                                    2555 Grand Blvd.
                                      Kansas City, MO 64108
13
                                      IRWIN FRITCHIE URQUHART & MOORE
14                                    BY:  DOUGLAS J. MOORE, ESQ.
                                           KELLY E. BRILLEAUX, ESQ.
15                                    400 Poydras St., Suite 2700
                                      New Orleans, LA 70130
16

17    Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR, RMR
                                      500 Poydras Street, B-275
18                                    New Orleans, Louisiana 70130
                                      (504) 589-7776
19

20      Proceedings recorded by mechanical stenography, transcript
      produced by computer.
21

22

23

24

25
```

1                          I N D E X

2

3  WITNESSES FOR THE PLAINTIFF:                    PAGE/LINE:

4

5  DAVID MADIGAN

6    Direct Examination by Mr. Miceli          1403/17

7    Cross-Examination by Mr. Strongman        1450/25

8    Redirect Examination by Mr. Miceli        1492/20

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2                 (TUESDAY, NOVEMBER 16, 2021)

3                    (MORNING SESSION)

4

5        (OPEN COURT.)

6             THE DEPUTY CLERK:  Court's in session.

7             THE COURT:  Mr. Moore, I think you have a motion.

8             MR. MOORE:  We do have a motion, but quickly, Mr. Lambert

9    wanted to request that Mr. Seebol be released from sequestration,

10   and we have no objection to that.  We don't plan on calling him.

11            THE COURT:  So ordered.

12            MR. MOORE:  Thank you.  And then I just want to confirm

13   that sequestration does not apply to experts.  We do have an expert

14   in the courtroom.

15            THE COURT:  Yeah.

16            MR. MOORE:  Okay.  All right.

17            THE COURT:  It's never applied to experts.

18            MR. MOORE:  All right.  I just --

19            THE COURT:  Sure.  I think Dr. Madigan was in the

20   courtroom yesterday and perhaps Bosserman -- I mean, the experts

21   have been in the courtroom.

22            Okay.  Please proceed, Mr. Moore.

23            MR. MOORE:  Good morning, Your Honor.  Pending before the

24   Court is Sanofi's oral motion for mistrial made yesterday afternoon

25   after the plaintiff's husband, Mr. Steve Seebol, likened Ms. Kahn's
```

1    permanent hair loss to the dehumanization and genocide perpetuated

2    by the Nazis during the Holocaust.  This motion was made, Your

3    Honor, after the culmination of what we think is prejudicial

4    statements that have been made in front of the jury.  We have

5    outlined those in a letter submission that we made to the Court

6    ranging from references to the 2006 New Orleans Saints to

7    Ms. Avila's examination, Dr. Bosserman's reference to the Tuskegee

8    experiment, and then every single expert offered by the plaintiffs

9    accusing counsel of misleading the jury in their responses to

10   cross-examination.  It's for these reasons that we believe a

11   mistrial is warranted.

12            THE COURT:  Thank you.

13            MR. MURA:  Good morning, Your Honor.  Andre Mura for the

14   plaintiff.  We would ask that the motion be denied.  I did want to

15   bring the Court's attention to one case; it's United States against

16   *761 Fed. Appx. 917*.  It is out of the Eleventh Circuit, and there,

17   the Court discusses how there's a difference between a disparaging

18   comment made by either the Court or counsel, and a witness merely

19   blurting something out.  And the Court there says, "There are no

20   cases requiring reversal" -- there, there was a denial of a

21   mistrial.  They say, "There's no cases requiring reversal because

22   of disparaging remarks made by witnesses."

23            So the Court simply found no legal basis when a witness

24   blurts something out to grant a mistrial, and the Court observes

25   that when a witness does something like that, has an emotional

 1    reaction or says something, it's not clear, even if the disparaging

 2    comments hurts one side or the other.  And I think anyone -- no one

 3    would want to counsel someone, to equate themselves to a Holocaust

 4    victim.  I mean, that would certainly blowback on plaintiff, and

 5    that's not what happened here.  The comment, when read in context,

 6    was simply the witness answering an open-ended question.  Counsel

 7    did not invite any sort of response along these lines.  The witness

 8    simply started talking about dehumanization, and no more likened

 9    Sanofi or its counsel to Nazis than to the military or to prisons,

10    which was the other examples.

11         I think he's a very kind gentleman.  I think the Court

12    observed, and the jury observed, that it was an off-hand and

13    unfortunate comment.  But it certainly wasn't intended to disparage

14    anyone.  He was simply talking about something very emotional for

15    himself, which is the way he has seen his wife suffer.  So for

16    those reasons, and because there's really no legal basis in the

17    case law to grant a motion for mistrial when a witness says

18    something unfortunate, we would ask that the motion be denied.

19         And we would also -- just the last thing I'll say is,

20    there clearly was -- to the extent that there was a suggestion

21    yesterday, we feel strongly that Mr. Schanker -- and he's given the

22    Court his word, that he did not prepare the witness to say any of

23    this, and it was simply an utterance from the witness.  And we

24    would respectfully ask that the Court merely recognize that on the

25    record.  Thank you very much.

1          THE COURT:  All right.  We have looked and could not find

2     any Fifth Circuit precedent directly on point to obtain a mistrial.

3     A party generally must demonstrate both a valid basis for a

4     mistrial and that it suffered an unfair prejudice that the Court

5     cannot cure by other means, such as a curative instruction.

6          Mr. Seebol blurted out that loss of hair can be

7     dehumanizing and equated it.  There are occasions where people are

8     dehumanized intentionally, and that would be in the military,

9     prisons, and during the Holocaust.  I do not -- and I will say on

10    the record that I was hesitant to even bring it up again because,

11    while I think it was inappropriate, I thought perhaps by even the

12    curative instruction, which I ultimately gave, that I might bring

13    more emphasis to the comment.

14          I do not believe that the jurors, in any way, could

15    equate a side effect of medication that the plaintiff alleges she

16    was not warned about can, in any way, be equated to the atrocities

17    of the Holocaust by the Nazi regime.  So to the extent that it

18    was -- it prejudiced the defendants, I don't think it rises to the

19    level that the Court would grant a mistrial.  Frankly, I don't know

20    who it helps, plaintiffs or defendants, to be perfectly frank with

21    you.  Because I am not sure if the -- the jury would not believe,

22    well, that's a bridge too far.

23          So with that, the motion for mistrial is denied.  I

24    believe I indicated to Mr. Schanker yesterday afternoon when he

25    represented that he did not know that comment was going to be made

```
 1    or that that would be -- that's what the question would elicit, and
 2    I take Mr. Schanker at his word.
 3            But I do believe, and I want to say for the record, after
 4    opening statement, I was -- I thought equating to the --
 5    continually bringing this jury back to Drew Brees and Sean Payton
 6    and the New Orleans Saints in 2006 was a bit much.  And I have
 7    noticed that each of the experts has talked about the questions
 8    being misleading.  Now, but I don't think any of that rises to the
 9    level of granting a mistrial, so the motion is denied.
10            Now, I think we're missing jurors.
11            THE DEPUTY CLERK:  They're up here, Judge.  They were
12    getting tested.
13            THE COURT:  Let me go grab some coffee.  I'll be right
14    back.
15        (WHEREUPON, A RECESS WAS TAKEN.)
16        (OPEN COURT.)
17            THE COURT:  All right.  Is everybody ready to proceed?
18            MR. STRONGMAN:  Yeah, we're getting Dr. Madigan.
19            THE COURT:  Is Ms. Kahn here?  Is Ms. Kahn here?
20            Mr. Strongman, are you taking Dr. Madigan?
21            MR. STRONGMAN:  Yes, Your Honor.
22            THE COURT:  Thank you.
23            MR. LAMBERT:  I did find the witness, Your Honor.
24            THE COURT:  We're making progress.
25            MR. LAMBERT:  I think we're going to proceed with this
```

```
 1   witness --
 2           THE COURT:  We don't have a plaintiff, but we got a
 3   witness.
 4           MR. LAMBERT:  Right.  I think we're going to proceed
 5   without Ms. Kahn here because she's going to be the next witness
 6   up.
 7           THE COURT:  Okay.  All right.  We're ready to bring in
 8   the jury.
 9        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)
10           THE COURT:  All jurors are present.  Court's back in
11   session.  You may be seated.
12           Mr. Miceli.  Dr. Madigan, I remind you you're under oath.
13           THE WITNESS:  Thank you.
14           THE COURT:  Thank you.  Please proceed.
15           MR. MICELI:  Thank you, Your Honor.
16                         DIRECT EXAMINATION
17   BY MR. MICELI:
18   Q.  Good morning, Dr. Madigan.
19   A.  Good morning, Mr. Miceli.
20   Q.  We spoke yesterday, and I promised that we would talk about
21   randomized controlled trials and observational studies.  And since
22   I promised that we would talk about that, could you just explain to
23   the jury what an observational study is.
24   A.  So in the context of health care studies, there are -- there
25   are many different types of studies, but there are two kind of
```

1    broad buckets.  There are observational studies, and there are

2    controlled trials, which are often randomized controlled trials.

3    The basic difference -- well, actually, in both cases, what you're

4    interested in is trying to figure out the effect of, let's say, a

5    medication or a treatment of some sort.  So is it better or worse

6    than doing nothing, or is it better or worse than doing an

7    alternate?

8             So you might have two potential treatments, A and B, and

9    you want to know which one is better.  So in an observational

10   study, typically, you simply observe what's going on in the world.

11   So you find patients who took drug A -- let's say, drug.  You find

12   patients who took drug A, you find patients who took drug B.

13   "Find" might mean in an electronic health record database, for

14   example, and you simply look at what happened to those patients.

15   How well did the patients on A do, how well did the patients on B

16   do, were there any differences, did one do better than the other.

17   So that's an observational study.

18            In a controlled trial, you don't just observe, you

19   actually intervene and assign people to treatment A or to treatment

20   B and then see what happens.  And it might seem like a fine

21   distinction, but it's a very large distinction.  The reason being,

22   in the controlled trial context, you get to assign who gets A --

23   you, the person doing the study -- you get to decide who gets A and

24   who gets B, and you can do so in a way, in a so-called randomized

25   trial, that ensures that the two groups are comparable.  So in a

```
 1   randomized trial, it's not literally because we use computers to do
 2   these things, but symbolically, it's the toss of a coin that
 3   decides who gets A and who gets B.  And as a consequence, you end
 4   up with two balanced groups.  So they would, generally speaking, be
 5   of similar ages, similar gender mixes, similar medical histories,
 6   because it was the toss of a coin that decided who got A and who
 7   got B.  So things balance out.
 8             In an observational study, you don't get to do that.  You
 9   just see, you know, out there in the wild, so to speak, who took A
10   and who took B.  The fundamental problem is, there might be
11   differences between the people who got A -- is everyone hearing
12   that noise?
13   Q.  Try to push the microphone away from you.
14             THE COURT:  Push the mike back and just speak louder.
15             MR. MICELI:  There you go.
16             THE WITNESS:  Okay.  Hopefully, that's better.
17             THE COURT:  That's it.
18             THE WITNESS:  Okay.  So in an observational study, you
19   don't get to decide who gets A and who gets B.  It's just whatever
20   happens, right?  Some people got A and some people got B.  The
21   fundamental worry is that there are differences between the people
22   who got A and the people who got B, other than the fact that they
23   got A or B.  So it could be, for instance, that doctors tend to
24   prescribe drug A to older people than drug B.  And then you look at
25   the outcomes, and the outcomes are not so good on drug A, but it's
```

1    got nothing to do with the fact that they took drug A versus drug

2    B; it's because they were older, or because they were sicker in

3    some way, to begin with.

4            Now, there are techniques to try and correct for that,

5    statistical techniques.  But be that as it may, a randomized trial

6    is a much more -- provides much higher quality evidence than an

7    observational study.  As I mentioned yesterday, you can't always do

8    randomized trials, so the world -- you know, we rely heavily on

9    observational studies, and there are thousands and thousands of

10   them conducted, you know, every week around the world.  But it's --

11   there's a difference in the quality of the evidence that you get

12   from a randomized trial as against an observational study.

13   BY MR. MICELI:

14   Q.  How long have randomized trials been around, randomized

15   controlled clinical trials?

16   A.  So randomized controlled trials in human beings, for the

17   purpose of studying health care, have been around since the 1950s.

18   The notion of randomization, it's a little counterintuitive, that a

19   toss of a coin would be a good way to do an experiment to decide

20   who gets A and who gets B.  But it turns out it has completely

21   revolutionized science, and certainly revolutionized medicine.  You

22   know, it is the gold standard in terms of how do you assess, you

23   know, the efficacy or the safety of a medical intervention.  And

24   from about the 1950s onwards, randomized trials have been a

25   mainstay of medical science.

```
 1              And, you know, for example, to get a drug approved in
 2       this country and in many countries, you know, the FDA will insist
 3       that you do randomized experiments where people are randomly
 4       assigned to your drug versus an alternate drug.
 5       Q.  Okay.  We're going to talk about your opinions.  I am going to
 6       go a little bit out of order for just this moment.  You reviewed
 7       information on TAX316?
 8       A.  I did.
 9       Q.  Because we're talking about randomization, did you look at the
10       randomization that was done in that trial?
11       A.  I did.
12       Q.  Okay.
13              MR. MICELI:  Jon, I'm going to show him this picture to
14       save time.
15       BY MR. MICELI:
16       Q.  I'm not going to belabor this.  The jury saw this yesterday, so
17       I'm not going to spend a lot of time circling numbers that they've
18       already seen.  But did you review this chart?
19       A.  I did.
20       Q.  Okay.  I just got to keep backing it down.  There we go.  And
21       what did it demonstrate to you as a statistician about the
22       randomization in this trial?
23       A.  So I guess, first of all, there were two trials.  So I looked
24       at the totality of the evidence from the randomized trials.  The
25       good news is, we have randomized trials here.  There were two of
```

them.  This is one of them, TAX316.  So, you know, roughly 1500
patients were enrolled into this study, and a toss of a coin
decided whether they got TAC or FAC.  Think A or B, like I was just
talking about a minute ago.  And I guess we'll talk about what
those are in a minute.

So 1500 people are enrolled in the study.  There are
eligibility criteria that, you know, decide whether you're eligible
to be included in the study.  Then a toss of a coin decided, do you
get TAC, or do you get FAC.  So it's -- you know, it's not a
clinician, a doctor there saying, you look like a good TAC person,
or you look like a good FAC person.  No.  It's a completely
objective toss of a coin decides, do you get FAC or do you get TAC.

As a consequence -- and this is the beauty of
randomization -- as a consequence, you end up -- mathematically
with certainty, you end up with two groups that are very
well-balanced.  There are very similar people in the two arms.
Other than the fact that some got FAC and some got TAC, other than
that, they're very similar.  So if you look at this chart -- so
most papers that describe randomized trials will include a table
like this, and it's basically to give you assurance that the
randomization worked.  So if you take a look at it, look at age.
So when the coin was deciding whether you're going to get TAC or
FAC, the coin didn't know how old the patient was.  That was --
that's not taken into account.  It's completely random.

But because it's a random process, look what happened.

 1    The average age of the people in the TAC group was 49.  The average

 2    age of the people in the FAC group was 49.  So even though, you

 3    know, there's range from, I guess, 42 years of age to 56 years of

 4    age for the people in the study, randomization gives you two groups

 5    that are balanced, generally -- you know, more or less balanced.

 6    In this case, with regard to average age, they're perfectly

 7    balanced.  The average age of the two groups was 49.  As a

 8    consequence, when we look at the results of this study, and we

 9    see -- if we see differences, which we do -- you know, at the end

10    of the study, you can be sure it's not due to age.  That's the

11    magic here.  Like, we know that it's -- if there's something

12    different between the two groups at the end of the study, you might

13    think, oh, maybe age is the issue.  It couldn't be, right, because

14    the average age in the two groups is the same.  So that can't

15    explain any differences we might see, and so on.

16            So if you look at, you know, what fraction were

17    premenopausal, the third line down, 57 percent in one group,

18    55 percent in the other group.  So, you know, very closely

19    balanced.  That's what you expect to see.  You don't expect

20    perfection, right; it is coin tossing.  So if you toss a coin ten

21    times, you won't get five heads and five tails every time.  You

22    might get six heads and four tails -- that wouldn't be surprising.

23    But here, it's actually 1500 coin tosses, and things will even out.

24    With mathematical certainty, things will more or less even out.  So

25    the fractions that are premenopausal are similar in the two groups,

```
 1    the fraction that had a mastectomy is similar in the two groups, et
 2    cetera, et cetera, et cetera.  Basically, anything you look at,
 3    you're going to see modest -- no difference or modest differences
 4    between the two groups.
 5            This is why randomization has revolutionized science.
 6    It's a beautiful thing.
 7    Q.  Did you go beyond what is seen in this chart to test to see if
 8    randomization worked?
 9    A.  Yeah.  I mean, you sort of don't need to because randomization,
10    mathematically, works.  But I just -- you know, having seen this
11    table, I thought, you know, let's look at a few other things.  So I
12    looked in the medical history of these patients, and I think the
13    first three things I looked at were hypertension, anxiety, and
14    obesity, you know, in the medical history.  I don't have the
15    numbers at my fingers, but they were just like these.  They were
16    very, you know, very closely balanced in the two groups.  So the
17    two groups, the TAC group and the FAC group, are very similar.
18    Q.  Now, when you say you looked in the medical history, did you go
19    to the medical records and pull out a file at any one point in
20    time?
21    A.  I did not.
22    Q.  Explain to the jury how you do that.
23    A.  So when you conduct clinical trials in, certainly in human
24    beings in this country, it's regulated, right.  So you have to get
25    approval to do this.  And these trials are conducted according to
```

1    very strict protocols that dictate how you're going to -- how

2    you're going to do the randomization, and how you're going to

3    assign -- treat the patients, and how you're going to follow the

4    patients over time.  These data are gathered throughout the

5    course -- this particular trial was a decade long, right.  And

6    throughout the course of the trial, data are constantly being

7    gathered, typically, in what's called case report forms.

8           Then these data are checked and double-checked and

9    triple-checked against the underlying medical records.  And

10   ultimately, the final data are put into a database.  Think, like, a

11   spreadsheet or a set of spreadsheets; they're put into a computer

12   database.  And there comes a moment in time when the trial is done

13   and you have -- you generate -- the sponsor of the study generates

14   what's called the final locked data, you know.  And it's often as

15   much as a year after the last patient finished the study.  So it's

16   extensive cleaning and checking and so on that goes on.  These data

17   are very important.  Like, important decisions are made by

18   regulators and by patients and physicians pursuant to these data.

19          So there comes a moment in time when you lock the data.

20   I mean, scrubbed it and cleaned it and checked it.  These are the

21   data.  This is the record of the study.  So when I say I checked

22   the medical history, just checking balance on a few factors, that's

23   what I am looking at.  So I have -- for these two trials, I have

24   the locked final data, and I run -- you know, I write a little

25   computer program to do an analysis to check whether anxiety, for

1    example, in the medical history is similar in the two groups.  So

2    it's not -- there is zero subjective judgment involved in the --

3    when I say I checked X, Y, or Z, there's nothing subjective about

4    this.  It's black and white.  Either the patient in the final

5    locked data had anxiety recorded in their medical history or they

6    did not.  And all I am doing is -- and sometimes, you know, I'm a

7    calculator when I'm not doing stuff like this.

8    Q.  Okay.  I want to follow up on that.  When you said it's like a

9    big spreadsheet, some people may be familiar with an Excel

10   spreadsheet that just has boxes that are in columns -- columns and

11   rows.  If you were to try to describe the locked clinical trial

12   data for the TAX316 or the TAX301/GEICAM study, how many columns

13   and how many rows would you have in that spreadsheet?

14   A.  So it's a little complicated.  A little complicated.  It's not

15   that complicated, but it's a little complicated in the sense that

16   there isn't just one spreadsheet.  So there would be, in TAX316 in

17   the final locked checked validated data, there is, for example, a

18   spreadsheet -- a spreadsheet that has one row for every person in

19   the study, like 1500 people in the study.  And it's got columns

20   that are labeled "Age" and "Karnofsky Score" and, you know, the

21   various factors that define the basic characteristics of these

22   patients.  That file also records TAC or FAC, which were they

23   randomized to.  So that's a spreadsheet that has a few dozen

24   columns and approximately 1500 rows, one per -- I was going to say

25   one per student.  That's not quite right.  One per patient.

```
 1              So there are other spreadsheets.  So for example,
 2    routinely, when patients come for follow-up visits in the trial
 3    over the ten-year period, you record things.  Like, you take their
 4    blood pressure and their pulse, for instance, you know, vital
 5    signs.  So those vital signs also end up in the final locked -- are
 6    checked and double-checked and end up in the final locked data.  So
 7    that spreadsheet is a little different.  That spreadsheet has
 8    hundreds of thousands of rows because each patient in the tens of
 9    thousands of rows, each patient in the study had their blood
10    pressure measured many times.  So there, you'll have an entry for
11    Patient 12345, date on which the blood pressure was taken, and the
12    actual blood pressure, you know, 120 over 80, or whatever it was.
13    So that spreadsheet will have many, many rows.
14    Q.  So if you wanted to find out what a patient -- what their blood
15    pressure was on this follow-up visit, number one, would you be
16    required to go back and look at medical records or case report
17    forms, or do you look to the final locked clinical trial data?
18    A.  Once the study is complete, the final locked data, these are
19    the data of record.  So if you want to check hypertension, as I
20    did, you go to the final locked data, you go to one of those
21    spreadsheets, and you pull out basic statistics about what
22    percentage of the patients had hypertension, you know, in the two
23    arms of the study.
24    Q.  Okay.  Now, we've heard yesterday about something called a
25    meta-analysis.  Can you -- or did you perform a meta-analysis?
```

1    A.  I did.

2    Q.  Okay.  I'm going to ask you about that in a little greater

3    detail in a moment.  What I want you to do is just explain to the

4    jury what a meta-analysis is, and why it's appropriate, if it is so

5    appropriate.

6    A.  So meta-analysis, right, it's analysis of analysis.  It's a

7    very important tool in science and in medicine.  So the basic idea

8    is, if you have multiple studies of a particular issue, preferably

9    similar studies -- if they're very different, there are issues we

10   could talk about.  But if you've got several similar studies in a

11   particular context -- like, here, we have two studies, 316 and 301;

12   very, very similar studies -- and scientific practice and

13   statistical practice says, let's analyze those, the totality of

14   these studies.  So don't just look at one study.  We want to get as

15   much evidence as we can out of the studies.

16          So you do something called a meta-analysis, which pulls

17   together the findings from, in our case, two studies -- sometimes

18   it's ten studies, but in this case it's two studies -- that pulls

19   together the findings from the two studies and says, here's the

20   totality of the evidence from these studies.

21   Q.  Okay.  Now, this is where we get started into the opinions.  At

22   our request, did you investigate the chemotherapy drug, Taxotere,

23   to determine -- well, did you investigate Taxotere at our request?

24   A.  I did.

25   Q.  Can you tell the jury, in just broad categories, what you did.

1  A.  So what I did was, you know, I was asked to address a set of

2  questions.  I looked at different strands of evidence, and I'll

3  explain, that might be relevant to the question of whether or not

4  Taxotere causes permanent alopecia.  So the strands of -- this is

5  absolutely standard practice, to look at everything.  To look at as

6  much evidence that you can lay your hands on to see what the

7  overall picture is.  So the strands of evidence that I looked at in

8  this case are, first and foremost, I looked at the randomized

9  trials.  So I did a meta-analysis of the randomized trials, 316 and

10  301.

11       I also looked at observational studies, as we just talked

12  about.  So there are some observational studies in the literature

13  that are pertinent to the question here.  For in particular that I

14  found, I presume we'll talk about that.  I looked at something

15  called FAERS, the FDA Adverse Event Reporting System.  So if you

16  take a drug, and you think it's caused an adverse effect, so you

17  take a drug and you got a headache the next day, you can go on the

18  FDA's website and fill in a form.  You can report that to the FDA.

19  It's a voluntary reporting system.  And so those reports stream

20  into the FDA at the rate of about a million a year.

21       In actual fact, many of them come from the pharmaceutical

22  companies.  Because oftentimes, what we all -- what we would do is,

23  you would dial the 1800 pharmaceutical company number, in which

24  case, you know, they will fill out a form and report it to the FDA.

25  Or it could be your health care provider.  But in any event, if you

1    experience an adverse event, you can voluntarily report it to the

2    FDA.  That database is called FAERS, FDA Adverse Event Reporting

3    System, and it's widely used to investigate safety concerns and to

4    do signal detection, which I presume we'll talk about, with respect

5    to safety issues.

6              So I did -- I looked at this, what does FAERS have to say

7    about the issue that we're studying here.  And the fourth strand I

8    looked at was, as I mentioned, these voluntary reports can -- you

9    report directly to the FDA, but they flow into the pharmaceutical

10   companies directly in many cases.  So pharmaceutical companies

11   maintain their own systems to keep track of the reports that flow

12   directly into them.  Every pharmaceutical company does this.

13   I've -- this is something I've worked on for a very long time.  So

14   I looked at Sanofi's internal database of reports of -- related to

15   alopecia with Taxotere.

16   Q.  Okay.  We're going to walk through those in a moment, but based

17   on everything that you've done, did you reach any conclusions about

18   whether or not the evidence you looked at from a statistical

19   standpoint demonstrates an increased statistical risk of permanent

20   chemotherapy-induced alopecia?

21   A.  That's precisely the conclusion I came to.  So from a

22   statistical point of view, the statistical causal association

23   between Taxotere and permanent alopecia is strong.

24   Q.  Okay.  Let's start walking through these items, then.  Tell us

25   what you looked at particularly and how you went about performing a

1    meta-analysis.

2    A.  So the two studies that are relevant here because of lengthy

3    follow-up, or the two randomized controlled trials, are TAX316 and

4    TAX301.  I presume the jury has heard about these studies

5    previously.

6    Q.  Assume that they have, but explain which is necessary for your

7    opinion.

8    A.  Okay.  So TAX316, we were just looking at a table from the

9    paper describing that study.  Actually, both TAX316 and TAX301

10    randomly assigned patients to either FAC or TAC.  So FAC refers to

11    three drugs -- F is -- the first one is 5-FU, fluorouracil -- I am

12    not entirely sure how to pronounce it -- plus Adriamycin plus

13    cyclophosphamide.  And then the TAC refers to Taxotere plus

14    Adriamycin and cyclophosphamide.

15        So crucially, the A and the C are in both arms, so

16    everyone in the study got A and C.  So any difference we see

17    between the two groups couldn't possibly be due to A and C.  It has

18    to be due to the T and the F -- that's the systematic difference

19    between the two groups.  So we have two randomized trials, both of

20    which were very similar in design.  Both assigned people to either

21    TAC or FAC and the difference was to do with eligibility.  So in

22    one study, it was axillary lymph node-positive folks, and the other

23    study it was axillary lymph node-negative patients.  But otherwise,

24    the two groups were similar.

25        So what I did was I looked at the final locked clinical

1  trial data and, just as Sanofi did, I identified the individuals

2  who had persistent alopecia at the end of the study.

3        So I did that in both studies.  And then performed a

4  statistical analysis that combined the findings from the two

5  studies, and what it showed was a statistically significant

6  increased risk on TAC as against FAC of persistent alopecia.

7  Should I describe statistical significance?

8  Q.  Let me ask that question, Doctor.

9        THE COURT:  Okay.  I think you need to ask a question.

10 BY MR. MICELI:

11 Q.  I know you've been a teacher or professor for 30-something

12 years and I want to let you teach, but let me just ask:  What is

13 statistical significance?  Or can you describe that for us?

14 A.  Sure.  When you do a study like TAX316 or TAX316 plus TAX301,

15 and you see a difference, you know, at the end -- so in this

16 particular case, when you look at the combined studies, it's

17 32 cases of persistent alopecia on TAC versus 17 on FAC.  So the

18 question that immediately arises is basically is that a big

19 difference or a small difference?  Is that a difference that could

20 have happened just by chance alone, just the way the cookie

21 crumbles, or is it sufficiently large that you can't really explain

22 it as just random chance?  So an analogy with coin tossing -- hope

23 this is helpful -- an analogy with coin tossing would be if you

24 tossed a fair coin 100 times, you don't really expect to get

25 exactly 50 heads and 50 tails.  You wouldn't be at all surprised if

1    you got 51 heads and 49 tails -- that would be unremarkable.  On

2    the other hand, if you tossed a coin 100 times and you got 90 heads

3    and 10 tails, something is wrong, all right?  That's just not going

4    to happen by chance.  In other words, it's an astronomically small

5    probability that that would happen by chance alone.  You can try it

6    yourself.  And we actually -- the mathematical rule -- something

7    called the binomial distribution that will tell you what's the

8    probability of getting 90 heads and 10 tails if you toss a coin 100

9    times and the answer is, you know, essentially zero, never going to

10   happen.

11         So when you do a study, you know, like these two studies,

12   you need to know where are you?  Are you in the realm of yeah, not

13   a big deal, small difference between the two groups, could be due

14   to chance, we're not sure whether there's a real difference here or

15   not.  Or are you in the realm of, no, this difference is

16   sufficiently large that there's something going on here -- there's

17   some difference between the two groups.  Has to be the T versus the

18   F.  That's the only difference between the two groups.  So

19   statistical significance is a term that has emerged since the 1930s

20   or '40s that scientists use to, if you will, kind of -- you draw a

21   line.  On one side of the line, it's statistically significant,

22   couldn't be due to chance, more or less, very small possibility

23   that it's due to chance, it's real.  Other side of the line, could

24   be due to chance.  The line, you know, the line is at 5 percent and

25   it's really just -- it's a device that, you know, by which science

1    says this is the line in the sand and this is the line we're going

2    to use.  And when I say "statistically significant," in other

3    words, the statistically significant difference in these two

4    studies with regard to persistent alopecia it's that side of the

5    line, meaning it sort of couldn't be due to chance, it's real.

6    Q.  Okay.  When you say -- said 5 percent is the cut off, I want to

7    make sure we're clear.  Does that mean you have 95 percent

8    confidence interval on the side of the line where you're finding

9    your meta-analysis lands?

10   A.  Sure.  You're kind of -- you're mixing two kind of concepts

11   there, but, yeah.  You know, you can think about a 95 percent

12   confidence -- it's something called a 95 percent confidence

13   interval, which I can explain, that you're fairly sure contains the

14   true increased risk.  So if you got a statistically significant

15   result, that's equivalent to saying that 95 percent interval

16   doesn't include one or doesn't include the neutral finding.  So

17   you're fairly -- you know, you have high confidence -- 95 percent

18   level -- that this is real.

19   Q.  Okay.  I hope I didn't confuse you or the jury with my

20   question.

21          But in the context of talking statistical significance,

22   did you find that your findings were real?  Did they meet that real

23   side of the line?

24   A.  In that sense, yes.

25   Q.  Okay.  So the -- we're talking about the meta-analysis

1  findings, correct?

2  A.  Correct.

3  Q.  Now, I want to address one thing because you looked at both

4  TAX316 and 301.  Were they -- was the follow-up the exact same?

5  A.  So the follow-up was more extensive in 316.  So in 301, that

6  study was conducted at multi- -- both studies were contacted at

7  multiple sites, which is very common.  You don't just recruit

8  patients at one location.  So in the case of TAX301, there were 55

9  study sites and there was follow-up in four adverse events in only

10  12 of those 55 sites, so there's -- there are fewer patients that

11  were followed-up up in 301.  It's still a randomized study -- it's

12  protected by randomization -- but there are fewer patients

13  contributing to the meta-analysis.

14  Q.  Does that mean that it's not worthy of inclusion?

15  A.  Oh, no.  It's a randomized study in which there were -- at 12

16  of the 55 sites, there was follow-up.

17  Q.  Okay.  All right.  Now, do the findings of your meta-analysis,

18  do they support your conclusion on the statistical -- I want to

19  make sure I say this correctly -- the statistical association or

20  inference of causation?

21  A.  Yes.

22  Q.  Okay.  Let's go to -- excuse me.  I want to make sure there's

23  nothing else I needed to put up there.  But, I did want to show you

24  one thing, Doctor, just because --

25          MR. MICELI:  Can I approach the witness, Your Honor?

1    THE COURT:  Yes, you may.

2  BY MR. MICELI:

3  Q.  Let me show you this.

4  A.  Thank you.

5  Q.  And I should have dog-eared a page for you, Doctor, but I want

6  to go to Table 7 in this -- well, can you identify that for us?

7  A.  So this is a document that's called -- it's the clinical study

8  report.  It's the definitive report of the study -- of TAX316 in

9  this case.

10  Q.  Now, and if you look at on the front page of that document, it

11  has a report date of 9 September, 2010.

12  A.  Yes.

13  Q.  Okay.  And if you -- and it has a start date, I believe, of

14  1997.

15  A.  Correct.

16  Q.  And then the second line says, "Study completion date.  Last

17  patient, last follow-up visit.  25 January of 2010"?

18  A.  Right.

19  Q.  And you told us earlier about this checking, double-checking,

20  and triple-checking, is that what's going on between January of

21  2010 and September 9th of 2010?

22  A.  Yes.  I mean, the data validation and checking kind of goes on

23  throughout the study.  But certainly, in the period after the last

24  patient finished and the data was reported, that's what would have

25  been going on is extensive validation and checking of every single

1   piece of data that ended up in the final locked data.

2   Q.  Okay.  And if you have final locked data, is there any reason

3   to go behind it to look at case report forms for the information

4   you need to analyze a study like TAX316?

5   A.  No.  Not for the question that we're addressing here.

6   Q.  Is it appropriate to even do so?

7   A.  Not after the data have been locked.  You can't have this kind

8   of Monday-morning quarterbacking.  There's a moment in time when

9   the study is done, we locked the data, this is the official

10  permanent validated record of the study and that's what we used to

11  analyze the findings.

12  Q.  Have you looked at any Sanofi documents or reviewed any

13  testimony from Sanofi witnesses that demonstrates that they

14  followed the same methodology you do in that regard?

15  A.  I did.  So Mr. Pierre Mancini was one of their statisticians --

16  was involved with this study.  So I read his testimony and it's,

17  you know, a lot similar to what I just described.  He talks about

18  the checking of the data, the locking of the data, and the locked

19  data are the permanent final record of the study and that's what

20  you analyze going forward.

21  Q.  If you could, at the bottom right corner of the page, there's

22  one that ends in 4298.  Can you go there with me?

23  A.  Okay.

24          MR. MICELI:  Can I show that table, Table 7.

25          MR. STRONGMAN:  No objection.

```
 1              MR. MICELI:  Thank you.
 2              MR. STRONGMAN:  Just for demonstrative purposes?
 3              MR. MICELI:  Yes, for demonstrative purposes only.
 4    BY MR. MICELI:
 5    Q.  Doctor, can you see that?  Well, you have it in front of you
 6    but is this what is in front of you?
 7    A.  Yes.
 8    Q.  Okay.  And it lists, "Alopecia" and it lists the, "29 ongoing
 9    at the end of the ten-year follow-up"?
10    A.  Correct.
11    Q.  Okay.  And if you flip to the next page -- I need to raise it
12    up a little bit.  I am going to try to do this.  Do you see this
13    string of letters and numbers here?
14    A.  I do.
15    Q.  Do you know what that is?
16    A.  I do.
17    Q.  Can you explain that to the jury?
18    A.  Sure.  So to produce a table like this or even just focus on
19    the first entry related to "persisting alopecia," as I said, these
20    numbers were generated from the locked final data -- the study
21    data, the spreadsheets that we talked about.  And so to produce a
22    table like this, you do need to write computer programs.  You don't
23    do this by hand with, you know, with pencil and paper.  You write a
24    computer program that accesses the spreadsheets and pulls the
25    information that you need to create a table like this.
```

1    So there's a computer system called SAS, S-A-S.  That is

2    the -- you know, it's the industry-standard computer software that

3    pharmaceutical companies use to do this kind of analysis.  So to

4    generate this table, a so-called SAS programmer at Sanofi wrote a

5    program and it's just a list of instructions for the computer.  You

6    know, go to this spreadsheet and extract this information and then

7    go to that spreadsheet and get this information and then put it

8    altogether to generate the numbers that are in the table.

9    So it's a set of, you know, instructions in a computer

10   language called SAS.  So that's -- at the bottom of that table

11   where it says A7_AEPT_FUP.SAS, that's the name of the SAS program

12   that the programer used, and this is to create the numbers in this

13   table.  This is standard practice.  So these SAS programs, you

14   know, go along with the clinical study report so you can see

15   exactly -- no ambiguity -- you can see exactly how they produced

16   this table.  So I -- that program was -- amongst others -- was

17   provided to me.  I have that program, so I know exactly how they

18   produced this table.

19   Q.  And in producing your meta-analysis, did you apply your program

20   against the same final locked clinical study trial data that Sanofi

21   utilized to make this chart or this table?

22   A.  So they didn't do a meta-analysis.

23   Q.  I'm talking about the source of information that you applied

24   your programming against, the locked data.  Did you use the locked

25   data?

1  A.  Yes.

2  Q.  Okay.  You had that from Sanofi?

3  A.  Yes.

4  Q.  Okay.  Did you find it at any time necessary to go look at case

5  report forms to validate anything in that final locked data?

6  A.  No.  I mean, that's -- I would never do that.

7  Q.  Okay.  All right.  Okay.  We talked about the meta-analysis.

8  Let me talk to you about the FAERS analysis that you did.  Can you

9  explain to the jury what you did in a FAERS analysis?

10  A.  So FAERS, just to refresh your memory is the FDA Adverse Event

11  Reporting System.  So these voluntary reports come into the agency,

12  they collect them in a database.  It's publicly available data.

13  You can go on the FDA's website and download these data.  So it's,

14  you know, what you want to do in conducting a study using FAERS is

15  standard analysis that is used around the world every day, is to

16  look -- if you're looking at a particular safety issue -- is to

17  look at the number of reports that have the drug that you're

18  interested in, that you're focused on -- Taxotere in this

19  particular case -- and the outcome that you're interested in.  In

20  this case, persisting or permanent alopecia.  So what you do is you

21  look at the number of reports of persisting or permanent alopecia

22  on Taxotere as compared with the background.  So, as compared with

23  reports for all other drugs, okay?  So that's the standard

24  analysis.  You don't just look at how many reports were there on

25  Taxotere.  Instead, what you say is, the number of reports of

1    permanent alopecia on Taxotere, was that larger or smaller than the

2    number of reports coming into the database with other drugs.

3          So that's the standard analysis -- the FDA does these

4    kinds of analysis routinely.  They do them more -- so they do them

5    in two different contexts -- there are two different contexts in

6    which the FDA does these kinds of analyses.  One context is what

7    they call "data mining."  So it's a -- you know, these data are

8    flowing in, they run these analyses to see basically is anything

9    popping up.  It's open-ended.  Is there an issue we don't know

10   about that might, you know, pop up in this database in which case

11   they would do an investigation.  So that's one type of analysis.  A

12   second type of analysis that the agency and science and

13   pharmaceutical companies perform is in the context of a specific

14   issue, like we have here -- Taxotere permanent alopecia -- and do a

15   study in FAERS to look at that specific issue.  You know, how does

16   the number of reports for permanent alopecia on Taxotere compare

17   with the background, the rest of the database?

18          So that's at a high level; that's the nature of the

19   analysis.  There are then different statistical methods or metrics

20   that are commonly used to measure how different the reporting is on

21   the drug you're interested in on the background, that's where, I

22   guess, maybe we're going to discuss.

23   Q.  Right.

24   A.  There are different statistics that are in use, and I did

25   actually a half a dozen -- used a half a dozen different

1    statistical analyses here so I can just look at the range of

2    methods that are used by scientists.

3    Q.  And what did your FAERS analysis find?

4    A.  So my analysis finds, no matter which way you look at it, that

5    there is a so-called "signal," a signal of disproportionate

6    reporting for Taxotere and permanent alopecia that is, for the most

7    part, not present with comparator drugs.  It's unique.  More or

8    less -- I am not sure if we're going to look at some figures--

9    Q.  We will.

10   A.  It's more or less unique to Taxotere.

11   Q.  Okay.  And -- well, let me back up with you because I think I

12   missed something there a little while ago.  I asked, you know,

13   harken back to talking about going behind the locked clinical trial

14   data and I think you told me you don't go behind there to look at

15   case report forms.  And why don't you do that?

16   A.  First of all, I am a statistician.  So my training and my

17   career involves analyzing quantitative data like we have here --

18   like the locked clinic clinical trial data.  This is what I do and

19   this is what statisticians and biostatisticians do when a study is

20   finished.  What goes on prior to the locked data is a clinical

21   exercise, right?  It involves reviewing charts and reviewing

22   medical records to create the final locked data.  So that, you

23   know, that is not what I do and it's not what biostatisticians do.

24   So, you know, it's the same in FAERS but what I am working is the

25   FDA's record of the report.  So it's what the FDA -- in the context

```
 1   of the safety reports, there is a narrative in the original report.
 2   So when you get one of these forms -- it's called MedWatch -- when
 3   you get one of these forms and you fill it in and you send it in to
 4   the FDA, there's a box where you write out in -- in your own words
 5   what happened to you.  And I took the drug and an hour later, I had
 6   a severe headache.  So you write something like that.  That goes to
 7   the pharmaceutical company or to the FDA and what happens next is
 8   an expert medical coder assigns a medical code to that report.  So
 9   if it was a headache, there is a code for headache.  And that's
10   what would end up in FAERS, in the actual database.  That's what I
11   analyze.  So I don't analyze the narratives in this context.  I
12   analyze the coded final data that are in FAERS.
13   Q.  Okay.  I was referring to the locked clinical trial database
14   that we were taking about earlier.  Why don't you go behind it to
15   look at case reports?
16   A.  I mean, it's basically the same answer.  Is that there's a
17   whole process -- that is a clinical process that clinicians are
18   involved in that involves review of medical records or review of
19   medical charts, review of case report forms that is cleaned and
20   scrubbed and validated and ends up in the spreadsheets and that's
21   when the statistician -- that's what the statistician works with.
22   Q.  Did you look at any Sanofi documents where the company went
23   behind its locked clinical trial database or data set in order to
24   respond to a regulatory agency?
25   A.  No.
```

 1   Q.  Did you look at documents that reflected that Sanofi used its

 2   locked clinical trial data to generate information to submit to

 3   regulatory agencies?

 4   A.  Repeatedly.  That's exactly what they did.

 5   Q.  Okay.  All right.  Let's get back to FAERS then.  Why do you do

 6   a FAERS analysis and what are you looking for?

 7   A.  So -- why do you do it?  Because you want to look at all

 8   strands of evidence that are available, you know, to look at the

 9   totality of the evidence as it bears on the question of Taxotere

10   and permanent alopecia.  This is unequivocally a strand of

11   evidence.  You know, is it as good as the randomized trials?  No,

12   right?  It's got limitations.  It's a voluntary reporting system.

13   But be that as it may, it's a strand of evidence and it's, you

14   know, standard practice when focused on a particular safety issue

15   to look at FAERS alongside other strands of evidence.  It's -- the

16   FDA does this routinely.

17   Q.  Okay.  And what did your FAERS analysis demonstrate?

18   A.  So like I said, you know, we look at reporting rates --

19   reporting rates of permanent alopecia on Taxotere as compared with

20   the background, and the reporting of permanent alopecia on Taxotere

21   was disproportionate.  There were more reports of permanent

22   alopecia with Taxotere than there were with all other drugs in the

23   database.  And that signal, as it referred to, is to a large extent

24   not present for any other comparator drug.

25   Q.  Okay.  So if you're doing a signal detection through FAERS,

1  does that establish causation?

2  A.  No.

3  Q.  Okay.  It just shows the signal?

4  A.  Just shows a signal.  You know, if there is a signal there, it

5  is supportive evidence of, you know, a statistical causal

6  association.

7  Q.  Do you -- did you do anything beyond just running the FAERS

8  analysis?  Did you investigate any further the findings of the

9  FAERS analysis?

10  A.  So I -- I did an analysis looking at the reporting rates for

11  persistent alopecia -- permanent alopecia on Taxotere versus the

12  background, and I did a similar analysis for seven or eight

13  comparator drugs to see if they showed any similar signal.

14  Q.  And did any of them show a similar signal?

15  A.  There was a blip or two here or there but none of them showed a

16  consistent signal.

17  Q.  Okay.  And did you do anything to investigate the strength of

18  what you were looking at in that FAERS analysis?

19  A.  So as I mentioned, I did several analyses.  I used several

20  different statistical metrics, kind of poking at it from different

21  angles.  The most simple one -- it's still widely used -- is really

22  very simple.  You really do look at the reporting rate on Taxotere

23  divided by the reporting rate on the background.

24         At the other end of the spectrum, I did something that's

25  more sophisticated that statistically adjusts for other variables,

1    and I can explain that, but it also enables you to check whether a

2    result is statistically significant or not.

3    Q.  Okay.  Are we using "statistically significant" in this context

4    the same way we just did talking about the meta-analysis?

5    A.  We are.

6    Q.  Looking for a real showing?

7    A.  That's exactly right.

8    Q.  Okay.  I want to show you a document, and I think I've already

9    got this with Mr. Strongman.

10             THE COURT:  No objection?

11             MR. STRONGMAN:  No objection, Your Honor.

12             THE COURT:  Thank you.

13             MR. STRONGMAN:  Thank you.

14             MR. MICELI:  Do you mind if I put it on the overhead?

15             MR. STRONGMAN:  No, I don't.  Thank you.

16   BY MR. MICELI:

17   Q.  Now, these are going to be some mind-numbing numbers, I know,

18   but we're not going to keep it up here long, Dr. Madigan.  Does

19   Table 5 reflect the results of one of your analyses?

20   A.  It does.

21   Q.  And can you explain what this analysis is?

22   A.  Sure.  So this is an analysis of FAERS, the FDA's database, and

23   yes, I apologize.  It's an eye full.  So the rows are different

24   years.  So I did this analysis as it would have looked in 2002,

25   2003, 2004, et cetera.  So that's what the rows are.  The columns

```
 1    are different drugs.  So the first one is docetaxel -- that's
 2    Taxotere -- and then there are one, two, three, four, five, six,
 3    seven other drugs that I ran as comparators to see what they looked
 4    like.  But just focus on -- I guess it's the docetaxel column.  So
 5    if you look at the last entry, for example.  So if you did an
 6    analysis of FAERS using a particular method here, it's something
 7    called "maximum likelihood logistic regression."  It's one of the
 8    six ways that I looked at this.  And the 2.73 that you see there
 9    says that the reporting of permanent alopecia was 2.7 times
10    higher -- 2.73 times higher on Taxotere than other drugs in the
11    database.
12              What's beside then, the next two numbers inside that
13    interval with the brackets around it, that's a so-called
14    "confidence interval."  So the lower end of that confidence
15    interval is 1.4.  So that's -- loosely speaking, that's saying, you
16    know, we're not entirely sure what the true reporting ratio is here
17    but we're pretty darn sure it's bigger than 1.4 and in particular,
18    we're pretty darn sure it's bigger than 1.  So 1 would mean
19    there's -- it's neutral.  That the reporting rate on Taxotere is
20    the same as every other drug.  So in this case here, you know, that
21    interval does not include 1, so it is statistically significant.
22    Q.  Okay.  Let's talk about that lower number and I am going to try
23    to use this as a pointer.  This number right here, 1.4.  If we go
24    to its next-door neighbor, paclitaxel, that's below 1, right? .64?
25    A.  That's right.
```

1  Q.  What does it mean the confidence interval -- the lower

2  number -- is below 1?

3  A.  So, you know, it means that there is -- you know, that it's not

4  statistically significant.

5  Q.  Okay.  So if we were to take all of the statistically

6  significant -- insignificant or non-statistically significant

7  numbers off of this chart, it would look like this, correct?

8  A.  You need to scratch out the one on the top.

9  Q.  Right.  Because you're talking about that line that we draw,

10 this one right here, we would have to scratch through because of

11 the .98, right?

12 A.  Yeah.

13 Q.  You told us about that line in the sand where on this side it's

14 statistically significant and on this side, we're not so sure,

15 right?

16 A.  Yep.

17 Q.  But at .98, you're just two one-hundredths, two pennies in a

18 dollar away from statistical significance, right?

19 A.  That's right.

20 Q.  Okay.  All right.  Now, what is the importance of looking at a

21 safety signal in the FAERS database and comparing it to the other

22 drugs that were on that chart?

23 A.  So the column that we focused on is what it is -- that's the

24 finding for Taxotere.  You know, Taxotere as compared to the

25 background in FAERS.  And a somewhat common practice -- very

1    standard practice is to do the same analysis for other drugs for

2    the same indication.  And the logic here is when you look at the

3    column for docetaxel, you might ask the question:  Is that because

4    of the drug, or is that because of the underlying condition that

5    the drug is prescribed for and is that why we're seeing more

6    reports?  The idea is, well, let's run the same analysis for other

7    drugs that are used for the same disease and see if they show a

8    signal.  So if they all showed a signal -- if they all looked like

9    docetaxel looks, you would say, hmm, you know, maybe it's the

10   cancer that's doing this, not the drug.  But, you know, in this

11   case, it's -- you know, the only one that signals is docetaxel so

12   that, to all intents and purposes, rules out, you know, what we

13   call "confounding by indication," that the -- it's the underlying

14   disease kind of can't be.  If it was the underlying disease, you

15   should see it across the table.

16   Q.  If it was an underlying -- well, can you give us an example of

17   something that would be an underlying disease?

18   A.  Cancer.

19   Q.  Sure.

20   A.  You know, so these drugs are all used and prescribed for

21   patients with cancer.  So, you know, if cancer in and of itself

22   caused permanent alopecia, well, then you would expect to see a

23   signal in every single column here because all of these patients

24   have cancer.

25   Q.  And if all of these drugs caused permanent alopecia, what would

1   you expect to see?

2   A.  You would -- if all of these drugs individually caused it, you

3   would expect to see a signal for all of them.

4   Q.  Okay.  Thank you.

5           Did you do -- at my request, did you do a pictorial

6   depiction of the chart we've been looking at?

7   A.  Yes, I think so.

8           MR. MICELI:  I've already shown it to Mr. Strongman.  I

9   just want to move it along, Your Honor.

10          THE COURT:  Thank you.

11  BY MR. MICELI:

12  Q.  Does this pictorially describe what we've been looking at in

13  the chart?

14  A.  Yes.

15  Q.  And can you explain to the jury what that line straight across

16  at 2 is?

17  A.  So a 2 here corresponds to a doubling of the risk, and so it's

18  somewhat standard in this context to use a doubling as a signal

19  threshold.  So if you see something that's doubling the risk,

20  generally speaking, people call that a "signal."

21  Q.  Okay.  Doubling of the risk of reporting permanent alopecia?

22  A.  Right.

23  Q.  Okay.  All right.  Now, you told us that -- I think you told

24  us -- that you can't prove causation with a signal detection,

25  correct?

1   A.  Correct.

2   Q.  All right.  Is it supportive of your opinion -- or what

3   relevance does it have to your opinion on the statistically

4   significant association demonstrated in your FAERS analysis?

5   A.  So it's supported.  As I said, I looked at these different

6   strands of evidence, and, you know, they're all pointing in the

7   same direction.

8   Q.  Okay.  All right.  We've talked about the meta-analysis, we've

9   talked about the FAERS database.  We have two other items we need

10  to discuss.  Did you look at -- I think you mentioned the

11  pharmacovigilance database?

12  A.  Right.  So the company maintains its own -- all companies do --

13  maintains its own database of reports that -- voluntary reports

14  that flow into it.

15  Q.  Okay.  And can you tell the jury what you did to investigate

16  the Sanofi's pharmacovigilance database.

17  A.  So in that context, I just wanted to see, you know, how many

18  reports -- you know, were they getting reports of permanent

19  alopecia flowing into their database.  So in that context -- as I

20  mentioned a few minutes ago, these voluntary reports, it's a

21  MedWatch or CIOMS.  There are different versions of it.  It's a

22  form that you fill out, and there's a narrative on the form where

23  you describe -- sometimes at great length, you describe, you know,

24  what happened to you.  In the context of FAERS, I don't actually

25  have those narratives.  They're -- the FDA does not release the

1    narratives when they release the data.  They just release the codes

2    that they've assigned.

3           For Sanofi's database, I didn't have the codes.  I had

4    the narratives.  So the question then is, okay, how do you identify

5    cases of permanent alopecia then, you know, in the database, given

6    that you just have these little, you know, narratives or stories

7    that people wrote?

8           So what I did in that context is, I consulted with Dr. --

9    that's a clinical exercise, then.  That is outside the scope of my

10   expertise.  So I consulted with Dr. Tosti, and she provided me with

11   search terms that -- you know, search for these terms.  If you find

12   these terms in the narrative, then that's indicative of permanent

13   alopecia.  So that's what I did.  I just took these search terms,

14   and I ran an analysis that is -- it's very simple.  It just shows

15   the number of reports in Sanofi's database over time that -- you

16   know, Taxotere reports that represent permanent alopecia per

17   Dr. Tosti's search terms.

18   Q.  And what did your study -- or what did your investigation

19   reveal?

20          MR. STRONGMAN:  Your Honor, may we just approach briefly?

21          THE COURT:  Yes.

22      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

23          MR. STRONGMAN:  I just didn't want to interrupt

24   Mr. Miceli in the middle of a question, I know what the witness

25   will say.  These reports, I want to make sure he's talking about

1    the numbers relevant to the time period at issue in the case, and

2    is he going to spit out -- because we don't have a demonstrative on

3    that.

4         MR. MICELI:  I'm not going to put a demonstrative up on

5    this.

6         MR. STRONGMAN:  Right.  But, I mean, I didn't want him to

7    spit it out.  I looked at these all, all the way through, all of

8    these dates --

9         THE COURT:  Which is 2021.

10        MR. STRONGMAN:  That's all I am just making sure he

11   doesn't say.

12        MR. MICELI:  Okay.  I'll make sure I limit it.

13        THE COURT:  Okay.

14        MR. STRONGMAN:  Thank you.

15        THE COURT:  Thank you.

16     (OPEN COURT.)

17   BY MR. MICELI:

18   Q.  Dr. Madigan, I want to try to limit your response to my

19   question about what the search of the pharmacovigilance database --

20   Sanofi's pharmacovigilance database revealed prior to -- including

21   and prior to 2008.  2008 is the year that Ms. Kahn received her

22   Taxotere, so -- so if there are numbers that you have that go

23   beyond that, let's just talk in generalities then, okay?

24   A.  Okay.

25   Q.  Okay.  What did your study or investigation into the

1    pharmacovigilance database -- Sanofi's pharmacovigilance database

2    reveal?

3    A.  Can I have my report?

4    Q.  Do you have it with you?

5    A.  No.

6    Q.  I will provide that to you.

7    A.  Thank you very much.  So through 2008, my analysis identifies

8    47 reports.

9    Q.  Okay.  And you have an 11.6 percent over to the right of that.

10   What does that number reveal?

11   A.  That's just the percentage of all alopecia reports in that year

12   that were identified as permanent.

13   Q.  Okay.  So 11 percent of the reports that they received up to

14   that year, or just that year?

15   A.  Just that year, alopecia reports.

16   Q.  Okay.  And does the 47 reports, is that just for 2008, or

17   cumulative up to --

18   A.  That's cumulative.

19   Q.  Okay.  Thank you.  All right.  And what was the purpose of

20   running the search in Sanofi's pharmacovigilance database?

21   A.  Again, it's just -- you know, it's supportive.  It's a strand

22   of evidence.  You know, if indeed Taxotere is causing permanent

23   alopecia, you'd expect to see reports coming into their database,

24   and, you know, there they are.

25   Q.  Okay.  Did you do any statistical analyses, or did you just do

1    a search?

2    A.    I just did simple arithmetic.

3    Q.    Okay.

4    A.    Counted up the number of reports that satisfied the search

5    criteria.

6    Q.    Okay.    Again, I hate to keep jumping forward and then going

7    back, but when you did your FAERS analysis, how did you define

8    "permanent alopecia"?

9    A.    So, okay.    Switching back to FAERS.    So I don't have the

10   narratives, one doesn't have the narratives, so I'm working from

11   the publicly released FAERS data, which has -- you know, each

12   report has the name of the drug and then the adverse events codes

13   that a medical coder applied to the narrative.

14          So there is no code in the standard dictionary.    There's

15   a medical dictionary for adverse events.    There is no code for

16   permanent alopecia.    So what I did, and this arises another context

17   as well, there is a code for alopecia, alopecias.    So I did use

18   that code.    But then there's another place on the MedWatch form

19   where you mark -- you can mark an outcome, you check a box.    One of

20   those outcomes is permanent or permanent and disabled -- the

21   language can vary -- but it indicates disability or permanence.

22          So what I did was, I looked for -- when I did my FAERS

23   analysis, I looked for reports that had the code "alopecia," and

24   had that box checked.    So that's what I did.

25   Q.    Okay.

1  A.  And this is not uncommon.  It's -- for example, if you're doing

2  a study, as I have done, of cardiovascular deaths, there are codes

3  for cardiovascular diseases, but not necessarily whether they were

4  fatal or not.  But there's a box for death as an outcome.  So you

5  look at the combination of the code and the outcome to define what

6  you're looking for.

7  Q.  Did you apply that same search criteria for Taxotere and all of

8  the comparator drugs?

9  A.  And the background.  Everything.  So the entire analysis

10  involves looking at that outcome, alopecia, plus box-checked, for

11  everything -- for every report in the database.

12  Q.  Okay.  And did you find positive hits in that database?

13  A.  I found -- yes.

14  Q.  Well, you found an increase.  We already talked about that.  I

15  apologize.

16        When -- when would it be appropriate, if it is

17  appropriate, to actually pull the reports and check only the

18  reports that test -- that showed positive hits on your search

19  criteria?

20  A.  So the problem is that that's generally inappropriate in the

21  context of the kind of analysis I'm doing, a statistical analysis.

22  Because the analysis I'm doing that we looked at on the screen a

23  minute ago, it actually includes every single report in the

24  database, millions of reports, because you look at the Taxotere

25  reports and you look at the non-Taxotere reports.  So if -- if --

```
 1   you know, this wouldn't be a statistical exercise.  If you wanted
 2   to look at the narratives, for example, you'd have to look at all
 3   of them, right; millions and millions of them.  And, you know, that
 4   kind of -- that's what was done in the first place.  That's why the
 5   coders, you know, they looked at the narratives and applied these
 6   codes.  So, you know, it is not an analysis I would ever do.
 7   Q.  Okay.
 8   A.  Or a statistician would ever do.
 9   Q.  I mean, is it even possible to do that --
10   A.  I mean --
11   Q.  -- if you had a lifetime?
12   A.  Exactly.  Given infinite resources, you could.
13   Q.  Okay.  Thank you.  Now, I want to go to the fourth strand of
14   evidence that you told us you looked into, and that was
15   observational studies.  What observational studies did you review?
16   A.  So my goal in this piece of the -- my work, this strand of
17   evidence, was to identify any and all observational studies that
18   were relevant, that provided some evidence with respect to the
19   question of Taxotere and permanent alopecia.  So I conducted a
20   search using a number of electronic databases.
21          So there are a number of companies out there that provide
22   databases of the scientific literature.  So they provide a
23   mechanism by which you can search the scientific literature.  So
24   it's, you know, a typical step one in a met -- not a -- in an
25   observational study analysis retrospective, a typical step one is
```

1    to conduct a search in one of these databases.  I actually did the

2    search in three different databases, and that process identified

3    four studies.

4    Q.  Okay.  What are those four studies?

5    A.  Sorry.  So I can identify them by the name of the first author.

6    Q.  Yeah.

7    A.  So the four --

8    Q.  I think we've heard them all so far, so --

9    A.  Oh, okay.  Okay.

10   Q.  -- please continue.

11   A.  So the four studies that, you know, came out of that search --

12   and it's, you know, I used search terms.  The four studies that

13   emerged were Crown, Kang, Martine, and Sedlacek.

14   Q.  Okay.  What's the common characteristic about these four that

15   was important to you?

16   A.  That they are -- well, they're observational studies, and they

17   provide a comparison of Taxotere with a comparator.

18   Q.  Okay.  And why is that important for a statistician?

19   A.  So if you're looking at -- you know, at the end of the day, a

20   statistical causation question, you know, you need a comparator.

21   You need something to compare Taxotere to.  You know, if you just

22   look at Taxotere, then, you know, you find X number of people have

23   permanent alopecia following, you know, a use of Taxotere, but the

24   question is:  Is that more or less than with other -- in other

25   contexts?  So you need a comparator in order to generate evidence

 1   relevant to the causal question.

 2   Q.  Okay.

 3           MR. MICELI:  Well, can I approach, Your Honor?

 4           THE COURT:  Yes, you may.

 5   BY MR. MICELI:

 6   Q.  I want to walk through this with you, Dr. Madigan.  Okay.  Can

 7   you identify that article for us.

 8   A.  So that's the Crown study.  That's the first one I mentioned.

 9   Q.  All right.  Could you please explain to the jury what was

10   pertinent -- what your pertinent findings were in this study.

11   A.  Sure.  So this, the Crown study, identified permanent alopecia

12   in all of the people who took -- let me back up, actually.

13           So what I focused on here in Crown is docetaxel versus

14   non-docetaxel.  So I looked at the patients whose regimen included

15   docetaxel versus the patients whose regimen did not include

16   docetaxel.  So 260 patients, their regimen included docetaxel.  Of

17   those patients, 39 had permanent alopecia per the Crown article.

18   And patients with regimens that did not include docetaxel was 35

19   patients.  And of those 35 patients, four had permanent alopecia.

20           So, you know, what I looked at here was something called

21   the odds ratio.  It's basically, like, what's the rate of permanent

22   alopecia on docetaxel as compared with the rate of alopecia on

23   non-docetaxel.  That ratio is 1.37.  So it's -- there's a --

24   permanent alopecia is 37 percent more likely -- in this study,

25   37 percent are more likely on the docetaxel as against

1    non-docetaxel.

2    Q.  Just to be clear, Doctor, I know docetaxel and Taxotere are the

3    same drug; it's different names for the same product, at least as

4    it regards Sanofi.  We've been referring to Taxotere throughout the

5    trial, so we're talking about Taxotere-in and Taxotere-out groups,

6    right?

7    A.  Yes.

8    Q.  Okay.  And you said it was 1.37?

9    A.  Right.

10   Q.  Okay.

11   A.  So there's a 37 percent increased risk on Taxotere as against

12   non-Taxotere.

13   Q.  Was that finding statistically significant?

14   A.  No.

15   Q.  Okay.  Let me show you the next of the four articles.

16   A.  Thank you.

17   Q.  Can you identify this for us, please.

18   A.  So this is the Kang article.

19   Q.  Okay.  And please explain your pertinent findings from this

20   study, or what is important to you in this study.

21   A.  So in this study, the author actually did an analysis looking

22   at the risk of permanent alopecia on Taxotere versus the

23   non-Taxotere.  So, you know, I didn't go to the -- he did the

24   analysis.  He used something called "logistic regression."

25   Q.  Okay.

```
 1    A.  I can describe.  So in his context, what he found was an
 2    eightfold increased risk of what he refers to as PCIA.  An
 3    eightfold increased risk on Taxotere as against non-Taxotere.  And
 4    that is -- that finding is statistically significant.
 5    Q.  Okay.  I'm sorry.  I'm walking over here, Doctor.
 6              MR. MICELI:  Your Honor, is it okay if I walk through
 7    these with him?
 8              THE COURT:  Yes.
 9    BY MR. MICELI:
10    Q.  Okay.  So we put -- first was Crown, and that was 1.37.  But
11    not statistically significant, correct?
12    A.  Correct.
13    Q.  And the next one we did was Kang?
14    A.  Yes.
15    Q.  And that was eightfold, did you say?
16    A.  8.01.
17    Q.  8.01.  And was that statistically significant?
18    A.  Yes.
19    Q.  Okay.  Okay.  Now, when we talk about an 8.01 odds ratio, is
20    that reflecting an 800 percent increase?
21    A.  Yes.
22    Q.  Okay.  Let's look at the next one.  Well, let me back up.
23    These two studies, observational studies we've discussed so far,
24    did they provide supportive information for your opinion?
25    A.  Yes.
```

1    Q.  Okay.  I apologize.  We're going to go to Sedlacek next.  I'm

2    going to go a little bit out of order.

3               MR. MICELI:  May I approach, Your Honor?

4               THE COURT:  Yes, you may.

5               MR. MICELI:  Thank you.

6    BY MR. MICELI:

7    Q.  Well, can you identify this for us, Doctor.

8    A.  So this is the Sedlacek study.

9    Q.  Okay.  And what was important about the Sedlacek study for your

10   review?

11   A.  It's an observational study where the author compared -- you

12   know, considered close to 500 patients.  Some of these patients

13   received a regimen containing Taxotere, and some didn't.  So that

14   enables a comparison.

15   Q.  And was this study statistically significant?

16   A.  Yes.

17   Q.  And what was the odds ratio in this study?

18   A.  54.7.

19   Q.  54.7.  Is that 1.47, or is that 547, or is it 54?

20   A.  54.7.

21   Q.  Okay.  And was that statistically significant?

22   A.  Yes.

23               MR. MICELI:  I didn't ask, I just --

24               THE COURT:  You may.

25               MR. MICELI:  Thank you, Your Honor.  Here you go, Doctor.

1        THE WITNESS:  Thank you.

2   BY MR. MICELI:

3   Q.  Is this the Martine study that you looked at?

4   A.  Yes.

5   Q.  Okay.  What was significant about this for your opinions?

6   A.  So same answer.  So it's -- you know, they considered -- in

7   this case, it's more than 700 patients, but they considered a set

8   of patients, some of whom had been treated with Taxotere, and some

9   of whom had not been treated with Taxotere.  So that enables a

10  comparison, and I did that comparison.

11  Q.  Okay.  And what did your comparison reveal?

12  A.  So that analysis shows an odds ratio of 3.61.

13  Q.  3.61.  Was that statistically significant?

14  A.  Yes.

15  Q.  Okay.  Any other observational studies?

16  A.  No.

17  Q.  Okay.  And each of these observational studies had Taxotere-in

18  and Taxotere-out?

19  A.  That's right.

20  Q.  Okay.  Well, based upon all of the strands of evidence, do you

21  have an opinion as to whether or not Taxotere demonstrates a

22  statistically increased causal inference for the adverse reaction

23  of permanent chemotherapy-induced alopecia?

24  A.  Yes.  I believe there's adequate statistical evidence that it

25  causes it.

```
 1   Q.  Okay.

 2           MR. MICELI:  One second.  Nothing further at this time,

 3   Your Honor.  Thank you.

 4           THE COURT:  Okay.

 5           MR. MICELI:  Thank you, Dr. Madigan.

 6           THE COURT:  All right.  It's 10 after 10:00.  It's a good

 7   time for our morning break.  Court will be at recess until 10:20.

 8   Please do not discuss the case amongst yourselves or with anyone

 9   else.

10           THE DEPUTY CLERK:  All rise.

11       (WHEREUPON, THE JURY EXITED THE COURTROOM.)

12           THE COURT:  Dr. Madigan, I remind you that you cannot

13   discuss your testimony with counsel --

14           THE WITNESS:  Sure.  Thank you.

15           THE COURT:  -- or with anyone else.

16       (WHEREUPON, A RECESS WAS TAKEN.)

17       (OPEN COURT.)

18       (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

19           THE COURT:  All jurors present.  Court's back in session.

20   You may be seated.

21           Dr. Madigan, I remind you, you're under oath.

22   Mr. Strongman.

23           MR. STRONGMAN:  Good morning.  Thank you.

24                       CROSS-EXAMINATION

25   BY MR. STRONGMAN:
```

1   Q.  Good morning, ladies and gentlemen.  Good morning, Dr. Madigan.

2   Good to see you again.

3   A.  Good morning, Mr. Strongman.

4   Q.  Now, Dr. Madigan, you would agree with me that it's important

5   to make sure that any analysis you do is based on a reliable

6   methodology.  Is that a fair statement?

7   A.  Sure.  In general, yes.

8   Q.  And, Doctor, you would agree with me that you would expect the

9   same level of scientific integrity for the work that you do, in

10  this case, as for the work that you do in matters outside the

11  courtroom, true?

12  A.  Sure.

13  Q.  All right.  Let's jump right into your FAERS analysis, okay?

14  It's one of the strands you talked about.  Let's start there.  You

15  mentioned that the FAERS analysis is an FDA adverse event analysis

16  database; is that correct?

17  A.  FAERS is an FDA database.

18  Q.  Very good.  And within FAERS, you said it's publicly

19  accessible; is that right?

20  A.  Right.

21  Q.  And you can download data from the database, correct?

22  A.  You can download the entire database, yep.

23  Q.  Very good.  And I think you mentioned that there were forms

24  that people could fill out and submit, and you talked about -- that

25  a form could come from a patient, a doctor, a company.  Do you

1  remember that testimony?

2  A.  Sure.  I mean, the form could be submitted to a doctor or a --

3  you know, or a company.

4  Q.  Right.  And then it's submitted into the FDA database, correct?

5  A.  Maybe yes, maybe no.

6  Q.  Okay.  And I want to look at that form real quickly and walk

7  through your methodology, okay?  All right.  And, Doctor, this is a

8  MedWatch form; is that correct?

9  A.  Yes.

10 Q.  Okay.  And this is an example of one of the forms that you've

11 said could be filled out by someone and submitted to the FDA, and

12 then coded into the database; is that correct?

13 A.  Sure, yes.

14 Q.  Okay.  And so with regard to the methodology that you used, in

15 this case, I think you explained it, and I want to just confirm.

16 What you said is that you first looked for MedWatch forms that

17 involved Taxotere, correct, as a product?

18 A.  Well, the analysis looks at the entire database.

19 Q.  Fair enough.  But you had -- an input for Taxotere was one of

20 the searches that you did, correct?

21 A.  Sure.  I didn't do searches, I did analysis, right?  So my

22 analysis identifies reports containing Taxotere, and it identifies

23 reports that don't contain Taxotere.

24 Q.  Very good.  And I want to focus on your -- I'll use the word

25 "analysis" so we're on the same page; fair enough?

1   A.  Sure.

2   Q.  And for your analysis on the reports that involved Taxotere,

3   that would mean that Taxotere would show up right here, like, in

4   the suspect products or in the concomitant products part of the

5   form; is that correct?

6           MR. MICELI:  Your Honor, can we approach on the side for

7   a second?  I just want to ask a question.

8           THE COURT:  Sure.

9      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10          MR. MICELI:  He talked about an electronic search, he

11  didn't talk about -- he did talk about a MedWatch form, and I

12  haven't objected to it.  But he hasn't talked about filling out

13  MedWatch forms in his work.  He said he doesn't review those, and

14  he's going to go over what doctors and patients did.

15          MR. STRONGMAN:  I am talking about the form that then

16  gets inputted into the database --

17          THE COURT:  I am going to allow it.

18          MR. MICELI:  Okay.  That's --

19          MR. STRONGMAN:  Yeah.

20          THE COURT:  I am going to allow it.

21     (OPEN COURT.)

22          THE COURT:  Please proceed.

23          MR. STRONGMAN:  All right.

24  BY MR. STRONGMAN:

25  Q.  And, Doctor, so for example, on this form, we have Taxotere as

1    a suspect product as I've filled it out; fair enough?

2    A.  Yes.

3    Q.  Okay.  And then you also looked for data in the database that

4    included a -- I think you called it a high-level term of alopecia,

5    correct?

6    A.  Sure.  It's a code.  So it's not -- I don't have the text

7    that's in that box.  What I have are the codes that were assigned

8    to the report.

9    Q.  Okay.  And then you also talked about having the box checked

10   for disability or permanent damage; is that correct?

11   A.  Yes.

12   Q.  And so when you did your analysis, these were the three factors

13   that you were looking at as it related to the reports on Taxotere,

14   correct?

15   A.  I also look at age, sex, and year of report in the analysis.

16   And in some of the analysis, I look at other drugs.  So it varies

17   according to my analysis.

18   Q.  And what we know is -- you mentioned there are some limitations

19   to the FDA database, correct?

20   A.  In general, sure, yes.

21   Q.  So when a MedWatch form like this is submitted to the FDA and

22   put into the database, we know there can be multiple products

23   listed, correct?

24   A.  Certainly, yes.  In Section C, there could be several drugs

25   listed.

1  Q.  Right.  And with regard to the adverse event, there could be

2  several adverse events listed as well, correct?

3  A.  There could be several different codes assigned to the report.

4  Q.  Fair point.  So you could have one code for an adverse event

5  assigned, or you could have 15 codes for 15 different adverse

6  events assigned, depending on what the reviewer decided; fair

7  enough?

8  A.  Sure.  I don't know about 15, but, yeah, sure.  There can

9  certainly be more than one.

10  Q.  And what we also know is that there's nothing in the report

11  that ties the disability box that's checked to any one particular

12  adverse event, correct?

13  A.  Not specifically.  So the box pertains to the report, not the

14  specific adverse event, if there's more than one.  Obviously, if

15  there's only one --

16  Q.  Fair enough.

17  A.  -- it's specific, but if there's more than one, the box is at

18  the level of the report.

19  Q.  And so what someone can do is, they can report alopecia, liver

20  problems, neuropathy, organ failure all on one report; fair enough?

21  A.  Sure, they could.

22  Q.  And there could be a box checked for disability or permanent

23  damage, and you don't know whether that applies to the alopecia, to

24  the organ failure, to the neuropathy, or to the liver problems,

25  correct?

1  A.  So the injuries -- you know, some of the injuries are permanent

2  or a cause of disability, but it's not specific to any one of them.

3  Q.  And so you could have a report that read, "Alopecia on

4  treatment, organ failure ongoing," and that could have come up in

5  your analysis, correct?

6  A.  I don't know because I don't look at the narratives.

7  Q.  It's possible, right?

8  A.  I don't know.  I suppose so.

9  Q.  You could also have an adverse event report like this that said

10  "Taxotere," and also identify tamoxifen as another product that the

11  patient used, correct?

12  A.  Could that happen, yes.  That could happen.

13  Q.  Very good.  And you could have a report that said, "Alopecia on

14  hormone therapy, alopecia after chemotherapy resolved."  And then

15  the box for permanent damage is checked.  That could turn up as a

16  hit in your analysis, true?

17  A.  Certainly, theoretically, it could, yes.

18  Q.  And, Doctor, you could have a report that said, "Patient

19  received Taxotere, had an allergic reaction and alopecia while

20  taking Taxotere, patient died while still on chemotherapy."  That

21  could turn up as a hit on your report, as long as the box for

22  disability was checked, alopecia was coded, and Taxotere was

23  identified, correct?

24  A.  The way you described it, I'd expect the death box to be

25  checked.

 1   Q.  And you can check death and permanent damage or disability,

 2   correct?  You can check two boxes, right?

 3   A.  Oh, you mean when you fill in the report, can you check in more

 4   than one -- can you check more than one box, yes.

 5   Q.  For example, look at this one.  We have Taxotere as a product,

 6   we have disability, permanent damage, we have death, we have

 7   alopecia.  Do you see that, what I've highlighted, Doctor?

 8   A.  I do.

 9   Q.  And an adverse event like this, "Patient had allergic reaction

10   and alopecia while taking chemotherapy, patient died while still

11   taking chemotherapy of progressive cancer," this could possibly

12   come up in your analysis, correct?

13   A.  It could.  I mean, it could also come up on the comparator

14   drugs for the background.  You know, what you're describing here is

15   not specific to Taxotere.

16   Q.  Fair enough.  So when you did all of your analyses on the

17   comparator drugs, this same problem could happen there; fair

18   enough?

19   A.  Not just the comparator drugs.  Any drug in the database, you

20   know, what you're describing here could occur.

21   Q.  But your analysis certainly didn't do anything to prevent an

22   adverse event form like this from being a hit in your analysis for

23   any particular medication that you looked at, correct?

24        MR. MICELI:  Object.  It's outside of the scope.

25        THE COURT:  I am going to allow it.  Answer this question

```
 1    and then move on.
 2                THE WITNESS:  So, you know, as I described, you know, if
 3    you were to entertain an exercise like that, you would need to
 4    look -- need to pull the narratives for every single report in the
 5    entire FAERS database.  It's not something I would do.  I wouldn't
 6    have the expertise to do.
 7    BY MR. STRONGMAN:
 8    Q.  And my question was -- and last question on this topic -- was
 9    just, nothing in your methodology eliminated a report like this
10    from returning a hit, correct?
11    A.  No.  As described, you know, code is alopecia, box is checked
12    for disability or permanent damage and the, you know, then it will
13    count as permanent alopecia.
14    Q.  And I think you mentioned that -- you answered one of my
15    questions just a minute ago that you never went and actually pulled
16    the narratives and actually looked at them, correct?
17    A.  Nor would I.
18    Q.  Okay.  And when you said that you could actually go to the FDA
19    database and run a report or spit out data, correct, you said
20    there's like a big table of information that's coded to each event,
21    correct?
22                MR. MICELI:  I object.  I think it misstates the
23    testimony.  I think it's confusing to --
24                MR. STRONGMAN:  Speaking objections.
25                THE COURT:  Rephrase your question.
```

```
 1              MR. STRONGMAN:  Sure.
 2    BY MR. STRONGMAN:
 3    Q.  So one of the pieces of information that you are able to
 4    ascertain is the manufacturer control number for a particular
 5    adverse event, correct?
 6    A.  Sure.  And maybe I should explain?  So --
 7    Q.  Sure.
 8    A.  When -- these reports that we're talking about, when they
 9    arrive at a pharmaceutical company, the companies attach a number
10    to it -- a "manufacturer's control number" is what is referred
11    to -- so basically, to enable a kind of tracking.  So when they
12    send it in to the FDA -- if they send it in to the FDA -- that
13    number goes with it so you can see those numbers in the FDA
14    database.
15    Q.  And my question was, when you said you could publicly access
16    that database, the manufacturer control number is one of the pieces
17    of information that you can access, correct?
18    A.  If it's there.  It's not always present, but, yes, for many
19    reports you can.
20    Q.  And, Doctor, did you pull the manufacturer control number for
21    any of the adverse events in your FAERS analysis?
22    A.  Not that I recall.  I mean, it's irrelevant.  I did a
23    quantitative analysis of the FAERS database.
24    Q.  I understand.  And my question was just, did you pull
25    manufacturer control numbers?  Yes or no.
```

 1   A.  I suppose I'm stumped about "pull -- pull the numbers."  I

 2   mean, I didn't look at the manufacturer's control -- the control

 3   codes.  They're not of any relevance to the -- you know, to the

 4   analysis I was conducting.

 5   Q.  Okay.  And, Doctor, I want to orient you.  This was a chart

 6   that Mr. Miceli showed you, and I think this is pulled from one of

 7   the tables in your expert report; is that correct?

 8   A.  Right.

 9   Q.  And behind these lines -- each of these lines on here -- are

10   numbers, correct?

11   A.  The numbers were actually on the screen.

12   Q.  Now, I want you to focus on the time from when Taxotere was

13   approved in 1996 all the way up to Quarter 1 of 2008 when Ms. Kahn

14   received her chemotherapy, okay?  Are you with me?

15   A.  I am with you.

16   Q.  How many reports hit for Taxotere in your analysis by that

17   time?

18   A.  I don't actually know.  I need the underlying spreadsheet.  I

19   don't have that in my head.

20          MR. STRONGMAN:  May I approach, Your Honor?

21          THE COURT:  Yes, you may.

22          MR. STRONGMAN:  This has your report in it.  This also

23   has the appendix.

24          THE WITNESS:  Thank you very much.

25   BY MR. STRONGMAN:

```
1    Q.  All right.  Doctor, what I've handed you is Appendix 4, and
2    this is something you produced to us as part of your expert report,
3    correct?
4    A.  Yes.
5    Q.  Okay.  And what it is, is it's a listing of data regarding your
6    FAERS analysis, correct?
7    A.  Sure.
8    Q.  And you had it broken out by year and quarter, correct?
9    A.  Sure.  So it shows quarter by quarter what the numbers are at
10   that moment and what the various statistics are at that moment.
11   Q.  Okay.  And so what you did in your statistical analysis is that
12   you had how many events you would expect to see and then how many
13   you actually observed.  You have an "Expected" column and an
14   "Observed" column, correct?
15   A.  That's right.
16   Q.  So as of Quarter 1, 2008, how many reports in your analysis
17   were actually observed with Taxotere?
18   A.  Six.
19   Q.  Six.  So all of the statistics that you ran, all of the charts
20   that you showed with Mr. Miceli, were based on six reports over
21   12 years, correct?
22   A.  No.  So they're based on the entire database, you know -- if
23   you're focusing specifically on Quarter 1 of 2008, the analysis is
24   based on everything in the database as of that time.
25   Q.  And for Taxotere as of Quarter 1 2008, six is less than one per
```

```
 1   year, correct?  For how long the product's been on the market,
 2   correct?
 3   A.  Six -- if you say it's eight years, then six is fewer than one
 4   a year.
 5   Q.  Okay.  And Taxotere was approved in 1996 so we're talking about
 6   around 12 years; fair enough?  1996 to 2008?
 7   A.  Sure.
 8   Q.  How many of those six reports involved patients that had hair
 9   loss that actually resolved?
10   A.  I don't understand the question.
11   Q.  Do you know?
12   A.  The six reports are Taxotere was listed as a drug, alopecia is
13   listed as an adverse event, and the permanent and disabled box is
14   checked.  That's what I know.
15   Q.  My question is just, of those six, do you know how many of
16   those patients actually had alopecia that resolved?
17   A.  Per my definition, zero.
18   Q.  You don't know, though, because you didn't look at the
19   narratives, correct?
20   A.  We're back to square one here.  Nor would I.  You would have to
21   look at every single narrative in the entire database.
22               MR. STRONGMAN:  May I approach, Your Honor?
23               THE COURT:  Yes, you may.
24               MR. MICELI:  Your Honor, we're going to have to speak.
25               THE COURT:  Okay.
```

```
 1        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

 2            MR. MICELI:  He is going to get into the individual case

 3    reports that are in the database.  And he's already said he does

 4    not look at these, and this is in every one of his depositions and

 5    he does not -- this is not part of his analysis and not part of his

 6    direct examination.  I didn't want to say that.  I can't just stand

 7    up and say outside of the scope because this is --

 8            THE COURT:  I think part of the problem with doing it

 9    this way, it's -- he has said repeatedly that I have to look at

10    everything in the database.  And I would -- do you have all of the

11    comparator drugs case reports?

12            MR. STRONGMAN:  Well, obviously, our position is that

13    this is a test of the reliability of the methodology.  So this is a

14    report -- these are reports that hit on his terms, they're coded to

15    his terms, and it's one of the six.  And I think it's fair to say,

16    here is one of them.  Let's just look at it.  Obviously, I am more

17    than willing to say there's all of these other reports.  This is

18    one of the six.

19            THE COURT:  And did it come from FAERS --

20            MR. STRONGMAN:  Yes.

21            THE COURT:  -- or did it come from Sanofi?

22            MR. STRONGMAN:  No.  I can give you --

23            MR. MICELI:  It comes from the company, I think, Your

24    Honor.

25            MR. STRONGMAN:  I can give the output that shows this is
```

```
 1    in FAERS.
 2              MR. MICELI:  All of that is irrelevant because this is
 3    not part of what he does.  Your Honor --
 4              THE COURT:  Stop.  All right.  I think you have gotten
 5    from him that there are holes in the methodology.  I think showing
 6    him something that he has not seen --
 7              MR. STRONGMAN:  He's --
 8              THE COURT:  Well, he's seen it only in the context of
 9    cross-examination, I guess.
10              MR. STRONGMAN:  Correct.  And depositions.
11              THE COURT:  And depositions because he could not.  FDA
12    wouldn't give it to him; am I right?
13              MR. MICELI:  It's not -- Your Honor --
14              MR. STRONGMAN:  The lawyers could have given it to him
15    when we produced it in the litigation.  So he could have done a
16    FOIA request.
17              THE COURT:  It would have required him to look at all of
18    the others.
19              MR. STRONGMAN:  That's his response; that's not our
20    response.
21              MR. MICELI:  That's the difference --
22              THE COURT:  I think the problem is, is the analysis
23    covers the broader rate and you can't say, all right, we're going
24    to have a problem with this one number without looking at all of
25    them to see if they all have --
```

```
 1              MR. STRONGMAN:  I would just say --

 2              THE COURT:  I am going to sustain the objection.

 3              MR. STRONGMAN:  Fair enough.  Can I just put on the

 4   record?

 5              THE COURT:  Of course.

 6              MR. MICELI:  Not in front of the jury.

 7              MR. STRONGMAN:  No, no, right here.  For the record, this

 8   is a problem that we've raised with his analysis on multiple

 9   motions that when you actually --

10              THE COURT:  Right.

11              MR. STRONGMAN:  -- look at the adverse events that his

12   search is hitting on don't show permanent alopecia.  So our

13   position has been and that if nothing else, this should be the

14   subject of rigorous cross-examination.  So that is our position and

15   Dr. Madigan could have had access to these forms if these were

16   produced in litigation and they were available.

17              MR. MICELI:  I am just --

18              MR. STRONGMAN:  I am just making a record.  She's ruled

19   on your objection.

20              So I understand your objection.  That's our point of

21   view.  I am going to go out there and I'm just going to say, you

22   didn't look at any reports and we'll move on.

23              THE COURT:  Thank you.

24              MR. MICELI:  Thank you.

25          (OPEN COURT.)
```

1    BY MR. STRONGMAN:

2    Q.  Are you ready to proceed, Doctor?

3    A.  Yep.

4    Q.  All right.  And so I want to make sure I understand.  The

5    bottom line is that when you did your FAERS analysis, you didn't

6    find it necessary nor did you actually go and look to see the

7    narrative reports for any of the adverse event forms, correct?

8    A.  You're asking the same question over and over.  I wouldn't, I

9    didn't, I don't; that's not the nature of what I do or what a

10   statistician does in this context.

11   Q.  Okay.  All right, Doctor.  I want to move to TAX316, okay?

12   A.  Okay.

13   Q.  And you talked with Mr. Miceli about TAX316 and TAX301; is that

14   correct?

15   A.  Yes.

16   Q.  And you talked about the randomization.  Do you remember that?

17   A.  I do.

18   Q.  What was the primary endpoint of the TAX316 study?

19   A.  I think it was disease-free survival.

20   Q.  And did you look at the results --

21   A.  Sorry.

22   Q.  No, please.

23   A.  Progression-free survival.

24   Q.  Okay.  And did you look at the results as it related to that

25   primary endpoint when you did your analysis at all?

1    A.  No.

2    Q.  Okay.  So you weren't looking at whether or not Taxotere worked

3    in treating cancer.  That wasn't part of your analysis, fair?

4    A.  Different question.  I looked at one question and one question

5    only.

6    Q.  And I think you're aware that what TAX316 reported on -- and

7    let's focus on TAX316 for one moment, okay?

8    A.  Okay.

9    Q.  And I think we would agree that what TAX316 reported on and

10   what you put up on the table with Mr. Miceli reported what was

11   called "ongoing alopecia," correct?

12   A.  I think that's the term they used, yes, at the end of the

13   study.

14   Q.  And ongoing alopecia was defined as what in the study?

15   A.  Alopecia that had not resolved at the end of follow-up.

16   Q.  Okay.  And so, obviously, for someone to have alopecia a

17   certain amount of time down the road, they had to have been

18   followed-up a certain amount of time down the road, correct?

19   A.  True.

20   Q.  And what the study didn't look at and the question that TAX316

21   didn't ask was, how many of these patients meet the definition of

22   PCIA as it's been set out in the medical literature, correct?

23   A.  I'm -- I am not sure -- kind of outside of the scope of my

24   expertise here --

25   Q.  Okay.

1    A.  I don't know what the definition of PCIA is.

2    Q.  I want you to assume for me -- I want you to make an assumption

3    for me that, in this case, permanent chemotherapy-induced alopecia

4    is defined as hair loss that has not fully resolved at least six

5    months after chemotherapy treatment has ended, okay?

6    A.  Okay.

7    Q.  And you would agree with me that in TAX316, that specific

8    question wasn't asked, correct?

9    A.  It wasn't asked.  I mean, you know, for the individuals with

10   ongoing alopecia at the end of the study, I know -- I have it in

11   front of me -- I know what the follow-up times are, so if you want

12   to apply a six month -- I'm not following.  The data are there.

13   Q.  And I am going to look at some of that data with you.  I want

14   to ask you a couple of questions before we get there.  In your

15   expert report, you provided a table of TAX316 analyses and you had

16   a statistical analysis of TAX316 at the end of the ten-year period,

17   correct?

18   A.  At the conclusion of the study, sure.

19   Q.  Sure.  And you talked with Mr. Miceli about statistical

20   significance.  Do you remember that?

21   A.  I do.

22   Q.  And as it relates to the TAX316 study at the end of the period,

23   there was not a statistically significant difference between

24   ongoing alopecia in the TAC arm and ongoing alopecia in the FAC

25   arm, correct?

1   A.  So in 316 alone, as against looking at the totality of the

2   evidence which is the two studies, in 316 alone, at the conclusion

3   of the study it was 29 ongoing in the TAC arm and 16 ongoing in the

4   FAC arm and that is -- the so-called P-value right is just above 5

5   percent, so in that study, in and of itself, at that time is not

6   statistically significant.

7   Q.  And I think you said before that when it comes to statistical

8   significance, it's a binary question.  You -- it either is or it

9   isn't, correct?

10  A.  Yeah, sure.  It is not.  It is .053.

11  Q.  Okay.  And with regard to TAX301, let's talk about that one for

12  a moment as well, okay?  Are you with me?

13  A.  Sure.

14  Q.  And in TAX301, you did a similar analysis and looked at ongoing

15  alopecia in the TAC arm and the FAC arm at the end of that study as

16  well, correct?

17  A.  Correct.

18  Q.  And the TAX301 study was also not statistically significant at

19  the end of the study for ongoing alopecia in the TAC arm or in the

20  FAC arm, correct?

21  A.  That study in isolation on its own was not statistically

22  significant.

23  Q.  And what I believe you said to Mr. Miceli is that when

24  something is not statistically significant, it means in scientific

25  language that you're not comfortable enough that chance has been

1  ruled out, correct?

2  A.  Yeah, that's not unreasonable.  And that -- you know, but you

3  need to look at the totality of the evidence.  You need to look at

4  the -- what we learned from the randomized trials -- in this case,

5  it's 2.  It is statistically significant.

6  Q.  So what you did is you took one statistically -- strike that.

7       What you did is you took one statistically insignificant

8  study, you added it to another statistically insignificant study,

9  and, boom, you got a statistically significant result in your

10  meta-analysis, correct?

11  A.  I certainly don't -- that describes a sequence which is not

12  what I did.  I did a meta-analysis.  The meta-analysis shows

13  statistical significance.

14  Q.  Okay.

15       MR. STRONGMAN:  May I approach, Your Honor?

16       THE COURT:  Yes, you may.

17       THE WITNESS:  Thank you very much.

18       MR. STRONGMAN:  Absolutely.

19  BY MR. STRONGMAN:

20  Q.  And, Doctor, what I've handed you is a table of data from

21  TAX316 that you've reviewed before, correct?

22  A.  Yes.

23       MR. STRONGMAN:  And do you mind if I display it just for

24  demonstrative purposes?

25       MR. MICELI:  No, go ahead.

```
 1    BY MR. STRONGMAN:
 2    Q.  And, Doctor, I think you testified that this table supports --
 3    is supportive of your opinion in this case, correct?  Consistent
 4    with your opinion?
 5    A.  Sure, consistent with.  Fine.
 6    Q.  All right.  And so this is an example here of some of the line
 7    listings that you were talking about.  And so what we have is we
 8    have "Alopecia" here listed -- again, these are each individual
 9    patients in TAX316, correct?
10    A.  Sorry.  I'm just stumping over what you said a second ago.
11    These are indicative of line listings --
12    Q.  I said these are just some of the -- you said data is collected
13    and it's in -- big outputs of data are collected and then you can
14    generate charts like this from the data?
15    A.  Sure.  But this is not the raw data, right?  This was generated
16    through an analysis of the locked raw data.  This is not one of the
17    underlying --
18    Q.  Very good.  So this is just an analysis generated from the
19    locked data, correct?
20    A.  Yes.
21    Q.  Okay.  And so what we have here is this is the line listing of
22    "Alopecia" and this is in the TAC arm, correct?
23    A.  Yes.
24    Q.  And then up here you have, "Date of last IV plus 30 days, date
25    of last follow-up, follow-up duration."  Do you see that?
```

1   A.  I do.

2   Q.  Okay.  And so if you count up all of the numbers under the TAC

3   arm there, and it goes to the next page and then we have the FAC

4   arm.  If you count them up you're going to get the 29 and 16 that

5   you've talked about; fair enough?

6   A.  Okay.

7   Q.  And you know, Doctor, when it comes to defining ongoing

8   alopecia in this study, if somebody, like, had alopecia the last

9   time they were seen but then passed away, it could be considered

10  ongoing in this study, correct?

11  A.  Yeah.  It's through the end of follow-up for, you know, however

12  that ends.

13  Q.  And somebody could be given additional chemotherapy medication,

14  like Taxol for example if they had an allergic reaction to

15  Taxotere, but they could still be considered as ongoing for adverse

16  events in this study, correct?

17  A.  So they -- you know, somebody could have another round of

18  chemotherapy because of a relapse, so they, you know, they -- yeah,

19  and say their alopecia continued after that, they could be

20  considered as ongoing.  But to that specific point, that's actually

21  something I looked at.  There are 9 patients -- amongst the 29 and

22  the 16, 9 of these people had what's called "Chemo 2," and 9 of

23  these people had Chemo 2.  So it's 9 people -- 9 out of the 29 and

24  9 out of the 26.  So, you know, if -- if you were to not include

25  those people, if -- so I am not arguing for this -- but if you were

1    to do that, you would then instead of having 29 and 16, you would

2    have 20 and 9, which is, as it happens, is actually statistically

3    significant in and of itself.

4    Q.  Fair enough.  And, Doctor, my question was just that you could

5    have somebody get additional chemotherapy that wasn't Taxotere and

6    they could still be counted as ongoing in the chart?

7    A.  Right.  And my answer was to say I'm aware of that and I did an

8    analysis --

9    Q.  Very good.

10   A.  -- to address that question.

11   Q.  And you could also have patients that are "lost to follow-up."

12   What's "lost to follow-up" mean?

13   A.  That you're lost to follow-up.  You know, it happens.  I don't

14   know if it happened in this study, but people moved city and can't

15   be found, stuff like that.

16   Q.  And you can have patients that are lost to follow-up that are

17   also counted as having ongoing adverse events in the study,

18   correct?

19   A.  You could.  I mean, the follow-up varied.  For, you know, many

20   of the patients it was eight, nine, ten years and for other

21   patients it was, you know, less than that.

22   Q.  And you could also have a situation where a patient, say, had

23   an allergic reaction, started a new chemotherapy, and so the study

24   didn't follow an adverse event after that point but did follow the

25   patient to see if they survived.  That could happen, correct?

```
 1              MR. MICELI:  Your Honor, I object to his hypotheticals.
 2              THE COURT:  Sustained.  I think that one's a bit much.
 3   BY MR. STRONGMAN:
 4   Q.  Doctor, do you agree that there can be a difference between
 5   following up on a patient for overall survival and following up on
 6   a patient for a specific adverse event?
 7   A.  Follow-up is follow-up.  The protocol says you follow these
 8   patients to see if these adverse events have resolved.
 9   Q.  I want to look at a couple of examples in this chart.  So right
10   here we have Patient 22312.  Do you see that, Doctor?
11   A.  I do.
12   Q.  And so this patient is included under the, "Alopecia Adverse
13   Event" and it says that, "The follow-up duration was 10.23 years."
14   Do you see that?
15   A.  I see that.
16   Q.  Now, I want to flip to page 13.  Let me know when you are
17   there.
18   A.  I am there.
19   Q.  And so alopecia wasn't the only adverse event that was tracked,
20   correct?
21   A.  Sure.
22   Q.  And so on this page, we see, "Constipation" and we see the same
23   patient and it says, "Constipation, 10.23 years."  Do you see that?
24   A.  I see that.
25   Q.  Let's flip ahead to page 21, Doctor.
```

1    A.   (WITNESS COMPLIES.)

2    Q.   And we have "Nausea."  Do you see that?

3    A.   I see that.

4    Q.   And we also have the same patient, 22312.  And it indicates

5    that this patient had a, "Follow-Up for nausea for 10.23 years."

6    Do you see that?

7    A.   I see that.  Hang on a second.  What I see is -- because this

8    is not something I've looked at -- what I see is, this is a patient

9    who had follow-up of 10.23 years and at some point along the way,

10   nausea was recorded.  That's all I know.

11   Q.   And so the same would go for alopecia, correct?

12   A.   No.  Alopecia is listed as one that is going to be followed to

13   resolution.

14   Q.   And, Doctor, you indicated that that patient, 22312, would have

15   permanent hair loss, do you believe they also had permanent

16   constipation and permanent nausea?

17   A.   No, I don't.  I don't know.  Maybe they did.  I hope not but I

18   don't believe so.

19   Q.   So your interpretation of this is that you can say, "Permanent

20   alopecia" but the other adverse events, it's not permanent,

21   correct?

22   A.   For hundreds and hundreds of patients in this study -- most

23   patients had alopecia going into follow-up, but for hundreds and

24   hundreds -- most patients in the study, the alopecia was marked as

25   "Resolved."  But we have 29 on TAC and 16 on FAC for whom it was

```
 1    not -- it was never recorded as resolved during follow-up.
 2              MR. STRONGMAN:  May I approach, Your Honor?
 3              THE COURT:  Yes, you may.
 4    BY MR. STRONGMAN:
 5    Q.  I am going to direct you just to the chart in this document as
 6    well.
 7    A.  Thank you.
 8    Q.  And, Doctor, this is a document that you reviewed in forming
 9    your opinions in this case, correct?  You addressed it in your
10    expert report, correct?
11    A.  Yes.
12    Q.  So if you could look with me, Doctor, on page 1, there's a
13    similar listing, correct?
14    A.  Yes.
15    Q.  What we see in this chart is that you have "Alopecia," you have
16    the "TAC arm," "Date of last IV plus 30 days," correct?  And those
17    are consistent with the other chart that we just looked at,
18    correct?  Take your time.
19    A.  Yep, thank you.  They're not the same.  One is date of -- the
20    first one you showed me, which is correct, is, "Date of last
21    follow-up."
22    Q.  Right --
23    A.  And here it's, "Date of last follow-up of AE," which, you know,
24    is the data -- is the last date on which the AE was noted.
25    Q.  Fair enough.
```

1    A.  It is what it is.

2    Q.  And let's take it step by step, okay?  So I asked you the "Date

3    of last IV plus 30 days," that's the same piece of information that

4    we looked at in the other chart, correct?

5    A.  I beg your pardon, sorry.  Yes, it is.  That column is the

6    same.

7    Q.  Now, this chart has a column that says, "Date of last follow-up

8    of AE."  Did I read that correctly?

9    A.  You read it correctly.

10    Q.  Now, AE means "adverse event," correct?

11    A.  Yes.

12    Q.  And let's go back to our Patient 22312, okay?  That's the

13    patient we were just looking at, right?  And what is the time frame

14    indicated for that patient for follow-up duration for last adverse

15    event follow-up?

16    A.  So the last time alopecia was, you know, explicitly recorded,

17    apparently, was in 1999.  But that patient was subsequently

18    followed for ten years, and the protocol says you follow alopecia

19    until the resolution.  And for hundreds and hundreds of patients,

20    that's exactly what happened.  And they have the alopecia marked as

21    resolved somewhere along the way.  But for many patients, including

22    this patient, it was never resolved.

23    Q.  And, Doctor, I want to just do a quality check on this as well.

24    If you look at page 16 --

25    A.  Okay.

1   Q.  -- we have "constipation."  Do you see that?

2   A.  I do.

3   Q.  And we have the same patient.

4   A.  I see.

5   Q.  And how long does it say this patient was followed up for in

6   terms of duration after the last adverse event for constipation?

7   A.  So what that means -- .23, right, so a quarter of a year.  So

8   my understanding is, that means that was the last time the

9   constipation was explicitly noted in the -- you know, in the case

10  report form.

11  Q.  And, Doctor, does it make more sense that a patient would have

12  constipation for .23 years than 10.23 years?

13  A.  It's not an event they were following to resolution.  So I have

14  no opinion here.  I don't know anything about this.

15  Q.  Okay.  And, Doctor, I think you can agree with me that six

16  months is .5 years, correct?

17  A.  We can agree on that, yes.

18  Q.  And, Doctor, on the chart that you're looking at, if you went

19  through and you counted up --

20  A.  Sorry, sorry, sorry.  Which chart?

21  Q.  Fair point.  The one that we were just looking at here that has

22  "Date of last follow-up of adverse event."  Do you see that?

23  A.  I do.

24  Q.  Okay.  And if you went through and you counted up how many

25  patients in the Taxotere, Adriamycin, and Cytoxan arm have a time

1    period greater than .5, or six months, how many would you get?

2    A.  I don't know.  It's not something I would do, because the

3    protocol says this should be -- the event should be followed until

4    resolution.  So the follow-up periods in the first document you

5    showed me are what the company did.  They're correct.  I can

6    reproduce them.  These are something different.  I have no -- these

7    are not intrinsically of any interest.

8    Q.  They are something that you looked at and included in your

9    report though, correct?  You considered this information?

10   A.  That information (INDICATING)?

11   Q.  Correct.  You considered it --

12   A.  No, I did not.  No, I did not.  I didn't know about this,

13   actually, until you put this in front of me at some point in time,

14   and, you know, they're not follow-up times per the protocol.

15   Protocol is sacrosanct here.

16   Q.  Doctor, here is my question.  If you were to go through and you

17   count -- and we could do it, but you could also just trust me -- if

18   you go through and you count how many of these patients were

19   followed up on this chart for more than six months in the TAC arm,

20   you would get seven; is that correct?  Do you trust me on that?

21   You're more than welcome to double-check.

22   A.  I trust you -- but it's like you put random numbers up there

23   and tell me how many of them are bigger than .5.  Sure.  Whatever.

24   Q.  Okay.

25   A.  They're not follow-up times.  It's not the length of time the

1    patients were followed up for.

2    Q.  I understand that's your opinion.  This document calls it a

3    "follow-up duration."  That's what the document says, correct?

4    A.  The words are "Date of last follow-up of AE."  And I find it

5    curious, by the way, that this analysis was done at 3 o'clock on

6    the same day that the correct analysis was done.  The correct

7    analysis was done at 11 o'clock in the morning, and this one was

8    referred to as -- it's a modified version of the original program.

9    I have no idea what this is.  It's not correct.  If your goal in

10   life is to figure out what the length of follow-up was -- excuse

11   me -- for each patient, this is not relevant.

12   Q.  And, Doctor, if you went to the FAC arm and did the same thing,

13   and you put in .5 on this chart, you would get four patients if you

14   counted it.  Do you trust me on that?

15   A.  Sure.

16   Q.  And, Doctor, obviously, your opinion is that these two charts

17   are inconsistent, correct, the two charts that we looked through?

18   A.  I mean, demonstratively, numbers are different on the two

19   charts.  Is that what you mean?

20   Q.  Yeah.

21   A.  Sure.

22   Q.  One thing you could do to figure out where these numbers come

23   from and what they mean is to go look at a case report form for a

24   patient and see, correct?

25   A.  No.  So the correct numbers, per the protocol, per the way the

1  study was supposed to be conducted, you know, it's black and white,

2  there's a start time, which is three weeks after -- three weeks

3  after the last infusion, and there's an end time, which is the last

4  follow-up visit.  30 days -- not three weeks.  30 days after the

5  last infusion.  That's follow-up, and that's how the company

6  defined it, that's how the company computed it in their, you know,

7  SAS programs that I have.  That analysis we just looked at is some

8  ad hoc analysis that somebody did in the afternoon of the day they

9  did the correct analysis.  This has no -- it's not -- this is not

10  germane to what they said -- what's in the protocol.

11  Q.  Well, Doctor, I guess going back to my question is -- you could

12  pull a case report form for one of those patients and try to make

13  sense of the difference, correct?

14          MR. MICELI:  Object.  Asked and answered.

15          THE COURT:  I think -- I am looking at his answer, and he

16  did say, "no," and then he explained it.  So sustained.  It has

17  been asked and answered.

18  BY MR. STRONGMAN:

19  Q.  Would you like to look at one of the case report forms for one

20  of those patients to see if they were actually followed for

21  alopecia beyond six months?

22  A.  No, it's not what I do.  I work with the final locked clinical

23  trial data.  It is black and white what the follow-up time is for

24  that patient.  It's 10.2 years or whatever it is.  I'm done.  Like,

25  there's nowhere else to go.  That's what the locked data showed.

1   Q.  And, Doctor, would you like to look at any case report form to

2   see if there's any patient that received Taxol after Taxotere?

3   Would you like to see --

4           MR. MICELI:  Your Honor, objection.  Asked and answered.

5           THE COURT:  Sustained.

6           MR. MICELI:  Thank you.

7   BY MR. STRONGMAN:

8   Q.  And, Doctor, I know you mentioned -- I think you mentioned

9   Mr. Mancini, a deposition that you had read; is that correct?

10  A.  Yes.

11  Q.  And I think you indicated in your questioning with Mr. Miceli

12  that there were certainly times that Mr. Sanofi presented the

13  TAX316 data in response to questions on permanent or persistent

14  alopecia; is that correct?

15  A.  I didn't --

16  Q.  Do you want me to repeat my question?

17  A.  I didn't say that I don't think, but maybe it's true, yeah.

18  Q.  Okay.  And the point I want to make is, have you seen anything

19  where Sanofi went through and said that the TAX316 data meets the

20  definition that I asked you to assume for PCIA?

21  A.  I don't know.

22  Q.  And, Doctor, I want to move quickly through the last couple of

23  topics that you covered.  You'd mentioned that you looked at the

24  Sanofi database; is that correct?

25  A.  Yeah, the internal pharmacovigilance database.

1    Q.  And I think you indicated that you came up with -- was it 47

2    reports; is that correct?

3    A.  I think that was the number as of 2008.

4    Q.  2008.  Through 2008, correct?

5    A.  I think that's right.

6    Q.  And, again, that's covering a period of time that's nearly

7    12 years, correct?

8    A.  If you say so, yeah.

9    Q.  Okay.  And do you know what the denominator is?  Do you know

10   how many patients were exposed to Taxotere in that period, 2008 and

11   before?

12   A.  I do not.

13   Q.  Okay.  And you talked about how what you did was, you searched

14   through the narratives using some terms that I believe that you ran

15   by Dr. Tosti; is that correct?

16   A.  No, she came up with those terms.

17   Q.  Oh, fair enough.  Fair enough.  So Dr. Tosti came up with some

18   terms, and then you implemented the analysis, correct?

19   A.  Yep.

20   Q.  But the reality is, you could have had a situation where you

21   searched and you found permanent headache and temporary alopecia in

22   your search, and that would have hit, correct?

23           MR. MICELI:  Your Honor, again, object to the incomplete

24   hypothetical.

25           THE COURT:  I am going to allow this question.

1    Overruled.

2           THE WITNESS:  It is what it is.  Like, I -- you know, I

3    didn't look at the narratives.  I searched the narratives for the

4    terms that Dr. Tosti suggested, and evidently, I found 47, you

5    know, hits, you know, as of a certain moment in time.  That's what

6    I did.

7    BY MR. STRONGMAN:

8    Q.  And my question was, permanent headache, temporary alopecia

9    possibly could have been one of the hits, correct?

10   A.  You're kind of -- maybe.  What you're asking me to do there,

11   basically, is to run my search on a hypothetical narrative.

12   Q.  Right.

13   A.  I'd have to go back and look at my search.

14   Q.  Yeah.

15   A.  I don't remember the exact details.

16   Q.  And that's fine.  Let's do it as a hypothetical.  Run your

17   search on my hypothetical narrative, okay?  Take your time.  I know

18   you have your code there.

19   A.  Sorry.  Say it again, your hypothetical narrative.

20   Q.  Sure.  Indicates permanent headache, okay?  You with me so far?

21   A.  Yep.

22   Q.  Alopecia, temporary.  That could hit, correct?

23   A.  Yes, I think it would.  It's conceivable that it would hit,

24   yeah, if such a report existed.

25   Q.  Okay.  Next, to your observational studies.  And this will be

1    brief.  Did you do any analysis as it related to dose, cumulative

2    dose, and Grade 2 alopecia in the observational studies?

3    A.  No.

4    Q.  We're close, Doctor.  Last couple of topics, okay?  Mr. Miceli

5    went over your CV with you and identified the kinds of work and

6    publications that you've done in your career.  Do you remember

7    that?

8    A.  Yes.

9    Q.  And I think you had a whole section of what you called "Referee

10   publications"; is that right?

11   A.  Yes.

12   Q.  And you explained that the peer-review process -- and I wrote

13   it down -- the purpose is to ensure quality.  Did I get that

14   correct?

15   A.  That's the objective, yes.

16   Q.  Okay.  And, Dr. Madigan, you've published on many, many things

17   over the years; fair enough?

18   A.  Okay.

19   Q.  You've never published on alopecia, correct?

20   A.  I don't believe so.

21   Q.  And you've certainly never published on Taxotere and permanent

22   alopecia, correct?

23   A.  Not specifically, certainly.

24   Q.  And, Doctor, have you taken any steps to publish your

25   meta-analysis that you did, in this case, and subject it to peer

1  review?

2  A.  Not yet.

3  Q.  And the reason that you haven't done it is because you're busy,

4  correct?

5  A.  Sure, yeah.

6  Q.  Okay.  And, Doctor, have you taken any steps to publish your

7  Taxotere FAERS analysis that you did, in this case, and subject it

8  to peer review?

9          MR. MICELI:  Your Honor, can we talk at the sidebar?

10         THE COURT:  Yes.

11     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

12         MR. MICELI:  I think this is going to be more of a

13  warning than an objection.  I'm getting ready to talk about that in

14  redirect and talk about the protective order, because Sanofi

15  required him to sign a protective order to see their data.  And so

16  I have to have his signature to protect him from disclosing

17  anything, and now he's saying, you haven't disclosed this in peer

18  review.  It's a joke.

19         MR. STRONGMAN:  FAERS --

20         MR. MICELI:  No, I know.

21         MR. STRONGMAN:  -- is publicly available.

22         MR. MICELI:  I know.  You've asked him about his opinions

23  and whether he's published them to peer review.  Now, FAERS is just

24  one aspect of it.  You've already done it, and you already put

25  something in front of this jury that says 2012.  I am getting ready

```
 1    to show them something that says 2013.

 2                MR. STRONGMAN:  Right.

 3                THE COURT:  Okay.

 4                MR. STRONGMAN:  And we can go with this.  I know what

 5    he's going to show him, and it's the question and answer regarding

 6    TAX316.  You're going to do that now while we're here, right?  I

 7    have no problem with you showing him that question and answer,

 8    okay?  That's fine.

 9                THE COURT:  Wait, wait.  Let's talk about the asking

10    whether or not he can subject any of this to peer review.  Let's go

11    over one thing at a time.

12                MR. STRONGMAN:  Sure.  Sorry.

13                THE COURT:  Okay.  And I believe the question was,

14    Taxotere and the meta-analysis, and then it was the FAERS reviewed.

15                MR. STRONGMAN:  Yeah.  And I haven't finished the FAERS

16    question.  He objected in the middle of that.

17                MR. MICELI:  But he's already said --

18                THE COURT:  But tread carefully.

19                MR. STRONGMAN:  And my perspective on this is that we're

20    here in court.  He's talked about it in open court.  It's public.

21                MR. MICELI:  As long as it's all fair game, then that's

22    good because we're going to talk about his protective order, too.

23                MR. STRONGMAN:  Which, we're here in court talking about

24    this publicly.

25                THE COURT:  Okay.
```

```
 1            MR. STRONGMAN:  He can publish on it.

 2            MR. MICELI:  But it's what prevented him from doing it,

 3    Your Honor.

 4            THE COURT:  You can ask him.

 5            MR. MICELI:  I can show you my --

 6            MR. STRONGMAN:  Just tell me.  I mean --

 7            MR. MICELI:  That's fine.  Let's continue.  If he opens

 8    up the door, then fine.

 9            THE COURT:  I don't -- I don't want us to get so

10    sidetracked --

11            MR. STRONGMAN:  Yeah.

12            THE COURT:  -- on things that are not pertinent to this

13    litigation.

14            MR. MICELI:  I agree.

15            THE COURT:  And I think this is what -- I am going to say

16    it ahead of time.  I am not going to allow you to go into the

17    protective orders, but I think it would be appropriate, you were

18    asked about this.  Now, were there restrictions associated with

19    this case placed that would have prevented you.

20            MR. MICELI:  Yeah.

21            THE COURT:  I think that's fair.

22            MR. MICELI:  Can I say the word "protective order"?

23    Because we didn't demand it, they did.

24            THE COURT:  Restrictions.  You can say restrictions

25    placed by Sanofi.
```

```
 1                MR. MICELI:  Sure.

 2                THE COURT:  That's fair enough.  Okay.

 3                MR. STRONGMAN:  Do we --

 4                THE COURT:  Wait.  Back to --

 5                MR. STRONGMAN:  Do you want to address the 2013 thing

 6    where --

 7                MR. MICELI:  No, I'm just going to use it.

 8                MR. STRONGMAN:  That's fine.

 9                THE COURT:  Okay.

10                MR. STRONGMAN:  What this is, is a question to the

11    European agencies on, give me your data on permanent alopecia, and

12    they gave him TAX316.

13                MR. MICELI:  That's 29 and 16.

14                MR. STRONGMAN:  Right.  And that's fine.

15                MR. MICELI:  Okay.

16                MR. STRONGMAN:  And so I know that's coming.  As long as

17    no dates are referenced and all that --

18                THE COURT:  But I have to tell you --

19                MR. MICELI:  Well, no.  Wait a second.  Dates?  He had

20    that up on the screen for 12 minutes.  I had my time over there --

21    hold on -- for 12 minutes, he had 2012 at the bottom of that chart,

22    flipping pages, and they saw it.  They're going to get to see 2013,

23    too.

24                MR. STRONGMAN:  That's fine.

25                THE COURT:  Yes, that's fair.
```

```
 1              MR. STRONGMAN:  That's fine.

 2              THE COURT:  Fair?

 3              MR. STRONGMAN:  Yes, that's fine.

 4              THE COURT:  Okay.  And I'm glad we discussed both of

 5    these while we were here.

 6              MR. STRONGMAN:  Thank you.

 7              THE COURT:  Okay.

 8          (OPEN COURT.)

 9    BY MR. STRONGMAN:

10    Q.  Doctor, are you ready to proceed?

11    A.  Yes.

12    Q.  Okay.  Doctor, your FAERS analysis, you said -- and I'm just

13    making sure I got the foundation for this question right -- the

14    FAERS database is publicly available, correct?

15    A.  Yes.

16    Q.  So there's nothing about what you did with your FAERS analysis

17    that's confidential or not public; it's perfectly available public

18    information, correct?

19    A.  Sure.

20    Q.  Okay.  And, Doctor, have you taken any steps to publish your

21    Taxotere FAERS analysis and subject it to peer review?

22    A.  Not yet.  I -- you know, I might do that.  I generally publish

23    papers on statistical methods and things that demonstrate novel

24    statistical methods.  Here, I am applying very standard methods to

25    standard data.  I have done things like this.  I might do that.
```

 1   Q.  And so as of today, as of coming into this courtroom, you

 2   haven't subjected your FAERS analysis to peer review, correct?

 3   A.  Subjected it to -- I have not written up a paper and submitted

 4   it to a journal.

 5   Q.  Okay.  And the reason that you haven't is because you're busy,

 6   right?

 7   A.  I just explained.  It's a little more nuanced than that.

 8   Q.  And, Doctor, I think you testified yesterday when you were

 9   going over your qualifications that you've testified in court

10   before, correct?

11   A.  Yes.

12   Q.  And I think your hourly rate is $700 an hour; is that correct?

13   A.  Yes.

14   Q.  And, Doctor, in the -- let me do it this way.  Again, I want to

15   talk about your experience outside of this case, outside of

16   Taxotere, okay?  Are you with me?

17   A.  Okay.

18   Q.  And over the last two years, you've testified on behalf of

19   plaintiff's lawyers in a trial or deposition nearly 40 times,

20   correct?

21   A.  In the last?

22   Q.  Two years.

23   A.  Okay.  I don't -- I don't know what that number is off the top

24   of my head.

25   Q.  And you provided us a list of your testimony, correct?

1    A.  I did.

2    Q.  Yeah.  And so if I went through and counted it up and the

3    number was around 40, you'd trust me on that?

4    A.  Okay.

5    Q.  Okay.  And, Doctor, the truth of the matter is, you've made

6    well over a million dollars doing work for plaintiff's lawyers in

7    litigation, correct?

8    A.  Could be.  I've never added it up.

9    Q.  Okay.

10   A.  Over, you know, almost, whatever it is, a 17-year period or

11   something.

12   Q.  All right.

13           MR. STRONGMAN:  No other questions.

14           THE COURT:  Thank you.  Mr. Micheli, redirect.

15           MR. MICELI:  Yes.  Thank you, Your Honor.

16           THE WITNESS:  Thank you, Mr. Strongman.

17           MR. STRONGMAN:  Thank you, Doctor.  I appreciate your

18   time.

19                       REDIRECT EXAMINATION

20   BY MR. MICELI:

21   Q.  Dr. Madigan, I'm going to try to be brief.

22   A.  Okay.

23   Q.  And I'm going to actually work, I think, backwards first from

24   where we just were moments ago after our little break on the side.

25   You were asked about publishing information about Taxotere and

```
 1   permanent chemotherapy-induced alopecia.  In the context of this
 2   litigation, have you had to sign a protective order?
 3   A.  Yes.
 4   Q.  And --
 5              MR. STRONGMAN:  Objection.
 6              THE COURT:  Sustained.  Rephrase it.
 7              MR. MICELI:  Okay.
 8   BY MR. MICELI:
 9   Q.  Are you restricted from disclosing certain information because
10   of your involvement in this case?
11   A.  I believe I am, yep.
12   Q.  Okay.  Did I demand that of you?
13   A.  No.
14              MR. STRONGMAN:  Objection.
15              THE COURT:  Overruled.
16   BY MR. MICELI:
17   Q.  Who demanded that of you, Doctor?
18   A.  My memory is that, when I was provided with the clinical trial
19   data, the locked clinical trial data, that I signed a document, a
20   Sanofi document that said I wouldn't use this for any purposes
21   other than, you know, this context.
22   Q.  Now, you were asked some questions about some different numbers
23   on follow-up.
24   A.  Right.
25   Q.  Do you recall those?
```

1    A.  I do.

2    Q.  Okay.  And did you note the date that was on that document,

3    what was on your screen -- or that you had in front of you?

4    A.  I noticed the time.  The date was the 15th of March 2012 on

5    both documents.

6    Q.  Okay.

7                MR. MICELI:  May I approach the witness, Your Honor?

8                THE COURT:  Yes, you may.

9    BY MR. MICELI:

10   Q.  You may look all the way through it, and I ask if you can

11   identify it for us, please.

12   A.  So this is a document that appears to be a response to -- it's

13   a Sanofi document.

14   Q.  It's a response to an agency?

15   A.  It's a response to an agency.  I don't actually know which one,

16   if it was the FDA or some other agency.

17   Q.  Okay.  Up in the top right corner, what is the date of that

18   document?

19   A.  The date of the document -- it's the bottom-left corner on

20   mine.  Oh, I see.  Next page.  22nd of January 2013.

21   Q.  Okay.  And can you tell the jury what the question was

22   concerning TAX316, and what the answer was concerning persisting

23   alopecia?

24   A.  So the question that was being posed --

25               MR. MICELI:  Your Honor, may I show it to the jury as

1    he's reading it as well?

2              THE COURT:  Yes.

3              MR. STRONGMAN:  Just for demonstrative purposes --

4              THE COURT:  Just for demonstrative.

5              MR. MICELI:  Yes.

6              THE COURT:  It's not being admitted into evidence.

7              THE WITNESS:  Maybe that's -- I'll start with the second

8    half.  "Could you please clarify to the agency" -- I think it's the

9    EMA, the European agency.  "Could you please clarify the

10   number/percentage of patients with long-term/permanent alopecia

11   from the pivotal breast cancer studies."

12   BY MR. MICELI:

13   Q.  And then a Sanofi response for TAX316 says what?

14   A.  So in the TAC group -- so first of all, they're identifying the

15   pivotal trials as TAX316 and TAX301.  These are the two studies

16   we've been talking about.  So TAX316, by the end of the follow-up

17   period, 29 patients still had persistent alopecia in the TAC group.

18   And in the FAC group, by the end of the follow-up period -- it goes

19   down at the bottom, two lines down.  There.  By the end of the

20   follow-up period, 16 still had persistent alopecia.  So 29 versus

21   16.

22   Q.  And because you've been given a math test so far today, let me

23   just ask you.  Is 2013 after 2012?

24   A.  Yes, it is.

25   Q.  Okay.  Thank you.  In the course of your statistical work in

1    investigating issues in the FAERS database, do you fill out

2    MedWatch forms?

3    A.  Sorry.  Do I fill out MedWatch forms?

4    Q.  MedWatch forms.

5    A.  No, of course not.

6    Q.  Okay.  I'm not going to go there.  Concerning manufacturer

7    control numbers that Mr. Strongman asked you about during

8    cross-examination, are you familiar with those?

9    A.  Yes.

10   Q.  When you reviewed the pharmacovigilance database for Sanofi for

11   events prior to 2008, did you notice any manufacturer report forms?

12   A.  Report forms, I did, yes.

13   Q.  Okay.  Did you do any investigation because of that?

14   A.  I did.

15   Q.  Can you tell us what you did?

16   A.  I searched for those codes in the FAERS database.

17   Q.  And did they -- did you find them?

18   A.  I can't find a single one.

19   Q.  Thank you.  Now, how is alopecia noted as resolved in the final

20   clinical trial data sets?

21   A.  There's -- you know, in the final locked data, there is an

22   annotation, you know, indicating that it was resolved.  And it's

23   there for, you know, many, many patients, but it's not there for

24   the 29 and the 16.

25   Q.  Okay.  Were you able to decipher how Sanofi searched for those

1    29 and 16?

2    A.  Oh, yeah.  I mean, I have their SAS program.  I can see

3    precisely how they did it.

4    Q.  Okay.  And have you seen any documents, other than that one

5    document Mr. Strongman showed you, in all of the things you've

6    reviewed, in this case, that demonstrates that Sanofi represents

7    the numbers in TAX316 for ongoing alopecia to be anything other

8    than 29 and 16?

9    A.  No.

10   Q.  Okay.  Now, the limitations that are in the FAERS database, or

11   inherent in the FAERS database that you discussed earlier, is that

12   just for your search of Taxotere and permanent chemotherapy

13   alopecia -- permanent chemotherapy-induced alopecia in the study

14   you did, or are those limitations system-wide?

15   A.  These are limitations, you know, that pertain to any analysis

16   of the FAERS database.

17   Q.  Okay.

18          MR. MICELI:  Thank you, Your Honor.  Nothing further.

19          THE COURT:  Thank you.

20          Could I see counsel in my little side office.

21      (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

22          THE COURT:  Members of the jury, just with the way the

23   schedule is working, I am going to give you an early lunch today.

24   So court will be at recess until 12:45, and we'll just do an early

25   lunch.

1          Let me remind you, do not discuss the case amongst

2    yourselves or with anyone else.  And if you happen to see any of

3    these people in the hallway, just please ignore them, and they will

4    ignore you.  Thank you.

5          MR. MICELI:  And don't take it personally.

6          THE COURT:  Yeah, don't take it personally.  All right.

7    Court's at recess until 12:45.

8          THE DEPUTY CLERK:  All rise.

9       (WHEREUPON, THE JURY EXITED THE COURTROOM.)

10          THE COURT:  Dr. Madigan, you can step down.

11          THE WITNESS:  Thank you.

12          THE COURT:  Thank you very much.

13       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

14

15                      *  *  *  *  *  *

16

17                    REPORTER'S CERTIFICATE

18          I, Karen A. Ibos, CCR, Official Court Reporter, United
     States District Court, Eastern District of Louisiana, do hereby
19   certify that the foregoing is a true and correct transcript, to the
     best of my ability and understanding, from the record of the
20   proceedings in the above-entitled and numbered matter.

21

                    /s/ Karen A. Ibos
22               Karen A. Ibos, CCR, RPR, CRR, RMR
                 Official Court Reporter
23

24

25