```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2
      ********************************************************************
 3
      IN RE:  TAXOTERE (DOCETAXEL)
 4    PRODUCTS LIABILITY LITIGATION

 5                                     Docket No. 16-MD-2740
                                       Section H
 6                                     New Orleans, LA
                                       Wednesday, November 17, 2021
 7    Relates to:  Elizabeth Kahn
                   16-CV-17039
 8
      ********************************************************************
 9
                     TRANSCRIPT OF TRIAL PROCEEDINGS
10        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                     UNITED STATES DISTRICT JUDGE
11                     DAY 7, MORNING SESSION

12
      APPEARANCES:
13
      FOR THE PLAINTIFF:             BACHUS & SCHANKER, LLC
14                                   BY:  DARIN L. SCHANKER, ESQ.
                                          J. KYLE BACHUS, ESQ.
15                                   101 W. Colfax Ave., Suite 650
                                     Denver, CO 80202
16
                                     GIBBS LAW GROUP, LLP
17                                   BY:  KAREN B. MENZIES, ESQ.
                                          ANDRE MURA, ESQ.
18                                   6701 Center Drive West, 14th Floor
                                     Los Angeles, CA 90045
19
                                     DAVID F. MICELI, LLC
20                                   BY:  DAVID F. MICELI, ESQ.
                                     P.O. Box 2519
21                                   Carrollton, GA 30112-0046

22                                   PENDLEY BAUDIN & COFFIN
                                     BY:   CHRISTOPHER L. COFFIN, ESQ.
23                                         JESSICA A. PEREZ, ESQ.
                                     2505 Energy Centre
24                                   1100 Poydras St.
                                     New Orleans, LA 70163
25
```

```
 1
                                    GAINSBURGH BENJAMIN DAVID
 2                                  MEUNIER & WARSHAUER
                                    BY:  M. PALMER LAMBERT, ESQ.
 3                                  2800 Energy Centre
                                    1100 Poydras St.
 4                                  New Orleans, LA 70163

 5

 6   FOR THE DEFENDANT:            SHOOK HARDY & BACON
                                    BY:  HILDY M. SASTRE, ESQ.
 7                                  201 Biscayne Blvd., Suite 3200
                                    Miami, FL 33131
 8
                                    SHOOK HARDY & BACON
 9                                  BY:  JON A. STRONGMAN, ESQ.
                                    2555 Grand Blvd.
10                                  Kansas City, MO 64108

11                                  IRWIN FRITCHIE URQUHART & MOORE
                                    BY:  DOUGLAS J. MOORE, ESQ.
12                                       KELLY E. BRILLEAUX, ESQ.
                                    400 Poydras St., Suite 2700
13                                  New Orleans, LA 70130

14
     Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR, RMR
15                                  500 Poydras Street, B-275
                                    New Orleans, Louisiana 70130
16                                  (504) 589-7776

17
        Proceedings recorded by mechanical stenography, transcript
18   produced by computer.

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

```
 1                         I N D E X

 2

 3   WITNESSES FOR THE PLAINTIFF:              PAGE/LINE:

 4

 5   ELIZABETH KAHN

 6     Continued Cross-Examination by Ms. Sastre    1699/14

 7     Redirect Examination by Mr Schanker         1751/20

 8     Further Examination by Ms. Sastre           1772/15

 9

10

11

12   WITNESSES FOR THE DEFENDANT:              PAGE/LINE:

13

14   DR. JOHN GLASPY

15     Voir Dire Examination by Mr. Strongman      1780/23

16     Direct Examination by Mr. Strongman         1792/8

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

(WEDNESDAY, NOVEMBER 17, 2021)

(MORNING SESSION)

07:59:59

08:00:12     (OPEN COURT.)

08:00:12          THE COURT:  Court's in session.  You may be seated.

08:00:17 Yesterday afternoon, plaintiffs approached the Court with concerns

08:00:25 regarding Juror No. 5 sleeping, and I did admit that I had been

08:00:35 very concerned during the entire trial.  But as a result of that

08:00:41 request, I visited with the juror privately in chambers.  None of

08:00:52 the attorneys were present during that visit.  I noted the

08:00:56 transcript that Mr. Moore said, I thought you would do that without

08:01:01 us.  There is a concern about having lawyers in the room while

08:01:06 you're interviewing a juror mid-trial.  But you were provided the

08:01:13 transcript, which, of course, is under seal, and I indicated that I

08:01:18 would give you an opportunity to argue this morning, five minutes.

08:01:23 And I don't know who is doing the plaintiff?

08:01:26          Mr. Mura.  All right.  Five minutes.

08:01:30          MR. MURA:  Thank you very much, Your Honor.

08:01:30          THE COURT:  Please proceed.

08:01:46          MR. MURA:  The lead case in this area is *United States*

08:01:49 *against Freitag*.  It's a Seventh Circuit case that many other

08:01:52 federal district courts cite.  It's *230 F.3d 1019*, and I think the

08:02:00 pincite is 1023.  And it discusses the standard for when a Court

08:02:05 should determine that a juror sleeping should be excused.  And, in

08:02:11  1    this case, the Court's comments yesterday about witnessing the

08:02:16  2    juror sleeping for substantial portions of the trial fits the

08:02:19  3    standard for excusing a juror.

08:02:23  4         At this point, plaintiffs' counsel has also noticed it.

08:02:28  5    I believe defense counsel has suggested that they haven't noticed

08:02:31  6    it, which is fine, but the Court itself noticed it.  It's a lengthy

08:02:36  7    problem, it's deeply prejudicial to plaintiffs to have a juror who

08:02:40  8    has missed the witness' testimony throughout the entire first week.

08:02:46  9    And although he could recall at least perhaps the names of one or

08:02:50 10    two witnesses, there's no doubt based on the Court's description

08:02:54 11    itself and the Court did everything it could at the time when it

08:02:59 12    noticed it to allow the jury to continue to be part of the

08:03:06 13    process -- the Court talked about looking at the juror, trying to

08:03:09 14    wake him up, and yet, unfortunately, the juror did not wake up and

08:03:13 15    missed significant portions of the trial.  And so we have eight

08:03:18 16    jurors, they can proceed to deliberation as seven jurors.

08:03:24 17         If he is not excused, the prejudice is severe to

08:03:27 18    plaintiffs because at this point, if he starts to pay attention, he

08:03:31 19    will be doing so on the last day that we rest, the plaintiffs rest,

08:03:35 20    and defendants begin their case.  He will see one side of the

08:03:39 21    presentation at best.  And so that is a deep concern to plaintiffs

08:03:43 22    that the individual would sit through only perhaps defendant's

08:03:48 23    portion of the case, will have missed plaintiff's portion of the

08:03:52 24    case, will then be forced to deliberate.  The jury has to be

08:03:56 25    unanimous, so he will have to participate, he will be unable to

08:03:59 1    participate meaningfully and this will deeply prejudice plaintiffs.

08:04:04 2            And so I understand that it's unfortunate that this has

08:04:08 3    happened, but it has happened in other trials, I believe it's

08:04:12 4    happened in the Talc MDL.  I believe it's happened in other MDLs as

08:04:18 5    well.  And it's not unheard of that a juror might doze off.

08:04:21 6            Typically, if it's caught early enough then the juror can

08:04:25 7    continue to participate, but sometimes jurors are not able to sit

08:04:28 8    through the entire trial.  We are certainly not suggesting that

08:04:31 9    this individual did anything wrong.  We understand he has a very

08:04:35 10   lengthy commute, he is not feeling well, things happen.  But in

08:04:40 11   these circumstances, allowing a juror who has not seen a

08:04:43 12   substantial portion of plaintiff's case would be deeply prejudicial

08:04:48 13   and it's quite clear under the case law is not an individual who

08:04:51 14   should be allowed to sit on the jury.  Particularly, when there is

08:04:54 15   no prejudice to defendants because they will have seven attentive

08:04:59 16   jurors deliberating and so will plaintiffs.

08:05:04 17           And I just want to underscore, this is the last Sanofi

08:05:08 18   trial that the parties will have.  The parties have been working on

08:05:10 19   these cases for almost five years, and so this is an incredibly

08:05:15 20   important case, not just to the system, but also to our clients and

08:05:18 21   it would just be a miscarriage of justice to allow an individual

08:05:22 22   who has slept through so much of the case to continue to

08:05:26 23   participate.  And it would be unfair of him to demand that he

08:05:30 24   meaningfully participate when, in all reality, he has not seen

08:05:33 25   plaintiff's case, and at best, he will only see defendant's case.

08:05:37   1          Unless the Court has any questions.  Thank you very much,
08:05:40   2   Your Honor.
08:05:40   3          THE COURT:  Thank you.  Mr. Moore.
08:05:41   4          MR. MOORE:  Thank you, Your Honor.
08:05:43   5          Douglas Moore on behalf of Sanofi.  I want to make sure
08:05:46   6   that the significance of this issue is understood.  And I am not
08:05:52   7   suggesting that it's not, but I didn't grasp when this issue came
08:05:57   8   up that an inattentiveness or sleeping in the form of -- is a form
08:06:03   9   of juror misconduct.  And so we think that if a juror is going to
08:06:10  10   be discharged for a form of juror misconduct, there has to be a
08:06:14  11   record of it happening.  And there have been issues, in this case,
08:06:19  12   bumps along the way, concerns raised about improper conduct.  And
08:06:24  13   in those circumstances, Your Honor has been willing to take the
08:06:28  14   person at their word.  And we think that Juror No. 5 deserves to be
08:06:32  15   taken at his word.
08:06:34  16          I have read the transcript of the interview that Your
08:06:38  17   Honor conducted.  It was under oath.  Your interview was thorough,
08:06:44  18   your questions were pointed, and for seven pages on what I count to
08:06:50  19   be six different occasions where you asked him to agree in one form
08:06:55  20   or another that he had missed a substantial portion of the case
08:06:59  21   because he was sleeping, he did not agree with that.  He
08:07:03  22   specifically said he did not think that he missed a significant
08:07:06  23   portion of the case.  He specifically stated that he thinks he may
08:07:09  24   have nodded off but he picks himself back up.  And when you asked
08:07:14  25   him the direct questions, the pointed questions, "Have you been

08:07:17 1    able to follow the evidence so that you understand?

08:07:19 2              "Answer:  Yes.

08:07:20 3              "What's at issue in the case?

08:07:21 4              "Yes, ma'am.

08:07:22 5              "Have you been able to follow the experts --

08:07:24 6              "Uh-huh.

08:07:24 7              "-- and satisfy yourself that you understood what their

08:07:27 8    opinions were, what they were based on?

08:07:30 9              "Answer:  Yes, ma'am."

08:07:31 10             So we don't think that when this transcript is taken at a

08:07:36 11   whole that it comes close to establishing that this juror has

08:07:38 12   missed a substantial portion of the trial, which is the standard as

08:07:46 13   Mr. Mura indicated, or that it is also part of the standard that

08:07:50 14   the portions missed were of particular -- were particularly

08:07:56 15   critical to the case.

08:07:58 16             And I've seen multiple jurors' heads bobbing in this

08:08:02 17   case, but my eyes have not been in that jury box long enough to

08:08:05 18   know, number one, are they even asleep, much less to know that they

08:08:09 19   have slept through a significant portion of this trial.

08:08:12 20             And I don't know what Your Honor saw.  I don't know what

08:08:16 21   Mr. Coffin saw, but I know I did not see it because my eyes aren't

08:08:20 22   there long enough.

08:08:21 23             THE COURT:  Sure.

08:08:22 24             MR. MOORE:  There's bench conferences, there's

08:08:25 25   objections, there's things on the screen.  And my question to the

08:08:28 1  Court would be to ask yourself if your eyes were there long enough

08:08:33 2  to convince yourself that this was a substantial portion of the

08:08:36 3  case that was missed.  Because it's not some portion, the standard

08:08:41 4  isn't any portion, it has to be a record of there being a

08:08:44 5  substantial portion of the case missed.  And we don't think what

08:08:46 6  the gentleman said to you yesterday under oath establishes that.

08:08:50 7  He did say at the end, when you asked him the last two questions,

08:08:55 8  would it surprise you -- you know, premised around what I know,

08:08:58 9  what I saw, would it surprise you?  And his answers, although he

08:09:02 10 agreed with you, were far from unequivocal.  He said, "Not really."

08:09:06 11 And "probably not."  And so we think those four words in this

08:09:12 12 transcript are insufficient to reject the other seven pages of what

08:09:16 13 he said where he testified that he understood the evidence.  You

08:09:20 14 did ask him about the witnesses, he described Dr. Bosserman, he

08:09:24 15 named Dr. Bosserman.  He then said it was Dr. Tosti and she was

08:09:27 16 from Italy.  So we think that this record is insufficient.

08:09:31 17         We also have a concern, Your Honor, about the timing of

08:09:37 18 this.  Because we felt a little caught off guard that this issue

08:09:41 19 was apparently observed for days but then not brought up.  And the

08:09:45 20 reason I bring that up is because the case law says that

08:09:48 21 inattentiveness of a juror must be raised when it is first seen.

08:09:52 22 It can't be let it grow to the point to where you have the ability

08:09:56 23 then to move to strike a juror you don't like and bring it up.  And

08:09:59 24 so we were concerned about the timing of this being basically

08:10:04 25 two-and-a-half witnesses before we're going on to put this case

08:10:08   1    into the jury room.

08:10:09   2            And so we do think it would be prejudicial to change the

08:10:15   3    composition of this jury at this late stage.

08:10:18   4            And to Mr. Mura's point about the imbalance of this

08:10:23   5    gentleman may be paying attention, our case comes in through cross.

08:10:25   6    If he was missing our cross-examinations, that's prejudicial to us.

08:10:30   7    We build our defense around cross-examination of the house of cards

08:10:33   8    we think they have built for this, and if this man wasn't paying

08:10:38   9    attention to that, that's prejudicial to us as well.  There's no

08:10:40  10    imbalance to whatever pieces he missed that would prejudice them

08:10:44  11    versus us.

08:10:44  12            And so we don't think on this record that they can be

08:10:48  13    said that a substantial portion of the case has been missed by this

08:10:52  14    man.  He did not agree with that proposition, he knew who the

08:10:56  15    witnesses were, he said that he has paid attention, and that he can

08:10:59  16    do his job as a juror.  And we think before we discharge him for

08:11:03  17    what is juror misconduct, there should be a more significant record

08:11:07  18    than what we have.

08:11:09  19            Thank you, Judge.

08:11:10  20            THE COURT:  Is there any other question you would like me

08:11:11  21    to ask him, Mr. Moore?

08:11:14  22            MR. MOORE:  If the gentleman is here today, we would like

08:11:20  23    Your Honor to ask him if he is able to do -- to satisfy his oath as

08:11:28  24    a juror, listen to the evidence, deliberate with his fellow jurors,

08:11:31  25    and render a verdict.  Because we think that the answer to those

08:11:35  1   questions would be in the affirmative.  We think that's the right

08:11:40  2   question to ask.  Because his sworn statements under oath, he did

08:11:46  3   not agree that he has missed a substantial portion of this case.

08:12:02  4              MR. MURA:  Would you like any response to that, Your

08:12:04  5   Honor?

08:12:04  6              THE COURT:  No.

08:12:06  7              MR. MURA:  Okay.

08:12:07  8              MR. MOORE:  Do you need anything further from me, Your

08:12:09  9   Honor?

08:12:10  10             THE COURT:  No.

08:12:21  11             Federal Rule Of Civil Procedure 47(c) provides that

08:12:24  12  "during a trial or deliberation, the Court may excuse a juror for

08:12:28  13  good cause."  Other federal courts have held that if sleep by a

08:12:33  14  juror makes it impossible for that juror to perform his or her

08:12:35  15  duties that would otherwise deny the parties a fair trial, the

08:12:39  16  sleeping juror should be removed from the jury.

08:12:44  17             The Fifth Circuit has affirmed district court judges who

08:12:48  18  did not excuse jurors after finding that the juror did not sleep

08:12:52  19  through substantial material portions of the evidence.

08:12:55  20  Unfortunately, I don't think that's the factual scenario here, and

08:13:01  21  I should begin by my concerns.  I think on the first day of trial,

08:13:07  22  I tapped my hands on the bench and said the jury has to wake up.

08:13:11  23  And I looked directly at this man.  And I think he knew that

08:13:16  24  because when we were talking in chambers he said, you know, yeah,

08:13:22  25  he recognized that.

08:13:26   1        I was very concerned in things that you do not know is we

08:13:32   2   knew that he was traveling two hours to get here and two hours to

08:13:35   3   get home, and I thought perhaps that that was an issue for him.  We

08:13:39   4   offered him a hotel room thinking that might make it easier, which

08:13:44   5   he denied.

08:13:46   6        I asked Erin and we made sure that we had caffeinated

08:13:52   7   drinks in there because it was an ongoing problem.  And I did not

08:13:58   8   continually rap my hand and say jurors wake up because it occurred

08:14:06   9   during the middle of testimony, but I did what I can only describe

08:14:09  10   as the mother or teacher eyes during church.  I stared at him.  I

08:14:16  11   stared at him, and we would make eye contact because I was trying

08:14:21  12   to do it in a way that would not disturb the rest of the jurors or

08:14:27  13   the flow of testimony.  He would make eye contact with me and then

08:14:32  14   turn away and then make eye contact and it was like you have got --

08:14:38  15   and he knew that, and he confirmed that when we spoke.  And then he

08:14:44  16   would fall asleep.

08:14:45  17        One of the reasons I asked him when your eyes were

08:14:49  18   closed, were you listening, because his eyes were closed for a

08:14:55  19   substantial parts of the trial.  And sometimes people do sit and

08:15:01  20   they're listening, and he said, "I was dozing off" and that's when

08:15:04  21   I said, well, you would be surprised.

08:15:07  22        I don't think -- I think this juror did what many, many

08:15:19  23   people do in an effort to minimize what occurred.  You remember

08:15:27  24   Dr. Tosti was from Italy.  He would generally keep his eyes open

08:15:32  25   when the witness was introduced, and that's when I tried to keep

08:15:40  1    eye contact with him to see if I could keep him awake.

08:15:47  2          But I asked him specifically, when your eyes were closed,

08:15:50  3    were you listening?  And he said, "I would doze off."  And that's

08:15:54  4    when I asked him, would you be surprised if it was more than just

08:16:05  5    what we all do during the course of the day, which is you might,

08:16:09  6    you know, doze off and your head pops right back up.  He was

08:16:14  7    sleeping.  And I will tell you and I can represent without putting

08:16:19  8    Brittany under oath, we've had ongoing conversations, and Erin,

08:16:23  9    about coffee.  Can we get him a hotel room?  We have to get this

08:16:26 10    man awake.  And other jurors have from time to time closed their

08:16:30 11    eyes but it has been for seconds and not -- and sometimes it's when

08:16:40 12    you get in -- repetitious you will see them dozing off.

08:16:48 13          Juror No. 5 has not been like that and it has worried me

08:16:53 14    this entire trial and I have -- you know, we have tried to do

08:16:55 15    things without just interrupting the entire process, which is why I

08:17:05 16    was trying to look at him, we had offered him coffee, offered him a

08:17:12 17    hotel room.  And yesterday, what he indicated to me was I will try

08:17:21 18    better today.

08:17:24 19          I believe that he has missed substantial portions.  I

08:17:28 20    don't know who it prejudices.  I don't know because I do know -- I

08:17:34 21    recognize that the defendant's case comes in through

08:17:37 22    cross-examination.  I don't know who's prejudiced.  I just know

08:17:40 23    that he was asleep for significant portions and I know that people

08:17:53 24    trying the case don't see that because you have other things that

08:17:56 25    you're looking at.  You're looking at the witness, you're looking

08:18:00 1    at the documents, you're coordinating with one another.  This is

08:18:03 2    something that I have seen and we have discussed through this

08:18:07 3    entire time.

08:18:08 4         I think it's appropriate, I think it does rise to the

08:18:11 5    level -- you know, it's hard to say misconduct because it's not

08:18:17 6    intentional.  I think he starts off by saying that "I've come down

08:18:29 7    with something for sure and I don't get a lot of sleep at home.  I

08:18:32 8    wake up at 4:00 no matter what, so I don't really sleep a lot plus

08:18:37 9    I'm coming down with something."  So, you know, he was explaining

08:18:41 10   what occurred.  But he's been asleep and it's not dozing.  He has

08:18:48 11   been asleep.  And so I am going to excuse Juror No. 5 based upon

08:18:53 12   that.

08:18:54 13        Now, I am not calling him in here, I am not going to

08:19:00 14   embarrass that man.  But I am going to talk to him privately and

08:19:08 15   tell him he is excused.

08:19:11 16        I would like input from counsel.  My intent is to tell

08:19:16 17   him that he should not discuss anything with anyone and excuse him.

08:19:22 18   And then I am going to tell the jurors that he is not here and that

08:19:27 19   they should draw no inference from it.  Beyond that, I don't think

08:19:31 20   it's appropriate for me to tell the jurors anything.  Unless I have

08:19:36 21   an objection from counsel.

08:19:37 22        Mr. Moore.

08:19:38 23        MR. MOORE:  No objection to the --

08:19:43 24        THE COURT:  Process.

08:19:44 25        MR. MOORE:  -- process.

08:19:45 1          THE COURT:  I know you object to the dismissal.

08:19:47 2          MR. MOORE:  Yes.

08:19:48 3          THE COURT:  And that's on the record.  But I want to talk

08:19:49 4  about the process.

08:19:50 5          MR. MOORE:  Yeah.  We don't have anything to add to what

08:19:53 6  Your Honor has suggested.

08:19:54 7          MR. MICELI:  Neither do we, Your Honor.

08:19:56 8          THE COURT:  Thank you.

08:19:59 9          All right.  Now, I need to talk to you all in the back so

08:20:02 10  that we can have our early morning conference.

08:20:06 11          THE DEPUTY CLERK:  All rise.

08:20:07 12       (WHEREUPON, A RECESS WAS TAKEN.)

08:32:02 13          THE COURT:  Court's in session.  You may be seated.

08:32:05 14          Just further on the record, I had Juror No. 5 discharged

08:32:15 15  and I indicated to him that I had been concerned that he had been

08:32:19 16  sleeping and, very frankly, his response to me was, am I in

08:32:29 17  trouble?  So I told him certainly not and discharged him.  I am

08:32:31 18  going to bring the jury in and advise them that -- advise them --

08:32:37 19          MS. SASTRE:  I'm sorry.

08:32:39 20          THE COURT:  I think I'm just going to say he is no longer

08:32:42 21  here and you should show him no inference and just let it go at

08:32:44 22  that.

08:32:44 23          MS. SASTRE:  That's fine, Your Honor.

08:32:49 24          THE COURT:  Is there anything that we need to do prior to

08:32:51 25  bringing in the jury?  Are they all here?

08:32:54  1        THE MARSHAL:  Yes.

08:32:56  2        THE COURT:  Okay.

08:32:56  3        MS. SASTRE:  I was just going to check to see if Ms. Kahn

08:32:59  4  still had her depo notebook.

08:33:02  5        THE COURT:  Perfect.  I think -- yes.

08:33:02  6        MS. SASTRE:  She does.

08:33:03  7        MR. SCHANKER:  Would you like Ms. Kahn to go ahead and be

08:33:08  8  seated?

08:33:08  9        THE COURT:  Is Ms. Kahn here?

08:33:08 10        MS. PEREZ:  Yes, she is.

08:33:10 11        There were also some housekeeping matters on exhibits

08:33:12 12  yesterday, Your Honor, but we can take them up during the break,

08:33:14 13  just moving them in to the record, or whenever Your Honor --

08:33:16 14        THE COURT:  Why don't we do that now.  If you could just

08:33:18 15  sit tight.  Why don't we do that now.  I would like to have that

08:33:24 16  proffer by Mr. Lambert prior to -- since you're going to rest after

08:33:29 17  Ms. Kahn, let's go ahead and get this in.

08:33:33 18        MS. PEREZ:  Yes, Your Honor, no problem.

08:34:04 19        Everybody ready?  Okay.  At this time, the plaintiffs

08:34:04 20  would move into evidence P2826, 2824, 2825, 2852, 2856, 2860, 2896,

08:34:24 21  2925, 2649, 2984, 2971, 3106, 3096, 3242, 3246, 3253, 3264, 3702,

08:34:52 22  3455, 3536, 3551, 3566, 3625, 3617, 3675, 3669, 2650, and then

08:35:16 23  Plaintiff 2811, but that will be an excerpt with only the relevant

08:35:22 24  portions that were done since it was an in globo of the medical

08:35:27 25  records so I will update that and get that to Erin accordingly.

08:35:30  1          THE COURT:  Okay.  And there was no objection?

08:35:39  2          MR. STRONGMAN:  I don't know where Ms. Sastre is.  It's

08:35:42  3  my understanding there was no objection.

08:35:43  4          THE COURT:  Okay.  Let it be admitted.

08:35:45  5          MR. STRONGMAN:  Okay.

08:35:45  6          THE COURT:  That was my understanding as well.

08:35:47  7          MS. PEREZ:  Okay.  Thank you, Your Honor.

08:35:51  8          MR. LAMBERT:  May it please the Court, Your Honor,

08:35:53  9  Palmer Lambert on behalf of Ms. Kahn.  Plaintiff makes the

08:35:58 10  following proffer of affirmatively designated deposition testimony

08:36:01 11  related to deposition and exhibits that have been excluded by the

08:36:04 12  Court.  Plaintiff proffers, number one, their deposition

08:36:09 13  designations and related exhibits within the deposition of Sanofi

08:36:14 14  employee Andris, A-N-D-R-I-S; Ortmanis, O-R-T-M-A-N-I-S, which the

08:36:23 15  Court excluded based on the court's ruling on defendant's MIL

08:36:27 16  No. 11 regarding motive.  That order is Record Document 13260.

08:36:34 17  Plaintiff believes their designations go to Sanofi's motive for not

08:36:37 18  disclosing internally known risks of permanent hair loss associated

08:36:42 19  with their drug, while at the same time competing with Taxol in a

08:36:46 20  self-stated goal of becoming a, quote, "billion-dollar taxing."

08:36:52 21          The evidence further supports the reasonable inference of

08:36:55 22  Sanofi's motive for not telling sales representatives including

08:37:00 23  Ruth Avila who detailed Dr. Kardinal and Dr. Larned's medical

08:37:04 24  oncology practice about the internally known risks of permanent

08:37:07 25  hair loss.  The information would have provided credibility support

08:37:11  1    for Ms. Avila's testimony.

08:37:15  2            Number two, plaintiff proffers their deposition

08:37:18  3    designations and related exhibits within those designations of

08:37:21  4    Matthew Goyer, G-O-Y-E-R, 30(b)(6) representative of Intouch

08:37:27  5    Solutions.  Mr. Goyer testified that Sanofi had a, quote, "rapid

08:37:32  6    response program," end quote, to scrub their VOICES Facebook page

08:37:39  7    of negative comments and reports of permanent hair loss.  The

08:37:42  8    information is relevant to Liberative Prescription under Louisiana

08:37:47  9    law and law of contra non valentem.  Because the case law requires

08:37:54 10    an analysis of whether the defendant did something affirmatively to

08:37:58 11    prevent plaintiff from availing herself of her claim and because

08:38:02 12    the case law requires the jury to evaluate the reasonableness of

08:38:07 13    plaintiff's action or inaction after she is on constructive notice

08:38:10 14    of an injury related to a specific product toward or cause.

08:38:17 15            Mr. Goyer's testimony was excluded by the Court based on

08:38:19 16    defendant's MIL No. 26, which sought to preclude evidence or

08:38:23 17    argument regarding Taxotere's or other third-party advocacy

08:38:29 18    communications group or group members.  That record document is

08:38:35 19    also 13260.

08:38:36 20            Number three, for the same reasons related to Mr. Goyer,

08:38:39 21    plaintiff proffers the excluded portions of their affirmative

08:38:43 22    deposition designations of Sanofi employee Lesley Fierro, and

08:38:47 23    related exhibits within those designations.  These designations and

08:38:53 24    exhibits were excluded also based on MIL No. 26, and that's Order

08:38:59 25    No. 13260.

08:39:01  1          Number four, plaintiff proffers P493, the 2015 clinical

08:39:09  2   overview; P318, 2011 clinical overview; P418, 2013 response to

08:39:17  3   European health authority.  Plaintiffs were allowed to present the

08:39:21  4   jury with certain information contained within these documents.

08:39:24  5   However, they were not -- they were precluded from entering these

08:39:29  6   documents as exhibits.  These three exhibits were excluded based on

08:39:35  7   the court's ruling on defendant's MIL No. 27 to preclude evidence

08:39:39  8   and argument regarding company conduct that postdates plaintiff's

08:39:43  9   chemotherapy treatment, and the order is Document 13260.

08:39:51 10          Furthermore, it was prejudicial to plaintiff's

08:39:55 11   presentation of this case for the jury to not see these exhibits as

08:39:58 12   they relate to general causation, which is based on evidence not

08:40:02 13   limited to pretreatment.  And they also relate to company conduct,

08:40:07 14   which is relevant to the jury's evaluation of Liberative

08:40:11 15   Prescription and contra non valentem under the *Sharkey* case,

08:40:15 16   *600 So. 2d 701.*  Under *Sharkey*, the defendant's causation defense

08:40:19 17   is relevant to the analysis of whether the case is stale as to a

08:40:25 18   defendant under the law of Liberative Prescription and contra non

08:40:25 19   valentem.

08:40:32 20          Number five, the plaintiff proffers the excluded portion

08:40:36 21   of Sanofi's former employee Frances Polizzano.  The testimony and

08:40:39 22   exhibits that were specifically excluded include an e-mail from

08:40:44 23   Ms. Polizzano to Gina Vestea, both employees of Sanofi at the time.

08:40:50 24   The subject line of the e-mail is, quote, "Re Taxotere FDA request

08:40:55 25   regarding permanent/irreversible alopecia-CO with my comments,"

08:41:03 1   closed quote.  The e-mail states, quote, "Well, this is going to be

08:41:08 2   fun submitting greater than four-year-old labeling changes to the

08:41:13 3   FDA now."  This evidence is of Sanofi's notice and state of mind

08:41:18 4   that a label change regarding permanent alopecia based at least in

08:41:22 5   part on the TAX316 data is a statement against interest which

08:41:29 6   prejudiced plaintiff's case by not allowing to play it based on

08:41:33 7   defendant's MIL No. 27.  That's Record Document 13260.

08:41:39 8         Finally, plaintiff proffers all photographs not admitted

08:41:42 9   by the Court on the grounds that they were cumulative.  Defendant's

08:41:46 10  case has centered on the photographs and claims that Ms. Kahn's

08:41:52 11  hair fully grew back after chemotherapy and gradually fell out

08:41:57 12  thereafter.  The plaintiff believes the jury is entitled to see all

08:42:01 13  of the photographs produced by Ms. Kahn in this case.  The

08:42:04 14  plaintiff and Sanofi agreed on the dates of the photographs and

08:42:08 15  there is no prejudice to defendant's to admit them.

08:42:08 16        MR. STRONGMAN:  Yeah.

08:42:10 17        MR. LAMBERT:  Plaintiffs will submit the excluded

08:42:14 18  designations -- exhibits and designations rulings electronically to

08:42:19 19  the Court for entry on the trial record.  Thank you.

08:42:21 20        THE COURT:  Thank you.  Mr. Moore.

08:42:25 21        MR. MOORE:  Your Honor, two brief housekeeping issues.  I

08:42:29 22  mentioned on Monday that we would check the exhibits that I showed

08:42:35 23  Mr. Seebol during his cross-examination, as I didn't know which

08:42:40 24  photos and records were in, and we would offer, file, and

08:42:45 25  introduced those yesterday but the issue with the juror kind of

1699

08:42:47 1   distracted us, so I wanted to do that now quickly.

08:42:50 2           Those would be photographs D2392, Defense Exhibit 3879

08:42:56 3   page 876, which was a medical record; and then photographs D3172,

08:43:01 4   3208, 3333, 3636, and 3753.  And then we would offer, file, and

08:43:10 5   introduce those in conjunction with the cross-examination of Steve

08:43:10 6   Seebol.

08:43:15 7           And then with reference to the exercise that Mr. Lambert

08:43:17 8   just went through, there is significant evidence that Your Honor

08:43:23 9   has excluded the defendants from using through the deposition

08:43:26 10  designations and the motions in limine, particularly the 2004

08:43:32 11  strikethrough by FDA of the label change to add alopecia as an

08:43:37 12  ongoing adverse event.  And we thought -- our thinking is that

08:43:42 13  those issues are preserved through the rulings.

08:43:44 14           THE COURT:  I thought so, too.

08:43:46 15           MR. MOORE:  Okay.  So I didn't know if we needed to come

08:43:48 16  up and do the same exercise to also preserve those things.  Our

08:43:50 17  thinking was that those were preserved through the rulings that

08:43:53 18  have already been made.  Thank you, Judge.

08:43:56 19           THE COURT:  Okay.  Is there anything further?

08:43:59 20           MS. PEREZ:  No, Your Honor.

08:44:00 21           THE COURT:  All right.  Let's bring in the jury.

08:44:47 22       (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

08:44:47 23           THE COURT:  All jurors are present.  Court's back in

08:44:50 24  session.  You may be seated.

08:44:52 25           Good morning.

08:44:53  1          THE JURY:  Good morning.

08:44:53  2          THE COURT:  Members of the jury, Juror No. 5 has been

08:44:57  3  excused.  You should draw no inference at all from that event, and

08:45:05  4  we will proceed as before.

08:45:09  5          Ms. Sastre.

08:45:10  6          MS. SASTRE:  Yes, ma'am.

08:45:11  7          THE COURT:  Ms. Kahn, I remind you you're under oath.

08:45:14  8          THE WITNESS:  Yes.

08:45:15  9          THE COURT:  Thank you.  Please proceed.

08:45:17 10          MS. SASTRE:  Thank you, Your Honor.

08:45:18 11          Good morning, ladies and gentlemen.

08:45:21 12          THE JURY:  Good morning.

08:45:21 13                    CONTINUED CROSS-EXAMINATION

08:45:22 14  BY MS. SASTRE:

08:45:22 15  Q.  Good morning, Ms. Kahn.

08:45:23 16  A.  Good morning.

08:45:23 17  Q.  Now, ma'am, let me go back for a moment to your testimony, both

08:45:34 18  on direct exam and cross-exam and just to sort of reorient

08:45:39 19  everybody.  You talked about the reasons that you decided you

08:45:43 20  wanted to be part of this clinical trial.  Do you recall that?

08:45:46 21  A.  Yes.  I talked about the clinical trial.

08:45:48 22  Q.  Okay.  And one of the reasons that you thought the clinical

08:45:56 23  trial would be a good option for you is because you thought it

08:46:03 24  might allow you to live a month or two longer, correct?

08:46:07 25  A.  That was part of the -- yes, that was part of the goals of the

08:46:15  1    clinical trial was looking at life span of the patient.

08:46:22  2    Q.  Okay.  And I appreciate your answer, ma'am, and my question is

08:46:28  3    just simply one of the reasons that you decided to be part of it is

08:46:32  4    because you believed and hoped and thought that the clinical trial

08:46:36  5    might allow you to live a couple months longer, fair?

08:46:39  6    A.  Yes.  But the greatest reason for me to sign on for the

08:46:45  7    clinical trial was because my doctor said it was standard of care

08:46:49  8    or better.  And that's how he expressed it to me and that's why I

08:46:53  9    made the decision.

08:46:53  10   Q.  Okay.  And I know that you have said that several times,

08:47:00  11   "standard of care or better," but we can agree based upon the

08:47:03  12   materials that we've gone through that it was the standard of care

08:47:07  13   plus two investigational drugs that were being researched and

08:47:13  14   weren't approved to either treat breast cancer or your kind of

08:47:16  15   cancer, fair?

08:47:16  16   A.  Yeah, fair.  Those drugs were being -- were new to using --

08:47:20  17   sorry -- were new to early-stage breast cancer, but they had been

08:47:23  18   used in cancer treatment for many years.  They were FDA-approved

08:47:27  19   drugs.

08:47:28  20   Q.  Okay.  And if you were one of the women or patients who went on

08:47:34  21   to develop a blood clot from Avastin where you had a 4.5 percent

08:47:44  22   chance of doing that, that wouldn't have been the standard of care

08:47:47  23   and better, right?

08:47:50  24        MR. SCHANKER:  Your Honor --

08:47:51  25        THE COURT:  Overruled.

OFFICIAL TRANSCRIPT

08:47:53  1          THE WITNESS:  No.  That wouldn't have been the standard

08:47:55  2   of care.  However, I was undergoing medical treatment.  I had -- I

08:48:00  3   was visiting my doctors every few weeks, I could -- the nurse was a

08:48:04  4   phone call away.  So if I had any adverse reactions, which I did

08:48:09  5   occasionally, I could talk to them and they could be dealt with.

08:48:12  6   BY MS. SASTRE:

08:48:13  7   Q.  Okay.  All right.  Very good, ma'am.  So let me follow-up on

08:48:16  8   your comment with regard to adverse reactions, all right?

08:48:20  9   A.  Correct, yes.

08:48:20 10   Q.  One of the things that I think you discussed with Counsel is

08:48:26 11   you talked with about the fact that you developed something called

08:48:29 12   "hand and foot syndrome," right?

08:48:31 13   A.  Yes.  That was one of the side effects that I had during my

08:48:35 14   chemo treatment.

08:48:36 15   Q.  And that was something that was painful to you and

08:48:38 16   uncomfortable, correct?

08:48:39 17   A.  Yes, it was very uncomfortable.  But what I did was called the

08:48:43 18   nurse and kept in touch and we worked something out, so they

08:48:47 19   finally lowered my dose and it resolved itself.

08:48:50 20   Q.  All right.  And I was just going to ask you about that.  The

08:48:54 21   medication that they changed, which was causing this problem, was

08:48:59 22   one of the unapproved investigational drugs and that was Xeloda,

08:49:03 23   right?

08:49:03 24   A.  Yes.  It was the Xeloda drug that was causing those issues.

08:49:07 25   Q.  Okay.  And if we can take a look at -- go back to your online

08:49:13  1  blog.

08:49:13  2          MS. SASTRE:  2164, please.  The entry from August 16th of

08:49:30  3  2008, Jen.  Thank you.  If you can just enlarge that, please.  All

08:49:37  4  right.  Thank you.

08:49:37  5  BY MS. SASTRE:

08:49:38  6  Q.  So here is your post, again, from August of 2008, and you

08:49:44  7  entitled it, "I Am Over the Xeloda," right?

08:49:47  8  A.  Um, it was unpleasant having the hand and foot.  What happened

08:49:51  9  with my feet, they hurt so much that it was difficult to walk.  But

08:49:55 10  the nurses worked with me and the doctors worked with me so it did

08:49:59 11  get resolved.

08:50:00 12  Q.  Okay.  But you typed just as you titled it, "I am over the

08:50:04 13  Xeloda," right?

08:50:05 14  A.  Yes.  That is the title of that blog post.

08:50:07 15  Q.  Okay.  And what you described Xeloda as was, "Dreaded pills"

08:50:13 16  that you hated taking, right?

08:50:15 17  A.  Yes.  I did hate taking the pills.  I hated taking the

08:50:21 18  infusion.  Chemotherapy is not for the faint of heart.  You are

08:50:23 19  going to have adverse reactions; that's the nature of chemotherapy.

08:50:27 20  Q.  Okay.  And I think you stated, if we go to the bottom, they had

08:50:32 21  to actually change your dosage of Xeloda because of this side

08:50:36 22  effect or adverse reaction you were having, right?  They had to

08:50:39 23  lower the dose?

08:50:41 24  A.  Yeah.  They had to lower the dose.  But that's what I meant

08:50:42 25  about -- I mean, I had medical care at my fingertips.  When things

OFFICIAL TRANSCRIPT

1704

08:50:46  1  happened that needed to be changed and altered, they were there

08:50:51  2  willing to work with me.

08:50:52  3  Q.  Okay.  And as you said here, you did continue to take the

08:50:59  4  Xeloda through completion even though, as you said, you hated it,

08:51:02  5  right?

08:51:02  6  A.  Right.  But once they were -- yes.  But once they lowered the

08:51:06  7  dosage, the problem started resolving.  I think I probably still

08:51:09  8  had red hands, but it was the difficulty walking that I -- we

08:51:14  9  talked -- I mean, I talked to my doctors and by lowering the dosage

08:51:18 10  then it wasn't so difficult walking once the dosage got lower and

08:51:22 11  it was, I guess, fixed, essentially, you know, so that my body

08:51:27 12  could handle it.

08:51:28 13  Q.  Okay, Mrs. Kahn.  All right.  Let's change gears a bit all

08:51:38 14  right, ma'am?

08:51:38 15  A.  Sure.

08:51:39 16  Q.  So the jury probably knows this by now but just to make sure --

08:51:43 17  just to orient everyone a little bit.  Your chemotherapy, the

08:51:46 18  chemotherapy portion of your treatment finished on October 23rd of

08:51:52 19  2008, right?

08:51:53 20  A.  Yes.  That's when I had the last treatment of the toxic chemo.

08:52:01 21  Q.  Okay.  And over the next few months -- January, February,

08:52:10 22  March, your hair was growing, correct?

08:52:14 23  A.  Yes.  My hair did start growing back after I finished the toxic

08:52:22 24  chemo.

08:52:22 25  Q.  Okay.  And you said yesterday -- you said, "My hair was growing

08:52:25  1   and then at some point it hit a plateau."  Do you recall that?

08:52:29  2   A.  Yes.  And I don't -- I can't tell you when that was, I don't

08:52:32  3   remember, but at some point, it stopped growing.  Now, it never --

08:52:36  4   you could always see my scalp.  So from the time it started growing

08:52:40  5   until it plateaued, you could always see my scalp.

08:52:42  6   Q.  So your testimony today is that you have no idea at what point

08:52:50  7   in time your hair reached its plateau?

08:52:53  8   A.  No, I don't remember.  I can tell you that I stopped wearing a

08:52:57  9   head covering around the end of February.  It hadn't -- it still --

08:53:02  10  it filled in after that, but at some point it filled in, and then

08:53:06  11  there was no more filling in.  So you always could see my scalp at

08:53:10  12  the top, you could always see my scalp at the back from the time it

08:53:14  13  started growing back till today.

08:53:16  14  Q.  Okay.  But, ma'am, in a case where you're claiming that your

08:53:22  15  hair looks the way it does today because of what you told us is

08:53:26  16  supposedly what Taxotere did to it, don't you think it would be

08:53:29  17  important with all of the pictures we have to be able to say,

08:53:33  18  Listen, this was the moment that my hair grew back after

08:53:36  19  chemotherapy and after that, I didn't get any more hair growing

08:53:40  20  back.  Wouldn't it be important to be able to talk about that

08:53:43  21  today?

08:53:44  22  A.  I'm confused about what your question is.  Are you asking me --

08:53:48  23  are you asking about my hair and then you're asking about photos

08:53:50  24  and I don't understand what the connection is exactly.

08:53:52  25  Q.  Well my question is:  In a case like this where your claim is

08:53:56 1   that your hair looks the way it does today because of what you

08:54:01 2   claim Taxotere supposedly did to it, wouldn't it be important for

08:54:06 3   you to know when it was in time that your hair plateaued?  This was

08:54:10 4   the most regrowth I got after chemotherapy.

08:54:13 5   A.  See, how would I know that because I was hoping it would keep

08:54:18 6   growing.  The other thing -- and I explained this yesterday -- is

08:54:21 7   that I didn't like pictures of the top of my head and the back of

08:54:24 8   my head, so I have much fewer pictures in my pictures from years

08:54:30 9   gone of those -- I can't think of the word -- that direction.  So I

08:54:37 10  certainly like the pictures of me front on when there's, like, a

08:54:40 11  shadow of my head.  It looks like I have a full head of hair.

08:54:43 12         THE COURT:  Ms. Kahn, I think the question is:  Do you

08:54:46 13  know when it plateaued?

08:54:47 14         THE WITNESS:  I thought I had answered that.  I said I

08:54:50 15  didn't.

08:54:50 16         THE COURT:  Okay.

08:54:51 17  BY MS. SASTRE:

08:54:51 18  Q.  While we're here talking about the plateau and we're going to

08:54:55 19  look at some pictures specifically, Ms. Kahn, isn't it true that

08:54:58 20  when your hair reached its plateau -- whenever that may have been

08:55:02 21  and we'll see if we can figure it out this morning with some

08:55:05 22  pictures -- but when your hair reached that plateau, isn't it true

08:55:08 23  that your hair did not continue to stay the same for the next

08:55:13 24  decade, true?

08:55:13 25  A.  Well, yeah.  I guess you could say that because over that

08:55:17 1   decade, that's ten years of aging and women's hair thins over time.

08:55:22 2   So now that I am 60, you know, I have -- if I had a full head of

08:55:27 3   hair, I would have less hair than I had at 50.  I would probably

08:55:31 4   have less hair than I had at 30, so that's the natural aging.  That

08:55:35 5   would happen regardless of whether I had the chemo or not.

08:55:41 6   Q.  Okay.  Ma'am, the way your hair looks today is not the way that

08:55:50 7   it looked just a year after chemotherapy, true?

08:55:53 8   A.  Well, it's been -- what, 12 years?  So maybe my hair has

08:56:00 9   thinned, but you could always see my scalp from the time

08:56:04 10  chemotherapy ended until today.

08:56:05 11  Q.  And to the extent that your hair thinned, which you just told

08:56:10 12  us it did, over the course of the past decade since it regrew, you

08:56:15 13  would agree with me you are not seeking to be compensated for that

08:56:17 14  thinning over the course of the past decade, true?

08:56:21 15  A.  Right, that is true.

08:56:22 16  Q.  Okay.

08:56:23 17  A.  But you can always see my scalp.  I never had a full head of

08:56:27 18  hair after chemo ever.

08:56:27 19  Q.  Okay.

08:56:29 20  A.  It was always very, very thin and you could see my scalp at the

08:56:34 21  top, you could see my scalp at the back, you could see the scalp --

08:56:39 22  depending on how the light hits it -- you could see it through my

08:56:42 23  head.  It has been like that since chemo ended until today.  That

08:56:45 24  has not changed.

08:56:46 25  Q.  So if we wanted to understand exactly what it is that you're

08:56:49  1  seeking to be compensated for in terms of your hair, we would have

08:56:52  2  to go back through some of these pictures and sort of find that

08:56:55  3  moment, approximately, when it was after chemotherapy that your

08:57:00  4  hair hit its plateau, fair?

08:57:02  5  A.  Yes.  But I don't think -- I think it's going to be impossible

08:57:05  6  through the pictures because there is no picture in time that we

08:57:08  7  can say that's the definitive plateau.  If I have -- if I had

08:57:13  8  hundreds of pictures from the top of my head, I think you might be

08:57:16  9  able to tell them.  And I gave you 800 pictures, but I can tell --

08:57:21  10  the number of picture that show the top of my head and the back of

08:57:24  11  the head is very minimal.

08:57:27  12  Q.  Okay.  Well, let's take a look, ma'am.  So let's go back to

08:57:32  13  your blog for a moment.

08:57:33  14      MS. SASTRE:  If we pull up 2164, January 25th of 2009,

08:57:40  15  please.  Okay.

08:57:40  16  BY MS. SASTRE:

08:57:51  17  Q.  And if we go to the bottom of the page, it says, "Hair today,

08:57:56  18  more tomorrow," correct?

08:57:57  19  A.  Yes.  That is the title of that blog post.

08:58:00  20  Q.  And I want to make sure that we're doing our math right,

08:58:03  21  because you gave some date yesterday on, well, this picture was X

08:58:08  22  number of months after chemotherapy.  Let's stay focused on

08:58:12  23  October 23rd of 2008, and make sure we're doing the math together,

08:58:16  24  okay?

08:58:17  25  A.  Sure.

08:58:18  1    Q.  Okay.

08:58:19  2    A.  Yeah, no problem.

08:58:20  3    Q.  So this post of yours was almost three months to the day after

08:58:25  4    you completed chemotherapy, correct?

08:58:27  5    A.  Yes, it would be about three.  Yes, it would be three months.

08:58:31  6    Q.  And as we said, you titled it, "Hair today," meaning you had

08:58:36  7    hair the day that you wrote this, and it was growing, meaning,

08:58:40  8    "More tomorrow," right?

08:58:41  9    A.  Well, at that point in January, I had some hair.  I was ready

08:58:45  10   for it to grow fully back.

08:58:47  11   Q.  Okay.

08:58:48  12   A.  That's why I said, "More tomorrow."  It wasn't at a place that

08:58:51  13   I was happy with, but it was growing.

08:58:53  14   Q.  Sure.  And that's what you stated here.  You said, "My hair is

08:58:56  15   growing, of course not as fast as I want it to, but it is growing,"

08:59:00  16   right?

08:59:00  17   A.  Yes.  My hair was growing at that point.

08:59:03  18   Q.  All right.  And if we take a look at a picture from this date.

08:59:07  19        MS. SASTRE:  If we go to January 29th, 2009, please.

08:59:11  20   It's 3112.  It's our first sort of demo.  Picture is January 29th,

08:59:32  21   2009.  3112.  Thanks.  Okay.  Perfect.

08:59:32  22   BY MS. SASTRE:

08:59:40  23   Q.  So here is a photograph of you and you posted this in the blog

08:59:45  24   as well, true?

08:59:46  25   A.  Yes.  I was just -- I wanted to show -- because I was still

08:59:49  1    wearing a head covering, I wanted to show everyone that my hair was

08:59:52  2    starting to grow back but I wasn't comfortable going out in public

08:59:56  3    with my hair looking quite like that.

08:59:58  4    Q.  Okay.  And, again, and this is just a photograph of you three

09:00:00  5    months after you completed chemotherapy, right?

09:00:02  6    A.  Yes.  That was three months after the chemotherapy had been

09:00:05  7    finished.

09:00:05  8    Q.  And this certainly wasn't anywhere near your plateau, right?

09:00:09  9    A.  No, it wasn't.

09:00:10  10   Q.  Okay.  Very good.  Let's go to the next month, please.  Just a

09:00:13  11   couple of weeks later.  Let's go to February 15th of 2009.  Let's

09:00:19  12   take a look at your blog entry first.

09:00:22  13          MS. SASTRE:  So back to 2164, February 15th, 2009,

09:00:28  14   please.

09:00:28  15   BY MS. SASTRE:

09:00:37  16   Q.  All right, ma'am.  So now, we're approximately three weeks from

09:00:42  17   your last post and from the last photo we just looked at and you

09:00:47  18   had titled --

09:00:49  19          MS. SASTRE:  Okay.  We have the wrong page up.  It's

09:00:56  20   February 15th, 2009 called, "Hair Update."  Thank you, Jen.

09:01:01  21   Perfect.  So if we go to the bottom of the page.

09:01:01  22   BY MS. SASTRE:

09:01:04  23   Q.  All right.  So you're posting an update on your hair and you

09:01:07  24   said, "I thought I would show you how my hair is growing," correct?

09:01:11  25   A.  Yes, that's correct.

09:01:13  1    Q.  All right.  And you said, "It's still too short to go out
09:01:15  2    without a scarf, but it's growing a lot more" -- or, excuse me --
09:01:21  3    "It's showing a lot more growth than the last picture that I
09:01:24  4    posted," right?
09:01:25  5    A.  Yes, it does, yes.
09:01:25  6    Q.  Okay.
09:01:27  7           MS. SASTRE:  And if we take a look -- if we go to the
09:01:31  8    next slide, please, the next demo.
09:01:31  9    BY MS. SASTRE:
09:01:34 10    Q.  And if we just look at both of these photos together.  Again,
09:01:39 11    we can all see from looking at this picture your hair is now --
09:01:43 12    it's continuing to grow, right?  You had more hair in February than
09:01:47 13    you did in January, true?
09:01:48 14    A.  Yes.
09:01:48 15    Q.  Okay.  And let's go to your blog post from the very next month,
09:01:56 16    March of 2009, please.
09:01:59 17           MS. SASTRE:  So 2164.  March 4th, 2009.
09:01:59 18    BY MS. SASTRE:
09:02:05 19    Q.  And at the bottom, it's entitled, "Just a Quickie."  And so you
09:02:13 20    are now approximately four months after chemotherapy, right?
09:02:16 21    A.  Um, yes.  That would be about four months.
09:02:19 22    Q.  Four months.  And you are now out without wearing a hat or
09:02:23 23    covering your head, correct?
09:02:24 24    A.  Yes.
09:02:25 25    Q.  And even though your hair is short in this photograph because

09:02:30  1   as we saw it's just growing back in, we can see hair all over your

09:02:36  2   head, true?

09:02:37  3   A.  Yes.  But you can see hair all over my head today, it's just

09:02:42  4   not filled in.  So I have hairs all over my head today.  I had

09:02:44  5   hairs all over my head then, but you could see the top of my scalp.

09:02:49  6   If you can see in that picture, you don't see the top of my scalp

09:02:52  7   or the back, so there's no way to know how much hair I have at the

09:02:55  8   top or the back.

09:02:59  9   Q.  Okay.  Let's keep going.  Now, let's go to the next period of

09:03:10  10  time which is just a couple of months later.  Let's go to June,

09:03:13  11  okay?  So if we take a look of a photo of you from June 30th of

09:03:20  12  2009 which the jury has seen.

09:03:21  13             MS. SASTRE:  It's 3145, please.

09:03:21  14  BY MS. SASTRE:

09:03:29  15  Q.  Okay.  So we're in the same year, 2009, and we just looked at

09:03:35  16  March and here we are about two months later, correct?

09:03:37  17  A.  Yes.  And you can see in that picture --

09:03:40  18  Q.  Well, hold on, ma'am.

09:03:40  19  A.  -- from the face --

09:03:40  20             THE COURT:  Let her --

09:03:44  21             THE WITNESS:  Well, you asked a question and I did say

09:03:45  22  yes and then I was going to explain.

09:03:45  23             THE COURT:  Okay.

09:03:47  24             THE WITNESS:  She said, was it from June 30th, 2009, so I

09:03:51  25  said, yes.

```
09:03:51  1              THE COURT:  Okay.  All right.  And I think that's the
09:03:52  2    answer.
09:03:53  3              THE WITNESS:  May I explain?
09:03:55  4              THE COURT:  That it's June 30th --
09:03:56  5              THE WITNESS:  Right.  But I wanted to explain about the
09:03:58  6    picture.
09:03:58  7              THE COURT:  I think we need to get a question first.
09:04:01  8              THE WITNESS:  Okay.
09:04:02  9              THE COURT:  Thank you.
09:04:03 10    BY MS. SASTRE:
09:04:03 11    Q.  All right.  My question is just simply, that last photograph we
09:04:05 12    looked at from March where your hair was growing in all over but it
09:04:10 13    was very short, you agree with me that your hair was still
09:04:14 14    continuing to grow in by June of 2009, correct?
09:04:18 15    A.  Yes, may I explain now?
09:04:21 16    Q.  Sure.
09:04:22 17    A.  Okay.  Thank you.
09:04:23 18              So what happened is it starts growing and it's just the
09:04:27 19    hairs that I have because I have dead follicles so it's not going
09:04:31 20    to fill in, but the hairs that I have are growing longer.  So in
09:04:35 21    that -- that's what you're seeing in that picture, that the hairs
09:04:37 22    are longer but it's still not full in at the top or the back and
09:04:42 23    you can't see the top or the back from that picture.
09:04:45 24    Q.  And can you tell from took looking at this picture, have you
09:04:49 25    reached your plateau yet?
```

09:04:50  1    A.  I don't know.  I don't know if I'll be able to tell from the

09:04:53  2    pictures or not.

09:04:53  3    Q.  Okay.  We'll see.  We'll go through them and we'll see if we

09:04:56  4    can, all right, ma'am?  So let's take a look at -- well, let me ask

09:05:00  5    you now.  So you're about eight months after chemotherapy in this

09:05:03  6    photo, correct?

09:05:04  7    A.  Somewhere -- nine, yeah.

09:05:09  8    Q.  Okay.

09:05:10  9           MS. SASTRE:  Let's go to the next photo which is the very

09:05:12  10   next month, July of 2009, please.  Thank you.  All right.  And for

09:05:23  11   some reason, this one's a little bit hard to see.  Do we have a

09:05:28  12   different version of this, or can you go back to the actual photo?

09:05:32  13   I think that's 3148.  Okay.  There it is.  That's better.

09:05:32  14   BY MS. SASTRE:

09:05:45  15   Q.  So we're looking, again, at the next month, July of 2009, about

09:05:49  16   nine months after chemotherapy, true?

09:05:51  17   A.  Yes, that would be true.

09:05:53  18   Q.  Okay.  And the jury hadn't heard much about this photo, but you

09:05:56  19   remember this day, right?

09:05:58  20   A.  Yes.  That was the day that I finished -- totally finished all

09:06:02  21   of my chemotherapy.

09:06:04  22   Q.  And you looked pretty happy, right?

09:06:06  23   A.  Right.  I wouldn't have to go back into the infusion room after

09:06:09  24   this point in my treatment.

09:06:12  25   Q.  And by now you had been told that your tumor in your breast --

Case 2:16-md-02740-JTM-MBN   Document 13718   Filed 01/19/22   Page 37 of 135

1715
09:06:17 1  your cancerous tumor had basically shrunk to nothing, right?

09:06:21 2  A.  Well, at this point, I had finished the chemotherapy so the

09:06:23 3  tumor had shrunk.  I had had surgery, so the cancer cells that were

09:06:28 4  left were taken out and I had finished the radiation treatment.  So

09:06:31 5  I had finished all of my treatment by this point in July.

09:06:35 6  Q.  All right.  And what you're doing is, just so folks understand,

09:06:39 7  there's like a bell that you ring when you complete your treatment

09:06:43 8  because that is a big day.  It's a "milestone," to use a word that

09:06:47 9  you used on direct exam, right?

09:06:49 10  A.  Yes.  That would be a milestone in your cancer treatment that

09:06:51 11  you don't have to go back into the infusion room.

09:06:54 12  Q.  All right.  And if we look at your hair here in July of 2009,

09:06:57 13  you would agree with me, if we compare it to the last photo, your

09:07:00 14  hair was still growing, true?

09:07:02 15  A.  Well, it was growing long, and at that point -- about that

09:07:06 16  point, I went to my hairdresser and he said, it's not long enough

09:07:11 17  to cut.  So my hair was growing but it wasn't filling in.  So the

09:07:15 18  top was still -- you can't see the top of my head and you can't see

09:07:19 19  the back of my head in that picture.

09:07:21 20  Q.  Okay.  Well, it wasn't long after this picture, ma'am, that

09:07:25 21  you, in fact, did go -- because your hair had grown so much and had

09:07:30 22  grown so long that you did actually go to get a haircut, true?

09:07:34 23  A.  I went to get a haircut about two or three months later.

09:07:37 24  Q.  Okay.  Let's take a look at that.  If we look at -- well, let

09:07:42 25  me ask you.  From the time that you got that haircut two or three

09:07:47  1  months later -- and I think you testified to this on direct exam --

09:07:50  2  I believe you told our jury that you continued to get a haircut

09:07:53  3  since that time basically every month?

09:07:54  4  A.  Yeah.  I think my hair does grow and I certainly know after we

09:08:01  5  were in quarantine for COVID, I couldn't get to the hairdresser so

09:08:04  6  my hair will grow longer, but that doesn't mean it fills in the top

09:08:08  7  or fills in the back.  It's just the hairs that I have will grow.

09:08:12  8  Q.  Okay.  Let's go forward, again, about a month in time.  Let's

09:08:16  9  move to around the time of your haircut.  So August of 2009, about

09:08:23 10  ten months after the completion of chemotherapy, correct?

09:08:26 11  A.  What are you talking about?  August is ten months, is that what

09:08:31 12  you're saying?

09:08:31 13  Q.  I'm asking roughly.  Does that sound right?

09:08:34 14  A.  Well, it's October to August, so --

09:08:35 15  Q.  Okay.  Around ten months, right?

09:08:38 16  A.  Yeah, we can go with that.

09:08:40 17  Q.  Okay.  I am not the best mathematician so that's why I am just

09:08:44 18  checking with you, okay?

09:08:47 19       And you agree with me that your hair was still continuing

09:08:50 20  to grow, correct?

09:08:50 21  A.  Well, in August I hadn't had my haircut yet, so, yes, the hair

09:08:54 22  is still growing and as I said -- I've said many times, it didn't

09:08:57 23  fill in the top and it didn't fill in the back.

09:09:00 24  Q.  Okay.  And, ma'am, in fact, it was around this time in August

09:09:06 25  of 2009, about ten months after you completed your chemotherapy,

1717

1  that you went to see your oncologist, Dr. Larned, and you said to

2  her that you were "pleased" and "happy" that your hair was growing

3  back, true?

4  A.  Well, I was happy that my hair was growing.  I thought that my

5  hair would fill in since it was still growing.  I had no clue at

6  that point that it wasn't going to fill in in the top or the back.

7  Q.  Mrs. Kahn, my question was just simply that around this time in

8  August of 2009 -- and actually it was on the date of this photo, on

9  the day that this photo was taken, August 13th of 2009 -- you went

10  to see your oncologist, Dr. Larned, and you told her that you were

11  "pleased" that your hair was growing back, true?

12  A.  Yes, I did.  I said yes because my answer is yes.  But I didn't

13  know then what I know now -- that it never would -- it never was

14  going to fill in.  So at that point, I just still thought it was

15  going to fill in and that my scalp would be covered.

16  Q.  Well, ma'am, you didn't go to that appointment with your

17  oncologist, Dr. Larned, and say, I am super upset and disappointed

18  with how my hair looks.  There's something wrong.  My hair has not

19  grown back since chemotherapy.  You didn't say any of that, true?

20  A.  No, because my hair was growing.  And I thought it was going to

21  eventually fill in.  It never occurred to me that it would not.

22  Q.  And, ma'am, the fact of the matter is that your hair grew so

23  much back by this time ten months after chemotherapy that it looked

24  much like it did before you had a drop of chemotherapy, true?

25  A.  No.  You could always see my scalp on the top and you could

1718

09:10:46  1   always see my scalp on the back.

09:10:49  2   Q.  Okay.  Well, let's take a look at some more pictures then,

09:10:53  3   ma'am, all right?

09:10:54  4   A.  Sure.

09:10:54  5   Q.  Okay.

09:10:55  6           MS. SASTRE:  Let's go to a photo, Defendant's 3085 from

09:10:58  7   May of 2008, please.  May 21st.

09:10:58  8   BY MS. SASTRE:

09:11:02  9   Q.  So to orient everybody -- I know this is a photo that we've

09:11:07 10   seen during the course of this trial -- and one of the reasons

09:11:12 11   we've been looking at it is because, as you know, this was seven

09:11:15 12   days before you had your first drop of chemotherapy, right?

09:11:19 13   A.  Yes.  That was right before I had chemotherapy.

09:11:23 14   Q.  Okay.  And, ma'am, you agree with me in looking at this

09:11:25 15   picture -- and I'll be happy to zoom in at the front of your

09:11:29 16   hair -- you agree with me you had lost enough hair in front that we

09:11:35 17   can see right through to your scalp, again, before you ever had a

09:11:39 18   drop of chemotherapy, correct?

09:11:41 19   A.  You can't see my scalp in terms of the top and the back.  You

09:11:45 20   can see my forehead and in that picture the way my bangs were cut,

09:11:49 21   it was cut so that you could see my forehead.

09:12:00 22           MS. SASTRE:  Can you zoom in, please.

09:12:02 23           THE WITNESS:  That's my forehead.  You can't see the top

09:12:03 24   of my head there or the back, so you can't see in that photo that I

09:12:07 25   have hair all over the rest of my head and the way the bangs are

09:12:10  1    cut, you can see my forehead.

09:12:11  2    BY MS. SASTRE:

09:12:11  3    Q.  Okay.  Your testimony under oath is that you can't see through

09:12:19  4    to your scalp in this photo, ma'am?

09:12:22  5            MR. SCHANKER:  Objection, Your Honor.  Asked and

09:12:23  6    answered.

09:12:24  7            THE COURT:  Sustained.

09:12:25  8            MS. SASTRE:  Okay.

09:12:27  9    BY MS. SASTRE:

09:12:30 10    Q.  Let's take a look at another picture.  Let's go now after

09:12:34 11    chemotherapy, all right?

09:12:35 12            MS. SASTRE:  So if we take a look at defendant's 3142,

09:12:38 13    please.

09:12:38 14    BY MS. SASTRE:

09:12:39 15    Q.  It's about eight months after you completed chemotherapy,

09:12:43 16    right, June 29th, 2009, correct?

09:12:46 17    A.  Yes.

09:12:46 18    Q.  Okay.  Ma'am, you would agree with me that in looking at this

09:12:51 19    photograph, you can see the top of your head -- and I don't know,

09:12:57 20    listen, you talked about, Ms. Kahn, something called a "signature

09:13:00 21    pose."  I am not sure if I understood that.  I don't know if this

09:13:04 22    is that pose or what that meant, but we can see in this photograph

09:13:07 23    the top of your head and you would agree with me that at this time,

09:13:10 24    eight months after chemotherapy was complete, your hair had grown

09:13:14 25    back to the extent that it looked much like it did before you ever

09:13:18  1   took chemotherapy, true?

09:13:19  2   A.  No, I don't agree.  I see longer hair in June.  I had not had a

09:13:25  3   haircut yet so it was long, it's flopping over.  It's the way the

09:13:30  4   picture is taken.  I am in a weird angle.  So I don't see that at

09:13:34  5   all.

09:13:36  6   Q.  Okay.

09:13:38  7            MS. SASTRE:  Let's take a look at the next composite,

09:13:42  8   please.

09:13:42  9   BY MS. SASTRE:

09:13:42  10  Q.  We're going to take a look at a side-view.

09:13:46  11           MS. SASTRE:   Thank you.

09:13:46  12  BY MS. SASTRE:

09:13:47  13  Q.  Okay.  So to orient everybody, we're looking at the photo on

09:13:51  14  the left is December of 2006 before chemotherapy, correct?

09:13:55  15  A.  Oh, yes, that was before chemotherapy.

09:13:58  16  Q.  About a year-and-a-half before, roughly?

09:14:00  17  A.  Yes.

09:14:01  18  Q.  Okay.  And the photo on the right, June of 2010, is roughly

09:14:06  19  about a year-and-a-half after the completion of chemotherapy,

09:14:09  20  correct?

09:14:10  21  A.  Not -- not quite, but almost.

09:14:14  22  Q.  Almost.  Okay.  First of all, the photo on the left, before

09:14:21  23  chemotherapy, you would agree with me that from the side, you can

09:14:25  24  see through to your scalp, ma'am, correct?

09:14:28  25  A.  The photo you can see the light.  That's not how my hair looked

09:14:33 1    in person and it's how it's brushed.  It's probably -- you know,

09:14:37 2    it's the haircut and it's the light.  That's what I see.  I know

09:14:41 3    what my hair looked like in 2006.  It was normal hair.

09:14:48 4    Q.  There's something wrong with the lighting in the photo?

09:14:52 5    A.  You know, I don't know -- shadows and light can affect all

09:14:55 6    photos, and it's the same with the photo on the right.  It's in a

09:14:58 7    lot of shadow so it looks -- you can see it looks like hair.

09:15:05 8    Q.  Ma'am, that photo on the right, you were standing in your

09:15:08 9    kitchen.

09:15:08 10   A.  I know exactly about the photo on the right.  My husband took

09:15:11 11   that photo and he always tried to get me in a good pose so that you

09:15:18 12   couldn't see that -- the hair that wasn't on my head and the hair

09:15:21 13   that wasn't on the back of my head.

09:15:23 14   Q.  Okay.

09:15:23 15   A.  All you see is the side.  If you look at my side today,

09:15:27 16   depending on the angle, you do not know that I have no hair on the

09:15:31 17   top of my head and the back.

09:15:32 18   Q.  Okay.  If I understand your testimony, the photos after

09:15:36 19   chemotherapy, like June of 2010, are photos where your husband

09:15:40 20   tried to get you in a good pose so your hair looked its best, but

09:15:44 21   the photos before chemotherapy, like this one from 2006, you've

09:15:48 22   been critical of nearly every single one of them talking about the

09:15:53 23   angle that you're holding your head, the lighting, how you were

09:15:56 24   standing, how the picture was taken; is that true?

09:15:59 25            MR. SCHANKER:  Your Honor, misstates the testimony.

09:16:03  1          THE COURT:  I am going to sustain the objection.  If you

09:16:07  2    can ask her questions and not argue.

09:16:11  3    BY MS. SASTRE:

09:16:11  4    Q.  Okay, ma'am.  You would agree with me in looking at the

09:16:15  5    photograph of you one-and-a-half years before chemotherapy and

09:16:19  6    one-and-a-half years after -- again, from a different view, the

09:16:22  7    side-view -- that by one-and-a-half years after chemotherapy, your

09:16:26  8    hair looked of much like it did before you ever had chemotherapy?

09:16:31  9    A.  In those pictures, it does look similar, but I want to tell the

09:16:34 10    jury and explain that there are 800 pictures that I've given and I

09:16:38 11    have many, many pictures before chemotherapy.  So you can see in

09:16:43 12    those pictures what my hair looks like.  So if you cherry pick

09:16:48 13    particular pictures, you can tell a story depending on which

09:16:51 14    pictures you take.

09:16:52 15          THE COURT:  Ma'am, you just need to answer the question,

09:16:54 16    please.

09:16:54 17          THE WITNESS:  Okay.  Sorry.

09:16:55 18          THE COURT:  Thank you.

09:16:56 19    BY MS. SASTRE:

09:17:01 20    Q.  Okay.

09:17:03 21          MS. SASTRE:  So you can take this down, Jen, thank you.

09:17:03 22    BY MS. SASTRE:

09:17:08 23    Q.  Let's talk about your hair today, okay?  Now, since 2009 and

09:17:21 24    2010, as we talked about a moment ago, your hair has changed

09:17:25 25    dramatically, correct?

09:17:27 1   A.  Since 20- -- no, it hasn't changed dramatically.

09:17:27 2   Q.  Okay.

09:17:30 3   A.  No, it has not.

09:17:31 4   Q.  Okay.  Let's take a look at the next series then.

09:17:35 5           MS. SASTRE:  If we go to the composite, please, with 3145

09:17:39 6   and 3673.  Thank you.

09:17:39 7   BY MS. SASTRE:

09:17:49 8   Q.  Okay.  So June of 2009, about eight months after you completed

09:17:56 9   chemotherapy, and then if we look at this photograph, about three

09:18:01 10  years ago, you would agree with me that your hair by 2017 looked

09:18:05 11  dramatically different, true?

09:18:07 12  A.  I think the style and the way it's cut is different, yes.

09:18:13 13  Q.  Ma'am, you have less hair by 2017 than you did eight months

09:18:17 14  after chemotherapy, true?  And you can see that in these pictures.

09:18:22 15  A.  I know that in June 2009, if you saw the top of my head, it

09:18:26 16  was -- you can see my scalp.  In the back of my head, you could see

09:18:29 17  my scalp.  So I just -- I think the hair is different.  I think the

09:18:34 18  hairstyle and the haircut is different.  I think any picture can

09:18:38 19  tell the story that you want, depending on which pictures you pick.

09:18:41 20  Q.  Okay.  Let's look at the next composite.  And I just have a

09:18:46 21  couple more photos to go through with you, okay?

09:18:49 22  A.  Sure.

09:18:49 23  Q.  All right.

09:18:49 24          MS. SASTRE:  Let's look at the next composite, please.

09:18:52 25  So this is 3157 and 3794 for the record.

09:18:52  1   BY MS. SASTRE:

09:18:58  2   Q.  And, again, we've gotten about one year after chemotherapy on

09:19:02  3   the left and then a photo that's more recent than the last one -- a

09:19:05  4   photo from a little over -- I guess about a year-and-a-half

09:19:08  5   ago now, right?  From February of 2020.  And you would agree with

09:19:12  6   me that you had significantly less hair by 2020 than you did just a

09:19:18  7   year after you completed chemotherapy, correct?

09:19:21  8   A.  In those pictures that's what it looks like.  But I am going to

09:19:25  9   say again, the jury can look at other pictures.  If you cherry pick

09:19:29 10   pictures, you can tell the story that you want.

09:19:31 11          MS. SASTRE:  Your Honor, I would move to strike those

09:19:34 12   comments.

09:19:34 13          THE COURT:  So ordered.

09:19:40 14        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

09:19:48 15          THE COURT:  You're asking her to admit something she is

09:19:53 16   not going to admit and she is saying, no, I'm not going -- what do

09:20:01 17   you want?

09:20:01 18          MS. SASTRE:  I just have one more slide to show of photos

09:20:04 19   and then I am on to a new topic.

09:20:07 20          THE COURT:  Okay.  I know you want to move to strike but

09:20:08 21   I thought that that was her answer, that she said, I am not going

09:20:10 22   to admit it because of this.

09:20:11 23          MS. SASTRE:  I understand.

09:20:11 24          THE COURT:  I'm going to overrule the objection.

09:20:15 25          MS. SASTRE:  Okay.  I meant the "cherry-picking" comment.

09:20:16  1   She said that twice.  I just thought that was an unfair thing to

09:20:21  2   say.

09:20:21  3          THE COURT:  Okay.

09:20:21  4          MS. SASTRE:  That's all.

09:20:21  5          THE COURT:  Fair enough.  But I think what's happening is

09:20:24  6   she is not going to say that.

09:20:25  7          MS. SASTRE:  For sure.

09:20:26  8          THE COURT:  When you said, move to strike I thought I

09:20:29  9   don't know what you want to strike.

09:20:29 10          MS. SASTRE:  Thank you.

09:20:29 11          THE COURT:  Okay.

09:20:31 12          MS. SASTRE:  Thank you, Your Honor.

09:20:37 13       (OPEN COURT.)

09:20:37 14   BY MS. SASTRE:

09:20:37 15   Q.  And let's just take a look at just one last slide with photos

09:20:42 16   and then we'll change topics.

09:20:45 17          MS. SASTRE:  If we go to the next one, please.  3140 and

09:20:48 18   3844.

09:20:48 19   BY MS. SASTRE:

09:20:53 20   Q.  So, again, here is another picture from June 2009, about eight

09:21:00 21   or nine months after chemotherapy.  And this photograph on your

09:21:05 22   right, which I don't think that we have seen yet.  This is pretty

09:21:09 23   recent.  This is just a few months ago, this year, right?

09:21:13 24   A.  Yes.  That was a really -- that was a selfie taken at

09:21:17 25   graduation and the light was weird and it was -- it actually -- it

1726

09:21:23   1   had, like, this weird red coloring that I don't see in this that I
09:21:26   2   think was in the original picture.  It was a selfie taken with a
09:21:31   3   cell phone and so it's an odd picture.  But I wanted to take it --
09:21:36   4   the student that's with me, that's why I wanted to take the
09:21:40   5   picture.  And it's not very becoming of my head.  I would have
09:21:44   6   never wanted my head to look like that.  And in June of 2009, I
09:21:48   7   hadn't had a haircut yet so the hair that I had on my head, I was
09:21:53   8   pulling forward.
09:21:56   9   Q.  Ma'am, can we agree that based upon your review of these
09:22:00  10   photos, that in May of 2021, just a few months ago, that you had
09:22:07  11   dramatically less hair on the top of your head than you had just
09:22:11  12   eight months after chemotherapy completed?
09:22:15  13   A.  The photos do not show a true picture.  I think you can find
09:22:19  14   other photos from 2021 where I look different than that.
09:22:23  15   Q.  Okay.
09:22:25  16        MS. SASTRE:  You can take that down, Jen.  Thank you.
09:22:38  17   BY MS. SASTRE:
09:22:38  18   Q.  All right.  Let's change topics a bit, Mrs. Kahn.  Now, despite
09:22:45  19   what we've just looked at, your claim, in this case, is that you
09:22:51  20   have permanent hair loss from chemotherapy, true?
09:22:53  21   A.  My hair never grew back fully from chemotherapy.  I've always
09:22:58  22   been able to see the scalp and the back of my head.
09:23:01  23   Q.  But, ma'am, none of your doctors -- of all of the doctors
09:23:10  24   you've seen going back all the way to 2008 over 13 years ago, no
09:23:17  25   doctor has ever told you -- no treating doctor -- that your hair

09:23:21  1   loss is permanent, correct?

09:23:22  2   A.  I don't -- I haven't talked to a doctor -- they don't know

09:23:27  3   about -- that's not their specialty.  So when you talk -- when I

09:23:31  4   talk to my gynecologist about it, that wasn't her specialty.  When

09:23:35  5   I mentioned to Dr. Larned --

09:23:35  6            THE COURT:  Ma'am --

09:23:36  7            THE WITNESS:  -- she hadn't seen it before, so they

09:23:39  8   didn't have the specialty to know that it was permanent.

09:23:42  9            THE COURT:  Ma'am --

09:23:44  10            THE WITNESS:  Oh, I'm sorry.

09:23:46  11            THE COURT:  Just the question was, none of your treating

09:23:48  12   physicians have told you that it's permanent; is that correct?

09:23:52  13            THE WITNESS:  No.  None of my treating physicians have

09:23:54  14   ever said that it was permanent.

09:23:56  15   BY MS. SASTRE:

09:23:57  16   Q.  Right.  None of your treating physicians have diagnosed you

09:23:59  17   with permanent hair loss, correct?

09:24:01  18   A.  Correct.  But I have not asked them for a diagnosis.

09:24:05  19   Q.  Well, and none of your doctors, you would follow, have told you

09:24:09  20   that you have permanent hair loss from Taxotere, true?

09:24:12  21   A.  Give me the question again.  I am confused what you're asking

09:24:16  22   me.

09:24:17  23   Q.  Sure.  I would be happy to ask it again.

09:24:19  24            None of your doctors in the past 13 years have told you

09:24:23  25   that you have permanent hair loss caused by Taxotere, true?

09:24:26  1   A.  Right, right.  None of my treating doctors have ever talked to

09:24:29  2   me about that.

09:24:30  3   Q.  Okay.  Now, you would agree with me, though -- and you talked

09:24:39  4   about this a little bit yesterday, Ms. Kahn -- that you did have a

09:24:42  5   conversation with your gynecologist, a doctor -- a lady by the name

09:24:48  6   of Dr. Roberie, right?

09:24:49  7   A.  Yes, I did.

09:24:50  8   Q.  Okay.  And what Dr. Roberie told you was that when you saw her,

09:24:59  9   that the way your hair looked was because of menopause and the

09:25:05 10   natural aging process, true?

09:25:06 11   A.  That's how she explained it to me, that it was aging that was

09:25:10 12   causing me not to have the hair that I wanted to have.

09:25:17 13   Q.  Okay.  And when Dr. Roberie told you that, even though you had

09:25:24 14   taken chemotherapy, of course, told you that you're going to lose

09:25:28 15   your hair from it, your hair did fall out, and, of course, as we've

09:25:32 16   all seen, your hair grew back.  But when Dr. Roberie told you that

09:25:37 17   the way your hair looks is because of menopause and because of the

09:25:40 18   natural aging, is that something that you believed?

09:25:43 19   A.  Well, I was disappointed because if it was because of aging,

09:25:48 20   then you can't reverse aging.  Was it -- did I believe it?  I don't

09:25:52 21   know if I believed it.  I guess I hoped it wasn't true because you

09:25:56 22   can't reverse it, but that's what she told me.

09:25:58 23   Q.  Okay.  And is that something -- well, let me ask you this:

09:26:03 24   There were certainly women that you saw walking around, around your

09:26:08 25   age, that didn't -- or, that had more hair than you, right?  Does

09:26:18  1    that make sense?

09:26:19  2    A.  Yes.  There were women my age with hair more than me, yes, of

09:26:24  3    course.

09:26:24  4    Q.  Okay.  And so my question is just simply, when Dr. Roberie told

09:26:28  5    you that, you know, Mrs. Kahn, I understand you're here complaining

09:26:31  6    about your hair.  I can see you don't have a full head of hair.

09:26:34  7    And when she said, look, this is aging.  This is menopause.  Is

09:26:37  8    that a statement that you relied upon, ma'am?

09:26:41  9    A.  Well, I took it at face value.  She told me that, that's what I

09:26:47  10   had to go with.

09:26:47  11   Q.  My question is:  Did you rely upon it?

09:26:50  12   A.  I don't know what you mean by "rely upon it."

09:26:53  13   Q.  Okay.  Well, did you do anything to determine whether what

09:26:56  14   Dr. Roberie told you -- this is menopause, this is age -- did you

09:26:58  15   do anything to determine whether, in fact, that was correct?

09:27:02  16   A.  I don't know what I would do.

09:27:04  17   Q.  Well, my question is whether you did anything?

09:27:08  18   A.  I didn't -- I didn't go -- no, I didn't do anything.  I

09:27:13  19   listened to what she said and I -- no.  I didn't do anything

09:27:17  20   particular about that statement that she said.

09:27:19  21   Q.  Okay.  But as you're sitting here today, your testimony is you

09:27:23  22   weren't sure if you believed her, fair?

09:27:24  23        MR. SCHANKER:  Objection.  Misstates the testimony.

09:27:31  24        THE COURT:  Well, she's answered that question.  I think

09:27:34  25   you've asked it and it's been answered.

09:27:38  1        MS. SASTRE:  Okay.

09:27:39  2   BY MS. SASTRE:

09:27:46  3   Q.  Well, let me ask you this:  Despite what Dr. Roberie said to

09:27:52  4   you in 2016, you had a friend call you and she said, you know, I

09:27:59  5   saw an ad about hair loss, right?  And about a lawsuit, true?

09:28:09  6   A.  She explained about there was a hair loss connection with

09:28:12  7   Taxotere, yes.

09:28:14  8   Q.  Ma'am, what she said to you is that she saw an advertisement,

09:28:17  9   correct?

09:28:17  10  A.  An ad for what?

09:28:19  11  Q.  An advertisement.

09:28:19  12  A.  Yes --

09:28:20  13  Q.  An ad.

09:28:21  14  A.  Yes, it was an advertisement, yes.

09:28:23  15  Q.  All right.  And despite the fact that no doctor had told you

09:28:26  16  you had permanent hair loss and despite the fact that no doctor had

09:28:29  17  told you you had permanent hair loss caused by Taxotere, and the

09:28:33  18  only doctor who told you anything was your gynecologist who said,

09:28:37  19  Listen, this is age and menopause, you decided at that time to hire

09:28:42  20  a lawyer and to file a lawsuit, correct?

09:28:45  21  A.  I decided to find out what the story was -- why there was an ad

09:28:51  22  about Taxotere and hair loss.

09:28:55  23  Q.  And --

09:28:56  24  A.  And that's when I talked to the lawyers to find out what the

09:29:00  25  story was.

09:29:00 1    Q.  And you hired them?

09:29:02 2    A.  And that there was a connection.

09:29:05 3    Q.  Ma'am, you hired a lawyer and then you filed a lawsuit,

09:29:07 4    correct?

09:29:08 5    A.  Well, yes, eventually, that's what I did, yes.

09:29:11 6    Q.  Okay.  And by the time you filed that lawsuit -- this

09:29:14 7    lawsuit -- that was roughly eight years since you had been

09:29:20 8    cancer-free, true?

09:29:23 9    A.  Yes.  I was eight years cancer-free.

09:29:26 10   Q.  Okay.  And even though we don't know the date of this plateau

09:29:29 11   of your hair, it was also about eight years since your hair had

09:29:35 12   grown back and reached this peak, right?

09:29:40 13   A.  Yeah, at that point.  I mean, it hadn't filled in anymore in

09:29:46 14   2016 than it filled in 2009.

09:29:49 15   Q.  Okay.  And, in fact, by this time -- and we looked at a photo

09:29:51 16   from 2017 -- by this time when you filed this lawsuit, you knew

09:29:56 17   that you had less hair than you even had nine months after you

09:30:02 18   completed chemotherapy, true?

09:30:03 19   A.  No, I wouldn't say that.

09:30:03 20   Q.  Okay.

09:30:05 21   A.  I said -- I said my hair was growing, so in June of 2009, it's

09:30:11 22   growing, so the longer hairs are falling over.  You could still see

09:30:14 23   my scalp -- you could still see the back of my scalp.  So the whole

09:30:18 24   time from 2009 to today, you could see my scalp.

09:30:22 25   Q.  Okay.  But by 2017, 2018, 2019, 2020, today, we can see a lot

09:30:34  1   more of your scalp than we saw in 2009, true?

09:30:38  2   A.  I don't know.  You know, I don't -- I don't -- I can't -- I

09:30:44  3   don't look at my scalp if possible.  It's depressing to me.  It's

09:30:47  4   been like that since 2009, so you try to -- you know, I try to fix

09:30:53  5   my hair so I can't see it, so it's not like I am constantly looking

09:30:57  6   because I don't want to look.  It's upsetting to me.

09:30:59  7   Q.  All right, ma'am.  Well, even though I understand you describe

09:31:07  8   it as "upsetting," in the past 13 years, you have not sought even

09:31:19  9   once any sort of treatment to try and correct this issue?

09:31:28 10   A.  I don't know what treatments that you're talking about that I

09:31:33 11   could get that would solve my issue.

09:31:35 12   Q.  Well, my question is:  In the past 13 years, you haven't tried

09:31:39 13   any treatment at all -- not a drop of anything, not even once,

09:31:42 14   right?

09:31:43 15   A.  I don't know what treatments you're talking about that are

09:31:45 16   possible that would give me hair.

09:31:48 17            THE COURT:  I think it's, did you seek treatment?

09:31:51 18            THE WITNESS:  No.  But I don't -- no, I did not.  But I

09:31:54 19   don't know what treatments you're talking about that are available.

09:31:57 20   BY MS. SASTRE:

09:31:58 21   Q.  Okay.  Well, let's talk about that for a moment because I think

09:32:03 22   you talked about it on direct exam.  So in 2020, just last year,

09:32:13 23   you saw -- and the jury has heard about Dr. Ochsner, right?

09:32:18 24   Dr. Coller Ochsner who is a dermatologist right here in New

09:32:21 25   Orleans, right?

09:32:21  1   A.   Correct.  That's my dermatologist that I go to see, yes.

09:32:24  2   Q.   And she's a lady you see for issues with your skin, right?

09:32:27  3   A.   Yes.

09:32:28  4   Q.   Okay.  And what happened when you saw Dr. Ochsner in July of

09:32:33  5   2020, she offered -- she offered to refer you to a dermatologist

09:32:41  6   here in New Orleans, correct?

09:32:42  7   A.   No.  Dr. Ochsner is my dermatologist.  You're mistaken on that

09:32:48  8   one.

09:32:48  9   Q.   Okay.  Give me just one second.  I have a typo.  I'm sorry.

09:33:00 10   You were seeing a Dr. Johnson, correct?

09:33:04 11   A.   Yes.  She is my primary care --

09:33:04 12   Q.   Correct.

09:33:07 13   A.   -- that I go regularly for primary care.

09:33:10 14   Q.   I apologize, I made a mistake.  So let me go back and redo

09:33:13 15   that, okay?

09:33:14 16             So in July of 2020, you mentioned to your general

09:33:17 17   practitioner, primary care physician Dr. Johnson, you mentioned how

09:33:25 18   your hair looked, correct?

09:33:26 19   A.   No, I did not.

09:33:27 20   Q.   Okay.

09:33:28 21   A.   No, I did not.

09:33:28 22   Q.   You didn't talk with her about your hair at all?

09:33:32 23   A.   No.  She brought it up because she was deposed for this lawsuit

09:33:35 24   and I have never talked to her about hair before.

09:33:38 25   Q.   Okay.  Well, let me try and get to the point here.  And the

09:33:42  1  point, ma'am, is just simply that your general practitioner or

09:33:45  2  primary care physician offered to refer you to a dermatologist here

09:33:50  3  in New Orleans, correct?

09:33:51  4  A.  I had never talked -- yes, correct.

09:33:51  5  Q.  Okay.

09:33:55  6  A.  But I need to explain, sorry.  She -- I had never talked to her

09:33:58  7  about hair before.  She brought it up because she had been deposed

09:34:01  8  in this lawsuit and she was -- wanted to recommend me to a

09:34:06  9  dermatologist.  I had already been seeing a dermatologist; I didn't

09:34:10  10  need to see someone else.  So I wanted -- for any dermatology

09:34:15  11  needs, I am going to go to my usual dermatologist.

09:34:18  12  Q.  Okay.  And we're going to get to that in a moment.  But can we

09:34:21  13  agree upon the fact that you declined to accept this referral from

09:34:24  14  your primary care physician, true?

09:34:26  15  A.  Well, yeah, that is true.  There's no need for me to go to her

09:34:30  16  dermatologist when I had already seen one.

09:34:32  17  Q.  Well, instead, one of the things you did was you traveled down

09:34:36  18  to Miami in that same year, in 2020, to see Dr. Tosti, true?

09:34:42  19  A.  Yes.  I did go see Dr. Tosti.

09:34:45  20  Q.  And she is a dermatologist, right?

09:34:47  21  A.  Yes, that's her specialty.

09:34:50  22  Q.  She isn't here in New Orleans; she is down in Miami, true?

09:34:53  23  A.  Right.

09:34:53  24  Q.  Okay.  And you saw her -- just to orient everybody, to be

09:35:01  25  precise -- it was September of 2020, correct?

09:35:04  1   A.  Yes.

09:35:05  2   Q.  And as opposed to a referral from your primary care doctor to

09:35:11  3   see a dermatologist right here in New Orleans, you instead traveled

09:35:18  4   all the way to Miami to see a dermatologist that your lawyer sent

09:35:24  5   you to, true?

09:35:25  6   A.  Well, that was for the case.

09:35:28  7   Q.  Ma'am, that's not my question.  Am I correct?

09:35:30  8   A.  Well, yes.  But I wasn't going down there for treatment.

09:35:36  9   Q.  Okay.  And, in fact, I believe one of your lawyers even

09:35:43  10  traveled with you to go see Dr. Tosti, true?

09:35:47  11  A.  Yes.  One of the lawyers went down there with me, yes.

09:35:50  12  Q.  Okay.  I mean, did your lawyers go to any other doctors visits

09:35:57  13  with you, or was it just Dr. Tosti?

09:35:58  14  A.  Well, I wasn't going to Dr. Tosti for treatment.  It wasn't

09:36:02  15  like, you know, I made an appointment and I am going there and she

09:36:06  16  is going to treat me and she is my patient (VERBATIM).  That wasn't

09:36:09  17  the intent of that visit.

09:36:10  18  Q.  Ma'am, my question was:  Other than you're going to Miami to

09:36:17  19  see Dr. Tosti, have your lawyers gone to any other doctor visits

09:36:22  20  with you?

09:36:22  21  A.  No.  Why would my lawyers go to any doctor visits with me?  All

09:36:27  22  of my doctors visits are for me to get treatment that have nothing

09:36:29  23  to do with them.

09:36:31  24  Q.  Okay.  And when you saw Dr. Tosti down in Miami, you would

09:36:35  25  agree with me, you really didn't ask her any questions at that

09:36:38  1    time, true?

09:36:38  2    A.  I didn't ask her questions because she was not my treating

09:36:42  3    doctor.

09:36:42  4    Q.  Okay.  And so that would mean you didn't ask her, what caused

09:36:47  5    my hair loss, true?

09:36:48  6    A.  Um, she was -- I had gone -- true, I didn't ask her.  But I

09:36:56  7    went to Miami for her to diagnose and she didn't finish the

09:37:01  8    diagnosis until the biopsy was back, so that wouldn't have happened

09:37:04  9    while I was down there.

09:37:05 10    Q.  Right.  So it would follow when you were there -- going all the

09:37:09 11    way down to Miami to see a dermatologist -- you didn't even ask

09:37:14 12    her, Dr. Tosti, I came a long way.  I am here with you.  Do you

09:37:18 13    have a diagnosis for me?  You never asked her that, true?

09:37:20 14    A.  No, I didn't need to.  She was not my treating doctor.  I was

09:37:24 15    going to find out when she made a diagnosis later but she wasn't my

09:37:28 16    treating doctor.

09:37:29 17    Q.  And other than that one time in September of 2020, until she

09:37:36 18    came to this courtroom last week, you have not seen Dr. Tosti

09:37:40 19    before or since that visit, true?

09:37:41 20    A.  Right.  No, I have not.  She is not my treating doctor.  I

09:37:45 21    haven't seen her again.

09:37:46 22    Q.  Okay.  And you keep saying that over and over, ma'am.  I

09:37:50 23    understand you keep saying she is "not your treating doctor."  And

09:37:52 24    the fact of the matter is, when you were there after traveling to

09:37:56 25    Miami to see this physician, you didn't ask her whether there was

09:38:01  1  any treatment that you could try for your hair, did you?

09:38:04  2  A.  No.  I didn't ask her particularly, but she talked to me about

09:38:07  3  it.

09:38:08  4  Q.  Right.  And even though you didn't ask, Dr. Tosti talked with

09:38:14  5  you about a treatment for your hair, true?

09:38:17  6  A.  Yes -- she made -- yes.  She made a suggestion of what I could

09:38:21  7  try.

09:38:22  8  Q.  And she suggested that you try minoxidil, correct?

09:38:26  9  A.  Yes, that was her suggestion.

09:38:27 10  Q.  Okay.  And as you sit here today, that's something you still

09:38:30 11  haven't done, not even once, true?

09:38:32 12  A.  No, I haven't done it.  But I did a lot of research on it and I

09:38:37 13  can't afford to lose any more hair, so I am not going to try

09:38:40 14  something that could actually make any situation worse.

09:38:42 15  Q.  Okay.  Well, if you were to use minoxidil -- we can agree, no

09:38:47 16  one in this courtroom has a crystal ball -- I mean, we don't know

09:38:51 17  if it might make your hair look better, true?  You don't know that.

09:38:55 18  A.  It's not going to fill -- I do know it's not going to fill in

09:38:59 19  any scalp.  The way minoxidil works -- because it's not going to

09:39:02 20  make the dead follicles grow.  What it will do with the hair that I

09:39:06 21  have, it may make it look a little thicker, but it's not going to

09:39:09 22  fill in where you see my scalp because I have dead follicles and

09:39:13 23  Rogaine can't grow -- I mean, can't help hair grow out of dead

09:39:18 24  follicles.

09:39:18 25  Q.  Well, ma'am, despite your testimony, there are three separate

09:39:21  1    dermatologists, including Dr. Tosti, that have suggested you try

09:39:25  2    minoxidil, true?

09:39:26  3    A.  They have suggested it, but it is not a cure for PCIA.

09:39:32  4    Q.  And those three dermatologists, including the one hired by your

09:39:36  5    lawyers, those three dermatologists suggested this treatment to you

09:39:47  6    and, again, to this day despite their suggestion, you've never

09:39:51  7    tried a drop of it, correct?

09:39:53  8    A.  No.  I don't want to try a drop of something that's going to

09:39:55  9    make my hair worse.

09:39:57 10    Q.  Okay.  Well, they didn't tell you when they suggested it, these

09:40:00 11    three dermatologists, Hey, we're suggesting you use this because

09:40:03 12    you know what?  It makes a lot of patients' hair look worse.

09:40:07 13    Nobody said that, ma'am, right?

09:40:08 14    A.  No.  Of course, they didn't say that --

09:40:09 15    Q.  And the reason they suggested it was because --

09:40:11 16           MR. SCHANKER:  Your Honor, I don't believe she's done

09:40:13 17    with her response.

09:40:15 18           MS. SASTRE:  I'm sorry.  Go ahead.

09:40:18 19           THE WITNESS:  I don't even know what the question is.

09:40:19 20    You're going to have to get back.  I can't even answer.

09:40:21 21    BY MS. SASTRE:

09:40:21 22    Q.  Ma'am, you know that the reason these three separate

09:40:24 23    dermatologists, two of them right here in New Orleans and Dr. Tosti

09:40:27 24    down in Miami, you know that the reason all three of them suggested

09:40:30 25    minoxidil to you is because they believed it was in your best

09:40:34  1  interest and that it would help your hair?

09:40:36  2  A.  They thought it might do some good.  It's not going to cure it,

09:40:41  3  it'll never fill in, you'll always see my scalp.  So, you know,

09:40:45  4  some people are willing to try something -- anything.  I am not

09:40:50  5  going to try something that's going to actually make my hair worse.

09:40:54  6  I also don't -- can't put a liquid in my hair in the morning and if

09:40:59  7  it's going to make it stick together, I can't -- I can't take --

09:41:03  8  the look of that is not going to make me look better.  And it's

09:41:07  9  something that you have to use forever.  And if it's not -- if it's

09:41:10  10  only going to make, you know, my hair is a little thicker and it's

09:41:13  11  not going to fill in, it doesn't cure me.  It doesn't solve my

09:41:17  12  problem.  I'll never get a full head of hair by using Rogaine.

09:41:20  13  Q.  Well, we're never going to know what you might get without you

09:41:26  14  trying, right?

09:41:27  15  A.  Well, you don't know until you try something, but I was not

09:41:30  16  willing to take the risk.  I weighed the risk and benefits and made

09:41:33  17  a decision for myself.

09:41:34  18  Q.  Okay.  And just while we're here on minoxidil, you just talked

09:41:42  19  about there's a liquid one and there's also a pill you can take,

09:41:45  20  true?

09:41:45  21  A.  Yes.  But the pill is also a blood pressure pill and so I would

09:41:51  22  have had to change my whole blood pressure regimen if I chose to

09:41:55  23  take that.

09:41:55  24  Q.  Okay.  And when you say "it's a blood pressure pill," I just

09:41:58  25  want to make sure that we're all clear.  You're saying that the

09:42:01  1   minoxidil pill is for patients like yourself -- you can take it to

09:42:06  2   make your hair grow back and it also helps with your blood

09:42:09  3   pressure, right?

09:42:10  4   A.  Well, it's -- it gives to lower blood pressure.

09:42:13  5   Q.  Right.

09:42:14  6   A.  Yes.

09:42:14  7   Q.  Right.  And so if I understand your testimony, your concern --

09:42:18  8   the reason after all of these years, after three recommendations,

09:42:20  9   that you haven't tried it because you might have had to have gone

09:42:25  10  back to your primary care doctor and said, Hey, I want to take this

09:42:28  11  treatment for my hair.  It's going to help my blood pressure, and

09:42:33  12  can I stay on the same blood pressure pill if I take this?  That

09:42:37  13  was the reason you didn't try it?

09:42:38  14  A.  Well, the -- I had -- I guess I had recently changed blood

09:42:43  15  pressure pills and I was happy with the -- I am not experiencing

09:42:46  16  side effects with them.  And I didn't want to change again.  So

09:42:50  17  I -- I -- I was happy with the pill I was on, I had had no side

09:42:55  18  effects with it, and so I wanted to stick with the pill -- the pill

09:42:58  19  that I'm on right now.

09:42:59  20  Q.  Okay.  And for those reasons when it comes to the minoxidil

09:43:03  21  pill, that's why you never tried it even once, right?

09:43:08  22  A.  Well, there were a number of reasons, but that was one of them,

09:43:12  23  yes.

09:43:12  24  Q.  Okay.  All right, Ms. Kahn.  Let's change topics, all right,

09:43:28  25  ma'am?

09:43:29  1   A.  Sure.

09:43:29  2   Q.  Okay.  And really I just have just one last thing I just want

09:43:33  3   to spend a little time on with you this morning, okay?

09:43:38  4        Now, I know you talked about -- you went through a fair

09:43:44  5   number of photos with your lawyer on direct exam, and you talked to

09:43:48  6   the jury with a lot of experiences that you've had in your life.

09:43:51  7   Do you recall that?

09:43:51  8   A.  Yes.  I don't know -- yes, I've had life, yeah.

09:43:55  9   Q.  Right.

09:43:56  10  A.  So.

09:43:56  11  Q.  For sure.  And just meaning the things that you did before

09:44:00  12  chemotherapy, right?  You talked with us about your job and I think

09:44:03  13  you described that as something that's super meaningful to you that

09:44:06  14  you enjoy, right?

09:44:07  15  A.  Yes.  My job is very important to me.

09:44:09  16  Q.  And that's a job that you still worked and enjoyed since your

09:44:13  17  treatment -- your successful treatment, correct?

09:44:14  18  A.  Yes.  I kept up with the job from treatment and actually, I

09:44:19  19  worked all during treatment.  It was very difficult but I did it,

09:44:22  20  yes.

09:44:23  21  Q.  Okay.  And from what I can tell -- and we'll look at some

09:44:26  22  pictures and then I'll be finished, I'll do sit down after that --

09:44:29  23  but from what I can tell from looking at your photos is you appear

09:44:32  24  to have a very active social life, spending time with your loved

09:44:36  25  ones, your family, and your friends, true?

```
09:44:37  1   A.  Well, I want to be active -- yes.  When I went under
09:44:42  2   chemotherapy, I -- you know, and the surgery and the radiation,
09:44:46  3   that was work.  And I attacked it like a second job and the goal
09:44:51  4   was to be cancer-free when I'm done.  And so, you know, once you do
09:44:56  5   that, you're going to live life.  I am still going to live life
09:44:59  6   whether I have hair or not.  I have to say it affects me every day,
09:45:04  7   but I am not going to stay home and stay in bed because I don't
09:45:07  8   have hair.
09:45:07  9   Q.  And you definitely haven't stayed home and stayed in bed,
09:45:10  10  agreed?
09:45:11  11  A.  No.  But -- because it's important for me to live my life.  But
09:45:15  12  I can't say this doesn't affect me, it does.
09:45:18  13  Q.  Okay.  And we've heard about that you go to Mardi Gras
09:45:22  14  frequently, right?
09:45:23  15  A.  Well, it's down the street; it's kind of hard to avoid.
09:45:26  16  Q.  Okay.  That's a nice thing, you have fun, right?
09:45:28  17  A.  Well, yeah, right.
09:45:30  18  Q.  Okay.  Hard to have a bad time there, true?
09:45:32  19  A.  Probably, right, yeah.
09:45:34  20  Q.  Okay.  And I think we heard from your husband you've had a
09:45:37  21  streak, an unbroken streak of going to Jazz Fest, right?
09:45:41  22  A.  Yeah.  That's something that -- we have friends that come in
09:45:44  23  town, so we go with them every year.
09:45:46  24  Q.  And you go out to eat frequently, right, that's something you
09:45:49  25  enjoy doing?
```

09:45:51 1   A.   Yeah.   Less now because of COVID, but yes.

09:45:53 2   Q.   Sure.   And I think we can agree that you are an avid traveler,

09:45:59 3   you travel quite frequently?

09:46:00 4   A.   You know, I think -- we always take one trip a year and then as

09:46:05 5   a vacation, and then we might travel other times to go see family.

09:46:11 6   But I don't think one trip a year is an avid traveler.

09:46:14 7   Q.   Okay.   Well, we'll look at some photos.   I mean, we can agree

09:46:18 8   and I don't think my list is complete, so maybe you can help me

09:46:21 9   with it.   You've been to New York, Colorado, Oregon, Nova Scotia,

09:46:26 10   which I wasn't even sure where it was, that's outside of the U.S.,

09:46:29 11   right?

09:46:29 12   A.   It's Canada.   It's not really that far away, but it's in

09:46:33 13   Canada.

09:46:33 14   Q.   Okay.   But it's outside of the country, true?

09:46:35 15   A.   Yeah.

09:46:35 16   Q.   Okay.   And you've been to Houston multiple times; that's a

09:46:40 17   girl's trip you take almost every year, true?

09:46:42 18   A.   Yeah, I go with friends.

09:46:43 19   Q.   Yeah.

09:46:44 20   A.   Uh-huh.

09:46:44 21   Q.   And you've been to Montgomery, true?

09:46:46 22   A.   Well, that's where my sister lives, so I went to see my sister.

09:46:49 23   Q.   All right.   But it still counts as traveling, right?

09:46:52 24   A.   It does.   But I don't count trips like that as vacation.   It's

09:46:55 25   going to see people that don't live in New Orleans, so I have to go

1744

09:46:58  1    away to see them.

09:46:59  2    Q.  You've been to Santa Fe, New Mexico, right?

09:47:04  3    A.  Yes, we -- yes.

09:47:07  4    Q.  And where else?

09:47:08  5    A.  You've named a lot of places, I don't know.  As I said, we go,

09:47:12  6    we make a trip once a year.  I think I'm allowed to have trips even

09:47:16  7    if I don't have hair, so I am not sure what you're asking of me.

09:47:22  8    Q.  Okay.  Well, my question was just simply, are there other

09:47:27  9    places you've been over the past decade beyond the list that we

09:47:30  10   just went through?

09:47:31  11   A.  Maybe, I don't remember.

09:47:33  12   Q.  You don't remember sitting here?

09:47:36  13   A.  No.  I don't -- you made a list, so I don't know what other

09:47:39  14   places we've been beyond that.

09:47:41  15   Q.  Okay.  Well -- all right.  Let's just take a look at some

09:47:44  16   photos then and see if I can refresh your memory, okay?

09:48:05  17           All right.  So let's get the date in.  All right.  So

09:48:14  18   this is July of 2009.  Again, about eight or nine months after you

09:48:19  19   completed chemotherapy, right?

09:48:20  20   A.  Yes.

09:48:21  21   Q.  And we can agree this isn't here in New Orleans, right?

09:48:24  22   A.  No.

09:48:25  23   Q.  Where are you?

09:48:25  24   A.  I don't know.  It's probably New Mexico because I think that's

09:48:29  25   where we went after we -- after I finished chemo.

09:48:34  1    Q.  Okay.  And you were able to enjoy yourself on that trip?

09:48:37  2    A.  Well, yeah, I can enjoy myself.  But even if I leave New

09:48:41  3    Orleans, I am still going to have the same hair away from New

09:48:44  4    Orleans as I am in New Orleans.

09:48:46  5    Q.  Okay.  And here is, again, July of 2009.  Is this the same

09:48:55  6    trip?

09:48:56  7    A.  Yeah.  That have the exact same trip that you showed the

09:48:59  8    previous picture.

09:49:00  9    Q.  And is this New Mexico, or you're not sure?

09:49:01 10    A.  Yeah, that's New Mexico.

09:49:03 11    Q.  Okay.  Because I think you testified that you went to Santa Fe

09:49:07 12    in 2021, were there two trips to New Mexico?

09:49:11 13    A.  Yes.  We were -- we went in 2009 and went again in to 2021.

09:49:17 14    Q.  Okay.  All right, ma'am.  And here is another photo from 2009,

09:49:22 15    November.  I am guessing because of the water -- I am taking a

09:49:27 16    guess that it's not New Mexico but this is a little bit later,

09:49:31 17    several months later.  Do you know where you are here, if you

09:49:35 18    recall?

09:49:35 19    A.  I'm thinking that's probably Maine.  My father had -- after

09:49:39 20    Katrina, he lost his house and so he moved to Maine, so we didn't

09:49:44 21    get to see him that often.  He only came down here once a year, so

09:49:47 22    if I wanted to see my father more, I had to go travel to see him.

09:49:51 23    So I'm thinking that was a trip to go see my father.

09:49:54 24    Q.  Okay.  So you're up in Maine, right?  Is that what you said?

09:49:58 25    A.  No, you know what, that isn't.  That's -- that's -- we got in

09:50:07  1  the car and drove to Grand Isle.

09:50:07  2  Q.  Okay.

09:50:09  3  A.  That's in Louisiana, sorry.

09:50:10  4  Q.  Okay.  No problem.

09:50:11  5  A.  And we went just for the day.

09:50:13  6  Q.  Sure.  Okay.  And going forward in time, this is April of 2010,

09:50:17  7  I think we have heard about this photo before, you were out having

09:50:20  8  lunch with your friends and classmates from Newman, right?

09:50:23  9  A.  Yeah.  That was just some people I went to high school with,

09:50:27 10  yes.

09:50:27 11  Q.  Okay.  And these are friends that you've had from Newman High

09:50:30 12  School that you stayed in touch with after all these years, right?

09:50:33 13  A.  Well, one of them I keep in touch with a lot.  The others, I

09:50:37 14  don't see that often, so it's nice to get together every few years.

09:50:40 15  Q.  Okay.  And then here is a photo, March 8th of 2011.  And let me

09:50:51 16  read these -- I'll read the exhibit numbers out after this, 3203.

09:50:58 17  You're at Mardi Gras?

09:51:00 18  A.  Yeah.  That was a Mardi Gras picture.

09:51:02 19  Q.  Okay.  With your husband, right?

09:51:05 20  A.  Yes.

09:51:06 21  Q.  Okay.  And then I believe we've seen this photo as well.  This

09:51:12 22  is 2011, and where are you here, ma'am?

09:51:15 23  A.  That was Maine when I was going to visit my father.

09:51:19 24  Q.  Okay.  When was it that you went to Nova Scotia?

09:51:23 25  A.  I think that was 2019.

09:51:26   1   Q.   Okay.   All right.   And then this is 2012, and where are you

09:51:39   2   here?

09:51:40   3   A.   I don't remember.

09:51:47   4   Q.   It's not Louisiana?

09:51:48   5   A.   No.   I don't remember where that was.

09:51:49   6   Q.   Okay.   It was a trip you can't recall?

09:51:51   7   A.   It was ten years ago; I don't remember.

09:51:53   8   Q.   Sure.   But it was some trip or vacation, you just can't

09:51:56   9   remember, fair?

09:51:56  10   A.   Yes.

09:51:57  11   Q.   Okay.   And then in 2013, this is in Miami, right?

09:52:07  12   A.   Oh, yes, that's in Miami.   My in-laws lived in Southern Florida

09:52:15  13   so -- and they very rarely came to New Orleans.   So if we wanted to

09:52:19  14   go see my husband's parents, we had to travel down to Southern

09:52:22  15   Florida to go see them.

09:52:22  16   Q.   Okay.

09:52:24  17   A.   That's the only way we could go see them.

09:52:26  18   Q.   And you're at a place down there, you may recall called

09:52:30  19   Vizcaya, right?

09:52:30  20   A.   Yes.

09:52:31  21   Q.   Okay.   So it's a vacation for you as well, right, in 2013?

09:52:35  22   A.   Well, we would do other things while we were there, but we

09:52:38  23   wouldn't have gone if my in-laws hadn't lived there, we wanted to

09:52:42  24   see them.

09:52:42  25   Q.   But, ma'am, even when we go to travel to family, can we just

09:52:45  1   agree upon the fact that that can still be called a vacation?

09:52:48  2   A.   Well, it's time away from home.   But you wouldn't have traveled

09:52:52  3   necessarily at that time at all if we weren't going to see family.

09:52:55  4   Q.   Do you enjoy spending time with your family?

09:52:57  5   A.   Well, I wanted to see them, yes.   I wanted to be with my

09:53:00  6   family.

09:53:00  7   Q.   No, my question is:   Do you enjoy it?

09:53:03  8   A.   Well, yeah, I do enjoy being with family.   We all enjoy being

09:53:08  9   with our family.

09:53:08 10   Q.   Okay.   All right.   And then here you are in 2013, and I think

09:53:11 11   you're getting some kind of award, correct?

09:53:13 12   A.   Yes.   That was a national award that I got.   I think that was

09:53:16 13   in San Antonio.

09:53:17 14   Q.   Okay.   And then 2013 as well, where is this taken?

09:53:27 15   A.   I think that's in New Mexico but I don't remember.

09:53:31 16   Q.   Okay.   All right.   So that might be a second trip to New

09:53:38 17   Mexico?

09:53:38 18   A.   That's some place my husband and I like to go.   We went because

09:53:42 19   it's so different from New Orleans and we like going places where

09:53:48 20   you experience different things than you do here.

09:53:51 21   Q.   Okay.   2013, looks like you're with family again, right?

09:53:59 22   A.   That was a birthday for my aunt.

09:54:04 23   Q.   Okay.   And here, 2014, and we've seen a couple pictures from

09:54:07 24   this day.   You're at a wedding, right?

09:54:11 25   A.   Yes.

1749

09:54:11  1   Q.  Okay.  And, you know, by the time we get to 2014, and there

09:54:21  2   have been again some other photos shown from this day, other photos

09:54:25  3   around this time period.  By now, you've been on tamoxifen for six

09:54:31  4   years, right?

09:54:34  5   A.  Probably, was '09 to 2014.

09:54:38  6   Q.  Yes.  So if you started tamoxifen in April of 2009, by the time

09:54:44  7   you get to this date, you would agree, this is after six years of

09:54:52  8   tamoxifen use, right?

09:54:53  9   A.  Yes.  I was on tamoxifen since 2009, so.

09:55:03  10  Q.  Okay.  All right.  And just a few more photos, ma'am.  So 2014,

09:55:09  11  where are you here?

09:55:10  12  A.  I don't -- it looks like New Mexico again.

09:55:18  13  Q.  Okay.  And here you are, it looks like with friends in 2014,

09:55:21  14  where is this?

09:55:22  15  A.  No.  That was for an event with school.  There were a number of

09:55:26  16  times, over the years, that educationally, I would travel like when

09:55:33  17  I won the award in San Antonio and then here when I was sent to go

09:55:37  18  to an event.  This was a conference that I went with these

09:55:40  19  teachers.

09:55:40  20  Q.  Where was it?

09:55:42  21  A.  This was in Boston.

09:55:44  22  Q.  Boston.  Okay.  Okay.  Let's look at this photo from 2016.  Do

09:55:58  23  you know where this is?

09:55:58  24  A.  Yes.  That was back in Maine.  I was visiting my father.  And

09:56:04  25  my father's wife had died and he was living alone and he was --

09:56:10  1    he's getting up there in age and we worried about him, so we

09:56:13  2    definitely needed to go see him after his wife died.

09:56:16  3    Q.  Okay.  And here, I think we can agree this is around Christmas,

09:56:23  4    right?  This is actually the day after Christmas, December 26,

09:56:26  5    2016, right?

09:56:27  6    A.  Yes.

09:56:28  7    Q.  And you're with your family?

09:56:29  8    A.  No.  Those -- no, those are all friends of mine.

09:56:29  9    Q.  Which friends?

09:56:32  10   A.  They're all family; we're not.

09:56:37  11   Q.  Okay.  And I know we talked about Jazz Fest.  Here you are in

09:56:41  12   2017, right?

09:56:42  13   A.  Yes.

09:56:44  14   Q.  And you have your VIP pass on for the Acura stage, right?

09:56:50  15   A.  Yes.

09:56:53  16   Q.  Okay.  The jury has seen this photo.  Ma'am, we're in 2017 now,

09:56:58  17   I think this is up in the Rocky Mountains in Colorado, you and your

09:57:01  18   husband, right?

09:57:01  19   A.  Yes.  That's what it looks like there.

09:57:04  20   Q.  Okay.

09:57:08  21   A.  But I want to explain that no matter whether I am here at home

09:57:12  22   or I am away, I still don't have hair on my head.  I am living.

09:57:18  23   Would I be happier with hair, yeah, I definitely would.

09:57:23  24   Q.  Okay.  This looks like Galatoire's, right, 2017?

09:57:28  25   A.  Yes, it does.  I think that was from my mother's birthday.

09:57:36  1    Q.  And 2018, where are you and your husband here, ma'am?

09:57:41  2    A.  Oh, that was our summer trip.  We went to Oregon.

09:57:55  3    Q.  Okay.  And I think -- last photo, it's pretty recent, 2021.  Is

09:58:00  4    this you and your girlfriends on your summer trip?

09:58:02  5    A.  Yeah.  We started -- actually -- yes, it is.  A friend of mine

09:58:06  6    who lives in New Orleans has a house in Houston and I even went --

09:58:10  7    when I started chemo treatment, we started a tradition of going to

09:58:14  8    Houston every summer to spend some time together and shop and just

09:58:19  9    visit.  And so it was -- it's very memorable because it all started

09:58:24 10    with my cancer treatment, and we do this every year.  We can drive,

09:58:27 11    it's easy.  We had a place to stay because my friend has a house.

09:58:31 12    And there are some people in Houston that -- we have friends in

09:58:34 13    Houston and we all visit together.

09:58:36 14    Q.  Okay.  And, ma'am, the fact of the matter is, we can agree that

09:58:42 15    every one of these trips, every one of these events, every one of

09:58:46 16    these holidays, every one of these special occasions, these

09:58:51 17    beautiful moments in your life, you know that they were made

09:58:55 18    possible because your treatment was successful, true?

09:58:58 19    A.  Well, yes, of course.  I guess -- I mean, I'm here today

09:59:02 20    because of my treatment.  But I also could have been here today and

09:59:06 21    still had hair on my head, that's the bottom line.  If I hadn't

09:59:09 22    taken Taxotere, I wouldn't be up here today complaining about the

09:59:12 23    fact that I have no hair on my head.

09:59:21 24    Q.  Okay.  I think you just celebrated another milestone in your

09:59:27 25    life, right, your 25th wedding anniversary?

09:59:31  1    A.  Yes.  We had a 25th -- yeah, we did.

09:59:33  2    Q.  Okay.  And that's something that's meaningful to you, right?

09:59:44  3    A.  Of course.

09:59:52  4    Q.  Okay.  And, ma'am, I understand -- I understand you wish you

09:59:57  5    had more hair today, right?  Is that fair?

10:00:01  6    A.  Well, I certainly do.

10:00:02  7    Q.  Okay.  And I understand that.  But you would agree with me that

10:00:10  8    every single day that you have been alive since your successful

10:00:17  9    treatment in 2008 has been a gift?

10:00:21 10    A.  It could -- yes.  I am going to say yes.  However, I could have

10:00:25 11    also gone through the treatment and had a different drug and then I

10:00:28 12    wouldn't be sitting here today complaining about the fact that my

10:00:31 13    hair hasn't grown in.

10:00:36 14            MS. SASTRE:  Okay.  Ma'am.  Thank you.

10:00:37 15            I have nothing further.  I pass the witness, Your Honor.

10:00:39 16            THE COURT:  Okay.  Thank you.

10:00:40 17            Redirect.

10:00:40 18            MR. SCHANKER:  Yes, Your Honor.

10:00:42 19                        REDIRECT EXAMINATION

10:00:42 20    BY MR. SCHANKER:

10:00:55 21    Q.  Good morning.  Good morning, Ms. Kahn.

10:01:01 22    A.  Hey.

10:01:02 23    Q.  A few follow-up questions.  Let's start with the photographs,

10:01:06 24    okay?

10:01:06 25    A.  Okay.

10:01:07 1   Q.  You were asked a lot of questions about your hair by the

10:01:11 2   defense attorney.  Do you remember the term "plateau" being used?

10:01:15 3   A.  Yes.

10:01:15 4   Q.  Was there any point in time when you did not have what you now

10:01:21 5   know to be Grade 2?

10:01:24 6   A.  No, I always had Grade 2.

10:01:27 7   Q.  And with regard to the photos, defense lawyer asked you about

10:01:32 8   the photos and a plateau.

10:01:35 9          MR. SCHANKER:  Scott, could you pull up the June 2009

10:01:41 10  photo that we saw as well as the August 2009.  Do you have that

10:01:44 11  together?  And October 2009.  Do you have all of those together,

10:01:49 12  Scott?

10:01:49 13  BY MR. SCHANKER:

10:01:52 14  Q.  Okay.  So just to orient ourselves here.  Let's see.  We've got

10:01:57 15  the October 2009 photos on the left.  We've got the June in the

10:02:04 16  upper right, and then we have the August.  So the earlier photos

10:02:07 17  are on the right.  Do you see that?

10:02:09 18  A.  Uh-huh.

10:02:10 19  Q.  So you were shown the photo from June of 2009, and it was

10:02:15 20  suggested that your hair had fully grown back in that picture.  Is

10:02:19 21  that the case?

10:02:20 22  A.  No.  My hair had never fully grown back.  You could always

10:02:25 23  see -- I mean, the top and the back have been significantly sparse,

10:02:29 24  you can see my scalp from 2009 till today.

10:02:32 25  Q.  And then the photo underneath that from August of 2009, you

1754

10:02:37  1  were shown that photo and it was again suggested that your hair had

10:02:42  2  all grown back.  Had your hair grown back in August of 2009?

10:02:48  3  A.  No.  You can clearly see in that picture that you can't see the

10:02:52  4  top of my head or the back because I am showing my front.  My hair

10:02:55  5  had not grown back.

10:02:58  6  Q.  Now, when we look at the top left photo which you were shown,

10:03:02  7  that's the October 2009 photo.  Do you see that?

10:03:05  8  A.  Uh-huh.

10:03:06  9  Q.  And it was suggested that your hair had all grown back.  Had it

10:03:11 10  indeed all grown back in October of 2009?

10:03:14 11  A.  No, it had not.

10:03:15 12  Q.  And how do we know it had not all grown back in October of

10:03:23 13  2009?  Look at the photo below, can you describe that from the same

10:03:26 14  date to the jury?

10:03:26 15  A.  Right.  You can -- you can see my scalp from that, it's a

10:03:30 16  different angle.  It really depends on the angle of the picture,

10:03:34 17  from any of these pictures after chemo to see whether you can -- it

10:03:38 18  focuses on the sections of my hair that are not there.  And I don't

10:03:42 19  have as many of those photos as I have the front on.

10:03:45 20  Q.  And why don't you have as many of those photos?

10:03:47 21  A.  Well, I don't look good, it's unattractive, it's unbecoming.  I

10:03:52 22  don't want to look at those pictures.  Those don't give me happy

10:03:55 23  memories about whatever the event I am attending.

10:03:57 24  Q.  So when we look at the lower left, October 2009 photo, is that

10:04:03 25  your scalp that appears to be visible there?

10:04:05  1    A.  Yes, it appears to be visible.

10:04:07  2    Q.  Is that what the top of your head looked like in the photos

10:04:14  3    that are on the right that were taken -- let's go through them.  Is

10:04:19  4    that what the top of your head looked like in June of 2009?

10:04:22  5    A.  Yeah.  The top of my head looked -- looked similar, yes.

10:04:28  6    Q.  And is -- then looking at the October of 2009 photo in the

10:04:32  7    lower left where we can see your scalp, is that a fair

10:04:36  8    representation of what your scalp, the top of your scalp would have

10:04:40  9    looked like in the lower right, August of 2009, photograph?

10:04:45  10   A.  I think so, yes.

10:04:47  11   Q.  So just so we're clear.  Your hair did not grow back in and

10:04:53  12   then fall out from the top and back of your scalp between June 2009

10:05:00  13   and October 2009?

10:05:02  14   A.  No.  It never grew in completely ever.

10:05:05  15   Q.  And then again, just to be clear, did your hair -- is it a

10:05:10  16   situation where your hair had grown back in August of 2009 and then

10:05:16  17   fallen out again by October of 2009?

10:05:19  18   A.  No, it did not.

10:05:21  19   Q.  How long have you been able to see the top of your scalp

10:05:25  20   following chemotherapy?

10:05:26  21   A.  Always.  Every single day.

10:05:32  22        MR. SCHANKER:  Scott, could you pull up the next group of

10:05:34  23   photos, please?

10:05:34  24   BY MR. SCHANKER:

10:05:35  25   Q.  So I want to orient you to those.  And you saw the photo on the

10:05:45 1  right, defense attorney showed you that from August of 2009.  Do

10:05:50 2  you recall that?

10:05:50 3  A.  Yes.

10:05:50 4  Q.  So I want to compare that to the photo on the left from January

10:05:56 5  of 2019?

10:05:58 6  A.  So those are ten years apart.  And to me, my hair from the

10:06:03 7  front looks very similar from 2009 and 2019.  Now, in neither of

10:06:08 8  those pictures can you see the top of my head or the back.  And if

10:06:12 9  you could see the top of my head or the back, you'd see that my

10:06:15 10 scalp is clearly visible.

10:06:17 11 Q.  Thank you.

10:06:20 12 A.  Uh-huh.

10:06:22 13      MR. SCHANKER:  Scott, could you pull up the next group of

10:06:25 14 photos, please?

10:06:25 15 BY MR. SCHANKER:

10:06:26 16 Q.  Okay.  Now, defense attorney showed you the center photograph

10:06:32 17 from May of 2021; is that right?

10:06:35 18 A.  Yes.

10:06:35 19 Q.  And I believe you said it was an "unflattering graduation"

10:06:39 20 photo?

10:06:39 21 A.  Well, it was unflattering of me, it was cute of kid that's in

10:06:43 22 there, so.

10:06:43 23 Q.  Sure.

10:06:44 24 A.  You know.

10:06:45 25 Q.  And did the defense attorney, to your recollection, show you

10:06:50  1   the photo on the left from just one month later in 2021?

10:06:55  2   A.  No.

10:06:56  3   Q.  Were you shown the June photo on the right from 2021?

10:07:01  4   A.  No.  And in all of those pictures, the ones that are face on,

10:07:06  5   you can't see the top of my head.  And in the one in the middle,

10:07:09  6   it's -- we're outside, it's hot, I had to wear a robe outside for

10:07:13  7   the graduation, there's a good chance I did something weird with my

10:07:17  8   hand over my head so that my hair is sticking out.

10:07:21  9   Q.  Okay.

10:07:23 10          MR. SCHANKER:  Your Honor, we want to move into evidence

10:07:25 11   just the photos P3551, P2964, P3675, P3683, and P3670.

10:07:46 12          THE COURT:  Any objection?

10:07:48 13          MS. SASTRE:  No, Your Honor.

10:07:49 14          THE COURT:  Thank you.  Let it be admitted.

10:07:50 15          MR. SCHANKER:  Thank you, Your Honor.

10:07:50 16   BY MR. SCHANKER:

10:08:00 17   Q.  Shifting gears.  You were shown a lot of pictures of your blog

10:08:02 18   and comments from your blog by the defense attorney.  Do you

10:08:06 19   remember that?

10:08:06 20   A.  Yes.

10:08:06 21   Q.  Is there anywhere in your blog where you have comments or a

10:08:12 22   picture where you're celebrating that your hair had fully returned

10:08:17 23   following chemotherapy?

10:08:18 24   A.  Well, you can't celebrate something that didn't happen.  So

10:08:22 25   even though, in the blog, I talk about some about my hair growing

10:08:25 1  back, because it was growing.  And then, you know, at some point, I

10:08:29 2  finally got a haircut, it never filled in.  So I wouldn't blog

10:08:33 3  about something that never happened.

10:08:34 4  Q.  Okay.  You testified concerning the clinical evaluation that

10:08:42 5  you went to for Dr. Tosti.  Do you recall that?

10:08:45 6  A.  Yes.

10:08:46 7  Q.  Okay.  And the defense attorney asked you about a lawyer

10:08:52 8  accompanying you on that trip.  Do you recall that question?

10:08:55 9  A.  Yes.

10:08:56 10 Q.  Just to be clear for the jury, did a lawyer go into the

10:09:00 11 examination or evaluation with you, did a lawyer go into the room

10:09:04 12 with you for that?

10:09:04 13 A.  No.  My husband was with me on the trip, and the lawyer -- my

10:09:08 14 lawyer and my husband were actually outside of the medical center,

10:09:13 15 they didn't even come inside with me.  So I walked in the building

10:09:16 16 by myself, I was up in -- it was all by myself.

10:09:20 17 Q.  Ms. Kahn, we just saw a litany of photos from different family

10:09:27 18 visits and trips that you had taken.  Now, why are you going on

10:09:32 19 these trips even though you've got the Grade 2 on the scalp?

10:09:35 20 A.  Well, I am not going to stop living.  I mean, I have to live

10:09:39 21 that's -- I can't -- you can ask my husband, if I stay home

10:09:43 22 24 hours a day I would probably go crazy.  So I do what I have to

10:09:47 23 do, and I can get on an airplane and I can go away.  But when I go

10:09:51 24 to New Mexico or I go to Houston with my friends, they all -- like

10:09:55 25 my -- Houston with my friends, they all have hair, I do not.  I go

10:09:59  1  to New Mexico and I still don't have hair.  So I can go on these

10:10:04  2  events, but it's not going to get my hair back.  It's not going to

10:10:07  3  get me whole.

10:10:08  4  Q.  Ms. Kahn, I want to shift gears to yesterday afternoon, and

10:10:14  5  some of the questions that you were asked by the defense lawyer; is

10:10:17  6  that okay?

10:10:17  7  A.  Sure.

10:10:18  8  Q.  Do you recall you were asked questions about Dr. Corsetti?

10:10:22  9  A.  Oh, yes.

10:10:23 10  Q.  And just refamiliarize the jury since it's been a little while.

10:10:27 11  Who is Dr. Corsetti?

10:10:29 12  A.  He was my surgeon.

10:10:31 13  Q.  Okay.  And so then his role, in this case, was to do the

10:10:35 14  surgery obviously.  And when was the surgery performed in relation

10:10:39 15  to the chemotherapy?

10:10:40 16  A.  Well, the way they work is you go see the surgeon first to talk

10:10:44 17  about your treatment options.  And then once it was decided that I

10:10:49 18  was going to have chemo first, then I went to see Dr. Kardinal and

10:10:53 19  I did start the chemo.  So I had the chemo started in May and then

10:10:57 20  my surgery wasn't until December.

10:10:58 21  Q.  Okay.  And do you recall we looked a medical record from

10:11:04 22  Dr. Corsetti yesterday from April 17th of 2008, you were taken

10:11:08 23  through some parts of that medical record by the defense attorney?

10:11:11 24  A.  Yes.  Yes, I was.

10:11:12 25  Q.  Can we go through some other parts of that medical record?

10:11:15  1    A.  Sure.

10:11:15  2         MR. SCHANKER:  Scott, could you pull up please D3879, 847

10:11:23  3    and then go to -- it should be your page 849 is what we were

10:11:29  4    looking at yesterday.

10:11:29  5    BY MR. SCHANKER:

10:11:36  6    Q.  Now, I want to focus on one aspect of this record.

10:11:36  7    A.  Okay.

10:11:39  8    Q.  So let me find it in here.

10:11:45  9         MR. SCHANKER:  Thank you.  Right there, yes.

10:11:45 10    BY MR. SCHANKER:

10:11:48 11    Q.  Do you see that highlighted portion of the record there?

10:11:51 12    A.  Yes.

10:11:52 13    Q.  And let's orient the jury again.  The date of this visit was

10:11:56 14    April of 2008?

10:11:59 15    A.  Yes.

10:12:00 16    Q.  And so had you had surgery at this point?

10:12:03 17    A.  No, not till December.

10:12:04 18    Q.  Had you had chemotherapy at this point in time?

10:12:06 19    A.  No.  At that point, I had no treatment at all.

10:12:08 20    Q.  Okay.  Could you go ahead and read what's been highlighted

10:12:12 21    there?

10:12:12 22    A.  "The patient understands this and is extremely motivated to

10:12:16 23    save her left breast."

10:12:18 24    Q.  Was that a true statement?

10:12:19 25    A.  Oh, yes, definitely.

10:12:21  1    Q.  And did you make that goal clear to Dr. Corsetti?

10:12:26  2    A.  Yes.  Yeah, he knew from the beginning.  He started explaining

10:12:31  3    treatments and I said -- I said that's exactly what he wanted --

10:12:35  4    what I want.  And he said, well, I need to give you all of

10:12:37  5    treatments possible so that you can -- you can make the most

10:12:40  6    informed decision, and then he explained everything to me and this

10:12:42  7    is the one I wanted to do.

10:12:44  8    Q.  And just so we're clear, that goal was to save the breast?

10:12:47  9    A.  Yes.  I wanted to save as much tissue as possible.

10:12:51 10    Q.  Did you make that goal clear to Dr. Kardinal, your oncologist?

10:12:55 11    A.  Yes, I did.  He knew that too.

10:12:58 12    Q.  Okay.  And is it fair to say that your goal then was to look

10:13:04 13    normal?

10:13:05 14    A.  Well, my goal, to get through -- once get through cancer, to be

10:13:10 15    as whole as possible.  I certainly was going to lose breast tissue.

10:13:14 16    I knew that.  But I wanted to look the same as I did when I started

10:13:17 17    my treatment.  And I have never looked the same again because of my

10:13:21 18    hair.

10:13:21 19    Q.  And did that goal make -- was that goal -- did it play a major

10:13:27 20    role in your treatment decisions?

10:13:28 21    A.  Yes.  I made -- because that was my goal, that's -- I followed

10:13:32 22    the treatment plan that was going to allow me to do that.

10:13:35 23    Q.  So, Ms. Kahn, was your goal achieved in this case?

10:13:38 24    A.  Well, it wasn't -- it was in relation to my breast, but it

10:13:44 25    wasn't in relation to my hair.  If I had had another option and had

10:13:47  1   known ahead of time that that -- that I was going to take a drug

10:13:51  2   that would take away my hair, I would never have taken that drug.

10:13:55  3   Q.  Thank you.  Let's shift gears and keep moving here.  You were

10:13:58  4   asked questions, do you recall, yesterday afternoon by the defense

10:14:03  5   attorney about your family history with cancer?

10:14:06  6   A.  Yes, I do remember that.

10:14:07  7   Q.  And you had indicated that you had had, not only a lot of

10:14:10  8   family members, but friends who had had cancer; is that right?

10:14:13  9   A.  Yes.

10:14:13  10  Q.  Well, I just want to follow-up on that and talk to you.  Have

10:14:17  11  you shared with us, concerning this issue, your life experiences

10:14:20  12  with family members prior who have been diagnosed with early-stage

10:14:25  13  breast cancer?

10:14:25  14  A.  Oh, well, everybody who's been diagnosed with early-stage

10:14:29  15  breast cancer has come through, friends and family.  And I've known

10:14:32  16  many, many women who have gone through the process and come out the

10:14:35  17  other side.

10:14:36  18  Q.  And you were asked about your mom and sister.  Do you recall

10:14:38  19  that?

10:14:38  20  A.  Right, yes.

10:14:39  21  Q.  Your mom, let's talk about her.  She had early-stage breast

10:14:44  22  cancer?

10:14:44  23  A.  She did.  She didn't even need chemotherapy.  She just had

10:14:47  24  surgery and radiation.

10:14:48  25  Q.  So she was cured of early-stage breast cancer?

10:14:50  1    A.  Yes, she was.

10:14:51  2    Q.  And I'm assuming she had all her hair after?

10:14:54  3    A.  She had all of her hair when she was done.

10:14:56  4    Q.  Your sister, let's talk about her.

10:14:58  5    A.  Uh-huh.

10:14:58  6    Q.  She had early-stage breast cancer?

10:15:02  7              MS. SASTRE:  Your Honor, I object.  May we come up for a

10:15:06  8    moment, please?

10:15:07  9              THE COURT:  Yes.

10:15:08  10     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10:15:08  11             MS. SASTRE:  So I was afraid of that's where this was

10:15:22  12    headed, that was something that was specifically discussed.

10:15:25  13    Counsel was instructed -- and, of course, we can talk about family

10:15:28  14    history, but you couldn't say whether relatives who had breast

10:15:32  15    cancer --

10:15:32  16             THE COURT:  It was not supposed to be hair.  I think that

10:15:34  17    what we talked about -- we talked about this --

10:15:34  18             MR. SCHANKER:  Yeah.

10:15:36  19             THE COURT:  -- specifically, it's not supposed to be

10:15:38  20    based on the hair.  I think the issue was her experience with

10:15:42  21    breast cancer and the fact that this was something that she

10:15:46  22    understood.

10:15:47  23             MR. SCHANKER:  Absolutely, Your Honor.  And where we're

10:15:49  24    going with this, where I am going with this, her experiences with

10:15:53  25    breast cancer, her experiences with recovery from breast cancer

10:15:56 1   with her friends and family, her experiences with whether their

10:16:00 2   hair came back is clearly relevant.

10:16:02 3           THE COURT:  That is specifically what I told you you

10:16:05 4   could not do.

10:16:05 5           MR. SCHANKER:  Your Honor --

10:16:05 6           THE COURT:  I said you cannot go to hair.  You can go to

10:16:08 7   their experiences, that they're cured, and so she was familiar with

10:16:11 8   treatment options.

10:16:12 9           MR. SCHANKER:  Okay.  Your Honor, and just to be clear,

10:16:15 10  we're not eliciting -- we're not eliciting Taxotere at all.  I

10:16:19 11  don't want her to say anything about who took Taxotere and who did

10:16:22 12  not.  That's not where I am going with this.  But she has an

10:16:26 13  understanding and an impression of what's going to happen with, not

10:16:30 14  only her treatment and her cancer, but she also has an

10:16:34 15  understanding of what's going to happen and whether her hair is

10:16:36 16  going to come back.

10:16:37 17          THE COURT:  I think it's fair to say you have had lots of

10:16:43 18  friends, and from that, did you have an impression about what would

10:16:46 19  happen with your hair.  That's fair.  Because I think it's fair she

10:16:50 20  goes into this, and she sees --

10:16:50 21          MR. SCHANKER:  Right.

10:16:52 22          THE COURT:  -- to her end and she believes it.  But she's

10:16:53 23  already said that.  But what I specifically said is, you cannot

10:16:56 24  do -- because there was an objection about the photograph of the

10:17:00 25  sister and the mom, and it was like, I don't -- this is not going

10:17:04  1    to be, they have hair with breast cancer and you don't.  Because we

10:17:07  2    don't know what they were treated with, one, and I have stopped

10:17:12  3    some of those other doctors.  I am not going to allow her to talk

10:17:17  4    about the anecdotal evidence.

10:17:18  5              MR. SCHANKER:  Okay.

10:17:20  6              THE COURT:  Okay.  But I think it's fair to say, you

10:17:22  7    know, you understood that hair loss was temporary for family

10:17:25  8    members.  That's fine.

10:17:27  9              MR. SCHANKER:  Okay.  Okay.  So I'll ask that question on

10:17:29 10    that and move on.

10:17:30 11              THE COURT:  All right.

10:17:31 12              MR. SCHANKER:  Is that fair?

10:17:32 13              THE COURT:  Listen to me.

10:17:33 14              MR. SCHANKER:  Yes.

10:17:33 15              THE COURT:  Don't do it.  Don't ask if your mom still has

10:17:39 16    hair and your sister still has hair and your friends still have

10:17:42 17    hair, and they had breast cancer.

10:17:43 18              MR. SCHANKER:  Right.  Yeah.  I'll ask the question,

10:17:44 19    based on your experiences with friends and family, what was your --

10:17:48 20    I just want to make sure I have it right -- what was your

10:17:50 21    expectation with regard to hair.

10:17:51 22              THE COURT:  I think that's fair.

10:17:52 23              MS. SASTRE:  All right, Your Honor.  Thank you.

10:17:54 24         (OPEN COURT.)

10:18:05 25              MR. SCHANKER:  May I, Your Honor?

10:18:07  1            THE COURT:  Yes, you may.

10:18:09  2            MR. SCHANKER:  Thank you.

10:18:09  3   BY MR. SCHANKER:

10:18:11  4   Q.  Ms. Kahn, based on the experiences that you were discussing

10:18:13  5   with friends and family members who had had early-stage breast

10:18:18  6   cancer, what was your expectation with regard to hair?

10:18:21  7   A.  Everybody I knew got their hair back.  Everybody.  I never saw

10:18:27  8   anybody who looked like me after chemotherapy.

10:18:31  9   Q.  Ms. Kahn, you recall you were asked questions about -- by

10:18:35  10  defense counsel about your diagnosis in this case?

10:18:37  11  A.  Yes.

10:18:38  12  Q.  And about when you went to Ochsner, the hospital?

10:18:43  13  A.  Uh-huh.

10:18:43  14  Q.  Now, you had mentioned Nurse Thomas; is that right?

10:18:47  15  A.  Yes.

10:18:48  16  Q.  She was at Ochsner?

10:18:54  17            MS. SASTRE:  Objection.

10:18:50  18            THE WITNESS:  Yes, she was --

10:18:54  19            THE COURT:  Sustained.  Wait, there's an objection.

10:18:56  20            MS. SASTRE:  Objection.  This is beyond the scope.  I did

10:18:58  21  not ask about that.  I would be happy to approach if Your Honor

10:19:02  22  would like.

10:19:02  23            THE COURT:  No.  Sustained.

10:19:02  24  BY MR. SCHANKER:

10:19:06  25  Q.  You were asked about Dr. Kardinal, right?

10:19:08  1    A.  Yes.

10:19:08  2    Q.  He's at Ochsner?

10:19:10  3    A.  Yes.

10:19:11  4    Q.  And what was your understanding with regard to your hair based

10:19:15  5    on your communications with Dr. Kardinal before you started the

10:19:19  6    regimen?

10:19:19  7    A.  Dr. Kardinal assured me my hair would grow back, and, actually,

10:19:24  8    all of the doctors and nurses assured me my hair would grow back.

10:19:29  9    They know that cancer patients are concerned about that.  That's a

10:19:32  10   very big concern, so they like to make you feel better and tell you

10:19:35  11   that, don't worry.  And I didn't think I needed to worry because

10:19:39  12   everybody I knew who lost hair got it back.

10:19:42  13        MR. SCHANKER:  Scott, could you pull up the informed

10:19:45  14   consent that we spent a lot of time going through yesterday.

10:19:49  15   That's P2811.

10:19:49  16   BY MR. SCHANKER:

10:19:52  17   Q.  And I promise you we're not going to spend a lot of time going

10:19:55  18   through it, but I have a question for you, Ms. Kahn.

10:20:00  19   A.  Uh-huh.

10:20:01  20        MR. SCHANKER:  Scott, if you could go to page 26 -- I'm

10:20:09  21   sorry, go to page 10.

10:20:09  22   BY MR. SCHANKER:

10:20:20  23   Q.  When you reviewed the informed consent, in this case, was there

10:20:25  24   anything there that said, "Permanent hair loss"?

10:20:28  25   A.  No.  Anything in the informed consent said, "Hair loss."  It

10:20:34 1   never, ever said "permanent hair loss" anywhere on any -- on all of

10:20:38 2   those, what, 29 pages or whatever they are, huh-uh.

10:20:40 3   Q.  Was there anything in the informed consent that gave you the

10:20:44 4   impression of the risk of permanent hair loss?

10:20:45 5   A.  No.  There was nothing there -- because they mentioned hair

10:20:49 6   loss I don't know how many times throughout, because different

10:20:52 7   drugs cause different hair -- I mean, causes hair loss.  But it

10:20:55 8   always said just "hair loss," never "permanent hair loss."

10:20:57 9   Q.  Was there anything in the informed consent that gave you the

10:21:01 10  impression of a risk of PCIA?

10:21:02 11  A.  No.  There was nothing mentioned in the informed consent at

10:21:06 12  all.

10:21:06 13  Q.  Okay.  You were asked this morning by defense counsel --

10:21:12 14          MR. SCHANKER:  And you can pull that down, Scott.

10:21:12 15  BY MR. SCHANKER:

10:21:14 16  Q.  You were asked this morning by defense counsel about whether

10:21:18 17  you had tried anything for your hair.  You recall that question?

10:21:21 18  A.  Yes.

10:21:23 19          MR. SCHANKER:  And, Scott, if you could pull up D2093.

10:21:23 20  BY MR. SCHANKER:

10:21:47 21  Q.  And while Scott's doing that --

10:21:47 22  A.  Okay.

10:21:50 23  Q.  -- do you remember your discussion about the binder, the spiral

10:21:54 24  notebook that you had yesterday afternoon with the defense

10:21:58 25  attorney?

| | | |
|---|---|---|
| 10:21:58 | 1 | A.  Right.  You mean that I got from the medical team -- |
| 10:21:58 | 2 | Q.  Yes. |
| 10:22:00 | 3 | A.  -- about the cancer?  Yes. |
| 10:22:03 | 4 | Q.  I want to ask you some questions about that as soon as we get |
| 10:22:07 | 5 | that pulled up. |
| 10:22:08 | 6 | A.  Okay. |
| 10:22:36 | 7 | MR. SCHANKER:  It's D2093.  Sorry, folks. |
| 10:22:36 | 8 | BY MR. SCHANKER: |
| 10:22:39 | 9 | Q.  Okay.  Now, just to refamiliarize the jury, what is this |
| 10:22:41 | 10 | document? |
| 10:22:45 | 11 | A.  Oh, is this my notebook? |
| 10:22:47 | 12 | Q.  Yes, yes. |
| 10:22:47 | 13 | A.  My little notebook that I kept. |
| 10:22:49 | 14 | Q.  Right.  And what kind of information did you keep in there? |
| 10:22:52 | 15 | A.  Well, I would take that with me to my doctor appointments, and |
| 10:22:55 | 16 | I was writing down what the doctors told me.  And, you know, I |
| 10:22:59 | 17 | never knew what was important or not, I just wrote things down and |
| 10:23:01 | 18 | then -- you know, because they're giving you a lot of information, |
| 10:23:05 | 19 | that way I had it in writing.  And then I would list side effects I |
| 10:23:09 | 20 | had in there for -- anything that the doctors asked me to write |
| 10:23:12 | 21 | down and the questions I wanted to ask the doctors.  That's what it |
| 10:23:15 | 22 | was for. |
| 10:23:15 | 23 | Q.  Okay. |
| 10:23:16 | 24 | MR. SCHANKER:  Scott, could you turn to the page in this |
| 10:23:19 | 25 | binder, 537. |

10:23:19  1    BY MR. SCHANKER:

10:23:41  2    Q.  And, Ms. Kahn, is this your writing?

10:23:43  3    A.  Yes, that is my writing.

10:23:44  4    Q.  So what date do we see here?

10:23:49  5    A.  July 27th.  And that was probably 2009 --

10:23:55  6    Q.  Okay.

10:23:55  7    A.  -- but I don't know the year.  But I would imagine that's what

10:23:59  8    it was.

10:23:59  9    Q.  Okay.  And then what does it say underneath that?

10:24:02 10    A.  Well, I went to my dermatologist, and that was my regular

10:24:04 11    dermatologist.

10:24:05 12    Q.  Okay.  And who is that?

10:24:06 13    A.  Dr. Ochsner.

10:24:07 14    Q.  Okay.  And then what does it say underneath that?

10:24:10 15    A.  "Biotin for hair."  Because I had asked her if there was

10:24:14 16    anything I could do, and biotin is like a vitamin.  So I did --

10:24:18 17    excuse me -- biotin for about -- probably about six months because

10:24:23 18    I thought, if I just take it a short time, it may take a while to

10:24:27 19    do any good.  And I took it for about six months, and it really --

10:24:30 20    it didn't help my hair at all.

10:24:32 21    Q.  So does this refresh your recollection concerning whether you

10:24:34 22    actually did attempt to do something with regard to your hair?

10:24:38 23    A.  It is.  And I had actually totally forgot that when defense

10:24:41 24    asked me about that, but I definitely did -- did take the biotin.

10:24:48 25    Q.  And continuing on this topic of doing something for your hair,

10:24:52  1  you recall you were asked the questions concerning minoxidil?

10:24:55  2  A.  Yes.

10:24:56  3  Q.  I want to follow up on that.  Did any of the doctors you spoke

10:24:58  4  with tell you that you would get rid of your Grade 2 PCIA with

10:25:03  5  minoxidil?

10:25:04  6  A.  No.  Their thing was, you could try it.  So what they were

10:25:10  7  saying is, try it, maybe it might give you a little help.  I mean,

10:25:13  8  they never told me that this is going to cover -- get me hair to

10:25:17  9  cover my scalp, no.  Nobody ever told me that.

10:25:20 10  Q.  Okay.  Realistically, what was your understanding of what, if

10:25:23 11  anything, the minoxidil could do for you?

10:25:25 12  A.  Well, the hairs that are growing on your head, it might make

10:25:28 13  them a little thicker.  My hair is fairly fine and each individual

10:25:31 14  hair is probably not very thick.  So there's a chance it'll make it

10:25:35 15  a little thicker, which would give maybe illusions that I have more

10:25:39 16  hair, but there's no way the dead follicles that I have, it can

10:25:41 17  make hair grow.

10:25:43 18  Q.  Okay.  Shifting gears, I want to ask you about Dr. Roberie.  Do

10:25:48 19  you remember defense counsel just speaking to you about

10:25:50 20  Dr. Roberie?

10:25:51 21  A.  Yes.

10:25:51 22  Q.  And specifically concerning hair loss over the years.  Do you

10:25:59 23  understand that Sanofi is claiming your lawsuit was too late

10:26:03 24  because you did not file a claim within a year and a half --

10:26:06 25          THE COURT:  Sustained.

10:26:06  1  BY MR. SCHANKER:

10:26:09  2  Q.  Did you go to yearly follow-up appointments with Dr. Larned?

10:26:13  3  A.  Oh, yeah.  After -- yes, I did.

10:26:16  4  Q.  Did you go to other doctors, including dermatologists, since

10:26:21  5  2010 on multiple occasions?

10:26:22  6  A.  Yes, I have.

10:26:23  7  Q.  Did any doctor or healthcare provider tell you before 2016 that

10:26:29  8  they thought you had PCIA?

10:26:31  9  A.  No, nobody told me that.  The only thing I got was the aging.

10:26:35 10  Q.  Did any doctor or healthcare provider tell you that they

10:26:38 11  thought -- before 2016, did they tell you that they thought that

10:26:42 12  you had been injured by Taxotere?

10:26:43 13  A.  No, nobody ever told me that.

10:26:47 14          MS. SASTRE:  Objection, Your Honor.

10:26:48 15          THE COURT:  Sustained.  Leading.

10:26:54 16          MR. SCHANKER:  I have no further questions, Your Honor.

10:26:56 17          THE COURT:  Thank you.

10:26:56 18          MS. SASTRE:  Your Honor, may we approach before

10:26:59 19  Ms. Kahn --

10:26:59 20          THE COURT:  Yes.

10:26:59 21          MS. SASTRE:  -- steps down, please.

10:27:04 22      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10:27:08 23          MS. SASTRE:  So after Mrs. Kahn clearly testified that

10:27:15 24  she didn't have any treatment of any sort, she then said, "I

10:27:21 25  forgot," and she just talked about the biotin.  I would like to

10:27:25  1   have permission to ask her two or three questions on biotin and

10:27:29  2   then two or three questions on minoxidil, and I have deposition

10:27:33  3   testimony directly on that.  And if she had answered the question

10:27:36  4   when I asked her any differently, I would have --

10:27:40  5            THE COURT:  I am going to allow.  I don't usually allow,

10:27:44  6   but I will.

10:27:44  7            MR. SCHANKER:  Okay.  All right.  We'll object for the

10:27:45  8   record.

10:27:45  9            THE COURT:  Sure.

10:27:46 10            MR. SCHANKER:  Thank you.

10:27:52 11        (OPEN COURT.)

10:27:52 12            THE COURT:  Ms. Sastre.

10:27:53 13            MS. SASTRE:  Yes, Your Honor.  Thank you.

10:27:55 14                         FURTHER EXAMINATION

10:27:55 15   BY MS. SASTRE:

10:27:57 16   Q.  Ms. Kahn, I just have a couple questions for you about biotin.

10:28:00 17   A.  Yes.

10:28:01 18   Q.  Okay.  So I'd asked you whether you'd taken any treatment, and

10:28:07 19   you just said now on redirect that you forgot.  And you said you

10:28:14 20   tried biotin, right?

10:28:16 21   A.  Yes, I had forgotten.  I'm sorry.  It had slipped my mind, but

10:28:20 22   it is -- it was something that I did try.

10:28:22 23   Q.  Okay.  It's a vitamin?

10:28:25 24   A.  Yeah.  Yes.

10:28:27 25   Q.  Okay.  Ma'am, can you take a look, please, at your deposition.

| 10:28:32 | 1 | It's the most recent -- no, excuse me -- it's January 30th, 2018, |

10:28:32   1   It's the most recent -- no, excuse me -- it's January 30th, 2018,

10:28:38   2   please.  And I'd like to refer you to page 53, line 11, please.

10:28:50   3   Let me know when you're there.

10:28:52   4   A.  Oh, yeah.  Yeah, I see it.

10:28:54   5   Q.  Let me ask a question.  This is your deposition.  You were

10:28:57   6   under oath just like today, right?

10:28:58   7   A.  Uh-huh.

10:28:59   8   Q.  And you were asked on line 11, "Did you ever take biotin," and

10:29:03   9   your answer was, "I don't remember."  Did I read that correctly?

10:29:07  10   A.  Yes, you did read it correctly.  May I explain?

10:29:11  11   Q.  Let me finish, please.

10:29:13  12   A.  Okay.

10:29:13  13         THE COURT:  Let her finish, ma'am.

10:29:13  14   BY MS. SASTRE:

10:29:15  15   Q.  And then you were asked, "Question:  Do you have any

10:29:17  16   recollection of taking biotin," and your answer was, "No."  Did I

10:29:22  17   read that correctly?

10:29:24  18   A.  Yes, you did.

10:29:28  19         MS. SASTRE:  Thank you, ma'am.  I have no further

10:29:30  20   questions.

10:29:30  21         THE WITNESS:  I can't explain?  She didn't give me a

10:29:32  22   chance to explain.

10:29:34  23         THE COURT:  Okay.  I think that's sufficient.

10:29:39  24         Anything further, Mr. Schanker?

10:29:41  25         MR. SCHANKER:  Yes, Your Honor.

```
10:29:43   1                    FURTHER EXAMINATION
10:29:43   2   BY MR. SCHANKER:
10:29:45   3   Q.  Could you please explain --
10:29:46   4             THE COURT:  No, I'm not allowing --
10:29:48   5             MR. SCHANKER:  Oh, okay.
10:29:49   6             THE COURT:  -- another redirect.
10:29:49   7             MR. SCHANKER:  She's not allowed to explain.  I'm sorry.
10:29:52   8             THE COURT:  You may step down, Ms. Kahn.  Thank you.
10:29:54   9             MR. SCHANKER:  Thank you, Your Honor.
10:29:56  10             THE COURT:  Okay.  Mr. Schanker?
10:30:03  11             MR. SCHANKER:  Just one moment.
10:30:06  12             THE COURT:  Sure.
10:30:24  13             MR. SCHANKER:  Thank you, Your Honor.  At this time, the
10:30:25  14   plaintiffs rest their case.
10:30:28  15             THE COURT:  Members of the jury, you have just heard and
10:30:30  16   seen all of the evidence that the plaintiffs have offered in their
10:30:34  17   case in chief.  After recess, the defendants may put on any
10:30:39  18   evidence they wish to present if they choose to.  I, again, clearly
10:30:44  19   admonish you not to discuss the case amongst yourselves or with
10:30:48  20   anyone else.  You must wait until you have heard all of the
10:30:51  21   evidence, listened to argument of counsel, and instructions by the
10:30:55  22   Court before you begin your deliberations.
10:30:58  23             Because I have business to discuss with counsel, we're
10:31:02  24   going to have a longer morning recess, and then we will return.  So
10:31:06  25   court will be at recess until -- it's 10:30 -- until 11:00.
```

10:31:12  1              THE MARSHAL:  All rise.

10:31:34  2         (WHEREUPON, THE JURY EXITED THE COURTROOM.)

10:31:34  3              THE COURT:  Mr. Schanker and Ms. Sastre, could I see you

10:31:37  4    on the side.

10:31:42  5         (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

10:32:21  6              THE COURT:  I'll be back.  Five minutes, I'll be back.

10:32:40  7              THE DEPUTY CLERK:  All rise.

10:32:41  8         (WHEREUPON, A RECESS WAS TAKEN.)

10:39:16  9              MR. MOORE:  Your Honor, while we were waiting for

10:39:18 10    Mr. Mura, I thought it might be okay if we formally offered the

10:39:21 11    files and introduce the exhibits that were shown to the plaintiff

10:39:24 12    during her cross-examination.  Those exhibits would be her journal,

10:39:29 13    which is Defense 2093; her blog, which is Defense 2164 --

10:39:37 14              THE COURT:  Let me -- Mr. Lambert.

10:39:43 15              MR. LAMBERT:  No objection.

10:39:46 16              THE COURT:  Okay.

10:39:46 17              MR. MOORE:  Medical records D3879, pages 847 through 849;

10:39:54 18    and then D3879 pages 860 through 861.  And then the following

10:40:00 19    defense exhibits, which were the photographs displayed to Ms. Kahn

10:40:06 20    during her cross-examination, Defense 3148, 3673, 3794, 3844, 3172,

10:40:20 21    3203, 3221, 3256, 3282, 3220, 3325, 3344, 3354, 3386, 3399, 3486,

10:40:40 22    3543, 3579, 3636, 3660, 3715, and 3861.

10:40:51 23              Thank you, Your Honor.

10:40:51 24              THE COURT:  Thank you.  Let it be admitted.

10:40:55 25              MR. LAMBERT:  No objection.

10:40:57 1          THE COURT:  Mr. Mura, are you ready?

10:40:59 2          MR. MURA:  Yes.  My apologies, Your Honor.

10:41:09 3          THE COURT:  Take your time.  Are you ready?

10:41:10 4          MR. MOORE:  I am.  May I proceed?

10:41:12 5          THE COURT:  You may.  Thank you.

10:41:13 6          MR. MOORE:  Good morning, Your Honor.  Douglas Moore on

10:41:15 7     behalf of Sanofi.  Pursuant to Rule 50 of the Federal Rules of

10:41:19 8     Civil Procedure, we move for judgment as a matter of law on the

10:41:21 9     grounds that no reasonable jury would have a legally sufficient

10:41:26 10    evidentiary basis to find for the plaintiff in this case.  As I

10:41:29 11    mentioned, we are filing a formal motion once we receive this

10:41:32 12    morning's transcript, and that will be on file later this afternoon

10:41:36 13    or this evening.

10:41:38 14         In that motion, we raise six separate grounds for

10:41:42 15    judgment as a matter of law.  First, that the plaintiff has not met

10:41:46 16    her burden of proof on whether the defendants failed to adequately

10:41:51 17    warn under the Products Liability Act.  Second, on warnings

10:41:56 18    causation.  Third, on general causation.  Fourth, on specific

10:42:00 19    causation.  Fifth, on the statute of limitations.  And lastly, on

10:42:06 20    the issue of preemption.

10:42:08 21         I wanted to briefly make a couple of comments on a couple

10:42:13 22    of those, understanding your Court's admonition to make this quick.

10:42:16 23         The first point I wanted to make was on failure to warn.

10:42:19 24    There are two things you'll see in our papers.  First relates to

10:42:24 25    Dr. Plunkett.  And Your Honor has said in this litigation, in order

10:42:28  1   to proceed on a failure to warn claim, you must present expert

10:42:33  2   evidence from a labeling expert.  That person was Dr. Plunkett for

10:42:37  3   them in this case.  And what we expected from the Court's *Daubert*

10:42:44  4   rulings and from the motions for summary judgment on these issues,

10:42:47  5   which there was going to be an evidentiary foundation laid by this

10:42:51  6   witness to establish that there was an inadequate label.  And what

10:42:56  7   we saw, even up until the point of opening, this crescendo of

10:43:01  8   information that was coming in that put Sanofi under this

10:43:04  9   obligation to make this label change, was not presented to the jury

10:43:06 10   by Dr. Plunkett.  And therefore, we think that there is

10:43:11 11   insufficient evidence to demonstrate a failure to warn.

10:43:13 12        Also, the only prescribing doctor that was on the stand

10:43:18 13   in the plaintiff's case said that when he read the label, "Hair

10:43:22 14   generally grows back," that informed him that there was a risk that

10:43:26 15   hair may not grow back.  And so from that testimony alone, there

10:43:30 16   cannot be a failure to warn if the labeling as written informed the

10:43:36 17   prescribing doctor of the risk.

10:43:38 18        On warnings causation, Your Honor, Dr. Kardinal's video

10:43:44 19   has now been played.  We've raised issues with his video and his

10:43:49 20   deposition testimony.  There were portions of those video

10:43:53 21   designations that we'd addressed in the motion practice that were

10:43:57 22   not played in the Court, and we believe what we did see in this

10:44:02 23   record is insufficient to establish that he would have prescribed a

10:44:06 24   different medicine if the label said something different.  And the

10:44:10 25   reason we believe that is, he did not say that.  He did not give

10:44:13 1    that testimony that he would have changed his prescribing decision

10:44:17 2    if the label said something else.  In fact, I think he said the

10:44:22 3    exact opposite.

10:44:22 4          As it relates to general causation, we don't think

10:44:29 5    putting balls in a bucket or counting cases is a sufficient basis

10:44:33 6    under the law to establish general causation.

10:44:36 7          On specific causation, Your Honor.  We believe that

10:44:38 8    Dr. Tosti admitted that she could not rule out alternatives, which

10:44:42 9    is an insufficient basis to establish specific causation.

10:44:46 10         And under the statute of limitations, quickly, Your

10:44:49 11   Honor, the plaintiff's testimony about her single visit with

10:44:53 12   Dr. Roberie where Dr. Roberie explained that hair thinning is part

10:44:57 13   of the aging process is insufficient under the Fifth Circuit's

10:45:01 14   decision in *Thibodaux* and in *Durden* to establish that she was

10:45:05 15   legally prevented from investigating her claim.  Her testimony,

10:45:09 16   essentially, is that she made no investigation, no effort to

10:45:13 17   discover the cause of her injury, despite testifying that it has

10:45:18 18   always existed since the completion of chemotherapy.

10:45:20 19         And then lastly, Your Honor, on preemption, we will be

10:45:24 20   asserting the same grounds that we asserted at the summary judgment

10:45:27 21   stage under Rule 50.  Thank you, Your Honor.

10:45:29 22         THE COURT:  Thank you.  Mr. Mura.

10:45:37 23         MR. MURA:  Thank you, Your Honor.  What Mr. Moore didn't

10:45:40 24   mention is the Rule 50 standard.  And under that standard, the

10:45:43 25   Courts must examine the evidence in the light most favorable to the

10:45:47  1   plaintiff, and that standard does a lot of work here.  Some of the

10:45:50  2   arguments that the Court heard were similar arguments that were

10:45:53  3   raised at the summary judgment stage where very similar testimony

10:45:57  4   was provided.  Defendants, obviously, have a different view of the

10:46:01  5   testimony, including what the treating physician may have said, or

10:46:05  6   whether reliance was reasonable.  Those are all fact questions for

10:46:09  7   the jury.  There was more than a scintilla of evidence here on each

10:46:14  8   of the claims for a jury to find.

10:46:15  9            For plaintiff, many of these arguments were also rejected

10:46:19 10   at the summary judgment stage, including the statute of

10:46:22 11   limitations.  I understand there's a disagreement between the

10:46:24 12   parties in the law, but for all of those reasons, and particularly

10:46:28 13   in light of the Rule 50 standard and the extraordinary nature of

10:46:31 14   that type of a motion, the Court should allow the jury to decide

10:46:36 15   these factual questions.

10:46:37 16            And the last thing I'll say is, on preemption, that is an

10:46:41 17   issue that the Supreme Court has said is for the Courts.  I suppose

10:46:45 18   it's fine to keep preserving it, but I don't think it's an

10:46:49 19   appropriate Rule 50 motion because it doesn't go to the jury in any

10:46:53 20   way.

10:46:53 21            So unless the Court has any questions for me.  Thank you

10:46:55 22   very much.

10:46:56 23            THE COURT:  Okay.  The Court's going to take this matter

10:47:00 24   under advisement and defer ruling until the conclusion of the

10:47:03 25   trial.  And I anticipate, as the parties have represented to me,

1781

10:47:08  1  that there will be extensive briefing on this issue, and I will

10:47:14  2  defer ruling until I've had an opportunity to review the briefing.

10:47:17  3  Thank you.

10:47:19  4          MR. MOORE:  Thank you, Your Honor.

10:47:19  5          THE COURT:  Anything else we need to do before?

10:47:34  6      (WHEREUPON, A RECESS WAS TAKEN.)

11:00:14  7      (OPEN COURT.)

11:01:41  8      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

11:01:41  9          THE COURT:  All jurors are present.  Court's back in

11:01:44 10  session.  Mr. Strongman, does the defense wish to present evidence?

11:01:50 11          MR. STRONGMAN:  Yes, Your Honor.  May it please the

11:01:52 12  Court.  Sanofi would call Dr. John Glaspy.

11:02:06 13          THE DEPUTY CLERK:  Doctor, can I have you raise your

11:02:08 14  right hand, please.

11:02:10 15      (WHEREUPON, JOHN GLASPY, WAS SWORN IN AND TESTIFIED AS

11:02:13 16      FOLLOWS:)

11:02:13 17          THE DEPUTY CLERK:  Thank you.  And you can have a seat.

11:02:17 18  If you don't mind, please state and spell your full name for the

11:02:20 19  record.

11:02:21 20          THE WITNESS:  John Glaspy, G-L-A-S-P-Y.

11:02:24 21          THE COURT:  Please proceed.

11:02:26 22                      VOIR DIRE EXAMINATION

11:02:27 23  BY MR. STRONGMAN:

11:02:27 24  Q.  Good morning, Dr. Glaspy.

11:02:30 25  A.  Good morning.

11:02:30 1  Q.  Can you please introduce yourself for the jury?

11:02:32 2  A.  Hi.  My name is John Glaspy.  I am an oncologist at UCLA.

11:02:36 3  Q.  And, Doctor, could you explain what is your role on a daily

11:02:39 4  basis with regard to treating breast cancer?

11:02:40 5  A.  So I treat a lot of breast cancer.  I treat patients nowadays,

11:02:47 6  three or three-and-a-half days a week.  And that would be my breast

11:02:52 7  cancer treatment work.

11:02:53 8  Q.  And how long have you been treating patients for breast cancer?

11:02:55 9  A.  Since 1985, so a long time.

11:03:02 10  Q.  And, Doctor, I would like to walk through your background a

11:03:06 11  little bit.

11:03:22 12          MR. STRONGMAN:  May I approach, Your Honor?

11:03:23 13          THE COURT:  Yes, you may.

11:03:25 14          MR. STRONGMAN:  Just in case you need a copy, Doctor.

11:03:25 15          THE WITNESS:  Thank you.

11:03:25 16  BY MR. STRONGMAN:

11:03:33 17  Q.  And Dr. Glaspy, is this a copy of your CV?

11:03:36 18  A.  It is.

11:03:36 19  Q.  And could you just walk through your educational background.

11:03:40 20  Let's start there.

11:03:41 21  A.  So we'll start with college.  I went to college at the

11:03:43 22  University of Santa Clara in Santa Clara, California.  It's a small

11:03:49 23  Jesuit school in the north of the state.

11:03:52 24          I then went to UCLA School of Medicine and earned an M.D.

11:03:57 25  degree and while I was doing that, I enrolled in the School of

1  Public Health and went to night school and weekends and earned a

2  master's of public health during those four years with the M.D.

3  Q.  And did you also do an internship, a residency?  Explain that

4  for the jury.

5  A.  So once a doctor finishes medical school, you're not a doctor

6  yet.  You have to do a year of what's called "internship," which is

7  sort of on hands apprentice training in the field you're going to

8  be practicing.  In my case, that was internal medicine.  And then

9  legally in most states, you can go out and practice medicine after

10  that internship.  Most of us choose to learn a little more before

11  we do that, and so there's a residency that follows internship in

12  internal medicine, and I did that as well.  So that was three years

13  of internal medicine training.

14        And then following that, you're an internist.  You take

15  care of nonsurgical problems, but you're not a specialized

16  oncologist.  So at that point I did -- I started and completed a

17  three-year fellowship in blood and cancer diseases, also at UCLA.

18  Q.  Okay.  And what year did you complete your fellowship?

19  A.  1985.

20  Q.  Okay.  And, Doctor, are you board certified?

21  A.  Yes, I am.

22  Q.  And what are your board certifications?

23  A.  Internal medicine, hematology, and medical oncology.

24  Q.  And I want to look down at your professional experience.  And

25  with regard to your current position, what is that today?

1784

11:05:43  1    A.  So my current position is I am a professor of medicine at UCLA

11:05:48  2    and I hold an endowed chair.  That's no longer the correct one; the

11:05:56  3    name of the chair has changed.  But it's now called the Simms/Mann

11:06:02  4    chair in oncology.  And so that's another title I have.

11:06:07  5    Q.  What does it mean to be a "chair with an endowment"?  What does

11:06:12  6    that mean?

11:06:13  7    A.  So in the university, one of the things that is helpful is

11:06:18  8    to -- especially when you're early in your career -- to have extra

11:06:26  9    time to do your research so you can write your papers and get your

11:06:32 10    tenure.  And sometimes a donor will donate money to the university

11:06:40 11    to fund a chair, and what that will do is it's put in the bank and

11:06:46 12    the interest on that money is made available to that faculty member

11:06:50 13    to support their research activities or their office staff or

11:06:56 14    something.  And so that's what I have.

11:07:02 15           When the university gets one of these endowments, they

11:07:06 16    form a committee and the committee advertises the chair and then

11:07:12 17    people apply both inside the university and outside, and then a

11:07:16 18    committee chooses who gets the chair.

11:07:18 19    Q.  Okay.  And, Doctor, you talked about your experience treating

11:07:22 20    patients every week.  Do you also do research as part of your job?

11:07:25 21    A.  I do.

11:07:25 22    Q.  And can you explain that to the jury?

11:07:27 23    A.  So I've done lots of different kinds of research over the

11:07:34 24    years.  I have most recently been doing clinical trial work in

11:07:40 25    melanoma and breast cancer, but I am also starting to get involved

11:07:46  1    in health services research in cancer.  It's -- there are a lot of

11:07:53  2    things we think we need to do to make our treatments higher quality

11:07:59  3    for patients, and we need to develop metrics to measure our

11:08:04  4    quality.  And so I am starting to work a lot in that field.

11:08:07  5    Q.  Okay.  And can you just elaborate a little bit about the

11:08:10  6    clinical trial work that you've done with breast cancer

11:08:12  7    specifically over your career?

11:08:16  8    A.  So pretty much for my whole career, because breast cancer is a

11:08:20  9    focus at UCLA, I have been involved in clinical trials meaning, in

11:08:26 10    my case, there have been two; one is trying to make our treatments

11:08:35 11    better for patients.  So taking whatever we're doing now and trying

11:08:40 12    to improve on it and then doing a trial large enough and well

11:08:46 13    designed enough to determine whether you're improving the outcomes.

11:08:51 14         And the second thing was I did a fair amount of work in

11:08:58 15    breast cancer prevention in my early career, looking at the effects

11:09:03 16    of fatty acids in the diet on breast cancer and breast cancer

11:09:07 17    prevention.

11:09:07 18    Q.  Okay.  And, Doctor, I see on your résumé, it mentions the

11:09:11 19    Jonsson Comprehensive Cancer Center.  Can you explain what that is

11:09:16 20    and what it means to be a "comprehensive" cancer center?

11:09:18 21    A.  Right.  So the Jonsson Comprehensive Cancer Center is UCLA's

11:09:28 22    organizational structure that pulls together all of the cancer

11:09:32 23    research on campus, organizes it, and presents it to the National

11:09:38 24    Cancer Institute, and writes a grant.  And if you win the grant,

11:09:42 25    then you get some money every year to run the center, and then you

11:09:49 1  can apply to become an NCI designated comprehensive cancer center,

11:09:55 2  which has a lot of prestige for the institution associated with it.

11:10:00 3  And UCLA has done that and is a designated NCI comprehensive cancer

11:10:06 4  center.

11:10:06 5  Q.  Okay.  And, Doctor, moving on in your résumé, have you given

11:10:11 6  lectures and presentations throughout the course of your career?

11:10:14 7  A.  Yes.

11:10:14 8  Q.  And have you specifically given numerous lectures and

11:10:19 9  presentations with regard to breast cancer?

11:10:22 10  A.  I have.

11:10:23 11  Q.  All right.  And have you also been a peer review -- a peer

11:10:29 12  reviewer for journals?

11:10:30 13  A.  I have.  So medical journals that are quality are peer

11:10:35 14  reviewed, meaning that when you -- when they receive a paper that

11:10:40 15  says, I did this work I want you to publish it, they send it to a

11:10:45 16  couple of peer reviewers -- sometimes three -- to be reviewed.  And

11:10:50 17  they'll say whether the paper is important, whether you need more

11:10:55 18  data.  They'll often ask you to provide another control group or to

11:11:00 19  clarify a point, et cetera.  And then if the three agree that it

11:11:08 20  should be published, it gets published.  And I do some of that peer

11:11:11 21  review.

11:11:11 22  Q.  Okay.  And, Doctor, I see there with regard to your peer

11:11:14 23  review, it lists a number of journals that you've been doing peer

11:11:19 24  review for some time there, including -- the *New England Journal of*

11:11:24 25  *Medicine* would be one; is that correct?

11:11:25  1   A.  That's correct.

11:11:25  2   Q.  And is the *New England Journal of Medicine*, where does it rank

11:11:29  3   in terms of the prestige of medical journals?

11:11:32  4   A.  It's a top-drawer journal.  It's the best in the world

11:11:37  5   probably.

11:11:37  6   Q.  And moving forward, have you also published on the topic of

11:11:43  7   breast cancer?

11:11:44  8   A.  I have.

11:11:46  9   Q.  And tell the jury about your publications.

11:11:49 10   A.  So when I have something I think other people should know

11:11:57 11   about, we write the paper.  We've done the work, we write the

11:12:00 12   paper, and it goes to peer reviewers that aren't me and they -- if

11:12:06 13   they think it's meritorious, they say it should be published.  They

11:12:10 14   might say it could be published but you need to do this extra work,

11:12:14 15   and they might say no thank you.

11:12:16 16   Q.  Okay.  And, Doctor, how many peer-reviewed publications have

11:12:19 17   you had in your career?

11:12:20 18   A.  It's well over 150 I think.

11:12:25 19   Q.  Okay.  And what percentage of your work in the peer-reviewed

11:12:28 20   literature, approximately, involves breast cancer and breast cancer

11:12:32 21   treatment?

11:12:32 22   A.  Yeah.  I would have to go through and count.  I would imagine

11:12:36 23   because I have eclectic interests and I've published in other areas

11:12:42 24   as well, it's probably 20 percent, something like that.

11:12:44 25   Q.  And, Doctor, I want to talk a little bit about what is "Stand

11:12:52  1    Up to Cancer" and what is your role in that?

11:12:54  2    A.  So about ten years ago now, I encountered one of the most

11:13:03  3    remarkable human beings I've ever seen.  Her name was Laura Ziskin

11:13:08  4    and she was a movie producer and she had breast cancer.  She had

11:13:13  5    early breast cancer, she later relapsed and had metastatic breast

11:13:21  6    cancer.  And her message to us was, you're not moving fast enough,

11:13:25  7    think outside of the box, do something.  What can I do to make

11:13:28  8    something happen?  So with a little bit of help from me -- she did

11:13:36  9    most of the heavy lifting -- she managed to pull together all of

11:13:41  10   the entertainment people because she had a compelling story and

11:13:45  11   because they felt bad she had metastatic breast cancer.  And she

11:13:48  12   pulled these people together and this was, I don't know, 10,

11:13:55  13   15 years ago now.  They decided to put on a roadblock.  You would

11:14:00  14   have noticed that there was one night that it didn't matter what

11:14:04  15   channel you turned to, you had to watch the Stand Up to Cancer show

11:14:09  16   because the television networks all agreed to do a roadblock.  That

11:14:14  17   was Stand Up to Cancer.  It was the name Laura thought of for it.

11:14:22  18        The roadblock now only happens every other year.  Laura's

11:14:28  19   passed and we don't have her anymore, but the other power women in

11:14:34  20   the entertainment industry in Southern California have carried this

11:14:38  21   on in her honor, and you'll see it, like, at Major League Baseball,

11:14:44  22   they always -- they're very close to Stand Up to Cancer.  Stand Up

11:14:48  23   to Cancer has raised more than $150 million for breast cancer

11:14:52  24   research and it's not spent the same way our other cancer research

11:14:57  25   is spent.  This is spent on cooperative, not competitive work.

1789

11:15:02  1   It's spent on outside-the-box work, work that doesn't have good

11:15:07  2   preliminary data yet.  It's long shots.  And it's paid off a couple

11:15:12  3   of dividends.  We have another treatment for metastatic breast

11:15:15  4   cancer because of it.  It's had some successes.  But it's not my

11:15:22  5   work mainly -- it's Laura Ziskin and those six women.

11:15:26  6   Q.  And, Dr. Glaspy, as part of your role, do you also work with

11:15:31  7   institutions or organizations in breast cancer research outside of

11:15:34  8   UCLA?

11:15:35  9   A.  I do.  There's a big cooperative group -- global cooperative

11:15:42 10   group that started out as Breast Cancer Research International,

11:15:48 11   BCIRG, and has since changed its name to TRIO Global, but it's the

11:15:56 12   same organization.  And they -- we aim to design clinical trials in

11:16:06 13   cancer to change how medicine is practiced.  And we aim to do it in

11:16:15 14   an innovative way and to be very efficient about it.  And so we've

11:16:20 15   got offices in Uruguay and Canada and Paris and -- and we're very

11:16:28 16   global so that we can accrue very fast.  And so the whole human

11:16:33 17   race is represented, so we don't end up with a treatment that the

11:16:36 18   first time somebody gives it to a Japanese person you find out

11:16:40 19   there are issues.  We develop it for humankind.  And so that's one

11:16:46 20   of those organizations.

11:16:47 21   Q.  And, Doctor, with regard to your role as a treating oncologist

11:16:51 22   over the years, are you familiar with the labeling for chemotherapy

11:16:59 23   drugs that you prescribe?

11:17:00 24   A.  Yes.  You're talking about the FDA package inserts?

11:17:04 25   Q.  Yes.

11:17:04  1   A.  Yes.

11:17:05  2   Q.  And is it your practice to regularly review the package

11:17:09  3   inserts, as you call them, for the drugs that you use with your

11:17:11  4   patients?

11:17:12  5   A.  If it's a drug where I don't already sort of know it backward

11:17:17  6   and forward, yes.

11:17:18  7   Q.  Okay.  And how many years has it been your practice to be

11:17:21  8   familiar with the risk information for the cancer treatments that

11:17:27  9   you use with your patients?

11:17:29 10   A.  The whole time -- the entire time, including my training.

11:17:33 11   Q.  And, specifically, are you familiar with the labeling

11:17:38 12   information for endocrine therapies that you use with your patients

11:17:43 13   as well?

11:17:43 14   A.  Yes.

11:17:44 15   Q.  And I want to just briefly touch on -- do you know what a "new

11:17:51 16   drug application" is, Doctor?

11:17:52 17   A.  I do.

11:17:52 18   Q.  And what has been your involvement with regard to any new drug

11:17:56 19   applications?

11:17:57 20   A.  Okay.  So, until recently, I hadn't been involved in writing

11:18:03 21   new drug applications, those were usually done by a pharmaceutical

11:18:09 22   company.  UCLA has, over the last three or four years, started its

11:18:15 23   own company so that we don't -- so the university can continue to

11:18:19 24   own the discoveries that it makes.  And we've started two of these

11:18:23 25   companies, one in conjunction with Caltech and the other just as

11:18:27 1   UCLA.  And now I've become very familiar with NDAs because I am one

11:18:34 2   of the founders of those companies, so we write some NDAs.

11:18:38 3   Q.  Okay.  And that's specifically a regulatory submission with the

11:18:40 4   FDA; is that correct?

11:18:41 5   A.  It is.

11:18:44 6   Q.  Okay.

11:18:44 7         MR. STRONGMAN:  Your Honor, I would offer Dr. Glaspy as

11:18:47 8   an expert in oncology, breast cancer care and treatment, and

11:18:49 9   labeling risk information for cancer medications, clinical trials,

11:18:54 10  and side effects of chemotherapy.

11:18:56 11        MR. MICELI:  Your Honor, we have no objection to

11:18:59 12  Dr. Glaspy testifying as an expert in oncology.  But can we talk

11:19:02 13  just briefly on the side over here?

11:19:04 14        THE COURT:  Yes.

11:19:05 15    (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

11:19:14 16        MR. MICELI:  I don't want to go through the document, the

11:19:17 17  one you hear of it, as he was disclosed as an oncology expert, not

11:19:20 18  labeling expert.  And he's -- you know, I don't want to hear him

11:19:27 19  turn into an FDA regulatory specialist in his direct exam.  That's

11:19:31 20  my concern.  If I have Mr. Strongman's representation that that's

11:19:34 21  not what he is offering him --

11:19:36 22        MR. STRONGMAN:  That's not where he is going.  He is not

11:19:38 23  going to get into FDA.

11:19:41 24        THE COURT:  Okay.  And I assume if he does, we'll be back

11:19:43 25  here.

11:19:43  1          MR. STRONGMAN:  Yes.

11:19:44  2          MR. MICELI:  We will be back.  I would say he is an

11:19:48  3   oncologist familiar with package inserts.

11:19:50  4          MR. STRONGMAN:  Yeah.  That's all I am going to ask him.

11:19:54  5   Exact same proffer as previously in the case.

11:20:00  6          THE COURT:  All right.  So I just want to make sure.  You

11:20:06  7   have tendered him as an expert in oncology, breast cancer care and

11:20:10  8   treatment --

11:20:11  9          MR. STRONGMAN:  Do you want me to reiterate?

11:20:13 10          THE COURT:  Yeah.

11:20:13 11          MR. MICELI:  I don't mind him saying "familiar with

11:20:17 12   package insert," but I can't stipulate to him being a regulatory

11:20:21 13   expert.

11:20:22 14          THE COURT:  Fair enough.  I think you said that.

11:20:23 15          MR. STRONGMAN:  I did.

11:20:24 16          THE COURT:  All right.  Let's just rephrase that.

11:20:30 17       (OPEN COURT.)

11:20:31 18          THE COURT:  Mr. Strongman, can I get you to, please --

11:20:37 19          MR. STRONGMAN:  Yes, Your Honor.  We would offer

11:20:40 20   Dr. Glaspy as an expert in oncology, breast cancer care and

11:20:45 21   treatment, labeling and risk information for cancer medications

11:20:49 22   from the perspective of a treating oncologist, clinical trials, and

11:20:54 23   the side effects of chemotherapy.

11:20:57 24          MR. MICELI:  No objections, Your Honor.

11:20:58 25          THE COURT:  Okay.  The Court's going to accept Dr. Glaspy

11:21:03   1    as an expert in the field of oncology, breast cancer care and

11:21:07   2    treatment, labeling and risk information, clinical trials, and side

11:21:14   3    effects of chemotherapy qualified to render opinions in those

11:21:18   4    areas.

11:21:19   5          Please proceed.

11:21:20   6          MR. STRONGMAN:  Thank you, Your Honor.

11:21:21   7                  DIRECT EXAMINATION

11:21:21   8    BY MR. STRONGMAN:

11:21:22   9    Q.  Now, Dr. Glaspy, have you formed opinions in this case?

11:21:25 10    A.  I have.

11:21:25 11    Q.  And can you describe for the jury what information that you

11:21:28 12    looked at and considered in forming your opinions?

11:21:31 13    A.  So I read the expert reports of the experts from the defense

11:21:38 14    and from the plaintiff's side.  I read many of the depositions.  I

11:21:44 15    read all of Ms. Kahn's records, looked at all of the pictures

11:21:48 16    that -- the many pictures that are in that file.  I read some of

11:21:59 17    the internal Sanofi documents that are listed in my report -- that

11:22:05 18    list has them on there -- and some internal -- some case report

11:22:10 19    forms that were also in that original disclosure.

11:22:17 20        I think that's pretty much it.  I read --

11:22:20 21    Q.  Have you also reviewed the medical literature?

11:22:22 22    A.  I did, yeah.

11:22:23 23    Q.  And in forming your opinions, did you also rely on your

11:22:26 24    experience?

11:22:26 25    A.  Yes.

11:22:28  1   Q.  And, Dr. Glaspy, do you have an opinion as to whether or not

11:22:31  2   Ms. Kahn needed chemotherapy?

11:22:34  3   A.  I think she did.

11:22:35  4   Q.  And, Doctor, do you have an opinion as to whether a

11:22:39  5   chemotherapy regimen with Taxotere was an appropriate choice for

11:22:42  6   Ms. Kahn?

11:22:43  7   A.  Yes.  I do have that opinion and I believe it was an

11:22:47  8   appropriate choice.

11:22:47  9   Q.  And, Dr. Glaspy, was the NSABP B-40 clinical trial an

11:22:55 10   appropriate option for Ms. Kahn?

11:22:57 11   A.  Yes.

11:22:59 12   Q.  And in your opinion, did Ms. Kahn need a taxane?

11:23:03 13   A.  In my opinion, a taxane served her best -- that the chance of

11:23:10 14   the chemotherapy helping her would be highest with a taxane.

11:23:13 15   Q.  And, Doctor, in your opinion, if Ms. Kahn was going to get a

11:23:19 16   standard of care chemotherapy that didn't involve Taxotere, were

11:23:25 17   there any regimens for the neoadjuvant treatment of breast cancer

11:23:29 18   that did not carry some risk of persistent hair loss or hair

11:23:36 19   thinning?

11:23:36 20   A.  Okay.  Are we talking with what was known at the time in 2008,

11:23:39 21   or what we know today?

11:23:42 22   Q.  Are there any treatment options, setting aside Taxotere, that

11:23:49 23   don't have some risk of persistent hair thinning with regard to

11:23:54 24   chemotherapy?

11:23:55 25   A.  I believe there are not, that they all have some risk.

11:23:58  1    Q.  And, Doctor, do you hold the opinions that you're going to

11:24:03  2    express today to a reasonable degree of medical certainty?

11:24:06  3    A.  I do.

11:24:06  4    Q.  Okay.  Now, I want to talk just a little bit about your

11:24:12  5    compensation in this matter, okay?

11:24:13  6    A.  Sure.

11:24:14  7    Q.  Doctor, does the university that you work for have a policy

11:24:20  8    regarding compensation for outside activities that you do?

11:24:23  9    A.  They do.

11:24:23 10    Q.  And could you explain that for the jury?

11:24:26 11    A.  So I have a salary that the university pays me.  I am an

11:24:32 12    employee of the Regents of the University of California.  And they

11:24:36 13    also have a system where some of the proceeds from my patient care

11:24:42 14    will come back in the form of a bonus at the end of the year.  And

11:24:49 15    that, in aggregate, forms my UCLA salary.

11:24:53 16         The university has developed rules to deal with the fact

11:24:58 17    that faculty can go out and make money consulting and doing things

11:25:05 18    like this today.  And the policy they developed was that each of us

11:25:12 19    has a maximum that we are allowed to keep, and after that every

11:25:18 20    year, the difference is to go to the university for their use.

11:25:24 21    Q.  And, Doctor, you're charging how much for your time today?

11:25:29 22    A.  $400 an hour.

11:25:30 23    Q.  And, Doctor, when you -- you talk about the maximum amount of

11:25:34 24    consulting income that you're allowed to keep every year, and that

11:25:37 25    would include work that you may do, for example, in this case,

11:25:41 1  correct?

11:25:41 2  A.  That's correct.

11:25:42 3  Q.  But it would also include work you would do in any other

11:25:45 4  consulting endeavor that you take; is that correct?

11:25:48 5  A.  That's correct.  It depends what happens earliest in the year

11:25:56 6  what ends up being kept because inevitably you end up maxed out.

11:26:00 7  Q.  And what's the maximum amount for all consulting, whether it be

11:26:04 8  litigation or anything else, what's the maximum amount that you're

11:26:07 9  allowed for yourself?

11:26:09 10  A.  Yeah.  For me, it's $40,000 a year.

11:26:12 11  Q.  And so, Doctor, are you able to just make as much money as you

11:26:18 12  want doing outside litigation consulting?

11:26:21 13  A.  I guess I am but I am not allowed to keep it, so.

11:26:25 14  Q.  And when you say anything above that number goes to the

11:26:29 15  university, can you explain that?

11:26:30 16  A.  So the university -- for instance, they bill and collect for

11:26:38 17  what I do for patients and for the chemotherapy that I give and all

11:26:41 18  of that.  And they keep that as sort of practice income that they

11:26:48 19  use to pay salaries and support our medical assistants and all of

11:26:53 20  that.  This goes into that pool so it becomes just as though I made

11:26:57 21  the money treating patients.

11:27:03 22  Q.  And, Doctor, over the years, have you also done consulting work

11:27:08 23  with pharmaceutical companies in clinical trials?

11:27:10 24  A.  Yes.

11:27:11 25  Q.  And could you describe that and whether or not you get any

11:27:15 1   financial benefit from that?

11:27:16 2   A.  So in the old days, there was a lot of Pharma companies being

11:27:30 3   involved in having faculty come to their town and talk about a

11:27:34 4   topic, and they offered that to their doctors as a sort of a gift

11:27:44 5   to help them.  And so I could go and talk about anything I wanted

11:27:51 6   and they would pay an honorarium.

11:27:56 7          The FDA worried because there were people going around

11:28:00 8   talking about off-label treatments and things, and so they

11:28:05 9   regulated Pharma, so now Pharma has to develop the slides.  So I

11:28:12 10  can't go and talk about Adriamycin.  I have to -- I have to show

11:28:19 11  the FDA-approved slides for that company.  And that ruined it for

11:28:24 12  most of us in terms of a useful endeavor.  We weren't educating

11:28:30 13  anybody and so we got out of that.  And the other thing that's

11:28:33 14  happened is that we're now tracked by the government, and the

11:28:44 15  results are put on the Internet so you can end up with a sort of a

11:28:51 16  tag that says that you receive a lot of money from this company or

11:28:55 17  that company, and patients rightfully have access to that database.

11:29:01 18  So that has driven that whole area down from where it used to be.

11:29:07 19         But there are still times when it's important, you know,

11:29:14 20  where there's a big drug company that has a drug that we've tested

11:29:18 21  and we're convinced it's very important for this kind of breast

11:29:22 22  cancer, and they're convinced it doesn't work in breast cancer, and

11:29:25 23  so we go and see them and say, please let us do, you know, support

11:29:31 24  a trial.  Because this is going to be a good thing for everybody

11:29:35 25  and --

11:29:36  1  Q.  Doctor, if that happens and you get funding to support a trial,

11:29:40  2  does that personally come to you, or does it go to the university?

11:29:42  3  A.  It depends where I am at on my max, right?

11:29:42  4  Q.  Right.

11:29:44  5  A.  So it goes in that hopper.

11:29:48  6  Q.  Okay.  Now, Doctor, I want to take a step back and talk just

11:29:53  7  generally and about your experience with Taxotere.  So when did you

11:30:01  8  first get introduced to Taxotere and how long have you had

11:30:03  9  experience with Taxotere and what has that experience been?

11:30:06  10  A.  So we were involved in some clinical trials in the mid-2000s --

11:30:14  11  early and mid-2000s -- of Taxotere in the treatment of metastatic

11:30:20  12  disease.  And then we were involved in the 316 trial, which was one

11:30:28  13  of the two trials of Taxotere in early breast cancer that was used

11:30:35  14  to support its approval for that.

11:30:37  15  Q.  And, Doctor, have you used Taxotere in your practice with

11:30:41  16  patients?

11:30:42  17  A.  Yes.

11:30:42  18  Q.  And for how long?

11:30:43  19  A.  Since it was approved in 1996.

11:30:48  20  Q.  And, Doctor, can you explain to the jury what cancer is and how

11:30:55  21  it works?

11:30:56  22  A.  Okay.  So briefly, cancer is -- you can think of it as it's a

11:31:07  23  normal part of being a human being.  While I've been talking to

11:31:11  24  you, I've had several million mutations happen, largely in my bone

11:31:16  25  marrow and other rapidly growing tissues, but also in other places

11:31:21  1   like my colon.  And those mistakes change the instruction book for

11:31:29  2   cells.  And if it changes it in a bad way, it makes it unstable and

11:31:34  3   it makes more mistakes next time it divides.  And if -- as it works

11:31:39  4   down this pathway, it becomes more and more malignant and

11:31:42  5   ultimately becomes cancer.  I have spell checkers that fix

11:31:48  6   99.99 percent of my mutations.  Some day I'll make one that my

11:31:54  7   spell checkers will miss and I'll be on that path, as well.  That's

11:31:58  8   why cancer rises with aging.  And that's -- by the time, say, a

11:32:06  9   breast cancer is diagnosed, there's something like 55 million

11:32:10 10   mutations -- 55 million changes in the instruction book that guide

11:32:17 11   whether it grows, where it grows, whether it invades, and whether

11:32:21 12   it commits suicide when it's supposed to.  And changes in those

11:32:27 13   characteristics make that cell malignant.  It will -- talking about

11:32:32 14   breast cancer, it starts in the breast, but it can spread either

11:32:37 15   very early or late to other parts of the body and grow there and

11:32:43 16   then do the things that, you know, cancer can do.

11:32:47 17   Q.  And what are micrometastases?

11:32:52 18   A.  So most breast cancer is -- that we diagnose is called "early"

11:32:59 19   breast cancer.  So only 6 percent of women who develop invasive

11:33:06 20   breast cancer present with Stage IV disease -- present with

11:33:12 21   metastatic breast cancer that you can see on a scan.

11:33:15 22        The other 94 percent of what's going to become metastatic

11:33:22 23   breast cancer is -- develops out of early breast cancer.  So for

11:33:30 24   many decades, we've been faced with the dilemma that we know that

11:33:37 25   some of our early breast cancer patients are harboring metastases

11:33:45  1    that are too small yet to see on a scan, and that's what we

11:33:51  2    decide -- that's what we are aiming at when we give endocrine

11:33:55  3    therapies in early breast cancer or chemotherapy in early breast

11:34:00  4    cancer.  We're aiming at those micrometastases because if you treat

11:34:05  5    micrometastatic breast cancer, you can sometimes cure people.

11:34:09  6    There's no guarantee and there are people who still relapse, but at

11:34:14  7    least the risk of that goes down.

11:34:17  8    Q.  Okay.  And, Doctor, is early-stage breast cancer a serious

11:34:22  9    disease?

11:34:23 10    A.  It is, yes.

11:34:25 11    Q.  And, Doctor, throughout your career, have you actually been

11:34:30 12    involved in the clinical trials and the treatments that have been

11:34:35 13    developed to treat early-stage breast cancer?

11:34:38 14    A.  I have, yes.

11:34:39 15    Q.  And can you elaborate on that a little bit?

11:34:42 16    A.  So when I first started doing oncology, we were at the very

11:34:48 17    beginning stages of doing this chemotherapy.  Up until that time,

11:34:59 18    everybody thought that early breast cancer was only a breast

11:35:04 19    problem and so, you know, people would get a mastectomy, there was

11:35:10 20    no breast conservation in those days.  And then two, five years

11:35:16 21    later, the people would come with it spread around the body.  The

11:35:20 22    first impulse by the medical community was to say we didn't do a

11:35:23 23    big enough operation.  So they started doing bigger and bigger and

11:35:27 24    bigger operations.  And by the early 70s, these operations were

11:35:31 25    huge.  They would take off all of your muscle and it wasn't just

11:35:35 1   losing your breast, it was losing a lot of arm function, having a

11:35:39 2   lot of arm swelling and it wasn't changing the relapse risk at all.

11:35:44 3   And that's when someone got the idea, why don't we assume it's

11:35:51 4   already spread and find women that are high risk for relapse and

11:35:58 5   treat them with chemotherapy?  And that improved survival.  And

11:36:05 6   that has been a progression since then.  I see we talk about first,

11:36:11 7   second, and third generation, but I've lived through eight

11:36:14 8   generations of chemotherapy.  We started with a chemotherapy pill

11:36:16 9   called melphalan that women would take for two years then, then we

11:36:22 10  add 5-FU to that.  Then we went to CMF, and then Adriamycin got

11:36:28 11  stuck in there, and these things like FEC and FAC and EC that

11:36:32 12  you're seeing in and hearing about in this case happened.  And then

11:36:38 13  the taxanes happened.

11:36:38 14  Q.   Okay.

11:36:39 15  A.   And that's how we got to where we're at today.

11:36:42 16  Q.   And, Doctor, what's the most common form of cancer for women in

11:36:47 17  the United States?

11:36:47 18  A.   It's infiltrating ductal cancer.

11:36:50 19  Q.   Breast cancer?

11:36:52 20  A.   Yeah.  It's breast cancer but specifically, it's infiltrating

11:36:56 21  the ductal subtype of breast cancer.

11:36:58 22  Q.   And, Doctor, are you familiar with breast cancer statistics, is

11:37:01 23  that something that you track and follow?

11:37:03 24  A.   Yes, I do.

11:37:05 25  Q.   And what percentage of women will develop breast cancer in

11:37:08   1   their lives?

11:37:08   2   A.  So about -- it's between one in eight and one in nine women

11:37:14   3   will develop breast cancer in their lifetime.  And the older our

11:37:19   4   population gets, the higher that number is going to go.

11:37:21   5   Q.  Going back in time to when Ms. Kahn was diagnosed, how many new

11:37:26   6   cases of breast cancer would there be in a year based on the

11:37:29   7   statistics?

11:37:29   8   A.  Oh, I would have to pull out the -- but in the order of 150 to

11:37:35   9   170,000.

11:37:36  10   Q.  Okay.  And, Doctor, what are the greatest risk factors for

11:37:41  11   developing breast cancer?

11:37:42  12   A.  Being female is the -- we forget to mention that, but men can

11:37:48  13   get breast cancer, it's just not common.  But once you get past

11:37:51  14   being female, a strong risk factor is having a gene that causes

11:37:55  15   breast cancer that makes you make more mistakes and not repair

11:38:00  16   them, we call the BRCA genes, so that's a risk factor.  Having a

11:38:05  17   positive family history is a risk factor, and the more positive it

11:38:09  18   is the higher the risk factor.  Having early menarche so that you

11:38:17  19   start menstruating younger has a higher risk factor, not having

11:38:21  20   children, having a late menopause, those are -- and taking estrogen

11:38:26  21   are risk factors.

11:38:28  22   Q.  And, Doctor, through the course of your career, how have

11:38:34  23   survival rates changed with regard to breast cancer?

11:38:36  24   A.  So survival rates have gone up.  Mortality rates have gone

11:38:43  25   down.  And it's complicated because breast cancer incidence has

1803

11:38:47  1    been going up.  So part of the success of the research is just

11:38:51  2    preventing that from translating into a rise in mortality.  So we

11:38:57  3    have a rising incidence with a stable or decreasing mortality and

11:39:02  4    that's -- there are two benefits there, you're overcoming the

11:39:05  5    increase as well as helping the people who already were in the

11:39:11  6    group that might develop breast cancer, that might die of breast

11:39:15  7    cancer.

11:39:15  8    Q.  And, Doctor, is the treatment of breast cancer improved during

11:39:25  9    the course of your care and treatment of patients?

11:39:28 10    A.  Yeah.  During my career, I have been lucky to see the efficacy

11:39:35 11    of breast cancer treatment improve, so that the mortality of early

11:39:40 12    breast cancer has clearly decreased.  And that's been due to two

11:39:46 13    things.  One is mammogram is becoming more common.  And two is, the

11:39:53 14    symptomatic treatments with chemotherapy and endocrine therapies

11:39:56 15    and those two have about the same impact.

11:39:58 16    Q.  Okay.  Talking about symptomatic therapies, can you just

11:40:02 17    explain for the jury how does chemotherapy work?

11:40:05 18    A.  So from a practical standpoint, chemotherapy these days almost

11:40:11 19    always is intravenous, there are a couple of exceptions.  So the

11:40:15 20    way -- the mechanics of how it works is you go into the doctor,

11:40:18 21    they put an I.V. in and they give you medicines to block side

11:40:22 22    effects and then they give you the treatment.  In terms of

11:40:28 23    mechanically how it works is it tends to do things that make it

11:40:36 24    hard for cells to divide.

11:40:41 25            So the taxanes, for instance, affect the ability of

1804

11:40:50  1  what's called a spindle apparatus to be dissembled.  So when one of

11:40:55  2  my cells -- while I've been talking to you, I've made millions of

11:40:56  3  them -- when one of them tried to divide, it had to make two cells

11:41:00  4  so it had to make an extra copy of all of the chromosomes so it

11:41:04  5  would have all of the information.  And then it had to make sure

11:41:06  6  that each cell got one of each chromosome, right.  So they'd make a

11:41:14  7  spindle apparatus that hooks to the chromosomes and then on

11:41:17  8  three -- you know, one, two, three go -- they pull apart and pull,

11:41:22  9  when it works well, two full copies of the chromosomes, one to each

11:41:28 10  of the cells.

11:41:31 11        What the taxanes do is they make it impossible for the

11:41:36 12  cell to break down the spindle apparatus.  So once a cell has

11:41:42 13  gotten ready and said go, now it can't get rid of this thing and it

11:41:46 14  kills it, so that's how taxanes work.

11:41:50 15        Other drugs work by being -- by cross-linking the

11:42:01 16  chromosomes so that when the cell try to divide, the chromosomes

11:42:06 17  get tied in a knot and they die.  Adriamycin works that way.

11:42:10 18  Cytoxan works that way.

11:42:11 19  Q.  And are chemotherapy drugs given in regimens in part based on

11:42:15 20  how each drug works?

11:42:17 21  A.  In part.  The usual rule has been if you have an operating

11:42:27 22  agent already in there, it doesn't make sense to add a second one,

11:42:30 23  just increase the dose of the one you got.  Or add a drug that has

11:42:35 24  a different mechanism of action because the theory was, and it

11:42:40 25  was -- it proved to be pretty true, that combinations would be more

11:42:46  1    effective than single agents and combinations that had different

11:42:50  2    mechanisms of action in the two or three drugs would work better.

11:42:54  3    And that turned out to be true as well.

11:42:56  4    Q.  Okay.  And, Doctor, we've heard the terms "adjuvant

11:43:01  5    chemotherapy" and "neoadjuvant chemotherapy," can you explain those

11:43:05  6    terms to the jury?

11:43:06  7    A.  Okay.  So what we've been talking about is adjuvant

11:43:09  8    chemotherapy.  We're talking about taking a woman who might be

11:43:13  9    cured by her mastectomy or could be cured with just a mastectomy

11:43:20 10    and saying there's enough chance that there's cancer cells spread

11:43:25 11    around your body that we need to talk about systematic treatment,

11:43:29 12    because if you have that, you still might be curable.  And if we

11:43:34 13    wait until it's big enough to see, it's too late.  And so we do

11:43:41 14    these treatments to treat the rest of the body while the radiation

11:43:47 15    therapist and the surgeon are treating this part of the breast --

11:43:50 16    are treating the breast.

11:43:52 17         When we give it after surgery, which is used to be

11:43:57 18    everybody, there was no exceptions, we call that adjuvant.  When

11:44:04 19    somebody said, Well, let's try giving it before the chemotherapy in

11:44:08 20    the hopes that it would work better, they had to make up a name for

11:44:13 21    it, and neoadjuvant just means new adjuvant, it's a new idea and it

11:44:17 22    stuck.  So we call it neoadjuvant when it's given before

11:44:21 23    chemotherapy and adjuvant when it's given after.  It turned out

11:44:24 24    they work exactly the same on relapse risk.  So there wasn't any

11:44:30 25    advantage or disadvantage to making the chemotherapy preoperative.

1806

| | |
|---|---|
| 11:44:35 | 1 |
| 11:44:40 | 2 |
| 11:44:40 | 3 |
| 11:44:48 | 4 |
| 11:44:51 | 5 |
| 11:44:56 | 6 |
| 11:45:00 | 7 |
| 11:45:05 | 8 |
| 11:45:08 | 9 |
| 11:45:10 | 10 |
| 11:45:16 | 11 |
| 11:45:21 | 12 |
| 11:45:28 | 13 |
| 11:45:34 | 14 |
| 11:45:40 | 15 |
| 11:45:45 | 16 |
| 11:45:50 | 17 |
| 11:45:56 | 18 |
| 11:46:02 | 19 |
| 11:46:03 | 20 |
| 11:46:04 | 21 |
| 11:46:07 | 22 |
| 11:46:10 | 23 |
| 11:46:16 | 24 |
| 11:46:20 | 25 |

Q.  What are some of the reasons a patient may want neoadjuvant chemotherapy?

A.  So these days where one of the fields migrating, so triple-negative breast cancer and HER2/neu-positive breast cancer are almost always now treated neoadjuvant.  Only the hormone-positive breast cancers like Mrs. Kahn had are being treated with postoperative chemotherapy in most centers.  And there are reasons for that, but they don't matter because they are not relevant to Mrs. Kahn.

Once you're dealing with a hormone-receptor-positive breast cancer, there's no good reason to give the chemotherapy before surgery unless the surgeon says, I can conserve the breast if this tumor is smaller but I can't if it's bigger.  If it's the size it is.  So for cosmetic reasons, the oncologist says, Look, I was going to give her chemo anyway, I'll move it before surgery, that's a very common -- that's the only reason we generally do preoperative chemotherapy in ER-positives is in that subset of patients where it's going to make a difference on whether their breast can be conserved.

Q.  Does doing neoadjuvant chemotherapy provide feedback to the patient and the doctor as it relates to whether or not the chemotherapy is having an impact on the tumor?

A.  It does.  That's an advantage for everybody including ER+s that you get to see the tumors shrink.  There's not a big advantage to that because, in general, there's not something to switch to that's

11:46:24  1    going to make the tumor shrink any better, which is why we haven't

11:46:29  2    moved to preoperative for everybody.

11:46:35  3          There's a disadvantage, and the disadvantage is that you

11:46:40  4    don't have accurate staging data, you only have clinical staging.

11:46:46  5    And so you don't know for sure whether the lymph nodes are

11:46:50  6    negative, and you don't know with accuracy how big the tumor is.

11:46:55  7    And so that can affect your decision-making process and your

11:47:00  8    estimations of risk and all of that, so that's a downside.  There's

11:47:04  9    an advantage to having the pathological stage in hand when you

11:47:09  10   treat a patient.

11:47:10  11   Q.  And, Doctor, we've heard about this, but what -- what are the

11:47:18  12   statistics that cancer does recur?  If early-stage cancer is not

11:47:21  13   cured and it does recur, what are the statistics say about that?

11:47:24  14   A.  So the statistics say the mortality rate is very high, for five

11:47:30  15   years it would be in the 15, 16 percent range.  And at ten years,

11:47:35  16   it would be in the 6 percent range.  And those patients would all

11:47:40  17   still be -- they would be on treatment.  So sometimes treatment

11:47:42  18   works and people can go for years receiving cancer treatment to

11:47:48  19   hold their cancer in check.  A lot of us know people who have done

11:47:52  20   that.  But most people don't go a long time and most of them are

11:48:00  21   gone by ten years.

11:48:01  22   Q.  And is that why it's important to get the right treatment the

11:48:04  23   first time with breast cancer?

11:48:07  24          MR. MICELI:  Object to leading.

11:48:08  25          MR. STRONGMAN:  I'll rephrase my question.

11:48:10 1          THE COURT:  Rephrase your question.

11:48:11 2    BY MR. STRONGMAN:

11:48:11 3    Q.  Is it important to get the treatment right the first time with

11:48:15 4    regard to breast cancer?

11:48:16 5    A.  You only get one chance to cure early breast cancer.

11:48:23 6    Q.  Next topic, Doctor.  You mentioned taxanes and the jury has

11:48:28 7    heard about Taxotere and Taxol, and are those both taxanes?

11:48:31 8    A.  They are.

11:48:32 9    Q.  And can you describe, for the jury, the development of taxanes,

11:48:37 10   where they came from and what the history is there?

11:48:39 11   A.  So I don't know -- you're probably not old enough to remember

11:48:44 12   this, but when I was a young oncologist, somebody discovered that

11:48:49 13   an extract of bark from the Pacific Yew tree had activity in

11:48:55 14   cancer.  They tested it against bacteria and it killed bacteria,

11:48:59 15   that was called the AIMS test.  And then they showed that it had

11:49:03 16   activity in cancer.  And it turned out to be a really active drug

11:49:07 17   at the time, especially in ovarian cancer and we really needed

11:49:11 18   drugs in ovarian cancer.

11:49:16 19          And so the people started harvesting those trees, and

11:49:21 20   each tree only produced a little bit of medication.  It took lots

11:49:26 21   of trees to treat one patient one time.  And so it became clear

11:49:31 22   that we needed to figure out a better way to get taxanes.

11:49:37 23          And two things happened; one, the people who were working

11:49:40 24   with Taxol developed ways to synthesize it to eliminate the need

11:49:45 25   for the Pacific Yew tree.  At the same time, people in France using

11:49:50  1   a different -- a European Yew tree, EEW I think it is or EWE, Yew

11:49:58  2   tree, and they found a compound there that they could work into a

11:50:05  3   drug, and that drug became Taxotere.

11:50:16  4   Q.  Specifically, how has the development of taxanes impacted

11:50:19  5   breast cancer treatment?

11:50:20  6   A.  They turned out to be the most active drugs that we've had in

11:50:24  7   breast cancer.  And they were the first drugs to suggest that in

11:50:33  8   metastatic disease, we could prolong survival.  There was a *New*

11:50:38  9   *England Journal* paper written right before the taxanes came out by

11:50:43 10   a guy named McBride who was one of the big breast cancer guys.  The

11:50:46 11   last sentence of which was, "There is no evidence that anything

11:50:47 12   that we do for metastatic breast cancer improves survival."

11:50:52 13          That's where we were at when I started.  And the taxanes

11:50:56 14   were part of the change in that because they were the first drugs

11:51:01 15   we had that were that active.

11:51:03 16   Q.  And so have taxanes improved the outcomes with regard to breast

11:51:07 17   cancer treatment?

11:51:08 18   A.  Yeah.  I was talking about metastatic disease a minute ago.

11:51:11 19          But after that -- after they were shown to be active

11:51:16 20   drugs in metastatic breast cancer, they were moved into the

11:51:21 21   adjuvant setting because we weren't doing a lot of neoadjuvant yet,

11:51:27 22   and that's where they were developed for early breast cancer was

11:51:31 23   there.

11:51:31 24   Q.  And what has the science been in terms of the efficacy of

11:51:38 25   taxanes in early-stage breast cancer?

11:51:41  1   A.   Okay.   So we don't have any data comparing -- in early

11:51:46  2   breast cancer -- comparing taxanes to no treatment because it's not

11:51:52  3   ethical or not thought to be ethical to do a trial like that where

11:51:57  4   a woman, by a flip of a coin, could be denied the current standard

11:52:03  5   of care.   So we don't -- we'll never know what taxanes alone would

11:52:10  6   do, and probably don't want to know.

11:52:12  7          But what was done was they picked regimens that were

11:52:20  8   working well without taxanes and were as -- the current standard at

11:52:27  9   the time, and then figured out a way to put the taxanes in and then

11:52:30 10   did a randomized trial where everybody got good chemo but only one

11:52:36 11   group got taxane.   And that's how the drugs got approved in early

11:52:42 12   breast cancer.

11:52:42 13   Q.   And what were the results of those studies as it relates to --

11:52:47 14   let's just give a specific example like you're talking about.   The

11:52:50 15   jury has heard a little bit about TAX316, and so you had in one arm

11:52:56 16   Taxotere, Adriamycin, cyclophosphamide, you had in the other arm

11:53:01 17   5-FU, Adriamycin, and cyclophosphamide.   What did those studies

11:53:06 18   show in terms of efficacy?

11:53:07 19   A.   So they showed -- and this was node-positive women.   They

11:53:12 20   showed that there was an improvement in progression-free survival

11:53:20 21   and an improvement in overall survival.   In fact, it was surprising

11:53:24 22   because that control group was a pretty good chemotherapy.   And so

11:53:31 23   TAC beat, you know, the Muhammad, the previous heavyweight

11:53:38 24   champion, and beat it bad.

11:53:41 25          At any given point on the survival curves, a woman -- if

11:53:48  1   you had a woman in the FAC arm and a woman in the TAC arm, the

11:53:53  2   woman in the TAC arm had a 30 percent less risk of dying at that

11:54:03  3   time point.  It was essentially a 30 percent improvement in

11:54:07  4   survival.  And so you know, that was -- that was pretty surprising

11:54:13  5   to everybody, but in retrospect, we probably shouldn't have been

11:54:18  6   because we were dealing with effective drugs.

11:54:20  7   Q.  Okay.  And, Doctor, are Taxol and Taxotere the same drug?

11:54:25  8   A.  No.

11:54:27  9   Q.  And are they entirely interchangeable?

11:54:29 10   A.  No, no.

11:54:31 11   Q.  So when you're looking at whether to use Taxol or Taxotere as a

11:54:37 12   taxane with a patient, what kind of considerations are you

11:54:40 13   undertaking?

11:54:41 14   A.  So in some diseases, we say one drug has been shown to be

11:54:46 15   helpful and the other one hasn't.  In breast cancer, that's not the

11:54:51 16   case.  In breast cancer, the two drugs for early breast cancer have

11:54:58 17   been shown to be equivalent in their effectiveness.  Okay.  So we

11:55:09 18   can say that Taxol and Taxotere is a choice a doctor makes when

11:55:14 19   they're dealing with breast cancer.  You can't make that choice

11:55:18 20   with prostate cancer, say.  But you can with breast cancer.  In

11:55:23 21   making the choice, you often look at what other things I am trying

11:55:29 22   to do with this patient and what are the patient's problems.

11:55:33 23   Taxol, we think, causes more neuropathy than Taxotere.  Taxotere

11:55:41 24   can cause more problems with blocked tear ducts than Taxol.  They

11:55:48 25   both can cause allergic reactions and need to have steroids given.

11:55:54  1    Taxol makes the ankles swell -- or Taxotere makes the ankles swell

11:55:59  2    more than Taxol does.  So there are pros and cons.  If a patient

11:56:03  3    has diabetes with neuropathy, meaning, they already have nerve

11:56:06  4    problems, that might cause you to migrate toward Taxotere.

11:56:11  5            Another goal that has affected this drug's development

11:56:17  6    and continues to is lot of us would like to see Adriamycin and

11:56:23  7    epirubicin, the anthracycline retired from the treatment of early

11:56:30  8    breast cancer because they -- we never did go back -- when we got

11:56:33  9    the taxanes, we were so excited, we just added them to A and C.  We

11:56:37 10    never asked the question, Do we really need the A anymore?  And the

11:56:45 11    A is causing heart damage that we have underestimated and continue

11:56:48 12    to underestimate, and leukemia risk.  And leukemia is a bad one;

11:56:55 13    it's not one we can effectively treat.  And so for those two

11:56:59 14    reasons, a lot of us would like to see Adriamycin retired.  We

11:57:03 15    don't have a lot of evidence that it provides any benefit.  In

11:57:07 16    fact, the preponderance of the evidence says that it doesn't.  And

11:57:11 17    there haven't been chemotherapy regimens developed for Taxol in

11:57:17 18    early breast cancer for any -- at least for this subtype of breast

11:57:23 19    cancer that don't involve Adriamycin.

11:57:26 20            So another reason to reach for Taxotere might be that you

11:57:31 21    want to avoid Adriamycin.

11:57:36 22            MR. STRONGMAN:  I'm at a transition point.

11:57:37 23            THE COURT:  Okay.  This is a good time.  Thank you.

11:57:40 24            Members of the jury, we're going to take our lunch break

11:57:42 25    now.  It's 10 to 12:00.  Let's return -- it's 5 to 12:00.  Let's

| | |
|---|---|
| 11:57:48 | 1 |
| 11:57:52 | 2 |
| 11:57:56 | 3 |
| 11:58:00 | 4 |
| 11:58:04 | 5 |
| 11:58:26 | 6 |
| 11:58:26 | 7 |
| 11:58:29 | 8 |
| 11:58:32 | 9 |
| 11:58:34 | 10 |
| 11:58:34 | 11 |
| 12:01:26 | 12 |

1   return at 1:15.  The Court will be at recess until 1:15.  And let

2   me remind you, do not discuss the case amongst yourselves or with

3   anyone else, and please don't even acknowledge anyone associated

4   with this case.  Thank you.  Court's at recess until 1:15.

5             THE MARSHAL:  All rise.

6        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

7             THE COURT:  Dr. Glaspy, I just want to remind you, you

8   are under oath and you cannot speak about your testimony during the

9   course of the lunch break.

10            THE WITNESS:  Okay.

11            THE COURT:  Thank you.

12       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

13

14                         * * * * * *

15

16                    REPORTER'S CERTIFICATE

17

18       I, Karen A. Ibos, CCR, Official Court Reporter, United
    States District Court, Eastern District of Louisiana, do hereby
19  certify that the foregoing is a true and correct transcript, to the
    best of my ability and understanding, from the record of the
20  proceedings in the above-entitled and numbered matter.

21            ___/s/ Karen A. Ibos_____
            Karen A. Ibos, CCR, RPR, CRR, RMR
22            Official Court Reporter

23

24

25

OFFICIAL TRANSCRIPT