UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *      16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *      Section H
                                  *
Relates to:  Elizabeth Kahn      *      November 17, 2021
             16-CV-17039          *
* * * * * * * * * * * * * * * * * *


              DAY 7 - AFTERNOON SESSION
          TRANSCRIPT OF JURY TRIAL BEFORE
          THE HONORABLE JANE T. MILAZZO
          UNITED STATES DISTRICT JUDGE


Appearances:


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                                  ZACHARY L. WOOL, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2225
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  JESSICA PEREZ REYNOLDS, ESQ.
                             24110 Eden Street
                             Post Office Drawer 71
                             Plaquemine, Louisiana 70765

1    <u>APPEARANCES</u>:

2
     For the Plaintiffs:            Gibbs Law Group, LLP
3                                   BY:  KAREN BARTH MENZIES, ESQ.
                                    6701 Center Drive West, Suite 1400
4                                   Los Angeles, California 90045

5
     For the Plaintiffs:            Bachus & Schanker, LLC
6                                   BY:   J. KYLE BACHUS, ESQ.
                                          DARIN L. SCHANKER, ESQ.
7                                   101 W. Colfax Avenue, Suite 650
                                    Denver, Colorado 80202
8

9    For the Plaintiffs:            DAVID F. MICELI, LLC
                                    BY:  DAVID F. MICELI, ESQ.
10                                  Post Office Box 2519
                                    Carrollton, Georgia 30112
11

12   For the Plaintiffs:            Martzell Bickford & Centola
                                    BY:  LAWRENCE J. CENTOLA, ESQ.
13                                  338 Lafayette Street
                                    New Orleans, Louisiana 70130
14

15   For the Sanofi                 Irwin Fritchie Urquhart
     Defendants:                        & Moore, LLC
16                                  BY:   DOUGLAS J. MOORE, ESQ.
                                          KELLY E. BRILLEAUX, ESQ.
17                                  400 Poydras Street, Suite 2700
                                    New Orleans, Louisiana 70130
18

19   For the Sanofi                 Shook Hardy & Bacon, LLP
     Defendants:                    BY:  HARLEY V. RATLIFF, ESQ.
20                                       JON A. STRONGMAN, ESQ.
                                    2555 Grand Boulevard
21                                  Kansas City, Missouri 64108

22
     For the Sanofi                 Shook Hardy & Bacon, LLP
23   Defendants:                    BY:  HILDY M. SASTRE, ESQ.
                                    201 Biscayne Boulevard, Suite 3200
24                                  Miami, Florida 33131

25

1    Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room B-275
2                                  New Orleans, Louisiana 70130
                                   (504) 589-7778
3

4

5
     Proceedings recorded by mechanical stenography using
6    computer-aided transcription software.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            <u>INDEX</u>

2                                                     <u>Page</u>

3     John Glaspy, M.D.

4          Direct Examination By Mr. Strongman        1818

5          Cross-Examination By Mr. Miceli            1845

6          Redirect Examination By Mr. Strongman      1911

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**AFTERNOON SESSION**

**(November 17, 2021)**

THE COURT:  All jurors are present.  Court is back in

**JOHN GLASPY, M.D.,**

having been duly sworn, testified as follows:

THE COURT:  Dr. Glaspy, I remind you you are under oath.

THE WITNESS:  I understand.

THE COURT:  Thank you.

Mr. Strongman.

MR. STRONGMAN:  Thank you.

**DIRECT EXAMINATION**

BY MR. STRONGMAN:

Q.    Now, Dr. Glaspy, I want to start this afternoon with the topic of, when a patient comes in your office, how do you go about coming up with a diagnosis and a treatment plan for that patient?

A.    So usually when they come to my office, diagnosis of the cancer isn't an issue.  It's already happened.  So they have had an abnormal mammogram, that someone biopsied it, and it was breast cancer.  These days we usually see patients in medical oncology with breast cancer before they are operated on, and so I will often see them on the same day that the breast surgeon sees them to go over things.

And then we make an initial assessment of what the

**JOHN GLASPY, M.D. - DIRECT**

1  rest of the evaluation needs to be to get a handle on what we

2  are going to do and how bad a breast cancer we think this is

3  with the limited knowledge we have so far.

4  Q.    And tell me what the next steps are in terms of finding

5  out what that information is and then what the treatment

6  options might be.

7  A.    So if they haven't been done, the biomarkers on the tumor

8  would be important.  So we want to know the hormone receptors

9  and we want to know the HER2/neu.  We want to know the HER2/neu

10  and we would want to know the tumor grade and how fast the

11  cells are dividing, it's something called the Ki-67.

12  Q.    And then I want to ask you a few questions about this.

13  This was -- the jury has seen this a little bit.  And,

14  Dr. Glaspy, can you identify what it is?  This is the 2008

15  version of what?

16  A.    So this is the NCCN Treatment Guidelines for, in this

17  case, invasive breast cancer.

18  Q.    And can you describe for the jury what the two sides -- so

19  there's one column over here to the left and one column over

20  here to the right.  Can you differentiate those for the jury?

21  A.    Sure.  So trastuzumab is the same thing as Herceptin,

22  which is the anti -- HER2/neu antibody -- I'm sorry, the --

23  that's a subtype of cancer that we know now we should pull out

24  and treat differently than the rest of breast cancer, and so

25  they have got two recipes here, one for HER2/neu positive and

JOHN GLASPY, M.D. - DIRECT

01:19   1    one for HER2/neu negative.  The one on the left is HER2/neu

01:19   2    negative.

01:19   3    Q.   Okay.  And what column did Ms. Kahn fall into?

01:19   4    A.   She fell into column 1.

01:19   5    Q.   Okay.  The one on the left, correct?

01:19   6    A.   That's correct.

01:19   7    Q.   And we have heard a little bit about first generation,

01:19   8    second generation, and third generation chemotherapies.  Can

01:19   9    you describe and explain that to the jury?

01:19   10   A.   So the way I think of it is, is what was -- what new

01:20   11   things were happening that caused this to generate a new

01:20   12   cookbook, a new list of drugs.  And I would call the CMF type

01:20   13   regimens the first generation even though there were several

01:20   14   generations before them.

01:20   15        And then the second generation would be the

01:20   16   anthracycline or Adriamycin containing regimens.

01:20   17        And the third generation would be the taxane

01:20   18   containing regimens.

01:20   19   Q.   And in terms of efficacy, how does the third generation

01:20   20   treatments compare to the first and second generation

01:20   21   treatments?

01:20   22   A.   They are better.  We talked about the difference between

01:20   23   TAC and FAC and the impact it had on recurrence risk and on

01:20   24   survival.

01:20   25   Q.   And so, Doctor, when you are selecting a regimen with a

**JOHN GLASPY, M.D. - DIRECT**

01:20    1   patient, what kind of risk information do you discuss with a

01:20    2   patient?

01:21    3   **A.**   So the first one if they are HER2 -- if they are -- I'm

01:21    4   sorry, if they are hormone receptor positive and HER2 negative,

01:21    5   then that's a class of patients where we usually wait until

01:21    6   after surgery before we plan treatment because we will have

01:21    7   better -- a better staging and will be able to put a sharper

01:21    8   point on the risk.

01:21    9        So at that point I would communicate with the surgeon

01:21   10   and say, "Is there a reason that you wanted -- that you would

01:21   11   want preoperative chemotherapy in this person?"  And if they

01:21   12   said, "Yes," we would talk about that.  If they said, "No,"

01:21   13   then I would sit with the patient and say, "Well, we should

01:21   14   wait until we have the final pathology before we talk to you

01:21   15   because we'll have a sharper focus on what your risk is and

01:22   16   what the benefits are with different treatments."

01:22   17   **Q.**   Okay.  And, Doctor, I want to switch gears a little bit

01:22   18   and talk about hair loss and chemotherapy.  Okay?

01:22   19   **A.**   Okay.

01:22   20   **Q.**   As a general principle, Doctor, are there any chemotherapy

01:22   21   drugs that do not have side effects?

01:22   22   **A.**   No.

01:22   23   **Q.**   And, Doctor, what is your experience in terms of

01:22   24   chemotherapy drugs used in the adjuvant or neoadjuvant setting

01:22   25   for breast cancer and alopecia?

JOHN GLASPY, M.D. - DIRECT

01:22  1    A.    So since we started into CMF, we have been seeing
01:22  2    alopecia, meaning hair loss, during chemo in the majority of
01:22  3    our patients, a big majority that's been going on.  The issues
01:22  4    about recovery we have been seeing for that long as well that
01:22  5    it -- there's always hair regrowth with these levels of
01:23  6    chemotherapy, and the question is:  Is it the same as it was
01:23  7    before?  And it usually isn't.  It's either thinner or curlier
01:23  8    or a different color or something different.  So we have been
01:23  9    dealing with that all along.
01:23  10   Q.    And, Doctor, are there reports of persistent hair loss or
01:23  11   persistent hair thinning with Adriamycin?
01:23  12   A.    Yes.
01:23  13   Q.    And, Doctor, are there reports of persistent hair loss or
01:23  14   persistent hair thinning with Cytoxan?
01:23  15   A.    Yes.
01:23  16   Q.    And are there reports of persistent hair loss or
01:23  17   persistent hair thinning with Taxol?
01:23  18   A.    Yes.
01:23  19   Q.    And, Doctor, when you prescribe chemotherapy medications
01:24  20   in a regimen, is it possible to attribute hair loss to any one
01:24  21   particular drug in a regimen?
01:24  22   A.    Usually not unless two of the drugs don't have an effect
01:24  23   on hair, and that would be very uncommon.
01:24  24   Q.    And I think you were talking about your experience going
01:24  25   all the way back to your introduction to Adriamycin and

**JOHN GLASPY, M.D. - DIRECT**

01:24  1   Cytoxan, and what did you see with regard to hair thinning,

01:24  2   persistent hair thinning, with those medications before

01:24  3   taxanes?

01:24  4   **A.**   So, first of all, this is confounded by the fact that the

01:24  5   majority of women who get chemotherapy in early breast cancer

01:24  6   also receive estrogen interdicting or antiestrogen treatments

01:24  7   because most of them are ER positive, and those also can affect

01:25  8   hair growth.  So to purely address your problem I would have to

01:25  9   focus on the patients who had triple negative breast cancer and

01:25  10  weren't going to get hormones, and we have those.  And even in

01:25  11  that population of patients we see persistent hair recovery

01:25  12  issues, not commonly, but including up to what we are now

01:25  13  calling Grade 2 alopecia.  We weren't calling it that in 2008.

01:25  14  **Q.**   And did you review the deposition of Dr. Kardinal?

01:25  15  **A.**   Yes.

01:25  16  **Q.**   And has your experience with Adriamycin been consistent

01:25  17  with what Dr. Kardinal described?

01:25  18  **A.**   Yes, I can't --

01:25  19           **MR. MICELI:**  Objection, Your Honor.  Hearsay -- well,

01:25  20  never mind.

01:25  21           **THE COURT:**  I'm going to allow it.

01:25  22           **MR. MICELI:**  Okay.

01:25  23           **THE WITNESS:**  Yes, I would disagree with his

01:25  24  characterization.

       25

JOHN GLASPY, M.D. - DIRECT

01:25   1    BY MR. STRONGMAN:

01:25   2    **Q.**   And, Doctor, would it be accurate to say that persistent

01:26   3    hair loss or persistent hair thinning with chemotherapy didn't

01:26   4    exist before Taxotere came on the market?

01:26   5    **A.**   It would not be possible to say that.

01:26   6    **Q.**   Why not?

01:26   7    **A.**   Because we would be -- if we are defining this as Grade 2

01:26   8    alopecia more than six months out from chemotherapy, which is

01:26   9    one of the mainstream definitions, we saw that in occasional

01:26   10    patients before we had the taxanes.

01:26   11    **Q.**   And, Doctor, when you counsel your patients on hair loss,

01:26   12    what do you say to your patients with regard to the taxanes,

01:26   13    let's use those?

01:26   14    **A.**   Well, with regard to the regimen because --

01:27   15    **Q.**   Correct.

01:27   16    **A.**   -- we talk in terms of regimens.  So if it's a regimen

01:27   17    that's going to have Adriamycin in it or Cytoxan in it and a

01:27   18    taxane in it, we talk about the fact there's a very high chance

01:27   19    your hair will fall out unless you wear a cold cap.  And we can

01:27   20    talk about that more later if you want.  And if you do -- if

01:27   21    you don't wear a cold cap, there's a very high chance it's

01:27   22    going to fall out.  And in general it recovers, but it's often

01:27   23    different than it was before.  It's either thinner or curlier

01:27   24    or a different color or all of those things.

01:27   25    **Q.**   And, Doctor, in addition to chemotherapy, we have also

JOHN GLASPY, M.D. - DIRECT

01:27  1  talked about hormone therapy in this case.  And have you

01:27  2  prescribed hormone therapy to your patients?

01:27  3  **A.**   Yes.

01:27  4  **Q.**   And have you prescribed tamoxifen specifically?

01:27  5  **A.**   Yes.

01:27  6  **Q.**   And what are the most common side effects of tamoxifen?

01:28  7  **A.**   So the most common side effects are hot flashes, feeling

01:28  8  achy especially when you have been at rest for a while.  If you

01:28  9  go to the movies, it takes you a while to get going afterward

01:28  10  and stand up straight.  And some women report increases in

01:28  11  appetite and mood swings.

01:28  12  **Q.**   Okay.  And can tamoxifen affect hair?

01:28  13  **A.**   It can.  It --

01:28  14  **Q.**   How does that happen?

01:28  15  **A.**   So gradually the hair becomes thinner.  It -- the

01:28  16  dermatologists I think call it telogen effluvium, the cells in

01:28  17  resting phase are selectively falling out faster and --

01:28  18       **MR. MICELI:**  Your Honor, I object.  This is outside

01:28  19  the scope.

01:28  20  **BY MR. STRONGMAN:**

01:28  21  **Q.**   And, Doctor --

01:28  22       **THE COURT:**  Sustained.

01:28  23  **BY MR. STRONGMAN:**

01:28  24  **Q.**   Yeah --

01:28  25       **THE COURT:**  Sustained.

JOHN GLASPY, M.D. - DIRECT

01:28  1  BY MR. STRONGMAN:

01:28  2  Q.   Doctor, focusing on just your experience prescribing the

01:28  3  drug.

01:28  4  A.   Sure.

01:28  5  Q.   How does tamoxifen work and explain that process.

01:29  6  A.   So tamoxifen is a form of estrogen, but it's a form of

01:29  7  estrogen that some cells in your body can't recognize and use.

01:29  8  So it will cause hot flashes because you're feeling like you

01:29  9  have less estrogen in your body, and your hair can become

01:29  10  thinner because you are having those hormone effects on your

01:29  11  scalp.  It also makes bone stronger because the bones can sense

01:29  12  it is an estrogen so it doesn't cause weakening of the bones.

01:29  13  But it also, because it's an estrogen, can cause blood clots

01:29  14  and uterine cancer.

01:29  15  Q.   And, Doctor, as an oncologist, based on your experience,

01:29  16  are there reports of persistent hair loss with tamoxifen?

01:29  17  A.   Yes.

01:30  18  Q.   And, Doctor, let's talk a little bit more about the

01:30  19  sources of information that a doctor has.  Can you describe for

01:30  20  the jury what sources of information an oncologist, such as

01:30  21  yourself, will consider when you are gathering information

01:30  22  about the medications that you prescribe?

01:30  23  A.   So you're always rooted in your training and in your

01:30  24  experience, that hopefully is increasing over time, there's

01:30  25  published papers.  There's meetings that we all go to and learn

JOHN GLASPY, M.D. - DIRECT

01:30  1   what's new and what's going on in areas that we treat patients
01:30  2   in.  And there's educational sessions that people sign up for.
01:30  3   There's package inserts that we already talked about.  There's
01:30  4   lots of places to get information.
01:31  5   Q.   And so you mentioned package inserts.  That isn't the only
01:31  6   place that an oncologist gets information; is that fair?
01:31  7   A.   That's fair.
01:31  8   Q.   But it certainly is one place, true?
01:31  9   A.   Yes.
01:31  10  Q.   And, Doctor, have you reviewed the Taxotere label from
01:31  11  2007 in this case?
01:31  12  A.   Yes.
01:31  13  Q.   And, Doctor, again, this is familiar language to the jury,
01:31  14  but the Taxotere label says that, "Hair loss will begin after
01:31  15  the first few treatments and varies from patient to patient.
01:31  16  Once you have completed all your treatments, hair generally
01:31  17  grows back."
01:31  18       Did I read that correctly?
01:31  19  A.   You did.
01:31  20  Q.   Now, Doctor, from your perspective as an oncologist with
01:31  21  your decades of experience, what does that language mean to
01:31  22  you?
01:31  23  A.   To me it means the same thing as if you said hair usually
01:31  24  grows back.  It doesn't -- it alerts us that there's a chance
01:32  25  it won't grow back.

**JOHN GLASPY, M.D. - DIRECT**

1   **Q.**   And, Doctor, based on all of your experience, is the

2   statement that, "Once you have completed your treatments, hair

3   generally grows back," is that an accurate statement based on

4   your experience?

5   **A.**   It is.  As long as we add in that when it grows back, it

6   often has a different character.  It may not be a Grade 2

7   alopecia, but it could be thinner and curly, etc.

8   **Q.**   Doctor, I want to transition now to talk about Ms. Kahn

9   and her treatment plan.  Okay?

10  **A.**   Sure.

11  **Q.**   And you had a chance to review Ms. Kahn's medical records;

12  is that right?

13  **A.**   I did.

14  **Q.**   And specifically you reviewed her chemotherapy records; is

15  that true?

16  **A.**   I did.

17  **Q.**   And can you explain to the jury why Ms. Kahn needed

18  chemotherapy?

19  **A.**   Well, for two reasons.  One was that she was not going to

20  be operable with a good cosmetic outcome unless her tumor was

21  smaller.

22          Secondly was she had a relatively large tumor and

23  there was the issue of making sure that any spread around the

24  body was covered as well.

25  **Q.**   And based on your review of the medical information, was

JOHN GLASPY, M.D. - DIRECT

01:33  1   breast conservation a consideration for Ms. Kahn?
01:33  2   A.   Yes.
01:33  3   Q.   In what way?
01:33  4   A.   Well, it was a consideration because it's what she wanted.
01:33  5   As it turned out it was feasible to do, so it's always
01:33  6   confirming to find out that what you thought might happen could
01:33  7   happen.  And she was motivated.  That's what she wanted.
01:33  8   Q.   And, Dr. Glaspy, the jury has seen this graphic.  There it
01:34  9   goes.  And, Doctor, in your opinion, is this an accurate
01:34  10  depiction of a patient in Ms. Kahn's situation?
01:34  11  A.   It's not for a few reasons.
01:34  12  Q.   Can you explain?
01:34  13  A.   So, first of all, this is drawn from the PREDICT database,
01:34  14  and the PREDICT database in order for us to use it with
01:34  15  reliance has to be done after surgery because you need a
01:34  16  pathological stage.  That's number 1.
01:34  17          Number 2, Ms. Kahn had an unusual sub -- not rare,
01:34  18  but unusual subtype of breast cancer, lobular breast cancer,
01:34  19  that isn't well represented in the databases for PREDICT.  It
01:35  20  also is the form of breast cancer that's famous for the tumor
01:35  21  when you remove it pathologically being much bigger than what
01:35  22  you measured it at with mammograms or the MRI or the physical
01:35  23  exam.  So -- and she was already a 4-centimeter tumor, and so
01:35  24  it wouldn't take much to become a -- cross over and become a
01:35  25  Stage 3 breast cancer.

JOHN GLASPY, M.D. - DIRECT

01:35  1        It's also not known whether her -- and we won't ever
01:35  2  know whether her lymph nodes were positive or negative.  We
01:35  3  know they didn't feel big, and we know they didn't look
01:35  4  abnormal on the scans, but still about 30 percent of the time
01:35  5  in lobular breast cancer the nodes are positive at surgery even
01:35  6  though you thought they were going to be negative.
01:35  7        And so for all of those reasons I wouldn't -- I don't
01:35  8  think we should pin it on this.  Moreover, the PREDICT doesn't
01:36  9  tell us anything about the breast conservation story that that
01:36  10  1 percent --
01:36  11  Q.   And let me just ask you, so when you say "the breast
01:36  12  conservation story," you're talking about the patient's desire
01:36  13  to --
01:36  14  A.   To save her breast.
01:36  15  Q.   -- to save her breast?
01:36  16  A.   Right.  So it -- I don't want to imply that -- the total
01:36  17  benefit was estimated at 1 percent for all the reasons we have
01:36  18  talked about, but also there were two benefits for her,
01:36  19  cleaning up the micro metastatic disease and saving the breast,
01:36  20  and the PREDICT is silent on that issue.
01:36  21  Q.   Okay.  And you mentioned a little bit of the description.
01:36  22  What specific type of cancer did Ms. Kahn have?
01:36  23  A.   She had lobular breast cancer.
01:36  24  Q.   And you said that it was not totally uncommon, but
01:36  25  unusual.  Can you just elaborate a little bit more what you

JOHN GLASPY, M.D. - DIRECT

1  mean by that?

2  A.   So this is a cancer -- you know, the breast -- breast

3  cancer is a cancer of the lining of the breast duct, the

4  tunnels that take the milk from its production site to the

5  nipple.  But lobular breast cancer is a cancer of the milk

6  making part, that little end of the tube that makes the milk.

7  And they tend to be very hormone responsive, and they tend to

8  be very chemotherapy resistant.  Hers turned out to be very

9  chemotherapy sensitive, but there was no way to know that going

10  in.

11  Q.   And in 2008, given Ms. Kahn's cancer type and staging and

12  her desire to have breast conservation, was enrolling Ms. Kahn

13  in the NSABP B-40 clinical trial a reasonable thing to do?

14  A.   Yes.

15  Q.   And are you generally familiar with the NSABP B-40

16  clinical trials?

17  A.   Yes.

18  Q.   And can you just elaborate a little bit more about what

19  the focus of that clinical trial was?

20  A.   So this was an unusual clinical trial in that they wanted

21  to answer a whole bunch of questions in one trial.  So there

22  were a few drugs they were bringing to bear in early breast

23  cancer to try to make a new -- a fourth generation, if you

24  will, regimen.  The drugs included gemcitabine, which was in

25  some of the arms but not the one Ms. Kahn got.  Xeloda,

**JOHN GLASPY, M.D. - DIRECT**

1    X-E-L-O-D-A, which is another drug that isn't used in early
2    breast cancer, but they were asking the question of whether it
3    would add anything.  And then Avastin, a drug that isn't really
4    chemotherapy.  It's a drug that blocks tumor blood vessel
5    formation that at the time there was reason to hope would be
6    useful in breast cancer.
7              And so they wanted to weave all those together and
8    also follow the ethical concerns we talked about earlier, which
9    is, you don't want to have it be that anybody is going to get
10   randomized and not at least get something that's as good as
11   standard.  And so they were building this along a standard
12   therapy skeleton that included Adriamycin, cyclophosphamide,
13   and Taxotere.
14   **Q.**   And when you say -- I just want to ask a clarification.
15   When you say "Avastin isn't a chemotherapy," can you just
16   elaborate a little bit on what you mean by that?
17   **A.**   So Avastin is an antibody, it's a -- you can take human
18   proteins and get a mouse to make antibodies to it, because we
19   are different than mice, so they reject us, and then you can
20   take those antibodies and grow them out and find one that
21   blocks the thing you injected them.  And then you can make that
22   humanized, you can humanize it, and then you have got a human
23   antibody that attacks a human target.
24             And the target of Avastin is vascular endothelial
25   growth factor, I'm sorry, VEGF, and that is -- was at the time

**JOHN GLASPY, M.D. - DIRECT**

01:40  1  thought to play a role in tumor blood vessel formation.  So if

01:40  2  a tumor is -- wants to grow, it needs to also make blood

01:40  3  vessels or it will have a heart attack, essentially.  It

01:40  4  will -- part of it will die from lack of blood flow.  So it

01:41  5  needs to do that, and the hope was that it would work as well

01:41  6  in breast cancer as it did in some other settings.

01:41  7  Q.   Now, does Avastin have a different set of risks than, say,

01:41  8  Taxotere or Adriamycin or cyclophosphamide?

01:41  9  A.   Yes, it --

01:41  10  Q.   And can you explain what the differences are?

01:41  11  A.   So some of them aren't surprising.  If you are blocking

01:41  12  blood vessel function, you could end up with something to cause

01:41  13  blood clots, which it does, or that increases the risk of

01:41  14  bleeding, which was one of the concerns with the preoperative

01:41  15  treatment that included Avastin.  That was one of the things

01:41  16  that the trial was interested in determining is whether it was

01:41  17  feasible to do surgery safely in somebody receiving Avastin.

01:41  18  So those are two of the side effects that happen with it.

01:41  19          There's some evidence in other diseases that it can

01:41  20  make hair falling out from chemotherapy more pronounced, but

01:42  21  that's never been proven and -- but that was an issue as well.

01:42  22  Q.   Okay.  And have you had an opportunity to review

01:42  23  Ms. Kahn's consent form?

01:42  24  A.   I did.

01:42  25  Q.   And does it elaborate on this -- more particular risks

**JOHN GLASPY, M.D. - DIRECT**

01:42  1   that you have talked about with Avastin in that consent form?

01:42  2   **A.**   It does.

01:42  3   **Q.**   And ultimately we know that Ms. Kahn was ultimately

01:42  4   assigned to Group 2B I believe; is that right?

01:42  5   **A.**   That's correct.

01:42  6   **Q.**   And can you just explain for the jury what her

01:42  7   chemotherapy regimen and what that process looked like in Group

01:42  8   2B?

01:42  9   **A.**   So she was treated with Taxotere at a dose of

01:42  10  75 milligrams per meter squared every three weeks for four

01:42  11  doses.  She also received Avastin.  And then in the

01:43  12  postoperative setting she received the Adriamycin and the

01:43  13  cyclophosphamide at 60 and 600 milligrams per meter squared

01:43  14  respectively, and received some additional Avastin.  And then

01:43  15  after that she received Avastin for a total of a couple of

01:43  16  years.  I'm sorry, for a total of -- I think it was six months.

01:43  17  **Q.**   Doctor, with regard to Ms. Kahn's treatment plan, she was

01:43  18  part of a randomization, correct?

01:43  19  **A.**   Yes.

01:43  20  **Q.**   And can you explain how that works specifically in

01:43  21  NSABP B-40?

01:43  22  **A.**   So in -- randomization is an attempt to make sure that the

01:44  23  patients in the two groups are equivalent at baseline so that

01:44  24  any differences are likely to be due to differences in the

01:44  25  treatment.  And it's become sort of a science in itself.  You

**JOHN GLASPY, M.D. - DIRECT**

1    would think it would be easy to randomize people but it turns

2    out to be statistically a little bit complicated.

3           All of the big cooperative groups have data centers

4    so when you have a patient and you have enrolled them, after

5    you consent them, you call the center and you tell them the

6    patient's characteristics, and then the machine spits out the

7    treatment that they are going to get.

8    **Q.**   And if a patient wants to, they can back out of the

9    clinical trial if they so choose after they get their

10   randomization, correct?

11   **A.**   Correct.

12   **Q.**   That's a decision that -- well, let me ask it this way.

13   Is that a decision that a patient and a doctor will have a

14   conversation about after the randomization has occurred?

15          **MR. MICELI:**  Object to the form.  That's highly

16   speculative.

17          **MR. STRONGMAN:**  Fair enough.

18          **THE COURT:**  Sustained.

19   **BY MR. STRONGMAN:**

20   **Q.**   Doctor, the point being once you are randomized you don't

21   have to move forward with the clinical trial?

22   **A.**   No, you can stop any time.  That's the rules of clinical

23   research is that the research doesn't has total autonomy and

24   can quit at any time.

25   **Q.**   And, Doctor, was Taxol part of NSABP B-40 at all?

1836

**JOHN GLASPY, M.D. - DIRECT**

01:45  1  **A.**    No.

01:45  2  **Q.**    Now, if Ms. Kahn were to received a chemotherapy regimen

01:45  3  involving Taxol instead of Taxotere, would she have avoided a

01:45  4  risk of persistent alopecia or persistent hair thinning?

01:45  5           **MR. MICELI:**  Object to the form -- or object.

01:45  6  Speculative.  Could we talk over here?

01:45  7           **THE COURT:**  I think we might need to.

01:46  8           (The following proceedings were held at the bench.)

01:46  9           **MR. MICELI:**  This doctor has been deposed twice by me

01:46  10  and once by another colleague of mine.  He said he has never

01:46  11  looked into whether or not any of the other drugs -- he has

01:46  12  never done a Bradford Hill assessment of whether or not they

01:46  13  can cause permanent chemotherapy-induced alopecia.  He should

01:46  14  not be able to ask that question.

01:46  15           **MR. STRONGMAN:**  I will not ask him if it causes it.

01:46  16  I will ask him, "Is there a risk with Taxol," and that will be

01:46  17  my last question on that topic.

01:46  18           **MR. MICELI:**  That's a difference without a

01:46  19  distinction.

01:46  20           **THE COURT:**  I have to go pull -- was that in his

01:46  21  report?

01:46  22           **MR. MICELI:**  No.

01:46  23           **MR. STRONGMAN:**  Yes, that there are risks with all

01:46  24  those chemotherapies for persistent --

01:46  25           **MR. MICELI:**  I can give you a page number, 23, 24,

JOHN GLASPY, M.D. - DIRECT

01:46   1   and 25.  He says, "Cases of permanent chemotherapy-induced

01:46   2   alopecia have been reported with," and then he lists 15 drugs.

01:47   3   And after he lists those 15 drugs, we deposed him and he said,

01:47   4   "No, I have not looked into whether or not it can cause.  These

01:47   5   are just case reports."  He does not say --

01:47   6               MR. STRONGMAN:  I'll ask him that question.

01:47   7               THE COURT:  Rephrase your question.

01:47   8               MR. STRONGMAN:  Sure.  Sure.

01:47   9               MR. MICELI:  Are there case reports?

01:47   10              MR. SCHANKER:  Sure.

01:47   11              THE COURT:  Rephrase your question.

01:47   12              (End of bench conference.)

01:47   13  BY MR. STRONGMAN:

01:47   14  Q.   Are you ready to proceed, Doctor?

01:47   15  A.   Yes.

01:47   16  Q.   We were talking about Taxol.  Do you remember that?

01:47   17  A.   I do.

01:47   18  Q.   And, Doctor, are there case reports of persistent alopecia

01:47   19  or persistent hair thinning with Taxol?

01:47   20  A.   Yes.

01:47   21  Q.   You talked a minute ago about Ms. Kahn's dosing, and I

01:47   22  think you indicated that according to the treatment plan she

01:47   23  was to receive 75 milligrams per meter squared, does that --

01:47   24  did I get that right, of Taxotere?

01:48   25  A.   Yes.

JOHN GLASPY, M.D. - DIRECT

01:48   1   **Q.**   And how many times?

01:48   2   **A.**   Four.

01:48   3   **Q.**   What is the total when you add up 75 milligrams per meter

01:48   4   squared four times?

01:48   5   **A.**   It's 300 per meter squared.

01:48   6   **Q.**   And did Ms. Kahn get all 300 milligrams per meter squared

01:48   7   of Taxotere?

01:48   8   **A.**   No, she got about 285 milligrams per meter squared.  She

01:48   9   had the last dose truncated.

01:48   10  **Q.**   Doctor, I have a question for you.  When we use the

01:48   11  milligrams per meter squared, what does that mean?

01:48   12  **A.**   So by convention and history, chemotherapy has always been

01:49   13  dosed on a meter square basis.  Most drugs are dosed either

01:49   14  everybody gets the same dose or it's based on your weight.

01:49   15         Chemotherapy is based on how many square meters of

01:49   16  skin you have.  If you killed me and skinned me, how many

01:49   17  square meters of skin when you spread it all out would I have.

01:49   18  You can calculate that if you know my height and my weight.

01:49   19         And so that's how this is done.  Oncologists, now the

01:49   20  chemotherapy machines do it for us.  We enter the weight and

01:49   21  the height, and it spits out our body surface area.  Most of us

01:49   22  are somewhere between 1.7-meter squared and 2.2-meter squared.

01:49   23  Then that number is what's used for the dose.

01:49   24         So if you were 2-meter squared and it was

01:50   25  75 milligrams per meter squared, you would receive 150 total

JOHN GLASPY, M.D. - DIRECT

01:50  1   milligrams, but that wouldn't be 300 milligrams per meter
01:50  2   squared.  It would be 75 per meter squared multiplied by 2.
01:50  3   **Q.**   Doctor, I just have a question for you.  This is from
01:50  4   Ms. Kahn's notebook.  The jury saw this yesterday.
01:50  5           This line here on Taxotere, do you see that?  And it
01:50  6   has doses in milligrams?
01:50  7   **A.**   I do.
01:50  8   **Q.**   Do you see that?
01:50  9   **A.**   I do.
01:50  10  **Q.**   Are the numbers represented there milligrams per meter
01:50  11  squared or not?
01:50  12  **A.**   They are not.  They are the total dose.  The meter squared
01:50  13  times the 75.
01:50  14  **Q.**   So what impact does -- the 285 milligrams per meter
01:51  15  squared that Ms. Kahn received, what impact does that dose have
01:51  16  on your opinion in this case?
01:51  17  **A.**   It doesn't have a big impact.  It makes it a little bit
01:51  18  easier because we may or may not be talking about some
01:51  19  publications that divide patients into greater than 300 per
01:51  20  meter squared versus less than that.  And if you receive
01:51  21  slightly less, then it clearly keeps you on one side of that,
01:51  22  so it makes you clearly 300 milligrams per meter squared less.
01:51  23  Yeah.  300 milligrams per meter squared less, yes.
01:51  24  **Q.**   Doctor, did Ms. Kahn also take tamoxifen?
01:51  25  **A.**   Yes.

JOHN GLASPY, M.D. - DIRECT

**Q.**   Did Ms. Kahn gain benefit from taking tamoxifen?

**A.**   We will never know because, thank God, she has done well and may well have been just fine after surgery.  Remember that when she was operated on, she was almost a complete pathologic responder.  She had a beautiful response to the treatment.

And we know from the B-40's final writeup that that subset of patients has an excellent prognosis.  So it's possible that the tamoxifen was totally unnecessary, right, because she may have already been cured at that point, but I think she needed the tamoxifen and she had lobular cancer, and hormonal therapies are particularly effective there.

**Q.**   Do you think it was appropriate to prescribe tamoxifen for Ms. Kahn?

**A.**   I do.

**Q.**   Would that be the standard of care?

**A.**   Yes.

**Q.**   How long did Ms. Kahn take tamoxifen?

**A.**   For almost ten years.

**Q.**   As part of your review of the materials in this case, did you look at photographs of Ms. Kahn?

**A.**   I did.

**Q.**   Did Ms. Kahn's hair, in your opinion, thin over time while she was taking tamoxifen?

                **MR. MICELI:**  Object, Your Honor.

                **THE COURT:**  Sustained.

JOHN GLASPY, M.D. - DIRECT

01:53  1    BY MR. STRONGMAN:

01:53  2    Q.   Doctor, based on your review of the photographs, did

01:53  3    Ms. Kahn's hair thin over time?

01:53  4            MR. MICELI:  Same objection.

01:53  5            (The following proceedings were held at the bench.)

01:54  6            THE COURT:  I didn't have that recollection.  I

01:54  7    looked at other stuff.

01:54  8            (End of bench conference.)

01:54  9            THE COURT:  Mr. Strongman, please proceed.

01:54 10            MR. STRONGMAN:  Thank you.

01:54 11    BY MR. STRONGMAN:

01:54 12    Q.   Dr. Glaspy, just where we were, you had a chance to look

01:54 13    at photographs of Ms. Kahn over the years where she was taking

01:54 14    tamoxifen; is that fair?

01:54 15    A.   Yes.

01:54 16    Q.   In your opinion, did Ms. Kahn's hair thin over time

01:54 17    according to your review of those photographs?

01:55 18    A.   That's in my opinion, yes.

01:55 19    Q.   Doctor, in your opinion, can Ms. Kahn's hair loss today be

01:55 20    reliably traced to Taxotere?

01:55 21            MR. MICELI:  Your Honor, object.  This is now

01:55 22    getting -- object.  Outside of the scope of his expertise.

01:55 23            THE COURT:  I think you can rephrase your question.

01:55 24    BY MR. STRONGMAN:

01:55 25    Q.   Doctor, as an oncologist, when a patient has taken many

JOHN GLASPY, M.D. - DIRECT

1   medications that can impact hair, is there any way to trace

2   hair loss to one particular medication?

3   A.   Not that an oncologist is aware of or does on a regular

4   basis.

5   Q.   Doctor, the tumor size when Ms. Kahn first came to see her

6   oncologist, Dr. Kardinal, I think -- what was the tumor size?

7   A.   It was in the 4-centimeter range.  I saw measurements of

8   3.7 centimeters as well.

9   Q.   Did Ms. Kahn's tumor respond to the chemotherapy regimen

10  that she received?

11  A.   It did.  It actually surprised me how well it responded.

12  Q.   Why did it surprise you?

13  A.   Because lobular cancers usually just sit there and look at

14  you when you give them chemotherapy.  I would have been worried

15  about her before because she wanted to save her breast and we

16  needed a smaller tumor to do that and, you know, the odds

17  weren't with us, but it turns out that the chemotherapy worked

18  very well.

19  Q.   As part of a clinical trial, explain -- well, let me ask a

20  more specific question.  As part of NSABP B-40, did they track

21  tumor response at various points in time?

22  A.   They did.

23  Q.   Can you explain why a clinical trial would do that?

24  A.   I think in part it was just in case -- you collect a lot

25  of data in clinical trial because you don't know what you're

JOHN GLASPY, M.D. - DIRECT

1  going to want to have data on, so you try and not --
2  overcollect if you can.  And so having multiple time points
3  allowed them to say whether it shrank.  Did most of its
4  shrinkage during the Xeloda and the Taxotere or did most of it
5  shrink during the Adriamycin and Cytoxan or grew during one of
6  them, those kind of things.  So they wanted to check after the
7  Phase 1 and then again at surgery.
8  Q.   With regard to Ms. Kahn, what did the tumor response forms
9  indicate after Phase 1?
10  A.   So her tumor after Phase 1 had gone down to 1 centimeter
11  in size.
12  Q.   What is -- explain what that means going from -- hold on.
13  I'll get my full question out.
14          Doctor, can you just explain what it means in terms
15  of a tumor going from a 4-centimeter tumor to a 1-centimeter
16  tumor?
17  A.   So we're talking about a three-dimensional object, and so
18  if you remember your high school -- I guess it was geometry --
19  the volume, the amount of space in a sphere, is related to the
20  radius of the sphere by the formula 4/3 pi r cubed.  So if you
21  4/3 and then pi, the little pi sign, and then r with a super 3,
22  the cube of the radius, which means that as the radius changes,
23  the volume changes tremendously.  So when you go from being a
24  centimeter to being 4 centimeters, that's a huge gain in
25  volume.

JOHN GLASPY, M.D. - DIRECT

01:59 1        If you do the math, the volume of this tumor, if you
01:59 2    pretend for a moment it's a sphere and realize you're just
01:59 3    estimating, the volume reduction is more than 98 percent.  So
01:59 4    she had 2 percent of the volume at the end than she had at the
01:59 5    beginning of Phase 1.
02:00 6    Q.   What did the tumor response form say with regard to
02:00 7    Phase 2?
02:00 8    A.   At the end of Phase 2, they couldn't feel it.  The
02:00 9    pathologic staging, which I told you it can be different, was
02:00 10   different.  It said there was still some tumor in the breast
02:00 11   and there was evidence that there had been a bigger tumor
02:00 12   there.  There was dead tissue that is what you see when you've
02:00 13   given effective chemotherapy.  And that residual mass was
02:00 14   7 millimeters.
02:00 15   Q.   And is -- that .7 centimeters is the same thing?
02:00 16   A.   Exactly the same thing.
02:00 17   Q.   Doctor, in your opinion, did Ms. Kahn's tumor have a good
02:00 18   response to her chemotherapy regimen?
02:00 19   A.   Yes, I've said so.  It was a beautiful response.
02:01 20   Q.   Doctor, in your opinion, was the treatment plan
02:01 21   implemented by Ms. Kahn's doctors, Dr. Kardinal and Dr. Larned,
02:01 22   successful in curing her cancer?
02:01 23   A.   I think it was.  I think her chances she's cured is
02:01 24   through the roof.  She's essentially cured.
02:01 25   Q.   Doctor, have all the opinions that you have stated today

JOHN GLASPY, M.D. - CROSS

1    been to a reasonable degree of medical certainty?

2    A.    Yes.

3              MR. STRONGMAN:  I pass the witness.

4              THE COURT:  Thank you.

5                   Mr. Miceli.

6              MR. MICELI:  Yes, Your Honor.  I may need a little

7    bit of time to get organized.

8                        CROSS-EXAMINATION

9    BY MR. MICELI:

10   Q.    It's good to see you again.

11             I want to get myself a little bit in order so that I

12   can, hopefully, be as efficient as possible.  I can't promise

13   you I'm going to be short, but I'll try not to waste our time.

14             All right.  Dr. Glaspy, before we get started, I was

15   wondering, have you been listening to our trial at all through

16   the last two weeks?

17   A.    Only a little bit.  I listened to a little bit of

18   testimony this morning.

19   Q.    Okay.  Have you read any of the testimony from prior in

20   the trial?

21   A.    I read some of the Dr. Bosserman's testimony, and I read

22   the opening statements.

23   Q.    So you know a little bit about what's been talked about

24   here?

25   A.    Yeah.  Yes.

JOHN GLASPY, M.D. - CROSS

**Q.**   Okay.  Now, I know we went through some of these things
with you in your deposition, so they may sound familiar to you,
but I want to make sure we're clear on some things before we
get started into more substantive topics.

        You are not a dermatologist, correct?

**A.**   That's correct.

**Q.**   You don't examine people's scalps to determine what type
of alopecia they have?

**A.**   I do examine people's scalps, but I'm not a dermatologist
and I would defer to a dermatologist if somebody needed a scalp
exam.

**Q.**   Okay.  If somebody were to examine a scalp with an
implement called a dermatoscope to determine whether or not
follicles are present, that would not be you.  You would defer
to the person who is normally using that type of equipment?

**A.**   Yeah, I've only heard of it being used by one person, but
I would not use one.

**Q.**   Okay.  You don't do scalp biopsies to determine causes of
alopecia?

**A.**   That's correct.

**Q.**   You don't do differential diagnoses on people to determine
what type or how severe alopecia they have?

**A.**   I do, but it's -- let's unpack the question.

        Differential diagnosis means if my patient has a
problem, do I generate a list of possible causes of the

JOHN GLASPY, M.D. - CROSS

1   problem?  You bet I do.

2   Q.   Okay.

3   A.   I would not be the court of last resort at UCLA on what

4   was going on with an individual patient's skin.  That would be

5   one of our dermatologists.

6   Q.   Okay.  You've agreed with me before that a dermatology

7   expert should testify about what is diagnosable from a

8   dermatology standpoint, and you don't need to get involved in

9   that decision-making, correct?

10  A.   I choose not to, yes.

11  Q.   You choose not to because you defer to a dermatologist,

12  right?

13  A.   Right, because I have them around me all the time.

14  Q.   Okay.  You are not -- we talked a little bit about -- or

15  you talked with Mr. Strongman a little bit about labeling.

16       You are not a regulatory expert, correct?

17  A.   That's correct.

18  Q.   You don't put labels together that get submitted to the

19  FDA, correct?

20  A.   I have been involved in that, but that's not my job and I

21  don't do it very much.

22  Q.   Right.  If I were to ask you just questions about what

23  sections of the code of federal regulation would be impacted by

24  making a label change, would you be able to tell me?

25  A.   I'd have to pull it out and find out.

JOHN GLASPY, M.D. - CROSS

02:05  1  **Q.**   I want to see if we can't find some things we can agree

02:05  2  upon.

02:06  3        Do you tell your patients that hair loss with

02:06  4  Taxotere can be permanent?

02:06  5  **A.**   I don't use those words.

02:06  6  **Q.**   Okay.

02:06  7  **A.**   But I tell them that hair loss with chemotherapy drugs

02:06  8  that cause hair loss is often associated with it coming back

02:06  9  different than it was and that it can be very thin.

02:06  10  **Q.**   Okay.  If Sanofi told you that their drug could cause

02:06  11  permanent chemotherapy-induced hair loss, would you tell that

02:06  12  to your patient?

02:06  13  **A.**   I sort of already do because I believe it's true of all

02:06  14  those drugs.

02:06  15  **Q.**   Well, that's not really my question.

02:06  16        My question is:  If Sanofi told you that, that their

02:06  17  drug in particular causes permanent chemotherapy-induced

02:06  18  alopecia, would you provide that information to the women who

02:07  19  are making a decision about what chemotherapy to use?

02:07  20  **A.**   If they also provided me with information that it was

02:07  21  clearly more common than with the other drugs, yes.

02:07  22  **Q.**   Okay.

02:07  23  **A.**   But otherwise, I think I already have it covered, and it

02:07  24  wouldn't change what I'm telling you.

02:07  25  **Q.**   Okay.  I want to confirm a few things that, hopefully, we

JOHN GLASPY, M.D. - CROSS

1  can agree on.

2          Taxotere and Taxol, from an efficacy standpoint, are

3  equivalent?

4  A.   In breast cancer.

5  Q.   In breast cancer.

6  A.   Yes.

7  Q.   Thank you for that clarification.  In the adjuvant care of

8  early stage breast cancer, correct?

9  A.   And in the treatment of metastatic breast cancer.  They're

10 equivalent in breast cancer --

11 Q.   Excellent.

12 A.   -- as long as the Taxol is given weekly.

13 Q.   With early stage breast cancer, the goal is curing the

14 patient, correct?

15 A.   Yes.

16 Q.   Doctor, you have not testified and you will not testify

17 today that Taxotere and Taxotere only gave Ms. Kahn the best

18 chance to survive her diagnosis of early stage breast cancer,

19 will you?

20 A.   Prospectively is different than after the fact.

21 Q.   Right.

22 A.   So prospectively, I would agree with you that I wouldn't

23 have said that Taxotere is more likely than an equivalent

24 amount of Taxol to help you get your breast cancer reduced so

25 you can have surgery.

JOHN GLASPY, M.D. - CROSS

02:09  1  **Q.**   Okay.

02:09  2  **A.**   After the fact, it becomes more complicated because she

02:09  3  had such an incredible response to Taxotere and Avastin and

02:09  4  Xeloda.  You know, two drugs can be equivalent, but they can be

02:09  5  helping different people.  Right?

02:09  6  **Q.**   Sure.

02:09  7  **A.**   It becomes a harder question then.  If we divide it up

02:09  8  like that, before the fact, I would agree with.

02:09  9  **Q.**   Sure, but we don't have a time machine to go back to say

02:09  10  if we used the Taxol regimen, we wouldn't be seeing the same

02:09  11  exact result, is there?

02:09  12  **A.**   That's correct.  We don't have any way of studying that.

02:09  13  **Q.**   So looking at it forward before treatment started, you

02:09  14  would say that you would have advised that Taxotere and Taxol

02:09  15  regimens for early stage breast cancer are equivalent?

02:09  16  **A.**   In efficacy, yes.

02:09  17  **Q.**   Okay.  You wouldn't say, looking at it prospectively, that

02:09  18  a Taxotere regimen over a Taxol regimen gave Ms. Kahn the best

02:10  19  chance of preventing her cancer from returning, either, would

02:10  20  you?

02:10  21  **A.**   We are going to trip over the same layer of when we

02:10  22  incorporate what we know happened, it gets more complicated.

02:10  23  **Q.**   Right.  That's why I said "prospectively."

02:10  24  **A.**   Okay.  Well, prospectively means we're talking about --

02:10  25  we're sitting there in 2008 with her.  I agree with you, yes.

JOHN GLASPY, M.D. - CROSS

02:10  1   **Q.**   Okay.  If we were looking at it in 2008, you would not

02:10  2   tell Ms. Kahn that a Taxotere regimen over a Taxol regimen gave

02:10  3   her the best chance not to experience serious side effects of

02:10  4   the drug?

02:10  5   **A.**   I wouldn't -- another complicating factor here is that if

02:10  6   she decided not to be in the B-40, which she would have had to

02:10  7   do in order to get Taxol, then she's not just switching out

02:11  8   taxane, she's also not doing Avastin, not doing Xeloda, and not

02:11  9   doing gemcitabine, which were things that I gathered she was

02:11  10  interested in receiving at least standard and maybe better than

02:11  11  standard treatment.

02:11  12         So that's another issue is, we wouldn't just be

02:11  13  sitting there saying let's don't do Taxotere.  We have to say

02:11  14  then we are not doing the B-40, and if we're not doing the

02:11  15  B-40, we're not doing all this other stuff.

02:11  16  **Q.**   I understand that.  Looking at it prospectively in 2008,

02:11  17  you would not say that a Taxotere regimen had a benefit over a

02:11  18  Taxol regimen for -- setting B-40 aside --

02:11  19  **A.**   Uh-huh.

02:11  20  **Q.**   -- that a Taxotere regimen would have given her the best

02:11  21  chance not to experience serious side effects of the drug?

02:11  22  **A.**   I would not have told her that.

02:11  23  **Q.**   Okay.

02:11  24  **A.**   I would not have told her that.

02:11  25  **Q.**   If anybody stands up and says, looking at it prospectively

JOHN GLASPY, M.D. - CROSS

1  in 2008, to those last three questions I asked you, we would

2  say Dr. John Glaspy doesn't agree with that person, right?

3  **A.**   Yeah, I guess --

4           **MR. STRONGMAN:**  Objection.

5           **THE WITNESS:**  -- as long as the nuance is there.

6           **THE COURT:**  Wait.

7           **MR. STRONGMAN:**  Objection.

8           **THE COURT:**  Sustained.  Sustained.

9  BY MR. MICELI:

10 **Q.**   Doctor, you cite to the book *The Story of Taxol* in your

11 report, don't you?

12 **A.**   I think so, yes.

13 **Q.**   Then Taxol, as I think you pointed out, was the first

14 taxane to the market?

15 **A.**   Yes.

16 **Q.**   It beat Taxotere to the market by a couple of years?

17 **A.**   I don't remember if it was two or three.

18 **Q.**   For adjuvant care of early stage breast cancer, for people

19 like Ms. Kahn it beat Taxotere to the market by the

20 indication -- by five years, didn't it?

21 **A.**   Four or five, I can remember, yeah.

22 **Q.**   So if we were to write the story of Taxotere, we could

23 call it "the second place taxane," right?

24 **A.**   If time to market is the critical factor, which I don't

25 think any one of us believes it is over efficacy and safety,

JOHN GLASPY, M.D. - CROSS

02:13  1  then yes.

02:13  2  **Q.**   But they're equivalent drugs, right?

02:13  3  **A.**   We didn't know it at the time, but, yes.

02:13  4  **Q.**   Thank you.

02:13  5  **A.**   We had to work through that.

02:13  6  **Q.**   Thank you.  You would agree that women like Ms. Kahn who

02:13  7  have early stage breast cancer have a right to know the truth

02:13  8  about the chemotherapy drugs they are going to receive.

02:13  9          You would agree with that, wouldn't you?

02:13  10         **MR. STRONGMAN:**  Objection.

02:13  11         **THE COURT:**  I overrule that.  I think we talked about

02:13  12  all this.

02:13  13 **BY MR. MICELI:**

02:13  14 **Q.**   Women like Ms. Kahn who were being treated for early stage

02:13  15 breast cancer have the right to know the truth about the drugs

02:13  16 they're receiving, correct?

02:13  17 **A.**   Yes.

02:14  18 **Q.**   They deserve nothing less than the truth, right?

02:14  19 **A.**   Yes.

02:14  20 **Q.**   You took an oath to tell the truth and the whole truth and

02:14  21 nothing but the truth, and that's what these women deserve,

02:14  22 right?

02:14  23 **A.**   Yes, on the planet I was raised, there is no degree of

02:14  24 truth.  You are either truthful or you're not.

02:14  25 **Q.**   I agree.

JOHN GLASPY, M.D. - CROSS

02:14   1   A.   So there's no degree of truth.

02:14   2   Q.   Thank you.

02:14   3        You would agree because early stage breast cancer

02:14   4   is -- well, first let me ask:  Early stage breast cancer is

02:14   5   highly survivable, isn't it?

02:14   6   A.   Yes.  But it's also fatal to that subset of patients,

02:14   7   those 94 percent of the however many die in a year, whether

02:14   8   it's 40 or 50,000.  It's very serious to them.

02:14   9   Q.   Those people are folks who have cancer return.  We're not

02:15   10  talking about the returning.  We're talking about the initial

02:15   11  treatment of early stage breast cancer, right?

02:15   12  A.   I'm talking about the ones who are returned, they were

02:15   13  early stage breast cancer.  Early stage breast cancer is

02:15   14  tomorrow's metastatic breast cancer.

02:15   15  Q.   I understand what you're saying, Dr. Glaspy, but you can't

02:15   16  sit there in an office when you're treating a woman, first time

02:15   17  counseling her, and say -- look at her records and say, "You

02:15   18  are the person, you are one of the 16 percent"?

02:15   19  A.   No.

02:15   20  Q.   Or you're one of the 84 percent?

02:15   21  A.   In fact, I have a stock way of informing them about this.

02:15   22  I tell them if I had a thousand of you in a room, I could say

02:15   23  X needs some treatment because you're in trouble, but God won't

02:15   24  talk to me, so I can't figure out which ones you are.  So we

02:15   25  are going to be talking about treating the whole group to

JOHN GLASPY, M.D. - CROSS

1    benefit those that need it.

2    Q.   That's right.  You have to treat the whole group.  You

3    have to treat everybody to make sure you capture the people

4    that need it, right?

5    A.   Right.

6    Q.   Okay.

7    A.   The reason I'm a little prickly is I want to make sure

8    that the notion didn't come out without me controverting it,

9    that mortality from breast cancer is trivial and small.  It's

10   not.

11   Q.   If I say anything today that makes you think that -- I

12   apologize --

13   A.   Okay.

14   Q.   -- because that's certainly not what I'm trying to

15   communicate.

16   A.   Okay.

17   Q.   What I would like to ask of you because you just gave us

18   that you have to treat everybody to make sure you capture the

19   ones that really need it, you don't know who is going to get

20   permanent alopecia when you're treating patients, do you?

21   A.   You do not.

22   Q.   So you have to warn everybody so that the people who get

23   it at least have the choice to make a choice, right?

24   A.   Yes.  Yes.

25   Q.   That's why people warn the way they do.  You have to warn

JOHN GLASPY, M.D. - CROSS

02:16  1  everyone to capture -- to give the warning to everybody to
02:16  2  protect the few, right?
02:16  3  A.   Yes.
02:17  4  Q.   One of the reasons or one of the things that you have been
02:17  5  concerned about with treating cancer patients is what happens
02:17  6  to patients when they have the disease, when they lose their
02:17  7  hair, and they're going through all of these problems, they get
02:17  8  socially isolated, don't they?
02:17  9  A.   I've seen them often, yes.
02:17  10  Q.   You've actually spoken about this in an interview that was
02:17  11  filmed, didn't you?
02:17  12  A.   I don't remember when we do films, but I'll take your word
02:17  13  for it, you know.
02:17  14  Q.   Let me just ask if this is you.
02:17  15       MR. MICELI:  Scott, can you let just Dr. Glaspy see
02:17  16  the treating patients video?
02:17  17       MR. STRONGMAN:  Your Honor, may we approach?
02:17  18       THE COURT:  I think so.
02:17  19       (The following proceedings were held at the bench.)
02:17  20       MR. MICELI:  He said a lot of things publicly, and I
02:17  21  just want to make sure that it's clear because he paints a very
02:17  22  different picture here than he does in his videos.
02:18  23       THE COURT:  No, I saw the videos, but he didn't deny
02:18  24  that he said they were socially isolated.
02:18  25       MR. MICELI:  I think it's the manner in which he says

JOHN GLASPY, M.D. - CROSS

1  it, the encouraging -- he is making cancer sound like a death

2  knell in this courtroom.  When he's giving this interview, he

3  was smiling and saying --

4          THE COURT:  Maybe you need to get him to say

5  something that's inconsistent with what he says in the video

6  because I haven't heard it yet.

7          MR. MICELI:  Okay.

8          MR. STRONGMAN:  I obviously have to say I know the

9  impeachment material is -- I haven't seen it, so I don't know,

10  which is fair.

11         THE COURT:  He played it last trial.

12         (End of bench conference.)

13         THE COURT:  Please proceed.

14         MR. MICELI:  Thank you, Your Honor.

15  BY MR. MICELI:

16  Q.   You would agree that hair loss, whether temporary or

17  permanent, is emotionally devastating?

18  A.   I don't know if I'd use the word "devastating."  I'd say

19  that it's one of the things that detracts from the patient's

20  quality of life.

21  Q.   If it's permanent, it affects that quality of life for the

22  rest of her life?

23  A.   It can, yes, sir.

24  Q.   Now, Taxotere is just one of many systematic therapies,

25  correct?

JOHN GLASPY, M.D. - CROSS

02:19  1  **A.**    Yes.

02:19  2  **Q.**    One of many systematic therapies that go into regimens

02:19  3  that are used to treat early stage breast cancer, correct?

02:19  4  **A.**    Right.  Yes.

02:19  5  **Q.**    Have you ever spoken before and characterized all

02:20  6  systematic therapies as benefiting women and saving lives?

02:20  7  **A.**    I don't remember if I used that phrase.  It doesn't sound

02:20  8  wrong to me.

02:20  9  **Q.**    Okay.  So if -- strike that.

02:20  10          Have you ever characterized the competition among

02:20  11  systematic therapies that treat early stage breast cancer as

02:20  12  fighting among themselves to see who is better to say who is

02:20  13  better, but all of them save lives?

02:20  14  **A.**    I don't remember saying that, but it also sounds right to

02:20  15  me.

02:20  16  **Q.**    You certainly wouldn't deny that, right?

02:20  17  **A.**    I wouldn't as long as we don't get too specific and say

02:20  18  they all save the same number of lives.

02:20  19  **Q.**    When you treat a patient with early stage breast cancer,

02:21  20  you don't treat them by giving them the survival rates for

02:21  21  metastatic breast cancer alone, do you?

02:21  22  **A.**    No.

02:21  23  **Q.**    You would want to be truthful with them and say, "You have

02:21  24  early stage breast cancer, and you are very likely going to

02:21  25  survive"?

JOHN GLASPY, M.D. - CROSS

02:21  1    **A.**    Yes.  We often say that and it's usually true, especially
02:21  2    these days, because we don't let them get away without
02:21  3    treatment if they need it.  So that's why mortality rates have
02:21  4    gone down.
02:21  5    **Q.**    But the good news is, when you meet with a person for the
02:21  6    first time who has been diagnosed with early stage breast
02:21  7    cancer, you have good news for them, right?
02:21  8    **A.**    I always start with, "You are going to be okay, but we
02:21  9    have work to do," because there's no reason to focus on the
02:21  10   fact that even if we do our best, this could be one of those
02:22  11   ones we still lose.  So I generally start with that kind of a
02:22  12   statement and it's not really a lie, but it's a human way to
02:22  13   embrace someone and get started.
02:22  14           I wouldn't tell somebody that you have the same
02:22  15   survival as metastatic breast cancer obviously, but at some
02:22  16   point in our discussion the survival of metastatic breast
02:22  17   cancer may come up because we are going to talk about the risk
02:22  18   and benefit of, say, chemotherapy.  And even if the risk --
02:22  19   even if the gain is small, say, 2 or 3 percent, if we guess
02:22  20   wrong, then that's metastatic breast cancer and they need to
02:22  21   know what that means.  And 3 percent doesn't sound high unless
02:22  22   it's you, unless it means fatal, and then it does show up on
02:23  23   people's radar screens.
02:23  24   **Q.**    Sure.  But when you have that meeting with them and you
02:23  25   give them all of that information because you are trying to

JOHN GLASPY, M.D. - CROSS

02:23  1    tell them as much truth as you can, right, the whole truth?

02:23  2    A.    Yes.

02:23  3    Q.    Okay.  And when you give them that information, it's

02:23  4    because they are participating with you in something called

02:23  5    shared decision-making, right?

02:23  6    A.    I don't call it that but I -- it sounds fine to me.

02:23  7    Q.    Well, you have heard that phrase before, haven't you?

02:23  8    A.    I don't know.  It's possible.

02:23  9    Q.    Well, do you encourage your patients coming in with early

02:23  10   stage breast cancer to be an active participant in the choices

02:23  11   about their care?

02:23  12   A.    It's not the concept.  I get the concept.  It's the word

02:23  13   "shared decision-making" just isn't one that I use or that I

02:23  14   hear it used.

02:23  15   Q.    Okay.

02:23  16   A.    The notion that we form a team and I am like the secretary

02:23  17   of state and they are the president, so the secretary of state

02:23  18   knows more about what's going on in Crimea and Russia than the

02:24  19   president does, so the president should listen to him.  But at

02:24  20   the end the president makes the decision.  So that's how the

02:24  21   relationship sort of works is, I know the ground and I know the

02:24  22   territory, and she ultimately makes the decision.

02:24  23          Another common way to say this is that we have an

02:24  24   election, and she gets a thousand votes and I get one.

02:24  25   Q.    Okay.

JOHN GLASPY, M.D. - CROSS

02:24  1    **A.**    Okay?  But, yes, we form a team, I give her the best

02:24  2    information she can have and that I believe to be true, and

02:24  3    then we go.

02:24  4    **Q.**    Okay.  So you have this meeting and this joint

02:24  5    decision-making discussion.  In order to have a full and open

02:24  6    discussion to make solid informed choices, you as the provider

02:24  7    of information have to have full truthful information to

02:25  8    provide to your patient, right?

02:25  9    **A.**    I do.

02:25  10   **Q.**    Okay.  And one of the things you talked to us about

02:25  11   earlier this morning was about your review of product inserts,

02:25  12   right?

02:25  13   **A.**    Yes.

02:25  14   **Q.**    And one of the product inserts that we could talk about

02:25  15   then is the Taxotere product insert, right?

02:25  16   **A.**    Yes.

02:25  17   **Q.**    And if the Taxotere product insert did not reflect the

02:25  18   full knowledge of the people at Sanofi on the issue of

02:25  19   permanent chemotherapy-induced hair loss and whether their

02:25  20   product causes it, you could not have a fully informed

02:25  21   discussion with your patients, could you?

02:25  22          **MR. STRONGMAN:**  Objection.  Beyond the scope and --

02:25  23   should we approach?

02:25  24          **THE COURT:**  I think we need to.

02:25  25          (The following proceedings were held at the bench.)

JOHN GLASPY, M.D. - CROSS

02:26  1        **MR. MICELI:**  He went into this.  He went into

02:26  2    discussions about risks.

02:26  3        **MR. STRONGMAN:**  I wasn't asking any questions about

02:26  4    company documents.  Mr. Miceli has repeatedly used the word

02:26  5    "cause," which is a complicating factor in this as well.

02:26  6    Company documents and company conduct, I did not get into at

02:26  7    all.

02:26  8        **THE COURT:**  I think Mr. Strongman is right.  You may

02:26  9    need to rephrase your question.  I don't even know if we got

02:26 10    much into Taxotere, into the informed consent process, and he

02:26 11    indicated that he looks to the company label.

02:26 12            I think you just need to rephrase your question

02:26 13    and not talk about what's in their company documents.  That's

02:26 14    not something he reviewed at all.

02:26 15        **MR. MICELI:**  Okay.  Okay.  Well, I'm going to be

02:26 16    going into things they didn't show him because he is in here

02:26 17    saying what he would have warned of and whether this is a

02:27 18    sufficient label and he hasn't seen what they said.  I'm going

02:27 19    to ask him --

02:27 20        **THE COURT:**  He did not give the regulatory opinion at

02:27 21    all.  He said, "As a treating oncologist, I read this and this

02:27 22    is what it means to me."

02:27 23        **MR. MICELI:**  Yeah, but if that doesn't include

02:27 24    information, I have to be able to ask if it included this

02:27 25    information, would it have changed your --

JOHN GLASPY, M.D. - CROSS

02:27  1          THE COURT:  That's different.  He says "generally"

02:27  2   means usual.  That's what he said.  Now, I think it's

02:27  3   appropriate to ask him, "We are looking at this and you said

02:27  4   this one individually.  Would permanent make it something else?

02:27  5          As an adverse -- I think you are going to just

02:28  6   have to -- look, y'all both held each other tight with cross,

02:28  7   it's not within the scope.  Let me tell you, this was not

02:28  8   within the scope; this is outside.  Now, you can ask him about

02:28  9   what he asked about, and he talked generally about the informed

02:28  10  consent process.  Then he spoke to, "What does this mean to

02:28  11  you?"  I think that's fair.  Then you can ask him if the word

02:28  12  "permanent" had been there, would that have --

02:28  13          MR. MICELI:  Okay.  Sure.

02:28  14          THE COURT:  I think that's fair.

02:28  15          MR. STRONGMAN:  Thank you.

02:28  16          (End of bench conference.)

02:28  17  BY MR. MICELI:

02:28  18  Q.   Are you ready, Doctor?

02:28  19  A.   Yes.

02:28  20  Q.   You had mentioned earlier that -- you described what hair

02:28  21  generally grows back would mean to you, correct?

02:28  22  A.   I did.

02:28  23  Q.   If Sanofi -- or excuse me, if the Taxotere label would

02:28  24  have included the word "permanent," would that have changed

02:28  25  your interpretation of the label at all?

JOHN GLASPY, M.D. - CROSS

02:29  1   A.    No.   "Permanent" and "not growing back," to me, mean the

02:29  2   same thing.

02:29  3   Q.    Now, when you have that discussion with your patients, you

02:29  4   do discuss options with them, don't you?

02:29  5   A.    Yes.

02:29  6   Q.    There are -- you had said that you believe that a person

02:29  7   with Ms. Kahn's diagnosis would need or you felt the best

02:29  8   choice was to include a taxane, correct?

02:29  9   A.    I do.

02:29  10  Q.    There were two choices, right, Taxol or Taxotere?

02:29  11  A.    For the taxane, correct.

02:29  12  Q.    There are also non-taxane options that are indeed options,

02:29  13  right?

02:29  14  A.    Yes.

02:29  15  Q.    You wouldn't fault the doctor for choosing a non-taxane

02:29  16  option, would you?

02:29  17  A.    It would raise my eyebrows.  It wouldn't get to the point

02:29  18  that I was willing to testify he'd breached the standard of

02:30  19  care.  The question would be why did we go to the trouble to

02:30  20  develop third generation regimens if we are not going to use

02:30  21  them when we really need to shrink a tumor.

02:30  22  Q.    Sure.  Mr. Strongman showed you the NCCN Guidelines,

02:30  23  correct?

02:30  24  A.    He did.

02:30  25  Q.    They include -- I apologize.  I'm not on my tabbed page.

JOHN GLASPY, M.D. - CROSS

02:30  1          Well, I'm going to have to come over here.

02:30  2          There are non-taxane options that still remain on the

02:30  3  approved list of the -- or the recommended list for the NCCN

02:30  4  Guidelines, correct?

02:30  5  A.   That's correct.

02:30  6  Q.   Given proper education to the patient and if in

02:30  7  consultation with her physician they chose a non-taxane option,

02:31  8  you would not say that breaches the standard of care, would

02:31  9  you?

02:31  10  A.   I wouldn't say it breaches the standard of care.  In

02:31  11  general, we use those regimens when there's a good reason we

02:31  12  can't use either taxane.

02:31  13  Q.   Okay.  Now, when it comes to curing early stage breast

02:31  14  cancer, you would agree that surgery is the hallmark of curing

02:31  15  early stage breast cancer?

02:31  16  A.   I don't know what "hallmark" means.  Surgery without

02:31  17  systematic follow-up treatment takes us back to pre-1975 where

02:31  18  we were cutting bigger and bigger chunks off women's chests and

02:31  19  getting nowhere.

02:31  20          There's not a hallmark.  There's a role for surgery,

02:31  21  sometimes a role for radiation, and often a role for systematic

02:31  22  treatment with endocrine or chemo or both.

02:31  23  Q.   Doctor, you said you don't know what saying the surgery of

02:31  24  hallmark means?

02:32  25  A.   I don't.

JOHN GLASPY, M.D. - CROSS

02:32  1          MR. MICELI:  Your Honor, may I show the video?

02:32  2          THE COURT:  You may.

02:32  3          MR. MICELI:  Number two.

02:32  4          THE DEPUTY CLERK:  Is it just to him?

02:32  5          THE COURT:  I think it's just to him.

02:32  6          THE DEPUTY CLERK:  Is there audio on it?

02:32  7          MR. MICELI:  Yes.

02:32  8          THE DEPUTY CLERK:  I can't block the audio to

02:32  9  everybody.

02:32 10          MR. MICELI:  I was going to show it to everybody.

02:32 11          THE COURT:  I think you can show it.

02:32 12          MR. MICELI:  Go ahead.

02:32 13          (Video played.)

02:32 14  BY MR. MICELI:

02:32 15  Q.   What did you mean when you --

02:32 16  A.   I don't have any memory of that.  If I meant it's the

02:32 17  first treatment, it often is.  If I meant it's the oldest

02:32 18  treatment, it is for sure.

02:32 19          They address different problems.  One of them is for

02:33 20  this and the other is for the rest of your body.

02:33 21  Q.   Well, with recognition of the 4 centimeters to

02:33 22  1 centimeter, at the end of the chemotherapy, neoadjuvant

02:33 23  chemotherapy, Ms. Kahn still needed the surgery to remove

02:33 24  cancer from her body, correct?

02:33 25  A.   Of course.

JOHN GLASPY, M.D. - CROSS

1    **Q.**    Just so we are clear -- I don't know -- strike that.

2            The neoadjuvant therapy that was given to shrink the

3    tumor, that doesn't remain -- the chemotherapy doesn't remain

4    in her body ongoing.  That has a half-life of what, about three

5    days?

6    **A.**    Well, it depends.  Taxotere's half-life, I think, is

7    11 hours.

8    **Q.**    So that means 50 percent --

9    **A.**    Xeloda's half-life is like 12 hours.

10   **Q.**    Both of those are out within, what, a day and a half?

11   **A.**    Yes.

12   **Q.**    I just want to make sure we don't have an army of Taxotere

13   soldiers running around the body here.  It's not what we're

14   going to be saying here, right?

15   **A.**    No.  Here's what we are saying:  The response of the huge

16   tumor in the breast tells us what the drug has done to the

17   invisible tumors in her lung and liver and bones.

18           If it shrinks a really big tumor, the hardest thing

19   for chemotherapy to shrink, by 98 percent, the chance that it

20   has cleared up any cancer cells that it might have needed to

21   clear up is sky high.  And that's why a complete pathologic

22   response correlates so well with cures.

23   **Q.**    Right.  The micrometastacies -- you held your hand up to

24   your lungs and you said "liver."

25           We give the adjuvant and neoadjuvant chemotherapy

JOHN GLASPY, M.D. - CROSS

1  because you can't see those, correct?

2  A.   Well, we give them in case they are there, to cure the

3  patient.

4  Q.   Right, because you said, "We give it to everyone in hopes

5  to help a few."

6  A.   Well, I did, but that was -- let's make sure.  We are

7  working to identify better and better who needs these

8  treatments and who doesn't.  And we are going to get a lot

9  better soon with genomics, but until then we are often in a

10  situation where we have to treat a hundred women to save five

11  lives.

12  Q.   Right.  I understand that, but you're talking about still

13  what we're doing today.  We are talking about what was done in

14  2008, right?

15  A.   Yes.

16  Q.   So the process still goes on.  I don't want to diminish

17  it.  I know it's serious work, but what you do is you give the

18  chemotherapy to everyone in hopes of helping a few.

19  A.   Right.  I'm only objecting to the word "everyone."  To

20  everyone with a given prognostic.

21  Q.   Right.  All appropriate --

22  A.   We don't treat everybody with breast cancer with

23  chemotherapy.

24  Q.   Right.  When you enter a study or when you are treating

25  somebody for early stage breast cancer and you have that

JOHN GLASPY, M.D. - CROSS

1   4-centimeter tumor, when the tumor is in the breast, you

2   palpate to measure, correct?

3   A.   That's what they were doing.  That was the best they had.

4   Q.   Right.  You have somebody's fingers feeling what the

5   swelling and the tumor and the tissue around the tumor feels

6   like, correct?

7   A.   Yes.

8   Q.   Then after the surgery, you take the tumor out and it goes

9   to a pathology lab.  They take a pair of calipers, and they

10  measure it absolutely, correct?

11  A.   Yes.

12  Q.   So when you say "4 to 1" -- again, I'm not diminishing

13  what happened.  When you say "4 to 1," it's not like standing

14  me against Shaquille O'Neal and saying Dave is short and

15  Shaquille is tall.  Because you're not doing it the same way.

16  You are feeling the breast at one point, and you're measuring

17  it exactly later, correct?

18  A.   Well --

19  Q.   Just yes or no.  I will let you answer.  I'll let you

20  explain.  Is it yes?

21  A.   I think the answer is no.

22  Q.   Oh.

23  A.   And I will tell you why.  I spent a little bit of time

24  before explaining to you that if we err on estimating the

25  lobular breast cancer size, we undersize it.  So now it's Wilt

JOHN GLASPY, M.D. - CROSS

1   Chamberlain versus a horseshoe crab.

2   **Q.**   Okay.

3   **A.**   There's a big difference.

4   **Q.**   Where is that cited in your report, about the undersizing?

5   **A.**   I think it's in my deposition with you, where lobular

6   cancers tend to be bigger than -- their pathologic stage is

7   bigger.  It was in part in answer to the idea of using the

8   postoperative tool that Dr. Bosserman used to calculate her

9   benefit preoperatively.

10   **Q.**   Well, you and I spoke about the PREDICT model.  The

11   PREDICT model has been around for a very long time, correct?

12   **A.**   For a few years.

13   **Q.**   Before that it was Adjuvant! Online?

14   **A.**   That's correct.

15   **Q.**   You did not do a predictive modeling for Ms. Kahn, did

16   you?

17   **A.**   Did I type her stuff into PREDICT?

18   **Q.**   No.  You did not do any type of modeling, predictive

19   modeling, to determine the relative contribution of various

20   treatments?

21   **A.**   Would typing into PREDICT make me a yes?

22   **Q.**   Well, it would make you a yes.

23   **A.**   Then, yes, I did type it into PREDICT out of curiosity

24   because I heard that was the methodology Dr. Bosserman used.

25   **Q.**   Again, is that something you put in your report?

JOHN GLASPY, M.D. - CROSS

02:38  1   A.   No.

02:38  2   Q.   It's not something we talked about before because I was

02:38  3   surprised to hear it.

02:38  4   A.   You were surprised to hear what?  That I typed it in?

02:38  5   Q.   Yes.  We can keep going, Doctor.

02:39  6        Now, Doctor, you had mentioned, I believe, earlier

02:39  7   that you prescribe Taxotere with Cytoxan?

02:39  8   A.   Yes.

02:39  9   Q.   And so that's because you don't like to use Adriamycin

02:39  10  because of long-term or delayed heart problems, correct?

02:39  11  A.   And leukemia, which isn't that long term.  And mainly

02:39  12  because we don't have evidence that it adds anything.

02:39  13  Q.   So you don't have evidence that it adds anything.  But the

02:39  14  long-term heart/cardiac issues, congestive heart failure,

02:39  15  that's something that has been in the label for Adriamycin for

02:39  16  a very long time, hasn't it?

02:39  17  A.   Yes.

02:39  18  Q.   So doctors can know how to prescribe around that adverse

02:39  19  event, right?

02:39  20  A.   Well, doctors know how to warn about it and how to monitor

02:40  21  patients, but we still see a lot of Adriamycin heart damage.

02:40  22  Q.   But it's in the label, so the doctor can include that in

02:40  23  their conversation with their patient, correct?

02:40  24  A.   Right.  But that wouldn't be the only source of that

02:40  25  doctor's knowledge, obviously.

JOHN GLASPY, M.D. - CROSS

1 **Q.**   Okay.  I just want to try to check it out.  You have a
2 drug company that has a label, right?  "DC," drug company, has
3 a label.  They include a warning in that label, and there are
4 doctors -- I'm just going to put "doctor," "doctor," "doctor."
5         So you have doctors that can read the label, and then
6 they can include that in their discussions with their patients,
7 right?
8 **A.**   If they aren't already, yes.
9         **MR. STRONGMAN:**  Objection.  May we approach?
10        **THE COURT:**  Yes.
11        (The following proceedings were held at the bench.)
12        **MR. STRONGMAN:**  Mr. Miceli is just drawing the
13 opening graphic there of the megaphone going out to --
14        **THE COURT:**  We are not doing megaphones.
15        **MR. MICELI:**  I'm not going to draw a megaphone.  I'm
16 going to draw a bunch of Ps, then I'm done.
17        **MR. STRONGMAN:**  Patients.  I have stayed out of the
18 way as best I can.  We have already had comments about you have
19 to warn everyone and you have to warn everyone.
20        **MR. MICELI:**  That's the purpose of --
21        **THE COURT:**  I understand that, but let me tell you
22 what we are not going to say.  I don't want to get into this --
23        **MR. STRONGMAN:**  The company knows --
24        **THE COURT:**  We are not saying that.
25        **MR. MICELI:**  Okay.  I won't.

JOHN GLASPY, M.D. - CROSS

02:41  1          (End of bench conference.)
02:41  2   BY MR. MICELI:
02:41  3   Q.   Are you with me so far?
02:42  4   A.   I am.
02:42  5          THE COURT:   Mr. Miceli, I think you need to talk to
02:42  6   the witness.   Don't do more drawing.
02:42  7   BY MR. MICELI:
02:42  8   Q.   Okay.   When doctors are warned, they can include that in
02:42  9   their discussion with their patients, correct?
02:42 10   A.   If they aren't already, yes.
02:42 11   Q.   If they aren't already.
02:42 12          If they don't -- well, you mentioned earlier that one
02:42 13   of the ways you keep informed is looking at product inserts,
02:42 14   right?
02:42 15   A.   Yes.
02:42 16   Q.   You are one of how many oncologists in America?
02:42 17   A.   Probably 70,000.
02:42 18   Q.   You are here to speak on behalf of Dr. John Glaspy, not
02:42 19   the other 69,999?
02:42 20   A.   As long as everybody understands that I know a lot of them
02:42 21   and I have a handle on what goes on out there.
02:42 22   Q.   Okay.   But you are still here just speaking for yourself?
02:43 23   A.   I'm the only one who is a hundred percent sure that what I
02:43 24   say is what I think.
02:43 25   Q.   Okay.   Thank you.

JOHN GLASPY, M.D. - CROSS

1    Now, you mentioned earlier that Ms. Kahn wanted to
2 have a lumpectomy instead of a mastectomy for cosmetic reasons,
3 correct?
4 A.    I assumed it was for cosmetic reasons.  She mentioned
5 today that she wanted to keep as much of her body as possible.
6 Q.    Right.  Having to have your breast removed is disfiguring,
7 correct?
8 A.    Yes.  That wasn't a question until you said "correct."
9 Q.    Okay.  When a patient decides for a lumpectomy instead of
10 a mastectomy, doesn't that demonstrate to you two things -- her
11 ability and willingness to exercise her right to choose, is
12 that one thing she can demonstrate by choosing?
13 A.    Yes.
14 Q.    Another thing is the importance to her of maintaining her
15 appearance?
16 A.    Yes, I suppose it evidences that.  I think everybody has
17 that inclination anyway.
18 Q.    I would like to lose some of me.
19    The only way Ms. Kahn could exercise her choice is if
20 she is actually given a choice, right?
21 A.    Right.  You can't exercise a choice you don't have, yes.
22 Q.    But you read Dr. Kardinal's deposition, right?
23 A.    Yes.
24 Q.    He said that if he had been warned of permanent
25 chemotherapy-induced alopecia being related to Taxotere, he

JOHN GLASPY, M.D. - CROSS

1       would have told Ms. Kahn.

2                 Do you remember reading that?

3       A.   I do.  I remember him reading also that he already

4       believed that there were cases of permanent alopecia related to

5       all the chemotherapy drugs we use.

6                 So I prefer to let his testimony speak for itself and

7       not be his interpreter.

8       Q.   We absolutely will.

9                 If he gave her that choice -- if he was able to give

10      her that choice, Ms. Kahn could have decided to not take

11      Taxotere, right?

12      A.   She could have decided not to take Taxotere even if he

13      didn't give her that choice.

14      Q.   I understand, but if informed of a risk of permanent

15      chemotherapy-induced alopecia, she could have decided not to

16      take Taxotere?

17                MR. STRONGMAN:  Objection.  Asked and answered.

18                THE COURT:  Sustained.

19      BY MR. MICELI:

20      Q.   Dr. Glaspy, you have had a relationship or a collaborative

21      working relationship with Sanofi for a while, haven't you?

22      A.   I have not had one for a while.  I had one in the past.

23      They are not really, to my knowledge, in the cancer business

24      for quite a while now.

25      Q.   They were in the cancer business when they hired or

JOHN GLASPY, M.D. - CROSS

1    retained, collaborated with your group, BCIRG, which is now,

2    what, Trion Oncology?

3    **A.**    TRIO.

4    **Q.**    They were in the business of breast cancer treatment

5    options in Taxotere, and they retained your contract research

6    organization to help conduct the TAX 316 study?

7    **A.**    That's correct.  We did that study.

8    **Q.**    You're a director of that TRIO oncology?

9    **A.**    I'm on the board of directors, yes.

10   **Q.**    TRIO oncology is a worldwide organization, isn't it?

11   **A.**    It is.

12   **Q.**    You have centers around the world, correct --

13   **A.**    Yes.

14   **Q.**    -- that conduct clinical trials just about on every

15   continent?

16   **A.**    Yes -- well, not Antarctica and not Africa.

17   **Q.**    Down two.  Dr. John Mackey, is he affiliated with TRIO

18   oncology?

19   **A.**    He was on the board of directors before I was and has

20   since stepped down.

21   **Q.**    After the TAX 316 study was completed, you served as a

22   speaker for Sanofi, correct?

23   **A.**    Yes.

24   **Q.**    You flew -- I think we have it in your CV.  From your

25   practice in Los Angeles, you started speaking for

JOHN GLASPY, M.D. - CROSS

1   pharmaceutical companies, it looks like, in about 2008.  Were
2   you speaking for them before then?
3   A.   I don't have any direct recollection.  I stand by what's
4   in my CV.
5   Q.   So in March 2009, which I think is before the TAX 316
6   study was complete, you started giving talks called "The role
7   of Taxotere/docetaxel Injection Concentrate in the Breast."
8          The first one is in -- is that Natrona Heights,
9   Pennsylvania?
10  A.   I think the first one is South Dakota.  Right?
11  Q.   No.  I think it's Natrona Heights, Pennsylvania.
12  A.   I think that's not on my screen.
13  Q.   I am sorry.  I apologize.
14          There we go.  Natrona Heights?
15  A.   Yes.
16  Q.   Then we have, I think, South Dakota?
17  A.   That's correct.
18  Q.   Nebraska?
19  A.   Correct.
20  Q.   East Syracuse, New York; Bakersfield, California;
21  Cherry Hill, New Jersey.  I'm going to stop there.
22          Was that a home office talk for Sanofi?
23  A.   I don't know what that means.
24  Q.   Did you go to home office?  Did you go to Sanofi's office
25  in --

JOHN GLASPY, M.D. - CROSS

02:49   1   **A.**   I doubt it.  No.

02:49   2   **Q.**   Okay.

02:49   3   **A.**   Most of these things that you have underlined are Glaxo,

02:49   4   not Sanofi.

02:49   5   **Q.**   I understand.  I have all the pharmaceutical companies

02:49   6   underlined.

02:49   7   **A.**   Got it.

02:49   8   **Q.**   I think you will remember when I deposed you, I asked you

02:49   9   when you go to speak on behalf of Sanofi, if you wear a button

02:49  10   that says, "I'm being paid by Sanofi to be here."

02:49  11   **A.**   No.  You announce it at the beginning.

02:50  12   **Q.**   Okay.  So you have spoken on behalf of a number of

02:50  13   pharmaceutical companies, correct?

02:50  14   **A.**   In the past, yes.

02:50  15   **Q.**   You said the slides have to be approved, the slides you

02:50  16   use to do these talks?

02:50  17   **A.**   No.  I said that's why I stopped doing them.

02:50  18   **Q.**   Oh.

02:50  19   **A.**   I am not interested in reading a company's FDA-approved

02:50  20   slide set.  If somebody wants to hear what we are doing in

02:50  21   breast cancer research at UCLA and all that stuff, I'm willing

02:50  22   to go, but I'm not willing to go read the package insert to

02:50  23   everybody.

02:50  24   **Q.**   Were you ever asked by Sanofi to travel around the country

02:50  25   to speak about the risk of permanent chemotherapy-induced

JOHN GLASPY, M.D. - CROSS

02:50  1   alopecia with Taxotere?

02:50  2   **A.**   No.

02:51  3            **MR. MICELI:**  Judge, I'm going to a different line.

02:51  4   Do you want to take our break now?

02:51  5            **THE COURT:**  It's 10 to 3:00.  Let's take our

02:51  6   afternoon break.  Court will be at recess until 3:00.

02:51  7            **THE DEPUTY CLERK:**  All rise.

02:51  8            (The jury exited the courtroom.)

02:51  9            **THE COURT:**  Dr. Glaspy, you know you can't talk about

02:51  10  your testimony.

02:51  11           **THE WITNESS:**  Yes.  Thank you for reminding me.

02:51  12           **THE COURT:**  Thank you.

03:06  13           (Recess.)

03:06  14           **THE DEPUTY CLERK:**  All rise.

03:06  15           **THE COURT:**  All jurors are present.  Court is back in

03:06  16  session.

03:06  17           You may be seated, Dr. Glaspy.  I remind you you

03:06  18  are under oath.

03:07  19           Mr. Miceli, please proceed.

03:07  20           **MR. MICELI:**  Thank you, Your Honor.

03:07  21  **BY MR. MICELI:**

03:07  22  **Q.**   Dr. Glaspy, I want to pick up with a number of things.

03:07  23  I'm going to go over several topics with you.

03:07  24           Before I do that, I wanted to review with you -- when

03:07  25  you gave your report, you provided a list of materials that you

JOHN GLASPY, M.D. - CROSS

1 reviewed, correct?

2 A.   I did.  Yes.

3 Q.   I think when you and I spoke -- and this is just for the

4 benefit of the jury.  This is a three-page document, correct?

5 A.   Yes.

6 Q.   You end with "All references identified in my expert

7 report," right?

8 A.   Meaning that all those references are also things I

9 reviewed.

10 Q.   Right.  Meaning what's in your report.  You have a very

11 extensive report with footnotes, and you reviewed that material

12 as well, correct?

13 A.   That's correct.

14 Q.   I'm going to go to the second page of this document, and

15 it lists --

16 A.   Which document?

17 Q.   The one that's on the screen, sir.

18 A.   I think I can see it here.  That's fine.

19 Q.   I want to go to those reports.

20        THE COURT:  I'm sorry.

21        MR. STRONGMAN:  Your Honor, he can ask questions.  I

22 don't know why we need to have it up on the screen.

23        THE COURT:  Okay.

24        MR. MICELI:  I was just going to direct his attention

25 to it.

JOHN GLASPY, M.D. - CROSS

03:08  1   BY MR. MICELI:

03:08  2   Q.   I just wanted to reference something on here.

03:08  3        I will pull it down.

03:08  4        Doctor, on the first page you list a number of

03:08  5   depositions, correct?

03:08  6   A.   Yes.

03:08  7   Q.   Okay.  Those are the depositions you reviewed to educate

03:08  8   yourself in forming your opinions for this case, correct, and

03:08  9   any that were in your report?

03:09  10  A.   Yes.

03:09  11  Q.   Do you know who Amy Freedman is?

03:09  12  A.   No.

03:09  13  Q.   You weren't provided with her deposition, were you?

03:09  14  A.   No.

03:09  15       MR. STRONGMAN:  Objection.  Beyond the scope.

03:09  16       MR. MICELI:  I'm just trying to find the basis of his

03:09  17  opinions, Your Honor.

03:09  18       (The following proceedings were held at the bench.)

03:09  19       THE COURT:  You are skirting a line.  I think it's

03:09  20  outside --

03:09  21       MR. MICELI:  It's fair to ask what he based his

03:09  22  opinion on.  He has a report.  He has materials reviewed.  I'm

03:09  23  going to ask him, three or four people, "Did you see this?  Did

03:10  24  you see this?"

03:10  25       THE COURT:  That's fair, but what are you trying to

JOHN GLASPY, M.D. - CROSS

1    get at?

2            MR. MICELI:  They have heard a bunch of testimony and
3    I want to say --

4            THE COURT:  He has never said that Taxotere cannot
5    result in permanent alopecia.  He does not say that.

6            MR. MICELI:  No.  I'm just asking if he saw that --
7    I'm not going to ask anything about what she said.  I'm not
8    going there.

9            THE COURT:  Where are we going?  What opinion are you
10   concerned --

11           MR. MICELI:  I'm creating a list of things he did not
12   review.  He thinks every drug causes it.  No other drug causes
13   it.  There's been no proof in this courtroom that any other
14   drug causes it.  I'm going to go over the ones that he says
15   cases have been reported with, and he will admit that he is not
16   saying that they cause it.  He hasn't done a Bradford Hill on
17   them.

18           THE COURT:  That's fair.

19           MR. MICELI:  It is.

20           MR. STRONGMAN:  Your Honor, I don't know what that
21   has to do with the company rep's deposition.

22           THE COURT:  I think that's beyond the scope.  He has
23   never said that Taxotere does not.

24           MR. MICELI:  Do you want me to not ask him anything
25   about what they did not show him?  I can't ask that they

JOHN GLASPY, M.D. - CROSS

1    didn't -- just to form his opinions?

2                    We have to be able to show that his opinion is

3    based on limited information.  He has like 12 Sanofi internal

4    documents.  He has our experts' depositions and he has

5    case-specific depositions.  He has that, but we have to be able

6    to show what he was not provided.

7        THE COURT:  That's fair.  I guess part of my problem

8    with this is what opinion would change if he had seen Amy

9    Freedman's deposition?

10       MR. MICELI:  Well, he can't give a causation opinion

11   because he hasn't given an analysis.  He just says it happens

12   with these products.  She says it causes it.  There is a

13   difference.  We have to draw a very fine line between cases

14   have been reported and causation.  They want to throw

15   everything in the soup and say it all causes it.  We want to

16   say -- and we are obligated under the law to prove it.

17       THE COURT:  I think since my opinion counts --

18       MR. MICELI:  It does.

19       THE COURT:  I think it's appropriate for you to ask,

20   "On which information did you base your opinion that everything

21   results in permanent alopecia?"

22       MR. MICELI:  Well, we still have to address what

23   causes it, and he hasn't been given the one deposition of the

24   person internal to the company that says it causes it.

25       THE COURT:  He doesn't say it doesn't.  I guess

03:12  1    that's my problem.  He never said it doesn't.

03:12  2            MR. STRONGMAN:  I feel like we are going to quickly

03:12  3    move into a bunch of out-of-the-scope commentary about what the

03:13  4    company witnesses said or what's in depositions, and I just

03:13  5    think that's --

03:13  6            MR. MICELI:  I'm not going to go into what's been

03:13  7    said in the company depositions, but there is an informed

03:13  8    consent I'm going to show him that says temporary hair loss.

03:13  9    There's going to be a witness that says before they studied it

03:13  10   in an adjuvant setting that hair generally grows back can't

03:13  11   mean permanent alopecia because they never tested it.  In fact,

03:13  12   his article, the Mackey article says this is the first

03:13  13   long-term follow-up that's ever been done in adjuvant care.

03:13  14           MR. STRONGMAN:  I feel like what we are getting --

03:13  15           THE COURT:  This is beyond the scope.  This is beyond

03:13  16   the scope.

03:13  17           MR. MICELI:  Well, I have him on cross.  I need to

03:13  18   find out a basis for his opinions.  I feel like my hands are

03:14  19   tied.  If you make that decision, I won't go there, but --

03:14  20           MR. STRONGMAN:  I've made the objection.

03:14  21           THE COURT:  It's good for the goose.

03:14  22           (End of bench conference.)

03:14  23           THE COURT:  Please proceed.

03:14  24   BY MR. MICELI:

03:14  25   Q.   Dr. Glaspy, do you believe that Taxotere causes permanent

JOHN GLASPY, M.D. - CROSS

1    chemotherapy-induced alopecia?

2    **A.**    I think, when used in combination with other drugs, it's

3    established that there is a risk of PCIA.  In a single-agent

4    form, that's less clear.

5    **Q.**    You were a study investigator on the TAX 316 study?

6    **A.**    Yes.

7    **Q.**    I know that we have talked about this before and you may

8    have even mentioned it earlier today that randomized controlled

9    trials were designed in such a way as to allow us to draw

10   causal inferences from their results, from adjusting the

11   treatment that is given to Group A versus Group B, correct?

12   **A.**    That's correct.

13   **Q.**    In the TAX 316 study, you had two arms that were TAC and

14   FAC, correct?

15   **A.**    That's correct.

16   **Q.**    The A and the C were received by everybody, correct?

17   **A.**    That's correct.

18   **Q.**    Tamoxifen was received by people who were appropriate for

19   it based upon the study protocol?

20   **A.**    Correct.

21   **Q.**    So we are really studying T versus 5-FU, correct?

22   **A.**    I think we are studying TAC versus FAC --

23   **Q.**    Okay.

24   **A.**    -- not T versus 5-FU.  But otherwise, I agree.

25   **Q.**    Isn't that how you control for drugs?  You give the same

JOHN GLASPY, M.D. - CROSS

1   thing to both groups except for one modification, T versus

2   5-FU?

3   A.    No, because there's the issue of unexpected interactions

4   of drugs.  So the question we had clinically was would TAC as a

5   regimen be better than FAC as a regimen not individual drugs

6   being different in some way.

7   Q.    Well, the regimens were studied against each other, but

8   the only difference between the two arms was the T and the

9   5-FU, correct?

10  A.    There were lots of differences, but they were small,

11  because it was such a large trial that things equaled out.

12  Q.    Let me rephrase that question.  The only difference in the

13  treatment regimens given to the patients in the study was the T

14  and the 5-FU?

15  A.    That's correct.

16  Q.    Everything else was randomized, which means they weren't

17  exactly matched but they were close?

18  A.    Yes.

19  Q.    Okay.  It was adequately sized for the efficacy results,

20  correct?

21  A.    Yes.

22  Q.    Okay.  Okay.  Now, in your report you have -- I think you

23  have said today that several drugs cause permanent alopecia.

24  Is that your testimony?

25  A.    I would prefer to say that they are associated with it,

JOHN GLASPY, M.D. - CROSS

1  but, yes, I have said that.

2  Q.   Okay.  In fact, you said that cases of permanent alopecia

3  have been reported with Adriamycin, carboplatin, CMF,

4  cisplatin, Taxol, epirubicin, etoposide, 5-fluorouracil,

5  Busulfan, gemcitabine, endurocitabine (phonetic), ifosfamide,

6  melphalan, thiotepa, and cyclophosphamide, right?

7  A.   That's correct.

8  Q.   You have not done a Bradford Hill analysis to determine

9  causation for any of those drugs, have you?

10  A.   No because I've been trained not to do Bradford Hill

11  analyses when there's randomized data available.  That's for

12  analyzing data without --

13  Q.   My question only is:  Did you do a Bradford Hill analysis

14  for any of those drugs?

15  A.   No.

16  Q.   You didn't attempt to determine causation of permanent

17  chemotherapy-induced alopecia as to any drug, correct?

18  A.   Well, I did.  You always do.  The Bradford Hill is a

19  formalized way --

20  Q.   I'm not asking about Bradford Hill.  I'm asking if you

21  personally did a causation analysis on any drug.

22  A.   I don't know what "causation analysis" means unless you

23  are referring back to Bradford Hill.  When I write --

24        MR. MICELI:  Your Honor, I don't think there's a

25  question on the table.

JOHN GLASPY, M.D. - CROSS

03:18  1          **MR. STRONGMAN:**  If you could let him finish his

03:18  2      answer.

03:19  3          **THE WITNESS:**  When I write --

03:19  4          **THE COURT:**  Wait.  I think the question was did you

03:19  5      do a Bradford Hill.

03:19  6          **THE WITNESS:**  And I'm trying to understand the

03:19  7      question.

03:19  8              So what do you mean by a causation analysis?

03:19  9          **MR. MICELI:**  Can I approach, Your Honor?

03:19  10          **THE COURT:**  Yes.

03:19  11      BY MR. MICELI:

03:19  12      **Q.**   The tab will separate your first two depositions.

03:19  13          Doctor, can you turn to page 171 of your January 2020

03:19  14      deposition.

03:19  15          **MR. MICELI:**  Did I not give you one?

03:20  16          **THE COURT:**  That's fine.

03:20  17          **MR. MICELI:**  I apologize, Your Honor.

03:20  18          **THE WITNESS:**  I'm there.

03:20  19      BY MR. MICELI:

03:20  20      **Q.**   Page 171.  Excuse me.  It's the May 13, 2020, the second

03:20  21      one.

03:20  22      **A.**   I'm there.

03:20  23      **Q.**   Okay.  At line 11 I asked this:

03:20  24          **"QUESTION:**  And nowhere in your report do you offer

03:21  25          an opinion that cyclophosphamide causes permanent hair

JOHN GLASPY, M.D. - CROSS

03:21  1      loss by whatever definition we apply?

03:21  2           "ANSWER:  I don't believe I do."

03:21  3           Correct?

03:21  4  A.   That was my answer.

03:21  5  Q.   If you just --

03:21  6           MR. STRONGMAN:  Just for optional completeness,

03:21  7  lines 19 through 172, 8.

03:21  8           MR. MICELI:  Okay.

03:21  9           THE COURT:  Please continue.

03:21  10 BY MR. MICELI:

03:21  11 Q.   Okay.

03:21  12          "QUESTION:  And you have not attempted to apply a

03:21  13     methodology such as the Bradford Hill or other methodology

03:21  14     to investigate the relationship between cyclophosphamide

03:21  15     and permanent hair loss, however we define that term,

03:21  16     correct?

03:22  17          "ANSWER:  Except now you have left out the literature

03:22  18     part of the question.  So now you are saying I haven't put

03:22  19     any methodology into generating opinions about drugs and

03:22  20     alopecia.  Do you want to keep it restricted to my

03:22  21     analysis of literature or to my personal experience?"

03:22  22 BY MR. MICELI:

03:22  23 Q.   You did not do a Bradford Hill analysis on

03:22  24 cyclophosphamide and the causing permanent chemotherapy-induced

03:22  25 alopecia, correct?

JOHN GLASPY, M.D. - CROSS

03:22 1   A.   That's correct.

03:22 2        MR. MICELI:   May I approach, Your Honor?

03:22 3        THE COURT:   Yes, you may.

03:23 4   BY MR. MICELI:

03:23 5   Q.   Dr. Glaspy, do you recognize this?

03:23 6   A.   I do.

03:23 7   Q.   This is the de Jonge paper?

03:23 8   A.   It is.

03:23 9   Q.   You cited this in your report for the proposition that

03:23 10  cases of permanent alopecia have been reported with

03:23 11  cyclophosphamide, correct?

03:23 12  A.   That's correct.

03:23 13  Q.   We can read this together if you like, but the de Jonge

03:23 14  paper stands for the proposition that these authors determined

03:23 15  cyclophosphamide does not cause permanent chemotherapy-induced

03:23 16  alopecia, correct?

03:23 17  A.   I would have to read what their conclusion was.

03:23 18        The treatment in combination was associated.

03:23 19  Q.   When you say "associated," you just mean the drug was used

03:23 20  and then the outcome was present, correct?

03:24 21  A.   That's correct.

03:24 22  Q.   This is not an adjuvant breast care study, correct?

03:24 23  A.   That's correct.

03:24 24  Q.   The treatment this was being used for was bone marrow

03:24 25  treatment?

JOHN GLASPY, M.D. - CROSS

03:24 1 **A.** This is high-dose chemotherapy to treat cancer, and it's
03:24 2 high dose enough chemotherapy that they needed bone marrow
03:24 3 support or stem cell support.
03:24 4 **Q.** If you turn to page 596 with me, please.
03:24 5 It says, "Cyclophosphamide is especially a drug with
03:24 6 high potential for inducing reversible alopecia" -- correct?
03:24 7 **A.** Yes.
03:24 8 **Q.** -- "used in CIA mouse models."
03:25 9 A little bit further down: "In spite of its high
03:25 10 potential for inducing irreversible alopecia, no relationship
03:25 11 between cyclophosphamide or 4-hydroxycyclophosphamide,
03:25 12 permanent alopecia was observed in our study." Correct?
03:25 13 **A.** That's correct. They were talking about its use in the
03:25 14 combination.
03:25 15 **Q.** This study stands for the proposition that
03:25 16 cyclophosphamide does not cause, at least in this regimen,
03:25 17 permanent chemotherapy-induced alopecia, correct?
03:25 18 **A.** No, because when you isolate the cyclophosphamide in a
03:25 19 mouse, you are not giving this regimen. They are saying that
03:25 20 of this three, it's the least likely to damage stem cells.
03:25 21 **Q.** You disagree with the author's statement there?
03:25 22 **A.** I don't think the author said that the regimen doesn't
03:25 23 cause it. They said that the cyclophosphamide monotherapy has
03:26 24 the most potential going forward because of its less damage to
03:26 25 stem cells. I don't disagree with that.

JOHN GLASPY, M.D. - CROSS

**Q.**   Doctor, earlier you had mentioned something -- I believe you were talking to Mr. Strongman about Ms. Kahn's use only reaching 285 milligrams per meter squared?

**A.**   Approximately, correct.

**Q.**   Have you reviewed anything that demonstrates patient having as low as 100 milligrams per meter squared have suffered permanent significant alopecia?

**A.**   I'm aware of it happening when people get 100 per meters squared every three weeks.  I'm not aware of it happening with a single dose, which is what you just said.

**Q.**   Have you read the Sedlaceck abstract?

**A.**   I did.

**Q.**   You would have read that -- let me make sure we are here.

   All 7 women with PSA, permanent significant alopecia, had received AC times 4 in 600 milligrams per meter squared in three weeks, followed by 100 milligrams per meter squared of docetaxel every three weeks, correct?

**A.**   Yes.

**Q.**   Two patients discontinued use after only one dose due to unacceptable toxicity, correct?

**A.**   Right.  But they still got the AC.  So that's a combination regimen, not a monotherapy single dose causing this.

**Q.**   But nobody in the other two arms of this study who all received A and C suffered PSA, correct?  Excuse me, Adriamycin

JOHN GLASPY, M.D. - CROSS

1    and Cytoxan, correct?

2    A.   Could you rephrase the question or just restate it.

3    Q.   Sure.  The study also demonstrated that Group A was just

4    the Adriamycin -- excuse me, the doxorubicin regimen, AC, FAC

5    or ACMF, correct?

6    A.   Correct.

7    Q.   Group B was the doxorubicin plus paclitaxel group,

8    correct?

9    A.   Correct.

10   Q.   Groups A and B both received -- patients received A, being

11   Adriamycin, and C, being Cytoxan, correct?

12   A.   That's correct.

13   Q.   None of those patients suffered from or reported as

14   suffering from permanent significant alopecia, correct?

15   A.   That's correct.

16   Q.   So 100 milligrams per meter squared of Taxotere plus

17   completing the AC rounds, the only patients in this study that

18   had permanent significant alopecia are the ones who had

19   Taxotere, and two of them only received 100 milligrams per

20   meter squared?

21   A.   They all received 100 milligrams per meter squared in the

22   Taxotere group, but two of the patients only received one dose.

23   Q.   So total dose of 100 milligrams per meter squared?

24   A.   In those two patients, yes.  As well as all the Adriamycin

25   and Cytoxan.

JOHN GLASPY, M.D. - CROSS

1   Q.   Doctor, do you have patients that make treatment decisions
2   based on quality of life?
3   A.   Yes.
4   Q.   That's appropriate, isn't it?
5   A.   It doesn't matter if it's appropriate; they are the boss.
6   I'm not here to say if it's appropriate.  When my time comes,
7   I'm going to make quality of life decisions for myself.  So I
8   don't fault them.
9   Q.   Doctor, we looked at the NCCN Guidelines.  You looked at
10   them earlier with Mr. Strongman.  I want to put them back up on
11   the -- I want to try to make sure you can read that because I'm
12   going to go to the bottom.
13          There's a comment at the bottom here.  Let me make
14   sure we read this:  "Clinical trials:  NCCN believes that the
15   best management of any cancer patient is in a clinical trial.
16   Participation in clinical trials is especially encouraged."
17          I think, from your testimony earlier today, you agree
18   with that.  Correct?
19   A.   Well, of course.
20   Q.   If someone were to suggest that being in a clinical trial
21   is somehow a bad thing or a risky experiment for the
22   individual, you would disagree with that?
23   A.   Being in a clinical trial can be a risky experiment, but
24   it is -- clinical trials are designed to provide as much
25   patient safety as you can and give people a chance of

JOHN GLASPY, M.D. - CROSS

03:32  1   benefiting.

03:32  2   Q.   Okay.

03:32  3   A.   So they're a safer place to be overall, but they can be a

03:32  4   very risky place.  The world sometimes gives you a choice of

03:32  5   10 risk versus 9 risk, and the 9 is lower.

03:32  6   Q.   Every patient has their own ability or desire to accept

03:32  7   certain risks, correct?

03:32  8   A.   I imagine.  I can't get inside the head, but I imagine

03:32  9   true, yes.  We all have different values.

03:32  10  Q.   I want to ask you a couple questions.  Earlier today you

03:32  11  said you looked at some photographs that were provided to you?

03:32  12  A.   Yes.

03:32  13  Q.   You looked at them and you offered a comment about what

03:32  14  you thought they demonstrated, correct?

03:32  15  A.   I did.

03:32  16  Q.   But it's fair to say, based upon sort of the first

03:32  17  questions you and I discussed -- your not being a dermatologist

03:33  18  or a hair expert -- maybe I should confirm that.

03:33  19       You are not a hair expert, right?

03:33  20  A.   That's correct.

03:33  21  Q.   But it's fair to say, then, you can't tell the jury what

03:33  22  caused the hair before chemo to turn into what Ms. Kahn is left

03:33  23  with after chemo, correct?

03:33  24  A.   The answer is, no, that's not correct.

03:33  25  Q.   You're saying you can offer expert opinion about why her

JOHN GLASPY, M.D. - CROSS

1   hair is different now than it was before chemo?

2   **A.**   I'm saying that part of this question is a dermatologic

3   question, deferring to dermatologies.

4           But part of the question is an oncology question.

5   Part of the question is what -- does this look like what you

6   have seen with tamoxifen, say, and that's an oncology question.

7   I wasn't asked it, but now you kind of asked it and brought it

8   up.

9   **Q.**   Well, I said if you were a hair expert first.

10  **A.**   So I have seen women lose hair and look like that with

11  Grade 2 alopecia, as defined now, from tamoxifen alone.  So

12  I've seen that, and it looks like what she looks like, but I'm

13  not a dermatologist.  I do see a lot of women with tamoxifen

14  hair.

15  **Q.**   What happens to tamoxifen -- do you have any opinions

16  about what happens to the hair follicle with tamoxifen?

17  **A.**   The -- I don't have any -- because I haven't done

18  biopsies, but starving a tissue of something it needs for a

19  long time can take it from just being suppressed to being dead.

20          **MR. MICELI:**   Scott, can you pull up 2884 and 2849.

21  BY MR. MICELI:

22  **Q.**   Dr. Glaspy, do you know Ms. Kahn in these photographs?

23  **A.**   I don't.

24  **Q.**   You don't recognize which one is --

25  **A.**   So, yeah, I don't recognize her in the one on the left.

JOHN GLASPY, M.D. - CROSS

03:35  1    On the right it's a little blurry, but the person in the middle
03:35  2    looks like her.
03:35  3          MR. MICELI:  Is it 2849 or 2889 you put up?  Okay.
03:35  4    BY MR. MICELI:
03:35  5    Q.   You don't have any opinions about what the cause of Ms. --
03:36  6    anything about the follicles on Ms. Kahn's head, do you?
03:36  7    A.   I do not.
03:36  8    Q.   You didn't look at the biopsies that she had performed?
03:36  9    A.   I did not.
03:36 10    Q.   And you don't intend -- as we sit here, you are not
03:36 11    offering dermatology opinions about her hair loss?
03:36 12    A.   I wasn't and didn't on direct.
03:36 13    Q.   Okay.  Thank you.
03:36 14          MR. MICELI:  You can take those down Scott.
03:36 15    BY MR. MICELI:
03:36 16    Q.   Now, when you investigate a drug, whether it's like
03:36 17    Taxotere or any drug, you investigate to learn, correct?  You
03:36 18    investigate an issue?
03:36 19    A.   You always investigate to learn.
03:36 20    Q.   Yes.  You investigate, you test a hypothesis, correct?
03:36 21    A.   Yes.
03:36 22    Q.   And then you either confirm or deny the hypothesis?
03:36 23    A.   Yes.
03:36 24    Q.   Then you adjust your behavior based upon that new
03:36 25    knowledge, correct?

1898

JOHN GLASPY, M.D. - CROSS

| | | |
|---|---|---|
| 03:36 | 1 | **A.**   Yes. |
| 03:36 | 2 | **Q.**   That's just the way clinical trials work, isn't it? |
| 03:36 | 3 | **A.**   It's the way medicine works. |
| 03:37 | 4 | **Q.**   It's the way medicine works?  Okay. |
| 03:37 | 5 | You rely upon clinical trials? |
| 03:37 | 6 | **A.**   Yes. |
| 03:37 | 7 | **Q.**   Clinical trials can result in label changes? |
| 03:37 | 8 | **A.**   Yes. |
| 03:37 | 9 | **Q.**   Okay.  You had told me that the TAX 316 was a registration |
| 03:37 | 10 | study at one point, correct? |
| 03:37 | 11 | **A.**   I did, yes. |
| 03:37 | 12 | **Q.**   That means that it was being used to get new approval, |
| 03:37 | 13 | correct? |
| 03:37 | 14 | **A.**   Yes, and that it had extra regulatory requirements on it |
| 03:37 | 15 | for documentation. |
| 03:37 | 16 | **Q.**   And it had clinical trial data, correct? |
| 03:37 | 17 | **A.**   It did. |
| 03:37 | 18 | **Q.**   That data gets locked, correct? |
| 03:37 | 19 | **A.**   Yes. |
| 03:37 | 20 | **Q.**   That's normal for the clinical trial process, isn't it, |
| 03:37 | 21 | that you don't go behind that clinical trial evidence? |
| 03:37 | 22 | **A.**   You don't go behind -- |
| 03:37 | 23 | **Q.**   Behind the data, behind the locked clinical trial data. |
| 03:37 | 24 | **A.**   You don't change data once it's locked. |
| 03:37 | 25 | **Q.**   Thank you. |

JOHN GLASPY, M.D. - CROSS

03:38   1          **MR. MICELI:**  May I approach, Your Honor?

03:38   2          **THE COURT:**  Yes, you may.

03:38   3   BY MR. MICELI:

03:38   4   **Q.**   Dr. Glaspy, you had talked about looking at labels,

03:38   5   correct, earlier today?

03:38   6   **A.**   I did, yes.

03:38   7   **Q.**   Now, this is a label -- I think we turn to the back page.

03:38   8   It has the date on it.  I may be mistaken.

03:38   9          There we are.  It's on the third page in.

03:38   10  **A.**   Third page from the back or --

03:39   11  **Q.**   Third page from the front.  I apologize.

03:39   12  **A.**   Okay.  Is that counting the face page?

03:39   13  **Q.**   Yes.

03:39   14  **A.**   Got it.

03:39   15  **Q.**   It says January 2005?

03:39   16  **A.**   It does.

03:39   17  **Q.**   Okay.  If you go to the second page, at the very bottom it

03:39   18  has the same language you went over with Mr. Strongman:  "Once

03:39   19  you have completed all your treatments, hair generally grows

03:39   20  back."

03:39   21          Do you see that?

03:39   22  **A.**   Yes.

03:39   23  **Q.**   Okay.  I'm done with that one.

03:39   24          **MR. MICELI:**  May I approach again, Your Honor?

03:39   25          **THE COURT:**  Yes, you may.

JOHN GLASPY, M.D. - CROSS

03:39  1    BY MR. MICELI:

03:40  2    Q.   If you go to, not the face page, but the second page in.

03:40  3             MR. STRONGMAN:   May I just approach briefly,

03:40  4    Your Honor?

03:40  5             THE COURT:   Yes, you may.

03:40  6             (The following proceedings were held at the bench.)

03:40  7             THE COURT:   My real time is gibberish.

03:40  8             MR. STRONGMAN:   This is a company document.   I'm not

03:40  9    sure what your plan was.

03:40  10            THE COURT:   Where are we going with this?

03:40  11            MR. MICELI:   Well, he talked about the informed

03:40  12   consent process before and he said hair generally grows back.

03:40  13   He just saw what was in a label in 2005, and this is a May 2005

03:40  14   informed consent when Sanofi is representing that it causes

03:40  15   reversible hair loss.

03:40  16            He is giving an oncologist's opinion about what

03:40  17   the label means, what an informed consent means, and I just

03:40  18   want to just show what Sanofi was saying at that time.   This is

03:41  19   before her treatment.

03:41  20            MR. STRONGMAN:   I would just say I think some

03:41  21   informed consent -- I don't know if it's a final informed

03:41  22   consent.   I don't know what the foundation is for using it with

03:41  23   this witness.   I don't know that this is in evidence.

03:41  24            MR. MICELI:   It's not.

03:41  25            MR. STRONGMAN:   I think plaintiff's case is closed

1   so --

2        MR. MICELI:  Actually, it is in evidence.  This was

3   used with Jean Philipe Aussel.

4        MR. STRONGMAN:  There is just no foundation to ask

5   this witness a question about some other informed consent --

6   it's beyond the scope.

7        THE COURT:  I think this is for closing argument.  We

8   went through all of this when Mr. Strongman was crossing

9   Dr. Plunkett.

10        MR. STRONGMAN:  Trying.

11        THE COURT:  This is outside the scope.  He talked

12   generally about informed consent.  He did not get into -- I

13   don't remember him talking about the informed consent that

14   you --

15        MR. MICELI:  I think he did, Your Honor, but --

16        THE COURT:  Well, what did he do?  He said, "This is

17   how I read the label."

18        MR. MICELI:  Here is the problem.  You have an

19   oncologist sitting on the stand telling this jury what the

20   label should have included, and I should be able to

21   cross-examine him with the company's documents about what the

22   company says because they don't take surveys to determine what

23   a label should say.  Labels drive what are in an informed

24   consent, and that's what we should be able to ask him.

25        MR. STRONGMAN:  I would clarify.  I didn't ask

JOHN GLASPY, M.D. - CROSS

1 Dr. Glaspy what the label should include.  I just asked him, as

2 an oncologist, how he interpreted that sentence.  That was it.

3        MR. MICELI:  Well, we are getting ready to get

4 explosive if I go back to that podium.  I'm going to be talking

5 about the loss of studies.

6        THE COURT:  The what?

7        MR. MICELI:  The material I sent you last evening.

8        MR. STRONGMAN:  What was it?

9        MR. MICELI:  The 483 letter that includes 49 lost

10 Taxotere studies; in offering his opinions, is he is aware that

11 Sanofi does not even have the information to tell the truth

12 because they have lost 49 postmarketing clinical trial studies.

13        MR. STRONGMAN:  I would say I think that's way beyond

14 the scope.  I don't know where you are coming from with that as

15 it relates to Dr. Glaspy and as an oncologist, again, bringing

16 up company documents from company depositions that were not --

17 this is not in evidence, obviously.  I think it's highly

18 prejudicial and inappropriate for this witness.

19        THE COURT:  I don't know if he -- I'm trying to think

20 of when that was in the scope of the direct exam.  What I

21 remember is, "I read the label.  I'm not a labeling expert.  I

22 don't talk about regulatory affairs.  As an oncologist, I read

23 these.  This is what it means to me."  Now, where do we get

24 into Sanofi company documents?

25        MR. MICELI:  Because this is what Sanofi says it

03:44  1   means.  What he is saying is, "I don't care what the label

03:44  2   means.  I can believe what I want to believe."  I think this is

03:44  3   fair game, Your Honor.  We have to be able to at least cross on

03:44  4   what the company says its documents mean.

03:44  5           MR. STRONGMAN:  I think Dr. Glaspy is speaking on

03:44  6   behalf of himself, as an oncologist, and all of this about what

03:44  7   the company means and the company documents and some 483 that's

03:44  8   irrelevant, unduly prejudicial, is not in evidence --

03:44  9           THE COURT:  This is what I will allow you to --

03:44  10          MR. STRONGMAN:  I just think we are about to get

03:44  11  into --

03:44  12          THE COURT:  I know he knows all 70,000 oncologists --

03:44  13          MR. MICELI:  Yeah.

03:44  14          THE COURT:  -- but I think it's appropriate for you

03:45  15  to say, "When you talked about this, you indicated that that's

03:45  16  how you read it."

03:45  17          MR. MICELI:  "You don't know what the company's

03:45  18  position is at that time?"

03:45  19          THE COURT:  And I think that's it.

03:45  20          MR. MICELI:  Okay.

03:45  21          THE COURT:  "Have you seen any documents that would

03:45  22  indicate that Sanofi had a different interpretation?"

03:45  23          MR. MICELI:  Okay.  I will do it.  I will go there.

03:45  24          THE COURT:  That's it.  Don't you dare pull a

03:45  25  document out.

JOHN GLASPY, M.D. - CROSS

03:45  1           MR. MICELI:  I understand, Your Honor.  I will do

03:45  2  that.  Thank you.

03:45  3           (End of bench conference.)

03:45  4  BY MR. MICELI:

03:45  5  Q.   Dr. Glaspy, earlier you told us what you thought the label

03:45  6  language of "hair generally grows back" means to you, correct?

03:45  7  A.   I did.

03:46  8  Q.   Okay.  You're here today only as an oncologist.

03:46  9           With all of the experience you have described to us,

03:46  10  you are not a regulatory expert, correct?

03:46  11  A.   That's correct.

03:46  12  Q.   You have not reviewed anything, any documents from Sanofi

03:46  13  to indicate to you what position Sanofi took on the issue of

03:46  14  what "hair generally goes back" means, correct?

03:46  15  A.   I saw some correspondence with the health authorities on

03:46  16  the subject, but I'm offering no opinion.

03:46  17  Q.   Well, that's just --

03:46  18           MR. STRONGMAN:  Your Honor.

03:46  19           MR. MICELI:  Well --

03:46  20           (The following proceedings were held at the bench.)

03:46  21           MR. MICELI:  He just invited me.

03:46  22           THE COURT:  He really is.

03:47  23           MR. STRONGMAN:  He is trying to answer the questions.

03:47  24  He has been shown depositions.  He is not offering any opinions

03:47  25  about what Sanofi's position is so --

JOHN GLASPY, M.D. - CROSS

1    **MR. MICELI:**  Now he has invited it, and I get to show
2  him that they have said it's permanent persistent.  Now I'm
3  going to different documents.  I'm going to the EMA that we
4  went through yesterday.
5         **THE COURT:**  I'm really trying to avoid doing this
6  because I don't think it's -- I think it's appropriate to say,
7  and using documents that say they don't necessarily agree with
8  that and then he --
9         **MR. STRONGMAN:**  I'm worried about how he is going to
10  try to understand that question in terms of scope because he is
11  not offering opinions about it, whether he has seen something,
12  whether he hasn't.
13        **THE COURT:**  Part of his problem is he is opining
14  about it.
15        **MR. MICELI:**  If he would have just said yes to that
16  question, I would have sat down, but the problem is now he said
17  that.  If I say, "And they may not agree with you," the problem
18  is I don't know which one he is referring to now.  Now I have
19  to show him one that disagrees with him.
20        **MR. STRONGMAN:**  I don't even know that he understands
21  quite what's going on, obviously, in terms of the intellectual
22  debate of this.
23        **MR. MICELI:**  I think I have to be allowed -- he said
24  he has seen communications with regulatory authorities, and he
25  can't pick and choose which one it is now.  I get to show him

JOHN GLASPY, M.D. - CROSS

03:48  1    one to a regulatory authority.  He opened the door with it.

03:48  2                    He has done a great job testifying.  He is a

03:48  3    good expert.  You have done well.  He can't say things that

03:48  4    throws the bait out there to the jury and then I don't get to

03:48  5    cross-examine him on it.

03:49  6            MR. STRONGMAN:  I just think you can't open the door

03:49  7    by asking a question that in my view is outside the scope.  He

03:49  8    is trying to answer honestly.  He is not trying to expand the

03:49  9    scope of his opinion.

03:49  10           THE COURT:  I am trying desperately.  I don't want to

03:49  11   go there.  I'm afraid to say it.

03:49  12           MR. MICELI:  You wanted to have an easy day, didn't

03:49  13   you?

03:49  14           THE COURT:  Huh?

03:49  15           MR. MICELI:  You wanted to have an easy morning.

03:49  16           THE COURT:  You have no idea.  I think part of you

03:49  17   perhaps -- "We have heard the testimony of Jean Philipe Aussel.

03:49  18   You haven't reviewed that, have you?"

03:49  19           MR. MICELI:  He hasn't reviewed it.  He hasn't

03:49  20   reviewed any of that stuff.

03:49  21           THE COURT:  "So if he testified to something

03:49  22   differently" --

03:49  23           MR. STRONGMAN:  "What he has testified to, you don't

03:49  24   know what that is?"  I can live with that question.

03:49  25           THE COURT:  I understand where you are coming from,

JOHN GLASPY, M.D. - CROSS

03:49   1    but let me tell you something.  I'm really trying to stay in

03:50   2    the scope.  I know what you're trying to do.  Unfortunately, we

03:50   3    are not in Louisiana state court where cross-examination is

03:50   4    wide open.  I'm giving you an opportunity to test his opinions.

03:50   5    I think it would be appropriate for you to say, "I know you

03:50   6    said you saw that.  Did you hear the testimony of Jean Philipe

03:50   7    Aussel here?"

03:50   8                MR. MICELI:  I hear what you are saying, Your Honor,

03:50   9    but the last time we were here, five minutes ago, I was going

03:50   10   to show that document that was used with Mr. Aussel.  Now,

03:50   11   because of what he said about, "I've seen communications with

03:50   12   regulatory authorities," I was going to show him the one that

03:50   13   says 29 case of permanent alopecia, persistent alopecia have

03:50   14   been reported."

03:50   15               MR. STRONGMAN:  What I want, what I did not ask, I

03:50   16   don't want to get into it -- obviously he knows about the 29.

03:51   17   I don't want to touch that with a 10-foot pole, and I feel like

03:51   18   if we show that we are back into this --

03:51   19               THE COURT:  I know.

03:51   20               MR. STRONGMAN:  You know.

03:51   21               THE COURT:  I know.

03:51   22               MR. STRONGMAN:  Because he does have information

03:51   23   about that that I was not interested in getting into because

03:51   24   I'm not trying to open doors on TAX 316 and what "ongoing"

03:51   25   means and all that.

JOHN GLASPY, M.D. - CROSS

03:51  1          MR. MICELI:  I can say, "You haven't heard the

03:51  2  testimony of John Felipe Aussel or Amy Freedman, who has been

03:51  3  in this courtroom?"

03:51  4          MR. STRONGMAN:  That's fair.

03:51  5          THE COURT:  That's fair.

03:51  6          (End of bench conference.)

03:51  7  BY MR. MICELI:

03:51  8  Q.   Dr. Glaspy, in all the work you have done in this case and

03:51  9  particularly with regard to this trial, you have not heard the

03:51  10  testimony of John Felipe Aussel as it was given in this

03:51  11  courtroom, have you?

03:51  12  A.   I have not.

03:51  13  Q.   You have not heard the testimony of Amy Freedman that was

03:52  14  given in this courtroom, correct?

03:52  15  A.   That's correct.

03:52  16  Q.   Okay.

03:52  17          MR. MICELI:  Your Honor, if I could just have a

03:52  18  couple minutes with my colleague, I may be done, but I think I

03:52  19  may have one or two other questions.

03:52  20          THE COURT:  Thank you.

03:52  21  BY MR. MICELI:

03:52  22  Q.   Dr. Glaspy, you also have not heard the testimony of any

03:52  23  Sanofi employee witnesses in this courtroom, correct?

03:53  24  A.   For this case?

03:53  25  Q.   Yes.

JOHN GLASPY, M.D. - CROSS

03:53   1   **A.**   That's correct.

03:53   2   **Q.**   Now, you had said it's established that there's a risk of

03:53   3   PCIA when Taxotere is used in a combination?  Did I understand

03:53   4   you correct to say that?

03:53   5   **A.**   The combinations containing Taxotere are among those that

03:53   6   have been associated with PCIA, yes.

03:53   7   **Q.**   What other ones have been associated with it?

03:53   8   **A.**   Regular old FAC would be a very well studied one.

03:53   9   **Q.**   Association is very different than causation, correct?

03:53   10   **A.**   Well -- but we have to use the same sauce that we did a

03:53   11   little while ago.  So in a randomized trial, if two sides are

03:53   12   differed by a drug and the side that doesn't have that drug in

03:53   13   it has been associated with some persistent alopecia, then you

03:53   14   have to conclude that that regimen is associated with it or

03:54   15   could cause it.

03:54   16   **Q.**   I want to understand if you agree with me that Taxotere in

03:54   17   combination regimen therapies can cause permanent

03:54   18   chemotherapy-induced alopecia.

03:54   19           **MR. STRONGMAN:**  Objection.  Asked and answered.

03:54   20           **MR. MICELI:**  I asked risk and then I asked cause.

03:54   21           **MR. STRONGMAN:**  It's already been asked previously.

03:54   22   Objection.

03:54   23           **THE COURT:**  I'm going to sustain it.

03:54   24   BY MR. MICELI:

03:54   25   **Q.**   Does "hair generally grows back," to you as an oncologist,

JOHN GLASPY, M.D. - CROSS

1  mean that Taxotere in combinations can cause -- in regimens can

2  cause Grade 2 chemotherapy-induced alopecia?

3  A.   It could be associated with it, yes.

4  Q.   Okay.

5  A.   The reason I'm changing the wording is because to say that

6  in this combination Taxotere causes it again misstates the

7  reality that in that combination, the combination causes it.

8  Q.   Now, when somebody like you, who is working or who your

9  organization BCIRG was doing clinical studies for Sanofi, you

10  have certain information available to you through the company,

11  correct?

12  A.   Yes.

13  Q.   If an organization that does not have a direct

14  relationship with a company whose drug they are using in a

15  clinical trial has to put together an informed consent, would

16  you agree with me that the best place to find that information

17  is in the product insert?

18  A.   No.   At that point, you recall the higher standard, and

19  every site is given something called an investigator's

20  brochure, which is not just the package insert.   It's all --

21  it's a lot of the relevant preclinical data, the animal

22  studies, the toxicology studies, the pharmacokinetic studies in

23  prehuman models and in humans, if it's got human data.

24          So everybody who is an investigator, everywhere in

25  the world, is given that investigator brochure, and it's a much

JOHN GLASPY, M.D. - REDIRECT

1    more rich source of that kind of information.

2    Q.   Is that for studies that are done for pharmaceutical

3    companies?

4    A.   Yes, and not for pharmaceutical companies.

5    Q.   Would you agree with me that studies that are done without

6    the involvement of the pharmaceutical company actually

7    conducting the study or having involvement in the study, one of

8    the sources of information for risks that should be included in

9    an informed consent is the product insert?

10   A.   That's one source of information, but in those studies --

11   those are called ISTs, because the farmer chose not to take it

12   forward with their machinery, but to allow an investigator who

13   is very interested and has the money to do it, do a clinical

14   trial, they also get the investigator brochure, if it's an

15   experimental drug.

16            MR. MICELI:   Thank you, Your Honor.

17            THE COURT:   Redirect, Mr. Strongman.

18                        REDIRECT EXAMINATION

19   BY MR. STRONGMAN:

20   Q.   Dr. Glaspy, I just have a couple questions.

21        Mr. Miceli was asking you some questions about

22   tamoxifen and the effect on the hair follicle.  Do you remember

23   those questions?

24   A.   I do.

25   Q.   Can you explain your answer?

JOHN GLASPY, M.D. - REDIRECT

03:57  1   A.   My answer was that, in general, if you starve a tissue
03:57  2   that needs a hormone of that hormone for long enough --
03:57  3            MR. MICELI:  This is cumulative of the direct, I
03:57  4   believe.
03:57  5            MR. STRONGMAN:  This is directly in response to what
03:57  6   Mr. Miceli was asking.
03:57  7            THE COURT:  I'm going to allow it.  Overruled.
03:57  8            THE WITNESS:  I'm almost done.  When you stop, the
03:57  9   tissue may not recover.
03:58  10  BY MR. STRONGMAN:
03:58  11  Q.   Doctor, you were asked some questions about toxical and
03:58  12  Taxotere and their equal efficacy.  Do you remember that?
03:58  13  A.   I do.
03:58  14  Q.   Did you review Dr. Kardinal's deposition with regard to
03:58  15  Taxol and neuropathy?
03:58  16  A.   I do.
03:58  17  Q.   What was Dr. Kardinal's concern?
03:58  18           MR. MICELI:  This is outside the scope.
03:58  19           THE COURT:  This is outside the scope.  Sustained.
03:58  20  BY MR. STRONGMAN:
03:58  21  Q.   Dr. Glaspy, last questions.
03:58  22           You were shown some talks that you gave on your CV
03:58  23  about your Taxotere research.  Do you remember that?
03:58  24  A.   I do.
03:58  25  Q.   Why would you want to go around the country and talk to

JOHN GLASPY, M.D. - REDIRECT

03:58  1   oncologists about research that you're doing and involved in

03:58  2   with Taxotere?

03:58  3   **A.**   I always try to tailor it to the interests of the

03:58  4   audience.  So often we didn't talk about Taxotere at all; we

03:58  5   talked about the studies that we were doing on fatty acids and

03:59  6   breast cancer, but we called it that because they had to do

03:59  7   that in order to put it through the company.

03:59  8           So what I talked about, depending on what the

03:59  9   audience wanted to hear -- we used to go around -- we don't do

03:59  10  it anymore because of COVID, but we used to go around the

03:59  11  country and talk about what we were doing to do -- to stop

03:59  12  competing and collaborate and share information and get this

03:59  13  done faster.

03:59  14          **MR. STRONGMAN:**  I don't have any questions.  Thank

03:59  15  you.

03:59  16          **THE COURT:**  Thank you.

03:59  17          You may step down, Dr. Glaspy.

03:59  18          **MR. MOORE:**  May we approach?

04:00  19          (Off the record.)

04:01  20          **THE COURT:**  Members of the jury, it's 4:00.  Because

04:01  21  of the way the schedule is running, I am going to recess for

04:01  22  today.  I'm going to ask that you return at 8:30 tomorrow

04:01  23  morning.

04:01  24          I will tell you that we anticipate tomorrow

04:02  25  that -- we anticipate concluding the evidence and argument and

1   charge conference tomorrow.  So we are going to start at 8:30.

2   We have just a bit more testimony.  Just for your planning

3   purposes, so that you know.

4           Now, I told you that, but that is not an

5   invitation for you to begin discussing the case amongst

6   yourselves or with anyone else.  I am going to admonish you, as

7   I have every day, that you should not discuss the case amongst

8   yourselves or with anyone else.  Do not discuss it with family

9   members at all.

10           It is very important that you hear the

11   completion of all of the evidence in the case, the argument of

12   counsel, as well as the jury charge to be given to you by the

13   Court.

14           It's very important that you maintain an open

15   mind this entire time.

16           With that, we are going to recess early this

17   evening, and we'll reconvene tomorrow morning at 8:30.

18           THE DEPUTY CLERK:  All rise.

19           THE COURT:  Leave your notebooks on your seats.

20   Thank you.

21           (The jury exited the courtroom.)

22           THE COURT:  We decided to move it to 8:30 because

23   that way we could hear it.

24           My intention, what I believe will occur is we

25   will listen to the video, and then we will go into closing.

1915

04:04   1   We'll do all closing arguments and then probably break for

04:04   2   lunch because that will get us close to the time.

04:04   3            I need to talk to closing attorneys and then

04:04   4   come back for the charge and let the jury begin their

04:04   5   deliberations.

04:04   6        **MS. SASTRE:**  Your Honor, time allowed for closing,

04:04   7   same thing as last time?

04:04   8        **THE COURT:**  Well, that's what I wanted to talk to

04:04   9   you-all about.  Who is closing?

04:04   10           (Off the record.)

04:04   11                                * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## <u>CERTIFICATE</u>

2

  I, Toni Doyle Tusa, CCR, FCRR, Official Court

3

Reporter for the United States District Court, Eastern District

4

of Louisiana, certify that the foregoing is a true and correct

5

transcript, to the best of my ability and understanding, from

6

the record of proceedings in the above-entitled matter.

7

8

9

      */s/ Toni Doyle Tusa*

      Toni Doyle Tusa, CCR, FCRR

10

      Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25