```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2
     *****************************************************************
 3
     IN RE:  TAXOTERE (DOCETAXEL)
 4   PRODUCTS LIABILITY LITIGATION

 5                                   Docket No. 16-MD-2740
                                     Section H
 6                                   New Orleans, LA
                                     Thursday, November 18, 2021
 7   Relates to:  Elizabeth Kahn
                  16-CV-17039
 8
     *****************************************************************
 9
                   TRANSCRIPT OF TRIAL PROCEEDINGS
10       HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                  UNITED STATES DISTRICT JUDGE
11                   DAY 8, MORNING SESSION

12
     APPEARANCES:
13
     FOR THE PLAINTIFF:            BACHUS & SCHANKER, LLC
14                                 BY:  DARIN L. SCHANKER, ESQ.
                                        J. KYLE BACHUS, ESQ.
15                                 101 W. Colfax Ave., Suite 650
                                   Denver, CO 80202
16
                                   GIBBS LAW GROUP, LLP
17                                 BY:  KAREN B. MENZIES, ESQ.
                                        ANDRE MURA, ESQ.
18                                 6701 Center Drive West, 14th Floor
                                   Los Angeles, CA 90045
19
                                   DAVID F. MICELI, LLC
20                                 BY:  DAVID F. MICELI, ESQ.
                                   P.O. Box 2519
21                                 Carrollton, GA 30112-0046

22                                 PENDLEY BAUDIN & COFFIN
                                   BY:   CHRISTOPHER L. COFFIN, ESQ.
23                                       JESSICA A. PEREZ, ESQ.
                                   2505 Energy Centre
24                                 1100 Poydras St.
                                   New Orleans, LA 70163
25
```

```
 1                                 GAINSBURGH BENJAMIN DAVID
                                   MEUNIER & WARSHAUER
 2                                 BY:  M. PALMER LAMBERT, ESQ.
                                   2800 Energy Centre
 3                                 1100 Poydras St.
                                   New Orleans, LA 70163
 4
                                   MARTZELL, BICKFORD & CENTOLA
 5                                 BY:  LAWRENCE J. CENTOLA, III, ESQ.
                                   338 Lafayette St.
 6                                 New Orleans, LA 70130

 7
    FOR THE DEFENDANT:             SHOOK HARDY & BACON
 8                                 BY:  HILDY M. SASTRE, ESQ.
                                   201 Biscayne Blvd., Suite 3200
 9                                 Miami, FL 33131

10                                 SHOOK HARDY & BACON
                                   BY:  JON A. STRONGMAN, ESQ.
11                                      ADRIENNE BYARD, ESQ.
                                   2555 Grand Blvd.
12                                 Kansas City, MO 64108

13                                 IRWIN FRITCHIE URQUHART & MOORE
                                   BY:  DOUGLAS J. MOORE, ESQ.
14                                      KELLY E. BRILLEAUX, ESQ.
                                   400 Poydras St., Suite 2700
15                                 New Orleans, LA 70130

16                                 DLA PIPER
                                   BY:  ILANA H. EISENSTEIN, ESQ.
17                                 One Liberty Place
                                   1650 Market St., Suite 5000
18                                 Philadelphia, PA 19103-7300

19
    Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR, RMR
20                                 500 Poydras Street, B-275
                                   New Orleans, Louisiana 70130
21                                 (504) 589-7776

22
       Proceedings recorded by mechanical stenography, transcript
23  produced by computer.

24

25
```

1                          I N D E X

2

3    WITNESSES FOR THE DEFENDANT:              PAGE/LINE:

4

5    DR. ZOE LARNED - (By videotaped deposition)

6

7     Direct Examination by Mr. Moore          1934/22

8     Cross-Examination by Mr Schanker         1971/5

9     Redirect Examination by Mr. Moore        2001/16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

──────────────────OFFICIAL TRANSCRIPT──────────────────

<u>P R O C E E D I N G S</u>

(THURSDAY, NOVEMBER 18, 2021)

(MORNING SESSION)

08:56:24  5    (OPEN COURT.)

08:56:24  6         THE COURT:  Please be seated.  As you all know, one of

08:56:29  7    the jurors has been in an accident.  He has indicated he is not

08:56:34  8    hurt, but we are waiting for police officers to arrive on the scene

08:56:38  9    so that the accident report can be prepared and he can do the

08:56:45 10    reporting requirements.

08:56:47 11         And prior to that, though, I thought we could take this

08:56:49 12    time to do an objection to the charge, as well as move in some of

08:56:53 13    the exhibits.  I also understand that there has been -- I think,

08:57:00 14    the wrong number was stated in court regarding an exhibit and so I

08:57:06 15    want to make that substitution.

08:57:11 16         THE DEPUTY CLERK:  For defense exhibits.

08:57:12 17         THE COURT:  Okay.  These are two defense exhibits,

08:57:16 18    Defense Exhibit 3220 should have been Defense Exhibit 3320, that's

08:57:23 19    the document that was considered in court that was actually moved

08:57:28 20    into evidence but it was improperly marked.  And Defense

08:57:33 21    Exhibit 2392 should have been Defense Exhibit 2382, so the Court

08:57:39 22    orders that those numbers be corrected in the record.  Thank you.

08:57:44 23         Mr. Lambert, you have, I think, another proffer.

08:57:48 24         MR. LAMBERT:  Yes, Your Honor, just two housekeeping

08:57:51 25    things.  First, with respect to Dr. Glaspy's cross-examination,

08:57:56 1    plaintiffs would move into evidence two photographs, P2884 and

08:58:04 2    P2849.

08:58:08 3              MR. STRONGMAN:  There's no objection, Your Honor.

08:58:09 4              THE COURT:  Let it be admitted.

08:58:10 5              MR. LAMBERT:  Thank you.  And just for the record,

08:58:13 6    Ms. Brilleaux and I have sent by e-mail the objections and

08:58:19 7    responses that were discussed in the charge conference -- in the

08:58:23 8    chambers conferences each morning before testimony, we sent those

08:58:27 9    to Erin to add to the record.

08:58:30 10             THE COURT:  Okay.  Let it be admitted.

08:58:32 11             MR. LAMBERT:  And then, finally, plaintiffs would proffer

08:58:37 12   the portions of the de bene esse deposition of Dr. Zoe Larned that

08:58:48 13   were excluded by the Court on the designations.

08:58:48 14             THE COURT:  Okay.

08:58:54 15             MR. LAMBERT:  Plaintiffs believe that the excluded

08:58:57 16   portions of the testimony relate directly to the suggestions and

08:59:04 17   implications of causation of other drugs and Ms. Kahn's permanent

08:59:13 18   hair loss.  Thank you, Your Honor.

08:59:15 19             THE COURT:  Okay.

08:59:16 20             MR. LAMBERT:  And I don't see Larry up here -- oh,

08:59:22 21   Mr. Centola will be handling our objections to the charges and

08:59:29 22   verdict form.

08:59:29 23             THE COURT:  Okay.  Mr. Centola.

09:00:04 24             MR. CENTOLA:  Thank you, Your Honor.  I apologize for the

09:00:07 25   delay.

09:00:10  1         Just to memorialize some of the things that were on

09:00:13  2  the -- that were discussed in chambers and some of our objections.

09:00:17  3  Plaintiff's object to the learned intermediary section of the jury

09:00:22  4  charge, which was on page 9 or page 10 of the last draft.

09:00:26  5  Plaintiffs request the inclusion of the charge from the Fifth

09:00:33  6  Circuit case that cited the Louisiana case of *Calhoun v. Hoffman La*

09:00:39  7  *Roche* and request the insertion of the language "The decision to

09:00:40  8  use a drug in a particular circumstance rests with both the doctor

09:00:44  9  and the patient."  So we object to the fact that that language is

09:00:48 10  not in the charge.

09:00:50 11         And regarding medical causation, on page 10 of the last

09:00:55 12  draft of the jury charge, originally, they had language from

09:01:00 13  *Burnham v. Fairglass*, which was included in the draft and that was

09:01:04 14  taken out.  And that language is, quote, "If the plaintiff probably

09:01:07 15  would have suffered those injuries regardless of Taxotere, then the

09:01:11 16  injuries were not caused by Taxotere.  If, on the other hand, the

09:01:15 17  plaintiff probably would not have suffered the claimed injuries in

09:01:18 18  the absence of Taxotere, then you must conclude that Taxotere did

09:01:21 19  play a part in plaintiff's injuries."  We request that that

09:01:24 20  language be inserted in the charge in the medical causation and we

09:01:29 21  object to that language being left out.

09:01:31 22         Regarding contra non valentem.  Plaintiffs previously

09:01:36 23  proposed specific language from *Sharkey v. Sterling Drug*, which is

09:01:40 24  a Louisiana First Circuit case, and plaintiffs would request that

09:01:45 25  that language that was submitted be the charge on contra non

09:01:53  1    valentem and object to the contra non valentem charge as currently

09:01:54  2    drafted.

09:01:55  3         On the Louisiana products liability charge, we object to

09:02:00  4    the inclusion of damages on page 7 and believe that that elevates

09:02:04  5    damages to a section in the charge where damages aren't being

09:02:07  6    discussed at that point.

09:02:09  7         And on the verdict form on question two, we object to the

09:02:15  8    phrase at the end of question two, "caused Ms. Kahn's injuries" as

09:02:20  9    language that would say, Do you find a preponderance of the

09:02:24 10    evidence that the defendant's failure to warn plaintiff's

09:02:27 11    prescribing physician would have changed his prescribing or changed

09:02:31 12    the prescribing practices?  We object to the phrase "caused

09:02:34 13    Ms. Kahn's injuries" and suggest change "prescribing practices or

09:02:38 14    decisions" in lieu of cause.  Thank you, Your Honor.

09:02:44 15         THE COURT:  Thank you.

09:02:45 16         Ms. Eisenstein -- Mr. Moore.

09:02:57 17         MR. MOORE:  Good morning, Your Honor.  Douglas Moore on

09:02:59 18    behalf of Sanofi.  I wanted to put on the record an objection as it

09:03:02 19    relates to the verdict form and then Ms. Eisenstein will address

09:03:04 20    the charges briefly.

09:03:06 21         Our objection to the verdict form is the ordering of the

09:03:10 22    jury interrogatories.  As we discussed in chambers, we believe that

09:03:15 23    the threshold question as memorialized in Section 2800.52 of the

09:03:23 24    Louisiana Products Liability Act which states:  "This chapter

09:03:27 25    establishes the exclusive theories of liability for manufacturers

09:03:30  1    for damage caused by their products."  We believe that the

09:03:34  2    threshold question and the threshold issue for the plaintiffs to

09:03:38  3    prove is that the plaintiff has, in fact, suffered damage caused by

09:03:42  4    this product, and we think that the first interrogatory should be

09:03:47  5    medical causation, and we wanted to memorialize our objection to

09:03:51  6    the ordering of the interrogatories in the verdict form.

09:03:53  7              THE COURT:  Thank you.  Ms. Eisenstein.

09:03:58  8              MS. EISENSTEIN:  Good morning, Your Honor.  Your Honor,

09:04:01  9    we have an objection to the final sentence of the charge on statute

09:04:06  10   of limitations.  The inclusion of the sentence, "The ultimate issue

09:04:11  11   is the reasonableness of the plaintiff's action or inaction in

09:04:14  12   light of her education, intelligence, and severity of the

09:04:18  13   symptoms."  We believe that under the *Thibodeaux* and *Durden*

09:04:22  14   decisions that the ultimate issue is whether the plaintiff

09:04:27  15   exercised reasonable diligence and that they rejected the

09:04:33  16   education, intelligence, and severity of the symptoms excuse that

09:04:36  17   requirement.

09:04:36  18             We also objected to the failure of the charge to include

09:04:40  19   language that the defendants had proposed in its proposed charge,

09:04:45  20   particularly if that sentence were to be included, which is that

09:04:49  21   plaintiff does not need to have all of the facts or evidence to

09:04:52  22   prove her claim to trigger her responsibility to inquire into a

09:04:57  23   possible claim.  For example, there's no requirement that an

09:04:59  24   attorney or physician inform plaintiff of a possible claim before

09:05:03  25   filing a lawsuit.

09:05:05 1          Thank you, Your Honor.

09:05:06 2          THE COURT:  Thank you.  All right.  Is there any other

09:05:12 3   preliminary matters that we can address prior to beginning court?

09:05:21 4          MR. LAMBERT:  Not yet, Your Honor.  We are filing, as we

09:05:25 5   discussed this morning, a renewed motion in limine regarding

09:05:30 6   suggestions during closing of causation between drugs other than

09:05:36 7   Taxotere and PCIA or permanent hair loss.  That should be filed

09:05:43 8   momentarily and then we can take up the argument on that.

09:05:48 9          THE COURT:  Do we have an e-mail copy of it?

09:05:51 10         MR. LAMBERT:  I am not sure what's taking so long, Judge,

09:05:55 11  but there is a final version.  I know they're downstairs filing it

09:06:00 12  right now.

09:06:01 13         THE COURT:  Okay.  Ms. Sastre.

09:06:02 14         MS. SASTRE:  Your Honor, yeah, we have a few moments so

09:06:04 15  what the heck.  Let's kill a little time.  Of course, we can all

09:06:08 16  wait for this to be filed.  I think I can completely shortcut this

09:06:12 17  issue and resolve it for the Court.

09:06:14 18         So the question is, what have all of the experts said

09:06:16 19  with regard to these other drugs, these other chemotherapy drugs?

09:06:21 20  It was obviously something we discussed with Your Honor going into

09:06:24 21  trial.  We understood what your ruling was, we abided by that

09:06:28 22  ruling, and we talked about all of it in terms of there are

09:06:31 23  reports.  However, and I will show you the testimony, it's just a

09:06:35 24  couple of questions and answers, Your Honor.  Dr. Tosti is

09:06:39 25  different because the exchange with Dr. Tosti, she did use the

09:06:44 1    words, "cause with regard to Taxol, Adriamycin, and Cytoxan."  And

09:06:48 2    I would be happy to read that to you, Your Honor, on page 710 from

09:06:52 3    the transcript, line 23, quote, from Dr. Tosti, "I am not hiding

09:06:58 4    that Adriamycin and Cytoxan can cause, I'm telling the truth.  So

09:07:03 5    they can cause.  And if you put Adriamycin and Cytoxan in a box,

09:07:08 6    it's exactly the same as you do with Taxotere."  And then she goes

09:07:15 7    on.

09:07:16 8         And the question was, in fact, I probably should have

09:07:18 9    read that first, "It's not just that there are reports of patients

09:07:22 10   taking Adriamycin and having PCIA, you've personally authored a

09:07:27 11   paper, which we haven't spent much time on, where you have reported

09:07:30 12   that work in that paper?"  And in response to that, I didn't even

09:07:34 13   use the word "cause."  She said, "Yes, I am not hiding that they

09:07:37 14   can cause."  And, again, the question was specifically with regard

09:07:40 15   to PCIA, not hair loss.

09:07:43 16        On Taxol, Your Honor, Dr. Tosti was asked on page 716,

09:07:48 17   line 15:  "You'd agree with me Taxol causes hair loss, true?"  Her

09:07:55 18   answer:  "Taxol can cause both temporary hair loss, which is

09:07:58 19   common, and permanent chemotherapy alopecia."

09:08:02 20        So I think that there should be no question in the

09:08:07 21   Court's mind that that is, in fact, what the evidence would support

09:08:11 22   at this time and that is a statement which would be accurate in

09:08:14 23   terms of Dr. Tosti, which is exactly how we intend to talk about it

09:08:18 24   with the jury.

09:08:19 25             THE COURT:  May I see?

09:08:20  1          MS. SASTRE:  Yes, of course.  It's the two tabs.

09:09:34  2      (COURT REVIEWS TRANSCRIPT.)

09:09:47  3          MS. SASTRE:  The only thing -- I'm sorry, Palmer -- I was

09:09:51  4  just going to add, just very briefly, Your Honor.  I mean, we are

09:09:52  5  in closing argument, you know, listen, lawyers get up there and

09:09:54  6  they make arguments and, you know, as judges always say, it's going

09:10:00  7  to be to whatever that jury's recollection is, and here, I think,

09:10:03  8  we are on really the firmest of firm ground on Dr. Tosti that's

09:10:08  9  all.

09:10:08 10          THE COURT:  I understand, Ms. Sastre.  What I was

09:10:10 11  concerned about, I did not want you to start arguing and for me to

09:10:14 12  have an objection.  And that's what I do not want to occur.

09:10:18 13          MS. SASTRE:  Me, too.  Okay.

09:10:19 14          THE COURT:  So if there is an issue, I want to flush it

09:10:22 15  out prior because I just don't want that to happen.

09:10:27 16          MS. SASTRE:  Yes.  And I will tell, Your Honor, and I

09:10:28 17  appreciate that in advance, we will describe Dr. Tosti's testimony

09:10:33 18  just as she testified to here.  And to the extent that we refer to

09:10:37 19  kind of, you know, all of the experts generically, then we'll go

09:10:40 20  back to what is accurate that they've conceded in their reports.

09:10:43 21          So thank you, Your Honor.

09:10:58 22          MR. LAMBERT:  Your Honor, in response to what Ms. Sastre

09:11:18 23  just said, we have worked in this case for a long time on causation

09:11:23 24  issues.  And the plaintiffs filed a motion for summary judgment,

09:11:31 25  that's Document 10928, regarding affirmative defenses concerning

09:11:36   1  alternative causes.  In denying that motion, Your Honor

09:11:43   2  specifically stated that there needed to be a reliable foundation

09:11:48   3  for arguing that a particular drug can cause or causes a particular

09:11:54   4  injury.  Plaintiffs then filed a motion in limine, that's

09:11:58   5  Document 12909, to prohibit the use of unreliable evidence to

09:12:04   6  support claims of alternative causation or questioning which

09:12:10   7  misconstrues the applicable burden of proof.

09:12:15   8         Well, in denying that, Your Honor stated defendant must

09:12:20   9  have a good faith basis to introduce such evidence.  Additionally,

09:12:27  10  this has been previously addressed in the Court's *Daubert* rulings,

09:12:33  11  that's Document 13260, order and reasons of September 13, 2021.

09:12:38  12         Following that, Your Honor, we had a charge conference

09:12:44  13  yesterday evening that lasted some time into the night, and

09:12:50  14  defendants requested changes to the causation section of the

09:12:54  15  instructions, included specific requirements for proof to a

09:13:00  16  reasonable degree of medical probability that Taxotere can cause

09:13:05  17  permanent hair loss.  Now, I understand from Ms. Sastre's quotes to

09:13:13  18  the trial record that there are statements of our specific

09:13:18  19  causation expert, Dr. Tosti, and there are statements and

09:13:25  20  admissions of case reports and attribution by authors between

09:13:36  21  particular drugs and the potential outcome of persistent alopecia,

09:13:42  22  permanent alopecia, or PCIA.

09:13:45  23         But the fact of the matter is, is that if somebody is

09:13:48  24  going to come up here and argue to the jury that particular

09:13:53  25  evidence meets the causation standard of "can cause" or "causes"

09:14:01  1   between a particular drug and an injury, they need to meet the

09:14:04  2   standard that's going to be in the instructions.  And if not, it's

09:14:08  3   going to cause serious confusion of the issues with the jury.

09:14:13  4        And without a reliable basis to say those words "can

09:14:19  5   cause" under the *Burst* case in this district, we believe that the

09:14:24  6   defendants should be precluded from saying those words "cause" or

09:14:29  7   "can cause" between any other drug other than Taxotere and

09:14:36  8   permanent hair loss or PCIA.

09:14:39  9        The plaintiffs also are filing a motion, I'm sorry, Your

09:14:42 10   Honor, that it's not in the record yet, but that will memorialize

09:14:47 11   more fully our arguments in this regard.  Thank you.

09:14:57 12        THE COURT:  I remember spending a great deal of time on

09:15:00 13   this in pretrial motion practice, and what I indicated at that time

09:15:04 14   is plaintiffs have the burden of proof and it's absolutely -- that

09:15:09 15   the defendants don't have the burden of proof in this matter.  I am

09:15:12 16   going to deny plaintiff's motion.  I think what needs to occur at

09:15:19 17   this time is the attorneys need to argue the facts that have been

09:15:22 18   presented to the jury if Dr. Tosti does say in her testimony that

09:15:32 19   it "can cause."  Now, she talks about it being very rare, she talks

09:15:37 20   about whether or not it can cause Grade 2 alopecia, those things.

09:15:41 21   And I think that's perfectly appropriate to be argued to the jury,

09:15:46 22   and the jury will have to make that determination as to whether or

09:15:50 23   not there was an adequate analysis of causation and that's

09:15:54 24   something that can be argued to the jury.

09:15:56 25        But I am not going to preclude defense counsel from

09:16:02  1  arguing what witnesses, plaintiff's witnesses have conceded.  Okay.

09:16:10  2          MS. SASTRE:  Thank you, Your Honor.

09:16:12  3          THE COURT:  And, you know, your motion will be filed in

09:16:13  4  the record for a later time.

09:16:19  5          Okay.  And we will be at recess until we have an accident

09:16:21  6  report.

09:16:23  7          THE DEPUTY CLERK:  All rise.

09:16:24  8      (WHEREUPON, A RECESS WAS TAKEN.)

09:16:24  9      (WHEREUPON, THE FOLLOWING PROFFER WAS MADE OUTSIDE OF THE

09:16:24 10      PRESENCE OF THE COURT.)

09:19:58 11          MS. BYARD:  Adrienne Byard, we are making our proffer of

09:20:02 12  evidence based on testimony and exhibits excluded under the Court's

09:20:05 13  ruling on the Motion in Limine No. 13, which is record Document

09:20:09 14  13260.

09:20:10 15          This evidence pertains to FDA and is probative of

09:20:14 16  Sanofi's efforts to take reasonable care to provide an adequate

09:20:18 17  warning.  The evidence would have shown that with FDA's approval of

09:20:23 18  Taxotere for advanced metastatic breast cancer in 1996, Sanofi

09:20:28 19  submitted data to the Oncology Drugs Advisory Committee on alopecia

09:20:33 20  twice before approval.  And that in considering the safety profile

09:20:37 21  of Taxotere, the ODAC never once raised concerns about the issue of

09:20:43 22  alopecia.  That would have also included the FDA's approval of the

09:20:49 23  medicine's labeling to include that hair generally grows back.

09:20:53 24  Those were Defense Exhibits 215 and 111.

09:20:59 25          Further, the evidence excluded would have shown that in

OFFICIAL TRANSCRIPT

09:21:02  1    March 2004, Sanofi submitted a supplemental NDA for the adjuvant

09:21:09  2    approval of Taxotere in node-positive breast cancer and that

09:21:12  3    included within its submission were the TAX316 clinic trial

09:21:17  4    results.  In particular, the evidence would have shown that Sanofi

09:21:21  5    proposed to include under other persistent reactions that 3.2

09:21:27  6    percent of TAC patients showed alopecia ongoing into the follow-up

09:21:31  7    period.

09:21:33  8         The evidence further would have showed that Sanofi

09:21:36  9    proposed to add to the adverse reaction section of the label

09:21:40 10    information about persistent alopecia.  The evidence would have

09:21:44 11    showed that Sanofi resubmitted this exact proposal to FDA in June

09:21:48 12    of 2004 and twice in August of 2004.  And that after an extensive

09:21:53 13    series of communications between FDA and Sanofi, FDA deleted

09:21:58 14    Sanofi's proposed inclusion of the TAX316 language and the

09:22:05 15    identification of alopecia as another persistent reaction.  The

09:22:07 16    exhibits would have demonstrated these facts were Defense 75,

09:22:14 17    Defense 241, 400C, 333, 209, 76, Defense 317, Defense 287, Defense

09:22:31 18    400 Part D, 102, 272, 317, 400 Part E.

09:22:46 19         Sanofi makes a second proffer of evidence based on

09:22:51 20    exhibits it was not permitted to use in the examination of

09:22:56 21    Dr. Laura Plunkett.  The Court will recall from Sanofi's prior

09:23:00 22    letter briefing on the issue that Dr. Plunkett offered different

09:23:05 23    bases for her opinion on the sufficiency of Sanofi's labeling at

09:23:10 24    trial than she had in her expert report.  Had Sanofi been permitted

09:23:15 25    to cross-examine Dr. Plunkett about the original bases of her

09:23:22  1   opinions, they would have offered Defense 2567, 2568, Defense 2569,

09:23:36  2   2570, 2571, 2577, 2578, Defense 2579, 80, 81, 82, 83; Defense 233,

09:23:50  3   and Defense 393 Part C.  All of which would have undermine the

09:23:56  4   credibility of Dr. Plunkett's ultimate conclusions on the

09:23:58  5   sufficiency of Sanofi's label.

09:24:02  6        Sanofi's third proffer relates to the deposition

09:24:05  7   testimony of Dr. Kopreski.  Sanofi's position is that

09:24:11  8   Dr. Kopreski's videotaped deposition testimony should have been

09:24:15  9   permissible for all purposes because he was an unavailable witness.

09:24:21 10   Had Sanofi been permitted to call Dr. Kopreski by videotaped

09:24:27 11   deposition at trial, separate and apart from the obligation of

09:24:31 12   calling him by livestream, which is Sanofi's position is an undue

09:24:37 13   burden on Dr. Kopreski as well as outside of the jurisdictional

09:24:42 14   limits of the court and the rules of 43 and 45.  Sanofi would have

09:24:45 15   offered the following exhibits through Dr. Kopreski.

09:24:48 16        First, from his October 11th, 2018 deposition, defendants

09:25:00 17   would have offered Exhibit 55, 56, 57, 60, 61, 62, and 64.

09:25:09 18        Further, from Dr. Kopreski's December 12th, 2018

09:25:13 19   deposition, Sanofi would have offered Exhibits 13, 14, 15, 16, 17,

09:25:19 20   19, 20, and 21, 22 through 34, and 35.

09:25:31 21        Sanofi's fourth proffer of evidence pertains to the

09:25:35 22   cross-examination of Dr. Madigan.  On counsel's objections to the

09:25:42 23   cross-examination of Dr. Madigan, Sanofi was precluding (VERBATIM)

09:25:46 24   from offering the following exhibits, which it offers would have

09:25:53 25   shown that there was no reliable basis for Dr. Madigan's opinion

09:25:56  1   that there was a safety signal of instances of permanent alopecia.

09:26:02  2   The exhibits that Sanofi would have offered were 2567 through 2571,

09:26:12  3   2577 through 2583.

09:26:24  4        Two final points.  On the testimony of Ruth Avila, Sanofi

09:26:29  5   renews its objection that it was unable to depose Ruth Avila on the

09:26:36  6   supposed case-specific interactions 14 years ago consisting of

09:26:39  7   three visits amounting to 20 minutes a piece.  Sanofi suggests that

09:26:45  8   had it been able to offer deposition testimony, a cross-examination

09:26:49  9   of Ruth Avila based on that testimony, the evidence would have

09:26:50 10   demonstrated that Ms. Avila had no case-specific recollections of

09:26:55 11   interactions with Dr. Kardinal with any relevancy to this case.

09:26:59 12        And finally, Sanofi proffers evidence related to the

09:27:08 13   examination by Dr. Antonella Tosti of plaintiff Elizabeth Kahn,

09:27:13 14   and, in particular, the fact that Ms. Kahn was examined following a

09:27:17 15   flight on a private jet by -- chartered by plaintiffs' counsel.

09:27:22 16   That testimony was excluded and Sanofi's position is simply that

09:27:26 17   that would have gone to the bias and credibility of the witness's

09:27:29 18   testimony, as well as the plaintiff's tolerance for exposure to

09:27:35 19   risks.

09:27:37 20        That's it.  Thank you so much.

09:59:33 21   (WHEREUPON, THE PROFFER WAS CONCLUDED AND A RECESS WAS TAKEN.)

09:59:33 22   (OPEN COURT.)

09:59:34 23        THE COURT:  Bring in the jury, please.

09:59:34 24   (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

09:59:53 25        THE COURT:  All jurors are present.  Court's back in

09:59:55  1    session.   You may be seated.

09:59:59  2            Mr. Moore, please call your next witness.

10:00:01  3            MR. MOORE:   Thank you, Your Honor.

10:00:03  4            Sanofi calls one of plaintiff's treating physicians,

10:00:07  5    oncologist Dr. Zoe Larned by video.

10:00:10  6            THE COURT:   Okay.   Members of the jury, you are -- you've

10:00:13  7    heard several videos during the course of -- video depositions

10:00:16  8    during the course of this trial.   I remind you, you should consider

10:00:20  9    this testimony as you would any other, and understanding that at

10:00:25 10    periods, it will appear choppy simply because certain edits had to

10:00:29 11    be made.   Please begin.

10:01:20 12            MS. SASTRE:   Looks like it just froze for a moment, Your

10:01:23 13    Honor.   Some of the other bumps we had, but we're going to get it

10:01:27 14    going.

10:02:23 15            THE COURT:   Thank you.

10:02:23 16            MR. MOORE:   Looks like we have to reboot, Judge.   Sorry.

10:02:26 17    Par for the course.

10:02:28 18            THE COURT:   That's fine.   Yeah, just par for the course.

10:00:32 19        (WHEREUPON, THE VIDEO DEPOSITION OF DR. ZOE LARNED WAS PLAYED

10:00:36 20        AS FOLLOWS:)

10:00:36 21                            DIRECT EXAMINATION

10:00:36 22    BY MR. MOORE:

10:03:53 23    Q.  Good afternoon, Dr. Larned.   My name is Douglas Moore.   I am a

10:03:53 24    lawyer from here in New Orleans, and I am going to ask you some

10:03:55 25    questions today.   Why don't we start by having you just introduce

10:03:59  1   yourself to the jury by stating your full name?

10:04:02  2   A.  Sure.  I'm Zoe Larned.

10:04:04  3   Q.  And are you a medical doctor?

10:04:06  4   A.  Yes.

10:04:06  5   Q.  And what type of medical doctor are you?

10:04:09  6   A.  Medical oncologist.

10:04:10  7   Q.  And what is a medical oncologist?

10:04:12  8   A.  We practice cancer management, treatment, and survivorship.

10:04:17  9   Q.  And where is your medical practice?

10:04:20 10   A.  The majority of my practice is at the Ochsner Main Campus.

10:04:23 11   Q.  And how long have you been working at Ochsner?

10:04:26 12   A.  Seventeen years.

10:04:28 13   Q.  And do you understand that the reason you're here today is to

10:04:32 14   give trial testimony related to the care and treatment that you

10:04:35 15   provided to one of your breast cancer patients named

10:04:38 16   Elizabeth Kahn?

10:04:38 17   A.  Yes.

10:04:40 18   Q.  Okay.  And the reason we're doing that here in this office as

10:04:43 19   opposed to the courtroom is because you're going to be out of town?

10:04:46 20   A.  Yes.

10:04:46 21   Q.  Why don't we take a look, Dr. Larned, at the first tab in the

10:04:52 22   binder, if we could.  And for identification, what I am showing you

10:04:57 23   is a medical record that's been marked Defense Exhibit 3879, page

10:05:04 24   970.  And can you tell me what this document is.

10:05:10 25   A.  This is a clinic encounter.

10:05:12  1    Q.  And what is the date on the clinic encounter?

10:05:14  2    A.  June 19, 2008.

10:05:18  3    Q.  And does this appear, from looking at it, to be the first date

10:05:21  4    that you began your care and treatment of Elizabeth Kahn?

10:05:25  5    A.  Yes.

10:05:26  6    Q.  And take a look at Tab 2, if we could, please.  And could you

10:05:34  7    describe what this document is.

10:05:35  8    A.  This is also a clinic encounter note.

10:05:38  9    Q.  And from review of this clinic note, does it appear to be your

10:05:42  10   final visit with Ms. Kahn?

10:05:43  11   A.  Yes.

10:05:45  12   Q.  And what is the date of this visit?

10:05:48  13   A.  July 17th, 2018.

10:05:50  14   Q.  So based on Tabs 1 and Tab 2, would you agree that Ms. Kahn was

10:05:59  15   under your care and treatment from June 19th, 2008, until July 17,

10:05:59  16   2018?

10:06:11  17   A.  Yes.

10:06:12  18   Q.  And that would be roughly ten years and one month?

10:06:14  19   A.  Yes.

10:06:14  20   Q.  And what disease did you treat her for?

10:06:19  21   A.  Breast cancer.

10:06:20  22   Q.  Having looked at the documents, the photographs that were in

10:06:26  23   Tab 3, 4, and 5 of the binder, whether you recognize that person as

10:06:32  24   your patient, Elizabeth Kahn?

10:06:33  25   A.  Yes, I recognize her.

10:06:35  1    Q.  And before I showed you those photographs, did you have an

10:06:39  2    independent recollection of Ms. Kahn?

10:06:41  3    A.  Absolutely.

10:06:41  4    Q.  Okay.

10:06:41  5    A.  I remember her well.

10:06:42  6    Q.  And when you first started treating Ms. Kahn in 2008, were you

10:06:50  7    relying on your education, training, and experience up to that

10:06:54  8    point in time?

10:06:55  9    A.  Yes.

10:06:55 10    Q.  Okay.  And what I'd like to do is just ask you, you know, some

10:06:59 11    basic information about your educational and professional

10:07:04 12    background.  Where did you attend college?

10:07:06 13    A.  Wellesley.

10:07:07 14    Q.  And upon graduating from Wellesley, did you attend medical

10:07:13 15    school?

10:07:13 16    A.  Yes.

10:07:13 17    Q.  Where at?

10:07:14 18    A.  Emory University.

10:07:16 19    Q.  After graduating from medical school at Emory, did you

10:07:19 20    undertake a residency?

10:07:21 21    A.  Yes.

10:07:21 22    Q.  Where at?

10:07:23 23    A.  Internal medicine at Emory University.

10:07:26 24    Q.  And then did you do a fellowship following your residency?

10:07:30 25    A.  Yes.

1938

10:07:30  1   Q.  And where did you undertake that fellowship?

10:07:33  2   A.  Duke University.

10:07:34  3   Q.  And did you have any subspecialty while you were a fellow?

10:07:38  4   A.  I did specialize in breast as a fellow.

10:07:41  5   Q.  Okay.  And when you say "breast," do you mean breast cancer?

10:07:44  6   A.  Yes.

10:07:44  7   Q.  Okay.  And have you been treating breast cancer patients ever

10:07:48  8   since 2001?

10:07:50  9   A.  Yes.

10:07:50 10   Q.  Okay.  And then once you completed your fellowship, where did

10:07:53 11   you go?

10:07:54 12   A.  Ochsner.

10:07:54 13   Q.  And how long -- and is that the only medical facility that

10:07:58 14   you've worked at?

10:07:59 15   A.  Yes.

10:07:59 16   Q.  And do you hold a medical -- Louisiana medical license?

10:08:03 17   A.  Yes.

10:08:03 18   Q.  Are you board certified?

10:08:05 19   A.  Yes.

10:08:05 20   Q.  In what area?

10:08:06 21   A.  Internal medicine and medical oncology.

10:08:09 22   Q.  Okay.  And do you have an area that you consider to be your

10:08:13 23   specialty in oncology?

10:08:14 24   A.  Breast oncology and genitourinary oncology.

10:08:19 25   Q.  And when did you start gaining experience treating patients

10:08:23  1   with chemotherapy for breast cancer?

10:08:24  2   A.  In the beginning of fellowship, I started gaining experience.

10:08:30  3   Q.  Okay.  And did you prescribe chemotherapy for the treatment of

10:08:35  4   breast cancer patients when you arrived at Ochsner?

10:08:38  5   A.  Yes.

10:08:38  6   Q.  Okay.  And did the chemotherapy regimens that you prescribed

10:08:44  7   during this time period beginning in 2001 up until you met Ms. Kahn

10:08:48  8   in 2008, did those include the medicine Taxotere?

10:08:52  9   A.  Yes.

10:08:53 10   Q.  Okay.  Did those regimens also include the medicine Adriamycin?

10:08:58 11   A.  Yes.

10:08:58 12   Q.  And what about the medicine Cytoxan?

10:09:02 13   A.  Yes.

10:09:03 14   Q.  Okay.  And is Cytoxan also called cyclophosphamide?

10:09:06 15   A.  Yes.

10:09:07 16   Q.  The medicine Taxotere, is that considered in the class of

10:09:10 17   medicines called taxanes?

10:09:12 18   A.  Yes.

10:09:13 19   Q.  Okay.  And are there other medicines in that category?

10:09:16 20   A.  Yes.

10:09:17 21   Q.  Okay.  And what are the names of those medicines?

10:09:20 22   A.  We have paclitaxel, docetaxel, Abraxane.

10:09:26 23   Q.  Did you have experience treating patients for endocrine therapy

10:09:31 24   with a medicine named tamoxifen?

10:09:33 25   A.  Yes.

1940

10:09:34   1   Q.  Let's talk about your first visit with Ms. Kahn.  And we can

10:09:41   2   turn back to Tab 1 in the binder in the exhibit book.  And that

10:09:53   3   first sentence reads:  "This is a patient of Dr. Carl Kardinal who

10:09:58   4   is being treated with neoadjuvant chemotherapy."

10:10:02   5          My first question is, who is Dr. Carl Kardinal?

10:10:05   6   A.  He was one of my partners at that time.

10:10:08   7   Q.  And why were you taking over Ms. Kahn's treatment in June of

10:10:13   8   2008?

10:10:14   9   A.  I do not recall.  It could have been one of two things, one

10:10:23  10   being that that may have been when he left Ochsner and moved.  Two,

10:10:28  11   I was his partner and covered him quite a bit if he was out or on

10:10:33  12   vacation.

10:10:34  13   Q.  When Dr. Kardinal transitioned to a new practice in Missouri,

10:10:39  14   did you take over the care and treatment of some of his patients?

10:10:42  15   A.  Yes.

10:10:42  16   Q.  And is Ms. Elizabeth Kahn one of those patients?

10:10:47  17   A.  Yes.

10:10:48  18   Q.  And when a patient is transitioning breast cancer treatment to

10:10:52  19   you from another oncologist, like in Ms. Kahn's case, can you

10:10:56  20   explain how you would approach that patient for the first time?

10:10:58  21   A.  Yes.  I would review her records prior to assuming care.  Then

10:11:09  22   when I would meet her for my initial visit, I would review those

10:11:13  23   records for accuracy with her, and then proceed management as I do.

10:11:21  24   Q.  And when you say, "as I do," what do you mean?

10:11:23  25   A.  I would use my clinical knowledge and skills to start managing

10:11:28  1    her care.

10:11:29  2    Q.  And it indicates in this first sentence that she's undergoing

10:11:33  3    something called "neoadjuvant chemotherapy."

10:11:36  4    A.  Yes, that means chemotherapy before surgery.

10:11:39  5    Q.  And in what sort of circumstances is neoadjuvant chemotherapy

10:11:46  6    indicated?

10:11:46  7    A.  There's several circumstances where it's indicated, based on

10:11:51  8    tumor size, based on the tumor markers that they may express, based

10:11:58  9    on if they have positive lymph nodes at the time of presentation.

10:12:03  10   Any of those factors could lead to the decision to do preoperative

10:12:07  11   chemotherapy.

10:12:07  12   Q.  Take a look at Tab 7 if we could real quick.  And for

10:12:15  13   identification, this is Defendant's 3879, pages 950, 953, and 954.

10:12:25  14   I wanted to ask you about the second page, Dr. Larned, which has

10:12:29  15   the 953 at the bottom right.  And can you tell me what this record

10:12:35  16   is?

10:12:37  17   A.  This is Dr. Kardinal's note as he was getting ready to make a

10:12:42  18   treatment decision for this patient.

10:12:44  19   Q.  Was part of your process when taking over a new patient in a

10:12:50  20   situation like Ms. Kahn's, was part of the process to confirm that

10:12:56  21   the chemotherapy and treatment plan was appropriate?

10:12:59  22   A.  Yes.

10:13:00  23   Q.  Okay.  And was it your medical judgment at the first time that

10:13:07  24   you met Ms. Kahn that neoadjuvant chemotherapy was appropriate for

10:13:09  25   her?

10:13:10  1   A.  Yes.

10:13:11  2   Q.  Okay.  Okay.  Let's go back to Tab 1.  I wanted to ask you a

10:13:17  3   couple of other questions about that medical record.  What's noted

10:13:23  4   there in the second photograph?  Can you describe what information

10:13:26  5   you're recording there.

10:13:27  6   A.  History of the patient.

10:13:31  7   Q.  Okay.  And the history of the patient, where would you gather

10:13:34  8   that information?

10:13:35  9   A.  From the medical chart.

10:13:36 10   Q.  Would you have reviewed her medical chart prior to your first

10:13:40 11   visit with her?

10:13:41 12   A.  Yes.

10:13:41 13   Q.  And the third paragraph, it reads:  "The patient opted to

10:13:48 14   participate in NSABP B-40 and was randomized to receive Taxotere,

10:13:52 15   Xeloda, and bevacizumab."  Do you see that?

10:13:55 16   A.  Yes.

10:13:55 17   Q.  Okay.  What is NA- -- I'm sorry, NSABP B-40?

10:14:02 18   A.  That's a clinical trial.

10:14:04 19   Q.  Is this clinical trial sponsored by a pharmaceutical company?

10:14:08 20   A.  No.

10:14:09 21   Q.  Okay.  And when I asked you about the notation in the paragraph

10:14:18 22   where the patient was randomized to receive Taxotere, Xeloda, and

10:14:23 23   bevacizumab, what is -- is there a brand name for bevacizumab?

10:14:29 24   A.  Avastin.

10:14:30 25   Q.  And what does it mean to be "randomized"?

10:14:33 1   A.  So it depends on the number of arms of clinical trial, but you

10:14:39 2   are randomly assigned to an arm on the trial.

10:14:43 3   Q.  And when a patient is randomized, do they know ahead of time

10:14:47 4   what medicines they're going to receive?

10:14:50 5   A.  No.

10:14:50 6   Q.  And were you familiar with the NSABP B-40 clinical trial at

10:14:55 7   this time?

10:14:55 8   A.  Yes.

10:14:55 9   Q.  Let's flip to Tab 8, if we could.  And for identification, this

10:15:00 10   is Defendant's Exhibit 2166.  And can you describe what this

10:15:08 11   document is, Dr. Larned?

10:15:11 12   A.  That's an informed consent.

10:15:15 13   Q.  Do you see on the first page where your name is listed?

10:15:18 14   A.  Yes.

10:15:19 15   Q.  Okay.  In what section is your name listed?

10:15:23 16   A.  Sub-investigator.

10:15:24 17   Q.  Okay.  And does being a sub-investigator require you to be

10:15:28 18   knowledgeable about the risks and benefits of the study

10:15:31 19   medications?

10:15:32 20   A.  Yes.

10:15:33 21   Q.  Okay.  And were you familiar with the risks and benefits of the

10:15:36 22   study medications in the NSABP B-40 study?

10:15:39 23   A.  Yes.

10:15:39 24   Q.  And going back to Tab 1, the regimen that is described in the

10:15:54 25   paragraph that we were discussing, paragraph 3, Taxotere, Xeloda,

10:15:59  1   and bevacizumab, which is Avastin, was that to be Ms. Kahn's first

10:16:07  2   phase of chemotherapy under the trial?

10:16:10  3   A.  Yes --

10:16:11  4   Q.  Okay.

10:16:13  5   A.  -- it could be.

10:16:13  6   Q.  So why don't we take a look at Tab 9.  And for identification,

10:16:23  7   this is 3879.1037.  And if you look on the second page, which is

10:16:33  8   1038, at the very bottom, it says:  "Assessment and plan."  Do you

10:16:37  9   see that?

10:16:38 10   A.  Yes.

10:16:38 11   Q.  What does it say there?

10:16:40 12   A.  Adriamycin, cyclophosphamide, and bevacizumab.

10:16:46 13   Q.  Just prior to that, does it say proceed with Cycle 2?

10:16:50 14   A.  Yes.

10:16:53 15   Q.  And is Adriamycin, cyclophosphamide, and bevacizumab, are those

10:16:57 16   medicines that you were familiar with at the time that the plan was

10:17:02 17   to proceed with Cycle 2?

10:17:04 18   A.  Yes.

10:17:04 19   Q.  And, again, bevacizumab is Avastin?

10:17:07 20   A.  Yes.

10:17:08 21   Q.  Do we know how many courses of the second phase of chemotherapy

10:17:14 22   Ms. Kahn was supposed to receive?

10:17:16 23   A.  I would have to look to review it.  It's usually four cycles of

10:17:22 24   Adriamycin and Cytoxan, so I'm assuming it was the same here.

10:17:26 25   Q.  Okay.  And was -- and Adriamycin, does that medicine have a

1945

10:17:31 1    nickname?

10:17:32 2    A.  The Red Devil.

10:17:33 3    Q.  Right.  And why is it called the Red Devil -- okay.  That's why

10:17:37 4    it's called Red?

10:17:38 5    A.  It used to have difficult side effects.

10:17:40 6    Q.  Does it still have difficult side effects?

10:17:43 7    A.  It can, but we've gotten much better at managing those.

10:17:46 8    Q.  Okay.  Following those rounds of chemotherapy, did she undergo

10:17:55 9    surgery in December of 2008?

10:17:57 10   A.  Yes.

10:17:57 11   Q.  Okay.  And following the completion of her surgery, did

10:18:04 12   Ms. Kahn undergo ten rounds of treatment with Avastin?

10:18:09 13   A.  Yes.

10:18:09 14   Q.  And then did she also undergo nine years of endocrine treatment

10:18:15 15   with tamoxifen starting in April of 2009?

10:18:20 16   A.  Yes.

10:18:20 17   Q.  Okay.  Endocrine treatment is the hormone treatment?

10:18:23 18   A.  It's hormonal manipulation.

10:18:25 19   Q.  Okay.  What I am going to show you is just a demonstrative, and

10:18:30 20   we've shared this already with the other side.  That is a timeline

10:18:39 21   that we've put together to just sort of graphically illustrate

10:18:47 22   Ms. Kahn's treatment timeline.  And so what I'd like you to do is

10:18:53 23   just look at that and tell me if that is consistent with what we've

10:18:57 24   discussed today based on the medical records.

10:19:01 25   A.  Yes.

10:19:02  1    Q.  And with the exception of the first dose of chemotherapy during

10:19:11  2    the first phase in early June of 2000 -- I'm sorry, late May of

10:19:19  3    2008, were all of the medicines depicted on the timeline the

10:19:23  4    medicines that were administered during your care and treatment of

10:19:29  5    Ms. Kahn?

10:19:29  6    A.  Yes.

10:19:29  7    Q.  So if we drew -- basically, if I took a Sharpie and I just drew

10:19:34  8    a line on the timeline after the first dose of the first phase,

10:19:39  9    would it be correct to say that the medicines to the left of the

10:19:47  10   dark line were the medicines that were administered when Ms. Kahn

10:19:51  11   was under the care and treatment of Dr. Kardinal, and the medicines

10:19:57  12   to the right side of the line were medicines administered when

10:20:03  13   she was your patient?

10:20:03  14   A.  Yes.

10:20:04  15   Q.  Let's take a look at Tab 13, if we could.  All right.  Can you

10:20:11  16   tell me what -- describe for the jury what this record is.

10:20:16  17   A.  This is a chemotherapy order.

10:20:17  18   Q.  Okay.  And does it have Elizabeth Kahn's name on it?

10:20:23  19   A.  Yes.

10:20:24  20   Q.  Does it have your name on it?

10:20:27  21   A.  Yes.

10:20:28  22   Q.  And what is the date?

10:20:29  23   A.  6- -- wait.  6/19/2008.

10:20:36  24   Q.  Does this line up with the first visit that you had with her

10:20:39  25   when you took over her treatment from Dr. Kardinal?

10:20:41  1    A.   Yes.

10:20:42  2    Q.   And is that your signature on the document?

10:20:44  3    A.   Yes.

10:20:45  4    Q.   And when you sign chemotherapy orders like what we're looking

10:20:51  5    at Tab 13, are you making a medical judgment for the patient that

10:20:57  6    the risks of the medicines are outweighed by the benefits you're

10:21:01  7    hoping to convey with the therapy?

10:21:03  8    A.   Yes.

10:21:04  9    Q.   And is it necessary to make this medical judgment each time

10:21:12  10   that chemotherapy is administered?

10:21:14  11   A.   Generally, yes.

10:21:15  12   Q.   Okay.  And if you thought that the risks of the medicines were

10:21:25  13   too great for the patient, do you have the ability, when making

10:21:31  14   this medical judgment, to recommend a different therapy?

10:21:33  15   A.   Yes.

10:21:35  16   Q.   And if it were your medical judgment that the therapy was not

10:21:40  17   appropriate for the patient, would you have, in that circumstance,

10:21:43  18   the ability to recommend a different therapy?

10:21:45  19   A.   Yes.

10:21:45  20   Q.   Okay.  And is that true even if a patient is in a clinical

10:21:52  21   trial?

10:21:52  22   A.   Yes.

10:21:52  23   Q.   And is that true even if the patient started her chemotherapy

10:21:57  24   with a different doctor?

10:21:58  25   A.   Yes.

1948

10:21:59  1   Q.  And when you put your signature on these chemotherapy orders,

10:22:05  2   did you make the medical judgment that the risks of the medicine

10:22:10  3   were outweighed by the benefits of the therapy?

10:22:12  4   A.  Yes.

10:22:13  5   Q.  Let's flip back to page -- Tab 1, if we could.  All right.  And

10:22:26  6   I think you told me earlier that this note was dictated by you?

10:22:30  7   A.  Yes.

10:22:31  8   Q.  And did you also discuss with the patient the side effects that

10:22:40  9   she was experiencing?

10:22:41 10   A.  Yes.

10:22:41 11   Q.  Is it important to have a discussion about the side effects

10:22:43 12   with the patient?

10:22:44 13   A.  Yes.

10:22:45 14   Q.  Okay.  And tell us why.

10:22:47 15   A.  For several reasons.  One is you need to make sure that they're

10:22:52 16   medically safe to proceed with additional therapy.  Two, you need

10:22:57 17   to make a decision as to whether you need to offer any other

10:23:00 18   medications that can support them through the treatment.  Three, if

10:23:04 19   they're safe to continue, do you need to make an adjustment on your

10:23:09 20   dosing.  There could be several reasons.

10:23:11 21   Q.  And at this point in time, what side effects did she report

10:23:13 22   that she was experiencing?

10:23:15 23   A.  It looks like it was some gastrointestinal, queasy stomach, and

10:23:20 24   diarrhea.  She also developed some mouth sores.  She had a rare

10:23:26 25   headache.  Runny nose.  She had also been treated for a urinary

10:23:37  1    tract infection and developed a rash.

10:23:42  2    Q.  And did she also experience some hair loss at this point in

10:23:45  3    time?

10:23:45  4    A.  She does report she lost her hair.

10:23:49  5    Q.  Okay.  What I want to do is, show you something that's been

10:23:54  6    marked as -- in the book as Tab 14.  And this has been marked as

10:23:59  7    Defendant's Exhibit 2164.  And what this document is, is a blog

10:24:10  8    that was -- that belonged to Ms. Kahn.

10:24:14  9              Did you know that Ms. Kahn had a blog?

10:24:16 10    A.  I did not.

10:24:17 11    Q.  Okay.  Did she ever talk to you about that?

10:24:20 12    A.  No.

10:24:20 13    Q.  Okay.  All right.  Turn to the second page.  And do you see

10:24:25 14    there at the bottom of the entry it says Thursday, June 19, 2008?

10:24:31 15    A.  Yes.

10:24:32 16    Q.  And is that the same date as your first visit with Ms. Kahn?

10:24:36 17    A.  Yes.

10:24:37 18    Q.  And it says -- in that entry, it says:  "Today, Steve and I met

10:24:44 19    my new oncologist, Dr. Larned.  Click her picture below to follow a

10:24:50 20    link to her resume."  Do you see that?

10:24:52 21    A.  Yes.

10:24:52 22    Q.  And then it says:  "We were very pleased with the way that she

10:24:56 23    handled all my questions about the side effects that I have been

10:25:00 24    having.  She had read my file and seemed to get a good sense of

10:25:04 25    what we expected from the treatments."  Do you see that?

10:25:07  1    A.  Yes.

10:25:07  2    Q.  Would it be part of your practice when you begin treating a

10:25:14  3    patient like Ms. Kahn, who had already undergone one round of

10:25:19  4    chemotherapy, to have a discussion with them during that first

10:25:22  5    visit about the side effects?

10:25:23  6    A.  Yes.

10:25:24  7    Q.  Okay.  And would it also be part of your protocol to also

10:25:28  8    discuss with them their expectations for therapy?

10:25:31  9    A.  Yes.

10:25:32  10   Q.  Was that a "yes"?

10:25:33  11   A.  Yes.

10:25:34  12   Q.  Okay.  All right.  And from this blog entry, does it appear

10:25:40  13   that such a conversation took place with Ms. Kahn?

10:25:42  14   A.  Yes.

10:25:43  15   Q.  Okay.  And if we go back to Tab 1, I think we already confirmed

10:25:50  16   this, but was one of the side effects that's reported in

10:25:58  17   Exhibit 3879, page 970, your treatment note from the first visit,

10:26:05  18   was one of the side effects hair loss?

10:26:06  19   A.  Yes.

10:26:07  20   Q.  And as it relates to expectations for the treatment, how does a

10:26:12  21   patient first learn about what the expectations of treatment should

10:26:18  22   be?

10:26:18  23   A.  With the initial discussion of the treatment plan and consent

10:26:22  24   process.

10:26:23  25   Q.  Okay.  And the consent process, does that involve the consent

10:26:26  1   form?

10:26:27  2   A.  Yes.

10:26:27  3   Q.  When you first met with Ms. Kahn, did she go through the

10:26:32  4   consent process already with Dr. Kardinal?

10:26:35  5   A.  Yes.

10:26:36  6   Q.  Would the consent form have been part of her medical chart that

10:26:41  7   was available for your review prior to her first visit?

10:26:44  8   A.  Yes.

10:26:45  9   Q.  Okay.  And were you familiar with the consent form for NSABP

10:26:50  10  B-40?

10:26:50  11  A.  Yes.

10:26:51  12  Q.  When you were first meeting with Ms. Kahn, was it your

10:26:58  13  expectation that she had been properly consented under the consent

10:27:05  14  form for NSABP B-40 clinical trial?

10:27:10  15  A.  Yes.

10:27:10  16  Q.  And if we look at that document, which is Defendant 2166,

10:27:18  17  Tab 8.  If you turn to page 10.  Okay.  Under the section entitled

10:27:37  18  "Risks," there's a question that's posed there.  Do you see that?

10:27:43  19  A.  "What side effects or risks can I expect from being in the

10:27:47  20  study?"

10:27:48  21  Q.  Yes.  And in the paragraph that follows that question, the

10:27:56  22  last -- second to last sentence reads:  "In some cases, side

10:28:00  23  effects may be very serious, long-lasting, or may never go away."

10:28:05  24  Did I read that correctly?

10:28:06  25  A.  Yes.

10:28:07 1    Q.  Okay.  And was it your expectation at the time that you first

10:28:12 2    met with Ms. Kahn that she understood the information in the

10:28:16 3    consent form?

10:28:17 4    A.  Yes.

10:28:17 5    Q.  And was that part of the information that you were relying upon

10:28:22 6    when you were making your initial medical judgments for her?

10:28:25 7    A.  Yes.

10:28:25 8    Q.  And if we can flip quickly to page 12 -- I'm sorry -- yeah,

10:28:40 9    page 12.  And do you see the section that is entitled "Risks and

10:28:49 10   Side Effects Related to Xeloda and Taxotere"?  Do you see that?

10:28:54 11   A.  Yes.

10:28:55 12   Q.  And what is the first side effect that's listed under the

10:28:57 13   category, "Likely Effects"?

10:29:01 14   A.  Hair loss.

10:29:03 15   Q.  So prior to your first visit with Ms. Kahn, did you review her

10:29:08 16   medical records?

10:29:09 17   A.  Yes.

10:29:10 18   Q.  Did you take blood work?

10:29:14 19   A.  Yes.

10:29:14 20   Q.  Did you conduct a physical exam?

10:29:16 21   A.  Yes, that day.

10:29:18 22   Q.  And did you review -- do a review of symptoms?

10:29:21 23   A.  The day of her exam, yes.

10:29:23 24   Q.  And did you also review her other medications as part of the

10:29:27 25   process?

10:29:27  1   A.  Yes.

10:29:28  2   Q.  Okay.  And you reviewed the side effects with Ms. Kahn of the

10:29:32  3   therapy?

10:29:33  4   A.  Yes.

10:29:34  5   Q.  And also her expectations for the therapy?

10:29:37  6   A.  That we proceed with her second cycle of therapy.

10:29:41  7   Q.  Okay.  And the second cycle would include Taxotere, Avastin,

10:29:44  8   and Xeloda?

10:29:45  9   A.  Yes.

10:29:46 10   Q.  And is this recommendation that you were making, was it your

10:29:54 11   medical judgment that the benefits of those medicines outweighed

10:29:58 12   the risks of the therapy?

10:29:59 13   A.  Yes.

10:30:00 14   Q.  Okay.  Let's talk about the risks for a minute.  Do all of the

10:30:06 15   medicines that are contained in Exhibit 1 on the timeline, do all

10:30:11 16   of those medicines that Ms. Kahn was prescribed under your care

10:30:15 17   have their own unique set of risks?

10:30:17 18   A.  Yes.

10:30:18 19   Q.  Is that true of all chemotherapies?

10:30:20 20   A.  Yes.

10:30:21 21   Q.  Was there any risk-free option for Ms. Kahn?

10:30:24 22   A.  No.

10:30:25 23   Q.  Okay.  And in terms of learning about the potential risks

10:30:31 24   associated with the medicines that you had prescribed, what

10:30:35 25   information do you rely upon?

10:30:37  1    A.   Several sources.  We have -- you know, there's vast literature

10:30:43  2    regarding chemotherapy, but you can look at original trials, you

10:30:48  3    can look at clinical trials that have occurred since where these

10:30:51  4    drugs have been used.  You can reference pharmacy guides.  Now we

10:30:55  5    have an oncology pharmacist on-site.  There are several references.

10:30:58  6    Q.   And are medical journals one of the sources of information that

10:31:03  7    you can rely upon?

10:31:04  8    A.   Yes.

10:31:05  9    Q.   And is the *Journal of Clinical Oncology* a journal that you

10:31:12 10    would customarily review?

10:31:13 11    A.   Yes.

10:31:13 12    Q.   And you consider that a reliable authority in the field of

10:31:17 13    oncology?

10:31:17 14    A.   Yes.

10:31:18 15    Q.   And do you also rely upon your experience with the medicines?

10:31:22 16    A.   Yes.

10:31:23 17    Q.   And do you have available to you as part of the information for

10:31:26 18    learning about the risks of a particular medicine, do you have

10:31:31 19    available the prescribing information or the warning label?

10:31:36 20    A.   Yes.

10:31:36 21    Q.   Let's talk about the risks of hair loss specifically.  Are you

10:31:40 22    familiar with the medical term for hair loss?

10:31:42 23    A.   There's several terms.  Alopecia is one.

10:31:47 24    Q.   And can alopecia be temporary or permanent?

10:31:52 25    A.   Yes.

1955

10:31:53  1    Q.  Okay.  And can the term "alopecia" by itself mean temporary or

10:31:59  2    permanent?

10:32:00  3    A.  Yes.

10:32:01  4    Q.  And as it relates to the chemotherapy medicines that you

10:32:07  5    prescribed for Ms. Kahn, those being Taxotere, Cytoxan, and

10:32:15  6    Adriamycin, were you aware that those medicines could carry a risk

10:32:23  7    of permanent changes to a patient's hair?

10:32:28  8    A.  Yes.

10:32:28  9    Q.  And could those changes include changes to texture?

10:32:31  10   A.  Yes.

10:32:32  11   Q.  Could they include changes to color?

10:32:34  12   A.  Yes.

10:32:35  13   Q.  Could those changes include changes to the fullness or

10:32:39  14   thickness of the hair?

10:32:40  15   A.  Yes.

10:32:40  16   Q.  And could those medicines also result in persistent or

10:32:47  17   permanent hair loss?

10:32:48  18   A.  Yes.

10:32:48  19   Q.  Okay.  And that was something that you understood at the time

10:32:53  20   that you proceeded with the therapy for Ms. Kahn?

10:32:58  21   A.  Yes.

10:32:59  22   Q.  Where did you gain that understanding?

10:33:02  23   A.  From use of medications over time and from learning from

10:33:09  24   attendings in training.

10:33:12  25   Q.  Have you had patients in your clinical practice have changes to

10:33:18  1    their hair texture?

10:33:20  2    A.  Yes.

10:33:21  3    Q.  Have you had patients who have undergone chemotherapy and their

10:33:27  4    hair was significantly thinner following therapy?

10:33:29  5    A.  Yes.

10:33:30  6    Q.  Have you seen patients who had significant thinning of their

10:33:34  7    hair that ended up being permanent?

10:33:36  8    A.  Yes.

10:33:37  9    Q.  And is it a risk that has been associated with the use of

10:33:41  10   Adriamycin?

10:33:41  11   A.  Yes.

10:33:43  12   Q.  Okay.  Is it a risk that's been associated with the use of

10:33:46  13   cyclophosphamide or Cytoxan?

10:33:48  14   A.  Yes.

10:33:49  15   Q.  Okay.  You told me earlier that there were other medicines in

10:33:56  16   the group of taxanes, Taxol -- and what was the other one?

10:34:01  17   A.  Abraxane.

10:34:06  18   Q.  Okay.  And are there cases of persistent significant hair

10:34:12  19   thinning associated with those medicines?

10:34:15  20   A.  Yes.

10:34:16  21   Q.  Is this information about the risk of persistent significant

10:34:21  22   hair thinning, did you learn about that all the way back in your

10:34:27  23   residency?

10:34:28  24   A.  I don't know that I would say I learned that as a resident, no.

10:34:31  25   Q.  But was it something that you were aware of when you first met

1957

10:34:35  1    Ms. Kahn?

10:34:36  2    A.  Yes.

10:34:36  3    Q.  But generally speaking, at the time that you first met

10:34:43  4    Ms. Kahn, was persistent significant hair thinning a risk

10:34:49  5    associated with chemotherapy for breast cancer patients?

10:34:52  6    A.  Yes, that's a risk we discussed.

10:34:56  7    Q.  Okay.  All right.  And let's take a look at Tab 15, and this is

10:35:02  8    Defendant's Exhibit 5.  And what I'm showing you, Doctor,

10:35:16  9    Defendant's Exhibit 5 is the prescribing information from Taxotere.

10:35:20 10    Do you see that?

10:35:21 11    A.  Yes.

10:35:21 12    Q.  And do you see the date in the sort of two-thirds of the way

10:35:28 13    down on the right-hand side of the first page?  It says "revised."

10:35:34 14    A.  Yes, I can barely read it.  I think it says "9/28/2007."

10:35:39 15    Q.  And let's flip to, if we could, page 55 or 56.  And let me see

10:35:48 16    when we get there.  Okay.  Let's actually look at page 54.  Okay.

10:36:01 17    So what is the title of the section that begins on page 54?

10:36:06 18    A.  "Patient Counseling Information."

10:36:08 19    Q.  And if you flip to page 56, do you see a section that's

10:36:19 20    entitled "Hair Loss"?

10:36:20 21    A.  Yes.

10:36:22 22    Q.  Could you please read that section into the record, please?

10:36:25 23    A.  "Loss of hair occurs in most patients taking Taxotere.

10:36:33 24    Including the hair on your head, underarm hair, pubic hair,

10:36:39 25    eyebrows, and eyelashes.  Hair loss will begin after the first few

10:36:45  1   treatments and varies from patient to patient.  Once you have

10:36:49  2   completed all your treatments, hair generally grows back."

10:36:54  3   Q.  What does the phrase "hair generally grows back" mean to you?

10:36:58  4   A.  I know who writes most consent forms.  It's a purposeful

10:37:02  5   general statement to say "in general it comes back."

10:37:06  6   Q.  Does "in general" mean always?

10:37:09  7   A.  No.

10:37:23  8   Q.  And the description that you just gave us was -- is that what

10:37:29  9   this language meant to you back in 2008?

10:37:32  10  A.  Yes.

10:37:32  11  Q.  Does the phrase "generally grows back," indicate to you that

10:37:42  12  there is a possibility that the hair might not grow back?

10:37:45  13  A.  Yes.  The suggestion is it's more likely to grow back but it

10:37:50  14  may not.

10:37:50  15  Q.  Okay.  Just to confirm, do you have any criticism of the label

10:37:55  16  language?

10:37:56  17  A.  No.

10:37:57  18  Q.  And what is the title of Section 6?

10:38:01  19  A.  "Adverse Reactions."

10:38:02  20  Q.  And are there subsections listed under Section 6?

10:38:06  21  A.  Yes.

10:38:07  22  Q.  And what are the names of those two subsections?

10:38:10  23  A.  "Clinical Trials experience.  Postmarketing experience."

10:38:15  24  Q.  If the Taxotere label, instead of saying "hair generally grows

10:38:26  25  back," if somewhere in Section 6 it indicated that cases of

10:38:34  1   permanent or persistent alopecia have been observed, would that

10:38:39  2   materially alter your risk-benefit assessment of Taxotere?

10:38:43  3   A.  No.

10:38:45  4   Q.  And as it relates to the Taxotere prescribing information, is

10:38:51  5   that something that you would have reviewed at some point prior to

10:38:56  6   treating Ms. Kahn?

10:38:57  7   A.  Generally, that would have been done at chemotherapy consent.

10:39:01  8   Q.  But in terms of your effort to apprise yourself of the risks of

10:39:08  9   Taxotere, is the Taxotere prescribing information a document that

10:39:14 10   you would have reviewed at some point prior to meeting with

10:39:18 11   Ms. Kahn?

10:39:19 12   A.  I would say the answer to that is not necessarily before seeing

10:39:23 13   Mrs. Kahn.  It would have been reviewed multiple times during my

10:39:28 14   personal job as administering chemotherapy.  So when changes are

10:39:32 15   made to the package insert, I refresh and make sure I am aware of

10:39:36 16   those changes.  But do I go to the package insert for each patient,

10:39:39 17   each time?  No.

10:39:41 18   Q.  No.  Right.  And that wasn't my question if you reviewed it

10:39:45 19   that day.  But was it something that you would have reviewed prior

10:39:48 20   to meeting with her at some point?

10:39:49 21   A.  Yes, at some point.

10:39:50 22   Q.  Okay.  Let's talk about the benefits of Taxotere for a second.

10:40:02 23   First of all, is breast cancer a serious disease?

10:40:05 24   A.  Yes.

10:40:06 25   Q.  Can it be fatal?

10:40:08  1  A.  Yes.

10:40:08  2  Q.  Okay.  What role does chemotherapy play in treating breast

10:40:14  3  cancer?

10:40:14  4  A.  Chemotherapy plays several roles.  One is, in this setting, to

10:40:23  5  try and shrink disease before surgery and see if someone is

10:40:29  6  responsive to the chemotherapy.  Two is, it can reduce the risk of

10:40:33  7  occurrence in the long run if you're successful.

10:40:36  8  Q.  And what role do taxanes play in the treatment of breast cancer

10:40:44  9  over other types of chemotherapy drugs?

10:40:48  10  A.  Taxanes are very common drugs used in the treatment of breast

10:40:52  11  cancer.

10:40:52  12  Q.  Has the introduction of taxanes, including Taxotere, helped

10:40:55  13  increase breast cancer survival rates?

10:40:58  14  A.  Yes.

10:40:58  15  Q.  And in your clinical experience, are Taxotere regimens

10:41:02  16  effective at preventing the return of cancer?

10:41:05  17  A.  Yes.

10:41:06  18  Q.  If cancer does come back, does that have an effect on a

10:41:10  19  patient's chances of survival?

10:41:12  20  A.  Absolutely, yes.

10:41:13  21  Q.  What were the medicines that Ms. Kahn was going to receive in

10:41:16  22  her second round of chemotherapy following the first visit with

10:41:24  23  her?

10:41:24  24  A.  Just to make sure I understand the question, are we talking

10:41:27  25  about Cycle 2 when I first met her?

10:41:30 1    Q.   Yes.

10:41:30 2    A.   So she was going to receive Taxotere, Xeloda, and Avastin.

10:41:34 3    Q.   And was it your medical judgment on that date, June 18, 2008,

10:41:45 4    that neoadjuvant chemotherapy including Taxotere was appropriate

10:41:49 5    for Ms. Kahn?

10:41:50 6    A.   Yes.

10:41:51 7    Q.   Is that what you recommended that she proceed with on that

10:41:55 8    date?

10:41:56 9    A.   Yes.

10:41:57 10   Q.   Okay.  And did you determine on that date that the benefits of

10:42:05 11   the medicines outweighed the risks?

10:42:08 12   A.   Yes.

10:42:09 13   Q.   Okay.  And did one of those risks include the possibility that

10:42:12 14   her hair may not come back the same way?

10:42:14 15   A.   Yes.

10:42:15 16   Q.   And during this first visit that's documented in Tab 1, which

10:42:29 17   is Defendant's Exhibit 3879, is there anything reflected in your

10:42:33 18   note that Ms. Kahn had any concerns with her physical appearance

10:42:38 19   that might have steered you away from using Taxotere in her

10:42:42 20   chemotherapy regimen?

10:42:43 21   A.   No.

10:42:44 22   Q.   If Ms. Kahn asked you about hair loss during this visit, would

10:42:53 23   you have told her not to worry, that her hair loss is always

10:42:57 24   temporary?

10:42:57 25   A.   No.

10:42:58  1    Q.  Okay.  Would you have told Ms. Kahn not to worry that the hair

10:43:04  2    always grows back?

10:43:06  3    A.  No.

10:43:06  4    Q.  Would you ever guarantee a patient like Ms. Kahn that their

10:43:16  5    hair loss would only be temporary?

10:43:18  6    A.  No.

10:43:18  7    Q.  Did you ever guarantee a patient like Ms. Kahn that her hair

10:43:28  8    will grow back within a certain period of time?

10:43:31  9    A.  No.

10:43:31 10    Q.  Let's move forward from Ms. Kahn's first visit of June 18,

10:43:43 11    2008.  And I want to talk about the next prescription that was

10:44:01 12    written.  Let's turn to Tab 17.  And what -- this is for

10:44:09 13    identification is Defendant's Exhibit 3879, page 984.  And what I'd

10:44:17 14    like to ask you about is, first, you see this -- what is this

10:44:23 15    document?  Let's start there.

10:44:25 16    A.  This looks like a document written by one of the research

10:44:28 17    nurses.

10:44:28 18    Q.  Let me read to you from this nurse's note and ask you a

10:44:33 19    question about what's notated here.  It says:  "Chemo orders and

10:44:40 20    labs reviewed per Dr. Larned.  Chemo orders signed and sent to

10:44:46 21    chemo."  It says:  "Patient to receive docetaxel, bevacizumab

10:44:56 22    and" -- I can't read the last one -- "capecitabine.  Patient will

10:45:04 23    receive premeds prior to infusion.  Patient also to start

10:45:12 24    capecitabine at a decreased level, Level 1, due to Grade 2 hand and

10:45:17 25    foot syndrome."

10:45:20  1          What is Grade 2 hand and foot syndrome?

10:45:23  2   A.  So there is different grading that we put on a symptom of

10:45:27  3   hand-foot syndrome based on the amount of redness or peeling or

10:45:31  4   symptoms that the patient is having.

10:45:33  5   Q.  What is -- just describe for the jury in layperson's terms what

10:45:40  6   is hand and foot syndrome.

10:45:40  7   A.  It's either redness, peeling, or tenderness of hands or feet

10:45:43  8   related to the treatment.

10:45:44  9   Q.  And the capecitabine, that's the Xeloda?

10:45:49 10   A.  Yes.

10:45:49 11   Q.  Okay.  Is Grade 2 hand and foot syndrome a clinical basis to

10:45:56 12   decrease the dose of Xeloda?

10:45:58 13   A.  Yes.

10:45:58 14   Q.  Okay.  Was that part of your medical judgment at this time?

10:46:02 15   A.  Yes.

10:46:03 16   Q.  Okay.  And so if we look at Tab 18, quickly, what's also been

10:46:16 17   marked as Defendant's Exhibit 3879, let's get the page right, page

10:46:29 18   58, I believe.  Can you tell us what this document is just for

10:46:33 19   identification?

10:46:34 20   A.  It's her chemotherapy order for that day.

10:46:36 21   Q.  And who signed the chemotherapy orders?

10:46:39 22   A.  I did.

10:46:40 23   Q.  Let me ask it a different way.  What does it say just above the

10:46:45 24   dose for Xeloda?

10:46:46 25   A.  "Dose level, minus one."

10:46:48  1    Q.  And is that an indication that the dose for Xeloda is being

10:46:55  2    decreased?

10:46:55  3    A.  Yes.

10:46:56  4    Q.  Okay.  And is this an adjustment that you're making to the

10:47:01  5    chemotherapy based on Ms. Kahn's clinical situation at the time?

10:47:04  6    A.  Yes.

10:47:05  7    Q.  Okay.  Is that what you prescribed for her on this date?

10:47:09  8    A.  Yes.

10:47:09  9    Q.  Let's take a quick look, if we could, at what is in the binder

10:47:19 10    at Tab 20.  And can you tell me what this document is?

10:47:24 11    A.  That's a chemotherapy order set for that date.

10:47:27 12    Q.  And what is the date?

10:47:29 13    A.  July 31st, 2008.

10:47:35 14    Q.  What is the dosage, at this time, for docetaxel based on this

10:47:38 15    record?

10:47:39 16    A.  60 milligrams per meter squared.  So multiplied by her body

10:47:44 17    surface area, it was 120 milligrams.

10:47:46 18    Q.  And if we flip back to Tab 18, what was the date of the

10:48:00 19    administration for the exhibit that's in Tab 18?

10:48:04 20    A.  July 10th, 2008.

10:48:07 21    Q.  And what is the dose of docetaxel administered on that date?

10:48:16 22    A.  75 milligrams per meter squared multiplied by her body surface

10:48:22 23    area.

10:48:22 24    Q.  Is that more or less than the amount of docetaxel that was

10:48:26 25    administered under Tab 20?

1965

10:48:29  1   A.  That's more.

10:48:30  2   Q.  Can you tell from looking at this document why the dosage of

10:48:35  3   docetaxel was decreased on this date?

10:48:38  4   A.  Not from looking at this document, no.

10:48:41  5   Q.  All right.  But do you agree that it was decreased?

10:48:46  6   A.  Yes.

10:48:47  7   Q.  And when I say "docetaxel," I'm talking about Taxotere?

10:48:51  8   A.  Correct, yes.

10:48:52  9   Q.  And if the medicine was reduced in its dose, would that be

10:48:58 10   something that you're deciding as a medical judgment for the

10:49:03 11   patient?

10:49:03 12   A.  Yes.

10:49:05 13   Q.  And all of these -- are all of these chemotherapy orders that

10:49:12 14   we've looked at, are these prescriptions for these medicines for

10:49:20 15   Mrs. Kahn?

10:49:21 16   A.  Yes.

10:49:22 17   Q.  When you signed these chemotherapy orders that we've looked at,

10:49:30 18   did you make a medical judgment for Ms. Kahn?

10:49:32 19   A.  Yes.

10:49:33 20   Q.  Okay.  And did that medical judgment include the assessment

10:49:38 21   that the risks were outweighed by the benefit?

10:49:40 22   A.  Yes.

10:49:41 23   Q.  And was one of the risks that you were aware of the possibility

10:49:49 24   that her hair may not return the same way?

10:49:52 25   A.  Yes.

1966

10:49:52 1   Q.  And once Ms. Kahn was done with the Phase I chemotherapy, what

10:50:01 2   were the medicines that she was going to undertake in Phase II?

10:50:04 3   A.  Adriamycin, Cytoxan, Avastin.

10:50:08 4   Q.  And when you signed the chemotherapy orders for those

10:50:18 5   medicines, did you make a medical judgment for the patient?

10:50:21 6   A.  Yes.

10:50:23 7   Q.  And did that medical judgment include the assessment that the

10:50:32 8   risks of those medicines were outweighed by the benefits of the

10:50:36 9   therapy?

10:50:37 10  A.  Yes.

10:50:38 11  Q.  Okay.  And did the risks include the risk of persistent

10:50:45 12  thinning of the hair?

10:50:46 13  A.  Yes.

10:50:47 14  Q.  Okay.  And did the risks include the risk of permanent hair

10:50:52 15  loss?

10:50:52 16  A.  Yes.

10:50:53 17  Q.  Once Ms. Kahn completed her Phase II chemotherapy, was there a

10:51:09 18  point in time at which you prescribed hormonal therapy?

10:51:13 19  A.  Yes.

10:51:15 20  Q.  Okay.  And what was the medicine that you prescribed for the

10:51:20 21  hormone therapy?

10:51:21 22  A.  Tamoxifen.

10:51:22 23  Q.  When you made the decision to prescribe tamoxifen to Ms. Kahn,

10:51:30 24  did you make a medical judgment that it was in her best interest?

10:51:33 25  A.  Yes.

10:51:34  1    Q.  And did you evaluate the risks and benefits of the medicine

10:51:40  2    before writing the prescription?

10:51:41  3    A.  Yes.

10:51:42  4    Q.  Okay.  And what are some of the risks associated with

10:51:46  5    tamoxifen?

10:51:47  6    A.  There are several.  So you're manipulating female hormones.

10:51:51  7    They may experience some weight gain.  They may experience some hot

10:51:55  8    flashes.  Some rare side effects.  There is a very rare chance of

10:52:02  9    blood clot.  And a very rare chance of uterine cancer.

10:52:07 10    Q.  Is hair thinning a risk associated with the use of tamoxifen?

10:52:11 11    A.  That's not one of the more common side effects, but during a

10:52:16 12    woman's lifetime, hormones shift.  On these medicines, hormones

10:52:21 13    shift.  When our hormones shift, hair may also change.

10:52:27 14    Q.  Do you discuss the risk of hair thinning with the use of

10:52:32 15    tamoxifen with your patients?

10:52:33 16    A.  We generally would not call it hair thinning on tamoxifen.

10:52:38 17    Q.  Oh, what would you call it?

10:52:40 18    A.  They may notice some hair texture changes, but it wouldn't

10:52:44 19    necessarily be hair thinning.

10:52:46 20    Q.  Okay.  Have you seen patients with significant hair thinning on

10:52:50 21    tamoxifen therapy?

10:52:54 22    A.  Very rarely.

10:52:55 23    Q.  Okay.  But you have seen it?

10:52:57 24    A.  Yes.

10:53:01 25    Q.  Okay.  I want to shift gears here for a second, if I can, and

10:53:08  1    talk to you a little bit about Ms. Kahn's medical records and some
10:53:18  2    of your subsequent visits with her.
10:53:21  3             So based on Exhibit No. 1, when did Ms. Kahn complete
10:53:31  4    chemotherapy with Phase II?
10:53:34  5    A.  October of 2008.
10:53:36  6    Q.  What I'd like to show you -- let's go to Tab 23.  And if we
10:53:46  7    look at Tab 23, can you tell us -- or for identification, this is
10:53:53  8    Defendant's Exhibit 3879 at page 1295.  Can you tell me what this
10:53:58  9    document is?
10:53:59 10    A.  It's a clinic encounter note.
10:54:02 11    Q.  And what is the encounter date?
10:54:06 12    A.  August 13th, 2009.
10:54:13 13    Q.  And so how long is this encounter date from the completion of
10:54:20 14    her Phase II chemotherapy?
10:54:22 15    A.  Ten months.
10:54:25 16    Q.  Okay.  And if you look at the -- one, two, three -- third
10:54:33 17    paragraph, is there any record that you made as it relates to
10:54:37 18    Ms. Kahn's hair?
10:54:38 19    A.  She is pleased that her hair is growing back.
10:54:42 20    Q.  Dr. Larned, I want to ask you a couple of questions to kind of
10:54:46 21    just wrap up here.  Did all of the chemotherapies that were
10:54:52 22    administered to Ms. Kahn, did they have risks?
10:54:55 23    A.  Yes.
10:54:55 24    Q.  And does Adriamycin have risks?
10:54:59 25    A.  Yes.

| | | |
|---|---|---|
| 10:55:00 | 1 | Q.  Does Cytoxan have risks? |
| 10:55:03 | 2 | A.  Yes. |
| 10:55:03 | 3 | Q.  Does Xeloda have risks? |
| 10:55:06 | 4 | A.  Yes. |
| 10:55:06 | 5 | Q.  Does Avastin have risks and did the risks vary from patient to |
| 10:55:11 | 6 | patient? |
| 10:55:12 | 7 | A.  Yes. |
| 10:55:12 | 8 | Q.  Okay.  And do some of the risks vary based on the patient's |
| 10:55:22 | 9 | medical history? |
| 10:55:23 | 10 | A.  Yes. |
| 10:55:23 | 11 | Q.  And can the risks vary from medicine to medicine? |
| 10:55:28 | 12 | A.  Yes. |
| 10:55:29 | 13 | Q.  And do all drug combinations or regimens have potential risks? |
| 10:55:41 | 14 | A.  Yes. |
| 10:55:41 | 15 | Q.  And can those risks be serious? |
| 10:55:44 | 16 | A.  Yes. |
| 10:55:46 | 17 | Q.  And can those risks be fatal? |
| 10:55:50 | 18 | A.  Yes. |
| 10:55:50 | 19 | Q.  And when it comes to chemotherapy, are there any risk-free |
| 10:55:55 | 20 | options? |
| 10:55:56 | 21 | A.  No. |
| 10:55:56 | 22 | Q.  When you started treating Ms. Kahn, were there any risk-free |
| 10:56:02 | 23 | chemotherapy options for her? |
| 10:56:03 | 24 | A.  No. |
| 10:56:04 | 25 | Q.  Do patients have to accept the risk of chemotherapy if they |

10:56:10  1    want to be treated?

10:56:11  2    A.  No, a patient can decline chemotherapy.

10:56:15  3    Q.  But if they want to be treated by chemotherapy, do they have to

10:56:18  4    accept the risks?

10:56:19  5    A.  Yes.

10:56:20  6    Q.  Was that true for Mrs. Kahn?

10:56:23  7    A.  Yes.

10:56:23  8    Q.  Okay.  And if a patient wants the benefit of the medicine, do

10:56:30  9    they have to accept the risks of the therapy?

10:56:32 10    A.  Yes, they accept the risks.

10:56:34 11    Q.  And was that true for Mrs. Kahn?

10:56:36 12    A.  Yes.

10:56:37 13    Q.  Do you understand what the claim is that's being made in this

10:56:42 14    case?

10:56:42 15    A.  Yes.

10:56:42 16    Q.  What is it?

10:56:43 17    A.  That Taxotere led to permanent hair loss.

10:56:47 18    Q.  Okay.  Do you stand by your decision to prescribe Taxotere for

10:56:53 19    Ms. Kahn?

10:56:53 20    A.  Yes.

10:56:54 21    Q.  Why?

10:56:54 22    A.  Because that was appropriate therapy at that time.

10:56:58 23    Q.  And if the prescribing information in Section 6 titled "Adverse

10:57:09 24    Events" had said, "Cases of permanent or persistent alopecia have

10:57:15 25    been reported," if it said that instead of "hair generally grows

| | |
|---|---|
| 10:57:21 1 | back," would that have affected your prescribing decision for |
| 10:57:25 2 | Ms. Kahn? |
| 10:57:25 3 | A.  No. |
| 10:57:25 4 | CROSS-EXAMINATION |
| 10:57:25 5 | BY MR. SCHANKER: |
| 10:57:33 6 | Q.  Good evening, Doctor.  My name is Darin Schanker and I |
| 10:57:36 7 | represent Elizabeth Kahn.  Thank you for your time here, okay? |
| 10:57:39 8 | A.  Yes. |
| 10:57:40 9 | Q.  And you recall Elizabeth Kahn, correct? |
| 10:57:42 10 | A.  Yes. |
| 10:57:43 11 | Q.  And she's -- are you surprised that she speaks fondly of you? |
| 10:57:48 12 | A.  Not at all.  I loved her very much.  She's great. |
| 10:57:51 13 | Q.  Now, I want to talk to you about a couple of things based on |
| 10:57:55 14 | questions that you were asked about by defense counsel. |
| 10:58:00 15 | Doctor, when you talk to a fellow oncologist or someone |
| 10:58:04 16 | on your team about treating a patient with cancer, like Mrs. Kahn, |
| 10:58:09 17 | you obviously don't just say she has cancer, right? |
| 10:58:14 18 | A.  No, we don't. |
| 10:58:15 19 | Q.  What I mean by that is, you all speak -- for us laypeople who |
| 10:58:21 20 | aren't knowledgeable, there's like technical terms.  Like, for |
| 10:58:24 21 | example, for Ms. Kahn, Stage IIA T2aNoMo infiltrating pleomorphic |
| 10:58:36 22 | carcinoma.  Did I get that right? |
| 10:58:37 23 | A.  Yes. |
| 10:58:38 24 | Q.  And the -- you need to use that kind of detailed level of |
| 10:58:44 25 | information to -- I'm assuming to properly diagnose and treat |

10:58:48  1  cancer; is that fair enough?

10:58:49  2  A.  Right.  That guides for appropriate treatment.

10:58:52  3  Q.  So if a patient came into your office and just said I have

10:58:58  4  cancer, that wouldn't be enough for you to determine what kind of

10:59:01  5  cancer they had or what kind of treatment or guidance you would

10:59:05  6  need to give that patient, would it?

10:59:07  7  A.  No.

10:59:08  8  Q.  It's not enough for you to diagnose and treat a patient.

10:59:13  9  That's not enough information, fair enough?

10:59:16  10  A.  Fair.

10:59:16  11  Q.  Based on what you know, would you agree it's similar with hair,

10:59:23  12  that there's many different kinds of alopecia and many different

10:59:27  13  causes?

10:59:28  14  A.  Yes.

10:59:33  15  Q.  Now, you were asked a lot of questions about hair and hair

10:59:39  16  loss.  Do you recall those by defense counsel?

10:59:41  17  A.  Yes.

10:59:42  18  Q.  Doctor, are you aware that there are specialties, individuals,

10:59:48  19  doctors who specialize in hair treatment?

10:59:51  20  A.  Yes.

10:59:52  21  Q.  Dermatologists?

10:59:53  22  A.  Correct.

10:59:54  23  Q.  And you're aware that there's a subspecialty in dermatology

10:59:59  24  that just focuses on hair?

11:00:00  25  A.  Yes.

1973

11:00:01  1   Q.  And then that there's subspecialties within that area that

11:00:05  2   focuses on -- focus on the causes of hair?

11:00:08  3   A.  Yes.

11:00:08  4   Q.  Hair loss?

11:00:09  5   A.  Correct.

11:00:09  6   Q.  Right.  Well, as I said, you were asked a bunch of questions

11:00:14  7   about hair.  And so I think it's important for the jury to

11:00:17  8   understand what, obviously, your vast areas of expertise are in

11:00:22  9   cancer, and then talk to you about what your experience is or what

11:00:27  10  your lack of expertise is in hair.  Can we have a conversation

11:00:33  11  concerning that; is that fair?

11:00:34  12  A.  Fair.

11:00:35  13  Q.  So do you agree then that you're not qualified to offer expert

11:00:42  14  opinions or expert opinion testimony, in this case, on diagnosing

11:00:46  15  the cause of persistent alopecia or hair loss; is that fair?

11:00:51  16  A.  Fair for persistent.

11:00:53  17  Q.  Okay.  Yes.  And thank you for clarifying.  Persistent or

11:00:58  18  permanent alopecia or hair loss; is that fair?

11:01:01  19  A.  Fair.

11:01:01  20  Q.  And because you're not qualified to offer an expert opinion on

11:01:05  21  diagnosing the cause of persistent hair loss, you're not offering

11:01:08  22  any opinions as to the cause of Ms. Kahn's permanent hair loss, are

11:01:12  23  you?

11:01:12  24  A.  No.

11:01:14  25  Q.  Okay.  And that would be something that would be outside your

11:01:19  1    area of expertise; is that fair?

11:01:21  2    A.  Fair.

11:01:23  3    Q.  Okay.  So just to make sure we're clear, Doctor, and understand

11:01:42  4    I am not saying anything that, in any way, is demeaning to you

11:01:45  5    about your vast areas of expertise.

11:01:47  6    A.  I never wanted to be a dermatologist.  I am not offended.

11:01:51  7    Q.  Okay.  Would it be fair to say then, just to make sure we're

11:01:54  8    clear, you're not qualified to offer an expert opinion on

11:01:56  9    diagnosing the cause of permanent hair loss?

11:01:59 10    A.  Fair.

11:02:00 11    Q.  Okay.  And we'll keep moving here.  Doctor, you were asked a

11:02:51 12    lot of questions by defense counsel about Ms. Kahn's prescription

11:02:57 13    for chemotherapy.  Do you recall those questions?

11:03:00 14    A.  Yes.

11:03:00 15    Q.  Well, let's talk about that.  And I just want to make sure

11:03:04 16    we're clear so the jury understands what your role was, what you

11:03:08 17    did, and then what you didn't do in terms of treating Ms. Kahn for

11:03:12 18    the early-stage breast cancer, okay?  Now, you didn't diagnose her

11:03:15 19    cancer, did you?

11:03:16 20    A.  No.

11:03:17 21    Q.  Okay.  Dr. Kardinal did that?

11:03:20 22    A.  Dr. Kardinal did.

11:03:21 23    Q.  Okay.  And so you did not diagnose; fair enough?

11:03:50 24    A.  I did not know her then, correct.

11:03:52 25    Q.  Yes.  Okay.  Right.  I'm not saying you weren't capable of

11:03:55  1    doing that --

11:03:55  2    A.  Right.

11:03:56  3    Q.  -- but just from a presentation standpoint, you weren't

11:03:58  4    involved?

11:03:59  5    A.  Correct.

11:03:59  6    Q.  And Dr. Kardinal did diagnose?

11:04:02  7    A.  With a team of others.

11:04:05  8    Q.  Okay.  Dr. Kardinal and a team diagnosed?

11:04:07  9    A.  Correct.

11:04:08 10    Q.  So I put "with a team on there"; is that okay?

11:04:11 11    A.  Yes.

11:04:11 12    Q.  Does that accurately reflect what happened?

11:04:14 13    A.  That's accurate.

11:04:15 14    Q.  Okay.  Thank you.  You didn't consider the risks and benefits

11:04:19 15    of Ms. Kahn using Taxotere before she started her treatment plan,

11:04:24 16    did you?

11:04:24 17    A.  No.  That process was done by Dr. Kardinal.

11:04:27 18    Q.  Okay.  So that was done by Dr. Kardinal and his team, or just

11:04:32 19    Dr. Kardinal?

11:04:33 20    A.  It would have just been Dr. Kardinal by then.

11:04:35 21    Q.  Okay.  So he just did that.  Okay.

11:04:38 22    A.  Yes.

11:04:38 23    Q.  And is it fair to say you didn't propose treatment options to

11:04:43 24    Ms. Kahn before she started her treatment plan?

11:04:46 25    A.  That's fair.

11:04:59  1    Q.  Okay.  Now, Dr. Kardinal proposed treatment options; is that

11:05:03  2    fair?

11:05:03  3    A.  Yes, he would have.

11:05:06  4    Q.  And, Doctor, you didn't discuss the risks and benefits of

11:05:19  5    potential treatment options with Ms. Kahn before she started her

11:05:23  6    treatment plan, did you?

11:05:24  7    A.  No.

11:05:25  8    Q.  You didn't explain to her what a clinical trial is, did you?

11:05:30  9    A.  No.

11:05:31 10    Q.  Dr. Kardinal discussed the risks and benefits of potential

11:05:37 11    treatment options with Ms. Kahn before she started the treatment

11:05:41 12    plan; is that fair?

11:05:42 13    A.  Fair.

11:05:42 14    Q.  And Dr. Kardinal explained to Ms. Kahn what her clinical

11:05:46 15    trial -- what the clinical trial was, correct?

11:05:48 16    A.  Yes.

11:05:49 17    Q.  NSABP B-40.  You didn't have that -- any conversation about

11:05:55 18    that with Ms. Kahn before she started her treatment; is that right?

11:05:59 19    A.  I did not.

11:05:59 20    Q.  Okay.  But Dr. Kardinal had a specific conversation with her

11:06:02 21    about the clinical trial, NSABP B-40, right?

11:06:06 22    A.  Yes.

11:06:07 23    Q.  You didn't discuss the potential side effects that Ms. Kahn may

11:06:13 24    experience?  You didn't discuss those with her before she started

11:06:16 25    her treatment plan, did you?

1977

11:06:18   1    A.  No, I did not.

11:06:19   2    Q.  Right.  But Dr. Kardinal discussed those potential side effects

11:06:24   3    with Ms. Kahn before she started her treatment plan, correct?

11:06:28   4    A.  Yes, yes.

11:06:30   5    Q.  Okay.  You didn't review the informed consent with Ms. Kahn

11:07:03   6    before she started the treatment plan that we've discussed here

11:07:07   7    today, did you?

11:07:08   8    A.  No, I did not.

11:07:09   9    Q.  Instead, Dr. Kardinal discussed the consent form, correct?

11:07:27  10    A.  Yes.

11:07:27  11    Q.  Dr. Larned, you didn't take over Ms. Kahn's care until she had

11:07:47  12    already started her clinical trial treatment plan; fair enough?

11:07:52  13    A.  Yes.

11:07:52  14    Q.  In fact, by the time you saw Ms. Kahn, she had already

11:07:56  15    completed her first dose of Taxotere, right?

11:07:59  16    A.  Yes.

11:08:00  17    Q.  Along with other combinations that she was taking at the time,

11:08:03  18    correct?

11:08:04  19    A.  Yes.

11:08:04  20    Q.  Okay.  And, in fact, as we reviewed the records earlier, she

11:08:08  21    had already lost her hair when you took over her treatment, right?

11:08:12  22    A.  Yes.

11:08:12  23    Q.  Now, is it fair to say that you didn't decide what drugs

11:08:22  24    Ms. Kahn would receive, but rather you executed the plan that

11:08:26  25    Dr. Kardinal and Ms. Kahn had already chosen together?

11:08:29  1    A.  Yes.

11:08:31  2    Q.  And since she had already started her Taxotere in the clinical

11:08:36  3    trial, you wouldn't have gone or re-gone over those consent forms

11:08:40  4    with her, would you have?

11:08:42  5    A.  No.

11:08:42  6    Q.  And you wouldn't have had any more discussion with her about

11:08:46  7    the risks and benefits of Taxotere at that point since that step

11:08:49  8    had already been done; fair enough?

11:08:52  9    A.  Yeah.  The only thing that would have changed that is if she

11:08:55 10    asked another question about it going forward.

11:08:57 11    Q.  Okay.  And, in fact, you and she never had any discussions

11:09:02 12    about -- about -- she didn't ask you any questions, right?

11:09:07 13    A.  No.

11:09:08 14    Q.  Including questions about any condition with her hair at that

11:09:12 15    particular time, right?

11:09:13 16    A.  Not during treatment, no.

11:09:15 17    Q.  Sure.  You never had any conversation with her about hair loss,

11:09:20 18    did you?  Ms. Kahn.

11:09:23 19    A.  I mean, she did comment on that as a side effect, yes.

11:09:26 20    Q.  Did you have any conversation with her about permanent hair

11:09:29 21    loss?

11:09:29 22    A.  No.

11:09:29 23    Q.  Doctor, you just referenced medical records and some of the

11:09:35 24    comments that Ms. Kahn made to you about the condition of her hair.

11:09:42 25    Can we talk about some of those?

11:09:45 1    A.  Okay.

11:09:46 2    Q.  Is that okay?

11:09:48 3    A.  Yes.

11:09:48 4    Q.  Okay.  So as we go through those records, I want to kind of

11:09:52 5    focus on what you heard and what you saw with Ms. Kahn.

11:09:55 6              So you took over her treatment after her treatment plan

11:09:59 7    had already been decided, correct?

11:10:01 8    A.  Yes.

11:10:01 9    Q.  And she had already lost her hair, right?

11:10:04 10   A.  Yes.

11:10:05 11   Q.  So let's look through some of your records and see what's

11:10:10 12   noticed about hair loss.  Is that -- can we do that?

11:10:16 13   A.  Okay.

11:10:16 14   Q.  All right.  Doctor, I'd like to have you take a look at the --

11:10:21 15   and I apologize for how small it is.  You're probably used to

11:10:25 16   reading these little things in the medical records.  This is the

11:10:29 17   January 8th, 2009 record, and we looked at this earlier.  Now, this

11:10:44 18   was when her cytotoxic chemotherapy had ended, correct?

11:10:50 19   A.  The preoperative part had ended.

11:10:54 20   Q.  Yes, thank you.

11:10:54 21   A.  Uh-huh.

11:10:56 22   Q.  And so the next step for her would have been the surgery; is

11:11:00 23   that right?

11:11:00 24   A.  Yes.

11:11:02 25   Q.  Now, pursuant to this note, you see that she notes that her

1980

11:11:12  1   alopecia had not resolved?

11:11:18  2            It's on page 3, Doctor, of the third page of what is

11:11:22  3   marked as -- what's marked as 1018 Kahn, Elizabeth, Ochsner Health

11:11:30  4   System, Bates-stamped 01215.  Do you see that there?

11:11:38  5   A.  Yes.

11:11:40  6   Q.  So at this point -- and if you could explain to me.  It looks

11:11:45  7   like -- is that Elizabeth Kahn reporting to you?  Is that how that

11:11:48  8   works?

11:11:49  9   A.  Yes.

11:11:56  10  Q.  Okay.

11:11:56  11  A.  Wait, on page 3?

11:11:56  12  Q.  Yes.

11:11:57  13  A.  That's -- hold on.  That's the exam.  So that's my commentary

11:12:09  14  on her exam.

11:12:11  15  Q.  Okay.  Good.  And if you could read that, does that say, "Hair

11:12:15  16  growing back in"?  Is that what that says?

11:12:18  17  A.  Yes.

11:12:18  18  Q.  Okay.  So that -- and the date of this exam is January 8th; is

11:12:23  19  that right?

11:12:24  20  A.  Yeah.

11:12:25  21  Q.  Okay.  So on January 8th, it's recorded in your note that hair

11:12:34  22  is growing back in, and she's done with the first phase of her

11:12:42  23  cytotoxic chemotherapy, right?

11:12:45  24  A.  Yes.

11:12:46  25  Q.  Now, I want to move on to the next record as we work through

11:13:08  1    these records and look at what is reported concerning Elizabeth

11:13:12  2    Kahn's hair.  And I want to place before you, Doctor, what is --

11:13:23  3    you got that okay?

11:13:25  4    A.  Uh-huh.

11:13:26  5    Q.  What is marked as Exhibit 1018 Kahn, Elizabeth, Ochsner Health

11:13:33  6    System Bates-stamped -- and if you could look at the third page --

11:13:37  7    01231.  And, Doctor, you see that this is a medical record which is

11:13:47  8    dated January 29th of 2009.  Do you see that?

11:13:53  9    A.  Yes.

11:13:54 10    Q.  Okay.  And so understanding what is reported on page 3

11:14:00 11    concerning hair there, what -- can you read that to the jury.

11:14:06 12    A.  "Hair growing back in."

11:14:08 13    Q.  Okay.  So would it be fair to say that, at that point in time,

11:14:15 14    Elizabeth's alopecia was -- Ms. Kahn's alopecia was not resolved if

11:14:20 15    you record hair growing back in?

11:14:21 16    A.  That's fair.

11:14:23 17    Q.  Had not resolved; that's fair?

11:14:25 18    A.  Yes.

11:14:26 19    Q.  Okay.  Doctor, moving along.  Next medical record, April 2nd of

11:15:00 20    2009.  And we have a Bates page there of 1018, Kahn, Elizabeth,

11:15:15 21    Ochsner Health System, Bates No. 01253.  And if you could turn to

11:15:24 22    the second page.

11:15:28 23    A.  (WITNESS COMPLIES.)

11:15:29 24    Q.  Do you see what's recorded there concerning Elizabeth Kahn's

11:15:35 25    hair?

11:15:37  1   A.  "Hair is growing back in."

11:15:42  2   Q.  Okay.  And so on that date, April 2nd of 2009, would it be fair

11:15:50  3   to say that her alopecia was not resolved?

11:15:53  4   A.  That's fair.

11:15:54  5   Q.  And, Doctor, moving to May 14th of 2009.  Okay.  And you have

11:16:17  6   that document in front of you, which is 1018 Kahn, Elizabeth,

11:16:23  7   Ochsner Health System, 01267.  Do you see that, her medical record,

11:16:29  8   for the date of May 14th of 2009?

11:16:35  9   A.  Yes.

11:16:35 10   Q.  And could you tell the jury what's reported under -- with

11:16:39 11   regard to hair in that medical record on that date?

11:16:42 12   A.  "Hair is growing back in."

11:16:45 13   Q.  So would it be fair to say that Elizabeth Kahn's alopecia was

11:16:49 14   not resolved on that date?

11:16:51 15   A.  I can see how it would be interpreted as such.  I mean, I'm

11:16:54 16   saying that it's still growing, so --

11:16:56 17   Q.  Right.  And I just want to make sure I'm fairly assessing that.

11:17:01 18   Is it reasonable to say that per her report, that it's not resolved

11:17:04 19   at that point in time?

11:17:05 20   A.  It's not back to baseline.  Otherwise, it wouldn't be commented

11:17:10 21   on.

11:17:16 22   Q.  Right.  And just for the record, the plaintiff's exhibit number

11:17:30 23   for these Ochsner records is 281- -- 2811.  And, Doctor, moving

11:17:41 24   along to August 13th of 2009.  And you see this medical record you

11:17:48 25   have before you, August 13th of 2009?

11:17:51  1    A.  Uh-huh.

11:17:52  2    Q.  And if you look in the fourth paragraph, the second sentence

11:18:00  3    there, you see where it says:  "She is pleased that her hair is

11:18:06  4    growing back"?

11:18:07  5    A.  Yes.

11:18:08  6    Q.  So would it be fair to state on that date, August 13th of 2009,

11:18:17  7    that Elizabeth Kahn's alopecia had not resolved based on the

11:18:22  8    reading of that medical record?

11:18:24  9    A.  Yes.

11:18:25  10   Q.  Doctor, moving along to November 16 of 2009.  And we have the

11:18:52  11   Bates number in the Ochsner Health System, 01325, and the same

11:18:59  12   exhibit for all those Ochsner records, 2811.

11:19:05  13        And on this November 16 of 2009, if you look on the first

11:19:12  14   page in that kind of first full paragraph that extends across, you

11:19:16  15   see the last sentence there?

11:19:18  16   A.  "Hair growing back slowly."

11:19:20  17   Q.  So would it be fair to say, based on that record, that

11:19:24  18   Elizabeth Kahn's alopecia had not resolved on November 16 of 2009?

11:19:30  19   A.  Yes.

11:19:30  20   Q.  Next placed before you, the medical record of February 23rd of

11:19:37  21   2010.  February 23rd of 2010, Doctor.  And I'd ask you the same

11:19:53  22   question with regard to the note on hair you see at the end of that

11:19:58  23   first full paragraph.  Can you read what that says there.

11:20:01  24   A.  "Hair growing back slowly."

11:20:04  25   Q.  And same question:  Would it be fair to say that

11:20:11  1   Elizabeth Kahn's, per that record, that her alopecia had not fully

11:20:15  2   resolved on that date, February 23rd?

11:20:18  3   A.  Yeah.

11:20:19  4   Q.  Next up, May 27 of 2010, Doctor.  This medical record -- and if

11:20:38  5   you can see, Doctor, I placed before you a medical record dated

11:20:42  6   May 27th of 2010.  And if you can see that -- again, that long

11:20:48  7   paragraph there, can you read what is noted with regard to the

11:20:54  8   condition of Elizabeth Kahn's hair.

11:20:56  9   A.  Still notes thinning hair.

11:20:58 10   Q.  Okay.  So fair to say that, per that medical record on

11:21:03 11   May 27th, alopecia not resolved?

11:21:06 12   A.  Yes.

11:21:06 13   Q.  Doctor, the medical record, August 30th of 2010.  Ochsner

11:21:12 14   medical record.  Same question:  You can see that same full

11:21:19 15   paragraph, last sentence.  Can you read for the jury what that

11:21:24 16   says.

11:21:25 17   A.  Still notes thinning hair.

11:21:29 18   Q.  Okay.  And so would it be fair to say at that point in time,

11:21:33 19   pursuant to that record, August 30th of 2010, that Elizabeth Kahn's

11:21:38 20   alopecia had not resolved?

11:21:39 21   A.  Yes.

11:21:40 22   Q.  Next up, November 30th.  November 30th of 2010, Ochsner medical

11:21:56 23   record for Elizabeth Kahn.  And, Doctor, can you read what that

11:22:01 24   medical record says concerning the condition of Elizabeth Kahn's

11:22:04 25   hair.

1985

11:22:05 1    A.  Still notes thinning hair.

11:22:07 2    Q.  So would it be fair to say that as of that date, per the

11:22:11 3    record, that Elizabeth Kahn's alopecia had not fully resolved?

11:22:15 4    A.  Yes.

11:22:15 5    Q.  Doctor, February 28th, 2011.  Same question:  What is noted in

11:22:27 6    that medical record concerning the condition of Elizabeth Kahn's

11:22:30 7    hair?

11:22:31 8    A.  Still notes thinning hair.

11:22:35 9    Q.  Fair to say that on that date, February 28th of 2011, pursuant

11:22:39 10   to that record, that Elizabeth Kahn's alopecia had not fully

11:22:43 11   resolved?

11:22:44 12   A.  Yes.

11:22:44 13   Q.  May 17th, 2011.  Same question, Doctor.  Can you tell the jury

11:22:59 14   what is noted in that Ochsner record for May 17th of 2011

11:23:04 15   concerning Elizabeth Kahn's hair.

11:23:05 16   A.  Still notes thinning hair.

11:23:07 17   Q.  So alopecia had not resolved pursuant to that record?

11:23:11 18   A.  Yes.

11:23:13 19   Q.  Doctor, August 18th of 2011.  Medical record from Ochsner.

11:23:19 20   Could you read for the jury what that record notes concerning the

11:23:22 21   condition of Elizabeth Kahn's hair.

11:23:24 22   A.  Still notes thinning hair, slightly better.

11:23:28 23   Q.  Okay.  So would it be fair to say that, on that date, that

11:23:31 24   Elizabeth Kahn 's alopecia had not resolved pursuant to that

11:23:35 25   record?

11:23:36  1    A.  Yes.

11:23:36  2    Q.  And then, Doctor, February 28th, 2012.  Ochsner medical record.

11:23:48  3    A.  Still notes thinning hair, slightly better.

11:23:51  4    Q.  Okay.  So, Doctor, would it be fair to say on that date, which

11:23:58  5    is February 28th of 2012, that Elizabeth Kahn's alopecia had not

11:24:07  6    resolved pursuant to that medical record?

11:24:10  7    A.  Yes.

11:24:11  8    Q.  Doctor, you were shown some photographs of Elizabeth Kahn in

11:24:20  9    this case.  And is it okay if I show you some more?

11:24:23 10    A.  Sure.

11:24:23 11    Q.  Okay.  Would you agree that photographs are always not the best

11:24:30 12    representation of a person's physical appearance, most accurate

11:24:34 13    representation?  Sometimes we can look better in a photograph, and

11:24:38 14    sometimes maybe not as good?

11:24:40 15    A.  Yes.

11:24:40 16    Q.  Doctor, I want to place before you a photograph that I will

11:24:48 17    represent to you -- and this is Plaintiff's Exhibit 3081.  I'll

11:25:01 18    represent to you, Doctor -- let me make sure I get this right --

11:25:07 19    that this is a photograph that was from 2013 for Elizabeth Kahn.

11:25:13 20         As you look at that -- and you recognize Ms. Kahn in that

11:25:17 21    photograph?

11:25:17 22    A.  Yes.

11:25:18 23    Q.  Is that an accurate depiction of what you recall her looking

11:25:21 24    like?

11:25:21 25    A.  Yes.

11:25:21 1   Q.  And, Doctor, would you agree that -- just from looking at that

11:25:27 2   picture -- that her alopecia is not resolved?

11:25:30 3   A.  Yes.

11:25:31 4   Q.  Doctor, I want to show you a photograph from 2014.  I'll

11:25:54 5   represent to you that Plaintiff's Exhibit 3137 is from 2014,

11:26:03 6   Doctor.  Now, from that photograph, 2014, would you agree that it

11:26:13 7   appears that Elizabeth Kahn's alopecia is not resolved?

11:26:16 8   A.  Yes.

11:26:17 9   Q.  Doctor, I'm going to show you a photograph from 2015.  You

11:26:46 10  recognize Elizabeth Kahn in that photograph?

11:26:48 11  A.  I do.

11:26:48 12  Q.  Would it be fair from viewing that photograph that it appears

11:26:52 13  that Elizabeth Kahn's alopecia is not resolved?

11:26:55 14  A.  Yes.

11:27:12 15  Q.  Let me show that photo.  This is the photo that you were

11:27:14 16  looking at for 2015, correct?

11:27:16 17  A.  Yes.

11:27:17 18  Q.  The photo where she's sitting around the table with two other

11:27:20 19  women?

11:27:20 20  A.  Yes.

11:27:21 21  Q.  Okay.  Doctor, 2016 photo that I'll represent to you is a

11:27:33 22  picture of Elizabeth Kahn.  And all you can see is the back of this

11:27:36 23  person's head.  Do you see that?

11:27:40 24  A.  Yes.

11:27:40 25  Q.  And I'll represent to you that that is Elizabeth Kahn.  From

11:27:45 1  that photo, does it appear that the person in this 2015 photo,

11:27:50 2  which is Exhibit No. 3264, that alopecia is not resolved?

11:27:57 3  A.  Yes.

11:27:57 4  Q.  2017.  I place before you a photograph, 3412.  And do you

11:28:11 5  recognize Elizabeth Kahn in that photograph?

11:28:12 6  A.  Yes.

11:28:13 7  Q.  And you would agree that, pursuant to this 2017 photograph of

11:28:20 8  Elizabeth Kahn, it appears that her alopecia is not resolved?

11:28:23 9  A.  Yes.

11:28:23 10 Q.  And, Doctor, I'll place before you a photograph from 2018.  And

11:28:54 11 it's not the greatest photograph, but do you recognize Elizabeth

11:28:58 12 Kahn in that photograph?

11:28:58 13 A.  I do.

11:28:59 14 Q.  Would it be fair to say that it appears in that photograph that

11:29:02 15 her alopecia is not fully resolved?

11:29:04 16 A.  Yes.

11:29:04 17 Q.  2019.  Doctor, I'll represent this is a photo from 2019,

11:29:18 18 Plaintiff's Exhibit 3566.  You recognize Elizabeth Kahn in that

11:29:22 19 photo?

11:29:22 20 A.  Yes.

11:29:22 21 Q.  Would it be fair to say that, in that photo, it appears that

11:29:27 22 Elizabeth Kahn's alopecia is not resolved?

11:29:29 23 A.  Yes.

11:29:29 24 Q.  2020, Plaintiff's Exhibit 3617.  Photograph of Elizabeth Kahn.

11:29:38 25 You recognize her in that photograph?

11:29:40   1    A.   I do.

11:29:40   2    Q.   Would it be fair to say that her alopecia appears not to be

11:29:44   3    resolved in that photograph?

11:29:45   4    A.   Yes.

11:29:45   5    Q.   And 2021, Plaintiff's Exhibit 3670.  Do you recognize

11:30:09   6    Elizabeth Kahn in this photo?

11:30:09   7    A.   Yes.

11:30:10   8    Q.   Doctor, would it be fair to say that, in that photograph from

11:30:14   9    2021, that it appears that Elizabeth Kahn's alopecia is not

11:30:19  10    resolved?

11:30:20  11    A.   Yes.

11:30:20  12    Q.   And, Doctor, I forgot to title this document.  Remember we

11:30:24  13    created -- when we went through the medical records.  Do you recall

11:30:27  14    this?  I can show this to you.

11:30:31  15    A.   Yes.

11:30:31  16    Q.   Do you recall that?

11:30:32  17    A.   Yes.

11:30:32  18    Q.   And is it fair if I title that "Dr. Larned's Medical

11:30:37  19    Records/Alopecia Notes"?  Is that a fair title for that?

11:30:42  20    A.   Yes.

11:30:43  21    Q.   Doctor, continuing to move briskly through this.  Just as we

11:31:18  22    reviewed those medical records and photos of Elizabeth Kahn, is it

11:31:23  23    okay if now we put that in the context of the treatment that she

11:31:27  24    received that you were a part of; is that okay?

11:31:31  25    A.   Yes.

11:31:31  1    Q.  And what I want to hand to you is a document that defense gave

11:31:35  2    you that was called Exhibit 1, okay?  And it's titled, "Clinical

11:31:47  3    Trial Treatment Timeline."  Obviously, you saw this document a

11:31:51  4    little while ago.

11:31:52  5    A.  Yes.

11:31:53  6    Q.  Okay.  And we'll go ahead and mark this as Exhibit 2 in the

11:32:05  7    deposition.  Doctor, you indicated that Elizabeth Kahn's

11:32:16  8    chemotherapy treatment -- well, first of all, you've seen the

11:32:23  9    chemotherapy with Taxotere, Avastin, and Xeloda represented on this

11:32:27 10    in Phase 1, correct?

11:32:28 11    A.  Yes.

11:32:29 12    Q.  And you began treating Elizabeth Kahn between the first bar and

11:32:33 13    the second bar; isn't that right?

11:32:36 14    A.  Yes.

11:32:36 15    Q.  If the bars represent the doses?

11:32:39 16    A.  Yes.

11:32:40 17    Q.  And when you began treating her, her hair had already fallen

11:32:45 18    out, right?

11:32:45 19    A.  Yes.

11:32:45 20    Q.  Okay.  So is it okay if I just put a black line on there

11:32:51 21    between those to represent that Ms. Kahn had alopecia at that point

11:32:55 22    in time?

11:32:55 23    A.  Yes.

11:32:56 24    Q.  Now, as we went through those last two documents, the

11:33:03 25    demonstratives where we went through your medical records and the

11:33:06  1    photographs, you saw that, in those medical records up through

11:33:12  2    2012, every notation in there you indicated was reasonably

11:33:17  3    representative of alopecia not resolved, correct?

11:33:20  4    A.  Yes.

11:33:20  5    Q.  So is it okay if I -- on this, to accurately reflect your

11:33:27  6    testimony, if I just put a red bar up to 2012 on there for alopecia

11:33:31  7    not resolved?

11:33:31  8    A.  Yes.

11:33:32  9    Q.  Okay.  And then, Doctor, you recall we went through those

11:33:55 10    photographs from 2013 -- 2013 forward, year by year, through 2021.

11:34:06 11    Do you recall that?

11:34:06 12    A.  Yes.

11:34:07 13    Q.  And is it fair if I put a bar -- I want to make sure we're

11:34:12 14    clear on this -- to represent -- to continue that red line for a

11:34:16 15    representative of, in those photographs, each year that it

11:34:19 16    identified, you indicated that it appeared that Elizabeth Kahn's

11:34:22 17    alopecia had not resolved; is that a fair --

11:34:26 18    A.  Yes.

11:34:26 19    Q.  Based on those photographs.  And you'll notice that this

11:34:44 20    clinical trial treatment guideline cuts off at 2018.  The timeline

11:34:49 21    that was created by defense counsel.  Do you see that?

11:34:53 22    A.  Yes.

11:34:54 23    Q.  Okay.  Now, Doctor, just to make clear when we see this.

11:35:08 24    Elizabeth Kahn's alopecia, as we look at Exhibit 2, on this, her

11:35:18 25    hair fell out before she started the Adriamycin, correct?

11:35:24  1    A.  Yes.

11:35:24  2    Q.  And, Doctor, Elizabeth Kahn's hair fell out, and she had

11:35:30  3    alopecia before she started the Cytoxan, correct?

11:35:34  4    A.  Yes.

11:35:35  5    Q.  And her hair fell out, and she had alopecia, Elizabeth Kahn

11:35:39  6    did, before her surgery, correct?

11:35:41  7    A.  Yes.

11:35:42  8    Q.  And Elizabeth Kahn's hair had fallen out, and she had radiation

11:35:47  9    before -- I'm sorry.  Her hair had fallen out before she had

11:35:54 10    radiation, correct?

11:35:55 11    A.  Yes.

11:35:55 12    Q.  And Elizabeth Kahn's hair had fallen out, and she had alopecia

11:36:01 13    before she started the tamoxifen, correct?

11:36:04 14    A.  Yes.

11:36:08 15    Q.  And, Doctor, earlier we talked about your areas of expertise,

11:36:38 16    which are extensive, and then you acknowledged that you are not an

11:36:42 17    expert in causes of hair loss; is that true?

11:36:46 18    A.  Yes.

11:36:47 19    Q.  So would it be fair to say that you are not offering an opinion

11:36:52 20    that Taxotere did or did not cause the permanent alopecia that

11:37:05 21    Elizabeth Kahn suffers from today?  Would that be fair to say?

11:37:07 22    A.  Yes.

11:37:08 23    Q.  Okay.  I want to make another exhibit here.  If you could mark

11:37:14 24    this as Exhibit 3.  Thank you, Doctor.

11:37:27 25    A.  You're welcome.

1993

11:37:29  1   Q.  Okay.  So this is the same timeline that we looked at just a
11:37:34  2   moment ago and that the defense had you look at a while ago.  Do
11:37:37  3   you recall that?
11:37:38  4   A.  Yes -- yes.
11:37:39  5   Q.  Now, with regard to tamoxifen, I want to have a conversation
11:37:43  6   about that, if we could.  You didn't -- I believe, based on your
11:37:48  7   testimony earlier, you didn't advise Ms. Kahn specifically about
11:37:51  8   any potential risk of alopecia from tamoxifen; is that fair to say?
11:37:56  9   A.  Yes.
11:37:57 10   Q.  Okay.  And nowhere in your records do you ever write down
11:38:04 11   that -- and I couldn't find it -- that Ms. Kahn's hair ever fully
11:38:09 12   regrew and then fell out again.  That's not recorded in your
11:38:12 13   records anywhere that we've seen today, is it?
11:38:14 14   A.  No.
11:38:15 15   Q.  And nowhere in your records do you write down that Ms. Kahn's
11:38:20 16   hair loss is caused by the tamoxifen, do you?
11:38:23 17   A.  I do not.
11:38:25 18   Q.  You didn't do any kind of differential diagnosis on tamoxifen,
11:38:35 19   right?
11:38:35 20   A.  No.
11:38:36 21   Q.  Doctor, so as part of Ms. Kahn's clinical trial she received,
11:38:40 22   you didn't recommend the Taxotere; is that fair enough?
11:38:43 23   A.  Yes.
11:38:44 24   Q.  That's true?  That was recommended by Dr. Kardinal, correct?
11:38:47 25   A.  Yes.

| | |
|---|---|
| 11:38:47 | 1 |
| 11:38:50 | 2 |
| 11:38:50 | 3 |

11:38:47  1   Q.  You didn't recommend the Avastin, correct?

11:38:50  2   A.  Correct.

11:38:50  3   Q.  That was Dr. Kardinal, right?

11:38:52  4   A.  Yes.

11:38:52  5   Q.  You didn't recommend the Xeloda, right?

11:38:55  6   A.  Yes.

11:38:55  7   Q.  That was recommended by Dr. Kardinal?

11:38:58  8   A.  Yes.

11:38:59  9   Q.  You didn't recommend the Adriamycin, correct?

11:39:02 10   A.  Yes.

11:39:03 11   Q.  That was recommended by Dr. Kardinal?

11:39:06 12   A.  (NO ANSWER ON VIDEO.)

11:39:07 13   Q.  You didn't recommend the tamoxifen, correct?

11:39:10 14   A.  Yes.

11:39:10 15   Q.  That was recommended by Dr. Kardinal, right?

11:39:13 16   A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

11:39:14 17   Q.  The only drug you recommended was the tamoxifen, correct?

11:39:17 18   A.  Yes.

11:39:18 19   Q.  Doctor, do you recall when defense counsel showed you the label

11:39:23 20   for Taxotere when they were asking you questions?

11:39:26 21   A.  Yes.

11:39:26 22   Q.  And that was a label that, because of -- when you got involved

11:39:31 23   in this -- treating Ms. Kahn, you never discussed that label with

11:39:34 24   her, did you?

11:39:35 25   A.  (NO ANSWER ON VIDEO.)

11:39:36 1   Q.  Doctor, you'd agree with me that because of work that people
11:39:39 2   like you do, early-stage breast cancer is highly survivable,
11:39:43 3   correct?
11:39:44 4   A.  Yes.
11:39:44 5   Q.  And that an early-stage breast cancer patient like Ms. Kahn
11:39:50 6   would have various treatment options, right?
11:39:52 7   A.  Yes.
11:39:52 8   Q.  One of those options would be chemotherapy with the taxane,
11:39:56 9   right?
11:39:57 10  A.  Yes.
11:39:58 11  Q.  And there are two main taxanes, Taxol and Taxotere.  You
11:40:02 12  mentioned another one, but those are two of the primary taxanes,
11:40:05 13  correct?
11:40:06 14  A.  Yes.
11:40:07 15  Q.  You would agree with me, wouldn't you, that Taxol and Taxotere
11:40:10 16  are equally efficacious?
11:40:13 17  A.  Yes.
11:40:14 18  Q.  When you're prescribing chemotherapy drugs or monitoring a
11:40:18 19  patient already on chemotherapy, you make decisions, in part, based
11:40:22 20  on the side effects of those drugs, right?
11:40:25 21  A.  Yes.
11:40:25 22  Q.  You rely on the drug label to give information about the drugs
11:40:31 23  you prescribe and their side effects, right?
11:40:34 24  A.  Yes.
11:40:34 25  Q.  And you find -- you've indicated you find "dear doctor letters"

11:40:39 1    with updated information about side effects to be helpful?

11:40:42 2    A.  Yes.

11:40:42 3    Q.  And those are letters that come from the pharmaceutical company

11:40:47 4    if they find out new information about their drug, right?

11:40:50 5    A.  Yes.

11:40:51 6    Q.  And you look at the label in the "dear doctor letters" in order

11:40:55 7    to be more informed about the potential side effects, right?

11:40:57 8    A.  Yes.

11:40:58 9    Q.  That's information you use when advising your patients?

11:41:01 10   A.  Correct.

11:41:02 11   Q.  You make prescribing decisions in part based on side effects,

11:41:07 12   correct?

11:41:07 13   A.  Correct.

11:41:10 14   Q.  But ultimately -- I mean, it's up to the patient to decide

11:41:14 15   which risks she's willing to take and which she's not willing to

11:41:18 16   take based on that conversation that you have with her, right?

11:41:21 17   A.  Yes.

11:41:22 18   Q.  With Ms. Kahn, do you remember when you were monitoring for the

11:41:27 19   issue that she had with the skin sloughing off?

11:41:30 20   A.  Uh-huh, yes.

11:41:31 21   Q.  Now, when she had that issue, you lowered the dose of the

11:41:36 22   Xeloda, correct?

11:41:36 23   A.  Yes.

11:41:37 24   Q.  And, in fact, you changed the prescription or prescribing

11:41:41 25   habits based on that side effect, right?

1997

11:41:43  1  A.  Yes.

11:41:43  2  Q.  And to be clear, though, you were just changing the dosage of a

11:41:49  3  drug chosen by Dr. Kardinal and Ms. Kahn, correct?

11:41:52  4  A.  Based on the parameters of the clinical trial.

11:41:54  5  Q.  Right.  Now, speaking of dosage, let's talk about that for a

11:41:59  6  second.

11:42:00  7          You were treat -- Ms. Kahn was treating in a clinical

11:42:03  8  trial, correct?

11:42:03  9  A.  Yes.

11:42:04 10  Q.  And there's nothing wrong with being in a clinical trial, is

11:42:08 11  there?

11:42:08 12  A.  No.

11:42:09 13  Q.  And I ask you this because some folks, some jurors may have a

11:42:14 14  perception that a clinical trial means it's a last-ditch effort.

11:42:19 15  And I just want to clarify that that's not the case for the

11:42:22 16  clinical trial that Ms. Kahn was on, correct?

11:42:24 17  A.  That is definitely not the case.

11:42:25 18  Q.  In fact, it was a very efficacious clinical trial, right?

11:42:35 19  A.  It was a large clinical trial to help us to determine what the

11:42:38 20  best treatment would be for early-stage breast cancers.

11:42:42 21  Q.  Right.  And it's because of patients like Ms. Kahn being

11:42:45 22  willing to be in a clinical trial with their cancer treatment that

11:42:49 23  that's of assistance to future women who are diagnosed with

11:42:53 24  early-stage breast cancer, right?

11:42:55 25  A.  Yes.

| | |
|---|---|
| 11:42:55 | 1 |
| 11:42:57 | 2 |
| 11:42:58 | 3 |
| 11:43:01 | 4 |
| 11:43:03 | 5 |
| 11:43:04 | 6 |
| 11:43:09 | 7 |
| 11:43:16 | 8 |
| 11:43:16 | 9 |
| 11:43:20 | 10 |

1  Q.  That's a benefit of a clinical trial, correct?

2  A.  Yes.

3  Q.  And it's true that you recommend clinical trials for your

4  patients, if it's appropriate treatment?

5  A.  Yes.

6  Q.  Now, specifically relating to Taxotere, the chemotherapy that

7  Ms. Kahn took, that was -- this phrase, "that was off-label,"

8  right?

9  A.  Because she was in a clinical trial, is that what you mean?

10  Q.  Yeah, yeah.

11  A.  It was not -- yeah.  The arm that she was on was an

12  experimental arm.  It was investigating other drugs.

13  Q.  Okay.  But I just want to make sure that jurors have a clear

14  understanding of what it means to be off-label.  That's not a bad

15  thing, is it?

16  A.  No.  These are all drugs, in this case, that have some data in

17  this diagnosis.

18  Q.  Right.

19  A.  And we're trying to compare what the best option would be.

20  Q.  And it's not unusual for you to prescribe chemotherapy

21  combinations off-label, is it?

22  A.  No.

23  Q.  And there's nothing wrong with that, correct?

24  A.  No.

25  Q.  In fact, that's normal to prescribe an off-label combination

11:44:04 1    therapy if that's in a patient's best interest, right?

11:44:08 2    A.  It's one of the most important things we do in medical

11:44:12 3    oncology.

11:44:12 4    Q.  Right.  Explain that if you could?

11:44:14 5    A.  So in clinical trials, we're trying to determine if there's a

11:44:19 6    superior regimen to one that's already known to better treat and

11:44:23 7    offer long-term survival to our cancer patients.

11:44:28 8    Q.  Now, if anyone tried to imply, in this case, that Ms. Kahn's

11:44:33 9    use of Taxotere in the combination therapy off-label was in some

11:44:36 10   way a bad thing or that caused -- you would tell the jury to ignore

11:44:41 11   that that's not true, correct?

11:44:43 12   A.  Correct.  That's true.

11:44:44 13   Q.  Now, with regard to the dosage.  The label use of Taxotere has

11:44:49 14   a recommended dose, right?

11:44:51 15   A.  Yes.

11:44:51 16   Q.  And do you recall, off the top of your head, what that is?

11:44:55 17   A.  It depends on the regimen.  But if it's every three weeks, it's

11:45:00 18   75 milligrams per meter squared.

11:45:02 19   Q.  Right.  It's six doses?

11:45:04 20   A.  Again, depends on the regimen.

11:45:05 21   Q.  Depends on the regimen.  Right.

11:45:07 22           And Dr. Kardinal's plan for Ms. Kahn was to give her 75

11:45:11 23   milligrams per meter squared for her infusions, right?

11:45:15 24   A.  Yes.

11:45:15 25   Q.  And at the conclusion of Ms. Kahn's chemotherapy, the first

11:45:23   1   phase of her chemotherapy, she still had breast cancer, didn't she?

11:45:30   2   A.  Yes.

11:45:32   3   Q.  Right.  She had to get the surgery to remove the cancer, right?

11:45:37   4   A.  In her case, yes.

11:45:40   5   Q.  Yes.

11:45:41   6   A.  Sometimes patients have a complete pathologic response to

11:45:44   7   chemotherapy.

11:45:44   8   Q.  Right.  But in Ms. Kahn's case, the Taxotere hadn't given her a

11:45:48   9   complete pathologic response, had it?

11:45:50  10   A.  She had some response but not full response at the time of

11:45:53  11   surgery.

11:45:54  12   Q.  So the surgery was necessary --

11:45:56  13   A.  Always is.

11:45:57  14   Q.  -- in order to give her the best chance for survival?

11:45:59  15   A.  Yes.

11:46:00  16   Q.  Doctor, just a few more questions.

11:46:03  17           I just want to make it clear for the jury.  This is not a

11:46:07  18   situation where you knew about the type of permanent hair loss that

11:46:13  19   Elizabeth Kahn might suffer and you just chose not to warn her.

11:46:17  20   That's not the situation here, correct?

11:46:19  21   A.  No, definitely not.

11:46:21  22   Q.  Right.  As a matter of fact, you weren't even involved in that

11:46:24  23   advisory, that was Dr. Kardinal, right?

11:46:25  24   A.  Yes.

11:46:26  25   Q.  You don't substitute your judgment for the patients, the

11:46:30  1    patient still gets a say in what treatment they get, right?

11:46:34  2    A.  Absolutely.

11:46:35  3    Q.  And when you make a medical judgment, you still provide risk

11:46:39  4    and benefit information to the patient?

11:46:41  5    A.  Yes.

11:46:42  6    Q.  All right.  And you don't strap them to the table and

11:46:46  7    administer the drug; that's not the way it works, right?

11:46:50  8    A.  No.  They can also opt out at any time.

11:46:53  9    Q.  Sure.  Or they could choose a different combination therapy if

11:46:56  10   you had that conversation with them, correct?

11:46:58  11   A.  Yes.

11:46:59  12   Q.  And a patient can't accept a risk that is not conveyed to them,

11:47:04  13   correct, it's impossible?

11:47:06  14   A.  That's the consent process, yes.

11:47:06  15                        REDIRECT EXAMINATION

11:47:06  16   BY MR. MOORE:

11:47:14  17   Q.  This is the first photograph that he showed you?

11:47:16  18   A.  Yes.

11:47:17  19   Q.  Okay.  And I think you said this was in 2013?

11:47:21  20   A.  I believe so, yes.

11:47:22  21   Q.  And did Mr. Schanker show you any pictures from 2012?

11:47:28  22   A.  Not if that's dated 2013.

11:47:32  23   Q.  Okay.  And then -- or from 2011, '10, or 2009?

11:47:37  24   A.  No.

11:47:38  25   Q.  And when this photograph was taken, if the date is correct that

11:47:42  1   was represented it was in 2013, Ms. Kahn would have -- at that

11:47:46  2   point in time -- have undergone four years of estrogen suppression

11:47:51  3   with tamoxifen?

11:47:52  4   A.  Yes.

11:47:54  5   Q.  And you were asked a series of questions about whether or not

11:47:59  6   you recommended certain medicines.

11:48:02  7   A.  Yes.

11:48:02  8   Q.  I think you went through all of the medicines about whether you

11:48:05  9   recommended them.  And is it true that when you took over

11:48:11 10   Ms. Kahn's care and treatment, that you made the medical judgment

11:48:16 11   to recommend that she proceed with therapy for each therapy

11:48:21 12   received while she was under your care and treatment?

11:48:23 13   A.  Yes, that's part of the process.

11:48:25 14   Q.  And you were asked also about Taxol.  And what the other -- the

11:48:34 15   other taxane.  Do you recall that testimony?

11:48:36 16   A.  Yes.

11:48:37 17   Q.  Okay.  And does Taxol have certain risks that Taxotere does not

11:48:43 18   have?

11:48:43 19   A.  Yes.

11:48:44 20   Q.  Okay.  And if Ms. Kahn had come to you on that first visit and

11:48:52 21   said, I want to take Taxol instead of Taxotere, could you tell this

11:48:57 22   jury that her hair would look any different today than it does?

11:49:01 23   A.  There's no way for me to know that.

11:49:03 24   Q.  And then do you recall me showing you this photograph, which is

11:49:07 25   Defendant's Exhibit 3145?

11:49:09  1    A.  Yes.

11:49:10  2    Q.  And that picture was taken June 30, 2009, I'll represent to

11:49:16  3    you.  If I set Plaintiff's Exhibit 3081 next to it, would you agree

11:49:23  4    that the hair in the 2009 photo looks different than the hair in

11:49:32  5    the 2013 photo?

11:49:33  6    A.  That's a little hard to do.  I mean, yes, possibly.  But it's

11:49:36  7    also a different angle, a different hair comb-over, different

11:49:42  8    looking.

11:49:42  9    Q.  Okay.  What about the hair, I think this was represented to be

11:49:46  10   2020 or '21.  Does that look different than either of the photos in

11:49:51  11   2009 or 2013?

11:49:53  12   A.  It does.  I've known her a long time.  Her hair is also lighter

11:49:56  13   in this picture than it was before.

11:49:56  14   Q.  All right.

11:50:00  15       (WHEREUPON, THE DEPOSITION WAS CONCLUDED.)

11:50:03  16           MR. LAMBERT:  Your Honor, may we sidebar?

11:50:05  17           THE COURT:  Yes.

11:50:21  18       (WHEREUPON, A CONFERENCE HELD AT THE BENCH.)

11:50:21  19           MR. LAMBERT:  We just have two photographs to enter into

11:50:24  20   the record.  And then we have a -- but we have a substitute for the

11:50:30  21   Ochsner records.  The records that we moved in before, 3,000 pages,

11:50:37  22   this has just the relevant records.  I don't know if they'd had a

11:50:41  23   chance to look at them.

11:50:42  24           MR. MOORE:  No.  Why don't you just use the pages that

11:50:45  25   you --

2004

11:50:45 1          MR. LAMBERT:  So that's what that is.  Okay.  We have to
11:50:48 2   fix that.
11:50:49 3          And then I think we can do -- they can rest and then we
11:50:55 4   can do lunch.
11:50:55 5          THE COURT:  Okay.  Good.  And I am going to ask you if
11:50:58 6   you have any rebuttal.
11:51:02 7          Okay.  All right.  So you want to enter those in --
11:51:08 8          MS. SASTRE:  I think we can do this all later.
11:51:09 9          THE COURT:  Okay.  All right.  That will be fine.  Thank
11:51:15 10  you.
11:51:15 11     (OPEN COURT.)
11:51:21 12         THE COURT:  All right.  Ms. Sastre.
11:51:22 13         MS. SASTRE:  Yes, Your Honor.
11:51:23 14         THE COURT:  Next witness.
11:51:24 15         MS. SASTRE:  Your Honor, the defense, at this time would
11:51:26 16  rest subject to motions that are pending before the Court.
11:51:29 17         THE COURT:  Thank you.
11:51:30 18         MS. SASTRE:  Thank you.
11:51:31 19         THE COURT:  Mr. Lambert, any rebuttal?
11:51:34 20         MR. LAMBERT:  No rebuttal, Your Honor.
11:51:39 21         THE COURT:  Okay.  Members of the jury, you have now
11:51:40 22  heard all of the evidence that you will hear during the -- that you
11:51:45 23  will hear during this trial.  What's remaining is argument of
11:51:49 24  counsel and instructions by the Court.
11:51:53 25         It's 10 to 12:00 now, so we will take our lunch recess

11:51:57 1    and we'll be at recess until 1:00 p.m.  Following that, you will

11:52:03 2    return and you will hear argument of counsel and instructions on

11:52:05 3    the law that you are to follow.

11:52:09 4           Let me caution you again, you should not begin your

11:52:13 5    deliberations.  You should not discuss this case amongst

11:52:17 6    yourselves.  You should wait until you hear the argument of counsel

11:52:20 7    and the law that you are to apply.

11:52:22 8           So with those instructions, I now say it's time for

11:52:28 9    lunch.  We will recess until 1:00 p.m.

11:52:32 10          THE DEPUTY CLERK:  All rise.

11:52:33 11       (WHEREUPON, THE JURY EXITED THE COURTROOM.)

11:52:57 12          THE COURT:  Mr. Moore.

11:52:58 13          MR. MOORE:  Thank you, Your Honor.  In conjunction with

11:53:00 14   the direct examination of Dr. Zoe Larned, the defense would

11:53:04 15   formally offer, file, and introduce Defense Exhibits 3879, pages

11:53:12 16   970, 2116, 1037, 1254, 1829, 1639, 984, 1638, and 1637.

11:53:32 17          We would also move in Defendant's 2166.  I noticed during

11:53:37 18   the video that I referred to the consent form as Defendant's 2166,

11:53:44 19   but the exhibit that displayed said 2035.  I think that's because

11:53:49 20   2035 is already in evidence, but since I identified it on the

11:53:52 21   record, I thought I would clip that out and they would just see

11:53:56 22   2035.  But since I mentioned it, in case someone wrote it down, we

11:54:01 23   just have a redundant exhibit of 2166.

11:54:03 24          THE COURT:  Okay.  Maybe we can just get with Erin on

11:54:06 25   that.  That's fine.

11:54:07 1          MR. LAMBERT:  Subject to our previous objections, we

11:54:10 2     don't object.

11:54:13 3          With regard to the Dr. Larned video, plaintiffs would

11:54:17 4     move in P3081, P3137, P3412, those are photographs that were

11:54:28 5     presented.  The remainder of the photographs are already in

11:54:31 6     evidence.

11:54:34 7          MR. MOORE:  No objection, Your Honor.

11:54:35 8          THE COURT:  Admitted.

11:54:35 9          MR. LAMBERT:  And then we noticed in the Court's listing

11:54:42 10    of exhibits that have been entered, P2811 is a voluminous set of

11:54:49 11    medical records.  It should be replaced -- substituted with

11:54:55 12    P2811.1, and I'll have that provided to Ms. Mouledous.

11:54:58 13         THE COURT:  Okay.

11:54:58 14         MR. MOORE:  No objection.

11:55:00 15         THE COURT:  All right.  So ordered.  Is there anything

11:55:03 16    else?

11:55:08 17         All right.  Thank you all.

11:55:44 18       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

19

20                          *  *  *  *  *

21

22

23

24

25

1
2
3                      REPORTER'S CERTIFICATE
4
5          I, Karen A. Ibos, CCR, Official Court Reporter, United
6    States District Court, Eastern District of Louisiana, do hereby
7    certify that the foregoing is a true and correct transcript, to the
8    best of my ability and understanding, from the record of the
9    proceedings in the above-entitled and numbered matter.
10
11
12                     ___/s/ Karen A. Ibos_____
13                     Karen A. Ibos, CCR, RPR, CRR, RMR
14                     Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25