1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4   IN RE:  TAXOTERE (DOCETAXEL)    *      16-MD-2740
    PRODUCTS LIABILITY LITIGATION   *
5                                   *      Section H
                                    *
6   Relates to:  Elizabeth Kahn     *      November 18, 2021
             16-CV-17039            *
7   * * * * * * * * * * * * * * * * *

8

9              DAY 8 - AFTERNOON SESSION
           TRANSCRIPT OF JURY TRIAL BEFORE
10          THE HONORABLE JANE T. MILAZZO
            UNITED STATES DISTRICT JUDGE
11

12  Appearances:

13

14  For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                                & Warshauer, LLC
                               BY:  M. PALMER LAMBERT, ESQ.
15                             1100 Poydras Street, Suite 2800
                               New Orleans, Louisiana 70163
16

17  For the Plaintiffs:        Barrios Kingsdorf & Casteix, LLP
                               BY:  DAWN M. BARRIOS, ESQ.
18                                  ZACHARY L. WOOL, ESQ.
                               701 Poydras Street, Suite 3650
19                             New Orleans, Louisiana 70139

20

21  For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                               BY:  CHRISTOPHER L. COFFIN, ESQ.
                               1100 Poydras Street, Suite 2225
22                             New Orleans, Louisiana 70163

23

24  For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                               BY:  JESSICA PEREZ REYNOLDS, ESQ.
                               24110 Eden Street
                               Post Office Drawer 71
25                             Plaquemine, Louisiana 70765

2009

```
 1   APPEARANCES:

 2
     For the Plaintiffs:           Gibbs Law Group, LLP
 3                                 BY:  KAREN BARTH MENZIES, ESQ.
                                   6701 Center Drive West, Suite 1400
 4                                 Los Angeles, California 90045

 5
     For the Plaintiffs:           Bachus & Schanker, LLC
 6                                 BY:   J. KYLE BACHUS, ESQ.
                                         DARIN L. SCHANKER, ESQ.
 7                                 101 W. Colfax Avenue, Suite 650
                                   Denver, Colorado 80202
 8
 9   For the Plaintiffs:           DAVID F. MICELI, LLC
                                   BY:   DAVID F. MICELI, ESQ.
10                                 Post Office Box 2519
                                   Carrollton, Georgia 30112
11
12   For the Plaintiffs:           Martzell Bickford & Centola
                                   BY:  LAWRENCE J. CENTOLA, ESQ.
13                                 338 Lafayette Street
                                   New Orleans, Louisiana 70130
14
15   For the Sanofi                Irwin Fritchie Urquhart
     Defendants:                        & Moore, LLC
16                                 BY:   DOUGLAS J. MOORE, ESQ.
                                         KELLY E. BRILLEAUX, ESQ.
17                                 400 Poydras Street, Suite 2700
                                   New Orleans, Louisiana 70130
18
19   For the Sanofi                Shook Hardy & Bacon, LLP
     Defendants:                   BY:   HARLEY V. RATLIFF, ESQ.
20                                       JON A. STRONGMAN, ESQ.
                                   2555 Grand Boulevard
21                                 Kansas City, Missouri 64108

22
     For the Sanofi                Shook Hardy & Bacon, LLP
23   Defendants:                   BY:   HILDY M. SASTRE, ESQ.
                                   201 Biscayne Boulevard, Suite 3200
24                                 Miami, Florida 33131

25
```

2010

```
1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, Room B-275
2                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
3

4

5
     Proceedings recorded by mechanical stenography using
6    computer-aided transcription software.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2011

1                                    <u>INDEX</u>

2                                                          <u>Page</u>

3    Closing Arguments
          Darin L. Schanker, Esq.                          2012
4         Hildy M. Sastre, Esq.                            2044
          Darin L. Schanker, Esq.                          2088
5

6    Jury Instructions                                     2094

7
     Question from the Jury                                2112
8

9    Verdict of the Jury                                   2114

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2012

|       |     |                                                                        |
|-------|-----|------------------------------------------------------------------------|
| 12:58 | 1   | **AFTERNOON SESSION**                                                  |
| 12:58 | 2   | **(November 18, 2021)**                                                |
| 01:02 | 3   | **THE COURT:**  All jurors are present.  The Court is                  |
| 01:02 | 4   | back in session.  You may be seated.                                   |
| 01:02 | 5   | Mr. Schanker.                                                          |
| 01:03 | 6   | **MR. SCHANKER:**  Thank you, Your Honor.                              |
| 01:03 | 7   | Good afternoon, folks.  First and foremost,                            |
| 01:03 | 8   | Ms. Kahn wanted me to tell you that she understands obviously          |
| 01:03 | 9   | that each of you have had hardships to be here for the last two        |
| 01:03 | 10  | weeks, understandably, and that she thanks you for your time.          |
| 01:03 | 11  | So in just a little while you're going to get                          |
| 01:03 | 12  | the case and you're going to have two jobs.  Your first job is         |
| 01:03 | 13  | going to be to answer the questions that Judge Milazzo gives to        |
| 01:03 | 14  | you, to go toward deciding this case; and then the second job          |
| 01:04 | 15  | you're going to have is going to be to explain to your fellow          |
| 01:04 | 16  | jurors why you decided or feel the way you do on each one of           |
| 01:04 | 17  | those questions.  I would like to give you some suggestions on         |
| 01:04 | 18  | how to do that, if that's okay.                                        |
| 01:04 | 19  | I was pleased as I looked back, preparing to                           |
| 01:04 | 20  | share remarks with you here to the opening statement that I            |
| 01:04 | 21  | gave you on Monday, about 10 days ago, and realized that the           |
| 01:04 | 22  | evidence had come in just the way we believed it would in this         |
| 01:04 | 23  | case.  It made my job easier.                                          |
| 01:04 | 24  | If you recall, back on Monday I told you that                          |
| 01:04 | 25  | this was a simple case, that Sanofi knew that Taxotere causes          |

01:04   1   PCIA, that Sanofi hid the risk of PCIA, and that Ms. Kahn must
01:04   2   live with Grade 2 PCIA forever.
01:05   3            Well, when you get this case as a juror,
01:05   4   Judge Milazzo will give you -- she is going to read these to
01:05   5   you in a little bit the jury instructions, the law that you
01:05   6   will use to decide this case.
01:05   7            One of those laws that you're going to get is
01:05   8   one that Judge Milazzo explained to you way back when you were
01:05   9   in jury selection on this case.  She read it to you before
01:05  10   that.  That is the burden of proof, how much evidence you need
01:05  11   to decide these various questions that you're going to have.  I
01:05  12   just wanted to spend just a moment going over that with you if
01:05  13   that's okay.
01:05  14            You remember Judge Milazzo explained that this
01:05  15   is not, obviously, a criminal case where the standard, how much
01:05  16   proof is needed to prove the case in a criminal is beyond a
01:05  17   reasonable doubt.  Beyond a reasonable doubt, that's not what
01:05  18   this case is.
01:05  19            It is a civil case.  And as you can see, the
01:06  20   standard then is the preponderance of the evidence, more likely
01:06  21   so than not so, more likely true than not true.  Judge Milazzo
01:06  22   gave some examples of that way back Monday, a week ago.  Some
01:06  23   folks think of it as just tilting the scales.  That's all the
01:06  24   proof that we need to prove our case.
01:06  25            Now, that's the law.  We believe that we have

01:06  1    proved it far beyond that, but that is the law that you have
01:06  2    taken a sworn oath to apply as a juror in this case.
01:06  3              So you're going to have to answer four questions
01:06  4    yes or no.  I would like to go through those questions with you
01:06  5    on the verdict form, if I could.
01:06  6              I will tell you right upfront that we believe
01:06  7    that your answer to each one of those should be yes,
01:06  8    unequivocally yes.  I'm going to explain to you how we believe
01:06  9    you should get there.
01:06  10             So what have you seen and heard in the courtroom
01:07  11   in this case?  The golden rule of labeling.  What a company
01:07  12   knows it must disclose in the label.  In this case you learned
01:07  13   about the history of the Taxotere label, and to educate you on
01:07  14   that, you heard from this man, Mr. Aussel, the global medical
01:07  15   affairs director from Sanofi.  He was a 20-year employee with
01:07  16   the company or he worked on Taxotere for 20 years, and he
01:07  17   talked to you about that language, that important language:
01:07  18   Hair generally grows back.  Alopecia and what it means.
01:07  19             He explained that that 1996 label, that was the
01:07  20   first label that ever came out with the Taxotere when it was
01:07  21   approved for metastatic use.  Mr. Aussel explained clearly that
01:07  22   that was never intended to warn of permanent hair loss, or
01:08  23   PCIA.  That's not what it was intended to do.  Because Sanofi
01:08  24   didn't even know back then that Taxotere could cause PCIA --
01:08  25   the reason they didn't know is -- remember, it was only used

1    for metastatic use at that point in time.  It wasn't used for
2    the early stage breast cancer.  Obviously you can't warn of
3    something you don't know.
4            Well, in this case you have heard from or heard
5    about these four Sanofi employees, and they have all admitted
6    something important:  They have admitted that the label,
7    Taxotere label, does not warn about PCIA.
8            You heard from one of the global safety
9    officers.  Mr. Palatinsky said it's not a warning for permanent
10   hair loss.
11           You saw an email from Noel Quinn -- that's a
12   scientist -- admitting that it's not -- acknowledging that it's
13   not a warning for permanent hair loss.
14           Obviously you heard from Ruth Avila, who is the
15   sales representative who came and spoke to you and explained
16   that she was never trained or understood that that label was a
17   warning for hair loss.  And Mr. Aussel himself said that it's
18   not a warning for hair loss.
19           You heard from the other global safety officer.
20   That's Amy Freedman.  What did she admit to you under oath?
21   This was obviously back in -- she testified recently but
22   referring back to 2006.  She indicated specifically -- she
23   admitted under oath that Sanofi knew in 2006 that Taxotere
24   causes the PCIA.
25           Mr. Palatinsky, that other global safety

2016

01:09  1   officer, he confirmed in writing that Sanofi knew by January of
01:09  2   2007 that Taxotere causes PCIA.  Remember, he put this proposal
01:10  3   together to be used in a clinical trial and indicated that
01:10  4   these side effects -- this is what he wrote that we know about
01:10  5   at present.  He mentioned hair loss, but he also described this
01:10  6   new and different side effect, permanent hair loss.  So
01:10  7   Palatinsky confirmed that.
01:10  8              Then you have heard a lot, a whole lot about the
01:10  9   Sedlaceck abstract.  That is a very important document in this
01:10  10  case.  It's just a one-pager.  It's simple and it's pretty
01:10  11  short, but it's packed with information that's important.  This
01:10  12  was the Denver oncologist who had always told his patients, his
01:10  13  female patients don't worry.  It's going to come out, but
01:10  14  started to learn something new and different concerning
01:10  15  Taxotere.
01:10  16             He looked at his patient population, those that
01:10  17  were taking the Taxotere in combination and isolated it out and
01:10  18  saw this condition that we know now as the Grade 2 PCIA.  He
01:11  19  went on to explain that such an emotionally devastating
01:11  20  long-term toxicity from this combination therapy with the
01:11  21  Taxotere needs to be taken into account when you are going to
01:11  22  be treating women who are going to be cured, who are going to
01:11  23  survive.
01:11  24             So long and short, we know that Sanofi knew
01:11  25  about this document.  Bottom line is they knew Grade 2.  So the

01:11
01:11
01:11
01:11
01:11
01:11
01:11
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:12
01:13

1    question is:  Did they follow that golden rule of labeling?

2    Did they disclose?  Well, the answer is plain and simple:  No.

3            Sanofi's label disclosures for Taxotere over the

4    years.  We know from the beginning, 1996 -- Aussel tells us

5    they weren't warning of permanent hair loss.

6            2006, after Freedman internally knows,

7    acknowledges that Sanofi knew at that time, was there a label

8    change?  No.  No change.

9            2007, the next year, no change.

10            2008, that's the year that Elizabeth Kahn

11    received the Taxotere, there's no label change at that point in

12    time.

13            But it gets worse than that, folks.  If you

14    recall the testimony of Ruth Avila -- she was the sales

15    representative.  And, remember, as a sales representative she

16    is only allowed to discuss what's in the label -- she called it

17    the package insert.  She can't go outside of it in advising.

18    She had been specifically trained as a sales representative to

19    tell the doctors that hair loss with Taxotere is temporary.

20    Which doctors did she call on?  The very doctors in the case:

21    Dr. Kardinal, Dr. Larned, as well, that Ochsner office.

22            What's important about all this sales reps,

23    including Ruth Avila, catch wind of the Sedlaceck abstract, but

24    they are instructed by Sanofi that they are not to tell doctors

25    about PCIA, and the rationale is it's not in the label.  So, in

1    essence, she is trained to tell doctors that it's temporary,

2    but -- and she knows it's not, but she's not permitted to

3    because Sanofi doesn't update the label.  In effect, they mute

4    her.

5              It gets worse than that because Ms. Avila

6    explained this Patient Alopecia Tear Sheet.

7              This is all going on at the same time, before

8    Ms. Kahn gets the Taxotere.  Well, this Patient Alopecia Tear

9    Sheet specifically -- it was explained by Ms. Avila that it's a

10   document that is basically like a vehicle or a cheat sheet in

11   order for regular people and the nurses, too, to understand

12   what the label really means.  Like in English what does it

13   mean.  This is what this -- translates the label.

14             This is a document that Ruth Avila gives out to

15   doctors offices just like Ochsner.  Well, how does it define

16   alopecia?  It defines it as a common yet temporary side effect.

17   It goes on to explain if you lose your hair, it's telling you

18   when it's going to come back.  It will come back after the

19   treatments are over or may grow back while you are still having

20   the treatments.

21             The bottom line with regard to this is, at the

22   same time that Sanofi knows, they know Grade 2, they haven't

23   updated their label.  They are preventing the sales

24   representatives from disclosing the information that they know,

25   that the sales reps know.  They are having them hand out this

01:14  1    information that says the exact opposite.

01:14  2               You heard from Dr. Plunkett in this case.  She

01:14  3    is the drug label expert you heard from, the only drug label

01:14  4    expert you heard from in this case.  She indicated that the

01:15  5    label and the words that are in the label -- you will remember,

01:15  6    this is the label that was in question at the time.  It has

01:15  7    alopecia in there, hair loss in there 12 times.  But she

01:15  8    explains clearly that that word does not adequately warn of

01:15  9    what Sanofi knew.

01:15  10              Bottom line, folks, they had 12 opportunities to

01:15  11   do the right thing, Sanofi did here with their label.  Every

01:15  12   time they repeat that word, and they broke the golden rule

01:15  13   every single time.

01:15  14              So, you know, now why all of this is so

01:15  15   important.  It's because the whole system is set up so that

01:15  16   patients are protected and patients have knowledge.  The system

01:15  17   is based on the following, right?  It's activating the

01:15  18   megaphone.  The way it's set up is that the label when it's

01:15  19   updated serves as a megaphone to blast out the information.  If

01:16  20   the system is followed, then it works.  You have a sales

01:16  21   representative -- if the label is updated, right, then the

01:16  22   megaphone blasts out the information, and Ruth Avila can now

01:16  23   talk about it and share it with doctors.

01:16  24              If the system works right and the label is

01:16  25   activated with an update, then the megaphone blasts the

2020

1    information, and informed subsequent, just like the one that

2    Ms. Kahn signed, gets updated with the information that the

3    company knows.

4                    Patient materials like Ms. Kahn testified about.

5    She got that binder from Ochsner, right, collected.  If the

6    label is updated and the megaphone blasts out, what happens to

7    that binder?  It gets updated with the information so that the

8    patient can be informed.

9                    Promotional materials, like that tear sheet that

10   we just looked at, gets updated as well when the label is

11   updated and the megaphone blasts out.

12                   "Dear Doctor" letters.  Letters can go out to

13   doctors, informing them of label updates.  Speaker programs get

14   updated.

15                   The point of this is that is how the doctors are

16   uniformly informed, doctors just like Dr. Kardinal, and

17   ultimately then doctors can pass this information on to

18   patients so they can make informed decisions.  That's how the

19   system is supposed to work.

20                   The megaphone would have been activated if

21   Sanofi had updated the label.  It's plain and simple, folks.

22   Kardinal and Ms. Kahn could have had that informed discussion,

23   and the PCIA warning would have been in the informed consent

24   that Ms. Kahn signed, and their discussion would have been very

25   different.  They would have talked about it, had the

1    opportunity to talk about it.

2              Instead, what happened?  In this case, when

3    Sanofi kept this information on PCIA out of the label, the

4    label gets muted.  When the label is muted, all these sources

5    that get updated with the information to pass it on don't get

6    the information, which then means the doctors don't get the

7    information, including Dr. Kardinal, which then results in

8    patients not knowing.  The megaphone gets silenced.  Ladies and

9    gentlemen, you will see that the best way to hide a side effect

10   is to keep it out of the label.

11             Well, Ms. Kahn's informed consent -- and we

12   heard a lot about Ms. Kahn's informed consent.  The silencing

13   of the megaphone worked in this case.  There was no description

14   of what Sanofi knew.  This is all it said, hair loss, nothing

15   about permanent, nothing about Grade 2 PCIA, only hair loss.

16   And why wasn't it in there, again?  You get it, right?  Because

17   the golden rule wasn't followed.

18             We heard a lot about the informed consent form

19   and how important it is.  You heard from Dr. Bosserman last

20   week on this issue.  Dr. Bosserman explained that it's

21   inappropriate to hide known side effects in the fine print.

22   That's not the way this is supposed to work.  You can't gloss

23   over a known side effect in a section like this where it talks

24   about things you cannot predict.  You can't gloss it over by

25   just saying, "Oh, anything can happen."  That breaks, as

2022

1  Dr. Bosserman explained, every rule of the informed consent

2  process.  In this country we have the right to know so patients

3  can make informed choices.  That's the whole reason we have the

4  golden rule.

5          You saw that, ladies and gentlemen, not only did

6  Sanofi fail to warn, but they actively suppressed the

7  information.  The result is Sanofi failed to adequately warn

8  Dr. Kardinal of the risk of PCIA.

9          Now, this is the first question that you are

10  going to be faced with.  I'll read it to you.  It's legalese.

11  Talk about what does it really mean.

12          "Number 1:  Do you find by a preponderance of

13  the evidence that Sanofi failed to take reasonable care to

14  provide an adequate warning to Ms. Kahn's prescribing physician

15  of the risk of permanent chemotherapy-induced alopecia

16  associated with Taxotere?"

17          Well, that means did Sanofi fail to adequately

18  warn Dr. Kardinal of PCIA.  Ladies and gentlemen, you will see

19  that the answer is absolutely yes, they did.

20          The next two questions that you will be working

21  through as a team on this verdict form, No. 2 there, you see:

22          "Do you find by a preponderance of the evidence

23  that Sanofi's failure to warn Ms. Kahn's prescribing physician

24  caused Ms. Kahn's injuries?"

25          Again, in plain English, did Sanofi's failure to

01:21  1    adequately warn -- their failure to adequately warn result in
01:21  2    Ms. Kahn's permanent hair loss.  That's what that question will
01:21  3    be.
01:21  4            The next one: "Do you find by a preponderance of
01:21  5    the evidence that Ms. Kahn has PCIA caused by Taxotere?"
01:21  6            Well, let's go through that evidence and see
01:21  7    what the answer to those questions are.
01:21  8            I'm having a little technical difficulty.  One
01:21  9    moment, Your Honor, I apologize.
01:21  10            Sorry folks.  Sorry folks.
01:22  11            So Dr. Kardinal, ladies and gentlemen, you will
01:22  12    see was the only prescribing doctor in this case.  This is
01:22  13    important.  As we go through this, you heard from Dr. Kardinal.
01:22  14    You also just heard from Dr. Larned today, right?  What did you
01:22  15    learn in this case concerning each of their roles?
01:22  16            Well, you heard that Dr. Kardinal did
01:22  17    diagnose -- we heard that Dr. Kardinal did diagnose --
01:22  18    Dr. Larned explained this.  Dr. Larned, she explained she
01:23  19    didn't do the diagnosis for Ms. Kahn.  That wasn't her role.
01:23  20    Dr. Kardinal proposed the treatment options for Ms. Kahn.
01:23  21    Dr. Larned, she didn't propose the treatment options.  That
01:23  22    wasn't her role.
01:23  23            Dr. Kardinal, he did discuss the side effects
01:23  24    with Ms. Kahn.  Dr. Larned didn't discuss those side effects.
01:23  25    Ultimately Dr. Kardinal, he discussed the consent form.

2024

01:23    1    Dr. Larned did not review the consent with Ms. Kahn.  That,
01:23    2    plain and simple, wasn't her role.
01:23    3             It's important, folks, you have learned in this
01:23    4    case as well that Ms. Kahn's hair had fallen out before
01:23    5    Dr. Larned even saw her.  That was after the first dose of the
01:23    6    Taxotere.  She ended up receiving over 500 milligrams of the
01:23    7    Taxotere, but her hair fell out after the first dose.
01:24    8             Well, in this case another one of the jury
01:24    9    instructions that relates to all of this that the judge is
01:24   10    going to give you -- and this is an important one.  This is on
01:24   11    what's called medical causation.  Ladies and gentlemen, the
01:24   12    question that you are going to answer as part of this is
01:24   13    demonstrating whether Taxotere was a substantial factor in
01:24   14    causing Ms. Kahn's injury.  Was Taxotere a substantial factor.
01:24   15             As I think about it, I see it like a player on a
01:24   16    football team.  Obviously there can be more than one player,
01:24   17    right, more than one player who is a cause of the team's
01:24   18    success.  Just like there can be, under the law, more than one
01:24   19    thing that could cause something to occur.  So how does that
01:24   20    work?
01:24   21             Well, in this case the question is whether
01:24   22    Taxotere is a substantial contributing factor in causing
01:25   23    Ms. Kahn's Grade 2 PCIA, whether it is a substantial
01:25   24    contributing factor.  Notice there it does not say the
01:25   25    substantial contributing factor, meaning there could be

01:25  1  multiple contributing factors.  You still decide in favor of
01:25  2  Ms. Kahn.  That's what you will have to determine.
01:25  3          But you see the language there:  "Taxotere is a
01:25  4  substantial contributing factor if Ms. Kahn probably would not
01:25  5  have suffered the claimed injuries in the absence of the
01:25  6  Taxotere.  A substantial factor does not mean only one cause of
01:25  7  the injury.  On the contrary, many factors or things may
01:25  8  operate at the same time, either independently or together, to
01:25  9  cause the injury."
01:25  10         So, ladies and gentlemen, in this case you'll
01:25  11  see -- and, again, the way I think about this -- you can think
01:25  12  about it and believe what the evidence will show you and has
01:26  13  shown you is like those of you who are a Saints fan, your
01:26  14  Drew Brees, no one could deny he was a substantial factor in
01:26  15  the result, the successful results that the Saints over the
01:26  16  15 years that he played here.
01:26  17         Now, you may recall that Alvin Kamara, your
01:26  18  running back, last year, one game, he scored six touchdowns,
01:26  19  right?  He was a factor in the success of the team in that game
01:26  20  as well as some others.  Michael Thomas, the wide receiver, was
01:26  21  certainly a factor in the success of the team in some other
01:26  22  games.  But no one could deny that over his career, Drew Brees
01:26  23  was a substantial factor.
01:26  24         As you saw in this case, you won't be able to
01:26  25  deny that Taxotere is a substantial factor in causing the PCIA.

1    So the treatment that Ms. Kahn received -- and

2    understanding this issue, we know that she got the alopecia,

3    that her hair fell out after the first round of chemo with the

4    Taxotere, and that from that point forward, pursuant to the

5    testimony, her alopecia has not resolved and she has had the

6    Grade 2.

7    Now, ladies and gentlemen, you will see this is

8    what we need to prove to prove a substantial factor, but we are

9    going to show you so much more in this case.

10    You have the two global safety officers, each of

11    them, admitting that Sanofi knew that Taxotere can cause PCIA.

12    You heard from these two women as well, Dr. Tosti, who is a

13    world-famous hair disorder expert and then Dr. Feigal, who is a

14    former head of the National Cancer Institute.  They talked

15    about what I see is the commonsense history timeline for these

16    chemotherapy drugs.

17    Specifically, you had Cytoxan come out in the

18    late '50s.  That's one of the drugs that Elizabeth Kahn took.

19    There were no reported cases of PCIA with Cytoxan when it came

20    into the early stage breast cancer realm, as well, all the way

21    up to 1996.  '96 is going to be important on this commonsense

22    timeline because what happens in 1996?  What comes on the

23    market?  Taxotere comes on market, right.  Adriamycin.  No

24    reports of PCIA in the early breast cancer setting up to '96.

25    Tamoxifen, no reports of permanent alopecia with tamoxifen.

```
01:28   1   Even the competitor, the gold standard at that point in time,
01:28   2   Taxol, no reports of PCIA.
01:28   3              Well, what happens in '96?  Taxotere comes on
01:28   4   the market.  Internal reports start in 1999.  It's approved
01:28   5   with AC in combination for early stage breast cancer in 2004.
01:29   6   And you see an explosion of cases that occur.  Ladies and
01:29   7   gentlemen, you will see Taxotere is a substantial factor.
01:29   8              I want you to listen carefully.  Hopefully you
01:29   9   did for the evidence in this but also the closing because we
01:29  10   saw the defense try to muddle this picture by throwing in
01:29  11   different types of cancer and regimens in which some of these
01:29  12   drugs are used.  But as you listen carefully, you heard those
01:29  13   were massive doses and long-term doses.  You have to look
01:29  14   apples to apples.  When you do, the commonsense history
01:29  15   timeline demonstrates that Taxotere is a substantial factor.
01:29  16              Well, in addition, we looked at the case
01:29  17   reports, the case reports that make up the history of this
01:29  18   explosion that you saw.  Taxotere given in the regimen, right?
01:29  19   So the independent scientists who put together that literature
01:30  20   attributed overwhelmingly these case reports -- and these are
01:30  21   for all grades -- but they attributed them overwhelmingly to
01:30  22   the Taxotere for all grades.
01:30  23              Now, remember, it wasn't Dr. Tosti that was
01:30  24   choosing what colors those balls would be.  It was the author
01:30  25   of the literature that did it.
```

1       Now, what matters most in this case, however, is
2    the Grade 2, and the Grade 2 is even more overwhelming.  This
3    is not a Grade 1 case.  This is not a loss of volume case where
4    you can't see it.  Only the person who has it knows it.  This
5    is the Grade 2 that Ms. Kahn has.  We wouldn't be here without
6    it, folks, the signature injury:  emotionally devastating, as
7    Dr. Sedlaceck said.
8       Ladies and gentlemen, Taxotere is a substantial
9    factor.
10      Well, how do these authors of this literature --
11   when you take the chemotherapy in a combination, how do they
12   determine which of the drugs is causing it?  We saw some
13   examples through the testimony in this case, and it's really
14   pretty simple, through the process of elimination.
15      This, again, is the Sedlaceck study.  What you
16   see here is that when the Taxotere is in the combination
17   regimen -- you see the Group 2 there -- the Group C, rather,
18   the AC plus Taxotere.  When you have Taxotere in, you get the
19   Grade 2.  When you take Taxotere out, you don't get it.  When
20   all you have is the AC and the Taxol, there is no Grade 2 PCIA.
21   You put the Taxotere in, you get the Grade 2.  You take the
22   Taxotere out, there is no Grade 2.
23      You also heard this through the Martin study.
24   Some folks pronounced it "Martin."  The Martin study went
25   through the same thing.  It's very important.  Martin broke it

01:32   1   out.  You can see the Grade 2 PA.  This is the Taxotere

01:32   2   combination from the study.  You put the Taxotere in, you get

01:32   3   the Grade 2. You take the Taxotere out, what you see right

01:32   4   here, that's Taxol regimens, different Taxol regimens, no

01:32   5   Grade 2.  Then you see tamoxifen over there.  The tamoxifen,

01:32   6   there's no permanent alopecia at all.  You take the Taxotere

01:32   7   out, there's no Grade 2.

        8          It's simple, folks.  You put the Taxotere in,

01:32   9   you take the Taxotere out.  You put the Taxotere in, you get

01:32 10 the Grade 2 on the scalp.  Sanofi, they knew, but doctors had

01:32 11 no clue.  That's what it's all about.  It's very simple.

01:33 12          Dr. Tosti didn't stop there.  We were concerned

01:33 13 that we were going to see the "anything but defense," anything

01:33 14 but Taxotere in this case.  So not only did Dr. Tosti rule out

01:33 15 the chemotherapy medications, but she went beyond.  We said,

01:33 16 "Look at everything under the sun."  Blood pressure medication;

01:33 17 antifungal medication; antinausea, ruled it out.  A steroid

01:33 18 that was taken for a brief period of time in preparation for

01:33 19 the treatment; menopause, ruled it out.  Vitamin D not a

01:33 20 substantial factor.  Metabolic syndrome, no.  Testosterone gel,

01:33 21 no.

01:33 22          Family history of baldness.  Remember, on the

01:33 23 right you see Ms. Kahn's dad, who is in his mid 90s at this

01:33 24 point in time.  He's bald.  As if having a bald dad or brother

01:34 25 means that all the daughters and sisters in that family are

01:34  1   bald, well, folks use your common sense.  We don't see that.

01:34  2                On your left you see mother and sister.  Mother

01:34  3   passed away.  She was in her early 90s.  But they had normal

01:34  4   hair.  Ms. Kahn had normal hair prior to the Taxotere too,

01:34  5   folks.

01:34  6                Now, we have learned that she probably had the

01:34  7   androgenetic alopecia, which we also learn -- what percentage

01:34  8   of women her age have that?  50 percent?  But do we see

01:34  9   50 percent of women walking around with the Grade 2?  Again,

01:34  10  use your common sense in this case, folks.  Dr. Tosti

01:34  11  determined that neither of these are substantial factors in

01:34  12  this case.

01:34  13               Taxotere is a substantial factor in causing

01:34  14  Ms. Kahn's Grade 2 PCIA.

01:34  15               Ladies and gentlemen, the entire defense in this

01:35  16  case can be boiled down to two things:  an erroneous medical

01:35  17  record and cherry-picked photographs.  Right?

01:35  18               The medical record from Nurse Breaux,

01:35  19  January 29, 2009, alopecia resolved.  Well, you saw that, but

01:35  20  putting it in context, what did we see?  On the 25th, four days

01:35  21  earlier, this is what Ms. Kahn looked like.  Clearly she had

01:35  22  alopecia at that point in time.  The record is just an error,

01:35  23  plain and simple.

01:35  24               Then, folks, from the defense throughout the

01:35  25  case we saw that "Choose Your Own Adventure" timeline with

1    their manipulation of the medical records.  You remember this,
2    right?  You can tell any story you want basically because the
3    pictures don't tell the full story.
4              So Sanofi has come into this courtroom and said
5    that Elizabeth Kahn's hair grew back and fell out again.  Their
6    flimsy theory is based on some cherry-picked photos, it's the
7    failed photo theory.
8              How do you know this cherry-picking isn't true?
9    You just saw it.  It may have been a little tedious, but it was
10   important.  What did you learn from Dr. Larned?  Larned first
11   saw her, and after only one dose of Taxotere -- that's when
12   Dr. Larned saw her.  And then for over a decade, alopecia had
13   not resolved.
14             Make no mistake, folks, in open court, on a
15   record for all time, the defendant has brazenly and cavalierly
16   insinuated that Ms. Kahn has come in here and lied to you.  So
17   just let that soak in for a second.  First they take her hair,
18   then they try to take her reputation.  Why?  Because Ms. Kahn
19   had the nerve to stand up to a bully.
20             We heard from Dr. Glaspy, defendants' expert
21   yesterday.  He is not a labeling expert.  He doesn't know the
22   regulations.  He has never heard of Amy Freedman, global safety
23   officer, or Aussel.  He's not a hair expert.  He said he would
24   defer to a dermatologist like Dr. Tosti.  But he spent a lot of
25   time talking about label and hair.  If you notice carefully,

1    Sanofi's attorney asked him lots of questions about persistent
2    hair thinning.  But, folks, this isn't a case about persistent
3    hair thinning.  This is a case about Grade 2 PCIA.  So why are
4    we talking about that?  Why is he here talking to us about hair
5    when he defers to a dermatologist like Dr. Tosti?
6              But if you listen carefully, folks, this
7    gentleman, under oath, made some stunning admissions, that
8    patients -- he admits that patients can't exercise a choice --
9    she can't exercise one if she doesn't have it, if it's not
10   given to her.  He admits that the patients get 1,000 votes for
11   their treatment choices, and he has one.  He admits you have to
12   warn every patient to protect those few patients who might get
13   the side effect.  He admits that when he sees an early stage
14   breast cancer patient for the first time, what does he assure
15   them?  "You are going to be okay."
16             But Glaspy also had a secret that revealed
17   itself, if you listened carefully.  He admitted under oath that
18   he knows Taxotere regimens cause PCIA, and to make it worse, he
19   doesn't warn his patients about it.  He tells them about hair
20   coming back different, color, texture.  He says that it may
21   come back finer, potentially thinner, but that's not what he
22   knows.  That's not what Sanofi knows.  They know -- they both
23   know that Taxotere causes the Grade 2 PCIA.
24             Remember the moment when he pointed at Ms. Kahn
25   and said he has so many patients that look like her.  Now,

01:39 1    think about that.  What did those patients and Ms. Kahn have in
01:39 2    common?  They all take the Taxotere.  That's what it is.  Like
01:39 3    Sanofi, John Glaspy takes away his patients' choices.  He uses
01:39 4    his one vote to veto their 1,000, and like Sanofi, like Glaspy,
01:39 5    they both use their vote to veto any choices Ms. Kahn has.
01:39 6              MS. SASTRE:  May we approach?
01:39 7              THE COURT:  Uh-huh.
01:39 8              MS. SASTRE:  Thank you.
01:39 9              (The following proceedings were held at the bench.)
01:39 10             MS. SASTRE:  Your Honor, the appellate lawyers have
01:39 11   asked me to renew the Rule 50 motion in light of the fact there
01:40 12   was new evidence adduced.  We are not changing the briefing but
01:40 13   they just want me to formally renew the motion at the close of
01:40 14   defendants' case.
01:40 15             THE COURT:  Well, he didn't say it was Taxotere.  He
01:40 16   said it was tamoxifen.
01:40 17             MR. SCHANKER:  Reading the record, that's what we
01:40 18   believe, Your Honor --
01:40 19             THE COURT:  Well --
01:40 20             MR. SCHANKER:  -- that it can cause it.
01:40 21             THE COURT:  He didn't say, "I have so many patients
01:40 22   like that because they took Taxotere."
01:40 23             MR. SCHANKER:  He pointed at her, and it's reasonable
01:40 24   to deduce that that's --
01:40 25             THE COURT:  That's a reasonable deduction.  That is

1   not the facts in evidence.  That is inaccurate.

2            MR. SCHANKER:  Your Honor, I believe my statement --

3            THE COURT:  You are going to have to correct it.

4            MR. SCHANKER:  My statement is clear, and I think

5   that's a reasonable deduction.

6            THE COURT:  He didn't say that.

7            MS. SASTRE:  We would like it corrected.

8            THE COURT:  Fix it.

9            MR. SCHANKER:  Okay.

10            MS. SASTRE:  Thank you.

11            (End of bench conference.)

12            MR. SCHANKER:  Ladies and gentlemen, to be clear, it

13   is our belief that it is a reasonable deduction from what

14   Dr. Glaspy said when referring to Ms. Kahn as well as his use

15   of Taxotere that that is what is attributable to the patient's

16   condition.

17            THE COURT:  I think you need to clear it up.

18            MR. SCHANKER:  Your Honor, can I approach?

19            THE COURT:  Yes.

20            (The following proceedings were held at the bench.)

21            THE COURT:  You know, to be clear, Dr. Glaspy did not

22   say, "My Taxotere patients look like Ms. Kahn."  He said, "I

23   have seen patients that look like Ms. Kahn."

24            MR. SCHANKER:  Okay.  I will clarify that.

25            MS. SASTRE:  Who took tamoxifen.

01:41    1            THE COURT:  "I have many patients that look like

01:41    2    Ms. Kahn."  He was talking, but he did not say -- I would say,

01:41    3    "To be clear, he did not say" --

01:42    4            MS. SASTRE:  And you're right, Your Honor.

01:42    5            THE COURT:  You can make that argument.

01:42    6            MS. SASTRE:  Yeah.  He said, "I have patients that

01:42    7    have taken tamoxifen over the years and that's what they look

01:42    8    like."  That's exactly what he said.  This was completely

01:42    9    turned and it's 100 percent inaccurate.  I think he needs to

01:42   10    say that.

01:42   11            THE COURT:  I think you need to correct that.

01:42   12            MR. SCHANKER:  Okay.

01:42   13            (End of bench conference.)

01:42   14            MR. SCHANKER:  May I, Your Honor?

01:42   15            THE COURT:  Yes.

01:42   16            MR. SCHANKER:  Ladies and gentlemen, to clarify,

01:42   17    Dr. Glaspy indicated when referencing Ms. Kahn that he had

01:42   18    patients that -- and I believe that -- our reading of the

01:42   19    record and what we want to say is that tamoxifen may have been

01:42   20    the cause, but, ladies and gentlemen, you will have to refer

01:42   21    back to that evidence.  Thank you, Your Honor.

01:42   22                Ladies and gentlemen, you heard a lot about

01:43   23    metastatic breast cancer in this case, when what we know is

01:43   24    that metastatic breast cancer is not the kind that Elizabeth

01:43   25    Kahn had.  Obviously metastatic breast cancer is incredibly

1    serious and -- but it's dramatically different, fortunately,

2    than the early stage breast cancer, which is used -- it

3    fortunately is curable.

4            We heard from many witnesses in this case

5    concerning this, that highly curable early stage breast cancer

6    is what this is all about.  And we saw the green lady that

7    Dr. Bosserman presented.  Dr. Bosserman taught us something

8    that was interesting, and that is that surgery is responsible

9    for 93 percent of the benefit from the chemotherapy treatment

10    for a patient such as Ms. Kahn.  It doesn't mean that the

11    chemotherapy is not important and certainly the hormone therapy

12    is important, but the surgery is the real MVP.

13            And all the cancer doctors in this case agreed

14    that early stage breast cancer is indeed curable.  Also, the

15    cancer doctors that you heard from in this case they all agree

16    that Taxol and Taxotere are equally effective.  The medical

17    doctors also agree that they prescribe side effect -- they

18    prescribe, they make the choice between Taxol and Taxotere

19    based upon the side effects.  Now, remember that Avila

20    indicated that it's hard to sell a drug with bad side effects.

21    It's important to remember that in this case.

22            Well, how do we know that with adequate warnings

23    Ms. Kahn would have avoided Taxotere?  Why should we believe

24    that she would have not taken the Taxotere and taken something

25    else?  Well, let's look at the medical record that you saw from

1    Dr. Corsetti yesterday, and this was specifically the record
2    that, "The patient is motivated to save her breast and would
3    like to proceed with neoadjuvant chemotherapy on the left."

4             Now, why was Ms. Kahn motivated to save her left
5    breast?  It's because she wanted to be a whole person.  She
6    testified about that.  She wanted to be a whole person after
7    the early stage breast cancer.  Ms. Kahn wanted to be a whole
8    person after early stage breast cancer, and Dr. Kardinal would
9    have given her an alternative.

10            And why do we believe that?  Remember he worked
11   with her to find a treatment, the clinical trial, that could
12   preserve her breast.  Certainly Dr. Kardinal if informed and if
13   Ms. Kahn wished would have worked with her to find a treatment
14   that would have preserved her hair.  The long and short of it,
15   ladies and gentlemen, is that a different warning would have
16   made for a different result in this case.  Is Ms. Kahn a whole
17   person today?  She is not because the golden rule was broken
18   and she has Grade 2 PCIA.

19            Well, what were the other treatment options for
20   patients like Ms. Kahn?  Would it have mattered?  Well, we see
21   here, first of all, that Dr. Kardinal testified that if the
22   PCIA were in the label, he would have told Ms. Kahn and given
23   her alternative treatment options.  Ms. Kahn indicated that she
24   would have chosen a different treatment option.

25            And so if the label is updated, then this is how

2038

1    the process works, right?  The consent form actually has the
2    information in it that it's supposed to.  The side effects
3    conversation is substantive regarding what the true side
4    effects are, and a different treatment can be utilized.  A
5    warning would have made a difference.
6                So the treatment options in 2008 Dr. Bosserman
7    talked about this, and these NCC options that were available.
8    And you heard her explain that they were available for patients
9    like Ms. Kahn in taxane and non-taxane regimens.  The question
10   is if she took one of these other treatment options, what was
11   more likely than not going to happen?
12               Dr. Madigan, the biostatistician, came in, the
13   Irishman, and he explained that only Taxotere has ever had a
14   signal for permanent hair loss, only Taxotere has the PCIA
15   problem.  Madigan also looked at observational studies which
16   show Martin 300 plus percent increase in risk with PCIA.
17   Sedlacek a 5500 percent increase with PCIA.
18               And then with regard to Grade 2 you saw the
19   different treatment options available, in particular obviously
20   the Taxotere and Taxol, and you can see that it's more likely
21   than not the Taxol or other potential options would not have
22   caused the Grade 2 PCIA, the signature injury.  So that
23   Ms. Kahn would have her health and her hair.
24               Now, is it possible that somehow that she could
25   have gotten the Grade 2 with some other combination?  Ladies

1    and gentlemen, you will have to look at what -- the oath that
2    you have sworn to upheld in this case, and is it more likely
3    true than not, that's the standard that you are supposed to
4    utilize.  More likely than not Ms. Kahn would not look like she
5    does today with another option.
6                    So:  "Do you find by a preponderance of the
7    evidence that the defendants' failure to warn plaintiff's
8    prescribing physician caused Ms. Kahn's injuries?"  The answer
9    is overwhelmingly yes.
10                   And:  "Do you find by a preponderance of the
11   evidence that plaintiff has permanent chemotherapy-induced
12   alopecia caused by Taxotere?"  Again resoundingly yes.
13                   Fourth question:  "Do you find by a
14   preponderance of the evidence that before December 9th of 2015
15   plaintiff could not have discovered through the exercise of
16   reasonable diligence that Taxotere was a potential cause of her
17   injury?"
18                   Well, what were Ms. Kahn's expectations at that
19   point in time?  Temporary versus permanent hair loss.  Remember
20   at the time Kardinal had told her that it would be temporary.
21   The nurses had told her it would be temporary.  Her Ochsner
22   binder, temporary.  Her informed consent never warned her of
23   permanent.  And Larned told her not to worry that she wouldn't
24   need a comb-over forever after she lost her hair.
25                   And remember she was a school librarian without

1    access to medical research.  And confidentially, the global

2    safety officers acknowledged that at that point in time they

3    knew, but that was not public information.  It wasn't available

4    to Ms. Kahn.  But Ms. Kahn was still curious so she talked to

5    her doctor, Roberie, who thought it was just age related.

6    Because Sanofi kept doctors in the dark by not updating the

7    labeling, not following the golden rule of labeling.

8            And it wasn't until the summer of 2016 when a

9    friend told her something new, a friend told Ms. Kahn that

10   there was a commercial with a connection between Taxotere and

11   permanent hair loss.  Ms. Kahn testified that she promptly

12   confirmed that she took the Taxotere and then hired a lawyer,

13   and then within just a few months had filed a lawsuit that

14   brought us here today.

15           Now, Ms. Kahn has no reason to think that her

16   condition was caused by Taxotere before her friend talked to

17   her.  We have heard no evidence to the contrary.

18           So, ladies and gentlemen, Question 4:  "Do you

19   find by a preponderance of the evidence that before December 9,

20   2015, plaintiff could not have discovered through the exercise

21   of reasonable diligence that Taxotere was a potential cause of

22   her injury?"  Answer:  Absolutely, yes.

23           That brings you to your last question, folks,

24   and that is:  "What amount do you find by a preponderance of

25   the evidence is appropriate to fairly and adequately compensate

1   the plaintiff for her injuries?"

2              Now, you see that there's two categories there.

3   There's permanent disfigurement and mental anguish and loss of

4   enjoyment of life, past, present, and future.

5              Now, plain and simple, in this country, folks,

6   we don't believe in eye-for-an-eye justice.  Obviously that's

7   not what we are talking about.  That's barbaric.  But we don't

8   turn a blind eye to justice either.  That's no justice.  We

9   believe in a remedy, and that's why you folks are brought

10  together so that in a civilized manner you can help resolve

11  this.

12             And we have heard testimony as to what Ms. Kahn

13  has been through with these two categories, the first being the

14  permanent disfigurement.  The fact she puts on her eyebrows and

15  puts on a brave face when she goes out in the world doesn't

16  mean she has been harmed at all [sic].  And it comes as no

17  surprise that Steve Kahn testified that when he refers to the

18  hair loss, he understands that it's very important to the way

19  people look at themselves and how they think about themselves.

20  He put it simply when he said, all you have to do is look at

21  his wife to see what has been taken from her, that that scar

22  from Taxotere is obvious.

23             And from the time that she lost her hair after

24  that first dose in 2006 until her last breath, she is going to

25  live with the disfiguring Grade 2, which is that signature

01:53  1   injury of Taxotere.  As Ms. Kahn said herself, she is never

01:53  2   going to be whole again.

01:53  3           Concerning the mental anguish and loss of

01:53  4   enjoyment of life, her past, present, and future, which is this

01:53  5   other line on here, you have heard from Ms. Kahn concerning

01:53  6   this.  And here was the testimony.  We start at the top.  "She

01:53  7   knows that her life will never be the same again," that as she

01:53  8   said, "She will never be whole.  We get that there is no magic

01:53  9   cure for the Grade 2."  And, "It's a constant reminder of

01:53  10  feeling of the cancer.  She avoids understandably looking at

01:53  11  her scalp."  Obviously she deals with the kids at school.  "She

01:53  12  won't leave home without her eyebrows."

01:53  13          And, plain and simple, she knows she looks

01:54  14  different from her friends and family members, and that's a

01:54  15  condition she is not going to be able to escape.  Plain and

01:54  16  simple, her hair is not going to grow back.

01:54  17          And why do you need to consider this cycle in

01:54  18  the context of the past and present and future?  Well, every

01:54  19  time she looks in the mirror obviously she is reminded.  When

01:54  20  she wakes up the first thing in the morning, puts on her

01:54  21  eyebrows, she is reminded.  Takes them off at night, she is

01:54  22  reminded.  Every time she poses for a photograph, she is

01:54  23  reminded.  Any time she sees her reflection anywhere, in the

01:54  24  mirror or in glass, she is reminded of what happened.  Every

01:54  25  time she absentmindedly reaches up to touch her hair, she is

01:54  1   reminded.  She is stuck in this cycle and can't escape.

01:54  2               Now, ladies and gentlemen, as to her permanent

01:54  3   disfigurement caused by the Grade 2 PCIA, the signature injury

01:54  4   of Taxotere, in a case like this I'm compelled to ask you for

01:55  5   $1.85 million for the loss of enjoyment of life, past, present,

01:55  6   and future, for what's been taken from her, ladies and

01:55  7   gentlemen, I will ask you for $1.5 million for that.  Now,

01:55  8   that's a lot of money, but that's a lot of hurt for a lot of

01:55  9   time, and why did it happen?

01:55  10              Now, whatever decision you make, Ms. Kahn will

01:55  11  respect it.  In jury selection each one of you said that you

01:55  12  put out of your mind any external concerns or any kind of

01:55  13  biases that you might have, and you will base that decision

01:55  14  solely on the evidence.  And if you -- when you're going

01:55  15  through this, if any of you might slip up and say, "Wait,

01:55  16  that's more money than so-and-so makes over a period of time,"

01:55  17  I would ask that you catch yourself or a fellow juror and just

01:56  18  respectfully remind them that that's not the law, that that's

01:56  19  not how it's supposed to work.  It's not about how much she is

01:56  20  going to get.  It's about what has been taken from her.

01:56  21              And ladies and gentlemen, in closing I just want

01:56  22  to ask you to think about two questions:  First, why didn't

01:56  23  Sanofi just follow the golden rule of labeling?  If they did,

01:56  24  we wouldn't be here.  Why didn't they just listen to their

01:56  25  global safety officer and activate the megaphone?  Thank you.

01:56 1    Thank you, Your Honor.

01:57 2    (Off the record.)

01:57 3    THE COURT:  Members of the jury, we are going to take

01:57 4  a five-minute recess before defense presents their closing

01:57 5  arguments so that we can switch equipment.  The court will be

01:57 6  at recess for five minutes.

01:57 7    (Recess.)

02:04 8    THE COURT:  All jurors are present.  Court is back in

02:04 9  session.  You may be seated.

02:04 10    Ms. Sastre.

02:04 11    MS. SASTRE:  May it please the Court.  Counsel.

02:04 12  Ms. Kahn.  Good afternoon, ladies and gentlemen.

02:05 13    We spent the past two weeks together here in

02:05 14  this courtroom listening to the evidence presented by the

02:05 15  parties, and I know that I speak for everybody here when I say

02:05 16  we are all happy that this trial is coming to an end today.

02:05 17    Now, we know that many of you have driven long

02:05 18  distances to be here with us.  We know that you have your own

02:05 19  lives, your own families, your own jobs, and we know that all

02:05 20  of that has been put on hold to be here with us every day for

02:05 21  two weeks.  And we want you to know, each and every one of you,

02:05 22  that we appreciate that because you stepped forward to serve as

02:05 23  a juror in this case.

02:05 24    And I will tell you, you may have seen my

02:05 25  partners, John and Doug, we have been here with you every

single day.  And you may have noticed sometimes us looking over
and we were looking at you, and what we were noticing was that
you were paying attention.  You were paying attention, every
one of you.  So thank you for that because it is very important
to us.

Now, one of the instructions that you are going
to get, just a little while after I go and sit down, will be
from Judge Milazzo, and what you are going to learn, ladies and
gentlemen, is that although Judge Milazzo is in the charge of
the law and she will give that to you, you are the sole judge
of the facts in this trial.

And this is particularly important, ladies and
gentlemen, because you've heard a lot of testimony over the
past two weeks from witnesses who have come in that witness
stand one after the other and they have done nothing short of
asking you to disregard common sense.  They have asked you,
these witnesses, to ignore what Ms. Kahn's oncologist and
cancer doctors have just told you, including just this morning
Dr. Larned.  And these witnesses, ladies and gentlemen, have
asked you to ignore the plain meaning of words that we use in
our language every day like the word "generally."

Now, I have to pause here for a moment.  You
just heard from Dr. Larned.  Dr. Larned is Ms. Kahn's
oncologist who gave her almost all of her chemotherapy
treatments except for the very first one.  She is over at

1    Ochsner.  She was involved with the clinical trial, right?  Yet
2    you had to wait two weeks to hear from Dr. Larned because we
3    had to wait for plaintiff to rest and we called her.  We
4    brought you Dr. Larned's testimony.

5                    Now, think about that.  For the two weeks that
6    we have been sitting here together and including just now when
7    counsel made his closing statement, what have you heard
8    hundreds of times in this courtroom?  You have heard, "Doctors
9    didn't know about the risk of permanent hair loss."  You just
10   heard and I wrote this down, "Doctors have," quote, "no clue."
11   They were kept in the dark."  But, ladies and gentlemen, you
12   know now with certainty -- after hearing from Dr. Larned, you
13   knew that all of that was untrue.  It's untrue.

14                   Dr. Larned just told you that she knew about the
15   risk of permanent hair loss long before she gave Taxotere to
16   Ms. Kahn.  She just told you she had seen patients develop
17   permanent hair loss after giving them chemotherapy long before
18   she treated Ms. Kahn.  She told you that when she looked at the
19   label -- the Sanofi label that every day you've heard a
20   criticism about it, when she looked at it and saw the word
21   "alopecia" -- and by the way it is only her opinion and
22   Dr. Kardinal's opinions that matter in this case as to whether
23   that warning is adequate or inadequate.  She just told you an
24   hour ago, "When I saw the word alopecia, I knew that meant
25   temporary hair loss and permanent."

02:09  1        You know what else she said?  She said, "When I
02:09  2  got the warning, that information in the label for Taxotere and
02:09  3  it said hair generally grows back," she told you exactly what
02:09  4  those words meant to her.  She said that, "I knew that meant
02:09  5  hair grows back most of the time, but not always."  That is not
02:09  6  a doctor that is in the dark.  And I think you have to ask
02:09  7  yourself how could plaintiff's counsel say that to you day
02:09  8  after day after day in this courtroom?
02:09  9        Now, not only did Dr. Larned tell you that she
02:10 10  would never tell a patient that their hair would grow back, she
02:10 11  just testified under oath, an oncology doctor with no dog in
02:10 12  this fight, she said, "I didn't say that to Ms. Kahn."  So ask
02:10 13  yourself how could plaintiff come in to this courtroom and tell
02:10 14  you under oath that Dr. Larned said to her, "Oh, don't worry,
02:10 15  all your hair is going to grow back"?  And don't forget, ladies
02:10 16  and gentlemen, Dr. Kardinal said the same thing.  These doctors
02:10 17  told you, "We don't tell that to patients."  It's simply not
02:10 18  based on reality, ladies and gentlemen.
02:10 19        Now, what else is wrong with this case?  Why
02:10 20  else does this case fail?  Now, first, as you have heard
02:11 21  numerous times during this trial, doing nothing about
02:11 22  Ms. Kahn's breast cancer it simply was not an option.  Ms. Kahn
02:11 23  told you herself, she said, "You have to be treated to get rid
02:11 24  of cancer."
02:11 25        And after I asked her -- you might remember it

1    took me several times of trying, but after I asked her several

2    times, she finally admitted, she said, "Yes, my Number 1 goal,

3    of course, was to survive cancer."  Beating breast cancer, make

4    no mistake about it, was more important to Ms. Kahn than any

5    risk of treatment, and you know that because you saw the

6    serious life-threatening risks that she accepted over and over

7    and over.

8         Now, Ms. Kahn and her lawyers they tried to

9    convince you, "Oh, early stage breast cancer, it's no big

10   deal."  We heard that.  We heard, "Oh, chemotherapy is not

11   important."  These were like their themes for this case, right?

12   And you know what, folks, those are things that are super easy

13   to say, you come in here when you know how the story ends,

14   right?  You come in here and you say those things.  But back in

15   2008, when Ms. Kahn was staring her diagnosis -- the breast

16   cancer, staring it in the face, she was devastated.  She told

17   you that.  And you know that if breast cancer is not treated

18   correctly and it spreads, that it's deadly.

19        Now, cancer is serious business.  Everybody

20   knows that.  Everybody knows that.  And not a single witness

21   came here and told you Ms. Kahn didn't need chemotherapy.  She

22   absolutely did, and everyone agreed upon that.

23        Now, again, as I said, it's easy to come to the

24   courtroom with what's called the luxury of hindsight 13 years

25   later, right?  Mr. Schanker likes football analogies.  Maybe I

1    could use the phrase "Monday morning quarterbacking."  That

2    would fit here, too, after the game ends, right?

3                But, ladies and gentlemen, here's the important

4    part.  That's not what you are here to evaluate.  You have to

5    go back to 2008 when Ms. Kahn, again, was facing the

6    uncertainty of her diagnosis, the uncertainty of whether her

7    treatment would work, and the uncertainty of what side effects

8    she might experience.  And it is in that moment when she was

9    facing her diagnosis and cancer that you have to go back to.

10   Because as you saw, in that moment of uncertainty in 2008,

11   ladies and gentlemen, there was not a single risk that Ms. Kahn

12   was unwilling to accept.

13               Now, in May of 2008 -- it's not working.  Okay.

14   Thank you.

15               Now, in May of 2008, as you know, Ms. Kahn

16   enrolled in an investigational clinical trial, and she was

17   told, ladies and gentlemen, in that trial, as you saw, that,

18   "Side effects may be very serious, long-lasting, or may never

19   go away."  As she had to, Ms. Kahn admitted that this warning

20   that, "Side effects may never go away," she told you -- she sat

21   right there the other day and she told you, "Yes, I understood

22   that it applied to every potential side effect and risk,"

23   including hair loss, of course.

24               Now, ladies and gentlemen, these words are

25   written again in plain English on a document that for the very

1    first time in this case -- which you have heard has been around

2    for a couple years now, you've heard that.  She sat in that

3    witness stand and said for the first time that she changed her

4    mind that the consent form that Ochsner gave her, Dr. Kardinal

5    and Dr. Larned, she said, "You know what, it's not a

6    well-written document."  That's what she said because she

7    didn't want to admit that she understood that for any risk,

8    including hair loss, it might not ever go away.

9              Now, what are the other serious risks?

10             It's not working.  Yeah?  Okay.  There we go.

11   Thanks.

12             So what are the serious risks?  And we showed

13   you this in our opening, ladies and gentlemen.  These are some

14   of the life-threatening risks that Ms. Kahn agreed to.  And we

15   went through them in detail during trial, so I'm not going to

16   do that with you now.  And the point is simply that when

17   Ms. Kahn went into this clinical trial, make no mistake about

18   it, she went in with her eyes open about the risks and the

19   benefit of the treatment.

20             And none of her doctors, as you've heard, did

21   guarantee an outcome or could guarantee an outcome, not one of

22   them.  No one was able to tell her whether her tumor would

23   shrink.  No one told her or could have told her that she was

24   going to survive cancer.  But Ms. Kahn agreed to move forward

25   and why?  And you know it's because she wanted the benefit of

1    her treatment.

2            Now, yesterday in this courtroom in the morning

3    I asked Ms. Kahn, "Are you telling us under oath that if just

4    one word was added to this consent form, just the word

5    permanent in front of the risk of hair loss, are you telling us

6    that you wouldn't have gone into the clinical trial and taken

7    this chemotherapy treatment?"  Right?  You remember that

8    testimony.

9            And what Ms. Kahn said, she said, "Well, I would

10   have asked for an option."  She said, "I would have asked for

11   an option."  But please don't forget in 2008 when Ms. Kahn

12   signed the consent form and accepted all of these serious

13   life-threatening risks, I asked her, I said, "Did you say that

14   that sounds terrible?  This risk doesn't sound too good to me.

15   I would like another option."

16           Please don't forget when you are back there

17   talking about this case, if you want to know what Ms. Kahn

18   would have done, right?  And that's what she is telling you,

19   "That's what I would have done."  If you want to know what she

20   would have done, ladies and gentlemen, think about what she did

21   do.  She never asked for a single other option.  And you know

22   when it came to hair loss, it was no different.

23           Now, ladies and gentlemen, I want to be clear.

24   You have heard a lot of different things about a lot of

25   different medications.  And I know it's probably been a little

1    bit confusing at times, and we are sorry for that.  But what
2    you know after being here with us for two weeks is that there
3    simply is no magic chemotherapy drug.  All of these drugs have
4    risks.  They all come with the risk of persistent hair loss.

5              And I have been sitting here, candidly, for two
6    weeks waiting to hear, what is the drug that Ms. Kahn would
7    have taken instead of Taxotere?  And the answer is, we still
8    don't know.  We don't know.  And that's because Ms. Kahn wants
9    a drug that's equally effective to Taxotere but with absolutely
10   zero risk of permanent hair loss.  And as you know after
11   sitting through this trial, that drug simply does not exist,
12   and nobody told you differently.

13             Now, the only other drug in the same class as
14   Taxotere is a drug called Taxol, and you have heard that they
15   are called taxanes.  But, ladies and gentlemen, the best
16   doctors, even the best doctors we know they can't see into the
17   future, right?  They don't have a crystal ball.  No person
18   could have told Ms. Kahn whether she would be alive after
19   treatment in one year, two years, or thirteen years, and no one
20   could have told Ms. Kahn what side effects that she might have
21   to experience, how severe they would be, or how long they would
22   last, and that's the reality of medicine.

23             And when it comes to Taxol -- and you have heard
24   that it has a risk of hair loss, too.  If Ms. Kahn had taken
25   Taxol, maybe you would have been sitting in this courtroom

1    listening to how she supposedly lost her hair from taking that
2    drug, or maybe you would have heard that now Ms. Kahn has
3    neuropathy because, as the doctors who came here told you,
4    there's a greater risk for the development of neuropathy with
5    Taxol.
6              Now, why else does this case fail?  It fails
7    because the warning in the Taxotere label was adequate.  Ladies
8    and gentlemen, you don't need a two-week-long trial with a
9    bunch of high-priced experts and lawyers to tell you what the
10   word "generally" means.  I mean, you just don't need it, right?
11   It has an agreed-upon meaning in our language, for heaven's
12   sake, but yet we have spent so much time every day having to
13   respond to plaintiff's tortured interpretation of what this one
14   word means.  It's just plain English, and it's a word that many
15   witnesses use from that witness stand.  And, of course, we all
16   use it in everyday conversation.  "Generally" means usually or
17   most of the time.  Everybody knows that.
18             But, most importantly, the prescribing doctors
19   in this case, Dr. Kardinal, Dr. Larned, that's what they told
20   you, and it is their testimony that matters.
21             Now, again, ladies and gentlemen, it's easy to
22   come into court and be critical, right?  It's easy to
23   criticize.  We all know that.  But it's another thing to come
24   forward with evidence and to prove -- plaintiff has to prove to
25   you, by the weight of the evidence, that this warning, "Hair

1    generally grows back" is inadequate.  That's something they
2    have not come close to doing in this case.
3              Think about it.  Counsel just told you you heard
4    from Dr. Plunkett.  That was their one witness to come forward
5    and talk with you about the label.  I think you will remember
6    her if I remind you of something she said.
7              My partner John was cross-examining her.  He
8    said, "Doctor, we can agree that these words here, 'generally
9    grows back,' it doesn't mean all the time, right?  It means
10   usually hair grows back."
11             She said, "Well, do you want me to answer that
12   question using plain English?"  For heaven's sake, yes, of
13   course.  What other language would we use to answer that
14   question?
15             So even Dr. Plunkett, who has been paid millions
16   of dollars going around the country -- you might recall that --
17   testifying for plaintiffs' lawyers in cases just like this.
18   She told you she says the same thing every time.  She walks
19   into court and she criticizes the label.  Even she had to admit
20   that "generally grows back," means most of the time, not
21   always.
22             Why else does this case fail, ladies and
23   gentlemen?  It fails because Ms. Kahn's cancer doctors,
24   Dr. Kardinal and Dr. Larned, stand by their decision to have
25   prescribed Taxotere to Ms. Kahn.  Both of these doctors told

1    you by video that they came here and they testified via video,

2    and they told you, "We believe this was the best medication for

3    her."  They said that to you even after they understood this

4    lawsuit had been filed.

5                Now, on Monday afternoon, ladies and gentlemen,

6    you heard Ms. Kahn testify -- and I know I just made this point

7    a moment ago, but I want to do it with regard to both doctors.

8    Ms. Kahn sat on the witness stand, and she testified to you,

9    "Both of my doctors, my oncologists, told me my hair loss would

10   be temporary."

11               But, ladies and gentlemen, you heard

12   Dr. Kardinal, her first oncologist, say something very

13   different.  He says, "When it comes to hair, I never make

14   guarantees."  I'm going to tell you the exact words he used.

15   He said, "I always leave the door open."  He said, "I would

16   tell my patients that their hair would probably will grow

17   back."

18               To believe what Ms. Kahn has told you, ladies

19   and gentlemen, you would have to think that Dr. Kardinal is not

20   telling the truth.  To believe Ms. Kahn, you would also have to

21   find that Dr. Larned is not telling the truth because, again,

22   she told you, "Not only do I never say that to patients" -- she

23   told you, "I did not say that to Ms. Kahn."

24               Now, ladies and gentlemen, after 13 years,

25   13 years, not a single treating doctor has told Ms. Kahn that

1   her hair loss is permanent, that it was caused by Taxotere, and
2   neither did Dr. Kardinal and neither did Dr. Larned or any of
3   Ms. Kahn's dermatologists.  And that's another reason, ladies
4   and gentlemen, why this case fails.

5              Now, you heard from Dr. Tosti.  She is the only
6   witness who came here to tell you about the cause of Ms. Kahn's
7   hair loss.  You will remember she comes up here from Miami --
8   and I think this part will be memorable to you.  This is the
9   lady, the physician who comes up here, and she says, "I charge
10  $1,000 an hour door to door, including while I'm sleeping."

11             So that's Dr. Tosti, right?  She admitted to you
12  that she could not rule out other causes.  She said she can't
13  rule out other chemotherapy drugs, like Adriamycin and Cytoxan.
14  She said she can't rule out tamoxifen.  She thinks it played a
15  role too.  She thinks she can't rule out androgenetic alopecia
16  or female pattern baldness or menopause or the natural aging
17  process.  Candidly, if plaintiff's expert cannot rule all of
18  those things out, how can you?

19             Don't forget the article that she published in
20  2019.  I will show it to you in a moment.  She had patients
21  that took Taxol and took Taxotere.  And you may remember that
22  there were more patients who took Taxol with permanent hair
23  loss than patients who took Taxotere.  That's her paper,
24  plaintiff's expert's paper.

25             Remember, ladies and gentlemen, plaintiff's

experts came in here one by one.  And, again, they sat on the witness stand and they admitted to you, as they had to, that there were reports of permanent hair loss with all of these chemotherapy drugs.  We told you that the very first day that we met.

But you might remember, Mr. Schanker came in here two weeks ago, and he stood at this podium.  When he made his opening statement to you, he said, "Unlike other chemotherapy medications, Taxotere causes Grade 2 permanent hair loss," unlike other chemotherapy medications.  After everything you have heard from the mouths of plaintiff's experts, how could he have come in here and said that to you?  How could he have said that to you?

Why else does this case fail, ladies and gentlemen?  It fails because photograph after photograph shows what Ms. Kahn's hair looked like at three critical points and times:  first, before chemotherapy; secondly, a year or so after chemotherapy; and then, finally, on the right, several years later.

Now, plaintiff started this case -- make no mistake about it -- started this case by seeking to be compensated for what her hair looks like today, right?  What you have heard is that the way Ms. Kahn looks today is what she looked like after she finished chemotherapy.

But you know that's not true, and we brought you

02:26  1    that evidence, those pictures.  Plaintiffs are leaving out the
02:27  2    part of the story in the middle, when her hair grew back, and
02:27  3    then slowly -- you can see it right here, the progression, her
02:27  4    hair fell out.  You can't leave out that part of the story.  It
02:27  5    reminds me of buying a book, you read the first chapter and the
02:27  6    last chapter.  You don't know the whole story if you do that.
02:27  7    We brought you that evidence.
02:27  8                    Even Dr. Tosti, plaintiff's hair loss expert,
02:27  9    even she had to admit that Ms. Kahn had thinning hair before
02:27  10   she ever started chemotherapy.  That's what she said to you.
02:27  11   She had to admit that Ms. Kahn's hair grew back after
02:27  12   chemotherapy to look much like it did before she started her
02:27  13   treatment.  And she actually said -- I was surprised to hear
02:27  14   her say it.  I said, "You agree with me.  Her hair looks the
02:27  15   same after chemo."  And she says, "No, it looks better."
02:27  16   That's the word Dr. Tosti used, their hair loss expert.
02:28  17                    Of course, she also had to admit that there's a
02:28  18   clear difference that you can see with your own eyes between
02:28  19   Ms. Kahn's hair one year after chemotherapy, in the middle, and
02:28  20   then you see what it looks like in 2017, 2020, and, of course,
02:28  21   today.  Ms. Kahn's hair gradually got thinner and thinner over
02:28  22   time, over the course of the past decade.  And, as you know,
02:28  23   when your hair grows back after chemotherapy and then you
02:28  24   slowly use it over the course of the next decade, that doesn't
02:28  25   have anything to do with chemotherapy 12 years earlier.  Again,

1     you don't need to be a physician or a hair loss expert to know

2     that.  It's simply a matter of common sense.

3              Now, ladies and gentlemen, I would like to spend

4     the rest of my time walking through the specific questions that

5     you're going to get on the verdict form.  You will see that

6     there's five questions for you to answer.  I want to start

7     first with a very important instruction.  As you can see, this

8     is called the burden of proof.

9              Now, you will get this instruction from

10     Judge Milazzo before you begin your deliberations.  What you

11     are going to learn is that the plaintiffs have the burden of

12     proof in this case on every issue and every element of every

13     claim that they made to you.  On all issues the scales have to

14     tip in plaintiff's favor.  It's not a light burden.

15              What this means, my client, our client does not

16     have to prove anything, not one thing to you.  It also means,

17     ladies and gentlemen, and this is very important.  If you feel

18     like on an issue or on a question that you're just sitting

19     right on that fence, then you have to come back with a defense

20     verdict for Sanofi.  Okay?

21              Let's take a look at the first question.  The

22     first question asks you:  "Do you find by the preponderance of

23     the evidence" -- that means the weight of the evidence that we

24     just talked about -- "that Sanofi failed to take reasonable

25     care to provide an adequate warning to Ms. Kahn's prescribing

1    physician of the risk of permanent chemotherapy-induced
2    alopecia associated with Taxotere?"  The answer to Question 1
3    is no.
4                 Now, let me explain that.  So for a prescription
5    medication like Taxotere, the adequacy of the label or the
6    warning is really a question of whether the doctor, right, in
7    this case the prescribing doctors, Kardinal and Larned,
8    reasonably understood the risks of the medication.
9                 So the question is:  Did Dr. Kardinal and Larned
10   have enough information, from the plain language in the
11   Taxotere label, to understand that there was a risk of hair not
12   growing back?  You know they did because they both told you so.
13   You know that.
14                 Again, you just heard from Dr. Larned this
15   morning.  You heard the same thing from Dr. Kardinal before.
16                 So when it comes to the Taxotere label, what did
17   it tell these doctors?  First, it told them that hair loss and
18   alopecia was listed 12 times.  It did not say "reversible"; it
19   did not say "short term."  Ladies and gentlemen, you have heard
20   from numerous witnesses about what this term means.
21                 So, again, going back to Dr. Tosti, plaintiff's
22   hair loss expert.  She testified to you -- she is the only hair
23   loss expert for them.  She came in here and she said that the
24   word "alopecia" covers all kinds of hair loss, including
25   temporary and permanent.

02:32  1          Dr. Larned told you just now, just now.  She
02:32  2     said to you that when she read the label, she understood that
02:32  3     the term "alopecia" all by itself meant temporary and permanent
02:32  4     hair loss.  Ladies and gentlemen, if you accept Dr. Larned's
02:32  5     testimony just on that point, then the answer to Question 1
02:32  6     should be no.  You can sign the verdict form, date it, let us
02:32  7     know you have a verdict; and, candidly, you get to go home just
02:32  8     for that reason alone.
02:32  9          Now, over the past two weeks -- and counsel
02:32  10    mentioned this -- you have heard from a couple of folks from
02:32  11    Sanofi, including a Dr. Palatinsky and a Dr. Freedman.  Their
02:32  12    testimony regarding the adequacy of the label, it was no
02:32  13    different than that of Ms. Kahn's two prescribing doctors,
02:32  14    right?
02:32  15         Dr. Larned and Kardinal -- they each testified,
02:33  16    the two folks from Sanofi, that alopecia is a medical term that
02:33  17    covers temporary and permanent hair loss.  They agreed with
02:33  18    Dr. Kardinal's and Dr. Larned's interpretation of that word.
02:33  19    They understood what it meant.
02:33  20         When asked about the warning, "hair generally
02:33  21    grows back," they both told you that that meant for a majority
02:33  22    of patients, their hair will grow back, but not for every
02:33  23    patient, not every time.
02:33  24         Now, let me see if I can put a finer point on
02:33  25    things.  I think this is important.  Plaintiff's counsel wants

1    you to somehow find or to somehow believe in this case that

2    simply because one word is not in the label, right -- the word

3    "permanent," that somehow that makes the entire label

4    inadequate.  Right?

5              Well, ladies and gentlemen, we can agree the

6    word "permanent" isn't there.  We never said anything different

7    to you.  If that's what this case was about, we would have all

8    been home last week after a day or two.  But it's not about the

9    words that aren't there; it's about the words that are there

10   and what they meant to Dr. Kardinal and Dr. Larned.  That is

11   the only question for you to answer on Question 1 of the

12   verdict form.

13             So what information did these words provide to

14   the prescribing doctors?  The labels, as you know, advise them

15   hair loss begins after the first few treatments and varies from

16   patient to patient.  Once you complete all your treatments,

17   hair generally grows back.  Again, both of the prescribing

18   doctors told you what those words mean to them:  Hair grows

19   back most of the time, not always.

20             Think about it, ladies and gentlemen -- as I

21   said, sometimes you will hear judges say to jurors, "When you

22   come in, don't check your common sense; don't leave it at the

23   door."  Right?  Using your God-given common sense, you, again,

24   know what those words, "hair generally grows back," mean.  It

25   means "usually or most of the time."

1    So it's no surprise that this is exactly what

2    both Dr. Kardinal and Dr. Larned testified to, and it's no

3    surprise that they told you -- this is undisputed -- that that

4    is what they understood the words present in the label meant to

5    them.

6    What else did you just hear from Dr. Larned this

7    morning?  She said to you, "I understand I'm in this

8    deposition.  I'm giving actually testimony for trial."  She

9    knew that.  Unfortunately, she couldn't be here, as you heard,

10   in person.  She said, "I don't have a single criticism of this

11   label, and I stand by my decision to have given Taxotere to

12   Ms. Kahn."

13   Now, you remember Dr. Kardinal talked about this

14   as well, and Dr. Kardinal's testimony was, in his experience,

15   hair loss over the years was rarely permanent.  No witness,

16   ladies and gentlemen, in this trial has told you otherwise.

17   That's because that warning, the same thing that Dr. Larned

18   said, hair does grow back most of the times -- the warning is

19   accurate.  The label says, "Generally hair comes back."  In the

20   experience of both of the oncologists in this case, that is

21   exactly what they told you they have seen with their patients.

22   It's a rare event, but it can happen.

23   You know here in this case, when it comes to

24   Ms. Kahn, that that's exactly what did happen.  Her hair

25   generally grew back.

1    So, ladies and gentlemen, for all of these
2  reasons, when it comes to the Taxotere label, plaintiffs have
3  not come close to proving to you by the weight of the evidence
4  that the language in that label, the warning given on hair
5  loss, was inadequate.  Both of the prescribing doctors told you
6  they knew of the risks.  They understood what those words
7  meant.  The answer to Question 1, ladies and gentlemen, is no.
8    Now, I don't think you will get past the first
9  question on the verdict form, but if you do, I don't want you
10 to wonder about what I might have said.  So I do want to go
11 through the rest of the questions with you.
12    The second question, ladies and gentlemen, is:
13 "Do you find by a preponderance of the evidence" -- again, the
14 weight of the evidence -- "that Sanofi's failure to warn
15 Ms. Kahn's prescribing physician caused Ms. Kahn's injury?"
16    So what this question is really asking you, it's
17 asking you whether a different warning, the addition of a word,
18 a single word, to the label would have made a difference to
19 Ms. Kahn's doctors or, said differently, even with a different
20 warning would they have still prescribed Taxotere to Ms. Kahn?
21    Now, you're going to see an instruction in this
22 case that says if Dr. Kardinal and Dr. Larned already knew of
23 the risk of this kind of hair loss, that even if there was a
24 different warning, it would have only been telling them what
25 they knew, right?  So a different warning wouldn't have made

any difference to them because they already had that
information.

You know that that is, in fact, the case.  Both
doctors told you that they knew of the risk of permanent hair
loss with chemotherapy long before they treated Ms. Kahn.  They
didn't need the label to tell them what they already knew.

Dr. Larned told you unequivocally that she had
seen for many years the risk of permanent alopecia with
Taxotere, with Adriamycin, with Cytoxan amongst her patient
group, and she knew that when she prescribed Taxotere to
Ms. Kahn.

Dr. Kardinal testified that he had seen the risk
of persistent thinning and loss long before he treated
Ms. Kahn.

Let me be clear.  These doctors, these
prescribing doctors, they were not waiting, as these
plaintiff's lawyers would like you to think, they were not
sitting around waiting for Sanofi to provide them with some
missing piece of information.

You know that that's true.  For one, it's
consistent with how they both told you they warned Ms. Kahn.
Again, they told her there's no guarantees.  Dr. Kardinal said,
"I always leave the door open."  These doctors knew everything
they needed to know, and that's why they told their patients,
hair probably comes back.  They didn't give a guarantee of hair

02:40  1    growth to anybody, including the plaintiff in this case.

02:40  2                    Now, the oncologists also told you -- this is

02:40  3    very important -- that even if that word one, right, that

02:40  4    plaintiffs are complaining about -- so if the word "permanent"

02:40  5    had been added to the label, it wouldn't have changed a thing.

02:40  6    Dr. Kardinal said he still would have recommended Taxotere to

02:40  7    Ms. Kahn.

02:40  8                    Dr. Larned testified that the word "permanent"

02:41  9    in the label would not have changed her decision to prescribe

02:41  10   Taxotere.  She told you it would not have been telling her

02:41  11   anything she didn't already know.  These doctors stood by their

02:41  12   decisions, ladies and gentlemen, so that you know a slightly

02:41  13   different warning would not have made any difference to them.

02:41  14                   Now, why else should the answer to Question 2 be

02:41  15   no?  So you have heard, again, that -- excuse me.  You have

02:41  16   heard from Dr. Kardinal that if Ms. Kahn didn't want to

02:41  17   participate in a clinical trial, he would have treated her with

02:41  18   what you know now is the standard treatment, and that would

02:41  19   have been Adriamycin, Cytoxan, and what's called a taxane.

02:41  20   When it came to selecting a taxane, Dr. Kardinal preferred

02:41  21   Taxotere.

02:41  22                   He told you he preferred Taxotere because of a

02:41  23   risk of neuropathy that Taxol had.  It is a risk that is less

02:41  24   common with Taxotere.  And he told you it can be painful, it

02:42  25   can interfere with a patient's gait or their ability to walk,

1    and it can be long lasting and severe.  Because of that, he

2    preferred Taxotere.

3              Even if you were to assume that Ms. Kahn did not

4    go into the clinical trial and even if you were to assume that

5    she was not prescribed Taxotere, Dr. Kardinal would have given

6    her Taxol.  If that had happened, you know from the evidence in

7    this case that Ms. Kahn would have had to have accepted the

8    risk of a debilitating, permanent, painful condition like

9    neuropathy which happens more frequently with Taxol.

10             What else would she still have to select?  The

11   risk of hair loss.  The risk of permanent hair loss.  Nobody

12   told you that if Ms. Kahn had taken Taxol, her hair would look

13   like it did 13 years ago.  That's missing from this trial.

14             Now, even if there had been different

15   information in the label, ladies and gentlemen, and even if it

16   would have told Dr. Kardinal and Dr. Larned something they

17   didn't know -- I know that's a lot of ifs.  But even if all of

18   those things had happened, you know it still would not have

19   made a difference in this case because, again, when presented

20   with serious life-threatening risks over and over and over,

21   Ms. Kahn never asked for a single option.

22             Ladies and gentlemen, I don't say that to be

23   critical.  Ms. Kahn was free to proceed however she wanted.  We

24   are very happy that her treatment worked and she is here today.

25   I don't say it to be critical.  But, again, in trying to

1   determine and figure out what Ms. Kahn would have done if she
2   had had a little bit of different information or additional
3   information she claims she was missing, you know what she would
4   have done because of what she actually did do:  She proceeded
5   with the treatment despite the serious risks.
6          I would remind you -- and we spent, I know, some
7   time on the consent form, and I'm sorry about that.  It's a
8   long document and it's very important, very important in this
9   case.  I am sorry that it took so long that one afternoon.
10          In going through that document with Ms. Kahn,
11  you were hearing first, "Oh, all these drugs are FDA-approved
12  and there's no problem with any of this.  It was just the
13  standard of care plus."  But that really wasn't exactly so.  I
14  had to point out that what Ms. Kahn was advised of and accepted
15  the risk of was taking two drugs that were being researched,
16  Avastin and Xeloda, as you know, one of which was not approved
17  to treat her kind of breast cancer, and the other one, ladies
18  and gentlemen, that wasn't approved to treat any breast cancer.
19          The point is simply that Ms. Kahn was willing to
20  accept, particularly with Avastin, those blood clot risks that
21  were life threatening, that happened in 4.5 percent of
22  patients.  That's not a small number, and it's a heck of a
23  serious risk.  She was willing to accept that risk for a
24  medication that was being investigated without knowing whether
25  that researched drug would even give her a benefit.

1    In light of that uncontroverted evidence, this

2 idea that some extra word in that document about her hair would

3 have caused her to not proceed with her treatment, not have

4 taken the taxane, not have taken Taxotere or not have taken

5 Taxol, it defies logic.  It would be a conclusion that is

6 contrary to the evidence that you have heard in this trial.

7    Ladies and gentlemen, for all of those reasons,

8 if you get to Question 2 on the verdict form and you're trying

9 to figure out would a different warning have made a difference,

10 whether it would have changed the outcome here, the answer to

11 that question is no.  Ms. Kahn's prescribing doctors, they knew

12 that hair doesn't always grow back, and they still prescribed

13 chemotherapy to Ms. Kahn because they believed it was the best

14 treatment for her, and they still believe that today.

15    Now -- more clicker problems.  Sorry.  Oops, too

16 far.  There we go.  Okay.

17    Ladies and gentlemen, again, the answer of no to

18 Question 2 is a hard stop for you.  You sign the verdict form

19 and you're finished here.

20    If you get past it -- and, again, I don't think

21 you will.  But if you get past it, you will be on Question 3.

22 Question 3 asks you:  "Do you find by a preponderance of the

23 evidence that Ms. Kahn has PCIA, or permanent

24 chemotherapy-induced alopecia, caused by Taxotere?"

25    This third question really goes into three

different issues, and you have heard a lot about this.  So is
Ms. Kahn's hair loss permanent?  If so, was Ms. Kahn's hair
loss caused by chemotherapy.  And if that was the case, and it
has been proven to you, was it caused by Taxotere?

So now I think you probably understand, after
having been sitting here for two weeks, why this plaintiff's
counsel worked so hard for two weeks to try and convince you
that the way Ms. Kahn's hair looked today is the way it looked
about a year after she completed chemotherapy.  That is
because, ladies and gentlemen, they know, they know, because if
your hair falls out after chemotherapy and then it grows back
and falls out over the course of the next decade, it doesn't
have anything to do with the chemotherapy.

Dr. Tosti came in here and told you that.  Their
expert.  But, as I said, you don't need high-priced experts or
lawyers to tell you that.  It's just simply a matter of good
common sense.

It was something, candidly, that we brought
you:  photo after photo in this case.  And they were
criticized.  He's still just criticized now.  Ladies and
gentlemen, you could see it with your own eyes, with your own
eyes.  Look, we have heard a lot of things about the photos,
right?  We have heard the photos were poor quality.  We have
heard there was too much light, there's not enough light; we
have heard it's a bad photo because it was taken indoors; this

1    is a bad photo because it was taken outdoors.  We have heard
2    the sun was in Ms. Kahn's hair; we heard, some photos, that the
3    sun was in her eyes; some were out of focus, too far away, the
4    angle wasn't good.  One of the last things we heard -- I'm not
5    sure I understood -- that it was a photo, but it didn't capture
6    Ms. Kahn's signature pose.  Right?
7              Then you might remember I asked Dr. Tosti -- I
8    said, "Have you heard the phrase that a picture is worth a
9    thousand words?"  And she said, "Not with hair.  Hair is the
10   opposite."
11             Ladies and gentlemen, candidly, it's been
12   ridiculous.  It's been ridiculous.  Because you know what
13   Ms. Kahn's hair looked like over the past 13 years.  You have
14   seen it.  The photos are the best evidence.  Don't let anybody
15   try to convince you otherwise of that.  Photos don't come into
16   court and testify.  They are not paid a thousand dollars an
17   hour.  Photos don't care who wins or loses this case.  Most of
18   those photos were taken long before it ever occurred to
19   Ms. Kahn to file this lawsuit.
20             Now, I will just go through them quickly because
21   I know you have seen them a lot.  What did you learn from the
22   photographs?  Here you can see Ms. Kahn, both pictures prior to
23   chemotherapy.
24             Dr. Tosti says, "Yeah, I can see there's hair
25   thinning in her hair before chemotherapy."  Ms. Kahn has still

02:50  1    taking the position in this trial that her hair was perfectly
02:50  2    normal and said to me, "I don't see my scalp coming through in
02:50  3    either of these."  As you saw, after chemotherapy was
02:51  4    concluded, her hair did grow back in.  It improved each month
02:51  5    to where you can see it's short but it's present all over her
02:51  6    head in March of 2009.
02:51  7               Here is the before-and-after series, ladies and
02:51  8    gentlemen.  Before chemo on the left and after chemotherapy on
02:51  9    the right.  We were accused of cherry-picking.  You have heard
02:51 10    this.  I think no matter how many different photos we show,
02:51 11    it's never good enough.  Look, here is a photo of the top of
02:51 12    Ms. Kahn's head on the right-hand side, after chemotherapy.
02:51 13    Does her hair look much the same?  Of course it does.  Perhaps,
02:51 14    most importantly, ladies and gentlemen, is this period of time
02:51 15    from when Ms. Kahn's hair grew back a year after chemotherapy
02:51 16    and what she looks like now.  Here she is in 2017.  I showed
02:51 17    you different pictures yesterday from 2020 and 2021.
02:52 18               Ms. Kahn is asking you to compensate her for the
02:52 19    way that she looks in that photo on the right.  I don't know
02:52 20    what Mr. Schanker is going to come up here and tell you.  He
02:52 21    gets to talk with you after I sit down.  But make no mistake
02:52 22    about it:  No matter what he says to you, he wants you to
02:52 23    compensate his client for what she looks like in that photo on
02:52 24    the right.
02:52 25               When you go into the jury room, please take the

1    time.  Our photos are back there in evidence.  We have admitted
2    a good amount of them because we wanted you to have access to
3    that evidence.  They all have dates on them.  Look at the
4    photos nine months, a year, a year and a half after
5    chemotherapy, and ask yourself:  How could Mr. Schanker come up
6    here and look you in the eye and ask you to pay for the way his
7    client looks now?

8                Now, we talked about this a moment ago, but this
9    is out of Dr. Tosti's mouth, their expert.  This is basically
10   her quote.  This is her definition.  "So if your hair grows
11   back and then falls out years later, that doesn't have anything
12   to do with chemotherapy," and you know that's just what
13   happened here.

14               Here is a timeline that essentially takes a look
15   at a drug that you know Ms. Kahn was taking for a long time, I
16   know you have heard a lot about tamoxifen.  And what you will
17   see, ladies and gentlemen, is that this timeline of Ms. Kahn
18   taking tamoxifen and you look at her hair before chemotherapy,
19   after chemotherapy, and then you look at those four photos on
20   the right, you can see the progression of her hair loss as she
21   is taking this medication, with her own eyes.

22               And remember, I want to be clear here, I know I
23   have said we don't have to prove anything.  We don't have to
24   prove that it was tamoxifen or what it was.  But the one thing
25   you can see for sure, ladies and gentlemen, is Ms. Kahn's hair

changed while she was taking a drug that every witness told you there are reports and cases of permanent hair loss with tamoxifen, including even in the paper that Dr. Tosti published.  That's their expert's paper.  Dr. Tosti also admitted to you, she said, "I cannot rule out tamoxifen as playing a role in Ms. Kahn's hair loss."  And, again, if she can't do it, how can you?

Here is Dr. Tosti's study.  She kind of tried to run from it a little bit.  You might remember there were some questions, like, "Oh, your name isn't the first one listed. Somebody else wrote it."  I mean, look, this is a paper that she had published in a peer-reviewed journal that has her name as one of the authors.  This is Dr. Tosti's paper.  It's from 2019, it's fairly recent, and nearly 13 percent of the patients in the study who took drugs like tamoxifen experienced Grade 2 permanent hair loss, the kind of hair loss Mr. Schanker come up here and he kept repeating, "Grade 2 permanent, the Grade 2."

Look no further than their own expert's paper if you want to know what drugs like tamoxifen can do to a patient's hair.  And Grade 2 means that more than 50 percent of your hair is gone.

Now, Dr. Glaspy also testified yesterday and he said, "Look, I've been treating cancer patients a long time.  I see a lot of women that take tamoxifen after battles with breast cancer."  And he said, "Look, I'm looking at Ms. Kahn.

02:55
02:55
02:55
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:56
02:57
02:57
02:57
02:57
02:57
02:57

1  This is the way that their hair looks."  Not all the time, not

2  every lady who takes tamoxifen.  We are not saying that.  But

3  when women have a slow progressive hair loss after taking

4  tamoxifen for a decade, he told you, "It looked pretty much

5  like Ms. Kahn's hair now."

6          Now, what else did Dr. Tosti tell you that she

7  couldn't rule out when it comes to the causes of Ms. Kahn's

8  hair loss?  You may remember but I showed her this document,

9  it's a pathology report and it's authored and prepared by,

10  again, another one of plaintiff's experts who didn't come here

11  to testify but the report was provided to Dr. Tosti.  This

12  pathologist hired by plaintiff concluded when he looked at the

13  biopsy that Dr. Tosti did from the top and the front of the

14  scalp, he found androgenetic alopecia or what is known as, as

15  you can see, female pattern hair loss.

16          And all that's really describing -- I know it's

17  sort of a lot of words there, it's describing a condition where

18  women develop a certain pattern of the baldness, similar to

19  what Ms. Kahn has, on the top of their scalp.  And you know

20  what's known to cause hair loss in the female pattern?  In this

21  androgenetic pattern?  Tamoxifen.  And that's been undisputed

22  in this trial, ladies and gentlemen.

23          So when it comes to Ms. Kahn's hair loss -- and,

24  again, plaintiffs have the burden of proof to prove to you all

25  issues in this case including the cause of Ms. Kahn's hair

1    loss, and they have to prove it to you by the weight of the

2    evidence, ladies and gentlemen.

3                And what that is saying in this context is they

4    have to prove to you by the weight of the evidence that the

5    cause of the claimed injury in this case that Taxotere's

6    involvement was so substantial that if Ms. Kahn had not

7    received Taxotere, that her hair would look like it did before

8    she took chemotherapy.  So let me see if I can explain that a

9    little bit better.

10                If you look at this slide and you look at the

11   list of risk factors on it, undisputed risk factors, many of

12   which plaintiff's hair loss expert said, "I can't rule them out

13   as playing a role.  It can't be done."  Right?  So you have

14   Adriamycin, Cytoxan, Taxotere, tamoxifen, the hormone drug,

15   androgenetic alopecia.

16                You have heard about Ms. Kahn reaching

17   menopause, her age, the passage of time.  You will remember she

18   said yesterday that one of her gynecologists right here in

19   New Orleans, a Dr. Roberie, told her, "You know, listen, I

20   think that your issues are more related to age and menopause in

21   your case."  That's what one doctor told her with regard to her

22   hair loss, so that's on the list.

23                So if you take this list, ladies and gentlemen,

24   and you only cross off the Taxotere, plaintiff has to prove to

25   you that if you just take the Taxotere off this list, that

02:59  1    without it, but everything else is the same, that Ms. Kahn's
02:59  2    hair looked like it did 13 years ago before she ever had a drop
02:59  3    of chemotherapy.
02:59  4              And you know what else you would have to do,
02:59  5    ladies and gentlemen --
02:59  6              MR. SCHANKER:  Your Honor, can we approach?
02:59  7              (The following proceedings were held at the bench.)
02:59  8              MR. SCHANKER:  Your Honor, she is misstating the law.
02:59  9    She just stated that we have to demonstrate that her hair would
02:59 10    have looked exactly the same way it did 13 years ago in order
02:59 11    to recover.
02:59 12              MS. SASTRE:  I don't think I said "exactly."
02:59 13              MR. SCHANKER:  That's what you did.
02:59 14              MS. SASTRE:  Okay.  I'll take it out.
02:59 15              MR. SCHANKER:  Can we have a correction?
02:59 16              THE COURT:  Take it out.
02:59 17              MS. SASTRE:  Sure.  I will.  You got it.
02:59 18              (End of bench conference.)
03:00 19              MS. SASTRE:  May I proceed?
03:00 20              THE COURT:  Yes.
03:00 21              MS. SASTRE:  Okay.  Thank you, Your Honor.
03:00 22              So, ladies and gentlemen, what plaintiff's
03:00 23    counsel would have to prove to you is if Taxotere comes off
03:00 24    this list, that Ms. Kahn's hair would look much like it did
03:00 25    13 years ago before she had chemotherapy.  But when you take --

03:00　1    **MR. SCHANKER:**  Your Honor, may we approach?

03:00　2    **THE COURT:**  Yes.

03:00　3    (The following proceedings were held at the bench.)

03:00　4    **THE COURT:**  I don't think she needs to show that it

03:00　5  would look like it did 13 years --

03:00　6    **MS. SASTRE:**  I said "much like."

03:00　7    **MR. SCHANKER:**  That's not the law.  We don't have to

03:00　8  show that her hair --

03:00　9    **MS. SASTRE:**  Of course --

03:00　10    **MR. SCHANKER:**  Can you step back so I can get in

03:00　11  there?

03:00　12    **MS. SASTRE:**  Yeah, of course.

03:00　13    **MR. SCHANKER:**  Thank you.  We don't have to show that

03:00　14  her hair would look "much like" it did 13 years ago in order to

03:00　15  recover.  That is just a flat misstatement of the law,

03:00　16  Your Honor.  We obviously have to show that she has damages,

03:01　17  but there's nothing in the jury instructions or in the law that

03:01　18  show we have to show that it looks "much like" it did 13 years

03:01　19  ago.

03:01　20    **MS. SASTRE:**  I said "much like," Your Honor --

03:01　21    **THE COURT:**  I know you said "much like."  It's such a

03:01　22  nuanced thing.  She just has to show that it --

03:01　23    **MS. SASTRE:**  What I was going to say, Your Honor, is

03:01　24  they are claiming in this case that the way -- they have denied

03:01　25  it the whole time that the way that she looks today is the way

03:01 1     that she has looked since she hit her peak, and so I don't know

03:01 2     of any other way to put it.  I'm trying to use my words as

03:01 3     clearly as I can.

03:01 4             **MR. SCHANKER:**  Your Honor, she can argue factually

03:01 5     that we have claimed something, but that's different.  She just

03:01 6     stated to the jury that the law requires that we show that her

03:01 7     hair looks "much like" it did 13 years ago, and that's not what

03:01 8     the law requires in any way, shape, or form.

03:01 9             That's what you said on the record.

03:01 10             **THE COURT:**  I'm trying to figure out what -- you have

03:02 11     to show that the hair -- that when you remove Taxotere --

03:02 12             **MR. SCHANKER:**  Uh-huh.

03:02 13             **THE COURT:**  -- she would not have had the damage.

03:02 14             **MR. SCHANKER:**  Right.  Your Honor --

03:02 15             **THE COURT:**  So how do you do that?

03:02 16             **MR. SCHANKER:**  -- a jury could find that damages are

03:02 17     caused by androgenetic alopecia, by A and C --

03:02 18             **THE COURT:**  Okay.

03:02 19             **MR. SCHANKER:**  Or if she uses -- Your Honor --

03:02 20             **MS. SASTRE:**  I think you can --

03:02 21             **THE COURT:**  I guess I really don't know what you want

03:02 22     her to say.  I mean, I know you don't want her to say anything.

03:02 23     I think the issue is, you know, you are claiming that the use

03:02 24     of Taxotere caused this damage to her hair.

03:02 25             **MR. SCHANKER:**  Uh-huh.

03:02  1          THE COURT:  So you would have to show that if we take

03:02  2   Taxotere out of the picture, she doesn't have this damage.

03:03  3          MR. SCHANKER:  Right, that she doesn't have damage.

03:03  4   She just --

03:03  5          THE COURT:  What do we do?

03:03  6          MR. SCHANKER:  Again, she has represented that we

03:03  7   have to show that her hair looked -- again, it was stated that

03:03  8   Taxotere --

03:03  9          THE COURT:  All right.

03:03  10         MS. SASTRE:  Thank you.

03:03  11         (End of bench conference.)

03:03  12         MS. SASTRE:  Sorry, ladies and gentlemen, almost

03:03  13  time.

03:03  14              All set, Your Honor?

03:03  15         THE COURT:  Yes.

03:03  16         MS. SASTRE:  Okay.  Now, going back to the list,

03:03  17  ladies and gentlemen, when you are looking at all of Ms. Kahn's

03:03  18  risk factors, right, when you take Taxotere off that list, you

03:03  19  know what else you have to do?  You have to add Taxol to the

03:03  20  list because you know in this case that Ms. Kahn needed what's

03:03  21  called a taxane, and you know by now, just after a couple of

03:03  22  weeks here with us, you know there's basically two drugs in

03:03  23  that class, Taxotere and Taxol.  And every witness has

03:03  24  admitted, they have come in here and sat on that witness stand

03:03  25  and they told you, "There's also reports of permanent hair loss

1    with Taxol, too."

2              Ladies and gentlemen, plaintiff has not come

3    close to proving what Ms. Kahn's hair might have looked like

4    without Taxotere, and he hasn't come close to proving that

5    these other causes have been ruled out and ruled out by the

6    weight of the evidence and to your satisfaction, that simply

7    has not been done in this trial.

8              Now, very quickly, here is Dr. Tosti.  And what

9    does she say about some of these other causes?  She says,

10   "Well, Adriamycin causes permanent hair loss.  Cytoxan causes

11   permanent hair loss."  And she has got Taxol on her list, too.

12             Now, I do want to be clear here, I am not saying

13   that Ms. Kahn's hair looks the way it does because of her

14   chemotherapy.  You know that.  You know that's not what I'm

15   saying in this case.  Because as you have seen over and over

16   from the photographs, her hair grew back, and then it changed

17   over the coming years.  It's totally different now.

18             But plaintiff's counsel through the course of

19   this trial has probably said a hundred times that, "Ms. Kahn's

20   hair loss is from chemotherapy," maybe thousands of times,

21   right?  But if that was true, and it's not, how could anyone

22   rule out the role that Adriamycin and Cytoxan have played?

23   Particularly with testimony like this from plaintiff's own

24   expert.

25             Now, Dr. Kardinal told you, just as a reminder,

1   that he had patients who took Adriamycin whose hair didn't come

2   back the same.  Dr. Larned told you again this morning she had

3   patients on all these drugs whose hair didn't come back the

4   same.  Dr. Glaspy told you the same thing yesterday.

5          Dr. Tosti also told you something else really

6   important and it was when we had out these buckets with the

7   balls, and you will probably remember that.  I had to empty one

8   of them, and I said, "Well, I don't understand, you have 380

9   balls in this bucket, every one of them took the combination

10  treatment," because now you know, right, Taxotere is typically

11  given in the combination form.  And she said, "Well, I agree

12  with you.  I think the combination is the problem."  That's

13  what she said.  And she said, "Alone, you don't see the problem

14  with Taxotere when it is given alone."  And that's when I

15  emptied the bucket and there were two balls left.

16         **MR. SCHANKER:**  Your Honor, may I approach?

17         **THE COURT:**  Overruled.  But I think it's -- what?

18         (The following proceedings were held at the bench.)

19         **MS. SASTRE:**  It's my third interruption during

20  closing.  I'm a little stunned, to tell you the truth.

21         **MR. SCHANKER:**  Well, Your Honor, the record is clear

22  Dr. Tosti does not say you don't see the combination -- that's

23  a flat-out misstatement.

24         **MS. SASTRE:**  He cannot keep doing this, Your Honor.

25  This is ridiculous.

03:06  1          **THE COURT:**  That's overruled.

03:07  2          (End of bench conference.)

03:07  3          **MS. SASTRE:**  Are you okay?  All right.

03:07  4          So as I was saying, Dr. Tosti told you, "You

03:07  5  don't see this when Taxotere is given alone."  That's what she

03:07  6  said to you, ladies and gentlemen.

03:07  7          You saw this when we opened, all the experts

03:07  8  agree, there's reports with all of these drugs, so, ladies and

03:07  9  gentlemen, how could anybody tell you that Adriamycin and

03:07  10  Cytoxan didn't play a role?  How can anybody tell you that

03:07  11  Taxol if given wouldn't have played a role?  No one can and no

03:07  12  one did.

03:07  13          Now, in addition to all of this, ladies and

03:07  14  gentlemen, plaintiff has to prove to you by the weight of the

03:07  15  evidence that Ms. Kahn's hair loss is actually permanent, and

03:07  16  that I think is the -- actually very first part of this

03:08  17  question, right?  But you will remember that Ms. Kahn has never

03:08  18  tried any treatment for her hair loss.

03:08  19          And we know that she traveled down to Miami to

03:08  20  see Dr. Tosti for about 30 or 40 minutes, right, and at that

03:08  21  visit, that trip that was arranged by her lawyers and her

03:08  22  lawyers attended, went with her down to Miami, one of the

03:08  23  things that they discussed at this visit that Dr. Tosti brought

03:08  24  up, she said to her, "You ought to try minoxidil.  It's

03:08  25  something that I have seen work for my patients."  Well, ladies

1    and gentlemen, even though Dr. Tosti has seen improvement in

2    her patients who have taken minoxidil, if there's any chance of

3    Ms. Kahn seeing improvement again, she would have to try.

4              Now, you heard that there were two other

5    dermatologists, both of them here in New Orleans, including a

6    dermatologist that she regularly saw, and she recommended also

7    minoxidil to Ms. Kahn.  So as we told you when we opened, three

8    doctors that have recommended this.

9              So, ladies and gentlemen, I ask you, how can a

10   supposed injury even be considered permanent when three doctors

11   have recommended a treatment and you haven't tried it?  And,

12   again, please, I'm not in any way criticizing Ms. Kahn.  She is

13   free to try treatment or not.  That is entirely up to her.  But

14   if she hasn't tried treatment for her hair loss, how could you

15   ever conclude that it's permanent, particularly after three

16   recommendations?

17             How am I doing on your clock?

18             May I have about two minutes, Your Honor?  Okay.

19   Thank you.

20             Let me move a little bit faster, folks.  Don't

21   forget that no treating doctor, none of the doctors outside

22   this courtroom in the real world, ever diagnosed Ms. Kahn with

23   permanent hair loss of any kind.  None of them diagnosed her

24   with hair loss from chemotherapy.  And not a single doctor in

25   13 years of all the physicians she has seen has ever told her

1    that her hair loss was from Taxotere.

2              So, ladies and gentlemen, for all of these

3    reasons the answer to Question 3 on the verdict form is no.

4    Plaintiff has failed to prove by the weight of the evidence

5    that Ms. Kahn's hair loss is permanent and was caused by

6    chemotherapy, no less Taxotere.

7              So the next question on the verdict form, and

8    I'm going to move through it quickly, relates to something

9    called the statute of limitations, and essentially what it

10   means is like most things in life, you have to follow certain

11   rules, right?  And the court is no different.

12             So this question is going to ask you, if you get

13   to it -- and, again, I don't think you will.  If your answer to

14   Question 3, that we were just in, as to whether Taxotere has

15   caused Ms. Kahn's hair loss is no.  Again, you sign and date

16   your verdict form and you go home.  But if you do get to the

17   statute of limitations question, it asks essentially:  "Did

18   Ms. Kahn file her lawsuit on a timely basis?"  Because here in

19   Louisiana you have one year to file or it's considered too

20   late.

21             Now, the question is whether Ms. Kahn had enough

22   information to look into a personal injury lawsuit, so that she

23   needed to file that lawsuit within a year of discovering her

24   injury.  And very briefly, ladies and gentlemen, in this case

25   plaintiff filed her lawsuit, as you may have heard, in December

1  of 2016.  One year before that, as you can see, is December of

2  2015.  But as you have heard, according to plaintiff, she

3  experienced her injury seven years earlier in April of 2009,

4  six months after she completed chemotherapy, but she didn't

5  file this lawsuit for seven years.

6          So you are going to have to determine whether

7  Ms. Kahn or a reasonable person in her position would have been

8  aware of her hair loss and chemotherapy as a potential cause at

9  any time before December of 2015.  And if you believe that

10  Ms. Kahn has failed to prove to you that she could not have

11  discovered chemotherapy or Taxotere as a potential cause of her

12  hair loss until 2015, then you have to come back with a no on

13  the statute of limitations to this question.

14          Now, the last thing I would like to talk about,

15  and I will just be another moment, ladies and gentlemen, is the

16  question on damages.  And, again, I don't think that you're

17  going to get this far, folks, but I just heard Mr. Schanker

18  come up here, and I tried to do the math quickly, but he asked

19  you for a little over $3 million, and I just simply have to

20  respond to that.

21          Now, how did Mr. Schanker -- you have to ask

22  yourself, "How did he come up with that number?"  Is it just

23  like a number that's pulled out of thin air?  Is it any

24  different than me coming up here saying, "You know what?  If

25  you get to damages, give Ms. Kahn $3,000."  Is there a

1    difference?

2              In a case like this, what would justify asking

3    for a number like that where plaintiff has to prove by the

4    weight of the evidence every single issue to you, including

5    every single dollar that he is asking you for.

6              What have you seen in this case that would

7    support an award of $3 million?  What would justify such a

8    large number in a trial like this?  Candidly, that number

9    defies common sense.  Ms. Kahn was 50 years old when she was

10   diagnosed with breast cancer.  13 years later Ms. Kahn is

11   alive; she is cancer-free; and her treatment worked.

12             Now, maybe Mr. Schanker wants to trivialize that

13   or minimize it, but I don't think you should.  I think it means

14   something.  Ms. Kahn received a benefit like no other.  Should

15   Ms. Kahn be handed over millions of dollars for taking a

16   chemotherapy regimen that the evidence has proven literally

17   shrunk her tumor to almost nothing?  And even after

18   chemotherapy you saw with your own eyes how her hair returned

19   to look pretty much the same as it did.

20             Now, given the evidence in this case that you

21   have heard, we don't believe any damages are appropriate.  But

22   if you do get this far, ladies and gentlemen, we would ask you

23   please use your common sense.  Use your everyday life

24   experiences in deciding how much money you think would be

25   appropriate to compensate Ms. Kahn.

1    Now, ladies and gentlemen, I'm going to go and
2    sit down in a moment, so these are the last words that I'm
3    going to get to have with you.  As I told you earlier,
4    plaintiff's counsel is going to have a chance to get back up
5    here and talk with you.  Because he has the burden of proof on
6    every issue, the law says he gets to go first and then he gets
7    to go last.
8         Now, I don't know what Mr. Schanker is going to
9    say, but I'm pretty confident he is going to say some things
10   that are pretty critical of Sanofi.  I want you to ask yourself
11   while you are listening to him, "What does it have to do with
12   the decisions made by Dr. Kardinal and Dr. Larned back in 2008
13   that they continue to stand by to this day?"
14        Now, ladies and gentlemen, let me end by
15   thanking you.  We very much appreciate your time and attention
16   that you devoted to this case.
17        There is only one correct verdict in this case,
18   and that is a verdict for Sanofi.  Thank you again on behalf of
19   John and Doug.  We very much appreciate it.
20        Thank you, Your Honor.
21        **THE COURT:**  Thank you.
22        **THE DEPUTY CLERK:**  You have an extra six minutes.
23        **MR. SCHANKER:**  May I, Your Honor?
24        **THE COURT:**  Yes, Mr. Schanker.
25        **MR. SCHANKER:**  Ladies and gentlemen, one thing that I

03:16  1    noticed that the Sanofi lawyer did was to leave out any real
03:16  2    conversation about the Grade 2, no conversation about the
03:16  3    Grade 2 PCIA.
03:16  4                What did we tell you at the beginning?  That's
03:16  5    what this case is about.  It's not about hair thinning or loss
03:17  6    of volume.  I trust that you noticed that and you will stay
03:17  7    focused on that.
03:17  8                Let's look at the tamoxifen in Grade 2.  We just
03:17  9    saw another example of Sanofi not telling the truth.  Do you
03:17  10   remember the Dr. Tosti study that defense counsel put up that
03:17  11   showed Grade 2 hair loss?  Well, hopefully you listened
03:17  12   carefully when Dr. Tosti testified because there is no Grade 2.
03:17  13               In that Dr. Tosti study that was just
03:17  14   represented to you by counsel, that's temporary hair loss.
03:17  15   This case isn't about temporary hair loss.  That's an example I
03:17  16   told you from the beginning, and I trust that you listened,
03:17  17   listened carefully to the comments about temporary versus
03:17  18   permanent or leaving those out and just using the phraseology
03:18  19   of hair loss.  Because the determination for you to find is
03:18  20   what is a substantial fact.
03:18  21               These may just be little balls, but they are
03:18  22   representative of something more.  These are representative of
03:18  23   examples and cases and studies done by scientists and
03:18  24   professionals.  And the evidence is clear, folks.  You saw it.
03:18  25   It's clear that Taxotere is a substantial factor and that

03:18   1    Taxotere only, not Taxol, not any of the other drugs.

03:18   2              With regard to the photographs, we continue to

03:18   3    play the "Choose Your Own Adventure" timeline.

03:19   4              Sanofi in this case has shown you a bunch of

03:19   5    photographs of Ms. Kahn shot from a particular angle, front-on.

03:19   6    They never showed you a single photo of Ms. Kahn from the back.

03:19   7    They never once explained how Ms. Kahn went from this, which is

03:19   8    what she looked like before the Taxotere, to this.

03:19   9              Now, this isn't androgenetic alopecia on the

03:19  10    right, ladies and gentlemen.  This is Grade 2 PCIA, but Sanofi

03:19  11    doesn't want you to see that.  They have never shown you a

03:19  12    single photo from before, from the back of her head, but you

03:19  13    can't miss it.  It's obvious and it can't be hidden.

03:19  14              As I said previously, their entire defense in

03:19  15    this case is that Ms. Kahn's hair grew back and then fell out

03:19  16    again.  They claim that by mid-2009 she had all her hair back

03:20  17    and then it fell out again and then thinned significantly over

03:20  18    time.

03:20  19              They have shown you the picture on the top left

03:20  20    over and over and over again from June of 2009, but what do you

03:20  21    see in the picture from ten years later of June of 2009?  They

03:20  22    have shown you the August 2009, but look at the picture from

03:20  23    June of 2021.

03:20  24              That cherry-picked story just doesn't add up

03:20  25    folks.  Ms. Kahn can still make herself look the same for a

1     moment of time if she takes the signature pose.  You can see

2     that on the right.

3              It's plain and simple, they are doing nothing

4     but calling her a liar in this case.  That's all they have done

5     to her.  They have come in here and they have directly called

6     her credibility into question.

7              Ms. Kahn's hair and eyebrows never grew back.

8     Think about the eyebrows.  This androgenetic alopecia, right?

9     When we see men who are balding significantly, do they lose

10     their eyebrows too?  No.

11              Use your common sense folks.  Ms. Kahn has been

12     nothing but an open book in this case.  She has told you the

13     truth that ever since her first dose of Taxotere, she has had

14     the Grade 2 PCIA.  You heard it from her.  You heard it from

15     her husband.

16              Most importantly, who else did you hear it from

17     today on that video?  You heard it from Dr. Larned.

18     Dr. Larned -- painstakingly we went through and documented that

19     she -- that Ms. Kahn's alopecia has never resolved.  That's not

20     what we have heard from the defense counsel in this case.

21     Sanofi would have you think that all these folks have some sort

22     of agenda -- including Dr. Larned, I guess -- based on four or

23     five cherry-picked photographs.

24              The word "alopecia" -- the Sanofi lawyer just

25     stood up here and said the word "alopecia" can mean anything.

1 Well, if it can mean anything, then what does it mean?  It

2 means nothing, right?  That would violate the golden rule.

3          Well, folks, look at Exhibit P1.  There's a

4 reason it's P1 in this case, Plaintiff's 1.  You have seen this

5 over and over.  This is Sanofi's own document.

6          Remember, we heard defense counsel say that

7 alopecia can mean anything.  Well, what did Sanofi say

8 specifically "alopecia" means?  "It's a common yet temporary

9 side effect."  But it's only now that Ms. Kahn has stood up to

10 Sanofi that suddenly alopecia in this courtroom is a warning.

11 It's a warning for PCIA.

12          Remember, as lawyers, we are not under oath, but

13 the Sanofi witnesses were under oath.  What did you hear Sanofi

14 witness after witness after witness go through?  And I showed

15 you that earlier in my closing.  What did they say?  They said

16 that alopecia is not a warning.  That's what the employees

17 said.

18          We heard a lot of talk about Dr. Larned from the

19 Sanofi lawyer, but what's important concerning that?  With

20 regard to the decision that was made for chemotherapy, that

21 decision that was not informed between Elizabeth Kahn and

22 Dr. Kardinal.  It wasn't informed because the label had not

23 been updated, the golden rule had not been followed, and the

24 megaphone had not been activated.

25          Who was not involved in that decision?

1   Dr. Larned.  We heard minutes of closing argument about

2   Dr. Larned and what her opinions are concerning this and that,

3   but the fact is, for your job what Dr. Larned thought, with all

4   due respect, doesn't matter because the train had already left

5   the station, right?  The chemotherapy had not only been

6   started, but what is the status of Ms. Kahn's hair by the time

7   she saw Dr. Larned?  It was gone.

8           So it doesn't matter what Dr. Larned thought

9   about all of this.  Dr. Larned wasn't the prescriber.  That was

10  Dr. Kahn [*sic*].  Dr. Larned wasn't the advisor.  Who was that

11  with regard to regimen?  That was Dr. Kardinal.

12          Ladies and gentlemen, it's what Sanofi knows in

13  this case.  Dr. Larned doesn't get to decide if the warning was

14  adequate or not.  That's not what the law says.  You, as the

15  jurors, are going to decide if that warning was adequate, was

16  the warning adequate.

17          You heard yourself from employee after employee

18  as they explained that label, that was the same label with

19  regard to hair from 1996.  That was never, ever intended to

20  warn of permanent hair loss.  And, quite frankly, just because

21  Ms. Kahn accepted some disclosed risks -- right -- what did we

22  hear in this case?  Chemotherapy has risks.  It's serious

23  business, right?

24          Does that mean that you aren't owed a duty

25  anymore?  No.  She still has that right to know and make an

1    informed decision.  That's what the law says.

2                    Ladies and gentlemen, I said to you earlier that

3    Ms. Kahn -- what Ms. Kahn has done in this case I think may be

4    one of the bravest things she has ever done in her life, quite

5    frankly.  It's pretty scary to sit up there on that witness

6    stand.  It's pretty scary to sit in this courtroom, vulnerable

7    and let all these pictures be shown of her.

8                    But what has she done here?  She stood up to the

9    bully.  You have seen it in here.  Ladies and gentlemen, she

10   can't do it alone.  She needs your help.

11                   Thank you for your attention.

12            **THE COURT:**  Before I read the jury charge to you, I'm

13   going to ask you to stand up and stretch so that I'm satisfied

14   that you-all are awake.  Any members, people observing that do

15   not intend to stay through the entire charge, I am going to ask

16   that you leave now.  I don't want people walking in during the

17   course of the charge.  I need a stretch myself.

18                   Please be seated.

19                   Members of the jury, it is my duty and

20   responsibility to instruct you on the law you are to apply in

21   this case.  The law contained in these instructions is the only

22   law that you may follow.  It is your duty to follow what I

23   instruct you the law is regardless of any opinion that you

24   might have as to what the law out to be.

25                   If I have given you the impression during the

trial that I favor either party, you must disregard that
impression.  If I have given you the impression during the
trial that I have an opinion about the facts of this case, you
must disregard that impression.  You are the sole judges of the
facts of this case.  Other than my instructions to you on the
law, you should disregard anything I may have said or done
during the trial in arriving at your verdict.

You should consider all of the instructions
about the law as a whole and regard each instruction in light
of the others, without isolating a particular statement or
paragraph.

The testimony of the witnesses and other
exhibits introduced by the parties constitute the evidence.
The statements of the counsel are not evidence; they are only
arguments.  It is important for you to distinguish between the
arguments of counsel and the evidence on which those arguments
rest.  What the lawyers say or do is not evidence.  You may,
however, consider their arguments in light of the evidence that
has been admitted and determine whether the evidence admitted
in this trial supports the arguments.  You must determine the
facts from all of the testimony that you have heard and the
other evidence submitted.  You are the judges of the facts, but
in finding those facts you must apply the law as I instruct
you.

You are required by law to decide the case in a

1    fair and impartial and unbiased manner based entirely on the

2    law and on the evidence presented to you in the courtroom.  You

3    may not be influenced by passion, prejudice, or sympathy you

4    might have for the plaintiff or the defendant in arriving at

5    your verdict.

6         Plaintiff Elizabeth Kahn has the burden of

7    proving her case by a preponderance of the evidence.  To

8    establish by a preponderance of the evidence means to prove

9    something is more likely so than not so.  If you find that

10   Ms. Kahn has failed to prove any element of her claim by a

11   preponderance of the evidence, then she may not recover on that

12   claim.

13        The evidence you are to consider consists of the

14   testimony of the witnesses, the documents and other exhibits

15   admitted into evidence, and any fair inferences and reasonable

16   conclusions you can draw from the facts and circumstances that

17   have been proven.

18        Generally speaking, there are two types of

19   evidence.  One is direct evidence, such as testimony of an

20   eyewitness.  The other is indirect, or circumstantial evidence.

21   Circumstantial evidence is evidence that proves a fact from

22   which you can logically conclude another fact exists.  As a

23   general rule, the law makes no distinction between direct and

24   circumstantial evidence but simply requires that you find the

25   facts from a preponderance of all of the evidence, both direct

and circumstantial.

You alone are to determine the questions of credibility or truthfulness of the witnesses.  In weighing the testimony of the witnesses, you may consider the witness' manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case that he or she may have, and the consistency or inconsistency of his or her testimony considered in light of the circumstances.  Has the witness been contradicted by other credible evidence?  Has he or she made statements at other times and places contrary to those made here on the witness stand?  You must give the testimony of each witness the credibility you think it deserves.

Even though a witness may be a party to the action and therefore interested in the outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted.  The test is not the relative number of witnesses but the relative convincing force of the evidence.

The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses

1    testified to the contrary, if after considering all of the
2    other evidence, you believe that witness.
3              When knowledge of a technical subject matter may
4    be helpful to the jury, a person who has special training or
5    experience in that technical field is permitted to state his or
6    her opinion on those technical matters.  However, you are not
7    required to accept that opinion.  As with any other witness, it
8    is up to you to decide whether to rely on it.
9              The fact that a person brought a lawsuit and is
10   in court seeking damages creates no inference that the person
11   is entitled to a judgment.  Anyone may make a claim and file a
12   lawsuit.  The act of making a claim in a lawsuit by itself does
13   not in any way tend to establish that claim and is not
14   evidence.
15             A stipulation is an agreement.  Where there is
16   no dispute about certain facts, the attorneys may agree, or
17   stipulate, to those facts.  You must accept a stipulated fact
18   as evidence and treat that fact as having been proven here in
19   court.
20             Plaintiff Elizabeth Kahn and Defendant Sanofi
21   have stipulated to the following facts:
22             First, for the purposes of this trial, Taxotere
23   and docetaxel mean the same thing.
24             Second, Sanofi is the manufacturer of the
25   Taxotere/docetaxel administered to Ms. Kahn within the meaning

1  of the Louisiana Products Liability Act, or LPLA.

2  Third, the use of Taxotere to treat Elizabeth

3  Kahn's breast cancer in 2008 was a reasonably anticipated use

4  of the product within the meaning of the LPLA.

5  Fourth, Ms. Kahn filed this action against

6  Sanofi on December 9, 2016.

7  Certain testimony has been presented to you

8  through depositions.  A deposition is the sworn, recorded

9  answers to questions a witness was asked in advance of the

10  trial.  Under some circumstances, if a witness cannot be

11  present to testify from the witness stand, that witness'

12  testimony may be presented under oath in the form of a

13  deposition.  Some time before this trial, attorneys

14  representing the parties in this case questioned these

15  witnesses under oath.  A court reporter was present and

16  recorded the testimony.  The questions and answers have been

17  shown to you.

18  This deposition testimony is entitled to the

19  same consideration and is to be judged by you as to credibility

20  as if the witnesses had been present and had testified from the

21  witness stand in court.

22  Certain charts, summaries, and demonstrative

23  aids have been shown to you solely to help explain or summarize

24  the facts disclosed by the evidence.  These charts, summaries,

25  and demonstrative aids are not evidence or proof of any facts.

1   You should determine the facts from the evidence.

2                   Do not let bias, prejudice, or sympathy play any

3   part in your deliberations.  A corporation and all other

4   persons are equal before the law and must be treated as equals

5   in a court of justice.

6                   Let me now discuss the law specifically

7   applicable to this case.

8                   As you know, this action arises out of Elizabeth

9   Kahn's use of Taxotere.  Sanofi is the manufacturer of

10  Taxotere.  Ms. Kahn contends that Taxotere prevented her hair

11  from growing back and that she now has permanent hair loss on

12  her head, eyebrows, eyelashes, and other areas that was caused

13  by Taxotere.  Ms. Kahn also asserts that Sanofi, the

14  manufacturer of Taxotere, did not warn her doctor about the

15  risk of permanent hair loss associated with Taxotere.  Ms. Kahn

16  seeks damages for her injuries from Sanofi.

17                  Sanofi denies these allegations and contends

18  that it provided adequate warnings to Ms. Kahn's doctor.

19  Sanofi contends that Taxotere did not cause Ms. Kahn's alleged

20  injury.  Sanofi contends that the approved prescribing

21  information contained accurate, science-based information that

22  enabled Ms. Kahn's doctor to make an informed decision about

23  the benefits and risks of using Taxotere.

24                  The law applicable to this case is the law of

25  Louisiana.  In Louisiana a products liability action such as

03:38  1  this one is governed by the Louisiana Products Liability Act,

03:38  2  or the LPLA.  The LPLA provides that the manufacturer of a

03:39  3  product shall be liable to a plaintiff for damage proximately

03:39  4  caused by one or more characteristics of the product that

03:39  5  render it unreasonably dangerous when such damage arose from a

03:39  6  reasonably anticipated use of the product by the plaintiff.

03:39  7          One of the ways in which a drug can be

03:39  8  unreasonably dangerous is by the manufacturer failing to use

03:39  9  reasonable care to provide an adequate warning of the risk not

03:39  10 otherwise known to the plaintiff's prescribing physician.

03:39  11         In order to decide Ms. Kahn's failure-to-warn

03:39  12 claim, you must determine whether she has proven by a

03:39  13 preponderance of the evidence that Sanofi failed to adequately

03:39  14 warn her prescribing physician and, if so, whether Sanofi's

03:39  15 failure to warn was a proximate cause of Ms. Kahn's injuries.

03:39  16         Ms. Kahn claims that Taxotere is unreasonably

03:40  17 dangerous because of inadequate warnings about its potential

03:40  18 risk of permanent alopecia.

03:40  19         In order to be successful, Ms. Kahn must prove

03:40  20 by a preponderance of the evidence that:

03:40  21         First, Taxotere had a potentially damage-causing

03:40  22 characteristic;

03:40  23         Second, Sanofi failed to use reasonable care to

03:40  24 provide an adequate warning to Ms. Kahn's prescribing physician

03:40  25 about this characteristic and its dangers to users of the

1  product;

2          Third, Ms. Kahn's injuries were proximately

3  caused by an inadequate warning;

4          Fourth, the injury Ms. Kahn suffered arose from

5  a reasonably anticipated use of the product; and

6          Fifth, Ms. Kahn experienced actual damage from

7  the Taxotere medication.

8          An adequate warning under the LPLA is defined as

9  a warning that would lead an ordinary, reasonable user or

10  handler of a product such as a prescribing physician to

11  contemplate the danger in using or handling the product and

12  either to decline to use or handle the product or, if possible,

13  to use or handle the product in such a manner as to avoid the

14  damage for which the claim is made.

15          There are certain circumstances, however, under

16  which a manufacturer does not have to provide an adequate

17  warning, as described above.  A manufacturer does not have to

18  provide such a warning when the prescribing physician already

19  knows or reasonably should be expected to know of the dangerous

20  characteristic of the product that may cause injury.

21          A manufacturer of a product shall not be liable

22  for damage proximately caused by a characteristic of the

23  product if at that time the product left the manufacturer's

24  control, it did not know and, in light of then-existing

25  reasonably available scientific and technological knowledge,

2103

1    could not have known of the characteristic that caused the
2    damage or the danger of such characteristic.
3             The Food and Drug Administration, or FDA, is a
4    regulatory body of the United States that regulates
5    pharmaceutical manufacturers.  Sanofi is a pharmaceutical
6    manufacturer.
7             Pharmaceutical manufacturers are heavily
8    regulated by the FDA.  The FDA, however, does not bear the
9    primary responsibility for creating or updating a drug's label.
10   It is the drug manufacturer who bears the responsibility for
11   the content of its label.
12            In creating or updating a label, the
13   pharmaceutical companies must comply with regulations of the
14   FDA.  However, FDA approval, although relevant, does not in and
15   of itself absolve Sanofi of all liability, nor does it
16   establish that the warnings provided with the drug were
17   adequate under the standards of Louisiana law.
18            Louisiana applies the learned intermediary
19   doctrine to warnings cases involving prescription drugs.  A
20   drug manufacturer has a duty to provide an adequate warning
21   only to a learned intermediary such as a prescribing physician.
22   It does not have a duty to provide any warning directly to the
23   patient.  That is because physicians are generally in a
24   superior position to evaluate the warning and to impart such
25   warning to the patient and can provide an independent medical

decision as to whether use of the drug is appropriate for a
particular patient.  Although a drug manufacturer's duty to
warn about the potential risks of its product is directed only
to the physician, the manufacturer is directly liable to the
patient for breach of this duty.

In determining the scope of a manufacturer's
duty to warn of risks and dangers of its products, the
manufacturer is held to the knowledge and skill of an expert in
its field.  The manufacturer must keep up with scientific
knowledge, discoveries, and advances, and is presumed to know
what could be learned by doing so.  This duty is continuing.
If the manufacturer learns of a characteristic or danger that
may cause injury after its product is on the market, the
manufacturer has a continuing duty to use reasonable care to
provide adequate warning to prescribing and treating physicians
concerning such later discovered matters.

That is to say, under the law applicable to this
case, drug manufacturers are responsible to draft the initial
label for their product, and they have a continuing duty to
ensure that the label remains adequate at all times.

It is a physician's duty to remain abreast of a
medication's characteristics and to take into account the
information contained in a prescription medication's label.
The manufacturer may reasonably assume that the prescriber or
treater will apply the same knowledge, professional expertise,

1    and good judgment that a reasonable physician would apply in

2    using the product.

3           Providing an adequate warning to the prescribing

4    or treating doctor relieves the manufacturer of its duty to

5    warn the patient regardless of how or if the prescriber or

6    treater warns the patient.

7           You must decide whether Ms. Kahn has proven that

8    a proper warning would have changed the decision of the

9    prescribing physician; that is, that but for the inadequate

10   warning, the prescribing physician would not have used or

11   prescribed the product.  In other words, plaintiff must prove

12   by a preponderance of the evidence that if an adequate warning

13   had accompanied Taxotere, her prescribing physician would have

14   altered the prescribing decision and Ms. Kahn would not have

15   suffered her injury.

16          Ms. Kahn also bears the burden of proving that

17   Taxotere caused her injury.  She must prove general and

18   specific causation.

19          To establish general causation, Ms. Kahn must

20   prove to a reasonable degree of medical probability that

21   Taxotere can cause permanent hair loss in general.  If Ms. Kahn

22   establishes general causation, she must then establish specific

23   causation, which requires her to prove that Taxotere was a

24   substantial contributing factor and proximate cause of her

25   injury, in this case, her permanent hair loss.

03:46  1           Taxotere is a substantial contributing factor if
03:46  2  Ms. Kahn would probably not have suffered the claimed injuries
03:46  3  in the absence of Taxotere.  A substantial factor does not mean
03:47  4  only one cause of any injury, consisting of only one factor or
03:47  5  thing.  On the contrary, many factors or things may operate at
03:47  6  the same time either independently or together to cause injury
03:47  7  or damage.
03:47  8           The law defines "proximate cause" as something
03:47  9  that produces a natural chain of events which in the end brings
03:47 10  about the injury.  A reasonable degree of medical probability
03:47 11  requires competent medical expert testimony.
03:47 12           Louisiana law required Ms. Kahn to file her
03:47 13  lawsuit within one year of experiencing her injury unless she
03:47 14  proves that neither she, nor a reasonable person in her
03:47 15  position, through the exercise of reasonable diligence, should
03:47 16  have discovered Taxotere as a potential cause of her injury
03:47 17  more than one year before she filed her lawsuit.  She filed her
03:48 18  lawsuit on December 9, 2016.  So Ms. Kahn must establish that
03:48 19  she could not have discovered the potential cause of her injury
03:48 20  before December 9, 2015.
03:48 21           The ultimate issue is the reasonableness of
03:48 22  Ms. Kahn's action or inaction in light of her education,
03:48 23  intelligence, and the severity of her symptoms.
03:48 24           If you decide that Ms. Kahn has established the
03:48 25  other elements of her case by a preponderance of the evidence,

1    you must decide the question of whether there has been damage

2    to Ms. Kahn and, if so, the amount of that damage.  Louisiana

3    law suggests simple reparation is a just and adequate

4    compensation for injuries.

5              Your award should be designed to fully and

6    fairly compensate Ms. Kahn for her injury, if you find one has

7    occurred, and should not go beyond such reparation.

8              The law recognizes the difficulty of translating

9    personal injuries into dollars and cents figure, but that is

10   what must be done if you decide Ms. Kahn has proven her claims

11   by a preponderance of the evidence.  You must arrive at a

12   figure that will fairly and adequately compensate her for

13   damages she has suffered.

14             In estimating such damages, you may take into

15   consideration the following elements:  physical injury; pain

16   and suffering; loss of enjoyment of life; and permanent

17   disability, if any.

18             Like other parts of Ms. Kahn's case, these

19   damages must be established by a preponderance of the evidence.

20   This means, on the one hand, you are not entitled to award

21   speculative damages for injuries which you think she may have

22   experienced or might experience in the future.

23             On the other hand, it means that you must also

24   make an effort to reasonably approximate the damages which she

25   has proved are more probable than not even though they cannot

1    be computed with mathematical certainty.

2              You may award compensatory damages only for

3    injuries that Ms. Kahn proves were caused by Sanofi's wrongful

4    conduct.  If Sanofi's conduct aggravates a preexisting injury

5    or condition, Sanofi must compensate the victim for the full

6    extent of the aggravation.

7              The damages you award must be fair compensation

8    for Ms. Kahn's damages, no more and no less.  Compensatory

9    damages are not allowed as punishment and cannot be imposed or

10   increased to penalize Sanofi.

11             If you decide to award compensatory damages, you

12   should be guided by dispassionate common sense; that is to say,

13   you should not be affected by sympathy, compassion, prejudice,

14   or bias.  Computing damages may be difficult, but you must not

15   let that difficulty lead you to engage in arbitrary guesswork.

16   On the other hand, the law does not require Ms. Kahn to prove

17   the amount of her losses with mathematical precision but only

18   with as much definiteness and accuracy as the circumstances

19   permit.

20             You must use sound discretion in fixing an award

21   of damages, drawing reasonable inferences where you can find

22   them appropriate from the facts and circumstances in evidence.

23             In reaching a verdict on the question of

24   damages, I caution you not to include anything for the payment

25   of expenses and attorneys' fees.  The law does not consider

these damages experienced by Ms. Kahn.  If you decide to make an award, follow the instructions I have given you, and do not add or subtract from that amount on account of federal or state income taxes.

Finally, let me say that the fact that I have given you these statements about the law of damages does not in any way imply or suggest that I feel or do not feel that any damages are due in this case.  Whether or not damages are due is solely for you to determine.

The law recognizes that a plaintiff may experience mental distress and anguish as a result of an injury.  You are permitted to consider such consequences as a part of the general damages which you may award.  By "mental distress and anguish," I mean substantial worry or concern, grief and the like.

As I mentioned to you, there is no practical way to introduce evidence as to the general damages which Ms. Kahn claims for pain and suffering and for mental distress.  There is no precise standard to fix these damages or assign them some kind of value -- or assign some kind of value to them.  Rather, your job is to determine an amount that will be fair and just on the basis of evidence of Ms. Kahn's injury and treatment that you have heard and that will fairly compensate Ms. Kahn for any damages she may have suffered.

It is now your duty to deliberate and to consult

1   with one another in an effort to reach a verdict.  Each of you

2   must decide the case for yourself but only after an impartial

3   consideration of the evidence with your fellow jurors.  During

4   your deliberations, do not hesitate to reexamine your own

5   opinions and change your mind if you are convinced that you are

6   wrong, but do not give up your honest beliefs because the other

7   jurors think differently or to just finish the case.

8               Remember at all times, you are the judges of the

9   facts.

10              You have been allowed to take notes during this

11  trial.  Any notes that you took during this trial are only aids

12  to memory.  If your memory differs from your notes, you should

13  rely on your memory and not on your notes.  The notes are not

14  evidence.  If you did not take notes, rely on your independent

15  recollection of the evidence and do not be unduly influenced by

16  the notes of other jurors.  Notes are not entitled to greater

17  weight than the recollection or impression of each juror about

18  the testimony.

19              When you go into the jury room to deliberate,

20  you may take with you a copy of this charge, the exhibits that

21  I have admitted into evidence, and your notes.  You must select

22  a jury foreperson to guide you in your deliberations and to

23  speak for you here in the courtroom.

24              Your verdict must be unanimous.  After you have

25  reached a unanimous verdict, your jury foreperson must fill out

03:54   1   the answers to the written questions on the verdict form and
03:54   2   sign it and date it.
03:54   3                   After you have concluded your service and I have
03:54   4   discharged the jury, you are not required to talk with anyone
03:55   5   about this case.
03:55   6                   If you need to communicate with me during your
03:55   7   deliberations, the jury foreperson should write the inquiry and
03:55   8   give it to the court security officer.  After consulting with
03:55   9   the attorneys, I will respond either in writing or by meeting
03:55  10   with you in the courtroom.  Keep in mind, however, that you
03:55  11   must never disclose to anyone, not even to me, your numerical
03:55  12   division on any question.
03:55  13                   Now I'm going to review the jury verdict form.
03:55  14                   The first question is:  "Do you find by a
03:55  15   preponderance of the evidence that Sanofi failed to take
03:55  16   reasonable care to provide an adequate warning to Ms. Kahn's
03:55  17   prescribing physician of the risk of permanent
03:55  18   chemotherapy-induced alopecia, PCIA, associated with Taxotere?"
03:55  19                   Then there is a place for the jury foreperson to
03:55  20   check yes or no.  There are directions underneath that says,
03:56  21   "If the answer to Question 1 is no, please sign the verdict
03:56  22   form and return it to the courtroom.  If the answer the
03:56  23   Question 1 is yes, then you proceed to Question 2."
03:56  24                   Then you proceed to Question 2, and it says:
03:56  25   "Do you find by a preponderance of the evidence that Sanofi's

1    failure to warn Ms. Kahn's prescribing physician caused

2    Ms. Kahn's injuries?"

3            Then again, the foreperson would check yes or

4    no, and then you follow the directions following that

5    interrogatory.

6            Then you proceed to -- 3, 4, and 5 have the same

7    instructions.  You will read the question.  The foreperson will

8    either check yes or no and follow the instructions underneath

9    the jury verdict form.

10           The jury verdict form, as I indicated to you,

11   must be unanimous, and you would date, and the foreperson would

12   sign it.

13           You may now proceed to the jury room to begin

14   your deliberations.

15           **THE DEPUTY CLERK:**  All rise.

16           (The jury was excused to begin their deliberations.)

17           **THE COURT:**  Does anybody need to put anything on the

18   record?

19           **MS. SASTRE:**  I'm glad we are finished, and it's been

20   fun.  I'll have fond memories no matter what.

21           (Recess.)

22                              *  *  *

23           **THE COURT:**  Okay.  The jury has sent me a question:

24   "Does it have to be unanimous on Question 1 to move on to

25   Question 2?"

05:20  1           I responded, unless there's an objection:  "The

05:20  2     verdict must be unanimous as to each question.  So, yes, the

05:20  3     answer to Question 1 must be unanimous before you can move to

05:20  4     Question 2."

05:20  5           (Recess.)

05:20  6                              *  *  *

05:22  7           THE COURT:  I am sending them a note asking how late

05:22  8     they would like to work tonight and that we can order dinner.

05:22  9           (Recess.)

05:22  10                             *  *  *

05:22  11          (The jury entered the courtroom.)

05:37  12          THE COURT:  I'm going to ask the jurors to return to

05:37  13     the jury room.

05:37  14          (The jury exited the courtroom.)

05:38  15          THE COURT:  I'm going to ask that that piece of paper

05:38  16     be returned to the jurors and brought out with the foreman.

05:38  17                             *  *  *

05:38  18          THE COURT:  Bring them back in.

05:39  19          (The jury entered the courtroom.)

05:39  20          THE COURT:  All jurors are present.  Court is back in

05:39  21     session.  You may be seated.

05:39  22           Who speaks as the foreperson?

05:39  23           Has the jury unanimously agreed upon a verdict?

05:39  24          THE FOREPERSON:  Yes, ma'am.

05:39  25          THE COURT:  Okay.  Would you please hand the verdict

05:39  1   to the clerk so it can be delivered for inspection before
05:39  2   publication.
05:39  3            THE FOREPERSON:  (Complies.)
05:39  4            THE COURT:  You just have to date it.  I'm sorry.  I
05:40  5   need you-all to return to the jury room because it requires a
05:40  6   date.
05:40  7            (The jury exited the courtroom.)
05:40  8                         *  *  *
05:41  9            THE COURT:  Bring in the jury.
05:41  10           (The jury entered the courtroom.)
05:41  11           THE COURT:  Please be seated.  I am going to now ask
05:41  12   that the verdict be presented to me to ensure regularity of
05:41  13   form.  Thank you.
05:41  14               Jurors, I am going to ask that you please pay
05:41  15   attention.  You may be polled regarding this.
05:41  16               Would you please read the verdict.
05:41  17           THE DEPUTY CLERK:  Jury Verdict Form in Civil
05:41  18   Action 16-17039, *Elizabeth Kahn v. Sanofi*.
05:41  19               "Question 1:  Do you find by a preponderance of
05:41  20   the evidence that Sanofi failed to take reasonable care to
05:42  21   provide an adequate warning to Ms. Kahn's prescribing physician
05:42  22   of the risk of permanent chemotherapy-induced alopecia
05:42  23   associated with Taxotere?"
05:42  24               Answer:  "No."
05:42  25               It is signed and dated this 18th day of

| | |
|---|---|
| 05:42 | 1 |
| 05:42 | 2 |
| 05:42 | 3 |
| 05:42 | 4 |
| 05:42 | 5 |
| 05:42 | 6 |
| 05:42 | 7 |
| 05:42 | 8 |
| 05:42 | 9 |
| 05:42 | 10 |
| 05:42 | 11 |
| 05:43 | 12 |
| 05:43 | 13 |
| 05:43 | 14 |
| 05:43 | 15 |
| 05:43 | 16 |
| 05:43 | 17 |
| 05:43 | 18 |
| 05:43 | 19 |

1  November, 2021, by a jury foreperson.

2          THE COURT:  Do the parties request polling?

3          MR. SCHANKER:  Yes, Your Honor.

4          THE COURT:  Please poll the jury.

5          (The jury was polled and all answered in the

6  affirmative.)

7          THE COURT:  Thank you.  I'm now going to ask the jury

8  to return to the jury room, and I will visit with you there

9  shortly.

10          (The jury was excused.)

11          THE COURT:  Please file the verdict.  Please record

12  and file the verdict.  I want to talk to the jurors.  I'm going

13  to order that any posttrial motions be filed in accordance with

14  deadlines outlined in the Code of Civil Procedure.

15          MR. SCHANKER:  Thank you, Your Honor.

16          MS. SASTRE:  Thank you, Your Honor.

17          THE COURT:  Court is adjourned.

18          (Proceedings adjourned.)

19                         *  *  *

20

21

22

23

24

25

1                        <u>**CERTIFICATE**</u>

2           I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                */s/ Toni Doyle Tusa*
                                 Toni Doyle Tusa, CCR, FCRR
10                               Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25