09:58:37  1                    UNITED STATES DISTRICT COURT
                             EASTERN DISTRICT OF LOUISIANA
       2   **********************************************************
          IN RE:  TAXOTERE (DOCETAXEL)
       3   PRODUCTS LIABILITY LITIGATION
                                          Docket No. 16-MD-2740
       4                                  Section "H"
                                          New Orleans, Louisiana
       5                                  Wednesday, March 11, 2020
          [THIS DOCUMENT RELATES TO:
       6   CASE NO. 16-CV-15397 JUNE PHILLIPS
                     16-CV-17039 ELIZABETH KAHN
       7   and ALL CASES]
          **********************************************************
       8
                          TRANSCRIPT OF MOTION PROCEEDINGS
       9            HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                          UNITED STATES DISTRICT JUDGE
      10

      11   APPEARANCES:

      12   FOR THE PLAINTIFFS:            MORRIS BART & ASSOCIATES
                                          BY:  RICHARD ROOT, ESQ.
      13                                  Pan American Life Center
                                          601 Poydras St., 24th Floor
      14                                  New Orleans, LA 70130

      15                                  BACHUS & SCHANKER, LLC
                                          BY:  DARIN L. SCHANKER, ESQ.
      16                                  1899 Wynkoop St., Suite 700
                                          Denver, CO 80202
      17
                                          PENDLEY BAUDIN & COFFIN
      18                                  BY:  CHRISTOPHER L. COFFIN, ESQ.
                                          2505 Energy Centre
      19                                  1100 Poydras St.
                                          New Orleans, LA 70163
      20
                                          GAINSBURG BENJAMIN DAVID
      21                                  MEUNIER & WARSHAUER
                                          BY:  M. PALMER LAMBERT, ESQ.
      22                                  1100 Poydras St., Suite 2800
                                          New Orleans, LA 70163
      23

      24

      25

```
 1
      FOR SANOFI S.A.:                 IRWIN FRITCHIE URQUHART & MOORE
 2                                     BY:  DOUGLAS J. MOORE, ESQ.
                                            KELLY E. BRILLEAUX, ESQ.
 3                                     400 Poydras St., Suite 2700
                                       New Orleans, LA 70130
 4
                                       SHOOK HARDY & BACON
 5                                     BY:  JON A. STRONGMAN, ESQ.
                                       2555 Grand Blvd.
 6                                     Kansas City, MO 64108

 7

 8
      Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR, RMR
 9                                     500 Poydras Street, B-275
                                       New Orleans, Louisiana 70130
10                                     (504) 589-7776

11

12      Proceedings recorded by mechanical stenography, transcript
      produced by computer.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

(WEDNESDAY, MARCH 11, 2020)

(STATUS CONFERENCE)

09:58:40  (OPEN COURT.)

09:58:40        THE COURT:  Good morning.  I have received your order
09:58:42  that you would like to argue in and that's fine.

09:58:44        Before we get started, let me just say that I have spent
09:58:52  lots of time and you have read lots of opinions coming from me, and
09:58:56  I think they're pretty consistent how I read contra non valentem,
09:59:01  what I think learned intermediary means, and how I view causation.
09:59:06  So I would hope that you don't read what I've already said back to
09:59:11  me, and spend some time just telling me what the uncontested facts
09:59:16  are in each of these that I should focus on.  Are we good?

09:59:22        MR. MOORE:  I believe so, your Honor.  Thank you.  Good
09:59:24  morning.  Douglas Moore on behalf of Sanofi.

09:59:28        And thank you for your Honor's indulgence on proceeding
09:59:32  in the sort of batting ordering that we proposed, starting first
09:59:35  with a Motion For Summary Judgment Based on Warnings Causation in
09:59:40  the June Phillips case.  And in thinking about what I would present
09:59:44  to your Honor in the time that I have for this motion, I did think
09:59:49  about a comment that you've made to us many times, and that is any
09:59:54  time you make an important ruling, 50 percent of the litigants are
09:59:57  dissatisfied.

09:59:59        THE COURT:  Oh, yeah.

10:00:01  1         MR. MOORE:  And certainly with respect to the learned

10:00:03  2  intermediary doctrine, we proposed a framework to your Honor that

10:00:08  3  was different than what your Honor ultimately imposed in the

10:00:12  4  *Earnest* case, in the *Mills* case and in this litigation.  And so

10:00:17  5  rather than try and convince your Honor to do something different

10:00:20  6  than you've already done -- because we've seen that doesn't work

10:00:24  7  very well, we tried that, both sides have learned that lesson -- I

10:00:29  8  thought it would be more sensible to respect the framework that

10:00:34  9  your Honor has given us and try and demonstrate to you why we think

10:00:38 10  there is no triable issue of fact under that framework with the

10:00:41 11  facts specific to this case.

10:00:43 12         THE COURT:  Right.

10:00:44 13         MR. MOORE:  And so consistent with your request, I am

10:00:47 14  going to try and focus my comments there.

10:00:49 15         But before I get to that point, I think it's important to

10:00:56 16  sort of identify what our responsibilities here are under Rule 56

10:01:01 17  in a federal court.  My job as the party who does not have the

10:01:04 18  burden at trial is simply to demonstrate that they lack evidence on

10:01:08 19  an essential element of their claim.  Their responsibility at that

10:01:11 20  point is to come forward with specific evidence, specific facts.

10:01:16 21         The evidence has to be significantly probative, can't be

10:01:23 22  mere assertion, can't be colorable, we can't simply say that there

10:01:27 23  is a fact issue or this is an issue that should be decided by the

10:01:31 24  jury because there's -- it's in by its nature a fact issue.  It

10:01:37 25  is -- there has to be evidence and they have to come forward with

10:01:39  1   that evidence and the time to do it is now.

10:01:44  2          So what is the framework that your Honor established for

10:01:46  3   us?  I've just put it on the screen here so that we know precisely

10:01:52  4   what we're talking about.  I think that this particular framework

10:01:56  5   in the context of this case with this evidence is simply not

10:02:01  6   satisfied by the evidence that exists in this case.  They have not

10:02:04  7   come forward with evidence that establishes the framework that your

10:02:08  8   Honor established; which focuses again on what happens in that

10:02:12  9   room, how would that discussion change, what would the plaintiff

10:02:16 10   have said, what options would the doctor have offered, what would

10:02:19 11   the doctor have said about those options in terms of their side

10:02:22 12   effects, their risks, their benefits, and then what would the

10:02:26 13   plaintiff have asked for.  And then ultimately, as you confirmed in

10:02:29 14   the *Gayhand* decision most recently, it has to end with the doctor

10:02:35 15   saying he would go ahead and prescribe that medicine if given those

10:02:38 16   options to the plaintiff, that's where it has to end.

10:02:41 17          And so to understand why we don't have evidence in the

10:02:44 18   June Phillips case to establish those elements of their case, it's

10:02:47 19   important to know a little bit about the June Phillips case.  She

10:02:52 20   was diagnosed in October of 2013, so this is about two and a half

10:02:56 21   years after Barbara Earnest's diagnosis.  She was diagnosed with

10:03:00 22   ER-positive/PR-positive node positive disease, that means that the

10:03:05 23   tumor is outside, the cancer has spread from the tumor, it's into

10:03:09 24   the lymph nodes now, and she had a particular pathological finding

10:03:13 25   called HER2-positive.  If you're a breast cancer patient and you're

10:03:17 1    waiting for your pathology to come back, you do not want it to say

10:03:21 2    HER2-positive.  It is a very aggressive type of cancer.  She was

10:03:25 3    staged at IIB with a high risk of recurrence; 40 to 50 percent

10:03:29 4    according to her oncologist.  And recurrence in this clinical

10:03:33 5    setting, according to the testimony in this case, means that it is

10:03:35 6    incurable.  So for her, back in October of 2013, it is literally a

10:03:41 7    coin toss.

10:03:44 8          And so how does Dr. Sonnier address a person who has

10:03:50 9    HER2-positive disease?  And you'll remember this from the Earnest

10:03:55 10   trial, and in the Earnest trial we were on the left side of the

10:03:58 11   page with all of these various options and regimens that could have

10:04:03 12   been offered that would have been better than Taxotere, according

10:04:06 13   to my adversaries.  But for HER2-positive disease, the plaintiffs

10:04:10 14   are required to be on the right side, and that is they're required

10:04:14 15   to take a medicine called Herceptin, the generic name is

10:04:18 16   Trastuzumab -- I practiced that several times this morning, but

10:04:22 17   I'll call it Herceptin because it's easier to pronounce -- and all

10:04:26 18   of the regimens for HER2-positive disease require a Herceptin

10:04:31 19   containing regimen for HER2-positive disease.

10:04:34 20         And you can see up on this side of the equation that

10:04:38 21   there are far fewer options under the NCCN guidelines.  And this is

10:04:42 22   certainly consistent with Dr. Sonnier's testimony that I'll get to

10:04:47 23   in a second.  So in looking at these questions, under the Court's

10:04:51 24   framework, you know, what would have happened if the warning was

10:04:56 25   different?  What would he have said to her about hair loss, what

10:05:00  1    would she have said about other options, what would he have

10:05:02  2    identified those options to be, what are the risks and benefits of

10:05:05  3    that, and what decision would ultimately be made by the plaintiff

10:05:08  4    and by the prescribing doctor.

10:05:10  5             So in the opposition that we received, the argument was,

10:05:15  6    it says specifically he would have recommended a non-anthracycline

10:05:21  7    therapy in light of her concerns about permanent hair loss and his

10:05:24  8    concerns about cardiac toxicity.  And so the reason the focus is on

10:05:31  9    a non-anthracycline therapy, it's not identified, we don't know

10:05:35 10    what medicines they're talking about, we don't know the risks or

10:05:38 11    benefits of those medicines.  Dr. Sonnier talked about it a little

10:05:44 12    bit, and I am going to show you that testimony in just a second.

10:05:46 13    But the reason we're talking about non-anthracycline therapy in

10:05:48 14    June Phillips' case is because she has a pre-existing cardiac

10:05:51 15    abnormality.  And because she had this cardiac abnormality,

10:05:56 16    anthracycline-based therapy - that's doxorubicin, which is

10:05:59 17    Adriamycin, the "A", and also epirubicin, which is the "E", we

10:06:02 18    heard about FEC in the other trial, we see that in the guidelines,

10:06:06 19    that's also an Anthracycline, those are not options for someone in

10:06:12 20    June Phillips' clinical scenario.

10:06:13 21             So to balance this statement against the testimony, I

10:06:16 22    thought it would make sense just to quickly walk through it.  This

10:06:20 23    was Ms. Phillips' lawyer at the deposition.  He asks:  "There was

10:06:26 24    another alternative?  Ultimately the client, the patient's choice

10:06:31 25    to make that decision, would you agree with that?"  And

10:06:35  1   Dr. Sonnier -- I make a form objection -- Dr. Sonnier says, "I
10:06:40  2   wouldn't agree with that wholeheartedly."

10:06:43  3          And then the lawyer doubles down, "The client makes the
10:06:47  4   ultimate decision about which regimen to go forward with?  I
10:06:51  5   wouldn't say that."  And the reason he wouldn't say that is because
10:06:54  6   in her clinical circumstance, the proposal that was being made in
10:06:58  7   the deposition was you can give her AC followed by Taxol.  And AC
10:07:04  8   is Adriamycin and what he said in her circumstances, I would not
10:07:08  9   give it.

10:07:09 10          And then this is the testimony that they rely upon to
10:07:12 11   suggest that he would have recommended a non-anthracycline therapy.
10:07:18 12   He says, "If she wanted to pursue an anthracycline course, her -- I
10:07:22 13   think that at that time, knowing what I know, would have known been
10:07:24 14   going with a non-anthracycline therapy, which would have lessened
10:07:28 15   the efficacy and would not have reduced her risk of recurrence to
10:07:34 16   the same degree of TCH, and he stops there.

10:07:37 17          Then the discussion continues about whether AC plus Taxol
10:07:43 18   is an available option.  And he continues.

10:07:46 19          "A. This would have been another alternative."  And he
10:07:48 20   says, "that I would have felt was very risky because of the cardiac
10:07:53 21   toxicity.

10:07:55 22          Q.  And would she have chosen to go with that alternative
10:07:58 23   that would have been okay with you as long as you discussed all of
10:08:02 24   the side effects, the risks, and everything associated?

10:08:04 25          A. I don't think that would be okay with me."

1    Doubles down again:

2    "Q. But it's still her decision, right?

3    A.  I wouldn't say that.  It's not right.  Whether or not

4    a person -- whether or not a person would get that is based on our

5    recommendation and our ordering, I would say that that's not --

6    that that's not the case."

7    And so what Dr. Sonnier is saying in this disposition is

8    that June Phillips could not have come in and said give me an

9    Adriamycin-containing course.  And the reason that's important --

10   if my clicker would work -- oops, I'm going the wrong way.

11   The reason that's important is you cannot give Taxol in a

12   Herceptin-containing regimen without an anthracycline.  So what we

13   have, what we end up with, if a plaintiff can't be prescribed

14   anthracycline and she says she is not going to take docetaxel, then

15   AC followed by T is out; TCH is out; docetaxel and the

16   anthracycline in that one, that one is out; AC followed docetaxel,

17   that one's out; she didn't have neoadjuvant treatment, that's where

18   you have the surgery after the chemotherapy, she didn't have that.

19   So what we're left with is this one option chemotherapy

20   followed by trastuzumab sequentially, that's the Herceptin.  So

21   what is that regimen?  Let me clear this.

22   So what is the regimen that he said he would have

23   prescribed?  He was never even asked if he would prescribe another

24   regimen other than TCH for this patient.  He certainly never

25   testified about what the risks or benefits of that particular

10:10:15  1    regimen would have been.  And there's certainly no testimony that

10:10:18  2    after he had this other discussion with the plaintiff that he would

10:10:21  3    actually have written the prescription.

10:10:27  4         This is all he says about this non-anthracycline course,

10:10:32  5    is it would not have reduced her risk of recurrence.  And that's

10:10:34  6    not the testimony that is necessary to meet the framework that your

10:10:38  7    Honor established.

10:10:40  8         I will get this going in the right direction at some

10:10:43  9    point.  Oh, I'm hitting the top and bottom, that's why.  Here we

10:10:50  10   go.

10:10:50  11        So this is what his testimony shows:  He wouldn't have

10:10:54  12   given her a different medicine.

10:10:56  13        I want to focus two last points on the framework that

10:10:59  14   your Honor gave us and then I will turn it over to my adversaries.

10:11:02  15   One of the other points that you asked them to establish is how

10:11:06  16   would the doctor have advised the patient of the risk of permanent

10:11:10  17   alopecia associated with Taxotere.  And we've had this litigation

10:11:12  18   advanced from the beginning that there is these two interchangeable

10:11:16  19   options, Taxotere and Taxol, one has the risk of permanent hair

10:11:21  20   loss, one does not.

10:11:21  21        We know that the evidence in the case has not borne that

10:11:25  22   out, and that there is a risk of permanent chemotherapy induced

10:11:28  23   alopecia with all sorts of medicines, it's there with the A, it's

10:11:31  24   there with the C, it's there with Taxol.  Dr. Tosti's recent

10:11:36  25   article in which she was an author showed a study which actually

10:11:39   1   had more cases with Taxol than with Taxotere.  So this isn't really

10:11:43   2   a situation where we have risk versus no risk.

10:11:46   3          But in this doctor's experience, what would he have said

10:11:50   4   about the risk of permanent hair loss with these medicines?  He's

10:11:56   5   known about it since his residency, the incomplete hair regrowth,

10:12:01   6   it doesn't come back the same way.  And in his experience, it's

10:12:04   7   comparable between Taxotere and Taxol.  So what evidence is there

10:12:07   8   based on his testimony about what his experience is that he would

10:12:10   9   have actually told her, "Hey, there is a higher risk," or that the

10:12:13  10   risk is exponentially higher.  There is no testimony to that effect

10:12:19  11   that would have ever put her in a position to ask for other

10:12:22  12   regimens.

10:12:23  13          And then lastly, what's the decision that the plaintiff

10:12:27  14   would have ultimately made?  We asked her, "Wouldn't you want to

10:12:30  15   know about the side effects of these other medicines?  You would

10:12:35  16   want to know how it would affect your heart?  So without that

10:12:40  17   information you can't say for sure that you would have taken the

10:12:42  18   other drug?  Her answer was, "I can't.  No, I can't say for sure

10:12:47  19   what I would have done.  I don't know what I would have done."

10:12:52  20          She testified that she didn't know anything about any of

10:12:55  21   the side effects of this other drug she was testifying that she

10:12:58  22   would have taken.

10:13:00  23          And the reason we think that's important, we've cited in

10:13:03  24   our papers, and I put it up on the screen, your Honor's decision in

10:13:06  25   a *Motrin* case.  And in that case, the plaintiff did not testify

10:13:11  1  that she would have done something differently, and in that case

10:13:15  2  under those circumstances, it entitled the defendant to judgment as

10:13:18  3  a matter of law.

10:13:18  4        So to sum up, we don't believe that any of the elements

10:13:24  5  of the Court's framework exist, and the time for evidence on that

10:13:30  6  framework to exist is now.  And, therefore, we think that we're

10:13:35  7  entitled to judgment as a matter of law, Judge.

10:13:37  8        THE COURT:  Thank you.  Mr. Root.

10:13:40  9        MR. ROOT:  Good morning, your Honor.  Richard Root for

10:13:43  10  June Phillips.

10:13:46  11        I do, in fact, agree with the four-part discussion of the

10:13:51  12  different elements of learned intermediary in this case in

10:13:56  13  causation.  The first one being whether and how the doctor would

10:14:00  14  advise the patient of risk of permanent hair loss.  In Exhibit B

10:14:05  15  there are several instances where the doctor describes how he has

10:14:10  16  that initial meeting with the patient and he goes over the

10:14:13  17  therapies, the benefits, the risks, and he certainly is a competent

10:14:18  18  physician who would have that discussion and did have that

10:14:21  19  discussion.

10:14:21  20        On page 33 of Exhibit B he is asked, "Once you became

10:14:26  21  known of the stronger warning about permanent alopecia, you started

10:14:30  22  notifying your patients?"  And he said, "That's fair, yes."  And

10:14:34  23  certainly later on he said, in page 38 of Exhibit B, he's asked,

10:14:39  24  "You disclosed to us that it altered your disclosures in which

10:14:42  25  you've made to your patients and you now report to them that there

10:14:46  1  could be permanent hair loss associated with Taxotere; is that

10:14:49  2  right?  Yes."  So as to the first question, he does have a

10:14:52  3  discussion and he does and would have told them about the permanent

10:14:56  4  hair risk -- permanent hair loss risk.

10:14:59  5       Second one, when a patient would have inquired about

10:15:03  6  other options; and certainly June would have, she is a very strong

10:15:07  7  woman and very involved in her health care.  Her exhibit,

10:15:09  8  Exhibit C, when they talk about her understanding of risk of

10:15:14  9  permanent hair loss there is this question from defense counsel,

10:15:18 10  "My question is, hypothetically, if it did, would you have refused

10:15:21 11  to take the drug?"  I would have -- and Ms. Phillips answered, "I

10:15:26 12  would have to find out what the options were of the other drugs."

10:15:28 13  And later asked her opinion, she goes, "My opinion is that if there

10:15:34 14  was a different kind of chemo other than Taxotere that hadn't

10:15:39 15  caused permanent hair loss, I should have been given the option of

10:15:42 16  taking that.  But I wasn't given that option because the doctors

10:15:46 17  didn't know that."

10:15:47 18       THE COURT:  But, Mr. Root, doesn't that beg the question,

10:15:51 19  was there another option that was not dangerous to this woman?  And

10:15:54 20  I understand because I've said that from the beginning, this is a

10:15:57 21  joint decision, and when the doctor is saying, "these are the risks

10:16:02 22  with this" and you're sitting there and you're trying to decide how

10:16:07 23  you're going to proceed, you sometimes say, "Well, Doctor, what

10:16:12 24  else do you have in that toolbox?  Tell me what other options I

10:16:17 25  have, and then let me do, with your guidance, a risk/benefit

10:16:21 1    analysis and make the decision."  And was there anything else in

10:16:26 2    his toolbox at that time?

10:16:29 3              MR. ROOT:  Well, that just moves to the third question,

10:16:32 4    your Honor, and that's that what would the doctor have recommended.

10:16:36 5    And a couple of points here.  First, the NCCN guidelines are

10:16:46 6    guidelines.  Dr. Sonnier himself in his deposition says it's not

10:16:50 7    the Bible.

10:16:51 8              THE COURT:  Right.

10:16:52 9              MR. ROOT:  So there's alternate treatments he can make.

10:16:54 10   Now, I am the first to admit, I would have loved to have had a more

10:16:58 11   robust discussion of the various options that the patient had in

10:17:03 12   that deposition, but there are three or four different places where

10:17:06 13   he's asked about other treatments, that's with an S, that's plural,

10:17:10 14   and he agreed, yes, there are.  Now, there's not a complete listing

10:17:15 15   of all of them and it's true they discussed Adriamycin and some its

10:17:20 16   negatives having to do with toxicity, but that goes to the entire

10:17:26 17   premise here, your Honor, of preference versus another option

10:17:31 18   available.  The fact that there is a preferred option the doctor

10:17:34 19   wants is really not the only question.  The question is are there

10:17:38 20   other chemotherapy options available that would help with their

10:17:42 21   chance of survival and yet are acceptable to the physician, because

10:17:46 22   there's no requirement under the law that we have to give the

10:17:50 23   doctor's preferred regimen.

10:17:53 24             THE COURT:  No.

10:17:54 25             MR. ROOT:  And so if you gave one of the chemotherapy

10:18:00 1  drugs, that's better than none.  There were certainly chemotherapy

10:18:05 2  drugs that existed for many decades prior to every new regime that

10:18:09 3  comes out that are available, not as successful perhaps.  But

10:18:13 4  surgery is the main key for surviving cancer and then you get an

10:18:17 5  additional boost when you have adjuvant therapy.

10:18:20 6          And so the question is, is there something they can do to

10:18:24 7  help her, and they talked about the drug treatment that she was on

10:18:29 8  that's helpful, but also he talks about taxanes.  There's a cite in

10:18:36 9  here where he talks about different alternatives and one of them is

10:18:40 10 Taxol.  He doesn't say that treatment with Taxol is unacceptable.

10:18:44 11 He says that I would -- in a regimen of TCH, which had just been

10:18:50 12 approved, they're generally, the three were cyclophosphamide,

10:18:54 13 Taxotere, I should say a taxane, which is Taxol or Taxotere, and

10:18:57 14 Adriamycin in talking about TAC.  So he doesn't like --

10:19:01 15          THE COURT:  But she can't take Adriamycin.

10:19:04 16          MR. ROOT:  He doesn't like Adriamycin, that's for sure,

10:19:06 17 but you can give Taxol; you can give Taxotere and have hair loss or

10:19:14 18 have Taxol without hair loss.  So you don't have to give TAC, you

10:19:17 19 could give some components of TAC.

10:19:19 20          And in all due respect to Mr. Moore, that's a heck of a

10:19:21 21 lot of his medical testimony to you that doesn't appear in the

10:19:25 22 record of what the options are.  Dr. Sonnier says that those

10:19:29 23 guidelines are not the Bible.  You can give other options.  He said

10:19:32 24 three different times in his deposition that there are other

10:19:35 25 treatments, with an "S", available.  So we know that's the case,

10:19:38  1   your Honor.

10:19:39  2          And I wish there were a greater discussion about what the

10:19:43  3   different options were in the deposition, but the deposition does

10:19:46  4   say that there are other treatments available.  And he does not say

10:19:50  5   anywhere in there that there are no treatments I would give her.

10:19:53  6          And so there certainly is a genuine issue of fact as to

10:19:58  7   what his other treatments might be, but we certainly have evidence

10:20:02  8   of other treatments being acceptable to the physician and were

10:20:06  9   available because he says expressly, yes, there were other options

10:20:09 10   available.  And I think that meets the element of proof for

10:20:13 11   purposes of summary judgment, and I'm sure they'll have an expert

10:20:18 12   to say that no other treatment is acceptable and there's nothing

10:20:22 13   else she could do.

10:20:23 14          THE COURT:  But isn't that your burden at summary

10:20:26 15   judgment?

10:20:29 16          MR. ROOT:  I think my burden is to show that there's

10:20:31 17   other chemotherapy treatments available and the doctors testified

10:20:34 18   that that was the case, your Honor.  And by agreeing multiple times

10:20:40 19   to other treatments available, not just TAC, that's a treatment;

10:20:43 20   but there's other treatments, because, of course, the guidelines

10:20:46 21   are not the Bible.  And so we know that there's --

10:20:49 22          THE COURT:  I know, we heard that last time.

10:20:53 23          MR. ROOT:  So we know there's a universe of treatments

10:20:55 24   available from the doctor's deposition, and I am saying that I

10:20:58 25   believe that meets that burden, your Honor.

10:20:59  1          And we certainly know that June has very much expressed

10:21:04  2     how she would, in fact, make a decision that involves a drug

10:21:09  3     without permanent hair loss.  She is a lady who cares very much

10:21:12  4     about her appearance.  She is in her 70s, and she has a

10:21:16  5     dermatologist for cosmetic reasons rather than health reasons.

10:21:20  6          And so I think you're focused on the doctor's prescribing

10:21:25  7     choice.  But I think, your Honor, we do a disservice when we talk

10:21:29  8     about what the doctor's preference is versus other options.  And

10:21:33  9     since there are other options, it may be unwise if she chooses an

10:21:38 10     option that's not as successful.  But it's not wrong.

10:21:42 11          And I have to tell you, your Honor, a year ago I was

10:21:45 12     diagnosed with Stage III colon cancer.  I was on a regime that I

10:21:50 13     picked that my oncologist said, "I don't think you should have

10:21:53 14     this.  You would be my only patient on this."  That's what I took

10:21:57 15     and that's what I completed, because in that relationship with your

10:22:00 16     oncologist, it's not that I took the one she wanted me to take, but

10:22:04 17     it was available and that's the one I chose.  And here when the

10:22:07 18     doctor says, "there are choices available to her, not my pick, not

10:22:11 19     the one I want," it then becomes the decision of the patient

10:22:15 20     weighing what they think is important in their standard of living,

10:22:20 21     quality of life, and their health care to make that choice.

10:22:23 22          And I think what we forget here is the power of that

10:22:25 23     patient choice when we focus on the physicians as the ruler of what

10:22:30 24     you get to do.  Because certainly they don't feel that --

10:22:34 25          THE COURT:  I said that from the beginning.  And I will

10:22:37  1    tell you, this side of the room has been flippant since I said

10:22:44  2    that.  I do think it is a joint decision and it is driven by a

10:22:50  3    plaintiff understanding what the risks are, understanding what the

10:22:53  4    benefits are, making an informed decision since they require

10:23:01  5    informed consent.  But I think --

10:23:04  6          What bothers me in this case is we know this lady

10:23:10  7    couldn't take Adriamycin because of the cardiac toxicity and the

10:23:14  8    doctor says I would not have given that.  Which is fine.  And then

10:23:18  9    I just wonder, well, then, what else -- and I'll go back to my

10:23:23  10   analogy, what else is in your toolbox?  Tell me, Doctor, what else

10:23:27  11   is there that I can take that is not going to result in my death?"

10:23:32  12         MR. ROOT:  To that point, your Honor, I would like you to

10:23:35  13   look very much at that doctor's testimony about Adriamycin, because

10:23:38  14   it seemed to me that there were -- it wasn't exactly on point to

10:23:42  15   the question of June Phillips.  It was to the point of can a

10:23:47  16   patient choose just anything and the doctor will agree.  I think

10:23:50  17   the doctor was pushing back on the concept of "if I don't want to

10:23:53  18   do Adriamycin, I don't have to."

10:23:55  19         If you read it, your Honor, I don't believe it's saying I

10:23:59  20   don't want to prescribe -- I would not have prescribed that for

10:24:02  21   Ms. Phillips.  I think he is saying to the concept of patient wins

10:24:06  22   no matter what.  Well, no, if it's harmful to the patient, the

10:24:11  23   physician can say no and June can go to another physician and maybe

10:24:15  24   another physician will have a different take.  And certainly, if

10:24:19  25   she very much has a problem with a permanent hair loss causing

10:24:24  1  drug, then that was an option.

10:24:28  2          Also the chart said neoadjuvant therapy.  Well, if you

10:24:35  3  can give therapy before your surgery but you can give that same

10:24:37  4  treatment after that surgery, there's no rule that prohibits that.

10:24:40  5  So that is an option that the defendant said.  Here is something

10:24:43  6  you can do.  Here is the choice of a drug for neoadjuvant therapy.

10:24:49  7  If your patient says, I am not taking your TAC and I am not going

10:24:51  8  to take your other option, well, here is a chemotherapy drug that

10:24:55  9  obviously works because they give it to you before your surgery,

10:24:58 10  take that one, that's a possibility.

10:25:01 11          So I think we met all of those, the four different steps,

10:25:04 12  and I think at least we have issues sufficient to go forward to

10:25:08 13  trial.  Thank you.

10:25:08 14          THE COURT:  Thank you, Mr. Root.

10:25:13 15          MR. MOORE:  Your Honor, just one comment before moving on

10:25:18 16  to the Kahn motion.  I've been up here a couple of times with

10:25:23 17  Mr. Root, and we've had the pleasure of working with him and his

10:25:26 18  firm in this litigation for a couple of years.  I think he is a

10:25:29 19  fine gentleman, I think he is a very professional lawyer.  His

10:25:32 20  interactions with us have always been the case.  And I am glad to

10:25:36 21  see he's doing well.

10:25:39 22          But to be frank, it's not enough for Mr. Root to say it.

10:25:46 23  It's not enough for Mr. Root to come up to this lectern and say

10:25:50 24  "could have given her Taxol," that's what I wrote down, "could have

10:25:55 25  given her Taxol."  Dr. Sonnier has to say it, he has to say that

10:25:59 1    that's in his toolbox, and then he has to say that he would have

10:26:03 2    prescribed it.  This has to culminate, as your Honor said, in the

10:26:07 3    doctor changing his prescribing decision, which means there has to

10:26:11 4    be testimony from the doctor saying that he would have written the

10:26:15 5    prescription.  I think that's the perfect segue --

10:26:21 6            THE COURT:  Can you give me one second -- one second.

10:27:01 7            MR. MOORE:  So I am going to borrow from some of the

10:27:03 8    comments that I made in the first argument as it relates.  So, you

10:27:13 9    know, we think the standard is still the same.  We think the issues

10:27:17 10   with Kahn are essentially the same.  We think that the deficiency

10:27:22 11   in Kahn under this motion is ultimately the same point, and that is

10:27:28 12   testimony from the prescribing doctor that he would have written a

10:27:33 13   prescription for a different medicine under the framework that your

10:27:37 14   Honor gave us.

10:27:38 15           And so I want to start by talking about Ms. Kahn's case

10:27:43 16   because it is a very different case than Ms. Phillips' case.

10:27:49 17   Ms. Kahn was diagnosed in April of 2008, so this is about three

10:27:53 18   years before Barbara Earnest.  She was diagnosed with stage IIA,

10:27:58 19   she had a very large or larger sized tumor.  Before she started

10:28:04 20   treatment, she decided she was going to do everything she could do

10:28:08 21   to survive.  And in consultation with her doctor at Ochsner,

10:28:15 22   Dr. Carl Kardinal, she elected to participate in a randomized

10:28:19 23   clinical trial.  She thought that gave her the best chance of

10:28:23 24   survival.  So the prescribing decision in this case is incredibly

10:28:31 25   unique because this is a clinical trial.

10:28:34  1          THE COURT:  Right.

10:28:35  2          MR. MOORE:  And the clinical trial, its name is

10:28:43  3  NSABP B-40, that's the National Surgical Adjuvant Breast and Bowel

10:28:47  4  Project, an organization that sponsors and conducts clinical

10:28:51  5  trials, both through the government and through private industry

10:28:54  6  for different medicines.  And this was a randomized clinical trial,

10:28:58  7  so there were six different chemotherapy regimens, and randomized

10:29:04  8  means that the oncologist doesn't pick which regimen the plaintiff

10:29:06  9  goes into, the plaintiff doesn't pick which one it goes into.  It

10:29:10  10  is a 30-page research consent form that is signed.  The patient is

10:29:16  11  basically agreeing to participate in a scientific experiment.  And

10:29:22  12  the consent form even says, "We don't know of everything that can

10:29:27  13  happen; some things might be very serious, some might be long

10:29:31  14  lasting, some may go away."  It is a different sort of circumstance

10:29:37  15  in that room for a clinical trial.

10:29:39  16          Plaintiff's treatment, she was randomized into an arm of

10:29:45  17  the study that went through multiple phases of chemotherapy; the

10:29:48  18  first phase was Taxotere, Avastin and Xeloda; the second phase was

10:29:52  19  Adriamycin, Cytoxan and Avastin.  This was neoadjuvant therapy, so

10:29:58  20  they went through chemotherapy first to shrink the tumor down, then

10:30:02  21  went through the surgery, then more chemo with Avastin.  Jon will

10:30:06  22  talk about the dates more than me.  And even before the Avastin

10:30:09  23  treatment was done, she began radiation and hormone treatments.

10:30:17  24          So Dr. Kardinal's testimony, consistent with the

10:30:20  25  testimony of many other oncologists in this case, and that is that

10:30:24 1  the risk/benefit decision really wouldn't change based on this

10:30:30 2  additional information, that Taxotere is still a medicine that they

10:30:33 3  would recommend.  He still would have recommended her to

10:30:36 4  participate in this clinical trial which involved Taxotere in each

10:30:39 5  of the treatment arms.

10:30:41 6      So with the background of your Honor's framework, what

10:30:46 7  testimony is there in this case that raises a genuine issue of

10:30:51 8  material fact on these points?  Again, what would have happened if

10:31:00 9  the warning was different and Dr. Kardinal would have said

10:31:03 10 something different, then the plaintiff would have said something

10:31:06 11 different, and then he would offered options, explained those side

10:31:10 12 effects, they would have had this different consent discussion, and

10:31:13 13 then he would have made a decision to prescribe a different

10:31:16 14 medicine.  What evidence is there in this case for that?

10:31:20 15     And so -- Erin, can I go to the document camera?  It's a

10:31:27 16 little clunky, your Honor, but I couldn't make the slides the way I

10:31:31 17 wanted to, so I gave up and decided to bring it over here and just

10:31:35 18 put it on the screen.

10:31:36 19     So the testimony relied on by the plaintiff is cited in

10:31:39 20 their papers, it begins at page 141, line 22.  The question is

10:31:49 21 asked:

10:31:49 22     "Q. So based on the fact that, as we sit here today, you

10:31:53 23 can't recall the product insert, product label that listed

10:31:56 24 permanent hair loss as a potential side effect, would it be a fair

10:32:00 25 statement to say that if you received a letter from a

10:32:09 1   pharmaceutical company, updating you on their label, that they were

10:32:13 2   changing it to include permanent hair loss as an adverse event

10:32:16 3   associated with the use of their drug, that would be news to you?

10:32:20 4           A. Yes."

10:32:21 5           And that was emanating from the testimony that he hadn't

10:32:24 6   looked at the label, much like Dr. Carinder.

10:32:31 7           And then Mr. Micheli continues, "Would that change what

10:32:35 8   you discuss with your patients concerning that drug?  It would be

10:32:38 9   something that would have to be included in the discussion.  But I

10:32:41 10  may -- may perhaps still recommend the use of the drug."

10:32:48 11          And then the testimony continues, Mr. Miceli begins to

10:32:52 12  examine the witness on what the other options are.  And he asks

10:32:57 13  him, "is paclitaxel an adequate alternative to docetaxel?  A. In

10:33:06 14  terms of efficacy?"  Throughout Dr. Kardinal's testimony, and we

10:33:11 15  cited it to your Honor in our motion, he repeatedly stated his

10:33:13 16  preference for Taxotere because of its superior side effect profile

10:33:17 17  and the addition of information about cases of permanent alopecia

10:33:21 18  did not change that.  And so his answer to this question was in

10:33:24 19  terms of efficacy, in terms of its ability to cure the cancer.

10:33:28 20  "It's the same.  It's comparable."

10:33:33 21          So the testimony continues.  "Are you familiar with

10:33:39 22  treatment option FAC?"  Mr. Micheli is going through the other

10:33:44 23  options that he can ask the doctor whether or not he would

10:33:46 24  prescribe that if this consent discussion changed.  And he says,

10:33:51 25  "5FU.  Q. Is that a standard of care -- or is that a treatment

10:33:57  1   option within the applicable standard of care?"  He says, "It was

10:34:00  2   an old treatment and it probably doesn't have the potency or

10:34:05  3   efficacy of TAC.  It would not be something I would choose."  "What

10:34:09  4   about AC without docetaxel, is that within the standard of care?"

10:34:13  5   And I underlined that word, that phrase for a reason.  And of

10:34:17  6   course he says, "AC by itself, that's not adequate, I wouldn't

10:34:21  7   prescribe it."

10:34:22  8          He's asked about paclitaxel, "Fairly equivalent

10:34:27  9   treatment."

10:34:29 10          And then we get to the home run question, and this is the

10:34:36 11   one they rely upon to say that they've satisfied your Honor's

10:34:40 12   framework and where we think they missed the mark.  And so he goes

10:34:43 13   through it, Mr. Micheli does, "Assuming that you had been warned

10:34:48 14   about the use of -- the permanent alopecia being associated with

10:34:50 15   the use of docetaxel (Taxotere) in your client and you advised your

10:34:54 16   client of that association, or your patient of that association,

10:34:56 17   and she informed you she did not wish to use that product, would

10:35:00 18   the combination of paclitaxel, cyclophosphamide and doxorubicin --

10:35:08 19   that is Taxol, Cytoxan, Adriamycin -- would that be an adequate

10:35:10 20   treatment option for that person?  Well, it should be fairly

10:35:15 21   equivalent."  That's what he says.

10:35:17 22          He's never asked would you prescribe it.  He's never

10:35:20 23   asked what would you tell a patient about the side effects of this

10:35:24 24   other regimen.  Ms. Kahn never testifies about what she would have

10:35:31 25   done if presented with that information.

10:35:37   1          So we asked them.  Ms. Bieri came back to him after

10:35:44   2   Mr. Miceli's testimony, "If the label had said, in most cases,

10:35:58   3   normal hair growth --" wait, I am going the wrong way.  Just a

10:36:09   4   second, your Honor.

10:36:17   5          "If you knew that Taxotere had a risk of permanent hair

10:36:22   6   loss and a patient expressed a concern about persistent hair loss,

10:36:26   7   would you potentially prescribe Taxol to that patient?  Was that

10:36:31   8   your testimony?  A. No."

10:36:34   9          So the question that Mr. Micheli should have asked, that

10:36:38  10   he did not ask, would you prescribe the medicine, we asked it, and

10:36:43  11   we even referred him back to that discussion with Mr. Miceli about

10:36:47  12   Taxol, "Are you saying that you would have written the

10:36:50  13   prescription?  A. No."

10:36:55  14          It also says in their papers that he was unwavering, that

10:37:00  15   had plaintiff chosen not to use the Taxotere regimen he would have

10:37:04  16   respected that decision, as the ultimate decision rests with the

10:37:07  17   patient.  This is what he said, "The patient does not do their own

10:37:14  18   prescribing.  He is not a bystander in the process."

10:37:19  19          So based on the record that we have in this case, we

10:37:23  20   simply don't have testimony from Dr. Kardinal that he would have

10:37:27  21   recommended other options.  He says he would have discussed them

10:37:30  22   with her but he doesn't say he would prescribed them.  His

10:37:35  23   testimony is I may still recommend the drug, being Taxotere.  We

10:37:37  24   have no testimony about what he would have told the plaintiff about

10:37:37  25   the risks or benefits of those medicines.  We don't even know what

10:37:41  1   he would have said to her about whether those other medicines also

10:37:45  2   have a risk of chemotherapy induced alopecia, and we certainly

10:37:51  3   don't have any testimony that he changed his prescribing decision.

10:37:54  4          And I think that point that I made in the Phillips

10:37:57  5   argument is the same here.  This is not a case of risk versus no

10:38:00  6   risk.  And when you look at the testimony in this case, we have no

10:38:07  7   testimony from Dr. Kardinal about what he understood the risk of

10:38:12  8   permanent alopecia with other therapies to be.  Dr. Larned, who

10:38:16  9   took over Ms. Kahn's therapy, said it could happen with pretty much

10:38:21 10   all of the chemotherapy regimens.  And then when we -- of course

10:38:25 11   all of the experts have recognized that it's been associated with

10:38:28 12   other medicines.

10:38:29 13          We asked Dr. Kardinal can he say whether her hair would

10:38:33 14   have looked any different if she had taken Taxol?  He couldn't.  We

10:38:37 15   asked him for Ms. Kahn and for Ms. Thibodaux.  He was the same

10:38:40 16   prescriber in Ms. Thibodaux's case.  And then again, the same issue

10:38:43 17   as Ms. Phillips.  We asked her whether or not what would she have

10:38:50 18   done, and she says at the very end, going through percentages,

10:38:54 19   "When you start going down -- she said I can tell you at ten

10:38:59 20   percent, certainly I wouldn't have taken it if the risk was ten

10:39:02 21   percent.  You start going down in smaller numbers, I can't give you

10:39:05 22   a definitive answer what I would have said at that time."

10:39:09 23          And so I've put up the *Motrin* case one more time.

10:39:17 24          THE COURT:  I remember it.

10:39:18 25          MR. MOORE:  This part here I think is what has particular

10:39:25  1   importance in this case --

10:39:26  2           THE COURT:  I know.

10:39:27  3           MR. MOORE:  -- is that the questions have to be asked and

10:39:29  4   the testimony has to be given in order to create a triable issue of

10:39:33  5   fact, and in this case we think that is missing, Judge, and we ask

10:39:39  6   the motion be granted.

10:39:42  7           THE COURT:  Thank you.  Mr. Schanker.

10:39:47  8           MR. SCHANKER:  Thank you, your Honor.  Good morning, your

10:40:19  9   Honor.

10:40:19 10           THE COURT:  Good morning.

10:40:20 11           MR. SCHANKER:  And I will try to heed your warning and

10:40:23 12   not get into things that we've tread already but focus on important

10:40:29 13   facts and address what counsel brought up.

10:40:32 14           I think we have discussed this concept, but it's

10:40:35 15   important to point out that we heard in counsel's argument a

10:40:40 16   conflation of recommendation and prescription, and I'm sure you

10:40:45 17   caught that.  It's about ultimately what would the prescription be.

10:40:49 18   We heard and saw testimony from Dr. Kardinal about he still may

10:40:53 19   recommend a particular drug, he may have his own particularities

10:40:58 20   and peculiarities for doing that, but what we want to focus on is

10:41:02 21   what the prescription would have potentially been under the law and

10:41:05 22   the framework as you've laid it out.

10:41:07 23           I think it's important to address just as we start out

10:41:14 24   the fact that Ms. Kahn was on a clinical trial, had agreed to a

10:41:18 25   clinical trial.  And we heard counsel say that this made it an

10:41:23  1   incredibly unique situation.  With regards to the issue before this

10:41:30  2   court, in no way does a clinical trial make it unique, except that

10:41:35  3   there was a much more robust advisory.  There was a 29-page

10:41:40  4   advisory versus as you saw in the Earnest case there was a two page

10:41:44  5   consent form.  In this case there was a 29 page consent form.

10:41:48  6        And it's important to note that in that consent form

10:41:51  7   nowhere, nowhere was PCIA referenced, nowhere was permanent hair

10:41:59  8   loss as a risk referenced.  As a matter of fact, what the consent

10:42:03  9   form got into was it did break out permanent side effects, it

10:42:07  10  listed them specifically, those that this entity that put the study

10:42:14  11  together had found in their analysis of everything, and the only --

10:42:19  12  a couple of the permanent side effects they listed permanent loss

10:42:23  13  of menstrual cycle, permanent lung damage, but nothing about

10:42:28  14  permanent hair loss.  And as a matter of fact, Dr. Kardinal

10:42:31  15  indicated that if he had known about the risk of permanent hair

10:42:35  16  loss, that he would have made sure that it was in the particular

10:42:38  17  consent form.

10:42:40  18       Your Honor, the motion in this case by counsel, defense

10:42:45  19  counsel should be denied.  Basically if we just look at your

10:42:50  20  analysis, what we see is that the doctor in this case was unaware

10:42:54  21  of the risk, first of all; that Dr. Kardinal did say if he was

10:42:59  22  aware of the risk of permanent hair loss, he would have warned.

10:43:03  23  And then Ms. Kahn says, specifically, that she would have heeded

10:43:08  24  the warning, that she would have asked for other options.  And then

10:43:13  25  using --

10:43:13  1          THE COURT:  But wasn't she in a trial?

10:43:15  2          MR. SCHANKER:  Let's address, yes, she was in a clinical

10:43:18  3   trial.  But that in no way changes the --

10:43:22  4          THE COURT:  Did she know exactly what she was going to be

10:43:25  5   getting?

10:43:26  6          MR. SCHANKER:  She knew the drug -- she knew that she was

10:43:28  7   going to be getting Taxotere.  Beyond that she did not know.

10:43:32  8          THE COURT:  Okay.

10:43:33  9          MR. SCHANKER:  I'm glad you asked that question, your

10:43:33  10  Honor.  She knew specifically that she would be receiving Taxotere.

10:43:37  11  And she got a warning on what the side effects should have been of

10:43:40  12  all of the drugs that she was taking, including Taxotere.  If there

10:43:45  13  would have been a warning, which we know in 2008 there was no

10:43:50  14  warning for PCIA in the Taxotere label, it would have been included

10:43:54  15  in the 29 pages, it would have been conveyed to Ms. Kahn, and

10:43:59  16  Ms. Kahn says that she would have heeded that and made an inquiry.

10:44:04  17         And specifically, Dr. Kardinal says that if he was

10:44:09  18  informed of the PCIA, he would have disclosed it.  Ms. Kahn says

10:44:14  19  that she would have heeded the warning.  And then ultimately,

10:44:19  20  Dr. Kardinal does explain that he would have considered other

10:44:24  21  options.

10:44:27  22         I think it's important that we look back at the specific

10:44:34  23  record in this case.  And Mr. Moore covered part of this.  So this

10:44:46  24  is Dr. Kardinal's deposition.  He specifically says, he is asked:

10:44:50  25  "So based on the fact that, as we sit here, you can't recall the

10:44:55 1   product insert, the product label that listed permanent hair loss

10:44:57 2   as a potential side effect, would it be a fair statement to say --

10:45:12 3   would it be a fair statement to say --" this is to Dr. Kardinal --

10:45:16 4   "that if you received a letter from the pharmaceutical company,

10:45:19 5   updating you on their label, that they were changing it to include

10:45:22 6   permanent hair loss as an adverse event associated with the use of

10:45:25 7   their drug, would that be news to you?  Yeah."  So he was unaware,

10:45:29 8   Dr. Kardinal was unaware.

10:45:31 9         And then the questioning goes on:  "And would you change

10:45:33 10  what you discuss with your patient concerning the drug?  A. It

10:45:37 11  would be something that would have to be included in the

10:45:39 12  discussion."  So right there he would include the risk of PCIA in

10:45:45 13  the discussion with the plaintiff.

10:45:47 14        And then it goes on:  "Q. Okay.  I may perhaps still

10:45:55 15  recommend the use of the drug."  He is referring to Taxotere;

10:45:58 16  that's recommendation, not prescription.

10:46:01 17        It goes on from there:

10:46:02 18        "Q. But it's something you would discuss with the

10:46:04 19  patient?

10:46:05 20        A. Yes.

10:46:06 21        Q.  And if after discussing it with your patient, your

10:46:11 22  patient told you because of that they did not wish to take the

10:46:14 23  drug, correct, and asked you for other options, would you discuss

10:46:17 24  other options with them?

10:46:19 25        A. Correct."

10:46:34 1            And then we get into what some of the other options are.

10:46:38 2            "Q. Okay.  And is paclitaxel," which is Taxol, "an

10:46:43 3    adequate alternative to docetaxel in terms of efficacy?  Yes,

10:46:48 4    they're very similar.  Okay.  And are there other adjuvant

10:46:51 5    therapies that do not include taxanes that are also within the

10:46:55 6    standard of care for use in patients?

10:46:56 7            A. Yes."

10:46:58 8            Specifically, Dr. Kardinal, as you know from the record,

10:47:03 9    your Honor, talks about understanding that the NCCN guidelines are

10:47:08 10   within the standard of care.  And you recall that detailed analysis

10:47:11 11   of NCCN guidelines, and Mr. Moore flashed those up there on the

10:47:16 12   node negative as well as -- or HER2-negative and HER2-positive with

10:47:21 13   regard to it -- and the record reflects, your Honor, that just

10:47:23 14   Taxol alone there are three different options, Taxol-based regimens

10:47:28 15   that would have been available in this particular case to the

10:47:31 16   plaintiff.

10:47:31 17           And so clearly there were options from an efficacy

10:47:36 18   standpoint.  Dr. Kardinal indicates that Taxol was equally

10:47:42 19   efficacious in his mind, that that's something that he certainly

10:47:46 20   would have advised the patient of concerning options.  And then

10:47:50 21   from a reasonable person standpoint, in the plaintiff's

10:47:54 22   standpoint -- or in the plaintiff's position that she would have

10:47:57 23   chosen another option.

10:48:01 24           Your Honor, we saw reference to the three percent,

10:48:10 25   Mr. Moore showed some question and answer concerning, well,

10:48:13  1    Ms. Kahn, if there was a ten percent risk, if there was a nine

10:48:17  2    percent risk, seven percent, five percent.  I think it's important

10:48:20  3    to clarify during that questioning how Ms. Kahn really responded to

10:48:26  4    that.  You can see, and this is specifically on page 302 of

10:48:32  5    Ms. Kahn's deposition, line 6, "If there was a five percent chance

10:48:37  6    of permanent or persisting hair loss, would you have asked about

10:48:41  7    other options?"  Ms. Kahn's answer, "I think if I saw the words

10:48:46  8    permanent hair loss anywhere, I would have asked for other

10:48:51  9    options."

10:48:51 10         She says if she would have seen those words or been

10:48:54 11    advised of that anywhere, whether it be any of these percentages,

10:48:59 12    the record is clear she said she would have asked for other

10:49:04 13    options.  So she clearly would have heeded the warning and made an

10:49:07 14    inquiry.

10:49:14 15         We heard Mr. Moore get into a causation, brief causation

10:49:20 16    discussion concerning Taxol.  And I think it's important to

10:49:24 17    distinguish, I guess he was saying that Taxol causes PCIA as well.

10:49:29 18    And as you know well from the testimony, we never heard that

10:49:33 19    testimony in the trial.  What we heard is that cases of PCIA have

10:49:38 20    been reported.  You never went through any *Daubert* analysis to

10:49:43 21    demonstrate causation, instead what we heard is case reports.  And

10:49:48 22    we all understand in this courtroom that you can't equate case

10:49:52 23    reports with causation.

10:49:54 24         Not that that matters because it's what went on in the

10:49:58 25    room and what the doctor's understanding was, what Dr. Kardinal's

10:50:02 1   understanding at the time was.  And what does the record show us

10:50:05 2   that Dr. Kardinal's understanding with regard to PCIA was in 2008?

10:50:10 3   When Dr. Kardinal made his advisory, he didn't advise any patients

10:50:14 4   of a risk of PCIA with the use of chemotherapy because he wasn't

10:50:19 5   aware of it.  So clearly, based on that testimony, it's a logical

10:50:24 6   extension that if faced with an option of Taxol and PCIA, he would

10:50:29 7   not have advised a patient that that was a potential side effect

10:50:33 8   because he wasn't aware of it.  And to this day we haven't seen a

10:50:37 9   *Daubert* opinion on causation with regard to Taxol.

10:50:39 10        So, your Honor, for those reasons, it's our position that

10:50:46 11  Ms. Kahn has clearly satisfied the elements, as you have laid them

10:50:51 12  out, for learned intermediary.

10:50:54 13        And pursuant to the summary judgment motion standard

10:50:58 14  that's been put forth in the Fifth Circuit, specifically is there

10:51:01 15  evidence that a warning would have changed the doctor's actions, we

10:51:04 16  heard that unequivocally multiple times that Dr. Kardinal says,

10:51:10 17  yes, I would have changed my advisory, and that that change in

10:51:14 18  actions would have avoided or lessened the plaintiff's injuries.

10:51:18 19  We understand that she, that Ms. Kahn indicated that she would have

10:51:21 20  inquired as to options, and a reasonable person in that position

10:51:24 21  that is told that that's equal efficacy with regard to these

10:51:29 22  side -- with regard to the chance of survival with the drug but

10:51:33 23  that we have permanent hair loss, which the record is clear that

10:51:37 24  Ms. Kahn considered that as a temporary side effect, that that

10:51:44 25  element is also satisfied.

10:51:46  1          And, your Honor, we believe that the motion should be

10:51:49  2   denied for those reasons.  Any particular questions?

10:51:52  3          THE COURT:  No.  Thank you.

10:51:53  4          MR. SCHANKER:  Thank you.

10:51:55  5          MR. MOORE:  Unless your Honor has any questions for me, I

10:51:57  6   have nothing further.

10:51:58  7          THE COURT:  No, thank you.  I need about a five-minute

10:52:00  8   break.  I'll be right back.  Court's at recess for five minutes.

10:52:03  9          THE DEPUTY CLERK:  All rise.

10:52:04  10     (WHEREUPON, A RECESS WAS TAKEN.)

10:57:30  11     (OPEN COURT.)

10:57:31  12          THE DEPUTY CLERK:  Court's in session, you may be seated.

10:57:33  13          THE COURT:  Mr. Strongman.

10:57:36  14          MR. STRONGMAN:  Good morning, your Honor.  Jon

10:57:38  15   Strongman --

10:57:39  16          THE COURT:  I'm sorry, are we ready?

10:57:45  17          MR. COFFIN:  Yes, your Honor.

10:57:47  18          MR. STRONGMAN:  Good morning, Jon Strongman on behalf of

10:57:50  19   Sanofi.

10:57:50  20          As your Honor knows, the court has set out a clear

10:57:52  21   framework for us to evaluate these issues under Louisiana law, most

10:57:56  22   recently in the *Thibodaux* case.  And the parallels between the Kahn

10:58:00  23   case and the *Thibodaux* case are unmistakable and they're

10:58:04  24   determinative of the issue presented in this prescription motion.

10:58:07  25          So what are the undisputed facts?  So Ms. Kahn and

10:58:11  1  Ms. Thibodaux both participated in the exact same clinical study.

10:58:15  2  Both of them started their treatment in 2008, both of them ended

10:58:20  3  their treatment in 2009; specifically for Ms. Kahn, it was July of

10:58:26  4  2009.

10:58:27  5       What else is undisputed?  Just like Ms. Thibodaux, after

10:58:31  6  the well established date of injury that has been litigated over

10:58:34  7  and over in this court, after that date and time for more than six

10:58:40  8  years, Ms. Kahn did not investigate her claim and she certainly did

10:58:45  9  not receive any information from a doctor that she relied on that

10:58:51 10  would have led her to believe that she had no actionable injury,

10:58:54 11  which is the standard that your Honor has set out as it relates to

10:58:58 12  your decision in the Earnest matter.

10:58:59 13       So like Ms. Thibodaux, Ms. Kahn's case is prescribed.

10:59:04 14       So what are the plaintiffs going to say?  There's really

10:59:08 15  two points that I want to address:  One is how are we going to

10:59:11 16  define the date of injury yet again; and the second is, what are we

10:59:16 17  to make of the physician visits that the plaintiffs point to in

10:59:20 18  this case?

10:59:21 19       So this is the *Thibodaux* decision, and what you see is

10:59:25 20  that in *Thibodaux*, again, a patient that participated in the exact

10:59:30 21  same clinical trial, you have the date of injury set out.  She

10:59:35 22  completed her chemotherapy in June of 2009, which meant that the

10:59:40 23  one year prescription period began in January 2010 and ended in

10:59:45 24  January of 2011.  The only difference for Ms. Kahn was that she

10:59:49 25  completed her chemotherapy in July of 2009.  Nowhere in the

10:59:55  1   *Thibodaux* case did the plaintiffs argue about what the dates of

10:59:58  2   treatment were, what that meant.

11:00:00  3           And, in fact, your Honor had a footnote in the *Thibodaux*

11:00:03  4   opinion, and here is what it said:  "Plaintiff's last Taxotere

11:00:06  5   infusion was April 16th, 2008, but Thibodaux completed her overall

11:00:13  6   chemotherapy treatment in June of 2009.  To be more generous to

11:00:16  7   Thibodaux, defendants rely on the June 2009 date.  The Court does

11:00:20  8   the same."

11:00:20  9           Now, in the Kahn case, the plaintiffs are arguing that

11:00:23 10   the date of injury here is not six months after the completion of

11:00:29 11   treatment.  It's now, in fact, tried -- plaintiffs are actually

11:00:34 12   trying to push it backwards in time and saying the date of injury

11:00:38 13   is six months after what they are calling cytotoxic chemotherapy.

11:00:42 14   This should not be tolerated and the well established, well

11:00:46 15   litigated definition of injury in this case should hold, which is

11:00:50 16   six months after the completion of treatment, which includes the

11:00:53 17   Avastin for both Ms. Thibodaux and Ms. Kahn.  The dates of injury

11:00:57 18   in both cases are the same.

11:00:58 19           So why are we having this debate about whether it's

11:01:02 20   cytotoxic chemotherapy, whether it's the end of all chemotherapy?

11:01:06 21   It's because the only doctors visits that the plaintiffs can point

11:01:10 22   to happened in 2009.  And so the plaintiffs believe that by

11:01:16 23   arbitrarily pushing back this date of injury to a date tied to when

11:01:21 24   they last received what they're calling cytotoxic chemotherapy,

11:01:25 25   they can boot strap in some otherwise unremarkable physician visits

11:01:30  1    to argue that contra non valentem should apply in this case.

11:01:34  2         But it doesn't.  Let's look the specific visits and the

11:01:38  3    specific issues.

11:01:39  4         I think your Honor has also made it clear, first of all,

11:01:42  5    that when it comes to visiting a physician, just going to see a

11:01:45  6    physician is not alone enough.  You actually have to make an

11:01:49  7    inquiry and you have to get information in that inquiry that you

11:01:52  8    then rely upon.

11:01:54  9         So what did Ms. Kahn do?  The first visit that's pointed

11:01:57 10    to is Dr. Roberie, this is in April of 2009, so nine months before

11:02:03 11    the date of injury as it's been established in this case.  And what

11:02:09 12    did Dr. Roberie tell her?  Dr. Roberie said that age can affect

11:02:14 13    hair thinning.  And what did Ms. Kahn say?  She said, "I think

11:02:18 14    those are two different things.  She didn't answer my question.  I

11:02:21 15    was 50 at the time.  Most 50 year olds' hairs do not thin.  You

11:02:25 16    know, 80 but not 50.  I dropped it."  And she goes on.  "Even

11:02:30 17    despite what Dr. Roberie said, you don't even think it's possible,

11:02:34 18    is that your testimony?  Yes."

11:02:39 19         So here, Dr. Roberie is an OB/GYN, and what Dr. Roberie

11:02:43 20    has told Ms. Kahn is that, well, I know you're saying your hair is

11:02:46 21    thinning -- she is still on treatment, by the way, so this is

11:02:49 22    hardly a remarkable conversation.  But Dr. Roberie says age can

11:02:53 23    also impact this, and Ms. Kahn says, "No, not me.  I'm 50.  I don't

11:02:58 24    buy it.  There's no reliance."

11:03:00 25         What about the next visit?  So this is a dermatologist

11:03:03 1  Dr. Claiborne, July 2009, right around the same time that she is

11:03:07 2  finishing her clinical trial treatments.  The only testimony about

11:03:14 3  this visit is that when she talked about her hair, she asked is

11:03:18 4  there anything that can help my hair grow faster.  Dr. Claiborne

11:03:24 5  said you can take biotin.  Did Ms. Kahn rely on that in terms of

11:03:28 6  not filing a lawsuit?  No.  In fact, what we know is that Ms. Kahn

11:03:32 7  never even remembered taking biotin.  This visit is unremarkable,

11:03:37 8  and again, not something that she relied on when it comes to a

11:03:41 9  decision on whether or not she should file a lawsuit.

11:03:44 10        THE DEPUTY CLERK:  You have one minute left.

11:03:47 11        MR. STRONGMAN:  That brings us to the last visit,

11:03:50 12 Dr. Larned, the oncologist.  Ms. Kahn went to Dr. Larned, and the

11:03:54 13 date when you put it together based on the depositions is

11:03:57 14 November 2009.  And she asked, "When will my hair grow back?"  And

11:04:03 15 what was Dr. Larned's response?  "She had none.  She couldn't

11:04:06 16 explain, she couldn't give me a date, she couldn't explain."  And

11:04:12 17 what we also know from Dr. Larned is that she never told Ms. Kahn

11:04:16 18 that hair loss would be temporary.

11:04:19 19        So the plaintiff's best case scenario here is that in

11:04:24 20 November of 2009, Ms. Kahn went to Dr. Larned, asked when her hair

11:04:29 21 would grow back, and was told I don't have an answer for that.  She

11:04:33 22 was also told that hair loss is not always temporary.

11:04:36 23        So if anything, Ms. Kahn is the opposite of reassured at

11:04:42 24 this point in time, and she does nothing else for more than six

11:04:46 25 years before a friend sees a lawyer ad.

11:04:48 1          And under those facts, just like in Thibodaux, your

11:04:52 2    Honor's held that the case is prescribed and the same result should

11:04:56 3    go here.

11:04:56 4          THE COURT:  Thank you.  Mr. Coffin.

11:05:00 5          MR. COFFIN:  Good morning, your Honor.  Chris Coffin on

11:05:40 6    behalf of the plaintiff Ms. Elizabeth Kahn.

11:05:44 7          Threshold issue here:  Are there disputed issues of

11:05:47 8    material fact?  If you just look at the black and white of what's

11:05:51 9    been submitted in our papers, Plaintiffs' Response to Defendant's

11:05:55 10   Statement of Undisputed Material Facts, there are approximately 11.

11:05:59 11   We've also added additional statements of additional material facts

11:06:03 12   in dispute, there are a total of approximately 32.  That should cut

11:06:08 13   short some of our time here, because there's no doubt, as we've

11:06:11 14   submitted, there are many disputed issues of material fact.

11:06:14 15         One in particular Mr. Strongman brings up, it's very

11:06:18 16   obvious that there is a dispute here as to when the chemotherapy

11:06:25 17   treatment ended.  And the reason is because the reality is that

11:06:28 18   Ms. Earnest -- excuse me, Ms. Kahn's chemotherapy treatment, her

11:06:34 19   toxic chemotherapy treatment that's at the heart of this case ended

11:06:38 20   in October of 2008.  We're not expanding anything.  The realty is

11:06:43 21   she went on Avastin as the last part of this clinical trial.

11:06:48 22   Avastin is not toxic chemotherapy.  They want to dispute when that

11:06:53 23   treatment ended.  That's a factual issue that they have creatively

11:06:57 24   put in dispute.  When did her Avastin end?  It wasn't until July of

11:07:02 25   2009, but that wasn't the toxic chemotherapy that's at issue.

11:07:06   1          Let me move so that I can get through the evidence that

11:07:08   2   you really want to see.

11:07:10   3          Before I do that, briefly, as a procedural point, in

11:07:13   4   Ms. Kahn's case, we have filed a motion to amend the short form

11:07:17   5   complaint, which your Honor indicated she would entertain motions

11:07:20   6   on if there were specific allegations specific to Ms. Kahn.  That

11:07:25   7   may substantively change the analysis in this case, as I think your

11:07:30   8   Honor is well aware, that was submitted on January 31st of 2020,

11:07:34   9   it's been briefed, and your Honor has not ruled on it.  I think

11:07:37  10   that has a significant bearing here.

11:07:39  11          But to the analysis of contra non valentem.  I am not

11:07:43  12   going to read back to you what you said in your previous opinions,

11:07:46  13   but I'll go straight to the testimony because the question on

11:07:51  14   summary judgement is:  Are there genuine issues of material fact in

11:07:54  15   dispute as to whether or not a reasonable inquiry was made?

11:07:57  16   Because your Honor has said, if there's been a reasonable inquiry

11:08:03  17   made, then contra non valentem applies.

11:08:04  18          So the first one I am going to talk about -- and I've

11:08:08  19   summarized this testimony, I have it from the actual transcripts,

11:08:10  20   if you would like to see that.  But this is her inquiry in April of

11:08:13  21   2009, again, as a reminder, cytotoxic chemotherapy at issue,

11:08:18  22   including Taxotere, was over in 2008, October of 2008.  Have you --

11:08:24  23          "Q. Have you ever asked any health care provider why they

11:08:27  24   thought your hair is thinner than it was before chemotherapy?

11:08:31  25          A. I talked once to my gynecologist, and her comments

| | |
|---|---|
| 11:08:35 1 | were -- her comments to me were, well, as you age, your hair gets |
| 11:08:39 2 | thinner. |
| 11:08:40 3 | Q. And which gynecologist? |
| 11:08:42 4 | A. Dr. Roberie. |
| 11:08:44 5 | Q. So have you considered whether the current condition |
| 11:08:46 6 | of your hair is affected by your aging process?" |
| 11:08:49 7 | And she goes on to answer.  That's Ms. Kahn expressing |
| 11:08:53 8 | her concern to her gynecologist about her hair loss after receiving |
| 11:08:58 9 | cytotoxic chemotherapy. |
| 11:08:59 10 | The next evidentiary example is her inquiry to her |
| 11:09:05 11 | dermatologist in July of 2009.  This dermatologist was |
| 11:09:09 12 | Dr. Claiborne.  And Ms. Kahn in this testimony is referring to her |
| 11:09:13 13 | journal entries so she refers to Dr. Ochsner, we now know that |
| 11:09:17 14 | really was Dr. Claiborne she was visiting.  But this is important |
| 11:09:21 15 | here because if you look at the question towards the middle it |
| 11:09:24 16 | says: |
| 11:09:24 17 | "Q. What medical institution," I am going to start there, |
| 11:09:28 18 | "was Dr. Ochsner affiliated with?" |
| 11:09:31 19 | A. She is an independent office. |
| 11:09:32 20 | Q. Did you -- is it your recollection that you had a |
| 11:09:35 21 | dermatologist visit with Dr. Coller Ochsner on July 27th, 2009? |
| 11:09:41 22 | A. Yes. |
| 11:09:41 23 | Q. And were you notating things here that you were going |
| 11:09:45 24 | to discuss with her or things that were discussed during that |
| 11:09:49 25 | appointment? |

11:09:50 1          A. Things that were discussed.

11:09:51 2          Q. And did you want biotin for your hair?

11:09:54 3          A.  I did want it, yeah.  It was suggested."  It was

11:10:00 4 suggested is what Ms. Kahn says.

11:10:02 5          "Q. Did you ask for something regarding your hair during

11:10:05 6 your July 27th, 2009, appointment with Dr. Ochsner?

11:10:10 7          A. I asked her if there was anything that I could do to

11:10:12 8 help my hair grow back faster.

11:10:15 9          Q. And she recommended biotin?  Yes."

11:10:18 10          This is evidence that Ms. Kahn was concerned about her

11:10:20 11 hair regrowth and she inquired to yet another physician, so that's

11:10:24 12 the second one.

11:10:24 13          THE COURT:  But did anybody tell her, "Be patient.  It's

11:10:28 14 going to grow back."?

11:10:30 15          MR. COFFIN:  Essentially that's what Dr. Larned says in

11:10:33 16 the next example.

11:10:34 17          But what's most important is nobody said, "Oh, I know

11:10:38 18 what's going on here from a medical standpoint.  And this is in the

11:10:41 19 context of the medical community and the public certainly weren't

11:10:45 20 aware, like Sanofi was, of the risk of permanent hair loss

11:10:49 21 associated with Taxotere.  I mean, it has to be considered with

11:10:52 22 that backdrop, which if I have time I'll get to later under the

11:10:57 23 other prong of contra non valentem.

11:10:59 24          Let's look at what Dr. Larned said.  This is, again,

11:11:03 25 Ms. Kahn 's deposition.

11:11:05  1          "Q. Did you ever discuss with your doctors when you could

11:11:07  2   expect your hair to regrow?

11:11:10  3          A.  At some point in '09, and I don't know when, when I

11:11:13  4   went to see Dr. Larned," her oncologist, "I asked her when will my

11:11:19  5   hair -- or it may have been in 2010.  I don't know the exact

11:11:23  6   appointment I had with her, but I did talk to her about when my

11:11:27  7   hair would go back.

11:11:28  8          You asked her that question, "When will my hair grow

11:11:31  9   back?

11:11:32 10          A. Yes."

11:11:35 11          And -- or did you ask it in a different way?  I want to

11:11:40 12   understand what you said to her.

11:11:41 13          "A. When will my hair grow back?

11:11:43 14          Q.  And what was her response?

11:11:46 15          A. She had none.  She couldn't explain.  She couldn't

11:11:50 16   give me a date.  She couldn't explain.

11:11:52 17          Q.  Do you remember any of the words she said?

11:11:55 18          A. No.

11:11:56 19          Q. When you talked to Dr. Larned in 2009 or 2010, did you

11:12:00 20   believe that your hair loss was due to Taxotere?"

11:12:04 21          I have an objection and the witness answered:

11:12:06 22          "A. We didn't discuss any particular thing about why it

11:12:09 23   wasn't growing back at the rate that I had hoped it would grow

11:12:12 24   back."

11:12:14 25          "Q. Well, you were talking to your oncologist, correct?"

11:12:18  1          A. Correct.  But we didn't talk about any particular

11:12:21  2     drugs or causes.

11:12:22  3          Q. Did you think at that point that it was due to

11:12:25  4     chemotherapy?"

11:12:25  5          This is critical right here, Judge, Ms. Kahn's answer.

11:12:28  6          "A. Well, I lost it because of chemotherapy.  I had no

11:12:32  7     clue about the growing back."

11:12:35  8          In other words, well, certainly we all know that we can

11:12:38  9     temporarily lose hair from chemotherapy, but I had no clue about

11:12:42  10    what was preventing the hair from growing back, which is really the

11:12:46  11    issue here.

11:12:47  12         She was clearly, if not in her first two doctor visits,

11:12:52  13    in her third one with Dr. Larned sometime in '09 or '010 asking

11:12:58  14    about why her hair wasn't going back.

11:13:00  15         The last question:

11:13:01  16         "Q. So was there a potential in your mind at that point

11:13:05  17    that your hair was not growing back due to something other than a

11:13:08  18    chemotherapy drug?

11:13:10  19         A. I didn't know.  And Dr. Larned was one of the doctors

11:13:13  20    I saw frequently.  I think I saw her every three months for awhile.

11:13:16  21    So I talked to her because she's the one that I would see all the

11:13:20  22    time.

11:13:20  23         Q. Did Dr. Larned recommend you do anything?

11:13:23  24         A. No, she had no suggestions."

11:13:26  25         So that's clear testimony based on what your Honor has

11:13:29  1    said in previous rulings about whether or not they made inquiries

11:13:33  2    to doctors.

11:13:34  3              Now, that testimony --

11:13:34  4              THE COURT:  Well, but the inquiries, if the doctor says

11:13:39  5    and lulls them in to some belief that the hair is going to grow

11:13:43  6    back, sit tight.  And that's what Ms. Earnest's doctor said,

11:13:48  7    "sometimes it takes longer."  But I am not seeing that here.

11:13:52  8              I guess my question for you is, when she says, "I think

11:13:56  9    it was due to chemotherapy," didn't that incite the duty to

11:14:01 10    investigate?

11:14:02 11              MR. COFFIN:  Here is the backdrop, your Honor, and

11:14:05 12    there's testimony about this, too.  And incidentally, we would like

11:14:07 13    to supplement because there were three depositions taken on Monday,

11:14:11 14    one on Tuesday, one of the husband of Ms. Kahn, who was in the room

11:14:15 15    with her.  So I will ask for that.

11:14:17 16              But the backdrop is that Ms. Kahn, and the evidence

11:14:21 17    shows, was instructed that your hair will grow back, this will be

11:14:26 18    temporary.

11:14:26 19              THE COURT:  Right.

11:14:27 20              MR. COFFIN:  She was instructed by her doctors.  So

11:14:29 21    what's the question she is asking, hey, when will my hair grow

11:14:33 22    back?  You told me it was going to.  The question is, what's going

11:14:36 23    on with this?  And the doctors, they don't know what to tell her,

11:14:41 24    other than, well, try this biotin, or no explanation, I am not

11:14:47 25    really sure what's going on with it.

11:14:50  1            So, I mean, so there's no definitive answer because the

11:14:55  2    doctors don't even know.  But the inquiries were clearly made.

11:15:00  3    She's clearly gone to a doctor and made an inquiry, there is no

11:15:05  4    doubt about that on three different occasions.  And Mr. --

11:15:10  5            THE DEPUTY CLERK:  You're over seven minutes.

11:15:12  6            THE COURT:  Finish that sentence.

11:15:13  7            MR. COFFIN:  Ms. Kahn's husband testified yesterday that

11:15:16  8    Dr. Larned specifically said that her hair would grow back.  He was

11:15:21  9    in the room with her.

11:15:23 10            If I can just cite one case and then I will stop.  Are

11:15:27 11    you okay with that, Judge?

11:15:28 12            THE COURT:  Yes.

11:15:29 13            MR. COFFIN:  It's not in our briefing, but I would

11:15:31 14    encourage the Court to look at a case that's really reflective of

11:15:37 15    our position here and that the court accepted in *Shepherd v.*

11:15:41 16    *Johnson & Johnson* from the Western District of Louisiana, the cite

11:15:45 17    is 2019 Westlaw 653817.  This case is really on point.  I don't

11:15:57 18    think it's been brought to your Honor's attention.  It even

11:16:00 19    discusses the plaintiff viewing a TV ad that put her on notice that

11:16:04 20    she was the victim of a tort.

11:16:05 21            THE COURT:  Okay.

11:16:06 22            MR. COFFIN:  Thank you, your Honor.

11:16:07 23            THE COURT:  Thank you.

11:16:09 24            MR. STRONGMAN:  I don't have anything else, your Honor.

11:16:10 25            THE COURT:  Okay.  Thank you.  Ms. Brilleaux.

11:16:23  1          MR. COFFIN:  Your Honor, I had mentioned supplementing

11:16:25  2   the record.  Can we do that because of the deposition testimony

11:16:28  3   that was taken after these briefs were filed?

11:16:30  4          THE COURT:  Is there an objection?  Was it taken within

11:16:33  5   the discovery time?

11:16:34  6          MR. COFFIN:  Oh, yes, yes.  The motions were filed before

11:16:37  7   the end of this discovery period.

11:16:38  8          MR. STRONGMAN:  Yeah, and they were taken as part of the

11:16:41  9   Phase II discovery or what not.  I certainly have think it has any

11:16:43 10   bearing on statute of limitations, but...

11:16:45 11          THE COURT:  That's fine.  If it's within the discovery

11:16:49 12   period, that's fine.

11:16:50 13          MR. COFFIN:  Okay.  Thank you, your Honor.

11:16:52 14          THE COURT:  Ms. Brilleaux.  You got another PowerPoint on

11:17:07 15   this?

11:17:07 16          MS. BRILLEAUX:  I thought you would be excited about it.

11:17:09 17          Good morning, your Honor.  Kelly Brilleaux on behalf of

11:17:12 18   Sanofi.  And on behalf of all of the defendants in this MDL, we are

11:17:17 19   currently seeking a modification of PTO 70B, which is the order

11:17:22 20   that governs ex parte communication with physicians.

11:17:26 21          THE COURT:  How are you prejudiced?  Let's cut to the

11:17:28 22   chase.

11:17:29 23          MS. BRILLEAUX:  Of course.

11:17:30 24          THE COURT:  We had this commotion during Ms. Earnest's

11:17:34 25   trial.

11:17:35  1              MS. BRILLEAUX:  Of course.

11:17:36  2              THE COURT:  And my question is, how were you prejudiced?

11:17:41  3    I guess -- and I told you at that time, so I am cutting out that.

11:17:48  4    I don't know a case that you try where you don't talk to your

11:17:52  5    witnesses before you put them on the stand.

11:17:55  6              MS. BRILLEAUX:  And that's actually the exact position

11:17:58  7    that defendants are in, because we would also be putting on the

11:18:01  8    prescribing physician.  As you know, the prescribing physician is

11:18:04  9    the most important non-party fact witness in the case.  It's

11:18:07 10    important to plaintiffs and it's equally important to defendants.

11:18:11 11    And we're put in a position where not only do we not get to talk to

11:18:15 12    the physician, but plaintiffs' counsel has the unlimited,

11:18:19 13    exclusive, and unfettered ability to talk to the same witness.

11:18:23 14              THE COURT:  But you know exactly what -- when they met,

11:18:27 15    what they reviewed, how much they were paid.  I got to tell you, I

11:18:31 16    haven't seen that in a case where a treating physician -- where the

11:18:36 17    plaintiff has to provide to --

11:18:40 18              MS. BRILLEAUX:  And, your Honor, you're correct, the

11:18:41 19    disclosures are helpful.  The real issue is and why we proposed our

11:18:46 20    alternate solution is that there's a wide window of time in-between

11:18:50 21    the deposition and trial.  And in the *Earnest* case on essentially

11:18:54 22    the eve of trial and during trial, plaintiffs' counsel are having

11:18:57 23    continued meetings with the physicians.  And while we are given a

11:19:01 24    disclosure list, we don't know what they're told.  Dr. Carinder was

11:19:06 25    on the stand during Earnest for nearly five hours that day, and

11:19:09  1   most of it was spent just trying to pick apart what he was educated

11:19:13  2   on by plaintiffs' counsel and what defendant's had no opportunity

11:19:17  3   to tell their side of the story.

11:19:19  4         So here we have a witness, a fact witness, who unlike the

11:19:22  5   sales rep, we had the opportunity to meet with her; but when it

11:19:27  6   came to Dr. Carinder, he had spent hours and hours and hours with

11:19:32  7   plaintiffs' counsel being told their trial themes, being educated

11:19:35  8   on their theories of liability and causation, being shown

11:19:38  9   documents --

11:19:39 10         THE COURT:  Hours and hours and hours?

11:19:41 11         MS. BRILLEAUX:  Yes.  And I don't have -- so I know that

11:19:44 12   there were at least three hours of meetings on the week before the

11:19:48 13   trial started.  And they had obviously met with him prior to his

11:19:54 14   deposition, too.  So, yes, several hours spent over the course of

11:19:58 15   the litigation.

11:19:58 16         THE COURT:  That was before the deposition, I am not even

11:20:00 17   counting that.

11:20:01 18         MS. BRILLEAUX:  Okay.  So at least three hours spent

11:20:05 19   between the week preceding trial and during -- while the trial was

11:20:08 20   happening they were having meetings and phone calls.

11:20:11 21         And what's really kind of significant about this, your

11:20:13 22   Honor, I do want -- if you'll let me just flash to one slide that I

11:20:18 23   have -- one aspect during the trial is that at defendant's request,

11:20:23 24   you provided an admonition to Dr. Carinder before his testimony

11:20:28 25   outside of the jury.  And you said, "But your testimony, you should

11:20:31 1  know, is going to be limited to your treatment of Mrs. Earnest and

11:20:35 2  not anything outside of that."

11:20:37 3        And so what really the crux of our argument is, if you

11:20:42 4  are going to allow plaintiffs' counsel to meet with these

11:20:45 5  physicians prior to trial, they should be limited to speaking about

11:20:52 6  the treatment and they should be limited in the documents shown to

11:20:57 7  the medical records.  Because if they're all allowed to testify at

11:20:59 8  trial --

11:21:00 9        THE COURT:  No, but suppose I am putting a treating

11:21:03 10  physician on and I am deciding that, as I am reviewing what was in

11:21:09 11  his toolbox, that has been my analogy, what was in his toolbox at

11:21:16 12  the time he was having a conversation, are you telling me that he

11:21:20 13  cannot show an exhibit that they prepared pursuant to the

11:21:22 14  guidelines that Mr. Moore had up before to say these are the

11:21:26 15  guidelines that we understand -- do you feel like these were

11:21:29 16  appropriate, that he couldn't show these are the demonstratives

11:21:33 17  that we intend to show during your testimony?

11:21:37 18        MS. BRILLEAUX:  The defendant's position is --

11:21:39 19        THE COURT:  No?

11:21:41 20        MS. BRILLEAUX:  Showing those demonstratives is extremely

11:21:44 21  prejudicial because it's showing things about the company, and the

11:21:47 22  line has to be drawn somewhere.  Can I show you an example of what

11:21:51 23  was shown?

11:21:51 24        THE COURT:  I am talking about the NIH, I mean, Mr. Moore

11:21:55 25  just showed that which is -- I think it's NIH.

11:21:59  1          MS. BRILLEAUX:  Your Honor, really I think the point here

11:22:01  2   is that you have the ability to limit it however you see fit.  So

11:22:04  3   if you wanted to enter an order and say the guidelines are in but

11:22:08  4   what's not in are company documents and what's not in are plaintiff

11:22:12  5   created slides, you have the ability to limit that as you see fit.

11:22:15  6          THE COURT:  Wait.  I am sorry, plaintiff created what?

11:22:19  7          MS. BRILLEAUX:  Plaintiff created demonstratives and

11:22:24  8   documents.

11:22:24  9          THE COURT:  This is my problem with that.  There are

11:22:26 10   times when you're putting up a witness that you show this is what I

11:22:34 11   intend to use when you testify, this demonstrative -- look, I don't

11:22:39 12   know if this is what they're thinking about -- these are the NIH

11:22:43 13   regulations at the time you treated this patient.  And I would like

11:22:46 14   to show these to you.  Is this something that's appropriate in your

11:22:51 15   care of the patient?  Is this something you would have considered?

11:22:55 16   Is this something that is beneficial?  And if he says -- I don't

11:22:59 17   know how many doctors you deal with, but when I was practicing --

11:23:05 18          MS. BRILLEAUX:  Of course.

11:23:05 19          THE COURT:  -- they were pretty clear about what they

11:23:08 20   would and would not -- so, you know, I think if you showed them

11:23:12 21   that and said, "Look, if we use this as a demonstrative, is this

11:23:17 22   something that you would be comfortable explaining to the jury?"

11:23:20 23   And if he says no --

11:23:22 24          MS. BRILLEAUX:  I have two points to respond to that.

11:23:24 25   The first is that your position is certainly reasonable, but the

11:23:28  1    defendants don't get that opportunity and they still need to elicit

11:23:32  2    the same factual testimony from this non-party fact witness.

11:23:36  3              THE COURT:  But it's their witness.

11:23:39  4              MS. BRILLEAUX:  But it is a non-party fact witness, it's

11:23:41  5    not necessarily their witness.  It's a physician who treated the

11:23:44  6    plaintiff that we should have equal access to.  And while we do

11:23:49  7    understand, defendants do understand that there are laws in

11:23:53  8    different states that govern how appropriate that is, at the end of

11:23:58  9    the day it's still the most important fact witness in the case and

11:24:01  10   it's no more their witness than it is ours.

11:24:01  11             THE COURT:  Oh, I agree.

11:24:03  12             MS. BRILLEAUX:  And my second point to respond to you is

11:24:06  13   that there are several cases that have outlined exactly, and I mean

11:24:11  14   very specifically, which documents plaintiffs' counsel cannot show

11:24:17  15   to a physician and should not.  And this is a great example, this

11:24:22  16   is in the *in re:  Pelvic Mesh* case in New Jersey.  "Plaintiffs'

11:24:26  17   counsel may not have ex parte discussions about their understanding

11:24:29  18   of risks and benefits, except as to what they knew of the patient,

11:24:33  19   their past and present use of the product, the risk and benefit

11:24:36  20   information that they received from sales reps, scientific

11:24:39  21   literature, theories of liability."

11:24:41  22             And this is not the only case.  There are other cases

11:24:43  23   that have the exact same language underlined about what plaintiffs'

11:24:48  24   counsel cannot do.

11:24:48  25             So it really doesn't have to be a broad stroke.  And if

11:24:53 1    there are items that you think are appropriate for plaintiffs'

11:24:56 2    counsel to discuss with the physicians, that can be outlined in the

11:25:00 3    order.  It certainly can be narrowly tailored to do so.

11:25:05 4           Defendant's real main concern with this is that showing

11:25:09 5    company documents and basically plaintiff theories of liability and

11:25:12 6    causation is inappropriate where we do not have even the ability to

11:25:15 7    discuss with the doctor.  They're getting a one-sided discussion

11:25:20 8    where there are obviously two sides.

11:25:24 9           And again, just to go back to your admonition.  If the

11:25:28 10   testimony that the doctor is going to give on the stand is limited

11:25:31 11   to the treatment and nothing outside of that, there is no reason

11:25:34 12   that things to do with the company and things to do with theories

11:25:39 13   of causation and liability, the bad company story, should be shown

11:25:42 14   to the physician.

11:25:43 15          Are there any other questions that I can answer for you?

11:25:46 16   Thank you, your Honor.

11:25:47 17          THE COURT:  Thank you.  Mr. Lambert.  Now, you know what

11:26:12 18   my dad would say?

11:26:14 19          MR. LAMBERT:  Yes, your Honor.

11:26:15 20          THE COURT:  Okay.  Proceed.

11:26:17 21          MR. LAMBERT:  I'll be very brief.  I don't think your

11:26:21 22   Honor -- excuse me, Palmer Lambert co-liaison counsel for

11:26:25 23   plaintiffs.  And may it please the Court.

11:26:27 24          Imposing restrictions on the substantive content of ex

11:26:37 25   parte contacts between plaintiffs' counsel and prescribing and

11:26:41  1    treating physicians would be both unenforceable and unreasonable.

11:26:45  2    That's a direct quote --

11:26:45  3              THE COURT:  You must have read Judge Fallon's opinion.

11:26:48  4              MR. LAMBERT:  -- from Judge Fallon and it's cited in our

11:26:52  5    brief.

11:26:53  6              Your Honor, I don't think anything presented in the

11:26:55  7    defendant's papers justifies a change to PTO 70B or its progeny in

11:27:01  8    this case, which has been --

11:27:03  9              THE COURT:  The only thing I would have a problem with

11:27:06 10    is, I mean, they were shown -- Dr. Carinder, as I recall, was shown

11:27:10 11    some things that I ultimately did not allow in opening statement.

11:27:14 12    And so that was problematic, which resulted in the admonition.  So

11:27:20 13    I am hesitant, that would be my concern.

11:27:24 14              But I think that there are demonstratives that are

11:27:29 15    appropriate to show the witness.  We are going to blow up this part

11:27:32 16    of your record.  These were the other options.  You indicated or

11:27:36 17    are you comfortable with -- I think those are fine.  But that

11:27:41 18    became a little problematic when you --

11:27:45 19              MR. LAMBERT:  Your Honor, I'm sorry to cut you off, but I

11:27:48 20    had a point written in my notes to address that.

11:27:51 21              THE COURT:  Okay.  Address that.

11:27:53 22              MR. LAMBERT:  The defendants did make a point to say that

11:27:56 23    there were on the eve of trial discussions with the doctor.  I

11:28:00 24    think your Honor will remember some meetings at Mr. Moore's office

11:28:04 25    going through demonstratives and things.

11:28:06  1          THE COURT:  I do.

11:28:07  2          MR. LAMBERT:  The timing of rulings and things leading up

11:28:10  3  to trial is important in that.  I don't think that those same

11:28:13  4  things will happen now that we have the benefit of in limine

11:28:19  5  rulings and the rulings on the opening demonstratives.  So that

11:28:22  6  aside, we don't see any reason for changing PTO 70B, which now

11:28:27  7  three judges have addressed, Judge North recently, specifically

11:28:31  8  authorized pretrial preparation-type meetings with the type of

11:28:37  9  protections that have been in place.

11:28:39 10          So unless your Honor has any further questions.

11:28:41 11          THE COURT:  No.

11:28:42 12          MR. LAMBERT:  Thank you, your Honor.

11:28:43 13          THE COURT:  All right.  Thank you.  Let me see liaison

11:28:46 14  counsel, please.

11:28:55 15          We can hang up the phone line now.  Thank you.

11:35:20 16      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

         17

         18                        *  *  *  *  *  *

         19

         20

         21

         22

         23

         24

         25

1

2                      REPORTER'S CERTIFICATE

3

4          I, Karen A. Ibos, CCR, Official Court Reporter, United

5    States District Court, Eastern District of Louisiana, do hereby

6    certify that the foregoing is a true and correct transcript, to the

7    best of my ability and understanding, from the record of the

8    proceedings in the above-entitled and numbered matter.

9

10

11                         ___/s/ Karen A. Ibos_____

12                         Karen A. Ibos, CCR, RPR, CRR, RMR

13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25