09:51:48

```
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3     ****************************************************************

 4     IN RE:  TAXOTERE (DOCETAXEL)
       PRODUCTS LIABILITY LITIGATION
 5
                              CIVIL ACTION NO. 16-MD-2740 "H"
 6                            NEW ORLEANS, LOUISIANA
                              THURSDAY, JANUARY 20, 2022, 10:00 A.M.
 7
       THIS DOCUMENT RELATES TO:
 8     AUDREY PLAISANCE V. HOSPIRA,
       INC. ET AL.
 9     CASE NO. 2:18-CV-08086

10     ****************************************************************

11                TRANSCRIPT OF MOTION HEARING PROCEEDINGS
                HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
12                     UNITED STATES DISTRICT JUDGE

13

14     APPEARANCES:

15
       FOR THE PLAINTIFFS:        BARRIOS KINGSDORF & CASTEIX
16                                BY:  DAWN M. BARRIOS, ESQ.
                                  701 POYDRAS STREET, SUITE 3650
17                                NEW ORLEANS, LOUISIANA 70139

18

19                                GAINSBURGH BENJAMIN DAVID
                                  MEUNIER & WARSHAUER
20                                BY:  M. PALMER LAMBERT, ESQ.
                                       CLAIRE E. BERG, ESQ.
21                                1100 POYDRAS STREET, SUITE 2800
                                  NEW ORLEANS, LOUISIANA 70163
22

23
                                  SIMMONS HANLY CONROY
24                                BY:  DAVID F. MICELI, ESQ.
                                  ONE COURT STREET
25                                ALTON, ILLINOIS 62002
```

***OFFICIAL TRANSCRIPT***

```
1   APPEARANCES CONTINUED:

2

3                              THE GOMEZ LAW FIRM
                               BY:  LINDSAY STEVENS, ESQ.
4                              655 WEST BROADWAY, SUITE 1700
                               SAN DIEGO, CALIFORNIA 92101
5

6
                               DAVIS & CRUMP
7                              BY:  TREVOR B. ROCKSTAD, ESQ.
                               2601  14TH STREET
8                              GULFPORT, MISSISSIPPI 39501

9

10  FOR HOSPIRA, INC.,
    HOSPIRA WORLDWIDE, LLC,
11  FORMERLY DOING BUSINESS
    AS HOSPIRA WORLDWIDE,
12  INC., AND PFIZER INC.:     CHAFFE MCCALL
                               BY:  JOHN F. OLINDE, ESQ.
13                             2300 ENERGY CENTRE
                               1100 POYDRAS STREET
14                             NEW ORLEANS, LOUISIANA 70163

15

16                             WILLIAMS & CONNOLLY
                               BY:  HEIDI K. HUBBARD, ESQ.
17                                  RICHMOND T. MOORE, ESQ.
                                    NEELUM J. WADHWANI, ESQ.
18                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
19

20
    OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
21                             CERTIFIED REALTIME REPORTER
                               REGISTERED MERIT REPORTER
22                             500 POYDRAS STREET, ROOM B-275
                               NEW ORLEANS, LOUISIANA 70130
23                             (504) 589-7779
                               Cathy_Pepper@laed.uscourts.gov
24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

*OFFICIAL TRANSCRIPT*

**I N D E X**

                                                                    PAGE

1  MS. HUBBARD......................................    6

   MOTION ON LEARNED INTERMEDIARY DOCTRINE..............    6

   MS. STEVENS.......................................   14

   MS. HUBBARD......................................   19

   MOTION ON STATUTE OF LIMITATIONS.....................   20

   MR. MOORE.........................................   20

   MR. ROCKSTAD......................................   26

   MR. MOORE.........................................   33

   *DAUBERT* MOTION ON ROSS...............................   34

   MR. MOORE.........................................   34

   MR. MICELI........................................   42

   MR. MOORE.........................................   48

   *DAUBERT* MOTION ON DR. FEIGAL.......................   49

   MS. WADHWANI......................................   49

   MR. MICELI........................................   58

   MS. WADHWANI......................................   64

*OFFICIAL TRANSCRIPT*

1       **P-R-O-C-E-E-D-I-N-G-S**

2       M O R N I N G   S E S S I O N

09:51:48  3       THURSDAY, JANUARY 20, 2022

09:51:48  4       (TELEVIDEOCONFERENCE VIA ZOOM)

09:51:48  5

09:58:07  6

09:58:09  7       THE COURT:  Are we ready to proceed?  Who do I have for

09:58:22  8   plaintiffs?  Palmer, are you going to --

09:58:24  9       MR. LAMBERT:  It will be Lindsay Stevens from the Gomez

09:58:29 10   firm to start.  Before we begin, Judge, just a bit of sad news

09:58:34 11   to deliver that some of you may be aware of.  A member of our

09:58:39 12   subcommittee team, Val Exnicios, passed away this week.  He was

09:58:45 13   a friend of the Court and a member of our local bar.  I just

09:58:51 14   wanted to mention that for the record.

09:58:53 15       THE COURT:  Judge Zainey informed us at the court.

09:59:01 16   It's certainly a significant loss to the Bar and his family.

09:59:10 17       MR. LAMBERT:  Yes.  Lindsay will be handling our first

09:59:14 18   argument for the plaintiff.

09:59:18 19       THE COURT:  Who do we have?

09:59:19 20           Ms. Hubbard, are you handling all four this

09:59:22 21   morning?

09:59:23 22       MS. HUBBARD:  Good morning, Your Honor.  I'm handling

09:59:24 23   the first argument on the learned intermediary.

09:59:29 24           My colleague, Rich Moore, is going to handle the

09:59:32 25   summary judgment argument on statute of limitations and the

***OFFICIAL TRANSCRIPT***

*Daubert* argument on Ross.

My colleague, Neelum Wadhwani, whose name I have spelled for the court reporter, is going to handle the *Daubert* argument on Dr. Feigal.  So, it will be the three of us, and everybody will remember to reintroduce themselves for the record so Cathy has that when we start.

THE COURT:  Okay.  Who do I have?  For the learned intermediary, you said that would be Ms. Stevens.  What about for the statute of limitations?

MR. LAMBERT:  For the statute of limitations, Judge, we have Trevor Rockstad from David & Crump on behalf of Ms. Plaisance.

Then for Dr. Ross and Dr. Feigal's arguments, we have David Miceli.

THE COURT:  Let me just start off with all of you people, I don't know if you have any idea how to pronounce Dr. Chauvin's name, but my guess it was going to be murdered, so I have to tell you, write this down:  S-H-O-W, dash, V- A-N, and then drop the N.  It's SHOW-VA.  Only those of us that grew up down the bayou know how to pronounce it.

I am ready to proceed.  Erin, can you call the case.

THE DEPUTY CLERK:  Yes, ma'am.  Good morning.  This is in the matter of Taxotere, MDL Number 2740.

Counsel, if you would like to make your

*OFFICIAL TRANSCRIPT*

10:01:23  1    appearance for record, please.

10:01:29  2         MS. HUBBARD:  Good morning, Your Honor.  Heidi Hubbard

10:01:31  3    from Williams & Connolly for Hospira, together with my

10:01:34  4    colleagues, Rich Moore and Neelum Wadhwani, who will be arguing

10:01:38  5    today, and our co-counsel, John Olinde.

10:01:48  6         MR. LAMBERT:  Good morning, Your Honor.

10:01:49  7    Palmer Lambert, coliaison counsel for plaintiffs.

10:01:55  8    Lindsay Stevens will be arguing the first argument today for

10:01:59  9    Ms. Plaisance, second will be Trevor Rockstad from

10:02:03 10    Davis & Crump, and third and fourth motions, David Miceli.

10:02:03 11    Dawn Barrios is also on as well, coliaison.

10:02:13 12         THE COURT:  Thank you.

10:02:15 13              All right.  Ms. Hubbard, please proceed.

10:02:19 14         MS. HUBBARD:  Thank you, Your Honor.  The learned

10:02:24 15    intermediary doctrine is one in which the Court is well

10:02:26 16    familiar, having issued an opinion in the *Guilbeau* case ten

10:02:31 17    days ago, opinions in the *Stewart* case and other cases.  Those

10:02:36 18    decisions as well as the Fifth Circuit's decision in *Phillips*

10:02:40 19    and in the -- I'm not going to say that right -- the

10:02:44 20    *Pustejovsky* decision are controlling for this particular case.

10:02:49 21              The plaintiffs in the Plaisance case cannot meet

10:02:54 22    the burden to show that a different Hospira label would have

10:02:59 23    changed the prescribing decision of the prescribing doctor

10:03:03 24    whose name I now feel like I'm not going to be able to say --

10:03:08 25    Dr. Chauvin.  No, I'm not going to get it.  I might have to

**OFFICIAL TRANSCRIPT**

10:03:14  1  call her *Dr. Laura,* which I feel like would be worse.  Anyway,

10:03:18  2  I may just refer to her as the *prescribing doctor*.  I did not

10:03:21  3  do well in my French class in college, just full disclosure.

10:03:25  4       So, as the Court is well aware, the plaintiff

10:03:29  5  does have the burden here to show that a different label of the

10:03:34  6  label at issue, that's Hospira's label, would have made a

10:03:38  7  difference to the prescribing physician.

10:03:40  8       THE COURT:  What I don't understand is how UpToDate

10:03:45  9  works.  I understand that Dr. Chauvin said from the beginning

10:03:55 10  that she doesn't actually look at labels, and frankly, that

10:03:59 11  makes sense to me that -- or each time she prescribes, she

10:04:05 12  reads the label, but she did say she monitors UpToDate.

10:04:09 13       What I'm curious about is whether or not if

10:04:13 14  Hospira had changed the label, would it pop up as Hospira says

10:04:18 15  that there is a risk of permanent hair loss or would it be

10:04:22 16  there is a risk in docetaxel of permanent hair loss and how

10:04:26 17  does that work in this environment where we have multiple

10:04:34 18  manufacturers producing docetaxel?

10:04:36 19       I'm curious, and maybe I'm just thinking out

10:04:43 20  loud, curious as to how that would work at Hospira but none of

10:04:48 21  the other manufacturers had changed the label or --

10:04:54 22       MS. HUBBARD:  So, let me address it -- let me address

10:05:00 23  UpToDate, three things about UpToDate.  I think it's important

10:05:03 24  to focus on her testimony as well as on what the decisions have

10:05:07 25  already said because UpToDate has already been addressed in the

*OFFICIAL TRANSCRIPT*

law.

So, UpToDate is a massive amount of medical information that a doctor can subscribe to.  She subscribed to it as did the prescribing doctor in *Stewart*.  She says, like the prescribing doctor in *Stewart*, that she checked UpToDate every few days, but she says that she doesn't remember it identifying manufacturers.  She does not remember checking it about docetaxel.

So, UpToDate is really, I think, not going to fill any evidentiary gaps here, and, you know, the Court had to deal with that exact same argument in the *Stewart* case.  The Fifth Circuit dealt with a very similar argument in the *Pustejovsky* case, where the idea was, well, maybe the doctor would have learned about a label change of the relevant label, which here is Hospira, maybe the doctor would have learned about it because the doctor was engaged in being a doctor, reading things about medical practice.  That's what a doctor does, a good diligent doctor like the doctor, here.  Yeah, they talk to their colleagues.  They go to conferences.  They read things.

So, the doctor in *Stewart*, Dr. Michaelis, was almost identical to Dr. Chauvin here.  I mean, he subscribed to UpToDate, he looked at it periodically, but the testimony here, as in *Stewart*, is not that the doctor, you know, was reading things about Hospira's docetaxel label on UpToDate, she said

10:06:43  1   she doesn't even remember manufacturer names being associated.

10:06:47  2        THE COURT:  Right.

10:06:48  3        MS. HUBBARD:  I think the other thing that's probably

10:06:50  4   important here is, like, she does remember reading the brand

10:06:54  5   Taxotere label way back when, so the brand Sanofi label, and

10:06:58  6   that, as Your Honor said, like, that makes sense.  When she

10:07:01  7   starts practicing and starts using docetaxel/Taxotere way back

10:07:06  8   in the late 1990's, she reads the brand label, but she doesn't

10:07:12  9   remember ever looking at or reading the Hospira label, and that

10:07:16 10   is just a fatal evidentiary gap in this case.

10:07:20 11        It is not in any way that the doctor did anything

10:07:24 12   improper.  It's just (audio disruption) a different Hospira

10:07:27 13   label would not have made a difference for this particular

10:07:29 14   prescriber.  It just necessarily couldn't have.

10:07:33 15        UpToDate cannot fill that evidentiary gap

10:07:36 16   because, as Your Honor said very effectively in the *Guilbeau*

10:07:40 17   decision on pages 4 and 5, it's like, yeah, there are other

10:07:44 18   sources of information for a doctor out there, and when we're

10:07:47 19   in the world before discovery is closed, there are

10:07:51 20   possibilities, maybe, possibly, might have, but here, the

10:07:58 21   possibilities never became actualities.

10:08:01 22        She does not testify to having reviewed any

10:08:04 23   Hospira information on UpToDate, and so, it is a pure guess.

10:08:08 24   It's a possibility.  I agree it's a possible but as Your Honor

10:08:13 25   has already found and the Fifth Circuit has already found,

*OFFICIAL TRANSCRIPT*

10:08:18 1    possibilities at this stage, the summary judgment stage, do not

10:08:20 2    fill the evidentiary gap.

10:08:22 3         One corollary to that, Your Honor, which I wanted

10:08:26 4    to flag for the Court is Dr. Bosserman, an expert who puts in a

10:08:31 5    declaration on what doctors do, that cannot fill the

10:08:34 6    evidentiary gap either.

10:08:36 7         The learned intermediary doctrine, as Your Honor

10:08:40 8    has repeatedly pointed out, the Fifth Circuit has pointed out,

10:08:42 9    that focuses on the prescribing doctor, and that's not

10:08:45 10   Dr. Bosserman.

10:08:46 11        I point it out because the same gap-filling

10:08:51 12   attempt was tried in *Stewart* as well where the plaintiff

10:08:56 13   pointed to Dr. Bosserman, the expert deposition and her expert

10:09:01 14   report, and tried to make the same argument about there are

10:09:05 15   these other sources of information out in the world, the

10:09:08 16   medical world, and there are, of course there are, and

10:09:12 17   responsible doctors look at them, but that doesn't tell us

10:09:16 18   that, in fact, the prescribing doctor did look at Hospira

10:09:21 19   information.  And, in fact, she says, you know, she was very

10:09:25 20   direct --

10:09:27 21        THE COURT:  Right.  Well, she followed it and she

10:09:29 22   checked it every couple days.

10:09:31 23        Let's talk about whether or not her prescribing

10:09:34 24   decision would have changed.

10:09:35 25        MS. HUBBARD:  Yes.

                              ***OFFICIAL TRANSCRIPT***

10:09:37  1          THE COURT:  What concerns me, maybe this is a better

10:09:42  2   question for Ms. Stevens, is I don't think we have anything of

10:09:44  3   equal efficacy.  We had that in the last case.  The doctor said

10:09:54  4   I could have prescribed either Taxol or Taxotere, and that's

10:09:59  5   not the situation in this case.

10:10:00  6          MS. HUBBARD:  That's right, Your Honor, and I found

10:10:05  7   that very powerful in her deposition, to be direct about it.

10:10:09  8   The key pages in her deposition where it's clear that her view

10:10:13  9   was this was the option to treat somebody who had an

10:10:20  10  intermediate risk of occurrence, and she was trying to make

10:10:24  11  sure that that risk got reduced with the chemotherapy.

10:10:28  12          It is powerful testimony because she says --

10:10:32  13  first of all, she stands by that decision today.  She says

10:10:35  14  docetaxel was the best option.  She was asked about two other

10:10:39  15  possible treatment regimens.  One of them was Taxol and she

10:10:43  16  said no, that was off the table.  Taxol is not right for this

10:10:47  17  patient.

10:10:48  18          The other one where she was pushed on it a lot by

10:10:51  19  plaintiffs' counsel was Adriamycin.  Your Honor is well

10:10:54  20  familiar with Adriamycin, and she said, both on the efficacy

10:10:58  21  side and the risk side, she would not have recommended that.

10:11:02  22          As Your Honor noted, on the efficacy side, she

10:11:05  23  said it is not -- you don't have the same benefit.  You don't

10:11:08  24  have the same chances of reducing the risk of recurrence, which

10:11:14  25  was her main goal.  Frankly, Ms. Plaisance was candid at

*OFFICIAL TRANSCRIPT*

10:11:20  1   several points in her deposition, it was Ms. Plaisance's main

10:11:22  2   goal, too, is that she, first and foremost, she wanted to get

10:11:25  3   the best treatment for her cancer.

10:11:28  4          The other problem with -- Dr. Chauvin identified

10:11:32  5   with Adriamycin is she said, hey, there is a risk of acute

10:11:39  6   leukemia with Adriamycin.  The thing about acute leukemia,

10:11:43  7   which is a drug-induced kind of leukemia, is if the patient

10:11:47  8   gets it, the patient is likely to die.  So, yeah, it's a small

10:11:51  9   percentage chance, but if they get it, that -- she did not want

10:11:55 10   that.

10:11:55 11          So, her testimony was strong in that this was the

10:11:58 12   best option.  She still prescribed docetaxel.  She stands

10:12:04 13   behind this being the best option for Ms. Plaisance, and she

10:12:08 14   finally said, look, if Ms. Plaisance had absolutely refused to

10:12:13 15   take docetaxel, then she maybe would have gone to Adriamycin,

10:12:17 16   but that was not her prescribing decision.  It was not her

10:12:21 17   prescribing recommendation.  You know, even knowing everything

10:12:25 18   she knows now, it would not be her prescribing decision or

10:12:29 19   recommendation.

10:12:30 20          I thought, you know, it was interesting because,

10:12:32 21   as Your Honor pointed out, in some of the other cases, the

10:12:35 22   doctors were a little more, you know, passive about other

10:12:40 23   alternatives, not -- *passive* is not the right word.  They were

10:12:44 24   open to other alternatives for the particular patient, and

10:12:49 25   here, the doctor was no, this was the right choice for this

**OFFICIAL TRANSCRIPT**

10:12:53 1   patient, both for the efficacy, as Your Honor identified, and

10:12:56 2   on the risk spectrum.

10:12:59 3           So, I think that's the second hole in the

10:13:02 4   evidence here.  It's really -- you know, there are two holes in

10:13:06 5   the evidence, and either one of them is enough to require

10:13:12 6   summary judgment or to say the plaintiff doesn't get to proceed

10:13:16 7   because we're past the stages of, like, maybe, possibly, you

10:13:20 8   know.  We're just at the place where the evidence isn't there.

10:13:24 9           I think that the good guidance that is already

10:13:29 10  here in this litigation from *Stewart*, from *Guilbeau*, which are

10:13:34 11  both 505(b)(2) cases, and then, as I said, from *Phillips* and

10:13:38 12  *Pustejovsky* -- at some point I will say it right -- in the

10:13:41 13  Fifth Circuit, that those really all lead to the outcome here

10:13:44 14  of summary judgment.

10:13:47 15          I think the only other way that the plaintiffs in

10:13:50 16  their opposition tries to fill the gap is with the heeding

10:13:55 17  presumption, but Your Honor has already addressed that.  If the

10:13:57 18  doctor didn't look at Hospira's label, then that -- the heeding

10:14:02 19  presumption is basically overcome because it's clear a

10:14:06 20  different label would not have made a difference.

10:14:08 21          I am happy to answer other questions that

10:14:11 22  Your Honor has.

10:14:12 23      THE COURT:  No, I'll hear from Ms. Stevens now.  Okay.

10:14:15 24  Thank you.

10:14:16 25          Ms. Stevens.

**OFFICIAL TRANSCRIPT**

10:14:17  1          MS. STEVENS:  Good morning, Your Honor.  May it please

10:14:20  2     the Court.  Lindsay Stevens from Gomez Trial Attorneys on

10:14:23  3     behalf of plaintiff Audrey Plaisance.  Your Honor, I'm also

10:14:27  4     more than happy to address any questions that the Court has but

10:14:29  5     would just like to lay out some key points to guide our

10:14:33  6     discussion.

10:14:33  7          First of all, if the Court considers under the

10:14:36  8     summary judgment standards the totality of the evidence in the

10:14:39  9     record, use it in the light most favorable to Ms. Plaisance and

10:14:45 10     indulges all reasonable instances in her favor, then I submit

10:14:47 11     that genuine factual issues do exist here, and summary judgment

10:14:51 12     is not proper.

10:14:51 13          Ms. Hubbard correctly identified the key inquiry

10:14:58 14     here is whether any updated warning about PCIA would have

10:15:01 15     reached Dr. Chauvin in such a way to affect her decision to

10:15:04 16     prescribe docetaxel for Ms. Plaisance.

10:15:06 17          We do not dispute that Dr. Chauvin did not

10:15:08 18     specifically read the Hospira labeling prior to prescribing it

10:15:14 19     to Ms. Plaisance; however, under the cases that this court has

10:15:17 20     relied upon, like *Pustejovsky*, *Phillips,* and this court's

10:15:21 21     ruling in *Guilbeau*, that is not necessarily where the inquiry

10:15:25 22     ends.  This is especially true in the chemotherapy treatment

10:15:29 23     context in the electronic era.

10:15:30 24          Now, in *Pustejovsky*, *Phillips*, and *Guilbeau*, the

10:15:33 25     Court looked for additional summary judgment evidence to

*OFFICIAL TRANSCRIPT*

10:15:35  1   establish that the revised warning would have reached the

10:15:39  2   prescribing doctor.  It looked at whether the doctor read the

10:15:42  3   *Physicians' Desk Reference*, the lectures doctor -- the doctor

10:15:45  4   attended, the medical literature reviewed, educational seminars

10:15:50  5   attended, discussions with colleagues, etcetera.  In those

10:15:53  6   cases, the Court found that no summary judgment evidence

10:15:56  7   existed; however, I would contend that sufficient evidence does

10:16:00  8   exist here.

10:16:02  9            Dr. Bosserman's declaration is summary judgment

10:16:05 10   evidence and establishes that in the electronic era, the review

10:16:09 11   of paper warning labels is not the standard of care for

10:16:13 12   oncologists like Dr. Chauvin.

10:16:14 13            Other channels, like electronic means or the

10:16:17 14   physician facilities' internal database or monographs would

10:16:22 15   have alerted prescribing physicians like Dr. Chauvin to the new

10:16:25 16   PCIA warning.

10:16:27 17            To address the question you posed to Ms. Hubbard,

10:16:30 18   UpToDate would classify that information across the entire

10:16:34 19   docetaxel molecule regardless of the manufacturer.

10:16:38 20        THE COURT:  That's what I was curious about, so it

10:16:41 21   would been, she would understand at that point that PCIA is a

10:16:45 22   risk in docetaxel?

10:16:48 23        MS. STEVENS:  Exactly, Your Honor.  Dr. Bosserman's

10:16:53 24   declaration supports that, that a label change by Hospira, even

10:16:57 25   as a 505(b)(2) defendant (speaking simultaneously) --

**OFFICIAL TRANSCRIPT**

10:16:59  1          THE COURT:  But if we accept that, Ms. Lindsay, we

10:17:04  2    still have to overcome -- I mean, Ms. Stevens -- we still have

10:17:06  3    to overcome her prescribing decision.  I'll be honest with you,

10:17:11  4    because I've read so much law on learned intermediary, my focus

10:17:16  5    was a very careful reading of the entire deposition of

10:17:22  6    Plaisance, who, apparently, is a lovely lady, and Dr. Chauvin.

10:17:27  7          Dr. Chauvin was, in my view, very strong, that

10:17:31  8    she thought Taxol was absolutely zero, was not an option at

10:17:36  9    all.  She was not inclined to prescribe Adriamycin, which she

10:17:46 10    indicated was the only other option that she could, and

10:17:55 11    indicated that Ms. Plaisance had to absolutely refuse to take

10:17:59 12    docetaxel.

10:17:59 13          Do we have evidence in the record that indicates

10:18:03 14    that Ms. Plaisance, understanding that there was a risk of

10:18:07 15    this, would have just refused to take it?  Do we have

10:18:14 16    sufficient evidence in the records to overcome that hurdle?

10:18:18 17          MS. STEVENS:  Your Honor, I would submit that we do in

10:18:20 18    the form of Ms. Plaisance's testimony.

10:18:23 19          So, we know that with the benefit of an adequate

10:18:26 20    warning, Dr. Chauvin clearly testifies that she would have

10:18:29 21    changed her counseling of Ms. Plaisance.

10:18:32 22          THE COURT:  She --

10:18:33 23          MS. STEVENS:  She's not necessarily definitive as to

10:18:35 24    whether she would have still prescribed a docetaxel regimen.

10:18:38 25    At one point in her testimony, she testified that she would

**_OFFICIAL TRANSCRIPT_**

10:18:41  1   probably still consider Taxotere Cytoxan if Ms. Plaisance came

10:18:47  2   in today but then went on as a caveat that she is paying

10:18:53  3   attention to lawyer advertisements about permanent hair loss

10:18:56  4   and reviewing that with her patients.

10:18:58  5        Now, Ms. Plaisance testified that she would have

10:19:00  6   inquired about other treatment options had she been counseled

10:19:03  7   on the risk of permanent hair loss, and we have Dr. Chauvin's

10:19:07  8   testimony that if Ms. Plaisance inquired about those options,

10:19:10  9   she would have discussed the other NCCN-preferred regimen of

10:19:17 10   AC, Adriamycin/Cytoxan, albeit with the warning of the risk of

10:19:20 11   acute leukemia.

10:19:21 12        So, that's where now Ms. Plaisance's testimony

10:19:24 13   can steer the prescribing decision.  I contend that if we

10:19:29 14   indulge all inferences in her favor, it would have, because

10:19:33 15   Ms. Plaisance's testimony further indicates that she may have

10:19:35 16   refused docetaxel in favor of the AC regimen despite the risk

10:19:40 17   of leukemia.

10:19:42 18        She says that she would have asked to look into

10:19:45 19   another option, and because her hair is so important to her, we

10:19:49 20   know that she testified that -- several times that hair is

10:19:52 21   important to a woman.  It's important to this woman.  Dealing

10:19:56 22   with hair loss is hard.  Trust me, it's really hard.

10:20:00 23        Because we know from her testimony also that she

10:20:05 24   says that she would have consented to the risk of death,

10:20:08 25   infection, and bleeding.  In fact, her testimony said -- if I

*OFFICIAL TRANSCRIPT*

could pull it up -- "Death can occur with anything, but had I known that I could have had permanent hair loss, I would have asked Dr. Chauvin to look into another option that wouldn't cause permanent hair loss."

So, Your Honor, and then couple that with Dr. Chauvin's testimony that if Ms. Plaisance absolutely refused TC, which, based upon her testimony, we can reasonably infer, then the doctor probably would have given her AC with that warning about acute leukemia.

So, I would submit to Your Honor that whether a factual question exists on the second prong of the learned intermediary analysis under the LPLA is too close to call at the summary judgment stage based on the facts in the record.

I would submit it's a closer question in the cases that defense cites in their (audio disruption), like *Stewart*, *Phillips,* and *Guilbeau*.  In fact, in the instant case are distinguishable from these previous cases, as I'm sure the Court is aware, but the application of the law in these cases is consistent with the finding that proximate causation is not severed by the learned intermediary doctrine in Ms. Plaisance's case.

Now, I can get into distinguishing those cases in more hard detail unless the Court has any others questions.

THE COURT:  No.  Thank you.

MS. HUBBARD:  Your Honor, would it be possible for me

***OFFICIAL TRANSCRIPT***

10:21:31   1   to respond very briefly on two points?

10:21:36   2             THE COURT:  Very briefly.

10:21:36   3             MS. HUBBARD:  Thank you, Your Honor.

10:21:37   4             First of all, Your Honor, on Ms. Plaisance's

10:21:39   5   testimony, she is a lovely lady, and she didn't stretch what

10:21:43   6   she would have done.  In her testimony, she says -- the key

10:21:50   7   pages are 29 through 30, 187, and 268 through 270.

10:21:55   8             She says first and foremost, she follows the

10:21:56   9   advice of her doctors.  Secondly, she wanted to live, and she

10:22:00  10   wanted to have the best treatment available.

10:22:02  11             Her primary goal, and this is page 165 through

10:22:06  12   166, was to beat cancer.  She said she was not even concerned

10:22:11  13   about hair loss at the time of her diagnosis.

10:22:14  14             Yes, of course, I mean, any of us would now say

10:22:17  15   that hair is a big deal.  It is.  But at the time of her

10:22:21  16   diagnosis, her primary goal was to beat the cancer, and that

10:22:25  17   was Dr. Chauvin's primary goal.

10:22:27  18             I think she -- you know, when you look at what

10:22:29  19   she actually said, she didn't say she would have absolutely

10:22:33  20   refused docetaxel.  She said:  Maybe she would have said, let's

10:22:39  21   look at something else, and she repeatedly said:  Maybe she

10:22:43  22   would have said, let's look at something else.

10:22:45  23             That takes us back to Dr. Chauvin.  Dr. Chauvin

10:22:49  24   is like, when you ask me to look at something else, I'm saying,

10:22:54  25   no on Taxol, and I recommend, I, the doctor, recommend against

*OFFICIAL TRANSCRIPT*

10:22:58   1   Adriamycin.  So, it can't be that the maybe let's look at

10:23:04   2   something else trumps the focus on the prescribing the

10:23:08   3   doctrine, this doctrine.

10:23:09   4           Really quickly on UpToDates.  Again, it is our

10:23:15   5   scenario here on UpToDates is exactly, almost exactly the same

10:23:19   6   as in *Stewart*.  The doctor subscribes.  The doctor checks every

10:23:24   7   few days.  Dr. Bosserman says it's a really big deal.  Those

10:23:29   8   all were present in *Stewart.*

10:23:30   9           THE COURT:  Okay.  All right.  Thank you.

10:23:32 10           MS. HUBBARD:  Thank you, Your Honor.

10:23:37 11           THE COURT:  Let's proceed on statute of limitations.

10:23:41 12   Let's have Mr. Moore and Mr. Rockstad.

10:23:47 13           Mr. Moore, are you ready to proceed?

10:23:51 14           MR. MOORE:  Yes, Your Honor.  May it please the Court.

10:23:55 15   Richard Moore from Williams & Connolly on behalf of Hospira.

10:23:56 16           Your Honor, this case is prescribed under a

10:23:58 17   straightforward application of Your Honor's precedent and

10:24:00 18   precedent from the Fifth Circuit.  There is no dispute that

10:24:03 19   it's prescribed on its face.

10:24:06 20           Her chemotherapy ended in March 2014.  Her date

10:24:10 21   of alleged injury was in September of 2014, six months later.

10:24:15 22   The prescription period ended on September 2015, one year

10:24:20 23   later, and she filed her complaint in April, 2018, almost four

10:24:25 24   years after her injury.  So, the question then becomes is there

10:24:28 25   anything that would toll the prescription period or suspend it

*OFFICIAL TRANSCRIPT*

in any way?

The plaintiffs have cited a few sources that they say toll the prescription period, so I want to focus on those. The first argument is that she was not aware until she saw the TV ad in 2018. As Your Honor is well aware, that argument has been raised and rejected numerous times, including by the Fifth Circuit, including by Your Honor in the *Hughes* case.

It's simply not the case that the plaintiff can allege that there was a failure to warn, and she can do nothing until she sees a TV ad. Rather, under the Fifth Circuit precedent in *Thibodeaux*, after the six-month period passes, she has a duty to investigate, and that reasonable investigation begins at that point, and there was evidence in the public record that would lead to a possible connection. So, that argument, I submit to Your Honor, has been -- is foreclosed by the Fifth Circuit precedence.

So, the next argument that the plaintiffs focus on the conversations with her doctors. Your Honor has recognized under the contra non valentem exception that there could be a certain narrow set of circumstances, as in *Kahn*, where a prescriber tells the plaintiff or a treater tells the plaintiff, your hair loss was caused by something else, and the plaintiff reasonably relied on that, and that tolls a prescription period. That's not this case here, Your Honor. We don't have that evidence in this case. None of the

**OFFICIAL TRANSCRIPT**

conversations that the plaintiffs are citing come close to that.

The first set of conversations that the plaintiffs cite are in May of 2014.  That's two months after she stopped her chemotherapy.  That's an important point because the timing matters.  At that point, she has not even suffered her injury yet.  It has been less than six months. So, of course, the doctor would say, you know, be patient. It's premature to be worried about your hair regrowing.

That's exactly what Dr. Chauvin said.  She didn't say:  Your hair is going to grow back or anything like that. She said:  It's premature to be worried.  I submit to you, there is nothing remarkable about that, and there is certainly nothing about that would entitle a plaintiff to sit on her hands for another four years and wait for her hair to grow.

Not only that, Dr. Chauvin did not make any kind of particular diagnosis and say:  Your hair was caused by something else -- your hair loss was caused by something else. You don't have permanent hair loss.  You have female pattern hair loss.  None of those things.  In fact, she said:  If you're concerned about your hair loss, you need to go see a dermatologist.  She didn't offer an opinion on that.

So, this is not a case where the doctor told the patient something and she's reasonably relied on that.  The plaintiff did not see a dermatologist until after the

*OFFICIAL TRANSCRIPT*

10:27:32   1    prescription period had run.  So, those conversations in May,

10:27:35   2    Your Honor, are not a basis to toll the prescription period.

10:27:39   3          The second conversation that the plaintiff

10:27:44   4    mentions in her brief just in passing was that there was a

10:27:47   5    conversation with a nurse in which a nurse told her that

10:27:49   6    two percent of her eyebrow hair loss may have been caused by

10:27:55   7    Femara, which is an aromatase inhibitor.

10:27:59   8          First of all, that doesn't say anything at all

10:28:00   9    about the other 98 percent of her eyebrow hair loss, which was

10:28:04  10    not attribute to Femara.  More importantly, the plaintiff has

10:28:09  11    admitted that no doctor ever told her, no nurse, no doctor,

10:28:13  12    Dr. Chauvin, no one during that time period told her that the

10:28:16  13    overall hair loss that she alleged was caused by Femara and

10:28:20  14    that doctor in that time period.  So, that is a nonstarter.

10:28:23  15    That conversation does not toll a prescription period.

10:28:26  16          Then finally, Your Honor, the plaintiff cites a

10:28:30  17    conversation with Dr. Matherne, the dermatologist, and

10:28:35  18    importantly, that's after the prescription period has run.

10:28:38  19    That's in March 2016.  So, at that point, Dr. Matherne did not

10:28:44  20    diagnose her with PCIA.  He treated her for some other

10:28:50  21    conditions.  He thought she may have telogen effluvium.

10:28:55  22          The plaintiffs are saying:  Look, as I understand

10:28:57  23    their argument, if I would have asked Dr. Matherne earlier,

10:29:02  24    Dr. Matherne would have told me I didn't have PCIA.  Well,

10:29:04  25    that's just a misunderstanding of the law.  She can't rely on a

**OFFICIAL TRANSCRIPT**

10:29:08  1   conversation that has not happened yet.

10:29:10  2        You can't toll the statute of limitations under

10:29:16  3   Your Honor's rationale on the *Horner* case, which is what's it

10:29:18  4   based on.  All of those rulings were based on this idea that

10:29:20  5   the doctor told the plaintiff something, and that caused her to

10:29:23  6   reasonably rely.

10:29:24  7        So, the conversation with Dr. Matherne, that

10:29:27  8   can't toll the statute of limitations.  So, there is no

10:29:31  9   tolling.  The prescription period had run, and it's prescribed,

10:29:36 10   I think.

10:29:37 11        The only other arguments that the plaintiffs have

10:29:41 12   made are they make the argument that because the defendant has

10:29:47 13   challenged causation, that somehow means the prescription

10:29:49 14   period didn't run.  That's every case.  Of course, we challenge

10:29:53 15   causation.  We don't have to admit causation for a case to be

10:29:57 16   prescribed.  The fact that -- it's a mischaracterization of

10:30:02 17   Your Honor's opinion in *Kahn* to say otherwise.

10:30:05 18        There is no basis -- the plaintiff only needs to

10:30:08 19   know of a possible connection.  That was the Fifth Circuit's

10:30:11 20   language, so there is no requirement that the defendant have to

10:30:15 21   admit general causation or specific causation for prescription

10:30:18 22   to run.

10:30:18 23        Then finally, Your Honor, they argue also under

10:30:23 24   the other contra non valentem exception relating to whether the

10:30:31 25   defendant did something that caused the plaintiff not --

                          ***OFFICIAL  TRANSCRIPT***

10:30:32  1          THE COURT:  We have been down that road in all the

10:30:36  2     other cases, so we can just move on.

10:30:40  3          MR. MOORE:  I don't know if you would like to hear

10:30:43  4     about the Dr. Mackay-Wiggan testimony.  There was a motion to

10:30:48  5     supplement the record after the time period.  Plaintiff, I

10:30:50  6     think, in a last-ditch effort has argued that Dr. Mackay-Wiggan

10:30:55  7     testified that it's difficult -- first of all, we think it's

10:30:57  8     procedurally improper because all of this argument could have

10:31:01  9     been made earlier, but leave that aside, Dr. Mackay-Wiggan just

10:31:05 10     said:  Look, it's very difficult to diagnose someone with PCIA.

10:31:09 11     It could be other kind of conditions.  It's very hard for me as

10:31:12 12     a person to diagnose -- a doctor to diagnose PCIA.  Well,

10:31:17 13     that's a problem for plaintiffs' specific causation case, but

10:31:20 14     it has nothing to do with prescription.

10:31:22 15          Plaintiff doesn't have to have a diagnosis of

10:31:26 16     PCIA.  The law is clear on that.  The Fifth Circuit says that

10:31:29 17     plaintiffs are not entitled to wait and see if they are certain

10:31:32 18     of what caused their injury.  They just need to show if there

10:31:36 19     is a potential root cause of their injury.

10:31:38 20          Likewise, they said Dr. Mackay-Wiggan wasn't

10:31:42 21     aware of certain facts regarding PCIA in certain articles, but,

10:31:46 22     again, that's the same argument that the Fifth Circuit

10:31:49 23     rejected.  In that case, the plaintiff said:  Look, my doctor

10:31:51 24     wasn't even aware.  How could I be aware?  The Fifth Circuit

10:31:54 25     said:  That's not the issue.  It doesn't matter whether the

**OFFICIAL TRANSCRIPT**

10:31:58  1    prescribing doctors are aware.  The issue is whether the

10:32:00  2    plaintiff had, based on a reasonable investigation, would have

10:32:03  3    had sufficient evidence.  So, we think this supplemental

10:32:08  4    pleading doesn't move the needle at all.

10:32:10  5            So, Your Honor, I think no matter how you analyze

10:32:13  6    it, none of these -- this case simply is squarely within the

10:32:18  7    existing precedent, the *Thibodeaux* case, and the

10:32:22  8    Fifth Circuit's and Your Honor's previous ruling.

10:32:25  9            THE COURT:  Thank you.

10:32:26 10            Mr. Rockstad.

10:32:30 11        MR. ROCKSTAD:  Good morning, Your Honor.

10:32:32 12            May it please the Court.  Hospira's standard that

10:32:35 13    they urge is ridged, formulaic, and wrong.  If we look at this

10:32:43 14    court's past rulings on the statute of limitations and

10:32:46 15    contra non valentem and apply that to the facts of this case,

10:32:50 16    denial of Hospira's summary judgment motion is appropriate.

10:32:55 17            This court has stated that the ultimate issue is

10:32:58 18    the reasonableness of the plaintiffs' action or inaction in

10:33:01 19    light of his education, intelligence, the severity of the

10:33:06 20    symptoms, and the nature of the defendant's conduct.

10:33:08 21        THE COURT:  We have no action.  None.  You're going to

10:33:12 22    have to tell me how do I get around the *Thibodeaux* decision,

10:33:16 23    and not Cynthia Thibodeaux's case exactly, but there was

10:33:22 24    Ms. Francis' case that was the Fifth Circuit -- there were

10:33:27 25    three cases that I granted summary judgment on.  In *Francis*,

**OFFICIAL TRANSCRIPT**

10:33:33 1 she asked her oncologist about persistent hair loss.  Asked but

10:33:38 2 she never asked what has caused this so that she would be able

10:33:42 3 to rely on some other causation that brings us to the

10:33:46 4 reasonableness, her response to that.

10:33:50 5          There was a question in *Kahn,* and her doctor

10:33:54 6 said, I think you're just getting old, and whether or not she

10:33:57 7 accepted that, I thought that's a question for the jury because

10:34:00 8 there was some other basis of causing this.

10:34:04 9          From the record, and I carefully read more of the

10:34:10 10 facts, to be honest, than the briefing because this is a very

10:34:14 11 factually intensive analysis, and what I see is from that six

10:34:21 12 months to the year, she made no inquiry whatsoever as to what

10:34:29 13 caused it.  I think that under Louisiana law, you have to make

10:34:33 14 some inquiry.  Whether or not you accept it, then that's a

10:34:38 15 question of fact, but what inquiry did she make during that

10:34:43 16 year that would toll prescription?

10:34:47 17     MR. ROCKSTAD:  I think it's important to look at the

10:34:49 18 totality of the evidence, Your Honor.

10:34:49 19     THE COURT:  Sure.

10:34:51 20     MR. ROCKSTAD:  We've got to look at every discussion --

10:34:52 21 every discussion she had with all the doctors.  So, we start a

10:34:58 22 month and a half after her chemo ends.  She's complaining to

10:35:04 23 Dr. Chauvin about her hair regrowth.  Dr. Chauvin says:  Be

10:35:10 24 patient.  It will regrow.

10:35:12 25          Two weeks later --

**OFFICIAL TRANSCRIPT**

10:35:13  1        THE COURT:  So, at that point she recognizes, in my

10:35:18  2   view, I think the only reasonable inference is, because she's

10:35:21  3   going to her oncology, that she believes it's related to

10:35:26  4   chemotherapy.

10:35:27  5        MR. ROCKSTAD:  Then her doctor, Dr. Chauvin, says two

10:35:32  6   weeks later, "It's premature to be concerned.  It's premature

10:35:35  7   to say she has permanent alopecia," and this is the important

10:35:39  8   part, Your Honor, "which I strongly doubt."

10:35:41  9             So, she doesn't necessarily at that point give

10:35:43 10   her another cause, but she says that she does not have

10:35:48 11   permanent hair loss caused by docetaxel, and so, that's our

10:35:57 12   starting point.

10:35:59 13        THE COURT:  So, Mr. Rockstad, does that just toll it

10:36:02 14   then forever?

10:36:03 15        MR. ROCKSTAD:  I don't think it tolls it forever, but

10:36:05 16   then we get into Dr. Matherne's treatment.  I started out by

10:36:08 17   saying how Hospira's approach is rigid and it's formulaic.  I

10:36:13 18   think that the reasonableness standard is not a rigid analysis.

10:36:18 19   We got to look at --

10:36:18 20        THE COURT:  Okay.

10:36:19 21        MR. ROCKSTAD:  Okay.  So, maybe the conversations with

10:36:24 22   Dr. Chauvin don't toll the statute of limitations forever, but

10:36:28 23   they get us to Dr. Matherne, who then says, this is caused by

10:36:32 24   something else, and he gives her a number of alternative

10:36:35 25   causes, none of which are docetaxel.

*OFFICIAL TRANSCRIPT*

It's important to keep in mind that Dr. Matherne knew that Ms. Plaisance had undergone chemotherapy treatment. She never went to him and specifically said:  Is this caused by chemotherapy?  In fact, I think that would have undermined our argument if she had at that point gone to him and said that.

She's going to him for treatment related to her hair loss.  She's undergoing treatment.  Of course, she thought her hair was going to regrow.  It would be unreasonable and only a crazy person would have injections in her scalp if she thought there was no hope for hair regrowth.

Dr. Matherne's testimony is clear that he thought there was the hope of hair regrowth or else he would not have prescribed those treatments.  It would be below the standard of care to prescribe treatment that he has no hope of working, especially when it's medications and injections in the scalp.  These weren't just shampoos or topical treatments.

THE COURT:  Right.

MR. ROCKSTAD:  These were serious, significant medical treatments.

Another thing that's important to keep in mind on this timing question is -- and Mr. Moore argued that it is irrelevant what a doctor would have said.  I think that's wrong.

The *Hoerner* case talked significantly about what the doctors would have told Ms. Hoerner if she had pressed

*OFFICIAL TRANSCRIPT*

further.  Specifically, the Court in *Hoerner* said:  Even had she inquired further, it was unlikely that Mrs. Hoerner would have been told in 1987 that extended wear contact lenses significantly increased the likelihood of eye infections.  It is relevant what Dr. Matherne would have said if she had asked six months earlier.

This urging by Hospira that you got to hit the sweet spot in between the six months and the year after treatment ends, that's incorrect.  We've got to look at the totality of the evidence, and we've got to look at what would have changed.

It's unreasonable to think that if Ms. Plaisance had gone to Dr. Matherne six months earlier, somehow the conversation would have been different.  It would have been exactly the same; and, in fact, his testimony is clear that if she would have pressed even further and said:  Is my hair loss permanent and was this caused by docetaxel, he would have told her:  No, it will regrow.

Hair regrowth is likely because he testified that's what he tells patients who ask him about chemotherapy-induced hair loss, and that's based on his medical training but also his experience with his wife.

That, I think, does get into it's difficult for a dermatologist, even an expert like Dr. Mackay-Wiggan, to make the determination of permanent chemotherapy-induced hair loss.

*OFFICIAL TRANSCRIPT*

10:39:47  1    Dr. Matherne didn't even know that docetaxel had this risk.  He

10:39:51  2    did some research before the deposition.  Honestly, when I read

10:39:55  3    his deposition, I think he was a little surprised to learn

10:39:58  4    that.  I think that was something he -- you know, his

10:40:01  5    conversations with his patients will likely be different in the

10:40:05  6    future based on this information.

10:40:07  7         THE COURT:  Right.  But I think part of what the

10:40:12  8    *Hoerner* case -- what distinguishes it was the state of the

10:40:15  9    science at that time didn't find that it could cause this

10:40:20 10    issue; whereas, you know, the Fifth Circuit in *Thibodeaux* goes

10:40:24 11    through what was there available to discover.

10:40:30 12         Go ahead.  I'm sorry.

10:40:36 13         MR. ROCKSTAD:  I want to speak to the issue of the

10:40:40 14    Hospira expert just to tie up that point.

10:40:44 15         Procedurally, her deposition had not been taken

10:40:47 16    when our opposition was filed, so we could not have filed that

10:40:51 17    or included that information, that evidence in our original

10:40:54 18    opposition.  That's why we filed the supplemental pleading.

10:40:59 19         I think that's important that Hospira's own

10:41:02 20    expert, it's not that we're asking them or arguing that they

10:41:06 21    have to concede causation in order to argue statute of

10:41:11 22    limitations.  That's not our argument.

10:41:14 23         Our argument is that there are a lot of causes of

10:41:18 24    hair loss, and it's difficult for a trained dermatologist who

10:41:25 25    is in her testimony saying that she's an expert in chemotherapy

*OFFICIAL TRANSCRIPT*

10:41:32  1   and an expert in hair loss, Dr. Matherne is neither.  He's a

10:41:37  2   general practice dermatologist, who -- wonderful doctor, but

10:41:42  3   he's not spending a lot of time looking at the science on

10:41:49  4   chemotherapy-induced hair loss.

10:41:51  5        I think as it becomes more known in the medical

10:41:54  6   community, certainly it is a more difficult question, but back

10:41:57  7   in 2015, that's not something that Dr. Matherne knew, and his

10:42:02  8   testimony is pretty clear on that.

10:42:04  9        So, I think that getting back to the

10:42:09 10   reasonableness standard, it's critical to look at all the

10:42:13 11   conversations, and while we don't have that sweet-spot

10:42:19 12   conversation that occurred six months after, Your Honor was

10:42:22 13   clear in the *Kahn* case, it's the earliest point at which the

10:42:29 14   plaintiff believes there may be some issue.  That's the point

10:42:33 15   Ms. Kahn, at five and a half months after ending her

10:42:36 16   chemotherapy, that's when she asked her doctor:  What's going

10:42:39 17   on?

10:42:39 18        Here, it's three and a half months earlier.

10:42:44 19   There is no evidence to say and no reason to think that somehow

10:42:49 20   if Ms. Plaisance had asked Dr. Chauvin at five and a half

10:42:53 21   months, the conversation would have been any different.

10:42:55 22   Dr. Chauvin said she's had one patient experience permanent

10:42:59 23   hair loss from chemotherapy, and she didn't believe that was a

10:43:04 24   risk that docetaxel carried.  At five and a half months, why

10:43:07 25   would the conversation have been any different?

**OFFICIAL TRANSCRIPT**

10:43:08  1          I think if you resolve all reasonable inferences

10:43:12  2     in favor of the plaintiff in view of the facts in the light

10:43:16  3     most favorable to the plaintiff, Hospira's motion has to be

10:43:21  4     denied.

10:43:21  5          THE COURT:  Thank you.

10:43:23  6          Mr. Moore, brief, brief rebuttal.

10:43:29  7     MR. MOORE:  Very briefly, Your Honor.

10:43:29  8          Your Honor, there is nothing rigid about what

10:43:32  9     we're arguing.  We're arguing the law as set forth by the

10:43:34 10     Fifth Circuit.  Your Honor, I did not hear a response to the

10:43:39 11     fact that Dr. Chauvin said:  If you're concerned about your

10:43:41 12     hair loss, go see a dermatologist.  He didn't respond to that.

10:43:47 13     There is no response.  She didn't say:  You don't have

10:43:50 14     permanent hair loss.  She said:  If you're concerned about your

10:43:52 15     hair loss, go see your dermatologist.

10:43:53 16          The sweet spot he refers to is otherwise known as

10:43:56 17     the *prescription period*.  That's the period where you have to

10:43:58 18     do a reasonable investigation.  The fact that she didn't do a

10:44:03 19     reasonable investigation during the sweet spot, known as the

10:44:05 20     *prescription period*, means that her claim is prescribed.

10:44:09 21          It's not understood, Your Honor, how somehow the

10:44:12 22     conversation outside the prescription period can toll the

10:44:17 23     statute of limitations.  It's illogical and contrary to the

10:44:20 24     law.

10:44:20 25          The *Hoerner* case was about the fact the doctor

**OFFICIAL TRANSCRIPT**

10:44:24 1   told the plaintiff that her eye infection was caused by a bug

10:44:27 2   and not her contact lenses and she relied on it.  It had

10:44:32 3   nothing to do about what she would have said in the future.

10:44:35 4   That's what Your Honor has recognized in the *Kahn* case.  So,

10:44:40 5   there can't be tolling based on something that happens after

10:44:43 6   the prescription period.

10:44:44 7            Thank you, Your Honor.

10:44:45 8        THE COURT:  Thank you.

10:44:50 9            I think the next argument is --

10:45:01 10       MS. HUBBARD:  I believe the next argument, Your Honor,

10:45:02 11   is the *Daubert* motion on Ross.

10:45:06 12       THE COURT:  That's Mr. Miceli and Mr. Moore.

10:45:06 13       MS. HUBBARD:  Yes.

10:45:06 14       THE COURT:  Bear with me.

10:45:18 15            All right.  Are you ready to proceed?

10:45:18 16       MR. MOORE:  Your Honor, if it please the Court,

10:45:47 17   Your Honor, our motion regarding Dr. Ross is a targeted motion

10:45:50 18   that goes right to the heart of his opinions.  Specifically, he

10:45:52 19   has not provided any basis from which to opine that Hospira had

10:45:58 20   newly acquired information, which is the required regulatory

10:46:01 21   standard for any label to change.  The regulatory framework,

10:46:05 22   Your Honor, I don't believe is in dispute here.

10:46:07 23            I think that Hospira's docetaxel was approved by

10:46:11 24   the FDA in March of 2011.  Dr. Ross is not claiming or opining

10:46:19 25   that it was inadequate at the time of approval.  Instead, his

**OFFICIAL TRANSCRIPT**

10:46:22  1   opinion is that Hospira should have updated its labeling after

10:46:26  2   March 2011 to include information on the risk of permanent hair

10:46:29  3   loss.

10:46:29  4        Now, Ms. Plaisance began taking docetaxel in

10:46:32  5   January of 2014.  So, we're talking about March 2011 to

10:46:37  6   January 2014.  That is the relevant time period.  To change a

10:46:41  7   label under the CBE process, Hospira cannot just change its

10:46:45  8   label whenever it wants.  It has to meet, of course, the

10:46:48  9   regulatory standard.

10:46:49  10       That standard is that there must be newly

10:46:53  11  acquired information that reveals risks of a different type or

10:46:57  12  severity or frequency than previously included in submissions

10:47:01  13  to the FDA.  So, that's the element on which Dr. Ross' opinions

10:47:06  14  have no reliable basis.

10:47:08  15       How do we know that?  Well, he never even cites

10:47:12  16  in his report the definition of newly acquired data.  Nowhere.

10:47:18  17  That should tell you something right off the bat, Your Honor.

10:47:20  18  Not only that, he doesn't go on to apply the data that he

10:47:25  19  relies on to that legal standard, as he is required to do under

10:47:30  20  *Joiner* and all the other cases in *Daubert*, which require the

10:47:33  21  expert to apply the data to the opinion.

10:47:35  22       Instead -- another thing, Your Honor, he did not

10:47:41  23  review the Hospira regulatory record.  So, how can he say what

10:47:46  24  was newly acquired information compared to what was previously

10:47:49  25  submitted when he doesn't even review what Hospira submitted at

*OFFICIAL TRANSCRIPT*

all?  He cited eight documents from Hospira.  That's all he

reviewed from Hospira, so he doesn't do a comparison.

I want to clarify just his (audio disruption) --

I started to say just to clarify the point about

how there could be reanalysis of previously submitted data.

THE COURT:  I talked about that and I think the only

thing that and -- but Dr. Ross does make -- and let me see if I

can get my hands on the notes that I have -- does make

reference to new scientific literature that came post approval

in 2011, that Hospira could have relied on regardless of what

he had submitted to the FDA, that this information was coming

in.

So, is it appropriate for him to say:  Listen,

there is no way they submitted this information because this

was some scientific literature that postdated the approval in

March 2011, and that should have piqued their interest, and

they should have began looking at that time?

MR. MOORE:  Thank you, Your Honor.  I want to clarify

that.  He does identify new information, new medical literature

that comes out.  No one is saying there was not new

information, but he has to compare that literature to what was

previously available and previously submitted and show that

whatever risk information is set forth in those articles is of

a, you know, different type or frequency or severity than what

was already known.  That's what he doesn't do.  He doesn't do

*OFFICIAL TRANSCRIPT*

the comparison.

It's not enough to come in and say, oh, we had an article.  There were ten cases of permanent alopecia reported in an article in 2012.  Well, that's -- okay, how many articles were published before 2011?  When he knows there was a Sedlacek article, the Naplins (spelled phonetically) article, all of those articles reported, you know, rates of permanent alopecia, not statistically significant, but they had incidence rates of six percent, five percent.  I mean, these are higher than the article that came out in 2011.

So, that's our point.  It's not that he -- it's not that he doesn't identify new information, but new is not the standard.  It's newly acquired information and in order to be newly acquired information, that requires a comparison to the old information.  He did not do that analysis.  He didn't do it.  It's simply not in his report.

So, with respect to the medical articles that you, Your Honor, mentioned, we went through those one by one, every single one that Dr. Ross had cited and relied on, and explained that those -- not only did he not do the homework that showed it was not of greater risk, we showed that they were not.  Those rates were lower -- lower than what had already been reported.

What did plaintiffs say in their opposition in response to our argument?  Nothing.  Not one word.  They don't

*OFFICIAL TRANSCRIPT*

10:52:42  1    dispute that.  They don't have anything to say about that.  So,

10:52:45  2    that's the medical literature.

10:52:46  3            Then, Your Honor, the other sources that they

10:52:51  4    cite, they don't have any response to that either.  They cite a

10:52:55  5    hodgepodge of different sources of evidence they say are newly

10:52:59  6    acquired evidence, all of which are -- are -- don't meet the

10:53:02  7    standard.

10:53:03  8            They say there is foreign labeling, Hospira's

10:53:06  9    foreign labeling.  Well, of course, Your Honor, there is a

10:53:08 10    reason why you and other courts routinely exclude evidence of

10:53:13 11    foreign labeling is because it's based on different regulations

10:53:18 12    in different countries.

10:53:20 13            In some countries, for example, Hospira's

10:53:22 14    docetaxel is treated like a generic.  They have to match the

10:53:27 15    Sanofi label word for word.  So, when Sanofi updates its label

10:53:31 16    in Europe to include TAX316 data, Hospira matches it in another

10:53:37 17    country, that's not evidence that its labeling in the U.S. is

10:53:41 18    inadequate.  That's why it gets excluded.  That's point one.

10:53:44 19            Let's just say even if it comes in, the idea that

10:53:46 20    it's somehow a smoking-gun document that Hospira knew something

10:53:50 21    in 2011 to 2014 doesn't hold water because the only information

10:53:56 22    that's in the label is a description of the TAX316 data.

10:54:00 23    That's it.

10:54:02 24            The TAX316 data was already submitted to the FDA.

10:54:06 25    Dr. Ross admits that.  That's not newly acquired information.

*OFFICIAL TRANSCRIPT*

10:54:11  1   It can't be.  The FDA knew about that for years.  So, the idea

10:54:13  2   that Hospira's foreign labeling somehow reveals that its new

10:54:18  3   information is not true.  It's based on the TAX316 data.

10:54:21  4        The same is true with Dr. Juergen Schmider.

10:54:26  5   Dr. Schmider was a head of drug safety at Hospira in 2013.

10:54:30  6   Plaintiffs allege he came over from Sanofi, and therefore, he

10:54:34  7   had all this information.  Well, first of all, the idea that

10:54:37  8   he's walking around -- he was in charge of a lot of products.

10:54:39  9   He doesn't even remember the -- he's testified he doesn't even

10:54:43 10   remember this issue of permanent hair loss.  That's the only

10:54:45 11   testimony in the record.

10:54:46 12        So, the idea that she's walking around with all

10:54:48 13   of this knowledge in his head, I submit to you is farfetched,

10:54:52 14   but even if you give that -- accept that as true, what do --

10:54:55 15   what information do they say he had?  They say that he had the

10:54:58 16   Sanofi core data sheet.  That was the -- there was a document

10:55:02 17   they found in all the production that came over, and they found

10:55:05 18   he had the core data sheet.  He says he doesn't remember.

10:55:09 19        What is a core data sheet?  It has a TAX316

10:55:12 20   description, the same information that's in the foreign label.

10:55:16 21   That's already been submitted to the FDA.

10:55:18 22        They say he was involved in the European labeling

10:55:22 23   change.  Again, he doesn't remember that, but if he was, that's

10:55:26 24   just the TAX316 data.  It all comes back to that.  That's not

10:55:30 25   new information.  The same argument.

                        *OFFICIAL TRANSCRIPT*

10:55:31 1        So, the other thing they cite is Hospira's

10:55:35 2   internal adverse event reports.  Hospira had a handful of

10:55:39 3   adverse event reports of reported permanent hair loss, but

10:55:43 4   Dr. Ross did not analyze Hospira's adverse event database.  If

10:55:48 5   he had, he would see there is only two that involved docetaxel

10:55:50 6   and no other suspect drug.

10:55:52 7        So, out of hundreds of thousands of women who are

10:55:55 8   taking this product, the idea that a handful of case reports is

10:56:00 9   somehow new information that would require a labeling change

10:56:04 10  would require a comparison and he didn't do that.

10:56:08 11       So, then he talks about the FAERS database.  The

10:56:12 12  FAERS database, of course, the FDA had that as its own

10:56:16 13  database, so we know that.

10:56:17 14      THE COURT:  Isn't it the analysis, because we went

10:56:21 15  through that in the Sanofi -- you know, it's not enough to say:

10:56:28 16  Listen, we gave you a roomful of boxes full of material; you

10:56:34 17  have it all.

10:56:34 18       I think the issue is whether or not you looked at

10:56:38 19  it and analyzed it, because the FDA, it's not their job to dig

10:56:43 20  through the documents that you've been presented and that they

10:56:47 21  have.  It's your job.  It's not enough to say:  We gave you

10:56:53 22  that with the other eight million pages of stuff we gave you.

10:56:57 23  You know, it's your job to look at it and analyze it.

10:57:05 24       But I need to ask Mr. Miceli:  How do we know

10:57:14 25  what they hadn't already analyzed and given them?  Because we

**_OFFICIAL TRANSCRIPT_**

10:57:16  1    have to compare it, it seems to me.

10:57:18  2         MR. MOORE:  I agree, Your Honor.  I just want to be

10:57:21  3    crystal clear, that's not our argument.  We have not -- we're

10:57:24  4    not arguing and we have not argued and we are not arguing that

10:57:28  5    we're let off the hook because we submit information to the

10:57:31  6    FDA.  It's not our argument here.

10:57:32  7         Our argument is there has been no analysis of the

10:57:36  8    information in the FAERS database, any of this information, to

10:57:39  9    show that it was any different.

10:57:41 10         The only thing they cite is Dr. Madigan,

10:57:43 11    all right?  They cite what Dr. Madigan did in reviewing the

10:57:46 12    FAERS database.  Well, we asked Dr. Madigan:  Did you do a

10:57:49 13    comparison to see if the information (audio disruption)

10:57:53 14    accurate in 2011 was any different than earlier?  He said no.

10:57:57 15    There was no signal after --

10:58:00 16         THE COURT:  Let me ask you this question, Mr. Moore:

10:58:03 17    I've got your argument.  If I grant summary judgment or any of

10:58:09 18    the other prior motions, is this still pertinent as to the

10:58:14 19    preemption motion?

10:58:17 20         MR. MOORE:  Yes, Your Honor.  It is pertinent as to the

10:58:20 21    preemption motion, because, although you don't have to grant

10:58:24 22    this motion to grant the preemption motion, if you do grant

10:58:28 23    this motion, that should require summary judgment on

10:58:31 24    preemption.

10:58:32 25         This is their only expert who says that the

*OFFICIAL TRANSCRIPT*

10:58:36 1   labeling was inadequate, and we don't think he extends the bar

10:58:44 2   in terms of *Daubert* when offering that opinion, so if this is

10:58:47 3   excluded, yes, I think that would be a basis on which to grant

10:58:49 4   the preemption motion.

10:58:52 5        THE COURT:  Thank you.  I know we're not arguing that

10:58:53 6   today.  I think that's enough.

10:59:06 7             Mr. Miceli.  You're on mute.

10:59:08 8        MR. MICELI:  Can you hear me?

10:59:08 9        THE COURT:  I can hear you now.

10:59:08 10        MR. MICELI:  Okay.  All right.  I'm not even going to

10:59:09 11   go into qualification because I know in the briefing --

10:59:09 12        THE COURT:  Yes, that's not an issue.  He's imminently

10:59:12 13   qualified to speak to FDA regulations.

10:59:17 14        MR. MICELI:  I want to start by pointing out Hospira's

10:59:20 15   motion to exclude Dr. Ross is entirely based upon the changes

10:59:25 16   being effective criteria for making a label change.  That is

10:59:30 17   not the only -- and that is the only the basis that they say

10:59:33 18   that Dr. Ross should be excluded because he didn't --

10:59:41 19        THE COURT:  Now you're frozen, Mr. Miceli.  Wait.  We

10:59:47 20   need to back up a little bit because you froze.

10:59:47 21        MR. MICELI:  Can you hear me?

10:59:47 22        THE COURT:  I can now.  Thank you.

10:59:52 23        MR. MICELI:  Okay.  The only basis argued in Hospira's

10:59:59 24   brief to exclude in their motion to exclude Dr. Ross is based

11:00:06 25   upon his failure to comply with the three requirements in the

*OFFICIAL TRANSCRIPT*

11:00:11  1   CBE label change.  A change being effective is only one of the

11:00:16  2   methods for making a label change, and the change being

11:00:19  3   effective, a CBE, is the type of change you make where a

11:00:24  4   company makes a change and then submits information to the FDA.

11:00:29  5       It is not -- and Dr. Ross does not offer the

11:00:34  6   opinion that a CBE was required.  He said a label change was

11:00:39  7   required, and as in the *Kahn* case, he relies upon 201.57(c)(7),

11:00:47  8   which is the adverse reaction section (audio disruption) --

11:00:59  9       THE COURT:  I'm sorry.  I lost you.  A bit when you

11:01:03  10  talked about 201.57, I think, and then after that you went --

11:01:09  11      MR. MICELI:  I apologize.  I must have a bad Internet

11:01:14  12  connection, Your Honor.

11:01:16  13      Dr. Ross' opinion, when you read his report -- if

11:01:18  14  you will, let me get back to the CBE.  The only mention of the

11:01:24  15  CBE (audio disruption) is in paragraphs 108 through 113 in

11:01:31  16  Dr. Ross' report.

11:01:32  17      Nowhere in there does he say that Hospira must

11:01:35  18  have used the CBE process.  That's the only basis for -- that

11:01:42  19  Hospira cites in its brief for excluding Dr. Ross.  I mean, we

11:01:49  20  could look at it, but that's all they say is he did not comply

11:01:52  21  with the CBE process.  That's not his opinion.  It is not his

11:01:56  22  opinion that that was required.

11:01:57  23      What he says is when there is a change (audio

11:02:03  24  disruption) -- of an adverse event, you need to change the

11:02:08  25  label.  In parity, through 140 in his report, he walks through

*OFFICIAL TRANSCRIPT*

11:02:12 1    those pieces of evidence.

11:02:13 2         Now, the -- Mr. Moore argued on Hospira's behalf

11:02:20 3    that Dr. Schmider is somehow absolved because he says he can't

11:02:28 4    recall something.  Well, what's happened here is Sanofi

11:02:31 5    basically poaches an employee -- excuse me, Hospira basically

11:02:33 6    poaches an employee in pharmacovigilance from Sanofi, who comes

11:02:36 7    to work at Hospira, leaves the Taxotere team and joins

11:02:44 8    Hospira's docetaxel team.

11:02:48 9         If you look at the evidence that's cited in our

11:02:53 10    opposition, Dr. Schmider in his LinkedIn page, which is

11:02:55 11    Exhibit, I think, 2 to his deposition, boasts of all the

11:02:58 12    involvement he has with regulatory authorities, in dealing with

11:03:03 13    FDA and EMA and CHMP.  It's Exhibits 5, 7, and 9 also in his

11:03:13 14    deposition show the (audio disruption) documents, the Sanofi

11:03:18 15    documents that now bear a Hospira Bates label that he brought

11:03:24 16    to his deposition.  So, he's producing his personal documents

11:03:26 17    as a Hospira employee or, perhaps, at that time a former

11:03:30 18    employee, and he brings that knowledge to the table.

11:03:35 19         The foreign regulatory authorities, different

11:03:42 20    standards in different countries, nobody argues that there are

11:03:45 21    different standards, but nobody also disputes that the

11:03:49 22    international conference or harmonization is to harmonize the

11:03:55 23    process in the United States and in Europe and Japan and in

11:03:59 24    other parts of the world.

11:04:01 25         And so, (audio disruption) -- you explain

*OFFICIAL TRANSCRIPT*

11:04:09  1   (audio disruption) about those authorities that has no basis.

11:04:11  2   We're not saying that because they changed it there, they

11:04:15  3   needed to change it here.  What it demonstrates is that as

11:04:19  4   early as 2012, Hospira had information, whether they initiated

11:04:24  5   it or the authority initiated it, to include information about

11:04:31  6   permanent chemotherapy-induced alopecia in labels in at least

11:04:34  7   three different countries.

11:04:36  8          Now, we have to remember what our burden is from

11:04:39  9   a regulatory standpoint.  In this case, we're only dealing with

11:04:43 10   the adverse reaction section of the label 201.57(c)(7).  We

11:04:48 11   should all remember that from the *Kahn* trial.

11:04:50 12          What that says is whenever there is some basis to

11:04:55 13   believe -- it doesn't require proof.  It doesn't require

11:04:58 14   reasonable evidence of the causal association.  It just needs

11:05:01 15   to be a heightened belief that there is some relationship

11:05:06 16   between the drug and the adverse effect, then the label should

11:05:11 17   include that adverse effect in Section 6 of the label.  That's

11:05:17 18   our burden.

11:05:19 19          What Dr. Ross does in his report, whether he

11:05:22 20   looked at what happened prior to approval, if we came in

11:05:29 21   (audio disruption) and argued we criticized their label at the

11:05:31 22   point of approval, I would agree with Your Honor, that would

11:05:33 23   have an impact on your preemption decision, which is why we

11:05:38 24   stayed away from it.  (Audio disruption) -- what happened

11:05:44 25   before, also have to remember --

***OFFICIAL TRANSCRIPT***

11:05:48  1        THE COURT:  Mr. Miceli, it really is problematic from

11:05:56  2   my perspective because you're going in and out.

11:05:56  3        MR. MICELI:  Would you like me to call in on the line

11:05:56  4   that has access to this Zoom?

11:06:02  5        THE COURT:  I think I would prefer that because I'm

11:06:04  6   really struggling, and I've been able to follow, but then the

11:06:07  7   last, I would say, couple of sentences, I --

11:08:58  8        MR. MICELI:  Okay.  I'll just briefly say that if we

11:09:00  9   challenge the label at approval, we would be dealing with

11:09:03 10   preemption, and we would be walking into that, Your Honor, so

11:09:06 11   we specifically focused on post approval.

11:09:08 12        What Dr. Ross did, as he did -- and he explains

11:09:14 13   this in his report -- as a professional at FDA, he relied upon

11:09:19 14   other subject matter experts -- Dr. Feigal, Dr. Plunkett,

11:09:26 15   Dr. Madigan.

11:09:27 16        So, he looked at that and the information as it

11:09:29 17   existed after approval.  That included information that went

11:09:33 18   back before approval.  That doesn't mean that he is criticizing

11:09:38 19   what was approved in 2011.  We adopted his report from the

11:09:43 20   *Stewart*, Hughes cases from -- so, he was talking about 2012,

11:09:48 21   this is 2014, but he does opine that as early as 2012 there was

11:09:58 22   a basis to believe there was a relationship between docetaxel

11:10:02 23   and permanent chemotherapy-induced alopecia.

11:10:04 24        He sets out the framework for how he reviewed

11:10:08 25   that in paragraphs up to 108.  He describes the CBE process

*OFFICIAL TRANSCRIPT*

11:10:14  1    between 109 and 113 but does not say that that was necessary or

11:10:19  2    required to be used, as argued by Hospira.  Then in the section

11:10:25  3    on Hospira between 130 and 140, he sets out the evidence that

11:10:29  4    meets that low bar of some basis to believe.

11:10:34  5           Once you reached -- once he reached the

11:10:38  6    watermark, he doesn't have say:  And I reviewed 20 other things

11:10:41  7    and I can identify 20 other things that meet this, based on the

11:10:46  8    knowledge that I have through the subject matter experts that

11:10:48  9    I've looked at and the information that I've looked at from

11:10:52 10    Hospira, it is my opinion, which I'm qualified to give -- and

11:10:55 11    there is no challenge to his qualifications -- that a label

11:10:59 12    change should have been made.

11:11:00 13           He does not say, due to CBE process, and we know

11:11:05 14    through 201.57 314.80 that a label has to be changed when

11:11:12 15    evidence is sufficient to establish the standard, and that is

11:11:16 16    some basis to belief.  He points that out.

11:11:19 17           I hear what Mr. Moore argues but if the CBE

11:11:25 18    process was the only method for changing a label, I think I

11:11:31 19    would be in trouble, Dr. Ross would be in trouble because

11:11:35 20    that's not what he says.  I think we are on sound footing here.

11:11:40 21           I can leave it at that unless Your Honor has

11:11:43 22    further questions.

11:11:43 23           THE COURT:  No.  I think that it clears up.  Okay.

11:11:47 24    Thank you.

11:11:50 25           MR. MICELI:  Thank you.

                                    *OFFICIAL TRANSCRIPT*

11:11:51 1          MR. MOORE:  Your Honor, may I have just less than a

11:12:00 2  minute?

11:12:00 3          THE COURT:  You can have a minute.

11:12:01 4          MR. MOORE:  I'm stunned that doctor -- excuse me, that

11:12:05 5  Mr. Miceli is saying he's not relying on the CBE process.

11:12:08 6  That's the entire basis for *Levine* and all the subsequent case

11:12:12 7  law that finds exception to preemption.  The only way -- the

11:12:18 8  only way Hospira can make a labeling change on its own is

11:12:22 9  through the CBE process, and that's the exception to the

11:12:25 10  preemption that plaintiffs routinely cite as a basis.

11:12:29 11          THE COURT:  I understand how CBE works, but I think

11:12:33 12  what I'm hearing Mr. Miceli say, and I have to go back and read

11:12:37 13  Dr. Ross' report again, is that Hospira could have proceeded

11:12:43 14  through the other process where they just apply to the FDA for

11:12:50 15  a label change as opposed to making the label change and then

11:12:55 16  asking them to retroactively approve it.  That's the only way

11:12:58 17  to change a label, correct?

11:13:00 18          MR. MOORE:  Absolutely.  But, Your Honor, first of all,

11:13:02 19  they never argued this for good reason.  That is an entirely

11:13:06 20  separate analysis.  If you have to go to the FDA for a prior

11:13:09 21  approval supplement and the FDA has the final word before you

11:13:13 22  can ever do anything, that's a completely separate preemption

11:13:18 23  analysis that has not been argued by the plaintiffs.  I submit

11:13:21 24  to Your Honor, there is no basis for avoiding preemption based

11:13:24 25  on a prior approval supplement.  If you look at the case law,

**OFFICIAL TRANSCRIPT**

11:13:28   1   all of the cases involve the CBE process, that's a starting

11:13:32   2   point.  That's why it's a newly acquired evidence.

11:13:35   3          I heard him say that he's in trouble, he's in

11:13:37   4   trouble if they were relying on the CBE process, and that's a

11:13:41   5   very important concession.  The reason he's in trouble is

11:13:44   6   because Dr. Ross didn't do the analysis under the CBE process.

11:13:48   7   He did not connect the dots under the CBE process as admitted

11:13:53   8   by Dr. Miceli.  It's not that he -- he said they were met but

11:14:01   9   that's ipse dixit.  That doesn't meet *Daubert*, Your Honor.

11:14:14  10          THE COURT:  Okay.  Thank you.

11:14:17  11          Dr. Feigal.  Ms. Wadhwani.

11:14:27  12          MS. WADHWANI:  Yes.  That is correct.  Should I

11:14:27  13   proceed?  Neelum Wadhwani.

11:14:34  14          THE COURT:  Well, we have some friends that are

11:14:34  15   Wadhwani, so it helps the process, which is why I can pronounce

11:14:34  16   it.

11:14:35  17          We can talk about Dr. Feigal.  Let's just take a

11:14:41  18   two-minute break and I'll be right back.  Court will be at

11:14:44  19   recess for two minutes.

11:16:55  20          (WHEREUPON, at 11:14 a.m., the Court took a recess.)

11:17:29  21          THE COURT:  Okay.  Are we ready to proceed?

11:17:30  22          MS. WADHWANI:  Good morning.  My name is

11:18:02  23   Neelum Wadhwani.

11:18:04  24          Hospira seeks the exclusion of four sets of

11:18:07  25   Dr. Feigal's opinions:  First, her opinions that she has

**OFFICIAL TRANSCRIPT**

disclaimed but that are in her expert report that she served in
Trial 5; two, her case-counting opinions; three, her mechanism
of action biological plausibility opinions; and, four, her
general causation opinion.

Because Dr. Feigal explicitly disclaims her
opinions, she should not be allowed to opine them at Trial 5.
The other three sets of opinions should be excluded as
unreliable.

Turning first to the opinions Dr. Feigal has
disclaimed, Your Honor may be wondering why she disclaimed
them, Hospira is seeking to exclude these.  The answer, Judge,
is that we are trying to assure well in advance that there is
no ambiguity concerning the nature and scope of Dr. Feigal's
opinions so that we are not unfairly surprised or prejudiced at
trial, and let me explain that concern a little bit further.

For her expert report in Trial 5, Dr. Feigal
re-served the same report she served in both the *Kahn* and
Trial 3 cases.  Even though she served here in Trial 5 the same
report that she served in *Kahn* and Trial 3, she was very clear
at her deposition in this case that the scope and number of
opinions she is offering for Trial 5 are not the same as the
scope and number of opinions she offered in *Kahn* in Trial 3.

At her deposition, she repeatedly and
unequivocally stated that she was offering only a general
causation opinion and nothing else.

*OFFICIAL TRANSCRIPT*

11:19:46 1          Now, the opposition concedes that, as it states

11:19:50 2     on page 5, that Dr. Feigal's offered to address one specific

11:19:55 3     topic, general causation.  We're not convinced, however, that

11:19:59 4     everyone is still on the same page.

11:20:01 5          Now, I'm not saying that in any way to cast

11:20:04 6     dispersions on plaintiffs' counsel, including Mr. Miceli, whom

11:20:08 7     I respect and with whom I have a very good relationship, I just

11:20:12 8     think there could be some confusion or ambiguity, and let me

11:20:16 9     give you a couple of examples from the opposition:

11:20:18 10         One, the opposition in several places states that

11:20:22 11    Dr. Feigal will only give a general causation opinion, but then

11:20:26 12    it concludes with a discussion of Hospira's alleged notice of

11:20:31 13    causation.  Dr. Feigal, however, was crystal clear in her

11:20:35 14    deposition that she is not opining on issues related to notice

11:20:39 15    nor what Hospira could and should have done in response to such

11:20:43 16    notice, and the opposition conceded as much on page 7, but then

11:20:49 17    on page 13 it, nevertheless, raises the issue of notice.  So,

11:20:53 18    that's one example where there could be a question of

11:20:58 19    ambiguity.

11:20:59 20         Two, the opposition also appears to hedge on any

11:21:02 21    opinions related to alternative breast cancer treatment options

11:21:08 22    when it says that Dr. Feigal will not offer any testimony about

11:21:11 23    the care and treatment of Ms. Plaisance on pages 5 and 6.

11:21:14 24         Now, to be sure, Dr. Feigal's report that she

11:21:18 25    served in Trial 5 does contain opinions generally concerning

**_OFFICIAL TRANSCRIPT_**

11:21:23 1   alternate breast-cancer treatments like she intended to offer

11:21:27 2   at prior trials, but she was clear in her deposition, she

11:21:30 3   stated that for Trial 5, I am not offering opinions on

11:21:36 4   epidemiology, on how to diagnose breast cancer or how to treat

11:21:40 5   it, and that's on page 135 of her depo.

11:21:43 6         So, we're just concerned that the goal post would

11:21:49 7   move at trial, so all we're trying to do here is level set and

11:21:52 8   make sure there is no ambiguity as to what opinions Dr. Feigal

11:21:56 9   is or is not offering.

11:21:58 10        The set of opinions that she has disclaimed is

11:22:01 11  set forth in our papers, and we ask simply that Dr. Feigal be

11:22:04 12  held to her word and the word of the plaintiffs in her

11:22:07 13  opposition that Dr. Feigal will testify only and at most as to

11:22:12 14  her opinions concerning general causation and nothing more.

11:22:16 15        THE COURT:  Okay.  All right.

11:14:27 16        MS. WADHWANI:  Turning to the second opinion related to

11:22:19 17  case counting, we move to exclude her case-counting calculation

11:22:23 18  in Table 2 of her report on the basis that it is irrelevant,

11:22:28 19  not reliable, would confuse the jury and prejudice Hospira.

11:22:32 20        As Your Honor stated in your orders in the

11:22:37 21  *Earnest* trial, to meet her burden on general causation, a

11:22:42 22  plaintiff must first demonstrate a statistically significant

11:22:45 23  association, and then once and only after she clears that

11:22:51 24  hurdle, she must show ethics association rises to the level of

11:22:56 25  cause.

**OFFICIAL TRANSCRIPT**

11:22:56  1             In the *Earnest* orders, you further noted that

11:22:59  2      both prongs of that general causation test do not have to be

11:23:03  3      proven by the same expert.  Instead, the first prong could be

11:23:07  4      met through Dr. Madigan and the second through Dr. Feigal.

11:23:10  5      That is how Ms. Plaisance is proceeding.

11:23:14  6             What Dr. Feigal has been offered for is the

11:23:17  7      second prong in the general causation test.

11:14:18  8             THE COURT:  Right.

11:14:27  9             MS. WADHWANI:  Does the statistically significant

11:23:24 10      association rise to the level of cause?  The case counting has

11:23:27 11      nothing to do with establishing that.  It simply provides a

11:23:30 12      number.  She does not and cannot identify an increased risk or

11:23:35 13      relative risk of PCIA from docetaxel.

11:23:39 14             Because Dr. Feigal has not identified, much less

11:23:43 15      attempted to show an increased or relative risk of PCIA from

11:23:48 16      docetaxel in her case-counting exercise, those counts are not a

11:23:53 17      reliable methodology for demonstrating the strength of

11:23:57 18      association factor under Bradford Hill, which is where she

11:24:00 19      cites that calculation.

11:24:01 20             To meet the strength of association factor, an

11:24:07 21      expert must show that there is an increased risk of the disease

11:24:10 22      from the product, especially where, as Dr. Feigal's Table 2

11:24:15 23      indicates, permanent hair loss is also reported in chemotherapy

11:24:20 24      regimens that do not include docetaxel.

11:24:24 25             Dr. Feigal's case counts don't show that and they

**OFFICIAL TRANSCRIPT**

11:24:27 1   couldn't show that.  They simply calculate the numerator.  So,

11:24:30 2   those case counts are not a reliable methodology for meeting

11:24:34 3   the strength of association factor for Bradford Hill.

11:24:37 4         Now, opposition accuses us of trying to conflate

11:24:40 5   a Bradford Hill causation analysis with a meta-analysis.  We

11:24:44 6   never did.  Our point is simply that Dr. Feigal has not

11:24:49 7   accounted for the difference between the studies which she

11:24:51 8   would need to do in order to determine whether these studies

11:24:55 9   reflected an increased risk sufficient to meet the strength of

11:24:59 10   association factor, but she hadn't done that.

11:25:01 11         Moreover, her case-counting opinion will also

11:25:05 12   confuse the jury and prejudice Hospira because there is a

11:25:10 13   substantial danger that the jury will misinterpret those

11:25:15 14   case-counting points as reflecting an increased risk of PCIA

11:25:19 15   from docetaxel regimens over nondocetaxel regimens.

11:25:26 16         Now, how do we know that's a danger?  We know

11:25:28 17   that's a danger because of Dr. Feigal's opinions on page 75 of

11:25:31 18   her report, where she sums up all her opinions in one section

11:25:35 19   called *Conclusion*.

11:25:39 20         Conclusion Number 4 on page 75 of Dr. Feigal's

11:25:42 21   report states that -- now, I'm going to paraphrase here a

11:25:48 22   little bit -- that the published, peer-reviewed literature

11:25:51 23   demonstrates a significantly increased risk of permanent

11:25:56 24   chemotherapy-induced alopecia with Taxotere-dosed Taxol over

11:26:02 25   other chemotherapy regimens.

*OFFICIAL TRANSCRIPT*

Right there Dr. Feigal implies, whether intentionally or not, that she bases her conclusion that there is a significantly increased risk of permanent alopecia from docetaxel based, at least in part, on those case counts.

So, if she offers her case counts and she offers this opinion that based on the published literature that she has cited that there is an increased risk of PCIA from docetaxel at trial, it will be very easy for the jury to yoke those two together and misinterpret those counts as reflecting increased risk, even though they clearly do not, and that is prejudicial to Hospira.

Finally, Your Honor, the opposition tries to conflate this challenge to her case counting as an overall challenge to Dr. Feigal's ultimate causation opinions.  It is not.  The Court can consider and grant this challenge to Dr. Feigal's case-counting opinions separate and apart from our challenge to her general causation opinion.

Next, moving to Dr. Feigal's mechanism of action and biological plausibility opinions, the plaintiff states that Dr. Feigal is not offering a stand-alone opinion concerning mechanism of action.  That's not what she says in her report on page 40, but if the plaintiff is now representing that Dr. Feigal will not proffer a mechanism action at trial, we will accept that and expect that she will not give such an opinion at trial.

**OFFICIAL TRANSCRIPT**

11:27:43 1        But that disclaiming of a mechanism of action

11:27:49 2   theory for Dr. Feigal at Trial 5 doesn't solve the issue that

11:27:54 3   her biological plausibility analysis is based on a mechanism of

11:27:59 4   action theory that is unreliable and prejudicial for three

11:28:03 5   reasons:

11:28:03 6        First, it is based on two articles whose authors

11:28:07 7   openly admit that the mechanism of action is unknown and that

11:28:11 8   the possible mechanisms identified are purely speculative.

11:28:19 9   Contrary to the opposition's statements on page 10, those two

11:28:24 10  articles to not reflect the prevailing theory of how docetaxel

11:28:28 11  allegedly causes PCIA, nor do those authors claim they do.

11:28:34 12       Those are reports from 2009 and 2010, which the

11:28:38 13  author states that they are the first and second reports of

11:28:42 14  PCIA with docetaxel whatsoever.  So, they are just postulating

11:28:49 15  what they think could be causing a brand-new injury, adverse

11:28:57 16  event, so to speak, and they are not saying this is a

11:29:00 17  prevailing theory.  They are not offering justification for why

11:29:04 18  that is.

11:29:05 19       Second, Dr. Feigal's biological plausibility

11:29:07 20  opinion is unreliable because she did not explain in her report

11:29:12 21  and could not explain in her deposition why the mechanism is

11:29:15 22  plausible.  She just kept repeating it was, and that's on page

11:29:20 23  129 through 132 of her depo.  That's just begging the question,

11:29:25 24  and experts ipse dixit doesn't satisfy *Daubert* nor does

11:29:29 25  Dr. Feigal know whether her opinion has been accepted by the

**OFFICIAL TRANSCRIPT**

dermatology community as plausible, and she confirms that community in her deposition.  But at her deposition, Dr. Tosti testified we don't know the mechanism.  It's still something that is unknown.

Third, Your Honor, Dr. Feigal's biologic plausibility opinion will confuse the jury because it relies on a different mechanism theory than Dr. Plunkett's.  Dr. Feigal talks about the irreversible damage to stem cells or disruption of the communication signals between stem cells.
Dr. Plunkett's theory is based on rapid cell division.

Now, plaintiff has represented, including in her opposition to Hospira's motion on Dr. Feigal, that Dr. Plunkett will offer the mechanism of action opinion at trial, but the jury could be confused by the fact that Dr. Feigal and Dr. Plunkett are stating two different theories.  The jury may very well think that there are multiple ways in which docetaxel can cause PCIA, which is prejudicial to Hospira, especially as this is not an opinion plaintiffs' experts have put forth.

Finally, Your Honor, turning to Dr. Feigal's general causation opinions, I'm going to be very simple and very brief here because we recognize Your Honor has permitted Dr. Feigal to testify.

THE COURT:  I (audio disruption) changed my mind much.

MS. WADHWANI:  Yes.

Simply put, Your Honor, we think Dr. Feigal's

*OFFICIAL TRANSCRIPT*

11:31:05  1   causation opinions are unreliable for the reasons we state in

11:31:09  2   our papers, including meta-analysis by Dr. Madigan that she

11:31:13  3   relies on that has been excluded by Your Honor, and because she

11:31:17  4   fails to consider alternative causes of alopecia even though

11:31:22  5   she acknowledged at the *Earnest* trial that those other

11:31:23  6   chemotherapies can cause PCIA, and she confirmed that testimony

11:31:26  7   in her trial by deposition.

11:31:26  8            Thank you very much, Your Honor.

11:31:30  9            THE COURT:  Mr. Miceli.  I can't hear you.

11:31:39 10            MR. MICELI:  Thank you.  Thank you, Your Honor.  Can

11:31:41 11   you hear me now?

11:31:42 12            THE COURT:  Now I can.

11:31:42 13            MR. MICELI:  I feel like that old cell phone

11:31:42 14   commercial.

11:31:45 15            You know, there is nothing new in this argument

11:31:48 16   that we just heard from Ms. Wadhwani on Hospira's behalf.  The

11:31:53 17   Court has previously heard motions on Dr. Feigal's opinions on

11:31:58 18   three different occasions.  She has been tendered twice at

11:32:02 19   trial, and Your Honor has accepted Dr. Feigal as an expert in

11:32:06 20   clinical research, study design and interpretation, design and

11:32:10 21   interpretation, and in general causation, qualified to render

11:32:15 22   opinions, and that was on the exact same report that is under

11:32:19 23   challenge and attack here.

11:32:20 24            I'm going to try to go through those four items

11:32:24 25   that Ms. Wadhwani just went through, but, you know, what I

**OFFICIAL TRANSCRIPT**

would like to point out is that the case-specific opinions that
they seek to exclude are medical specific causation opinions,
medical standard of care opinions, alternative treatment as
they relate to Ms. Plaisance's specific treatment, and she --
Dr. Feigal is offered only as a general causation expert.

         She does not list Audrey Plaisance's medical
records in her case -- in her materials reviewed, nor does she
mention Ms. Plaisance in her report, nor does she mention
Ms. Plaisance's physicians or any medical record in her report;
yet, 43 percent of the questioning in Dr. Feigal's deposition
for this trial, the Plaisance trial, was devoted by Hospira to
questioning Dr. Feigal about Ms. Plaisance, her positions and
the review or lack of review of her medical records.

         How I came to that number, Your Honor, is that 74
pages, when the questionings began -- when the questions begin,
you go to page 74 of her deposition, which only lasted 171
pages, and 74 of those, up to page 74, was devoted to opinions
that are not included in Dr. Feigal's report, and that's
important.

         MDLs are created to streamline a process and for
efficiency.  Her opinions -- Dr. Feigal's opinions have not
changed materially since her first report.  Hospira has
attended and participated in, the last one, has attended seven
depositions of Dr. Feigal.

         They know exactly what Dr. Feigal's opinions are

*OFFICIAL  TRANSCRIPT*

11:34:20  1   on general causation, and she has never, ever given a

11:34:26  2   case-specific opinion; yet, Hospira seeks to exclude, get an

11:34:32  3   order.  The only thing I can figure, Your Honor, is they are

11:34:34  4   trying to get an easy win.  They are so desperate to get a win

11:34:39  5   on a *Daubert* motion that they want to exclude opinions that are

11:34:42  6   not included in Dr. Feigal's report.  That includes regulatory

11:34:48  7   opinions, labeling opinions, and signal detection.

11:34:54  8        But Hospira cannot get an order excluding

11:34:56  9   opinions that Dr. Feigal simply does not offer.  There is no

11:35:00  10  issue to resolve or no confusion to be avoided, as was just

11:35:05  11  argued, because the opinion has never been offered.  The fact

11:35:09  12  that they ask a question in a deposition does not mean that

11:35:14  13  Dr. Feigal offers such an opinion.

11:35:15  14       The proper mechanism, if they want to limit or

11:35:19  15  control or put parameters around what Dr. Feigal will testify

11:35:23  16  to at trial, that's for the motion in *limine* stage.  Beyond the

11:35:28  17  motion in *limine* the stage, it's for cross-examination.

11:35:31  18       But you can't come in and just make up opinions

11:35:34  19  that don't exist in a report based upon information or

11:35:38  20  materials that are never reviewed by an expert and say we

11:35:42  21  deserve or order excluding and precluding testimony that is

11:35:48  22  never offered.  That's for the first few.

11:35:50  23       The mechanism of action arguments.  Ms.  Wadhwani

11:35:56  24  is correct.  We do not offer Dr. Feigal a specific opinion on

11:36:00  25  mechanism of action, but within the Bradford Hill context,

**OFFICIAL TRANSCRIPT**

11:36:05 1    there is biologic plausibility.  It seems to me that the

11:36:10 2    mechanism of action argument focuses, as others have before

11:36:16 3    this one, on the lack of certainty of the mechanic.

11:36:19 4            But in the words of Sir Bradford Hill himself,

11:36:23 5    "It would be helpful if the causation we suspect is

11:36:27 6    biologically plausible, but this is a feature I am convinced we

11:36:32 7    cannot demand."  Because what we're talking about here --

11:36:36 8    that's the end of the quote -- what we're talking about here is

11:36:39 9    a biologically plausible mechanism.

11:36:45 10           Ms. Wadhwani argues to the Court that

11:36:51 11   Dr. Plunkett and Dr. Feigal have differing mechanism of action

11:36:52 12   or biologic plausibility theories when, in fact, they are not

11:36:56 13   different at all.  They are simply on a continuum.

11:37:00 14           Nobody disputes that a taxane is a microtubular

11:37:04 15   inhibitor.  What it does is it attacks rapidly dividing cells.

11:37:11 16   Your Honor could probably give this testimony yourself because

11:37:14 17   you heard it at trial.  Rapidly dividing cells are found in the

11:37:17 18   hair follicle, and what's at the bottom of the hair follicle?

11:37:20 19   The bulge where the stem cells first divide and produce a hair.

11:37:26 20           So, to say that one person says that it's rapidly

11:37:28 21   dividing cells and another one says it's either the

11:37:32 22   communication or disruption of stem cells is like saying heads

11:37:37 23   of a quarter or tails of a quarter but they both can't be a

11:37:41 24   quarter.  They are the same thing.  It's just on a continuum.

11:37:44 25           Dr. Plunkett and Dr. Feigal are not inconsistent;

*OFFICIAL  TRANSCRIPT*

11:37:46  1   in fact, they are quite consistent.  They are absolutely

11:37:50  2   consistent and there will be no confusion by allowing

11:37:54  3   Dr. Feigal to include, as she must in her Bradford Hill

11:37:58  4   criteria, testimony about biologic plausibility.  That's the

11:38:03  5   second argument.

11:38:04  6          The third argument I heard was case counting.

11:38:07  7   Again, this is nothing new.  We've heard about Table 2 from the

11:38:12  8   very first report that was challenged.  The Table 2 includes a

11:38:19  9   summary of the findings of each of the elements that provide

11:38:23 10   data on patient level -- on a patient level.  That is the

11:38:28 11   TAX316 and TAX301 data and all of the summary data from the

11:38:34 12   literature review.  It gives the Taxotere, the nonTaxotere

11:38:39 13   regimens.  What else it includes is on the far-right column,

11:38:44 14   which -- which Bradford Hill criteria, each of those articles

11:38:51 15   applies to or is applicable to.

11:38:55 16          But throughout that 171-page deposition of

11:38:59 17   Dr. Feigal, Hospira did not question Dr. Feigal about the nine

11:39:03 18   elements of the Bradford Hill criteria or her courtesy in

11:39:09 19   providing them in Table 2 with which criteria are applicable to

11:39:13 20   each of the listed data sources.  Instead, they wanted to

11:39:18 21   question about case-specific information.

11:39:20 22          So, Hospira is repackaging an old argument.  It's

11:39:26 23   nothing new.  Case-counting calculations -- all Dr. Feigal does

11:39:30 24   in Table 2 is summarize, provide in a summary fashion what she

11:39:36 25   reviewed.  It's simple and it provides additional information

*OFFICIAL TRANSCRIPT*

11:39:40  1    by telling what part of her analysis each article or each

11:39:46  2    element goes to.

11:39:47  3               They never asked her to explain that and they

11:39:50  4    never asked her to walk through Table 2 to describe what her

11:39:56  5    calculations were.  They come up with this case calculation.

11:40:00  6    This case-counting calculation, if you go to her deposition,

11:40:04  7    which I know has been provided to Your Honor, and simply search

11:40:08  8    for *case-counting calculation*, there is not a series of

11:40:15  9    questions on that.

11:40:16 10               Now, I know that I'm talking about three specific

11:40:19 11    words in a specific order.  Case counting is not an opinion --

11:40:23 12    is not her opinion.  It's simply just a summary and she gives a

11:40:27 13    total and she explains herself.

11:40:29 14               Then we go to general causation.  I feel like

11:40:32 15    this is the one I should spend the least amount of time on

11:40:36 16    because she has survived *Daubert* on two occasions.  It's been

11:40:39 17    argued to Your Honor three times, and you have ruled that she

11:40:42 18    is qualified to render opinions.

11:40:44 19               But, Your Honor, I'll just repeat that in the

11:40:46 20    prior two cases -- I think it's 8094 and 11804 are the two

11:40:56 21    orders.  They are in our briefing -- where Your Honor has found

11:41:00 22    proper methodology was followed.

11:41:02 23               I know Ms. Wadhwani has mentioned -- I don't know

11:41:05 24    if she mentioned it by name, but she went through the standard

11:41:08 25    of *Burst v. Shell Oil*, that case says that the Bradford Hill

**OFFICIAL TRANSCRIPT**

11:41:13 1   analysis is a recognized analysis, and that is precisely what

11:41:19 2   Dr. Feigal walks through in her report.

11:41:21 3               So, unless you have any questions on the general

11:41:23 4   causation, I have nothing further, Your Honor.

11:41:25 5               THE COURT:  Thank you.

11:41:29 6               MR. MICELI:  Thank you, Your Honor.

11:41:29 7               THE COURT:  Ms. Wadhwani, briefly.

11:41:30 8               MS. WADHWANI:  Yes, very quickly.

11:41:32 9               Your Honor, the record in the MDL and this case

11:41:36 10  speaks for itself.  Hospira's challenge to Dr. Feigal's case

11:41:44 11  count is a new challenge.  The challenge to her particular

11:41:47 12  biological plausibility opinion is a new challenge.

11:41:50 13              Dr. Feigal and I walked through many sections of

11:41:53 14  her report in her deposition, and she disclaimed those opinions

11:41:57 15  that were written in her report.  They are not opinions that we

11:42:01 16  made up, and then after she giving them, we walked through her

11:42:06 17  report and she said:  Oh, I know I say that there, but that's

11:42:09 18  really just background.  That's preamble.  That's not actually

11:42:13 19  what I'm going to be opining on.  What I'm going to opine on

11:42:16 20  only is general causation.

11:42:19 21              Fourth, Dr. Feigal does not give the same

11:42:25 22  mechanism of action theory as Dr. Plunkett.  You heard

11:42:30 23  Mr. Miceli say it's on a continuum.  This is precisely what we

11:42:35 24  are concerned about, Your Honor, with our motion to exclude

11:42:39 25  opinions she's disclaimed because we wanted to make sure that

*OFFICIAL TRANSCRIPT*

11:42:43 1   our file prep reflects and matches what Dr. Feigal says she

11:42:48 2   particularly is coming to testify to.

11:42:50 3           Finally, Your Honor, I'll just say because

11:42:52 4   Mr. Miceli referred to *Burst*, we don't dispute that the courts

11:42:56 5   have agreed that the Bradford Hill analysis is a recognized

11:43:02 6   methodology for analyzing general causation; however, the

11:43:07 7   courts don't say that simply doing a Bradford Hill analysis is

11:43:11 8   your get out of *Daubert* free card.

11:43:14 9           Every aspect of that Bradford Hill analysis has

11:43:18 10  to be reliable and done pursuant to a reliable methodology

11:43:23 11  under *Daubert*.  That's established case law and we have pointed

11:43:26 12  out where Dr. Feigal has not done that.

11:43:29 13          Thank you.

11:43:29 14      THE COURT:  Thank you.  All right.  You'll hear from me

11:43:34 15  shortly.  Thank you very much.

16          MS. WADHWANI:  Thank you, Your Honor.

17          MR. MICELI:  Thank you, Your Honor.

18          MR. MOORE:  Thank you, Judge.

19          (WHEREUPON, at 11:43 a.m., the proceedings were

20  concluded.)

21                          *   *   *

22

23

24

25

***OFFICIAL TRANSCRIPT***

1                     REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Certified Court Reporter in and for the State

5    of Louisiana, Official Court Reporter for the United States

6    District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript to

8    the best of my ability and understanding from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11                              *s/Cathy Pepper*

12                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
13                              Registered Merit Reporter
                                Official Court Reporter
14                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25

                     **OFFICIAL TRANSCRIPT**