## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br>Tina Hickey, Case No. 2:18-cv-04731 |

## MEMORANDUM IN SUPPORT OF HOSPIRA'S MOTION FOR <u>SUMMARY JUDGMENT BASED ON PREEMPTION</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

THE UNDISPUTED FACTS ............................................................................................3

ARGUMENT .....................................................................................................................7

I.  PLAINTIFF'S STATE-LAW, FAILURE-TO-WARN CLAIMS ARE
    PREEMPTED BY FEDERAL LAW UNLESS PLAINTIFF CAN PROVE THAT
    HOSPIRA HAD "NEWLY ACQUIRED INFORMATION" ...............................................7

II. PLAINTIFF HAS FAILED TO ESTABLISH THAT HOSPIRA HAD "NEWLY
    ACQUIRED INFORMATION" ABOUT PERMANENT HAIR LOSS ........................10

III. HOSPIRA DID NOT POSSESS "NEWLY ACQUIRED INFORMATION" ................12

    A.  Hospira's Labeling Was Adequate at the Time of Approval in March 2011 ........13

    B.  Hospira Did Not Have "Newly Acquired Information" as of October 2013 .........14

        1.  No new evidence of greater frequency .....................................................15

    C.  Plaintiff's Own Expert Has Not Opined that Hospira Had Newly Acquired
        Information ...............................................................................................................23

CONCLUSION..................................................................................................................24

CERTIFICATE OF SERVICE .........................................................................................26

**INTRODUCTION**

It was not lawful under federal law for Hospira to unilaterally implement a labeling change to warn about permanent hair loss in October 2013, as Plaintiff Hickey contends state law required. If Plaintiff is right about what state law required, then federal and state law conflicted, and it was impossible for Hospira to comply with both. When that is true, as the undisputed facts establish here, federal law preempts state law. Accordingly, the Court should grant summary judgment for Hospira.

The FDA granted Hospira's 505(b)(2) application in March 2011 and, in so doing, specifically approved Hospira's proposed labeling. Like the Sanofi Taxotere labeling, the Hospira labeling in both the Highlights and Adverse Reactions sections described hair loss as one of the most common side effects of using docetaxel. The FDA *required* those exact warnings regarding hair loss as of the date of approval, and it would have been legally impossible for Hospira to have given doctors a different warning as of March 2011. Plaintiff's expert, Dr. David Ross, acknowledges this fact, having testified that "I've not offered and I do not anticipate offering any opinions about what Hospira did prior to approval to get approval" and that he is not offering any opinion "that the Hospira label for docetaxel approved by FDA was inadequate at the time of approval in March of 2011."[1]

The issue, then, is whether Hospira was obligated at some point after FDA approval (March 2011), but before Plaintiff Hickey received treatment with docetaxel (beginning in October 2013) to use the Changes Being Effected ("CBE") regulation to independently add such

---

[1]   *See infra* note 24. The plaintiff in *Plaisance* offered Dr. Ross's opinions. This case has similar dates of use as in *Plaisance* and involves the same legal issues. Accordingly, although Dr. Ross's opinions have not been formally designated in *Hickey*, this Motion treats his opinions, and the opinions of other non-case-specific experts in *Plaisance*, as applying here. Hospira previously filed *Daubert* motions in *Plaisance*, which the Court denied as moot after granting Hospira's motion for summary judgment based on the statute of limitations. Order (Jan. 20, 2022), ECF No. 13726. Although the Court need not address any *Daubert* motions to decide this Motion, Hospira does not concede the admissibility of Plaintiff's experts and reserves the right to file *Daubert* motions in *Hickey* at an appropriate time if the Court were to deny this Motion.

a warning about permanent hair loss to the labeling.  A drug manufacturer cannot resort to the CBE regulation, however, unless it has "newly acquired information"—that is, information (1) "not previously submitted" to the FDA that (2) reveals "risks of a different type or greater severity or frequency" than previously submitted to the agency and that (3) constitutes "reasonable evidence" of "a causal association" between the drug and a clinically significant hazard.  21 C.F.R. § 314.70(c)(6)(iii)(A); *id.* § 314.3(b).

Whatever may be true of Sanofi regarding Taxotere (the brand-name and Reference Listed Drug), Plaintiff has not shown that Hospira came into possession of such "newly acquired information" after the FDA approved Hospira's docetaxel and before Plaintiff used the drug. Her expert, Dr. Ross, cannot make that showing, for he did not do the basic homework necessary to render an opinion about what "newly acquired information" Hospira may have had, never having reviewed the twelve volumes of data submitted in support of Hospira's docetaxel New Drug Application, nor the Periodic Safety Update reports, Periodic Adverse Experience reports and NDA annual reports submitted to the FDA by Hospira, nor the full record of correspondence between Hospira and the FDA regarding docetaxel—indeed, having reviewed only eight Hospira documents from the documentary record, six of them cherry-picked for him by Plaintiff's counsel.

Even if Plaintiff did not have the burden of showing that Hospira had "newly acquired information," however, the undisputed evidence is that Hospira did not have such information. Dr. Ross testified that "between the time frame that I'm talking about and when they actually updated it, ***there was nothing new***.  There was ***nothing***— … I mean, you know, it was not, like, oh my God, here's a new 2014 paper."[2]  And there was nothing to prompt a re-analysis of what had been previously published in the scientific literature and reported to the FDA.  The number of adverse events reported to Hospira between March 2011 and October 2013 that involved permanent hair loss and pointed to docetaxel as the suspect drug could have been counted on two

---

[2]   Ex. W, Deposition of David Ross, M.D., Ph.D. (Sept. 30, 2021) ("Ross Dep.") at 180:5–182:2 (emphasis added).

hands—and, indeed, was far smaller proportionately than the number of such reports before March 2011.  Thus, from Hospira's vantage point, the sparse information about possible permanent hair loss did not meet the requirements for a CBE submission:  the information (1) did not "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA" and (2) did not reflect a causal relationship.

As a 505(b)(2) applicant, Hospira relied on the FDA's finding that Sanofi's Taxotere was safe and effective.  Hospira did not have access to Sanofi's New Drug Application and its supporting clinical trial data, nor to its internal safety database with 15 years' worth of adverse event reporting information.  The limited information available to Hospira in the short period before Plaintiff Hickey used docetaxel did not provide the company legal warrant to make a CBE labeling change, nor was it sufficient to trigger a re-analysis of the data at hand.  As the FDA recognized, Sanofi had by far the most information and was in the best position to determine, working with the FDA, whether any labeling changes were warranted.  Thus, in 2015, when the FDA was contacted by oncology patient advocates who expressed concern that the Taxotere labeling did not warn that hair loss could be permanent, the FDA sent an information request to Sanofi alone, without informing Hospira and the other 505(b)(2) manufacturers that the FDA had made the request or that amendment of the hair-loss warning was under consideration.  In the FDA's apparent view, Hospira had nothing to contribute.  And, as demonstrated below, the FDA was right.

## THE UNDISPUTED FACTS

Hospira's docetaxel is an unbranded version of Taxotere, the branded docetaxel product developed by Sanofi US Services Inc. and Sanofi-Aventis U.S. LLC., and approved by the FDA for the treatment of advanced or metastatic breast cancer in 1996.  Statement of Undisputed Facts ("SOF") ¶ 4.  After Sanofi's patent for Taxotere expired in 2010, several manufacturers obtained FDA approval to sell docetaxel products under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, which permits follow-on medications to gain FDA approval through an

abbreviated pathway based on the safety and efficacy data of the branded or Reference Listed Drug ("RLD"). Hospira submitted its § 505(b)(2) New Drug Application ("NDA") for docetaxel in July 2007, and pursuant to § 505(b)(2), the FDA approved the NDA in March 2011. *Id.* ¶¶ 6-7. FDA approved the similar NDAs for the docetaxel products of Sandoz and Accord in June 2011. For all three products, the warnings, precautions, and adverse reactions information in the approved labeling was identical to the information in the approved Taxotere labeling.[3]

Like the Taxotere labeling, the Hospira docetaxel labeling described alopecia as one of the most common adverse reactions and also referred to alopecia in the Patient Counseling section and five tables. (Indeed, the FDA-approved Hospira labeling was identical to that of Taxotere in every respect, with the minor difference in the preparation-and-administration section of the labeling, which described a single-step dilution for Hospira docetaxel versus a two-step process for Taxotere.) *Id.* ¶ 10. The term "alopecia" includes all types of hair loss, including more persistent or permanent cases. The FDA Adverse Event Reporting System ("FAERS") can be searched using the term "alopecia," but not "permanent alopecia" or "persistent alopecia."[4]

Hospira's NDA sought approval for docetaxel injection in a less concentrated formulation than Taxotere. Otherwise, Hospira docetaxel for injection was the same active ingredient, with the same route of administration, seeking the same indications as those of the previously approved Taxotere. Hospira did not submit new clinical data as part of its NDA, and

---

[3]   SOF ¶¶ 8-9; Ex. H, Hospira Docetaxel Launch Label (Feb. 2011), HOS00100000119-165; Ex. I, Accord Docetaxel Launch Label (June 2011); Ex. J, Sandoz Docetaxel Launch Label (June 2011); Ex. K, Sanofi Taxotere Label (May 2010).

[4]   SOF ¶ 14; Ex. B, Expert Report of Marianne C. Mann, M.D. (Oct. 8, 2021) ("Mann Rep.") 11; Ex. L, Deposition of Angeliki Kotsianti (Feb. 19, 2020) ("Kotsianti Dep.") at 164:11-165:8; Ex. M, Deposition of Juergen Schmider (June 17, 2019) ("Schmider Dep.") at 233:14-236:10.

the FDA relied entirely on its prior review of the Sanofi NDA for Taxotere to support the safety and efficacy of Hospira docetaxel. *Id.* ¶ 11.[5]

Hospira monitored its docetaxel product in the post-approval period using a three-tiered process of review that involved physicians and, ultimately the head of the global safety department. Signal detection of a safety concern involved looking for an aberration in adverse event reports—i.e., a report different in the type or severity of an event or, across all reports, of the frequency of an event. The sources of information available to Hospira from March 2011 to January 2014 were the scientific literature and post-marketing case reports. *Id.* ¶¶ 15-16.

There had been case reports of permanent alopecia during the 15 years Taxotere was on the market before Hospira's docetaxel was approved. Following the Hospira approval in March 2011, there were additional case reports. The limited scientific literature in this post-approval time frame addressed single cases or small numbers of cases, which involved confounding variables. The prevalence of permanent hair loss reported in this literature (0.059%, ~2%, and 3.9%) was lower than in articles submitted to the FDA before approval of Hospira's 505(b)(2) NDA or was described in the publications as "unknown."[6]

After oncology patient advocates contacted the FDA to express concerns that the docetaxel labeling did not state that hair loss could be permanent, the agency in March 2015 sent Sanofi (as the manufacturer of the RLD) a request for a summary of cases in Sanofi's internal clinical database regarding permanent partial or total alopecia associated with the use of docetaxel. The FDA did not send a similar request to Hospira, nor did it advise the company that permanent hair loss was a concern, nor did it make a public safety announcement about the risk of permanent hair loss.[7] Sanofi found 2,172 reports of alopecia (of all types) associated with

---

[5]    In September 2015, Pfizer acquired Hospira, after which Pfizer marketed docetaxel through Hospira, Inc. as a Pfizer subsidiary. SOF ¶ 12.

[6]    SOF ¶ 18; Ex. X, Nabholtz (2001); Ex. Y, Sedlacek (2006).

[7]    SOF ¶¶ 19-20. These post-use facts are neither relevant nor admissible in the Hickey case, given her initial prescription date in 2013. Hospira includes them here only to show that, regardless (with or without them), Plaintiff's' claims are still preempted.

docetaxel in its database.  Of that number, 70 percent involved the use of docetaxel in combination with other chemotherapy agents known to cause alopecia, and many reports concerned patients who also received hormonal therapies that cause alopecia.  Only 117 reports (5.3%) described "permanent," "irreversible" or "lasting> 2 years" alopecia.  The FDA medical officer who reviewed the Sanofi submission concluded:  "I think the sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data."[8]  In December 2015, Sanofi added the following sentence to the Adverse Reaction section of the labeling:  "Cases of permanent alopecia have been reported." SOF ¶ 23.

The FDA did not advise Hospira of the revision once it was made and did not advise or instruct Hospira to make the same revision.  After Hospira became aware of a July 2016 update regarding docetaxel labeling on the FDA website, it conducted a review to determine whether to also change its labeling.  It, of course, first took note of the fact that Sanofi and FDA had already agreed to a labeling change based on the reports in Sanofi's internal database, information that had not been previously available to Hospira.  But Hospira then proceeded to undertake a review of its pharmacovigilance safety database, searching through September 17, 2016, for all cases reporting "alopecia" with docetaxel.[9]  That review identified 146 cases of alopecia reported to Hospira.  In 43 of the 146 cases (29%), the person reporting the case described alopecia as "permanent" or "irreversible."  In 33 (76%), the reporter listed co-suspect drugs; in 14 (33%), concomitant drugs; and in 20 (46%), prior chemotherapy or radiotherapy.  The reporter identified docetaxel as the single agent or the only suspect drug in just 10 (6.8%) of the 146 cases.  On

---

[8]   SOF ¶¶ 21-22; Ex. S, Letter from Prowell, T. to Diggs, F., et al. (Dec. 4, 2015) (regarding congressional response to Taxotere Adverse Events).

[9]   SOF ¶ 24; Ex. U, Deposition of Karilyn Halloran (Nov. 26, 2019) ("Halloran Dep.") at 94:9-18; Ex. R, Docetaxel 2.5 Clinical Overview: Addition of Permanent Alopecia to the Docetaxel United States Prescribing Information (Mar. 2017) ("Clinical Overview"), HOS002000030958 at -962.

further investigation of those 10 reports, however, Hospira determined that eight cases involved confounding chemo- or hormone therapies.[10]

On March 31, 2017, Hospira/Pfizer submitted a CBE application and, at the same time, implemented changes to the labeling that addressed reports of permanent alopecia in the Post-Marketing Experience and Patient Counseling sections of the labeling and in the Patient Package Insert. The Post-Marketing Experience section noted, "Cases of permanent alopecia have been reported." The Patient Counseling Information noted that the side effects associated with docetaxel may include "hair loss (cases of permanent hair loss have been reported)." The Patient Information Leaflet noted, "hair loss: In some people permanent hair loss has been observed."[11]

## ARGUMENT

## I.   PLAINTIFF'S STATE-LAW, FAILURE-TO-WARN CLAIMS ARE PREEMPTED BY FEDERAL LAW UNLESS PLAINTIFF CAN PROVE THAT HOSPIRA HAD "NEWLY ACQUIRED INFORMATION"

Plaintiff contends that state law (Louisiana law, in the case of Ms. Hickey) required Hospira to warn that "cases of permanent hair loss have been reported" before she was treated with docetaxel. But FDA regulations governing drug labeling prevented Hospira from unilaterally amending the FDA-approved docetaxel labeling to give that warning absent "newly acquired information." Accordingly, the doctrine of conflict preemption bars Plaintiff's failure-to-warn claim and warrants summary judgment in Hospira's favor.

The sequence of Supreme Court decisions from *Wyeth v. Levine*, 555 U.S. 555 (2009) to *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) to *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013) to *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019) define the standard for conflict preemption where state law claims concern the adequacy of drug labeling. State and federal law conflict when it is "impossible for a private party to comply with both state

---

[10]   SOF ¶ 25; Ex. B (Mann Rep.) 20; Ex. R (Clinical Overview) at -963; Ex. L, Kotsianti Dep. at 170:1-172:12.

[11]   SOF ¶¶ 26-27; Ex. V, CBE-0 Submission (Mar. 31, 2017) HOS03200000001-62.

and federal requirements." *Albrecht*, 139 S. Ct. at 1672 (quoting *Bartlett*, 570 U.S. at 480).
When such a conflict exists, state law is "without effect." *Id*. at 1678 (quoting *Bartlett*, 570 U.S.
at 480).

What makes compliance with both state and federal law "impossible"?  The Supreme
Court has answered that compliance is impossible when the private party cannot "independently
do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (citing *Wyeth*, 555
U.S. at 573).  Although drug manufacturers have a legal duty under both state and federal law to
provide an adequate warning, a manufacturer is not at liberty to provide whatever warnings it
deems appropriate or compliant with state law whenever it wants.

In the first instance, before a manufacturer can sell the drug, the FDA determines what
warnings are adequate; indeed, it determines the exact language of each warning.  *Wyeth*, 555
U.S. at 568 ("The FDA's premarket approval of a new drug … includes the approval of the exact
text in the proposed label.").[12]  There are two ways by which a manufacturer can update its label.
First, the "default rule" is that a manufacturer "must secure FDA approval for a proposed change
prior to distributing the product with the changed label."[13]  This close control of the labeling by
the FDA is a "backstop to prevent manufacturers from warning of every possible adverse
reaction in an effort to insulate themselves from any conceivable liability." *Gayle v. Pfizer Inc.*,
452 F. Supp.3d 78, 85 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 79 (2d Cir. 2021).  Such "over-

---

[12]   *See also In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 779 F.3d 34, 37, 41 (1st Cir.
      2015) (describing the FDA as "the exclusive judge of safety and efficacy based on
      information available at the commencement of marketing"); *Gayle v. Pfizer Inc.*, 452 F.
      Supp. 3d 78, 84 (S.D.N.Y. 2020) ("[T]he FDA closely controls the label for all FDA-
      approved drugs ….  During a drug's initial application, the FDA must approve the label."),
      *aff'd*, 847 F. App'x 79 (2d Cir. 2021).

[13]   *In re Celexa*, 779 F.3d at 37 (citing 21 C.F.R. § 314.70(b)(2)(v)(A)); *Gibbons v. Bristol-
      Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019) ("[D]rug manufacturers are limited in
      their ability to unilaterally change the labels on their products."); *see also Merck Sharp &
      Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1673 (2019) ("Drug manufacturers generally seek
      advance permission from the FDA to make substantive changes to their drug labels.").

warning" dilutes the warnings regarding the most serious adverse reactions and can unjustifiably deter patients from using the drug.[14]

The second way to update a label is called the Changes Being Effected ("CBE") regulation, 21 C.F.R. § 314.70(c)(6)(iii)(A), which permits a manufacturer to strengthen a warning if it has "newly acquired information"—a term defined by regulation to establish three conditions.[15] First, the information must be "data, analyses, or other information not previously submitted to the [FDA]." 21 C.F.R. § 314.3(b). Second, the information must "reveal risks of a different type or severity or frequency than previously included in submissions to FDA." *Id.* And, third, the information must reflect "evidence of a causal association" between the drug and the risk. 21 C.F.R. § 314.70(c)(6)(iii)(A).

These conditions ensure that a manufacturer will act unilaterally only if the enhanced warning reflects truly new, scientifically justified information.[16] Because hypotheses and preliminary conclusions do not constitute such information, courts have "caution[ed] against a quick trigger in determining the existence of newly acquired information." *Knight v. Boehringer*

---

[14] *Albrecht*, 139 S. Ct. at 1673 ("The hierarchy of label information is designed to 'prevent overwarning' so that less important information does not 'overshadow' more important information."); *Gayle*, 452 F. Supp. 3d at 85 ("Over-disclosure dilutes warnings …."); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1028 (S.D. Cal. 2021) ("The regulations reflect the FDA's cautious approach to drug labeling, recognizing that … 'inclusion of speculative or hypothetical risks[] could discourage appropriate use of a beneficial drug ….'" (citation omitted)).

[15] *See Silverstein v. Boehringer Ingelheim Pharms., Inc.*, 2020 WL 6110909, at *31 (S.D. Fla. Oct. 7, 2020) (recapping the three conditions); *see also Albrecht*, 139 S. Ct. at 1673.

[16] *Albrecht*, 139 S. Ct. at 1679 ("[M]anufacturers cannot propose a change that is not based on reasonable evidence."); *In re Incretin-Based Therapies*, 524 F. Supp. 3d at 1022 ("The FDA's regulations are intended to ensure that a label's wording is scientifically valid …."); *id.* at 1028-29 (explaining "the FDA's CBE regulations are designed to ensure that only scientifically justified information is provided in the labeling for an approved product" and holding that evidence of an "indeterminate causal link" did not support a CBE submission); *Ridings v. Maurice*, 444 F. Supp. 3d 973, 992 (W.D. Mo. 2020) ("[S]tudies concluding that it 'remains unknown' whether a drug is linked to a particular adverse reaction or risk … do not constitute reasonable or well-grounded scientific evidence of 'clinically significant adverse effects' under the CBE regulation.").

*Ingelheim Pharms., Inc.*, 984 F.3d 329, 340 (4th Cir. 2021).  If the manufacturer did not have the requisite "newly acquired information" to support a unilateral CBE submission, "then the state law claim is preempted," and the preemption analysis stops there.  *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1018 (S.D. Cal. 2021).

If, on the other hand, the manufacturer did have "newly acquired information," then the analysis proceeds to the question whether there is clear evidence that the FDA would have rejected the amended warning.  The answer to that question turns on whether the FDA was "fully informed" about the purported justification for the amended warning and communicated its disapproval by action "carrying the force of law."  *Albrecht*, 139 S. Ct. at 1678-79.[17]

Whether the manufacturer possessed "newly acquired information" that justified a CBE submission and whether there is clear evidence that the FDA would have rejected a labeling change are matters of law for the judge to decide.  *Id.* at 1676 ("We here decide that a judge, not the jury, must decide the pre-emption question.").

As demonstrated below, Plaintiff has failed to come forward with evidence that Hospira had "newly acquired information" about permanent hair loss that supported a CBE submission, and the undisputed evidence is that Hospira did not have such information before Plaintiff used docetaxel.

## II.     PLAINTIFF HAS FAILED TO ESTABLISH THAT HOSPIRA HAD "NEWLY ACQUIRED INFORMATION" ABOUT PERMANENT HAIR LOSS

As a matter of precedent, logic, and fairness, it is incumbent on Plaintiff, in the first instance, to identify the "newly acquired information" that allegedly obligated Hospira to make a CBE submission adding the sentence, "Cases of permanent alopecia have been reported."  When defendants move to dismiss failure-to-warn claims on the ground of preemption, courts regularly

---

[17]   Only the first part of this framework—*i.e.*, whether Hospira had "newly acquired information" (it did not)—is at issue in this Motion.

require the plaintiff to plead the facts that constitute the "newly acquired information."[18]  It follows that once discovery has been completed, it is only fair to place this burden of identifying the "newly acquired information" on the plaintiff, because the defendant cannot guess what facts the plaintiff may contend constitutes such information and cannot prove a negative.  *Silverstein v. Boehringer Ingelheim Pharms.*, 2020 WL 6110909, at *12 (S.D. Fla. Oct. 7, 2020).

Plaintiff Hickey has only partially identified the purported "newly acquired information." Her regulatory expert, Dr. David Ross, has opined that Hospira (i) should have been aware of the scientific literature discussed by Drs. Feigal and Madigan (two other experts), (ii) obviously knew what was said in its own foreign labeling, (iii) possessed vicariously the alleged knowledge of Dr. Juergen Schmider, who left Sanofi in 2013 to work for Hospira, and (iv) should have been aware of adverse event reports in the FAERS database.[19]  But this listing of documents goes only part of the way to identifying "newly acquired information" because Dr. Ross does not identify (i) which documents were new (in the sense of not previously submitted to the FDA), (ii) which

---

[18]   *See Gibbons*, 919 F.3d at 708 ("[T]o state a claim for failure-to-warn that is not preempted by the FDCA, a plaintiff must plead 'a labeling deficiency that [Defendants] could have corrected using a CBE regulation.'"); *In re Celexa*, 779 F.3d at 41 ("[A] necessary step in defeating [defendant's] preemption defense is to establish that the complaint alleges a labeling deficiency that [defendant] could have corrected using the CBE regulation."); *Gayle*, 452 F. Supp. 3d at 87 ("Plaintiffs' complaint does not identify any 'newly acquired information' on which Pfizer could have altered the Lipitor label."); *Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018) (noting plaintiff's failure "to offer evidence that [defendant] acquired new information" that "would have justified a change in the label").

[19]   Dr. Ross is Plaintiff's only expert who even attempts to address this question.  Ex. Z, Deposition of David Madigan (Sept. 17, 2021) ("Madigan Dep.") at 29:1-15 (Dr. Madigan testifying he is "not a regulatory expert" and not offering any opinions about "the adequacy of Hospira's docetaxel labeling"); Ex. AA, Expert Report of Dr. Ellen Feigal (June 8, 2020) ("Feigal Rep.") at 1 (Dr. Feigal is "not offering regulatory opinions about FDA requirements"); Ex. BB, Deposition of Ellen Feigal (Sept. 29, 2021) ("Feigal Dep.") at 69:16-17 ("I am offering no regulatory opinions."); Ex. CC, Deposition of Laura Plunkett (Sept. 24, 2021) ("Plunkett Dep.") at 30:12-17 ("Q: [Y]ou're not offering any opinions on regulatory issues, right?  A:  That is correct.  There's another expert, it's my understanding, that will handle those issues.").

were new (in the sense of demonstrating that permanent hair loss was more frequent than reported in Sanofi's preapproval clinical trials and the medical literature that existed before Hospira's docetaxel was approved), and (iii) which demonstrated the requisite reliable causal association between docetaxel and permanent hair loss.

Neither Dr. Ross's expert report nor his deposition testimony provided this necessary identification of what Plaintiff asserts was the "newly acquired information."  To the contrary, when asked directly, "[w]hat is it in 2012 that was new information that should have been a signal that alerted the company to the need to do the review you're suggesting," Dr. Ross answered, "[R]eally, between the time frame that I'm talking about and when [Hospira] actually updated it, ***there was nothing new***.  There was nothing— … I mean, you know, it was not, like, oh, my God, here's a new 2014 paper."[20]  Merely listing articles and documents does not satisfy Plaintiff's burden to identify the purported "newly acquired information."  For this reason alone, Hospira is entitled to summary judgment.

## III.   HOSPIRA DID NOT POSSESS "NEWLY ACQUIRED INFORMATION"

Even if Plaintiff did not have the burden of identifying the purported "newly acquired information" with any greater specificity than did Dr. Ross, the undisputed evidence demonstrates that his listing of articles and documents does not constitute "newly acquired information" within the meaning of the CBE regulations.  For the most part, the listed scientific literature had been submitted to the FDA before it approved Hospira's docetaxel (March 2011) or was not published until after Plaintiff Hickey began her treatment (October 2013).  What few articles were published between March 2011 and October 2013 did not indicate that permanent hair loss was any more frequent than had been reported in older, pre-approval studies—that is, exceedingly infrequent.  The same was true for the tiny number of adverse event reports received by Hospira between March 2011 and October 2013.  Moreover, Hospira's labeling in Israel, Hungary, and the United Kingdom (where different regulatory requirements governed) does not

---

[20]   Ex. W (Ross Dep.) at 180:5-182:2 (emphasis added).

itself constitute "newly acquired information," and those changes were not based on any new data not previously submitted to the FDA.

### A.     Hospira's Labeling Was Adequate at the Time of Approval in March 2011

The FDA approved Hospira's 505(b)(2) NDA for docetaxel in March 2011 and, in so doing, approved the proposed labeling.  That labeling tracked word for word the warnings, precautions and adverse reactions in the FDA-approved Taxotere labeling.  This labeling was adequate as a matter of law as of the time of approval, and Hospira could not have provided different information.  *See In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 779 F.3d 34, 37, 41 (1st Cir. 2015) ("[T]he FDA [is] the exclusive judge of safety and efficacy based on information available at the commencement of marketing ...."); *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019) ("The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label." (citation omitted)).

At the recent oral argument on the Sandoz and Accord preemption motions, Plaintiff's counsel argued that information available *before* the March 2011 approval can qualify as the "newly acquired information" that required a 505(b)(2) defendant, like Hospira, to update its labeling through the CBE process.  Ex. GG, Feb. 17, 2022 Oral Arg. Tr. 17:12-19:2; 33:19-34:8. Plaintiff's argument is, in essence, that while the labeling may have been adequate when it was approved by the FDA on Day One, on Day Two Hospira should have immediately undertaken a re-analysis of the pre-approval information and proposed a labeling change.

This argument makes a mockery of the 505(b)(2) approval process, under which Hospira's docetaxel was approved.  That process entitled Hospira to rely on the previously submitted Sanofi safety and efficacy information as the basis for Hospira's approval—and, specifically, for the approval of its labeling, which was *required* to match the Sanofi labeling as to warnings, precautions, and adverse reactions.  *See* 21 U.S.C. § 355(b)(2); Ex. W (Ross Dep.) 54:11-55:6; *see also* Ex. B (Mann Rep.) 8, 14.  Accordingly, at the time of approval, Hospira did not have the discretion to second-guess the labeling that the FDA approved and deemed safe and

effective based on all the information that had been submitted by that point, including information submitted by Sanofi.[21]

To the contrary, the CBE regulation specifies that "newly acquired information" must be "data, analyses, or other information *not previously submitted* to [FDA]."  21 C.F.R. § 314.3(b) (emphasis added).  Thus, any labeling change by Hospira must be based on some "newly acquired information" that arose *after* its approval and revealed "risks of a different type or greater severity or frequency" than previously submitted to the agency.  *Id.*  Otherwise, Plaintiff's argument is effectively a backdoor challenge to the adequacy of the initial label, a position that Plaintiff purports to disavow and that is foreclosed as a matter law.

This is not to say that a re-analysis of pre-March 2011 data could never be a basis for a labeling change after approval, where the re-analysis "reveal[s] risks of a different type or greater severity or frequency" than what had been previously reported to the FDA.  *See* 21 C.F.R. § 314.3(b).  But there must be something new that post-dates the FDA's approval of Hospira's docetaxel that triggers such a look-back at the pre-approval information.  *See id.*  Yet when asked to identify the date upon which Hospira had evidence that warranted a labeling change—i.e., the date on which there was a signal alerting Hospira to do a retroactive analysis—Plaintiff's own expert testified, "I don't believe it's possible to say … you know, on this date," but it was "sometime in 2012."[22]  As explained below, there was no information triggering such a re-analysis of what had been previously published in the scientific literature and reported to the FDA.  At bottom, then, Plaintiff's challenge is to the adequacy of the initial, FDA-approved label.  Thus, this argument fails.

### B.     Hospira Did Not Have "Newly Acquired Information" as of October 2013

In his 37-page expert report, Dr. Ross tellingly devotes only three pages to discussion of the specific information that, in his opinion, should have prompted Hospira to amend the

---

21    *See* Ex. W (Ross Dep.) at 71:18-72:5.

22    *Id.* at 177:1-16.

labeling.  In the one paragraph of his report that mentions the CBE regulation and what it requires, he fails to acknowledge that "newly acquired information" must be (i) "data, analyses, or other information not previously submitted to [FDA]" and (ii) must "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA."  21 C.F.R. § 314.3(b).  Not surprisingly, then, his opinion does not address either requirement.

There is a reason for this omission:  during the relevant time period (i.e., before October 2013), Hospira was not in possession of information (i) not previously submitted to the FDA that (ii) revealed a greater frequency of permanent hair loss or (iii) scientifically reliable evidence of causation.  The evidence known and available to the company after March 2011 showed the same information about permanent hair loss that was known before March 2011—a small number of patients reported permanent hair loss, and the same confounding factors were present that rendered causation indeterminate.  Accordingly, Hospira was not authorized to submit a Changes Being Effected revision of the labeling to warn of permanent hair loss.

### 1.    No new evidence of greater frequency

**The scientific literature**.  In his report, Dr. Ross says that "[h]ad Hospira performed an adequate literature search prior and signal detection analytics ***prior to market approval***, it would have seen the same literature and safety signal demonstrated in the reports of Drs. Feigal and Madigan."[23]  In other words, Dr. Ross failed to address the proper question and instead is merely attacking the FDA-approved initial label, despite claiming that he would not be offering any such opinion.[24]

The question is whether there was scientific literature after FDA approval and before October 2013 of which Hospira should have been aware that met the definition of "newly

---

[23]  Ex. E, Expert Report of David Ross, M.D., Ph.D., M.B.I. (June 8, 2020) ("Ross Rep.") ¶ 136.

[24]  Ex. W (Ross Dep.) at 107:9-20 ("Q. … [Y]ou're not offering any opinion that the Hospira label for docetaxel approved by FDA was inadequate at the time of approval in March of 2011. A.  I was not asked to address that question.  Q.  Okay.  And so you … will not be offering that opinion.  Right?  A.  Correct.").

acquired information" about permanent hair loss.  On that question, Dr. Ross's report says only, "There was adequate scientific literature available prior to Ms. Sanford's [sic] initial infusion date."[25]  Dr. Ross cannot really say when Hospira should have submitted a CBE labeling change. Pressed in his deposition to give a date, he said, "I don't believe it's possible to say … you know, on this date."  The most precise he could be was "sometime in 2012."[26]  Taking him at his word, it is absolutely clear that Hospira did not have "newly acquired information" between March 2011 and "sometime in 2012."  But as the discussion below demonstrates, the same is true even if one asks whether Hospira came into possession of "newly acquired information" between March 2011 and October 2013.  Dr. Ross does not identify by author or title any article in the scientific literature published between those dates that reported a higher incidence of permanent hair loss than previously reported in the literature.

Dr. Ross refers generally to the literature listed in the reports of Drs. Madigan and Feigal. But that literature mostly falls outside the period from March 2011 to October 2013, and the few articles that fall within the period disclose data that quite clearly does not qualify as "newly acquired information."  Dr. Madigan's report lists four published reports of irreversible alopecia.[27]  Of the four, three *post-date* the treatment of Plaintiff Hickey by three or more years[28] and one *pre-dates* the FDA's approval by five years.[29]  Dr. Feigal lists the same four published reports and fifteen more.[30]  But of those fifteen, ten either *post-date* Plaintiff's treatment or *pre-*

---

[25]   Ex. E (Ross Rep.) ¶ 136.  Ms. Sanford received treatment with docetaxel in August 2013, two months before Ms. Hickey started treatment.

[26]   Ex. W (Ross Dep.) at 177:1-16.

[27]   Ex. II, *Docetaxel and Irreversible Alopecia*, Expert Report of David Madigan, Ph.D. (Mar. 23, 2020) ("Madigan Rep.") at 22.

[28]   *Id*. (listing studies in 2017, 2018 and 2019 by Crown, Martin, and Kang, respectively).

[29]   *Id*. (listing 2006 abstract by Sedlacek).

[30]   Ex. AA (Feigal Rep.) Table 2.

***date*** FDA approval of Hospira's docetaxel.[31]  The five other published reports signaled nothing new[32]:

1.      Palamaras, *Permanent Chemotherapy-induced alopecia: a review* (March 2011). This letter to the editor reported on a retrospective study of the charts of 8,430 patients with non-scarring alopecia who attended the author's hair clinic over a seven-year period.  There were only seven cases of chemotherapy-induced permanent alopecia, and of that number, only five followed treatment with taxanes (i.e., docetaxel).  The reported incidence rate was ***0.059 percent***. This rate is more than ***100 times less frequent*** than the rate reported by Nabholtz in 2001 (7.4 percent) and Sedlacek in 2006 (6.3 percent), which plaintiff cites as the two earliest reports of permanent hair loss, both long known to the FDA when it approved Hospira's docetaxel.

2.      Miteva, *Permanent Alopecia After Systemic Chemotherapy:  A Clinicopathological Study of 10 Cases* (June 2011).  Of the 10 cases of permanent alopecia that were the subject of this study, only six patients were treated with docetaxel.  The authors did not describe the size of the universe of patients from which the 10 cases were drawn.  They concluded that both "[t]he cause of permanent alopecia due to chemotherapy" and "[t]he real prevalence" of permanent alopecia are unknown.

3.      Kluger, *Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel:  a prospective study of 20 patients* (May 2012).  The authors of this prospective study followed 20 women treated for breast cancer by a sequential FEC and docetaxel regimen and who experienced permanent hair

---

[31]   Post-dating treatment are articles by Thorp (2015), Kim (2017), Fonia (2017), Werbel (2018), and Freites-Martinez (2019).  Pre-dating FDA approval are articles by Nabholtz (2001), Masidonski & Mahon (2009), Prevezas (2009), Bourgeois (2010), and Tallon (2010).

[32]   Ex. P, Palamaras (2011); Ex. DD, Miteva (2011); Ex. O, Kluger et al. (2012); Ex. EE, Tosti (2013); Ex. Q, Bertrand (2013).  The following discussion focuses on the fact that the publications, the majority of which are letters to the editor or poster presentations, do not constitute "newly acquired information."  The reports suffer from other limitations (e.g., none involve a "control" group that would permit the calculation of risk) that are not directly relevant to the subject of this Motion.

loss.  There were significant confounding factors:  all had received FEC followed by docetaxel; all had been given hormonal and radiation therapy; and many had received other chemotherapy as well.[33]  These 20 were drawn from "[a]pproximately 1000 patients affected by early breast cancer [who] were treated with this type of … chemotherapy in our institution during the accrual period."  The authors spoke of "the relatively low incidence of this side-effect" and concluded that "the incidence of this side-effect in this patient population is ~*2%*"—i.e., ***less than one-third*** the rate reported by Nabholtz (2001) and Sedlacek (2006).

4.      Tosti, *Docetaxel and permanent alopecia* (May 2013).  This brief note to the editor of the Journal of the American Academy of Dermatology advised that the author had observed five patients with permanent loss following high-dose docetaxel chemotherapy during the preceding four years.  She stated, "The real prevalence of this devastating long-term side effect of docetaxel is unknown.…"

5.      Bertrand, *Permanent chemotherapy induced alopecia in early breast cancer patients after (neo)adjuvant chemotherapy:  Long term follow up* (Dec. 2013).[34]  This poster abstract reported on 79 patients treated with FEC and docetaxel, three of whom (***3.9 percent***) developed severe alopecia.

Thus, the "scientific literature" about permanent hair loss between March 2011 and December 2013 consists of two letters to journal editors, a poster abstract from a conference, and only two articles that reported on studies of any size.  The prevalence of permanent hair loss reported in the two studies was significantly lower (0.059 percent and ~2 percent) than the prevalence rates reported in pre-approval studies.  So was the prevalence in the Bertrand abstract (3.9 percent).  And the two other publications stated that the prevalence was "unknown."  No wonder, then, that Dr. Ross did not mention these five articles by name and explain how they

---

[33]  SOF ¶ 17; Ex. O, Kluger et al. (2012).

[34]  The Bertrand article was published in December 2013—two months after Ms. Hickey began receiving docetaxel in October 2013 but two months before she completed her treatment in February 2014.

"reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA."  21 C.F.R. § 314.3(b).  Plainly, they do not.  They gave reason to believe that permanent alopecia was less, not more, frequent.

**Hospira's European labeling**.  Dr. Ross does not state, but implies, that Hospira had "newly acquired information" because it "changed at least five of its European labels to include additional information regarding the TAX316 data and permanent alopecia."[35]  But Dr. Ross does not explain—and cannot—how the TAX316 data in the foreign labeling could be considered information that revealed "risks of a different type or greater severity or frequency than previously included in submissions to FDA."  21 C.F.R. § 314.3(b).

First, Hospira did not have access to the underlying clinical trial data from TAX316, a Sanofi trial.  Second, the information was not new, in the sense of not previously submitted to the FDA.  As Dr. Ross admitted, this Sanofi clinical trial data had been available to the FDA "for years" before Hospira's approval in 2011.[36]  Sanofi not only submitted the TAX316 data, but also in March, June and August 2004 proposed a labeling change to identify permanent alopecia as a "persistent reaction" based on the TAX 316 data—a change that the FDA each time rejected.[37]  Based on the same information, the European Medicines Agency recommended that Sanofi add alopecia as a "persistent reaction" in 2011.[38]

Third, Plaintiff's expert, Dr. Feigal, states that "[a]t the end of the 10-year follow up period for TAX316, [permanent hair loss] was seen in *3.9%* of patients on the Taxotere-containing regimen …."[39]  Thus, the information was not "newly acquired information" for

---

[35]  Ex. E, Ross Rep. ¶ 138.

[36]  Ex. FF, Deposition of David Ross, M.D., *Hughes v. Accord Healthcare, Inc.*, No. 2:17-cv-11769 & *Stewart v. Sandoz, Inc.*, No. 2:17-cv-10817 (Aug. 31, 2020) at 346:14-347:25.

[37]  *See* SOF ¶ 13; Ex. B (Mann Rep.) 24.

[38]  Ex. B (Mann Rep.) 24-25.

[39]  Ex. AA (Feigal Rep.) ¶ 44, n.85.  Even 3.9 percent is an over-estimation of the prevalence of permanent hair loss.  Hospira disputes that Dr. Feigal has properly characterized many of these reports as permanent hair loss.

purposes of the CBE regulations because it did not signal that permanent hair loss was more frequent than reported in pre-approval articles submitted to the FDA, but less frequent.

In short, Hospira's foreign labeling for docetaxel does not reflect that the company had any new information about permanent hair loss, but rather that other countries have "different and distinct regulatory standards and decisions." *Ridings*, 444 F. Supp.3d at 994 ("[T]he actual warnings approved for a foreign label are not in and of themselves newly acquired evidence when they are based on consideration of substantially similar information."); Ex. W (Ross Dep.) at 168 (agreeing that the different regulatory requirements of different countries mean that the same information may be acted on differently). That certain countries (Israel, Hungary, the United Kingdom) required Hospira to match the Sanofi foreign labeling does not reflect that Hospira had new information, but only that foreign regulators applied different labeling rules to that information.

**Dr. Schmider's alleged knowledge**. Dr. Juergen Schmider was Vice President of Safety Surveillance and Product Safety for Sanofi from March 2011 through April 2013, then becoming Global Vice President of Pharmacovigilance and Product Safety for Hospira. Dr. Ross opines that Hospira therefore had "unique" knowledge, because it knew what Dr. Schmider knew from his time at Sanofi. And while there, "Sanofi submitted to the European Medicines Agency an application to revise the labeling to identify alopecia as a "persistent" reaction.[40] As if identifying a smoking gun, Dr. Ross claims that Dr. Schmider had several Sanofi documents in his files, including the Sanofi Core Data Sheet for Taxotere, "which included information regarding [permanent hair loss] from TAX316."[41]

As an initial matter, Dr. Schmider's testimony makes clear that he did not have "unique" knowledge that he brought with him to Hospira.[42] As explained above, moreover, the

---

[40]   Ex. E (Ross Rep.) ¶¶ 131-32.

[41]   *Id*. ¶ 133.

[42]   Dr. Schmider testified that he was not involved in creation of the Sanofi Core Data sheet or Sanofi's European labeling changes for docetaxel, and that he had no recollection of being

information that prompted the European Medicines Agency to recommend that Sanofi, Hospira, and others refer to permanent hair loss as a persistent reaction was not new, in the sense of "reveal[ing] risks of a different type or severity or frequency than previously included in submissions to FDA." The Sanofi Core Data sheet, which included data from the TAX316 study, was (i) information previously submitted to the FDA by Sanofi and (ii) revealed an incidence rate of only 3.9 percent (according to Dr. Feigal), a lower rate than previously reported in the scientific literature.

**Adverse event reports**. Dr. Ross opines that adverse event data from the FAERS database showed a signal "from as early as 2000."[43] This opinion, however, is based entirely on Dr. Madigan's analysis, and Dr. Madigan has admitted there was no safety signal in 2012 that was not already present since the early 2000s.[44] Thus, the FAERS data was not "newly acquired information."

Dr. Ross does not claim that the adverse events reported to Hospira constituted "newly acquired information." He simply notes that when Pfizer/Hospira initiated a review of its safety database after Sanofi's December 2015 labeling change, it identified 146 cases of alopecia, of which 43 were described as "permanent" or "irreversible."[45] But Dr. Ross stops there and disregards what the Pfizer/Hospira clinical review of the adverse events reports—the document cited by Dr. Ross—went on to say. The adverse event reports themselves (i.e., the information reported by the patient or patient's doctor or even a lawyer) identified docetaxel as the single agent or the only suspect drug in just 10 of the 43 cases. Thus, according to the reporters, the vast majority of the 43 cases (33 or 76%) were confounded by co-suspect drugs (i.e., chemo- or

---

aware of permanent hair loss as an issue while at Sanofi. Ex. M (Schmider Dep.) at 143:5-12; 163:2-11; 118:24-120:2; 124:19-125:19; 127:6-13; 131:20-132:8; 137:23-138:5.

43   Ex. E (Ross Rep.) ¶ 95.

44   Ex. Z (Madigan Dep.) at 76:11-12, 76:16-79:18.

45   Ex. E (Ross Rep.) ¶ 139.

hormone therapies believed to cause permanent hair loss).  Pfizer/Hospira delved deeper, however, examining medical records, and determined that docetaxel was the sole suspect drug in only *two* of the 43 reported cases of permanent alopecia.[46]

So small a number (whether 10 or two) did not constitute new information that permanent hair loss occurred with unexpected greater frequency.  According to Plaintiff's expert, Dr. Feigal, there had been far more case reports of permanent hair loss reported in the scientific literature before Hospira's approval.[47]  She identifies 133 reported cases, or approximately 9 per year.  Even as many as 10 cases reported to Hospira between March 2011 and September 2016 represents two cases per year, or one-third the number of reports per year for the period before March 2011 (according to Dr. Feigal).

As a percentage of all women treated with Hospira's docetaxel, these reports are even less significant.  The "denominator" for these few adverse event reports was approximately 161,000 patients through mid-2014.  The total number of reports of permanent hair loss was therefore, 0.03 percent, at most.[48]  That percentage is far lower than the incidence rate reported by Sedlacek in 2006, not a risk occurring with greater frequency.

Moreover, "[u]nder a plain reading of the regulations, adverse event reports, without any analysis indicating causality, cannot constitute 'newly acquired information.'"  *Gayle*, 452 F. Supp.3d at 88; *see also Sabol v. Bayer Healthcare Pharm. Inc.*, 439 F. Supp. 3d 131, 149 (S.D.N.Y. 2020) (finding that "observational studies such as case studies" were not sufficient evidence for a labeling change under the CBE regulation because the "authors here draw only a tentative, at best, suggestion of a causal relationship").  And Dr. Ross provided no such analysis.

---

[46]   *See* SOF ¶ 25.

[47]   *See* Ex. AA (Feigal Rep.) Table 2.

[48]   That percentage includes all 43 reports, even though there were confounding drugs used in 76 percent of those reports.  The percentage would be far lower if the percentage were calculated based on the of reports (2) of the use of docetaxel alone.

Thus, these small number of case reports were not "newly acquired information" that were the basis for a labeling change. Rather, the key fact that triggered the change was that the FDA and Sanofi had already made a labeling change based on Sanofi's data that was not available to Hospira.[49]

### C. Plaintiff's Own Expert Has Not Opined that Hospira Had Newly Acquired Information

Not only does the evidence show that Hospira did not have newly acquired evidence as of October 2013, but Plaintiff's own expert has not opined that Hospira had newly acquired information. In *Plaisance*, when the Court heard oral argument on Hospira's motion to exclude the testimony of Dr. Ross, Plaintiff's counsel stated that "Dr. Ross does not offer the opinion that a CBE was required," but that "if the CBE process was the only method for changing a label, *I think I would be in trouble, [and] Dr. Ross would be in trouble because that's not what he says*." *See* Ex. HH, Jan. 20, 2022 Oral Arg. Tr. 43:5-6, 47:17-20. In other words, Plaintiff's counsel (i) acknowledged that Dr. Ross could not testify that "newly acquired information" existed by October 2013, and (ii) then argued for the first time that Hospira should have sought a labeling change through a regulatory pathway other than the CBE process. *Id.* at 43:1-3 ("A [CBE] is only one of the methods for making a label change …."); *see also id.* at 47:17-20.

But this attempt to sidestep the CBE process further demonstrates that preemption is warranted here. As referenced earlier, a registrant can seek permission from the FDA to make a labeling change by submitting a "prior approval supplement." *In re Celexa*, 779 F.3d at 37 (citing 21 C.F.R. § 314.70(b)(2)(v)(A)). Taking this route, however, leads directly to preemption. As the term itself indicates ("prior approval"), a registrant cannot *independently* update its label, but must first seek and receive prior FDA approval. 21 C.F.R. § 314.70(b)(2)(v)(A). The Supreme Court has held that compliance with state law is impossible when the private party cannot "*independently* do under federal law what state law requires of it."

---

[49]   Ex. B (Mann Rep.) at 20-21.

*Mensing*, 564 U.S. at 620 (citing *Wyeth*, 555 U.S. at 573); *id.* at 624 (explaining *Wyeth* exception only applies in situations in which a drug manufacturer can, "*of its own volition*, … strengthen its label in compliance with its state tort duty").  In other words, "[t]he line *Wyeth* and [*Mensing*] thus draw [is] between changes that can be independently made using the CBE regulation and changes that require prior FDA approval."  *In re Celexa*, 779 F.3d at 41.  Plaintiff is thus "stymied" by her reliance on the prior approval supplement:  "[Hospira] could not independently change its label to read as plaintiff[ ] says it should have read in order to comply with [Louisiana] law" and "is therefore preempted by federal law."  *In re Celexa*, 779 F.3d at 43 (citing *Mensing*, 564 U.S. at 624).  This last-ditch attempt to avoid the CBE process only confirms that Plaintiff's claims are preempted.

## CONCLUSION

As an 505(b)(2) applicant, Hospira was obligated to follow the already FDA-approved labeling for the Reference Listed Drug upon approval of its own docetaxel.  Thereafter, Hospira could change the labeling independent of FDA pre-approval only if it had "newly acquired information."  The FDA determined in late 2015 that Sanofi had such information, but that information was nearly 20 years' worth of case reports in Sanofi's safety database and the Sanofi clinical trial data, to which only it had access.  That information was the "tipping point," and Hospira did not have it.  As Dr. Ross rightly stated, "between the time frame that I'm talking about and when [Hospira] actually updated it, ***there was nothing new***.  There was ***nothing***— …."[50]  Accordingly, it was impossible under federal law for Hospira to have made the labeling change purportedly required by state law.

---

[50] Ex. W (Ross Dep.) at 191:17-21.

Dated: March 2, 2022

Respectfully submitted,

*/s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Telephone: 202-434-5000
hhubbard@wc.com

John F. Olinde (Bar No. 1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Telephone: 504-858-7000
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc.,*
*Hospira Worldwide, LLC, formerly doing*
*business as Hospira Worldwide, Inc., and*
*Pfizer Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of March 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Heidi K. Hubbard*