# EXHIBIT M

Confidential - Subject to Protective Order

```
 1               IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3    IN RE:  TAXOTERE              )

 4    (DOCETAXEL) PRODUCTS          )  MDL No. 2740

 5    LIABILITY LITIGATION          )  SECTION: "H"

 6                                  )  JUDGE MILAZZO

 7    This Document Relates To:     )  MAG. JUDGE NORTH

 8    ALL CASES                     )

 9

10                      CONFIDENTIAL

11              SUBJECT TO THE PROTECTIVE ORDER

12

13         The videotaped 30(b)(6) deposition of HOSPIRA,

14    INC. through JUERGEN SCHMIDER and the videotaped

15    deposition of JUERGEN SCHMIDER, called by the

16    Plaintiffs for examination, taken pursuant to the

17    Federal Rules of Civil Procedure of the United States

18    District Courts pertaining to the taking of

19    depositions, taken before JULIANA F. ZAJICEK, C.S.R.

20    No. 84-2604, a Notary Public within and for the County

21    of Kane, State of Illinois, and a Certified Shorthand

22    Reporter of said state, at the offices of Dechert,

23    LLP, 35 West Wacker Drive, Suite 3400, Chicago,

24    Illinois, on the 17th day of June, at 9:00 a.m.
```

Confidential - Subject to Protective Order

1      Q.     Sure.

2      A.     And on the Pfizer side I'm responsible for

3   everything related to pharmacovigilance operations.

4   So that includes all of the Pfizer drug portfolio

5   including docetaxel.

6      Q.     Sure.  Okay.

7      A.     But not directly with docetaxel.

8      Q.     Okay.  Okay.  And this, the last name

9   Rabbani, I'm not sure, is that a man or a woman?

10     A.     Man.

11     Q.     And what's his first name?

12     A.     Golam.

13     Q.     Golam.

14            And you spoke with him as well in

15   preparation for your deposition today?

16     A.     Yes, I did, yes.

17     Q.     And what topics did you cover with him?

18     A.     Primarily on the responsibility from the

19   medical review perspective, meaning the individuals

20   who review individual case safety reports for

21   information or content, follow-up questions that need

22   to be obtained, and who within the group had

23   responsibility for docetaxel, I clarified with him.

24     Q.     Okay.  And he is a Pfizer employee,

Confidential - Subject to Protective Order

1    correct?

2         A.    That is correct.

3         Q.    Was he also a Hospira employee?

4         A.    No.

5         Q.    And who was responsible for that role at

6    Hospira?

7         A.    For medical review?

8         Q.    Yes.

9         A.    There were multiple individuals.  The

10   medical directors, which are listed also on the Tab 3,

11   you see them also labeled as safety positions, so

12   primarily Claudia Rodriguez, Rets Jacot, Niko

13   Gonzalez, Rita Tarzynski, Pinal Modi, Tom Bugliosi,

14   Daniel Sigg, that's a complete listing of individuals.

15   Not all of them were present at the same time because

16   there were some transitions between them.

17        Q.    Sure.

18              And the responsibilities for these people

19   included supervising people that did the individual

20   case reports or were they actually the people that

21   took in their -- in -- in took -- did the intake for

22   the individual case reports?

23        A.    No.  The intake was done by -- by

24   healthcare professionals, but from a lower level, like

Confidential - Subject to Protective Order

1    nurses or pharmacists.  The medical doctors had the

2    ultimate responsibility -- the responsibility for the

3    medical adjudication of those reports or for the

4    adjudication of the signal detection.

5         Q.    And when you say "medical adjudication,"

6    what do you mean by that?

7         A.    It's forming a medical opinion, making an

8    assessment of what -- what does it mean medically,

9    what is the -- the impact on the product of the

10   product pro -- profile.

11        Q.    So would they review causality -- or make

12   causality assessments based on each individual report

13   or was it on a grander level than that?

14        MR. MOORE:  Object to the form.

15   BY THE WITNESS:

16        A.    They review on individual reports and they

17   review the output of the aggregate analyses as well.

18   BY MS. LIAKOS:

19        Q.    Okay.  So these individuals would do a

20   causal assessment on each individual report?

21        MR. MOORE:  Object to the form, asked and

22   answered.

23   BY THE WITNESS:

24        A.    These individuals reviewed those reports

Confidential - Subject to Protective Order

```
 1   and a causality assessment for postmarketing reports

 2   in that sense is not required, but if -- there is a

 3   company assessment which would -- they would provide

 4   an opinion regarding the probability of causality.

 5   BY MS. LIAKOS:

 6       Q.    Okay.  I'm just trying to understand what

 7   level that assessment is done at, if it was done at

 8   the intake level or by someone superior to the intake

 9   level.

10           And it sounds like you are saying it was

11   someone who supervised the people at the intake level

12   that made that assessment?

13       A.    Yes.

14   MR. MOORE:  Object to the form.

15           Go ahead.

16   BY THE WITNESS:

17       A.    It is -- they didn't supervise them

18   directly.

19   BY MS. LIAKOS:

20       Q.    Okay.

21       A.    But they were of a higher medical

22   qualification and they, in the workflow of these cases

23   when they were reviewed, it was first an intake and

24   then it went on and the next workflow step and they
```

Confidential - Subject to Protective Order

1    were in that workflow and they had -- in the end if

2    there was any questions or resolutions to be made, it

3    came down to them, they had the highest or the

4    ultimate responsibility.

5        Q.    I understand.  Thank you.

6              And it looks like -- or maybe I should

7    just ask you.

8              For example, for the first one, Claudia

9    Rodriguez, there is a timeframe there it looks like in

10   the brackets after the name, is that right?

11       A.    That's correct.

12       Q.    Is this the timeframe that that person was

13   working either for Hospira or Pfizer?

14       A.    Hospira.

15       Q.    Okay.  So none of these individuals are

16   with the company any further -- any longer, is that

17   right?

18       A.    No.  That's, in -- indeed, Rets and Niko

19   are both still with the company.

20       Q.    Oh, I see.

21             Niko Gonzalez is still with the company?

22       A.    Yeah.  I believe the name -- the times

23   captured here reflect their responsibility for

24   Hospira, but they are still --

Confidential - Subject to Protective Order

```
1        Q.    I see.

2        A.    -- on the Pfizer payroll.

3        Q.    Okay.  So when you were preparing for your

4    deposition today, did you speak to anybody who did

5    individual medical review for Hospira?

6        A.    No.

7        Q.    Okay.  And why not?

8        A.    There was -- it was not identified during

9    the preparation as a need.

10       Q.    Okay.  Do you feel like you have an

11   understanding of how that process worked at Hospira?

12       A.    I believe so.

13       Q.    Okay.  And is -- what -- what is that

14   understanding based on?

15       A.    On my role as the head of safety and

16   overseeing all the safety systems.

17       Q.    Okay.  And in -- in that role in

18   overseeing all of the safety systems, did you ever

19   have day-to-day interaction with the people who were

20   doing intake of adverse events?

21       A.    I did.

22       Q.    You did.  Okay.

23       A.    So any questions that came up were

24   resolved use -- as usually on the first line, if that
```

Confidential - Subject to Protective Order

1    couldn't be, it was escalated during -- in -- within

2    the workflow to physicians.  If there were further

3    questions, it was up -- it was escalated to me.

4         Q.    And where was the intake done, in what

5    location?

6         A.    In Manila, Philippines.  That is where the

7    processing into the database occurred.  If we are

8    taking the term "intake" literally, it would occur, of

9    course, in the various countries where product is

10   being sold and where information is being reported.

11        Q.    Okay.  That's good.  So let's talk about

12   that for a minute.

13              So, for example, whatever country the

14   adverse event happened, they would call into their own

15   country's office, is that right?

16        A.    It depends on the language.

17        Q.    Sure.

18        A.    And the practicality.  So if there is

19   primarily English-dominated language, the -- it would

20   be a central intake.  If it's a language that required

21   translation, it could be in -- within a specific

22   country, a specific country office, or a liaison

23   office that would then perform a translation and

24   provide the English translation.

Confidential - Subject to Protective Order

1    evaluation.  It is going to be -- always be considered

2    causal -- causally associated by the reporter.

3              That doesn't mean that the event is

4    associated at all.  In the contrary, the vast majority

5    of them have really by any medical standards no

6    relation to the product or -- or cannot be discerned,

7    because in postmarketing world the information we

8    receive on these reports is often ser -- very spare --

9    sparse and we try to obtain more information, but as I

10   indicated before, the response rate to these follow-up

11   questions is also very low.

12        Q.   Okay.

13             Are you aware of or do you remember any

14   instance where someone internally raised a concern

15   about any pharmacovigilance activities at Hospira?

16        A.   Not that I recall.

17        Q.   Okay.  Was the structure of Hospira's

18   pharmacovigilance department similar to others that

19   you had seen in your experience?

20        A.   Yes.

21        Q.   Is there anything that was unique about

22   it?

23        A.   Not for the -- for the drug part, not

24   really.  I mean, the combination with devices, there

Confidential - Subject to Protective Order

1   are not that many companies with such a large device

2   portfolio on this side as well, but the setup of the

3   pharmacovigilance department was fairly industry

4   typical.

5        Q.    Okay.

6              What is signal detection?

7        A.    So signal detection is the activities

8   related to identifying new information about our other

9   products, any information that in its aberration

10  indicates that would be more frequent in the

11  observation than would be what we expected or unusual

12  in its observation than what we would expect with the

13  product and with its known profile.

14       Q.    Okay.  So when -- when you're looking for

15  signals, is it fair to say that you're looking for a

16  side effect of the drug?

17       A.    Most of the time it refers to the

18  identification of drug event combination.  So, yes, so

19  you can say in a more lay term it would be a side

20  effect, yes, but we are looking at drug event

21  combinations, so a drug and -- and an event that may

22  potentially have an association.

23       Q.    Okay.  Right.

24             And so if -- if I am trying to explain it

1    to somebody who doesn't understand how pharmacology

2    works, or you'd -- you are looking for a side effect

3    of the medication that may not be already in the

4    label, correct?

5         A.   We are looking at all, even if it's in the

6    label, but the ones that are on the label do not

7    require any further action.

8         Q.   Right, right.

9              So is it fair to say, then, that you're

10   trying to get a better understanding of the drug and

11   the impact that it may have on a certain person when

12   they take it or are exposed to it?

13        A.   That was a very general statement, but I

14   think more specifically, the company strives to have

15   as complete a profile of the product safety as -- as

16   it can offer to their constituents, meaning the

17   physicians and ultimately to the patients.

18        Q.   Right.

19             And -- and some of the -- some of the

20   things that companies learn about their products

21   happen during the clinical trial stage, right?

22        A.   That's where the first information, the

23   first human exposure happens and where the first

24   information is being accumulated.

Confidential - Subject to Protective Order

1      Q.     Okay.  But not every side effect that can

2  occur or adverse event effect that can occur from a

3  drug happens during the clinical trials, right, some

4  of it you don't see until postmarketing, correct?

5      A.     That is correct.

6      Q.     And if it's an effect that you don't see

7  until postmarketing, how -- how do you find or how do

8  you figure out that effect?

9      A.     There are various ways to figure that out.

10  So signal detection we already mentioned.

11      Q.     Yes.

12      A.     It is looking at an aberration of such

13  event reports that would be beyond what we expect what

14  we call in the population background.

15      Q.     Yes.

16      A.     Because most events do occur without drug

17  exposure, so, and some may be triggered by drug

18  exposure.  Then part of the -- of the activity is to

19  differentiate if we have that many individuals exposed

20  to a product and we get that many reports would that

21  be expected in a population even if they would not

22  have been exposed to the drug or is it something that

23  is more associated with the drug.  So it's a --

24  depending on what event we are looking at, I can give

1    you an example, headache, you know.

2         Q.    Sure.

3         A.    It is a very frequent event, whether you

4    take a drug or not, many people experience headache

5    multiple times in their lifetimes, right.  So it may

6    coincide with taking a drug or it may be triggered by

7    a drug, but being able to differentiate that, saying

8    that headache occurs, it takes a significant body of

9    data to eventually make that determination.

10        Q.    Okay.  And that significant body of data

11   that you are referring to comes in in adverse event

12   reports, right?

13        A.    That's correct.

14        Q.    Okay.

15              What group was responsible for signal

16   detection at Hospira?

17        A.    It was Robynn Michelson's group.

18        Q.    Okay.  And what was the name of that

19   group, if you remember?

20        A.    I really don't remember the exact names.

21        Q.    Okay.

22        A.    Apologies.

23        Q.    Fair enough.

24              In your binder it refers to Robynn

Confidential - Subject to Protective Order

1   that's being discussed in this critical finding

2   relates to the alignment of the SmPC with the core

3   safety information?

4        A.    That is correct.

5        Q.    And the CSI, is that the core safety

6   information?

7        A.    Yes.

8        Q.    And what is the SmPC?

9        A.    That is the des -- the designation for the

10  European label and for the EMA label and for the

11  respective reference member states in the Europe -- in

12  Europe.

13       Q.    Is the SmPC used in the United States?

14       A.    No.  It has nothing to do with the

15  United States.

16       Q.    So does this refor- -- report refer in any

17  way to any problem with labeling in the United States?

18       A.    It does not.

19       Q.    This report refers specifically to seven

20  instances of issues, is that correct?

21       A.    Yes, seven identified situations where the

22  implementation of the CSI update into a local label

23  exceeded their expectations.

24       Q.    And how many of those instances related to

Confidential - Subject to Protective Order

```
1   docetaxel?

2        A.    There is one instance.

3        Q.    And does this instance related to

4   docetaxel have anything to do with hair loss?

5        A.    It has nothing to do with hair loss.  It

6   relates to leukopenia.

7        Q.    So this is a report -- excuse me.

8              Does this report identify any problem with

9   the United States labeling for docetaxel relating to

10  permanent hair loss?

11       A.    No.

12       MS. LIAKOS:  Objection.

13  BY MR. MOORE:

14       Q.    You were asked some questions about the

15  safety database.

16             Do you remember that?

17       A.    Yes.

18       Q.    And you were asked about how those case

19  reports get entered into the database.

20             Do you remember that?

21       A.    Yes.

22       Q.    And could you just explain what -- how do

23  the individual case reports get categorized in the

24  safety database?
```

Confidential - Subject to Protective Order

1    A.    The key to the categorization is the

2    coding based on an internationally-required drug

3    dictionary or adverse event dictionary, I should say.

4    Q.    What's the name of that dictionary?

5    A.    It's called MedDRA, Medical Dictionary For

6    Regulatory Activities.

7    Q.    And so did -- did Hospira come up with its

8    codes for how to categorize adverse events in the

9    database?

10   A.    No.  It's the MSSO.  It is an organization

11   that is specifically designed to -- for international

12   purposes to update MedDRA, the dictionary, on a

13   regular basis to keep up with the evolving medical

14   knowledge and medical terminology.  And that is

15   accepted by all -- as far as I know, all regulatory

16   authorities around the world and they all require that

17   we do classify our adverse events based on this

18   dictionary.

19   Q.    And is there a code in MedDRA for

20   permanent alopecia?

21   A.    There is not.  Well, anything alopecia is

22   related to the term, to the primary term, which is the

23   key classification term "alopecia."

24   Q.    So if a company received a report of

Confidential - Subject to Protective Order

1    permanent alopecia, how would that get coded?

2         A.    As alopecia.

3         Q.    And during the time that you were at

4    Hospira, was there any time that the company ever

5    detected a signal for permanent alopecia related with

6    docetaxel?

7         A.    No.

8         Q.    And would it be possible to detect a

9    signal for permanent alopecia based on your signal

10   detection procedures?

11        A.    No, it would not be possible.

12        Q.    Why not?

13        A.    Because any of the events, even if they

14   are designated in the -- verbatim or in the narrative

15   as permanent alopecia have to be coded to alopecia

16   based on MedDRA rules.  And the retrieval for signal

17   detection purposes is based on the primary term, the

18   preferred term, I'm sorry, PT, the preferred term of

19   MedDRA.  That is the industry standard and the

20   expection -- expectations by regulators and that's

21   what we do.

22        Q.    And as a -- as a physician, what does the

23   term "alopecia" mean to you?

24        A.    Alopecia means hair loss and it can be

Confidential - Subject to Protective Order

1    either permanent or reversible.  And particularly

2    oncologists are very familiar with this adverse event,

3    hair loss, because many chemotherapeutic agents do

4    that and a -- alopecia in -- for some patients is

5    reversible, for others it is not, and in my

6    experience, which is certainly limited, but I do

7    have a -- an -- a degree in -- in oncology as well,

8    that is what any physician, regardless of what the

9    label states, what you prefer -- prepare your patient

10   for.

11        MR. MOORE:  No further questions.

12        MS. LIAKOS:  Okay.  I have a few.

13                   FURTHER EXAMINATION

14   BY MS. LIAKOS:

15        Q.   Whose responsibility is it to make sure

16   the label for a drug is accurate and complete?

17             Is it the pharmaceutical company's

18   responsibility or the FDA's responsibility?

19        MR. MOORE:  Object to the form.

20             You can answer.

21   BY THE WITNESS:

22        A.   It's -- it's a combined responsibility,

23   really, because the pharmaceutical company has an

24   interest and the obligation to update the label as it

1   becomes appropriate, and it's the authority's

2   prerogative to approve and to agree with any of these

3   changes.  So it is a -- really a combined

4   responsibility.

5   BY MS. LIAKOS:

6       Q.    Okay.  It's the FDA's prerogative to

7   approve and agree with changes is what you said?

8       A.    Yes.

9       Q.    Okay.  Whose obligation is -- is it to

10  update the label with information?

11      MR. MOORE:  Object to the form.

12  BY THE WITNESS:

13      A.    Once the label change is approved, then

14  the authority -- the -- the marketing authorization or

15  the company is then obliged to update the label.

16  BY MS. LIAKOS:

17      Q.    What is a CBE?

18      A.    That is a changes being effective.

19      Q.    What does that mean?

20      A.    I'm not a regulatory specialist, so I have

21  some knowledge about it, but I am far from claiming

22  having the ultimate knowledge on this, but this is

23  a -- a provision where important label changes can be

24  done on an expedited manner without prior agency

Confidential - Subject to Protective Order

1      MS. LIAKOS:  We are on 15.

2      MR. MOORE:  That's 15.

3      MS. LIAKOS:  Here, I'll just -- here.

4      MR. MOORE:  15.  And then also the -- yeah, I

5  just wanted to make sure that the cross-notice was

6  marked and I believe the cross-notice that we marked

7  earlier applied to both depositions.

8      MS. LIAKOS:  I thought so, yeah.

9      MR. MOORE:  Since we are doing the deposition

10  exhibits sequentially, we are -- we are good on that.

11      MS. LIAKOS:  Okay.  Thank you.  I think we are

12  off.

13      THE VIDEOGRAPHER:  We are off the record at

14  4:40 p.m.  This concludes the videotaped deposition of

15  Juergen Schmider.

16              (Time Noted:  4:40 p.m.)

17              FURTHER DEPONENT SAITH NAUGHT.

18

19

20

21

22

23

24

Confidential - Subject to Protective Order

```
 1                 REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5              That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9              That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14              That the said deposition was taken before

15    me at the time and place specified;

16              That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21              IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 23rd day of July, 2019.

23

24              JULIANA F. ZAJICEK, Certified Reporter
```