# EXHIBIT W

Page 1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                         MDL NO. 16-2740
3
4
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
5                                             *
        IN RE:   TAXOTERE (DOCETAXEL)  *
6                                             *
        PRODUCTS LIABILITY LITIGATION *
7                                             *
        This pertains to:              *
8       Clare Guilbault,               *
            Case No. 2:16-cv-17061     *
9       Audrey Plaisance,              *
            Case No. 2:18-cv-08068     *
10                                            *
                                              *
11      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
12
13         REMOTE VIDEOTAPE VIDEOCONFERENCE DEPOSITION OF
                     DAVID ROSS, M.D., Ph.D.
14
15
16                    TRANSCRIPT of the stenographic notes of
17      the proceedings in the above-entitled matter, as
18      taken by and before LINDA M. JORRITSMA, a Certified
19      Registered Professional Reporter and Certified Court
20      Reporter and Notary Public, held via ZOOM
21      VIDEOCONFERENCE at various locations with the witness
22      located at 212 Stony Run Lane, Baltimore, Maryland,
23      on Thursday, September 30, 2021, commencing at 9:42
24      a.m.
25

Page 2

```
1  A P P E A R A N C E S (All Via Zoom):
2
3  For the Plaintiffs:
4
   MARTZELL, BICKFORD & CENTOLA
5  BY:  LARRY CENTOLA, ESQ.
   338 Lafayette Street
6  New Orleans, Louisiana  70130
   504-581-9065
7  ljc@mbfirm.com
8
   LEMMON LAW FIRM
9  BY:  ANDREW LEMMON, ESQ.
   15058 River Road
10 Hahnville, Louisiana 70057
   985-783-6789
11 andrew@lemmonlawfirm.com
12
   DAVIS & CRUMP, PC
13 BY:  TREVOR B. ROCKSTAD, ESQ.
       TAYLOR HARDENSTEIN, ESQ.
14 2601 14th Street
   Gulfport, Mississippi 39501
15 228-863-6000
   trevor.rockstad@daviscrump.com
16 taylor.hardenstein@daviscrump.com
   Attorneys for Plaintiff Audrey Plaisance
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  A P P E A R A N C E S, continued:
2
3  For the Defendant Sun Pharmaceutical in Taxotere
   Litigation:
4
   HINSHAW & CULBERTSON
5  53 State Street, 27th Floor
   Boston, Massachusetts 02109
6  By:  ROBERT M. BUCHHOLZ, ESQ.
   617-213-7019
7  RBuchholz@hinshawlaw.com
8
9
   Counsel for Defendants Hospira Worldwide, LLC,
10 Formerly doing business as Hospira Worldwide, Inc.
   And Hospira, Inc.
11
12 ARNOLD & PORTER KAYE SCHOLER LLP
   BY:  JEFFREY HOROWITZ, ESQ.
13     ASHLEY BURKETT, ESQ.
       DIANA STERK, ESQ.
14 250 West 55th Street
   New York, New York 10019
15 (212) 836-7572
   Jeffrey.Horowitz@arnoldporter.com
16 Ashley.Burkett@arnoldporter.com
   Diana.Sterk@arnoldporter.com
17
18 For Defendant Accord Healthcare, Inc.
19 TUCKER ELLIS LLP
   JULIE A. CALLSEN, ESQ.
20 950 Main Avenue
   Suite 1100
21 Cleveland, Ohio 44113-7213
   216-696-2286
22 Julie.callsen@tuckerellis.com
23
24
25
```

Page 4

```
1  A P P E A R A N C E S (continued):
2  For the Defendant for Sandoz Inc.
3  GREENBERG TRAURIG, LLP
   BY:  EVAN HOLDEN, ESQ.
4  3333 Piedmont Road NE
   Suite 2500
5  Atlanta, Georgia  30305
   678-553-7320
6  holdene@gtlaw.com
7
   For Actavis Pharma, Inc., Actavis LLC and Sagent
8  Pharmaceuticals, Inc.
9  ULMER & BERNE LLP
   BY:  MICHAEL J. SUFFERN
10 600 Vine Street, Suite 2800
   Cincinnati, Ohio 45202-2409
11 513-698-5000
   msuffern@ulmer.com
12
13
   ALSO ATTENDING:
14     MARCELO RIVERA, Videographer
       MICHAEL ROBSON, Veritext Concierge
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1            I N D E X
2  WITNESS:              PAGE
3  DAVID ROSS, M.D., Ph.D.
     BY MR. HOROWITZ            6
4
5          E X H I B I T S
6  No.   Description            Page
   Exhibit 1   Expert Report of David Ross, M.D.,   12
7      Ph.D., M.B.I, dated June 8, 2020
   Exhibit 2   "Guidance for Industry Applications  46
8      Covered by Section 505(b)(2) Draft
       Guidance" dated October 1999
9  Exhibit 3   21 CFR 314.54         67
   Exhibit 4   Letter dated July 9, 2007, Original  72
10     New Drug Application,
       HOS00200007762 - HOS00200007765
11 Exhibit 5   E-Mail dated 11/9/2010, with    81
       attachments, HOS01400254441 -
12     HOS01400254568
   Exhibit 6   NDA Approval, HOS01400256285 -   87
13     HOS01400256346
   Exhibit 7   "Guidance for Industry, Good    119
14     Pharmacovigilance Practices and
       Pharmacoepidemiologic Assessment,
15     March 2005
   Exhibit 8   SEAK Seminar Brochure,     126
16     "Supplemental Income for
       Physicians", February 2014
17 Exhibit 9   SEAK Brochure, "Independent Medical  135
       Examination Training For
18     Physicians," Naples, Florida
   Exhibit 10   Updated Curriculum Vitae of David  140
19     B. Ross, M.D., Ph.D., M.B.I.
   Exhibit 11   Article, "Use of data mining at the  157
20     Food and Drug Administration"
   Exhibit 12   Notice of Deposition       203
21 Exhibit 13   Updated List of Expert Witness   204
       Testimony
22 Exhibit 14   Ross Statements and Invoices   210
23     SPECIAL REQUESTS
            Page   Line
24     Conference Manual  128   12
       re: Exhibit 8
25
```

2 (Pages 2 - 5)

Page 6

1       THE VIDEOGRAPHER:  Good morning.  We're
2  going on the record at 9:42 a.m. on September 30th,
3  2021.  This deposition is being taken remotely of
4  Dr. David Ross In Re: Taxotere Products Liability
5  Litigation.
6       My name is Marcelo Rivera from Veritext
7  Legal Solutions and I am the videographer.  The court
8  reporter is Linda Jorritsma in association with
9  Veritext Legal Solutions.
10       I am not related to any party in this
11  action nor am I financially interested in the
12  outcome.
13       Counsel and all present remotely will be
14  on the stenographic record.
15       Will the court reporter please swear in
16  the witness.
17  DAVID ROSS, 212 Stony Run Lane, Baltimore, Maryland
18  21210, having been duly sworn by the Notary Public,
19  testified as follows:
20  DIRECT EXAMINATION BY MR. HOROWITZ:
21  Q.    Good morning, Doctor.
22  A.    Good morning.
23  Q.    You and I have met on a prior occasion
24  so this is not the first time we've done this
25  together, is it?

Page 7

1  A.    It is -- it is not.  We had another
2  chance to converse.
3  Q.    Indeed.  And today you understand that I
4  represent Hospira for this deposition.
5  A.    Yes.
6  Q.    And you have been identified as an
7  expert for the plaintiffs in lawsuits filed against
8  Hospira involving allegations related to the
9  medication docetaxel.  True?
10  A.    Yes.
11  Q.    And you understand that the allegation
12  generally involves permanent alopecia, and alopecia
13  being hair loss.  Fair?
14  A.    That's my understanding, yes.
15  Q.    Okay.  And you've done this several
16  times before, have been deposed, and you I have done
17  this before, but you understand the purpose of this
18  is for me to understand your opinions and get a sense
19  of the testimony that you're going to offer at trial
20  in these cases.  You understand that.  Right?
21  A.    Yes.
22  Q.    And, in fact, because of the nature of
23  this particular litigation, as I understand it,
24  you've been deposed over the course of several days
25  by a few of my colleagues.  I think you were deposed

Page 8

1  for three days by the -- we'll call it the 505(b)(2)
2  defendants and Accord, and then I think you had a
3  one-day deposition with Sanofi about Taxotere.  Is
4  that right?
5  A.    Yes.
6  Q.    Okay.  And, obviously, I have those
7  transcripts and I'm not going to try to rehash
8  everything in those but obviously some concepts and
9  things will be unavoidable for us to have a
10  meaningful discussion today.  Is that fair?
11  A.    Yes.
12  Q.    Is there any reason you can't give
13  complete and accurate testimony this morning?
14  A.    Not that I'm aware of.
15  Q.    And I know you're good about this, but
16  if you don't understand one of my questions, if you
17  could just let me know so that I fix it for you;
18  otherwise, if you answer I'm going to assume that you
19  understood.  Is that fair?
20  A.    Yes.
21  Q.    Okay.
22       Let's -- let's jump right to it -- well,
23  actually, let me ask you this because it's been a
24  little bit of time since your last deposition.  What
25  did you do to get ready to come talk to me today

Page 9

1  about Hospira's docetaxel?
2  A.    So I reviewed my prior reports for this
3  litigation.  And reviewed materials, the underlying
4  materials that I had reviewed in preparing those
5  reports.  And I did look over the prior depositions
6  to refresh my memory.
7  Q.    By reports that you reviewed, was that
8  the report that is the subject of this deposition
9  that involves Hospira, Sandoz, and Accord, and also
10  the report that you prepared regarding Sanofi and
11  Taxotere?
12  A.    Yes.  So to be just specific, there's
13  the report that I understand is under discussion
14  today is the one that I submitted June 8th of 2020.
15  Q.    Correct.  Okay.  Did you review any
16  other reports?
17  A.    The other report that I referenced was
18  the one that was submitted in I believe it was
19  February of this year related to Sanofi.
20  Q.    Understood.  And did you meet with
21  attorneys and talk to them in advance of the
22  deposition?
23  A.    Yes.
24  Q.    And who did you meet with?
25  A.    Mr. Centola, Mr. Lemmon, and Mr. Miceli.

3 (Pages 6 - 9)

Page 10

1    Q.    And are they all lawyers that you
2  understand represent plaintiffs in this litigation?
3    A.    Yes.
4    Q.    Did you meet with them in person?  I
5  assume that you had a conference on your phone?
6    A.    Videoconferencing.
7    Q.    And how long -- how many meetings did
8  you have?
9    A.    Three, I believe.
10   Q.    And how long were each of those
11 meetings?
12   A.    Roughly an hour.
13   Q.    And did you review documents separate
14 and apart from those meetings or only during the
15 course of those meetings?
16   A.    There were the documents that I -- you
17 know, the documents that I mentioned earlier in terms
18 of my preparation, I looked at at times outside those
19 teleconferences.
20   Q.    And did you record your time for
21 purposes of creating future invoices for both in
22 reviewing documents and meeting with the attorneys?
23   A.    Yes.
24   Q.    All right.  How much time did you spend
25 reviewing documents separate and apart from your

Page 11

1  meanings with the attorneys?
2    A.    I'd say -- and this is not exact because
3  I haven't finalized all the work slips -- but
4  somewhere between, I would say, eight to ten hours.
5    Q.    And then that's separate and apart from
6  the three or so hours you spent in videoconferencing
7  with the attorneys.
8    A.    Correct.
9    Q.    And if I recall correctly, unless it's
10 changed since we last spoke, I think your billing
11 rate is $550 per hour?
12   A.    That's correct.
13   Q.    Did you speak with anyone besides
14 Mr. Centola, Lemmon, or Miceli in preparation?
15   A.    No.
16   Q.    Didn't talk to any other experts?
17   A.    No.
18   Q.    Did you review any -- or I should say
19 re-review any other expert reports besides your own?
20   A.    There are the reports that I referenced
21 in my report of June 8th from Drs. Feigal and
22 Madigan.  So those were among the -- those were
23 captured, so to speak, when I said materials that I
24 had reviewed in preparing the report originally.
25   Q.    Let's go ahead and mark your expert

Page 12

1  report that you referenced June 8, 2020, as
2  Exhibit 1.
3         (Exhibit 1, Expert Report of David Ross,
4  M.D., Ph.D., M.B.I, dated June 8, 2020, marked for
5  identification.)
6    Q.    And I think if we mark the magic
7  properly, it should be accessible to you.
8         Do you have the report?
9    A.    Well, I don't have the exhibit in front
10 of me and I may need a little bit of guidance here.
11 This is what sometimes happens when you get too
12 highly specialized.
13   Q.    Yeah.
14   A.    So I'm on Zoom.  I have the participants
15 on the right-hand side of my screen.
16   Q.    Let's see.  I believe we're able to show
17 it to you and maybe through Share Screen.  I have a
18 colleague.
19        MR. HOROWITZ:  Ashley, are you able to
20 bring it up in Share Screen?
21   Q.    There we go.  Are you able to see that,
22 Dr. Ross?
23   A.    I am.
24   Q.    And is Exhibit 1 a copy of your expert
25 report that you prepared dated June 8th, 2020, that

Page 13

1  you signed?
2    A.    If -- can I just go to the last page?
3    Q.    We'll go to the signature page.
4    A.    That's right.  The signature page,
5  that's what I meant.  There it is.  Yes, that is.
6    Q.    And why don't we keep scrolling.
7         As part of your expert report, there were
8  three exhibits, I believe, on the June 8, 2020,
9  report.  Your curriculum vitae I think was the first
10 exhibit.  Right?
11   A.    Yes.
12   Q.    And then your next exhibit I believe is
13 your materials -- no, no.  It's your testimony list
14 for the last four years.  Right?
15   A.    Correct.
16   Q.    And then finally, you have your list of
17 documents reviewed.
18   A.    Yes.
19   Q.    And let's -- let's stay here on Exhibit
20 C since we're here.
21        Well, let me ask you this:  There's a
22 couple things in your report maybe we should set out
23 up front.  You used the phrase, "Permanent
24 Chemotherapy Induced Alopecia, PCIA."  Is that
25 shorthand -- is "PCIA" shorthand for "Permanent

4 (Pages 10 - 13)

1 Chemotherapy-Induced Alopecia"?

2    A.    Yes.

3    Q.    And can we use -- if we're talking about

4 permanent alopecia today, can we agree that that's

5 really just shorthand for PCIA?

6    A.    Yes.

7    Q.    And is your report a full and complete

8 summary of all the opinions that you have formed with

9 respect to regulatory issues related to Hospira's

10 docetaxel and permanent alopecia?

11    A.    We're just restricting my answer to the

12 questions that I was asked to address, and -- for the

13 report, and the information that is mentioned

14 in -- you know, that I reviewed it for this report.

15       Yes, there's a paragraph in there, as I'm

16 sure you're aware, that if there's additional

17 information that comes available for me or I'm asked

18 to respond to -- to reports from defendants' experts,

19 that I may -- that I reserve the right to respond.

20    Q.    Understood.

21    A.    But with that scope, the answer is yes.

22    Q.    So as we sit here now for our

23 conversation, your June 8, 2020, report is a full and

24 complete summary of the opinions that you have formed

25 and were asked to address with respect to regulatory

1 issues related to Hospira's docetaxel and permanent

2 alopecia.  Correct?

3    A.    Yes.

4    Q.    And I know you include this paragraph as

5 most experts do about sort of this mythical

6 reservation of rights, but obviously you understand

7 that if you form any new opinions based on our expert

8 reports, Hospira's expert reports, or anything else,

9 that you'll let your -- the plaintiffs' lawyers know

10 and you and I will have a chitchat about what those

11 opinions might be.  You understand that.  Right?

12    A.    With -- and I'm sorry.  I'm saying this

13 a little bit -- but I understood.  I don't regard the

14 reservation as mythical, but I understand why you

15 said that.  The answer to your question is yes.

16    Q.    Okay.  And you understand the process

17 that, before you testify at trial, I should know and

18 have the opportunity, I should say, to talk to you

19 about what you might testify about and your opinions.

20 You get the process.  Right?

21    A.    Yes.

22    Q.    And by the way, I don't know that I

23 agree to the reservation of rights and I don't know

24 that I agree that, you know, that you should be

25 offering anything else beyond what you've already

1 offered as we sit here now; but that said, that's a

2 fight for another day for when we have it.  So I'm

3 just putting that on the record, Doctor.

4    A.    I completely understand.  I appreciate

5 you saying that.

6    Q.    So let's go back to your -- well, before

7 we do that, too, I'm sorry.  Have you outside

8 of -- let me start that question again.  I'm sorry.

9       So it's fair to say that you were

10 retained by -- by lawyers representing plaintiffs in

11 this -- this lawsuit, this litigation.  Right?

12    A.    By the Plaintiffs' Steering Committee

13 for this MDL.

14    Q.    Okay.  I'm going to come back a little

15 later and talk to you about that original retention

16 and your understanding of it, but the lawyers as part

17 of the Plaintiffs' Steering Committee in the MDL, the

18 multi-district litigation with respect to these

19 cases, is it fair to say that they asked you to

20 provide opinions that you have now set forth in this

21 report?  This was done at their -- their -- their

22 ask, if you will.

23       MR. CENTOLA:  Object to form.

24    A.    So just to make sure that I'm --

25    Q.    Let me -- let me withdraw the question.

1    A.    Go ahead.

2    Q.    And I think I can ask a better question.

3       But were you retained by plaintiffs'

4 lawyers to prepare an expert report and give

5 testimony in this case?

6    A.    Well, I think that the first task was

7 for me to review materials and see what my

8 conclusions were to specific regulatory questions.

9 That's before to reducing anything to writing, if

10 that's the right way to put it.

11    Q.    Is it fair to say that you didn't have

12 these opinions and conclusions before the lawyers

13 approached you and -- and retained you?

14       MR. CENTOLA:  Objection, form.

15    A.    I'm -- I'm not sure.  I'm -- I'm not

16 trying to split hairs here, but I think the general

17 question -- just to take one question that I was

18 asked, which is, do holders of NDAs approved under

19 505(b)(2) of the Food, Drug, and Cosmetic Act have

20 regulatory obligations that are independent of those

21 from the holder or holders of NDA or NDAs approved

22 under 505(b)(1) that they've relied on.  Sorry,

23 that's quite a mouthful.  I don't know that I've ever

24 been asked that question before in a general way or

25 even had an opportunity to think about it.  I do feel

5 (Pages 14 - 17)

1 quite confident in saying that if I was asked that as
2 a general proposition without referencing a
3 litigation, I would have said yes, which is, you
4 know, obviously when asked to look at the details.
5 But I think it's not that I, you know, was unaware of
6 these issues, it's just that specific question on
7 docetaxel 505(b)(2) applications, I had never been
8 asked before.
9         But if -- and just if this were to have
10 come up in a discussion when I was at FDA, for
11 example, I -- I and other reviewers and review
12 officials would have said yes.
13        So I don't mean that there's no way I
14 would ever say anything but that.  Again, I have to
15 look at what the specific facts are because they may
16 involve other issues.  So I know that's quite a long
17 answer but I --
18    Q.    Quite a long answer, Doctor, but I got
19 you.  I got you.  And I appreciate that.  And you and
20 I have gone back and forth about your tendency to
21 give long answers and so we'll try and --
22    A.    If I -- if I may say, Mr. Horowitz, I
23 will try and do all of us a favor and be more
24 succinct.
25    Q.    I appreciate that.  Thank you, Doctor.

1    A.    I want to make sure I'm not lumping
2 together and splitting things when it should be the
3 reverse, but I really will try and rein that in.
4    Q.    And I think you got to an important
5 distinction there.
6         So what you're telling me, I think, is
7 your views with respect to the obligations of what's
8 called a 505(b)(2) NDA holder, those are views that
9 you already had before you were approached by the
10 plaintiffs' lawyers, in summary.
11        I'm trying to help you out here, Doc.
12    A.    Let me just say if I had hypothetically
13 been asked the question as a general proposition, I
14 would say yes again.
15    Q.    Okay.  I'm sorry.
16    A.    But always -- you never say -- there's
17 no way it could be any different.
18    Q.    Okay.
19    A.    So I just want to say this.
20    Q.    And you're saying, too, that it's not
21 really a question that you ever addressed or been
22 asked before directly before -- before the lawyers
23 approached you.
24    A.    On docetaxel?  No.
25    Q.    Okay.  Well, that's the second piece.

1 So with respect to docetaxel, is it fair to say that
2 the opinions you offer specific to docetaxel and
3 specific to Hospira are opinions that you only formed
4 after you were retained by the plaintiffs' lawyers in
5 this litigation?
6         MR. CENTOLA:  Object to form.
7    A.    Well, with an important qualification
8 that it was after -- I did not form then until after
9 I had reviewed materials.  It was not, obviously,
10 immediately upon retention.
11    Q.    And the materials you reviewed -- that's
12 fair.  But I didn't say immediately upon retention.
13 I mean, you described the process, the opinions --
14    A.    No, I -- I know --
15    Q.    Right.  Let me finish my question.
16        The opinions that you have offered in
17 your expert report with respect to docetaxel in
18 particular and Hospira in particular, these were all
19 opinions that you formed after you were approached by
20 the plaintiffs' lawyers to review materials and offer
21 opinions.  Right?
22    A.    On this specific issue, yes, correct.
23    Q.    And it's fair to say that you've never
24 published any of the opinions about Hospira and
25 docetaxel that you offer in this report anywhere

1 outside of this litigation.  True?
2    A.    That is correct.
3    Q.    And you've never subjected your opinions
4 that are set forth in your expert report to peer
5 review, have you?
6         MR. CENTOLA:  Objection to form.
7    A.    Are you -- just to clarify -- talking
8 about these specific opinions in the report or the
9 more general question about 505(b)(2)'s?
10    Q.    Well, let's take them both.  Have you
11 ever subjected your opinions set forth in your expert
12 report about Hospira and docetaxel to peer review?
13        MR. CENTOLA:  Objection to form.
14    A.    By peer review, I'm going to understand
15 that to mean exactly what you're saying, that I mean,
16 one form, of course, is scientific publication with
17 peer review.  Not all publications are peer-reviewed.
18        Or peer review could mean, you know,
19 discussions with other regulatory experts.  I'm just
20 getting that distinction on the record, though the
21 answer to both of those would be no.
22    Q.    Both of those is no.  Right?
23    A.    Yes.
24    Q.    Okay.  And what about with respect to
25 505(b)(2) NDA holders and their obligations in

Page 22

1 general, have you ever subjected those opinions to
2 peer review outside of this litigation?
3     A.    So the answer to that is if in terms of,
4 again, going to this distinction or -- or
5 understanding that peer review is not limited to
6 scientific publication is one of the issues that
7 would get discussed internally at the FDA, that, you
8 know, what would a 505 -- an applicant seeking
9 approvals under 505(b)(2), would they need to do
10 anything in addition to -- anything extra in order to
11 garner approval.  And so that implicitly is do
12 they -- are they independent obligations.  So that
13 was discussed.  That is something, a discussion,
14 regarding my fellow reviewers and with the primary,
15 secondary, more senior that would be peer review, and
16 the answer to that would be yes as a general
17 proposition.
18         MR. HOROWITZ:  Well, objection, move to
19 strike, nonresponsive.
20     Q.    Doctor, have you ever published in the
21 peer-reviewed literature anything about 505(b)(2)
22 applications and the obligations of 505(b)(2) NDA
23 holders?
24     A.    By peer-reviewed, you mean the
25 scientific literature I'm going to assume?  Is

Page 23

1 that --
2         MR. HOROWITZ:  Can you read back the
3 question, please.
4     Q.    I think you're filibustering, but I'll
5 ask it again.
6         Doctor, have you ever published in the
7 peer-reviewed literature -- you know what
8 peer-reviewed literature is.  Right?
9     A.    I assume you're talking about scientific
10 literature?  Yes.
11     Q.    Have you ever published in the
12 peer-reviewed literature anything about the duties of
13 a 505(b)(2) New Drug Application holder?
14     A.    With the understanding that there have
15 been very few publications at all on this topic, no.
16     Q.    Doctor, the truth of the matter is you
17 have not attempted to publish and never have
18 published anything about 505(b)(2) New Drug
19 Application holders' duties.  Correct?
20         MR. CENTOLA:  Objection, form.
21     A.    I'm sorry.  I don't know if you heard my
22 answer.  I said that's correct.
23     Q.    With respect to your opinions set forth
24 in your report about specifically now Hospira and
25 docetaxel, you've never discussed those with -- with

Page 24

1 the FDA or advised FDA of those opinions, have you?
2     A.    No.
3     Q.    And before -- well, sorry.  As part of
4 your process in preparing your report and crafting
5 your opinions, you did not discuss with FDA their
6 views on Hospira and docetaxel and the docetaxel
7 label.  True?
8     A.    No.
9     Q.    And you've never discussed with FDA
10 anything about Hospira's approach to what we'll call
11 pharmacovigilance or drug safety monitoring.  Right?
12     A.    No.
13     Q.    And just so we're clear on your role in
14 this case, you are the regulatory expert, if you
15 will, proffered by plaintiffs' counsel.  Right?
16     A.    I'm not sure I'd say I'm the regulatory
17 expert.  I am a regulatory expert.
18     Q.    That's what I meant.  So your, if you
19 will, your bailiwick, you'll be talking about
20 regulatory issues in this case.
21     A.    Correct.
22     Q.    And by regulatory issues, we're really
23 talking about the FDA, the Food and Drug
24 Administration, and their rules and regulations.
25 Fair?

Page 25

1     A.    Yes.
2     Q.    And am I correct that you're not going
3 to be offering your opinions about whether docetaxel
4 can or does cause permanent alopecia?
5     A.    Any -- I'm going to be discussing issues
6 purely from a regulatory perspective; so in terms of
7 purely medical -- the medical causality or causation,
8 that is not an issue that I am addressing.  I'm going
9 to only be addressing issues from a regulatory point
10 of view.
11     Q.    And you also won't be talking
12 specifically about any particular plaintiff and
13 whether or not docetaxel caused her alopecia.
14 Correct?
15     A.    As I understand it right now -- and I
16 don't have any reason to think this is going to be
17 different, changed -- that's correct.
18     Q.    Do you know which plaintiffs you're here
19 to testify on behalf of today?
20     A.    I am -- I know that the names of the
21 plaintiffs in the bellwether trial -- trials that are
22 coming up are in the Notice of Deposition.  To be
23 honest with you, I -- I couldn't -- I would have to
24 look at it to recall them.  And also I just want to
25 say, and again I want to be very clear, I'm not

7 (Pages 22 - 25)

1 faulting you for saying this, but when you say
2 "testifying on behalf of plaintiffs," I just want to
3 make clear I am not representing myself the
4 plaintiffs.  So I'm not advocating for them.  I
5 just -- not that there's anything wrong with that,
6 but I just want to make clear that's not my role
7 here, either.
8      Q.     You don't view your role as an advocate.
9 True?
10     A.     Only for my opinion.  My role -- and I'm
11 not just repeating these words -- is to assist the
12 trier-of-fact.
13     Q.     You don't view this as where
14 you're -- well, let me -- we'll come back to that.
15 I'm sorry.  Let's not go down that rabbit hole.
16 We'll come back to that later, perhaps.
17         So I noticed in your report you
18 reference particular plaintiffs from the early, I
19 guess, process that are no longer part of this
20 particular trial setting.  Right?
21     A.     Could I ask that you just -- yeah.
22 Paragraph 1.
23         That was -- again, as you're aware, over
24 15 months ago those were the specific plaintiffs.
25 Again, I'm going to the footnote.  They

1 were -- excuse me.  I mention that I may -- that
2 testimony of other -- testimony I give may involve
3 other cases.
4      Q.     And that's what's happened here is now
5 you would plug in the new names of -- of the new
6 plaintiffs for this particular report, but you didn't
7 actually do that.  You just -- you left the old
8 plaintiffs in there.  Is that fair?
9      A.     If I -- I'll just say if I had been
10 asked to do that.  Again, my opinions from June 8th
11 were not specific to any particular plaintiff, they
12 involve this 505(b)(2) NDA holders in this case.  So
13 that's -- that's fair.  Again, if I had been asked
14 to, I certainly would have been willing to do that.
15     Q.     And is it fair to say you don't know the
16 dates of product use, of docetaxel use, for either of
17 the new two plaintiffs that are before us now?
18     A.     That's correct.
19     Q.     And so it's fair to say, then, that
20 you're not going to be offering any opinions about
21 regulatory issues and the timing of the use of
22 docetaxel by these individual plaintiffs.
23     A.     Correct.
24         MR. CENTOLA:  Objection, objection to
25 form.

1      A.     So not directly, but I will say -- to be
2 honest, this came up a year ago in depositions you
3 know, the question came up, well, when should the NDA
4 holders have been in a position -- when should they
5 have submitted a CBE supplement or when do I think
6 they should have.
7         So insofar as that has any bearing on
8 specific plaintiffs, that -- that would be.  But I'm
9 not going to say -- I'm not talking about, you know,
10 a specific plaintiff and when they used an infusion.
11 It's just at what point in time information was
12 available to be added to the label.
13     Q.     You're not going to connect those two
14 things because you don't even know when these
15 particular plaintiffs took the drug.  Right?
16     A.     I am -- and if I'm asked a question
17 about a specific time frame, I'll answer it to the
18 best of my ability.  But I -- you know, as you look
19 at my report, I don't -- other than mentioning those
20 specific plaintiffs there, I believe I said somewhere
21 else where it's not going to be anything
22 case-specific that I'm going to be.
23     Q.     And to be clear, you don't know when
24 either of the plaintiffs here took the drug.  Right?
25     A.     Not -- certainly not off the top of my

1 head.
2      Q.     That's another way in a lot of words
3 saying you don't know, do you?
4      A.     Yes, you're correct.
5      Q.     Let's go to Exhibit C of your report.  I
6 think this is the materials reviewed list.
7         Did you prepare Exhibit C?
8      A.     If I recall correctly, you know,
9 certainly I reviewed it, but I believe retaining
10 counsel had prepared it to the best -- as best I
11 recall.  And it's not that I didn't have anything to
12 do with it, but it was -- and obviously anything that
13 I mentioned, I think the reference -- I'm sorry,
14 under I, "All references in the content and footnotes
15 of my report," those were some issues -- you know,
16 some of those were materials I had obtained.  So, you
17 know, I -- I was involved in preparing it and so was
18 retaining counsel.
19     Q.     And between your materials reviewed list
20 and the footnotes in the text, is that a full and
21 complete listing of the materials you reviewed in
22 order to form your opinions?
23     A.     Yes.
24     Q.     So let's go through.
25         The Roman numeral III, "Depositions

8 (Pages 26 - 29)

1 & Deposition Exhibits," do you know which of
2 those -- well, let me -- let's frame this out a
3 little bit because I'm trying to do this a little
4 quickly.
5         But your report actually doesn't just
6 address Hospira, does it?
7     A.    Correct.
8     Q.    There's also opinions offered with
9 respect to another company called Sandoz.  Right?
10    A.    Yes.
11    Q.    And another company called Accord.
12 Correct?
13    A.    Yes.
14    Q.    And what your report does at a high
15 level, and -- and I'm hoping I do this in a way that
16 we don't have to fuss about it, but you give some
17 general opinions like we talked about with respect
18 to the obligations of 505(b)(2) NDA holders, and we'll
19 obviously talk about those.
20        And then you give some sort of I guess
21 more specific opinions about the three companies with
22 respect to how they handled their docetaxels within
23 the auspices, if you will, of the FDA regulations.
24 Is that a generally fair summary?
25    A.    Yes.

1     Q.    And the -- the report, though, in your
2 materials reviewed list, this list captures the
3 things related to all three companies in the entire
4 report.  You had one single materials reviewed list
5 or list of documents reviewed.  Right?
6     A.    Correct.
7     Q.    Okay.  So -- and the depositions and
8 deposition exhibits, that listing there before you,
9 that includes depositions of -- of witnesses or
10 employees or former employees from all three
11 companies.  Right?
12    A.    Yes.
13    Q.    And do you know which of those in
14 particular relate to Hospira or Hospira employees?
15    A.    At least, for at least one I -- I do.
16    Q.    Which one?
17    A.    So Dr. Schmider was deposed on
18 July 17th, 2019.  And I believe -- I believe also
19 Dr. Mir was deposed in 2020.
20    Q.    Any others that you believe are Hospira?
21    A.    To be honest with you, it's been a while looking at
22 to be honest with you, it's been a while looking at
23 some of these, so I -- I want to say I don't believe
24 so, but I would really -- to say definitively I
25 really need to look back at those quickly.  But those

1 two, Schmider -- Drs. Schmider and Mir I would say
2 are.
3     Q.    Do you know how many depositions of
4 Hospira employees were actually taken?
5     A.    I don't.  I don't.
6     Q.    And did you -- were you ever provided a
7 list to make a -- you know, a selection or involved
8 in the selection process in any way?
9     A.    I asked -- in my report I mentioned that
10 it was my understanding the discovery for Hospira at
11 the time that I wrote this report -- by discovery I
12 mean depositions and anything else that's covered
13 under that if I'm not using that term right.  Sorry.
14        So I said, you know, there may be other
15 information coming in.  And I've asked about that and
16 I have not had -- I have to talk to retaining counsel
17 I think about -- about that.  I don't want to -- I
18 just want to say that I -- I have asked about
19 other -- any additional -- subsequent information
20 from Hospira.
21    Q.    And you have not been provided any
22 additional deposition transcripts besides these two
23 with respect to Hospira.
24        MR. CENTOLA:  Objection, form.
25    A.    I'm sorry.  Go ahead.

1     Q.    Well, I'm not sure I heard your answer.
2 But you have not been provided any other Hospira
3 deposition transcripts, Hospira witness or employee
4 deposition transcripts besides Drs. Schmider and Mir.
5 Correct?
6         MR. CENTOLA:  Objection, form.
7     A.    So, again, I have asked if there's
8 subsequent to this report and specifically about
9 Hospira, if there's any additional information that
10 would be arguably relevant.  And so just --
11        THE WITNESS:  Mr. Centola, I assume
12 you'll stop me if I should not respond.
13    A.    I have asked and there's not been
14 anything else I have been told -- I have not been
15 told of anything else.
16    Q.    Okay.  Let's go down to -- maybe I can
17 shortcut this.
18        The documents -- there's obviously some
19 things like the Code of Federal Regulations.  There
20 may be some guidances, general materials.  Is it fair
21 to say that those would apply to all three companies
22 in your discussion of the 505(b)(2) obligations and
23 duties, but that for the specific opinions about
24 Hospira and the specific opinions about Accord and
25 the specific opinions about Sandoz, the documents

1 that are specific to those companies are what you
2 relied upon to form your specific opinions?
3     A.   Respectfully, no.  I mean, you're
4 correct about -- there was kind of two parts there.
5         First, you're correct that the things
6 such as guidances, the CFR, scientific publications,
7 apply to all of the defendants.
8         In terms of the specific companies.  I
9 guess, you know, if I saw something -- this is purely
10 hypothetical, and actually not even hypothetical,
11 this is mythical.
12         If a company said, you know, we really
13 want to change the label but the FDA has said no,
14 that would be an example of where I would have
15 reached a different conclusion.
16         But, you know, absent something like
17 that, it's a rebuttable -- not presumption, but a
18 conclusion that they all have an obligation to follow
19 those regulations unless there's some conflicting law
20 or regulation or non-public information that's
21 contained in there.
22         So, you know, basically, you know,
23 the -- looking at those documents and depositions,
24 if -- again, if there's something where it would say,
25 you know, we wanted to do it and we couldn't or we

1 tried to do it and we couldn't, that's the sort of
2 thing where I would have reached a different
3 conclusion.
4         But -- so if there were no depositions,
5 nothing on that, I'd say until proven otherwise, this
6 is my conclusion.
7     Q.   I'm going to move to strike just because
8 I had a really hard time following that.  I'm not
9 sure it was responsive.  And in fairness, I might
10 have tried to put too much into one question.
11         But in any event, maybe I can come with
12 this differently because I don't want to take the
13 time to march through if we don't have to.
14         Is it fair to say that the documents on
15 this list that are internal documents to either
16 Sandoz or Accord, you're not using those internal
17 documents to form your opinions about Hospira's
18 docetaxel and Hospira's approach to its label and
19 pharmacovigilance?
20     A.   You're correct in that.  I'm sorry I
21 misunderstood.  You're correct.
22     Q.   Okay.  Good.
23         So let's then -- I'm going to skip over
24 the Accord and Sandoz stuff and I'm going to talk to
25 you a little bit about the Hospira documents you

1 identified.
2         Let's go up a little bit first.
3         MR. HOROWITZ:  Ashley, I'm sorry.  The
4 page before.  There we go.
5     Q.   You list under, "US Labels" -- well,
6 let's skip that.  Well, let's just go down to the
7 PSURs.
8         Doctor, a PSUR is a Periodic Safety
9 Update Report.  Right?
10     A.   Correct.
11     Q.   And a PADER is a Periodic Adverse Drug
12 Experience Report?
13     A.   Correct.
14     Q.   And I notice that for your review you
15 list PSURs for -- for Sandoz.  And for PADERs you
16 list several for Sandoz and I think one for Accord.
17 Is it fair to say to say, though, that you don't list
18 any PSURs or PADERs for Hospira?
19     A.   That's correct.
20     Q.   And so you did not review as part of
21 your process of reviewing materials and forming your
22 opinions with respect to Hospira, you didn't review
23 Hospira's PADERs, did you?
24     A.   With the caveat that that would not have
25 affected my conclusions, no.

1     Q.   Okay.  Doctor, I don't need to know why
2 you didn't do it --
3     A.   Okay.
4     Q.   -- I just need to know that you didn't
5 do it.  So it's fair to say you didn't do it.  Right?
6         MR. CENTOLA:  And I object to the
7 colloquy.  He can answer the question however he
8 wants to answer the question as long as he's
9 answering the question.
10     Q.   That's right.  Answer the question,
11 Doctor.  You didn't review Hospira's Periodic Adverse
12 Drug Experience reports in forming your opinions in
13 this case, did you?
14     A.   Since it would be irrelevant to my
15 conclusions, no.
16     Q.   That's your opinion is that they're
17 irrelevant to your conclusions.  Right?  That's part
18 of your opinion.  In other words, folks could
19 disagree with you.  Right?  Others might say, Well,
20 you know what, Doctor, these actually are relevant to
21 your opinions.  I don't agree with you.  Would you
22 accept that?
23     A.   Certainly people have the right to
24 disagree.  They need to provide a basis as to how
25 those would change the opinion.

Page 38

1    Q.    Got you.
2          All right.  So you didn't review the
3  PADERs because if you had you would have listed them
4  for Hospira.  Right?
5    A.    Correct.
6    Q.    Let's go down then to the Hospira
7  documents.
8          You've got one, two, three, four, five,
9  six, seven -- roughly eight documents listed here.
10 Correct?
11   A.    Correct.
12   Q.    Do you know how many documents were
13 produced by Hospira as part of this litigation?
14   A.    I have to believe it's tens or even
15 hundreds of thousands.
16   Q.    You just -- you know it's more than
17 eight though.  Right?
18   A.    Say it again?
19   Q.    You know it's more than eight?
20   A.    Oh, yeah.
21   Q.    And it's fair to say that as -- you
22 don't know how many documents.  You don't know if
23 it's tens of thousands, hundreds of thousands, or
24 even in the millions, but you know that you were
25 limited in your review to these eight documents

Page 39

1  listed here.  Fair?
2    A.    I would not -- if I could answer.  I'm
3  sorry, I don't agree with the use of the
4  word "limited."  If I thought I needed more documents
5  or other documents, I would have asked for them.
6    Q.    So you felt that in applying your
7  methodology that you were comfortable forming your
8  opinions through the review of roughly eight Hospira
9  documents to form your opinions.
10        MR. CENTOLA:  Objection, form.
11   A.    That's correct.
12   Q.    And did you, yourself, select these
13 eight documents or were these selected for you by
14 retaining counsel, plaintiffs' lawyers?
15   A.    I don't agree with the use of the word
16 "selected."  I was provided these.  Again, I was
17 not -- my agreement with retaining counsel
18 specifically says that I can ask and they're
19 obligated to provide any -- any arguably relevant
20 materials.
21   Q.    Do you -- I'm sorry.
22   A.    Go ahead.
23   Q.    It sounds to me, though, like you make
24 the ask but you rely on the judgment of retaining
25 counsel to decide what's relevant for you.  Is

Page 40

1  that -- is that my understanding?
2          MR. CENTOLA:  Objection to form.
3    A.    No, that's not correct.
4    Q.    So then I -- I guess my question is you
5  weren't provided access to Hospira's full document
6  production, were you?
7    A.    That's incorrect.
8    Q.    Did you get the document production and
9  search it yourself?
10   A.    So if I understand the process of
11 production, the volumes are so massive that law firms
12 frequently -- I'm not saying that's happened
13 here -- have attorneys whose sole task is to go
14 through the production and figure out which ones need
15 to be -- I don't want to say produced, but are
16 relevant when they've -- when they've got them.  So
17 that's not something that I have ever asked for is a
18 full production because it -- it's not necessary.
19        And, you know, again, when you
20 say "access," it's different from providing the whole
21 production.  My understanding is I have access unless
22 there's some reason -- and often privilege or
23 confidentiality which I didn't hear anything
24 about -- that if I ask for it, retaining counsel
25 would provide it to me.  It's that simple.

Page 41

1    Q.    And so you were provided by retaining
2  counsel these eight documents listed here.  Right?
3    A.    Well, some of these I actually had
4  obtained on my own already.  So you know, others were
5  provided to me.  But, honestly, as I've said before,
6  this is a little bit like -- if I want to figure out
7  if someone is blind, I don't need to do -- look at
8  the retinal photographs, I need to just say, "Can you
9  see this light?"  And that's about --
10   Q.    Doctor, I'm not asking you -- yeah, I'm
11 sorry.  I'm sorry.  You're going off on a tangent
12 respectfully.
13        All I asked you was, you know, these
14 eight documents -- and I see here you have a label
15 and -- and, you know, the physician prescribing
16 information, which is also another word for label.
17 But the ones with Bates numbers, I guess six of them
18 have what we lawyers call Bates numbers.  Those six
19 were certainly just -- and all I'm asking is they
20 were provided to you, given to you by plaintiffs'
21 counsel.  Right?
22   A.    Yes.
23   Q.    Okay.  You did not review the entire New
24 Drug Application submitted by docetaxel to FDA for
25 approval of its -- did I say -- did I say "submitted

11 (Pages 38 - 41)

Page 42

1  by docetaxel."
2       Let me start that again.  You did not
3  submit -- we have to take a break in a minute.  Daddy
4  was up late last night, so...
5       You did not review the entire New Drug
6  Application submitted by Hospira to FDA for approval
7  of its docetaxel product, did you?
8    A.   That's correct.
9    Q.   And you did not review as we said the
10  Periodic Adverse Drug Experience reports either.
11  Correct?
12    A.   Correct.
13    Q.   You didn't review any NDA annual reports
14  submitted by Hospira to -- to FDA with respect to its
15  docetaxel product.  Correct?
16    A.   Correct.
17    Q.   You didn't review the full record of
18  correspondence between FDA and Hospira with respect
19  to regulation by FDA of Hospira's docetaxel product.
20  Right?
21    A.   Correct.
22    Q.   You did not review any individual
23  letters submitting 15-day adverse event reports,
24  expedited reports, by Hospira to FDA for its
25  docetaxel product, did you?

Page 43

1    A.   No.
2    Q.   Okay.  Has FDA ever taken any
3  enforcement action against Hospira with respect to
4  docetaxel?
5    A.   I don't know.
6    Q.   That's not something you looked into as
7  part of forming your opinions with respect to
8  docetaxel, Hospira's docetaxel in this case?
9    A.   I may have looked, but whether it has or
10  not would not have affected my conclusions.
11    Q.   Would you say that it would be
12  irrelevant to your opinions in this case?
13       MR. CENTOLA:  Objection, form.
14    A.   The lack of enforcement action by itself
15  does not automatically have implications for whether
16  a company is meeting -- has regulatory obligations or
17  is meeting them.
18    Q.   Okay.  And it's fair to say that you
19  have no idea as you sit here now whether FDA has ever
20  taken any enforcement action against Hospira with
21  respect to docetaxel.
22    A.   I -- I -- as I said, I don't know.
23    Q.   And has FDA ever found Hospira's
24  docetaxel to be misbranded?
25    A.   Not that I know of.

Page 44

1    Q.   Have you seen any FDA finding where FDA
2  has found that Hospira violated or was out of
3  compliance with any FDA regulation with regard to
4  docetaxel?
5    A.   Not that I'm aware of.
6    Q.   The answer is, no, you have not seen
7  that?
8    A.   Not that I'm aware of.
9    Q.   Doctor, in the interests of me needing
10  some coffee and maybe we should take a break.  We've
11  been going about an hour.  We'll try not to break
12  every hour, but if that's okay with you.
13    A.   I am a huge advocate of coffee and I may
14  do that in parallel, sir.
15       MR. HOROWITZ:  All right.  Excellent.
16  Let's make this fairly quick.
17    A.   Okay.  So how many minutes?
18       MR. HOROWITZ:  Maybe five, six minutes.
19  Is that all right, Larry?
20       MR. CENTOLA:  Perfect.
21       THE VIDEOGRAPHER:  The time is
22  10:45 a.m.  We are going off the record.
23       (A recess is taken.)
24       THE VIDEOGRAPHER:  The time is
25  10:55 a.m. and we're back on the record.

Page 45

1    Q.   Doctor, are you ready to continue?
2    A.   I am.
3    Q.   So, Doctor, we've been talking about
4  505(b)(2)'s as if we know what we're talking about.
5  And you and I might, but I want to dive into that a
6  little bit if you'll indulge me.  Is that okay?
7    A.   Sure.
8    Q.   Okay.  Now, you understand that Hospira
9  submitted a New Drug Application for docetaxel under
10  Section 505(b)(2) of the Federal Food, Drug and
11  Cosmetic Act.  Right?
12    A.   Yes.
13    Q.   And that's the approval pathway, the
14  505(b)(2) approval pathway is how docetaxel's -- I'm
15  sorry -- how Hospira's docetaxel was approved by FDA.
16  True?
17    A.   Yes.
18    Q.   And you would agree generally that this
19  approval pathway, the 505(b)(2) approval pathway,
20  allows sponsors of New Drug Applications to rely on
21  FDA's findings of safety and efficacy for drugs that
22  have already been approved.  That's part of it.
23  Right?
24    A.   Yes.
25    Q.   Let's take a look at an FDA Guidance if

12 (Pages 42 - 45)

Page 46

1  we could.
2          I'm going to mark as Exhibit No. 2 a
3  document titled, "Guidance for Industry Applications
4  Covered by Section 505(b)(2) Draft Guidance" dated
5  October 1999.
6          (Exhibit 2, "Guidance for Industry
7  Applications Covered by Section 505(b)(2) Draft
8  Guidance" dated October 1999, marked for
9  identification.)
10     A.    Yes.
11     Q.    And before we dive into the guidance, I
12  know you addressed this or guidances in your report
13  at paragraph 34, and I'm just going to read this to
14  you and just make sure we're on the same page.
15         In paragraph 34 of your report you
16  state, "Draft and Final Guidances published in the
17  Federal Register under FDA's Good Guidance Practices
18  regulation reflect the FDA's current thinking at a
19  given point of time on a particular regulatory or
20  technical issue."
21         Correct?
22     A.    Yes.
23     Q.    Okay.  And pharmaceutical companies and
24  folks who tried to comply with the FDA's rules and
25  regulations offer to look to these guidances -- and

Page 47

1  I'm trying to make this a little more
2  understandable -- for exactly what it says, guidance
3  for how they're supposed to proceed under the
4  regulations and how FDA would prefer they proceed.
5  Is that generally fair?
6      A.    With the understanding that that is not
7  the sole avenue for guidance.  And of course,
8  guidances are always subordinate to the constitution,
9  statutes, case law, and regulations.
10     Q.    You're not -- you don't want to revise
11  what you wrote in your report.  Right?
12     A.    No.  I'm simply giving that context.
13     Q.    And you also say in your report,
14  "Although technically not legally binding" -- and
15  this is paragraph 34 -- "Guidances represent a safe
16  harbor for FDCA."
17         That's the Federal Food Drug -- Food and
18  Drug and Cosmetic Act.  Right?  You say, "Guidances
19  represent a safe harbor for FDCA compliance, and
20  manufacturers who choose an approach different from
21  that described in a relevant Guidance" -- I screwed
22  that up.  Let me -- let me read that again.  I was
23  going to ask you if I read it correctly and I can
24  answer the question.  I did not.
25         It says, "Although technically not

Page 48

1  legally binding, Guidances represent a safe harbor
2  for FDCA compliance, and manufacturers who choose an
3  approach different from that described in a relevant
4  Guidance must still comply with FDCA.  In addition,
5  Guidances carry sufficient weight that Congress has
6  frequently directed the FDA through appropriate
7  legislation to develop Guidances on specific topics."
8          Did I read those sentences from your
9  report correctly?
10     A.    You did.  I want to -- I think it's
11  important to clarify one aspect in terms of my use of
12  the word "legally binding."  I -- this just happens
13  to be a notebook I have of the binder with the FDA
14  Guidance, and I'm -- this is going to be language
15  similar to this and any Guidance.
16          "This Guidance does not create or confer
17  any rights for or on any person and does not operate
18  to bind FDA or the public.  You can use an
19  alternative approach if the approach satisfies the
20  requirements of the applicable statutes and
21  regulations.  If you want to discuss an alternative
22  approach, contact the FDA staff responsible for
23  implementing this Guidance."
24          So --
25     Q.    Doctor, let me pause you there.  You

Page 49

1  just read from something.  What are you reading from?
2      A.    Oh, I'm sorry, I apologize.  And I'm
3  just -- this is actually -- I'm going to hold this
4  up.  And if the reporter needs it, this happens to be
5  from a May 2005 Guidance For Industry.  Apologies.  I
6  did want to use what it says in 1999 --
7      Q.    But -- I'm sorry.
8      A.    I'm talking over you.  Go ahead.  I'm
9  sorry.
10     Q.    No, I'm not fussing with you about the
11  meaning of a Guidance.
12     A.    Yeah, that's what it says.  I
13  just -- and, again, I'm sorry, I want to -- when I
14  say "legally binding," I just -- the reason I read
15  that is just to say that's in the context of FDA and
16  pharmaceutical manufacturers.
17     Q.    Okay.  Let me simplify this.
18          You agree with what you wrote in your
19  report.  Right?
20     A.    I do, I do.
21     Q.    And the paragraph you just read, just
22  for your own benefit if you want, but you just read
23  for me from the 2005 Guidance, and I think I've seen
24  in every Guidance, it's the same that appears on the
25  bottom of page 1 of the 1999 Guidance we just marked

13 (Pages 46 - 49)

1 as Exhibit 2.
2     A.   Yes.  Yeah, and if I had that -- yes, if
3 I had that in front of me, Mr. Horowitz, I really
4 apologize, I would have asked you to read it.
5     Q.   No worries, no worries.
6     A.   I'm sorry.  Go ahead.
7     Q.   Let's move on and make some magic here
8 together.
9         So let's look at the cover page for this
10 Guidance For Industry.  And it says, "Applications
11 Covered by Section 505(b)(2).  Draft Guidance."  Do
12 you see that?
13     A.   I do.
14     Q.   And it's dated October 1999.  Do you see
15 that there?
16     A.   I do.
17     Q.   And this is an FDA Guidance in the
18 manner or -- or an example of one that we just
19 discussed in relation to paragraph 34 of your report.
20     A.   Yes.
21     Q.   So one question I have is did you review
22 this Guidance in the process of preparing your
23 opinions in this case?
24     A.   I had -- I've seen it before.  Certainly
25 I was aware of it.  Excuse me.

1     Q.   I didn't see that listed in your
2 exhibit, materials reviewed list, and I didn't see it
3 cited anywhere in your text of your report, so can I
4 assume that you didn't review or rely upon it for the
5 specific purpose of giving your opinions in this
6 case?
7         MR. CENTOLA:  Objection, form.
8     A.   I certainly didn't rely on it.  You
9 know, I -- I did not review -- again, it's a document
10 I've seen many times.  It's -- but I did not review
11 it specifically for preparing my report.  Let me just
12 say that.  That's why it would not be listed on the
13 materials reviewed.
14     Q.   If you go to page 1, it says, "What is
15 the purpose of this Guidance?"  And by the way, for
16 your benefit, there's the paragraph you quoted at the
17 bottom there.  Do you see that?
18     A.   Yes.
19     Q.   Okay.  It says under Roman numeral I,
20 "What is the Purpose of this Guidance?"  I want to go
21 down to the third paragraph, the first couple of
22 sentences there.  Do you see it?  Are you with me
23 there, Doc?
24     A.   Yeah.
25     Q.   It says, "Section 505(b)(2) was added to

1 the Act" -- and the Act is the FDCA, right, the
2 Federal Food, Drug and Cosmetic Act?
3     A.   Yes.
4     Q.   -- "by the Drug Price Competition and
5 Patent Term Restoration Act of 1984 (Hatch-Waxman
6 Amendments).  This provision expressly permits FDA to
7 rely, for approval of an NDA, a New Drug Application,
8 on data developed by the applicant."
9         Did I read that reasonably correctly?
10     A.   Yes.
11     Q.   Do you agree with those statements?
12     A.   I do.
13     Q.   And if you go to the last sentence of
14 that paragraph, it's actually on page 2.  FDA says,
15 "Section 505(b)(2) permits approval of applications
16 other than those for duplicate products and permits
17 reliance for such approvals on literature or an
18 Agency finding of safety and/or effectiveness for an
19 approved drug product."
20         Did I read that correctly?
21     A.   You did.
22     Q.   And is that consistent with your
23 understanding of what a Section 505(b)(2) application
24 permits?
25     A.   Yes.

1     Q.   And then if you go to the next section,
2 Section II, it says, "What is a 505(b)(2)
3 Application?"
4         Do you see that?
5     A.   Um-hum.
6     Q.   And if you go to Section II-A, it says,
7 "What type of information can an applicant rely
8 upon" -- or "rely on?"  Do you see that?
9     A.   I do.
10     Q.   I want to go down to the second
11 paragraph labeled number 2 conveniently, subsection
12 2.
13         It says, "The Agency's finding of safety
14 and effectiveness for an approved drug."
15         Do you see that?
16     A.   Yes.
17     Q.   "An applicant should submit a 505(b)(2)
18 application for a change in a drug when approval of
19 the application relies on the Agency's previous
20 finding of safety and/or effectiveness for a drug.
21 This mechanism, which is embodied in a regulation at
22 21 CFR 314.54, essentially makes the Agency's
23 conclusions that would support the approval of a
24 505(j) application" -- let me pause here.  That's an
25 ANDA application.  Right?

14 (Pages 50 - 53)

Page 54

1     A.    That's abbreviated. That's the section
2  of the Act that sets forth -- defines an Abbreviated
3  NDA and describes the process for that.
4     Q.    Okay. It goes on to say -- "a 505(j) or
5  an ANDA application available to an applicant who
6  develops a modification of a drug."
7           Did I read all of this correctly so far?
8     A.    Yes.
9     Q.    Anything you disagree with?
10    A.    No.
11    Q.    It says, "Section 314.54 permits a
12 505(b)(2) applicant to rely on the Agency's finding
13 of safety and effectiveness for an approved drug to
14 the extent such reliance would be permitted under the
15 generic drug approval provisions under Section
16 505(j).
17          Do you see that?
18    A.    I do.
19    Q.    It says, "This approach is intended to
20 encourage innovation in drug development without
21 requiring duplicative studies to demonstrate what is
22 already known about a drug while protecting the
23 patent and exclusivity rights of the approved drug."
24          Did I read that correctly?
25    A.    You did.

Page 55

1     Q.    Is that consistent with your
2  understanding as to the purpose and policy behind a
3  505(b)(2) application?
4     A.    It's not only consistent with my
5  understanding, it's also consistent with my opinion,
6  or perhaps I should put that the other way around.
7           But I specifically discuss this issue in
8  my report about the similarities between 505(b)(2)'s
9  and 505(j)'s.
10          So, yes, I agree with everything you've
11 said there -- or more accurately, everything that
12 this Guidance says.
13    Q.    Okay. Let's take a look at Section
14 II-B. "What kind of application can be submitted as
15 a 505(b)(2) application?"
16          Do you see that?
17    A.    I do.
18    Q.    We're going to subsection 2 again. It
19 says, "Changes to previously approved drugs," that
20 can be submitted under a 505(b)(2). Do you see that?
21    A.    I do.
22    Q.    Okay. And it goes on to say -- and I
23 guess let's go to the third sentence: "This use of
24 Section 505(b)(2)" -- it's the third sentence in. Do
25 you see that?

Page 56

1     A.    Yes, I'm sorry. Yes, go ahead.
2     Q.    Maybe Ashley can put the cursor on it.
3  You got it. There it is.
4           "This use of Section 505(b)(2),
5  described in the regulations at 21 CFR 34.54, was
6  intended to encourage innovation without creating
7  duplicative work and reflects the same principles as
8  the 505(j) application. It is wasteful and
9  unnecessary to carry out studies to demonstrate what
10 is already known about a drug."
11          Did I read that correctly?
12    A.    Not only did you read that correctly, I
13 agree 100 percent with -- obviously it's the FDA
14 writing this, but I believe that was valid in 1999
15 and it's still valid almost a quarter century later.
16    Q.    And you agree in particular it's
17 wasteful and unnecessary to carry out studies to
18 demonstrate what is already known about a drug.
19 True?
20    A.    That is actually, I would say, true not
21 just for ANDAs and 505(b)(2)'s, it's also true
22 for -- for traditional 505(b)(1)'s. But please go
23 ahead.
24    Q.    All right. Let's go to the glossary for
25 a second. I just want to make sure we get into the

Page 57

1  weeds a little bit. We're using -- speaking the same
2  language, if you will.
3     A.    Um-hum.
4     Q.    We're not going to do all of these. I
5  think some of them are self-evident. But I want to
6  talk about the first one, "active ingredient." Do
7  you see that?
8     A.    Yes.
9     Q.    And it says, "Active ingredient: Any
10 component that is intended to furnish pharmacological
11 activity or other direct effect in the diagnosis,
12 cure, mitigation, treatment, or prevention of
13 disease, or to affect the structure or any function
14 of the body of man or of animals."
15          Do you see that?
16    A.    I do.
17    Q.    Is that in your mind an appropriate and
18 accurate definition of what an active ingredient is?
19    A.    Well, it's the definition of -- that's
20 provided in the cited section of the CFR.
21    Q.    So is that a "yes," you agree?
22    A.    That is a "yes."
23    Q.    Okay. And in this, the context of our
24 discussion here today, the active ingredient in
25 docetaxel is docetaxel. Right?

Page 58

1   A.   It is -- so I think it's important, just
2   for clarity, to say you look at the definition
3   immediately below that, which is "active moiety."
4   Okay?
5        So there's the same active moiety does
6   not reference whatever the ester of salt is that the
7   active ingredient is either complex with or bound to.
8        Having -- so they both, that and the
9   505(b)(1) NDA Taxotere have the same active moiety.
10  I believe that it is also the same active drug
11  ingredient.
12  Q.   So --
13  A.   To understand for Hospira's NDA.
14  Q.   Okay.  So we're on the same page.
15       So for docetaxel, then, the active
16  ingredient in Hospira's docetaxel and the active
17  ingredient in Sanofi's Taxotere, and you're telling
18  me the active moiety in Hospira's docetaxel and the
19  active moiety in Sanofi's Taxotere are the same.
20  Fair?
21  A.   Yes.
22  Q.   Let's take a look at "Listed Drug."  Do
23  you see that?
24  A.   Yes.
25  Q.   It says, "A listed drug is a new drug

Page 59

1   product that has an effective approval under Section
2   505(c) of the Act for safety and effectiveness, or
3   under Section 505(j) of the Act."
4        And then it goes on to talk about
5   withdrawn or suspended.  But they're not, you know,
6   any of those things.  Right?
7   A.   When you say, "they're not any of those
8   things" --
9   Q.   I'm sorry.  Yeah, I just was trying not
10  to read the whole paragraph.  I don't want you to
11  fuss with me if I say that you agree that a listed
12  drug is the new drug product that has an effective
13  approval under Section 505(c) of the Act for safety
14  and effectiveness or under 505(j) of the Act?
15  A.   I will make it even simpler.  A listed
16  drug is one that has an effective NDA that's
17  approved, which is 505(c), or an Abbreviated NDA to
18  be approved under 505(j).
19  Q.   Well said.
20  A.   So docetaxel is approved under 505(c).
21  Q.   Right.  And Taxotere is a 505(c) as well
22  but under 505(b)(1).  Right?
23  A.   So submitted under 505(b)(1).
24       Hospira's docetaxel is submitted as a
25  505(b)(2), which as I mention in my report, is a

Page 60

1   subset of 505(b)(1).
2   Q.   Okay.  Fair enough.
3        So -- but Taxotere is 505(b)(1),
4   docetaxel is 505(b)(2).  I mean, there's nothing to
5   fuss about there.  Right?
6   A.   No, and those are two
7   different standards for approval, if you will, 505(c)
8   and 505(j).
9   Q.   Let's go to the Orange Book.  You're
10  familiar with the Orange Book.  Right?
11  A.   Yes.
12  Q.   It's the approved drug products with
13  therapeutic equivalence evaluations.  Do you see
14  that?
15  A.   Yes.
16  Q.   Okay.  We'll talk about that in a
17  second.
18       And then the next definition is
19  "Pharmaceutical equivalent or duplicate."  Do you see
20  that?
21  A.   Yes.
22  Q.   And you're familiar with this as well?
23  A.   Yes.
24  Q.   And it says, "Drug products that contain
25  identical amounts of the identical active ingredient,

Page 61

1   i.e., the same salt or ester of the same therapeutic
2   moiety in identical dosage forms but not necessarily
3   containing the same inactive ingredients."
4        Do you see that?
5   A.   Yes.
6   Q.   And it says, "And that meet the
7   identical compendial or other applicable standard of
8   identity, strength, quality and purity including
9   potency, and where applicable, content uniformity,
10  disintegration times and/or dissolution rates."
11  A.   Yes.
12  Q.   Did I read that reasonably correct?  You
13  agree that that's the definition of "pharmaceutical
14  equivalence or duplicate."  Right?
15  A.   Yes.
16  Q.   Do you believe that -- or have an
17  opinion as to whether Hospira's docetaxel is the
18  pharmaceutical equivalent of Sanofi's Taxotere?
19  A.   My understanding is that it's not only a
20  pharmaceutical equivalent, it is also a
21  bioequivalent.  And this is from the Office of
22  Generic Drugs.  And it's been determined to be
23  therapeutically equivalent to Sanofi's Taxotere.
24       Let me -- hopefully I got rid of a couple
25  of questions.  I will add, though, that that does not

16 (Pages 58 - 61)

1 make it, quote, a generic drug because it's
2 therapeutically equivalent.  The two are not
3 synonymous concepts.  And, again, I'm not sure if I
4 have that in my report, but they're
5 not -- they're -- a generic drug approved under
6 505(j) is not necessarily therapeutically equivalent
7 to the Reference Listed Drug.
8    Q.   Yeah, sorry.
9    A.   But anyway, I just -- I just mean that's
10 a really important point.
11    Q.   And I'm not going to fuss with you on
12 that.
13    A.   Okay.
14    Q.   I know I've got some fuss on that.  I'm
15 not going to do that.
16         But just so we're clear on our terms.
17 What you're saying is that a 505(j), an application
18 approved under 505(j) which is an Abbreviated New
19 Drug Application, that's when you label something
20 generic, that's what you have in mind in the first
21 instance.  Right?
22    A.   Well, if we could just go back up on the
23 page -- the page in the Guidance you were reading
24 from, talking about the purpose, but just so I can
25 help to clarify the point a little bit.

1    Q.   Where are we?
2    A.   It is what is -- I'm sorry, I think it's
3 up one more.
4    Q.   You know, Doc, maybe I'll just withdraw
5 the question.  Because it's really -- I'm not fussing
6 with you about --
7    A.   No, and I understand.
8         (Cross-talk.)
9    A.   That third paragraph goes over, you
10 know, distinguishes -- I think it's that one.
11 Actually, it's on the next -- the next page.
12    Q.   Yeah.
13    A.   The one that mentions department letter?
14    Q.   I'll let you finish your thought but
15 we're not going to fuss with that.
16    A.   All right.  It distinguishes between
17 505(b)(2)'s and 505(j)'s is all I want to say.
18    Q.   Understood.  Understood.
19         Okay.  I think we got where we wanted to
20 be.
21         Let's just end with Reference Listed
22 Drug.
23    A.   Um-hum.
24         MR. HOROWITZ:  If we can go back.  I'm
25 sorry, Ashley.  I'm blaming the doctor, though.  He's

1 the one that made you go back up.
2    A.   I'm sorry.  I apologize to the reporter.
3 I'm sorry, I'm not laughing as it's funny.
4    Q.   No worries.
5         Referenced Listed Drug.  "The listed
6 drug identified by FDA as the drug product upon which
7 an applicant relies in seeking approval of its
8 abbreviated application."
9         Do you agree with that definition?
10    A.   Yes.
11    Q.   And the regulation that's referenced in
12 here a few times, several times, it sets forth the
13 procedure for submitting a 505(b)(2) application is
14 Section 21 CFR 314.54.  Do you agree with that?
15    A.   I believe that's correct.
16    Q.   And just so we're on the same page, with
17 respect to a 505(b)(2) applicant, in general terms,
18 they're not required to demonstrate what is already
19 known about the drug.  Right?  We talked about that.
20    A.   I'm hesitating.  I'm trying to spare you
21 a long answer.
22    Q.   Please.
23    A.   It's whether they -- whether they can
24 rely on AFSE.  That's the abbreviation I use in my
25 report, the Agency's finding of safety and efficacy.

1    Q.   Correct.
2    A.   And sometimes they can and sometimes
3 they can't.  And it may be that they can rely on it
4 for part of it but not other things they have to do
5 additional.  So they want to do additional studies
6 because it will open up another door for them.
7 That's, I'll just say, a very interesting use and
8 very appropriate use of 505(b)(2)'s.
9         So to the extent that you can
10 extrapolate from what has already been demonstrated
11 to another, quote, new drug, the answer is yes.  But
12 I'm sorry, I'm really trying not -- I'm a recovering
13 academic.
14    Q.   You can do that in the exceptions under
15 the rule.  I understand what you're saying.
16    A.   Sorry.
17    Q.   That's why I was hesitant to even ask
18 this because, you know, it's like when lawyers try to
19 summarize and I don't think we even need to have this
20 conversation because I think we covered it.
21         But in other words, the whole point of
22 505(b)(2) is so that the applicant doesn't need to
23 repeat everything that was already done if they're
24 relying upon, let's say, a 505(b)(1) NDA such as
25 Taxotere in the docetaxel situation.  The whole point

17 (Pages 62 - 65)

1 is that they're not required to do all of the same
2 studies, all of the same clinical trials, all of the
3 same pre-clinical. All of the same work done
4 under the -- that's just not part of the program.
5 Right?
6     A.    No. To the extent that you can. And
7 also -- and I know you know this, but it's -- it's
8 also to strike a balance between not requiring
9 wasteful use of resources and time and providing some
10 intellectual property protection for --
11     Q.    Yeah, intellectual property protection
12 you mean, just so I can clarify, is patents, and
13 things like that.
14     A.    Yes, yes.
15     Q.    Right. And just so -- I'm sorry. One
16 of the things we'll see with the 505(b)(2)
17 applications here is that there's a bit of a gap
18 between when they're first submitted and when they're
19 finally approved, and part of that is because of what
20 you're talking about, exclusivity and patent issues
21 related to the innovator product which here would
22 have been Taxotere. Right?
23     A.    Yes. And the third thing -- and forgive
24 me -- is also in making sure that there's covered
25 rails, so to speak, in terms of some regulatory or

1 labeling that you don't go beyond -- like, speaking
2 specifically about generics, that they have to stay
3 identical to the label. And I'm not talking about
4 suitability petitions or that kind of thing.
5     Q.    Yeah.
6     A.    And I'm sorry, I know that's -- I know
7 that's -- I'm not trying to fuss with you either, I
8 just feel like those are important considerations.
9     Q.    I got you. I know you like to caveat
10 and that's fine.
11     A.    Well, it's not caveat. Actually, I
12 think this is really important stuff for the Court.
13 Go ahead. Go ahead. Sorry.
14     Q.    We're torturing the court reporter now.
15 Poor Linda.
16         Let's go to a new exhibit because maybe
17 we can button this up a little bit with the
18 regulation.
19         Why don't we mark as Exhibit 3
20 21 CFR 314.54.
21         (Exhibit 3, 21 CFR 314.54, marked for
22 identification.)
23     Q.    Go ahead and put that up on the screen.
24         MR. HOROWITZ: Our first technical
25 glitch. It's loading. There we go.

1     Q.    And you recognize this, Doctor,
2 Exhibit 3 as 21 CFR 314.54, Procedure for submission
3 of a 505(b)(2) application requiring investigations
4 for approval of a new indication for, or other change
5 from, a listed drug.
6     A.    Yes. Can I ask? My eyes are not what
7 they were.
8     Q.    You want to make it bigger?
9     A.    Bless you. Thank you.
10     Q.    And this is obviously a regulation that
11 you're familiar with?
12     A.    Yes.
13     Q.    So let's go to the last paragraph of the
14 first section, because I think the first part kind of
15 covers our discussion before.
16         But you see it says, "The 505(b)
17 application need not -- need contain -- I'm sorry.
18 I'll do that again.
19         "This 505(b)(2) application need contain
20 only that information needed to support the
21 modification(s) of the listed drug."
22         Do you see that?
23     A.    Yes.
24     Q.    And then if you go down to little
25 number iii. Do you see that? I think we overshot

1 it. We are. There it is. Sorry.
2         "Identification of each listed drug."
3         Do you see that?
4     A.    Yes.
5     Q.    It says, "The applicant must submit a
6 complete archival copy of the application that
7 contains the following:"
8         And little number iii says,
9 "Identification of each listed drug for which FDA has
10 made a finding of safety and effectiveness and on
11 which finding the applicant relies in seeking
12 approval of its proposed drug product by established
13 name, if any, proprietary name, dosage form,
14 strength, route of administration, name of listed
15 drug's application holder, and listed drug's approved
16 NDA number. The listed drug(s) identified as relied
17 upon must include a drug product approved in an NDA
18 that, (A) is pharmaceutically equivalent to the drug
19 product for which the original 505(b)(2) application
20 is submitted; and (B), Was approved before the
21 original 505(b)(2) application was submitted."
22         Did I read all of that correctly?
23     A.    You did.
24     Q.    Okay. And this is the regulation that
25 governs what we've basically been discussing with

18 (Pages 66 - 69)

Page 70

1  respect to 505(b)(2) applications and what's
2  required.  Fair?
3      A.   Well, it's -- it's one of them.  If I
4  can just comment.  First and foremost, so that the
5  thing in the paragraph that you just read, it
6  says "identification of each listed drug," and then
7  the last line there's a parenthetical (s).
8          Now, for a generic drug that is --
9      Q.   I'm sorry, Doctor --
10     A.   I know, I know, but I just --
11     Q.   You're going off on a tangent here.
12     A.   It's -- it's one of the things, it's one
13 of the things I just will say.
14     Q.   Doctor, I'll withdraw the last question.
15 Let me ask you this.
16     A.   Okay.
17     Q.   Do you agree that I read correctly the
18 FDA's regulation?
19     A.   This is one of the requirements for
20 approval of a 505(b)(2), yes.
21     Q.   And I think you said in your prior
22 deposition that when FDA reviews a 505(b)(2)
23 application, where there is a reliance upon a listed
24 drug and FDA's finding of safety and effectiveness,
25 that FDA doesn't go back to the beginning and redo

Page 71

1  everything and all the analyses that had previously
2  been done.  Do you remember saying that?
3      A.   I have to -- I'd want to see the exact
4  statement I made.  I would not say that never
5  happens.  But I'm certainly -- I'd want to see what
6  before, to be honest with you.
7      Q.   Let me ask you now.  Do you think FDA
8  goes back to the beginning of time and redoes all the
9  analysis and re-looks and redoes everything that was
10 previously done in the process of reviewing a
11 505(b)(2) application?
12     A.   No.  And I'd stand by, you know, just
13 leaving aside the exact wording, no.  But on the
14 other hand, they don't simply treat it as a black box
15 that says effective, safe and effective.  You want to
16 look at -- sorry -- for a 505(b)(2) specific aspects
17 of it.
18     Q.   Right.  I think that's what you said
19 before, too.  A 505(b)(2) application, when FDA is
20 reviewing that, they're going to look for issues that
21 are specific to the new 505(b)(2) filing.  Right?
22     A.   Yes.
23     Q.   And, essentially, FDA, you know, builds
24 upon what's already known about the approved product.
25 Agree with that?

Page 72

1      A.   Known, and also the regulatory analysis
2  and decisions that applied -- were applied to the
3  original drug.  But, again, I agree with your basic
4  point except generally they don't go back and do
5  everything again.  I would agree with you on that.
6          MR. HOROWITZ:  Let's mark as our next
7  exhibit, number 4, the NDA cover letter submission.
8          (Exhibit 4, Letter dated July 9, 2007,
9  Original New Drug Application, HOS00200007762 -
10 HOS00200007765, marked for identification.)
11         MR. HOROWITZ:  Ashley, that's Tab 7.
12 We're having loading issues.  It's just slow.
13     Q.   So, Doctor, what I've put in front of
14 you as Exhibit 4 is a document from Hospira's
15 production dated July 9, 2007.  It says, "Original
16 New Drug Application."  Do you see that?
17     A.   Yes.
18     Q.   And this would be the cover letter to
19 Hospira's submission of its New Drug Application for
20 its docetaxel product under Section 505(b)(2).
21 Right?
22     A.   Yes.
23     Q.   And if you go to the paragraph text in
24 the middle, it says, "Hospira, Inc., hereby submits a
25 New Drug Application for Docetaxel Injection in

Page 73

1  accordance with Section 505(b)(2) of the Federal
2  Food, Drug, and Cosmetic Act."
3          Do you see that?
4      A.   Yes.
5      Q.   "The basis for this submission is
6  Sanofi-Aventis U.S., NDA No. 20-449 for Taxotere
7  Injection Concentrate, approved on May 14, 1996."
8          Did I read that correctly?
9      A.   Yes.
10     Q.   And the reference to Taxotere is because
11 under the regulation that we just went through,
12 Taxotere would be the product that was already
13 approved as safe and effective that Hospira is
14 relying upon for this application.  Correct?
15     A.   Yes.
16     Q.   And if you go to the -- by the way,
17 the -- the May 14, 1996, date, that's the original
18 approval of Taxotere by FDA.  True?
19     A.   I believe that's correct, yes.
20     Q.   And that's roughly 11-plus years before
21 Hospira even submits this application.  Correct?
22     A.   Yes.
23     Q.   And not the direct subject of our
24 discussion today, but, generally, you would agree
25 that Sanofi once Hospira -- I'm sorry -- once

19 (Pages 70 - 73)

Page 74

1  Taxotere was on the market, you would expect that
2  they would be providing adverse event reports and
3  Periodic Adverse Drug Experience reports, and
4  expedited safety reports, and NDA annual reports, and
5  IND annual reports, and all of those things would be
6  provided to FDA as part of the regulatory obligations
7  of a New Drug Application holder.  True?
8      A.   Yes.
9      Q.   And FDA would, of course, be charged
10 with the review and assessments of those materials
11 and its duty to regulate the Taxotere product.  Fair?
12     A.   To the extent that it's able to do so,
13 of course.
14     Q.   And then if you turn to the next page of
15 Hospira's cover letter dated July 9, 2007, it says,
16 "The active ingredient, indications, route of
17 administration, and dosage form are the same as those
18 have the Reference Listed Drug."
19        Do you see that?
20     A.   I do.
21     Q.   And again, the Reference Listed Drug is
22 Taxotere.  Right?
23     A.   That is not the correct use of that
24 term; but, yes -- to the term "Reference Listed
25 Drug," but, you're correct, that is what's identified

Page 75

1  by that.
2      Q.   Why is that not the correct use of the
3  term?  I have to ask you that.
4      A.   If you -- we've looked at this before in
5  terms of the definition.  That applies to generics
6  approved under 505(j).  I mean, you can have -- a
7  generic by definition only has one listed drug on
8  which it relies.  A 505(b)(2) can have more than one,
9  and that was -- you know, looking at 314.54, that was
10 one of the points in there.
11        So Reference Listed Drug, and I'm aware
12 that FDA has -- I think to save a mouthful, has in
13 recent years actually started using it.  But that,
14 the definition in 314.3 for Reference Listed Drug
15 applies to 505(j)'s.
16     Q.   All right.  So when I have documents
17 from FDA and context from FDA that talk about
18 Taxotere is the Reference Listed Drug with respect to
19 Hospira's docetaxel, you're saying that those folks
20 at FDA got it wrong as well?
21     A.   What I'm saying is that's not the
22 definition of Reference Listed Drug that we looked at
23 before in 314.3.
24     Q.   Okay.  And your view is that Reference
25 Listed Drug is only something that is ever going to

Page 76

1  be used in the context of a 505(j) ANDA application?
2      A.   So if the Agency choose -- chooses to
3  use it as shorthand for a -- not the, but a listed
4  drug under which the 505(b)(2) NDA holder relies in
5  whole or in part on the Agency's findings of safety
6  and effectiveness, the Agency can do that.  But it
7  does the risk of confusion.
8         And, again, I think the bottom line is
9  the definition in 3.14.3 for an RLD -- we can go back
10 and look.
11     Q.   Yeah, I think you're tilting at a
12 windmill.  I've tried to do it for you, but you know,
13 this difference between 505(j) and 505(b)(2), we're
14 not going to be fighting very much about that today.
15 We're just not.  So --
16     A.   I take --
17     Q.   Let me say --
18     A.   Believe me.
19     Q.   Everybody used it.
20     A.   Okay.  I just want to say one thing.
21 Not about this but about process.  And I know you're
22 tired and I'm really not trying to be difficult, but
23 I also would like to make sure I'm clear on the
24 record --
25     Q.   Okay.

Page 77

1      A.   -- for everybody's sake.
2         But you have enormous -- if you were up
3  late, believe me, last night, you have enormous
4  sympathy from me.  I mean that.  I just want to make
5  it clear, I'm not trying to tilt at windmills and be
6  difficult.  I'm really not.
7      Q.   Let's continue.
8      A.   Go ahead.
9      Q.   It says, "The active ingredient,
10 indications, route of administration, and dosage form
11 are the same as those of the Reference Listed Drug."
12        And here Hospira is referring to
13 docetaxel.  Is that fair?
14     A.   That's what it says, yes.
15     Q.   And if you go onto the end of that
16 paragraph, it says, "The differences between the
17 labeling content of the proposed drug product and
18 that of the Reference Listed Drug, Taxotere Injection
19 Concentrate, are noted in the side-by-side labeling
20 comparison provided in Module 1 (Section 1.14.3.1)."
21        Do you see that?
22     A.   Yes.
23     Q.   And, "A high-level summary of the
24 differences between Hospira, Inc.'s Docetaxel
25 Injection and the Reference Listed Drug Taxotere

1 Injection Concentrate is provided below."
2     Do you see that?
3   A.  I do.
4   Q.  And then they give the specific changes
5 with respect to their proposed product and Taxotere
6 Injection.
7     And we can look at those, but would you
8 agree with me that none of those changes relate to
9 information about adverse events or warnings?
10   A.  I would say not explicitly certainly,
11 but you know, there's -- I would just say there are
12 immediate precaution or patient safety issues that in
13 terms of labeling that these raise.
14     For example, you know, the question of
15 the first, the very first bullet, direct dilution.
16 And it's neither good nor bad in that way, but
17 it's -- there's labeling implications other than just
18 this.  But you're correct in terms of saying, well,
19 there's this adverse event or that, that does not by
20 itself have direct implications for the Adverse
21 Reactions section.
22   Q.  And, in fact, what's being submitted is
23 a side-by-side label comparison.  I mean, they're
24 literally putting the Taxotere label side by side
25 with the proposed Hospira label for FDA to take a

1 look at.  Right?
2   A.  Correct.
3   Q.  And to do that comparison.  True?
4   A.  Yes.
5   Q.  And if you go down to below the bullet
6 list of -- of differences, it says, "The data
7 supporting this application is provided in 12 volumes
8 and is organized according to the sections defined in
9 the FDA's Guidance For Industry."
10     Do you see that?
11   A.  I do.
12   Q.  And as we discussed earlier, you have
13 not reviewed those 12 volumes that FDA had to review
14 and reviewed before they approved this application.
15 Right?
16   A.  With the understanding that actually I
17 was not asked to address anything related to approval
18 itself, no, that's correct.
19   Q.  And is it your view that -- that
20 the -- well, let me ask it this way -- no, let me not
21 do that.  We'll come back to that.
22     Let's go to the next page.
23     It says in the middle there, do you see
24 where it says, "Hospira, Inc., requests a therapeutic
25 equivalence designation of AP"?  Do you see that?

1   A.  Yes.
2   Q.  -- "as defined in the FDA Orange Book
3 for Docetaxel Injection product upon approval of the
4 NDA."
5     Did I read that correctly?
6   A.  Yes, yes.
7   Q.  Do you know if that ultimately occurred?
8   A.  I don't know if that was the code.  My
9 understanding is that they did get an A code, which
10 as opposed to a B code, would mean therapeutic
11 equivalence.  I don't know if it was that specific
12 code, though.
13   Q.  Do you agree that FDA believes -- I'm
14 just reading from the Orange Book but I'm trying to
15 expedite this.
16     But when FDA talks about therapeutic
17 equivalence, it says, "FDA believes that products
18 classified as therapeutically equivalent can be
19 substituted with the full expectation that the
20 substituted product can be expected to have the same
21 clinical effect and safety profile as the prescribed
22 product when administered to patients under the
23 conditions specified in the labeling."
24     Is that your understanding of FDA's view
25 of pharmaceutical equivalence -- or I'm sorry,

1 therapeutic equivalence?
2   A.  Yes.
3   Q.  Okay.  Let's get back on track here.
4     MR. HOROWITZ:  Let's go to our next
5 exhibit, which will be Tab 8.
6     (Exhibit 5, E-Mail dated 11/9/2010, with
7 attachments, HOS01400254441 - HOS01400254568, marked
8 for identification.)
9   A.  Mr. Horowitz, apologies.  Just a brief
10 addendum.  That therapeutic equivalence, I do agree
11 that's FDA's -- that's my understanding of FDA's use
12 of therapeutic equivalence.  With the understanding
13 is that's at the time that therapeutic equivalence
14 determination is made.  I just want to add that
15 clarification.
16   Q.  And do you know for Hospira when that
17 was done with their docetaxel product and Taxotere?
18   A.  I believe -- I don't -- I honestly
19 don't.  I mean, I believe it was after approval,
20 obviously, but I would not be able to tell you when.
21   Q.  Let's go to exhibit -- which is probably
22 loading.  I believe we're up to Exhibit 5 or is it 6?
23 Anyone?  Larry, help me out?
24     MR. CENTOLA:  No clue.
25   Q.  Exhibit 5.

21 (Pages 78 - 81)

Page 82

1        All right.  Let's start at the top.  You
2 see this as an e-mail from Laurie Wojtko.  Do you
3 know who she is?
4        A.    I don't.  I gather she's a senior
5 associate in Reg Affairs for Hospira or was at the
6 time.
7        Q.    And we can agree you never read her
8 deposition.  Right?
9        A.    Correct.
10        Q.    She sends an e-mail on November 9th,
11 2010, to two individuals at FDA.  Do you see that?
12        A.    Yes.
13        Q.    And do you know who those individuals
14 are?
15        A.    I don't.
16        Q.    If you go to the next page, do you see
17 it's dated November 9, 2010, at the top?
18        A.    Yes.
19        Q.    And it's -- it says, "Telephone
20 Request - Labeling."
21        And this is a Hospira document.  Right?
22        A.    Yes.
23        Q.    And it says, "In response to the
24 telephone request from Modupe Fagbami at FDA, on
25 November 8, 2010, Hospira, Inc., hereby submits

Page 83

1 redlined labeling, created based upon the most recent
2 revision to the Reference Listed Drug's Taxotere
3 label 1-vial system label approved on August 2nd,
4 2010."
5        Did I read that correctly?
6        A.    Yes.
7        Q.    It says, "Hospira's label is unchanged
8 from its tentatively approved label, with the
9 exception of changes made to align with the RLD's
10 revisions."
11        And do you understand "RLD's revisions"
12 in this context to mean the Reference Listed Drug?
13        A.    Yes.
14        Q.    "Hospira has filed this application
15 using Taxotere's 2-vial system as its reference.
16 This redline label demonstrates alignment of
17 Hospira's proposed label with both the 1-vial and
18 2-vial system labels."
19        Did I read that correctly?
20        A.    Yes.
21        Q.    And in forming your opinions and as part
22 of the review, you did not review either this e-mail
23 contact report or the side-by-side labeling
24 comparison submitted to FDA.  Is that fair?
25        A.    No.

Page 84

1        Q.    Okay.  Let's go on then.
2        Well, let me ask you this.  We're going
3 to get to the approval in a second.  You know that
4 FDA ultimately approved Hospira's 505(b)(2) NDA
5 application for docetaxel.  Right?
6        A.    Yes.
7        Q.    Did FDA require any clinical studies for
8 Hospira's docetaxel before approval beyond those
9 already conducted by Sanofi?
10        A.    Keeping in mind that I was not asked to
11 address questions involving approval itself, as best
12 I'm aware, no.
13        Q.    So as far as you know and as far as you
14 understand it, FDA did not require any clinical
15 studies of Hospira as part of its approval of its
16 505(b)(2) application for docetaxel.  Fair?
17        A.    Yes.
18        Q.    And you're not going to be offering any
19 opinions about whether Hospira should have conducted
20 studies as part of its approval process.  As I
21 understand it, you're just not getting into the
22 approval process from what you've told me.
23        A.    If you mean -- here are you talking
24 about clinical trials?
25        Q.    Yeah, clinical studies.

Page 85

1        A.    I mean, I did not address that question
2 so I'm not -- yeah.  No, I do not plan on offering
3 opinions on pre-approval clinical trials.
4        Q.    And would you agree that Hospira is part
5 of -- well, prior to -- I'm sorry.
6        Would you agree that Hospira would not
7 have had access to Sanofi's proprietary clinical
8 trial information or pre-clinical information prior
9 to its approval of its 505(b)(2) NDA?
10        A.    To the extent that any of that
11 information was either not public, that is, posted on
12 FDA's website as part of -- with the reviews, or it
13 was not available under FOIA, I'd agree that that
14 material would not be available.
15        Q.    And do you agree that Hospira would not
16 have had access to all of the pre-approval
17 communications that occurred between FDA and Sanofi
18 before Taxotere was first approved?
19        A.    I don't know what material they would
20 have had available in terms of that correspondence.
21 And, again, that's not -- did not deal with my -- I'm
22 sorry -- wasn't relevant to the questions that I was
23 asked to look at.
24        Q.    Okay.  So if I asked you the same
25 question about, you know, post-approval, post-1996

22 (Pages 82 - 85)

1 prior to the approval in 2011 of -- of Hospira's
2 docetaxel under 505(b)(2), you would give me the same
3 answer, this just wasn't something you were looking
4 at?
5     A.    Well, let me -- so --
6     Q.    I'm sorry.  What I mean by that is
7 specifically related to whether Hospira had access to
8 all of the back-and-forth between Sanofi and FDA.
9     A.    Only to the extent in terms of this
10 correspondence between the NDA holder, in this case
11 Sanofi, and FDA, only what either had been made
12 public for whatever reason, or that was available
13 under FOIA.  But otherwise, no.
14     Q.    And when you say, "available under
15 FOIA," you're not trying to suggest that Hospira
16 would have had access to proprietary information
17 related to the clinical studies and pre-clinical
18 studies and all of the back-and-forth between FDA and
19 Sanofi pre- or post-approval, you're not suggesting
20 that they could have accessed it that way, are you?
21     A.    No, and I just saying that if it is
22 FOIA-able, they have -- somebody, anybody would have
23 access to it.  But there's actually a specific
24 regulation -- I'm sorry, I can't remember the number,
25 it's somewhere in part 314 -- saying that actually

1 this represents -- for example, trade -- I may not be
2 using the right term here -- trade secret or
3 commercial confidential, the FDA cannot release and
4 will not release.  I mean, the regs explicitly say
5 that the FDA will not even confirm the existence or
6 the submission of an application unless the applicant
7 says it's okay or does it itself.
8         MR. HOROWITZ:  Let's go on to our next
9 exhibit, which will be Exhibit 6.
10    Q.    I think we're still loading, Doctor.
11 Sorry.
12        MR. HOROWITZ:  I'm sorry, Tab 9.  I'm so
13 sorry, Ashley.
14        (Exhibit 6, NDA Approval, HOS01400256285
15 - HOS01400256346, marked for identification.)
16        (A discussion is held off the record.)
17        MR. HOROWITZ:  Hey, Ashley, maybe we can
18 make that a little bigger for the Doc.
19    Q.    All right.  Doctor, I put before you
20 what we've marked as Exhibit No. 6, and this is the
21 approval letter from FDA to Hospira with respect to
22 its Docetaxel 505 NDA, including the label and the
23 other materials.  Do you see that?
24    A.    I do.
25    Q.    And I believe it's dated -- go to the

1 very end.  I will make this easy, it has an
2 electronic signature, March 8, 2011.  Do you see
3 that?
4     A.    Yes.
5     Q.    So it's fair to say then that the
6 Hospira docetaxel NDA under Section 505(b)(2) was
7 approved by the FDA on March 8, 2011.
8     A.    Sorry to be a purist, "was effectively
9 approved."  If you look at the beginning, it says it
10 was tentatively approved, and I assume it has to do
11 with patent and exclusivity issues.  But, yes,
12 effectively it was approved on that date.
13    Q.    I think you might be mixing two things.
14    A.    I could be.
15    Q.    This is the final approval.  This is
16 not --
17    A.    Yes, yes, and I'm -- I'm -- this is the
18 date on which it could be marketed.
19    Q.    This is the final approval.  I'm sorry.
20    A.    Yes, that's -- that's all I'm saying.
21    Q.    Okay.  And we'll cover that.  Nothing
22 tricky here.
23        Let's go to the first page and just
24 maybe clean this up a little.
25        Doctor, do you see there in the top right

1 corner on this letterhead from FDA it says, "NDA
2 Approval."
3     A.    Yes, yes.  And I wasn't challenging
4 that.  I just was referring to that third paragraph
5 there.  That's all.
6     Q.    Understood.  Understood.
7         And so just to clarify then, you see the
8 third paragraph says, "Also please refer to our
9 tentative approval letter dated December 11, 2009."
10    A.    Yeah.
11    Q.    And so that was the tentative approval,
12 and then this is the final approval on March 8, 2011.
13    A.    Yeah, effective approval, yes.
14    Q.    And it says -- and by that we mean this
15 is the date upon which the company can now market and
16 put into the marketplace its docetaxel product.
17    A.    Correct.  In the United States, correct.
18    Q.    In the United States.  You are a purist.
19    A.    I'm sorry.  If it makes you feel any
20 better, I drive people -- in my day job I drive
21 people nuts with this.
22    Q.    I find that shocking.
23        All right.  And let's go through the
24 letter a little bit if you'll indulge it and I think
25 this will be it before lunch.

23 (Pages 86 - 89)

Page 90

1    A.   Okay.
2    Q.   It says, "Dear Ms. Wojtko."  We talked
3  about that earlier.  She's in Regulatory Affairs at
4  Hospira.  Right?
5    A.   Yes.
6    Q.   It says, "Please refer to your New Drug
7  Application dated July 9, 2007, received July 11,
8  2007, submitted pursuant to Section 505(b)(2)."
9         Do you see that?
10   A.   Yes.
11   Q.   And it says there were some amendments
12 that were also submitted, several amendments there,
13 we don't have to go through them all.  But multiple
14 amendments particularly in 2010 and early 2011.  Do
15 you see that?
16   A.   Yes.
17   Q.   And then it goes on to say, "This NDA
18 provides for use of Docetaxel" -- "Docetaxel
19 Injection, 20 milligrams per 2 milliliters,
20 single-dose vial; 80 milligrams per 8 milliliters,
21 multi-dose vial; and 160 milligrams/16 milliliter
22 multi-dose vial for locally advanced or metastatic
23 breast cancer after failure of prior chemotherapy in
24 combination with doxorubicin and cyclophosphamide as
25 adjuvant therapy of operable node-positive breast

Page 91

1  cancer," semicolon.
2         Putting aside my pronunciation, did I
3  read that reasonably correctly?
4    A.   Better than I would have.
5    Q.   So the first indication, if you will,
6  involves treatment of breast cancer.  Is that fair?
7    A.   A specific class of -- of -- the
8  people -- the patients with the more advanced breast
9  cancer, but yes.
10   Q.   And by "more advanced," what do you
11 mean?
12   A.   So as opposed to, for example, early
13 breast cancer or node-negative -- I'm sorry -- yeah,
14 or node-negative breast cancer.  I'm just -- and,
15 again, I'm just -- that's -- that's a specific
16 indication, and of course it's based on the Taxotere
17 label.  So typically approvals from cancer drugs are
18 going to be specific to a particular stage.  You
19 know, most commonly it's you start out with the most
20 advanced form compared to -- as opposed to earlier
21 stages, because those are generally the patients with
22 the fewest options.
23   Q.   And then it says, "For locally advanced
24 or metastatic non-small lung cancer after failure of
25 prior platinum-based chemotherapy in combination with

Page 92

1  cisplatin for unresectable, locally advanced or
2  metastatic, untreated, non-small cell lung cancer,
3  and in combination with prednisone for androgen
4  independent (hormone refractory) metastatic prostate
5  cancer."
6         Again, did I read that reasonably
7  correctly?
8    A.   Yeah, that's absolutely it.
9    Q.   Okay.  So we're talking about a form of
10 lung cancer as -- as a next indication after -- after
11 what you described for us with respect to breast
12 cancer.  Right?
13   A.   Yes.
14   Q.   And, again, we're talking about advanced
15 or metastatic type of cancer?
16   A.   Yes.  Unresectable.
17   Q.   Understood.
18        And then the last would be the
19 metastatic prostate cancer.  Is that right?
20   A.   I'm sorry.  I'm just -- I'm seeing
21 distinctions here.  And I'm not trying to make any
22 particular problem here.  I mean, the hormone
23 refractory is particularly problematic.  So, again,
24 there's nothing bad about that.  I'm not saying, oh,
25 my God, that's terrible.  I'm just -- those

Page 93

1  are -- cancer is a collection of several hundred
2  diseases ultimately and that's why these distinctions
3  are important, why the FDA labels -- and the company
4  studies it in a very precise way.
5         Go ahead.  I'm sorry, Mr. Horowitz.
6    Q.   All good.  All good.
7         And it goes on to say, "We have
8  completed our review of this application, as amended.
9  It is approved, effective on the date in this letter,
10 for use as recommended in the enclosed agreed-upon
11 labeling text."
12        Did I read that correctly?
13   A.   You did.
14   Q.   I mean, I think you said this, but we're
15 talking about pretty -- pretty life-threatening
16 conditions here with respect to these indications for
17 which this drug is being approved.  Right?
18   A.   Absolutely.
19   Q.   And would you agree that an
20 oncologist -- an oncologist is a doctor who
21 specializes in treating patients with -- with various
22 types of cancer.  Would you agree with that?
23   A.   Yes.
24   Q.   And you would agree that it's the role
25 of an oncologist to work with their patient when they

24 (Pages 90 - 93)

Page 94

1 prescribe a medication to treat these serious types
2 of cancer to consider the benefits and risks of that
3 medicine as they're prescribing it.
4     A.    Yes.
5     Q.    I guess one question I have is, in
6 forming your opinions about alopecia and permanent
7 alopecia, did you consider the risk -- I'm sorry, the
8 benefit here, the benefits out of the equation?
9         MR. CENTOLA:  Objection, form.
10    A.    I'm not -- I want to try and make my
11 answer as -- as succinct as possible so I'm going to
12 ask you to provide a little context to that.  I mean,
13 I have an answer but is it based on assumptions about
14 your question, I don't --
15    Q.    Yeah, let me ask it differently.  Have
16 you -- have you yourself assessed the benefit of
17 docetaxel as a treatment for any of the conditions we
18 just went through?
19    A.    The -- let me put it like this:  The
20 question of benefit was not one that I was asked to
21 look at and I certainly am not saying that there's
22 not benefit.  I mean, these are obviously patients
23 with extremely serious diseases.  So that's -- that's
24 not the question that I was asked to address.
25    Q.    Understood.  Understood.

Page 95

1         And did you look at any other risks when
2 you assessed at the request of the plaintiffs'
3 lawyers the issue of alopecia and permanent alopecia,
4 did you look at any of the risks associated with
5 docetaxel?
6     A.    Again, that was not -- well, two things.
7 First off, when the FDA is looking at, you know, a
8 labeling change, for example, it's going to be
9 focused on the specific adverse event or adverse
10 reaction.  It's not going to be looking at
11 automatically at all risks in the benefit unless
12 there's something where it dramatically alters the
13 benefit/risk ratio.  That's number one.
14        To answer your question directly, again,
15 this is the FDA just looking at labeling changes as
16 indicated.  I was not looking at that issue.  I mean,
17 it's just -- it's not -- generally it's not germane
18 to whether this adverse event met the threshold for
19 going in.
20    Q.    I'm not sure, there's one thing you said
21 I'm not sure I fully understood, which is, are you
22 suggesting that when FDA considers a particular
23 adverse event it does so I, guess, in a silo and
24 doesn't consider, you know, the benefits and risks in
25 association with that adverse event and -- and where

Page 96

1 that adverse event fits within the overall profile?
2     A.    No.  What I'm saying is that -- we can
3 go back to -- let me just -- and, again, just make
4 sure that I am -- so there's a -- you know, a
5 definition of an adverse event in the regs.  And then
6 the threshold for adding it to the Adverse Reactions
7 section -- and this is on paragraph 27 of my report
8 is -- there's some basis to believe that is a causal
9 relationship between the adverse event and the drug.
10 And in terms of a warning, it's reasonable evidence
11 of a causal -- the causal association.
12        It's -- the regs don't say, well,
13 there's a really important benefit to this so don't
14 list this.  Or don't list this, it's not -- you know,
15 it just doesn't say that.  I'm just looking at what
16 the regulatory standard is.
17        If it doesn't meet that standard, that's
18 a different issue.  But that information may not
19 change globally the benefit/risk ratio.  And most
20 often it doesn't.  But that doesn't mean for the
21 population for which it's approved, but it may be
22 extremely important information that oncologists and
23 patients have in terms of what do they do.  Even if
24 they say it's not going to affect my decision to use
25 this drug, there's other reasons that they should

Page 97

1 know it, and that's the basic principle of medical
2 ethics.
3     Q.    Doctor, let's -- let's look at the first
4 page of the label attached.  This is the enclosed
5 agreed-upon labeling text just for context.  Right?
6     A.    Yes.
7     Q.    We see the very first page, as it is
8 with all labels these days, we have the Highlights Of
9 Prescribing Information.  Do you see that?
10    A.    Yes.
11    Q.    The first thing, it says "Initial U.S.
12 Approval," it gives the date 1996.  Do you see that?
13    A.    I do.
14    Q.    And you understand that this is the
15 Hospira label for docetaxel.  Right?
16    A.    Yes.
17    Q.    But that initial U.S. approval date,
18 that's actually the Sanofi Taxotere approval date.
19 Correct?
20    A.    That is correct.
21    Q.    And the date that we just went through
22 for the first full effective approval of Hospira's
23 docetaxel is March 8, 2011.  Right?
24    A.    Yes.
25    Q.    And then you see there's a big box

25 (Pages 94 - 97)

1 warning. Right?

2    A.    Yeah.

3    Q.    And that's -- you know, that's not

4 uncommon with medications or drugs like this. Right?

5 Cancer drugs. Right?

6    A.    Yes.

7    Q.    And then if you go to "Recent Major

8 Changes," there's several listed there. Do you see

9 that?

10    A.    Yes.

11    Q.    And the first is "Dosage and

12 Administration," a change to Section 2.8 and a change

13 to Section 2.9. And that's July 2010. Do you see

14 that?

15    A.    I do.

16    Q.    And then it says, "Contraindications,"

17 Section 4. That's a change made May of 2010? Do you

18 see that?

19    A.    I do.

20    Q.    And then "Warnings and Precautions,"

21 Section 5.2, May of 2010. Do you see that?

22    A.    I do.

23    Q.    And "Drug Interactions," Section 7,

24 April 2010. Right?

25    A.    Yes.

1    Q.    Now, this is also before the effective

2 approval on March 8th, 2011, of Hospira's docetaxel.

3 Right?

4    A.    Yes.

5    Q.    And is it your understanding that these

6 changes are actually referring to changes made to

7 Sanofi's Taxotere label?

8    A.    Correct.

9    Q.    If you go over to the "Highlights"

10 section, I mean, it's got the Recent Major Changes,

11 Indications and Usage, Dosage and Administration,

12 Dosage Forms and Strength, Contradictions, and then

13 more warnings and precautions that are not

14 necessarily covered in the boxed warning. Right?

15    A.    Yes.

16    Q.    And underneath that is something called

17 Adverse Reactions. Do you see that?

18    A.    Yes.

19    Q.    And it goes through what it calls, "The

20 most common adverse reactions across all docetaxel

21 indications are." Do you see that?

22    A.    I do.

23    Q.    And you'd agree with me that alopecia is

24 one of those that is listed.

25    A.    Um, so it's -- it's, like, I think I'm

1 kind of -- it's the 20th out of 22nd, and it just

2 says "alopecia" rather than "persistent" or

3 "permanent alopecia."

4    Q.    I didn't ask you that. I simply said

5 "alopecia" is listed. Right?

6    A.    That single word is listed. Correct.

7    Q.    And "alopecia" means hair loss so we're

8 on the same page. Right?

9    A.    I'm not sure. I'm just commenting that

10 it's alopecia.

11    Q.    I'm sorry, you're not sure what

12 "alopecia" means?

13    A.    No, no. Again, I'm not -- you probably

14 know I mean I'm saying it's -- I would not agree that

15 alopecia and permanent alopecia are the same.

16    Q.    I didn't ask you that question. I

17 simply said alopecia means hair loss. Right?

18    A.    Yes.

19    Q.    Okay.

20    A.    That is correct.

21    Q.    All right.

22        Let's -- by the way, that's not the only

23 information on the label where alopecia information

24 is given, is it, the Adverse Reactions section, or do

25 you know?

1    A.    I mean, the -- when you're talking about

2 looking at Section 6 of the label. Is that --

3    Q.    You're talking about the clinical

4 trials?

5    A.    No, I'm talking about the adverse -- the

6 actual, the full prescribing information, the Adverse

7 Reactions section.

8    Q.    Right. I'm asking you if you know as

9 part of your review did you consider whether alopecia

10 was included elsewhere in the label in March of 2011

11 when it was first approved by FDA other than the

12 Adverse Reactions section?

13    A.    So what I looked at was -- was alopecia

14 included, was permanent alopecia included, was any

15 information provided on the incidence, and was there

16 any information on the duration.

17    Q.    What sections of the label do you know

18 was alopecia included other than the Adverse

19 Reactions section, or do you know?

20    A.    There's a kind of post-marketing

21 experience that's --

22    Q.    I'm not asking about post-marketing.

23 I'm just asking you in the whole label, there's no

24 post-market experience yet for Hospira. Right? I

25 mean, I'm asking at the time of this approval, what I

26 (Pages 98 - 101)

1 want to know is do you know where alopecia is
2 included in this label other than the Adverse
3 Reactions section. Do you know?
4     A.   I would want to go through the label and
5 take a look to give an accurate answer.
6     Q.   Okay. Let's go to the Patient
7 Information section. Let's go to -- it's on page 42
8 of 46 of the label.
9         Let me see if I have a PDF.
10        MR. HOROWITZ: Go up a little bit.
11 Yeah.
12    Q.   Do you see that, Doctor, it says
13 "Patient Information" -- there we go. "Patient
14 Information." Do you see that under -- on the screen
15 in front of you?
16    A.   Yes.
17    Q.   And this is a section of the -- of the
18 label. Right?
19    A.   Yes.
20    Q.   And it's directed actually to patients,
21 is it not?
22    A.   Yes.
23    Q.   And it says, "Read this Patient
24 Information before you receive your first treatment
25 with Docetaxel Injection and each time before you are

1 treated."
2       Did I read that correctly?
3     A.   Yes.
4     Q.   Okay. "There may be new information.
5 This information does not take the place of talking
6 with your doctor about your medical condition or your
7 treatment."
8       You would agree with that advice,
9 wouldn't you?
10    A.   Absolutely.
11    Q.   And then it starts, "What is the most
12 important information I should know about the
13 Docetaxel Injection?" And it talks about serious
14 side effects including death. Do you see that?
15    A.   Yes.
16    Q.   It talks about the possibility of
17 infecting your blood cells. Do you see that?
18    A.   Yes.
19    Q.   Serious allergic reactions. Things like
20 that. Right?
21    A.   Yes.
22    Q.   And if you go down to the side effects
23 discussion. Do you see there in bold letters, "What
24 are the possible side effects of Docetaxel
25 Injection?"

1       And then it answers, "Docetaxel
2 Injection may cause serious side effects including
3 death."
4     Q.   Do you see that?
5     A.   I do.
6     Q.   And then it discusses some of the things
7 that we just kind of ran through. Acute myeloid
8 leukemia, other bloods disorders, skin reactions,
9 neurological symptoms. Do you see all of that?
10    A.   Yes.
11    Q.   And that's written in a language
12 designed for patients to maybe absorb and understand.
13 Right?
14    A.   Based on the labeling.
15    Q.   Correct.
16        And it says, "The most common side
17 effects of Docetaxel Injection include." And instead
18 of the word "alopecia," if you go down, they have the
19 word "hair loss." Do you see that?
20    A.   I do.
21    Q.   That's actually two words, "hair loss."
22    A.   Okay.
23    Q.   And this, again, is in the Information
24 For Patients. Right?
25    A.   Yes.

1     Q.   And do you see underneath, it says,
2 "Tell your doctor."
3       "Tell your doctor if you have any side
4 effect that bothers you or does not go away."
5       Do you see that?
6     A.   Yes.
7     Q.   Okay. And you agree with me that that's
8 information that was included in the labeling for
9 docetaxel when it was first approved in -- in March
10 of 2011. Fair?
11    A.   That general statement does appear in
12 there. You're correct.
13    Q.   Okay. It says what it says. Right?
14    A.   I'm sorry?
15    Q.   It says what it says. Right?
16    A.   Correct.
17    Q.   It says, "Tell your doctor if you have
18 any side effect that bothers you or does not go
19 away." Right?
20    A.   It applies to all of these without
21 singling any of them out. You are correct.
22    Q.   And hair loss would be one of those that
23 it applies to. Right?
24    A.   One of the whole list, yes.
25    Q.   It's one of those. Right?

27 (Pages 102 - 105)

Page 106

1    A.   Well, it is.  It doesn't single it out
2 or provide any indication that the hair loss might
3 not go away.  That's the only point I want to say.
4    Q.   It's not singling it out.  It applies to
5 this whole list including hair loss.  Right?
6    A.   Yes.
7    Q.   It doesn't exclude it.  Right?
8    A.   Doesn't particularly give any --
9    Q.   I didn't ask that.  It doesn't exclude
10 it.  Right?
11    A.   It does not -- let's say it -- it does
12 not exclude it.  If you were to say, though, you
13 know, this could make you feel bad, that would cover
14 the waterfront, too.
15        MR. HOROWITZ:  Objection.  Move to
16 strike everything after the responsive portion of the
17 question.
18    Q.   Doctor, why don't we stop for lunch.
19 It's just about 12:30.
20        Larry, what do you think, maybe usually
21 45 minutes?
22        MR. CENTOLA:  That sounds fine.
23        MR. HOROWITZ:  Is that good?
24        MR. CENTOLA:  Sure.
25        MR. HOROWITZ:  We'll pick up at 1:15?

Page 107

1        THE VIDEOGRAPHER:  The time is 12:28.
2 We are going off the record.
3        (A lunch recess is taken.)
4        A F T E R N O O N   S E S S I O N
5        THE VIDEOGRAPHER:  The time is 1:21 p.m.
6 We are back on the record.
7    Q.   Doctor, are you ready to proceed?
8    A.   I am.
9    Q.   Doctor, I want to ask you if you'd agree
10 with me that with regard to your opinions -- and I
11 think you've said this but I want to be clear -- that
12 you're not offering any opinion that the Hospira
13 label for docetaxel approved by FDA was inadequate at
14 the time of approval in March of 2011.
15    A.   I was not asked to address that
16 question.
17    Q.   Okay.  And so you were not asked and you
18 are not so opining and will not be offering that
19 opinion.  Right?
20    A.   Correct.
21    Q.   And you're not going to offer any
22 opinions regarding Hospira's meeting of its
23 pre-approval regulatory obligations.  Correct?
24    A.   Correct.
25    Q.   And you won't be offering relatedly any

Page 108

1 opinions with respect to FDA's decision to approve
2 the Hospira docetaxel 505(b)(2) NDA.  True?
3    A.   That's correct.
4    Q.   And you're not going to be offering any
5 opinions -- and I certainly didn't see anything in
6 your report, but I just want to button this
7 up -- that Hospira failed to submit any required
8 information to FDA.  Correct?
9    A.   With -- if your question is with regard
10 to its original NDA application, you are correct.
11    Q.   Okay.  I'm going to come back then to
12 the -- the second part of that.  I mean, are you
13 going to offer any opinions that Hospira ever failed
14 to submit any required information to FDA?
15        MR. CENTOLA:  Objection, form.
16    Q.   With respect to docetaxel.
17    A.   Can you be more specific about "required
18 information"?
19    Q.   No, I can't.  I mean, I think you know
20 what we're talking about.  There's regulations in
21 compliance with regulations, and my question is
22 pretty simple, and I don't see this in your report so
23 I thought this was an easy one but I'm going to ask
24 it again.
25        You're not going to be offering any

Page 109

1 opinion, and I certainly don't see anything in your
2 report that suggests that Hospira failed to submit
3 any required information under the regulations to
4 FDA?
5        MR. CENTOLA:  And I will object to the
6 colloquy.  If you want to ask a question, that's
7 fine, but I think that you know that you're -- what
8 you're stating is incorrect.  So if you want to get
9 into a colloquy, we can get into a colloquy, if you
10 want to ask questions we can have questions, but you
11 know he is going to say that.
12        MR. HOROWITZ:  Whoa, whoa, whoa,
13 Seabiscuit.  No speaking objections there, Larry.
14 Come on.  Objection, form.
15    Q.   And my question is, Doctor --
16        MR. CENTOLA:  If you stick to questions,
17 I'll stick to objection to form.
18        MR. HOROWITZ:  Are you done?
19    Q.   Okay.  Let's do this again, Doctor.
20        Are you going to be offering any opinion
21 that Hospira failed to submit any required
22 information to FDA with respect to its docetaxel
23 product?
24        MR. CENTOLA:  Objection, form.
25    A.   Yes.

28 (Pages 106 - 109)

1    Q.    And what is that?  What did they fail to
2 submit?
3    A.    So --
4    Q.    Can I ask you -- it looks like you're
5 looking at something.  May I ask what you're looking
6 at?
7    A.    Oh, yes.  My -- my report.
8    Q.    And is that a hard copy of your report
9 or electronic?
10    A.    It's a -- hard copy, so I want to make
11 sure that I'm giving you an accurate citation of the
12 paragraph.
13         Paragraph 30 states that deposition
14 testimony provided by employees or representatives of
15 Sandoz, Hospira, and Accord demonstrate they did not
16 comply with their regulatory responsibilities
17 regarding post-marketing surveillance,
18 pharmacovigilance, and safety reporting to the FDA
19 during the relevant time period.
20         Paragraph 31, "Likewise, deposition
21 testimony provided by employees or representatives of
22 Sandoz, Hospira, and Accord demonstrate that they did
23 not comply with their regulatory responsibilities to
24 ensure that their products' labeling in the United
25 States -- in the U.S., was at all times not false and

1 misleading."
2         So the immediate answer to your question
3 is, yes, they did not submit a label that, as I
4 discussed in my report, they were obligated to,
5 adding permanent alopecia at a time when they
6 had -- when they had -- not just had available but
7 had information that there was some basis to
8 believe -- and I'm going to my report -- "that there
9 is a causal relationship between docetaxel and the
10 occurrence of irreversible alopecia."
11    Q.    I understand what you're saying.  Fair
12 enough.
13         So when you say, "failed to submit,"
14 what you're talking about is failure to submit a CBE,
15 a Change Being Effected label supplement to add
16 "permanent alopecia" as opposed to "alopecia."
17 That's what you're referring to here.
18    A.    Among other things, yes.
19    Q.    Okay.  I thought that's what you were
20 saying.  Okay.
21         What about -- you cited paragraphs 30
22 and 31.  What specific deposition testimony provided
23 by employees of Hospira -- and by the way, you said
24 all three companies here, and I don't see any
25 footnotes in these paragraphs.  But I want to ask

1 about Hospira, what specific testimony are you
2 referring to?
3    A.    So go to the section -- there is a
4 number of sections in my report where I describe
5 this.
6         Let me start with -- in the interest
7 of Hospira, starting at paragraph 130 of my report,
8 continuing through to paragraph 140.
9         So the footnotes there reference
10 Dr. Schmider's deposition, specific sections from it.
11    Q.    Did you read all of Dr. Schmider's
12 deposition?
13    A.    I did.
14    Q.    Did you yourself identify these
15 citations to his deposition that are included in the
16 footnotes to support the propositions you cite them
17 for?
18    A.    For as best as I can remember, yes.
19    Q.    And were you very careful in making sure
20 that the deposition citations that you included
21 actually supported the propositions you were citing
22 them for?
23    A.    Well, not careful enough, because I'll
24 note that for Footnote 97 I put down page 79 and that
25 really should be 119.  And I apologize for that.

1    Q.    Any other corrections you -- you want to
2 make?
3    A.    There are other typographical errors, I
4 believe.  But in the interest of time -- I'm sorry.
5    Q.    Well, I'm being specific.  I didn't mean
6 globally.  I meant with respect to the change in your
7 deposition citations, do you believe all the others
8 are correct and accurate?
9    A.    Correct and accurate.
10    Q.    Do you believe they're correct?  Let's
11 break it apart.
12    A.    Okay.  I'm not sure what they -- they
13 point to, again, with Section 97 what I intend them
14 to point to.  I'm not sure, accurate is different.
15    Q.    Well, let's do it this way.  You cite
16 here for Footnote 92, you say, "Similar to Sandoz,
17 Hospira utilizes a Core Safety Information, a
18 company-controlled document that sets forth the
19 minimum safety information to be listed in the labels
20 used in the countries where Hospira markets
21 docetaxel."
22         And then you direct the reader to the
23 Schmider deposition, pages 69, line 16, to pages 71,
24 line 3.
25         Do you see that?

29 (Pages 110 - 113)