Page 114

1    A.    I do.
2    Q.    And are you -- do you believe that that
3  deposition testimony supports what you say in the
4  text that I just read?
5    A.    Well --
6    Q.    I'm not asking you to figure it out now.
7  I'm asking --
8    A.    No, I'm sorry.  I can't answer that
9  question unless you let me look at it.  I just can't.
10  I'm not -- it's a 252-page deposition.  I'm sorry?
11    Q.    This exercise when you drafted the
12  report a year and a half ago or whatever it is,
13  15 months ago, did you go through this exercise and
14  make sure that you were accurately characterizing and
15  citing deposition testimony?
16    A.    I did, but obviously I made a
17  typographical error -- or there was a typographical
18  error.  But it does not -- you know, if you don't
19  want me to look at the page, I can't help you here in
20  terms of saying.  And I don't want to say, well, yes,
21  it's absolutely right, and then I haven't had a
22  chance to look.  Okay?
23    Q.    You did have a chance, Doctor.  You
24  wrote the report yourself.  Right?
25    A.    Fifteen months ago.

Page 115

1    Q.    All right.  And you certainly didn't
2  make any corrections in the interim 15 months before
3  you came in to talk to me today.  Right?
4    A.    If your question is -- I'm not sure what
5  your question is, honestly.  I have not -- since I
6  wrote it and submitted it and was deposed, it's not
7  something I've returned to every day.
8    Q.    It would be important, though, you
9  understand that we're in Federal Court and you
10  submitted a report with respect to a litigation, a
11  multi-district litigation.  Right?  Do you understand
12  that?
13    A.    I do.
14    Q.    You take that responsibility seriously,
15  don't you?
16    A.    I do.
17    Q.    You would want to be correct and
18  accurate in your representations to the Court and to
19  those involved in this litigation with respect to
20  what you say these depositions say.  Right?
21    A.    To the best of my ability, yes.
22  Not -- that may mean, if I may say, that also means
23  not answering your questions without looking at the
24  appropriate records.
25    Q.    And to be clear, for Hospira, you're

Page 116

1  citing Dr. Schmider's deposition.  The only other one
2  I saw, and we talked about this, was the Mir dep.  I
3  think you have a cite to Dr. Mir's deposition at
4  Footnote 97.  Do you see that?
5    A.    Yes.
6          Here it is.  Yes, I do.
7    Q.    And do you see where it says "rough"?
8  You've got, "Mir dep page 128 (rough)."  Do you see
9  that?
10    A.    Yes.
11    Q.    Do you know what "rough" means?
12    A.    My -- it's what it said on the
13  deposition.  My understanding is -- and this is,
14  again, I'm not an attorney, but that's the initial
15  rough transcript before it's been reviewed by the
16  deponent.
17    Q.    Well, it's actually before it's been
18  finalized by the court reporter.  You understand
19  that.  Right?
20    A.    Okay.
21    Q.    It's -- it's the rough that gets sent
22  out the night after the deposition.  It hasn't been
23  even checked yet.  You know that.  Right?
24    A.    I'm willing to accept what you're saying
25  as being the description.

Page 117

1    Q.    And did you ever read Dr. Mir's full
2  final deposition transcript?
3    A.    Not -- you know, if I had, I would have
4  indicated as such in my report.
5    Q.    And --
6    A.    If you're saying that makes a
7  difference, I'm happy to consider that.
8    Q.    Did you know how many other employees of
9  Hospira that touch on pharmacovigilance were deposed
10  besides Drs. Schmider and Mir?
11    A.    I believe you asked a very similar
12  question early in this deposition and I indicated,
13  you know, I asked if there was any other Hospira
14  witnesses that had arguably relevant -- I didn't ask
15  specifically about that, but if there were other
16  information regarding Hospira that I should know
17  about; and answer -- the answer, I wasn't provided
18  with anything else.
19    Q.    And when you say you asked, just to be
20  clear, you're talking about asking the plaintiffs'
21  lawyers who retained you for purposes of this
22  litigation.  Right?
23    A.    Yes.
24    Q.    We'll talk a little bit more about the
25  pharmacovigilance since we're there.

30 (Pages 114 - 117)

Page 118

1    What is pharmacovigilance?  What does
2 that term mean?
3    A.   So, again, I define that term -- and
4 it's really taken from the FDA's definition at
5 paragraph 51 in my report.  And I refer to activities
6 which are described in the preceding paragraphs from
7 44 onwards.
8    So a continuing collection of
9 information on adverse events.  And in paragraph 46 I
10 indicate that those focus in large part on serious
11 adverse events and unexpected AE's.  Define those.
12    The need for expedited reporting for
13 unexpected serious adverse events.
14    The obligation to review, evaluate them,
15 and report the results of analyses to the FDA both in
16 PSURs and annual reports.
17    And developing -- this is paragraph
18 50 -- written procedures for surveillance, receipt,
19 evaluation, and reporting of post-marketing AE's.
20    Q.   In summary review -- and that's all
21 fair.  Do you agree that pharmacovigilance means all
22 scientific -- if we're going to try to give a single
23 definition to work from, the term
24 "pharmacovigilance" means all scientific and
25 data-gathering activities relating to the detection,

Page 119

1 assessment, and understanding of adverse events?
2    A.   Say that one more time?
3    Q.   Why don't we do it this way.  Let's mark
4 as the next exhibit a document you cited in your
5 report.
6    MR. HOROWITZ:  It's Tab 10, Ashley.
7    (Exhibit 7, "Guidance for Industry, Good
8 Pharmacovigilance Practices and Pharmacoepidemiologic
9 Assessment, March 2005, marked for identification.)
10    Q.   We're loading, Doctor.
11    A.   I understand.
12    Q.   Doctor, Exhibit 7 is another FDA
13 Guidance For Industry called, "Good Pharmacovigilance
14 Practices and Pharmacoepidemiologic Assessment,"
15 dated March 2005.  Do you see that?
16    A.   Yes.
17    Q.   And this is Guidance you are -- are
18 familiar with.  Right?
19    A.   Yes.
20    Q.   And, in fact, you cite this Guidance in
21 your expert report.  Correct?
22    A.   I believe it's Footnote 18, if I'm not
23 mistaken.
24    Q.   And so if you just go to page 4, I
25 wasn't trying to be tricky but I thought it would be

Page 120

1 easier now just for us to look at the same thing.  I
2 was trying to avoid marking another exhibit, but here
3 we are.
4    Do you see where it says at the top,
5 "This Guidance uses the term 'pharmacovigilance' to
6 mean all scientific and data-gathering activities
7 related to -- relating to the detection, assessment
8 and understanding of adverse events."
9    You agree with that general definition?
10    A.   You're talking about the second sentence
11 at the top of the page.  Correct?
12    Q.   Yeah, Doctor, the one we've read now
13 twice.
14    A.   Okay.  So --
15    Q.   Do you agree with it?
16    A.   Well, I agree that it says, "This
17 Guidance uses the term 'pharmacovigilance.'"  So for
18 this Guidance that's how it is using the
19 term "pharmacovigilance" is how I understand it.
20    Q.   Okay.  I don't know what that means, but
21 do you generally accept that that's what it means and
22 that these are the activities described that are
23 pretty typical of pharmacovigilance activities
24 undertaken?
25    A.   So understanding that it says,

Page 121

1 "Activities relating to detection, assessment, and
2 understanding of adverse events," and keeping in mind
3 that what I characterize as pharmacovigilance is
4 based on the Regulations 314.80, I agree that's what
5 this Guidance -- how this Guidance uses that term.
6    Q.   Do you disagree with how the Guidance
7 uses this term?  I mean, I -- I don't have any idea
8 why you're fussing with me on this, so help me
9 understand.
10    A.   I'm just trying to make sure that I
11 didn't -- someone doesn't think, oh, he's using a
12 different definition that uses different words and
13 therefore that's a mistake.  I just am pointing those
14 things out.  I have no problem with what that's
15 saying there about pharmacovigilance.
16    Q.   And the top of the next paragraph, says,
17 "Pharmacovigilance principally involves the
18 identification and evaluation of safety signals. "
19    Do you agree with that statement?
20    A.   As used in this Guidance, yes.
21    Q.   Do you agree with it in general in the
22 absence of it being used in this Guidance?
23    A.   Pharmacovigilance outside the scope of
24 this Guidance involves other activities that are
25 respond -- required by regulation.  For example,

31 (Pages 118 - 121)

1 written procedures, the surveillance receipt,
2 evaluation, and reporting of post-marketing AEs.
3    Q.    There's a separate Guidance on Section
4 314.80 about good FDA pharmacovigilance reporting
5 practices, is there not?
6    A.    The subject of that Guidance is exactly
7 as you state.  It is not guidance on 314.80.
8    Q.    Doctor?
9    A.    Yes.
10    Q.    I guess I'm having a hard time
11 understanding.  Pharmacovigilance are activities
12 undertaken to detect, assess, and understand adverse
13 events.  Do you agree with that?
14    A.    So, again, as used in this Guidance,
15 that is how it is using it.
16    Q.    I'm going to switch gears for a second,
17 Doctor.
18    A.    Okay.
19    Q.    We'll come back to this.
20       Take a look at your CV.
21    A.    Um-hum.
22    Q.    Let's turn to Exhibit 1, page 2 of your
23 CV.
24       Are you with me?
25    A.    I am.

1    Q.    Do you see where it says, you have a
2 section here called "Expert Witness Training."  Do
3 you see that?
4    A.    Yes.
5    Q.    And you and I chitchatted about this at
6 your last deposition, did we not?
7    A.    I do recall -- I believe so.  Then I
8 definitely remember your colleague asking me
9 questions about -- about it.  You also may have.  So
10 yes.
11    Q.    Remind me, what is SEAK again?
12    A.    SEAK is a company that offers training
13 to, among other things, just my interactions with it
14 would have been training on expert witnesses about,
15 you know, the -- what's required of an expert
16 witness.  How to do a good job as an expert witness
17 is the simplest way I can put it.
18    Q.    It's also what you advertise yourself
19 and hold yourself out as an expert that can be
20 retained for litigation.  Right?
21    A.    So SEAK publishes a directory that I
22 purchase a listing in.
23    Q.    Is that a "yes"?  I mean, we've had this
24 conversation before in connection with this question.
25    A.    Yeah, no.  I -- I -- I'm -- when you

1 said, oh, SEAK is where you advertise yourself.  It's
2 not SEAK, it's a directory that SEAK publishes.  SEAK
3 is a company.  So that's why I'm --
4    Q.    And you have a listing that's available
5 in the SEAK, Inc., expert witness directory that's
6 available online with your picture where you are
7 advertising your services as an -- as an expert
8 witness.  Right?
9    A.    Yes.
10    Q.    And SEAK doesn't just allow you to
11 advertise your expert services but it provides
12 seminars and training for how to be an expert
13 witness, as you've just described.
14    A.    How to be an expert witness.  I
15 think -- yeah, I'd agree to that.  It's --
16    Q.    It teaches you how to be an effective
17 expert witness.  Right?
18    A.    If I'm going to interpret your question
19 as effective in terms of what we've talked about
20 before as being -- the role being to assist the
21 trier-of-fact.  So I would say yes.
22    Q.    Let's go to -- you actually attended
23 these seminars listed here for expert witness
24 training.  Right?
25    A.    Yes.

1    Q.    And you went in 2014 to Florida.  Right?
2    A.    Yes.
3    Q.    2015 to Washington, DC?
4    A.    Yes.
5    Q.    2016 to Chicago.
6    A.    Yes.
7    Q.    Did it twice in 2016, right, in Chicago?
8 Two different seminars over four days?
9    A.    Yes, it was in the same venue and they
10 were both of interest to me.
11    Q.    And the last one -- I mean, the first
12 title was, "How to be an effective expert
13 witness," in 2014.  Right?
14    A.    Correct.
15    Q.    And then you have 2018, "How to excel at
16 your expert witness deposition, SEAK, Inc.,
17 December 1 to 2, Naples, Florida."
18       Do you see that?
19    A.    Yes.
20       MR. HOROWITZ:  Let's mark Tab 19 as your
21 next exhibit.
22       Still loading.  Oh, there we are.
23       This has been marked as exhibit
24 number -- Ashley, what number is this?  Eight, thank
25 you.

32 (Pages 122 - 125)

1    (Exhibit 8, SEAK Seminar Brochure,
2 "Supplemental Income for Physicians", February 2014,
3 was marked for identification.)
4    Q.   Exhibit 8 to your deposition, Dr. Ross.
5 This is the brochure for the seminar that you paid to
6 attend in Naples, Florida, on December 1 and 2, 2018,
7 that's identified in your curriculum vitae.  Is it
8 not?
9    A.   Well, these -- the dates on these are
10 2014.
11    Q.   All right.  We can use this one.  Let's
12 start with this one.
13       Do you see at the top it says,
14 "Supplemental Income For Physicians"?
15    A.   Yes.
16    Q.   Big bold letters?
17    A.   Yes.
18    Q.   There's a seminar called, "How to Start,
19 Build, and Run a Successful Expert Witness Practice."
20 You see that?
21    A.   The second bullet, yes.
22    Q.   Yeah.  And then the last bullet, "How to
23 be an Effective Medical Expert Witness."  Do you see
24 that?
25    A.   Yes.

1    Q.   All right.  And -- let's see.  Right
2 underneath that.
3       MR. HOROWITZ:  If we can go down a
4 little bit.
5    Q.   You see it says, "Lucrative
6 Assignments," right there in the middle?  Under "How
7 to be an Effective."  "Lucrative."  "Lucrative" means
8 financially lucrative, doesn't it?
9    A.   That's my understanding of it.
10    Q.   And then if we go to the discussion of
11 the seminars on, "How to be an Effective Medical
12 Expert Witness."
13       MR. HOROWITZ:  Make that a little
14 bigger.  There we are.
15    Q.   This is the specifics of what you
16 attended on February 8 and 9 of 2014.  "How to be an
17 Effective Medical Expert Witness," down there in
18 Clearwater Beach, Florida, at the Sandpearl Resort.
19 Right?
20    A.   Yes, I believe that's correct.
21    Q.   And the executive summary of the
22 seminar -- and you paid money to go to this, right,
23 as a registration fee?
24    A.   Correct.
25    Q.   And this registration fee, you paid over

1 a thousand -- you paid $1,295 of tuition to go down
2 there for this seminar.  Right?
3    A.   Well, not only that, but don't forget
4 the travel expenses down there.
5    Q.   You paid $1,295 in tuition.  Do you see
6 down there, "Registration Information"?
7    A.   Yes.
8    Q.   And it gives you a continental breakfast
9 and lunch with faculty each day.  And detailed
10 conference manual.  Do you see that?
11    A.   I do.
12    Q.   Okay.  Did you get the conference
13 manual?
14    A.   I'm sure I did.
15    Q.   Do you still have it?
16    A.   I -- I do not believe so.
17    Q.   Can you check for me?
18    A.   I can check.  I have moved since taking
19 this seminar a couple of times.  So I -- if I have
20 it, I would have to look for it.  I -- I doubt I do.
21 But I will look for it.
22    Q.   You see -- oh, I'm sorry.
23       There's an executive summary at the top.
24    A.   Um-hum.
25    Q.   It says, "The number one way to grow an

1 expert witness practice is to build the reputation of
2 being an effective witness."
3       Did I read that correctly?
4    A.   You did.  It's the bold part.
5    Q.   Right.
6       And then the next sentence says,
7 "Participating Physicians" -- the second sentence, I
8 should say.  "Participating Physicians" -- you were a
9 participating physician.  Right?
10    A.   Yes.
11    Q.   -- "will learn how to become markedly
12 more effective and significantly more valuable expert
13 witnesses."  Did I read that correctly?
14    A.   I think so.
15    Q.   And by "valuable expert witness" here,
16 they mean valuable both in terms of your own finances
17 and valuable to the attorneys retaining you.  Right?
18       MR. CENTOLA:  Objection, form.
19    A.   Well, this actually doesn't say who it's
20 valuable to, I mean.
21    Q.   It says what it says.
22    A.   Certainly, it says what it says.  I
23 mean, I'm not going to read anything into it.  I
24 mean --
25    Q.   You were learning --

Page 130

1     A.    -- it's one group.  Not the only one but
2 that's one reasonable inference.  Not the only one.
3     Q.    Right.  And it's a reasonable inference
4 though.  Right?
5     A.    Yeah.
6     Q.    And it says, "Learning Objectives."  We
7 can maybe flush it down a little bit.
8         "At the conclusion of this workshop,
9 physicians" -- and, again, that would be you.
10    A.    Um-hum.
11    Q.    -- "should be able to," and it gives a
12 list of learning objectives and -- with bullet
13 points.  Do you see that?
14    A.    I do.
15    Q.    And the third one says, "Discuss
16 strategies that can be followed when giving an expert
17 deposition and when testifying at trial."
18        Do you see that?
19    A.    I do.
20    Q.    "Explain techniques for excelling at
21 videotaped depositions."
22        Did I read that correctly?
23    A.    Yes.
24    Q.    And the next one -- actually, two down
25 from that, "Describe techniques physicians can use

Page 131

1 when testifying at deposition and trial."
2        Did I read that correctly?
3     A.    Yes.
4     Q.    And did you, by the way, as a physician
5 at the conclusion of the workshop, were you able to
6 discuss strategies that can be followed when giving
7 an expert deposition and when testifying at trial?
8 Did you accomplish that objective?
9     A.    If I remember correctly, that was
10 actually something that you had to be able to say you
11 could do because, as you can see two paragraphs below
12 that, this course is actually given, accredited by
13 the ACCME for continuing medical education credits.
14 So I would -- those are the objections -- objectives
15 that you have to meet in order to be able to receive
16 credit.
17    Q.    I got you.
18        So the -- you're saying that this was
19 endorsed by the medical community is -- is what
20 you're saying.
21    A.    No.
22    Q.    Okay.
23        Let's go to the next --
24    A.    I'm sorry, just -- I just literally said
25 what it says there.  It's accredited by the ACCME.

Page 132

1 That's all.
2     Q.    That's great.
3        It's not required that you choose this
4 to reach your accreditation requirements, is it?
5     A.    It's --
6     Q.    There's other types of seminars.  You
7 don't have to go to the "How to be an Expert Witness"
8 seminar, do you?
9     A.    Let's open -- sorry.
10    Q.    You chose to do this.  Right?
11        MR. CENTOLA:  Can we let him finish?  He
12 was starting to answer.  Can you let him finish?
13        MR. HOROWITZ:  Oh, I'm sorry.
14    A.    I would say yes.  And it's -- if it was
15 not something that was related to CME, did not have a
16 valid educational purpose, it would not be accredited
17 by the ACCME.  That's all I would say.  So, yes, I
18 did choose to do this.
19    Q.    And you chose to do it because you
20 wanted to be a more effective and more valuable
21 expert witness.  Right?
22    A.    That is what that says as how they
23 advertise it.  That does not mean that I am doing it
24 for each and every one of the reasons that's there.
25 So that is not a valid conclusion.  It's --

Page 133

1     Q.    Let's see, the learning objectives that
2 you say are accredited.  The last one is "Discuss
3 techniques to make a positive impression on the
4 jury."
5        Do you think you accomplished that
6 objective?
7        MR. CENTOLA:  Objection, form.
8     A.    Of learning how to discuss techniques?
9 Yes.  That's different from making a positive
10 impression on the jury.  And I would say making a
11 positive impression on the jury is with respect to
12 your opinion and nothing else.
13    Q.    Let's go to the next page.  The section
14 on Deposition Skills.  There are actually several
15 sessions with respect to deposition skills.  Right?
16    A.    Yes.
17    Q.    One of those is called, "Deposition
18 Strategies For Experts," 9:30 to 10:15, that you
19 attended.  Do you see that?
20    A.    Yes.
21    Q.    It says, "You will learn a four-step
22 methodology for answering deposition questions."  Do
23 you see that?
24    A.    Yes.
25    Q.    Are you applying that methodology today

34 (Pages 130 - 133)

Page 134

1 as I talk to you?
2     A.    I will be honest with you, I can't
3 remember what those four steps are, Mr. Horowitz,
4 really.  So I can't -- I just don't know what -- I'm
5 trying to answer your questions.
6     Q.    How about "Videotaped Deposition:
7 Special Techniques" from 11 to 11:15?  It's a pretty
8 short one, I see.  Did they teach you anything?  "You
9 will learn special techniques which are applicable
10 when your deposition is being videotaped."
11         Did you -- are you applying those
12 special techniques that you learned down there today?
13     A.    Well, just one that I can think of,
14 which is I was looking at ties to wear and I
15 remembered the word "moray."  So I chose this tie,
16 for whatever it's worth, instead of another tie that
17 might be distracting.
18     Q.    How about 11:15 to 12 you learned
19 "Advanced Deposition Tactics For Experts"?  "You will
20 learn numerous techniques that will help you to excel
21 during your expert medical deposition."
22         Do you see that?
23     A.    I do.
24     Q.    So you learned tactics to come in and
25 talk to me and give a deposition.

Page 135

1     A.    Well, the primary tactic would be
2 prepare, read your report, and know what it says.
3 That's an example of -- that was the first -- that's
4 an example of a tactic.  So opposed to just winging
5 it.
6     Q.    So 1,300 bucks and a trip to Florida,
7 you could have saved yourself that if you had just --
8 just done what you said.  Right?
9         MR. CENTOLA:  Objection, form.
10     A.    I'm sorry.  Say that -- say that again?
11     Q.    Well, you said all you've got to do is
12 prepare and read your report, and that's really the
13 only tactic you need, except you paid $1,300 to go
14 down to Florida for two days to meet with these folks
15 to tune you up.  Right?  You could have saved
16 yourself the trouble.
17         MR. CENTOLA:  I don't think there was
18 even a question there.
19     Q.    Couldn't you?
20     A.    I did not say, respectfully, that was
21 the only thing that was involved.  I gave that as an
22 example.
23         MR. HOROWITZ:  Let's go to Tab 20.
24 Yeah, Tab 20.
25         (Exhibit 9, SEAK Brochure, "Independent

Page 136

1 Medical Examination Training For Physicians," Naples,
2 Florida, marked for identification.)
3     Q.    Doctor, this is the brochure, if you go
4 down, from December 1 of 2018 where you also went
5 back to "How to Excel At Your Expert Witness
6 Deposition" training seminar from SEAK."
7     A.    Yes.
8     Q.    And this was in Naples, Florida.  Right?
9     A.    Correct.
10     Q.    The Naples Beach Hotel & Golf Club,
11 December 1 to 2, 2018.  Right?
12     A.    You are correct.
13     Q.    And at the bottom of this glossy
14 brochure, it says, "Learn How to Supplement Or
15 Replace Your Clinical Income."  Did I read that
16 correctly?
17     A.    I -- I just, I don't see it on here, but
18 I -- oh, I see what you are saying.  In blue.  Yeah,
19 that's -- I was going to say I believe it probably
20 would say something like that.
21     Q.    Yeah, it says, "Learn How to
22 Supplement" -- in big bold letters -- "or Replace" --
23 in big, bold, and all cap letters also -- "Your
24 Clinical Income."
25     A.    They list that as your goal.  You are

Page 137

1 correct.
2     Q.    If you go to the description again of
3 the seminar, which is -- by the way, you paid, again,
4 another fee.  Right?  Another $1,295 for this one?
5     A.    You are correct.
6     Q.    Well, that's if you signed up on time.
7 Actually, the fee gets up to closer to $1,500
8 depending on when you signed up.  Does that sound
9 right?
10     A.    Yeah, I -- yes.
11     Q.    And there's -- on page 11 of the
12 brochure -- here we are -- there's a similar list of
13 bullet points that we just went through in the 2014
14 seminar.  Right?
15     A.    Correct.
16     Q.    A point, "Numerous proven strategies to
17 excel at deposition."
18         "Recognizing and defeat opposing
19 counsel's tactics."  Do you see that?
20     A.    I do.
21     Q.    "Effectively deal with skeletons in your
22 closet."  Do you see that?
23     A.    Yes.
24     Q.    Doctor, do you have any skeletons in
25 your closet?

35 (Pages 134 - 137)

1    A.   I can go look, if you would like.  I can
2  turn the camera towards it, but I think there's only
3  dress shirts.
4    Q.   And it says, "Prepare an individualized
5  protocol to excel at expert witness depositions."  Do
6  you have an individualized protocol that you've
7  developed?
8    A.   Let me put it like this:  This is
9  a -- I'm here today under Rule 26.  Is that -- am I
10  right?  I get confused about all the rules.  So
11  there's rules that deal with expert witnesses.
12  There's Rule 702 and 703, and a Rule 26 at the State
13  level.  But it's one thing to see a rule, it's
14  another thing to know, okay, how do you do that?  How
15  do you provide an opinion that you believe in, that
16  you are confident in, when the counsel for the other
17  side -- and this is their job -- is trying to get you
18  to give up that opinion, but you honestly believe it.
19        So that's really what this is about is
20  following the rules.  And I would say I am actually
21  very -- I'm glad I signed up for this course.  I'm
22  glad I took it.  It has had a lot of other -- the
23  skills and the things that I learned are applicable
24  to things in other areas of my profession that don't
25  directly deal with legal matters.

1        It's also taught me things not to do
2  that are not useful to the Court or retaining counsel
3  or to opposing counsel for that matter.
4        MR. HOROWITZ:  Objection, move to
5  strike, nonresponsive.
6    Q.   Let's see.  If you go to the next page,
7  I believe, there's a seminar, 10:30 to 11:15, "How to
8  Leave Yourself Wiggle Room."  Do you see that?
9    A.   Yes.
10    Q.   You were taught how to leave yourself
11  wiggle room.  Right?
12    A.   Yes.
13    Q.   And if you go to the next seminar,
14  "Deposition Strategies For Expert Witnesses," it
15  says, "Attendees" -- and that would be you, Dr.
16  Ross -- 47 -- whoo -- "47 techniques for excelling at
17  their deposition."
18        Do you see that?
19    A.   Yes.
20    Q.   One of those is not showing weakness,
21  avoiding absolute words, using time limits to your
22  advantage, breaking counsel's momentum, encouraging
23  opposing counsel to lose his cool.  These are the
24  deposition strategies among those 47 techniques that
25  you were taught at this seminar.  Right?

1    A.   Well, I have to tell you, there may only
2  have been 44, so maybe I should get a refund.  I
3  think that's -- in all seriousness, that sounds about
4  right.
5    Q.   Okay.  So these are all things that you
6  learned down in Naples, Florida, about being an
7  effective expert witness at a deposition.  Right?
8    A.   That was the course that I -- that's
9  basically the course that I took.  I learned them as
10  best I could.
11    Q.   As best you could.  Is that what you
12  said?
13    A.   Yes.
14    Q.   Okay.  Fair enough.
15        Let's -- let's go back to our real work
16  for a little bit.
17    A.   Okay.  Please.
18    Q.   Actually, since we're on the subject and
19  hopefully we can put this to bed.  I was given a new
20  CV last night, I guess filed in response to our
21  Notice For Deposition which we'll get to at the end.
22        MR. HOROWITZ:  Why don't we go ahead and
23  mark that as our next exhibit.
24        (Exhibit 10, Updated Curriculum Vitae of
25  David B. Ross, M.D., Ph.D., M.B.I., marked for

1  identification.)
2    Q.   Okay.  And this would be Exhibit No. 10.
3    Doctor, we've marked as Exhibit No. 10 a
4  curriculum vitae that we were provided last night via
5  e-mail, I guess in advance of this deposition.  Is
6  this a revised or a new version of your curriculum
7  vitae?
8    A.   Updated.  I mean, it's not -- it's
9  not -- there's a couple of additional papers that
10  I've had published.  Other than that, I don't believe
11  there's a whole lot -- anything else that's
12  different.
13    Q.   But one thing that's different is it
14  says, "Expert Not Retained," in enormous bold letters
15  across.  What on God's green earth is that?
16    A.   Oh, that is one of the things at SEAK,
17  you know, that they recommend because -- and I've had
18  this happen.  I've had people, attorneys, you know,
19  get my CV, and then without my knowledge say that I'm
20  their expert, which is a little problematic.
21        So, you know, once I'm retained by
22  somebody, obviously I remove that in the copy that I
23  give them.  I mean, this just -- this is -- I -- it's
24  just a watermark on the Word document.  That's all.
25    Q.   So if you are retained, you remove this?

36 (Pages 138 - 141)

1    A.   Yes.
2    Q.   Can we agree that you are retained in
3 this litigation?
4    A.   Of course.
5    Q.   So this was just whenever you shot the
6 server to the plaintiffs' lawyers last night
7 electronically you just didn't get a chance to remove
8 your -- you forgot to remove your "Expert Not
9 Retained" stamp?
10    A.   Of course.  And I -- had I thought of
11 it, I would have removed it.
12    Q.   Okay.  And then there's one other change
13 I noticed in relation to what we were just
14 discussing.  But if you go to page 2, the SEAK
15 seminars in the Expert Witness Training section that
16 you had is no longer included.  It seems to have been
17 removed or deleted from your CV.
18    A.   Oh, that was -- I actually did not
19 realize that.  That was not at all intentional.  You
20 know, thank you for letting me know.  I'm going to
21 add that back in.
22    Q.   Did you send it to the plaintiffs'
23 lawyers with that in there, do you think?
24    A.   The original version that you have has
25 it added.  I mean, I, you know, updated this quickly.

1 If I removed it, it was --
2    Q.   Well, let me ask you this.
3    A.   Yeah.
4    Q.   Did you, yourself, remove it?
5    A.   Yeah.  I -- I -- well, I think so.  I
6 mean, you know, it wasn't retaining counsel.  If I
7 did, it was -- not if I did, I mean, the fact that
8 it's not in there is inadvertent.  Again, I'm going
9 to correct that.  Because in my academic CV, which
10 this is -- well, I don't think this is it.
11        But can you go back up to the first page
12 for -- if you could for a minute, just so...
13        Yeah, this is not my -- this is for my
14 academic CV I use my work e-mail and I don't include
15 the -- the SEAK training because it's not relevant to
16 that.  But that was not something that I did
17 intentionally.
18    Q.   So I just want to make sure I
19 understand.  Do you keep two versions of a curriculum
20 vitae, one for academic purposes and one for expert
21 witness purposes?
22    A.   Correct.
23    Q.   And the one for expert witness services,
24 you include the seminars that you've attended
25 specifically for expert witness training offered by

1 SEAK.  Correct?
2    A.   Correct.
3    Q.   And but in the academic arena, you
4 remove the SEAK seminars in the section on expert
5 witness training.  Fair?
6    A.   Yeah.  It's not something that is part
7 of the -- unless, you know, if you're doing something
8 with a -- a -- in law school, it might be relevant.
9 But in terms of biomedical.  And if somebody asks me,
10 do you do this, I would say sure.  I'm not going
11 to -- I'm not completely illegitimate, but, you know,
12 I -- it's just that's the distinction.  I
13 don't -- that this version -- and I apologize, I
14 didn't realize I had taken that out, it was certainly
15 unintentional.  And I can provide, you know, another
16 version.  I mean, I can do that -- not another
17 version, but I mean add those back in.  But that was
18 not something I was aware that I had done.
19    Q.   Okay.
20        Let's -- let's go back to where we were.
21        MR. HOROWITZ:  If you could pull back
22 up, Ashley, Exhibit 7.
23    Q.   I just wanted, I mean, I really was
24 using this for definitional purposes more than
25 anything else, Doctor, especially since you cited it

1 in your report.
2    A.   Okay.
3    Q.   We left off, this was our discussion on
4 pharmacovigilance.
5    A.   Yes.
6    Q.   And I just -- you know, part of it is
7 just helping folks that are not steeped in, you know,
8 the pharma world like you and I are to follow along
9 with us.
10    A.   Okay.
11    Q.   So we were at the point where we were
12 talking about safety signals.  Do you recall that?
13 And by "talking about that," just definitionally.  I
14 think all I had done was read "Pharmacovigilance
15 principally involves the identification and
16 evaluation of safety signals."  I think that's where
17 we left off.  Okay?
18    A.   Yes.
19    Q.   And then it says, "In this Guidance
20 document" -- this FDA Guidance document -- "'safety
21 signal' refers to a concern about an excess of
22 adverse events compared to what would be expected to
23 be associated with a product's use."
24        Do you see that?
25    A.   Yes.

37 (Pages 142 - 145)

Page 146

1    Q.    And I guess I'm going to risk the
2  question, but do you agree with this characterization
3  of a safety signal; and if not -- or -- or if you
4  would want to modify it, how would you do so?
5    A.    Well, I agree with it.  I would modify
6  it by the following sentences, that signals could
7  arise from post-marketing data and other sources and
8  other products in the same pharmacologic class.  And
9  it's possible -- just reading from here.  Well, you
10  can see it.
11         And certainly -- well, a single well
12  documented case report can be viewed as a signal.
13         And they indicate rechallenge.  And
14  there's plenty of examples of that single case
15  representing not just a signal but by itself can meet
16  the threshold for modifying the label.  That's one
17  thing it says on the Adverse Reactions guidance which
18  I cite in my report.  I'm talking about the
19  January 2006 AR Guidance.
20    Q.    And just to be clear, though -- and I
21  agree with everything you said, you're -- you're
22  reading the rest of the definition to give it some
23  context in this paragraph of the Guidance.  Right?
24    A.    Yes.
25    Q.    And our discussion of safety signal.

Page 147

1         And you mentioned the single case report
2  can be viewed as a signal.  But it goes on to say,
3  "Particularly if a report describes a positive
4  rechallenge."  And you emphasized that and I just
5  don't want to gloss over that.  What do you mean by a
6  "positive rechallenge"?
7    A.    So please -- please indulge me.  If
8  somebody is on a drug and they develop an unwanted
9  effect that you think might be due to it, and you
10  stop the drug, that's a dechallenge.
11         If the effect goes away, that's a
12  positive dechallenge.
13         If you start the drug again or the agent,
14  or whatever it is, and the same event occurs, that's
15  a positive rechallenge.
16    Q.    Got you.  And then it goes on to say,
17  "Signals generally indicate the need for further
18  investigation which may or may not lead to the
19  conclusion that the product caused the event."
20         Do you agree with that statement?
21    A.    Yes.
22    Q.    It goes on to say, "After a signal is
23  identified, it should be further assessed to
24  determine whether it represents a potential safety
25  risk and whether other actions should be taken."

Page 148

1         Do you agree with that?
2    A.    Yes.
3    Q.    All right.
4         Do you agree -- I guess I should ask you
5  this while I have this open.  Page 9, I guess it's
6  on -- I assume it's PDF page 9.  There it is.
7         Do you see where it says, "Use of data
8  mining techniques is not a required part of signal
9  identification or evaluation"?  Do you see that?
10    A.    I do.
11    Q.    And do you agree with that?
12    A.    What I would say is the -- as with any
13  guidance, a guidance is not legally binding on FDA or
14  the public, i.e., drug manufacturers included in
15  that.  It is one way of meeting the requirements of
16  the underlying statute or regulation.
17    Q.    So -- I'm sorry.
18    A.    No, I was just going to say, I'd agree
19  with you it's not required.  Of course, if you want
20  to use an alternative approach, just quoting from the
21  Guidance statements at the beginning, then you should
22  make sure that it is meeting the requirements of the
23  regulation or statute.  But I'd agree with you on
24  that.
25    Q.    Okay.  And just to make it a little more

Page 149

1  specific to Hospira.  I know you talk about some data
2  mining techniques in your report and we'll talk a
3  little bit about that, but I want to be clear that
4  you're not saying that Hospira violated any
5  regulatory -- any regulation or any regulatory duty
6  if they did not employ the data-mining techniques
7  that you discuss in your report.  Fair?
8         MR. CENTOLA:  Objection, form.
9    A.    That is -- hang on one second.  I just
10  want to think through how to answer this.
11    Q.    Want me to read you the answer you gave
12  last time?
13    A.    Yes, I'm glad -- I'd love to -- I would
14  love it.  But I -- I think again, I hope it was
15  something similar.
16         Not -- by itself, it's -- that's not a
17  requirement in the regulation, that's a way of
18  meeting the regulation.  And if somebody meets it
19  another way, that's fine.  If that's -- by it -- but
20  if that were the only way and you don't do it -- and
21  I'm not saying that's not -- that's the case here --
22  then -- but it's not that data -- not doing the data
23  mining.  It's the underlying regulation that you need
24  to comply with or the manufacturer needs to comply
25  with.

38 (Pages 146 - 149)

1    Q.    So you said in your August 31, 2020,
2  deposition, "I do not cite those" -- and the question
3  was about the data-mining techniques that I was
4  asking you about.
5    A.    Um-hum.
6    Q.    That you said in your report.
7          -- "as the kind of thing that a Court or
8  any of the Defendants should or should not have done.
9  I'm simply providing those as a description of the
10  kind of techniques that are available.  I am not
11  pointing to a specific technique and saying that they
12  should have done this."
13    A.    I think that's -- you can disagree, but
14  I think that's similar to what I said or it's
15  certainly -- I'm not contradicting myself.
16    Q.    Okay.
17    A.    I'd agree with myself, for what it's
18  worth.
19          Data mining is a tool, like anything
20  else.  And it's not -- sometimes it's a good tool,
21  sometimes it -- like, with any tool, it certainly has
22  its limitations.  And you know, I won't go on about
23  those, but it's a tool.
24    Q.    And the answer that I just read and
25  your -- your description, I wasn't really reading it

1  to suggest that it was different than what you said.
2    A.    No, I -- I know.  I was going to say if
3  you didn't read it, I was going to ask you.
4    Q.    And I just want to make sure that that
5  answer applies here in this case with Hospira, and it
6  sounds like you're saying, yes, it does.
7    A.    Yes, yes.
8    Q.    Excellent.
9          I guess my other related question
10  is -- and maybe at a slightly higher level -- are you
11  offering any opinions in this case with respect to
12  the actual processes and procedures that Hospira did
13  use to conduct pharmacovigilance with respect to
14  docetaxel?
15          MR. CENTOLA:  Objection, form.
16    A.    Well, what I think I'm saying is, not
17  explicitly, but if -- I'm sorry.  I want to go back
18  to my conclusion here for a minute.
19          Conclusions.  Sorry, 30 and 31.
20          So here's this adverse reaction.  Added
21  to labels in other countries in 2012, and not
22  added -- and this is, you know, my conclusion about
23  labeling in paragraph 31.
24          And the previous paragraph I do say that
25  there was a -- in essence, a failure to comply with

1  regulatory responsibilities about pharmacovigilance.
2  And that is reflected in the fact that the label
3  change was not proposed in the U.S. until 2017.
4    Q.    And in order to form this opinion
5  about -- we talked about the deposition testimony so
6  we don't need to relive that.  You can put that
7  aside.  I think we've covered that.
8    A.    Thank you.
9    Q.    But I'm asking you about other things.
10  For example, in forming your opinion about Hospira's
11  approach to pharmacovigilance with respect to
12  docetaxel, did you review any standard operating
13  procedures, SOPs, that were in effect at Hospira that
14  governed internally their pharmacovigilance
15  processes?
16    A.    So I'm just, I'm thinking about
17  Dr. Schmider's deposition testimony which is probably
18  the fullest -- not fullest, but it's one description.
19  So I think that's the one place where I learned about
20  it.
21          I think it's -- you know, I think
22  the -- the exact processes are not, you know, where
23  they broke down.  And this is, you know --
24    Q.    I'm sorry.  I don't mean to cut you off
25  but I'm going to move on.

1    A.    I'm sorry.  Let me -- not in detail that
2  I can -- I mean, I'm trying to remember if I looked
3  at specific.
4    Q.    You know enough about companies and
5  pharmacovigilance to know that they -- well, first of
6  all, let's even take one step back.  I think you
7  referenced this earlier.
8          Companies are required to have written
9  processes and procedures with respect to their
10  pharmacovigilance and safety reporting activities.
11  Right?
12    A.    Correct.
13    Q.    Okay.  And Hospira, those SOPs, those
14  written processes and procedures, all I was asking
15  was, as part of the review you didn't look at those.
16  Right?
17    A.    I don't recall off the top of my head.
18  It didn't play -- whether I did or not, if I had, it
19  was not going to make a difference.  It's not so much
20  the processes but the outcomes.  The process outcomes
21  and then the equivalent of clinical outcome which is
22  the labeling.
23    Q.    Doctor, the rooster crows when the sun
24  rises.  Right?
25    A.    Well, not if you're at the North Pole.

39 (Pages 150 - 153)

1      I'm sorry. I'm not trying to be -- the
2 only thing is there's a -- under the regs there's --
3      Q.    I'll withdraw the question. Let's get
4 away from the chicken and the rooster and the crow.
5 You saw my point.
6      But I'm not asking about any of that
7 because you didn't -- you didn't list this in your
8 materials reviewed and so I'd expect that you would
9 if you had reviewed them. So is it fair to say that
10 you simply -- you didn't look and review the SOPs and
11 the written processes and procedures?
12     A.    No, that's -- so let me not -- you know,
13 looking at one of the cites I do have to
14 Dr. Schmider's --
15     Q.    That's deposition testimony.
16     A.    Okay. If I could finish my answer.
17     Okay. I mean, if you're looking,
18 saying -- when I hear someone say, no, we didn't look
19 at permanent alopecia separately, I don't -- again,
20 and going to, you know, say can somebody see or not.
21     Q.    You're changing the question,
22 respectfully, Doctor.
23     A.    No, I'm not.
24     MR. CENTOLA: Can you let him finish,
25 please, Mr. Horowitz.

1      MR. HOROWITZ: No, We can't. We can't.
2 We can't. Because it's a waste of my time.
3      Q.    You've got to answer my questions.
4 That's what we're doing here, Doc. And you
5 know -- you know the drill.
6      So respectfully, I'm not asking you
7 about --
8      MR. CENTOLA: Let's be a little bit
9 considerate to the witness, please. Let's not be
10 rude.
11     MR. HOROWITZ: The record will speak for
12 itself, Dr. Ross. You and I know this. I'm being
13 very considerate, am I not?
14     MR. CENTOLA: Well, that wasn't a
15 considerate statement, but can we please just let the
16 witness answer the question.
17     MR. HOROWITZ: When you watch the video,
18 Larry, it's very considerate.
19     Q.    You've got to answer my questions,
20 Doctor, respectfully.
21     So all my question is if you put hands on
22 the written processes and procedures in forming your
23 opinions. And I know you want to talk about the
24 deposition testimony, I'm not asking you about that.
25 I'm asking about the processes and procedures. And

1 my understanding is, just so I understand the basis
2 of your opinions, you didn't review those as part of
3 forming your opinions. That's all I'm asking.
4      A.    Okay. So if your question means did I
5 look at the flow chart or a written, you know, list.
6 For Sandoz, certainly I remember -- I'm mixing that
7 up.
8      For Hospira, I can't remember reviewing
9 something like that. I'll add a caveat that that's
10 not the only way to get a sense of
11 whether there -- not a sense, but to determine
12 whether somebody is complying. That's not the only
13 source of information.
14     But if you're talking about that specific
15 did I look at this specific set of processes for
16 Hospira, I can't remember doing that.
17     Q.    And you don't include in your list of
18 materials reviewed in Exhibit C any reference to
19 Hospira pharmacovigilance SOPs. Correct?
20     A.    Let me think. The reference I have is
21 the document that's labeled "2.5 Clinical Overview,"
22 which is where I got the information about clinical
23 processes -- I'm sorry -- SOPs. Not as a catalog of
24 what was done, which is I think is what you're asking
25 about.

1      So if you're talking about that catalog,
2 no.
3      Q.    Doctor, I'm asking you about SOPs.
4      A.    No, I understand. I'm talking about a
5 catalog of, like, an SOP that says we do this, we do
6 this, we do this, we do this, we do this. I don't
7 recall reviewing that particular type of SOP.
8      Q.    And you don't have an SOP identified in
9 your materials reviewed list for Hospira. Correct?
10     A.    I believe it's correct.
11     Q.    And you don't have an SOP about
12 pharmacovigilance for Hospira identified in the
13 footnotes of the text of your report. Right?
14     A.    I believe you are correct.
15     Q.    Let's take a look at something you did
16 cite.
17     MR. HOROWITZ: Let's do Tab 11.
18     (Exhibit 11, Article, "Use of data mining
19 at the Food and Drug Administration", marked for
20 identification.)
21     MR. HOROWITZ: Loading.
22     THE WITNESS: I honestly, I mean, I
23 understand. It's Thursday, the computers are tired,
24 so...
25     MR. HOROWITZ: I came in yesterday and

40 (Pages 154 - 157)

1  my network was down. That was really pleasant.
2          THE WITNESS: Yes.
3      Q.   Okay. And this is an article which
4  we'll mark as Exhibit 11, that you cited in your
5  report at Footnote 16 on page 15. And it's titled,
6  "Use of data mining at the Food and Drug
7  Administration."
8          Do you see that?
9      A.   I do.
10     Q.   And this is an article that you cited
11 and relied upon in forming your opinion. Right?
12     A.   Well, the context was I was describing
13 data mining.
14     Q.   And that's in the title of the article.
15 Right? "Use of data mining at the FDA."
16     A.   Yes.
17     Q.   Okay. And this is a 2015 article.
18 Right?
19     A.   Correct.
20     Q.   In the Journal of the American Medical
21 Information Association?
22     A.   Informatics Association, yes.
23     Q.   Is that peer-reviewed?
24     A.   Yes.
25     Q.   And there are actually 30 individuals

1  listed as authors on this paper. Do you see that?
2      A.   I do.
3      Q.   And all 30 of those individuals are
4  affiliated with FDA. Do you understand that?
5      A.   I do.
6      Q.   And it says -- well, actually, they --
7  if you go to the end of the article, they actually
8  represent nine different offices or centers
9  within -- within FDA. Do you see that?
10     A.   Yes.
11     Q.   Okay.
12          And it says, "Objectives. This
13 article" -- I'm sorry. Let's go to the abstract.
14 There it is. Just the first sentence probably will
15 frame it out for us, Doctor.
16          It says, "This article summarizes past
17 and current data mining activities at the United
18 States FDA."
19          Do you see that?
20     A.   Yes.
21     Q.   Let's look at some of the things that
22 they talked about.
23          If you can go to the Introduction, the
24 second paragraph. Are you able to read that? Is
25 that big enough for you, Doctor?

1      A.   Yes, thank you.
2      Q.   The first sentence says, "The FDA
3  collects and maintains sets of data that provide
4  safety information for its regulated products."
5          Did I read that correctly?
6      A.   Yes.
7      Q.   And that's true. Right?
8      A.   Yes.
9      Q.   And if you go to -- towards the end of
10 that paragraph, there's a sentence that
11 starts -- that starts, "These reports are entered
12 into various databases maintained by FDA" --
13          Do you see that?
14     A.   Yes.
15     Q.   -- "so that the Agency can perform
16 analyses to identify potential safety issues and
17 enhance understanding about those issues."
18          Correct?
19     A.   Correct.
20     Q.   And that's something that FDA does.
21 Right?
22     A.   Correct.
23     Q.   And then on the next column on the same
24 page it talks about what they're doing in this paper.
25 The second paragraph in the right-hand column starts,

1  "In this paper."
2          Do you see that?
3      A.   Yes.
4      Q.   "In this paper, we summarize the data
5  mining tools and methods that F -- that the FDA
6  currently uses to identify safety signals."
7          Did I read that correctly?
8      A.   Yes.
9      Q.   And if you go to next page, it talks
10 about the place of data mining in safety report
11 assessment.
12          Do you see that?
13     A.   Yes.
14     Q.   It says in the first sentence, "Data
15 mining analyses are used to detect potential signals
16 and generate hypotheses related to those signals, but
17 cannot be used in isolation to establish causality
18 between an adverse event and a product."
19          Do you agree with that statement?
20     A.   In general I would agree with that.
21     Q.   And it goes on to say, "There are many
22 possible reasons other than a direct causal
23 relationship for there to be a statistical
24 association between a product and an event." And it
25 gives an example.

41 (Pages 158 - 161)

Page 162

1      And then it goes on to say, "Hands-on
2  case reviews, analysis of other data sources, for
3  example, FDA regulatory databases, the World Health
4  Organization drug safety report -- drug safety report
5  database, public scientific literature, and public
6  knowledge databases, and further epidemiologic
7  assessments are necessary to characterize the
8  clinical and public health significance of signals
9  generated by data mining analyses."
10      Do you agree with that?
11      A.  In general.  I mean, it's not always
12  correct, but you know, as we've talked about, you can
13  have single cases that not only represent a signal
14  but may represent the need for a label change.  But
15  in general I believe I agree with that.
16      Q.  The single case.  That would be a unique
17  and unusual situation.  I'm not saying it doesn't
18  happen, but that's definitely not the norm.  Right?
19  I don't know why you keep bringing up the single case
20  report.
21      A.  Again, I mean, it's that what I learned,
22  "avoid absolutes."  But it's that's -- please go
23  ahead.
24      Q.  You got your money's worth, Doc, right
25  there.

Page 163

1      A.  I don't know about that, but please go
2  ahead.
3      Q.  All right.  It goes on to say, "When the
4  evidence of a new safety issue is compelling, the FDA
5  may take regulatory action such as issuing a product
6  recall or changing a product labeling and is
7  responsible for informing the public of these actions
8  along with any firm initiated communications."
9      Did I read that correctly?
10      A.  You did.
11      Q.  And that's true.  Right?
12      A.  With -- it may take regulatory action or
13  change in the product labeling.  Excuse me.  Of
14  course, if the company, the manufacturer says, hey,
15  we are submitting a label change, that may remove the
16  need for the FDA to take action.
17      Q.  It could, or FDA could initiate it
18  itself, which is what's expressed here.  Right?
19      A.  If it under -- well, I'll just say if
20  you're talking about ordering a safety label change
21  order under 505.04, the guidance on that says it's
22  FDA's expectation that most label changes are
23  going to come from the manufacturer, not FDA.
24      Q.  Sure, sure.  But none of that is in my
25  question at all.  So I move to strike, nonresponsive.

Page 164

1      I guess I'm just asking you -- I mean,
2  this is what the 30 authors in 2015 from the nine
3  different offices and divisions at FDA say in the
4  peer-reviewed published article, that when the
5  evidence for a new safety issue is compelling, the
6  FDA may take regulatory action such as issuing a
7  product recall or changing a product labeling, and is
8  responsible for informing the public of these actions
9  along with any firm-initiated communications.
10      Did I read that correctly?
11      A.  With the understanding that this is in a
12  paper and is not in a guidance or a regulation, you
13  did read it correctly.
14      Q.  Why do you need that understanding,
15  Doctor?  I never lied.
16      Never mind, I withdraw the question.
17      MR. HOROWITZ:  Move to strike the "with
18  that understanding."
19      Q.  Let me just be clear, though, on the
20  signal piece, Doctor.  Once you identify a signal
21  then there's certain things you would expect either
22  FDA or, frankly, a company to engage in to assess
23  that signal.  Is that fair?
24      A.  Correct.
25      Q.  Okay.  And some of the things that are

Page 165

1  spoken about here in the context of this article and
2  FDA is the hands-on case reviews, analysis of other
3  data sources, you know, regulatory databases, the
4  WHO, public scientific literature, epidemiologic
5  assessments, all of those things are possible ways to
6  assess the safety signal whether it's by the
7  regulatory body or by the company, in fairness.
8  Right?
9      A.  Well, that's a little bit -- first off,
10  the pharmacovigilance guidance does recommend that if
11  you have a signal.
12      If you're not looking for signals, then
13  obviously you can't do that.  When you say, no, we're
14  not going to do data mining, although on the first
15  page of this, the authors note that this is
16  recommended in the industry.
17      But if you don't do it, then these
18  activities, some of them you mentioned, for example,
19  scientific literature reviews, are still expected,
20  not just in the context of signal analysis.
21      Q.  Well, you mentioned two things, I think.
22  So I know you're talking about the duty to review the
23  literature for purposes of annual reports?  Is that
24  what you were referring to?
25      A.  No, actually, respectfully, I wouldn't

42 (Pages 162 - 165)

Page 166

1 say that I'm mixing two things, I'm distinguishing
2 between two things.
3      So literature analysis certainly would be
4 important if you identify a signal, but certainly
5 that should be something that is done anyhow.
6    Q.   Right.
7    A.   Regardless of whether you're doing data
8 mining analysis or not.
9    Q.   Got you.
10    A.   So it can be done as an independent
11 activity certainly in this context that it's
12 important.
13      MR. CENTOLA:  Do you mind if we take a
14 quick five-minute restroom break?
15      MR. HOROWITZ:  Sure.
16      THE VIDEOGRAPHER:  The time is 2:48 p.m.
17 Going off the record.
18      (A recess is taken.)
19      THE VIDEOGRAPHER:  The time is
20 2:59 p.m.  We are back on the record.
21    Q.   Doctor, are you ready to proceed?
22    A.   Yes.
23    Q.   I want to continue in our tour of the
24 Duggirala article.
25    A.   Um-hum.

Page 167

1    Q.   And if you could go to -- or we'll go
2 there for you -- on page 432 of the article.  The
3 bottom of the left column has a section
4 there -- there we go -- called, "Challenges Related
5 to Applying Data Mining to Safety Reports."  Do you
6 see that?
7    A.   Yes.
8    Q.   It goes on to say, "Specific data mining
9 methodologies and the interpretation of signals
10 requires database-specific understanding of," and
11 then it has six bullet points.  Do you see that?
12    A.   I do.
13    Q.   The first bullet point says, "Acceptance
14 of foreign versus domestic reports with different
15 reporting requirements."  Correct?
16    A.   Yes.
17    Q.   And you understand that there are
18 various health agencies around the world in various
19 countries and regions that are responsible for
20 regulating pharmaceutical products and drugs in their
21 own regions and countries.  Right?
22    A.   That's correct.  I mean, that's
23 certainly something that is that, you know, is one of
24 the reasons for the International Conference on
25 Harmonization.  There are differences and there are

Page 168

1 similarities, so you are correct on that.
2    Q.   Right.  And then they refer to, one of
3 the issues is, of course, countries and regions
4 outside the United States still have, to some degree,
5 different reporting requirements or can have
6 different reporting requirements in those countries
7 or regions.  Right?
8    A.   In terms -- you mean in terms of if
9 there's, like, a particular piece of data that is
10 there, how it gets acted on from a regulatory point
11 of view by one country versus another is what you
12 mean.  Is that correct?
13    Q.   Yes?
14    A.   I'd agree with that.
15      I -- I agree that, you know, there's a
16 particular piece of data and it's going to differ.
17 The piece of data itself doesn't change, though.
18    Q.   Right.  It's the reporting requirements
19 and how the regulatory agency may approach that piece
20 of data that can be different.  Right?
21    A.   Correct.
22    Q.   And the changing reporting requirements
23 over time is the next bullet point.  Do you see that?
24    A.   Yes.
25    Q.   And then the next one says, "Changing

Page 169

1 coding dictionaries for products and events resulting
2 in discrepant product names and/or events."
3      Do you see that?
4    A.   I do.
5    Q.   And I know that you've had some
6 discussions in the prior depositions about MedDRA, in
7 particular, one of the coding dictionaries.  I don't
8 think we need to relive that, but I'm pretty sure
9 that's what this is referring to there is MedDRA is
10 but one example of a coding dictionary.  Right?
11    A.   It's probably the predominant one
12 that's -- that's in -- I mean, whatever version is
13 used in any particular system.  I mean, it's
14 certainly not the only one, but that's correct.
15    Q.   In forming your opinions, did you -- did
16 you study MedDRA's definition of alopecia and how
17 it's treated within the confines of the MedDRA
18 dictionary?
19    A.   I did.
20    Q.   "The changing data entry and coding
21 processes" is the next bullet point.  Do you see
22 that?
23    A.   Yes.
24    Q.   And then the next bullet point says,
25 "Inconsistent database structure architecture."

43 (Pages 166 - 169)

1      And the last is everybody's favorite,
2  "Malicious reporting and spam." Right?
3      A.   Yes.
4      Q.   Okay.  And then it goes on to say, the
5  article says by the 30 FDA folks, "Signal thresholds
6  are adjusted to account for the severity of the
7  adverse event related to the product and the severity
8  of the condition for which the product is being
9  used."
10      Do you see that?
11      A.   Yes.
12      Q.   And do you have an understanding as to
13  what that's referencing?
14      THE WITNESS:  I'm sorry, if you could
15  just, the scrolling scrolled away for a minute.
16      Um, if you could just go up.  Sorry.  I
17  want to make sure I'm looking at it in context.
18      A.   Um, I'm not quite sure what they're
19  referring to here.  If -- if the question is, you
20  know, how sensitive do you set a -- what signal
21  you're going to look at for saying this is something
22  for cancer -- and as I said earlier, there's a lot of
23  different kinds of cancer.  You know, that is how I'm
24  interpreting this purely in terms of a signal
25  threshold.  Not -- I'm not interpreting it as

1  regulatory action, but just as signal analysis.
2      Q.   Right.  They're talking about signal
3  detection.  Right?
4      A.   It just says the threshold for
5  evaluating a safety issue.
6      Q.   Right.  And then they say, "the
7  interpretation of signals."  If you're going to
8  interpret what comes out of this data mining, you
9  need to have a database-specific understanding of
10  various points.  And we just walked through those
11  points.  Right?
12      A.   If we can go back, scroll back down so I
13  can take a look at it again.
14      Yes, that's -- that is what it says.
15      Q.   Okay.  And then it gives an example of
16  what it means -- or the article or the FDA folks who
17  authored the article give an example of what they
18  mean by, "signal thresholds are adjusted to account
19  for the severity of the adverse event related to the
20  product and the severity of the condition for which
21  the product is being used."
22      Do you see that?
23      A.   Oh, I see the sentence at the bottom.
24  When you say, "an example" --
25      Q.   At the top.

1      A.   Sorry.
2      Q.   And it says, "For example."  Now do you
3  see that?
4      A.   Yes.
5      Q.   It says, "For example, the threshold for
6  evaluating a safety issue for a drug used to treat
7  cancer would be different than the threshold for a
8  drug used to treat acne."
9      Do you see that?
10      A.   That is literally what it says.  You are
11  correct.
12      Q.   Okay.  And you don't take issue with the
13  FDA authors using this example with respect to data
14  mining and signal thresholds, do you?
15      A.   Well, I wouldn't call it an example.
16  You're talking about, certainly for cancer, two very
17  broad categories.  You know, there's basal cell
18  carcinoma of the skin, which is very -- it's another
19  skin condition which is very rarely life-threatening.
20  So I'm -- that's a very -- that's not really an
21  example.  And I'm actually -- so the --
22      Q.   I'm sorry.
23      A.   I -- I think it's actually I find it
24  more confusing than anything else.
25      Q.   So the nine divisions at FDA represented

1  by the 30 authors who actually used the words "for
2  example," and then give the example, you're saying
3  that they're wrong, you disagree.
4      A.   No, that's not what I said.  But let me
5  unpack that question just quickly.  You said the nine
6  divisions represented.  First off, I'm not
7  clear -- these are nine employees -- I wasn't clear
8  that any of these are, quote, speaking officially
9  representing FDA.  Certainly the ones that I'm
10  familiar with are not necessarily even decisionmaking
11  officials.
12      Secondly, I wouldn't take this as a
13  statement of FDA policy.  So I'm not saying they're
14  wrong --
15      Q.   I'll withdraw the question, Doctor.
16  Your objections are sustained.  Let's try it this
17  way.
18      The 30 authors -- you agree with me,
19  there's 30 authors who are affiliated with FDA.
20  Right?
21      A.   Yes.
22      Q.   Okay.  The 30 authors who are affiliated
23  with FDA who published this article in the
24  peer-reviewed literature use the words, "for
25  example," when describing the threshold for

44 (Pages 170 - 173)

1 evaluating a safety issue for a drug used to treat
2 cancer would be different than the threshold for a
3 drug used to treat acne, they're citing that as an
4 example.  Right?
5     A.    Well, actually, what they're citing are
6 three references, references 2, 9, and 54, and I
7 don't know what those are.  You know, from a
8 regulatory -- I don't know if they're speaking from a
9 regulatory standpoint or a pharmacoepidemio -- sorry.
10 I don't know what perspective they're talking from.
11 You're saying they must be talking about what the FDA
12 would do.
13     Q.    Okay.  So the bottom line is the article
14 says what it says.  Right?  We can agree it says what
15 it says.
16     A.    Yes.
17     Q.    And it cites what it cites.  Right?
18     A.    Yes.
19     Q.    Okay.
20           Do you agree that FDA evaluates the
21 severity of an adverse event against the severity of
22 the condition being treated?
23     A.    Respectfully, I -- really -- it's a
24 really broad question.  And I'm not trying to be
25 difficult here, but you know, there's a lot of

1 factors.  Are you talking about a drug that's never
2 been approved?  Are you talking about a drug, what
3 the nature of the risk is, or whatever.  I'm
4 not -- in addition -- first off, there's no cap.
5 There's no upper limit to how many adverse reactions
6 or warnings there can be on a label, at least not in
7 the regulations.  It's not like -- so if that gets
8 turned -- if that's what you're asking, they
9 certainly, in terms of making decisions about risk
10 mitigation and real world, are going to look at those
11 are things that -- a drug that has risks and very
12 little benefit in one situation, and the same risks
13 and greater -- much greater benefit in another, the
14 Agency is going to take that into account.
15     Q.    So you're aware of both FDA's statements
16 and policy statements with respect to adverse events
17 where FDA has talked about the need to evaluate the
18 severity of the event against the severity of the
19 condition being treated?  Are you aware of that?
20     A.    I -- I'd ask what you're -- specifically
21 what you're referring to.  I -- you know, I need to
22 see, you know, more specifically what you're asking
23 about.
24     Q.    And you agree there's -- there's the
25 labeling for pharmaceutical products is governed by

1 Federal -- Code of Federal Regulation Section 21 of
2 the CFR.  Right?  Specifically 201.56 and 201.57?
3     A.    In general, yes.
4     Q.    And the criteria for what's required to
5 be included in the various sections of the product
6 labeling are set forth in Section 201.57.  Right?
7     A.    For the vast majority of drugs, yes.
8     Q.    Including drugs like docetaxel.  Right?
9     A.    Yes.
10     Q.    Taxotere?
11     A.    Yes.
12     Q.    So let's go to your report, Exhibit 1 in
13 paragraph 28.  Let's take a look at that.
14           I want to focus on the first piece of
15 that.  We talked about the plaintiffs this morning.
16 You say, "Each of these 505(b)(2) NDA holders" -- and
17 here you list Sandoz, Hospira, and Accord -- "knew or
18 had reason to know that sufficient evidence existed
19 to warrant a label change under 21 CFR 201.57(c)(6)
20 and/or 21 CFR 201.57(c)(7) at the time their
21 respective products" -- and then you talk about the
22 plaintiffs.  Of course, at the time you wrote this
23 report, that was a different set of plaintiffs.
24 Right?
25     A.    That's my understanding, yes.

1     Q.    Okay.  So let's -- let's put aside -- we
2 talked this morning about the various plaintiffs.  I
3 want to focus on the first piece.
4           What is it -- for Hospira, right?  We
5 know Hospira was approved on March 8, 2011.  What's
6 the date upon which, in your opinion, Hospira
7 was -- had sufficient evidence that warranted a
8 proposed label change to FDA?
9     A.    So, first, I don't believe it's possible
10 to say as -- you know, on this date.  But I certainly
11 would say sometime in 2012 there was the -- the new
12 safety information that was available to Hospira as
13 well as the other companies and provided -- and I'm
14 reading from 27a -- "some basis to believe that
15 there's a causal relationship between docetaxel and
16 the occurrence of irreversible alopecia."
17     Q.    What specifically is the new evidence in
18 2012 you were referring to?
19     A.    So there's actually, you know, a number
20 of things.  And I go over these in my report.  But
21 just, you know, I mentioned a number of these
22 publications that were published before that.  For
23 example, Nabholtz in 2001.  I'm taking this from
24 Drs. Feigal and Madigan.
25           But I would certainly cite the abstract

45 (Pages 174 - 177)

1 from 2006 by Dr. Sedlacek.  The "Annals of Oncology"
2 paper from Dr. Kluger.  And in addition, and this
3 falls within the, you know, part of the new analysis,
4 the label changes in Hungary, Israel, and other
5 countries that represents new safety information that
6 provided some basis to believe there is a causal
7 relationship.
8     Q.     Was there, in your view, a signal in
9 2012 that should have alerted Hospira to conduct an
10 evaluation of that signal with respect to permanent
11 alopecia in 2012?
12     A.     So I'm not -- I'm taking "signal" in a
13 very broad sense, not necessarily data mining, but
14 you know, having a, for example, a paper appear such
15 as Kluger where the change in label is a signal.  And
16 when I said labels are a signal I don't mean in terms
17 of a regulatory change or a label change.  Those
18 label changes reflected the -- an
19 underlying -- underlying information, the TAX 316
20 study; and regardless of whether FDA regulations are
21 the same or not as those in other countries, that
22 represents new safety information.
23         So I think the question of whether it's
24 a signal -- not a data mining signal,
25 obviously -- but it's -- it actually represents new

1 safety information goes beyond a signal that
2 triggered the obligation to update the label.
3     Q.     So if I understand correctly, you've got
4 Tax 316 data that appeared in some ex-U.S. labels.
5 You've got some of the publications that were cited
6 by Dr. Feigal, and I guess maybe you said Madigan.
7 Anything else?
8     A.     Well, again, I think if you -- I
9 describe this in my report.  I mean, there's the
10 Accord European labels, the Sandoz labels.  I mean,
11 those are publicly available.  The other publications
12 such as described in Dr. Feigal's report.
13         We talked about data mining.  You know,
14 if Hospira had wanted to do that, there was nothing
15 stopping it.  Those -- the AERS data I talked about
16 before are released quarterly.
17     Q.     But, Doctor -- oh, I'm sorry.
18     A.     No, go ahead.  I'm sorry.  Go ahead.
19     Q.     What I'm trying to understand is, we've
20 spent hours talking about the whole purpose of a
21 505(b)(2) and not having to reinvent the wheel, and
22 you seem to be suggesting that information that FDA
23 had or that really long predated, even if it's public
24 data -- and we can talk about whether FDA had
25 it -- you seem to be suggesting that there was some

1 obligation on the part of Hospira to do some sort of
2 retrospective look.  And I'm having a hard time
3 understanding what it is that you think should have
4 sparked that.
5         What is it in 2012 that was new
6 information that should have been a signal that
7 alerted the company to the need to do the review
8 you're suggesting in the first place?
9         MR. CENTOLA:  Objection, form.
10     A.     That's a fair question.  So first of
11 all, I just want to observe, I'm not suggesting that,
12 I'm saying it straight out.  That's number one.
13         Number two, in terms of avoiding, you
14 know, duplicative studies, that refers to
15 pre-approval studies.  It does not, not, not, refer
16 to post-marketing activities.  Both Hatch-Waxman and
17 the regulations do not say anything, nor was that, as
18 far as I can see, with the passage of that act
19 anything that they said, well, we want to avoid
20 duplication in post-marketing as well.  This doesn't
21 say that.  It's all about pre-marketing.
22         Third, and this is a common myth that
23 new safety information only involves things that
24 appear in the last few months.  And the statute and
25 the definition -- I'm sorry, the definition was

1 drafted intentionally to be quite broad so that if
2 it's information that exists and is analyzed or added
3 as part of an analysis, that analysis is the new
4 safety information.  It is not restricted -- it does
5 not exclude things that the FDA as individual bits
6 and pieces may know about just because they've been
7 there.  In fact, it's -- the FDA has emphasized that
8 it's the company's responsibility to do this kind of
9 analysis and bring it to the FDA's attention.
10         So the new safety information, each of
11 these -- you're correct that each of these pieces
12 that I've talked about, they're -- may or may not be
13 in there in one way or another, but the -- if a
14 company says, you know, putting these all together,
15 clearly this is something where we need to update the
16 label, that's new safety information.
17         And, really, between the time frame that
18 I'm talking about and when they actually updated it,
19 there was nothing new.  There was nothing -- it was
20 just -- I mean, you know, it was not, like, oh, my
21 God, here's a new 2014 paper.  In fact, in the
22 clinical overview that I mentioned, the review that
23 Pfizer did specifically mentions the Kluger paper
24 from 2012.
25         So it's incorrect to say, well, this

46 (Pages 178 - 181)

1 isn't really new, and that is exactly why this was
2 drafted the way it was.
3    Q.  Doctor, if I understood you correctly,
4 you -- you said that there was nothing new, it was
5 really putting together the bits and pieces that
6 already existed in 2012. That's what you just said.
7 Right?
8    A.  No.
9    Q.  Oh.
10   A.  That is not what I said.
11       It is that an analysis itself is new,
12 and it's not simply semantics.
13   Q.  I understand that, Doctor. You can
14 always do a new analysis of old data. Right? You
15 can always do that. Is that what -- just so we're
16 talking the same language.
17       There's an old -- there's an analysis of
18 data that exists, the preexisting analysis, right,
19 and then there's something that is truly new that
20 comes into existence that causes, you know,
21 that -- there's something that's surely new that
22 exists for the first time, and that's the distinction
23 you're making. Right?
24   A.  No. What I'm saying is, first off,
25 there is no -- let me finish. There's no definition

1 of, quote, old data. There's -- you know, in the
2 regs.
3       Secondly, that is exactly how -- it's
4 not trivial to put things together.
5    Q.  I'm not suggesting that, Doctor, but --
6    A.  But it's not -- I'm trying to say it's
7 not just -- it's not new for its own sake. You can
8 do an analysis where it doesn't reveal something.
9    Q.  Okay. Let's try to get back on track
10 here. We're talking about new evidence. Right?
11   A.  New safety information.
12   Q.  My question is: How do you define as a
13 regulatory expert what is -- what is the definition
14 of "new evidence" you're applying to this duty that
15 Hospira had in 2012 to submit a CBE? What's the
16 definition you're using?
17   A.  Just a second -- just bear with me here.
18       So paragraph 45: "The FDCA broadly
19 defines new safety information as, quote, information
20 derived from a clinical trial, an adverse event
21 report, a post-approval study, or peer-reviewed
22 biomedical literature or other scientific data about
23 a serious risk or an unexpected serious risk
24 associated with the use of the drug the secretary has
25 become aware of that may be based on a new analysis

1 of existing information since the drug was approved."
2       That's the definition that I'm using.
3    Q.  Is that the whole definition?
4    A.  There's ellipses in there.
5    Q.  What did you leave out, Doctor?
6    A.  You know what? If we can pull up the
7 statute, I could do it right now and read the whole
8 thing, if you'd like. But it's not -- it's things
9 that -- the words did not substantively change the
10 meaning of this. But if you'd like, I'll pull it up
11 right now and we can read it and I'm sure you've got
12 it.
13   Q.  You wouldn't want to leave anything out
14 that was important to the accuracy of your
15 definition, would you?
16   A.  No.
17   Q.  So was -- was there any particular truly
18 new piece of data or event that occurred in 2012 that
19 you can point to that you think was enough of a
20 signal that with respect to permanent alopecia that
21 you think Hospira should have conducted a signal
22 analysis and assessed?
23       MR. CENTOLA:  Objection to form.
24   A.  So you used the term, "truly new."
25   Q.  Correct.

1    A.  Okay.
2    Q.  That didn't exist in 2012. I'll define
3 it for you. That didn't exist before 2012.
4       MR. CENTOLA:  Objection, form.
5    A.  Okay. First off, if a company does not
6 do an analysis that would constitute new safety
7 information, it will never exist. That's number one.
8       Number two -- and I pointed this
9 out -- the Kluger article, the label changes that are
10 described in my report, those certainly did not, you
11 know, appear.
12   Q.  You talked about Dr. Madigan and your
13 review and reliance on the report. Are you relying
14 on Dr. Madigan's report for your opinions in this
15 case?
16       MR. CENTOLA:  Object to form.
17   A.  If I can --
18       MR. HOROWITZ:  What's the objection?
19       MR. CENTOLA:  Sure. You said, "Are you
20 relying on his report?" The question is are you
21 relying on data in his report? Are you relying on
22 the entire report? Did you use some of the
23 information in the report to impart his opinion
24 or -- you're -- it is an imprecise question.
25       MR. HOROWITZ:  I got you.

47 (Pages 182 - 185)

Page 186

1      MR. CENTOLA:  That's why there's a form
2  objection.  If you want to ask a precise question,
3  that's fine, but you can't say are you relying --
4  which part --
5      MR. HOROWITZ:  Objection, imprecise.
6  I'm with you, Larry.  I appreciate your explaining.
7      Q.   Doctor, are you relying upon
8  Dr. Madigan's report in forming your opinions in this
9  case?
10      MR. CENTOLA:  Objection to form.
11      A.   So the role of these reports is
12  described in paragraph 85.  "My understanding and
13  opinions are supported by the analyses and opinions
14  of the Plaintiffs' expert witnesses, Dr. Feigal,
15  Dr. Madigan, and Dr. Plunkett.  I have reviewed their
16  expert reports and I accept and consider their
17  assessments."
18      Q.   And to be clear, just so when you say
19  Plaintiffs' expert witnesses, Drs. Feigal and Madigan
20  and Plunkett are -- are witnesses such as yourself
21  who have been retained by Plaintiffs' counsel to
22  offer their opinions in these cases.  Is that right?
23      A.   That's my understanding.
24      Q.   And just as yourself, they are
25  compensated for the time they devote to preparing

Page 187

1  reports and giving depositions and providing these
2  opinions in this litigation.  Right?
3      A.   That's my understanding from their
4  reports.
5      Q.   And do you know how much money either
6  of -- or any of the three of them have been paid with
7  respect to this litigation?
8      A.   I have no idea.
9      Q.   Do you know how frequently these folks
10  testify on behalf of plaintiffs' lawyers and how much
11  of their income comes from providing reports for
12  plaintiffs' lawyers in litigations like this?
13      A.   I have no idea.
14      Q.   And when you were at FDA, and I saw
15  something in your report about the internal processes
16  at FDA when you function as a medical officer,
17  sometimes you -- and not infrequently, you would rely
18  upon subject matter experts for their reports that
19  were outside of your direct area.  Correct?
20      A.   I think it might be more accurate to say
21  I would take their analyses and conclusions and
22  recommendations into consideration.
23      Q.   Correct.  And when you did that at FDA,
24  it seems to me that you're suggesting you might be
25  skeptical sometimes of their -- of the experts that

Page 188

1  sent you reports in areas outside of your own
2  expertise and you would do your own sort of
3  assessment or -- or -- or due diligence with respect
4  to the conclusions and recommendations they were
5  making.  Right?
6      A.   I don't think "skeptical" is the right
7  word in the sense that -- that, you know, I would
8  read their reports.  The reports might be something I
9  completely agreed with or I'd agree with in a narrow
10  way but there was a broader context for viewing their
11  conclusions.  Certainly I didn't feel, you know,
12  like, I must accept what they're saying.  But I don't
13  think I -- skeptical?  I didn't automatically accept
14  what they would say.  You know, I read it and
15  evaluate it accordingly.
16      Q.   And did you apply the same level of
17  rigor here when you looked at the retained
18  compensated expert reports from Dr. Feigal, Madigan,
19  and Plunkett?
20      A.   Yes.
21      Q.   Okay.
22           What exactly did you do to assess the
23  quality of their reports?
24      A.   The quality of their reports?
25      Q.   Let me ask that differently.  What

Page 189

1  exactly did you do to get yourself comfortable with
2  the -- the conclusions or whatever -- whatever it was
3  that you were relying upon from each of their
4  reports?  What did you do?
5      A.   So what I would say as to -- you know,
6  first off, the areas that they were offering opinions
7  on I certainly have some knowledge of.  It's not that
8  I know nothing about it.
9           So, you know, what I would do with any
10  report -- and, honestly, it doesn't matter whether
11  they're compensated or not or even what side they're
12  on, I have to make up my own mind.  I'm not -- you
13  know, if I'm reading -- there's reports that I've
14  looked at from -- retained by opposing counsel,
15  not -- not talking just limited to this case, and I
16  don't say, well, they're retained by the other side,
17  they must be wrong.  That's not how science works.
18           You say, okay, from what I know of
19  methodology in this -- and some of this is
20  general about the things that lead to incorrect
21  conclusions and not specific to any field -- are
22  there any obvious errors here?  Can I understand what
23  they're saying?  Are their methods supported by
24  previous work in the field?  And if there's a
25  regulatory aspect or -- regulatory implications, do I

Page 190

1 have the information I need to apply it.
2    Q.   Take a look at -- let's go back to your
3 report, Exhibit 1, paragraph 91.
4        You talk about how Dr. Madigan analyzed
5 the results of four observational studies. Do you
6 see that?
7    A.   Yes.
8    Q.   And concluded that there was a
9 significantly increased risk of PCIA in
10 docetaxel-containing regimens versus the
11 non-docetaxel containing regimens when analyzed
12 cumulatively, and, for three of them (including
13 Sedlacek 2006) on their own. Do you see that?
14    A.   Yes.
15    Q.   That was a metaanalysis, right, that he
16 conducted?
17    A.   Well, I think -- I'm not sure. It
18 depends on the exact definition of metaanalysis that
19 one is using. But essentially in terms of pooling
20 the data here, I'm not sure that -- I prefer to refer
21 to it as a pooled analysis.
22    Q.   Okay.
23    A.   But at any rate.
24    Q.   Dr. Madigan performed what you would
25 call a pooled analysis. Right?

Page 191

1    A.   Well, I think that's one way to look at
2 it. I think the point is that there's more than one
3 study and methodology for -- but for
4 metaanalyses and if you're just pooling things. Not
5 just if you're pooling things, two are overlapping
6 but not necessarily the same.
7        But at any rate, that's something I would
8 refer to Dr. Madigan exactly how you would regard it.
9        But at any rate, please go ahead.
10    Q.   And you took the trouble to write this
11 in your report and include it as part of your report
12 that you submitted against Hospira in this case.
13 Right?
14        MR. CENTOLA: Objection, form.
15    A.   I'm not sure I would say it was against
16 Hospira. It was my opinion on these questions.
17    Q.   Are you aware that the Federal Judge
18 presiding over this case has ruled that Dr. Madigan's
19 analysis is not reliable?
20        MR. CENTOLA: Objection, opinion.
21    Q.   Are you aware of that?
22    A.   I know that there was a Daubert motion
23 filed. I'm looking at it from a scientific
24 perspective and not a judicial perspective.
25    Q.   Well, are you aware that the Judge

Page 192

1 stated that she finds it significant that Dr. Madigan
2 himself has written -- that means Dr. Madigan has
3 written himself outside the concepts of this
4 litigation -- "that in the face of high
5 heterogeneity" -- you do know what that is. Right?
6 Heterogeneity?
7    A.   I do know. It depends what the context
8 is; but please go ahead.
9    Q.   Okay. I'll give you the context.
10 "Simply pooling data or performing a metaanalysis
11 would generally not provide satisfactory outputs."
12        Were you aware that the Judge wrote this
13 in her opinion about Dr. Madigan's analysis?
14    A.   I believe that I actually -- you know, I
15 think that was actually cited in my reliance
16 material. Or not reliance, but my review materials,
17 if I'm not mistaken. So if that's the line that I'm
18 thinking about, I did.
19    Q.   I'm sorry. You're saying that the
20 Judge's opinion is cited in your reliance materials?
21 If I were to tell you that that's simply not the
22 case, would you --
23    A.   Then I may be -- then I may be mistaken,
24 which is always -- the one I'm thinking of here is
25 "Order and Reasons," Barbara Earnest. I don't have

Page 193

1 that in front of me. But I guess --
2    Q.   I'm talking about a different order, Dr.
3 Ross.
4    A.   Okay. That's fine. I guess what I
5 would say is there are two different -- you're
6 talking about the legal system versus looking at it
7 as a -- from a regulatory science perspective. Those
8 are two different things.
9    Q.   Well, not -- not exactly, Doctor.
10 You -- you cited Daubert yourself. Right? You just
11 mentioned you understand that there are Daubert
12 decisions, and you know what that is, that the
13 Court's gatekeeping role on the reliability of the
14 methodology used --
15        MR. CENTOLA: We're not here to argue
16 law, are we? We're going to stick to science?
17    Q.   Doctor, you used the word "Daubert."
18 Right? Can you answer my question? You understand
19 what that is.
20    A.   I know it's a legal -- it's a case that
21 was applied in from -- in terms of expert witness.
22 It's not a regulatory concept, however.
23    Q.   It's a reliability of methodology
24 concepts. Right?
25        MR. CENTOLA: Objection to form.

49 (Pages 190 - 193)

1     A.    From a legal perspective.
2     Q.    Sure.  But it's assessing science in a
3   regulatory -- any other form of proffered expertise.
4   Right?
5         MR. CENTOLA:  Objection, form.
6     Q.    You understand that.  Right?
7     A.    Yes.
8     Q.    I'm getting an echo.  Do you have a
9   phone on in your room?
10    A.    I don't, but let me go on mute.  Maybe
11  that will help.
12    Q.    How can you go on mute if you have to
13  answer my questions?
14    A.    I'll go off mute.  I have this happen
15  sometimes at work.  I just -- you know,
16  somebody -- for whatever reason there's an echo.  But
17  I'll just go on mute.  You can hear me now.  I just
18  have to hit the space bar on my machine.
19    Q.    Doctor, with respect to Dr. Madigan's
20  FAERS database analysis that you talk about in your
21  report for the proposition that there were signals as
22  early as 2000, you didn't independently analyze the
23  adverse event data for FAERS regarding Taxotere and
24  docetaxel, did you?
25    A.    That's correct.

1     Q.    You -- you are only relying upon
2   Dr. Madigan's analysis.  True?
3     A.    So, again --
4         MR. CENTOLA:  Objection to form.
5     A.    -- tell me what paragraph.
6     Q.    Paragraph 95.
7     A.    Yes.  So as I said, the role of those
8   reports, as I say in paragraph 85, is that my
9   understanding and my opinions are supported by the
10  analyses and opinions of those expert witnesses.  I
11  don't use the word "rely" here.
12    Q.    Okay.  So then can we just -- I guess my
13  question is are you relying on these reports of
14  Madigan, Feigal, and Plunkett?  Are you relying on
15  them in any way?
16    A.    Again, the word that I use here is that
17  they support my understanding and opinions.  And I
18  really think that's what I would say.
19    Q.    So you could give your opinions in this
20  case with the absence of any recitation to any of
21  their three reports is what you're saying.
22        MR. CENTOLA:  Objection, form.
23    A.    No, that's not what I said.
24    Q.    Then you are relying on them.
25        MR. CENTOLA:  Objection, form.

1     A.    That is also not what I said.
2     Q.    Okay.  Because what you're saying,
3   honestly, Doctor, doesn't make any sense.  I mean,
4   you know, you're saying, "I've got an opinion and
5   they agree with it but I'm not relying upon them."
6         So if you have an opinion and they agree
7   with it but that's all you're doing, then they've got
8   nothing to do with your report.
9         MR. CENTOLA:  There's no question on the
10  table.  Can we ask questions?
11        MR. HOROWITZ:  There is a question.
12    Q.    Which is it, Doctor, are you relying
13  upon them or are you not?  That is the question.
14        MR. CENTOLA:  Well, that's a question
15  after a soliloquy.  Can we ask a question without
16  arguing with the witness.
17        MR. HOROWITZ:  I'm not arguing.  I'm
18  trying to understand.
19    Q.    You have to help me out here, Doctor,
20  because I really don't understand what you're saying.
21        I don't understand the role that you
22  think these reports play with respect to your report.
23  Could you explain that to me.
24    A.    So I'm trying to answer your question,
25  which is in terms of I don't need their report.  I

1   did not conduct the exercise of saying, well, let's
2   pretend I never saw these, would I still reach the
3   same conclusion?  I haven't done that nor would I do
4   that.  I mean, that's not the way that science works.
5   You don't say, well, what can I exclude here?  I
6   understand that exclusion or inclusion of evidence in
7   law in extremely important and I understand that, but
8   I'm not a lawyer and that's -- I'm a regulatory
9   expert.
10        Secondly, I don't -- in terms of "rely
11  on," I'm -- again, I use this wording and I don't say
12  that from my understanding and opinions I rely on the
13  analyses.  I also don't say I don't rely on them.  I
14  do say that my opinions are supported by the analyses
15  and opinions of plaintiffs' expert witnesses.  And,
16  again, I'm afraid I'm going -- that's the best I can
17  do to explain it.
18    Q.    Doctor, did you yourself do a pooled
19  analysis of the four articles that Dr. Madigan
20  analyzed, the four observational studies?
21    A.    No.
22    Q.    Did you, yourself, do an analysis of the
23  FAERS database that Dr. Madigan looked at?
24    A.    No.  I also paused because there was a
25  previous question in which you had posited that I,

Page 198

1 quote, agree with them.  What I said was --
2    Q.    Let's not go back to a previous
3 question, Doctor.  Answer the question in front of
4 you, please.
5    A.    I'm sorry, no.
6    Q.    Mr. Centola can ask you questions at the
7 end if you think there's something you want to go
8 back to.
9        And with respect to -- well -- and you
10 certainly didn't analyze the methodology that
11 Dr. Madigan used to conduct his FAERS analysis, did
12 you?
13    A.    I reviewed it.  If there had been
14 something that I did not find acceptable, I wouldn't
15 have written, "I accept and consider their
16 assessments valid. "
17        So I don't know if analyze it is what
18 you would say, but I -- I -- it was -- I did not
19 simply read the last paragraph of their -- either
20 reports, I guess I would say.  So --
21    Q.    I'm sorry.
22    A.    Please go ahead.
23    Q.    Sorry.  Did you verify whether or not
24 Dr. Madigan followed the same FDA guidance and best
25 practices that drug manufacturers should follow?

Page 199

1    A.    Which specific guidance are you -- or
2 best practices are you referring to?
3    Q.    Can you answer my question?  I mean, did
4 you do any sort of assessment as compared to any
5 particular guidance?
6    A.    There are hundreds of guidances that FDA
7 has issued including a large number on biometrics and
8 analysis, so I can't answer that question unless you
9 say did you look to see if you followed this or that
10 or the other thing.  So if you can do that, I can
11 answer your question; otherwise, I mean,
12 there's -- besides the guidances, there's --
13 know, I -- I can't answer that unless you say here's
14 what I'm talking about.
15    Q.    Did you look at any of them in
16 comparison to -- not in comparison, but when you were
17 assessing Dr. Madigan's analysis, did you look at any
18 of the guidances with respect to best practices on
19 post-marketing surveillance to see where his
20 methodology stacked up?
21    A.    So guidances and
22 scientific -- statistical, rather, and clinical trial
23 issues come first and foremost out of the underlying
24 science.  So if something is consistent with not just
25 the guidance but starting with the science, that's

Page 200

1 what I'm looking for.
2    Q.    I'm not asking --
3    A.    If I could -- if I could finish.
4    Q.    You're not answering my question.
5    A.    Well, the answer is these are guidances
6 for industry, so I'm not going to look at that with
7 respect to Dr. Madigan.  What the --
8    Q.    What about guidances -- oh, I'm sorry.
9 I thought you were done.
10    A.    I'm going to say, I, you know, did not
11 consult a whole slew of reference works that weren't
12 applicable.  There's a whole universe of those.  So,
13 no, I would not look at that because it wouldn't help
14 me.
15    Q.    What about any -- there are -- there are
16 maps and internal processes and procedures and
17 guidances within FDA for medical officer reviewers.
18 Right?  Are you familiar with those?
19    A.    Yes.
20    Q.    Did you look at any of those and make an
21 assessment as to whether Dr. Madigan was in
22 compliance with any of those guidances or protocols?
23    A.    That was not only -- it would be not
24 only irrelevant but potentially the wrong thing to
25 do.  So, again, it's -- he's not an FDA employee, was

Page 201

1 not doing this as a regulatory expert; so, no.
2    Q.    Are you offering an opinion that Hospira
3 was required to conduct an analysis of all of the
4 FAERS data regarding docetaxel before it submitted
5 it's 505(b)(2) application?
6    A.    Again -- again, I've not offered and I
7 do not anticipate offering any opinions about what
8 Hospira did prior to approval to get approval.
9    Q.    Paragraphs 91 to 94 you discuss the
10 medical literature that you cite.  Do you see that?
11    A.    I'm sorry.  Please go ahead.  I'm sorry.
12 I knocked over a cup.  Can you repeat the question?
13    Q.    I'm sorry.  Do you need a second, Doc?
14    A.    No, there was nothing in it.  I'm sorry.
15 Can you just repeat the question?
16    Q.    Yeah, sure.
17        Paragraphs 91 to 94 you discuss medical
18 literature.  Correct?
19    A.    Yes, that's correct.
20    Q.    Did you do your own independent review
21 of that literature or are you simply relying upon
22 what Dr. Feigal or Plunkett did?
23        MR. CENTOLA:  Objection, form.
24    A.    So, again, I reviewed their reports, and
25 I'm excerpting from those reports studies that I

51 (Pages 198 - 201)

Page 202

1 found -- in terms of testing my opinions, I found
2 supported the conclusions that I had drawn.  Did I
3 review each and every one of these studies as they
4 did?  No.  Nor if I were doing this in an NDA review
5 or a review of a post-marketing issue, would I
6 necessarily have done that either.
7       Q.   Doctor, we're getting close.  It
8 actually may help, you know, I think we're at the
9 point where I may streamline a bit.
10      MR. HOROWITZ:  Larry, I can't see you
11 anymore for some reason.  I don't know if it's me
12 or -- oh, there you are.  I missed you, Larry.
13      MR. CENTOLA:  Miss you, too.
14      MR. HOROWITZ:  Well, if you could
15 indulge me for maybe -- maybe this will be ten
16 minutes because I think it will help us on the back
17 end, if that's okay.
18      (A discussion is held off the record.)
19      THE VIDEOGRAPHER:  The time is
20 3:56 p.m.  Going off the record.
21      (A recess is taken.)
22      THE VIDEOGRAPHER:  The time is
23 4:15 p.m. and we're back on the record.
24      Q.   Doctor, it's getting a little later.
25 It's after four.  We're getting there.  I appreciate

Page 203

1 you hanging in.
2       Let's go to our next exhibit, which will
3 be Exhibit 12.
4       (Exhibit 12, Notice of Deposition, marked
5 for identification.)
6       MR. HOROWITZ:  Which is Tab 12, Ashley,
7 the Notice of Deposition.
8       Q.   And, Doctor, while we are loading the
9 Notice of Deposition, Exhibit 12, you've -- you're
10 familiar with this process where we serve what's
11 called a deposition notice and then we attach a list
12 sometimes and usually the items that we would like to
13 be produced.  You're sort of familiar with that
14 process?
15      A.   Sort of.
16      Q.   And so were you sent -- and here's the
17 notice, the front page.  But let's look at Exhibit A
18 which is the Items to Be Produced.
19      Did you take a look at this before your
20 deposition?
21      A.   I did.
22      MR. CENTOLA:  I presume you received our
23 objections?
24      MR. HOROWITZ:  I did.  And, Larry, if
25 you want, we can put the sticker marker after.  I'm

Page 204

1 just using this as a prop to get through this.  Okay?
2       MR. CENTOLA:  Sure.
3       Q.   Your most current curriculum vitae is
4 request number one.  And I think we were given an
5 updated copy last night which we've already marked as
6 a deposition exhibit.
7       Number 2 is an up-to-date list of all
8 articles, abstracts -- I'm not going to read the
9 whole thing in the interest of everybody's sanity.
10 But I presume that your updated CV has anything
11 that's additional that you've published that is CV
12 worthy.  Let's ask it that way.
13      A.   I like that expression.  Correct.
14      Q.   And then there's always the glorious
15 list of testimony.  We probably should mark this for
16 completeness.  Your counsel last night was kind
17 enough to provide us with an updated list which I
18 believe is Tab 33.
19      MR. HOROWITZ:  And we'll just go ahead
20 and mark that as Exhibit 13.
21      (Exhibit 13, Updated List of Expert
22 Witness Testimony, marked for identification.)
23      Q.   And I'll just have you verify that
24 that's an updated list of the past four years of your
25 testimony, deposition and trial.

Page 205

1       A.   Yes.
2       Q.   And did you -- I assume you prepared
3 that list?
4       A.   Yes.
5       Q.   Okay.  So then we can dispense with the
6 loading.  You're familiar with it and you obviously
7 provided it to counsel to provide to me.  Fair?
8       A.   Yes.
9       Q.   With respect to -- I'm going to skip
10 number 4 for a minute.
11      Your file.  I remember talking to you
12 about this in the other litigation I deposed you
13 about.  What's the manner in which you keep your file
14 for this case?  And by "this case" I mean, I guess,
15 the 505(b)(2) docetaxel report that you put together.
16 Is it electronic?  Do you have hard copies?  How does
17 that work?
18      A.   Electronic.
19      Q.   Okay.  So everything that you were
20 provided, do you keep it in a single, kind of,
21 electronic file, a single file?  Is it, like, with
22 multiple sub files?  How do you keep that?
23      A.   I think you're crediting me,
24 Mr. Horowitz, with too much organizational skill.  I
25 apologize.  That's my goal.  It's

52 (Pages 202 - 205)

1 essentially -- that's -- that's -- yeah, it tends to,
2 you know, some downloading things, things get
3 scattered. But that's basically it.
4     Q. Do you take notes on the documents as
5 you review them or -- or reports, or anything that
6 you're reviewing that's been provided to you?
7     A. Um, usually -- usually not. I mean, I
8 would never say never. I do have a folder, a
9 separate folder, just in case that's saying this is
10 part of my template that's marked -- you know,
11 marked-up materials. But I rarely, if ever, actually
12 use that. I mean, just -- it's not just in this
13 situation, it's usually almost any -- any case.
14     Q. So when you -- you say you keep a folder
15 that's called, "Marked-Up Materials." Is that
16 materials that you would mark up or do they come to
17 you marked up?
18     A. No, that's for anything. Because I -- I
19 sort of -- I think I know why you're asking. But in
20 case I need to -- you know, there's a request, you
21 know, in any case to, you know, please provide any
22 notes or whatever, anything, like, marked up. Marked
23 up, I mean, like scribbled a note or electronically,
24 I want to be able to identify those.
25     So I have that as sort of my -- I have a

1 standard format at the start of a case. And I've got
2 that as part of it. But I -- I've set up this system
3 a few years ago and I just -- it turns out I don't
4 typically mark -- mark stuff up or write notes on it.
5     Q. Do you have any notes as you just
6 described in the manner that you keep them with
7 respect to your docetaxel report?
8     A. I -- I checked in that folder. It's
9 empty. I mean, I did not had a chance yet to
10 check -- you know, do a more global search. But as
11 best as I know, no. Because, again, I -- you know,
12 it's -- you know, that's something that is
13 discoverable and I want to be able to find it so
14 that's why I have it. But I usually -- it's not
15 turned out to be helpful to me usually as I've gone
16 through materials.
17     Q. Would you -- I mean, the request would
18 call -- calls for your whole file.
19     A. Sure.
20     Q. And you're right, what I'm most
21 interested in, frankly, are -- are documents that you
22 may have marked up or notes that you've taken, or if
23 any documents were provided to you pre-highlighted
24 or -- or pre-marked with notes, that's what I'm most
25 interested in.

1     A. Oh, okay. So --
2     MR. CENTOLA: I think this is beyond the
3 scope of the Rule 26 and the Case Management Order.
4 Don't we have a Case Management Order of what's asked
5 to be produced? And Rule 26 that's what applies.
6     MR. HOROWITZ: Well, respectfully, let
7 me see if it even exists because I don't want to tilt
8 at a windmill.
9     Q. So I guess my question is does it even
10 exist? Do the things I just described exist?
11     A. Well, first and foremost, I really take
12 these rules very seriously. And I know everybody
13 says that and they mean it, but I really mean it.
14 It's not -- if it's there, then I'm obligated to
15 produce it and, you know, the other side is entitled
16 to it.
17     Having said that, I honestly don't think
18 so. But, you know, in terms of -- but I'm only
19 talking about right now things that I have marked up.
20 But I -- I want to make sure that I can say that and
21 feel comfortable. So I, you know, don't want to do
22 it in a rush right now. But I can --
23     Q. Okay.
24     A. -- certainly confirm that in the next
25 24 hours.

1     Q. Okay. Understood.
2     And then, I guess, if you could check on
3 that. And then obviously it's between me and
4 Mr. Centola whether there's things that you would be
5 required to produce. But if you can at least, you
6 know, endeavor to look. And if you don't have
7 anything, you don't have anything. But if you do,
8 you know, maybe it's something I'm entitled to see
9 and certainly I'll pursue that if I can. And if I
10 can't.
11     And then the other piece was, I guess
12 I'm wondering, do you receive things from the
13 plaintiffs' lawyers in this case that are sort of
14 pre-highlighted and pre-marked up or are they blank
15 so you can review them yourself clean?
16     MR. CENTOLA: Objection to form.
17     Q. Dr. Ross, you're on mute.
18     A. Sorry. I thought I was interrupting
19 Mr. Centola.
20     I don't know the answer to that. And,
21 again, I would have to check and see what I've got,
22 but I can do that pretty quickly. And by quickly I
23 mean in the next 24 hours.
24     Q. Okay. You'll check and we'll see what's
25 what.

53 (Pages 206 - 209)

1        Let's turn then to the next exhibit.
2 It's really in response to the invoice request which
3 was number 4 in the items to be produced.  And I
4 think we were sent a PDF.  Let's pull that up and
5 mark it as one exhibit.  I think we're up to 14.
6        (Exhibit 14, Ross Statements and
7 Invoices, marked for identification.)
8        MR. HOROWITZ:  Loading.
9    Q.    So, Doctor, I'll represent to you that
10 we were provided, as I said, this PDF which we've
11 marked as Exhibit No. 14 last night which certainly
12 appears to me to be a collection of statements and
13 invoices with respect to your work on docetaxel for
14 this litigation.
15        Is this something you provided to
16 plaintiffs' counsel to provide to me?
17    A.    Yes.
18    Q.    And I'm hoping you can help walk us
19 through this.  I don't want to spend too much time
20 but I will confess that I'm not sure I fully followed
21 the methodology here, and I want to make sure that
22 we're all on the same page.
23        Maybe I can start with a simple question
24 which is:  It says on the first page, "February 24,
25 2020, Retainer."

1        Do you see that?
2    A.    Yes.
3    Q.    And you were given a check for $11,000
4 as I'm going to assume that's the initial retainer
5 for this litigation?
6    A.    Yes.
7    Q.    And one of the questions -- I used "this
8 litigation" pretty cavalierly in that question.  I
9 know there's the 505(b)(2) aspect in the report that
10 I just deposed you about that includes Accord,
11 Hospira, and Sandoz.  And then I know you also did a
12 report with respect to Sanofi and Taxotere that you
13 were deposed about.  Is this retainer in this
14 retention, does this include both the 505(b)(2) and
15 the Sanofi Taxotere or is this just the 505(b)(2)?
16    A.    Both.
17    Q.    And do you separately invoice for the
18 work you do on Sanofi Taxotere versus the work you do
19 on the 505(b)(2)'s?
20    A.    I believe in general that's how
21 it's -- it just happened to work out.  I mean, I
22 don't -- I think for any given invoice it tends to
23 be -- so the structure of this -- and this may help.
24 I have work slips that are basically a particular
25 task or activity or event.  And then an invoice is

1 composed of a number of completed work slips, that
2 is, where that activity of, you know, I said, okay,
3 that's all I'm putting on this slip.
4        And the way that it's happened to work
5 out is each invoice that has, I think, always been
6 for one or the other, not a mixture of 505(b)(2) and
7 Sanofi-related activities.
8    Q.    In the collection that I was provided
9 here, and if you need to go through it, does this
10 include only the work done on 505(b)(2) and not the
11 work that was done on Sanofi Taxotere?
12    A.    I believe it's both.
13    Q.    You believe it's both.  Okay.
14 Interesting.
15        Did you sign a retainer agreement?
16    A.    Yes.
17    Q.    And is your retainer agreement with the
18 entire Plaintiffs' Steering Committee as you have
19 here on your "Bill to" statement?
20    A.    I believe so, yes.
21    Q.    And I believe we did the math and we
22 counted eight invoices totaling $159,005.  Does that
23 sound right to you?
24    A.    It sounds about right.  I mean, I
25 obviously need to go through and say, yes, that's it.

1 But that's -- that sounds about right.
2    Q.    And the last time entries we have are
3 for May 6 and 7, 2021.  Have you prepared
4 any -- well, let me ask it this way:  Presumably
5 you've done some work since May 6 and 7, 2021, that
6 you'll invoice for?
7    A.    Yes.
8    Q.    And I assume you have not yet prepared
9 those invoices?
10    A.    Correct.
11    Q.    Do you have -- and you're going to love
12 this question:  Do you have an estimate as to what
13 we're looking at -- and maybe I'll say once this
14 deposition is completed today -- what you think you
15 will bill?
16        MR. CENTOLA:  Objection, form.
17    Q.    And I understand it's an estimate,
18 Doctor.
19        You're on mute.  I can't hear you.
20    A.    Sorry.  I'm sorry.
21        It's related to this deposition.  So, you
22 know, as I -- which I don't have the time slips in
23 front of me.  But it's -- as I said, you know, not
24 counting teleconferences -- somewhere around eight to
25 ten hours.  And then videoconferences or

Page 214

1  teleconferences.  And then -- then our discussion.
2      Q.   Okay.  And so you will provide, or you
3  will invoice the Plaintiffs' Steering Committee for
4  the additional work between May and -- and this
5  deposition.
6          MR. HOROWITZ:  And obviously we'll,
7  Larry, make a request to see those once they've been
8  received by you.
9      Q.   One of the things I was confused about.
10 There are invoice numbers that get skipped.  And
11 again, that's part of what raised my question about
12 whether this is everything or if this is just split
13 between 505(b)(2) and Taxotere.  Are you able to just
14 explain why some of the invoice numbers are skipped?
15     A.   Absolutely.
16         So almost always it's because that
17 invoice -- you know, the skipped invoice number is
18 connected with an unrelated case.
19         Sometimes it's just because I've -- I've
20 screwed up the number and I just void out the
21 invoice.  But usually it's -- you know, it's simply
22 another case.
23     Q.   Got you.
24         And have any of your invoices ever been
25 rejected by the Plaintiffs' Steering Committee?

Page 215

1      A.   No.
2      Q.   If there are time entries for the same
3  day with the same description but on different
4  invoice numbers, how -- I guess my question is how
5  would that work?  Is it -- is it possible that you
6  just separately captured work done?  I guess -- I
7  guess how would that work or why would that be?
8          MR. CENTOLA:  Objection to form.
9      A.   So when I first started using this
10 particular software, you know, I'd start on, I don't
11 know, let's say October 5th.  And this isn't just for
12 this case.
13         And then, you know, if it's going over
14 several days, I would go -- you know, there would be
15 a bunch of start and stop times on different days.
16         And then I -- you know, I would say,
17 okay, it's completed as of this day.
18         That turned out to be confusing to
19 everybody because what happened -- you know, I would
20 say, okay, here's the date that it was completed.
21 Let's say October 9th.  But it didn't really -- you
22 know, it's like, okay, October 9th, 35 hours.  And
23 it's, like, okay, what's going on here?
24         So to try and untangle that, what I have
25 done is for a given activity, like, let's suppose I'm

Page 216

1  reviewing -- well, I'm reviewing my report.  Okay?
2  And whatever I've done on a given day, if I spend two
3  hours on that day then I then finish and that work
4  slip is marked completed.  And then the next day, if
5  I do it, you know, do it on the next day, so it will
6  be October 6th, October 7th for that particular
7  activity and they'll all have the same title but it's
8  done on different days.
9          If I'm doing more than one activity on a
10 given day, it's -- you know, so let's suppose
11 I'm -- on a particular day I'm reviewing a report and
12 but I'm also doing a literature search.  That would
13 get put on a different slip, so that it makes it
14 easier, I hope makes it easier, to see how my
15 time -- I've allocated my time.
16     Q.   Got you.  Got you.  And I think you've
17 explained that before, I think, when I -- either I or
18 one of my colleagues spoke with you about this in the
19 past.
20         Okay.  I think I understand that.
21         When did -- do you have -- I didn't ask
22 you this, I'm sorry.  Do you have a lawyer -- a
23 plaintiffs' lawyer for the Steering Committee that
24 you kind of consider to be your primary contact for
25 the docetaxel cases?

Page 217

1      A.   I -- yes.  I don't know if I'd say
2  primary, but I think the person who I speak with most
3  often is Mr. Miceli.
4      Q.   And is he the individual that originally
5  contacted you to get involved?
6      A.   I believe that's correct.
7      Q.   Do you know when he contacted you in
8  relationship to when you signed the February 24,
9  2020, retainer?
10     A.   I don't have the exact date.  It was --
11 would have been sometime, I believe, in January of
12 2020, I think.
13     Q.   And were you sent materials to review in
14 advance of you signing the retainer?
15     A.   Not -- not that I recall.  If I was, it
16 was -- it was only shortly before the retainer was
17 executed.
18     Q.   Okay.
19         Doctor, why don't --
20         MR. HOROWITZ:  And, Larry, if you give
21 me just a few minutes this time, I think this is the
22 point where I'm going to check my notes and make sure
23 I didn't skip anything that we consider to be mission
24 critical.  Okay?
25         MR. CENTOLA:  All right.

55 (Pages 214 - 217)

1       THE VIDEOGRAPHER:  The time is 4:39 p.m.
2  We are going off the record.
3       (A recess is taken.)
4       THE VIDEOGRAPHER:  The time is 4:51 p.m.
5  We're back on the record.
6  Q.    Doctor, I just want to look at one more
7  part of your report, paragraph 76 in Exhibit 1.
8  A.    Okay.
9  Q.    The last sentence says, "Additionally,
10  the 505(b)(2) NDA holders" -- and you include Hospira
11  in there -- "did not uniformly or entirely adopt
12  Sanofi's December 11, 2015, label change."
13       Do you see that?
14  A.    Yes.
15  Q.    And I guess one of my questions is
16  really more a regulatory question, but I'm having a
17  hard time understanding your view of the duty.
18       Is it your view that the 505(b)(2) NDA
19  holder does have a duty to uniformly adopt label
20  changes by the innovator, the Reference Listed Drug,
21  and has an independent duty as well?  I'm trying to
22  reconcile those two things.  Do you see what I'm
23  saying?
24  A.    Yes, I do.
25       MR. CENTOLA:  Objection, form.

1  Q.    Okay.  And could you explain it to me?
2  A.    Sure.  So let me contrast two situations
3  where -- I'm sorry -- compare and contrast, sorry,
4  adopting -- adoption of a changed label by a generic
5  drug approved under 505(j) and the drug approved
6  under NDA.
7       In the case of the 505(j), the reason
8  for the change is statute.  They -- they have to
9  change it because of the label has to be identical.
10       In a case of the 505(b), that label
11  change, the new information that's in that label
12  represents new safety information.  So, you know, as
13  soon as that new label from the, in this case,
14  Taxotere comes out, that is new scientific
15  information.
16       Now, they say, "Well, we actually
17  disagree with that and we are not going to change it
18  and here's why."  They could do that, but they
19  didn't.  They essentially -- the way that months and
20  months and months, even though this is new safety
21  information, and not only is that, you know, not -- I
22  mean, if you say, well, we're going through this
23  process or whatever, you know, why is it -- I could
24  see, you know, taking some time.  Obviously there's
25  internal processes.  But, you know, I mentioned --

1  Q.    I'm sorry.  Do you remember my question?
2  A.    Yes, I do, and I'm explaining it and I'm
3  trying -- it's not something that I can do in one
4  sentence.
5       I am saying they have an independent duty
6  but -- or they have a duty to change their label, so
7  does the generic drug.  The generic drugs is because
8  they have to be same.  Theirs is because of the
9  requirements under 201.57.
10  Q.    I understand.  I understand.
11       Okay.  And so what you're saying is is
12  the data that's presented in the Taxotere label is
13  something that the 505(b)(2), it needs to -- it needs
14  to look at as potential new evidence in assessing the
15  safety of its drug and whether or not there needs to
16  be a label change based on that, or at least as part
17  of its analysis, I should say.  I think that's what
18  you're saying.
19  A.    Yes.
20  Q.    Okay.  Understood.  Understood.
21       And then you cite in a footnote when the
22  Hospira label change was approved is September 2017.
23  I noticed you didn't actually put when Hospira
24  submitted its supplement.  Do you know the date they
25  actually submitted their supplement to FDA?

1  A.    I don't -- I probably did 15 months ago,
2  but I don't remember now.  It was -- I don't
3  remember.
4  Q.    And do you remember if you knew the date
5  when Hospira actually implemented the change as it
6  was submitted as a CBE-0?
7  A.    I don't.
8  Q.    And I guess the last thing is you
9  mentioned the time that went by.  You mentioned
10  earlier the -- the 2017 clinical IRB review that I
11  know you cite in your report that was submitted as
12  part of the CBE-0 from Hospira.
13       You understand that Hospira did do its
14  own review of alopecia in support of its label
15  change.  Right?
16  A.    Yes.
17       MR. HOROWITZ:  Doctor, with that, I have
18  no further questions at this time.
19       THE WITNESS:  Okay.
20       Thank you.  And both of us get some
21  rest.
22       MR. HOROWITZ:  I need to see my kids.
23       THE WITNESS:  That's even better.
24       MR. CENTOLA:  Any other counsel have
25  questions?

56 (Pages 218 - 221)

Page 222

1    Going once?  Going twice?  Thank you
2 very much.
3    MR. HOROWITZ:  Okay.  Are we done,
4 Larry?
5    MR. CENTOLA:  We're done.
6    MR. HOROWITZ:  Excellent.  Dr. Ross,
7 excellent to see you again.  Thank you for enduring
8 this always pleasant experience.
9    THE WITNESS:  The feeling is mutual.  It
10 really is.  Thank you.
11    MR. HOROWITZ:  Good to see you.
12    THE VIDEOGRAPHER:  The time is 4:58 p.m.
13 Going off the record.
14    (The deposition concluded at 4:58 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 224

1 ATTACH TO DEPOSITION OF:  DAVID ROSS, M.D., Ph.D.
2 IN THE MATTER OF:  IN RE: TAXOTERE (DOCETAXEL)
   PRODUCTS LITIGATION
3
DATE TAKEN:  Thursday, September 30, 2021
4
   E R R A T A   S H E E T
5
   I wish to make the following changes, for    the
6 following reasons:
  PAGE LINE:
7 _____  CHANGE:_____
   REASON:_____
8 _____  CHANGE:_____
   REASON:_____
9 _____  CHANGE:_____
   REASON:_____
10 _____  CHANGE:_____
   REASON:_____
11 _____  CHANGE:_____
   REASON:_____
12 _____  CHANGE:_____
   REASON:_____
13 _____  CHANGE:_____
   REASON:_____
14 _____  CHANGE:_____
   REASON:_____
15 _____  CHANGE:_____
   REASON:_____
16 _____  CHANGE:_____
   REASON:_____
17 _____  CHANGE:_____
   REASON:_____
18 _____  CHANGE:_____
   REASON:_____
19 _____  CHANGE:_____
   REASON:_____
20 _____  CHANGE:_____
   REASON:_____
21 _____  CHANGE:_____
   REASON:_____
22 _____  CHANGE:_____
   REASON:_____
23 _____  CHANGE:_____
   REASON:_____
24 _____  CHANGE:_____
   REASON:_____
25

Page 223

1    J U R A T
2
3    I DO HEREBY CERTIFY that I have read the
4 foregoing transcript and I certify that it is true and
5 correct to the best of my knowledge.
6
7
8
9
10    DAVID ROSS, M.D., Ph.D.
11
12
13
14
15 SWORN AND SUBSCRIBED
16
17 BEFORE ME ON THIS
18 DAY OF       2021.
19
   Notary Public of the State of
20
21
22
23
24
25

Page 225

1    CERTIFICATE
2    I, LINDA M. JORRITSMA, a Notary Public,
   Registered Professional Reporter and Certified Court
3 Reporter, do hereby certify that prior to the
   commencement of the examination, DAVID ROSS, M.D.,
4 Ph.D., was duly sworn by me to testify the truth, the
   whole truth and nothing but the truth.
5    I DO FURTHER CERTIFY that the foregoing is a
   true and accurate transcript of the testimony as
6 taken stenographically by and before me at the time,
   place and on the date hereinbefore set forth.
7    I DO FURTHER CERTIFY that I am neither a
   relative nor employee nor attorney nor counsel of any
8 of the parties to this action, and that I am neither
   a relative nor employee of such attorney or counsel,
9 and that I am not financially interested in the
   action.
10
11 *Linda M. Jorritsma*
   Notary Public of the State of New Jersey
12 My Commission expires December 14, 2023
13 Dated:  October 6, 2021
14
15
16
17
18
19
20
21
22
23
24
25

57 (Pages 222 - 225)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.