# EXHIBIT FF

1      David B. Ross, M.D., Ph.D., M.B.I.

2          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
3

4   - - - - - - - - - - - - - -
                              |
5   IN RE: TAXOTERE          |
                              |
6   (DOCETAXEL) PRODUCTS      |   MDL Number: 2740
                              |
7   LIABILITY LITIGATION      |   Section H(5)
                              |
8   This Document Relates to: |   Hon. Jane Milazzo
                              |
9    Alice D. Hughes vs. Accord |   Magistrate Judge
    Healthcare, Inc., Case    |   Michael B. North
10   Number 2:17-cv-11769     |
                              |
11    - and -                 |
                              |
12   Wanda Stewart v. Sandoz, |   Section N(5)
    Inc., Civil Case No.      |
13   2:17-cv-10817            |
    - - - - - - - - - - - - - -+
14

15

16          Remote Videotaped Deposition of

17          DAVID B. ROSS, M.D., Ph.D., M.B.I.

18                  (Volume 2)

19             Monday, August 31, 2020

20                  9:16 a.m.

21

22

23   Job No. 183201

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

Page 207

1  David B. Ross, M.D., Ph.D., M.B.I.
2      Remote Deposition of
3  DAVID B. ROSS, M.D., Ph.D., M.B.I.
4          (Volume 2)
5
6
7
8
9
10
11
12
13
14
15
16
17
18      Taken pursuant to notice, before
19  Laurie Donovan, Registered Professional
20  Reporter, Certified Realtime Reporter, and
21  notary public for the District of Columbia.
22
23
24
25

Page 208

1      David B. Ross, M.D., Ph.D., M.B.I.
2        A P P E A R A N C E S
3  ON BEHALF OF THE PLAINTIFFS:
4      The Gomez Firm
5      655 West Broadway
6      San Diego, California 92101
7      By:  Lindsay Stevens, Esq. (phone)
8
9
10  ALSO ON BEHALF OF PLAINTIFFS:
11      Lemmon Law Firm
12      15058 River Road
13      Hahnville, LA 70057
14      By:  Andrew Lemmon, Esq. (phone)
15
16
17
18  ALSO ON BEHALF OF PLAINTIFFS:
19      Williams Hart Boundas Easterby
20      8441 Gulf Freeway,
21      Houston, TX 77017
22      By:  Brian Abramson, Esq. (phone)
23
24
25

Page 209

1      David B. Ross, M.D., Ph.D., M.B.I.
2  (Appearances continued)
3  ALSO ON BEHALF OF PLAINTIFFS:
4      The Maher Law Firm
5      P.O. Box 2209
6      271 West Canton Avenue, Suite 1
7      Winter Park, FL 32790
8      By:  Jason Fraxedas, Esq. (video)
9
10
11  ON BEHALF OF DEFENDANT SANDOZ, INC.:
12      Greenberg Traurig
13      Terminus 200
14      3333 Piedmont Road Northeast
15      Atlanta, GA 30305
16      By:  Cliff Merrell, Esq. (video)
17
18
19  ON BEHALF OF DEFENDANT SUN PHARMACEUTICALS:
20      Hinshaw & Culbertson
21      53 State Street
22      Boston, MA 02109
23      By:  Geoffrey Coan, Esq. (phone)
24
25

Page 210

1      David B. Ross, M.D., Ph.D., M.B.I.
2  (Appearances continued)
3  ON BEHALF OF DEFENDANTS ACTAVIS PHARMA, INC.;
4  ACTAVIS LLC; and SAGENT PHARMACEUTICALS, INC.:
5      Ulmer & Berne
6      600 Vine Street
7      Cincinnati, OH 45202
8      By:  Michael Suffern, Esq. (phone)
9
10
11
12  ON BEHALF OF DEFENDANT SANOFI, S.A.:
13      Shook Hardy & Bacon
14      2555 Grand Boulevard
15      Kansas City, MO 64108
16      By:  Chris McRae, Esq. (phone)
17        Matt Depaz, Esq. (phone)
18
19
20
21
22
23
24
25

Page 211

1      David B. Ross, M.D., Ph.D., M.B.I.
2  (Appearances continued)
3  ON BEHALF OF DEFENDANTS HOSPIRA WORLDWIDE, LLC,
4  and PFIZER, INC.:
5      Williams & Connolly
6      725 12th Street Northwest
7      Washington, DC 20005
8      By:  Richmond Moore, Esq. (phone)
9
10
11  ON BEHALF OF ACCORD HEALTHCARE, INC.
12      Tucker Ellis
13      950 Main Avenue
14      Cleveland, OH 44113
15      By:  Julie Callsen, Esq. (video)
16
17
18
19  ALSO PRESENT:
20      Nolan Wileman, Videographer
21
22
23
24
25

Page 212

1      David B. Ross, M.D., Ph.D., M.B.I.
2      EXAMINATION INDEX
3                              PAGE
4  EXAMINATION BY MR. MORIARTY . . . . . . . . .  216
5
6
7
8
9
10
11      E X H I B I T S
12  EXHIBIT      DESCRIPTION          PAGE
13  Exhibit 9  List of materials reviewed  . . .  217
14  Exhibit 10  Updated list of materials
15      reviewed  . . . . . . . . . . .  219
16  Exhibit 11  Notice of Deposition  . . . . . .  237
17  Exhibit 12  Article entitled "The FDA and the
18      Case of Ketek" written by David B.
19      Ross  . . . . . . . . . . . . .  260
20  Exhibit 13  21 U.S.C.A 355-1, Risk Evaluation
21      and Mitigation Strategies . . . .  306
22  Exhibit 14  Comparison of Label Changes made
23      by Sanofi, Sandoz, Hospira and
24      Accord, June 2011 - December 2015  310
25

Page 213

1      David B. Ross, M.D., Ph.D., M.B.I.
2  (Exhibits continued)
3  EXHIBIT      DESCRIPTION          PAGE
4  Exhibit 15  Accord's Application to Market
5      a New or Abbreviated New Drug
6      or Biologic for Human Use,
7      Bates ACC.00087944  . . . . . . .  331
8  Exhibit 16  Letter to FDA from Accord dated
9      December 30, 2015, regarding
10      docetaxel CBE, Bates
11      ACC.00030608  . . . . . . . . . .  335
12  Exhibit 17  Letter from FDA to Accord regarding
13      its NDA, Bates ACC.00087907 . . .  337
14  Exhibit 18  Another letter from FDA to Accord
15      Bates ACC.00083941  . . . . . . .  350
16  Exhibit 19  Agarwal article entitled "Overview
17      of Recently Approved 505(b)(2)
18      NDAs (2010 - 2012) Role of Clinical
19      Pharmacology"  . . . . . . . . .  354
20  Exhibit 20  Letter from FDA, dated October 14,
21      2003, response to citizens
22      petition  . . . . . . . . . . .  368
23
24
25

Page 214

1      David B. Ross, M.D., Ph.D., M.B.I.
2      P R O C E E D I N G S
3      THE VIDEOGRAPHER:  Good morning,
4  ladies and gentlemen.  My name is Rick
5  Richey.  I'm a legal videographer in
6  association with TSG Reporting, Inc.
7      Due to the severity of the COVID-19
8  and following the practices of social
9  distancing, I will not be in the same room
10  with the witness.  Instead, I will record
11  this videotaped deposition remotely.  The
12  court reporter, Laurie Donovan, also will not
13  be in the same room, and will swear the
14  witness remotely.
15      Do all parties stipulate to the
16  validity of this video recording and remote
17  swearing and that it will be admissible in
18  the courtroom as if it had been taken
19  following Rule 30 of the Federal Rules of
20  Civil Procedures and the state rules where
21  the case is pending?
22      Do all agree?
23      MR. MORIARTY:  Yes.
24      MR. FRAXEDAS:  We agree.
25      MR. MERRELL:  Cliff Merrell for

Page 215

David B. Ross, M.D., Ph.D., M.B.I.

1     David B. Ross, M.D., Ph.D., M.B.I.
2  Sandoz.  We agree.
3     THE VIDEOGRAPHER:  This will be the
4  video-recorded deposition of David Ross,
5  M.D., Ph.D., volume 2.  Today's date is
6  August 31, 2020.  It's 9:16 a.m.  The case is
7  In Re Taxotere (Docetaxel), MDL number 2740,
8  in the United States District Court, Eastern
9  District of Louisiana.
10     Would the attorneys please
11  introduce themselves.
12     MR. FRAXEDAS:  Jason Fraxedas on
13  behalf of the plaintiffs.
14     MR. MORIARTY:  Matthew Moriarty on
15  behalf of Accord Healthcare, Inc.
16     MR. MERRELL:  Cliff Merrell on
17  behalf of Sandoz.
18     THE VIDEOGRAPHER:  Would the court
19  reporter please swear in the witness.
20     (Witness duly sworn.)
21
22
23
24
25  ///

Page 216

David B. Ross, M.D., Ph.D., M.B.I.

1     David B. Ross, M.D., Ph.D., M.B.I.
2     * * * * *
3     DAVID ROSS, M.S., Ph.D.,
4  having been first duly sworn, testified
5  upon his oath as follows:
6     EXAMINATION BY COUNSEL FOR ACCORD
7  BY MR. MORIARTY:
8     Q   Just for the record, before I start
9  asking Dr. Ross questions, when I looked at the,
10  my notes and the rough transcript over the
11  weekend, I noticed that no one delineated on the
12  record at what time I began questioning on Friday.
13  The last denoted time was at a break that ended at
14  4:30.  Mr. Merrell questioned for 20 or 30
15  minutes.  I don't -- I didn't keep track of that,
16  and then I started somewhere around 5:00 and
17  concluded at 6:08 p.m.  So my estimate is that I
18  still have five hours and 50 minutes of
19  questioning to go.  We can -- if anybody objects
20  to that, we can check that at a break.
21     Dr. Ross, are you ready?
22     A   Yes, sir.
23     Q   The first session of your deposition in
24  this case ended Thursday evening at about
25  6:10 p.m.

Page 217

David B. Ross, M.D., Ph.D., M.B.I.

1     David B. Ross, M.D., Ph.D., M.B.I.
2     Between then and this morning, before we
3  started the deposition, did you review any new
4  materials that you would rely on to form opinions
5  in this case?
6     A   I want to make sure I understand.  You
7  mean any new materials beyond the reliance list
8  that was provided separately by retaining counsel?
9     Q   Yes, sir.
10     A   No, I have not.
11     Q   All right.  Did you have additional
12  conferences with plaintiffs' counsel to continue
13  to prepare for this second session?
14     A   Yes.
15     MR. MORIARTY:  All right.  I would
16  like to mark -- I believe we're up to Exhibit
17  9, and it's my understanding we're going to
18  mark consecutively, and that Mr. Merrell
19  ended with Exhibit 8 last week.
20     So I'd like to mark as Exhibit 9,
21  which is a Word document transmitted to us on
22  Thursday, that was then a draft list of
23  documents reviewed.
24     (Exhibit 9 was marked for
25  identification.)

Page 218

David B. Ross, M.D., Ph.D., M.B.I.

1     David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3     Q   Dr. Ross, did you see this on Thursday
4  during the day when we were debating what was
5  going on with your, as we call it, "reliance
6  list"?
7     A   No, I don't believe so.
8     Q   Did you see it at any point between
9  Thursday and late Friday?
10     A   Could, could you -- could I just see the
11  additional pages on this, if there are any?
12     Q   Sure.
13     A   Thank you.
14     Q   That's the second page.
15     A   Okay.
16     Q   And that's the third page.
17     A   Okay, and when you say "late Friday" --
18     Q   Well, did you see this document at any
19  point after it was discussed among the lawyers on
20  Thursday?
21     A   Yes.
22     MR. MORIARTY:  All right.  Let's
23  mark the next exhibit, which will be Exhibit
24  10.
25

Page 219

1          David B. Ross, M.D., Ph.D., M.B.I.
2          (Exhibit 10 was marked for
3              identification.)
4    BY MR. MERRELL:
5      Q   Sorry, Doctor.  It takes a minute to
6    upload and appear on the screen.
7      A   The computers have not had enough
8    coffee, I assume.
9      Q   All right.  This, Doctor, is something
10   we received late Friday in a PDF format and was
11   considered the final list of documents reviewed.
12   So I assume that at some point Thursday night or
13   during the day Friday, you saw Exhibit 9, and
14   ultimately it got revised into what we see as
15   Exhibit 10.
16         Is that fair?
17     A   If I, again, could just see the --
18     Q   So that's the second page of Exhibit 10
19   on the screen now.
20     A   Okay.  Go to the next page.
21     Q   That's the third page, and we're about
22   to see the fourth page.
23     A   Right.
24     Q   So am I correct that Exhibit 9 was
25   revised throughout Thursday night to Friday to

Page 220

1          David B. Ross, M.D., Ph.D., M.B.I.
2    become the final, which is Exhibit 10?
3      A   You mean by retaining counsel?
4      Q   With or without your participation.
5    Either way.  I'm just asking for the best of your
6    knowledge.
7      A   To the best of my knowledge, yes.
8      Q   All right.  Let's walk through a few
9    things on what is Exhibit 10, and at the top it
10   says "Exhibit C," because this would be Exhibit C
11   to your expert report package, right?  That's what
12   it was called when we originally got it.  Do you
13   know that?
14     A   That is my understanding.
15     Q   Okay.  Let's start with expert reports.
16   Did you tell us last Thursday that you had
17   reviewed the expert report of a gentleman named
18   Mukul Agarwal, M-U-K-U-L, Agarwal, Ph.D.?
19         I'm not asking whether it's on the list.
20   I'm asking whether you reviewed it.
21     A   I, I'm sorry.  I have two different
22   questions here.  One is did I tell you on last
23   Thursday, and secondly is have I reviewed it.
24     Q   Have you reviewed the expert report of
25   Mukul Agarwal?

Page 221

1          David B. Ross, M.D., Ph.D., M.B.I.
2      A   I have read it, yes.
3      Q   Okay, and it is not on this list; is
4    that correct?
5      A   That is correct.
6      Q   All right.  Let's go down to "FDA
7    Documents," the second bullet point.  Do you see
8    where it says "Supplemental Approval from
9    Department of Health and Human Services to Accord
10   Healthcare," and then it gives an NDA number?
11     A   Yes.
12     Q   Is that the 2016 FDA approval of Accord
13   Healthcare, Inc.'s CBE application for a label
14   change?
15     A   I believe that is correct.
16     Q   All right.  Let's go to the next page.
17   Look under "US Labels."  Do you see the bottom two
18   bullet points are Accord docetaxel labels with
19   dates?
20     A   Yes.
21     Q   I will represent to you that if we went
22   back to Exhibit 9, those do not appear on that
23   list.  So is that an oversight as to Exhibit 9?
24     A   I'm afraid I don't understand the
25   question.

Page 222

1          David B. Ross, M.D., Ph.D., M.B.I.
2      Q   These two items, the Accord labels, were
3    not on Exhibit 9.  They were also not on the list
4    that we marked last week during your deposition
5    as -- I think it was Exhibit 4.  I'm just
6    wondering whether that was an oversight or whether
7    these are new items that you have reviewed.
8      A   So -- I'm sorry.  I thought someone was
9    about to say something.
10         MR. FRAXEDAS:  I'm going to object
11   to form.
12         THE WITNESS:  So, Mr. Moriarty,
13   there are two questions that I hear in that.
14   One is:  Is this an oversight?  The second
15   is:  Are these items that, reviewed that are
16   new?  Those are the, the two separate
17   questions if I understand correctly.  Is
18   that -- am I correct?
19   BY MR. MORIARTY:
20     Q   When I asked the second issue, you said
21   you didn't understand the first one, so you can
22   answer -- if you understand either question, just
23   answer.
24         MR. FRAXEDAS:  Object to form.
25         THE WITNESS:  With regard to the

Page 223

1     David B. Ross, M.D., Ph.D., M.B.I.
2   second question, these are not materials
3   that -- I'm specifically referring to the
4   last two bullets under heading VII, "U.S.
5   Labels," the Accord label dated June 8, 2011,
6   the Accord label dated July 26, 2016. Those
7   are not new items. These were reviewed in
8   preparation of my report.
9   BY MR. MORIARTY:
10      Q   So it was an oversight. All right.
11  Let's go down to Roman numeral IX, please.
12      A   Mm-hmm.
13      Q   It says "Accord Foreign Labels: Accord
14  docetaxel European Union -- European Union,"
15  excuse me, label, date May 2012.
16      Do you see that?
17      A   Yes.
18      Q   Do you know that that is not the -- the
19  entity that filed that foreign label is not a
20  party to this lawsuit; do you know that?
21      MR. FRAXEDAS: Object to form.
22      THE WITNESS: I do not know what
23  the status is of this in terms of the
24  relationship of the party who filed this.
25

Page 224

1     David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3      Q   Okay. Do you know the name of the
4   pharmaceutical company that filed what you have
5   listed under Roman numeral IX?
6      Could you repeat the question for me?
7      Q   Do you know the name of the
8   pharmaceutical company that filed the application
9   which led to the label that you list under Roman
10  numeral IX in your list of documents reviewed,
11  Exhibit 10?
12      MR. FRAXEDAS: Object to form.
13      THE WITNESS: So I would say that
14  for purposes of my review and my analysis,
15  the identity of that entity that filed was
16  not a primary consideration, so that's what I
17  would say.
18  BY MR. MORIARTY:
19      Q   Was it a consideration at all?
20      A   Yes.
21      Q   Okay. Well, why isn't it a primary
22  consideration?
23      A   Because the relevant factor, the most
24  relevant factor in regulatory analysis concerns
25  the availability of new safety information to an

Page 225

1     David B. Ross, M.D., Ph.D., M.B.I.
2   NDA holder.
3      Q   What NDA holder? Are you an NDA holder?
4      A   No not specifically. I'm speaking in
5   general terms. I'm reciting from -- if I might
6   refer to my report.
7      Q   Well, no. I'm just asking you a very
8   simple question now. I will get into detail about
9   European labeling later. I just want to
10  understand this list, okay?
11      A   Okay.
12      Q   And listed under Roman numeral XI on
13  your reliance list, Exhibit 10 which is on the
14  screen, way at the bottom, "Accord docetaxel
15  PADERs market as exhibits to deposition of Accord
16  Healthcare, Inc., October 7, 2019."
17      Do you see that?
18      MR. FRAXEDAS: Object to form.
19      THE WITNESS: Yes.
20  BY MR. MORIARTY:
21      Q   Why did you review those?
22      A   So first of all, again, just in the
23  interest of clarity, there was a previous question
24  on the table. You had asked do you mean the US
25  NDA holder, and I began to answer that, and -- by

Page 226

1     David B. Ross, M.D., Ph.D., M.B.I.
2   saying I would refer to my report, and you broke
3   in at that point with a question, a different
4   question. So I just want to make sure that I'm
5   understanding, in terms of that previous question,
6   was I referring to the USA, the US NDA holder. Is
7   that question still on the table? Because I have
8   not responded, as far as I can understand.
9      Q   It is not. It is not on the table. I
10  want you to -- no. I'll withdraw that question.
11      Answer the question now about the Accord
12  docetaxel PADERs. When did you review them?
13      A   So these were reviewed as part of the
14  review of documents in preparation of my report.
15      Q   Do you have an explanation, Dr. Ross,
16  for why that item is not on Exhibit 4, the
17  reliance list we had before last Thursday, and is
18  not on Exhibit 9, the reliance list we were given
19  Thursday, and first appears in this reliance list,
20  Exhibit 10? Do you know why?
21      MR. FRAXEDAS: Object to form.
22      THE WITNESS: What I can offer you
23  as to why -- and this is information that was
24  communicated to me by retaining counsel -- is
25  that the -- there was an original reliance

Page 227

David B. Ross, M.D., Ph.D., M.B.I.

1  list which was provided by retaining counsel
2  to opposing parties' counsel.  It was not the
3  correct version, and they emphasized that
4  this was not something that I had knowledge
5  of; and in terms of, in terms of any further
6  details, I would ask that you -- I refer you
7  back to retaining counsel.
8  BY MR. MORIARTY:
9      Q   I did not find anywhere in your report,
10  which I believe was Exhibit 5, any discussion of
11  Accord's PADERs.
12      Laurie, PADERs is all caps, P-A-D-E-R-s.
13      I didn't find any discussion of Accord's
14  PADERs in your report.
15      Did I miss something?
16      MR. FRAXEDAS:  Object to form.
17      THE WITNESS:  Can I take a minute
18  to refer to my report?
19      MR. MORIARTY:  Sure.
20      Let's go off the video and the
21  record while he takes the time to review
22  that.
23      THE VIDEOGRAPHER:  9:37.  We're off
24  the record.

Page 228

David B. Ross, M.D., Ph.D., M.B.I.

1      (Whereupon, a short recess was
2      taken.)
3      THE VIDEOGRAPHER:  9:39.  We're
4  back on the record.
5  BY MR. MORIARTY:
6      Q   Dr. Ross, my question is:  I never saw a
7  discussion in your report of Accord's PADERs, and
8  I was asking whether I had missed something.
9  You've now had a chance to recheck your report.
10  Is there any discussion of Accord's PADERs in it?
11      MR. FRAXEDAS:  Object to form.
12      THE WITNESS:  I'll preface my
13  answer by saying that inclusion of material
14  on this list does not automatically imply
15  that it is explicitly mentioned or cited.
16  However, it does indicate that I reviewed it
17  and it contributed to my opinions.
18      With that said, no, I, I think
19  you're -- as you said, those, those literal
20  words are not within the four corners of this
21  document.
22  BY MR. MORIARTY:
23      Q   Where in your report, Dr. Ross, does it
24  say that you reviewed them and that they

Page 229

David B. Ross, M.D., Ph.D., M.B.I.

1  contributed to your opinions, or are you just
2  making an implication?
3      A   Neither, sir.
4      Q   But does it say anywhere in your report
5  that you reviewed Accord's PADERs and that they
6  contributed to your opinions?
7      A   So --
8      Q   Doctor, let's just make clear:  It's
9  fine if you reviewed them.  I'm just asking a
10  simple question.
11      Do you say anywhere in your report that
12  you reviewed them and that they contributed to
13  your opinion?
14      MR. FRAXEDAS:  Object to form.
15      THE WITNESS:  Respectfully,
16  Mr. Moriarty, in the last session during your
17  questioning, I asked you, when I'm answering,
18  if you could refrain from interrupting me,
19  and you agreed to that, so --
20  BY MR. MORIARTY:
21      Q   Can you answer my question?
22      A   Okay.
23      MR. FRAXEDAS:  Same objection.
24      THE WITNESS:  Again, I'm sorry.

Page 230

David B. Ross, M.D., Ph.D., M.B.I.

1  With the interruption, I lost track.  Would
2  you please repeat it again.  I'm sorry.  I'm
3  not trying to waste your time, but I do want
4  to try and answer your question accurately,
5  sir.
6  BY MR. MORIARTY:
7      Q   That's fine.  I, I asked you when you
8  read them.  You said you read them in preparation
9  of your opinions and your report, okay?  Then I
10  asked do you mention them explicitly, and you said
11  no, but that doesn't mean I didn't review and that
12  they didn't contribute.  I got the impression,
13  from the way you said that, that somewhere in the
14  report you say that explicitly.
15      I just want to know:  Is there anywhere
16  in the report itself, Exhibit 5, where it says
17  that you reviewed Accord's PADERs and that they
18  contributed to your opinion?
19      MR. FRAXEDAS:  Object to form.
20      THE WITNESS:  Do I -- I just want
21  to make sure I understand the question.  Do I
22  have an explicit statement in there?  I
23  reviewed these documents, and they
24  contributed to my opinion.  Is that what,

Page 231

1      David B. Ross, M.D., Ph.D., M.B.I.
2   what you're asking me?  I don't mean to put
3   words in your mouth.
4   BY MR. MORIARTY:
5      Q   No, that's what I'm asking.
6      A   Okay.  So those exact words do not
7   appear in my report.  You're correct.
8      Q   All right.  Let's go to Roman numeral
9   XIV.
10      Do you see it's a list of Accord
11   documents?
12      A   Yes.
13      Q   All right.  The first is "Answers to
14   First Set of Interrogatories."  Is there anything
15   from Accord's answers to the first set of
16   interrogatories that were significant to your
17   regulatory opinions in this case?
18      A   Yes.
19      THE REPORTER:  I'm sorry.  I
20   couldn't hear the answer.
21   BY MR. MORIARTY:
22      Q   Sorry.  I didn't hear.  If you answered,
23   it got cut off.
24      A   Sorry.  The answer was yes -- is yes.
25      Q   Do you remember what that was?

Page 232

1      David B. Ross, M.D., Ph.D., M.B.I.
2      A   So again, I want to make sure I'm
3   answering accurately.
4      Q   I just want to know if you, if you
5   remember off the top of your head what facts you
6   got from that document that was significant to
7   your regulatory opinion.
8      A   Okay.  I -- in order to answer that, I
9   do not wish to answer off the top of my head.  I
10   wish to answer accurately, as I swore to do, so if
11   you would please let me refer to my report.
12      Q   No.  I'm withdrawing the question,
13   Doctor.
14      A   Okay.
15      Q   All right.  The third bullet is Accord
16   Healthcare, Inc.'s "New Drug Application," and
17   then you give a number of Bates pages.
18      Do you see that?
19      A   I do.
20      Q   By my count, that's approximately 99
21   pages worth of material.
22      Do you know how many pages is the full
23   NDA?
24      MR. FRAXEDAS:  Object to form.
25      THE WITNESS:  I do not.

Page 233

1      David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3      Q   Did you choose these specific pages that
4   you list here?
5      A   No.
6      Q   All right.  Did counsel choose those
7   particular pages?
8      MR. FRAXEDAS:  Object to form.
9      MR. MORIARTY:  What's the matter
10   with the form of that question?  I'd like a
11   chance to cure it.
12      MR. FRAXEDAS:  You're asking -- can
13   you hear me?
14      MR. MORIARTY:  Yeah, I can hear
15   you.  It was a yes-or-no question.
16      MR. FRAXEDAS:  Communications with
17   attorneys for plaintiffs is privileged
18   information as well as speculation.
19      MR. MORIARTY:  Okay.
20   BY MR. MORIARTY:
21      Q   Dr. Ross, did you receive information
22   about Accord's NDA from anyone other than
23   plaintiffs' counsel?
24      A   No.
25      Q   Okay.

Page 234

1      David B. Ross, M.D., Ph.D., M.B.I.
2      The fifth bullet says "Department of
3   Health and Human Services, Complete Response."  Is
4   that the -- it looks like it's three pages.
5      Do you remember what that document is?
6      A   Yes.
7      Q   What is it?
8      A   That is -- so just to be clear, that is
9   actually a four-page document.  That was a
10   complete response letter.
11      Q   To the original NDA?
12      A   Yes.
13      Q   Okay.  So that was probably back in
14   2011; is that correct?
15      A   I don't believe so.
16      Q   Was that 2016?
17      A   No.
18      Q   All right.  I'll check on that at a
19   break.
20      The next bullet is an NDA approval.  Is
21   that the original NDA approval back in 2011?
22      A   I believe so.
23      Q   And did that Bates range of documents
24   that you referred to include the label that was
25   approved by FDA?

Page 235

David B. Ross, M.D., Ph.D., M.B.I.
1
2   A   I believe it did.
3   Q   All right.  The last bullet is "European
4   Commission Implementing Decision."
5       Do you know how many pages that was?
6   A   I believe so.
7   Q   Give me a ballpark, and you can use it
8   in reference to is it more than five pages, more
9   than 50 pages . . .
10  A   The best of my recollection, it's 140
11  pages.
12  Q   All right, and did you find that on the
13  internet yourself, or did someone supply you that
14  document?
15  A   The latter.
16  Q   All right.  Do you know anything about
17  the difference between Accord Healthcare, Inc. and
18  Accord Healthcare, Ltd.?
19      MR. FRAXEDAS:  Object to form.
20      THE WITNESS:  When you say
21  "anything," can you be more specific than
22  that?
23  BY MR. MORIARTY:
24  Q   I'm going to ask a different question.
25  I appreciate your, your asking for clarification.

Page 236

David B. Ross, M.D., Ph.D., M.B.I.
1
2       Do you know anything – I'm sorry.  Are
3   you an expert, and are you going to express expert
4   opinions about the legal significance of the
5   difference between Accord Healthcare, Ltd. and
6   Accord Healthcare, Inc.?
7       MR. FRAXEDAS:  Object to form.
8       THE WITNESS:  So my – as I say in
9   my report, my conclusions, my opinions are
10  regulatory conclusions, not opinions of law.
11  BY MR. MORIARTY:
12  Q   You have a regulatory opinion about the
13  difference between those two entities?
14  A   As I mentioned earlier, that was not the
15  focus of my regulatory analysis.
16  Q   Okay.  Were you asked to assume any
17  facts about the relationship between those two
18  entities?
19  A   Not that I can recall.
20      MR. MORIARTY:  All right.  Doctor,
21  there was a Notice of Deposition that we
22  filed, asking you to bring or produce certain
23  documents, and I'll mark that as an exhibit;
24  and plaintiffs' counsel did file objections
25  to that.  It's going to be Exhibit 11.

Page 237

David B. Ross, M.D., Ph.D., M.B.I.
1
2       (Exhibit 11 was marked for
3           identification.)
4   BY MR. MORIARTY:
5   Q   Let's go to page 7 of this document.  Do
6   you know whether you've ever seen this before?
7   It's very similar to the one that was filed by
8   Sandoz.  Do you know whether you've ever seen this
9   before?
10  A   I am not sure that I have.
11  Q   Okay.  Item number 4 – and I'm
12  skipping, because some of these have already been
13  asked and debated between lawyers.
14      I'm sorry.  Let's go to number 3.
15      Last Thursday, toward the end of the
16  day, I asked you whether you had a list of all
17  litigation matters, not just those you had
18  participated in in the last four years.
19      Did you look for such a list?
20      MR. FRAXEDAS:  I'm going to object
21  to that, based on being outside the scope of
22  Rule 26.
23  BY MR. MORIARTY:
24  Q   All I'm doing right now is asked whether
25  there is such a list.

Page 238

David B. Ross, M.D., Ph.D., M.B.I.
1
2   A   So I will discuss this with retained
3   counsel.
4   Q   Okay.  Well, did you look in response to
5   my request that you do so?
6   A   So again, I will discuss this with
7   retained counsel.
8   Q   All right, and by – when you say
9   "retained counsel," did you retain separate
10  counsel or are you referring to plaintiffs'
11  counsel?
12  A   I'm sorry.  Plaintiffs' counsel.  Thank
13  you for clarifying that.
14  Q   All right.  Number 4 is "All
15  Communications by or between You and any other
16  Person relating to Chemotherapy and/or hair loss
17  as a side effect of cancer treatment."
18      I just want to know if such – any such
19  documents exist.
20      MR. FRAXEDAS:  And I'll object to
21  this Response and instruct the witness not to
22  respond to the extent that it involves
23  communications between plaintiffs' counsel
24  and Dr. Ross that do not relate to specific
25  facts applied to him to form his expert

Page 239

1        David B. Ross, M.D., Ph.D., M.B.I.
2    opinions.
3            If you can answer within those
4    confines, Dr. Ross, go ahead.
5    BY MR. MORIARTY:
6        Q    Doctor, based on his objection, I'm
7    going to withdraw my question.  I'm going to ask
8    it a different way, okay?
9            Before you were ever retained as an
10   expert in this litigation, did you have any
11   communications that fit the description of Exhibit
12   4 [sic]?
13       A    I don't believe so.
14       Q    Since you were retained as an expert,
15   have you had any such communications with anyone
16   other than plaintiffs' counsel?
17       A    I don't believe so.
18       Q    Number 5 is similar, but it's asking
19   about presentations and posters and slides, things
20   of that nature.
21           Did you ever have any of those before
22   you were retained as an expert in this litigation?
23       A    Possibly.
24       Q    Explain that, please.
25       A    This is listed on my CV.  It would have

Page 240

1        David B. Ross, M.D., Ph.D., M.B.I.
2    been sometime in the 1990s.  I gave a – I can't
3    remember, honestly.  It was a poster presentation
4    or an oral presentation at an infectious disease
5    meeting on complications of chemotherapy related
6    to risk of infectious disease.
7        Q    And is that the presentation you
8    discussed with Mr. Merrell last week?
9        A    Mr. Moriarty, I honestly – I don't –
10   I'd have to look at the transcript, and I honestly
11   don't remember specifically which presentation.  I
12   really don't.  I'm happy to answer that if I can
13   get a transcript.  I, I don't remember exactly
14   which presentation that was, but . . .
15       Q    Did you use presentation materials, or
16   were those in computers at FDA?
17       A    I don't know.  That was – God, that was
18   almost a quarter of a century ago.  I don't know.
19       Q    Okay.  During the Thursday session, I
20   asked if you still had the SEAK – S-E-A-K, all
21   caps – materials from that seminar that
22   Mr. Merrell asked you about.
23           Do you still have those?
24       A    Again, I will discuss those with – that
25   issue with retaining counsel, and by "retaining

Page 241

1        David B. Ross, M.D., Ph.D., M.B.I.
2    counsel" -- just in the interest of time, when I
3    refer to "retaining counsel," I mean plaintiffs'
4    counsel.  It's just – it's – so I just want to
5    be clear that I'm not referring to, unless I say
6    otherwise, not counsel, but getting back to your
7    question, sir, I will discuss that with
8    plaintiffs' counsel.
9        Q    Number 17, do you have a consulting or
10   retention contract with plaintiffs' counsel?  I
11   just want to know if you had one, not what the
12   contents are.
13           MR. FRAXEDAS:  I'm going to object
14       and incorporate our Rule 26 objections that
15       were submitted with our objections to the
16       Notice of Deposition here.
17   BY MR. MORIARTY:
18       Q    What's your answer to the question,
19   Doctor?
20       A    Am I permitted – well, am I permitted
21   to answer on the record?
22           MR. FRAXEDAS:  Subject to the
23       objections, yeah, go ahead.
24           THE WITNESS:  Yes.
25

Page 242

1        David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3        Q    Doctor, there was a series of questions
4    last week with Mr. Merrell when you were going
5    back and forth with him about – he was asking
6    whether you had read, for example, the entire
7    deposition of a particular witness, and whether
8    you had read the, all of the exhibits to that
9    particular deposition, even though you only cited
10   in your report certain pages or certain exhibits.
11           Do you remember that back-and-forth
12   colloquy with Mr. Merrell?
13       A    Yes.
14       Q    All right.  If I remember your responses
15   correctly, you – I think you were trying to make
16   the point that it was reasonable to infer, from
17   what you had put in the materials, that you had
18   read the entirety of the deposition and all of the
19   exhibits.
20           Is that what you were trying to convey
21   in your answers to his questions?
22           MR. FRAXEDAS:  Object to form.
23           THE WITNESS:  I was trying to
24       convey that I had, in fact, reviewed those
25       entire depositions.

Page 243

1      David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3      Q   Even though it did not say that
4  explicitly in your report, correct?
5      A   Correct.
6      Q   So am I fair in saying that sometimes
7  you, as a professional, say or write things, and
8  you expect other professionals to make reasonable
9  inferences from what you say or write?
10         MR. FRAXEDAS:  Object to form.
11         THE WITNESS:  So with regard to
12     this specific issue, that was not what I was
13     attempting to communicate.  I was looking at
14     the exhibit, and I'm sorry, I don't remember
15     which number it was, but it was the reliance
16     list that was shown last week, and I was -- I
17     knew that I had reviewed those materials.  I
18     honestly did not recognize at the time that
19     there might be an issue with that specific
20     reliance list, and so I was trying to convey
21     that I had read it, but that was, that was
22     the, that was the only intent that I had
23     there.
24  BY MR. MORIARTY:
25     Q   Okay.

Page 244

1      David B. Ross, M.D., Ph.D., M.B.I.
2      A   It's not a question of --
3      Q   After --
4      A   It's not a question I normally --
5      Q   Go ahead.
6      A   It's not a question whether I normally
7  expect that.  I'm just explaining what the
8  situation was.
9      Q   I'm just asking generally now, not with
10  regard to that specific incident, Thursday.
11  Generally, do you expect professionals with whom
12  you are communicating, whether that communication
13  is in writing or when you're talking to them, for
14  them to make some reasonable inferences based on
15  what you actually say either out loud or in your
16  writing?
17         MR. FRAXEDAS:  Object to form.
18         THE WITNESS:  You know, I think
19     that is, unfortunately, such a broad
20     question, it, it really depends on the
21     context.  It really -- and the, to whom I am
22     speaking, whether they know context that I --
23     I can assume they know context or not or
24     whether I have to provide that context, so it
25     really -- that's also in a different setting

Page 245

1      David B. Ross, M.D., Ph.D., M.B.I.
2  than this one.
3  BY MR. MORIARTY:
4      Q   Do you know Dr. Agarwal?
5      A   No, I don't believe so.
6      Q   Do you have any reason to doubt that he
7  is a qualified regulatory expert?
8         MR. FRAXEDAS:  Object to form.
9         THE WITNESS:  I don't have any
10     basis for forming an opinion one way or the
11     other.
12  BY MR. MORIARTY:
13     Q   Just off the top of your head, do you
14  have any recollection of any specific comments
15  that he made in his report about which you
16  disagree?
17     A   So I do not -- I will say, first off, I
18  did not.  If anything, it strengthened my opinion,
19  but having said that, in terms of specifics, I
20  would want to have the report as an exhibit in
21  front of me before answering any question about
22  specifics.
23     Q   Okay.  Doctor, in your report -- and I
24  can't give you a page, but I know you used the
25  term "vertically integrated."

Page 246

1      David B. Ross, M.D., Ph.D., M.B.I.
2      Do you remember using that term?
3      A   I'd like to consult my report.  Again,
4  I'm -- let me just put this out there, okay, and I
5  understand you would like to get questions and get
6  answers for them.  I'm not trying to frustrate
7  that.  On the other hand, I do not want to give an
8  answer that's wrong -- it's that simple -- or
9  misleading, and that's what the, uh . . .
10         MR. MORIARTY:  Okay.  Let's go off
11     the record while he searches for that, and I
12     will look at the report and see if I can find
13     it.
14         THE VIDEOGRAPHER:  10:10.  We're
15     off the record.
16         (Whereupon, a short recess was
17     taken.)
18         THE VIDEOGRAPHER:  10:13.  We're
19     back on the record.
20  BY MR. MORIARTY:
21     Q   Doctor, I actually made a mistake, so
22  I'm going to ask my question again.
23     You used the term "globally integrated"
24  in your report, and we've been able to find that
25  that's at page -- footnote 52.

Page 247

1    David B. Ross, M.D., Ph.D., M.B.I.
2    Do you see that?
3    A   Yes.
4    Q   Is that a regulatory term?
5    A   Is it a regulatory term?
6    Q   Yes.  Is "globally integrated" a
7    regulatory term?
8    A   It's -- not in the way that "new drug
9    application" or "new chemical entity" would be,
10   but I mean it's a description of an entity.
11   Q   All right.  Let me, let me try this
12   another way.
13   Many of the regulations that apply to
14   pharmaceutical NDAs and other regulations
15   surrounding that have definition sections, don't
16   they?
17   A   Yes.
18   Q   All right.  To the best of your
19   knowledge, is "globally integrated" a term defined
20   in any FDA regulations?
21   A   To the best of my knowledge, no.
22   Q   To the best of your knowledge, is the
23   term "globally integrated" discussed in any FDA
24   guidance documents?
25   A   I -- to the best of my knowledge, I've,

Page 248

1    David B. Ross, M.D., Ph.D., M.B.I.
2    I've never seen it.  Whether it's there or not, I
3    don't know whether it's defined.  I can't say.
4    Q   Okay.  Is it a term -- as you use it in
5    footnote 52, is it a term that you came up with in
6    this case, or is it a quote from a document or
7    witness?
8    A   If I remember correctly -- and this is
9    the best of my recollection -- it's Accord's
10   description of itself.
11   Q   All right.  Well, you don't have a
12   citation in footnote 52.  Do you know from where
13   you got that information?
14   A   So I mention Accord's website.
15   Q   Is it a fact you were asked to assume?
16   A   To the best of my recollection, no.
17   Q   Okay.
18   All right.  Dr. Ross, other than
19   consulting for litigation, can you tell us what
20   FDA regulatory work or consulting that you have
21   done since you left FDA in 2006?
22   A   When you say "FDA work," can you clarify
23   that?
24   Q   Have you done any consulting work
25   directly with FDA since you left your employment

Page 249

1    David B. Ross, M.D., Ph.D., M.B.I.
2    there in 2006?
3    A   To the best of my recollection, no.
4    Q   And I did look at the transcript from
5    Thursday, and Mr. Merrell asked you whether you
6    had done consulting work for any pharmaceutical
7    company regarding regulatory things outside the
8    context of litigation, and your answer was that
9    you had not, correct?
10   A   So when you say "correct," correct,
11   that's what I said, or does that correctly --
12   Q   Yes.
13   A   -- describe the situation?
14   Q   Well --
15   THE REPORTER:  I'm sorry.  What was
16   it?
17   THE WITNESS:  I obviously don't
18   have the transcript, but that does accurately
19   describe the situation.
20   BY MR. MORIARTY:
21   Q   Okay.  So other than litigation, have
22   you done any FDA regulatory consulting work since
23   you left your employment with FDA in 2006?
24   A   So I'm going to ask for a clarification.
25   You're only asking about consulting as the

Page 250

1    David B. Ross, M.D., Ph.D., M.B.I.
2    individual activity, not about any FDA-related
3    issues that I've dealt with working for my current
4    employer; is that correct?
5    Q   Your current employer meaning the
6    Veterans Administration?
7    A   U.S. Department of Veterans Affairs.
8    Q   Yes.
9    A   Okay.
10   Q   Yes.  Any other consulting outside
11   things that may come up in your VA job, during FDA
12   reg --
13   A   I'm sorry.  Sorry.  Please go ahead.
14   Q   Go ahead.  I was done with my question.
15   A   Okay.  I just -- I'm sorry.  I thought
16   maybe you had one thing to add.
17   So excluding that, in terms of
18   consulting as a -- outside of my VA work, no, not
19   to the best of my recollection.
20   Q   What percentage of your work at the VA
21   involves FDA regulatory issues?
22   A   I, I honestly can't provide a
23   quantitative answer to that, simply because things
24   come up episodically, and it, you know, really
25   depends on the time frame, that kind of thing.  I

Page 251

David B. Ross, M.D., Ph.D., M.B.I.

1  David B. Ross, M.D., Ph.D., M.B.I.
2  mean they certainly come up, but it's sort of
3  incorporated into things that I do. It's
4  understood that that's something that I'm dealing
5  with, but in terms of a percentage of time, it's
6  not possible to break it out like that.
7  Q  All right. I want to get back on
8  something I touched on very briefly last Thursday,
9  and that is your references to Drs. Madigan,
10  Plunkett and Feigal in your expert report.
11  Each of those experts – am I correct
12  that each of those three experts is offered as an
13  expert in a discipline different from FDA
14  regulatory affairs, which is what you were offered
15  for in this case?
16  A  Respectfully, I would not say that is
17  completely correct.
18  Q  Okay. Have you made an independent
19  assessment, separate from any assessments that
20  they made, regarding whether certain clinical
21  studies, medical articles, or adverse event
22  reports needed to be reported to FDA and, if so,
23  when they needed to be reported?
24  A  So again, I'm, I'm hearing two questions
25  here. Have I done an independent assessment of

Page 252

1  David B. Ross, M.D., Ph.D., M.B.I.
2  whether adverse events needed to be – well, I
3  don't want to put words in your mouth, but if you
4  could break this into two questions; just an
5  independent assessment of what, and then the
6  second one is when they need to be reported.
7  Okay.
8  Q  I'm not asking generally about their
9  duties, okay? I'm asking whether you formed --
10  made an independent assessment and, hence, whether
11  you formed independent opinions about whether
12  particular clinical studies or particular medical
13  articles or particular adverse events needed to be
14  reported to FDA, and if so, when they needed to be
15  reported.
16  A  So I do not wish to put words in your
17  mouth, but the issue for me was what is called
18  "new safety information," and so I did do an
19  independent assessment, relying on the reports of
20  the experts you mentioned, about whether that
21  constituted new scientific information – new
22  safety information, rather, the answer to that
23  part, new safety information, which is the
24  regulatory issue here, and I formed a conclusion
25  about that, and then the answer to your second

Page 253

1  David B. Ross, M.D., Ph.D., M.B.I.
2  question about when that should have been
3  reported, I have formed a conclusion about that as
4  well.
5  Q  All right. So if I just pick a random
6  example, whether – I think there was a study
7  called GEICAM, G-E-I-C-A-M. I think that's how it
8  was spelled, and that's all caps, Laurie. That's
9  just an example. I'll get into this in more
10  detail later.
11  You formed an independent assessment,
12  separate and apart from anything that Madigan,
13  Feigal or Plunkett did, that that constituted or
14  did not constitute new safety information?
15  A  So I don't believe that's what I said.
16  What I said was that I – the question I addressed
17  was whether taking the information from their
18  reports, whether there was new safety information.
19  That's number one.
20  Number two, in terms of the specific
21  article or study that you mentioned, again, I was
22  looking at the overall results, the totality of
23  the evidence from Drs. Feigal, Madigan and
24  Plunkett as to whether there was new safety
25  information. I – that specific article, again,

Page 254

1  David B. Ross, M.D., Ph.D., M.B.I.
2  I'd want to see that in front of me, but that was
3  not the methodology that I used, trying to
4  reproduce that they had done. I relied on their
5  reports and their conclusions.
6  Q  Yes. I've got one person completely
7  dropped off the screen, and another person has
8  gone dark. I assume that the dark is still Cliff,
9  but Jason may have dropped off the video.
10  Oh, he's back.
11  Okay. Doctor, let me, let me keep
12  plugging away at this and see if I can understand
13  it.
14  Before you ever read the expert reports
15  of Feigal, Madigan and Plunkett, did you
16  independently read the medical articles and the
17  clinical studies and the PADERs, and then come to
18  a conclusion; or, in the alternative, were the
19  Feigal, Madigan and Plunkett reports available to
20  you in your initial review of materials?
21  A  So we're going to have to – I'm sorry.
22  We're going to have to unpack this a little bit.
23  First off, what do you mean by "initial
24  review of materials"?
25  Q  All right. Let's stick with my original

Page 255

David B. Ross, M.D., Ph.D., M.B.I.

1     question.

2     Before you ever reviewed the Madigan,

4     Feigal and Plunkett expert reports, had you

5     already reviewed the PADERs, the clinical studies,

6     and the medical literature?

7     A   You know, again, that's very, very

8     broad, and I, I can't answer it. I'm sorry. I

9     can't answer your question. I certainly did look

10    at -- and by "PADERs" I assume you mean what's on

11    the review list. I looked at those in conjunction

12    with my review of the expert reports.

13    Q   Okay, but you don't recall or you -- do

14    you recall reviewing medical literature sent to

15    you or found by you before you ever read the

16    reports of those three other experts?

17    A   Again, let me -- I feel like I need to

18    provide this context rather than just say yes or

19    no, because I don't want to be misleading.

20    My regulatory analysis was not based on

21    trying to replicate or validate those experts'

22    results. I relied on their report. I was

23    considering a question that was related to the

24    subject of their reports and their analyses, but

25    was not the same.

Page 256

David B. Ross, M.D., Ph.D., M.B.I.

2     MR. MORIARTY:  Okay.  Let me find

3     my exhibit list here.

4     (Discussion was held off the

5     record.)

6     BY MR. MORIARTY:

7     Q   Doctor, I want to pull up an article

8     that you authored.  I just have a couple of

9     questions about it.  We have to find it.  It's

10    buried in the list.

11    Let me ask you a question about it while

12    my colleague looks for the exhibit.

13    You wrote an article about the FDA in

14    the case of Ketek, K-E-T-E-K.  Do you remember

15    that article?

16    A   Yes.

17    Q   All right.  In that article at page

18    1602, you said that foreign post-marketing reports

19    were unreliable data.  I would like to know why

20    you said that.

21    A   Well, I'm tempted to ask how much time

22    you have left for questions, Mr. Moriarty.  I'm

23    sorry.  I'm teasing you a little bit.  This is

24    a -- I do not want to inflict another lecture on

25    anybody.  The context --

Page 257

David B. Ross, M.D., Ph.D., M.B.I.

2     Q   Well, let me ask, let me ask my question

3     a different way.

4     In one paragraph or less, why did you

5     say in this article that foreign post-marketing

6     reports were unreliable data?

7     A   So the context for that statement, which

8     is critical, is this was used for the initial

9     demonstration by the manufacturer that product of

10    the tradename Ketek was safe and effective for

11    Ketek to use, so that was for its initial

12    approval.

13    It was in the context of -- which I

14    discuss elsewhere in this article -- oh, 3014,

15    that was riddled with flaws, which the company

16    knew of, and then submitted the data.

17    So the question on the table was:  Could

18    foreign safety data from a variety of sources, a

19    variety of reporting mechanisms be used to

20    substitute for respectively collected safety data

21    from adequate and well-controlled trials, given

22    concern over a serious -- so that was the

23    question, not look at whether -- excuse me.  If I

24    could finish.  Not -- that was the question.  It

25    was not about the utility of such data for

Page 258

David B. Ross, M.D., Ph.D., M.B.I.

2     post-marketing surveillance.

3     Q   Okay, thank you.

4     All right.  Did Accord's -- let me

5     restart the question.

6     Did Accord Healthcare, Inc.'s docetaxel

7     receive an AP rating from FDA?

8     A   Just to be clear, are you referring to a

9     therapeutic equivalence rating?

10    Q   I am.

11    A   Okay, and the reason I asked is "AP" is

12    sometimes also used about counsel approval

13    letters.

14    I don't know.

15    Q   Do you think that that would be

16    important to know in formulating your opinions in

17    this case?

18    A   Without asking you to clarify the word

19    "important," knowing that information would not

20    change my opinions.

21    Q   Succinctly explain to us, please -- and,

22    and I thank you for recognizing we have time

23    limits, but succinctly explain to us, please, what

24    it means to have an AP rating.

25    A   Well, I'm -- to be honest with you,

Page 259

1         David B. Ross, M.D., Ph.D., M.B.I.
2   that's something where I would want to go to
3   what's called the Orange Book. This is not an
4   issue that I was asked to opine on. Again, I will
5   just say that that was not the, the focus. The
6   original approval was not the focus of my
7   analysis, if that helps.
8      Q   All right. It does help. Thank you for
9   saying that, because when I asked you last week
10  what were you asked to render opinions on, you
11  used the word post, post-market -- "post-approval"
12  or "post-marketing." I can't remember which you
13  used.
14        So is that the scope of the opinions
15  that you're going to express about Accord
16  Healthcare, Inc. in this litigation, not
17  pre-approval, but post-approval?
18     A   In terms of -- excuse me --
19  post-approval obligations and actions.
20     Q   Okay.
21        THE REPORTER: Mr. Moriarty, that
22  last exhibit you had there, we didn't give
23  mark it, we didn't give it a number.
24        MR. MERRELL: Oh, you're right.
25  Thank you very much. That should be Exhibit

Page 260

1         David B. Ross, M.D., Ph.D., M.B.I.
2   12, the Ketek article.
3        (Exhibit 12 was marked for
4        identification.)
5        MR. FRAXEDAS: Mr. Moriarty, if
6   you're switching gears, do you mind if we
7   take a quick break?
8        MR. MORIARTY: Yes. Is that you,
9   Jason?
10       MR. FRAXEDAS: Yes. Can you --
11  we've been going about an hour.
12       MR. MORIARTY: That's fine. Just
13  tell me when you want to be back. I see
14  10:40 on my clock.
15       MR. FRAXEDAS: Yea, so you want to
16  just do ten minutes? Does that work? 10:50?
17       MR. MORIARTY: Sure.
18       THE VIDEOGRAPHER: 10:40. We're
19  off the record.
20       (Whereupon, a short recess was
21       taken.)
22       THE VIDEOGRAPHER: 10:53. We are
23  back on the record.
24  BY MR. MORIARTY:
25     Q   Okay, Dr. Ross, are you ready?

Page 261

1         David B. Ross, M.D., Ph.D., M.B.I.
2      A   Yes, sir.
3      Q   Have you seen any information in this
4   case to indicate that FDA sent Accord Healthcare,
5   Inc. any warning letters regarding their label or
6   their marketing -- I'm sorry. Let me restart that
7   question.
8        Have you seen any documents in this case
9   to indicate that FDA sent Accord Healthcare, Inc.
10  any warning letters regarding the labeling of its
11  docetaxel product?
12     A   No.
13     Q   Has FDA ever declared Accord Healthcare,
14  Inc.'s docetaxel product to be mislabeled or
15  misbranded?
16       MR. FRAXEDAS: Object to form.
17       THE WITNESS: Mislabeled or
18  misbranded? I have not seen any such
19  communication publicly from FDA.
20  BY MR. MORIARTY:
21     Q   All right. Is docetaxel currently
22  considered to be safe and effective?
23       MR. FRAXEDAS: Object to form.
24       THE WITNESS: I need to clarify.
25  By whom?

Page 262

1         David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3      Q   By operation of the FDA regulations, is
4   it considered to be safe and effective?
5        MR. FRAXEDAS: Object to form.
6        THE WITNESS: I'm sorry. I
7   can't -- you know, I can't answer the
8   question in that form. It's just -- I'm, I'm
9   not clear. Are you asking whether I consider
10  it, whether the FDA considers it? Who, who
11  would consider it? I just, I can't answer in
12  the current form.
13  BY MR. MORIARTY:
14     Q   All right. Thank you.
15       Are you going to render an opinion that
16  Accord Healthcare, Inc.'s docetaxel product is not
17  safe or not effective?
18     A   So the opinions that I'm going to
19  express are contained in my report --
20     Q   Right.
21     A   -- based on the information -- as you
22  know, I've also said that if there's additional
23  information or I'm asked additional questions,
24  asked to opine on additional questions, you know,
25  that's something where I reserve the right to

Page 263

David B. Ross, M.D., Ph.D., M.B.I.
1  David B. Ross, M.D., Ph.D., M.B.I.
2  amend or modify my opinions, but in terms of the
3  basic answer to your question, those are contained
4  in my report.
5      Q   Dr. Ross, I think, from the content of
6  your report, you're generally aware that Sanofi's
7  Taxotere product was approved by FDA in 1996.
8      Were you aware of that?
9      A   Yes.
10     Q   From a regulatory perspective, did that
11  approval mean that FDA had determined that the
12  benefits of Taxotere outweighed its risks?
13     A   Based on the information that FDA had at
14  the time, the FDA determined that Taxotere was
15  safe and effective for the conditions of use
16  described in the label at that time.
17     Q   And does that come with it an
18  implication, from a regulatory standpoint, that
19  the benefits outweighed the risks?
20     MR. FRAXEDAS:  Object to form.
21     THE WITNESS:  So I'm, I'm afraid
22  the question is broad, especially because
23  drugs are marketed in the U.S., but they're
24  administered to individual patients, so
25  I'm – if you could clarify that a bit, that

Page 264

1  David B. Ross, M.D., Ph.D., M.B.I.
2  would be helpful.
3  BY MR. MORIARTY:
4      Q   Well, I, I appreciate your, your answer,
5  but does the finding of safety and effectiveness
6  for the conditions of use imply that, in general,
7  for the majority of patients, the drug's benefits
8  would exceed its risks?
9      MR. FRAXEDAS:  Object to form.
10     THE WITNESS:  Again, I'm – the,
11  the – it's not possible to make a global
12  statement that it – what I would say is that
13  it met regulatory conditions, or, more
14  accurately, none of the conditions for
15  declining or failing to approve – refusing
16  to approve, rather – implications were
17  found.
18     So, you know, it really – in terms
19  of majority of patients, that's not what an
20  approval necessarily means.
21  BY MR. MORIARTY:
22     Q   Okay.  Has, has the term "alopecia"
23  always been in the Taxotere label?
24     A   You know, to be honest with you, I, I
25  believe it was in the original label, but I'd have

Page 265

1  David B. Ross, M.D., Ph.D., M.B.I.
2  to go back and look.  I don't want to say yea or
3  nay without actually having that label in front of
4  me.
5      Q   All right, and I believe at the end of
6  the labels, there's typically like a patient
7  counseling or a patient portion that's in more
8  plain English; is that true?
9      A   Yes.  It's referred to as the "Patient
10  Package Insert" or sometimes called the "Med
11  Guide."
12     Q   Okay.  Has the term "hair loss" always
13  been in that guide in association with the
14  Taxotere label?
15     A   Again, I'd want to look at the actual
16  text, have it in front of me.  I don't – I
17  really – I'm not saying it hasn't been.  I just
18  don't want to give – I want to be careful about
19  giving a definitive answer without having the
20  document in front of me.
21     Q   To the best of your knowledge, from 1996
22  up until December of 2015, was the term "alopecia"
23  or "hair loss" always neutral as to time?  In
24  other words, it didn't contain a description of
25  transient or consistent.

Page 266

1  David B. Ross, M.D., Ph.D., M.B.I.
2  Am I correct about that?
3  A   So the term that was used – sorry.
4     MR. FRAXEDAS:  Object to form.
5     THE WITNESS:  So to the best of my
6  understanding, the term that was used was
7  simply "alopecia."
8  BY MR. MORIARTY:
9      Q   All right.  As part of your review in
10  this case and to form opinions, have you read a
11  communication between Sanofi and FDA between 1996
12  and early December 2015 so far as it concerned the
13  alopecia portion of the Taxotere label?
14     A   Oh, if there's specific documents that
15  are related to that that you'd like to ask me
16  about, I can answer that kind of question.  Again,
17  I don't want to say, you know – except in
18  association with the supplement where "alopecia"
19  was changed to "permanent alopecia," I really
20  don't want to say off the top of my head.  Again,
21  if there's a specific document that you'd like me
22  to answer questions about, I'm happy to do that.
23     Q   I don't have a specific document I want
24  to ask you about.  What I'm trying to find out
25  is – and maybe this is part of your reliance

Page 267

1    David B. Ross, M.D., Ph.D., M.B.I.
2  materials.  If over the years Sanofi had
3  communications with FDA regarding that portion of
4  the label, did you review it all, in any year
5  prior to two thousand – November and December of
6  2015?
7         MR. FRAXEDAS:  Object to form.
8         THE WITNESS:  Again, nothing comes
9    to mind, but I will also say that if there
10   was such correspondence, I would have
11   considered it, but in general, that would not
12   have altered my conclusions.
13 BY MR. MORIARTY:
14   Q   Hypothetically, Dr. Ross, if the
15 evidence shows that Sanofi gave everything that
16 Drs. Feigal, Plunkett and Madigan suggest should
17 have been given to FDA, and proposed changes to
18 the alopecia part of the label, and FDA rejected
19 those proposed changes, would that affect your
20 opinions in this case?
21        MR. FRAXEDAS:  Object to form.
22        THE WITNESS:  I can't speak to
23   hypotheticals.  I can say that in ten and a
24   half years with the FDA, I never saw – the
25   only time I would see a situation like that

Page 268

1    David B. Ross, M.D., Ph.D., M.B.I.
2  is if the agency felt that the sponsor was
3  understating the severity of the problem.
4  BY MR. MORIARTY:
5    Q   Well, Dr. Ross, we are entitled to ask
6  hypothetical questions, but can you answer my
7  hypothetical other than the answer you've already
8  given?
9         MR. FRAXEDAS:  Object to form.
10        THE WITNESS:  So can you repeat the
11   question again?
12 BY MR. MORIARTY:
13   Q   Yes.  If the evidence shows that Sanofi
14 gave FDA everything that Drs. Madigan, Feigal and
15 Plunkett suggest that they should have, and asked
16 for changes to the alopecia part of the label –
17 the proposed changes, I should say, to the
18 alopecia part of the label, and FDA rejected
19 proposed changes, would that affect your opinions
20 in this case?
21        MR. FRAXEDAS:  Object to form.
22        THE WITNESS:  It would depend – it
23   would depend on the rationale that the agency
24   gave.  Again, it's hypothetical.  You know,
25   certainly if there is such correspondence, I

Page 269

1    David B. Ross, M.D., Ph.D., M.B.I.
2  would be happy to take a look at it and
3  provide an answer based on what actually
4  happened, but just to repeat a basic
5  principle here, FDA is in charge of enforcing
6  the Food, Drug & Cosmetic Act.  Manufacturers
7  are responsible for complying with it.
8  BY MR. MORIARTY:
9    Q   Between 1996 and 2015, did FDA ever
10 unilaterally revise the Taxotere patient brochure,
11 specifically that portion regarding hair loss?
12   A   Can you clarify what you mean by
13 "unilaterally revise"?
14   Q   Yes.  Without prompting, requesting or
15 proposing by Sanofi.
16   A   Respectfully, the – I, I can't answer
17 that question, because the FDA is not the NDA
18 holder.  It's the manufacturer's product.  I mean
19 the FDA has certain authorities at, at various
20 times, but it's not the FDA's NDA.  So I just –
21 I, I'm -- the FDA doesn't print it, it doesn't
22 distribute the drug.  I, I – so I'm sorry.
23 Respectfully, I don't understand the question.
24   Q   Okay.  It seems to me from your answer
25 you find it hard to believe that FDA would ever do

Page 270

1    David B. Ross, M.D., Ph.D., M.B.I.
2  that.  My question is:  Do you know whether, in
3  fact, they ever did it between 1996 and 2015?
4         MR. FRAXEDAS:  Object to form.
5         THE WITNESS:  So it, it's not –
6    I'm sorry, Mr. Moriarty.  I'm trying to
7    address your question, but the FDA, as far as
8    I know – and perhaps there's some counter
9    example.  I would be happy to look at it.
10   The FDA cannot do that with regard to any
11   drug, and that includes generics.
12        I mean they can take various
13   enforcement actions, but they themselves do
14   not revise the label.  I, I'm just – I mean
15   they don't print the label.  The FDA can't
16   just say, well, we're going to print up a new
17   label and ship it off to pharmacies and
18   say – I mean the FDA doesn't do that.
19 BY MR. MORIARTY:
20   Q   If FDA unilaterally told Sanofi to
21 revise it, do you know whether they did that?  I'm
22 not asking whether they printed it themselves and
23 stuck it on drug packages.
24   A   Well –
25   Q   Do you know whether they ever

Page 271

1     David B. Ross, M.D., Ph.D., M.B.I.
2   unilaterally revised it and told Sanofi that's the
3   new label or that's the new section?
4         MR. FRAXEDAS:  Object to form.
5         THE WITNESS:  So again, I, I –
6   BY MR. MORIARTY:
7     Q   I just want to know if you know if they
8   did that, not how incredible you find it.  I just
9   want to know, from your review of the materials,
10  whether that happened.
11        MR. FRAXEDAS:  Object to form.
12        THE WITNESS:  So I am not aware of
13    any instance prior to enactment of the FDA
14    Amendments Act in 2007 in which the FDA
15    applied for, through judicial proceedings, to
16    enforce a change in the label with respect to
17    permanent alopecia or, after 2007, issued a,
18    what's known as a labeling safety order with
19    respect to this, under Section 505.04, I
20    believe it is, of the Act, with regard to
21    permanent alopecia.
22        So that's the best I can answer
23    your question.
24  BY MR. MORIARTY:
25    Q   Do you have any reason to dispute that

Page 272

1     David B. Ross, M.D., Ph.D., M.B.I.
2   FDA had all of Sanofi's clinical trial
3   information, post-marketing adverse event reports,
4   and other studies up through June of 2011 when it
5   approved Accord Healthcare, Inc.'s docetaxel
6   505(b)(2) application?
7         MR. FRAXEDAS:  Object to form.
8         THE WITNESS:  So again with the
9     understanding that my opinions concern
10    post-approval actions, I actually would not
11    be able to tell you what FDA did or didn't
12    have in its possession at the time of
13    approval.
14  BY MR. MORIARTY:
15    Q   Okay.  In a, in a general setting –
16  well, would you agree that Accord Healthcare, Inc.
17  would not have access to Sanofi's proprietary
18  clinical information, clinical trial information?
19        MR. FRAXEDAS:  Object to form.
20        THE WITNESS:  With the caveat that
21    that is not the question that determined my
22    conclusions, I would agree with that.
23        THE REPORTER:  I'm not sure I got
24    the answer exactly right.
25        THE WITNESS:  Well, let me – I'm

Page 273

1     David B. Ross, M.D., Ph.D., M.B.I.
2   sorry.  I'm going to start leaning a little
3   closer.
4         I said with the caveat that that
5   actually did not determine the regulatory –
6   my regulatory conclusion, I would agree with
7   that, with what Mr. Moriarty asked about.
8   BY MR. MORIARTY:
9     Q   Well, do you agree that Accord would not
10  have access or communication between FDA and
11  Sanofi that occurred post-, post-approval?
12        THE REPORTER:  You said post or
13    pre?
14        THE WITNESS:  Again – sorry.  Go
15    ahead.
16        THE REPORTER:  You said
17    "post-approval" or "post- or pre-approval"?
18        MR. MORIARTY:  Post-approval.
19        THE REPORTER:  Okay.
20        MR. FRAXEDAS:  Same objection.
21        THE WITNESS:  So with the same
22    caveat that that fact would not affect my
23    conclusions, yes, I would agree with that.
24  BY MR. MORIARTY:
25    Q   And I assume, then, that you'd agree

Page 274

1     David B. Ross, M.D., Ph.D., M.B.I.
2   that Accord wouldn't have access to Sanofi's
3   post-marketing adverse event data; that your
4   answer would be the same, correct?
5     A   Not completely.  Along with the caveat
6   that I previously expressed, any data provided
7   by – post-marketing data provided by Sanofi to
8   FDA, which was subsequently made publicly
9   available through the FDA adverse event reporting
10  system, would be available to the entire public.
11    Q   Now, I know you read some NDA submission
12  material regarding Hospira.  That's mentioned in
13  your reliance list, correct?
14    A   Yes.
15    Q   And we keep calling it "reliance list."
16  You actually call it "list of documents reviewed."
17  Fair, if we're talking about the same thing, can I
18  use that shortcut?
19    A   Yes.
20    Q   Did you read any NDA materials from a
21  company called Actavis?
22    A   Not to the best of my recollection.
23    Q   Did you read any NDA information from
24  companies Pfizer or Sun Pharma?
25    A   Not to the best of my recollection.

Page 275

David B. Ross, M.D., Ph.D., M.B.I.

1  David B. Ross, M.D., Ph.D., M.B.I.
2  Q  Do you know when FDA approved
3  applications by Actavis, Pfizer or Sun Pharma to
4  market docetaxel?
5  A  I don't.
6  Q  Do you have any information to indicate
7  whether the Actavis, Pfizer and Sun Pharma
8  approved labeling was consistent with what the
9  Reference Listed Drug Taxotere label was at that
10  time?
11  A  So I think I know what you mean by
12  "Reference Listed Drug," but because that term is
13  generally applied to abbreviated NDAs, I'm going
14  to just say assume Taxotere – and I don't know
15  anything about these drugs – an NDA, you're
16  referring to it in the context of an NDA that
17  those sponsors relied on, or the, those sponsors
18  relied on the agency's findings of safety and
19  effectiveness.  I don't, I don't know anything
20  about that.
21  Q  Okay.  Are you aware of any reason why
22  FDA would accept a pharmaceutically and
23  therapeutically equivalent drug under 505(b)(2)
24  who have different warnings on the, as I'm calling
25  it, the "RLD," or in this case Taxotere?

Page 276

David B. Ross, M.D., Ph.D., M.B.I.

1  David B. Ross, M.D., Ph.D., M.B.I.
2  A  I don't know if it's a matter of what
3  FDA would expect about this in terms of what the
4  regulations say in terms of NDA holders'
5  obligations.
6  Q  Well, if, for example, a company files a
7  505(b)(2), and the drug is pharmaceutically and
8  therapeutically equivalent to Taxotere, and they
9  ask for FDA to have the [same] warnings, that
10  would be appropriate from a regulatory standpoint,
11  wouldn't it?
12  MR. FRAXEDAS:  Object to form.
13  THE WITNESS:  Sure.  Could you
14  repeat?  I didn't hear all the entire
15  question here.
16  BY MR. MORIARTY:
17  Q  That was pretty convoluted.
18  THE REPORTER:  Do you want me to
19  read it, counsel?
20  MR. MORIARTY:  Yeah, that would be
21  great, Laurie.  Thank you.
22  (Whereupon, reporter reads
23  requested material.)
24  BY MR. MORIARTY:
25  Q  It should be "the same warnings."

Page 277

David B. Ross, M.D., Ph.D., M.B.I.

1  David B. Ross, M.D., Ph.D., M.B.I.
2  Go ahead, Doctor.
3  A  Thank you.
4  MR. FRAXEDAS:  Object to form.
5  THE WITNESS:  It, it depends.  This
6  is not a generic, which is a duplicate.
7  505(b)(2)s may be different in some respects
8  from the original product and still be
9  pharmaceutically and therapeutically
10  equivalent.  You know, in terms of – for
11  example, I'll just take – well, actually,
12  this could apply to anything.  There may be
13  differences in terms of the formulation
14  excipients, which – for example, or dilution
15  mechanisms that could result in different
16  warnings.
17  So it's not something where I would
18  say generally, unless we were saying it is –
19  unlike generics, which must, in general, have
20  the same dosage form, strength, route of
21  administration, and conditions for use, those
22  can differ between a 505(b)(2) and the NDA
23  that it is basing the – on which the sponsor
24  is requesting approval.  So it really depends
25  on the details.

Page 278

David B. Ross, M.D., Ph.D., M.B.I.

1  David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3  Q  And it may, as you said, or it may not
4  require a different warning, right?
5  A  I would phrase it more, even more
6  generally than that.  I would say it may require
7  differences in labeling that would include
8  differences in warning, precautions, adverse
9  events, and so on.
10  Q  Okay.  When there are several
11  manufacturers making a particular drug product,
12  and, like here, they are interchangeable, doesn't
13  FDA strive for uniformity in its – in the
14  labeling of those drugs?
15  MR. FRAXEDAS:  Object to form.
16  THE WITNESS:  Depending on the, A,
17  the signs, and B, the information that
18  actually is submitted to the agency, they
19  strive for it, but the primary consideration
20  is does the label provide adequate directions
21  for its intended use, and that would override
22  uniformity at the cost of communicating those
23  adequate directions.
24  BY MR. MORIARTY:
25  Q  Doctor, if there is not uniformity –

Page 279

David B. Ross, M.D., Ph.D., M.B.I.

1    under those circumstances where we're talking
2    about an interchangeable group of drugs made by
3    different manufacturers, okay, if there was not
4    uniformity in the labeling, and a company could
5    unilaterally change its labeling, would it
6    potentially cause confusion among doctors and
7    patients?
8    MR. FRAXEDAS:  Object to form.
9    THE WITNESS:  I think, honestly,
10   respectfully, there's too many "ifs" there.
11   It depends on what the information is.
12   If there's appropriate safety
13   information that is submitted, new safety
14   information that is submitted that requires
15   updating the label, the agency could – you
16   know, I don't believe that it is correct to
17   say, oh, the agency would just reject it.
18   They have the authority, since
19   2007, to order administratively, rather than
20   go to court, companies to update their label
21   if necessary, but if – in the circumstances
22   you describe, if this is new safety
23   information that's correct, that meets the
24   regulatory criteria, and a company says we
25

Page 280

David B. Ross, M.D., Ph.D., M.B.I.

1    want to do the right thing and update our
2    label, you know, the question would not, to
3    my mind, would not be, oh, well, the FDA
4    turned it down because it wants to keep
5    everything the same.  The question is
6    why wouldn't they try and stretch the
7    uniformity by having the other labels
8    updated.
9    BY MR. MORIARTY:
10   Q    Are you – is it your opinion that a
11   pharmaceutical company in that setting, where
12   there are multiple manufacturers and they are
13   considered interchangeable, that one of those
14   companies can make a label change with no input
15   from FDA?
16   MR. FRAXEDAS:  Object to form.
17   THE WITNESS:  First off, what kind
18   of label are we talking about here?
19   BY MR. MORIARTY:
20   Q    An adverse – change to an adverse
21   event, like, like it is here.  We're talking about
22   this case.
23   A    Okay.  So when you say they're
24   "interchangeable," I'm not quite sure what you
25

Page 281

David B. Ross, M.D., Ph.D., M.B.I.

1    mean by – you mean interchangeable from an FDA
2    regulatory sense?  There – I just – I'm sorry.
3    I just don't completely understand the question.
4    Q    Are you going to, are you going to
5    render opinions that – to the effect that
6    Accord's docetaxel, Sanofi's Taxotere, Sandoz's
7    docetaxel product – I mean I could go on down the
8    line – are not considered interchangeable from a
9    regulatory standpoint?
10   A    No, that's not what I was – I'm not
11   talking about interchangeability.  That's not
12   within the scope of my opinions.
13   Q    Okay.  So what I'm trying to find out,
14   Doctor, let's assume you've got you a
15   reference drug like Sanofi's Taxotere, and you've
16   got four or five what I'll just lump in as
17   generics, 505(j)s and 505(b)(2)s, okay?  Are you
18   going to tell a jury that one of the generics,
19   regardless of whether it's a 505(b)(2) or a
20   505(j), can unilaterally update its label with no
21   input from FDA –
22   MR. FRAXEDAS:  Object to form.
23   BY MR. MORIARTY:
24   Q    – and put it on products and distribute
25

Page 282

David B. Ross, M.D., Ph.D., M.B.I.

1    it?
2    A    So –
3    MR. FRAXEDAS:  Object to form.
4    THE WITNESS:  The premise at the
5    heart of that question is incorrect.
6    505(b)(2) –
7    BY MR. MORIARTY:
8    Q    What is incorrect?
9    A    505(b)(2)s and 505(j)s, it may be
10   convenient shorthand to refer to both of them as
11   "generics," but from a regulatory point of view,
12   they are not the same.
13   An application approved under Section
14   505(j) of the Act – as I said in my report, I'm
15   not talking about petitioned ANDAs – must have
16   the same label, which is – except for things like
17   is it a different manufacturer, a different date
18   of approval or something like that.  That is not
19   true.
20   Q    Well, let me go back and fix my
21   question.  Let me fix my question so you and I are
22   on the same page.
23   First of all, among Actavis, Hospira,
24   Sandoz, Pfizer and Sun Pharma, how many of those
25

Page 283

David B. Ross, M.D., Ph.D., M.B.I.

1  are 505(j) and how many are 505(b)(2)?
2      A   I, you know, just – I would – I don't
3  know, and I certainly am not going to guess.
4      Q   All right.  So let's just take a setting
5  where Accord is a 505(b)(2), and Taxotere is the
6  RLD to it, okay?  Is it – are you going to tell a
7  jury that Accord could have unilaterally updated
8  its label with no input from FDA, before those
9  labels went out to distributors and doctors and
10  hospitals?
11      MR. FRAXEDAS:  Object to form.
12      THE WITNESS:  What I would say is
13  that unlike 505(j) drugs, 505(b)(2) NDAs,
14  which are a subset of 505(b)(1)s, are able to
15  change their label if it's – in terms of
16  updating it, if it's based on new safety
17  information, that they do have that
18  authority, and that there are specific
19  regulations, as outlined in my report, that
20  give them authority.  If the FDA – these
21  could be done as Changes Being Effected
22  supplements.  That's what I –
23  BY MR. MORIARTY:
24      Q   I don't think you're listening to my

Page 284

David B. Ross, M.D., Ph.D., M.B.I.

1  question, okay, with all due respect.
2      Are you going to tell a jury that a
3  company like Accord, which is a 505(b)(2), can
4  uni- – if it, if it has what it believes is new
5  safety information, that it can unilaterally
6  implement label changes with no input from FDA?
7      MR. FRAXEDAS:  Object to form.
8      THE WITNESS:  Well, can you clarify
9  what you mean by "unilaterally" before I
10  answer this question?
11  BY MR. MORIARTY:
12      Q   Yes.  By itself, with zero input from
13  FDA.
14      A   Zero prior input; is that what you're
15  saying?
16      Q   Yes.
17      A   Well, they do that now.  NDA holders do
18  that all the time right now.  Most CBE supplements
19  are not solicited, so yes, I would say that – I
20  don't say unilaterally.  FDA has to review and
21  approve it.  If the FDA does not agree with the
22  labeling, the typical response is "we want you to
23  make these changes, please; add at the next
24  printing."  So yes, I would be very comfortable

Page 285

David B. Ross, M.D., Ph.D., M.B.I.

1  telling a jury that.
2      Q   Okay.
3      Now, I see from your list of materials
4  reviewed, you never looked at the, Accord's
5  pre-IND meeting minutes from their meeting with
6  FDA.  Is that because they were pre-approval and
7  were not essential to the opinions you intend to
8  express in this case?
9      A   Well, I, I can't, I can't exactly say,
10  speaking, you know, without a document that I
11  don't recall having reviewed, but in general, as I
12  said earlier, my opinions concern what was
13  reported or not reported and what actions were
14  taken or not taken post-approval.
15      Q   Did you even know that Accord
16  Healthcare, Inc. had a pre-IND meeting?
17      MR. FRAXEDAS:  Object to form.
18      THE WITNESS:  I, I don't know.
19  Honestly, again, I'm looking at
20  post-approval, so that particular universe of
21  data that's pre-approval would not affect my
22  opinions about what happened after the date
23  of approval, starting on day one.

Page 286

David B. Ross, M.D., Ph.D., M.B.I.

1  BY MR. MORIARTY:
2      Q   All right.  Let me go back to my last
3  question.
4      Exactly what regulation do you believe
5  allows a pharmaceutical company to implement a
6  label change without the approval of FDA?
7      A   I want to be clear.  You're saying
8  without the prior approval of FDA; is that
9  correct?
10      Q   Yes.
11      A   Okay.  I again want to make sure I'm
12  giving you a correct citation here.
13      So the regulations are contained in
14  21 C.F.R. 314 and concern when the Changes Being
15  Effected supplement may be submitted.
16      Q   Can you be more specific?  Is this
17  314.70?
18      A   I believe that's correct.  Say it again.
19      Q   Is it 314.70 or some other section?
20      A   I believe that it is contained in – I,
21  I mean there certainly are other relevant
22  sections, but I believe it is in 314.70.
23      Q   All right.  Would you agree, in general,
24  Dr. Ross, that FDA instructs manufacturers, under

Page 287

David B. Ross, M.D., Ph.D., M.B.I.
1   505(b)(2) pathways, to rely "to the fullest extent
2   possible" on what has already been established
3   with regard to the safety and efficacy of the
4   reference listed drug?
5       A   To the fullest extent possible?  I
6   would -- honestly, I don't know whether I can
7   agree or disagree, but I would want to know what
8   the source is for that statement and what the
9   context is.
10      Q   So based on what I think you've told me
11  so far, as of the middle of June 2011, Accord's
12  docetaxel was not mislabeled or misbranded,
13  correct?
14          MR. FRAXEDAS:  Object to form.
15          THE WITNESS:  I was not asked to
16      address the question of whether it was
17      misbranded or whether the label was false or
18      misleading in any particular at that time, at
19      the time.  I was not asked to opine on that.
20  BY MR. MORIARTY:
21      Q   Okay.  Do applications under 505(b)(2)
22  bear characteristics of both ANDAs and standalone
23  NDAs?
24      A   Again, I think you're going to have to
25

Page 288

David B. Ross, M.D., Ph.D., M.B.I.
1   be more specific.  I mean, you know, start,
2   start -- they all have in common that they are
3   submitted to the U.S. Food & Drug Administration,
4   for example.  What, what specific similarities or
5   differences are you asking about?
6       Q   Doctor, I'm going to return to that
7   question later.  I'm going to need time to find my
8   questions about that.
9           When things were rolling out in real
10  time after approval for Accord Healthcare, Inc. in
11  June of 2011, do you agree that the decisions it
12  had to make regarding the label were based on
13  facts available to them at the time as well as the
14  content of the FDA regulations?
15      A   I'm sorry.  You're going to have to
16  repeat that question.  Again, I'm, I'm going to
17  just tell you I'm going to ask you to clarify
18  things, so if you could just repeat that for me.
19      Q   Well, I'll, I'll rephrase it.
20          So I have a practical question for you.
21  When the Accord Healthcare, Inc. people in North
22  Carolina, after approval, let's say the end of
23  June 2011, are three quarters of the way through
24  that calendar year, are into 2012, as it went on
25

Page 289

David B. Ross, M.D., Ph.D., M.B.I.
1   in time, they would have to make decisions about
2   labeling based on the information available to
3   them as well as the FDA regulations, correct?
4           MR. FRAXEDAS:  Object to form.
5           THE WITNESS:  I guess I would say
6       they would have to comply with the
7       regulations based on the regulations and data
8       available to them.
9   BY MR. MORIARTY:
10      Q   At that time?
11      A   Well, as of -- again I'm, I'm having a
12  little heartburn about the word "available,"
13  because there's a difference between available and
14  I have it right now.  So it's not just what they
15  have but what they are expected to have as part of
16  pharmacovigilance activities required under safety
17  reporting.
18      Q   Okay.  All right.  Let's, let's get back
19  to your report, which was marked as Exhibit -- I
20  think it was Exhibit 5 last week.  Let me just
21  double-check that and make sure.
22          Yes, it is Exhibit 5, and I don't know
23  if we need to put it up on the screen, because I
24  think everybody has it, but go to your paragraph
25

Page 290

David B. Ross, M.D., Ph.D., M.B.I.
1   23, please.
2           Are you there?
3       A   I am.
4       Q   All right, and this is in the Summary of
5   Opinions section, correct?
6       A   Yes.
7       Q   All right, and would I be correct that
8   based on everything you've told me now, that the
9   last statement you made in paragraph 23 applies to
10  the post-approval duties?
11      A   That is what I am writing about here.
12      Q   Okay.  To put it another way,
13  pre-approval, FDA permits a 505(b)(2) applicant,
14  in compliance with regulations, to submit
15  different material than that that is required of
16  the 505(b)(1).
17          Do you understand the question?
18      A   No.  I actually was going to ask if you
19  could put it in the form of a question.  I'm
20  sorry.  Please, please go ahead.
21      Q   All right.  So 505(b)(1)'s need to
22  submit, for example, clinical study data that they
23  have done to prove safety and effectiveness.  The
24  FDA, for a 505(b)(2), does not require that of a
25

Page 291

David B. Ross, M.D., Ph.D., M.B.I.

1   505(b)(2).  A 505(b)(2) may rely on what has
2   already been done previously, correct?
3
4        MR. FRAXEDAS:  Object to form.
5        THE WITNESS:  That is not
6   completely correct in the sense that – for
7   both B1 ands B2s.
8   BY MR. MORIARTY:
9        Q   All right.  Let me, let me see if I can
10  shortcut this, because I think we're on the same
11  page, and you're being very technical, which is
12  fine.
13       The pre-approval duties for 505(b)(1)s
14  and 505(b)(2)s are not exactly the same, correct?
15       A   I'm sorry.  Say that one more time.
16       Q   The pre-approval duties for 505(b)(1)
17  applicants versus 505(b)(2) applicants are not
18  exactly the same, correct?
19       A   No, and I'm, I am not being technical,
20  I'm not being picky, I'm not playing semantics,
21  truly.  I'm really not.  Both are NDAs.  Both must
22  provide substantial evidence of effectiveness and
23  safety.  Where they may differ – let me just
24  finish.  I know time is on the – the clocks march
25  on.  They both have to provide full study reports.

Page 292

David B. Ross, M.D., Ph.D., M.B.I.

1
2        In the case of B2s, the applicant may
3   rely, for some of the material, on data that –
4   studies it has not itself conducted or does not
5   have the right of reference to, but –
6        Q   Okay.
7        A   – they both have to – they both have
8   the same approval criteria.
9        Q   All right.
10       A   How they act – some of those may
11  differ.  You're – that is where I want to be
12  clear what I'm talking about, but that is –
13  certainly there is no distinction made that I've
14  seen in terms of post-approval requirements.
15  Pre-approval, yes, they can rely on the – that
16  responded, yada, yada, yada.
17       Q   All right.  So when we talk about
18  paragraph 24, at least for – of your report, for
19  purposes of this litigation, what you're
20  testifying about is the post-approval duties of
21  Accord, right?
22       A   That is correct.
23       Q   Is it ultimately FDA's decision
24  regarding the content of the label for a
25  505(b)(2)?

Page 293

David B. Ross, M.D., Ph.D., M.B.I.

1
2        A   I would say it's their decision as to
3   whether to approve a label and under exactly what
4   conditions, based on the information provided to
5   them by the applicant.
6        Q   And based upon all other information it
7   knows about other similar drugs?
8        MR. FRAXEDAS:  Object to form.
9        THE WITNESS:  So what I would say
10  is – again, I want to give another one of my
11  caveats here.  There's an assumption that the
12  FDA is like a computer, and it just instantly
13  retrieves all the information that's
14  available.  That may happen; it may not
15  happen.
16       Ultimately, it is up to the
17  applicant to make sure that it has made its
18  case that it has demonstrated safety and
19  effectiveness in its submission, and again,
20  the regulations, you know, don't speak to –
21  you know, the contents – assume that the
22  contents of your application will be
23  supplemented by other things that the agency,
24  quote, "knows" or "remembers" or whatever.
25       So I would say that certainly to

Page 294

David B. Ross, M.D., Ph.D., M.B.I.

1
2   greater and lesser degrees, the agency during
3   its review will take into account that, but
4   if it doesn't, that does not mean that the
5   applicant has automatically fulfilled its
6   responsibilities.
7   BY MR. MORIARTY:
8        Q   Okay, but in the case of a 505(b)(2)
9   that is relying on information on the safety and
10  effectiveness determination by an RLD, you would
11  expect FDA to bring to bear, in looking at the
12  505(b)(2), everything submitted by the 505(b)(2),
13  and take into account what it already knows about
14  the RLD, correct?
15       MR. FRAXEDAS:  Object to form.
16       THE REPORTER:  Mr. Fraxedas, I can
17  barely hear you.
18       MR. FRAXEDAS:  Sorry.  Object to
19  form.
20       THE REPORTER:  Got it.
21       THE WITNESS:  No, I, I don't agree
22  in the sense that the company cannot just
23  say, well, we're going to – in one sentence
24  saying we're relying on the agency's findings
25  of safety and effectiveness, and just say,

Page 295

1    David B. Ross, M.D., Ph.D., M.B.I.
2    well, that's enough.
3        I, I think that it's – so no, I
4    wouldn't, I wouldn't agree that – you know,
5    it's something that does happen during the
6    review process, but again, I can't advise
7    this too strongly.  FDA approval does not
8    automatically mean that the label – that the
9    FDA has done – made the right decision.
10        At the end of the day – and I'm
11    not criticizing the FDA.  They have to make a
12    decision, but that is not by itself – you
13    know, sometimes the FDA doesn't get the full
14    information, but there's normal things that
15    happen, so, you know, it's a little bit like
16    if I'm speeding, and a state trooper doesn't
17    pull me over, and I crash into somebody, I
18    can't say, well, the state trooper didn't
19    pull me over, I didn't do anything wrong.
20  BY MR. MORIARTY:
21    Q    Okay.  Let's go to paragraph 25 of your
22  report.
23    A    Yes.
24    Q    Is the opinion you give in paragraph 25,
25  does that apply pre- and post-approval?

Page 296

1    David B. Ross, M.D., Ph.D., M.B.I.
2    A    Yes.
3    Q    All right, and tell us in what ways
4    does – I want you to assume we're talking about
5    the context that we have here.
6    A    Sure.
7    Q    Accord and maybe others have relied on
8    Taxotere and have sought and obtained approval of
9    505(b)(2)s, okay?  We're not doing this in the
10    abstract.  We're talking about these specific
11    drugs.
12        Give me an example or two of ways that
13    the 505(b)(2) label could substantively differ
14    from Sanofi's label and what, in general, is the
15    regulatory basis for them allowing that to happen.
16        MR. FRAXEDAS:  Object to form.
17        THE WITNESS:  Let me start by – I
18    don't – the one example I'll give right now,
19    I would want to look at the labels, but if I
20    take the Sandoz NDA label on approval, that
21    differs in sections 2.8 and 2.9 from the
22    Taxotere label.
23  BY MR. MORIARTY:
24    Q    Okay.  What was the basis for the
25  difference?  What scientific basis led to the

Page 297

1    David B. Ross, M.D., Ph.D., M.B.I.
2    ability for there to be that difference?
3    A    Well, the original Taxotere – or not
4    original, but Taxotere, the excipients basically
5    result in it being a very viscous solution that
6    requires dilution, and if you look at the, those
7    sections specify just clearly says because of the
8    differences in the excipients, there are certain
9    things you shouldn't do with the Sandoz product.
10    Q    Give me, give me another example,
11  please.
12    A    Sure.  So I'll stick with Sandoz for
13    right now, but the dosage strength differs.
14    That's a very substantive difference.  So
15    basically I really, I really need the labels in
16    front of me to do this, but if the strength is –
17    if I remember correctly – for the original
18    product 20 milligrams per mil, whereas it's
19    20 milligrams for two mls for the Sandoz product,
20    and that is not some minor difference.
21    Q    I appreciate those examples.  Let me ask
22  you this question then, and I appreciate those
23  examples.
24        Was there any substantive scientific
25  difference between Accord's docetaxel product and

Page 298

1    David B. Ross, M.D., Ph.D., M.B.I.
2    Sanofi's Taxotere that warranted a difference
3    between the two labels, whether it's dose, route
4    of administration, excipients, active ingredients,
5    inactive ingredients, anything?
6        Do you understand my question?
7    A    I understand your question.  This is
8    something where I would want to have the labels in
9    front of me in order to answer that question.
10    Q    All right.  Would you – do you know
11    whether, at the time of approval in 2011, whether
12    there was any difference in any of those
13    substantive ways that would have warranted a
14    difference between the labels?
15    A    Again, I'm – I, I really want the
16    labels in front of me to answer that question.
17        (Discussion was held off the
18        record.)
19        THE WITNESS:  Please go ahead,
20    Mr. Moriarty.  I'm sorry.
21  BY MR. MORIARTY:
22    Q    Okay.  In the case of – sorry.  My
23  computer went out.
24        In the case of Accord Healthcare, Inc.'s
25  docetaxel NDA, did FDA ever ask for or permit the