Page 299

1     David B. Ross, M.D., Ph.D., M.B.I.
2  label to be different than Sanofi's?
3        MR. FRAXEDAS:  Object to form.
4        THE WITNESS:  It, it may have, and
5  again, I'm, I'm -- this is something where
6  I'd have to look, go back and look at the
7  exact labels, but I, I know in at least one
8  instance -- and I just -- I apologize -- I
9  can't remember if it was Accord.  This is
10  post-approval.  There was a change made to a
11  505(b)(2) label post-approval, before such
12  change was made in the Taxotere label.
13  BY MR. MORIARTY:
14     Q   But sitting here right now, you don't
15  remember if that was Accord or not?
16     A   It, it may have been, and I'm just --
17  I'm -- I, I just don't remember if it was, but
18  certainly it can be done.  I mean I think that's
19  the fundamental point is it's not -- again, if you
20  have a generic, and I mean a 505(j), I'm not
21  talking about a petitioned ANDA, other than these
22  minor allowable changes, like manufacturer name,
23  that sort of thing, you're not going to see that.
24     Q   Let's go to your paragraph 29, footnote
25  4.  Tell me when you're there.

Page 300

1     David B. Ross, M.D., Ph.D., M.B.I.
2     A   I'm, I'm there.
3     Q   Do you still agree with what you wrote
4  in footnote 4?
5     A   I do.
6     Q   And here's a term that Laurie has not
7  heard yet, but the MedDRA, M-e-d-D-R-A.  Is the
8  MedDRA dictionary the source of definitions for
9  adverse events?
10     A   I would say it's more -- not necessarily
11  the definition, but what's called a controlled
12  vocabulary.
13     Q   Do you know -- I, I see that the MedDRA
14  dictionary was on your list of materials reviewed.
15  Is there a definition of "persistent chemotherapy-
16  induced alopecia" in the MedDRA dictionary?
17     A   Well, again, I don't know that MedDRA is
18  going to provide general definitions.  I mean
19  there may be some terms in terms of how the,
20  what's called the taxonomy -- Laurie, I'm sorry.
21  That's T-A-X-O-N-O-M-Y -- is organized.
22        Basically, you know, in this kind of
23  setting, and I'd have to go back to the -- MedDRA
24  is also constantly being updated and revised, but
25  it would be -- alopecia, you know, would be

Page 301

1     David B. Ross, M.D., Ph.D., M.B.I.
2  assigned to an available, mapped to an available
3  term that was the closest, represented the closest
4  concept.
5     Q   I mean I'm, I'm not asking you
6  theoretical.  Whether you call it "defined" or
7  "controlled vocabulary," use whatever you deem
8  appropriate, but is, is there some explanation,
9  definition, or controlled vocabulary for what PCIA
10  is?
11     A   So MedDRA would not be the source, so
12  let me -- but, but I don't want to get hung up on
13  that.  In terms of --
14     Q   That, that is the extent of my question.
15     A   Oh, okay.  I, I don't know that --
16        THE REPORTER:  What was
17  the question?
18        THE WITNESS:  Go ahead.
19        THE REPORTER:  You're both, you're
20  both talking at the same time.
21        THE WITNESS:  I'm so sorry.
22  Please, Mr. Moriarty.  Go ahead.
23        MR. MORIARTY:  Let's go up to
24  paragraph 37.
25        MR. FRAXEDAS:  Was there a question

Page 302

1     David B. Ross, M.D., Ph.D., M.B.I.
2  and answer to that last exchange?  Because I
3  didn't have an opportunity to object.  I
4  couldn't hear.  Where you were talking over
5  each other, was there an answer?
6        MR. MORIARTY:  I thought, I thought
7  before I started talking over him, that he
8  had answered my question.  If that's not
9  true, we should go back.
10  BY MR. MORIARTY:
11     Q   But my question was:  Whether you call
12  it "defined, controlled vocabulary" or not, does
13  the MedDRA dictionary establish what PCIA is?  And
14  I thought he said it does not, and then he was
15  going to go on to something else.
16     A   So let me go back and answer.
17        MedDRA does not necessarily contain
18  definitions in the sense of, well, what is this
19  thing, what is it in other words.  It is a list of
20  terms, but -- and, actually, it's not a minor
21  technical distinction.  It's the name -- it's the
22  map versus the territory, if you will; the name
23  versus the concept.
24        So the terms are not -- that are in
25  there, for example, "alopecia," are not

Page 303

1         David B. Ross, M.D., Ph.D., M.B.I.
2    necessarily going to be defined in MedDRA itself.
3    It provides standard terminology – maybe that's a
4    better word – for describing these adverse
5    events.
6         Q    All right.  I think I had asked you to
7    go up to paragraph 37.
8         A    I'm there.
9         Q    Does the FDCA, do the regulations
10   implementing it mention anything about foreign
11   drug labeling?  And I'll give you examples of what
12   I mean by that if you'd like it.  Does the FDCA or
13   the regs mention whether to submit such
14   information to FDA, under what circumstances to
15   submit it to FDA, or any description of the
16   significance, if any, that FDA would ascribe to
17   it?
18        A    Okay.  To answer your question – I'm
19   sorry.  To answer your question, in the context
20   that we're talking about here, if a foreign
21   label – now, just in the interest of time, I'll
22   restrict it to this.  If a foreign label
23   represents – I'm going to paragraph 45 of my
24   report.
25        "Information derived from a clinical

Page 304

1         David B. Ross, M.D., Ph.D., M.B.I.
2    trial, an adverse event report, a post-approval
3    study . . . or peer-reviewed biomedical literature
4    . . . or other scientific data . . . about a
5    serious risk or an unexpected serious risk," if
6    the foreign label fell under that definition, or
7    that information from a label met the requirements
8    for reporting under a 15-day alert, then yes, that
9    information would need to be reported to the
10   agency.
11        Q    All right.  I think what you're
12   saying – and please correct me if I'm wrong.
13   It's not foreign labeling as an independent item,
14   it's what is the data that drove the foreign
15   labeling; is that correct?
16        MR. FRAXEDAS:  Object to form.
17        THE WITNESS:  I'd need to go –
18   this may be spelled out in more detail –
19   guidances about use of what are called
20   periodic benefit risk update reports, but
21   simply reporting that without the underlying
22   data, the underlying source, I think would be
23   problematic.
24        In the case of literature, for
25   example, an applicant reporting new safety

Page 305

1         David B. Ross, M.D., Ph.D., M.B.I.
2    information from a published study would be
3    expected to submit the actual article.  So
4    the other – and I, I want to just also
5    mention that periodic reports of various
6    types and annual – including annual reports,
7    will – assuming the annual reports, there's
8    frequently a section on regulatory actions
9    taken in other countries.
10   BY MR. MORIARTY:
11        Q    All right.  So let me, let me linger
12   here.
13        First, if I understand what you just
14   said, if a pharmaceutical company in the United
15   States just gave FDA a foreign label with a
16   proposal that something happen, I think you said
17   it would be very unlikely that FDA would just take
18   that and approve it; in other words, FDA would
19   want the underlying data.
20        Is that a fair characterization of some
21   of what you said there?
22        A    Well, what FDA would want is a – and
23   this is part of pharmacovigilance – is
24   information, an analysis of why this is or is not
25   new safety information, why it does or does not

Page 306

1         David B. Ross, M.D., Ph.D., M.B.I.
2    merit the label update, and then the actual data,
3    but I think the key thing is, it would need to be
4    not just throwing a label on there and assuming
5    the agency finds it, but including it if it's a
6    serious unexpected adverse event, addressing it.
7         Q    Okay.  In your answer to what I was
8    asking you about paragraph 37, you referred to
9    your paragraph 45, and I'm going to deal with
10   paragraph 45 now and then go backwards.  So look
11   at paragraph 45 if you will.
12        (Discussion was held off the
13        record.)
14   BY MR. MORIARTY:
15        Q    While my colleague is looking for your
16   cite in paragraph 45, the cite that you discuss
17   there is 21 United States Code 355-1(b), correct?
18        A    Yes.
19        MR. MORIARTY:  I have put – we
20   have put on the screen and are marking as
21   Exhibit 13, 21 U.S.C.A. 355-1.  That's the
22   reference you made.
23        (Exhibit 13 was marked for
24        identification.)
25

Page 307

1      David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3      Q    Is this -- does the Risk Evaluation and
4  Mitigation Strategies section of the Code apply to
5  the circumstances with docetaxel and Accord?  I
6  mean does the FDA -- was this ever called an REM?
7      A    So I -- again, there's two questions on
8  the table, but before getting to that, I actually
9  reference paragraph B on, on this.
10     Q    It's here.  So you're just going to the
11  definitions section of the Risk Evaluation and
12  Mitigation Strategy section of the Code?
13     A    I don't know that I would say "just,"
14  but that's what the cite refers to.  It doesn't
15  refer to the initial page that you have here.
16  That's why I was saying I wanted to go to
17  paragraph B where the definition of New Safety
18  Information is found.
19     Q    Well, the definition section B says "for
20  purposes of this section," and when the United
21  States legislature, Congress, passes a law and
22  refers to this section, it's referring to 21 USCA
23  355-1, correct?
24     A    Yes.
25          MR. FRAXEDAS:  Object to form.

Page 308

1      David B. Ross, M.D., Ph.D., M.B.I.
2          THE WITNESS:  But if I, if I may, I
3  discuss new safety information and its
4  significance in paragraph 27, in which I
5  discuss 21 -- the requirements when an update
6  to a label is triggered, and that's under 21
7  C.F.R. 201.57(c)(6) and (c)(7), and it's
8  again paragraph 27(a) and (b).
9  BY MR. MORIARTY:
10     Q    What I'm trying to find out is:  Do you
11  believe that what we have marked as Exhibit 13 is
12  the legal definitions for things outside the Risk
13  Evaluation and Mitigation Strategies section of
14  the United States Code?
15          MR. FRAXEDAS:  Object to form.
16          THE WITNESS:  So I, I am, as I
17  mentioned before, not an attorney.  I'm not
18  offering legal opinions.
19  BY MR. MORIARTY:
20     Q    Okay.  All right.  So we were talking
21  about paragraph 37, and then we went to paragraph
22  35.
23          THE VIDEOGRAPHER:  Mr. Moriarty,
24  this is Rick, the videographer.  Within the
25  next five minutes, we need to take a break so

Page 309

1      David B. Ross, M.D., Ph.D., M.B.I.
2  I can rename the file.  It's getting pretty
3  big.  We've been on the record about an hour
4  and 26 minutes, and they like me to break
5  about an hour and 30.
6          MR. MORIARTY:  Okay.  Let me ask
7  one question, and then we can take a break.
8  BY MR. MORIARTY:
9      Q    Doctor, I'd like you to look at
10  paragraphs 30 through 44 of your report, okay?
11     A    Okay.
12     Q    In general, Dr. Ross, do those apply to
13  and describe the obligations and what Sanofi did
14  in this case?
15     A    In general, yes.
16          MR. MORIARTY:  All right.  Let's
17  take a break.  We can go off the video
18  record, Rick.
19          THE VIDEOGRAPHER:  12:20.  We are
20  off the record.
21          (Discussion held off the video and
22  stenographic record.)
23          MR. MORIARTY:  Rick, how long have
24  we been on the record today?
25          THE VIDEOGRAPHER:  Two hours and 48

Page 310

1      David B. Ross, M.D., Ph.D., M.B.I.
2  minutes.
3          (Whereupon, the lunch recess was
4  taken.)
5          THE VIDEOGRAPHER:  1:11.  We're
6  back on the record.
7          MR. MORIARTY:  Dr. Ross, we're
8  going to mark Exhibit 14 and put it up on the
9  screen.
10          (Exhibit 14 was marked for
11  identification.)
12  BY MR. MORIARTY:
13     Q    Okay.  This is a document listed in your
14  list of documents reviewed as "Comparative Label
15  Changes made by Sanofi, Sandoz, Hospira and
16  Accord, June 2011 through December 2015."
17          Did you draft this document?
18          If you're answering, we can't hear you.
19  You may be on mute.
20     A    I am on mute.  I'm sorry.  I apologize.
21  No.
22     Q    Did you receive it from someone other
23  than plaintiffs' counsel?
24     A    No.
25     Q    And it says "Draft" in the upper

Page 311

David B. Ross, M.D., Ph.D., M.B.I.

1    right-hand corner on the first page.  Do you know
2    whether you received more than one of these?
3    
4    A    To the best of my recollection, no.
5    Q    Did you ever ask them to create a
6    similar chart but include label changes proposed
7    by any of these entities in that same period of
8    time?
9    A    By "same period of time," you mean the
10   dates in the two right-hand columns, correct?
11   Q    Well, June 2011 through December 2015.
12   Did you ask them to prepare a chart with proposed
13   changes as opposed to the changes actually made?
14   A    To the best of my recollection, no.
15   Q    All right.  I'm done with that.
16   Now, is it your opinion that Accord
17   Healthcare, Inc. could have updated its docetaxel
18   label at some point between the middle of
19   June 2011 and the end of December 2015?
20   A    Yes.
21   Q    I want to know exactly when the earliest
22   date is that, in your opinion, Accord Healthcare,
23   Inc. could have done that.
24   A    The date of approval was June 8, 2011.
25   The first 90-day periodic safety update report was

Page 312

David B. Ross, M.D., Ph.D., M.B.I.

1    due 90 days after that.  That label change should
2    have been put in place by Accord by then.
3    
4    Q    All right, and I assume it's your
5    opinion that that duty continued from after those
6    90 days up until at least the end of 2015.  I
7    don't want to ask you every month, every year,
8    every day between those two times.
9    Is that your opinion?
10   A    Yes.
11   Q    All right.  In your opinion, what was
12   the precise regulatory vehicle that Accord
13   Healthcare, Inc. should have used to either apply
14   for or effectuate the change in label that you
15   believe should have been made?
16   A    So with the caveat that there are many
17   additional routes to communicate new safety
18   information about patients and providers in
19   addition to the label, the most appropriate route
20   would have been what we discussed before, which is
21   a changes being effected supplement.
22   Q    Can you be specific about exactly which
23   regulation, including the subpart?
24   MR. FRAXEDAS:  Object to form.
25   THE WITNESS:  So I believe I'm –

Page 313

David B. Ross, M.D., Ph.D., M.B.I.

1    subject to checking the exact, the exact
2    citation, I would say it is three – 21
3    C.F.R. 314.70(c)(6) I believe is the correct
4    citation for that.  If I'm – I may have the
5    actual letter, construing of letters and
6    numbers, I don't want to . . .
7    BY MR. MORIARTY:
8    Q    This is of vital importance to our
9    client, Accord, to know exactly which regulation
10   you believe – so you said "21 C.F.R. 314.70," and
11   then I could not hear the subparts after that that
12   you said.
13   A    I, I understand, and I want to be clear.
14   What I'm referring to is the regulation that
15   describes changes being effected.
16   Q    Yes, I understand that.  I'd like to
17   know exactly which subpart.
18   What are you looking at, Doctor?
19   A    I'm just actually looking at the exact
20   citation that you want in the C.F.R. to make sure
21   I'm getting it right.
22   Q    Okay.  That's fine.  I just don't know
23   what you're looking at, and I want to know what
24   you're looking at.

Page 314

David B. Ross, M.D., Ph.D., M.B.I.

1    A    Okay, so – and this would be – let's
2    see.  21 C.F.R. 314.70(c)(6)(III)(A).
3    Q    All right.  What is the basis for your
4    opinion that Accord Healthcare, Inc. should have
5    initiated that process on or immediately after 90
6    days from June 8, 2011?
7    A    So to clarify, I say that it should have
8    been done within the 90 days –
9    Q    Oh, okay.
10   A    – from the date of the first required
11   periodic safety update report.
12   Q    So sometime within June 9 through the
13   next 90 days?
14   A    June 9 of 2011, correct.
15   Q    The day after the label was approved by
16   FDA, it's your opinion that Accord Healthcare,
17   Inc. had a duty to initiate a change to it,
18   correct?
19   MR. FRAXEDAS:  Object to form.
20   THE WITNESS:  No, sir.  That's not
21   what I said.
22   BY MR. MORIARTY:
23   Q    You tell me what you said, because that
24   sure sounded like what you said.

Page 315

1    David B. Ross, M.D., Ph.D., M.B.I.
2    A   No.
3        MR. FRAXEDAS:  Object to form.
4        THE WITNESS:  What I said was that
5    during the 90-day period "beginning" June 9,
6    was what I was referring to.  I was not
7    saying "on" June 9.
8    BY MR. MORIARTY:
9    Q   No, but you're saying that the duty to
10   do this started on June 9, correct?
11   A   I need some clarity here, because we're
12   talking about two different things.  You're
13   talking about a duty – and I understand that's an
14   important issue here – versus when it should have
15   been done, which is related, obviously, but not
16   the same, so which are you asking me about?
17   Q   Well, what's the difference?  Aren't you
18   testifying as a regulatory expert that they had a
19   duty to do it?
20       MR. FRAXEDAS:  Object to form.
21       THE WITNESS:  Sorry.  Go ahead.
22       MR. FRAXEDAS:  No, no.  Go ahead.
23   I objected.
24       THE WITNESS:  Okay.  So you're
25   asking me not just about the duty, but

Page 316

1    David B. Ross, M.D., Ph.D., M.B.I.
2    actually executing that as well, so I'm just
3    asking for clarity on which you are asking
4    about.  When did the duty begin or when
5    should they have executed it by?
6    BY MR. MORIARTY:
7    Q   Well, you're saying that the duty begins
8    June 9, 2011, correct?
9    A   That is correct.
10   Q   And they should have executed that duty
11   on June 9, 2011 or in the next 89 days, correct?
12   A   I'm not saying it should have been done
13   by June 9.  I am saying that it should have been
14   done by the date of the first periodic safety
15   update report.
16   Q   But you are saying the duty – the clock
17   on the duty began to run June 9, 2011?
18   A   I, I'm not saying the clock.  I'm saying
19   like any other NDA, post – by definition,
20   post-marketing responsibility begin for any NDA
21   holder, including Accord, immediately after
22   approval.  There's no gap.  It's not unique to
23   Accord.  It's true for any NDA holder.
24   Q   Okay.  Doctor, I'm not saying – I'm not
25   asking you who it applies to.  I'm trying to get a

Page 317

1    David B. Ross, M.D., Ph.D., M.B.I.
2    date.  My client is entitled to know when they had
3    this duty and when you believe they violated the
4    duty.
5        So it sounds to me like what you're
6    saying is that duty started on June 9, and they
7    had from between June 9 and the next 89 days after
8    June 9 to put it into effect; is that correct?
9        MR. FRAXEDAS:  Object to form.
10       THE WITNESS:  Again, let me restate
11   what I said, and, respectfully, I did answer
12   your question.  I said for any NDA holder,
13   post-approval obligations begin upon
14   approval.  Accord had its NDA approved on
15   June 8; therefore, they began immediately on
16   approval, so yes, that would be June 9.
17   That's a simple –
18   BY MR. MORIARTY:
19   Q   When, in your opinion –
20   A   – a simple –
21   Q   When, in your opinion – when, in your
22   opinion, did Accord first violate its duty to
23   update the label?
24   A   So again, as I said previously, the
25   label should have been updated to reflect the

Page 318

1    David B. Ross, M.D., Ph.D., M.B.I.
2    available information regarding permanent alopecia
3    no later than the date on which the first periodic
4    safety update report was to be submitted, which is
5    90 days after approval.
6    Q   Okay.  Now, what is the basis for your
7    opinion that this duty was triggered on June 9,
8    2011?
9        MR. FRAXEDAS:  Object to form.
10       THE WITNESS:  The basis – sorry.
11   So the basis is first that, as explained in
12   21 C.F.R. 314.80 – excuse me.  Paragraph
13   46 and following.  Sorry.  21 C.F.R.
14   314.80(a).  That, that states what the
15   obligations are for an NDA holder.
16   BY MR. MORIARTY:
17   Q   Okay.  That's the pharmacovigilance,
18   correct?  Point 80 is the pharmacovigilance
19   obligation, right?  Post-marketing reporting of
20   adverse drug experiences; is that correct?
21   A   It's reporting, but pharmacovigilance,
22   as I explain elsewhere in my report, is broader
23   than that.
24   Q   I understand, but what facts about
25   docetaxel and Accord triggered the duty on June 9,

Page 319

David B. Ross, M.D., Ph.D., M.B.I.

1   2011?
2   
3       A   Their NDA was approved.
4       Q   What facts regarding Accord Healthcare,
5   Inc. and docetaxel triggered the duty to change
6   the label?
7       A   Number one, that duty began when the NDA
8   was approved.  Two, 21 C.F.R. 201.57 provides --
9   let me refer to my report here -- that --
10      Q   I didn't say anything.  I'm waiting for
11  your answer.
12      A   Okay.  Provides -- I'm citing 21 C.F.R.
13  201.57(c)(6) -- that the label must be updated if
14  there is -- as soon as there is a reasonable
15  evidence of a causal association, and in this case
16  there was reasonable evidence of a causal
17  association between docetaxel and the occurrence
18  of permanent alopecia -- I say in my report
19  "irreversible alopecia" -- well before this date,
20  and --
21      Q   Are you done?
22      A   I'm, I'm sorry.  You asked for the
23  facts, and I'm just telling you, and as I detail
24  in my report, there was ample information
25  available to all of the NDA holders.  This is

Page 320

David B. Ross, M.D., Ph.D., M.B.I.

1   detailed in Dr. Madigan's report and Dr. Feigal's
2   report, that that information existed and was
3   available to them, and some of the information had
4   been available for years.
5   
6       So those are the facts.
7       Q   And do you believe that 21 C.F.R. 201.57
8   contains the standard that Accord needed to follow
9   in order to trigger the obligation to file a CBE
10  under 21 C.F.R. 314.70?
11      MR. FRAXEDAS:  Object to form.
12      THE WITNESS:  Yes.
13  BY MR. MORIARTY:
14      Q   Does 21 C.F.R. 314.7 -- let me withdraw
15  that question.
16      All right.  So you told us that there
17  was knowledge of this causal association prior to
18  June 2011, according to the reports of Madigan,
19  Feigal and Plunkett, and that this information was
20  known already by June of 2011, correct?
21      A   No.  Sorry.  That is not what I said.
22      THE REPORTER:  Was there an
23  objection there?  If there was, I didn't hear
24  it.
25      MR. FRAXEDAS:  Yes.  I objected to

Page 321

David B. Ross, M.D., Ph.D., M.B.I.

1   
2   form.
3   BY MR. MORIARTY:
4       Q   I'm trying to clarify, Doctor.  I want
5   to know -- okay.  You've told me what regulation
6   you believe applied, and then I was asking about
7   facts, and when I asked you about facts, you said
8   that per the reports of Madigan, Feigal and
9   Plunkett, by June of 2011 it was already known
10  that there was a causal association between
11  docetaxel and an increased risk of PCIA.
12      Isn't that what you said?
13      A   No, sir.  What I said was --
14      MR. FRAXEDAS:  Object to form.
15  BY MR. MORIARTY:
16      Q   I --
17      A   Sorry.  Go ahead.  What I said was --
18      THE REPORTER:  Wait a minute.
19  Counsel, I did not hear the question at all.
20  For some reason, Mr. Moriarty, you were
21  completely silent on that question, so I
22  don't know if the mute got accidentally
23  touched.
24      MR. MORIARTY:  Okay.  I need one
25  minute to look at my notes, and you can stay

Page 322

David B. Ross, M.D., Ph.D., M.B.I.

1   
2   on the record.
3       THE REPORTER:  Okay, but you heard
4   what I said, that I, I didn't get whatever it
5   was you said?
6       MR. MORIARTY:  I'm looking at my
7   notes.  I am not listening to you at this
8   very moment, but I will listen to you when I
9   come back.
10      All right.  I'm trying to figure
11  out what the issue is here, so, Laurie, could
12  you go back?  I asked him a question about
13  what were the facts, and he answered the
14  question based on 21 C.F.R. 201.57(c)(6), and
15  then he went on to talk about Madigan, Feigal
16  and Plunkett.  I would like you to read that
17  answer back, please.
18      (Whereupon, reporter reads
19  requested material.)
20  BY MR. MORIARTY:
21      Q   Doctor, did you listen to her read back
22  your answer?
23      A   I did.
24      Q   Can you tell me what information it was
25  that was available to the NDA holders, some of

Page 323

```
 1        David B. Ross, M.D., Ph.D., M.B.I.
 2   which was available for years?  What information
 3   are you referring to?
 4        A   Certainly.  So I'm simply, again,
 5   because I want to make sure I am quoting it
 6   accurately, going to the C.F.R.
 7        So the information I'm referring to
 8   constitutes -- and this is -- I'm quoting directly
 9   from, from the reg, from 201.57.
10        Q   Before you take off on the reg, what I'm
11   asking about is the facts that were available to
12   the NDA holders, because you just referred to
13   facts were available to them, some for years.
14   What facts are you talking about?
15        A   Okay.  Again, I'm -- what I'm saying is
16   the facts constituted reasonable evidence of a
17   causal association.  That's number one.
18        You say what facts.  Dr. Feigal and
19   Dr. Madigan's analysis point to the increase of
20   published studies showing an increase in risk of
21   permanent alopecia, or PCIA, among other things,
22   as reviewed by Dr. Feigal.
23        And I'm not saying this is a whole
24   universe, but going back to 2000, there were
25   signals in the FAERS database as early as 2000,
```

Page 324

```
 1        David B. Ross, M.D., Ph.D., M.B.I.
 2   showing that there was reasonable evidence -- part
 3   of the totality of the evidence, that there was
 4   reasonable evidence in causal association.
 5        So that's in part what I'm referring to.
 6   That's described further in Dr. Feigal's report
 7   and Dr. Madigan's report, and, as I mentioned
 8   previously, Dr. Plunkett's report.
 9        Q   All right.  So you said published
10   studies of an increased risk and signals in the
11   FAERS database.
12        A   Among -- sorry.  Please go ahead.
13        Q   Well, I don't want "among other things."
14   I want all the things.
15        A   So --
16        Q   If you are on Feigal and Madigan, just
17   tell me what they said.
18        A   Sure.
19        MR. FRAXEDAS:  Object to form.
20   BY MR. MORIARTY:
21        Q   Tell me what you're relying on from
22   Feigal and Madigan of the other things.  I want to
23   know them all, not just examples.  You've already
24   told us the published studies and signals in the
25   FAERS database.
```

Page 325

```
 1        David B. Ross, M.D., Ph.D., M.B.I.
 2        MR. FRAXEDAS:  Object to form.
 3        THE WITNESS:  Let me again refer
 4   back to my report, and I list the facts that
 5   you were asking about there in paragraph 91.
 6   BY MR. MORIARTY:
 7        Q   If you're referring to your report,
 8   please tell us what paragraph.
 9        A   It's paragraph 91 --
10        Q   Okay.
11        A   -- and following.
12        Q   So Doctor, when you say "paragraph 91
13   and following," for example, at page 30 -- or I'm
14   sorry -- footnote 36, you list some citations, but
15   most of the -- and later on the page you have one
16   article, but mostly you are quoting Madigan and
17   Plunkett, correct?
18        A   I'm referring and relying on their
19   reports.
20        THE REPORTER:  I'm referring what?
21   I'm referring what?
22        THE WITNESS:  I'm sorry.  Referring
23   and relying -- referring to and relying on
24   their reports.
25
```

Page 326

```
 1        David B. Ross, M.D., Ph.D., M.B.I.
 2   BY MR. MORIARTY:
 3        Q   All right.  Did you ever run your own
 4   analysis of the FAERS database?
 5        A   With regard to this issue, no.
 6        Q   Did you, did you see anything in the
 7   Accord PADERs to which you refer in your list of
 8   documents reviewed to indicate there were any more
 9   than one or two adverse events regarding
10   persistent alopecia?
11        MR. FRAXEDAS:  Object to form.
12        THE WITNESS:  Would you repeat the
13   question again?  I'm sorry.  I want to make
14   sure I got the, got it completely.
15   BY MR. MORIARTY:
16        Q   In your list of documents reviewed,
17   which is Exhibit 10, you list Accord docetaxel
18   PADERs marked as exhibits to a deposition of an
19   Accord Healthcare, Inc. witness.  I assume you
20   reviewed those PADERs as part of your analysis of
21   this case, correct?
22        A   Yes.
23        Q   How many adverse event reports were
24   there, to Accord, of persistent alopecia following
25   the use of docetaxel used either alone or in
```

Page 327

1        David B. Ross, M.D., Ph.D., M.B.I.
2   combination with other chemotherapeutic agents?
3        A   So with the caveat – I say this in my
4   report quite explicitly, that pharmacovigilance
5   does not consist of simply tallying up events and
6   passing them on to the FDA.  I'm not sure that I
7   saw any –
8        Q   Okay.
9        A   – reports prepared by Accord.
10       Q   Is it your testimony that Accord had an
11  obligation to analyze the entire FAERS database on
12  an ongoing basis, starting June 9, 2011?
13       MR. FRAXEDAS:  Object to form.
14       THE WITNESS:  That is the
15   responsibility for any NDA holder, so Accord
16   would –
17  BY MR. MORIARTY:
18       Q   Can you –
19       A   – fall under.
20       Q   Okay.  Can you cite to me a regulation
21  or guidance which says or suggests that that is
22  the case?
23       A   Certainly.  I mean this was – I just
24  gave in my report – sorry.
25       MR. FRAXEDAS:  Go ahead.

Page 328

1        David B. Ross, M.D., Ph.D., M.B.I.
2        THE REPORTER:  Was there an
3   objection?
4        THE WITNESS:  So my report on
5   the page numbers –
6        MR. FRAXEDAS:  Yes.  Object to the
7   form.
8        THE WITNESS:  – but this is from
9   paragraph 57, footnote 18.  I refer to the
10   fundamental guidance that was issued or
11   promulgated in 2005 by FDA on good
12   pharmacovigilance practices.
13  BY MR. MORIARTY:
14       Q   And somewhere in that document, if I
15  review it, I will find a statement or suggestion
16  about an ongoing duty to review the entire FAERS
17  database –
18       MR. FRAXEDAS:  Object to form.
19  BY MR. MORIARTY:
20       Q   – by a 505(b)(2) holder?
21       A   It actually refers to NDA holders in
22  general, but I'm – except for the guidances that
23  specifically are titled 505(b)(2), I have not run
24  across guidances with regard to safety reporting
25  that make any distinction between traditional and

Page 329

1        David B. Ross, M.D., Ph.D., M.B.I.
2   505(b)(2) NDA holders.
3        Q   All right.  Doctor, so if I understand
4   you correct, your testimony correctly, any NDA
5   holder would have had an ongoing obligation, after
6   approval, to conduct complete FAERS database
7   analyses in their various duties
8   under the regulations; is that correct?
9        MR. FRAXEDAS:  Object to form.
10       THE WITNESS:  I don't believe that
11   I used the word "complete."  They have the
12   responsibility to conduct appropriate
13   pharmacovigilance activities.  Examining
14   FAERS, which is – as I mentioned, FDA
15   releases data files quarterly.  They're
16   available to people all over the world.  So
17   that is an obligation that NDA holders have,
18   beginning with approval, and that, in
19   general, are aware of when they submit their
20   application.
21  BY MR. MORIARTY:
22       Q   And are you saying that when Accord
23  started with this duty on June 9, for example, of
24  2011, that an analysis of the FAERS database would
25  have included retrospective data as well as going

Page 330

1        David B. Ross, M.D., Ph.D., M.B.I.
2   on into the future contemporaneous data?
3        A   That is correct.
4        Q   And the guidance you cite at footnote 18
5   addresses that?
6        A   I'm – I'd have to look at it.  Simply
7   saying – it does not make scientific sense,
8   though, to say, well, we're only going to look at
9   things going forward, and we're not going to look
10  at anything that came before.  That makes less
11  than no sense.  That is accumulated data that's
12  available, and you need to examine it.
13       Again, they're relying on the NDA
14  holder, the NDA traditional one, for the agency's
15  findings of safety and efficacy at the time of
16  approval, but there's nothing that says they can
17  rely on it for post-marketing safety.
18       Q   Okay.  So what you're telling us,
19  hypothetically it could happen that a company
20  could get its drug and label approved on day one,
21  and on day two it could do some research and find
22  all sorts of information that would trigger the
23  duty to change the label pretty much immediately,
24  correct?
25       A   That is not what I said.

Page 331

David B. Ross, M.D., Ph.D., M.B.I.

1

2        MR. MORIARTY:  Okay.  All right.  I
3   want to ask you about some things that
4   happened at the end of 2015.
5        So, Julie, if you could upload our
6   number 10.  We're going to mark it as Exhibit
7   15.
8        (Exhibit 15 was marked for
9        identification.)
10  BY MR. MORIARTY:
11  Q   Do you see Exhibit 15 there on the
12  screen?
13  A   I do.
14  Q   At least according to your list of
15  documents reviewed, this Accord document is not
16  something you looked at; is that fair to say?
17  A   No.  I actually believe this is listed
18  among the documents that I reviewed.
19  Q   Find it.  Find it, please.
20  A   I certainly will do my best.  That is
21  Bates number –
22  Q   Use the document.  Go ahead.
23      THE REPORTER:  I'm sorry.  What was
24  the question?
25      THE WITNESS:  I'm sorry.

Page 332

David B. Ross, M.D., Ph.D., M.B.I.

1

2   BY MR. MORIARTY:
3   Q   Where is it on Exhibit 10?
4   A   If you would give me a minute,
5   Mr. Moriarty, I will do my best to find it.
6   Q   Are you looking for the document or
7   Exhibit 10?
8   A   Well, right now I only have Exhibit 15
9   in front of me.
10      MR. MORIARTY:  Do you want to put
11  up Exhibit 10, Julie?
12  BY MR. MORIARTY:
13  Q   Doctor, we're going to put up Exhibit 10
14  for you.
15  A   Okay.
16  Q   This is your final list of documents
17  reviewed.  Please look at page 1.  Let us know
18  when you've looked at page 1.
19  A   I have looked at it.
20  Q   Is the – is Exhibit 15 somewhere on
21  page 1 of your list of documents reviewed?
22  A   If we could go to the next page.
23  Q   Is it on page 2?
24  A   No.  If you could please continue.
25  Q   Is it on page 3?

Page 333

David B. Ross, M.D., Ph.D., M.B.I.

1

2   A   Okay.  If you could allow me to just
3   look at the list under XIV.
4   Q   Roman numeral XIV is what I believe
5   you're referring to.
6   A   That is correct.  I believe that it is
7   in this list, one of the – most likely the new
8   drug application, the third bullet, so if you will
9   give me a minute, I will try and tell you which of
10  these long strings of numbers represents the form
11  356h.
12  Q   All right.  So when you were talking
13  about the third bullet under Roman numeral XIV,
14  all it says there is "new drug application."
15  You're talking now about something that happened
16  long after the NDA was approved.
17  A   No, sir.
18  Q   Exhibit, Exhibit 15 is a CBE document –
19  A   I will –
20  Q   – pertaining to docetaxel.
21      THE REPORTER:  You're both
22  talking – you're both talking at the same
23  time.  I did not get the last exchange at
24  all.
25      Mr. Moriarty, you said "Exhibit 15

Page 334

David B. Ross, M.D., Ph.D., M.B.I.

1

2   is a CBE document," and I didn't get anything
3   after that.
4       MR. MORIARTY:  He wants to see
5   Exhibit 15, so we're putting it back up.
6   BY MR. MORIARTY:
7   Q   When it comes up, Dr. Ross, please look
8   at the upper right-hand corner of the document for
9   the date of submission, 12/23/2015.
10      Do you see that?
11  A   I do.
12  Q   All right.  This is not part of the
13  original NDA application, is it?
14  A   I do not see a date stamp on it from the
15  CDER document room, but assuming this is –
16  this would not be the original NDA.  I apologize.
17  I leaped to the conclusion this was the 356h
18  submitted with the original NDA, so I misspoke.
19  Q   I want to go to the second page of this
20  document, Doctor.  Look in the upper right-hand
21  corner.  Does it say "CBE" with a check box next
22  to it?
23  A   Yes.
24      MR. MORIARTY:  Okay.  Now I want to
25  show you Exhibit 16.

Page 335

1        David B. Ross, M.D., Ph.D., M.B.I.
2            (Exhibit 16 was marked for
3            identification.)
4    BY MR. MORIARTY:
5        Q    You see this is on Accord letterhead?
6        A    Right now it's still not clear.
7        Q    Do you see the exhibit?
8        A    I see the first, the first page.
9        Q    Okay.  It's on Accord letterhead,
10   correct?
11       A    It appears to be.
12       Q    And the date is December 30, 2015?
13       A    Is that a question?
14       Q    Is the date December 30, 2015?
15       A    Yes.
16       Q    And I have looked at your list of
17   documents reviewed, and nowhere do I find this
18   document.
19           Do you believe you've seen this before
20   today?
21       A    I honestly don't know.
22       Q    All right.  I want to ask you some
23   questions about this document.
24           In the bolded section after the address,
25   it says "Special Supplement - Changes Being

Page 336

1        David B. Ross, M.D., Ph.D., M.B.I.
2    Effected [CBE]," correct?
3        A    Yes.
4        Q    Then in the first sentence it says,
5    "Pursuant to 21 C.F.R. 314.70(c)," and it goes on
6    to discuss what Accord Healthcare, Inc. is
7    submitting, correct?
8        A    Yes.
9        Q    The next paragraph, the first sentence
10   refers, does it not, to Taxotere's label having
11   just been revised and approved as of the middle of
12   December 2015, does it not?
13           MR. FRAXEDAS:  Object to form.
14           THE WITNESS:  Yes.
15   BY MR. MORIARTY:
16       Q    And you know from your review of the
17   materials that that is in the general time period
18   in which Sanofi applied under the CBE regulations
19   and was granted permission by FDA to change its
20   label regarding the alopecia section of the
21   adverse events, correct?
22           MR. FRAXEDAS:  Object to form.
23           THE WITNESS:  You mean that they --
24   you mean, you mean they approved the labeling
25   supplement?  Is that -- that, that is what

Page 337

1        David B. Ross, M.D., Ph.D., M.B.I.
2    FDA did.
3    BY MR. MORIARTY:
4        Q    Okay, and then in the boxes underneath
5    that, in the first four boxes under "Documents,"
6    Accord refers to its proposed package insert,
7    labeling text, package insert, package insert.
8    They used the word "proposed" four times out of
9    the five boxes, correct?
10       A    They do.
11           MR. MORIARTY:  All right.  Let's go
12   to paragraph 17 [sic].  I'm sorry.  Exhibit
13   17.
14           (Exhibit 17 was marked for
15           identification.)
16   BY MR. MORIARTY:
17       Q    Dr. Ross, we've marked this as Exhibit
18   17, and I would like to go to the last page before
19   I question you about it.  I don't know why, but
20   this is how FDA does it.  This is the date that
21   this person from FDA signed and sent this letter,
22   correct?
23       A    I don't know when it was sent, but in
24   terms of the electronic archiving system that FDA
25   uses, that would be the date, the date stamp on

Page 338

1        David B. Ross, M.D., Ph.D., M.B.I.
2    it.
3        Q    Okay.  February 5, 2016?
4        A    Yes.
5        Q    Let's go back to the first page.  You
6    see in the upper right-hand corner, it says -- and
7    this is a letter from FDA to Accord Healthcare,
8    Inc. in North Carolina, correct?
9        A    Yes.
10       Q    And it says to the right of that "CBE
11   Supplement - Acknowledgement," correct?
12       A    Yes.
13       Q    Down in the -- under the date of
14   receipt, after talking about what Accord proposes,
15   does FDA say "Unless we notify you within 60 days
16   of the receipt date that the application is not
17   sufficiently complete . . . we will file the
18   application on February 28, 2016, in accordance
19   with," and it cites a paragraph of the C.F.R.
20           Am I -- are we on the same page here?
21       A    Yes.
22       Q    And it says, "If the application is
23   filed, the goal date will be June 30, 2016"; is
24   that correct?
25       A    That is what it says.

Page 339

1  David B. Ross, M.D., Ph.D., M.B.I.
2  Q  And the FDA did not immediately give
3  permission or approve Accord's proposed label
4  change, did it?
5  MR. FRAXEDAS:  Object to form.
6  THE WITNESS:  I don't, I don't
7  quite understand your question.
8  BY MR. MORIARTY:
9  Q  It's a simple question.  Based on this
10  letter, this was telling Accord that it did not
11  have permission or approval to immediately begin
12  implementing the label change and issuing it with
13  its packages, did it?
14  A  No, sir, that is incorrect.
15  MR. FRAXEDAS:  Object to form.
16  BY MR. MORIARTY:
17  Q  What is this letter – in your, in your
18  opinion, what is this letter saying?
19  A  I wouldn't say it's my opinion.  It's –
20  this is an FDA – this is not a prior – this is
21  acknowledging explicitly that it is not a prior
22  approval supplement, something that the
23  manufacturer can't do until FDA approves it.  It's
24  explicitly saying that it's not that.
25  It's a changes being effected

Page 340

1  David B. Ross, M.D., Ph.D., M.B.I.
2  supplement.  That is the opposite of what you're
3  saying.  This is a CBE supplement submitted under
4  21 C.F.R. 314.70(c), as I said before, and it
5  refers – it says in the regulations, this does
6  not need to be reviewed by FDA before it goes into
7  effect.
8  Q  What's the goal date?
9  A  Ah, the goal date.  So under the
10  Prescription Drug User Fee Act of 1992 and its
11  successive reenactment, applications that are sent
12  to the FDA, there is a side agreement to those,
13  uh, that legislation where FDA says we're going to
14  try and do 90 percent, review 90 percent of
15  particular kinds of applications within a certain
16  period of time.
17  So for labeling supplements – and I
18  don't know the details for whenever the PDUFA
19  version of this was.  What they're saying is we
20  will accept it for review, which is what they mean
21  by "file," as of February 28, 2016, and then they
22  are going to try and review it by June 30 of 2016.
23  That is what they mean by the action goal date,
24  but that has nothing to do with whether Accord
25  could implement it before.  This is a CBE-0

Page 341

1  David B. Ross, M.D., Ph.D., M.B.I.
2  supplement.  They could do it right away.
3  Q  Did FDA – in Exhibit 17, did FDA
4  approve the label change?
5  A  I, I don't know.
6  Q  Well, you've got the exhibit up on the
7  board.  Anywhere in this letter, did FDA tell
8  Accord Healthcare, Inc. that the first label
9  change was approved?
10  A  The only thing that calls for a changes
11  being effected is that the company can institute
12  it without prior approval.  That's, that's in the
13  regulation very explicitly.  There will be an
14  action letter at some point, hopefully by the
15  action goal date, saying that the application is
16  approved or not approved.  That's after the fact.
17  Q  So even though Sanofi had just updated
18  its label, and Accord was asking FDA or proposing
19  that it update its label in the exact same manner
20  regarding alopecia, you're saying that FDA is
21  basically in this letter saying you can do it, but
22  we're not telling you it's approved?
23  What are you saying?
24  MR. FRAXEDAS:  Object to form.
25  THE WITNESS:  It's – first off,

Page 342

1  David B. Ross, M.D., Ph.D., M.B.I.
2  there has to be some supplement associated
3  with a change in the label, whether it's
4  prior approval or it's changes being
5  effected.  There has to be something.
6  I mean that actually, you know,
7  could sometimes occur in the setting of an
8  NDA annual report, that that's how the label
9  change is effected, but, you know, this
10  letter – if, if the FDA – if you look at a
11  letter for a prior approval supplement where
12  it's acknowledging it, there will be text in
13  there – and I don't remember the exact
14  text – saying you can't change this until we
15  review it.  You don't see that here.
16  BY MR. MORIARTY:
17  Q  Is it your, is it your testimony in this
18  case that Exhibit 16 is exactly what Accord should
19  have done, except sooner, like back to 2011, use
20  that same vehicle?
21  MR. FRAXEDAS:  Object to form.
22  THE WITNESS:  Yes, that, that's –
23  the basis would not have been the same; that
24  is, a change in the Taxotere label; on – the
25  basis would have been, as I mentioned, the

Page 343

1      David B. Ross, M.D., Ph.D., M.B.I.
2  abundance of evidence from a variety of
3  sources described in my report, yes. I
4  mean -- and I'm not -- something to say it's
5  permanent alopecia, so yes, that is exactly
6  my contention.
7  BY MR. MORIARTY:
8      Q   I will get back to this subject in a
9  minute with the approval letter, but I want to go
10 to something else first, Dr. Ross.
11     Are you familiar with a clinical study
12 called PAX 702?  P-A-X, all caps.
13     A   I may have seen something about it.  It
14 does not ring a bell.  It does not mean that I
15 haven't seen something about it.
16     Q   Did you read the study and its results
17 yourself?
18     Doctor, you turned your camera off by
19 accident.
20     A   I'm, I'm still on the line here.  I'm
21 afraid it wasn't by accident.  It was probably one
22 of those HAL 9000 computers at work.  Just bear
23 with me.
24     THE VIDEOGRAPHER:  This is the
25 videographer.  Before you went off, you had

Page 344

1      David B. Ross, M.D., Ph.D., M.B.I.
2  been locking up on my end.  I don't know if
3  anybody else noticed it, but everybody else
4  was moving in their pictures, and yours was
5  locked up.
6      THE REPORTER:  I noticed it.
7      MR. FRAXEDAS:  Yeah, I noticed that
8  as well.
9      THE WITNESS:  Well, I was trying to
10 get the pavÈ doors open, I just want you to
11 know.  Hopefully I'll be back up in a minute
12 here.
13     I'm reconnected, but there's no
14 image available for anyone.
15     MR. MORIARTY:  I don't think you
16 feel comfortable answering my questions while
17 you're fiddling with the video, so let's just
18 go off the video record for a few minutes.
19     THE VIDEOGRAPHER:  2:18.  We're off
20 the video record.
21     (Whereupon, a short recess was
22 taken.)
23     THE VIDEOGRAPHER:  2:29.  We're
24 back on the record.
25

Page 345

1      David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3      Q   All right, Doctor, the question that was
4  pending is:  Did you ever read the study results
5  from the study called PAX 702?
6      A   I don't recall doing so.
7      Q   Do you know who gave that study result
8  to FDA for exam?
9      A   I don't.
10     Q   Would it matter to your opinions in this
11 case?
12     A   I, I would need to know more
13 information.
14     Q   Okay.  You've heard of a study called
15 TAX316, have you not?
16     A   Yes.
17     Q   Did you read the results of that study
18 yourself?
19     A   I just want to make sure.  I know it's
20 mentioned in my report.  I want to just see
21 exactly how I cite it.  I believe I did, but I
22 just want to make sure that I'm . . .
23     THE REPORTER:  Did you say PAX316
24 or TAX316?
25     THE WITNESS:  T-A-X.  Tango, alpha,

Page 346

1      David B. Ross, M.D., Ph.D., M.B.I.
2  X-ray.
3      I believe, at the very least, I
4  certainly looked at them.  This is described
5  in paragraph 96.
6  BY MR. MORIARTY:
7      Q   Does that mean you read it yourself, or
8  could Madigan, Feigal or Plunkett have read it,
9  and you just relied on them?
10     A   No.  I certainly looked at the --
11 Sanofi's summary of product characteristics, and
12 that I reviewed myself about the, from PCIA data
13 and TAX316.
14     Q   Do you know who gave the interim results
15 of TAX316 to the FDA?  Do you know?
16     A   I do not.
17     Q   Do you know when it was given to FDA?
18     A   But when you say -- yes.  What
19 specifically are you talking about?  Again, what
20 dataset are you describing here?
21     Q   There were interim results that were
22 available by March of 2004.  There were final
23 results available by September of 2010.  Do you
24 know what company gave that data to FDA or when
25 they gave it to FDA?

Page 347

David B. Ross, M.D., Ph.D., M.B.I.
1
2      MR. FRAXEDAS:  Object to form.
3      THE WITNESS:  I, I honestly don't
4  know.
5  BY MR. MORIARTY:
6      Q    Is it significant to your opinions?
7      A    Is it significant to my opinions?
8      Q    Is the fact of when that data was given
9  to FDA significant to your opinions?
10      MR. FRAXEDAS:  Object to form.
11      THE WITNESS:  I'm – the question I
12  analyzed was not when things became available
13  to FDA.  It's when it became available to the
14  NDA holders.  That's the regulatory question
15  I analyzed.
16  BY MR. MORIARTY:
17      Q    Okay.  So as far as you know, the
18  results, the interim and then final results of
19  TAX316 were available for years to FDA?
20      A    I'm sorry.  Did you say "to FDA" or
21  "through FDA"?
22      Q    To FDA.
23      A    So your question is – as far as I know,
24  they were available for years to FDA.  I'm going
25  to, I'm going to accept that.

Page 348

David B. Ross, M.D., Ph.D., M.B.I.
1
2      Q    Okay.  There was a study called GEICAM
3  9805.  I referred to that earlier.  Do you know
4  who gave it to FDA or when?
5      MR. FRAXEDAS:  Object to form.
6      THE WITNESS:  With the caveat that
7  again my analysis was not focused on when
8  information became available to FDA, it was
9  when it became available to NDA holders, I
10  don't know.
11  BY MR. MORIARTY:
12      Q    Let me ask you about some medical
13  articles that Drs. Madigan, Feigal and Plunkett
14  referred to, and then I believe you referred to
15  them in your report as footnotes.
16      There is a Dr. Sedlacek,
17  S-E-D-L-A-C-E-K, who made a presentation in 2006.
18  Do you know when the data underlying his paper was
19  given to FDA or who gave it to FDA?
20      MR. FRAXEDAS:  Object to form.
21      THE WITNESS:  So again, with the
22  caveat that my analysis focused on the
23  availability of new information to the NDA
24  holders, not the FDA, no, I don't know.
25

Page 349

David B. Ross, M.D., Ph.D., M.B.I.
1
2  BY MR. MORIARTY:
3      Q    Why do you have to keep giving the
4  caveat?  Can't you just answer no, you don't know?
5      A    Well, respectfully, no, because I –
6      Q    I'm asking do you think it's
7  significant.  You're interpreting this and saying
8  it's misleading so you can make a speech.  I'm
9  asking very simple questions, Doctor.
10      Dr. Prevevas, P-R-E-V-E-V-A-S, published
11  an article in 2009.  Do you know who gave it to
12  FDA or when?
13      MR. FRAXEDAS:  Object to form.
14      THE WITNESS:  So with the caveat
15  that every question I addressed is when
16  information became available to the NDA
17  holders, no, I don't know when it was given
18  to the FDA.
19  BY MR. MORIARTY:
20      Q    Doctor Bourgeois, B-O-U-R-G-E-O-I-S,
21  wrote an article in 2010.  Do you know who gave
22  that information to FDA or when?
23      MR. FRAXEDAS:  Object to form.
24      THE WITNESS:  With the caveat that
25  my regulatory analysis, the regulatory

Page 350

David B. Ross, M.D., Ph.D., M.B.I.
1
2  question that I needed to answer is when it
3  became available to NDA holders, no, I don't
4  know.
5  BY MR. MORIARTY:
6      Q    Maybe to shortcut this, Doctor, do you
7  know when or who gave the following three medical
8  articles to FDA?  Dr. Talen's 2010 article,
9  Dr. Mitevasvs, M-I-T-E-V-A-S-V-S, article in June
10  of 2011, Dr. Kluger's 2012 article; do you know
11  who gave it to FDA or when?
12      MR. FRAXEDAS:  Object to form.
13      THE WITNESS:  Same answer as before
14  with the caveat.
15      MR. MORIARTY:  Ms. Callsen, would
16  you do me a favor, please, and put up our tab
17  7?  That's Exhibit 18.
18      (Exhibit 18 was marked for
19  identification.)
20  BY MR. MORIARTY:
21      Q    Doctor, I'm going to circle back to the
22  approval of the CBE, and I will represent to you
23  that the signature date from the FDA at the end of
24  this document is July 26, 2016.
25      Do you have any reason to dispute me on

Page 351

1        David B. Ross, M.D., Ph.D., M.B.I.
2   that?
3        A   I'm sorry.  Say the date one more time.
4        Q   Doctor, do you see the exhibit on your
5   screen?
6        A   I don't.  I'm sorry.
7        Q   Okay.  We have a technical issue.  Let
8   me see if I can ask some questions while we fix
9   our technical problems.  I'm going to have to log
10  back in.  It will take a minute, but I need to ask
11  about these.
12       Do you now see the document?
13       MR. FRAXEDAS:  There we go.  You
14  got him now.
15  BY MR. MORIARTY:
16       Q   All right.  This is the July 26, 2016
17  letter from FDA, and I believe you've seen this
18  and it's in your reviewed materials, correct?
19       A   I believe that is correct.
20       Q   All right, and it says in the second
21  paragraph -- from the beginning it just says when
22  FDA received certain information, and then it
23  says, "This Changes Being Effected supplemental
24  new drug application provides for revisions to
25  align with the current package insert for the

Page 352

1        David B. Ross, M.D., Ph.D., M.B.I.
2   Reference Listed Drug Taxotere."
3        Do you see that?
4        A   Yes.
5        Q   And in the next section it says, "We
6   have completed our review of the supplemental
7   application, as amended.  It is approved,
8   effective on the date of this letter, for use as
9   recommended in the enclosed, agreed-upon labeling
10  text."
11       Did I read that correctly?
12       A   Yes.
13       Q   All right.  So back in December when
14  Accord sent the proposal, is it, is it your
15  testimony that FDA expected Accord to immediately
16  implement the changes before sending out an
17  approval letter similar to the one in Exhibit 18?
18       MR. FRAXEDAS:  Object to form.
19       THE WITNESS:  No, that's not
20  exactly what I'm saying.
21  BY MR. MORIARTY:
22       Q   All right.  From a practical standpoint,
23  does it make sense for a pharmaceutical company to
24  order, print, pay for, and begin to use labels
25  that the FDA may later say are not approved or to

Page 353

1        David B. Ross, M.D., Ph.D., M.B.I.
2   suggest some revisions to it?
3        MR. FRAXEDAS:  Object to form.
4        THE WITNESS:  So again I'm -- let
5   me answer, but this -- respectfully, the
6   premise is that, oh, the FDA might turn us
7   down, and then we've got to pull everything
8   back.
9        I have never seen that happen, and
10  that's during my time at FDA and since,
11  unless, as I mentioned, there was a company
12  submitting something as a CBE supplement, and
13  the FDA said, no, wait a minute, wait, you're
14  understating things, and converted them to a
15  prior approval supplement.  Never seen that
16  happen.
17       So does it make sense?  Yes, it
18  does, because you're talking -- what you're
19  talking about is a nonexistent risk.  If FDA
20  says, you know, we think it should be phrased
21  like this, and it's not a major change,
22  they're not going to make them pull it all
23  back.  They're going to say at the next
24  printing, please change it.
25

Page 354

1        David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3        Q   Do you know what discussions and
4   amendments may have taken place between Accord
5   Healthcare, Inc. and FDA between December 30, 2015
6   and July 26, 2016?
7        MR. FRAXEDAS:  Object to form.
8        THE WITNESS:  No.
9        MR. MORIARTY:  Could you go to our
10  tab 23, please.
11       I'm going to have another exhibit
12  marked.  It's Exhibit 19.
13       (Exhibit 19 was marked for
14  identification.)
15  BY MR. MORIARTY:
16       Q   And Doctor, if you could turn to your
17  report while that's getting teed up, to paragraph
18  112.
19       All right.  So it says -- you're talking
20  about the variation you just testified about, the
21  authority to retroactively block CBE supplements,
22  and in paragraph 112 you say, "On the other hand,
23  manufacturers may consult with the FDA before
24  submitting a CBE supplement.  Based on my
25  background, education, training and experience,

Page 355

1      David B. Ross, M.D., Ph.D., M.B.I.
2  such prior consultation is unusual."
3      Do you see that?
4      A   I do.
5      Q   And you drop a footnote to, number 61,
6  an article by, coincidentally, a Dr. Agarwal.
7      Do you see that?
8      A   Yes.
9      Q   Did you read that article?
10     A   I did.
11     Q   Did you come up with this article, or
12  was it given to you, as part of your reliance, by
13  plaintiffs' counsel or someone other than
14  plaintiffs' counsel?
15         MR. FRAXEDAS:  Object to form.
16         THE WITNESS:  I believe that I
17     retrieved that article.
18  BY MR. MORIARTY:
19     Q   All right.  I have that article up as
20  Exhibit 19, and in the abstract it's talking about
21  a review of 106 505(b)(2) NDAs approved in a
22  basically two-year window of time, from 2010 to
23  2012.
24     Do you see that?
25     A   Well, it's a little bit small on my

Page 356

1      David B. Ross, M.D., Ph.D., M.B.I.
2  screen here.  Let me just try and blow it up a
3  little bit if I can.
4      Ah, here we go.  Okay.
5      Q   Doctor?
6      A   Yes.
7      Q   Did that zoom on your screen when I
8  zoomed it on mine?
9      A   Oh, maybe.  Hey, first off, let's –
10     Q   Go to the bottom, the bottom left of the
11  image screen, there's a magnifying glass.  If you
12  hit that, it will allow you to zoom in and make
13  the print bigger.
14     All right.  So among the 106 505(b)(2)s
15  approved from 2010 to 2012, that's the universe
16  that they are discussing in this article, correct?
17     A   I believe that's correct.  It's
18  excluding what are called "PEPFAR" applications.
19     Q   So I want to go to the third page of the
20  article.
21     Do you see where it says "Summary of the
22  Pre-Submission Interaction Information for the
23  505(b)(2) NDAs"?
24     A   Yes.
25     Q   And it says there, "Our survey indicated

Page 357

1      David B. Ross, M.D., Ph.D., M.B.I.
2  that among the 106 non-PEPFAR 505(b)(2) NDAs
3  approved between 2010 and 2012, the sponsors of 62
4  products," which is 58 percent of the number,
5  "engaged in a pre-submission interaction with the
6  Agency."
7      Do you see that?
8      A   Yes.
9      Q   So among this population of 505(b)(2)s
10  for this study, and these are NDAs, 58 percent
11  have pre-submission interaction with FDA, correct?
12     A   Yes.  I believe that is the basis for
13  that final sentence in paragraph 112.
14     Q   So you said that pre-submission,
15  basically pre-submission interaction was
16  "unusual," but it's more likely than not, isn't
17  it, to take place, according to the study you
18  cited?
19     A   So let me read the beginning of
20  paragraph 112.
21     "On the other hand, manufacturers may
22  consult with the FDA before submitting a CBE
23  supplement.  Based on my background, education,
24  training and experience, such prior consultation
25  is unusual."

Page 358

1      David B. Ross, M.D., Ph.D., M.B.I.
2      That refers to the first sentence, which
3  are CBE supplements.  I then go on to point out
4  that there's not a requirement to consult even for
5  more substantive applications, and I specifically
6  cite 505(b)(2)s, but the word "unusual" applies to
7  prior consultation with regard to CBE supplements.
8      Q   Do you have any statistics or articles
9  that support that statement?
10     A   I have my ten and a half years of
11  experience as an FDA medical officer.
12     Q   Okay, and you'd agree with me that this
13  article that you cited doesn't discuss CBEs at
14  all, correct?
15     A   Yes, I would agree with that.
16     Q   Doctor, have you made any independent
17  assessment in this case about which adverse events
18  are "serious" and "unexpected"?  And I'm referring
19  specifically to paragraphs 46 and 47 of your
20  report where you discuss the subject.  I just want
21  to know if you did an independent assessment of
22  that in this case.
23     A   I'm not sure what you mean by
24  "independent."
25     Q   Independent of your analysis of the

Page 359

1    David B. Ross, M.D., Ph.D., M.B.I.
2  Feigal, Madigan and Plunkett reports.
3    A  So I examined this issue, and it does
4  not depend on any specific adverse event report.
5    So an unexpected adverse event, by
6  definition, is one that is not included in the
7  label.  The definition of "serious" –
8    Q  That's what you said.  Hold on.
9    A  Please.  I'm sorry.  Please go ahead.
10  Yes.  The answer to your question is yes.  Sorry.
11    Q  What independent – so which, which
12  PADERs did you review – did you review the PADERs
13  and mark down somewhere which ones were serious
14  and unexpected?
15    A  I don't believe so.
16    Q  All right.  Let's talk about paragraphs
17  54 to 56, which generally cover the subject of
18  data mining, okay, and you refer specifically to
19  Bayesian, B-A-Y-E-S-I-A-N, data mining.
20    Is there a statute, regulation, or
21  guidance which informs pharmaceutical companies
22  that they need to use these techniques as part of
23  their pharmacovigilance?
24    A  So, yes.
25    Q  What statute, regulation or guidance

Page 360

1    David B. Ross, M.D., Ph.D., M.B.I.
2  addresses the use of these data mining techniques?
3    A  So the immediate one that I would point
4  to is the guidance which I previously cited on
5  good pharmacovigilance practices.
6    Q  I forget what footnote that was, but
7  we'll figure it out.
8    Is that the same guidance you answered
9  when I was asking you about the use of analyzing
10  the FAERS database?
11    A  When you say – what, what was the
12  specific question about FAERS?  I just don't –
13  I'm sorry.  I don't remember exactly –
14    Q  I was asking some questions about FAERS
15  and whether there was a statute, reg or guidance
16  which addressed that, and you referred to a
17  particular footnote in your report.
18    Are you now referring to the same
19  footnote and guidance?
20    A  So with the caveat that I don't exactly
21  remember, but I – I think I do, but I just want
22  to make clear.  Is this what you were referring
23  to?  This is the footnote.
24    Q  18.
25    A  I'm sorry.

Page 361

1    David B. Ross, M.D., Ph.D., M.B.I.
2    Q  Footnote 18.  Footnote 18 I believe is
3  what you referred us to.
4    A  So referring to paragraph 57, I provide,
5  as an example, the 2005 Pharmacovigilance
6  Guidance, and I provide citations in footnote 18.
7    Q  I'm asking whether there's a specific
8  statute, reg or guidance regarding the data mining
9  techniques that you discuss in paragraphs 54 to
10  56.
11    A  So with the caveat that regulations –
12  unless we're talking about specific drugs or
13  monographs – do not descend to that level of
14  granularity, I don't believe so.
15    I will say that there may be reference
16  to it in either the FDA Amendments Act of 2007 or
17  the committee reports that accompanied that
18  legislation.  I would have to see.  The other may
19  be covered or subsumed in the regulations,
20  specifically 314.3, but with the caveat that I
21  wouldn't expect that level of detail in a statute
22  or regulation, I don't know that there's anything
23  like this.
24    Q  Okay.  Did you run any of these data
25  mining techniques or programs as part of your

Page 362

1    David B. Ross, M.D., Ph.D., M.B.I.
2  workup in this case?
3    A  With the caveat that Dr. Madigan states
4  explicitly that he has not engaged in data mining
5  in his analysis, I did not do that myself.
6    Q  Do you know how to?
7    A  Do I know how to?
8    Q  How to run those data-mining techniques.
9  Do you have that software available to you,
10  whatever it takes?  Have you ever done it?
11    A  So there's multiple questions on the
12  table.  I have done it in the past, distant past.
13  I don't currently have that software, and it's
14  more than just a software.  It's also knowing how
15  to use it and frame the questions.  So I would not
16  feel comfortable conducting these kinds of
17  analyses on my own, but I know that general terms
18  how they're conducted.
19    Q  Now, the database to which you're
20  referring that should be searched, it's FDA's
21  database, isn't it?
22    MR. FRAXEDAS:  Object to form.
23    THE WITNESS:  If you're referring
24  to FAERS, that would be correct.
25

Page 363

1        David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3        Q    Well, in paragraphs 54 to 56 of your
4   report, I assume that you're suggesting that a
5   certain technique should have been used to search
6   a particular database.
7            Is it the FAERS database you believe
8   that should have been searched in the techniques
9   that you refer to here?
10       A    So that's not actually what I said.
11       Q    Well, let me put it to you a different
12  way:  Are you going to render opinions at the time
13  of trial that Accord violated some regulatory duty
14  if it did not employ the data mining techniques
15  that you discuss in paragraphs 54, 55, 56?
16           MR. FRAXEDAS:  Object to form.
17           THE WITNESS:  I, I do not cite
18  those as the kind of thing that Accord or any
19  of the defendants should or should not have
20  done.  I'm simply providing those as a
21  description of the kind of techniques that
22  are available.  I am not pointing to a
23  specific technique and saying they should
24  have done this.
25

Page 364

1        David B. Ross, M.D., Ph.D., M.B.I.
2   BY MR. MORIARTY:
3        Q    All right.  Now, before, we were talking
4   about the CBE regulation, 21 C.F.R. 314.70, and we
5   had both honed in on Subsection C.  Is there
6   another different regulation that in your opinion
7   Accord should have used to update its label
8   between 2011 and 2016, or is that the reg we need
9   to focus on?
10       A    That is one mechanism by which they
11  could have, if they had wished to, updated the
12  label.  It's not the only opportunity that they
13  had in terms of -- or regulatory obligation,
14  depending on, on exactly what their development
15  program looked like.
16       Q    Well, is 21 C.F.R. 314.70 the one that
17  you believe was required -- or that Accord was
18  required to follow for your opinions in this case?
19       A    So the regulations include that
20  201.57(c), regarding the need to update the label;
21  the description of what should be reported under
22  314.80 and 81, including reference to appropriate
23  guidances.
24       Q    Okay, Doctor, I think you misperceived
25  my question, and maybe it was a bad question.

Page 365

1        David B. Ross, M.D., Ph.D., M.B.I.
2            I just want to know the regulatory
3   vehicle.  21 C.F.R. 314.70 is what I look at as
4   the regulatory vehicle, the thing that Accord
5   needed to do to meet 301.57, okay?
6            So is there another regulatory vehicle
7   besides 314.70 that, in your opinion, Accord was
8   required to employ before it used the CBE
9   mechanism in 2015 and '16?
10           MR. FRAXEDAS:  Object to form.
11           THE WITNESS:  I want to try and --
12  the vehicle is not the same thing as the
13  duty.  Yea, vehicle, 314.70, is the mechanism
14  for complying with it.  Duty is ultimately in
15  21.57.
16           Another example of a vehicle, as I
17  mentioned before, would be labeling changes
18  that are put in effect in an NDA annual
19  report.
20           And then lastly, there are
21  regulations that mention the pre-IND meeting
22  that Accord had.  There are regulations on
23  safety reporting.  I believe that -- I
24  believe it's 21 C.F.R. 312.32, and FDA has
25  issued a guidance on that.

Page 366

1        David B. Ross, M.D., Ph.D., M.B.I.
2            So these are not, by the way,
3   mutually exclusive.  I'm really not --
4   BY MR. MORIARTY:
5        Q    Doctor, when a pharmaceutical company
6   wants to change the label, they go to 314.70;
7   that's the reg the FDA expects them to use to
8   change the label, correct?
9            MR. FRAXEDAS:  Object to form.
10           THE WITNESS:  For an approved drug,
11  that is the section titled "Supplements to an
12  Approved NDA."
13  BY MR. MORIARTY:
14       Q    All right.  Let's go to paragraph 75 of
15  your report.
16           And Jason, no insults intended, but
17  Dr. Ross is so unresponsive that we are going to
18  seek more time to complete this deposition.  We
19  can argue about that later.
20           MR. FRAXEDAS:  Yeah, we can, we can
21  talk about that another time.  Obviously, we,
22  we would disagree, but we can discuss that
23  later.
24  BY MR. MORIARTY:
25       Q    All right.  Doctor, are you at page 75?

Page 367

1        David B. Ross, M.D., Ph.D., M.B.I.
2     A   I'm at paragraph 75.
3     Q   I'm sorry.  Paragraph 75.
4     A   Yes.
5     Q   I want to read -- I want to deal with
6  the last two sentences, okay?  They're talking
7  about the difference between the labeling
8  requirements or the similarities between labels
9  are due entirely to the similarity between the
10  science underlying the approval, right?
11     A   Correct.
12     Q   The last sentence:  "In other words, the
13  drug labels are similar because they both make use
14  of the same 'full reports,' not because of
15  statutory and/or regulatory dictates," correct?
16     A   That's what I write in there, yes.
17     Q   All right.  So just from a practical
18  standpoint, if the, if the 505(b)(2)'s drug is
19  equivalent in its delivery system, its active
20  ingredients, in all the substantive ways, the
21  science in effect is what drives FDA to look at
22  sameness or similarities in the labels?  Is that
23  really what you're saying here?
24     A   With the understanding that I am not
25  addressing issues involving patents that might

Page 368

1        David B. Ross, M.D., Ph.D., M.B.I.
2  result in differences in intended use, yes.
3     Q   Okay.  In general, do you agree with the
4  belief and some statements by FDA that a 505(b)(2)
5  can rely to the fullest extent possible on what is
6  already known about a drug?
7     A   I--
8        MR. FRAXEDAS:  Object to form.
9        THE WITNESS:  I -- you've mentioned
10  this statement before.  I don't know truly
11  where it's drawn from or what the context is,
12  so I can't answer that question.
13  BY MR. MORIARTY:
14     Q   Okay.  Give me a minute to talk to
15  Ms. Callsen about something in my notes, okay?
16     A   Okay.
17     Q   Stay on the record.
18        All right, Doctor, I think we found what
19  we need.  This will be Exhibit 20.
20        (Exhibit 20 was marked for
21        identification.)
22  BY MR. MORIARTY:
23     Q   All right.  When you were at FDA between
24  1996 and 2006, did you have anything to do with
25  writing any part of this document which we refer

Page 369

1        David B. Ross, M.D., Ph.D., M.B.I.
2  to as the "response to the citizen petitions"?
3     A   I don't believe so.
4     Q   All right.  Are you familiar with it?
5     A   It's a 38-page document.  I, I have read
6  it, but that's the best I can say.
7     Q   Okay.  Let's look at page 3.
8        Doctor, is this -- I mean this is an
9  official pronouncement of FDA on issues
10  surrounding 505(b)(2)s, is it not?
11     A   This is a letter, if I remember
12  correctly, signed by either Janet Woodcock or Doug
13  Throckmorten.  Is that, is that correct?
14        THE REPORTER:  You said "Jana"
15  Woodcock or Doug something?
16        THE WITNESS:  Janet, J --
17        THE REPORTER:  Woodcock?
18        MR. MORIARTY:  Yes, Woodcock, like
19  in Butch Cassidy and the Sundance Kid.
20        THE REPORTER:  Yeah, and there was
21  another name, Doug something.
22        THE WITNESS:  Right.  I guess I did
23  say that name.  Doug was the deputy for --
24  may still be.  So that's
25  T-H-R-O-C-K-M-O-R-T-O-N.

Page 370

1        David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3     Q   All right.  I'm at the third page of
4  this document, and if you look, after the, after
5  the bullet-pointed paragraph, there's a paragraph
6  that says "each type," and I want to go to the
7  first sentence of the paragraph after that.
8        It says, "A 505(b)(2) application shares
9  characteristics of both ANDAs and standalone
10  NDAs."
11        Do you agree with that statement from
12  FDA?
13     A   I agree.  If I might, this is a letter
14  sent by Janet Woodcock, so I'm going to -- when
15  you say statements from FDA, Dr. Woodcock I
16  believe at the time was center director and not in
17  the Office of the Commissioner, so that's the
18  first thing I would say.
19        Secondly, this is a letter.  It is not a
20  guidance or other official document, so I think I
21  need to be very, very clear about that.  I agree
22  that's what it says.
23     Q   I didn't, I didn't ask for a bunch of
24  disclaimers.  I just asked if you agreed or
25  disagreed with the statement.

Page 371

David B. Ross, M.D., Ph.D., M.B.I.
1
2       MR. FRAXEDAS:  Object to form.
3       THE WITNESS:  Those are not, those
4   are not disclaimers.  I am not agreeing with
5   your statement that this is from FDA, that
6   this is an official statement from FDA, so
7   that's -- those are not disclaimers, sir.
8       I want to adequately characterize
9   this document.  It is not a guidance
10  document, a proposed rule, a preamble to a
11  proposed rule, a rule, or a preamble to a
12  rule.
13      Having said that, I agree that's
14  what it says.
15 BY MR. MORIARTY:
16  Q   When you worked there, did you work in
17 the Center for Drug Evaluation and Research?
18  A   I did.
19  Q   So in 2003, Janet Woodcock was your
20 boss, right?
21  A   I don't know what you -- when you say my
22 boss, she did not write my performance review, and
23 I, as I said, I don't know what position she held
24 in 2003.
25  Q   Was she your boss's boss?

Page 372

David B. Ross, M.D., Ph.D., M.B.I.
1
2   A   Again, I don't know what position she
3   held.
4   Q   Okay.  Well, it says right here on her
5   signature line, she was the director of the Center
6   for Drug Evaluation and Research, so she was the
7   director of that division of FDA.  So she, she was
8   superior to you at FDA, correct?
9   A   She was above me in the hierarchy.
10  Q   All right.  Let's move down further on
11  the page.
12      The last paragraph begins, "FDA's
13  long-standing interpretation of Section 505(b)(2)
14  is intended to permit the pharmaceutical industry
15  to rely to the greatest extent possible under the
16  law on what is already known about a drug."
17      Do you agree with that statement?
18  A   So what I would say is I agree that's
19  what it says.  I would say also that's different
20  from what you said earlier, where you said that
21  FDA encouraged companies to rely to the greatest
22  extent possible.
23      And then lastly, going back to the
24  discussion where you called this an official
25  statement, I realize I should have noted, this is

Page 373

David B. Ross, M.D., Ph.D., M.B.I.
1
2  a response to a citizen's petition.  That is the
3  specific scope of this.
4   Q   Do you know, Dr. Ross, whether FDA has
5  any subsequent documents referring back to this
6  citizen's petition as authority for given
7  positions?
8   A   It may have.  I don't know.
9       Mr. Moriarty, I'm sorry.  I think you're
10 speaking, but there's, there's no, there's no
11 audio.
12  Q   I haven't said anything.
13  A   Oh, okay.  Sorry.  There must be a lag
14 then involved.
15  Q   There's a crane that runs outside our
16 building that sometimes is background noise.
17      Have you ever conducted -- I'm sorry.
18 You can take that exhibit down.
19      Dr. Ross, have you ever conducted and
20 published a meta-analysis of observational
21 studies?
22  A   In what area?
23  A   In any area.
24  A   May I refer back to my CV?
25  Q   Sure, and I'm just asking for that

Page 374

David B. Ross, M.D., Ph.D., M.B.I.
1
2  specific type of article, a meta-analysis of
3  observational studies.
4   A   Just a quick look here.
5       MR. MORIARTY:  Let's go off the
6  video record while he looks.
7       THE VIDEOGRAPHER:  3:23.  We're off
8  the video record.
9       (Whereupon, a short recess was
10      taken.)
11      THE VIDEOGRAPHER:  3:29.  We're
12  back on the record.
13 BY MR. MORIARTY:
14  Q   All right.  Doctor, the pending question
15 was whether you had even conducted and published a
16 meta-analysis of observational studies.
17      Have you or not?
18  A   I'm sorry?
19  Q   Have you or not?
20  A   I don't see any papers in my CV where
21 I've used that particular technique.
22  Q   All right.  When Accord did send its CBE
23 letter on December 30, 2015, was that letter in
24 compliance with the CBE regulation?
25      MR. FRAXEDAS:  Object to form.

Page 375

David B. Ross, M.D., Ph.D., M.B.I.

1
2      THE WITNESS:  It followed the
3  formatting requirements.  It did not
4  contain – was on a regulatory basis rather
5  than a scientific basis of the sort that I
6  referred to previously with 201.57 with
7  regard to reasonable evidence of a causal
8  association.
9  BY MR. MORIARTY:
10     Q   Are you done with your answer?
11     A   Yes.
12     Q   So when, when Sanofi sought and obtained
13  permission to update its label, it had to submit
14  the underlying scientific data, did it not?
15         MR. FRAXEDAS:  Object to form.
16  BY MR. MORIARTY:
17     Q   The FDA would have asked for them to
18  submit the data to support the proposed change,
19  wouldn't they?
20     A   So, I'm sorry.  Which question – there
21  was two questions in a row here.  Which one would
22  you like me to answer?
23     Q   Just one question, Dr. Ross.
24     A   I'm sorry?
25     Q   Sanofi, Sanofi didn't just say "here's

Page 376

David B. Ross, M.D., Ph.D., M.B.I.

1
2  our proposed change," and FDA approved it.
3  Wouldn't you assume, based on your years of
4  experience, that Sanofi submitted scientific data
5  to support the change?
6         MR. FRAXEDAS:  Object to form.
7         THE WITNESS:  They – if I remember
8  correctly, they submitted adverse event
9  reports.
10  BY MR. MORIARTY:
11     Q   Are you suggesting that on December 30
12  when Accord sent its letter, 2015, when Accord
13  sent its CBE, you're not suggesting that it was
14  required to submit or resubmit scientific data,
15  are you?  It had every regulatory right to rely on
16  what Taxotere and Sanofi had done; true?
17         MR. FRAXEDAS:  Object to form.
18         THE WITNESS:  That is not what –
19         THE REPORTER:  "That is not what"
20  what?
21  BY MR. MORIARTY:
22     Q   That's not what?
23     A   That is not what I am saying.
24     Q   Was it permissible for Accord to wait
25  for approval before implementing the label change

Page 377

David B. Ross, M.D., Ph.D., M.B.I.

1
2  in 2016?
3     A   Well, what I would say is that their
4  doing so and their waiting, in essence, four years
5  did not comply with the applicable regulations of
6  401.57.
7     Q   Okay.  In paragraph 124 of your report,
8  you refer to something called a "Core Data Sheet."
9  Is a Core Data Sheet required by any statute,
10  regulation, or guidance from FDA in the United
11  States?
12     A   I'm sorry.  Could you say again what –
13  I thought you said 142, but I don't believe I have
14  such a paragraph in my report.
15     Q   I said 124.
16     A   124.  Thank you.
17         With the caveat that I never said that
18  there is such a requirement, no, there isn't such
19  a requirement.
20     Q   Thank you.  That's all I needed to know.
21         At paragraph 126, you're referring to
22  some European Union document.  I have questions
23  about that subject.
24     A   Mm-hmm.
25     Q   Do you know when Accord Healthcare, Ltd.

Page 378

David B. Ross, M.D., Ph.D., M.B.I.

1
2  applied for its marketing authorization in the EU?
3     A   What I have written here is June 22,
4  2011.
5     Q   Do you know when the EU approved Accord
6  Healthcare, Ltd.'s application?
7     A   I believe it was sometime in May 2012.
8     Q   So at least from June of 2011 through
9  May of 2012, Accord Healthcare, Ltd. did not have
10  an approved label or marketing authorization in
11  the EU, true?
12     A   As far as I know, that statement is
13  correct.
14     Q   Once FDA did approve the labeling
15  changes in the United States, it approved those
16  changes to take place in the adverse reaction
17  section of the label, correct?
18     A   With the caveat that that was based on
19  the information submitted to it by Accord and what
20  Accord had proposed, yes.
21     Q   Move to strike the "caveats."
22         Let's talk about European labeling.  Do
23  you know exactly what information was submitted to
24  the regulators in Europe by Accord Healthcare,
25  Ltd. when it filed the application in June of

Page 379

1     David B. Ross, M.D., Ph.D., M.B.I.
2   2011?
3     A   Exactly what information, no.
4     Q   All right.  Was there another product
5   already authorized in Europe, another docetaxel
6   product authorized in Europe before June 2011?
7     A   Let me consult my report regarding the
8   other 505.
9         THE REPORTER:  The other what?
10        THE WITNESS:  I'm sorry.  The other
11    505(B)(2).  I believe that there were
12    formulation – there was a formulation
13    marketed by Sandoz in the, at least one
14    country in the European Union.
15  BY MR. MORIARTY:
16    Q   Was there a Sanofi product before
17  June 2011 in the EU?
18    A   I believe that may be correct as well,
19  so those are at least two that I believe were
20  marketed there.
21    Q   Do I think I know the answer to this
22  question based on what you told me.  I asked
23  whether you knew exactly what information was
24  submitted to the EU.  You don't know whether the
25  information that was submitted to the EU is

Page 380

1     David B. Ross, M.D., Ph.D., M.B.I.
2   information that FDA already had prior to June of
3   2011, do you?
4     A   With the caveat that my regulatory
5   analysis focused on what the NDA holder had, not
6   the FDA, no, I don't.
7     Q   Motion to strike the "caveats."
8         Does FDA routinely rely on foreign
9   labeling information when it makes decisions about
10  labeling in the United States?
11    A   I don't know what you mean by
12  "routinely."  I mean it certainly does review it,
13  but I'm not sure what you mean by "routinely."
14    Q   Well, I'm not asking whether it reviews
15  it.  My question involved does it rely on it.
16  Does FDA rely on foreign labeling information when
17  making decisions about labeling in the United
18  States?
19    A   Again, I think the question, as phrased,
20  is way too deep for me to answer it meaningfully.
21    Q   Do you know whether FDA ever asked
22  Accord Healthcare, Inc. to submit foreign labeling
23  information from a company called Accord
24  Healthcare, Ltd.?
25    A   I do not know.  Foreign regulatory

Page 381

1     David B. Ross, M.D., Ph.D., M.B.I.
2   actions generally require to be recorded in an NDA
3   annual report.
4         THE REPORTER:  Can you say that
5     answer again?  I'm not sure I got it.
6         THE WITNESS:  I'm sorry, Laurie.
7     So I don't know.  Foreign regulatory actions
8     are generally required to be reported in an
9     NDA annual report, and possibly in the
10    periodic safety update reports that we've
11    discussed.
12  BY MR. MORIARTY:
13    Q   All right.  So if Accord Healthcare,
14  Inc. had foreign labeling, it would submit that
15  information to FDA through the channels you just
16  suggested, correct?
17    A   So I just want to get some
18  clarification, and I'm certainly aware that there
19  are different entities with the name Accord.
20        If we're talking about the holder of the
21  NDA in the United States, Accord, they would
22  submit it to the FDA.  If the information in there
23  represented, met the criteria for a 15-day alert,
24  that is a serious and unexpected adverse event.
25  Then they would need to report it within 15 days,

Page 382

1     David B. Ross, M.D., Ph.D., M.B.I.
2   I believe it's calendar days, of having become,
3   having become available to them.
4     Q   If I understand what you just said,
5   you're saying if the NDA holder in the United
6   States has foreign labeling, obviously in some
7   other country, that would be reportable through
8   the route that you just suggested, correct?
9     A   Yes, with the distinction that if there
10  was information in there that represented a
11  serious and unexpected adverse event, then the
12  obligation would be to report it as a 15-day alert
13  rather than a periodic report such as an annual
14  report or a periodic safety update report.
15    Q   Have you seen any evidence in this case
16  that Accord Healthcare, Inc., the United States
17  NDA holder for docetaxel, has labeling in any
18  country outside the United States?
19    A   So with the caveat that the question
20  centers on what it had available, not what it's
21  marketing, no.
22    Q   Would you agree that – well, move to
23  strike the "caveat" as nonresponsive.
24        Would you agree with me, Dr. Ross, that
25  foreign drug labeling is a product of different

Page 383

David B. Ross, M.D., Ph.D., M.B.I.

1      David B. Ross, M.D., Ph.D., M.B.I.
2  and distinct regulatory standards and decisions
3  from those of FDA in the United States?
4      MR. FRAXEDAS:  Object to form.
5      THE WITNESS:  I would say there are
6  similarities and there are differences.
7  BY MR. MORIARTY:
8      Q   Are you an expert in the similarities
9  and differences between USFDA and the EU labeling?
10     A   I have not been retained to give
11  opinions on foreign labeling, drug labeling, per
12  se, so I'm not representing – for purposes of
13  this proceeding, I'm not representing myself as an
14  expert on that very narrow slice, only as far as
15  it is relevant to FDA drug labeling.
16     Q   Okay.  I know it feels late.  We've been
17  going at this a couple of days, and this question
18  here, the language is a little clumsy, so bear
19  with me, okay?
20     A   Sure.
21     Q   Do you believe that an FDA-approved
22  label in the United States that differs from an
23  EU-approved label for the same drug means that the
24  FDA-approved label is somehow misbranded or
25  mislabeled?

Page 384

David B. Ross, M.D., Ph.D., M.B.I.

1      David B. Ross, M.D., Ph.D., M.B.I.
2      MR. FRAXEDAS:  Object to form.
3  BY MR. MORIARTY:
4      Q   Just that fact alone.
5      A   I – it, it depends.  I do not believe
6  there is some general rule.  It, it really
7  depends.
8      Q   So that fact alone does not mean that
9  the U.S. drug label is mislabeled or misbranded;
10  you would need more information, true?
11     MR. FRAXEDAS:  Object to form.
12     THE WITNESS:  I would not be able
13  to draw an opinion one way or the other
14  that – whether the label was not false and
15  misleading or it was false and misleading
16  without more information.
17     THE REPORTER:  Was there an
18  objection there?
19     MR. FRAXEDAS:  Yes, there was.
20  Sorry.  We kind of talked over each other.
21  BY MR. MORIARTY:
22     Q   Doctor, I've got so many notes here, and
23  I've made such a mash-up mess of going through
24  them and jumping around.  What I'd like to do is
25  go off the record, review my notes with my

Page 385

David B. Ross, M.D., Ph.D., M.B.I.

1      David B. Ross, M.D., Ph.D., M.B.I.
2  colleague, regroup, and be efficient with the last
3  approximately 35 plus minutes of my time.
4      Is that okay?
5      A   Absolutely.
6      MR. MORIARTY:  All right.  Let's
7  come back at say 4:05.  That's 15 minutes.
8  That's good?
9      MR. FRAXEDAS:  That works.
10     MR. MORIARTY:  Okay.
11     THE VIDEOGRAPHER:  3:49, we're off
12  the record.
13     (Whereupon, a short recess was
14     taken.)
15     THE VIDEOGRAPHER:  4:07, we're on
16  the record.
17  BY MR. MORIARTY:
18     Q   Dr. Ross, your reliance list contains
19  reference to three depositions from Accord
20  Healthcare, Inc. personnel.  Do you have in mind
21  or in a separate note somewhere exactly what
22  testimony from those three witnesses you are
23  relying upon to say that they did not – that the
24  company did not comply with its regulatory
25  obligations?

Page 386

David B. Ross, M.D., Ph.D., M.B.I.

1      David B. Ross, M.D., Ph.D., M.B.I.
2      MR. FRAXEDAS:  Object to form.
3      THE WITNESS:  I'm sorry.  I did not
4  completely get, understand your question.
5  BY MR. MORIARTY:
6      Q   Okay.  Hang on a second.  I'm just going
7  to repeat it.
8      A   Okay.
9      Q   In your reliance list you have the
10  depositions of three Accord Healthcare, Inc.
11  employees.  What I want to know is whether you can
12  tell today if there are specific pages of those
13  depositions that you are relying on for your
14  opinion that Accord Healthcare, Inc. did not
15  comply with its regulatory obligations.
16     MR. FRAXEDAS:  Object to form.
17  BY MR. MORIARTY:
18     Q   And Doctor, to make this go faster, I
19  would direct you to paragraphs 30 and 31.  You
20  have no page cite there.
21     A   You mean in the section labeled "Summary
22  of Opinions"?
23     Q   Yes.
24     A   Yes, that's – you are correct.  That is
25  a summary.

Page 387

1     David B. Ross, M.D., Ph.D., M.B.I.
2     Q   Do you have page cites for the pages on
3  which you rely there or in some other place in
4  your report?
5     A   So to address your question, I cite in
6  paragraph 123 and continuing, specific portions of
7  Nair's.
8         THE REPORTER:  Portions of what?
9         THE WITNESS:  So Nair is spelled
10  N-A-I-R.
11  BY MR. MORIARTY:
12     Q   Are you done with your answer?
13     A   No, sir, I'm not.
14         In paragraph 128 in footnote 90, I cite
15  one of many examples that I could of Dr. Nair's
16  belief that Accord is a 505(j) drug that is not
17  permitted to change its label rather than a
18  505(b)(2) that has the same obligations as any
19  other NDA holder.  That is –
20     Q   Are you now done –
21     A   No, sir.
22     Q   – with your answer?
23     A   No, sir.  I, I – please.  I've asked
24  you multiple times.  Please.  I would ask – I
25  know you would like to get things in.  Please let

Page 388

1     David B. Ross, M.D., Ph.D., M.B.I.
2  me finish.
3     Q   Doctor, you paused, and all I did was
4  ask if you were done with your answer.  That's all
5  I asked.  If you were not done, I was happy to let
6  you go on.
7     A   Okay.
8     Q   There was a long pause, so I don't know
9  when to begin, okay?
10     A   Okay.
11     Q   Do you have more – answer the question
12  I asked.  Go ahead if you do.
13     A   Are you through, sir?  Are you through,
14  sir?
15     Q   I'm asking whether you're done with your
16  answer.  If you're not, please continue with your
17  answer.
18     A   Are you through, sir?
19     Q   I've asked my question.
20     A   Okay.  So that is one example, um, that
21  I cited along with other examples that could be
22  cited, so, um, I will stop right now.
23     Q   All right.  Paragraph 123 talks about
24  having a contract with Lambda, L-A-M-B-D-A,
25  Therapeutic.  That's not a violation of the

Page 389

1     David B. Ross, M.D., Ph.D., M.B.I.
2  regulations, is it?
3     A   Well –
4         MR. FRAXEDAS:  Object to form.
5         THE WITNESS:  – looking at these
6  excerpts – and I was limited in the amount
7  of space that I could provide, sir – it was
8  not clear to me that the NDA holder, Accord,
9  was doing anything substantive that you would
10  characterize as pharmacovigilance.
11  BY MR. MORIARTY:
12     Q   My question to you, Dr. Ross, is
13  specifically about 123.  Is it permissible for NDA
14  holders to enter into contracts with other
15  companies to assist in performing its
16  pharmacovigilance duties?
17     A   The question you asked me before was
18  different.  It was whether there was anything
19  there that I saw as a violation.  The new
20  question, which is different from the one you just
21  asked me, was is there anything wrong with their
22  entering into a contract.
23         The answer to the first question is that
24  Dr. Nair's deposition testimony, along with the
25  totality of the evidence, illustrates that Accord

Page 390

1     David B. Ross, M.D., Ph.D., M.B.I.
2  was not in compliance.
3         The answer to your second question?  No.
4  Remembering that Lambda is not responsible for the
5  updated label.  Accord is.
6     Q   Okay.  That's not what I'm asking you.
7  At least I don't think so.  I'm going to see if we
8  can clarify our miscommunication here.
9         Is it permissible under the FDA
10  regulations for NDA holders to have contractors
11  assist them in performing their pharmacovigilance
12  duties?
13     A   Assist them?  Yes.
14     Q   Okay.  I'm not trying to say, Doctor,
15  that they're passing the buck to some other
16  company.  The NDA holder is responsible for the
17  pharmacovigilance.  You and I agree on that,
18  correct?
19     A   Yes.
20     Q   But the, just the fact that they
21  contract out "certain pharmacovigilance
22  activities," as you quote here, is not a violation
23  of the regulations, is it?
24     A   Dr. Nair testified that Lambda provides
25  not "certain" but all the pharmacovigilance for

Page 391

1        David B. Ross, M.D., Ph.D., M.B.I.
2  Accord.  I would agree with you.
3        Q.  Okay.  Are you going to testify in this
4  case that docetaxel and Taxotere are not
5  pharmaceutically equivalent?
6        A.  That was not a question I was asked to
7  address.
8        Q.  Are you going to testify that docetaxel
9  and Taxotere are not therapeutically equivalent?
10       A.  That is not a question I was asked to
11  address.
12       Q.  Were you asked to address any opinions
13  about substantive chemical differences between
14  Accord's docetaxel and Sanofi's Taxotere?
15       A.  No.
16       Q.  Are you aware that most states have
17  adopted laws and regulations that encourage the
18  substitution of interchangeable drug products?
19       MR. FRAXEDAS:  Object to form.
20       THE WITNESS:  So understanding that
21  "interchangeable" and "generic" are not –
22  "interchangeable" is actually a term that has
23  been more recently applied to biosimilars.
24  Um, I'm certainly aware of that.  To the
25  extent to what, which that applies to drugs

Page 392

1        David B. Ross, M.D., Ph.D., M.B.I.
2  marketed under an abbreviated, abbreviated
3  NDA versus a 505(b)(2) NDA is something that
4  I don't know.
5  BY MR. MORIARTY:
6        Q.  All right.  Well, as a specific example,
7  at the VA, if an oncologist orders Taxotere for
8  the treatment of a breast cancer patient – or
9  prescribed it, I should say – do you know whether
10  the pharmacy at various VA medical centers is
11  allowed to automatically substitute either any of
12  the 505(b)(2) docetaxels or the 505(j) docetaxels
13  in place of the name brand product?
14       A.  So it's not a matter of substitution.
15  The VA national formulary relies on a national
16  contracting process, whether it's a drug that's
17  actually on the formulary or is obtained outside
18  the formulary, so there's no question of
19  substitution.  That's the best I can answer that.
20       Q.  I don't know what you mean by "no
21  question of substitution."  In other words, the
22  patient could receive the 505(b)(2) or a 505(j)
23  product instead of Taxotere?
24       A.  They could, unless there was a basis for
25  what's called the, the Medication Advisory Panel

Page 393

1        David B. Ross, M.D., Ph.D., M.B.I.
2  to believe that particular products marketed as
3  505(b)(2)s or as ANDAs require more information
4  for whatever reason.
5        Q.  Do many health insurance plans require
6  prescriptions be filled with generic medications
7  if they are available?
8        MR. FRAXEDAS:  Object to form.
9        THE WITNESS:  I honestly don't know
10  overall what the situation is with that.
11  BY MR. MORIARTY:
12       Q.  Do you write prescriptions for patients
13  you see on a clinical basis at the Washington,
14  D.C. VA Medical Center?
15       A.  Yes.
16       Q.  And when you do that, are you aware of
17  the possibility that it may – even if you name
18  the name brand, it may be substituted with a
19  generic by the pharmacist?
20       A.  So I don't write for, quote, "a name
21  brand."  I mean it may be that that is what is
22  dispensed, but there is a single national contract
23  that applies to all VA facilities, unless a
24  provider wishes to get another formulation of the
25  same drug for some reason.

Page 394

1        David B. Ross, M.D., Ph.D., M.B.I.
2        Q.  Okay.  Dr. Ross, do you have any
3  evidence on which to base an opinion that the FDA
4  would have approved a proposed label change
5  regarding the alopecia adverse event, had one been
6  proposed in 2011 or '12 or '13 or '14 or earlier
7  in 2015 than it did?
8        MR. FRAXEDAS:  Object to form.
9        THE WITNESS:  The answer to that
10  question is it depends.
11  BY MR. MORIARTY:
12       Q.  What does it depend on?
13       A.  The quality of the data submitted by the
14  applicant.
15       Q.  Are you done with your answer?
16       A.  To that question, yes.
17       Q.  Well, I asked what does it depend on.
18  Does it depend on anything other than the quality
19  of the data?
20       A.  That would be the primary consideration,
21  and by "quality of data," I want to be clear that
22  I mean has the applicant put together a package
23  that looks at newly acquired information and
24  provides an analysis of why this is warranted.  If
25  the applicant were to submit something and then

Page 395

David B. Ross, M.D., Ph.D., M.B.I.
1
2 say, well, we're only going to put in really weak
3 data, that would be –
4    Q   I guess my – go ahead.
5    A   – what it depends on.  So let me stop.
6 Go ahead.
7    Q   My question isn't in the abstract.  My
8 question is whether you have formed opinions and
9 expressed them in your report regarding whether or
10 not an earlier application by Accord would have
11 been approved before the, before FDA approved
12 Sanofi's Taxotere label change in 2015, specific
13 facts in this case.
14    A   Yes, I have formed such an opinion.
15       THE REPORTER:  Was there an
16    objection there?
17 BY MR. MORIARTY:
18    Q   Is your opinion written in your report
19 somewhere?
20    A   So I would say that the summary of my
21 opinions in paragraphs 26 through 31, which are
22 amplified or expanded elsewhere in the report,
23 make that clear, along with other sections where I
24 discuss the extremely low likelihood that FDA
25 would ever reject an appropriately presented

Page 396

David B. Ross, M.D., Ph.D., M.B.I.
1
2 request for a label change.
3    Q   I'm looking at the paragraphs to which
4 you referred me.
5    A   Mm-hmm.
6    Q   Just to make sure that I understand –
7 well, let me withdraw that question.
8       Let me just consult with Ms. Callsen for
9 a second.
10    A   Of course.
11       (Discussion held off the record.)
12       MR. MORIARTY:  Dr. Ross, I don't
13 have any other questions for you at this
14 time.
15       THE WITNESS:  Okay.  Thank you,
16 sir.
17       MR. MORIARTY:  What do you want to
18 do about –
19       MR. MERRELL:  Sorry.  I was just
20 going to say for the record that, as we
21 discussed on Friday, that Sandoz is going to
22 reserve any time to ask questions for a date
23 in the future we agree to, and perhaps when
24 we go off the record, we can even figure out
25 what day works best for everyone.

Page 397

David B. Ross, M.D., Ph.D., M.B.I.
1
2    MR. FRAXEDAS:  I have no questions
3 for Dr. Ross at this point either, so do you
4 want to go off the record now?
5       MR. MORIARTY:  I'm sorry.  I didn't
6 hear what someone said, and I didn't know
7 whether it was Andrew or Jason.
8       MR. FRAXEDAS:  So Jason.  I talked
9 after Cliff.  Did you hear what Cliff said?
10       MR. MORIARTY:  I heard what Cliff
11 said.  I'm sorry.  I didn't hear what you
12 said.
13       MR. FRAXEDAS:  I said I have no
14 questions for Dr. Ross either, so would you
15 all like to go off the record now?
16       MR. MORIARTY:  Well, that's fine
17 with me.
18       MR. FRAXEDAS:  Okay.
19       THE WITNESS:  I, I'm happy to stay
20 on if you need me.  If not, I don't want to
21 intrude.  So should I, should I exit the
22 deposition?
23       MR. FRAXEDAS:  No.  Stay on,
24 because – wait a minute.  Hold on, because
25 if Cliff, if Cliff is going to give us a

Page 398

David B. Ross, M.D., Ph.D., M.B.I.
1
2 date, then we're going to need to know
3 Dr. Ross' availability as well.
4       MR. MERRELL:  Sure.  Yeah, let's
5 just get off the record, and then we can have
6 that discussion.
7       THE VIDEOGRAPHER:  4:31.  We're off
8 the record.
9       (Signature having not been waived,
10    Volume 2 of the deposition of DAVID
11    B. ROSS, M.D., Ph.D., M.B.I. was
12    concluded at 4:31 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 399

1       David B. Ross, M.D., Ph.D., M.B.I.

2

3

4

5

6      ACKNOWLEDGEMENT OF WITNESS

7      I, David B. Ross, M.D. Ph.D.,

8   M.B.I., do hereby acknowledge that I have

9   read and examined the foregoing testimony,

10   and the same is a true, correct and complete

11   transcription of the testimony given by me,

12   and any corrections appear on the attached

13   Errata sheet signed by me.

14

15

16   _____  _____

17  (DATE)     (SIGNATURE)

18

19

20

21

22

23

24

25

---

Page 400

1       David B. Ross, M.D., Ph.D., M.B.I.

2      E R R A T A  S H E E T

3  IN RE:  TAXOTERE PRODUCTS LIABILITY LITIGATION

4  RETURN BY:

5  PAGE   LINE       CORRECTION AND REASON

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24  _____  _____

25  (DATE)     (SIGNATURE)

---

Page 401

1       David B. Ross, M.D., Ph.D., M.B.I.

2

3

4

5  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

6      I, Laurie Donovan, Registered
     Professional Reporter, Certified Realtime

7   Reporter, and notary public for the District
   of Columbia, the officer before whom the

8   foregoing deposition was taken, do hereby
   certify that the foregoing transcript is a

9   true and correct record of the testimony
   given; that said testimony was taken by me

10   stenographically and thereafter reduced to
   typewriting under my supervision; and that I

11   am neither counsel for, related to, nor
   employed by any of the parties to this case

12   and have no interest, financial or otherwise,
   in its outcome.

13

14      IN WITNESS WHEREOF, I have hereunto
   set my hand and affixed my notarial seal this
   12th day of September, 2020.

15

16   My commission expires:  March 14, 2022

17

18

19  _____

20  LAURIE DONOVAN
   NOTARY PUBLIC IN AND FOR

21  THE DISTRICT OF COLUMBIA

22

23

24

25