1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4    **********************************************************
     IN RE: TAXOTERE (DOCETAXEL)        MDL NO. 2740
5    PRODUCTS LIABILITY LITIGATION      SECTION "H" (5)
                                        FEBRUARY 17, 2022
6    *This document relates to:*
     *16-17583, 18-194, 17-12674, 18-9799*
7    **********************************************************

8

9        TRANSCRIPT OF MOTIONS HEARING HELD VIA VIDEO CONFERENCE
             HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
10                   UNITED STATES DISTRICT JUDGE

11

12

13   APPEARANCES:

14   FOR PLAINTIFFS:              M. Palmer Lambert, Esquire
                                  GAINSBURGH, BENJAMIN, DAVID
15                                  MEUNIER & WARSHAUER
                                  1100 Poydras Street, Suite 2800
16                                New Orleans, LA 70163

17

18                                Andre M. Mura, Esquire
                                  GIBBS LAW GROUP
19                                505 14th Street
                                  Suite 1110
20                                Oakland, CA 94612

21

22                                Emily C. Jeffcott, Esquire
                                  MORGAN & MORGAN
23                                700 S.  Street
                                  Suite 95.
24                                Pensacola, FL  32505

25

                        OFFICIAL TRANSCRIPT

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR DEFENDANTS:                    John F. Olinde, Esquire
                                        CHAFFE MCCALL
 4                                      1100 Poydras Street
                                        Suite 2300
 5                                      New Orleans, LA  70163

 6

 7   FOR ACCORD HEALTHCARE:             Julie A. Callsen, Esquire
                                        Michael J. Ruttinger, Esquire
 8                                      TUCKER ELLIS
                                        950 Main Avenue, Suite 1100
 9                                      Cleveland, OH 44113

10

11
     FOR SANDOZ, INC.:                  R. Clifton Merrell, Esquire
12                                      GREENBURG TRAURIG
                                        Terminus 200
13                                      3333 Piedmont Road, NE
                                        Atlanta, GA 30305
14

15
                                        Gregory E. Ostfeld, Esquire
16                                      GREENBURG TRAURIG
                                        77 West Wacker Drive
17                                      Suite 3100
                                        Chicago, IL  60601
18

19

20   Official Court Reporter:          Alexis A. Vice, RPR, CRR
                                        500 Poydras Street, HB-275
21                                      New Orleans, LA 70130
                                        (504) 589-7777
22                                      Alexis_Vice@laed.uscourts.gov

23

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.

                         OFFICIAL TRANSCRIPT
```

```
 1                P-R-O-C-E-E-D-I-N-G-S
 2                   FEBRUARY 17, 2022
 3                  (MOTIONS HEARING)
 4
 5           (The Court was called to order.)
 6        THE COURT:  Please be seated.
 7        DEPUTY CLERK:  The Court calls Taxotere MDL 2740.
 8        Counsel, please make your appearances.
 9        MR. OSTFELD:  Good morning, Your Honor.  Greg Ostfeld
10   and Cliff Merrell on behalf of Sandoz, Inc.
11        MS. CALLSEN:  Julie Callsen and Mike Ruttinger on
12   behalf of Accord Healthcare.
13        MR. LAMBERT:  Good morning, Your Honor.  Palmer
14   Lambert co-liaison counsel for plaintiffs, and Andre Mura and
15   Emily Jeffcott are on Zoom today on behalf of the plaintiffs.
16        THE COURT:  Let me do something with this computer.  I
17   have a lot of things I have to close.  Just a minute.
18           (An off-the-record discussion was held.)
19        THE COURT:  Mr. Mura, can you hear me?
20        MR. MURA:  Yes, Your Honor.  Thank you.
21        THE COURT:  And Ms. Jeffcott?
22        MR. MURA:  I believe I'll be presenting both
23   arguments, Your Honor.
24        THE COURT:  Okay, great, thank you.
25        MR. MURA:  Thank you.


                    OFFICIAL TRANSCRIPT
```

 1          **THE COURT:** Let's start with Accord's motion.  Are we
 2  ready to proceed, Mr. Ruttinger?
 3          **MS. CALLSEN:** We had that Sandoz was going to start,
 4  Your Honor.
 5          **THE COURT:** Okay, that's fine.
 6          **MR. OSTFELD:** If it pleases the Court.
 7          **THE COURT:** It pleases.
 8          **MR. OSTFELD:** Thank you, Your Honor.
 9          Your Honor, may I remove my mask to present?
10          **THE COURT:** Please.  It's really difficult to hear.
11          **MR. OSTFELD:** Thank you, Your Honor.  May it please
12  the Court.
13          Your Honor, I know that at this point, you are pretty
14  familiar with the general legal framework of the preemption
15  issue we're here to discuss.  So my plan for the day is to
16  basically move pretty briskly through the legal framework and
17  move into the particulars of the record with respect to
18  Ms. Conley's case that we believe compels summary judgment
19  under the circumstances of this case.
20          On the legal side, the question we are here to answer
21  is whether it was possible under federal law for Sandoz to do
22  what plaintiff alleges state law required it to do which is
23  alter the FDA-approved label for its docetaxel to add a
24  permanent alopecia adverse reaction to the label prior to or
25  during the time that Ms. Conley was using the product during

OFFICIAL TRANSCRIPT

1 which plaintiff alleges it would have made a difference in her

2 decision or her treater's decision to use that product.

3        The default answer to that question under federal law

4 is no.  As a general rule, federal law requires that any change

5 of that type to an FDA-approved label requires the FDA's prior

6 approval.  And if that's the case, then under the *Mensing,*

7 *Bartlett* framework --

8        **THE COURT:** Right.

9        **MR. OSTFELD:** -- the manufacturer cannot independently

10 do what federal law requires of them, and the claims are

11 preempted.

12        The recognized exception to that is the *Wyeth*

13 exception which looks to the changes being effected regulation

14 and essentially says the CBE regulation, if it can be

15 satisfied, provides a path for the manufacturer to unilaterally

16 change the label.  And in that instance, it may be possible for

17 the manufacturer to comply simultaneously with federal and

18 state law.

19        For that to happen, though, there has to be newly

20 acquired information.  If you don't have newly acquired

21 information, you basically can't even step through that CBE

22 regulation door.  So that's the focal point of the discussion

23 today is:  Was there newly acquired information during the

24 relevant time period that would have enabled Sandoz to initiate

25 the label change that plaintiff alleges state law required?

OFFICIAL TRANSCRIPT

1           Newly acquired information basically means two

2   things:  It must be something new, and it must reveal a risk of

3   a different type or greater severity or frequency from what was

4   known before.  When those two criteria are satisfied, then you

5   also look at whether that newly acquired information presents

6   evidence of a causal association that satisfies the standard

7   for inclusion of the particular label change under the labeling

8   regulation.

9           So what that boils down to, Your Honor, is there's

10  basically three paths to summary judgment here.  Sandoz is

11  entitled to summary judgment if there was no new information at

12  all during the relevant time frame, if there were no risks of a

13  different type or greater severity or frequency during the

14  relevant time frame, or if there was no causal association

15  sufficient to satisfy the standard for inclusion.  We only need

16  to prevail on one of those paths for summary judgment to be

17  appropriate, but here, Your Honor, we contend we prevail on all

18  three.

19          Now moving into the particulars of the record here, a

20  really important starting point is the relevant time frame.

21  Because if you're talking about newly acquired information, you

22  have to say newly acquired relative to when.  And the answer to

23  that for Sandoz is, the starting point is June 29th, 2011

24  which is when the FDA approved Sandoz's version of docetaxel

25  and the Sandoz docetaxel label; and the endpoint is

OFFICIAL TRANSCRIPT

1    January 24th, 2012 which is when Ms. Conley ceased using

2    Sandoz's docetaxel because her cancer was cured and her life

3    was saved.  So you're really looking --

4          **THE COURT:** Is the time frame from -- is it not

5    October when she started using it?  We've kind of gone back and

6    forth, and I'm just curious.

7          Is that a consistent date that we need to determine?

8    When she started using, would they have changed her?

9          **MR. OSTFELD:** Your Honor, for the sake of being

10   conservative, I'm using the endpoint of her treatment.  I

11   actually agree, October 14th, 2011 probably would be the time

12   frame because there's no evidence that her doctor would have

13   changed the course of treatment once she began the course of

14   treatment.

15         But for the sake of a summary judgment motion, I'm

16   looking at the entire time frame in which she was being treated

17   with docetaxel on the theoretical risk that or the theoretical

18   possibility her doctor might have made a change of course

19   although however unlikely that may be.

20         So let's look at how this time frame compares to the

21   *Earnest* and *Kahn* cases where Your Honor ruled against

22   preemption.  In *Earnest*, you were looking at a 15-year time

23   frame, 1996 to 2011.  In *Kahn*, you were looking at a 12-year

24   time frame, 1996 to 2008.  Here, you're looking at a less than

25   7-month time frame, from June 2011 to January 2012.  So we're

OFFICIAL TRANSCRIPT

1  obviously dealing with a much narrower time frame.  That has
2  really significant implications here that differentiate this
3  case from *Earnest* and *Kahn* because there was simply no new
4  information that satisfies the newly acquired information
5  standard during that 7-month time period.
6          And respectfully, I would point to plaintiffs' own
7  response and the evidence they have mustered as the evidence of
8  this.  They have gathered all of the literature, all of the,
9  what they are calling signals from the Federal Adverse Event
10 Reporting System, and multiple regulatory submissions that they
11 say collectively or individually should have caused Sandoz to
12 initiate a label change under the CBE regulation.
13         But a couple of notable things arise when you look at
14 their evidence against the relevant time frame.  Virtually all
15 of it, not all, but almost all of it comes before the date of
16 Sandoz's label approval, and that is a hugely significant fact
17 here because the FDA already had a pretty robust collection of
18 data by June 29th, 2011 as to the type, severity, and
19 frequency of the risk of alopecia.
20         There is, moreover, no evidence of any significant
21 new information coming into the mix during the requisite
22 7-month time period that altered the mix of information to
23 suggest a risk of a different type, severity, or frequency that
24 could have merited a label change.
25         In fact, Your Honor, even if you went past the

OFFICIAL TRANSCRIPT

1    endpoint, the latest possible endpoint of our relevant time
2    period and looked at the evidence plaintiffs are pointing to
3    post Sandoz's -- I'm sorry, post Ms. Conley's treatment,
4    there's no evidence that those additional data changed the mix
5    or indicated a risk of a different type, severity, or frequency
6    up until 2015 when, as Your Honor knows, Sanofi undertook a
7    review of its own pharmacovigilance at the FDA's behest,
8    submitted about a thousand cases of alopecia, and at that point
9    and only at that point, the FDA said it's time to include a new
10   adverse reaction.

11           So the problem for plaintiffs here, Your Honor, is
12   there is simply no evidence of a risk of a different type,
13   severity, or frequency.  The only item they point to that even
14   arguably falls within the relevant 7-month time frame is the
15   Miteva article which came out in June 2011, roughly
16   contemporaneously with the approval of Sandoz's label.  We
17   don't know which day in June the Miteva article was published;
18   but it was published in June, and Sandoz's label was approved
19   in June.

20           The problem for plaintiffs is there's nothing to
21   suggest the Miteva article pointed to a risk of a different
22   type, severity, or frequency or even accumulated with the data
23   that came before.

24           **THE COURT:** I think that's where -- with Sanofi, it
25   wasn't enough to say this one thing.  It's this cumulative

OFFICIAL TRANSCRIPT

1  data, and I think the Supreme Court was pretty clear about that

2  in *Wyeth*.  You can't just look at, "Well, now we have ten new

3  cases."  It's what's been happening over the course of time.

4  Even when they had label changes or submissions to the FDA,

5  what are you doing to continue to assess this risk?

6          And I would say I think permanent alopecia is more

7  severe than temporary alopecia.  You're just going to have to

8  accept that because I think that is a more severe assessment.

9          But what do I charge Sandoz with, you know, if this

10 article comes out at the same time that you have approval and

11 your scientists begin looking at it?

12         **MR. OSTFELD:** Sure.

13         **THE COURT:** Do we just ignore what came before or how

14 do -- and I will tell you, this is hard because I want you to

15 tell me what is sufficient newly acquired information.

16         **MR. OSTFELD:** Certainly, Your Honor.

17         **THE COURT:** At what point do we say, "That's enough"?

18         **MR. OSTFELD:** Certainly, Your Honor.  And to be clear,

19 it is not our position that you ignore everything that came

20 before the approval deadline.  It is clear that accumulating

21 data can support a label change, but there's two important

22 points on that.

23         First of all, Your Honor, whose data, because in

24 Sanofi's case, of course, they had access to their own

25 pharmacovigilance system and their own pharmacovigilance

OFFICIAL TRANSCRIPT

1   reports.  In 2015, we know when the FDA requested their review,

2   they were able to submit a thousand cases of alopecia which

3   included some significant percentage of permanent alopecia

4   which is what moved the needle for the FDA and resulted in the

5   cases of permanent alopecia have been reported adverse

6   reaction.

7          There's no dispute Sandoz didn't have Sanofi's

8   adverse event reports and their adverse event data.  So you

9   need to look at what Sandoz had, and there's no evidence in the

10  record to suggest Sandoz had anything like that.  The only

11  evidence in the record on that is the report of Sandoz's expert

12  Roger Williams who indicates, one, there were very few adverse

13  reports of permanent or persistent alopecia to Sandoz; and two,

14  there was nothing in there that would have given rise to a

15  signal indicating that Sandoz needed to make this change.

16  That's one point.

17         The second point, Your Honor, is whatever

18  accumulating data means, it can't just mean deciding

19  spontaneously to go back and review old data.  There has to be

20  something new that enters the mix and alters the picture.  It

21  has to point to some kind of change in severity, frequency,

22  etcetera.  And there's simply no evidence that that happened

23  here.

24         The Miteva article was six cases of persistent

25  alopecia.  There's nothing to suggest that what was reported in

OFFICIAL TRANSCRIPT

1  that article was any different from what came in the Palamaras
2  article a few months earlier or the Bourgeois article or the
3  Tallon article.  All of which were reporting similar instances
4  of permanent or persistent alopecia.  There was nothing to
5  suggest that what was seen in Miteva was of a different type,
6  severity, or frequency from what was seen in the literature
7  before and certainly nothing to suggest anything on the scale
8  of the thousand cases of alopecia that were reported in 2015
9  that led to the label change.

10         And you know, to try to be a little more specific in
11  answering your question, Your Honor, when you're talking about
12  a new adverse reactions label, then what the regulations
13  require is there must be sufficient evidence which means at or
14  above the specified rate for inclusion.  And there are
15  important policy reasons for that.  The *McGrath* and *Utts* cases
16  both discuss this.  The problem is you don't want every
17  possible reaction observed clinically to go on the label
18  because, one, you're going to deter patients from getting
19  life-saving treatment because they're intimidated by this long
20  list of adverse reactions; and two, you're going to divert
21  treaters from the reactions that matter, the statistically
22  significant, the real risks, from the conjectural or
23  hypothetical.  So that's why there's a specified rate for
24  inclusion standard under the regulations.

25         There is no evidence to suggest, no expert has

OFFICIAL TRANSCRIPT

1  opined, no data has been put in to suggest that Sandoz ever had

2  data that exceeded or met the specified rate for inclusion or

3  that the six cases in the Miteva article, whether individually

4  or accumulated with what came before, were sufficient to raise

5  the level to the point where Sandoz was required or -- and

6  actually, in the case of an adverse reaction, you're never

7  required, but would have been permitted to add a permanent

8  alopecia adverse reaction to its label.

9          I would also note, Your Honor, there has never been

10  data to support a warnings and precautions label.

11          **THE COURT:** And I think I've already addressed that in

12  the Sanofi.

13          **MR. OSTFELD:** Yes.

14          So really briefly, Your Honor, I want to address what

15  this motion isn't because I think there was some confusion on

16  that in plaintiffs' response brief.  We're not taking a

17  follow-the-leader position here.  We're not saying that

18  Sandoz's docetaxel is a (j) pathway generic drug that has a

19  duty of sameness.  We recognize that the CBE regulation

20  applies.  We could have initiated the label change through that

21  process.  There was simply no newly acquired information to

22  support it.

23          This isn't about the *Albrecht* inquiry because the

24  problem from that is you need newly acquired information before

25  you can even submit a CBE label change for the FDA to review,

OFFICIAL TRANSCRIPT

1   be fully informed, and either approve or reject.  Here, because
2   we never had newly acquired information, we couldn't walk
3   through that door.  We couldn't even submit a CBE label change,
4   and the record is undisputed on that.

5           Finally, Your Honor, although we have a point of view
6   on the burden of proof, it really doesn't matter here.  We've
7   presented the entire record to Your Honor.  So whether it's our
8   burden of proof to demonstrate preemption, to prove the
9   negative in the words of the *Silverstein* court, or whether it's
10  plaintiffs' initial burden of proof to allege newly acquired
11  information and then ours to rebut it, under either instance,
12  Your Honor, the record is devoid of the requisite newly
13  acquired information for Sandoz to have initiated the label
14  change.

15          So for that reason, Your Honor, Sandoz --
16          **THE COURT:** I have a question, and it's probably very
17  elementary; so just bear with me.

18          We talked several slides ago about the specified
19  rate.  Evidence must be sufficient, must be at or above the
20  specified rate.  What is the specified rate?

21          It really becomes very curious to me because it seems
22  like these are terms that one has difficulty wrapping their
23  arms around.

24          **MR. OSTFELD:** So what I'll say, Your Honor, is that's
25  not an elementary question at all.  It is a question that, my

OFFICIAL TRANSCRIPT

1   understanding is, varies from product to product based on the

2   clinical trial results.  It is a question that epidemiologists

3   answer and biostatisticians answer by evaluating the clinical

4   trial data and then distinguishing between adverse reactions

5   that essentially satisfy the statistically significant

6   threshold and could be causally associated with the drug from

7   those that may merely be experienced adverse reactions that

8   were either coincidental or correlated, but not causally

9   connected with the drug.

10          And that's why you have experts who come in and offer

11  testimony on this type of issue.  And here, you have one

12  expert, Roger Williams, who looked at Sandoz's data and said it

13  does not satisfy the standard for inclusion on the label as an

14  adverse reaction and didn't have any reason to change its label

15  until Sanofi altered its label based on a much more robust body

16  of data.  Plaintiffs' experts have not refuted Dr. Williams on

17  that point.

18          Thank you, Your Honor.

19          **THE COURT:** Where is Mr. Mura?

20          **MR. MURA:** Good morning, Your Honor.  Can you see me

21  and hear me okay?

22          **THE COURT:** I can see and hear you, thank you.

23          **MR. MURA:** May it please the Court.  Let me start with

24  this question about causal association because I think that's

25  one of the weaker arguments of Sandoz.  Because here, they're

OFFICIAL TRANSCRIPT

1   essentially saying that there is no evidence in the record of
2   causal association that would support a label change and it's
3   entirely speculative.  But that's entirely contrary to this
4   Court's rulings, including, the 2015 fencepost ruling in which
5   the Court said that the label change clearly and consistently
6   explained that the drug carries a risk of permanent hair-loss.

7           And the requirement under the causal standard for CBE
8   change to the adverse reaction section, as the Court knows, is
9   quite minimal, and there's no question that there's a causal
10  association sufficient to meet that label change.  For Sandoz
11  to suggest that there's just no evidence of any causal
12  association whatsoever with docetaxel and permanent hair-loss,
13  again, it's completely unsupported and contrary to this Court's
14  rulings.

15          **THE COURT:** Mr. Mura, I'm not -- I will tell you what
16  my concern is just very frankly, is whether or not you meet the
17  criteria for newly acquired information.

18          So I have a couple of questions that I want to make
19  sure I understand is that you agree that we're not contesting
20  the initial label of Sandoz?

21          **MR. MURA:** Yes.  Sandoz used a process for approval.
22  Yes, we're not contesting that approval process.

23          **THE COURT:** Okay.  So it's just whether or not during
24  the course of that six, seven months, whether or not there was
25  newly acquired information that would warrant a label change so

OFFICIAL TRANSCRIPT

1  that they would be in compliance with federal regulations.

2          I don't think you're arguing that they can ignore the

3  requirement for CBE change; correct?

4          **MR. MURA:** That's correct.  Although I think there's a

5  disagreement from our side about what newly acquired

6  information means.

7          **THE COURT:** Okay, tell me.

8          **MR. MURA:** Sandoz is looking at it -- I'm sorry, Your

9  Honor, I didn't mean to talk over you.

10          **THE COURT:** No, I was going to say, okay, now tell me,

11  where is the difference.

12          **MR. MURA:** Okay.  And our disagreement has to do with

13  how Sandoz is looking at newly acquired information in a very

14  blinkered way.  So its obligations begin when it enters the

15  market.  But the mere fact that certain data predates the

16  label's approval under a 505(b)(2) does not mean -- they're

17  assuming that the FDA considered that information in 2011, all

18  the information that predated, which is why they're saying,

19  "The clock has to start in 2011 because we got our approval.

20  The FDA considered this information."  And that's not how the

21  505(b)(2) pathway works.

22          It's completely contrary to this Court's rulings,

23  including, in *Kahn*, and the preemption ruling in the Sanofi

24  cases because this Court has held that an association between

25  docetaxel and permanent alopecia was not known to the FDA.  It

OFFICIAL TRANSCRIPT

1  said that at the time, relevant time that Sandoz's NDA was
2  approved.  That's at 508 F.Supp.3d at 85.

3         What the Court said is the data on permanent alopecia
4  was apparently accumulating in the years before 2015, and the
5  FDA was not recognizing it.  And the Court said that it was not
6  until patients alerted the FDA to the risk of permanent
7  alopecia in 2015 that the agency first took note.  The Court
8  wrote the evidence shows that the FDA learned from third-party
9  sources about the risk of permanent alopecia.

10        So it's not the case that in 2011 the FDA made some
11 determination that all the evidence that predated that date was
12 insufficient to support a different label.  That wasn't the
13 question before the FDA, and so it makes no sense for Sandoz to
14 say we can't even look at that data.

15        What the Court has said about newly acquired
16 information is that it's accumulating data and you don't look
17 at it in a vacuum.  You don't just look at a single study to
18 determine whether that study had a very different incidence
19 rate or alone would support a label change.  You look at the
20 data in its entirety, and each piece of the puzzle provides
21 information.

22        And so if you look at that information as a whole,
23 there's no question that in 2011 when Sandoz came on to the
24 market, there was sufficient information out there for Sandoz
25 to have asked -- to have updated the label through a CBE

OFFICIAL TRANSCRIPT

1  change.  So that's why we don't think that Sandoz's approach to
2  saying plaintiffs have to identify --

3      **THE COURT:** I guess where I'm having difficulty in
4  this process is Sanofi had reports that were coming in into
5  TAX316 study.  They had all of that, and I'm not sure Sandoz
6  had all of that.  And then they also had access to the FAERS
7  database.  I think there's a question as to whether or not
8  these 505(b)(2)s had access to that.

9      So it seems to me -- and so this is my question to
10 you -- that what they had were some reports, some literature,
11 that was showing what I would call, perhaps, a questionable
12 uptick that might cause a manufacturer to say, "We need to look
13 into this."

14     And so my question is:  Is Sandoz, in that first six
15 months, just having to look at this literature with having no
16 reports to them, no access to the underlying data from some of
17 these other studies?  Is that sufficient to be newly acquired
18 information?  Are you arguing that that's sufficient?

19     **MR. MURA:** Well, let me address the idea that Sandoz
20 didn't have some of this information about TAX316 because the
21 records show that in 2010 and 2011, Sandoz's foreign labeling
22 for docetaxel in Austria, Germany, and Australia included
23 persistent alopecia data from Sanofi's TAX316 clinical trial.
24 So that information was available.

25     But even so, if you look at -- I mean we did cite

OFFICIAL TRANSCRIPT

1  Palamaras and Miteva which were published while the NDA was

2  pending, and those authors linked docetaxel to permanent hair

3  loss.  And the only explanation is you have to look at those in

4  a vacuum, and you have to just examine what they said about

5  incidence rates, and looking at that, we don't think it was

6  enough.

7          But you don't look at that in a vacuum.  And in any

8  event, that was newly acquired information that was available

9  to Sandoz.  And Sandoz's arguments are essentially that we just

10 assume that the FDA had all of this information, including,

11 information that Sanofi was providing.  But the problem with

12 that argument is that the FDA was not reanalyzing information.

13 And the Court has correctly recognized in its preemption ruling

14 that the FDA was not aware until 2015.  So Sandoz had a legal

15 obligation to provide a label change.

16         It's claiming that it's entitled to immunity, but it

17 did nothing to meet the *Albrecht* standard that, I believe

18 Counsel said, correctly applies to it because it's a brand name

19 drug.  There's claims in the argument that it's a generic drug.

20 And so in our view, that is sufficient evidence because we've

21 both cited additional studies, and you have to look at those

22 studies holistically.

23         **THE COURT:** Please proceed.

24         **MR. MURA:** Your Honor, I think the last point I'll

25 make is about the analysis of the FDA's adverse event database.


                    OFFICIAL TRANSCRIPT

1  The Court has said and it's looked at, you know, whether that
2  information could be analyzed.
3          And so there's no question that -- it's not a
4  question of whether they analyzed it and reached a different
5  conclusion.  Sandoz just didn't do the work.  I do think it's
6  fair to say that Sandoz's behavior in 2011 was, "We're just
7  going to follow the leader."  So Sandoz just didn't do any work
8  to provide the FDA with this information.  It didn't do any
9  work to provide an update to the label.  It didn't do it until
10 after Sanofi provided an update to the label.
11         And that, you know, that is how it historically
12 played out.  But we provided FDA guidance, including, from
13 Janet Woodcock, which clearly explained that the labeling
14 obligations are independent, including, if a brand name drug is
15 taken off the market, that does not automatically take off the
16 505(b)(2) because it's a brand name drug.  If you look at the
17 statute, it imposes CBE obligations on an NDA holder which --
18         **THE COURT:** I agree with that.  You can't have it both
19 ways.  But I think Sandoz has conceded that, "My obligation is
20 independent of Sanofi's."
21         Okay, thank you.
22         **MR. MURA:** Yes, Your Honor.
23         **MR. OSTFELD:** Thank you, Your Honor.  I'll be brief.
24         I believe Counsel's predicate assumption is that this
25 is the same as *Kahn* because the FDA was not aware of

OFFICIAL TRANSCRIPT

1   accumulating data and Sandoz apparently was.  The problem is

2   plaintiff cannot point to any evidence in the record that

3   establishes that Sandoz was aware of accumulating data that was

4   not before the FDA.

5        The TAX316 and GEICAM studies were before the FDA.

6   What Sandoz knew about those studies and what was showing up in

7   the foreign regulatory filings was the same data and the same

8   information that was before the FDA.  Sandoz did not have, and

9   it's undisputed Sandoz did not have, the underlying clinical

10  data that Sanofi had.  Sandoz also did not have the

11  accumulating data, those 1,000 alopecia reports that Sanofi

12  submitted to the FDA in 2015.

13       So essentially, Sandoz and FDA were in the same boat.

14  There may have been accumulating data, but it was not data that

15  was accumulating on Sandoz's radar screen.  The only evidence

16  on that in the record is Mr. Williams' opinion indicating that

17  he analyzed everything that was in front of Sandoz.  It was

18  just a handful of adverse reports, and it wasn't enough to give

19  rise to a signal.

20       Even Mr. Ross, plaintiffs' expert, does not say that

21  Sandoz met the newly acquired information standard at the

22  specified rate prior to the 2015 Sanofi label change.

23       Now foreign labeling, obviously, we have issues with

24  that.  I mean essentially, these are just foreign regulatory

25  authorities making different decisions based on the same data

OFFICIAL TRANSCRIPT

1    that was before the FDA.  So the fact that Sandoz had a

2    different label overseas than it had in the United States is a

3    reflection of different regulatory schemes, not evidence that

4    it had accumulating data that it was somehow showing to foreign

5    regulators, but not showing to the FDA.  There's no evidence of

6    that.

7            On the analysis of the FDA data, what was in the

8    FAERS database, I respectfully disagree with the notion that

9    Sandoz somehow had a pharmacovigilance obligation to analyze or

10   had the ability to analyze what was in that database.  As Your

11   Honor has heard plenty of evidence on this, what's in that

12   database, on the public-facing side, is relatively minimal

13   versus what the actual reporting manufacturer has.  Sanofi has

14   all the information regarding confounding factors, potential

15   alternative causes, you know, all of the details of these

16   reports that Sandoz does not have.

17           But even if you accept plaintiffs' premise, they're

18   saying there was a signal in 2000, 2004, 2008, 2010.  So these

19   were all data that were before the FDA, the FDA's database.

20   There's no suggestion that this couldn't have been before the

21   FDA.  There's no suggestion there's an analysis --

22           **THE COURT:**  But it's not the FDA's responsibility.  At

23   the end of the day, it is the manufacturer's -- the label is

24   the responsibility of the manufacturer.  They had the

25   information there, but to analyze it.

                        OFFICIAL TRANSCRIPT

1          **MR. OSTFELD:** But there also needs to be evidence to

2   suggest that the data that was accumulating in the FDA database

3   after, post-approval of Sandoz's docetaxel and Sandoz's label

4   at least changed.  You can look back at the accumulating data,

5   but there has to be a change in circumstances post label

6   approval.  Otherwise, what plaintiffs are really doing is

7   challenging the label that we got approved by the FDA.

8          And *In re Celexa* is pretty clear on this as is the

9   *Buckman* case.  You don't get to second guess the FDA's approval

10  decision on this.  You don't get to say that we hid the ball

11  from the FDA.  That's a fraud on the FDA claim, and it's

12  preempted.  The FDA is the exclusive judge of the sufficiency

13  of the label.  Once the label comes in, then you look at

14  whether the mix of information changed in the ensuing seven

15  months, and there's no evidence that it did, Your Honor.

16         **THE COURT:** Thank you.

17         **MR. OSTFELD:** Thank you, Your Honor.

18         **THE COURT:** Mr. Ruttinger.

19         **MR. RUTTINGER:** Good morning, Your Honor.  May it

20  please the Court, Mike Ruttinger representing Accord

21  Healthcare, Incorporated as to the summary judgment motions

22  filed in the *Adams*, *Cooper*, and *Woodson* cases.

23         It's a threshold matter today.  I know you've already

24  heard Mr. Ostfeld talk a lot about the changes being effected

25  regulation, the newly acquired information definition.  I'm not

OFFICIAL TRANSCRIPT

1   going to spend a lot of time addressing how those interact with

2   the federal preemption standard.  I think this Court's got a

3   pretty good grasp on that.  I'm also not going to talk an awful

4   lot about the scientific literature or data.  I think that's

5   more or less covered in the briefs.

6           Instead, I want to focus today on a bigger-picture

7   problem with plaintiffs' approach to these cases and why that

8   approach requires a finding of preemption as to Accord.  And

9   that's that plaintiffs have approached all of these cases with

10  a sort of one-size-fits-all theory of liability that would hold

11  every manufacturer, including, all of the 505(b)(2)

12  manufacturers and Accord, culpable for ignoring what they

13  characterize as the accumulating data regarding persistent

14  alopecia.

15          The problem with a one-size-fits-all theory of

16  liability to this is that it conflicts with what the Supreme

17  Court itself has said about how you determine impossibility

18  preemption based on, if you look at the *Albrecht* case, the

19  Court having to look at these issues on each defendant's

20  specific regulatory record.

21          That framework for preemption is a problem for

22  plaintiffs because they've chosen to litigate this case against

23  Accord, and frankly, against all the 505(b)(2) defendants,

24  based on the exact same record they attempted to litigate it

25  against Sanofi on the assumption that all of the 505(b)(2)

OFFICIAL TRANSCRIPT

1   defendants have access to the exact same universe of data as
2   Sanofi.

3           But we know that 505(b)(2) manufacturers come from a
4   different regulatory pathway than a 505(b)(1) manufacturer like
5   Sanofi does and necessarily have access to a more limited
6   universe of information.  That's by design.  When Congress
7   enacted the Hatch-Waxman Amendments and created the 505(b)(2)
8   pathway to market, it did so intending to be creating an
9   approval scheme that would streamline bringing life-saving
10  therapeutics, like docetaxel treatments, to market with fewer
11  barriers to entry and fewer costs.

12          And for that reason, it may curtail on some of the
13  clinical trial information stuff on the front end so that these
14  manufacturers would rely, in terms of the FDA's guidances, to
15  the greatest extent possible on what's already known about the
16  safety and efficacy of the Reference Listed Drug, in this case,
17  Taxotere.

18          Now what that means is that manufacturers, 505(b)(2)
19  manufacturers, once they come to market, they carry out the
20  same post-market surveillance, the same pharmacovigilance
21  obligations as Sanofi.  But when they actually look at that
22  information when they receive an adverse event report or a new
23  study -- Mr. Ostfeld talked about sort of needing the trigger
24  to determine when it's necessary to conduct that reanalysis.
25          505(b)(2) manufacturers, because of their regulatory

1  pathway, Congressionally intended, can't take a new study and
2  contextualize it or reanalyze it in the same way a 505(b)(1)
3  like Sanofi is able to.   And you don't have to take my word for
4  it.   When you look at Accord's regulatory record, plaintiffs
5  have essentially conceded the way in which Accord's approach to
6  these, in looking at new data as it comes in, was necessarily
7  different from Sanofi's.

8          So it's undisputed that Accord, whose docetaxel
9  differed from Taxotere only with respect to two inactive
10 ingredients, was told by the FDA before approval rely to the
11 greatest extent possible on what's already been shown with
12 respect to Sanofi, and that Sanofi is Taxotere.   What that
13 means in terms of the regulation is that Accord did not have a
14 right of reference to Sanofi's clinical trial data.

15         In practice, it's important because it means while
16 Accord could rely on the fact of Taxotere being found to be
17 safe and effective for market, it couldn't so to speak look
18 under the hood into Sanofi's underlying clinical trial data.
19 And also, when it comes to whether or not Accord could make a
20 CBE supplement or make a CBE submission when it did, it can't
21 use that underlying Sanofi data as part of its CBE supplement.
22 So it's got to have data of its own that it's seeing that would
23 be sufficient to meet that standard.

24         Now plaintiffs have effectively conceded that Accord
25 didn't have anything that would have reached the level of newly

OFFICIAL TRANSCRIPT

1    acquired information at that time.  They actually admit in

2    response to the facts that we filed in support of our summary

3    judgment motion that Accord instituted various standards of

4    operating procedures for carrying out pharmacovigilance and

5    surveillance.  They've admitted that we made quarterly reports.

6    They've admitted that during the relevant time frame for these

7    cases, Accord received no adverse event reports regarding

8    persistent alopecia to trigger any kind of reanalysis, and

9    they've also admitted that we couldn't have made up for our

10   relatively narrow vantage point as a 505(b)(2) by accessing any

11   of the FAERS data or adverse reports of other manufacturers, be

12   they other 505(b)(2)s or of Sanofi itself.

13           So the upshot of all this, Your Honor, is that

14   preemption questions have to be answered from the vantage point

15   of each individual defendant in light of its regulatory

16   history.  The record is clear that Accord had a different and

17   much more narrow vantage point than Sanofi.

18           But you won't hear plaintiff really get into that

19   issue because the reality is that neither plaintiffs nor their

20   experts have ever attempted to compare what Accord actually

21   received and knew with what Sanofi had access to.  And without

22   doing so, plaintiffs can't refute Accord's regulatory record

23   and can't negate its defense that it would have been impossible

24   for Accord to submit a CBE application or submission during the

25   relevant time frame in these cases.


                        OFFICIAL TRANSCRIPT

1          Now I want to close with a note about the significant
2    policy applications your decision here carries because holding
3    the plaintiffs' one-size-fits-all theory of liability in this
4    case would effectively require a 505(b)(2) manufacturer to
5    devote substantially greater resources at the time following
6    approval, and frankly, even at the time of FDA approval itself
7    in the 505(b)(2) pathway which is sending a mixed message with
8    what the FDA has said about 505(b)(2)s needing to rely to the
9    greatest extent fully possible on what has already been
10   established for that drug.

11         The consequence variable may be that it increases the
12   barriers for entry of 505(b)(2)s to market and increases the
13   costs of these drugs.  Both of which are at odds with the
14   scheme Congress put in place when it created the 505(b)(2)
15   pathway in the first place.

16         So I won't take up more of this Court's time unless
17   there are any further questions.  We would ask that you
18   consider the motions for summary judgment in the *Adams, Cooper*,
19   and *Woodson* cases and rule in Accord's favor.

20         **THE COURT:** Thank you.

21         **MR. MURA:** Your Honor, thank you again.

22         Let me start with this argument that you have to look
23   at each 505(b)(2) individually because then the argument you
24   heard was that and then you can find no 505(b)(2) can be held
25   liable because no one has the information that Sanofi has.  And

OFFICIAL TRANSCRIPT

1  that's just not --any -- including this Court has defined newly

2  acquired information.  What this Court --

3                    (Audio technical difficulties.)

4            **THE COURT:** You froze up a little bit; so I'd like you

5  to go back.

6            You spoke about Accord taking the position that you

7  analyze each one differently, but then ends with all of -- so I

8  want you to go back because I don't want to miss what you're

9  saying.  Thank you.

10           **MR. MURA:** Yes, Your Honor.  I'm sorry for freezing

11 up.

12           What I was saying is the argument that you heard was

13 look at each 505(b)(2) individually, but then the legal

14 argument that you heard was you should find that no 505(b)(2)

15 can be held liable because no one other than Sanofi had

16 Sanofi's information.  And that's just not consistent with any

17 regulatory understanding of newly acquired information.

18           And what this Court said in *Kahn* is exactly correct.

19 Newly acquired information is defined as an analysis of the

20 accumulating data, including, any pertinent data that predated

21 supplemental application.  And so it's an increasing body of

22 data.

23           There was sufficient data.  And if you wanted to look

24 at what Accord knew, noticed, just look at the 2012 European

25 label.  In Section 4.8, it said cases of persisting alopecia

1  have been reported.  So there's no question that Accord was

2  aware that cases of persisting alopecia have been reported, and

3  yet it did nothing to update the U.S. label.

4       And I know they say there are different regulatory

5  standards in Europe and the U.S., but that's not what we're

6  citing the European label for.  We're citing it for purposes of

7  notice and knowledge.

8       And now they've said, well, that's sort of a lame

9  duck.  That's a part of Accord that's separate.  But I don't

10  think that, you know, the question of whether Accord could know

11  and provide information to the FDA is apparent especially

12  because here you have dates of administration which are much

13  later, much closer in time to 2015, and you have all the

14  studies and information that we cited.

15       And so -- and that includes, again, Palamaras and

16  Miteva, and it includes other studies as well and consistent

17  with this Court's ruling which said that Sedlacek itself is

18  newly acquired information that supports a causal association.

19       I think Accord, even if you just look at what Accord

20  knew, Accord cannot show as a matter of law that it had no

21  newly acquired information for which it could go to the FDA and

22  say we want to update the label to say cases of persisting

23  alopecia have been reported when it had done so in Europe in

24  2012.

25            **THE COURT:** Mr. Mura, let me ask this.  Is there a

OFFICIAL TRANSCRIPT

1  different analysis at all that this Court should apply when

2  dealing with Sanofi and the 505(b)(2)s?

3           Because there is a different body of evidence that

4  Sanofi had in its possession, we can agree to that.  My

5  question is:  How is my analysis to change or should it at all

6  with Sanofi and the 505(b)(2)s?

7           **MR. MURA:** Your Honor, we don't think it should

8  change.  Because in the Sanofi preemption ruling, the Court had

9  not found or rejected preemption based on something that was,

10 for example, in Sanofi's vault, right.  It has always looked at

11 information that was equally available to Accord.  So for that

12 reason alone, the Court's prior rulings on preemption are fully

13 supportive of our position on preemption with respect to the

14 505(b)(2)s.

15          It would have been different if Accord had said,

16 look, Sanofi didn't have it, the world didn't have it, no one

17 else had it, and that was the basis for finding no preemption

18 for Sanofi.  I might understand why Accord would be making the

19 arguments it did.  But if you review the Court's preemption

20 ruling, that was not its analysis.  I mean it looked at things

21 like Sedlacek and talked about how that information was newly

22 acquired and how that information had not been provided to the

23 FDA, how patients had alerted the FDA, and the FDA began to

24 work with Sanofi in 2015.

25          So all of that is based on information that Accord

OFFICIAL TRANSCRIPT

1   was aware of which is quite obvious given the European label
2   where it first introduced the language that it would later
3   introduce in the U.S. label.  And so I do think that it's an
4   especially new argument for Sandoz and Accord because all of
5   this is happening in 2011 and the preemption ruling with
6   respect to Sanofi had to do with the type of information that
7   was available to them and had to do with dates of
8   administration that were in 2009 and 2011.

9          So all of those rulings essentially compel a ruling
10  here in our view in favor of finding no preemption because I do
11  think also that --

12          **THE COURT:** Let me ask this question.  Because it
13  seems to me that if these labels were approved by the FDA, are
14  you not making the challenge to the initial label that was used
15  by Accord and Sandoz?

16          I know we're dealing with Accord now; so let me just
17  keep my record straight.  As to Accord, are you not making, are
18  you not challenging the initial label?

19          **MR. MURA:** When you say "initial label," we are not
20  challenging the Sandoz 2011 initial label, and that's why we
21  focus on the regulatory requirement and the 505(b)(2) pathway
22  because the FDA is not looking in 2011 at all the evidence and
23  deciding safety and efficacy.

24          It is a pathway that says effectively you can
25  introduce this drug because it's on the market to the extent

OFFICIAL TRANSCRIPT

1  that you have changes to support them.  And so it's very clear,

2  the regulatory standard, that what Sandoz is getting is it's

3  becoming an NDA holder with all the responsibilities of an NDA

4  holder.  But what the FDA is doing is it's not signing off on

5  all the evidence present in 2011 and saying there wouldn't be a

6  basis to change the label to say things like cases of permanent

7  alopecia have been reported.  It's not having that conversation

8  in 2011 at all.  It's not having that until 2015.

9          **THE COURT:** I have one more question, Mr. Mura, one

10  more, and it's probably going to lead to another, but for right

11  now anyway.

12          Does the record before me indicate exactly what

13  Accord presented to the FDA so that I can satisfy myself that

14  you did not bring this information to them at that time?

15          **MR. MURA:** I think there's nothing in the record.  And

16  again, the burden, this is an affirmative defense.  The burden

17  is on Accord and Sandoz to say that they fully informed the FDA

18  and the FDA rejected language, right.

19          And so Accord and Sandoz point to nothing that

20  happened in 2011 where they fully informed the FDA and the FDA

21  said, no, you cannot include in your label, your independent

22  label language, such as, cases of permanent alopecia have been

23  reported.  So if there's an absence of evidence of that, that's

24  a big failure of proof on Accord and Sandoz's part.

25          If I could just make one more point about -- I do

OFFICIAL TRANSCRIPT

1  think there's an analogy here.  Everyone understands that a
2  true generic cannot be sued anymore.  But essentially, if you
3  had the FDA approve a generic, this is sort of equivalent to a
4  brand name drug then saying the clock starts again because the
5  FDA approved the generic.
6          And that argument would be rejected because what the
7  FDA is doing when it's approving a generic, it's not doing a
8  full, complete review of the evidence before it.  It's just
9  allowing a generic to enter on the market because the brand has
10  been on the market.
11          So here, part of the pathway is just allowing drugs
12  on to the market based on the fact that these other drugs are
13  on the market and requiring the 505(b)(2)s to substantiate the
14  changes that they're making to the drug and also imposing on
15  them the obligation of an NDA holder.  I think that's
16  undisputed that they have the same obligation, they have an
17  independent obligation as an NDA holder.  I think Sandoz agreed
18  with that.
19          I think Accord sometimes says it agrees with that.
20  Other times in its brief, it sort of suggests that it does have
21  some obligation to go second after Sanofi.  I don't think
22  that's supported.  And the only federal district court case on
23  this issue from Arizona rejected the application of that
24  *Mensing* framework in the context of the 505(b)(2).  So you do
25  have one case out there.

OFFICIAL TRANSCRIPT

1          But I hope that -- unless the Court has any other
2   questions?
3          Okay, thank you very much, Your Honor.  We ask that
4   the Court deny the motion.
5          **THE COURT:** Thank you.
6          Mr. Ruttinger, briefly.
7          **MR. RUTTINGER:** Briefly.  Thank you, Your Honor.
8          Just a couple quick points, and I want to start out
9   with this question that Mr. Mura ended on and answer your
10  question, Your Honor, about how the analysis changes in this
11  case between a 505(b)(2) versus a 505(b)(1) like Sanofi.
12         So let me make clear what we are not arguing.  We are
13  categorically not arguing that a 505(b)(2) is a 505(j) generic
14  drug or gets a *Mensing* style preemption argument.  The fact of
15  505(b)(2) approval doesn't lead to a preemption.  And the
16  Court's analysis for how it looks at whether Sanofi had newly
17  acquired information or a 505(b)(2) like Accord had newly
18  acquired information is legally the same regulations and
19  standards.
20         The place where the difference between a 505(b)(1)
21  like Sanofi and a 505(b)(2) like Accord matters is what
22  factually the information, the universe of data that those
23  manufacturers had access to is.  Because the limits and
24  parameters of that universe of data fundamentally affects when
25  it is that a 505(b)(2) versus 505(b)(1) can actually make a CBE

OFFICIAL TRANSCRIPT

1  update.

2          Now in terms of the record in this case with a

3  505(b)(2) like Accord, we're not saying that Accord can never

4  submit a CBE because it's a 505(b)(2).

5          **THE COURT:** Oh, I know.  I know.

6          **MR. RUTTINGER:** So what I am saying, and plaintiffs'

7  counsel has ignored this in this case, is there might be

8  occasions when a 505(b)(2) can submit it, for example, had we

9  received a bunch of, you know, adverse events during the

10  relevant time frame about persistent alopecia.  Plaintiffs

11  conceded in their briefs and in their response to our statement

12  of facts that Accord received zero adverse event reports about

13  persistent alopecia during the relevant time period.

14          When Mr. Mura says there's nothing in the record that

15  would support a ruling on preemption in Accord's favor in this

16  case, I urge this Court to go back and look at those separate

17  statement of facts that were filed in this case and see where

18  plaintiff admitted, and Accord put this evidence in the

19  regulatory record for these cases, that Accord fulfilled its

20  obligation by creating standard operating procedures, that it

21  did, in fact, report safety data to the FDA, that it received

22  no adverse event reports during the relevant time period, and

23  plaintiff further admitted that Accord did not have an ability

24  to access other manufacturers' adverse events.

25          Actually, in fact, if you look at Accord's briefs on

OFFICIAL TRANSCRIPT

1    this and you look at the federal dashboard, public dashboard

2    for Federal Adverse Event Reports that plaintiffs have

3    referenced before, it wasn't even launched until 2017.

4            **THE COURT:** Right, right.

5            **MR. RUTTINGER:** So fundamentally, the record here

6    shows that there was nothing that Accord actually could have

7    based a change being effected.

8            I do want to address very briefly the Sedlacek study

9    that plaintiff has relied on.  To answer the question you

10   asked, Your Honor, there's a very fine and technical line here,

11   I think, between this argument that says, well, we're not going

12   to contest the adequacy of labels at the time of approval for a

13   505(b)(2) like Accord, but we're going to try to reach back to

14   all of that preapproval data on day one after approval and then

15   hold you liable on that.  I just don't think it's tenable.

16           I think the case law is relatively clear that the

17   knowledge that matters starts at the date of the 505(b)(2)'s

18   approval and that the case law has held that those 505(b)(2) or

19   any NDA approval is deemed adequate as a matter of law at the

20   time of approval which is what the *Celexa* case at the First

21   Circuit said and the *Maze* case cited in our brief said.

22           With that, thank you, Your Honor, and we urge you to

23   grant summary judgment.

24           **THE COURT:** Thank you all.

25           **MR. MURA:** Thank you, Your Honor.

OFFICIAL TRANSCRIPT

1          **THE COURT:** Court's adjourned.

2               (Whereupon this concludes the proceedings.)

3

4                         **CERTIFICATE**

5     I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

6     the United States District Court, Eastern District of

7     Louisiana, do hereby certify that the foregoing is a true and

8     correct transcript, to the best of my ability and

9     understanding, from the record of the proceedings in the

10    above-entitled and numbered matter.

11

12                    */s/Alexis A. Vice, RPR, CRR*
                      Alexis A. Vice, RPR, CRR
13                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

                    OFFICIAL TRANSCRIPT