LAW  OFFICES

ROBERT J. DAVID
GERALD E. MEUNIER
IRVING J. WARSHAUER
MICHAEL J. ECUYER
WALTER C. MORRISON IV*
M. PALMER LAMBERT
RACHEL M. NAQUIN
CLAIRE E. BERG
BRITTANY  R.  WOLF

OF COUNSEL STEVAN C. DITTMAN

*ALSO ADMITTED IN MISSISSIPPI

**GAINSBURGH, BENJAMIN,**
**DAVID, MEUNIER & WARSHAUER,  L.L.C.**

2800 ENERGY CENTRE
1100 POYDRAS
**NEW ORLEANS 70163-2800**

TELEPHONE
(504)  522-2304

TELECOPIER
(504)  528-9973

SAMUEL C . GAINSBURGH
(1926-2003)
JACK C. BENJAMIN
(1927-2018)

NEWROADS OFFICE:
143 EAST MAIN STREET
SUITE 3
NEW ROADS, LA 70760
TELEPHONE : (225) 638-8511

JACKSON OFFICE :
240 TRACE COLONY PARK DR .
SUITE 100
RIDGELAND, MS 39157
TELEPHONE: (601) 933-2054

**REPLY TO  NEW  ORLEANS OFFICE**

February 18, 2022

*Via Email (Brittany_Flanders@laed.uscourts.gov)*
The Honorable Jane Triche Milazzo
United States District Court of the Eastern District of Louisiana
500 Poydras Street
Room C206
New Orleans, LA 70130

Re:    PSC Proposed Case Management Order – Wave Discovery and Remand
*In Re: Taxotere (Docetaxel) Products Liability Litigation*, MDL 2740

Dear Judge Milazzo,

At Your Honor's direction, the PSC and Sanofi have exchanged proposals and conferred regarding a proposed Case Management Order to begin the process of preparing cases for eventual remand.  While the parties' proposals overlap in some regards, we have been unable to reach agreement on important issues that remain for the Court's determination.

Because the structure of each party's proposal is different, we have endeavored to compare them via the attached table (Exhibit A) which summarizes our differences by issue.  We also attach a chart of the PSC's proposed schedule (Exhibit B) for the Court's convenience.  Our hope is that the table will assist the Court in evaluating the remaining issues.

The PSC's proposal mirrors the process implemented in Xarelto. *See* Xarelto CMO 6, attached as Exhibit C.  What Sanofi proposes is not a wave discovery process, but rather individualized motion practice on a handful of cases followed by discovery.  The Xarelto orders provide a similar framework to what the PSC suggests, with no motion practice authorized prior to discovery; consistent with the PSC's proposal, motions were only allowed after the discovery process in cases to be remanded within the Eastern District. *See* Xarelto CMO 8, attached as Exhibit D.

## I.    Size of Discovery Waves

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| **Number of Cases** | |
| **Wave Discovery Process**: 600 cases to be selected in two Waves. | |
| **Wave 1 Case Selection (April 4, 2022):** 300 plaintiffs for Wave 1 - 100 per party and 100 random. No more than 20 cases by same counsel.[1] | **Discovery Pool 1**: 75 cases by random selection. |

The PSC has carefully reviewed other discovery/wave workup orders in similar MDLs. In the Xarelto MDL, Judge Fallon instituted a process in CMO 6 comprised of a 1,200-plaintiff workup divided into two 600-plaintiff waves. His Honor divided the selections evenly between plaintiff nominations, defendant nominations and random selections. Since the Xarelto MDL had more than 21,000 cases pending at the time the order was instituted, and given this MDL is roughly half the size, the PSC's proposal of 300-plaintiff waves is proportional and appropriate.

Sanofi's proposal, on its face, requests a wave of only 75 cases; however, as will be discussed below, Sanofi's actual number of cases that would comprise a wave would be significantly reduced by the exclusion criteria set forth in paragraph 4 of its proposal. Plaintiffs believe a more significant number of cases should comprise each wave to ensure meaningful progress is made towards conclusion of the MDL.

## II.    Criteria for Selection of Cases

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| **Qualifications to Enter Discovery Wave** | |
| **Eligibility (Wave 1):** (1) Sanofi only case (Taxotere or Winthrop) based on PID identified in Section III of PFS. (2) Must have photo evidence of hair condition prior to infusion and photo | **Eligibility:** (1) Only single-defendant cases based on PID identified in Section III of PFS. |

---

[1] Plaintiffs' position is that there should be an appropriate limitation on the number of cases selected from any given firm. The 20-case limitation proposed herein should be adjusted in the event a different number of cases comprise a given Wave.

| | |
|---|---|
| evidence of hair condition more than 6 months after infusion.<br>(3) Both parties include living plaintiffs, but Sanofi's proposal would be applied after selection.<br>(4) Both parties exclude infusions prior to 12.15.06 and after 12.11.15, but Sanofi's proposal would exclude them after selection.<br>(5) Plaintiffs propose excluding Fifth Circuit and Michigan cases. Both sides exclude Michigan and Texas, but Sanofi would exclude them after selection. | |
| **Exclusion (Strike) Criteria:**<br>PSC proposes that all 300 cases selected should move forward with discovery without a deselection process, unless a plaintiff voluntarily dismisses. | **Exclusion (Strike) Criteria:**<br>Sanofi proposes exclusion criteria to reduce the 75 cases before discovery.<br>(1) If PID contested, Court determines, but it is not a determination of PID.<br>(2) Must have complied with CMO 12A.<br>(3) Living plaintiffs only.<br>(4) Photos must comply with PTO 68.<br>(5) CMO 14C- Requires certification of willingness to proceed within 14 days. If unwilling or cannot be contacted, plaintiff is ineligible for discovery pool and subject to a rule to show cause.<br>(6) Treatment before 12.15.06 and after 12.11.15.<br>(7) Resides or treated in MI.<br>(8) "Certain state law impediment to claims against FDA approved medicines", ex. TX, NJ.<br>(9) Exclude lack of medical diagnosis (comply with Sanofi's proposed *Lone Pine* order).<br>(10)      Must not be facially time-barred. |

Plaintiffs' proposal creates conditions that would be applied to the population of plaintiffs **before** the 300 cases are selected.  There have been numerous PFS show cause proceedings over the past five (5) years, and the parties should be satisfied that most plaintiffs would meet the PSC's proposed inclusion criteria.  Because Michigan has been ruled upon, both parties agree cases

involving application of Michigan substantive law should be excluded.  In the bellwether process, due to *Lexecon* and limitations on the Court sitting by designation outside the Fifth Circuit, all cases worked up thus far have been from within the Fifth Circuit.  This Court has addressed numerous motions involving application of Louisiana and Mississippi law.  Therefore, the PSC suggests the first wave of cases should prioritize cases from outside the Fifth Circuit.[2] Sanofi agrees, in part, as their proposal also excludes Mississippi and Texas.

Sanofi's proposed exclusions apply *after* the random selection of 75, reducing the number of cases for workup and creating an unworkable culling process that would impede the efficient workup of cases for eventual remand.  The certification of willingness and ability to proceed, combined with penal "strike" provisions, in CMO 14C was a bellwether order instituted to avoid imbalance in the bellwether pools, due to the importance placed on bellwether results.  It is unnecessary here, where the PSC's proposal would allow dismissals with prejudice and without penalty within 30 days of selection.  Additionally, Sanofi's proposal would do exactly what the Court indicated would not be acceptable, i.e., putting show cause and motion practice ahead of the wave remand process.

Given the history of this MDL, it is reasonable to envision Sanofi's proposal will result in many contradictory hearings on the many exclusion categories suggested by Sanofi (compliance with CMO 12A, PTO 68, CMO 14C, state law prohibiting claims against approved drugs, determination of a facially time-barred claim). Application of these numerous exclusions *after* selection would complicate the process, insert unnecessary and predictable delay, and cause inefficiency in this Wave discovery framework.

## III.   *Discovery Wave 2 (Inclusion of 505(b)(2) Defendants)*

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| Case Selection – Wave 2 | |
| **Wave 2 Case Selection (August 12, 2022)**: 300 plaintiffs for Wave 2- 100 per party (any defendant) and 100 random. No more than 20 cases by same counsel. | **Discovery Pool 2:** Sanofi only proposes one pool. |
| Eligibility for Wave 2 | |
| **Eligibility for Discovery Wave 2:** Same criteria except the pool would include the 505(b)(2) defendants, and Louisiana and Mississippi cases. | |

---

[2] However, the PSC would note that some plaintiffs traveled to Texas for treatment, likely because of Texas' renowned cancer treatment centers.  Rulings on pending choice-of-law motion practice regarding cases with some connection to Michigan may resolve some of the issues; however, the PSC's position is that plaintiffs who resided in other states, and whose only connection to Texas is travel to a cancer center, should be allowed to participate in the remand Waves.  The MDL Centrality data can be culled to exclude only cases where all contacts are with Texas, i.e., residence, oncologist location, and treatment location.

Plaintiffs and Sanofi each propose including the 505(b)(2) defendants in the discovery and remand processes.  Sanofi's proposal contemplates only single-defendant cases.

The PSC agrees that Wave 1 should include only single-defendant cases involving Sanofi, but Wave 2 should include the 505(b)(2) defendants, and the PSC contends the single-defendant restriction should not apply in Wave 2. The 505(b)(2) defendants do not agree that the remand process should apply to them, and, as we understand, will be submitting papers to the Court justifying their position.

With regard to the 505(b)(2)'s contention that remand of their cases is premature, our collective experience in this MDL suggests otherwise.  Indeed, the three largest 505(b)(2)s defendants, in terms of cases identifying them as defendants, have each had the opportunity to do expert discovery in the bellwether process, assess the strengths and weaknesses of the experts and certain defenses through motion practice, and receive the Court's rulings on general causation matters that we anticipate will apply similarly in their cases.  They have had the benefit of participating in each aspect of the MDL. And, perhaps most importantly, the general causation issues – whether docetaxel (the molecule) can cause PCIA – is an issue common to all defendants that manufacture, package, market and sell a docetaxel product.

Preemption briefing and oral argument on Sandoz's and Accord's motions is complete.[3] The PSC anticipates that such briefing will be ruled upon prior to the PSC's proposed start date for selection of Wave 2 cases, August 2022.  Additionally, regarding *Daubert*, the PSC's proposed CMO on trial package expert depositions will afford the 505(b)(2) defendants, and, in fact, all defendants, a final opportunity to address any unresolved *Daubert* issues.  Litigating common issues once and once only is one of the primary reasons for an MDL,[4] and each defendant's insistence on having "an opportunity" to be heard on issues previously addressed contradicts the efficient use of common resources.

This Court has worked diligently for the past five years, and the parties are now equipped with abundant information—very lengthy and detailed plaintiff fact sheets, PTO 71A electronic discovery, CMO 12A product identification information, evidence produced in discovery, numerous depositions of fact and expert witnesses, two bellwether jury trials, and judicial opinions on numerous issues—all of which the 505(b)(2) defendants have  to evaluate the merits of the remaining MDL cases prior to remand.  This is particularly so concerning the Court's repeated *Daubert* rulings. While the 505(b)(2) defendants have not been parties to the two jury trials, they have participated in every other aspect of the case.

At this point in the litigation, centralization has minimal benefit to any party, including the sensitive population of cancer survivors.  Further, the Court has, on numerous occasions, suggested that the parties, through their Court-appointed settlement committees, endeavor to analyze and

---

[3] The Court invited Hospira to present its own briefing, if it so desires; however, the legal issues are identical to those fully briefed, argued and submitted to the Court for ruling.

[4] 28 U.S.C. 1407 (a) states in pertinent part: "When civil actions involving one or more *common questions of fact* are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." (Emphasis supplied.)

evaluate the potential for resolution given this plethora of information gained over the lifespan of this MDL. The 505(b)(2) defendants have refused mediation and chosen to put their proverbial marbles in the preemption basket. By August, it will be appropriate to include all defendants in the second Wave of this MDL's remand framework. Transferor courts and juries in those locales are well-suited to evaluate the claims and damages alleged by plaintiffs following this process of orderly and efficiently preparing cases for remand.

## IV.   *Scope of Wave Discovery and Depositions*

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| **Scope of Wave Discovery** | |
| **Wave Discovery**:<br>(1) Update/amend PFS, if necessary, in 30 days.<br>(2) Defendant files answer and amends DFS, if necessary, within 60 days.<br>(3) 4 depositions- Plaintiff, prescriber, treater and a sales representative selected by Plaintiff who called on prescriber or prescriber's practice.<br>(4) Joint scheduling of physician depositions. PTO 70B applies.<br><br>Each side agrees:<br><br>(5) No written discovery.<br>(6) Half of the prescribers are examined first by plaintiffs' counsel and half by defendants' counsel. | **Wave Discovery:**<br>(1) Plaintiff must review and update PFS with "wet signature."<br>(2) Plaintiff must review and update CMO 12A with "wet signature."<br>(3) Plaintiff must review and update PTO 71A ESI disclosure with "wet signature."<br>(4) 2-3 depositions- Plaintiff, prescribing and treating physicians (if any).<br>(5) PTO 70B numerical limitations removed, but substantive parts remain in effect (objections preserved).<br><br>Each side agrees:<br><br>(6) No written discovery.<br>(7) Half of the prescribers are examined first by plaintiffs' counsel and half by defendants' counsel. |
| **Deadlines:**<br>Wave discovery complete in 7 months. | **Deadlines:**<br>If plaintiff meets all deadlines, Wave discovery complete within 7 months.<br><br>If all sections of PFS not complete in 30 days dates tolled until complete or case dismissed. |

The areas of disagreement on the scope of Wave discovery are limited. Regarding the number of depositions, the PSC and Sanofi both agree there should be a deposition of plaintiff, the prescribing physician, and a treating physician. Consistent with Xarelto CMO 6, the PSC also

proposes a detail/sales representative deposition be allowed, at plaintiff's selection.[5]  As this Court is aware from the bellwether trials, the case-specific testimony of detail representatives regarding the nurse tear sheet and/or representations made to the trial plaintiff's physicians is important to plaintiffs' claims and defendants' asserted defenses.

Consistent with Xarelto CMO 6, the PSC and Sanofi also agree to split who proceeds first with questioning of the prescribing physicians.  The Defendants have made no showing of why PTO 70B requires amendment by removing the number of prescribing and treating physicians that the defense may contact to determine if the physician will be an expert, as they have had no difficulty retaining experts for their cases.

With regard to updating written discovery, there is simply no reason to require, as Sanofi proposes, that plaintiffs "must" update their PFSs ESI declarations, and product identification disclosures with a "wet signature".  Sanofi cannot demonstrate the need for a wet signature,[6] a procedure which will require many hours of each counsel's time to accomplish and serves no useful purpose. Plaintiffs should only update them, if necessary, in accordance with the Federal Rules of Civil Procedure.

Consistent with Xarelto, neither party proposes additional written discovery. And, both parties propose a 7-month discovery period before remand.

## V.   *Motion Practice*

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| **Dispositive Motions** | |
| **Dispositive Motions:** Reserved for transferor courts. | **Dispositive Motions:** Defendants can file any dispositive motion not involving expert testimony whenever they determine, or on a schedule to follow Wave discovery. |

The PSC firmly believes that motion practice should be deferred to the transferor courts, following completion of Wave discovery. As set forth in our proposal, trial related matters, including deadlines for case-specific Daubert/dispositive motion practice, case-specific expert disclosures/discovery, and motions *in limine* should be subject to the discretion of the trial judges in the transferor courts.[7]   And, although Your Honor has jurisdiction over these cases and the authority to interpret and apply the laws of 49 states on numerous issues (which may be required

---

[5] Six depositions were allowed in Phase 1 discovery in this MDL's bellwether process, the plaintiff plus 3 defendant selected witnesses plus 2 plaintiff-selected witnesses.  *E.g.,* CMO 14.

[6] Amended PTO 22 (Doc. 325) allows for amendments to a PFS to be electronically signed.  One firm's issues with electronic signatures should not be a basis to apply this unnecessary requirement on otherwise complying plaintiffs.

[7] This position is consistent with CMO 8 in Xarelto, where motion practice was limited to issues surrounding suggestion of remand pleadings and the cases slated to be remanded within the Eastern District of Louisiana.

by Sanofi's motion practice), the Court cannot try the cases of the women who successfully defend against dispositive pretrial motions. The PSC suggests that this consequence of the motion practice is highly inefficient and will prove to delay ultimate remand and trials.

Defendants refused to waive *Lexecon* to allow non-Fifth Circuit cases to be tried by this Court. Accordingly, it would be consistent with Defendants' position that this Court respectfully decline pre-adjudication of dispositive motion practice in each and every case outside of the Fifth Circuit before remand.

Sanofi's proposal to file motions at any time of its choosing would potentially create a fiasco of serial motions contemporaneous with the parties' efforts to conduct hundreds of depositions. Not only would such scattershot pleadings impact the efficient preparation of cases for remand, but it would only serve to delay ultimate remand of cases brought by cancer patients. More importantly, it will foster many filings and hearings to resolve the inevitable disputes which will arise. Sanofi's proposal would only serve to further delay remand of the cases by including unnecessary steps before the Court transfers the cases

## VI.   *Remand*

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| **Remand** | |
| **Remand after Wave Discovery:** Court promptly enters suggestion of remand at completion of discovery. Venue in PFS presumed. | **Remand of Pool 1 Cases:** (1) After ruling on motion for trial preservation discovery. (2) After meeting and conferring on schedule for expert discovery, selection for cases to be considered for remand. (3) After suggestion of remand motion practice. (4) After petitions for remand to JPML. |

The PSC's proposal would expeditiously and efficiently effectuate the remand of cases to transferor courts upon completion of the contemplated initial phase of discovery, reserving trial related and expert related issues for the trial judges to schedule and adjudicate. Sanofi's proposal would cause more delay and require yet another set of conferrals and motions before remand.

Sanofi's response to the Court's request to propose a remand procedure doesn't substantively address the method of remand; instead, it suggests that the parties meet and confer to select the cases for remand after the Wave discovery, rulings on motion for trial preservation discovery, and its various motions. Sanofi's proposal when viewed in its entirety is a plan designed to delay ultimate remand as long as possible, mostly within its own control through its self-determined

schedule for motions practice, and to construct barriers to remand as opposed to effectuating it. Sanofi likely will point to Xarelto CMO 8 as its authority, but that Order reserved motion practice and expert deadlines for the cases that would be remanded within the Eastern District of Louisiana.

## VII.   *Dismissals*

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| **Dismissals** ||
| **Dismissals:** Any plaintiff who voluntarily dismisses with prejudice within 30 days of selection bears her own costs. Later dismissals addressed on a case-by-case basis. | **Dismissals**: Per CMO 14C, plaintiff selected be removed for good cause. If Plaintiff seeks dismissal at any time, Defendants can de-designate 2 cases in Pool 1. All dismissals with prejudice. No substitutions or replacements. |

CMO 14C was a bellwether selection process order intended to avoid manipulation of the bellwether pool, due to the importance placed on bellwether trials; it simply has no place in the remand process. Defendants' proposal to add a punitive measure such that one plaintiff's unwillingness to proceed causes two wholly unrelated plaintiffs to lose their ability to expeditiously move towards remand is untenable and unfair, and without any justification. It is yet another attempt by Sanofi to reduce the number of cases per Wave and to delay remand.

Similar to Xarelto CMO 6, there should be a grace period for dismissals with prejudice should a plaintiff desire not to proceed. Certainly, dismissal of a case, by itself, is a victory for the defendant.

## VIII.   *Lone Pine*

A *Lone Pine* order at this pre-settlement stage of proceedings is unwarranted and would unnecessarily bifurcate expert discovery, severely prejudicing plaintiffs.[8]  In the Digitek MDL, Judge Goodwin memorialized his concerns with such orders: "Overlying all of these factors, however, are the valid concerns expressed by some judges about the untethered use of the Lone Pine process: A significant criticism of the *Lone Pine* order is that 'it gives courts the means to ignore existing procedural rules and safeguards.'" *In re Digitek Prod. Liab. Litig.*, 264 F.R.D. 249, 257 (S.D.W. Va. 2010) (internal citation omitted) (discussing concerns related to circumventing

---

[8] If the Court wishes to consider entry of some type of order that would require plaintiffs without photograph evidence to provide something more, the PSC would understand the need for such a limited order; however, the PSC would respectfully oppose any MDL-wide expert requirement at this stage of the MDL that Sanofi suggests should require involvement of hundreds, if not thousands, of physicians.  If the Court disagrees, the PSC would respectfully ask that briefing proceed on defendants' motion for entry of a medical diagnosis order so that a record can be made.

discovery protections afforded in the Federal Rules).  Judge Goodwin also distinguished *Lone Pine* and another case in which such orders were implemented:

> the Acuna case involved "approximately one thousand six hundred plaintiffs suing over one hundred defendants for a range of injuries occurring over a span of up to forty years .... [with] **[n]either the defendants nor the court ... on notice from plaintiffs' pleadings as to how many instances of which diseases were being claimed as injuries or which facilities were alleged to have caused those injuries**." *Acuna*, 200 F.3d at 340; *see also McManaway*, 265 F.R.D. at 386, 2009 WL 4061581, at \*2 (noting that **the Lone Pine case itself involved a court determination "that plaintiffs had failed to allege a prima facie case in their complaint...."**).

*Id.* (emphasis added).  It is worth noting that this MDL entails claims of a single type of injury, permanent hair loss, against defendants which have been identified as manufacturer in most cases (per CMO 12A) and in others there is already a pretrial management process in place to determine the identity of the manufacturer (i.e., CMO 12A and the pending show cause process).  Consistent with this reasoning, there are five non-exclusive reasons why this Court should deny entry of a Lone Pine order in this case.

First, Sanofi's proposed "diagnosis order" is simply a Lone Pine order in disguise.  Sanofi seeks to have the Court require Plaintiffs' counsel to hire thousands of doctors across the country to give diagnoses and causation analyses (i.e., excluding other causes), which would necessarily require a full review of the general and specific cause materials relied upon by experts in this case.  And, it would create situations where Sanofi would inevitably disagree with the diagnoses and causation analyses, causing additional briefing and argument before the Court for ultimate resolution.

Second, it unfairly places expert requirements on Plaintiffs without a reciprocal requirement on Defendants.  This Court has equated a medical evaluation, even by a consulting expert, to a Rule 35 examination requiring disclosures.  Therefore, a plaintiff could not simply seek input from a physician and then later hire a testifying expert once expert deadlines were set in the transferor/remand court – their "proceduralist" (i.e., like Dr. Claiborne in the Earnest trial) who would be subjected to  cross examination (i.e., why didn't you just have the local guy do it?, or would you ever rely on someone else to do a biopsy in your regular practice?).  Such opening the door to cross examination due to a bifurcated expert discovery process would be highly prejudicial.

Third, by Defendants' own litigation position, and the law of the case as set forth by this Court and the *Thibodeaux* panel, every plaintiff suffered persistent/permanent hair loss six months following completion of chemotherapy.  In effect by requesting a medical diagnosis order, Defendants' have contradicted and overridden their master answers, and for statute-of-limitations purposes admitted injury.  They cannot have it both ways.  If any evidence, i.e., a photograph or declaration, substantiates persistent hair loss more than 6 months after completion of docetaxel chemotherapy, the plaintiffs have shown a prima fascia case of injury.

Fourth, because of the developing science, and the parties' experts' agreement on the difficulty of diagnosis, the criteria for diagnosing, and causation analysis, diagnosis and causation cannot be easily untangled. Causation is an issue for every case at trial and should be reserved for the expert discovery phase. Moreover, due to some of the Defendants' experts' positions that PCIA does not even exist and/or that the objective criteria are inconsistent across the field of dermatology, these are necessarily expert issues that require full reports on both sides with an opportunity to evaluate the respective experts' opinions. A plaintiff's dermatologist will, in almost every situation, be unfamiliar with PCIA and such lack of knowledge is an issue Plaintiffs allege is a direct result of the Defendants' concealment of the relationship between PCIA and docetaxel. Not a single bellwether plaintiff's expert has provided a finding of PCIA with which a defendant has agreed.

Finally, the *Lore v. Lone Pine* decision and its progeny do not support entry of the Defendants' "medical diagnosis order."[9] In *Lone Pine*, there were specific findings made that plaintiffs' claimed injuries were varied and unknown based on the pleadings. In this case, there is a single injury claimed, i.e., permanent hair loss, and the defendants have seen extensive expert and scientific evidence presented regarding those claims. Furthermore, Lone Pine orders generally are instituted in connection with a settlement, where plaintiffs refusing to join in the resolution (or plaintiffs who attempt to bring subsequent, post-resolution claims) are required to produce expert reports to support their litigation claims.[10] Sometimes, even after a global resolution, such orders are not warranted if the types of claimed injuries are not novel.[11] It is also important to note that such a process contemplated by Sanofi likely would inject medical lien resolution issues and special damages in cases where such issues may not currently exist, further complicating matters in advance of settlement negotiations.

For all of the above reasons, the PSC respectfully requests entry of its proposed Case Management Order. We look forward to addressing any concerns or questions the Court may have at our next conference.

Respectfully submitted,

M. Palmer Lambert

cc:     Plaintiffs' and Defendants' Liaison Counsel

---

[9] *Lore v. Lone Pine* Corp., No. L-33606-85, 1986 WL 637507, at *1 (N.J. Super. Ct. Law Div. Nov. 18, 1986)

[10] Vioxx and Xarelto are examples of MDLs where post settlement Lone Pine orders were entered. *In re Vioxx Prod. Liab. Litig.*, 557 F. Supp. 2d 741, 742 (E.D. La. 2008), aff'd, 388 F. App'x 391 (5th Cir. 2010); Xarelto CMO 11.

[11] *See In re: E.I. Du Pont De Nemours and Company C-8 Personal Injury Litig.*, No. 2:13-md-2433 (CMO 24, Doc. 5140) (S.D. Ohio Jun. 22, 2018) attached as Exhibit E.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                              SECTION "H" (5)
THIS DOCUMENT RELATES TO
ALL CASES

## CASE MANAGEMENT ORDER NO.

### (Wave Discovery and Remand Process)

In recognition of this MDL's mature posture entering its sixth year, the Court enters the instant Case Management Order to begin the orderly process of remanding cases to transferor districts.

The Court has addressed numerous discovery disputes, dispositive motions, and other pretrial issues involving facts and legal questions common to the various cases in this MDL proceeding. The parties have engaged in a bellwether process that has concluded after two bellwether jury trials. No further pretrial motions raising common questions are pending in these cases, and remand to the transferor courts is in the best interest of judicial efficiency and fairness to the parties.

To lessen the heavy burden that a remand of approximately 12,000+ MDL cases would fall upon transferor courts, the Court deems it appropriate to begin a wave discovery process within the MDL for some cases following which the Court will enter a suggestion of remand. Completion of initial discovery depositions described herein in this wave discovery process is an efficient and orderly step in the preparation of cases for ultimate trial in the transferor trial courts.

**Wave Discovery Process**

To begin this orderly process of discovery and selection of cases to be remanded, this Court will oversee a phase I discovery process for a portion of the cases similar to that contemplated in the bellwether process. *See, e.g.,* Case Management Order 14, *et seq*.

This Order shall govern the selection and discovery of 600 cases to comprise Wave 1 and Wave 2, which shall complete the below initial discovery process within the MDL, after which the Court will issue a suggestion of remand order directed to the Judicial Panel on Multidistrict Litigation.

**Wave 1 Case Selection**

Wave 1 shall consist of 300 cases involving the Sanofi defendants only: 100 cases selected by PSC, 100 cases selected by the Sanofi Defendants, and 100 cases selected by the Court by random selection

1.  <u>Selection Dates</u>. On **April 4, 2022**, the Plaintiffs and Sanofi Defendants shall each select 100 cases for inclusion in the first wave of individual case discovery.  There will be reasonable variety and balance regarding the types of cases selected by the parties.  After an opportunity to review the party-selected cases, the parties shall meet and confer to determine the criteria for eligibility to be included in the random selection pool.  These criteria shall take into consideration the age of the plaintiff, the hormone receptor status of the plaintiff, the cancer staging at time of diagnosis, the transferor jurisdiction of the plaintiff's case and any appropriate other criteria. The meet-and-confer to determine eligibility for random selection shall be conducted such that the Court can make its random selections on April 18, 2022.  Neither party nor the random selection may include

2

more than 20 cases with representation by the same plaintiffs' counsel of record. Remand Waves 1 and 2 shall also be limited to living plaintiffs; deceased plaintiffs represented by others shall be addressed in future Waves.

2.    Eligibility for Inclusion in Discovery Wave 1. Plaintiffs whose Plaintiff Fact Sheet identifies only brand name Taxotere and/or Winthrop in Section III(1-3) on or before the date of this Order, are eligible for Wave 1 selection.

   a.    On March 18, 2022, MDL Centrality data will be assessed to determine the beginning date of administration of Taxotere/docetaxel. No cases with administrations prior to December 15, 2006 or after December 11, 2015 shall be included in Wave 1.

   b.    On March 18, 2022, MDL Centrality data will be assessed to determine the state of administration of Taxotere/docetaxel. No cases where administration of Taxotere/docetaxel occurred in the states of Michigan, Mississippi, Louisiana or Texas shall be included in Wave 1.

   c.    On March 18, 2022, MDL Centrality data will be assessed to determine whether there exists at least one photograph evidencing plaintiff's hair condition prior to chemotherapy treatment with docetaxel-containing chemotherapy and at least one photograph evidencing plaintiff's hair condition more than six (6) months following completion of docetaxel-containing chemotherapy.  No cases without such proof of injury shall be included in Wave 1.

**Wave 2 Case Selection**

Wave 2 shall consist of 300 cases: 100 cases selected by PSC, 100 cases selected by Defendants, and 100 cases selected by the Court by random selection.

3.    Selection Dates. On **August 12, 2022,** the Plaintiffs and Defendants shall each select 100 cases for inclusion in the second wave of individual case discovery.  There will be reasonable variety and balance regarding the types of cases selected by the parties. After an opportunity to review the party selected cases, the parties shall meet and confer to determine the criteria for eligibility to be included in the random selection pool.  These criteria shall take into consideration the age of the plaintiff, the hormone receptor status of the plaintiff, the cancer staging at time of diagnosis, the transferor jurisdiction of the plaintiff's case and any appropriate other criteria. The meet and confer to determine eligibility for random selection shall be conducted such that the Court can make its random selections on August 22, 2022.  Neither party nor the random selection may include more than 20 cases with representation by the same plaintiffs' counsel of record.

4.    Eligibility for Inclusion in Discovery Wave 2. Plaintiffs who have a substantially complete Plaintiff Fact Sheet on or before **August 1, 2022,** are eligible for Wave 2 selection.  On August 3, 2022, the MDL Centrality data will be assessed to determine the available remaining cases for selection utilizing the same eligibility criteria (¶2.a-c.) for Wave 1 , except that cases involving any Defendant or Defendants are subject to selection, and Mississippi and Louisiana cases also are subject to selection.[1]

---

[1] The Court, in its discretion, may amend these criteria as necessary to efficiently administer this process of wave workup in preparation for remand.

**Wave 1 and Wave 2 Discovery**

5.      <u>Discovery</u> in the selected Wave 1 and Wave 2 individual cases shall consist of:

a.      <u>An updated Plaintiff Fact Sheet.</u> Selected plaintiffs must review and make any amendments, if necessary, to the Plaintiff Fact Sheet pursuant to Pretrial Order Nos. 55, 38, and Amended Pretrial Order 22 within **30 days** of selection.

b.      <u>An updated Defendant Fact Sheet.</u> Subject to paragraph 6, Defendants must serve an individual answer to the Plaintiff's Short Form Complaint, and Defendants must review and make any amendments, if necessary, to its Defendant Fact Sheet pursuant to Amended Pretrial Order 22 within **60 days** of selection.

c.      <u>Written Discovery.</u>  Notwithstanding the Court's previous ruling (Rec. Doc. 1138), the parties cannot serve written discovery in Discovery Wave 1 or 2 cases at this time and without further leave.

d.      <u>Depositions.</u>  Four depositions in each case shall be allowed – Plaintiff, Plaintiff's prescribing physician, Plaintiff's treating physician and one detail representative selected by Plaintiff from the Defendants who called on the Plaintiff's prescribing physician (or physician's office) at any time.[2] The parties shall meet and confer and, thereafter, submit a joint protocol for these wave case depositions no later than **15 days** after entry of this order. If the parties are unable to reach agreement

---

[2] On good cause shown, or by agreement, the parties may schedule additional depositions.  For example, should any dispute remain on sufficiency of manufacturer identification submitted pursuant to CMO 12A, additional depositions may be granted on a case-by-case basis.  The parties are encouraged to utilize zoom or similar videoconferencing for depositions, given the efficiencies of the platform and time constraints.

on the protocol, a redlined draft protocol highlighting the areas of disagreement shall be submitted in lieu of a joint protocol.

e.   <u>Order of examination</u>.  The Plaintiff shall be allowed to examine half of the prescribing doctors first and the Defendants shall be allowed to examine half the prescribing doctors first on a randomly assigned basis by MDL Centrality for the selected wave pool cases.

f.   <u>Physician Depositions</u>:   Pretrial Order 70B regarding *ex parte* physician communications is hereby modified to require joint scheduling of physician depositions, i.e., both parties will contact physician's office together for purpose of scheduling a date for deposition.   Unilateral contact by defendants' counsel remains prohibited.  Unilateral contact by plaintiffs' counsel remains permissible. Pretrial Order 70B's record-keeping and disclosure provisions are extended to all Wave 1 and Wave 2 selected cases.

6.   <u>Deadlines</u>:   Provided the Plaintiff timely completes all sections of the Plaintiff Fact Sheet within 30 days of selection, the deposition discovery set forth in paragraph 5(d) must be completed in no later than seven (7) months. An individual Plaintiff's failure to timely complete all sections of the Plaintiff Fact Sheet within 30 days of selection shall toll all deadlines in this Case Management Order with respect to that Plaintiff's case until the Plaintiff has complied or the case is dismissed.   The deadlines in this Order may be extended in a particular Plaintiffs' case by agreement of the parties or by the Court due to circumstances beyond the parties' control such as the failure of a third party medical provider to timely produce medical records or the failure of a timely scheduled third party physician to timely appear for deposition.

**Trial Related Deadlines**

7.      All trial related deadlines, including deadlines for Daubert/dispositive motion practice, expert disclosures/discovery, and motions in limine, are deferred and subject to further orders of the transferor courts.

**Remand after Wave Discovery**

8.      At the close of each respective Wave Discovery period, the Court shall promptly enter a suggestion of remand of all remaining cases to the appropriate transferor courts. The transferor court is presumed to be the venue identified in Paragraph 8 of each individual Plaintiff's Short Form Complaint.  Any party may object to the presumptive venue by filing an objection at any time prior to the Court's suggestion of remand.

**Dismissals**

9.      For Wave 1 and Wave 2 selected cases, any Plaintiff may voluntarily move to dismiss their matter with prejudice within **thirty (30) days** from the date of selection with each party to bear its own costs.  Any other dismissals will be addressed by the Court on a case-by-case basis.

10.      All dismissals of Wave 1 and Wave 2 selected cases shall be with prejudice.

**Scope of the Order**

11.      This order governs only those cases selected in Wave 1 or 2 and is neither binding nor precedential with respect to how the Court will proceed with respect to cases that are not selected. Further orders governing additional discovery or subsequent Waves shall be entered at a later date.

NEW ORLEANS, LOUISIANA this the ___ day of February 2022.


_____
UNITED STATES DISTRICT JUDGE

EXHIBIT A

| Plaintiffs' Proposal | Sanofi's Proposal |
|---|---|
| **Number of Cases** | |
| **Wave Discovery Process**:<br>600 cases to be selected in two Waves. | |
| **Wave 1 Case Selection (April 4, 2022):**<br>300 plaintiffs for Wave 1 - 100 per party and 100 random.<br>No more than 20 cases by same P counsel. [1] | **Discovery Pool 1**:<br>75 cases by random selection. |
| **Qualifications to Enter Discovery Wave** | |
| **Eligibility (Wave 1):**<br>(1) Sanofi only case (Taxotere or Winthrop) based on PID identified in Section III of PFS.<br>(2) Must have photo evidence of hair condition prior to infusion and photo evidence of hair condition more than 6 months after infusion.<br>(3) Both parties include living plaintiffs, but Sanofi's proposal would be applied after selection.<br>(4) Both parties exclude infusions prior to 12.15.06 and after 12.11.15, but Sanofi's proposal would exclude them after selection.<br>(5) Plaintiffs propose excluding Fifth Circuit and Michigan cases. Both sides exclude Michigan and Texas, but Sanofi would exclude them after selection. | **Eligibility:**<br>(1) Only single-defendant cases based on PID identified in Section III of PFS. |
| **Exclusion (Strike) Criteria:**<br>PSC proposes that all 300 cases selected should move forward with discovery without a deselection process, unless a Plaintiff voluntarily dismisses. | **Exclusion (Strike) Criteria:**<br>Sanofi proposes exclusion criteria to reduce the 75 cases before discovery.<br>(1) If PID contested, Court determines, but it is not a determination of PID.<br>(2) Must have complied with CMO 12A.<br>(3) Living plaintiffs only. |

---

[1] Plaintiffs' position is that there should be an appropriate limitation on the number of cases selected from any given firm.  The 20-case limitation proposed herein should be adjusted in the event a different number of cases comprise a given Wave.

2

| | |
|---|---|
| | (4) Photos must comply with PTO 68.<br>(5) CMO 14C- Requires certification of willingness to proceed within 14 days. If unwilling or cannot be contacted, Plaintiff is ineligible for discovery pool and subject to a rule to show cause.<br>(6) Treatment before 12.15.06 and after 12.11.15.<br>(7) Resides or treated in MI.<br>(8) "Certain state law impediment to claims against FDA approved medicines", ex. TX, NJ.<br>(9) Exclude lack of medical diagnosis (comply with Sanofi's proposed *Lone Pine* order).<br>(10)      Must not be facially time-barred. |
| **Case Selection – Wave 2** ||
| **Wave 2 Case Selection (August 12, 2022)**: 300 plaintiffs for Wave 2- 100 per party (any defendant) and 100 random. No more than 20 cases by same counsel. | **Discovery Pool 2:**<br>Sanofi only proposes one pool. |
| **Eligibility for Wave 2** ||
| **Eligibility for Discovery Wave 2:**<br>Same criteria except the pool would include the 505(b)(2) defendants, and Louisiana and Mississippi cases. | |
| **Scope of Wave Discovery** ||
| **Wave Discovery**:<br>(1) Update/amend PFS, if necessary, in 30 days.<br>(2) Defendant files answer and amends DFS, if necessary, within 60 days.<br>(3) 4 depositions- Plaintiff, prescriber, treater and a sales representative selected by Plaintiff who called on prescriber or prescriber's practice.<br>(4) Joint scheduling of physician depositions. PTO 70B applies. | **Wave Discovery:**<br>(1) Plaintiff must review and update PFS with "wet signature."<br>(2) Plaintiff must review and update CMO 12A with "wet signature."<br>(3) Plaintiff must review and update PTO 71A ESI disclosure with "wet signature."<br>(4) 2-3 depositions- Plaintiff, prescribing and treating physicians (if any). |

| | |
|---|---|
| Each side agrees:<br><br>(5) No written discovery.<br>(6) Half of the prescribers are examined first by plaintiffs' counsel and half by defendants' counsel. | (5) PTO 70B numerical limitations removed, but substantive parts remain in effect (objections preserved).<br><br>Each side agrees:<br><br>(6) No written discovery.<br>(7) Half of the prescribers are examined first by plaintiffs' counsel and half by defendants' counsel. |
| **Deadlines:**<br>Wave discovery complete in 7 months. | **Deadlines:**<br>If Plaintiff meets all deadlines, Wave discovery complete within 7 months.<br><br>If all sections of PFS not complete in 30 days dates tolled until complete or case dismissed. |
| **Dispositive Motions** | |
| **Dispositive Motions:**<br>Reserved for transferor courts. | **Dispositive Motions:**<br>Defendants can file any dispositive motion not involving expert testimony whenever they determine, or on a schedule to follow Wave discovery. |
| **Remand** | |
| **Remand after Wave Discovery:**<br>Court promptly enters suggestion of remand at completion of discovery. Venue in PFS presumed. | **Remand of Pool 1 Cases:**<br>(1) After ruling on motion for trial preservation discovery.<br>(2) After meeting and conferring on schedule for expert discovery, selection for cases to be considered for remand.<br>(3) After suggestion of remand motion practice.<br>(4) After petitions for remand to JPML. |

# EXHIBIT B

**PSC Proposed Wave Remand Deadlines**

| Wave 1 | |
|---|---|
| Substantially Complete PFS by: | [date of Order] |
| Centrality Data to Identify Eligible Cases | Friday, March 18, 2022 |
| Party Nominations | Friday, April 08, 2022 |
| Random Selection | Monday, April 18, 2022 |
| Updated PFS | Wednesday, May 18, 2022 |
| Updated DFS | Friday, June 17, 2022 |
| Discovery Depositions | Monday, November 14, 2022 |

| Wave 2 | |
|---|---|
| Substantially Complete PFS by: | Monday, August 01, 2022 |
| Centrality Data to Identify Eligible Cases | Friday, August 05, 2022 |
| Party Nominations | Friday, August 26, 2022 |
| Random Selection | Monday, September 05, 2022 |
| Updated PFS | Wednesday, October 05, 2022 |
| Updated DFS | Friday, November 04, 2022 |
| Discovery Depositions | Monday, April 03, 2023 |

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| ALL CASES | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * * * * * *

## CASE MANAGEMENT ORDER NO. 6

This Order shall govern the selection and discovery for 1200 cases to comprise Wave 1 and Wave 2 cases.

## Wave 1 Case Selection

Wave 1 shall consist of 600 cases: 200 cases selected by PSC, 200 cases selected by Defendants, and 200 cases selected by the Court by random selection.

1.    Selection Dates. On **April 16, 2018**, the Plaintiffs and Defendants shall each select 200 cases for inclusion in the first wave of individual case discovery.  After an opportunity to review the party-selected cases, the parties shall meet and confer to determine the criteria for eligibility to be included in the random selection pool.  These criteria shall take into consideration the age of the plaintiff, the injury alleged by the plaintiff, the indication for which the plaintiff was prescribed Xarelto, the venue of the plaintiff and any appropriate other criteria. The meet-and-confer shall be conducted such that the Court can make its random selections on **April 30, 2018**.  There will be reasonable variety and balance regarding the types of cases selected by the parties. Each party reserves the right to challenge the opposing party's selections on this basis. Any challenges shall be submitted to this Court and the Court's decision shall be final and not subject to appeal.

1

2.      Eligibility. Plaintiffs who have met the core requirements for the Plaintiff Fact Sheet on

on or before January 31, 2018, are eligible for Wave 1 selection.

   a.      On March 16, 2018, MDL Centrality data will be assessed to determine the

   percentage of cases alleging an Intracranial Hemorrhage as an injury. No more

   than double this percentage shall be eligible for PSC-selected cases in Wave 1.

   b.      On March 16, 2018, MDL Centrality data will be assessed to determine the

   percentage of cases where plaintiff's alleged injury involves less than one-day

   hospitalization. No more than double this percentage shall be eligible for

   Defendants-selected cases in Wave 1.

**Wave 2 Case Selection**

Wave 2 shall consist of 600 cases: 200 cases selected by PSC, 200 cases selected by

Defendants, and 200 cases selected by the Court by random selection.

3.      Selection Dates. On **August 16, 2018**, the Plaintiffs and Defendants shall each select 200

cases for inclusion in the second wave of individual case discovery.  After an opportunity

to review the party selected cases, the parties shall meet and confer to determine the

criteria for eligibility to be included in the random selection pool.  These criteria shall

take into consideration the age of the plaintiff, the injury alleged by the plaintiff, the

indication for which the plaintiff was prescribed Xarelto, the venue of the plaintiff and

any appropriate other criteria. The meet and confer shall be conducted such that the Court

can make its random selections on **August 30, 2018**.  There will be reasonable variety

and balance regarding the types of cases selected by the parties. Each party reserves the

right to challenge the opposing party's selections on this basis. Any challenges shall be submitted to this Court and the Court's decision shall be final and not subject to appeal.

4.    <u>Eligibility</u>. Plaintiffs who have met the core requirements for the Plaintiff Fact Sheet on or before March 30, 2018, are eligible for Wave 2 selection.

   a.    On July 16, 2018, MDL Centrality data will be assessed to determine the percentage of cases alleging an Intracranial Hemorrhage as an injury. No more than double this percentage shall be eligible for PSC selected cases in Wave 2.

   b.    On July 16, 2018, MDL Centrality data will be assessed to determine the percentage of cases where plaintiff's alleged injury involves less than one-day hospitalization. No more than double this percentage shall be eligible for Defendants selected cases in Wave 2.

**Wave 1 and Wave 2 Discovery**

5.    Discovery in the selected Wave 1 and Wave 2 individual cases shall consist of:

   a.    <u>An updated Plaintiff Fact Sheet.</u> Selected plaintiffs must complete all sections of the Plaintiff Fact Sheet pursuant to Pretrial Order 13 within 30 days of selection.

   b.    <u>An updated Defendant Fact Sheet.</u> Subject to paragraph 6, Defendants must serve a completed Defendant Fact Sheet pursuant to Pretrial Order 14 within 60 days of selection.

   c.    <u>Revision of Pretrial Order 27.</u>  Pretrial Order 27 revising the scope of the Plaintiff Fact Sheet and suspending the Defendant Fact Sheet shall no longer apply to

cases selected in Wave 1 and Wave 2.   Cases not selected in Wave 1 or Wave 2 shall continue to be governed by Pretrial Order 27.

      d.    <u>Depositions</u>.  Four depositions in each case shall be allowed – Plaintiff or Plaintiff representative, Plaintiff's prescribing physician, Plaintiff's treating physician and one detail representative from the Defendants who called on the Plaintiff's prescribing physician.

      e.    <u>Order of examination</u>.  The plaintiff shall be allowed to examine half the doctors first and the Defendants shall be allowed to examine half the doctors first as was the protocol for the original discovery pool cases.

      f.    <u>Physician Depositions</u>:  Pretrial Order 28 regarding *ex parte* physician communications is hereby modified to require joint scheduling of physician depositions, i.e. both parties will contact physician's office together for purpose of scheduling a date for deposition.   Unilateral contact by defendants' counsel remains prohibited.  Unilateral contact by plaintiffs' counsel remains permissible.  Pretrial Order 28's record-keeping and disclosure provisions are extended to all Wave 1 and Wave 2 selected cases.  All parties' prior objections to Pretrial Order 28 are expressly preserved.

6.  <u>Deadlines</u>:   Provided the plaintiff timely completes all sections of the Plaintiff Fact Sheet in compliance with Pretrial Order 13 within 30 days of selection, the deposition discovery set forth in paragraph 5(d) must be completed no later than seven months after the due date for the Defendant Fact Sheet.   An individual plaintiff's failure to timely complete all sections of the Plaintiff Fact Sheet in compliance with Pretrial Order 13 within 30 days of selection shall toll all

deadlines in this Case Management Order with respect to that plaintiffs' case until the plaintiff has complied or the case is dismissed. The deadlines in this order may be extended in a particular plaintiffs' case by agreement of the parties or by the Court due to circumstances beyond the parties' control such as the failure of a third party medical provider to timely produce medical records or the failure of a third party physician to timely appear for deposition.

**Filing Fees and Dismissals**

7.    For Wave 1 and Wave 2 selected cases, any unpaid filing fee must be paid within 45 days from selection.

8.    If the plaintiff moves to dismiss with prejudice within 45 days from the date of selection, an unpaid filing fee is waived.

9.    All dismissals of Wave 1 and Wave 2 selected cases shall be with prejudice. For party-selected cases that are dismissed, each party reserves the right to request or oppose a replacement case being selected. For random selection cases that may be dismissed, there will be no replacement selection.

**Scope of the Order**

10.    This order governs only those cases selected in Wave 1 and Wave 2, and is neither binding nor precedential with respect to how the Court will proceed with respect to cases that are not selected in Wave 1 or Wave 2.

NEW ORLEANS, LOUISIANA this 27th day of February 2018.

UNITED STATES DISTRICT JUDGE

5

# EXHIBIT D

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION** | **MDL No. 2592** |
| **THIS DOCUMENT RELATES TO ALL ACTIONS** | **SECTION L** |
| | **JUDGE ELDON E FALLON** |
| | **MAG. JUDGE NORTH** |

**CASE MANAGEMENT ORDER NO. 8**

**[Generic Expert Trial Preservation Depositions, Trial Preparation of Wave 1 E.D.LA. Cases, Selection of Wave 3 Cases, Procedures for Consideration of Possible Wave 1 Remands, Plaintiff Profile & Consent Form, Short Form PFS, Short Form DFS]**

The Court hereby Orders as follows:

**I.    GENERIC EXPERT TRIAL PRESERVATION DEPOSITIONS**

    **A.    Scope**.  The Court orders that that each side may take trial preservation depositions of their previously disclosed generic experts, subject to the schedule and provisions of this section.

    **B.    Protocol and Procedures.**  The parties shall meet and confer concerning the procedures to apply to the generic expert trial preservation depositions, including supervision of such depositions, and by the March 12, 2019 case management conference shall submit for the Court's consideration a proposed pretrial order governing such procedures or absent agreement advise the Court as to their differences.

    **C.    Schedule.**  By agreement of the parties, the preservation of generic expert testimony shall be taken in only two rounds.  The parties further agree there shall be no further preservation of generic expert testimony without a prior showing of good cause.

    **D.    First Round.**  The following deadlines will apply to the first round of generic expert preservation depositions:

        **1.**  By **February 22, 2019**, Plaintiffs shall disclose:

            **a.**  a list of all plaintiff experts in the first round whose testimony they seek to preserve; and

            **b.**  a statement made in good faith as to whether plaintiffs will be supplementing any previously disclosed opinions;

1

2.  By **March 8, 2019**, for each disclosed witness, Plaintiffs shall provide:

   a.  an updated CV, publication list, and prior testimony list of any plaintiff experts whose testimony they seek to preserve;

   b.  all supplemental reports and reliance materials; and

   c.  a statement made in good faith as to which of the expert's previously disclosed opinions will be covered by the direct examination, and which are abandoned.

3.  By **March 22, 2019**, defendants shall disclose:

   a.  a list of all defense experts in the first round whose testimony they seek to preserve; and

   b.  a statement made in good faith as to whether defendants will be supplementing any previously disclosed opinions.

4.  By **April 5, 2019**, for each disclosed witness, Defendants shall provide:

   a.  an updated CV, publication list, and prior testimony list;

   b.  all supplemental reports and reliance materials; and

   c.  a statement made in good faith as to which of the expert's previously disclosed opinions will be covered by the direct examination, and which are abandoned.

5.  Consistent with CMO 2, the Plaintiffs shall be allowed a rebuttal expert report only upon a showing of good cause to the Court.  In the event good cause is found by the Court for such a rebuttal expert report, the remaining deadlines in the protocol shall all be moved back 30 days from the date of the disclosure of the rebuttal expert report(s).

6.  By **April 19, 2019**, Defendants may take a discovery deposition as to any plaintiff expert who supplements his/her report or reliance materials required in Paragraph D(1) & (2) above.

7.  By **May 17, 2019**, Plaintiffs may take a discovery deposition as to any defense expert who supplements his/her report or reliance materials required in Paragraph D(3) & (4) above.

8.  By **May 31, 2019**, trial depositions of all disclosed Plaintiff generic experts disclosed in Paragraph D(1) must be taken.

9.  By **June 28**, 2019, trial depositions of all disclosed Defense generic experts disclosed in Paragraph D(3) must be taken.

   **E.     Second Round.**   The following deadlines will apply to the second round of generic expert preservation depositions:

   1.  By **April 15, 2019,** Plaintiffs shall disclose:

       a.  a list of all plaintiff experts in the second round whose testimony they seek to preserve; and

       b.  a statement made in good faith as to whether plaintiffs will be supplementing any previously disclosed opinions.

   2.  By **April 29, 2019**, for each disclosed witness, Plaintiffs shall provide:

       a.  an updated CV, publication list, and prior testimony list of any plaintiff experts whose testimony they seek to preserve;

       b.  all supplemental reports and reliance materials; and

       c.  a statement made in good faith as to which of the expert's previously disclosed opinions will be covered by the direct examination, and which are abandoned.

   3.  By **May 13, 2019**, defendants shall disclose:

       a.  a list of all defense experts in the second round whose testimony they seek to preserve; and

       b.  a statement made in good faith as to whether defendants will be supplementing any previously disclosed opinions.

   4.  By **May 27, 2019**, for each disclosed witness, Defendants shall provide:

       a.  an updated CV, publication list, and prior testimony list;

       b.  all supplemental reports and reliance materials; and

       c.  a statement made in good faith as to which of the expert's previously disclosed opinions will be covered by the direct examination, and which are abandoned.

   5.  Consistent with CMO 2, the Plaintiffs shall be allowed a rebuttal expert report only upon a showing of good cause to the Court.  In the event good cause is found by the Court for such a rebuttal expert report, the remaining deadlines in the protocol shall all be moved back 30 days from the date of the disclosure of the rebuttal expert report(s).

   6.  By **June 14, 2019**, Defendants may take a discovery deposition as to any plaintiff expert who supplements his/her report or reliance materials required in Paragraph E(1) & (2) above.

3

7. By **July 19, 2019**, Plaintiffs may take a discovery deposition as to any defense expert who supplements his/her report or reliance materials required in Paragraph E(3) & (4)  above.

8. By **September 13, 2019**, trial depositions of all disclosed Plaintiff generic experts disclosed in Paragraph E(1) must be taken.

9. By **October 15, 2019,** trial depositions of all disclosed Defense generic experts disclosed in Paragraph E(3) must be taken.

## II.    WAVE 1 & 2 EDLA CASES

A.    **Applicability of Order**. The following procedures and schedules will govern the identification and selection of additional trial plaintiffs whose claims will be adjudicated in the U.S. District Court for the Eastern District of Louisiana ("EDLA").  The Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court, Eastern District of Louisiana shall apply to these proceedings, subject to provisions permitting Court orders or stipulations by the parties to make appropriate modifications.

B.    **Definitions.**

1. "Wave 1 EDLA Cases" means all of the remaining EDLA cases selected for workup pursuant to CMO 6 Wave 1, to wit:

    a.    ***Braswell* (2:14-cv-02258)**

    b.    ***Brown* (2:17-cv-02492)**

    c.    ***Gaitan* (2:16-cv-16571)**

    d.    ***Heckler* (2:15-cv-06996)**

2. "Wave 2 EDLA Cases" means all of the remaining EDLA cases selected for workup pursuant to CMO 6, Wave 2, to wit:

    a.    ***Griffin* (2:15-cv-02438)**

C.    **Remaining Fact Discovery.**  Any additional discovery pertaining to the selected Wave 1 EDLA Cases shall be completed on or before **April 15, 2019.**

D.    **Expert Schedule**. The following schedule shall apply to expert witness discovery in the Wave 1 EDLA Cases:

1. **Generic Expert Reports.**  Procedures for disclosure, discovery and preservation of generic expert testimony shall be governed by the case management order contemplated in Section 1.B.

2. **Case Specific Expert Reports**. On or before **May 15, 2019**, plaintiffs shall designate and provide reports by their expert witnesses who will appear live at trial.

3. **Case Specific Expert Reports**. On or before **June 14, 2019**, defendants shall designate and provide reports by their expert witnesses who will appear live at trial.

4

4. **Plaintiff Rebuttal Reports**. Consistent with CMO 2, the Plaintiffs shall be allowed a rebuttal expert report only upon a showing of good cause to the Court. In the event good cause is found by the Court for such a rebuttal expert report, the remaining deadlines in the protocol shall all be moved back 30 days from the date of the disclosure of the rebuttal expert report(s).

5. **Depositions**. At the time of the submission of the expert report, each expert shall indicate no fewer than three dates the expert is available for deposition. Expert depositions shall conclude by **July 19, 2019**. At least ten (10) days prior to the deposition, the expert shall produce all files, documents and reliance materials subject to discovery under the Federal Rules, as modified by the CMOs and PTOs entered in this case. Absent a showing of good cause to the Court, plaintiff's case-specific experts in any given case must be deposed prior to the deposition of the defendants' case-specific experts in that case.

6. **Discovery.** The limitations on expert discovery set forth in Rule 26 of the Federal Rules of Civil Procedure, including the provision of Rule 26(b)(4)(A)-(D) limiting discovery with respect to draft reports, communications with experts, and depositions of consulting experts, shall apply.

E.     **Briefing Schedule for Dispositive /** *Daubert* **Motions in the Wave 1 EDLA cases.** Dispositive motions not involving expert testimony may be filed whenever the parties stipulate that such motion is ready for resolution or, absent agreement, upon a showing that expert testimony is not required to resolve the motion. Unless earlier filed in an individual case, the schedule for resolution of dispositive/*Daubert* motions is as follows:

1. **Motions and Briefs: August 9, 2019**

2. **Response in Opposition Briefs: August 30, 2019**

3. **Reply Briefs: September 13, 2019**

4. **Hearing and Argument (if necessary): September 25, 2019**

F.     **Trials of Wave 1 EDLA Cases.**  The Court reserves decision on whether trial of Wave 1 EDLA Cases will be single plaintiff or multi-plaintiff trials.  All parties preserve their respective positions in the district and appellate courts regarding the propriety or desirability of single plaintiff versus multi-plaintiff trials.  Following the dispositive/Daubert motions in these Wave 1 EDLA Cases, the parties will meet and confer and advise the Court of their respective positions regarding whether any EDLA cases may be consolidated for trial, including whether any EDLA Wave 2 and/or 3 cases are adequately discovered at that time.  Defendants reserve all rights to make summary judgment/Daubert motions on EDLA Wave 2 or 3 cases that are adequately discovered.  Absent agreement, the Court will resolve the issue of consolidation based on the record before it.  The Court will determine a schedule for the remaining pretrial proceedings -- including the jury questionnaire, witness and exhibit lists and objections thereto, deposition designations and objections thereto, motions in limine, and proposed jury charges -- after the Court determines which plaintiff or plaintiffs shall be included in the first trial.

G.     **Wave 2 EDLA Case**:  Pursuant to CMO 6, the remaining Wave 2 EDLA case has a CMO 6 fact discovery deadline of June 16, 2019.  As the deadline for completion of CMO

6 fact discovery approaches, the parties will meet and confer regarding a case management order that puts the remaining Wave 2 EDLA case on a schedule similar to the Wave 1 EDLA cases.

## III.   REMAND OF WAVE 1 & 2 CASES

 **A.** **Selection Process**.  On **March 15, 2019**, Plaintiffs and Defendants will each select up to 30 Wave 1 cases for consideration for remand.   Thereafter, the parties will meet and confer regarding whether it is appropriate to remand cases at that time and if so the appropriate cases for remand.

 **B.** **Suggestion of Remand Motion Practice.**  On **April 15, 2019**, if there is no agreement on whether cases should be remanded or upon a remand plan, plaintiffs may make a suggestion of remand application to the Court; Defendants reserve all rights to object.  Likewise, Plaintiffs reserve all rights to object in the event Defendants make a suggestion of remand application to the Court.

 **C.** **Direct Filed Cases Subject to Transfer Under PTO 9.**  For purposes of this order, cases directly filed in this District and subject to transfer to another District pursuant to PTO 9 shall be considered remand cases and are eligible to be selected pursuant to Section III(A) above.  If the Court suggests a remand to the JPML, cases selected for possible transfer under PTO 9 shall be transferred only when the JPML issues a remand order with respect to cases subject to remand.

 **D.** **Remand Trials**.  The parties reserve all rights to challenge any application for consolidated trials in any remand jurisdiction.

 **E.** **Second Round of MDL Remands.**  If this Court issues a Suggestion of Remand, and the JPML remands the first round of MDL remands, no further requests on the remaining Wave 1 and Wave 2 cases shall be made before **September 15, 2019**, and any second wave of remands shall not exceed 60 total cases.

## IV.   WAVE 3 CASE SELECTION

 This Order shall govern the selection and discovery for 1,000 cases to comprise Wave 3 cases for completion of fact discovery according to the same procedures set forth in CMO 6 and CMO 6A.

 **A.** **Selection Date and Eligibility.**  On **April 15, 2019**, the Court (with the assistance of BrownGreer using the MDL Centrality database) shall select 1,000 cases for inclusion in the third wave of individual fact discovery, with 5% of those cases to be EDLA cases.  Before the selection date, the parties shall meet and confer to determine additional criteria for eligibility, if any, to be included in the third wave.  These criteria shall take into consideration the age of the plaintiff, the injury alleged by the plaintiff, the indication for which the plaintiff was prescribed Xarelto, the venue of the plaintiff and any appropriate other criteria.  The meet-and-confer shall be conducted such that the Court can make its random selections on **April 15, 2019**.

      **B.**    **Pool of Wave 3 Cases.**

          **1.**  **Pool A.**  650 cases shall be randomly selected from a pool of filed cases comprised of all Eligible Cases (defined above) from firms with less than 2% of the firm's total filed cases selected as plaintiff pick cases or less than 3 cases (whichever is greater) as plaintiff pick cases in Wave 1 and Wave 2.

          **2.**  **Pool B.**  350 cases shall be randomly selected with no other criteria beyond the eligibility criteria.

      **C.**    **Schedule**.  All 1,000 Wave 3 cases will be selected on April 15, 2019, but the Court will stagger the discovery commencement dates as follows:

          **1.**  On **April 15, 2019**, 400 randomly selected cases from Pool A will begin core-discovery under the same seven-month schedule under CMO 6.

          **2.**  On **June 15, 2019**, 200 randomly selected cases from Pool A and Pool B will begin core-discovery under the same seven-month schedule under CMO 6.

          **3.**  On **September 15, 2019**, 200 randomly selected cases from Pool A and Pool B will begin core-discovery under the same seven-month schedule under CMO 6.

          **4.**  On **December 15, 2019**, 200 randomly selected cases from Pool A and Pool B will begin core-discovery under the same seven-month schedule under CMO 6.

The Court will announce which 1,000 Wave 3 cases fall within which discovery groups on April 15, 2015 when the Wave 3 cases are selected.

      **D.**    **Filing Fee.**   Any cases selected for Wave 3 who have not yet paid a filing fee must pay their filing fee in this Court within 45 days after the selection is announced.  This filing fee will be excused if a case is dismissed with prejudice before then.

      **E.**    **Dismissal/No Replacement.**   If a Wave 3 case is dismissed at any point in time after selection for any reason -- including, but not limited for failure to comply with the Plaintiff Profile & Consent Form or the Short Form PFS, or failure to pay the filing fee – there shall be no replacement or substitute pick.

## V.   **PLAINTIFF PROFILE & CONSENT FORM**

      **A.**    **Approved Form.**   Attached hereto as Exhibit A is the Plaintiff Profile & Consent Form (or PPCF).

      **B.**    **Current Obligations.**   The PPCF must be completed and filed with MDL Centrality within 60 days by (i) plaintiffs in Wave 3 cases, and (ii) any plaintiff in a case filed, removed to or transferred to this MDL after the date of this CMO.  Failure to comply with this requirement will result in the Order to Show Cause dismissal procedure already entered by this

Court under PTO 31A.  Pretrial Order 13 setting the form of the Plaintiff Fact Sheet and Pretrial Order 27 revising the scope of the Plaintiff Fact Sheet shall no longer apply to cases selected in Wave 3 and to any case filed, removed or transferred to this MDL after the date of this CMO.

      **C.**      **Future Application.**  If this Court issues a Suggestion of Remand then all plaintiffs in this MDL who have not already completed and filed a PPCF pursuant to Paragraph V(A) will be obligated to complete and file this PPCF with MDL Centrality within 60 days. Failure to comply with this requirement will result in the Order to Show Cause dismissal procedure already entered by this Court under PTO 31A.  Upon the Suggestion of Remand order, this Court will enter a CMO setting forth this obligation and will terminate the requirement for completion of the Core Compliant PFS.

## VI.    SHORT FORM PFS

      **A.**      **Approved Form.**  Attached hereto as Exhibit B is the Short Form PFS.

      **B.**      **Current Obligations.**  All Wave 3 cases must complete this Short Form PFS within 30 days of announcement of their inclusion in Wave 3.  Failure to comply with this requirement will result in the Order to Show Cause dismissal procedure already entered by this Court under PTO 31A.

      **C.**      **Future Application.**  The Short Form PFS will be required to be completed by any plaintiff that is selected for workup in a future wave of work up cases.

## VII.    SHORT FORM DFS

      **A.**      **Approved Form.**  Attached hereto as Exhibit C is the Short Form DFS.

      **B.**      **Current Obligations.**  In any Wave 1 or 2 where a DFS has not been filed, and as required in CMO 6 for the Wave 3 cases, Defendants must complete this Short Form DFS 30 days after the plaintiff's deposition is taken.  Pretrial Order 13 setting the form of the Defendant Fact Sheet and Pretrial Order 27 suspending the Defendant Fact Sheet shall no longer apply to cases selected in Wave 3.

      **C.**      **Future Application.**  The Short Form DFS will be the only required version of the DFS to be completed by defendants in a future wave of work up cases.

NEW ORLEANS, LOUISIANA this 7th day of March, 2019.

**HONORABLE ELDON E. FALLON**
**UNITED STATES DISTRICT JUDGE**

**EXHIBIT A**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO PRODUCTS LIABILITY LITIGATION | Master File No.: _____ |
| | MDL No. 2592 |
| This Document Relates To: | |
| MDL Case No. _____ | Plaintiff: _____ |

## PLAINTIFF PROFILE AND CONSENT FORM

This Form must be completed by each plaintiff who has filed a lawsuit related to the use of Xarelto® by the plaintiff or the plaintiff's decedent.  Please answer every question to the best of your knowledge. In completing this Form, you are under oath and must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details requested, please provide as much information as you can. You must supplement your responses if you learn that they are incomplete or incorrect in any material respect. For each question, where the space provided does not allow for a complete answer, please attach additional sheets so that all answers are complete. When attaching additional sheets, clearly label what question your answer pertains to.

In filling out this Form, please use the following definitions: (1) "**health care provider**" means any hospital, clinic, medical center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, dietary, psychiatric, or psychological care or advice, and any pharmacy, weight loss center, x-ray department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, physician, psychiatrist, osteopath, homeopath, chiropractor, psychologist, nutritionist, dietician, or other persons or entities involved in the evaluation, diagnosis, care, and/or treatment of the plaintiff or plaintiff's decedent; (2) "**documentation**" means any writing or record of every type that is in your possession, including but not limited to written documents, documents in electronic format, cassettes, videotapes, photographs, charts, computer discs or tapes, and x-rays, drawings, graphs, phone- records, non-identical copies, and other data compilations from which information can be obtained and translated, if necessary, by the respondent through electronic devices into reasonably usable form.

Information provided by plaintiff in this Plaintiff Profile and Consent Form will only be used for purposes related to this litigation and may be disclosed only as permitted by the protective order in this litigation. This Form is completed pursuant to the Federal Rules of Civil Procedure governing discovery (or, for state court case, the governing rules of civil of the state in which the case is pending).

1

## I.    PRELIMINARY CASE INFORMATION

A.    Please provide the following information for the civil action that you filed:

| | |
|---|---|
| Caption: | |
| Docket No.: | |
| Plaintiff's Attorney: | |

B.    Please provide the following information for the individual on whose behalf this action was filed:

| | | | |
|---|---|---|---|
| Name: | | Social Security Number: | |
| Maiden Name or Other Names You Have Used: | | | |
| Address: | | | |
| Date of Birth: | | Gender: | |
| Select Marriage Status: | • Single<br>• Married<br>• Widowed | Name of Spouse, if Married: | |
| What is the highest educational degree that you received and from what educational institution did you receive it? | Degree _____<br><br><br>Educational Institution _____ | | |

C.    If there is another Plaintiff involved in this action other than the individual named in I.B., provide the following for each additional Plaintiff:

| | | | |
|---|---|---|---|
| Name: | | Date of Birth: | |
| Address: | | | |

**If you are completing this questionnaire in a representative capacity, please respond to the remaining questions with respect to the person whose medical treatment involved the use of Xarelto®.  Those questions using the term "You" refer to the person whose treatment involved the use of Xarelto®.  If the individual is deceased, please respond as of the time immediately prior to his or her death unless a different time period is specified.**

D.    Please provide the following information regarding usage of Xarelto® with a separate entry for each date range of use and prescriber.

   **PROVIDE (1) ALL RECORDS FROM HEALTH CARE PROVIDERS WHO**

**PRESCRIBED XARELTO® AND THAT ENCOMPASS THE DATES OF USE OF
XARELTO®; AND (2) ALL PHARMACY RECORDS THAT ENCOMPASS THE
DATES OF USE OF XARELTO®.  AS NEW RECORDS COME INTO YOUR
POSSESSION, YOU MUST PRODUCE THEM AND UPDATE YOUR
RESPONSES WITHIN 14 DAYS OF RECEIPT OF RECORDS.**

| Dates of Use: | | State Where Prescription Was Received: | [DROPDOWN STATE LIST] |
|---|---|---|---|
| Select Dosage: | <ul><li>2.5 mg twice daily</li><li>10 mg once daily</li><li>15 mg twice daily for 21 days, then 20mg once daily</li><li>15 mg once daily</li><li>20 mg once daily</li><li>Off-Label Dosage – [Provide Explanation in Textbox]</li></ul> | | |
| Select Reason for Prescription: | <ul><li>Reduction of Risk of Stroke and Systemic Embolism in Nonvalvular Atrial Fibrillation</li><li>Treatment of Deep Vein Thrombosis (DVT)</li><li>Treatment of Pulmonary Embolism (PE)</li><li>Reduction in the Risk of Recurrence of Deep Vein Thrombosis and of Pulmonary Embolism</li><li>Prophylaxis of Deep Vein Thrombosis Following Knee Replacement Surgery</li><li>Prophylaxis of Deep Vein Thrombosis Following Hip Replacement Surgery</li><li>Reduction of Risk of Major Cardiovascular Events (CV Death, MI, and Stroke) in Chronic CAD or PAD</li><li>Off-Label Use – [Provide Explanation in Textbox]</li></ul> | | |
| Prescriber's First and Last Name | | | |
| Prescriber's Address | | | |
| Pharmacy Name (If Pharmacy does not apply because Xarelto® was administered at a facility during these dates of use, provide the name of the facility instead.) | | | |

3

| Pharmacy Address (If Pharmacy does not apply because Xarelto® was administered at a facility during these dates of use, provide the name of the facility instead.) | |
|---|---|

E.      Samples

Did you receive Xarelto® samples?

Yes _____      No _____

If yes, provide the following information with a separate entry for each provider:

| Sample Provider Name: | | Sample Provider Address: | |
|---|---|---|---|
| Date(s) Samples Provided: | | Quantity Provided: | |

F.      Please provide the following information regarding each event(s) you attribute to use of Xarelto®.

**PROVIDE ALL RECORDS RELATING TO ANY MEDICAL CARE AND TREATMENT ASSOCIATED WITH THE ALLEGED EVENTS IDENTIFIED. AS NEW RECORDS COME INTO YOUR POSSESSION, YOU MUST PRODUCE THEM AND UPDATE YOUR RESPONSES WITHIN 14 DAYS OF RECEIPT OF RECORDS.**

| **Bleeding Event** | |
|---|---|
| • Brain/Cerebral Hemorrhage | |
| • Gastrointestinal Bleeding | |
| • Rectal Bleeding | |
| • Kidney Bleeding (Does Not Include Hematuria) | |
| • Hematuria | |
| • Hemoptysis/Coughing Up Blood | |
| • Acute Blood Loss Anemia | |

4

| | |
|---|---|
| (Requiring Blood Transfusion) | |
| • Nosebleeds | |
| • Stroke (Hemorrhagic) | |
| • Vaginal or Uterine Bleeding | |
| • Pleural Effusion with Bleeding | |
| **Non-Bleeding Event** | |
| • Heart Attack | |
| • Stroke (Ischemic) | |
| • Anemia (Not Acute Blood Loss Anemia) | |
| • Respiratory Failure | |
| • Pleural Effusion with Fluid (No Bleeding) | |
| **Other Event\*** | |

\*If you checked Other Event, identify the event(s) that you are claiming that are not listed in the above chart.

| Other Event: | |
|---|---|
| Is the Other Event a Bleeding Event or Non-Bleeding Event? | ___ Bleeding Event |
| | ___ Non-Bleeding Event |

| Date of Diagnosis: | | | State Where Event Occurred: | [DROPDOWN STATE LIST] |
|---|---|---|---|---|
| Name of Diagnosing Physician or Facility Where Diagnosed: | | | | |
| Address of Diagnosing Physician or Facility Where Diagnosed: | | | | |
| Hospitalized | Yes ____ <br> No ____ | Date(s) of Hospitalization(s) | | |
| Name of Hospital(s) Where You Treated: | | | | |
| Address of Hospital(s) Where You Treated: | | | | |

G.   Prior to your use of Xarelto®, have you ever had the event(s) alleged in I.F?

Yes _____      No _____

If yes, provide all records in your possession relating to medical care and treatment associated with the event(s) that occurred prior to your use of Xarelto® and respond to the following for each event:

| Event: | | Date of Diagnosis: | |
|---|---|---|---|
| Name of Diagnosing Physician or Facility Where Diagnosed: | | Address of Diagnosing Physician or Facility Where Diagnosed: | |

H.   If you are completing this form on behalf of an individual who is deceased, please provide the following information, including a copy of the death certificate, an autopsy report if performed, and letters of administration and/or an affidavit of next of kin.

| Date of Death: | | Cause of Death: | |
|---|---|---|---|
| Place of Death: | | Date of Autopsy: | |
| Do you allege death as an event that you attribute to use of Xarelto®? | Yes _____  No _____ | | |

I.   If you are completing this form in a representative capacity (e.g., on behalf of the estate of a deceased person or as guardian of a living person), please complete the following:

| Representative Name: | |
|---|---|
| Representative Address: | |
| Relationship to Represented Person | |
| Capacity of Representation (e.g., Power of Attorney, Executor, etc.) | |
| State Where Appointed as Representative | |
| Court That Appointed You Representative | |

## II.   CLAIM INFORMATION

Please provide responses to the following:

1.   At the time you experienced the events you attribute to Xarelto®, were you also taking aspirin?

Yes _____   No _____

If yes, medical or pharmacy records demonstrating concomitant use of aspirin and Xarelto® at the time of the alleged events identified in Section I.F must be uploaded to MDL Centrality, and the upload must be confirmed below.

Yes _____   No _____

2.  At the time you experienced the events you attribute to Xarelto®, were you also taking Plavix (clopidogrel) or another P2Y12 platelet inhibitor (prasugrel (Efient, Effient), ticagrelor (Brilinta), and cangrelor (Kengreal))?

Yes _____   No _____

If yes, medical or pharmacy records  demonstrating concomitant use of Xarelto® and Plavix (clopidogrel) or another P2Y12 platelet inhibitor (prasugrel (Efient, Effient), ticagrelor (Brilinta), and cangrelor (Kengreal)) at the time of the alleged events identified in Section I.F must be uploaded to MDL Centrality, and the upload must be confirmed below.

Yes _____   No _____

3.  While on Xarelto®, or at the time you experienced the events you attribute to Xarelto®, did you have a PT (prothrombin time) level higher than 20?

Yes _____   No _____

If yes, medical or pharmacy records demonstrating PT tests you received while on Xarelto® and the results of those tests must be uploaded to MDL Centrality, and the upload must be confirmed below.

Yes _____   No _____

4.  While on Xarelto®, or at the time you experienced the events you attribute to Xarelto®, did you have an abnormal Anti-Factor Xa assay reading?

Yes _____   No _____

If yes, medical or pharmacy records demonstrating the levels of Anti-Factor assay readings taken while you were on Xarelto® must be uploaded to MDL Centrality, and the upload must be confirmed below.

Yes _____   No _____

5.  Did your use of Xarelto® end prior to September 10, 2015 *and* any of the events you attribute to Xarelto® occur prior to September 10, 2015?

Yes _____   No _____

If yes, medical or pharmacy records demonstrating use of Xarelto® ended prior to September 10 2015 and that any of the alleged events identified in Section I.F occurred prior to September 10, 2015 must be uploaded to MDL Centrality, and the upload must be confirmed below.

Yes _____   No _____

6. If Xarelto® was prescribed to you prior to September 10, 2015, did you use Xarelto® after September 10, 2015 *and* did any of the alleged events identified in Section I.F occur after September 10, 2015?

Yes _____ No _____   Not Prescribed Prior to September 10, 2015 _____

If yes, medical or pharmacy records demonstrating Xarelto® was prescribed prior to September 30, 2015, Xarelto® use continued after September 10, 2015, and any of the alleged events identified in Section I.F occurred after September 10, 2015 must be uploaded to MDL Centrality, and the upload must be confirmed below.

Yes _____ No _____

7. Did you take Xarelto® for the reduction in the risk of recurrence of DVT and/or PE *and* use Xarelto® after at least 6 months of standard anticoagulation treatment?

Yes _____ No _____

If yes, medical or pharmacy records demonstrating that you took Xarelto® for the reduction in the risk of recurrence of DVT and/or PE and used Xarelto® after at least 6 months of standard anticoagulation must be uploaded to MDL Centrality, and the upload must be confirmed below.

Yes _____ No _____

### III.   <u>DECLARATION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the information provided in connection with this Plaintiff Profile and Consent Form is true and correct to the best of my knowledge, information, and belief formed after due diligence and reasonable inquiry.  I acknowledge that I have an obligation to supplement the above responses if I become aware of additional responsive information, or if I learn that they are in some material respects incomplete or incorrect.

Pursuant to 28 U.S.C. § 1746, I further declare under penalty of perjury that I have read, agreed to, and understand all of the following:

1.      In order for my case to proceed, I will make myself available for a deposition, to be taken under oath and that will consist of up to 7 hours of questioning by Defendants.

2.      My lawyer and/or I will be responsible for paying the full court filing fee for my case, if not already paid.

3.      The cost for any medical records that are collected by Defendants and that my lawyer and/or I access via the court-approved medical records collection vendor (Marker Group) will be shared 50/50 with the Defendants.

Date: _____                    _____

                                       Signature of Plaintiff


                                       _____

                                       Print Name of Signing Plaintiff


Date: _____                    _____

                                       Signature of Attorney


                                       _____

                                       Print Name of Signing Attorney

9

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO® PRODUCTS
LIABILITY LITIGATION

Master File No.: _____

MDL No. 2592

This Document Relates To:

MDL Case No. _____

Plaintiff: _____

**<u>SHORT FORM PLAINTIFF FACT SHEET</u>**

This Short Form Plaintiff Fact Sheet ("Short Form PFS") must be completed in each case that has been chosen for additional work up in this litigation. The Short Form PFS must be completed by the plaintiff or plaintiff's decedent. Please answer every question to the best of your knowledge. In completing this Short Form PFS, you are under oath and must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details requested, please provide as much information as you can. You must supplement your responses if you learn that they are incomplete or incorrect in any material respect. For each question, where the space provided does not allow for a complete answer, please attach additional sheets so that all answers are complete. When attaching additional sheets, clearly label what question your answer pertains to.

In filling out this Short Form PFS, please use the following definitions: (1) "**health care provider**" means any hospital, clinic, medical center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, dietary, psychiatric, or psychological care or advice, and any pharmacy, weight loss center, x-ray department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, physician, psychiatrist, osteopath, homeopath, chiropractor, psychologist, nutritionist, dietician, or other persons or entities involved in the evaluation, diagnosis, care, and/or treatment of the plaintiff or plaintiff's decedent; (2) "**document**" means any writing or record of every type that is in your possession, including but not limited to written documents, documents in electronic format, cassettes, videotapes, photographs, charts, computer discs or tapes, and x-rays, drawings, graphs, phone- records, non-identical copies, and other data compilations from which information can be obtained and translated, if necessary, by the respondent through electronic devices into reasonably usable form.

Information provided in this Short Form PFS will only be used for purposes related to this litigation and may be disclosed only as permitted by the protective order in this litigation. This Short Form PFS is completed pursuant to the Federal Rules of Civil Procedure governing discovery (or, for state court case, the governing rules of civil of the state in which the case is pending).

## I.   **PRELIMINARY CASE INFORMATION**

A.   Please provide the following information for the civil action that you filed:

| Caption: | |
|---|---|
| Docket No.: | |
| Plaintiff's Attorney: | |

B.   Please provide the following information for the individual on whose behalf this action was filed:

| Name: | | Social Security Number: | |
|---|---|---|---|
| Maiden Name or Other Names You Have Used: | | | |
| Address: | | | |
| Date of Birth: | | Gender: | |

C.   What is the production date of the most recent Plaintiff Profile and Consent Form (PPCF) that you reviewed and produced to Defendants prior to filling out this Short Form PFS?

| Plaintiff Profile and Consent Form Iteration (i.e. Original PPCF or First Amended PPF) | MDL Centrality Produced Date |
|---|---|
| | |

Are all of the responses in the most recent Plaintiff Profile and Consent Form identified above still accurate?

Yes ___ No ___

If no, please supplement the Plaintiff Profile and Consent Form.  This Short Form PFS will be considered incomplete until the Plaintiff Profile and Consent Form is supplemented to provide accurate responses through a verified, amended PPCF.

## II.   **CLAIM INFORMATION**

A.   Xarelto® Use

1.   Were you given any oral instructions from a health care provider regarding Xarelto®?

Yes _____ No _____

If yes, provide the following:

| Provider Name | | Provider Address | |
|---|---|---|---|

2.  Were you given any written instructions, including any prescriptions, packaging, package inserts, literature, medication guides, or dosing instructions, regarding Xarelto®?

Yes _____   No _____

If yes, describe the documents/materials and provide a copy of said documents/materials if they are in your possession:

_____

B.   Claims

1.  Do you claim that Xarelto® worsened a previously existing injury/condition?

Yes _____   No _____

If yes, provide the following:

| | |
|---|---|
| Condition/Injury: | |
| Did you recover from this existing injury/condition before you first used Xarelto®? | Yes ___   No ___ |
| Date Recovered (If Applicable): | |

2.  Do you claim that your use of Xarelto® caused or aggravated any psychiatric and/or psychological condition(s) for which treatment was sought and for which damages are being sought in this lawsuit?

Yes _____   No _____

If yes, provide the following as it pertains to your treatment of any psychiatric and/or psychological condition(s) in the last ten (10) years:

| Name of Mental Health Care Provider | Address | Reason for Treatment | Approx. Dates/Years of Treatment/Visits |
|---|---|---|---|
| | | | |

3.  Are you seeking medical expenses?

Yes ___   No ___

If yes, please list all  medical expenses you are claiming, including amounts billed or paid by insurers and other third-party payors, which are related to any condition which you claim was caused by Xarelto® for which you seek recovery in the action which you have filed.

| Provider | Date | Expense |
|---|---|---|
| | | |

4. Are you making a claim for lost wages or lost earning capacity?

Yes ____ No ____

If yes, state the annual gross income you derived from your employment for each of the five (5) years prior to the injury or condition you claim was caused by Xarelto®, and the annual gross income derived for every year following the injury or condition you claim was caused by Xarelto®.

| Year | Annual Gross Income | Name of Employer | Address of Employer(s) |
|------|---------------------|------------------|------------------------|
|      |                     |                  |                        |

5. Has your spouse filed a loss of consortium or other claim in this lawsuit?

Yes _____ No _____ Not Applicable _____

### III.   MEDICAL HISTORY AND AUTHORIZATIONS

**SIGNED AUTHORIZATIONS IN THE FORMS ATTACHED HERETO MUST BE PROVIDED.   HIPAA AUTHORIZATIONS MUST BE PROVIDED FOR EACH PROVIDER, FACILITY, OR PHARMACY IDENTIFIED IN THIS SHORT FORM PFS.**

A.   Health Care Providers: Provide the following information for every provider who provided treatment to you in the past twelve (12) years:

| Name | Address | Approximate Dates | Reason for Consultation |
|------|---------|-------------------|-------------------------|
|      |         |                   |                         |

B.   Health Care Facilities: Provide the following information for every facility where you treated in the past twelve (12) years:

| Name | Address | Approximate Dates | Reason for Consultation |
|------|---------|-------------------|-------------------------|
|      |         |                   |                         |

C.   Pharmacies: Provide the following information for every pharmacy that filled prescriptions for you in the past ten (10) years:

| Name | Address | Approximate Dates |
|------|---------|-------------------|
|      |         |                   |

D.   Insurance Carriers: Provide the following information for every insurance carrier who provided you with medical coverage and/or pharmacy benefits for the last ten (10) years:

| Name | Address | Name of Insured & SSN (if not identified in | Policy Number | Approx. Dates of Coverage |
|------|---------|---------------------------------------------|---------------|---------------------------|

4

| | | I.B.) | | |
|---|---|---|---|---|
| | | | | |

E.      Other Anticoagulant Medication Use:

Have you ever used any anticoagulant other than Xarelto®?

Yes ____   No _____

If yes, provide the following:

| Anticoagulant Used (Dropdown Choices: Warfarin/Coumadin, Pradaxa, Eliquis, Savaysa, or Lovenox): | Dates of Use | Reason for Use | Adverse Events (If Any) | Reason for Discontinuation | Prescriber Name | Prescriber Address |
|---|---|---|---|---|---|---|
| | | | | | | |

F.      Have you ever had any medical procedure performed in which a stent was used?

Yes _____   No _____   I do not recall or know: _____

If yes, provide the following:

| Type of Stent: | | Date of Procedure: | |
|---|---|---|---|

G.      Do you currently take, or have you ever taken in the last ten (10) years, any of the following medications or supplements (Generic name is followed by brand name):

| Medication | Yes | No | Condition for which taken | Did you take this medication on a regular basis before you first took Xarelto®? | Prescribing Physician | Prescribing Physician Address | Dispensing Pharmacy |
|---|---|---|---|---|---|---|---|
| Aggrenox (Aspirin and Extended Release Dipyridamole in Combination) | | | | | | | |
| Amiodarone (Cordarone, | | | | | | | |

| Medication | Yes | No | Condition for which taken | Did you take this medication on a regular basis before you first took Xarelto®? | Prescribing Physician | Prescribing Physician Address | Dispensing Pharmacy |
|---|---|---|---|---|---|---|---|
| Pacerone) | | | | | | | |
| Anisindione (Miradon) | | | | | | | |
| Aspirin once a day for more than two weeks | | | | | | | |
| Cimetidine (Tagamet) | | | | | | | |
| Dronaderone (Multaq) | | | | | | | |
| Heparin | | | | | | | |
| Mannitol | | | | | | | |
| Non-Steroidal Anti-Inflammatory drugs (NSAIDs) regularly for more than four (4) weeks consecutively (including Ansaid, Pontsel, Toradol, Acular, Feldene, Naprosyn, Lodine) | | | | | | | |
| Plavix (Clopidogrel) | | | | | | | |
| Prasugrel (Effient) | | | | | | | |
| St. John's Wart | | | | | | | |

H.   Other than the medications you identified in the above chart, are there any prescription medications that you have taken on a regular basis in the seven (7) year period before you first took Xarelto®?  For purposes of this question, "regular basis" means that you were

directed by a health care provider to take a medication for at least forty-five (45) consecutive days.

Yes ___ No ___

If yes, provide the following for each medication:

| Medication | Prescriber Name | Prescriber Address | Approx. Dates/Years Taken |
|---|---|---|---|
| | | | |

## IV.   PLAINTIFF HISTORY

A.   Worker's Compensation and Disability Claims

Within the last ten (10) years, have you ever filed for workers' compensation, social security, and/or state or federal disability benefits?

Yes ___ No ___

If yes, state the following for each application:

| Year Claim was Filed | Company and/or Court Where Claim was Filed | Nature of Claimed Injury | Period of Disability | Amount Award |
|---|---|---|---|---|
| | | | | |

B.   Prior Convictions

Have you ever been convicted of, or pled guilty (or no contest) to, a felony and/or a crime involving an act of dishonesty or providing a false statement within the last ten (10) years?

Yes ____ No _____

If yes, provide the following information:

| Charge You Plead Guilty To or Were Convicted Of | Court Where Action Was Pending |
|---|---|
| | |

C.   Bankruptcy

In the last five (5) years, have you filed for bankruptcy?

Yes ____ No _____

D.   Computer Use

7

Apart from communications to or from your attorney, have you communicated via e-mail, visited any chat rooms, or publicly posted a comment, message, or blog entry on a public internet site regarding your experience with or injuries you attribute to Xarelto®, other New Oral Anticoagulants, atrial fibrillation, or the risk of stroke or blood clots during the past five (5) years? (You should include all postings on public social network sites including Twitter, Facebook, MySpace, LinkedIn, or "blogs" that address the topics above).

Yes ____ No ____

If yes, provide the following information:

| On what site or through what medium was the communication made? | When was the communication posted or transmitted? | What was said in the communication? |
|---|---|---|
| | | |

## V.    FACT WITNESSES

Other than your health care providers, please identify all persons who you believe possess information concerning your alleged injury(ies) and current medical conditions, and provide the following information for each person:

| Name | Address | Relationship to You |
|---|---|---|
| | | |

## VI.    DOCUMENT REQUESTS

Produce all documents in your possession, including writings on paper or in electronic form (if you have any of the following materials in your custody or possession, please indicate which documents you have and attach a copy of them to this PFS) and signed authorizations as requested herein:

1.  All non-privileged documents you reviewed that assisted you in the preparation of the answers to this Plaintiff Fact Sheet.

    Yes ____ No ____

2.  A copy of all medical records and/or documents relating to the use of Xarelto® and treatment for any disease, condition, or symptom referred to in any of your responses to the questions in this Short Form PFS or in the most recent Plaintiff Profile and Consent Form referenced in I.C., for the past twelve (12) years.

    Yes ____ No ____

3.  All documents referenced as written instructions in II.A.2 or that constitute, concern, or relate to product use instructions, product warnings, package inserts, pharmacy

handouts, or other materials distributed with or provided to you in connection with your use of Xarelto®.

Yes ___ No ___

4. All documents relating to your purchase of Xarelto® including, but not limited to, receipts, prescriptions, prescription records, containers, labels, or records of purchase.

Yes ___ No ___

5. Copies of entire packaging, including the box and label for Xarelto® (plaintiffs or their counsel must maintain the originals of the items requested in this subpart).

Yes ___ No ___

6. All laboratory reports and results of blood tests performed on you.

Yes ___ No ___

7. All documents reflecting your use of any prescription drug or medication in the past twelve (12) years, including documents sufficient to identify all anticoagulation medications that you have taken.

Yes ___ No ___

8. If you have been the claimant or subject of any workers' compensation, social security, or other disability proceeding within the last ten (10) years, all documents relating to such proceeding.

Yes ___ No ___

9. All documents known to you and in your possession which mention Xarelto® or any alleged health risks or hazards related to Xarelto® in your possession at or before the time of the injury alleged in your Complaint, other than legal documents, documents provided by your attorney or documents obtained or created for the purpose of seeking legal advice or assistance.

Yes ___ No ___

10. All documents in your possession or anyone acting on your behalf (not your lawyer) obtained directly or indirectly from any of the Defendants.

Yes ___ No ___

11. All documents constituting any communications or correspondence between you and any representative of the Defendants.

Yes ___ No ___

12. Copies of advertisements or promotions for Xarelto® and articles discussing Xarelto®.

Yes ___ No ___

13. All photographs, drawing, journals, slides, videos, DVDs, or any other media, including any "day in the life" videos, photographs, recordings, or other media that you may utilize to demonstrate damages or relating to your alleged injury.

Yes _____ No _____

14. Any and all documentation of Plaintiff's use of social media, Internet postings, or other electronic networking website (including, but not limited to, Facebook, MySpace, LinkedIn, Google Plus, Windows Live, YouTube, Twitter, Instagram, Pinterest, blogs, and Internet chat rooms/message boards) relating to Xarelto® or any of your claims in this lawsuit.

Yes _____ No _____

15. If you claimed you suffered a loss of earnings or earning capacity, your federal tax returns for each of the five (5) years preceding the injury you allege to be caused by Xarelto®, and every year thereafter or W-2s for each of the five (5) years preceding the injury you allege to be caused by Xarelto®, and every year thereafter.

Yes _____ No _____

16. Copies of all documents you (and not your lawyer) obtained from any source related to Xarelto® or to the alleged effects of using Xarelto®.

Yes _____ No _____

17. If you claim any loss from medical expenses, copies of all bills from any physician, hospital, pharmacy, or other health care providers.

Yes _____ No _____

18. Copies of all records of any other expenses allegedly incurred as a result of the injuries alleged in the complaint.

Yes _____ No _____

19. Copies of any writings comprising or relating to any public statements made by you relating to this litigation in your possession.

Yes _____ No _____

20. If applicable and not already provided as part of the most recent Plaintiff Profile and Consent Form referenced in I.C., copies of letters testamentary or letters of administration relating to your status as plaintiff.

Yes _____ No _____

21. If applicable and not already provided as part of the most recent Plaintiff Profile and Consent Form referenced in I.C., decedent's death certificate and autopsy report.

Yes _____ No _____

22. All bankruptcy petitions and orders of discharge (if applicable) for all bankruptcy claims made by you or your spouse since the date of your first ingestion of Xarelto®.

Yes _____ No _____

23. Signed authorizations in the forms attached hereto (where applicable).

Yes _____ No _____

Plaintiff reserves right to supplement additional documentation.

Yes _____ No _____

## VII.   **DECLARATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the information provided in connection with this Short Form Plaintiff Fact Sheet is true and correct to the best of my knowledge, information, and belief formed after due diligence and reasonable inquiry.  I acknowledge that I have an obligation to supplement the above responses if I become aware of additional responsive information, or if I learn that they are in some material respects incomplete or incorrect.

Pursuant to 28 U.S.C. § 1746, I further declare under penalty of perjury that I have read, agreed to, and understand all of the following:

1.      In order for my case to proceed, I will make myself available for a deposition, to be taken under oath and that will consist of up to 7 hours of questioning by Defendants.

2.      My lawyer and/or I will be responsible for paying the full court filing fee for my case, if not already paid.

3.      The cost for any medical records that are collected by Defendants and that my lawyer and/or I access via the court-approved medical records collection vendor (Marker Group) will be shared 50/50 with the Defendants.

Date: _____          _____
                            Signature of Plaintiff


                            _____
                            Print Name of Signing Plaintiff


Date: _____          _____
                            Signature of Attorney


                            _____
                            Print Name of Signing Attorney

11

EXHIBIT C

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | : | **MDL NO. 2592** |
| **PRODUCTS LIABILITY LITIGATION** | : | |
| | : | **SECTION L** |
| ********************************* | : | |
| **THIS DOCUMENT RELATES TO:** | : | **JUDGE ELDON E. FALLON** |
| | : | |
| *Case Name* | : | **MAG. JUDGE NORTH** |
| **Case No.** | : | |
| | : | |

## SHORT FORM DEFENDANT FACT SHEET

For each case that has been chosen for additional work up in this litigation, Defendants Janssen Research & Development, LLC and Janssen Pharmaceuticals, Inc. (collectively "Janssen"); Bayer Pharma AG and Bayer Healthcare Pharmaceuticals Inc. (collectively "Bayer"); must complete this Short Form Defendant Fact Sheet ("Short Form DFS") and identify or provide documents and/or data responsive to the questions set forth below to the best of their knowledge. In the event the Short Form DFS does not provide you with enough space for you to complete your responses or answers, please attach additional sheets if necessary. Please identify any documents that you are producing as responsive to a question or request by bates number.

Per CMO 8, upon receipt of both a complete and verified Plaintiff Profile and Consent Form ("PPCF") and Short Form Plaintiff Fact Sheet ("Short Form PFS"), with responses in all sections, and upon the completion of Plaintiff's deposition in this matter, Defendants must complete and serve this Short Form DFS on each Plaintiff's counsel identified in the Short Form PFS within thirty (30) days of the completion of Plaintiff's deposition. Defendants will not be required to serve a Short Form DFS on Plaintiff's counsel until Plaintiff supplies a complete and verified PPCF and Short Form PFS, including but not limited to copies of all of the required medical records, and Plaintiff's deposition has been completed.

## DEFINITIONS

As used herein, the terms "YOU," "YOUR," or "YOURS" means the responding Defendants.

As used herein, the term "XARELTO" includes Rivaroxaban.

As used herein, the phrase "PRESCRIBING HEALTHCARE PROVIDER" means any physician, medical provider, or person identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, who prescribed and/or dispensed Xarelto® to the Plaintiff.

**I.      Case Information**

This DFS pertains to the following case:

Case caption: _____

Court in which action was originally filed: _____

Date that this DFS was completed: _____

**II.     Contacts With Prescribing Healthcare Providers**

For each Prescribing Healthcare Provider identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, please state the following:

A.      Physician's Information Request Letters ("PIR"):

1.   Please indicate if any of the Prescribing Healthcare Provider(s) identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, has (have) ever initiated a PIR by identifying the name and address of the sender of the PIR; the date it was sent; the name and address of the recipient; and whether or not a response to the PIR or similar document was sent.

| Sender (Name and Address) | PIR Date | Recipient (Name and Address) | Response Sent? (Yes or No) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

2.   For each PIR in which a response was sent as indicated by a "Yes" above, please identify the format of the response; the date the response was sent; the name and address of the sender of the response; the name and address of the recipient of the response; and provide and identify by Bates number any and all documentation, including lists or database records, which demonstrates that the responsive documents were sent.

| Original PIR or Request Document | Format of Response (Letter or Otherwise) | Date Response Sent | Response Sender (Name and Address) | Response Recipient (Name and Address) | Bates Number of Supporting Documentation |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

      B.    <u>Other Contacts:</u>

          1.   For each Prescribing Healthcare Provider identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, please identify by name any of the Defendants' Detail Representatives and/or any other detail person ("Representative") who called on the Prescribing Healthcare Provider and provide dates of each contact that related in any way to Xarelto®.

| Prescribing Health Care Provider(s) | Name of Representative | Current or Former Employee | Date(s) of Each Contact with Prescribing Health Care Provider |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

          2.   Have Defendants or their representatives ever provided any Xarelto® samples to Plaintiff's Prescribing Healthcare Provider(s) identified in Section I.E. of the PPCF?  To be answered only if Plaintiff answers "Yes" in Section I.E. of the PPCF.

             Yes_____   No _____   Not Applicable_____

          A. If the answer is "Yes," please state the Prescribing Healthcare Provider(s) identified in Section I.E. of the PPCF that received the samples; the dates in which such samples were provided; the amount, and dosage of such samples; and the name of the Representative(s) who provided the samples.

3

| Prescribing Health Care Provider(s) and/or Primary Treating Physician | Date Shipped to and/or Provided | Amount and Dosage | Representative Who Provided |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

### III.  Consulting With Plaintiffs Prescribing Health Care Provider(s)

    A.    Consulting and Professional Relationships

        1.    If any of Plaintiff's Prescribing Health Care Providers identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, have been retained and/or compensated by Defendants as a "key opinion leader," "thought leader," member of a speaker's bureau, or consultant, relating to the subject of anticoagulants (including Xarelto®) stroke prevention, and/or the treatment/prevention of Atrial Fibrillation, PE, DVT, or strokes, please identify date(s) that each Prescribing Health Care Provider was retained or compensated; the nature of the affiliation; and the amount of any compensation and/or reimbursement for expenses.

| Prescribing Health Care Provider(s) | Date(s) that Prescribing Health Care Provider Retained or Compensated | Nature of Affiliation | Compensation and/or Reimbursement |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

### IV.  Plaintiff's Prescribing Healthcare Providers' Practices

For each Prescribing Healthcare Provider identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, please state and produce the following:

    A.    Do you have or have you had access to any databases, documents, or other information that track or purport to track the prescribing or treating practices of Plaintiff's Prescribing Healthcare Provider(s) identified in Section I.D. of the

PPCF, as verified in Section I.C. of the Short Form PFS, with respect to Xarelto®.

Yes _____ No _____

**V.** **Plaintiff's Medical Condition (Section to be completed only if Plaintiff asserts in good faith that Plaintiff, or anyone acting on behalf of Plaintiff, communicated with Defendants.)**

A.   Have you been contacted by Plaintiff, or anyone acting on behalf of Plaintiff (other than Plaintiff's counsel) concerning Plaintiff?

Yes _____ No _____

B.   If you have been contacted by any person or entity concerning the Plaintiff (other than Plaintiff's counsel) for a reason other than reporting an adverse event, please state the name of the person(s) who contacted you and the name and address of the person(s) who responded to the contact on your behalf.

_____

_____

_____

C.   Please identify and produce all documents created before the filings of this lawsuit which reflect any communication between any person and you concerning Plaintiff.

_____

_____

_____

D.   Please produce a copy of any MedWatch form, other than documents initiated in the course of litigation, which refers or relates to Plaintiff. Any MedWatch form produced shall be redacted as necessary per federal law.

_____

_____

_____

**V.** **Documents**

A.   To the extent you have not already done so, please produce a copy of all documents and things that fall into the categories listed below. These include documents in the possession of any of your present and former employees, including information provided to your attorneys:

1.   Any document created before the filing of this lawsuit which relates to or refers to Plaintiff other than documents received or produced in discovery in this matter (To be produced only if Plaintiff asserts in good faith that

Plaintiff or anyone acting on behalf of Plaintiff communicated with Defendants.)

2.  Subject to limitations set forth in this fact sheet concerning timeframes and categories of relevant information, any document sent to or received from any of Plaintiff's Prescribing Health Care Providers identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS.

3.  Subject to limitations set forth in this fact sheet concerning timeframes and categories of relevant information, any and all documents reflecting any contacts or communications between you and any of Plaintiff's Prescribing Health Care Providers identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, regarding Xarelto®.

4.  Any and all documents which purport to describe, analyze, investigate, track, and/or report the prescribing practices of any of Plaintiff's Prescribing Healthcare Providers identified in Section I.D. of the PPCF, as verified in Section I.C. of the Short Form PFS, relating to Xarelto®, subject to the approval and/or agreement of the owner of the prescribing data (IMS Health) to release the data, which approval and/or agreement Defendant will request.

## **CERTIFICATION**

      I am employed by _____, one of the Defendants in this litigation. I am authorized by _____[names of other Defendants] to execute this certification on each corporation's behalf. The foregoing answers were prepared with the assistance of a number of individuals, including counsel for Defendants, upon whose advice and information I relied. I declare under penalty of perjury that all of the information as to the foregoing Defendants provided in this Defendant Fact Sheet is true and correct to the best of my knowledge upon information and belief.

_____
Signature

_____
Print Name

Date: _____

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

        Civil Action 2:13-md-2433
        CHIEF JUDGE EDMUND A. SARGUS, JR.
        Magistrate Judge Elizabeth Preston Deavers

This document relates to:  ALL NEWLY-FILED CASES.

## CASE MANAGEMENT ORDER NO. 24

### June 20, 2018 Conference

### Management of Newly-Filed Cases

This matter came before the Court for an in-person status conference on June 20, 2018. This Order memorializes the results of that conference as follows:

The Plaintiffs' Steering Committee ("PSC") initially reported that the global settlement is nearly complete.  The PSC expects that the matter will be concluded by the end of summer 2018. The parties indicated that they would work together to propose a dismissal entry that will be sufficient to establish dismissal of the 3,500-plus cases that are the subject of the global settlement.

The Court next discussed the management plan for the newly-filed cases.  Without a meet and confer with the PSC, DuPont filed a motion the day before the conference requesting that the Court adopt its proposed Case Management Order ("CMO") directed at the approximately 33 newly-filed cases.  (Defendants' Motion for Proposed Case Management Order No. 24, ECF No. 5139.)  In DuPont's motion, defendants ask for the entry of a CMO that would require the individual plaintiffs in the newly-filed cases to provide additional causation evidence before

opening discovery. DuPont provides to the Court a proposed CMO, which included a different

Plaintiff's Fact Sheet ("PFS") and authorizations than the ones previously utilized in this

multidistrict litigation ("MDL"). DuPont posits:

> In light of the multiple cases within this MDL, the proposed CMO, which requires
> a physician's certification or *Lone Pine*, as well as other basic protocols, will
> ensure that the critical aspects of each case are explored early, will allow for
> culling of non-viable claims, will deter specious filings in the future, and will
> drive prompt adjudication of each of the individual claims and defenses of the
> cases.

(Defs.' Mot. at 2–3) (citing to *Lore v. Lone Pine Corp.*, 1986 N.J. Super. LEXIS 1626 (N.J.

Super Ct. Nov. 18, 1986)).

"*Lone Pine* orders 'are pre-discovery orders designed to handle the complex issues and

potential burdens on defendants and the court in mass tort litigation by requiring plaintiffs to

produce some evidence to support a credible claim.'" *Adkisson v. Jacobs Eng'g Grp., Inc.*, 2016

U.S. Dist. LEXIS 99350, 2016 WL 4079531 (E.D. Tenn. 20016) (referring to *Lone Pine* orders

as "an extraordinary case management order" and citing *Steering Comm. v. Exxon Mobil Corp.*,

461 F.3d 598, 604, n.2 (5th Cir. 2006)). DuPont asserts that if this Court were to issue DuPont's

proposed CMO, it would adopt a *Lone Pine* order, which is designed to weed out frivolous or

otherwise non-viable claims as early as possible, and alleviate potential burdens on defendants

and the Court. *Id*. at 3 (citing *Lone Pine* and *Modern Holdings, LLC v. Corning, Inc.*, 2015 U.S.

Dist. LEXIS 145181, at *3, 12-13 (E.D. Ky. Oct. 27, 2015) ("each plaintiff should have had at

least some information regarding the nature of his injuries, the circumstances under which he

could have been exposed to harmful substances, and the basis for believing the named

defendants were responsible for his injuries in order to join in the suit in the first place")).

Further, DuPont argues that "<u>courts have found that case management orders which</u>

<u>require each plaintiff to support key aspects of his or her claim, including a physician's</u>

2

statement, are particularly appropriate in the later stages of an MDL." *Id.* at 4 (citing as an example *In re Fosamax Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 166734, at *5-6 (S.D. N.Y. Nov. 20, 2012) (noting that "the posture of the litigation" is a relevant factor and finding that entry of a *Lone Pine* order was appropriate in later stage of the MDL)).

At the in-person status conference, the Court entertained the idea that it would allow the parties to engage in motions practice to determine new procedures for moving forward, setting a briefing schedule for the PSC to respond to DuPont's motion. Upon reflection, the Court here changes the directions given at the conference.

A brief overview is necessary to reach the issues presently before the Court. The litigation between the parties in this MDL began in 2001 in a class action in West Virginia state court captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The *Leach* Case ended in November 2004 when the parties entered into a class-wide settlement ("*Leach* Settlement Agreement"). In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the class ("*Leach* Class") would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant.

The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study whether there is a connection between C-8 and human disease among the *Leach* Class. (*Leach* Settlement Agreement "S.A." at §§ 12.2.1, 12.2.2; ECF No. 820-8.) The *Leach* Settlement Agreement provides that the results of the Science Panel's study would be issued in

3

either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the
Panel studied. (S.A. § 12.2.3.) The *Leach* Settlement Agreement provides the following
definition:

> "Probable Link" shall mean that based upon the weight of the available scientific
> evidence, it is more likely than not that there is a link between exposure to C-8
> and a particular Human Disease among Class Members.

(S.A. § 1.49.)

In 2011 and 2012, the Science Panel delivered No Probable Link Findings for over forty
human diseases and Probable Link Findings for the following six human diseases ("Linked
Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high
cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia.

The *Leach* Settlement Agreement permits the individual members of the *Leach* Class
who have or had any Linked Disease to pursue claims "for personal injury and wrongful death,
including but not limited to any claims for injunctive relief and special, general and punitive and
any other damages whatsoever associated with such claims, that . . . relate to exposure to C-8 of
Class Members" and DuPont agreed not to contest general causation in those actions. (S.A. §
3.3.) DuPont retained the right to contest specific causation and to assert any other defense not
barred by the *Leach* Settlement Agreement.

This MDL consists of approximately 3542 cases, each filed by a plaintiff who asserts that
he or she is a member of the *Leach* Class and was diagnosed with one of the Linked Diseases.
The MDL was filed in this Court in April 2013 and was globally settled on February 14, 2017.
(ECF No. 5086.) At that point, the parties had engaged in extensive discovery and negotiations
leading to many agreed-upon, Court-approved, procedures. Additionally, the parties filed
hundreds of motions, which the Court grouped into its decisions resulting in the issuance of 19

4

Dispositive Motions Orders, 22 Case Management Orders, 9 Evidentiary Motions Orders, 12

Discovery Orders, and 47 Pretrial Orders. Not a single one of the plaintiffs' personal injury

cases was dismissed through this motions practice. When the parties reached global settlement,

the Court was in the middle of the fourth trial, the first three of which resulted in verdicts in

favor of the plaintiff, including two awards of punitive damages assessed against DuPont. Each

trial exceeded four weeks in length.

The global settlement was administered by a special master, with procedures that

required evidence of each plaintiff's *Leach* Class membership and evidence of a medical

diagnosis of a Linked Disease. Over 3500 individual plaintiffs received an award through these

procedures.

With these facts in mind, the Court finds that the *Lone Pine* case upon which DuPont

relies could not be more inapposite to the facts presented in this MDL. The *Lone Pine* case was

"instituted by the plaintiffs against some 464 defendants . . . . [t]he first named defendant, Lone

Pine Corporation, is alleged to have operated a landfill; the remaining defendants are alleged to

have been generators and/or haulers of toxic materials." *Lone Pine*, 1986 N.J. Super. LEXIS

1626, *2, 1986 WL 637507. The *Lone Pine* court started its opinion as follows:

> This matter having come before this Court for the purpose of case
> management, and the Court having determined that, upon the face of the
> Complaint, no prima facie claim for personal injuries or property damage appears,
> the Court having ordered plaintiffs to provide sufficient information to establish
> the existence of a prima facie case . . . .

> The information submitted as to personal injury claims was so inadequate
> as to be deemed unbelievable and unreal. Plaintiffs merely listed a variety of
> illnesses such as allergies, itching, dryness of skin, and the like. No records were
> submitted to substantiate any physical problems, their duration or severity. No
> doctors' reports were provided.

> . . . .

5

Sixteen months after the start of the suit, plaintiffs' counsel has failed to provide anything that resembles a prima facie cause of action based upon property diminution or personal injuries.

*Lone Pine Corp.*, 1986 N.J. Super. LEXIS 1626, *1, *6, *7 1986 WL 637507 (emphasis added).

In the case *sub judice*, no such predicate findings can be made. No case was dismissed upon a defense motion for failure to state a claim or for failure to raise any genuine issue of material fact as to whether their injury resulted from DuPont's conduct. And, even DuPont cannot say that the plaintiffs who are *Leach* Class members and who have Linked Diseases have not set forth prima facie evidence of personal injury.

Similarly, of little if any relevance is *Fosamax*, relied upon by DuPont *supra*, for the proposition that because this case is in its later stages the Court should enter a *Lone Pine* order. The *Fosamax* court entered a limited *Lone Pine* order, noting the following with regard to the six years the approximately 1,000 cases comprising the MDL were before it:

> [T]he Court has reason to believe that spurious or meritless cases are lurking in the some 1,000 cases on the MDL docket. As Merck points out, more than 50% of the cases set for trial have been dismissed, and some 31% of cases that have been selected for discovery have been dismissed. Plaintiffs' habit of dismissing cases after both parties have expended time and money on case-specific discovery demonstrates that this MDL is ripe for a *Lone Pine* order.
>
> . . . .
>
> As Merck noted in its 2010 letter requesting that the Court consider a Lone Pine order, "It is Merck's position that there is no medical or scientific evidence or opinion that Fosamax® may cause jaw injuries other than ONJ." (Letter of Jan. 27, 2010 at 1.) In its letter dated January 3, 2011, Merck reiterated its position: "[U]nlike the cases involving alleged ONJ or osteomyellitis, the Non-ONJ Jaw Cases . . . have not been subject to the same level of scrutiny . . . regarding the medical and scientific basis [for their claims.]" (Letter of Jan 3, 2011 at 2.)

*In re Fosamax Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 166734, *7, 2012 WL 5877418. Even under these conditions, the *Fosamax* court allowed only a limited *Lone Pine* order directed only to "non-ONJ and non-osteomyellitis plaintiffs [so to] target potentially spurious claims without

imposing undue obligations upon other plaintiffs." *Id.* at *9–10.

Again, in the instant MDL, the conduct of the PSC and the survival of nearly 98% of the individual personal injury claims through awards by the settlement special master show the dissimilarity to the facts in *Fosamax*. There have been no spurious or meritless claims presented to this Court, and therefore, no reason to target spurious or meritless claims from being filed.

Moreover, the Science Panel's Probable Link Findings make the evidence before this Court totally unlike Merck's description of the evidence in *Fosamax* related to injuries other than ONJ, *i.e.*, that there was no medical or scientific evidence or opinion that Fosamax® may cause jaw injuries other than ONJ. The Science Panel found that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a Linked Disease among the *Leach Class* Members. Each of the pending cases has alleged a linked condition.

In sum, this Court has no reason to believe that spurious or meritless cases are lurking in 33 newly-filed cases on the MDL docket. Thus, there is simply no need for this Court to enter the extraordinary *Lone Pine* order in an attempt to weed out frivolous or otherwise non-viable claims as early as possible. In other words, entry of a *Lone Pine* order under the circumstances here amounts to an unprecedented condition precedent to filing a claim and insertion of defense counsel screening of a plaintiff's claims. There is simply no justification for such conditions, none of which is required by the Federal Rules of Civil Procedure or this Court's Local Rules.

Accordingly, the Court declines DuPont's invitation to enter a *Lone Pine* order, and hereby **DENIES** Defendants' Motion for Proposed Case Management Order No. 24. Further, as can be seen by the brief overview offered above, the procedures this Court has utilized to date in this MDL have been, by any measurement, successful. Thus, the Court will continue to utilize

those procedures.  Of import to the current CMO, the PFS that are established in CMO 4, will be utilized for the newly-filed cases.  Any modification, upon which the parties jointly agree, may be instituted.  The Court, however, will not entertain briefing on the issue.

The Court, therefore, sets the following schedule:

- Plaintiffs shall provide the PFS from the newly-filed cases to DuPont within 45 days of the date of this CMO.

- DuPont shall inform this Court the cases it believes have issues with statute of limitations and/or *Leach* Class disputes 45 days after it receives the PFS.

After review of DuPont's submissions, the Court will set a schedule for motions practice and for trials.  The first trial will be scheduled in October 2019, with each remaining trial to start every other month until completion.

Last, the next in person status conference is now scheduled for **September 28, 2018 at 1:00 p.m.** as opposed to the November date discussed at the conference.  As set forth in PTO 1, the parties must confer prior to the status conference and send to the Court, no later than two business days prior to the conference, an agenda of issues to be addressed.  If any of those issues relate to proposed orders or other documents the parties plan to discuss with the Court during the conference, those proposed orders or other documents should be submitted with the agenda.

**IT IS SO ORDERED**.

_____6 -22 -2018_____
**DATE**

_____
**EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE**

8