

February 18, 2022

The Honorable Jane Triche Milazzo, United States District Judge
500 Poydras Street
Room C206
New Orleans, Louisiana 70130

Harley V. Ratliff

2555 Grand Blvd.
Kansas City, Missouri 64108
**t** 816.474.6550
**f** 816.421.5547
hratliff@shb.com

Judge Milazzo:

This Court has addressed many common issues across the more than 15,000 cases that have been filed in this MDL.  More issues, however, remain before considering disposition and remand of individual cases.  At this stage, an MDL court "should endeavor to use the MDL forum to resolve or streamline the litigation before remand to the district courts."  Bolch Judicial Institute, Duke Law School, Guidelines and Best Practices for Large and Mass-Tort MDLs 94 (2d ed. 2018) [hereinafter MDL Guidelines and Best Practices].[1]  "[C]ommonly, courts have utilized alternative available mechanisms [such as proof-of-injury orders] to close the gap between remand and continued MDL consolidation." *Id.* at 95.

Rather than remanding cases for the sake of remand—as the PSC contemplates—Sanofi's attached proposal closes the gap by moving cases along two tracks:

- **Track 1** addresses remaining global issues in the MDL, which will help further cull the litigation as a whole.

- **Track 2**, on the other hand, anticipates affirmative discovery and motion practice in a select pool of eligible cases.

Together, these two tracks will streamline the litigation by eliminating non-viable cases, while leaving only viable, trial-ready cases for the eventual transferor courts.  As a result, Sanofi requests that this Court enter Sanofi's Selection and Discovery Pool Case Management Order ("Discovery Pool CMO")[2] and Hair Loss Diagnosis Pretrial Order ("Diagnosis PTO").[3]

### MDL Architecture and the Resolution of Initial Global Issues

This Court has constructed an MDL architecture equipped to handle the next phase of litigation.  Sanofi's proposal incorporates learnings from the following:

Bellwether Work-Up and Trials:

The Court has used bellwether case work-up to test the claims of representative plaintiffs. This process has been instructive, and it suggests that few cases will proceed to trial.

---

[1]   The MDL Guidelines and Best Practices are "a product of five years of bench-bar MDL Conferences hosted by the Duke Law Center for Judicial Studies."  *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2021 WL 3883265, at *3 (D. Md. Aug. 31, 2021).

[2]   **Ex. A**.

[3]   **Ex. B**.



Approximately half of the Sanofi bellwether cases were removed or disqualified from the pool for, among other things, lack of product identification, lack of photographs, and health reasons.[4]  Another four cases were voluntarily dismissed with prejudice by plaintiffs.[5]  Of the 19 Sanofi cases to face dispositive motion practice, 17 cases (89%) have been dismissed or are subject to dismissal, primarily on the statute of limitations or learned intermediary doctrine.[6]  Thus, even for cases *carefully* selected by both sides, more than 95% could not reach trial.  Only two cases did—*Earnest* and *Kahn*.[7]  Most recently in *Kahn*, the jury entered a verdict in Sanofi's favor, finding that the Taxotere label adequately warned Ms. Kahn's prescribing physician of the risk of permanent alopecia.[8]

February 18, 2022
Page 2

<u>MDL-Wide Briefing</u>:

This Court has narrowed the inventory of viable cases through a series of "fencepost" rulings.  The Court first held that Sanofi did not have a duty to warn of the risk of permanent hair loss before December 15, 2006, giving the MDL a clear starting point.[9]  The Court next held that the Taxotere label adequately warned of the risk of permanent hair loss as of December 11, 2015, giving this litigation a clear endpoint.[10]

The Court also ruled on various test motions, then utilized show-cause procedures to resolve the claims of similarly situated plaintiffs.  The Court granted summary judgment on the claims of one Michigan plaintiff (Brenda Mixon) under the Michigan Product Liability Act.[11]  The

---

[4]   **Ex. C**, Sanofi Bellwether Tracking Chart.

[5]   *Id.*

[6]   *Id.*  The Court has granted summary judgment in Sanofi's favor in 10 bellwether cases.  After the Court granted Sanofi's motion for judgment on the pleadings on the claims of bellwether plaintiff Juanita Greer, six Mississippi bellwether plaintiffs would be subject to dismissal under Sanofi's proposed show-cause order.  *See* Rec. Doc. 13746 (Mot. for Rule to Show Cause Regarding Dismissal of Mississippi Pls.).

[7]   The recent ruling in *Earnest* should be addressed together with the issues raised in this letter submission.  There are significant issues to address in *Earnest*, such as prescription and the learned intermediary doctrine.

[8]   *See* Rec. Doc. 13436 at 1 (Jury Verdict Form).

[9]   *See* Rec. Doc. 10487 (Order and Reasons Granting Sanofi's Mot. for Summ. J. on the Claims of Pls. Whose Taxotere Treatment Started Before December 15, 2006).  More than 1,400 active plaintiffs allege that they received Taxotere before December 15, 2006.

[10]  Rec. Doc. 10464 (Order and Reasons Granting Sanofi's Mot. for Summ. J. on the Claims of Pls. Whose Taxotere Treatment Started After December 11, 2015).  More than 500 active plaintiffs allege that they received docetaxel after December 15, 2006.

[11]  Rec. Doc. 12405 (Order and Reasons Granting Sanofi's Mot. for Summ. J. on the Claims of Pl. Brenda Mixon and Entry of Order to Show Cause).  The MPLA provides a "complete defense" in a product-liability action involving a prescription drug where, as here, the FDA approved the drug for safety and efficacy, and the drug carried an FDA-approved label when it left the manufacturer's control.  *Id.* at 2–3.



Court then employed a show-cause process for other plaintiffs who were prescribed or administered Taxotere in Michigan, resulting in 350 dismissals.[12]

Similarly, the Court granted judgment on the pleadings on the claims of bellwether plaintiff Juanita Greer because she filed outside the statute of limitations and met no tolling or equitable exception under Mississippi law.[13]   Nearly 300 Mississippi cases fall under the same analysis.[14]   No discovery was or is needed to determine that most Mississippi plaintiffs do not have viable claims.  Many other states have similar statute of limitations laws.

Show Cause Procedures:

The Court has also enforced baseline discovery compliance.  Defendants have noticed for dismissal plaintiffs who fails to submit a Plaintiff Fact Sheet ("PFS"), verification, or authorizations, among other actionable deficiencies.[15]   The Court has required plaintiffs to provide signed written statements and responsive electronically stored information.[16]   Lastly, the Court has instituted a show-cause procedure for plaintiffs who fail to provide product identification.[17]   Together, these protocols have resulted in the dismissal of almost 2,500 plaintiffs, all of whom were unable to provide basic discovery required by civil litigation.

Appellate Review:

The Fifth Circuit has affirmed almost all of this Court's MDL rulings.  Procedurally, the Fifth Circuit has affirmed this Court's dismissal of plaintiffs for discovery noncompliance.  *See, e.g.*, *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kuykendall)*, 966 F.3d 351, 354 (5th Cir. 2020); *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Nevin)*, 837 F. App'x 267 (5th Cir. 2020).  Substantively, the Fifth Circuit has affirmed (and expanded) this Court's application of state law on warnings causation under both Louisiana and Colorado law.  *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Phillips)*, 994 F.3d 704, 705 (5th Cir. 2021) (per curiam) (under Louisiana law, causation analysis "focuses on the prescribing physician's decision to prescribe the drug."); *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Gahan)*, 859 F. App'x 692, 695 (5th Cir. 2021) (per curiam) (Colorado law).  The Fifth Circuit has likewise affirmed this Court's entries of summary judgment on statute of limitations under Louisiana law.  *See, e.g.*, *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Thibodeaux)*, 995 F.3d 384 (5th Cir. 2021) (agreeing with this Court that the three plaintiffs suffered their injuries as pleaded in the Master Complaint—that is, "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy").

---

[12]   Rec. Doc. 13327 (Minute Order).

[13]   Rec. Doc. 12057 (Order and Reasons Granting Sanofi's Mot. for J. on the Pleadings Based on the Statute of Limitations).

[14]   Rec. Doc. 13746 (Mot. for Rule to Show Cause Regarding Dismissal of Mississippi Pls.).

[15]   Rec. Doc. 3493 (Pretrial Order No. 22A).

[16]   Rec. Doc. 1531 (Pretrial Order No. 71A).

[17]   Rec. Doc. 1506 (Case Management Order No. 12A).



**Remaining Global Issues**

To address the remaining 12,000 cases in the MDL, Sanofi proposes a balance between working up larger pools of cases and creating global opportunities to identify potentially non-viable cases.  These remaining global items include the following:

February 18, 2022
Page 4

Lack of Medical Diagnosis:

Currently, more than 10,000 plaintiffs (85% of the case inventory) have never been diagnosed with permanent hair loss.[18]  Plaintiffs' failure to provide prima facie evidence of their injuries after years of litigation has prevented both sides from meaningfully evaluating the case inventory and has frustrated potential resolution.

Statute of Limitations:

All plaintiffs allege that they experienced "permanent" hair loss, defined as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy."[19]  As a result, six months after chemotherapy each plaintiff knew that her hair had fallen out from chemotherapy and that she had suffered an alleged injury.  These facts alone are sufficient notice for a reasonable plaintiff to investigate and file a lawsuit within the applicable statute of limitations.

Nevertheless, thousands of plaintiffs filed their lawsuits many years—or even decades—after they received chemotherapy.  Nearly 90% of cases against Sanofi were filed after the applicable state statute of limitations.  Consistent with other MDLs, an efficient strategy to address statute of limitations problems across the MDL inventory is both necessary and prudent before remand.[20]

Lack of Product Identification:

More than 2,000 plaintiffs have not (or cannot) come forward with sufficient product identification evidence under CMO 12A.

**Parallel Tracks to Resolve Global Issues and Pool Work-Up**

To "use the MDL forum to resolve or streamline the litigation before remand to the district courts[,]" an MDL court should "explore and consider all possibilities for resolution of the cases" while also "prepar[ing] cases that do not resolve for trial in the transferor courts."  MDL Guidelines and Best Practices 94.  Consistent with these best practices, Sanofi proposes the MDL proceed on parallel tracks.

---

[18]   A similar percentage of plaintiffs—88%—has never sought treatment for the alleged injury.

[19]   Rec. Doc. 4407 at ¶ 181 (Second Am. Compl.).

[20]   Besides the statute of limitations issues, other states, such as Texas, provide legal protections to manufacturers of FDA-approved medications, which could result in a show-cause process involving more than 1,000 plaintiffs.



Under **Track 1**, the parties will address many of the remaining global issues in the MDL, including proof of medical diagnosis and dispositive state-law issues, such as statute of limitations. At the same time, the parties will work-up a pool of cases under **Track 2**. Cases ineligible for work-up under Track 2 would move to Track 1.

February 18, 2022
Page 5

### Track 1: Global MDL Issues

Diagnosis PTO:

Sanofi requests that the Court enter the Diagnosis PTO together with Sanofi's proposed Discovery Pool CMO. The Court deferred ruling on Sanofi's original motion for entry of a diagnosis order until after the third bellwether trial.[21] Now that the Court has dismissed the third bellwether plaintiffs, Sanofi renews its request to require the more than 85% of plaintiffs who have never been diagnosed with their claimed injury to provide medical proof.[22]

Statewide Statute of Limitations Motion Practice:

After the Court's ruling in *Greer*, Sanofi asked the Court to enter a show-cause order to address the plaintiffs whose claims are also barred by Mississippi's statute of limitations, which only recognizes a discovery rule for latent injuries.[23] Similarly, many plaintiffs who filed suit in this MDL are subject to statute of limitations laws with no discovery rule (or a narrow one):

- Alabama – 489 plaintiffs. *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983) ("[T]his Court has refused to accept the so-called 'discovery rule.'").

- North Carolina – 446 plaintiffs. *Pembee Mfg. Corp. v. Cape Fear Const. Co.*, 329 S.E.2d 350, 354 (N.C. 1985) ("[A]s soon as the injury becomes apparent to the claimant or should reasonably become apparent, the cause of action is complete and the limitation period begins to run.").

- Virginia – 249 plaintiffs. *Adams v. Am. Optical Corp.*, 979 F.3d 248, 256 (4th Cir. 2020) ("Virginia courts have repeatedly explained that a plaintiff's cause of action accrues on the actual date of injury, not the date on which that injury is discovered by or communicated to the plaintiff.").

For these states, the *In re Mirena* MDL provides an efficient template to address statute of limitations issues. There, Judge Seibel considered the facts of multiple test cases and whether plaintiffs' claims were time-barred under the laws of particular states. *See In re Mirena IUD Prods. Liab. Litig.*, 29 F. Supp. 3d 345 (S.D.N.Y. 2014). Judge Seibel then issued a statute of limitations CMO, which allowed the parties to submit letter briefs on the timeliness of other

---

[21]   Rec. Doc. 10908 (Order Deferring Sanofi's Mot. for Entry of an Order Requiring Proof of Diagnosis).

[22]   Rec. Doc. 10808-1 at 1 (Mem. of Law in Supp. of Defs.' Mot. for Entry of an Order Requiring Proof of Diagnosis).

[23]   Rec. Doc. 13746 (Mot. for Rule to Show Cause Regarding Dismissal of Mississippi Pls.).



plaintiffs' claims under the test-case rulings.[24]  The CMO permitted efficient rulings on dozens of common legal questions.  *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 2015 WL 144214 (S.D.N.Y. Jan. 9, 2015), *aff'd sub nom. Medinger v. Bayer Healthcare Pharms. Inc.*, 667 F. App'x 321 (2d Cir. 2016).  A similar approach would streamline this MDL, which has been flooded with facially untimely claims.[25]

February 18, 2022
Page 6

## Track 2: Discovery Pool CMO

Sanofi and the PSC have worked to narrow the points of disagreement between their respective proposals for case selection and work-up.  Sanofi addresses each point below.

Pool Size and Selection:

Sanofi proposes the first discovery pool consist of no more than 75 cases.  The pool size allows the parties and the Court to scale-up incrementally from the bellwether pools of 25 plaintiffs. By starting with 75 cases, the parties can address any unforeseen problems with a manageable pool, rather than having an untested process affect several hundred plaintiffs.  The parties can discuss increasing the number of plaintiffs in later pools.

Further, the Court should select the 75 cases at random from all pending cases—the same procedure the Court adopted for the fourth and fifth rounds of trial pool plaintiffs under CMO 19.[26]  The Court may choose which Defendants' cases are eligible for participation.  Random selection ensures the pool is proportional to case inventory and market share.

To that end, random selection *should not* be subject to a per-firm limit of 20 cases per discovery pool, especially when the PSC is proposing larger pools of cases.  The proposed limit would push work to plaintiffs' firms with lower case volume without justification, disproportionately off-loading case work-up from the leadership proposing such limits (which have much higher case counts in this MDL).  Under the PSC's proposal, leadership firms, such as the Bachus & Schanker Firm (1,920 active cases), stand to receive a proportional benefit from any recovery while shielding themselves from proportional case work-up.

Eligibility:

The parties have reached agreement on some, but not all, eligibility criteria for the case pool. The Court should adopt Sanofi's proposed criteria on medical diagnosis, statute of limitations, and product identification to screen meritless cases before work-up and remand.

First, plaintiffs must have proof of permanent hair loss to be eligible for the discovery pool. "In preparation for remand, the court should consider *Lone Pine* [*i.e.*, proof-of-injury] proceedings or other methods to cull meritless cases and ensure that only the viable cases may ultimately be eligible for remand."  MDL Guidelines and Best Practices 104.  Courts often

---

[24]   CMO No. 22A, *In re Mirena IUD Prods. Liab. Litig.*, No. 7:13-md-02434 (S.D.N.Y. Aug. 7, 2014) (Dkt. 1510).

[25]   And, like *Mixon*, Sanofi plans to file a test motion under the Texas Product Liability Act, which provides a rebuttable presumption of non-liability for FDA-approved medications.

[26]   Rec. Doc. 7402 (Case Management Order No. 19).



implement these orders before remand "to weed out truly meritless cases and cases that claimant and counsel are not prepared to pursue, and to ensure that the transferor courts receive only viable cases." *Id.*

Sanofi's Diagnosis PTO works together with its Discovery Pool CMO to cull meritless claims, while moving only potentially viable claims through work-up. The PTO is less rigorous than Sanofi requested in its initial proposed order from July 2020.[27]  Under the new version, plaintiffs may submit medical records confirming diagnosis or treatment from any time before January 1, 2022. Proof of either diagnosis or treatment constitutes compliance. The previous order required all plaintiffs to prove a diagnosis, even if they had been treated. The new order does not require plaintiffs to identify the cause(s) of their permanent chemotherapy-induced hair loss, so long as there is a diagnosis or treatment for their alleged injury. Plaintiffs without any existing records may comply with the PTO by receiving a medical declaration. Plaintiffs who submit either category of proof satisfy their obligations to remain in the discovery pool. Any plaintiff may also excuse herself from the process by filing a certification of refusal to seek diagnosis; these plaintiffs, however, would be excluded from the discovery pool and addressed under Track 1.

This stage of the MDL requires objective proof of injury. *See* MDL Guidelines and Best Practices 104. The PSC proposes to continue to use photographs as a proxy for medical diagnosis. But even the PSC's own hair loss expert has rejected this premise. Dr. Antonella Tosti "cannot make [a] diagnosis [of alopecia] from pictures."[28]  Sanofi's proposal, however, does not eliminate previous work on photographs. Plaintiffs choosing the medical declaration route must provide the physician with their photographs. As such, photographs remain a part of the case evidence.

Second, facially time-barred cases without PTO 105 amendments are ineligible for the discovery pool and would be addressed under Track 1.[29]  At a macro level, thousands of plaintiffs allege Taxotere treatment years or even decades before they filed their lawsuits. At a micro level, many bellwether plaintiffs' claims have not survived pretrial proceedings on statute of limitations—13 out of the 19 cases against Sanofi to face dispositive motion practice (68%) were or are subject to dismissal on statute of limitations. Taken together, the Court can conserve resources by eliminating cases with glaring statute of limitations deficiencies and instead address them under Track 1.

Third, Sanofi proposes excluding any cases where the plaintiff has failed to satisfy product-identification requirements under CMO 12A. "It is well established that product identification is an essential element of every products liability action, regardless of which state's law

---

27   *Cf.* Rec. Doc. 10808-2 ([Proposed] Pretrial Order No. X (Hair Loss Diagnosis Order)).

28   **Ex. D**, Dec. 12, 2019 Tosti Dep. 119:22–120:5; *see also id.* at 181:25–182:1 ("I cannot make a diagnosis on photographs for any – anything."); **Ex. E**, Nov. 10, 2021 Kahn Trial Tr. 741:19–23.

29   Rec. Doc. 10338 (Pretrial Order No. 105). PTO 105 permitted plaintiffs to amend their Short Form Complaints to add allegations about their care, treatment, and communications with medical professionals after the Court ruled on a series of statute of limitations motions. The deadline to amend expired last year.



governs." *In re Dow Corning Corp.*, 250 B.R. 298, 353–54 (Bankr. E.D. Mich. 2000). Here, more than 2,000 plaintiffs still do not have adequate product identification evidence despite years of litigation. Plaintiffs without this essential element of their products liability claim should be addressed under Track 1.

It is also worth mentioning that the PSC's proposal eliminates *all* Louisiana, Mississippi, and Texas cases. No Fifth Circuit cases would remain in play, which would remove any chance of trial in the MDL through direct, interdistrict, or intracircuit transfer. Those cases merit inclusion on the same footing as cases from any other state and benefit the most from existing Fifth Circuit guidance.

Pool Discovery:

While the parties generally agree on how discovery should proceed once pool plaintiffs are selected, the PSC requests to depose a "detail representative" in each case. This is unnecessary

The dispositive issues in these cases, such as statute of limitations and the learned intermediary doctrine, turn on the testimony of the plaintiff and the treating physician, not a sales representative. Indeed, the Court has never cited sales representative testimony in its decisions on the statute of limitations or learned intermediary doctrine.[30] The Court should limit pool discovery to what is necessary to determine these two dispositive issues. The parties may depose additional witnesses, such as a plaintiff's family members and friends or a sales representative, in remaining pretrial discovery on remand.

Motion Practice:

This Court should hear all non-expert, dispositive motion practice. Although the PSC's proposal shifts all summary judgment ruling to the transferor courts, the goal of a mature MDL is to identify and work-up cases for remand that can ultimately be tried in the transferor court. *See* MDL Guidelines and Best Practices 94. When it is possible for the MDL court to resolve cases before remand, "efficiency is served because district courts across the country are spared extensive work on cases in which they have little or no background." *Id.* at 93; *see also In re Baycol Prods. Litig.*, 2008 WL 6259241, at *13 (D. Minn. Sept. 9, 2008) ("The accrual of judicial expertise is central to the multi-district litigation process.").

Most MDL cases will never be trial ready because they cannot survive summary judgment on statute of limitations or learned intermediary doctrine. Given that nearly 90% of Sanofi bellwether cases to face dispositive motion practice have been dismissed or are subject to dismissal, efficiency dictates that this Court address non-expert, dispositive motion practice in discovery pool cases. This Court is well-versed in both issues, and the Fifth Circuit has affirmed all six of this Court's appealed rulings on dispositive motions under various states' laws. As a result, this Court should resolve meritless cases now instead of sending them back to the transferor courts.

---

[30]   In *Kahn*, for example, the PSC did not cite or rely on any testimony of former Sanofi sales representative Ruth Avila to oppose Sanofi's motions for summary judgment.



Next Steps:

Working up a larger pool of cases while addressing outstanding global MDL issues represents a new chapter in this litigation that the parties should assess before jumping to remand.  In *Xarelto*, Judge Fallon did not enter a remand order when he directed the parties to begin working-up waves of cases.[31]  Judge Fallon instead opted to enter a procedure to remand Pool 1 and 2 cases a year after entering the initial pool discovery order with specific protocols to select and brief cases for remand.[32]  The same procedure is warranted here.  Identifying trends from discovery pool work-up, such as the drop-out rate, will inform the MDL's course and any future remand order.

February 18, 2022
Page 9

## Conclusion

The next phase of this MDL is an opportunity to continue global progress.  Any proposal that ignores inventory-wide problems, such as statute of limitations and proof of injury, risks wasting the expertise this Court has gained over six years.  Sanofi's two-track proposal addresses the remaining global issues in this MDL while working-up a pool of cases, which could later be remanded.  Together, these tracks will streamline the litigation by eliminating non-viable cases and leaving only viable trial cases for the transferor courts.

Best regards,

Harley V. Ratliff

---

[31]   Case Management Order 6, *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. 14-md-2592 (E.D. La. Feb. 27, 2018).

[32]   Case Management Order 8, *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. 14-md-2592 (E.D. La. Mar. 7, 2019).  The Bayer and Johnson & Johnson Defendants settled soon after.

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                              SECTION "H" (5)

THIS DOCUMENT RELATES TO
ALL CASES

### [PROPOSED] CASE MANAGEMENT ORDER NO.

**(Selection and Discovery for Pool 1)**

This Order shall govern the selection and discovery for 75 cases to comprise Pool 1.

**Pool 1 Case Selection**

Pool 1 shall consist of 75 cases selected by the Court by random selection.

1. <u>Selection Dates.</u> On April 8, 2022, the Court will provide the parties with a list of case names and numbers randomly selected from MDL Centrality.

2. <u>Initial Selection Criteria.</u> The only initial selection criteria applied by the Court for Pool 1 random selection will be product identification on the Plaintiff Fact Sheet as follows:

---

**III. PRODUCT IDENTIFICATION**

Taxotere®

   1. Were you treated with brand name Taxotere®? Yes ☐ No ☐ Unknown ☐

Other Docetaxel

   2. Were you treated with another Docetaxel or generic Taxotere®? Yes ☐ No ☐

   3. If yes, select all that apply:

| Name of Drug | Yes |
|---|---|
| Docetaxel – Sanofi-Aventis U.S. LLL d/b/a Winthrop US | ☐ |
| Docetaxel – McKesson Corporation d/b/a McKesson Packaging | ☐ |
| Docetaxel – Actavis LLC f/k/a Actavis, Inc. / Actavis Pharma, Inc. | ☐ |
| Docetaxel – Pfizer Inc. | ☐ |
| Docetaxel – Sandoz Inc. | ☐ |
| Docetaxel – Accord Healthcare, Inc. | ☐ |

---

| | |
|---|---|
| Docetazel – Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc. / Hospira, Inc. | ☐ |
| Docefrez – Sun Pharma Global FZE | ☐ |
| Docefrez – Sun Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical Laboratories, Ltd. | ☐ |
| Docetaxel – Teva Parenteral Medicines, Inc. | ☐ |
| Docetaxel – Dr. Reddy's Laboratories Limited | ☐ |
| Docetaxel – Eagles Pharmaceuticals, Inc. | ☐ |
| Docetaxel – Northstar Rx LLC | ☐ |
| Docetaxel – Sagent Pharmaceuticals, Inc. | ☐ |
| Unknown | ☐ |

Plaintiffs must have single-defendant product identification to be eligible for the discovery pool.  Cases are ineligible for the discovery pool if their product identification implicates more than one manufacturer.  For example, cases selecting "yes" to both III(1) and III(2) may be included, so long as only Winthrop U.S. is selected in response to III(3).  Cases selecting multiple docetaxel products in response to III(3) also may be included, so long as only one manufacturer is implicated.  Cases that select multiple manufacturers in response to III(3) are ineligible for the discovery pool.

Cases that select "Unknown" to III(1) or "Unknown" to III(3) also are ineligible for the discovery pool.

3. <u>Certificate of Willingness to Proceed.</u>  Pursuant to Case Management Order No. 14C (Rec. Doc. 6789), within 14 days of selection, Plaintiffs' counsel has a duty to certify that each selected Plaintiff is willing to proceed.  Cases where the plaintiff is unwilling to proceed or cannot be contacted within this deadline are ineligible for the discovery pool and may be subject to an order to show cause.

4. <u>Eligibility.</u> After an opportunity to review the selected cases, the parties shall meet and confer to determine whether the cases meet the following exclusion criteria.  Each party

- 2 -

reserves the right to challenge the selections on any basis.  The parties will submit such challenges to this Court and the Court's decision shall be final and not subject to appeal.

a.  <u>Living Plaintiffs.</u> Cases involving deceased plaintiffs are ineligible for the discovery pool.  Such cases may be subject to future Orders.

b.  <u>Photograph Problems.</u>  Cases without photographs complying with Pretrial Order No. 68 (Rec. Doc. 1085) are ineligible for the discovery pool.

c.  <u>Pre-2006.</u>  Cases where a plaintiff's treatment took place on or before December 15, 2006 are ineligible for the discovery pool. (Rec. Doc. 10487)

d.  <u>Post-2015.</u>  Cases where a plaintiff's treatment took place on or after December 11, 2015 are ineligible for the discovery pool. (Rec. Doc. 10464)

e.  <u>Certain State Law Impediments to Claims Against FDA Approved Medicines.</u> Plaintiffs who resided or were treated in Michigan are ineligible for the discovery pool. (Rec. Doc.  12405)

Defendants may file dispositive motions on the claims of Plaintiffs who resided or were treated in states foreclosing product liability claims against FDA-approved medicines (e.g., Texas, New Jersey).  The Court encourages the parties to meet and confer about whether cases subject to such motion(s) should remain eligible for the discovery pool, or whether the Court should stay discovery to conserve resources pending disposition.

f.  <u>CMO 12A, Single- Manufacturer Product Identification.</u>  Discovery pool plaintiffs must have product identification as defined by CMO 12A (Rec. Doc. 3492).  The parties shall confer regarding the product identification information for each case and any concerns either party may have.  If the parties cannot agree on whether the product

- 3 -

identification information is sufficient, the parties should bring the issue to the Court. The Court's resolution of eligibility for the discovery pool does not constitute adjudication of product identification.  Plaintiffs' counsel must promptly reconcile the named defendants and proceed with dismissals of improper party-defendants in selected cases.

g. <u>Excluding Facially Time-Barred Cases.</u>  The provisions of Paragraph 7, below, are intended to assist the Court in evaluating the breadth of statute of limitations issues in the cases filed in these MDL proceedings.  The Court encourages the parties to meet and confer about whether cases subject to Paragraph 7 should remain eligible for the discovery pool, or whether the Court should stay discovery to conserve resources pending disposition.

h. <u>Excluding No Injury or Undiagnosed Cases.</u>  All remaining eligible cases are required to comply with PTO XXX, Order Requiring Proof of Medical Diagnosis (Rec. Doc XXX).  Cases where the plaintiff complies with the Order paragraphs (a) or (b) are eligible for the discovery pool.  Cases where plaintiff fails to comply with the Order or complies only with paragraph (c) of the Order are ineligible for the discovery pool and may be subject to an order to show cause.[1]

---

[1] To assist the Court in evaluating the breadth of proof of injury issues in cases filed in these MDL proceedings, the parties will update the Court at lead and liaison counsel meetings about the status of compliance with PTO XXX, Order Requiring Proof of Medical Diagnosis (Rec. Doc XXX).

Should the parties subsequently identify eligibility issues or other challenges, they should routinely meet and confer on the same and submit them to this Court in an effort to conserve resources pending disposition.[2]

5. <u>Discovery Parameters.</u> Discovery in Pool 1 cases shall consist of:

    a. <u>Updated Plaintiff Fact Sheet, ESI, and Product Identification Disclosures.</u> Selected plaintiffs must review and update all sections of the Plaintiff Fact Sheet pursuant to Pretrial Order Nos. 55, 38, and Amended 22, as well as their Pretrial Order No. 71A and Case Management Order 12A disclosures within 30 days of selection.

        Notwithstanding the provisions of footnote 2 in Amended Pretrial Order No. 22 or any other orders to the contrary, Pool Plaintiffs must sign, verify, and date their updated disclosures by wet signature, uploaded to MDL Centrality as "Pool Discovery – Wet Signature."

    b. <u>Updated Defendant Fact Sheet.</u> If any updates described in Paragraph 5(a) materially change Defendants' responses in its Defendant Fact Sheet (e.g., changes to chemotherapy treatment facility or prescribing physician), Defendants shall timely serve updated Defendant Fact Sheet(s).

    c. <u>Written Discovery.</u> Notwithstanding previous ruling (Rec. Doc. 1138), the parties cannot serve written discovery in Pool 1 cases at this time and without further leave.

    d. <u>Depositions.</u> Two or three depositions in each case shall be allowed: (i) Plaintiff, (ii) Plaintiff's prescribing physician, and, if any, (iii) Plaintiff's treating physician.

---

[2] Given the number of prescribing and treating physicians implicated by cases subject to work up under this Order, the Court hereby repeals the numerical limitations imposed in Pretrial Order No. 70B Paragraph 5.  Its substantive requirements remain in effect.

    e.  <u>Order of examination.</u> The plaintiff shall be allowed to examine half the doctors first and the Defendants shall be allowed to examine half the doctors first depending on the ordered numbering of the cases in the Court's random selection (1-75) with plaintiffs going first in odd-numbered cases and Defendants going first in even-numbered cases.

    f.  <u>Physician Depositions.</u> Pretrial Order No. 70B remains in effect except as described in footnote 2.  All parties' prior objections to said order and stated in Defendants' Motion to Amend (Rec Doc. 9109) are expressly preserved.

6.  <u>Deadlines.</u> Provided the plaintiff timely completes all sections of the Plaintiff Fact Sheet within 30 days of selection, the deposition discovery set forth in paragraph 5(c) must be completed in no later than seven (7) months.  An individual plaintiff's failure to timely update all sections of the Plaintiff Fact Sheet within 30 days of selection shall toll all deadlines in this Case Management Order with respect to that plaintiffs' case until the plaintiff has complied or the case is dismissed. The deadlines in this Order may be extended in a particular plaintiffs' case by agreement of the parties or by the Court due to circumstances beyond the parties' control, such as pandemic circumstances, the failure of a third party medical provider to timely produce medical records, or the failure of a third party physician to timely appear for deposition.

**Excluding Facially Time-Barred Cases**

7.  Over the course of these proceedings, this Court has ultimately dismissed many cases in late stages of discovery under applicable state statutes of limitations.  The Court therefore Orders as follows:

- 6 -

a. <u>Cases Facially Timely Filed.</u>  Based on the state of residence at the time of treatment or state of treatment and except as described in (b), all cases filed within the state statute of limitations plus six months from the end of docetaxel treatment are eligible for the discovery pool.

b. <u>Compliance with PTO 105.</u>  Based on the state of residence at the time of treatment or state of treatment, all cases filed outside of the state statute of limitations plus six months from the end of docetaxel treatment <u>but</u> who have filed an amendment complying with PTO 105 remain eligible for the discovery pool.  Cases in which the plaintiff has not filed an amendment complying with PTO 105 may be ineligible for the discovery pool and subject to a show cause process.[3]  Nothing in this paragraph re-opens the period for filing PTO 105 amendments.  The deadline for such filings has passed.  Late filing now does not render cases eligible who had not done so previously.

c. <u>Per se Barred.</u>  Based on the state of residence at the time of treatment or state of treatment, all cases filed outside of the state statute of limitations where there is no "discovery rule" (or a narrow one) may be ineligible for the discovery pool.  Examples of such states include Alabama, Idaho, Mississippi, North Carolina, North Dakota, Texas, or Virginia.

---

[3] To assist the Court in evaluating the breadth of the statute of limitations issues in cases filed in these MDL proceedings, the parties will submit lists of cases to the Court for the lead and liaison counsel meeting following random selection: one list of cases eligible for the discovery pool under 7(a), one list of cases eligible for the discovery pool under 7(b), and one list of cases falling under 7(c).  The parties will indicate any cases where a plaintiff disputes her eligibility, but only if that dispute relates to a fact question about her date of treatment.  All objections to the application of the Court's prior rulings on statute of limitations and to PTO 105 to her case are preserved.  The Court will hear argument from the parties on whether cases complying with 7(c) should be eligible for the discovery pool.

The Court will take up exemplar motions by Defendants, similar to the *Greer* (Mississippi) and *Mixon* (Michigan) motion, which will be ruled upon and may result in entry of a show cause process. The Court encourages the parties to meet and confer about whether cases subject to such motion should remain eligible for the discovery pool, or whether the Court should stay discovery to conserve resources pending disposition.

### Dispositive Motions

8. Defendants may file dispositive motions not involving expert testimony in Pool 1 whenever they determine. Unless filed before, the schedule for resolution of such motions is as follows:

    a. Motions and Briefs: 30 days following Paragraph 6 deadline.

    b. Response in Opposition Briefs: 21 days later.

    c. Reply Briefs: 14 days later.

    d. Hearing and Argument (if necessary): To be scheduled.

### Dismissals

9. The provisions of Case Management Order No. 14C (Rec. Doc. 6789) are amended in Pool 1 as follows:

    a. A plaintiff selected for Pool 1 may be removed only for good cause such as health or critical family matters so long as the eligibility criteria set forth in Paragraph 4 are met.

    b. Any Plaintiff who seeks to be removed from Pool 1 without good cause shall do so only by dismissal with prejudice.

    c. There is no 14-day grace period wherein cases voluntary dismissed with or without good cause may be substituted or replaced.  Instead, if at any point after selection a discovery pool plaintiff elects to voluntarily dismiss her case, Defendants may de-designate an additional two (2) other cases from Pool 1.

    d. There shall be no replacement or substitution for Pool 1 cases.

    e. The provisions of Pretrial Order No. 54 (Rec. Doc. 671) and Case Management Order No. 14(c) (Rec. Doc. 6789) otherwise remain in effect.

**Remand of Pool 1 Cases**

10. After disposition by the Court of the parties' proposals for trial preservation discovery and entry of a schedule regarding the same, the parties shall meet and confer regarding a schedule for (a) expert discovery for Pool 1 cases; (b) a selection process for Pool 1 cases for consideration for remand; (c) suggestion of remand motion practice; (d) petitions for remand, if needed, to the JPML.

**Scope of the Order**

11. This order governs only those cases selected in Pool 1, and is neither binding nor precedential with respect to how the Court will proceed with respect to cases that are not selected in Pool 1, particularly in cases with different product identification.

NEW ORLEANS, LOUISIANA this __ day of March 2022.

                                   _____
                                   JANE TRICHE MILAZZO
                                   UNITED STATES DISTRICT JUDGE

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: TAXOTERE (DOCETAXEL)    )    MDL No. 2740
PRODUCTS LIABILITY LITIGATION )
                              )    SECTION: "H" (5)
                              )
THIS DOCUMENT RELATES TO:      )
ALL ACTIONS                    )

**[PROPOSED] PRETRIAL ORDER NO. X**
**(HAIR LOSS DIAGNOSIS ORDER)**

1.   **Applicability of Order.**  This Order applies to all Plaintiffs in MDL No. 2740 and shall govern proof of alleged hair loss injury, in supplement to Section IV, question 5, 6, 7, and 8, and the document requests in Section IX of the Plaintiff Fact Sheet (*see* PTO No. 55 (Rec. Doc. 688)).

2.   **Hair Loss Injury Diagnosis – Medical Records or Medical Declaration.**  Each Plaintiff in MDL No. 2740 must comply with the following requirements of this Order:

a.   **Before January 1, 2022: Medical Records Confirming Diagnosis or Treatment of Permanent Alopecia.**  Within 60 days of entry of this Order (or on the date that a Plaintiff Fact Sheet is due where one is not yet due), each Plaintiff must upload to MDL Centrality excerpts of the specific medical record reflecting diagnosis or treatment by a qualified physician of permanent hair loss as alleged in her Complaint(s) and PFS (i.e., "permanent chemotherapy-induced alopecia").  The medical record must be made for—and reasonably pertinent to—medical diagnosis or treatment in the ordinary course of care within the meaning of Federal Rule of Evidence 803(4) and may not consist of a record generated for litigation-related screening.  Such physician cannot have served as a testifying expert or consulting expert for any Plaintiffs' counsel bringing Taxotere claims.  If a pathology report exists, it must be included with the excerpt provided.  The medical record excerpt, along with any associated pathology, invoicing or billing documents in the Plaintiff's possession: (i) must document

1

diagnosis or treatment for permanent alopecia before January 1, 2022; (ii) shall be uploaded to MDL Centrality using the "Proof of Injury – Pre-Order Medical Record" document-type field; and (iii) shall be uploaded within the deadline set forth in this Order.

In the event that Plaintiff does not have a medical record confirming diagnosis or treatment of permanent alopecia before January 1, 2022, Plaintiff must comply with either (b), or (c), below:

**b.   After January 1, 2022: Medical Declaration Confirming Permanent Alopecia.** Within 90 days of entry of this Order (or on the date that a Plaintiff Fact Sheet is due where one is not yet due), each Plaintiff must upload to MDL Centrality a signed declaration, authored by a qualified physician in good standing with his or her state licensing authority, attesting within a reasonable degree of medical probability that Plaintiff has suffered permanent hair loss as alleged in her Complaint(s) and PFS (i.e., "permanent chemotherapy-induced alopecia"). Such physician cannot have served as a testifying expert or consulting expert for any Plaintiffs' counsel bringing Taxotere claims. Plaintiff must provide the physician with high-quality copies, date-labeled, of all photographs she has uploaded to MDL Centrality, along with her dates of chemotherapy and/or hormone treatment. The physician declaration must include: (i) the physician's differential diagnosis (e.g., an explanation of the basis for the diagnosis, other causes considered, a description of specific medical findings); (ii) identification of all documents, including lab results, pathology reports, photographs, or physical examination reviewed; and (iii) the proposed treatment plan. The medical declaration, along with any associated invoicing or billing documents in the Plaintiff's possession, must be uploaded to MDL Centrality using the "Proof of Injury – Post-Order Medical Declaration"

document-type field within the deadlines set forth in this Order. No physician may submit more than five such declarations.

    **c.  Plaintiff Certification of Refusal to Seek Diagnosis or Treatment of Permanent Alopecia from Taxotere (Docetaxel).** Within 90 days of entry of this Order (or on the date that a Plaintiff Fact Sheet is due where one is not yet due), each Plaintiff must upload to MDL Centrality a signed Certification that she refuses to seek diagnosis or treatment of her alleged permanent hair loss. The Certification must be uploaded to MDL Centrality using the "Proof of Injury – Refusal to Seek Diagnosis or Treatment" document-type field within the deadlines set forth in this Order.

    **3.  Enforcement.** Any Plaintiff who fails to comply with the terms of this Order—including any Plaintiff who refuses to seek diagnosis or treatment of permanent hair loss under subsection (c)—may be listed for Non-Compliance and Show Cause Order Process following the ordinary procedures of Pretrial Order No. 22A (Rec. Doc. 3493). Defendants reserve the right to challenge any Plaintiff submissions pursuant to ¶ 2 of this Order. Plaintiffs' objections to entry of this order are noted and preserved for purposes of appeal of any dismissal pursuant to it.

    **4.  Rule 26(g) certification.** Any statements, declarations or certifications made by a Plaintiff or her attorney regarding information and documents produced in discovery in this litigation, including the medical declaration or certification and the disclosure required under ¶ 2 of this Order, shall be subject to Federal Rule of Civil Procedure 26(g)(3).

    **5.  Penalties for Fraud and Deception.** Any Plaintiff (and/or her attorneys or physicians) who submits false or intentionally misleading information, or otherwise attempts to satisfy the documentation requirements of this Order through any form of deception, dishonesty, or fraud

shall be subject to appropriate sanctions (including monetary sanctions and costs) and dismissal with prejudice pursuant to Federal Rule of Civil Procedure 37.

NEW ORLEANS, LOUISIANA this __ day of March 2022.

_____
JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

# EXHIBIT C

| BW Round | Case Name | Current Status |
|---|---|---|
| 1 | Ray, Pearl | Dismissed with Prejudice |
| 1 | Tuyes, Lisa | Removed from Trial Pool |
| 1 | Durden, Antoinette | Motion for Summary Judgment (SOL) 5th Circuit Affirmed |
| 1 | Francis, Tanya | Motion for Summary Judgment (SOL) 5th Circuit Affirmed |
| 1 | Martin, Della | Removed from Trial Pool |
| 1 | Chetta, Debra | Removed from Trial Pool |
| 1 | Thibodeaux, Cynthia | Motion for Summary Judgment (SOL) 5th Circuit Affirmed |
| 1 | Johnson, Deborah | Motion for Summary Judgment (SOL) 5th Circuit Affirmed |
| 1 | Earnest, Barbara | Pending Following 5th Circuit Decision |
| 1 | Kahn, Elizabeth | Trial 2 - Defense Verdict |
| 2 | Gahan, Kelly | Motion for Summary Judgment (LID) 5th Circuit Affirmed |
| 2 | Phillips, June | Motion for Summary Judgment (LID) 5th Circuit Affirmed |
| 2 | Addelson, Barbara | Removed from Trial Pool |
| 2 | Mills, Jacqueline | Removed from Trial Pool |
| 2 | Crayton, Sheila | Removed from Trial Pool Motion for Summary Judgment (Causation) |
| 3 | Gabriel, Kathleen | Dismissed with Prejudice |
| 3 | Warren, Diana | Dismissed with Prejudice |
| 3 | Collins, Tonia | Removed from Trial Pool |
| 3 | Stevenson, Sharon | Removed from Trial Pool |
| 4 | Grines, Hattie | Dismissed with Prejudice |
| 4 | Roach, Melissa | Motion for Summary Judgment (SOL) |
| 4 | Willie, Emma | Motion for Summary Judgment (LID) |
| 4 | Greer, Juanita | Motion for Summary Judgment (SOL) |
| 4 | Smith, Cindy | Motion for Summary Judgment (SOL) |

| BW Round | Case Name | Current Status |
|----------|-----------|----------------|
| 4 | Brown, Cynthia | Pending MS Show Cause/SOL MSJ |
| 4 | Burks, Sandra | Pending MS Show Cause/SOL MSJ |
| 4 | Durden, Angela | Pending MS Show Cause/SOL MSJ |
| 4 | Kumar, Mildred | Pending MS Show Cause/SOL MSJ |
| 4 | Moore, Minnie | Pending MS Show Cause/SOL MSJ |
| 4 | Pigott, Shirlon | Pending MS Show Cause/SOL MSJ |
| 4 | Allen, Sharon | Removed from Trial Pool |
| 4 | Alvarez, Nancy | Removed from Trial Pool (DQ by Agreement) |
| 4 | Berry, Samantha | Removed from Trial Pool |
| 4 | Broussard, Geraldine | Removed from Trial Pool |
| 4 | Carter, Sybil | Removed from Trial Pool (DQ by Agreement) |
| 4 | Crosby, Georgiann | Removed from Trial Pool (DQ by Agreement) |
| 4 | Dixon-Young, Barbara | Removed from Trial Pool |
| 4 | Dyson, Tanga | Removed from Trial Pool (DQ by Agreement) |
| 4 | Elmore, Gloria | Removed from Trial Pool (DQ by Agreement) |
| 4 | Jolivette, Marcella | Removed from Trial Pool |
| 4 | Jones, Daphne | Removed from Trial Pool |
| 4 | Mosher, Kelly | Removed from Trial Pool (DQ by Agreement) |
| 4 | Thomas, Tinella | Removed from Trial Pool (DQ by Agreement) |
| 4 | White, Pamela | Removed from Trial Pool |

# EXHIBIT D

Page 119

1           Do you see that?

2      A.    Yes.

3      Q.    Would you agree that those are diffuse

4  presentations of hair loss?

5           MR. SCHANKER:  Objection, form.

6           THE WITNESS:  For some, it's evident.  For

7      others, it's difficult.  For instance, H, you

8      don't see the back.

9  BY MR. SEARS:

10     Q.    So A, B, D, E, F, G and I, C too, they all

11  look very diffuse, don't they?

12     A.    C, you don't see the side.  You don't see

13  the back.  How can you say it's diffuse?

14          I believe that A is diffuse.  F is

15  definitely diffuse.  The other one may be diffuse,

16  but the pictures don't show.

17     Q.    Do you think that any of those photographs

18  look like the alopecia that's seen with

19  Ms. Thibodeaux?

20          MR. SCHANKER:  Objection, form.

21          THE WITNESS:  I think D is very similar,

22      but, you know, you cannot make diagnosis from

23      pictures.

24  BY MR. SEARS:

25     Q.    Right, it's hard to assess hair density

1    from a photo alone, isn't it?

2         A.    It's hard to make any possible diagnosis

3    from picture.

4              I use trichoscopy because I believe just

5    even looking at the patient is not enough.

6         Q.    I've read all the literature that you've

7    included in your report, and for the clinical

8    presentation of PCIA, some of the literature says it

9    presents a new diffuse pattern, right?

10              MR. SCHANKER:  Objection, form.

11              THE WITNESS:  It presents with a diffuse

12         pattern often more prominent on

13         androgen-dependent scalp.  Everybody says that.

14    BY MR. SEARS:

15         Q.    Do you think that for women that present

16    with more of a pattern hair loss, more of a

17    androgenetic-like pattern, that hair loss is likely

18    due to or contributed to from the aromatase

19    inhibitors or Tamoxifen intake?

20              MR. SCHANKER:  Objection, form.

21              THE WITNESS:  I cannot answer that

22         question.  I don't think so, but even if you

23         look A, which is very diffuse, you know, the

24         androgen-dependent scalp is more affected.

25    BY MR. SEARS:

Page 181

1              THE WITNESS:  What I said is different, is

2         that to make a diagnosis of alopecia from

3         endocrine therapy, you have to have the patient

4         with hair, so the patient should start with

5         hair.

6    BY MR. SEARS:

7         Q.   Would a patient know, after receiving

8    chemotherapy, that their hair did not regrow after

9    six months?

10             MR. SCHANKER:  Objection, form.

11             THE WITNESS:  What's the question?

12   BY MR. SEARS:

13        Q.   So if a patient took chemotherapy and the

14   hair did not regrow after six months, would the

15   patient know that there's some sort of issue going

16   on?

17             MR. SCHANKER:  Objection, form.

18             THE WITNESS:  I think so.

19   BY MR. SEARS:

20        Q.   So if I were to give you 100 photographs

21   of patients who had PCIA, would you be able to look

22   at the photographs and tell me which of those

23   patients received Taxotere?

24             MR. SCHANKER:  Objection, form.

25             THE WITNESS:  I cannot make a diagnosis on

Page 182

1          photographs for any -- anything.

2     BY MR. SEARS:

3          Q.   If you were to walk into a room and there

4     were 100 patients who had PCIA and you weren't

5     allowed to talk to them, you could just look at them

6     and inspect them, would you be able to tell which of

7     those patients received Taxotere?

8               MR. SCHANKER:  Objection, form.

9               THE WITNESS:  No.  As many things in

10          medicine, history is fundamental for diagnosis,

11          okay?

12               It's like you have a patient that's

13          complaining of pain, and you have to

14          distinguish between a myocardial infarction,

15          or, you know, he fall down from a tree.  You

16          have to have information.

17     BY MR. SEARS:

18          Q.   Let's say there were a hundred patients in

19     the room and some of them had endocrine-induced

20     alopecia and some of them had chemotherapy --

21     persistent chemotherapy-induced alopecia.

22               Would you be able to tell which one was

23     which from just looking at them?

24               MR. SCHANKER:  Objection, form.

25               THE WITNESS:  Asking the history, yes.

# EXHIBIT E

1    alopecia based upon the pathology that you just talked a

2    little bit about.  Do you agree with that?  Or the biopsy you

3    took of Mrs. Kahn.

4       A.  Yes, but this is in general.  So pathology, clinical

5    examination, pictures give you the diagnosis.  If it's -- is

6    this alopecia areata?  Is this scarring alopecia?  Is this

7    permanent alopecia?  Doesn't give you the causative factor so

8    these are two different problems, you know.  Pictures cannot

9    tell you what drug was the problem, can only tell you it's

10   probably -- it's drug-induced alopecia and the same for other

11   stuff.

12      Q.  Okay.  And I want to talk about your physical

13   examination of Mrs. Kahn for a moment, because you would

14   agree with me, again, that you cannot rule out the other

15   chemotherapies that Mrs. Kahn took based upon the physical

16   examination you performed of her?

17      A.  Yes.  Because the physical examination is just to

18   make the diagnosis, not to find the cause of the problem.

19   And that's not only for chemotherapy alopecia, because if I

20   see alopecia areata I want to understand which -- what cause

21   alopecia areata in that patient, but that's the second part.

22   The first part is a clinical examination and provide a

23   diagnosis.

24      Q.  Okay.  Doctor, there's no test that can be done to

25   determine which chemotherapy drug may have caused Ms. Kahn's