## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL No. 2740 |
| | SECTION: "H" |
| **This Document Relates To:** | |
| *Tina Hickey,* | JUDGE MILAZZO |
| *Case No. 2:18-cv-04731* | |
| | MAG. JUDGE NORTH |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO HOSPIRA'S MOTION FOR SUMMARY JUDGMENT BASED ON PREEMPTION

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 3

STATUTORY AND REGULATORY BACKGROUND .............................................................. 5

LEGAL STANDARD.................................................................................................................... 9

ARGUMENT .............................................................................................................................. 10

    I.    Hospira's Arguments that Plaintiff Bears the Burden of Disproving Preemption Should Again be Rejected. ................................................................................................................ 10

    II.    Hospira Cannot Establish as a Matter of Law that it Fully Informed the FDA of the Justifications for a Stronger Warning...................................................................................... 12

    III.   Hospira has also Failed to Show that the FDA Disapproved the Warning of PCIA Required Under Louisiana Law. ........................................................................................... 18

CONCLUSION............................................................................................................................ 20

## INTRODUCTION

Defendant Hospira moves this Court for summary judgment on its defense that Plaintiff Tina Hickey's failure-to-warn claim is preempted by federal law. But Hospira fails to clear the twin hurdles of this "demanding" affirmative defense. As this Court has recognized, Supreme Court precedent requires Hospira to establish through "clear evidence" both that "it fully informed the FDA of the justifications for the warning [that Plaintiff claims was] required by state law" and that the "FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning." *In re Taxotere (Docetaxel) Prod. Liab. Litig.* [*Earnest*], No. 16-17144, 2019 WL 11660424, at *4 (E.D. La. Aug. 14, 2019) (quoting *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1678 (2019).). It is not enough for Hospira to argue, as it does here, that *if it had submitted* a new label with additional warnings to the FDA, the FDA would have rejected the warning. What's more, preemption is further limited to when the FDA has *actually* rejected a proposed labeling change through action "taken pursuant to the FDA's congressionally delegated authority." *Albrecht*, 139 S. Ct. at 1679 (citation omitted). The "possibility of impossibility is not enough" to establish an actual, irreconcilable conflict between federal labeling duties and state-law duties to warn. *Id.*

Hospira can present no evidence, let alone "clear evidence," to establish that either event occurred here, as the law requires—because they never occurred. Hospira attempts to circumvent this evidentiary problem first by placing the burden of proof on Plaintiff, a position that this Court has held is contrary to the law. *In re Taxotere* [*Earnest*], 2019 WL 11660424, at *3. Next, Hospira argues that it had no obligation to consider pre-marketing safety data in its ongoing pharmacovigilance. But this Court has repeatedly held that safety signals arising from preexisting data are precisely the type of "newly acquired information" envisioned by the Changes Being

Effected (CBE) regulations. *Id.*; *In re Taxotere (Docetaxel) Prods. Liab. Litig.* [*Kahn*], 508 F. Supp. 3d 71, 82 (E.D. La. 2020) ("[T]he Supreme Court makes clear that a manufacturer must analyze the accumulating data …."). But even notwithstanding any of the evidence that arose before Hospira's docetaxel NDA was approved in 2011, a body of scientific literature arose after that time—and before Plaintiff's injury—to put Hospira on notice of a causal association with permanent alopecia. Indeed, the Fifth Circuit has held that several of these publications should have put *plaintiffs* on notice that docetaxel causes the condition. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F.3d 384, 394 (5th Cir. 2021).

Lastly, Hospira brazenly argues that, as a matter of law, there was never any "basis to believe" that permanent alopecia was "reasonably associated with use of" docetaxel—not in October 2013, nor ever. Yet, as Hospira admits, its current label states that "[c]ases of permanent alopecia have been reported," a warning that this Court has held "clearly and consistently explain[s] that the drug carrie[s] a risk of permanent hair loss," *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 462 F. Supp. 3d 650, 653 (E.D. La. 2020) (2015 fence-post order), and a warning that requires that the "undesirable effect [is] reasonably associated with use of a drug," 21 C.F.R. § 201.57(c)(7). Moreover, the Court has time and again found sufficient scientific evidence to put the issues of notice before a jury. *See, e.g.*, *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2021 WL 3006897, at *2 (E.D. La. July 15, 2021) (noting that Drs. Ross and Plunkett may rely on Dr. Madigan's signal identification through FAERs analysis in their assessments "whether there is 'some basis to believe there is a causal relationship.'").

In sum, because all of Hospira's arguments run directly counter to the Court's rulings in *Earnest* and *Kahn*, adopting them now would be a full reversal of course on the question of preemption. Here, too, Hospira bears the burden to establish its entitlement to the preemption

defense, and to do so with clear evidence. But once again the defendant has failed to provide *any* evidence that it submitted, and that the FDA rejected, the label change Plaintiff alleges was required by Louisiana law. Hospira's motion therefore presents an easy question for the Court and should be denied.

## STATUTORY AND REGULATORY BACKGROUND

The Federal Food, Drug and Cosmetic Act (FDCA), ch. 675, 52 Stat. 10440, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (Hatch-Waxman Amendment),  describes two broad categories for approval of drug applications: new drug applications, or NDAs, the requirements of which are set forth in Section 505(b) and (c) of the FDCA; and abbreviated new drug applications, or ANDAs, the requirements of which are set forth in Section 505(j).

The FDA's interpretation of these drug approval pathways and their corresponding regulatory obligations is set forth in great detail in the FDA's 2003 consolidated response to various citizen petitions, and that response reflects the FDA's current interpretation of Section 505(b)(2). *See* Pl.'s Ex. 1, FDA's Consolidated Response to Citizen Petitions at 18, Docket Nos. FDA-2001-P-0369 and FDA-2003-P-0274 (Oct. 14, 2003) (rejecting manufacturers' challenges to FDA's implementation of Section 505(b)(2)) (emphasis added) (hereinafter, "Woodcock Letter"); *see also* Pl.'s Ex. 2, CDER, Guidance for Industry, Determining Whether to Submit an ANDA or a 505(b)(2) Application 1 n.4 & 5 n.17 (May 2019) (citing Pl.'s Ex. 1, Woodcock Letter). "The FDA's views are 'controlling unless plainly erroneous or inconsistent with the regulation[s]' or there is any other reason to doubt that they reflect the FDA's fair and considered judgment." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 461, 462 (1997)).

As the FDA summarizes there, Congress passed the Hatch-Waxman Amendments in 1948, which, among other things, established an explicit regulatory pathway to approve duplicates of post-1962 drugs — Section 505(j).  Pl.'s Ex. 1, Woodcock Letter 6. This law also "created a new subset of NDA" — Section 505(b)(2) — which "permits an applicant seeking approval for a drug product that differs from the approved drug product to obtain approval without conducting new studies to demonstrate to the Agency what has already been demonstrated." Pl.'s Ex. 1, Woodcock Letter 14.

Although a 505(b)(2) application may rely on a safety-and-effectiveness determination for a listed drug to the same extent as an ANDA, FDA regulations make clear that Section 505(b)(2) is not an appropriate pathway for a copycat drug eligible for approval under Section 505(j). Pl.'s Ex. 1, Woodcock Letter 17 & n.18 (citing 21 C.F.R. §§ 314.54(b), 314.101(d)(9)). As such, and relevant here, there are important differences between 505(b)(2) new drugs and generic drugs.

For one, "there are no analogues in section 505(b)(2) to the provisions in section 505(j) requiring that the product under the 505(j) application be bioequivalent to, have the same conditions of use as, and use the same labeling as the listed drug referenced." Pl.'s Ex. 1, Woodcock Letter 18 (emphasis added). For another, because ANDAs are duplicates of a reference listed drug (albeit sometimes with minor variations), and therefore are expected to have the same safety and effectiveness profile as a listed drug, an ANDA must be withdrawn when the listed drug is withdrawn because it is not safe or effective. *Id.* (citing Section 505(j)(6)). There is no comparable withdrawal requirement for products approved under Section 505(b)(2). *Id.*

The FDA prohibits the sale of a prescription drug in interstate commerce unless the FDA has given its approval. 21 U.S.C. § 355(a). The FDCA, however, does not prohibit a manufacturer from changing the label of a brand-name drug post-approval, provided the label does not render

6

the drug "misbranded." *See id.* §§ 331(a), 352(a) (drug is misbranded "[i]f its labeling is false or misleading in any particular").

Under the current "changes being effected" or "CBE" regulation, a manufacturer may make "[c]hanges in the labeling to reflect newly acquired information" without prior FDA approval, if the change is "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under [21 C.F.R.] §201.57(c)." 21 C.F.R. §314.70(c)(6)(iii). This provision explicitly authorizes "the holder of an approved NDA" to unilaterally make such a label change. *Id.* § 314.70(c)(6) (emphasis added).

"Newly acquired information" is defined to include "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (*e.g.*, meta-analyses)." *Id*. § 314.3. A manufacturer making such a label change must submit a supplement to the FDA regarding the change. If the FDA disapproves the CBE supplement, "it may order the manufacturer to cease distribution of the drug product(s) made with the ... change." *Id.* § 314.70(c)(6)(iii), (c)(7). A manufacturer can also apply for FDA approval to update the label through a "Prior Approval Supplement" ("PAS"), which requires prior approval by the FDA. *Id.* § 314.70(b)(2)(v)(A).

FDA regulations establish the format for drug labeling. Relevant here are two sections called "Adverse Reactions" and "Warnings and Precautions." The Adverse Reactions section includes a listing of all "undesirable effect[s], reasonably associated with use of a drug." 21 C.F.R. § 201.57(c)(7). A manufacturer must list an adverse reaction if "there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id.* The Warnings and Precautions section, in turn, describes "clinically significant adverse reactions," and

"limitations in use imposed by them (*e.g.,* avoiding certain concomitant therapy), and steps that should be taken if they occur (*e.g.*, dosage modification)." *Id.* § 201.57(c)(6)(1). This section "must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." *Id.* Since 2008, those standards also have applied to warnings added through a CBE supplement. *Id.* § 314.70(c)(6)(iii)(A).

If the FDA "determines that [it] will not approve" either an NDA or a labeling supplement "in its present form," it will "send the applicant a complete response letter." *Id.* § 314.110(a). The complete response letter "will describe all of the specific deficiencies that the agency has identified in an application." *Id.* § 314.110(a)(1). Complete response letters, however, merely "infor[m] sponsors of changes that must be made before an application can be approved, with no implication as to the ultimate approvability of the application." 73 Fed. Reg. 39588 (2008). A drug manufacturer who has received a complete response letter can "[r]esubmit the application ... , addressing all deficiencies identified in the complete response letter"; "[w]ithdraw the application"; or request a hearing at which FDA will make a final determination whether to approve or reject the application. 21 C.F.R. §314.110(b).

Before 2007, FDA lacked authority to mandate that manufacturers change prescription drug labels. *Albrecht*, 139 S. Ct. at 1677. "[W]hen Congress granted the FDA this authority, in the 2007 Amendments to the FDCA, Congress simultaneously reaffirmed the manufacturer's obligations and referred specifically to the CBE regulation, which both reflects the manufacturer's ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval." *Id.* (internal quotation marks and citation omitted).

## LEGAL STANDARD

It is the drugmaker who has the burden of asserting a preemption defense. Under *Wyeth v. Levine* and *Merck v. Albrecht*, "[t]he underlying question for this type of impossibility pre-emption defense is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law." *Albrecht*, 139 S. Ct. at 1678; *see Wyeth v. Levine*, 555 U.S. 555, 571 (2009). "And, of course, in order to succeed with that defense *the manufacturer* must show that the answer to this question is yes." *Albrecht*, 139 S. Ct. at 1678 (emphasis added).

To prove impossibility, a drug manufacturer like Hospira must present "clear evidence that the FDA would not have approved a change to [the drug]'s label." *Levine*, 555 U.S. at 571. The "clear evidence" needed is "evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning." *Albrecht*, 139 S. Ct. at 1672.

To "show[ ] that federal law prohibited [a] drug manufacturer from adding a warning that would satisfy state law," the drug manufacturer must demonstrate that:

(1) "it fully informed the FDA of the justifications for the warning required by state law" and

(2) "the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning."

*Id.* at 1678; *accord. In re Avandia Mktg., Sales & Prod. Liab. Litig.*, 945 F.3d 749, 758 (3d Cir. 2019).

In applying these factors, *see Albrecht*, 139 S. Ct. at 1680 (holding this preemption defense is for the judge not jury), courts must keep two important limitations in mind. *In re Avandia*, 945

F.3d at 758-59; *Crockett v. Luitpold Pharm., Inc.*, 2020 WL 433367, *7 (E.D. Pa. Jan. 28, 2020); *see also Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 890 (7th Cir. 2020). First, "it is not sufficient for the proponent to contend that if it had submitted a new label—with additional warnings—to the FDA, the FDA *would have* rejected the warning." *Crockett*, 2020 WL 433367, at *7. As *Albrecht* explained, there must be an actual, irreconcilable conflict between federal and state law—"[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." 139 S. Ct. at 1679 (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982)). Simply put, the "possibility of impossibility [is] not enough." *Albrecht*, 139 S. Ct. at 1678 (quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 625, n.8 (2011) (internal quotation marks omitted)).

"Preemption is further limited in state law failure-to-warn situations where the FDA has *actually* rejected a proposed labeling change through action 'taken pursuant to the FDA's congressionally delegated authority.'" *Crockett*, 2020 WL 433367, at *7. As the Third Circuit recently explained in *In re Avandia*, "the upshot of [*Albrecht*] is that a drug manufacturer must show that *the FDA made a fully informed decision to reject a change* to a drug's label in order to establish the 'demanding defense' of impossibility preemption." 945 F.3d at 759 (emphasis added) (citing *Albrecht*, 139 S. Ct. at 1678).

## ARGUMENT

### I.   Hospira's Arguments that Plaintiff Bears the Burden of Disproving Preemption Should Again Be Rejected.

Hospira's attempt to shift the burden to Plaintiff to disprove preemption is contrary to law—and indeed, the law of this case.

In *Earnest*, this Court applied *Albrecht*'s two-pronged test and declined to find preemption when Earnest's use of Taxotere was in 2011. *In re Taxotere*, 2019 WL 11660424, at *4. There, as

here, defendant argued it was the plaintiff's burden to show new data to support a label change. The Court summarized the argument as follows, "Sanofi argues that 'the plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulation without prior FDA approval.'" *Id.* at *3 (quoting Def's Br., Doc. 6186 at 13). But the Court rejected that argument as a "misapprehen[sion of] both the federal drug regulatory scheme and [a defendant's] burden in establishing a pre-emption defense.'" *Id.* at *3–4 (quoting *Levine*, 555 U.S. at 569). Rather, under Supreme Court precedent, the defendant bears the burden of showing by clear evidence that the FDA would have prohibited a warning. *Id.* at *4. The Court properly placed the burden on Sanofi to present such clear evidence, which it could not then and Hospira likewise cannot now.

The Court's ruling is consistent with those of other courts post-*Albrecht*. The Third Circuit in *In re Avandia* squarely placed the burden on the drug manufacturer to prove both parts of *Albrecht*'s two-part preemption test. 945 F.3d at 758–59. Likewise, the district court in *Crockett* rejected a drug manufacturer's attempt to shift the burden to plaintiff to plead or prove that the FDA lacked knowledge of scientific data that would have supported a label change:

> Having failed to meet their burden, Defendants attempt to shift it to Plaintiff by suggesting that because "Plaintiff pled no facts supporting a reasonable inference that the FDA lacked knowledge of the existing scientific data when it approved Injectafer," her claims must be dismissed on impossibility preemption grounds. But preemption is an affirmative defense, and it is thus Defendants' burden, not Plaintiff's, to demonstrate that it applies. *See Wyeth*, 555 U.S. at 573.

*Crockett*, 2020 WL 433367, at *8.

More recently still, the court in *Evans v. Gilead Scis., Inc.*, 2020 WL 5189995 (D. Haw. Aug. 31, 2020), rejected the same argument Hospira makes here, concluding that it "misapprehends … [defendant's] burden in establishing its preemption defense." *Id.* at *10. "[E]ven if there was little or no 'newly acquired information' relevant to Evans' claims, that did

11

not make it impossible for Gilead to change its Truvada label." *Id.* at *11. "The notion that perhaps there was not sufficient 'newly acquired information' or 'evidence of a causal association' between Truvada and the risk of injuries alleged here, 21 C.F.R. § 314.70(c)(6)(iii)(A), are merely two of any number of reasons for the FDA to reject the label changes after Gilead had made them. But federal law did not preclude Gilead from making a label change in the interim." *Id.*

In any event, Hospira's position—that in order to defeat its defense Plaintiff's experts must opine *with specificity* "what it is about the listed articles and documents that should have prompted Hospira to" analyze pre-approval data—finds no support in the authorities it cites. (Mot. at 11-12.) For instance, in *Gibbons v. Bristol-Myers Squibb Company*, 919 F.3d 699 (2d Cir. 2019), the court affirmed dismissal on preemption grounds because the plaintiffs had not "plausibly *allege[d]* the existence of newly acquired information" in their complaint's "conclusory and vague" allegations. *Id.* at 708. By contrast, Plaintiff has presented ample testimony from her regulatory expert, Dr. David Ross, that Hospira had information of the risk of permanent alopecia from docetaxel before she was administered it, and that analysis of all the available data was sufficient to justify a CBE submission. These new developments, which include six publications, the hiring of a Sanofi pharmacovigilance executive responsible for Taxotere, continued safety signals from statistical analysis of publicly available adverse event reporting, and foreign label changes citing incidences of persisting alopecia and data from the TAX 316 clinical trial, are explained more fully below.

## II.    Hospira Cannot Establish as a Matter of Law that It Fully Informed the FDA of the Justifications for a Stronger Warning.

Hospira's preemption argument rests on the presumption that it is only responsible for monitoring the safety profile of its drug based on new data arising between 2011, when its NDA was approved, and Plaintiff's first administration of Taxotere in October of 2013. But federal law does not sanction Hospira's blinkered approach to pharmacovigilance, which essentially

presupposes that it can discharge this responsibility blind to whatever medical literature or data may have existed before 2011. To the contrary, although its post-marketing pharmacovigilance obligations began upon FDA approval, nothing in federal law allows Hospira to ignore all evidence arising before then when evaluating drug safety. Such an approach would, by definition, lead to incomplete safety assessments. But Hospira's argument is wrong, and the company cannot get around this Court's ruling that would advance that position because it is the company's only way around this Court's findings of fact in *Kahn* that "[t]he [2006] Sedlacek presentation ... was enough to support a CBE change." *In re Taxotere*, 508 F. Supp. 3d at 85.

Had Hospira performed proper post-marketing pharmacovigilance, it would have arrived at the conclusion that the low threshold for a label change — "some basis to believe" there exists an "undesirable effect, reasonably associated with use of a drug," 21 C.F.R. §201.57(c)(7) — had been met. And it would have done so shortly after its NDA was approved, based on the strength of the pre-2011 evidence of a causal association. But even notwithstanding that, this Court has held that, for purposes of preemption analysis, information on the risks associated with a drug may continue to accumulate over time. Indeed, "newly acquired information could be an increasing body of data of an inherent risk with the drug." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 42 (1st Cir. 2015) (internal quotations omitted) (citing *Levine*, 555 U.S. at 571).[1] And, as Plaintiff's expert has opined, the data points kept adding up after Hospira's NDA approval.

---

[1] The Court has adopted—and applied—this principle from *Levine* repeatedly in this MDL, for instance, in ruling in Kahn that "Sanofi 'could have analyzed the accumulating data' prior to [her] treatment and used the CBE process to unilaterally strengthen its label." *In re Taxotere (Docetaxel)*, 508 F. Supp. 3d at 84 (quoting *Levine*, 555 U.S. at 569–70 ("In later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug.")). Here too, Hospira "could have analyzed the accumulating data and added a stronger warning" as the injury "continued to occur" in docetaxel patients. *Id.* at 83.

The question then is not, as Hospira frames it, whether individual pieces of data, including medical papers and clinical trial data, constitute "newly acquired information." Rather, the relevant information is the safety signal Hospira should have gleaned from the entire body of evidence, which only increased after 2011 with new medical literature supporting a causal association between docetaxel and permanent alopecia. By the time Plaintiff was administered docetaxel in October 2013, there was mounting evidence in the medical literature, a growing number of reports of permanent alopecia with docetaxel in its safety database, and a new Global Vice President of Pharmacovigilance and Product Safety at Hospira who had worked closely with Taxotere as a pharmacovigilance executive at Sanofi. *See* 21 C.F.R. § 314.80(b) (identifying sources for post-market safety data surveillance). Indeed, during this timeframe, Hospira even updated its docetaxel label in foreign countries to include information about the risk of permanent alopecia.[2]

Hospira was in a unique position among 505(b)(2) NDA-holders with respect to new information about docetaxel's safety risks because in 2013 the company hired Dr. Juergen Schmider, Sanofi's former Vice President of Safety Surveillance and Product Safety from 2011 to 2013, as its new Global Vice President of Pharmacovigilance and Product Safety.[3] At both companies, Dr. Schmider was responsible for Taxotere/docetaxel, and he brought knowledge obtained from those years at Sanofi to his new position with Hospira.[4] This includes his dealings with the European Medicines Agency (EMA) over changes to Taxotere's label to highlight safety

---

[2] Hospira mischaracterizes Dr. Ross's testimony to suggest he believes "there was nothing new" in terms of evidence available to Hospira during the relevant time frame, 2011 to 2014. (Mot. 12.) Dr. Ross's testimony is that there was nothing new *between* [that] time frame … and when they actually updated it"— *i.e.*, 2014 to 2017. *See* Def's Ex. W at 180:5—182:12. Dr. Ross in fact points to all the evidence referenced in this brief as giving rise to a duty to analyze all available data to look for evidence of a causal association, and he remarks that in Hospira / Pfizer's clinical overview "specifically mentions the Kluger paper from 2012" as evidence of a causal association. *Id.*

[3] Def's Ex. E, Ross Rep. ¶ 131.

[4] *Id.* ¶ 131.

issues, including persistent alopecia, and the EMA's insistence that "health care professionals should be informed of the possible irreversibility of alopecia" because the condition had potential for "serious psychological consequences."[5] Dr. Schmider was also apparently in possession of Sanofi's 2011 Core Data Sheet for Taxotere containing PCIA information from Taxotere's major clinical trial.[6]

The body of medical literature highlighting the risk of PCIA with docetaxel was growing, too, after Hospira's drug was approved in the U.S., with six new articles published between that time and Plaintiff's first use of the drug in October 2013. For example, an article published by Miteva *et al.* in the American Journal of Dermatopathology discussed "the histological features of 10 cases of permanent alopecia after systematic chemotherapy with taxanes (docetaxel)," including six cases in which the patients took docetaxel for breast cancer. Pl's Ex. 11, Miteva M, *et al.*, Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am. J. Dermatopathol. 2011 Jun; 33(4):345-50; *see also* Pl.'s Ex. 12, Rule 26 Report of Dr. Laura Plunkett ("Plunkett Report") pp. 18-21. Another article by Kluger *et al.* in the Annals of Oncology reported six cases of permanent alopecia among docetaxel patients in a retrospective study evaluating patients that had taken docetaxel or paclitaxel in combination with other chemotherapy agents. Pl.'s Ex. 12, Plunkett Report at 18, 20–21. Also in 2012, Bourgeois *et al.* published their research on cases of irreversible alopecia reported among French patients using docetaxel. *Id.* at 19–20. The following year, two articles were published regarding reports of permanent alopecia associated with docetaxel, including an article published by Plaintiff's expert Dr. Antonella Tosti. *Id.* at 19–21.

---

[5] *Id.* ¶ 132.
[6] *Id.* ¶ 133.

Hospira makes much of the fact that it was not privy to Sanofi's internal adverse event database before or after its NDA was approved. But data collected in the FDA's public Adverse Event database ("FAERs") illustrate the accumulating data on the risk of permanent alopecia associated with docetaxel at all relevant times. Both Dr. David Madigan's lasso logistic regression and L2 logistic regression analyses of FAERS evidence an increased reporting rate of docetaxel against all other drugs exceeding the standard statistical threshold of 2 as of the end of 2010 and remaining above that threshold at the end of 2011 and beyond. Def's Ex. E, Ross Rep. ¶ 95. This publicly available data alone, if properly analyzed under industry-accepted methods, supported a causal association between docetaxel and permanent alopecia in 2011. Just as in *Levine*, the drug manufacturer here "could have analyzed the accumulating data and added a stronger warning." 555 U.S. at 570.[7] But the evidence shows Hospira did no such thing, and instead *declined* to follow up on PCIA reports because it considered "alopecia" a known side effect of chemotherapy.[8] Despite Hospira's claims that it periodically performed literature searches for its entire product line, these were inadequate as they failed to detect safety signals arising both pre- and post-approval, including from the industry standard analyses used by Dr. Madigan.[9]

Indeed, Hospira's deficiencies in pharmacovigilance during this period were noted in regulatory inspections by multiple European health authorities. *Id.* ¶ 137. This is illustrated by Pfizer's clinical overview of the available data on PCIA after it acquired Hospira, which included a 2016 search of its safety database.[10] That search revealed 146 cases of alopecia, 29% of which

---

[7] In *Levine*, the Court concluded that adverse event reporting could provide a basis to update the label, even after given to the FDA in periodic reporting. *See Demahy v. Actavis, Inc.*, 593 F.3d 428, 447 (5th Cir. 2010) (discussing *Levine*), *rev'd sub nom. PLIVA*, 564 U.S. 604.

[8] Def's Ex. E, Ross Rep. ¶ 135.

[9] *Id.* ¶ 136.

[10] *Id.* ¶ 139.

were described as "permanent" or "irreversible."[11] The results of the clinical overview, which included the database search, led to Hospira's seeking a U.S. label change in March 2017 to state that "cases of permanent alopecia have been reported."[12]

Finally, as far back as 2012, Hospira's docetaxel labels in Israel, Hungary, and the United Kingdom (among other countries) included persistent alopecia data from Sanofi's TAX 316 clinical trial.[13] And in July 2013, Hospira changed at least five of its European labels with additional TAX 316 data.[14] These regulatory moves show that Hospira possessed new scientific information regarding PCIA from Sanofi's clinical trial and that, had Hospira reviewed Sanofi's Summary of Product Characteristics (SPC) for Taxotere at that time, Hospira would have had access to the final clinical trial data and additional statements regarding the risk of PCIA.[15]

In sum, any number of these pieces of information should have prompted Hospira to analyze the available safety data, including pre-approval data, and to conclude there was "some basis to believe" that PCIA was "reasonably associated with use of" docetaxel by 2014. *See* 21 C.F.R. § 201.57(c)(7). Although it is *not* Plaintiff's burden under *Levine* to establish the existence of "newly acquired information" that justified a label change, the foregoing evidence nonetheless shows that Hospira has not met its burden to establish that it fully informed the FDA of the justifications for a warning of PCIA. *See In re Taxotere [Earnest]*, 2019 WL 11660424, at *4 ("Defendants do not point to any attempted CBE change [. . . .] They have not shown that [they] fully informed the FDA of the justifications for a stronger warning on the risk of [PCIA . . . .] Hospira does not provide the Court with a formal administrative record showing that, as reports of

---

[11] *Id.*
[12] *Id*.
[13] *Id.* ¶ 98.
[14] *Id.*
[15] *Id.*

permanent hair loss accumulated, it alerted the FDA and made a deliberate effort to change the language of the label."); *In re Taxotere* [*Kahn*], 508 F. Supp. 3d at 87 ("[B]ecause there is no clear evidence showing the FDA before 2008 was 'fully informed' … Plaintiff's claim is not preempted."). Instead, as the Court has observed, "the FDA learned from third-party sources … about the risk of permanent alopecia." *Id.* For this reason alone, Hospira's motion must be denied.

### III.    Hospira Has Also Failed to Show that the FDA Disapproved the Warning of PCIA Required under Louisiana Law.

Hospira also cannot establish the "demanding defense" of impossibility preemption for the independent reason that it hasn't shown that the FDA ever rejected a stronger warning for docetaxel about PCIA. As *Crockett* explains, "it is not sufficient for the proponent to contend that if it *had* submitted a new label—with additional warnings—to the FDA, the FDA *would have* rejected the warning." 2020 WL 433367, at *7. Again, the "possibility of impossibility" is not enough to establish an actual, irreconcilable conflict between federal labeling obligations and state duties to warn. *Albrecht*, 139 S. Ct. at 1678 (citing *PLIVA*, 564 U.S. at 625, n.8 ). To establish an actual conflict, a drug manufacturer must point to final agency action that prohibits it from complying with state-law duties. *Id.* at 1679.

Here, Hospira can identify nothing of the sort, and so it is left to speculate that the FDA *would have* rejected a labeling change had it used the CBE process. Hospira's *only* evidence that it was allegedly prohibited from making a CBE submission is an FDA medical officer's 2015 letter in response to a patient advocacy group about what that officer "thinks."[16] But one FDA employee's comments to patient advocates hardly meets *Albrecht*'s requirement of "clear evidence" that the FDA "informed the drug manufacturer that the FDA would not approve a

---

[16] Def's Ex. S and Def's SOF ¶ 22.

change to the drug's label to include [the] warning." *See In re Taxotere [Kahn]*, 508 F. Supp. 3d at 85 (quoting *Albrecht*, 139 S. Ct. at 1678).

Recognizing the weakness of this evidence, Hospira pivots to argue that the risk of PCIA with docetaxel was, and remains, only "speculative or hypothetical" and, for that reason, the FDA would have rejected its CBE. But even if this argument had any bearing on the question of preemption under *Albrecht* (it does not), it directly conflicts with multiple rulings from the Court in this MDL and the history of docetaxel's labeling. For instance, the Court has ruled that Sanofi's 2015 label, stating that "[c]ases of permanent alopecia have been reported," "clearly and consistently explain[s] that the drug carrie[s] a risk of permanent hair loss," *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 462 F. Supp. 3d 650, 653 (E.D. La. 2020) (2015 fence-post order). This warning, which appeared in the Adverse Reactions section of the label, necessarily required a finding that the "undesirable effect [is] reasonably associated with use of a drug," 21 C.F.R. § 201.57(c)(7). Hospira eventually submitted a CBE to provide the same warning. Def's SOF ¶¶ 32–33; Ex. V, CBE-0 Submission (Mar. 31, 2017). Hospira cannot now claim there is no evidence of a causal association with permanent alopecia after asking the FDA to add a warning on that very basis. The Court has also found—repeatedly—that there was sufficient scientific evidence to support such an association, *see e.g.*, *In re Taxotere*, 508 F. Supp. 3d at 85 ("The [2006] Sedlacek presentation … was enough to support a CBE change."), or to otherwise put the question to a jury, *In re Taxotere*, 2021 WL 3006897, at *2 (noting that Drs. Ross and Plunkett may rely on Dr. Madigan's signal identification through FAERs analysis in their assessments "whether there is 'some basis to believe there is a causal relationship."); *see also In re Taxotere*, 462 F. Supp. 3d

at 654 (E.D. La. 2020) (pre-label change claims may generally proceed to trial).[17] Hospira's argument not only lacks support in the factual record, but is contrary to the law of this case.

## CONCLUSION

For the foregoing reasons, Hospira's motion for summary judgment on its preemption defense should be denied.

Dated: March 31, 2022                                    Respectfully submitted,


/s/ Christopher L. Coffin                              /s/ Karen B. Menzies
Christopher L. Coffin (#27902)                        Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                      GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225                       6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                          Los Angeles, California 90045
Phone: (504) 355-0086                                 Telephone: 510-350-9700
Fax: (504) 355-0089                                   Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                                kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                          *Plaintiffs' Co-Lead Counsel*

/s/M. Palmer Lambert                                  /s/Dawn M. Barrios
M. Palmer Lambert (#33228)                            Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                             BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                              701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street              New Orleans, LA 70139
New Orleans, LA 70163-2800                            Phone: 504-524-3300
Phone: 504-522-2304                                   Fax: 504-524-3313
Fax: 504-528-9973                                     barrios@bkc-law.com
plambert@gainsben.com

                                                      *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

---

[17] *See also In re Taxotere*, 995 F.3d at 393–94 (holding that, as a matter of law, the 2011 – 2013 medical articles associating docetaxel with permanent alopecia provided notice to plaintiffs that docetaxel could have caused their injuries).

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin

655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT