```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


****************************************************************
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                          Civil Action No. 16-MD-2740
                          Section "H"(5)
                          New Orleans, Louisiana
                          April 14, 2022

THIS DOCUMENT RELATES TO ALL CASES
****************************************************************


            TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
                  BASED ON PREEMPTION HEARING
         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                  UNITED STATES DISTRICT JUDGE



APPEARANCES:


FOR THE PLAINTIFFS:


                    MATTHEW PALMER LAMBERT
                    GAINSBURGH BENJAMIN DAVID MEUNIER
                    & WARSHAUER, LLC
                    1100 POYDRAS STREET
                    SUITE 2800
                    NEW ORLEANS, LA 70163



                    RICHMOND T. MOORE
                    KARI M. LORENTSON
                    WILLIAMS & CONNOLLY, LLP
                    725 12TH STREET NW
                    WASHINGTON, DC 20005
```

FOR HOSPIRA, INC., HOSPIRA WORLDWIDE, LLC,
FORMERLY DOING BUSINESS AS HOSPIRA WORLDWIDE, INC.,
AND PFIZER, INC.:

                    JOHN F. OLINDE
                    CHAFFE MCCALL
                    1100 POYDRAS STREET
                    SUITE 2300
                    NEW ORLEANS, LA 70163


                    ANDRE MURA (via Zoom)
                    GIBBS LAW GROUP, LLP
                    505 14TH STREET
                    SUITE 1110
                    OAKLAND, CA 94612

Official Court Reporter:      Nichelle N. Drake, RPR, CRR
                              500 Poydras Street, B-275
                              New Orleans, Louisiana 70130
                              (504) 589-7775

     Proceedings recorded by mechanical stenography,
transcript produced via computer.

1                    **P R O C E E D I N G S**

2                    (Call to order of the court.)

3          THE CASE MANAGER:  MDL No. 16-2740, *In Re:  Taxotere.*

4    This is set for a motion hearing.

5          And, Counsel, you can please make your appearance for

6    the record.

7          MR. LAMBERT:  Good morning, Your Honor.  Palmer

8    Lambert, co-liaison counsel for plaintiffs, and I believe

9    Mr. Mura is on the Zoom.

10         THE COURT:  Mr. Mura, can you hear us?

11         MR. MURA:  Yes, Your Honor, good morning.

12         THE COURT:  Thank you.  Good morning.

13         MR. MOORE:  Good morning, Your Honor.  Rich Moore for

14   the Hospira defendants.  And I have my colleague, Kari

15   Lorentson, also from Williams & Connolly.

16         THE COURT:  Okay.  Thank you.

17         MR. OLINDE:  John Olinde, liaison counsel for 505.

18         THE COURT:  Okay.  Thank you.

19         Mr. Moore, you ready to proceed?

20         MR. MOORE:  Yes, Your Honor.

21         Good morning, Your Honor.  May it please the Court,

22   first, I just want to say, I realize this is not the first

23   time we've discussed these issues, and you've had multiple

24   arguments, including the arguments on the Accord and Sandoz

25   motions just a few weeks ago, and they are largely

1    overlapping of these issues.  So I'm not going to start from

2    scratch with my argument, but I want to hit some of the high

3    points as well as the additional arguments that have come out

4    in our briefing.

5         So Your Honor, our -- our motion involves a single

6    issue and that issue is, did Hospira have newly-acquired

7    information about the risk of permanent alopecia that

8    provided a basis for it to change its label.  And the

9    relevant time period here is March 2011; that's the date the

10   FDA approved Hospira's docetaxel, and October 2013, that's

11   the date Ms. Hickey began using docetaxel.

12        Now, it's undisputed that the labeling for Hospira

13   was adequate as of the date of approval.  Plaintiffs do not

14   dispute that.  In fact, it's required -- not only was it

15   adequate, but Hospira was required to have that exact

16   labeling that it had as of the time of approval because as a

17   505(b)(2) applicant, in effect, it's a generic at the time of

18   approval, other than with respect to the particular

19   differences in doses and so forth.

20        THE COURT:  Right.

21        MR. MOORE:  But with regard to safety efficacy, it

22   relied entirely on Sanofi's application, and the labeling was

23   the same.

24        And so the question then becomes, did -- was there

25   newly-acquired information after that point, which would have

1    given reason for Hospira to change its labeling, consistent

2    with federal law?  And newly-acquired information, as Your

3    Honor knows, is a term of art.  It's not -- it doesn't mean

4    any new information; it means newly-acquired information as

5    defined by the Code of Federal Regulations.  And that

6    regulation states that it has to reveal risks of a different

7    type or severity or frequency than previously included in

8    submissions to the FDA.

9          So it's -- it's that requirement, different type or

10   severity or frequency that we believe was lacking in this

11   case, and that's why there was no newly-acquired information

12   that would have given rise to a new labeling change.

13         And before we talk about the actual evidence, Your

14   Honor, I think it's important to note plaintiffs repeatedly

15   refuse to address that question.  Nowhere in their opposition

16   brief do they even cite that language, let alone explain why

17   it's been met.  I think that should tell us something.  Their

18   expert, Dr. Ross, does not explain why that requirement has

19   been met and, in fact, when we --

20         THE COURT:  Let me ask something, Mr. Moore, because

21   I have to tell you, this is hard.  This is really hard.  And

22   we have looked at this repeatedly, and I know -- but if the

23   plaintiffs -- and I understand that, but this is your

24   defense, and you must plead and prove this defense.

25         Now, wouldn't it make sense that the plaintiffs just

1  present evidence like there's a difference between production

2  and persuasion.

3          MR. MOORE:  Yes.

4          THE COURT:  And if the plaintiffs brought forth

5  evidence of things that occurred post-approval, that would --

6  isn't it then for you to say, but no, that doesn't meet the

7  standard?

8          I think there's been a problem with whose job is it,

9  to tell us that it does or does not meet the CBE standard

10  that would allow you to make a change.

11          MR. MOORE:  I understand, Your Honor.

12          THE COURT:  And I don't know if it's clear, because

13  it's been --

14          MR. MOORE:  And there's conflicting law on that, Your

15  Honor.  I think our position is the plaintiff does have the

16  burden of production on that issue, and we believe that

17  regardless of who has the burden, we've shown there is no

18  newly-acquired information.

19          I mean, we come forward in our brief and set forth

20  all of the affirmative evidence.  And we discussed it, and we

21  explained why it does not meet that test.  So I don't think

22  this turns on the question of who has the burden.  We think

23  the plaintiff does has the burden of production.  We say in

24  our brief, it's hard for us to prove a negative.  But they

25  said we have -- we have the information that they've

1    identified as newly-acquired information, but the problem is

2    they don't connect the dots. So they say there's a new

3    article out there, but they don't explain or there's no

4    analysis of why that is of a different severity or frequency

5    or type than the previous information. That's the thrust of

6    our motion. It's the before and after comparison, and we've

7    done that. So there's not a burden issue. We said look,

8    actually the evidence that came out post-approval is not only

9    more of the same, it's actually of less frequency. The

10   articles they cite are of lower frequency. So it can't be

11   newly-acquired information and we can -- we can go through

12   it. I can explain why each of those doesn't meet the test.

13          Before I do that, I just want to note also that when

14   we argued this motion previously in the Ross *Daubert* motion,

15   plaintiff's counsel, I remember being very surprised, made an

16   argument for the very first time. He said, "If we had to

17   meet the newly-acquired information test, we'd be in

18   trouble." And he suggested there's another regulatory

19   pathway that we can use to update the label. And at the

20   time, I remember thinking, I don't have the case law in front

21   of me to rebut that, and I don't think that's right.

22          But in our brief, we've set forth the case law, and

23   we explained there is another pathway called a "prior

24   approval supplement," but that's preempted under U.S. Supreme

25   Court law. And we put that in our brief and we explained why

1    the reason that the CBE is an exception is because you can do

2    that unilateral.

3         THE COURT:  Right.

4         MR. MOORE:  PAS, prior approval supplement, that

5    requires FDA approval --

6         THE COURT:  Right.

7         MR. MOORE:  -- so the point is, Your Honor, why are

8    they dodging the issue?  Why are they trying to talk about

9    another regulation?  And then when we point out that it

10   doesn't apply, what do they say in their opposition?

11   Nothing.

12        And then third, Your Honor, when you read the

13   plaintiffs' opposition, it almost entirely talks about the

14   clear evidence test.

15        THE COURT:  Right.

16        MR. MOORE:  And Your Honor has said three times,

17   that's not the right order of operations.  You said it in

18   both of the hearings.  You said it in the *Kahn* opinion that

19   newly-acquired evidence is the first test.  So again, why are

20   we talking about the clear evidence test, that's a later part

21   of the analysis.  Our argument is the newly-acquired

22   evidence.

23        So you wonder why, why do the plaintiffs not want to

24   address this?  I think the answer is in the evidence.

25   Because when you look at the evidence, there's not a good

1   answer for why they can meet the test of greater frequency.

2   As we stated in our brief, out of all the articles they've

3   cited, there are five that come -- that are in the relevant

4   time period.  And these articles, going through them on page

5   17 and 18 of our opening brief --

6        THE COURT:  I got it.

7        MR. MOORE:  Going through the details -- the point

8   is, they don't show you -- either the author's report, we

9   don't know what the prevalence is.  Or they state, "We have

10  six new cases," okay?  "We have six new cases in this

11  article."

12       That's nothing new, Your Honor.  Dr. Feigal says

13  there's 133 cases reported in the medical literature before

14  March 2011, and so there are cases in the Nabholtz article,

15  the Sedlacek article that have a way higher frequency.  We

16  have a much higher frequency than reported in those articles.

17  Nabholtz article from 2001 has a rate of 7.4 percent

18  reported, incidence read; Sedlacek 6.3 percent.

19       So our point is, this doesn't tell us anything new

20  about the risk of permanent alopecia.  If anything, it was a

21  lower frequency.  That's why the plaintiffs don't want to

22  talk about the frequency requirement because they can't meet

23  it.

24       Your Honor, their only response to that is to point

25  to the fact that there can be a reanalysis under the

1   regulation.  We understand that.  That's in the regulation.

2   No one is disputing that.  But it has to be new.  In other

3   words, if you think that the risk is "X," and then you have

4   new information, whether it's a reanalysis of that old

5   information or whether it's a combination or accumulating

6   data or something, any of those things; that now shows you it

7   is actually a greater frequency than what we previously

8   thought; that can be a basis to change the label.  So that --

9   so that's what -- it's a before and after comparison and what

10  we're saying here is, we understand that you can look back --

11          THE COURT:  Right.

12          MR. MOORE:  -- to some extent at the previous

13  information.

14          THE COURT:  And I think to say that once the label is

15  approved in 2011, that doesn't mean that the information

16  prior died.

17          MR. MOORE:  Absolutely.

18          THE COURT:  It is something that you continue to go

19  on, but I think you've acknowledged that in your brief.

20          MR. MOORE:  We agree with that.  But what we -- the

21  rub though, there has to be -- there has to be information

22  that shows a higher frequency of the risk or a different

23  risk.  The example that is used in the regulations is the

24  meta-analysis.  So if somebody comes up with a meta-analysis

25  and says, oh, wow, this risk is really a lot higher than we

1    thought.  We don't have that here.  We don't have anything.

2    All we have is a handful of articles which show a lower

3    frequency.  So then it's not in medical literature.  So then

4    plaintiffs resort to evidence, which I submit, doesn't come

5    close to establishing newly-acquired evidence -- the foreign

6    labeling; they cite the foreign labeling.

7         So Hospira had in its foreign labeling, a reference

8    to the TAX316 data.  In other countries, unlike the U.S.,

9    Hospira has to match, after approval, the Sanofi labeling.

10   There are different regulations in different countries.  So

11   Sanofi, as you probably know, had some information about

12   TAX316 in its foreign labeling; whereas in the U.S., it

13   submitted that information to the FDA, and they did not

14   include that in the U.S. label.

15        So this is the TAX316 data from Sanofi that is

16   undisputed that FDA already had before approval.  It cannot

17   be newly-acquired information.  The FDA had that and decided

18   not to put it in the labeling.  And that's why, Your Honor,

19   is actually excluded foreign labeling in the first two

20   trials, and it's repeatedly excluded for this very reason.

21   Different countries have different regulations.  So to say

22   that, because Hospira copied Sanofi's label, included some

23   information about TAX316, which Hospira didn't even have by

24   the way, we didn't have the underlying data.  That was Sanofi

25   that had that data.

1    So the idea that we would put that in our labeling

2    when, Sanofi, the sponsor, had already submitted it to the

3    FDA, and they decided, for whatever reason not to include

4    that in the labeling, and Hospira didn't even have it; that

5    doesn't meet the test, Your Honor.

6    And then similarly, they've cited the fact that an

7    executive, Juergen Schmider, former Sanofi executive, he

8    comes and works for Hospira.  Now he says -- I wasn't even

9    involved -- they say he must have known because there was

10   a -- a European labeling change, and Sanofi's core datasheet,

11   so he must have known about this information.  He says he

12   doesn't even remember working on that.

13   But be that as it may, the only information they're

14   talking about, again, is the TAX316 data.  That's what is in

15   the foreign labeling.  That's what's in the Sanofi core

16   datasheet.  That's why they don't cite -- it's not like he's

17   walking around with a smoking gun document.  It's just the

18   TAX316 data.  That's not newly-acquired information.

19   They cite the FAERS database.  First of all, part of

20   the dashboard wasn't available until 2017, and then Dr.

21   Madigan -- reportedly, Dr. Madigan -- I asked him at his

22   deposition, was there any new safety signal after 2011 that

23   wasn't already -- wasn't already in the database.  Because in

24   his report, he shows safety signals going all the way back to

25   2001.  He had several different graphs.  One of them is

1    afterwards, after 2011.  So I ask him if this is a new safety

2    signal that wasn't already there?  He said no.  He was very

3    clear about that.  So his analysis is not newly-acquired

4    information.

5         They also cite the fact that Hospira looked at its

6    own internal database and saw that there were a handful of

7    adverse event reports.  There were ten in which it was

8    reported that it was docetaxel use.  But when Hospira did

9    it's analysis, there was really only two where there were no

10   other known drugs involved.  But whether it's ten or two,

11   again, this is a handful of adverse event reports.  I mean,

12   that was known well before Hospira was approved.  So that

13   does not move the needle.  I mean we're talking about

14   hundreds of thousands of people who took the product.

15   Whether it's ten, whether it's two, people that had a report

16   of permanent hair loss; that's not of a different frequency

17   or duration that would be newly-acquired information that

18   would require -- that would allow Hospira to change its

19   label.

20        So you might wonder why did they change it then?

21   Well, they changed it because Sanofi changed its label.  I

22   mean, Sanofi changed its label; the FDA went to Sanofi.

23        THE COURT:  Yes.

24        MR. MOORE:  And as you know, looked at their internal

25   database and said, well, we can't -- you know, there's a lot

1    of confounding factors here, but you need to include

2    information in the label.

3          THE COURT:  Right.

4          MR. MOORE:  So that's why we, at that point --

5    Hospira didn't know that.  It didn't have access to Sanofi's

6    internal database, but then once Sanofi changes its label,

7    you know, they had that good information, had access to the

8    FDA basis for its labeling change, so they changed the label.

9          But, again, Your Honor, I think the failure,

10   regardless of who has the burden, the evidence here is not --

11   does not meet the test for newly-acquired evidence, and

12   therefore under federal law, Hospira did not have a basis

13   under federal law to change its label.  And as a result,

14   plaintiffs' claims they should have changed their labeling

15   under state law are preempt.

16         THE COURT:  Thank you.  Mr. Mura.

17         MR. MURA:  Good morning, Your Honor.

18         I know Austin (phonetic) made the third or fourth

19   argument on this.  And I would like to sort of cut to the

20   chase a little and hopefully address the Court's questions.

21         The first thing I would like to respond to was this

22   suggestion that we haven't at all addressed newly-acquired

23   information.  And that is just not an accurate statement of

24   plaintiffs' position or what plaintiffs have addressed.  And

25   so I think the problem with defendant's approach here, is it

1  completely ignored this Court's preemption rulings.  This

2  Court has already held that an association between docetaxel

3  and permanent alopecia was not known to the FDA at the time

4  Hospira's MDAs were approved in 2011.  That's this Court's

5  preemption rulings correctly noted and this is the quote:

6  "The data of permanent alopecia was apparently accumulating

7  in the years before 2015, and the FDA was not recognized in

8  it" --

9      THE COURT:  But Mr. Mura, are you impugning Sanofi's

10 knowledge to Hospira because Sanofi -- because this drug was

11 formulated a long time ago, and then we looked at the

12 studies, the reports, this ongoing accumulation of data, and

13 I -- this is where I'm getting.  I will tell you it's

14 becoming very difficult, are you attempting to impute all of

15 that knowledge on Hospira?

16     MR. MURA:  No, Your Honor, and the Court's preemption

17 rulings looked at public information like Sedlacek.  I mean,

18 the Court said Sedlacek provided a basis for a CBE change.

19 This is public information that was available to Hospira, and

20 there's quite a lot of information coming out.  In 2011 --

21     THE COURT:  But how does -- but this is my -- Hospira

22 has an original label in 2011.  And do we have to assume that

23 the 2011 label at that time, the FDA was fully informed of

24 what preceded, and how do we know that?  That's where it

25 seems to me that you're almost making an argument that the

1    2011 label was inaccurate.

2           MR. MURA:  No, Your Honor.  And part of the process

3    for 505(b)(2) to get approval through this sort of other

4    pathway, the FDA is not going back and approving -- we're not

5    challenging that label.  We're not saying there's a problem

6    with that pathway.  But part of that pathway, the FDA is not

7    going back and reviewing all the data, and the key point is,

8    the FDA didn't know at that time.

9           So the question is, what could Hospira have done

10   after 2011?  Did it have a basis to go forward and ask for a

11   label change?  Hospira doesn't say it wasn't allowed to ask

12   for a label change.

13          THE COURT:  Right.

14          MR. MURA:  Hospira doesn't say that it couldn't

15   look -- that whatever happened before 2011 wasn't relevant.

16   All Hospira said is every time we cite a study, and there

17   were many studies that we cited that found that the risk of

18   PCIA with docetaxel was growing.  We cited Miteva.  We cited

19   Kluger.  We cited Bourgeois.

20          The last two years there were two articles that came

21   out, including by Dr. Tosti, and there is significant data

22   that has been accumulated.  And we're talking about the end

23   of 2013, the label was changed in 2015.

24          So, of course, there was enough information by the

25   end of 2013 for Hospira to go forward and present and ask for

1    a label change.  And had it asked, and if the FDA had said

2    no, then there would have been preemption, but Hospira never

3    asked and we know, quite frankly, that the FDA would have

4    approved the label change because it did it maybe 14,

5    16 months later.  And according to the rules, the FDA was not

6    aware of this information.

7         THE COURT:  So when we're doing the CBE analysis and

8    we're looking at type, severity, and frequency, are you

9    arguing that the fact that there was -- the fact that there

10   was additional information being provided is sufficient to

11   cause the reanalysis?  Or are you saying, look, you were

12   approved in 2011, you had a right -- you had an obligation at

13   that time to go back?

14        MR. MURA:  We're saying you're approved in 2011, you

15   had an obligation at that point as an MDA holder.  The

16   regulation and the statute clearly apply to MDA holders,

17   which is what 505(b)(2) is.

18        So at that point, between 2011 and 2013, the question

19   is, was there any newly-acquired information such that

20   Hospira could have gone to the FDA and said we think the

21   label should be updated to say cases of permanent alopecia

22   have been reported?  Essentially, the label change was not

23   adopted until 2015.  The answer to that question is quite

24   obviously yes.

25        Because you have quite a lot of information coming

1    out between 2011 and 2013, it was a fertile ground for new

2    information.  And then you analyze that information; you

3    don't just look at it individually, which is what Hospira is

4    doing.  Hospira is saying we're just going to look at this

5    one study, we're going to look at it in isolation; we're

6    going to pretend that Sedlacek didn't matter, so we'll just

7    look at it in isolation; we'll compare the incident's rate of

8    this study versus some study pre-2011.  That's not how

9    newly-acquired information works.  That's a very sort of

10   backward view of how to look at the problem, and so --

11        THE COURT:  I have another question because I will

12   tell you, Brittany and I have been fighting every day for

13   weeks, struggling through this.

14        When we look to type, severity, and frequency, are we

15   doing that analysis based upon what's actually in the label

16   or what occurred?  Let me see if I can make sense of this.

17        If we accept, let's just accept for purposes of this

18   argument that the label did not properly warn of permanent

19   alopecia.  So when one looks to type, severity, and

20   frequency, are they looking to the label and saying, listen,

21   there is more information that we can -- cumulatively, that

22   is of a different type, severity, and frequency that is

23   warned, that is included in the label, or that the FDA

24   considered in approving the label?

25        And I think those are two things.  It's the fact of

1    the label, what's in the label itself, and it is what was the

2    FDA apprised of and approved.  Does that -- do you understand

3    my question?

4         MR. MURA:  I believe so, Your Honor.  When the FDA is

5    approving a 505(b)(2) label, it's not reanalyzing -- and this

6    is the Woodcock letter that we provided to you.  The FDA made

7    this very clear, it's not reanalyzing all the data.  It

8    assumes that essentially because the drug has been on the

9    market, that you can have this copy, but to the extent that

10   there are differences, it can't become a generic drug; it has

11   to be a 505(b)(2).  And that makes a world of difference

12   because then it's its own drug; it's a new drug in that

13   sense, and it fits the pathway of new drugs.  So all the

14   obligations of new drugs in terms of label changes, in terms

15   of pharmacovigilance apply, so I think we talked about this

16   before.

17        Even if the brand name drug comes off the market, the

18   505(b)(2) doesn't necessarily come off the market.  Even if

19   the brand name drug has a particular label, the FDA has made

20   it very clear there can be differences in the 505(b)(2)

21   label.  And so I think you can simplify this one because

22   we're talking about a date of administration of 2013, 2014.

23   If you just look at the information that was between 2011 and

24   2013, and you look at it in light of the prior information,

25   quite obviously, and the Court's prior preemption rulings,

1   it's quite clear that there was sufficient information to go

2   forward and provide a label change request.

3          And when the Court is asking about severity, I just

4   want to make clear that the standard for changing the adverse

5   reaction section of the label is much lower.  Some basis to

6   believe, but --

7          THE COURT:  But that's the second step.  We have to

8   have newly-acquired information to even get there.  And

9   I guess --

10          MR. MURA:  Yes, Your Honor, and we have identified --

11          THE COURT:  But if we have post-approval reanalysis

12   that we say constitutes newly-acquired information, if it

13   shows the same risks that were shown in the information

14   submitted prior to approval, can it be newly-acquired?

15          MR. MURA:  Because it's accumulating data, Your

16   Honor.  I think even in the Supreme Court in why it has made

17   clear -- for example, you might have an adverse event, right?

18   And then you might have the same adverse event later.  A drug

19   company -- and this is what Hospira is saying, well, it's the

20   same adverse event --

21          THE COURT:  Right.

22          MR. MURA:  -- it's not really telling us very much.

23          But what the Supreme Court said in *Wise* is all of

24   this is accumulating, and the more information you have

25   showing that there is a risk associated with this, with a

1   particular drug, that provides, when you look at it all

2   together and you reanalyze it, that's newly-acquired

3   information.  That's just a new analysis of pre-existing

4   available data --

5           THE COURT:  Okay.  I have another question.

6           MR. MURA:  -- that clearly Hospira could have done

7   that new analysis.  The FDA has never punished a company for

8   proposing a CBE change.  I mean, the threshold here is quite

9   low to go to the FDA and say, we think this label should be

10  changed in the following way.  They could have done it in

11  late 2013.  The Court's preemption rulings clearly -- clearly

12  states that Sanofi could have done it based on less

13  information at an earlier point in time.  Quite obviously,

14  Hospira could have done it much later in time, in late 2013

15  when it has a lot more information.  I mean, it simply --

16          THE COURT:  I guess Mr. Mura, are you requiring

17  Hospira to have -- be imputed with Sanofi's knowledge?

18  Because Sanofi's scope of information was much broader than

19  what Hospira and the other 505(b)(2)s have.  I mean, are you

20  imputing that knowledge to them?

21          MR. MURA:  No, Your Honor.  And the Court's

22  preemption rulings aren't based on some particular knowledge

23  that was further in Sanofi's head and not public.  That's not

24  our fact pattern here.

25          The Court's prior preemption rulings are very largely

1    about Sanofi having an awareness of things like Sedlacek,

2    Nabholtz, and the FDA not being clued into that, and not

3    knowing until 2015 about those issues.  And the Court has

4    said it's the responsibility of the drug manufacturer to tell

5    the FDA to communicate that clearly --

6            THE COURT:  Right.

7            MR. MURA:  Merely providing all sorts of reporting

8    data is not sufficient.

9            But even if Hospira was just reporting data or even

10   if Sanofi was, I think that's a red-herring for Hospira to

11   say we didn't have TAX316 because that's not how the Court

12   has analyzed TAX316 in its preemption rulings.  And it

13   completely ignores the fact that even in the international

14   context, Hospira docetaxel labels were being changed to say

15   make these changes.  For Hospira to say we had no notice, we

16   had no ability, our hands were tied; we could have done

17   nothing before 2015, and Hospira makes an extreme argument

18   even after 2015.  What they're saying to the Court is that

19   even after 2015, the only reason we changed the label was

20   because Sanofi changed the label.

21           They don't even think that there is sufficient causal

22   information to change the label as it was changed in 2015,

23   which is again, directly contrary to this Court's rulings.

24   So it's Hospira's argument, which is quite extreme here,

25   particularly when you look at the timeline of all the

1    information that was available in the public sphere to these

2    drug companies; even to the extent that the Fifth Circuit has

3    said that women who were prescribed Taxotere could have made

4    these sorts of associations between the drug and this risk.

5         And here you have a drug company saying we didn't

6    have enough information even to go forward with this CBE

7    change.  I mean, that simply strains credibility,

8    particularly in a late 2013 case when you have many studies,

9    when you have again -- we presented an analysis of the FDA's

10   adverse event database.  We pointed to the fact that Hospira

11   was changing the label internationally, and I think most

12   important, if you look closely at the Court's preemption

13   rulings, it's quite clear that the FDA did not know about

14   this risk until 2015.  It was not recognizing it, and clearly

15   Hospira had enough information.  It's a low bar to go forward

16   with a CBE change.  I do think that Hospira is overstating

17   the bar for what it needs to do to go forward to the FDA and

18   say, we have a new analysis of previously available data.

19   That is newly-acquired information, a new analysis of

20   previously available data.  That's federal law.

21        And so for Hospira to keep suggesting that none of

22   this evidence was new as it understood it, because it wanted

23   to look at the information in isolation.  And it made very

24   technical internal arguments about how this -- we can

25   discount Miteva; we can discount Kluger; none of this is

1  telling us anything new.  I don't think that's at all

2  consistent with this Court, and other courts have discussed

3  newly-acquired information.  So if the bar were as high as

4  Hospira is suggesting, then very few labels would be changed,

5  and this would be contrary to the way -- the entire

6  framework.  And even if you look at the Woodcock letter and

7  Supreme Court precedence on changes being effected,

8  newly-acquired information, the burden is really on the drug

9  manufacturers to go to the FDA and say we think the label

10  should be changed in this way based on this information; the

11  FDA can say no.

12      And then the drug manufacturers can avail themselves

13  of preemption, but here, Hospira did nothing.  And so to say

14  that the FDA would have somehow rejected the label or

15  wouldn't have allowed this to happen or would have said you

16  don't have newly-acquired information in late 2013, when we

17  know exactly what happened in 2015, I think that's a very

18  hard argument for Hospira to make.  And I don't think it's an

19  argument that works given this Court's preemption rulings,

20  which again, based on public information way earlier than

21  2013, that there was sufficient information for drug

22  companies to go forward and present a proposed label change.

23      THE COURT:  Okay.  Thank you, Mr. Mura.

24      MR. MURA:  Thank you.

25      THE COURT:  Mr. Moore?

1          MR. MOORE:  A lot was said there, Your Honor.  I just

2    want to try to focus on what I believe are the key elements

3    of the argument, though.  And first, the idea that there is

4    accumulating data, and Hospira is raising the bar for what

5    newly-acquired information -- definition of newly-acquired

6    information.  It's just not so.  Reading from the information

7    itself, different frequency, severity, and type.  And that's

8    the point he continues not to address.  He says these are

9    technical arguments.  These are not technical arguments.

10   There can be more information.  There can be more case

11   reports than we already knew.  There can be five more case

12   reports.  The definition is not is there any accumulating

13   data.  Is there accumulating data that shows a risk of a

14   different severity or frequency or type?  That's what he

15   still has not answered.  And that's why, when we say that

16   there is an article -- when we already have information

17   before approval that shows rates, instance rates of 6,

18   7 percent, case reports, that's what we know, that's the

19   baseline.

20          If we have another article that comes out that says,

21   okay, there have been six more case reports out of, you know,

22   2 percent of the people who took them, that doesn't change

23   the risk.  In other words, it has to be a different risk.

24   And just to take a step back here, Your Honor.  From

25   Hospira's standpoint, there is a reset; there is a reset as

1   of the date of approval, because that was a labeling that

2   Hospira was required to have.  And so it's looking at that as

3   the baseline and understanding is there any information

4   that's going to be different than what is already known at

5   that time?  And I heard him directly say in the argument, in

6   response to Your Honor's question, "as of the date of

7   approval."  And he said the labeling, "We had to change the

8   labeling as of the date of approval."  That's in direct

9   conflict with the concession that the label -- they're not

10  challenging the adequacy of the label.  They are basically

11  making a -- as we say in our brief, which they don't respond

12  to it, they're making a mockery of the process.  We're

13  required to have this label, and the very next day, we're

14  supposed to propose that it be changed.  That's not the

15  regulation.  It has to be something new that triggers this

16  label change; newly-acquired information after the date of

17  approval, and he's speaking in generalities without

18  discussing the actual evidence and the actual facts as we set

19  forth in the brief.

20      Lastly, Your Honor, he keeps saying we know that

21  because the label changed in 2015, there must have been

22  information in 2013.  But he does not address the fact that

23  the reason it was changed in 2015 was based on Sanofi's

24  internal database.  They didn't say anything about that.

25  That's explicitly why the FDA said it was changing the label.

1   That's undisputed how Hospira didn't have access to that.  So

2   he did not address that argument.  The fact that there was a

3   later labeling change does not mean there was information

4   that Hospira had in 2013.

5         So, Your Honor, I believe that -- unless Your Honor

6   has any further questions, I'll step down.

7         THE COURT:  Thank you.

8         MR. MOORE:  Thank you.

9         THE COURT:  Court's adjourned.

10                        *  *  *  *

11      (WHEREUPON, the proceedings were adjourned.)

12                        *  *  *  *

13                  REPORTER'S CERTIFICATE

14        I, Nichelle N. Wheeler, RMR, CRR, Official Court
    Reporter, United States District Court, Eastern District of
15  Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
16  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

17

18            /s/ Nichelle N. Wheeler
              Official Court Reporter
19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT
Page 27