**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)      MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                   SECTION "H" (5)

**THIS DOCUMENT RELATES TO:**
**Barbara Earnest, Case No. 2:16-cv-17144**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT**

Defendants Sanofi US Services Inc. and Sanofi-Aventis U.S. LLC are entitled to summary judgment on Plaintiff Barbara Earnest's sole claim of failure to warn that Taxotere was unreasonably dangerous—under La. Rev. Stat. Ann. § 2800.57—for two reasons. First, Plaintiff's claim is time-barred. Second, as he testified at trial, Plaintiff's treating oncologist, Dr. James Carinder, would not have changed his prescribing decision even if he had received the warning that Plaintiff claims was necessary.

Sanofi previously moved for summary judgment on prescription and warnings causation grounds in 2019, and Sanofi renewed those arguments in moving for directed verdict at the close of Plaintiff's evidence during trial. The trial ended in a defense verdict, with the jury finding Plaintiff did not prove she had permanent alopecia caused by Taxotere, and, as a result, Sanofi's pending motion for directed verdict was denied as moot. Although the Fifth Circuit reversed the jury's verdict on appeal on unrelated *Daubert* grounds, that ruling did not address and has no bearing on Sanofi's prescription and warning causations arguments.

Not only do the facts from Plaintiff's first trial conclusively demonstrate that no dispute as to any material fact remains, but this Court's rulings in other cases as affirmed by the Fifth Circuit show that, as a matter of law, Plaintiff's claim cannot survive. *See In re Taxotere (Docetaxel)*

1

*Prods. Liab. Litig. (Thibodeaux)*, 995 F.3d 384 (5th Cir. 2021) (ruling that where a plaintiff makes no inquiry into Taxotere as a possible source of persistent hair loss, plaintiff acts unreasonably); *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Durden)*, 860 F. App'x 886 (5th Cir. 2021) (same); *see In re Taxotere (Docetaxel) Prods. Liab. Litig. (Phillips)*, 994 F.3d 704, 705 (5th Cir. 2021) (per curiam) (under Louisiana law, causation analysis "focuses on the prescribing physician's decision to prescribe the drug").  Based on this clarified precedent and the trial record, Sanofi is entitled to summary judgment.

## BACKGROUND

The Court previously denied summary judgment for Sanofi on prescription grounds because six months after Plaintiff finished chemotherapy, when her hair had not grown back as she expected, Plaintiff asked her oncologist, Dr. Carinder, about her hair loss.[1]  The Court held that a reasonable jury could find Plaintiff reasonably relied on Dr. Carinder's alleged statements that "[her hair was] going to come back" and "it just takes time."[2]

At trial, however, Dr. Carinder did not testify that he told Plaintiff her hair would grow back, but rather that he told her hair loss persisting at six months after chemotherapy was "uncommon."[3]  Regardless, since the Court's initial decision, the Fifth Circuit has issued two decisions that demonstrate Sanofi is entitled to judgment.  *See In re Taxotere (Docetaxel) Prods. Liab. Litig. (Thibodeaux)*, 995 F.3d 384 (5th Cir. 2021); *see also In re Taxotere (Docetaxel) Prods. Liab. Litig. (Durden)*, 860 F. App'x 886 (5th Cir. 2021).  Rather than focusing on whether the plaintiff inquired about her hair loss generally, the Fifth Circuit asked whether the plaintiff specifically explored *Taxotere* "as a possible explanation for [her] persistent hair loss."  *Durden*,

---

[1]    Rec. Doc. 7571 at 8.

[2]    *Id*.

[3]    Exhibit C, Trial Tr. 1587:15−23.

860 F. App'x at 892 (internal quotation marks and citation omitted). According to the Fifth Circuit, where a plaintiff "ma[kes] no inquiry into Taxotere as a possible explanation for their persistent hair loss, they ha[ve] not act[ed] reasonably in light of their injuries and *contra non valentem*'s fourth category d[oes] not suspend prescription." *Id.* (internal quotation marks and citation omitted).

This Court also denied Sanofi's initial motion for summary judgment on warnings causation, ruling that Dr. Carinder's deposition testimony—together with Plaintiff's—created an issue of fact for the jury on whether a stronger warning would have changed Dr. Carinder's prescribing decisions.[4] This Court relied on Dr. Carinder's testimony that paclitaxel and docetaxel had "equivocal efficacy," and Plaintiff's testimony that she would have wanted to know the side effects of both paclitaxel and docetaxel before making a decision as to which taxane to take.[5] Based on this testimony, the Court held that the "jury will need to hear the testimony at trial and decide whether [Plaintiff] would have chosen paclitaxel . . . or whether she would have still chosen Taxotere knowing its risk of permanent alopecia."[6]

At trial, Dr. Carinder testified that he already knew Plaintiff's Taxotere regimen posed a risk of permanent hair loss, yet prescribed Taxotere anyway.[7] Dr. Carinder also testified that he advised Plaintiff about the possibility of permanent hair loss before she began treatment,[8] but

---

[4]   Rec. Doc. 7571 at 21.

[5]   *Id.*

[6]   *Id.* (emphasis added).

[7]   Ex. C, Trial Tr. 1533:7–1534:8 (Dr. Carinder's testimony about a 2005 patient who suffered from permanent hair loss after taking the same regimen as Plaintiff); *Id.* at 1541:22-24, 1542:11-1543:3 (Dr. Carinder's testimony that he reviewed the 1999 Taxotere label, which stated: "Once you have completed all your treatments, hair generally grows back" and understood it to mean that hair grows back "usually or most of the time," but not "always."); *Id.* at 1556:16-20 (Dr. Carinder's testimony that he had read the Nabholtz article (published in 2001), in which he "learned of Taxotere, Adriamycin, and Cytoxan being associated with four reports of persistent hair loss[.]").

[8]   *Id.* at 1537:13–1538:5.

3

Plaintiff did not ask about other options.[9]  Ultimately, Dr. Carinder remained unequivocal that even if a permanent alopecia warning had been added to the label prior to Plaintiff's treatment, he would have still recommended and prescribed Plaintiff the same regimen including Taxotere.[10] For her part, Plaintiff testified that she "did not know" what decision she would have made had Dr. Carinder discussed other options.[11]

Since the Court's summary judgment ruling, the Fifth Circuit has also clarified the standard for warnings causation under Louisiana law.  *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Phillips)*, 994 F.3d 704, 705 (5th Cir. 2021) (per curiam) (under Louisiana law, causation analysis "focuses on the prescribing physician's decision to prescribe the drug.").  In *Phillips*, the Fifth Circuit held that the focus for warnings causation is *solely* on the physician's decision to prescribe the drug at issue.  *Id*. at 709.  According to the Fifth Circuit, "how patient choice . . . would have steered the [doctor-patient] conversation" is irrelevant to the analysis under Louisiana law.  *Id*. at 708, 709 n.4.

## LEGAL STANDARD

This Court may consider post-trial motions for summary judgment because "a summary judgment proceeding is the functional equivalent of a new trial."  *See Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 559 (7th Cir. 1985).  This authority is illustrated by *Martin v. McElvaney*, No. 92-2103, 1994 WL 442449 (5th Cir. 1994) ("*Martin I*"), and *Martin v. McElvaney*, No. 97-20742, 1998 WL 307618, at *1 (5th Cir. 1998) ("*Martin II*").  In *Martin I*, a civil jury rendered a defense verdict and plaintiff appealed the judgment as to one of his claims. 1994 WL 442449, at *1.  On appeal, the Fifth Circuit held that the district court committed

---

[9]     *Id*. at 1521:7–9 ("Q. And you would agree with me, sir, she didn't ask you for any other options, true? A. No.").

[10]    *Id*. at 1612:2−17.

[11]    *Id*. at 1801:22−1803:7; 1816:2−11 ("It's hard to say. I may have went to another doctor. I don't know.").

prejudicial error in its jury charge.  *Id.* at *4.  The Court reversed and remanded for a new trial. *Id.*  On remand, before a new trial was held, the district court granted a summary judgment motion filed by the defendants on other grounds.  *Martin II*, 1998 WL 307618, at *1−2.  The Fifth Circuit affirmed the district court's decision during a second appeal.  *Id.*  The Fifth Circuit has since applied this same logic in remanding a reversed judgment for "further proceedings" rather than a new trial.  *Weinhoffer v. Davie Shoring, Inc.*, 23 F.4th 579, 580–81 (5th Cir. 2022) ("Because the district court abused its discretion by improperly admitting evidence and taking judicial notice of the terms, we reverse the judgment of the district court and *remand this case for further proceedings*." (emphasis added)).  So too here, after Sanofi sought clarification of the Fifth Circuit's remand "for a new trial," the Fifth Circuit's mandate remanded for "further proceedings" in accordance with its opinion.

Other circuits have also recognized that summary judgment is proper after remand for a new trial or for "further proceedings" if the requirements for summary judgment are met.  *See United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (granting en banc review to clarify that a panel had discretion to remand for further proceedings rather than only for a new trial); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 83-84 (3d Cir. 2009) (likewise remanding a prejudicial trial ruling requiring vacatur for further proceedings); *Perlmutter v. U.S. Gypsum Co.*, 54 F.3d 659, 662 (10th Cir. 1995) ("Nevertheless, '[a] mandate from [an appellate] court ordering a new trial does not preclude the district court from entering summary judgment if all of the appropriate requirements are met.'" (quoting *Sales v. State Farm Fire & Cas. Co.*, 902 F.2d 933, 936 (11th Cir. 1990))).

The same standard applies post-remand as it did pre-trial.  Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56.  In establishing that there is no genuine dispute as to material facts, the parties may rely upon the record from Plaintiff's trial.  *See Fuqua v. Turner*, 996 F.3d 1140, 1148 (11th Cir. 2021) ("We regard testimony in a judicial proceeding as functionally equivalent to deposition testimony since it is given under oath and with the opportunity for cross-examination. Accordingly, we hold that such testimony can be considered on a motion for summary judgment."); *Conrod v. Davis*, 120 F.2d 92, 95 (8th Cir. 1997) (finding summary judgment should have been granted based on pre-remand trial testimony, and finding trial court erred in believe "law of the case" prevented reconsideration prior ruling).  The party seeking summary judgment initially bears the responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party can meet this burden by pointing out that the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.  *Id.* at 322–23.  Once the moving party has met its burden, the nonmoving party bears the burden of coming forward with evidence of each element of its claim, such that a reasonable jury could find in its favor.  *Id.*  The existence of a mere scintilla of evidence to the support the nonmoving party's position, however, will not defeat summary judgment.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).  Without sufficient evidence on an essential element, summary judgment is warranted.

## **ARGUMENT**

## I.     **PLAINTIFF'S CLAIM FAILS BECAUSE IT IS TIME BARRED.**

### A.     **Plaintiff's Claim Is Facially Prescribed.**

In Louisiana, the prescriptive period for product liability claims is one year from the day the alleged injury is sustained.  La. Civ. Code. Ann. art. 3492; *Thibodeaux*, 995 F.3d at 388.  The prescriptive period for Plaintiff's claim began running in February 2012, six months after she

completed chemotherapy in August 2011.  *See In re Taxotere (Docetaxel) Prods. Liab. Litig. (Earnest)*, 2019 WL 2995897, at *2 (E.D. La. July 9, 2019).  Plaintiff, however, did not file her lawsuit until December 2016, and, as this Court has already ruled, her claim is prescribed on its face.[12]  *Id.*

### B.    Plaintiff Cannot Meet Her Burden to Prove *Contra Non Valentem* Saved Her Untimely Claim.

Where the face of the complaint shows the prescriptive period has already run, the plaintiff bears the burden of proving a suspension or interruption of the prescriptive period.  *Thibodeaux,* 995 F.3d at 388−90.  In exceptional circumstances, *contra non valentem* will suspend the prescriptive period until "the time there is notice enough to call for inquiry about a claim."  *Id.* (internal citation and quotation marks omitted).  The Fifth Circuit held in *Thibodeaux* that where a plaintiff admits she "attributed her initial hair loss to her chemotherapy treatment . . . [it] considers the standard of 'knew or should have known' to mean [she] needed to investigate Taxotere as a potential cause" of her injury.  *Id.* at 393 (internal citation omitted).

Sanofi's initial motion for summary judgment was denied before the Fifth Circuit's decisions in *Thibodeaux* and *Durden* were issued.  This Court accordingly analyzed only whether Plaintiff generally "investigated her injury."[13]  In determining there was a factual dispute as to whether Plaintiff did so, this Court relied on Plaintiff's testimony that, six months after she completed chemotherapy, she asked Dr. Carinder about her hair loss and Dr. Carinder responded that her hair was going to come back.[14]  This Court held that in "[r]elying on her doctor's

---

[12]   Plaintiff did not appeal the ruling that her claim was facially prescribed, and so waived any argument to the contrary.  *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("[A]n issue that could have been but was *not* raised on appeal is forfeited and may not be revisited by the district court on remand.").

[13]   Rec. Doc. 7571 at 8−9.

[14]   *Id*. at 8.

statements, [Plaintiff] acted reasonably in waiting and remaining hopeful for her hair to return."[15]

But the Fifth Circuit has since clarified that neither Plaintiff's general inquiry about her injury nor Dr. Carinder's alleged statement about hair re-growth are sufficient to save an untimely claim. Rather, as the Fifth Circuit held in *Thibodeaux*, a plaintiff is required to investigate *Taxotere* as a cause of her injury for *contra non valentem* to toll the prescriptive period. 995 F.3d at 393; *Durden*, 860 F. App'x at 892; *see also In re Taxotere (Docetaxel) Prod. Liab. Litig. (Plaisance)*, No. 18-8086, 2022 WL 644166, at *4 (E.D. La. Feb. 22, 2022) (applying the Fifth Circuit's decisions and holding "[Plaintiff] attributed her initial hair loss to her chemotherapy treatment, and though she did not know the cause of her persistent hair loss, 'the standard of 'knew or should have known' means she 'needed to investigate [docetaxel] as a potential cause.'").

Like Plaintiff, the plaintiffs in both *Thibodeaux* and *Durden* attributed their hair loss to chemotherapy. *See Thibodeaux*, 995 F.3d at 393 ("Each Appellant testified at her deposition that she attributed her initial hair loss to her chemotherapy treatment"); *see also Durden*, 860 F. App'x at 888 ("[Plaintiff] knew she would lose her hair during chemotherapy, but she did not know the hair loss would be permanent."); *Plaisance*, 2022 WL 644166, at *1. Here, too, Plaintiff testified that she always attributed her hair loss to chemotherapy:

> Q.  And at that time [of your conversation with Dr. Carinder], you believed that the condition of your hair or the lack of regrowth was due to chemotherapy, true?
>
> A. Yes.
>
> Q. And after that date, February or March of 2012, you didn't have any other conversations with Dr. Carinder about why your hair wasn't coming back, true?

---

[15]  *Id*. at 8−9.

A. True.[16]

Like the plaintiffs in *Thibodeaux* and *Durden*, Plaintiff accordingly "needed to investigate Taxotere as a potential cause" of her hair loss, but she did not do so:

> Q. In the eight years since 2011, since you have lost your hair, you haven't asked any of your doctors as to what was the cause of your hair loss, right?
>
> A. No.
>
> Q. You haven't asked any of them whether it was permanent, right?
>
> A. No.[17]

Plaintiff's lack of inquiry into Taxotere as the potential source of hair loss was unreasonable as a matter of law. According to the Fifth Circuit, "key information" alleged in the Master Complaint establishes "that Taxotere as a possible cause of the persistent hair loss was not an obscure possibility" as early as 2006. *Durden*, 860 F. App'x at 892. Diligence accordingly "required that Taxotere be explored as a possible explanation for each plaintiff's persistent hair loss" well before Plaintiff filed suit. *Id.* (internal quotation marks and citation omitted) (emphasis added) (noting Durden's filing date of November 2016); *see also Thibodeaux,* 995 F.3d at 387 (noting filing date of October 2016); *Earnest*, 2019 WL 2995897, at *2 (Plaintiff filed her lawsuit in December 2016). Under the Fifth Circuit's decisions, where a plaintiff "ma[kes] no inquiry into Taxotere as a possible explanation for their persistent hair loss, they ha[ve] not act[ed] reasonably in light of their injuries," *contra non valentem* does not apply, and the prescriptive period is not tolled. *Durden*, 860 F. App'x at 892 (internal quotation marks and citation omitted).

---

[16]   Ex. C, Trial Tr. 1866:1−8; *see also id*. at 1864:12−18 (Plaintiff has never asked any of her doctors about the cause of her hair loss).

[17]   *Id*. at 1864:12−18.

The trial testimony established that no dispute remains on any material issue.  The trial testimony was unequivocal that Plaintiff knew her ongoing hair loss was due to chemotherapy and that she conducted no investigation or diligence to explore Taxotere as a potential cause.  Whether Dr. Carinder told Plaintiff her hair would regrow is no longer relevant.  The Fifth Circuit has held, as a matter of law, that such a statement would not relieve Plaintiff of the duty to investigate Taxotere.  The plaintiff in *Thibodeaux* similarly believed that her hair would regrow, and yet, the Fifth Circuit found that insufficient to save her claims from prescription.  995 F.3d at 388. Likewise, in *Durden* the Fifth Circuit found the Plaintiff's claim was prescribed where she failed to investigate Taxotere, even after "four doctors said [her hair] would grow back."  *See Durden*, 860 F. App'x at 893.  The Fifth Circuit found that such generic statements about hair re-growth, without a diagnosis that plaintiff suffered exclusively from an ailment unrelated to chemotherapy (and that she believed it), were irrelevant.  *Id.*; *see also Plaisance*, 2022 WL 644166, at *1 (Plaintiff's conversation with her doctor did not toll prescription where she "was given no reason to believe her hair loss was attributable to anything other than chemotherapy.").  The same is true here.

Regardless, the trial testimony did not support Plaintiff's argument.  At trial, Dr. Carinder testified not that he told Plaintiff her hair would come back but that he told Plaintiff her ongoing hair loss was *uncommon*:

> Q.  Did you discuss with Mrs. Earnest after she had gone about six months after chemotherapy without her hair returning was there a discussion between you and her that this is unusual?
>
> A.  Yes.
>
> Q.  And did you tell her you were concerned that her hair hadn't grown back after chemotherapy?
>
> A.  I said, "It's not common. It's uncommon to see the hair take this long to come back."

10

Q.  Approximately when would you start to have that conversation with the patient, at what period after treatment?

A.  I would say six to eight months.

Q.  You believe you had that conversation here with Mrs. Earnest?

A.  Yes.[18]

Dr. Carinder further testified that he never told Plaintiff her hair loss was anything but a result of her chemotherapy treatment.[19]   And, Dr. Carinder warned Plaintiff about the possibility of permanent hair loss by telling Plaintiff about another patient who suffered permanent hair loss after undergoing treatment with the same chemotherapy regimen as Plaintiff.[20]

On this record, no reasonable juror could find Plaintiff acted reasonably.[21]  Any statement allegedly made by Dr. Carinder as to hair regrowth is irrelevant.  Plaintiff believed her hair loss was caused by chemotherapy and failed to investigate Taxotere as a cause.  Under *Thibodeaux*, *contra non valentem* cannot apply to save Plaintiff's untimely claim.

## II.    PLAINTIFF'S   CLAIM   FAILS   BECAUSE   SHE   CANNOT   ESTABLISH WARNINGS CAUSATION.

This Court should also enter judgment for Sanofi as a matter of law based on the unrefuted testimony of Dr. Carinder as to his prescribing decisions and the lack of warnings causation.

Plaintiff's warnings claim "must be viewed through the lens of the learned intermediary doctrine, which Louisiana law applies to claims of failure to warn involving drugs or medical

---

[18]    *Id*. at 1587:11−1588:5.

[19]    *Id*. at 1588:6−13.

[20]    *Id*. at 1537:13−1538:5.

[21]    This Court also rejected Sanofi's argument that Plaintiff was constructively aware of the connection between Taxotere and permanent hair loss because she was given a handbook that stated "rare reports of permanent hair loss" had been reported with Taxotere.  Rec. Doc. 7571 at 8.  In so holding, the Court relied on Dr. Marie Celeste Lagarde's testimony that she would have only directed Plaintiff to two sections in the handbook that were unrelated to Taxotere.  *Id*.  At trial, the evidence revealed that Dr. Lagarde left the handbook at her desk for Plaintiff and so could not have directed Plaintiff to only two sections of the handbook. Trial Tr. 1385:6-10.

devices dispensed by a physician." *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 765 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001). Under the learned-intermediary doctrine, "[a prescription drug] manufacturer has no duty to warn the patient, but need only warn the patient's physician," *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991), because the physician "acts as an informed intermediary between the drug company and the patient[,]" *Phillips*, 994 F.3d at 708.

Because a drug manufacturer's duty to warn runs only to the physician, warnings causation turns on "the prescribing physician's decision to prescribe the drug." *Id.* at 709. As the Fifth Circuit has explained, a patient—like Plaintiff—must prove both "(1) a manufacturer's failure to adequately warn the prescribing physician of a risk associated with the product *that the physician did not otherwise know about*, and (2) that the failure to warn was the cause in fact and the proximate, or legal, cause of the plaintiff's injury." *Id.* at 708 (emphasis added); *see also Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 265–66 (5th Cir. 2002)).

This Court denied Sanofi's initial motion for summary judgment on warnings causation.[22] The Court focused on Dr. Carinder's testimony that paclitaxel and docetaxel had similar efficacy and, most significantly, Plaintiff's testimony that she would have wanted to know the side effects of both paclitaxel and docetaxel before making a decision as to which taxane to take.[23] The Court held there was a fact issue on patient choice, and the jury would need to decide "whether [Plaintiff] would have chosen paclitaxel . . . or whether she would have still chosen Taxotere knowing of its risk of permanent alopecia."[24]

---

[22]   Rec. Doc. 7571 at 21.

[23]   *Id.*

[24]   *Id.* (emphasis added).

The Fifth Circuit's rulings in *Phillips* and *Gahan*, together with Dr. Carinder's trial testimony, however, made clear that Plaintiff cannot prove warnings causation on this record.

### A.    Dr. Carinder Knew of the Risk Associated with Taxotere.

Since the Court's first ruling on summary judgment, the Fifth Circuit has clarified the standard for warnings causation under Louisiana law.  In *Phillips*, the Fifth Circuit held that the focus for warnings causation is *solely* on the physician's decision to prescribe the drug at issue. *Id*. at 709 ("[T]o the extent that patient choice is relevant, that relevance is cabined to helping [the Court] decide whether . . . [the doctor's] prescribing decision would have been different had he known that Taxotere's associated risk of alopecia was potentially permanent rather than temporary.").  The Fifth Circuit rejected the plaintiff's argument that the inquiry should focus on "how patient choice . . . would have steered the conversation" as without support under Louisiana law.  *Id*. at 708, 709 n.4.  Accordingly, when a prescribing physician testifies that the allegedly non-disclosed risk would not have materially altered the physician's risk-benefit decision for the drug, a plaintiff cannot avoid summary judgment by claiming she would have chosen a different medicine had she known of the risk.  *Id*. at 708–09.

Plaintiff's prescribing physician Dr. Carinder not only was aware of the general risk of alopecia but also was aware that cases of *permanent* alopecia had been reported with Taxotere.  It is undisputed that Dr. Carinder read the *Nabholtz* Article (published in 2001).[25]  The *Nabholtz* Article identified four patients with persistent hair loss after receiving Taxotere, Adriamycin, and Cytoxan.[26]  Then, in 2005, Dr. Carinder observed that one of his patients experienced permanent hair loss after receiving dose-dense Adriamycin and Cytoxan followed by Taxotere ("AC + T")—

---

[25]    Ex. C, Trial Tr. 1554:11−1556:10.

[26]    *Id*. at 1556:11−24.

the exact regimen he prescribed to Plaintiff in 2011.[27]  Dr. Carinder attributed his patient's lack of

hair regrowth in 2005 to the AC + T regimen.[28]  At trial, Dr. Carinder swore that he "always" told

patients, including Plaintiff, about his 2005 patient.[29]

      Dr. Carinder's knowledge of the risk of permanent alopecia breaks the causal connection

regardless of whether Dr. Carinder, as a learned intermediary, decided to relay this information to

Plaintiff.  As the learned intermediary, Dr. Carinder's awareness of the risk makes it impossible,

as a matter of law, for Plaintiff to establish either that Sanofi had a duty to warn or that an alleged

failure to warn caused Plaintiff's harm.  La. Rev. Stat. Ann. § 9:2800.57B(2) ("A manufacturer is

not required to provide an adequate warning about his product when . . . [t]he user or handler of

the product already knows or reasonably should be expected to know of the characteristic of the

product that may cause damage and the danger of such characteristic."); *see also Phillips*, 994 F.3d

at 709 (Because Dr. Sonnier knew of the side effect of alopecia associated with Taxotere, "Sanofi's

alleged failure-to-warn could not have been the cause of Phillips's injury."); *In re Taxotere*

*(Docetaxel) Prod. Liab. Litig. (Gahan)*, 859 F. App'x 692, 694 (5th Cir. 2021) (affirming summary

judgment in favor of Sanofi where the plaintiff "was specifically aware of the risk of permanent

hair loss because [her prescribing physician] had told her about the three previous patients whose

hair did not regrow" after chemotherapy); *Cooper v. Sams*, 628 So. 2d 1181 (La. App. 3rd Cir.

1993) (affirming summary judgment "where a failure to warn 'could not have caused [a patient's]

injuries . . . because [*the prescribing physician*] already knew of . . . those dangers[.]'") (cited by

*Phillips*, 994 F.3d at 709).

---

[27]  *Id*. at 1532:9−1533:24.

[28]  *Id*. at 1420:13−15 ("Q.  Before you treated Mrs. Earnest, did you have any idea what caused the 2005's patient's hair to be thinner, to not come back?  A.  The chemotherapy.").

[29]  *Id*. at 1537:13−1538:5.

Because Dr. Carinder knew of the alleged risks associated with Taxotere prior to prescribing it to Plaintiff, Sanofi is entitled to judgment on this undisputed fact alone.

**B.      A Different Warning Would Not Have Changed Dr. Carinder's Decision to Prescribe Taxotere to Plaintiff.**

Not only was Dr. Carinder aware of the risk, but as he testified, additional warning language in the Taxotere label about the risk of permanent alopecia would not have changed his "decision to prescribe the drug." *Phillips*, 994 F.3d at 709. Dr. Carinder felt that the AC + T regimen was in Plaintiff's "best interest"[30] because it was "the most effective option."[31] That has not changed. At trial, Dr. Carinder testified that he stood by his prescribing decision for Plaintiff.[32]

Whether non-Taxotere regimens were available to Plaintiff in 2011 has no bearing on the warnings causation analysis. When Dr. Carinder prescribed AC + T to Plaintiff, he did not identify any alternative chemotherapy regimens.[33] *Phillips*, 994 F.3d at 709 ("When Dr. Sonnier prescribed TCH, he identified alternatives, specifically Anthracycline-based therapies."). Plaintiff did elicit testimony from Dr. Carinder at trial that other non-Taxotere regimens were *available*, such as AC + Taxol, FEC + Taxol, FAC, and FEC.[34] But the inquiry is not only whether other chemotherapies were available to Plaintiff in 2011, but whether "a warning of potentially permanent hair loss—as opposed to temporary hair loss—would have led [Dr. Carinder] to prescribe these [regimens] instead of a [Taxotere-based regimen]." *Id.* at 710; *see also id.* at 709 n.4 (cautioning that the question under the learned intermediary doctrine is not "whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with

---

[30]    Ex. C, Trial Tr. at 1612:2−9.

[31]    *Id*. at 1513:19−24.

[32]    *Id*. at 1612:2−17.

[33]    *Id*. at 1520:18−25.

[34]    *Id*. at 1492:19–1493:10, 1494:15–24, 1497:10–18.

Taxotere, whether the patient would have inquired about other options, what the doctor would have recommended, and what decision the plaintiff would have ultimately made.").

Here, Dr. Carinder did not testify that he would have chosen a non-Taxotere regimen instead of a Taxotere regimen had Taxotere included a warning about permanent hair loss in 2011. Instead, Dr. Carinder chose Taxotere over other treatments for specific reasons unrelated to the warning labels.  He chose Taxotere over Taxol because Taxol was not approved for weekly dose-dense use in 2011 and carried serious side effects that Taxotere did not, including neuropathy and severe infusion reactions.[35]  Dr. Carinder also testified that the non-taxane regimens, such as FAC and FEC, carried a lower survival rate.[36]  While those regimens were available in 2011, there is no evidence that an additional warning (of a risk Dr. Carinder already knew) in the Taxotere label would have caused Dr. Carinder not to prescribe Taxotere.  To the contrary, Dr. Carinder testified that he stands by his prescribing decision today.

The mere existence of alternative non-Taxotere regimens has no bearing on Plaintiff's ability to prove warnings causation here.  She cannot do so on this record, and so judgment should now be granted.[37]

---

[35]   Ex. C, Trial Tr. 1525:11–14, 1528:21-24.

[36]   *Id*. at 1523:1–1524:7.

[37]   Dr. Carinder also testified that he did not read any of the versions of Taxotere labeling that came out after 1999 in their entirety (or on alopecia specifically).  *Id*. at 1544:23–1546:6.  That undisputed fact also means Plaintiff cannot establish warnings causation because any inadequacies in Taxotere labeling after 1999 could not have played a causal role in Dr. Carinder's decision.  *See, e.g.*, *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) ("Dr. Collini did not recall ever reading the package insert for the drug . . . .  Her lack of memory, of course, does not preclude the possibility that she had read these materials, but neither can sustain [plaintiff]'s burden.").

C.      There is no "patient choice" issue to consider here.

Finally, although this Court initially considered Plaintiff's own potential choices in connection with its summary judgment ruling in 2019, the Fifth Circuit has since clarified the limited import of such evidence in *Phillips*.   Patient choice evidence

> is cabined to helping [the Court] decide whether [the] evidence . . . is sufficient to introduce a genuine dispute of material fact as to whether [the doctor's] prescribing decision would have been different had *he* known that Taxotere's associated risk of alopecia was potentially permanent rather than temporary.

*Phillips*, 994 F.3d at 709.   In *Phillips*, the oncologist discussed the risk of temporary alopecia and abnormal hair regrowth, yet the patient never investigated or asked about alternatives to avoid the abnormal hair growth or hair loss.   *Id.* at 710.   Instead, the oncologist presented one treatment plan, and the patient "'put her faith in [him],' and consented to treatment." *Id.*

As in *Phillips*, Dr. Carinder and Plaintiff discussed the risk of temporary alopecia and abnormal hair regrowth.[38]   Dr. Carinder also testified that he advised Plaintiff about the possibility of permanent hair loss before she began treatment.[39]   Plaintiff did not investigate or ask about alternatives that might avoid abnormal hair growth or hair loss.[40]   Nor did Dr. Carinder present AC + T to Plaintiff as one of several viable options; rather, AC + T was Dr. Carinder's sole recommendation.[41]   Plaintiff, in turn, did not ask about any side effects of the regimen, including hair loss.[42]   Instead, Plaintiff told Dr. Carinder, "I am in your hands," and consented to treatment.[43]   The undisputed facts show that Dr. Carinder's prescribing decision would not have changed if a

---

[38]   Ex. C, Trial Tr. 1733:9–15.

[39]   *Id.* at 1537:13-1538:5.

[40]   *Id.* at 1521:7-9, 1771:24-1772:4.

[41]   *Id.* at 1520:18-25.

[42]   *Id.* at 1770:21–1771:14.

[43]   *Id.* at 1771:5-8, 1773:21-1774:2.

different label was present—indeed, Plaintiff testified that she "did not know" what decision she would have made had Dr. Carinder discussed other options.[44]

Under *Phillips* and undisputed trial testimony, Plaintiff cannot prove warnings causation, and Sanofi is entitled to judgment as a matter of law.

## III.   PLAINTIFF'S CLAIM FAILS BECAUSE SHE CANNOT PROVE TAXOTERE IS CAPABLE OF CAUSING PCIA.

As this Court already recognized, proving general causation requires proof of both elements of a two-prong test: (1) statistically significant association, and (2) a true causal relationship.[45]  A reasonable jury could not find for Plaintiff on either prong.

Dr. Madigan testified that a statistically significant relationship existed based on his review of two clinical studies:  TAX 316 and TAX 301.[46]  At trial, Dr. Madigan admitted that neither study actually showed a statistically significant relationship between Taxotere and permanent alopecia.[47]  Dr. Madigan was able to find a significant relationship only after combining the two studies into a "meta-analysis," which multiple courts have found inappropriate and should not have been utilized to support Dr. Madigan's conclusions.  *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II)*, 892 F.3d 624, 634 (4th Cir. 2018) ("In re Lipitor II") ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.");  *Freeman v. Hoffman-La Roche, Inc.*, 300 Neb. 47, 911 N.W.2d 591, 596-

---

[44]   *Id*. at 1801:22-1803:7; 1816:2-11 ("It's hard to say. I may have went to another doctor. I don't know."). *Hunt v. McNeil Consumer Healthcare*, 2014 WL 1779471, at *2–3 (E.D. La. May 5, 2014) (J. Milazzo) (granting judgment in favor of defendants and recognizing that in order to establish causation, a plaintiff must *affirmatively* testify that a different warning would have changed her decision to take the drug).

[45]   Rec. Doc. 8094 at 5.

[46]   Ex. C, Trial Tr. 631:14−18.

[47]   *Id*. at 705:8−14; 709:5−11.

98 (2018) (holding that trial court did not abuse its discretion in excluding expert testimony where expert employed inconsistent methodology and "cherry[-]pick[ed] studies from an overwhelmingly contrary body of literature").[48]

Further, on cross-examination about the other data relied on for his conclusions, Dr. Madigan admitted that some of his assumptions about the data could have been incorrect and that he likely included false hits (patients who did not have permanent alopecia) in his conclusions.[49] No reasonable jury could find that Dr. Madigan proved a statistically significant relationship when the undisputed facts show his conclusions were based on false data. *See, e.g.*, *E.R. Squibb & Sons, Inc. v. Stuart Pharms.*, No. 90-cv-1178, 1990 WL 159909, at *15 (D.N.J. Oct. 16, 1990) (rejecting use of a meta-analysis because one of the two studies analyzed was poorly performed); *In re Baycol Prod. Litig.*, 532 F. Supp. 2d 1029, 1041 (D. Minn. 2007) (excluding plaintiffs' expert's meta-analyses due to the insufficiency of the underlying data).

Plaintiff has also failed to identify legally sufficient evidence that a causal relationship exists. Dr. Feigal claimed such a relationship exists after researching the TAX clinical trials and reports of PCIA in the literature.[50] Dr. Feigal admitted, however, that both the clinical trials and the literature reports included patients who took combination regimens that included both A and C.[51] And, during cross-examination, Dr. Feigal admitted that either the A or the C or both can cause and could have caused these patients' "permanent alopecia."[52] Given these concessions

---

[48]  *Id*. at 645:22−646:6; 648:22−24.

[49]  *Id*. at 677:10−678:11; 677:21−25; 685:21−687:1; 687:4−694:10; 702:23−704:3.

[50]  *Id*. at 1189:24−1190:14.

[51]  *Id.* at 1229:19−25; 1231:1−11.

[52]  *Id*. at 1235:22−1236:22 ("It could be either A or C or both" that caused the permanent alopecia in the FAC arm of TAX 316).

about the data relied upon, no reasonable jury could find that Plaintiff established a true causal

relationship through Dr. Feigal.

## IV. PLAINTIFF'S CLAIM FAILS BECAUSE SHE CANNOT PROVE THAT TAXOTERE CAUSED HER PCIA.

In order to meet her burden on specific causation, Plaintiff was required to prove that: (a)

Plaintiff suffers from the injury she alleges, and (b) Plaintiff would not have sustained her injury

"but for" taking Taxotere. *See Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La.

2008); *see also Nagle v. Gusman*, 61 F. Supp. 3d 609, 622 (E.D. La. 2014).[53]   No reasonable jury

could find for Plaintiff on specific causation.

Plaintiff did not meet her burden to prove she suffers from a permanent injury. *See, e.g.*,

*Wainwright v. Fontenot*, 774 So. 2d 70, 77 (La. 2000).  Plaintiff testified that no doctor has ever

told her she has permanent alopecia, and she has never asked.[54]   Plaintiff also testified that in the

eight years since she lost her hair, she has never tried any medication or treatment to see if she

could get her hair to come back.[55]   Dr. Tosti, the only dermatologist who testified in Plaintiff's

case, stated that she *could not say* whether Plaintiff's hair loss would ever improve but that many

of her patients who have tried hair regrowth products see results.[56]   Without ever having tried a

---

[53]  "But for" causation is the standard required by Louisiana law.  The Court in *Earnest* erred by accepting Plaintiff's causation jury instruction, which improperly introduced the concept of "substantial factor" as adequate proof of "proximate cause," and Plaintiff submitted a similar instruction here.  "Substantial factor" is actually an alternative test for *cause in fact*, not proximate cause, and it is not applicable here regardless. *See Nagle*, 61 F. Supp. 3d at 622 ("Louisiana case law is clear that cause-in-fact is usually a 'but for' inquiry.") (citations omitted); *see also Beary v. Deese*, 2018 WL 3417878, at *6 (E.D. La. July 13, 2018) ("'While the term 'substantial factor' has received recognition in the courts of appeal, the 'but-for' test clearly prevails.'" 12 La. Civ. L. Treatise, Tort Law § 4.6 (2d ed.).").

[54]  Ex. C, Trial Tr. 1865:10−18.

[55]  *Id.* at 1868:2−8.

[56]  *Id.* at 1102:5−8 ("Q. All right. Well, Doctor, we can agree that we can't say if Mrs. Earnest could have hair regrowth, some hair regrowth, if she hasn't tried any treatment; is that fair? A. I agree."); *id.* at 1101:5−20.

product that could improve her hair regrowth, Plaintiff cannot establish that she has permanent

alopecia—hair that *will not* grow back.

Similarly, the undisputed facts do not show that Plaintiff's injury was caused by Taxotere.

When a plaintiff is exposed to different substances capable of causing the alleged injury, an

expert's opinion must be "based on or tied to the specific facts and circumstances" of the particular

plaintiff's exposure to the particular substance. *Comardelle v. Pa. Gen. Ins. Co.*, 76 F. Supp. 3d

628, 634 (E.D. La. 2015); *see also Vedros v. Northrop Grumman Shipbuilding, Inc.*, 119 F. Supp.

3d 556, 563–65 (E.D. La. 2015).  At trial, Dr. Tosti concluded Taxotere caused Plaintiff's injury

based on her "personal experience" with Taxotere and her "personal experience with [her]

literature review."[57]  But nothing about other patients with other risk factors and medical histories

is sufficient evidence of specific causation related to Plaintiff.[58]  *Comardelle*, 76 F. Supp. 3d at

635.

Finally, because Plaintiff must prove that she would not have sustained permanent hair loss

"but for" Taxotere, she is required to present evidence that a treatment regimen existed that did

not pose the risk of her injury.  *See generally Stahl*, 283 F.3d at 265–66.  Plaintiff did not—and

cannot—do so.  No expert testimony establishes that, if Plaintiff had taken a different regimen, she

would have avoided the risk of permanent hair loss.  Dr. Plunkett identified permanent hair loss as

---

[57]  *Id*. at 1005:15−18.

[58]  *See* Rec. Doc. 7612 at 6−10.  In ruling on Sanofi's Motion to Exclude Expert Testimony on Specific Causation, Rec. Doc. 8095, the Court incorrectly turned the burden on Sanofi to prove that Dr. Tosti's reliance on medical literature was *unreliable*.  But it was Plaintiff's burden to prove that Dr. Tosti's reliance on medical literature to rule out other drugs was reliable.  *See, e.g.*, *Burst*, 120 F. Supp. 3d at 550; *Moore*, 151 F.3d at 276; *Comardelle*, 76 F. Supp. 3d at 635.

a risk with Taxol,[59] Adriamycin,[60] Cytoxan,[61] and 5-FU.[62]   Dr. Tosti identified reports of permanent alopecia with anthracyclines generally,[63] Adriamycin,[64] Cytoxan,[65] and reports of persistent alopecia with FEC.[66]   And Dr. Feigal identified reports of persistent alopecia with Taxol,[67] Cyclophosphamide,[68] Adriamycin,[69] the AC regimen,[70] and the AC + Taxol regimen.[71] Plaintiff cannot establish that she would not avoided hair loss if she had taken a non-Taxotere regimen.   Instead, the undisputed record shows that other available options posed a risk of permanent or persistent alopecia, so Plaintiff cannot show that but for Taxotere, she would have avoided her injury.   Plaintiff's claim cannot prevail because she cannot establish specific causation.

## CONCLUSION

For the reasons stated above, the Court should grant Sanofi's motion for summary judgment.

---

[59]   Ex. C, Trial Tr. 861:3–6.

[60]   *Id*. at 861:7–10.

[61]   *Id*. at 873:20–25.

[62]   *Id*. at 874:19–21.

[63]   *Id*. at 1030:23–1031:3.

[64]   *Id*. at 1030:6–14.

[65]   *Id*. at 1031:11–16.

[66]   *Id*. at 1058:20–23.

[67]   *Id*. at 1218:5–9.

[68]   *Id*. at 1219:4–6.

[69]   *Id*. at 1219:7–9.

[70]   *Id*. at 1219:14–16.

[71]   *Id*. at 1219:17–24.

Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2022, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*