# EXHIBIT C

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   IN RE:   TAXOTERE (DOCETAXEL)
              PRODUCTS LIABILITY          Docket No.: 16-MD-2740
 6            LITIGATION                   Section "H(5)"
                                          September 18, 2019
 7                                        New Orleans, Louisiana

 8   Relates To:  Barbara Earnest,
     Case No.: 16-CV-17144
 9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12                        DAY 3, MORNING SESSION
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
13          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                      UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                                BY:  DAWN BARRIOS, ESQ.
17                              701 Poydras Street
                                Suite 3650
18                              New Orleans, Louisiana 70139

19

20   For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                  Meunier & Warshauer, LLC
21                              BY:  PALMER LAMBERT, ESQ.
                                2800 Energy Centre
22                              1100 Poydras Street
                                New Orleans, Louisiana 70163
23

24

25

                          OFFICIAL TRANSCRIPT
```

Page 628

1    done that before?
2    A. Yes. As Dr. Kessler described yesterday, it's sort of
3    routine within academic settings to go give talks at other
4    institutions. It's one of the key ways in which ideas get
5    exchanged and so on. So I've given -- I've never counted in
6    up, but it may be hundreds of talks over my career at various
7    universities all over the place. I mean, we're in the South,
8    so maybe I -- you know, I've given talks at University of
9    Florida, Florida State, Vanderbilt, Emory, CDC, and so on. But
10   this is sort of normal academic interchange that I've engaged
11   in quite a lot.
12   Q. Well, we're in Tiger country, so we might want to get you
13   to LSU soon.
14   A. I'd like that.
15   Q. Do you still teach statistics and biostatistics at
16   Columbia?
17   A. Yes, I do.
18   Q. On what level do you teach? Do you teach undergraduates,
19   graduates, doctoral students?
20   A. All of the above. Not in any one year, but, you know,
21   over a period of time. I teach undergraduates courses,
22   master's courses and Ph.D. courses.
23   Q. Well, the methods that we're going to talk a little bit
24   about today in this courtroom, do you teach those methods to
25   your students at Columbia?

Page 629

1    A. Sure. I do.
2    Q. Have you ever taught those methods to persons or groups
3    outside of the university setting?
4    A. Yes. So, over the years, I've taught quite a few --
5    they're typically called short courses, sort of like a half-day
6    course or a one-day course, on drug safety -- on statistical
7    methods for drug safety. So I've taught those at a number of
8    conferences over the years. It's typical to have a tutorial
9    program or a short course program at a conference.
10       I've also taught such courses for pharmaceutical
11   companies, quite a number of them over the years, including
12   Sanofi, in the company setting.
13   Q. Again, the statistical methods and biostatistical analyses
14   that we're going to hear about today, did you teach those same
15   principles and methods that we're going to hear in this
16   courtroom to Sanofi when you did that short course for them?
17   A. Sure, I did.
18       MR. MICELI: Your Honor, I would like to tender
19   Dr. Madigan as an expert in biostatistics, statistics,
20   pharmacovigilance and safety.
21       THE COURT: Any objection?
22       MR. PATERSON: No objection, Your Honor.
23       MR. MICELI: Thank you.
24       THE COURT: The Court is going to accept Dr. Madigan as
25   an expert in the field in the biostatistics, statistics,

Page 630

1    pharmacovigilance and safety, qualified to render an opinion in
2    those areas.
3        Please proceed.
4        MR. MICELI: Thank you.
5            DIRECT EXAMINATION
6    BY MR. MICELI:
7    Q. Dr. Madigan, at my request, did you investigate the
8    chemotherapy drug Taxotere?
9    A. Yes, I did.
10   Q. You might want to speak a little closer to that
11   microphone.
12       Will you please tell the jury what your investigation
13   included.
14   A. So I considered three strands of evidence pertaining to
15   the question of Taxotere and irreversible hair loss.
16       So, first and foremost, I considered the
17   clinical trials that we heard Dr. Kessler talk about. I also
18   considered a government run, if you will, drug safety database
19   called FAERS. I conducted an analysis in that database. Then
20   I also looked at the company's internal pharmacovigilance
21   database, their own drug safety database.
22       MR. MICELI: Your Honor, I would like to put on the
23   screen so the jury knows where we're going.
24       THE COURT: That's fine. Is there any objection?
25       MR. PATERSON: It's fine.

Page 631

1        THE COURT: Thank you.
2    EXAMINATION BY MR. MICELI:
3    Q. Dr. Madigan, I'm going to put up a little road map, just
4    to keep us oriented as to where we're going traveling down this
5    road of your testimony.
6        We've talked about your education and your
7    qualifications. The first thing that you said you looked at
8    were the clinical studies. I believe you said you did a
9    meta-analysis; is that true?
10   A. I don't think I said that, but it is true that I did it,
11   yes.
12   Q. I'm sorry. Well, I built the road sign incorrectly. I
13   apologize.
14       You mentioned that you looked at Sanofi's
15   clinical trial data. Can you tell the jury and the Court which
16   clinical trials you reviewed?
17   A. So I reviewed two randomized control trials that
18   Dr. Kessler actually discussed yesterday, TAX316 and TAX301.
19   Q. Can you tell the jury just a little bit about the studies
20   that you reviewed?
21   A. So these two randomized controlled trials were very, very
22   similar. So they were -- the design of these studies was very
23   similar, except for one particular difference. But in both
24   cases, the subjects in the studies were randomly assigned to
25   either TAC or FAC. So TAC being Taxotere plus two other drugs,

Page 644

1  familiar with how Sanofi recorded data?
2  A. Sure.
3  Q. Is that represented in their final clinical study trial
4  data, that locked set that you were talking about?
5  A. Yes.
6  Q. How many patients did Sanofi record in the final
7  clinical study data, the locked data, with ongoing persistent
8  or permanent alopecia as of the end of the ten-year followup in
9  TAX316?
10  A. So in 316, on the T arm, the Taxotere arm, there are
11  29 patients in there who had -- they refer to it in their
12  documents as ongoing alopecia. So that was -- yeah, at the end
13  of the study.
14  Q. Were you able to reproduce those numbers when you ran
15  analyses based upon how Sanofi did them as well?
16  A. Yes, I can absolutely reproduce the numbers in their
17  clinical study report.
18  Q. Were you able to verify the length of followup for these
19  patients with ongoing persist permanent hair loss?
20  A. Yes.
21  Q. How many of those patients were represented in the final
22  clinical study data as having followup less than six months?
23  A. So of the 29 patients with ongoing hair loss at the end of
24  the study, of the 29 one of those patients had a followup of
25  less than six months. It was 117 days for one patient.

Page 645

1  Q. Now, is that the 29 that are represented in that -- I want
2  to make sure I get the term right -- the definitive
3  representations of Sanofi?
4  A. Yes.
5  Q. Thank you.
6      Dr. Madigan, now that we have Sanofi's final verified
7  clinical study trial data, and you understand how they were
8  recording it, are there statistical tools that provide you an
9  opportunity to get some level of certainty in what you're
10  looking at is actually a real effect?
11  A. Yes. So there's -- in this particular context, because
12  there is more than one trial -- which is typical -- the
13  particular type of statistical analysis that is appropriate is
14  something called a meta-analysis.
15      So I conducted a meta-analysis of the trials to
16  estimate the treatment effect, the effect of Taxotere.
17  Q. Once you do that, is there a way that you can look to
18  see -- you talked about play of chance and such earlier. Is
19  there a way you can rule out play of chance?
20  A. Yes. So --
21  Q. How -- I'm sorry. Please explain that.
22  A. So the meta-analysis that I conducted the analysis of, the
23  clinical trials, shows an effect size -- something called a
24  relative risk of 1.85. So it's close to a doubling of the risk
25  of irreversible hair loss on Taxotere, as compared with the

Page 646

1  other arm of the study.
2      This finding was statistically significant. So it
3  is -- by conventional standards, you cannot attribute this to
4  the play of chance. The difference between the two arms is
5  large enough that that can't be chance alone. There is a real
6  causal effect here.
7  Q. That's in the TAX316 data?
8  A. No, that's the meta-analysis.
9  Q. Oh, that's the meta-analysis. I'm sorry. You're going to
10  learn just how bad my handwriting is.
11      Now, the meta-analysis was of TAX316 and TAX301?
12  A. Yes, the totality of the evidence -- of the studies.
13  Q. So TAX316, you said they had -- in the TAC arm, they had
14  29?
15  A. Correct.
16  Q. Am I able to get all that on there?
17      And in the FAC arm, you had 16?
18  A. That's correct.
19  Q. This is based on what you referred to as the definitive --
20  make sure I get this right -- definitive representation of
21  Sanofi, correct?
22  A. Yes.
23  Q. Now, the TAX301, did you determine what the definitive
24  representation of Sanofi was there in the final clinical study
25  data that was locked?

Page 647

1  A. So the numbers -- the equivalent numbers for TAX301 -- the
2  followup was more limited in 301, so the equivalent numbers are
3  3 on TAC and 1 on FAC.
4  Q. You said they were a little bit more limited. And I'm
5  just going to put "DR," definitive rep of Sanofi.
6      Now, you said something about more limited followup.
7  Let me ask you: Did you determine how many clinical study
8  centers there were that conducted TAX301?
9  A. Sure. So both of these are, I suppose, called multicenter
10  studies. When you're trying to recruit a thousand-plus
11  patients, you generally have to recruit patients from all over
12  the world, from different centers. So there were actually 55
13  different -- for 301, there were 55 different sites or centers
14  from around the world where they recruited and randomized
15  patients.
16  Q. Did you investigate how many of those centers followed
17  patients and reported adverse events, including permanent
18  alopecia?
19  A. Of the 55 centers, only 12 of them report anything about
20  hair loss in followup.
21  Q. So only 12 of 55 are reported, right?
22  A. That's correct.
23      MR. MICELI: Sorry, Judge.
24  EXAMINATION BY MR. MICELI:
25  Q. Is it with these numbers, these definitive represented

Page 648

1    numbers, that you conducted your meta-analysis?
2    A.  Yes.  There are other numbers involved as well, but these
3    are the primary inputs to the meta-analysis.
4    Q.  Of the individuals that reported persisting permanent
5    ongoing hair loss, these were the numbers of those patients?
6    A.  Yes.
7    Q.  Now, before we sort of move on to talk more about these,
8    is meta-analysis a recognized statistical tool in your
9    industry?
10   A.  Absolutely.
11   Q.  Is it something you teach at the college level?
12   A.  It's something I teach.  It's something I published about.
13   It's something I do in my consulting for pharmacology
14   companies.  Meta-analysis of sets of randomized trials, that's
15   as good as it gets in terms of the quality of evidence.
16   Q.  Now, we're looking at two studies put together in a
17   meta-analysis.  Is it appropriate in this particular
18   circumstance to combine these two studies into a meta-analysis?
19   A.  Absolutely.  They are about as similar a pair of studies
20   as you're likely to encounter.
21   Q.  Please tell the jury the results of your meta-analysis.
22   A.  As I said already, there was a statistically significant
23   elevated risk of irreversible hair loss on Taxotere; and from
24   this, I infer that Taxotere causes irreversible hair loss.
25   Q.  Okay.  Dr. Madigan, when you say you infer that Taxotere

Page 649

1    causes permanent hair loss, because what we're going to hear in
2    this courtroom, have you reached an opinion to a reasonable
3    degree of scientific certainty that Taxotere causes permanent
4    hair loss?
5    A.  Absolutely, yes.
6    Q.  I'm going to move up the road a little bit from the
7    meta-analysis.  I want to go to your next item, which is the
8    FAERS analysis.  You mentioned earlier you conducted an
9    analysis of the FAERS database.  Can you tell the jury what
10   that is?
11   A.  Maybe as a kind of preamble, the analysis of the
12   randomized controlled trials is the centerpiece of what I did,
13   but it's good statistical practice to look at other sources of
14   evidence.  What we're about to talk about, FAERS, is one of
15   those.  But it's supportive.  It's not in and of itself
16   definitive, unlike the clinical trials.  It's qualitatively
17   different from the clinical trials.  It's limited in various
18   ways, which I'm happy to talk about, but that side you asked --
19   what is it, I suppose, is what you asked.
20   Q.  Let's try to slow down.  I want to make sure, because I'm
21   with you, I talk fast, Dr. Madigan.  But can you explain to us
22   what the -- first just explain to us what FAERS database
23   is.
24   A.  Sure.  It's a voluntary adverse event reporting system.
25   So if you take a medication and you believe it has caused a

Page 650

1    side effect, you can submit that information on a form to this
2    database.  It's maintained by the government, by the FDA.  But
3    it's publicly available.
4        If you go to your doctor or nurse or whatever, then
5    that person might submit a report and, in particular, if you
6    call or your doctor calls the pharmaceutical companies, they
7    have a duty to report to this database.
8        So reports flow into FAERS, the FDA Adverse Event
9    Reporting System.  Reports flow in over time.  As of the end of
10   June, there is about 13 million reports in this database, so
11   it's a very important data source for public health and for
12   understanding drug safety.
13       And statistical techniques for analyzing these data
14   have been developed by people like me and others over a number
15   of years that are now widely used, you know, by -- every
16   pharmacology company, essentially, is analyzing -- uses these
17   statistical methods to analyze these data.
18       There's kind of two major use cases that you might
19   distinguish.  One is pharmaceutical companies use these
20   databases prospectively to identify potential signals, meaning
21   they will look at a broad range of drugs and adverse events to
22   see:  Is anything popping up?  Is there anything we should be
23   worrying about?  That's one use of these data.  That's
24   perfectly legitimate.
25       A different use that is more akin to what I'm doing

Page 651

1    here is retrospectively.  If an issue arises from one source or
2    another that you're concerned about, it's routine practice to
3    look -- to analyze the FAERS database to see:  What does that
4    database have to say about this issue?
5        That's more akin to -- that's the nature of what I'm
6    doing here.  That's a specific concern.
7    Q.  Is the use of the FAERS database for the purposes you just
8    mentioned, is that limited to the United States?
9    A.  No.
10   Q.  People from all over the world can use it?
11   A.  Absolutely.  The data are on the FDA website.  You can
12   download them.
13   Q.  How do you perform your safety investigation in the FAERS
14   database?  How do you actually go about doing it?
15   A.  So, to conduct a kind of analysis I'm doing here, which is
16   very routine, you need to define an outcome.  What is the issue
17   that you're concerned about.  You need to define -- it's called
18   a target outcome.  You need to define a target drug, the drug
19   that you're studying.
20       And then typically, and certainly in my practice and
21   the one that I published about, you typically also look at some
22   comparator drugs.  You also look at the relationship between
23   related drugs and the outcome, for various reasons.
24   Q.  And what -- do you just select any term you want to look
25   at through the FAERS database?

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION     *      Docket No.: 16-MD-2740
                                  *      Section "H(5)"
                                  *      New Orleans, Louisiana
*Relates to:  Barbara Earnest*    *      September 18, 2019
*Case No.: 16-CV-17144*           *
* * * * * * * * * * * * * * * * * *


DAY 3 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139



For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163



For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

Page 9

674

DAVID MADIGAN - CROSS

12:50PM 1  counsel to you?  Correct?

12:50PM 2  A.   Yes.

12:50PM 3  Q.   And you don't have an opinion as to whether or not those

12:50PM 4  search terms were actually the appropriate search terms to find

12:50PM 5  or define "permanent alopecia"; correct?

12:50PM 6  A.   Not from a medical point of view, but I think there

12:50PM 7  were -- I added what I refer to as linguistic variations of

12:50PM 8  some of these search terms, just -- not any medical expertise,

12:50PM 9  just English to those search terms.

12:51PM 10  Q.   Okay.  And a high-level term -- I think we may have even

12:51PM 11  heard a little bit about that.

12:51PM 12      But a high-level term in the database you were

12:51PM 13  searching had "alopecia" as a high-level term; correct?

12:51PM 14  A.   I'm not following you.

12:51PM 15  Q.   Is that in the FAERS database?

12:51PM 16      Well, let me do if this way.

12:51PM 17      So you had all of Sanofi's alopecia reports to search

12:51PM 18  through; correct?

12:51PM 19  A.   Yes.

12:51PM 20  Q.   Okay.  And then you took this collection of search terms

12:51PM 21  that you got from Dr. Tosti, and you searched through this -- I

12:51PM 22  think you said there was like 2,000 of them, something like

12:51PM 23  that; correct?

12:51PM 24      And then you filtered them through these search

12:51PM 25  terms, and you ended up with the number that Mr. Miceli showed

OFFICIAL TRANSCRIPT

Page 10

675

DAVID MADIGAN - CROSS

12:51PM 1  you today up to 2011; correct?

12:51PM 2  A.   Yes.

12:51PM 3  Q.   Okay.  And you know, in the internal database, that there

12:51PM 4  can be more than one event that's listed in an internal report;

12:51PM 5  correct?

12:51PM 6  A.   More than one event listed?  You mean there's a narrative?

12:52PM 7  Q.   Yes, there's a narrative.

12:52PM 8      For example, if somebody put into the internal

12:52PM 9  database that they had a complaint of alopecia, they could also

12:52PM 10  put into the internal database that they had a complaint about

12:52PM 11  a headache or a complaint about joint pain; correct?

12:52PM 12  A.   Yes.

12:52PM 13  Q.   Okay.  And so the search terms that you used included the

12:52PM 14  terms "permanent," "irreversible," "chronic," "persistent," and

12:52PM 15  then several others; correct?

12:52PM 16  A.   Right.  Can I modify that a little bit, though?

12:52PM 17      So what I did was in -- in looking for the

12:52PM 18  linguistic variants on some of the search terms that Dr. Tosti

12:52PM 19  provided, I modified some of these.  It's in my report.

12:52PM 20      So, for example, I had "chronic" -- I didn't look for

12:52PM 21  just the word "chronic."  I looked for "chronic" followed by

12:52PM 22  "hair loss," or "chronic" followed by "alopecia," for example.

12:52PM 23  Q.   But what we know is that there's nothing preventing you

12:53PM 24  from turning up a report of somebody that actually had

12:53PM 25  temporary alopecia but chronic back pain; correct?  That could

OFFICIAL TRANSCRIPT

Page 11

676

DAVID MADIGAN - CROSS

12:53PM 1  happen?

12:53PM 2  A.   That can't happen because it's -- "chronic hair loss" or

12:53PM 3  "chronic alopecia" is what I searched for.

12:53PM 4  Q.   Well, Doctor, did you go look at any one of those

12:53PM 5  168 reports?

12:53PM 6  A.   I looked at all 2,174.

12:53PM 7  Q.   Well, Doctor, you said there's a narrative; correct?

12:53PM 8  A.   Yes.

12:53PM 9  Q.   Did you actually pull the narrative and go through it?

12:53PM 10  A.   Yes.

12:53PM 11  Q.   And did you determine that every single one of those 164

12:53PM 12  actually were cases -- 168 were actually cases of persistent

12:53PM 13  hair loss?

12:53PM 14  A.   No.  That's not my expertise, but I don't think there any

12:53PM 15  false positives in there.  If there are one or two of them,

12:53PM 16  were that wouldn't surprise me.  But I think, in general, there

12:53PM 17  aren't.

12:54PM 18  Q.   Okay.  Doctor, do you have your report in front of you?

12:54PM 19  A.   No.

12:54PM 20      MR. STRONGMAN:  May I approach the witness, Your

12:54PM 21  Honor?

12:54PM 22      THE COURT:  Yes, you may.

12:54PM 23      THE WITNESS:  Thank you.

12:54PM 24      MR. MICELI:  Your Honor, I hate to be intrusive, but

12:54PM 25  I'm just going to get my binder so I can follow along with him.

OFFICIAL TRANSCRIPT

Page 12

677

DAVID MADIGAN - CROSS

12:54PM 1      THE COURT:  Sure.

12:54PM 2  BY MR. STRONGMAN:

12:55PM 3  Q.   All right.  Doctor, give me a second.

12:55PM 4      All right.  I want you to look in your report with me

12:55PM 5  at Table 4.

12:55PM 6  A.   Yep, I'm there.

12:55PM 7  Q.   So Table 4 in your report actually is the table that you

12:55PM 8  generated from the internal database; correct?

12:55PM 9  A.   Yes.

12:55PM 10  Q.   Okay.  Now, Doctor, if there is a report with a

12:55PM 11  higher-level term of permanent "alopecia" and, in that

12:55PM 12  narrative, there's a comment that this individual's headache is

12:55PM 13  permanent, that report would be counted in Table 4; correct?

12:56PM 14  A.   That could happen.

12:56PM 15  Q.   And, in fact, what we know is that you never went through

12:56PM 16  and verified that any of those reports that Mr. Miceli

12:56PM 17  listed actually meet the definition of irreversible hair loss,

12:56PM 18  which means six months or more?  You didn't do that analysis;

12:56PM 19  correct?

12:56PM 20  A.   Correct.  I applied Dr. Tosti's search terms.  That's it.

12:56PM 21  Q.   And, Doctor, out of the 168 reports in the internal

12:56PM 22  database, you can't sit here today and say how much actually

12:56PM 23  had their alopecia resolved; correct?

12:56PM 24  A.   Had their alopecia resolved ultimately?

12:56PM 25  Q.   Correct.

OFFICIAL TRANSCRIPT

## Page 17

682

DAVID MADIGAN - CROSS

1:03PM 1  here that says, "Describe event or problem."

1:03PM 2  A.  That's not the box we're talking about.  Sorry.  Beg your

1:03PM 3  pardon.

1:03PM 4  Q.  So Step 1, we're going to talk about alopecia as a

1:03PM 5  high-level term first.  Okay?

1:03PM 6  A.  Is it okay if I come down?

1:03PM 7  Q.  Absolutely.  Come on down.

1:03PM 8       THE COURT:  Do we have this in a mechanism that puts

1:03PM 9  it on a computer instead or no?

1:03PM 10      MR. STRONGMAN:  Well, I'm going to write on it.

1:04PM 11      THE COURT:  Okay.  Thank you.

1:04PM 12      MR. STRONGMAN:  But I could give you a paper copy.

1:04PM 13  BY MR. STRONGMAN:

1:04PM 14  Q.  All right.  So, Doctor, let's move down the form.  How

1:04PM 15  about that.

1:04PM 16  A.  Sure.

1:04PM 17  Q.  Let's do that first.

1:04PM 18      So what we've got here is the "Outcome" box right up

1:04PM 19  here; right?

1:04PM 20  A.  Yes, so this, yeah, collection of boxes.

1:04PM 21  Q.  And there's a whole collection of options; isn't that

1:04PM 22  right?

1:04PM 23  A.  Sure.

1:04PM 24  Q.  Right.  And there's "death," "life-threatening."

1:04PM 25      And then over here and a box, "Disability or

OFFICIAL TRANSCRIPT

## Page 18

683

DAVID MADIGAN - CROSS

1:04PM 1  permanent damage."  Correct?

1:04PM 2  A.  Yes.

1:04PM 3  Q.  And when the person fills out this form -- and, by the

1:04PM 4  way, this form could be filled out by any number of different

1:04PM 5  types of people; correct?

1:04PM 6  A.  Correct.

1:04PM 7  Q.  It could be filled out by a doctor; it could be filled out

1:04PM 8  by a patient --

1:04PM 9  A.  Sure.

1:04PM 10  Q.  Right.  And there's no limitation on the number of boxes

1:04PM 11  that could be checked?

1:04PM 12  A.  That's correct.

1:04PM 13  Q.  Okay.  And then over here, we have a box for "Product."

1:04PM 14  A.  Yes.

1:04PM 15  Q.  And there's -- the top two box -- the two top lines

1:04PM 16  are for the name of a product.

1:05PM 17      And then down here, there's a place where you could

1:05PM 18  put concomitant medications as well; is that correct?

1:05PM 19  A.  Yes.

1:05PM 20  Q.  So this one is sort of the primary product identified; is

1:05PM 21  that fair?

1:05PM 22  A.  Sure.

1:05PM 23  Q.  And when you did your search of this database, what you

1:05PM 24  looked for as a Taxotere showing up either in the concomitant box

1:05PM 25  or up here in this section; is that correct?

OFFICIAL TRANSCRIPT

## Page 19

684

DAVID MADIGAN - CROSS

1:05PM 1  A.  Right.  I've done it both ways.  The results are very

1:05PM 2  similar, whether you just restrict it to here or you include

1:05PM 3  both drugs here and here.

1:05PM 4  Q.  Very good.  And then you were also looking for reports

1:05PM 5  that obviously had the term "alopecia" in them; correct?

1:05PM 6  A.  They were coded to the higher-level term "alopecias."

1:05PM 7  Q.  And the higher-level term for permanent "alopecias" is --

1:05PM 8  comes from what's called like a medical -- it's called MedDRA?

1:05PM 9  A.  Yes.

1:05PM 10  Q.  What does MedDRA stand for?

1:06PM 11      MR. RATLIFF:  Medical Dictionary for Regulatory

1:06PM 12  Affairs, I think.

1:06PM 13  BY MR. STRONGMAN:

1:06PM 14  Q.  Okay.  And MedDRA is a dictionary, and it has all of these

1:06PM 15  terms in it; correct?

1:06PM 16  A.  Sure.

1:06PM 17  Q.  And then you have a high-level term, and then under it are

1:06PM 18  a bunch of -- are they called preferred terms?  Is it the next

1:06PM 19  level down?

1:06PM 20  A.  Yes.

1:06PM 21  Q.  So "alopecia" is the broadest term --

1:06PM 22  A.  No.

1:06PM 23  Q.  -- in that category of alopecia; correct?

1:06PM 24  A.  I'm probably agreeing with you.  It's organized

1:06PM 25  hierarchically.  So there are preferred terms, which there are

OFFICIAL TRANSCRIPT

## Page 20

685

DAVID MADIGAN - CROSS

1:06PM 1  tens of thousands of them.  And they're grouped into

1:06PM 2  higher-level terms.  And, in turn, those higher-level terms are

1:06PM 3  grouped into higher-level group terms.  And they're grouped

1:06PM 4  into a system.  So it's organized in a tree.

1:06PM 5      So I'm basically agreeing with you.  So I'm at one

1:06PM 6  level up -- I was following Sanofi.  That's why I did it this

1:06PM 7  way.  I'm one level up in the tree.  So there's a higher-level

1:06PM 8  term called "alopecias," and under there are about a dozen or

1:06PM 9  so preferred terms for different kinds of alopecia.

1:07PM 10  Q.  And when a report like this is made, there can be several

1:07PM 11  higher-level terms identified in one report; correct?

1:07PM 12  A.  There can be, yes.  Sometimes yes; sometimes no.

1:07PM 13  Q.  Right.  So I could report on this form that the patient

1:07PM 14  had alopecia that the patient had liver problems, that the

1:07PM 15  patient had neuropathy.

1:07PM 16      I could report all of those on the same form;

1:07PM 17  correct?

1:07PM 18  A.  That can happen.

1:07PM 19  Q.  I can report that the patient passed away; correct?

1:07PM 20  A.  Yeah, you could.

1:07PM 21  Q.  Okay.  And this outcome box up here, the disability or

1:07PM 22  permanent damage, is not inherently tied to any one specific

1:07PM 23  high-level term; correct?

1:07PM 24  A.  Correct.

1:07PM 25  Q.  And so let's walk through just a couple of examples.  Is

OFFICIAL TRANSCRIPT

Page 21

686

DAVID MADIGAN - CROSS

1:07PM 1  that okay?

1:07PM 2  A.  Sure.

1:07PM 3  Q.  Don't want to use the permanent marker on a dry-erase

1:08PM 4  board.

1:08PM 5      Okay.  So we've got Taxotere up there as the product;

1:08PM 6  fair enough?

1:08PM 7  A.  Yes.

1:08PM 8  Q.  Okay.  We've got "alopecia" here as a high-level term;

1:08PM 9  fair enough?

1:08PM 10  A.  Yes.

1:08PM 11  Q.  Okay.  And we've got a "disability or permanent damage"

1:08PM 12  box checked; correct?

1:08PM 13  A.  Sure.

1:08PM 14  Q.  Now, we could also have an event in there, something like

1:08PM 15  organ failure?

1:08PM 16  A.  That could happen.

1:08PM 17  Q.  Okay.  And if you read the narrative, you could actually

1:08PM 18  see that it could say -- it could say, "Alopecia on treatment,

1:09PM 19  organ failure ongoing."  Correct?

1:09PM 20  A.  That could happen.

1:09PM 21  Q.  And so what we know is that, if you actually look, if

1:09PM 22  you're having alopecia while you're on the treatment and you're

1:09PM 23  having ongoing organ failure that could result in permanent

1:09PM 24  damage, that's still going to generate a positive number in

1:09PM 25  your search; correct?

OFFICIAL TRANSCRIPT

Page 22

687

DAVID MADIGAN - CROSS

1:09PM 1  A.  That could happen.  It'll happen in the foreground and the

1:09PM 2  background, as I'm looking at a ratio.  So it could happen on

1:09PM 3  the drug; it could happen on the comparator.

1:09PM 4  Q.  Right.  And so your analysis, your methodology, didn't do

1:09PM 5  anything to eliminate this circumstance from happening;

1:09PM 6  correct?

1:09PM 7  A.  So there's no -- with the kind of analysis I'm doing, I

1:09PM 8  said there were limitations.  There is one of the limitations.

1:09PM 9  So, you know, I mentioned earlier today that it's routine, for

1:09PM 10  example, to look at things like cardiovascular death.  Same

1:09PM 11  issue arises.  So you can't be certain that the death is due to

1:10PM 12  a cardiovascular event.

1:10PM 13      Now, I will say that, in more than half of the

1:10PM 14  reports that enter into my set --

1:10PM 15  Q.  Doctor, could you focus on my question.

1:10PM 16  A.  Sorry.

1:10PM 17  Q.  I know.  We're getting along, but it's still a little bit

1:10PM 18  of a cross.  So just focus on my question.

1:10PM 19      So another example, so we have the "disability or

1:10PM 20  permanent damage" box checked.  Okay?

1:10PM 21  A.  Sure.

1:10PM 22  Q.  Over here -- over here, we have the suspect drug primary

1:10PM 23  as Arimidex.  Okay.

1:10PM 24      Are you with me so far?

1:10PM 25  A.  Uh-huh.

OFFICIAL TRANSCRIPT

Page 23

688

DAVID MADIGAN - CROSS

1:10PM 1  Q.  And then down here, we have concomitant medications,

1:10PM 2  Taxotere.

1:10PM 3  A.  I see that.

1:10PM 4  Q.  And your search would pick up this because Taxotere is in

1:10PM 5  this box; true?

1:10PM 6  A.  Like I said, I've done it both ways.

1:10PM 7  Q.  Yeah.  And what we know is that -- so if we had a report

1:11PM 8  that reported alopecia on hormone therapy, disability box

1:11PM 9  checked, this would generate a positive result in your

1:11PM 10  analysis; correct?

1:11PM 11  A.  You're right.  That could happen.

1:11PM 12  Q.  And your methodology didn't do -- and just so we know

1:11PM 13  Arimidex is a hormone therapy?

1:11PM 14  A.  I don't know.

1:11PM 15  Q.  You don't know?

1:11PM 16      Taxotere is not a hormone therapy; correct?

1:11PM 17  A.  That's what I understand.

1:11PM 18  Q.  And, in fact, if we went and actually pulled it -- and

1:11PM 19  what if it said alopecia on hormone therapy -- "alopecia

1:11PM 20  resolved after treatment of Taxotere" -- let's just say it said

1:11PM 21  that.

1:11PM 22  A.  You're right.  That could happen.

1:11PM 23  Q.  And your search terms would still -- your methodology

1:12PM 24  would still generate a positive result; correct?

1:12PM 25  A.  Sure.  For about half of them, alopecia is the only event.

OFFICIAL TRANSCRIPT

Page 24

689

DAVID MADIGAN - CROSS

1:12PM 1  We can be certain in the other.  In others, you're right,

1:12PM 2  there's uncertainty.

1:12PM 3  Q.  And these are the inherent weaknesses in this type of

1:12PM 4  analysis; correct?

1:12PM 5  A.  It's a limitation.

1:12PM 6  Q.  Yeah.  And the fact of the matter is you didn't pull any

1:12PM 7  of these individual reports and look at them; correct?

1:12PM 8  A.  So my analysis involves every report in the database.  So

1:12PM 9  there's four numbers that go into the analysis.

1:12PM 10      So you'd have to pull 13 million reports and look at

1:12PM 11  narrative on every one of them.  It's conceivable.  That's not

1:12PM 12  what a statistician does.  So I'm doing a statistical analysis

1:12PM 13  of these data with the limitations that it has.

1:12PM 14  Q.  I understand, Doctor, that you are a man of statistics.

1:12PM 15  Fair enough?

1:12PM 16  A.  I'm a statistician.

1:12PM 17  Q.  You're a well-qualified statistician, but you're not a man

1:12PM 18  of medicine; correct?

1:13PM 19  A.  Yes, I'm not a medical doctor.

1:13PM 20  Q.  Okay.  And what we know, though, is that, when you did

1:13PM 21  your analysis -- so you showed the jury, with Mr. Miceli, a

1:13PM 22  chart; right?  And it had a line on it -- it had a bunch of

1:13PM 23  lines on it.

1:13PM 24  A.  FAERS.

1:13PM 25  Q.  It was the FAERS database chart.

OFFICIAL TRANSCRIPT

6 (Pages 21 to 24)

Page 25

690

DAVID MADIGAN - CROSS

1:13PM 1 A.  Sure.

1:13PM 2 Q.  There's numbers behinds that chart; correct?

1:13PM 3 A.  Yes.

1:13PM 4 Q.  Okay.  And your chart had from, you know, a certain date

1:13PM 5 up to 2011 and then had the lines.  And then there's numbers of

1:13PM 6 reports that you hit on that are underlying that chart;

1:13PM 7 correct?

1:13PM 8 A.  You know, every report in the database enters into that

1:13PM 9 calculation.

1:13PM10 Q.  So, Dr. Madigan, with regard to this FAERS analysis, from

1:13PM11 1996 up through 2011, was your search time-limited going

1:13PM12 backwards?

1:13PM13 A.  No.  It begins at the beginning of the database.  There's

1:13PM14 not essentially anything happening more or less prior to -- I

1:14PM15 start the graph in 2000.

1:14PM16 Q.  Right.  But you searched the data all the way back to --

1:14PM17 when did the database begin?

1:14PM18 A.  1969.

1:14PM19      THE WITNESS:  Should I go back to my chair?

1:14PM20      THE COURT:  Are we finished?

1:14PM21      MR. STRONGMAN:  You may.  We can stay down here if

1:14PM22 you want, but you may.

1:14PM23 BY MR. STRONGMAN:

1:14PM24 Q.  So you understand Taxotere came onto the market in 1996?

1:14PM25 A.  Yes, I think so.

OFFICIAL TRANSCRIPT

---

Page 26

691

DAVID MADIGAN - CROSS

1:14PM 1 Q.  Okay.  And your analysis that you showed -- this is the

1:14PM 2 FAERS analysis the internal database analysis that you showed,

1:14PM 3 and it had those lines.  That analysis went all the way up to

1:14PM 4 2011.

1:14PM 5      So we can assume that's -- what? -- 11 plus 4 --

1:14PM 6 15 years?

1:14PM 7 A.  Sure.

1:15PM 8 Q.  Okay.  And, Doctor, when you look at your FAERS analysis,

1:15PM 9 how many reports did you get a hit on in that 15 years between

1:15PM10 1996 and 2011 -- and, let's say, up until the second quarter of

1:15PM11 2011?

1:15PM12 A.  I actually can't answer that with what's in front of me.

1:15PM13 Q.  I'm happy to provide that for you.

1:15PM14      You had a table attached as part of your report;

1:15PM15 correct?

1:15PM16 A.  It's not here.

1:16PM17      MR. STRONGMAN:  May I approach, Your Honor?

1:16PM18      THE COURT:  Yes, you may.

1:16PM19      THE WITNESS:  Thank you.

1:16PM20 BY MR. STRONGMAN:

1:16PM21 Q.  So this was a table that you generated as part of your

1:16PM22 report; correct, Doctor?

1:16PM23 A.  Yes.

1:16PM24 Q.  And so do you have the information in front of you now?

1:16PM25 A.  Yes.

OFFICIAL TRANSCRIPT

---

Page 27

692

DAVID MADIGAN - CROSS

1:16PM 1 Q.  So in the 15 years in the FAERS analysis, where you did

1:16PM 2 this search that we went through, how many reports?

1:16PM 3 A.  Eleven.

1:17PM 4 Q.  That's 11 reports in more than 15 years; correct?

1:17PM 5 A.  That's correct.

1:17PM 6 Q.  It goes without saying that that's less than one report

1:17PM 7 per year; correct?

1:17PM 8 A.  Indeed.

1:17PM 9 Q.  Now, Doctor, out of those 11 reports, how many actually

1:17PM10 had alopecia that totaled?

1:17PM11 A.  I don't believe any of them did, but I don't know that for

1:17PM12 certain.  It is what it is.  The alopecia was recorded in the

1:17PM13 one place, and "permanent disability" was checked in the other

1:17PM14 place.

1:17PM15 Q.  And as we established, the term down here in the -- like

1:17PM16 if there's -- so liver failure.  Okay.  So we've got Arimidex.

1:17PM17 Yeah, yeah.

1:17PM18      So we've got Arimidex, we've got alopecia, and we've

1:17PM19 got liver failure.

1:17PM20      Are you with me?

1:18PM21 A.  Yep.

1:18PM22 Q.  This box up here, it's not tied to one of these two events

1:18PM23 in the data that you looked at; correct?

1:18PM24 A.  Not necessarily.  The same is true for the comparators.

1:18PM25 This is one of the reason that you run comparator drugs.

OFFICIAL TRANSCRIPT

---

Page 28

693

DAVID MADIGAN - CROSS

1:18PM 1 Q.  And I understand, Doctor, that you've got -- the

1:18PM 2 response -- my question is very simple.

1:18PM 3      On this very report that we've got here right in

1:18PM 4 front of us, the patient had liver failure that was

1:18PM 5 disabling or permanent, alopecia that occurred on the hormone

1:18PM 6 drug but they had taken Taxotere months before for

1:18PM 7 chemotherapy, that would have hit on your report; correct.

1:18PM 8 A.  Yes.  Yes, it could have -- it would have.

1:18PM 9 Q.  So how many of these 11 -- I think we established how many

1:18PM10 of the 11 had hair loss that totaled.

1:19PM11      You can't say for sure; correct?

1:19PM12 A.  Like I said, the goal is to capture that they're all

1:19PM13 irreversible alopecia, but I can't measure it.

1:19PM14 Q.  Okay.  How many of those 11 actually had hair loss that

1:19PM15 was evaluated six months post-chemotherapy?

1:19PM16 A.  I don't know.

1:19PM17 Q.  How many of those 11 included reports of people with hair

1:19PM18 loss while they were actually on the drug?

1:19PM19 A.  I don't know.

1:19PM20 Q.  How many of those 11 involved actual other drugs in the

1:20PM21 list?

1:20PM22 A.  I don't know -- for the 11, I don't know.

1:20PM23      I did conduct an analysis, as you know, to address

1:20PM24 the question of other drugs.

1:20PM25 Q.  And, Doctor, the bottom line is you didn't actually pull

OFFICIAL TRANSCRIPT

## Page 29

694

DAVID MADIGAN - CROSS

1:20PM 1 the report with all the narrative information and go through
1:20PM 2 each and every one of the 11; correct?
1:20PM 3 A. I'm a statistician. You'd have to -- to do that
1:20PM 4 appropriately to bolster what I'm doing, you'd need to look
1:20PM 5 at 13 million reports. You have to look at every report.
1:20PM 6    There's a foreground and a background, and there's
1:20PM 7 reports with permanent alopecia and without. You have to look
1:20PM 8 at every single one of them.
1:20PM 9    I'm not arguing against it, but it's just not the
1:20PM10 nature of what I'm doing here. It's a statistical analysis.
1:21PM11 Q. And I understand what you're saying is you'd have to
1:21PM12 actually pull the report for all the adverse events and go
1:21PM13 through them one by one. I understand that's what you're saying.
1:21PM14    But my question is -- my purpose is just you
1:21PM15 didn't pull the 11 reports and actually read the narrative
1:21PM16 about what actually happened with each individual patient;
1:21PM17 correct?
1:21PM18    MR. MICELI: Object. It's been asked and answered
1:21PM19 twice now.
1:21PM20    THE COURT: Sustained. Let's move on.
1:21PM21 BY MR. STRONGMAN:
1:21PM22 Q. Doctor, here is a question for you. I'm going to try to
1:21PM23 use sort of a different way of explaining this. Okay?
1:21PM24    Would you agree with me that an apple is a red fruit?
1:21PM25 A. No. It could be green.

OFFICIAL TRANSCRIPT

## Page 30

695

DAVID MADIGAN - CROSS

1:21PM 1 Q. It could be green. It could be red. Fair enough. Right.
1:21PM 2    It could be red; fair?
1:21PM 3 A. Sure.
1:21PM 4 Q. Would you agree with me that a raspberry is a red fruit?
1:21PM 5 A. I agree with you on that one.
1:21PM 6 Q. Would you agree with me that a cherry can be a red fruit?
1:22PM 7 A. Yes.
1:22PM 8 Q. And if I am holding a bag in my hands right now and I told
1:22PM 9 you that I've got a piece of fruit in the bag and that it's
1:22PM10 red, you can't tell me that it's an apple; correct?
1:22PM11 A. Correct.
1:22PM12 Q. The only way to tell me it's an apple is to open the bag
1:22PM13 and look; fair enough?
1:22PM14 A. Yeah. I think the analogy is kind of out there, but okay.
1:22PM15 Q. And, Doctor, when you performed your work in this case,
1:23PM16 you didn't do any kind of thorough medical literature review;
1:23PM17 correct?
1:23PM18 A. Sorry. You're now talking like just in general? You're
1:23PM19 not talking about FAERS anymore?
1:23PM20 Q. Sorry. Yes. I'm just talking about when you worked on
1:23PM21 generating your report in this case, you didn't do any kind of
1:23PM22 thorough medical literature review, did you?
1:23PM23 A. No. I'm -- it's a statistical exercise that I conducted.
1:23PM24 Q. Okay. And, in fact, I think you indicated that what you
1:23PM25 thought was in the literature were case reports generally and

OFFICIAL TRANSCRIPT

## Page 31

696

DAVID MADIGAN - CROSS

1:23PM 1 that you didn't find them all that helpful; correct?
1:23PM 2 A. Something along -- I'm aware of the fact that there are
1:23PM 3 case reports in the literature. And in terms of, you know,
1:23PM 4 looking at a causal association, that's a piece of the puzzle.
1:23PM 5 But it's arguably not as important as what I'm looking at here.
1:23PM 6 Q. Fair enough. And I think you said they're not terribly
1:23PM 7 useful.
1:23PM 8 A. I might have something like that, yeah, for purposes of
1:24PM 9 establishing a causal association. They're used for other
1:24PM10 purposes. But for establishing if they're a causal
1:24PM11 association, case reports are of some value but a limited
1:24PM12 value.
1:24PM13 Q. I think you testified about this, but I want to make sure
1:24PM14 I'm clear. This search that you did, ending up with 11 reports
1:24PM15 in 15 years, you would agree that that does not, in and of
1:24PM16 itself, prove causation; correct?
1:24PM17 A. It doesn't. You're calling it a search. I call it an
1:24PM18 analysis. It's an important distinction.
1:24PM19    But no, in and of itself, my FAERS analysis does not
1:24PM20 establish causation.
1:24PM21 Q. And you actually did -- Mr. Miceli showed you one chart,
1:24PM22 correct, of the FAERS analysis -- sorry, that wasn't clear.
1:24PM23    So you did put up one chart that showed the various
1:24PM24 medications over time; correct?
1:24PM25 A. It showed one particular metric for the five medications

OFFICIAL TRANSCRIPT

## Page 32

697

DAVID MADIGAN - CROSS

1:24PM 1 over time.
1:25PM 2 Q. And you also did a metric that is called -- and what was
1:25PM 3 the title of that metric that Mr. Miceli showed you?
1:25PM 4 A. SEBGM.
1:25PM 5 Q. SEBGM.
1:25PM 6    You also did a metric called EB05.
1:25PM 7 A. Yes.
1:25PM 8 Q. And it's another way of running an analysis for what you
1:25PM 9 are calling signals; correct?
1:25PM10 A. It's another metric. It's one of the ones that uses --
1:25PM11 it's very conservative, "conservative" meaning it tends to be
1:25PM12 lower than all the others.
1:26PM13 Q. And what we know is that EB05 metric is the one that's
1:26PM14 primarily used by the FDA; correct?
1:26PM15 A. No. I know you're going to produce a document where I
1:26PM16 probably said that, and I thought it was true. I no longer
1:26PM17 believe that's true. I now know it's not true.
1:26PM18 Q. Doctor, you have your report in front of you; correct?
1:26PM19 A. Yes.
1:26PM20 Q. Let me ask you this question: Doctor, you prepared this
1:26PM21 report yourself; correct?
1:26PM22 A. Yes.
1:26PM23 Q. And when you prepared this report, did you take your time
1:26PM24 and make sure you got the information correct?
1:26PM25 A. Certainly.

OFFICIAL TRANSCRIPT

Page 13

678

DAVID MADIGAN - CROSS

12:56PM 1   A.   No.

12:56PM 2   Q.   And you can't tell me, out of the 168, how many actually

12:56PM 3   meet Dr. Kessler's definition of irreversible alopecia;

12:57PM 4   correct?

12:57PM 5   A.   Well, it's what your representing as his definition.  I

12:57PM 6   don't know that I necessarily accept that.

12:57PM 7        But I don't know what Dr. Kessler's definition would

12:57PM 8   be.  And I'm applying, if you will, Dr. Tosti's definition.

12:57PM 9   Q.   And you don't know how many of the individuals in that 168

12:57PM10   actually were reporting alopecia during treatment; correct?

12:57PM11   A.   I don't know.

12:57PM12   Q.   And I asked you the question about -- how about this one,

12:57PM13   Doctor:  Do you remember I asked you a question about back

12:57PM14   pain?  Do you remember that just a second ago?

12:57PM15        Let me ask it this way:  If the report has a

12:58PM16   higher-level term of "alopecia" and the narrative describes the

12:58PM17   individual having chronic back pain, that report would count

12:58PM18   and include in your Table 4; correct?

12:58PM19   A.   Wrong.  It wouldn't.

12:58PM20   Q.   So, Doctor, I handed you your deposition.

12:58PM21        Do you see it?

12:58PM22   A.   I do.

12:58PM23   Q.   And I want you to turn to page 228 with me.  Okay?

12:58PM24   A.   Okay.

12:59PM25   Q.   Now, the jury's heard a little bit about this, but when

OFFICIAL TRANSCRIPT

Page 14

679

DAVID MADIGAN - CROSS

12:59PM 1   you give a deposition, Doctor, you give sworn testimony under

12:59PM 2   oath; correct?

12:59PM 3   A.   Yes.

12:59PM 4   Q.   And when you give a deposition, it's just -- with the same

12:59PM 5   level of seriousness as the testimony that you're giving today;

12:59PM 6   correct?

12:59PM 7   A.   Certainly.

12:59PM 8   Q.   And you were deposed in this case; correct?

12:59PM 9   A.   Yes.

12:59PM10   Q.   And when you answered questions in your deposition in this

12:59PM11   case, you tried to be as forthcoming and honest as you could;

12:59PM12   correct?

12:59PM13   A.   Yes.

12:59PM14   Q.   Now, I want you to look at page 228, line 18.

12:59PM15        Are you with me?

12:59PM16   A.   Yes.

12:59PM17   Q.   And it says:

12:59PM18        "Q.   If the report has a higher-level term of

12:59PM19   'alopecia,' and the narrative describes the individual

1:00PM20   having chronic back pain, that report would be counted and

1:00PM21   included in your Table 4?

1:00PM22        "A.   You know, I don't know if that ever happened.

1:00PM23   That could happen.

1:00PM24        "Q.   The methodology you use to search wouldn't

1:00PM25   prevent that from happening?

OFFICIAL TRANSCRIPT

Page 15

680

DAVID MADIGAN - CROSS

1:00PM 1        "A.   That's true."

1:00PM 2   Q.   Did I read that correctly?

1:00PM 3   A.   You read it correctly.  I misspoke.

1:00PM 4   Q.   Did I read that correctly?

1:00PM 5   A.   I answered the question, I did -- yes, you did.

1:00PM 6   Q.   Now, Dr. Tosti gave you these search terms.

1:00PM 7        Did you ever give the results of your research to

1:01PM 8   her?

1:01PM 9   A.   I don't know.  I didn't personally.

1:01PM10   Q.   Would it have been a good idea to give her the results?

1:01PM11   A.   I don't know.  I mean, maybe she has a copy of my report.

1:01PM12   I don't know.

1:01PM13   Q.   And, Doctor, with regard to the 168, you don't know a

1:01PM14   denominator for the number of individuals exposed to Taxotere

1:01PM15   during that time period from 1996 up to 2011; correct?

1:01PM16   A.   That's correct, I don't.

1:01PM17   Q.   And I talked with Dr. Kessler about that yesterday, and

1:01PM18   you were here for that; correct?

1:01PM19   A.   I was.  I was very unhappy with it, but yes.

1:01PM20   Q.   Now, let's talk with -- next step, the FAERS analysis.

1:01PM21   Okay?

1:02PM22   A.   Okay.

1:02PM23   Q.   And what you did with regard to the FAERS analysis -- now,

1:02PM24   that is the FDA database; correct?

1:02PM25   A.   Sure.

OFFICIAL TRANSCRIPT

Page 16

681

DAVID MADIGAN - CROSS

1:02PM 1   Q.   And what you did with regard to this analysis is that you

1:02PM 2   had a form, and it included "alopecia" as a high-level term;

1:02PM 3   correct?

1:02PM 4   A.   Yes.

1:02PM 5   Q.   And then it also included Taxotere somewhere over in the

1:02PM 6   medications list; correct?

1:02PM 7   A.   Correct.

1:02PM 8   Q.   And then it has a box on the form, and there's a --

1:02PM 9   several boxes, but one of them is listed as "disability,

1:02PM10   permanent"; correct?

1:02PM11   A.   Let's just be clear.  There's sections on the form.

1:02PM12   There's a section for -- called "Outcome," and there are five

1:02PM13   little check boxes in there can, one of which is "permanent" or

1:02PM14   "disability."

1:02PM15   Q.   So, Doctor, what I've got here is a blowup of a MedWatch

1:03PM16   form; correct?

1:03PM17   A.   Okay.  Yes.

1:03PM18   Q.   And so this is what we were talking about?

1:03PM19   A.   Okay.

1:03PM20        THE WITNESS:   Can I stand up, Your Honor?

1:03PM21        THE COURT:   Yes, you may.

1:03PM22   BY MR. STRONGMAN:

1:03PM23   Q.   You can even come down here if you need to.

1:03PM24   A.   That's okay.

1:03PM25   Q.   So what we were talking about is there's this box right

OFFICIAL TRANSCRIPT

Page 37

702

DAVID MADIGAN - CROSS

1:32PM 1  A.  Okay.  If you say so.
1:32PM 2  Q.  Or "irreversible."
1:32PM 3      But here's my question, Doctor:  If you actually look
1:32PM 4  in TAX 316 or TAX 301, is the word "irreversible alopecia"
1:32PM 5  reported there?
1:32PM 6  A.  No.  They call it "ongoing."
1:32PM 7  Q.  They call it "ongoing."
1:32PM 8  A.  Yeah.
1:32PM 9  Q.  Do you know the definition of "ongoing" as it related to
1:32PM10  TAX 316?
1:32PM11  A.  Meaning the --
1:33PM12  Q.  Do you know?
1:33PM13  A.  Yeah.  The adverse event is persistent.
1:33PM14  Q.  Do you know how that term is actually defined and followed
1:33PM15  up on as the study moves on in TAX 316?
1:33PM16  A.  Their protocol says that, at every follow-up, you check
1:33PM17  for if side effects have reversed or are continuing, clinical
1:33PM18  adverse events that started on treatment.
1:33PM19  Q.  I have a similar question as it relates to TAX 316 and
1:33PM20  TAX 301, those -- the 29 and the 16 in TAX 316.
1:33PM21      Are you with me?
1:33PM22  A.  Yes.
1:33PM23  Q.  Did you actually pull any of the clinical information on
1:33PM24  any of those patients and look at them?
1:33PM25  A.  I did not.  I'm doing a statistical analysis, as any

OFFICIAL TRANSCRIPT

Page 38

703

DAVID MADIGAN - CROSS

1:33PM 1  biostatistician would do, of the frozen, locked clinical trial
1:33PM 2  data.  That's not the nature of my analysis or of any analysis
1:33PM 3  that one would do like this.
1:34PM 4  Q.  And so you didn't open the bag on any of those 29 or those
1:34PM 5  16 to look underneath and see do any of these individuals
1:34PM 6  actually have alopecia that lasted longer than six months?
1:34PM 7  A.  The database says -- states that they do.  It's the frozen
1:34PM 8  file.  It is what happened in the clinical trial.  That's what
1:34PM 9  I look at.
1:34PM10  Q.  That wasn't my question.
1:34PM11  A.  I thought I answered your question.
1:34PM12  Q.  My question was did you actually pull the clinical
1:34PM13  information on each one of those patients and evaluate it to
1:34PM14  determine whether or not any of them --
1:34PM15      MR. MICELI:  Your Honor, this has been asked and
1:34PM16  answered.  Object.
1:34PM17      THE COURT:  I'm going to let him finish the question
1:34PM18  because I think -- finish your question.
1:34PM19  BY MR. STRONGMAN:
1:34PM20  Q.  Doctor, did you actually pull --
1:34PM21      THE COURT:  Overruled.
1:34PM22  BY MR. STRONGMAN:
1:34PM23  Q.  -- any of the clinical medical information that gives the
1:34PM24  narrative about each one of those individual patients in the 29
1:34PM25  or the 16?

OFFICIAL TRANSCRIPT

Page 39

704

DAVID MADIGAN - CROSS

1:34PM 1  A.  That's not what I do.  It's not what a statistician does.
1:35PM 2  It's not the nature of my analysis.  It's -- I'm conducting a
1:35PM 3  statistical analysis of the locked clinical trial data.
1:35PM 4  Q.  And then what you did was you did these analyses, and
1:35PM 5  Mr. Miceli talked to you about a meta-analysis; correct?
1:35PM 6  A.  Sure.
1:35PM 7  Q.  And you did an analysis, actually, of each of the two
1:35PM 8  studies individually; correct?
1:35PM 9  A.  Sure.  As part -- on the way to -- to doing a
1:35PM10  meta-analysis, which is the totality of the evidence.
1:35PM11  Q.  And when you did your analysis on each individual study,
1:35PM12  you set a parameter for statistical significance, a P value;
1:35PM13  correct?
1:35PM14  A.  I computed a P value.  Is that what you mean?  Are we
1:35PM15  agreeing?
1:35PM16  Q.  Well, you know what P value .05 means; right?
1:35PM17  A.  So if the P value is less than .05, typically, it's not
1:36PM18  right or wrong but, typically, call that statistically
1:36PM19  significant.
1:36PM20  Q.  So, Doctor, at the end of the TAX 316 study, you ran an
1:36PM21  analysis between the 29 and the 16 to see if there was a
1:36PM22  statistically significant difference between the two at that
1:36PM23  point in time; correct?
1:36PM24  A.  No.  That wasn't the purpose of why I did the analysis.  I
1:36PM25  did the analysis to estimate the effect size.  I computed a key

OFFICIAL TRANSCRIPT

Page 40

705

DAVID MADIGAN - CROSS

1:36PM 1  value along the way.
1:36PM 2      The way you phrased it there is -- I'm uncomfortable
1:36PM 3  with it.  You're saying I did it to see whether it was
1:36PM 4  statistically significant.  No, that's not why I did it.
1:36PM 5  Q.  Maybe not the why but the result.  Let's talk about the
1:36PM 6  result.
1:36PM 7  A.  Sure.
1:36PM 8  Q.  At the end of the ten-year study, when you compared the 29
1:36PM 9  and the 16 in TAX 316 -- are you with me so far?
1:36PM10  A.  Absolutely.
1:36PM11  Q.  -- your analysis showed that it was a not statistically
1:37PM12  significant result; correct?
1:37PM13  A.  It just missed statistical significance, .054, I think
1:37PM14  or -- but you're right, it wasn't statistically significant.
1:37PM15  Q.  And with regard to TAX 301, you did the same type of
1:37PM16  analysis; correct?
1:37PM17  A.  Sure.
1:37PM18  Q.  And what we know is, at the end of ten years, you looked
1:37PM19  to see whether or not there's a statistically significant
1:37PM20  difference, and you didn't find one there either; correct?
1:37PM21  A.  Same problem with your question.  I did not do either of
1:37PM22  those to see if they were statistically significant.  I
1:37PM23  couldn't care less whether they're statistically significant or
1:37PM24  not because I'm going to do a meta-analysis that looks at the
1:37PM25  totality of the evidence, and that's what I care about.

OFFICIAL TRANSCRIPT

Page 41

706

DAVID MADIGAN - CROSS

1:37PM 1  Q.  Well, Doctor, you did an analysis of TAX 316 alone; right?

1:37PM 2  A.  Sure.  But not -- the way you're characterizing it is I

1:37PM 3  did it to see if there was statistical significance.  That's

1:37PM 4  simply wrong.  I didn't do that.

1:37PM 5  Q.  Doctor, at the end of the ten-year analysis in TAX 301

1:37PM 6  alone, the Taxotere arm and the 5-FU arm were not statistically

1:38PM 7  significant in terms of the difference; correct?

1:38PM 8  A.  The P value is bigger than .05 in 301.

1:38PM 9  Q.  So the answer to my question is it is not statistically

1:38PM10  significant; correct?

1:38PM11  A.  Yeah.  I said that a couple minutes ago.

1:38PM12  Q.  Mr. Miceli also asked you some questions about my

1:38PM13  examination of Dr. Kessler yesterday on whether the 29 or the

1:38PM14  16 were actually followed for six months.

1:39PM15      Do you remember that?

1:39PM16  A.  I do.

1:39PM17  Q.  And I think you said something along the lines of you had

1:39PM18  never seen any document where Sanofi represented data to anyone

1:39PM19  consistent with the way that I asked Dr. Kessler those

1:39PM20  questions.

1:39PM21  A.  Something like that.  Yeah, I haven't seen a document like

1:39PM22  that.

1:39PM23      MR. STRONGMAN:  May I approach, Your Honor?

1:39PM24      THE COURT:  Yes, you may.

1:39PM25      MR. MICELI:  I think we need to approach the bench.

OFFICIAL TRANSCRIPT

---

Page 42

707

DAVID MADIGAN - CROSS

1:39PM 1      THE COURT:  Okay.

1:39PM 2      (WHEREUPON, the following proceedings were held at

1:39PM 3  the bench.)

1:40PM 4      MR. MICELI:  Your Honor, if I can address this -- I

1:40PM 5  need to go to page 10 of this document.  This is -- Your Honor,

1:40PM 6  this is a document that's was used yesterday with Dr. Kessler.

1:40PM 7  It was not admitted.  There's no foundation for this -- to use

1:40PM 8  this with this witness.  It is also a document that if you --

1:40PM 9  that there's no foundation.

1:40PM10      THE COURT:  What is it?

1:40PM11      MR. MICELI:  I'll show you exactly what it is, Your

1:40PM12  Honor.  This is a listing of the TAX 316 adverse events for

1:40PM13  alopecia.  It's all adverse events.

1:40PM14      But if you look at the bottom here, you see this

1:40PM15  SAS string.  It ends in 2012.  Their statistician is testifying

1:41PM16  that if you see a SAS string that like that, it ends in 2012,

1:41PM17  that is an analysis he's done after 2011.

1:41PM18      If we're not allowed to put in stuff that's

1:41PM19  analyzed after 2011, the defendant should not be allowed to

1:41PM20  use.  This is a 2012 reanalysis of --

1:41PM21      THE COURT:  Is this Dr. Kopreski?

1:41PM22      MR. MICELI:  This is not Dr. Kopreski.  But I suspect

1:41PM23  we'll learn, if he ever shows up in this courtroom, that this

1:41PM24  is where they came up with the Dr. Kopreski analysis.

1:41PM25      MR. STRONGMAN:  May I explain, Your Honor?

OFFICIAL TRANSCRIPT

---

Page 43

708

DAVID MADIGAN - CROSS

1:41PM 1      So what Dr. Madigan has said at the questioning

1:41PM 2  of Mr. Miceli is that nowhere did we ever represent that the

1:41PM 3  data meant what I asked Dr. Kessler about.

1:41PM 4      What this is, this was a question, it was

1:41PM 5  asked, "What does 'ongoing' mean?"  The company provided the

1:41PM 6  data, and it said, "Here is the follow-up duration for the

1:41PM 7  adverse events."  And it just gives a time period.

1:41PM 8      If Mr. Miceli wants to talk -- this is the

1:41PM 9  TAX 316 data that we've been talking about at trial.  This

1:42PM10  isn't a --

1:42PM11      MR. MICELI:  This is not the TAX 316 data we've been

1:42PM12  talking about all trial.

1:42PM13      MR. STRONGMAN:  Just let me finish.

1:42PM14      MR. MICELI:  I will.

1:42PM15      MR. STRONGMAN:  So all this does is it shows how long

1:42PM16  each individual patient for each adverse event was actually

1:42PM17  followed up on that adverse event.  And he has said

1:42PM18  unequivocally this didn't exist anywhere.  I feel like I -- I

1:42PM19  don't have to move it into evidence even.  I feel like I should

1:42PM20  be able to show it to him.

1:42PM21      MR. MICELI:  Your Honor, if you flip through those

1:42PM22  pages, what you're going to see is this is something that was

1:42PM23  produced in Canada.  What you told us we wouldn't be able to

1:42PM24  produce in here things from foreign countries.

1:42PM25      This is a reanalysis in 2012 of their data.

OFFICIAL TRANSCRIPT

---

Page 44

709

DAVID MADIGAN - CROSS

1:42PM 1  This is data that has never been shared with the FDA.  There's

1:42PM 2  no been no proof through any deposition that this has been

1:42PM 3  provided to a regulatory agency.  This is not a statement from

1:42PM 4  Sanofi to anybody.

1:42PM 5      There's no -- there's certainly no proof of it.

1:42PM 6  There's no foundation that's been laid, and there's none that

1:43PM 7  can be laid to use this with this witness.

1:43PM 8      If this comes in, then, we need to be able to

1:43PM 9  show the jury the 2015 clinical overview that analyzes

1:43PM10  partially data from before 2011.  In 2015, Sanofi is still

1:43PM11  representing 29 and 16.

1:43PM12      MR. STRONGMAN:  For ongoing.  It's just a matter of

1:43PM13  how "ongoing" is defined in this courtroom versus the actual

1:43PM14  study.

1:43PM15      MR. MICELI:  Well, Jon, it's important how they

1:43PM16  represented to the world, to the people who used the drug, and

1:43PM17  to the doctors.  This 29 and 16 is how they represented it.

1:43PM18      They're trying to create a false narrative

1:43PM19  before this jury.  And if they're going to do it, we have to

1:43PM20  have the opportunity -- if they go beyond 2011, we have to have

1:43PM21  the opportunity to do the same, Your Honor.

1:43PM22      THE COURT:  All right.

1:43PM23      MR. STRONGMAN:  Can I make just a couple of points?

1:43PM24      So, one, with regard to foreign regulatory, your

1:43PM25  order was clear that anything we say to a foreign regulatory

OFFICIAL TRANSCRIPT

Page 193

858

LAURA MASSEY PLUNKETT - CROSS

5:22PM 1  A.   You did.

5:22PM 2  Q.   All right.  Now --

5:22PM 3        THE COURT:  The jury can make a determination whether

5:22PM 4  that was --

5:22PM 5        MS. SASTRE:  I'm sorry, Your Honor?

5:22PM 6        THE COURT:  Mr. Nolen was standing up to object, and

5:22PM 7  I overruled him before he got to say it.

5:22PM 8        MS. SASTRE:  I thought you were telling me something.

5:22PM 9  Okay.  All right.  No problem.  Thank you, Judge.

5:22PM10  BY MS. SASTRE:

5:22PM11  Q.   Okay.  Let's do this, Dr. Plunkett.  So let's talk about

5:22PM12  that a little further.  Okay.

5:22PM13        When you say that there's a group of chemotherapy

5:22PM14  drugs and they're associated with hair loss, I'd like to make a

5:22PM15  list with you.  Can we do that?

5:22PM16  A.   Sure.

5:22PM17  Q.   Okay.  Great.  So first let's start with Taxol.  Okay.  Is

5:22PM18  Taxol associated with hair loss as a chemotherapy drug?

5:22PM19  A.   Yes.  It is if you're -- and I assume -- but I want to

5:22PM20  make sure we understand when I'm talking here, I'm talking

5:23PM21  about drug-induced hair loss, which is the -- not the same as

5:23PM22  permanent alopecia.  It's two different things.

5:23PM23  Q.   We're going make a list.  The next thing we'll talk about

5:23PM24  is whether those drugs with associated with persistent or

5:23PM25  permanent alopecia.  Okay?

OFFICIAL TRANSCRIPT

Page 194

859

LAURA MASSEY PLUNKETT - CROSS

5:23PM 1  A.   Okay.  So we're not doing just drug-induced alopecia, or

5:23PM 2  you are -- are you going to do both?

5:23PM 3  Q.   We're going to do both.  We're going to take it one step

5:23PM 4  at a time.  Okay?

5:23PM 5  A.   Okay.  That's fine.

5:23PM 6  Q.   Okay.  Very good.  So, Doctor, first, with regard to

5:23PM 7  Taxol, you would agree with me that Taxol has been associated

5:23PM 8  with alopecia; correct?

5:23PM 9  A.   Drug-induced reversible alopecia, yes, it has.

5:23PM10  Q.   Okay.  So I'm going to write "Taxol" here.

5:23PM11        You would agree with me that Adriamycin has also been

5:24PM12  associated with alopecia or hair loss; correct?

5:24PM13  A.   Yes.  It's the same drug as doxorubicin, but that's right.

5:24PM14  Q.   Okay.  Did you know that Ms. Earnest took Adriamycin?  You

5:24PM15  didn't; right?

5:24PM16  A.   I didn't know her therapy.  But I assumed, if she was

5:24PM17  taking Taxol, she was on the combination regimen, which would

5:24PM18  include that.

5:24PM19  Q.   Okay.  So Adriamycin is on our list.  All right.

5:24PM20        You would agree with me that Cytoxan has been

5:24PM21  associated with alopecia; correct?

5:24PM22  A.   Yes, it has.  This drug-induced alopecia, yes.

5:24PM23  Q.   And you'd also agree with me that a drug by the name of

5:24PM24  5-FU or 5-fluorouracil has also been associated with alopecia;

5:24PM25  correct?

OFFICIAL TRANSCRIPT

Page 195

860

LAURA MASSEY PLUNKETT - CROSS

5:24PM 1  A.   Yes, with the reversible drug-induced, it has.

5:24PM 2  Q.   Okay.  And that's a drug that's frequently used in

5:25PM 3  combination with place and Cytoxan; correct?

5:25PM 4  A.   Yes.  It was part of the clinical trials.  The FAC was

5:25PM 5  5-FU, Adriamycin, Cytoxan.  And then the other, TAC, was

5:25PM 6  instead of 5-FU, Taxol.

5:25PM 7  Q.   Okay.  So I'll write "5-FU" here.  Okay.

5:25PM 8        And that was the as you said the first drug if one of

5:25PM 9  the arms of the TAX 316 clinical trial; correct?

5:25PM10  A.   It was an interchangeable drug, yes.  It took Taxol or you

5:25PM11  took 5-FU, and the other drugs were the same.

5:25PM12  Q.   And because it's almost 5:30 and I'm sure everyone's

5:25PM13  tired, you would agree with me there's other drugs we could put

5:25PM14  on that list; right?

5:25PM15  A.   Yes.  Many drugs used to kill cancer cells will cause

5:25PM16  drug-induced alopecia, hair loss.  It's common as a reversible

5:25PM17  side effect.

5:26PM18  Q.   Now, let's move on to the next step in the chart

5:26PM19  that we're making.  Okay?

5:26PM20  A.   Okay.

5:26PM21  Q.   So you would agree with me that you identified permanent

5:26PM22  hair loss as a hazard, a hazard of the Taxol; correct?

5:26PM23  A.   There are some case reports, yes.  That's true.

5:26PM24  Q.   Okay.  So I wrote "persistent" here.  I'm going to change

5:26PM25  it.  I'm going to write "permanent."  Okay?

OFFICIAL TRANSCRIPT

Page 196

861

LAURA MASSEY PLUNKETT - CROSS

5:26PM 1  A.   I think the reports would fit either definition.

5:26PM 2  Q.   Sometimes it's called one and sometimes it's called the other.

5:26PM 3  A.   Okay.  But let me just be clear.  When it came to Taxol

5:26PM 4  and the research and the work you did, you specifically

5:26PM 5  identified permanent hair loss as a hazard of Taxol; true?

5:26PM 6  A.   Within case reports, yes.  There were some case reports.

5:27PM 7  Q.   Let's talk about Adriamycin.  You identified permanent

5:27PM 8  hair loss as a hazard of Adriamycin; correct?

5:27PM 9  A.   Same answer.  There are some case reports for that as

5:27PM10  well.  Not as many, but there are some.

5:27PM11  Q.   But it's something you saw in the literature; correct?

5:27PM12  A.   Yes, there are some case reports.

5:27PM13  Q.   Okay.  And if we move to Cytoxan -- well, let me actually

5:27PM14  stop for a moment.

5:27PM15        Did you review the Adriamycin label?

5:27PM16  A.   I believe that was on my reliance materials, yes.

5:27PM17  Q.   Okay.

5:27PM18  A.   I think I tell you that in my report, that I looked at the

5:27PM19  labeling for the drugs that were used in combination with

5:27PM20  Taxotere.

5:27PM21  Q.   Okay.  And did you see that it says "reverse complete

5:27PM22  alopecia occurs in most cases"?

5:27PM23  A.   I don't recall the words.  I would have to pull it back

5:27PM24  out.  But let me look at my report.  I might have it in here,

5:27PM25  if you want me to -- I just don't recall the specific wording

OFFICIAL TRANSCRIPT

## Page 205

870

LAURA MASSEY PLUNKETT - CROSS

5:49PM 1 intended to confuse the jury. It's intended to confuse the
5:50PM 2 jury. It's the May 8th, 2003. I don't know that this is the
5:50PM 3 label that would have been in existence at the time this drug
5:50PM 4 was prescribed.
5:50PM 5      THE COURT: I don't think that's the issue. I think
5:50PM 6 the issue is -- is that -- I believe the argument is Adriamycin
5:50PM 7 causes permanent alopecia. So that is -- I think it's for that
5:50PM 8 limited purpose.
5:50PM 9      MR. NOLEN: Your Honor, I would just add for the
5:50PM10 record that this is another one of those deals where you throw
5:50PM11 everything up against the wall and see what sticks. Because
5:50PM12 the reality is -- the reality is that there is no
5:50PM13 statistically significant -- you can't prove statistically
5:50PM14 significant association between Adriamycin and permanent hair
5:50PM15 loss. We have done that research, Your Honor.
5:50PM16      THE COURT: Okay. I'm not telling you --
5:50PM17      MS. SASTRE: I don't know about it. I don't even
5:50PM18 know what that is.
5:50PM19      THE COURT: That's way past what I'm talking about
5:51PM20 here.
5:51PM21      MR. NOLEN: So you put it in, it's misleading.
5:51PM22      THE COURT: The question is whether or not this
5:51PM23 should come in. I think you questioned her about it, the
5:51PM24 document -- did she review this document?
5:51PM25      MS. SASTRE: She has three Adriamycin labels on her

OFFICIAL TRANSCRIPT

## Page 206

871

LAURA MASSEY PLUNKETT - CROSS

5:51PM 1 reliance list, yes, Your Honor. She just said she reviewed
5:51PM 2 them. She reviewed them also in particular --
5:51PM 3      THE COURT: He can't help it.
5:51PM 4      MS. SASTRE: She reviewed them in particular, Your
5:51PM 5 Honor, because she also read them carefully because there's
5:51PM 6 clinical information contained within them. And a lot of her
5:51PM 7 opinions are based upon clinical information within the labels.
5:51PM 8 I mean, Judge, this case is -- Adriamycin is an issue that's
5:51PM 9 alive and well in this case in numerous respects.
5:51PM10      MR. NOLEN: Your Honor, that clinical information
5:51PM11 that all of her opinions are based on --
5:51PM12      THE COURT: Listen, I'm not going to do an assessment
5:51PM13 of whether or not -- and I think that gives you just whether or
5:51PM14 not it's relevant.
5:51PM15      MR. NOLEN: I did not elicit that testimony. And,
5:51PM16 therefore, again, it's 611. It exceeds the scope. So that's
5:52PM17 another objection.
5:52PM18      MS. SASTRE: It's a label for a drug she took, Judge.
5:52PM19 I'm just a little bit beside myself. It's a label for a drug
5:52PM20 she took.
5:52PM21      THE COURT: I don't think you need to be beside
5:52PM22 yourself.
5:52PM23      MS. SASTRE: Okay. I'm sorry. I'm tired, Judge. I
5:52PM24 apologize.
5:52PM25      THE COURT: We all are.

OFFICIAL TRANSCRIPT

## Page 207

872

LAURA MASSEY PLUNKETT - CROSS

5:52PM 1      MS. SASTRE: Okay.
5:52PM 2      THE COURT: I'm going to allow it. The jury can make
5:52PM 3 a determination as to what it means.
5:52PM 4      (WHEREUPON, the following proceedings were held in
5:52PM 5 open court.)
5:53PM 6      MS. SASTRE: Your Honor, the defendant would move in
5:53PM 7 Exhibit D-388-D, then, Adriamycin labeling into evidence.
5:53PM 8      THE COURT: Over plaintiff's objection, let it be
5:53PM 9 admitted.
5:53PM10 BY MS. SASTRE:
5:53PM11 Q. Okay. Very good.
5:53PM12      I'll just go ahead and put it up on the ELMO just
5:53PM13 because we have it right here. And so what we were talking
5:53PM14 about Dr. Plunkett is underneath the adverse reaction section,
5:53PM15 Adriamycin states "reversible complete alopecia occurs in most
5:53PM16 cases." Correct?
5:53PM17 A. That's what is stated, which means most women will lose
5:53PM18 their hair as a result of drug, which I believe is true, that
5:53PM19 drug-induced alopecia.
5:53PM20 Q. Okay. All right. Thank you.
5:53PM21      Now, if we go back to the chart that we're making,
5:53PM22 let's talk about Cytoxan for a moment. Okay?
5:54PM23 A. Okay.
5:54PM24 Q. You said that you knew or you found out recently that
5:54PM25 Mrs. Earnest took Adriamycin; correct?

OFFICIAL TRANSCRIPT

## Page 208

873

LAURA MASSEY PLUNKETT - CROSS

5:54PM 1 A. I assume. I said I assume she did based on the fact that
5:54PM 2 she was -- she was taking it for breast cancer -- well, I say
5:54PM 3 taking it, Taxotere, as an adjuvant treatment. So I assume
5:54PM 4 that she was taking Adriamycin and cyclophosphamide, but I
5:54PM 5 don't know for sure. I'm not a case-specific expert.
5:54PM 6 Q. Okay. Well, your assumptions were right. So Cytoxan, you
5:54PM 7 just used the word "cyclophosphamide"?
5:54PM 8 A. Yes.
5:54PM 9 Q. And just to be clear, Cytoxan is cyclophosphamide;
5:54PM10 correct?
5:54PM11 A. Yes. And I'm using that word because that's what's in the
5:54PM12 literature most of the time.
5:54PM13 Q. Okay. Is it okay if we use the term "Cytoxan"?
5:54PM14 A. That's fine.
5:54PM15 Q. Okay. Very good.
5:54PM16      So you now know that Mrs. Earnest was also taking
5:54PM17 Cytoxan; correct?
5:54PM18 A. If you're going to tell me that's true, I will believe
5:54PM19 that's true.
5:54PM20 Q. Okay. Okay. All right. So with regard to, again, your work in
5:55PM21 this case, your search, your review, your analysis of the
5:55PM22 literature, you would agree with me that you identified
5:55PM23 permanent hair loss as a hazard of Cytoxan; correct?
5:55PM24 A. In terms of case reports, yes, there are some case
5:55PM25 reports.

OFFICIAL TRANSCRIPT

Page 209

874

LAURA MASSEY PLUNKETT - CROSS

5:55PM 1 Q.  Okay.  So I'm going to put a check mark there.  All right,

5:55PM 2 Doctor?

5:55PM 3       And then going on to 5-FU or what's called

5:55PM 4 5-fluorouracil.  Did I say that correctly?

5:55PM 5 A.  Yes.

5:55PM 6 Q.  Okay.  It's a miracle.

5:55PM 7       And you said that that was, again, in the TAX 316

5:55PM 8 study, there was the arm that got Taxotere, Adriamycin, and

5:55PM 9 Cytoxan; correct?

5:55PM10 A.  Yes.

5:55PM11 Q.  And then there was an arm that got 5-FU, right, or

5:55PM12 5-fluorouracil, Adriamycin, and Cytoxan; correct?

5:55PM13 A.  Yes.

5:55PM14 Q.  Hence the name TAC versus FAC; correct?

5:56PM15 A.  Yes.

5:56PM16 Q.  And when we talk about FAC in the TAX 316 study, we're

5:56PM17 talking about 5-FU; right?

5:56PM18 A.  Yes.

5:56PM19 Q.  Okay.  And you would agree with me, Doctor, that you also

5:56PM20 identified permanent hair loss as a hazard of 5-FU; correct?

5:56PM21 A.  One case report that I can find.

5:56PM22 Q.  Okay.  But you would agree with me that in a combination

5:56PM23 setting, where it was given with Adriamycin and Cytoxan, you

5:56PM24 don't have to go any further than TAX 316 to agree that it is

5:56PM25 identified as a hazard, at least in the combination setting,

OFFICIAL TRANSCRIPT

---

Page 210

875

LAURA MASSEY PLUNKETT - CROSS

5:56PM 1 when it comes to hair loss; true?

5:56PM 2 A.  I would agree that they did -- results of that study, yes.

5:56PM 3 It's different than Taxotere, but you're correct.  It had some

5:56PM 4 of those.

5:56PM 5 Q.  Okay.  So I'm going to put a check mark next to 5-FU for

5:56PM 6 permanent alopecia.  Okay?  Fair enough?

5:56PM 7 A.  With the idea that the evidence is different for the

5:56PM 8 drugs, but, yes.

5:57PM 9 Q.  I'm sorry, I didn't hear you.  The idea that what?

5:57PM10 A.  With the understanding that there is different evidence

5:57PM11 for different drugs, but, yes.

5:57PM12 Q.  I didn't ask you about any of the evidence.  Just that you

5:57PM13 identified permanent hair loss as a hazard for all of these

5:57PM14 medications.  Okay?

5:57PM15 A.  Well, that's what I'm having a problem with.  I don't

5:57PM16 think I've said it's a hazard.  I think what I'm saying to you

5:57PM17 is that there are some reports, and there's a different hazard

5:57PM18 posed by different drugs.

5:57PM19       If, under hazard assessment, I find a report, yes, I

5:57PM20 agree with that.  That is there.

5:57PM21 Q.  Well, there are reports for sure.  We can agree upon that;

5:57PM22 correct?

5:57PM23 A.  There is at least one case report for each of those.

5:57PM24 That's true.

5:57PM25 Q.  Okay.  Take a look at your deposition, please,

OFFICIAL TRANSCRIPT

---

Page 211

876

LAURA MASSEY PLUNKETT - CROSS

5:57PM 1 Dr. Plunkett.  If you go to page 185, line 14.

5:58PM 2       Let me know when you're there, please.

5:58PM 3 A.  I am.

5:58PM 4 Q.  Okay.

5:58PM 5 A.  Line 14?

5:58PM 6 Q.  Yes, ma'am.  Page 185.

5:58PM 7       "Q.  Did you identify permanent hair loss as a hazard

5:58PM 8 of Taxol, 5-FU, doxorubicin, cyclophosphamide, cisplatin

5:58PM 9 and prednisone?

5:58PM10       "A.  Identified alopecia initially, and then I looked

5:58PM11 within that for permanent alopecia as well.  Within the --

5:58PM12 I already told you, with some of these drugs, I did not

5:58PM13 see information that indicated the hazard would be

5:58PM14 permanent hair loss for all of these drugs."

5:58PM15       Question on line 25:

5:58PM16       "Q.  But you did see it for Taxol?

5:58PM17       "A.  Yes, I did.

5:58PM18       "Q.  And you did see it for doxorubicin; correct?

5:58PM19       "A.  Yes.

5:58PM20       "Q.  And for cyclophosphamide?

5:58PM21       "A.  And I think I told you another one that I looked

5:58PM22 at that isn't discussed because I pulled literature and

5:58PM23 there's literature on busulfan which, is not used for

5:58PM24 breast cancer.

5:59PM25       "Q.  You also saw it for 5-FU?"

OFFICIAL TRANSCRIPT

---

Page 212

877

LAURA MASSEY PLUNKETT - CROSS

5:59PM 1 MR. NOLEN:  Objection, Your Honor.

5:59PM 2       MS. SASTRE:  It's each one of the drugs she's

5:59PM 3 identifying as a hazard, Your Honor.  That was the --

5:59PM 4       THE COURT:  Okay.  I think we need to.

5:59PM 5       (WHEREUPON, the following proceedings were held at

5:59PM 6 the bench.)

5:59PM 7       MS. SASTRE:  Here's the question, Judge.

5:59PM 8       THE COURT:  I'm wondering if we have that she took

5:59PM 9 prednisone?

5:59PM10       MS. SASTRE:  No, that just -- it was in there.  I was

5:59PM11 just getting to the part because you have to continue -- she

5:59PM12 said with those that she didn't identify them.  I'm not asking

5:59PM13 about those.

5:59PM14       THE COURT:  I understand that, but where are we

5:59PM15 going?

5:59PM16       MS. SASTRE:  Because, Your Honor, she just said

5:59PM17 that -- she just said that -- she just said that -- when I said

5:59PM18 you identified all these drugs as a hazard in the summary

5:59PM19 question, she sort of begged off of it.  And I have claimed

6:00PM20 concessions in her deposition on each one of them, that she

6:00PM21 said she identified them as a hazard for permanent hair loss.

6:00PM22 I have no choice but to impeach her, Judge.  It's right here.

6:00PM23       THE COURT:  Okay.  I'm just wondering where are we

6:00PM24 going?  How far -- how many doors are we opening here?  Because

6:00PM25 her testimony on direct was limited to Taxotere's associated

OFFICIAL TRANSCRIPT

08:48:06

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:   TAXOTERE (DOCETAXEL)
             PRODUCTS LIABILITY          Docket No.: 16-MD-2740
6            LITIGATION                  Section "H(5)"
                                         September 19, 2019
7                                        New Orleans, Louisiana

8   *Relates To*:  *Barbara Earnest*,
    *Case No.: 16-CV-17144*

9

10  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12                       DAY 4, MORNING SESSION
               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                   UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                               BY:  DAWN BARRIOS, ESQ.
17                             701 Poydras Street
                               Suite 3650
18                             New Orleans, Louisiana 70139

19

20  For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                 Meunier & Warshauer, LLC
21                             BY:  PALMER LAMBERT, ESQ.
                               2800 Energy Centre
22                             1100 Poydras Street
                               New Orleans, Louisiana 70163-2800
23

24

25

                        *OFFICIAL TRANSCRIPT*

Page 1004

1    cells with K15?  What was he interested in, if you know?
2    A.  K15 is a chemical stain that stain the stem cells of the
3    epidermal stem cells.  But it's not very specific.  It also
4    stains other cells.  But I'm not discussing that.
5         What I think he found, it was positive, meaning the
6    stem cells were there, but this stain doesn't show you if the
7    stem cells work.  It's like you do -- you, for instance, have
8    cirrhosis.  So your liver is there, but may not work.  So, this
9    stain just show that stem cells are there, doesn't show they
10   are working properly.
11   Q.  So I want to ask you a question, but understand if I'm
12   clear.  Did you say that results of the staining for stem cells
13   were positive in this situation for Barbara Earnest?
14   A.  Yes, the stain was positive.  The significance, I don't
15   think there is any significance.
16   Q.  Whether it was positive or negative, would it have any
17   significance to you?
18   A.  You know, I don't believe one case can ever make
19   significance, not diagnostic significance, and not even
20   significant to understand exactly what's happening.
21   Q.  As a scientist and a researcher, you said one case doesn't
22   have significance.  What kind of volume of cases would you need
23   on stem cells in order -- can you even answer that question?
24   A.  I don't know, maybe 100.  I don't know exactly the number.
25   A statistician should decide the number.

Page 1005

1    Q.  Doctor, getting back to your conclusion concerning
2    permanent chemotherapy-induced alopecia, is permanent
3    chemotherapy-induced alopecia, is that different than just a
4    diagnosis of alopecia or hair loss?
5    A.  Yes.  Alopecia is like -- well, hair loss is like fever.
6    You have to give the specific name to each type of alopecia.
7    Alopecia is not a diagnosis.
8    Q.  So we've worked through your differential diagnosis,
9    correct?  Is that right?
10   A.  Yes.
11   Q.  Did you, Doctor, then make a determination as to which
12   chemotherapy drug caused Barbara Earnest's permanent
13   chemotherapy-induced alopecia?
14   A.  Yes.  I believe it was docetaxel, Taxotere.
15   Q.  What formed the basis for that conclusion?
16   A.  The basis from that conclusion is my personal experience
17   with this medication, my -- with this condition, sorry, my
18   personal experience with the -- with my literature review.
19   Q.  Let's first talk about your personal experience with this
20   condition and these medications.  You touched a little bit on
21   this earlier, but I want to come back to it.
22        Have you, as a clinician and practitioner, seen
23   permanent --
24        MS. SASTRE:  Your Honor's Motion in Limine ruling.  I
25   would be happy to come up, Your Honor.

Page 1006

1         THE COURT:  Come up.
2         (WHEREUPON, at this point in the proceedings, a
3    conference was held at the bench.)
4         MS. SASTRE:  So, Your Honor, your ruling was that for
5    all experts they couldn't talk about numbers of patients that
6    they've seen.  They can talk about what they've seen in their
7    clinical experience.  But, like, for example, Dr. Glaspy you
8    said couldn't come in and say, I've seen X number of patients.
9    You know, it's kind of getting into the numbers, numbers of
10   patients.  That was the issue.
11        They could talk about that they'd seen things
12   like this, which, of course, she's done all morning.
13        I have it here.  I just have to find it,
14   Your Honor.
15        THE COURT:  I know what you're talking about.
16        MR. SCHANKER:  Your Honor, that's a big distinction
17   because she's a causation witness.  Dr. Glaspy and
18   Dr. Miletello, as well as the plaintiff's, Dr. Bosserman and
19   Dr. Feigal, are not causation experts.  So --
20        THE COURT:  Dr. Feigal is not a causation expert?
21        MR. SCHANKER:  I'm sorry.  She does offer a general
22   causation opinion.
23        But this is a specific causation expert.  As part
24   of her opinion concerning specific causation, and as we
25   explained in specific causation argument, she has formed her

Page 1007

1    opinion based on seeing these patients in her practice.
2         THE COURT:  I think what I said is she could -- I think
3    she can talk about the literature viewed and that she has seen
4    it.  I think she's even written on it.  That was my
5    appreciation, that she did the case studies on it.  She can
6    talk about that.  As I said last week, I saw -- I don't want to
7    get into where it's anecdotal evidence --
8         MR. SCHANKER:  So, basically, her history, Your Honor,
9    is that she saw a presentation in clinic, and then she
10   researched that.
11        THE COURT:  She could give us that history which
12   presented, why she did the research.
13        MR. SCHANKER:  Then she saw another patient, as she
14   started to touch on earlier, and researched based on that, and
15   that it continued to drive her research, Your Honor, in this
16   and publish this, as she saw more and more of these patients
17   present.  This then continued to form and educate her on her --
18        THE COURT:  I understand that.  She can say, I saw it
19   in the clinic and research.  She ultimately did a case study,
20   didn't she?
21        MS. SASTRE:  Yes.
22        MR. SCHANKER:  She did multiple case studies.
23        THE COURT:  Right.  That she can talk about.  Those are
24   case studies.  They are different from, oh, my gosh, I've been
25   practicing for 30 years, I've never seen this before.  That

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)     *
PRODUCTS LIABILITY LITIGATION    *     Docket No.: 16-MD-2740
                                 *     Section "H(5)"
                                 *     New Orleans, Louisiana
*Relates to:  Barbara Earnest*   *     September 19, 2019
*Case No.: 16-CV-17144*          *
* * * * * * * * * * * * * * * * * *


DAY 4 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

## Page 5

1028

12:54PM 1          AFTERNOON SESSION
12:54PM 2          (September 19, 2019)
12:54PM 3          *****
1:15PM 4      THE DEPUTY CLERK:  All rise.
1:15PM 5      MR. COFFIN:  Your Honor, before we bring the jury, we
1:15PM 6  have these Kopreski designations ready to talk to you about on
1:16PM 7  the video.
1:16PM 8      THE COURT:  Are you all playing that this afternoon?
1:16PM 9      MR. COFFIN:  Well, that's a good point.  We might be;
1:16PM10  it just depends on the timing of things.  We can switch some
1:16PM11  things around so we don't have to jam you up.
1:16PM12      THE COURT:  Well, the problem is you're jamming the
1:16PM13  jury up.  Okay.  Let me see.
1:16PM14      MR. COFFIN:  These are what are -- this is --
1:16PM15          (OFF THE RECORD)
1:17PM16      THE COURT:  Let's bring in the jury.
1:17PM17      THE DEPUTY CLERK:  All rise.
1:17PM18      (WHEREUPON, the jury entered the courtroom.)
1:17PM19      THE COURT:  All jurors are present.  Court's back in
1:17PM20  session.  You may be seated.
1:17PM21      Dr. Tosti, I remind you you're under oath.
1:17PM22      MS. SASTRE:  Thank you, Your Honor.
1:18PM23      THE COURT:  Ms. Sastre.
1:18PM24      MS. SASTRE:  Good afternoon, everybody.
1:18PM25      (WHEREUPON, ANTONELLA TOSTI, having been previously

OFFICIAL TRANSCRIPT

## Page 6

1029

ANTONELLA TOSTI - CROSS

1:18PM 1  duly sworn, testified as follows.)
1:18PM 2          CROSS-EXAMINATION
1:18PM 3  BY MS. SASTRE:
1:18PM 4  Q.  Dr. Tosti, hello.
1:18PM 5  A.  Hello.
1:18PM 6  Q.  I don't believe we've ever had the pleasure of meeting
1:18PM 7  before.  My name is Hildy Sastre.  I have some questions for
1:18PM 8  you, just like Mr. Schanker had.  All right?
1:18PM 9  A.  Yes, ma'am.
1:18PM10      MS. SASTRE:  Before we start, Your Honor, I would
1:18PM11  just like to give the witness a copy of her depositions in this
1:18PM12  matter, if I may.
1:18PM13      THE COURT:  Sure.
1:18PM14      MS. SASTRE:  Okay.  Very good.
1:18PM15      THE WITNESS:  Thank you.
1:18PM16      MS. SASTRE:  You're welcome.
1:18PM17  BY MS. SASTRE:
1:18PM18  Q.  So, Dr. Tosti, you know that Mrs. Earnest had chemotherapy
1:18PM19  in 2011; correct?
1:18PM20  A.  Yes.
1:18PM21  Q.  And that was to treat breast cancer; right?
1:18PM22  A.  Yes.
1:18PM23  Q.  And you understand that she was treated specifically with
1:18PM24  a drug by the name of Adriamycin?
1:18PM25  A.  Yes.

OFFICIAL TRANSCRIPT

## Page 7

1030

ANTONELLA TOSTI - CROSS

1:18PM 1  Q.  And you'd agree with me that Adriamycin causes hair loss;
1:19PM 2  correct?
1:19PM 3  A.  Adriamycin can cause anagen effluvium, yes.
1:19PM 4  Q.  Okay.  When you say that, though, I'm asking you a very
1:19PM 5  specific question.
1:19PM 6      When a patient takes Adriamycin for chemotherapy,
1:19PM 7  does that Adriamycin can cause hair loss?
1:19PM 8  A.  Yes, hair loss, but not prevent regrowth.
1:19PM 9  Q.  I'm sorry.  Say that again.  Not what?
1:19PM10  A.  Can cause hair loss.  But what she has is different.  She
1:19PM11  has no regrowth.
1:19PM12  Q.  Okay.  Well, my question is just simply it can cause hair
1:19PM13  loss; right?
1:19PM14  A.  Yes, it can cause hair loss.
1:19PM15  Q.  Very good.  And you'd also agree with me that there are
1:19PM16  reports in the literature of what you call -- what you talked
1:19PM17  about this morning, persistent chemotherapy-induced alopecia
1:19PM18  with Adriamycin; true?
1:19PM19  A.  With Adriamycin alone, just a very, very high dosage, not
1:20PM20  for breast cancer.
1:20PM21  Q.  All right.  Let me see if I can ask you a different
1:20PM22  question.
1:20PM23      Is Adriamycin considered an anthracycline drug?
1:20PM24  A.  Yes.
1:20PM25  Q.  And there's case reports of persistent

OFFICIAL TRANSCRIPT

## Page 8

1031

ANTONELLA TOSTI - CROSS

1:20PM 1  chemotherapy-induced alopecia with anthracycline regimens;
1:20PM 2  true?
1:20PM 3  A.  Yes.
1:20PM 4  Q.  Okay.  Now, we can agree that Mrs. Earnest was also
1:20PM 5  treated with Cytoxan?
1:20PM 6  A.  Yes.
1:20PM 7  Q.  And another name for that is cyclophosphamide?
1:20PM 8  A.  Yes.
1:20PM 9  Q.  And you'd agree that Cytoxan causes hair loss; true?
1:20PM10  A.  Yes.
1:20PM11  Q.  And you'd also agree with me, Doctor, that there are
1:20PM12  reports in the literature which you have seen personally of
1:20PM13  persistent chemotherapy-induced alopecia with Cytoxan?
1:20PM14  A.  Very rare.
1:20PM15  Q.  But they exist was my question.
1:20PM16  A.  Yes, but they are very rare.
1:20PM17  Q.  Okay.  Now, there's also a group of chemotherapies used to
1:21PM18  treat breast cancer known as taxanes; right?
1:21PM19  A.  Yes.
1:21PM20  Q.  And Taxotere is a taxane; true?
1:21PM21  A.  Yes.
1:21PM22  Q.  Taxol is a taxane?
1:21PM23  A.  Yes.
1:21PM24  Q.  And let's talk about Taxol for a moment.  I know you spoke
1:21PM25  with Mr. Schanker about it on your direct exam.

OFFICIAL TRANSCRIPT

## Page 33

1056

ANTONELLA TOSTI - CROSS

1:54PM 1 Q.  Okay.  And let me try to pull those up.

1:54PM 2      You looked at cyclophosphamide; correct?

1:54PM 3 A.  Yes.  I don't know the data about these drugs exactly.  I

1:55PM 4 see here, but I don't know if they -- patients took these,

1:55PM 5 association.  Not just cyclophosphamide alone.  I don't know.

1:55PM 6 Q.  Okay.  Cyclophosphamide is listed; right?

1:55PM 7 A.  But it's listed maybe in association with methotrexate and

1:55PM 8 fluorouracil.

1:55PM 9 Q.  Well, Doctor, there may be a lot of things going on here.

1:55PM10 I don't know.  I'm just asking you is cyclophosphamide listed?

1:55PM11 A.  It's listed.

1:55PM12 Q.  Okay.  And what it says next to cyclophosphamide, which is

1:55PM13 Cytoxan, and then two other drugs that are listed, it has a

1:55PM14 number of 13; correct?

1:55PM15 A.  But you don't know which one as the number.  It's a mix to

1:55PM16 it.

1:55PM17 Q.  I didn't ask that, ma'am.  I'm just asking you is the

1:55PM18 number 13 there.

1:55PM19 A.  I see number 13, but it's for three drugs, not for one.

1:55PM20 Q.  I understand.  And all I'm asking you is that some number

1:55PM21 of these 13 patients, I know you don't know how many today, but

1:55PM22 some number within those 13 patients took cyclophosphamide --

1:56PM23 A.  I am very aware of this, yes.

1:56PM24 Q.  -- and had persistent chemotherapy-induced alopecia?

1:56PM25 A.  Yes.

OFFICIAL TRANSCRIPT

## Page 34

1057

ANTONELLA TOSTI - CROSS

1:56PM 1 Q.  As you sit here today, you don't know if the number is

1:56PM 2 one, you don't know if the number is 10 for cyclophosphamide;

1:56PM 3 right?

1:56PM 4 A.  Absolutely, I don't know.

1:56PM 5 Q.  Okay.  And then if we look a little further down, it says

1:56PM 6 "doxorubicin."  Do you see that?

1:56PM 7 A.  Yes, I do.

1:56PM 8 Q.  And if lists other drugs as well?

1:56PM 9 A.  Yes.

1:56PM10 Q.  Doxorubicin is Adriamycin; right?

1:56PM11 A.  Yes.

1:56PM12 Q.  And in your paper published in 2109, you recorded five

1:56PM13 cases for a group of drugs, including Adriamycin, where you saw

1:56PM14 five patients with persistent chemotherapy-induced alopecia;

1:56PM15 correct?

1:56PM16 A.  They were also taking Adriamycin.

1:56PM17 Q.  Right.  And that's what I'm saying.  You don't know of

1:56PM18 that five patients who had persistent chemotherapy-induced

1:56PM19 alopecia, if it was two or three or four or even just one of

1:57PM20 them that had that drug, but you know some of them did;

1:57PM21 correct?

1:57PM22 A.  Yes, but what I really think is that those drugs are you

1:57PM23 know, sometimes occasionally causing the problem.  I never said

1:57PM24 they never cause.  It's just a question of, likely, frequency.

1:57PM25 Q.  One of the other drugs that the jury has heard a little

OFFICIAL TRANSCRIPT

## Page 35

1058

ANTONELLA TOSTI - CROSS

1:57PM 1 bit about, and I think you discussed on your direct exam, is

1:57PM 2 fluorouracil; correct?

1:57PM 3 A.  No, I have no experience with that.  I discussed busulfan.

1:57PM 4 I have experience with busulfan.

1:57PM 5 Q.  All right.  But you've heard of fluorouracil; correct?

1:58PM 6 A.  Sorry?

1:58PM 7 Q.  Fluorouracil.  I just highlighted it on the page.

1:58PM 8 A.  Yes, I have no experience with that drug.

1:58PM 9 Q.  Okay.  But it's included within your group where some

1:58PM10 number of patients within that 13 had persistent

1:58PM11 chemotherapy-induced alopecia after taking fluorouracil; right?

1:58PM12 A.  Yes.

1:58PM13 Q.  Okay.  Now, the jury's heard a little bit about a drug

1:58PM14 regimen.  They heard about FAC, F-A-C.  And they've also heard

1:58PM15 about a regimen called FEC, F-E-C.  All right.  And do you

1:58PM16 understand the E in FEC to be epirubicin?

1:58PM17 A.  I'm not an oncologist, and to be honest, I don't feel I

1:58PM18 can give an expert opinion, but I'm here and I will do what I

1:59PM19 can do.

1:59PM20 Q.  Well, let me ask you this, Doctor:  There's case reports

1:59PM21 of persistent chemotherapy-induced alopecia with the F-E-C, or

1:59PM22 FEC, regimen; true?

1:59PM23 A.  I think so.

1:59PM24 Q.  And the E in the FEC is also included within your study?

1:59PM25 Right?  Epirubicin?

OFFICIAL TRANSCRIPT

## Page 36

1059

ANTONELLA TOSTI - CROSS

1:59PM 1 A.  Yes.

1:59PM 2 Q.  Okay.  Let me find that.

1:59PM 3      I may have misspoke, and I apologize.  I couldn't

1:59PM 4 find it because you actually don't comment on epirubicin in the

2:00PM 5 study.

2:00PM 6      All right.  So let's -- let's go back to

2:00PM 7 Mrs. Earnest.  Okay?

2:00PM 8 A.  Yes.

2:00PM 9 Q.  All right.  Now, we talked about Mrs. Earnest taking

2:00PM10 hormone therapy or Arimidex; true?

2:00PM11 A.  Yes.

2:00PM12 Q.  And I believe what these drugs are called -- and we

2:00PM13 haven't spent as much time on them as we have the chemotherapy

2:00PM14 drugs, so I'd like to just spend a moment here.

2:00PM15      But I think what they're called is aromatase

2:00PM16 inhibitors; true?

2:00PM17 A.  Yes.

2:00PM18 Q.  And doctors use Arimidex for women who have been diagnosed

2:00PM19 with cancer, particularly if they're past menopause; right?

2:00PM20 A.  Yes.

2:01PM21 Q.  Like Mrs. Earnest; correct?

2:01PM22 A.  Yes.  And I explained today that they're used for

2:01PM23 estrogen-positive breast cancer, and so.

2:01PM24 Q.  And you would agree with me that aromatase inhibitors,

2:01PM25 like Arimidex, cause hormonal changes in the body?

OFFICIAL TRANSCRIPT

## Page 77

1100

ANTONELLA TOSTI - CROSS

2:57PM 1 Q.  Let's change topics, and this is last topic I have for
2:57PM 2 you, Doctor.  When a patient comes to see you -- we're talking
2:57PM 3 about hair loss, okay, for persistent hair loss, you often
2:57PM 4 recommend treatment for them; true?
2:57PM 5 A.  If the patients come to see me, usually comes for
2:57PM 6 treatment, yes.
2:57PM 7 Q.  Okay.  And we can agree that there is good news that, in
2:57PM 8 fact, your article states, the one we were just looking at,
2:58PM 9 that there are treatment options for patients with permanent
2:58PM10 chemotherapy-induced alopecia; true?
2:58PM11 A.  I believe there are treatment options for mild Grade 1.
2:58PM12 But in Grade 2, I don't believe.
2:58PM13 Q.  Okay.  You've stated moderate to significant improvement
2:58PM14 was observed in 36 out of 54 patients with permanent
2:58PM15 chemotherapy-induced alopecia?
2:58PM16 A.  The one with not severe alopecia.
2:58PM17 Q.  Okay.  And that would be 67 percent of the patients; true?
2:58PM18 A.  67 percent of probably the one with not severe alopecia.
2:58PM19 It's not stated that -- it's not -- but that's my experience.
2:58PM20 Q.  And that's something you note in your report, correct,
2:58PM21 that patients do experience improvement with treatment even
2:59PM22 after permanent chemotherapy-induced alopecia?  Correct?
2:59PM23 A.  Yes.
2:59PM24 Q.  So we've used the word -- I mean, we've been using this
2:59PM25 word "permanent," but in order to meet that definition, it just

OFFICIAL TRANSCRIPT

## Page 78

1101

ANTONELLA TOSTI - CROSS

2:59PM 1 means you have hair loss in excess of six months; right?
2:59PM 2 That's how you use that word; true?
2:59PM 3 A.  Everybody use that word.
2:59PM 4 Q.  Everybody.
2:59PM 5      And even though we use the word "permanent" when it
2:59PM 6 comes to chemotherapy-induced alopecia, you've seen, with your
2:59PM 7 eyes, improvement with treatment; true?
2:59PM 8 A.  But this improvement doesn't allow to remove the wig.
2:59PM 9 It's a very minimal improvement.
2:59PM10 Q.  Is the answer to my question "yes"?
2:59PM11 A.  Minimal improvement, yes.  Not severe.
2:59PM12 Q.  Well, you usually recommend patients try something called
2:59PM13 Rogaine; true?
2:59PM14 A.  I do in some cases, not every, every time.
3:00PM15 Q.  But as far as you know, you don't -- Mrs. Earnest hasn't
3:00PM16 tried that, as far as you know; is that fair?
3:00PM17 A.  Yes.
3:00PM18 Q.  Okay.  And I think that you also prescribe your patients
3:00PM19 something called minoxidil.
3:00PM20 A.  It's the same as Rogaine.
3:00PM21 Q.  Same thing.
3:00PM22      All right.  And then there's something else I believe
3:00PM23 you use called spironolactone?
3:00PM24 A.  Spironolactone.  I don't use because I don't think it's
3:00PM25 completely safe in breast cancer.  And also our paper says that

OFFICIAL TRANSCRIPT

## Page 79

1102

ANTONELLA TOSTI - CROSS

3:00PM 1 with caution.
3:00PM 2 Q.  So that's something that you don't use?
3:00PM 3 A.  I don't use because it's something that act on hormones,
3:00PM 4 and so if --
3:00PM 5 Q.  All right.  Well, Doctor, we can agree that we can't say
3:00PM 6 if Mrs. Earnest could have hair regrowth, some hair regrowth,
3:01PM 7 if she hasn't tried any treatment; is that fair?
3:01PM 8 A.  I agree.
3:01PM 9 Q.  Okay.  All right, Doctor.  Thank you.
3:01PM10      MS. SASTRE: I have no further questions.
3:01PM11      THE WITNESS:  Thank you very much.
3:01PM12      THE COURT:  It might be a good time for our afternoon
3:01PM13 break.  Court will be at recess for 15 minutes.
3:01PM14      THE DEPUTY CLERK:  All rise.
3:01PM15      (WHEREUPON, the jury exited the courtroom.)
3:22PM16      THE DEPUTY CLERK:  All rise.
3:23PM17      THE COURT:  Your Honor, before we bring the jury in,
3:23PM18 could I raise one issue?  Maybe we could approach.
3:23PM19      THE COURT:  Sure.
3:23PM20      (WHEREUPON, the following proceedings were held at
3:23PM21 the bench.)
3:23PM22      MS. SASTRE:  So on direct exam, we had a discussion
3:23PM23 about giving Mr. Schanker some leeway on leading, and I
3:23PM24 understood that.  I had no issue with that.  I do have
3:23PM25 different feelings on the redirect.

OFFICIAL TRANSCRIPT

## Page 80

1103

3:23PM 1      THE COURT:  Okay.  This was where the issue was with
3:23PM 2 leading.  There are occasions where she said something, and I'm
3:23PM 3 having to look.  So if he says -- I agree, you should not lead.
3:24PM 4 We can play that by ear.  I agree.
3:24PM 5      MS. SASTRE:  Sure.
3:24PM 6      THE COURT:  But if she says "effluvium," and nobody
3:24PM 7 can understand it, and you said, "So your opinion is
3:24PM 8 tel-whatever effluvium."
3:24PM 9      MR. SCHANKER:  Sure.  I'll do my best, Your Honor.
3:24PM10      THE COURT:  Okay.  So that they -- I don't want them
3:24PM11 not to be able to understand, and that was my only issue.
3:24PM12      MS. SASTRE:  I understand.
3:24PM13      THE COURT:  I don't think you should lead on the
3:24PM14 question, but if at the conclusion, it's pretty apparent nobody
3:24PM15 has understood her, and maybe I can even help with that just
3:24PM16 for the --
3:24PM17      MS. SASTRE:  Yep, I got it.
3:24PM18      THE COURT:  That was my primary concern.
3:24PM19      MS. SASTRE:  I know that, Judge.  I wanted to, in
3:24PM20 fairness, be heard.
3:24PM21      THE COURT:  Sure.
3:24PM22      MS. SASTRE:  And the second thing is, just so we
3:24PM23 don't have to waste the jurors' time, I'll just say it, I see
3:24PM24 you guys highlighting a bunch of her deposition testimony, and
3:24PM25 I just wanted to say before we have a bunch of lengthy bench

OFFICIAL TRANSCRIPT

08:48:06  1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5     IN RE:   TAXOTERE (DOCETAXEL)
               PRODUCTS LIABILITY          Docket No.: 16-MD-2740
6              LITIGATION                  Section "H(5)"
                                           September 20, 2019
7                                          New Orleans, Louisiana

8     *Relates To*:  *Barbara Earnest*,
      *Case No.: 16-CV-17144*

9

10    * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12                       DAY 5, MORNING SESSION
                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                   UNITED STATES DISTRICT JUDGE

14

15    APPEARANCES:

16    For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                                  BY:  DAWN BARRIOS, ESQ.
17                                701 Poydras Street
                                  Suite 3650
18                                New Orleans, Louisiana 70139

19

20    For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                    Meunier & Warshauer, LLC
21                                BY:  PALMER LAMBERT, ESQ.
                                  2800 Energy Centre
22                                1100 Poydras Street
                                  New Orleans, Louisiana 70163-2800
23

24

25

                         ***OFFICIAL TRANSCRIPT***

1 codes published literature.  You can use computer -- you can
2 use computer search engines to find literature that you're
3 particularly interested in.
4        There are medical terms -- there is a way to search
5 the literature that I reliably use, scientifically valid
6 methods that I've used to do a comprehensive analysis of the
7 literature.
8        So I think, as I mentioned earlier, I used the terms
9 chemically-induced -- or chemotherapy-induced alopecia
10 conjointly with the terms permanent, irreversible, or
11 persistent.  Then I looked at the specific types of
12 chemotherapy that are provided to patients with early stage
13 breast cancer.  That turned up literature.
14        I looked at the different literature for -- may I go
15 on?
16 Q.  Sure.
17 A.  I looked at the literature to see whether or not it
18 actually did have the terms that I was interested in looking
19 at.
20        Sometimes search terms, you get extraneous things.
21 Maybe they are improperly coded.  You know, stuff happens.
22 But, basically, I made sure that the topic of interest was in
23 the article.
24        Then I also looked at whether or not they named that
25 chemotherapy, whether or not there were numbers to the type of

1 regimen that were provided to patients.
2        So, for example, if they didn't name the regimen for
3 the breast cancer, they just have a laundry list of different
4 chemotherapy agents, any one of which might have been pertinent
5 for a breast cancer patient, I couldn't use that because the
6 topic under discussion is Taxotere.  So I was trying to find
7 out what the data was concerning that.
8        The other is whether or not they just used
9 percentages, but there were no numbers.  Well, I can't do much
10 with that.  I need to have numbers when I'm looking at data.  I
11 need to see, are we talking about 300 patients, or are we
12 talking about ten patients.
13        The other thing is whether or not -- the quality of
14 the paper.  You know, I rank them according to the hierarchy of
15 evidence, but, basically, was it a paper?  Was it an abstract?
16 Was it a poster?  But everything I looked at was peer-reviewed
17 and was published.
18 Q.  Okay.  Now, you talk about -- what's under investigation
19 is Taxotere.  When you did this literature search, did you do
20 it just for Taxotere, or did you do it for other breast cancer
21 chemotherapy drugs as well?
22 A.  I did it for the -- I did it for the cancer chemotherapy
23 drugs that are relevant for breast cancer.
24 Q.  Okay.  I just want to ask you a little list here.  Did
25 your search -- scientific medical literature search, search for

1 are articles and literature on anthracycline, the A in the TAC
2 that we've heard about?
3 A.  Yes.
4 Q.  Did it search for Cytoxan, the C that the jury has heard
5 about in the TAC regimen?
6 A.  Yes.  The terms were either Cytoxan or the longer term,
7 cyclophosphamide.
8 Q.  Did your scientific literature search, search for
9 5-fluorouracil, the F in the FAC arm of TAX316?
10 A.  Yes, I did.
11 Q.  Did you look for any other breast cancer -- did you
12 investigate any other breast cancer chemotherapy drugs in this
13 scientific literature search?
14 A.  Yes.  Of course, I looked for Taxotere or what's also
15 called docetaxel.  Then I also had a broad term, chemical or
16 chemotherapy-induced alopecia.
17 Q.  Did you search for Taxol, or paclitaxel?
18 A.  Yes, those were part of the articles that came up in the
19 broader search for chemotherapy-induced alopecia.
20 Q.  The A, anthracycline, is that also called epirubicin
21 sometimes?
22 A.  Well, there is several different types of -- anthracycline
23 is the class.  It's also called doxorubicin, Adriamycin,
24 epirubicin.  Those are other names for anthracyclines.
25 Q.  Thank you.

1        Dr. Feigal, did you create a chart that details the
2 results of your search?
3 A.  I did.
4 Q.  Would putting that in front of the jury help you explain
5 what you did?
6 A.  It would.
7        MR. MICELI:  Your Honor, may I provide the witness with
8 a copy?
9        THE COURT:  Yes, you may.
10        THE WITNESS:  Thank you.
11        Is this supposed to come up on my monitor as
12 well, or no?
13        THE COURT:  It should be.
14        THE WITNESS:  It's not.
15        THE COURT:  Do you all have it on your monitor?
16        MR. MICELI:  I have it on mine.
17        THE WITNESS:  Do I just have to hit it?
18        Well, I have it in front of me.  But if there's
19 other things that need to be shown.
20        Anyway, I can hear you, and I have got the table
21 in front of me.
22        MR. MICELI:  Thank you.
23 EXAMINATION BY MR. MICELI:
24 Q.  Can you just generally explain what this chart seeks to
25 represent to the jury?

Page 1190

1    A.  Yeah.  What I was trying to do is, in an efficient way,
2    try to put down the summary of the data that I looked at in a
3    way that hopefully is digestible.
4         So what I did, in the -- so these are the data
5    sources that reported permanent alopecia in the treatment of
6    breast cancer.
7         So on the left-hand side, I -- if you look at the --
8    you know, there is columns that go down, there is rows that go
9    across.  So in the columns I have where the data came from.
10        So, for the clinical trials, it lists the two
11   randomized clinical trials that were sponsored by Sanofi.  Then
12   in the publication, which was -- involved my search, I list all
13   the relevant articles by the author's last name and by the year
14   in which it was published.
15        You'll notice it's not in a yearly sequence -- you
16   know, it sort of jumps from 2001 to 2013 -- because what I was
17   trying to do is put it in terms of the hierarchy of the level
18   of evidence, whether it was a prospective clinical trial.  That
19   is to say, you look forward.  Patients get something, or they
20   have an exposure to a chemotherapy agent, and you follow them
21   over time.  You're going forward.
22        Other types of trials are what we call retrospective.
23   They'll look back.  So you could have lookbacks, where the
24   patient got exposure to the agent, but it was sometime in the
25   past.

Page 1191

1         You also have lookback trials where it's the outcome
2    that you're looking at.  The patients are coming forward with
3    permanent or irreversible or persistent alopecia, and then you
4    look back to see what chemotherapy regimens they received.
5         Then there is papers or there is abstracts.  I put
6    more emphasis on published papers than I do on published
7    abstracts or published posters, just because there's a
8    higher -- it's not that you don't get valuable information from
9    all of these things, but just there is a higher level of rigor.
10   There is a higher amount of material you can look at.  There is
11   more details.
12        Maybe I'll stop there.  I tend to go on.  But that's
13   the first column.
14        So then the second column is actually listing the
15   exposure -- you know, Taxotere.  Those are the cases that are
16   reported that are relevant to the Taxotere exposure.
17        The next column that you'll see in the published
18   literature -- because, obviously, in the randomized
19   clinical trial, there is no Taxol in the randomized
20   clinical trial -- you'll see the column of Taxol.
21        Then the next column, I have Taxotere and Taxol.
22   There are some rare instances where some patients got both of
23   the taxanes.
24        Then in the next column, I have a category called
25   Taxane.  That's where the author of the publication failed to

Page 1192

1    specify whether it was Taxol or Taxotere.  What I did in that
2    one instance was contact the author, who affirmed that they
3    actually gave both -- there was both Taxotere and Taxol in the
4    study, but he didn't look to see whether or not it was due to
5    the Taxol or to the Taxotere.
6         I asked further, could he look?  No.  It just didn't
7    happen.  So I didn't throw out the data.  I included it.
8         Then the next column are the non-taxanes, where there
9    is not a Taxol or a Taxotere in the regimen.
10   Q.  I want to talk more about the chart, but right now I want
11   to ask a couple of questions about what's not in the chart.
12        Well, I'm going to ask about the clinical trials
13   first.  TAX316 and TAX301, the jury has already heard, that's
14   Sanofi's studies, right?  Correct?
15   A.  I believe that's true.
16   Q.  Okay.  So I'm going to just put RCT's, randomized
17   controlled trials, only Sanofi, on your chart.
18        Now, the literature search that you did, if there
19   would have been published peer-reviewed medical scientific
20   articles that documented an increased risk of permanent
21   hair loss with any of the other breast cancer chemotherapy
22   drugs, would your search have caught them?
23   A.  It should have caught them.  But I do want to say a
24   caveat, it was not an exhaustive search.  It was a
25   comprehensive search.  So I will -- you know, caveat, it's

Page 1193

1    possible that I didn't catch everything.  I'd be shocked if a
2    randomized clinical trial didn't show up, but it's possible
3    that a case report or something may not have.  So I do want to
4    say, it's not 100 percent, but it's comprehensive.
5    Q.  More likely than not that you would have caught those
6    studies?
7    A.  Absolutely.
8    Q.  I'm going to put a circle over here in these absence
9    categories.  I'm going to put no RCT's for any other -- I'm
10   going to put BC -- breast cancer chemo drugs.  Is that a fair
11   statement?
12   A.  And permanent alopecia, right.
13   Q.  That's what this all about.
14   A.  That's right.
15   Q.  Okay.  So no RCT's --
16   A.  There are a lot of RCT's out there.
17   Q.  Certainly, but there's no -- your search captured no
18   randomized controlled trials or articles that document or
19   report upon randomized controlled trials that show an increased
20   risk of permanent alopecia with any other breast cancer chemo
21   drug other than Taxotere?
22   A.  That's correct.
23   Q.  Now, let's look down at these publications just for a
24   second.  I've counted them before.  I think there is 19.
25   A.  There are.

1    MR. MICELI: Same objection, Your Honor.
2    THE COURT: I think we're now really going far afield
3    of what her direct testimony was and her qualifications.
4    EXAMINATION BY MR. STRONGMAN:
5    Q. Now, Doctor, with regard to the opinions that you offered
6    today regarding causation, you would agree with me, Doctor,
7    that there have been cases of permanent hair loss reported with
8    Taxol, correct?
9    A. Correct.
10   Q. You would agree with me that there have been cases of
11   permanent hair loss reported with cyclophosphamide, correct?
12   A. I actually don't have isolated cyclophosphamide in here,
13   unless it's pooled in Freites-Martinez's article. But it's
14   captured in my table.
15   Q. Well, Doctor, let me just ask the question again. You
16   would agree that there have been cases of permanent hair loss
17   reported with cyclophosphamide, correct?
18   A. I can't tell from the Freites-Martinez paper, to tell you
19   the truth, but if it was, it was in that paper.
20   MR. STRONGMAN: May I approach the witness, Your Honor?
21   THE COURT: Yes, you may.
22   THE WITNESS: Oh, I'm sorry. It is in the AC regimen,
23   so yes.
24   EXAMINATION BY MR. STRONGMAN:
25   Q. So let me just ask the question again, so we have a clear

1    reference.
2    A. I'm sorry, I thought you were talking about monotherapy.
3    So my apologies.
4    Q. Would you agree with me that there have been cases of
5    permanent hair loss reported with cyclophosphamide?
6    A. Yes. Yes.
7    Q. Would you agree with me that there have been cases of
8    permanent hair loss reported with Adriamycin?
9    A. Correct.
10   Q. Would you agree with me that there have been cases of
11   permanent hair loss reported with the AC regimen?
12   A. Well, now I am a little confused. I was including the
13   cyclophosphamide in the anthracycline answer, with combo.
14   Q. But you would agree with me that in the AC regimen combo,
15   there have been cases of permanent hair loss?
16   A. Yes, I do agree.
17   Q. You would agree with me that there have been cases
18   reported of permanent hair loss with the AC Taxol regimen,
19   correct?
20   A. I believe that's captured in some of the cases I have on
21   the --
22   Q. So the answer is yes?
23   A. Yes. I'd have to look at the specifics of the article,
24   but I believe those were in combo.
25   Q. Now, you talked through a chart of literature that you

1    reviewed; is that correct?
2    A. That's correct.
3    Q. Okay. One of the things that you did was you searched the
4    literature, and you came up with these articles, and then you
5    counted the reports; is that correct?
6    A. Well, I reviewed the articles.
7    Q. Fair enough.
8        But then you counted the reports, correct?
9    A. Yes. I looked at the number of events that were reported
10   in those papers, so I accurately described what was in the
11   papers.
12   Q. I think you explained that your search was -- I think you
13   called it comprehensive, but not exhaustive; is that correct?
14   A. That's a correct description.
15   Q. You certainly remember during your deposition you were
16   shown some articles that had reports with other drugs that you
17   had not found during your original search, correct?
18   A. They handed me articles that I had not found on my
19   original search, but I read them in realtime and, after reading
20   them, decided one would have gone in, the others would have
21   not. Two were actually incorrect and were corrected in the
22   literature.
23   Q. I think you testified several times that the topic under
24   consideration was Taxotere, right? That's what you've said
25   today multiple times, correct?

1    A. Yes, that's my impression of why we're all here today.
2    Q. You were laser focused on Taxotere, correct?
3    A. Well, I was focused on issues relevant to Taxotere in the
4    setting of the treatments that breast cancer patients received.
5    So I looked at the regimens, if that's what you're asking.
6    MR. STRONGMAN: May I approach, Your Honor?
7    THE COURT: Yes, you may.
8    EXAMINATION BY MR. STRONGMAN:
9    Q. Now, Dr. Feigal, one more question. During your direct
10   examination with Mr. Miceli, you did not offer any opinions
11   about the overall exposure in the entire patient population for
12   each individual drug, correct?
13   A. Well, I did talk about -- I thought I talked about the
14   cumulative dose for those papers.
15   Q. Let me just ask it a different way. You didn't offer any
16   opinions about how many patients worldwide were exposed to one
17   drug or another drug or another drug, correct?
18   A. Worldwide?
19   Q. Yes.
20   A. No.
21   Q. You didn't offer any opinions about that, correct?
22   A. I didn't offer opinion on worldwide exposure.
23   Q. Now, what I've handed you is the Crown poster, correct?
24   A. Correct.
25   Q. Crown is included in your list; is it not?

Page 1226

1    Q.  Now, your chart.  So when Mr. Miceli showed you the chart,
2    it had a category for Taxotere, it had a category for Taxol,
3    and then it had, I think, a category for maybe taxanes that you
4    couldn't differentiate, and then it had a non-taxane, correct?
5    A.  That's correct.
6    Q.  Now, what you know, though, is that when you really dig
7    into the data, when you focus on the details of those papers,
8    almost all of those patients were on combination therapies,
9    correct?
10   A.  That's correct.
11        MR. STRONGMAN:  May I approach the witness, Your Honor?
12        THE COURT:  Yes, you may.
13   EXAMINATION BY MR. STRONGMAN:
14   Q.  Now, Doctor --
15   A.  I don't know what you handed me.  You'll have to explain
16   it.
17   Q.  Now, Doctor, what I have handed you --
18        MR. MICELI:  Your Honor, may we approach?
19        THE COURT:  Yes.
20        THE WITNESS:  I've never seen this before.
21        THE COURT:  Let's take it down.  Thank you.
22        (WHEREUPON, at this point in the proceedings, a
23   conference was held at the bench.)
24        THE COURT:  What is this?
25        MR. STRONGMAN:  What this is, is this is her listing of

Page 1227

1    all the papers.  It shows how many patients in each one were
2    exposed to Cytoxan or Adriamycin, in addition to the Taxotere
3    or the Taxol.  That's all it is.
4        MR. MICELI:  Well, actually, Your Honor, I think --
5    one, I think that's incorrect.  I think this number would be
6    744, 744, 735.  The TAX316 study had about 1480 people.
7        MR. STRONGMAN:  The point is this --
8        MR. MICELI:  These numbers -- excuse me -- these
9    numbers are nowhere in any of their literature or any of their
10   documents that we've seen from the TAX316 study report.
11        If he came up with these from something internal
12   that we have never been able to look at, I don't know where
13   they came from.
14        MR. STRONGMAN:  So, Judge, what I did is, in TAX316,
15   this is just showing, in all their studies, that the fact that
16   these were combination regimens, and that she only counted the
17   Taxol one or the Taxotere one.  I'm just showing what the
18   numbers would be if she actually tabulated for each of the
19   drugs in the regimen.
20        Mr. Miceli is happy to cross-examine her on
21   anything he thinks is inaccurate.  It's just creating a chart
22   just like the chart they created.
23        MR. MICELI:  It's not just like the one we created
24   because the one we pulled is straight out of the clinical study
25   report.  These numbers --

Page 1228

1        MR. STRONGMAN:  These are your studies.  You can go and
2    say I'm wrong.  You can show it and say, you're wrong.
3        MR. MICELI:  I'm not worried about what you have down
4    here.  I'm worried about what you have up top here and what
5    it's attributed to.
6        Where does that 45 come from?  Because every
7    patient in the TAX316 study received 60 milligrams of Cytoxan
8    and 600 milligrams of Adriamycin.  It's not 45.  It's the
9    entire population of that study that received it.  I can show
10   you the protocol, Your Honor, and the treatment on it.
11        MR. STRONGMAN:  This is fair cross-examination.
12        THE COURT:  She's your causation expert.  I'm going to
13   let him cross her on this.  I have no doubt that you're going
14   to revisit this and review this, as you should.
15        But, I mean, this is fair game.  This is an
16   expert.
17        MR. MICELI:  Thank you, Your Honor.  As long as I get
18   to revisit it on redirect.
19        THE COURT:  Of course, you do.
20        MR. MICELI:  Thank you.
21        (WHEREUPON, at this point in the proceedings, the bench
22   conference concluded.)
23        THE COURT:  Please proceed.
24   EXAMINATION BY MR. STRONGMAN:
25   Q.  Are you ready to proceed, Doctor?

Page 1229

1    A.  Sure.
2    Q.  So what we've done here, just as an example, we know that,
3    like you said, in most of these studies, most of these patients
4    received more than one drug at the same time, correct?
5    A.  Right.
6    Q.  So if a patient received the TAC regimen, for example,
7    does that make sense, so Taxotere, Adriamycin, Cytoxan, you
8    only tabulated a count for the Taxotere when you did your
9    chart, correct?
10   A.  Since the question is, is there some differential between
11   Taxotere in combination versus non-Taxotere combinations,
12   that's exactly the scientific method you would use to try and
13   determine --
14   Q.  Doctor, just listen to my question.
15        THE COURT:  Carefully listen to the question,
16   Dr. Feigal.
17        THE WITNESS:  Okay.
18   EXAMINATION BY MR. STRONGMAN:
19   Q.  In your chart, when a patient received Taxotere,
20   Adriamycin, and cyclophosphamide, you only counted a tabulation
21   for the Taxotere, correct?
22   A.  Right, and --
23   Q.  Yes or no, Doctor?
24   A.  Yes.  It's a Taxotere regimen.  It was counted in the
25   Taxotere regimen arm.

Page 1230

1    I just want to say --
2    Q.  Doctor, if you could focus on the question.
3    A.  No, I do have to --
4    THE COURT:  When I talk, everybody has to stop.
5    You have to answer the question.  You may explain
6    it, but you have to answer the question first.
7    THE WITNESS:  So the answer is yes.  May I explain it?
8    MR. STRONGMAN:  Mr. Miceli can have you answer any
9    questions that he has about your opinions.
10   MR. MICELI:  Your Honor, object --
11   THE COURT:  I think she gets to explain her answer.
12   You may explain your answer.
13   MR. STRONGMAN:  Go ahead.
14   THE WITNESS:  Yeah.  The only reason I didn't put
15   Taxotere-containing regimen with the anthracycline and
16   cyclophosphamide is it doesn't fit on a column header.
17   So the implication is those are
18   Taxotere-containing regimens.  I wasn't trying to be
19   nontransparent.  I just can't fit all of those words on a
20   column.
21   THE COURT:  Okay.  Now, answer his questions.
22   EXAMINATION BY MR. STRONGMAN:
23   Q.  Doctor, I was certainly not trying to imply you weren't
24   being transparent.
25   A.  Okay.

Page 1231

1    Q.  What I'm trying to say is that when you see a report that
2    has Taxotere, Adriamycin and cyclophosphamide -- are you with
3    me so far?
4    A.  Yes.
5    Q.  -- you put a one check mark for Taxotere, correct?
6    A.  In the Taxotere-containing regimen --
7    Q.  Correct.
8    A.  -- which I can't fit all the words on a column header.
9    Q.  But what you didn't do is say Taxotere one, Adriamycin
10   one, cyclophosphamide --
11   A.  That part is correct.
12   Q.  So if you look at these studies, and you look at all of
13   the medications that the patients were exposed to, and you add
14   them up, you can get numbers bigger than your 350-some number
15   that you got for Taxotere, correct, looking at the chart?
16   A.  You know what?  Since this is the first time I'm seeing
17   it, I'm not able to check your math.  So I can't -- I can't
18   just accept this out of hand.  I haven't been able to review it
19   and see if it's accurate.
20   Q.  Can you agree with me on some basic principles?
21   A.  I'll try.
22   Q.  400 is bigger than the number that you had in your chart
23   for Taxotere, correct?
24   Is 405 bigger than 347?  I think everybody would agree,
25   yes.

Page 1232

1    Q.  Very good.
2    We can agree that when you did your tabulation, you
3    didn't break it out that way, correct?
4    A.  I put it under the column header for the TAX combination
5    regimen.  That is correct.  That's how it was described.
6    That's how I listed it.
7    Q.  We can also agree that when you look at the right-hand
8    column, anthracyclines, that would include Adriamycin and some
9    other medications, like epirubicin, correct?  The category of
10   anthracyclines generally?
11   A.  I'm a little bit confused because, obviously, Adriamycin
12   is an anthracycline.  So you've listed this twice.
13   Q.  Yeah.  And what we've done is there are some studies where
14   you know exactly what the anthracycline is, and there are some
15   studies when it's general, you don't know which one of the
16   anthracyclines it is.
17   A.  Well, that would be impossible for TAX316 and GEICAM 9805.
18   You know exactly what they used.
19   Q.  Exactly.  It was Adriamycin, correct?
20   A.  But you listed it twice.
21   Q.  I'm not -- Doctor --
22   THE COURT:  You're really going to just have to answer
23   the questions that Mr. Strongman asks.  You can't ask him
24   questions.  He's going to ask the question.
25   MR. STRONGMAN:  Very good.

Page 1233

1    THE WITNESS:  Fine.  Yes, you've listed it under, I
2    guess, Adriamycin, and you've also listed it under
3    anthracycline.
4    EXAMINATION BY MR. STRONGMAN:
5    Q.  Exactly.  So what we have is we have a category here that
6    has Adriamycin.  We know that Adriamycin is an anthracycline,
7    correct?
8    A.  Correct.
9    Q.  So, anthracycline is a broader category.  Adriamycin is a
10   more narrow category.  Are you with me so far?
11   A.  Yeah.
12   Q.  So in TAX316, as example, you found -- or you saw 29 in
13   the TAC arm?
14   A.  Correct.
15   Q.  You saw 16 in the FAC arm?  Are you with me?
16   A.  Yeah.
17   Q.  What's 29 plus 16?  It's 45, correct?  Yes?
18   A.  Yes.
19   Q.  All 45 of those patients would have been exposed to
20   Cytoxan, correct?
21   A.  Okay.
22   Q.  All 45 of those patients would have been exposed to
23   Adriamycin, correct?
24   A.  Correct.
25   Q.  We know in the FAC arm there were 16 exposed to the

Page 1234

1   5-fluorouracil, correct?
2   A.  Correct.
3   Q.  We know that 45 were exposed to some type of
4   anthracycline, which was the Adriamycin, correct?
5   A.  Right.  I'm just confused why you listed it twice, but
6   that's okay.
7       THE COURT:  That's -- that's -- Mr. Strongman.
8       THE WITNESS:  I also don't see the 29 anywhere on this
9   chart.
10      THE COURT:  Doctor, you really just need to answer
11  Mr. Strongman's questions.
12  EXAMINATION BY MR. STRONGMAN:
13  Q.  Now I want to talk about TAX316 very briefly, Doctor.
14      Let me just ask one question.  I want to make sure I
15  understood your answer.  So this is the chart that you had
16  showed the jury with Mr. Miceli, correct?
17  A.  You know, I'm really sorry, I can't see that from here.
18  Q.  Do you have that one in front of you still?
19  A.  Well, I don't know what you're holding.
20      THE COURT:  The chart that Mr. Miceli gave you.
21  EXAMINATION BY MR. STRONGMAN:
22  Q.  Do you have that one in front of you still?
23  A.  Yeah, yeah, yeah.
24  Q.  Did you prepare this chart yourself?
25  A.  Yes.

Page 1235

1   Q.  You typed it up?
2   A.  Yes.  Well, they provided the visual for the trial, but I
3   provided the table.
4   Q.  The actual -- you actually typed up this table?
5   A.  Yes, this is the data I put together.
6       MR. MICELI:  Your Honor, I object to the form of the
7   question, asked and answered.
8       THE COURT:  Sustained.
9       MR. MICELI:  Thank you.
10  EXAMINATION BY MR. MICELI:
11  Q.  Doctor, if I understand what you said earlier, is that
12  when you put -- you wrote Taxotere here, correct?
13  A.  That's correct.
14  Q.  The reason that you didn't include the A and the C was
15  because it didn't fit in that cell; is that correct?
16  A.  Correct.
17  Q.  You didn't think about maybe making it a landscape
18  version, so you could include that information?
19  A.  I'm just saying in headers -- no, I didn't have a big
20  header.  It was a Taxotere, and it was implied these are
21  Taxotere regimens.  None of these are monotherapy.
22  Q.  So, Doctor, we can also agree that when you looked at the
23  TAX316 data, just like with the Taxotere arm, there were cases
24  of what you're calling irreversible alopecia in the
25  non-Taxotere arm, correct?

Page 1236

1   A.  That's correct.
2   Q.  So, Doctor, my question to you is, for these -- there were
3   16 of them, correct?
4   A.  That's correct.
5   Q.  For those 16, was it the F that caused the permanent
6   alopecia, was it the A that caused the permanent alopecia, or
7   was it the C that caused the permanent alopecia?
8   A.  I just call it a non-taxane arm.
9   Q.  Well, Doctor, that wasn't my question.
10  A.  I didn't isolate the 16 according to which part of the
11  combo, that is correct.
12  Q.  Doctor, sitting here today, can you tell me that it was
13  the F that caused the permanent alopecia in 16, yes or no?
14  A.  Highly unlikely, because there is nothing in the
15  literature about the 5- FU.
16  Q.  Doctor, sitting here today, can you tell me, yes or no,
17  whether it was the A that caused the permanent alopecia in
18  those 16 patients?
19  A.  It could be either A or C or both.
20  Q.  And so you would agree with me that it could have been the
21  A, the C, or both, correct?
22  A.  It could have been both, right.
23  Q.  Now, Doctor, you also asked -- were asked some questions
24  about, I think, biologic plausibility, correct?
25  A.  That's correct.

Page 1237

1   Q.  And mechanism of action, do you remember that?
2   A.  Yes.
3   Q.  And stem cells, do you remember that?
4   A.  Yes.
5   Q.  And I think you said you had quite a bit of -- quite a bit
6   of experience with stem cells, I think, was -- something along
7   those lines, right?
8   A.  Not specifically on hair stem cells, but on stem cell
9   research.
10  Q.  And when you were discussing your opinions with us, you
11  believed that the theory -- and I know it's a theory -- would
12  be that Taxotere damages stem cells in some fashion, correct?
13  A.  I think what I said in my depos and here is that the
14  hypothesis is that it damages stem cells and/or the signalling
15  between -- the communication.  So it may not affect the stem
16  cells directly.  It may affect the communication signals
17  between stem cells.  That is --
18  Q.  And I think?  I'm sorry.  Are you finished?  Go ahead.
19  A.  May I explain?
20  Q.  You may.  Certainly.
21  A.  That is in addition to the known mechanism of action in
22  terms of damaging hair cells and rapidly dividing cells.  So we
23  already know that Taxotere, as a cytotoxic chemotherapy, does
24  cause hair loss.  There is no question about that.  So it's on
25  top of what we already know about the product.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)     *
PRODUCTS LIABILITY LITIGATION    *     Docket No.: 16-MD-2740
                                 *     Section "H(5)"
                                 *     New Orleans, Louisiana
*Relates to:  Barbara Earnest*   *     September 20, 2019
*Case No.: 16-CV-17144*          *
* * * * * * * * * * * * * * * *  *


DAY 5 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

## Page 97

1382

MARIE CELESTE LAGARDE - CROSS

3:41PM 1   A.   Yes.
3:41PM 2   Q.   And the date there, February 10th, 2011?
3:41PM 3   A.   Yes.
3:41PM 4   Q.   Okay.   And it looks like, under the "Note" section, is
3:41PM 5   says, "Copy of pathology left for patient at front desk with
3:41PM 6   educational book."   Right?
3:41PM 7   A.   Yes.
3:41PM 8   Q.   Okay.   And the educational book was the book that we
3:41PM 9   talked about; correct?
3:41PM10   A.   Yes.
3:41PM11         MR. MOORE:   And then if you could, Jen, drop that
3:41PM12   call out.
3:41PM13   BY MR. MOORE:
3:41PM14   Q.   I wanted to ask about the highlighted section where it
3:41PM15   says instructional -- "instructed patient" -- that one.
3:41PM16         MR. MOORE:   There you go, Jen.
3:41PM17   BY MR. MOORE:
3:41PM18   Q.   "Instructed patient with ER/PR, HER2/neu, breast MRI, and
3:41PM19   PET/CT."   And next to that, it says, "for invasive carcinomas
3:41PM20   only."
3:41PM21   A.   Yes.
3:41PM22   Q.   What does that mean?   What is an invasive carcinoma?
3:41PM23   A.   Ductal carcinoma in situ -- there's different ladders with
3:41PM24   breast cancer.   You have a regular breast.   Then you have
3:41PM25   atypical hyperplasia, which means the cells are starting to

OFFICIAL TRANSCRIPT

## Page 98

1383

MARIE CELESTE LAGARDE - CROSS

3:42PM 1   look abnormal.
3:42PM 2         Then you have ductal carcinoma in situ, and that
3:42PM 3   means there's cancer cells in the duct but no break through the
3:42PM 4   duct or no invasion beyond the duct.
3:42PM 5         Invasive carcinomas mean that now the cells have
3:42PM 6   broken through the duct and are invading beyond the duct.
3:42PM 7         PET/CT scans, which, as we talked about previously,
3:42PM 8   indicate metastases.   Ductal carcinoma in situs rarely
3:42PM 9   metastasize.   Breast cancers don't kill because they're in the
3:42PM10   breast; they kill because they go somewhere else.
3:42PM11         So an in situ lesion, which means it's just in the
3:42PM12   duct, we usually don't do metastatic workups.   So invasion, by
3:42PM13   definition, we would do the PET/CT scan, which tells us if the
3:42PM14   tumor is somewhere else in the body.
3:42PM15   Q.   Okay.   And that was your recommendation for Ms. Earnest?
3:43PM16   A.   Yes.
3:43PM17   Q.   And do you know if she sent forward with the PET/CT scan?
3:43PM18   A.   Yes.
3:43PM19   Q.   And do you know whether or not cancer was found anywhere
3:43PM20   else in her body besides the breast?
3:43PM21   A.   The CT scan I had said that she had a questionable lymph
3:43PM22   node in her axilla.
3:43PM23   Q.   Okay.   So if the lymph node that we're referring to --
3:43PM24   that you're referring to from your record contained the cancer,
3:43PM25   that's an indication that the cancer is escaping the breast;

OFFICIAL TRANSCRIPT

## Page 99

1384

MARIE CELESTE LAGARDE - CROSS

3:43PM 1   right?
3:43PM 2   A.   Correct.
3:43PM 3   Q.   And that's a very ominous finding, isn't it?
3:43PM 4   A.   It would change the way we treat her.
3:43PM 5   Q.   Okay.   All right.   And as I understand the testimony today
3:43PM 6   and from looking at your records, the only time you saw her was
3:43PM 7   on February 7th, yes?
3:43PM 8   A.   Yes.
3:43PM 9         MR. MOORE:   Okay.   And, Jen, you can take that down.
3:43PM10         Erin, if you can throw me back over here.
3:44PM11   BY MR. MOORE:
3:44PM12   Q.   Okay.   And you had testified during your direct
3:44PM13   examination, that it would be your practice for the breast
3:44PM14   cancer book -- the breast cancer treatment handbook, to
3:44PM15   highlight certain sections and discuss with the patient what
3:44PM16   sections you wanted them to review; right?
3:44PM17   A.   Yes.
3:44PM18   Q.   But your medical records for Barbara Earnest indicate that
3:44PM19   the book was left for her when she came in to get a copy of her
3:44PM20   pathology report; right?
3:44PM21   A.   Yes.
3:44PM22   Q.   And I'm assuming, sitting here today, you don't have any
3:44PM23   independent recollection of discussing this book at all with
3:44PM24   Barbara Earnest; right?
3:44PM25   A.   I'm sure I didn't.

OFFICIAL TRANSCRIPT

## Page 100

1385

MARIE CELESTE LAGARDE - CROSS

3:44PM 1   Q.   Okay.   You're sure you did not discuss it with her?
3:44PM 2   A.   Right.   Because, remember, I didn't have her path report
3:44PM 3   in my hand.   I only had the ultrasound examination.   I'm not
3:44PM 4   going to give her the book without a documentation of carcinoma
3:44PM 5   with the pathology report.
3:44PM 6   Q.   Okay.   And so do you have any way of knowing or telling
3:44PM 7   this jury that, for certain, any particular pages or passages
3:44PM 8   would have been dog-eared or highlighted for Ms. Earnest when she
3:45PM 9   picked it up?
3:45PM10   A.   No.
3:45PM11   Q.   Okay.   And the information that's contained in this book,
3:45PM12   you would agree, is quite comprehensive?
3:45PM13   A.   Yes.
3:45PM14   Q.   And it looks like it covers information -- Mr. Schanker
3:45PM15   showed you some of these pages.   I'll show you page little
3:45PM16   Roman IX where it starts off with "the functional impact of
3:45PM17   breast cancer" in Chapter 1.
3:45PM18         Do you see that?
3:45PM19   A.   Yes.
3:45PM20   Q.   And then it goes through -- you were shown other sections
3:45PM21   on treatment, surgery, emotional impact, finances.   It covers
3:45PM22   the whole waterfront, the book, doesn't it?
3:45PM23   A.   Yes.
3:45PM24   Q.   And it even has an appendix on chemotherapy medicines;
3:45PM25   right?

OFFICIAL TRANSCRIPT

08:38:49  1

2                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA

3       ********************************************************************

4       IN RE:  TAXOTERE (DOCETAXEL)        Docket No. 16-MD-2740
        PRODUCTS LIABILITY LITIGATION       Section H
5                                           New Orleans, LA
        Relates to:  Barbara Earnest        Monday, September 23, 2019
6                    16-CV-17144

7       ********************************************************************

8                       TRANSCRIPT OF TRIAL PROCEEDINGS
               HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
9                     UNITED STATES DISTRICT JUDGE
                         DAY 6, MORNING SESSION

10

11      APPEARANCES:

12      FOR THE PLAINTIFF:              BACHUS & SCHANKER, LLC
                                        BY:  DARIN L. SCHANKER, ESQ.
13                                           J. KYLE BACHUS, ESQ.
                                        1899 Wynkoop St., Suite 700
14                                      Denver, CO 80202

15                                      FLEMING NOLEN & JEZ
                                        BY:  RAND P. NOLEN, ESQ.
16                                      2800 Post Oak Blvd., Suite 4000
                                        Houston, TX 77056

17
                                        GIBBS LAW GROUP, LLP
18                                      BY:  KAREN B. MENZIES, ESQ.
                                        6701 Center Drive West, 14th Floor
19                                      Los Angeles, CA 90045

20                                      DAVID F. MICELI, LLC
                                        BY:  DAVID F. MICELI, ESQ.
21                                      P.O. Box 2519
                                        Carrollton, GA 30112-0046
22
                                        PENDLEY BAUDIN & COFFIN
23                                      BY:  CHRISTOPHER L. COFFIN, ESQ.
                                        2505 Energy Centre
24                                      1100 Poydras St.
                                        New Orleans, LA 70163
25

Page 1417

1    article and notify you of any information concerning permanent hair
2    loss and Taxotere?
3    A. No.
4    Q. Have you ever had a -- well, first of all, Doctor, what is an
5    abstract?  Explain to the jury what an abstract is in the medical
6    context.
7    A. An abstract is -- when you read a journal article, an abstract
8    is a brief summary that kind of summarizes the entire article
9    before you read the whole thing.  It's kind of just a bullet
10   presentation of the whole article.
11   Q. Have you, on occasion, had pharmaceutical companies send you an
12   abstract on a particular drug?
13   A. Yes.
14   Q. To your knowledge, prior to the time that you treated Barbara
15   back in 2011, had Sanofi ever sent you a reprint of an abstract
16   notifying you that it had important information about permanent
17   hair loss and Taxotere?
18   A. No.
19   Q. Doctor, talking about how you get information.  Do you get on
20   the computer and just Google to get information?
21   A. On occasion.
22        MS. SASTRE: Objection.  Vague and ambiguous, your Honor.
23        THE COURT:  Overruled.
24        THE WITNESS:  On occasion.
25   BY MR. SCHANKER:

Page 1418

1    Q. And in the time period of 2011 -- we'll keep it to that and
2    prior being that that's Barbara Earnest's time frame -- do you
3    consider just getting on the computer and Googling an overall
4    reliable source for you to get your information?
5    A. No.
6    Q. And why not?
7    A. Because a lot of what you Google, a lot of the stuff that pops
8    up is not peer-reviewed literature.
9    Q. Explain to the jury what you mean by "peer-reviewed
10   literature."
11   A. Peer-reviewed, meaning, that it's been reviewed by a group of
12   thought leaders that are experts in the field.  A lot of what is
13   published on the web is not peer reviewed and a lot of it is very
14   inaccurate.
15   Q. Have you heard of the word anecdotal before?
16   A. Yes.
17   Q. What does that mean in the medical context?
18   A. Isolated case.
19   Q. Speaking about an isolated case, the jury's heard that you had
20   another patient that had hair loss, permanent hair loss prior to
21   Barbara Earnest.  Do you recall that patient?
22   A. Yes.
23   Q. When -- do you recall when you treated -- and, obviously, we
24   won't violate any HIPAA rules here, but do you recall when you
25   treated this particular patient?

Page 1419

1    A. About 2005.
2    Q. And Barbara Earnest treated in 2011?
3    A. Yes.
4    Q. How old was that prior patient, the 2005 patient, when you
5    treated her, approximately?
6    A. About 69 or 70.
7    Q. So was she older or younger than Barbara Earnest at the time
8    you treated Barbara?
9    A. Older.
10   Q. Do you recall what her hair was like when you treated her, this
11   prior patient?
12   A. Thin, almost light pattern hair loss.
13   Q. How was her hair, this prior patient's -- we're talking about
14   prior to the chemotherapy, correct, when you say, "pattern hair
15   loss"?
16   A. Yes.
17   Q. So this -- just so we're clear.  The prior patient from 2005
18   had light pattern hair loss prior to her chemotherapy?
19   A. Yes.
20   Q. How did her hair loss compare to Barbara's hair loss -- I'm
21   sorry.  How did --
22        MR. SCHANKER:  It's a bad question, your Honor.  Can I
23   start over?
24        THE COURT:  Rephrase.
25        MR. SCHANKER:  I apologize.

Page 1420

1    BY MR. SCHANKER:
2    Q. Talking about the prior 2005 patient, how did her hair prior to
3    chemotherapy compare to Barbara's hair prior to chemotherapy?
4    A. Thinner.
5    Q. Whose was thinner?
6    A. The 2005 patient.
7    Q. Do you recall what treatment you gave to that other patient?
8    A. AC for four cycles and then docetaxel for four cycles.
9    Q. And did you follow-up with that patient?
10   A. Yes.
11   Q. Doctor, are you a dermatologist?
12   A. No.
13   Q. Before you treated Mrs. Earnest, did you have any idea what
14   caused the 2005's patient's hair to be thinner, to not come back?
15   A. The chemotherapy.
16   Q. And describe for the jury that prior patient what her hair was
17   like after the chemotherapy when you indicated it didn't come back
18   or didn't all come back.  Paint a picture for the jury so they
19   understand.
20   A. All she has now is just very short -- like stub.  It never --
21   you know, it was thin before, but that's what it was after that.
22   Q. So when you spoke with -- and we'll get into this in more
23   detail, but when you spoke with Barbara prior to her chemotherapy,
24   did you explain to her about that prior patient?
25   A. No.

Page 1465

1    A. Okay.
2    Q. "Palpated the lump," tell us what that means.
3    A. She had noticed -- she had palpated an abnormality in her left
4    breast.
5    Q. And continue on, if you can.
6    A. "She'd never undergone mammography.  Saw her gynecologist who
7    referred her for a mammogram.  This revealed 2.1 by 1.5 sonometer
8    density, upper outer aspect of the left breast."
9    Q. Let me stop you there, Doctor.  If we skip down, as opposed to
10   having you go through all of that background.  And if there's
11   something you think that I am skipping that we should not as far as
12   really explaining this, let me know, okay?
13   A. Okay.
14   Q. What happened on March 10th of 2001 --
15   A. She had a lumpectomy and a sentinel node biopsy.
16   Q. So Barbara had a lumpectomy prior to coming to see you on
17   March 31st of 2011?
18   A. Yes.
19   Q. And then, why was she referred to see you?
20   A. She had a sentinel lymph node that was positive.  She was
21   referred for systemic treatment.
22   Q. She was referred to you for discussion of adjuvant treatment;
23   is that correct?
24   A. Yes.
25   Q. Did you examine Barbara?

Page 1466

1    A. Yes.
2    Q. And could you -- let me just ask you that.  Go to the next page
3    of the examination itself.  Get there in just a moment.  So we're
4    on your March 31st treatment note; is that right?
5    A. Consultation note.
6    Q. So on that consultation note, you actually physically examined
7    the patient; is that right?
8    A. Yes.
9    Q. Did you note -- and this is before chemotherapy, correct?
10   A. Yes.
11   Q. Did you note any hair loss at that time?
12   A. No.
13   Q. I want to go to the third page of that office visit note,
14   Doctor.  Page 3.  Are you there?
15   A. Yes.
16   Q. Thank you.  Your impression, I see there dose dense AC followed
17   by T, by Taxotere.  What was your impression concerning your
18   recommendation for Ms. Earnest at that time?  What did you
19   recommend for Ms. Earnest with regard to treatment?
20   A. Four cycles of AC and then four cycles of docetaxel.
21   Q. Which you've gone through in detail with us, correct?
22   A. Yes.
23   Q. Under the plan, I note that you indicated that you would obtain
24   a MUGA scan.  Can you read that sentence and then explain it to us,
25   please?

Page 1467

1    A. "I will obtain a MUGA scan to assess her left ventricular
2    ejection fraction in anticipation of anthracycline based
3    chemotherapy."
4    Q. What is a MUGA scan?
5    A. It's a nuclear medicine study to assess cardiac function.
6    Q. And why is that?  Why did you plan on obtaining one of those?
7    A. Because you have to see what their cardiac reserve is before
8    you give them an anthracycline.
9    Q. So you wanted to test Barbara's heart before you gave her the
10   Adriamycin?
11   A. Yes.
12   Q. And educate the jury on why that's something you do.
13   A. Because if people have an underlying cardiomyopathy that you're
14   not aware of and you give them a drug that potentially can put them
15   into congestive heart failure, that's an avoidable mistake.  And
16   the heart damage from anthracycline is irreversible.  With
17   trastuzumab, which we use for breast cancer, it's reversible; but
18   with anthracyclines, it's not.
19   Q. So do you do the MUGA scan for patient protection?
20   A. Yes.
21   Q. And was that done in this case?
22   A. Yes.
23   Q. And based on the MUGA scan, what was the impact of the results
24   of the MUGA scan?
25   A. That it was safe to give her the anthracycline.

Page 1468

1    Q. I note in your record you talk about chemotherapy teaching.
2    Can you read this to the jury and then explain what that is?
3    A. "We will arrange a chemotherapy teaching to be completed this
4    week."  Every patient that we treat meets with -- in Barbara's
5    case, she met with a chemotherapy nurse.  My office now, our mid
6    levels actually do the chemotherapy teaching; but at the time, we
7    had a chemotherapy nurse do it.
8          And that's where they go through potential side effects
9    of the drug and also just management strategies for how -- to help
10   patients get through their treatment.
11   Q. Okay.  Then, Doctor, can you read that last two sentences of
12   that paragraph -- well, actually, go ahead and read the entire --
13   A. "Potential side effects of cytoreductive chemotherapy including
14   myelosuppression, nausea, vomiting, diarrhea, stomatitis as well as
15   potential cardiac toxicity from doxorubicin were explained to the
16   patient.  Other potential side effects of docetaxel including fluid
17   retention, hyperlacrimation, skin and nail changes were also
18   explained.  She is anxious to proceed."
19   Q. So, Doctor, did you also explain to Barbara about the issue
20   with regard to hair loss at that time, temporary hair loss?
21   A. Yes.
22   Q. And is that a conversation that -- with the drugs that you're
23   giving to Barbara, is that a conversation that, in your typical
24   practice, you always have with the patient?
25   A. If the drugs can cause alopecia.  All three of those drugs can

Page 1489

1   A. That the hair was trying to recover.
2   Q. When you say, "trying to recover," what is it that you mean by
3   that?
4   A. Well, that there was some growing back.
5   Q. And describe to the jury when you say, "some growing back" what
6   that means.
7   A. Just that there was some hair starting to show up.  She went
8   for a long time with no hair.
9       Like I said, as I mentioned earlier, some patients they
10  start growing hair back even before the chemotherapy is finished.
11  It varies from one patient to the next.
12  Q. And what I want to understand is for the jury, I want to make
13  sure they're clear on the time when you were seeing Barbara through
14  the period of time how much of the hair that you described grew
15  back.  And so I want to --
16  A. Very little.
17  Q. Okay.
18      MR. SCHANKER:  May I approach, your Honor?
19      THE COURT:  Yes, you may.
20  BY MR. SCHANKER:
21  Q. Doctor, I want to show you a photograph that the jurors have
22  already seen in this case, and these are photos of Barbara
23  Earnest's scalp that were taken in June of 2018.  And I'll just go
24  through these photographs.  And you have these as well and these
25  are part of Exhibit G.  Do you recognize that to be Barbara

Page 1490

1   Earnest?
2   A. Yes.
3   Q. And you see that's the left profile?
4   A. Yes.
5   Q. And, Doctor, you see that's the back of Barbara Earnest scalp?
6   A. Yes.
7   Q. And then we see the right profile of Barbara?
8   A. Yes.
9   Q. So I want to be clear, Doctor.  It appears that you saw Barbara
10  Earnest for treatment up through August of 2013.
11  A. Yes.
12  Q. So at any time during your treatment of Barbara Earnest from
13  2011 when her -- you gave her the chemotherapy, through 2013 when
14  you last saw her, did you ever see hair regrowth greater than what
15  the jury is looking at in these photographs?
16  A. No.
17  Q. Just to be clear, was there any point in time in all of these
18  visits that you go through where you saw Barbara Earnest's hair
19  come back and then fall out again?
20  A. No.
21  Q. Doctor, going through your medical records, I note that you had
22  a follow-up visit with Barbara in February of 2013.  That's Tab L.
23  A. I have it.
24  Q. And then Tab M you had a follow-up visit in May 7 of 2013.  Do
25  you have that?

Page 1491

1   A. Yes.
2   Q. And then you had a follow-up visit on August 13 of 2013.  Do
3   you have that?
4   A. Yes.
5   Q. Now, at a certain point you stopped seeing Barbara.  Do you
6   know why that was?
7   A. Because her insurance changed and I wasn't a provider on her
8   list of providers anymore.
9   Q. Doctor, let's shift gears back to the NCCN guidelines.  Can we
10  do that?  First of all, with regard to these NCCN guidelines, was
11  what you prescribed to Barbara, the AC followed by Taxotere, was
12  that the only available chemotherapy option for her at the time?
13  A. No.
14  Q. Let's go to page 4 of the NCCN guidelines, which is Plaintiff's
15  Exhibit 1878.  So page 4 -- sorry, Doctor.  I misspoke.  We're
16  talking page 1 here.  Back to page 1, okay.  So I am putting that
17  back up just for the record.
18      And just to make sure we're on the same page.  Are these
19  the guidelines from which you treated Barbara?
20  A. Yes.
21  Q. Which regimen did you give her?
22  A. AC followed by docetaxel.
23  Q. And could you point that regimen out to me?
24  A. It's the first column under other adjuvant regimens.
25  Q. Yes.

Page 1492

1   A. The fourth one down.
2   Q. Right here (INDICATING)?
3   A. Yes.
4   Q. So, Doctor, on this list of these regimens, which are the ones
5   on here that contain the Taxotere?  If you could work from the top
6   down.
7   A. The TAC, TC --
8   Q. The TAC right here (INDICATING)?
9   A. The TC.
10  Q. This right here (INDICATING)?
11  A. Yes.  AC followed by docetaxel.
12  Q. Which is the one you gave Barbara?
13  A. Yes.
14  Q. Okay.  Is that it?
15  A. That's it.
16  Q. Now, Doctor, the rest of the regimens listed here, are they
17  Taxotere free?
18  A. Yes.
19  Q. Doctor, if you knew about the risk of permanent hair loss and
20  Taxotere and Barbara asked you for an alternative that did not
21  cause permanent hair loss, which ones on here would you have
22  considered?
23  A. I would have used the AC, but I would have used paclitaxel
24  instead of docetaxel.
25  Q. And which one is that specifically on here?  How would I

Page 1493

1    identify which one you're referring to?
2    A. The one under TAC.
3    Q. Yes, right here (INDICATING). So that was an option --
4    A. Yes.
5    Q. -- that you would have considered?
6    A. Yes.
7    Q. Is that an option, just to be clear, that you would have
8    considered if Barbara had asked you because she wanted to avoid
9    this risk of permanent hair loss?
10   A. Yes.
11   Q. And, Doctor, just to clarify, the FEC followed by T, what does
12   the T stand for?
13   A. Paclitaxel.
14   Q. And just to work through each one of these. The A followed by
15   T followed by C. What is the T referred to there?
16   A. Paclitaxel.
17   Q. And the FEC followed biweekly paclitaxel.
18   A. Paclitaxel.
19   Q. Would you have considered any of these other -- let's make sure
20   the jury understands. Paclitaxel is a chemotherapy drug, right?
21   A. Yes.
22   Q. And is it the same as -- is that the same as Taxol?
23   A. Taxol, yes.
24   Q. Taxol. Would you have considered these other paclitaxel or
25   Taxol options for Barbara, if she had -- any of the other

Page 1494

1    paclitaxel or Taxol options if Barbara had voiced a concern of
2    wanting to avoid the risk of permanent hair loss?
3    A. Yes.
4    Q. And which of those on this list, as we make the list, would you
5    have considered or recommended to Barbara?
6    A. The AC followed by the paclitaxel.
7    Q. And so is that the next one on the list here, the non-dose
8    dense or --
9    A. Paclitaxel. Paclitaxel is given every two weeks. We give it
10   more weekly now, but -- because it's less neuropathy doing it that
11   way. But at that time the prevailing way of giving it was the
12   175 mg/m2 every two weeks.
13   Q. So is it fair to list that as an option here?
14   A. Yes.
15   Q. Okay. Just want to make sure.
16       And then are there any other on this list, paclitaxel
17   regimens, just focussing on paclitaxel, that you would have
18   considered?
19   A. I mean, you could consider using FEC, but AC you're going to
20   have about a similar efficacy.
21   Q. And you're referring to the last one on the list here --
22   A. Yes.
23   Q. -- FEC followed biweekly paclitaxel (INDICATING)?
24   A. Yes.
25   Q. So was that an option for Barbara?

Page 1495

1    A. It would have been.
2    Q. If she wanted to avoid the risk of permanent hair loss in
3    Taxotere?
4    A. Right.
5    Q. And just so I am clear, we were making our docetaxel or
6    Taxotere list earlier. Is FEC followed by T, which is right here
7    above, is that another Taxotere option on this list?
8    A. Yes.
9    Q. Now, Doctor, let's talk about paclitaxel. All chemotherapy
10   drugs have risks; is that fair?
11   A. Yes.
12   Q. Are there any risks with regard to paclitaxel or Taxol, if you
13   were having -- if you're in the room and having this conversation
14   with Barbara and she said to you, "Well, I don't want to take on
15   this risk of permanent hair loss," walk the jury through that
16   conversation, if you would.
17   A. Then I would offer paclitaxel. Paclitaxel has a different
18   toxicity profile. A lot of similar toxicities, but there's longer
19   lasting neuropathy, worse neuropathy, and you have the risk for the
20   infusion reactions.
21   Q. Let's talk about -- you mentioned neuropathy earlier.
22   A. Yes.
23   Q. And that neuropathy is, again, could you just describe that?
24   What is neuropathy?
25   A. Neuropathy is nerve damage; like, diabetics get peripheral

Page 1496

1    neuropathy. Well, a lot of chemotherapy drugs called peripheral
2    neuropathy. And it can run the whole spectrum from being
3    paresthesias to being really, really burning, uncomfortable painful
4    sensations.
5    Q. And what you would have advised Barbara Earnest if you were
6    having this conversation in the room with her about --
7    A. I would say that the risk for neuropathy is going to be higher
8    with paclitaxel.
9    Q. And is that a temporary neuropathy or a permanent neuropathy?
10   A. I've never seen it permanent, but it can persist for a long
11   time. Some people recover from it sooner than others.
12   Q. And what is your typical recovery time that you would have
13   advised Barbara Earnest on concerning neuropathy with paclitaxel,
14   potential risks?
15   A. At least a year, sometimes longer.
16   Q. And when you say, "sometimes longer," just so --
17   A. I've had patients that are three or four years out that still
18   say they still feel like they're stepping on gravel.
19   Q. And so you would have had that conversation with Barbara?
20   A. Yes.
21   Q. Does Taxotere have the risk of neuropathy?
22   A. Yes, but not to the degree that paclitaxel does.
23   Q. So working through this, it sounds like this is a discussion
24   that you have with the patient; is that fair to say?
25   A. Yes.

Page 1497

1    MS. SASTRE:  Your Honor, I hate to keep objecting.  It's
2  leading.
3        THE COURT:  I am going to let him get there, but you need
4  to ask your question without leading.
5        MR. SCHANKER:  Absolutely.
6  BY MR. SCHANKER:
7  Q.  What is the point of that discussion that you have with the
8  patient about the options?
9  A.  For informed consent.
10  Q.  And working through that discussion, if Barbara would have told
11  you that she wanted to avoid the risk of permanent hair loss in
12  Taxotere and also minimize the risk of neuropathy, are there any
13  other options on this --
14  A.  I would probably use FAC at that point.
15  Q.  Okay.  And which one is FAC?
16  A.  The first one under other adjuvant regimens.
17  Q.  Explain to the jury, if you would, what the FAC regimen is?
18  A.  5-FU, doxorubicin, cyclophosphamide.
19  Q.  Now, I see on this regimen page it's broken out into a top list
20  here, Category 1, and then other adjuvant regimens.  What is that
21  about?
22  A.  Category 1, just the most commonly used.
23  Q.  Is there any more to that or is that it?
24  A.  That's it.
25  Q.  Doctor, in your experience, are all of these regimens, assuming

Page 1498

1  they're used with the right patient, good regimens?
2  A.  Yes.
3  Q.  Have you used all of these regimens at one time or another in
4  your career?
5  A.  Yes.  Epirubicin, actually, is a better anthracycline than
6  doxorubicin, but it's cost prohibitive.
7  Q.  Explain that to us.
8  A.  It's -- it has a little bit less cardiac toxicity, it has very
9  good efficacy, but most insurance carriers do not want to pay for
10  it because it is a more expensive drug.
11  Q.  And which one are we talking about?
12  A.  Epirubicin.
13  Q.  And is that one of the potential options available --
14  A.  That's the E in the FEC.
15  Q.  Okay.  So we're talking about this here FEC (INDICATING)?
16  A.  Uh-huh.
17  Q.  So working through the conversation that you've described, just
18  so I am clear, if Barbara said she wanted to avoid the risk of
19  permanent hair loss in Taxotere and also minimize the risk of
20  neuropathy, would FEC have been an option available for her?
21  A.  Yes.
22        THE COURT:  Okay.  You're leading.
23  BY MR. SCHANKER:
24  Q.  Doctor, just to be clear, if Barbara had chosen one of these
25  other options, based on that informed conversation that you

Page 1499

1  described, would you have given it to her?
2  A.  Yes.
3  Q.  Doctor, as part of this, we're talking about what happens in
4  the room, the conversation with you and Barbara, in your experience
5  have you seen permanent hair loss with Taxol?
6  A.  With --
7  Q.  With Taxol, paclitaxel?
8  A.  No.
9  Q.  Doctor, in your experience, have you seen permanent hair loss
10  with A, Adriamycin?
11  A.  No.
12  Q.  Doctor, in your experience, have you seen permanent hair loss
13  with C, cyclophosphamide?
14  A.  No.
15  Q.  You're referring to your practice experience?
16  A.  Yes.
17  Q.  At that time in 2011, had you seen permanent hair loss with any
18  of the other drugs that you listed as options on this list, these
19  other options that you would have made available to Barbara?
20  A.  No.
21  Q.  Doctor, as we wrap up here, I want to ask you a few more
22  questions.
23        If I had told you prior to -- let's do it this way.
24  Hypothetically, if I told you that prior to 2011 Sanofi had a
25  clinical trial that showed that 3.1 percent of women who took

Page 1500

1  Taxotere --
2        MS. SASTRE:  Objection, your Honor.
3        THE COURT:  There's an objection.
4        MR. SCHANKER:  Yes.  Go ahead.
5        THE COURT:  Y'all want to approach?
6        MS. SASTRE:  Yes.
7    (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
8        MS. SASTRE:  He was asking him an improper hypothetical
9  question again.  This is a fact witness.  This idea of "if I asked
10  you to assume that Sanofi had something," he is, first of all
11  testifying, and having put that in front of him, he didn't say
12  about that that it had anything to do with it.  We know that he
13  didn't.  It's improper, Judge.
14        MR. SCHANKER:  Your Honor --
15        THE COURT:  It's not a hypothetical.  What's a
16  hypothetical?
17        MR. SCHANKER:  Well, your Honor, the jury is going to
18  hear evidence in this case that this information was available to
19  the doctor, and it's all talking about what information would have
20  changed the doctor's prescribing decision.  I certainly -- and this
21  is information that the company could have been -- made available
22  to the doctor.
23        THE COURT:  I think the question is:  Did you see it?
24  Not hypothetical, if you could have seen it.
25        MR. SCHANKER:  But, your Honor, isn't the question about

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *        16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *        Section H
                                  *
Relates to:  Barbara Earnest      *        September 23, 2019
             16-CV-17144          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *


DAY 6 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2505
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West, Suite 1400
                             Los Angeles, California 90045

JAMES CARINDER - CROSS

Page 1511

1   A.  No.
2   Q.  Okay.  So, Doctor, let me start off by asking you some
3   questions just about breast cancer generally, okay?
4   A.  Okay.
5   Q.  All right, sir.  Now, you would agree with me that breast
6   cancer is a serious disease, true?
7   A.  Yes.
8   Q.  And it's a disease that, in fact, when we say it's
9   serious, to be clear, it can be deadly or fatal, correct?
10  A.  Yes.
11  Q.  And if breast cancer spreads to the lymph node, it can
12  spread throughout the lymphatic system and metastasize to other
13  parts of the body, true?
14  A.  Yes.
15  Q.  And here I believe you said, sir, that Mrs. Earnest's
16  breast cancer had spread to one of her lymph nodes, true?
17  A.  Yes.
18  Q.  Now, chemotherapy, you would agree with me, is an
19  important tool for treating breast cancer.
20  A.  Yes.
21  Q.  And taxanes -- T-A-X-A-N-E-S -- taxanes are a class of
22  chemotherapy medicines used to treat breast cancer, right?
23  A.  Yes.
24  Q.  And when we say "taxanes," I want to be clear, Taxotere is
25  a taxane.

Page 1512

1   A.  That's correct.
2   Q.  Now, with the advent of taxanes, including Taxotere, you
3   agree that they have helped increase breast cancer survival
4   rates.
5   A.  Yes.
6   Q.  And taxanes have incredible efficacy in breast cancer
7   treatment, true?
8   A.  Yes.
9   Q.  And when we say that, Dr. Carinder, when we say they have
10  incredible efficacy, what we are saying is that they improve
11  survival, true?
12  A.  Yes.
13  Q.  They increase a patient's risk [sic] of surviving breast
14  cancer, as opposed to dying from breast cancer.
15  A.  Yes.
16  Q.  Taxotere is a good drug, in your experience?
17  A.  Yes.
18  Q.  Effective?
19  A.  Yes.
20  Q.  And you would agree with me, sir, that that's one of the
21  reasons why you prescribed it to Mrs. Earnest back in 2011.
22  A.  Yes.
23  Q.  Now, when you're treating a patient with chemotherapy for
24  breast cancer, one of your goals is to select a regimen,
25  meaning a combination of medications or chemotherapy drugs,

Page 1513

1   that gives the patient the best chance to survive?
2   A.  Yes.
3   Q.  To give the patient the best chance of having a
4   reoccurrence of their breast cancer, true?
5   A.  Avoidance of reoccurrence.
6   Q.  Yes, sir.
7       That's something that's in your mind, correct?
8   A.  Yes.
9   Q.  It's in your mind when you are selecting medications for
10  your patients, true?
11  A.  True.
12  Q.  You would agree with me, Dr. Carinder, that it was, of
13  course, in fact, in your mind back in 2011 when you were
14  prescribing chemotherapy to Mrs. Earnest?
15  A.  You mean to keep her breast cancer from recurring?  Yes.
16  Q.  Yes.  Okay.
17      That was one of your goals?
18  A.  Yes.
19  Q.  And as the jury has heard -- and we will spend a little
20  time on it, Doctor -- but what you decided was going to be the
21  most effective option to treat Mrs. Earnest's breast cancer and
22  to prevent a reoccurrence was a regimen involving Adriamycin,
23  Cytoxan, and Taxotere, true?
24  A.  True.
25  Q.  And we can agree, of course, Mrs. Earnest is here in the

Page 1514

1   courtroom.
2       I assume you saw her today, sir?
3   A.  Yes.
4   Q.  When was the last time you saw Mrs. Earnest?
5   A.  2013.
6   Q.  The last time she was your patient?
7   A.  That's correct.
8   Q.  So it's been about six years?
9   A.  Yes.
10  Q.  Are you aware of the fact that she is cancer free today?
11  A.  Yes.
12  Q.  Okay.  So we can agree that after the surgery that was
13  done to remove her cancerous tumor and the chemotherapy that
14  you prescribed, which included Taxotere, that as a result of
15  that, Mrs. Earnest is alive today and cancer free.
16  A.  Yes.
17  Q.  And I think you might have said this on direct, but I just
18  want to be clear:  Mrs. Earnest was at risk for her cancer
19  coming back if she did not get chemotherapy.
20  A.  Absolutely.
21  Q.  Let's talk about risks, generally, for just a moment,
22  okay?
23      So you would agree with me that all chemotherapy
24  drugs have risks.
25  A.  Yes.

JAMES CARINDER - CROSS

Page 1519

1    Q.   And so what we are talking about here is that when you add
2    a taxane, including Taxotere, to a regimen that includes
3    Adriamycin, that patient has a better chance of living.
4    A.   Yes.
5    Q.   Now, in the context of adjuvant breast cancer treatment,
6    there's really two taxanes that we're talking about, Taxotere
7    and Taxol?
8    A.   Yes.
9    Q.   And I know we touched on them a moment ago, but you would
10   agree with me that taxanes, including Taxotere, have caused
11   survival rates to go up, true?
12   A.   Yes.
13   Q.   And I believe, sir, that you were prescribing Taxotere for
14   many years before you prescribed it to Mrs. Earnest in 2011.
15   A.   Yes.
16   Q.   And would it be fair to say that you had been prescribing
17   Taxotere going all the way back to, I believe, the late 1990s?
18   A.   Yes.
19   Q.   And is that after you essentially finished all of your
20   medical training and you became a fully fledged --
21   A.   Yes.
22   Q.   -- licensed oncologist?
23   A.   Yes.
24   Q.   Right away you started using Taxotere?
25   A.   Yes.

Page 1520

1    Q.   And you would agree with me, sir, that you started using
2    it then because it was a drug that you found worked, it was a
3    good drug, right?
4    A.   Yes.  If you'll recall, though, its initial indication was
5    for metastatic disease, not adjuvant treatment.
6    Q.   And we are going to talk about that, but I appreciate you
7    pointing that out.
8            And you would agree with me, Doctor -- I know you
9    were asked a lot of hypothetical questions today, a lot of
10   questions that were like, "Well, if you saw X, what would you
11   have done," right?  Do you remember those questions?
12   A.   Yes.
13   Q.   Okay.  So I want to ask you instead a little bit of a
14   different question about what you actually did, going back to
15   the day that you prescribed this medication to Mrs. Earnest,
16   which was March 31, 2011, right?
17   A.   Yes.
18   Q.   And on that date, we can agree that you came into that
19   room where you were meeting with your patient, with
20   Mrs. Earnest, and you had a single recommendation for her,
21   true?
22   A.   Yes.
23   Q.   And that recommendation was, to be specific, dose-dense
24   Adriamycin plus Cytoxan, then to be followed by Taxotere, true?
25   A.   Yes.

Page 1521

1    Q.   And on that day, sir, when we go back to March 31, 2011 --
2    I know you talked a lot with counsel about all these options
3    and I'm going to ask you about that later -- but for now, when
4    we go back to what actually happened, you didn't discuss any
5    other options with Mrs. Earnest, right?
6    A.   No.
7    Q.   And you would agree with me, sir, she didn't ask you for
8    any other options, true?
9    A.   No.
10   Q.   Now, when talking about the guidelines with plaintiff's
11   counsel, Mr. Schanker, you talked about -- I believe it was
12   three other options that you said under a series of certain
13   circumstances that you could have potentially discussed with
14   Mrs. Earnest, fair?
15   A.   Yes.
16         MR. SCHANKER:  Objection, Your Honor.  Misstates the
17   testimony.  Multiple options, Your Honor.
18         THE COURT:  I'm going to allow the question and I'm
19   just going to let the witness answer it.  Overruled.
20         MS. SASTRE:  Thank you, Your Honor.
21   BY MS. SASTRE:
22   Q.   Now, why don't we go ahead and bring up the guidelines,
23   please, page 1 of the guidelines.  Oh, we have them up.  I'm
24   sorry.
25         So if we look at other adjuvant regimens, I believe

Page 1522

1    that one of the options you talked about was F-E-C, or FEC,
2    correct?
3    A.   Yes.
4    Q.   Okay.  And that's fluorouracil, epirubicin, and then
5    Cytoxan, correct?
6    A.   Yes.
7    Q.   And then it would be followed by weekly Taxol?
8    A.   Yes.
9    Q.   Now, I just want to ask you a few questions about the FEC
10   regimen.
11         MS. SASTRE:  Jen, if you can highlight it, it's just
12   the bottom of that.
13   BY MS. SASTRE:
14   Q.   First of all, you would agree with me it's not listed in
15   the preferred regimens, true?
16   A.   True.
17   Q.   It's listed in the other regimens.
18         You would agree with me, in fact, when you look at
19   the preferred adjuvant regimens for 2011, the very first
20   regimen listed is Taxotere, Adriamycin, Cytoxan; correct?
21   A.   Yes.
22   Q.   Okay.  So when it comes to FEC, if it's given without a
23   taxane, you would agree with me that survival will be reduced,
24   correct?
25   A.   I agree.

Page 1523

1    Q.  And so if you were going to have a conversation with
2    Mrs. Earnest or, candidly, any patient in 2011 about the FEC
3    regimen on the one hand and a regimen including a taxane like
4    Taxotere on the other hand, you would agree with me that you
5    would say, "Listen, with FEC without a taxane, there's less
6    survival."  You would tell them that.
7    A.  I would say there's a slightly higher risk that she could
8    get a recurrence.
9    Q.  Which is another way of saying "slightly higher risk your
10   breast cancer could come back," right?
11   A.  Yes.
12   Q.  "Slightly higher risk you may not survive"?
13   A.  True.
14   Q.  All right.  Okay.  Now, I believe if we go to the top
15   line, under "Other Adjuvant Regimens," you also talked about
16   the F-A-C or C-A-F regimen?
17   A.  Yes.
18   Q.  And FAC is fluorouracil, Adriamycin, and then Cytoxan,
19   right?
20   A.  Yes.
21   Q.  And, again, this is a regimen which does not include a
22   taxane, true?
23   A.  True.
24   Q.  And so would it follow, Dr. Carinder, that you would be
25   having essentially the same conversation with any patient you

Page 1524

1    would have seen in 2011, including Mrs. Earnest, and you would
2    have said, "On the one hand, I have a regimen which includes
3    Taxotere; it's a taxane, it's effective.  And over here I have
4    a nontaxane regimen, a non-Taxotere regimen.  With the FAC
5    regimen, there is going to be a slightly higher chance of your
6    breast cancer reoccurring."
7    A.  True.
8    Q.  Okay.  You would share that --
9    A.  Yes.
10   Q.  -- with Mrs. Earnest if you were going to talk with her
11   about FAC, true?
12   A.  Yes.  The only time, though, that I would offer the FAC is
13   if she had not wanted to run the risk of developing neuropathy.
14   If she had said, "I absolutely don't want anything that's going
15   to give me numb feet or numb fingers," then we would avoid a
16   TAC.  I would avoid a taxane, period, at that point, because
17   both taxanes have the potential to cause neuropathy.
18        Before the taxanes came along, FAC was a very widely
19   used regimen in the adjuvant setting.
20   Q.  And then FAC became less widely used, right?
21   A.  Exactly.
22   Q.  And that's because taxanes --
23   A.  Because the taxanes came along and proved themselves.
24   Q.  And I think you just made a comment on neuropathy.  You
25   said, "Well, you can have neuropathy with Taxol or Taxotere,"

Page 1525

1    something like that.
2    A.  Yes.  Or if you had a diabetic patient that already had
3    preexisting neuropathy, you don't want to give them something
4    that's going to aggravate it.
5    Q.  Right.
6        But, sir, you would agree with me -- and I believe
7    you testified to this clearly on direct exam -- that with
8    Taxol, there is a greater risk for the patient to develop
9    neuropathy, true?
10   A.  Yes.
11   Q.  And with Taxol, Dr. Carinder.  It's not only that the risk
12   is greater that you get neuropathy, you said that there is a
13   higher risk of getting worse neuropathy with it, right?
14   A.  Yes.
15   Q.  Okay.  And I believe in your deposition you used the words
16   several times of "daunting neuropathy."
17        Do you recall that?
18   A.  Yes.
19   Q.  And when you say "daunting neuropathy," you are talking
20   about a serious condition, true?
21   A.  Yes.
22   Q.  Something that's painful.
23   A.  Yes.
24   Q.  Pins and needles in your hands and feet, right?
25   A.  In some people, yeah.

Page 1526

1    Q.  Some people can't button their shirts, right?
2    A.  True.
3    Q.  Some people have trouble walking.
4    A.  True.
5    Q.  We are talking about a condition that with Taxol, you have
6    a better chance of getting it and you have a chance of it being
7    worse, and this is the kind of condition that is debilitating
8    to people, true?
9    A.  Yes.
10   Q.  And if you were there talking with Mrs. Earnest in 2011
11   about Taxol, you would have told her all of that, right?
12   A.  Yes.
13   Q.  Okay.  And you would have told her with any regimen,
14   whether it's TAC or FEC, if it didn't include a taxane, you
15   would have said, "There's a better chance your cancer is going
16   to return with this one," right?
17   A.  Yes.
18   Q.  Now, let me just ask you while we are here, sir:  Your
19   testimony on direct exam, if I understand it, was that if the
20   Taxotere label had said "Cases of permanent alopecia have been
21   reported," you would have shared that information with
22   Mrs. Earnest in 2011.
23        Is that fair?
24        MR. SCHANKER:  Objection, Your Honor.  Misstates
25   testimony.

JAMES CARINDER - CROSS

Page 1527

1    THE COURT:  You need to rephrase the question.
2    MS. SASTRE:  Okay.
3  BY MS. SASTRE:
4  Q.  I'll ask you this way:  Doctor, do you agree with me that
5  if the Taxotere label said "Cases of permanent alopecia have
6  been reported," that you would have shared this information
7  with Mrs. Earnest, along with all of the other risks of
8  chemotherapy you discussed with her?
9  A.  Yes.
10  Q.  And if Mrs. Earnest said in response to that, "Thank you,
11  Dr. Carinder, but I don't need to hear anything else about any
12  other options," and if she had said to you -- if she didn't ask
13  for another option, we can agree you wouldn't have given her
14  one, right?
15  A.  I'm sorry, can you repeat that?
16  Q.  Yeah, let me redo that, okay?
17  A.  Uh-huh.
18  Q.  If after you said to Mrs. Earnest --
19  A.  "You could potentially have permanent hair loss."
20  Q.  Well, let me reask that question.
21  A.  Okay.
22  Q.  So you would agree with me that if the Taxotere label had
23  stated:  "There have been cases of permanent alopecia
24  reported," that you would have shared that information with
25  Mrs. Earnest, along with all the other risks of chemotherapy,

Page 1528

1  true?
2  A.  Yes.
3  Q.  All right.  And my next question, Doctor, is that if
4  Mrs. Earnest didn't ask for another option, you would have
5  given her what was the only recommendation you walked in the
6  door with, which was dose-dense Adriamycin and Cytoxan,
7  followed by Taxotere, true?
8  A.  True.
9  Q.  And if Mrs. Earnest did say, "You know what, Dr. Carinder,
10  I would like to hear more about other options," you would have
11  discussed a Taxol regimen with her, correct?
12  A.  True.
13  Q.  And just to go back for a moment, but in discussing that
14  Taxol regimen with Mrs. Earnest, you would agree with me you
15  would have talked to her about the increased neuropathy and the
16  worse neuropathy with Taxol, true?
17  A.  Yes.
18  Q.  And you would have also told her about the increased risk
19  for developing an infusion reaction with Taxol, correct?
20  A.  Yes.
21  Q.  And so to be clear, there is a greater chance of
22  developing a severe infusion-related reaction if a patient
23  takes Taxol instead of Taxotere, true?
24  A.  True.
25  Q.  And you would have shared that with Mrs. Earnest, right?

Page 1529

1  A.  True.
2  Q.  Because all of this is important information for her to
3  have, right, Dr. Carinder?
4  A.  Yes.
5  Q.  If Mrs. Earnest had then said -- let's continue down the
6  road, okay?  If she had then said, "Well, what else do you
7  have" -- right? -- then you would have said, "Well, I have an
8  FAC regimen" --
9  A.  FAC.
10  Q.  -- "or FEC regimen," right?
11  A.  Yes.
12  Q.  But on those regimens, you would have made sure to have
13  told her, "You have a better chance of your breast cancer
14  coming back if I give you this," right?
15  A.  A higher risk.
16  Q.  A higher risk, right?  A greater chance.
17  A.  Yes.
18  Q.  And was Mrs. Earnest supposed to then somehow pick what
19  she was going to take without your recommendation, sir?
20  A.  I'm sorry, what do you mean by that?
21  Q.  Is it your expectation, Dr. Carinder, that after you
22  discussed Taxotere and after you discussed Taxol and after you
23  discussed FAC and after you discussed FEC, are you telling the
24  jury that after you had that conversation with Mrs. Earnest,
25  that your expectation was, without any further input or

Page 1530

1  recommendation from you, that she was just going to have to
2  pick on her own?
3  A.  No.
4  Q.  You wouldn't have let that happened.
5  A.  No.
6  Q.  You were going to make a recommendation to her, right?
7  A.  Right.
8  Q.  Because lots of patients come in and they go, "I mean, I'm
9  not a doctor.  I'm certainly not an oncologist.  I'm here to
10  get treatment for a deadly disease.  Doctor, this is what you
11  do.  Tell me what I'm supposed to take," right?
12  A.  Yes.
13  Q.  And that's what you would have done here, right, sir?
14  A.  Yes.
15  Q.  And what you were doing at the time, Doctor, in 2011 was
16  prescribing, under these circumstances, a lot more Taxotere
17  than Taxol, true?
18  A.  True.
19  Q.  And you were doing it because the way that you needed to
20  give Taxol was every two weeks at the time, true, with this
21  regimen?
22  A.  True.
23  Q.  And because of the higher dose that you would have to
24  give, at a bimonthly rate, right, the dosing would change,
25  correct?

JAMES CARINDER - CROSS

Page 1531

1   A.  Yes.
2   Q.  And because of that, sir, that is what was exposing
3   patients to this increased risk and worsened risk of neuropathy
4   with Taxol, true?
5   A.  True.
6   Q.  And that's why back in 2011, Taxotere was your go-to
7   taxane, right?
8   A.  True.
9   Q.  And you would agree with me, sir, that in your clinical
10  experience, even if it's stated in the label -- well, let me
11  ask you this.
12      The Taxol label warns of neuropathy, right?
13  A.  Yes.
14  Q.  And you had seen that in your clinical experience prior to
15  2011.
16  A.  True.
17  Q.  And you had seen it more than once.
18  A.  Yes.
19  Q.  It wasn't unusual; can we agree upon that?
20  A.  It's not unusual, but it's not to the severity or the
21  degree that paclitaxel has.
22      And then with paclitaxel given every two weeks, those
23  patients have to be premedicated heavily because they have the
24  risk of having infusion-related complications.
25  Q.  Let me go back for a moment.  I'm going to try to use the

Page 1532

1   words "Taxotere" and "Taxol," if that's okay with you.  We have
2   been using them for most of the trial.
3       My question to you, Doctor, is prior to 2011 you had
4   seen patients develop daunting neuropathy after using Taxol?
5   A.  Yes.
6   Q.  That was not something which was unusual when it came to
7   your patients who took Taxol, true?
8   A.  True.
9   Q.  But if we go back prior to 2011, sir, and think about, on
10  the other hand, how many patients you had seen develop
11  persistent or long-term hair loss after taking Taxotere, you
12  had only seen it once, right?
13  A.  Yes.
14  Q.  One time, and it was six years before you saw
15  Mrs. Earnest, true?
16  A.  True.
17  Q.  In all of the other patients you treated with Taxotere
18  between 1999 and the date that you saw Mrs. Earnest in 2011,
19  you had one lady whose hair didn't grow back?
20  A.  Yes.
21  Q.  You said her hair was not exactly perfect in the first
22  place, right?
23  A.  That's true.
24  Q.  So if we are going to complete your conversation with
25  Mrs. Earnest, you are going to share this information with her

Page 1533

1   too, right?
2   A.  Yes.
3   Q.  What you are going to tell her you are going to do, sir,
4   is exactly what you did do.  You were going to recommend the
5   Taxotere regimen, true?
6   A.  True.
7   Q.  Just bear with me one second, Doctor, please.
8       Now, let's talk about your prior patient for a
9   moment, while we are here.  So 2011 you're seeing Mrs. Earnest,
10  and you meet her, you assess her, you make your recommendation;
11  and it's dose-dense A plus C -- Adriamycin and Cytoxan, three
12  weeks later to be followed by Taxotere, right?
13  A.  Yes.
14  Q.  By that time, as we just discussed a moment ago, you had a
15  prior patient who had the exact same regimen, same drugs, same
16  dose, same schedule as Mrs. Earnest, true?
17  A.  True.
18  Q.  That patient, you said her hair fell out and it didn't
19  grow back.
20  A.  A little bit.
21  Q.  But for the most part --
22  A.  For the most part.
23  Q.  -- it didn't return, correct?
24  A.  Right.
25  Q.  What you believe, Dr. Carinder, is that this prior patient

Page 1534

1   from 2005 that you gave the dose-dense A plus C and the
2   Taxotere too, it was your opinion and belief that chemotherapy
3   is what prevented her hair from regrowing, right?
4   A.  Yes.
5   Q.  So, sir, you knew, we can agree, from your own clinical
6   experience with this patient, that hair does not always return
7   after chemotherapy?
8   A.  In her case it didn't.
9   Q.  Because Mrs. Earnest was getting the same exact three
10  medications, the same exact schedule, the same exact dose, you
11  would agree with me this was important information to share
12  with her, sir, wasn't it?
13  A.  Well, it was an anecdotal case.  I had treated countless
14  other patients with the same regimen and had not seen that
15  occur.
16  Q.  I understand.  It happened one time, that it's incredibly
17  rare to not have your hair grow back after chemotherapy, from
18  your experience.  But my question is simply different.
19      You're using this word "anecdotal."  I'm not asking
20  about that.  You would agree with me this was important
21  information to have shared with Mrs. Earnest, correct?
22      MR. SCHANKER:  Objection, Your Honor.  Asked and
23  answered.
24      THE COURT:  Sustained.  It's been asked and answered.
25

JAMES CARINDER - CROSS

Page 1535

1   BY MS. SASTRE:
2   Q.  Doctor, isn't it true that you always told patients who
3   were on dose-dense Adriamycin and Cytoxan, followed by
4   Taxotere, that you did have a patient who didn't recover her
5   hair?
6   A.  No.
7        MS. SASTRE:  Your Honor, may I approach the witness?
8        THE COURT:  Yes, you may.
9        MS. SASTRE:  Okay.  Thank you.
10       Your Honor, would you like a copy?
11       THE COURT:  Please.
12       MS. SASTRE:  Counsel, do you need a copy?
13  BY MS. SASTRE:
14  Q.  Dr. Carinder, I have just handed you your deposition which
15  was taken in this case.  You see, sir -- I'm sure you will
16  recall.  It's dated January 11, 2018, right?
17  A.  Yes.
18  Q.  In your deposition you took an oath, just like you did
19  here today, coming into court.  Right, sir?
20  A.  Yes.
21  Q.  Both sides asked you some questions that day, as we heard,
22  for, I think, about three hours or four hours, correct?
23  A.  Yes.
24  Q.  Okay, sir.  If I get you to turn, please, to page 125 of
25  your deposition, line 4, sir.

Page 1536

1        MR. SCHANKER:  Your Honor, improper use of showing
2   the depo.  She can certainly read it, but showing the entire
3   page of the deposition -- I ask that it be read.
4        THE COURT:  It's appropriate to read it to him.
5        MS. SASTRE:  Okay, Your Honor.
6        MR. SCHANKER:  What's the page number?  I'm sorry.
7        MS. SASTRE:  Sure.  125.  I thought both sides had
8   done that, Judge, but I'm happy to just read it, Your Honor.
9   BY MS. SASTRE:
10  Q.  So page 125, line 4.
11       "QUESTION:  Did you ever warn patients who were on
12  the dose-dense AC, and then followed by Taxotere cycle, of
13  the possibility of permanent hair loss?
14       "ANSWER:  Patients have asked about that, and at the
15  time I always told them -- I said, I have one lady, I
16  said, who still hasn't recovered her hair yet.  But prior
17  to her, I had never seen anyone have long-lasting
18  alopecia."
19       Did I had read that correctly, sir?
20  A.  Yes.
21       MR. SCHANKER:  Your Honor, the time frame is not in
22  response to the question.  Improper use of the deposition.
23       THE COURT:  Mr. Schanker, overruled.  The jury will
24  make that determination.
25       MR. SCHANKER:  Thank you.

Page 1537

1        THE COURT:  Let's proceed.
2        MS. SASTRE:  Okay.  Thank you.
3   BY MS. SASTRE:
4   Q.  So, Dr. Carinder, you see you said here you always told
5   your patients, right?  I just read that to you?
6   A.  Yes.
7   Q.  So does that refresh your recollection in any way that, in
8   fact --
9   A.  Yes.
10  Q.  Okay, sir.  So let me just make sure I get the whole
11  question out for the record, Dr. Carinder.
12  A.  Yes.
13  Q.  It's true, you would agree with me, you always told your
14  patients, if they were on dose-dense AC followed by Taxotere,
15  you would tell them about the prior patient, true?
16  A.  Yes.
17  Q.  As you sit here today, sir, you don't have any reason that
18  you deviated from that practice when it came to Mrs. Earnest,
19  right?
20  A.  No.
21  Q.  So you would have told her about that patient, correct?
22  A.  Yes.
23  Q.  After having heard about that patient and after learning
24  about the possibility that her hair might not grow back, you
25  would agree with me that Mrs. Earnest accepted your treatment

Page 1538

1   plan and agreed to proceed with the same regimen of dose-dense
2   AC followed by Taxotere, true?
3   A.  Yes.
4        MR. SCHANKER:  Your Honor, it misstates the
5   testimony.
6        THE COURT:  You're going to have a time in redirect
7   to cover this.
8        MR. SCHANKER:  Thank you.
9   BY MS. SASTRE:
10  Q.  One of the things that you said, Dr. Carinder, on direct
11  exam, you said something like permanent hair loss can be a big
12  deal to women, right?
13  A.  Yes.
14  Q.  Okay, sir.  So, again, because of that, that would be why
15  you were sharing information like this, true?
16  A.  Yes.
17  Q.  Okay, sir.  Okay.
18       So let's switch gears a little bit.  I want to talk
19  with you, I think, first, about the 2004 Taxotere label.  I
20  know you call it the "package insert."  Right?  And I will tell
21  you, only in this courtroom we have been calling it the
22  "label," but I mean all of the information that comes with the
23  drug.  Is that okay?
24  A.  You mean like a warning label?
25  Q.  Yes.

Page 1543

1  would agree with me that what that means is usually or most of
2  the time, right?
3  A.  Yes.
4  Q.  It doesn't mean always, right?
5  A.  No.
6  Q.  I know counsel asked you, again, a lot of hypothetical
7  question about, "Well, what if it had said cases of persistent
8  alopecia or permanent alopecia?  Would you have talked about
9  this?"
10        I want to ask you a question that's not hypothetical,
11  but based off of what you really did read before you saw
12  Mrs. Earnest in 2011.  Sir, did you tell her what you had
13  learned from the Taxotere label that you last read?  Did you
14  tell her, "Listen.  It says right in the label hair grows back
15  most of the time but not always"?
16  A.  No, I did not tell her that.
17  Q.  But you would agree with me you didn't give her any
18  guarantees when it came to her treatment, right?
19  A.  There are no guarantees in medicine.
20  Q.  That's right, and it's especially true with cancer and
21  chemotherapy.
22  A.  True.
23  Q.  You didn't give Mrs. Earnest any guarantees when it came
24  to the issue of whether her cancer would return, right?
25  A.  No.

Page 1544

1  Q.  You didn't give her any guarantees with regard to what
2  side effects she might experience?
3  A.  No.
4  Q.  You would agree with me you didn't give her any guarantees
5  when it came to her hair either, right?
6  A.  No.
7  Q.  Had you forgotten, because it was 12 years later, that you
8  had read those exact words in this 33-page label?
9  A.  I hadn't forgotten anything.
10  Q.  Okay.
11  A.  You have to remember, the population of patients of that
12  first label when the drug was developed were with people with
13  metastatic disease.  As I commented earlier today, most of
14  those patients had seen chemotherapy before, and they're not
15  going to have as risk or normal or customary recovery of blood
16  counts and hair that people that are chemotherapy naive would
17  have.
18  Q.  Sir, you would agree with me -- you said this earlier --
19  the 2004 label, which speaks to the treatment of metastatic
20  cancer and adjuvant treatment that Mrs. Earnest had, it had the
21  same language?
22  A.  It had the same language.
23  Q.  You hadn't read that label, though, cover to cover, like
24  you did this one, right?
25  A.  No.  The initial 1999, when the drug was new, I read

Page 1545

1  everything.
2  Q.  That's what I'm saying, Dr. Carinder.  The labels that
3  came out afterward, including 2004 and 2010, you didn't read
4  them word for word, page by page, line by line, like you did in
5  1999, true?
6  A.  True.
7  Q.  If you had read the 2004 label word for word and saw that
8  it said in the context of adjuvant treatment like Mrs. Earnest,
9  that hair grows back most of the time or all of the time --
10  excuse me -- most or the time, or usually would you have shared
11  that information with Mrs. Earnest?
12        MR. SCHANKER:  Your Honor, mischaracterizes the
13  testimony and the label as read.
14        THE COURT:  I think you need to rephrase your
15  question.
16        MS. SASTRE:  Sure.
17  BY MS. SASTRE:
18  Q.  If you had read word for word the 2004 label and read that
19  it said hair generally grows back, would you have shared that
20  information with Mrs. Earnest in 2011?
21  A.  Yes.
22  Q.  That would have been telling her hair usually grows back
23  but not every time.
24  A.  Yes.
25  Q.  Now, I know counsel walked through the 2010 label with

Page 1546

1  you, asked you some questions about it.  Do you recall that?
2  A.  Yes.
3  Q.  Okay, sir.  I know he went through a number of times where
4  it said alopecia and hair loss.  Would it surprise you to learn
5  that's listed in that label 13 times?
6  A.  No.
7  Q.  Is that a label that you read word for word, line by line?
8  A.  Which year?
9  Q.  2010, Doctor?
10  A.  No.
11  Q.  I know you talked about something called ASCO, or A-S-C-O,
12  and you said, "I kind of use it to stay up to date."  Do you
13  recall that?
14  A.  Yes.
15  Q.  Let me ask you a very specific question:  You're not
16  telling us that you have a specific recollection of reading
17  about some update in ASCO, if there even was one, with regard
18  to the 2004 Taxotere label, right?
19  A.  No.
20  Q.  You're also, likewise, Dr. Carinder, not telling us today
21  that you have a specific recollection of reading about some
22  ASCO update, if there even was one, for the 2010 Taxotere
23  label.  Fair?
24  A.  True.
25  Q.  You would agree with me, when you discuss the risks -- are

1 way. She can ask him if he has seen this article without
2 talking about the contents of the article, loading the question
3 to get the jury to hear the information. That's my concern
4 here.
5 MS. SASTRE: I'm not tracking at all. Here is what I
6 heard. He said that he stays abreast of the literature, and I
7 just want to ask him about sort of what was out there in the
8 public sphere. These are all published in journals that he
9 gets. Had he seen those? Is he aware of it?
10 MR. SCHANKER: So she can ask him about the Nabholtz
11 article. He can look at it. She can't ask him about and
12 testify to the jury about the contents of the article when he
13 hasn't -- no foundation has been laid.
14 THE COURT: Well, it's a little bit like a learned
15 treatise, but that's with experts. This is not --
16 MR. SCHANKER: Right.
17 THE COURT: This is a really strange --
18 MR. SCHANKER: He is not an expert, Your Honor. She
19 can say, "Did this go to form your opinion?" If he says he's
20 never seen it --
21 THE COURT: Well, except that he shouldn't be --
22 MS. SASTRE: He was shown a bunch of stuff -- go
23 ahead, Your Honor. I don't want to interrupt you.
24 THE COURT: I think it's appropriate for the
25 defendants to show him an article and ask him if this is the

1 literature that he received and did he review this article. If
2 he says, "This is the kind of literature that I receive and
3 regularly review," then we will just see where it takes us.
4 I think I'm not going to say no, but I think
5 it's appropriate because he talked about that. We will see
6 where it takes us.
7 MR. SCHANKER: And to be clear, Your Honor, he didn't
8 say, "I keep up with all these articles." He acknowledged that
9 he doesn't read every single article.
10 THE COURT: He said, "I don't read cover to cover,
11 but I pick up what's pertinent."
12 MR. SCHANKER: Right. If he's shown the Nabholtz
13 article and he says, "No, I don't recognize that," then she
14 can't cross-examine him on something he has never seen because
15 it clearly didn't go into his decision-making in the room,
16 which is the way that this has been defined --
17 MS. SASTRE: Your Honor, they had him testify that he
18 had no idea that this could happen. They went through a list.
19 He wrote "no" on a piece of paper 15 times and he left it up
20 there during the course of his entire exam, that this man had
21 no earthly idea, as if he was like in a cave in Afghanistan or
22 something. I'm just showing that he wasn't.
23 MR. SCHANKER: Sure, and I'm not disagreeing --
24 THE COURT: I think it's fair examination and then we
25 will see. If it's a periodical here, you know, he's --

1 MR. SCHANKER: If he says he hasn't seen it, then --
2 THE COURT: Not necessarily. If it says some renegade
3 outfit, that would be one thing. If it's from a journal of
4 oncology or one of these that everybody reads --
5 MS. SASTRE: It is that category, Your Honor.
6 MR. SCHANKER: But, Your Honor, then what we are
7 getting into is a violation of the MIL that somehow he violated
8 the standard of care by not staying up to date and it's --
9 MS. SASTRE: No.
10 THE COURT: No, that's not what I'm hearing.
11 MR. SCHANKER: That somehow he is at fault for not
12 staying abreast of the literature, that's --
13 MS. SASTRE: I'm not saying that.
14 MR. SCHANKER: That's the only inference that a jury
15 could draw from allowing --
16 THE COURT: That's not how I'm seeing it.
17 Mr. Schanker, you had him go through everything and say, "I
18 have never seen this. I never heard it. I never saw it."
19 His informed consent issue as to Mrs. Earnest,
20 he had to tell her, "I'm going to give you these three drugs.
21 Let's talk about these three drugs." If this literature says
22 that these drugs are associated with permanent hair loss,
23 that's something that would have been part of his conversation.
24 MR. SCHANKER: If he had seen it. If he hasn't seen
25 it --

1 THE COURT: Mr. Schanker, I'm going to let her go
2 over it. We could stay up here for another 20 minutes, but
3 that decision is already made.
4 MS. SASTRE: Thank you, Your Honor.
5 THE COURT: Charged to plaintiff.
6 (End of bench conference.)
7 THE COURT: Please proceed.
8 MS. SASTRE: Thank you, Your Honor. May I approach?
9 THE COURT: Yes, you may.
10 BY MS. SASTRE:
11 Q. Doctor, I've just handed you an article. As you can see,
12 it's titled "Phase II study of docetaxel, doxorubicin, and
13 cyclophosphamide as first-line chemotherapy for metastatic
14 breast cancer."
15 Do you see that, sir?
16 A. Yes.
17 Q. And my question is that this is --
18 THE COURT: Can I get a copy of the article?
19 MS. SASTRE: Oh, I'm so sorry. Here you are. Sorry
20 about that, Your Honor.
21 THE COURT: Thank you.
22 BY MS. SASTRE:
23 Q. You see that this is published in the Journal of Clinical
24 Oncology?
25 A. Yes.

JAMES CARINDER - CROSS

---

Page 1555

1   Q.  And, sir, that's a journal that you get, right?
2   A.  Yes.
3   Q.  I think you told us you get it every month?
4   A.  Yes.
5   Q.  Is that something that is a peer-reviewed journal, sir?
6   A.  Oh, absolutely.
7   Q.  I mean, it's a good one, right?
8   A.  Yes.
9   Q.  It's reliable, the information contained in it?
10  A.  Yes.
11  Q.  It's considered authoritative?
12  A.  That's ASCO's journal.
13  Q.  Okay.  So let me ask you this, sir:  Did you see this
14  paper?
15  A.  Yes.
16  Q.  You have seen it previously?
17  A.  Yes --
18  Q.  Okay.
19  A.  -- years ago.
20      MS. SASTRE:  Your Honor, I would like to go ahead and
21  put it up, please.  Okay.
22      THE COURT:  Are you offering it into evidence?
23      MS. SASTRE:  Well, it's medical literature.  I don't
24  think we have been moving it in --
25      THE COURT:  All right.

---

Page 1556

1       MS. SASTRE:  -- but we have been publishing it.
2       THE COURT:  That's fine.  You can publish it.
3       MS. SASTRE:  Okay.  Thank you, Your Honor.
4   BY MS. SASTRE:
5   Q.  So, Doctor, just a couple quick questions on it, okay?
6       You see it's from 2001, right, sir?
7   A.  Yes.
8   Q.  Which we can agree, of course, was years before you
9   treated Mrs. Earnest, true?
10  A.  True.
11  Q.  And you see that there are four patients in the study who
12  were identified as having long-lasting partial alopecia, and
13  they were treated with Taxotere, Adriamycin, and Cytoxan,
14  correct?
15  A.  Yes.
16  Q.  Okay.  And so that's something, when you reviewed this
17  article, you would have learned of Taxotere, Adriamycin, and
18  Cytoxan being associated with four reports of persistent hair
19  loss, correct?
20  A.  Yes.
21  Q.  And, again, this is something that's published and
22  available in the literature, true?  Publicly available even,
23  true?
24  A.  Yes.
25  Q.  Did you share this information with Mrs. Earnest?

---

Page 1557

1   A.  No.
2   Q.  Okay.
3   A.  I guess I didn't focus on that when I read this.  This
4   would never be a regimen I would use with somebody with
5   metastatic disease.
6   Q.  Fair enough.
7   A.  It's too harsh.
8   Q.  Okay, sir.  Let's take a look at another article.
9       So, Dr. Carinder, I just handed you an article, do
10  you see, from 2009, sir.
11  A.  Yes.
12  Q.  And it's called the Prevezas article, correct?  That's the
13  author?  Do you see that, sir?
14  A.  No.
15      MR. SCHANKER:  Your Honor, I would like this to be
16  established as a learned treatise.  This is a dermatology --
17      THE COURT:  Wait.  I think the first question is -- I
18  think she needs to lay a foundation.
19      MR. SCHANKER:  Yes.
20      MS. SASTRE:  Okay.  Sure.
21  BY MS. SASTRE:
22  Q.  So my question is simply:  Do you see that this was
23  published in 2009?
24  A.  Yes.
25  Q.  Okay.  And it's published in -- it's the British Journal

---

Page 1558

1   of Dermatology.
2       Do you see that?
3   A.  Yes.
4   Q.  Is this something that you saw before you treated
5   Mrs. Earnest in 2011, this article?
6   A.  No.
7   Q.  Do you see, if you look at the article --
8       MR. SCHANKER:  Your Honor, we would object.
9       THE COURT:  Wait.
10      MR. SCHANKER:  This is a derma --
11      THE COURT:  I think --
12      MR. SCHANKER:  There's no foundation laid within his
13  area of expertise.
14      THE COURT:  I think we need to lay a foundation that
15  this is something he would have relied on.
16      MS. SASTRE:  Okay.
17  BY MS. SASTRE:
18  Q.  Well, let me ask you this, sir:  I mean, have you heard of
19  the Journal of Dermatology before?
20  A.  Yes.
21      MR. SCHANKER:  Misstates the title.  That's not the
22  title.
23      THE COURT:  Mr. Schanker, let's see if we can get
24  past this line of questioning first, if a foundation is going
25  to be laid.  But I'm going to allow some questions.

---

JAMES CARINDER - CROSS

Page 1563

1    out there."  Now, whether he saw it and whether he relied on it
2    or anything, I just think it's probative whether it was out
3    there.  She has said that in cross-examination and to go --
4    very frankly, what I expected you to do in your direct
5    examination and then when you told me what you wanted it for, I
6    said, "That's fine.  You can do it for that purpose."  We told
7    her she didn't have to read this portion.
8         MR. SCHANKER:  He has never seen the book, so --
9         THE COURT:  And I'm expecting we're going to hear
10   that, but if this is --
11        MR. SCHANKER:  He has already testified to that.
12        THE COURT:  I understand that, but I think that
13   what's pertinent is that this is information that's
14   disseminated to people that says just the opposite.  It's a
15   little bit different to hold him accountable to what's in a
16   dermatology journal.
17        MR. SCHANKER:  She's going right to it.  She has not
18   established that it's a learned treatise or it's in the realm
19   of something that he should see.  She skipped that step.  All
20   she said is, "You have seen this book," the cover of the book.
21   She hasn't established --
22        THE COURT:  I think you can lay a foundation.
23        MR. SCHANKER:  -- in any way that he --
24        THE COURT:  He doesn't have to have read it if it's
25   out there.

Page 1564

1         MS. SASTRE:  This is in the ether is how I've been
2    thinking about it, right?
3         THE COURT:  I got it.
4         MR. SCHANKER:  The ether versus within the realm of
5    what -- she can't bring out any shred of --
6         THE COURT:  I don't think any of this is being
7    offered to show that he was not doing his job.  I don't think
8    any of this is being offered there.  I think this is in
9    response to the inference that it was being kept a secret.
10        MR. SCHANKER:  It's a warn case, Your Honor, and if
11   that's established as a treatise --
12        THE COURT:  All he has to say is, "I didn't see it.
13   This is not the kind of thing that I read.  I expected to get
14   information from the company."
15        MR. SCHANKER:  She does have to establish that he
16   acknowledges that as a learned treatise.
17        MS. SASTRE:  It doesn't have to be a treatise.  The
18   question is it's out there in the domain, did he see it or not.
19        THE COURT:  It's in evidence.
20        MS. SASTRE:  Right.
21        MR. SCHANKER:  Yes, I know that, but she shouldn't be
22   allowed to cross him on that.
23        THE COURT:  I think I have already told you what I'm
24   going to allow her to do and what you can do in response.
25        MS. SASTRE:  Okay.  Thank you.

Page 1565

1         THE COURT:  Charged to plaintiff.
2         (End of bench conference.)
3         THE COURT:  Please proceed.
4         MS. SASTRE:  May I approach?
5         THE COURT:  Yes, you may.
6    BY MS. SASTRE:
7    Q.  Do you already have a copy, Doctor?
8    A.  I have one up here.
9    Q.  Very good.  Okay.
10        So, Doctor, this is the Breast Cancer Treatment
11   Handbook, which plaintiff's counsel, Mr. Schanker, asked you a
12   few questions about.
13        You recall that, right?
14   A.  Yes.
15   Q.  All right.  And, sir, is this something that -- you see
16   it's the 7th edition, and if you go a little further in the
17   book, you will see that it was published in 2009, if we turn to
18   the third page.
19        Just to establish that, Dr. Carinder, if you see
20   that, please.
21   A.  I see it.
22   Q.  Okay.  Very good.
23        So this would have been about two years before you
24   treated Mrs. Earnest, fair?
25   A.  Yes.

Page 1566

1    Q.  Okay.  And then I would like to ask you a question.  If
2    you turn to page 195, please.  Yes.
3         And you see that there's a section on docetaxel,
4    which, of course, is Taxotere, right?
5    A.  Yes.
6    Q.  And you see that it states: "Side effects:  Temporary
7    hair loss, rare reports of permanent hair loss," right?
8    A.  Yes.
9    Q.  And you would agree with me that what is stated there in
10   this handbook in 2009, two years before Mrs. Earnest ever
11   walked into your office, was consistent with your clinical
12   experience, that hair loss was normally temporary, but that
13   rarely it was permanent.
14   A.  I had had one incident.
15   Q.  Yes.  This is generally consistent with your experience;
16   fair, sir?
17   A.  Yes.
18   Q.  Okay.  Thank you.
19        And if you had reviewed this entry, if it was
20   something you had come across for whatever reason, you agree
21   with me that you would have shared that with Mrs. Earnest,
22   true?
23   A.  Yes.
24   Q.  Now, I believe your office was, in 2011, giving out
25   something to patients called Chemocare?

JAMES CARINDER - CROSS

Page 1587

1    your experience at that time, Dr. Carinder, was that it took
2    about 8 to 10 weeks after chemotherapy, and then typically, but
3    not always, a patient's hair would return, true?
4    A.  On average, about 8 to 10 weeks.  As I mentioned earlier,
5    some patients' hair will start growing back even before the
6    treatment is done.
7    Q.  Again, just sticking with what you said was on average,
8    the 8 to 10 weeks, obviously that's about two to three months,
9    true?
10   A.  Roughly, yes.
11   Q.  And if a patient didn't get their hair back six months
12   after chemotherapy, that would be an amount of time where you
13   would start to be concerned?
14   A.  That would be unusual.
15   Q.  Did you discuss with Mrs. Earnest -- after she had gone
16   about six months after chemotherapy without her hair returning,
17   was there a discussion between you and her that this is
18   unusual?
19   A.  Yes.
20   Q.  And did you tell her you were concerned that her hair
21   hadn't grown back after chemotherapy?
22   A.  I said, "It's not common.  It's uncommon to see the hair
23   take this long to come back."
24   Q.  Approximately when would you start to have that
25   conversation with the patient, at what period of time after

Page 1588

1    treatment?
2    A.  I would say six to eight months.
3    Q.  You believe you had that conversation here with
4    Mrs. Earnest?
5    A.  Yes.
6    Q.  I believe, based upon your experience with your prior
7    patient, the fact Mrs. Earnest's hair, of course, fell out when
8    she was taking chemotherapy, it would have been your belief
9    that her hair loss was caused by chemotherapy, true?
10   A.  Yes.
11   Q.  That would have been something you discussed with her,
12   right?
13   A.  Yes.
14   Q.  Now, I don't want to go back through all of the records.
15   I'll just touch on some dates with you.  I know you have a
16   whole notebook in front of you.
17        But you would agree with me that starting in April of
18   2012 -- which is about seven months after Mrs. Earnest's
19   completed her treatment, right?
20   A.  Yes.
21   Q.  -- starting in that time period, sir, you have a number of
22   records, one after the other, that indicate her hair loss was
23   resolving.  Is that fair?
24        MR. SCHANKER:  Objection.  Misstates the record.
25        THE COURT:  Overruled.  I'm going to let Dr. Carinder

Page 1589

1    answer.
2        THE WITNESS:  She was starting to get some hair
3    growth back.
4    BY MS. SASTRE:
5    Q.  You noted that on a number of occasions.  Fair?
6    A.  I mean, very sparse hair, but there was some hair
7    growth.
8    Q.  Understood.  I think you described -- if I understood you
9    correctly, that at some point -- and you noted this for a
10   number of months -- that it looked like hair was starting to
11   come back, but then it just kind of came to a standstill,
12   right?
13   A.  Yes.
14   Q.  You would agree with me that at the time when you noticed
15   this standstill, right, that this was at the same time
16   Mrs. Earnest was taking Arimidex?
17        MR. SCHANKER:  Objection.  Foundation.
18        THE COURT:  Overruled.  Overruled.
19        THE WITNESS:  She was taking anastrozole.
20   BY MS. SASTRE:
21   Q.  You were prescribing it to her?
22   A.  Yes.
23   Q.  Okay.  And so again, during this period of 2012 --
24   mid-2012 and 2013, when you were noting resolving alopecia in
25   your records and you were seeing with your own eyes there was

Page 1590

1    some activity, some regrowth -- my question is just simply this
2    was during the time period when, of course, she was taking
3    Arimidex that you had prescribed?
4    A.  Yes.
5    Q.  You would agree with me that Arimidex is something that
6    works by blocking estrogen, right?
7    A.  Yes.
8    Q.  And the reason you were giving it to Mrs. Earnest was
9    because it's part of her breast cancer treatment, true?
10   A.  Yes.
11   Q.  It's another medication, in addition to the chemotherapy
12   drugs, and the idea is that it's going to help Mrs. Earnest in
13   not having a reoccurrence of breast cancer?
14   A.  Yes.
15   Q.  That's why she agreed to take it, right?
16   A.  Yes.
17   Q.  You told her there were risks associated with it, true?
18   A.  Side effects associated with it.
19   Q.  Because I know we are focused on chemotherapy, but we can
20   agree that it is a truism to say there are no risk-free
21   medications at all.
22   A.  The only thing in this world that's without side effects
23   is air -- fresh air and water.  Every medication has side
24   effects.  Anastrozole, the most common side effect is
25   fatigue -- fatigue and bone and joint pain.  That's what you

JAMES CARINDER - CROSS

Page 1611

1 question, Judge.  He is saying that nobody could say that.  So
2 if I was to say to him, "It's not your opinion in this case
3 that Mrs. Earnest -- you don't know whether she would be alive
4 today if she had taken Taxol or Taxotere," he is saying that
5 nobody can know that.  He is saying, "If she had taken a
6 different medication, I don't know" --
7        THE COURT:  I think what is relevant for this case is
8 at the time he prescribed it, he thought that was the best way
9 to keep her alive.
10        MS. SASTRE:  Okay.
11        MR. SCHANKER:  That's been asked and answered
12 multiple times.
13        MS. SASTRE:  What if I said something like "So if you
14 gave her Taxol at the time, do you know one way or another
15 whether she would be alive today?"
16        THE COURT:  How is that any different from asking
17 about the neuropathy?  He made a prescribing decision based
18 upon information he had at the time.  He made a prescribing
19 recommendation.
20        MS. SASTRE:  Okay.  I'll ask a couple different
21 questions and then I will sit down.  Thank you.  I think yours
22 are better than mine.
23        THE COURT:  Charged to defendant.
24        (End of bench conference.)
25

Page 1612

1 BY MS. SASTRE:
2 Q.  Dr. Carinder, the treatment of dose-dense Adriamycin and
3 Cytoxan followed by Taxotere that you prescribed to
4 Mrs. Earnest, that is something that you believed at the time,
5 on March 31, 2011, to be in Mrs. Earnest's best interest?
6        MR. SCHANKER:  Asked and answered, Your Honor.
7        THE COURT:  I'm going to let him answer this one, and
8 then --
9        THE WITNESS:  Yes.
10        THE COURT:  -- that's it.
11 BY MS. SASTRE:
12 Q.  And you stand by that decision today, sir?
13        THE COURT:  Okay.  That's asked and answered.
14        MS. SASTRE:  Whether he stands by the decision today?
15        MR. SCHANKER:  Yes, Your Honor.
16        THE COURT:  You can answer that.
17        THE WITNESS:  Yes.
18        MS. SASTRE:  Okay.  Thank you, sir.  I have no
19 further questions.  I appreciate your time.
20        THE COURT:  Okay.  Mr. Schanker.
21        MR. SCHANKER:  Thank you, Your Honor.
22             REDIRECT EXAMINATION
23 BY MR. SCHANKER:
24 Q.  Good afternoon again, Dr. Carinder.
25      Were you aware -- you were asked questions about

Page 1613

1 attorneys meeting with you.  Were you aware that the Court
2 entered an order in this case allowing plaintiff's lawyers to
3 meet with you?
4        MS. SASTRE:  Objection, Your Honor.
5        THE COURT:  Sustained.  Sustained.
6        (The following proceedings were held at the bench.)
7        THE COURT:  The fact there were orders in place,
8 there was nothing improper with him meeting with this witness.
9 I'm inclined to tell the jury there's nothing improper.
10        MS. SASTRE:  I didn't suggest there was anything
11 improper, Your Honor, but to go through --
12        MR. SCHANKER:  We believe that inference was created.
13        MS. SASTRE:  Your Honor, they decided how many times
14 they were going to meet him, how much time to spend with him,
15 what they were going to discuss with him, showing documents
16 from their opening, showing him materials that he wouldn't have
17 an opportunity to see in his care and treatment, and the truth
18 is we could have had an opportunity --
19        MR. SCHANKER:  Could you keep your voice down,
20 please.
21        MS. SASTRE:  Sure.  We could have had an opportunity
22 to have met with them as well, but we didn't because they
23 opposed that.
24        MR. SCHANKER:  The judge entered an order.
25        MS. SASTRE:  You opposed our having an opportunity to

Page 1614

1 meet with the prescribing doctors.  I could have asked that
2 question too.  In fact, they have an obligation to tell him
3 that when they meet with him.  I did not ask that question.
4      So they have met with him -- Your Honor, if you
5 want to go and spend this much time with a fact witness, we are
6 going to bring it out.  The inference is the inference.  I
7 didn't suggest there's something wrong with it.  But if they
8 are going to talk with him about the questions I'm going to ask
9 him and the things that they are going to ask him on direct
10 exam --
11        MR. SCHANKER:  Your Honor, we are allowed to do that,
12 and the inference was created by counsel that it's
13 impermissible.
14        THE COURT:  I wasn't involved in any order that was
15 entered.  It is what it is.  I think there was an inference
16 that there was something improper with the meeting, and there
17 is nothing improper with meeting with a witness that you intend
18 to call at trial.
19        MS. SASTRE:  Well, Your Honor, candidly, we do think
20 that there were things that were done that we talked to you
21 about that we believe were improper.  So I'm just saying --
22        MR. SCHANKER:  Nothing improper was done.
23        MS. SASTRE:  Hold on.  If you want to spend six hours
24 with a fact witness and show him a bunch of things and have
25 five different lawyers meet with him for, quote, prep talks

```
 1                      UNITED STATES DISTRICT COURT
 2                      EASTERN DISTRICT OF LOUISIANA

 3      ********************************************************************

 4      IN RE:  TAXOTERE (DOCETAXEL)          Docket No. 16-MD-2740
        PRODUCTS LIABILITY LITIGATION         Section H
 5                                            New Orleans, LA
        Relates to:  Barbara Earnest          Tuesday, September 24, 2019
 6                   16-CV-17144

 7      ********************************************************************

 8                      TRANSCRIPT OF TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 9                      UNITED STATES DISTRICT JUDGE
                        DAY 7, MORNING SESSION
10

11      APPEARANCES:

12      FOR THE PLAINTIFF:              BACHUS & SCHANKER, LLC
                                        BY:  DARIN L. SCHANKER, ESQ.
13                                           J. KYLE BACHUS, ESQ.
                                        1899 Wynkoop St., Suite 700
14                                      Denver, CO 80202

15                                      FLEMING NOLEN & JEZ
                                        BY:  RAND P. NOLEN, ESQ.
16                                      2800 Post Oak Blvd., Suite 4000
                                        Houston, TX 77056
17
                                        GIBBS LAW GROUP, LLP
18                                      BY:  KAREN B. MENZIES, ESQ.
                                        6701 Center Drive West, 14th Floor
19                                      Los Angeles, CA 90045

20                                      DAVID F. MICELI, LLC
                                        BY:  DAVID F. MICELI, ESQ.
21                                      P.O. Box 2519
                                        Carrollton, GA 30112-0046
22
                                        PENDLEY BAUDIN & COFFIN
23                                      BY:  CHRISTOPHER L. COFFIN, ESQ.
                                        2505 Energy Centre
24                                      1100 Poydras St.
                                        New Orleans, LA 70163
25
```

Page 1721

1  graduate this coming year in 2020, I have a 13-year-old, and I have
2  a four-year-old, and then the baby is the one that just made one.
3  Q. Now, I understand that you do regular childcare for some of the
4  grandsons; is that right?
5  A. Yes.
6  Q. Could you share that with the jury, please.
7  A. I baby-sit -- well, I watch the three kids, which I don't have
8  to watch the 18-year-old, but the four-year-old and the
9  one-year-old, I watch them on Sundays and Mondays. And then the
10 other grandma comes in and she watches them Tuesday, Wednesdays,
11 and part of Thursday. Then I go back on a Thursday and a Friday.
12 So I look forward to those days, you know. I been here for two
13 weeks and I miss them.
14 Q. Barbara, I want to talk to you a little bit about what your
15 hair looked like before the chemotherapy, okay?
16 A. Okay.
17 Q. And just so we are clear, what year did you receive the
18 chemotherapy?
19 A. 2011.
20 Q. So prior to that, can you describe to the jury what your hair
21 looked like?
22 A. It was short up to my ears. It was -- I'd either frost it or,
23 I don't know, highlight, however y'all want to call it. But I had
24 a full head of hair. Do you want --
25 Q. No, I think -- what I would like to do --

Page 1722

1  A. No, I mean, do you want me to show the wig because that's my
2  hair?
3  Q. Oh, yeah, we'll show that wig that you brought here in a little
4  bit.
5  A. Okay.
6  Q. What I would like to do, as far as making sure that jurors
7  understand, can I show you some of the photographs that you
8  provided of what you looked like prior? Is that okay?
9  A. Sure.
10     MR. SCHANKER: Your Honor, I would like to admit
11 Plaintiff's Exhibit 0649.
12     THE COURT: Any objection?
13     MS. SASTRE: No, your Honor.
14     THE COURT: Let it be admitted.
15     MR. SCHANKER: And I have hard copies if you need them,
16 your Honor.
17 BY MR. SCHANKER:
18 Q. Barbara, I want to take you through some photographs. And you
19 can just let us know as best you can when these were taken and
20 we'll ask you just a few questions about them, okay?
21 A. Okay.
22 Q. Who is this?
23 A. That's me. Graduation, 1970.
24 Q. And what color was your hair then?
25 A. Back then it was more -- I called it, like, a dirty blonde or

Page 1723

1  mousy blonde, brown. It was, like, a brown. It wasn't blonde at
2  all there. At that time I hadn't did any highlights or frosting in
3  1970. I didn't do it until after I was married that I started
4  frosting my hair.
5  Q. Did you always have what -- did you always consider your hair
6  normal or did you have any problems with it?
7  A. Oh, no, it was normal. I never had any problems with my hair.
8  Q. Several photographs here. I'll zero in on these as best I can.
9  This top right here, what are we looking at?
10 A. That's my wedding picture. It was at my mother's house.
11 Q. And what year is this?
12 A. 1972. And I had a full head of hair there.
13 Q. That's your natural hair?
14 A. Yes.
15 Q. And then, let the jury know, do you know when this was taken?
16 A. Yes. That's -- I am holding little Ralph. Ralph, Jr. That's
17 his christening, and that was in 1975.
18 Q. And then identify the folks in that photograph for us.
19 A. That's my husband, myself, Michael, holding the little ball,
20 and Ralph, Jr. And that's about 1983.
21 Q. Go through some more photographs.
22     MR. SCHANKER: Your Honor, I believe these are in
23 evidence, but just to confirm, Plaintiff's Exhibit 0645. We'll go
24 ahead and make sure those are admitted.
25     THE COURT: That wasn't --

Page 1724

1      THE DEPUTY CLERK: I don't have that one in.
2      THE COURT: Any objection, Ms. Sastre?
3      MS. SASTRE: No, your Honor.
4      THE COURT: Let them be admitted.
5      MR. SCHANKER: Thank you, your Honor.
6  BY MR. SCHANKER:
7  Q. And moving through these just to give the jury an idea here.
8  We have a couple of them back to back -- next to each other,
9  rather, and we have years identifying these. Tell us --
10 A. That's Ralph, my husband, myself, and Ralph, Jr. That was
11 1977.
12 Q. Okay.
13 A. My hair is full at the top.
14 Q. Yes.
15 A. The next picture, that's 1991. Just me and my husband in that
16 picture.
17 Q. And just to be clear, up until the time you took chemotherapy,
18 did you always consider your hair to be normal?
19 A. Yes.
20 Q. Tell us about this photograph, if you would.
21 A. That's one of my grandsons, that's 2006, and I was at the
22 hospital.
23 Q. Who is that little baby?
24 A. Caleb, Michael's son.
25     MR. SCHANKER: Your Honor, we move to admit Plaintiff's

1    A. Yes. Well, they were in the same building.
2    Q. And tell us about -- did you see Dr. Lagarde?
3    A. Yes, I did.
4    Q. Share with the jury about your time seeing Dr. Lagarde.
5    A. Well, I went to go see Lagarde, and she got the results from
6    the mammogram. And right away she put it on the screen and she was
7    showing it to me. And she started talking about reconstructive
8    surgery, which meant she was going to remove my breasts. But not
9    just one, she wanted to remove both of them.
10        Well, that sort of scared me. So I just let her finish
11   her -- you know, she was saying that she was going to take fat from
12   my stomach, my butt, my thighs and reconstruct my breasts. And it
13   really scared me.
14        So on the way home, I just told my husband, I said, "I've
15   got to go get a second opinion. I am not -- I am not just going to
16   jump into something I don't know anything about." So I went and
17   got a second opinion. I went to another doctor.
18   Q. So tell the jury about that part of the story, about you
19   getting a second opinion.
20   A. Well, then I went to my primary care physician, and he sent me
21   to have tests done, which I think it was a PET scan and a CAT scan.
22   And then they -- he sent me to a surgeon. And that surgeon looked
23   at all of my tests. And I asked him, I said, "Do you believe that
24   I need to have both of my breasts removed?"
25        And he looked at me and said, "No." He told me, "No,"

1    that he thinks that I could just have the lump removed. And so
2    that's what I wanted to have done. But I wanted it to come from
3    someone else to tell me that.
4    Q. So then, what surgery did you have?
5    A. Lump -- how you say it lump --
6    Q. Lumpectomy?
7    A. Yes, that's what I had -- I had done. So they only removed the
8    lump and one lymph node.
9    Q. So I want to go back briefly to Dr. Lagarde. And you were in
10   the courtroom when Dr. Lagarde testified. And do you remember the
11   discussion about the pink cancer book?
12   A. Yes.
13   Q. Did Dr. Lagarde leave that pink cancer book for you?
14   A. Yes.
15   Q. Share with the jury whether you looked at that cancer book.
16   A. I may have looked at a few of the pages. I couldn't tell you
17   what they were. But I didn't read that whole book. There's no way
18   I read that book. I know I didn't. In fact, I put it away after
19   since I wasn't going to her. I just decided to -- that I didn't
20   need it.
21   Q. So, Barbara, Dr. Lagarde had testified that she dog-ears pages.
22   Do you have any recollection of that?
23   A. Not really. I may have read those pages, but I don't remember
24   what they were.
25   Q. And did you -- we saw something on page 195. Were you in

1    here -- page 195 of that book of the appendix. Do you remember
2    that testimony?
3    A. Uh-huh, yes.
4    Q. Did you look at anything in that book concerning chemotherapy
5    drugs or side effects?
6    A. No.
7    Q. Were you instructed by anyone in this case to read that book in
8    its entirety?
9    A. No.
10   Q. Did Dr. Carinder's office give you that book?
11   A. No.
12   Q. Where did you end up -- when and where did you end up realizing
13   you had that book?
14   A. I was -- honestly, I was putting some tax papers away in the
15   closet, and that's when I found the book. I forgot that it was
16   even in there.
17   Q. And when was this?
18   A. I think that was in 2017. I think that's when I found it.
19   Q. Why didn't you read that book cover to cover?
20   A. I can't -- I just didn't read it being that I wasn't going to
21   that doctor.
22   Q. Did you receive that pink cancer book before you saw
23   Dr. Carinder or after you saw Dr. Carinder?
24   A. Before.
25   Q. Speaking of Dr. Carinder, can you share with the jury how you

1    came to be seeing him?
2    A. Well, I had my surgery in Bogalusa. And after the surgery, on
3    the ride home I got sick. My husband had to pull over. So I am
4    thinking ahead of time because the doctor told me I would have to
5    do chemotherapy and radiation. I'm thinking I don't know if I can
6    make this long trip every day, because I know chemo, you go -- or
7    radiation is done every day, chemo's done so often.
8        I decided to talk to him and ask him, that's Dr. Karlin,
9    if I could go find me a doctor in Slidell to do my chemo and
10   radiation. And he told me I could, just to let him know who he
11   was.
12        And I went to the cancer center, and I found
13   Dr. Carinder, which I gave the name to Dr. Karlin, and he said that
14   I could go over there.
15   Q. So you saw Dr. Carinder?
16   A. Yes.
17   Q. What was he like as a doctor?
18   A. Very nice, very gentle. I liked him. I thought he was giving
19   me the information correctly at that time, you know. He was very
20   nice.
21   Q. Do you remember the chemotherapy drugs that Dr. Carinder ended
22   up prescribing you?
23   A. Adriamycin, the C one was -- I call it ACT. I can't remember
24   the name. And the last was Taxotere, but I can't remember the name
25   of the second one.

Page 1733

1  Q. Okay. After your meeting with Dr. Carinder, did you have an
2  understanding of what side effects you might have from the
3  chemotherapy drugs?
4  A. Yes, he gave me a list of side effects. I would get weak. I
5  wouldn't want to eat. I'd have sores in my mouth. Probably
6  wouldn't want to go anywhere if you don't want to eat. Loss of
7  limb. Death. There was a lot of major side effects, too, he
8  mentioned it.
9  Q. What was your understanding after meeting with Dr. Carinder
10  about what would happen to your hair when you underwent the
11  chemotherapy?
12  A. That I would lose my hair. In fact, he told me I would lose my
13  hair, but that it would grow -- and he said it would grow back in a
14  different way or it could come back the same. He said it could
15  come back curly. And my husband joked and said, "Oh, well, maybe
16  I'll get a redhead," when I told him all of that. I said, "Nay,
17  not a redhead."
18  Q. Do you recall signing an informed consent before you took the
19  chemotherapy?
20  A. Yes, I did.
21      MR. SCHANKER: Your Honor, Exhibit 621, which has been
22  admitted --
23      THE COURT: It's already in evidence.
24      MR. SCHANKER: Thank you.
25      THE COURT: Thank you. Please proceed.

Page 1734

1  BY MR. SCHANKER:
2  Q. Take a look at this, if you would, Barbara. Does this look
3  like that informed consent that you signed?
4  A. Yes, it is.
5  Q. And is that your signature?
6  A. Yes, it is.
7  Q. Barbara, when you were in that room meeting with Dr. Carinder,
8  did you ask him anything about permanent hair loss?
9  A. I can honestly say, "No," because he didn't mention permanent
10  hair loss to me.
11  Q. If Dr. Carinder had told you about the risk of your hair not
12  coming back with Taxotere, what would you have done?
13  A. I'd -- I would have asked him if there was another drug out
14  there that I could have used.
15  Q. And if Dr. Carinder would have given you another option that
16  did not cause permanent hair loss, what would you have done?
17  A. I would have taken it.
18  Q. Barbara, you've heard testimony in this case about a side
19  effect of neuropathy.
20  A. Yes.
21  Q. And what's your understanding of neuropathy?
22  A. That it's the tingling in the hands and the feet. But if you
23  have neuropathy -- I feel like if I had neuropathy, no one would
24  know that. But since I have this (INDICATING), everybody knows I
25  have cancer because they see my bald -- they see my head. They

Page 1735

1  don't see my bald head because I do not go out without wearing my
2  turban.
3  Q. Barbara, did Dr. Carinder tell you anything about a prior
4  patient that he had whose hair did not grow back?
5  A. No. If he did, I probably would have asked him, "Well, am I
6  going to be like that, too?" But he didn't say anything to me.
7  Q. In that room, Barbara, with what you explained that
8  Dr. Carinder said to you, why didn't you ask for a second choice?
9  A. Because I did not hear the word "permanent hair loss." I did
10  hear about all of the side effects, but every drug has side
11  effects. I took my risk on that. But I wouldn't have wanted to
12  take a risk on permanent hair loss.
13  Q. Barbara, I want to take you to the time after your chemotherapy
14  treatments. And you continued to see Dr. Carinder; is that
15  correct?
16  A. Yes.
17  Q. Now, at any time during the time that you saw Dr. Carinder when
18  your hair wasn't growing back, did you ever ask him about that?
19  A. Oh, yes. I've asked him.
20  Q. And when did you ask him?
21  A. I'd say it was in early April I asked him about my hair. And
22  all he said, "Honey, it's going to grow. It takes time." So
23  that's what I kept doing. I kept waiting.
24  Q. That's April of 2012?
25  A. Yes.

Page 1736

1  Q. And how long did you hold out hope that your hair was going to
2  grow back?
3  A. Until I found out about this lawsuit, which was when my brother
4  called.
5  Q. Barbara, let's talk about your hair now.
6  A. I don't feel like I have hair now.
7  Q. How long has your hair looked the way it does right now?
8  A. Ever since -- I can't say I lost it. It was coming out, I
9  chose to shave it early. So ever since I shaved it, this is how
10  it's been. And that was in 2011.
11  Q. And it's grown back a little bit --
12  A. A little bit.
13  Q. -- we've seen from pictures?
14  A. Yes.
15  Q. Has it ever grown all the way back and then fallen out again?
16  A. No. Never.
17  Q. Do you style your hair now in any way?
18  A. No.
19  Q. You talked about what you wear on your head, and we'll get into
20  that a little bit more. But if you leave the house now, do you
21  ever leave it without something on your head?
22  A. Never.
23  Q. And why not?
24  A. I'll leave my teeth, which I have a partial, I'll leave that
25  home before I go out the house without my wig. I am just -- and I

Page 1769

1   right?
2   A. Yes.
3   Q. And that was to prevent the cancer from going somewhere else in
4   your body from that lymph node?
5   A. Right.
6   Q. And then you understood around this same time that, in addition
7   to the surgery, that wasn't going to be enough for you, you were
8   also going to need chemotherapy and radiation?
9   A. Yes.
10  Q. And you told us a little bit about how you ultimately made your
11  way into Dr. Carinder's office, right?
12  A. Yes.
13  Q. And he was closer to you in Slidell, as you said, so it was
14  convenient?
15  A. Right.
16  Q. Because you knew you would have to go a number of times to get
17  chemo?
18  A. Yes.
19  Q. Do you remember your first visit with him?
20  A. Yes.
21  Q. That was March 31st, 2011?
22  A. Correct.
23  Q. Were you nervous that day?
24  A. Yes.
25  Q. You were about to go in and meet with an oncologist and he was

Page 1770

1   going to talk to you about chemotherapy?
2   A. Yes.
3   Q. And you knew chemotherapy is not easy. It's not fun, right?
4   A. No, it's not.
5   Q. People get sick from it, right?
6   A. Yes.
7   Q. It's tough, right?
8   A. Yes.
9   Q. Now, during the first appointment on March 31st, 2011,
10  Dr. Carinder recommended a drug to you by the name of Adriamycin,
11  right?
12  A. Yes. I'm sorry.
13  Q. And he also recommended a chemotherapy drug to you by the same
14  of Cytoxan?
15  A. Yes, yes.
16  Q. That was the one with the "C"?
17  A. Yes, ma'am.
18  Q. And he also recommended that they be followed by
19  Taxotere?
20  A. Yes.
21  Q. And you asked Dr. Carinder when he told you that, "How long am
22  I going to get chemo for," meaning, how long will this last, right?
23  A. Yes.
24  Q. And you asked him, "How long do I have to go for each time I
25  get chemo"?

Page 1771

1   A. Yes.
2   Q. But other than that, you didn't ask Dr. Carinder any other
3   questions about the treatment he recommended?
4   A. No.
5   Q. What you said to Dr. Carinder after he told you about his
6   recommendation on March 31st, 2011, you said, "I am in your hands.
7   Whatever you tell me I have to do, I'll do it"?
8   A. Correct.
9   Q. And when Dr. Carinder came in to talk with you about his
10  recommendation on March 31st, that was the only recommendation he
11  gave you, Adriamycin, Cytoxan, Taxotere?
12  A. Yes.
13  Q. There was no discussion of any options that day, correct?
14  A. No, he did not give me any options.
15  Q. And you didn't ask for any, true?
16  A. What he gave me -- the option that I heard was that I was --
17  that I was going to get better, that I was going to get well, that
18  I was going to regrow my hair. So I didn't ask for any options.
19  Those were all good options. Why would I?
20  Q. I --
21  A. That's what I wanted to hear, I was going to get better. I was
22  going to regrow my hair. The lump -- my cancer wouldn't come back.
23  That's what I was hoping.
24  Q. I understand. I am just asking you, ma'am, when Dr. Carinder
25  told you, "These are the three drugs I am recommending," he talked

Page 1772

1   with you about them. You didn't say, "Hey, do you have anything
2   else"?
3   A. No, because I didn't know anything about drugs. Why would I --
4   that's all right.
5   Q. Well, before you left Dr. Carinder's office on March 31st, he
6   did talk with you about possible side effects and the potential
7   risks --
8   A. Yes.
9   Q. -- of these three medications?
10  A. Yes.
11  Q. Now, let's talk about the drug Adriamycin for a moment. Okay?
12  A. Okay.
13  Q. Okay. And Dr. Carinder -- in Dr. Carinder's records it states:
14  "Potential cardiac toxicity from the doxorubicin," which is
15  Adriamycin, "were explained to the patient in detail."
16      I just want to ask you: Do you recall the detailed
17  conversation that Dr. Carinder had with you about Adriamycin on
18  March 31st?
19  A. Not all of it, some of it.
20  Q. What do you remember?
21  A. I remember him telling me about what you just said, and I
22  figured I had a good heart. I don't have heart trouble, that I
23  probably -- I'm sure if something would happen that they would
24  correct it. You have to listen to your doctor. That's all I'm
25  saying and that's what I was doing. He recommended those drugs.

Page 1773

1    That's what -- I thought he was doing the right thing.  Which I
2    still do.  He did the right thing.
3    Q. And you're living proof of that today, right?
4    A. Yes.
5    Q. When you said that Dr. Carinder talked with you about -- my
6    question I used the words "cardiac toxicity."  But when he talked
7    with you about Adriamycin, what he was telling you was that you
8    could have heart failure from this drug, right?
9    A. Yes.
10   Q. And he told you, "Mrs. Earnest, it's not just that you can have
11   heart failure from Adriamycin, you could have heart failure years
12   after you stopped taking it."  Right?
13   A. Yes.
14   Q. That's a big risk to accept, right?
15   A. Yes, it is.
16   Q. But you agreed to accept that risk?
17   A. Yes.
18   Q. Because you had made up your mind you were going to fight this
19   cancer?
20   A. Yes.
21   Q. And you had made up your mind that you were going to follow
22   Dr. Carinder's recommendations?
23   A. Yes.
24   Q. And that was because preventing a recurrence of your breast
25   cancer was more important than even the potential side effect or

Page 1774

1    risk of heart failure years later, right?
2    A. Yes.
3    Q. Now, when Dr. Carinder talked with you, Mrs. Earnest, about
4    Adriamycin, he used the words to describe it, he called it the red
5    devil.  Do you remember that?
6    A. Yes, I remember that.
7         MR. SCHANKER:  Objection.  States facts not in evidence.
8         THE COURT:  Overruled.  I am going to allow it.
9    BY MS. SASTRE:
10   Q. And when he called this drug that he just recommended you take
11   the red devil, that probably didn't sound too good to you, right?
12   A. No, it didn't.
13   Q. And you thought this is a drug that must be pretty bad, I think
14   those were your words?
15   A. I didn't really say, "bad," in my mind.  I used the word must be
16   a strong drug, that's the word I thought of.  Not bad, strong to
17   knock this cancer out.  That's what I thought he was saying to me.
18   That's what I interpreted.
19   Q. Did you ask Dr. Carinder and say, "Why is Adriamycin called the
20   red devil?  What are you giving me"?
21   A. No, I didn't ask him that.  I really didn't.
22   Q. Did you say, "Doctor, I don't know if I feel comfortable taking
23   something you just called the red devil"?
24   A. No, I didn't tell him that.
25   Q. Do you still remember how you felt on March 31st when you were

Page 1775

1    talking to Dr. Carinder?
2    A. Yes.
3    Q. Why is that something you remember, Mrs. Earnest?
4    A. Because I was getting information about drugs that was -- that
5    I was going to have to take, scared.
6    Q. Did you understand that chemotherapy was being recommended to
7    you by your doctors with the idea of being your cancer wouldn't
8    come back?
9    A. What was --
10   Q. I'm sorry -- let me ask you a different question, ma'am.  I
11   apologize.
12   A. That's okay.
13   Q. You understood that chemotherapy was being recommended because
14   the goal of the treatment was to stop your cancer from coming back?
15   A. Yes.
16   Q. And that's what you wanted, right?
17   A. Yes.
18   Q. Sitting here right now, you know that your treatment worked,
19   right?
20   A. Yes, yes.  Because I'm here.
21   Q. That's right.  If we try to go back together to that day when
22   you -- when you were in Dr. Carinder's office on March 31st, you
23   didn't know how this story was going to turn out, right?
24   A. No.
25   Q. Sitting there that day, you didn't know if you were going to be

Page 1776

1    alive another year, five years, ten years?
2    A. No, nobody knew.  I don't know if I am going to die tomorrow.
3    Q. Sure.  That's true for all of us.
4    A. Right.
5    Q. But your situation was a little different there because you
6    were being treated for breast cancer, right?
7    A. Right.
8    Q. When you're thinking about whether cancer is going to return,
9    one of the things you're thinking about is:  Am I going to make it
10   to next Christmas, right?
11   A. Yes.
12   Q. Am I going to get to see these beautiful grandbabies you have,
13   are you going to get to see them grow up?
14   A. Yes.
15   Q. Right?  You're thinking about your family?
16   A. Yes.
17   Q. And the number one thing that you were praying and wishing and
18   hoping for when you were meeting with Dr. Carinder on that day was
19   that your cancer didn't ever come back, right?
20   A. Yes.
21   Q. That was your number one goal, survival was No. 1?
22   A. Yes, ma'am.
23   Q. Because not having your breast cancer come back was more
24   important than any of the potential risks of these medications,
25   right?

```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)    *        16-MD-2740
PRODUCTS LIABILITY LITIGATION   *
                                *        Section H
                                *
Relates to:  Barbara Earnest    *        September 24, 2019
             16-CV-17144        *
    * * * * * * * * * * * * * * *
```


```
                    DAY 7 - AFTERNOON SESSION
                 TRANSCRIPT OF JURY TRIAL BEFORE
                 THE HONORABLE JANE T. MILAZZO
                 UNITED STATES DISTRICT JUDGE
```


Appearances:


For the Plaintiffs:              Barrios Kingsdorf & Casteix, LLP
                                 BY:  DAWN M. BARRIOS, ESQ.
                                 701 Poydras Street, Suite 3650
                                 New Orleans, Louisiana 70139


For the Plaintiffs:              Gainsburgh Benjamin David Meunier
                                   & Warshauer, LLC
                                 BY:  M. PALMER LAMBERT, ESQ.
                                 1100 Poydras Street, Suite 2800
                                 New Orleans, Louisiana 70163


For the Plaintiffs:              Pendley Baudin & Coffin, LLP
                                 BY:  CHRISTOPHER L. COFFIN, ESQ.
                                 1100 Poydras Street, Suite 2505
                                 New Orleans, Louisiana 70163


For the Plaintiffs:              Gibbs Law Group, LLP
                                 BY:  KAREN BARTH MENZIES, ESQ.
                                 6701 Center Drive West, Suite 1400
                                 Los Angeles, California 90045
```

Page 1798

1    Q.  I'm going to put in there the word "permanent."  Okay?
2    A.  But it doesn't say permanent.
3    Q.  My question to you, Mrs. Earnest, is:  Even if the word
4    "permanent" had appeared before "hair loss" on this consent
5    form, you still would have signed it?
6    A.  No, I wouldn't have.  No.  I would have asked him about
7    explain that to me, more about that.  I know I would have.
8    Q.  So the only risk you were unwilling to accept was the risk
9    of permanent hair loss?
10   A.  Yes.
11   Q.  Even compared to brain damage?
12        MR. SCHANKER:  Objection.  Asked and answered.
13        THE COURT:  Sustained.
14   BY MS. SASTRE:
15   Q.  So you said if the word "permanent" had been there, you
16   would have asked Dr. Carinder about that?
17   A.  Yes, I would have.  I would have asked him if there would
18   be another drug.
19   Q.  Even though you didn't ask him questions about anything
20   else in the entire consent form?
21   A.  No, I didn't.  I think if he -- in my own opinion, I think
22   that if he had previously had anything happen like that, I
23   think he would have automatically told me, "Mrs. Earnest, I had
24   a patient that did this" or "Mrs. Earnest, I had a patient that
25   did that."  He didn't tell me that.

Page 1799

1        He told me that my hair would grow back, and that's
2    what I was hoping for all these years because that's what I
3    heard from him.  And it didn't.
4    Q.  So I believe you testified that if Dr. Carinder gave you
5    another option that had less of a risk of hair loss, you would
6    have taken it.  Right?
7    A.  Yes.
8    Q.  So the only thing that would have caused you to have asked
9    about another option or taken another medication -- the only
10   thing you're telling us is hair loss?
11        MR. SCHANKER:  Objection.  Asked and answered.
12        THE COURT:  Sustained.
13   BY MS. SASTRE:
14   Q.  Let's assume that you did ask Dr. Carinder for a different
15   option.  Okay?
16   A.  Okay.
17   Q.  You would have wanted to have known something about that
18   option too, right?
19   A.  What option?  What do you mean?
20   Q.  This drug we are talking about.
21   A.  Oh.
22   Q.  Let me go back.  It's kind of a hypothetical question,
23   following up on your lawyer's questions.
24        So, again, I think what you said is that
25   hypothetically, if Dr. Carinder -- well, let me back up.

Page 1800

1        I think what you are telling us is that if
2    Dr. Carinder had advised you of permanent hair loss risk, that
3    you would have asked him questions about that?
4    A.  Yes, I would have.
5    Q.  Would it have been important to you -- when asking
6    Dr. Carinder questions about this hair loss risk, wouldn't you
7    want to know how often he had seen that?
8    A.  If he would have told me about the permanent hair loss,
9    yes.
10   Q.  I understand what you are saying, that that was the thing
11   that was going to determine what you took, but my question is:
12   You might think that that's a risk that you don't like the
13   sound of, but what you would also want to know about that risk
14   is, well, how often does it happen, right?
15        MR. SCHANKER:  Objection.  Misstates the testimony.
16        THE COURT:  Overruled.
17        THE WITNESS:  So repeat.
18   BY MS. SASTRE:
19   Q.  I would be happy to.  I will try to, ma'am.
20        If Dr. Carinder had told you about the permanent hair
21   loss issue, you would want to know what were the chances of
22   something like that happening, right?
23   A.  Yes.
24   Q.  I know you were here yesterday when Dr. Carinder
25   testified.  Right?

Page 1801

1    A.  Yes.
2    Q.  And you heard him tell us, tell the ladies and gentlemen
3    of the jury that before you, he had only had one patient in his
4    whole medical career who lost her hair and it didn't come back,
5    right?
6    A.  Yes.
7    Q.  If that's what Dr. Carinder told you, he said, "Well,
8    Mrs. Earnest, I have only seen this one time, one time before
9    my visit with you in 2011," are you telling us that would have
10   been enough for you to say, "I'm not going to take Taxotere"?
11   A.  I can't say I can answer that, because it never happened.
12   I can answer something that I can't -- that I never heard.
13   That's hard to answer, a hypothetical question.
14   Q.  Well, the problem is that you answered a hypothetical
15   question that your lawyer asked you when he said, "If
16   Dr. Carinder told you about permanent hair loss, what would you
17   have done" --
18   A.  Well, that's not a hypothetical question to me, because it
19   doesn't say "permanent" on there, on the paper that I signed.
20   But if it had said "permanent," I would have asked him
21   something.  I know I would have.
22   Q.  Let me go back to my question a moment ago and see if we
23   can get on the same page, Mrs. Earnest.  Okay?
24        My question is just simply:  If Dr. Carinder had told
25   you about a risk of permanent hair loss, wouldn't you have

Page 1802

1  asked him, "Well, how often have you seen that?" and he told
2  you one time, are you telling us today that that would have
3  been enough for you to say, "I'm not taking Taxotere"?
4         MR. SCHANKER: Objection. Asked and answered.
5         THE WITNESS: I can't answer that question.
6         THE COURT: You can't answer that, ma'am?
7         THE WITNESS: I can't answer a hypothetical question.
8  That's the way I feel. I don't want to say, "Yeah, I'm going
9  to go just because of that one," or "No, I'm not. I would need
10 more evidence."
11        I don't know how I would do. I would to have
12 that actually, really happen. I can't answer a hypothetical
13 question like that. I don't know what I would have done. All
14 I know is had I known it would have caused -- if he would have
15 told me, "Barbara, you're going to have permanent hair loss," I
16 know I would have went in that direction. And I wasn't told
17 that. That's what I'm saying.
18        MS. SASTRE: Okay.
19        THE COURT: I think you can explore --
20        MS. SASTRE: I'm sorry, ma'am.
21        THE COURT: You're looking at me --
22        MS. SASTRE: Oh, I'm sorry. Okay. I'll just
23 continue, Judge.
24        THE COURT: -- explore.
25        MS. SASTRE: That's what I thought you said.

Page 1803

1  BY MS. SASTRE:
2  Q. So I understand you have said twice that you can't tell
3  us. You don't have an answer to the question as to whether
4  hearing that Dr. Carinder had one patient who had lost their
5  hair, whether that would have been enough for you to make a
6  decision to not take Taxotere. Right?
7  A. Right.
8  Q. Okay. I want to follow up on something you just said a
9  moment ago. You tell me if I heard you correctly, if I
10 understood you correctly. You said what you think you should
11 have been told or what you would have liked to have been told
12 was that Dr. Carinder or somebody should have told you that
13 this was going to happen to you, right?
14 A. Correct.
15 Q. But you would agree with me, Mrs. Earnest, that no person,
16 including Dr. Carinder, can see into the future and tell me
17 what your outcome will be, right?
18 A. No. But if he had the record that drug caused
19 permanent hair loss, I think he would have told me that.
20 Q. My question is a little different. I'm just going to ask
21 you again.
22 A. But it's not different to me. I don't understand how you
23 can give me a hypothetical question, but then I can't say -- if
24 I see the word "permanent," I'm going to reflect on that word.
25 If I don't see it, then that means my hair is going to grow

Page 1804

1  back. To me, to -- why would he tell me my hair is going to
2  grow back? That's what I don't understand.
3  Q. Let me just go back for a moment with you, Mrs. Earnest.
4  My question was that you stated that you believed you should
5  have been told that this was going to happen to you. And all
6  I'm asking you is that you would agree these are potential
7  risks, and no person, including Dr. Carinder, can look into the
8  future and tell you, "Mrs. Earnest, I'm going to tell you
9  exactly what's going to happen with your hair or any other part
10 of this."
11        MR. SCHANKER: Objection. Asked and answered.
12        THE COURT: Overruled.
13        THE WITNESS: But they are telling me -- by giving
14 you that list, they are telling me what could happen; and on
15 that list that I'm going by, saying hair loss, and in the same
16 sentence he said would grow back.
17        So that's what I'm telling you. That's what I
18 see, that's on there.
19 BY MS. SASTRE:
20 Q. Let's continue a little bit with the hypotheticals. Okay?
21 Let's assume you did say to Dr. Carinder, "Well, I want to take
22 something else." Okay?
23 A. Okay.
24 Q. You would agree with me that it would be important to know
25 if that drug was effective in treating breast cancer, right?

Page 1805

1  A. Yes.
2  Q. You would want to make sure that that other drug was at
3  least as effective in treating breast cancer as Taxotere,
4  right?
5  A. Yes.
6  Q. Because at the end of the day, like we talked about before
7  the lunch break, the number one goal was to survive this?
8  A. Right.
9  Q. And potential risks were secondary?
10 A. It all depends on what's the potential risk.
11 Q. Okay. Well, if Dr. Carinder gave you an option for
12 another drug, but he said to you, "It's not as effective as
13 Taxotere, you're not telling us today that you would have
14 agreed to that, right?
15 A. It's hard to answer those questions. It's a hypothetical.
16 Unless you have it in front of you, black and white, you're not
17 going to know how you are going to deal with something.
18        I mean, you want to say a hypothetical. I could get
19 in my car and have a wreck. So do I not ever drive? That's
20 hypothetical. You don't know. I don't know if I'm going to
21 get into a wreck. I don't know what another drug is going to
22 do. Like you say, nobody knows. But I'm only going by what he
23 told me at the time that I went and seen him and what I signed.
24 Q. I understand. Thank you.
25        If you had been told that another option or an option

BARBARA EARNEST - CROSS

Page 1810

1    come back, right?
2    A.  Right.
3         MR. SCHANKER:  Objection.  Misstates the testimony,
4    Your Honor, of Dr. Carinder.
5         THE COURT:  Just approach.
6         MR. SCHANKER:  Yes.
7         (The following proceedings were held at the bench.)
8         THE COURT:  That's exactly what Dr. Carinder said.
9    What did he not say?
10         MR. SCHANKER:  He didn't say what she said, hair
11   didn't come back, right?  That's not what Dr. Carinder said.
12   Dr. Carinder said she already had thin hair and that it
13   didn't come all the way back.  That implied that she had
14   complete hair loss.  That's not what Dr. Carinder said in his
15   testimony.  He was very clear about that.  It misstates his
16   testimony.
17         MS. SASTRE:  I just wrote that.  He said she lost her
18   hair.
19         THE COURT:  I understand what you are saying, but he
20   did testify numerous times that if patients asked about
21   permanent hair loss, he always told them about that one
22   patient.
23         MR. SCHANKER:  And just to correct the record, yeah,
24   he did say he referenced that patient, Your Honor, but he
25   didn't say that he had one woman who had hair loss; he said he

Page 1811

1    had one woman whose hair didn't come all the way back, who
2    already had thin hair to start with.  That's what he said.
3         THE COURT:  I think you're parsing what Dr. Carinder
4    said.  I believe he clearly testified that this woman, the
5    result of the chemotherapy was permanent hair loss.
6         MR. SCHANKER:  Okay.  Thank you, Judge.
7         THE COURT:  Overruled.
8         Plaintiff.
9         (End of bench conference.)
10         THE COURT:  Please proceed.
11   BY MS. SASTRE:
12   Q.  I can't remember if you answered the question, so just to
13   reorient myself, you recall the testimony from Dr. Carinder
14   yesterday about his prior patient.
15   A.  Yes.
16   Q.  And you told us that you did have a conversation with
17   Dr. Carinder about hair loss when you went to see him.
18   A.  Yes.
19   Q.  And you heard Dr. Carinder yesterday testify that he
20   always told his patients about this prior patient, especially
21   if he gave them the exact same drugs?
22         MR. SCHANKER:  Objection, Your Honor.  Misstates the
23   testimony.
24         THE COURT:  That's sustained.
25

Page 1812

1    BY MS. SASTRE:
2    Q.  Okay.  Let me ask it this way:  Did you hear Dr. Carinder
3    talk about explaining his situation with this other patient to
4    his patients like yourself?
5         MR. SCHANKER:  Objection, Your Honor.  Vague.
6         THE COURT:  Rephrase your question.
7         MS. SASTRE:  Okay.
8    BY MS. SASTRE:
9    Q.  So did you ask any questions of Dr. Carinder about your
10   hair during that visit on March 31?
11         MR. SCHANKER:  Objection, Your Honor.  Asked and
12   answered.
13         THE COURT:  Overruled.
14         THE WITNESS:  Yes.
15   BY MS. SASTRE:
16   Q.  What did you ask?
17   A.  When will it come back, how will it come back.  And he
18   automatically said --
19         THE WITNESS:  Can I say what he said to me?
20         THE COURT:  Yes, ma'am.
21         THE WITNESS:  -- that -- he said that my hair
22   would -- that it may not come back like it is.  It may come
23   back curly, may come back a different color.  But he did tell
24   me it was going to come back.  And that's what I've been hoping
25   for all these years.

Page 1813

1    BY MS. SASTRE:
2    Q.  You heard when Dr. Carinder said that if a patient asked
3    questions about their hair, that he would tell them about his
4    prior patient who lost her hair, true?
5         MR. SCHANKER:  Objection, Your Honor.  Misstates the
6    testimony of Dr. Carinder.
7         THE COURT:  Overruled.
8         THE WITNESS:  Yes, I heard him say that.
9    BY MS. SASTRE:
10   Q.  You heard him say that, right?
11   A.  Yes.
12   Q.  But it's your testimony in this case that even though you
13   spoke to him about your hair and had a couple questions, he
14   never told you about his prior patient?
15   A.  No.
16   Q.  Does that upset you?
17   A.  No.
18   Q.  Why not?
19   A.  It just -- I can't be upset.  It's over.  It's done with.
20   Now I'm trying to get past this part.
21         If he did tell me, I don't remember.  Let me put
22   it that way.  If he did.  He could have.  I really don't know
23   if he told me.  But I can't even be mad at the fact that I have
24   lost my hair, because there's -- why be -- I'm mad, but I can't
25   get it back.

BARBARA EARNEST - CROSS

Page 1814

1  Q.  As you sit here today, the best of your recollection is
2  you are not sure if he told you about that patient?
3  A.  Right, not sure.
4  Q.  If he did tell you --
5  A.  Here we go with the hypothetical thing.
6  Q.  Well, just two questions on it.
7       If he did tell you, you would have been made aware
8  that this is a possible potential outcome but still agreed to
9  the treatment.
10  A.  No.  I would have asked for another drug.  I know I would
11  have.
12  Q.  But we know you didn't.
13  A.  No, we didn't.  That's why I'm like I am.
14  Q.  My question is just simply:  If he did tell you about this
15  patient, what we know you did is you still agreed to take
16  Adriamycin, Cytoxan, and Taxotere.
17       MR. SCHANKER:  Objection, Your Honor.  Asked and
18  answered.
19       THE COURT:  Sustained.
20  BY MS. SASTRE:
21  Q.  And if he didn't tell you, do you wish he had?
22  A.  I can say that, but wishing isn't going to make it happen
23  now.
24  Q.  Wouldn't that have been important information for you to
25  have, based upon your being very, very concerned -- amongst all

Page 1815

1  these risks, Mrs. Earnest, you're telling us the decision point
2  for you is hair.  And so don't you wish he had told you that?
3       MR. SCHANKER:  Objection, Your Honor.  Compound
4  question; argumentative.
5       MS. SASTRE:  I'll rephrase, Your Honor.
6       THE COURT:  You need to rephrase it.
7       MS. SASTRE:  Yeah.
8  BY MS. SASTRE:
9  Q.  Don't you wish Dr. Carinder had told you?
10       MR. SCHANKER:  Objection, Your Honor.  Asked and
11  answered.
12       THE WITNESS:  But I don't know if he did or didn't,
13  so I can't --
14       THE COURT:  Wait.
15       MS. SASTRE:  If I did, I'm sorry, Your Honor.  I'll
16  ask a different question.
17       THE COURT:  It has been asked and answered.
18       MS. SASTRE:  Yeah.
19  BY MS. SASTRE:
20  Q.  The last question, I think, was:  Wouldn't that have been
21  important information that you would like to have known?
22       MR. SCHANKER:  Objection, Your Honor.  Asked and
23  answered and asked and answered.
24       THE COURT:  Sustained.
25

Page 1816

1  BY MS. SASTRE:
2  Q.  Let me ask you this:  As you're working through these
3  other options that you're discussing with Dr. Carinder, right,
4  and if he had said to you at the end, "Mrs. Earnest, I
5  understand your concerns about your hair.  These are all the
6  options.  These are the risks of these other drugs."  If he
7  said to you at the end of that, "My recommendation is that you
8  take Adriamycin and Cytoxan, followed by Taxotere," wouldn't
9  you have followed his advice?
10  A.  It's hard to say.  I may have went to another doctor.  I
11  don't know.  I would have went and found some -- there has to
12  be another drug that I could have took that wouldn't have gave
13  me my hair loss, is what I'm saying.  There's women out there
14  that have cancer that had their hair grow back.  Why couldn't
15  mine grow back?
16  Q.  Ma'am, let's talk about the handbook that you got from
17  Dr. Lagarde's office for a moment.
18  A.  Sure.
19  Q.  All right.  Very good.  Let me get a copy of that.
20       MS. SASTRE:  May I approach?
21       THE COURT:  Yes, you may.
22       MS. SASTRE:  Would Your Honor like a copy?
23       THE COURT:  I have one, but I'll take one so I don't
24  have to dig mine out.
25       MS. SASTRE:  Okay.

Page 1817

1       Mrs. Earnest.
2       THE WITNESS:  Thank you.
3       MS. SASTRE:  You're very welcome.
4  BY MS. SASTRE:
5  Q.  So I know you were asked a few questions on direct exam
6  about when and how you got this book.
7  A.  Yes.
8  Q.  So I just want to follow up for a moment.
9       This was a book that was left for you at the front
10  desk at Dr. Lagarde's office?
11  A.  Yes.
12  Q.  Okay.  And she's been a witness here at trial.  The jury
13  has heard from Dr. Lagarde.
14       And the book was left for you, it appears, in early
15  February of 2011, right?
16  A.  Correct.
17  Q.  And so you would have had the Breast Cancer Handbook for
18  about a month before you saw Dr. Carinder in March, right?
19  A.  Yes.
20  Q.  Let's talk about that period first, those first 30 days,
21  about.
22       So at this time, you have been diagnosed with breast
23  cancer, right?
24  A.  Yes.
25  Q.  And you know what the future holds:  You're going to have

BARBARA EARNEST - CROSS

Page 1862

1      THE COURT:  Just --
2      MR. SCHANKER:  That portion of the deposition that
3   explains the note.
4      THE COURT:  Just this.
5         And I will tell you, if there's contrary that
6   they wish to bring from his deposition, we will do that too.
7         But I am not going to allow you to read about
8   television ads and other lawsuits and that sort of thing,
9   because I think if there's any explanation for this note, it's
10  these two very limited paragraphs.
11     MR. SCHANKER:  May I approach?
12     THE COURT:  Because I don't want to go any further
13  into Dr. Bianchini, because I don't want to get into why she
14  was there and what she was doing there.
15        All right.  I think we got it.
16     MS. SASTRE:  Okay.
17     THE COURT:  Thank you.
18        Please.
19     (The plaintiff entered the courtroom.)
20     THE COURT:  Please bring in the jury.
21     Mrs. Earnest, you're not the first person who
22  has been in that hallway.
23     THE WITNESS:  Not the last.
24     THE COURT:  You will not be the last.
25     (The jury entered the courtroom.)

Page 1863

1      THE COURT:  All jurors are present.  Court is back in
2   session.  You may be seated.
3         Ms. Sastre.
4      MS. SASTRE:  Yes.  Thank you, Your Honor.
5   BY MS. SASTRE:
6   Q.  Mrs. Earnest, welcome back from our break, ma'am.
7   A.  Thank you.
8      THE COURT:  I'll remind you, you are under oath.
9      THE WITNESS:  Yes.
10     THE COURT:  Thank you.
11  BY MS. SASTRE:
12  Q.  Mrs. Earnest, you have in front of you the document that I
13  handed you before our break, ma'am.
14  A.  Yes.
15  Q.  And I just want you to take a look at the top three lines
16  of that document.  And if you could just look at them for a
17  moment, okay?  Tell me when you have done that.
18  A.  Okay.
19  Q.  Okay.  Very good.
20        And my question to you, Mrs. Earnest, is:  Did you
21  tell Dr. Bianchini on May 14 of 2019 that you thought your hair
22  was growing back and that another medicine was causing your
23  hair loss?
24  A.  No.  I don't know where he got that.  In fact, this is the
25  first time I'm seeing it.

Page 1864

1      MS. SASTRE:  Your Honor, may I publish the document?
2      THE COURT:  Yes, you may.
3      MS. SASTRE:  Okay.
4      THE WITNESS:  Had I known he had wrote that down, I
5   would have questioned him about that.
6   BY MS. SASTRE:
7   Q.  Okay.  So just taking a look for a moment, you see that it
8   states here:  "Why no treatment for alopecia?"
9   A.  Yes.
10  Q.  Then it states:  "Thought hair was coming back and other
11  medicine causing hair loss," right?
12  A.  That's what it says.  I don't think I said that.
13  Q.  Okay.  Thank you, ma'am.
14        Mrs. Earnest, I want to ask you about just a couple
15  other things quickly.  And my goal is to be done with my
16  questions as soon as I can, okay?
17  A.  Sure.
18  Q.  So I'm going to try to move a little bit quickly.  I just
19  wanted to let you know that, ma'am.  All right?
20  A.  Okay.
21  Q.  So, ma'am, has any doctor at any point ever told you that
22  they believe -- or that they know what the cause of the
23  condition of your hair is?
24  A.  No.
25  Q.  Has any doctor ever said to you, Mrs. Earnest, that they

Page 1865

1   think you have permanent alopecia?
2   A.  No.  Because I have never, ever really asked them.
3   Q.  So in about the eight years, approximately, since you lost
4   your hair, you haven't asked any of your doctors what was the
5   cause of your hair loss?
6   A.  Well, the only doctors I went to was my two cancer
7   doctors, is what I would ask.  And I asked them.  And they
8   didn't say that it was not going to come back; they just told
9   me to wait.
10  Q.  Let me ask you again.  And I know you're pointing to
11  certain doctors.  My question is a little bit broader, and it's
12  just simply that:  In the eight years since 2011, since you
13  have lost your hair, you haven't asked any of your doctors as
14  to what was the cause of your hair loss, right?
15  A.  No.
16  Q.  You haven't asked any of them whether it was permanent,
17  right?
18  A.  No.
19  Q.  Now, I believe you have described for us a conversation
20  that you had with Dr. Carinder in about February or March of
21  2012 where you and he had a conversation about whether your
22  hair was going to come back.
23  A.  Yes.
24  Q.  It was a few months after you lost your hair?
25  A.  Yes.

BARBARA EARNEST - CROSS

Page 1866

1    Q. All right. And at that time, you believed that the
2    condition of your hair or the lack of regrowth was due to
3    chemotherapy, true?
4    A. Yes.
5    Q. And after that date, February or March of 2012, you didn't
6    have any other conversations with Dr. Carinder about why your
7    hair wasn't coming back, true?
8    A. True.
9    Q. I just have a few questions about Dr. Tosti, okay?
10   A. Uh-huh.
11   Q. All right, ma'am.
12       Now, Dr. Tosti is coming here to trial, and she is a
13   physician in Miami, right?
14   A. Yes.
15   Q. And your lawyers arranged for you to have a visit with
16   her?
17   A. Yes.
18   Q. And you met with her just one time?
19   A. Yes, correct.
20   Q. In about June of 2018; does that sound about right?
21   A. Yeah, I guess it does. I don't really remember the date.
22   Q. Okay. You would agree with me you didn't have much of a
23   conversation with Dr. Tosti at that visit?
24   A. No. She was very busy.
25   Q. Very busy.

Page 1867

1        And was she in and out of the room, seeing other
2    patients, while she was with you?
3    A. Yes.
4    Q. And did you feel like, ma'am, in all candor, that it was a
5    long way for you to travel, all the way down to Miami, and then
6    to have Dr. Tosti be in a rush?
7    A. Not really, no. I mean, she's very -- from what I
8    understand, she's very well-known and very busy.
9        And what happened, it was a mixup. They put me in
10   the wrong room, so that's what put our time short. It wasn't
11   because she was in a rush; it was because somebody put me in
12   the wrong room.
13   Q. She was busy; is that fair?
14   A. Yes.
15   Q. Okay. Very good.
16       Dr. Tosti didn't provide you with a diagnosis?
17   A. No.
18   Q. She didn't tell you what she thought caused the condition
19   of your hair?
20   A. No.
21   Q. She certainly didn't tell you that she thought the
22   condition of your hair was caused by Taxotere?
23   A. No, she didn't say that to me.
24   Q. And she didn't provide any recommendations for treatment
25   for you?

Page 1868

1    A. No.
2    Q. Now, in the eight years since you have lost your hair, you
3    haven't tried any medications or treatments to see if you could
4    get it to come back?
5    A. You mean like --
6    Q. Like anything.
7    A. No. Any shampoos or medicine that you take by mouth? No.
8    I haven't done anything.
9    Q. And you would agree with me you haven't even considered
10   undertaking any treatment to see if it would help your hair,
11   right?
12   A. No, I haven't, because I always thought in my mind it
13   would come back.
14   Q. I want to ask you a few questions about some photos, and
15   we are almost done, okay?
16   A. Okay.
17   Q. Just bear with me for a minute.
18       MS. SASTRE: Your Honor, may I approach?
19       THE COURT: Yes, you may.
20   BY MS. SASTRE:
21   Q. Mrs. Earnest, if you could just flip through this.
22       MS. SASTRE: I would like to move it into evidence,
23   the photos.
24       THE COURT: Any objection?
25       MR. SCHANKER: No objection.

Page 1869

1        THE COURT: Let them be admitted.
2    BY MS. SASTRE:
3    Q. Okay. Very good.
4        So I just want to ask you a few questions about
5    photos, and I'm going to try and not go through any of the same
6    ones that were shown before.
7        But before I do that, let me ask you this first: The
8    first photograph is from December of 2011, and then I wrote the
9    word "Christmas" on there when you were talking. That's my
10   writing.
11       This is a Christmas picture you told us about?
12   A. Yes.
13   Q. And do you tend to take pictures with your family just
14   about every Christmas?
15   A. That's not my family.
16   Q. Okay. But do you do that? I know that we have some
17   pictures in here every year around Christmastime.
18   A. Right, but the question is my family. That's not my
19   family; that's my friends.
20       But we do this every year. We get together, the
21   three of us. We went to school together. And we have been
22   doing that since 2011. That's when we started. And we just
23   get together at each other's house, we cook, and we take
24   pictures.
25   Q. Okay. It sounds nice.