**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                              MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                        SECTION "H" (5)

THIS DOCUMENT RELATES TO
Barbara Earnest, Case No. 2:16-cv-17144

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**SANOFI'S RENEWED MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

**I.   BACKGROUND**

In advance of the September 2022 re-trial of plaintiff Barbara Earnest's claims against it,

Sanofi seeks summary judgment on four grounds, liberative prescription, the learned intermediary

defense (warnings causation), general causation, and specific causation.  With no new intervening

precedent altering this Court's rulings on summary judgment (and *Daubert*) related to general and

specific causation since this Court's denials of summary judgment in multiple cases in this MDL,

including most recently in *Kahn*, Sanofi's renewed motion with regard to general and specific

causation fails.  Likewise, considering the Fifth Circuit's affirmances in *Thibodeaux*, *Durden*, and

*Phillips*, the subsequent rulings of this Honorable Court in *Kahn* on the issues of liberative

prescription and learned intermediary (warnings causation), and the trial testimony of witnesses in

Ms. Earnest's first trial, there remain general issues of material fact that preclude judgment as a

matter of law on the defenses of statute of limitations and learned intermediary.

She reasonably relied on her physician's statement – that her hair would grow back – in

response to her inquiry about her hair condition following chemotherapy. Moreover, any additional

investigation beyond inquiry to her physician would have been futile given Sanofi's continued

concealment of any causal association between Taxotere and permanent hair loss through the end

1

of 2015.[1] Moreover, considering this Court's rulings in *Kahn*, the testimony of Sanofi's experts and Sanofi's arguments to the jury that Ms. Earnest had age-related, or hormone therapy related, hair loss must be considered by the jury in their evaluation of the reasonableness of Ms. Earnest's actions. And, the very defenses also advanced as alternatives in Sanofi's instant motion, related to general and specific causation, should independently cause this liberative prescription defense to fail under the *Sharkey* analysis.[2]

Sanofi claims that *Phillips* and the testimony of Ms. Earnest and her oncologist, James Carinder, M.D., require judgment in their favor because, as they say it, no reasonable jury could find that a different warning would have mattered. Unfortunately for Sanofi, the cherry-picked testimony that it suggests is dispositive is only a one-sided sliver of the facts and cannot be read to the exclusion of prior sworn testimony. A reasonable jury could find that other testimony, not cited by Sanofi, was more credible and, therefore, could find that a warning related to the risk of permanent hair loss would have steered Dr. Carinder to prescribe a different, non-Taxotere regimen.

Accordingly, and consistently with this Court's prior rulings in this case as well as others in this MDL, summary judgment remains improper because the facts, viewed in light most favorable to the non-movant, present genuine issues for the jury to decide.

---

[1] Ms. Earnest was aware that her hair fell out as a result of a chemotherapy cocktail administered to her, but she did not know that her scalp had been permanently damaged, with follicles and root structures destroyed to an extent that her hair will never regrow, until she was told years later in 2016 about an advertisement concerning Sanofi's failure to disclose information about the risk permanent hair loss associated with Taxotere.

[2] *Sharkey v. Sterling Drug,* 600 So.2d 701, 714 (La. App. 1 Cir. 1992) ("Sterling's contention that this action has prescribed is greatly undermined by its own contention that the cause of Reye's Syndrome is unknown. If the cause is unknown for purposes of Sterling's liability, then Sterling can hardly argue that the cause was known to the Sharkeys more than one year prior to their filing this action."). In this case, not only does Sanofi challenge causation, but they also challenge that Ms. Earnest even has the condition (PCIA) that it claims their drug does not cause.

## II. SANOFI IMPROPERLY RELIES SOLELY UPON (REVERSED) TRIAL TESTIMONY IN SUPPORT OF THE INSTANT MOTION

As an initial procedural matter, Sanofi's motion fails because it improperly urges a grant based almost exclusively on trial testimony.  Reversal of a judgment and remand for new trial places parties in the same position as if the case had never been tried. *See Wheeler v. John Deere Co.,* 935 F.2d 1090, 1096 (10th Cir. 1991); *see also Gospel Army v. City of Los Angeles*, 331 U.S. 543, 546, 67 S. Ct. 1428, 1430, 91 L. Ed. 1662 (1947).  When a judgment is reversed by a higher court, it is "without any validity, force or effect, and ought never to have existed." Black's Law Dictionary 1319 (6th ed. 1990); *Reversal*, Black's Law Dictionary (11th ed. 2019) ("An annulling or setting aside; esp., an appellate court's overturning of a lower court's decision.").  Summary judgment is not permissible based on the testimony of an invalid trial because the new trial is almost certain to be different than what is in the present record. *See Smoot v. State Farm Mut. Auto. Ins. Co.*, 299 F.2d 525, 534 (5th Cir. 1962); *see also Duke v. Sun Oil Company*, 320 F.2d 853, 866 (5th Cir. 1963).

The unequivocal mandate from the Fifth Circuit in this instance was that of a new trial. *See In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 269 (5th Cir. 2022); *see also* R. Doc. 13927 (" . . . [T]he cause is REMANDED to the District Court for further proceedings *in accordance with the opinion of this Court*." (emphasis added)).  As such, the parties are now placed back in the same position they were prior to trial – as if the trial never occurred.[3]  Given the Fifth Circuit recognition that a new trial is not expected to be the same as a prior trial found to be invalid,

---

[3] Because it is unnecessary with respect to the instant motion, Plaintiff reserves argument related whether the trial testimony may be used for impeachment, despite the Fifth Circuit's reversal for a new trial.

it defies credulity that Sanofi attempts to utilize testimony from that invalidated trial to urge that previously disputed material facts genuinely in dispute no longer exist.[4,5]

When the Fifth Circuit reversed and remanded, it returned the parties to the position they were in prior to the trial.  As such, the record with respect to these issues raised in Sanofi's Motion remains the same today as it did when this Court rejected Sanofi's arguments prior to trial; thus, summary judgment remains as improper today as it was then.  However, even considering the trial testimony as substantive evidence, the same result nevertheless is appropriate.

## ARGUMENT

### I.  LEGAL STANDARD

Sanofi's instant Motion asks this Court to reconsider its prior denials of summary judgment on the very same issues advanced previously based on the Fifth Circuit's subsequent affirmances in *Thibodeaux*, *Durden*,[6] *Gahan*,[7] and *Phillips*, as well as testimony elicited during Ms. Earnest's first trial.[8] Because the Fifth Circuit's rulings do not change this Court's analysis, and given the trial testimony both requires jury evaluation of the weight/credibility given to the evidence and <u>cannot be read in isolation to override (or assigned higher evidentiary consideration than) prior sworn testimony that this Court already found sufficient to overcome summary judgment</u>, summary judgment remains improper. This Court has previously recognized this standard:

---

[4] Plaintiff anticipates that Sanofi may attempt to argue, based on *Donlin v. Philips Lighting N. Am. Corp.*, that Ms. Earnest had a "full and fair" opportunity to present her case and thus, it is entitled to rely on trial testimony. *See Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 91 (3d Cir. 2009); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 443, 120 S. Ct. 1011, 1015, 145 L. Ed. 2d 958 (2000).  However, the circumstances in *Donlin* varied significantly from the facts of the instant case.  The appellate court's mandate in *Donlin* was for either a new trial on issues of equity or to direct a verdict on those issues. *See Donlin*, 581 F.3d at 91.  Because the matters for remand in *Donlin* were ones of equity, the *Donlin* district court could properly rely on evidence adduced at trial.

[5] The logical inference from Sanofi's attempt to rely on trial testimony is that Sanofi is improperly attempting to once again renew its motion brought pursuant to Fed. R. Civ. P. 50(a) despite this Court's admonition that it would not entertain such a motion.

[6] Unpublished opinion.

[7] Unpublished opinion.

[8] Jury verdict reversed by *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256 (5th Cir. 2022).

> Rule 54(b), however, does not give the Court unlimited power to consider new arguments. Any position is supportable by boundless arguments, but judicial economy counsels against reconsidering an issue each time someone presents a new argument. When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted.

*In re Taxotere (Docetaxel) Prod. Liab. Litig.,* 2020 WL 2473772 at *1 (E.D. La. May 13, 2020).

Summary judgment is improper unless the moving party shows there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). To satisfy this initial burden, the movant must inform the court of the basis for the motion and identify the portions of the record that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party fails to meet this initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *See Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, this Court is to determine whether "there is a genuine issue for trial." *Id.* at 249. When the non-movant produces evidence contradicting the movant's facts, a motion for summary judgment should be denied because the evidence and all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* at 255 (stating, "Credibility determinations, the weighing of the evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether

he is ruling on a motion for summary judgment or for a directed verdict."); *see also Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002) (stating, ". . . [A]ll the evidence and factual inferences are viewed in a light most favorable to the non-moving party, resolving all reasonable doubts accordingly.").

## II. DISPUTED ISSUES OF MATERIAL FACT EXIST REGARDING WHETHER PLAINTIFF'S CLAIM IS TIME BARRED – LIBERATIVE PRESCRIPTION

Summary judgment is unwarranted as disputed issues of material fact exist with respect to the timeliness of Ms. Earnest's failure to warn claim based both upon the record as it existed prior to trial and considering the additional testimony elicited during the now-invalidated trial.

Importantly, as an initial matter, the Louisiana Supreme Court has recognized:

. . . [P]rescriptive statutes are to be strictly construed against prescription and in favor of the claim that is said to be extinguished. Of the two possible constructions, the one that maintains enforcement of the claim or action, rather than the one that bars enforcement, should be adopted.

*Louisiana Health Serv. & Indem. Co. v. Tarver*, 635 So. 2d 1090, 1098 (La. 1994). Further, and equally as important, as a general matter the fact finder should resolve exceptions to liberative prescription because the determination of when a prescriptive period accrues is a fact-dependent inquiry. *See Chiasson v. Medtronic Inc.*, Nos. 16-789, 16-3552, 16-3721, 2016 WL 4191837, at *6 (E.D. La. August 9, 2016) ("the reasonableness of delay in filing suit often hinge[s] on the testimony of the plaintiff and his or her doctor."); *see also Body by Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 838 (E.D. La. 2014) (application of "*contra non valentem* is generally a question of fact that may go to the jury for resolution."). Even assuming the movant demonstrates a claim is facially prescribed,[9] the burden does not shift to the non-movant to prove application of

---

[9] Plaintiff vehemently disagrees with the idea that a 2017 master complaint allegation can saddle her with knowledge of a permanent injury occurring years before. Nonetheless, Plaintiff acknowledges and respectfully objects to application of the master complaint allegations as attributable to her present sense impressions. Plaintiff likewise

*contra non valentem*; rather, the burden remains with the defendant. *See, e.g., Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992) (stating, ". . . [T]he defendant's burden was to demonstrate the absence of a genuine issue of material fact."); Fed. R. Civ. P. 56(a) (summary judgment appropriate "if the *movant* shows that there is no genuine dispute as to any material fact." (emphasis added)); *Celotex*, 477 U.S. at 323.

### A. Under Louisiana Law Of Liberative Prescription, Ms. Earnest's Claim Is Not Prescribed As A Matter Of Law Because She Conducted A Reasonable Inquiry Similar To Ms. Kahn's.[10]

In deciding post-*Thibodeaux*, post-*Durden*, and post-*Phillips* motions in the *Kahn* matter, this Court declined to reconsider or reverse its prior rulings denying summary judgment based on the statute of limitations and learned intermediary defenses.  The same result should be reached here, because the trial testimony cited by Sanofi (like the pre-trial deposition testimony) presents disputed facts and credibility determinations for the jury to resolve.

In Louisiana, the applicable statute of limitations—otherwise known as the prescriptive period—for actions under the Louisiana Product Liability Act ("LPLA") is one year from the day injury or damage is sustained.  *See* La Civ. Code art. 3492; *Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 12-270 (La. App. 3 Cir. 10/3/12), 99 So.3d 739, 741 (noting that La. Civ. Code art. 3492 applied to claims under the LPLA).   However, "[u]nder Louisiana law, there is a firmly rooted equitable-tolling doctrine known as contra non valentem agere non currit praescriptio, which means '[n]o prescription runs against a person unable to bring an action.'" *Thibodeaux*, 995 F.3d 384, 390 (5th Cir. 2021) (quoting *R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776, 786 (5th Cir. 1963)). Prescription is suspended until "a plaintiff obtains actual or constructive knowledge of facts

---

adopts, as set forth fully herein, all allegations and support therefore stated in the proposed Third Amended Master Complaint.

[10] Ms. Earnest adopts, as if fully restated herein, all previous arguments in opposition, including exhibits, from the prior briefing on the statute of limitations defense. R. Doc. 6611.

indicating to a reasonable person that he or she is a victim of a tort." *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002). Constructive knowledge is defined as "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510 -11.

But constructive knowledge "requires more than a mere apprehension that something might be wrong. Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligence or unreasonable." *Griffin v. Kinberger*, 507 So.2d 821, 823 (La. 1987) (citing *Cardova v. Hardford Accident & Indemnity Co.*, 387 So.2d 571 (La. 1980)); *see also  Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010) ("[W]hen a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant."). "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Campo*, 828 So 2d at 511 (citations omitted). As this Court has recognized:

> Contra non valentem, as it is known, tolls prescription in four exceptional circumstances:
> * * *
> (3) where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant.

R. Doc. 12805 at 3-4.

This Court originally held that equitable tolling doctrine of *contra non valentem* suspended prescription in Ms. Earnest's case (R. Doc. 7571) under the fourth category and, following the Fifth Circuit's Opinions in *Thibodeaux* and *Durden*, this Court later recognized that issues of fact

surrounding application of *contra non valentem* precluded summary judgment under factual circumstances akin to Ms. Earnest's case in the *Kahn* matter.[11]

Like Ms. Kahn, Ms. Earnest consulted with her physician,[12] meeting the Fifth Circuit's description of a "reasonable inquiry." *Thibodeaux*, 995 F.3d at 393 ("A reasonable inquiry into the cause of one's persistent hair loss would likely include consultation with doctors…"). Unlike in *Durden*, there is no evidence that Ms. Earnest's oncologist said, "it's likely not going to come back." *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 860 F. App'x 886, 888 (5th Cir. 2021); R. Doc. 10833. Accordingly, there was no requirement under the Fifth Circuit's analysis to go further than Ms. Earnest's inquiry to her physician. *Id.* Ms. Earnest was advised by her oncologist, Dr. Carinder, that her hair loss would be temporary.[13] She was not warned of a risk of permanent hair loss.[14] Neither Sanofi nor its Taxotere label warned Dr. Carinder, prior to Ms. Earnest's treatment, about Taxotere's risk of permanent hair loss.[15]

Sanofi claims that it is entitled to summary judgment based on Dr. Carinder's recollection of Ms. Earnest's inquiry conversation with him; however, the trial testimony regarding Ms. Earnest's inquiry is an issue for the jury to weigh based on conflicting testimony, and it cannot be read in a vacuum (or as a trump card) to the exclusion of prior deposition testimony.[16]  As acknowledged in this Court's initial Order denying summary judgment, Ms. Earnest gave deposition testimony that Dr. Carinder responded to her inquiry that "[her hair was] going to come back" and "it just takes time."[17] The trial testimony should be given no greater weight or credibility

---

[11] See R. Doc. 12805; Ex. 1, Transcript of Oral Argument dated July 29, 2021 (denying reconsideration with oral reasons).
[12] Response to Defendants' Statement of Facts ("Resp. to SOF") #33.
[13] Plaintiff's Supplemental Statement of Facts ("Earnest SOF") #22, 29-32, 35-36.
[14] Earnest SOF #22, 30.
[15] Earnest SOF #29, 34.
[16] R. Doc. 7571 at 8; Resp. to SOF #33-42.
[17] *Id*; *see also* Earnest SOF #24-26.

than the prior sworn deposition testimony and, therefore, must be considered in a light most favorable to Ms. Earnest.

While she testified at trial that "I don't feel like I have hair now," Ms. Earnest always believed it would return in reliance on Dr. Carinder's reassurance.[18]  Ms. Earnest testified that she believed she had temporary hair loss.[19]  It was not known to Ms. Earnest that her hair loss was permanent, much less why her hair had not returned, until her brother told her about an advertisement that he had seen linking Taxotere with permanent hair loss in approximately 2016.[20] As the Court determined in *Kahn*, a reasonable jury could find that Ms. Earnest had still not perceived her actual injuries, i.e., permanent and irreversible hair loss, and that her actions were reasonable in light of the circumstances.[21,22]

Dr. Carinder was unaware of the risk and, therefore, could not have warned or advised Ms. Earnest about Taxotere's risk of permanent alopecia.[23]  Dr. Carinder's deposition testimony demonstrates Sanofi's successful concealment of the association between Taxotere and permanent hair loss from the medical and scientific community.[24]  Indeed, Dr. Carinder never learned of the potential risk of permanent hair loss associated with Taxotere from Sanofi.[25] This Court has recognized similar testimony in the *Mills* matter precluded summary judgment on a Georgia fraud-

---

[18] Response to SOF #40; Earnest SOF #18-21.

[19] Earnest SOF #20-22, 24, 33.

[20] Earnest SOF #68.

[21] R. Doc. 12805; Ex. 1, Transcript of Oral Argument at 15-16.

[22] It was not unreasonable for Ms. Earnest to believe that her hair might return.  As a reasonable layperson, Ms. Earnest does not know the dermatological definition of permanent alopecia.  Even Sanofi has a differing view of the definition of permanent hair loss.  Emanuel Palatinsky, Sanofi's Global Safety Officer testified that it would be reasonable to assume that hair loss was permanent after four years. Ex. 2, Sanofi_05252078 ("Even if we make the reasonable assumption that persistent alopecia after more than 4 years is consistent with 'permanent' alopecia, I cannot estimate the general incidence rate of permanent alopecia when docetaxel is administered in combination with other chemotherapy agents on the basis of two studies (both using the adjuvant TAC regimen in breast cancer)").

[23] Earnest SOF #30.

[24] Earnest SOF #34.

[25] Earnest SOF #29.

based claim[26] and has denied summary judgment on the master complaint's fraudulent concealment count.[27] Dr. Carinder did not begin warning his patients of the risk of persistent or permanent hair loss associated with Taxotere until approximately 2015 "when all the news came out that patients were having persistent alopecia."[28] As such, even if Ms. Earnest had been excited (sufficiently under the Louisiana Supreme Court's interpretation in *Campo*) to inquire about her persistent hair loss while treating with Dr. Carinder, she would not have learned sufficient information to alert her to bring a products liability action against the manufacturers of Taxotere. Accordingly, not only are Ms. Earnest's actions reasonable in light of the circumstances, but the third category of *contra non valentem* also is applicable.

The discovery process has supplied evidence of what Sanofi knew and failed to share about permanent hair loss during the same period of time in which Sanofi claims Ms. Earnest should have realized she should bring an action against it. For example, by the time Ms. Earnest was administered Taxotere in February 2012, Sanofi had received many reports of persisting alopecia in patients taking Taxotere. Nonetheless, Sanofi's Global Safety Officer told French health authorities in a January 2011 Taxotere clinical overview that there was insufficient evidence to determine that Taxotere caused permanent alopecia.[29] Likewise, the FDA asked Defendants for a list of all cases reporting permanent/irreversible alopecia in March 2015. Defendants again concluded that there was insufficient evidence to support a link between Taxotere and permanent

---

[26] R. Doc. 7571 at 19:
> Defendants made express statements to Dr. Shah through Taxotere's label. In their Motion, Defendants admit that while the Taxotere label has since its inception warned of hair loss, it did not warn of permanent hair loss until December of 2015.77 Further, Dr. Shah's testimony provides evidence tending to show that she did rely on Defendants' representation. In reliance on the Taxotere/docetaxel label, she did not warn her patient, Ms. Mills, of permanent hair loss. Accordingly, Plaintiffs have created an issue of fact on their fraud-based claims.

[27] R. Docs. 784, 877.
[28] Earnest SOF #40.
[29] *See* Ex. 3, Sanofi_043353204.

alopecia.[30]  After prompting from FDA, Sanofi changed its position, acknowledging that sufficient evidence of a causal association existed between Taxotere and permanent alopecia and noting "[t]his is going to be fun submitting >4 year old labeling changes to the FDA now."[31] Sanofi therefore internally acknowledge its failure to warn until changing its label in December 2015.

Consequently, it would be impossible for a lay person, like Ms. Earnest, to make such a determination considering the approved warning label's absence of an adequate warning coupled with the complex pharmacological and epidemiological questions associated with linking permanent alopecia to Taxotere use.  Any delay in Plaintiff's understanding of Sanofi's tortious conduct clearly was not due to Ms. Earnest's willful ignorance or negligence, and Ms. Earnest should not be held to have knowledge of facts <u>either</u> known, disregarded and concealed <u>or</u> not known within Sanofi's organization.

Nor did conflicting testimony with regard to an over 200-page Breast Cancer Treatment Handbook provide Ms. Earnest with undisputed knowledge; however, there is no testimony controverting the fact that Ms. Earnest did not read the entire handbook.[32] In analyzing the reasonableness of Ms. Earnest's actions, it is an incorrect statement of law to consider what a plaintiff "could have" known. *Wells v. Zadeck*, 89 So. 3d 1145, 1152 (La. 2012) ("the law of prescription references what a plaintiff knew or should have known about his potential cause of action not what he could have known.").[33] Instead, a jury should address the question of "the reasonableness of the [plaintiff's] action or inaction, in light of [her] education, intelligence, the

---

[30] *See* Ex. 4, Sanofi_01267881 at 24.
[31] *See* Ex. 5, Sanofi_05207927.
[32] Earnest SOF #37-39. Sanofi only makes a passing reference in a footnote to the handbook. Sanofi Mem. at n.21
[33] While Ms. Earnest's inquiry to her physician is reasonable under the Fifth Circuit's *Thibodeaux* decision, the idea that laypersons could have looked further to find a Canadian news article, a breast cancer symposium abstract, or medical journal articles is flawed. *See Lennie v. Exxon Mobil Corp.*, 251 So. 3d 637, 646 (La. App. 5 Cir. 2018) (finding it would be legal error to "infer[] that the availability of information on the internet, in and of itself, with nothing more, is sufficient constructive knowledge to put the Lennies on notice of their cause of action … [under] the fourth category of contra non valentem.").

severity of the symptoms, and the nature of the defendant's conduct." *Campo*, 828 So. 2d at 511 (citations omitted). Moreover, like sales representatives, physicians are limited to providing their patients with warnings from pharmaceutical manufacturers through the labeling (and not creating additional, anecdotal warnings based on their experience). As the *Thibodeaux* panel correctly determined, a reasonable inquiry is to the physician, and Ms. Earnest's recollection of that conversation and her actions based thereon are reasonably believable by a jury.

### B. Ms. Earnest's Inquiry, Like Ms. Kahn's, Was Reasonable In Light Of Sanofi's Position In This Litigation On Causation.

As this Court recognized in *Kahn*:

> I think there's still factual issues for the jury to consider, and this is what my thought process is. I specifically note that throughout this litigation the defendant has pointed to multiple causes of alopecia. Most are not tort related. Of interest is age-related alopecia. What we hear from countless experts is there are reasons that have nothing to do with improper conduct that cause alopecia in women. That is a plausible cause of alopecia. Here, the plaintiff sought and investigated a cause for ongoing alopecia and was advised by her gynecologist that she was not the victim of a tort, but rather the aging process, and according to plaintiff she dropped it. Now, did she take vitamins? Did she use other products to try to facilitate hair growth? She did that, but she dropped it. Whether or not that was reasonable, to accept the opinion of one physician, I think is for the jury to decide, so the motion is denied.

Ex. 1, Transcript of Oral Argument at 15-16.[34]  The exact same reasoning is applicable here, given the nearly verbatim

- Dermatologist Jerry Shapiro, M.D.:

    *[I]t has not been proven to a reasonable medical probability that Taxotere itself causes permanent alopecia ... [and] ... [i]t is impossible to rule out other drugs in the regimen as causes of a patient's alopecia ... [and] ... there is not a pathological diagnosis that would definitively state that a person's alopecia is caused by a chemotherapy agent instead of some other cause.*[35]

---

[34] The *Thibodeaux* and *Durden* opinions were based on specific factual record evidence on "early motions" and neither opinion addresses the hotly contested science about PCIA, the difficulty of diagnosing PCIA, and challenges lodged by Sanofi on all levels of causation.

[35] Ex. 6, Shapiro General Expert Report dated December 10, 2018 at 18-20.

- Oncologist John Glaspy, M.D.:

  *Ms. Earnest lost her hair before chemotherapy with Taxotere. There is no medically reliable way to trace Taxotere as the significant cause of her complaints about her hair not re-growing since her pre-Taxotere chemotherapy. She voluntarily continues to take medications, including Gabapentin and Arimidex, which can cause hair loss. She is also post-menopausal, ageing, and has several other medical conditions that could contribute to her hair loss.*[36]

- Statistician Lee-Jen Wei, Ph.D.:

  *I cannot find any statistical evidence that shows Taxotere increases the risk of permanent or irreversible alopecia as compared to other cancer-treatment regimens.*[37]

If Sanofi's experts in these fields claim no scientific causal link exists, it cannot be said that Ms. Earnest's cause of action against Sanofi was "reasonably knowable" by her as a layperson. A jury likewise could find Ms. Earnest was reasonable given the specific opinions of Sanofi's expert dermatologist[38] about Ms. Earnest's hair loss:

  It is my opinion to a reasonable degree of medical probability that Ms. Earnest is experiencing androgenetic alopecia or "AGA". My opinion is that Ms. Earnest is likely to have had the initial stages of androgenetic alopecia before her chemotherapy. It is also my opinion that Ms. Earnest's long-term use of Arimidex has caused or contributed to her hair loss.[39]

Dr. Shapiro's opinions are also supported by Sanofi's expert dermatopathologist:

  Both of Ms. Earnest's biopsies show features consistent with androgenetic alopecia. Androgenetic alopecia is the most prevalent form of alopecia seen in women. Her clinical presentation and pathology are consistent with androgenetic alopecia. It is my opinion that Ms. Earnest has androgenetic alopecia, which likely is worsened by her Aromatase Inhibitor use.[40]

---

[36] Ex. 7, Glaspy Report dated December 14, 2018 at 49.

[37] Ex. 8, Wei Report dated December 10, 2018 at 25.

[38] Dr. Jerry Shapiro is a dermatologist who has "specialized in hair disorders as both a practitioner and researcher for more than 30 years," who "established the University of British Columbia Hair Research and Treatment Center, which was one of North America's most comprehensive academic hair biology and treatment centers," and whose "clinical practice is 100% dedicated to treating patients for disorders of the hair and scalp." Ex. 6, Shapiro General Report at 1.

[39] Ex. 9, Shapiro Specific Report (Earnest) dated January 11, 2019 at 1.

[40] Ex. 10, Smart expert report dated January 11, 2019 at 8.

Indeed, in the very motion addressed herein, Sanofi continues to claim that Ms. Earnest lacked diligence in failing to determine what Sanofi claims (general and specific causation) cannot be proven by experts in oncology, dermatology, dermatopathology, and statistics using complicated scientific analyses, such as Bradford Hill and other pharmacovigilance practices.

Sanofi also urged the jury that Ms. Earnest had hormone induced hair loss.  Dr. Shapiro's report explains the theory: "Because many women take Tamoxifen or Aromatase Inhibitors after chemotherapy and those are known to cause alopecia and hair thinning, long-term endocrine therapy is another complicating factor in determining whether a woman's persistent alopecia is caused by chemotherapy or some other factor."[41] Sanofi's closing argument further buttresses what a jury could find in terms of the reasonableness of Ms. Earnest's actions in light of a complicated medical causation situation:

> So in the context of the first question on the verdict form, what does this mean? It means that you have a list of potential causes of hair loss in this case. Adriamycin, Cytoxan, Taxotere, put it on the list.… Put Taxotere on the list. Put Arimidex on the list.
> * * *
> Now, ladies and gentlemen, no doctor has told Mrs. Earnest that she has permanent hair loss. She told you that. Or told her that her hair loss was caused by Taxotere. Why is that important? When you look at this question, the word "permanent" is in it. If you are not convinced by the weight of the evidence that this is a permanent injury, if you think her hair would look different if she stopped taking Taxotere, then you put down no to Question 1 on the verdict form.
> Remember Mrs. Earnest's statement to Dr. Bianchini what she attributes her hair loss to when you're answering this question.[42]

Excluded from Sanofi's statement of facts is a line of impeachment cross examination of Ms. Earnest, whereby it identifies a statement of Ms. Earnest: "Thought hair was coming back and other medicine causing hair loss."[43] While a jury ultimately must weigh Ms. Earnest's credibility

---

[41] Ex. 6, Shapiro General Report at 20.
[42] Ex. 11, Trial Transcript at 2204-2206.
[43] Response to SOF #39.

in determining whether her contrary statement that she did not recall saying this,[44] the Court is precluded at the Rule 56 stage from choosing one version over the other and certainly could answer "no" to the verdict question likely to be given at Ms. Earnest's retrial.[45]

### III. DISPUTED ISSUES OF MATERIAL FACT EXIST REGARDING WARNINGS CAUSATION – LEARNED INTERMEDIARY DEFENSE

On July 9, 2019, this Court addressed and denied – pursuant to Fed. R. Civ. P. 56 – Sanofi's warnings causation challenge *prior* to the now-invalidated trial in the instant case.[46]  Sanofi self-servingly posits that testimony elicited during the now-invalidated trial in the instant case coupled with Fifth Circuit affirmances in *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Gahan*"), 859 F. App'x 692, 694 (5th Cir. 2021) (unpublished), and *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Phillips*"), 994 F.3d 704, 708 (5th Cir. 2021), dictate judgment as a matter of law in its favor. Plaintiff asserts that it is improper for Sanofi to substantively rely upon testimony from the now-invalidated trial for purposes of summary judgment in the first place, that Sanofi overstates the impact of fact-specific rulings in *Gahan* and *Phillips*, and that facts from the record – whether they be drawn from the record as it existed prior to trial or during the trial – demonstrate the existence of disputed issues of material fact vis-à-vis warnings causation notwithstanding the *Gahan* or *Phillips* decisions.  As such, Defendants' Motion must be denied.

As a prefatory matter, two things should be pointed out.  First, as previously recognized by this Court,[47] the Fifth Circuit has held that a two-prong analysis controls whether a plaintiff demonstrates warnings causation:

---

[44] Ex. 11, Trial Transcript at 1840:9-16.

[45] The jury verdict form was amended for the second bellwether trial. *Compare* R. Doc. 13436 (Q.4) *with* R. Doc. 8284 (Q.4). The *Kahn* verdict form question related to liberative prescription stated: "Do you find by a preponderance of the evidence that, before December 9, 2015, Ms. Kahn could not have discovered through the exercise of reasonable diligence that Taxotere was a potential cause of her injury? ___YES ___NO"

[46] *See* R. Doc. 7571, Order and Reasons (hereinafter "July 9, 2019 Order").

[47] *See* July 9, 2019 Order, p. 20.

> Louisiana applies the "learned intermediary doctrine" to products liability claims involving prescription drugs. Under this doctrine, a drug manufacturer discharges its duty to consumers by reasonably informing prescribing physicians of the dangers of harm from a drug. This court has acknowledged that there is a two-prong test governing inadequate-warning claims under the LPLA when the learned intermediary doctrine is applicable. **First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician. Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.**

*Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 265–66 (5th Cir. 2002) (emphasis added) (internal citations omitted). Second, though omitted in Sanofi's brief, this Court has previously considered the impact of *Phillips* with respect to warnings causation in a motion to reconsider filed by Sanofi in the related *Kahn* case.[48]

### A. Disputed Issues Of Material Fact Exist With Respect To Sanofi's Failure To Warn Dr. Carinder.

Sanofi argues that Dr. Carinder knew of the risk of permanent hair loss associated with Taxotere at the time he prescribed it to Ms. Earnest, but Sanofi's assertions that the foregoing facts are "undisputed" fail when examined through the lens of the record.

In the Court's July 9, 2019 Order denying summary judgment prior to trial, this Court focused on the second *Stahl* prong.[49,50] In the briefing leading up to the July 9, 2019 Order, Plaintiff

---

[48] *See* R. Doc. 13062, Order and Reasons, pp. 1, 4 (hereinafter "July 14, 2021 Order") (Recognizing that the *Phillips* Court found that patient choice remained relevant to the warnings causation analysis even in circumstances where the learned intermediary doctrine applied and denying Sanofi's post-*Phillips* (994 F.3d 704) Motion for Reconsideration on Warnings Causation vis-à-vis summary judgment).

[49] *See* July 9, 2019 Order, pp. 20-21.

[50] However, therein this Court also specifically recognized:

> Regarding the adequacy of Defendants' warning, Plaintiffs in this MDL allege that from the time of Taxotere's FDA approval in 1996 through December of 2015, Taxotere's label contained no reference or warning regarding permanent hair loss.

July 19, 2019 Order, p. 14 (citation omitted). Though this Court relied upon reference to Plaintiff's Second Amended Master Complaint for the foregoing proposition (*see* July 9, 2019 Order, p. 14, n.55), it is undisputed in this case that the label had no reference or warning of permanent hair loss at the time Plaintiff Earnest was treated with Taxotere. In any event, this Court relied upon the foregoing for the presumption that the label was, in fact, inadequate – at least,

set forth facts demonstrating that a disputed issue of material fact existed with respect to whether Sanofi warned Dr. Carinder in the first place.[51]  As recognized therein, Dr. Carinder specifically testified in his deposition that Sanofi failed to warn him of the potential risk of permanent hair loss; he had no knowledge of same.[52]  Therefore, with respect to the state of the instant case prior to trial, the foregoing, coupled with the fact that Sanofi's label contained no reference or warning regarding permanent hair loss between 1996 and 2015, demonstrates a disputed issue of material fact as to whether Sanofi warned Dr. Carinder of the risk of permanent hair loss with the use of Taxotere/docetaxel.

Testimony elicited at trial likewise demonstrates a disputed issue of material fact regarding whether Dr. Carinder was aware of the risk of permanent hair loss.  As an initial matter, based on undisputed trial testimony, Sanofi cannot claim that *it* warned Dr. Carinder of the risk of permanent hair loss associated with Taxotere use. First, Dr. Carinder testified that he read the Taxotere label sometime in 1999 and that he did not read it to mean that Taxotere caused permanent hair loss.[53] Second, Dr. Carinder expressly testified that, at the time he treated Ms. Earnest in 2011, the Taxotere label did not warn him of Taxotere's risk of permanent hair loss.[54]  Third, Dr. Carinder testified that at the time he met with Ms. Earnest in 2011 he did not warn her that she could experience permanent hair loss from using Taxotere because he was not aware of that fact.[55]

Further, based on the trial testimony, disputed issues of material fact exist with respect to whether Dr. Carinder was aware nonetheless of the risk of permanent hair loss associated Taxotere

---

insofar as another plaintiff (Jacqueline Mills) was concerned. *See* July 19, 2019 Order, p. 14.  That same reasoning – and the corollary presumption – is likewise applicable to Plaintiff Earnest herein.

[51] *See* R. Doc. 6604, Plaintiff Barbara Earnest's Opposition To Defendants' Motion For Summary Judgment On Causation Based On The Learned Intermediary Doctrine, p. 2.  *See also* Earnest SOF 9-11.

[52] *See* Doc. No. 6604, p. 2; *see also* Earnest SOF 10-11.

[53] *See* Ex. 11, Trial Transcript at 1422:10-18.

[54] *See id.* at 1394:14-16.

[55] *See id.* at 1395:1-6.

use when he prescribed it to Ms. Earnest in 2011 despite Sanofi's failure to provide such a warning in its labeling. Sanofi misleadingly asserts that, "[i]t is undisputed that Dr. Carinder read the *Nabholtz* Article (published in 2001)" suggesting he read it before seeing Ms. Earnest. Dr. Carinder acknowledged that the *Nabholtz* article was published in 2001, but Sanofi did not establish that Dr. Carinder reviewed this article prior to treating Ms. Earnest. Dr. Carinder merely stated in his 2019 trial testimony- eight years after treating Ms. Earnest, that he had read the article "years ago."[56] Dr. Carinder testified that he was never provided the Nabholtz study by Sanofi.[57,58]

Sanofi also claims that Dr. Carinder's **one (1)** anecdotal experience of a patient having thinning before and after receiving dose-dense AC + T supports its proposition that there are no disputed issues of material fact that Dr. Carinder was aware of the risk of permanent hair loss associated with Taxotere use prior to prescribing Taxotere to Ms. Earnest.[59] Dr. Carinder is not a dermatologist and did not diagnose permanent hair loss in the 2005 patient; the 2005 patient had hair loss prior to starting her chemotherapy regimen and it grew back in a similar, thin fashion after chemotherapy.[60] As such, Sanofi's purported undisputed "fact" that Dr. Carinder observed permanent hair loss in the 2005 patient is neither undisputed nor a "fact." Dr. Carinder testified that the 2005 patient's case was idiosyncratic and anecdotal.[61] And, in any event, when questioned at trial about this **one (1)** patient he treated in 2005, the following exchange occurred:

> Q. And as a medical practitioner, do you change your prescribing habits based on one idiosyncratic case?
> A. No.
> Q. Why not? Why would that not be a good idea? Why don't you do it?
> A. Because I don't think it's -- that's not a strong enough argument to change your entire practice and technique.

---

[56] *See id.* at 1555: 13-19; 1556:5-7.

[57] *See id.* at 1629:5-10.

[58] Similarly, to be clear, Dr. Carinder testified that Sanofi never provided him the Sedlacek abstract either. *Id.* at 1629:11-18.

[59] Sanofi Mem. 13-14.

[60] *See* Ex. 11, Trial Transcript at 1419:17-19; 1420:16-24.

[61] *See id.* at 1421:3-7.

Q. And make sure the jury understands why that is, why you don't change your entire practice and technique based on one idiosyncratic case?
A. Because you'll have an anecdotal case from now and then. Unless it's an extreme adverse event, it wouldn't deter me from my usual practice pattern.[62]

Based on the foregoing, and drawing all reasonable inference from same in Ms. Earnest's favor, disputed issues of material fact exist with respect to the first prong of the *Stahl* analysis – whether Sanofi failed to warn (or inadequately warned) Dr. Carinder of a risk associated with Taxotere that was not otherwise known to Dr. Carinder.

**B. Disputed Issues Of Material Fact Exist With Respect To Whether Sanofi's Failure To Warn Dr. Carinder Was Both A Cause In Fact And The Proximate Cause Of Plaintiff's Injury.**

As noted above, the second prong of the *Stahl* analysis is whether the failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury. *See Stahl*, 283 F.3d at 266.  Sanofi argues there is no disputed issue of material fact vis-à-vis same because:

Not only was Dr. Carinder aware of the risk, but as he testified, additional warning language in the Taxotere label about the risk of permanent alopecia would not have changed his "decision to prescribe the drug." *Phillips*, 994 F.3d at 709.[63]

Notably, Sanofi provides no record citation for the foregoing.

*Phillips* recognized that, to prove causation in the learned intermediary context, a "plaintiff must show that a proper warning would have changed the decision of the [prescribing] physician, *i.e.* that but for the inadequate warning, the [prescribing] physician would not have used or prescribed the product." *In re Taxotere (Docetaxel) Prod. Liab. Litig* ("*Phillips*"), 994 F.3d 704, 708 (5th Cir. 2021) (citations omitted).[64] And, while the *Phillips* Court provided clarification with

---

[62] *Id.* at 1421:8-20.
[63] Sanofi Mem., p. 15.
[64] This Court applied the very same framework in its July 9, 2019 Order (at 20):
   . . . [T]he law is well established that, to prove causation, "the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product."

respect to a portion of the *corollary* reasoning employed by this Court in the July 9, 2019 Order,[65] the core analysis of the issue post-*Phillips* remains unchanged.   In other words, *Phillips adds nothing* to the relevant analytical framework this Court must employ to determine whether a disputed issue of fact exists regarding whether Dr. Carinder's prescribing decision would have been different had he known that Taxotere's associated risk of alopecia was potentially permanent rather than temporary.

Additionally, as noted above, this Court has already considered the warnings causation analysis in light of the *Phillips* opinion in the related *Kahn* matter; noting the Fifth Circuit's recognition that patient choice remains relevant with respect to the doctor's prescribing decision.[66] Thus, patient choice is relevant to help this Court decide whether Ms. Earnest's evidence – including that of other available treatments and the importance she places on her appearance – is sufficient to introduce a genuine issue of material fact as to whether Dr. Carinder's prescribing decision would have been different had he known the potential risk of permanent alopecia associated with Taxotere's use.[67]  The disputed facts of this case demonstrate summary judgment is unwarranted based upon the record prior to trial or testimony elicited at trial.

---

[65] *See Phillips*, 994 F.3d at 709 n.4.  Taken at face value, for purposes of the learned intermediary doctrine, the foregoing footnote demonstrates nothing more than the fact that the *Phillips* Court intended to emphasize, as discussed *infra*, the fundamental question of whether an adequate warning would have changed *the doctor's prescribing decision*.  Indeed, as the *Phillips* Court made clear, it is plain beyond cavil that, "certainly, under Louisiana law, '[t]he decision to *use* a drug in a particular circumstance rests with [both] the doctor and the patient.'" *Phillips*, 994 F.3d at 708 (citations omitted) (emphasis added).  Lest any confusion remains, the *Phillips* Court clearly and expressly *ratified* the potential relevance of patient choice evidence, stating:

> So, to the extent that patient choice is relevant, that relevance is cabined to helping us decide whether Phillips's evidence—including that of other available treatments and the importance she places on her appearance—is sufficient to introduce a genuine dispute of material fact as to whether Dr.   Sonnier's   prescribing   decision   would   have   been   different   had *he* known that Taxotere's associated risk of alopecia was potentially permanent rather than temporary.

*Phillips*, 994 F.3d at 709.
[66] *See* July 14, 2021 Order p. 4 (Doc. No. 13062).
[67] *See* July 14, 2021 Order pp. 4-5 (Doc. No. 13062); *see also Phillips*, 994 F.3d at 709.

Analyzing this prong through the prism of record prior to trial (that is, post-remand – as if the trial never existed), this Court previously denied summary judgment on this issue.   As presented to this Court in Plaintiff's response briefing vis-à-vis Sanofi's motion for summary judgment that led to this Court's July 9, 2019 Order, Plaintiff specifically presented evidence from Dr. Carinder's deposition that Dr. Carinder *would not* have prescribed Taxotere to Ms. Earnest if he had known that Taxotere causes permanent alopecia.[68]  Lest there be any doubt, Dr. Carinder expressly testified as follows:

> Q. So why -- today, why do you think that there is a risk of permanent alopecia with docetaxel?
> A. Because there have been cases that have come forth, and it's been in the news, and -- and so you're -- you're pretty -- if you're aware of that, you have to, I think, inform patients of that. We weren't aware of that at the time we were -- this lady was treated. We were aware that there was po- -- hair loss was a definite. Okay? But there was nothing that had been made known to me that she potentially would not get her hair back, you know.
> . . . .
> Q. If she presented to you today having –
> A. -- a new case of breast cancer just like her?
> Q. Today.
> A. No, I would give her paclitaxel.[69]

When viewing the record post-remand – that is, as if the trial never occurred – the foregoing testimony and reasonable inferences to be drawn from same demonstrate that under the overarching analytical question expressly recognized by this Court in its July 9, 2019 Order – *and* the Fifth Circuit in *Phillips* – disputed issues of material fact flatly preclude entry of summary judgment.

The same result inures *even if* this Court also considers testimony elicited at trial.[70]  That is true because the testimony at trial demonstrates that had Sanofi warned Dr. Carinder of the risk

---

[68] *See* Ex. 12, Carinder Dep. 138:6-11.
[69] *Id.* at 137:2-17; 138:6-11 (objection omitted).
[70] Rather than restating the entire litany of facts that Ms. Earnest asserts demonstrates that disputed issues of fact exist with respect to the second Stahl prong, Ms. Earnest hereby incorporates herein by reference the contemporaneously-

of permanent hair loss associated with Taxotere use, his prescribing decision for Ms. Earnest would have changed.[71] Continuing, Dr. Carinder testified that, when he was advising Plaintiff on the use of Taxotere, "[i]t's a two-way conversation. Patients and doctors work as a team during this. Their input is just as critical as mine."[72]  Dr. Carinder specifically testified:

> Q. And if she chose one of those other options that you presented to her, would you have prescribed it to her?
> A. Yes.[73]

Ms. Earnest specifically testified that if Dr. Carinder would have told her about the risk of permanent hair loss, she would have asked for another regimen and would have taken that regimen.[74]

The foregoing trial testimony – as well as all reasonable inferences to be drawn in Ms. Earnest's favor from same – clearly demonstrates that disputed issues of material fact exist with respect to the second prong of the *Stahl* analysis.

## IV. DISPUTED ISSUES OF MATERIAL FACT EXIST REGARDING WHETHER TAXOTERE IS CAPABLE OF CAUSING PCIA – "GENERAL CAUSATION"

Plaintiff adopts, as if fully set forth herein, the pleadings and evidence cited in opposition to general causation challenges, in support of Ms. Kahn's motion for partial summary judgment on general causation, and challenges to the opinions of Drs. Ellen Feigal and David Madigan, by

---

filed Plaintiff's Response to Defendants' Statement of Facts, Plaintiff's Supplemental Undisputed Statement of Facts, as well as the facts found in R. Doc. 6604 for the sake of brevity and page-limit compliance. With that in mind, the following analysis includes only the most paramount facts demonstrating a disputed issue of material fact exists (on which the Court previously found genuine issues existed for the jury's determination).

[71] *See* Ex. 11, Trial Transcript at 1620:4-14 (did not advise Earnest of risk of permanent hair loss, only temporary hair loss); 1394:17-25 (Sanofi had not provided Dr. Carinder with a warning of permanent hair loss at time he treated Ms. Earnest in 2011); 1397:4-7 (had Dr. Carinder been advised of risk of permanent hair loss by Sanofi, he would have warned Ms. Earnest); 1493:24-1494:3 (Dr. Carinder would have considered paclitaxel or other Taxol options for Ms. Earnest if she had voice concern of wanting to avoid risk of permanent hair loss); 1494:16-20 (Dr. Carinder noted FEC regimen and AC regiment  could have been considered; AC would have similar efficacy); 1497:10-14 (Dr. Carinder would have probably used FAC regimen if Ms. Earnest would have told him that she wanted to avoid the risk of permanent hair loss and minimize risk of neuropathy).

[72] *See id.* at 1626:24-1627:1.

[73] *Id.* at 1397: 14-16.

[74] *Id.* at 1734:11-17.

Sanofi.[75] The Court has already addressed and rejected Sanofi's prior arguments related to the exact issues with Dr. Madigan, specifically stating: (1) "The limitations Sanofi identifies are not weaknesses in Dr. Madigan's methodology; they are limitations beyond his control that he deliberately worked around. Accordingly, Sanofi's concerns relate to the weight of Dr. Madigan's testimony, not its admissibility, and on cross-examination, Defendants can highlight these limitations for the jury;" (2) "[t]he Court rejects Sanofi's argument and finds that Sanofi's concern goes to the weight of Dr. Madigan's testimony, not to its admissibility;" and (3) these are "criticism[s] that Sanofi can highlight for the jury on cross-examination."[76] Likewise, Sanofi's attempt to now argue that Dr. Feigal's trial testimony somehow undermines her general causation analysis should be rejected for the same reasons articulated as to the alleged weaknesses in Dr. Madigan's analysis.[77] Given no change in the applicable law since this Court's original rulings on general causation,[78] and considering subsequent decisions of this Honorable Court finding genuine issues of material fact with regard to general causation,[79] there remain genuine issues of material fact to be weighed by a jury.

## V. DISPUTED ISSUES OF MATERIAL FACT EXIST REGARDING WHETHER TAXOTERE CAUSED PLAINTIFF'S PCIA – "SPECIFIC CAUSATION"

Plaintiff adopts, as if fully set forth herein, the pleadings and evidence cited in opposition to specific causation challenges, and challenges to the opinions of Drs. Antonella Tosti and Curtis

---

[75] From Earnest pretrial proceedings, plaintiff adopts all briefing and evidence cited in R. Docs. 7474 (Opposition to Motion to Exclude Expert Testimony of Ellen Feigal, M.D., R. Doc. 6149), 7469 (Opposition to Motion to Exclude Expert Testimony of David Madigan, Ph.D., R. Doc. 6144), & 7513 (Opposition to Motion to Exclude Expert Testimony on Expert Causation, R. Doc. 6163). From post-Earnest pretrial proceedings on general causation, plaintiff adopts all briefing and evidence cited in R. Docs. 10936 (Motion for Partial Summary Judgment on General Causation), 11165 (Reply in Support of Motion for Partial Summary Judgment on General Causation), 11083 (Opposition to Motion to Exclude Testimony of Ellen Feigal) & 11086 (Opposition to Motion to Exclude Dr. David Madigan).

[76] R. Doc. 8094, 12098; Response to SOF #50-52.

[77] R. Doc. 8094; Response to SOF #53.

[78] R. Doc. 8094.

[79] R. Docs. 11810, 12098

Thompson, by Sanofi.[80] Sanofi's one-sided view of Dr. Tosti's trial testimony is neither lacking in genuine issues for the jury alone nor can it override Dr. Tosti's previously accepted analysis on which summary judgment was previously denied.[81] Dr. Tosti applied an accepted differential diagnosis to conclude that Ms. Earnest has permanent hair loss and excluded all potential causes other than Taxotere.[82] Moreover, no evidence was presented by Defendants to rebut the conclusions of Dr. Tosti, and no evidence sufficient to support general causation with any other drug, including those identified by Dr. Carinder as alternative options, was presented to the jury.[83] Given no change in the applicable law since this Court's original rulings on specific causation,[84] and considering subsequent decisions of this Honorable Court finding genuine issues of material fact with regard to specific causation,[85] there is no reason for the Court to upend its prior rulings finding the expert testimony on specific causation should be weighed by a jury.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, and for any other reasons this honorable Court deems just, Plaintiff respectfully requests that Sanofi's Motion for Summary Judgment (R. Doc. 14146) be denied.

Dated: May 13, 2022                                    Respectfully submitted,

---

[80] Plaintiff adopts all briefing and evidence cited in R. Doc. 7486 (Opposition to Motion to Exclude Expert Testimony on Specific Causation).
[81] R. Doc. 8095; Response to SOF #47.
[82] *Id.*
[83] Response to SOF #46-55.
[84] R. Doc. 8095.
[85] R. Doc. 12401.

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT