# EXHIBIT 11

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5     IN RE:   TAXOTERE (DOCETAXEL)
                PRODUCTS LIABILITY           Docket No.: 16-MD-2740
6               LITIGATION                   Section "H(5)"
                                             September 17, 2019
7                                            New Orleans, Louisiana

8     *Relates To*:  *Barbara Earnest*,
      *Case No.: 16-CV-17144*

9

10    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
                           DAY 2, MORNING SESSION
12               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                   UNITED STATES DISTRICT JUDGE

14

15    APPEARANCES:

16    For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                                 BY:  DAWN BARRIOS, ESQ.
17                               701 Poydras Street
                                 Suite 3650
18                               New Orleans, Louisiana 70139

19

20    For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                   Meunier & Warshauer, LLC
21                               BY:  PALMER LAMBERT, ESQ.
                                 2800 Energy Centre
22                               1100 Poydras Street
                                 New Orleans, Louisiana 70163-2800
23

24

25

                        *OFFICIAL TRANSCRIPT*

1    Q.    Just going back to -- my question was, to make sure I have

2    got the question actually answered on the record, from -- based

3    upon your knowledge at Sanofi in 2006, Sanofi knew Taxotere

4    could cause irreversible alopecia in 2006, correct?

5    A.    Yes.  Well, they were listed events.  They were certainly

6    considered listed events.

7    Q.    Do you agree with me that, by definition, something that

8    is temporary is not the same as something that is permanent?

9    A.    By definition, yes.  I'm sorry, I think I misunderstood

10   you.  I thought you were saying temporary and reversible.

11   Q.    From an outcome perspective, if you have something that is

12   permanent in outcome, that's different, by definition, than

13   something that is temporary in outcome, right?

14   A.    The outcome, yes.  We collect outcomes on reports when we

15   can get it, and permanent would be not recovered.

16   Q.    Temporary would be?

17   A.    Recovered.

18   Q.    Those aren't the same thing, are they?

19   A.    Not recovered is -- does not -- is not the same as

20   recovered.

21   Q.    Say it again.

22   A.    Not recovered is not the same as recovered, right, because

23   there is a not in front of one of the words.

24         (WHEREUPON, at this point in the proceedings, the video

25   deposition testimony of Amy Freedman concluded.)

**OFFICIAL TRANSCRIPT**

1   date on the last page, I believe.

2   Q.   All right.  I want to make sure I understand.  Who is

3   responsible for the safety of a pharmaceutical drug?

4   A.   So the drug company has primary responsibility for the

5   safety of a drug, for the drugs it sells.

6   Q.   Is part of the safety of a drug the drug's labeling?

7   A.   Of course.  Safety information needs to be in the drug

8   label.  Again, it's the sort of central document from which a

9   lot of other documents emanate, but it's the sort of central

10   repository of key information, of safety information about a

11   drug.

12   Q.   Doctor, whose drug label is this label for Taxotere?

13   A.   I mean, this is Sanofi's label.  If you look at the last

14   page, as my colleagues at FDA used to say, it's the drug

15   company who owns the label.  They, in fact, have -- there is a

16   little c, I think there's a copyright mark on the last page.

17   So it's the drug company that owns the label.

18   Q.   I've just highlighted that.  That's copyright 2010

19   Sanofi-Aventis U.S. LLC.  Do you see that?

20   A.   I do.

21   Q.   So this is published by the drug company; is that correct?

22   A.   Correct.  It's reviewed by the agency at the time of

23   approval, but it's sort -- this is sort of a living document

24   that can have changes throughout the life of a drug.

25   Q.   So as far as drug safety is concerned, how important is

*OFFICIAL TRANSCRIPT*

1    the label?

2    A.    It's key.  May I explain?

3    Q.    Oh, yes.

4    A.    So it's key because it's the agreed-upon language for

5    which we want doctors and patients to have information.  So

6    anything doctors and patients need to make a decision should be

7    in the label.

8             Now, that doesn't mean -- I mean, I wish it were the

9    case that every doctor read every section of the label.  I

10   don't believe that.  But I do believe the label is key because

11   the label -- sometimes it's copied into -- and it's fine, we

12   encourage that -- it's copied into textbooks or handbooks or

13   books that -- you know, little pocket books that I would carry

14   in my white coat, or I'd have it in my phone these days, or it

15   would be on lecture slides, or it would be discussed in

16   lectures.

17            So, the label, just think about it, is at the center,

18   but all of this -- other ways of communicating with doctors --

19   sales representatives, when they go in, for example, to talk to

20   a doctor, they are supposed to stay and give the information

21   that is consistent with the drug label.

22            So, while, you know, in the physical form, you know,

23   not everybody may read it, it has enormous effect because it's

24   supposed to influence, generally, what doctors and patients

25   know about a drug.

*OFFICIAL TRANSCRIPT*

1    Q.    So, Doctor, just briefly -- I don't want to go through

2    every section of this drug label -- can you tell us what the

3    sections are of a drug label.

4    A.    Sure.  If you turn, I think, to the second page of the

5    drug label, you'll see there is a table of contents, and there

6    is 17 different sections.

7         So you have what the drug is used for, what its

8    dosage should be.  Then you have a series of, in essence,

9    warning sections that include contraindications, Section 5 that

10   I've discussed, the warning section, and the adverse reaction

11   section.

12        Then you have other sections lower down, including a

13   section about the clinical trials, as well as information about

14   patient counseling.  That would be information that's sometimes

15   shared directly and actually copied and given to patients.

16        Sometimes when you go into a drug store, and they

17   staple a piece of paper, we worked on that.  That's the sort of

18   abbreviated -- that's the patient package insert.  Not every

19   drug has it, but we encourage that information, so that

20   patients know everything -- have a choice.

21   Q.    I noticed that, unlike what many of us may be familiar

22   with, this is a pretty extensive drug label that is 62 pages in

23   length; is that right?

24   A.    Correct.

25   Q.    Did you review every part of this label?

*OFFICIAL TRANSCRIPT*

1    A.    I study drug labels, but that's what I like to do.

2    Q.    That's what you do in your spare time?

3    A.    Absolutely.

4    Q.    So, Doctor, you told us that the drug company is

5    responsible for the label.  Who is required and responsible and

6    in the best position to provide warnings about the dangers of a

7    drug?

8    A.    So, the primary responsibility rests with the drug

9    company.  They are the ones who do the clinical studies.

10          Many people don't realize that.  They think the FDA

11   does the studies.  We have a private system of drug development

12   in this country.  So a company will study it.  They will get

13   the results.  They will write the reports.  They know the

14   drugs.  They get the adverse reactions.

15          Once the drug is on the market, most of the time they

16   get first the adverse reaction reports.  Sometimes the FDA can

17   get them, but then they are shared with the drug company.

18          Just think about it, a company will have a handful of

19   drugs, I mean, at any one time that it's focused on.  They are

20   really sitting on that information on a day-by-day basis.  FDA

21   has -- when I was there, I had tens of thousands of drugs.  So

22   that's why we say that the company has primary responsibility

23   for assuring the safety of a drug, not only up until the time

24   it gets approved, but throughout the life of the drug while

25   it's on the market.

**OFFICIAL TRANSCRIPT**

1        That's why -- what's very important is to update this

2    label and change it as soon as you have evidence that -- or

3    information that you think may be relevant to a doctor and a

4    patient having a discussion.

5    Q.   So, Doctor, that begs the question, I guess, is what role

6    does FDA, the agency you headed, have?

7    A.   That's a great question.  FDA is responsible for the

8    approval of the drug.  So you can't get it on the market unless

9    FDA approves it.

10        So the day that a drug is approved -- and this, I

11    think, if you go back to the first page, you see it was

12    approved in 1996 -- that day of approval, FDA has gone through

13    that label pretty thoroughly.

14        Here, you have -- it's a little complicated because

15    the drug has gotten approved for different indications

16    subsequently.  So FDA does look at it periodically.

17        So, no doubt, FDA takes a lot of care at the time of

18    approval; but, then this -- it's this period of postmarketing

19    when things happen.  So, FDA does have some information and

20    does have back and forth, but that's -- in general, I mean, and

21    the rules have it, it's the company's responsibility to update

22    the label as soon as they have information that a doctor and a

23    patient should need to discuss.

24    Q.   All right.  Now, Doctor, you mentioned a couple of things,

25    and I just need to kind of unpack that answer you just gave.

*OFFICIAL TRANSCRIPT*

1  A.   No.

2  Q.   Is alopecia the same as hair loss?

3  A.   Alopecia is hair loss, yes.

4  Q.   Is alopecia warned of in this label?

5  A.   It is.

6  Q.   I think I can see it here.  Under Adverse Reactions, which

7  is this section right here on the first page, I see alopecia.

8  Do you see that, sir?

9  A.   I do, sir.

10  Q.   I'm going to try to get a little closer.  Doctor, since

11  1996, when this drug first came on the market, from the very

12  beginning, has alopecia been on the label?

13  A.   It has.

14  Q.   Through this label in 2010, was permanent alopecia in the

15  label?

16  A.   No.

17  Q.   Is that significant?

18  A.   Yes.

19  Q.   Why?

20  A.   Because they are different.

21  Q.   And explain that, please.

22  A.   Certainly through the year 1999 or so, the general

23  understanding was that hair loss associated with chemotherapy

24  was reversible, that it would come back.  So anytime there is a

25  change, there is a big difference between something that comes

**OFFICIAL TRANSCRIPT**

1    have been a warning about permanent hair loss?

2    A.    Yes.

3    Q.    With regard to the information that you have reviewed,

4    have you made a determination about approximately when the

5    information was sufficient to put Sanofi on notice that it

6    needed to provide a permanent hair loss warning?

7    A.    Yes, I have made that determination.

8    Q.    When, approximately, was that?

9    A.    I think not later than about 2009, and probably as early

10   as around 2006.

11   Q.    We talked about this earlier, but I need to be clear.  Did

12   Sanofi need FDA to tell it to make a labeling change to add

13   *permanent* to the alopecia warning?

14   A.    No, it does not.

15   Q.    I think you told us about changes being effected.  How

16   does that process work?

17   A.    Changes being effected is if you have evidence of a safety

18   hazard, if you have any new information that you think doctors

19   and patients should have, it's one of the ways you can get that

20   information on the label.  You can go ahead and make that

21   changes -- that change to the label, even without FDA approval.

22   But then you have to come in to FDA, and FDA ultimately gets to

23   review that label.

24   Q.    Okay.  But the labeling change itself is not FDA

25   generated; is that correct?

**OFFICIAL TRANSCRIPT**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION     *      Docket No.: 16-MD-2740
                                  *      Section "H(5)"
                                  *      New Orleans, Louisiana
*Relates to:  Barbara Earnest*    *      September 17, 2019
*Case No.: 16-CV-17144*           *
* * * * * * * * * * * * * * * * * *


DAY 2 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:            Barrios Kingsdorf & Casteix, LLP
                               BY:  DAWN M. BARRIOS, ESQ.
                               701 Poydras Street
                               Suite 3650
                               New Orleans, Louisiana 70139


For the Plaintiffs:            Gainsburgh Benjamin David Meunier
                                 & Warshauer, LLC
                               BY:  M. PALMER LAMBERT, ESQ.
                               1100 Poydras Street
                               Suite 2800
                               New Orleans, Louisiana 70163


For the Plaintiffs:            Pendley Baudin & Coffin, LLP
                               BY:  CHRISTOPHER L. COFFIN, ESQ.
                               1100 Poydras Street
                               Suite 2505
                               New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:09PM  1          **MR. STRONGMAN:**  Objection.  Misstates the evidence.

1:09PM  2  Foundation.

1:09PM  3          **THE COURT:**  I think -- just rephrase your question.

1:09PM  4  **BY MR. NOLEN:**

1:09PM  5  **Q.**   Did anything Dr. Freedman testified to that you heard in

1:09PM  6  court today differ from any opinions that you've offered?

1:09PM  7          **MR. STRONGMAN:**  Objection.  Foundation.  Misstates

1:09PM  8  the evidence.

1:10PM  9          **THE COURT:**  I'm going to allow him to answer the

1:10PM  10  question.  I think I'll allow him to answer the question.

1:10PM  11          **THE WITNESS:**  Dr. Freedman's statement that Taxotere

1:10PM  12  caused permanent hair loss in 2006, her statement I would

1:10PM  13  corroborate.

1:10PM  14  **BY MR. NOLEN:**

1:10PM  15  **Q.**   Okay.  And so is it fair to say that -- that Sanofi should

1:10PM  16  have warned about permanent hair loss as early as '06?

1:10PM  17  **A.**   Yes.  Because in addition to the reasonable evidence of a

1:10PM  18  causal association, I think permanent hair loss is serious,

1:10PM  19  certainly a clinically significant hazard, that can be

1:10PM  20  life-changing.

1:10PM  21          So the two together, I think, meet the definition of

1:11PM  22  reasonable evidence of a causal association, as well as the

1:11PM  23  standard for an adverse event, which is reasonably associated

1:11PM  24  or some basis to believe.  Both standards, I believe, would be

1:11PM  25  met.

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:11PM 1  **Q.**   And where were they supposed to warn?

1:11PM 2  **A.**   Clearly and prominently in the label.

1:11PM 3  **Q.**   And so -- and I want to go back, because I'm concerned

1:11PM 4  that there may be some confusion.

1:11PM 5          In 2007, we looked at, a moment ago, a warning

1:11PM 6  that -- about permanent hair loss that was in a clinical trial;

1:11PM 7  correct?

1:11PM 8  **A.**   It was a warning in a informed consent that was for just

1:11PM 9  the clinical trial, correct.

1:11PM 10 **Q.**   All right.  But that warning about permanent hair loss was

1:12PM 11 not appearing in labeling --

1:12PM 12 **A.**   Correct.

1:12PM 13 **Q.**   -- all the way through 2011?

1:12PM 14 **A.**   Correct.

1:12PM 15 **Q.**   Thank you.

1:12PM 16         **MR. NOLEN:**  I pass the witness.

1:12PM 17         **THE COURT:**  Mr. Strongman.

1:12PM 18         **MR. STRONGMAN:**  If I could take a moment just to set

1:12PM 19 up, Your Honor.

1:12PM 20         **THE COURT:**  Of course.

1:13PM 21             Can you all see the easel?

1:13PM 22         **A JUROR:**  Yes.

1:13PM 23         **THE COURT:**  Okay.  Thank you.

1:13PM 24         **MR. STRONGMAN:**  Dr. Kessler, can you see?

1:13PM 25         **THE WITNESS:**  Yes.

OFFICIAL TRANSCRIPT

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:   TAXOTERE (DOCETAXEL)
             PRODUCTS LIABILITY          Docket No.: 16-MD-2740
6            LITIGATION                  Section "H(5)"
                                         September 18, 2019
7                                        New Orleans, Louisiana

8   *Relates To*:  Barbara Earnest,
    *Case No.: 16-CV-17144*

9

10  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
                         DAY 3, MORNING SESSION
12            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                 UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  For the Plaintiffs:      Barrios, Kingsdorf & Casteix, LLP
                             BY:  DAWN BARRIOS, ESQ.
17                           701 Poydras Street
                             Suite 3650
18                           New Orleans, Louisiana 70139

19

20  For the Plaintiffs:      Gainsburgh, Benjamin, David,
                               Meunier & Warshauer, LLC
21                           BY:  PALMER LAMBERT, ESQ.
                             2800 Energy Centre
22                           1100 Poydras Street
                             New Orleans, Louisiana 70163
23

24

25

                          *OFFICIAL TRANSCRIPT*

1   already.

2   Q.   That's all right.  What were your impressions -- you

3   worked with Dr. Carinder.  What were your impressions of him?

4   A.   I loved Dr. Carinder.  He's a great guy.  He's a good

5   physician.  I found him very up to date, very clinical.  He

6   went to all of the latest meetings.  We had high-level clinical

7   discussions.  I sought out his advice when I got breast cancer.

8   He was one of the physicians that I went to.  I said:  You

9   know, tell me, is this the right thing that they want to do?  I

10  really respect him a lot.

11  Q.   I want to show you Plaintiff's Exhibit 192.

12       MS. MENZIES:  Am I allowed to give her -- may I

13  approach and give her a physical copy?

14       THE COURT:  Yes, you may.  Is it already in evidence?

15       MS. MENZIES:  Yes, Your Honor.  Monday, I believe.

16  EXAMINATION BY MS. MENZIES:

17  Q.   I've put up on the board here -- I know you have it in

18  front of you -- Plaintiff's Exhibit 192, and you can flip

19  through those pages a little, if you haven't already.  Have you

20  seen this document before?

21  A.   Yes, I have.

22  Q.   And was this one of the materials that you used when you

23  were promoting Taxotere for Sanofi?

24  A.   Yes.

25  Q.   What are we looking at in 192?

*OFFICIAL TRANSCRIPT*

1  A.   We had a packet that we could give -- I gave it out a lot

2  to the nurses.  It was a CD-ROM and a USB port, and it housed

3  individual tear sheets on all of the side effects -- the common

4  side effects of the drug.

5       And so, it was nifty because the clinics could

6  customize it.  So they could put on the top of it

7  "Hematology/Oncology Specialist" and they could put their

8  number on it in case of an emergency or what have you.

9       Also, it did not take up a ton of space because it

10 was either a USB port or a CD-ROM, so they could put on it

11 their computer.  If they had somebody coming in and they were

12 having trouble with nail fungus and neutropenia, they could

13 just go on their desktop and click neutropenia, nail fungus,

14 and print out the associated sheet that is with that side

15 effect and hand it to the patient and say:  Here, take this

16 home.  This will help you.  They'd go over what's on the sheet

17 with the patient.

18      And so we used this a lot to help with side effect

19 management.

20 Q.   Let's just look at it briefly.  The first page we have

21 here, and then there's just a dark page, and then go to the

22 next page.  Can you tell us what this first page is here?

23 A.   This is the side effect sheet for hair loss, or *alopecia*

24 is the term for it.

25 Q.   Go one before that.  It's Bates ending 472, if you see

*OFFICIAL TRANSCRIPT*

1    that in the lower right.  And --

2    A.    Sorry.

3    Q.    And this -- who is this letter to?

4    A.    This is to the nurses.

5    Q.    And it's from Sanofi; is that correct?

6    A.    Correct.

7    Q.    You mentioned the CD-ROM, USB port.  Looks like we have a

8    picture of that here?

9    A.    Correct.

10   Q.    What was the purpose of providing it as a USB port or

11   CD-ROM as well?

12   A.    As I said, the clinics don't have a lot of space for

13   materials, and so this was an easy way for them to save space

14   but yet have all of the information necessary to help the

15   patients with all of the different side effects.

16   Q.    And we have a -- we just have four pages in this exhibit.

17   Is this brochure actually a bigger document?

18   A.    Yes.

19   Q.    So we just have an excerpt of a few pages.  If you turn

20   the next page, what are we looking at there?

21   A.    This is the hair loss page.

22   Q.    And let's take a little bit closer look at that.  It says:

23   "Alopecia hair loss.  What is alopecia?"

24         Can you read that first sentence to the jury, please.

25   A.    "Alopecia is another word for hair loss or thinning of the

**OFFICIAL TRANSCRIPT**

1    hair.  It is a common, yet temporary, side effect of some

2    cancer medicines."

3    Q.   And when -- we have at the top:  "Coping with side effects

4    of chemotherapy."  In that sentence, it says:  "Common

5    temporary side effect of some cancer medicines."

6              Did you understand that *some cancer medicines*

7    include --

8              MR. STRONGMAN:  Objection, leading.

9              THE COURT:  Rephrase.

10   EXAMINATION BY MS. MENZIES:

11   Q.   Did *some cancer medicines* include Taxotere?

12             MR. STRONGMAN:  Same objection.

13             THE COURT:  Can you rephrase it?

14   EXAMINATION BY MS. MENZIES:

15   Q.   When it says *some cancer medicines*, what cancer medicines

16   is it referring to, to your understanding?

17   A.   This is my drug.  It's what I sold.  And this is what the

18   company gave me to sell my drug.  I felt, and still do feel,

19   that they were saying it's temporary.

20   Q.   Okay.  And then if we look to the right side, it says --

21   can you read that to the jury?

22   A.   "If you do lose your hair, it will usually grow back after

23   the treatments are over.  It may grow back while you are still

24   having treatments.  And it may grow back a different color or

25   texture."

*OFFICIAL TRANSCRIPT*

```
 1   Q.    Is this part of the brochure telling you when --
 2          MR. STRONGMAN:  Objection.  Leading.
 3   EXAMINATION BY MS. MENZIES:
 4   Q.    What is this part of the brochure telling you?
 5   A.    It's telling me that the patient's hair is going to grow
 6   back when their treatment is over, and it might grow back
 7   different.
 8   Q.    Is that because it varies between patients?
 9          MR. STRONGMAN:  Same objection.
10          THE COURT:  Overruled.
11          THE WITNESS:  It does vary between patients.  I've seen
12   it myself.  And it does.  Sometimes it grows back curly,
13   sometimes it grows back straight.  A different color.
14   EXAMINATION BY MS. MENZIES:
15   Q.    And then it says:  "When my hair grows back."
16          What is the purpose of that explanation?
17   A.    This is telling -- this whole entire sheet is telling the
18   patient how to manage hair loss.  Hair loss is -- was -- it is
19   a devastating side effect to these patients.  It's one of the
20   number one things that they talk about.  And this sheet is to
21   help them cope with that side effect and how difficult it is.
22          So it's reassuring them that you can deal with it,
23   it's going to grow back.  It might grow back a little
24   different, but it's going to grow back.  And if you wash your
25   hair, you can maybe help it.  Maybe you shave it.  This is what
```

*OFFICIAL TRANSCRIPT*

1    they used to help with the hair loss.

2    Q.   Does this language in this brochure tell patients that

3    their hair loss could be permanent?

4              MR. STRONGMAN:  Objection.  Leading and foundation.

5              MS. MENZIES:  Your Honor --

6              THE COURT:  Why don't you -- I'm going to overrule it.

7    You can answer it.

8              THE WITNESS:  I thought this meant, and I still do

9    think this meant that the hair loss was temporary.

10   EXAMINATION BY MS. MENZIES:

11   Q.   Did you trust that Sanofi would tell you about the side

12   effects it knew about?

13   A.   Yes, I did.  I'm a professional, and I thought that they

14   would.

15   Q.   From your experience, what side effects were patients

16   concerned about when they take therapy?

17   A.   They are concerned about hair loss.  They are concerned

18   about all of them.  I mean, it's chemotherapy; it's terrifying.

19   But women are especially concerned about hair loss.  That's why

20   there is programs like Look Good, Feel Better through the

21   American Cancer Society that helps them cope with it, because

22   they are shocked.

23              They don't just lose their hair.  They lose their

24   eyebrows, they lose their eyelashes, and they don't feel

25   normal.  There is sexual concerns.  There is infection

*OFFICIAL TRANSCRIPT*

1  A.    Sure.  I do.

2  Q.    Have you ever taught those methods to persons or groups

3  outside of the university setting?

4  A.    Yes.  So, over the years, I've taught quite a few --

5  they're typically called *short courses*, sort of like a half-day

6  course or a one-day course, on drug safety -- on statistical

7  methods for drug safety.  So I've taught those at a number of

8  conferences over the years.  It's typical to have a tutorial

9  program or a short course program at a conference.

10           I've also taught such courses for pharmaceutical

11  companies, quite a number of them over the years, including

12  Sanofi, in the company setting.

13  Q.    Again, the statistical methods and biostatistical analyses

14  that we're going to hear about today, did you teach those same

15  principles and methods that we're going to hear in this

16  courtroom to Sanofi when you did that short course for them?

17  A.    Sure, I did.

18           MR. MICELI:  Your Honor, I would like to tender

19  Dr. Madigan as an expert in biostatistics, statistics,

20  pharmacovigilance and safety.

21           THE COURT:  Any objection?

22           MR. PATERSON:  No objection, Your Honor.

23           MR. MICELI:  Thank you.

24           THE COURT:  The Court is going to accept Dr. Madigan as

25  an expert in the field in the biostatistics, statistics,

**OFFICIAL TRANSCRIPT**

1   pharmacovigilance and safety, qualified to render an opinion in

2   those areas.

3                   Please proceed.

4               MR. MICELI:  Thank you.

5                          DIRECT EXAMINATION

6   BY MR. MICELI:

7   Q.   Dr. Madigan, at my request, did you investigate the

8   chemotherapy drug Taxotere?

9   A.   Yes, I did.

10  Q.   You might want to speak a little closer to that

11  microphone.

12                  Will you please tell the jury what your investigation

13  included.

14  A.   So I considered three strands of evidence pertaining to

15  the question of Taxotere and irreversible hair loss.

16                  So, first and foremost, I considered the

17  clinical trials that we heard Dr. Kessler talk about.  I also

18  considered a government run, if you will, drug safety database

19  called FAERS.  I conducted an analysis in that database.  Then

20  I also looked at the company's internal pharmacovigilance

21  database, their own drug safety database.

22              MR. MICELI:  Your Honor, I would like to put on the

23  screen so the jury knows where we're going.

24              THE COURT:  That's fine.  Is there any objection?

25              MR. PATERSON:  It's fine.

                        ***OFFICIAL TRANSCRIPT***

1           THE COURT:  Thank you.

2    EXAMINATION BY MR. MICELI:

3    Q.    Dr. Madigan, I'm going to put up a little road map, just

4    to keep us oriented as to where we're going traveling down this

5    road of your testimony.

6            We've talked about your education and your

7    qualifications.  The first thing that you said you looked at

8    were the clinical studies.  I believe you said you did a

9    meta-analysis; is that true?

10   A.    I don't think I said that, but it is true that I did it,

11   yes.

12   Q.    I'm sorry.  Well, I built the road sign incorrectly.  I

13   apologize.

14           You mentioned that you looked at Sanofi's

15   clinical trial data.  Can you tell the jury and the Court which

16   clinical trials you reviewed?

17   A.    So I reviewed two randomized control trials that

18   Dr. Kessler actually discussed yesterday, TAX316 and TAX301.

19   Q.    Can you tell the jury just a little bit about the studies

20   that you reviewed?

21   A.    So these two randomized controlled trials were very, very

22   similar.  So they were -- the design of these studies was very

23   similar, except for one particular difference.  But in both

24   cases, the subjects in the studies were randomly assigned to

25   either TAC or FAC.  So TAC being Taxotere plus two other drugs,

**OFFICIAL TRANSCRIPT**

1   and FAC being 5-FU plus two other drugs.  So, basically, the

2   difference between the two arms of study is Taxotere.  So, you

3   know, one group received Taxotere, and the other did not.

4           So both studies were of that type.  Both studies had

5   fairly lengthy followup.  So ten years in the case of TAX316,

6   eight years in the case of TAX301.  That's the basics of these

7   two studies.

8   Q.   As a statistician, are clinical trials -- is

9   clinical trial data important to you?

10  A.   Absolutely.  So randomized controlled trials are sort of

11  at the pinnacle in terms of the quality of evidence that they

12  provide.  So there are many reasons for this.

13          So randomized controlled trials, first of all, they

14  are regulated in this country and in most countries.  If you

15  want to conduct a clinical trial in human beings, you have to

16  get permission, and the FDA has to approve it.

17          So they are very important for many reasons.  There

18  are sort of five things that I talk about when I teach this.

19  So one of them is prespecification.

20          So when you conduct a randomized controlled trial --

21  an RCT is the acronym -- when you conduct an RCT you have to

22  state in advance exactly what you're going to do, right, the

23  design of the study, how you're going to recruit the patients,

24  how you're going to randomize them, how you're going to follow

25  up, how you're going to measure everything.  You have to have a

1    statistical analysis plan in advance that says how you're going

2    to analyze the data, so you can't after the fact change

3    direction and decide to analyze it some other way.

4           So there's prespecification.

5           There's typically extensive inclusion and exclusion

6    criteria.  So you select very particular patients to include in

7    the study, so that you can isolate the effect of the drug that

8    you're studying.

9           Randomization is of central importance.  So, a flip

10   of a coin decides whether you get, in our case, TAC or FAC.

11   The beauty of that, as against, say, a physician saying, I

12   think you would do well on TAC, or you would do well on FAC,

13   which is -- that's clinical practice down the road, but when

14   you're trying to study the effect of a drug, you don't want any

15   bias creeping in.  So randomization ensures that there isn't

16   any sort of slanting of things one way or the other in deciding

17   who gets which drugs.

18          So randomization -- the first randomized trials in

19   humans was in the 1940s.  It's arguably kind of one of the most

20   important developments in all of science in the last century.

21   It's hugely important in terms of advancing our ability to

22   study the effects of interventions, drugs, devices and so on,

23   in an unbiased way.

24          The fourth thing is followup.  So good randomized

25   trials follow patients after the treatment, essentially, to see

*OFFICIAL TRANSCRIPT*

1    what happened to them.  In our particular case here, there is

2    lengthy followup of the patients.

3            The final piece of it is the quality of the data.  So

4    in the conduct of these trials -- and I've been involved in

5    many trials -- the data are gathered typically using what are

6    called *case report forms* during the conduct of the study, but

7    then they are checked and double-checked and triple-checked

8    against source medical records and various other avenues.  So

9    they are very heavily curated data.

10           So, at the end of the day, when you lock the data --

11   maybe we can talk about locked, what that means, in a few

12   minutes -- but when you lock the data at the end of the study,

13   you're highly confident that the data are accurate.  They are

14   verified.  They are reliable.  You can -- you can be sure that

15   what's in there is what actually happened.

16           That's a lengthy process, that curation process.  You

17   know, pharmaceutical companies devote, you know, hundreds of

18   people, thousands of people to that process to ensure that you

19   have very high quality data at the end of the day.

20           So these five things together are why randomized

21   controlled trials, particularly multiple randomized control

22   trials, are at the top of the heap in terms of, you know, the

23   best possible science in pharmaceutical science.

24   Q.   Thank you.

25           Just one thing, Doctor.  I tend to talk fast.  You

**OFFICIAL TRANSCRIPT**

1    tend to talk fast.  I don't want the jury to feel like they are

2    hearing two auctioneers talking here.  If we could try to slow

3    down just a little bit.

4    A.    Okay.

5    Q.    Thank you.

6    A.    I'll do my best.

7    Q.    With what you just explained about clinical trials, can

8    clinical trials help determine if a drug is causing an adverse

9    event like permanent hair loss?

10   A.    Absolutely.

11   Q.    How is that?

12   A.    It's to do with the random- -- it's everything I just

13   said, but, in particular, the randomization.  So if there is a

14   difference between the two arms of the study, you know, at the

15   end of the day, then you can be sure that that difference is

16   due to one of two things:  It's either due to the drug in

17   question, that it's causing the outcome, or it could be the

18   play of chance.

19          That's where you need a statistician.  So it's the

20   body of knowledge that is statistics, which has been around for

21   a couple hundred years, can quantify the role of chance.

22          So if you see a difference between the two arms,

23   statistical calculations can tell you, what's the chance that

24   that is just, you know, random variation, as against a real

25   effect?

                        *OFFICIAL TRANSCRIPT*

1              So statistical significance is kind of a widely used

2      arbiter.  So if you have a statistically significant difference

3      between the two arms, then basically that rules out, for all

4      intents and purposes, that it could be due to chance.  It's

5      real.  It's a causal effect.

6      Q.    Thank you.

7              Doctor, did Sanofi study permanent hair loss in

8      clinical trials?

9      A.    Absolutely.  So, irreversible hair loss was a prespecified

10     endpoint in both studies.

11     Q.    Did you review -- in forming your opinions, did you review

12     the statistical analysis plan for TAX316?

13     A.    Yes, I did.

14     Q.    Did it inform your decisions and your opinions?

15     A.    Yes.  I mean, it shows the irreversible hair loss is one

16     of -- is prespecified in that plan before they gathered the

17     data -- before they looked at the data.

18              MR. MICELI:  Your Honor, may I approach the witness?

19              THE COURT:  Yes, you may.

20     EXAMINATION BY MR. MICELI:

21     Q.    I'm just going to give you that.  I put a finger there

22     just to help you identify the location.

23              Is this the statistical analysis plan that you

24     reviewed?

25              THE COURT:  I'm sorry.  Is there --

                        *OFFICIAL TRANSCRIPT*

1          MR. STRONGMAN:  Your Honor, may we approach?

2          THE COURT:  Sure.

3          (WHEREUPON, at this point in the proceedings, a

4     conference was held at the bench.)

5          MR. STRONGMAN:  This is a document that's not on his

6     reliance list or referenced in his report anywhere, and I

7     haven't seen any verification of that.

8          MR. MICELI:  He reviewed Pierre Mancini's deposition.

9     This is an exhibit to Pierre Mancini's deposition.  I can ask

10    him if he reviewed the deposition with the exhibit.  He's going

11    to say yes.

12         THE COURT:  What is this?

13         MR. MICELI:  Your Honor, if you look, this is a 2002

14    document.

15         THE COURT:  Was this reviewed in his deposition?

16         MR. MICELI:  It is not reviewed in his deposition, but

17    he reviewed it in preparation for giving his report.  The fact

18    that they didn't ask the questions in the deposition is not

19    really the key.  It's whether or not he relied upon it.

20              He did review -- Pierre Mancini is the head of

21    biostatistics for Sanofi.  He is the Dr. Madigan of Sanofi.  He

22    helped me prepare and he helped review what Mr. Mancini --

23         THE COURT:  Does his material say that he reviewed

24    Dr. Mancini --

25         MR. MICELI:  Mancini's is on his reliance list.

*OFFICIAL TRANSCRIPT*

1    MR. STRONGMAN:  I trust your judgment with that.  But

2  it's like an exhibit to a deposition.  He specifically lists

3  the documents he relies on.  My position is just, when getting

4  down to having to pull it from an exhibit to a deposition, this

5  really isn't something that he relied on.  This is something

6  they've decided is important today.  That's my objection.

7    MR. MICELI:  No, it's not important today.  It's been

8  used in multiple depositions.

9    THE COURT:  Overruled.

10    MR. MICELI:  Thank you.

11    THE COURT REPORTER:  The objection time goes to?

12    THE COURT:  Objection goes to nobody.

13    (WHEREUPON, at this point in the proceedings, the bench

14  conference concluded.)

15  EXAMINATION BY MR. MICELI:

16  Q.   Dr. Madigan, is this the statistical analysis plan that

17  you reviewed?

18  A.   Yes.

19  Q.   I want to direct your attention to Section 11.7.

20    You know what?  Before we do that, let's stay with

21  the front page just for one moment.  I'm going to --

22    MR. MICELI:  May I publish to the jury, Your Honor?

23    THE COURT:  It's admitted into evidence.  Yes.

24  EXAMINATION BY MR. MICELI:

25  Q.   This is the statistical analysis plan that you reviewed?

*OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    It's dated at the bottom, correct?

3    A.    Yes.

4    Q.    28 February, 2002?

5    A.    Yes.

6    Q.    Have you reviewed statistical analysis plans before?

7    A.    Yes, hundreds of them.

8    Q.    When you see a date like that, what do you take that to

9    mean?

10   A.    That's the date on which it was finalized.

11   Q.    Thank you.

12           Now, I'm going to direct your attention to page 30 of

13   47, Section 11.7.

14           Do you see right here, Dr. Madigan?

15   A.    Yes.

16   Q.    "Reversibility of the following events will be analyzed."

17   Alopecia is the first adverse event listed in Sanofi-Aventis'

18   statistical analysis plan, correct?

19   A.    Yes.

20   Q.    Did you take that into consideration while reviewing their

21   clinical trial data?

22   A.    Yes.

23   Q.    This formed a portion of the basis of your opinions?

24   A.    Yes.

25   Q.    Thank you.

*OFFICIAL TRANSCRIPT*

1      I may have said this.  I just want to make sure whose
2  statistical analysis plan we're talking about.
3      Down at the bottom, right underneath the plaintiff's
4  exhibit sticker, is the name Sanofi, correct?
5  A.   At the top, as well.
6  Q.   I don't think there is any argument about that.  I just
7  wanted to make it clear.
8      Can you describe the data that you reviewed in
9  preparation for forming your opinions and reaching your
10  conclusions in this case?
11  A.   Sure.  So I asked for and received the locked data for the
12  two studies.  So I mentioned that term earlier.  Maybe I should
13  just explain it a little bit.
14      So as a trial takes place, over many years in some
15  cases, like here, the data are flowing into the company,
16  typically on these case report forms, and they are keyed in.
17  Then there is a process of validation and verification and
18  checking that goes on extensively.
19      But there comes a moment in time after -- they call
20  it *last patient out*, right, after the last patient is finished
21  in the study, and sometime after that, there comes a moment in
22  time where you sort of have to say:  Okay, we're done.  This is
23  it.  Right?  The study is done.  These are the data.  Okay.
24      It's sacrosanct.  This is not just -- I'm not just
25  talking about Sanofi.  This the industrywide.  This is

**OFFICIAL TRANSCRIPT**

1   worldwide.  It's common sense.  Right?  You have to say:  Okay,

2   we're done, at a certain moment in time.  And then we can reach

3   certain conclusions and move forward.  You can't go back at

4   that point and open it up again and change your mind.

5           So I asked for and received the locked data for both

6   TAX316 and TAX301.

7   Q.   When you say you reviewed the data, is that like pages and

8   pages of documents, or is it electronic?

9   A.   It's all electronic.

10  Q.   Okay.  So because of the terminology that the jury may

11  hear throughout this trial, that locked data that you referred

12  to, was that the final clinical trial data?

13  A.   Yes.

14  Q.   Okay.  Just so when we hear those terms -- I may say it

15  differently when I speak to you, but the locked data you're

16  referring to is the final clinical study trial data?

17  A.   Yes.

18  Q.   Thank you.

19          What importance do you place on having that locked

20  data, that final clinical trial study data?

21  A.   It is the definitive representation of what happened.  So

22  if you want to know, you know, what do these two studies tell

23  you about an issue, like irreversible hair loss, this is -- you

24  know, the locked data, frozen file some people call it, is the

25  definitive representation of what happened in that trial.

**OFFICIAL TRANSCRIPT**

1    Q.    In addition to the final clinical trial study data, did
2    you also review the clinical study reports?
3    A.    Sure.  So I reviewed -- actually, you know, it might be
4    worth kind of going over this.  So, typically, there are many
5    documents associated with a clinical trial, but there are three
6    key documents, from my perspective, a statistician's
7    perspective.
8             So there's the protocol, which describes what's going
9    to happen in the study in great detail.  There is the
10   statistical analysis plan, which we just looked at, which
11   describes, you know, what statistical analysis is going to be
12   conducted.  Then, after the study is done, and after the data
13   have been locked down, there is a document published, produced
14   called the clinical study report, the CSR, that contains the
15   record of -- it contains the analysis that were set out in the
16   statistical analysis plan, and it's a document that summarizes,
17   here is what happened in this study.  These are voluminous
18   reports.
19   Q.    I want to back up just a little bit because you said, this
20   is the definitive representation of what the data is, but we
21   didn't say who is representing that this is the definitive
22   data.  Who is representing that?
23   A.    The company.
24   Q.    Sanofi here?
25   A.    Sanofi in this case.

*OFFICIAL TRANSCRIPT*

1    Q.    Thank you.

2          Do you know how much time Sanofi spent validating the

3    final clinical study trial data, that locked data?

4    A.    I don't know exactly, but, I mean, they would have been

5    doing it throughout the conduct of the trials, but many months.

6    I don't know exactly how many, but several months elapsed

7    between the last patient out and the time they locked the

8    database.  This is not an overnight process.

9    Q.    Okay.  You were in the courtroom yesterday when

10   Dr. Kessler was being questioned?

11   A.    Yes, I was.

12   Q.    You heard him being questioned by defense counsel going

13   through what they represented to be some of Sanofi's

14   clinical study trial data?

15   A.    Yes.

16   Q.    I want to be verify clear.  The final clinical study trial

17   data that you looked at, was it consistent with what was being

18   asked of Dr. Kessler yesterday?

19   A.    No.

20   Q.    Have you seen any report from Sanofi or submission by the

21   company or a statement in any other source outside of this

22   litigation where Sanofi has represented the numbers that were

23   being questioned to Dr. Kessler yesterday?

24   A.    No.

25   Q.    Before we get to the analysis of the data, are you

*OFFICIAL TRANSCRIPT*

1    familiar with how Sanofi recorded data?

2    A.    Sure.

3    Q.    Is that represented in their final clinical study trial

4    data, that locked set that you were talking about?

5    A.    Yes.

6    Q.    How many patients did Sanofi record in the final

7    clinical study data, the locked data, with ongoing persistent

8    or permanent alopecia as of the end of the ten-year followup in

9    TAX316?

10   A.    So in 316, on the T arm, the Taxotere arm, there are

11   29 patients in there who had -- they refer to it in their

12   documents as *ongoing alopecia*.  So that was -- yeah, at the end

13   of the study.

14   Q.    Were you able to reproduce those numbers when you ran

15   analyses based upon how Sanofi did them as well?

16   A.    Yes, I can absolutely reproduce the numbers in their

17   clinical study report.

18   Q.    Were you able to verify the length of followup for these

19   patients with ongoing persist permanent hair loss?

20   A.    Yes.

21   Q.    How many of those patients were represented in the final

22   clinical study data as having followup less than six months?

23   A.    So of the 29 patients with ongoing hair loss at the end of

24   the study, of the 29 one of those patients had a followup of

25   less than six months.  It was 117 days for one patient.

**OFFICIAL TRANSCRIPT**

1    Q.    Now, is that the 29 that are represented in that -- I want

2    to make sure I get the term right -- the definitive

3    representations of Sanofi?

4    A.    Yes.

5    Q.    Thank you.

6          Dr. Madigan, now that we have Sanofi's final verified

7    clinical study trial data, and you understand how they were

8    recording it, are there statistical tools that provide you an

9    opportunity to get some level of certainty in what you're

10   looking at is actually a real effect?

11   A.    Yes.  So there's -- in this particular context, because

12   there is more than one trial -- which is typical -- the

13   particular type of statistical analysis that is appropriate is

14   something called a *meta-analysis*.

15         So I conducted a meta-analysis of the trials to

16   estimate the treatment effect, the effect of Taxotere.

17   Q.    Once you do that, is there a way that you can look to

18   see -- you talked about play of chance and such earlier.  Is

19   there a way you can rule out play of chance?

20   A.    Yes.  So --

21   Q.    How -- I'm sorry.  Please explain that.

22   A.    So the meta-analysis that I conducted the analysis of, the

23   clinical trials, shows an effect size -- something called a

24   relative risk of 1.85.  So it's close to a doubling of the risk

25   of irreversible hair loss on Taxotere, as compared with the

**OFFICIAL TRANSCRIPT**

1    other arm of the study.

2             This finding was statistically significant.  So it

3    is -- by conventional standards, you cannot attribute this to

4    the play of chance.  The difference between the two arms is

5    large enough that that can't be chance alone.  There is a real

6    causal effect here.

7    Q.   That's in the TAX316 data?

8    A.   No, that's the meta-analysis.

9    Q.   Oh, that's the meta-analysis.  I'm sorry.  You're going to

10   learn just how bad my handwriting is.

11            Now, the meta-analysis was of TAX316 and TAX301?

12   A.   Yes, the totality of the evidence -- of the studies.

13   Q.   So TAX316, you said they had -- in the TAC arm, they had

14   29?

15   A.   Correct.

16   Q.   Am I able to get all that on there?

17            And in the FAC arm, you had 16?

18   A.   That's correct.

19   Q.   This is based on what you referred to as the definitive --

20   make sure I get this right -- definitive representation of

21   Sanofi, correct?

22   A.   Yes.

23   Q.   Now, the TAX301, did you determine what the definitive

24   representation of Sanofi was there in the final clinical study

25   data that was locked?

**OFFICIAL TRANSCRIPT**

1    A.   So the numbers -- the equivalent numbers for TAX301 -- the

2    followup was more limited in 301, so the equivalent numbers are

3    3 on TAC and 1 on FAC.

4    Q.   You said they were a little bit more limited.  And I'm

5    just going to put "DR," definitive rep of Sanofi.

6             Now, you said something about more limited followup.

7    Let me ask you:  Did you determine how many clinical study

8    centers there were that conducted TAX301?

9    A.   Sure.  So both of these are, I suppose, called multicenter

10   studies.  When you're trying to recruit a thousand-plus

11   patients, you generally have to recruit patients from all over

12   the world, from different centers.  So there were actually 55

13   different -- for 301, there were 55 different sites or centers

14   from around the world where they recruited and randomized

15   patients.

16   Q.   Did you investigate how many of those centers followed

17   patients and reported adverse events, including permanent

18   alopecia?

19   A.   Of the 55 centers, only 12 of them report anything about

20   hair loss in followup.

21   Q.   So only 12 of 55 are reported, right?

22   A.   That's correct.

23        MR. MICELI:  Sorry, Judge.

24   EXAMINATION BY MR. MICELI:

25   Q.   Is it with these numbers, these definitive represented

*OFFICIAL TRANSCRIPT*

1   numbers, that you conducted your meta-analysis?

2   A.   Yes.  There are other numbers involved as well, but these

3   are the primary inputs to the meta-analysis.

4   Q.   Of the individuals that reported persisting permanent

5   ongoing hair loss, these were the numbers of those patients?

6   A.   Yes.

7   Q.   Now, before we sort of move on to talk more about these,

8   is meta-analysis a recognized statistical tool in your

9   industry?

10  A.   Absolutely.

11  Q.   Is it something you teach at the college level?

12  A.   It's something I teach.  It's something I published about.

13  It's something I do in my consulting for pharmacology

14  companies.  Meta-analysis of sets of randomized trials, that's

15  as good as it gets in terms of the quality of evidence.

16  Q.   Now, we're looking at two studies put together in a

17  meta-analysis.  Is it appropriate in this particular

18  circumstance to combine these two studies into a meta-analysis?

19  A.   Absolutely.  They are about as similar a pair of studies

20  as you're likely to encounter.

21  Q.   Please tell the jury the results of your meta-analysis.

22  A.   As I said already, there was a statistically significant

23  elevated risk of irreversible hair loss on Taxotere; and from

24  this, I infer that Taxotere causes irreversible hair loss.

25  Q.   Okay.  Dr. Madigan, when you say you infer that Taxotere

*OFFICIAL TRANSCRIPT*

1    causes permanent hair loss, because what we're going to hear in

2    this courtroom, have you reached an opinion to a reasonable

3    degree of scientific certainty that Taxotere causes permanent

4    hair loss?

5    A.    Absolutely, yes.

6    Q.    I'm going to move up the road a little bit from the

7    meta-analysis.  I want to go to your next item, which is the

8    FAERS analysis.  You mentioned earlier you conducted an

9    analysis of the FAERS database.  Can you tell the jury what

10   that is?

11   A.    Maybe as a kind of preamble, the analysis of the

12   randomized controlled trials is the centerpiece of what I did,

13   but it's good statistical practice to look at other sources of

14   evidence.  What we're about to talk about, FAERS, is one of

15   those.  But it's supportive.  It's not in and of itself

16   definitive, unlike the clinical trials.  It's qualitatively

17   different from the clinical trials.  It's limited in various

18   ways, which I'm happy to talk about, but that side you asked --

19   what is it, I suppose, is what you asked.

20   Q.    Let's try to slow down.  I want to make sure, because I'm

21   with you, I talk fast, Dr. Madigan.  But can you explain to us

22   what the -- first just explain to us what the FAERS database

23   is.

24   A.    Sure.  It's a voluntary adverse event reporting system.

25   So if you take a medication and you believe it has caused a

*OFFICIAL TRANSCRIPT*

1    side effect, you can submit that information on a form to this

2    database.  It's maintained by the government, by the FDA.  But

3    it's publicly available.

4         If you go to your doctor or nurse or whatever, then

5    that person might submit a report and, in particular, if you

6    call or your doctor calls the pharmaceutical companies, they

7    have a duty to report to this database.

8         So reports flow into FAERS, the FDA Adverse Event

9    Reporting System.  Reports flow in over time.  As of the end of

10   June, there is about 13 million reports in this database, so

11   it's a very important data source for public health and for

12   understanding drug safety.

13        And statistical techniques for analyzing these data

14   have been developed by people like me and others over a number

15   of years that are now widely used, you know, by -- every

16   pharmacology company, essentially, is analyzing -- uses these

17   statistical methods to analyze these data.

18        There's kind of two major use cases that you might

19   distinguish.  One is pharmaceutical companies use these

20   databases prospectively to identify potential signals, meaning

21   they will look at a broad range of drugs and adverse events to

22   see:  Is anything popping up?  Is there anything we should be

23   worrying about?  That's one use of these data.  That's

24   perfectly legitimate.

25        A different use that is more akin to what I'm doing

*OFFICIAL TRANSCRIPT*

1    here is retrospectively.  If an issue arises from one source or

2    another that you're concerned about, it's routine practice to

3    look -- to analyze the FAERS database to see:  What does that

4    database have to say about this issue?

5              That's more akin to -- that's the nature of what I'm

6    doing here.  That's a specific concern.

7    Q.   Is the use of the FAERS database for the purposes you just

8    mentioned, is that limited to the United States?

9    A.   No.

10   Q.   People from all over the world can use it?

11   A.   Absolutely.  The data are on the FDA website.  You can

12   download them.

13   Q.   How do you perform your safety investigation in the FAERS

14   database?  How do you actually go about doing it?

15   A.   So, to conduct a kind of analysis I'm doing here, which is

16   very routine, you need to define an outcome.  What is the issue

17   that you're concerned about.  You need to define -- it's called

18   a *target outcome*.  You need to define a target drug, the drug

19   that you're studying.

20             And then typically, and certainly in my practice and

21   the one that I published about, you typically also look at some

22   comparator drugs.  You also look at the relationship between

23   related drugs and the outcome, for various reasons.

24   Q.   And what -- do you just select any term you want to look

25   at through the FAERS database?

**OFFICIAL TRANSCRIPT**

1    A.    For the outcome?

2    Q.    Yes.

3    A.    So, maybe I should explain a bit.  So the reports -- when

4    they flow into the database, the reports, you know, have

5    descriptions in natural language of what happens -- what

6    happened to the patient.  So the FDA and pharmaceutical

7    companies actually more typically, they code the narrative.

8          There is a dictionary called MedDRA, which is a list

9    of tens of thousands of terms.  There is a term for fever.

10   There is a term for alopecia.  There is a term for heart

11   attack.

12         What the pharmaceutical companies do is they assign

13   to the description in text, they will assign codes.  So if

14   somebody said, you know, I had a temperature of 104, the code

15   *fever* might get attached -- would -- presumably would get

16   attached to that report.

17         So the version of the data that are publicly

18   available and have these codes, so they don't actually have the

19   narratives.  The FDA does not release the narratives for

20   privacy reasons, at least not en masse.

21         The kind of analysis I did and the kind of analysis

22   that is done every day of the week across essentially every

23   pharmaceutical company is a statistical analysis of these codes

24   and how they relate to the drugs.  Maybe I went off.

25   Q.    I think that's what I wanted to learn.

                         *OFFICIAL TRANSCRIPT*

1          Is every term that you want to search for in that

2     dictionary that you were discussing?

3     A.    No.  So, there are many reasons why it's not as simple as

4     find the term in the dictionary and just analyze that.

5     Sometimes -- actually, I published a study recently where I had

6     to use a whole collection of terms to capture the clinical

7     concept that I was studying.  I didn't choose them; a physician

8     chose them.

9          And other times, you have to combine terms -- like,

10    for example, supposing you're concerned about cardiovascular

11    mortality.  Well, there is no MedDRA term for that, but there

12    is a box on the form -- MedWatch is the name of the form.

13    There is a box on the MedWatch form for *death.*  So an analysis

14    I've done, this kind of analysis you might do, is to look for

15    cardiovascular events and the box checked for *death.*

16          So in this particular case, which I think to head off

17    your next question, there is no code, there no MedDRA-preferred

18    term for irreversible alopecia or hair loss.  There is a term

19    for alopecia, that is a preferred -- it's a preferred term, and

20    there is actually -- let me use that.  We can get into that.

21          There is a term for *alopecia*, so I used that.  And

22    then there is a term -- there is a box on the form for

23    *permanent or disabled*.  It's for the outcome.  If the outcome

24    is permanent or disabled, then that's what I looked for.

25          I looked for a code for *alopecia* and the box

***OFFICIAL TRANSCRIPT***

1    *permanent or disabled* checked on the form.  And this is -- you

2    know, this is not perfect, but this is -- this is, you know, a

3    reasonable way to capture the concept of irreversible alopecia.

4    Q.    I just want to make sure we're clear for the jury.  We're

5    talking about one box that says *disability [sic] or permanent*,

6    not two boxes, choice between the two words?

7    A.    That's right.  There is five choices for -- I think it's

8    for the outcome, one of which is -- it's slightly different

9    names on different forms, but *permanent or disabled*.

10   Q.    Thank you.

11         So, you run this analysis.  Then what do you do with

12   the information?

13   A.    So I -- the statistical analysis computes -- it's

14   essentially a measure of association, how strong is the

15   association between your target drug and your target outcome.

16         There are a number of statistics in use.  I think I

17   ran basically all of the metrics that are in common use.  And

18   they all basically say the same thing, they all point in the

19   same direction, which is to say that there is a striking

20   association between Taxotere and irreversible alopecia.  And

21   that isn't present for the comparator drugs.  It's certainly

22   very spotty for the other drugs.

23   Q.    Because you mentioned the other the drugs, you didn't just

24   do it on Taxotere only?

25   A.    No.  So I also did it -- I used as the comparator drugs --

*OFFICIAL TRANSCRIPT*

1    in consultation with some of the physicians, I used A and C,

2    the two other ones that are in the clinical trial, Adriamycin

3    and cyclophosphamide, and then I also did Taxol, and I did

4    5-FU.

5    Q.   I think you've already made this point, but I want to make

6    sure I'm clear.  Are these types of investigations or tools and

7    investigating this database, is this widely accepted in the

8    pharmacovigilance industry?

9    A.   This is completely routine.

10   Q.   I'm sorry, you've answered some of my questions as parts

11   of others.  So, I'm going to try to shorten this.

12          Did you chart your findings for your FAERS analysis

13   graphically for me?

14   A.   Sure.  It's routine to plot these things -- or I guess

15   you're going to show one in a second.  It's routine to plot

16   these things over time because it's of interest.  And I've done

17   this over and over.  And it's routine.

18          It's of interest just to see how this developed, how

19   it evolved over time, and also to look at what it would have

20   shown had you looked at a particular moment in time.  It's

21   routine to plot these things with time on the horizontal axis

22   and the vertical axis is the statistic, the measure.

23          THE COURT:  Have you reviewed that with Mr. Strongman?

24          MR. STRONGMAN:  No objection.

25          MR. MICELI:  May I approach the witness?

*OFFICIAL TRANSCRIPT*

1       THE COURT:  Yes.

2   EXAMINATION BY MR. MICELI:

3   Q.   You'll see it on the screen, but I wanted you to have that

4   as well, Doctor.  Doctor, is this one of the graphically

5   depicted -- graphic depictions of one of the analyses you did?

6   A.   Yes.

7   Q.   Can you explain what we're looking at here?

8   A.   This is what I was talking about.  I don't need a pointer.

9   Q.   Excuse me, is there a way we can activate his pointer?

10       THE COURT:  You can.

11       THE WITNESS:  With this?

12       THE COURT:  Yes?  You should be able to -- try it now,

13   Doctor.

14       THE WITNESS:  So time is on the horizontal axis, so

15   here it begins in 2000, and this particular one is limited to

16   the end of 2011.  In fact, we have data beyond that, but for

17   the purposes of this litigation, I think it's restricted to

18   2011.

19            So the vertical axis is a particular statistic;

20   the SEBGM, which I'm happy to explain.  And you can think of

21   this -- when I teach this -- actually, this is exactly what I

22   was teaching, the short course, at Sanofi.  When I teach this,

23   I often tell people think of this like a Richter scale that

24   measures the strength of earthquakes.  So the bigger the

25   number, the more the concern.

                    *OFFICIAL TRANSCRIPT*

1          In this particular case -- well, 2 -- you see up

2   on a horizontal line here at the value 2.  So 2 is -- this is

3   not God-given, but 2 is widely considered to be a threshold

4   that -- above 2 is a concern.  So, you're worried about it.

5          So what I'm showing here is that for docetaxel,

6   for Taxotere, which is the red one, the colors aren't so clear,

7   but it's the one on the top, so it was above 2 in the first

8   quarter of 2000.  And then it dropped below 2, then it peaked

9   above 2, then it went below 2.  And then sometime actually in

10  Q2, the second quarter of 2008, it went above 2, and it's been

11  above 2 consistently since that time.

12         So it's a signal.  This is evidence of a concern.

13  And for the comparator drugs, they don't -- they don't rise to

14  that level of -- they never get to that level of concern.

15  Q.   You may have pointed to this, but you're referring to the

16  dotted lines.  We have the legend there for paclitaxel,

17  fluorouracil, doxorubicin and cyclophosphamide.

18         All those are well below the 2 line?

19  A.   Right.  So, this one up here is Taxotere.  And then these

20  ones down here are the other drugs, and they are coded.  So

21  this one is Taxol, it's paclitaxel.  The other ones are bunched

22  together down below.

23  Q.   Looking at the data that you did in the FAERS database,

24  what conclusions do you draw from this from a statistical point

25  of view?

*OFFICIAL TRANSCRIPT*

1    A.    In and of itself, this does not establish causation, but

2    it's supportive.  It's pointing in the same direction.  It's

3    suggesting that there is an issue here and a potential causal

4    association between Taxotere and irreversible alopecia.  So it

5    is supportive evidence for the randomized trial analysis.

6    Q.    If you're looking -- well, why do you chart it over time

7    like this?

8    A.    It's a conventional thing to do.  It's just to see how the

9    signal -- people use the term *signal* in this context -- how it

10   has evolved over time.  And as I said before, it enables you to

11   look -- see -- everything is cumulative here.  So, you know, if

12   you -- my arrow is pointed here is about -- is about 2010, so

13   that's what it look have looked like had you done the analysis

14   in 2010.  So it's a historical perspective.

15   Q.    And what conclusions do you draw with regard to Taxotere

16   versus the other drugs that are listed on this graphic

17   depiction concerning a safety signal?

18   A.    So there is a safety signal for Taxotere that is not

19   present for the other drugs.  The picture for other metrics --

20   this isn't the only metric that people use, the thing on the

21   vertical axis.  Some of the others periodically and

22   sporadically signal, but the only one that is consistently

23   signalling over time is Taxotere.

24   Q.    We're using a term *signal*, and we all take signal --

25   traffic signal, everything else, but what does a signal mean to

*OFFICIAL TRANSCRIPT*

1   a statistician who is doing a safety investigation in a

2   database like the FAERS database?

3   A.   So a safety signal -- if you were doing this

4   prospectively, a safety signal would be -- you know, raise a

5   red flag, this is something you should look at and be concerned

6   about.

7           In the context here, there is a particular issue that

8   we're studying, which is irreversible alopecia.  So here the

9   fact that it's above the signalling level is saying, this is

10  supportive of the idea that there is a causal effect here.

11  Q.   Now, you explained at the very beginning, and I should

12  have asked this then, but since I didn't, I'll ask it now, you

13  talked about sort of the imperfection in the terms and

14  dictionary that you get to use.  Did you use the same exact

15  terms in searching for safety signals with paclitaxel,

16  fluorouracil, doxorubicin and cyclophosphamide that you used in

17  doing it with Taxotere?

18  A.   Yes.  So, there are real limitations to this kind of

19  analysis.  These are voluntary reports, but the playing field

20  is entirely level.  It's actually the same computer program

21  that does the analysis for Taxotere as for the other four

22  drugs.  It's the exact same analysis using the same definition

23  of the target outcome.

24  Q.   Do you teach this process and these methods to your

25  students?

**_OFFICIAL TRANSCRIPT_**

1    A.    Yes, you betcha.

2    Q.    Do you teach them and speak of them in publishing in your

3    professional career on this?

4    A.    Absolutely.

5    Q.    If contacted by a drug company to say this is what's being

6    shown for our product, what would you tell them?

7    A.    I would tell them this -- well, in light of the

8    clinical trials, I would say to them, we've established there

9    is a causal effect here, and it is supported by this analysis.

10   Q.    And can you tell that to this jury, again, to a reasonable

11   degree of scientific certainty in your profession?

12   A.    Yes.

13   Q.    All right.  Now, we've talked -- we're going down the

14   road.  We're done with your qualifications.  We're done with

15   the randomized controlled trials.  We've talked about the FAERS

16   database.

17            And we're now at the fourth sign on this road.  And

18   that is the Sanofi database.  Did you look at the Sanofi

19   pharmacovigilance database?

20   A.    Yes, I did.  So this is kind of the counterpart to FAERS.

21   So FAERS is national, somewhat international.  Reports are

22   flowing in constantly --

23   Q.    Doctor, if I could interrupt you, and I apologize for

24   this, because when I removed my document, your highlighting

25   remained.

*OFFICIAL TRANSCRIPT*

1                   Can we delete that?  Thank you.

2                   I'm sorry.  Could you continue.  You were explaining

3     the Sanofi pharmacovigilance database.

4     A.    The Sanofi database is essentially the internal

5     counterpart.  So every pharmaceutical company maintains an

6     internal database of reports that come in to them about their

7     products.  So that's what this is.

8     Q.    How did you go about looking at Sanofi's internal

9     pharmacovigilance database?

10    A.    So here, I simply looked at a tally over time of how many

11    reports they had received cumulatively over time of

12    irreversible hair loss.

13    Q.    And did you chart those out for us, Doctor?

14    A.    Yes, I did.

15    Q.    I'm going to --

16                  MR. MICELI:  Your Honor, may I approach so that the

17    witness has copies as well?

18                  THE COURT:  Mr. Strongman.

19                  MR. STRONGMAN:  No objection.

20                  THE COURT:  Okay.

21    EXAMINATION BY MR. MICELI:

22    Q.    Dr. Madigan, because you were here yesterday, you saw that

23    these were shown during Dr. Kessler's testimony, before I put

24    them on the screen, can you tell me how you went about

25    searching that database?

                         *OFFICIAL TRANSCRIPT*

A.    Sure.  So there is a bit of a difference here between this
database and FAERS that I just described.  So the FAERS
database that is available, as I mentioned, has these MedDRA
codes that you look for or you analyze along with other
information.

          In the internal database, at least what I was
provided with, there were no codes.  So there was just a
textual description of, you know, a narrative, if you will, of
what happened to the patient.

          Perhaps I should even preface this further.  The
database that I'm looking from Sanofi is their alopecia
database.  So it was restricted to -- I think it's 2,174
reports of alopecia.

          What I wanted to identify in there was the
occurrences of irreversible alopecia.  So I couldn't do what I
did with the FDA's database because there no codes and there
isn't a box for the outcome.

          Instead, what I did was I consulted with Dr. Tosti,
who is an alopecia specialist, and I asked her to provide me
the terms, words and phrases that would be, in her estimation,
indicative of irreversible hair loss.  And there was some
to-ing and fro-ing with her, which I'd be happy to describe.
That's what I did.

          I basically ran her search on these -- in this
database.  And then what you see -- what's about to be on the

**OFFICIAL TRANSCRIPT**

1    screen -- is on the screen --

2    Q.   We'll first do the numbers.  Are these the results of your

3    search, Dr. Madigan?

4    A.   Yes, this is the cumulative number of events that sat --

5    in the past -- Dr. Tosti's search terms -- that were returned

6    by Dr. Tosti's search over a period of time.

7              As you can see, by the end of 2011, there were 168 of

8    these alopecia reports that were irreversible.  And this is the

9    number we saw yesterday.

10   Q.   Are these without duplication because you used different

11   terms?

12   A.   They are without duplication because there are individual

13   case report identifiers within the database.

14   Q.   I am going to put up this graph that the jury has seen

15   already through Dr. Kessler.  Is this the graphic depiction of

16   what is shown in your numeric chart?

17   A.   Yes.

18   Q.   What did your review of Sanofi's internal database show

19   about Taxotere causing permanent hair loss?

20   A.   So, not unlike the FAERS analysis, in and of itself, it

21   doesn't establish that the drug is causing irreversible hair

22   loss.  But it's supportive.  So you would expect there to be

23   reports piling up, so to speak, in the internal database,

24   indeed, when there is a causal association.  And that is

25   exactly what we see.

*OFFICIAL TRANSCRIPT*

1    Q.    Is this consistent with what you saw in the other two

2    strands of evidence that you looked at?

3    A.    Yes.

4    Q.    Does that give you any level of confidence that what

5    you're seeing, more likely than not, this is supportive of your

6    opinion on causation?

7    A.    It is definitely supportive of my opinion.

8    Q.    Okay.  We've looked at all three sources that you've

9    reviewed -- excuse me, have we looked at all three sources of

10   what you've reviewed?

11   A.    Yes.

12   Q.    I want to finish up with just one slide.  Does this slide

13   here accurately summarize your opinions as we've discussed them

14   today?

15   A.    Yes, it does.

16   Q.    Do you hold all of the conclusions that you've reached in

17   this case through your investigation to a reasonable degree of

18   scientific certainty within your field of biostatistics?

19   A.    Yes, I do.

20          MR. MICELI:  Nothing further, Your Honor.

21          THE COURT:  Members of the Jury, it's quarter to 12:00.

22   I believe we're going to have some testimony for some time, so

23   it would be a good idea for us to take our lunch break now.

24              So court will be at recess until quarter to 1:00,

25   for an hour.  So we'll be at recess for an hour.

**OFFICIAL TRANSCRIPT**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION     *     Docket No.: 16-MD-2740
                                  *     Section "H(5)"
                                  *     New Orleans, Louisiana
_Relates to:  Barbara Earnest_    *     September 18, 2019
_Case No.: 16-CV-17144_           *
* * * * * * * * * * * * * * * * * *


DAY 3 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - REDIRECT

6:53PM 1  **A.**   Yes.

6:53PM 2  **Q.**   And did you see any warning at all for permanent hair

6:53PM 3  loss?

6:53PM 4  **A.**   Absolutely not.  It's not in the label.

6:53PM 5  **Q.**   And would you base an opinion about increased risk on --

6:53PM 6  an increased risk of permanent hair loss on case reports?

6:53PM 7  **A.**   No.

6:53PM 8  **Q.**   And --

6:53PM 9  **A.**   Not alone, no.

6:53PM 10  **Q.**   For the other drugs you were asked about -- Taxol, 5-FU,

6:53PM 11  Prednisone, busulfan, cisplatin -- did you find anything other

6:53PM 12  than case reports?

6:53PM 13  **A.**   That's all I found.  That's the difference between those

6:53PM 14  drugs and Taxotere.

6:54PM 15  **Q.**   And would you agree that it would be improper to base an

6:54PM 16  opinion about increased risk of permanent hair loss on just

6:54PM 17  those case reports?

6:54PM 18         **MS. SASTRE:**  Leading, objection.

6:54PM 19         **THE COURT:**  Overruled.

6:54PM 20         **THE WITNESS:**  Yes, that's correct.

6:54PM 21  BY MR. NOLEN:

6:54PM 22  **Q.**   When you were reviewing Sanofi's data related to 316,

6:54PM 23  TAX 316, did you believe that you could rely on their published

6:54PM 24  study results?

6:54PM 25  **A.**   Yes, I did.

08:48:06

                        UNITED STATES DISTRICT COURT

                        EASTERN DISTRICT OF LOUISIANA




IN RE:   TAXOTERE (DOCETAXEL)
         PRODUCTS LIABILITY              Docket No.: 16-MD-2740
         LITIGATION                      Section "H(5)"
                                         September 19, 2019
                                         New Orleans, Louisiana

*Relates To*:  *Barbara Earnest*,
*Case No.: 16-CV-17144*


     * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


                         DAY 4, MORNING SESSION
                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS
             HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                      UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiffs:          Barrios, Kingsdorf & Casteix, LLP
                             BY:  DAWN BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh, Benjamin, David,
                               Meunier & Warshauer, LLC
                             BY:  PALMER LAMBERT, ESQ.
                             2800 Energy Centre
                             1100 Poydras Street
                             New Orleans, Louisiana 70163-2800




                        ***OFFICIAL TRANSCRIPT***

09:33:12  1          THE COURT:  Wait.  Excuse me.  Hair regrowth, diagnosis

09:33:19  2     of chemotherapy-induced alopecia --

09:33:20  3          MR. SCHANKER:  Permanent chemotherapy-induced alopecia,

09:33:27  4     including the diagnosis of permanent chemotherapy-induced

09:33:39  5     alopecia caused by Taxotere.

09:33:42  6          MS. SASTRE:  Your Honor, I believe the expert is just

09:33:45  7     supposed to be tendered in the field in which they are going to

09:33:48  8     offer testimony.  So we do not object that Dr. --

09:33:49  9          THE COURT:  I mean, I think it's the final area that's

09:33:54 10     problematic.

09:34:04 11          MS. SASTRE:  I'm looking at it, Your Honor.

09:34:06 12          THE COURT:  I think that's her opinion, is the last

09:34:09 13     one.

09:34:09 14               Okay.  The Court is going to accept Dr. Tosti as

09:34:11 15     an expert in the field of dermatology, hair, hair disorders,

09:34:16 16     lack of hair regrowth, and a diagnosis of permanent

09:34:19 17     chemotherapy-induced alopecia, qualified to render opinions.

09:34:23 18          MR. SCHANKER:  Thank you, Your Honor.

09:34:24 19          THE COURT:  Thank you.  Please proceed.

09:34:26 20                         DIRECT EXAMINATION

09:34:28 21     BY MR. SCHANKER:

09:34:28 22     Q.   Dr. Tosti, we'll get into detail on how you reached your

09:34:32 23     conclusions, but I ask, did you reach a conclusion in this

09:34:35 24     case, first of all, yes or no?

09:34:37 25     A.   Yes, I did.

                          ***OFFICIAL TRANSCRIPT***

09:34:37 1    Q.    Would you share with the jury what conclusion you reached
09:34:42 2    in regards to our client, Barbara Earnest.
09:34:45 3    A.    My conclusion about Barbara is that she is affected by
09:34:51 4    permanent alopecia due to chemotherapy from Taxotere.
09:34:55 5    Q.    Doctor, are you prepared to give the jury some basics on
09:35:06 6    hair facts?
09:35:07 7    A.    Sure.
09:35:07 8    Q.    Doctor, what is it that we're looking at here on this
09:35:19 9    diagram?  If you could just familiarize and orient the jury.
09:35:23 10        THE COURT:  Dr. Tosti, if it helps, you have a pen.
09:35:28 11        THE WITNESS:  I saw that yesterday.  I will use when I
09:35:31 12   need, because I am afraid to make mistakes.
09:35:34 13             So what you see here is the hair follicle.  The
09:35:39 14   hair follicle that you see is something that is into the skin
09:35:42 15   and produce the hair.
09:35:44 16             So the hair is, in reality, a dead structure.  So
09:35:49 17   the hair is dead.  The cell into the hair shaft don't reply.
09:35:58 18   It's the hair follicle that has cells that reply and produce
09:36:00 19   the hair.
09:36:01 20   EXAMINATION BY MR. SCHANKER:
09:36:01 21   Q.    Ask you what might seem like a basic question, but where
09:36:05 22   is the hair on the human body?
09:36:07 23   A.    It's everywhere except for our palms and soles.
09:36:10 24   Q.    Explain what you mean, it's everywhere.
09:36:15 25   A.    All our skin except for palms and soles.

*OFFICIAL TRANSCRIPT*

09:51:01  1   Q.   So after you use that -- do the dermoscopy, what's next as

09:51:07  2   far as your clinical evaluation?

09:51:08  3   A.   You know, you may need to take a biopsy.  You may need to

09:51:15  4   take a piece of skin and look under the microscope.  And you

09:51:20  5   may need the laboratory tests, depending on the diagnosis.  So,

09:51:24  6   when you have an idea what you think the patient may have, you

09:51:29  7   go ahead.

09:51:30  8   Q.   And let's go back through those.  You indicated that you

09:51:33  9   might need to take a biopsy.  Is that always the case?

09:51:40 10   A.   You know, very often the patient has seen somebody else

09:51:47 11   before you, because patients often go to many doctors, and they

09:51:51 12   may already have a biopsy.  And you don't always need to have a

09:51:55 13   biopsy.  It depends on the situation.

09:51:57 14   Q.   And then you talked about the laboratory results.  The lab

09:52:01 15   results.  Is that just a blood test?

09:52:03 16   A.   Yes, blood test.  If somebody is shedding hair, I will do

09:52:08 17   a blood test and check if he has any disease that can cause

09:52:12 18   that.  If I see a woman with hair on her face, I will check

09:52:19 19   labs to be sure she doesn't have some problem with hormones.

09:52:24 20   Q.   Doctor, in this case, did you perform a clinical

09:52:32 21   evaluation of Barbara Earnest?

09:52:34 22   A.   Yes.  Absolutely, yes.  She came to Miami, and I saw her.

09:52:39 23   Q.   So we understand that the first step on the clinical

09:52:50 24   evaluation is history.  You indicated that you saw

09:52:55 25   Barbara Earnest.  Specifically with regard to Barbara Earnest,

*OFFICIAL TRANSCRIPT*

09:53:04  1   you took a history; is that correct?

09:53:06  2   A.   Yes.  I had her medical records in advance because this

09:53:11  3   was a kind of a very long history, but I -- then I spoke with

09:53:17  4   her, and we -- she explained me what happened, and I did a

09:53:25  5   clinical exam.  I did the pull test.  I did the dermoscopy.

09:53:29  6   She already had the pathology results with her.

09:53:34  7   Q.   So what I would like to do is go ahead and go through each

09:53:37  8   of those steps specifically that you did with Barbara.  Is that

09:53:43  9   fair?

09:53:43 10   A.   Yes.

09:53:43 11   Q.   Could you take us through your history, what you gathered

09:53:48 12   in regard to Barbara's case?

09:53:50 13   A.   The most important aspect of her history is that she

09:53:53 14   didn't regrow hair after chemotherapy.  So she had

09:54:00 15   breast cancer.  She had chemotherapy.  At the end of

09:54:05 16   chemotherapy, the hair didn't grow back.  Okay.  Usually when

09:54:09 17   you have chemotherapy, we know you lose hair, but then the hair

09:54:14 18   grow back.  In this situation, didn't.

09:54:16 19   Q.   Now, Doctor, during this history, were you made aware of

09:54:20 20   the drugs that Barbara Earnest took, the chemotherapy drugs, as

09:54:26 21   well as the order that she took those drugs in?

09:54:28 22   A.   Yes, of course I did.  So she first had the two

09:54:33 23   chemotherapy therapy together, that is called *AC*, and she had

09:54:37 24   that chemotherapy.  During that chemotherapy, had she had

09:54:42 25   hair loss and lost all her hair.

*OFFICIAL TRANSCRIPT*

09:54:44  1          After that, she had docetaxel, Taxotere.  When she

09:54:52  2  had Taxotere, she had no hair at that moment.  After Taxotere,

09:54:56  3  the hair didn't grow back.

09:55:01  4  Q.    You indicated that you performed a physical exam of

09:55:06  5  Barbara; is that correct?

09:55:06  6  A.    Yes.

09:55:07  7  Q.    Did you take photographs of Barbara's scalp?

09:55:10  8  A.    Yes, I did, because with this instrument, you need to take

09:55:12  9  also photographs to take the dermoscopy.  So I did.

09:55:17 10  Q.    So you took the dermoscopy photos, correct?

09:55:21 11  A.    I took both.

09:55:22 12  Q.    Both.  And by *both*, you mean you took just regular

09:55:27 13  photographs as well?

09:55:28 14  A.    This instrument that does the dermoscopy, you need first

09:55:33 15  to take a regular photo and then to do the dermoscopy.

09:55:36 16  Q.    And with Barbara's permission, as part of you explaining

09:55:44 17  her condition, I'm going to show us all photographs of

09:55:49 18  Barbara's scalp.  Would that assist you in explaining to the

09:55:53 19  jury what you did?

09:55:54 20  A.    Yes.  If she's okay with that.

09:56:06 21          So, what you can see here is that she has a very

09:56:12 22  severe and diffuse alopecia that involves all the top and the

09:56:17 23  back of her scalp and the side.  She has just a very minimal

09:56:24 24  hair that's on the occipital and the parietal scalp.

09:56:31 25  Q.    Can you slow down right there.  You just used a couple of

*OFFICIAL TRANSCRIPT*

09:56:36  1    scientific words that we may not understand.  So if you could

09:56:39  2    go over those again, please.

09:56:40  3    A.   So, she has some remaining hair in the back here and on

09:56:44  4    the lateral side here.  But the top is almost -- very thin,

09:56:53  5    fuzzy hair.  And her longest hair was 10 centimeter, you know,

09:57:00  6    which is very, very typical, we'll discuss later, of her

09:57:06  7    problem.

09:57:06  8         And she also lost -- had very, very thin eyebrows and

09:57:15  9    eyelashes.  And I also examined other body areas.  So she had

09:57:19 10    no hair in the arms and legs and no hair in the armpits, almost

09:57:27 11    no pubic hair.  So all the hair is basically gone.

09:57:34 12    Q.   Doctor, you indicated that you performed a pull test.  You

09:57:43 13    demonstrated for the jury what that was.  As part of your

09:57:47 14    clinical exam -- or as part of your clinical evaluation,

09:57:50 15    rather, did you do that in Barbara's case?

09:57:53 16    A.   Yes, but you couldn't get even one hair.  She doesn't have

09:57:58 17    almost hair, so it's very difficult to get hair in this

09:58:01 18    situation.  But negative, it was negative.

09:58:04 19    Q.   So the pull test --

09:58:05 20    A.   Was negative.

09:58:06 21    Q.   -- just so I'm clear, was negative?

09:58:07 22    A.   Was negative.

09:58:08 23    Q.   Okay.  And then did you use the dermatoscope on Barbara's

09:58:17 24    scalp?

09:58:17 25    A.   Yes.

*OFFICIAL TRANSCRIPT*

09:58:18  1    Q.   And if you could, you know, one thing I haven't asked is,

09:58:28  2    do you recall when this -- if you don't recall the exact date,

09:58:32  3    we can work through that.

09:58:33  4    A.   No.

09:58:33  5    Q.   Do you recall when the examination was that you did?

09:58:35  6    A.   June 2018.  Exact date, I don't remember.

09:58:39  7    Q.   Let me ask you this concerning that examination because I

09:58:46  8    think it's important, I didn't ask you this before, is how you

09:58:50  9    came to be involved in this case.

09:58:52 10    A.   You know, I was contacted by -- by the lawyers.

09:58:56 11    Q.   And had you ever done any of this kind of legal work or

09:59:02 12    expert testimony work before?

09:59:04 13    A.   No, never.

09:59:04 14    Q.   Okay.  And you obviously agreed to do it in this case?

09:59:09 15    A.   Yes.

09:59:10 16    Q.   And could you tell the jury why you agreed to do it in

09:59:14 17    this case.

09:59:15 18    A.   Because I thought it was important for these women to --

09:59:22 19    to understand what's going on.

09:59:23 20    Q.   So we were talking about the dermoscopy.  Just to clarify,

09:59:34 21    is this the first time you've testified?

09:59:36 22    A.   Yes.

09:59:37 23    Q.   Are you nervous?

09:59:39 24    A.   Yes.

09:59:39 25    Q.   It doesn't seem like it.

*OFFICIAL TRANSCRIPT*

09:59:44  1          THE COURT:  Mr. Schanker, I just want to --

09:59:44  2          (WHEREUPON, at this point in the proceedings, there was

09:59:58  3   a conference held at the bench.)

09:59:58  4          THE COURT:  I don't know if you -- she said *these*

10:00:01  5   *women*, and I'm inclined to just admonish the witness that she

10:00:05  6   should not -- because I think if I say something, it makes it

10:00:10  7   worse.  But she needs to not say that.  So if you all are okay,

10:00:16  8   I will just tell her, Dr. Tosti.

10:00:18  9          MS. SASTRE:  My antenna was up when I heard the

10:00:22 10   question, the why did you get involved, and I kind of thought

10:00:25 11   it worried me, but I didn't want to object.  I was just

10:00:29 12   listening carefully, I'll put it that way.

10:00:30 13          MR. SCHANKER:  She's clearly -- because she examined

10:00:35 14   two other women, and she's been told not to talk about it.

10:00:38 15          THE COURT:  If you all don't mind, I'm going to quietly

10:00:43 16   say, Dr. Tosti, only reference Ms. Earnest.

10:00:46 17          MS. SASTRE:  Maybe if you want to let her know now,

10:00:51 18   too, -- when I ask her in the deposition, did I read that

10:00:52 19   correctly, I don't want her to say you left out the names.

10:00:54 20          THE COURT:  You all are okay with that?

10:00:57 21          MS. SASTRE:  Sure.

10:01:24 22          THE COURT:  Dr. Tosti, the jury is unaware that there

10:01:26 23   were other women involved in this litigation.  So, I'm going to

10:01:31 24   ask you if any question like that comes about --

10:01:31 25          THE WITNESS:  (Speaking simultaneously) I'll just ask.

                          *OFFICIAL TRANSCRIPT*

10:01:37 1          THE COURT:  And if during the course of your testimony

10:01:42 2    you're called to look upon your prior deposition, if they skip

10:01:47 3    over the mention of those other two women, I'm going to ask you

10:01:50 4    to ignore that.

10:01:52 5          THE WITNESS:  Okay.  Thank you very --

10:01:54 6          THE COURT:  Thank you.

10:01:54 7          (WHEREUPON, at this point in the proceedings, the bench

10:01:54 8    conference concluded.)

10:01:54 9    EXAMINATION BY MR. SCHANKER:

10:02:15 10   Q.   So you indicated that you performed the dermoscopy, and at

10:02:23 11   Step Number 4, what's the jury looking at, Doctor?

10:02:25 12   A.   They are looking at a small area of the scalp that is

10:02:32 13   magnified.  So you can see very well the hair, and you can see

10:02:35 14   what's very evident is that the density of the hair is reduced.

10:02:39 15   So normally you have much more hair and less space between the

10:02:43 16   hair.

10:02:46 17          They are all very thin.  And you see these yellow

10:02:49 18   dots.  You see those yellow dots.  Those correspond to the

10:02:53 19   upper part of the follicle that is full of sebum because in --

10:03:01 20   the follicle has these glands that produce the oil that may

10:03:06 21   have on the scalp, and usually sebum is pushed out by the hair,

10:03:11 22   but here there are no hair, and so you have those yellow dots.

10:03:15 23   Q.   So I want to ask you about a couple of those things that

10:03:20 24   you just mentioned.  You said low hair density.  Could you

10:03:26 25   please explain to the jury what you mean by *low hair density*?

**OFFICIAL TRANSCRIPT**

10:03:30  1    A.    You see here that you have a space between the hair.

10:03:34  2    Normally you should have one hair close to the other one.

10:03:41  3    Q.    You also mentioned hair thinning.  Is there a distinction

10:03:45  4    between hair density and hair thinning?

10:03:48  5    A.    You know, they may go together, but here you see that you

10:03:53  6    have less hair -- let's see if I can make it -- this area that

10:03:56  7    have no hair.  Okay?  And then you see that this hair, for

10:04:00  8    instance, is much thinner than this one.  So, you have some

10:04:04  9    hair that became very loose, that became thinner, miniaturized.

10:04:04  10            THE REPORTER:  What did you say?

10:04:04  11            THE WITNESS:  Miniaturized.

10:04:13  12   EXAMINATION BY MR. SCHANKER:

10:04:13  13   Q.    So we see some -- just so I'm clear, too, along with

10:04:19  14   Cathy, we see some hairs that are miniaturized; is that right?

10:04:24  15   A.    Yes.  Then we see all these yellow dots are openings

10:04:27  16   without the hair.  The hair is so small that you don't see it.

10:04:31  17   Q.    Doctor, working through the steps --

10:04:39  18            MS. SASTRE:  Objection.

10:04:39  19            THE COURT:  Yes.  I think we need to approach.  Was

10:04:39  20   there an objection?

10:04:39  21            MS. SASTRE:  Yes.

10:04:39  22            (WHEREUPON, at this point in the proceedings, there was

10:04:50  23   a conference held at the bench.)

10:04:50  24            MS. SASTRE:  The yellow dots was taken out of the

10:04:50  25   slide.  It was my understanding she was told not to talk about

*OFFICIAL TRANSCRIPT*

10:04:50  1     it.

10:04:50  2             THE COURT REPORTER:  I can't hear you.

10:04:56  3             MS. SASTRE:  The yellow dots issue, we argued that this

10:04:58  4     morning.  I know you said you took it out of the slides.  I

10:05:02  5     would assume she was told not to talk about it as well.  Same

10:05:06  6     objection.  It's not in her report.  That's why they took it

10:05:08  7     out of the slides.

10:05:08  8             THE COURT:  I'm going to overrule.  I think she

10:05:10  9     was just --

10:05:10 10             MS. SASTRE:  Well, I'm just afraid, Your Honor, that --

10:05:14 11     they agreed to take it out of the slides because it's not in

10:05:17 12     her report, so she just can't keep talking about something

10:05:19 13     that's not in her report, Judge.  Now, I'm not suggesting there

10:05:22 14     is anything that counsel did incorrectly.

10:05:24 15             MR. SCHANKER:  I'm not going to ask her questions about

10:05:27 16     it.  I'm not going to elicit any testimony --

10:05:30 17             THE COURT:  You've changed the slide?

10:05:33 18             MR. SCHANKER:  Yeah, I went through and redacted it.

10:05:34 19             MS. SASTRE:  Because you don't have it electronically?

10:05:38 20     You had to cross it out?

10:05:40 21             MR. SCHANKER:  I just crossed it out.  I've been told

10:05:43 22     that Harley agreed to that.

10:05:46 23             MS. SASTRE:  Okay.  There's nothing we can do.  Okay.

10:05:47 24     Thanks.

10:05:47 25             (WHEREUPON, at this point in the proceedings, the bench

*OFFICIAL TRANSCRIPT*

10:06:02 1    conference concluded.)

10:06:02 2            THE COURT:  Please proceed.

10:06:05 3            MR. SCHANKER:  Thank you, Your Honor.

10:06:05 4    EXAMINATION BY MR. SCHANKER:

10:06:07 5    Q.    So working our way through the clinical evaluation,

10:06:10 6    Dr. Tosti, after the dermoscopy and analyzing your findings,

10:06:17 7    what -- what did you do next as far as your analysis?  What are

10:06:23 8    the steps?  What came next?

10:06:25 9    A.    After that, I -- she already had biopsy results because

10:06:29 10   she had the biopsy before, so I looked at her biopsy results.

10:06:34 11   And I didn't order any lab because she was not shedding hair or

10:06:38 12   she had no features that suggested any hormonal problem.

10:06:46 13   Q.    We'll talk about those biopsy results later.  But what I

10:06:50 14   would like to move on to now -- and just to clarify, you didn't

10:06:55 15   order the lab tests?

10:06:56 16   A.    No, I did not because she didn't need.

10:06:59 17   Q.    Doctor, are you familiar with a phrase *differential*

10:07:16 18   *diagnosis*?

10:07:16 19   A.    Yes, I do.

10:07:17 20   Q.    And could you please explain to the jury what -- for a

10:07:23 21   medical doctor, what a differential diagnosis is.

10:07:25 22   A.    You know, when you see a patient, you see a condition in

10:07:29 23   your head came, all the conditions that may look similar, and

10:07:34 24   you have -- one by one, compare and decide.  This is all in

10:07:40 25   medicine for any type of problem.

                              *OFFICIAL TRANSCRIPT*

10:07:42  1   Q.   And just so I'm clear, is that -- how does a doctor use a

10:07:49  2   differential diagnosis in her practice?

10:07:53  3   A.   To -- use a differential diagnosis to rule out the other

10:07:57  4   possible diseases.  Because you have, for instance, somebody

10:08:01  5   who complains that he has pain in the chest, and you have to

10:08:06  6   rule out all possible causes of chest pain.  The same is for

10:08:11  7   hair.  I see a diffuse alopecia, I have to exclude the other

10:08:16  8   possible causes of diffuse alopecia.

10:08:18  9   Q.   And did you perform a differential diagnosis on Barbara?

10:08:24 10   A.   Yes, I did.

10:08:24 11   Q.   And just so we're clear, I understand you were educated in

10:08:29 12   Europe as a medical doctor.  Do they do differential diagnoses

10:08:35 13   in Europe?

10:08:35 14   A.   They do, but in a different way.  So, in Europe, you

10:08:39 15   usually go to the diagnoses and then exclude.  In the

10:08:45 16   United States, we go one by one.  Now I do go around in the

10:08:51 17   United States, we go one by one.

10:08:52 18   Q.   And which way did you do it in Barbara's case?

10:08:56 19   A.   I did the United States way.

10:08:57 20   Q.   And is that what you're going to share with us here?

10:09:00 21   A.   Yes.

10:09:01 22   Q.   So, based upon the condition that you found on

10:09:07 23   Barbara Earnest's scalp, what did you consider in working

10:09:13 24   through your differential diagnosis?

10:09:15 25   A.   I consider those conditions that cause diffuse hair loss.

**OFFICIAL TRANSCRIPT**

10:09:21  1   And I consider, first of all, telogen effluvium.

10:09:30  2   Q.   Let me stop you there.  I want to make sure because

10:09:31  3   there's a lot of technical terms there.  Diffuse hair loss.

10:09:33  4   What is diffuse hair loss?

10:09:35  5   A.   Diffuse hair loss.  Maybe I didn't explain why.  Meaning

10:09:40  6   diffuse alopecia, meaning when you have almost no hair left,

10:09:45  7   okay.  And there are conditions that can cause that, and I

10:09:51  8   wanted to exclude those conditions.

10:09:52  9   Q.   So you started out with diffuse and then worked through

10:09:57 10   those potential conditions; is that fair?

10:09:58 11   A.   Yes.  Of course.

10:10:00 12   Q.   What was the first of those conditions that you considered

10:10:07 13   in your differential diagnosis?

10:10:09 14   A.   You know, first of all, you have to see if the patient is

10:10:13 15   shedding or not, okay, because it's very different a patient

10:10:19 16   who lose hair on his food, on his pillow, on his books from a

10:10:24 17   patient who doesn't lose any hair.  That was the most important

10:10:28 18   thing to decide.

10:10:30 19        And so if you see that the patient does not shed and

10:10:36 20   has a negative pull test, then you can exclude telogen

10:10:40 21   effluvium, because telogen effluvium is a condition

10:10:44 22   characterized by shedding, okay.

10:10:46 23   Q.   So you just used another term I want to make sure we

10:10:50 24   understand.  You considered this condition called *telogen*

10:10:53 25   *effluvium*?

**OFFICIAL TRANSCRIPT**

10:10:53  1   A.    Yes.

10:10:54  2   Q.    And what does a patient who has that present with?

10:11:01  3   A.    You know, they come and they say they found hair

10:11:04  4   everywhere.  Okay.  They found it on the floor.  They found

10:11:10  5   hair on the pillow.  They found hair on their books.  So

10:11:17  6   they -- their main complaint is they come with those bags of

10:11:20  7   hair because they shed.

10:11:23  8   Q.    And what are the results of a pull test if a patient --

10:11:28  9   A.    Very positive.  Very positive.  Very -- in these patients,

10:11:32 10   it's very positive.  Very different from Barbara, where it was

10:11:35 11   negative.

10:11:35 12   Q.    And the dermoscopy, if a patient has telogen effluvium,

10:11:41 13   what do you see on the dermoscopy?

10:11:43 14   A.    I explain you that when the follicle -- the hair fall down

10:11:47 15   when the new hair is growing.  So when you see a patient with

10:11:50 16   telogen effluvium, you see all the new hair growing on the

10:11:53 17   scalp.

10:11:53 18   Q.    And if a patient who has these conditions you described,

10:11:59 19   has telogen effluvium, what causes telogen effluvium?

10:12:03 20   A.    Many causes.  Drugs, medications cause telogen effluvium.

10:12:07 21   Almost all medications, if you look inside, they say may cause

10:12:12 22   that.  Inflammatory disorders, severe disease, nutritional

10:12:24 23   deficiencies, all these things.  But there is a long list.

10:12:28 24   Q.    So, Doctor, did you reach a conclusion in this case as to

10:12:34 25   whether or not Barbara Earnest suffers from telogen effluvium?

*OFFICIAL TRANSCRIPT*

10:12:36  1    A.    Yes.  She did not have telogen effluvium, because history

10:12:42  2    is different and everything is different.

10:12:44  3    Q.    And you went through and gave the reasons.  Any more to

10:12:49  4    add?  What you see here summarizes that, fair?

10:12:53  5    A.    Okay, so, you want me to summarize?

10:12:56  6    Q.    No.

10:12:56  7    A.    I already told them.

10:12:57  8    Q.    Yeah, you already told them.  Thank you.  Feel free to do

10:13:02  9    that.

10:13:05  10          So, you continued on with your differential

10:13:09  11   diagnosis, correct?

10:13:10  12   A.    Okay.  Yes.

10:13:11  13   Q.    What was the next condition that you considered for

10:13:14  14   Barbara?

10:13:14  15   A.    You know, she had chemotherapy, so you have to consider

10:13:17  16   anagen effluvium, which is the hair loss caused by

10:13:23  17   chemotherapy.  So when everybody -- most patients in

10:13:28  18   chemotherapy, they lose their hair, and this happens usually

10:13:32  19   two, three weeks after starting the chemotherapy.  And patients

10:13:36  20   usually shave because they don't want to see all of this hair

10:13:40  21   all around.

10:13:41  22   Q.    They usually do what?

10:13:43  23   A.    Shave.

10:13:44  24   Q.    Shave their head?

10:13:45  25   A.    Yes, because they don't want to see hair like that coming

*OFFICIAL TRANSCRIPT*

10:13:49 1    out.  And so that's a condition that should be ruled out, but

10:13:57 2    it's very different because this is an acute condition that

10:14:02 3    happens with chemotherapy and usually resolves, let's say,

10:14:07 4    three months after chemotherapy, the hair grow back.

10:14:10 5    Q.    And in Barbara Earnest's case, do you recall what year,

10:14:15 6    what time period she received her chemotherapy during?

10:14:17 7    A.    Yes, she received her chemotherapy in 2011, and the hair

10:14:24 8    never grow back.  Grow back like that.

10:14:28 9    Q.    Grew back the little bit that we saw?

10:14:28 10   A.    Uh-huh.

10:14:31 11   Q.    So, Doctor, did Barbara suffer from anagen effluvium?

10:14:38 12   A.    No.

10:14:39 13   Q.    So, just so we're clear, this is that condition of when

10:14:42 14   people go through chemotherapy and their hair falls out?

10:14:46 15   A.    Yes, and occurs during the chemotherapy, and the hair

10:14:49 16   regrow.

10:14:49 17   Q.    What is the next condition that -- as your differential

10:15:03 18   diagnosis, what was next on your list of conditions that you

10:15:05 19   considered?

10:15:05 20   A.    I think it was androgenetic alopecia.  Androgenetic

10:15:05 21   alopecia is a common condition, so I wanted to consider in the

10:15:05 22   differential diagnosis, even though the presentation is

10:15:05 23   different.

10:15:18 24        So androgenetic alopecia is also called *female

10:15:18 25   pattern hair loss*.  It's the same, that baldness in women.  So

**OFFICIAL TRANSCRIPT**

10:15:30  1    women may become a little bit bald sometimes.  This baldness

10:15:34  2    affect typically the top of the scalp.

10:15:36  3            This is a condition that start slowly.  It's not

10:15:40  4    something that sudden.  It's -- the pull test may be positive.

10:15:48  5    Here, we see, these are the scales that are used by doctors to

10:15:56  6    establish severity of androgenetic alopecia.

10:16:04  7    Q.   Let me stop you there, Doctor.  I think we need to break

10:16:04  8    this down, if we could.

10:16:05  9            So the next condition that you considered was called

10:16:09 10    *androgenic alopecia*; is that correct?

10:16:11 11    A.   You can call *androgenic*.  Androgenetic, I like more.

10:16:15 12    Q.   You like --

10:16:17 13    A.   Androgenetic, or female pattern hair loss.

10:16:24 14    Q.   Androgenetic alopecia or female pattern hair loss.

10:16:28 15            What's the time frame for this condition,

10:16:33 16    androgenetic alopecia?  I mean, does it happen overnight?  Does

10:16:36 17    it happen over a period of time?  Please educate the jury on

10:16:41 18    that.

10:16:41 19    A.   You know, it's usually -- I always tell them, usually it's

10:16:46 20    slowly progressive.  It's something that slowly progress.

10:16:49 21    Q.   When you say *slowly progress*, in your scientific medical

10:16:53 22    experience, what is the progression of that condition, over how

10:16:57 23    long a period of time?

10:16:58 24    A.   Slowly means a few years.  Okay.  Sometimes maybe more.

10:17:02 25    Not months.  Not months.

                              *OFFICIAL TRANSCRIPT*

10:17:06  1    Q.    What does this condition cause?

10:17:09  2    A.    Hair loss on the top of the scalp.  Thinning.  Again, the

10:17:17  3    hair becomes vellus, like in men.  So there are hair, but are

10:17:23  4    thin.

10:17:24  5    Q.    What -- we have some scales here in front of us.  We have

10:17:33  6    the Ludwig and the Savin Scale for female hair loss.  Is this

10:17:42  7    for female pattern hair loss or androgenetic alopecia; is that

10:17:44  8    what we're looking at?

10:17:44  9    A.    It's for androgenetic alopecia in women, which is also

10:17:47 10    called female pattern hair loss.

10:17:51 11    Q.    So is this a female version of when we think of male

10:17:56 12    pattern hair loss?

10:17:57 13    A.    Yes, that is.

10:17:57 14    Q.    I think important for us to understand, is the pattern

10:18:00 15    different for women and men?

10:18:02 16    A.    Yes, it is.  Because in women, the condition affects only

10:18:08 17    the top of the scalp.  In men, it may affect the back of the

10:18:12 18    scalp.

10:18:14 19           Some men, just like a little rim of hair left; but,

10:18:21 20    in women, as you see the scales don't even show the back of the

10:18:24 21    scalp because the doctors who made the scale knew that the

10:18:28 22    condition doesn't affect the back of the scalp.

10:18:30 23    Q.    Just so we're clear, as we work across the top, what is

10:18:35 24    the top row?  The diagrams we're looking at, what is that

10:18:35 25    showing?

*OFFICIAL TRANSCRIPT*

10:18:40  1   A.    The one at the top is Ludwig Scale.  It's just for type,

10:18:46  2   normal, type 1, type 2 and type 3.

10:18:50  3        Then some doctors like to use a more detailed scale.

10:18:54  4   Especially if you do a clinical trial for hair regrow, you want

10:18:58  5   to have more options.  That's the Savin Scale.  But they are

10:19:04  6   basically the same, the top of the scalp.

10:19:07  7   Q.    So the top of the scalp.  You distinguish between male

10:19:13  8   pattern and female pattern.  Can you point on your head to

10:19:17  9   where that is, just so we can see?

10:19:19  10  A.    That's the top.  That's the back.

10:19:21  11  Q.    So in your clinical experience, as well as your work as a

10:19:28  12  researcher, do you see women who suffer from female pattern

10:19:33  13  hair loss who have lost hair on the back of her scalp?

10:19:37  14  A.    Back of their scalp down there, no.  I've never seen

10:19:42  15  anything like that.

10:19:42  16  Q.    What about eyebrows and eyelashes, with this androgenetic

10:19:53  17  alopecia do you see loss of eyebrows, eyelashes, underarm hair,

10:19:59  18  other hair on the body?

10:20:00  19  A.    No.  No.  Eyebrow and eyelashes, absolutely not.  Other

10:20:06  20  hair on the body, they may be -- may grow more, so you see the

10:20:10  21  opposite.  Because androgenetic alopecia, the name androgenetic

10:20:18  22  is because androgen hormones genetic predisposition.

10:20:26  23        So androgen hormone cause the hair on the scalp to

10:20:26  24  become thinner, but the hair on the body to become thicker.  So

10:20:30  25  that's what I was saying.  If I see a woman that has hair on

*OFFICIAL TRANSCRIPT*

10:20:34  1    the body, I'm concerned she may have excessive hormones.

10:20:38  2    Q.    You did a physical exam of Barbara Earnest; is that

10:20:44  3    correct?

10:20:44  4    A.    Yes.  I explained before, she had no hair on her arm and

10:20:51  5    legs, and no axillary, and almost no pubic hair.

10:20:57  6    Q.    So you did not see any excessive body hair?

10:20:59  7    A.    No, the opposite.

10:21:00  8    Q.    Doctor, did Barbara's lack of hair regrowth match the

10:21:18  9    presentation of androgenetic alopecia?

10:21:19 10    A.    No, that's not my opinion, absolutely not.  And, also, her

10:21:24 11    family history from the women side, which is the most

10:21:28 12    important, was negative.

10:21:28 13    Q.    Okay.  Let's talk about Barbara first.  You've seen this

10:21:35 14    photograph before, correct?

10:21:36 15    A.    Yes, this is her photograph, I know, from a trip to

10:21:39 16    Grand Canyon.  That was taken, I think, less than one year

10:21:46 17    before chemotherapy.  I think she has absolutely a normal

10:21:56 18    quantity of hair, hair density.

10:22:02 19    Q.    So do you see any signs, whether it be the photograph or

10:22:11 20    the history that you got from Barbara Earnest, that she

10:22:14 21    suffered from any sort of androgenetic alopecia?

10:22:18 22    A.    No.

10:22:18 23    Q.    You also mentioned female family members, blood relatives.

10:22:30 24    Why is it important when you're making this diagnosis for you

10:22:34 25    to consider female family members?

*OFFICIAL TRANSCRIPT*

10:22:37  1   A.   You know, because it's called *androgenetic* because you may

10:22:42  2   have a genetic disposition.  In women, I look for female

10:22:49  3   members in the family to see if they have any sign of the

10:22:52  4   disease.  In this case, she said no.

10:22:55  5        These are pictures of her sisters.  These are taken

10:23:01  6   at the 80 birthday of her sister, the one on the right is 80.

10:23:07  7   The other one, I don't know the age, but they have completely

10:23:11  8   normal hair.

10:23:12  9   Q.   Now, we talked about the female members of the family.

10:23:19 10   These are blood relatives, you were told, correct?

10:23:22 11   A.   Yes.

10:23:23 12   Q.   Yes.

10:23:26 13   A.   I also ask about her mother.

10:23:29 14   Q.   Yes.  That's what I was going to say.  What did you learn

10:23:32 15   concerning Barbara's mother, who is deceased?

10:23:36 16   A.   Also, no problem -- hair problem.

10:23:38 17   Q.   What about this idea of age and hair counts?

10:23:48 18   A.   You know, of course, when we age, everything gets worse.

10:23:54 19   The hair as well.  Okay.

10:23:56 20        So, there is a little bit of thinning of the hair

10:24:02 21   with aging.  But if you look at the numbers -- and this is a

10:24:06 22   very good paper of David Whiting, who is the most important

10:24:13 23   pathologist on hair -- and you look at the different condition.

10:24:18 24   Here is female pattern hair loss, and here is men.  We don't

10:24:23 25   want to look at me.  This is diffuse hair loss.

*OFFICIAL TRANSCRIPT*

10:24:24  1        What you see here, from 70 to 79, to 99, you see the

10:24:32  2    numbers.  There is a decrease from 20, but they're still high.

10:24:42  3    You know, Barbara count is 15.  Here, it's 28.  So it's nothing

10:24:48  4    that may cause severe alopecia.

10:24:51  5        You know, most old people have normal amount of hair.

10:24:55  6    Okay.  They are white, of course, but thinning is not part of

10:25:00  7    aging.

10:25:01  8    Q.    Now, just because it comes to mind, we talked -- when you

10:25:09  9    consider the female members, blood relatives of a patient, do

10:25:16 10    you take into consideration the male relatives?

10:25:18 11    A.    The male relatives are not as important, but I know that

10:25:22 12    in the male side of the family, her brother and her son had

10:25:29 13    problems; but, you know, the sister, no.

10:25:31 14    Q.    So you took that into consideration too?

10:25:37 15    A.    I don't think that's important.  The female part of the

10:25:41 16    family has normal hair, and the patient itself had normal hair.

10:25:45 17    Q.    So, Doctor, if you could, walk us through

10:26:00 18    Barbara Earnest's presentation with her hair pattern compared

10:26:04 19    to what you see as a scientist and medical professional with

10:26:10 20    women with female pattern hair loss, if you would.

10:26:16 21    A.    You know, I think that everybody can see that her loss was

10:26:20 22    much more severe than any type of female pattern hair loss that

10:26:24 23    can happen.

10:26:24 24    Q.    So let's specifically go through some of the things you

10:26:31 25    laid out.  When we see the profile and the back picture of

*OFFICIAL TRANSCRIPT*

10:26:36  1  Barbara Earnest, the back of her scalp --

10:26:39  2  A.   I think this is the most important picture, okay, because

10:26:42  3  here you see that she has hair loss practically everywhere.

10:26:47  4  Even the rim over here is not normal.

10:26:51  5  Q.   I'm sorry, the what was not normal?

10:26:52  6  A.   The rim of hair, the hairline, the back hairline, you see,

10:27:00  7  it's thin.

10:27:01  8  Q.   Could you, with your pen, touch exactly what you're

10:27:06  9  referring to, please.

10:27:07  10  A.   Here.

10:27:08  11  Q.   So why is that important to you?

10:27:13  12  A.   Because in female pattern hair loss, the back of the scalp

10:27:19  13  is typically not involved in women.  Even in men, it's never so

10:27:24  14  involved.

10:27:24  15  Q.   Now, you've used this phrase *diffuse* -- or this word

10:27:29  16  *diffuse*, diffuse hair loss.  Do you typically see diffuse

10:27:33  17  hair loss with female pattern hair loss?

10:27:37  18  A.   Sometimes you can, okay, but it's the degree of severity

10:27:43  19  that is completely different.

10:27:44  20  Q.   Explain that to us, if you would.

10:27:46  21  A.   You know, in some women, you may have a little bit of

10:27:49  22  thinning on the side, a little bit of thinning of the back, but

10:27:53  23  never loss, complete loss like here, with no hair on the back.

10:27:59  24  Q.   Doctor, what I'd like to show you is example of male

10:28:08  25  pattern hair loss.  What is this we're looking at here?

**OFFICIAL TRANSCRIPT**

10:28:14 1    A.    What I want to explain you is this, even the worst

10:28:19 2    scenario, the worst severity of male pattern hair loss, they

10:28:25 3    have hair here.

10:28:26 4          I don't know why it doesn't work anymore.

10:28:28 5          Okay.  Here.  This hair is the base of hair

10:28:34 6    transplantation, you know.  You know that in men you can do

10:28:36 7    hair transplantation.  Why?  Because the hair in this area do

10:28:41 8    not react to androgens, so they never thin.  So you can take

10:28:48 9    the hair from there and put them here.

10:28:50 10   Q.    Let me stop you there.  I want to make sure I understand.

10:28:53 11   You're talking about -- we've probably all heard of hair

10:28:58 12   transplant.  You're referring to that.  You indicated something

10:29:03 13   about that with males, they can get -- who have male pattern

10:29:07 14   hair loss, they can utilize that part of their hair for hair

10:29:12 15   transplant; is that correct?

10:29:13 16   A.    Yes, that's the donor area.  It's called the *donor area*.

10:29:17 17   The reason of that is that those hair do not react to

10:29:21 18   androgens.

10:29:21 19   Q.    You've talked about this a couple times.  I think it's

10:29:24 20   important we understand.  When you say *don't react to*

10:29:30 21   *androgens*, what are androgens, just briefly?  And then how are

10:29:33 22   they involved in this hair loss process?

10:29:36 23   A.    Androgens are the main hormones.  Testosterone is the most

10:29:42 24   important androgens.  Androgens, in certain situation, make the

10:29:49 25   hair to get thinner.  In androgenetic alopecia, androgens make

*OFFICIAL TRANSCRIPT*

10:29:54  1    the hair to become thin and thin and invisible.

10:29:58  2              But not all the scalp react to androgens.  There are

10:30:04  3    these area that do not.  They are androgen independent.  That's

10:30:08  4    why you can utilize those area for hair transplantation.

10:30:16  5              But my idea is that even the men with the worst

10:30:18  6    scenarium has this part preserved, has the hair in this area

10:30:31  7    preserved.

10:30:31  8    Q.   So even men who have more dramatic hair loss, when you say

10:30:36  9    they have that hair preserved, what does that mean?

10:30:39 10    A.   They have it as in this picture.  The hair in that area is

10:30:43 11    normal.

10:30:43 12    Q.   Then compare that, if you would, to what you see with

10:30:51 13    Barbara.  Do you see that hair preserved there, as you're

10:30:54 14    referring to?

10:30:54 15    A.   I was saying that even this hair is very thin.  You can

10:30:57 16    see the skin through this hair here.  So it's very, very thin.

10:31:06 17    So the hair loss is more severe than the worst scenarium of

10:31:14 18    male pattern hair loss.

10:31:15 19    Q.   So, Doctor, does Barbara Earnest suffer from androgenetic

10:31:25 20    alopecia?

10:31:25 21    A.   No.

10:31:25 22    Q.   I don't want to make you repeat everything.  For all the

10:31:34 23    reasons you went through?

10:31:34 24    A.   Yes.

10:31:35 25    Q.   In your differential diagnosis, did you consider a

*OFFICIAL TRANSCRIPT*

10:31:46  1    condition called *alopecia areata*?

10:31:58  2    A.    Yes, I did.

10:31:59  3    Q.    What is alopecia areata?

10:31:59  4    A.    Alopecia areata is a very common disorder that usually

10:32:00  5    cause patches of hair loss, but sometimes can cause -- lose of

10:32:04  6    all your hair.  So you can be without any hair on your scalp,

10:32:09  7    on your eyebrows, on your eyelashes.

10:32:14  8          But in alopecia areata, you have no hair, which is

10:32:19  9    different than in Barbara's situation, when you have this fuzzy

10:32:27 10    hair.

10:32:28 11    Q.    So that's true loss of all hair, alopecia areata can be?

10:32:33 12    A.    Yes.  The one in differential, yes, because she has no

10:32:36 13    patches.  It's not a patchy alopecia there.

10:32:42 14    Q.    So you considered alopecia areata; is that correct?

10:32:45 15    A.    I did.

10:32:45 16    Q.    Let's just walk through what we see here, just what we see

10:32:52 17    here, alopecia areata and how that presents, and then how

10:32:58 18    Barbara Earnest presented, so we understand how you reached

10:33:00 19    your conclusion.

10:33:02 20          I should have you state that first.  Do you believe

10:33:04 21    that Barbara suffered from alopecia areata?

10:33:09 22    A.    No.  I think alopecia areata was really not in the

10:33:12 23    differential, but I'm going to go through the slide --

10:33:15 24    Q.    When you say it wasn't even in the differential, what does

10:33:17 25    that mean?

**OFFICIAL TRANSCRIPT**

10:33:18 1    A.   Because the clinical examination is very different.  The

10:33:23 2    skin is like no hair at all, smooth.  They don't have any hair

10:33:30 3    left.

10:33:30 4    Q.   So then why don't we just quickly move through this, just

10:33:34 5    so the jurors understand it.

10:33:36 6    A.   Yes.

10:33:36 7    Q.   Go ahead, if you can take us through --

10:33:39 8    A.   The history in alopecia areata, they have a history of

10:33:45 9    acute hair loss.  They may lose all the hair in a few weeks.

10:33:52 10   From patchy can become complete.  When they still have hair,

10:33:58 11   the pull test is positive.  When they have no hair, of course,

10:34:02 12   is negative.

10:34:12 13   Q.   So in Barbara's case, did you do a pull test that showed

10:34:18 14   negative, correct?

10:34:19 15   A.   Yes.

10:34:19 16   Q.   If it was alopecia areata, it would have been what result?

10:34:25 17   A.   Depend on the phase.  If it's alopecia areata that's still

10:34:30 18   losing hair, it's positive.  But it's already completely

10:34:34 19   without hair, it's negative, has no hair.

10:34:38 20   Q.   So, as you indicated, you considered alopecia areata,

10:34:44 21   although it wasn't in the differential diagnosis.  What was

10:34:46 22   your conclusion?

10:34:47 23   A.   That she has not alopecia areata.

10:34:50 24   Q.   Doctor, moving through your differential diagnosis, did

10:35:13 25   you consider what's referred to as EIA, endocrine-induced

*OFFICIAL TRANSCRIPT*

10:35:21  1   alopecia?

10:35:22  2   A.    Okay.  Yes, I did.  Also, because Barbara was -- is still

10:35:29  3   taking a medication that is an aromatase inhibitor, and that

10:35:37  4   has been reported to cause -- possibly cause this

10:35:43  5   endocrine-induced alopecia.

10:35:45  6   Q.    So let's make sure we walk through this.  So

10:35:54  7   endocrine-induced alopecia.

10:35:59  8   A.    You want me to explain, or you want to me ask?

10:36:02  9   Q.    Yes.  Let's have you explain.

10:36:04 10   A.    Okay.  So this is a type of alopecia due to medications

10:36:10 11   that block the estrogen activity.  Because in women with

10:36:18 12   breast cancer, when the cancer is positive to estrogens, we

10:36:22 13   give medication to prevent estrogens to stimulate the cancer.

10:36:28 14          So these medications are antiestrogens, or

10:36:34 15   aromatase inhibitor.  This medication can cause androgenetic

10:36:34 16   alopecia.  It basically is a type of androgenetic alopecia due

10:36:44 17   to this medication.

10:36:45 18   Q.    Let's kind of just make sure the jury understands the

10:36:48 19   history for Barbara Earnest.  She finished her chemotherapy

10:36:52 20   approximately when?

10:36:53 21   A.    She finished chemotherapy, I think, in June.  Because she

10:37:03 22   started the aromatase inhibitor in November, three months after

10:37:08 23   chemotherapy.  No, November, October, September, August.

10:37:15 24   Q.    So Barbara Earnest finished her chemotherapy --

10:37:19 25   A.    Yes.

*OFFICIAL TRANSCRIPT*

10:37:20  1    Q.    -- and then, at some point, went on what you referred to

10:37:24  2    as the aromatase inhibitor?

10:37:24  3    A.    Yes.

10:37:28  4    Q.    Arimidex, correct?

10:37:30  5    A.    Yes.  She finished chemotherapy.  She had the -- therapy

10:37:34  6    after that.  So after three months, she started the

10:37:38  7    aromatase inhibitor.

10:37:38  8          But this type of alopecia, you have hair, and you

10:37:42  9    lose hair during the medication.  So, in this case, you have

10:37:47  10   normal hair after chemotherapy.  You start the medication.

10:37:50  11   This medication slowly cause androgenetic alopecia.

10:38:00  12         So the chronology is completely different, because

10:38:00  13   she had no hair when she started the medication, and the

10:38:04  14   situation remained the same.

10:38:08  15   Q.    So this drug that she's on is called *Arimidex*?

10:38:12  16   A.    Yes.  It's an aromatase inhibitor.

10:38:17  17   Q.    This inhibits some hormones; is that right?

10:38:22  18   A.    Yes.

10:38:22  19   Q.    You were explaining to the jury, I believe, that it

10:38:28  20   interferes with androgen -- the androgen balance in the female

10:38:31  21   body; is that right?

10:38:31  22   A.    Yes.

10:38:31  23   Q.    What type of presentation or impact does

10:38:39  24   aromatase inhibitor, like Arimidex, have on a woman's hair?

10:38:42  25   A.    You see, here is a picture from the literature.  It's

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:38:45 | 1 | hair loss on the top, like androgenetic alopecia -- Gladwell. |
| 10:38:55 | 2 | Q.   Now, Doctor, are you aware that Barbara Earnest is still |
| 10:39:01 | 3 | on this particular type of drug? |
| 10:39:05 | 4 | A.   Yes, of course. |
| 10:39:06 | 5 | Q.   So, how in this case, with the fact that she's still |
| 10:39:11 | 6 | taking -- do you know how this -- this drug is taken with a |
| 10:39:14 | 7 | pill? |
| 10:39:14 | 8 | A.   Uh-huh (affirmative response).   Yes. |
| 10:39:15 | 9 | Q.   How in this case do you rule out Barbara's type of |
| 10:39:26 | 10 | alopecia, the diffuse alopecia, with comparison to the alopecia |
| 10:39:31 | 11 | or hair loss that is caused by the aromatase inhibitor?   Take |
| 10:39:44 | 12 | us through that, if you would. |
| 10:39:44 | 13 | A.   First of all, the severity.   So, clinically, it's much |
| 10:39:45 | 14 | more severe than the alopecia due to endocrine medication, but |
| 10:39:50 | 15 | is more similar to the androgenetic alopecia. |
| 10:39:56 | 16 | Q.   Well, let me stop you there, just to make sure we |
| 10:39:58 | 17 | understand.   So the endocrine drug can cause some type of hair |
| 10:40:04 | 18 | thinning? |
| 10:40:04 | 19 | A.   Yes. |
| 10:40:05 | 20 | Q.   Okay. |
| 10:40:07 | 21 | A.   They do. |
| 10:40:08 | 22 | Q.   Can you describe to the jury the type of hair thinning |
| 10:40:12 | 23 | that is caused by this type of endocrine therapy? |
| 10:40:19 | 24 | A.   It's hair thinning that is very similar to androgenetic |
| 10:40:23 | 25 | alopecia because the mechanism is similar.   So it cause |

*OFFICIAL TRANSCRIPT*

10:40:28  1    miniaturization, so thinning of the hair on the top of the

10:40:32  2    scalp.  But they don't cause diffuse hair loss severe like

10:40:37  3    this.

10:40:37  4    Q.    So, I'm assuming -- well, just let me ask.  You indicated

10:40:41  5    that the aromatase inhibitor drug, Arimidex, that Barbara takes

10:40:50  6    mimics or presents like some form of androgenic alopecia?

10:40:53  7    A.    The type of hair loss is very similar.

10:40:56  8    Q.    So, does that mean that the pattern is similar?

10:41:00  9    A.    Yes.

10:41:01  10   Q.    The pattern between the Arimidex drug hair loss and

10:41:10  11   androgenetic hair loss is similar?

10:41:12  12   A.    Yes.

10:41:12  13   Q.    Are those patterns similar to what Barbara Earnest has?

10:41:16  14   A.    No, are milder.

10:41:16  15   Q.    I'm sorry?

10:41:21  16   A.    Are not as severe as her hair loss.

10:41:23  17   Q.    Not as severe?

10:41:24  18   A.    Are less severe.  Much less severe.

10:41:29  19   Q.    Have you ever -- have you ever seen Arimidex inhibitor

10:41:40  20   endocrine-induced alopecia caused by this hormone drug, have

10:41:43  21   you ever seen it present in the severity that Barbara Earnest

10:41:47  22   suffers from with her permanent hair loss?

10:41:53  23   A.    Absolutely not.  The chronology also doesn't match because

10:41:58  24   she never grow back the hair.  So it's a different situation.

10:42:01  25   Q.    I think that's important.  Let's walk through that

**OFFICIAL TRANSCRIPT**

10:42:04 1    chronology.

10:42:05 2                  So take the jury through the chronology that you see

10:42:10 3    with women who you diagnose with endocrine-induced alopecia.

10:42:17 4    Take us through that chronology, please.

10:42:20 5    A.   It's not just me, all the literature.  So these women

10:42:24 6    regrow hair after chemotherapy, and then start these

10:42:31 7    medications.  After usually one year, they start seeing some

10:42:36 8    thinning that in some case may be severe, but never as severe.

10:42:42 9    Q.   So in your history that you took for Barbara, did you find

10:42:47 10   any evidence that her hair fell out with the anagen effluvium,

10:42:56 11   like it does with chemotherapy, and then returned, and then

10:42:58 12   fell out to some degree again?  Did you see anything like that

10:43:02 13   at all?

10:43:02 14   A.   Absolutely not.

10:43:03 15        THE COURT:  Mr. Schanker, is this a good time for a

10:43:10 16   break?  I'm going to rely on you to give me a time where it's a

10:43:14 17   good time for a break.

10:43:15 18        MR. SCHANKER:  How about just two more minutes?  Is

10:43:17 19   that okay?

10:43:17 20        THE COURT:  That would be perfect.  Thank you.

10:43:23 21   EXAMINATION BY MR. SCHANKER:

10:43:24 22   Q.   So, Doctor, does Barbara suffer from endocrine-induced

10:43:30 23   alopecia?

10:43:30 24   A.   No.

10:43:30 25   Q.   Without going through the details of how you reached this

*OFFICIAL TRANSCRIPT*

10:43:37 1    determination --

10:43:38 2            I think you've covered those, correct?

10:43:39 3    A.   Yes.

10:43:40 4    Q.   -- the answer is she does not, no; is that correct?

10:43:44 5    A.   Yes.

10:43:51 6            MR. SCHANKER:  Your Honor, that was a fast two minutes.

10:43:55 7            THE COURT:  Okay.  Members of the Jury, we'll be at

10:43:58 8    recess for ten minutes.  Again, don't talk amongst yourselves

10:44:04 9    or with anyone else about this case.  Just leave your tablets

10:44:08 10   in your chairs.  Court is in recess for ten minutes.

10:44:12 11           THE DEPUTY CLERK:  All rise.

10:44:13 12           (WHEREUPON, at 10:44 a.m. the jury panel leaves the

10:44:38 13   courtroom.)

10:44:38 14           MR. SCHANKER:  Since she hasn't done this before, you

10:44:41 15   might want to instruct her as far as not speaking with --

10:44:44 16           THE COURT:  Dr. Tosti, while you're in the middle of

10:44:48 17   your examination, you can't speak to the lawyers and review

10:44:53 18   again what you said or what you're going to say.

10:44:55 19           THE WITNESS:  Okay.

10:44:56 20           THE COURT:  But you may certainly run to the restroom

10:45:01 21   if you need to.

10:45:02 22           THE WITNESS:  Okay.

10:45:03 23           (WHEREUPON, at 10:45 a.m. the Court took a recess.)

10:56:37 24           THE DEPUTY CLERK:  All rise.

10:56:38 25           THE COURT:  All jurors are present.  Court is back in

*OFFICIAL TRANSCRIPT*

10:58:50  1   session.  You may be seated.

10:58:51  2              Dr. Tosti, I remind you you're still under oath.

10:58:54  3              Please proceed, Mr. Schanker.

10:58:54  4   EXAMINATION BY MR. SCHANKER:

10:58:57  5   Q.   Good morning, again.  Dr. Tosti, good morning again.

10:59:00  6        So we were working through your differential

10:59:04  7   diagnosis.  And what conditions have you ruled out, just

10:59:08  8   briefly to cover the names of the conditions we've ruled out up

10:59:12  9   to this point.

10:59:13 10   A.   We rule out telogen effluvium.  We rule out anagen

10:59:21 11   effluvium.  We rule out androgenetic alopecia.  We rule out

10:59:24 12   alopecia areata.  We rule out endocrine-induced alopecia.

10:59:27 13   Q.   So at this point, what is left in your differential

10:59:33 14   diagnosis, Doctor?

10:59:36 15   A.   Permanent alopecia after chemotherapy.

10:59:38 16   Q.   And just so we're clear, there is a difference between

10:59:43 17   permanent alopecia and temporary alopecia?

10:59:46 18   A.   Yes.  This alopecia has been defined as permanent

10:59:52 19   persistent or irreversible, depending on the status, but

10:59:57 20   basically is permanent.

10:59:59 21   Q.   And, Doctor, what is permanent chemotherapy-induced

11:00:03 22   alopecia?

11:00:05 23   A.   It is a type of alopecia that occurs after chemotherapy

11:00:12 24   with certain drug and is characterized by diffuse alopecia

11:00:18 25   involving almost the whole scalp, and the hair are very short

*OFFICIAL TRANSCRIPT*

11:00:27  1    and miniaturized.

11:00:28  2    Q.    And, Doctor, we're looking at a picture.  Is this picture

11:00:33  3    from the medical literature?

11:00:35  4    A.    Yes.  This is a picture from a paper that has been

11:00:38  5    published.  This is the clinical picture showing the

11:00:42  6    presentation of this condition.

11:00:45  7    Q.    And if you could take us through what the indications are

11:00:54  8    that support a diagnosis of permanent chemotherapy-induced

11:00:59  9    alopecia, please.

11:01:02  10   A.    The classical diagnosis depends on history that is

11:01:09  11   incomplete hair regrowth six months after the end of

11:01:14  12   chemotherapy.  And this is Type 2, because there are only two

11:01:19  13   severity grade, unfortunately, because this is what -- the way

11:01:25  14   we grade the severity is just Type 1 and Type 2.

11:01:29  15         So, this is the severe type, which is called *Type 2*,

11:01:34  16   when you have almost -- you know, involvement of almost the

11:01:38  17   whole scalp with thinning.  Severe, severe thinning.  And

11:01:45  18   involvement of eyebrows and eyelashes is also very typical.

11:01:50  19   Q.    Explain that to the jury, if you would, eyebrows and

11:01:54  20   eyelashes.

11:01:54  21   A.    Eyebrows and eyelashes are lost as well.  Become very

11:01:59  22   thin.

11:01:59  23   Q.    And with a presentation of permanent chemotherapy-induced

11:02:03  24   alopecia, what is the result of a pull test?

11:02:07  25   A.    A pull test is usually negative because they have no hair

*OFFICIAL TRANSCRIPT*

11:02:10  1   left.

11:02:11  2   Q.   And then as far as -- let's do this.  You indicated,

11:02:21  3   Doctor, that this particular photograph comes from the

11:02:26  4   literature; is that right?

11:02:27  5   A.   Yes.

11:02:27  6   Q.   And do you remember which study that is?

11:02:33  7   A.   To be honest, I don't know if it was my own study.

11:02:39  8        Yes.  That was my own study.  The study published

11:02:43  9   with Maria Miteva.

11:02:51 10   Q.   What is the name of this study?

11:02:52 11   A.   "Permanent alopecia after systemic chemotherapy:  A

11:02:59 12   clinical pathological study of ten cases."

11:03:00 13   Q.   When was this published?

11:03:02 14   A.   This was published in 2011.

11:03:05 15   Q.   And where was it published?

11:03:07 16   A.   This is *Journal of Dermatopathology*.  I think was the

11:03:13 17   *American Journal of Dermatopathology*.

11:03:30 18        MR. SCHANKER:  Your Honor, may I approach?

11:03:33 19        THE COURT:  Yes, you may.

11:03:33 20   EXAMINATION BY MR. SCHANKER:

11:03:34 21   Q.   Doctor, what was the purpose of this study?

11:03:36 22   A.   This was a study mainly on the pathology, because we

11:03:40 23   wanted to try to put the basis for the pathology of this

11:03:45 24   condition for dermatopathologists to recognize.

11:03:51 25        And this did not only involve permanent alopecia

*OFFICIAL TRANSCRIPT*

11:03:57  1    after Taxotere.  We also had cases of permanent alopecia from

11:04:00  2    other drugs, including busulfan and I think cisplatin.  So,

11:04:13  3    there were different type of drugs that caused the problem in

11:04:16  4    these patients.

11:04:16  5    Q.    You mentioned other drugs.  Cisplatin and busulfan; is

11:04:23  6    that right?

11:04:23  7    A.    Yes.  Not for breast cancer.  For other types of tumors.

11:04:25  8    Q.    That's what I was going to ask you.  Those other drugs

11:04:27  9    that you mentioned, are those used in breast cancer treatment

11:04:31 10    or for other types of tumors?

11:04:32 11    A.    They are used for other types of tumor.

11:04:34 12    Q.    And what is important for the jury to understand

11:04:39 13    concerning this publication?

11:04:42 14    A.    You know, that the clinical presentation of this patient

11:04:45 15    is absolutely identical to Barbara's clinical presentation.  If

11:04:52 16    you put them together, they look exactly the same.  And, you

11:05:00 17    know, dermatology is very visual.  We look at the skin, we

11:05:03 18    look -- and so, that's why I'm visual and I want to show the

11:05:07 19    visual comparison.

11:05:09 20    Q.    So this is -- the photograph we were looking at before

11:05:13 21    comes out of this publication?

11:05:14 22    A.    Yes.

11:05:14 23    Q.    And you indicated that if we put this photograph of this

11:05:19 24    patient who suffered from --

11:05:23 25    A.    Permanent alopecia after docetaxel, this particular

*OFFICIAL TRANSCRIPT*

11:05:29  1    patient.

11:05:29  2    Q.    So this is docetaxel or Taxotere?

11:05:31  3    A.    Yes.

11:05:31  4    Q.    And if we put this patient next to Barbara Earnest?

11:05:38  5    A.    You see that the clinical presentation is very, very

11:05:42  6    similar.  They have the same problem.

11:05:45  7    Q.    And so what does this mean to the jury?

11:05:53  8    A.    That they are -- this is the same disease.

11:05:57  9    Q.    Doctor, are there more examples in the literature of this

11:06:10 10    permanent chemotherapy-induced -- bless you -- alopecia --

11:06:16 11         Are there more examples in the literature of this

11:06:19 12    permanent chemotherapy-induced alopecia after Taxotere?

11:06:24 13    A.    Yes, there are many examples.  I think I gave you several.

11:06:39 14    Q.    And when you say gave us, they were materials that you

11:06:42 15    relied upon in preparing your report?

11:06:44 16    A.    Yes.  Those are all the articles in the literature that I

11:06:49 17    utilized for my report.

11:06:51 18    Q.    Doctor, are you familiar with this study?

11:06:59 19    A.    Yes, I am.

11:07:00 20    Q.    Could you please take the jury briefly through this study.

11:07:10 21    And what do you refer to this study as?

11:07:13 22    A.    Martin study.  This is a study done by oncologists.  And

11:07:21 23    they show that 10 percent of patients with -- in treatment with

11:07:29 24    docetaxel and other chemotherapy have severe permanent alopecia

11:07:35 25    after chemotherapy.  But they did not find any case in

*OFFICIAL TRANSCRIPT*

11:07:41  1    chemotherapy without Taxotere, so the only cases they saw were

11:07:49  2    with Taxotere.

11:07:50  3    Q.    So let's come back to that important point a little bit

11:07:55  4    later, if we could.  Right now I want to focus on the

11:07:58  5    presentation concerning -- visual presentation.  Is that fair?

11:08:02  6    A.    Yes.  Here, if you go on the following page, it may be two

11:08:08  7    following page, you'll find the clinical pictures, and you can

11:08:12  8    put the clinical pictures close to Barbara's picture to show

11:08:19  9    that it's the same condition.

11:08:27  10        Here it show not only the severe type, but in the --

11:08:33  11    here, below, you'll see the Type 1.  So the difference between

11:08:38  12    Type 1 and Type 2 severity is that Type 2, they cannot -- they

11:08:45  13    need to wear a wig.  They cannot go out without it because they

11:08:51  14    cannot camouflage the problem.  Type 1, yes, there they can

11:08:59  15    camouflage.  It's less severe.

11:09:01  16    Q.    So this bottom row --

11:09:05  17    A.    Is Type 1.

11:09:06  18    Q.    And so, just so we're clear, we have two types that you've

11:09:11  19    seen or that are found in the literature of permanent

11:09:14  20    chemotherapy-induced alopecia; is that correct?

11:09:15  21    A.    Yes.  This is a limit of this classification because, of

11:09:19  22    course, I would like to have a classification with more type to

11:09:25  23    put that very severe, like Type 4 and -- we have intermittent

11:09:33  24    grade by sure.

11:09:34  25        But this is the Type 2.  And so on the top is a very

*OFFICIAL TRANSCRIPT*

11:09:38 1   severe Type 2, and these patients look very much like Barbara,

11:09:46 2   this, this, this.

11:09:47 3   Q.    So, Doctor, this top left, which is marked with the big A,

11:09:56 4   what is the classification for that type of permanent hair loss

11:10:00 5   caused by chemotherapy?

11:10:01 6   A.    Type 2.

11:10:02 7   Q.    That's Type 2.  And, Doctor, can we look at matching

11:10:11 8   Barbara's condition with the condition of the big A?

11:10:15 9   A.    Yes.

11:10:15 10   Q.    And --

11:10:19 11   A.    You see it's very, very, very similar, okay.  Maybe a

11:10:24 12   little bit less severe than Barbara.

11:10:27 13   Q.    And what do you see here that enables you to make that

11:10:31 14   kind of determination?

11:10:34 15   A.    The diffuse hair loss and very important finding in this

11:10:40 16   condition, the shortness of the hair.

11:10:42 17   Q.    You mentioned that earlier.  Take us through that, if you

11:10:46 18   would.

11:10:47 19   A.    You know, all the reported cases, this is a specific

11:10:51 20   feature, the hair do not get long.  They are very, very short.

11:10:54 21   Q.    And so, does this evidence information go to support your

11:11:02 22   conclusion in this case?

11:11:03 23   A.    Yes.

11:11:44 24        MR. SCHANKER:  May I approach?

11:11:45 25        THE COURT:  Yes, you may.

*OFFICIAL TRANSCRIPT*

11:11:46  1    EXAMINATION BY MR. SCHANKER:

11:11:53  2    Q.    Doctor, is there more literature and photo evidence that

11:11:58  3    supports your conclusion in this case?

11:12:00  4    A.    Yes.

11:12:00  5    Q.    Can we continue to work through that?

11:12:02  6    A.    Yes.

11:12:02  7    Q.    Doctor, did you present to us this publication?

11:12:14  8    A.    Yes.

11:12:19  9    Q.    Do you recall this?

11:12:21 10    A.    This is a French publication.

11:12:23 11    Q.    And is there photographic support in this treatise or

11:12:32 12    publication?

11:12:32 13    A.    Yes.

11:12:33 14    Q.    Would it assist the jury if I showed them that?

11:12:41 15    A.    Yes.

11:12:43 16    Q.    What are we looking at here?

11:12:50 17    A.    Again, we're looking at the severe alopecia, diffuse

11:12:57 18    severe alopecia.

11:12:58 19    Q.    And this appears to be a slightly different presentation.

11:13:02 20    Explain that.  Is there -- is there anything to draw from that?

11:13:04 21    A.    It's milder.  That's what I was saying before.

11:13:07 22    Q.    It's what?

11:13:08 23    A.    A little less severe, okay, because we have just two

11:13:14 24    grade, and so in Grade 2, you have more severe and less severe.

11:13:22 25    But she needs a wig, so here the distinction is need a wig or

*OFFICIAL TRANSCRIPT*

11:13:27　1　don't need a wig.

11:13:28　2　Q.　And, Doctor, in this case, does Barbara's hair loss meet

11:13:41　3　that of chemotherapy-induced alopecia?

11:13:51　4　A.　Yes, I think so.

11:13:52　5　Q.　Did you continue to go through the literature in your

11:14:00　6　report?

11:14:00　7　A.　Yes.

11:14:01　8　Q.　Doctor, are you familiar with this publication?

11:14:46　9　A.　Yes.

11:14:48　10　Q.　If you could orient the jury to this, tell them about this

11:14:53　11　study which appeared in the *American Academy of Dermatology*.

11:14:58　12　A.　Yes.  This is a study done together from people from

11:15:03　13　United States and people from London.  The main author is

11:15:12　14　Catherine Stefanato, which is -- I know very well.  In this

11:15:15　15　publication, they report patients with the condition.

11:15:19　16　Q.　The main author on this case --

11:15:19　17　A.　Yes, because the main author is always the last author in

11:15:19　18　medical literature.

11:15:19　19　Q.　Have you worked with Dr. Stefanato?

11:15:37　20　A.　I know her very well, yes.  I was invited in London by

11:15:37　21　her.

11:15:38　22　Q.　Did you utilize this report in finding your conclusions in

11:15:43　23　the case that Barbara Earnest's hair loss presentation matched

11:15:47　24　that of permanent chemotherapy-induced alopecia?

11:15:54　25　A.　Yes.

*OFFICIAL TRANSCRIPT*

11:15:54  1    Q.    Was there photographic support in this document?

11:15:54  2    A.    Yes.

11:15:57  3    Q.    Let me show it to you and see.  You recall this?

11:16:01  4    A.    Yes, I do.

11:16:02  5    Q.    What is it that the jury is looking at here?

11:16:06  6    A.    Again, a very diffuse severe alopecia that affects not

11:16:14  7    only the top, but also the back of the scalp, with almost no

11:16:19  8    hair left.

11:16:20  9    Q.    Did you do a comparison to match Barbara's presentation of

11:16:29 10    permanent hair loss with that that we're looking at here?

11:16:33 11    A.    Absolutely, yes.

11:16:33 12    Q.    When you did that side-by-side comparison, what did you

11:16:39 13    conclude, Doctor?

11:16:40 14    A.    You know, they look identical to me.

11:16:42 15    Q.    Describe that, if you could, just the presentation.

11:16:46 16    A.    You know, both have severe involvement of the back of the

11:16:52 17    scalp, with a very, very thin rim, involvement of the top and

11:16:57 18    involvement of the side.

11:16:58 19    Q.    All these -- this particular picture, this is a permanent

11:17:05 20    condition?

11:17:06 21    A.    This is a picture of permanent alopecia from chemotherapy

11:17:12 22    due to docetaxel.

11:17:13 23    Q.    Doctor, just to be clear, in this case, did you, in your

11:17:43 24    differential diagnosis, rule in permanent chemotherapy-induced

11:17:49 25    alopecia as the cause of Barbara Earnest's scalp condition?

*OFFICIAL TRANSCRIPT*

11:17:54 1    A.   Yes, I think she's affected by permanent alopecia from

11:17:59 2    chemotherapy due to Taxotere.

11:18:03 3    Q.   Let's just make sure.  You said, "I think she's

11:18:05 4    affected" --

11:18:06 5    A.   She is.

11:18:08 6    Q.   What was the basis for your conclusion that

11:18:13 7    Barbara Earnest suffered from permanent chemotherapy-induced

11:18:16 8    alopecia?

11:18:19 9    A.   Everything from history to clinical exam, to pull test

11:18:25 10   results, to consistency with pathology results and --

11:18:34 11   Q.   You mentioned pathology results.  Let's talk about those

11:18:40 12   for a moment.

11:18:40 13   A.   Yes.

11:18:49 14   Q.   So you indicated earlier that pathology was done in this

11:18:54 15   case.  Did you do the pathology?

11:19:00 16   A.   No.  She had the biopsy taken before.  So I saw her, and

11:19:05 17   she already had the pathology results.

11:19:09 18        But I saw the biopsy sites, so where the biopsy were

11:19:16 19   taken.  These biopsy were taken, one, from the top of the

11:19:20 20   scalp, the area that was very bald, and one in the area where

11:19:23 21   she has those few hair left.

11:19:28 22        And the both biopsy --

11:19:31 23   Q.   Let me stop you there.  Pathology, you're talking about

11:19:34 24   the biopsy results.

11:19:36 25   A.   Uh-huh (affirmative response).

*OFFICIAL TRANSCRIPT*

11:19:36 1   Q.   So did you need those biopsy results to reach your

11:19:40 2   conclusion that Barbara Earnest suffered from -- suffers from

11:19:45 3   permanent chemotherapy-induced alopecia, or how did those fit

11:19:49 4   into your analysis and conclusion in this case?

11:19:51 5   A.   To be honest, I didn't need.  Even in the literature, not

11:19:57 6   every patient had the biopsy, because the history had a

11:20:01 7   presentation as so strong that you usually don't take a biopsy

11:20:05 8   to a patient who already has this problem.

11:20:10 9        If it is my patient, I probably wouldn't because I

11:20:13 10  know what it is.  But in this case, the biopsy were already

11:20:17 11  taken because it was a different type of case.

11:20:20 12  Q.   Let's talk about that.  You indicated if this was your

11:20:25 13  patient.  You mean like a traditional patient that comes to see

11:20:29 14  you?

11:20:29 15  A.   Yes.  If it is one of my patients at University of Miami,

11:20:33 16  I wouldn't take a biopsy.  Why should I take a biopsy, put

11:20:38 17  stitches, if I already know what it is?

11:20:40 18  Q.   But this case, obviously, is not a traditional situation

11:20:44 19  where an individual is going to see you about this condition,

11:20:44 20  correct?

11:20:50 21  A.   Yes.

11:20:50 22  Q.   In fact, it involves this lawsuit and this litigation?

11:20:54 23  A.   Yes.  In fact, in this case, I was prepared to take a

11:20:58 24  biopsy if I -- if I need it, but I didn't need, and I didn't

11:21:05 25  take.

*OFFICIAL TRANSCRIPT*

11:21:05  1    Q.    Now, in this case, you understand that a biopsy was done?

11:21:08  2    A.    Yes.

11:21:09  3    Q.    Then how does this work?  If you could explain to the

11:21:16  4    jurors, who is it that looks at or interprets a biopsy?

11:21:20  5    A.    So the biopsy is looked at by a specialized doctor who is

11:21:27  6    called *dermatopathologist*.

11:21:31  7    Q.    Let me stop you there.  Dermatopathologist?

11:21:37  8    A.    Dermatopathologist.  Or can be only a pathologist, but the

11:21:41  9    best is a dermatopathologist, who is trained in the looking at

11:21:45 10    biopsies.

11:21:47 11            They cut the biopsies, like transverse, like this.

11:21:52 12    They count the number of follicles in the 4-millimeter punch.

11:22:01 13    So they can count how many follicles are there.  They can

11:22:05 14    measure how big these follicles are and give you this count

11:22:10 15    that important for diagnosis.

11:22:11 16    Q.    In this case, was that done?

11:22:16 17    A.    Yes.  It was done.

11:22:17 18    Q.    Who did it?

11:22:20 19    A.    Dr. Thompson, who is a dermatopathologist from Oregon.

11:22:25 20    Q.    Is that Dr. Curtis Thompson?

11:22:29 21    A.    Yes, it is.

11:22:29 22    Q.    Dr. Thompson, are you aware that he is to be a witness in

11:22:34 23    this case as well?

11:22:35 24    A.    Yes, of course I do.

11:22:37 25    Q.    So, prior to this litigation, did you know Dr. Thompson?

*OFFICIAL TRANSCRIPT*

11:22:43  1   A.   Yes, of course.  I've been publishing with him, and I know

11:22:49  2   him very well.

11:22:49  3   Q.   So just briefly, so the jury understands the context and

11:22:56  4   relationship, describe the work that you've done with

11:22:59  5   Dr. Thompson prior to this.

11:23:01  6   A.   Dr. Thompson is one of the few dermatopathologists who are

11:23:07  7   expert in nails.  So I've been working with him in tumors of

11:23:13  8   the nails.

11:23:13  9   Q.   Have you ever worked with him in any other capacity?

11:23:18 10   A.   Yes.  We published some studies on a disease which is

11:23:24 11   called *frontal fibrosing alopecia.*

11:23:27 12   Q.   Is that a separate type of hair?

11:23:30 13   A.   Yes.  Nothing to do with this problem.

11:23:32 14   Q.   So did you -- do you know how Dr. Thompson became

11:23:38 15   involved?  Did you recommend him or --

11:23:40 16   A.   I did recommend Dr. Thompson.

11:23:42 17   Q.   Why did you recommend Dr. Thompson?

11:23:44 18   A.   Because I trust him and think he's a very good

11:23:47 19   pathologist.  Also, because there are very few

11:23:51 20   dermatopathologists in the United States who are specialized on

11:23:55 21   hair.

11:23:55 22   Q.   Did you then receive those biopsy results that --

11:24:04 23   Dr. Thompson's conclusions in this case?

11:24:06 24   A.   I did receive the biopsy results with her medical records

11:24:13 25   before seeing her.

**OFFICIAL TRANSCRIPT**

11:24:13  1    Q.   Do you have an understanding of what Dr. Thompson's

11:24:16  2    conclusions were in this case?

11:24:16  3    A.   Yes.  I saw his counts, which are also important, the

11:24:22  4    numbers.

11:24:24  5         THE COURT:  No, I'm sorry.  I interrupted.

11:24:26  6         MR. SCHANKER:  No, that's okay.

11:24:27  7    EXAMINATION BY MR. SCHANKER:

11:24:28  8    Q.   You saw his counts?

11:24:30  9    A.   Counts.  They count.  They count how many follicles, how

11:24:37  10   many small follicles, how about big follicles.  You have

11:24:40  11   numbers.

11:24:41  12   Q.   So did Dr. Thompson's conclusions -- explain to the jury

11:24:49  13   how that fit into your conclusion in this case, if at all, just

11:24:54  14   how that works.

11:24:55  15   A.   Yes, because the biopsy show a very important reduction in

11:25:01  16   the number of the hair follicles.  Very similar of what I show

11:25:05  17   you at the dermoscopy.  So there are very, very few follicles,

11:25:11  18   okay, less than half the normal -- almost half the normal, and

11:25:15  19   all the follicles were small.

11:25:16  20   Q.   So with regard to your conclusion, explain how, if at all,

11:25:25  21   you used Dr. Thompson's conclusion in rendering your opinion in

11:25:29  22   the case.

11:25:29  23   A.   You know, Dr. Thompson's conclusion were consistent with

11:25:34  24   my diagnosis, okay.  That's what I like to say.  I don't think

11:25:38  25   his conclusion changed anything.  Was just consistent with my

*OFFICIAL TRANSCRIPT*

11:25:44  1    diagnosis.

11:25:44  2    Q.    Just so we're clear, Dr. Thompson doesn't go in and offer

11:25:50  3    conclusions, to your knowledge, about what types of

11:25:52  4    chemotherapy drugs might cause anything?

11:25:55  5    A.    No, he cannot.  He looks at the specimens.

11:25:58  6            MS. SASTRE:  I know we talked about that, Judge.

11:25:58  7            MR. SCHANKER:  Yes.

11:26:01  8            MS. SASTRE:  Leading.

11:26:01  9            THE COURT:  Leading.  Okay.  Sustained.

11:26:02  10            MR. SCHANKER:  Thank you, Your Honor.

11:26:03  11    EXAMINATION BY MR. SCHANKER:

11:26:05  12    Q.    So any other use that you did with Dr. Thompson's

11:26:09  13    conclusions in this case, other than what you've described to

11:26:12  14    the jury?

11:26:12  15    A.    No.

11:26:13  16    Q.    You just indicated that -- let me ask you this:  To your

11:26:26  17    knowledge, did Dr. Thompson -- is what he does as a

11:26:31  18    pathologist, is he able, to your knowledge and experience and

11:26:38  19    expertise, able to render any kind of opinion on the different

11:26:42  20    chemotherapy drugs that were taken and cause in that regard?

11:26:45  21            MS. SASTRE:  Objection.

11:26:47  22            THE WITNESS:  I don't think --

11:26:47  23            THE COURT:  Overruled.  I'm going to allow her to

11:26:50  24    answer the question.

11:26:51  25            THE WITNESS:  I don't think so.

*OFFICIAL TRANSCRIPT*

11:26:52 1    EXAMINATION BY MR. SCHANKER:

11:26:53 2    Q.   So that's not what he was doing in this case?

11:26:56 3    A.   That's not his expertise at all.

11:26:59 4    Q.   That's yours?

11:27:00 5    A.   That's mine, yes.

11:27:02 6         THE COURT:  Sustained.  You can't keep repeating it.

11:27:04 7    EXAMINATION BY MR. SCHANKER:

11:27:07 8    Q.   So you reached your conclusion concerning permanent

11:27:14 9    chemotherapy-induced alopecia, correct?

11:27:15 10   A.   Yes.

11:27:16 11   Q.   I understand that there were -- are you aware that

11:27:24 12   Dr. Thompson did some stem cell testing in this case?

11:27:30 13   A.   Yes.

11:27:30 14   Q.   First of all, from a broad standpoint, what are

11:27:34 15   scientists -- why do scientists do stem cell testing?  Why

11:27:41 16   would they be done in general?

11:27:43 17   A.   You know, stem cells are cells that have a big potential

11:27:49 18   to reconstitute -- reconstitute organs.  So stem cells are the

11:27:56 19   cells that can regenerate our -- most part of the body.

11:28:04 20        The follicles has stem cells and are very important.

11:28:10 21   There is a researcher in England who was able to make blood

11:28:16 22   cells from the follicle stem cells, just to give you an idea

11:28:20 23   how complicate is this situation.

11:28:26 24   Q.   What are scientists like you still trying to learn about

11:28:30 25   permanent chemotherapy-induced alopecia?

                          *OFFICIAL TRANSCRIPT*

11:34:15  1   Q.    Doctor, getting back to your conclusion concerning

11:34:24  2   permanent chemotherapy-induced alopecia, is permanent

11:34:29  3   chemotherapy-induced alopecia, is that different than just a

11:34:33  4   diagnosis of alopecia or hair loss?

11:34:36  5   A.    Yes.  Alopecia is like -- well, hair loss is like fever.

11:34:42  6   You have to give the specific name to each type of alopecia.

11:34:45  7   Alopecia is not a diagnosis.

11:34:46  8   Q.    So we've worked through your differential diagnosis,

11:34:57  9   correct?  Is that right?

11:34:59 10   A.    Yes.

11:35:00 11   Q.    Did you, Doctor, then make a determination as to which

11:35:05 12   chemotherapy drug caused Barbara Earnest's permanent

11:35:11 13   chemotherapy-induced alopecia?

11:35:12 14   A.    Yes.  I believe it was docetaxel, Taxotere.

11:35:18 15   Q.    What formed the basis for that conclusion?

11:35:26 16   A.    The basis from that conclusion is my personal experience

11:35:31 17   with this medication, my -- with this condition, sorry, my

11:35:36 18   personal experience with the -- with my literature review.

11:35:44 19   Q.    Let's first talk about your personal experience with this

11:35:53 20   condition and these medications.  You touched a little bit on

11:35:58 21   this earlier, but I want to come back to it.

11:36:02 22         Have you, as a clinician and practitioner, seen

11:36:10 23   permanent --

11:36:10 24         MS. SASTRE:  Your Honor's Motion in *Limine* ruling.  I

11:36:13 25   would be happy to come up, Your Honor.

**OFFICIAL TRANSCRIPT**

11:36:13 1          THE COURT:  Come up.

11:36:13 2          (WHEREUPON, at this point in the proceedings, a

11:36:25 3  conference was held at the bench.)

11:36:25 4          MS. SASTRE:  So, Your Honor, your ruling was that for

11:36:28 5  all experts they couldn't talk about numbers of patients that

11:36:34 6  they've seen.  They can talk about what they've seen in their

11:36:38 7  clinical experience.  But, like, for example, Dr. Glaspy you

11:36:41 8  said couldn't come in and say, I've seen X number of patients.

11:36:46 9  You know, it's kind of getting into the numbers, numbers of

11:36:48 10 patients.  That was the issue.

11:36:51 11         They could talk about that they'd seen things

11:36:51 12 like this, which, of course, she's done all morning.

11:36:51 13         I have it here.  I just have to find it,

11:36:55 14 Your Honor.

11:36:55 15         THE COURT:  I know what you're talking about.

11:36:58 16         MR. SCHANKER:  Your Honor, that's a big distinction

11:37:01 17 because she's a causation witness.  Dr. Glaspy and

11:37:06 18 Dr. Miletello, as well as the plaintiff's, Dr. Bosserman and

11:37:11 19 Dr. Feigal, are not causation experts.  So --

11:37:14 20         THE COURT:  Dr. Feigal is not a causation expert?

11:37:17 21         MR. SCHANKER:  I'm sorry.  She does offer a general

11:37:20 22 causation opinion.

11:37:21 23         But this is a specific causation expert.  As part

11:37:24 24 of her opinion concerning specific causation, and as we

11:37:31 25 explained in specific causation argument, she has formed her

*OFFICIAL TRANSCRIPT*

11:37:35  1   opinion based on seeing these patients in her practice.

11:37:38  2          THE COURT:  I think what I said is she could -- I think

11:37:47  3   she can talk about the literature viewed and that she has seen

11:37:52  4   it.  I think she's even written on it.  That was my

11:37:58  5   appreciation, that she did the case studies on it.  She can

11:38:05  6   talk about that.  As I said last week, I saw -- I don't want to

11:38:06  7   get into where it's anecdotal evidence --

11:38:10  8          MR. SCHANKER:  So, basically, her history, Your Honor,

11:38:13  9   is that she saw a presentation in clinic, and then she

11:38:20 10   researched that.

11:38:21 11          THE COURT:  She could give us that history which

11:38:24 12   presented, why she did the research.

11:38:25 13          MR. SCHANKER:  Then she saw another patient, as she

11:38:29 14   started to touch on earlier, and researched based on that, and

11:38:33 15   that it continued to drive her research, Your Honor, in this

11:38:35 16   and publish this, as she saw more and more of these patients

11:38:42 17   present.  This then continued to form and educate her on her --

11:38:47 18          THE COURT:  I understand that.  She can say, I saw it

11:38:50 19   in the clinic and research.  She ultimately did a case study,

11:38:52 20   didn't she?

11:38:53 21          MS. SASTRE:  Yes.

11:38:53 22          MR. SCHANKER:  She did multiple case studies.

11:38:55 23          THE COURT:  Right.  That she can talk about.  Those are

11:38:59 24   case studies.  They are different from, oh, my gosh, I've been

11:39:01 25   practicing for 30 years, I've never seen this before.  That

**OFFICIAL TRANSCRIPT**

11:39:04  1    doesn't tell me what it was before.  That's a little different.

11:39:08  2           She's a clinician and an academic that does

11:39:13  3    research.  I think she could say, my curiosity was peaked when

11:39:18  4    I saw this patient.  I began to do research.  As a result of

11:39:22  5    this research, this is what I determined.  But there is some

11:39:25  6    basis for it.  It's not just, oh, in my practice, I saw this.

11:39:31  7           You can ask --

11:39:32  8           MR. SCHANKER:  I want to make sure that I'm staying --

11:39:32  9    I'm not going (speaking simultaneously) --

11:39:36  10          THE COURT:  -- what prompted this research.

11:39:36  11          MR. SCHANKER:  So I will not elicit testimony from her,

11:39:39  12   as I'm hearing Your Honor, on the number of patients that she's

11:39:42  13   seen.  Is that --

11:39:43  14          THE COURT:  That's what I'm saying.  There is something

11:39:45  15   that prompted the research, and she did research it, and she

         16   published --

         17          MR. SCHANKER:  (Speaking simultaneously) So we can

         18   elicit what prompted --

         19          THE COURT REPORTER:  Please speak one at a time.

         20          MR. SCHANKER:  I'm sorry.

11:39:57  21          THE COURT:  I think we're on the same page.  I'm

11:39:58  22   telling you what she can do.  But I don't want anecdotal

11:40:03  23   evidence that, oh, last week I saw a lady, and I think she had

11:40:07  24   that.  That I'm not going to allow.  But I think she can say, I

11:40:10  25   saw a patient ten years ago, prompted my curiosity, I began

                              *OFFICIAL TRANSCRIPT*

doing research.  Then I did these studies, and this is what --

MR. COFFIN:  Maybe just ask the question saying, without telling the numbers, have you seen this?

THE COURT:  You know what, you have got to kind of stay back.  I think Mr. Schanker can speak for himself.  This is becoming problematic.

MR. COFFIN:  I understand.

THE COURT:  Pretty soon, it's going to be an order that says you've got to stay back there unless I call you up.

What I'm saying is, you can say anecdotal experience, something prompted her to do this study.

MR. SCHANKER:  She can explain what that was?

THE COURT:  Yes.  I saw a patient.  I was curious.  I did this research.  This is what my research did.  Then I've written these papers as a result of it.

MR. SCHANKER:  I'm sorry.

MS. SASTRE:  No.  Go ahead.

MR. SCHANKER:  I'm trying to lay out the testimony is that she saw another presentation, and then she did further research.

THE COURT:  She did further research, and then she's had this stuff.  There's something that prompts you to do the research.  You don't just wake up one morning and think about it.

MS. SASTRE:  So the only comment I have, Your Honor, is

*OFFICIAL TRANSCRIPT*

11:41:24  1   that, depending upon the depth that Mr. Schanker goes into,

11:41:27  2   because I can't cross-examine on other patients, but if it's

11:41:31  3   sort of as Your Honor described, I have no issue with that.

11:41:34  4        THE COURT:  She's already published on it.  So there is

11:41:36  5   something that you've published.  What prompted that?

11:41:39  6        MS. SASTRE:  Yes.  It's just the in-depth level that

11:41:42  7   I --

11:41:42  8        THE COURT:  No, no, no, no, no, no.

11:41:43  9        MR. SCHANKER:  I'm not planning on going through the

11:41:47 10   multitude of patients --

11:41:47 11        THE COURT:  Thank you.

11:41:49 12        MS. SASTRE:  Thank you, Your Honor.

11:41:49 13        THE COURT:  Wait, Ms. Sastre.

11:41:54 14            How much longer do you think you have?

11:41:55 15        MR. SCHANKER:  I guess, maybe 15 minutes.  Probably

11:41:59 16   something that's going to be good for the lunch break.

11:42:03 17        MS. SASTRE:  You're not going to make me stay until

11:42:06 18   7 o'clock, are you?

11:42:07 19        THE COURT:  Unless you talk for five hours.

11:42:07 20        (WHEREUPON, at this point in the proceedings, the bench

11:42:07 21   conference concluded.)

11:42:21 22        THE COURT:  Please proceed, Mr. Schanker.

11:42:22 23        MR. SCHANKER:  Thank you, Your Honor.

11:42:23 24   EXAMINATION BY MR. SCHANKER:

11:42:33 25   Q.   So, Doctor, we were talking about what prompted your --

**OFFICIAL TRANSCRIPT**

11:42:40  1    let's walk through your experience, your initial experience in

11:42:44  2    your clinical practice with permanent chemotherapy-induced

11:42:55  3    alopecia and Taxotere.

11:42:55  4    A.    So my clinical experience started in Italy.  Then, when I

11:43:00  5    moved to Miami, I start seeing cases in Miami as well.  So I've

11:43:03  6    seen -- I would say many, but maybe between 30 and 50 cases of

11:43:10  7    permanent alopecia --

11:43:11  8          THE COURT:  Rephrase -- you might want to just ask the

11:43:14  9    next question.

11:43:14  10   EXAMINATION BY MR. SCHANKER:

11:43:14  11   Q.    So specifically, Doctor, let's -- you indicated clinical

11:43:23  12   experience.  Did that clinical experience then cause you to

11:43:27  13   perform research in this area?

11:43:29  14   A.    Yes, clinical research.

11:43:33  15   Q.    Let's walk the jury through the clinical research that you

11:43:39  16   did in order to gain the knowledge that you have with regard to

11:43:46  17   this topic that enables you to come here and share your opinion

11:43:49  18   with the jury.

11:43:50  19   A.    No.  My clinical research involved looking at the history

11:43:54  20   of these patients, the chronology of the problem.  We did

11:43:59  21   literature review.

11:44:01  22   Q.    I'm sorry, the what?

11:44:02  23   A.    A review of what has been published before.  It's called

11:44:06  24   *literature review*.  In 2012, I think, we did the pathological

11:44:14  25   study, which was to try to define the pathological features of

***OFFICIAL  TRANSCRIPT***

11:44:21  1   this condition.

11:44:22  2          I was recently involved in another study that

11:44:28  3   involved many doctors around the world that also tried to

11:44:35  4   clarify the epidemiology of the features of this condition.

11:44:41  5   Q.   So, as far as that research, the clinical research that

11:44:48  6   you've done, you've indicated that you've published on this

11:44:51  7   topic.  Could you let the jury know how many times you've

11:44:56  8   actually published on this topic of permanent

11:44:59  9   chemotherapy-induced alopecia as it relates to Taxotere?

11:45:03 10   A.   I published four papers.  Three maybe in 2010, 2012 at

11:45:11 11   that time, and one recent paper.

11:45:13 12   Q.   So in addition to your personal experience and then your

11:45:29 13   own clinical research that you performed, you've also talked

11:45:34 14   about your literature review, what you did as far as a

11:45:37 15   literature review in order to reach your conclusion in this

11:45:42 16   case that Barbara's permanent chemotherapy alopecia was caused

11:45:48 17   by Taxotere.  Could you please explain to the jury what you

11:45:54 18   mean by this literature review.

11:45:54 19   A.   You look at what has been published before.  That's all.

11:45:59 20   What we do often when we see something new or something we

11:46:05 21   don't know exactly, we go on *PubMed*, it's called, like a

11:46:11 22   database where you can find if something similar has been

11:46:14 23   published to understand.

11:46:15 24   Q.   And you did that in this case?

11:46:19 25   A.   I always -- I'm always in PubMed most of my day.

**OFFICIAL TRANSCRIPT**

11:46:23  1    Q.    And as far as the literature that you found and relied

11:46:30  2    upon in this case, describe for the jury, is there very little

11:46:36  3    literature out there on this topic, is there an abundance of

11:46:39  4    it?  Explain this so the jury understands.

11:46:40  5    A.    I believe there is a moderate amount of literature, you

11:46:45  6    know, not a -- not much.  But recently, a CME article was

11:46:53  7    published.  I want to explain to you briefly what a CME is.

11:46:58  8          Medical doctors, to maintain their license, they have

11:47:02  9    to have CME.  It's continuing medical education.  So they have

11:47:06 10    to keep -- be up with new thing that happens.  So they have to

11:47:12 11    either go to meeting to get that or to read these CME articles.

11:47:18 12    And there was a recent CME article describing this condition.

11:47:23 13    Q.    And, Doctor, referring to the Martin article?

11:47:31 14    A.    No, no.  The CME, it's an article that was published on

11:47:35 15    the JOD, which is a very important journal for dermatology.

11:47:42 16    Freites Martinez.  The main author is Mario Lacouture.

11:48:01 17    Q.    Doctor, let's go through some of that literature that went

11:48:11 18    to form your opinion in this case.  But before we do that, did

11:48:23 19    you get an idea from your review of the literature as to the

11:48:31 20    number of cases that you see cited concerning what you believe

11:48:36 21    to be Taxotere-caused permanent alopecia versus other

11:48:42 22    chemotherapy drugs that were used in this case?

11:48:44 23    A.    Yes.  From the literature, there are probably published

11:48:51 24    300-and-something cases of Taxotere-induced permanent alopecia,

11:48:58 25    and the numbers for -- just for instance, AC, around 35.  So

*OFFICIAL TRANSCRIPT*

11:49:05  1    there is a very big difference in what has been reported in the

11:49:11  2    literature.

11:49:12  3    Q.   So, I want to go through some of that literature with you

11:49:16  4    here.  But you indicated that in your literature search that

11:49:22  5    you saw -- what did you say as far as --

11:49:27  6    A.   Three-hundred-and-something.  I'm not very good with

11:49:32  7    numbers.

11:49:33  8    Q.   And then it sounds like you also searched the literature

11:49:47  9    concerning A and C; is that correct?

11:49:49 10    A.   Yes.  That's because what she had.  And I think there are

11:49:57 11    35.

11:49:57 12    Q.   Approximately.

11:50:03 13    A.   Approximately.  Also because some literature is not on

11:50:06 14    PubMed, and that literature I cannot assess.  Because sometimes

11:50:15 15    doctors present to meetings and there is an abstract, and that

11:50:18 16    abstract, either you are at a meeting or you don't see.

11:50:23 17    Q.   And, Doctor, this is the literature that you referenced

11:50:26 18    and cited in your report; is that correct?

11:50:29 19    A.   I think there is something new, but it may not be in my

11:50:33 20    report.

11:50:33 21    Q.   There may be newer things.  This is constantly -- just

11:50:37 22    like any science, there is constantly more coming in.  But at

11:50:41 23    the time of your report, do you recall how many -- if you know,

11:50:44 24    how many pieces of literature you ended up citing,

11:50:49 25    approximately?

**OFFICIAL TRANSCRIPT**

11:50:49  1    A.    No.  I don't remember.

11:50:50  2    Q.    Do you have any idea at all?

11:50:57  3    A.    Probably 20, something like that.  It's not a big, big

11:51:02  4    literature.

11:51:02  5    Q.    Did you use the term *moderate* amount of literature?

11:51:05  6    A.    Uh-huh (affirmative response).

11:51:06  7    Q.    Is that right?

11:51:06  8    A.    Yes.

11:51:07  9    Q.    Well, let's go through just a couple of these and work

11:51:11  10   through some issues here that -- questions that the jury may

11:51:14  11   have.

11:51:19  12          From your report, it looks like you reviewed the

11:51:22  13   Martin study and relied upon that; is that correct?

11:51:22  14   A.    Yes.

11:51:27  15   Q.    And we've shown this to the jury earlier, but this -- the

11:51:37  16   Martin study -- and where was that published?

11:51:43  17   A.    In an oncology journal, Breast Cancer, something like

11:51:48  18   that.

11:51:48  19   Q.    The *Breast Cancer Research and Treatment*, is that what

11:51:52  20   you're referring to?

11:51:52  21   A.    Yes.

11:51:53  22   Q.    And then if you could just take us through this Martin

11:52:03  23   study.

11:52:03  24   A.    What's very important of this study, you look, it was sent

11:52:11  25   to the journal on June 11th and accepted after a few days.

**OFFICIAL TRANSCRIPT**

11:52:16  1   That's very important for a paper.  If you have a good paper

11:52:21  2   and you send a good paper to the journal, if you are lucky,

11:52:26  3   they send you back with revisions.

11:52:28  4   Q.   With what?

11:52:30  5   A.   Asking for changes.  If you are unlucky, they reject.  And

11:52:36  6   that happen very often.  But if the paper is very, very good,

11:52:41  7   the editor may decide to accept the paper immediately, which

11:52:45  8   is -- which is rare.

11:52:48  9         Why this paper is very important for me, because this

11:52:53 10   is the first time they show you can prevent this condition by

11:52:59 11   cooling the scalp during chemotherapy.  So this is something

11:53:03 12   that is not involved with this litigation, but I think is very,

11:53:07 13   very important from a medical point of view.

11:53:10 14   Q.   Now, Doctor, with the issues that are involved in this

11:53:15 15   litigation, tell us what the jury should know concerning

11:53:23 16   Martin's study.

11:53:25 17   A.   So they found Grade 2 alopecia in 2 percent [verbatim] of

11:53:31 18   patients with a docetaxel regimen.

11:53:36 19   Q.   What percent was that?

11:53:39 20   A.   10 percent of Grade 2.

11:53:42 21   Q.   So just so I'm clear, I want to make sure from a language

11:53:48 22   standpoint.  So what did Martin -- what did Martin find?

11:53:53 23   Because there is a lot loaded in that sentence.

11:53:57 24   A.   He found a prevalence of 10 percent -- that 10 percent of

11:54:04 25   patients undergoing chemotherapy with a different drug

*OFFICIAL TRANSCRIPT*

11:54:09  1   associated with Taxotere had Type 2 severity permanent

11:54:17  2   alopecia.

11:54:19  3   Q.   So just so I'm clear, so the patients that were involved

11:54:24  4   in this study, 10 percent of them had a particular condition

11:54:32  5   result, and what was that?

11:54:34  6   A.   Permanent alopecia after chemotherapy.

11:54:36  7   Q.   And this patient group --

11:54:39  8   A.   Type 2 severity.

11:54:42  9   Q.   Type 2 severity.  Which is the most severe on the scale?

11:54:46 10   A.   Uh-huh (affirmative response).

11:54:46 11   Q.   And Taxotere was involved in that chemotherapy?

11:54:48 12   A.   Yes.

11:54:49 13        I didn't see the side effects in patients with other

11:54:57 14   chemotherapy agents.

11:54:58 15   Q.   So I understand, was -- in the Martin study, Doctor, did

11:55:11 16   they look at A and C?

11:55:14 17   A.   Yes.  And they had no cases of severe permanent alopecia

11:55:21 18   after chemotherapy.

11:55:22 19   Q.   So what percentage of cases in Martin had severe permanent

11:55:27 20   chemotherapy alopecia of those patients who took the A and C?

11:55:32 21   What percentage?

11:55:34 22   A.   Zero percent.

11:55:35 23   Q.   And just to be clear, Barbara Earnest, you know, received

11:55:43 24   her chemotherapy treatment when?

11:55:46 25   A.   In 2011.

*OFFICIAL TRANSCRIPT*

11:55:47  1    Q.    And this article is from when?

11:55:52  2    A.    2018, I think.  Yes.  Yes.  2018.

11:55:55  3    Q.    Doctor, highlighting another of the articles that was on

11:57:02  4    your reliance list, do you recall the Kang article?

11:57:11  5    A.    Yes, I do.

11:57:18  6    Q.    And the year of that was 2018?

11:57:20  7    A.    Yes.  2018.

11:57:23  8    Q.    And that appeared in what?

11:57:26  9    A.    *The Oncologist*.

11:57:30  10   Q.    *The Oncologist*, that journal?

11:57:32  11   A.    Yes.

11:57:34  12   Q.    Do you have -- obviously you've written publications and

11:57:41  13   written articles that have appeared in publications, but do you

11:57:45  14   have any other involvement with publications at all?

11:57:48  15   A.    I'm editor of a journal.

11:57:50  16   Q.    Which one is that?

11:57:52  17   A.    It's called *Skin Appendage Disorders*.  It's a journal for

11:57:56  18   hair and nail disease.

11:57:57  19   Q.    And so you have great familiarity with the way journals

11:58:04  20   work?

11:58:05  21   A.    Yes, I do.

11:58:05  22   Q.    And with regard to *The Oncologist*, this particular 2018

11:58:12  23   Kang piece of literature, share with the jury why you included

11:58:20  24   in your reliance list.

11:58:21  25   A.    This is a prospective study, so it's more important.  This

*OFFICIAL TRANSCRIPT*

11:58:26  1    is Mario Lacouture here as well.  The people working on this is

11:58:31  2    somehow the same, they are working around the world.

11:58:34  3    Q.    And do you know the individuals, the Lacouture that you

11:58:38  4    mentioned?

11:58:38  5    A.    Yes, I know him, of course.  He's in New York at the

11:58:43  6    Sloan Cancer Center, and he's been involved in studying the

11:58:53  7    side effects of cancer medications.

11:58:57  8            So this is a prospective study.  What means?  For a

11:59:02  9    prospective study, you take a patient before and you follow the

11:59:04 10    patient during the chemotherapy and after the chemotherapy so

11:59:09 11    you have an idea what is happening.

11:59:12 12            They did this study just for looking at the hair, and

11:59:19 13    they measure the density -- again, how many hair -- with the

11:59:23 14    dermoscopy, and the thickness.  So this is an important study

11:59:27 15    because gives us an idea of what happens locally in the scalp;

11:59:36 16    not just looking, but with an instrument that measure.

11:59:39 17    Q.    And what did you find important in the Kang study that you

11:59:49 18    think you should share with the jury?

11:59:50 19    A.    They found in chemotherapy that include Taxotere, it cause

11:59:57 20    permanent alopecia after chemotherapy eight time more

12:00:02 21    frequently than other chemotherapy.

12:00:04 22    Q.    Doctor, with regard to the A and C, did you look at the

12:00:29 23    Kim study?

12:00:32 24    A.    I did.  I think I have it here.  It's again in Korea.

12:00:39 25    They do a lot of study in Korea.

**OFFICIAL TRANSCRIPT**

Q.   And in that Kim study in Korea, do you recall how many AC patients were found to have ongoing or permanent --

A.   Many.  I would say that most of the cases of AC from this paper from Korea.

Q.   Do you recall approximately how many?

A.   I think 29, but I may be wrong.  Something like that.

Q.   So 29 of the AC were all from one study?

A.   Yes.  I would put 29, question mark.  Maybe 27.  I wouldn't swear on 29.

Q.   What type of study was that?  Do you recall?

A.   Yes.  They sent patients a questionnaire, and the patients who answered they had the problem, they take the -- they took the patient in and look at the scalp.

Q.   So, Doctor, with regard to your clinical evidence that you gathered, based on your experience as well as your review of the scientific literature and personal experience in publishing in that regard, did you reach a conclusion as to the specific cause of Barbara Earnest's permanent hair loss?

A.   Yes.  I conclude that her permanent alopecia after chemotherapy is due to the docetaxel, or Taxotere.

Q.   And how does the weight of the evidence play into that?

A.   The weight of the published literature is definitely important, and the clinical presentation, everything, is really very highly indicating that.

Q.   And is that opinion within a reasonable degree of

***OFFICIAL TRANSCRIPT***

12:03:00  1    scientific certainty?

12:03:01  2    A.    Yes.  It is.

12:03:03  3    Q.    Do you believe that that's more likely true than not?

12:03:07  4    A.    I believe that it is much more likely true.

12:03:11  5    Q.    Now, Doctor, in this particular case, there has been some

12:03:21  6    evidence of another chemotherapy drug called paclitaxel, or

12:03:29  7    Taxol.  Are you familiar with that?

12:03:30  8    A.    Yes.

12:03:31  9    Q.    Just to be clear, you understand Barbara Earnest did not

12:03:34 10    take that drug?

12:03:35 11    A.    She did not.

12:03:36 12    Q.    I want to ask you some questions.

12:03:38 13    A.    That's why it was not included in my report.

12:03:40 14    Q.    Okay.  Did you, in the materials that you have put

12:03:46 15    together in this case, review or analyze incidence rates of

12:03:52 16    Taxol?

12:03:52 17    A.    I did, because there are studies on that, yes, I did.

12:03:57 18    Q.    And in your review of the literature and the clinical

12:04:11 19    experience that you have, did you gather the case number -- do

12:04:16 20    you have any idea of case numbers reported in the literature on

12:04:19 21    that?

12:04:20 22    A.    I don't have a clear idea.  Maybe 90, maybe 80, maybe 50.

12:04:25 23    50.  I think 50.

12:04:28 24    Q.    And you were involved -- in one of your recent

12:04:37 25    publications, there were some incident rates of paclitaxel or

*OFFICIAL TRANSCRIPT*

12:04:45 1  Taxol?

12:04:46 2  A.   Yes, it's a publication on quality of life of patients who

12:04:56 3  have permanent alopecia after chemotherapy.   And that show that

12:05:04 4  the quality of life is really affected, but this is not

12:05:08 5  difficult to imagine, and that there were a number of cases

12:05:14 6  from Taxol.

12:05:20 7  Q.   But in your review, those numbers were, as reflected on

12:05:29 8  the demonstrative, significantly less than Taxotere?

12:05:33 9  A.   Yes.

12:05:41 10 Q.   And in that review, is there any indication of severity or

12:05:45 11 anything like that in those publications?   Severity?

12:05:49 12 A.   Yes.   You know, all the publications distinguish a severe

12:05:56 13 from -- the grade, but doesn't indicate if Taxotere or Taxol

12:06:03 14 give a different severity, if this is the question.

12:06:05 15 Q.   So, Doctor, with regard to your conclusions in this case

12:06:11 16 concerning Taxotere and it causing Barbara Earnest's permanent

12:06:19 17 irreversible chemotherapy-caused alopecia, are those opinions

12:06:24 18 within a reasonable degree of scientific probability?

12:06:28 19 A.   Yes, I already answered your question.   Yes, they are.

12:06:32 20      MR. SCHANKER:   I don't have any more questions right

12:06:34 21 now, Your Honor.

12:06:34 22      THE COURT:   Okay.   Thank you.

12:06:36 23           Members of the Jury, it's an ideal time to break

12:06:40 24 for lunch.   Court will be at recess until 12:15 [verbatim].   I

12:06:45 25 remind you, don't discuss the case amongst yourselves or anyone

*OFFICIAL TRANSCRIPT*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)     *
PRODUCTS LIABILITY LITIGATION    *      Docket No.: 16-MD-2740
                                 *      Section "H(5)"
                                 *      New Orleans, Louisiana
Relates to:  Barbara Earnest     *      September 19, 2019
Case No.: 16-CV-17144            *
* * * * * * * * * * * * * * * * *



DAY 4 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139



For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163



For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

3:32PM   1          (WHEREUPON, the jury entered the courtroom.)

3:33PM   2          **THE COURT:**  All jurors are present.  Court's back in

3:33PM   3   session.  You may be seated.

3:33PM   4              Mr. Schanker, redirect.

3:33PM   5              Wait.  Dr. Tosti, I'll remind you, you're under

3:33PM   6   oath.

3:33PM   7              Please proceed.

3:33PM   8              **REDIRECT EXAMINATION**

3:33PM   9   **BY MR. SCHANKER:**

3:33PM  10   **Q.**   So, Dr. Tosti, just a few topics I want to cover based on

3:33PM  11   questions you were asked by defense counsel.  Okay?

3:33PM  12   **A.**   Okay.

3:33PM  13   **Q.**   You were asked about Rogaine began or other hair-growth

3:33PM  14   treatments.

3:33PM  15          Based on your clinical experience, do you believe

3:33PM  16   that, if Ms. Earnest used Rogaine, she would get a full head of

3:33PM  17   hair back?

3:33PM  18   **A.**   No, absolutely not.  She could have improved at minimum,

3:33PM  19   not to remove the wig or the turban.

3:33PM  20   **Q.**   I'm sorry.  What was that?

3:33PM  21   **A.**   Not to be happy to go out without covering her head.

3:33PM  22   **Q.**   Okay.  Just so I'm clear, would you expect regrowth such

3:33PM  23   that she would not have to cover her head?

3:34PM  24   **A.**   No, I would not expect that.

3:34PM  25   **Q.**   What would you expect, just so the jury understands?

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

3:34PM  1    **A.**   Minimal improvement so that the hair become minimal

3:34PM  2    thicken, but that's -- but using something on your scalp twice

3:34PM  3    a day, which, of course, it's boring and expensive for what you

3:34PM  4    can have.

3:34PM  5              **MR. SCHANKER:**   Your Honor, actually, I don't need the

3:34PM  6    clarification.

3:34PM  7    **BY MR. SCHANKER:**

3:34PM  8    **Q.**   Dr. Tosti, you were asked by defense attorney about some

3:34PM  9    photographs that you had, photographs Ms. Earnest had.

3:34PM  10             You've had the opportunity to treat women with hair

3:34PM  11   loss issues over your 30-plus-year career; correct?

3:34PM  12   **A.**   Yes.

3:34PM  13   **Q.**   Have you had experience as to whether these women

3:35PM  14   typically are interested in having photographs taken of them

3:35PM  15   without a head covering or photographs taken of them with no

3:35PM  16   wig on?

3:35PM  17   **A.**   Depends.  I cannot answer this question.

3:35PM  18   **Q.**   Just depends on the individual?

3:35PM  19   **A.**   Depends on the individual.

3:35PM  20   **Q.**   Would you be surprised if Ms. Earnest or others in her

3:35PM  21   position are not --

3:35PM  22             **THE COURT:**   Sustained.

3:35PM  23             **THE WITNESS:**   I --

3:35PM  24             **THE COURT:**   No.  That's fine.

3:35PM  25             Next question, Mr. Schanker.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

3:35PM  1  **BY MR. SCHANKER:**

3:35PM  2  **Q.**   You were asked about androgenetic alopecia and

3:35PM  3  female-pattern hair loss.  In 50 percent of -- I want to make

3:35PM  4  sure I understand and then ask you questions about it.

3:35PM  5          Something about 50 percent of women at some point may

3:35PM  6  have suffered from this condition?

3:35PM  7  **A.**   Yes.

3:35PM  8  **Q.**   And so if you could just sort of educate us, make sure

3:35PM  9  we're clear on that, because I don't know if that was clear.

3:36PM  10         At what point in time do women typically have this,

3:36PM  11  and then how does it present?

3:36PM  12  **A.**   Okay.  There are, I would say, two peaks important in the

3:36PM  13  literature.  One peak that present around when they have their

3:36PM  14  first baby, after delivery sometimes; and the other peak after

3:36PM  15  menopause.  Okay.  Those are the times that women have most the

3:36PM  16  problem.  But now I see a lot of young women with the problem.

3:36PM  17         And the condition presents as a progressive thinning

3:36PM  18  of the top of the scalp.  So you can see the scalp through the

3:36PM  19  hair.

3:36PM  20  **Q.**   Hold on just one sec.

3:36PM  21         **THE JUROR:**  I'm good.

3:36PM  22         **MR. SCHANKER:**  Are you okay?

3:36PM  23         **THE COURT:**  Oh, I'm sorry.

3:36PM  24         **MR. SCHANKER:**  No problem.  Don't worry about it.  We

3:36PM  25  can just -- hold on for a second.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

| | |
|---|---|
| 3:36PM | 1 |
| 3:36PM | 2 |
| 3:36PM | 3 |
| 3:37PM | 4 |
| 3:37PM | 5 |

3:36PM 1    **THE JUROR:**  That's all right.  I'm good.

3:36PM 2    **MR. SCHANKER:**  I'm sorry, Dr. Tosti.

3:36PM 3         Can we continue, Your Honor?

3:37PM 4    **THE COURT:**  Please.

3:37PM 5  BY MR. SCHANKER:

3:37PM 6  **Q.**   Go ahead.

3:37PM 7  **A.**  So you start seeing the scalp through the hair.  So

3:37PM 8  usually that part becomes larger, okay, and sometimes even the

3:37PM 9  front of the hairline.  And then that can progress.  Usually,

3:37PM 10  it's a slow progression, okay, and becomes little bit -- little

3:37PM 11  bit more evident, as I show in those case.

3:37PM 12  **Q.**   So how does this condition that you're describing compare

3:37PM 13  to what Barbara suffers from as far as presentation?

3:37PM 14  **A.**   It's never so severe and never affects, as I said several

3:37PM 15  times, the back of the scalp.

3:37PM 16  **Q.**   And so is that part of why you ruled that out in this

3:37PM 17  case?

3:37PM 18         **MS. SASTRE:**  Leading, Your Honor.

3:37PM 19         **THE COURT:**  You're leading.

3:38PM 20              Sustained.

3:38PM 21  BY MR. SCHANKER:

3:38PM 22  **Q.**   And did you rule that out in this case, androgenetic

3:38PM 23  alopecia?

3:38PM 24  **A.**   Yes, I did rule it out because of the history, which is

3:38PM 25  very different.  Because history is an incomplete hair regrow

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

3:38PM   1   after the end of chemotherapy.  It's not gradual thinning of

3:38PM   2   the scalp.  And from the clinical examination, because it was

3:38PM   3   too severe for being that.

3:38PM   4   Q.   Let's move on to a different topic.  We've heard about the

3:38PM   5   slides that were provided from the pathology that was taken

3:38PM   6   here in New Orleans to Dr. Thompson.

3:38PM   7        And were there two kinds of slides that were

3:38PM   8   provided?

3:38PM   9   A.   No.  It's different.  The biopsy means the tissue went

3:38PM  10   from here to Dr. Thompson.  Dr. Thompson cut the tissues and

3:39PM  11   did the stains and look at the slides.

3:39PM  12   Q.   Okay.  So you just described the pathology that was sent

3:39PM  13   from the biopsies; is that right?

3:39PM  14   A.   Yes.

3:39PM  15   Q.   And does that have anything to do with the conversation

3:39PM  16   about this stem cell?

3:39PM  17           MS. SASTRE:  Objection.

3:39PM  18           THE WITNESS:  Yes.

3:39PM  19           MS. SASTRE:  Objection.  It's vague and ambiguous,

3:39PM  20   Your Honor.

3:39PM  21           THE COURT:  Rephrase your question.

3:39PM  22           MR. SCHANKER:  Thank you.

3:39PM  23   BY MR. SCHANKER:

3:39PM  24   Q.   So we have those biopsies.

3:39PM  25           And what were done with those biopsies, just to

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

| | | |
|---|---|---|
| 3:57PM | 1 | **A.**   Absolutely, yes. |
| 3:57PM | 2 | **Q.**   And explain why she -- in your opinion, just so I'm clear, |
| 3:57PM | 3 | why she does not suffer from endocrine-induced alopecia. |
| 3:57PM | 4 | **A.**   First -- |
| 3:57PM | 5 | **MS. SASTRE:**  Your Honor, I object.  This was explored |
| 3:57PM | 6 | on direct exam.  It's repetitive of the direct.  It's not |
| 3:58PM | 7 | responsive to cross. |
| 3:58PM | 8 | **THE COURT:**  Overruled. |
| 3:58PM | 9 | **MR. SCHANKER:**  Thank you, Your Honor. |
| 3:58PM | 10 | BY MR. SCHANKER: |
| 3:58PM | 11 | **Q.**   Go ahead. |
| 3:58PM | 12 | **A.**   First of all, the history.  So she had -- the hair didn't |
| 3:58PM | 13 | regrow after chemotherapy.  Instead, in endocrine-induced |
| 3:58PM | 14 | alopecia, you have your hair and then you lose the hair after |
| 3:58PM | 15 | chemotherapy. |
| 3:58PM | 16 | **Q.**   Let's stop and just make sure that the jury understands |
| 3:58PM | 17 | that. |
| 3:58PM | 18 | So after chemotherapy, when do you expect the hair to |
| 3:58PM | 19 | regrow? |
| 3:58PM | 20 | **A.**   Usually at three months after the end of chemotherapy, the |
| 3:58PM | 21 | hair has regrowth.  There is the Kang paper.  They measure the |
| 3:58PM | 22 | density, and they show that people will regrow -- will likely |
| 3:58PM | 23 | regrow after three months.  And that's when, usually, you start |
| 3:58PM | 24 | the endocrine therapy.  So they don't overlap. |
| 3:58PM | 25 | **Q.**   Okay.  So Barbara's chemotherapy ended in what month?  Do |

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

3:59PM  1    you recall?

3:59PM  2    A.   I know she started the endocrine therapy November.  That

3:59PM  3    was three months after it ended.  So it's September, October,

3:59PM  4    November.

3:59PM  5    Q.   Right.  So is it your impression that it was August when

3:59PM  6    she ended her chemotherapy?

3:59PM  7    A.   Yes.  Three months before, yes.

3:59PM  8    Q.   Okay.  And then -- so her endocrine therapy started in

3:59PM  9    what month?

3:59PM  10   A.   November.  And she had no hair regrowth at that time.

3:59PM  11   Q.   And what would you have expected in November, as far as

3:59PM  12   hair regrowth goes?

3:59PM  13   A.   First, the hair should have start to regrow.  But then, to

3:59PM  14   make a diagnosis of endocrine-induced alopecia, you have to

3:59PM  15   start with hair.  You know, it's a diagnostic criteria.

3:59PM  16   Q.   So an individual with endocrine-induced alopecia, which is

4:00PM  17   from the hormone drugs, who starts with hair, takes the

4:00PM  18   endocrine drug.

4:00PM  19        When do they start to experience hair loss from that

4:00PM  20   endocrine drug?

4:00PM  21   A.   Exactly.  And they may have a little bit of androgenetic

4:00PM  22   alopecia before, but they cannot be without hair or almost

4:00PM  23   without hair before.  This is a criteria for diagnosis.

4:00PM  24   Q.   And, Doctor, do you remember when this photograph on the

4:00PM  25   right was shown by defense counsel?

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

4:00PM  1    **A.**   Yes, I do.

4:00PM  2    **Q.**   And this is -- did you notice that that photograph had

4:01PM  3    been rotated the other direction in the picture that we looked

4:01PM  4    at?

4:01PM  5    **A.**   I didn't notice, but I notice now.

4:01PM  6    **Q.**   Doctor, you were asked questions about the different

4:01PM  7    grades of permanent chemotherapy-induced alopecia during the

4:01PM  8    cross-examination.  I want to follow-up on that.

4:01PM  9          Based your knowledge, which chemotherapy drug as

4:01PM  10   reported in the literature causes Grade 2 permanent

4:01PM  11   chemotherapy-induced alopecia such as the kind that Barbara

4:01PM  12   suffers from?

4:01PM  13         **MS. SASTRE:**  Objection.  Your Honor, I didn't go

4:01PM  14   through the grades in the context.  Beyond the scope.

4:01PM  15         **MR. SCHANKER:**  Your Honor, clearly we went through

4:01PM  16   grades in detail.

4:01PM  17         **THE COURT:**  I think there was some --

4:01PM  18         **MS. SASTRE:**  That was limited to endocrine questions,

4:01PM  19   Your Honor, strictly limited to it.

4:01PM  20         **THE COURT:**  Overruled.

4:01PM  21   BY MR. SCHANKER:

4:01PM  22   **Q.**   Would you like me to ask the question again, Doctor?

4:02PM  23   **A.**   Yes.

4:02PM  24   **Q.**   Based on your knowledge and experience, Doctor, which

4:02PM  25   chemotherapy drug as reported in the literature causes Grade 2

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - REDIRECT

4:02PM   1   personal chemotherapy-induced alopecia?

4:02PM   2   **A.**   Taxotere, but I cannot disprove that also Taxol can do it.

4:02PM   3   **Q.**   Doctor, you were asked questions specifically concerning

4:02PM   4   Taxol and the rates and incidents that occur in the literature.

4:02PM   5        Do you recall that on the cross-examination?

4:02PM   6   **A.**   Yes.

4:02PM   7   **Q.**   And you -- is it still your opinion that -- that there are

4:02PM   8   roughly 50 Taxol cases in the literature that report some

4:02PM   9   incidence of permanent chemotherapy-induced alopecia?

4:03PM  10   **A.**   Yes.  Because when I did this, I already included the new

4:03PM  11   paper.

4:03PM  12   **Q.**   And, Doctor, you explained to us what your conclusion is

4:03PM  13   in this case, and you've been asked a lot of questions on

4:03PM  14   cross-examination, and I want to ask you:  Has your conclusion

4:03PM  15   in any way changed in this case that it is the Taxotere that

4:03PM  16   within a reasonable degree of scientific probability is the

4:03PM  17   cause of Barbara's permanent chemotherapy-induced alopecia?

4:03PM  18   **A.**   No.  My conclusion is the same.  I -- I believe that

4:03PM  19   permanent alopecia is the most -- most likely cause.

4:04PM  20   **Q.**   One more line of question concerning the Arimidex.  When

4:04PM  21   you see a patient who has her hair and then begins taking

4:04PM  22   Arimidex, when typically will that patient, if at all, begin

4:04PM  23   experiencing the hair thinning that you have described?

4:04PM  24   **A.**   That the data from the literature show in the first year.

4:04PM  25   So either you start developing or you don't.

OFFICIAL TRANSCRIPT

ELLEN FEIGAL - VOIR DIRE

4:57PM  1    **A.**   Yeah, actually.

4:57PM  2    **Q.**   When did you last teach in it?

4:57PM  3    **A.**   Yesterday.  I actually taught at the opening session.  So

4:57PM  4    I did a very quick trip from here to Washington, D.C., so that

4:58PM  5    I can open the session for the program.

4:58PM  6    **Q.**   Now, you were in this courtroom earlier this week; right?

4:58PM  7    **A.**   Yes, I was.

4:58PM  8    **Q.**   You went to Washington to teach this course --

4:58PM  9    **A.**   Yes.

4:58PM  10   **Q.**   -- and you came back?

4:58PM  11   **A.**   Right.

4:58PM  12   **Q.**   Okay.

4:58PM  13           **MR. MICELI:**  Your Honor, I tender Dr. Ellen Feigal as

4:58PM  14   an expert in clinical research, clinical study design and

4:58PM  15   interpretation, and general causation.

4:58PM  16               Any objection?

4:58PM  17           **MR. STRONGMAN:**  No objections to the subject matters.

4:58PM  18           **THE COURT:**  Okay.  Court's going to accept Dr. Feigal

4:58PM  19   as an expert in the field of clinical research, clinical study

4:58PM  20   design, interpretation -- study design and interpretation and

4:58PM  21   general causation, qualified to render opinions.

4:58PM  22           **MR. MICELI:**  Your Honor, let the record reflect it's

4:58PM  23   4:59.

4:58PM  24           **THE COURT:**  I wasn't going to let you say one more

4:58PM  25   word.

OFFICIAL TRANSCRIPT

08:48:06

```
 1                     UNITED STATES DISTRICT COURT

 2                     EASTERN DISTRICT OF LOUISIANA

 3

 4

 5    IN RE:   TAXOTERE (DOCETAXEL)
               PRODUCTS LIABILITY            Docket No.: 16-MD-2740
 6             LITIGATION                    Section "H(5)"
                                             September 20, 2019
 7                                           New Orleans, Louisiana

 8    Relates To:  Barbara Earnest,
      Case No.: 16-CV-17144
 9

10    * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
                          DAY 5, MORNING SESSION
12             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                  UNITED STATES DISTRICT JUDGE

14

15    APPEARANCES:

16    For the Plaintiffs:          Barrios, Kingsdorf & Casteix, LLP
                                   BY:  DAWN BARRIOS, ESQ.
17                                 701 Poydras Street
                                   Suite 3650
18                                 New Orleans, Louisiana 70139

19

20    For the Plaintiffs:          Gainsburgh, Benjamin, David,
                                     Meunier & Warshauer, LLC
21                                 BY:  PALMER LAMBERT, ESQ.
                                   2800 Energy Centre
22                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163-2800
23

24

25

                          *OFFICIAL TRANSCRIPT*
```

08:32:52 1            There are two items on your CV that we didn't go over

08:32:56 2     with the jury, and that is, what do you currently do today

08:33:01 3     professionally?

08:33:02 4     A.    Currently today I'm a partner in NDA Partners.  It's a

08:33:07 5     global strategy firm that helps in medical product development.

08:33:12 6     Q.    In the -- does that -- NDA Partners, do they also do

08:33:17 7     litigation support?

08:33:18 8     A.    They can do litigation support.

08:33:19 9     Q.    Will you please tell the jury about your experience in

08:33:23 10    testifying in court.

08:33:24 11    A.    I have never testified before in a trial.  And I've never

08:33:28 12    given any depositions before this case.

08:33:30 13    Q.    And we talked about some of your teaching experience at

08:33:36 14    UC San Francisco, UC San Diego yesterday.  Do you teach

08:33:36 15    anywhere currently other than the course that you mentioned

08:33:44 16    that you were teaching Wednesday?

08:33:44 17    A.    I'm also adjunct professor at the Sandra Day O'Connor

08:33:53 18    College of Law in Phoenix, Arizona, and I teach two classes

08:33:54 19    there.

08:33:54 20    Q.    Let's just jump right into it.  Please tell the jury what

08:34:01 21    you were asked to do in relationship to this case.

08:34:04 22    A.    I was asked to look into the potential causal relationship

08:34:07 23    of Taxotere in causing permanent persistent alopecia.

08:34:16 24    Q.    And what did your investigation include?  And I would ask

08:34:20 25    you, just direct your answers to the jury, please.

**OFFICIAL TRANSCRIPT**

08:34:23  1    A.    Okay.  Well, my investigation included using reliable

08:34:28  2    scientific methods to evaluate the evidence in different

08:34:31  3    categories of information.  This included the clinical trials

08:34:35  4    that were sponsored by Sanofi.  It included what was available

08:34:39  5    in the worldwide published literature on Taxotere and

08:34:44  6    permanent, persistent or irreversible alopecia, and included

08:34:49  7    looking at the internal pharmacovigilant database from Sanofi

08:34:54  8    on safety reporting of permanent irreversible alopecia.

08:34:58  9    Q.    What exactly is your opinion?

08:35:01  10   A.    My opinion, based on my review of these different

08:35:05  11   categories of information, is that there is reasonable

08:35:09  12   scientific evidence that Taxotere causes permanent irreversible

08:35:12  13   alopecia.

08:35:12  14   Q.    When you say *permanent irreversible alopecia*, we've heard

08:35:18  15   testimony in this case so far about hair falling out.  Are we

08:35:21  16   talking about hair falling out or hair not regrowing?

08:35:25  17   A.    We're talking about hair that the patients lose and not

08:35:32  18   sufficiently coming back within a period after the end of

08:35:35  19   chemotherapy.

08:35:35  20   Q.    Okay.  Now, because of your answer, I have to ask this.

08:35:39  21   Does this mean that every woman that takes Taxotere is going to

08:35:43  22   end up with hair loss?

08:35:44  23   A.    No.

08:35:44  24   Q.    What does it mean?

08:35:47  25   A.    It means that some individuals who take Taxotere can end

*OFFICIAL TRANSCRIPT*

08:35:52  1    up with permanent or irreversible alopecia.

08:35:54  2    Q.    Okay.  Now, if you said this already, I apologize.  It's

08:35:59  3    the first thing in the morning, and I shouldn't be forgetting

08:36:01  4    things yet, but what exactly -- what sources of data or

08:36:05  5    evidence did you review in order to educate yourself to give an

08:36:08  6    opinion?

08:36:09  7    A.    Well, the sources of information I looked at, I briefly

08:36:13  8    mentioned earlier, but basically I looked at the randomized

08:36:18  9    clinical trials that were sponsored by Sanofi, the TAX316, the

08:36:22  10   TAX301, the protocol, and the clinical study reports that went

08:36:26  11   out to ten years.

08:36:28  12         I also looked at the published literature.  I did a

08:36:33  13   search using PubMed and EndNote using computer algorithms to

08:36:38  14   look for relevant articles related to permanent irreversible or

08:36:40  15   persistent alopecia, and then used the term specific for the

08:36:43  16   types of chemotherapy the patients with breast cancer use.

08:36:46  17         I also looked and then I reviewed those -- all of

08:36:50  18   those articles that came up on those -- that were relevant to

08:36:53  19   my search.  And then I also looked at -- Sanofi has a

08:36:57  20   pharmacovigilance database where safety reporting comes into

08:37:02  21   the company, and there are a certain number of reports that

08:37:06  22   were relevant to permanent irreversible or alopecia that lasts

08:37:09  23   a certain duration or period, and that is what I reviewed.

08:37:13  24   Q.    Did you apply the same sort of standards or methods that

08:37:19  25   you would use to investigate issues outside of the context of

*OFFICIAL TRANSCRIPT*

08:37:22  1   the courthouse?

08:37:23  2   A.   Yes.  I mean, there are certain criteria that I used to

08:37:27  3   try to establish causation.  So I did look at a variety of

08:37:30  4   those different factors to evaluate the evidence.

08:37:33  5   Q.   Can you tell us what those factors are?

08:37:36  6   A.   Sure.  Those factors include issues such as consistency of

08:37:41  7   the data, particularly because I was looking at different

08:37:43  8   bodies of evidence, so I was looking at the cumulative body of

08:37:46  9   evidence and whether or not there was a consistent trend across

08:37:50 10   all of those different areas.

08:37:51 11          I also looked at biologic plausibility.  Let me ask

08:37:56 12   you if you want me to go into detail with each of these

08:38:00 13   criteria or just explain the criteria right now.

08:38:02 14   Q.   Why don't you just list the criteria, and then we can go

08:38:05 15   through one at a time.

08:38:06 16   A.   I looked at whether or not there was reasonable biological

08:38:06 17   plausibility for Taxotere causing --

08:38:06 18          THE REPORTER:  Can you just slow down a little bit?

08:38:06 19          THE WITNESS:  I'm sorry.

08:38:12 20   EXAMINATION BY MR. MICELI:

08:38:12 21   Q.   Remember, we have more than 15 minutes we had yesterday,

08:38:18 22   Dr. Feigal.

08:38:18 23   A.   So I'll start over.  I looked at consistency.  I looked at

08:38:23 24   biologic plausibility.  I looked at specificity, whether or not

08:38:29 25   the outcome of interest, permanent irreversible alopecia or

*OFFICIAL TRANSCRIPT*

08:38:34  1    persistent alopecia, was related to Taxotere.  I looked at dose

08:38:38  2    response, whether or not -- if you get more of Taxotere,

08:38:43  3    whether that can lead to a higher degree of permanent

08:38:47  4    irreversible or persistent alopecia or a more severe grade of

08:38:53  5    alopecia.

08:38:53  6           I looked at coherence and whether or not it was --

08:39:00  7    whether or not there was any conflicting evidence with what was

08:39:03  8    in the literature about these issues.

08:39:06  9           I looked at temporality, whether or not the exposure

08:39:12  10   preceded the event of permanent irreversible or persistent

08:39:16  11   alopecia.  I didn't just look at whether it preceded reversible

08:39:21  12   alopecia.  I looked at whether it preceded the event of

08:39:26  13   permanent irreversible persistent alopecia.

08:39:27  14          There was some other criteria I may have forgotten

08:39:30  15   without a little bit of a trigger here, but the other criteria

08:39:34  16   that you can look at is challenge, dechallenge and rechallenge,

08:39:38  17   where you actually have the patient receive the exposure, then

08:39:43  18   you take them away from exposure, and then you rechallenge them

08:39:46  19   with the exposure.  That's really not possible with a toxic

08:39:53  20   chemotherapy agent.  We don't just rechallenge them, so I

08:39:57  21   didn't use that criteria.

08:39:59  22          The other criteria is whether or not there is an

08:40:01  23   analogy with other conventional chemotherapy causing permanent

08:40:04  24   persistent or irreversible alopecia, and there is not another

08:40:07  25   analogy in terms of that.

*OFFICIAL TRANSCRIPT*

08:40:08  1    Q.    Okay.  I'm going to do the court reporter a favor, I hope,

08:40:12  2    and ask you to keep slowing down, because I don't want to pick

08:40:14  3    up the pace as we run through the answers.

08:40:18  4    A.    Sure.

08:40:18  5    Q.    Did you look at strength of association?

08:40:20  6    A.    I did look at strength of association.  And so strength of

08:40:23  7    association is really thinking about the magnitude of effect,

08:40:27  8    and so looking at whether or not there is a -- how strong is

08:40:30  9    the association with permanent persistent or irreversible

08:40:34 10    alopecia.

08:40:34 11    Q.    Okay.  I'm going to -- okay.

08:40:39 12    A.    There is basically nine different -- may I just make one

08:40:42 13    more comment?  There is basically nine different criteria that

08:40:47 14    I looked at.  You don't have to check the box for every

08:40:50 15    criteria, but basically you have to look at the criteria, apply

08:40:54 16    those that are relevant, and base the interpretation of all of

08:40:59 17    that evidence as to whether or not there is a causal

08:41:03 18    relationship to permanent alopecia.

08:41:09 19            MR. MICELI:  Mr. Strongman agreed that I could --

08:41:14 20            THE COURT:  Thank you.

08:41:14 21    EXAMINATION BY MR. MICELI:

08:41:20 22    Q.    There we have it.  Does this circle here go over the

08:41:28 23    factors you considered?

08:41:29 24    A.    Yes, it does.

08:41:30 25    Q.    Let's talk about those individually.

*OFFICIAL TRANSCRIPT*

08:41:39 1       But before we talk about them individually, because

08:41:42 2  there are nine factors -- there are eight pieces of this

08:41:47 3  puzzle, but I have analogy and experiment up in the upper

08:41:49 4  left-hand corner -- do those apply to your analysis of whether

08:41:53 5  Taxotere causes permanent irreversible hair loss, hair that

08:41:59 6  doesn't come back?

08:42:00 7  A.    Those particular criteria don't really apply.  As I

08:42:04 8  briefly mentioned, the challenge, dechallenge, rechallenge,

08:42:08 9  very difficult to do an experimental setting with this kind

08:42:11 10 of -- with any kind of toxic chemotherapy.  It's not just

08:42:16 11 Taxotere, but any kind of toxic chemotherapy, that would be a

08:42:20 12 very difficult criteria to meet.

08:42:22 13      The other criteria that he mentioned is analogy.

08:42:27 14 Once again, I said there is really not an analogous situation

08:42:29 15 of conventional chemotherapy in the setting of breast cancer

08:42:33 16 where this occurs.

08:42:34 17 Q.    Let's walk through these and just define them, if we

08:42:43 18 could.  What is plausibility?

08:42:44 19 A.    Plausibility is the possibility, the potential.  It's a

08:42:52 20 reasonable setting that this could occur.

08:42:55 21 Q.    Explain that to the jury.  When you direct your answers,

08:42:58 22 if you could, Dr. Feigal, explain this to the jury.  What is

08:43:03 23 temporality?

08:43:04 24 A.    So temporality is really based on the presence -- on the

08:43:09 25 premise that the exposure has to precede the event.

*OFFICIAL TRANSCRIPT*

08:43:13  1          The event in this case is permanent irreversible or

08:43:17  2   persistent alopecia.  It's not about reversible alopecia.

08:43:21  3   Everybody knows and accepts that cytotoxic chemotherapy does

08:43:28  4   cause reversible alopecia.

08:43:30  5          This is about the event downstream of permanent

08:43:34  6   irreversible or persistent, and that the exposure to the event,

08:43:37  7   Taxotere, has to precede that event.

08:43:41  8   Q.    Then can you have temporality where the injury that

08:43:48  9   manifests itself does not come along until sometime after the

08:43:52  10   exposure, like six months, a year or two years, as we may hear

08:43:57  11   in this case?

08:43:57  12   A.    Oh, absolutely.

08:43:58  13   Q.    Let's walk through -- I've fallen down on my job.  We

08:44:05  14   already talked about plausibility.

08:44:07  15          We've talked about temporality.

08:44:09  16          Now let's talk about consistency.  What is

08:44:13  17   consistency?

08:44:15  18   A.    Consistency is that it's -- it really aligns with

08:44:20  19   different lines of evidence.  Some of the strongest evidence

08:44:23  20   for causation is that you're looking at different categories of

08:44:28  21   interest, so -- different categories of evidence.

08:44:31  22          So I was looking at randomized clinical trials.  I

08:44:36  23   was looking at published literature.  I was looking at the

08:44:37  24   pharmacovigilance database.

08:44:39  25          Some of the most -- best ways to look for consistency

**OFFICIAL TRANSCRIPT**

08:44:42  1   is whether the compass is pointing in the same direction when

08:44:46  2   you're looking at these different areas of evidence.  So

08:44:51  3   consistency is everybody -- everything is going in the same

08:44:54  4   direction.

08:44:54  5   Q.   Thank you.

08:44:57  6        If we could, explain what coherence is.

08:45:00  7   A.   Well, coherence is really does it -- are there evidence

08:45:06  8   you're finding that contradicts what's out there, so if there

08:45:11  9   is -- does it really seriously conflict with other -- other

08:45:16 10   evidence that's out there about the causation of permanent

08:45:19 11   irreversible -- maybe I -- if I could, just say *permanent*

08:45:23 12   *alopecia* for the other three terms that we're using today.

08:45:26 13   Q.   Certainly.  I want to keep walking through the factors of

08:45:30 14   the criteria.  Can you explain what specificity is?

08:45:36 15   A.   Well, specificity -- and the whole topic of what we're

08:45:39 16   talking about today is Taxotere.  We're not talking about, you

08:45:42 17   know, all the laundry list of other things that could cause

08:45:46 18   permanent alopecia.  The topic is Taxotere.  And can Taxotere

08:45:51 19   cause permanent alopecia?

08:45:53 20        So I specifically looked for that alignment in the

08:45:57 21   evidence of whether all the needles on the compass pointed --

08:46:03 22   reasonably pointed to Taxotere as being the causative agent.

08:46:07 23   Q.   Can you explain what dose response is?

08:46:13 24   A.   Well, the concept of dose response -- and it's true even

08:46:17 25   when you're looking at product development, and you're trying

*OFFICIAL TRANSCRIPT*

08:46:20 1    to see whether a higher dose or a longer period of dosing

08:46:25 2    actually leads to heightened, say, response rate.

08:46:29 3            You know, you have a patient with cancer.  You have a

08:46:32 4    low dose, and then you have a higher dose.  You have different

08:46:36 5    cycles of chemotherapy you give.  One of the concepts is, if

08:46:41 6    it's due to the drug, the activity, maybe a higher dose leads

08:46:45 7    to a higher level of activity.

08:46:47 8            In the same vein, no pun intended, but you can look

08:46:51 9    at that in terms of safety.  Sometimes if you give -- and

08:46:54 10   that's often how we do early phase clinical trials, is you get

08:46:58 11   to a higher dose, does it lead to more toxicity?

08:47:04 12           So, basically, dose response, if you see that, gives

08:47:07 13   stronger evidence that the effect is due to that exposure.  In

08:47:10 14   this instance, the exposure is Taxotere.

08:47:12 15           Does that make sense?

08:47:14 16   Q.   All right.  I think it does.

08:47:16 17           Dr. Feigal, before we move on to the next criteria,

08:47:21 18   you talked about dose response.  We talked about lower doses

08:47:24 19   and higher doses.  In every situation, do you look just at the

08:47:29 20   dose that is given at any one time, or is it also cumulative

08:47:35 21   dosing that you have to be concerned of?

08:47:37 22   A.   So when you look -- I'm not a pharmacologist, but when you

08:47:42 23   at the -- but I certainly have reviewed a lot of pharmacology

08:47:46 24   in my day.  But, basically, what you look -- you know, there is

08:47:48 25   different ways that the pharmacology of the product can impact

**OFFICIAL TRANSCRIPT**

08:47:53   1    on safety or efficacy.

08:47:56   2         So sometimes you look at the dose.  Maybe the peak

08:48:00   3    dose is perhaps what causes the toxicity.  Other times you look

08:48:03   4    at what's called the *area under the curve*.  You look at the

08:48:07   5    cumulative dose over time, and is it that cumulative dose

08:48:12   6    that's at -- you know, you give, you know, anywhere from three

08:48:15   7    to six cycles of chemotherapy.  Is it that you're giving that

08:48:21   8    cumulative dose, and that's what's leading to the toxicity?

08:48:25   9         So in the specific instance of Taxotere, the data

08:48:28  10    shows that it's that cumulative dose over time, not the

08:48:32  11    individual dose, but the cumulative, that leads to the

08:48:35  12    increased toxicity.

08:48:36  13    Q.   The next piece of the puzzle -- or criteria as we move

08:48:44  14    around the circle is the strength of association.  Can you

08:48:48  15    explain to the jury what strength of association is?

08:48:50  16    A.   So what I looked at is, really, the cumulative evidence.

08:48:53  17    As I said, you know, is it just one article?  Is it 19

08:48:57  18    articles?  In this particular instance, I found 19 articles

08:49:01  19    that were relevant to the topic under discussion.  Was there,

08:49:04  20    you know, no randomized clinical trials, or did we have

08:49:09  21    randomized clinical trials that showed this effect?

08:49:12  22         Then I looked at the pharmacovigilance database.

08:49:14  23    Were there no safety reporting coming in?  Was there some

08:49:18  24    safety reporting coming in?

08:49:19  25         So I looked at the magnitude of the effect across the

*OFFICIAL TRANSCRIPT*

08:49:23  1   different categories of evidence.  That leads to -- it's

08:49:25  2   qualitative -- from my -- I'm not the biostatistician, so I

08:49:29  3   looked at the qualitative evidence over all these different

08:49:32  4   categories of evidence.

08:49:33  5        There is another, you know, biostatistician who can

08:49:37  6   talk to you about the strength of association and whether it's

08:49:40  7   statistically significant.  I looked at the medical qualitative

08:49:46  8   judgment of these issues.

08:49:47  9   Q.   Thank you.

08:49:48 10        Then the last one that completes this circle is

08:49:52 11   analogy and experiment.  I believe you said earlier already

08:49:55 12   that these two don't apply?

08:49:57 13   A.   These two criteria really aren't relevant to the case

08:50:00 14   under study.  As I also said at the beginning, this is not a

08:50:03 15   check box.  You know, you have to check the box for all these

08:50:06 16   different criteria.  You don't need all of them.  You just need

08:50:09 17   to have some of them and show that there is relevance -- there

08:50:14 18   is enough evidence.

08:50:15 19        It's qualitative decision of whether or not this is

08:50:18 20   causative evidence for Taxotere and permanent alopecia.

08:50:22 21   Q.   Okay.  Now, you said you don't have to check every box.

08:50:28 22   Is there any magic number that we have to look to?

08:50:30 23   A.   There's not a magic number.

08:50:31 24   Q.   Okay.  Before we go further into applying these, I want to

08:50:36 25   talk -- let's talk about the data you reviewed.

**OFFICIAL TRANSCRIPT**

08:50:42  1        The jury has heard a lot about Sanofi's

08:50:45  2   clinical trials, TAX301, TAX316.  They've heard about some

08:50:49  3   medical literature.  They've heard about Sanofi's internal

08:50:54  4   database.  So I don't want to have to re-plow the same ground

08:50:57  5   with you to summarize those things, but I do want the jury to

08:51:01  6   understand how you reviewed and analyzed this evidence.

08:51:04  7        So can you walk us through each of the data sources

08:51:07  8   that you relied upon first with the clinical trial data.  What

08:51:12  9   exactly did you look at in the clinical trials?

08:51:16 10   A.   So I looked at the clinical trial protocol.  I looked at

08:51:19 11   the objectives.  I look at the dosing.  I looked at the sample

08:51:23 12   size.  I looked at how the -- how the patients were supposed to

08:51:28 13   have been followed, the time intervals they followed, the

08:51:32 14   length of time of follow-up.

08:51:34 15        Then I also looked at the clinical study report.  In

08:51:37 16   particular, I looked at the ten-year clinical study report.

08:51:41 17   There was ten-year follow-up on those patients.

08:51:44 18   Q.   So you said you looked at the clinical study report.  Did

08:51:50 19   you look at the actual, you know, the hard data, or is it the

08:51:54 20   data in the clinical study report that you relied upon?

08:51:54 21   A.   I looked at the -- you know, I didn't look at thousands

08:51:58 22   and thousands of pages of raw data.  I did not do that.  I

08:52:01 23   looked at the summary of the data and I did look at the tables,

08:52:04 24   and I reviewed the clinical study report as it pertains to the

08:52:08 25   pertinent findings from that clinical study report.

**OFFICIAL TRANSCRIPT**

08:52:10   1    Q.    Okay.   Are there any other sources of evidence that you

08:52:15   2    reviewed to inform your opinions about Taxotere and causing

08:52:19   3    permanent hair loss, that being hair that doesn't regrow?

08:52:23   4    A.    So are we moving on beyond the randomized clinical trials

08:52:27   5    now?

08:52:27   6    Q.    We're going to talk in greater detail about some of these,

08:52:31   7    but I just want the jury to understand what you looked at.

08:52:33   8    A.    So then I did a medical search of the literature in terms

08:52:36   9    of chemotherapy-induced alopecia, and included the terms

08:52:42  10    *permanent*, *persistent* or *irreversible*.

08:52:45  11          Then, I also looked at the specific types of

08:52:49  12    chemotherapy that are involved in administering to patients

08:52:53  13    with breast cancer.

08:52:53  14    Q.    Anything else?

08:52:56  15    A.    Then I looked at the pharmacovigilance database.   I read

08:53:00  16    their report, the clinical overview.   I looked at the -- how

08:53:04  17    they did their analysis of the clinical studies, the

08:53:10  18    pharmacovigilance database, the worldwide literature, the

08:53:12  19    things that were included in the clinical overview.

08:53:15  20          Then I also looked at the tabulation of the reports

08:53:18  21    that are coming in of those cases that they said were

08:53:21  22    consistent with permanent irreversible or alopecia lasting at

08:53:26  23    least two years.

08:53:26  24    Q.    Okay.   We're going to come back to that in just a little

08:53:31  25    bit, but let's talk about how -- well, we'll talk about the

*OFFICIAL TRANSCRIPT*

08:53:36  1    pharmacovigilance database.  How many cases of permanent

08:53:41  2    irreversible alopecia lasting more than two years did you see?

08:53:48  3    A.    117.

08:53:48  4    Q.    Now, we've heard about investigations into this database

08:53:57  5    already in this trial.  Now, does the number -- the number

08:54:02  6    117 was generated, as you understand, by what?

08:54:05  7    A.    Well, by whether or not it fit with the terms, *permanent*,

08:54:10  8    *irreversible* and *two years*.

08:54:12  9          Then there was actually a larger denominator of

08:54:17  10   alopecia that was reported.  There was a certain number --

08:54:20  11   you're asking me to recall by memory -- there's about, I think,

08:54:23  12   2,172 that came in.  They excluded about 1,300 because there

08:54:27  13   were -- they couldn't figure out the outcome.  Then there were

08:54:32  14   other categories that were weeded out, and it came down to 117.

08:54:38  15   Q.    Did your investigation reveal whether or not Sanofi used

08:54:41  16   verbatim terms or whether they used an algorithm to look for

08:54:47  17   pseudonyms?

08:54:48  18   A.    It's my impression from reading the report that was

08:54:52  19   available to me that they used verbatim terms, that it had to

08:54:56  20   be permanent.  It had to be verbatim.  By that, I mean it had

08:55:00  21   to be explicit, permanent, irreversible, or lasting more than

08:55:05  22   two years in duration.

08:55:06  23   Q.    Now, you mentioned medical literature.  Can you tell us

08:55:15  24   how you identified the medical literature that you reviewed?

08:55:17  25   A.    Yeah.  So there's -- the National Library of Medicine

*OFFICIAL TRANSCRIPT*

08:55:20  1    codes published literature.  You can use computer -- you can

08:55:25  2    use computer search engines to find literature that you're

08:55:30  3    particularly interested in.

08:55:32  4         There are medical terms -- there is a way to search

08:55:34  5    the literature that I reliably use, scientifically valid

08:55:41  6    methods that I've used to do a comprehensive analysis of the

08:55:43  7    literature.

08:55:44  8         So I think, as I mentioned earlier, I used the terms

08:55:47  9    *chemically-induced* -- or *chemotherapy-induced alopecia*

08:55:52 10    conjointly with the terms *permanent*, *irreversible*, or

08:55:56 11    *persistent*.  Then I looked at the specific types of

08:55:59 12    chemotherapy that are provided to patients with early stage

08:56:02 13    breast cancer.  That turned up literature.

08:56:06 14         I looked at the different literature for -- may I go

08:56:10 15    on?

08:56:10 16    Q.   Sure.

08:56:11 17    A.   I looked at the literature to see whether or not it

08:56:15 18    actually did have the terms that I was interested in looking

08:56:20 19    at.

08:56:20 20         Sometimes search terms, you get extraneous things.

08:56:24 21    Maybe they are improperly coded.  You know, stuff happens.

08:56:30 22    But, basically, I made sure that the topic of interest was in

08:56:33 23    the article.

08:56:33 24         Then I also looked at whether or not they named that

08:56:37 25    chemotherapy, whether or not there were numbers to the type of

*OFFICIAL TRANSCRIPT*

08:56:41  1    regimen that were provided to patients.

08:56:43  2          So, for example, if they didn't name the regimen for

08:56:47  3    the breast cancer, they just have a laundry list of different

08:56:51  4    chemotherapy agents, any one of which might have been pertinent

08:56:54  5    for a breast cancer patient, I couldn't use that because the

08:56:58  6    topic under discussion is Taxotere.  So I was trying to find

08:57:02  7    out what the data was concerning that.

08:57:05  8          The other is whether or not they just used

08:57:08  9    percentages, but there were no numbers.  Well, I can't do much

08:57:12  10   with that.  I need to have numbers when I'm looking at data.  I

08:57:15  11   need to see, are we talking about 300 patients, or are we

08:57:19  12   talking about ten patients.

08:57:19  13         The other thing is whether or not -- the quality of

08:57:22  14   the paper.  You know, I rank them according to the hierarchy of

08:57:27  15   evidence, but, basically, was it a paper?  Was it an abstract?

08:57:30  16   Was it a poster?  But everything I looked at was peer-reviewed

08:57:34  17   and was published.

08:57:35  18   Q.   Okay.  Now, you talk about -- what's under investigation

08:57:40  19   is Taxotere.  When you did this literature search, did you do

08:57:45  20   it just for Taxotere, or did you do it for other breast cancer

08:57:49  21   chemotherapy drugs as well?

08:57:51  22   A.   I did it for the -- I did it for the cancer chemotherapy

08:57:55  23   drugs that are relevant for breast cancer.

08:57:57  24   Q.   Okay.  I just want to ask you a little list here.  Did

08:58:01  25   your search -- scientific medical literature search, search for

*OFFICIAL TRANSCRIPT*

08:58:07 1    are articles and literature on anthracycline, the A in the TAC

08:58:13 2    that we've heard about?

08:58:13 3    A.    Yes.

08:58:14 4    Q.    Did it search for Cytoxan, the C that the jury has heard

08:58:22 5    about in the TAC regimen?

08:58:24 6    A.    Yes.   The terms were either *Cytoxan* or the longer term,

08:58:29 7    *cyclophosphamide*.

08:58:29 8    Q.    Did your scientific literature search, search for

08:58:38 9    5-fluorouracil, the F in the FAC arm of TAX316?

08:58:44 10   A.    Yes, I did.

08:58:44 11   Q.    Did you look for any other breast cancer -- did you

08:58:47 12   investigate any other breast cancer chemotherapy drugs in this

08:58:51 13   scientific literature search?

08:58:52 14   A.    Yes.   Of course, I looked for Taxotere or what's also

08:58:56 15   called *docetaxel*.   Then I also had a broad term, *chemical or*

08:59:03 16   *chemotherapy-induced alopecia*.

08:59:03 17   Q.    Did you search for Taxol, or paclitaxel?

08:59:07 18   A.    Yes, those were part of the articles that came up in the

08:59:10 19   broader search for chemotherapy-induced alopecia.

08:59:16 20   Q.    The A, anthracycline, is that also called *epirubicin*

08:59:23 21   sometimes?

08:59:24 22   A.    Well, there is several different types of -- anthracycline

08:59:27 23   is the class.   It's also called *doxorubicin*, Adriamycin,

08:59:34 24   epirubicin.   Those are other names for anthracyclines.

08:59:38 25   Q.    Thank you.

***OFFICIAL TRANSCRIPT***

08:59:41  1              Dr. Feigal, did you create a chart that details the
08:59:44  2     results of your search?
08:59:45  3     A.    I did.
08:59:45  4     Q.    Would putting that in front of the jury help you explain
08:59:49  5     what you did?
08:59:50  6     A.    It would.
08:59:51  7              MR. MICELI:  Your Honor, may I provide the witness with
08:59:53  8     a copy?
09:00:00  9              THE COURT:  Yes, you may.
09:00:04 10              THE WITNESS:  Thank you.
09:00:18 11              Is this supposed to come up on my monitor as
09:00:21 12     well, or no?
09:00:22 13              THE COURT:  It should be.
09:00:23 14              THE WITNESS:  It's not.
09:00:25 15              THE COURT:  Do you all have it on your monitor?
09:00:29 16              MR. MICELI:  I have it on mine.
09:00:29 17              THE WITNESS:  Do I just have to hit it?
09:00:42 18              Well, I have it in front of me.  But if there's
09:00:44 19     other things that need to be shown.
09:00:48 20              Anyway, I can hear you, and I have got the table
09:00:50 21     in front of me.
09:00:51 22              MR. MICELI:  Thank you.
09:00:53 23     EXAMINATION BY MR. MICELI:
09:00:55 24     Q.    Can you just generally explain what this chart seeks to
09:00:59 25     represent to the jury?

*OFFICIAL TRANSCRIPT*

09:01:00 1    A.    Yeah.  What I was trying to do is, in an efficient way,

09:01:07 2    try to put down the summary of the data that I looked at in a

09:01:13 3    way that hopefully is digestible.

09:01:16 4         So what I did, in the -- so these are the data

09:01:20 5    sources that reported permanent alopecia in the treatment of

09:01:24 6    breast cancer.

09:01:24 7         So on the left-hand side, I -- if you look at the --

09:01:29 8    you know, there is columns that go down, there is rows that go

09:01:32 9    across.  So in the columns I have where the data came from.

09:01:37 10        So, for the clinical trials, it lists the two

09:01:40 11   randomized clinical trials that were sponsored by Sanofi.  Then

09:01:45 12   in the publication, which was -- involved my search, I list all

09:01:49 13   the relevant articles by the author's last name and by the year

09:01:55 14   in which it was published.

09:01:55 15        You'll notice it's not in a yearly sequence -- you

09:02:01 16   know, it sort of jumps from 2001 to 2013 -- because what I was

09:02:05 17   trying to do is put it in terms of the hierarchy of the level

09:02:09 18   of evidence, whether it was a prospective clinical trial.  That

09:02:13 19   is to say, you look forward.  Patients get something, or they

09:02:17 20   have an exposure to a chemotherapy agent, and you follow them

09:02:22 21   over time.  You're going forward.

09:02:25 22        Other types of trials are what we call retrospective.

09:02:29 23   They'll look back.  So you could have lookbacks, where the

09:02:31 24   patient got exposure to the agent, but it was sometime in the

09:02:35 25   past.

**OFFICIAL TRANSCRIPT**

09:02:36 1          You also have lookback trials where it's the outcome
09:02:40 2     that you're looking at.  The patients are coming forward with
09:02:44 3     permanent or irreversible or persistent alopecia, and then you
09:02:48 4     look back to see what chemotherapy regimens they received.
09:02:54 5          Then there is papers or there is abstracts.  I put
09:02:57 6     more emphasis on published papers than I do on published
09:03:02 7     abstracts or published posters, just because there's a
09:03:04 8     higher -- it's not that you don't get valuable information from
09:03:06 9     all of these things, but just there is a higher level of rigor.
09:03:11 10    There is a higher amount of material you can look at.  There is
09:03:14 11    more details.
09:03:16 12         Maybe I'll stop there.  I tend to go on.  But that's
09:03:20 13    the first column.
09:03:21 14         So then the second column is actually listing the
09:03:26 15    exposure -- you know, Taxotere.  Those are the cases that are
09:03:29 16    reported that are relevant to the Taxotere exposure.
09:03:34 17         The next column that you'll see in the published
09:03:37 18    literature -- because, obviously, in the randomized
09:03:41 19    clinical trial, there is no Taxol in the randomized
09:03:44 20    clinical trial -- you'll see the column of Taxol.
09:03:47 21         Then the next column, I have Taxotere and Taxol.
09:03:52 22    There are some rare instances where some patients got both of
09:03:57 23    the taxanes.
09:03:58 24         Then in the next column, I have a category called
09:04:01 25    *Taxane*.  That's where the author of the publication failed to

**OFFICIAL TRANSCRIPT**

09:04:06  1   specify whether it was Taxol or Taxotere.  What I did in that

09:04:11  2   one instance was contact the author, who affirmed that they

09:04:16  3   actually gave both -- there was both Taxotere and Taxol in the

09:04:20  4   study, but he didn't look to see whether or not it was due to

09:04:25  5   the Taxol or to the Taxotere.

09:04:29  6           I asked further, could he look?  No.  It just didn't

09:04:35  7   happen.  So I didn't throw out the data.  I included it.

09:04:39  8           Then the next column are the non-taxanes, where there

09:04:45  9   is not a Taxol or a Taxotere in the regimen.

09:04:47 10   Q.   I want to talk more about the chart, but right now I want

09:04:51 11   to ask a couple of questions about what's not in the chart.

09:04:54 12           Well, I'm going to ask about the clinical trials

09:04:58 13   first.  TAX316 and TAX301, the jury has already heard, that's

09:05:05 14   Sanofi's studies, right?  Correct?

09:05:06 15   A.   I believe that's true.

09:05:07 16   Q.   Okay.  So I'm going to just put RCT's, randomized

09:05:16 17   controlled trials, only Sanofi, on your chart.

09:05:25 18           Now, the literature search that you did, if there

09:05:33 19   would have been published peer-reviewed medical scientific

09:05:36 20   articles that documented an increased risk of permanent

09:05:42 21   hair loss with any of the other breast cancer chemotherapy

09:05:50 22   drugs, would your search have caught them?

09:05:53 23   A.   It should have caught them.  But I do want to say a

09:05:57 24   caveat, it was not an exhaustive search.  It was a

09:05:59 25   comprehensive search.  So I will -- you know, caveat, it's

*OFFICIAL TRANSCRIPT*

09:06:05  1    possible that I didn't catch everything.  I'd be shocked if a

09:06:08  2    randomized clinical trial didn't show up, but it's possible

09:06:12  3    that a case report or something may not have.  So I do want to

09:06:16  4    say, it's not 100 percent, but it's comprehensive.

09:06:19  5    Q.   More likely than not that you would have caught those

09:06:27  6    studies?

09:06:27  7    A.   Absolutely.

09:06:28  8    Q.   I'm going to put a circle over here in these absence

09:06:33  9    categories.  I'm going to put no RCT's for any other -- I'm

09:06:42  10   going to put BC -- breast cancer chemo drugs.  Is that a fair

09:06:50  11   statement?

09:06:51  12   A.   And permanent alopecia, right.

09:06:51  13   Q.   That's what this all about.

09:06:51  14   A.   That's right.

09:06:51  15   Q.   Okay.  So no RCT's --

09:06:59  16   A.   There are a lot of RCT's out there.

09:07:01  17   Q.   Certainly, but there's no -- your search captured no

09:07:05  18   randomized controlled trials or articles that document or

09:07:09  19   report upon randomized controlled trials that show an increased

09:07:15  20   risk of permanent alopecia with any other breast cancer chemo

09:07:21  21   drug other than Taxotere?

09:07:22  22   A.   That's correct.

09:07:22  23   Q.   Now, let's look down at these publications just for a

09:07:34  24   second.  I've counted them before.  I think there is 19.

09:07:37  25   A.   There are.

*OFFICIAL TRANSCRIPT*

09:07:38  1    Q.   Do any of these articles document that Sanofi reported the

09:07:46  2    results from their clinical trials and the incidents of

09:07:52  3    permanent chemotherapy-induced alopecia with Taxotere?

09:07:59  4    A.   Nothing in the published literature.

09:08:01  5    Q.   In your experience, Dr. Feigal, who makes the decision

09:08:10  6    whether a company publishes the results of their

09:08:14  7    clinical trials?

09:08:14  8    A.   Well, the company does.

09:08:27  9         I do want to add, if I may, a caveat.  There are

09:08:31  10   investigator-sponsored clinical trials.  In this instance, that

09:08:35  11   isn't the case.  This is a Sanofi-sponsored clinical trial.

09:08:38  12        So issues have evolved over time, but, if it's only

09:08:42  13   an investigator-sponsored clinical trial -- let's say the

09:08:47  14   sponsor is providing the drug, but they are independent of the

09:08:51  15   statistical analysis and the design, they are just providing

09:08:55  16   the drug -- the investigator can write up the results.

09:08:57  17        In general, they provide it to the sponsor and give

09:09:01  18   them X period time, maybe it's 30 days, to review it, so that

09:09:05  19   the sponsor can, you know, have a say in what the paper says.

09:09:11  20   But usually that's worked out ahead of time.

09:09:14  21        THE COURT:  Dr. Feigal --

09:09:16  22        MR. MICELI:  Dr. Feigal, I don't think there's -- there

09:09:16  23   wasn't a question about that, so let's --

09:09:19  24        THE WITNESS:  Oh, I'm sorry.

09:09:20  25        THE COURT:  Just listen to the question.

                              *OFFICIAL TRANSCRIPT*

09:09:22  1          THE WITNESS:  Thank you.

09:09:23  2          THE COURT:  Thank you.

09:09:23  3     EXAMINATION BY MR. MICELI:

09:09:25  4     Q.    You did review TAX316 and TAX301's clinical study reports?

09:09:30  5     A.    I did.

09:09:30  6     Q.    Who conducted those studies?

09:09:34  7     A.    Sanofi.

09:09:34  8     Q.    Thank you.

09:09:35  9          The second column in your chart, the numbers -- or

09:09:38 10     the second through -- second from the left and all the way to

09:09:41 11     the right, those depict, I think you said, the numbers of

09:09:44 12     events that have actually been reported in the published

09:09:47 13     peer-reviewed medical literature?

09:09:50 14     A.    With the caveat that the permanent alopecia on the

09:09:55 15     randomized clinical trials were not reported in the literature.

09:09:58 16     Q.    I was just referring to the publications.

09:10:01 17     A.    That's correct, for the published literature.

09:10:03 18     Q.    I think what you're saying is -- what you were trying to

09:10:05 19     communicate is, this 347 down here, that doesn't include these

09:10:10 20     32; is that right?

09:10:11 21     A.    That's correct.

09:10:11 22     Q.    Just so we're clear.

09:10:19 23          Because a case report is reported in a published

09:10:26 24     journal, does that mean that that particular event rises to the

09:10:30 25     same level as something you see in a randomized controlled

*OFFICIAL TRANSCRIPT*

09:10:36  1    trial?

09:10:37  2    A.    It's supportive, but it doesn't rise to the same level.

09:10:41  3          If you have evidence from a randomized controlled

09:10:44  4    trial, and the variable under study is the variable you want to

09:10:49  5    examine, then the randomized clinical trial has a higher level

09:10:53  6    of evidence.

09:10:53  7    Q.    Thank you.

09:10:58  8          Did you review each of these articles carefully?

09:11:01  9    A.    I did.

09:11:01  10   Q.    Okay.  Now, with the exception of the Freites-Martinez

09:11:11  11   article, which is on your chart, which was published, I

09:11:14  12   believe, after your report was given --

09:11:15  13   A.    That's true.  The report was provided, I believe, in late

09:11:20  14   2018.  The -- I want to pronounce his name correctly --

09:11:26  15   Freites-Martinez report, I believe, was published in March of

09:11:32  16   2019.

09:11:33  17   Q.    We're going to talk probably just a little bit more about

09:11:35  18   that article in a moment, but I want the jury to understand,

09:11:38  19   does the Freites-Martinez article change your opinions in any

09:11:42  20   way?

09:11:43  21   A.    Not at all.

09:11:43  22   Q.    Why does it not change your opinions?

09:11:47  23   A.    Well, I think there is a lot of methodologic issues I have

09:11:52  24   with the Freites-Martinez article in terms of -- I'm sure it's

09:11:56  25   nothing intentional by the author, but it's just the methods

*OFFICIAL TRANSCRIPT*

09:12:01  1   are a little bit opaque to figure out exactly what they did.

09:12:07  2           Be that it as it may, I still think it is valuable,

09:12:10  3   so I did look at it, and do I think there is important

09:12:13  4   information that can be derived.  But, no, it did not change my

09:12:16  5   opinion in this case.

09:12:17  6   Q.   Okay.  Does -- do the authors of the Freites-Martinez

09:12:28  7   article set out the number of patient -- let me back up.  Let

09:12:35  8   me just lay a little foundation.

09:12:36  9           What type of a study is the Freites-Martinez article?

09:12:40 10   A.   You know, I think they sort of mischaracterize their

09:12:42 11   study as a -- and these terms probably won't mean a lot to you,

09:12:46 12   but they characterize it as a retrospective cohort study.

09:12:51 13   Actually, it's more of a retrospective case study.

09:12:51 14           I tried to explain it at the beginning, but the

09:12:58 15   outcome is already there, alopecia.  And then they looked back,

09:13:02 16   you know, to look at the regimens that were provided.  And, you

09:13:06 17   know, it's just a -- I just look at everything, but basically

09:13:10 18   it's more of a case than a cohort study.

09:13:13 19   Q.   I'm going to hand you a copy of a Freites-Martinez

09:13:23 20   article.

09:13:24 21           MR. MICELI:  May I approach, Your Honor?

09:13:26 22           THE COURT:  Yes, you may.

09:13:28 23           THE WITNESS:  May I ask for a pen?

09:13:30 24   EXAMINATION BY MR. MICELI:

09:13:30 25   Q.   Here you are.

**OFFICIAL TRANSCRIPT**

09:13:37  1    A.    Okay, thanks.

09:13:38  2    Q.    Now, Dr. Feigal, you're familiar with -- and I'm going to

09:13:46  3    start on the first page.  You're familiar with how articles are

09:13:51  4    published, are you not?

09:13:51  5    A.    Yes.

09:13:52  6    Q.    You've published them yourself before?

09:13:55  7    A.    And currently.

09:13:56  8    Q.    When an article is published -- the first name in the list

09:14:00  9    of authors there is Freites-Martinez, correct?

09:14:04  10   A.    Correct.

09:14:04  11   Q.    And the last name mentioned is Mario Lacouture, correct?

09:14:10  12   A.    Correct.

09:14:11  13   Q.    And then there is a number of individuals in between,

09:14:13  14   including a gentleman by the name of Dr. Jerry Shapiro?

09:14:17  15   A.    Correct.

09:14:17  16   Q.    And Dr. Tosti, who the jury heard from yesterday?

09:14:24  17   A.    Correct.

09:14:24  18   Q.    Now, when you look at that list of authors there, how do

09:14:28  19   you identify the primary author?

09:14:30  20   A.    It should be the first author.

09:14:32  21   Q.    And then on the front page there, it says,

09:14:36  22   "Correspondence," I believe, "to Mario Lacouture."

09:14:39  23   A.    Yes.

09:14:39  24   Q.    What does that mean?

09:14:40  25   A.    Well, corresponding author, since I've been that before,

**OFFICIAL TRANSCRIPT**

09:14:43  1    is you handle all the correspondence with the journal editor

09:14:47  2    and any letters to the editor or comments that come in.  You

09:14:51  3    are the contact with the journal.

09:14:53  4    Q.    So the lead author whose study this was or whose article

09:15:05  5    this was, was Dr. Martinez?

09:15:07  6    A.    Yes.  I just want to make the caveat.  You don't have

09:15:10  7    to -- oh, you didn't ask a question.

09:15:10  8            THE COURT:  Just see if you can answer the question.

09:15:12  9    EXAMINATION BY MR. MICELI:

09:15:12 10    Q.    If you don't mind, I just want to -- stick to the

09:15:16 11    questions with me, Doctor, please.

09:15:18 12              Dr. Lacouture is who individuals would write to if

09:15:22 13    they had questions or concerns about the study and how it was

09:15:25 14    conducted; is that correct?

09:15:25 15    A.    Yes.  The corresponding author is who, if people have

09:15:31 16    questions, they can either send a letter to the journal editor,

09:15:34 17    who will then funnel it to the corresponding author, or I have

09:15:38 18    gotten emails directly from people who want to ask questions

09:15:41 19    about the article.

09:15:42 20    Q.    Okay.  To characterize, one of the individuals between

09:15:47 21    Freites-Martinez and the corresponding author, Dr. Lacouture,

09:15:53 22    it's their study, as if they are the primary author, would that

09:15:58 23    be correct or incorrect?

09:15:58 24    A.    If somebody is the primary author -- and I had this

09:16:04 25    example just recently, is we had -- because academics --

*OFFICIAL TRANSCRIPT*

09:16:07  1    Q.    The question was:  Is somebody in between

09:16:10  2    Freites-Martinez -- to characterize somebody between

09:16:14  3    Freites-Martinez and Dr. Lacouture as the primary author, would

09:16:19  4    that be correct or incorrect?  You can explain.

09:16:21  5    A.    I was going to try to -- there's a caveat.  Sometimes the

09:16:25  6    first two authors on a paper are primary authors, but it's

09:16:32  7    denoted that they are sharing coprimary authorship.  But if

09:16:36  8    it's not denoted, then the primary author is the first author.

09:16:39  9    Q.    Thank you.

09:16:49 10         Now, in this retrospective case review or case report

09:16:56 11    review publication, do they -- do the authors tell you how many

09:17:03 12    charts were reviewed to come up with 47 in Taxol, 31 in

09:17:03 13    Taxotere, and 18 others?

09:17:16 14    A.    It's challenging to figure out their methods.  Some of

09:17:18 15    that may be a consequence of journal limitations, but that

09:17:23 16    wasn't the question you asked.  So I could just say it was

09:17:26 17    challenging to figure out their methods from what was

09:17:30 18    published.

09:17:38 19    Q.    Now, are you familiar with the term in clinical study

09:17:43 20    research or scientific research called *bias*?

09:17:46 21    A.    I am familiar with the term *bias*.

09:17:48 22    Q.    Can you explain to the jury what bias is?

09:17:50 23    A.    Well, let me start with non-bias.  You flip a coin.  It

09:17:56 24    comes up heads or tail.  You do something to that coin to sort

09:18:00 25    of weight it so it always comes up tails.  That's a simplified

*OFFICIAL TRANSCRIPT*

09:18:06  1   version.

09:18:07  2          But it's introducing prejudice.  It's introducing

09:18:11  3   some bias.  Sometimes it can be intentional and sometimes it's

09:18:14  4   just unintentional that it happens, but it's sort of weighting

09:18:20  5   it in one way rather than have it be perfectly randomized.

09:18:25  6   Q.   When you're comparing randomized controlled trials versus

09:18:28  7   a retrospective cohort study, which one has the likelihood --

09:18:34  8   all other things being equal, which one has more likelihood of

09:18:37  9   being affected by bias?

09:18:39 10   A.   Well, the ones that aren't randomized and the ones --

09:18:42 11   there are ways -- to be clear, there is caveats to everything,

09:18:46 12   unfortunately, you'll find out as we're talking to each other.

09:18:49 13   There are ways to minimize bias in even these types of studies,

09:18:53 14   but generally there is the introduction of more bias when

09:18:57 15   you're not working with randomized clinical trials.

09:18:59 16   Q.   Okay.  Now, the chart that you've created -- the chart

09:19:21 17   that you've created in your 19 articles lists one from 2001,

09:19:28 18   that's Nabholtz, and one from 2006 that is Sedlacek, correct?

09:19:36 19   A.   That's correct.

09:19:36 20   Q.   And the rest begin in 2009, correct?

09:19:42 21   A.   Yes, that's correct.

09:19:42 22   Q.   Now, between 2010 and the -- let me back up.  I may have

09:19:50 23   asked this.  I'm going to shortcut it.

09:19:52 24          You've looked at TAX316 and TAX301.  Have you seen

09:19:57 25   where those articles have been published in the peer-reviewed

**OFFICIAL TRANSCRIPT**

09:20:02  1   medical literature?

09:20:02  2   A.   Those articles without the persistent permanent

09:20:05  3   irreversible alopecia results are published in the literature.

09:20:09  4   Q.   They were published?

09:20:10  5   A.   Yes.  That's right.

09:20:11  6   Q.   They just don't have the alopecia information, as these

09:20:14  7   other articles do?

09:20:15  8   A.   They don't have the permanent alopecia information.

09:20:17  9   Q.   Thank you.

09:20:21  10           I'm going to walk through the factors with you a

09:20:24  11  little bit more and we're going to apply them, I hope, to this

09:20:28  12  chart.  I may take them in a little bit different order than we

09:20:35  13  discussed them or named them for the jury, but I want to talk

09:20:38  14  to you first about plausibility.

09:20:41  15           You explained what biologic plausibility was

09:20:43  16  earlier -- or plausibility, and I have a question for you.  In

09:20:47  17  forming your opinions in this matter, do the clinical trials

09:20:50  18  and the literature reviewed and the randomized controlled data

09:20:53  19  that you reviewed demonstrate that there is a plausible

09:20:57  20  mechanism of how Taxotere can cause permanent hair loss?

09:21:01  21  A.   Yes.  There is a plausible mechanism for how Taxotere can

09:21:04  22  cause permanent hair loss.

09:21:07  23  Q.   I'm going to ask you for each one of these factors, is the

09:21:10  24  evidence more favorable to demonstrating biologic plausibility?

09:21:17  25  A.   You'll have to rephrase that question.

                              *OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 09:21:18 | 1 | Q.    Does it show biologic plausibility? |
| 09:21:21 | 2 | A.    The biologic plausibility is actually evidenced by what we |
| 09:21:27 | 3 | know about the mechanism of action of Taxotere, not all of |
| 09:21:29 | 4 | which is in each of these clinical trials, but it's well known |
| 09:21:33 | 5 | about the effect of Taxotere on hair loss. |
| 09:21:37 | 6 | Q.    Right.  And part of the mechanism of action is the effect |
| 09:21:43 | 7 | it has on the cells that create the growth of the hair? |
| 09:21:47 | 8 | A.    Yeah.  I mean, obviously Taxotere is an |
| 09:21:51 | 9 | anti-chemotherapy -- is a chemotherapy drug that's antitumor. |
| 09:21:54 | 10 | So it gets the rapidly dividing cells and -- I know I'm going |
| 09:22:00 | 11 | farther than you want, but basically the rapidly dividing cells |
| 09:22:05 | 12 | also occur on the hair on your head, and so it also -- because |
| 09:22:09 | 13 | blood circulates to the scalp of the head, and the hair gets |
| 09:22:13 | 14 | nutrition and its nutrients from the blood that circulates, it, |
| 09:22:18 | 15 | too, is affected because it gets exposed to the drug.  So that |
| 09:22:22 | 16 | causes your hair to fall out at different phases of the hair |
| 09:22:28 | 17 | cycle. |
| 09:22:28 | 18 |      And there is also a biologically plausible mechanism |
| 09:22:32 | 19 | that's been articulated in the literature in multiple places, |
| 09:22:36 | 20 | including in these clinical studies that it's been thought that |
| 09:22:39 | 21 | it may attack the hair follicle and/or the stem cells and the |
| 09:22:47 | 22 | signalling. |
| 09:22:47 | 23 |      So the stem cells themselves may not be affected, but |
| 09:22:50 | 24 | the signalling -- there probably are seven or eight different |
| 09:22:53 | 25 | factors, growth signals that can be researched and evaluated as |

*OFFICIAL TRANSCRIPT*

09:22:58   1   to whether or not that communication between cells is

09:23:01   2   interrupted.  So those are some of the biologically plausible

09:23:06   3   mechanisms that have been proposed.

09:23:07   4   Q.    I'm going to ask you about that, because I think we're

09:23:10   5   probably going to hear some more about it this morning when

09:23:12   6   others are questioning you.

09:23:15   7          Is the effect on stem cells by Taxotere or any

09:23:21   8   chemotherapy agent a proven scientific fact in the medical

09:23:24   9   literature?

09:23:24  10   A.    No.

09:23:25  11   Q.    Is it just a theory?

09:23:27  12   A.    It's biologically plausible, since hair has stem cells,

09:23:36  13   that that would be one avenue where it might permanently affect

09:23:39  14   it or the signalling.  But, no, it's not proven.

09:23:42  15   Q.    Based upon your knowledge of stem cells, are follicles the

09:23:47  16   only place that stem cells are present on the scalp?

09:23:49  17   A.    No.  I realized when you were doing my CV, you didn't

09:23:52  18   mention that I headed up research and development of the

09:23:56  19   California Institute for Regenerative Medicine.  So I do a lot

09:23:57  20   of work with stem cells.

09:23:58  21          But, basically, the stem cells are throughout the

09:24:01  22   body and in various parts of the body, and they are sort of the

09:24:05  23   mother cell that can replicate, they can form in certain

09:24:10  24   instances every tissue in the body or, for the hair, they form

09:24:14  25   hair.  So if there is some damage or there is a loss of

*OFFICIAL TRANSCRIPT*

09:24:17  1    communication between the hair cell, that cue to regrow isn't

09:24:21  2    there.

09:24:22  3    Q.    Thank you.

09:24:24  4          Now, we talked about temporality earlier.  I stopped

09:24:28  5    when we were just running through them, but you already

09:24:32  6    testified about temporality, correct?

09:24:34  7    A.    Correct.

09:24:34  8    Q.    So we're going to move past that one.  Let's move to

09:24:41  9    consistency.

09:24:42  10         Your review of the medical literature that you have

09:24:45  11   here today and that you've documented for jury, does it

09:24:48  12   demonstrate to a reasonable degree of scientific certainty that

09:24:52  13   consistency as a criteria for establishing causation has been

09:24:56  14   met in the scientific literature and clinical studies?

09:25:00  15   A.    Yes.

09:25:00  16   Q.    In fact, when you look at this chart, the Taxotere column

09:25:12  17   is filled with the exception of the Kim article, correct?

09:25:18  18   A.    I'm sorry, say this again.

09:25:20  19   Q.    Sure.  When we look at the number of articles that's your

09:25:23  20   literature search -- and I want to make clear, the literature

09:25:27  21   search you did didn't just look for Taxotere, it looked for all

09:25:30  22   of these breast cancer chemotherapy drugs?

09:25:32  23   A.    Yes.  I had a broad term for chemotherapy-induced

09:25:35  24   permanent irreversible or persistent alopecia.

09:25:38  25   Q.    And then these articles that you have listed here in the

**OFFICIAL TRANSCRIPT**

09:25:43   1   Taxotere column, there is only one column with an empty cell,

09:25:47   2   and that's the Kim study, right?

09:25:49   3   A.   Oh, yes. I'm sorry. Yes.

09:25:51   4   Q.   And you look at the Taxol column. How many of the cells

09:25:57   5   are filled with numbers?

09:25:58   6   A.   There are three.

09:25:59   7   Q.   Now, let's talk about just for a second the

09:26:03   8   Freites-Martinez article.

09:26:05   9   A.   Just a little caveat. There is that second column that's

09:26:08  10   called *Taxotere and Taxol*, so there is, I guess, some

09:26:13  11   additional cases.

09:26:14  12   Q.   I understand what you're saying, but we can't unscramble

09:26:17  13   that egg, can we, to figure out which one it is?

09:26:20  14   A.   I know.

09:26:20  15   Q.   So let's just talk about the ones where we have one listed

09:26:24  16   for a second. But with the Taxol column, you have the Crown

09:26:30  17   study that only documents three events, correct?

09:26:34  18   A.   That's correct.

09:26:34  19   Q.   And then you have the Prevezas, the 2009 article that has

09:26:39  20   just one report?

09:26:40  21   A.   That's correct.

09:26:41  22   Q.   So we have 51 reports with Taxol, but all but four of them

09:26:47  23   come from the Freites-Martinez article?

09:26:51  24   A.   That's correct.

09:26:51  25   Q.   Are you familiar with the term called *outlier*?

***OFFICIAL TRANSCRIPT***

09:26:53  1   A.   Yes.

09:26:54  2   Q.   Would the Freites-Martinez article represent consistency

09:26:59  3   or outlier?

09:26:59  4   A.   It represents an outlier in terms of what's happening with

09:27:05  5   Taxol.  It represents consistency in terms of Taxotere still

09:27:11  6   being associated with permanent alopecia.  There are some other

09:27:16  7   valuable things I could say.  I know I'm going further than you

09:27:21  8   asked.

09:27:21  9   Q.   We're just talking about the consistency criteria.  Now, I

09:27:25 10   appreciate that you could impart much more knowledge on each of

09:27:27 11   these to us, but I just want to try to keep it organized.

09:27:32 12         So let's talk about specificity.  You've already

09:27:35 13   explained to us what specificity is, correct?

09:27:38 14   A.   I hope so.

09:27:38 15   Q.   Well, why don't you just go ahead and repeat it for us,

09:27:42 16   just to make sure we're clear.

09:27:42 17   A.   Well, the topic under discussion is Taxotere, so I was

09:27:46 18   looking for articles specifically where there was exposure to

09:27:50 19   Taxotere, and, you know, there is other chemotherapy agents,

09:27:54 20   other things that were provided to that patient, but whether

09:27:56 21   all the evidence did or did not point to Taxotere.

09:28:00 22   Q.   Okay.  Now, did the clinical trials, literature,

09:28:05 23   pharmacovigilance database information that you reviewed

09:28:09 24   demonstrate that the criteria of specificity was met in your

09:28:15 25   causation analysis?

*OFFICIAL TRANSCRIPT*

09:28:17  1    A.    Yes.

09:28:17  2    Q.    How about dose response?

09:28:20  3    A.    Yes, some of the articles did look at dose response,

09:28:24  4    specifically the cumulative dose, not the individual dose, but

09:28:27  5    the cumulative dose over time, and I believe -- I have to jog

09:28:32  6    my memory, but I believe it was 400 milligrams per meters

09:28:37  7    squared, some of them may have looked at 450 milligrams per

09:28:41  8    meters squared.

09:28:41  9          Anyway, the higher cumulative dose showed either

09:28:43 10    more alopecia or more severe permanent alopecia compared to

09:28:47 11    the lower dose, and I believe the lower dose was around

09:28:51 12    300 milligrams per meters squared.  And when I say -- do I need

09:28:56 13    to define milligram or meters squared?

09:28:59 14    Q.    I think they've heard a lot about that all this week.

09:29:02 15    A.    So, good.

09:29:02 16    Q.    I want to talk to you about dose response just for a

09:29:05 17    second.  And you list the Martin study from 2018.  I think it's

09:29:12 18    fourth the top of the publication list.

09:29:14 19    A.    Okay.

09:29:16 20          MR. MICELI:  And, Your Honor, may I provide the witness

09:29:18 21    with a copy?

09:29:19 22          THE COURT:  Yes, you may.

09:29:22 23    EXAMINATION BY MR. MICELI:

09:29:33 24    Q.    Does this article provide support for dose response with

09:29:39 25    Taxotere?

**OFFICIAL TRANSCRIPT**

09:29:39  1    A.    Yes.  I believe from my -- jogging my memory here, taking

09:29:48  2    all the three institutions together, that there was more

09:29:54  3    higher-grade permanent chemotherapy-induced alopecia at the

09:29:59  4    higher cumulative dose of 400 milligrams per meters squared,

09:30:05  5    but not in the patients who received a lower cumulative dose.

09:30:09  6    Q.    If you could flip with me to page -- the third page in.

09:30:21  7    A.    Where the graph is?

09:30:24  8    Q.    Yes.

09:30:25  9    A.    Oh, you're on the table?

09:30:26  10   Q.    Yes.

09:30:27  11   A.    Okay.  Okay.  Just so you know, that table was corrected

09:30:32  12   in an errata, so there is an update.

09:30:35  13   Q.    What does the errata show?

09:30:38  14   A.    What investigators do is they -- if there is a correction

09:30:42  15   that's needed, they send it in to the -- they send it in to the

09:30:47  16   journal and ask for a correction.

09:30:48  17   Q.    Okay.  And that was done with this case?

09:30:51  18   A.    Yes, it was.  I think it was --

09:30:52  19   Q.    It was done with that chart?

09:30:54  20   A.    It was done with that table.

09:30:56  21   Q.    With this table?

09:30:57  22   A.    Because I looked for it.  Actually, when you find the

09:31:00  23   paper, it automatically lets you know if there is an errata.

09:31:05  24   If there is a -- there is a correction that was -- and I

09:31:10  25   usually look for those, because it may impact what I say about

*OFFICIAL TRANSCRIPT*

09:31:14 1   the article.

09:31:14 2   Q.   Okay.  So, what I just put on the screen did not have the

09:31:22 3   accurate depiction of what that table should be?

09:31:25 4   A.   Well, all it did, just to be clear, is it took out all of

09:31:29 5   the zeros.

09:31:29 6   Q.   And what I want to talk about, though, is -- I put an X on

09:31:37 7   mine because this one was corrected and removed.  Down at the

09:31:42 8   bottom, where it talks about the dosing at Hospital Clínico

09:31:48 9   San Carlos, Madrid -- and just so we're clear, this was a study

09:31:50 10  that was done at only three hospitals in Spain, right?

09:31:54 11  A.   That's correct.

09:31:54 12  Q.   And with regard to dosing of Taxotere, when you're looking

09:32:07 13  at cumulative dosing, what contains -- cumulatively more

09:32:15 14  Taxotere, a 75 milligram per meters squared over six cycles --

09:32:22 15  may have to do some math there, Doc -- or four cycles with

09:32:28 16  100 milligrams?

09:32:29 17  A.   Oh, well, the six cycles of 75 have a higher cumulative

09:32:33 18  dose.

09:32:33 19  Q.   So if we're concerned about cumulative dose, giving it at

09:32:37 20  75 times 6 is greater than giving it 4 times 100?

09:32:42 21  A.   That's correct.

09:32:42 22  Q.   When you give drugs together versus sequentially, does

09:32:46 23  that have an impact on toxicity?

09:32:50 24  A.   That may have an impact on toxicity.  There may be

09:32:55 25  overlapping toxicity when you give them together.

*OFFICIAL TRANSCRIPT*

09:32:57 1   Q.    Thank you.

09:32:59 2         If I didn't ask this already, does the literature

09:33:02 3   that you've reviewed support a dose response relationship with

09:33:06 4   Taxotere?

09:33:06 5   A.    Yeah, from the literature I reviewed, there is evidence

09:33:09 6   for a dose response.

09:33:17 7         MR. MICELI:  May I have a moment to speak to my --

09:33:20 8         THE COURT:  Sure.

09:33:21 9         MR. STRONGMAN:  Your Honor, may I just grab my

09:33:35 10  exhibits?

09:33:36 11        THE COURT:  Sure.

09:33:37 12  EXAMINATION BY MR. MICELI:

09:34:11 13  Q.    Now, Dr. Feigal, because this jury has been told that

09:34:15 14  A and C may have caused Ms. Earnest's lack of hair regrowth, I

09:34:21 15  have to ask you, have you reviewed -- in your review of all of

09:34:26 16  the scientific evidence and medical literature that's out

09:34:28 17  there, have you seen evidence that A or C has been related --

09:34:34 18  causally related to permanent irreversible hair loss, hair that

09:34:38 19  doesn't grow back when it's supposed to?

09:34:41 20  A.    I haven't seen evidence for causal relationship.  You'll

09:34:44 21  see those anecdotal cases that have been reported in the

09:34:48 22  published literature.

09:34:48 23  Q.    I just want to do a little bit of simple math with you,

09:34:53 24  based upon your chart.  Okay?  I guess I can look at it right

09:34:59 25  here.

*OFFICIAL TRANSCRIPT*

09:34:59 1   A.   Just so you know, the monitor still doesn't work.  I can

09:35:06 2   see it.  I just wanted to let them know that.

09:35:10 3         THE DEPUTY CLERK:  I can take a one-minute recess and

09:35:12 4   just reset it in the background.

09:35:12 5         THE COURT:  Why don't we take just a one-minute break.

09:35:12 6         (WHEREUPON, there was a brief pause in the

09:35:14 7   proceedings.)

09:35:14 8   EXAMINATION BY MR. MICELI:

09:36:57 9   Q.   Can you see this if I write on it?

09:37:00 10   A.   Yes.  I have good eyesight.

09:37:00 11   Q.   We have your report where your literature search revealed

09:37:08 12   347 events documented in the scientific medical literature for

09:37:17 13   Taxotere, right?

09:37:18 14   A.   Correct.

09:37:18 15   Q.   Okay.  And there were 51 with Taxol, correct?

09:37:29 16   A.   Correct.

09:37:29 17   Q.   That ends up -- when we divide the number of Taxol into

09:37:34 18   the number of Taxotere, that is 6.8 times more reports with

09:37:45 19   Taxotere than there are with Taxol?

09:37:47 20   A.   That's correct.

09:37:47 21   Q.   Okay.  And if we were to rewrite this as a percentage,

09:37:52 22   would it be accurate, Doctor, to call this 680 percent?

09:38:03 23   A.   It is correct with one caveat.

09:38:07 24   Q.   What is that caveat, Doctor?

09:38:10 25   A.   It's just a little math.  347 is indeed 680-some percent

*OFFICIAL TRANSCRIPT*

09:38:17  1   of 54, but because you're not starting from zero, you're

09:38:21  2   starting from 54, you subtract 100.  So it's a 580 percent

09:38:27  3   increase from 51.  Just a minor -- it's still big, but it's

09:38:31  4   just 580 percent instead of 680.

09:38:33  5   Q.   So it's 580 percent more likely that you're going to see

09:38:42  6   Taxotere reported in the medical literature related to

09:38:46  7   permanent hair loss than Taxol?

09:38:49  8            MR. STRONGMAN:  Objection.  Leading.

09:38:51  9            THE COURT:  Sustained.  Rephrase your question.

09:38:53 10   EXAMINATION BY MR. MICELI:

09:38:53 11   Q.   Could you restate what this number, 6.8-fold, relates to

09:38:58 12   on a percentage basis, doing the caveat?

09:39:01 13   A.   With all the caveats, it's what you observed -- what I've

09:39:06 14   observed in the literature with my review of the published

09:39:09 15   literature of 347 cases in Taxotere and 51 cases in Taxol,

09:39:17 16   that's about a 6.8 times' increase, and that does translate to

09:39:22 17   about a 580 percent increase from 51.

09:39:26 18   Q.   Okay.  Did your investigation into the evidence that you

09:39:36 19   saw in your -- in the medical literature reflect -- ever

09:39:42 20   reflect a physician or scientist reporting that Taxol was

09:39:48 21   reasonably related -- or excuse me, causally related to

09:39:55 22   permanent hair loss?

09:39:55 23   A.   There is nothing I read in the published literature that

09:40:01 24   was suggesting Taxol was causally related.  There was the one

09:40:07 25   article that we've talked about, Freites-Martinez, where it was

*OFFICIAL TRANSCRIPT*

09:40:13 1   obviously suggested that they saw it.

09:40:16 2   Q.   Suggested they saw it.  My question simply was -- I'm

09:40:18 3   going to ask you this sort of collectively -- with regard to

09:40:20 4   the A in the TAC, anthracycline, Cytoxan, 5-FU or Taxol, did

09:40:32 5   you find anything in the medical literature that causally

09:40:35 6   relates those drugs to permanent irreversible hair loss, hair

09:40:39 7   that doesn't come back?

09:40:40 8   A.   Not the non-Taxotere arms, no.

09:40:47 9        Perhaps I should have said drugs, not arms.

09:40:53 10        MR. MICELI:  That's all I have at this time.

09:40:56 11  Thank you.

09:40:56 12        THE COURT:  Thank you.

09:40:57 13        THE WITNESS:  Thank you.

09:40:57 14        THE COURT:  Mr. Strongman.

09:41:00 15        Please proceed.

09:41:00 16                  CROSS-EXAMINATION

09:41:00 17  BY MR. STRONGMAN:

09:42:07 18  Q.   Good morning, Dr. Feigal.  How are you?

09:42:09 19  A.   I'm good.

09:42:10 20  Q.   My name is Jon Strongman.  We haven't met yet; is that

09:42:14 21  correct?

09:42:14 22  A.   That's correct.

09:42:15 23  Q.   All right.  Very good.

09:42:16 24        Now, I want to make just a couple of things clear at

09:42:18 25  the beginning about what you're not offering some opinions on,

*OFFICIAL TRANSCRIPT*

10:41:05 1    It's the first time I'm seeing it, so I can't speculate what

10:41:08 2    the intent was, but I had trouble interpreting it.

10:41:12 3    EXAMINATION BY MR. MICELI:

10:41:14 4    Q.   Let me just do something over here.

10:41:26 5          In talking to you about his chart, Mr. Strongman went

10:41:32 6    over the TAX316 numbers on his chart with you, didn't he?

10:41:38 7    A.   He went over the TAX316 numbers I believe just for FAC.

10:41:45 8    Q.   But there was a TAC arm and a FAC arm, correct?

10:41:50 9    A.   Correct.

10:41:50 10   Q.   Both arms received A and C, correct?

10:41:54 11   A.   Correct.

10:41:55 12   Q.   Okay.  Now, what do you call that when you control for

10:41:59 13   those things?

10:42:01 14   A.   It's randomized and controlled.

10:42:03 15   Q.   What is the purpose of that?

10:42:06 16   A.   To isolate the effect of the chemotherapy you're trying to

10:42:11 17   evaluate.

10:42:11 18   Q.   Okay.  So when you do that, then -- I'm going to try to

10:42:16 19   speak loud enough for this microphone to hear me -- if you

10:42:21 20   control for them, you can take them out of both arms; is that

10:42:27 21   correct?

10:42:27 22         MR. STRONGMAN:  Objection, leading.

10:42:29 23         THE COURT:  Sustained.

10:42:31 24   EXAMINATION BY MR. MICELI:

10:42:35 25   Q.   Can controlling account for A and C?

*OFFICIAL TRANSCRIPT*

11:23:09  1    is given for three cycles, and the docetaxel, again, because

11:23:13  2    it's given alone in -- but in sequence after the FEC, the

11:23:19  3    effect -- the appropriate dose is 100 milligrams per meters

11:23:24  4    squared times three cycles.  That cumulative dose is

11:23:28  5    300 milligrams per meters squared.

11:23:30  6    Q.    And can you tell us what regimen Ms. Barbara Earnest

11:23:36  7    received?

11:23:36  8    A.    She received the AC followed by docetaxel regimen.

11:24:05  9    Q.    I missed a highlight.

11:24:16 10    A.    Oh, the TC for four cycles or the --

11:24:20 11    Q.    So you mentioned that the sequential dosing for docetaxel

11:24:25 12    in the AC followed by T regimen includes a dose of

11:24:30 13    100 milligrams, correct?

11:24:31 14    A.    That is the correct single-agent dose.  When it's given in

11:24:35 15    combination like in TAC, you have to reduce the dose to

11:24:38 16    75 milligrams per meters squared.

11:24:39 17    Q.    Among women who have a diagnosis similar to

11:24:45 18    Barbara Earnest, is chemotherapy essential to survival?

11:24:52 19    A.    Chemotherapy is an option.  Most people with early-stage

11:24:55 20    IIA disease are cured by surgery and/or radiation.  So,

11:25:01 21    chemotherapy is recommended because it can improve the outcome

11:25:06 22    for some patients, and so it's considered a standard, but some

11:25:12 23    patients accept it and some people don't.

11:25:14 24    Q.    I'm going to switch gears on you a little bit.  Let's just

11:25:20 25    talk very generally about the doctor-patient discussions

*OFFICIAL TRANSCRIPT*

11:29:37  1    Q.    Doctor, can you tell the jury, please, what your opinion

11:29:44  2    is on the treatment options for stage II, ER/PR positive, HER2

11:29:52  3    negative, early-stage breast cancer in the 2011 time frame?

11:29:56  4    A.    So, in 2011, there were 13 proven effective regimens, and

11:30:02  5    a patient might choose any of those and expect an excellent,

11:30:06  6    high survival rate in the 95 to 98 percent range.  So, there

11:30:13  7    are some, as you noticed on the top, that were preferred.

11:30:17  8    Those might be more chosen, but there is reason to choose

11:30:21  9    other.

11:30:21 10         So all are Category 1.  All are approved by the

11:30:24 11    United States experts who are the breast cancer leaders for the

11:30:29 12    country for use in patients with this disease.

11:30:32 13    Q.    Thank you, Dr. Bosserman.

11:30:34 14         MS. MENZIES:  Nothing further at this time, Your Honor.

11:30:36 15         THE COURT:  Mr. Strongman.

11:30:39 16                         CROSS-EXAMINATION

11:30:39 17    BY MR. STRONGMAN:

11:30:56 18    Q.    Good morning, Dr. Bosserman.  How are you?

11:30:57 19    A.    Good morning.

11:30:58 20    Q.    Nice to see you again.

11:31:00 21    A.    You, too.

11:31:01 22    Q.    You and I had an opportunity to spend a good bit of time

11:31:05 23    together when I took your deposition, do you remember that?

11:31:07 24    A.    I do.

11:31:08 25    Q.    Now, I want to talk just a little bit about these

*OFFICIAL TRANSCRIPT*

08:38:49

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

      **********************************************************

  IN RE:  TAXOTERE (DOCETAXEL)          Docket No. 16-MD-2740
  PRODUCTS LIABILITY LITIGATION         Section H
                                        New Orleans, LA
  Relates to:  Barbara Earnest          Monday, September 23, 2019
               16-CV-17144

      **********************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
             HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
                    DAY 6, MORNING SESSION


  APPEARANCES:

  FOR THE PLAINTIFF:              BACHUS & SCHANKER, LLC
                                  BY:  DARIN L. SCHANKER, ESQ.
                                       J. KYLE BACHUS, ESQ.
                                  1899 Wynkoop St., Suite 700
                                  Denver, CO 80202

                                  FLEMING NOLEN & JEZ
                                  BY:  RAND P. NOLEN, ESQ.
                                  2800 Post Oak Blvd., Suite 4000
                                  Houston, TX 77056

                                  GIBBS LAW GROUP, LLP
                                  BY:  KAREN B. MENZIES, ESQ.
                                  6701 Center Drive West, 14th Floor
                                  Los Angeles, CA 90045

                                  DAVID F. MICELI, LLC
                                  BY:  DAVID F. MICELI, ESQ.
                                  P.O. Box 2519
                                  Carrollton, GA 30112-0046

                                  PENDLEY BAUDIN & COFFIN
                                  BY:  CHRISTOPHER L. COFFIN, ESQ.
                                  2505 Energy Centre
                                  1100 Poydras St.
                                  New Orleans, LA 70163
```

08:42:22 1  for her early stage breast cancer in 2011?

08:43:24 2  A.  Yes.

08:43:24 3  Q.  And do you recognize Barbara Earnest here in the courtroom here

08:43:24 4  today?

08:43:24 5  A.  Yes.

08:43:24 6  Q.  You remember her as a patient?

08:43:24 7  A.  Yes.

08:43:24 8  Q.  And as part of that team that treated Barbara Earnest for her

08:43:24 9  early stage breast cancer in 2011, did you prescribe the drug

08:43:24 10  Taxotere to Barbara?

08:43:24 11  A.  Yes.

08:43:24 12  Q.  Doctor, in your experience, is Taxotere a good drug?

08:43:24 13  A.  Yes.

08:43:24 14  Q.  And at the time you treated Barbara in 2011, did the Taxotere

08:43:24 15  label warn you about Taxotere's risk of permanent hair loss?

08:43:24 16  A.  No.

08:43:24 17  Q.  Doctor, when Barbara came to you in 2011, what was her

08:43:24 18  prognosis?

08:43:24 19  A.  With appropriate treatment, good.

08:43:24 20  Q.  Doctor, I asked you about whether or not you were warned of the

08:43:24 21  risk of permanent hair loss with Taxotere.  Following up on that,

08:43:24 22  at the time you treated Barbara in 2011, at that time had Sanofi

08:43:24 23  provided you with a warning by any other avenue that Taxotere

08:43:24 24  caused permanent hair loss?

08:43:24 25  A.  No.

08:43:24  1  Q.  At that time in 2011, did you warn Barbara that she could

08:44:43  2  experience permanent hair loss from using Taxotere before you

08:44:43  3  prescribed it to her?

08:44:43  4  A.  No.

08:44:43  5  Q.  And why not?

08:44:43  6  A.  Because we weren't aware of that.

08:44:43  7  Q.  Doctor, generally speaking, in the course of your practice, has

08:44:43  8  a drug company ever warned you about a new side effect after the

08:44:43  9  drug is on the market?

08:44:43  10  A.  Yes.

08:44:43  11        MS. SASTRE:  Objection, your Honor.  Relevancy; lack of

08:44:43  12  foundation.

08:44:43  13        THE COURT:  Rephrase your question.

08:44:43  14  BY MR. SCHANKER:

08:44:43  15  Q.  Doctor, understanding your background and whether or not this

08:44:43  16  is the process of your understanding and receiving warnings, have

08:44:43  17  you ever been warned by a drug company -- setting aside Taxotere,

08:44:43  18  just in general, have you ever been warned by a drug company about

08:45:13  19  a new side effect after the drug was on the market?

08:45:13  20  A.  Yes.

08:45:13  21  Q.  And does one in particular come to mine?

08:45:13  22  A.  Bevacizumab.

08:45:13  23  Q.  So when you receive a warning like that after a drug is on the

08:45:13  24  market, does that inform your prescribing decisions?

08:45:13  25        MS. SASTRE:  Objection, leading, your Honor.

08:46:03 1    Q.  When you receive information as you described, is it

08:46:03 2    information that, if appropriate, you pass on to the patient?

08:47:12 3    A.  Yes.

08:47:12 4    Q.  If Sanofi -- if Sanofi had warned you by 2011, would you have

08:47:12 5    warned Barbara about Taxotere's risk of permanent hair loss?

08:47:12 6    A.  Yes.

08:47:12 7    Q.  Doctor, is permanent hair loss, to you, different from

08:47:12 8    temporary hair loss?

08:47:12 9    A.  Yes.

08:47:12 10   Q.  Doctor, were there other chemotherapy options you would have

08:47:12 11   presented to Barbara if Barbara had asked for those alternatives

08:47:12 12   based upon this permanent hair loss issue?

08:47:12 13   A.  Yes.

08:47:12 14   Q.  And if she chose one of those other options that you presented

08:47:12 15   to her, would you have prescribed it to her?

08:47:12 16   A.  Yes.

08:47:12 17   Q.  Doctor, if Sanofi had warned you, would you have changed the

08:47:12 18   information that you passed on to Barbara?

08:47:12 19   A.  Yes.

08:47:12 20   Q.  Dr. Carinder, did you trust that Sanofi would warn you about

08:47:12 21   what it knew about its drug Taxotere?

08:47:12 22   A.  Yes.

08:47:12 23   Q.  Doctor, would you expect a warning about permanent hair loss to

08:47:57 24   include the words "permanent hair loss"?

08:47:57 25   A.  Yes.

08:59:34 1   to go about marketing their agent.  And they do that a lot on the

08:59:38 2   advice of the practitioners that they invite to the meeting.

08:59:41 3   Q.  Have you ever served on an advisory board for Sanofi?

08:59:45 4   A.  Yes.

08:59:45 5   Q.  Have you been hired by Sanofi to serve on an advisory board for

08:59:55 6   the drug Taxotere?

08:59:55 7   A.  Yes.

08:59:55 8   Q.  When you were on that advisory board, did Sanofi ever warn you

09:01:29 9   that Taxotere could cause permanent hair loss?

09:01:29 10  A.  No.

09:01:29 11  Q.  Last week we heard from a doctor sitting right where you are

09:01:29 12  named Dr. Lagarde.  Do you know Dr. Lagarde?

09:01:29 13  A.  Yes.

09:01:29 14  Q.  How do you know Dr. Lagarde?

09:01:29 15  A.  She is a colleague of mine.  She is a breast surgeon.

09:01:29 16  Q.  Does Dr. Lagarde refer patients to you when they need a medical

09:01:29 17  oncologist?

09:01:29 18  A.  Yes.

09:01:30 19  Q.  While we're talking about Dr. Lagarde, I just want to clear

09:01:30 20  something up.

09:01:30 21          MR. SCHANKER:  May I approach the witness, your Honor?

09:01:30 22          THE COURT:  Sure.

09:01:30 23  BY MR. SCHANKER:

09:01:30 24  Q.  I am placing on the ELMO here -- that's what this thing is

09:01:30 25  called, an ELMO.  I am not sure why the company, but -- so I am

09:04:40  1    A.   No.

09:04:40  2    Q.   And why not?

09:04:40  3    A.   Because I am busy.

09:04:40  4    Q.   Busy doing what?

09:04:40  5    A.   Taking care of patients.

09:04:40  6    Q.   Can you attend every presentation at every conference you go

09:04:40  7    to?

09:04:41  8    A.   I try to attend as many as I can.

09:04:44  9    Q.   Doctor, in addition to conferences, we talked about ASCO.

09:04:51 10    A-S-C-O.  And what, again, are those initials stand for?

09:04:54 11    A.   American Society of Clinical Oncology.

09:04:56 12    Q.   Do you use ASCO to stay up-to-date?

09:05:01 13    A.   Yes.

09:05:03 14    Q.   How so?

09:05:06 15    A.   I get e-mails from them with -- regular e-mails with updates

09:05:12 16    and then plus articles in *Journal of Clinical Oncology* that I want

09:05:17 17    to read.

09:05:18 18    Q.   Doctor, do you use sources such as ASCO to stay up-to-date on

09:05:25 19    label modifications or changes?

09:05:28 20    A.   Yes.

09:05:31 21    Q.   Tell us about that.

09:05:32 22    A.   Typically that comes in an e-mail if there's a new label

09:05:40 23    indication.

09:05:40 24    Q.   And is that how you stay up-to-date on label modifications or

09:05:46 25    changes?

09:05:47  1    A.  That and through the pharmaceutical reps.

09:05:49  2    Q.  And we'll talk about -- let's go ahead and talk about how you

09:05:54  3    stay up-to-date through the pharmaceutical reps.  Explain that to

09:05:57  4    the jury, if you would.

09:05:58  5    A.  If their drug has a new label, new indication it's approved by

09:06:05  6    the FDA, they're -- most reps will be coming in very soon to let us

09:06:08  7    know about it.

09:06:09  8    Q.  Let's talk about the NCCN guidelines.  You mentioned those.

09:06:18  9    What are -- just so the jury is clear, what are the NCCN

09:06:22 10    guidelines?

09:06:22 11    A.  They're a set of guidelines that have been published, and

09:06:27 12    they're updated every year on appropriate treatment for

09:06:33 13    malignancies at whatever particular stage that malignancy is.

09:06:37 14    Q.  And how do you use those NCCN guidelines to stay up-to-date?

09:06:42 15    A.  You can access them any time.

09:06:46 16    Q.  Do you access those NCCN guidelines often?

09:06:50 17    A.  Yes.

09:06:51 18    Q.  Do you access them often on the drugs that you regularly

09:06:55 19    prescribe?

09:06:57 20    A.  Yes.

09:06:57 21    Q.  Is Taxotere -- and we'll focus -- in this case, the focus is on

09:07:01 22    the time of Barbara Earnest's treatment and prior to that.  Did you

09:07:07 23    access the NCCN guidelines on a regular basis at that time to stay

09:07:12 24    up-to-date?

09:07:12 25    A.  Yes.

09:07:13  1    Q.  To stay -- did you access those guidelines to stay up-to-date

09:07:19  2    on changes or warnings concerning the label?

09:07:26  3    A.  They don't -- there's really not warnings posted on the NCCN

09:07:29  4    guidelines.  It's simply guidelines for how to treat something.

09:07:34  5    They don't routinely publish adverse events, that type of thing.

09:07:40  6    Q.  Fair enough.  And we'll get into the specific NCCN guidelines,

09:07:44  7    Doctor.  Thank you.

09:07:46  8              Are the NCCN guidelines important in what you do as an

09:07:51  9    oncologist?

09:07:51 10    A.  Yes.

09:07:53 11    Q.  Explain to the jury how and why those guidelines are important.

09:07:57 12    A.  These are published guidelines that are based on clinical

09:08:04 13    evidence, clinical trials.  You know, they're evidence based.

09:08:11 14    Q.  Moving on, you mentioned journals.  Do you receive journals?

09:08:16 15    A.  Yes.

09:08:17 16    Q.  Can you read them all?

09:08:18 17    A.  I don't read them from cover to cover, but I pick the articles

09:08:24 18    out that are of interest to me.

09:08:26 19    Q.  Doctor, have you had occasion where a sales representative will

09:08:33 20    bring you a particular article about a drug?  Provide you with a

09:08:38 21    copy of it?

09:08:39 22    A.  Yes.

09:08:39 23    Q.  Do you recall in this case ever being provided any materials

09:08:44 24    like that that warned of a permanent side effect of irreversible

09:08:54 25    hair loss concerning Taxotere?

09:08:55  1    A.  No.

09:08:56  2    Q.  We talked a little bit about getting information from sales

09:09:06  3    representatives.  I just want to make sure that the jury is clear.

09:09:11  4    Are you including sales representatives or pharmaceutical

09:09:16  5    representatives from Sanofi when you explain that?

09:09:18  6    A.  From any of them.

09:09:20  7    Q.  And do you remember any of the Sanofi representatives in

09:09:25  8    particular?

09:09:26  9    A.  Ruth.

09:09:28 10    Q.  And why is it that you were -- why is it that you remember

09:09:38 11    Ruth?  You explained her background.  Was she a well-informed sales

09:09:43 12    representative?

09:09:44 13    A.  Yes.

09:09:44 14    Q.  Do you recall her ever telling you that Taxotere had a risk of

09:09:51 15    permanent hair loss?

09:09:51 16    A.  No.

09:09:52 17    Q.  We touched on this generally before, but I want to ask you

09:10:05 18    specifically.  Do you recall Ruth Avila, the Taxotere sales

09:10:12 19    representative, ever giving you any articles on Taxotere having a

09:10:15 20    risk of permanent hair loss?

09:10:17 21    A.  No.

09:10:20 22    Q.  Do you recall Ruth Avila giving you any educational materials

09:10:27 23    for patients on Taxotere's risk of a permanent hair loss?

09:10:30 24    A.  No.

09:10:31 25    Q.  After Ruth Avila stopped working for Sanofi and before you

09:10:47  1  prescribed Barbara the Taxotere in 2011, did Sanofi send any other

09:10:56  2  sales representatives that you recall?

09:10:58  3  A.  I don't remember who it was.

09:10:59  4  Q.  Do you recall that there was a sales representative or

09:11:04  5  representatives?

09:11:04  6  A.  There would have been a representative, but I don't remember

09:11:07  7  who it was.

09:11:08  8  Q.  Did any of those sales representatives after Ruth Avila tell

09:11:15  9  you about Taxotere's risk of permanent hair loss before 2011?

09:11:20 10  A.  No.

09:11:21 11  Q.  Did any of those sales representatives give you written

09:11:34 12  materials on Taxotere's risk of permanent hair loss before 2011,

09:11:39 13  those outside of Ruth Avila?

09:11:41 14  A.  No.

09:11:41 15  Q.  Did any of those other sales reps give you written materials to

09:11:50 16  give to patients on Taxotere's risk of permanent hair loss?

09:11:53 17  A.  No.

09:11:55 18  Q.  You mentioned that you started prescribing Taxotere around, I

09:12:07 19  believe, 1999, in your deposition; is that correct?

09:12:10 20  A.  Yes.

09:12:11 21  Q.  Were there sales representatives who called on you before Ruth

09:12:17 22  Avila?

09:12:17 23  A.  That was when I was in Cleveland.

09:12:20 24  Q.  When you were in Cleveland, were there sales representatives

09:12:25 25  that called on you concerning Taxotere?

09:12:28  1   A.  The fellows weren't allowed to meet with the representatives.

09:12:32  2   Q.  Okay.  Doctor, do you know what a "Dear doctor letter" is from

09:12:37  3   a pharmaceutical company?

09:12:38  4   A.  No, not really.

09:12:41  5   Q.  Let's work through this.  Have you ever received a letter from

09:12:47  6   a pharmaceutical company to you as a prescribing physician

09:12:52  7   informing you about some side effects of a drug?

09:12:56  8   A.  Very infrequently.

09:13:01  9   Q.  Have you ever --

09:13:02  10  A.  I think I've received one, but, I mean, I can't even remember

09:13:07  11  what it was.

09:13:07  12  Q.  And that gets to the point.  Do you recall ever receiving such

09:13:12  13  a letter from Sanofi warning you about Taxotere's risk of permanent

09:13:19  14  hair loss?

09:13:19  15  A.  No.

09:13:20  16  Q.  Did you ever receive an e-mail from Sanofi, prior to treating

09:13:32  17  Barbara Earnest in 2011, warning you about the drug Taxotere's risk

09:13:38  18  of permanent hair loss?

09:13:40  19  A.  No.

09:13:40  20  Q.  Do pharmaceutical companies -- have you ever received from a

09:13:51  21  pharmaceutical company a reprint of a journal article that they

09:13:54  22  want you to read?

09:13:55  23  A.  Yes.

09:13:55  24  Q.  To the best of your knowledge, prior to treating Barbara

09:14:01  25  Earnest in 2011, did Sanofi ever send you a reprint of a journal

09:14:07  1   article and notify you of any information concerning permanent hair

09:14:12  2   loss and Taxotere?

09:14:12  3   A.  No.

09:14:13  4   Q.  Have you ever had a -- well, first of all, Doctor, what is an

09:14:27  5   abstract?  Explain to the jury what an abstract is in the medical

09:14:30  6   context.

09:14:32  7   A.  An abstract is -- when you read a journal article, an abstract

09:14:36  8   is a brief summary that kind of summarizes the entire article

09:14:39  9   before you read the whole thing.  It's kind of just a bullet

09:14:43 10   presentation of the whole article.

09:14:44 11   Q.  Have you, on occasion, had pharmaceutical companies send you an

09:14:49 12   abstract on a particular drug?

09:14:51 13   A.  Yes.

09:14:51 14   Q.  To your knowledge, prior to the time that you treated Barbara

09:14:57 15   back in 2011, had Sanofi ever sent you a reprint of an abstract

09:15:02 16   notifying you that it had important information about permanent

09:15:05 17   hair loss and Taxotere?

09:15:07 18   A.  No.

09:15:08 19   Q.  Doctor, talking about how you get information.  Do you get on

09:15:24 20   the computer and just Google to get information?

09:15:27 21   A.  On occasion.

09:15:29 22        MS. SASTRE:  Objection.  Vague and ambiguous, your Honor.

09:15:33 23        THE COURT:  Overruled.

09:15:36 24        THE WITNESS:  On occasion.

09:15:37 25   BY MR. SCHANKER:

09:17:06 1  A.  About 2005.

09:17:07 2  Q.  And Barbara Earnest treated in 2011?

09:17:12 3  A.  Yes.

09:17:12 4  Q.  How old was that prior patient, the 2005 patient, when you

09:17:19 5  treated her, approximately?

09:17:22 6  A.  About 69 or 70.

09:17:26 7  Q.  So was she older or younger than Barbara Earnest at the time

09:17:33 8  you treated Barbara?

09:17:34 9  A.  Older.

09:17:34 10  Q.  Do you recall what her hair was like when you treated her, this

09:17:38 11  prior patient?

09:17:39 12  A.  Thin, almost light pattern hair loss.

09:17:43 13  Q.  How was her hair, this prior patient's -- we're talking about

09:17:48 14  prior to the chemotherapy, correct, when you say, "pattern hair

09:17:52 15  loss"?

09:17:52 16  A.  Yes.

09:17:52 17  Q.  So this -- just so we're clear.  The prior patient from 2005

09:17:56 18  had light pattern hair loss prior to her chemotherapy?

09:17:59 19  A.  Yes.

09:18:01 20  Q.  How did her hair loss compare to Barbara's hair loss -- I'm

09:18:07 21  sorry.  How did --

09:18:09 22        MR. SCHANKER:  It's a bad question, your Honor.  Can I

09:18:11 23  start over?

09:18:12 24        THE COURT:  Rephrase.

09:18:13 25        MR. SCHANKER:  I apologize.

09:18:15  1    BY MR. SCHANKER:

09:18:15  2    Q.  Talking about the prior 2005 patient, how did her hair prior to

09:18:19  3    chemotherapy compare to Barbara's hair prior to chemotherapy?

09:18:23  4    A.  Thinner.

09:18:24  5    Q.  Whose was thinner?

09:18:26  6    A.  The 2005 patient.

09:18:28  7    Q.  Do you recall what treatment you gave to that other patient?

09:18:37  8    A.  AC for four cycles and then docetaxel for four cycles.

09:18:42  9    Q.  And did you follow-up with that patient?

09:18:45 10    A.  Yes.

09:18:50 11    Q.  Doctor, are you a dermatologist?

09:18:54 12    A.  No.

09:18:54 13    Q.  Before you treated Mrs. Earnest, did you have any idea what

09:19:01 14    caused the 2005's patient's hair to be thinner, to not come back?

09:19:08 15    A.  The chemotherapy.

09:19:12 16    Q.  And describe for the jury that prior patient what her hair was

09:19:17 17    like after the chemotherapy when you indicated it didn't come back

09:19:22 18    or didn't all come back.  Paint a picture for the jury so they

09:19:25 19    understand.

09:19:25 20    A.  All she has now is just very short -- like stub.  It never --

09:19:33 21    you know, it was thin before, but that's what it was after that.

09:19:37 22    Q.  So when you spoke with -- and we'll get into this in more

09:19:42 23    detail, but when you spoke with Barbara prior to her chemotherapy,

09:19:47 24    did you explain to her about that prior patient?

09:19:51 25    A.  No.

09:19:51 1    Q.  And explain to the jury why you didn't.

09:19:55 2    A.  I didn't think it was relevant.

09:19:58 3    Q.  Explain why.  In the context of anecdotal.

09:20:02 4    A.  I -- the assumption I had was that because her hair was already

09:20:09 5    very thin, that's why it was just an idiosyncratic case.

09:20:14 6    Q.  What does an idiosyncratic case mean to you?

09:20:18 7    A.  Odd, out of the ordinary.

09:20:19 8    Q.  And as a medical practitioner, do you change your prescribing

09:20:27 9    habits based on one idiosyncratic case?

09:20:31 10   A.  No.

09:20:32 11   Q.  Why not?  Why would that not be a good idea?  Why don't you do

09:20:36 12   it?

09:20:36 13   A.  Because I don't think it's -- that's not a strong enough

09:20:42 14   argument to change your entire practice and technique.

09:20:45 15   Q.  And make sure the jury understands why that is, why you don't

09:20:50 16   change your entire practice and technique based on one

09:20:55 17   idiosyncratic case?

09:20:57 18   A.  Because you'll have an anecdotal case from now and then.

09:21:01 19   Unless it's an extreme adverse event, it wouldn't deter me from my

09:21:04 20   usual practice pattern.

09:21:05 21   Q.  Doctor, we've talked about how -- let me ask you this:  Do you

09:21:20 22   believe that you stay updated on the relevant portions of the drug

09:21:27 23   label for drugs that you prescribe?

09:21:31 24   A.  Yes.

09:21:32 25   Q.  And we've gone through ways that you stay updated.  I just want

09:21:36  1  to make sure we're clear.  Are those the ways that you stay updated

09:21:40  2  on the relevant drugs that you prescribe and those drug labels?

09:21:44  3  A.  Yes.

09:21:46  4  Q.  And based upon that, Doctor, do you believe that you were

09:21:52  5  up-to-date on the relevant contents of the Taxotere label at the

09:21:56  6  time that you prescribed Taxotere to Barbara Earnest?

09:22:00  7  A.  You mean the label for use?

09:22:02  8  Q.  Yes.

09:22:02  9  A.  Yes.

09:22:03  10  Q.  Doctor, in your deposition, you indicated that you read the

09:22:21  11  Taxotere drug label for the first time around the time -- when you

09:22:26  12  started prescribing that -- prescribing the drug; is that fair?

09:22:29  13  A.  Yes.

09:22:30  14  Q.  And you indicated that was sometime 1999 you believe?

09:22:37  15  A.  Yes.

09:22:37  16  Q.  Doctor, when you read that 1999 label, did you read it to mean

09:22:47  17  that Taxotere causes permanent hair loss?

09:22:50  18  A.  No.

09:22:51  19  Q.  Doctor, I would like to show you the label from 1999; is that

09:23:06  20  okay?

09:23:06  21  A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

09:23:18  22        MR. SCHANKER:  One moment.  May I approach, your Honor?

09:23:20  23        THE COURT:  Yes, you may.

09:23:40  24  BY MR. SCHANKER:

09:23:40  25  Q.  Doctor, if you could flip to Tab 1 in that big binder that you

09:29:02  1    read that (INDICATING)?

09:29:02  2    A.  "Loss of hair occurs in most patients taking Taxotere

09:29:06  3    (including the hair on your head, underarm hair, pubic hair,

09:29:11  4    eyebrows and eyelashes).  Hair loss will begin after the first few

09:29:26  5    treatments and varies from patient to patient.  Once you have

09:29:26  6    completed all of your treatments, hair generally grows back."

09:29:26  7    Q.  I want to ask you about that last part where it says, "Once you

09:29:31  8    have completed your treatments, hair generally grows back."

09:29:31  9    Doctor, to you, as a prescribing oncologist, was that ever a

09:29:35 10    warning for permanent hair loss?

09:29:37 11    A.  No.  If I could just clarify one thing?

09:29:51 12    Q.  Yes.

09:29:53 13    A.  When Taxotere got its indication at the time this document was

09:29:56 14    written, Taxotere was indicated for people that had metastatic

09:30:01 15    disease, okay.  It was not yet approved for treating people in the

09:30:08 16    adjuvant setting.  And so the majority -- the vast majority of

09:30:09 17    these patients that were treated with Taxotere had seen

09:30:13 18    chemotherapy before, okay.

09:30:15 19            And people that have seen chemotherapy before, especially

09:30:18 20    multiple regimens, okay, always have a slower recovery of their

09:30:24 21    blood counts, slower recovery of hair growth because they're not

09:30:26 22    naive to chemotherapy.  They've seen chemotherapy before.  The hair

09:30:43 23    follicles have taken a beating.  The stem cells have taken a

09:30:43 24    beating.  So it would not -- I think there -- it would be very

09:30:43 25    variable with that population of patients how much hair they might

09:35:28  1   these numbers here.  I'll put the first page -- the previous page

09:35:33  2   back, page 18, so the jury can see.  Are these numbers that we see

09:35:38  3   in these columns, are those percentages?

09:35:40  4   A.  Yes.

09:35:41  5   Q.  Thank you.  So going to page 19.  Doctor, do you see where it

09:35:54  6   lists alopecia on this page?

09:35:57  7   A.  Yes.

09:35:58  8   Q.  Is that that word there, alopecia as listed in this warning

09:36:16  9   label, is that a warning for you as a medical doctor of permanent

09:36:21  10  hair loss?

09:36:21  11  A.  No.

09:36:22  12  Q.  In your experience prior to Barbara Earnest, was hair loss with

09:36:47  13  chemotherapy temporary?

09:36:49  14  A.  Yes.

09:36:52  15  Q.  As a practicing oncologist, Doctor, if a drug company knows

09:36:56  16  that its drug can cause both temporary hair loss and permanent hair

09:37:03  17  loss, would you rely on the drug company to warn you about both of

09:37:07  18  those conditions?

09:37:08  19  A.  Yes.

09:37:09  20  Q.  Why?

09:37:11  21  A.  So that we can have an informed discussion with the patient.

09:37:20  22  Q.  And, Doctor, let's now turn to page 23.  And we are still in

09:37:32  23  the 1999 warning label for Taxotere.  And actually, I want to make

09:37:50  24  sure we're all clear on what section we're looking at, so it's

09:37:55  25  important that I put page 22 up first because I want to be

09:37:57  1    perfectly clear here.

09:37:58  2              So what is the title on page 22 for this chart?  Can you

09:38:08  3    read that to the jury, please?

09:38:08  4    A.  "Treatment Emergent Adverse Events in Non-Small Cell Lung

09:38:12  5    Cancer Patients Receiving Taxotere Regardless of Relationship to

09:38:15  6    Treatment."

09:38:16  7    Q.  So this section of the label, warning label is not specifically

09:38:23  8    about breast cancer; is that right?

09:38:26  9    A.  Right.

09:38:28  10   Q.  Okay.  But I want to go through and just see what in total this

09:38:31  11   warning label has concerning hair loss, so I want to ask you about

09:38:36  12   this section as well.  And so, on page 23 of the warning label for

09:38:48  13   this section on non-small cell lung cancer -- and actually, Doctor,

09:39:01  14   I'll let you -- and you can flip through these pages, but do you

09:39:08  15   see on page 23, do you see where I've highlighted the word

09:39:13  16   "alopecia"?

09:39:14  17   A.  Yes.

09:39:14  18   Q.  Just to be clear with the jury, does anything on page 23 warn

09:39:22  19   you as a medical doctor about a risk for Taxotere of permanent hair

09:39:28  20   loss?

09:39:28  21   A.  No.

09:39:33  22   Q.  And just to be clear, your interpretation of this, we see these

09:39:43  23   percentages after alopecia.  Is it your understanding that based on

09:39:49  24   your experience, are those indications of temporary or permanent

09:39:54  25   alopecia?

09:39:55  1   A.   Temporary.

09:40:08  2   Q.   We'll go back to page 22 for a moment.  And again, we're just

09:40:21  3   in that small cell -- non-small cell lung cancer patients receiving

09:40:21  4   Taxotere.  And what was the dosage for the information contained in

09:40:26  5   this chart?  I just want to clarify.

09:40:29  6   A.   75 mg/m$^2$.

09:40:42  7   Q.   Doctor, I would like to take you through another warning label.

09:41:03  8   Get situated here.  Bear with me, folks.

09:41:20  9        Doctor, could you turn to Tab 2, please, of your binder.

09:41:31 10        MR. SCHANKER:  And, your Honor, this is Plaintiff's

09:41:34 11   Exhibit 396.

09:41:45 12   BY MR. SCHANKER:

09:41:46 13   Q.   Doctor, does this appear to be the Taxotere label that was in

09:41:54 14   effect in 20 -- label as you use it, the warning label that was in

09:42:01 15   effect in 2010?  And there's really small writing on this.

09:42:08 16        MR. SCHANKER:  Your Honor, if I can approach and direct

09:42:09 17   the witness to a particular section, may I?

09:42:13 18        THE COURT:  You may approach.

09:42:14 19        MR. SCHANKER:  I am not sure if you'll be able to read

09:42:17 20   this.

09:42:20 21        Yes -- it's going to be too small, your Honor.  Can I put

09:42:31 22   this on the overhead for the limited purpose first of showing him?

09:42:31 23        THE COURT:  Yes.  And we can limit it to just --

09:42:33 24        THE WITNESS:  I think I can make it out.

09:42:35 25   BY MR. SCHANKER:

09:52:06 1    A.  "Explain to patients that side effects such as nausea,

09:52:11 2    vomiting, diarrhea, constipation, fatigue, excessive tearing,

09:52:16 3    infusion site reactions, and hair loss are associated with

09:52:20 4    docetaxel administration."

09:52:22 5    Q.  And, Doctor, was there anything -- anything in that section

09:52:33 6    that you just read in that patient information section that warned

09:52:39 7    you of Taxotere's risk of permanent hair loss?

09:52:44 8    A.  No.

09:52:45 9    Q.  All right.  Now, I would like you to flip to page 60, if you

09:53:07 10   could.

09:53:07 11            MR. SCHANKER:  And, Erin, I just touched a button and

09:53:09 12   turned that off.  Can you turn that back on for me?  Thank you.

09:53:12 13   I'll try not to do that again.  I might.

09:53:12 14   BY MR. SCHANKER:

09:53:19 15   Q.  So page 60.  And we'll look at, on page 60, in this patient

09:53:35 16   information section, what are the possible side effects of

09:53:43 17   Taxotere.  Do you see that section there, Doctor?

09:53:46 18   A.  Yes.

09:53:47 19   Q.  Now, what I would like to do, I just want to orient the jury to

09:53:51 20   where we are in this section of the warning label of 2010.  If you

09:53:55 21   could now flip to the next page.  And I'll get it lined up, your

09:53:59 22   Honor.

09:54:07 23            So we are on page 61 of the 2010 warning label for the

09:54:23 24   drug Taxotere.  And do you see the list of the most common side

09:54:31 25   effects of Taxotere?

09:54:33  1    A.  Yes.

09:54:33  2    Q.  And is there -- when you look at that list, what have I

09:54:46  3    highlighted there, Doctor?

09:54:47  4    A.  Hair loss.

09:54:48  5    Q.  Is there anything listed there in that section that warned you,

09:54:55  6    so that you could warn patients, of Taxotere's risk of permanent

09:55:00  7    hair loss?

09:55:01  8    A.  No.

09:55:03  9    Q.  Doctor, I would like you to turn to page 16, page 16 of the

09:56:01 10    2010 warning label that was in effect at the time Barbara Earnest

09:56:07 11    received the Taxotere.  Do you see the table we have on page 16,

09:56:11 12    Doctor?

09:56:11 13    A.  Yes.

09:56:12 14    Q.  And could you tell the jury what the title of that table is?

09:56:20 15    A.  "Summary of Adverse Reactions in Patients Receiving Taxotere At

09:56:26 16    100 mg/m$^2$."

09:56:31 17    Q.  And what were the milligrams per meter squared that Barbara

09:56:35 18    Earnest received?

09:56:36 19    A.  One hundred.

09:56:37 20    Q.  You see, so we have this chart here, correct?

09:56:50 21    A.  Yes.

09:56:51 22    Q.  And I want to flip to the next page where the chart continues.

09:57:02 23    Make sure we can see what page we are on here.  What page is this,

09:57:07 24    Doctor?

09:57:08 25    A.  Seventeen.

09:57:09  1   Q.  And on page 17, do you see the fifth from the bottom; one, two,

09:57:19  2   three, four, five, count up?  What is that word?

09:57:22  3   A.  Alopecia.

09:57:24  4   Q.  Doctor, does that tell you anything about the duration of the

09:57:30  5   alopecia?

09:57:31  6   A.  No.

09:57:35  7   Q.  Doctor, is there anything here on page 17 of the 2010 warning

09:57:42  8   label for Taxotere that told you of Taxotere's risk of permanent

09:57:51  9   hair loss?

09:57:51  10  A.  No.

09:57:53  11  Q.  Dr. Carinder, can you please turn to page 22.  I am going to

09:58:32  12  zoom in so we can see the title of this table on page 22.  Table 7.

09:58:41  13  Could you read the title to the jury of Table 7?

09:58:45  14  A.  "Clinically important treatment emergent adverse reactions

09:58:50  15  regardless of causal relationship in patients receiving Taxotere in

09:58:54  16  combination with doxorubicin and cyclophosphamide."

09:59:00  17  Q.  And, Doctor, what is the other name for doxorubicin?

09:59:06  18  A.  Adriamycin.

09:59:06  19  Q.  And did you give Adriamycin as well as Taxotere to Barbara

09:59:11  20  Earnest?

09:59:11  21  A.  Yes, not simultaneously.

09:59:14  22  Q.  Good point.  And we'll make sure we get to exactly how you

09:59:18  23  administered it.  But was that a drug that Barbara Earnest had at

09:59:22  24  your prescription in this case, chemotherapy drug?

09:59:25  25  A.  Adriamycin?

09:59:27  1    Q.  Yes.

09:59:27  2    A.  Yes.

09:59:28  3    Q.  And we see the word cyclophosphamide.  Is there another word

09:59:36  4    for that particular drug?

09:59:39  5    A.  Cytoxan.

09:59:41  6    Q.  So cyclophosphamide or Cytoxan, is that another chemotherapy

09:59:45  7    drug that you prescribed to Barbara Earnest in this case?

09:59:48  8    A.  Yes.

09:59:59  9    Q.  Let's flip to the next page, which is page 23.  Make sure the

10:00:08  10   jury can see where we are.  So we're in the 2010 warning label for

10:00:14  11   Sanofi's drug Taxotere.  Page 23 in this table that we've been

10:00:20  12   discussing.  So it looks like it's the fifth down.  Can you read

10:00:30  13   what is that word there?

10:00:31  14   A.  Alopecia.

10:00:36  15   Q.  And then up here, on this chart, we have the dosing.  And

10:00:44  16   what's the dosing there?

10:00:45  17   A.  Seventy-five mg/m$^2$.

10:00:51  18   Q.  Doctor, does anything in this part of the warning label tell

10:00:57  19   you that hair loss after Taxotere might be permanent?

10:01:05  20   A.  No.

10:01:06  21   Q.  Doctor, if prior to Barbara Earnest's treatment Sanofi would

10:01:42  22   have told you about a risk of permanent hair loss and Taxotere, is

10:01:49  23   that information you would have given to Barbara Earnest?

10:01:51  24   A.  Yes.

10:01:52  25   Q.  Why?

10:01:55 1    A.  Because she would need to know that.  She -- you can't have an

10:02:05 2    informed discussion with a patient about treatment if you don't

10:02:07 3    disclose the potential warnings.

10:02:10 4    Q.  Doctor, in your practice, the many years that you've been an

10:02:14 5    oncologist, have you seen temporary hair loss with your female

10:02:21 6    patients?

10:02:21 7    A.  Yes.

10:02:22 8    Q.  Tell the jury whether or not temporary hair loss is a concern

10:02:30 9    to your female patient population.

10:02:33 10   A.  If they don't want -- some women don't want to lose their hair,

10:02:40 11   period.  Okay.  But the majority of patients, if they are under the

10:02:47 12   assumption that their hair is going to regrow, that doesn't deter

10:02:52 13   them from taking their treatment.

10:02:54 14   Q.  And you're talking just about temporary hair loss, correct?

10:02:58 15   A.  Right.

10:02:59 16   Q.  Doctor, based on your experience, is permanent hair loss a big

10:03:06 17   deal to women?

10:03:07 18   A.  I think so.

10:04:00 19   Q.  Doctor, I want to talk to you specifically about the treatment

10:04:04 20   that you provided to Barbara Earnest --

10:04:09 21              THE COURT:  Are we shifting gears now?

10:04:10 22              MR. SCHANKER:  Yes, we are.  Is this a good time for a

10:04:12 23   break?

10:04:13 24              THE COURT:  Might be time for our morning break.  It's

10:04:15 25   five after ten.  The Court's going to be at recess until 10:15.

| | | |
|---|---|---|
| 10:04:19 | 1 | MR. SCHANKER:  Thank you, your Honor. |
| 10:04:20 | 2 | THE COURT:  All rise. |
| 10:04:21 | 3 | THE DEPUTY CLERK:  All rise. |
| 10:04:21 | 4 | (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS |
| 10:04:21 | 5 | TAKEN.) |
| 10:04:21 | 6 | (OPEN COURT.) |
| 10:17:47 | 7 | (WHEREUPON, THE JURY ENTERED THE COURTROOM.) |
| 10:17:47 | 8 | THE COURT:  All jurors are present.  Court's back in |
| 10:17:47 | 9 | session.  You may be seated. |
| 10:17:49 | 10 | Dr. Carinder, I remind you you're under oath. |
| 10:17:52 | 11 | Please proceed. |
| 10:17:52 | 12 | MR. SCHANKER:  Thank you, your Honor. |
| 10:17:53 | 13 | BY MR. SCHANKER: |
| 10:17:56 | 14 | Q.  Switching gears, Doctor, I want to talk about Barbara Earnest's |
| 10:18:01 | 15 | cancer and treatment.  And you provided care to Barbara, correct? |
| 10:18:07 | 16 | A.  Yes. |
| 10:18:07 | 17 | Q.  Why did she come to you? |
| 10:18:10 | 18 | A.  She was referred to me. |
| 10:18:12 | 19 | Q.  Referred by whom? |
| 10:18:14 | 20 | A.  Dr. Karlin. |
| 10:18:18 | 21 | Q.  And tell the jury, who is Dr. Karlin? |
| 10:18:20 | 22 | A.  He is a surgeon. |
| 10:18:21 | 23 | Q.  Did he do Barbara's breast surgery? |
| 10:18:27 | 24 | A.  Yes. |
| 10:18:28 | 25 | Q.  By the time that you treated Barbara, had she already had |

10:18:33  1    surgery to remove the cancer?

10:18:34  2    A.  Yes.

10:18:35  3    Q.  Did she -- did Barbara through her treatment receive any

10:18:41  4    radiation after she got your chemotherapy?

10:18:45  5    A.  I think -- yeah, that's always after the chemotherapy.

10:18:49  6    Q.  You use this word "adjuvant chemotherapy" or the word

10:18:56  7    "adjuvant" before.  Could you make sure that the jury understands

10:18:59  8    the purpose of adjuvant chemotherapy?  What's it for?

10:19:03  9    A.  To minimize the risk of recurrent disease.

10:19:09 10    Q.  And, Doctor, what was Barbara's prognosis when she came to you?

10:19:13 11    A.  She would have been at risk to have -- develop recurrent

10:19:22 12    disease in the absence of chemotherapy.

10:19:24 13    Q.  And with chemotherapy what was her prognosis?

10:19:29 14    A.  Good.

10:19:29 15    Q.  Let's talk about what you prescribed specifically to Barbara.

10:19:37 16    Share that with the jury.  Do you remember what it was?

10:19:39 17    A.  Doxorubicin and cyclophosphamide for four cycles, given every

10:19:45 18    two weeks.  And then after that, docetaxel every 21 days.

10:20:00 19    Q.  I want to take you through that prescription, Doctor.  Let's

10:20:04 20    get this set up here.  Everybody see that okay?  All right.  So --

10:20:21 21              THE COURT:  Have you seen this?

10:20:22 22              MS. SASTRE:  Yes, your Honor.

10:20:23 23              MR. SCHANKER:  And I -- you know what?  Shall I

10:20:26 24    approach -- I have one if you want it.

10:20:28 25              THE COURT:  No, that's fine.  I'm watching.

10:20:28  1          MS. SASTRE:  No objection.

10:20:29  2          THE COURT:  Okay.  Thank you.

10:20:32  3   BY MR. SCHANKER:

10:21:12  4   Q.  Doctor, you just described to the jury the chemotherapy that

10:21:12  5   you prescribed to Barbara.  Let's walk through it.  First, does

10:21:12  6   this accurately reflect it?

10:21:12  7   A.  Yes.

10:21:12  8   Q.  Okay.  Walk us through that chemotherapy regimen if you would.

10:21:12  9   First, we have here Adriamycin, 60 mg/m$^2$.  What does that mean the

10:21:15 10   meters squared?  We've heard that phrase a lot in this courtroom.

10:21:15 11   A.  Based on the height and weight.

10:21:15 12   Q.  So that's a formula that you go through?

10:21:15 13   A.  Yes.

10:21:15 14   Q.  So Adriamycin, what was that other term for Adriamycin that we

10:21:17 15   heard?

10:21:22 16   A.  Doxorubicin.

10:21:22 17   Q.  So that's the same thing?

10:21:22 18   A.  Yes.

10:21:22 19   Q.  So next on this list we have cyclophosphamide; is that right?

10:23:00 20   A.  Yes.

10:23:00 21   Q.  And have we heard another word for cyclophosphamide in your

10:23:00 22   testimony?

10:23:00 23   A.  Cytoxan.

10:23:00 24   Q.  That's the same thing?

10:23:00 25   A.  Yes.

10:23:00 1   Q.  Now, you just explained to us, I believe, that the Adriamycin

10:23:00 2   and the cyclophosphamide are given in combination; is that right?

10:23:00 3   A.  Yes.

10:23:00 4   Q.  And what -- explain to the jury what that means practically.

10:23:00 5   How is that done?

10:23:00 6   A.  They're both given on the same day.

10:23:00 7   Q.  Okay.  And how are these chemotherapies administered?  Is it an

10:23:00 8   IV?

10:23:00 9   A.  Yes.

10:23:00 10  Q.  And so the schedule then, take us through that.  It says,

10:23:00 11  "Cycle every 15 days for four cycles."  That's what you testified

10:23:00 12  to, correct?

10:23:00 13  A.  Yes.

10:23:00 14  Q.  Explain what that means, how this AC combination, practically,

10:23:00 15  what does it mean a "cycle every 15 days for four cycles"?

10:23:00 16          THE COURT:  I have just one quick question.

10:23:00 17  Dr. Carinder, were the Adriamycin and the cyclophosphamide mixed or

10:23:00 18  were they given --

10:23:00 19          THE WITNESS:  No, given separately.

10:23:00 20          THE COURT:  But at the same --

10:23:00 21          THE WITNESS:  On the same day.

10:23:00 22          THE COURT:  Okay.  Thank you.  I'm sorry.  Please

10:23:00 23  proceed.

10:23:00 24          MR. SCHANKER:  Thank you, your Honor.

10:23:00 25          THE WITNESS:  I'm sorry.  Ask your question again.

10:23:00  1    BY MR. SCHANKER:

10:23:00  2    Q.  Yes.  The Adriamycin and the cyclophosphamide, the cycle every

10:23:04  3    15 days for four cycles.  So practically, just walk the jury

10:23:08  4    through how that works.

10:23:09  5    A.  They come in.  They get premedications.  They get the

10:23:27  6    cyclophosphamide, which is hung over an hour.  Doxorubicin is given

10:23:27  7    as a push from a syringe slowly.  And then they come back the

10:24:20  8    following day and get a growth factor shot.

10:24:58  9    Q.  What is a growth factor shot?

10:24:58 10    A.  To help the white blood cell count recover.

10:24:58 11    Q.  Why do you want to help the white blood cell count recover?

10:24:58 12    A.  Because -- to avoid neutropenia.

10:24:58 13    Q.  And explain to the jury what neutropenia is.

10:24:58 14    A.  Neutrophils are the white blood cells that people have that

10:25:03 15    fight infection and chemotherapy drugs, many of them, suppress the

10:25:03 16    bone marrow, including the neutrophils.  And this is to help

10:25:03 17    facilitate the recovery of neutrophils so that the patients don't

10:25:03 18    have a prolonged period where their white blood cell count is low,

10:25:03 19    because they're at higher risk for infection then.

10:25:29 20    Q.  So let me see if I am following you.  In order to try to

10:25:29 21    minimize the neutropenia, you give growth factor; is that right?

10:25:29 22    A.  With some chemotherapy regimens, yes.

10:25:29 23    Q.  And what is -- just so we understand, that phrase seems a

10:25:29 24    little strange.  What is growth factor?

10:25:38 25    A.  It stimulates stem cells in the bone marrow.

1448

10:25:38 1    Q.  And do you give that growth factor as part of patient

10:25:38 2    protection, minimize side effects?

10:25:38 3    A.  With certain chemotherapy regimens.  Not every one of them.

10:25:38 4    You have to have a 14-day window between a Neulasta injection.

10:25:38 5    Q.  Neulasta injection.  What is that and how does that --

10:26:19 6    A.  Neulasta is the growth factor shot to stimulate white blood

10:26:19 7    cell recovery.

10:26:19 8    Q.  So Neulasta is the name of the drug, the growth factor?

10:26:19 9    A.  When GCSF was first developed, it was -- the trade name for it

10:26:19 10   was Neupogen and Neupogen was given on a daily basis for, say,

10:26:19 11   several days to help the white blood cell count recover.

10:26:19 12           And then, in about 2000 Amgen, the drug company Amgen

10:26:19 13   developed Neulasta which was a kind of sustained released Neupogen,

10:26:19 14   which you only had to give the one injection.

10:26:19 15   Q.  We talked about metered squared, and I just want to make sure I

10:26:19 16   am clear on that.  Does that mean that it's individualized for each

10:26:19 17   patient depending on their height and weight?

10:26:19 18   A.  Yes.

10:26:19 19   Q.  With that formula that you calculate?

10:26:19 20   A.  Yes.

10:26:19 21   Q.  And that's something that you do with every patient?  You don't

10:26:19 22   just give them 60 milligrams or 600, you have to do that

10:26:19 23   calculation?

10:26:19 24   A.  Right.

10:26:19 25   Q.  So following the AC cycle every 15 days for four cycles, what

10:26:19  1  did Barbara Earnest receive next as part of the chemotherapy that

10:26:22  2  you prescribed?

10:26:59  3  A.  Docetaxel.

10:26:59  4  Q.  And docetaxel is another word for what drug?

10:26:59  5  A.  Taxotere.

10:26:59  6  Q.  And what was the dosing amount for the Taxotere?

10:26:59  7  A.  100 mg/m$^2$.

10:26:59  8  Q.  And then how was that given from a time frame standpoint?

10:26:59  9  A.  Every 21 days.

10:26:59  10  Q.  So the A and the C was received first on the cycle that you

10:26:59  11  described, 15 days for four cycles?

10:26:59  12  A.  Yes.

10:26:59  13  Q.  And then the Taxotere every 21 days for four cycles?

10:27:01  14  A.  Yes.

10:27:06  15  Q.  Doctor, are you familiar with the phrase cumulative dosage?

10:27:26  16  A.  Yes.

10:27:26  17  Q.  What does cumulative dosage mean?

10:27:33  18  A.  The total amount of drug per metered squared that they get.

10:27:33  19  Q.  Is that something that you pay attention to as an oncologist?

10:27:36  20  A.  With certain drugs, yes.

10:27:37  21  Q.  And why is that?

10:27:39  22  A.  With anthracyclines you have to pay attention to that because

10:27:45  23  you run the risk of causing significant cardiac toxicity if you

10:27:52  24  exceed it.

10:27:52  25  Q.  So I want to do some math here, if we could.  And let's start

10:27:57 1  with the A.  So am I right that she had the 60 mg/m² and received

10:28:04 2  that for four cycles?

10:28:06 3  A.  Yes.

10:28:06 4  Q.  So what would her -- Barbara's cumulative dosage of Adriamycin

10:28:12 5  have been?

10:28:12 6  A.  240 mg/m².

10:28:16 7  Q.  So 240?

10:28:28 8  A.  Yes.

10:28:28 9  Q.  Let's talk about the cyclophosphamide.  Am I right she received

10:28:30 10  600 milligrams per dosage; is that correct?

10:28:44 11  A.  600 mg/m².

10:28:44 12  Q.  Yes, per meter squared.  And then she received four cycles of

10:28:44 13  that.  So what would the total cumulative dosage amount be per

10:29:00 14  meter squared?

10:29:00 15  A.  2,400 mg/m².

10:29:00 16  Q.  And then the Taxotere.  So Barbara received, am I right,

10:32:22 17  400 mg/m² for four cycles?

10:32:22 18  A.  100 mg/m² for four cycles.

10:32:22 19  Q.  Just checking if you were awake.  100 mg/m² for four cycles,

10:32:22 20  which means the cumulative dose for Barbara of Taxotere?

10:32:22 21  A.  400 mg/m².

10:32:22 22  Q.  Have I written all of those cumulative dosages correctly?

10:32:27 23  A.  Yes.

10:32:27 24  Q.  So in this case, Doctor, we've heard about the TAC regimen.  I

10:32:27 25  want to talk about that.  In regard to the TAC regimen, what is the

1451

10:32:27  1   TAC regimen?

10:32:27  2   A.  It's a regimen that we use in the neoadjuvant as well as

10:32:28  3   adjuvant setting in higher risk breast cancer patients.

10:32:28  4   Q.  Okay.  You use it in the neoadjuvant and adjuvant setting for

10:32:28  5   higher risk breast cancer patients.  Let's break that down and have

10:32:28  6   you explain that to the jury.

10:32:28  7           First of all, what's the neoadjuvant setting?

10:32:28  8   A.  Where we -- patients that present with locally advanced disease

10:32:41  9   or very large tumors or bulky adenopathy in the axilla, we often

10:32:41  10  treat them with -- I probably treat more patients preoperatively

10:32:41  11  than I do postoperatively.  It's to help reduce the bulk of

10:32:41  12  disease, because when they present with very bulky locally advanced

10:32:41  13  tumors, they're not surgical candidates at that point, you're not

10:32:42  14  going to have good margins, you're not going to have a good

10:32:42  15  surgery.  And those patients we tend to treat preoperatively to

10:32:42  16  down stage the disease.

10:32:42  17  Q.  Did you call this, did I hear correctly, patients that present

10:32:42  18  with a bulky --

10:32:42  19  A.  Bulky.

10:32:42  20  Q.  -- locally advanced disease?

10:32:42  21  A.  Yes.

10:32:42  22  Q.  Could you explain to the jury these patients that present with

10:32:42  23  a bulky locally advanced disease, what does that mean?

10:32:42  24  A.  Large tumors, clinically palpable axillary adenopathy.  They're

10:32:42  25  not good candidates for surgery at that point.

10:32:42  1    Q.  So for those particular patients that present with a bulky

10:32:42  2    locally advanced disease, are you explaining that -- just so I

10:32:42  3    understand, do they typically get chemotherapy before surgery?

10:32:42  4    A.  Yes.

10:32:42  5    Q.  And just so the jury understands, for those patients -- as we

10:32:42  6    do that, was Barbara one of those patients who presented with bulky

10:32:42  7    locally advanced disease?

10:32:42  8    A.  No.

10:32:42  9    Q.  And for those particular patients, why do they do chemotherapy

10:32:42 10    before surgery often?

10:32:42 11    A.  Because they're not operative candidates at that point.  The

10:32:42 12    tumor is too big.  They're not going to have good margins.  It's a

10:32:42 13    high morbidity surgery when you try to operate on someone like

10:32:42 14    that.  And you're not going to have good margins, you're not going

10:32:42 15    to have a good outcome.

10:32:42 16    Q.  So I want to make sure I understand your testimony, Doctor.

10:32:42 17    These higher risk patients with bulky locally advanced disease, how

10:32:42 18    does that relate to this conversation about the TAC regimen that

10:32:42 19    we've heard a lot about in this courtroom?

10:32:56 20    A.  I typically use that, like I said, with higher risk patients,

10:32:56 21    younger patients.  I don't -- there's nothing published that says

10:32:56 22    the age cut off where you should or shouldn't give someone a TAC

10:33:15 23    regimen.  My experience and my judgment, I typically -- after about

10:33:15 24    age 55, I am not going to give somebody that regimen because

10:33:15 25    there's a lot of toxicity associated with it.

10:33:15  1   Q.  So the TAC regimen --

10:33:28  2   A.  It's all three drugs given simultaneously.

10:33:28  3   Q.  So the TAC regimen that Barbara did not receive, did you say

10:33:28  4   something about higher toxicity with that regimen?

10:34:03  5   A.  With TAC, yes, there is.

10:34:03  6   Q.  And you also said something about patients over 55.  Explain

10:34:03  7   that to the jury, if you would.

10:34:03  8   A.  It's just my personal preference because that regimen has the

10:34:03  9   potential to be really myelosuppressive and just more toxicity and

10:34:03  10  adverse events and fatigue and everything else.  I think it's more

10:34:16  11  appropriate for a younger population.

10:34:16  12  Q.  So would you have given Barbara with her presentation the TAC

10:34:16  13  regimen?

10:34:16  14  A.  No, she didn't warrant that.

10:34:16  15  Q.  For the reasons that you explained?

10:34:16  16  A.  Right.

10:34:16  17  Q.  So you ruled that regimen out; is that fair?

10:34:30  18  A.  I didn't even consider it.

10:34:30  19  Q.  Okay.  Let's go ahead and make sure I understand the cumulative

10:34:30  20  dosage for that TAC regimen.  Can you help me do that, please?

10:37:17  21  A.  Yes.

10:37:17  22  Q.  And so we'll understand -- I want to make sure we're clear on

10:37:17  23  how this regimen is received first of all.

10:37:17  24          So you indicated in the, I believe, the adjuvant or you

10:37:17  25  also said the neoadjuvant.  What does neoadjuvant mean?

10:37:17   1   A.  Preoperative.

10:38:59   2   Q.  Node positive breast cancer, if you can just explain that to

10:38:59   3   the jury, please.

10:38:59   4   A.  Locally advanced.  I use that regimen either in people --

10:38:59   5   younger patients that have typically high risk disease.  You know,

10:38:59   6   people that have what are called triple negative breast cancers,

10:38:59   7   they're -- that's a high risk breast cancer, and they're more

10:38:59   8   commonly found in younger patients.  And they have a very high risk

10:38:59   9   for developing recurrent disease.  And many of them present with

10:38:59  10   bulky disease, locally advanced disease because they grow very

10:38:59  11   quickly.  But there again, if it's a 70-year-old patient, I am not

10:38:59  12   going to give them that.  35-year-old patient I would.

10:39:00  13   Q.  Or a 60-year-old patient like Barbara?

10:39:00  14   A.  No.  After about 55 that's kind of my cut off for using that

10:39:00  15   regimen.  I think it just has too much toxicity.

10:39:00  16   Q.  So as far as the way this regimen is administered and the

10:39:00  17   dosage, and kind of following off the judge's question, educate us.

10:39:00  18   Are all three of these drugs given at the same time in the same

10:39:00  19   setting?

10:39:00  20   A.  On the same day.

10:39:00  21   Q.  On the same day.  Okay.  Explain that to us just so we

10:39:00  22   understand.

10:39:00  23   A.  They get premedications.  They get the Taxotere infused over

10:39:00  24   about an hour, the Cytoxan's administered over about an hour, and

10:39:00  25   the doxorubicin is given as a push.

10:39:00  1    Q.  And then it's received -- so Taxotere is 75 mg/m$^2$, correct?

10:39:00  2    A.  Yes.

10:39:00  3    Q.  Every three weeks for six courses?

10:39:00  4    A.  Yes.

10:39:00  5    Q.  So cumulative dose of the Taxotere with this TAC regimen is how

10:39:00  6    much?

10:39:00  7    A.  450 mg/m$^2$.

10:39:00  8    Q.  And then which chemotherapy drug is administered after the

10:39:00  9    Taxotere in that setting?  What comes next, the C?

10:39:00 10    A.  Cyclophosphamide and then the doxorubicin is given as a push.

10:39:00 11    Q.  Let's talk about the cyclophosphamide first.  And so 500 mg/m$^2$

10:39:00 12    every three weeks for six courses.  So 500 times six?

10:39:00 13    A.  300.

10:39:00 14    Q.  3,000?

10:39:00 15    A.  300.

10:39:00 16    Q.  Cyclophosphamide --

10:39:00 17    A.  I'm sorry, 3,000.

10:39:00 18    Q.  Yes.  And then you indicated that the A, the Adriamycin, or as

10:39:00 19    it's listed up here, the doxorubicin, right?

10:39:00 20    A.  Yes.

10:39:00 21    Q.  Same thing, same drug?

10:39:00 22    A.  Yes, same drug.

10:39:00 23    Q.  And you said it's administered or used as a push.  What does

10:39:00 24    that mean, "used as a push"?

10:39:00 25    A.  It's not dripped in from a piggyback or from a bag.  It's in a

10:39:00 1    syringe and the nurse -- a nurse administers it over about a 15- or

10:39:00 2    20-minute period because it's a vesicant so you really should give

10:39:00 3    it as a push.

10:39:00 4    Q.  And that's given, the A or doxorubicin is given 500 milligrams

10:39:00 5    every three weeks for six courses?

10:39:00 6    A.  Fifty.

10:39:00 7    Q.  Sorry about that.  It is 50.  And every three weeks for six

10:39:00 8    courses, correct?

10:39:01 9    A.  Yes.

10:39:11 10   Q.  And so what's the total cumulative dose of the A?

10:39:11 11   A.  300 per meter squared.

10:39:32 12   Q.  So just to wrap this part up.  Does what you prescribed to

10:39:32 13   Barbara have less of a cumulative dose for Taxotere than the TAC

10:41:23 14   regimen we just went through?

10:41:23 15   A.  Yes.

10:41:23 16   Q.  Let's show the entire comparison side by side.  So the TAC

10:41:23 17   regimen has a higher dose cumulatively of Taxotere; is that

10:41:23 18   correct?

10:41:23 19   A.  Yes.

10:41:23 20   Q.  That's 450 mg/m$^2$ for the T in the TAC regimen versus 400 mg/m$^2$

10:42:23 21   for the T in the regimen that you -- the treatment that you gave to

10:42:23 22   Ms. Earnest, correct?

10:42:23 23   A.  Right.

10:42:23 24   Q.  And then, Doctor, let's talk about the A.  In the TAC regimen

10:42:23 25   is the cumulative dose of the A higher than the cumulative dose of

10:42:23   1   the A in the regimen that you gave to Barbara?

10:42:23   2   A.  Yes.

10:42:23   3   Q.  And tell me, what are the difference in those numbers per meter

10:42:23   4   squared?

10:42:23   5   A.  60 mg/m$^2$.

10:42:23   6   Q.  So 60 milligrams higher in the TAC?

10:42:23   7   A.  Yes.

10:42:23   8   Q.  And then the cyclophosphamide.  In the TAC regimen, is that

10:42:23   9   higher than in the regimen for cyclophosphamide that you gave to

10:42:23  10   Barbara?

10:42:23  11   A.  Yes.

10:42:23  12   Q.  How much higher?

10:42:23  13   A.  600 milligrams.

10:42:23  14   Q.  And just to be clear, you administered Barbara the T and the A

10:42:23  15   and the C, but you did not give her the TAC regimen, correct?

10:42:23  16   A.  That's correct.

10:42:23  17   Q.  You gave it to her in the manner that you described to us?

10:42:23  18   A.  Yes.

10:42:23  19   Q.  Thank you.  Doctor, let's shift gears and talk about the NCCN

10:42:23  20   guidelines.  Okay.  And if you could turn in your binder to Tab 4.

10:42:23  21           MR. SCHANKER:  And, your Honor, that is Plaintiff's

10:42:23  22   Exhibit 1878.

10:42:38  23   BY MR. SCHANKER:

10:42:38  24   Q.  You have that before you?

10:42:38  25   A.  I do.

10:42:40  1    Q.  It's a big binder, sorry.  Do you recognize these?

10:42:58  2    A.  Yes.

10:42:59  3    Q.  What do you recognize them to be?

10:43:02  4    A.  Treatment guidelines for breast cancer.

10:43:06  5    Q.  And specifically, what is the title for these?

10:43:16  6    A.  "NCCN Guidelines Version 2.2011 Invasive Breast Cancer."  That

10:43:23  7    would be the guidelines from 2011.

10:43:26  8    Q.  Okay.  So what exactly are these guidelines?  Educate the jury

10:43:40  9    on what they're used for by oncologists.

10:43:48 10    A.  These are evidence-based trials that have met the standard to

10:43:51 11    be published in the NCCN, and we use it for treatment guidelines

10:43:55 12    for treating patients.

10:43:57 13    Q.  You just used the phrase "evidence-based trials."  Explain what

10:44:01 14    that means.

10:44:01 15    A.  Based on clinical trials, published data, and FDA approved.

10:44:11 16    Q.  Doctor, did you use the NCCN guidelines as the base for your

10:44:14 17    treatment for Barbara?

10:44:15 18    A.  Yes.

10:44:16 19    Q.  I would like you to look at the first page of these guidelines.

10:44:24 20    I am going to zero in on a box that's on that first page and ask

10:44:30 21    you to read through it, and then educate -- read it aloud and

10:44:35 22    educate the jury on it, okay?

10:44:38 23            Give me a moment here.  Do you see this box, the black

10:44:47 24    box here?

10:44:47 25    A.  Yes.

10:44:47  1    Q.  Could you go ahead and read -- start -- go ahead and read the

10:44:54  2    first sentence for us.

10:44:55  3    A.  "The selection, dosing, and administration of anti-cancer

10:44:58  4    agents and the management of associated toxicities are complex."

10:45:04  5    Q.  Do you agree with that statement?

10:45:05  6    A.  Yes.

10:45:06  7    Q.  Let's go ahead and work our way through the next sentence.  I

10:45:14  8    may interrupt you and ask you questions as we go, okay?  Can you go

10:45:19  9    ahead and read the next sentence that starts with "modifications"?

10:45:22 10    A.  "Modifications of drug dose and schedule and initiation of

10:45:26 11    supportive care interventions are often necessary because of

10:45:29 12    expected toxicities" --

10:45:31 13    Q.  Let me stop you there.  "Modifications of drug dose and

10:45:37 14    schedule of initiation of supportive care interventions."  Are you

10:45:49 15    permitted to, pursuant to these guidelines, to modify the drug dose

10:45:55 16    and schedule?

10:45:56 17    A.  Of course.

10:45:57 18    Q.  And explain that to the jury.

10:46:01 19    A.  If we have a patient that has untoward toxicity from their

10:46:07 20    treatment, and oftentimes it mandates giving a dose reduction on

10:46:11 21    the drug so that they don't experience the same severe toxicities

10:46:14 22    the second time.

10:46:15 23    Q.  And so is the prescription of these chemotherapy drugs, is

10:46:22 24    there a one-size-fits-all cookie-cutter --

10:46:25 25    A.  Never.

10:46:26  1    Q.  Is that why this language is written like this with the drug,

10:46:32  2    that modifications of drug dose and schedule initiation?

10:46:36  3    A.  Yes.

10:46:37  4    Q.  And is that known in your field, widely known?

10:46:43  5    A.  Is what widely known?

10:46:45  6    Q.  This acceptance of the NCCN guidelines and the language

10:46:51  7    concerning modification of drug dose and schedules.

10:46:54  8    A.  Yes.

10:46:55  9    Q.  And is that done for patient safety and protection and

10:46:59 10    efficacy?

10:46:59 11    A.  Yes.

10:47:00 12           MS. SASTRE:  Leading, your Honor.

10:47:01 13           MR. SCHANKER:  Withdrawn.

10:47:03 14           THE COURT:  Rephrase your questions.

10:47:05 15           MR. SCHANKER:  Thank you, your Honor.

10:47:06 16    BY MR. SCHANKER:

10:47:09 17    Q.  I cut you off there.  If you could go ahead and read the

10:47:12 18    sentence from the top, and then we'll work through it again.

10:47:15 19    Modifications.

10:47:15 20    A.  The one I just read?

10:47:19 21    Q.  Yes.  I want to work through the rest of it.

10:47:22 22    A.  "Modifications of drug dose and schedule and initiation of

10:47:26 23    supportive care interventions are often necessary because of

10:47:31 24    expected toxicities and because of individual patient variability,

10:47:33 25    prior treatment, and comorbidity."

10:47:38  1   Q.  Doctor, could you go ahead and read on?

10:47:41  2   A.  "The optimal delivery of anti-cancer agents therefore requires

10:47:45  3   a healthcare delivery team experienced in the use of anti-cancer

10:47:50  4   agents and the management of associated toxicities in patients with

10:47:55  5   cancer."

10:47:57  6   Q.  Are you part of the healthcare delivery team?

10:48:00  7   A.  Yes.

10:48:01  8   Q.  Are you experienced in the use of anti-cancer agents and the

10:48:06  9   management of associated toxicities in patients with cancer?

10:48:10  10  A.  Yes.

10:48:11  11  Q.  Is that box directed at you?

10:48:14  12  A.  Yes.

10:48:20  13  Q.  And that's just on the first page.  I want to look at a few

10:48:27  14  other pages of these NCCN guidelines.  What page are we looking at

10:48:46  15  here of these NCCN guidelines?

10:48:48  16  A.  Three.

10:48:50  17  Q.  Do you see here at the bottom, do you see what I just put a

10:48:58  18  highlighter around there?

10:48:59  19  A.  Yes.

10:49:01  20  Q.  Is that -- and you can go ahead and take time and read it.

10:49:03  21  A.  That was in the box that I just read on the prior page.

10:49:07  22  Q.  It's the same language?

10:49:08  23  A.  Yes.

10:49:09  24  Q.  Specifically, can you read the language that I just

10:49:16  25  highlighted?

10:49:16  1    A.   "Because of individual patient variability."

10:49:20  2    Q.   Explain to the jury what individual patient variability is.

10:49:24  3    What does that mean to you?

10:49:26  4    A.   Well, I mean, every patient is an individual.  You have to

10:49:30  5    tailor the treatment.  People that have liver functions that are

10:49:36  6    elevated, specifically with docetaxel or any taxane drug, you may

10:49:41  7    have to do a dose modification, sometimes from the onset, in order

10:49:48  8    to reduce potential toxicity.

10:49:50  9         If the drug is clear through the liver and their liver

10:49:53 10    functions are abnormal, not grossly abnormal but above normal, we

10:50:02 11    sometimes -- I frequently will make a dose adjustment from the

10:50:05 12    onset.

10:50:06 13    Q.   Is age an example of a patient variability, age of a patient?

10:50:11 14    A.   Yes.

10:50:12 15    Q.   And, Doctor, on page 4 of this same document, the NCCN

10:50:23 16    guidelines for invasive breast cancer, highlight this language at

10:50:31 17    the bottom.  Do you see what page I am on here?  What page is that?

10:50:34 18    A.   Four.

10:50:35 19    Q.   And is what I've highlighted the same language that you've

10:50:41 20    already walked the jury through on page 1 and page 3?

10:50:44 21    A.   Yes.

10:50:44 22    Q.   Now, I want to -- Erin, can you clear that off for me?  Thank

10:50:44 23    you.

10:51:25 24         So looking back at the first page of these guidelines,

10:51:29 25    Doctor.  See, actually, what I want to do is go to -- let's go to,

10:51:49  1   instead, Exhibit 621, your Honor, which is -- have lettered -- for

10:51:57  2   you it's the Tab 5, Doctor, in your big binder.  Let me know when

10:52:16  3   you've made it to Tab 5.  It's 5A actually.  Are you there?

10:52:38  4   A.  Yes.

10:52:39  5   Q.  Make sure you speak in the microphone.

10:52:42  6   A.  Yes.

10:52:43  7   Q.  Thank you.  So Tab 5A, plaintiff's Exhibit 621.  Doctor, what

10:52:56  8   do you recognize that to be?

10:53:00  9   A.  Consultation note.

10:53:02  10  Q.  Could you explain -- and this is a consultation note for

10:53:08  11  Barbara Earnest?

10:53:08  12  A.  Yes.

10:53:08  13  Q.  Could you explain to the jury what a consultation note is?

10:53:12  14  A.  When a patient's referred for their initial evaluation.

10:53:17  15          THE DEPUTY CLERK:  Do you want this in evidence?

10:53:19  16          THE COURT:  Is this in evidence?  Before it gets up, it

10:53:22  17  needs to be in evidence.

10:53:23  18          MR. SCHANKER:  Sorry.  Your Honor, we'll go ahead and

10:53:26  19  introduce Plaintiff's Exhibit 0621, Bates page 117 -- let me make

10:53:41  20  sure I have the correct Bates page on here.

10:53:41  21          THE COURT:  You don't have an exhibit number on it?

10:53:44  22          MR. SCHANKER:  Yes, your Honor, but it is -- it's an in

10:53:48  23  globo exhibit, you Honor, and we can go ahead and admit the whole

10:53:50  24  exhibit if that's fine.

10:53:51  25          MS. SASTRE:  We have no objection to moving in

10:53:55  1    Dr. Carinder's complete set of medical records.

10:53:57  2              THE COURT:  Let it be admitted.

10:53:58  3              MR. SCHANKER:  We'll go ahead and do it that way.  Thank

10:54:00  4    you.  Thank you, Erin.

10:54:10  5    BY MR. SCHANKER:

10:54:10  6    Q.  This is the consultation note for what date?

10:54:11  7    A.  March 31st, 2011.

10:54:23  8    Q.  And this is your office consultation note; is that correct?

10:54:27  9    A.  Yes.

10:54:27  10   Q.  I would like to walk through this.  You indicated that the

10:54:31  11   referring physician was whom?

10:54:32  12   A.  Dr. Karlin.

10:54:34  13   Q.  And does Dr. Karlin refer you cases, I assume, then?

10:54:40  14   A.  Yes.

10:54:41  15   Q.  So working through this record, if you could just take us

10:54:55  16   through the beginning of the history of present illness.  What did

10:55:00  17   you note?

10:55:00  18   A.  She -- you want me to read that?

10:55:06  19   Q.  Yeah, you can read it or summarize it and I'll ask you

10:55:09  20   questions.

10:55:10  21   A.  Okay.  I'll just read it.  "60-year old postmenopausal

10:55:16  22   causation female referred for adjuvant treatment for recently

10:55:19  23   diagnosed left breast carcinoma.  Had palpated a lump in the outer

10:55:25  24   aspect of the left breast."

10:55:27  25   Q.  Let me stop you there, Doctor.

10:55:29  1    A.  Okay.

10:55:31  2    Q.  "Palpated the lump," tell us what that means.

10:55:37  3    A.  She had noticed -- she had palpated an abnormality in her left

10:55:41  4    breast.

10:55:45  5    Q.  And continue on, if you can.

10:55:46  6    A.  "She'd never undergone mammography.  Saw her gynecologist who

10:55:51  7    referred her for a mammogram.  This revealed 2.1 by 1.5 sonometer

10:56:00  8    density, upper outer aspect of the left breast."

10:56:05  9    Q.  Let me stop you there, Doctor.  If we skip down, as opposed to

10:56:09 10    having you go through all of that background.  And if there's

10:56:14 11    something you think that I am skipping that we should not as far as

10:56:18 12    really explaining this, let me know, okay?

10:56:20 13    A.  Okay.

10:56:22 14    Q.  What happened on March 10th of 2001 --

10:56:25 15    A.  She had a lumpectomy and a sentinel node biopsy.

10:56:30 16    Q.  So Barbara had a lumpectomy prior to coming to see you on

10:56:35 17    March 31st of 2011?

10:56:36 18    A.  Yes.

10:56:37 19    Q.  And then, why was she referred to see you?

10:56:44 20    A.  She had a sentinel lymph node that was positive.  She was

10:56:52 21    referred for systemic treatment.

10:56:55 22    Q.  She was referred to you for discussion of adjuvant treatment;

10:56:58 23    is that correct?

10:56:58 24    A.  Yes.

10:56:59 25    Q.  Did you examine Barbara?

10:57:02  1   A.  Yes.

10:57:04  2   Q.  And could you -- let me just ask you that.  Go to the next page

10:57:12  3   of the examination itself.  Get there in just a moment.  So we're

10:57:20  4   on your March 31st treatment note; is that right?

10:57:24  5   A.  Consultation note.

10:57:25  6   Q.  So on that consultation note, you actually physically examined

10:57:39  7   the patient; is that right?

10:57:40  8   A.  Yes.

10:57:41  9   Q.  Did you note -- and this is before chemotherapy, correct?

10:57:44  10  A.  Yes.

10:57:45  11  Q.  Did you note any hair loss at that time?

10:57:51  12  A.  No.

10:57:57  13  Q.  I want to go to the third page of that office visit note,

10:58:06  14  Doctor.  Page 3.  Are you there?

10:58:11  15  A.  Yes.

10:58:18  16  Q.  Thank you.  Your impression, I see there dose dense AC followed

10:58:23  17  by T, by Taxotere.  What was your impression concerning your

10:58:30  18  recommendation for Ms. Earnest at that time?  What did you

10:58:34  19  recommend for Ms. Earnest with regard to treatment?

10:58:37  20  A.  Four cycles of AC and then four cycles of docetaxel.

10:58:44  21  Q.  Which you've gone through in detail with us, correct?

10:58:47  22  A.  Yes.

10:58:47  23  Q.  Under the plan, I note that you indicated that you will obtain

10:58:54  24  a MUGA scan.  Can you read that sentence and then explain it to us,

10:59:03  25  please?

10:59:03  1   A.   "I will obtain a MUGA scan to assess her left ventricular

10:59:08  2   ejection fraction in anticipation of anthracycline based

10:59:11  3   chemotherapy."

10:59:12  4   Q.   What is a MUGA scan?

10:59:15  5   A.   It's a nuclear medicine study to assess cardiac function.

10:59:20  6   Q.   And why is that?  Why did you plan on obtaining one of those?

10:59:25  7   A.   Because you have to see what their cardiac reserve is before

10:59:28  8   you give them an anthracycline.

10:59:31  9   Q.   So you wanted to test Barbara's heart before you gave her the

10:59:36  10  Adriamycin?

10:59:37  11  A.   Yes.

10:59:37  12  Q.   And educate the jury on why that's something you do.

10:59:43  13  A.   Because if people have an underlying cardiomyopathy that you're

10:59:49  14  not aware of and you give them a drug that potentially can put them

10:59:53  15  into congestive heart failure, that's an avoidable mistake.  And

10:59:57  16  the heart damage from anthracycline is irreversible.  With

11:00:02  17  trastuzumab, which we use for breast cancer, it's reversible; but

11:00:05  18  with anthracyclines, it's not.

11:00:08  19  Q.   So do you do the MUGA scan for patient protection?

11:00:12  20  A.   Yes.

11:00:12  21  Q.   And was that done in this case?

11:00:16  22  A.   Yes.

11:00:16  23  Q.   And based on the MUGA scan, what was the impact of the results

11:00:25  24  of the MUGA scan?

11:00:26  25  A.   That it was safe to give her the anthracycline.

11:00:40  1   Q.  I note in your record you talk about chemotherapy teaching.

11:00:49  2   Can you read this to the jury and then explain what that is?

11:00:51  3   A.  "We will arrange a chemotherapy teaching to be completed this

11:00:54  4   week."  Every patient that we treat meets with -- in Barbara's

11:01:00  5   case, she met with a chemotherapy nurse.  My office now, our mid

11:01:07  6   levels actually do the chemotherapy teaching; but at the time, we

11:01:11  7   had a chemotherapy nurse do it.

11:01:13  8          And that's where they go through potential side effects

11:01:18  9   of the drug and also just management strategies for how -- to help

11:01:24 10   patients get through their treatment.

11:01:25 11   Q.  Okay.  Then, Doctor, can you read that last two sentences of

11:01:34 12   that paragraph -- well, actually, go ahead and read the entire --

11:01:39 13   A.  "Potential side effects of cytoreductive chemotherapy including

11:01:44 14   myelosuppression, nausea, vomiting, diarrhea, stomatitis as well as

11:01:48 15   potential cardiac toxicity from doxorubicin were explained to the

11:01:52 16   patient.  Other potential side effects of docetaxel including fluid

11:01:55 17   retention, hyperlacrimation, skin and nail changes were also

11:01:59 18   explained.  She is anxious to proceed."

11:02:01 19   Q.  So, Doctor, did you also explain to Barbara about the issue

11:02:04 20   with regard to hair loss at that time, temporary hair loss?

11:02:08 21   A.  Yes.

11:02:09 22   Q.  And is that a conversation that -- with the drugs that you're

11:02:14 23   giving to Barbara, is that a conversation that, in your typical

11:02:17 24   practice, you always have with the patient?

11:02:19 25   A.  If the drugs can cause alopecia.  All three of those drugs can

11:02:25 1    cause alopecia.

11:02:26 2    Q.  So take us through the conversation concerning temporary hair

11:02:31 3    loss that you would have had with Barbara Earnest.

11:02:34 4    A.  In her case with what she was treated with, patients,

11:02:37 5    typically, their hair is going to start falling out very quickly

11:02:41 6    after the second course of treatment.  They won't notice a whole

11:02:45 7    lot of hair loss after the first cycle, but very soon after the

11:02:50 8    second cycle the hair starts falling out.  And I tell them that.

11:02:54 9    When I see them in-between treatments, I said, "After this next

11:02:57 10   one," I said, "it's going to start coming out."

11:02:59 11   Q.  And you're talking about between those AC cycles?

11:03:02 12   A.  Yes.  They lose their hair before they get to the docetaxel

11:03:07 13   stage.

11:03:07 14   Q.  And that's conversation that you would have had with Barbara at

11:03:10 15   that time?

11:03:10 16   A.  Yes.

11:03:20 17   Q.  Did you talk to her about how you anticipated her hair coming

11:03:23 18   back?

11:03:24 19   A.  That it varies from one patient to the next.

11:03:28 20   Q.  Explain what you mean with regard to returning and it varies

11:03:31 21   from one patient to the next.

11:03:32 22   A.  Some patients will begin to actually get hair regrowth even

11:03:38 23   before their chemotherapy is finished.  Other patients it takes

11:03:42 24   longer.  Like I said, it varies from one person to the next.

11:03:46 25   Q.  Do you explain to patients such as Barbara that the texture,

11:03:51  1   color of her hair may come back in any way different?

11:03:54  2   A.  Yes.

11:03:54  3   Q.  Explain the conversation that you would have had with Barbara.

11:03:57  4   A.  That the hair may come back in a different color.  If it was

11:04:00  5   straight hair before, it may come back in curly.  I've had patients

11:04:06  6   that had gray hair that their hair came back in dark again.  They

11:04:11  7   were thrilled with that.  It can occur.

11:04:13  8        But you can't -- there's nothing that we can predict with

11:04:18  9   any patient what their hair is going to look like when it grows

11:04:24 10   back.

11:04:24 11   Q.  So you explain to Barbara about the different ways her hair

11:04:28 12   could come back; is that right?

11:04:29 13   A.  Yes.

11:04:29 14   Q.  But would you explain to her that it would come back?

11:04:32 15   A.  Yes.

11:04:34 16   Q.  Did you at any time advise her of a risk of permanent hair

11:04:39 17   loss?

11:04:39 18   A.  No.

11:04:39 19   Q.  Doctor, let's go to tab -- yours is Tab O in the medical

11:04:52 20   records that you have.  Let me know when you're there, please.

11:05:04 21   A.  I'm here.

11:05:16 22        MR. SCHANKER:  And, your Honor, this is part of that same

11:05:18 23   exhibit.

11:05:20 24        THE COURT:  Okay.

11:05:26 25        MR. SCHANKER:  And, your Honor, I apologize.  On this in

11:05:28   1   globo exhibit there are not Bates numbers.  If you need a physical

11:05:34   2   copy, let me know.

11:05:34   3            THE COURT:  That's fine.  Just show him.

11:05:36   4            MR. SCHANKER:  Thank you.

11:05:52   5   BY MR. SCHANKER:

11:05:52   6   Q.  Doctor, what is it that the jury is looking at here?

11:05:55   7   A.  A consent form.

11:05:56   8   Q.  A consent form.  And what is the title on the consent form

11:06:06   9   here?  What's the name of the office?

11:06:08  10   A.  Hematology and Oncology Specialists, Chemotherapy Consent.

11:06:12  11   Q.  So Hematology and Oncology Specialists, was that who you worked

11:06:17  12   with back in 2011?

11:06:18  13   A.  That was our group back then.

11:06:19  14   Q.  It was your group.  And this was your -- your group's consent

11:06:26  15   form for chemotherapy?

11:06:27  16   A.  Yes.

11:06:28  17   Q.  Just so the jury is clear.  Is this a Sanofi consent form?

11:06:34  18   A.  No.

11:06:35  19   Q.  Was Barbara Earnest part of a clinical trial?

11:06:40  20   A.  No.

11:06:40  21   Q.  So, we're probably all somewhat familiar with consent forms,

11:06:49  22   but if you could, from your professional experience, what is a

11:06:52  23   consent form all about?  What's it for?

11:06:55  24   A.  Where you're presented all of the risks and benefits of a

11:07:00  25   potential procedure or treatment, and then if the patient agrees to

11:07:05  1    proceed.

11:07:05  2    Q.  And so is it fair to say that there's a lot of side effects and

11:07:13  3    risks listed in this consent form?

11:07:16  4    A.  Yes.

11:07:16  5    Q.  Some -- such as, I'll just highlight a few of them here,

11:07:24  6    quadriplegia; do you see that?

11:07:26  7    A.  Yes.

11:07:26  8    Q.  Brain damage?

11:07:28  9    A.  Yes.

11:07:29  10   Q.  We see death there?

11:07:33  11   A.  Yes.

11:07:34  12   Q.  Doctor, with the chemotherapy drugs that at this point in time

11:07:45  13   you were planning on giving to Barbara Earnest with her consent,

11:07:50  14   was death an avoidable risk, or is that just one of the risks of

11:07:56  15   these chemotherapies?

11:07:57  16   A.  There's a remote risk of that with any treatment.

11:08:02  17   Q.  So is it fair to say that's not an avoidable risk, even if it's

11:08:08  18   remote?

11:08:09  19          MS. SASTRE:  Objection, leading.

11:08:09  20          MR. SCHANKER:  Withdrawn.

11:08:10  21          THE COURT:  Sustained.  But you need to watch yourself.

11:08:13  22   BY MR. SCHANKER:

11:08:14  23   Q.  Can you administer these chemotherapy drugs without that risk

11:08:20  24   of death?

11:08:22  25   A.  There's no guarantee.

11:08:25  1    Q.  Thank you.  Doctor, just focusing specifically on the issue in

11:08:37  2    this case.  I see that hair loss is listed here.  And, obviously,

11:08:49  3    I'll give you time if you need to.  You probably know this form in

11:08:52  4    detail, but does it say anywhere in this form anything about

11:08:56  5    permanent hair loss?

11:08:57  6    A.  No.

11:08:58  7    Q.  And why at that time did this form not say anything about

11:09:04  8    permanent hair loss?

11:09:05  9    A.  Because nothing had been presented to us that showed that.

11:09:08 10    Q.  And I see that, if we look down, the medications listed at the

11:09:19 11    bottom.  What do we have here?  We first have Adriamycin; is that

11:09:31 12    right?

11:09:31 13    A.  Yes.

11:09:31 14    Q.  And then, what is -- is that a place for the patient to

11:09:36 15    initial?

11:09:37 16    A.  Yes.

11:09:38 17    Q.  And then why is it that each of these drugs are broken out

11:09:44 18    individually with a place for individual initials?

11:09:46 19    A.  Because they go over each drug individually.

11:09:50 20    Q.  And you indicated "they" go over this drug.  How does it work?

11:09:54 21    Who goes over this?

11:09:56 22    A.  The one that's doing the teaching.

11:09:59 23    Q.  And who does --

11:10:01 24    A.  At that time it was a nurse, chemotherapy nurse.

11:10:05 25    Q.  And looking at the second page, is that who signed this here?

11:10:09  1   A.  Yes.

11:10:10  2   Q.  And who is that individual?

11:10:12  3   A.  Lisa -- well then Penzato, but Reso.

11:10:21  4   Q.  Okay.  And Lisa Penzato or Lisa Reso, was that your nurse at

11:10:29  5   the time?

11:10:29  6   A.  Yes.

11:10:32  7   Q.  And you had trained her as to -- had she been trained as to how

11:10:36  8   to do this advisory?

11:10:38  9   A.  She's been a chemotherapy nurse for years.

11:10:41 10   Q.  So we talked earlier about the conversation concerning side

11:10:47 11   effects when we were going through your medical records.  I just

11:10:49 12   want to make sure we're clear with the jury.  Is that a

11:10:52 13   conversation that you have specifically with Barbara?

11:10:55 14   A.  Yes.

11:10:56 15   Q.  And then, we also have a consent form that's gone through, so

11:11:01 16   that's a separate conversation?

11:11:03 17   A.  Yes.  They get -- in addition to what I go over with them, they

11:11:09 18   also get a teaching session with the nurse, or now with my mid

11:11:13 19   levels, but they go an hour-long teaching session.

11:11:16 20   Q.  Going to the second page of the consent form, it references the

11:11:44 21   medications which are received do not fall in the category of

11:11:52 22   research, experimental, or investigational agents.  Why is that

11:11:56 23   language in there?

11:11:57 24   A.  Because if a patient's enrolled on a clinical trial with an

11:12:01 25   experimental drug, that's a whole different consent form.

11:12:04  1   Q.  Doctor, back in 2011, did you ever tell your nurses like Nurse

11:12:20  2   Reso to educate patients that permanent hair loss was a risk of

11:12:23  3   Taxotere?

11:12:24  4   A.  No.

11:12:25  5   Q.  And why did you not tell nurses that back in 2011?

11:12:29  6   A.  Because I wasn't aware of it then.

11:12:32  7   Q.  Doctor, let's go to Tab S, if we can, which is in the same

11:13:07  8   exhibit, your Honor.  Let me know when you're there, please.

11:13:13  9   A.  I'm here.

11:13:15 10   Q.  What is it that we are looking at here, Doctor?

11:13:36 11   A.  Chemotherapy order form.

11:13:48 12   Q.  And what's the date on this chemotherapy order form?

11:13:51 13   A.  March 31st, 2011.

11:13:55 14   Q.  And who signed that chemotherapy order form?

11:13:58 15   A.  I did.

11:13:59 16   Q.  And just explain to the jury, what is this chemotherapy order

11:14:03 17   form?  What's going on here?

11:14:04 18   A.  That goes to the pharmacy.  They get the chemotherapeutic

11:14:11 19   agents ready.

11:14:12 20   Q.  And what patient was this chemotherapy order form for?

11:14:16 21   A.  Barbara Earnest.

11:14:19 22   Q.  And what was the treatment plan?

11:14:22 23   A.  Four cycles of AC every 15 days.

11:14:34 24   Q.  And so at this point in time you're not filling a chemotherapy

11:14:38 25   order form for the Taxotere; is that right?

11:14:40  1    A.   That's correct.

11:14:41  2    Q.   And so under the chemotherapy orders, could you just explain to

11:14:51  3    the jury what is listed there?

11:14:53  4    A.   The Adriamycin, 60 mg/m$^2$; cyclophosphamide, 600 mg/m$^2$; Neulasta

11:15:03  5    injection, and then the standing lab orders.

11:15:08  6    Q.   You explained the Neulasta to us, the growth factor, correct?

11:15:14  7    A.   Yes.

11:15:14  8    Q.   You said, "the standard lab orders".

11:15:17  9    A.   Standing lab orders.

11:15:19 10    Q.   What are those, please?

11:15:22 11    A.   Because we monitor patient's lab on a regular basis, so we

11:15:26 12    submit a standing order for the lab work.   Weekly blood count,

11:15:30 13    chemistry panel every two weeks.

11:15:33 14    Q.   Why are you doing all of that?

11:15:36 15    A.   To monitor for toxicity.

11:15:38 16    Q.   Is that part of patient protection?

11:15:40 17    A.   Yes.

11:15:43 18    Q.   Doctor, moving on, if you could look at Tab B.

11:15:56 19            MR. SCHANKER:   Which is, your Honor, in that same

11:16:00 20    exhibit.

11:16:00 21    BY MR. SCHANKER:

11:16:01 22    Q.   Let me know, Doctor, when you're there, please.

11:16:12 23    A.   I have it.

11:16:15 24    Q.   What is it that we are looking at with Tab B with this medical

11:16:32 25    note?   What is this, Doctor?

1477

11:16:33  1    A.  Office visit.

11:16:35  2    Q.  Office visit dated May 10th?

11:16:40  3    A.  Yes.

11:16:40  4    Q.  And if you could look at the presenting problem history

11:16:53  5    section, begin taking us through that section if you would.

11:16:56  6    A.  Do you want me to read it?

11:16:59  7    Q.  Please.

11:17:00  8    A.  "Barbara returned for evaluation of her breast carcinoma.  She

11:17:03  9    is currently receiving adjuvant chemotherapy consisting of

11:17:06 10    Adriamycin, cyclophosphamide given in dose-dense fashion.  Thus far

11:17:10 11    tolerating it relatively well" --

11:17:11 12    Q.  Let me stop you there.  The court reporter is able to get all

11:17:17 13    of that.  That was amazing.  You were talking fast.

11:17:22 14            So I want to make sure the jury understands what is going

11:17:27 15    on at this point in time.  So May 10th Barbara returns for a

11:17:32 16    reevaluation, right?

11:17:34 17    A.  Yes.

11:17:34 18    Q.  And at that point in time what's going on?  What is she

11:17:42 19    reporting?  What are you seeing?

11:17:45 20    A.  She had a respiratory infection.

11:17:49 21    Q.  Okay.  Did you feel overall that she was tolerating it well?

11:17:53 22    A.  Yes.

11:17:53 23    Q.  I see in the record here at this point -- and what is HEENT

11:18:04 24    under physical examination?  What does that stand for?

11:18:08 25    A.  Head, eyes, ears, nose, throat.

1478

11:18:11  1   Q.   And what do you note there?

11:18:13  2   A.   Alopecia.

11:18:13  3   Q.   Could you go ahead and read that?

11:18:15  4   A.   "There is alopecia secondary to cytotoxic chemotherapy."

11:18:20  5   Q.   So that means her hair is falling out?

11:18:22  6   A.   Yes.

11:18:23  7   Q.   And this is after her first dose?

11:18:27  8   A.   Second.

11:18:28  9   Q.   Second dose.  And is that what you expected?

11:18:31 10   A.   Yes.

11:18:33 11   Q.   Based on your practice history?

11:18:34 12   A.   Yes.

11:18:35 13   Q.   Concerning this lab and radiology.  Take us through that.

11:18:48 14   Explain that to us.

11:18:50 15   A.   That just has her CBC that was drawn that week.

11:18:55 16   Q.   And what's your takeaway from -- well --

11:19:00 17   A.   The white count was down.  I put her on antibiotics for the

11:19:04 18   respiratory infection.

11:19:06 19   Q.   Why do you do the lab and radiology at this point in time?

11:19:09 20   A.   The CBC is monitored every week, okay, because we have to check

11:19:15 21   their counts, okay.  We check a chemistry panel typically every two

11:19:19 22   to three weeks.

11:19:20 23   Q.   Is that part of patient protection?

11:19:22 24   A.   Yes.

11:19:23 25   Q.   And under "Plan," take the jury through that, if you would.

11:19:31 1   A.  "Third cycle chemotherapy due on May 17, 2011.  She will need a

11:19:36 2   repeat CBC prior to receiving that."  That's to verify that the

11:19:40 3   neutrophils were back.  I've given her a prescription for Cipro to

11:19:44 4   take for seven days.  I've advised her that should any fever

11:19:49 5   develop with her white count being this low, that she is to contact

11:19:51 6   me at once.

11:20:12 7   Q.  Doctor, if you could just flip to Tab C in that same exhibit.

11:20:16 8   And let me know when you're there.  Do you have it before you?

11:20:27 9   A.  Yes.

11:20:28 10  Q.  And is this another office visit through this process?

11:20:34 11  A.  Yes, yes.

11:20:35 12  Q.  And what is the date of this visit?

11:20:37 13  A.  May 31st, 2011.

11:20:40 14  Q.  And so is Barbara returning for yet another reevaluation?

11:20:48 15  A.  Yes.

11:20:48 16  Q.  Now, where is she, as far as the cycles go, of the drug --

11:20:55 17  chemotherapy drugs as of this point May 31st?

11:20:59 18  A.  She's completed three of them.

11:21:01 19  Q.  And is she tolerating it well?

11:21:05 20  A.  Overall, yes.

11:21:07 21  Q.  Is there alopecia noted at this point in time?

11:21:17 22  A.  Yes.

11:21:18 23  Q.  What was your plan?

11:21:21 24  A.  Repeat the CBC to make sure, again, that her granulocytes are

11:21:27 25  recovered because they were low at that visit.  And then if the

11:21:30  1   counts are recovered and she was doing okay, then we would proceed

11:21:32  2   with the treatment as scheduled.

11:21:34  3   Q.  So is that analysis and plans, that all part of patient

11:21:38  4   protection?

11:21:38  5   A.  Yes.

11:21:38  6   Q.  Doctor, if you could turn to Tab D, please.  Are you there?

11:22:04  7   A.  Yes.

11:22:05  8   Q.  And what are we looking at?

11:22:08  9   A.  Office visit.

11:22:09 10   Q.  For which date?

11:22:10 11   A.  June 21st, 2011.

11:22:13 12   Q.  Under "Plan" on this date -- and this is June 21st.  So what

11:22:30 13   does it say under "Plan," Doctor?

11:22:32 14   A.  That she was going to be starting her Taxotere the following

11:22:34 15   day.

11:22:35 16   Q.  And then, what does it say after that?

11:22:40 17   A.  "Counts are adequate to proceed with this."

11:22:43 18   Q.  And what does that mean to the jury?

11:22:45 19   A.  That her neutrophils were -- her neutrophils and her platelets

11:22:50 20   were adequate to treat her.

11:22:52 21   Q.  Doctor, if you could flip to Tab U in that same exhibit.  Do

11:23:29 22   you have that before you?

11:23:30 23   A.  Yes.

11:23:30 24   Q.  And what are we looking at?  Could you let the jury know here?

11:23:37 25   A.  Chemotherapy order form.

11:23:39 1    Q.   And this is for what patient?

11:23:43 2    A.   Barbara Earnest.

11:23:45 3    Q.   And what is this chemotherapy order form for?

11:23:51 4    A.   Taxotere.

11:23:53 5    Q.   And what is the date of the order form?

11:23:56 6    A.   May 31st.

11:23:58 7    Q.   And who made that --

11:24:00 8    A.   2011.

11:24:01 9    Q.   I'm sorry.  And that was signed by you?

11:24:03 10   A.   Yes.

11:24:04 11   Q.   And specifically, what was the treatment plan?

11:24:10 12   A.   Taxotere every 21 days for four courses.

11:24:14 13   Q.   And what else was on the chemotherapy order on that date?

11:24:22 14   A.   Neulasta.

11:24:23 15   Q.   And what was the dosage for the Taxotere that was on the order

11:24:29 16   form?

11:24:29 17   A.   100 mg/m$^2$.

11:24:32 18   Q.   And what else was on the chemotherapy order form?

11:24:36 19   A.   Neulasta.

11:24:37 20   Q.   And what else was on the plan as far as CBC?

11:24:41 21   A.   Standing lab work.

11:24:44 22   Q.   That's what you explained to us earlier?

11:24:46 23   A.   Yes.

11:24:46 24   Q.   And, Doctor, if you could flip to Tab E.  Let me know when

11:25:13 25   you're there, please.

11:25:21  1   A.   I have it.

11:25:22  2   Q.   And what are we looking at, Doctor?

11:25:32  3   A.   Office visit.

11:25:34  4   Q.   What's the date of the visit?

11:25:38  5   A.   August 2nd, 2011.

11:25:40  6   Q.   And at this point in time how much of chemotherapy had Barbara

11:25:50  7   Earnest completed?

11:25:51  8   A.   Four cycles of AC and two cycles of Taxotere.

11:25:57  9   Q.   And what do you note about, if anything, about alopecia on that

11:26:08  10  record?

11:26:09  11  A.   She still has it.

11:26:12  12  Q.   And on August 2nd, what was the plan for Barbara?

11:26:18  13  A.   To proceed with the chemotherapy the next day.

11:26:23  14  Q.   And at that point in time what was remaining in her

11:26:27  15  chemotherapy?

11:26:27  16  A.   Two more cycles of Taxotere.

11:26:34  17  Q.   Doctor, please turn to Tab F.  Are you there?

11:26:50  18  A.   Uh-huh.

11:26:51  19  Q.   And what is the jury looking at in Tab F?

11:26:55  20  A.   Office visit.

11:26:56  21  Q.   What's the date of this office visit?

11:27:00  22  A.   August 23rd, 2011.

11:27:03  23  Q.   And at this point in time where was Barbara in the chemotherapy

11:27:20  24  treatment?

11:27:21  25  A.   She had one cycle of chemotherapy left.

11:27:23  1    Q.  And when was that last cycle to be received?

11:27:27  2    A.  August 24th, 2011.

11:27:31  3    Q.  And, Doctor, with all of these chemotherapy cycles that we've

11:27:35  4    referred to, was it the Taxotere -- was it actually Taxotere,

11:27:41  5    according to your records, that she received?

11:27:43  6    A.  Yes.

11:27:59  7    Q.  If you could turn to Tab G.  Are you there?

11:28:07  8    A.  Yes.

11:28:07  9    Q.  And what is the date of this office visit?

11:28:12  10   A.  September 20th, 2011.

11:28:15  11   Q.  And specifically, concerning this office visit, where is

11:28:26  12   Barbara as far as the adjuvant chemotherapy?

11:28:28  13   A.  She's finished it.

11:28:29  14   Q.  Okay.  And just so we're clear, what had she finished?  What

11:28:38  15   had she received?

11:28:38  16   A.  Four cycles of AC and four cycles of Taxotere.

11:28:41  17   Q.  And concerning her alopecia or hair loss, what are you noting?

11:28:48  18   A.  It's still there.

11:28:51  19   Q.  And is that in any way surprising to you that it's still there

11:28:56  20   at that point?

11:28:57  21   A.  No.

11:28:57  22   Q.  What was the plan on September 20th for Barbara's treatment?

11:29:04  23   A.  Refer her for radiation.

11:29:07  24   Q.  And what is the radiation for?  Why do you involve radiation as

11:29:13  25   part of the treatment for cancer, breast cancer?

11:29:16 1    A.   Local control; to prevent a recurrence on the chest wall or in

11:29:21 2    the breast or to prevent an axillary recurrence.

11:29:25 3    Q.   What is an axillary recurrence?

11:29:28 4    A.   A recurrence of the breast cancer in the axilla.

11:29:34 5    Q.   Just so the jury understands, the axilla, is that under the

11:29:38 6    armpit?

11:29:39 7    A.   Yes.  Not every patient that gets breast radiation get nodal

11:29:46 8    radiation.  If they've had node positive disease, then the

11:29:50 9    radiation oncologist, most of the time, especially a large tumor,

11:29:55 10   will incorporate all of the node basins in the radiation portal.

11:29:59 11   Q.   So it was that plan for referring for radiation therapy, is

11:30:05 12   that part of patient protection?

11:30:07 13   A.   Patient treatment, yes.

11:30:15 14   Q.   Doctor, let's turn to Tab H in that same exhibit section.  Let

11:30:27 15   me know when you're there.

11:30:28 16   A.   I'm there.

11:30:29 17   Q.   And the date of this office visit is what?

11:30:35 18   A.   November 29th, 2011.

11:30:45 19   Q.   And concerning the status of the radiation therapy, what do you

11:30:51 20   note on that date, August 29th?

11:30:54 21   A.   November 29th.

11:30:57 22   Q.   Thank you.  November 29.  Concerning the status of the

11:31:01 23   radiation therapy on your November 29 visit, what do you note?

11:31:05 24   A.   She'd finished it.

11:31:07 25   Q.   On November 29, what do you note about the alopecia?

11:31:14 1    A.  Still has it.

11:31:16 2    Q.  Take us through your plan for Barbara on November 29, if you

11:31:29 3    would.

11:31:30 4    A.  She had completed her radiation, and so it was -- because her

11:31:36 5    tumor was positive for both estrogen and progesterone receptors

11:31:40 6    then estrogen modulation would be part of her adjuvant treatment,

11:31:43 7    and so she was started on an aromatase inhibitor.

11:31:50 8    Q.  Let's break that down.  What, first of all, is an aromatase

11:32:00 9    inhibitor?

11:32:01 10   A.  It's a medication to suppress estrogen production.

11:32:04 11   Q.  And --

11:32:05 12   A.  We use them in treating postmenopausal women with breast

11:32:11 13   cancer.

11:32:11 14   Q.  Explain to the jury why this is part of the treatment for

11:32:15 15   postmenopausal women in treating breast cancer.

11:32:17 16   A.  Estrogen modulation is for any patient that has an estrogen

11:32:22 17   receptor positive breast cancer.  We only use aromatase inhibitors

11:32:25 18   in postmenopausal women.  They don't work in premenopausal women.

11:32:30 19        The rationale behind that is because the tumor cells,

11:32:33 20   there's always the vague assumption that there could still be a few

11:32:37 21   straggling clones left behind, and suppressing the estrogen just

11:32:41 22   further minimizes the risk of them developing recurrent disease

11:32:46 23   down the road.

11:32:48 24   Q.  And so that was the plan in Barbara's case?

11:32:50 25   A.  Yes.

11:32:50  1    Q.  And practically speaking, how does that work?  Do you give her

11:32:53  2    a prescription?

11:32:54  3    A.  Yes.

11:32:54  4    Q.  And what did you give her a prescription for?

11:32:58  5    A.  Anastrozole.

11:33:01  6    Q.  And is that also -- anastrozole is also known as what?

11:33:06  7    A.  Arimidex.

11:33:07  8    Q.  And how often does a patient such as Barbara take that

11:33:14  9    Arimidex?

11:33:14 10    A.  Well, every day.

11:33:15 11    Q.  And it's in pill form?

11:33:17 12    A.  Yes.

11:33:17 13    Q.  Doctor, does Arimidex, based on your experience, have the risk

11:33:32 14    of hair loss?

11:33:34 15    A.  Yes.

11:33:36 16    Q.  Describe to the jury based on your experience that -- what sort

11:33:42 17    of hair loss you see with Arimidex?

11:33:45 18    A.  Hair thinning more than anything.  I've never had a patient

11:33:51 19    that's had their hair fall out.  It's generally not noticeable to

11:33:58 20    me.  But the ladies will come in and say, "I think that pill is

11:34:02 21    making my hair thin."  They're combing their hair every day.

11:34:05 22    They're brushing their hair every day.  It isn't noticeable to my

11:34:09 23    eyes, but they notice it and they tell me.  And that's not every

11:34:16 24    patient.

11:34:17 25    Q.  What percentage of your patients do you see even -- do you see

11:34:24 1    noticeable hair thinning with Arimidex?

11:34:25 2    A.  I've never really noticed it in anybody.

11:34:29 3    Q.  But the patients report it to you?

11:34:31 4    A.  Yes.

11:34:31 5    Q.  Is the type of hair thinning that the patients report to you

11:34:35 6    with Arimidex different than what Barbara Earnest has based on the

11:34:39 7    last time you saw her and her scalp?

11:34:41 8    A.  It's different.  It's different.

11:34:46 9    Q.  And just how -- make it clear.

11:34:48 10   A.  I mean, you don't -- I mean, you don't see the skin and

11:34:52 11   everything like you do with chemotherapy induced hair loss.

11:34:57 12   Q.  Let's go to Tab I, if we could.  And what is the date of this

11:35:20 13   office visit?

11:35:21 14   A.  January 24th, 2012.

11:35:39 15   Q.  And, Doctor, you talked about the Arimidex which you

11:35:43 16   prescribed.  Do you note in this office visit on January 24th of

11:35:51 17   2012, anything about hair thinning at all?  Anything about hair

11:35:58 18   loss?

11:35:58 19   A.  She still had alopecia.

11:36:00 20   Q.  Okay.  The same note that you read earlier, could you go ahead

11:36:05 21   and read that to the jury?

11:36:06 22   A.  "This is alopecia secondary to cytotoxic chemotherapy."

11:36:11 23   Q.  And that's the note that you had in there previously?

11:36:14 24   A.  Yes.

11:36:14 25   Q.  Doctor, next office visit, April 24, do you see that?  What

11:36:38  1  year are we looking at here?  And this is -- I'm sorry.  Let's get

11:36:42  2  you to your tab.

11:36:43  3  A.  I have it.  I have it.

11:36:44  4  Q.  Okay.  That was Tab --

11:36:48  5          THE COURT:  He's got it.

11:36:50  6          THE WITNESS:  J.

11:36:51  7          MR. SCHANKER:  Thank you.

11:36:52  8  BY MR. SCHANKER:

11:37:04  9  Q.  And just to be clear, what was the date of this office visit?

11:37:07  10  A.  April 24th, 2012.

11:37:10  11  Q.  And specifically, what do you note on this date concerning hair

11:37:21  12  loss or alopecia?  April 24th, 2012.

11:37:24  13  A.  She was beginning to get some hair, some sprouting.

11:37:29  14  Q.  Okay.  Describe to the jury what you mean by that, as of

11:37:33  15  April 24 of 2012.

11:37:34  16  A.  Well, that there was some hair trying to grow back.

11:37:39  17  Q.  Moving through the records.  Let's go to Tab K.  Doctor, what

11:38:25  18  is the date of the office visit that I just published to the jury

11:38:31  19  here?  Do you see that?

11:38:33  20  A.  November 5th, 2012.

11:38:35  21  Q.  And specifically, what do you note about alopecia on

11:38:52  22  November 5th of 2012?

11:38:54  23  A.  That she was getting some hair growth.

11:39:00  24  Q.  And, Doctor, as you go through these medical records, you note

11:39:11  25  resolving alopecia.  What did that mean to you?

11:39:14  1   A.  That the hair was trying to recover.

11:39:18  2   Q.  When you say, "trying to recover," what is it that you mean by

11:39:22  3   that?

11:39:22  4   A.  Well, that there was some growing back.

11:39:24  5   Q.  And describe to the jury when you say, "some growing back" what

11:39:30  6   that means.

11:39:31  7   A.  Just that there was some hair starting to show up.  She went

11:39:36  8   for a long time with no hair.

11:39:38  9          Like I said, as I mentioned earlier, some patients they

11:39:41 10   start growing hair back even before the chemotherapy is finished.

11:39:45 11   It varies from one patient to the next.

11:39:47 12   Q.  And what I want to understand is for the jury, I want to make

11:39:53 13   sure they're clear on the time when you were seeing Barbara through

11:39:58 14   the period of time how much of the hair that you described grew

11:40:04 15   back.  And so I want to --

11:40:07 16   A.  Very little.

11:40:08 17   Q.  Okay.

11:40:31 18          MR. SCHANKER:  May I approach, your Honor?

11:40:33 19          THE COURT:  Yes, you may.

11:40:48 20   BY MR. SCHANKER:

11:40:49 21   Q.  Doctor, I want to show you a photograph that the jurors have

11:40:53 22   already seen in this case, and these are photos of Barbara

11:40:59 23   Earnest's scalp that were taken in June of 2018.  And I'll just go

11:41:04 24   through these photographs.  And you have these as well and these

11:41:10 25   are part of Exhibit G.  Do you recognize that to be Barbara

11:41:14  1    Earnest?

11:41:14  2    A.  Yes.

11:41:15  3    Q.  And you see that's the left profile?

11:41:21  4    A.  Yes.

11:41:22  5    Q.  And, Doctor, you see that's the back of Barbara Earnest scalp?

11:41:33  6    A.  Yes.

11:41:34  7    Q.  And then we see the right profile of Barbara?

11:41:41  8    A.  Yes.

11:41:42  9    Q.  So I want to be clear, Doctor.  It appears that you saw Barbara

11:41:52 10    Earnest for treatment up through August of 2013.

11:41:57 11    A.  Yes.

11:41:58 12    Q.  So at any time during your treatment of Barbara Earnest from

11:42:05 13    2011 when her -- you gave her the chemotherapy, through 2013 when

11:42:11 14    you last saw her, did you ever see hair regrowth greater than what

11:42:19 15    the jury is looking at in these photographs?

11:42:22 16    A.  No.

11:42:23 17    Q.  Just to be clear, was there any point in time in all of these

11:42:28 18    visits that you go through where you saw Barbara Earnest's hair

11:42:33 19    come back and then fall out again?

11:42:35 20    A.  No.

11:42:36 21    Q.  Doctor, going through your medical records, I note that you had

11:43:00 22    a follow-up visit with Barbara in February of 2013.  That's Tab L.

11:43:14 23    A.  I have it.

11:43:14 24    Q.  And then Tab M you had a follow-up visit in May 7 of 2013.  Do

11:43:23 25    you have that?

11:43:23  1    A.  Yes.

11:43:25  2    Q.  And then you had a follow-up visit on August 13 of 2013.  Do

11:43:32  3    you have that?

11:43:32  4    A.  Yes.

11:43:35  5    Q.  Now, at a certain point you stopped seeing Barbara.  Do you

11:43:41  6    know why that was?

11:43:42  7    A.  Because her insurance changed and I wasn't a provider on her

11:43:46  8    list of providers anymore.

11:43:57  9    Q.  Doctor, let's shift gears back to the NCCN guidelines.  Can we

11:44:04 10    do that?  First of all, with regard to these NCCN guidelines, was

11:44:22 11    what you prescribed to Barbara, the AC followed by Taxotere, was

11:44:28 12    that the only available chemotherapy option for her at the time?

11:44:33 13    A.  No.

11:44:33 14    Q.  Let's go to page 4 of the NCCN guidelines, which is Plaintiff's

11:44:45 15    Exhibit 1878.  So page 4 -- sorry, Doctor.  I misspoke.  We're

11:44:59 16    talking page 1 here.  Back to page 1, okay.  So I am putting that

11:45:04 17    back up just for the record.

11:45:08 18            And just to make sure we're on the same page.  Are these

11:45:12 19    the guidelines from which you treated Barbara?

11:45:14 20    A.  Yes.

11:45:15 21    Q.  Which regimen did you give her?

11:45:21 22    A.  AC followed by docetaxel.

11:45:27 23    Q.  And could you point that regimen out to me?

11:45:31 24    A.  It's the first column under other adjuvant regimens.

11:45:37 25    Q.  Yes.

11:45:38  1    A.  The fourth one down.

11:45:41  2    Q.  Right here (INDICATING)?

11:45:43  3    A.  Yes.

11:45:43  4    Q.  So, Doctor, on this list of these regimens, which are the ones

11:46:13  5    on here that contain the Taxotere?  If you could work from the top

11:46:19  6    down.

11:46:20  7    A.  The TAC, TC --

11:46:25  8    Q.  The TAC right here (INDICATING)?

11:46:28  9    A.  The TC.

11:46:29  10   Q.  This right here (INDICATING)?

11:46:31  11   A.  Yes.  AC followed by docetaxel.

11:46:37  12   Q.  Which is the one you gave Barbara?

11:46:39  13   A.  Yes.

11:46:40  14   Q.  Okay.  Is that it?

11:46:49  15   A.  That's it.

11:46:54  16   Q.  Now, Doctor, the rest of the regimens listed here, are they

11:47:00  17   Taxotere free?

11:47:01  18   A.  Yes.

11:47:02  19   Q.  Doctor, if you knew about the risk of permanent hair loss and

11:47:14  20   Taxotere and Barbara asked you for an alternative that did not

11:47:18  21   cause permanent hair loss, which ones on here would you have

11:47:23  22   considered?

11:47:24  23   A.  I would have used the AC, but I would have used paclitaxel

11:47:31  24   instead of docetaxel.

11:47:44  25   Q.  And which one is that specifically on here?  How would I

1493

11:47:49  1   identify which one you're referring to?

11:47:52  2   A.  The one under TAC.

11:47:54  3   Q.  Yes, right here (INDICATING).  So that was an option --

11:48:03  4   A.  Yes.

11:48:03  5   Q.  -- that you would have considered?

11:48:06  6   A.  Yes.

11:48:06  7   Q.  Is that an option, just to be clear, that you would have

11:48:09  8   considered if Barbara had asked you because she wanted to avoid

11:48:13  9   this risk of permanent hair loss?

11:48:15 10   A.  Yes.

11:48:16 11   Q.  And, Doctor, just to clarify, the FEC followed by T, what does

11:48:35 12   the T stand for?

11:48:40 13   A.  Paclitaxel.

11:48:40 14   Q.  And just to work through each one of these.  The A followed by

11:48:46 15   T followed by C.  What is the T referred to there?

11:48:51 16   A.  Paclitaxel.

11:48:53 17   Q.  And the FEC followed biweekly paclitaxel.

11:49:00 18   A.  Paclitaxel.

11:49:02 19   Q.  Would you have considered any of these other -- let's make sure

11:49:06 20   the jury understands.  Paclitaxel is a chemotherapy drug, right?

11:49:10 21   A.  Yes.

11:49:10 22   Q.  And is it the same as -- is that the same as Taxol?

11:49:14 23   A.  Taxol, yes.

11:49:16 24   Q.  Taxol.  Would you have considered these other paclitaxel or

11:49:23 25   Taxol options for Barbara, if she had -- any of the other

11:49:28  1   paclitaxel or Taxol options if Barbara had voiced a concern of

11:49:35  2   wanting to avoid the risk of permanent hair loss?

11:49:37  3   A.   Yes.

11:49:38  4   Q.   And which of those on this list, as we make the list, would you

11:49:43  5   have considered or recommended to Barbara?

11:49:46  6   A.   The AC followed by the paclitaxel.

11:49:50  7   Q.   And so is that the next one on the list here, the non-dose

11:49:54  8   dense or --

11:49:56  9   A.   Paclitaxel.  Paclitaxel is given every two weeks.  We give it

11:50:01  10  more weekly now, but -- because it's less neuropathy doing it that

11:50:05  11  way.  But at that time the prevailing way of giving it was the

11:50:10  12  175 mg/m$^2$ every two weeks.

11:50:13  13  Q.   So is it fair to list that as an option here?

11:50:17  14  A.   Yes.

11:50:17  15  Q.   Okay.  Just want to make sure.

11:50:35  16           And then are there any other on this list, paclitaxel

11:50:41  17  regimens, just focussing on paclitaxel, that you would have

11:50:46  18  considered?

11:50:46  19  A.   I mean, you could consider using FEC, but AC you're going to

11:50:54  20  have about a similar efficacy.

11:50:58  21  Q.   And you're referring to the last one on the list here --

11:51:01  22  A.   Yes.

11:51:02  23  Q.   -- FEC followed biweekly paclitaxel (INDICATING)?

11:51:05  24  A.   Yes.

11:51:05  25  Q.   So was that an option for Barbara?

11:51:08  1    A.  It would have been.

11:51:13  2    Q.  If she wanted to avoid the risk of permanent hair loss in

11:51:16  3    Taxotere?

11:51:17  4    A.  Right.

11:51:18  5    Q.  And just so I am clear, we were making our docetaxel or

11:51:28  6    Taxotere list earlier.  Is FEC followed by T, which is right here

11:51:34  7    above, is that another Taxotere option on this list?

11:51:37  8    A.  Yes.

11:51:43  9    Q.  Now, Doctor, let's talk about paclitaxel.  All chemotherapy

11:51:52 10    drugs have risks; is that fair?

11:51:54 11    A.  Yes.

11:51:54 12    Q.  Are there any risks with regard to paclitaxel or Taxol, if you

11:52:01 13    were having -- if you're in the room and having this conversation

11:52:04 14    with Barbara and she said to you, "Well, I don't want to take on

11:52:09 15    this risk of permanent hair loss," walk the jury through that

11:52:13 16    conversation, if you would.

11:52:15 17    A.  Then I would offer paclitaxel.  Paclitaxel has a different

11:52:23 18    toxicity profile.  A lot of similar toxicities, but there's longer

11:52:28 19    lasting neuropathy, worse neuropathy, and you have the risk for the

11:52:33 20    infusion reactions.

11:52:35 21    Q.  Let's talk about -- you mentioned neuropathy earlier.

11:52:39 22    A.  Yes.

11:52:40 23    Q.  And that neuropathy is, again, could you just describe that?

11:52:47 24    What is neuropathy?

11:52:48 25    A.  Neuropathy is nerve damage; like, diabetics get peripheral

11:52:56  1   neuropathy.  Well, a lot of chemotherapy drugs called peripheral

11:53:00  2   neuropathy.  And it can run the whole spectrum from being

11:53:03  3   paresthesias to being really, really burning, uncomfortable painful

11:53:11  4   sensations.

11:53:12  5   Q.  And what you would have advised Barbara Earnest if you were

11:53:15  6   having this conversation in the room with her about --

11:53:18  7   A.  I would say that the risk for neuropathy is going to be higher

11:53:21  8   with paclitaxel.

11:53:24  9   Q.  And is that a temporary neuropathy or a permanent neuropathy?

11:53:27 10   A.  I've never seen it permanent, but it can persist for a long

11:53:31 11   time.  Some people recover from it sooner than others.

11:53:35 12   Q.  And what is your typical recovery time that you would have

11:53:39 13   advised Barbara Earnest on concerning neuropathy with paclitaxel,

11:53:44 14   potential risks?

11:53:45 15   A.  At least a year, sometimes longer.

11:53:47 16   Q.  And when you say, "sometimes longer," just so --

11:53:50 17   A.  I've had patients that are three or four years out that still

11:53:54 18   say they still feel like they're stepping on gravel.

11:53:58 19   Q.  And so you would have had that conversation with Barbara?

11:54:02 20   A.  Yes.

11:54:03 21   Q.  Does Taxotere have the risk of neuropathy?

11:54:06 22   A.  Yes, but not to the degree that paclitaxel does.

11:54:08 23   Q.  So working through this, it sounds like this is a discussion

11:54:19 24   that you have with the patient; is that fair to say?

11:54:22 25   A.  Yes.

11:54:23  1         MS. SASTRE:  Your Honor, I hate to keep objecting.  It's

11:54:26  2  leading.

11:54:28  3         THE COURT:  I am going to let him get there, but you need

11:54:30  4  to ask your question without leading.

11:54:31  5         MR. SCHANKER:  Absolutely.

11:54:32  6  BY MR. SCHANKER:

11:54:34  7  Q.  What is the point of that discussion that you have with the

11:54:37  8  patient about the options?

11:54:39  9  A.  For informed consent.

11:54:47 10  Q.  And working through that discussion, if Barbara would have told

11:54:54 11  you that she wanted to avoid the risk of permanent hair loss in

11:55:02 12  Taxotere and also minimize the risk of neuropathy, are there any

11:55:08 13  other options on this --

11:55:11 14  A.  I would probably use FAC at that point.

11:55:15 15  Q.  Okay.  And which one is FAC?

11:55:19 16  A.  The first one under other adjuvant regimens.

11:55:26 17  Q.  Explain to the jury, if you would, what the FAC regimen is?

11:55:34 18  A.  5-FU, doxorubicin, cyclophosphamide.

11:55:49 19  Q.  Now, I see on this regimen page it's broken out into a top list

11:55:54 20  here, Category 1, and then other adjuvant regimens.  What is that

11:56:00 21  about?

11:56:01 22  A.  Category 1, just the most commonly used.

11:56:06 23  Q.  Is there any more to that or is that it?

11:56:10 24  A.  That's it.

11:56:14 25  Q.  Doctor, in your experience, are all of these regimens, assuming

11:56:20  1    they're used with the right patient, good regimens?

11:56:24  2    A.  Yes.

11:56:26  3    Q.  Have you used all of these regimens at one time or another in

11:56:31  4    your career?

11:56:31  5    A.  Yes.  Epirubicin, actually, is a better anthracycline than

11:56:45  6    doxorubicin, but it's cost prohibitive.

11:56:49  7    Q.  Explain that to us.

11:56:51  8    A.  It's -- it has a little bit less cardiac toxicity, it has very

11:56:56  9    good efficacy, but most insurance carriers do not want to pay for

11:56:59 10    it because it is a more expensive drug.

11:57:01 11    Q.  And which one are we talking about?

11:57:05 12    A.  Epirubicin.

11:57:06 13    Q.  And is that one of the potential options available --

11:57:09 14    A.  That's the E in the FEC.

11:57:11 15    Q.  Okay.  So we're talking about this here FEC (INDICATING)?

11:57:18 16    A.  Uh-huh.

11:57:19 17    Q.  So working through the conversation that you've described, just

11:57:23 18    so I am clear, if Barbara had said she wanted to avoid the risk of

11:57:29 19    permanent hair loss in Taxotere and also minimize the risk of

11:57:34 20    neuropathy, would FEC have been an option available for her?

11:57:39 21    A.  Yes.

11:57:40 22            THE COURT:  Okay.  You're leading.

11:58:15 23    BY MR. SCHANKER:

11:58:15 24    Q.  Doctor, just to be clear, if Barbara had chosen one of these

11:58:18 25    other options, based on that informed conversation that you

11:58:23  1   described, would you have given it to her?

11:58:27  2   A.  Yes.

11:58:28  3   Q.  Doctor, as part of this, we're talking about what happens in

11:58:35  4   the room, the conversation with you and Barbara, in your experience

11:58:41  5   have you seen permanent hair loss with Taxol?

11:58:47  6   A.  With --

11:58:48  7   Q.  With Taxol, paclitaxel?

11:58:50  8   A.  No.

11:58:51  9   Q.  Doctor, in your experience, have you seen permanent hair loss

11:58:59 10   with A, Adriamycin?

11:59:02 11   A.  No.

11:59:04 12   Q.  Doctor, in your experience, have you seen permanent hair loss

11:59:11 13   with C, cyclophosphamide?

11:59:13 14   A.  No.

11:59:16 15   Q.  You're referring to your practice experience?

11:59:18 16   A.  Yes.

11:59:24 17   Q.  At that time in 2011, had you seen permanent hair loss with any

11:59:29 18   of the other drugs that you listed as options on this list, these

11:59:36 19   other options that you would have made available to Barbara?

11:59:39 20   A.  No.

11:59:39 21   Q.  Doctor, as we wrap up here, I want to ask you a few more

11:59:59 22   questions.

12:00:03 23       If I had told you prior to -- let's do it this way.

12:00:10 24   Hypothetically, if I told you that prior to 2011 Sanofi had a

12:00:18 25   clinical trial that showed that 3.1 percent of women who took

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)     *     16-MD-2740
PRODUCTS LIABILITY LITIGATION    *
                                 *     Section H
                                 *
Relates to:  Barbara Earnest     *     September 23, 2019
             16-CV-17144         *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *


DAY 6 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2505
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West, Suite 1400
                             Los Angeles, California 90045

**JAMES CARINDER - CROSS**

Q.   And Adriamycin has certain risks, correct?

A.   Yes.

Q.   Cytoxan has certain risks?

A.   Yes.

Q.   Taxol has certain risks?

A.   Yes.

Q.   And the risks vary from drug to drug?

A.   Yes.

Q.   And you'd agree with me, sir, that the risks can also vary from patient to patient, depending upon that patient's medical history or other patient-specific factors?

A.   Yes.

Q.   Now, we already talked about your primary goal is to pick what you think is going to be the most effective combination of medications to prevent the patient's breast cancer from returning.

        And what I would like to ask you about now is that one of your considerations is also to pick a combination of medications that will minimize potential risks; is that fair?

A.   Well, the goal with treating anyone, whether it's in a metastatic setting or adjuvant setting, okay, is to afford that patient the most effective treatment with as little adverse side effect as we can get away with.

Q.   So those are the two big goals; is that fair?

A.   Yes.  And you have to take into account, when you are

JAMES CARINDER - CROSS

01:41 1   words "Taxotere" and "Taxol," if that's okay with you.  We have

01:41 2   been using them for most of the trial.

01:41 3           My question to you, Doctor, is prior to 2011 you had

01:41 4   seen patients develop daunting neuropathy after using Taxol?

01:41 5   A.   Yes.

01:41 6   Q.   That was not something which was unusual when it came to

01:41 7   your patients who took Taxol, true?

01:41 8   A.   True.

01:41 9   Q.   But if we go back prior to 2011, sir, and think about, on

01:41 10  the other hand, how many patients you had seen develop

01:41 11  persistent or long-term hair loss after taking Taxotere, you

01:41 12  had only seen it once, right?

01:41 13  A.   Yes.

01:41 14  Q.   One time, and it was six years before you saw

01:41 15  Mrs. Earnest, true?

01:41 16  A.   True.

01:41 17  Q.   In all of the other patients you treated with Taxotere

01:41 18  between 1999 and the date that you saw Mrs. Earnest in 2011,

01:41 19  you had one lady whose hair didn't grow back?

01:41 20  A.   Yes.

01:41 21  Q.   You said her hair was not exactly perfect in the first

01:42 22  place, right?

01:42 23  A.   That's true.

01:42 24  Q.   So if we are going to complete your conversation with

01:42 25  Mrs. Earnest, you are going to share this information with her

JAMES CARINDER - CROSS

01:44 1    from 2005 that you gave the dose-dense A plus C and the

01:44 2    Taxotere too, it was your opinion and belief that chemotherapy

01:44 3    is what prevented her hair from regrowing, right?

01:44 4    A.    Yes.

01:44 5    Q.    So, sir, you knew, we can agree, from your own clinical

01:44 6    experience with this patient, that hair does not always return

01:45 7    after chemotherapy?

01:45 8    A.    In her case it didn't.

01:45 9    Q.    Because Mrs. Earnest was getting the same exact three

01:45 10   medications, the same exact schedule, the same exact dose, you

01:45 11   would agree with me this was important information to share

01:45 12   with her, sir, wasn't it?

01:45 13   A.    Well, it was an anecdotal case.  I had treated countless

01:45 14   other patients with the same regimen and had not seen that

01:45 15   occur.

01:45 16   Q.    I understand.  It happened one time, that it's incredibly

01:45 17   rare to not have your hair grow back after chemotherapy, from

01:45 18   your experience.  But my question is simply different.

01:45 19             You're using this word "anecdotal."  I'm not asking

01:45 20   about that.  You would agree with me this was important

01:45 21   information to have shared with Mrs. Earnest, correct?

01:45 22             MR. SCHANKER:  Objection, Your Honor.  Asked and

01:45 23   answered.

01:46 24             THE COURT:  Sustained.  It's been asked and answered.

25

JAMES CARINDER - CROSS

01:46  1    BY MS. SASTRE:

01:46  2    Q.   Doctor, isn't it true that you always told patients who

01:46  3    were on dose-dense Adriamycin and Cytoxan, followed by

01:46  4    Taxotere, that you did have a patient who didn't recover her

01:46  5    hair?

01:46  6    A.   No.

01:46  7            MS. SASTRE:  Your Honor, may I approach the witness?

01:46  8            THE COURT:  Yes, you may.

01:46  9            MS. SASTRE:  Okay.  Thank you.

01:46 10            Your Honor, would you like a copy?

01:46 11            THE COURT:  Please.

01:46 12            MS. SASTRE:  Counsel, do you need a copy?

01:46 13    BY MS. SASTRE:

01:46 14    Q.   Dr. Carinder, I have just handed you your deposition which

01:46 15    was taken in this case.  You see, sir -- I'm sure you will

01:46 16    recall.  It's dated January 11, 2018, right?

01:47 17    A.   Yes.

01:47 18    Q.   In your deposition you took an oath, just like you did

01:47 19    here today, coming into court.  Right, sir?

01:47 20    A.   Yes.

01:47 21    Q.   Both sides asked you some questions that day, as we heard,

01:47 22    for, I think, about three hours or four hours, correct?

01:47 23    A.   Yes.

01:47 24    Q.   Okay, sir.  If I get you to turn, please, to page 125 of

01:47 25    your deposition, line 4, sir.

JAMES CARINDER - CROSS

02:13  1   **Q.**   And, sir, that's a journal that you get, right?

02:13  2   **A.**   Yes.

02:13  3   **Q.**   I think you told us you get it every month?

02:13  4   **A.**   Yes.

02:13  5   **Q.**   Is that something that is a peer-reviewed journal, sir?

02:13  6   **A.**   Oh, absolutely.

02:13  7   **Q.**   I mean, it's a good one, right?

02:14  8   **A.**   Yes.

02:14  9   **Q.**   It's reliable, the information contained in it?

02:14  10  **A.**   Yes.

02:14  11  **Q.**   It's considered authoritative?

02:14  12  **A.**   That's ASCO's journal.

02:14  13  **Q.**   Okay.  So let me ask you this, sir:  Did you see this

02:14  14  paper?

02:14  15  **A.**   Yes.

02:14  16  **Q.**   You have seen it previously?

02:14  17  **A.**   Yes --

02:14  18  **Q.**   Okay.

02:14  19  **A.**   -- years ago.

02:14  20       **MS. SASTRE:**  Your Honor, I would like to go ahead and

02:14  21  put it up, please.  Okay.

02:14  22       **THE COURT:**  Are you offering it into evidence?

02:14  23       **MS. SASTRE:**  Well, it's medical literature.  I don't

02:14  24  think we have been moving it in --

02:14  25       **THE COURT:**  All right.

JAMES CARINDER - CROSS

02:14 1      MS. SASTRE:  -- but we have been publishing it.

02:14 2      THE COURT:  That's fine.  You can publish it.

02:14 3      MS. SASTRE:  Okay.  Thank you, Your Honor.

02:14 4  BY MS. SASTRE:

02:14 5  Q.   So, Doctor, just a couple quick questions on it, okay?

02:14 6      You see it's from 2001, right, sir?

02:14 7  A.   Yes.

02:14 8  Q.   Which we can agree, of course, was years before you

02:14 9  treated Mrs. Earnest, true?

02:14 10  A.   True.

02:14 11  Q.   And you see that there are four patients in the study who

02:14 12  were identified as having long-lasting partial alopecia, and

02:14 13  they were treated with Taxotere, Adriamycin, and Cytoxan,

02:14 14  correct?

02:14 15  A.   Yes.

02:14 16  Q.   Okay.  And so that's something, when you reviewed this

02:14 17  article, you would have learned of Taxotere, Adriamycin, and

02:15 18  Cytoxan being associated with four reports of persistent hair

02:15 19  loss, correct?

02:15 20  A.   Yes.

02:15 21  Q.   And, again, this is something that's published and

02:15 22  available in the literature, true?  Publicly available even,

02:15 23  true?

02:15 24  A.   Yes.

02:15 25  Q.   Did you share this information with Mrs. Earnest?

JAMES CARINDER - CROSS

02:15 1    A.   No.

02:15 2    Q.   Okay.

02:15 3    A.   I guess I didn't focus on that when I read this.  This

02:15 4    would never be a regimen I would use with somebody with

02:15 5    metastatic disease.

02:15 6    Q.   Fair enough.

02:15 7    A.   It's too harsh.

02:15 8    Q.   Okay, sir.  Let's take a look at another article.

02:16 9         So, Dr. Carinder, I just handed you an article, do

02:16 10   you see, from 2009, sir.

02:16 11   A.   Yes.

02:16 12   Q.   And it's called the Prevezas article, correct?  That's the

02:16 13   author?  Do you see that, sir?

02:16 14   A.   No.

02:16 15        MR. SCHANKER:  Your Honor, I would like this to be

02:16 16   established as a learned treatise.  This is a dermatology --

02:16 17        THE COURT:  Wait.  I think the first question is -- I

02:16 18   think she needs to lay a foundation.

02:16 19        MR. SCHANKER:  Yes.

02:16 20        MS. SASTRE:  Okay.  Sure.

02:16 21   BY MS. SASTRE:

02:16 22   Q.   So my question is simply:  Do you see that this was

02:16 23   published in 2009?

02:16 24   A.   Yes.

02:16 25   Q.   Okay.  And it's published in -- it's the *British Journal*

JAMES CARINDER - CROSS

02:56  1    treatment?

02:56  2    A.   I would say six to eight months.

02:56  3    Q.   You believe you had that conversation here with

02:56  4    Mrs. Earnest?

02:56  5    A.   Yes.

02:56  6    Q.   I believe, based upon your experience with your prior

02:56  7    patient, the fact Mrs. Earnest's hair, of course, fell out when

02:56  8    she was taking chemotherapy, it would have been your belief

02:56  9    that her hair loss was caused by chemotherapy, true?

02:56 10    A.   Yes.

02:56 11    Q.   That would have been something you discussed with her,

02:56 12    right?

02:56 13    A.   Yes.

02:56 14    Q.   Now, I don't want to go back through all of the records.

02:56 15    I'll just touch on some dates with you.  I know you have a

02:56 16    whole notebook in front of you.

02:56 17           But you would agree with me that starting in April of

02:56 18    2012 -- which is about seven months after Mrs. Earnest's

02:56 19    completed her treatment, right?

02:57 20    A.   Yes.

02:57 21    Q.   -- starting in that time period, sir, you have a number of

02:57 22    records, one after the other, that indicate her hair loss was

02:57 23    resolving.  Is that fair?

02:57 24           MR. SCHANKER:  Objection.  Misstates the record.

02:57 25           THE COURT:  Overruled.  I'm going to let Dr. Carinder

JAMES CARINDER - REDIRECT

03:40 1  BY MS. SASTRE:

03:40 2  Q.   Dr. Carinder, the treatment of dose-dense Adriamycin and

03:40 3  Cytoxan followed by Taxotere that you prescribed to

03:40 4  Mrs. Earnest, that is something that you believed at the time,

03:40 5  on March 31, 2011, to be in Mrs. Earnest's best interest?

03:40 6       MR. SCHANKER:  Asked and answered, Your Honor.

03:40 7       THE COURT:  I'm going to let him answer this one, and

03:40 8  then --

03:40 9       THE WITNESS:  Yes.

03:40 10      THE COURT:  -- that's it.

03:40 11 BY MS. SASTRE:

03:40 12 Q.   And you stand by that decision today, sir?

03:40 13      THE COURT:  Okay.  That's asked and answered.

03:40 14      MS. SASTRE:  Whether he stands by the decision today?

03:40 15      MR. SCHANKER:  Yes, Your Honor.

03:40 16      THE COURT:  You can answer that.

03:40 17      THE WITNESS:  Yes.

03:40 18      MS. SASTRE:  Okay.  Thank you, sir.  I have no

03:40 19 further questions.  I appreciate your time.

03:40 20      THE COURT:  Okay.  Mr. Schanker.

03:40 21      MR. SCHANKER:  Thank you, Your Honor.

03:40 22                    REDIRECT EXAMINATION

03:41 23 BY MR. SCHANKER:

03:41 24 Q.   Good afternoon again, Dr. Carinder.

03:41 25      Were you aware -- you were asked questions about

JAMES CARINDER - REDIRECT

03:50  1    **A.**    Yes.

03:50  2    **Q.**    Doctor, was that within the standard of care?

03:50  3    **A.**    Yes.

03:51  4    **Q.**    You were asked some questions by defense counsel

03:51  5    concerning your advisory to patients such as Barbara Earnest

03:51  6    back before and including 2011 -- the conversation in the room.

03:51  7             Do you remember those questions you were asked?

03:51  8    **A.**    Yes.

03:51  9    **Q.**    I want to clarify some things because I was confused.

03:51  10   Remember when they pulled out your deposition, defense counsel

03:51  11   did, and asked you a question concerning your deposition?

03:51  12   **A.**    Yes.

03:51  13   **Q.**    Was I at your deposition?

03:51  14   **A.**    Yes.

03:51  15   **Q.**    So, Doctor, just for the jury's understanding:  When

03:51  16   you -- back in 2011 and prior to that, with Barbara Earnest,

03:51  17   when you were having the conversation in the room, you were --

03:52  18   were you advising as to a risk of permanent hair loss with

03:52  19   Taxotere?

03:52  20   **A.**    No.

03:52  21   **Q.**    Back then were you advising -- with every one of these

03:52  22   patients, would you talk about temporary hair loss?

03:52  23   **A.**    Yes.

03:52  24   **Q.**    And would you only bring up the prior 2005 patient if

03:52  25   asked about a risk of permanent hair loss by a patient?

JAMES CARINDER - REDIRECT

03:52  1          MS. SASTRE:  It's leading, Your Honor.

03:52  2          THE COURT:  You are leading.  Ask the question.

03:52  3  BY MR. SCHANKER:

03:52  4  Q.   Let me rephrase that.

03:52  5          Would you say anything about your prior patient that

03:53  6  you referenced here for us -- the 2005 patient, would you say

03:53  7  anything about that just out of the box when talking about

03:53  8  temporary hair loss?

03:53  9          MS. SASTRE:  Objection.  It's ambiguous.  It's a

03:53 10  vague and ambiguous question, Your Honor.

03:53 11          THE COURT:  Under what circumstances would you talk

03:53 12  about your prior patient?

03:53 13          THE WITNESS:  If asked about it, yes.

03:53 14  BY MR. SCHANKER:

03:53 15  Q.   I want to make sure the jury understands.  If asked about

03:53 16  what?

03:53 17  A.   Permanent hair loss.

04:58 18  Q.   Just so I'm clear:  So you would advise as to the risk of

03:53 19  temporary hair loss?

03:53 20  A.   Temporary hair loss always.

03:53 21          THE COURT:  That's been asked and answered, yes.

03:53 22          THE WITNESS:  Always.

03:53 23          THE COURT:  Sustained.

03:53 24  BY MR. SCHANKER:

03:53 25  Q.   Under what circumstances would you bring up the prior --

JAMES CARINDER - REDIRECT

03:53  1    this one prior patient that you had?

03:53  2              THE COURT:  Sustained.

03:54  3    BY MR. SCHANKER:

03:54  4    Q.   So if Barbara Earnest did not ask you about a risk of

03:54  5    permanent hair loss, would you bring up the prior 2005 patient?

03:54  6              THE COURT:  Sustained.  Sustained.  Ask your next

03:54  7    question.

03:54  8    BY MR. SCHANKER:

03:54  9    Q.   As you sit here, do you have any memory of Barbara Earnest

03:54  10   on her own bringing up a risk of permanent hair loss in that

03:54  11   conversation?

03:54  12   A.   No.

03:54  13   Q.   As you sit here today, do you have any memory of Barbara

03:54  14   Earnest -- of you explaining to Barbara Earnest about this one

03:54  15   prior patient that you had?  Do you have any memory of that at

03:54  16   all?

03:54  17             MS. SASTRE:  Objection, Your Honor.

03:54  18             THE WITNESS:  No.

03:54  19             THE COURT:  Sustained.  That's been asked and

03:54  20   answered.

03:54  21             MR. SCHANKER:  Your Honor, not with regard to Barbara

03:54  22   Earnest.  It has not.

03:55  23             THE COURT:  I think it has.

03:55  24   BY MR. SCHANKER:

03:55  25   Q.   Doctor, you were asked a lot of questions on

JAMES CARINDER - REDIRECT

03:59  1        **MS. SASTRE:**  Let me finish, please.  On the

03:59  2   guidelines, he read the exact same thing he had him read.  He

03:59  3   reread it and then he asked him the same thing.

03:59  4             It's not a response to the cross.  You are going

03:59  5   literally back to your direct, and I don't want to be up here

03:59  6   every time.

03:59  7        **MR. SCHANKER:**  Your Honor, that's not what happened

03:59  8   on the guidelines.  We hadn't specified that particular box we

03:59  9   have shown on page 3.  We hadn't referred to that.

04:00 10        **THE COURT:**  Page 3 was covered in cross-examination,

04:00 11   but I'm going to allow you to ask the common and then that's

04:00 12   it.  That's it.

04:00 13             Charged to plaintiff.

04:00 14        (End of bench conference.)

04:00 15   BY MR. SCHANKER:

04:00 16   **Q.**   Doctor, if you had been told by Sanofi that a risk of

04:00 17   permanent hair loss was a common side effect of Taxotere, would

04:00 18   you have told Barbara Earnest that?

04:00 19   **A.**   Yes.

04:00 20   **Q.**   Doctor, there was on cross-examination a discussion of the

04:00 21   conversation that goes on in the room.  Is that a two-way

04:00 22   conversation between you and the patient?  Or do you make the

04:01 23   decision on your own?

04:01 24   **A.**   No.  It's a two-way conversation.  Patients and doctors

04:01 25   work as a team during this.  Their input is just as critical as

JAMES CARINDER - REDIRECT

1  mine.

2  **Q.**   Tell us about that.  Explain what you mean by that, if you

3  would.

4  **A.**   This is a big journey for these patients, and they -- it's

5  a team effort.  I'm giving them poisons to try to keep their

6  cancer away.  They have to be informed and compliant.  If

7  there's not effort on both sides, it's not going to work.  You

8  are not going to have a good outcome.

9  **Q.**   Doctor, on cross-examination you were asked about the 1999

10  label and the language "hair generally grows back."  Do you

11  recall that?

12  **A.**   Yes.

13  **Q.**   With regard to that "hair generally grows back" language,

14  did that warn you in 1999 of the risk of permanent hair loss

15  for patients in the adjuvant setting such as Barbara Earnest?

16          **THE COURT:**  Sustained.  That's been covered.

17  **BY MR. SCHANKER:**

18  **Q.**   Doctor, in cross-examination the phrase "all risks are not

19  the same" was used.  Do you recall that?

20  **A.**   Yes.  Vaguely.

21  **Q.**   Is the risk of temporary hair loss different than the risk

22  of permanent hair loss?

23  **A.**   Temporary hair loss is more common.

24  **Q.**   Are those the same thing in your mind:  temporary and

25  permanent hair loss?

JAMES CARINDER - REDIRECT

04:03 1   **A.**   No, they are different.

04:03 2   **Q.**   Doctor, on cross-examination did you use the phrase "there

04:03 3   are no guarantees in medicine"?

04:03 4   **A.**   There are no guarantees in medicine.

04:03 5   **Q.**   And does that in any way influence your decision on what

04:03 6   you warn a patient of because there are no guarantees?

04:03 7   **A.**   I give the patients as much information as they need.

04:03 8   **Q.**   So do you want as much information as you can get from the

04:04 9   pharmaceutical company?

04:04 10  **A.**   Yes.

04:04 11  **Q.**   Do you regularly read dermatology journals?

04:04 12  **A.**   No.

04:04 13  **Q.**   Do you regularly read nursing journals?

04:04 14  **A.**   No.  I read *ASH*, *JCO*, *Blood*, and *New England Journal of*

04:04 15  *Medicine*.  That's pretty much where I glean all my information

04:04 16  from.

04:04 17  **Q.**   Doctor, you were shown Defense Exhibit 47, the Nabholtz

04:04 18  study.  Do you recall that?

04:04 19  **A.**   Yes.

04:04 20  **Q.**   You were asked about it?

04:04 21  **A.**   Yes.

04:04 22  **Q.**   Do you have any recollection at all with regard to this

04:05 23  Nabholtz study that Sanofi ever --

04:05 24        **THE COURT:**  There's some writing on that that needs

04:05 25  to be covered.

## JAMES CARINDER - REDIRECT

04:05 1        **MR. SCHANKER:**  That's why I picked it up, Your Honor,

04:05 2   there.

04:05 3        **THE COURT:**  Okay.

04:05 4   BY MR. SCHANKER:

04:05 5   **Q.**   With regard to the Nabholtz study.  You have it in your

04:05 6   hand.

04:05 7   **A.**   Yes.

04:05 8   **Q.**   Do you have any information at all that that was ever

04:05 9   provided to you by Sanofi?

04:05 10  **A.**   I don't think so.

04:05 11  **Q.**   You were also shown the Sedlacek abstract?  Do you

04:05 12  remember the little, teeny writing?

04:05 13  **A.**   From San Antonio.

04:05 14  **Q.**   From San Antonio?

04:05 15  **A.**   Yes.

04:05 16  **Q.**   Do you have any information at all that that was ever

04:05 17  provided to you by Sanofi?

04:05 18  **A.**   No.

04:05 19  **Q.**   Doctor, you were taken through on cross-examination many

04:06 20  of the serious risks that are associated with the chemotherapy

04:06 21  drugs.  Do you remember that?

04:06 22  **A.**   Yes.

04:06 23  **Q.**   Are those risks that you warn of in your practice?

04:06 24  **A.**   Yes.

04:06 25  **Q.**   Are those unavoidable risks?

```
 1                       UNITED STATES DISTRICT COURT
 2                       EASTERN DISTRICT OF LOUISIANA

 3    *********************************************************************

 4    IN RE:  TAXOTERE (DOCETAXEL)          Docket No. 16-MD-2740
      PRODUCTS LIABILITY LITIGATION         Section H
 5                                          New Orleans, LA
      Relates to:  Barbara Earnest          Tuesday, September 24, 2019
 6                  16-CV-17144

 7    *********************************************************************

 8                    TRANSCRIPT OF TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 9                    UNITED STATES DISTRICT JUDGE
                         DAY 7, MORNING SESSION
10

11    APPEARANCES:

12    FOR THE PLAINTIFF:               BACHUS & SCHANKER, LLC
                                       BY:  DARIN L. SCHANKER, ESQ.
13                                          J. KYLE BACHUS, ESQ.
                                       1899 Wynkoop St., Suite 700
14                                     Denver, CO 80202

15                                     FLEMING NOLEN & JEZ
                                       BY:  RAND P. NOLEN, ESQ.
16                                     2800 Post Oak Blvd., Suite 4000
                                       Houston, TX 77056
17
                                       GIBBS LAW GROUP, LLP
18                                     BY:  KAREN B. MENZIES, ESQ.
                                       6701 Center Drive West, 14th Floor
19                                     Los Angeles, CA 90045

20                                     DAVID F. MICELI, LLC
                                       BY:  DAVID F. MICELI, ESQ.
21                                     P.O. Box 2519
                                       Carrollton, GA 30112-0046
22
                                       PENDLEY BAUDIN & COFFIN
23                                     BY:  CHRISTOPHER L. COFFIN, ESQ.
                                       2505 Energy Centre
24                                     1100 Poydras St.
                                       New Orleans, LA 70163
25
```

08:53:23  1    A.  Barbara's appearance before chemotherapy was great.  I tell you

08:53:29  2    what, she always kept herself clean, always immaculate.  She was a

08:53:33  3    very meticulous individual.

08:53:40  4    Q.  We talked to you about the experience that you and Barbara went

08:53:44  5    through when you watched her undergo the cancer treatment.  How did

08:53:48  6    you feel when you learned she had been diagnosed with cancer?

08:53:51  7    A.  I was -- it's beyond thought.  I tell you what, I really

08:53:58  8    thought that I was going to -- my world was at a loss.  I thought I

08:54:04  9    was going to lose a person I had been living with for years, and I

08:54:08  10   don't know how I was going to be able to handle it.

08:54:10  11   Q.  Did you attend doctors appointments with Barbara for the breast

08:54:16  12   cancer?

08:54:16  13   A.  No, sir, not too many.

08:54:19  14   Q.  And why is that?

08:54:20  15   A.  Because I had to work.  I had to support my family.

08:54:26  16   Q.  Do you remember Barbara's oncologist?  Do you remember who that

08:54:35  17   was?

08:54:35  18   A.  Dr. Carinder, something like that.

08:54:42  19   Q.  Dr. Carinder.  Dr. Carinder.  Did you go to the Dr. Carinder

08:54:51  20   visits?

08:54:51  21   A.  I went -- not too many times, no.  I tell you what, I think to

08:54:54  22   his visit I went one time.

08:54:57  23   Q.  Ralph, did you go to -- do you recall, did you go to the

08:55:01  24   Dr. Carinder visit when the chemotherapy was initially discussed?

08:55:09  25   A.  Yes, I did.

08:55:11  1   Q.  And do you recall was the issue of the hair loss discussed in

08:55:19  2   that meeting?

08:55:19  3   A.  Yes, it was discussed.  We were told at that point that she --

08:55:24  4   Barbara would lose her hair upon starting chemo, but that her hair

08:55:30  5   would grow back.

08:55:33  6   Q.  Were you told anymore about how it would grow back or anything

08:55:38  7   like that at all?

08:55:39  8   A.  We were told that her hair could grow back differently, it

08:55:43  9   could be curly, could be the same, could be a different color.

08:55:47 10   Myself, I was looking for hair to turn back red.  I wanted

08:55:51 11   something different in my life.

08:55:57 12   Q.  So, Ralph, I just want to be clear.  Before Barbara took the

08:56:01 13   chemotherapy, to your knowledge was she warned at all that if she

08:56:07 14   took Taxotere she might be forever bald?

08:56:09 15   A.  No, sir.

08:56:10 16   Q.  I want to move on now to Barbara now, Barbara after the

08:56:21 17   permanent hair loss.  Could we see -- Barbara's wearing a turban

08:56:29 18   today.  When did she start wearing that turban?

08:56:32 19   A.  She started wearing the turban after she began to lose her

08:56:35 20   hair.

08:56:35 21   Q.  Did she wear that turban at all before the chemotherapy?

08:56:39 22   A.  No, sir, she did not.

08:56:40 23   Q.  After the chemotherapy, sir, has there ever been a time where

08:56:50 24   your wife felt comfortable enough to go outside of the house

08:56:53 25   without something on her head?

09:13:35  1    Q.  And you testified a little bit, I think, on direct examination

09:13:41  2    that you had met with Dr. Carinder at least once.  Do you recall

09:13:44  3    that testimony?

09:13:45  4    A.  Yes, sir.

09:13:46  5    Q.  And when you met with Dr. Carinder, he talked to you and

09:13:52  6    Barbara about some of the potential complications and risks that

09:13:56  7    were associated with chemotherapy.  Do you remember that?

09:13:57  8    A.  Yes, sir.

09:13:57  9    Q.  And I think Mr. Schanker asked you about whether or not he

09:14:05  10   talked to you about hair loss?

09:14:07  11   A.  That is correct.

09:14:08  12   Q.  And your testimony was that he told you that the hair would

09:14:15  13   grow back?

09:14:15  14   A.  He told us during the chemo that the hair -- she would lose her

09:14:20  15   hair and that her hair would grow back.

09:14:23  16   Q.  Okay.  All right.  And do you remember giving a deposition in

09:14:27  17   this case?

09:14:27  18   A.  Yes, I do.

09:14:27  19   Q.  And that happened in April of 2016.  About a year-and-a-half

09:14:34  20   ago?

09:14:34  21   A.  That sounds about right.

09:14:36  22            MR. MOORE:  Your Honor, may I approach the witness?

09:14:38  23            THE COURT:  Yes, you may.

09:14:58  24   BY MR. MOORE:

09:14:59  25   Q.  Do you recall at the end of your deposition that, after the

10:51:59  1    A.   Yes.  Well, they were in the same building.

10:52:01  2    Q.   And tell us about -- did you see Dr. Lagarde?

10:52:05  3    A.   Yes, I did.

10:52:05  4    Q.   Share with the jury about your time seeing Dr. Lagarde.

10:52:10  5    A.   Well, I went to go see Lagarde, and she got the results from

10:52:15  6    the mammogram.  And right away she put it on the screen and she was

10:52:20  7    showing it to me.  And she started talking about reconstructive

10:52:25  8    surgery, which meant she was going to remove my breasts.  But not

10:52:30  9    just one, she wanted to remove both of them.

10:52:33  10           Well, that sort of scared me.  So I just let her finish

10:52:37  11   her -- you know, she was saying that she was going to take fat from

10:52:44  12   my stomach, my butt, my thighs and reconstruct my breasts.  And it

10:52:50  13   really scared me.

10:52:52  14           So on the way home, I just told my husband, I said, "I've

10:52:55  15   got to go get a second opinion.  I am not -- I am not just going to

10:53:00  16   jump into something I don't know anything about."  So I went and

10:53:04  17   got a second opinion.  I went to another doctor.

10:53:06  18   Q.   So tell the jury about that part of the story, about you

10:53:10  19   getting a second opinion.

10:53:11  20   A.   Well, then I went to my primary care physician, and he sent me

10:53:19  21   to have tests done, which I think it was a PET scan and a CAT scan.

10:53:25  22   And then they -- he sent me to a surgeon.  And that surgeon looked

10:53:31  23   at all of my tests.  And I asked him, I said, "Do you believe that

10:53:36  24   I need to have both of my breasts removed?"

10:53:38  25           And he looked at me and said, "No."  He told me, "No,"

10:53:43   1   that he thinks that I could just have the lump removed.  And so

10:53:48   2   that's what I wanted to have done.  But I wanted it to come from

10:53:54   3   someone else to tell me that.

10:53:56   4   Q.  So then, what surgery did you have?

10:53:58   5   A.  Lump -- how you say it lump --

10:54:02   6   Q.  Lumpectomy?

10:54:04   7   A.  Yes, that's what I had -- I had done.  So they only removed the

10:54:08   8   lump and one lymph node.

10:54:12   9   Q.  So I want to go back briefly to Dr. Lagarde.  And you were in

10:54:18  10   the courtroom when Dr. Lagarde testified.  And do you remember the

10:54:22  11   discussion about the pink cancer book?

10:54:25  12   A.  Yes.

10:54:25  13   Q.  Did Dr. Lagarde leave that pink cancer book for you?

10:54:30  14   A.  Yes.

10:54:31  15   Q.  Share with the jury whether you looked at that cancer book.

10:54:38  16   A.  I may have looked at a few of the pages.  I couldn't tell you

10:54:42  17   what they were.  But I didn't read that whole book.  There's no way

10:54:47  18   I read that book.  I know I didn't.  In fact, I put it away after

10:54:54  19   since I wasn't going to her.  I just decided to -- that I didn't

10:54:59  20   need it.

10:55:02  21   Q.  So, Barbara, Dr. Lagarde had testified that she dog-ears pages.

10:55:07  22   Do you have any recollection of that?

10:55:09  23   A.  Not really.  I may have read those pages, but I don't remember

10:55:14  24   what they were.

10:55:17  25   Q.  And did you -- we saw something on page 195.  Were you in

10:55:23  1    here -- page 195 of that book of the appendix.  Do you remember

10:55:29  2    that testimony?

10:55:29  3    A.  Uh-huh, yes.

10:55:30  4    Q.  Did you look at anything in that book concerning chemotherapy

10:55:34  5    drugs or side effects?

10:55:35  6    A.  No.

10:55:36  7    Q.  Were you instructed by anyone in this case to read that book in

10:55:40  8    its entirety?

10:55:42  9    A.  No.

10:55:42  10   Q.  Did Dr. Carinder's office give you that book?

10:55:47  11   A.  No.

10:55:48  12   Q.  Where did you end up -- when and where did you end up realizing

10:55:56  13   you had that book?

10:55:57  14   A.  I was -- honestly, I was putting some tax papers away in the

10:56:02  15   closet, and that's when I found the book.  I forgot that it was

10:56:06  16   even in there.

10:56:07  17   Q.  And when was this?

10:56:10  18   A.  I think that was in 2017.  I think that's when I found it.

10:56:15  19   Q.  Why didn't you read that book cover to cover?

10:56:18  20   A.  I can't -- I just didn't read it being that I wasn't going to

10:56:26  21   that doctor.

10:56:26  22   Q.  Did you receive that pink cancer book before you saw

10:56:32  23   Dr. Carinder or after you saw Dr. Carinder?

10:56:34  24   A.  Before.

10:56:35  25   Q.  Speaking of Dr. Carinder, can you share with the jury how you

10:56:43 1  came to be seeing him?

10:56:45 2  A.  Well, I had my surgery in Bogalusa.  And after the surgery, on

10:56:55 3  the ride home I got sick.  My husband had to pull over.  So I am

10:57:01 4  thinking ahead of time because the doctor told me I would have to

10:57:04 5  do chemotherapy and radiation.  I'm thinking I don't know if I can

10:57:08 6  make this long trip every day, because I know chemo, you go -- or

10:57:13 7  radiation is done every day, chemo's done so often.

10:57:19 8          I decided to talk to him and ask him, that's Dr. Karlin,

10:57:24 9  if I could go find me a doctor in Slidell to do my chemo and

10:57:30 10 radiation.  And he told me I could, just to let him know who he

10:57:34 11 was.

10:57:34 12         And I went to the cancer center, and I found

10:57:40 13 Dr. Carinder, which I gave the name to Dr. Karlin, and he said that

10:57:44 14 I could go over there.

10:57:45 15 Q.  So you saw Dr. Carinder?

10:57:48 16 A.  Yes.

10:57:49 17 Q.  What was he like as a doctor?

10:57:52 18 A.  Very nice, very gentle.  I liked him.  I thought he was giving

10:58:00 19 me the information correctly at that time, you know.  He was very

10:58:09 20 nice.

10:58:10 21 Q.  Do you remember the chemotherapy drugs that Dr. Carinder ended

10:58:14 22 up prescribing you?

10:58:15 23 A.  Adriamycin, the C one was -- I call it ACT.  I can't remember

10:58:28 24 the name.  And the last was Taxotere, but I can't remember the name

10:58:31 25 of the second one.

10:58:31  1    Q.   Okay.  After your meeting with Dr. Carinder, did you have an

10:58:39  2    understanding of what side effects you might have from the

10:58:44  3    chemotherapy drugs?

10:58:45  4    A.   Yes, he gave me a list of side effects.  I would get weak.  I

10:58:57  5    wouldn't want to eat.  I'd have sores in my mouth.  Probably

10:59:02  6    wouldn't want to go anywhere if you don't want to eat.  Loss of

10:59:09  7    limb.  Death.  There was a lot of major side effects, too, he

10:59:17  8    mentioned it.

10:59:18  9    Q.   What was your understanding after meeting with Dr. Carinder

10:59:22 10    about what would happen to your hair when you underwent the

10:59:26 11    chemotherapy?

10:59:26 12    A.   That I would lose my hair.  In fact, he told me I would lose my

10:59:30 13    hair, but that it would grow -- and he said it would grow back in a

10:59:34 14    different way or it could come back the same.  He said it could

10:59:37 15    come back curly.  And my husband joked and said, "Oh, well, maybe

10:59:41 16    I'll get a redhead," when I told him all of that.  I said, "Nay,

10:59:45 17    not a redhead."

10:59:48 18    Q.   Do you recall signing an informed consent before you took the

10:59:54 19    chemotherapy?

10:59:54 20    A.   Yes, I did.

11:00:04 21         MR. SCHANKER:  Your Honor, Exhibit 621, which has been

11:00:08 22    admitted --

11:00:08 23         THE COURT:  It's already in evidence.

11:00:10 24         MR. SCHANKER:  Thank you.

11:00:10 25         THE COURT:  Thank you.  Please proceed.

BY MR. SCHANKER:

Q.  Take a look at this, if you would, Barbara.  Does this look like that informed consent that you signed?

A.  Yes, it is.

Q.  And is that your signature?

A.  Yes, it is.

Q.  Barbara, when you were in that room meeting with Dr. Carinder, did you ask him anything about permanent hair loss?

A.  I can honestly say, "No," because he didn't mention permanent hair loss to me.

Q.  If Dr. Carinder had told you about the risk of your hair not coming back with Taxotere, what would you have done?

A.  I'd -- I would have asked him if there was another drug out there that I could have used.

Q.  And if Dr. Carinder would have given you another option that did not cause permanent hair loss, what would you have done?

A.  I would have taken it.

Q.  Barbara, you've heard testimony in this case about a side effect of neuropathy.

A.  Yes.

Q.  And what's your understanding of neuropathy?

A.  That it's the tingling in the hands and the feet.  But if you have neuropathy -- I feel like if I had neuropathy, no one would know that.  But since I have this (INDICATING), everybody knows I have cancer because they see my bald -- they see my head.  They

11:02:06 1  don't see my bald head because I do not go out without wearing my

11:02:11 2  turban.

11:02:11 3  Q.  Barbara, did Dr. Carinder tell you anything about a prior

11:02:18 4  patient that he had whose hair did not grow back?

11:02:21 5  A.  No.  If he did, I probably would have asked him, "Well, am I

11:02:27 6  going to be like that, too?"  But he didn't say anything to me.

11:02:34 7  Q.  In that room, Barbara, with what you explained that

11:02:39 8  Dr. Carinder said to you, why didn't you ask for a second choice?

11:02:47 9  A.  Because I did not hear the word "permanent hair loss."  I did

11:02:54 10  hear about all of the side effects, but every drug has side

11:02:58 11  effects.  I took my risk on that.  But I wouldn't have wanted to

11:03:01 12  take a risk on permanent hair loss.

11:03:08 13  Q.  Barbara, I want to take you to the time after your chemotherapy

11:03:13 14  treatments.  And you continued to see Dr. Carinder; is that

11:03:17 15  correct?

11:03:17 16  A.  Yes.

11:03:18 17  Q.  Now, at any time during the time that you saw Dr. Carinder when

11:03:25 18  your hair wasn't growing back, did you ever ask him about that?

11:03:29 19  A.  Oh, yes.  I've asked him.

11:03:31 20  Q.  And when did you ask him?

11:03:34 21  A.  I'd say it was in early April I asked him about my hair.  And

11:03:40 22  all he said, "Honey, it's going to grow.  It takes time."  So

11:03:44 23  that's what I kept doing.  I kept waiting.

11:03:47 24  Q.  That's April of 2012?

11:03:49 25  A.  Yes.

11:03:49  1    Q.  And how long did you hold out hope that your hair was going to

11:03:55  2    grow back?

11:03:55  3    A.  Until I found out about this lawsuit, which was when my brother

11:04:02  4    called.

11:04:04  5    Q.  Barbara, let's talk about your hair now.

11:04:13  6    A.  I don't feel like I have hair now.

11:04:15  7    Q.  How long has your hair looked the way it does right now?

11:04:19  8    A.  Ever since -- I can't say I lost it.  It was coming out, I

11:04:25  9    chose to shave it early.  So ever since I shaved it, this is how

11:04:30 10    it's been.  And that was in 2011.

11:04:34 11    Q.  And it's grown back a little bit --

11:04:36 12    A.  A little bit.

11:04:37 13    Q.  -- we've seen from pictures?

11:04:38 14    A.  Yes.

11:04:39 15    Q.  Has it ever grown all the way back and then fallen out again?

11:04:44 16    A.  No.  Never.

11:04:48 17    Q.  Do you style your hair now in any way?

11:04:51 18    A.  No.

11:04:55 19    Q.  You talked about what you wear on your head, and we'll get into

11:04:58 20    that a little bit more.  But if you leave the house now, do you

11:05:03 21    ever leave it without something on your head?

11:05:05 22    A.  Never.

11:05:07 23    Q.  And why not?

11:05:07 24    A.  I'll leave my teeth, which I have a partial, I'll leave that

11:05:12 25    home before I go out the house without my wig.  I am just -- and I

11:33:28  1    should have been inconvenienced.  I don't see why they couldn't

11:33:30  2    have taken it with the turban.  This is me.  This is me now.  The

11:33:36  3    wig ain't me.  That's -- it may be part of me, you see that on my

11:33:43  4    head, but that's not me.  I don't have my hair back.

11:33:46  5    Q.  You said earlier that you feel like part of you is missing.

11:33:50  6    Can you explain to the jury?

11:33:51  7    A.  Yeah.  My hair is missing.  When it fell out and it didn't come

11:33:57  8    back, I feel like it died.

11:34:01  9    Q.  How many lawsuits have you filed in your lifetime?

11:34:04 10    A.  None.

11:34:06 11    Q.  Why are you doing this?

11:34:08 12    A.  I am doing this to make it aware to pharmaceutical companies

11:34:16 13    that they have to put all of the warnings on labels and tell the

11:34:21 14    doctors what's at risk for us.  That we should get all of the

11:34:26 15    information, not just part of the information.  Because had I known

11:34:30 16    that I was going to lose my hair, just like that first doctor

11:34:34 17    wanted to remove both breasts, then I would have -- it would have

11:34:38 18    put up a red flag to me, and I wasn't told that.  I was told my

11:34:42 19    hair was going to grow back.

11:34:46 20    Q.  How would you describe to the jury the way it feels to be a

11:34:50 21    woman with no hair?

11:34:52 22    A.  I just -- I just don't feel like a woman.  Like I said, a man

11:34:58 23    is distinguished when they lose their hair.  A woman is not

11:35:02 24    distinguished by no means.

11:35:06 25    Q.  When you look in the mirror without your turban on, what do you

12:02:19 1    A.  Yes.

12:02:20 2    Q.  But other than that, you didn't ask Dr. Carinder any other

12:02:27 3    questions about the treatment he recommended?

12:02:30 4    A.  No.

12:02:36 5    Q.  What you said to Dr. Carinder after he told you about his

12:02:42 6    recommendation on March 31st, 2011, you said, "I am in your hands.

12:02:51 7    Whatever you tell me I have to do, I'll do it"?

12:02:55 8    A.  Correct.

12:02:56 9    Q.  And when Dr. Carinder came in to talk with you about his

12:03:09 10   recommendation on March 31st, that was the only recommendation he

12:03:15 11   gave you, Adriamycin, Cytoxan, Taxotere?

12:03:19 12   A.  Yes.

12:03:19 13   Q.  There was no discussion of any options that day, correct?

12:03:23 14   A.  No, he did not give me any options.

12:03:26 15   Q.  And you didn't ask for any, true?

12:03:29 16   A.  What he gave me -- the option that I heard was that I was --

12:03:35 17   that I was going to get better, that I was going to get well, that

12:03:38 18   I was going to regrow my hair.  So I didn't ask for any options.

12:03:42 19   Those were all good options.  Why would I?

12:03:45 20   Q.  I --

12:03:46 21   A.  That's what I wanted to hear, I was going to get better.  I was

12:03:50 22   going to regrow my hair.  The lump -- my cancer wouldn't come back.

12:03:55 23   That's what I was hoping.

12:03:58 24   Q.  I understand.  I am just asking you, ma'am, when Dr. Carinder

12:04:06 25   told you, "These are the three drugs I am recommending," he talked

12:04:10  1   with you about them.  You didn't say, "Hey, do you have anything

12:04:14  2   else"?

12:04:15  3   A.  No, because I didn't know anything about drugs.  Why would I --

12:04:20  4   that's all right.

12:04:26  5   Q.  Well, before you left Dr. Carinder's office on March 31st, he

12:04:34  6   did talk with you about possible side effects and the potential

12:04:40  7   risks --

12:04:41  8   A.  Yes.

12:04:41  9   Q.  -- of these three medications?

12:04:44 10   A.  Yes.

12:04:44 11   Q.  Now, let's talk about the drug Adriamycin for a moment.  Okay?

12:05:00 12   A.  Okay.

12:05:01 13   Q.  Okay.  And Dr. Carinder -- in Dr. Carinder's records it states:

12:05:16 14   "Potential cardiac toxicity from the doxorubicin," which is

12:05:21 15   Adriamycin, "were explained to the patient in detail."

12:05:26 16          I just want to ask you:  Do you recall the detailed

12:05:31 17   conversation that Dr. Carinder had with you about Adriamycin on

12:05:35 18   March 31st?

12:05:37 19   A.  Not all of it, some of it.

12:05:39 20   Q.  What do you remember?

12:05:40 21   A.  I remember him telling me about what you just said, and I

12:05:47 22   figured I had a good heart.  I don't have heart trouble, that I

12:05:51 23   probably -- I'm sure if something would happen that they would

12:05:56 24   correct it.  You have to listen to your doctor.  That's all I'm

12:06:01 25   saying and that's what I was doing.  He recommended those drugs.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *        16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *        Section H
                                  *
Relates to:  Barbara Earnest      *        September 24, 2019
             16-CV-17144          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


DAY 7 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                                & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2505
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West, Suite 1400
                             Los Angeles, California 90045

BARBARA EARNEST - CROSS

01:31 1    **Q.**   I'm going to put in there the word "permanent."  Okay?

01:31 2    **A.**   But it doesn't say permanent.

01:31 3    **Q.**   My question to you, Mrs. Earnest, is:  Even if the word

01:31 4    "permanent" had appeared before "hair loss" on this consent

01:31 5    form, you still would have signed it?

01:31 6    **A.**   No, I wouldn't have.  No.  I would have asked him about

01:31 7    explain that to me, more about that.  I know I would have.

01:31 8    **Q.**   So the only risk you were unwilling to accept was the risk

01:32 9    of permanent hair loss?

01:32 10   **A.**   Yes.

01:32 11   **Q.**   Even compared to brain damage?

01:32 12           **MR. SCHANKER:**  Objection.  Asked and answered.

01:32 13           **THE COURT:**  Sustained.

01:32 14   BY MS. SASTRE:

01:32 15   **Q.**   So you said if the word "permanent" had been there, you

01:32 16   would have asked Dr. Carinder about that?

01:32 17   **A.**   Yes, I would have.  I would have asked him if there would

01:32 18   be another drug.

01:32 19   **Q.**   Even though you didn't ask him questions about anything

01:32 20   else in the entire consent form?

01:32 21   **A.**   No, I didn't.  I think if he -- in my own opinion, I think

01:32 22   that if he had previously had anything happen like that, I

01:32 23   think he would have automatically told me, "Mrs. Earnest, I had

01:33 24   a patient that did this" or "Mrs. Earnest, I had a patient that

01:33 25   did that."  He didn't tell me that.

BARBARA EARNEST - CROSS

01:33  1          He told me that my hair would grow back, and that's

01:33  2   what I was hoping for all these years because that's what I

01:33  3   heard from him.  And it didn't.

01:33  4   Q.   So I believe you testified that if Dr. Carinder gave you

01:33  5   another option that had less of a risk of hair loss, you would

01:33  6   have taken it.  Right?

01:33  7   A.   Yes.

01:33  8   Q.   So the only thing that would have caused you to have asked

01:33  9   about another option or taken another medication -- the only

01:33  10  thing you're telling us is hair loss?

01:33  11          MR. SCHANKER:  Objection.  Asked and answered.

01:33  12          THE COURT:  Sustained.

01:34  13  BY MS. SASTRE:

01:34  14  Q.   Let's assume that you did ask Dr. Carinder for a different

01:34  15  option.  Okay?

01:34  16  A.   Okay.

01:34  17  Q.   You would have wanted to have known something about that

01:34  18  option too, right?

01:34  19  A.   What option?  What do you mean?

01:34  20  Q.   This drug we are talking about.

01:34  21  A.   Oh.

01:34  22  Q.   Let me go back.  It's kind of a hypothetical question,

01:34  23  following up on your lawyer's questions.

01:34  24          So, again, I think what you said is that

01:34  25  hypothetically, if Dr. Carinder -- well, let me back up.

BARBARA EARNEST - CROSS

01:52  1  **BY MS. SASTRE:**

01:52  2  **Q.**   Okay.  Let me ask it this way:  Did you hear Dr. Carinder

01:52  3  talk about explaining his situation with this other patient to

01:52  4  his patients like yourself?

01:53  5           MR. SCHANKER:  Objection, Your Honor.  Vague.

01:53  6           THE COURT:  Rephrase your question.

01:53  7           MS. SASTRE:  Okay.

01:53  8  **BY MS. SASTRE:**

01:53  9  **Q.**   So did you ask any questions of Dr. Carinder about your

01:53 10  hair during that visit on March 31?

01:53 11           MR. SCHANKER:  Objection, Your Honor.  Asked and

01:53 12  answered.

01:53 13           THE COURT:  Overruled.

01:53 14           THE WITNESS:  Yes.

01:53 15  **BY MS. SASTRE:**

01:53 16  **Q.**   What did you ask?

01:53 17  **A.**   When will it come back, how will it come back.  And he

01:53 18  automatically said --

01:53 19           THE WITNESS:  Can I say what he said to me?

01:53 20           THE COURT:  Yes, ma'am.

01:53 21           THE WITNESS:  -- that -- he said that my hair

01:53 22  would -- that it may not come back like it is.  It may come

01:53 23  back curly, may come back a different color.  But he did tell

01:54 24  me it was going to come back.  And that's what I've been hoping

01:54 25  for all these years.

BARBARA EARNEST - CROSS

01:54  1    **BY MS. SASTRE:**

01:54  2    **Q.**   You heard when Dr. Carinder said that if a patient asked

01:54  3    questions about their hair, that he would tell them about his

01:54  4    prior patient who lost her hair, true?

01:54  5              **MR. SCHANKER:**  Objection, Your Honor.  Misstates the

01:54  6    testimony of Dr. Carinder.

01:54  7              **THE COURT:**  Overruled.

01:54  8              **THE WITNESS:**  Yes, I heard him say that.

01:54  9    **BY MS. SASTRE:**

01:54 10    **Q.**   You heard him say that, right?

01:54 11    **A.**   Yes.

01:54 12    **Q.**   But it's your testimony in this case that even though you

01:54 13    spoke to him about your hair and had a couple questions, he

01:54 14    never told you about his prior patient?

01:54 15    **A.**   No.

01:54 16    **Q.**   Does that upset you?

01:54 17    **A.**   No.

01:54 18    **Q.**   Why not?

01:54 19    **A.**   It just -- I can't be upset.  It's over.  It's done with.

01:54 20    Now I'm trying to get past this part.

01:55 21              If he did tell me, I don't remember it.  Let me put

01:55 22    it that way.  If he did.  He could have.  I really don't know

01:55 23    if he told me.  But I can't even be mad at the fact that I have

01:55 24    lost my hair, because there's -- why be -- I'm mad, but I can't

01:55 25    get it back.

## BARBARA EARNEST - CROSS

01:55 1  **Q.**   As you sit here today, the best of your recollection is
01:55 2  you are not sure if he told you about that patient?
01:55 3  **A.**   Right, not sure.
01:55 4  **Q.**   If he did tell you --
01:55 5  **A.**   Here we go with the hypothetical thing.
01:55 6  **Q.**   Well, just two questions on it.
01:55 7          If he did tell you, you would have been made aware
01:55 8  that this is a possible potential outcome but still agreed to
01:55 9  the treatment.
01:55 10 **A.**   No.  I would have asked for another drug.  I know I would
01:55 11 have.
01:55 12 **Q.**   But we know you didn't.
01:55 13 **A.**   No, we didn't.  That's why I'm like I am.
01:56 14 **Q.**   My question is just simply:  If he did tell you about this
01:56 15 patient, what we know you did is you still agreed to take
01:56 16 Adriamycin, Cytoxan, and Taxotere.
01:56 17         **MR. SCHANKER:**  Objection, Your Honor.  Asked and
01:56 18 answered.
01:56 19         **THE COURT:**  Sustained.
01:56 20 BY MS. SASTRE:
01:56 21 **Q.**   And if he didn't tell you, do you wish he had?
01:56 22 **A.**   I can say that, but wishing isn't going to make it happen
01:56 23 now.
01:56 24 **Q.**   Wouldn't that have been important information for you to
01:56 25 have, based upon your being very, very concerned -- amongst all

## BARBARA EARNEST - CROSS

02:00 1    to have treatment and surgery, correct?

02:00 2    **A.**   Yes.

02:00 3    **Q.**   And I think you said that you might have looked through

02:00 4    some portions of the book, but you didn't read it from

02:00 5    beginning to end.

02:00 6    **A.**   No, I didn't.

02:00 7    **Q.**   What portions did you read through?

02:00 8    **A.**   Honestly, right now sitting here, I don't remember.

02:00 9    **Q.**   Okay.  That's fair.

02:01 10           And when did you do that?  When did you read through

02:01 11   these portions?

02:01 12   **A.**   I can't give a date, but I know it probably may have been

02:01 13   the first week or second week that I got -- that I took the

02:01 14   book home.

02:01 15   **Q.**   Okay.  And then you go in to see Dr. Carinder in March?

02:01 16   **A.**   Yes.

02:01 17   **Q.**   Okay.  And, of course, as the jury has seen many times,

02:01 18   you're given the exact name of the drugs that you're going to

02:01 19   take, right?

02:01 20   **A.**   Yes.

02:01 21   **Q.**   And I believe you kept a little journal once you heard --

02:01 22   once you were diagnosed with cancer.

02:01 23   **A.**   Yes.

02:01 24   **Q.**   It was like one of those little spiral notebooks you kept

02:01 25   in your purse?

BARBARA EARNEST - CROSS

02:01 1  **A.**   Yes.

02:01 2  **Q.**   And you wrote down in there -- when you saw Dr. Carinder

02:01 3  in March, you wrote down exactly what he was going to give you,

02:01 4  the names of the drugs, right?

02:01 5  **A.**   Yes.

02:01 6  **Q.**   Okay.  And so my question is:  Did you go back to the book

02:01 7  after your visit with Dr. Carinder on March 31 to -- now that

02:02 8  you know chemo is a real thing, I'm on the verge of having it,

02:02 9  and I know the drugs that I'm going to take, did you go back

02:02 10  and read about chemotherapy in this book?

02:02 11  **A.**   No, I didn't.

02:02 12  **Q.**   Did you go back and read about the drugs that you were

02:02 13  about to take from this book?

02:02 14  **A.**   Using the individual names?

02:02 15  **Q.**   Yes, ma'am.

02:02 16  **A.**   No, I didn't.

02:02 17  **Q.**   Well, let's just take a look for a moment at what you had

02:02 18  in your possession.  And I would like to look at page 195 with

02:02 19  you.

02:02 20      **MR. SCHANKER:**  Your Honor, objection.  Foundation.

02:02 21  She has testified she didn't look at this.

02:02 22      **THE COURT:**  I agree.  Overruled, but I believe the

02:03 23  question -- the book was in her possession.

02:03 24      **MR. SCHANKER:**  May I please have a copy?

02:03 25      **MS. SASTRE:**  Yes.  I'm sorry.  I just want to put up

**BARBARA EARNEST - CROSS**

02:10 1        MS. SASTRE:  I can ask her whether that's important

02:10 2  information she would have liked to have known; does she wish

02:10 3  that she had read it?  But if you want me to limit it, I will,

02:10 4  Judge.  You tell me while I'm here so I don't have to come

02:10 5  back.

02:10 6        THE COURT:  Okay.

02:10 7        MR. SCHANKER:  We are creating some legal burden

02:10 8  that --

02:10 9        THE COURT:  That's my concern.

02:10 10        MR. SCHANKER:  -- a 250-page book that was given to

02:10 11  her.

02:10 12        THE COURT:  I understand, but I'm not --

02:10 13        MS. SASTRE:  I'll move fast.

02:10 14        THE COURT:  Okay.  I think it's fine to ask it.

02:10 15        MS. SASTRE:  Thank you.

02:10 16            Charged to nobody.

02:10 17        (End of bench conference.)

02:10 18        THE COURT:  Please proceed.

02:10 19        MS. SASTRE:  Okay.  Thank you, Your Honor.

02:10 20  BY MS. SASTRE:

02:10 21  Q.   All right.  So, Mrs. Earnest, we are on page 195 of the

02:10 22  *Breast Cancer Handbook*, and I just have a question for you

02:10 23  here.

02:10 24            You see where it says "Brand Name:  Taxotere"?

02:11 25  A.   Yes.

BARBARA EARNEST - CROSS

02:11 1    **Q.**   Okay.  And it states:  "Side effects:  Temporary hair

02:11 2    loss, rare reports of permanent hair loss."

02:11 3           And my question to you is just simply:  Did you read

02:11 4    this information about permanent hair loss from this book at

02:11 5    any time?

02:11 6    **A.**   No.  No, I didn't read the book.  I read the inserts

02:11 7    that -- the pages that Lagarde told me about, and that was it.

02:11 8    And I put it in my closet and I forgot about it even being in

02:11 9    there.

02:11 10   **Q.**   Okay.  Thank you.

02:12 11          You told us, I believe, in your deposition that you

02:12 12   thought you might have been given some pamphlets by

02:12 13   Dr. Carinder's office.

02:12 14   **A.**   Yes.

02:12 15   **Q.**   Do you remember whether you were or weren't?

02:12 16   **A.**   I really don't remember.  I don't remember if I just took

02:12 17   them home and threw them away.  I really don't know.

02:12 18   **Q.**   Dr. Carinder said yesterday although he didn't hand things

02:12 19   out, he said that his nurses did.

02:12 20   **A.**   Right.

02:12 21   **Q.**   And he described something called *Chemocare* as being a

02:12 22   pamphlet they were giving out, and we looked at the 2011

02:12 23   *Chemocare*.

02:12 24          Do you remember getting that?

02:12 25   **A.**   I don't remember.

BARBARA EARNEST - CROSS

02:29 1   **Q.**   What did she tell you about the risks of Arimidex?

02:29 2   **A.**   I honestly don't remember the risks.  I was already on it

02:29 3   for five years, so I considered, what's five more years?

02:29 4   **Q.**   Let me ask you this, though.  Do you dispute what's stated

02:29 5   here by Dr. Collins-Burow that the risks were specifically

02:30 6   discussed?

02:30 7   **A.**   No, I don't dispute that.  I just don't remember.

02:30 8   **Q.**   You don't remember.  Okay.  Very good.

02:30 9         Well, ma'am, let me ask you this:  Have you ever

02:30 10   thought it possible that Arimidex is contributing to the

02:30 11   current condition of your hair?

02:30 12   **A.**   No.

02:30 13   **Q.**   Well, ma'am, isn't it true that you met with the physician

02:30 14   and told them that you thought your hair was coming back and it

02:30 15   was the other medicine causing your hair loss?

02:31 16   **A.**   I don't ever remember saying that.

02:31 17         **MS. SASTRE:**  May I approach?

02:31 18         **THE COURT:**  Yes, you may.

02:31 19   **BY MS. SASTRE:**

02:31 20   **Q.**   So, Mrs. Earnest, I'm going to direct your attention to

02:31 21   the second line.

02:31 22         **MR. SCHANKER:**  Could we approach, Your Honor?

02:31 23         **THE WITNESS:**  I can't read it.

02:31 24         **MR. SCHANKER:**  Could we approach, Your Honor?

02:31 25         **THE COURT:**  Okay.

BARBARA EARNEST - CROSS

03:19  1          MS. SASTRE:  Your Honor, may I publish the document?

03:19  2          THE COURT:  Yes, you may.

03:19  3          MS. SASTRE:  Okay.

03:19  4          THE WITNESS:  Had I known he had wrote that down, I

03:19  5   would have questioned him about that.

03:19  6   BY MS. SASTRE:

03:19  7   Q.   Okay.  So just taking a look for a moment, you see that it

03:20  8   states here:  "Why no treatment for alopecia?"

03:20  9   A.   Yes.

03:20 10   Q.   Then it states:  "Thought hair was coming back and other

03:20 11   medicine causing hair loss," right?

03:20 12   A.   That's what it says.  I don't think I said that.

03:20 13   Q.   Okay.  Thank you, ma'am.

03:20 14          Mrs. Earnest, I want to ask you about just a couple

03:20 15   other things quickly.  And my goal is to be done with my

03:20 16   questions as soon as I can, okay?

03:20 17   A.   Sure.

03:20 18   Q.   So I'm going to try to move a little bit quickly.  I just

03:20 19   wanted to let you know that, ma'am.  All right?

03:20 20   A.   Okay.

03:20 21   Q.   So, ma'am, has any doctor at any point ever told you that

03:20 22   they believe -- or that they know what the cause of the

03:20 23   condition of your hair is?

03:20 24   A.   No.

03:20 25   Q.   Has any doctor ever said to you, Mrs. Earnest, that they

03:21 1    think you have permanent alopecia?

03:21 2    A.    No.   Because I have never, ever really asked them.

03:21 3    Q.    So in about the eight years, approximately, since you lost

03:21 4    your hair, you haven't asked any of your doctors what was the

03:21 5    cause of your hair loss?

03:21 6    A.    Well, the only doctors I went to was my two cancer

03:21 7    doctors, is what I would ask.   And I asked them.   And they

03:21 8    didn't say that it was not going to come back; they just told

03:21 9    me to wait.

03:21 10   Q.    Let me ask you again.   And I know you're pointing to

03:21 11   certain doctors.   My question is a little bit broader, and it's

03:21 12   just simply that:   In the eight years since 2011, since you

03:21 13   have lost your hair, you haven't asked any of your doctors as

03:21 14   to what was the cause of your hair loss, right?

03:22 15   A.    No.

03:22 16   Q.    You haven't asked any of them whether it was permanent,

03:22 17   right?

03:22 18   A.    No.

03:22 19   Q.    Now, I believe you have described for us a conversation

03:22 20   that you had with Dr. Carinder in about February or March of

03:22 21   2012 where you and he had a conversation about whether your

03:22 22   hair was going to come back.

03:22 23   A.    Yes.

03:22 24   Q.    It was a few months after you lost your hair?

03:22 25   A.    Yes.

BARBARA EARNEST - REDIRECT

03:35 1              REDIRECT EXAMINATION

03:35 2     BY MR. SCHANKER:

03:36 3     Q.   Good afternoon, again, Barbara.  Let's address this

03:36 4     photograph issue.  Can we, first?

03:36 5     A.   Yes.

03:36 6     Q.   Do you keep all your photos in a certain place?

03:36 7     A.   I used to but not anymore.  When I lost them all in

03:36 8     Katrina, I just use a shoebox now.

03:36 9     Q.   Did you give all those photos to us in this case?

03:36 10    A.   Yes, I did.

03:36 11    Q.   Barbara, are there mystery photos out there of you with a

03:36 12    full head of hair that this jury should see?

03:36 13    A.   Not that I know of.

03:36 14    Q.   Did your hair ever grow back and fall out again, Barbara?

03:36 15    A.   No.

03:36 16    Q.   I want to talk to you a little bit about the pink cancer

03:37 17    book.  Remember, you were asked about this?

03:37 18    A.   Yes.

03:37 19    Q.   You were shown some parts of this book.  I want to show,

03:37 20    make sure that you and the jury see some other parts of this

03:37 21    book.  Is that okay?

03:37 22    A.   Yes.

03:37 23    Q.   First of all, can you see how many pages there are in this

03:37 24    book, just so we get an idea?  It looks like 242 pages plus

03:37 25    worksheets.  Do you see that?

**BARBARA EARNEST - REDIRECT**

03:37  1    **A.**    Yes.

03:37  2    **Q.**    The part you were shown was on page 195.  Can you turn to

03:38  3    page 195?  Tell me when you have it there.

03:38  4    **A.**    I have it.

03:38  5    **Q.**    Can you see at the top of page 194 -- I'll put that up

03:38  6    here.  Page 195 is the part you were shown.  Did you ever look

03:38  7    at page 195 of this book?

03:38  8    **A.**    No.

03:38  9    **Q.**    Page 194, what does it say at the top of that, at the very

03:38 10    top there?

03:38 11    **A.**    "Appendix B."

03:38 12    **Q.**    Say that again.

03:38 13    **A.**    "Appendix B."

03:38 14    **Q.**    Okay.  Did you look at the appendix to this book?

03:38 15    **A.**    No.

03:38 16    **Q.**    Can you see -- what is the title there under the

03:38 17    Appendix B?  What's that section?  Can you see this --

03:38 18    **A.**    "Chemotherapy Drugs."

03:38 19    **Q.**    You never looked at that part of the appendix?

03:38 20    **A.**    No.

03:39 21    **Q.**    Did you ever look at Chapter 10 of this book?

03:39 22    **A.**    No.

03:39 23    **Q.**    So you didn't look at the section on hair loss and the

03:39 24    temporary hair loss, in this book?

03:39 25            If you look on page -- take a look at page 84, and I

BARBARA EARNEST - REDIRECT

03:39 1   will show it to you and see if it's something you looked at or

03:39 2   not.

03:39 3            THE COURT:  Mr. Schanker, I want to caution you about

03:39 4   leading.

03:39 5            MR. SCHANKER:  Yes.

03:39 6            I'm sorry, Your Honor.  I'm just trying to move

03:39 7   this along.

03:39 8            THE COURT:  I understand.

03:39 9   BY MR. SCHANKER:

03:39 10  Q.   Do you see this section on hair loss?

03:39 11  A.   Yes.

03:39 12  Q.   Let me find it here.

03:40 13            I'm going to do this.  I'm going to ask Ms. Perez if

03:40 14  you could find it so --

03:40 15            While she is doing that, I will shift gears, and

03:40 16  we'll come back to the cancer book.

03:40 17            Ms. Sastre asked you whether your number one goal was

03:40 18  to live cancer-free.  Do you remember that line of questioning?

03:40 19  A.   Yes.

03:40 20  Q.   I would like to give you a chance to explain, if you like.

03:40 21  Are you free from the side effects of your cancer treatment at

03:40 22  this time?

03:40 23  A.   Am I free from the side effects?

03:40 24  Q.   Yes?

03:40 25  A.   No, because one of my side effects is losing my hair, and

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *      16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *      Section H
Relates to:  Barbara Earnest      *
             16-CV-17144          *
                                  *      September 25, 2019
* * * * * * * * * * * * * * * * * *


DAY 8 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances:</u>


For the Plaintiffs:            Barrios Kingsdorf & Casteix, LLP
                               BY:  DAWN M. BARRIOS, ESQ.
                               701 Poydras Street, Suite 3650
                               New Orleans, Louisiana 70139


For the Plaintiffs:            Gainsburgh Benjamin David Meunier
                                 & Warshauer, LLC
                               BY:  M. PALMER LAMBERT, ESQ.
                               1100 Poydras Street, Suite 2800
                               New Orleans, Louisiana 70163


For the Plaintiffs:            Pendley Baudin & Coffin, LLP
                               BY:  CHRISTOPHER L. COFFIN, ESQ.
                               1100 Poydras Street, Suite 2505
                               New Orleans, Louisiana 70163


For the Plaintiffs:            Gibbs Law Group, LLP
                               BY:  KAREN BARTH MENZIES, ESQ.
                               6701 Center Drive West, Suite 1400
                               Los Angeles, California 90045

JOHN GLASPY - CROSS

02:21 1  the other?

02:21 2  A.   Yes.

02:21 3  Q.   You randomize them so that they're -- you try to get them

02:22 4  evenly split, and then you control for certain factors.  Then

02:22 5  one group shows an effect, and the other one doesn't, right?

02:22 6  A.   Correct.

02:22 7  Q.   You said, "That's why the trials are so big.  And you need

02:22 8  a lot of patients because both groups are going to be fine --

02:22 9  some people in both groups are going to be fine even without

02:22 10 chemo.  We guessed wrong.  They didn't have tumor spots in

02:22 11 their body."  Right?

02:22 12 A.   Correct.

02:22 13 Q.   That's because -- I think your words before had been:  The

02:22 14 hallmark of treating early-stage breast cancer is surgery.

02:22 15 Right?

02:22 16 A.   I don't know if I said a hallmark.  I think that the

02:22 17 mainstay of treatment for the local tumor is surgery.

02:22 18 Q.   Dr. Glaspy, do you from time to time for

02:22 19 Stand Up to Cancer do interviews on television or have them

02:22 20 filmed?

02:22 21 A.   I may --

02:22 22 Q.   Have you ever had one done in your office before?

02:22 23 A.   Probably.

02:22 24      MR. MICELI:  Can you cue up No. 2.  Before we play

02:23 25 it, just pull up the picture.

JOHN GLASPY - CROSS

03:06 1    cured, don't you?

03:06 2    A.    I sometimes can say that, yes.

03:06 3    Q.    Okay.  In fact, you've said it on one of those interviews

03:07 4    that's online, haven't you?

03:07 5    A.    I don't know.  But I have said it -- yeah, I've said it

03:07 6    when it's true.

03:07 7    Q.    And somebody that comes in with a 2B early-stage breast

03:07 8    cancer has a very strong likelihood of survival.

03:07 9    A.    Especially if she takes treatment.

03:07 10   Q.    Right.

03:07 11   A.    Yes.

03:07 12   Q.    Let's go back to the de Jonge article.  And if you look on

03:07 13   page 596, towards the middle of the page, there's a sentence

03:07 14   that begins:  "Cyclophosphamide is often used in CIA mouse

03:07 15   models to induce alopecia."

03:07 16          Do you see that?

03:07 17   A.    Which -- did you say second paragraph?

03:07 18   Q.    Second paragraph, beginning third sentence.

03:07 19   A.    Third sentence.  Got it.

03:07 20   Q.    Okay.

03:07 21   A.    No, wait a minute.  I --

03:07 22   Q.    Actually, drop down to -- you see where Footnotes 20 and

03:07 23   22 are, the sentence that starts "In spite of"?

03:08 24   A.    Are we still on page 596?

03:08 25   Q.    Yes, sir.

JOHN GLASPY - CROSS

03:08 1  A.   Second paragraph?

03:08 2  Q.   Second full paragraph.

03:08 3  A.   Okay.  Second full paragraph.  Okay.  So "In spite of its

03:08 4  high"?

03:08 5  Q.   Right.  "In spite of its high potential for inducing

03:08 6  reversible alopecia, no relationship between cyclophosphamide

03:08 7  or 4-hydroxycyclophosphamide exposure in permanent alopecia was

03:08 8  observed in our study."

03:08 9        That's what it says?

03:08 10 A.   Yes.

03:08 11 Q.   The study author said that no permanent alopecia was

03:08 12 related to cyclophosphamide, but you included it in your -- as

03:08 13 support in your paper for relationship between cyclophosphamide

03:08 14 and permanent alopecia, right?

03:09 15 A.   That's correct.

03:09 16 Q.   That's because you're only talking about cases that have

03:09 17 been reported, right?

03:09 18 A.   It's because I'm pointing out cases that have been

03:09 19 reported.  A lot of these things obviously have never been

03:09 20 reported over the years.

03:09 21 Q.   And for 60 years -- 60 years -- this drug has been on the

03:09 22 market, you cited four articles:  One article that specifically

03:09 23 says it's not cyclophosphamide, one is a mail-in survey from a

03:09 24 hospital in Boston, and two studies from 2016 and 2017.

03:09 25        That's what you --

JOHN GLASPY - CROSS

03:09  1    A.    Is that a question?

03:09  2    Q.    -- support a 60-year history?  Yes.

03:09  3    A.    Yes.  Yes, that's accurate.

03:09  4    Q.    All right.  So I'm just going to put a line across this

03:09  5    page here.  I'm going to put "2011" on this side; we are going

03:10  6    to put "1959."  We will do a little history lesson just to give

03:10  7    context to what we are doing.

03:10  8          Do you recall that 1959 is when Hawaii and Alaska

03:10  9    became our 49th and 50th states?

03:10  10   A.    I'll take your word for it.

03:10  11   Q.    Eisenhower was president, right?

03:10  12   A.    1959, that's correct.

03:10  13   Q.    Okay.  That's when this drug came on the market, and the

03:10  14   support that you bring to this courtroom to say that

03:10  15   cyclophosphamide is related to permanent hair loss, four

03:10  16   articles, 60 years, 1 every 15 years, except they are all four

03:10  17   jumbled up at the end where Taxotere is being used, right?

03:10  18   A.    Taxotere was in use by that point, yes.

03:10  19   Q.    All right.  I'm going to put the four, which is -- I'm

03:10  20   just going to put "Cytoxan."

03:10  21         MR. MICELI:  Is it A-N or I-N?

03:10  22         Okay.  Thank you.

03:10  23   BY MR. MICELI:

03:11  24   Q.    Four studies.  So we had about 52 years without a hitch,

03:11  25   and four come in at the end, right?

JOHN GLASPY - CROSS

03:11 1   A.   Four that I found, correct.

03:11 2   Q.   And then you have Adriamycin.  What's that, about 1974,

03:11 3   '79?

03:11 4   A.   It was in that range.  It was the early '80s.

03:11 5   Q.   I couldn't find the old label.  I thought it said '74, but

03:11 6   let's just give it 1980.  1980, 39 years on the market.

03:11 7        And before Taxotere came on the market and it was

03:11 8   used in combination with Taxotere [sic], how many studies did

03:11 9   you find that related Adriamycin to permanent hair loss?

03:12 10  A.   I don't remember.

03:12 11  Q.   I think it was zero, sir.

03:12 12  A.   Okay.  Well, it --

03:12 13  Q.   Okay.

03:12 14        THE COURT:  I think -- I just want to correct -- your

03:12 15  question was:  "Before Taxotere came on the market and it was

03:12 16  used in combination with Taxotere, how many studies did you

03:12 17  find?"

03:12 18        Did you mean to say -- maybe I misunderstood the

03:12 19  question.

03:12 20        MR. MICELI:  My colleague has shown me the error of

03:12 21  my way.

03:12 22  BY MR. MICELI:

03:12 23  Q.   For 39 years -- actually, it's going to be '96, so

03:12 24  16 years before Taxotere comes on the market, 22 years if

03:12 25  you -- 24 years if you include when it's approved for adjuvant

JOHN GLASPY - CROSS

03:13  1    care -- no reports of permanent alopecia with Adriamycin that

03:13  2    you cited us to in your report, right?

03:13  3    A.   That's correct.

03:13  4    Q.   And then Arimidex.  When did Arimidex come on the market?

03:13  5    A.   I would have to look it up.  It was 20 years, 25 years

03:13  6    ago --

03:13  7    Q.   Okay.

03:13  8    A.   -- that range.

03:13  9    Q.   This says 1995, but I only have one copy, so --

03:13 10    A.   Oh, pretty good.

03:13 11    Q.   It was very good.

03:13 12         You cite in your report that Arimidex causes hair

03:13 13    thinning, correct?

03:13 14    A.   It does, yes.  It frequently causes that.

03:13 15    Q.   But you didn't cite us to any studies that say that

03:13 16    Arimidex causes permanent hair loss, where hair just doesn't

03:14 17    regrow again?

03:14 18    A.   Well, see, there we are getting into the semantic issues.

03:14 19    So it's very common with all these drugs that women are never

03:14 20    happy with their hair again, because it's thinner than it was.

03:14 21         Is that permanent hair loss?  It is; it's just not

03:14 22    total permanent hair loss with scarring.  But it's permanent

03:14 23    hair loss.

03:14 24         And with Arimidex, in general, it recovers when you

03:14 25    stop.  In general.

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2
    ****************************************************************
 3
    IN RE:  TAXOTERE (DOCETAXEL)        Docket No. 16-MD-2740
 4  PRODUCTS LIABILITY LITIGATION       Section H
                                        New Orleans, LA
 5  Relates to:  Barbara Earnest        Thursday, September 26, 2019
                 16-CV-17144
 6
    ****************************************************************
 7
                    TRANSCRIPT OF TRIAL PROCEEDINGS
 8           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
 9                     DAY 9, MORNING SESSION


10
    APPEARANCES:
11
    FOR THE PLAINTIFF:              BACHUS & SCHANKER, LLC
12                                  BY:  DARIN L. SCHANKER, ESQ.
                                         J. KYLE BACHUS, ESQ.
13                                  1899 Wynkoop St., Suite 700
                                    Denver, CO 80202
14
                                    FLEMING NOLEN & JEZ
15                                  BY:  RAND P. NOLEN, ESQ.
                                    2800 Post Oak Blvd., Suite 4000
16                                  Houston, TX 77056

17                                  GIBBS LAW GROUP, LLP
                                    BY:  KAREN B. MENZIES, ESQ.
18                                  6701 Center Drive West, 14th Floor
                                    Los Angeles, CA 90045
19
                                    DAVID F. MICELI, LLC
20                                  BY:  DAVID F. MICELI, ESQ.
                                    P.O. Box 2519
21                                  Carrollton, GA 30112-0046

22                                  PENDLEY BAUDIN & COFFIN
                                    BY:  CHRISTOPHER L. COFFIN, ESQ.
23                                  2505 Energy Centre
                                    1100 Poydras St.
24                                  New Orleans, LA 70163

25
```

10:44:04  1    Causation, in fact, is provided by establishing a plaintiff's

10:44:09  2    injury would not have occurred but for the defendant's actions.  In

10:44:13  3    order to prove cause-in-fact in this case, plaintiff must show to a

10:44:16  4    reasonable degree of medical probability that Taxotere can cause

10:44:19  5    permanent hair loss, that Taxotere caused permanent hair loss for

10:44:23  6    Mrs. Earnest, and that a failure to warn Dr. Carinder was the cause

10:44:26  7    of Mrs. Earnest's injury.

10:44:29  8         So in the context of the first question on the verdict

10:44:32  9    form, what does this mean?  It means that you have a list of

10:44:37 10    potential causes of hair loss in this case.  Adriamycin, Cytoxan,

10:44:43 11    Taxotere, put it on the list.  We didn't spend time fighting that

10:44:47 12    in this case.  Put Taxotere on the list.  Put Arimidex on the list.

10:44:53 13    Plaintiff has to prove to you that they've been able to rule out

10:44:59 14    everything on that list as being the substantial cause of

10:45:02 15    Mrs. Earnest's hair loss.

10:45:04 16         Said another way.  If you take that list, ladies and

10:45:07 17    gentlemen, and you cross Taxotere off of it, you would have to be

10:45:10 18    convinced that Mrs. Earnest would have her hair today.  That's what

10:45:13 19    this question asks you to decide.

10:45:18 20         You know that Mrs. Earnest lost her hair before.  I am

10:45:22 21    not going to go over that again.  What else do you know about

10:45:25 22    Adriamycin and Cytoxan?  Again, all of plaintiff's experts agree it

10:45:30 23    causes permanent hair loss.

10:45:33 24         Go back.  I'm sorry.  You heard from Dr. Tosti.  I just

10:45:40 25    want to remind you again.  I showed you it earlier.  She said, "No

10:45:44  1    one can tell you what drug has caused this."  So how can

10:45:49  2    Mr. Schanker tell you?  She said, "No one can tell you."  And

10:45:52  3    that's their expert, not mine.

10:45:53  4             What else do you know about the medications Mrs. Earnest

10:45:56  5    is taking?  She takes Arimidex.  You heard from the witnesses,

10:46:01  6    including Dr. Tosti and Dr. Carinder, it causes hair loss.  This is

10:46:05  7    from Dr. Tosti's article from this year.  Twenty five percent -- up

10:46:09  8    to 25 percent of the patients taking drugs like Arimidex experience

10:46:14  9    persistent hair loss, and it was significant.  Grade II.  That

10:46:18  10   means over 50 percent or more of your hair is gone.  You've heard

10:46:23  11   about Mrs. Earnest, eyebrows and eyelashes, Arimidex does that.

10:46:28  12   That's right in plaintiff expert's recent article.

10:46:31  13            And the number of patients who took Arimidex or drugs

10:46:35  14   like it in Dr. Tosti's paper who developed permanent or persistent

10:46:40  15   hair loss, it was 12 out of 92.  That's Arimidex.  That's not a

10:46:44  16   rare event.  It happens, and it has not been ruled out as the cause

10:46:49  17   in this case.

10:46:50  18            What did you hear from Mrs. Earnest on Arimidex?  I

10:46:54  19   showed her a medical -- showed her a record from a conversation she

10:46:58  20   had with a doctor named Dr. Bianchini.  And she said to

10:47:03  21   Dr. Bianchini, "I didn't get treatment for my hair loss because I

10:47:06  22   thought the Arimidex was causing it."  That is what Mrs. Earnest

10:47:12  23   told Dr. Bianchini.

10:47:28  24            Now, let me move on.  What else have you heard in this

10:47:33  25   case?  You've heard about stem cells and you've heard that the

10:47:35  1    theory from plaintiff's expert was that there is a mechanism where

10:47:40  2    chemotherapy attacks the stem cells, right?  And you heard that

10:47:44  3    they ran a test, their experts, not ours, to determine if

10:47:48  4    Mrs. Earnest had damaged stem cells.  The results showed positive

10:47:53  5    that her stem cells were present, didn't show they were damaged.

10:47:59  6         And what did the plaintiff's experts do?  They came into

10:48:02  7    court.  They knew about all of this.  It was their test, their

10:48:07  8    test.  They ran it, they designed it, they did it.  And they came

10:48:11  9    in here and they looked you in the eye and they testified about

10:48:15 10    their opinions and they never told you about this.  We had to ask

10:48:19 11    these questions on cross-exam, ladies and gentlemen.  It is

10:48:26 12    literally the definition of cherry picking.  Only talk about the

10:48:30 13    information that you like.  And if you don't like it, just push it

10:48:34 14    aside.  That's what they came in here and they did.

10:48:37 15         Now, ladies and gentlemen, no doctor has told

10:48:41 16    Mrs. Earnest that she has permanent hair loss.  She told you that.

10:48:44 17    Or told her that her hair loss was caused by Taxotere.  Why is that

10:48:48 18    important?  When you look at this question, the word "permanent" is

10:48:51 19    in it.  If you are not convinced by the weight of the evidence that

10:48:56 20    this is a permanent injury, if you think her hair would look

10:49:00 21    different if she stopped taking Taxotere, then you put down no to

10:49:04 22    Question 1 on the verdict form.

10:49:11 23         Remember Mrs. Earnest's statement to Dr. Bianchini what

10:49:18 24    she attributes her hair loss to when you're answering this

10:49:23 25    question.  For all of these reasons, ladies and gentlemen, the

| | | |
|---|---|---|
| 12:06:12 | 1 | DELIBERATIONS.) |
| 12:06:33 | 2 | THE COURT:  The court is at recess until the jury has |
| 12:06:36 | 3 | reached a verdict. |
| 12:06:37 | 4 | MR. MOORE:  Your Honor, can we approach? |
| 12:06:51 | 5 | (WHEREUPON, A DISCUSSION HELD OFF THE RECORD.) |
| 12:16:11 | 6 | MR. COFFIN:  In regard to the plaintiff's motion to |
| 12:16:15 | 7 | reopen the evidence, I am going to make a proffer.  Mr. Strongman, |
| 12:16:20 | 8 | who represents Sanofi, and I have agreed to a stipulation, only for |
| 12:16:26 | 9 | purposes of this proffer, that if called to the stand, Ms. Earnest |
| 12:16:33 | 10 | would testify that she received the call from her brother Jules |
| 12:16:39 | 11 | LeBlanc informing her that he had seen a TV commercial that |
| 12:16:46 | 12 | informed of a lawsuit related to Taxotere.  He had made that call |
| 12:16:52 | 13 | to her in February of 2016. |
| 12:16:57 | 14 | That's our stipulation, solely for the purposes of |
| 12:17:00 | 15 | proffer. |
| 12:17:01 | 16 | MR. STRONGMAN:  For the proffer, thank you. |
| 12:17:03 | 17 | MR. COFFIN:  Thank you. |
| 12:17:03 | 18 | (WHEREUPON, THE PROCEEDINGS WERE RECESSED FOR JURY |
| 12:17:03 | 19 | DELIBERATIONS.) |
| 14:58:30 | 20 | (OPEN COURT.) |
| 14:58:30 | 21 | THE COURT:  I understand we have a verdict.  Please bring |
| 14:58:32 | 22 | in the jury. |
| 14:59:32 | 23 | (WHEREUPON, THE JURY ENTERED THE COURTROOM.) |
| 14:59:32 | 24 | THE COURT:  All jurors are present.  Court's back in |
| 14:59:32 | 25 | session.  You may be seated. |