# EXHIBIT 12

                                                                    1

1                UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4  BARBARA EARNEST,

5              Plaintiff,

6  VERSUS              CASE NO. 2:16-cv-17731

7  SANOFI S.A., SANOFI-AVENTIS
   U.S. L.L.C., SANOFI US SERVICE,
8  INC., AND AVENTIS-PHARMA,

9              Defendants.

10

11

12

13           Videotaped deposition of JAMES E.

14 CARINDER, M.D., taken at the offices of NORTHSHORE

15 ONCOLOGY ASSOCIATES, LLC, 1120 Robert Boulevard,

16 Suite 390, Slidell, Louisiana 70458, on Thursday,

17 January 11, 2018, commencing at 1:08 p.m.

18

19

20

21

22

23

24

25    Job No. NJ2757175

```
                                                   22                                                        24
 1   that question implicating that we inaccurately         1   EXAMINATION BY MS. BIERI:
 2   provided information based on what the doctor says    2       Q.  Sorry, Dr. Carinder.
 3   here.                                                 3       A.  Okay.
 4           MS. BIERI:                                    4       Q.  Back to what we were talking about.
 5               I'm just -- w- -- we can do this          5       A.  Okay.
 6   off the record, but I'm telling you what your         6       Q.  After you spoke with Mr. Coffin on the
 7   office provided to me about the ex parte contacts     7   phone, then you had a meeting with Mr. Schanker
 8   that you had --                                       8   and another attorney --
 9           MR. SCHANKER:                                 9       A.  Yes.
10               Okay.                                    10       Q.  -- correct?
11           MS. BIERI:                                   11           And was that in your office here?
12               -- with Dr. --                           12       A.  Yes.
13           MR. SCHANKER:                                13       Q.  Okay.  And how long was that meeting?
14               Can you show me what you're              14       A.  An hour roughly.
15   referring to?                                        15       Q.  And when do you think that took place?
16           MS. BIERI:                                   16       A.  Two or three weeks ago.
17               I have it in my notes.  I can't          17       Q.  What did you discuss at that meeting?
18   show you this --                                     18       A.  They -- they basically just explained
19           MR. SCHANKER:                                19   to me that my patient was preparing a litigation
20               Okay.                                    20   against Sanofi regarding her persistent alopecia.
21           MS. BIERI:                                   21       Q.  That's a long -- that's a long time to
22               -- but I'm happy to show you the        22   meet.
23   e-mail --                                            23           Do you remember anything else that
24           MR. SCHANKER:                                24   was discussed?
25               Yes.                                     25           MR. SCHANKER:

                                                   23                                                        25
 1           MS. BIERI:                                    1               Objection, form.
 2               -- that Miss Heck --                      2           THE WITNESS:
 3           MR. SCHANKER:                                 3               It was -- it took a while because
 4               Yes.                                      4   we had to retrieve the lady's file.  I hadn't seen
 5           MS. BIERI:                                    5   her in years.  I can't -- I can't -- without
 6               -- from your office sent.                 6   reviewing a chart, I can't remember every detail
 7           MR. SCHANKER:                                 7   of every patient's case.
 8               I saw the e-mail, and it was              8   EXAMINATION BY MS. BIERI:
 9   accurate to my knowledge, and --                      9       Q.  That seems fair.
10           MS. BIERI:                                   10           Did you discuss the allegations
11               Well, we --                              11   with any more specificity in that meeting?
12           MR. SCHANKER:                                12       A.  Clarify your question, please.
13               -- the way --                            13       Q.  Absolutely.
14           MS. BIERI:                                   14           Did you talk about Taxotere
15               We're not doing this on the              15   specifically?
16   record.                                              16       A.  Yes.
17           MR. SCHANKER:                                17       Q.  Or docetaxel?
18               The way -- the way you're ask- --        18       A.  Yes.
19   the way you were asking these questions is very     19       Q.  And what -- what is your recollection
20   confusing and misleading as to who was involved in  20   of that discussion?
21   the meetings.  The doctor can testify.  I mean the   21       A.  At the time that Mrs. Earnest was
22   doc- --                                              22   treated, that was an ASCO-approved, NCCN-approved
23           MS. BIERI:                                   23   adjuvant drug.  And you have two taxanes that
24               Move to strike Mr. Schanker's            24   you're -- basically two taxanes you could use.
25   comments.                                            25   You had paclitaxel or docetaxel.
```

7 (Pages 22 to 25)

26

1  Q. (Affirmative response.)
2  A. At that time, I used docetaxel more
3  because you had less risk of infusion reactions,
4  and you had less neuropathy. And the efficacy was
5  very similar. And so in order to avoid infusion
6  reactions and -- and persistent neuropathy, which
7  is daunting for many people we take care of, at
8  that time, I used more docetaxel.
9  Q. And did they -- so you told them a
10 little bit about your use of paclitaxel and
11 docetaxel?
12 A. Yes.
13 Q. Did they tell you anything about
14 Taxotere or docetaxel?
15 A. With regard to?
16 Q. To anything.
17    Did they make --
18 A. No, not really. I mean, I -- they --
19 they -- the questions I got were basically why
20 were I -- why did -- why was I using that. Okay?
21 And at the time, like I said, both drugs were
22 proven to have pretty much equivocal evica- --
23 efficacy. And if I can avoid the neuropathy and
24 the infusion reactions, of course I'm gonna use
25 that.

27

1  Q. Do you recall any of the other
2  questions that counsel asked you during that
3  meeting?
4  A. They asked me if I were aware at the
5  time that I treated her that the drug could cause
6  permanent alopecia.
7  Q. And what was your response?
8  A. I told them that no, I was not aware of
9  that.
10 Q. And you said that there is a transcript
11 of that meeting?
12    MR. SCHANKER:
13      Objection, form.
14    THE WITNESS:
15      I go- -- I was sent something,
16 yeah, to that effect. But it's in the -- like I
17 said, it's in the other office.
18 EXAMINATION BY MS. BIERI:
19 Q. Did you have any discussions that day
20 that occurred before or after the recording was
21 made?
22    MR. SCHANKER:
23      Objection, form.
24    THE WITNESS:
25      No.

28

1  EXAMINATION BY MS. BIERI:
2  Q. You also talk- -- did you also talk
3  about Miss Earnest's medical records?
4  A. Yes.
5  Q. Do you --
6  A. I have her file here.
7  Q. I mi- -- I'm gonna ask you to get that
8  when we go onto a break.
9     Do you remember any specific
10 portions of the medical records that were
11 discussed?
12 A. Nothing that stood out.
13 Q. Did you look at any other documents
14 with counsel?
15 A. No.
16 Q. Did counsel talk to you about any other
17 documents?
18 A. No.
19 Q. Have you told me everything that you
20 remember about the meeting that you had a couple
21 of weeks ago with plaintiff's counsel?
22 A. Yes.
23    MR. SCHANKER:
24      Objection, form.
25 EXAMINATION BY MS. BIERI:

29

1  Q. How --
2  A. I'm -- I'm sorry. I just have a
3  question.
4  Q. Of course.
5  A. I'm not be- -- not being an attorney, I
6  have to ask this.
7     THE WITNESS:
8       What exactly do you mean when you
9  say that?
10    MR. SCHANKER:
11      So a -- obviously, we don't have a
12 judge here to rule on the questions, and if it's
13 my belief that there is a problem with a question
14 from a legal standpoint, in order to preserve that
15 objection so that it can be ruled on later by a
16 judge -- and it could be a variety of reasons that
17 I think the question is improper that I won't get
18 into at this time -- then I have to preserve that
19 objection on the record at this point.
20      So I apologize if it's a little
21 bit annoying to you, but it's the rules --
22    THE WITNESS:
23      It's not annoying. I just don't
24 know what you mean when you do it. That's why I'm
25 asking.

Veritext Legal Solutions
800-227-8440                                                                973-410-4040

## Page 38

1  Q. Would you have in 2011?
2  A. No.
3  Q. None?
4  A. None that I can recall, no.
5  Q. Can I direct you to what I think is the
6  fourth page of the book. There -- it doesn't have
7  a page number; I would direct you to that. If
8  you'll allow me, I could lean over and show you,
9  but I don't want to encroach in your space.
10     This is the page.
11     MR. SCHANKER:
12         Is there a Roman numeral page
13  number --
14     MS. BIERI:
15         There is no --
16     MR. SCHANKER:
17         -- Counsel?
18     MS. BIERI:
19         There is no page number.
20         Darin, do you want me to show you?
21  I'm happy to.
22     MR. SCHANKER:
23         It's -- certainly, that's great.
24     MS. BIERI:
25         It's the --

## Page 39

1      MR. SCHANKER:
2          What -- what's the first words on
3  the page?
4      MS. BIERI:
5          The first words on the page are
6  "Copyright 2009."
7      MR. SCHANKER:
8          Okay.
9  EXAMINATION BY MS. BIERI:
10     Q. Doctor, in looking at that page, do you
11  agree that the copyright date on this book is
12  2009?
13     MR. SCHANKER:
14         Objection, form.
15     THE WITNESS:
16         That's what it says.
17  EXAMINATION BY MS. BIERI:
18     Q. And can you please turn to Page 195 of
19  the book. It's in the section, "Understanding
20  Chemotherapy Drugs"?
21     A. Yes.
22     Q. And is this the -- one of the pages
23  that Mr. Schanker directed you to?
24     A. Yes.
25     MR. SCHANKER:

## Page 40

1          Objection, form.
2  EXAMINATION BY MS. BIERI:
3      Q. Is this the only page he directed you
4  to?
5      A. Yes.
6      Q. Okay. Can you read me the first -- so
7  I'm gonna orient you to the docetaxel section.
8      A. (Affirmative response.)
9      Q. Under "Side Effects," would you mind
10  reading for me the first sentence after Side
11  Effects?
12     A. "Temporary hair loss, rare reports of
13  permanent hair loss, decreased white blood cell
14  count with increased risk of infection, decreased
15  platelet count with increased risk of bleeding,
16  hair thinning or loss, diarrhea, loss of appetite,
17  nausea, vomiting, rash, numbness and tingling in
18  the hands or feet."
19     Q. Do you have any reason to dispute the
20  copyright date of this book?
21     A. No.
22     Q. Do you have any reason -- I mean, you
23  agree that this book would have been in the public
24  sphere in 2009, correct?
25     MR. SCHANKER:

## Page 41

1          Objection, form.
2      THE WITNESS:
3          Yes.
4  EXAMINATION BY MS. BIERI:
5      Q. Were you aware -- and you treated
6  Miss Earnest beginning in 2011, correct?
7      A. Yes.
8      Q. In 2011, were you aware of any
9  chemotherapy drugs, at all, that carried a risk of
10  permanent hair loss?
11     A. No.
12     Q. Have we discussed all of the documents
13  that plaintiff's counsel showed to you?
14     A. Yes.
15     Q. Did anyone representing the plaintiff
16  tell you questions that they would be asking you
17  during this deposition?
18     A. No.
19     Q. Did you take any notes of your meetings
20  with plaintiff's counsel?
21     A. No.
22     Q. Did you have any discussions with
23  plaintiff's counsel about serving as an expert
24  witness in this case?
25     A. No.

Veritext Legal Solutions
800-227-8440                                                              973-410-4040

**Page 62**

1  Q. Has the number of breast cancer
2  patients that you see been consistent over the
3  course of your practice?
4  A. I would say so, yes.
5  Q. And how long have you been treating
6  breast cancer pra- -- patients?
7  A. Eighteen years.
8  Q. How do you keep yourself current on
9  medical issues regarding breast cancer and breast
10 cancer treatment?
11  A. I attend numerous conferences every
12 year for CME, and -- and I go to the Miami breast
13 cancer every year, which is coming up in March. I
14 go to the Chemotherapy Foundation Symposium every
15 year. Most of the conferences that I attend
16 either deal with breast or deal with hematology,
17 because that's where the majority of my
18 practice -- my patients are.
19  Q. Can you think of any of those
20 conferences that you've attended that discussed
21 docetaxel?
22  A. Well, sure. Lots of them.
23  Q. Do you ever speak at the conferences,
24 or do you just attend?
25  A. I attend. I gave up speaking at

**Page 63**

1  meetings a long time ago.
2  Q. Beyond conferences, do you keep up with
3  medical journals?
4  A. Yes.
5  Q. What medical journals do you consider
6  authoritative regarding oncology?
7  A. Journal of Clinical Oncology.
8  Q. And is that one that you follow?
9  A. I get one every month. If you're an
10 ASCO member, you get a JCO sent to you every
11 month. If you're an ASH member, you get a Blood
12 sent to you every month. Blood is ASH's journal.
13  Q. Understood.
14     Are you familiar with Supportive
15 Care in Cancer, that journal? Are you familiar
16 with a journal called "Supportive Care in Cancer"?
17  A. No.
18  Q. Are you familiar with a journal called
19 "Cancer Research"?
20  A. No. Most -- most of those journals --
21 most oncologists will read JCO or read New England
22 Journal of Medicine or will read Blood. Okay? A
23 lot of these journals that are sent to us in the
24 mail wind up in the trash. And we basically --
25 the joke, we call them "throw-away journals"

**Page 64**

1  because most of them aren't as peer reviewed as
2  what they should be, and so I tend to read -- you
3  know, if you're reading AS- -- if you're reading
4  JCO or if you're reading Blood or if you're
5  reading New England Journal, that is a
6  peer-reviewed article.
7  Q. You know that it definitely will be a
8  peer-reviewed article?
9  A. If -- yes. Oh.
10  Q. The other ones would be --
11  A. They won't get published in those
12 journals without being.
13  Q. Do you subscribe to or use any Internet
14 services for research or current information on
15 breast cancer?
16  A. I don't subscribe to them, but ASCO --
17 ASCO occasionally sends out -- will send out an
18 update, like when a drug gets a new FDA label or a
19 new FDA indication.
20  Q. Will you tell me what ASCO stands for?
21  A. American Society of Clinical Oncology.
22 It's a professional membership.
23  Q. And how long have you been a member?
24  A. Eighteen years. Actually longer than
25 that, when I was a fellow, so over 20 years.

**Page 65**

1  Q. And how do you receive communications
2  from ASCO?
3  A. E-mail.
4  Q. Can you think of any information that
5  you've received regarding docetaxel from ASCO?
6  A. Not lately.
7  Q. How about not lately?
8  A. Noth- -- I mean nothing -- there's been
9  really nothing new with docetaxel in the last few
10 years.
11  Q. Can you tell me the last thing you
12 remember receiving from ASCO regarding docetaxel?
13  A. I can't remember when that was.
14  Q. Can you remember what it was?
15  A. Something -- when -- with HER2 positive
16 breast cancers. The -- it actually -- it dealt
17 more with -- it dealt more with a drug called
18 "pertuzumab," which is a HER2 blocker. But the
19 regimen was docetaxel and carboplatin,
20 trastuzumab, which we've used for a long time, and
21 it was adding the pertuzumab to it.
22  Q. Anything else you can think of that you
23 would have received from ASCO regarding docetaxel
24 or Taxotere?
25  A. Over the years, probably several

17 (Pages 62 to 65)

78

1  A. -- by any stretch. Okay? We have some
2 phenotypes that are very indolent; some that are
3 super aggressive. Okay? The one predictor -- in
4 2018, the number one predictor still for risk of
5 developing relapse disease is a positive lymph
6 node. A positive axillary node is still the
7 number one predictor for a patient developing a
8 recurrence.
9       And so unless there is a plethora
10 of mitigating factors against treating that
11 patient if patients have node-positive disease,
12 I'm gonna be in favor of treating them because
13 they -- they're at higher risk of developing
14 recurrence. Obviously if they're 90 years old,
15 you have to take that into account. But, you
16 know, Miss Earnest was a 60-year-old lady who was
17 otherwise quite healthy.
18  Q. You mentioned a certain type of node
19 being a predictor of recurrence.
20       You said the ancillary nodes,
21 right?
22  A. Axillary.
23  Q. Axillary. Forgive me.
24       What about sentinel nodes?
25  A. Do you know what the definition of a

79

1 sentinel node is?
2  Q. I -- can you tell me?
3  A. Okay. I mean, you're -- you're using
4 this term, but you -- do you know what it means?
5  Q. I would -- I would like someone like
6 you with more experience than --
7  A. The sentinel node --
8  Q. -- me to tell me.
9  A. The sentinel node is, in theory, the
10 first node that receives lymphatic drainage from
11 the breast. Okay? So back in the old days, they
12 did axillary dissections, and those have a lot of
13 morbidity with lymphedema and swelling and pain
14 and limited arm movement.
15       And so then they developed
16 sentinel node mapping, which is where they inject
17 it with the dye, and the dye is carried through
18 the lymphatic channels. And it goes to the first
19 lymph node because in theory, if the cancer cells
20 have drained from the breast into the lymphatics,
21 that sentinel node, when you take it out, is gonna
22 have tumor cells in it.
23       So when we say that the patient's
24 had a sentinel node biopsy, basically that's that
25 they've done sentinel node mapping, and the first

80

1 node that it came to where the dye was is what
2 they removed, and they look at that. Because if
3 the sentinel node is positive, that's an
4 indication to then look further in the axilla. If
5 the sentinel node is negative, then they figure
6 there's no need to go and filet out their axilla
7 and cause all this lymphedema and swelling.
8       So that's what a sentinel node is.
9 But a sentinel node is an axillary node.
10  Q. It's just the closest one in?
11  A. The nearest one.
12  Q. Okay. Wh- -- I want to switch gears a
13 little bit. And I want to talk to you about your
14 initial consultation with Miss Earnest.
15  A. (Affirmative response.)
16  Q. I -- if you look at Exhibit #3, I think
17 it should be right on the -- the top. I'm
18 looking --
19  A. You're looking at the front page?
20  Q. Yeah.
21       I am not looking at the front
22 page. I am looking at the third page, 224.
23       In the "Impression" section, this
24 indicates that you recommended -- what did you
25 recommend to -- for the treatment of

81

1 Miss Earnest's cancer?
2  A. Adjuvant chemotherapy.
3  Q. More specifically?
4  A. Four cycles of doxorubicin and
5 cyclophosphamide and four cycles of docetaxel
6 following that.
7  Q. And you recommended dose-dense
8 doxorubicin and cyclophosphamide, right?
9  A. Yes.
10  Q. What does "dose-dense" mean?
11  A. Traditionally, when that first -- when
12 that regimen was first used years ago, way back,
13 it was given every 21 days.
14  Q. (Affirmative response.)
15  A. And then they determined you could give
16 it safely every 14 days. And there was a -- a
17 little bit better efficacy giving it every 14
18 days. And man- -- and we do that, and many
19 patients actually like that because a lot of
20 ladies work, and they want to go ahead and get all
21 their treatment done as soon as they can.
22  Q. This record doesn't mention any other
23 options that were presented to Miss Earnest.
24       Do you have any reason to think
25 you discussed other options for chemotherapy

21 (Pages 78 to 81)

Page 82

1  regimens?
2  A.  No, this is what I talked about with
3  her.
4  Q.  Do you mind turning to what is marked
5  as NOA 259?  I'm gonna try to tell you how far
6  down in the packet it is.  Oh.  It's -- I don't
7  think it is in the packet.
8  A.  I have an NOA 259 here.
9  Q.  And is that the 5- -- what's the date
10 of that record?
11 A.  May 31st.
12 Q.  Perfect.  Thank you.
13     In the "Plan" section --
14     MR. SCHANKER:
15         Hold on just one second.  I don't
16 know if I have that.
17     MS. BIERI:
18         You do, Dar- -- I was having a
19 hard time too.  It's the fifth page in the packet.
20 It's 259.
21 EXAMINATION BY MS. BIERI:
22 Q.  And in the Plan section, the last line
23 indicates that after the AC dose-dense cycles,
24 that you would be -- that Miss Earnest would begin
25 four cycles of Taxotere at a hundred MGs per meter

Page 83

1  square ov- -- every 21 days, correct?
2      How did you decide on the hundred?
3  A.  Because that's the published guideline
4  for adjuvant treatment.  For metastatic disease,
5  it was 75.
6  Q.  Is somebody who ha- -- is node positive
7  considered metastatic?
8  A.  When I say "metastatic disease," I'm
9  referring to advanced stage, Stage 4.
10 Q.  Okay.  And what was --
11 A.  Either Stage -- either Stage 4 at
12 diagnosis or someone with recurrent disease.
13 Okay?  There's a misconception that if somebody
14 has a recurrence -- say if she developed a
15 recurrence, okay, they would say, "Oh, she's got
16 Stage 4 disease."  No.  She has Stage 2 disease.
17 Okay?  You keep the same stage that you were given
18 when you were diagnosed.  Okay?  The way you would
19 define her at that point is Stage 2 disease, now
20 with recurrence.
21 Q.  If that were her situation?
22 A.  If that were her situation.
23 Q.  Ah.
24 A.  But it's -- but it's a common error
25 that people say, "Well, they've got Stage 4 breast

Page 84

1  cancer."  No, they've got Stage 2 breast cancer;
2  they just have a recurrence.
3  Q.  That has recurred?
4  A.  Yes.
5  Q.  And I don't think we actually have said
6  what Miss Earnest's breast cancer stage was.
7  A.  She was a 2A.
8  Q.  And was she T1?
9  A.  She was at T1c.
10 Q.  And N1?
11 A.  N1a.
12 Q.  And then her metastatic was zero?
13 A.  Negative.
14 Q.  Negative.
15     Do all people react to
16 chemotherapy the same way?
17 A.  No.
18 Q.  Are all people gonna get the exact same
19 side effects from taking the same chemotherapy
20 drug?
21 A.  No.
22 Q.  Have you ever, with any of your
23 patients, had a -- had a cancer patient who is
24 taking chemotherapy have a side effect that
25 surprised you?

Page 85

1  A.  On occasion.
2  Q.  Have you ever had a chemotherapy
3  patient experience a side effect you weren't aware
4  of before?
5  A.  Yes.
6  Q.  Tell me about that circumstance or
7  circumstances.
8  A.  This lady with the hair.
9  Q.  Any others?
10 A.  I had one other lady who never got her
11 hair back.  And she also received docetaxel.  But
12 was treated before this.
13 Q.  Do you know what other -- I feel weird
14 calling her "the other lady."  It seems strange.
15     But --
16 A.  Well, it's another patient of mine --
17 Q.  Sure.
18 A.  -- who I treated in -- I want to say
19 around 2005.
20 Q.  Okay.  May I refer to her as your 2005
21 patient?
22 A.  Yes.
23 Q.  Okay.  What other drugs, chemotherapy
24 agents, was your 2005 patient on?
25     MR. SCHANKER:

**Page 90**

1    THE WITNESS:
2        We appraise patients of the side
3    effects that they're definitely going to have,
4    and -- you know, and the ones that are gonna be
5    most concerning to them, and to the physician.
6    EXAMINATION BY MS. BIERI:
7    Q.  You talked to me a little bit about
8    the -- sorry.
9        You talked to me a little bit
10   about the nurse coordinators?
11   A.  Navigators.
12   Q.  Navigators, thank you.
13       Would -- who are the nurse
14   navigators employed by --
15       MR. SCHANKER:
16       Objection --
17   EXAMINATION BY MS. BIERI:
18   Q.  -- that you're referring to?  If you
19   know.
20   A.  The cancer center.
21       MR. SCHANKER:
22       -- form.
23       THE WITNESS:
24       The cancer center.
25   EXAMINATION BY MS. BIERI:

**Page 91**

1    Q.  So you mean for Miss Earnest, if she
2    saw a nurse navigator --
3    A.  They're employed by this cancer center.
4    Q.  Which is called?
5    A.  Slidell Memorial.
6    Q.  Do you mind looking at Exhibit #3
7    again?  I'm looking at the third page of that
8    record.  It has a Bates stamp of 224 in the bottom
9    right-hand corner.
10       I'm looking under the Plan
11   section.  The last sentence indicates that you are
12   planning to arrange chemotherapy treatment --
13   or -- strike that.
14       That you were planning to arrange
15   chemotherapy teaching for Miss Earnest?
16   A.  Yes.  Yes.
17   Q.  Do you remember what you were referring
18   to?
19   A.  When -- we do this with every patient
20   we treat.  And it's where they meet with the
21   navigator, which is generally a chemotherapy nurse
22   as well, and they get -- they -- th- -- they're
23   basically taught -- they're given literature or
24   published material on the drugs they're gonna be
25   treated with with potential common side effects,

**Page 92**

1    as well as kind of a survivor's guide to getting
2    through chemo.  Basic, basic things, like how to
3    get through oral care, what to do with diarrhea,
4    what to do with nausea, this type of thing.
5    Q.  Beyond, potentially, the nurse
6    navigators --
7    A.  (Affirmative response.)
8    Q.  -- or you, is there anyone else that
9    you can think of who would have given chemotherapy
10   education to Miss Earnest?
11   A.  The only other person I could think may
12   have said anything to her would have been the
13   nurse that was actually hanging the chemotherapy
14   and treating her.
15   Q.  The infusion nurse?
16   A.  Yes.
17   Q.  Potentially?
18   A.  Yes.
19   Q.  You talked about the written materials
20   that the nurse navigator might provide to
21   patients.
22       Do you provide any written
23   materials related to chemotherapy or side effects
24   thereof to your patients?
25   A.  No.  I said earlier, the navigator does

**Page 93**

1    that.
2    Q.  Just confirming.
3        Generally speaking --
4    A.  (Affirmative response.)
5    Q.  -- how do you explain chemotherapy-
6    related hair loss to a patient before they start
7    chemotherapy?
8    A.  You mean why does it occur?
9    Q.  I'm just interested in what -- what, if
10   anything, you tell patients.
11   A.  I tell them generally --
12       MR. SCHANKER:
13       Objection, form.
14       THE WITNESS:
15       -- about when it's going to occur
16   in -- like as it does in most patients.  You know,
17   with -- with AC, typically right after the second
18   cycle of treatment is when the hair really starts
19   to go.  And the reason that people get hair
20   loss -- do you know why people get hair loss with
21   chemo?  Do you know?
22   EXAMINATION BY MS. BIERI:
23   Q.  I -- I think that I do.
24   A.  Why?
25   Q.  Well, I'm not being deposed, but I

24 (Pages 90 to 93)

94

1  think it has to do with rapidly dividing cells,
2  but go on.
3      A.  Exactly.  Exactly.  Cells that have
4  rapid turnover --
5      Q.  You're trying to quiz me.
6      A.  Cells that have rapid turnover are
7  targeted by chemotherapy drugs.  Okay?
8      Q.  (Affirmative response.)
9      A.  So cells that line your gut, cells that
10 line your mouth.
11     Q.  (Affirmative response.)
12     A.  Hair follicles, bone marrow.  Those
13 cells have the rapid turnover.  And so that's why
14 a lot of people get diarrhea.
15     Q.  (Affirmative response.)
16     A.  That's why people sometimes get the
17 mouth sensitivity and the mouth ulcers, and why
18 the people get myelosuppression with certain
19 chemotherapy drugs and why certain chemotherapy
20 drugs disrupt the hair follicles and make the hair
21 fall out.
22         I tell patients when their scalp
23 starts to feels sensitive and s- -- sore, that
24 they're hair is getting ready to fall out.
25 Because most patients will experience that.

95

1      Q.  That sensation before it does?
2      A.  Yes.  And a -- a lot of patients will
3  say -- they'll say, "My scalp is feeling very
4  sensitive," or "It's feeling sore," and I said --
5  and I will tell them, I'll say, "Because your hair
6  is getting ready to go."
7      Q.  Do you tell them anything else about
8  chemotherapy hair loss?
9          MR. SCHANKER:
10             Objection, form.
11         THE WITNESS:
12             I typically tell them that in most
13 cases, i- -- within a few weeks, it'll start.  A
14 lot of patients, by the time they come back in
15 three weeks after their last round of chemo,
16 they'll say, "I'm starting to get some stubble,"
17 you know.  And it -- in some patients it comes
18 back quicker than others.
19             And also I tell them that in many
20 cases, their hair may come back a different color,
21 and it might come back curly rather than straight.
22 Because some people, they're -- may have had
23 straight hair to begin with, and it comes back
24 with wave or curl in it.
25 EXAMINATION BY MS. BIERI:

96

1      Q.  And why do you warn patients that their
2  hair may regrow a different texture or color?
3      A.  Because some people are not -- I --
4  that's -- that's just because it can, okay, and
5  you're informing them.  Some people are quite
6  thrilled when they come in and have curly hair.
7  But I tell them, I said, "It may come back a
8  different texture."
9      Q.  And is that based on something that
10 you've read or something that you've seen in your
11 practice?
12     A.  Seen.  Seen countless times.
13     Q.  Do you ever tell patients that their --
14 do you ever tell patients that their hair
15 absolutely will regrow after chemotherapy?
16     A.  No.
17         MR. SCHANKER:
18             Objection, form.
19         THE WITNESS:
20             No.
21 EXAMINATION BY MS. BIERI:
22     Q.  Do you ever tell patients -- do you
23 ever tell patients that their hair loss will only
24 be temporary?
25     A.  I te- -- yes.  Yes.

97

1      Q.  What is the basis for telling your
2  patients that?
3      A.  On experience with other patients.
4      Q.  Anything else?
5      A.  No.
6      Q.  Have you treated patients with acute
7  leukemia before?
8      A.  Yes.
9      Q.  With what frequency?
10     A.  A lot when I was a fellow.  I don't
11 give induction chemotherapy to patients with acute
12 leukemia now because they're too labor intensive.
13 And I treated the -- when I was busy with acute
14 leukemia was when I was a fellow.
15         Acute leukemics, unless they're
16 elderly and can't receive induction treatment, I
17 think should be treated in a referral center,
18 because they're too labor intensive.  And if they
19 need a transplant, they're already in the system
20 at a referral center.  If it's an older person
21 that can't withstand a standard 7 plus 3 induction
22 regimen we're gonna treat with a hypomethylating
23 agent or a drug called "Mylotarg," then I will
24 treat those patients.
25         So, yes, I do have some

25 (Pages 94 to 97)

114

1  A.  (Affirmative response.)
2  Q.  Did you prescribe Miss Earnest Arimidex
3  on November 29th of 2011?
4  A.  Yes.
5  Q.  In the last paragraph --
6  A.  (Affirmative response.)
7  Q.  -- of the first page of that record --
8  A.  (Affirmative response.)
9  Q.  -- can you read the first sentence to
10 me, please, before --
11 A.  "The potential side effects of
12 Arimidex, including bone resorption, bone pain,
13 aggravation of vasomotor symptoms, and asthenia
14 were explained to the patient in detail."
15 Q.  And I'm curious to know -- so that
16 listed four specific --
17 A.  The most common side effects that
18 patients will come in complaining about.
19 Q.  So are those the four that you would
20 have described to her?
21 A.  Yes.
22 Q.  Would you have described additional
23 potential side effects to her?
24 A.  I'd probab- -- you know, I can't attest
25 to exactly what I said.  I always tell patients, I

115

1  said, "Not every patient gets thinning of the
2  hair."  Okay?  "And that doesn't occur that
3  frequently."  But I've seen patients where they
4  will come in and say, "My hair feels thinner," and
5  it's not glaringly obvious to look at; but, of
6  course, patients are looking at their hair more
7  than I am.  And they will come in and say, "My
8  hair seems like it's thinning."
9  Q.  In this record, you don't note that you
10 talked about hair thinning with Miss Earnest,
11 correct?
12 A.  No, I -- right.  I did not.
13 Q.  Do you have a recollection of talking
14 to her about the potential of hair thinning?
15 A.  No.
16 Q.  Do you have any recollection at all of
17 talking to Miss Earnest about the risk of hair
18 loss?
19 A.  When she --
20 Q.  Persis- --
21 A.  -- was getting --
22 Q.  Yeah.
23 A.  When she was gonna get chemotherapy?
24 Yes.
25 Q.  Tell me about that.

116

1  A.  I told her her hair would fall out.
2  Q.  Any other specific recollections of
3  conversations you had with Miss Earnest?
4  A.  No, but I just told her, I sa- --
5  and -- and -- and as -- and as the second cycle or
6  treatment was approaching, I said, "It's after
7  this" -- I -- when the second cycle was coming up,
8  I said, "After this second treatment is done," I
9  said, "very shortly after that is typically when
10 you're really gonna have it fall out then."
11 Q.  Okay.  Anything else about hair loss
12 that you can remember discussing with
13 Miss Earnest?
14 A.  No.
15 Q.  Do you read the labels for all of the
16 chemotherapy drugs that you prescribe?
17     MR. SCHANKER:
18         Objection, form.
19     THE WITNESS:
20         You mean the package inserts when
21 a new chemo drug comes out?  When you say "label,"
22 okay, label refers to what the drug is indicated
23 for as far as the FDA approving treatment.  Okay?
24         Are you referring to that, or are
25 you referring to a package insert?

117

1  EXAMINATION BY MS. BIERI:
2  Q.  I'm talking about the physician
3  prescribing information.
4  A.  A package insert.  Yes, I do look at
5  that.
6         "Label," in the oncology world,
7  refers to, you know, if you -- the label is what
8  the drug is FDA approved for.  Okay?  If you hear
9  people make the -- make the comment "Well, she's
10 being treated off label with such and such drug,"
11 okay, that means that she's getting a certain
12 drug, but there's no FDA indication or approval
13 for it.  Okay?  That's -- when you say "label,"
14 that's what I'm thinking you're referring to.
15         But you're talking about
16 prescribing information.  That would be a package
17 insert.  Yes, I do look at that.
18 Q.  When I asked you earlier --
19 A.  (Affirmative response.)
20 Q.  -- about if you had read a label with
21 regard to a certain drug, and you told me, "Yeah,
22 probably when I first started prescribing it," do
23 you remember that?
24 A.  No.  But label typically means -- when
25 you hear that term in the oncology world means

### 118

1  what the drug is being -- what it's FDA approved
2  for. But prescribing information is -- is a
3  package insert that basically has how it's
4  prescribed and drug interactions and potential
5  side effects and toxicity warnings, this type of
6  thing.
7     Q.  So have you read -- how would you like
8  to call it? Not the label. You would like me to
9  call it --
10    A.  Package insert.
11    Q.  Package insert?
12    A.  Package insert.
13    Q.  Have you read what you call the
14 "package insert" for doxorubicin?
15    A.  Years ago, yes.
16    Q.  When you first started prescribing it
17 or since then?
18    A.  When I first started using it back when
19 I was a fellow. I mean, we're talking 20 years
20 ago.
21    Q.  Not since then?
22    A.  (Shakes head negatively.) No.
23    Q.  Have you read the package insert for
24 cyclophosphamide?
25    A.  Yes.

### 119

1     Q.  When?
2     A.  Again, probably 20 years ago.
3     Q.  Have you read the package insert for
4  Taxotere?
5     A.  Yes.
6     Q.  When?
7     A.  Back when it first came on the market.
8  Whatever --
9     Q.  Be- --
10    A.  -- year that was, I can't remember.
11    Q.  Before 2000?
12    A.  2000, yeah. 1999, 2000.
13    Q.  Ever after that?
14    A.  No.
15    Q.  Today when you talk to breast cancer
16 patients who are going to receive docetaxel --
17    A.  (Affirmative response.)
18    Q.  -- do you warn of the possibility of
19 persistent or permanent hair loss?
20    A.  Yes.
21       MR. SCHANKER:
22          Objection, form.
23 EXAMINATION BY MS. BIERI:
24    Q.  And when did you start doing that?
25    A.  About three years ago when all the news

### 120

1  came out that patients were having persistent
2  alopecia.
3     Q.  Are you talking about related to
4  litigation?
5     A.  That was -- yes. Yes.
6     Q.  Was it based on your review of any
7  written materials?
8     A.  They -- I had gotten an e-mail from,
9  I -- I think, one of the ASCO -- one of those --
10 one of those FDA things that had been sent out
11 with kind of a warning that now they were seeing
12 cases of permanent hair loss. Patients are quite
13 aware of that too now. Even before we're gonna
14 offer up treatment, they're already -- they're --
15 they're already, a lot of them, very aware of
16 this.
17    Q.  So when you -- so you said for the last
18 three years, you've been warning about a potential
19 for --
20    A.  -- permanent hair not growing back.
21    Q.  So what do you say?
22    A.  I tell them, I said, "There is a remote
23 possibility that your hair may not grow back."
24    Q.  So your change to your counseling
25 practices as it relates to hair loss has to do

### 121

1  with things that you saw in -- in the media
2  regarding -- you tell me. I don't want to put
3  words in your mouth.
4        MR. SCHANKER:
5           Objection, form.
6        THE WITNESS:
7           What was -- what was in the --
8  what was in the news, as well as, like I said, I
9  had gotten -- I get these updates from ASCO and
10 various sites, and they had said that there was
11 now -- some evidence had surfaced that there were
12 cases where patients were not getting their hair
13 back.
14          And I had had -- I had had, like I
15 said, this lady and one other lady that received
16 docetaxel that their hair hasn't grown back. The
17 other lady has no hair, none.
18 EXAMINATION BY MS. BIERI:
19    Q.  So the -- the other lady --
20    A.  Yeah.
21    Q.  -- you treated her in 2005, correct?
22    A.  2004, 2005, somewhere in there.
23    Q.  And she's still your patient, correct?
24    A.  Yes.
25    Q.  And so when I say "you treated her in

134

1  cytoreductive chemotherapy, including
2  myelosuppression, nausea, vomiting, diarrhea,
3  stomatitis, as well as potential cardiac toxicity
4  from doxorubicin, were explained to the patient in
5  detail.  Other potential effects of docetaxel
6  include fluid rete-" -- "fluid retention,
7  hyperlacrimation.  Skin and nail changes were also
8  explained.  She's agree" -- "anxious to proceed
9  ahead.
10      Q.   Wh- -- okay.  Let's break that down.
11           Which of the drugs that you were
12  prescribing to Miss Earnest are considered
13  cytoreductive chemotherapy?
14      A.   All three of them.
15      Q.   Okay.  And you -- according to this,
16  you specifically warned about the cardiac risks
17  for doxorubicin, correct?
18      A.   Yes.
19      Q.   And then you described a few risks
20  s- -- specifically in connection with docetaxel,
21  correct?
22      A.   (Nods head affirmatively.)
23           THE COURT REPORTER:
24               Out loud, please.
25  EXAMINATION BY MS. BIERI:

135

1      Q.   Would you have --
2      A.   Yes.  You -- I'm sorry.  I didn't -- I
3  nodded, and she's sitting there going ...
4      Q.   And also, I think you may be talking a
5  bit fast for the court reporter, maybe.
6           THE COURT REPORTER:
7               (Shakes head negatively.)
8           MS. BIERI:
9               No?  Oh.
10          THE WITNESS:
11              They can keep up with anyone.
12          MS. BIERI:
13              I should not have doubted you,
14  Madam Court Reporter.
15  EXAMINATION BY MS. BIERI:
16     Q.   Back to the question.
17     A.   Okay.
18     Q.   So you identified -- or you went over
19  fluid retention, hyperlacrimation, skin and nail
20  changes, related to docetaxel, correct?
21     A.   Yes.
22     Q.   Did you talk about any other risks of
23  docetaxel with Miss Earnest?
24     A.   You mean as far as -- well, I mean,
25  skin and nail changes, I mean, that's including

136

1  the hair.  Okay?  One -- one feature that patients
2  will get sometimes with docetaxel and, on
3  occasion, paclitaxel, is they will get darkening,
4  darkening of the nails; and the nails sometimes
5  will actually fall off.  That doesn't occur
6  frequently, but it can.
7           You'll see a rare case where
8  people will get what's called "palmar-plantar
9  erythrodysesthesia," which is s- -- sluffing of
10 the skin on the hands and the feet, s- -- pain,
11 severe pain.  Very uncommon, but can occur, you
12 know.
13          And so, yes, we go over -- I -- I
14 tell them, I said, "There's a potential you could
15 get hand-and-foot syndrome," you know, this --
16     Q.   (Affirmative response.)
17     A.   -- red hands, red feet.  "Nails could
18 turn dark and fall off.  Hair is gonna fall out,"
19 this type of thing.
20          Hyperlacrimation is a common side
21 effect.  Okay?  It's almost like an allergic --
22 almost like hayfever kind of thing.  They get
23 runny nose with coryza, they get the watery eyes,
24 this type of thing.  It doesn't occur immediately;
25 it doesn't -- it typically occurs toward the end

137

1  of their treatment.
2      Q.   So why -- today, why do you think that
3  there is a risk of permanent alopecia with
4  docetaxel?
5           MR. SCHANKER:
6               Objection, form.
7           THE WITNESS:
8               Because there have been cases that
9  have come forth, and it's been in the news, and --
10 and so you're -- you're pretty -- if you're aware
11 of that, you have to, I think, inform patients of
12 that.  We weren't aware of that at the time we
13 were -- this lady was treated.  We were aware that
14 there was po- -- hair loss was a definite.  Okay?
15              But there was nothing that had
16 been made known to me that she potentially would
17 not get her hair back, you know.
18 EXAMINATION BY MS. BIERI:
19     Q.   Your experience with your one patient,
20 though, correct?
21     A.   Right.
22     Q.   Would you prescribe docetaxel to
23 Miss Earnest again?
24          MR. SCHANKER:
25              Objection, form.

35 (Pages 134 to 137)

Page 138

```
 1        THE WITNESS:
 2            Do you mean if she recurred?  If
 3   she developed recurrent disease?  No, because
 4   she's seen that drug.
 5   EXAMINATION BY MS. BIERI:
 6      Q.  If she presented to you today having --
 7      A.  -- a new case of breast cancer just
 8   like her?
 9      Q.  Today.
10      A.  No, I would give her paclitaxel.
11      Q.  If --
12      A.  If she had HER2-positive disease, yes,
13   I would give her docetaxel.
14      Q.  Can you say with certainty that
15   Miss Earnest, if she had received paclitaxel,
16   would be alive today?
17         MR. SCHANKER:
18            Objection, form.
19         THE WITNESS:
20            No one can say that with
21   certainty.
22   EXAMINATION BY MS. BIERI:
23      Q.  Can you say with certainty that
24   Miss Earnest's hair wouldn't be in the same level
25   of fullness that it is today?
```

Page 139

```
 1      A.  You can't say that --
 2         MR. SCHANKER:
 3            Objection, form.
 4         THE WITNESS:
 5            -- with certainty either.
 6   EXAMINATION BY MS. BIERI:
 7      Q.  Do you agree with me that while
 8   docetaxel and paclitaxel are structurally similar,
 9   they are not the same drug?
10      A.  They're not the same drug.
11      Q.  They carry different risks and
12   benefits.
13            Do you agree with that?
14      A.  Yes.  Their side effect profiles are
15   slightly different.
16      Q.  One has been associated with
17   cardiotoxicity more, correct?
18      A.  Yes.
19      Q.  Which one?
20      A.  Paclitaxel.
21      Q.  Has one been associated with cardiac
22   problems more?
23      A.  Paclitaxel.
24      Q.  Has one been associated with neuropathy
25   more?
```

Page 140

```
 1      A.  Paclitaxel.
 2      Q.  Have you ever served as a consultant
 3   for a pharmaceutical company?
 4      A.  I've sat on advisory boards before.
 5      Q.  For how many different pharmaceutical
 6   companies?
 7      A.  I don't recall.
 8      Q.  More --
 9      A.  Three or four.
10      Q.  What does it mean to sit on an advisory
11   board?
12      A.  You attend the advisory meetings when
13   they're going over the marketing and -- and -- and
14   the drug development.  And then once the drug has
15   been released, you know, what's -- what's --
16   what's going to make that drug stand out better
17   than other drugs that have been used in a
18   particular area, that type of thing.
19      Q.  And you would provide -- what was your
20   role to do?
21      A.  Provide input based on clinical
22   experience and the fact -- because I'm a
23   practitioner.
24      Q.  Say, how the drug had performed for
25   you?
```

Page 141

```
 1      A.  How the drug had performed, and what a
 2   lot of -- what the pharmaceutical company would
 3   need to do to -- advice on how to market the drug
 4   to make it more appealing than, say, an existing
 5   drug that's already been established and out there
 6   that they're trying to go up against or compete
 7   against.
 8      Q.  Can you name the companies for whom
 9   you've sat on advisory boards?
10      A.  You would ask.
11            Gilead.  Amgen.  Whoever makes --
12   whoever makes carfilzomib.  I can't remember who
13   makes carfilzomib.  I've sat on their advisory
14   board before.  There's been three or four.
15      Q.  Were you compensated for the Gilead
16   advisory board work?
17      A.  I was compensated for all of them.
18      Q.  And you were compensated for your time
19   in connection with them?
20      A.  Yes.
21      Q.  Do you remember how much you usually
22   receive in relation to those?
23         MR. SCHANKER:
24            Objection, form.
25         THE WITNESS:
```

## 158

```
 1  witness --
 2          Oh, Dr. Carinder, do you mind for
 3  just one second?
 4          THE WITNESS:
 5              Okay.
 6          MR. SCHANKER:
 7              I haven't --
 8          MS. BIERI:
 9              Do you mind if I see it?
10          MR. SCHANKER:
11              I haven't decided if I'm going to
12  give it to the witness yet.  And if and when --
13          MS. BIERI:
14              Okay.
15          MR. SCHANKER:
16              -- I decide I'm gonna give it to
17  the witness, as is protocol as you're well aware,
18  Counsel, you'll get a copy.  But until then, you
19  won't.
20  EXAMINATION BY MR. SCHANKER:
21      Q.  And could you go ahead and tell us what
22  the NCCN guidelines are?
23      A.  They're established guidelines for
24  treatment of cancers at various stages.
25      Q.  And, Doctor, I've placed before you
```

## 159

```
 1  what's been marked as --
 2          MS. BIERI:
 3              Thank you.
 4  EXAMINATION BY MR. SCHANKER:
 5      Q.  -- Exhibit #5.
 6          And -- and at the top, this says
 7  the "NCCN Guidelines, Version 2.2011."
 8          Does that -- and you see that,
 9  Doctor?
10      A.  Yes.
11      Q.  Does -- does that mean that this was
12  the version that was in effect in 2011?
13      A.  Yes.
14      Q.  Okay.  And NCCN then stands for
15  National Comprehensive Cancer Network?
16      A.  Yes.
17      Q.  And so what -- what are these
18  guidelines?
19      A.  They're data-proven, literature-proven,
20  trial-proven established regimens as standard of
21  care for cancer treatment.
22      Q.  And are these guidelines that -- that
23  you follow in your practice?
24      A.  Yes.
25      Q.  And so 2011 would have been the year
```

## 160

```
 1  when Barbara Earnest received the treatment that
 2  you prescribed to her, correct?
 3      A.  Yes.
 4      Q.  And could you -- you take a look there,
 5  and you see that what the non- -- can you
 6  pronounce that just so I pronounce it right?
 7  Traz- -- Trazodone?
 8      A.  Trastuzumab.
 9      Q.  Yeah, "trastuzumab-containing regimens
10  (all category 1)."
11          What is listed under there just so
12  we just understand how these guidelines are laid
13  out?  I can see that it says "Preferred --
14  Adjumant" -- "Adjuvant Regimen."
15      A.  "TAC AC followed by taxane, Taxotere
16  and cyclophosphamide, and then AC."
17      Q.  Okay.  And then it also has a TC and
18  another AC there as well.
19          So are those --
20      A.  Yes.
21      Q.  -- listed un- -- under Preferred
22  Adju- -- Adjuvant Regimens just what it sounds
23  like?  Those are the preferred regimens --
24      A.  Yes.
25          MS. BIERI:
```

## 161

```
 1              Object to the --
 2  EXAMINATION BY MR. SCHANKER:
 3      Q.  -- pursuant to the guidelines back in
 4  2011?
 5          MS. BIERI:
 6              Object to the form.
 7          THE WITNESS:
 8              Yes.
 9  EXAMINATION BY MR. SCHANKER:
10      Q.  Okay.  So at -- at the time back in
11  2011, the pa- -- the AC guidelines which involved
12  paclitaxel were preferred regimens --
13          MS. BIERI:
14              Object to the form.
15  EXAMINATION BY MR. SCHANKER:
16      Q.  -- is that correct?
17      A.  They were established -- established
18  regimens.
19      Q.  Okay.  Are you familiar with the term
20  "Dear Doctor letter"?  Have you ever heard that
21  before, the phrase?
22      A.  A letter -- have you in your
23  practice ever seen or received a letter from a
24  pharmaceutical company with some update
25  concerning -- whether it be contraindications or
```

162

1  information concerning a particular drug?
2       MS. BIERI:
3           Object to the form.
4       THE WITNESS:
5           On occasion, yes.
6  EXAMINATION BY MR. SCHANKER:
7     Q.  Are those -- when you get those kind of
8  letters, are those things that you -- how do you
9  treat them when you receive them?
10    A.  Well, I mean, if it's a black box
11 warning, obviously you're gonna look at it.  You
12 know, I -- I remember getting something in the
13 e-mail with regard to the -- with the hair loss,
14 the permanent hair loss, with -- potential for
15 peterm- -- permanent hair loss with docetaxel, but
16 I don't remember exactly where it came from.
17    Q.  Sure.
18    A.  I mean, this is years ago.
19    Q.  Understand.
20        I- -- if -- if -- if you can
21 answer, Doctor, if you would have received from
22 Sanofi -- and -- and you know Sanofi was the
23 manufacturer of Taxotere, correct?
24    A.  Yes.
25    Q.  If at some point you would have

163

1  received -- and I don't have any information that
2  they sent such a thing out, but if Sanofi had sent
3  out information to you concerning source -- some
4  sort of risk of permanent hair loss in significant
5  patient populations with the use of Taxotere, is
6  that something that you would have reviewed?
7       MS. BIERI:
8           Object to the form.
9  EXAMINATION BY MR. SCHANKER:
10    Q.  If it would have come to your
11 attention?
12    A.  Yes.
13    Q.  Okay.  And is that something that you
14 would have taken seriously if it would have come
15 to your attention?
16      MS. BIERI:
17          Object to the form.
18      THE WITNESS:
19          Yes.
20 EXAMINATION BY MR. SCHANKER:
21    Q.  Is it something that if -- assuming
22 that it appeared substantiated properly and
23 legitimate, that you would have potentially
24 incorporated into your patient advisory if you had
25 received such a thing?

164

1     A.  Well, I do tell them now.
2     Q.  You tell them now?
3         And if you had received such
4  information previously from a legitimate source,
5  that's something you could would have taken
6  seriously and advised patients accordingly?
7       MS. BIERI:
8           Object to the form.
9       THE WITNESS:
10          When you say "previously," you
11 mean prior to Miss Earnest?
12 EXAMINATION BY MR. SCHANKER:
13    Q.  Yes.
14    A.  Yes.
15    Q.  You talked about neuropathy with the
16 use of chemotherapy drugs, in particular docetaxel
17 and paclitaxel, correct?
18    A.  Yes.
19    Q.  The -- and -- and you had said that
20 neuropathy can be daunting, and you were referring
21 to use of paclitaxel, especially with the regimen
22 that involved four- -- treatment every 14 days; is
23 that correct?
24    A.  Yes.
25    Q.  Is -- now, is that neuropathy that

165

1  you're talking about, you indicated that it could
2  be long lasting, but in most all circumstances, do
3  you see that neur- -- neuropathy resolve?
4       MS. BIERI:
5           Object to the form.
6       THE WITNESS:
7           It typically resolves, but it
8  persists for months.  And the s- -- it can range
9  from paresthesias to burning, painful, extremely
10 sensitive, you know, feet and hands.  And it
11 varies from -- you can't predict what kind of
12 neuropathy someone's gonna get.  They want -- they
13 may feel like they've got gravel under their feet
14 all the time, or they may have may numb toes, or
15 they may have, like I said, very exquisitely
16 sensitive burning-type pain.
17 EXAMINATION BY MR. SCHANKER:
18    Q.  Right.
19    A.  Okay?  And that -- that's bothersome
20 for people.
21    Q.  Now, Doctor, is it fai- -- is it -- is
22 it fair to say that back when Miss Earnest was
23 re- -- your patient when she came into your office
24 in 2011, and you were evaluating her for
25 appropriate treatment, that you had no knowledge

### Page 166

1  of a risk of permanent hair loss in significant
2  patient populations with the use of docetaxel?
3      A. No, I did not know that.
4      Q. So then I would assume because you did
5  not know that, you didn't advise Miss Earnest of
6  that potential side effect, correct?
7          MS. BIERI:
8              Object to the form.
9          THE WITNESS:
10             That's correct.
11 EXAMINATION BY MR. SCHANKER:
12     Q. And that if you had knowledge of that,
13 you would have advised Miss Earnest on that
14 particular potential side effect, correct?
15     A. Yes.
16         MS. BIERI:
17             Object to the form.
18 EXAMINATION BY MR. SCHANKER:
19     Q. And is it fair to say that -- would you
20 have given her other treatment options if sh- --
21 if Miss Earnest voiced a concern over the risk of
22 side effect of permanent hair loss --
23     A. Yes.
24     Q. -- associated with docetaxel?
25     A. Yes.

### Page 167

1      Q. That you would have given her a choice?
2          MS. BIERI:
3              Object to the form.
4          THE WITNESS:
5              Yes.
6  EXAMINATION BY MR. SCHANKER:
7      Q. You don't -- you don't make your
8  patients --
9      A. You can't force patients to do
10 anything.
11     Q. Right.
12         It's a patient's choice
13 ultimately?
14     A. Yes.
15     Q. And it would have been Miss Earnest's
16 choice, correct?
17     A. My job is to give them information so
18 they can make an informed decision.
19     Q. Right.
20         And -- and you did that at the
21 time for Miss Earnest, correct?
22     A. Yes.
23         MS. BIERI:
24             Object to the form.
25 EXAMINATION BY MR. SCHANKER:

### Page 168

1      Q. Based on your knowledge that you had?
2      A. Yes.
3      Q. And you would do that today based on
4  the knowledge you have?
5      A. Yes.
6      Q. And if Miss Earnest chose -- based on
7  your advisory and the information you gave her to
8  make an informed choice, if she chose to take the
9  paclitaxel regimen, that would have been something
10 that you felt, pursuant to the NCCN guidelines and
11 your practice, to be reasonable and appropriate,
12 correct?
13         MS. BIERI:
14             Object to the form.
15         THE WITNESS:
16             Yes.
17 EXAMINATION BY MR. SCHANKER:
18     Q. You indicated that you warn of side
19 effects that you believe will be -- amongst other
20 side effects, you warm of -- warn of those that
21 you believe will be most concerning to a patient,
22 correct?
23     A. Yes.
24     Q. That's based upon your decades of
25 professional experience, I'm assuming?

### Page 169

1      A. Yes.
2      Q. Would you include hair loss as being
3  one of those side effects that is concerning to
4  your female population?
5      A. Yes.
6          MS. BIERI:
7              Object to the form.
8  EXAMINATION BY MR. SCHANKER:
9      Q. Is -- would -- based on your -- and
10 you -- you testified about your knowledge with
11 regard to hair loss and your patient population.
12         Would you consider hair loss to be
13 a big deal, an important issue, for women who are
14 undergoing chemotherapy treatment in an adjuvant
15 setting?
16         MS. BIERI:
17             Object to form.
18         THE WITNESS:
19             Yes, for many of them, it is.
20 EXAMINATION BY MR. SCHANKER:
21     Q. And that's something that you take
22 seriously as a practitioner? As far -- their --
23 their -- their concern --
24     A. Yes.
25     Q. -- with regard to that?

170

1  A.  Yes.
2  Q.  I'll be done here real soon, Doc.
3  A.  Okay.
4  Q.  You were asked some questions about
5  sales representatives, and you indicated that you
6  do recall some sales representatives or
7  representative from Sanofi; is that right?
8  A.  Yes.
9  Q.  Who is -- who is that individual or
10 individuals that you recall?
11     MS. BIERI:
12         Object to the form.
13     THE WITNESS:
14         Who was -- at that time who was
15 the --
16 EXAMINATION BY MR. SCHANKER:
17 Q.  Yeah.
18     Do you recall the name of the
19 person?
20 A.  Ruth Avila.
21 Q.  Okay.  Ruth Avila?
22 A.  (Nods head affirmatively.)
23 Q.  Any other folks, individuals, that you
24 recall from Sanofi visiting you with regard to
25 Taxotere specifically?

171

1  A.  (Shakes head negatively.)  She was the
2  Taxotere person.
3  Q.  Okay.  Did Ruth Avila -- am I
4  pronouncing that right?
5  A.  Yes.
6  Q.  Did Ruth Avila, the sales
7  representative from Sanofi, to your knowledge,
8  ever advise you or provide you with information
9  concerning this potential side effect of permanent
10 hair loss in association with Taxotere?
11 A.  No.
12     MS. BIERI:
13         Object to the form.
14 EXAMINATION BY MR. SCHANKER:
15 Q.  And if she had provided you with that
16 information and you considered that information
17 legitimate, is that information you would have
18 taken seriously?
19 A.  Yes.
20     MS. BIERI:
21         Object to the form.
22 EXAMINATION BY MR. SCHANKER:
23 Q.  Is that information, if you had
24 received that from Ruth Avila or some sales
25 representative from Sanofi, and you believed it

172

1  was legitimate, that you would have incorporated
2  in your advisory of your patient?
3  A.  Yes.
4  Q.  Do you recall any Sanofi sales
5  representative ever specifically marketing
6  information or providing you with marketing
7  information concerning neuropathy?  Do you have
8  any recollection of that?
9  A.  No.
10 Q.  Okay.  Do you re- -- recall a sales
11 representative or Sanofi -- specifically Sanofi
12 sales representative or a individual from Sanofi
13 by the name of Michael Gillespie?  Does that ring
14 a bell at all?
15 A.  Yes.
16 Q.  Who -- any -- any -- any specific
17 recollection with regard to Michael Gillespie
18 or --
19     MS. BIERI:
20         Object to form.
21 EXAMINATION BY MR. SCHANKER:
22 Q.  Do you remember what he -- what --
23 A.  He -- he is -- he was from Jackson,
24 Mississippi, and he was a -- I think he was like
25 Ruth's boss.  He was like a regional person.

173

1  Regional director, regional manager, something
2  like that.  I think he was -- I think he was over
3  Ruth.
4  Q.  Okay.  How about James Bradley?  Any
5  recollection of James?
6  A.  I'm bad with names.  Probably if I saw
7  his face I'd recognize him, but I don't recall
8  that name.
9  Q.  Okay.
10 A.  But Mike Gillespie was like a
11 regional -- he was like a sales -- regional sales
12 manager-type person.
13 Q.  Did you have any -- did you have any
14 opinion conc- -- you expressed an opinion
15 concerning Ruth Avila earlier.
16     Did you have any --
17 A.  Ruth wa- -- Ruth is -- I've known her
18 for years.
19 Q.  (Affirmative response.)
20 A.  And she's worked in several -- for
21 several pharma companies.  But at the time I met
22 her, she was working for Sanofi.  But she is an
23 oncology-certified nurse, and she is a nurse
24 practitioner, and she -- I -- she is more
25 knowledgeable than a lot of pharma reps because of

44 (Pages 170 to 173)