```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3   ******************************************************************
     IN RE: TAXOTERE (DOCETAXEL)           MDL NO. 16-2740
 4   PRODUCTS LIABILITY LITIGATION         SECTION "H"(5)
                                           JUNE 3, 2022
 5   This document relates to:
     Barbara Earnest, No. 16-17144
 6   ******************************************************************

 7

 8
              TRANSCRIPT OF MOTIONS HEARING VIA VIDEOCONFERENCE
 9        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
10

11

12   APPEARANCES:

13   FOR PLAINTIFFS:                 Dawn M. Barrios, Esquire
                                     BARRIOS, KINGSDORF & CASTEIX
14                                   701 Poydras Street, Suite 3650
                                     New Orleans, LA 70139
15

16
                                     M. Palmer Lambert, Esquire
17                                   Claire E. Kreider, Esquire
                                     GAINSBURGH, BENJAMIN, DAVID
18                                       MEUNIER & WARSHAUER
                                     1100 Poydras Street, Suite 2800
19                                   New Orleans, LA 70163

20

21

22   FOR SANOFI DEFENDANTS:         Douglas J. Moore, Esquire
                                    Kelly E. Brilleaux, Esquire
23                                  IRWIN, FRITCHIE, URQUHART & MOORE
                                    400 Poydras Street, Suite 2700
24                                  New Orleans, LA  70130

25

                              OFFICIAL TRANSCRIPT
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR SANOFI DEFENDANTS:          Jon Strongman, Esquire
                                     Adrienne Byard, Esquire
 4                                   Jordan Baehr, Esquire
                                     SHOOK, HARDY & BACON
 5                                   2555 Grand Boulevard
                                     Kansas City, MO 64108
 6

 7

 8

 9

10

11

12   Official Court Reporter:       Alexis A. Vice, RPR, CRR
                                     500 Poydras Street, HB-275
13                                   New Orleans, LA 70130
                                     (504) 589-7777
14                                   Alexis_Vice@laed.uscourts.gov

15

16

17

18

19

20

21

22   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.
23

24

25


                          OFFICIAL TRANSCRIPT
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                       JUNE 3, 2022
 3                    (MOTIONS HEARING)
 4
 5              (The Court was called to order.)
 6         THE COURT: Good morning.  Just give me a second.
 7         DEPUTY CLERK: MDL 16-2740, In Re: Taxotere Products
 8  Liability Litigation.
 9         THE COURT: I knew there was going to be a PowerPoint,
10  Mr. Strongman.  Thank you.
11         MR. STRONGMAN: You're welcome.  I didn't want to
12  disappoint.
13         THE COURT: There's certain expectations.
14         MR. STRONGMAN: You've got to uphold them.
15         THE COURT: That's it, that's it.  I appreciate you
16  not throwing anything else off.
17         Let's proceed.
18         MR. STRONGMAN: Good morning, Jon Strongman, on behalf
19  of Sanofi, and may it please the Court.
20         There are several arguments that we raised in our
21  motion, but I want to start with this.  It's one simple
22  question, and the undisputed answer to this one simple question
23  requires that this case be dismissed.  And the question is
24  this:  Did Ms. Earnest investigate Taxotere as a potential
25  cause of her persistent hair loss?
```

OFFICIAL TRANSCRIPT

1    And the answer to that question is no.  The answer to
2 that question before trial was no.  The answer to that question
3 during trial was no, and the answer to that question is always
4 going to be no.  It's an undisputed fact.

5    Ms. Earnest testified that in the years since she
6 took Taxotere, she never asked any doctor what the cause of her
7 persistent hair loss was.  She never did any independent
8 research of her own as to whether or not Taxotere was an
9 explanation of her persistent hair loss.  She did not
10 investigate Taxotere.

11    And in light of the Fifth Circuit's more recent
12 decisions in *Thibodeaux* and *Durden* and then this Court's
13 decision in *Plaisance*, there's simply no way that Ms. Earnest
14 can proceed on her case in light of that law.  She had to
15 investigate Taxotere as a potential cause.  She didn't.  Her
16 claims are barred by prescription.

17    I want to look just a little bit more specifically at
18 the language of the Fifth Circuit because I think it's
19 important.  As Your Honor knows, this law came down after the
20 *Earnest* trial --

21    **THE COURT:** Right.

22    **MR. STRONGMAN:** -- and after your summary judgment
23 decision in *Earnest*.  And the Fifth Circuit, first in
24 *Thibodeaux* and then *Durden*, put a finer point on what a
25 reasonable inquiry requires in this litigation.  And the Court

OFFICIAL TRANSCRIPT

1  made it clear that diligence required that Taxotere be explored
2  as a possible explanation.
3          **THE COURT:** You know, I don't think there's anything
4  that I saw anywhere that she asked, "What caused my persistent
5  hair loss?"  I believe if you look at a fair reading of her
6  testimony, of everything that we saw in trial, she understood
7  that her persistent hair -- she attributed her persistent hair
8  loss to chemotherapy.
9          **MR. STRONGMAN:** Correct.
10          **THE COURT:** The only thing, and I'm going to ask you
11  to just see if it is an issue, is she's -- in the master
12  complaint, if you recall, permanent hair loss is defined as
13  hair loss six months after the last date of treatment.
14          And then there was a move, if you will, to amend it,
15  the master complaint, and I said no, the time has passed.  But
16  as to the short form complaints, and I haven't looked at her
17  short form complaint, I said if there was some factual issue
18  that you could put that said for some reason as to this
19  plaintiff, it is more than six months.
20          Does it matter if she approaches her doctor after
21  that six months period and he says wait?  Has she realized a
22  damage if he tells her?  And I don't know.  I'm asking you to
23  address that because I don't think any of this -- I don't think
24  it's at issue that she didn't investigate the cause of her hair
25  loss, that she always attributed it to chemotherapy.

OFFICIAL TRANSCRIPT

1          And I think that was part of *Thibodeaux* when I said
2    she knew it was chemotherapy, but they all knew at six months
3    post.  Am I clear on what my question is?
4          **MR. STRONGMAN:** I believe so.
5          **THE COURT:** Did she understand there was an injury
6    when the doctor says keep waiting?
7          **MR. STRONGMAN:** She did.  Ms. Earnest was on notice
8    that something was wrong.  That's why she asked her doctor
9    about it in the first place.
10          And what we know is that the Fifth Circuit has
11   actually looked at some of these issues too, as Your Honor has
12   in the *Plaisance* case.  So the Fifth Circuit says she needed to
13   investigate Taxotere as a potential cause, and all the
14   plaintiffs have pointed to is the conversation that we've
15   discussed before which is a conversation with Dr. Carinder.
16          Now, setting aside the fact that Dr. Carinder
17   testified that that conversation didn't happen --
18          **THE COURT:** But that would be a factual issue, who do
19   you believe.
20          **MR. STRONGMAN:** But that's a factual issue,
21   understood.  So assuming that what Ms. Earnest says is true and
22   that Dr. Carinder said to her, "Honey, it's going to grow.
23   Take time," she's already expressed some understanding that
24   something is not right.
25          And what the Fifth Circuit said, as your Court held

OFFICIAL TRANSCRIPT

1  in *Plaisance* as well, Ms. Earnest always attributed her hair

2  loss to chemotherapy, and before filing suit, no doctor ever

3  told her ever that her hair loss was caused by something other

4  than chemotherapy.

5  And what the Court in *Durden* held was that the only

6  way, honestly the only way to escape the application of

7  prescription in this case would be for a doctor to tell

8  Ms. Earnest that her persistent hair loss was singularly

9  attributable to something other than chemotherapy.  And this is

10 the quote from the Fifth Circuit, "singularly attributable to

11 something at the exclusion of other potential causes."

12 That never happened to Ms. Earnest, never.  And

13 unless a doctor tells you that, Ms. Earnest is charged with the

14 constructive notice that the Fifth Circuit has already held

15 applies.  There is no question that she never investigated

16 Taxotere as a cause, no doctor ever told her that it was

17 singularly attributable to anything other than chemotherapy.

18 And Your Honor in the *Plaisance* case walked through

19 these steps exactly.  So Ms. Plaisance had a conversation with

20 her doctor just like we're talking about, and Ms. Plaisance

21 pointed to that conversation.  And Your Honor specifically said

22 in that ruling that that conversation did not toll the

23 prescription because she was given no reason to believe that

24 her hair loss was attributable to anything other than

25 chemotherapy.  The same applies to the facts of the *Earnest*

OFFICIAL TRANSCRIPT

1 | case.

2 |       And just like the *Earnest* case, Ms. Plaisance, also

3 | by the order of this Court, was charged with what the Fifth

4 | Circuit said a reasonable inquiry would have found.  And what

5 | the Fifth Circuit said is well before Ms. Earnest filed her

6 | lawsuit in this case, a reasonable inquiry would have found

7 | enough evidence to put her on notice of some connection between

8 | Taxotere and persistent hair loss.  Constructive notice alone

9 | charges Ms. Earnest with the knowledge required to dismiss this

10 | case.

11 |       And I want to also point out the plaintiffs cite *Kahn*

12 | quite a bit in their opposition in this case.  In *Plaisance*,

13 | Your Honor distinguished *Kahn*, and what Your Honor said

14 | specifically about it there goes to this point.  Your Honor

15 | says in the *Plaisance* decision, "In *Kahn*, this Court found a

16 | question for the jury to determine, whether a conversation

17 | Ms. Kahn had with her doctor where the doctor told her that her

18 | lack of hair growth was likely attributable to age and not

19 | chemotherapy, that that was sufficient to toll prescription."

20 |       Again, no conversation like that happened with

21 | Ms. Earnest.  It's undisputed.  And it doesn't matter if you

22 | look at the testimony before trial or if you look at the

23 | testimony at trial.  And again, it doesn't matter if we try

24 | this case again.  That's going to be the testimony.

25 | Constructive notice is charged to Ms. Earnest.  Her case is not

1  tolled, and her case is prescribed.

2          I want to talk about warnings causation just briefly

3  as well.  Since the *Earnest* trial, there's also been obviously

4  some Fifth Circuit opinions, or at least, one, in *Phillips*, on

5  the learned intermediary doctrine and warnings causation.  In

6  our brief, we pointed to this testimony, and I'll just

7  reiterate it briefly.

8          Dr. Carinder testified that he stood by his decision.

9  And as the Fifth Circuit has held in *Phillips*, whether or not

10  Dr. Carinder would have changed his prescribing decision is the

11  primary focus of that analysis.  He said he stands by his

12  decision.  Dr. Carinder also expressed an understanding of some

13  risk of reports of permanent hair loss at the time that he made

14  his prescription to Ms. Earnest as well.  Those two things

15  require our summary judgment motion be granted.

16          But I want to focus a little bit more on this last

17  point.  Your Honor has mentioned many times in this case that

18  what's important is what the conversation is or would have been

19  in that room.  And in trial, Ms. Earnest was put in that room

20  in the most real way.  She was asked the questions.

21          Okay, let's look at this in a straightforward way.

22  Taxol, that's an option.  You're going to have to deal with

23  daunting neuropathy as a risk.  There's also case reports of

24  permanent hair loss with that.  Okay, that's one option.  We

25  could go down the FAC, FEC route, so without a Taxane, but

OFFICIAL TRANSCRIPT

1   you're going to have to deal with a lower efficacy.  That's an

2   option.  And then you've got Taxotere and the Taxotere regimen

3   that Dr. Carinder recommended, that's an option.  What would

4   you have done?  And her testimony was, "I don't know."

5          And through the series of that questioning, it even

6   caught Your Honor's attention.  Your Honor stopped her and

7   asked her, "You can't answer that question?"

8          And she said, "No, I can't."

9          Based on that alone, again, there's not sufficient

10  evidence, and this is consistent again with your decision in

11  the *Hunt* case.  There's simply not enough evidence to overcome

12  the standard required to meet warnings causation for the

13  plaintiff, and the case must be dismissed.  She was put in that

14  room with all the considerations, and she did not know.

15         I want to end where I began with this very basic

16  question.  Did Ms. Earnest investigate Taxotere as a potential

17  cause of her persistent hair loss?  The Court cannot deny

18  Sanofi's motion on prescription without setting aside the plain

19  language of the Fifth Circuit.  They can't.

20         And it does not make any sense to spend the extensive

21  amount of money that would be required to try this case again

22  just to bring the witnesses in here again to say what they've

23  already said repeatedly, and that's that Ms. Earnest did not

24  investigate Taxotere as a potential cause and that she doesn't

25  know what she would do.

1     It makes no sense to spend the resources, to go

2 through all of that again, to have the witnesses say the same

3 thing again, and have this Court have to grant a directed

4 verdict motion, or in the case that we lost, have the Fifth

5 Circuit say what they've already said.  So in light of what the

6 Fifth Circuit has put out there in terms of its precedent,

7 there's no choice, but to grant this motion.  Thank you.

8     **THE COURT:** Thank you.

9     Mr. Lambert.

10     **MR. LAMBERT:** Thank you, Your Honor.

11     Good morning, Palmer Lambert, from Gainsburgh

12 Benjamin, co-liaison counsel for plaintiffs on behalf of

13 Ms. Earnest, and may it please the Court.

14     Your Honor, I will start with where Mr. Strongman

15 just ended, and I'm going to go to this Court's order in the

16 *Kahn* case, post the *Thibodeaux* and *Durden* rulings.  And the

17 Court said, Document 12805 at page 4, "In *Thibodeaux*, the Fifth

18 Circuit wrote that, quote, 'a reasonable inquiry into the cause

19 of one's persistent hair loss would likely include consultation

20 with doctors,'" end quote.

21     "And indeed, plaintiff Kahn consulted with a doctor.

22 Kahn spoke to her gynecologist, Dr. Marjorie Roberie, on

23 April 9, 2009 about why her hair had become thinner after

24 chemotherapy.  Dr. Roberie told Kahn that her hair thinning may

25 be due to her age.  This is sufficient to create an issue of

OFFICIAL TRANSCRIPT

1  fact on *contra non valentem*."

2          Your Honor, the defendants urge this Court to

3  reconsider summary judgment based on additional testimony that

4  happened at Ms. Earnest's trial beyond the testimony that the

5  Court already determined was sufficient to create a genuine

6  issue of fact.

7          **THE COURT:** You know, but Mr. Lambert, nobody -- I

8  think it's clear that Ms. Kahn attributed her hair loss to

9  chemotherapy.  She never -- nobody tells her otherwise.  She

10 doesn't ask what causes it.  It comes after chemotherapy, and

11 it doesn't grow back.  And she asks her oncologist, and he says

12 wait.  Is that an investigation?

13          **MR. LAMBERT:** Well, Your Honor, and you said Ms. Kahn.

14 I think you meant Ms. Earnest.

15          **THE COURT:** I meant Ms. Earnest, excuse me.

16          **MR. LAMBERT:** I think it's the same, so.

17          **THE COURT:** How is that?

18          **MR. LAMBERT:** Well, because, Your Honor, the whole

19 *contra non valentem* idea is to look at the reasonableness of a

20 plaintiff's action or inaction in light of all the

21 circumstances, okay.

22          And so what I heard Mr. Strongman say was that she

23 always attributed hair loss to chemotherapy.  Well, temporary

24 hair loss is always attributed to chemotherapy.

25          **THE COURT:** Right, right.

                    OFFICIAL TRANSCRIPT

1          **MR. LAMBERT:** So at some point, Ms. Earnest asks, and

2     she's told that it's going to come back.  And that's based on

3     what Dr. Carinder knew at that time.  Dr. Carinder testified

4     that he did not know about this risk.  He certainly wasn't

5     warned about it in the Sanofi labeling information.

6          **THE COURT:** Is there a period of time where it becomes

7     no longer reasonable?  You know, that's what -- she sees him

8     sometime after the six months, and I have the dates written

9     here.  And he says, "Just wait.  Yeah, this is long, but just

10    wait."  Four years?

11         **MR. LAMBERT:** Your Honor, there is a point when it

12    becomes unreasonable.

13         **THE COURT:** And when is that?

14         **MR. LAMBERT:** Well, and I think it's interesting that

15    Mr. Strongman completely disregarded parts III and IV of their

16    motion for summary judgment related to causation and specific

17    causation, and that is because it becomes reasonable once the

18    science catches up.  Once the science and the general community

19    understand what Sanofi knew since 2007 about the propensity of

20    its drug to cause permanent hair loss, then it becomes

21    unreasonable.

22         Because the question goes to the doctor, the doctor,

23    after December 2015, knows that Taxotere comes with a risk of

24    permanent alopecia and can share that information.

25         **THE COURT:** Well, then it never runs.  Then

OFFICIAL TRANSCRIPT

1  prescription never runs because that's the substantive claim

2  that you didn't warn us.

3     **MR. LAMBERT:** I would disagree only because you have

4  to look at the reasonableness in light of all the

5  circumstances.  And the circumstances are here you have a

6  company that knows a lot of information, and you have some

7  anecdotal reports outside of that.

8     **THE COURT:** But Mr. Lambert, the Fifth Circuit's

9  already said no, you're charged with what you've included in

10  the master complaint.  So what do I do with that?

11     **MR. LAMBERT:** Well, Your Honor, that, again, I think

12  in *Kahn*, you specifically addressed that.  And in Your Honor's

13  oral reasons denying the second motion for reconsideration in

14  *Kahn*, Your honor went through an analysis.  This is page 15 and

15  16 of the transcript of the July 29, '21 hearing.  It's also

16  Exhibit 1 to our opposition.

17     And you said based on the same law, very similar

18  circumstances, "I think there's still factual issues for the

19  jury to consider, and this is what my thought process is.  I

20  specifically note that throughout this litigation, the

21  defendant has pointed to multiple causes of alopecia.  Most are

22  not tort related."

23     And then you go on later, "What we hear from

24  countless experts is there are reasons that have nothing to do

25  with improper conduct that cause alopecia in women.  That is a

OFFICIAL TRANSCRIPT

1  plausible cause of her alopecia."

2            And so we have --

3        **THE COURT:** But we have there an alternative cause.

4  Here, you have none.

5        **MR. LAMBERT:** Well, Your Honor, we do.

6        **THE COURT:** Somebody told her it was something other

7  than chemotherapy?  I didn't see it.

8        **MR. LAMBERT:** Well, Ms. Sastre, in opening and

9  closing, suggested that she had endocrine-induced alopecia.

10  All of their experts --

11        **THE COURT:** Wait a minute.  Somebody has got to stop

12  the running of prescription, and it can't be that Ms. Sastre is

13  arguing what their experts say.  Somebody's got to tell this

14  plaintiff prior to the running of prescription.

15            Now I understand the experts didn't agree on much.

16  But we're looking at what this plaintiff, this one plaintiff

17  relied upon in not investigating.  And I think Ms. Kahn had

18  somebody that said, "I don't think -- that's not it.  It's

19  this."

20            And so what I remember specifically was then she quit

21  talking about it because I think it made her angry.  That's not

22  what she wanted to hear.  And I said that's for a jury to

23  decide if that was reasonable to accept that.

24            But you've got nothing here that says -- now the only

25  question I had is when he said that, does that somehow extend

                          OFFICIAL TRANSCRIPT

1    that six months because she's at six months and he says wait

2    some more?  Does she understand that there is an injury?

3           But I don't think that's what the Fifth Circuit --

4    but I'm listening, Mr. Lambert.  I'm just trying to understand.

5           **MR. LAMBERT:** Well, Your Honor, again, I go back to --

6    and it's in the *Thibodeaux* decision, that the time period,

7    *contra non valentem* tolls the time period.

8           **THE COURT:** Yes.

9           **MR. LAMBERT:** Until a point when a reasonable

10   investigation suggests that there is a cause of action to be

11   brought.

12          **THE COURT:** Uh-huh.

13          **MR. LAMBERT:** And so the point in this case when that

14   happens, based on the deposition testimony, is when Ms. Earnest

15   learns through others that Taxotere contains a risk of

16   permanent alopecia and then brings suit within a year of that

17   time period.

18          And again, the reason why this Court's decision in

19   advance of the first trial is so important is because that

20   document, Document 7571, acknowledges that there were genuine

21   issues of material fact based on that record.  We now have in

22   the interim additional testimony from the trial, but that trial

23   does not resolve the genuine issues that already were present.

24   It's just additional information for the fact finder to

25   consider in terms of credibility determinations and the drawing

OFFICIAL TRANSCRIPT

1  of reasonable inferences in favor of the non-moving party.

2          The trial testimony, we mentioned in our briefing.

3  The trial testimony can be considered for certain things.

4  Certainly, there will, at the re-trial, be some necessary

5  precautions that counsel don't say, "At the first trial, you

6  said blah, blah, blah."  It would be used as impeachment

7  testimony, and it would be that, "You gave sworn testimony on X

8  date."

9          **THE COURT:** Right.

10          **MR. LAMBERT:** And so we have that testimony.  But

11  numerous times, I think it's five times within the defendant's

12  briefing, they suggest the words "no reasonable juror could

13  find."  That's the wrong standard, Your Honor.  They asked Your

14  Honor to consider, go back in time and consider Rule 50 and

15  dispose of this case based on the testimony that far.

16          Your Honor said, "We're not doing that."  The

17  appropriate test at this point is the Rule 56 test.

18          **THE COURT:** Right, right.

19          **MR. LAMBERT:** The burden is always on the

20  defendants --

21          **THE COURT:** Right.

22          **MR. LAMBERT:** -- under the federal rules to show an

23  absence of genuine issue of material fact, and Your Honor, I

24  don't believe that they can do it based on this record.

25          **THE COURT:** Let's talk about causation.

OFFICIAL TRANSCRIPT

1          **MR. LAMBERT:** Okay.  Can I say one more thing on SOL?

2          Your Honor, Ms. Earnest was impeached at trial about

3    some testimony that she -- about some things that she said to

4    Dr. Bianchini, and that impeachment evidence was presented to

5    the jury to suggest that Ms. Earnest thought it was the

6    endocrine therapy that was causing her hair loss.

7          So again, there's another credibility determination

8    and a factual issue for the jury to consider in terms of was

9    she being reasonable under all of the circumstances.

10          **THE COURT:** Thank you.

11          **MR. LAMBERT:** And when you say causation, Your Honor

12    wants to talk about warnings causation?

13          **THE COURT:** Yes.

14          **MR. LAMBERT:** Learned intermediary, okay.

15          Your Honor, on the warnings causation, learned

16    intermediary issue, this Court made a ruling denying Sanofi's

17    motion for reconsideration on warnings causation in the *Kahn*

18    case.  That's Document 13062.  The facts of this case are

19    similar, both in deposition and trial testimony, to that in

20    *Kahn*.  And there is no reason for this Court to reconsider and

21    reverse its prior ruling denying summary judgment, again,

22    Document 7571.

23          And I'm going to read another quote here from that

24    order.  This is Document 13062 at 5.  "Like the oncologist in

25    *Phillips*, Dr. Kardinal testified that if the Taxotere label had

OFFICIAL TRANSCRIPT

1  warned permanent alopecia, this would not have changed his

2  chemotherapy recommendation for plaintiff Kahn.  He testified,

3  however, that such a risk, quote, 'would have been included in

4  the discussion,' end quote, with a patient."

5       "He testified unequivocally that, quote, 'If Sanofi

6  stated the incidence of permanent hair loss were X percent or

7  whatever, those things should be made known to the patient,'"

8  end quote.

9       "Dr. Kardinal further stated that if a patient did

10  not wish to take Taxotere because of such a risk he would have

11  discussed other options with her.  He stated that paclitaxel is

12  an adequate alternative to Taxotere in terms of its efficacy,

13  and the Court has found no evidence in the record suggesting

14  that paclitaxel was unsuitable for plaintiff Kahn."

15       The Court then discusses how that's distinguishable

16  from *Phillips*.

17       **THE COURT:** I have to tell you, when we, you know,

18  during this case, Ms. Earnest's case, it was very clear that

19  his recommendation was the regime that she was prescribed.

20  That was his recommendation.  But you know, he said we talk to

21  our patients; and if there is a firm indication that I don't

22  want to do that, then you look ration -- these oncologists look

23  in their toolbox and find other things.

24       She said, because I remember, "I don't know."  And

25  then she said, because I thought I was, "If I had known it

OFFICIAL TRANSCRIPT

1   would do this, I would not have taken it."  Well, no one knows
2   that at the time medication is being discussed and prescribed.
3   What do I do with that?

4         Because it seems to me, absent a clear indication
5   from the plaintiff that, "I would have not.  No.  We would have
6   definitely" -- I mean his recommendation was firm, and she
7   doesn't...

8         **MR. LAMBERT:** Your Honor, I point the Court to the
9   trial testimony at 1734, 11 through 17, and I don't have the
10  quote in front of me.  But it's cited in our papers, 1734, 11
11  through 17, where she agrees she would have asked for another
12  regimen and would have taken that regimen.

13        Now, again, credibility determination is for the
14  jury.

15        **THE COURT:** Let me see because I have to tell you I
16  remember that.

17        **MR. LAMBERT:** But, again, that statement can't be read
18  in isolation or exclusion of the prior deposition testimony
19  either because we can't just pretend like the deposition
20  testimony doesn't also count.  It counts the same in terms of
21  Rule 56 in terms of evaluating whether or not there are genuine
22  issues for the jury to consider.

23        **THE COURT:** Genuine issues of fact that she changes
24  her testimony?

25        **MR. LAMBERT:** Well, Your Honor, I do think, though,

                        OFFICIAL TRANSCRIPT

1  that it's a hard thing for a plaintiff to sit here years later

2  and talk about what they would have done given different

3  information.  It's just as hard for a doctor to say that too.

4       But on direct exam and redirect, I think the

5  testimony, when read in the light most favorable to

6  Ms. Earnest, would allow a jury to determine that she would

7  have taken a different medication.  And this is much stronger

8  testimony.  It's similar to *Kahn* because it's not like in

9  *Phillips* where the doctor says, Sonnier says, "No, there's no

10  other options that I would have prescribed."

11       Dr. Carinder talks about other options being

12  available --

13           **THE COURT:** Right.

14           **MR. LAMBERT:** -- that he would have used.  And he

15  specifically testifies, this is at 1397, 14 through 16:

16       "And if she chose one of those other options that you

17  presented to her, would you have prescribed it to her?"

18       And his answer is, "Yes."

19       And so I think given all of the facts at this point,

20  there are genuine issues of material fact that a jury could

21  evaluate in this case.  It's not, again, it's not the "no

22  reasonable juror" standard of Rule 50 that we're looking at, at

23  this point.

24           **THE COURT:** Right, right.

25           **MR. LAMBERT:** In this case, in *Earnest*, as I think

OFFICIAL TRANSCRIPT

1  it's the *Duke* case that we cited, it's an older case in the

2  Fifth Circuit, we don't know what the trial testimony is going

3  to be.  We have a pretty good idea from the testimony.  But I

4  think all of our experience as trial lawyers is there's some

5  issues that result in impeachment.

6        But in the *Kahn* case which Your Honor allowed to go

7  to trial on very similar testimony, Dr. Kardinal's testimony

8  was fixed.  He wasn't able to attend trial, and there was a

9  deposition that was used.  And so I think considering that *Kahn*

10 decision, I think it would be hard for the Court to reverse

11 course now from its initial decision allowing this case to go

12 to trial.

13       I also would point out in another case that I noticed

14 in prep for today, I don't think it's in our papers, this is

15 the -- and I'm not going to say the name correctly, *Couturier*.

16 And I'm from here I should know how to pronounce this.  It's

17 548 F.Supp 3d 596, and it's from last year, a Judge Lemelle

18 decision.  I just want to read one of the quotes.

19       "For a summary judgment of an inadequate warning

20 claim to be appropriate, the plaintiff's physician must also

21 unequivocally testify that the warning was adequate to inform

22 her of the risks involved in prescribing the drug."  And Judge

23 Lemelle cites the *Stahl* decision for that.

24       We don't have that here.  We don't have Dr.

25 Kardinal -- excuse me, Dr. Carinder unequivocally testifying

OFFICIAL TRANSCRIPT

1  that the warning was adequate to him.  It's far from that.  We

2  provided multiple cites to the trial testimony and the

3  deposition testimony.

4        **THE COURT:** But I don't think that's what's at issue

5  here.  I think what's at issue is if he had been warned, what

6  would have been different.  It's not that he wasn't properly

7  warned.  That's an easy one.  But here, it's if you got the

8  warning, would it have changed your prescribing decision, and

9  that's the issue.

10        **MR. LAMBERT:** Yes, Your Honor.  And I think the quote

11  that I read previously, 1397 of the trial transcript, answers

12  that question.

13        **THE COURT:** That's it, okay.

14        **MR. LAMBERT:** I know that Mr. Strongman didn't address

15  it, but I would just say with respect to general and specific

16  causation, there's no intervening law cited.  Similar

17  challenges in *Kahn* have been denied, and there's no reason for

18  this Court to revisit its prior rulings.  That's Record

19  Documents 8094 and 8095.

20        And I would just say, Your Honor, it's interesting to

21  read this brief from front to back because it's not the same

22  record that the Fifth Circuit had in *Thibodeaux* and *Durden*.

23  They did not have the benefit of all of the expert testimony

24  that Your Honor has in this case.

25        And I think in Your Honor's oral reasons denying the

OFFICIAL TRANSCRIPT

1  second motion for summary judgment in *Kahn*, you recognize the
2  difficulty that's presented with diagnosing this particular
3  condition.  And if you read it from back to front, you have the
4  defendant saying Ms. Earnest never had PCIA.  Her renowned
5  scientist can't prove that she has it or that the drug causes
6  it, and yet, fast forward to the front of the brief where they
7  say that she should have figured it out.

8         I think that just has to be considered in terms of
9  whether or not she acted reasonably under the circumstances.
10 We'd ask that the Court deny the motion for summary judgment.

11        **THE COURT:** Thank you, Mr. Lambert.

12        Briefly, Mr. Strongman.

13        **MR. STRONGMAN:** Thank you, Your Honor.

14        A couple of brief things, the Fifth Circuit has
15 rejected and this Court has rejected, but specifically, the
16 Fifth Circuit has rejected the arguments that Mr. Lambert made
17 about causation and whether or not it's fair to put that on a
18 plaintiff in light of the state of the evidence.

19        I want to point the Court to the *Durden* opinion and
20 footnote 2.  The Court there noted that the three lawsuits in
21 *Thibodeaux* were filed in October, October, and December 2016
22 respectively, and the Court notes that, "We said the causes of
23 action in those lawsuits were reasonably knowable in excess of
24 one year prior to filing suit.  So we have necessarily noted
25 that the link between Taxotere and persistent alopecia was

OFFICIAL TRANSCRIPT

1   reasonably knowable by October 14, 2015, one year prior to the

2   filing of the earliest filed suit."

3           So this is the conclusion of the Fifth Circuit, and

4   that date that they put, which is still far out, is well over a

5   year before Ms. Earnest filed her lawsuit.  So there's no

6   dispute under the Fifth Circuit law that Ms. Earnest's claim

7   must be dismissed on prescription.

8           There is no meaningful distinction between the facts

9   of this case and the facts of the *Plaisance* case.  The result

10  of the *Plaisance* case dictates here the result.  And

11  Mr. Lambert mentioned the commentary about consultation with a

12  doctor.  Well, Ms. Plaisance consulted a doctor, and Ms. Durden

13  consulted a doctor, and their claims were prescribed.  So the

14  same result is required.

15          With regard to the second point on warnings

16  causation, when you read through the trial transcript, it was

17  very clear that when Dr. Carinder was asked if he stood by his

18  decision, he said he did.  He was also asked if you were going

19  to offer her these options, what would you say to her about

20  them.  And he made it very clear what he would tell her.  Other

21  risks, reduced efficacy, this was all part of the conversation

22  that would take place in that room.

23          It is unequivocal that Ms. Earnest said "I don't

24  know" to the question about what she would do.  So under the

25  Rule 56 standard, there is no genuine issue of material fact

OFFICIAL TRANSCRIPT

1   here on either prescription or warnings causation.  We would

2   ask that our motion be granted.

3            **THE COURT:** Thank you.

4            **MR. LAMBERT:** Your Honor my colleague Ms. Kreider

5   found the quote for me, and I'd just like to read it.  It's

6   where I told you it was.  It was page 1734, line 11 through 17.

7            "Question:  If Dr. Carinder had told you about the

8   risk of your hair not coming back with Taxotere, what would you

9   have done?

10           "Answer:  I would have asked him if there was another

11  drug out there that I could have used.

12           "Question:  And if Dr. Carinder would have given you

13  another option that did not cause permanent hair loss, what

14  would you have done?

15           "Answer:  I would have taken it."

16           **THE COURT:** Thank you.

17           **MR. LAMBERT:** Thank you.

18           **THE COURT:** Okay, let's do a quick break.

19                (Whereupon this concludes the motions
         proceedings.)

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

1                              **<u>CERTIFICATE</u>**

2

3

4          I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

5     the United States District Court, Eastern District of

6     Louisiana, do hereby certify that the foregoing is a true and

7     correct transcript, to the best of my ability and

8     understanding, from the record of the proceedings in the

9     above-entitled and numbered matter.

10

11                                   *<u>/s/Alexis A. Vice, RPR, CRR</u>*
                                     Alexis A. Vice, RPR, CRR
12                                   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

                          OFFICIAL TRANSCRIPT