UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*******************************************************************
IN RE: TAXOTERE (DOCETAXEL)          MDL NO. 16-2740
PRODUCTS LIABILITY LITIGATION        SECTION "H"(5)
                                     JUNE 3, 2022
*This document relates to:*
*Certain cases*
*******************************************************************


TRANSCRIPT OF ELIGIBILITY HEARING VIA VIDEOCONFERENCE
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE



<u>APPEARANCES:</u>

FOR PLAINTIFFS:                 Dawn M. Barrios, Esquire
                                BARRIOS, KINGSDORF & CASTEIX
                                701 Poydras Street, Suite 3650
                                New Orleans, LA 70139


                                M. Palmer Lambert, Esquire
                                Claire E. Kreider, Esquire
                                GAINSBURGH, BENJAMIN, DAVID
                                    MEUNIER & WARSHAUER
                                1100 Poydras Street, Suite 2800
                                New Orleans, LA 70163




FOR SANOFI DEFENDANTS:          Douglas J. Moore, Esquire
                                Kelly E. Brilleaux, Esquire
                                IRWIN, FRITCHIE, URQUHART & MOORE
                                400 Poydras Street, Suite 2700
                                New Orleans, LA  70130


OFFICIAL TRANSCRIPT

```
1   APPEARANCES CONTINUED:

2

3   FOR SANOFI DEFENDANTS:          Jon Strongman, Esquire
                                    Adrienne L. Byard, Esquire
4                                   Jordan Baehr, Esquire
                                    SHOOK, HARDY & BACON
5                                   2555 Grand Boulevard
                                    Kansas City, MO 64108
6

7   ALSO PRESENT FOR PLAINTIFFS:
8
                                    Jennifer Nolte, Esquire
9                                   Melanie Sulkin, Esquire
                                    Karen Menzies, Esquire
10                                  Erin Wood, Esquire
                                    David Friend, Esquire
11                                  Jessica Reynolds, Esquire
                                    Jennifer Greene, Esquire
12

13

14

15

16

17  Official Court Reporter:       Alexis A. Vice, RPR, CRR
                                   500 Poydras Street, HB-275
18                                 New Orleans, LA 70130
                                   (504) 589-7777
19                                 Alexis_Vice@laed.uscourts.gov

20

21

22

23

24  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.
25
```

OFFICIAL TRANSCRIPT

1                      **P-R-O-C-E-E-D-I-N-G-S**

2                         **JUNE 3, 2022**

3                      **(ELIGIBILITY HEARING)**

4

5          **THE COURT:** Please be seated.  Court's in session.

6          Are we ready?

7          **MS. BYARD:** Yes, Your Honor.  Adrienne Byard for

8  defendant Sanofi.

9          The great news is that we come here with a wealth of

10 successful work behind us and very few, relatively speaking,

11 issues for dispute.  After today's hearing, our hope is to

12 provide the Court with essentially two lists:  Cases that are

13 in after the rulings today and cases that are out at this time.

14         What we have now is an interim list of 63 cases that

15 Your Honor is not hearing about today either because they've

16 already been dismissed, counsel have told us that a dismissal

17 is forthcoming, or the parties have agreed that the cases are

18 ineligible under CMO 33 and there's a meeting of the minds on

19 that issue.  Both sides agree those cases are ineligible.  That

20 accounts for 63 of the cases which Your Honor is not going to

21 hear about today which will be provided after the hearing

22 today, and that could become a CMO 33 where the cases are put

23 into two -- 33A where the cases are put into one bucket or the

24 other based on the rulings.

25         There is one slight issue with respect to agreements

                         OFFICIAL TRANSCRIPT

1   between individual counsel and Sanofi on delaying certain cases
2   to Wave 2.  So in instances when there was a plaintiff who had
3   a present emotional or mental health or physical health issue,
4   she was eligible, but she's not able to participate in the
5   discovery right now, counsel have agreed to delay those cases
6   to Wave 2.
7           And in fact, you'll hear when you'll hear from my
8   colleagues about individual cases today that that's our request
9   of the Court in some of these cases, saying that they're just
10  not ready to go forward right now.  They're not on the same
11  footing as the other cases.  We shouldn't hold back the whole
12  wave with these cases.  They should be delayed to the next
13  round of discovery.  That's the 63 cases that there's no
14  dispute about.
15          There's also another large swath of cases where
16  there's no dispute about.  So there's 50 cases that you're not
17  going to hear about today where both sides agree that all the
18  boxes have been checked and that the case is ready to start
19  going.
20          Also, there's a small category of cases that have PFS
21  verification issues which would be deferred until July in which
22  our hope is that those issues will be completely resolved
23  between now and then.
24          **THE COURT:** Right.
25          **MS. BYARD:** So finally, Your Honor, you're hearing

OFFICIAL TRANSCRIPT

about 47 cases today.  10 cases that we previously presented to
Your Honor have been cured since the last time we provided the
list, and we'll flag those as we go through.  You'll see that
the information on your chart is blanked out for those cases
because an agreement has been reached that there's not a
problem to be heard by Your Honor today.

Okay, so let's talk about the 47 cases that you'll
hear today.  We wanted to make clear at the outset that today
differs from a show cause in a few different respects.  The
first is in some respects it's more lenient because we're not
asking for dismissal of any of these cases.  There's one case
where there's a problem with attorney contact.  You'll hear
from both parties.  They just can't get ahold of the client.
That would be the single dismissal ask.  I don't think there's
an objection, but we'll hear about it.

But for the most part, all we're saying is this isn't
eligible for discovery at this time.  This isn't a Wave 1 case.
Maybe this is a Wave 2 case or when other manufacturers come
in, in mixed product ID cases.  We're not saying dismiss them.
We're just saying they're not ready.

But in another sense, it's more rigorous.  And the
challenge is that we're seeing some cases that have issues that
haven't been part of the prior bellwether process because we
include, for example, double cancer cases in Wave 1.  So you'll
hear questions about photographs that we would never bring to

OFFICIAL TRANSCRIPT

1   Your Honor in a show cause because it's not a basis for

2   dismissing a case.  It's a question of do we have enough

3   information about this case to be a good Wave 1 case.

4           **THE COURT:** Right.

5           **MS. BYARD:** And you'll hear that dispute today.

6           So to preview the buckets that Your Honor will hear

7   today, there's essentially four buckets that we've tried to, in

8   a way that makes sense to at least us and hopefully you, divide

9   them amongst Sanofi counsel.  The first bucket are plaintiffs

10  that are not completing the discovery that's asked of them in

11  CMO 33.  So these are cases where plaintiffs either haven't

12  gotten their authorizations in or have not done a PFS or some

13  other way that they're not checking the boxes to go forward.

14  And that's where that dispute occurs.

15          We're saying just delay those cases to Wave 2 because

16  they're behind.  I think you'll hear from plaintiffs' counsel,

17  an argument that those should just come into the cue later,

18  that they should just be tolled for now and come in later.  Our

19  thought is not to stagger cases coming in, to go ahead and

20  leave today, tomorrow, whenever, with a list of the cases that

21  are in or out.  Much easier for us to administer.

22          The second bucket -- so first bucket that you'll hear

23  from Ms. Brilleaux on are these plaintiffs not checking the

24  boxes, not completing discovery.  The second bucket which I'll

25  handle is on product identification, and there's two categories

OFFICIAL TRANSCRIPT

1   there.  The first are cases where there's partial product ID.
2   Meaning, a lady, for example, took six cycles of chemo, and we
3   have product ID on two of them that are Sanofi, but there are
4   four other cycles that we don't know what medicine she took.

5            And our understanding, as well as the vast majority
6   of plaintiffs' counsel, is that those are Sanofi only cases.
7   Those are cases where we would do a CMO 12 records custodian
8   deposition with co-counsel all, you know, at the table or on
9   the phone, figuring out what medicine she took for those other
10  cycles.  Sanofi's position is that those aren't single
11  manufacturer cases.  Those are still questionable product ID
12  cases.  We need to figure out who the proper defendants are.
13  That case is not a Wave 1 case.  Meaning, it's a Wave 2 case,
14  but it's not eligible for Wave 1.

15           The second category of cases with product ID are
16  confirmed multi-manufacturer cases.  So you'll hear about a
17  case later, for example, that has Sagent medicine in addition
18  to Sanofi medicine.  There's no dispute about that, and the
19  question is whether or not that case can go forward.

20           Plaintiff's position in the conferrals has been that
21  they can choose just to pursue Sanofi and choose not to pursue
22  the other manufacturers, and it can go forward.  And our
23  position is that CMO 33 is single manufacturer product ID only.

24           Okay, so bucket 1, bucket 2, we've done.  Bucket 3 is
25  authorizations, and I want to be crystal clear on this.  All of

OFFICIAL TRANSCRIPT

1   the cases that you'll hear about in this problem authorization
2   bucket are cases where plaintiffs have since cured the problem.
3   Meaning, that we now have a physical signature from the
4   plaintiff herself.  My colleagues, who have been working day
5   and night to look at the signature issue, say there's no
6   problem with the signature, "Adrienne, it's okay for the nurses
7   to go get protected health information on this authorization."

8          The challenge that we face on those cases, Your
9   Honor, is that we still don't have clarification from counsel
10  about what happened with the prior authorizations and why we
11  had authorizations that were copied and pasted with different
12  dates and with witness signatures that were the same in every
13  single case; even though ladies lived all over the country.

14         We only bring this to Your Honor's attention to say
15  that there needs to be an answer.  I still don't have an answer
16  for you this morning about whether those were valid or invalid
17  authorizations.  I have a position on it, but I do believe it's
18  appropriate that there be a remedy for that issue.  And I
19  believe that the remedy should have been plaintiff saying,
20  "Sanofi, those authorizations have an issue.  Do not use them."
21  We gave them that opportunity, and they didn't take us up on
22  that suggestion consistent with Your Honor's prior order.

23         Now, because we are where we are this morning, with a
24  lot of cases where we're collecting records, I got invoices for
25  like 60 records while we've been sitting here in court today,

OFFICIAL TRANSCRIPT

1  where records are coming in on these cases, we're ready to go.
2  We're going.  Those cases are still sitting off to the side
3  because I don't know what is happening with these
4  authorizations and whether we had permission to use them.
5  We've quarantined the records for those women.  And once we
6  figure out what happened with the authorizations we had before,
7  we'll make a decision about what we do next.  But I think for
8  now, those cases just aren't in Wave 1.
9          **THE COURT:** Okay.
10         **MS. BYARD:** And then finally, Your Honor, the fourth
11 bucket are photographs, and as I mentioned, in some ways,
12 that's a more rigorous requirement than you would ever hear at
13 a show cause because it's not a basis for dismissal.  We didn't
14 know what line to draw.  What Amended PTO 22 says is that a
15 case has to have photographs within six months of chemotherapy.
16         We said five years when we decided which cases to
17 bring to Your Honor or not.  Meaning, that after a plaintiff
18 has ended chemotherapy, if we have photographs anywhere within
19 a five-year time frame afterwards, we said that this case can
20 go forward.  If it was a decade, though, between when she
21 finished her chemo and when we have the first photographs, we
22 think that that's a case where we don't have enough information
23 for it to be a Wave 1 case.
24         **THE COURT:** Okay.
25         **MS. BYARD:** And that's principally because of the

OFFICIAL TRANSCRIPT

1  question of hormone therapy use which Your Honor heard a lot
2  about in both the *Earnest* and the *Kahn* trial.

3         Okay, Your Honor, with great thanks to Ms. Barrios,
4  her team, Ms. Kreider, as well as Mr. Horrell who is with me in
5  court, Ms. Eickbush on the phone, that's how far we've come.

6         As I previewed, I think we can go through some of
7  these cases individually, get Your Honor's guidance on how you
8  are inclined to rule on eligibility in those circumstances, and
9  I think we may be able to stop at lunch with an agreement with
10 liaison counsel to apply your prior rulings to the remaining
11 cases, and resolve all of the issues without actually going
12 through them all individually at some point.

13         But I know Ms. Barrios has some comments as well.

14         **THE COURT:** Okay, Ms. Barrios.

15         **MS. BARRIOS:** Good morning, Your Honor.  Thank you for
16 letting me appear by Zoom.  Hopefully, for the next hearing in
17 July, I'll be in the courtroom.  It pains me to not be there
18 while this is going on.

19         I'd like to make some general comments for the record
20 which would apply to all cases selected for inclusion in Wave 1
21 and just lay those before the Court today.  I'd like to report
22 to the Court how effective the meet and confers have been
23 between Sanofi and individual counsel.  Sanofi appears to be
24 very organized in dealing with counsel in almost 200 cases.  We
25 were copied on the email exchanges which was very helpful for

OFFICIAL TRANSCRIPT

1   us to keep track of the 200, and we believe Sanofi promptly and

2   fully responded to each counsel.

3         The manner in which the conferrals were conducted

4   resolved many issues that will not need Court intervention.  We

5   want to thank Ms. Byard's team as well as our own team for the

6   seemingly endless hours devoted to working on this eligibility

7   project during a holiday week.

8         Your Honor, we're here to determine if cases chosen

9   meet the eligibility criteria set forth in CMO 33.  The parties

10  were each to select 50 cases to meet the criteria, including,

11  PID, first CMO 12A, and photos.  The Court also selected 100

12  cases randomly.

13        It's interesting to note that Sanofi is challenging

14  the eligibility of 7 cases it selected based upon

15  authorization, photos, and prior cancer which was previously

16  revealed; and it now challenges on these grounds despite

17  investigations that should have been done prior to nomination.

18  It can be argued that Sanofi has made substantial efforts to

19  reduce the number of cases in Wave 1 through dismissals and

20  challenges.

21        We can't lose sight of the fact that this is the

22  first step in remand discovery, the initial step.  It's the

23  initial discovery to be done in the MDL.  Certainly, Sanofi

24  would want more discovery in the court which tries the case.

25  Again, this is preliminary.  As Mr. Lambert stated in our call

OFFICIAL TRANSCRIPT

1   with the Court last Thursday, if Sanofi has had difficulty

2   obtaining records to begin the process of completing the four

3   depositions in seven months, plaintiffs would be amenable to a

4   reasonable extension in those cases.

5          Our largest objection, Your Honor, is in the relief

6   Sanofi requests.  This requested relief goes far beyond the

7   eligibility purpose of today's hearing.  First, Sanofi seeks

8   sanctions for failure of counsel to disclose to liaison counsel

9   by May 25th whether the then operative authorizations were

10  originally signed; although all new authorizations have

11  plaintiff's original signature now.  The request for sanctions

12  is obviously inappropriate and an attempt to create satellite

13  litigation and delay.

14         Plaintiffs ask the Court not to entertain such an

15  extraordinary request.  The issue is moot.  Sanofi has the

16  original signatures.  It would just be going down a rabbit

17  hole.

18         Secondly, Sanofi seeks to delay certain cases until

19  Wave 2.  At this point, there's not even been a Wave 2 order,

20  nor any parameters on party versus plaintiff selection.  Even

21  if the Court had ordered Wave 2, would Sanofi agree it an

22  eligible case to put there, or would we have to reargue the

23  case at a Wave 2 eligibility hearing?  If the Court is amenable

24  to discussing the option of deferral of a particular case to

25  the next wave versus the remedy given in CMO 33, that is,

OFFICIAL TRANSCRIPT

1  tolling the seven-month discovery period until the PFS is

2  compliant, there needs to be a discussion of how that process

3  will work and against whose selection that case would count.

4         Our third major objection to remedy is Sanofi asking

5  counsel to produce originally operative authorizations of PFS

6  verifications for inspection; although counsel has complied

7  with CMO 33 requirements to upload authorizations with

8  plaintiff's original signatures.  We're unaware if Sanofi

9  contemplates a handwriting expert battle in connection with

10  this request to order inspections.  But even if such a witness

11  can pass *Daubert* today, the issue is moot as newly signed

12  authorizations have been uploaded.  Plaintiffs see this as

13  another delay tactic; so the MDL can go off on a tangent to

14  examine documents which are not even in play.

15         I remind the Court of CMO 33's remedy.  Paragraph 9

16  of CMO 33 sets forth the remedy if plaintiff does not timely

17  complete her Plaintiff Fact Sheet.  It provides that all

18  deadlines in the CMO with respect to that plaintiff's case are

19  tolled until the plaintiff has complied or the case is

20  dismissed.  Sanofi ignores this paragraph that was clearly put

21  into the order to address this situation.

22         We ask the Court to reject any argument on Sanofi's

23  request for sanctions, defer cases to Wave 2 without further

24  negotiation and discussion with the Court, or a slide show

25  inspection of authorizations and verifications which are old

OFFICIAL TRANSCRIPT

1   and outdated.  The CMO was entered to create an orderly,

2   streamlined, and efficient process to move the MDL forward.

3   The remedies urged by Sanofi in this eligibility hearing will

4   do the opposite, cause delay and create satellite litigation.

5           Your Honor, I appreciate the opportunity to enter

6   those general remarks in the record.  There are two small

7   objections for the record I'd also like to add.  Sanofi

8   color-coded the chart in two different colors that they gave to

9   the Court.  Plaintiffs have had no input into the coloring or

10  color cells and object to the color-coded chart we believe

11  Sanofi gave to the Court today.

12          **THE COURT:** This one?

13          **MS. BRILLEAUX:** It's not color-coded, Your Honor.

14          **MS. BARRIOS:** Your Honor, I was sent one

15  electronically.  And I'm assuming that Sanofi gave Your Honor

16  one, but I don't know that.

17          **THE COURT:** I don't have...

18          **MS. BYARD:** We weren't able to print that one.  We

19  printed the one that we sent to the Court.  I'm sorry.

20          **THE COURT:** I didn't have a color-coded chart.  So I

21  thought there was something I was missing.

22          Okay, proceed.

23          **MS. BARRIOS:** Do you have that, Your Honor, or not?

24          **THE COURT:** I do not.

25          **MS. BARRIOS:** Okay, then I withdraw the objection.

OFFICIAL TRANSCRIPT

1    We've also learned yesterday that Sanofi was

2  including in its material screenshots of Centrality activities

3  of plaintiff.  There's been several additional Centrality

4  uploads late yesterday.  We just object generally if the

5  screenshot is not totally up to date.

6    We have worked tirelessly this past week.  Ms. Byard

7  and I were on the phone until late yesterday evening.  Our

8  teams have been fabulous, and there are little nits here and

9  there.  But I think with our cooperation with Sanofi, we can

10 get over everything very well.  Thank you, Your Honor.

11    **THE COURT:** Thank you.

12    **MR. LAMBERT:** Judge, just a reminder to counsel, when

13 it's their turn, Star 6 to unmute.

14    **THE COURT:** All right, thank you.

15    Are we ready to proceed, Ms. Brilleaux?

16    **MS. BRILLEAUX:** Good morning, Your Honor.  Kelly

17 Brilleaux for Sanofi defendants.

18    The first case on the call docket is actually --

19 well, not a call docket.  On the hearing list, I should say, is

20 the one that Ms. Byard previously mentioned that's really the

21 exception to the rule.  This is probably the -- well, I can

22 tell you it's the only case we're asking to be dismissed today.

23    And in this case, it's Kirsten Peterson, and

24 Ms. Peterson is represented by Allen & Nolte.  And in this

25 case, counsel did file a declaration of no contact.  She's been

OFFICIAL TRANSCRIPT

1  unable to reach her client; so I obviously will allow

2  Ms. Nolte, if she's on the line, to acknowledge this.  But we

3  believe that this is the one case today that's eligible for

4  dismissal on the record today.

5         **MS. NOLTE:** Good morning, Your Honor, Jennifer Nolte

6  for plaintiff Kirsten Peterson.  We last spoke with our client

7  on April 21st after she was selected.  Since then, we've tried

8  to contact her on no less than nine dates by various forms of

9  communication to get her authorizations and Plaintiff Fact

10 Sheets to submit pursuant to the CMO.

11        She has been completely nonresponsive to any of our

12 forms of communication.  So at this point, we do not anticipate

13 that she will be able to meet those requirements.

14        **THE COURT:** Let me just understand, a quick question,

15 Ms. Nolte, you did talk to her April 21st and told her that

16 she had been selected?

17        **MS. NOLTE:** We did.  We told her and told her to

18 expect all these documents, and she indicated at that point she

19 thought she would go forward with it.  So we sent everything

20 out to her for her review and to send back, and since then, she

21 has been completely nonresponsive.  We've called her.  We've

22 emailed her.  We've texted her, tried to contact her on social

23 media.  Of course, sent her things through the U.S. mail, and

24 she won't respond to anything.

25        **THE COURT:** Thank you.  The Court is going to dismiss

OFFICIAL TRANSCRIPT

1  this case with prejudice.  And I want to specifically note that
2  plaintiff's counsel has attempted to contact her client and has
3  done what she can do.  And plaintiff has failed to meet her
4  obligations in this discovery, and as a result, the case is
5  dismissed.

6            **MS. BRILLEAUX:** Thank you.

7            **MS. BYARD:** Next, Your Honor, is the Sandra Moore
8  case.  And the next cases that follow are all Bachus & Schanker
9  cases.  I believe we have Ms. Sulkin on the line for those
10 matters.

11           **THE COURT:** Ms. Sulkin, are you here?

12           **MS. SULKIN:** I am.  Good morning, Your Honor.

13           **THE COURT:** Good morning.  Thank you.

14           Are we ready to proceed?

15           **MS. BYARD:** Yes.  The first case is a partial CMO 12A
16 case which we would contend as ineligible as not being a single
17 manufacturer product ID case.  Ms. Moore received four cycles
18 of medicine.  We have confirmed Sanofi product ID for the first
19 two cycles in June of 2012; however, we have no information at
20 all regarding the July and the August cycles.

21           The first step, if this were a CMO 12 case, which it
22 is, would be to take a records custodian deposition to
23 ascertain whether or not they have information regarding the
24 July and the 2012 cycles which would involve my colleagues the
25 505(b)(2) codefendants.

OFFICIAL TRANSCRIPT

1          But in this case, despite us alerting counsel to the

2   fact of there being a PID problem, the last activity on product

3   ID was in 2019.  And this case was filed in 2017 with these

4   questions on product ID for two cycles still outstanding.  It's

5   our position that the case is ineligible for that reason.

6          **THE COURT:** Ms. Sulkin.

7          **MS. SULKIN:** Your Honor, as Sanofi concedes, Sanofi is

8   identified as the product ID manufacturer for two of the

9   cycles, and the other two cycles are unknown.

10         At this point, Sanofi is, I believe, the only

11  remaining defendant in this case as it is; so there would be no

12  involvement of the 505(b)(2) defendants unless they voluntarily

13  wanted to attend some sort of records deposition.  However,

14  we're prepared to proceed against Sanofi only as they are the

15  only defendant.

16         It's also my understanding that the Sedlacek article

17  shows that after just one treatment, there can be a resulting

18  PCIA.  And so it's our position that because there's no other

19  manufacturer identified, there are no defendants other than

20  Sanofi that are in this case any more, that we should be

21  allowed to proceed against Sanofi only in the Wave 1 remand.

22         **THE COURT:** I'm looking at Paragraph 4a, "Wave 1

23  plaintiffs must have product ID as defined by CMO 12A.

24  Plaintiffs' counsel must promptly reconcile the named

25  defendants and proceed with dismissals of improper party

OFFICIAL TRANSCRIPT

1   defendants in selected cases."

2              Everybody but Sanofi has been dismissed.

3          **MS. BYARD:** The way that we --

4          **THE COURT:** I would think, and if there's a belief

5   that there is another manufacturer, that would probably be on

6   the verdict form.

7          **MS. BYARD:** So I guess the interpretation of that

8   paragraph is ambiguous.  We understood it to mean that there

9   would be confirmed product identification for all cycles of her

10  medicine so that there would be CMO 12 evidence for each cycle,

11  and this is a case where it's undisputable that there's not CMO

12  12 evidence for each cycle.  There's two cycles where there's

13  just no information about.

14             So as Sanofi's counsel, the very first thing I'm

15  going to do is try and figure out who made the medicine for

16  those other cycles.  And if I have to, take the deposition of

17  the records custodian to find out if they don't have

18  information for those cycles.  Meaning, there's an open

19  question.

20             And at least, as we understood it, Wave 1 was

21  supposed to be Sanofi only cases, and maybe Wave 2 would be

22  cases where they make choices about which defendants to pursue.

23  And they're certainly entitled, I think, to do that in a wave

24  where there's not a CMO 12 requirement or there's not --

25         **THE COURT:** Right, and I guess I understand your

OFFICIAL TRANSCRIPT

1  concern, and I didn't think that we would find ourselves in a
2  situation where we have Sanofi, Sanofi, Sanofi, I don't know, I
3  don't know, I don't know.

4          **MS. BYARD:** Right, right.

5          **THE COURT:** Docetaxel.

6          **MS. BYARD:** Well, and I'll say that other counsel in
7  the rest of the wave have agreed with our interpretation of the
8  order.  Meaning, the only cases you're going to hear this
9  dispute on are Bachus & Schanker and PBC cases.  Everyone else
10 has said, "You're right, we're missing PID for one cycle.
11 She's not eligible."

12         **THE COURT:** How many cases are we --

13         **MS. BYARD:** Six.

14         **MS. SULKIN:** Your Honor, if I may?

15         **MS. BYARD:** There's only six cases that present this
16 issue.

17         **THE COURT:** That are in that bucket?

18         **MS. BYARD:** Correct, yeah.

19         **THE COURT:** Ms. Sulkin.

20         **MS. SULKIN:** Your Honor, if I may, CMO 12 does not
21 require the identification of each and every cycle.  That
22 language is not in CMO 12.

23         I think you hit the nail on the head.  There are no
24 other defendants in this case.  I don't think at this point in
25 time when we're taking four depositions, I don't think it's

OFFICIAL TRANSCRIPT

1  necessary for Sanofi to take the records custodian at this
2  time.

3        Obviously, when this is remanded back to the trial
4  court, as Ms. Barrios pointed out, there will be additional
5  discovery if Sanofi wants to include that as a defense, try to
6  pin the hair loss on another manufacturer.  However, Sanofi is
7  the only remaining defendant.  We believe that this case should
8  go forward.

9        **THE COURT:** No, I understand that, Ms. Sulkin.  But it
10  is remand.  We are now dealing with the remand process, and I
11  think part of the concern is we're trying to see which things
12  we don't have to deal with so that we can get these things
13  submitted.  I understand that there's one defendant.

14        **MS. BYARD:** It would be a different CMO, a CMO that
15  included product ID question cases would have different
16  discovery allowed.  I wouldn't have to wait in the case.

17        **THE COURT:** Plaintiff shall voluntarily dismiss any
18  and all named defendants not identified by product ID, they've
19  done that.

20        **MS. BYARD:** That was, at least as I intended it in
21  drafting it, for a different problem which is that we have
22  still some of those shotgun complaints out there.

23        **THE COURT:** Right, right, right, right.

24        **MS. BYARD:** Yes, yes.  And that was meant to, if they
25  still had their complaint inadvertently or incorrectly naming

OFFICIAL TRANSCRIPT

1  additional defendants, that would get cleaned up so that other
2  counsel wasn't worried about their involvement in those cases.
3        **MS. SULKIN:** Your Honor, that's not correct.
4        **MS. BYARD:** Just as I drafted it and negotiated it
5  with PLC, my intent was to deal with shotgun complaint
6  problems.  Not this problem.
7        **MS. SULKIN:** Your Honor, operatively, that's not how
8  it's been utilized.  In fact, I've gotten several requests from
9  Sanofi and other defendants in this matter where if we have,
10  you know, product ID concerns for three of the treatments and
11  the fourth one we cannot find product ID, it's been requested
12  that I dismiss all the not named defendants.  So that's not a
13  correct application of CMO 12A.
14        We have dismissed any and all manufacturers not
15  already identified.  And should, at some point in the future,
16  Sanofi somehow shows that another manufacturer was used -- and
17  Your Honor, I can attest that we've done our diligence in
18  attempting to get product identification in this case.  I
19  believe it's more likely than not, the only party we're ever
20  going to be able to proceed against is Sanofi.
21        **MS. BARRIOS:** Your Honor, may I address the issue?
22        **MS. BYARD:** The question here isn't whether there --
23        **THE COURT:** No, I understand.  I understand the
24  question.  I understand the question.  I understand that we're
25  dealing with six cases.

OFFICIAL TRANSCRIPT

1        **MS. BYARD:** Yes.

2        **THE COURT:** Ms. Barrios, do you have something to say?

3        **MS. BARRIOS:** Yes, ma'am, thank you.  I just wanted to

4    point out if individual counsel is willing to roll the dice and

5    go to trial with two of the four, why can't she?

6        **MS. BYARD:** I would be fine with that.

7        **THE COURT:** Well, this is what I'm thinking.  This is

8    more difficult for plaintiffs' counsel.  Because what's going

9    to happen at trial in my view is we've got Sanofi two times, we

10   don't know who else did it.  Which one caused the damage?

11       The jury could very well say, "I think it was the

12   third cycle, and we don't know who it is, and it's certainly

13   not Sanofi."  They certainly can't carry that burden.  I don't

14   know how -- I would be more concerned if there was product ID

15   that says this is from Sandoz or some of these others.

16       **MS. BYARD:** Yes, and there is one of those cases.

17   It's the Galloway case.

18       **THE COURT:** That's a different issue.  I think I'm

19   going to allow these to proceed, and proceed at your own peril,

20   plaintiff.  That's my thought.

21       **MS. BYARD:** The only ask I would make --

22       **THE COURT:** What's the ask?

23       **MS. BYARD:** -- would be our CMO wasn't built for

24   product ID discovery.  I didn't contemplate that there would be

25   product ID discovery.  So if Your Honor would allow in those

OFFICIAL TRANSCRIPT

1  five cases me to take an additional deposition?

2            **THE COURT:** Absolutely, absolutely.  That's your

3  remedy.  Take a deposition.

4            **MS. BYARD:** Yes.

5            **THE COURT:** If you discover it's someone else, then

6  we'll deal with that at the time.

7            **MS. BYARD:** Okay.

8            **THE COURT:** But if we find ourselves where there's...

9            **MS. BYARD:** With that understanding in mind, I think

10 we can pass hearing the Floraida Aragon case which is Tab 3.  I

11 think we can pass hearing the Cheryl House which is Tab 4.  I

12 think we can pass hearing the Mathilda Cummings case which is

13 Tab 30.

14           The only product ID question we would need to have

15 decided -- oh, I'm sorry, I have one more to deal with.  So the

16 only two cases that we would have to discuss would be the

17 Christine Galloway case which is your Tab 31, and that's a PBC

18 case, as well as Elaine McDuell which is Tab 33.  That's also a

19 PBC case.

20           **THE COURT:** Okay.

21           **MS. BYARD:** And I think it's going to be faster to

22 move around; even though we're switching counsel.  But I defer

23 to Your Honor.

24           **THE COURT:** That's fine.  You all have worked through

25 this, and you know these issues.


                          OFFICIAL TRANSCRIPT

1          **MS. BYARD:** Because we can apply your ruling on that

2    first case to the other cases, no problem.

3          **THE COURT:** Fine.  Okay, what do we have with

4    Christine Galloway?

5          **MS. BYARD:** So Christine Galloway, Tab 31, again,

6    Ms. Reynolds on that case, is a case where the last cycle is

7    Sagent; so it's confirmed multi-manufacturer.  I dearly like

8    Mike Suffern.  I do not want to work on the -- I don't want to,

9    in Wave 1, workup cases with codefendants' counsel with the

10   fact that everything has been negotiated.

11         **THE COURT:** No, I think -- so Ms. Reynolds, are you on

12   the line?  Is that your name?  It's not Reynolds anymore.

13         **MS. BYARD:** Ms. Perez Reynolds.

14         **THE COURT:** It is Reynolds.  I get so confused.

15         Okay, yes, ma'am.

16         **MS. REYNOLDS:** That's okay.  I'm trying to make it

17   easier for you now, Judge.  Just Ms. Reynolds, so we don't have

18   any more confusion over the name.  Hopefully, that helps.

19         Yes, as it relates to Ms. Galloway, Your Honor, she

20   has six cycles of treatment with docetaxel.  We have confirmed

21   product identification on all six.  Out of the six, five of

22   those belong to either Sanofi or Winthrop.

23         At the time of filing the short form complaint, I

24   believe there was still some sage disagreement as to whether

25   Sagent was going to be adopted by any of the valid 505(b)(2)'s

OFFICIAL TRANSCRIPT

1    as a 505(b)(2) rather than a true generic.

2            And so if you take a look at Ms. Galloway's short

3    form complaint, the only defendant that was named was Sanofi,

4    in part because the majority of the contribution of all

5    Taxotere which Ms. Galloway received is from Sanofi and not

6    from Sagent.  So we believe because that is the only defendant

7    that Ms. Galloway named, that it is five of the six cycles, and

8    the complication of Sagent being adopted by any of the

9    505(b)(2)'s.  So this case is eligible for Wave 1 remand and

10   should be able to proceed, Your Honor.

11           **MS. BYARD:**  Sagent was not a named defendant on the

12   short form complaint at the time this lawsuit was filed, I

13   don't think.  I could be wrong, but I don't think in November

14   of 2017.

15           The issue is, in addition to the fact that Sagent is

16   named and that, I think, case wouldn't necessarily involve

17   codefendants' counsel, or you know, potentially crossclaims,

18   who knows, the last authorizations --

19           **THE COURT:**  Okay, I'm not going to allow these to

20   proceed in Wave 1.  It doesn't mean that the case is being

21   dismissed, but I think we spoke of having a single named -- a

22   single defendant.  For me, that means a single product ID

23   manufacturer.

24           I think it's going to create problems we don't have.

25   Those that have no name, that's a little bit different because

OFFICIAL TRANSCRIPT

1  we won't have any claims associated with that.  Does that help?

2           **MS. BYARD:** Understood, Your Honor.

3           **THE COURT:** So this one is not proceeding.

4           **MS. BYARD:** And then the only other case that sort of

5  falls into this CMO 12 question mark bucket, Ms. Brilleaux does

6  have a few proof of use cases which is very similar to what

7  Your Honor hears at the show cause, is Elaine McDuell which is

8  Tab 33.

9           **THE COURT:** Okay, and how is this different from the

10  other two?

11          **MS. BYARD:** This, I don't have any medical records on

12  this case, period.  I have none.  What I have is what Your

13  Honor sees in our Tab 33 which is this statement regarding

14  chemotherapy drug administered.  There's one box checked, and

15  then it had this description of docetaxel.  And that's what I

16  have.  I don't have medical records.  I have -- the only word I

17  can use to say it is weird.  What I have is weird.  It's not

18  CMO 12.

19          **THE COURT:** Is that a term of art?

20          **MS. BYARD:** Yes, yes, coined by Jordan, we'll say.

21          So this case doesn't yet have CMO 12.  So this case

22  would require -- we don't have medical records.  We didn't

23  have, at least as of the last time I checked, the most recent

24  Plaintiff Fact Sheet was from 2018.  But this is Ms. Reynolds

25  again.

1          **THE COURT:** Ms. Reynolds.

2          **MS. REYNOLDS:** Yes, Your Honor.  If you look at MDL

3   Centrality No. 182155 for Ms. McDuell which should have been

4   provided to Your Honor in the supporting documentation, you can

5   see that it's a bit of a mischaracterization to say that there

6   is no product identification in this case.

7          I believe it would be more accurate to say that the

8   CMO 12 checklist is not signed in a manner that Sanofi may

9   like.  But if you review it, what you'll find, Your Honor, is

10  that Winthrop is checked.  And then over the certification

11  where the signature would go, there is a handwritten note, not

12  written by myself or anyone in my office, but from

13  Ms. McDuell's facility.  It says, "Please see attached

14  certification."

15         And if you look, what you'll find, Your Honor, is

16  that Ciox, who completed plaintiff's request for product

17  identification, filled out their own form or affidavit, if you

18  will, and it is signed by someone, L. Nelson.  It lists the

19  exact dates of treatment.  And then it says that what's being

20  sought is the NDC of specific.  They then check that in the

21  checklist that we sent them.  And then they also send their own

22  sheet printed out from their own facility that goes through the

23  Winthrop NDC numbers.

24         So I believe that it is sufficient to establish

25  product ID.  It's just that Ciox created its own affidavit to

1  certify the information and attach the checklist and checked

2  off the appropriate box that matched the patient's record.

3         I am having my paralegal double-check, but I am

4  almost certain that there are medical records that have been

5  uploaded and provided for Ms. McDuell.  I can clarify that as

6  soon as my paralegal updates me on that situation.

7         And then as it relates to any PFS, all authorizations

8  are already provided, updated ones for Ms. McDuell.  She had

9  received a copy of her latest PFS and has been asked to review

10  that to determine if there's anything that needs to be

11  supplemented.  But certainly, with the current authorization,

12  the PFS that was submitted, the defendant has an ample amount

13  of information regarding providers.

14         The providers who prescribed the Taxotere certainly

15  has not changed.  And although that original PFS and the

16  original authorizations have been in the custody of Sanofi for

17  many years now, not a single record as far as we can tell has,

18  at least, been obtained yet by Sanofi on Ms. McDuell.  So

19  there's certainly a wealth of providers that they already know

20  about, have knowledge of, and have a valid authorization to

21  begin to collect medical records on.

22         Certainly, should Ms. McDuell update her PFS or

23  supplement with any needed information, that will be provided

24  promptly upon receipt by my office.

25         **THE COURT:** Okay, all right.  I think this is

OFFICIAL TRANSCRIPT

1  sufficient product ID because I do understand what they did.
2  You just have to look at it.  That's not bothering me.
3          What else is -- do you not have her actual medical
4  records?
5          **MS. BYARD:** My notes -- and again, things could have
6  been uploaded since -- are that we don't have a PFS since 2018
7  and that we don't have medical or billing records -- or medical
8  records, excuse me.
9          **MS. REYNOLDS:** Your Honor, my paralegal just came in,
10 and it appears that the medical records that we did receive
11 from the facility is a flowsheet.  I don't know if it's an
12 issue of there not being any more medical records to collect,
13 but every record that we've received, we put in there.  So
14 there is a flowsheet.
15         **THE COURT:** Stop, stop.  I'm satisfied with the NDC.
16         So what I will say is I'm going to ask that
17 Ms. Brilleaux or somebody talk to Ms. Perez in the next week
18 and just work it through.  It sounds like this is going -- if
19 there's a problem, it's an easy fix.  It sounds like the
20 medical records are there, and I don't know what the problem
21 is.  But somebody sitting over there needs to call Ms. Perez
22 this week, and I don't care who it is.
23         **MS. BYARD:** We're all friends.  Understood, Your
24 Honor.
25         So then I think Ms. Brilleaux has one proof of use

OFFICIAL TRANSCRIPT

1  case, and then we switch back to the Bachus & Schanker docket

2  with that.

3         **THE COURT:** Okay, thank you.

4         **MS. BRILLEAUX:** So this is Tab 5, Your Honor, and this

5  is Bernice Cummings.  I'm going to let you know that as you'll

6  see on the chart that you have, there are several issues with

7  this case, but I'm just going to cut to the chase.

8         This case does not have a single medical record

9  demonstrating proof of use, and I'm anticipating plaintiff's

10  response.  They're going to respond that they have CMO 12A

11  product identification which I frankly don't understand.  We

12  don't have any medical records, and we cannot proceed with Wave

13  1 discovery without medical records establishing proof of use.

14         So our request for relief, Your Honor, is that this

15  gets moved to the show cause docket to decide whether it should

16  remain in this litigation.  We're not asking for it to be

17  dismissed today, but because we do not have proof of use of

18  docetaxel, it's certainly not appropriate for Wave 1 discovery.

19         **THE COURT:** Ms. Sulkin.

20         **MS. SULKIN:** Your Honor, we do have a CMO 12 form that

21  is clearly filled out by this facility Medical Oncology

22  Associates where they write Ms. Cummings' name, put her date of

23  birth, and sign off on it, and select the appropriate product

24  ID.  I cannot fathom why any medical facility would do this if

25  Ms. Cummings did not, in fact, receive docetaxel.

OFFICIAL TRANSCRIPT

1          **THE COURT:** But do we have the record of her actual --
2    I understand this is the NDC codes.  But do we have records as
3    to what she received when?

4          **MS. SULKIN:** We just have the form that does state
5    that she received her first treatment with docetaxel on
6    May 28th, 2010 and her last treatment on September 13th of
7    2010 and that she received six doses.

8          **THE COURT:** What else did she receive with it?

9          **MS. SULKIN:** That, I am unsure of at this point.

10         **THE COURT:** You see, that's part of the problem.  We
11   have to -- it's apparent that she received this, but I think
12   the medical records are going to tell us what she received,
13   when, and in what form.  And maybe I'm wrong, but I haven't
14   seen a plaintiff yet that received Taxotere solely and how was
15   it administered, that sort of thing.  So we need the actual
16   records from the facility.

17         **MS. SULKIN:** Yes, Your Honor.

18         **THE COURT:** Just answer me, has that been requested,
19   Ms. Sulkin?  What's the problem there?

20         **MS. SULKIN:** We did request medical records from the
21   chemotherapy infusion center.  However, I believe that because
22   the records are so old, they may have been destroyed.

23         However, we have provided defendants with the medical
24   providers.  We will continue to request medical records, and
25   you know, it's my theory that the defendants will also request

                        OFFICIAL TRANSCRIPT

1  medical records based on what's been provided in the Plaintiff
2  Fact Sheet.
3            You know, I don't have the Plaintiff Fact Sheet in
4  front of me.  That's not something I prepared for this hearing,
5  but it may have other information about what this plaintiff
6  took with the Taxotere.  I'm trying to look at that in
7  Centrality right now.
8            **MS. BRILLEAUX:** Your Honor, if I may, this just -- we
9  can't proceed with Wave 1 discovery if we don't have medical
10 records about cancer treatment.  Again, we're not arguing that
11 the case should be dismissed at this time.  We do think it's
12 appropriate for a show cause to determine what we can do with
13 this case, but we can't proceed with Wave 1.
14           **MS. SULKIN:** And Your Honor, just as with all the
15 other plaintiffs, Sanofi is in the process of ordering medical
16 records, and the same can be done with Ms. Cummings.  And we
17 will also continue to order medical records.  And so it's our
18 position that Ms. Cummings can proceed with Wave 1 discovery.
19           **MS. BARRIOS:** Your Honor, if I might address the point
20 because I think it is a very important one?
21           The issue that Sanofi brings to Your Honor is lack of
22 proof of use.  CMO 12A statement of chemotherapy certainly is
23 proof of use.  Proof of use is a very low bar.  All you have to
24 do was say docetaxel was taken.  Then you go --
25           **THE COURT:** Oh, I understand that.  I'm just trying to

OFFICIAL TRANSCRIPT

1    see if -- I want to make sure there's sufficient information

2    that this becomes meaningful discovery that we can move on

3    without having to -- I think part of the plan in this Wave 1

4    was that there would be sufficient information on hand that you

5    could meaningfully engage in discovery and move these matters

6    toward remand for settlement or trial or whatever.

7            **MS. BARRIOS:** I understand, Your Honor.  But there is

8    sufficient information.  As I understand from Ms. Sulkin, she

9    has a Plaintiff Fact Sheet, and she has authorizations there.

10   The defendants would just -- next step is to order the medical

11   records and then start taking the depositions.

12           **THE COURT:** Okay, thank you.

13           **MS. BARRIOS:** Thank you, Your Honor.

14           **MR. LAMBERT:** May I just add, Your Honor?

15           I'm sorry, Ms. Brilleaux.

16           This is not the only case where there's problems with

17   the time period that's elapsed since there was treatment.

18           **THE COURT:** I know.

19           **MR. LAMBERT:** It may be helpful for the parties to

20   understand that as an issue going forward, like the partial PID

21   which also is shared with many cases in the MDL, so it may be

22   that, you know, after 30 days or so, when everybody tries to

23   seek records, maybe the Court wants to look at it again at that

24   point.

25           But right now, I think we would like it to stay in

OFFICIAL TRANSCRIPT

1  because it is representative of some other cases as well.

2          **THE COURT:** Right.

3          **MS. BRILLEAUX:** May I make two points?  I want to

4  reiterate a couple of things that Ms. Byard raised earlier.

5  The first being, again, we're not here asking this case to be

6  dismissed.

7          **THE COURT:** I understand.

8          **MS. BRILLEAUX:** The second being, we're looking for --

9  this is remand.  We're ready to go now, right.  These are cases

10  that should be ready to be worked up within the next month, and

11  we don't have a single medical record.  So our position is just

12  this is going to hold up the process.

13          **MS. SULKIN:** And Your Honor, if I may?

14          **THE COURT:** No.  This is what I'm going to do.  I know

15  that we have some people that we said we're going to roll over

16  until July.  I think I'm going to roll this over until July,

17  and I'm going to see if we're able to gather appropriate

18  medical records.  We got to get some medical records.

19          I don't want this Wave 1 discovery to be just -- I

20  want these cases to be able to try, but I understand that we

21  sent a stack.  Ms. Sulkin, you need to do whatever you can to

22  get something by July.

23          **MS. SULKIN:** Yes, Your Honor.

24          **THE COURT:** Defendants, I expect you to, you know,

25  you've got authorizations.  Let's see where we are.  But if

OFFICIAL TRANSCRIPT

1   there's nothing there by July, then we're going to have to
2   maybe consider moving this one to another wave.
3            **MS. BRILLEAUX:** Thank you, Your Honor.
4            **MS. SULKIN:** Thank you, Your Honor.
5            **MS. BYARD:** In the spirit of deciding some test cases
6   to look at, then applying to other cases, I would suggest we
7   look at the cases without updated fact sheets which are with
8   Ms. Reynolds.
9            **THE COURT:** Okay.
10           **MS. BYARD:** And I would suggest that we talk about the
11  authorizations issue, but only in the context of whether or not
12  those cases should be delayed to Wave 2 and set aside the more
13  interesting questions about it for a different setting.
14           Would you mind covering the Plaintiff Fact Sheet
15  cases?  Okay.
16           **MS. BRILLEAUX:** So Your Honor, we have a chunk of
17  cases; so we can kind of go through a section of them.  And I
18  agree with Ms. Byard that this is kind of good to address these
19  by buckets.
20           So it's beginning with Tab 34 and ending with Tab 45.
21  They're all cases, Ms. Reynolds is on the line for Pendley,
22  Baudin & Coffin.  And the issue here with each of these cases
23  is that we're missing an updated PFS.  As you're well aware,
24  CMO 33 requires that the plaintiffs and their counsel review
25  the Plaintiff Fact Sheet and update it to bring it up to speed.

OFFICIAL TRANSCRIPT

1  All these cases, you know, were filed in 2017 and 2018, and

2  none of these plaintiffs complied with this discovery deadline.

3          **THE COURT:** It looks like -- are these all

4  authorizations?

5          **MS. BRILLEAUX:** No, they're updated PFS.

6          **THE COURT:** No, I understand that.  Okay, I'm looking

7  at -- oh, I see, I see.

8          **MS. BRILLEAUX:** We have other authorizations cases.

9  This is not an authorization issue.  It's a PFS issue.

10          **THE COURT:** Ms. Perez Reynolds.

11          **MS. REYNOLDS:** Whatever you'd like to call me, I'll

12  answer to it.

13          So this could have been something that I caused a

14  little bit.  Because in the manner that I decided to handle my

15  plaintiffs, I sent the requests to them for updated

16  authorizations first instead of the PFS.  In my experience,

17  sometimes a lot of documentation, they may not always respond

18  to immediately.

19          But in every single one of these cases where we're

20  still waiting on the supplemental PFS to be returned, the

21  defendants are in possession of valid, updated, signed

22  authorizations signed and executed by the plaintiffs.  I did

23  this in part because the defendants do have in their possession

24  a completed PFS that was originally submitted that identified

25  all of the primary providers with all of the main information

OFFICIAL TRANSCRIPT

1 which they are going to be truly interested in which is the
2 prescribing oncologist, and then, of course, any provider that
3 they've seen about their hair loss during that time period.

4       Again, much like when we were discussing Ms. McDuell,
5 even though Sanofi has had possession of the original PFS and
6 original authorizations for several years, no records have been
7 collected by Sanofi on any of these plaintiffs.

8       I understand the importance of supplementing the PFS.
9 We are doing that with each of our clients.  I believe some of
10 them have had PFS's come back that my office is working to get
11 uploaded and put the verifications in.

12       But I don't believe this is an issue that rises to
13 the level where these plaintiff cases should be removed from
14 the Wave 1 remand pool.  Sanofi in no way is prejudiced from
15 being able to collect any records.  They have updated
16 authorizations.  They have the identity of the numerous
17 providers.  And as soon as the updated supplemental PFS is
18 produced in the mail to us, we will get it to them.  But it's
19 not going to change the information that's provided about the
20 original prescribing oncologist which Sanofi has full access to
21 in the current PFS.

22       **THE COURT:** I would see this, and I don't know, that
23 that might be subsets in the updated PFS cases.  And if what
24 Ms. Perez is saying is accurate, these plaintiffs -- and I
25 don't know how many there are -- had completed Plaintiff Fact

OFFICIAL TRANSCRIPT

1   Sheets and they were fine.  They just needed to be updated.
2   And so now we've got updated authorizations.  They had a wealth
3   of material in them already.  It's just a matter of making sure
4   that everything is updated.

5          **MS. BRILLEAUX:** And that's accurate, Your Honor.  But
6   we have -- there's a reason that this is a requirement of CMO
7   33 for Wave 1.  We're ready to proceed.  We have all these, you
8   know, we have 200 cases, not anymore, but you know, we have 200
9   cases where these plaintiffs had an obligation to update their
10  Plaintiff Fact Sheet so that we're all well positioned to
11  proceed with Wave 1 discovery which we're ready to start with.

12         And now we have these plaintiffs.  We don't know
13  necessarily whether they are willing to proceed.  We don't know
14  because we haven't gotten updated PFS's.  Like I mentioned
15  before, these were cases that were filed years ago.

16         **THE COURT:** No, I understand.  I understand.  And you
17  had PFS's before until I ordered an updated.

18         **MS. BRILLEAUX:** Right.

19         **THE COURT:** And they were completed.  I think there's
20  part of me, and through the show cause process, we've seen
21  people that fill in their name, and that's it.  But these are
22  completed.

23         This is what I'm going to say.  Today is Friday.
24  Ms. Perez, I'm giving you two weeks to get these all in.

25         **MS. REYNOLDS:** Yes, Your Honor, we'll certainly do our

OFFICIAL TRANSCRIPT

1  best to comply with --

2           **THE COURT:** No, no, not our best.  Two weeks.

3           **MS. REYNOLDS:** We'll do everything we can.

4           **THE COURT:** If they're not there in two weeks, they're

5  going to be not dismissed, but they're not going to be suitable

6  for Wave 1 discovery.

7           **MS. BRILLEAUX:** That is out request, Your Honor, just

8  to be clear, that they be moved to a later wave.

9           **THE COURT:** I just said that.

10          **MS. BRILLEAUX:** Yeah, sorry.  Thank you.

11          **MS. BARRIOS:** Your Honor, I'd like to invoke the

12  paragraph in your Case Management Order 33 paragraph 9, that

13  says if the Plaintiff Fact Sheet isn't complete, the time is

14  just tolled and will start again when the plaintiff provides

15  the Plaintiff Fact Sheet.

16          I don't want to -- I don't think it's appropriate for

17  these cases to go in limbo when you have an order with

18  paragraph 9 that tells you what to do.

19          **MS. BRILLEAUX:** And Your Honor, what Ms. Barrios is

20  saying, that is the language of the order; but logistically

21  speaking, it doesn't make sense for these cases to come in

22  piecemeal.  I think what happens is we're left in limbo.  We're

23  left with cases in Wave 1 that aren't moving forward with the

24  rest of the group, and they're holding back the rest of the

25  wave.

OFFICIAL TRANSCRIPT

1          **MS. BARRIOS:** I appreciate, Ms. Brilleaux, that you
2  agree that that's what the order says.
3          **MS. REYNOLDS:** Respectfully, I would disagree with
4  Ms. Brilleaux's position, Your Honor, because the purpose of
5  the PFS is to identify providers.  And as Sanofi has stated in
6  other meet and confers, the purpose as they see it for the
7  supplemental PFS is to identify any new providers.
8          My position is just that aside from any updates as to
9  what doctor my plaintiff saw for a mammogram since the time
10 that she filled out her original PFS or any additional oncology
11 visits or if she has some new specialist or other provider that
12 she saw for any other condition, other than that, all that
13 other information is already there, and they're not prejudiced
14 because they do have a valid active authorization.
15         And as soon as we have additional PFS's come in with
16 the supplementals, they'll be able to easily identify any new
17 providers and make a request.  It is my assumption, and
18 perhaps, it shouldn't be, that when they make a request based
19 even on the PFS they currently have, they're certainly going to
20 ask any currently identified provider for records from the
21 beginning of treatment all the way through present.
22         So it's not as if they need my supplemental PFS to
23 make that request to my plaintiff's prescribing oncologist.
24 They have all of that information available.  And I agree with
25 Ms. Barrios.  The best procedure is what Your Honor already

OFFICIAL TRANSCRIPT

```
 1   outlined in CMO 33.
 2           THE COURT: All right.  I'm not changing my mind.  Get
 3   it done in two weeks.  We got to get this thing moving.  You
 4   had 30 days to comply with this, and then it was basically
 5   held.  I said we were going to toll, and then it's like you can
 6   get more time by agreement of the parties or by the Court's
 7   order.  I'm giving you two weeks, and then we'll just see.
 8   We've got to be able to get this show on the road.
 9           MS. BARRIOS: Thank you, Your Honor.
10           THE COURT: Let's go.
11           MS. BRILLEAUX: Thank you, Your Honor.
12           THE COURT: How many cases are we talking about,
13   Ms. Reynolds Perez, Jessica?
14           MS. BRILLEAUX: On the list, Your Honor, it's Tab 34
15   to 45; so that's nine cases.
16           MS. REYNOLDS: Yes.  It's not an overwhelmingly
17   substantial amount or anything like that.  Like I said, I
18   believe that the majority of them are on the way.
19           MS. BRILLEAUX: It's not nine.  I can't count.
20           THE COURT: I listened to you.  You can get it done in
21   two weeks.  All right, thank you.
22           Who do we have now?
23           MS. BRILLEAUX: So the next kind of --
24           THE COURT: I will tell you, and I know you think
25   everything is cookie cutter, Ms. Perez Reynolds.
```

OFFICIAL TRANSCRIPT

1        **MS. REYNOLDS:** Jessica.

2        **THE COURT:** Jessica.  From now on, it's just Jessica.

3   Part of, as I'm looking through this, is she's already done all

4   of the authorizations.  These were completed Plaintiff Fact

5   Sheets.  Probably what we're going to have is just somebody

6   looking and saying, yes, that's all.  So I think it is not

7   going to be a particularly cumbersome process to get this done

8   in two weeks.

9        Sometimes you have a different attitude toward all of

10   this, and that's why I said we may have subsections in these

11   various buckets.  I think hers, that group is likely easy to

12   cure, and so we need to get it done.

13       Now let's see where we are.

14       **MS. BRILLEAUX:** As Ms. Byard previewed, we have

15   another kind of subcategory with authorizations.  So I'm going

16   to try and go through those quickly; so we can move along.

17       The first one with an authorization issue is Tab 24,

18   and it's Jacqueline Ludwig.  In this case, as Your Honor is

19   aware, there was a self-disclosure list that was provided by

20   plaintiffs' liaison counsel on May 25th that listed the

21   plaintiffs that did not have original authorizations.

22       **THE COURT:** Right.

23       **MS. BRILLEAUX:** And so this was one of the cases that

24   was identified on that list.  And pursuant to that process, we

25   decided that our request for relief in these cases would be to

OFFICIAL TRANSCRIPT

1    delay these until Wave 2.  And that is the situation that we
2    have with Ms. Ludwig.
3          I don't know if plaintiff's counsel is on the line,
4    but we don't think it's appropriate for Wave 1 discovery.
5          **MS. MENZIES:** I am on the line.  Can you hear me, Your
6    Honor?  This is Karen Menzies for the plaintiff.  Good morning.
7          I'm glad that we're actually first on the list in
8    this category because to us this is an example, a prime example
9    of Sanofi doing its best to delay a case that should not be
10   delayed.
11         When we first were identifying cases, we heard the
12   first sufficiency concern they had was lack of PID, and then we
13   responded immediately and sent them and articulated that we
14   have PID for all four infusions, and they've had it for four
15   years.  We have submitted authorizations every year for three
16   years -- for the last four years.  They have the
17   authorizations.
18         They have now come up with an excuse to try to kick
19   this case out indefinitely, because we don't have any Wave 2
20   plan as Ms. Barrios pointed out, based on one of six
21   authorizations that had -- on the authorization, you type in
22   the birth date.  And it was typed in as 2946 as the year of
23   birth.  Obviously, it's patently a typo when it was 1946.  We
24   have fixed that.  We fixed it within -- in less than a week.
25   They just told us about that deficiency last week.  We fixed

1   it.  It's already been uploaded.  We amended the PFS timely.

2   We gave brand new authorizations.

3          **THE COURT:**  Wait, wait, wait.  I'm getting confused.

4   Do you have an authorization?

5          **MS. BRILLEAUX:**  We have --

6          **MS. MENZIES:**  Yes.

7          **THE COURT:**  Wait, I'm asking Ms. Brilleaux.

8          **MS. BRILLEAUX:**  We've seen on MDL Centrality that on

9   June 1st a photograph of an updated HIPPA authorization was

10  uploaded.

11         But again, the reason that this case is on this list

12  is because they were on the self-disclosure list that was

13  provided to defendants by PLC.  So that's the reason they're on

14  the list.  We have a photograph uploaded to MDL Centrality on

15  June 1st which, you know, was two days ago.  So that's where

16  we are now.

17         **THE COURT:**  Do you have an authorization, a signed

18  authorization?

19         **MS. MENZIES:**  Yes, Your Honor, let me respond if you

20  don't mind.  They have all the authorizations.  They just told

21  us last week about this typo.  We went to the client, got a

22  freshly signed one.  Again, this has nothing to do with her

23  signature or her date.  It's a typo that was 2946 in the birth

24  date of the form itself.

25         We sent -- so they would see it immediately, two days

OFFICIAL TRANSCRIPT

1  ago, the picture.  We had our client go to a fax machine which

2  she did last night.  We got the faxed version of it this

3  morning, and we sent it and uploaded it today of the copy

4  version.  So they have more than just the photograph version.

5  There's no reason to delay this case.

6         **MS. BRILLEAUX:** If that's --

7         **THE COURT:** If it's a valid authorization, then we're

8  done.

9         **MS. BRILLEAUX:** Right, I agree with that.  Thank you,

10  Your Honor.  That was Gibbs Law Group.

11         The next case is Alma Green, and this is also an

12  authorization case.  Honestly, Your Honor, a similar issue,

13  this was another case that was on the disclosure list which is

14  the reason that this case was on -- I don't know where the echo

15  is coming from.  But it was the reason that the case is being

16  heard at this hearing.

17         We were advised this morning that there were updated

18  authorizations submitted.  So that's where we are right now.

19         **THE COURT:** Do I have someone on the line for --

20         **MR. FRIEND:** Yeah.  This is David Friend with Hissey,

21  Mulderig & Friend representing Alma Green.

22         **THE COURT:** Have you uploaded an adequate, a properly

23  executed authorization?

24         **MR. FRIEND:** Yeah, we got new authorizations that were

25  uploaded on May 31st into MDL Centrality.

OFFICIAL TRANSCRIPT

1      **MS. BRILLEAUX:** And Counsel, is it all of the

2  authorizations?

3      **MR. FRIEND:** Yes, I believe it's all of them, all that

4  were necessary.  We haven't heard that it wasn't since then.

5      **MS. BARRIOS:** Excuse me.  Ms. Brilleaux, I was in

6  touch with Ms. Byard about this case this morning.  I sent her

7  all the authorizations.

8      The reason they were re-signed is because the client

9  actually has a different first name, and the original

10 authorization -- David, correct me if I'm wrong -- said Alma

11 Green, and the new authorizations say Renee Alma Green, but

12 they're all perfectly fine.

13     **MR. FRIEND:** The original authorizations were signed

14 by the client.  The new authorizations were signed by the

15 client.  Her name is Alma Renee Green.  And apparently, some of

16 the original authorizations that were uploaded back in 2018,

17 she signed simply as Renee Green instead of Alma Green or Alma

18 Renee Green because she does go by Renee sometimes.

19     So maybe the issue is some of the authorizations say

20 Renee Green, some say Alma Renee Green, but they're all signed

21 by the same person.

22     **MS. BRILLEAUX:** Your Honor, just to respond, you know,

23 we were dealing with a much larger scale issue with these

24 authorizations as Your Honor is aware because of the order.

25     Our request is because we had to deal with this and

OFFICIAL TRANSCRIPT

```
1   because of the delay with all the cases and all the issues
2   across, you know, the inventory dealing with the
3   self-disclosure list which is, again, why this case is on the
4   list.  Our request is for all of these to be delayed until Wave
5   2 because it's caused a huge delay in the process of collecting
6   medical records.  So that is our request for that.
7            THE COURT:  If you have the adequate authorizations
8   today, I'm not going to delay the cases.  Now, if you have
9   someone that has not updated, that's a different matter.
10           MS. BRILLEAUX:  I'm going to skip ahead to Tab 53,
11  Harriet McKinney.  This is another case with issues with
12  resubmitting authorizations.  This is a case that's on the
13  May 25th disclosure list.  We're also missing an updated PFS
14  with the verification.  And so we would ask that this case be
15  delayed until Wave 2.
16           THE COURT:  Okay, and this is, who do I have on the
17  line for Ms. McKinney?
18           MS. GREENE:  Yes.  I apologize, Your Honor.  Jennifer
19  Greene.  I had forgot to unmute myself; even though Mr. Lambert
20  reminded us of that in the beginning.
21           So Ms. McKinney's authorizations were uploaded.  Let
22  me just pull the date.  I just need to get some clarification
23  of which authorizations they were asking about so that I could
24  figure out which date.  I can get to them, I believe.
25           MS. BARRIOS:  I believe it was May 8th or May 9th,
```

OFFICIAL TRANSCRIPT

```
 1   Ms. Greene.
 2            MS. GREENE: Okay, thank you.
 3            MS. BRILLEAUX: Your Honor, this was a case that was
 4   on the May 25th disclosure list.
 5            THE COURT: Wait, I'm confused.
 6            MS. BRILLEAUX: So Counsel --
 7            THE COURT: The authorizations have been uploaded, is
 8   that what you're telling me, Ms. Greene?
 9            MS. GREENE: Yes, Your Honor.
10            THE COURT: What about the amended Plaintiff Fact
11   Sheet?
12            MS. GREENE: Those were uploaded.  Ms. McKinney's were
13   uploaded yesterday along with the verification.
14            MS. BRILLEAUX: But Counsel, was this case not listed
15   on the self-disclosure list on May 25?
16            MS. BARRIOS: I'm not sure if Ms. Greene knows of the
17   correspondence between myself, Mr. Lambert, and Sanofi.  I
18   personally don't know if it was on the list or not.
19            THE COURT: Okay.  Ms. Greene, were the authorizations
20   that were uploaded signed by the plaintiff?
21            MS. GREENE: Yes, Your Honor, hand signed, wet signed.
22   We FedEx'ed them to her and had her FedEx them back to us.
23            THE COURT: What's the problem?
24            MS. BRILLEAUX: I suppose I'm just unclear why this
25   was listed on the self-disclosure list.  But if Counsel has
```

OFFICIAL TRANSCRIPT

1  made the representation that they've been uploaded and wet ink

2  signed.

3        **THE COURT:** Were you familiar that the

4  self-disclosure, there were concerns about the signature,

5  Ms. Greene?

6        **MS. GREENE:** No, Your Honor, I'm not aware that there

7  were concerns about the signature.  Just to be clear, no one

8  raised that with me personally.

9        **THE COURT:** Ms. Barrios, is there something I'm

10  missing?

11        **MS. BARRIOS:** No, ma'am.  Just a little clarification,

12  if you recall, we were on the phone with you on, I think,

13  May 25th and were talking about getting this list to the

14  defendants.  Mr. Lambert and I worked hours and hours to try to

15  contact every plaintiff and get it to them on May 25th.

16        If there was one that fell through the cracks, it is

17  our fault.  It is not the plaintiff's counsel's fault.  We put

18  it together as quickly as we could.  This was ultimately cured.

19        And what I fear, honestly, Your Honor, is that

20  they're seeking the self-disclosure and they're looking for a

21  needle in a haystack to see if somebody violated some sort of

22  authorization, and then they're going to bring sanctions and

23  costs as they requested before.  So I don't think it's even

24  relevant if we have the authorization now.

25        **MS. BYARD:** Your Honor, if I may, we just want to know

OFFICIAL TRANSCRIPT

1  if we can use the authorizations to collect records.

2          **THE COURT:** You can use the authorizations.  I make

3  that finding.  You can use the authorization.  Let's go.

4          **MS. BRILLEAUX:** Then to end on some good news for me,

5  Your Honor, No. 55, Linda Ayers has been cured.  That's No. 55,

6  and we don't need to address that.

7          **THE COURT:** Thank you.

8          **MS. BYARD:** So there's a subset of the authorizations

9  issue.  I believe I understand Your Honor's ruling, but just to

10 clarify, and then there's photographs, and we would be done

11 because we would be able to apply the rulings that you've made

12 to the rest of the cases.

13         The only subset issue on authorizations are that

14 there were cases with problem authorizations that were fixed

15 that there was no self-disclosure on.  And those are seven

16 Bachus & Schanker cases that are in your notebook on Tab 6

17 through 12.

18         The only thing that I'm asking for clarification on,

19 I believe I understand your position, is that it doesn't matter

20 if they disclosed or didn't disclose that we should stop using

21 the authorizations that had been provided.  If they have good

22 authorizations now, you're going to let them through.  Is that

23 correct?

24         **THE COURT:** If they have good authorizations, let's

25 move these cases along.

OFFICIAL TRANSCRIPT

1          **MS. BYARD:** Okay, that takes care of those questions.

2          Mr. Baehr will cover a few examples of photograph

3    issues with which I think we can apply your ruling across the

4    other cases.

5          **THE COURT:** Thank you.

6          **MR. BAEHR:** Good morning, Your Honor.  There are

7    basically two categories of photo cases that we need your

8    guidance on.

9          **THE COURT:** All right.

10          **MR. BAEHR:** The second will be cases where there are

11    multiple cancer diagnoses and no photos from the between

12    period.

13          The first category which is the broader category,

14    sorry, I didn't mean to -- I should have given a trigger

15    warning there.  There are about 13 cases where we just have a

16    wide gap in photos, between photos that have been produced, and

17    in particular, more than five years, as Ms. Byard referred to

18    earlier, after chemotherapy treatment before we have any

19    photographs from the plaintiff.

20          We understand -- the deficiency that's actually

21    listed here is no photographs within six months after

22    treatment.  That's because that's what's in the PFS obviously

23    incorporated into CMO 33.  So technically, under an extremely

24    strict reading of CMO 33, that would make them ineligible.

25    Certainly, we haven't listed every case that doesn't have

OFFICIAL TRANSCRIPT

1  photos within six months.  We recognize it's a short window.

2  We just need some --

3      **THE COURT:** Let me see what we're talking about.

4      **MR. BAEHR:** Okay.  So the first case I have for you is

5  Tab 14.  It's Deb Kassing.  In this case, the most recent

6  before photo is in 2008, and then she had treatment in February

7  of 2009.  So the before photo is there.

8      And then the first after photo isn't until

9  November 2019 which is more than ten years later and a total

10 gap of 11 years between photos.  And importantly, this

11 plaintiff was on hormone therapy after chemotherapy treatment

12 and throughout that time which makes, you know, photos within

13 that time period particularly important in this case.

14     **THE COURT:** Who is counsel?

15     **MR. BAEHR:** Counsel is, this is Bachus & Schanker.

16     **THE COURT:** Ms. Sulkin.

17     **MS. SULKIN:** Your Honor, it's me again.

18     Your Honor, I do believe that while defendants are

19 trying to weigh the evidence, this plaintiff is compliant with

20 PTO 68, and in turn, compliant with PTO 33.  I don't think that

21 this is an issue of eligibility, and certainly, the defendants

22 will conduct additional discovery later on.

23     However, this plaintiff is certainly in compliance

24 with all of her obligations.  We think that she should be able

25 to proceed with Wave 1 discovery.

OFFICIAL TRANSCRIPT

1          **THE COURT:** I'm trying to see the photograph criteria,

2     "22, Pretrial Order 68, may be ineligible if, after an

3     opportunity is given to cure the issue, the photographs

4     supplied remain insufficient."  I need to look at PTO 22.

5          **MR. BAEHR:** I'll just specify, Your Honor, PTO 22 is

6     the general order.  It's Amended 22 that addresses the PFS and

7     DFS deadlines.  It's actually PTO 38 includes the substance of

8     the PFS itself, the latest iteration of the mandatory PFS.  So

9     that's where the six-month requirement is stated.

10          **THE COURT:** It's in here.  It's Amended Pretrial Order

11     68.  Is that it?

12          **MR. BAEHR:** So 68 refers to -- it gives guidance on

13     photographs, and 68 itself does not set a specific line for

14     after photographs.  It sets a specific line for before

15     photographs at five years.  And for whatever reason, it just

16     didn't specify a time period.

17          The only time period for after photographs that we

18     have is that six months.  Again, we don't --

19          **THE COURT:** What do I do -- I'm looking at the

20     language of 33 that says cases without photographs compliant

21     with Amended Pretrial Order 22 and Pretrial Order 68 may be

22     ineligible.

23          Are you telling me Amended Pretrial Order 22 is

24     another pretrial order that's not identified here?

25          **MR. BAEHR:** What I'm telling you is that, yes, Amended

OFFICIAL TRANSCRIPT

1   Pretrial Order 22 incorporates PTO 38 which is the order that

2   actually has the model PFS in it which is where all of these,

3   the substance of all of these requirements comes from.

4            **THE COURT:** Brittany, can you get me that, please?

5            **LAW CLERK:** Yes, ma'am.

6            **THE COURT:** I just need to be able to see it.

7            **MR. BAEHR:** Your Honor, I'm trying to pull up an

8   example of a PFS here in just any of the tabs so that you can

9   see exactly what I'm referring to.

10           **MS. KREIDER:** I have one, a sample Plaintiff Fact

11  Sheet.

12           **MR. BAEHR:** That would be great.

13           **MS. BYARD:** If you look at Tab 12 has Donna Baugh's

14  Plaintiff Fact Sheet.

15           **THE COURT:** What page is it, the fact sheet?

16           **MR. BAEHR:** If you're in Tab 12 if you're looking at

17  the fact sheet, it's generally the very last page.  It's three

18  cells in that chart there above the declaration section.  So

19  it's the third to last.

20           And if you look a few before that, the fifth to last

21  lists photos of your hair before treatment, and then we have

22  during treatment, and then we have six months after, and then

23  we have present day.  So this is where all these requirements

24  that we've addressed in various forms comes from.  And

25  technically, the only line for the after photos is six months.

OFFICIAL TRANSCRIPT

1          Now our position is it's not going to be six months,
2    but there has to be a line somewhere.  In this case, it's ten
3    years.  The plaintiff hadn't produced any photos within ten
4    years of treatment.  We think that's too long.

5          **THE COURT:** Okay, all right.  Ms. Sulkin.

6          **MS. SULKIN:** Your Honor, as Mr. Baehr admits, there's
7    nothing that requires a specific amount of time.  In fact, it
8    asks for present-day photos.  I would like to point out that
9    we've not only given photographs from 2019, but we've also
10   updated photographs from 2022.

11         I think this is, you know, an after-the-fact wish of
12   Sanofi to impose a certain timeline.  I think if we're trying
13   to move on with discovery and get these cases to remand, I
14   think this is just another tactic to delay these cases moving
15   forward.

16         I don't think, and I think Mr. Baehr is being
17   incredibly reasonable in stating that most of these plaintiffs
18   aren't going to have photographs during chemotherapy, and
19   six months after is an incredibly narrow window, especially,
20   you know, considering this particular plaintiff's treatment was
21   back in 2009.  A lot of people didn't have smart phones in
22   2009.

23         However, we've complied with the spirit of this
24   order, and thus this plaintiff is definitely eligible to
25   participate in Wave 1 remand discovery.

OFFICIAL TRANSCRIPT

1    **THE COURT:** Well, I'm looking at it, and it does say

2 six months.  It says photographs of you that are representative

3 of your hair composition six months after conclusion of

4 treatment with Taxotere, and then there's a separate line,

5 photographs of you that are representative of your hair

6 composition in present day.

7    It does say six months, and what I heard Mr. Baehr

8 say is, "We're not going to hold you to six months.  We just

9 want five years."  I think that's -- we've grappled with

10 photographs through the show cause process, and I have said I'm

11 not going to dismiss anyone with problems with photographs

12 simply because there are other ways to prove it.

13    But we're dealing with Wave 1 cases that we want to

14 make sure are ready to be tried, and this is not in compliance

15 with the type of photographs.  I knew this day would come where

16 photographs would become an issue.  For Wave 1, I think we're

17 there.  And so I think she's going to have to just proceed in

18 Wave 2 discovery -- I mean Wave 2 remand.

19    **MS. SULKIN:** And Your Honor, I just want to understand

20 the distinction about why this plaintiff would be ready in Wave

21 2 and not now.  We're going to --

22    **THE COURT:** Well, let me tell you why.  Let me tell

23 you why because we are now sending the first 200 cases home for

24 trial, and we're trying to work through that process as we

25 proceed.  And I think we wanted to -- that the intent was to

OFFICIAL TRANSCRIPT

1  select cases that would not have any particular problems, that
2  elements of proof that would be easier as to discovery.
3          As to Wave 2, maybe we will go through, and we're
4  going to deal with cases that have other problems with
5  discovery, but we'll have worked through some of the kinks.
6  That's why.
7          **MS. SULKIN:** Your Honor -- go ahead.
8          **MS. BARRIOS:** I'm sorry.  I just wanted to point out
9  that the language of CMO 33 gives the plaintiffs an opportunity
10 to cure the photograph problem.  And so I just ask if you give
11 Ms. Sulkin an opportunity to cure and follow the language of
12 CMO 33, and if she doesn't cure, then your ruling goes into
13 effect.
14         **MR. BAEHR:** Certainly, our position is that we've
15 identified this deficiency long ago.  We've had, as has been
16 stated, many meet and confers about all these issues.  They've
17 had many opportunities to cure.  We accepted cures up until
18 this morning, and so we would agree with your previous
19 statement that this should just be deferred.
20         **THE COURT:** We're going to just defer this one.  This
21 one, she has had an opportunity to cure, and it hasn't been.
22         **MS. SULKIN:** Your Honor, if I may, just for the
23 record, this new rule about five years before is a new
24 obligation that was never described in any orders.  It simply
25 says present-day photos, and I think that's where my

1  difficulty --

2          **THE COURT:** Do you not see where it says six months?

3          **MS. SULKIN:** Your Honor, yes, but that's never been so

4  much of an issue whether it be show cause hearings, and as

5  Mr. Baehr has elaborated on, he's not going to hold plaintiffs

6  to six months.

7          **THE COURT:** So you want him to make sure it's

8  six months?  We're going to take away the five-year grace

9  period they're giving you?

10          **MS. SULKIN:** No, no.  But Your Honor, this requirement

11  has changed, and this is the first notice that I've got --

12          **THE COURT:** Okay, well, then it should be six months.

13  Then we can make it six months.

14          **MS. BARRIOS:** Your Honor, on behalf of all other

15  plaintiffs, we're very happy to take Mr. Baehr's concession

16  that he's willing to do five years.

17          **THE COURT:** I would have thought so.

18          And I'm not trying to be -- this remand process was

19  negotiated.  And we had some concerns about people falling

20  within, and we wanted it, very frankly, since these are the

21  first cases going back -- and I'm hesitant to say it this way.

22  But we wanted cases that were not going to have problems in

23  dealing with discovery.

24          And so I'm looking at some of these things.  I know

25  that these objections as to what was not in compliance were

OFFICIAL TRANSCRIPT

1  made some time ago, and there was an opportunity to cure them.

2          Now, as I see it, we go into that portion of the

3  order that says the Court can still grant you some more time if

4  I deem it appropriate.  You're asking me now, and I said no.

5          **MR. LAMBERT:** Your Honor, may I point one more thing

6  out with respect to this issue?  I think it's important for

7  Mr. Baehr to tell us how many cases his five-year suggestion is

8  going to eliminate because --

9          **THE COURT:** Fair enough.  How many?

10         **MR. LAMBERT:** -- I think the Court needs to hear that.

11  And in addition to that, it's also important to know who picked

12  these cases.

13         **THE COURT:** How many are we talking about?

14         **MR. BAEHR:** It's 13 cases on this list today.  It's 15

15  cases including the case that I was going to address with

16  regard to multiple cancer diagnoses also falls in this category

17  of five years.  So it would be 15 cases.

18         **THE COURT:** How many of them are multiple cancer

19  diagnoses?

20         **MR. BAEHR:** Only two of those cases.

21         **THE COURT:** So 13 of them don't have photographs

22  within those five years?

23         **MR. BAEHR:** Correct.  All 15 of them don't have photos

24  within those five years.  The multiple cancer cases, we

25  actually don't need to address because they also fall in that

OFFICIAL TRANSCRIPT

1   category.  So I apologize for creating confusion.  15 cases is

2   the answer to the question.

3           **MS. SULKIN:** Your Honor, several of these cases were

4   defense picked.  I think actually the majority of the ones

5   with, you know, proclaimed photograph issues were chosen by the

6   defendants to proceed with Wave 1 discovery.

7           **THE COURT:** Why?

8           **MR. BAEHR:** Why were they chosen?  We put the cases on

9   the list agnostic whether they were plaintiff or defense picks

10   because we thought that that was the evenhanded way to address

11   it.

12           **THE COURT:** No, I understand that.

13           **MS. BYARD:** I think that covers all the cases.

14           **MS. SULKIN:** My issue is if defendants are allowed to

15   put up cases for discovery and claim that they're eligible and

16   then later on claim that they are ineligible, I think that's

17   counterintuitive and almost a dilatory tactic.  So I would

18   request that at least for the cases that are defense picked

19   where they're claiming that the photographs don't comply with

20   PTO 68 that those be allowed to proceed with Wave 1 remand

21   discovery.

22           **THE COURT:** I'm not certain why I would treat those

23   differently.  They are still plaintiffs' cases, and it's still

24   plaintiffs' counsel's responsibility to comply with discovery.

25           **MS. SULKIN:** Yes, Your Honor, but if defendants are

OFFICIAL TRANSCRIPT

1  simply allowed to chose cases that they believe are ineligible
2  and claim for one purpose that they're eligible to participate
3  in Wave 1 discovery and then later on claim ineligibility, it
4  kind of defeats the purpose of sending a good sample of cases
5  back for remand.

6         It would allow them to choose only cases that are
7  ineligible, and at a later date, claim that to the Court, and
8  then none of those cases go back for remand.  And so we ask
9  that if they're going to represent to the Court that these are
10 cases that they believe are eligible for Wave 1 remand
11 discovery, that absent a challenge by our team, that they be
12 allowed to move forward with Wave 1 discovery.

13         **MS. BYARD:** Your Honor, we didn't select cases so that
14 they'd be ineligible.  Once the cases were selected, we applied
15 the criteria of CMO 33 and started getting working on
16 discovery.  Some of the cases don't check the boxes.
17 Unfortunately, some of them are our cases that we liked.  We
18 applied the same standard to all the cases, whether they
19 checked the boxes or not.  We tried to reach agreements.  A lot
20 of cases got dismissed.

21         **THE COURT:** You don't need to.  Have a seat.

22         **MS. BYARD:** Okay.  I think that takes care of all the
23 cases, Your Honor.  I think we're done with that.

24         **MS. REYNOLDS:** Your Honor, I apologize, this is
25 Ms. Reynolds.  There is one case which was listed from my firm

OFFICIAL TRANSCRIPT

1   as two cancers and no photographs in between that period of

2   time, but I believe that's a factual error.  So I do think that

3   may be a case that we should discuss.

4           **THE COURT:** Please.  Which case is that, Ms. Reynolds?

5           **MS. REYNOLDS:** Joyce Davis, D-A-V-I-S.  I apologize, I

6   do not have a copy of your tabbed binder; so I am uncertain

7   what tab she may fall under.  Perhaps if Ms. Barrios or Mr.

8   Baehr --

9           **MR. BAEHR:** It should be Tab 46, Your Honor.

10          **THE COURT:** 46.

11          **MS. REYNOLDS:** Your Honor, the reason that I seek to

12  just draw your attention to this particular case is I know it's

13  the defendant's position that she had two separate cancer

14  treatments, and therefore, two separate cancer diagnoses.

15          But I've spoken with this plaintiff in detail about

16  this issue.  She was first treated for breast cancer in 2006,

17  but she was started on Arimidex then, Your Honor.  She did not

18  actually undergo any chemotherapy at that time.  So it was not

19  until sometime later in 2008 that her oncologist suggested that

20  she should move forward with chemotherapy treatment.  So she's

21  technically only undergone chemotherapy once and only had hair

22  loss as a result of chemotherapy treatment once.

23          I don't think she technically falls into the category

24  of having two prior cancer diagnoses where she's had two

25  separate sets of chemotherapy.  She did provide photographs

OFFICIAL TRANSCRIPT

1  from 2006 which would be before that chemotherapy time frame,

2  and then one during treatment, it looks like as well, on

3  June 3rd, 2008.

4         **MR. BAEHR:** As much as I eagerly look forward to

5  discussing the details of the multiple cancer cases when

6  necessary, in this case, there's an eight-year gap between the

7  date that Ms. Reynolds just gave for her chemotherapy in 2008

8  and the first after photo we have that is in 2016.  So this

9  would also fall into the five-year category.

10        We don't think it's necessary for you to consider or

11 rule on the particular multi-cancer, multi-chemotherapy issue

12 in this case.  I believe the photos, the photo in Tab 46 from

13 2006, I mean you can see the photo in 2006 which is the before

14 photo and then 2016 which is the after photo.  So it's actually

15 a ten-year gap between photos.

16        **MS. BARRIOS:** I see a photo from 2008, June 3rd.

17        **THE COURT:** Where is that?

18        **MS. BARRIOS:** It's in plaintiff's binder under Tab 46,

19 Your Honor.

20        **MR. BAEHR:** I don't see it.  But even if that were

21 true, even if that's the case, we still have a gap of eight

22 years from her chemotherapy treatment until the first photo.

23        **THE COURT:** I don't know when this photograph is.  I

24 see a photograph before and after.  After 2016, I mean 6, and

25 then after 2006.

OFFICIAL TRANSCRIPT

1          Do we have a date on this one, on the 2006?

2          **MS. REYNOLDS:** There should be two photos that are

3   from 2008 that are dated.  The dates are actually on the bottom

4   corner of the photographs themselves, Your Honor.  And I just

5   double-checked that to make sure what the status was between

6   that 2008 and 2016 because I don't see it as --

7          **THE COURT:** Do you have one from 2008?  See I have one

8   that says January 2006.  That one's easy.

9          **MS. REYNOLDS:** Yes, Your Honor.  There should have

10  been another one.  It would be under, I believe it's MDL

11  Centrality No. 56636.  It's actually a photograph of the

12  plaintiff during her treatment which is in 2008, and that is

13  from June 3rd of 2008 as that photo is dated.  Just waiting

14  on a confirmation.

15         **THE COURT:** Then this last one is what?

16         **MS. REYNOLDS:** The ones that were placed in my binder

17  for the purposes of this hearing, Your Honor, were the before

18  photographs.  And so my staff did not pull the afters and was

19  not looking at that particular issue.  So I apologize.  I'm

20  trying to see if I can pull that up now.

21         **THE COURT:** This is what I'm going to do.  Mr. Baehr,

22  I'm going to charge you to talk to Ms. Reynolds about this

23  because it looks like there might be photographs that I don't

24  have, and there's some confusion.

25         **MR. BAEHR:** Yeah, okay, happy to do that.

                    OFFICIAL TRANSCRIPT

66

1        **THE COURT:** Just work it out.

2        **MR. BAEHR:** Okay.  I don't think we have any further

3   cases for you.

4        **THE COURT:** Okay, anything further?

5        **MS. KREIDER:** Should we list the -- should we go

6   through the cases that are agreed to be eligible that we can

7   address?

8        **MS. BYARD:** At least what our proposal is, is that we

9   have rulings from Your Honor on all the dispositive issues,

10  that we'll apply those rulings from the test cases, and then

11  have a list that's agreed that's in and out.

12        So just because we didn't address the case today

13  doesn't necessarily mean, because Mr. Lambert pointed out,

14  there are several other cases that don't have photographs for

15  seven, eight, nine, ten years plus.  Because the requirement is

16  that there are photos within six months, we're accepting them

17  within five years, those cases are also ineligible for Wave 1

18  at this time is my understanding.

19        **THE COURT:** Yes.

20        **MS. BYARD:** Without going through things on an

21  individual basis, we were trying to get exemplary rulings.

22        **THE COURT:** Okay.

23        **MR. WOOD:** Your Honor, this is Erin Wood on behalf of

24  plaintiff Dulce Knox.  I'm so sorry to interrupt, but I do

25  believe that Ms. Knox's case, we do have a photo from

OFFICIAL TRANSCRIPT

1 six months after the chemotherapy.  We have a photo from
2 November of 2010, and her chemotherapy took place ending in
3 2009, June of 2009.  And the photo was included in the binder
4 that you received, I believe.  It was MDL Centrality 530590,
5 and I would believe that under Your Honor's ruling today that
6 this case would not be ineligible because of that photo within
7 five years.
8        **MR. BAEHR:** I haven't seen that photo.  I don't think
9 it's here tabbed or anything.  I don't know.  I can talk to her
10 too.
11        **THE COURT:** This is what I think is going to need to
12 occur.  And let me say before we close, I do congratulate the
13 parties because I know this has been a very tedious process,
14 extraordinarily frustrating for all parties involved, and I
15 appreciate the professionalism with which you've handled it.
16        I know that there are 16 cases where photographs are
17 a problem, but part of me is just we've been dealing with
18 photographs from the beginning of this case.  As I indicated to
19 you earlier, I believe at some time, we were trying to keep
20 Wave 1 a case where we can easily get our hands around the
21 information and the evidence associated with the case to at
22 least get these moving smoothly.
23        I'm not going to ever dismiss a case because of
24 failure of photographs because I think there are other methods
25 of proof.  We don't want to deal with that today in these Wave

OFFICIAL TRANSCRIPT

1  cases, maybe Wave 2, you know, as things go on, and we get a

2  better handle at the evidence and working these cases up.

3         I am going to ask, and I think I'm going to appoint

4  Mr. Baehr and -- you changed your name on me too, Claire.

5         **MS. KREIDER:** Sorry.  Kreider or Claire.

6         **THE COURT:** To handle those cases, and I think we're

7  certainly under 20, you know, 15 cases with photographs and

8  confirm that there, indeed -- because I've heard people

9  interject and say, "Wait a minute, I've got a photograph.  It's

10 there."  So I'm going to charge you with the responsibility to

11 confirm that, and I want something within seven days.

12        **MR. BAEHR:** I would say within -- I mean I would be

13 happy to provide it within 24 hours because we don't want to be

14 in a situation where people are submitting things now.

15        **THE COURT:** I don't either.  But I need somebody to be

16 able to sit across the table and work through that and have

17 easy access to plaintiff's counsel to see if there was some

18 problem with MDL Centrality.

19        Stranger things have happened that, "I've uploaded

20 it, and it's right here in my hand.  And how come you don't

21 have it?"  So I want that confirmed.

22        **MS. KREIDER:** Yes, Your Honor, seven days is okay for

23 me.  I mean we have to collect from multiple plaintiffs.

24        **THE COURT:** I think it's just a matter of being able

25 to get people on the phone and to review what's in MDL

OFFICIAL TRANSCRIPT

 1   Centrality.  If someone has had a problem uploading something,
 2   I am not going to hold that case back.  I'm going to send it
 3   on.  But I am concerned about doing a photograph search because
 4   that has been an ongoing problem.  So that's where we are.

 5            **MR. BAEHR:** Thank you, Your Honor.

 6            **THE COURT:** Any other questions?  Do I need to do
 7   anything with you-all today?

 8            **MS. BARRIOS:** Your Honor, I do have a question, really
 9   a clarification.  The cases which Ms. Byard said at the
10   beginning they have no challenge on eligibility, they're ready
11   to start their discovery, I just want to make sure because I
12   spoke with Ms. Byard about this, and we're going to put it in
13   an order.  But I think Your Honor will be out of pocket from us
14   to sign the order; so I just wanted to get it on the record.

15            **THE COURT:** It is, yes.  We're ready to proceed with
16   those cases.  But I will be able to -- it's just going to be a
17   longer process for me to sign the order.  I will be signing
18   orders daily.

19            **MS. BARRIOS:** Okay, thank you, Your Honor.

20            **MS. BRILLEAUX:** Your Honor, one unrelated thing, but
21   tangentially related thing.  The parties are working on a
22   briefing schedule on the innovator liability issues, and we
23   hope to have a schedule, a proposed schedule to you next week.
24   I know you'll be traveling.

25            **THE COURT:** Thank you.  Okay, yes.

                        OFFICIAL TRANSCRIPT

1          Anything else?

2          Okay, Court's adjourned.  Thank you all.

3              (Whereupon this concludes the proceedings.)

4

5

6

7                          **CERTIFICATE**

8

9

10     I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

11   the United States District Court, Eastern District of

12   Louisiana, do hereby certify that the foregoing is a true and

13   correct transcript, to the best of my ability and

14   understanding, from the record of the proceedings in the

15   above-entitled and numbered matter.

16

17

18                    */s/Alexis A. Vice, RPR, CRR*
                      Alexis A. Vice, RPR, CRR
19                    Official Court Reporter

20

21

22

23

24

25

                          OFFICIAL TRANSCRIPT