# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  TAXOTERE (DOCETAXEL)          Docket No. 16-MD-2740
PRODUCTS LIABILITY LITIGATION         Section H
                                      New Orleans, LA
Relates to:  Barbara Earnest          Wednesday, September 25, 2019
             16-CV-17144

*********************************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                      UNITED STATES DISTRICT JUDGE
                         DAY 8, MORNING SESSION
```

APPEARANCES:

| | |
|---|---|
| FOR THE PLAINTIFF: | BACHUS & SCHANKER, LLC |
| | BY:  DARIN L. SCHANKER, ESQ. |
| |      J. KYLE BACHUS, ESQ. |
| | 1899 Wynkoop St., Suite 700 |
| | Denver, CO 80202 |
| | |
| | FLEMING NOLEN & JEZ |
| | BY:  RAND P. NOLEN, ESQ. |
| | 2800 Post Oak Blvd., Suite 4000 |
| | Houston, TX 77056 |
| | |
| | GIBBS LAW GROUP, LLP |
| | BY:  KAREN B. MENZIES, ESQ. |
| | 6701 Center Drive West, 14th Floor |
| | Los Angeles, CA 90045 |
| | |
| | DAVID F. MICELI, LLC |
| | BY:  DAVID F. MICELI, ESQ. |
| | P.O. Box 2519 |
| | Carrollton, GA 30112-0046 |
| | |
| | PENDLEY BAUDIN & COFFIN |
| | BY:  CHRISTOPHER L. COFFIN, ESQ. |
| | 2505 Energy Centre |
| | 1100 Poydras St. |
| | New Orleans, LA 70163 |

Page 1919

1     THE COURT: Take it down.
2     MR. MARKOFF: It's a switch.
3     THE COURT: Okay. Just take it down.
4     (OPEN COURT.)
5     THE COURT: Okay. Please proceed.
6     (WHEREUPON, THE VIDEO RESUMED PLAYING AS FOLLOWS:)
7     Q. All right, Dr. Kopreski. I want to shift gears and focus a
8     little bit on the time period of 2005 to 2011, and I want to spend
9     a little time talking about Taxotere and what kind of cancers
10    Taxotere was approved by the regulatory authorities to treat. So
11    in this time period, what were the range of types of cancers that
12    Taxotere was authorized to treat?
13    A. Well, before this time period in the United States, Taxotere
14    was approved for breast cancer and lung cancer. But during this
15    time period, there was an increased use of Taxotere in other
16    indications. And during this time period, indications such as
17    gastric cancer, prostate cancer, and head and neck cancer were, to
18    the best of my recollection, all received approval during this
19    period of time in the United States.
20    Q. Okay. And are you able to review Sanofi's documentation to
21    determine an estimate of the number of patients who would have been
22    treated for these various cancers by Taxotere in this time period
23    of 2005 to 2011?
24    A. I did review estimates of marketing data from -- of
25    accumular -- from reports of PSURs. I do have to caution that

Page 1920

1     these are estimates and rather indirect estimates in part because
2     of the -- they were not recording actual patient numbers, but they
3     were estimating the number of patients that would have been used
4     based on the amount of drug that was sold. But they do provide
5     estimates that are provided to the regulatory authorities.
6     Q. You may have said that number. What is the estimate?
7     A. The estimate during the time period of 2005 through 2011 that I
8     came up was over three million patients; approximately, 3.4 million
9     patients.
10    Q. Okay.
11    A. Okay. So with that as an understanding, yes, I did review the
12    data of patients that were described as having alopecia that went
13    into the follow-up period, and was described as ongoing.
14    Q. We're going to spend some more time on TAX316, but the first
15    thing I want to do, Doctor, is I want to have you described for the
16    jury what TAX316 meant in terms of clinical data of the efficacy of
17    Taxotere in treating women with node positive breast cancer.
18        And I am going to hand you what is Exhibit No. 21, which
19    is a study that was published in 2005, and that would be within
20    this time period, right? 2005?
21    A. Correct.
22    Q. Okay. And I'm going to hand you Exhibit No. 21, and I will put
23    this on the ELMO, and I am going to ask a couple of quick questions
24    here, and then we can -- the New England Journal of Medicine, that
25    is a foremost peer-reviewed medical journal?

Page 1921

1     A. Yes, I would consider it so.
2     Q. And this is -- just tell the jury what this published study
3     represents as it relates to TAX316, and then we'll spend a little
4     time identifying some of the results of the study.
5     A. Well, it appears this is a publication of the TAX316 55-month
6     data. Now, that's important because -- one of the reasons why
7     TAX316 is important is that it was the basis of the approval of
8     Taxotere in combination with Adriamycin and cyclophosphamide for
9     the treatment of node positive women with breast cancer as adjuvant
10    treatment. So this was basically a study that FDA used, and this
11    reflects of the data that the FDA would have used to approve
12    Taxotere for the treatment of adjuvant breast cancer.
13    Q. And when this study speaks in terms -- and we'll talk of this
14    in more detail, but FAC and TAC, the TAC is a regimen that includes
15    Taxotere and the FAC is a regimen that does not?
16    A. That is -- that is correct. The study -- the study is
17    characterized by, first, being a very large study. It's secondly
18    characterized by being a randomized study. So that provides some
19    scientific power to evaluate the effect of Taxotere.
20        And by the randomization, it compared the TAC regimen to
21    commonly-used alternative regimen, which is the FAC.
22    Q. Okay. So, in particular, this statement here, which you can
23    look on the ELMO, "Treatment with TAC resulted in a 30 percent
24    reduction in the risk of death." I think that's pretty obvious
25    what that means, but if you could just elaborate on that as a board

Page 1922

1     certified oncologist?
2     A. Well, as a company representative, you know, I think it
3     indicates that there is substantial efficacy -- for this regimen,
4     when it is compared against the FAC regimen. Now, note that both
5     of the arms have the Adriamycin and cyclophosphamide in there, so
6     the comparison, whether there is a difference between the Taxotere
7     and the fluorouracil, the comparison suggests that it's the
8     Taxotere which is predominantly making that difference, that
9     reduction in the risk of death that's being seen with this regimen,
10    the TAC regimen.
11    Q. All right. Is it also significant to you, Dr. Kopreski, the
12    statement here about quality of life scores decreased during
13    chemotherapy but returned to baseline levels after treatment?
14    A. I take it as it reads; that they did a quality of life
15    assessment, and this was the finding that they found in the TAC
16    arm.
17    Q. Okay. And then the last sentence I want to ask you about is
18    the conclusion: "Adjuvant chemotherapy with TAC, as opposed to
19    FAC, significantly improves the rates of disease-free and overall
20    survival among women with operable node positive breast cancer."
21        This study led to the approval of Taxotere for node
22    positive women with breast cancer?
23    A. Yes. If you could just give me a moment. I agree with that
24    statement, but I also, particularly within that statement, I would
25    like you -- to draw your attention to page 2309 of the --

Page 1923

1  Q. Okay.
2  A. -- and I would like to draw your attention to the table on page
3  2309, which is a risk reduction of disease-free survival in
4  subgroups. And you will see, if you look at the hormonal status,
5  whether the patient was hormone receptor-negative or hormone
6  receptor-positive. They both had fairly similar risk reduction in
7  favor of the TAC.
8       So this is important because for women who have hormonal
9  receptor-positive status, which is roughly two-thirds of the women
10 with breast cancer, this Taxotere regimen provides them an option
11 that has a survival benefit.
12 Q. Okay. All right. Very good. All right. I want to spend just
13 a little bit more time on the study design of TAX316, and then
14 we'll get in the particulars of some of the patients there. But I
15 created this -- this rather crude graphic here, and the first thing
16 I want -- describe for the jury the information you requested with
17 respect to these TAX316 patients and why it was important to you.
18 A. Well, in particular, since the focus of this -- of my testimony
19 has been regarding persistent alopecia, I thought it was important
20 to look at the -- the data of patients with ongoing alopecia in the
21 manner that my understanding was that persistent or permanent
22 alopecia was being defined, and that was patients who had alopecia
23 greater than six months duration after chemotherapy that did not
24 resolve.
25      Now, I -- I mentioned before, you know, this definition,

Page 1924

1  there is -- there was not a, you know, clear-set clinical
2  definition that we would say when we said persistent. So in the
3  early reports, there might be some confusion as to when you say,
4  "persistent" or "ongoing" compared with the -- the definition I
5  just described of at least six months.
6  Q. Okay.
7  A. Okay? So in view of that, and also in view that the analysis
8  described ongoing, which I previously talked about in the
9  definition of -- the meaning of "ongoing" to mean, you know,
10 alopecia was present, you know, when they died a month later, you
11 know.
12      So I review this data from a stricter standpoint in terms
13 of whether the criteria laid out of -- of at least six months
14 without resolution, six months after chemotherapy without
15 resolution was being fulfilled in these patients that were being
16 called "ongoing."
17 Q. All right. I've identified -- I know you've talked about some
18 of these already. I want to just quickly go through some of the
19 features of TAX316, and I just want to just briefly have you
20 discuss some of the characteristics of this study being an
21 important part of its design. So, the randomized aspect, just
22 briefly, what does that mean and why is that significant to the
23 study?
24 A. Well, randomization is a way of trying to avoid and introduce
25 bias in -- in a study. So if you're going to compare two treatment

Page 1925

1  groups, you could consciously or unconsciously skew the patients
2  that receive one treatment versus -- versus another.
3       Well, let's say, for example, you're doing a study at a
4  single institution, and you know who the patients are and what
5  treatment they're going to get. You could, perhaps, put your
6  select patient so that the patient who has the worst prognosis will
7  get one treatment and the patient that has the best prognosis gets
8  another treatment. That -- that introduces a bias in -- in terms
9  of interpreting not only the efficacy data, but also the safety
10 data.
11      You might -- a single institution might give one
12 treatment at one period of time, let's say, for five years, then
13 switch to another treatment, and then report all of the data
14 together. That's -- that's a biased way --
15 Q. Okay.
16 A. -- of looking at the data.
17 Q. Okay.
18 A. So randomization, in a prospective manner -- in other words,
19 you're going back looking at what was given, but you're
20 prospectively proceeding with the trial and you're randomizing
21 patients so the characteristics of the patients are balanced in
22 both arms.
23 Q. Okay. Another feature was long-term follow-up. Why was that
24 important to TAX316?
25 A. This is particularly important in TAX316 because it -- it does

Page 1926

1  have not only long-term efficacy follow-up, but long-term safety
2  follow-up. In a lot of trials, even randomize trials -- randomized
3  trials, you might see follow-up reported for survival and some
4  efficacy follow-up, but might not provide information on long-term
5  safety.
6       The absence of a report of a toxicity in the long-term
7  follow-up depends on how the study was conducted, and if you are
8  going to analyze a specific issue, it has to be planned for in --
9  preferably in a -- in a manner where the follow-up, such as
10 alopecia, is done on a regular basis to make assessments.
11 Q. Okay.
12 A. So -- so this study was very well designed and specifically
13 designed within a standpoint of looking not only at long-term
14 efficacy, but certain long-term safety issues.
15 Q. Okay. Quickly, there's two other -- there's three things that
16 I want to just identify of TAX316. I think we've already talked
17 about it led to a new clinical indication that we just described in
18 the New England Journal of Medicine?
19 A. Correct.
20 Q. And then briefly talk about the multiple endpoints. Why is
21 that important in TAX316?
22 A. Can you clarify further what you mean by "multiple endpoints"?
23 Q. Did they -- they were evaluating a whole host of side effects,
24 in addition to just alopecia, for example. And just describe for
25 the jury, a study like this, the extensive consideration of how

Page 1927

1  they were doing and their, you know, their health as a whole.
2  A. Okay. So it's important to realize that there's an obligation
3  when the company's doing these trials that it doesn't only look at
4  one specific toxicity; it -- it needs to -- it needs to look at all
5  the toxicities that might occur and that might be made aware of.
6      So, during the course of the study, there are -- there
7  are a number of toxicities that were -- that were being evaluated,
8  and they were evaluated on a -- on a basis of intimate --
9  intermittent and follow-up. The further out from the study the
10 patients got, the less frequent the follow-up was, but there was
11 well-prescribed intermittent follow-up.
12 Q. Okay. I want to direct your attention specifically to the
13 follow-up in TAX316 that tracked patients for alopecia. Are you
14 with me?
15 A. (Witness nodded.)
16 Q. With me?
17 A. Okay.
18 Q. I've put up a graphic here that has some statistics on it, and
19 if you could just walk us through this flow chart and explain what
20 these numbers represent?
21 A. The -- the 316 had two groups of patients, as I had mentioned.
22 The patients receiving TAC, and also the patients receiving FAC.
23 One is the Taxotere arm and -- the TAC, and the other was without
24 the Taxotere. There were 744 patients in the safety population
25 being evaluated in the TAC arm. It's 736 in the -- in the FAC arm.

Page 1928

1      Now, this is ten-year follow-up data, but I think it's
2  important to understand what that -- what that means. That doesn't
3  mean that every single patient is -- is seen for ten years. It
4  means -- because some patients will have died within that ten-year
5  period; some patients will have been lost to follow-up or refused
6  to be followed, basically, refuse -- you know, refused to give it
7  further informed consent. Some patient may have, due to recurrence
8  of the -- of their breast cancer, got onto other treatments, and --
9  and thus, might not be followed for certain conditions. So the
10 follow-up is to -- goes ten years to evaluate, but it's important
11 not to be confused to think that every single patient has lived for
12 ten years and had a ten-year evaluation.
13     Okay. So that's the first point I would like to make.
14 With -- with -- within that, patients were evaluated to see if they
15 had alopecia, did that alopecia persist into the follow-up period.
16     Now, what's the follow-up period? The follow-up period
17 is 30 days after the last treatment with the Taxotere or the FAC
18 on -- on the protocol. And that kicks in the follow-up period. So
19 the question is: Do patients have continuation into the follow-up
20 period?
21     Well, indeed, most patients, since hair grows rather
22 slowly, you know, most -- most patients take more than 30 days from
23 the last treatment to have resolution of their alopecia. So, what
24 you have is a large number of the patients have alopecia going into
25 the follow-up period, and the question then is, of those who have

Page 1929

1  alopecia, is -- is there resolution or is it ongoing? And the vast
2  majority of patients will have document -- will resolve.
3      But this particular table classified 29 patients in the
4  TAC arm and 16 patients in the FAC arm as having alopecia that was
5  ongoing.
6      Now, I previously testified and we discussed, and I think
7  in some detail, that ongoing doesn't mean that it's -- that it has
8  persisted for more than six months. "Ongoing" means that the last
9  time that there was a documentation, there was still alopecia.
10 That means that if the patient had alopecia at the time that they
11 died, it would be considered ongoing. If they had alopecia at the
12 time that they removed their informed consent, it would be
13 considered ongoing. If they had alopecia at the time they switched
14 therapy to another chemotherapy and were no longer seen, that would
15 be considered ongoing.
16 Q. So what -- what did you do? Explain to the jury what you did
17 to evaluate the patients and -- to have, according to the study of
18 29 ongoing to six persistent, briefly, how did you -- what work did
19 you do to evaluate these patients and determine what, in fact, was
20 the nature of their alopecia over the ten-year period?
21 A. Okay. So again, the criteria that I utilized for persistent
22 was if they had alopecia that lasted at least six months, was
23 documented to have lasted at least six months after chemotherapy,
24 and did not have any subsequent resolution. That was -- that was
25 the criteria.

Page 1930

1      In order to -- in order to evaluate that, I looked at the
2  patients that were -- had -- were classified as ongoing. The other
3  patients had already -- you know, the -- there -- there were
4  patients that were previously defined in the analysis of ongoing of
5  having been resolved. So we didn't -- I didn't look at -- at all
6  of those patients that had already been classified as having been
7  resolved.
8      I looked at the patients from the 29 that were considered
9  to be ongoing, and I asked of those if there was documentation that
10 answered two questions, two simple questions: Number 1, did we
11 have documentation, either from what was provided in the CRFs or
12 what was provided in terms of SAS or clinical trial datasets, that
13 were produced from the CRFs that showed documentation that the
14 alopecia was still present six months after the last chemotherapy.
15 So that was -- that was the first criteria: Was the alopecia still
16 present six months after the last chemotherapy that was received.
17     The second criteria: Was there any evidence of
18 resolution of that alopecia? If there was any resolution, then it
19 would not be considered persistent. So that -- that, very simply,
20 is -- is the process. It was a very straightforward process. It
21 was looking to see if -- if there was documentation for any of
22 those two characteristics.
23 Q. Okay. I just want to briefly ask you about the -- the fact
24 that the FAC -- that these patients did not have Taxotere; is that
25 right?

Page 1931

1  A. Correct.
2  Q. The fact that the FAC patients had evidence of both ongoing
3  alopecia and persistent alopecia?
4  A. That is correct.
5  Q. And how -- what is one explanation for why the FAC patients
6  were having ongoing and persistent alopecia and the TAC patients
7  were also having ongoing and persistent alopecia? What's in common
8  with those two arms?
9  A. Well, let me first go back to when I started testifying with
10  you, Mr. Keenan, that alopecia is -- is fairly common to a wide
11  range of chemotherapeutic agents. So alopecia is not simply a
12  condition that occurs with Taxotere.
13       We -- we also -- I also testified that the AC causes --
14  which is the Adriamycin plus the cyclophosphamide, has a very high
15  incidence of alopecia. I -- I believe it was roughly 90 percent,
16  and also a very high incidence of even severe alopecia, Grade 3-4
17  alopecia, which, by the grading, would include very -- very severe
18  alopecia.
19       So -- so this is -- this is common with chemotherapy,
20  such as Adriamycin and cyclophosphamide in combination.
21       Now, what you have is demonstration that in some of those
22  patients that receive Adriamycin and cyclophosphamide, the alopecia
23  persists for more than six months. There were three patients where
24  it fit the criteria for persistent. We also see that there were
25  six patients in the TAC arm that fit the persistence.

Page 1932

1       So I -- I think the presence of persistent alopecia being
2  in the -- in the FAC arm demonstrates that the AC is an important
3  component in the extent and the severity and duration, or is
4  likely, at least, to be a very important component of the extent,
5  severity, and duration of the -- of the alopecia in these patients.
6  Q. One more question about this, and then I want to identify a
7  couple specific patients in this group.
8       Based on your review of the medical records and the study
9  of TAX316, were you able to identify what the percentage -- what
10  the frequency was of persistent or permanent alopecia with respect
11  to these two patient populations and are those numbers reflected
12  here in this?
13  A. Yes, I believe those are correct reflection of six -- divided
14  by 200 and -- six out of 244 patients, 24 and three out of the 736
15  patients. That's, I believe, rounded off --
16  Q. Okay.
17  A. -- to -- to the nearest tenth.
18  Q. I previously marked as Exhibit No. 13 this document. And
19  briefly, what -- what is Exhibit 13, if you could just describe
20  this? I don't want to spend any time on it. I just want to have
21  you identify this in your own --
22       MR. MICELI: Your Honor, may we approach?
23       THE COURT: Yes.
24       MR. MICELI: Take that down, please.
25       (WHEREUPON, THE VIDEO WAS PAUSED AND THE FOLLOWING BENCH

Page 1933

1  CONFERENCE WAS HELD:)
2       MR. MICELI: They said they weren't going to show it.
3  This IT fella back there puts it right up there.
4       THE COURT: That is not supposed to come up.
5       MR. STRONGMAN: Okay. This video has been previewed. I
6  am not putting up with Dr. Glaspy, he'll take it down. I thought
7  that video had all been previewed on both sides.
8       THE COURT: And we talked about --
9       MR. MICELI: And we objected to --
10       THE COURT: They objected and I said it's not going to up
11  because I didn't let the other stuff go up, so it's exactly -- I
12  don't know how that happened. Okay. How long is it going to take
13  to fix it?
14       MR. STRONGMAN: I think he can click a button and it
15  takes off the screen.
16       THE COURT: Click that button.
17       (OPEN COURT.)
18       (WHEREUPON, THE VIDEO WAS RESUMED.)
19  A. -- to the nearest tenth.
20  Q. I previously marked as Exhibit No. 13 this document. And,
21  briefly, what -- what is Exhibit 13, if you could just describe
22  this? I don't want to spend any time on it. I just want to have
23  you identify this in your own -- in your own words.
24  A. This appears to be a document that shows patients in the --
25  patients who were among the 29 TAC and the 16 FAC patients

Page 1934

1  identified as ongoing, who, upon further analysis, by my analysis,
2  failed to meet the criteria that I outlined of either being greater
3  than six months or not having resolution.
4       So -- so, essentially, these are patients in the TAC and
5  the FAC arm that do not meet -- my -- the criteria that I -- that I
6  defined as being persistent alopecia.
7  Q. Okay.
8  A. And I would just mention that the first group are the TAC arm
9  patients, and then, at the end of the document are the FAC arm
10  patients. And, further, this is structured to be very simple with
11  the subject number, the treatment arm, the last date of
12  chemotherapy, and the last documented -- documentation of alopecia,
13  so you can see whether or not it was more than six months or not.
14  And then, also, there's a column for resolution. And then, on the
15  far right is the -- is a clinical description with the Bates
16  numbers and documentations.
17  Q. For the record, I've marked as Exhibit 22 the flow chart that
18  we were just discussing.
19       Doctor, I want to spend time talking about three patients
20  in particular that were part of the initial set of patients in the
21  29 that, upon your review, were determined not to be in the final
22  six. Are you with me?
23  A. Yes.
24  Q. Okay. Doctor, one of the patients that was in the initial
25  group of ongoing is Patient 12403. Are you familiar with Patient

Page 1935

1  12403?
2  A. I am, if you give me a second to find them on the --
3  Q. Describe in a summary fashion what your review of the records
4  of Patient 12403 revealed.
5  A. Well, this patient received six cycles of the TAC regimen, and
6  the last cycle was administered in December -- December 11th of
7  1998. And, at this time, the patient had ongoing alopecia.
8      On the first follow-up visit of -- of April 7th, 1999,
9  the alopecia was recorded as resolved. So that would have been --
10 that follow-up visit appears to have been less than six months, but
11 the resolution date was -- at that follow-up visit was listed as
12 January of 1999.
13 Q. All right.
14 A. So it was less than six months with a -- with a resolution date
15 specified, and a review of the additional -- next ten follow-ups
16 did not have alopecia record as an adverse event.
17 Q. Okay. Doctor, I've put this document on the screen, and I've
18 marked it Exhibit 24. And this shows -- this is Patient 12403; is
19 that right?
20 A. That's correct.
21 Q. And does this show a tracking of alopecia on a date certain
22 that it would have resolved?
23 A. That appears to be correct, and it says, "ceased January 1999."
24 Q. All right. So this would be a patient that would not be
25 considered a patient with permanent or irreversible alopecia?

Page 1936

1  A. No, for -- for -- for two reasons. The first is: Does it meet
2  the six-month criteria? And the answer to that is no. And the
3  second is: Does it meet the resolution criteria? And in this
4  case, the patient also resolved. So in -- in neither of those
5  criteria is there a basis of saying tis patient had permanent
6  alopecia.
7  Q. Exhibit 25 identified as another patient, and this is Patient
8  17603. If you could pull the notes up for 17603, and describe for
9  me what your notes reflect about the review of the records for this
10 patient who was in TAX -- in TAX316.
11 A. Okay. So patient 17603 received six cycles of the TAC regimen,
12 the Taxotere/Adriamycin/cyclophosphamide regimen. The last cycle
13 was administered on 5/8/98. May 8th of 1998.
14     On this date, the patient was recorded as having ongoing
15 alopecia. The alopecia was recorded as ongoing -- during her first
16 three follow-up visits. So it was recorded as being ongoing, with
17 the third follow-up visit being on the -- February 19th, 1999.
18 However, on the fourth follow-up visit of -- of May 7th, 1999, the
19 alopecia was listed as being resolved.
20     So in -- in -- in this patient, although it appears that
21 the alopecia continued for more than six months, the alopecia did
22 subsequently resolve and we have a resolution date.
23 Q. Okay.
24 A. Accordingly, this patient was not considered to have persistent
25 alopecia.

Page 1937

1  Q. Okay. And just for the record, I am marking this Exhibit 26.
2  Exhibit 26 reflects Patient 17603.
3  A. Correct.
4  Q. And then, in this record, does it reflect the alopecia and
5  its -- its status as resolved?
6  A. It does.
7  Q. Okay. And would this be a patient that, upon your review, you
8  concluded would not meet the criteria of irreversible or permanent
9  alopecia as part of TAX316?
10 A. That is correct.
11 Q. Okay. The final patient that I want to speak to, and then we
12 will take a break, is Patient No. 15002. And I'll mark this as
13 Exhibit 27.
14     15002 is a little bit more complicated than the others.
15 If you could just take a moment and look at your notes and describe
16 why this patient is significant to you, Dr. Kopreski, and why it
17 was not counted in the final ten-year data as persistent alopecia.
18 A. This patient received only one cycle of Taxotere arm, TAC, and
19 that cycle was administered on the 8th of -- I'm sorry, on August
20 the 26th, 1998. The patient developed alopecia and was withdrawn
21 from the study after developing gastrointestinal mucositis
22 following the -- the administration of the TAC regimen.
23     On the September of 1998, the patient started alternative
24 chemotherapy with Adriamycin and cyclophosphamide, or the AC.
25 The -- the numbers of the cycle are not known.

Page 1938

1      She was seen in follow-up on November 3rd of 1998, at
2  which time alopecia was ongoing, but because the patient was on
3  another therapy and was no longer in this therapy, there was no
4  longer any follow-up due to the new chemotherapy. It's recorded
5  that there's no longer follow-up due to the new chemotherapy
6  regimen started, and no further alopecia assessments were -- were
7  made for -- for the patient.
8  Q. Okay.
9  A. So the -- the documentation of -- of alopecia that we have was
10 less than six months, and then the patient received another therapy
11 instead of Taxotere, which was continuing. She -- she later had a
12 breast cancer relapse and -- and was started on Taxol, but,
13 unfortunately, this patient later died from -- from her breast
14 cancer in August of 2001.
15 Q. Okay. So some of the records that you just described are here,
16 and I've marked these records as Exhibit 28. This describes her
17 regimen of Taxol weekly, and obviously, that's -- Taxol is a -- is
18 not a drug made by Sanofi.
19 A. That's correct.
20 Q. And the next document reflects that, unfortunately, this woman
21 passed away?
22 A. Unfortunately, that's the case for this patient.
23 Q. Okay. And so, obviously, Dr. Kopreski, TAX316 was an important
24 part of our submission to the FDA?
25 A. Yes, it was.

Page 1939

1  Q. Okay. I've marked as Exhibit 32 from the journal called The
2  Oncologist, and it is a paper by Vishal Saggar, S-A-G-G-A-R, and I
3  ask you to take a moment and describe that study for me. What are
4  we looking at here, Doctor?
5  A. Well, this -- this paper by Saggar is entitled "Alopecia With
6  Endocrine Therapies in Patients With Cancer." And it's a review of
7  various studies looking at various endocrine therapies, which I
8  referred to previously as hormonal therapy or antihormonal therapy.
9  But it -- so it's -- it's a review of -- of the literature, and
10 what it emphasizes is that patients very often will have alopecia
11 who are receiving these -- these endocrine therapies.
12      For example, just reading from the abstract in the
13 results section, Saggar state -- states that the incidence of
14 all-grade alopecia range from 0 to 25 percent with an overall
15 instance of 4.4 percent, the highest incidence. And I'm -- I am
16 paraphrasing here, the highest incidence of all-grade alopecia was
17 observed in patients treated with tamoxifen in a Phase II study at
18 25.4 percent.
19 Q. Now, what does that mean in plain English, Doctor?
20 A. Well, when it says in this -- in this trial, looking at
21 patients treated with tamoxifen, in this particular trial, roughly
22 a quarter of the patients had alopecia.
23 Q. Okay.
24 A. So it -- it goes on also to say that the overall incidence of
25 Grade 2 alopecia, which we previously described as essentially

Page 1940

1  being a more severe alopecia, by meta-analysis was highest in
2  tamoxifen, and they have it at 6.4 percent.
3  Q. And -- and this -- this study was a review of -- describes here
4  19,000 patients in 35 clinical trials. Is that called a
5  meta-analysis, Doctor?
6  A. Well, meta-analysis is more of a statistical term where they --
7  it's -- as -- to my understanding, it's a methodology of --
8  where -- that allows them to combine and analyze different studies
9  together.
10 Q. Okay. There were a couple other findings in this. I want to
11 direct your attention to page 1130 where it has Incidence of
12 High-Grade Alopecia. Do you see that, on page 1130?
13 A. Yes. Yes, I do.
14 Q. Is that significant to you?
15 A. Well, high-grade alopecia -- high-grade -- yes -- yes, it would
16 be significant to me in terms of representing a more severe
17 alopecia. They -- high-grade would be, you know, above -- would be
18 patients that have more of a frank alopecia.
19 Q. And this --
20 A. It's more -- it would of greater severity.
21 Q. And this is identifying the high-grade with tamoxifen.
22 A. Well, the study says that the incidence of high-grade alopecia
23 range between 0.2 percent and 16.9 percent. And it says that the
24 highest incidence of 16.9 percent was observed in a Phase II trial
25 studying the use of tamoxifen in treatment of, in this case, renal

Page 1941

1  cell carcinoma.
2  Q. Okay. All right. And then there's one other finding here, and
3  that's on page 1132, the conclusion. And I'll just read that.
4  A. I -- I --
5  Q. Do you have it there?
6  A. Yes, I do have it.
7  Q. Okay.
8  A. Would you like me to read --
9  Q. Sure.
10 A. -- the conclusion?
11     "The results of this meta-analysis indicate that alopecia
12 is a common but underreported adverse event associated with
13 endocrine agents used to treat cancer, particularly of the breast.
14 This study aims to provide information that is critical for
15 counselling and intervention against alopecia. These findings are
16 critical for pretherapy counselling, the identification of risk
17 factors, and the development of interventions that could mitigate
18 this psychosocially untoward event."
19 Q. And this article also has a photograph of Grade 1 alopecia and
20 Grade 2 alopecia. Do you see that, Doctor?
21 A. I do. So the -- the -- the -- I -- I would consider that the
22 terms the used in this article, the Grade 2 alopecia, would -- I --
23 I -- I would consider is what they consider high grade.
24 Q. What is the value of more information as opposed to less
25 information when evaluating a spontaneous case report? And I will

Page 1942

1  put up on the ELMO a document that I will mark as Exhibit No. 34.
2  A. Okay. So -- so -- so let's consider what -- when one is doing
3  an analysis, one would like to have the best understanding you can
4  of the clinical situation. One of the -- one of the questions that
5  from a corporate side would like to understand is -- is what role
6  is Taxotere potentially playing in -- in the event, and is there
7  anything to suggest that there are certain conditions in the -- in
8  the patient population or certain -- that would be important to
9  note, or is -- is -- is there -- are there other factors that might
10 be accounting for alopecia?
11     So in general -- in general one likes to have as much
12 information as possible.
13     Now, sometimes I think that results in doctors, perhaps,
14 ordering more tests than -- than -- that they would like to order.
15 But -- but, in general, when it comes to clinical assessment, one
16 wants to know as much information about the case as possible.
17 Q. All right. Without -- without -- we're going to come back to
18 this, but is this -- is this demonstrative, does this give a little
19 bit of context in terms of information that ideally you would like
20 to have in evaluating a case report of a man or woman who is having
21 a side effect of Taxotere?
22 A. Well, this -- this case or -- or the document that you were
23 displaying indicates many considerations that we would want to
24 understand when evaluating a case of alopecia in -- and I think
25 we've already talked about one of those cases.

## Page 1943

1  I see at the bottom you have hormonal therapy.
2  Q. Right.
3  A. And I've already talked about hormonal therapy being a very
4  common therapy in women with -- with breast cancer. Keep in mind
5  the vast majority of the cases of the ones that we discussed today
6  are women with breast cancer.
7  Q. We talked about chemotherapy drugs that cause alopecia, right?
8  In terms of the top of the chart it says, "treatment
9  dates." Well, when did the alopecia occur with respect to when was
10 Taxotere received? We noted that many of the combination regimens
11 involved giving a sequential combination instead of a concurrent
12 combination, such as receiving the FEC followed by the Taxotere.
13 That's the epirubicin combination plus Taxotere. Or other times
14 it's the Adriamycin, such as AC, followed by Taxotere.
15 Well, if -- if you recall the -- the labelling
16 information --
17 (WHEREUPON, THE VIDEO WAS PAUSED AND A DISCUSSION WAS HELD OFF
18 THE RECORD.)
19 (WHEREUPON, THE VIDEO WAS RESUMED.)
20 A. In terms of the top of the chart it says, "treatment dates."
21 Well, when did the alopecia occur with respect to when was Taxotere
22 received? We noted that in many of the combination regimens
23 involved giving a sequential combination instead of a concurrent
24 combination, such as receiving the FEC followed by the Taxotere.
25 That's the epirubicin combination plus Taxotere. Or other times

## Page 1944

1  it's the Adriamycin, such is, AC followed by Taxotere.
2  Well, if -- if you recall the -- the labelling
3  information, there's a very high percent of patients who received
4  those drugs in their own right who developed alopecia. So, if you
5  have a 90 percent expectation that the -- that the drug is going to
6  cause alopecia and you notice alopecia with -- with the regimen,
7  the one question is: Did the alopecia occur even before the
8  Taxotere was given?
9  Q. Right. What about dose?
10 A. The -- one wants to know that one is giving a proper dose
11 and -- and not an overdose. So -- so knowing the dose and knowing
12 the time is making -- knowing -- one of the assessments you want to
13 know is whether the -- the patient received medication along the
14 lines of what's prescribed in our labelling.
15 Q. Now, we're going to get --
16 A. In other words, the company would want to know if you're
17 following the -- the way that the medicine is supposed to be given
18 in terms of dose. You would want -- you would want to have that
19 information.
20 Obviously, there are other medications that may cause
21 alopecia that are not normally used in a chemotherapy regimen.
22 Q. And generally speaking, when you talk about going over the
23 cases, what did your review include?
24 A. Well, my review included looking at the -- the case. Usually,
25 the CIOMS. Trying to transcribe that case into my notes so that I

## Page 1945

1  would be able to quickly respond to the case without having to
2  reread the entire case in -- in detail.
3  I -- I reviewed or tried to review, when there was
4  co-medications mentioned, which of those medications might have
5  caused alopecia or have alopecia in the -- in the label or
6  publications.
7  I -- I tried to review the case in terms of whether or
8  not there was sufficient support to show that the case was going
9  beyond six -- six months duration. In many of these cases, there's
10 no clear documentation or it is unknown that these cases were going
11 beyond six months duration. There was some cases where I -- I felt
12 that the documentation showed that it was less than six months in
13 duration. I tried to understand their regimens that -- that the
14 case was receiving. In some cases, that meant going back to an
15 abstract such as the ones that were provided in exhibit, or
16 referring to a regimen discussed in that abstract, such as the
17 exhibit that we had on -- on the PACS 01 trial.
18 The analysis also included paying particular attention to
19 the antihormonal agents and trying to categorize and note with the
20 cases if they were serious or not. I paid attention to were these
21 adjuvant breast cancer or metastatic breast cancer when indicated,
22 what was the indication. Was the indication being provided?
23 Q. Doctor, if you look at Exhibit No. 38, it's the clinical study
24 report.
25 A. This is the ten-year follow-up --

## Page 1946

1  Q. Yep.
2  A. -- study report, correct?
3  Q. Do you agree with me -- and you can look at the monitor if you
4  want, that the study completion date was January 25th, 2010,
5  correct?
6  A. For the ten-year study report, correct.
7  Q. Right. Oh, now -- well, since you mentioned it, let's just
8  confirm that. And the previous version was interim at 55 months,
9  and that was in January 2004, correct?
10 A. That's correct. The study was planned to have interim analysis
11 and a ten-year analysis, and that's what that reflects.
12 Q. During your -- the testimony that you are giving on -- from
13 your lawyers, you referenced a patient with a patient number of
14 12403. Do you remember that? 12403?
15 A. This is on the TAX316 study?
16 Q. Yes.
17 A. Okay.
18 Q. Do you remember that?
19 A. Yes.
20 Q. Can you see the patient number 12403?
21 A. I do.
22 Q. Okay.
23 A. I do.
24 Q. Do you see that your company made representation to regulatory
25 authorities that the last follow-up date with this particular

Page 1947

1    patient was in 2009?  Do you see that?  And at the time -- do you
2    see that, sir?
3    A.  I -- I do.
4    Q.  Now, the material that you were given by the lawyers for your
5    company, is this document right here.  You guys entered it as an
6    exhibit when you were testifying.  Do you see the date on this
7    document, December the 9th, 2003?
8    A.  I do.
9    Q.  All right.  So the last follow-up that you were given related
10   to this patient was from December of 2003, but the last follow-up
11   according to regulatory submissions regarding this patient from
12   your company was some six years later.  Do you see that?
13   A.  I -- I -- okay.
14   Q.  That was one of the three examples that you gave of people who
15   should not be part of the persistent alopecia group at the end of
16   the follow-up study --
17   A.  But --
18   Q.  Let me -- let me ask you this:  Do you believe that you were
19   provided with a single follow-up line item data sheet that went
20   beyond the year 2003 as part of your preparation for today's
21   deposition?
22   A.  Was I provided with a single line item data sheet beyond 2003?
23   Q.  For the 29.
24   A.  In -- in my preparation in terms of if a patient showed
25   resolution, including data sheets that may have been derived from

Page 1948

1    the interim study report, if it showed a resolution, I would
2    consider that patient resolved.
3    Q.  Can you answer my question?  Do you believe that you were
4    provided with a single, by the lawyers who gave you the information
5    that you were relying upon, that you previously testified you don't
6    know whether it's complete or not, do you believe that the lawyers
7    gave you any follow-up data, data lines, after 2003, when you were
8    commenting about a study that ended in 2010?
9    A.  The ten-year follow-up ended in 2010.  If you look at the --
10   Q.  Can you answer my question, please?
11   A.  I don't -- I don't -- I don't know.  It's not -- it's not a
12   question that I had considered.
13   Q.  If you would look at Exhibit 39, just under the last patient
14   that we discussed under 12403, you'll see patient reference 12612.
15   Do you see that patient?
16   A.  Yes.  Yes, I do.
17   Q.  Do you see the representation made by Sanofi to regulatory
18   authorities regarding that patient in March of 2012 that the last
19   follow-up date with this patient was on June the 16th of 2009?
20   A.  I see the date of follow-up was June the 16th, 2009.
21   Q.  And according to the representations made by Sanofi to
22   regulatory authorities in 2012, that at the time of last follow-up
23   in June of 2009, 10.02 years in duration, that alopecia was ongoing
24   at the end of the follow-up period.  Do you see that representation
25   that's been made?  Third from the bottom, Patient 12612.

Page 1949

1    A.  Okay.  Yes.
2    Q.  All right.
3    A.  I see that.
4    Q.  But the material you were provided by the lawyers regarding
5    this patient is dated 2003.  Do you see that?
6    A.  I want to remind you that all of the patients of the 29 and the
7    6 -- and the 16 that were reviewed were analyzed as ongoing at the
8    end of the follow-up period.
9         The question is not whether it was ongoing at the end of
10   the follow-up period; the question was whether it meets the -- the
11   definition of -- of the persistence.  And that is why you have the
12   29 and the 16 because there -- so -- so you can -- you can go
13   through these, and it -- and it says, "ongoing" at the end of the
14   follow-up period, which is exactly what the table and study report
15   says with the patients.  But then next step that we went through,
16   as was detailed, was whether it meets the criteria.
17   Q.  Sir, did you -- can you answer my question?  Did you realize
18   that you -- that the information that was given -- that was given
19   to you in terms -- in terms of the patient data stopped in 2003,
20   six years before the end of the study?  Did you realize that when
21   you were reviewing it?
22   A.  I realize that much of the data that we were utilizing was data
23   that was available in the 55-month analysis.
24   Q.  Then why didn't you tell the jury that when you were
25   pontificating about the fact that you reviewed the full ten years

Page 1950

1    of follow-up data?
2    A.  I believe what I said to the jury, I think I went through and
3    detailed exactly how the analysis was -- was conducted.  And if
4    there was evidence of resolution or evidence of persistence, you
5    know, if there was evidence of persistence, then we certainly would
6    want to know was there any resolution beyond the 55 months.  But if
7    there was evidence of resolution, then the question was addressed.
8    If it resolved, it resolved.  If it resolved within the 55 months,
9    it resolved.
10   Q.  Let me ask you this:  When did Sanofi research and study
11   Taxotere and permanent alopecia in a clinical trial setting so that
12   you could make sure that you had all of this case assessment
13   information that you wanted to study, permanent alopecia and your
14   drug, whether in a monotherapy setting or in combination with
15   others?  When did you do that?
16   A.  Well, I previously testified that in the conduct of a clinical
17   trial, we don't restrict the gathering of safety information.  Only
18   to an event, or one event, such as alopecia, but we gather all
19   safety information.
20        Within the -- within the study of -- of recovery of
21   alopecia I previously cited that I think the best study trying to
22   control for these factors was the TAX316, which was initiated, I
23   believe, in 1997.
24   Q.  Didn't you previously testify in this very deposition that the
25   company had only limited information with respect to many of the

Page 1951

```
1    adverse event reports?
2    A. I did.
3    Q. Okay. And all that I asked you previously was: Wouldn't you
4    agree with me that the company didn't have the outcome information
5    or all of the information that the company would have liked to have
6    had in many of the adverse event reports that we discussed? The
7    answer to that is yes, right?
8    A. Well, you --
9    Q. It didn't have all of the information that you wanted?
10   A. I'm sorry. You asked about processing. So there's information
11   that we would like to have, but there's information that we need to
12   have for processing; and what I am drawing the distinction of is
13   there can be two groups of information.
14        All of those cases with limited information, obviously,
15   were processed and had sufficient information to process, but there
16   were limited information in terms of determining aspects such as,
17   you know, likelihood of cause.
18   Q. Okay. Let me mark and show to you Exhibit 45, which is a
19   document that may be more instructive on the issue of whether or
20   not there was an effort by the company to track alopecia as a side
21   effect for patients in TAX316, and I've got this on the ELMO.
22        What do these headings reflect, and how do these headings
23   differ from Exhibit 39 that was marked and shown to you by
24   Mr. Bachus?
25   A. Well, I think this is a document based on the date of 15th of
```

Page 1952

```
1    March 2012, so it would be based upon the ten-year data. And in
2    contrast to the document shown by Mr. Bachus, you can see the
3    header of this document shows date of last follow-up of the adverse
4    event.
5    Q. What does that mean?
6    A. Well, that means if you want to see when was the last date that
7    the alopecia was actually recorded or had a follow-up, whether that
8    follow-up was resolved or ongoing but had a follow-up evaluation,
9    that would be shown in this document in the second-to-right column,
10   as opposed to the one that Mr. Bachus had shown us, which is only
11   the date of the last follow-up for the patient.
12        And on the right-hand column, you will have the duration
13   of the follow-up for that adverse event. So if you really want to
14   determine the dates of the follow-up for alopecia, you would use
15   this document looking at the -- particularly looking at the last
16   two columns.
17   Q. And was this document and this evaluation done independent of
18   your analysis?
19   A. Yes, it was.
20   Q. And --
21   A. It was done in 2012.
22   Q. Okay. And are there a couple individual patients that are
23   listed here that are of interest to you that you want to talk about
24   briefly in greater detail?
25   A. Well, I think all of the patients are of interest. If you --
```

Page 1953

```
1    if you look down the entire list, you can see that, particularly
2    when you go to the -- it's even clearer on the next page, that the
3    vast majority of patients in the TAC arm have alopecia. And,
4    again, this refers to, you know, patients that we had previously
5    looked at, including those with Mr. Bachus. You can see the
6    numbers on the right are all, for the most part, very short
7    duration in years. Most of them indicate less than six months of
8    duration.
9    Q. And that's duration of alopecia?
10   A. That's duration of alopecia.
11   Q. Let's focus on Patient 40401.
12   A. Okay.
13   Q. What does the Exhibit 45 reflect in terms of duration of
14   alopecia?
15   A. Well, if you look at -- this demonstrates the difference
16   between the document and Mr. Bachus, the way he interpreted, and
17   the actual duration of the alopecia. So if you look in the
18   previous Exhibit 39 of Mr. Bachus, underneath 40401, which is
19   page -- numbered page 2 out of 32 --
20   Q. Yes.
21   A. -- you see that the last date reflected here is October 2008
22   and that the duration is 10.24 years. Now, that's not the last
23   date of the alopecia. That is when the last follow-up of the
24   patient was.
25        But if you want to know when the date of the ongoing
```

Page 1954

```
1    alopecia being followed is for that patient, if you look at this
2    Exhibit 45, underneath 40401, you see that, in actuality, the date
3    of the last follow-up is in September of 1998 and that the total
4    duration of the alopecia in years is 0.14 years, plus 30 days,
5    since the counting started 30 days after the last IV, so less than
6    six months.
7    Q. Okay.
8    A. So this is a clarification of ongoing with respect to alopecia.
9    Q. Okay. I want to spend my last few minutes talking about
10   Patient 12403, and that's also a patient that was part of the
11   TAX316 study; is that right?
12   A. That is correct.
13   Q. In Mr. Bachus's cross-examine of you in December, he asked you
14   questions about Patients 120 -- 12403 and represented to you that
15   was a patient who had alopecia that was ongoing into 2009. Do you
16   recall that -- those questions?
17   A. I do.
18   Q. Okay. I am going to mark as Exhibit No. 46 a document that I
19   think speaks to that question, and I'll hand you that Exhibit 46.
20   Exhibit -- exhibit -- I have just a few minutes left here.
21        Dr. Kopreski, I want to start here with the date here,
22   July 6, 2010, at the bottom of Exhibit 46. And what does that tell
23   us, the origin of this document?
24   A. This would indicate this is -- this is ten-year data.
25   Q. And does this document also speak to this particular patient
```

Page 1955

1  12403 that was the subject of questions by you by Mr. Bachus?
2    A. Yes, I believe it does.
3    Q. Okay. And just briefly, tell the jury what is this document
4  and what value does it add in terms of evaluating a particular
5  patient's progress in this particular TAX316 study?
6    A. Well, this is -- this is the data by a cycle and follow-up
7  period that allows you to assess given events. And you will see
8  for this patient, the alopecia, contrary to the way that was
9  previously described and the interpretation from Mr. Bachus's
10 document of it being ongoing for the period of time he mentioned,
11 you can see on page 38267 on the bottom where it says, "Follow-up
12 period 601 alopecia" provides an end date of January 1999.
13   Q. And what does that mean?
14   A. That means the patient -- alopecia resolved on January of 1999
15 in contrast to the suggestion that Mr. Bachus made that it was
16 ongoing. This is Patient 02403.
17   Q. 12403?
18   A. Yeah, 12403. Mr. Bachus's document it has date of last
19 follow-up is February 2009. So the last follow-up was in 2009, but
20 the resolution of the alopecia, consistent with my analysis, was in
21 January of 1999.
22       (WHEREUPON, THE VIDEO WAS CONCLUDED.)
23       MR. COFFIN: Your Honor, may we approach?
24       THE COURT: Yes.
25       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

Page 1956

1        MR. COFFIN: With regard to this Kopreski testimony, your
2  Honor, we now have had Figure A, which is his reanalysis example,
3  shown to the jury, which your Honor specifically said was not, was
4  prohibited, shouldn't have been shown to the jury. To be clear,
5  this is the deposition testimony of a witness that Sanofi -- was a
6  Sanofi employee, was not an expert. We never saw this analysis
7  until it was sprung on us at that deposition and then they don't
8  bring him live. Then they put the analysis up, which your Honor
9  said should not be shown to the jury.
10       Then they show pictures, comparison pictures that have to
11 do with tamoxifen, not an issue in this case. They show a case
12 assessment, hormonal therapy assessment, sequence of treatment,
13 dosing, other chemotherapy drugs, this man has just given expert
14 opinion on multiple, multiple areas, extremely prejudicial,
15 extremely. A lot of which has no probative value like tamoxifen.
16 It's really troubling.
17       THE COURT: What are you asking me?
18       MR. COFFIN: I mean, quite frankly I think we might have
19 to move for a mistrial.
20       MR. MOORE: I think your Honor ruled on the designations,
21 I think that happened and --
22       THE COURT: Yeah, but --
23       MR. MOORE: The exhibit, I texted Harley because Dave was
24 not in the negotiations with your Honor yesterday. Harley said
25 that that table was shown to you --

Page 1957

1        THE COURT: That table but not -- there was something
2  that went up that wasn't supposed to be -- the individual case
3  reports with the table.
4        MR. MOORE: Which we don't know what that was. Dan,
5  maybe Dan can shed some light on it.
6        MR. MARKOFF: We objected to all of it --
7        MR. COFFIN: In but in chambers --
8        THE COURT: I did not allow them to go through the
9  individual reports and that went up and then that came down. And I
10 think there was something else that went up that wasn't supposed
11 to.
12       MR. MARKOFF: The hair.
13       THE COURT: The hair was not supposed to go up.
14       MR. MARKOFF: I think we should at least -- it's up to
15 Chris, but I think we should at least get an instruction that
16 tamoxifen is not an issue in this case, in relation to the photos
17 that were shown, especially to tamoxifen, they were inappropriate
18 and should not have been shown to the jury.
19       MR. COFFIN: I understand that, but there have been
20 multiple MIL violations, now we have this. The prejudice is
21 overwhelming, and I am going to talk to my team about a mistrial,
22 Judge.
23       THE COURT: Okay. Well, until you do that, I am going to
24 tell them -- I am going to remind them that Dr. Kopreski is not an
25 expert, he has not been tendered or accepted by this court as an

Page 1958

1  expert, and that the issue of tamoxifen has no bearing on any issue
2  in this lawsuit.
3        MR. STRONGMAN: Fair enough.
4        MR. MARKOFF: I think you also need to say that the
5  photos that were shown and the testimony related to tamoxifen was
6  not an issue, was never taken by this client Ms. Earnest, and
7  should not have been shown.
8        MR. STRONGMAN: Should not have been shown. I mean, they
9  were all cleared.
10       (WHEREUPON, MR. RATLIFF APPROACHED THE BENCH.)
11       THE COURT: The photographs of tamoxifen? I don't
12 remember the alopecia looking like that.
13       MR. RATLIFF: Their objection, your Honor, was as it
14 related to the demonstrative exhibits, those flow charts and
15 graphs, and that's what we talked about yesterday, which is they
16 said that should not be coming into evidence or published.
17       THE COURT: The issue was there was pictures of some hair
18 loss.
19       MR. STRONGMAN: It was an article.
20       MR. RATLIFF: Yeah, there was no objection to that.
21 There was nothing ever raised about that. They vetted this video,
22 your Honor, they've had it for two days. They've watched it. They
23 never said anything to us about it. The only issues that were
24 raised with us were the inclusion of wanting to enter that one
25 section that Larry wanted to enter, which you said would not come