# EXHIBIT C



*Center for Health Sciences*

# Expert Report of
# Ellen T. Chang, Sc.D.

*in re:*

**Taxotere (Docetaxel) Products Liability Litigation**

Exponent, Inc.
149 Commonwealth Dr
Menlo Park, CA 94025

April 17, 2020

# Contents

| | Page |
|---|---|
| **Contents** | **1** |
| **Summary of opinions** | **3** |
| **Qualifications** | **5** |
| **Case-specific materials reviewed** | **6** |
| **Introduction to epidemiology** | **15** |
| Basic epidemiological principles | 15 |
| Epidemiological study designs | 15 |
| Measures of disease frequency | 19 |
| Measures of association | 20 |
| Interpretation of statistical associations versus causation | 21 |
| **Large, long-term, randomized controlled trials provide the best available human evidence on whether docetaxel causes irreversible or permanent alopecia.** | **24** |
| Alopecia has numerous forms and risk factors; if these are unevenly distributed across nonrandomized treatment groups, then estimated associations with treatment will be biased. | 24 |
| Many medications, including several types of cancer chemotherapy, can cause alopecia and may confound or bias observed associations with nonrandomized treatments. | 26 |
| **Most of the available epidemiological evidence is inadequate to evaluate the potential causal effect of docetaxel on irreversible or permanent alopecia.** | **29** |
| Irreversible or permanent alopecia as a discrete clinical outcome is not typically captured or reported in clinical trials. | 29 |
| Adverse event reports are not a valid scientific basis for evaluating the causation or incidence of adverse events. | 31 |
| Dr. Madigan's analyses of the FAERS and Sanofi global pharmacovigilance databases do not pertain to irreversible or permanent alopecia. | 34 |
| Dr. Madigan's analyses of the FAERS and Sanofi global pharmacovigilance databases are not a valid scientific basis for evaluating the causation or incidence of irreversible or permanent alopecia among patients treated with docetaxel. | 43 |
| Published studies have major limitations for evaluating the causation or incidence of irreversible or permanent alopecia among patients treated with docetaxel. | 46 |

Summary of relevant published studies of docetaxel and irreversible or permanent alopecia — 56

Methodological limitations of relevant published studies — 66

Dr. Madigan's meta-analysis of the results of four of these studies is not a valid scientific basis for evaluating the causation of irreversible or permanent alopecia among patients treated with docetaxel. — 70

By citing flawed retrospective studies, nonrandomized clinical trials, case reports, and adverse event reports, Plaintiffs' experts rely on an inappropriate and inadequate scientific basis for their opinions on the causation and incidence of irreversible or permanent alopecia. — 71

**The TAX 316 randomized controlled trial provides the best available evidence to assess potential causation of irreversible or permanent alopecia by docetaxel-containing chemotherapeutic regimens.** — **77**

Two large, long-term, randomized controlled trials of docetaxel-containing chemotherapeutic regimens versus nondocetaxel regimens—namely, TAX 316 and GEICAM 9805—reported information on the cumulative incidence of alopecia. — 77

"Ongoing" alopecia and alopecia that "persisted into the follow-up period," as defined in TAX 316 and GEICAM 9805, are not equivalent to irreversible, permanent, or even long-term alopecia. — 79

Due to the lack of long-term follow-up for adverse events in GEICAM 9805, TAX 316 is superior to GEICAM 9805 for evaluating potential causation of irreversible or permanent alopecia by docetaxel. — 88

Documentation from TAX 316 shows that most patients classified as having "ongoing" alopecia did not have irreversible alopecia. — 89

Plaintiffs' experts rely on results from the TAX 316 and GEICAM 9805 trials that do not pertain to irreversible or permanent alopecia and are not a valid scientific basis for evaluating the causation or incidence of permanent or irreversible alopecia among patients treated with docetaxel-containing chemotherapeutic regimens. — 94

The cumulative incidence of possible irreversible alopecia did not differ significantly between the TAC and FAC arms of TAX 316, indicating no statistically significant difference in the causal effect of docetaxel versus 5-fluorouracil on irreversible alopecia. — 96

**Evaluation of evidence from randomized controlled trials using the Hill guidelines does not establish a causal effect of docetaxel versus other chemotherapeutic agents on irreversible or permanent alopecia.** — **105**

**Conclusions** — **110**

**References** — **112**

# Summary of opinions

I have been asked by counsel for Sanofi to evaluate the available scientific evidence on the occurrence of irreversible or permanent alopecia among breast cancer patients using chemotherapeutic regimens containing docetaxel (Taxotere®), and to use the science of epidemiology to address whether a causal relationship has been established between docetaxel and irreversible or permanent alopecia.

In general, I consider terms such as "irreversible alopecia," "permanent alopecia," "nonreversible alopecia," "persistent alopecia," and "persisting alopecia" to refer to the same concept, that is, hair loss that continues over an extended duration of time, without subsequent resolution. There is no universal or authoritative clinical definition of this condition, and various scientists and clinicians may define it differently, for example, based on the duration of persistence or the degree of hair regrowth. For this report, I took into consideration all relevant scientific studies of this concept of irreversible or permanent alopecia, referred to using assorted similar terms. In the context of the TAX 316 randomized controlled trial, I use the term "irreversible alopecia" specifically to refer to hair loss that persists for at least six months after the cessation of study chemotherapy, without subsequent resolution. This definition is consistent with the typical expected duration of chemotherapy-induced alopecia for approximately one month to six months after cessation of chemotherapy.

In my evaluation of whether docetaxel causes irreversible or permanent alopecia in breast cancer patients, I considered comparison populations of breast cancer patients who received other anticancer chemotherapies. I made such comparisons because the alternative to docetaxel-containing chemotherapeutic regimens would not be the absence of breast cancer treatment, but rather other accepted chemotherapeutic regimens that are within the standard of care.

In my opinion, to a reasonable degree of scientific certainty, large, long-term, randomized controlled trials are the best source of evidence to address the potential causal relationship between docetaxel and irreversible or permanent alopecia. Such evidence comes from the TAX 316 trial, which conducted 10-year follow-up to evaluate the efficacy of docetaxel in combination with doxorubicin and cyclophosphamide (TAC) versus 5-fluorouracil in combination with doxorubicin and cyclophosphamide (FAC) as adjuvant treatment for operable breast cancer patients with positive axillary lymph nodes. This trial did not demonstrate a statistically significant increase in risk of irreversible alopecia among breast cancer patients randomized to TAC, compared with those randomized to FAC. Other randomized controlled trials of docetaxel-containing chemotherapy that I identified from a systematic literature search were limited by not methodically ascertaining or reporting the long-term frequency of irreversible or permanent alopecia. Besides TAX 316, I found only one other randomized

controlled trial of docetaxel versus nondocetaxel chemotherapy that reported on the incidence of irreversible or permanent alopecia, and that trial was neither large nor long-term. Other studies with a nonrandomized design are highly susceptible to selection bias and confounding that may invalidate the observed association between chemotherapy with docetaxel and risk of irreversible or permanent alopecia; thus, such studies are inadequate for assessing potential causal effects of docetaxel. Therefore, based on the best available scientific evidence, a causal relationship has not been established between docetaxel-containing chemotherapeutic regimens, compared with nondocetaxel regimens, and irreversible or permanent alopecia.

I did not directly assess whether a causal relationship has been established between use of any other specific chemotherapeutic agent and irreversible or permanent alopecia. I also did not directly investigate the incidence of irreversible or permanent alopecia among breast cancer patients using chemotherapeutic agents other than docetaxel.

My opinions expressed in this report are based on standard, well-established scientific methods in epidemiology. This report summarizes work performed to date for this specific case and presents the findings resulting from that work. The findings presented herein are made to a reasonable degree of scientific certainty. I reserve the right to supplement this report and to expand or modify my opinions based on review of additional material as it becomes available through ongoing discovery and/or through any of my additional work or review of additional work performed by others on this matter.

# Qualifications

I am an epidemiologist specializing in cancer epidemiology. I earned my undergraduate degree at Harvard College in 1998 and my doctorate degree (Doctor of Science, Sc.D.) in epidemiology with a minor in biostatistics from the Harvard School of Public Health in 2003. I completed a postdoctoral fellowship in medical epidemiology and biostatistics at the Karolinska Institute in Stockholm, Sweden, in 2005.

I am currently a Principal Scientist at Exponent, Inc., an international science and engineering consulting company. I am also a member of the Stanford Cancer Institute, and a Visiting Professor at the Sun Yat-sen University Cancer Center.

Prior to joining Exponent in 2012, I was a research scientist at the nonprofit Cancer Prevention Institute of California, where I conducted original research studies on cancer epidemiology and performed cancer surveillance research at a National Cancer Institute Surveillance, Epidemiology, and End Results (SEER) population-based cancer registry. I was also the Chief Epidemiologist at the Asian Liver Center at Stanford University, where I conducted community-based research on hepatitis B and liver cancer awareness, detection, prevention, and management. From 2005 to 2016, I was a Consulting Assistant Professor in the Division of Epidemiology, Department of Health Research and Policy at the Stanford University School of Medicine.

My main research interests are cancer epidemiology, surveillance, and prevention, and I have published several original research studies of breast cancer incidence and long-term outcomes (Hausauer et al. 2007, Keegan et al. 2007, Henderson et al. 2008, Chang et al. 2009, Hausauer et al. 2009, Phillips et al. 2009, West-Wright et al. 2009, Gomez et al. 2010a, Gomez et al. 2010b, Keegan et al. 2010, Telli et al. 2011). I have conducted epidemiologic studies of a wide range of exposures in association with cancer risk and outcomes, including medication use, reproductive factors, occupational exposures, infections, immunological biomarkers, physical activity, body size, diet and nutrition, alcohol consumption, tobacco smoking, family structure, personal and family medical history, and genetic variation. My publications on epidemiological studies of medication use, including cancer chemotherapies, are particularly relevant to this matter (Chang et al. 2005, Smedby et al. 2006, Chang et al. 2010, Lu et al. 2011, Stram et al. 2011, Keegan et al. 2013, Sieh et al. 2013, Glimelius et al. 2015a, Glimelius et al. 2015b, Hummel et al. 2016, Glimelius et al. 2017, Xiao et al. 2018, Trinh et al. 2019). Overall, I have published more than 190 peer-reviewed scientific articles and reviews and 12 book chapters. These are listed in my *curriculum vitae*, which is attached to this report as Appendix A. A list of all cases in which I have provided deposition or trial testimony in the last four years is included as Appendix B. My employer, Exponent, is compensated at $395 per hour for my work on this matter.

April 17, 2020

# Case-specific materials reviewed

In addition to the references cited at the end of this report, I received and considered the following case-specific materials. In the event that relevant additional case-specific materials are made available in this matter, I reserve the right to amend this report accordingly.

- Clinical Study Report. Compound: Docetaxel. Sanofi Aventis. A multicenter phase III randomized trial comparing docetaxel in combination with doxorubicin and cyclophosphamide (TAC) versus 5-fluorouracil in combination with doxorubicin and cyclophosphamide (FAC) as adjuvant treatment of operable breast cancer patients with positive axillary lymph nodes. 10-year follow-up. Study Number: TAX 316 (EFC6041/BCIRG001). Report Date: September 9, 2010. Sanofi_02649521.
- TAX 316 Case Report Forms:

| | | |
|---|---|---|
| 10101 (Sanofi_05482569) | 11210 (Sanofi_05481093) | 12114 (Sanofi_05495734) |
| 10204 (Sanofi_03259280) | 11301 (Sanofi_05522264) | 12115 (Sanofi_05495881) |
| 10205 (Sanofi_05483591) | 11406 (Sanofi_05486252) | 12203 (Sanofi_05488029) |
| 10301 (Sanofi_03258655) | 11701 (Sanofi_05493979) | 12210 (Sanofi_05487890) |
| 10302 (Sanofi_05519599) | 11702 (Sanofi_03264910) | 12214 (Sanofi_03253614) |
| 10303 (Sanofi_05482983) | 11703 (Sanofi_05494747) | 12216 (Sanofi_05487594) |
| 10402 (Sanofi_03257713) | 11705 (Sanofi_03256810) | 12302 (Sanofi_05497279) |
| 10403 (Sanofi_05481726) | 11710 (Sanofi_05494606) | 12308 (Sanofi_05523429) |
| 10501 (Sanofi_05481899) | 11715 (Sanofi_03256572) | 12312 (Sanofi_03255219) |
| 10503 (Sanofi_05482262) | 11717 (Sanofi_05494316) | 12314 (Sanofi_05497784) |
| 10509 (Sanofi_03257906) | 11719 (Sanofi_03256359) | 12317 (Sanofi_05497462) |
| 10601 (Sanofi_05501452) | 11725 (Sanofi_03256148) | 12318 (Sanofi_05497639) |
| 10603 (Sanofi_05500941) | 11730 (Sanofi_03255941) | 12601 (Sanofi_05488354) |
| 10611 (Sanofi_05500803) | 11731 (Sanofi_05494155) | 12602 (Sanofi_05488898) |
| 10612 (Sanofi_03254519) | 11732 (Sanofi_04157252) | 12702 (Sanofi_05498990) |
| 10613 (Sanofi_05500694) | 11742 (Sanofi_05492971) | 12706 (Sanofi_05498790) |
| 10621 (Sanofi_03254307) | 11743 (Sanofi_05492801) | 12709 (Sanofi_05498663) |
| 10625 (Sanofi_05500318) | 11803 (Sanofi_05523775) | 12805 (Sanofi_05485066) |
| 10701 (Sanofi_04161784) | 11805 (Sanofi_05496681) | 13418 (Sanofi_05505012) |
| 10702 (Sanofi_05499813) | 11806 (Sanofi_05496380) | 13428 (Sanofi_05520910) |
| 10708 (Sanofi_05499645) | 11807 (Sanofi_05496520) | 13430 (Sanofi_04602366) |
| 10710 (Sanofi_05499460) | 11905 (Sanofi_05496825) | 13433 (Sanofi_05505169) |
| 10714 (Sanofi_05499310) | 11912 (Sanofi_05522970) | 13505 (Sanofi_05521875) |
| 10717 (Sanofi_05499168) | 12001 (Sanofi_05486827) | 13506 (Sanofi_05489426) |
| 11101 (Sanofi_05484313) | 12006 (Sanofi_05487151) | 13507 (Sanofi_05489104) |
| 11102 (Sanofi_05484645) | 12007 (Sanofi_05486967) | 13510 (Sanofi_05489261) |
| 11201 (Sanofi_03257331) | 12009 (Sanofi_05486390) | 13606 (Sanofi_05510422) |
| 11203 (Sanofi_05480956) | 12103 (Sanofi_05523630) | 13701 (Sanofi_05472738) |
| 11205 (Sanofi_03257139) | 12107 (Sanofi_03255423) | 13801 (Sanofi_05473316) |
| | 12109 (Sanofi_05496065) | 13808 (Sanofi_05473850) |

| | | |
|---|---|---|
| 13810 (Sanofi_05474020) | 14558 (Sanofi_02242760) | 16518 (Sanofi_02249336) |
| 13811 (Sanofi_05473482) | 14901 (Sanofi_05469679) | 16519 (Sanofi_02248111) |
| 14001 (Sanofi_04600111) | 14905 (Sanofi_05469865) | 16601 (Sanofi_02223649) |
| 14410 (Sanofi_05476998) | 15002 (Sanofi_05503576) | 16602 (Sanofi_02223157) |
| 14426 (Sanofi_05477162) | 15006 (Sanofi_05503656) | 16603 (Sanofi_02222708) |
| 14431 (Sanofi_05476252) | 15303 (Sanofi_05490293) | 16605 (Sanofi_05502057) |
| 14435 (Sanofi_03251849) | 15304 (Sanofi_05490146) | 16606 (Sanofi_05502249) |
| 14454 (Sanofi_02241355) | 15401 (Sanofi_04603183) | 16607 (Sanofi_02222131) |
| 14501 (Sanofi_02244803) | 15601 (Sanofi_05505649) | 16608 (Sanofi_04189127) |
| 14503 (Sanofi_02240129) | 15605 (Sanofi_05512180) | 16610 (Sanofi_05503010) |
| 14504 (Sanofi_02236726) | 15607 (Sanofi_05511991) | 16611 (Sanofi_04188714) |
| 14505 (Sanofi_02240503) | 15704 (Sanofi_05501604) | 16612 (Sanofi_02224815) |
| 14507 (Sanofi_02235171) | 15801 (Sanofi_05521608) | 16613 (Sanofi_02225173) |
| 14510 (Sanofi_02238971) | 15811 (Sanofi_05513479) | 16615 (Sanofi_02223450) |
| 14512 (Sanofi_02235553) | 15813 (Sanofi_05491509) | 16616 (Sanofi_02222511) |
| 14514 (Sanofi_02234823) | 15820 (Sanofi_04603578) | 16703 (Sanofi_05474189) |
| 14515 (Sanofi_02243077) | 16002 (Sanofi_05501908) | 16802 (Sanofi_05506463) |
| 14516 (Sanofi_03251449) | 16101 (Sanofi_05501452) | 16901 (Sanofi_05467772) |
| 14517 (Sanofi_02236902) | 16201 (Sanofi_05521386) | 17201 (Sanofi_02226061) |
| 14519 (Sanofi_02243910) | 16203 (Sanofi_05491989) | 17202 (Sanofi_02226534) |
| 14520 (Sanofi_02235351) | 16207 (Sanofi_05491685) | 17203 (Sanofi_02227800) |
| 14523 (Sanofi_02234466) | 16209 (Sanofi_05491844) | 17204 (Sanofi_02225365) |
| 14524 (Sanofi_02237246) | 16301 (Sanofi_05511487) | 17205 (Sanofi_02227436) |
| 14525 (Sanofi_02239277) | 16302 (Sanofi_02252729) | 17206 (Sanofi_02225524) |
| 14528 (Sanofi_02238073) | 16303 (Sanofi_02251800) | 17301 (Sanofi_02232807) |
| 14529 (Sanofi_04189728) | 16304 (Sanofi_02252914) | 17302 (Sanofi_02228892) |
| 14530 (Sanofi_02242578) | 16305 (Sanofi_02251279) | 17303 (Sanofi_02228202) |
| 14531 (Sanofi_02244984) | 16306 (Sanofi_02251987) | 17304 (Sanofi_03245351) |
| 14532 (Sanofi_02245876) | 16402 (Sanofi_05474673) | 17406 (Sanofi_03247995) |
| 14533 (Sanofi_02245168) | 16501 (Sanofi_02249691) | 17415 (Sanofi_03247755) |
| 14534 (Sanofi_02234636) | 16502 (Sanofi_02248363) | 17502 (Sanofi_03259842) |
| 14535 (Sanofi_02237760) | 16503 (Sanofi_02246705) | 17601 (Sanofi_05471653) |
| 14538 (Sanofi_02242207) | 16504 (Sanofi_02247363) | 17605 (Sanofi_03250000) |
| 14540 (Sanofi_03251233) | 16505 (Sanofi_02248583) | 17611 (Sanofi_03249738) |
| 14541 (Sanofi_02241178) | 16506 (Sanofi_05504334) | 17705 (Sanofi_03247573) |
| 14544 (Sanofi_02236385) | 16507 (Sanofi_02250568) | 17801 (Sanofi_02220789) |
| 14545 (Sanofi_02246038) | 16508 (Sanofi_02249941) | 17802 (Sanofi_02220998) |
| 14546 (Sanofi_02239167) | 16509 (Sanofi_02248769) | 17803 (Sanofi_05463945) |
| 14547 (Sanofi_02245331) | 16510 (Sanofi_02246920) | 17804 (Sanofi_02221386) |
| 14551 (Sanofi_02238272) | 16511 (Sanofi_02246356) | 17901 (Sanofi_05471040) |
| 14552 (Sanofi_02237911) | 16512 (Sanofi_02250993) | 17902 (Sanofi_04162180) |
| 14553 (Sanofi_05480329) | 16513 (Sanofi_02248960) | 17904 (Sanofi_03249253) |
| 14554 (Sanofi_02241355) | 16514 (Sanofi_02250135) | 18001 (Sanofi_02218208) |
| 14555 (Sanofi_02242369) | 16515 (Sanofi_02247558) | 18002 (Sanofi_02219826) |
| 14556 (Sanofi_02243268) | 16516 (Sanofi_02247151) | 18003 (Sanofi_02218905) |
| 14557 (Sanofi_02238621) | 16517 (Sanofi_02250352) | 18101 (Sanofi_02254439) |

April 17, 2020

| | | |
|---|---|---|
| 18103 (Sanofi_02255541) | 20702 (Sanofi_05522567) | 22702 (Sanofi_05498458) |
| 18104 (Sanofi_03245834) | 20801 (Sanofi_05485740) | 22704 (Sanofi_05523181) |
| 18105 (Sanofi_02253601) | 20802 (Sanofi_05485414) | 22801 (Sanofi_05485220) |
| 18106 (Sanofi_02254015) | 20804 (Sanofi_05485585) | 23002 (Sanofi_05489730) |
| 18107 (Sanofi_03243530) | 20805 (Sanofi_05485917) | 23202 (Sanofi_05490458) |
| 18108 (Sanofi_03245596) | 21002 (Sanofi_05484884) | 23203 (Sanofi_05490612) |
| 18201 (Sanofi_02226882) | 21004 (Sanofi_05484800) | 23206 (Sanofi_04603801) |
| 18202 (Sanofi_02227065) | 21102 (Sanofi_05484496) | 23301 (Sanofi_02212411) |
| 18203 (Sanofi_02227619) | 21201 (Sanofi_05480752) | 23302 (Sanofi_04603978) |
| 18204 (Sanofi_02226722) | 21206 (Sanofi_05518080) | 23401 (Sanofi_04602134) |
| 18205 (Sanofi_02225708) | 21301 (Sanofi_05483744) | 23404 (Sanofi_05505490) |
| 18307 (Sanofi_03249086) | 21307 (Sanofi_05483889) | 23407 (Sanofi_05505318) |
| 18402 (Sanofi_05471370) | 21308 (Sanofi_05484168) | 23801 (Sanofi_05473645) |
| 18501 (Sanofi_03248887) | 21311 (Sanofi_05484053) | 23803 (Sanofi_04600812) |
| 18601 (Sanofi_03260065) | 21401 (Sanofi_05486059) | 23808 (Sanofi_05473094) |
| 19201 (Sanofi_02219359) | 21501 (Sanofi_05488196) | 23809 (Sanofi_04600583) |
| 19301 (Sanofi_02217430) | 21701 (Sanofi_05523919) | 23810 (Sanofi_05472900) |
| 19302 (Sanofi_02217827) | 21704 (Sanofi_05492631) | 23909 (Sanofi_04601265) |
| 19303 (Sanofi_02212738) | 21707 (Sanofi_05493643) | 23914 (Sanofi_05474508) |
| 19401 (Sanofi_02213125) | 21708 (Sanofi_05493818) | 23916 (Sanofi_04601018) |
| 19402 (Sanofi_02218003) | 21709 (Sanofi_05493131) | 24001 (Sanofi_04805207) |
| 19403 (Sanofi_02217616) | 21710 (Sanofi_05493296) | 24101 (Sanofi_04600338) |
| 19701 (Sanofi_02227243) | 21712 (Sanofi_05493463) | 24103 (Sanofi_05472222) |
| 19801 (Sanofi_02218332) | 21714 (Sanofi_05492500) | 24105 (Sanofi_05472396) |
| 19901 (Sanofi_03245107) | 21715 (Sanofi_05492199) | 24107 (Sanofi_05472578) |
| 19902 (Sanofi_02231205) | 21721 (Sanofi_05492365) | 24303 (Sanofi_05479073) |
| 19903 (Sanofi_02229398) | 21728 (Sanofi_05495405) | 24304 (Sanofi_05478892) |
| 20102 (Sanofi_05482418) | 21730 (Sanofi_05495574) | 24305 (Sanofi_05478724) |
| 20202 (Sanofi_05483440) | 21732 (Sanofi_03255618) | 24307 (Sanofi_05478410) |
| 20303 (Sanofi_03258332) | 21733 (Sanofi_05495053) | 24309 (Sanofi_05478269) |
| 20304 (Sanofi_03258072) | 21734 (Sanofi_05495243) | 24311 (Sanofi_05478555) |
| 20403 (Sanofi_03257533) | 22003 (Sanofi_05486530) | 24312 (Sanofi_05478085) |
| 20404 (Sanofi_05481385) | 22004 (Sanofi_05486686) | 24403 (Sanofi_05476395) |
| 20407 (Sanofi_05481576) | 22005 (Sanofi_05487313) | 24406 (Sanofi_05476559) |
| 20503 (Sanofi_05482106) | 22203 (Sanofi_05487460) | 24407 (Sanofi_03251644) |
| 20601 (Sanofi_05500480) | 22204 (Sanofi_05487765) | 24409 (Sanofi_05476715) |
| 20604 (Sanofi_05499983) | 22302 (Sanofi_03254976) | 24411 (Sanofi_05476868) |
| 20605 (Sanofi_05500154) | 22303 (Sanofi_05496992) | 24413 (Sanofi_05477910) |
| 20609 (Sanofi_03254095) | 22306 (Sanofi_05497133) | 24420 (Sanofi_04143196) |
| 20610 (Sanofi_05501177) | 22307 (Sanofi_05498137) | 24421 (Sanofi_05477750) |
| 20612 (Sanofi_04604558) | 22308 (Sanofi_03254749) | 24422 (Sanofi_05477618) |
| 20613 (Sanofi_05501095) | 22312 (Sanofi_05497967) | 24424 (Sanofi_05477467) |
| 20614 (Sanofi_03253888) | 22401 (Sanofi_05480615) | 24429 (Sanofi_05477309) |
| 20615 (Sanofi_05501315) | 22504 (Sanofi_05481221) | 24501 (Sanofi_02237075) |
| 20616 (Sanofi_04604332) | 22605 (Sanofi_05488548) | 24502 (Sanofi_02239765) |
| 20701 (Sanofi_05522765) | 22606 (Sanofi_05488728) | 24503 (Sanofi_02241509) |

**April 17, 2020**

| | | |
|---|---|---|
| 24504 (Sanofi_02244281) | 25805 (Sanofi_05490910) | 27803 (Sanofi_03246019) |
| 24505 (Sanofi_02238793) | 25806 (Sanofi_05491067) | 27804 (Sanofi_02222319) |
| 24506 (Sanofi_02237415) | 25809 (Sanofi_05490760) | 28101 (Sanofi_02253242) |
| 24508 (Sanofi_02244468) | 26001 (Sanofi_04602757) | 28102 (Sanofi_02253400) |
| 24509 (Sanofi_02245481) | 26002 (Sanofi_05501756) | 28104 (Sanofi_02255778) |
| 24510 (Sanofi_02238440) | 26102 (Sanofi_05512651) | 28105 (Sanofi_02253813) |
| 24511 (Sanofi_05480469) | 26201 (Sanofi_03926351) | 28301 (Sanofi_05470567) |
| 24512 (Sanofi_02244087) | 26301 (Sanofi_02251443) | 28302 (Sanofi_03248669) |
| 24513 (Sanofi_02241858) | 26302 (Sanofi_05503333) | 28601 (Sanofi_05470699) |
| 24514 (Sanofi_03250799) | 26303 (Sanofi_02252545) | 28702 (Sanofi_05470422) |
| 24515 (Sanofi_02235001) | 26304 (Sanofi_02251629) | 29301 (Sanofi_02217053) |
| 24516 (Sanofi_02244649) | 26305 (Sanofi_02252164) | 29701 (Sanofi_02226381) |
| 24517 (Sanofi_02241685) | 26306 (Sanofi_02253091) | 29901 (Sanofi_02229747) |
| 24518 (Sanofi_02242023) | 26501 (Sanofi_05503981) | 29902 (Sanofi_02228773) |
| 24519 (Sanofi_05480047) | 26502 (Sanofi_02247774) | 30001 (Sanofi_02216546) |
| 24521 (Sanofi_02243434) | 26503 (Sanofi_02251089) | 30002 (Sanofi_02213316) |
| 24522 (Sanofi_05479714) | 26504 (Sanofi_02249167) | 30003 (Sanofi_03247365) |
| 24524 (Sanofi_02234300) | 26505 (Sanofi_02249529) | 30004 (Sanofi_02218555) |
| 24526 (Sanofi_02236058) | 26506 (Sanofi_05504625) | 30101 (Sanofi_02218704) |
| 24527 (Sanofi_02243606) | 26601 (Sanofi_04601904) | 30201 (Sanofi_02213526) |
| 24528 (Sanofi_02246194) | 26602 (Sanofi_02224611) | 30202 (Sanofi_02214875) |
| 24530 (Sanofi_02242922) | 26604 (Sanofi_02222932) | 30203 (Sanofi_03247161) |
| 24532 (Sanofi_02235743) | 26606 (Sanofi_05502805) | 30204 (Sanofi_02214028) |
| 24533 (Sanofi_02236559) | 26608 (Sanofi_02225010) | 30205 (Sanofi_02216692) |
| 24534 (Sanofi_03250461) | 26609 (Sanofi_04188512) | 30302 (Sanofi_02220586) |
| 24537 (Sanofi_02237601) | 26610 (Sanofi_02224201) | 30303 (Sanofi_02216865) |
| 24538 (Sanofi_03250250) | 26703 (Sanofi_05474341) | 30304 (Sanofi_03243287) |
| 24540 (Sanofi_02243772) | 26802 (Sanofi_05506636) | 30401 (Sanofi_05467562) |
| 24541 (Sanofi_02236218) | 26804 (Sanofi_05506290) | 30402 (Sanofi_03244857) |
| 24542 (Sanofi_02235907) | 26809 (Sanofi_05520549) | 30403 (Sanofi_02231722) |
| 24602 (Sanofi_05474863) | 26901 (Sanofi_05467905) | 30501 (Sanofi_03244634) |
| 24603 (Sanofi_05475013) | 26902 (Sanofi_05468195) | 30502 (Sanofi_02229928) |
| 24901 (Sanofi_05470060) | 26903 (Sanofi_05468060) | 30503 (Sanofi_02232406) |
| 24905 (Sanofi_05470236) | 26904 (Sanofi_05468346) | 30601 (Sanofi_02233749) |
| 25005 (Sanofi_05503852) | 27001 (Sanofi_05468522) | 30701 (Sanofi_02230574) |
| 25009 (Sanofi_05521221) | 27010 (Sanofi_05468666) | 30702 (Sanofi_02228393) |
| 25010 (Sanofi_05503726) | 27103 (Sanofi_03248256) | 30703 (Sanofi_02232238) |
| 25101 (Sanofi_05511807) | 27201 (Sanofi_02226215) | 30801 (Sanofi_02217237) |
| 25203 (Sanofi_05503416) | 27202 (Sanofi_03248489) | 30802 (Sanofi_03246776) |
| 25208 (Sanofi_03252602) | 27301 (Sanofi_02232086) | 30803 (Sanofi_02219988) |
| 25302 (Sanofi_05490020) | 27302 (Sanofi_02230239) | 30804 (Sanofi_02215076) |
| 25305 (Sanofi_05489870) | 27303 (Sanofi_02228588) | 30805 (Sanofi_03246573) |
| 25601 (Sanofi_05506147) | 27304 (Sanofi_02231561) | 30806 (Sanofi_03246364) |
| 25602 (Sanofi_05505992) | 27602 (Sanofi_03249473) | 30807 (Sanofi_05464803) |
| 25603 (Sanofi_05505831) | 27801 (Sanofi_02221563) | 30808 (Sanofi_02219185) |
| 25801 (Sanofi_05521803) | 27802 (Sanofi_02221751) | 31001 (Sanofi_02231916) |

| 31201 (Sanofi_03259501) | 40201 (Sanofi_02216246) | 41001 (Sanofi_03243961) |
|---|---|---|
| 31202 (Sanofi_02230098) | 40301 (Sanofi_02219688) | 41101 (Sanofi_02231004) |
| 31203 (Sanofi_02234134) | 40401 (Sanofi_03244364) | 42202 (Sanofi_05482744) |
| 31401 (Sanofi_02228006) | 40402 (Sanofi_02229549) | 42203 (Sanofi_03258857) |
| 31601 (Sanofi_02214204) | 40403 (Sanofi_02229054) | 42204 (Sanofi_03914535) |
| 32001 (Sanofi_02213716) | 40501 (Sanofi_02229230) | 42205 (Sanofi_05482903) |
| 32002 (Sanofi_02214368) | 40601 (Sanofi_02233951) | 42301 (Sanofi_05475836) |
| 32204 (Sanofi_03259070) | 40701 (Sanofi_05466270) | 42302 (Sanofi_05475187) |
| 32304 (Sanofi_05476043) | 40801 (Sanofi_02220374) | 42304 (Sanofi_03260435) |
| 32311 (Sanofi_05475619) | 40802 (Sanofi_02214669) | 42307 (Sanofi_05475371) |
| 32312 (Sanofi_01865122) | 40804 (Sanofi_02213837) | 42310 (Sanofi_05475441) |
| 32315 (Sanofi_05475789) | 40806 (Sanofi_02215865) | |

TAX 316 Case Report Form Summaries:

| 14002 (Sanofi_04143083) | 14428 (Sanofi_04143350) | 24204 (Sanofi_04144951) |
|---|---|---|
| 14003 (Sanofi_04143089) | 14429 (Sanofi_04143355) | 24205 (Sanofi_04144958) |
| 14201 (Sanofi_04144892) | 14430 (Sanofi_04143360) | 24206 (Sanofi_04144964) |
| 14202 (Sanofi_04144899) | 14432 (Sanofi_04143371) | 24207 (Sanofi_04144969) |
| 14203 (Sanofi_04144905) | 14433 (Sanofi_04143376) | 24401 (Sanofi_04143412) |
| 14204 (Sanofi_04144911) | 14434 (Sanofi_04143381) | 24402 (Sanofi_04143418) |
| 14205 (Sanofi_04144917) | 14436 (Sanofi_04143391) | 24404 (Sanofi_04143429) |
| 14206 (Sanofi_04144923) | 14437 (Sanofi_04143397) | 24405 (Sanofi_04143435) |
| 14207 (Sanofi_04144929) | 14438 (Sanofi_04143402) | 24408 (Sanofi_04143451) |
| 14401 (Sanofi_04143196) | 14439 (Sanofi_04143407) | 24410 (Sanofi_04143462) |
| 14402 (Sanofi_04143202) | 14502 (Sanofi_04144310) | 24412 (Sanofi_04143473) |
| 14404 (Sanofi_04143204) | 14506 (Sanofi_04144334) | 24414 (Sanofi_04143484) |
| 14405 (Sanofi_04143220) | 14508 (Sanofi_04144346) | 24415 (Sanofi_04143489) |
| 14406 (Sanofi_04143226) | 14509 (Sanofi_04144352) | 24416 (Sanofi_04143494) |
| 14407 (Sanofi_04143232) | 14511 (Sanofi_04144364) | 24417 (Sanofi_04143500) |
| 14408 (Sanofi_04143238) | 14513 (Sanofi_04144375) | 24418 (Sanofi_04143506) |
| 14409 (Sanofi_04143244) | 14518 (Sanofi_04144403) | 24419 (Sanofi_04143511) |
| 14411 (Sanofi_04143256) | 14522 (Sanofi_04144427) | 24423 (Sanofi_04143532) |
| 14412 (Sanofi_04143262) | 14526 (Sanofi_04144450) | 24425 (Sanofi_04143542) |
| 14413 (Sanofi_04143268) | 14527 (Sanofi_04144456) | 24426 (Sanofi_04143547) |
| 14414 (Sanofi_04143274) | 14536 (Sanofi_04144507) | 24427 (Sanofi_04143552) |
| 14415 (Sanofi_04143280) | 14537 (Sanofi_04144512) | 24428 (Sanofi_04143557) |
| 14416 (Sanofi_04143286) | 14539 (Sanofi_04144522) | 24430 (Sanofi_04143568) |
| 14417 (Sanofi_04143291) | 14542 (Sanofi_04144538) | 24431 (Sanofi_04143573) |
| 14418 (Sanofi_04143296) | 14543 (Sanofi_04144543) | 24507 (Sanofi_04144665) |
| 14419 (Sanofi_04143301) | 14548 (Sanofi_04144568) | 24520 (Sanofi_04144741) |
| 14420 (Sanofi_04143306) | 14549 (Sanofi_04144573) | 24523 (Sanofi_04144757) |
| 14421 (Sanofi_04143311) | 14550 (Sanofi_04144578) | 24525 (Sanofi_04144767) |
| 14422 (Sanofi_04143316) | 14559 (Sanofi_04144623) | 24529 (Sanofi_04144789) |
| 14423 (Sanofi_04143322) | 24002 (Sanofi_04143100) | 24531 (Sanofi_04144800) |
| 14424 (Sanofi_04143327) | 24201 (Sanofi_04144934) | 24535 (Sanofi_04144822) |
| 14425 (Sanofi_04143333) | 24202 (Sanofi_04144940) | 24536 (Sanofi_04144827) |
| 14427 (Sanofi_04143345) | 24203 (Sanofi_04144946) | 24539 (Sanofi_04144844) |

24543 (Sanofi_04144866)

- Clinical Study Report. Compound: Docetaxel (XRP6976). A multicenter Phase 3 randomized trial comparing docetaxel in combination with doxorubicin and cyclophosphamide (TAC) versus 5-fluorouracil in combination with doxorubicin and cyclophosphamide (FAC) as adjuvant treatment of high risk operable breast cancer patients with negative axillary lymph nodes. Study Number: TAX.ES1.301/GEICAM 9805. Report Date: November 9, 2009.
- Clinical Overview Docetaxel – Persistent Alopecia. Author: Emanuel Palatinsky, M.D., Global Safety Officer, Sanofi. January 18, 2011. Sanofi_00201045−00201092.
- Listing of Patients with TEAEs during treatment period, regardless of causal relationship that persisted into the follow-up period and were ongoing at the end of the follow-up period – Safety population. March 15, 2012, 11:37. Sanofi_05319538–05319565.
- Correspondence between Pierre Mancini, Deputy Global Head, Oncology Biostatistics, Sanofi France, and Sai Bhavaraju, Senior Manager, Statistical Programming, Sanofi. March 13–15, 2012. Sanofi_05319518–05319528.
- Correspondence among Emanuel Palatinsky, Pierre Mancini, Sai Bhavaraju, Mihaela Livia Cojocaru, M.D., Project Leader of Regulatory Affairs, Sanofi Canada, and others. March 13–16, 2012. Sanofi_01030001–01030007.
- Correspondence between Mihaela Livia Cojocaru and Matthew C. Ernst, Ph.D., Assessment Officer, Oncology Division 2, Bureau of Metabolism, Oncology and Reproductive Sciences, Therapeutic Products Directorate, Health Products and Food Branch, Health Canada. March 9–16, 2012. Sanofi_02368838–02368922.
- Response to Agency Request [from European Medicines Agency]. Information on Alopecia Topic Dated on 26-Nov-2012. January 22, 2013. Sanofi_04938203.
- Correspondence among Pierre Mancini; Emanuel Palatinsky; Bénédicte Marchal-Pugnat, PharmD, Oncology & Anti-infective Axis Head, Regulatory Affairs Europe, Sanofi; Vanina Groult, Ph.D., Global Regulatory Affairs, Labeling, Oncology and Nutraceuticals, Sanofi; and others. December 5–10, 2013. Sanofi_04919878–04919885.
- European Medicines Agency, CHMP Type II variation assessment report, Invented name Taxotere, Procedure No EMEA/H/C/000073/II/0114, Marketing authorization holder (MAH): Aventis Pharma S.A. December 18, 2013. Sanofi_00723830–00723840.
- 2.5 Clinical Overview: Docetaxel and Permanent Alopecia. Author: Nanae Hangai, M.D., Ph.D., Global Safety Officer, Sanofi. November 11, 2015. Sanofi_00829529−00829565.
- Center for Drug Evaluation and Research. Approval Package for: Application Number: NDA 20-449/S-075. Trade name: Taxotere. Generic name: docetaxel. Sponsor: Sanofi Aventis US. Approval Date: December 11, 2015. Indications: For permanent or irreversible alopecia.

- Docetaxel labeling queries from PMDA [Pharmaceuticals and Medical Devices Agency] (Inquiry 160415-001). Date created: May 24, 2016. Date last modified: May 24, 2016. Sanofi_01331114.
- Deposition transcript (with exhibits 29 and 34) of Pierre Mancini, in re: Taxotere (docetaxel) Products Liability Litigation, March 23, 2018.
- Deposition transcript (with exhibits 1–35) of Michael S. Kopreski, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, September 6, 2018.
- Deposition transcript (with exhibits 36–64) of Michael S. Kopreski, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, October 11, 2018.
- Expert report of David Madigan, Ph.D., "Docetaxel and Irreversible Alopecia," November 2, 2018.
- Expert report of Laura Plunkett, Ph.D., DABT, November 4, 2018.
- Expert report of Ellen G. Feigal, M.D., MDL - 2740 Taxotere (Docetaxel) Products Liability Litigation, November 6, 2018.
- Expert report of David A. Kessler, M.D., November 6, 2018.
- Deposition transcript (with exhibits 1–21) of David Madigan, Ph.D., in re: Taxotere (docetaxel) Products Liability Litigation, December 7, 2018.
- Deposition transcript (with exhibits 1–12 and 15) of Ellen Feigal, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, December 7, 2018.
- Deposition transcript (with exhibits 1–12) of Laura Plunkett, Ph.D. in re: Taxotere (docetaxel) Products Liability Litigation, December 10, 2018.
- Deposition transcript (with exhibits 5–40) of Michael S. Kopreski, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, December 13, 2018.
- Expert report of Justin R. Victoria, December 28, 2018.
- Expert report of Janet B. Arrowsmith, M.D., F.A.C.P., F.A.C.E., in re Taxotere (docetaxel) Products Liability Litigation, December 31, 2018.
- Deposition transcript (with exhibits 16–26) of Ellen Feigal, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, January 11, 2019.
- Deposition transcript (with exhibits 1–28) of Michael S. Kopreski, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, April 3, 2019.
- Deposition transcript (with exhibits 13–15) of Laura Plunkett, Ph.D., in re: Taxotere (docetaxel) Products Liability Litigation, April 22, 2019.
- Deposition transcript (with exhibits 1–3) of Ellen Feigal, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, April 30, 2019.
- Deposition transcript (with exhibits 41–46) of Michael S. Kopreski, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, June 4, 2019.
- Deposition transcript (with exhibits 1–41) of Michael S. Kopreski, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, June 24, 2019.

- Jury trial transcript (with exhibits 1–6 of David Madigan, Ph.D.) in re: Taxotere (docetaxel) Products Liability Litigation, Relates to: Barbara Earnest, Case No.: 16-CV-17144, Day 3 – Morning Session, September 18, 2019.
- Jury trial transcript in re: Taxotere (docetaxel) Products Liability Litigation, Relates to: Barbara Earnest, Case No.: 16-CV-17144, Day 3 – Afternoon Session, September 18, 2019.
- Jury trial transcript (with demonstratives of Antonella Tosti, M.D.) in re: Taxotere (docetaxel) Products Liability Litigation, Relates to: Barbara Earnest, Case No.: 16-CV-17144, Day 4 – Afternoon Session, September 19, 2019.
- Jury trial transcript (with demonstratives 1 and 2 of Ellen G. Feigal, M.D.) in re: Taxotere (docetaxel) Products Liability Litigation, Relates to: Barbara Earnest, Case No.: 16-CV-17144, Day 5 – Morning Session, September 20, 2019.
- Expert report of David Madigan, Ph.D., "Docetaxel and Irreversible Alopecia," October 20, 2019.
- Expert report of Ellen G. Feigal, M.D., MDL - 2740 Taxotere (Docetaxel) Products Liability Litigation, October 21, 2019.
- Expert report of Laura Plunkett, Ph.D., DABT, October 21, 2019.
- Supplemental expert report of David A. Kessler, M.D., October 21, 2019.
- Deposition transcript (with exhibits 1–37) of David Madigan, Ph.D., in re: Taxotere (docetaxel) Products Liability Litigation, November 14, 2019.
- Deposition transcript (with exhibits) of Laura M. Plunkett, Ph.D., DABT, in re: Taxotere (docetaxel) Products Liability Litigation, November 19, 2019.
- Deposition transcript (with exhibits 1–20) of Ellen Feigal, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, November 21, 2019.
- Deposition transcript of David A. Kessler, Ph.D., in re: Taxotere (docetaxel) Products Liability Litigation, November 26, 2019.
- Supplemental expert report of Professor Lee-Jen Wei, Ph.D., in re: Taxotere (docetaxel) Products Liability Litigation, submitted December 9, 2019.
- Deposition transcript (with exhibits) of Laura M. Plunkett, Ph.D., DABT, in re: Taxotere (docetaxel) Products Liability Litigation, December 13, 2019.
- Deposition transcript of Lee-Jen Wei, Ph.D., in re: Taxotere (docetaxel) Products Liability Litigation, December 20, 2019.
- Deposition transcript (with exhibits) of Ellen T. Chang, Sc.D., in re: Taxotere (docetaxel) Products Liability Litigation, January 7, 2020.
- Expert report of Ellen G. Feigal, M.D., MDL -2740 Taxotere (Docetaxel) Products Liability Litigation, March 23, 2020.
- Expert report of David Madigan, Ph.D., "Docetaxel and Irreversible Alopecia," March 23, 2020.

- Deposition transcript of David Madigan, Ph.D., in re: Taxotere (docetaxel) Products Liability Litigation, April 9, 2020.
- Deposition transcript (uncertified rough draft) of Ellen Feigal, M.D., in re: Taxotere (docetaxel) Products Liability Litigation, April 10, 2020.

# Introduction to epidemiology

## Basic epidemiological principles

Epidemiology is the scientific study of the distribution and determinants of diseases in populations. Epidemiological research is required to measure disease occurrence, to identify the causes of specific health outcomes in humans, to assess the contribution of various causal factors to the occurrence of diseases that can be induced by multiple agents, and to determine exposure-response relationships between causes and human health effects.

This introductory section identifies and defines some technical terms used by epidemiologists to describe the design, results, and interpretation of epidemiological studies. Many of these terms are used later in this report to describe the results of epidemiological studies pertaining to this matter.

## Epidemiological study designs

Epidemiologists use a variety of study designs to evaluate hypotheses regarding associations between specific exposures and health outcomes; study designs that are relevant to the present matter are described below. Although case reports and case series are not epidemiological studies, they are described in this section because they comprise much of the evidence available in the present matter.

A *case report or case series* is a description of an individual or individuals with a specific exposure or health outcome. Case reports and case series are not analytic epidemiological studies because they lack a comparison group and, therefore, cannot provide estimates of relative risk or risk differences. They may generate a hypothesis that an exposure may be related to a health outcome, but they can neither test associations nor be used to establish causality due to the absence of a comparison group.

The inadequacy of case reports, case series, and other anecdotal evidence to establish associations between potential risk factors and disease outcomes is well established; for example, in a standard epidemiology textbook, Hennekens and Buring (1987) state:

> While case reports and case series are very useful for hypothesis formulation, **they cannot be used to test for the presence of a valid statistical association**. One fundamental limitation of the case report is that it is based on the experience of only one person. **The presence of any risk factor, however suggestive, may simply be coincidental**. Although case series are frequently sufficiently large to

permit quantification of frequency of an exposure, the interpretability of such information is severely limited by the lack of an appropriate control group. This lack can either obscure a relationship or suggest an association where none actually exists (emphasis added).

Confirmation or refutation of the hypotheses generated by case reports can be provided only by properly designed analytic epidemiological studies, which aim to identify associations of disease with possible risk factors and to test hypotheses regarding causation. Analytic epidemiological studies test causal hypotheses by using comparison groups.

A *randomized controlled trial* compares health outcomes between participants randomly (by chance) assigned to receive one of two or more specific interventional exposures. This type of study generally is used to test the efficacy of a drug, medical device, surgical procedure, or public health intervention in a well-defined patient population. Randomized controlled trials provide the highest standard of scientific evidence used to evaluate the causal effect of a medical treatment on a given health outcome.

The advantages of studies of medical interventions that use randomized as opposed to nonrandomized treatment allocation are well established in epidemiology and are commonly discussed in standard epidemiology textbooks. For example:

> Randomization has many unique advantages when compared with other methods of allocation. First, if randomization is properly done, nobody either involved in deciding whether a patient is eligible to enter into a trial or responsible for the allocation procedure will know the assigned treatment group. Thus, **the potential for bias in allocation to study groups is removed, and investigators can be confident that observed differences are not due to the selection of particular patients to receive a given therapy**. Whenever a system can be predicted, as with the use of any other procedure to allocate treatment, there is the potential for manipulation …

> Another unique advantage of randomization is that on average, the study groups will tend to be comparable with respect to all variables except for the interventions being studied. 'On average' implies that the larger the sample size, the more successful the randomization process will be in distributing these factors equally among the groups … This feature of randomization is important because all baseline characteristics that affect risk and differ between the treatment groups could potentially confound the relationship between exposure and disease. An even more crucial implication, however, is that on average not only will all known confounding variables be equally distributed, but so will all potential

confounders that are unsuspected by the investigator because of limitations of biologic knowledge at the time the trial is initiated … **Consequently, the only possible way to achieve control for any influence of unknown variables is through randomization** …

Finally, a significant advantage of randomization is the deservedly favorable impression that this design strategy may have on those reading the published results of a trial. When exposure is assigned by a method other than randomization, the burden of proof is on the investigator to show that all possible biases in the allocation of patients to a study group or confounding effects of known or unknown factors that may differ between the study groups did not account for the observed result. Thus, **there is an inherent confidence in the results of a well-designed and conducted randomized trial that cannot be achieved with any alternative allocation scheme** (Hennekens and Buring 1987; emphasis added).

Similarly:

A study with random assignment of the treatment allows one to compute the probability of the observed association under various hypotheses about how treatment assignment affects outcome. In particular, **if assignment is random and has no effect on the outcome except through treatment, any systematic (nonrandom) variation in outcome with assignment must be attributable to a treatment effect** …

[I]t is desirable to assign treatments in clinical trials in a way that allows one to account for possible differences among treatment groups with respect to unmeasured 'baseline' characteristics. As part of this goal, the assignment mechanism should deter manipulation of assignments that is not part of the protocol. **It is almost universally agreed that randomization is the best way to deal with concerns about confounding by unmeasured baseline characteristics and by personnel manipulation of treatment assignment**. The validity of the trial depends strongly on the extent to which the random assignment protocol is the sole determinant of the treatments received. When this condition is satisfied, confounding due to unmeasured factors can be regarded as random, is accounted for by standard statistical procedures, and diminishes in likely magnitude as the number randomized increases (Rothman et al. 2008; emphasis added, references omitted).

Epidemiological studies other than randomized controlled trials involve nonrandom assignment of exposures, including medical interventions, to study subjects. Such nonrandomized or observational studies may be conducted when a randomized controlled trial is logistically and/or ethically infeasible, when long-term follow-up is needed beyond the typical scope of a clinical trial, or when results from highly selected clinical trial populations may not be generalizable to broader patient populations. The limitations to interpreting the results of nonrandomized studies arise largely from the fact that people who receive a particular medical treatment or who are voluntarily or involuntarily exposed to an external agent may differ systematically from people who do not receive that treatment or exposure. If these groups differ in ways that influence the health outcome of interest—for instance, if the clinical indication (i.e., the underlying medical condition) that prompts the selection of a certain treatment in turn affects the risk of the outcome—then the treatment may appear to be associated with the outcome even if it is not. The general inability of nonrandomized studies to provide valid information on the efficacy of medical interventions is well known:

> **Only infrequently can nonrandomized studies provide a valid estimate of the efficacy of a treatment**. In most situations, the measured differences between the experiences of patient groups receiving alternative therapies are primarily the result of underlying differences between the groups regarding the chances of progression or complications. In other words, patients are selected for different therapies based on clinical indications. If, as one would expect, these indications are also prognostic factors, the estimates of treatment efficacy become confounded by these factors (Rothman et al. 2008; emphasis added).

Likewise:

> With a sufficient sample size, randomization will virtually ensure that all potential confounding factors—those known to the investigator and, even more importantly, those currently unknown or even as yet unsuspected—are evenly distributed among the treatment groups. **This ability of randomization to control for unknown confounders cannot be achieved by any other approach in the design or analysis of an epidemiologic study** (Hennekens and Buring 1997; emphasis added).

The most commonly used types of observational (nonexperimental) epidemiological studies are cohort studies, case-control studies, and cross-sectional studies.

A *cohort study* involves a comparison of incidence or mortality rates of a specific health outcome between study subjects with various levels of a specific exposure who are observed over time. In this type of study, assessment of subjects' exposure to a drug, medical device, or

other agent may be based on information collected prior to onset of the health outcome (prospective assessment) or reconstructed from existing information collected after the onset of the health outcome in most or all subjects (retrospective assessment).

A *case-control study* entails a comparison of specific past exposures between study subjects with the health outcome of interest ("cases") and a suitable group of subjects without the disease ("controls"). In this type of study, exposure assessment usually occurs after onset of the health outcome in cases, i.e., retrospectively. Exposure assessment may occur prior to the outcome if a case-control study is nested within a prospective cohort study, where closer investigation is conducted for a subset of selected cases and controls.

A *cross-sectional study* compares the prevalence of a specific health outcome across levels of a specific exposure in study subjects (or vice versa), with the exposure and outcome both measured at a given time. This type of study provides a "snapshot" of the association between the exposure and the health outcome at one time. In general, cross-sectional studies cannot establish causal relationships because exposures and health outcomes are assessed simultaneously, such that the temporal sequence of a cause preceding an effect cannot be demonstrated (except if the exposure of interest occurred in the past).

## Measures of disease frequency

Epidemiologists use several standard measures to describe the frequency of occurrence of diseases and other health outcomes in populations; these measures are defined below.

*Incidence* refers to the occurrence of a new health event in an individual, or the frequency of developing a specific health outcome during a given time period among individuals without a history of that health outcome. Incidence is influenced by factors that cause a specific health outcome.

*Prevalence* is a measure of the existence of new and pre-existing health events, or the frequency of having a specific health outcome at a moment or period in time. Prevalence is influenced by both factors that cause a specific health outcome and factors that affect the duration of the outcome (e.g., survival and treatment).

An *incidence rate* is a time-based measure of the frequency at which new health events arise in a population. It is calculated as the number of individuals who newly develop a specific health outcome in a given population during a given time interval, divided by the average number of persons at risk (i.e., without a history) of that health outcome in the population multiplied by the length of the specified time interval.

A *prevalence proportion* is the percentage of people in a defined population who have a specific health outcome at a given time. It is calculated as the number of existing cases of a specific health outcome in a given population at a given moment or interval in time, divided by the total number of persons in the population at the time or the total number of persons midway through that time period.

*Cumulative incidence (incidence proportion)* refers to the percentage of people in a defined population who develop a specific health outcome during a given time period. It is calculated as the number of individuals who newly develop a specific health outcome in a given population during a given time interval, divided by the total number of persons at risk of that health outcome during the specified time interval.

## Measures of association

*Relative risk (RR)* is a general term that refers to the ratio of the probability of a health outcome in subjects who are exposed, compared with those who are not (or, in a case-control study, the probability of exposure in cases compared with controls). An RR equal to 1.0 (i.e., unity) signifies that the probability of the health outcome is equal in exposed and unexposed subjects; it can be referred to as "no association," "null association," or an association that includes unity. An RR greater than 1.0 signifies that the probability of the health outcome is higher in exposed than unexposed subjects; it can be referred to as a "positive association." An RR less than 1.0 signifies that the probability of the health outcome is lower in exposed than unexposed subjects; it can be referred to as a "negative association" or an "inverse association." Measures of RR include rate ratios and risk ratios (typically reported in randomized controlled trials and some cohort studies), hazard ratios (typically reported in cohort studies), odds ratios (typically reported in case-control studies), and prevalence ratios and prevalence odds ratios (typically reported in cross-sectional studies).

*Risk difference* is another general term that refers to the absolute difference in the probability of a health outcome between subjects who are exposed and those who are not. A risk difference equal to 0 signifies that the probability of the health outcome is equal in exposed and unexposed subjects, i.e., a "null association." A risk difference greater than 0 signifies that the probability of the health outcome is higher in exposed than unexposed subjects (i.e., a "positive association"), whereas a risk difference less than 0 signifies that the probability of the health outcome is lower in exposed than unexposed subjects (i.e., a "negative association"). Typically, risk differences are reported less often than RRs in epidemiological studies.

A *confidence interval* is a statistical measure of variability, uncertainty, or precision, that is, a margin of error around an estimate of association, such as an RR. Confidence intervals

calculated from repeated sampling of the same underlying study population and in the absence of bias (i.e., systematic, nonrandom error) are expected to contain the value of the point estimate of interest with a frequency no less than the stated confidence level (usually set at 95% by convention). By convention, a "statistically significant" result is one where the 95% confidence interval for an RR excludes the null value of 1.0; however, it does *not* provide the range in which the correct or true point estimate lies.

A *p value* is the probability, in the absence of bias, of observing the result of a hypothesis test or a more extreme result, assuming that the null hypothesis is true (typically, that the exposure and health outcome of interest are not associated). In other words, it is the probability that the observed difference or a more extreme difference occurred in the absence of bias. By convention, a "statistically significant" result is one where $p < 0.05$; a *p* value does *not* denote the probability that the observed study result or the null hypothesis is correct or true.

## Interpretation of statistical associations versus causation

The detection of a statistical association, even a statistically significant one, between a specific exposure and a specific health outcome in an epidemiological study—particularly an observational study in which the exposure of interest is not randomly assigned—does not necessarily indicate that the exposure caused the outcome. Causal inference based on statistical associations must take into account potential explanations for a spurious (noncausal) association. These alternative explanations, which include bias, confounding, and chance, are defined below.

*Bias* refers to any methodological deviation from the truth in the design, conduct, or analysis of a study that can lead to invalid results; bias is also referred to as systematic error.

*Selection bias* is a systematic difference between study participants and nonparticipants in characteristics that are associated with the exposure and health outcome of interest. In a case-control study, selection bias results from a difference in study participation or data completeness between cases and controls due to reasons related to the exposure under investigation. In a cohort study, selection bias results from a difference in study follow-up or data completeness between exposed and unexposed subjects due to reasons related to the health outcome under investigation.

*Information bias* is a systematic difference in data quality or validity between comparison groups. This type of bias includes *recall bias*, a systematic difference in accuracy or completeness of recollected or reported information (e.g., exposure history) between comparison groups (e.g., cases and controls); *interviewer bias*, a systematic difference in accuracy or completeness of data collection by study staff between comparison groups; and

*response bias*, a systematic difference in the voluntary completion of survey data between comparison groups.

*Confounding* is defined as distortion of the estimated exposure-outcome association due to the influence of an additional factor, referred to as a confounder, that is associated with the exposure of interest, independently associated with the health outcome of interest, and neither on the causal pathway (i.e., not an intermediate) between the exposure and the outcome of interest, nor an effect of the outcome. A confounder is an alternative risk factor, but not necessarily a cause, that can create spurious associations between an exposure and an outcome if not measured in adequate detail and sufficiently controlled by statistical adjustment or study design restrictions.

*Chance* refers to random error resulting from variability in sampling a finite number of study subjects from a complete underlying population or from imprecise measurement of exposures, outcomes, or confounders. The probability of chance as an explanation for a statistical association can be reduced, but not completely eliminated, by increasing study size, improving accuracy and precision of study measures, or increasing the number of measures taken.

Typically, to determine whether an association is causal, epidemiologists consider the potential for bias, confounding, and chance as explanations for statistically significant associations observed in individual epidemiological studies. Epidemiologists also evaluate the overall weight of the scientific evidence based on the totality of relevant epidemiological studies, also taking into account evidence from relevant toxicological and mechanistic studies. A set of general guidelines for evaluating causality based on observational epidemiological studies was formulated by Sir Austin Bradford Hill (Hill 1965); these guidelines or "viewpoints" are commonly used by epidemiologists and accepted in the scientific community and in legal settings (Cole 1997, Rothman et al. 2008, NRC 2011). These nine considerations include the association's strength (i.e., magnitude), consistency, specificity, temporality, biological gradient (i.e., exposure-response trend), plausibility, coherence (with known natural history and biological presentation of the health outcome), experiment, and analogy (with other exposure-outcome associations for which a causal relationship is accepted) (Hill 1965). To establish potential causal effects, consideration of the full weight of epidemiological evidence in accordance with the Hill guidelines is important in the absence of large, randomized controlled trials. Such trials are lacking for the vast majority of studied epidemiological associations, where it is infeasible or unethical to randomly assign individuals to potentially hazardous or known beneficial exposures. However, where large, randomized controlled trials are available, thereby essentially eliminating the potential for bias or confounding, evaluation of observational epidemiological studies according to the Hill guidelines is unnecessary; instead, causal evidence can be derived directly from those trials. In the present matter, such trials are available and

provide the most appropriate evidence to determine causation, as elaborated upon in the next section of this report.

# Large, long-term, randomized controlled trials provide the best available human evidence on whether docetaxel causes irreversible or permanent alopecia.

As detailed in the preceding section, well-conducted randomized controlled trials, if available, provide the best scientific evidence for evaluating the causal health effects of medical treatments, including both beneficial and adverse health effects. This is primarily because proper randomization eliminates the potential for patients who receive a given treatment to be selected in a manner that differs from that of patients who do not receive that treatment, and it also balances known and unknown confounders (i.e., alternative risk factors) equally across treatment groups.

To evaluate the potential for selection bias or confounding to distort observed associations between medical treatments, including docetaxel, and the development of irreversible or permanent alopecia in nonrandomized studies, it is important to understand the known risk factors for alopecia in general. Any imbalance in these factors between patients who do and do not receive docetaxel treatment in nonrandomized studies can result in a spurious apparent association with docetaxel use.

## Alopecia has numerous forms and risk factors; if these are unevenly distributed across nonrandomized treatment groups, then estimated associations with treatment will be biased.

The phases of the normal hair growth cycle consist of anagen (active growing phase; ~90% of hairs), catagen (degeneration phase; < 10% of hairs), and telogen (resting phase, during which hair is shed; ~5−10% of hairs). Alopecia (hair loss) can take several clinically recognized forms with different, often multifactorial causes (Filbrandt et al. 2013, Patel et al. 2013, Saggar et al. 2013, Mubki et al. 2014b, a, Varothai and Bergfeld 2014, Guzman-Sanchez and Asz-Sigall 2015, Lolli et al. 2017, Phillips et al. 2017). Alopecia can be classified broadly as diffuse or focal (patchy), and as nonscarring or scarring. In randomized controlled trials of therapeutic agents where alopecia is an adverse event rather than a target health effect, the various types of alopecia typically are not specified.

The most common type of alopecia is a diffuse nonscarring form called androgenetic alopecia, which reportedly affects more than 80% of white men and 40% of white women by age 70 years (Varothai and Bergfeld 2014). In male-pattern androgenetic alopecia, affected individuals develop a receding hairline and bald spots in a well-defined pattern beginning above both

temples and the crown of the head, whereas female-pattern androgenetic alopecia typically features generalized hair thinning, starting at the part line, without a receding hairline. Androgenetic alopecia appears to have multiple genetic and environmental risk factors that affect levels of reproductive hormones called androgens (especially dihydrotestosterone), which are involved in normal sexual development. Established risk factors include older age, white race, and a patrilineal or matrilineal family history (Lolli et al. 2017).

Another type of diffuse nonscarring alopecia is telogen effluvium, which consists of premature entry of hairs into the resting phase of the hair growth cycle, followed by a significant increase in hair shedding several weeks to months later. Many causes of telogen effluvium are specific triggering events, such as severe physiological or emotional stress, major surgery, severe febrile or chronic illness, cancer, thyroid and other endocrine disorders, poor nutrition, sudden weight loss, recent childbirth, and a variety of medications, as well as discontinuation of long-term use of oral contraceptives (Patel et al. 2013, Mubki et al. 2014b, a, Guzman-Sanchez and Asz-Sigall 2015, Phillips et al. 2017).

Anagen effluvium, another type of diffuse nonscarring alopecia, occurs due to impairment of mitotic (cell-division) or metabolic activity of the hair follicle during the growth phase of the hair growth cycle, leading to significant hair shedding within days to weeks. Triggering events for anagen effluvium include treatment with chemotherapy or certain other medications, radiotherapy, exposure to toxic metals, metalloids, or chemicals, and certain immune-mediated skin conditions such as mycosis fungoides and pemphigus vulgaris (Patel et al. 2013, Mubki et al. 2014b, a, Phillips et al. 2017).

Types of focal nonscarring alopecia include traction alopecia, trichotillomania, tinea capitis, and alopecia areata (Mubki et al. 2014b, a, Phillips et al. 2017). Traction alopecia often involves repeated or prolonged use of hair care and styling practices, such as braids, ponytails, and rollers, that apply pulling force to the hair. Trichotillomania is an impulse-control disorder that involves a recurrent urge to pull, twist, or tease the hair; it typically begins during late childhood or young adulthood. Tinea capitis is a superficial fungal infection of the skin of the scalp, eyebrows, and eyelashes that affects the hair shafts and follicles, primarily in children. Infectious fungal particles can be spread from person to person or via infected hairs, animals, or fomites such as contaminated hats, brushes, and barber instruments. Alopecia areata is thought to be an autoimmune disease in which the body's immune cells attack its own hair follicles. It can develop at any age but usually occurs before 20 years. The causes of alopecia areata are largely unknown, but may include a combination of genetic susceptibility and environmental factors.

The third broad type of alopecia, focal scarring alopecia (also called cicatricial alopecia), involves permanent destruction of the hair follicle by inflammatory cells and replacement by

fibrous tissue (Filbrandt et al. 2013). Causes of primary focal scarring alopecia include folliculitis decalvans, dissecting cellulitis of the scalp, lichen planopilaris, chronic cutaneous lupus erythematosus, and pseudopelade of Brocq. In general, these conditions have no known cause, but several of them are more common in women, older age groups, or certain racial/ethnic groups (Filbrandt et al. 2013). Causes of secondary focal scarring alopecia, in which destruction of the hair follicle is incidental to a nonspecific cause, include burns, trauma, radiation, and metastatic cancer.

Given the numerous types and potential causes of alopecia, nonrandomized studies may be unable to identify true treatment effects on the incidence of alopecia (reversible or irreversible) if patients are selected to receive certain treatments based on characteristics that influence alopecia risk, such as age, race/ethnicity, medical history, or concomitant medication use. Likewise, if known and unknown risk factors for alopecia are unequally distributed across treatment groups due to the lack of randomization, then confounding can lead to differences in alopecia incidence that are erroneously attributed to treatment.

## Many medications, including several types of cancer chemotherapy, can cause alopecia and may confound or bias observed associations with nonrandomized treatments.

A broad range of medications are known to cause alopecia, primarily in the form of telogen effluvium or anagen effluvium. Alopecia secondary to medication use is usually diffuse in pattern, although it may be patchy or androgenic, and it has been described for decades as "ranging from barely detectable shedding to frank, irreversible baldness" (Brodin 1987). "Nonreversible alopecia" was included in 1979 as a grade in the World Health Organization's criteria for hair-related toxicity from cancer therapies (WHO 1979, Miller et al. 1981). Any causal links between medication use and irreversible or permanent alopecia generally have not been documented in well-controlled epidemiological studies, most likely due to the rarity of this condition, the dearth of randomized controlled trials that ascertain irreversible or permanent alopecia (as discussed in later in this report), and the difficulty of identifying an appropriate comparison group in nonrandomized studies.

Anticancer chemotherapies that frequently cause alopecia, typically of a severe grade, in the majority of patients include certain topoisomerase inhibitors (e.g., daunorubicin, doxorubicin, etoposide, irinotecan), alkylating agents (e.g., cyclophosphamide, ifosfamide), taxanes (e.g., docetaxel, paclitaxel), and conditioning chemotherapy for stem cell transplants (e.g., busulfan, fludarabine, melphalan) (Chon et al. 2012, Freites-Martinez et al. 2019b). Certain other antitumor antibiotics (e.g., bleomycin), antimetabolites (e.g., 5-fluorouracil, methotrexate), vinca alkaloids (e.g., vinblastine, vincristine), and targeted therapies (e.g., sorafenib,

vemurafenib, vismodegib) can also cause alopecia, as do endocrine anticancer agents, including antiestrogens (e.g., tamoxifen) and aromatase inhibitors (e.g., anastrozole, exemestane, letrozole) (Chon et al. 2012, Saggar et al. 2013, Freites-Martinez et al. 2019b). Chemotherapy-induced alopecia is described as typically lasting for one month to six months (Chon et al. 2012, Freites-Martinez et al. 2019b). In some cases, alopecia in cancer patients treated with various types of chemotherapy other than docetaxel has been described as permanent (Feher et al. 2005, Park et al. 2005, Bourgeois et al. 2009, Masidonski and Mahon 2009, Prevezas et al. 2009, Chon et al. 2012, Jung and Lee 2013, Alkeraye et al. 2015, Crown et al. 2017b, Kim et al. 2017, Freites-Martinez et al. 2019a, Freites-Martinez et al. 2019b, Kang et al. 2019). In fact, case reports of irreversible or permanent alopecia in cancer patients following alkylating chemoradiotherapy or conditioning chemotherapy date back at least to the 1980s and early 1990s (Lange et al. 1987, Lange et al. 1990, Baker et al. 1991, Vowels et al. 1993, Ljungman et al. 1995); however, the frequency of irreversible or permanent alopecia after treatment with various anticancer chemotherapies is not well studied. Moreover, published case reports provide a highly incomplete and nonrepresentative depiction of health outcomes in the general population (Hoffman 1999). Therefore, whether specific chemotherapeutic agents can or cannot cause irreversible or permanent alopecia, especially in isolation from other therapeutic agents and medical conditions, cannot be assessed based on case reports alone.

Numerous other common medications have been reported to cause alopecia. Because cancer patients often use concomitant medications other than chemotherapy, these drugs could act as potential confounders of observed associations between anticancer chemotherapy use and irreversible or permanent alopecia. Medications described as possible causes of alopecia include retinoids (e.g., acitretin, isotretinoin), beta blockers (e.g., metoprolol, propranolol), angiotensin-converting enzyme inhibitors (e.g., captopril), proton pump inhibitors (e.g., omeprazole), anticoagulants (e.g., dalteparin, enoxaparin, heparin, tinzaparin, warfarin), anticonvulsants (e.g., carbamazepine, phenytoin), antithyroid medications (e.g., methimazole, propylthiouracil), antidepressants (e.g., amitriptyline, fluoxetine, lamotrigine, paroxetine), mood stabilizers (e.g., lithium, sodium valproate), antifungals (e.g., terbinafine), antivirals (e.g., indinavir, interferon alpha-2b, isoniazide), inotropic agents (e.g., dopamine), androgenic hormones (e.g., levonorgestrel, testosterone), and nonsteroidal anti-inflammatory drugs (e.g., ibuprofen) (Brodin 1987, Patel et al. 2013, Mubki et al. 2014a, Guzman-Sanchez and Asz-Sigall 2015, Phillips et al. 2017).

Only in large, appropriately designed and conducted randomized controlled trials can past and current use of medications other than the treatments of interest be balanced across groups, on average. Cancer patients frequently use concomitant medications, including prescription drugs, nonprescription drugs, and supplements, some of which may cause alopecia, to treat their disease or comorbidities (Riechelmann and Del Giglio 2009, Hanigan et al. 2011). By evenly distributing patterns of medication use across treatment groups, randomization effectively

eliminates potential selection bias and confounding based on these and other exposures. In studies of docetaxel used in combination with other chemotherapeutic agents that may cause alopecia, only randomized controlled trials that compare treatment arms that differ solely by docetaxel use (e.g., docetaxel plus agents A and B versus agents A and B alone, or docetaxel plus agents C and D versus agent E plus agents C and D) can isolate potential causal effects of docetaxel.

In summary, in light of the many types and potential causes of alopecia, many of which may be common among cancer patients and many of which may not be ascertained in research studies, the randomized controlled trial is the most suitable study design for identifying the potential causal effect of docetaxel on irreversible or permanent alopecia.

# Most of the available epidemiological evidence is inadequate to evaluate the potential causal effect of docetaxel on irreversible or permanent alopecia.

## Irreversible or permanent alopecia as a discrete clinical outcome is not typically captured or reported in clinical trials.

To provide a consistent and standardized method for ascertaining and reporting adverse events among patients receiving cancer therapy in clinical trials, the U.S. National Cancer Institute developed the Common Terminology Criteria for Adverse Events (CTCAE; formerly called the Common Toxicity Criteria, CTC) in the 1980s and has subsequently updated this system several times (National Cancer Institute 2017). The CTCAE is the standard system for reporting of adverse events in cancer clinical trials (Colevas and Setser 2004).

An adverse event is defined by the CTCAE as "any unfavorable and unintended sign (including an abnormal laboratory finding), symptom, or disease temporally associated with the use of a medical treatment or procedure that may or may <u>not</u> be considered related to the medical treatment or procedure" (National Cancer Institute 2017). That is, the CTCAE consists of a set of criteria for the classification of any abnormal clinical finding that is temporally, *but not necessarily causally*, associated with the use of a treatment or procedure in the context of a clinical trial. CTCAE terms are classified by organ system (e.g., blood and lymphatic system, nervous system, skin and subcutaneous tissue). Five grades are defined to refer to the severity of each adverse event: grade 1 is "mild," grade 2 is "moderate," grade 3 is "severe or medically significant but not immediately life-threatening," grade 4 is "life-threatening," and grade 5 is death related to the adverse event. The CTCAE does not include terminology to classify the duration of an adverse event.

The current version of the CTCAE (version 5.0, released on November 27, 2017) defines two grades of alopecia (National Cancer Institute 2017). Grade 1 is defined as "hair loss of <50% of normal for that individual that is not obvious from a distance but only on close inspection; a different hair style may be required to cover the hair loss but it does not require a wig or hair piece to camouflage." Grade 2 is defined as "hair loss of ≥50% normal for that individual that is readily apparent to others; a wig or hair piece is necessary if the patient desires to completely camouflage the hair loss; associated with psychosocial impact." Nearly identical definitions of alopecia, with two possible grades of severity, were defined in CTCAE version 4.0 (released on May 28, 2009). CTCAE version 3.0 (released on August 9, 2006) defined two grades of alopecia as "thinning or patchy" (grade 1) and "complete" (grade 2), and version 2.0 (released on April 30, 1999) defined two grades of alopecia as "mild hair loss" (grade 1) and "pronounced

hair loss" (grade 2). The first version of the CTC (released in revised form in December 1994) defined three grades of alopecia: "mild hair loss" (grade 1), "pronounced or total head hair loss" (grade 2), and "total body hair loss" (grade 3).

The CTCAE is designed to harmonize with the Medical Dictionary for Regulatory Activities (MedDRA), the standardized international medical terminology dictionary used by pharmaceutical regulatory authorities worldwide to facilitate communication and data sharing on the registration, documentation, and safety monitoring of pharmaceutical products (MedDRA 2019). In the current version of MedDRA, "alopecias"[1] are further classified as alopecia, alopecia areata, alopecia scarring, alopecia syphilitic, alopecia totalis, alopecia universalis, androgenetic alopecia, application site alopecia, diffuse alopecia, follicular mucinosis, hypotrichosis, madarosis, progeria, radiation alopecia, and Satoyoshi syndrome. "Alopecia"[2] as a preferred term in MedDRA is used to classify alopecia reversible, body hair loss, hair loss, traction alopecia, frontal-parietal thinning, alopecia unspecified, atrichia, alopecia post-chemotherapy, atrichosis, baldness, accelerated hair loss, and hair thinning. No unique MedDRA term is defined to classify irreversible or permanent alopecia, nor is there available terminology to classify the duration of a medical concept.

The WHO in 1979 developed criteria for grading treatment response and toxicity for cancer therapies (WHO 1979, Miller et al. 1981). The WHO system is often used in cancer clinical trials that do not use the CTCAE to classify adverse events. According to the WHO toxicity criteria, hair-related toxicity is classified into four grades: "minimal hair loss" (grade 1), "moderate, patchy alopecia" (grade 2), "complete alopecia but reversible" (grade 3), and "nonreversible alopecia" (grade 4). The duration of persistence after which alopecia should be considered nonreversible is not specified.

In summary, the CTCAE and MedDRA, the most commonly used standard systems for classifying adverse events in clinical trials, do not have specific terminology to capture irreversible or permanent alopecia, where permanence refers to alopecia that persists for a given duration of time after treatment, without subsequent recovery. Although the WHO toxicity criteria define a specific grade for "nonreversible" alopecia, no guidance is provided regarding the determination of the duration after which alopecia should be considered permanent. Moreover, I have not elsewhere seen a standard clinical definition for irreversible or permanent alopecia (Tallon et al. 2013). Consequently, the majority of clinical trials would not be anticipated to systematically ascertain or report irreversible or permanent alopecia as a discrete outcome.

---

[1]   http://purl.bioontology.org/ontology/MEDDRA/10001769

[2]   http://purl.bioontology.org/ontology/MEDDRA/10001760

## Adverse event reports are not a valid scientific basis for evaluating the causation or incidence of adverse events.

As described earlier in this report, case reports do not provide a sufficient basis for establishing causal links due in part to the absence of an appropriate comparison group. In the present matter, a case report or case series cannot determine whether the frequency of irreversible or permanent alopecia in cancer patients receiving docetaxel-containing chemotherapeutic regimens is higher, lower, or the same as in a suitable reference group of comparable cancer patients treated with other regimens.

The U.S. Food and Drug Administration (FDA) Adverse Event Reporting System (FAERS) is a database that contains information on adverse events and medication errors that are submitted to FDA for the purpose of postmarketing pharmaceutical safety surveillance (FDA 2018). Reports are submitted to FAERS on a voluntary basis from healthcare professionals (e.g., physicians, pharmacists, nurses) and consumers (e.g., patients, family members, attorneys). Any reports received (typically from health care professionals and consumers) by regulated entities such as product manufacturers, user facilities, distributors, importers, or applicants, are required by federal regulations to be submitted to FDA. Adverse events and medication errors in FAERS are coded using MedDRA terminology.

For the purpose of postmarketing safety surveillance of medicines, medical devices, and vaccines, Sanofi maintains a global pharmacovigilance database that collects information on adverse events reported as being related to use of these products in the countries where Sanofi products are used (Sanofi 2018). Reports are submitted voluntarily to Sanofi by healthcare professionals, patients, and other consumers. Adverse events in the Sanofi database are coded using MedDRA terminology.

Several major limitations preclude adverse event reports, including those collected in FAERS and the Sanofi global pharmacovigilance database, from serving as a valid scientific basis for evaluating adverse event causation or incidence. As FDA (2018) acknowledges:

> FAERS data does have limitations. First, **there is no certainty that the reported event (adverse event or medication error) was due to the product.** FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event. Furthermore, FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether an event will be reported, such as the time a product has been marketed and publicity about an event. There are also duplicate reports where the same report was submitted by a consumer and by the sponsor. Therefore, **FAERS data cannot be used to**

**calculate the incidence of an adverse event or medication error in the U.S. population** (emphasis added).

First, voluntarily reported adverse event data are not clinically validated for accuracy, including information on the medication(s) and the adverse event(s) at issue (FDA 2018). Thus, there is no assurance that adverse event reports are factually correct or complete.

Second, voluntarily reported adverse events are known to be vastly underreported in general. An expert estimate of the proportion of adverse events recorded in FAERS was 1−10% (Heinrich 2000). FDA (2018) also notes that there are many instances of duplicative reports in FAERS. A recent analysis found that the proportion of reported adverse events in FAERS ranged from 0.002% to > 100% in comparison with estimates from ambulatory health care data, with the degree of underreporting (or overreporting) varying substantially by type of medication and type of adverse event (Alatawi and Hansen 2017).

Third, voluntarily reported adverse events are not representative. That is, they are not randomly sampled from all adverse events; on the contrary, they are reported in a biased manner. For instance, adverse events may be more likely to be reported to FAERS if the event or the associated medication receives widespread publicity (Heinrich 2000, FDA 2018). Therefore, the 1–10% reporting estimate most likely does not apply to all drugs and adverse events, and any conclusions drawn based on adverse event reports cannot be generalized to the total population at large:

> [T]he adverse events that are reported are unlikely to represent the much larger number of unreported events. For example, there is evidence that [adverse drug events] are reported more often to FDA if they involve a newly released drug or one sold by a company that has a relatively large postmarketing surveillance program. **Consequently, any estimate of [adverse drug events] incidence based on a spontaneous reporting system such as [F]AERS would necessarily incorporate the biases of the data, underrepresenting some types of adverse events and overrepresenting others** (Heinrich 2000; emphasis added).

Fourth, adverse event report databases lack an appropriate denominator with which to estimate incidence. In other words, the size of the population at risk of adverse events from use of a given medication over time is typically unknown. Population-level data on pharmaceutical sales, pharmacy prescriptions, or payer reimbursements do not directly reflect individual patient use of medications, and may produce considerable error if used to estimate the number of patients using a given medication over a certain time period. Without such information on the at-risk population, accurate incidence rates cannot be calculated. With respect to the lack of

information on the size of the at-risk population for calculating incidence, FDA (2005) states the following:

> [T]he size of the population at risk is at best an estimate. Limitations in national denominator estimates arise because:
>
> 1. Accurate national estimates of the number of patients exposed to a medical product and their duration of exposure may not be available;
>
> 2. It may be difficult to exclude patients who are not at risk for an event, for example, because their exposure is too brief or their dose is too low[3]; and
>
> 3. A product may be used in different populations for different indications, but use estimates are not available for the specific population of interest.

Fifth, voluntarily reported adverse events are often incomplete (FDA 2018). Adverse event report forms[4] may be missing key information such as treatment dose, frequency, route, and duration, disease indication for treatment, concomitant medication use, pre-existing comorbidities, and other factors that may affect or confound the potential relationship between treatment and a given adverse event.

Finally, adverse event report databases lack a suitable comparison group with which to estimate associations with risk of any given adverse event in patients treated versus those untreated with a given medication. All patients included in these databases, by definition, reported an adverse event; any patients who did not experience adverse events while using a given medication are excluded. Comparisons between patients who reported an adverse event while using the medication of interest and those who reported an adverse event while using other medications would be hopelessly confounded by myriad factors related to demographics, health status and history, propensity to file a report, healthcare access and use, and healthcare provider characteristics, among others.

In summary, adverse event reports are undermined by their largely anecdotal, unvalidated, underreported or overreported, duplicative, nonrepresentative, and incomplete nature, as well as by the absence of information on at-risk and appropriate comparison populations. As a result, although adverse event databases can be useful for the identification of rare adverse events, events not observed in clinical trials, and hypotheses regarding potential safety concerns, they

---

3   See *Current Challenges in Pharmacovigilance: Pragmatic Approaches*, Report of the Council for International Organizations of Medical Sciences (CIOMS) Working Group V, Geneva, 2001 (footnote in quoted text).

4   https://www.accessdata.fda.gov/scripts/medwatch/index.cfm?action=reporting.home

cannot be used to evaluate potential causal effects of medications on adverse events, nor can they be used to calculate the incidence of adverse events among patients using certain medications.

## Dr. Madigan's analyses of the FAERS and Sanofi global pharmacovigilance databases do not pertain to irreversible or permanent alopecia.

In his report for this matter, Plaintiffs' expert Dr. David Madigan presents results from analyses of four sources of data: the FAERS database, the Sanofi global pharmacovigilance database, observational epidemiological studies, and two randomized controlled trials of docetaxel conducted by Sanofi (TAX 316 and GEICAM 9805). I discuss all of these sources in my report. Here, I focus on Dr. Madigan's analyses of the FAERS and Sanofi global pharmacovigilance databases. These analyses are also relied upon by Plaintiffs' expert Dr. David A. Kessler (Supplemental Report of David A. Kessler, M.D., pp. 5, 8, 13, 14, 18–19).

A critical flaw of Dr. Madigan's analyses of both the FAERS database and the Sanofi global pharmacovigilance database is that his definition of the adverse event at issue does not accurately capture irreversible or permanent alopecia, but instead almost certainly includes some cases of reversible or temporary alopecia.[5] As described in his report, in his analysis of the FAERS database, Dr. Madigan searched for adverse event reports coded to the MedDRA high-level term "alopecia," restricted to reports "tagged with the outcome of 'Disability or Permanent Damage.'" Of note, the outcome of "disability or permanent damage" does not distinguish between "disability"—which denotes seriousness, but does not provide any indication of duration, and may be temporary—and "permanent damage." Moreover, the adverse event reporting forms used from the inception of the FDA MedWatch adverse event reporting system on June 3, 1993, and at least as of March 31, 2005, provided only the outcome of "disability," without an accompanying reference to "permanent damage" (Figures 1A and 1B); therefore, adverse event reports tagged with this outcome on those forms did not have any information on adverse event permanence or persistence. (Instead, those adverse event report forms had a separate outcome for events that "required intervention to prevent permanent impairment/damage.")

Moreover, Dr. Madigan could not restrict the analysis to reports where alopecia per se was specifically marked as causing "disability or permanent damage." On the contrary, in Dr. Madigan's analysis, the outcome of "disability or permanent damage"—which is currently

---

[5]   Because Dr. Madigan did not retain the patient identification numbers from his analyses of the FAERS and Sanofi global pharmacovigilance databases (2018 Deposition of David Madigan, Ph.D., 118:1–119:14, 226:5–18), whether certain individuals were actually included in his analysis has not been determined.

indicated by a single checkbox for an entire FDA MedWatch adverse event reporting form (Figure 2) or an entire Council for International Organizations of Medical Sciences (CIOMS) adverse event reporting form (Figure 3)—could have corresponded to any other adverse event reported on a form submitted by a given individual. As he acknowledged during his 2019 deposition, "I mean, there is a box that one takes [*sic*] that's not connected to the narrative, so to speak" (2019 Deposition of David Madigan, Ph.D., 162:19–24). Dr. Madigan also did not take into consideration any information on the timing of alopecia development relative to taking docetaxel, including whether alopecia developed in a patient before starting docetaxel (2018 Deposition of David Madigan, Ph.D., 127:19–129:8).[6]

Similarly, as revealed in Appendix 5 of his report, in his analysis of the Sanofi global pharmacovigilance database, Dr. Madigan searched for adverse event reports coded to the MedDRA high-level term "alopecia" (2018 Deposition of David Madigan, Ph.D., 227:1–8), with an additional search for a variety of keywords such as "permanent," "irreversible," "chronic," "persistent," "ongoing," or "continuing," sometimes combined in various ways with "alopecia" or "hair loss." In some instances, his keywords (e.g., "hair has not returned"; "never got my hair"; "no hair starting to grow"; "chronic" followed directly by "alopecia" or "hair loss"; "alopecia" or "hair loss" followed by "persistent," "persistant," or "persisting," with or without a preceding parenthesis) may have identified true cases of irreversible or permanent alopecia. In several other instances, however, his keywords would have identified records that did not correspond to irreversible or permanent alopecia; these include his keyword searches for "permanent" or "irreversible" without requiring a preceding or subsequent reference to "alopecia" or "hair loss"; his keyword searches for "bald" or "baldness" without requiring any reference to these conditions' being "permanent" or "irreversible"; and his keyword searches for "didnt grow," "did not grow," "is not growing," "has not grown," "never grew," "not yet grown," "not started growing," or "not regrowing," without requiring a preceding or subsequent reference to "hair."

Dr. Madigan acknowledged during both of his depositions that his approach to identifying reports of alopecia in the FAERS database was not specific to individuals with irreversible or permanent alopecia. For example, his 2018 deposition included the following exchange (2018 Deposition of David Madigan, Ph.D., 148:18–149:17):

---

[6]   Dr. Madigan also did not restrict his search of the FAERS database to women, breast cancer patients, or reports for which docetaxel was identified as a "suspect product" or "suspect drug" as opposed to a "concomitant medical product" or "concomitant drug" (2018 Deposition of David Madigan, Ph.D., 111:18–113:7).

Figure 1A. Page 1 of original FDA MedWatch voluntary adverse event reporting form (dated 06-1993, expired 12-31-1994). Checkbox for "Disability" (but not "Permanent Damage") and separate text box for "Event, Problem or Product Use Error" are highlighted. From Gruchalla (1995).

Figure 1B. Page 1 of 2005 FDA MedWatch voluntary adverse event reporting form (dated 12-2003, expired 03-31-2005). Checkbox for "Disability" (but not "Permanent Damage") and separate text box for "Event, Problem or Product Use Error" are highlighted.

Figure 2. Page 1 of current FDA MedWatch voluntary adverse event reporting form (dated 10-2015; expired 09-30-2018, but still available at https://www.fda.gov/media/76299/download). Checkbox for "Disability or Permanent Damage" and separate text box for "Event, Problem or Product Use Error" are highlighted.

April 17, 2020



Figure 3. Current CIOMS adverse event reporting form (available at https://cioms.ch/wp-content/uploads/2017/05/cioms-form1.pdf). Checkbox for "Involved Persistence or Significant Disability or Incapacity" and separate text box for "Reaction(s)" are highlighted.

Q: We can agree there's nothing in this form where the reporter tells that the outcome is related to alopecia?

A: Okay. We talked about that earlier. So that's just not the nature of these. So there's a single box to record the outcome.

Q: So we can agree on that point?

A: Yeah. I think I'm agreeing with you. So the patient had, it appears, you know, set of adverse reactions. And this is their outcome. This is the outcome for that patient; you know, my analysis looks for alopecia. And it looks for the particular outcome. And it's there.

Q: Even if the reporter did not intend the outcome to relate to the adverse event alopecia?

A: My analysis can't go there. It's a different kind of analysis.

Q: And it didn't go there; right?

A: My analysis can't go there.

He then went on to confirm several examples of patients without irreversible or permanent alopecia who would have been identified by his approach. One of these was a lung cancer patient who received docetaxel on October 7 and/or 9, 2002, was noted to have alopecia on November 20, 2002, was still receiving docetaxel as of December 11, 2002, and had died by December 31, 2002 (2018 Deposition of David Madigan, Ph.D., 150:21–154:17; Exhibit 16). Another example was a breast cancer patient treated with docetaxel and carboplatin who had exanthema (diffuse skin rash), vomiting, diarrhea, muscle pain, and hair loss (no dates reported), experienced improvement or subsiding of the adverse drug reactions after withdrawal of docetaxel and carboplatin, and at the time of the adverse event report, still suffered from some adverse events that did not include alopecia (2018 Deposition of David Madigan, Ph.D., 170:7–172:11; Exhibit 17). Another such patient was a woman with breast cancer treated with docetaxel and tamoxifen who had previously experienced alopecia, but was described at the time of the report to have several persisting adverse events that did not include alopecia (2018 Deposition of David Madigan, Ph.D., 180:4–181:9; Exhibit 18). None of these patients can reasonably be characterized as having irreversible or permanent alopecia.

Similarly, in his 2019 deposition, Dr. Madigan acknowledged that several other adverse event reports dated during the period of his analysis, with docetaxel listed as a suspect medication, alopecia listed as an adverse event, and the box checked for "disability," could have been included in his analysis, if they were filed in FAERS by the FDA and correctly coded (2019 Deposition of David Madigan, Ph.D., Exhibits 17–22, 146:24–169:7). Yet, examination of these original adverse event report forms reveals that none of them describes the reported alopecia as being irreversible or permanent. On the contrary, Exhibit 17 corresponds to woman with breast cancer patient who filed an adverse event report less than two months after her last reported treatment with docetaxel, and did not describe her alopecia using any adjectives (e.g., irreversible, permanent, or persistent), and in the same report described several other adverse events (decreased sharpness of vision, mild paresthesis, bone pain, and neurological pain). Thus, the checkbox of "disability" could have corresponded to any of these adverse events. Exhibit 18 corresponds to a man with lung cancer who died less than four months after his last treatment with docetaxel; the form does not describe his alopecia (which he experienced after his second course of docetaxel) using any adjectives characterizing it as irreversible or permanent. Moreover, the form lists other adverse events including blurring of vision, hearing loss, complete blindness in the left eye "thought to be due to an ischaemic vascular event," eventual loss of sight in both eyes, hospitalization with epigastric pain due to a chronic duodenal ulcer with mild gastritis, vomiting, fatigue, pain, cough, poor appetite, weight loss, and death, any of which could have been described with the check box for "disability."

Exhibit 19 corresponds to a woman with lung cancer who filed an adverse event report less than two months after her first reported treatment with docetaxel, again without describing her alopecia using any adjectives. Other reported adverse events include decreased hearing in the left ear, vertigo, liver dysfunction, fever, leukopenia, sensorineural deafness in the left ear, and a small amount of effusion in the left auris media. Exhibit 20 corresponds to a woman with lung cancer who died within one month after receiving docetaxel; her alopecia is listed without any adjectives. Several other adverse events are listed, including worsening radiation pneumonitis, shortness of breath, crackles in lung, non-productive cough, fatal lung cancer, temporomandibular joint discomfort, increased platelets, white blood cell count, increased white blood cell count, weight loss, and tachycardia. Exhibit 21 corresponds to a woman with breast cancer who received both taxotere and paclitaxel prior to filing this adverse event report, and reported 29 adverse events, any of which could have been characterized with the outcome of "disability." Finally, Exhibit 22 corresponds to a woman with breast cancer who listed nine adverse events other than alopecia, mostly of an ocular/visual nature (fluid buildup, disorder in eyes, eyes tear all the time, eyes red and sticky, impaired vision (because of so much tearing), spots on macula, severe fatigue, nail changes, and feeling cold all the time), and did not further describe her alopecia using any adjectives. Again, none of these patients can reasonably be characterized as having irreversible or permanent alopecia.

In his 2018 deposition, Dr. Madigan acknowledged similar flaws with his analysis of the Sanofi global pharmacovigilance database (2018 Deposition of David Madigan, Ph.D., 227:21–229:5):

> Q: If a record – if a report mentions alopecia as a higher-level term and anywhere in the report one of these search terms occurs, that report gets counted in your Table 4?
>
> A: That's right.
>
> Q: Did you or anyone look at any of the individual narratives to determine whether the search term actually described the alopecia?
>
> A: I didn't. I just ran the analysis with – you know, with these terms. And the code is in the appendix. You can see exactly what I did.
>
> Q: So if there's a report with a higher-level term of alopecia and in the narrative, there's a comment that this individual's headache is permanent, that report would be counted as one of your 291 in Table 4?
>
> A: I suppose that could happen. I don't know.
>
> Q: If the report has a higher-level term of alopecia and the narrative describes the individual having chronic back pain, that report would be counted and included in your Table 4?
>
> …
>
> A: You know, I don't know if that ever happened. That could happen.
>
> Q: The methodology you used to search wouldn't prevent that from happening?
>
> A: That's true.

Dr. Madigan further confirmed that his approach could have identified adverse event reports stating that a patient's "hair never grew back until chemotherapy ended," as well as reports indicating that a patient "still has no hair" one month after the end of chemotherapy, even if that patient had subsequent reports indicating resolution of her alopecia (2018 Deposition of David Madigan, Ph.D., 232:5–11; 238:9–239:13). Again, such patients would not have irreversible or permanent alopecia.

In summary, Dr. Madigan's analyses of the FAERS and Sanofi global pharmacovigilance databases used methods that were not specific to irreversible or permanent alopecia, but rather could have included an unknown proportion of patients with reversible or temporary alopecia and some other irreversible, permanent, or persistent adverse event unrelated to alopecia. Therefore, his findings based on these analyses cannot be relied upon as being informative about the occurrence or causation of irreversible or permanent alopecia among patients treated with docetaxel. Likewise, Dr. Kessler's opinions based on Dr. Madigan's analytical results from these databases are not relevant to the outcome of irreversible or permanent alopecia.

## Dr. Madigan's analyses of the FAERS and Sanofi global pharmacovigilance databases are not a valid scientific basis for evaluating the causation or incidence of irreversible or permanent alopecia among patients treated with docetaxel.

Dr. Madigan provides the results of safety signal analyses of his defined alopecia outcome in the FAERS database, as well as an analysis of the cumulative number of reports per year of his defined alopecia outcome in the Sanofi global pharmacovigilance database. Besides the fact that his classification of alopecia does not correspond to irreversible, permanent, or even long-term alopecia, neither the safety signal analyses nor the annual numbers of adverse event reports constitute valid scientific evidence regarding whether docetaxel causes irreversible or permanent alopecia, or how often irreversible or permanent alopecia occurs in cancer patients treated with docetaxel. These flaws undermine Dr. Madigan's and Dr. Kessler's reliance on these analyses to support their opinions on the causation and incidence of irreversible or permanent alopecia in docetaxel-treated patients.

To support his causation opinion, Dr. Kessler also relies in part on "internal Sanofi spreadsheets of call and web inquiries from patients reporting cases of irreversible alopecia and seeking information from Sanofi about the risk of irreversible alopecia with Taxotere" (Supplemental Report of David A. Kessler, M.D., p. 14). In addition, he cites correspondence from the French Health Authorities indicating that they found no published case reports or French pharmacovigilance database reports of breast cancer patients who had irreversible or permanent alopecia following anthracycline treatment (Supplemental Report of David A. Kessler, M.D., p. 18). These sources are inadequate for evaluation of the causation or incidence of irreversible or permanent alopecia for the same reasons as the FAERS and Sanofi global pharmacovigilance databases, described below.

In its guidance document to industry on good pharmacovigilance practices and pharmacoepidemiological assessment of observational data on drugs, FDA (2005) explicitly indicates that safety signals can raise hypotheses about potential adverse drug effects, but they

do not establish causal relationships; instead, well-designed analytical epidemiological studies can be used to assess causation (emphasis added):

> [S]afety signal refers to a concern about an excess of adverse events compared to what would be expected to be associated with a product's use. Signals can arise from postmarketing data and other sources, such as preclinical data and events associated with other products in the same pharmacologic class. It is possible that even a single well-documented case report can be viewed as a signal, particularly if the report describes a positive rechallenge or if the event is extremely rare in the absence of drug use. **Signals generally indicate the need for further investigation, which may or may not lead to the conclusion that the product caused the event.** After a signal is identified, it should be further assessed to determine whether it represents a potential safety risk and whether other action should be.
>
> …
>
> For any individual case report, it is rarely possible to know with a high level of certainty whether the event was caused by the product. To date, there are no internationally agreed upon standards or criteria for assessing causality in individual cases, especially for events that often occur spontaneously (e.g. stroke, pulmonary embolism). **Rigorous pharmacoepidemiologic studies, such as case-control studies and cohort studies with appropriate follow-up, are usually employed to further examine the potential association between a product and an adverse event**.

In his report and deposition, Dr. Madigan acknowledges several of the "inherent, well-documented limitations" of the FAERS database and other spontaneous reporting systems, which include the Sanofi global pharmacovigilance database; among these shortcomings are incomplete information, limited temporal information, lack of follow-up information, underreporting, and overreporting (2020 Report of David Madigan, Ph.D., p. 4; 2018 Deposition of David Madigan, Ph.D., 80:11–81:4). As described above, voluntarily reported adverse event data also are unvalidated and nonrepresentative (FDA 2018), and they provide no information on the size of the population at risk over time, which is necessary for calculation of cumulative incidence (FDA 2005). Collectively, these problems preclude FAERS and the Sanofi global pharmacovigilance database, including Dr. Madigan's analyses of these data sources, from providing reliable information on the cumulative incidence of any adverse event, including irreversible or permanent alopecia.

Dr. Madigan also recognizes that analyses of adverse event reports from FAERS and the Sanofi global pharmacovigilance databases cannot establish causation. As stated by FDA (2018), reported adverse events may or may not be causally linked to the medical product at issue. Moreover, these databases lack an appropriate comparison group of patients with which to calculate the relative risk of an adverse event in association with a particular drug. As Dr. Madigan states in his report with respect to FAERS: "The nature of the database does not permit definitive causal inferences but the evidence therein nonetheless forms an important component of any drug safety investigation" (2020 Report of David Madigan, Ph.D., p. 19).

Dr. Madigan likewise acknowledged in his 2018 deposition that his FAERS safety signal analysis and counts of adverse event reports in the Sanofi global pharmacovigilance database cannot establish causal links with docetaxel use (2018 Deposition of David Madigan, Ph.D., 293:24–294:7):

> Q: Does your analysis of the FAERS database alone demonstrate that docetaxel causes irreversible alopecia?
>
> A: No.
>
> Q: Does your analysis of the Sanofi internal database alone demonstrate that docetaxel causes irreversible alopecia?
>
> A: No.

He stated: "I wouldn't base a causal – I wouldn't draw a causal inference from an analysis of spontaneous reports alone" (2018 Deposition of David Madigan, Ph.D., 292:2–8). Instead, Dr. Madigan asserted that his analysis of two randomized controlled trials was sufficient to establish causation (2018 Deposition of David Madigan, Ph.D., 293:8–23):

> Q: Does your analysis of the clinical trials alone demonstrate that docetaxel causes irreversible alopecia?
>
> A: Yeah. I believe it does. It's a question of degree or strength of evidence. The evidence is strengthened by the other strands.
>
> Q: Let me make sure I understand your answer. Let me ask the question again. Does your analysis of the clinical trials alone without any other information demonstrate to your satisfaction that docetaxel causes irreversible alopecia?

A: Yes.

I discuss Dr. Madigan's analysis of the two randomized controlled trials at issue, TAX 316 and GEICAM 9805, later in this report.

## Published studies have major limitations for evaluating the causation or incidence of irreversible or permanent alopecia among patients treated with docetaxel.

To gain insight into the potential causation and incidence of irreversible or permanent alopecia among cancer patients treated with docetaxel, I searched for relevant published scientific literature in PubMed, the National Library of Medicine's database of over 30 million citations for biomedical literature. I also examined the reference lists of retrieved articles to identify additional studies.

Prior to conducting the literature search, I determined that relevant articles would be original research studies of cancer patients treated with docetaxel-containing chemotherapeutic regimens with reported post-treatment data on the incidence or prevalence of alopecia classified as irreversible or permanent (or synonyms indicating long-term unresolved alopecia). To focus my literature search on the patient population most germane to the present matter, I limited eligible studies to those of female breast cancer, because the other cancer populations approved for docetaxel treatment are mostly male (Edgren et al. 2012).[7] To identify studies with greater statistical reliability, I restricted eligible studies to those with at least 100 patients treated with docetaxel combination therapy or at least 50 patients treated with docetaxel monotherapy. These minimums were based in part on the expectation that irreversible or permanent alopecia following chemotherapy is an uncommon event. Where multiple articles described the same clinical trial, I included articles that described the full population of study participants, and excluded those that described secondary subgroup analyses. I excluded animal and cell studies, as well as reviews, commentaries, and letters that did not report original data.

As of March 27, 2020, I identified 618 articles using the following search string in PubMed:

---

[7]   Docetaxel is currently approved by FDA as a single agent for treatment of locally advanced or metastatic breast cancer after chemotherapy failure; in combination with doxorubicin and cyclophosphamide as adjuvant treatment of operable node-positive breast cancer; as a single agent for locally advanced or metastatic non-small-cell lung cancer after platinum therapy failure; in combination with cisplatin for unresectable, locally advanced or metastatic untreated non-small-cell lung cancer; in combination with prednisone in metastatic, castration-resistant prostate cancer; in combination with cisplatin and fluorouracil for untreated, advanced gastric adenocarcinoma, including the gastroesophageal junction; and in combination with cisplatin and fluorouracil for induction treatment of locally advanced squamous cell carcinoma of the head and neck (https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020449s080s082lbl.pdf).

> *(breast AND (chemotherapy OR chemotherapies OR taxane OR taxanes OR docetaxel OR taxotere) AND (alopecia OR "hair loss") AND (permanent OR long-term OR "long term" OR persistent OR persisting OR persist\* OR irreversible OR non-reversible OR nonreversible OR reversible OR long-lasting OR lasting OR enduring OR continuing OR continued OR continual OR continu\*)) OR (docetaxel [ti] AND alopecia) OR (("docetaxel monotherapy" OR "single-agent docetaxel") AND breast).*

To supplement this search with large, randomized controlled trials[8] of docetaxel for breast cancer, I added the following search string, which identified an additional 212 articles in PubMed as of March 27, 2020:

> *(docetaxel [ti] AND breast [ti] AND ("phase III" [title/abstract] OR "phase 3" [title/abstract])) OR (docetaxel [ti] AND breast [ti] AND (j clin oncol [journal] OR new engl j med [journal] OR jama [journal])).*

Figure 4 is a flowchart illustrating the results of my review of the 830 retrieved articles, along with 102 articles and abstracts added from reference lists and other sources,[9] including the websites of the San Antonio Breast Cancer Symposium and the American Society for Clinical Oncology.[10] Of the 932 documents, I excluded 704 because their titles and abstracts indicated that they did not pertain to docetaxel and/or breast cancer; evaluated fewer than 100 patients on docetaxel combination therapy or 50 patients on docetaxel monotherapy; reported secondary subgroup analyses of a larger clinical trial; were reviews, commentaries, or letters without original research data; or were animal or cell studies. I reviewed the full texts of the remaining 228 articles and conference abstracts, and determined that 75 did not report any information on alopecia; 105 reported data on alopecia but did not specifically address irreversible or permanent alopecia[11]; one reported data on combined chemotherapies not specific to docetaxel;

---

[8]   Briefly, microdosing (also called phase 0) clinical trials involve a small number of participants and are designed to evaluate drug pharmacokinetics. Phase I clinical trials involve approximately 20−100 participants and are designed to evaluate drug safety and dosage. Phase II clinical trials involve up to several hundred participants and are designed to evaluate drug efficacy and toxicity. Phase III clinical trials are randomized controlled trials that involve up to a few thousand participants and are designed to evaluate drug efficacy and toxicity. Phase IV trials involve up to several thousands of participants and are designed to evaluate post-market drug safety.

[9]   Approximately 20 of these articles were identified by PubMed searches that I conducted earlier, but were no longer identified when I re-ran the search in March 2020.

[10]  I searched for relevant abstracts presented at the San Antonio Breast Cancer Symposium in 2015–2019 (https://www.sabcs.org/Past-Meetings) and at the American Society for Clinical Oncology Annual Meeting in 2017–2019 (https://meetinglibrary.asco.org/search-meetings) using the keywords "alopecia" and "hair loss."

[11]  In accordance with the WHO toxicity criteria, I included grade 4 ("nonreversible") alopecia as irreversible or permanent alopecia in studies that used the WHO system. Because the National Cancer Institute CTC and CTCAE criteria do not define a separate grade for irreversible or permanent alopecia, I did not include any grade of alopecia, unless specifically characterized as irreversible, permanent, persistent, etc., as irreversible or

and 24 pertained to this classification of alopecia but did not report frequency (cumulative incidence) data. The last category of articles included studies that described, for example, quality of life, preventive measures, treatment outcomes, or clinicopathological findings in patients with irreversible or permanent alopecia, but did not report the proportion of all docetaxel-treated patients who developed this condition. Thus, such articles cannot be used to evaluate the cumulative incidence of irreversible or permanent alopecia, nor can they be used to compare the frequency of this outcome between patients treated with docetaxel-containing regimens and those treated with other regimens.

Results from the remaining 23 articles are summarized in Table 1, including 11 original full-length papers (Lemenager et al. 1997, Sjostrom et al. 1999, Nabholtz et al. 2001, Schmidinger et al. 2001, Amat et al. 2003, Han et al. 2009, Martin et al. 2015, Kim et al. 2017, Martin et al. 2018b, Kang et al. 2019, Watanabe et al. 2019), eight original conference abstracts (Sedlacek 2006, Bertrand et al. 2013, Bourgeois et al. 2014, Thorp et al. 2015, Crown et al. 2017b, Crown et al. 2018, Lim et al. 2018, Ohsumi et al. 2019), one published correction to an included article (Martin et al. 2018a), and three abstracts or letters that contained duplicate data (Lemenager et al. 1995, Thorp et al. 2014, Crown et al. 2017a). Four of these studies described the cumulative incidence of irreversible or permanent alopecia among breast cancer patients treated with taxane chemotherapy, which includes but is not limited to docetaxel (Kim et al. 2017, Kang et al. 2019, Ohsumi et al. 2019, Watanabe et al. 2019).[12] To err on the side of considering more information rather than less, I included these studies because the authors specified that at least some of the patients received docetaxel. Also to be inclusive, I counted in three studies with fewer than 100 patients treated with docetaxel combination therapy (Nabholtz et al. 2001, Lim et al. 2018, Kang et al. 2019). All of the epidemiological studies of the cumulative incidence of irreversible or permanent alopecia reviewed by Plaintiffs' experts, including clinical trials and observational studies, but excluding case reports and case series (which cannot estimate cumulative incidence), were captured by my literature review, as were several relevant epidemiological studies not reviewed by Plaintiffs' experts.

---

permanent alopecia in studies that used the CTC or CTCAE system or that did not specify the adverse event grading system used.

[12] Kang et al. (2019) referred to "taxane-based chemotherapy" generally, but described only docetaxel-based chemotherapeutic regimens in their study population.

April 17, 2020



Figure 4. Literature search flow chart

Table 1. Summary of published studies of cumulative incidence of irreversible or permanent alopecia in breast cancer patients treated with docetaxel-containing chemotherapeutic regimens

| Reference | Chemotherapy Regimen | Design | Random ized? | Median Follow-up | Outcome Assessment | Patients | Irreversible/ Permanent Alopecia Cases (n) | Cumulative Incidence (%) | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Lemenager 1995, 1997 | T/scalp cooling | Prospective | No | 9 m | Clinical | 88 | 0 | 0.0% | "grade 4, complete and irreversible" |
| Sjöström 1999 | T | Prospective | Yes | 11 m | Clinical | 140 | 3 | 2.1% | WHO grade 4 ("nonreversible") |
| " | MF | Prospective | Yes | " | Clinical | 140 | 1 | 0.7% | " |
| Nabholtz 2001 | TAC | Prospective | No | 32 m | Clinical | 54 | 4 | 7.4% | "long-lasting" (> 2 years) partial |
| Schmidinger 2001 | T | Prospective | No | ~18 m | Clinical | 93 | 1 | 1.1% | WHO grade 4 ("nonreversible") |
| Amat 2003 | T | Prospective | No | 31 m | Clinical | 88 | 4 | 4.5% | WHO grade 4 ("nonreversible") |
| Sedlacek 2006 | AC, FAC, A/CMF | Retrospective | No | Mean 48 m | Clinical | 258 | 0 | 0.0% | "persistent significant," < 50% regrowth from prechemotherapy |
| " | AC/P, AP/P, AC/P dose-dense, APC, AC/PH | Retrospective | No | " | Clinical | 126 | 0 | 0.0% | " |
| " | AC/T, AT, ACT, AC/T + X, AC/TH, AT/FAC, FAC/T | Retrospective | No | " | Clinical | 112 | 7 | 6.3% | " |
| Han 2009 | T/E (4 or 6 cycles) | Prospective | Yes | Not reported | Clinical | 150 | 0 | 0.0% | all "reversible" |
| Bertrand 2013 | FEC/T | Retrospective | No | 5 y | Clinical | 79 | 26 all 21 minimal 2 moderate 3 severe | 32.9% all 26.6% minimal 2.5% moderate 3.8% severe | "permanent chemotherapy-induced alopecia" 5 years after end of chemotherapy |

| Reference | Chemotherapy Regimen | Design | Random ized? | Median Follow-up | Outcome Assessment | Patients | Irreversible/ Permanent Alopecia Cases (n) | Cumulative Incidence (%) | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Bourgeois 2014 | FEC/T | Retrospective | No | 3.7 y | Self-report | 829 | At 6 m: 271 grade 1 71 grade 2  At 3.7 y: 248 grade 1 29 grade 2 | At 6 m: 32.7% grade 1 [reported as 32.6%] 8.6% grade 2  At 3.7 y: 29.9% grade 1 3.5% grade 2 | "persisting alopecia" at 6 months after last course of docetaxel or at inquiry; grade 1 = "up to 50% not obvious from a distance, a different hair style may be required to cover the loss"; grade 2 = "> 50% with a psychosocial impact" |
| Thorp 2014, 2015 | T regimens | Retrospective | No | ~34 m–3.5 y | Self-report | 133 | 21 | 15.8% | "significant scalp hair loss" ~34 months to 3.5 years after chemotherapy |
| Martin 2015 | EC/T | Retrospective | No | 1–2 y | Self-report | 111 | 33 | 29.7% | "incomplete scalp hair recovery" 1–2 years after chemotherapy |
| " | ET/X | Retrospective | No | " | Self-report | 249 | 35 | 14.1% | " |
| Crown 2017a, b | T 300 mg/m$^2$ without A/anthracyclines | Retrospective | No | > 1 y | Self-report | 90 | 6 grade 10 grade 2 | 6.7% grade 10% grade 2 | "ongoing alopecia" > 1 year after chemotherapy; grade 1 = "mild," grade 2 = "severe/total" |
|  | T 450 mg/m$^2$ without A/anthracyclines | Retrospective | No | > 1 y | Self-report | 95 total | 13 grade 1 5 grade 2 | 13.7% grade 1 5.3% grade 2 | " |
|  | + carboplatin + C |  |  |  |  | 55 40 | 12 grades 1–2 6 grades 1–2 | 21.8% grades 1–2 15.0% [reported as 16%] grades 1–2 |  |

| Reference | Chemotherapy Regimen | Design | Random ized? | Median Follow-up | Outcome Assessment | Patients | Irreversible/ Permanent Alopecia Cases (n) | Cumulative Incidence (%) | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | T with A/anthracyclines | Retrospective | No | > 1 y | Self-report | 75 | 14 grade 1 4 grade 2 | 18.7% grade 1 5.3% grade 2 | " |
| | P with A/anthracyclines | Retrospective | No | > 1 y | Self-report | 23 | 1 grade 1 2 grade 2 | 4.3% grade 1 8.7% grade 2 | " |
| | A/anthracyclines without T/P | Retrospective | No | > 1 y | Self-report | 12 | 0 grade 1 1 grade 2 | 0% grade 1 8.3% grade 2 | " |
| Kim 2017 | AC | Retrospective | No | 1–3 y | Self-report | 112 | 29 total stu26 mild 3 severe | 25.9% total 23.2% mild 2.7% severe | "consistent absence of hair" ≥ 6 months after chemotherapy; "mild" ≤ 50%, "severe" > 50% |
| " | AC/T, AC/P | Retrospective | No | " | Self-report | 153 | 93 total 77 mild 16 severe | 60.8% total 50.3% mild 10.5% severe | " |
| Crown 2018 | TC without A/anthracyclines, 4 cycles | Retrospective | No | > 5 y | Self-report or clinical? | 140 | 17 grade 1 4 grade 2 | 12.1% grade 1 2.9% grade 2 | "long-term hair loss"; graded per CTCAE |
| " | TC without A/anthracyclines, 6 cycles | Retrospective | No | > 5 y | Self-report or clinical? | 96 | 26 grade 1 10 grade 2 | 27.1% grade 1 10.4% grade 2 | " |
| " | T + carboplatin + trastuzumab without A/anthracyclines | Retrospective | No | > 5 y | Self-report or clinical? | 132 | 31 grade 1 10 grade 2 | 23.5% grade 1 7.6% grade 2 | " |
| Lim 2018 | T | Retrospective | No | Not reported | Self-report | 38 | 25 | 65.8% | "long-term" or "chronic" alopecia with "effect [on] patient's life" |
| " | P | Retrospective | No | Not reported | Self-report | 50 | 21 | 42.0% | " |

April 17, 2020

| Reference | Chemotherapy Regimen | Design | Randomized? | Median Follow-up | Outcome Assessment | Patients | Irreversible/ Permanent Alopecia Cases (n) | Cumulative Incidence (%) | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Martin 2018a, b | FAC, FEC, AC, EC | Retrospective | No | 43 m | Clinical and self-report | 148 | ~19 grade 1 0 grade 2 | ~12.8% grade 1 0% grade 2 | "persistent" ≥ 18 months after chemotherapy; grade 1 = "weakening of hair" or partial loss not requiring a wig; grade 2 = complete, requiring a wig |
| " | FAC/P, FEC/P, AC/P, EC/P | Retrospective | No | " | Clinical and self-report | 29 | ~5 grade 1 0 grade 2 | ~17.2% grade 1 0% grade 2 | " |
| " | ET/X | Retrospective | No | " | Clinical and self-report | 31 | ~4 grade 10 grade 2 | ~12.9% grade 10% grade 2 | " |
| " | TAC | Retrospective | No | " | Clinical and self-report | 74 | ~33 grade 1 ~3 grade 2 | ~44.6% grade 1 ~4.1% grade 2 | " |
| " | A or E +/- C, T +/- H | Retrospective | No | " | Clinical and self-report | 66 | ~25 grade 1 ~9 grade 2 | ~37.9% grade 1 ~13.6% grade 2 | " |
| " | Tamoxifen | Retrospective | No | " | Clinical and self-report | 57 | 0 grade 1 0 grade 2 | 0% grade 1 0% grade 2 | " |
| " | Aromatase inhibitors | Retrospective | No | " | Clinical and self-report | 87 | ~3 grade 1 0 grade 2 | ~3.4% grade 1 0% grade 2 | " |
| " | Regimens above with T cumulative dose ≥ 400 mg/m$^2$ | Retrospective | No | " | Clinical and self-report | 358 | 36 grade 2 | 10.1% grade 2 | " |
| " | Regimens above with T cumulative dose ≥ 400 mg/m$^2$ with hormonal therapy | Retrospective | No | " | Clinical and self-report | 221 | 22 grade 2 | 10.0% grade 2 | " |

April 17, 2020

| Reference | Chemotherapy Regimen | Design | Random ized? | Median Follow-up | Outcome Assessment | Patients | Irreversible/ Permanent Alopecia Cases (n) | Cumulative Incidence (%) | Notes |
|---|---|---|---|---|---|---|---|---|---|
| " | Regimens above with T cumulative dose ≥ 400 mg/m$^2$ without hormonal therapy | Retrospective | No | " | Clinical and self-report | 137 | 14 grade 2 | 10.2% grade 2 | " |
| " | Regimens above with T cumulative dose ≤ 300 mg/m$^2$ | Retrospective | No | " | Clinical and self-report | 59 | 0 grade 2 | 0% grade 2 | " |
| " | Regimens above without T | Retrospective | No | " | Clinical and self-report | 306 | 0 grade 2 | 0% grade 2 | " |
| Kang 2019 | AC, TC, FAC, TAC, AC/T | Prospective | No | 3 y | Clinical | 61 at 6 months; 52 at 3 years | 24 at 6 months; 22 at 3 years | 39.3% [reported as 39.5%] at 6 months; 42.3% at 3 years | "persistent" ≥ 6 months after chemotherapy; absent or "incomplete" = hair density or thickness ≥ 2 standard deviations below pre-chemotherapy mean |
| " | " | Prospective | No | " | Self-report | 53 | 35 | 66.0% [reported as 62.5%] at 3 years | "subjective"; "hair had not recovered to its level prior to chemotherapy" |
| Ohsumi 2019 | TC, T, AC/taxane, EC/taxane, EC, T + carboplatin + trastuzumab emtansine | Prospective | No | 13 m | Clinical | 116 at 7 and 13 months; 117 at 10 months | At 7 months: 15 grade 1 1 grade 2 1 grade 3  At 10 months: 9 grade 1 1 grade 2 | At 7 months: 12.9% grade 1 0.9% grade 2 0.9% grade 3  At 10 months: 7.7% grade 1 0.9% grade 2 0.9% grade 3 | "hair loss" at 7, 10, and 13 months after chemotherapy; "objective" grade 1 = 1–25%, grade 2 = 26–50%, grade 3 = > 50% |

| Reference | Chemotherapy Regimen | Design | Random ized? | Median Follow-up | Outcome Assessment | Patients | Irreversible/ Permanent Alopecia Cases (n) | Cumulative Incidence (%) | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1 grade 3<br><br>At 13 months:<br>8 grade 1<br>1 grade 2<br>1 grade 3 | At 13 months:<br>6.9% grade 1<br>0.9% grade 2<br>0.9% grade 3 | |
| Watanabe 2019 | ACT, ACP, T, AC, P, ACTP, PT | Retrospective | No | 1–2 y | Self-report | 1,478 | 7 | 0.5% | no regrowth of scalp hair > 6 months after chemotherapy |

A: doxorubicin; C: cyclophosphamide; CTCAE: Common Terminology Criteria for Adverse Events; E: epirubicin; F: 5-fluorouracil; H: trastuzumab; M: methotrexate; P: paclitaxel; T: docetaxel; WHO: World Health Organization; X: capecitabine

## Summary of relevant published studies of docetaxel and irreversible or permanent alopecia

The earliest publication identified by my literature search was a single-arm outpatient trial of a scalp-cooling cap for prevention of docetaxel-induced alopecia (of any duration) in 98 cancer patients, including 88 with metastatic breast cancer, treated with intravenous docetaxel 100 mg/m$^2$ every three weeks (Lemenager et al. 1995, Lemenager et al. 1997). The other 10 patients were three women with advanced ovarian cancer, two women with advanced pancreatic cancer, and five men with advanced pancreatic cancer. All patients had failed one or more prior chemotherapy regimens that included epirubicin, mitoxantrone, vinorelbine, cisplatin, cyclophosphamide, or 5-fluorouracil (85.6% anthracycline-based, mostly epirubicin; regimens and doses not described). The authors noted that some patients had previously used a cold cap or experienced alopecia during their prior cancer treatment, but patients were excluded if they had current baldness or significant hair loss, scalp metastases, or prior radiation to the scalp. After a median follow-up of nine months after the end of treatment (range: 4–12 months), none of the patients (0/88 with breast cancer, 0%) developed grade 4 alopecia, which the authors described as "complete and irreversible" alopecia.

The second-earliest study was a phase III randomized controlled trial in Scandinavia comparing intravenous docetaxel 100 mg/m$^2$ every three weeks with sequential intravenous methotrexate 200 mg/m$^2$ and 5-fluorouracil 600 mg/m$^2$ on days 1 and 8 every three weeks for advanced breast cancer patients whose disease had progressed during or after first-line anthracycline treatment for advanced disease or relapsed within 12 months after discontinuation of adjuvant anthracycline therapy (Sjostrom et al. 1999). Along with an anthracycline, the previous chemotherapy regimen included 5-fluorouracil without methotrexate for 69.1% of the 282 patients, and 5-fluorouracil with methotrexate for 31.9% of patients. Prior treatment with multiple endocrine therapies (used as adjuvant therapy by 29.4% of patients and as therapy for advanced disease by 39.4% of patients) or radiotherapy by 39.4% of patients) or radiotherapy was allowed, but prior treatment with taxanes or more than one chemotherapy regimen was not. The incidence of alopecia related to prior therapy was not reported. Docetaxel treatment was preceded by oral dexamethasone or betamethasone, while oral leucovorin followed methotrexate administration. Salvage crossover treatment with the alternative therapy was considered if disease progression occurred; however, toxicity data were collected only up to discontinuation of the initial treatment. Any alopecia was observed in 95 patients (95/140, 67.9%) treated with docetaxel, and 49 patients (49/140, 35.0%) treated with methotrexate and 5-fluorouracil, a statistically significant difference (Fisher's exact p < 0.00001)[13]. Grade 4 alopecia classified according to the WHO toxicity criteria (where grade 4 corresponds to "nonreversible alopecia") was observed in three patients treated with docetaxel

---

[13]   Throughout this section of my report, I provide p values for a Fisher's exact test comparing the cumulative incidence of irreversible or permanent alopecia between treatment groups, where sufficient data are available.

(3/140, 2.1%), and one patient treated with methotrexate and 5-fluorouracil (1/140, 0.7%), a statistically nonsignificant difference (Fisher's exact p = 0.62).

A 2001 publication described a Canadian phase II, single-arm clinical trial of intravenous doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$, followed one hour later by intravenous docetaxel 75 mg/m$^2$, administered to 54 patients with anthracycline-naïve, metastatic breast cancer for a maximum of eight three-week cycles as first-line chemotherapy (Nabholtz et al. 2001). Prior adjuvant or neoadjuvant non-anthracycline-containing chemotherapy, but not prior treatment with taxoids, was permitted if more than one year before the study, and prior radiation therapy was permitted at sites other than those used to assess treatment response (e.g., breast). Hormonal therapy was allowed as adjuvant treatment or for metastatic disease if the patient had progressive disease at study entry. Eligible patients were required to have "fully recovered from any toxic effects of previous antitumor therapy." As a single-arm clinical trial, this study did not include a comparison treatment arm. Alopecia was noted in 47 patients (47/54, 87.0%), all classified as CTC grades 1−2. Four patients (4/54, 7.4%) were described as experiencing "long-lasting (longer than 2 years) partial alopecia."

Another 2001 publication reported results from a phase II, single-arm clinical trial in Austria that was conducted to evaluate intravenous docetaxel 100 mg/m$^2$ administered every three weeks for a median of six cycles (range: two to ten cycles) to 93 metastatic breast cancer patients who had progressed during or relapsed following at least one prior chemotherapy regimen, one of which was required to have included an anthracycline (Schmidinger et al. 2001). Other prior chemotherapies included cyclophosphamide/methotrexate/5-fluorouracil, cisplatin, vinca alkaloids, gemcitabine, and mitomycin C. All patients were pre-medicated with dexamethasone, and granulocyte colony-stimulating factor was given to 36 patients at the physician's discretion. Alopecia was described as the "most common side effect" (89/93, 95.7%), and one patient (1/93, 1.1%) was characterized as having "irreversible" alopecia (classified as grade 4 using the WHO toxicity criteria).

Another phase II, single-arm clinical trial evaluated neoadjuvant intravenous docetaxel 100 mg/m$^2$ administered every three weeks for six cycles to 88 patients in France with stages II−III primary operable breast cancer (Amat et al. 2003). Oral methylprednisolone was administered before and after each cycle of neoadjuvant docetaxel. Patients were required to have had no prior specific treatment for their disease. Following surgery and radiotherapy, if significant residual disease remained, adjuvant chemotherapy with 5-fluorouracil and vinorelbine or epirubicin and cyclophosphamide was administered at the clinician's discretion (received by 48.7% of patients), and tamoxifen could be provided to postmenopausal patients with estrogen-receptor-positive tumors (received by 44.7% of patients). Alopecia was noted as a toxicity of neoadjuvant docetaxel treatment in 64 patients (64/88, 72.7%), including four patients (4/88, 4.5%) who had nonreversible alopecia (classified as WHO grade 4) of unspecified duration.

As reported in a conference abstract presented at the annual San Antonio Breast Cancer Symposium in 2006, a retrospective review was conducted of consecutive breast cancer patients (stage(s) not specified) treated by the author in Denver, Colorado, over an 11-year period from 1994 (predating the initial FDA approval of docetaxel in 1996[14]) through 2004 (Sedlacek 2006). The analysis included patients with at least one year of follow-up after adjuvant chemotherapy with one of three broadly defined regimens: a doxorubicin regimen without a taxane (i.e., doxorubicin and cyclophosphamide; doxorubicin, cyclophosphamide, and 5-fluorouracil; or doxorubicin followed by cyclophosphamide, methotrexate, and 5-fluorouracil); a regimen with doxorubicin plus paclitaxel (i.e., doxorubicin and cyclophosphamide followed by paclitaxel; doxorubicin and paclitaxel plus paclitaxel; doxorubicin and cyclophosphamide followed by dose-dense paclitaxel; doxorubicin, paclitaxel, and cyclophosphamide; or doxorubicin and cyclophosphamide followed by paclitaxel and trastuzumab); or a regimen with doxorubicin plus docetaxel (i.e., doxorubicin and cyclophosphamide followed by docetaxel; doxorubicin and docetaxel; doxorubicin, cyclophosphamide, and docetaxel; doxorubicin and cyclophosphamide followed by docetaxel and capecitabine; doxorubicin and cyclophosphamide followed by docetaxel and trastuzumab; doxorubicin and docetaxel followed by cyclophosphamide, doxorubicin, and 5-fluorouracil; or cyclophosphamide, doxorubicin, and 5-fluorouracil followed by docetaxel). Treatment regimens were not described as having been randomly assigned; the author did not explain the bases for assigning patients to a given treatment, or the contexts in which patients were treated (e.g., within a clinical trial or not, potentially resulting in differences in data collection methods). No information was given on any concomitant medication use, which is often restricted in clinical trials (McGahey and Weiss 2017), but less so outside of the trial setting. "Persistent significant alopecia," which the author defined as "hair regrowth less than 50% of the pre-chemotherapy amount of hair as judged by both the patient and the author," was not observed in any of the patients treated with a doxorubicin regimen without a taxane (0/258, 0%) or with a doxorubicin plus paclitaxel regimen (0/126, 0%), whereas it was observed in seven women who received a regimen with doxorubicin plus docetaxel (7/112, 6.3%) (Fisher's exact p = 0.0002 for doxorubicin plus docetaxel versus doxorubicin without taxane; p = 0.0046 versus doxorubicin plus paclitaxel). "Persistent alopecia" with 50% or greater hair regrowth was not described. The author stated that most of these patients "would describe their hair as male pattern baldness and are wearing wigs," and added that there was a "small but significant possibility of poor hair regrowth lasting up to 7 years." All seven of the patients with "persistent significant alopecia" had received doxorubicin 60 mg/m$^2$ and cyclophosphamide 600 mg/m$^2$ every three weeks for four cycles, followed by docetaxel 100 mg/m$^2$ every three weeks. Doses used in nondocetaxel regimens were not specified.

The next available study, published in 2009, was a phase III randomized controlled trial based in South Korea that compared six versus four tri-weekly cycles of neoadjuvant chemotherapy with

---

[14]   https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020449s080s082lbl.pdf

epirubicin 75 mg/m$^2$ plus docetaxel 75 mg/m$^3$, premedicated with dexamethasone, among 150 chemotherapy-naïve patients diagnosed with stages II−III breast cancer featuring tumors larger than 3 cm (Han et al. 2009). Prophylactic use of granulocyte colony-stimulating factor was prohibited. All patients underwent curative surgery within 30 days after the completion of neoadjuvant chemotherapy, and two additional cycles of postoperative (adjuvant) chemotherapy were administered to patients in the four-cycle neoadjuvant chemotherapy arm whose primary tumor responded to initial treatment. If indicated, radiotherapy began within four weeks after the last cycles of postoperative chemotherapy, and postoperative tamoxifen was provided to women with hormone-receptor-positive tumors. As reported by the authors, "Reversible alopecia was observed in all patients" (nonreversible alopecia: 0/66 (0%) treated with four cycles, 0/84 (0%) treated with six cycles). The authors did not specify the maximum duration of follow-up for toxicity.

A conference abstract presented at the annual San Antonio Breast Cancer Symposium in 2013 described a retrospective analysis based at a single cancer center in Lille, France, where 79 early breast cancer patients had been treated five years earlier with neoadjuvant or adjuvant 5-fluorouracil, epirubicin, and cyclophosphamide, followed by docetaxel (doses not specified), along with scalp cooling during chemotherapy (Bertrand et al. 2013). No information was given on whether all patients who received such treatment at the study center were included, or whether unspecified criteria were applied to select an eligible subset. The distribution of neoadjuvant treatment, adjuvant treatment, or both was not provided. The authors also did not indicate whether any patients were treated in the context of a clinical trial, or whether any concomitant medications were used. Based on a clinical examination and analysis of scalp photograph by two physicians, 32.9% of patients (26/79) were determined to have "permanent chemotherapy-induced alopecia," including 26.6% (21/79) with minimal alopecia, 2.5% (2/79) with moderate alopecia, and 3.8% (3/79) with severe alopecia (grades not further described). In a multivariate analysis, only menopause (but not age) was identified as a significant risk factor for developing alopecia.

A conference abstract presented at the 2014 annual meeting of the American Society of Clinical Oncology summarized the results of a retrospective survey-based study of breast cancer patients in France treated in 2008−2009 with adjuvant 5-fluorouracil, epirubicin, and cyclophosphamide, followed by docetaxel 100 mg/m$^2$ (Bourgeois et al. 2014). Whether any patients were treated in the context of a clinical trial was not stated, and any concomitant medication use was not described. A self-administered survey was distributed to 829 patients and completed by 653, with the remaining 176 patients assumed by the authors not to have "persisting alopecia." The bases for selecting the 829 patients who received the questionnaire were not given. According to the survey results, at six months after the last course of docetaxel, 32.7% of patients (271/829) had grade 1 "persisting alopecia," defined as up to 50% hair loss, and 8.6% (71/829) had grade 2 "persisting alopecia," defined as more than 50% hair loss. At the time of the survey in 2012, a

median of 3.7 years after treatment, 29.9% of patients (248/829) still reported grade 1 "persisting alopecia" and 3.5% (29/829) still reported grade 2 "persisting alopecia."

Another conference abstract presented at the San Antonio Breast Cancer Symposium in 2015, as well as a 2014 National Cancer Research Institute Cancer Conference in the U.K., reported results from a questionnaire mailed to patients who had received neoadjuvant or adjuvant docetaxel for early breast cancer at a single regional cancer center in Wirral, U.K. approximately 34 months up to 3.5 years earlier (Thorp et al. 2014, 2015). The authors did not state whether the questionnaire was sent to all docetaxel-treated patients at the center during this time frame, or whether a subset was selected based on unspecified criteria. Chemotherapy regimens (i.e., any other anticancer agents used in combination with docetaxel), doses, and treatment contexts were not described. Of 189 questionnaires mailed, 134 were returned and 133 (70.4%) reported information on scalp hair loss. Of the participants, 15.8% (21/133) reported "significant scalp hair loss" (not further described); 74.4% (99/133) reported "no significant scalp hair loss," and the other 9.8% (13/133) "gave equivocal responses." Questionnaire results also showed that 16 patients (11.9% of 134) reported using products such as wigs and hair extensions, five (3.7%) reported no regrowth of eyebrows, two (1.5%) reported no regrowth of eyelashes, six (4.5%) reported no regrowth of nostril hair, and 14 (10.4%) reported no regrowth of hair on other body parts such as legs. The majority (85.1%) of patients reported that they were taking adjuvant hormonal therapy, including anastrazole (19.4%), letrozole (10.4%), or tamoxifen (55.2%). No significant associations were observed between "other patient and treatment characteristics" (e.g., adjuvant endocrine therapy or menopausal status) and hair loss (outcome not specified).

In 2015, results were published from a phase III randomized controlled trial in Spain that compared four cycles of epirubicin 90 mg/m$^2$ and cyclophosphamide 600 mg/m$^2$ followed by four cycles of docetaxel 100 mg/m$^2$ (n = 667 patients) versus epirubicin 90 mg/m$^2$ and docetaxel 75 mg/m$^2$ followed by capecitabine 1,250 mg/m$^2$ twice daily on days 1 and 14 for four cycles (n = 711 patients), all administered on three-week cycles as adjuvant chemotherapy for patients with node-positive early breast cancer (Martin et al. 2015). After chemotherapy, all patients with hormone-receptor-positive tumors received five years of tamoxifen (44.1%) or an aromatase inhibitor (26.8%), or both in sequence if postmenopausal (12.2%). In addition, 3.0% of patients received adjuvant trastuzumab for human epidermal growth factor receptor 2 (HER2)-positive disease, before the study protocol was amended to exclude such patients. Patients were ineligible if they had previous or concomitant systemic or radiation therapy for breast cancer, previous anthracyclines or taxanes for any malignancy, chronic therapy with corticosteroids, or any other serious concomitant disorder, among other criteria. Post-chemotherapy radiotherapy was mandatory for patients with lumpectomy and guideline-specific for those with mastectomy. An optional 15-item alopecia questionnaire addressing hair loss type, grade, recovery time, recovery level, and duration of wig use was completed

retrospectively by 360 patients (26.1% of the 1,378 patients available for toxicity assessment) within one to two years after cessation of chemotherapy. Among the latter patients, "incomplete scalp hair recovery" was reported by 29.7% of patients (33/111) treated with epirubicin and cyclophosphamide plus docetaxel, a proportion statistically significantly higher than the 14.1% of patients (35/249) treated with epirubicin and docetaxel (Fisher's exact p = 0.0007). Patients in the former group wore wigs for an average of 8.35 months compared with 6.03 months in the latter group (p < 0.001), and five patients in the former group wore a wig permanently after therapy (5/111, 4.5%), apparently compared with none in the latter group (0/249, 0%) (Fisher's exact p = 0.0026). The authors interpreted the adverse event of "persistent partial or total alopecia" as being "probably related to docetaxel" and seemingly dose-dependent (Martin et al. 2015).

An abstract presented in 2017 at two conferences, including the annual meetings of the American Society of Clinical Oncology and the European Society for Medical Oncology, described a retrospective telephone survey of 295 early breast cancer patients who had been treated more than one year earlier in clinical trials (not specified as randomized controlled trials or another design) involving adjuvant or neoadjuvant anthracyclines and/or taxanes (Crown et al. 2017a, Crown et al. 2017b). Chemotherapy regimens were not described, and the bases for treatment assignment (including randomization, if applicable) were not explained. Any concomitant medication use was not discussed. The authors did not state whether all trial participants or only a selected subset were eligible for the telephone survey, and they did not provide the survey participation rate. The frequencies of grade 1 ("mild") and grade 2 ("severe/total") "permanent alopecia" for all patients treated with docetaxel were 11.9% (31/260) and 3.1% (8/260), respectively, including 18.7% (14/75) and 5.3% (4/75), respectively, for those who also received an anthracycline, and 8.1% (15/185) and 4.9% (9/185), respectively, for those who did not receive an anthracycline. In the latter group, the frequencies of grades 1 and 2 "permanent alopecia" were reported as 6.7% (6/90) and 0% (0/90), respectively, for those treated with docetaxel at a dose of 300 mg/m$^2$, and 13.7% (13/95) and 5.3% (5/95), respectively, for those treated with docetaxel at a dose of 450 mg/m$^2$ (Fisher's exact p = 0.02 for difference in grades 1–2 "permanent alopecia" by docetaxel dose[15]). Furthermore, in the latter group that received the higher dose of docetaxel, the frequency of "permanent alopecia" (grade not specified) was 21.8% (12/55) for those who also received carboplatin and 15.0%[16] (6/40) for those who also received cyclophosphamide (Fisher's exact p = 0.44). Among patients who were

---

[15]   The numbers of patients with grades 1 and 2 "permanent alopecia" stratified by docetaxel dose without anthracycline (i.e., n = 6 and 0, respectively for 300 mg/m$^2$ docetaxel, and n = 13 and 5, respectively, for 450 mg/m$^2$ docetaxel) do not sum correctly to the numbers for docetaxel without anthracycline overall (i.e., n = 15 and 9, respectively). The numbers of patients with grades 1 and 2 "permanent alopecia" stratified by anthracycline treatment with docetaxel (i.e., n = 15 and 9, respectively, without anthracycline and n = 14 and 4, respectively, with anthracycline) do not sum correctly to the numbers for docetaxel overall (i.e., n = 31 and 8, respectively).

[16]   The authors reported that this frequency was 16%, but 6 of 40 = 15.0% and 7 of 40 = 17.5%.

treated with paclitaxel and an anthracycline, the frequencies of grades 1 and 2 "permanent alopecia" were 4.3% (1/23) and 8.7% (2/23), respectively (Fisher's exact p = 0.76 for difference in grades 1–2 "permanent alopecia" versus 450 mg/m$^2$ docetaxel without anthracycline), and for those who received an anthracycline without either docetaxel or paclitaxel, they were 0% (1/12) and 8.3% (1/12), respectively (Fisher's exact p = 0.69 for difference in grades 1–2 "permanent alopecia" versus 450 mg/m$^2$ docetaxel without anthracycline). Differences in the cumulative incidence of grades 1–2 "permanent alopecia" in comparison with either dose of docetaxel without an anthracycline (23.8%; 44/185) also were statistically nonsignificant for paclitaxel plus anthracycline (Fisher's exact p = 0.30) and for anthracycline without docetaxel or paclitaxel (Fisher's exact p = 0.30). Doses of nondocetaxel agents were not provided.

In 2017, a retrospective survey study was published from South Korea, where a questionnaire about alopecia was completed by 265 stages I–III (58.1% stage II) breast cancer patients (59% of 449 eligible patients) who had been treated in a neoadjuvant or adjuvant setting with four cycles of doxorubicin 60 mg/m$^2$ and cyclophosphamide 600 mg/m$^2$; four cycles of doxorubicin 60 mg/m$^2$ and cyclophosphamide 600 mg/m$^2$ followed by four cycles of docetaxel 75 mg/m$^2$; four cycles of doxorubicin 60 mg/m$^2$ and cyclophosphamide 600 mg/m$^2$ followed by 12 weekly cycles of paclitaxel 80 mg/m$^2$; six cycles of doxorubicin 50 mg/m$^2$, cyclophosphamide 500 mg/m$^2$, and docetaxel 75 mg/m$^2$; or six cycles of doxorubicin 50 mg/m$^2$ plus docetaxel 75 mg/m$^2$ (Kim et al. 2017). The survey participation rate was 61.3% (265/432, excluding 17 ineligible patients). Concomitant treatments included hormonal therapy (78.1%, including 51.7% tamoxifen, 25.3%, aromatase inhibitors, and 1.1% others), trastuzumab (18.1%), and gonadotropin-releasing hormone agonists (5.7%). A past personal history of alopecia was reported by 9.4% of participants, and 4.2% reported a family history of alopecia. No information was provided on treatment setting, bases for treatment assignment, or patient selection criteria, if any, for survey distribution. The authors compared two broad treatment groups: doxorubicin and cyclophosphamide with or without taxane. The main survey-reported outcome of interest was "chemotherapy-induced irreversible alopecia," which was defined as "consistent absence of hair at least 6 months since the end of the chemotherapy." This condition was reported by 25.9% of women treated with doxorubicin and cyclophosphamide alone (29/112) and 60.8% of those additionally treated with docetaxel or paclitaxel (93/153) (Fisher's exact p < 0.00001). This form of outcome was reported as "mild," corresponding to ≤ 50% hair loss, by 23.2% of women who received doxorubicin and cyclophosphamide alone (26/112) and as "severe" (> 50% hair loss) by 2.7% of women in this treatment group (3/112). Among women who additional received docetaxel or paclitaxel, the cumulative incidence of "mild chemotherapy-induced irreversible alopecia" was 50.3% (77/153) (Fisher's exact p < 0.00001), and that of "severe" grade was 10.5% (16/153) (Fisher's exact p = 0.0159). After controlling for age at chemotherapy, disease stage, and receipt of endocrine treatment, chemotherapy regimen remained statistically significantly associated with "chemotherapy-induced irreversible

alopecia" (odds ratio for doxorubicin and cyclophosphamide with taxane v. without = 4.753, 95% confidence interval = 2.292−9.857, p < 0.001).

In a 2018 abstract presented at the American Society of Clinical Oncology annual meeting, Crown et al. (2018) described a retrospective analysis of 368 early breast cancer patients treated with adjuvant or neoadjuvant docetaxel-containing nonanthracycline regimens at least one year earlier. (This patient population may overlap partially with that described in the earlier abstracts from this group (Crown et al. 2017a, Crown et al. 2017b).) Some patients were treated in clinical trials of unspecified design, and others were treated according to the standard of care at the authors' single academic institution; no information was provided on how treatment decisions were made in either setting. Adjuvant endocrine therapy was given to 85% of patients, but other concomitant drugs, if any, were not described. The authors stated that clinical trial patients were "contacted directly" to assess their hair loss, while non-trial patients were "assessed during clinic visits." It is unclear how trial participants were contacted (e.g., by phone or in person), and how assessments were made during clinic visits (e.g., by self-report or by clinical examination). Participation rates were not reported. The outcome of interest, "long-term hair loss," was graded according to the NCI CTCAE (version not specified). After a median of more than 5 years of follow-up, the cumulative incidence of "long-term hair loss" was 15.0% (17/140, 12.1% grade 1; 4/140, 2.9% grade 2) among patients who received four cycles of docetaxel 75 mg/m$^2$ and cyclophosphamide 600 mg/m$^2$ every three weeks; 37.5% (26/96, 27.1% grade 1; 10/96, 10.4% grade 2) among patients who received six of these cycles (Fisher's exact p = 0.006 for grade 1, p = 0.02 for grade 2, p = 0.0001 for grades 1–2 vs. four cycles); and 31.1% (31/132, 23.5% grade 1; 10/132, 7.6% grade 2) among patients who received six cycles of docetaxel 75 mg/m$^2$, carboplatin area under the concentration-time curve 6, and trastuzumab every three weeks (Fisher's exact p = 0.54 for grade 1, p = 0.48 for grade 2, p = 0.32 for grades 1–2 vs. six cycles of docetaxel and cyclophosphamide). The authors reported that receipt of endocrine therapy or companion drugs (cyclophosphamide or carboplatin) "did not correlate" with "long-term hair loss" (Crown et al. 2018).

Another abstract presented at the same 2018 American Society for Clinical Oncology annual meeting described a retrospective study of early breast patients who had received adjuvant chemotherapy with docetaxel- or paclitaxel-containing regimens in 2010–2015 (Lim et al. 2018). Chemotherapy regimens and doses, treatment contexts, and use of concomitant medications were not described, other than a mention of aromatase inhibitor treatment in an unspecified proportion of patients. Of 210 patients who were mailed the study questionnaires, 88 (41.9%) participated. Time since completion of treatment was not reported, nor did the authors describe how the outcome of "long-term alopecia" (also referred to as "chronic alopecia") was defined. Of the 38 patients who were treated with docetaxel-containing regimens, 25 (65.8%) reported an effect of hair loss on quality of life (that is, 34.2% reported "no effect at all" on quality of life); of the 50 patients who received paclitaxel-containing

regimens, 21 (42.0%) reported an effect of hair loss on quality of life (Fisher's exact p-value = 0.03). The authors added that they found "no association with aromatase inhibitor exposure," but the outcome(s) at issue were not specified (Lim et al. 2018).

A 2018 Spanish retrospective study involved stages I−III breast cancer patients who were interviewed and "explored" one and a half to five years after having received neoadjuvant or adjuvant anthracycline or taxane chemotherapy with or without endocrine adjuvant therapy and/or trastuzumab, or adjuvant endocrine aromatase therapy alone without chemotherapy (Martin et al. 2018b, a). Eligible patients were required to have no evidence of disease recurrence. Patient enrollment was described as consecutive at the primary study institution, but not at the other two study institutions, where unspecified selection criteria may have been applied. Patients at the primary study institution were seen at outpatient clinics, presumably outside of clinical trials, but the treatment setting was not specified for patients at the other institutions. Participation rates were not reported. Among 492 patients at the primary study institution, "persistent alopecia" at least 18 months after the end of adjuvant chemotherapy was classified according to the CTCAE as grade 1 ("weakening of hair or partial alopecia and not leading to the use of a wig") or grade 2 ("complete alopecia that requires a wig"). The cumulative incidence of "persistent alopecia" by chemotherapy regimen was as follows: six cycles of 5-fluorouracil/doxorubicin/cyclophosphamide, 5-fluorouracil/epirubicin/cyclophosphamide, doxorubicin/cyclophosphamide, or epirubicin/cyclophosphamide (~19/148, ~12.8% grade 1; 0 grade 2); four cycles of one of these combinations, followed by eight to twelve cycles of weekly paclitaxel (~5/29, ~17.2% grade 1; 0 grade 2); four cycles of epirubicin 90 mg/m$^2$ and docetaxel 75 mg/m$^2$, followed by four cycles of capecitabine (~4/31, ~12.9% grade 1; 0 grade 2); six cycles of docetaxel/doxorubicin/cyclophosphamide (~33/74, ~44.6% grade 1; ~3/74, ~4.1% grade 2); four cycles of doxorubicin/epirubicin with or without cyclophosphamide, followed by four cycles of docetaxel 100 mg/m$^2$ with or without trastuzumab (~25/66, ~37.9% grade 1; ~9/66, ~13.6% grade 2); tamoxifen without prior adjuvant chemotherapy (0/57, 0% grade 1 or grade 2); or aromatase inhibitors without prior adjuvant chemotherapy (~3/87, ~3.4% grade 1; 0 grade 2). Across all three participating study institutions, with a median follow-up of 43 months after the conclusion of chemotherapy, 10.1% of patients who received chemotherapy regimens with a cumulative docetaxel dose of ≥ 400 mg/m$^2$ (36/358) developed grade 2 "persistent alopecia," with no appreciable difference between the 61.7% who also received hormonal therapy (22/221, 10.0%) and the 38.2% who did not (14/137, 10.2%). Receipt of trastuzumab (prevalence not specified) also reportedly did not affect the incidence of "persistent alopecia." No patients who received a cumulative docetaxel dose < 300 mg/m$^2$ (0/59) or chemotherapy not containing docetaxel (0/306) developed grade 2 "persistent alopecia" (Fisher's exact p = 0.0049 for higher versus lower docetaxel dose; p < 0.00001 for higher docetaxel dose versus no docetaxel).

In a 2019 prospective observational clinical cohort study set in South Korea, 61 patients with postoperative stages I−III breast cancer expected to receive adjuvant chemotherapy were assessed for alopecia before, during, and up to three years after chemotherapy using a Folliscope to measure hair density and mean hair shaft diameter (Kang et al. 2019). The available combination chemotherapeutic regimens were doxorubicin plus cyclophosphamide, fluorouracil plus cyclophosphamide and doxorubicin, and doxorubicin plus cyclophosphamide and docetaxel. In addition, 70.5% of patients received hormone therapy with tamoxifen (50.8%) or an aromatase inhibitor (19.7%). The authors did not describe the bases for treatment assignment, which was not randomized. Patients with existing alopecia, atopic dermatitis, psoriasis, or infectious diseases, or concomitant use of steroids, antihistamines, antidepressants, or anticonvulsants were excluded. The outcome of interest, "permanent chemotherapy-induced alopecia," was defined as absent or incomplete hair regrowth at six or more months after chemotherapy, where "incomplete" hair regrowth constituted hair density or thickness two standard deviations or more below the mean prior to chemotherapy. The cumulative incidence of "permanent chemotherapy-induced alopecia" based on Folliscope measurements was 39.3% (reported by the authors as 39.5%; 24/61) at six months and 42.3% (22/52) at three years; these results were not reported separately by treatment regimen. Adjusting for age and hair density and thickness at diagnosis, receipt of taxane chemotherapy was statistically significantly associated with a higher cumulative incidence of "permanent chemotherapy-induced alopecia" at three years (odds ratio = 8.01, 95% confidence interval = 1.20−53.26), and the association was nonsignificantly positive at six months (odds ratio = 6.82, 95% confidence interval = 0.91−51.06). Hormone therapy was not significantly associated with this outcome at six months or three years (odds ratios = 8.52 and 3.81, respectively), nor was targeted therapy. At three years, the cumulative incidence of self-reported hair loss that had not recovered to its pre-chemotherapy level (characterized by the authors as "subjective permanent chemotherapy-induced alopecia") was 66.0% (reported by the authors as 62.5%; 35/53).

At the 2019 San Antonio Breast Cancer Symposium, an abstract and poster described a prospective study of 122 Japanese breast cancer patients who underwent scalp cooling 30 minutes prior to and during and 90 minutes after each infusion with neoadjuvant or adjuvant chemotherapy with anthracyclines and/or taxanes (Ohsumi et al. 2019). Treatment regimens were four cycles of docetaxel and cyclophosphamide (n = 84), four cycles of doxorubicin or epirubicin and cyclophosphamide followed by four cycles of unspecified taxane (n = 34), four cycles of epirubicin and cyclophosphamide (n = 1), four or six cycles of docetaxel (n = 2), or four cycles of docetaxel and carboplatin followed by four cycles of trastuzumab emtansine (n = 1) (doses not specified). Bases for treatment assignment, study eligibility criteria, participation rates, and concomitant medications were not described. Two investigators graded the percentage of hair loss based on photographs taken at one, four, seven, 10, and 13 months after completion of chemotherapy (grade 0 = 0% hair loss; grade 1 = 1–25%; grade 2 = 26–50%; grade 3 = > 50%). Patients also self-reported their use of a wig or a hat to conceal hair loss. At seven

months, the cumulative incidence of hair loss was 15/116 (12.9%) grade 1, 1/116 (0.9%) grade 2, and 0.9% grade 3. At 10 months, the cumulative incidence was 9/117 (7.7%) grade 1, 1/117 (0.9%) grade 2, and 0.9% grade 3; and the respective values at 13 months were 8/116 (6.9%) grade 1, 1/116 (0.9%) grade 2, and 0.9% grade 3. The proportion of patients with hair loss was statistically significantly higher for patients who did not complete the scalp cooling than patients who did (10/40, 25.0% vs. 7/66, 9.2% at seven months; 9/41, 22.0% vs. 2/76, 2.6% at 10 months; 8/39, 20.5% vs. 2/77, 2.6% at 13 months).

Finally, a retrospective survey-based study was conducted to evaluate self-reported hair loss in 1,478 breast cancer patients (79.8% of 1,853 eligible patients; stage(s) not specified) who were disease-free after having completed adjuvant chemotherapy with anthracycline and/or taxanes within the previous five years at 47 hospitals and clinics in Japan (Watanabe et al. 2019). The authors did not state whether any patients were treated in a clinical trial setting. Reported chemotherapy regimens, for which doses were unspecified, were anthracycline, cyclophosphamide, and docetaxel (38.4%); anthracycline, cyclophosphamide, and paclitaxel (24.2%); docetaxel (19.0%); anthracycline and cyclophosphamide (16.3%); paclitaxel (1.2%); anthracycline, cyclophosphamide, docetaxel, and paclitaxel (0.8%); and paclitaxel and docetaxel (0.1%); thus, 58.3% of participants reported having been treated with docetaxel. Use of post-chemotherapy hormone therapy was reported by 68.7% of subjects; regimens included aromatase inhibitors (33.4%); selective estrogen receptor modulators (23.5%); luteinizing hormone-releasing hormone agonists and selective estrogen receptor modulators (7.6%); selective estrogen receptor modulators and aromatase inhibitors (3.4%); luteinizing hormone-releasing hormone agonists (0.6%); all three (0.1%); and luteinizing hormone-releasing hormone agonists and aromatase inhibitors (0.1%). Of 1,476 patients who provided answers about scalp hair loss, 1,474 (99.9%) reported having experienced some degree of hair loss. Of 1,470 patients who provided answers about scalp hair regrowth, 31 (2.1%) reported that regrowth did not occur; seven of these patients (7/1,470, 0.5%) reported that scalp hair regrowth did not occur after more than six months following the completion of chemotherapy.

## Methodological limitations of relevant published studies

The studies described above have major limitations that preclude reliable evaluation of potential causal effects or estimation of the cumulative incidence of irreversible or permanent alopecia in breast cancer patients treated with docetaxel-containing regimens. First, only one of the 19 studies was a randomized controlled trial that compared a docetaxel-based chemotherapy regimen with a nondocetaxel regimen (Sjostrom et al. 1999) (Table 1). This study found no statistically significant difference in the cumulative incidence of nonreversible alopecia between 140 advanced breast cancer patients randomized to docetaxel and 140 patients randomized to methotrexate and 5-fluorouracil after failure of a prior anthracycline-containing chemotherapeutic regimen. The other two randomized controlled trials used docetaxel in both

treatment arms (Han et al. 2009, Martin et al. 2015). One study compared four versus six cycles of epirubicin and docetaxel in 66 and 84 patients, respectively, with stages II−III breast cancer and found no occurrences of nonreversible alopecia in either group (Han et al. 2009). The other described retrospective findings in a selected subset of 26% of clinical trial participants who completed a questionnaire about alopecia (Martin et al. 2015). In the latter study, the advantages of treatment randomization were nullified by the reliance on a voluntary questionnaire completed by a minority of participants who were unlikely to be representative of all patients in the clinical trial; thus, selection bias and confounding were almost certainly introduced in the retrospective analysis.

The remaining studies included four single-arm clinical trials that lacked any comparison group, thereby precluding hypothesis testing of a potential causal effect of docetaxel (Lemenager et al. 1995, Lemenager et al. 1997, Nabholtz et al. 2001, Schmidinger et al. 2001, Amat et al. 2003); ten retrospective studies (Sedlacek 2006, Bertrand et al. 2013, Bourgeois et al. 2014, Thorp et al. 2014, 2015, Crown et al. 2017a, Crown et al. 2017b, Kim et al. 2017, Crown et al. 2018, Lim et al. 2018, Martin et al. 2018b, a, Watanabe et al. 2019); and two prospective observational cohort studies (Kang et al. 2019, Ohsumi et al. 2019) that were all highly susceptible to selection bias and confounding due to the lack of randomized treatment assignment, thereby undermining the validity of estimated associations between treatment type and irreversible or permanent alopecia.

Second, ten studies relied at least in part on self-reported information on irreversible or permanent alopecia (Bourgeois et al. 2014, Thorp et al. 2014, Martin et al. 2015, Thorp et al. 2015, Crown et al. 2017a, Crown et al. 2017b, Kim et al. 2017, Crown et al. 2018, Lim et al. 2018, Martin et al. 2018b, a, Kang et al. 2019, Watanabe et al. 2019) (Table 1). Self-reported health outcome data are prone to error and even systematic bias based on respondents' awareness of their treatment history and beliefs about potential adverse effects (Moffatt et al. 2000). Unfortunately, the three studies that ascertained both self-reported and clinically assessed information on alopecia did not compare the two sources to determine the validity and reliability of self-reported information (Martin et al. 2018b, Kang et al. 2019, Ohsumi et al. 2019). Self-reported male-pattern androgenetic alopecia has been shown to be only modestly accurate (Taylor et al. 2004, Littman and White 2005), but these results may not be generalizable to chemotherapy-related alopecia in women, for whom validation data are lacking.

Third, eleven studies were retrospective in design, meaning that eligible patients were identified and their data were assembled for analysis in hindsight, after the patients had already undergone chemotherapy and, potentially, developed alopecia (Sedlacek 2006, Bertrand et al. 2013, Bourgeois et al. 2014, Thorp et al. 2014, Martin et al. 2015, Thorp et al. 2015, Crown et al. 2017a, Crown et al. 2017b, Kim et al. 2017, Crown et al. 2018, Lim et al. 2018, Martin et al. 2018b, a, Watanabe et al. 2019). Prospective data collection, which is initiated at a set time

point, uses a protocol developed in advance for the explicit purpose of the study. Consequently, the prospective study design enables a clear definition of the eligible study population; ensures that all eligible patients can be included, thereby minimizing the risk of selection bias due to exclusion of certain patients, such as those with incomplete data; and allows relevant data to be collected uniformly for all patients throughout the study period. In contrast with prospective studies, retrospective studies are more prone to bias from systematic differences in patient selection criteria, data collection methods, and data quality and completeness. Therefore, in general, prospective studies are considered to be of higher quality than retrospective studies, and more likely to yield valid results for answering a range of clinical research questions (North American Spine Society 2005).

Fourth, nine studies combined various chemotherapeutic regimens for analysis (Sedlacek 2006, Thorp et al. 2014, 2015, Crown et al. 2017a, Crown et al. 2017b, Kim et al. 2017, Lim et al. 2018, Martin et al. 2018b, a, Kang et al. 2019, Ohsumi et al. 2019, Watanabe et al. 2019), in some instances including regimens that contained docetaxel or other taxanes (Kim et al. 2017, Kang et al. 2019, Ohsumi et al. 2019, Watanabe et al. 2019). The aggregation of different treatment regimens precludes causal attribution of irreversible or permanent alopecia to an effect of docetaxel per se, as opposed to other anticancer therapies (Saggar et al. 2013, Dunnill et al. 2018).

Fifth, eleven studies reported that some patients were also treated with hormonal therapy (Sjostrom et al. 1999, Nabholtz et al. 2001, Han et al. 2009, Thorp et al. 2014, Martin et al. 2015, Thorp et al. 2015, Kim et al. 2017, Crown et al. 2018, Lim et al. 2018, Martin et al. 2018b, a, Kang et al. 2019, Watanabe et al. 2019), which can cause alopecia (Saggar et al. 2013, Freites-Martinez et al. 2019b). Most of the remaining studies did not exclude the possibility of coexisting treatment with hormonal therapy, and nearly all studies omitted information on concomitant use of other medications that may cause alopecia. Although some studies found that hormonal therapy was not associated with the occurrence of irreversible or permanent alopecia (Thorp et al. 2014, 2015, Crown et al. 2018, Lim et al. 2018, Martin et al. 2018b, a, Kang et al. 2019), one study found that risk of "chemotherapy-induced irreversible alopecia" was significantly increased in association with hormonal therapy in univariate (but not multivariate) analysis (Kim et al. 2017), and most studies lacked results related to this association. Again, the use of concomitant hormonal therapies and certain other medications prevents causal attribution of irreversible or permanent alopecia to any particular treatment. Because breast cancer patients with hormone-receptor-positive tumors often continue on long-term adjuvant hormone therapy for at least 5–10 years (Carlson et al. 2006), current or recent use of hormonal therapy may cause contemporaneous alopecia that is misclassified as an irreversible or permanent effect of earlier chemotherapy.

Sixth, eight studies followed patients for a median duration of less than three years after chemotherapy (Lemenager et al. 1995, Lemenager et al. 1997, Sjostrom et al. 1999, Nabholtz et al. 2001, Schmidinger et al. 2001, Amat et al. 2003, Martin et al. 2015, Ohsumi et al. 2019, Watanabe et al. 2019), and only two (Bertrand et al. 2013, Crown et al. 2018) had median or mean follow-up longer than four years (Table 1). Short follow-up could distort cumulative incidence estimates by providing insufficient time for patients to develop and report irreversible or permanent alopecia, as well as insufficient time for existing alopecia to resolve. This problem is especially pronounced for studies that included metastatic breast cancer patients (Lemenager et al. 1995, Lemenager et al. 1997, Sjostrom et al. 1999, Nabholtz et al. 2001, Schmidinger et al. 2001), whose expected five-year relative survival is 27% (American Cancer Society 2019).

Seventh, most studies provided limited information on the definition of irreversible or permanent alopecia, and those that offered more detail generally used varying definitions. Conference abstracts, which are substantially shorter than full-length research articles, had especially sparse information on study methods, including the classification of irreversible or permanent alopecia (Sedlacek 2006, Bertrand et al. 2013, Bourgeois et al. 2014, Thorp et al. 2014, 2015, Crown et al. 2017a, Crown et al. 2017b, Crown et al. 2018, Lim et al. 2018, Ohsumi et al. 2019). The inconsistency in the definition of irreversible or permanent alopecia hinders comparisons of cumulative incidence across study populations. (Such comparisons are also impeded by differences in chemotherapy regimens, patient eligibility criteria, study design, and other factors.) The lack of a standardized definition of irreversible or permanent alopecia is also problematic for assessing the true cumulative incidence of irreversible or permanent alopecia. As shown in Table 1, the reported range of values for the cumulative incidence of irreversible or permanent alopecia across the 19 available studies is 0% to 66%. The wide breadth of this range is most likely due in large part to the heterogeneous definitions of this outcome, along with variability in methods for outcome assessment. Estimates suggesting a relatively high frequency of irreversible or permanent alopecia lack face validity. If this condition were a common occurrence in docetaxel-treated cancer patients, then I would expect that it would have been recognized as a widespread issue many years ago.

Finally, some studies had relatively small numbers of participants, especially within subgroups stratified by chemotherapy regimen (Table 1), resulting in statistically unstable cumulative incidence values with wide margins of error.

Taken together, these methodological problems make the available published epidemiological studies unsuitable for use in evaluating the potential causal effect of docetaxel on irreversible or permanent alopecia, or for estimating the cumulative incidence of irreversible or permanent alopecia among patients treated with docetaxel-containing chemotherapeutic regimens. Only one study was a randomized controlled trial of docetaxel versus a nondocetaxel regimen (specifically, methotrexate and 5-fluorouracil), making it potentially suitable for investigating

causation (Sjostrom et al. 1999). This study found no significant difference in the cumulative incidence of nonreversible alopecia (not further described) between the treatment arms for advanced breast cancer refractory to prior anthracycline. However, this study was relatively short-term and small: it followed patients for overall survival for only a median of 11 months after treatment (range: 4−36 months), and each treatment arm included only 140 patients evaluated for safety. Moreover, 48 patients randomized to docetaxel and 74 patients randomized to methotrexate and 5-fluorouracil crossed over to the other study treatment due to disease progression, at which point follow-up for adverse events ceased, making the duration of follow-up for safety particularly short in this substantial proportion of patients (median time to progression = 6.3 months, range = 2 days to 19 months for docetaxel; median = 3.0 months, range = 6 days to 29 months for methotrexate and 5-fluorouracil). Thus, the opportunity to observe both irreversible or permanent alopecia and its resolution was constrained in this study, and the relatively small sample size yielded statistically unstable cumulative incidence values and potentially insufficient balancing of known and unknown confounders by randomization, which is more effective in larger populations.

## Dr. Madigan's meta-analysis of the results of four of these studies is not a valid scientific basis for evaluating the causation of irreversible or permanent alopecia among patients treated with docetaxel.

Dr. Madigan states that he was "asked to review observational studies in the literature concerning docetaxel and irreversible alopecia" (2020 Report of David Madigan, Ph.D., p. 2); therefore, he conducted a literature search to identify original studies of irreversible or permanent alopecia in breast cancer patients comparing docetaxel with other anticancer medications. From this search, Dr. Madigan identified four studies, all of which I also found in my literature search: Sedlacek (2006), Crown et al. (2017a), Martin et al. (2018b, 2018a), and Kang et al. (2019). As described earlier in my report, these four studies comprise a nonrandomized, retrospective analysis of breast cancer patients treated by one physician over an 11-year period (Sedlacek 2006); a nonrandomized, retrospective telephone survey of breast cancer patients treated more than one year before (Crown et al. 2017a); a nonrandomized, retrospective evaluation of breast cancer patients treated 18–60 months earlier (Martin et al. 2018b); and a nonrandomized, prospective cohort study of breast cancer patients who received various chemotherapeutic regimens not specific to docetaxel (Kang et al. 2019).

In his report, Dr. Madigan does not describe the design of these studies. Unlike randomized controlled trials, in which, according to Dr. Madigan, "statistically one can be confident that the resulting estimate of the treatment effect is not biased" (2020 Report of David Madigan, Ph.D., p. 11), all four of these investigations are nonrandomized studies, in which, according to Dr. Madigan, "myriad factors can influence treatment choice, making it challenging to estimate the

effect of the treatment" (2020 Report of David Madigan, Ph.D., p. 11). As discussed in the preceding section of my report, the nonrandomized nature of these studies, as well as the exclusively self-reported information on irreversible or permanent alopecia in one study (Crown et al. 2017a), the retrospective nature of three studies (Crown et al. 2017a, Martin et al. 2018b, Kang et al. 2019), the mixing of different chemotherapeutic regimens in all four studies (Sedlacek 2006, Crown et al. 2017a, Martin et al. 2018b, Kang et al. 2019), the additional treatment with hormonal therapy in at least two studies (Martin et al. 2018b, a, Kang et al. 2019), and the heterogeneous, sometimes poorly described (Sedlacek 2006, Crown et al. 2017a) definitions of irreversible or permanent alopecia undermine the ability of these studies to provide valid information on the causation of irreversible or permanent alopecia in docetaxel-treated breast cancer patients. Consequently, the combined odds ratio resulting from Dr. Madigan's meta-analysis of these four studies is equally uninformative.

Dr. Madigan reports an $I^2$ value of 62.9% (p = 0.07) for heterogeneity among these studies. Although nominally statistically nonsignificant, this value indicates substantial inconsistency of findings across the four studies. In the presence of such heterogeneity, a single summary estimate of association may not be scientifically meaningful. Dr. Madigan does not report the 95% confidence interval around $I^2$, even though there may be considerable uncertainty in this value, especially when based on only four studies (Ioannidis et al. 2007).

In summary, given the major methodological weaknesses of these nonrandomized studies that preclude them from assessing causal effects of docetaxel-containing regimens in comparison with other chemotherapeutic regimens, Dr. Madigan's reliance on his meta-analysis of these four observational studies to support his opinion on causation is scientifically unjustified, as is the reliance of Plaintiffs' experts on Dr. Madigan's meta-analysis for the same purpose (2020 Report of Ellen G. Feigal, M.D., pp. 56, 69; Supplemental Report of David A. Kessler, M.D., p. 8).

## By citing flawed retrospective studies, nonrandomized clinical trials, case reports, and adverse event reports, Plaintiffs' experts rely on an inappropriate and inadequate scientific basis for their opinions on the causation and incidence of irreversible or permanent alopecia.

Plaintiffs' experts Dr. Madigan, Dr. Kessler, Dr. Laura M. Plunkett, and Dr. Ellen G. Feigal all rely in part on studies and other data sources that have major methodological shortcomings to support their opinions on whether docetaxel causes irreversible or permanent alopecia, and how frequently irreversible or permanent alopecia occurs in docetaxel-treated patients.

To support his conclusion that "there is adequate statistical evidence that docetaxel causes permanent/irreversible alopecia," Dr. Madigan cites in part his own statistical results presented in his report, including "the identification of safety signals in FAERS in the 2000's, [his] analyses of Sanofi's internal pharmacovigilance database, [his] review of observational studies, and the results from Sanofi's TAX 316 and TAX 301 clinical trials" (2020 Report of David Madigan, Ph.D., p. 26).

Dr. Kessler asserts "to reasonable degree of medical probability that there is more likely than not a causal relationship between Taxotere and irreversible alopecia" (Supplemental Report of David A. Kessler, M.D., p. 20). He expresses this opinion based on his review and analysis of "the following data sources: (i) Sanofi's TAX 316 and TAX 301 clinical trial data; (ii) reports of irreversible alopecia in Sanofi's internal global pharmacovigilance database; (iii) a statistical analysis of the FDA's Adverse Event Reporting System database; (iv) medical literature discussing or identifying reports of irreversible alopecia after treatment with Taxotere, Taxotere-containing regimens, or other chemotherapy drugs; (v) Sanofi's internal documents; and (vi) Sanofi's communications with and submissions to U.S. and foreign regulatory authorities" (Supplemental Report of David A. Kessler, M.D., p. 5).

Dr. Plunkett opines that "the evidence linking Taxotere exposure with permanent, irreversible hair loss includes controlled clinical trial data as well as epidemiological data (case series) and individual case reports. When the available evidence is considered, the weight-of-the-evidence indicates it is biologically plausible that Taxotere can cause [chemotherapy-induced permanent alopecia/permanent chemotherapy-induced alopecia]" (2019 Report of Laura M. Plunkett, Ph.D., DABT, p. 20). To support this opinion, Dr. Plunkett cites results from Sanofi's clinical trials TAX 316 and TAX 301/GEICAM 9805,[17] along with nonrandomized clinical trials, retrospective observational studies, and case reports, case series, or secondary reviews of such reports. Dr. Plunkett acknowledges, however, that "[p]hase III clinical trials"—that is, randomized controlled trials such as TAX 316 and GEICAM 9805—"are the most important studies in terms of demonstrating both efficacy and safety of drugs" (2019 Report of Laura M. Plunkett, Ph.D., DABT, p. 25).

Dr. Feigal states that she was asked to provide her "assessment on the causal relationship of Taxotere/docetaxel to permanent chemotherapy-induced alopecia in the adjuvant treatment of patients with breast cancer" (2020 Report of Ellen G. Feigal, M.D., p. 7). As described in her report, Dr. Feigal uses information from published articles and abstracts, Sanofi's global pharmacovigilance database, and TAX 316 and GEICAM 9805 for her causation assessment, and she concludes that "Taxotere/docetaxel has been shown by reliable scientific evidence to

---

[17]   Except where quoting others, I refer throughout this report to TAX 301 using its alternative name, GEICAM 9805, to avoid confusion with TAX 316.

cause permanent chemotherapy-induced alopecia" (2020 Report of Ellen G. Feigal, M.D., p. 71). To guide her assessment of causation, Dr. Feigal notes that the strongest scientific evidence comes from "Prospective, randomized, controlled, clinical trials," followed sequentially by "Prospective, nonrandomized, controlled, clinical trials," "Prospective cohort studies," and "Retrospective case series or other observational study designs based on exposure (i.e., to Taxotere/docetaxel) or on outcome (permanent chemotherapy-induced alopecia," with studies of "Consecutive cases" being preferred over "Nonconsecutive cases or other observational study designs (e.g., cohort or case control studies)" (2020 Report of Ellen G. Feigal, M.D., pp. 33–34).

In my literature review, I evaluated all of the observational studies included by Dr. Madigan in his meta-analysis (2020 Report of David Madigan, Ph.D., p. 22), which encompasses the same four observational studies relied upon by Dr. Kessler (Supplemental Report of David A. Kessler, M.D., pp. 11–12, 15); all of the references pertaining to docetaxel cited by Dr. Kessler in Schedule 5 of his supplemental report, entitled "Studies Regarding the Risk of Irreversible Alopecia Associated with Taxotere and Details of Other Studies Cited or Referenced in This Report" (Schedule 5, Supplemental Report of David A. Kessler, M.D.); all of the articles and abstracts cited by Dr. Plunkett in paragraphs 34–43 of her report, where she summarizes the published literature on Taxotere and irreversible or permanent alopecia (2019 Report of Laura M. Plunkett, Ph.D., DABT, pp. 15–20); and all of the references concerning docetaxel cited by Dr. Feigal in Table 2 of her report, entitled "Publications on PCIA [permanent chemotherapy-induced alopecia] in the Treatment of Breast Cancer" (2020 Report of Ellen G. Feigal, M.D., pp. 40–564).

Several of these studies are addressed in the prior section of this report, where I discussed the methodological weaknesses of the published literature for evaluating the causation or incidence of irreversible or permanent alopecia among docetaxel-treated patients (Nabholtz et al. 2001, Sedlacek 2006, Bertrand et al. 2013, Bourgeois et al. 2014, Martin et al. 2015, Thorp et al. 2015, Crown et al. 2017a, Crown et al. 2017b, Kim et al. 2017, Crown et al. 2018, Martin et al. 2018b, Kang et al. 2019). In particular, the published studies (excluding unpublished data from TAX 316 and GEICAM 9805) relied upon by Dr. Madigan, Dr. Kessler, Dr. Plunkett, and Dr. Feigal include the following, none of which is a randomized controlled trial, and all of which have major shortcomings for testing causal effects:

- A single-arm clinical trial of 54 patients treated with one docetaxel-containing regimen (Nabholtz et al. 2001);
- A retrospective analysis of 112 patients treated with various docetaxel- and doxorubicin-containing regimens, 126 treated with various paclitaxel- and doxorubicin-containing regimens, and 258 treated with various doxorubicin-containing regimens without a taxane (Sedlacek 2006);

- A retrospective analysis of 79 patients treated with a single docetaxel-containing regimen (Bertrand et al. 2013);
- A retrospective study of self-reported alopecia in 829 patients (643 with survey data) treated with a single docetaxel-containing regimen (Bourgeois et al. 2014);
- A retrospective study of self-reported alopecia in 111 patients treated with epirubicin and cyclophosphamide followed by docetaxel, and 249 treated with epirubicin and docetaxel followed by capecitabine (Martin et al. 2015);
- A retrospective analysis of self-reported survey data from 133 patients treated with various docetaxel-containing regimens (Thorp et al. 2015);
- A retrospective analysis of self-reported survey data from 260 patients treated with various docetaxel-based regimens, 23 treated with paclitaxel- and anthracycline-based regimens, and 12 treated with anthracycline-based nontaxane regimens (Crown et al. 2017a, Crown et al. 2017b);
- A retrospective analysis of self-reported survey data from 122 patients who reported having "chemotherapy-induced irreversible alopecia" and 143 who did not (Kim et al. 2017);
- A retrospective analysis of 368 patients, assessed for hair loss using unspecified methods, following treatment with various docetaxel-containing nonanthracycline-based regimens (Crown et al. 2018);
- A retrospective analysis of 664 total patients, 358 of whom were treated with various regimens including docetaxel $\geq 400$ mg/m$^2$ (Martin et al. 2018b);
- A prospective observational study of 61 patients treated with various taxane-based regimens (Kang et al. 2019).

The other publications cited by Dr. Kessler, Dr. Plunkett, and Dr. Feigal (but excluded by Dr. Madigan from his analysis of comparative observational studies) are case series, case reports, or reviews of such reports that do not report the cumulative incidence of irreversible or permanent alopecia in an at-risk population (Bourgeois et al. 2009, Masidonski and Mahon 2009, Prevezas et al. 2009, Tallon et al. 2010, Miteva et al. 2011, Palamaras et al. 2011, Bourgeois et al. 2012, Kluger et al. 2012, Tosti et al. 2013, Namini 2016, Sibaud et al. 2016, Fonia et al. 2017, Werbel and Cohen 2018, Freites-Martinez et al. 2019a). As explained previously, because they lack a comparison group, these descriptive reports are not a valid scientific basis for establishing causation. The inability of adverse event reports in the Sanofi global pharmacovigilance database to establish causation is also discussed earlier in my report.

In Table 2 of her report, Dr. Feigal sums up the number of Taxotere/docetaxel-treated patients found to have irreversible or permanent alopecia across her cited sources (n = 347, excluding Crown et al. (2018) to avoid potential double-counting of patients), as well as the number of irreversible or permanent alopecia cases who were reportedly treated with Taxol/paclitaxel (n = 51), both Taxotere/docetaxel and Taxol/paclitaxel (n = 4), a nonspecific taxane (n = 93), or a

non-taxane chemotherapeutic agent (n = 54). She also provides alternative estimates based on the assumption that 81% of the taxane-treated patients described in one case series (Freites-Martinez et al. 2019a), instead of 100%, were treated with docetaxel. At the bottom of the table, Dr. Feigal writes: "Overall, the number of published cases of PCIA in Taxotere/docetaxel-based regimens are 6.4 to 6.7 times higher than in non-Taxane based regimens and are 6.8 to 8.1 times higher than in the Taxol/paclitaxel-based regimens" (2020 Report of Ellen G. Feigal, M.D., p. 56). Likewise, in her trial testimony, Dr. Feigal compared her total number patients with irreversible or permanent alopecia between the docetaxel and paclitaxel groups, and concluded: "With all the caveats, it's what you observed – what I've observed in the literature with my review of the published literature of 347 cases in Taxotere [docetaxel] and 51 cases in Taxol [paclitaxel], that's about a 6.8 times' increase, and that does translate to about a 580 percent increase from 51" (Jury Trial Testimony of Ellen G. Feigal, M.D., 1212:11–1213:17).

Such a comparison has no scientific validity for addressing causation. As presented, Dr. Feigal's comparison mixes patients from various study designs and populations, with different ages, racial/ethnic backgrounds, disease characteristics, concomitant treatments, comorbidities, and other factors that can affect alopecia risk. Treatments were not randomly assigned across comparison groups, leading to a considerable risk of selection bias and confounding. Finally, this comparison is highly susceptible to influence by noncausal factors such as drug approval dates (where drugs approved earlier in time tend to have more research studies in the published literature), publication bias (where confirmatory studies often follow an initial positive publication, and results published earlier in time tend to have more studies on the same topic that are subsequently published), and secular changes that affect breast cancer incidence (e.g., mammographic screening (Bleyer and Welch 2012)) and survival (e.g., treatment options). Thus, Dr. Feigal's comparison of numbers of patients with irreversible or permanent alopecia described in the published literature across treatment groups has no bearing on the causal effect of docetaxel in comparison with other anticancer agents.

In summary, as a basis for their opinions on the causation and frequency of irreversible or permanent alopecia in docetaxel-treated patients, Dr. Madigan, Dr. Kessler, Dr. Plunkett, and Dr. Feigal rely in part on several methodologically flawed observational studies, and Dr. Plunkett and Dr. Feigal additionally rely on case series and case reports, which together provide inadequate scientific evidence to evaluate causal effects or the cumulative incidence of adverse events. Therefore, their opinions regarding the causal effect of docetaxel on irreversible or permanent alopecia, as well as the frequency of irreversible or permanent alopecia, are not scientifically valid.

The two remaining sources cited by Plaintiffs' experts are the TAX 316 and GEICAM 9805 trials, both of which are large, long-term, randomized controlled trials.[18] As designed, TAX 316 and GEICAM 9805 both provide an appropriate scientific basis for evaluating potential causal effects of docetaxel on irreversible or permanent alopecia. However, due to highly incomplete follow-up for adverse events in GEICAM 9805, only TAX 316 provides sufficient data to address this causal question. These two trials are discussed in the next section of this report.

---

[18]   None of Plaintiffs' experts cites Sjostrom et al. (1999), a randomized controlled trial of docetaxel monotherapy versus methotrexate and 5-fluorouracil that is an appropriate scientific basis for comparing adverse effects of docetaxel with nondocetaxel chemotherapy. This trial is relatively small and has relatively short follow-up compared with TAX 316 and GEICAM 9805.

## The TAX 316 randomized controlled trial provides the best available evidence to assess potential causation of irreversible or permanent alopecia by docetaxel-containing chemotherapeutic regimens.

### Two large, long-term, randomized controlled trials of docetaxel-containing chemotherapeutic regimens versus nondocetaxel regimens—namely, TAX 316 and GEICAM 9805—reported information on the cumulative incidence of alopecia.

A randomized controlled trial is the gold-standard study design for evaluating the potential causal effect of a specific therapeutic intervention on a given health outcome. To assess potential causation of irreversible or permanent alopecia as the particular outcome of interest, such a randomized controlled trial must not only be large (to enable effective randomization and to provide statistically robust results), but it must also provide several years of follow-up of clinically ascertained alopecia to ensure that cases of irreversible or permanent alopecia are valid and consistently defined, and that sufficient time has elapsed for alopecia to either resolve (in the case of reversible or temporary alopecia) or persist for a given duration of time (in the case of irreversible or permanent alopecia). Finally, to assess potential causation by docetaxel as the particular treatment of interest, such a large, long-term, randomized controlled trial must assess a therapeutic regimen consisting of docetaxel monotherapy or docetaxel in combination with other therapeutic agents known not to cause irreversible or permanent alopecia, or—if docetaxel is used in combination with other therapeutic agents that may cause irreversible or permanent alopecia—then the comparison treatment arm must also include those other agents at the same doses, so that a potential effect of docetaxel itself can be identified.

None of the published studies described in the previous section of this report is a large, randomized controlled trial of docetaxel with long-term follow-up for clinically ascertained alopecia. To my knowledge, potentially relevant results are available from only two large, randomized controlled trials of docetaxel with planned long-term follow-up for adverse events including alopecia: the TAX 316 trial (also known as BCIRG 001; ClinicalTrials.gov registry identifier NCT00688740) (Martin et al. 2005, Mackey et al. 2013) and the GEICAM 9805 trial (also known as TAX 301; ClinicalTrials.gov registry identifier NCT00121992) (Martin et al. 2010). Both studies evaluated six cycles of treatment with TAC or FAC[19] as post-surgery

---

[19]  TAC: intravenous docetaxel 75 mg/m$^2$ in combination with doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ every three weeks for six cycles, with dexamethasone premedication, primary prophylactic antibiotic therapy, and possible primary prophylactic granulocyte colony-stimulating factor

adjuvant therapy for breast cancer with positive axillary lymph nodes (TAX 316) or negative axillary lymph nodes (GEICAM 9805). In both trials, patients were excluded if they had prior systemic anticancer therapy or radiotherapy for breast cancer, prior therapy with anthracyclines or taxanes, or concurrent treatment with any other anticancer therapy. After completion of chemotherapy, radiotherapy was mandatory for patients who had undergone lumpectomy and discretionary for those who had undergone mastectomy, and tamoxifen was administered to patients with hormone-receptor-positive tumors. Since the randomized treatment arms in TAX 316 and GEICAM 9805 consisted of chemotherapeutic regimens that differed only by one agent between the two arms—that is, both treatment arms contained the same doses of doxorubicin and cyclophosphamide, such that they differed only by the use of docetaxel or 5-fluorouracil— these trials are well suited to evaluate the specific potential causal effects of docetaxel in comparison with 5-fluorouracil.

Neither study provided information on irreversible or permanent alopecia in published research articles. In TAX 316, Martin et al. (2005) reported that at a median follow-up of 55 months, the cumulative incidence of any grade of alopecia was 97.8% (728/744) in the TAC group and 97.1% (715/736) in the FAC group, with no significant difference between the two groups (p = 0.39; Fisher's exact p = 0.41) and no reports of grade 3 alopecia (defined as "total body hair loss" (National Cancer Institute 2017)) or grade 4 alopecia (not defined) in either group using CTC version 1.0. At a median follow-up of 124 months in TAX 316, Mackey et al. (2013) reported the cumulative incidence of grades 3–4 cardiac adverse events and hematological malignancies as adverse events, but not alopecia. In GEICAM 9805, Martin et al. (2010) reported that at a median follow-up of 77 months, the cumulative incidence of any grade of alopecia was 96.6% (514/532) in the TAC group and 97.9% (508/519) in the FAC group (p = 0.21; Fisher's exact p = 0.26), while the cumulative incidence of grades 3–4 alopecia using CTCAE version 2.0 was 0.2% (1/532) in the TAC group and 0.4% (2/519) in the FAC group (Fisher's exact p = 0.62). The authors did not further describe the three patients with grades 3–4 alopecia or explain what was meant by this grading, given that CTCAE version 2.0 does not define grade 3 or grade 4 alopecia (National Cancer Institute 2017).

In both TAX 316 and GEICAM 9805, the "treatment period" was defined as the period up to 30 days after the last administration of study chemotherapy, and the "follow-up period" was defined as more than 30 days after the last administration of study chemotherapy until the study cutoff date (Martin et al. 2010, Mackey et al. 2013). In TAX 316, the cumulative incidence of alopecia persisting into the follow-up period after the end of study chemotherapy—referred to as "ongoing" alopecia—was 3.9% (29/744) in the TAC group and 2.2% (16/736) in the FAC group (Fisher's exact p = 0.068) after a median overall follow-up time of 96 months. In GEICAM

---

FAC: intravenous 5-fluorouracil 500 mg/m$^2$ in combination with doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ every three weeks for six cycles, with prophylactic antibiotic therapy and granulocyte colony-stimulating factor in the event of an episode of febrile neutropenia or infection

9805, the cumulative incidence of "ongoing" alopecia, using the same definition, was 0.6% (3/532) in the TAC group and 0.2% (1/519) in the FAC group (Fisher's exact p = 0.62) after a median overall follow-up time of 10 years and 5 months. The same totals of 29 TAC-treated patients and 16 FAC-treated patients with "ongoing" alopecia in TAX 316, and 3 TAC-treated patients and 1 FAC-treated patient with "ongoing" alopecia in GEICAM 9805, were provided by Sanofi to the European Medicines Agency on January 22, 2013, in response to a request for information (Sanofi_04938203).[20] However, as explained in the following section, "ongoing" alopecia, defined as alopecia continuing into the follow-up period of 31 or more days after the last administration of study chemotherapy, does not correspond to irreversible or permanent alopecia. Also as explained below, overall follow-up for efficacy (i.e., survival) does not correspond to follow-up for safety (i.e., adverse events such as alopecia).

### "Ongoing" alopecia and alopecia that "persisted into the follow-up period," as defined in TAX 316 and GEICAM 9805, are not equivalent to irreversible, permanent, or even long-term alopecia.

The Clinical Study Reports for TAX 316 and GEICAM 9805 state that according to study protocol, "ongoing" treatment-emergent adverse events[21] were defined as those that "were still ongoing more than 30 days after last study treatment" (p. 46 of 2009 Sanofi Clinical Study Report for GEICAM 9805) or that "persisted into the follow-up period," (p. 36 of 2010 Sanofi Clinical Study Report for TAX 316), where the follow-up period was defined as more than 30 days after the last administration of study drugs until the end of study follow-up (p. 16 of 2010 Sanofi Clinical Study Report for TAX 316; p. 54 of 2009 Sanofi Clinical Study Report for GEICAM 9805).

Correspondence from March 2012 between Sanofi Canada and the Therapeutic Products Directorate (TPD) of the Health Products and Food Branch at Health Canada (i.e., Canada's regulator of prescription drugs and medical devices for human use) further establishes that so-called "ongoing" alopecia in TAX 316 refers to alopecia persisting for more than 30 days after completion of study chemotherapy, regardless of subsequent resolution (Sanofi_02368838–02368922). Thus, "ongoing" alopecia does not constitute irreversible or permanent alopecia, and it may be as time-limited as 31 days after treatment cessation. Likewise, alopecia that

---

[20]   Subsequent Sanofi correspondence clarifies that the denominators for these totals should be the safety population, i.e., 744 TAC-treated patients and 736 FAC-treated patients in TAX 316, and 532 TAC-treated patients and 519 FAC-treated patients in GEICAM 9805 (Exhibit 34 of the Deposition of Pierre Mancini, March 23, 2018, Sanofi_01363130).

[21]   Treatment-emergent adverse events are defined as adverse events that first occurred or worsened in severity after initiation of therapy (Nilsson and Koke 2016) (2010 Clinical Study Report for TAX 316, p. 16; 2009 Clinical Study Report for GEICAM, p. 45).

"persisted into the follow-up period" does not correspond to irreversible or permanent alopecia, but instead refers to alopecia lasting for at least 31 days after completion of treatment. These definitions also apply to GEICAM 9805, which used the same chemotherapeutic regimens and the same definition of the "treatment period" and "follow-up period" as TAX 316 (Martin et al. 2005, Martin et al. 2010, Mackey et al. 2013), and for which "ongoing" treatment-emergent adverse events were described in the same manner in Sanofi's Clinical Study Reports for each trial.

In the 2012 correspondence, Matthew C. Ernst, Ph.D., an Assessment Officer from TPD, submitted the following question to Mihaela Livia Cojocaru, M.D., a Project Leader from Regulatory Affairs at Sanofi Canada, with respect to the results of TAX 316:

> Can the sponsor please clarify the definition of "ongoing" with respect to adverse events? For example, in Table 7 of the clinical study report, "Number (%) of patients with TEAEs [treatment-emergent adverse events] during the treatment period (incidence $\geq 2\%$ in TAC) that persisted into the follow-up period, regardless of causal relationship – safety population," Nausea was reported as a TEAE that persisted into follow-up in 35 patients and remained ongoing in 10 patients. Does this mean that 10 patients have experienced treatment-emergent nausea for 10 years? A similar question could be asked regarding Table 9, "Outcome in patients with adverse events starting or worsening in follow-up regardless of causal relationship (incidence $\geq 0.5\%$ in the TAC group) – safety population.["] Therefore, please provide clarification as to the definition of ongoing.

In reply to this TPD request, Dr. Cojocaru relayed Sanofi's response that included the following explanation (emphasis added):

> Adverse events reported during the follow-up period include 3 categories of adverse events (AEs):
>
> - Ongoing treatment-emergent AEs (TEAEs) possibly or probably related to study drug that persisted into the follow-up period;
> - Possibly or probably related AEs that started or worsened during the follow-up period;
> - Relevant non cancer-related signs and symptoms occurring after completion of chemotherapy (e.g., congestive heart failure, toxicities related to tamoxifen and/or radiation therapy).

April 17, 2020

**These AEs were to be followed until resolution or the initiation of further anti-cancer therapy.** They were evaluated, and data were captured during protocol-defined, routine follow-up visits, as described in Section 5.11, Appendix I.A.I of the final Clinical Study Report. **Therefore, it was not always possible to determine the precise duration of the AE for those AEs that were reported as either resolved or ongoing at the patient's last visit**.

**The "Ongoing" columns of Tables 7 and 9 present data in regards to those AEs that were persisting or starting during the follow-up period and that were present at the last follow-up visit (whenever this visit occurred – starting 30 days after the last IV [intravenous] treatment and up to the end of the 10-year follow-up). Thus, "ongoing" does not necessarily mean that these AEs were ongoing for the entire 10-year follow-up period; rather, it means that they were noted as ongoing at the last follow-up visit.**

The Sanofi response clearly indicates that the company's definition of "ongoing" alopecia is based on persistence at the time of the last follow-up visit for the adverse event, regardless of the time interval since completion of study chemotherapy, where follow-up could have ended due to initiation of additional anticancer therapy (e.g., for breast cancer progression or relapse, or for a second primary malignancy), as well as study drop-out or death. The Sanofi response also clarifies that the company's definition of "ongoing" alopecia does not explicitly account for whether a given patient's hair loss subsequently resolved after the end of follow-up for alopecia. Similarly, this response confirms that Sanofi's definition of alopecia that "persisted into the follow-up period" relates to continuance of alopecia at more than 30 days after treatment completion, regardless of subsequent resolution. These classifications of "ongoing" alopecia and alopecia that "persisted into the follow-up period" are thus substantially different from irreversible or permanent alopecia.

Nearly identical explanatory language is used in Sanofi's 2005 and 2010 Clinical Study Reports for TAX 316 (pp. 173 and 36 of TAX 316 2010 Clinical Study Report, emphasis added):

Clinical adverse experiences designated as requiring further ongoing evaluation included:

- Ongoing clinical adverse experiences possibly or probably related to study drug at the time of End of Chemotherapy,
- Any delayed AE starting during follow-up and considered as possibly or probably related to study medication,

- Relevant non cancer-related signs and symptoms occurring after completion of chemotherapy (e.g., congestive heart failure, toxicities related to tamoxifen and/or radiation therapy).

**These AEs were to be followed until resolution or the initiation of further anti-cancer therapy.** For AEs occurring during the follow-up period, the investigator was asked to select a "most likely cause" from the following: study chemotherapy, tamoxifen administered as per protocol, radiotherapy administered as per protocol, tumor or other.

…

**Therefore, it is not always possible to determine the precise duration of the AE for those AEs that were reported as resolved.**

The TAX 316 2010 Clinical Study Report also includes the following text in its appendices, specifying that follow-up for adverse events should cease at resolution or initiation of additional chemotherapy, or when it was judged to be unrelated or remotely related to the study chemotherapy (pp. 1273, 1318, and 1340, emphasis added):

All ongoing adverse events related to study drug must be **followed until resolution or until the relationship to study drug becomes 'none' or 'remote' or until the patient receives further systemic anticancer therapy** (Refer to 'Follow-up Guidelines' for details)

…

At any time IN ADDITION IF APPLICABLE THE FOLLOWING EXTRA-FORMS WILL BE INSERTED: … CLINICAL ADVERSE EXPERIENCES: to be completed only for Ongoing clinical adverse experiences at time of [end of chemotherapy] and relevant non cancer related signs and symptoms occurring after completion of chemotherapy (i.e. Congestive cardiac failure, any toxicity related to tamoxifen and/or radiation therapy regardless of grade, appearance of any chronic disease, etc.) **until resolution or further anti-cancer therapy**).

…

April 17, 2020

Please follow all averse [*sic*] experiences possibly or probably related to study drug listed from the last treatment cycle **until resolution or when the relationship of a listed adverse event becomes « none » or « remote »**.

If an event commences in the Cycle and continues into Follow Up, and is 'possibly related' to chemotherapy, e.g. cough, then is still present 6 months after the end of chemotherapy, i.e. is clearly not related to the chemotherapy any longer - the report of the event should be ceased (change to ongoing adverse event, date relationship changed as a stop date and relationship : remote).

**When the patient receives an alternative post study drug systemic therapy (i.e., radiotherapy and surgery are not included), all adverse experiences are not followed anymore** except for the gray tinted boxes:

- skin toxicities[22]
- nail disorders
- peripheral edema
- cardiac function
- cardiac ischemia
- cardiac pericardial
- congestive heart failure.

In his deposition on March 23, 2018, Mr. Pierre Mancini, who at that time was Sanofi's Global Biostatistics Head, Medical Affairs and Data Mining, confirmed that patients classified as having "ongoing" alopecia did not necessarily have alopecia after 10 years of follow-up for efficacy: "[A]fter 10 years of follow-up, obviously, you cannot say for sure that the 29 still had ongoing, yeah. You may be lost to follow it [*sic*]. You can have, you know, some patient moving to other therapies and so on and so forth" (Deposition of Pierre Mancini, 161:11–15). Mr. Mancini also clarified that the alopecia classifications used by Sanofi did not correspond to irreversible or permanent alopecia: "That's not the way … the reports, you know, analyze that. We don't have this definition of long-term and permanent alopecia as an end point here" (Deposition of Pierre Mancini, 212:1–4). Therefore, in correspondence with the European Medicines Agency, Mr. Mancini instead provided information on "persistent" alopecia, which Sanofi had previously defined as alopecia persisting into the post-treatment period: "[W]e have a definition of persistent alopecia. We don't, you know, qualify for irreversibility or this kind of thing … The point I'm making is that we have a definition for persistent alopecia that we report. We call it -- we have our definition of persistent. We don't call persistent a Grade 3/4, and, you

---

[22]   Table 7 (p. 37) of the 2010 TAX 316 Clinical Study Report shows that alopecia is classified separately from "skin disorder."

know, we don't have, you know, any data collection or question to the investigators, you know, whether, you know, this adverse event is permanent or not" (Deposition of Pierre Mancini, 278:25–279:2, 280:19–25).

Additional information contained in the Sanofi Canada response to TPD includes tables of "ongoing" treatment-emergent adverse events listed by MedDRA preferred term, treatment arm, subject ID number, date of last intravenous study chemotherapy plus 30 days (i.e., date of the initiation of the "follow-up period"), date of last follow-up of adverse event, and duration of follow-up of adverse event (i.e., the time interval between the two dates). For alopecia characterized as "ongoing," 29 patients in the TAC arm and 16 in the FAC arm are listed. The distribution of follow-up times is shown below in Table 2 of my report. In my table, which is adapted from the Sanofi response, I show the duration of follow-up for alopecia after the end of the "treatment period," i.e., *excluding* the first 30 days after cessation of study chemotherapy, as reported in the Sanofi response (Table 2 column labeled "Alopecia Follow-Up Duration (Years)"). I also show the duration of follow-up for alopecia *including* the first 30 days after cessation of study chemotherapy, that is, the 30 days before the start of the study-defined "follow-up period" (Table 2 column labeled "Alopecia Follow-Up Duration + 30 Days (Years)"). I provide the data in the latter column to show the total duration of time that patients were followed for alopecia after the end of treatment with study chemotherapy.

As shown in Table 2, 19 (66%) of the 29 patients treated with TAC who were classified as having "ongoing" alopecia as defined by Sanofi, as well as of the 11 (69%) of the 16 FAC-treated patients classified as having "ongoing" alopecia, were followed for less than six months, including the first 30 days after cessation of study chemotherapy, at the time when they were classified as having "ongoing" alopecia. Thus, 30 of the 45 patients were not followed for a sufficient duration of time to observe irreversible alopecia, defined as persistence of alopecia for at least six months after cessation of chemotherapy, without subsequent resolution. In fact, the median duration of follow-up for alopecia, including the first 30 days after cessation of study chemotherapy, among all patients classified as having "ongoing" alopecia (excluding one patient with an unknown duration of follow-up) in either treatment arm was only 118 days, or less than four months.

This relatively short duration of follow-up for the adverse event of alopecia contrasts markedly with the 10 years of long-term follow-up for disease-free survival (i.e., breast cancer relapse) and overall survival (i.e., death) in TAX 316 and GEICAM 9805. According to the trial documentation, follow-up for treatment-emergent adverse events was distinct from overall follow-up for efficacy based on survival outcomes. Thus, patients' duration of follow-up for disease-free and overall survival (median = 124 months, interquartile range = 90–126 months (Mackey et al. 2013); median = 9.74 years, or 117 months, for patients classified as having

"ongoing" alopecia (Sanofi_05319538–05319540[23])), does not provide any indication of their duration of follow-up for treatment-emergent adverse events. The median duration of follow-up in TAX 316 and GEICAM 9805 provided by Sanofi in response to docetaxel labeling queries from the Pharmaceuticals and Medical Devices Agency of Japan (Sanofi_01331114) also is on the order of 10 years; thus, these durations clearly pertain to follow-up for survival to evaluate efficacy, rather than safety.

Figure 4 on p. 24 of Dr. Madigan's 2019 report illustrates the duration of follow-up for efficacy, not safety, among the 45 TAX 316 participants in his analysis. Dr. Madigan thus incorrectly equates follow-up for survival with follow-up for alopecia in TAX 316. During his 2019 deposition, he stated: "I mean, the protocol says that every adverse event is followed up through the follow-up period"; he also responded "Yes" to the question: "So it's your position, then, that Figure 4 reflects both the amount of time a patient was in the TAX 316 study and the amount of time for which that patient was followed for their alopecia?" (2019 Deposition of David Madigan, Ph.D., 53:7–16). The above correspondence between Sanofi and TPD, as well as the repeated language in the TAX 316 2010 Clinical Study Report, makes it clear that these two follow-up times are distinct. Dr. Madigan's erroneous use of follow-up time for efficacy instead of follow-up time for alopecia has been confirmed by Dr. Lee-Jen Wei using the same TAX 316 data set as used by Dr. Madigan (Supplemental Report of Lee-Jen Wei, Ph.D., pp. 2–6). As shown in Figure A of Dr. Wei's supplemental report the follow-up period for alopecia (beginning more than 30 days after cessation of study chemotherapy) was shorter than six months for 34 of the 45 patients in TAX 316 who were classified as having "ongoing" alopecia. Dr. Wei's findings confirm those shown below in Table 2, in the column labeled "Alopecia Follow-Up Duration (Years)."

---

[23] This source is cited by Dr. David Kessler in his causation analysis (Supplemental Report of David A. Kessler, M.D., p. 14); however, it shows duration of follow-up for efficacy, not safety.

Table 2. Patients in TAX 316 with treatment-emergent alopecia that persisted into the follow-up period (more than 30 days after last study chemotherapy) and was "ongoing" at the end of follow-up for alopecia. Adapted from table in Sanofi Canada Response to Agency Request, Taxotere® (docetaxel), SNDS Control #150484, March 13, 2012 (Sanofi_02368847–02368849)

| Subject ID | Treatment | Start of Follow-Up Period | End of Follow-Up for Alopecia | Alopecia Follow-Up Duration (Years) | Alopecia Follow-Up Duration + 30 Days (Years) |
|---|---|---|---|---|---|
| 11702 | TAC | 1997-11-30 | 2007-12-14 | 10.04 | 10.12 |
| 11724 | TAC | 1998-10-23 | 2001-10-09 | 2.96 | 3.04 |
| 11738 | TAC | 1999-05-27 | 1999-08-23 | 0.24 | 0.32 |
| 12211 | TAC | 1998-09-11 | 1998-11-04 | 0.15 | 0.23 |
| 12314 | TAC | 1999-03-20 | 1999-05-11 | 0.14 | 0.22 |
| 22312 | TAC | 1999-03-17 | 1999-06-10 | 0.23 | 0.31 |
| 12403 | TAC | 1999-01-10 | 2005-01-04 | 5.98 | 6.07 |
| 12612 | TAC | 1999-06-10 | 2001-12-18 | 2.52 | 2.61 |
| 22702 | TAC | 1998-10-02 | 1998-12-14 | 0.20 | 0.28 |
| 13605 | TAC | 1998-09-25 | 1998-12-03 | 0.19 | 0.27 |
| 13607 | TAC | 1998-10-16 | 1998-11-23 | 0.10 | 0.19 |
| 13610 | TAC | 1999-05-06 | 1999-07-22 | 0.21 | 0.29 |
| 13615 | TAC | 1999-07-15 | 1999-11-05 | 0.31 | 0.39 |
| 23907 | TAC | 1998-12-25 | . | . | . |
| 15002 | TAC | 1998-09-25 | 1998-11-03 | 0.11 | 0.19 |
| 15005 | TAC | 1999-04-08 | 1999-09-28 | 0.47 | 0.56 |
| 15006 | TAC | 1999-01-22 | 1999-02-23 | 0.09 | 0.17 |
| 25010 | TAC | 1999-08-29 | 1999-11-25 | 0.24 | 0.32 |
| 15606 | TAC | 1999-01-03 | 1999-01-11 | 0.02 | 0.10 |
| 15808 | TAC | 1998-10-04 | 1998-12-30 | 0.24 | 0.32 |
| 26802 | TAC | 1998-10-07 | 1998-12-31 | 0.23 | 0.31 |
| 26809 | TAC | 1999-10-02 | 2008-11-18 | 9.13 | 9.21 |
| 17407 | TAC | 1998-06-20 | 1998-11-25 | 0.43 | 0.51 |
| 17603 | TAC | 1998-06-07 | 1999-05-07 | 0.91 | 1.00 |
| 17608 | TAC | 1998-07-23 | 1998-09-22 | 0.17 | 0.25 |
| 28101 | TAC | 1997-12-14 | 1998-11-06 | 0.90 | 0.98 |
| 29701 | TAC | 1998-08-08 | 1998-11-12 | 0.26 | 0.34 |
| 40401 | TAC | 1998-08-01 | 1998-09-22 | 0.14 | 0.22 |
| 30702 | TAC | 1999-05-16 | 1999-08-30 | 0.29 | 0.37 |
| **Median** | **TAC** | | | **0.24** | **0.32** |
| 32207 | FAC | 1999-06-25 | 1999-09-15 | 0.22 | 0.31 |
| 20610 | FAC | 1999-05-29 | 1999-07-08 | 0.11 | 0.19 |
| 11710 | FAC | 1998-04-09 | 1999-04-13 | 1.01 | 1.09 |
| 13608 | FAC | 1999-02-17 | 1999-04-22 | 0.18 | 0.26 |
| 24411 | FAC | 1999-04-09 | 1999-06-10 | 0.17 | 0.25 |

April 17, 2020

| Subject ID | Treatment | Start of Follow-Up Period | End of Follow-Up for Alopecia | Alopecia Follow-Up Duration (Years) | Alopecia Follow-Up Duration + 30 Days (Years) |
|---|---|---|---|---|---|
| 24520 | FAC | 1999-03-13 | 1999-03-22 | 0.02 | 0.11 |
| 25501 | FAC | 1998-12-16 | 1999-02-12 | 0.16 | 0.24 |
| 25601 | FAC | 1998-05-03 | 1998-09-14 | 0.37 | 0.45 |
| 16301 | FAC | 1999-02-27 | 1999-05-26 | 0.24 | 0.32 |
| 26804 | FAC | 1998-12-18 | 1999-03-16 | 0.24 | 0.32 |
| 27304 | FAC | 1999-09-08 | 1999-09-07 | 0.00 | 0.08 |
| 27601 | FAC | 1998-05-17 | 1998-09-08 | 0.31 | 0.39 |
| 27610 | FAC | 1999-10-10 | 2000-06-16 | 0.68 | 0.77 |
| 19801 | FAC | 1998-04-16 | 2000-02-15 | 1.83 | 1.92 |
| 30001 | FAC | 1998-03-01 | 1999-03-10 | 1.02 | 1.11 |
| 30204 | FAC | 1999-04-04 | 1999-09-22 | 0.47 | 0.55 |
| Median | FAC | | | 0.24 | 0.32 |

**Due to the lack of long-term follow-up for adverse events in GEICAM 9805, TAX 316 is superior to GEICAM 9805 for evaluating potential causation of irreversible or permanent alopecia by docetaxel.**

Table 6 (p. 35) of Sanofi's 2010 Clinical Study Report for TAX 316 shows that at 10 years of overall follow-up, 70.3% (n = 523) of the 744 patients treated with TAC and 67.3% (n = 495) of the 736 patients treated with FAC were recorded as having at least one adverse event that started or worsened during the follow-up period, i.e., more than 30 days after last receipt of study chemotherapy. In addition, Table 46 (p. 154) of Sanofi's 2004 Interim Clinical Study Report for TAX 316 (included as Appendix 14.1.1 to the 2010 Clinical Study Report, p. 237) shows that at 5 years of overall follow-up, 67.5% (n = 502) of the 744 TAC-treated patients and 65.2% (n = 480) of the 736 FAC-treated patients were recorded as having at least one adverse event that started or worsened during the follow-up period.

By contrast, Table 42 (p. 103) of Sanofi's 2009 Clinical Study Report for GEICAM 9805 shows that at 5 years of overall follow-up, only 15.8% (n = 84) of the 532 patients treated with TAC and 13.7% (n = 71) of the patients treated with FAC were recorded as having at least one treatment-emergent adverse event during the follow-up period. The disparity between TAX 316 and GEICAM 9805 in the cumulative incidence of treatment-emergent adverse events during the follow-up period contrasts with the cumulative incidence during the chemotherapy period (within 30 days of last treatment), when results were highly similar between the two trials (e.g., for overall alopecia, cumulative incidence = 97.8% for TAC and 97.1% for FAC in TAX 316, and 96.6% for TAC and 97.9% for FAC in GEICAM 9805 (Table 7, p. 37 of 2010 Clinical Study Report for TAX 316; Table 43, p. 104 of 2009 Clinical Study Report for GEICAM 9805)). Given that the two trials evaluated the same chemotherapeutic regimens in comparable populations of women with unilateral, operable breast cancer,[24] such a wide disparity in the cumulative incidence of adverse events during the follow-up period is almost certainly explained by less follow-up for adverse events in GEICAM 9805, rather than a true difference.[25] Indeed, in Sanofi's response to docetaxel labeling queries from the Pharmaceuticals and Medical Devices Agency of Japan (Sanofi_01331114), Sanofi stated that in GEICAM 9805, according to the Clinical Study Report, "'Most [treatment-emergent adverse events] were

---

[24]   The main differences in eligibility criteria were that TAX 316 enrolled women with axillary lymph-node-positive breast cancer, whereas GEICAM 9805 enrolled women with axillary lymph-node-negative breast cancer and at least one high-risk criterion (i.e., tumor size > 2 cm, negative test results for expression of estrogen receptor and progesterone receptor, tumor histologic grade 2 or 3, and age < 35 years) (Martin et al. 2005, Martin et al. 2010, Mackey et al. 2013).

[25]   According to Dr. Madigan, 43 of the 55 study sites that participated in GEICAM 9805 did not report data on alopecia during follow-up, and he did not know the reason for the difference in follow-up between TAX 316 and GEICAM 9805 (2019 Deposition of David Madigan, Ph.D., 123:14–24; 124:21–24).

followed into the follow-up period at the discretion of the Investigator.' This implies that most of cases [*sic*] of alopecia were not followed during the follow up in GEICAM study."

In light of the incomplete follow-up for adverse events in GEICAM 9805, results from this trial cannot be relied upon to yield valid data on irreversible or permanent alopecia. Therefore, TAX 316 provides the best available data for the evaluation of the potential causal effect of docetaxel on irreversible or permanent alopecia among breast cancer patients.

## Documentation from TAX 316 shows that most patients classified as having "ongoing" alopecia did not have irreversible alopecia.

As shown in Appendix 14.2.7.1.9 of the Clinical Study Report for TAX 316, reproduced below as Figure 5 of my report, 29 patients treated with TAC and 16 treated with FAC were classified as having "ongoing" alopecia during the follow-up period. This documentation, which lists all treatment-emergent adverse events with a frequency of more than 1% during the treatment period that persisted into the follow-up period in TAX 316, shows that 108 such adverse events were recorded using MedDRA Preferred Terms. Of these 108 distinct treatment-emergent adverse events that persisted into the follow-up period, 53 (49.1%) were classified as "ongoing" during the follow-up period in at least one patient. Adverse events classified as "ongoing" in at least 10 patients each included alopecia, nausea, asthenia, pain, peripheral edema, amenorrhea, irregular menstruation, peripheral sensory neuropathy, hot flush, arthralgia, nail disorder, and weight increased (Figure 5).

This appendix is an expanded version of Table 7 of the TAX 316 2010 Clinical Study Report that prompted Health Canada's TPD to contact Sanofi Canada to inquire about the definition of "ongoing" adverse events, as discussed earlier in this report.[26] Again, as communicated in Sanofi's response to TPD, "'ongoing' does not necessarily mean that these AEs were ongoing for the entire 10-year follow-up period; rather, it means that they were noted as ongoing at the last follow-up visit," where follow-up for adverse events may have ended due to resolution, initiation of further anticancer therapy (e.g., for breast cancer progression or relapse), study withdrawal, or death (Sanofi_02368838–02368922). Thus, patients who were classified as having "ongoing" nausea, hot flushes, weight gain, or alopecia, for example, did not necessarily have irreversible conditions that persisted at the end of 10 years of follow-up for treatment efficacy.

---

[26] Table 7 shows the number and percentage of patients with treatment-emergent adverse events with incidence ≥ 2% in TAC, whereas Appendix 14.2.7.1.9 shows the number and percentage of patients with treatment-emergent adverse events with incidence > 1%.

To determine whether patients classified as having "ongoing" alopecia in TAX 316 had documentation of alternative chemotherapy, breast cancer relapse, alopecia resolution, study withdrawal, or none of these, I examined case report forms (where available) and other clinical trial documentation from TAX 316 (available for all patients) for the 29 TAC-treated patients and 16 FAC-treated patients who were classified as having "ongoing" treatment-emergent alopecia.[27] Of note, all 45 of the patients with "ongoing" alopecia also had documentation of various other "ongoing" adverse events during the follow-up period, such as hot flush, asthenia, pain, insomnia, amenorrhea, skin disorder, weight loss, and weight gain. For completeness, I also included the one additional TAC-treated patient identified by Sanofi in correspondence with TPD as having "ongoing" non-treatment-emergent alopecia that started or worsened in follow-up, after the treatment period (patient 32001; Sanofi_0236880).

Based on this information, I classified the patients into several categories, as follows: 1) 11 patients who were no longer followed for alopecia, in accordance with the study protocol, because they had a documented change to a different chemotherapeutic regimen; 2) eight patients who were no longer followed for alopecia, also apparently in accordance with the study protocol, due to a documented breast cancer relapse (typically followed by a chemotherapy change or death); 3) 15 patients who had documented resolution of alopecia after having been noted at an earlier date to have "ongoing" alopecia; 4) two patients who were documented to have dropped out of the study; 5) one patient who had no notation of alopecia during several documented long-term follow-up visits; and 6) nine patients who did not have the foregoing documentation, and therefore potentially had irreversible alopecia, that is, alopecia persisting for at least six months after the end of study chemotherapy, without subsequent resolution. As several of the patients in the last category stopped follow-up for alopecia after more than six months due to breast cancer relapse, alternative chemotherapy, or unspecified reasons, it cannot be determined whether some of them later experienced resolution of their alopecia; therefore, I refer to all nine patients as having "possible" irreversible alopecia.

As discussed during his depositions,[28] Michael S. Kopreski, M.D., an oncologist and the former Associate Vice President and Head of the Oncology Area of Global Pharmacovigilance and Epidemiology at Sanofi since 2005 (now retired),[29] also evaluated TAX 316 documentation for the 29 patients in the TAC treatment arm and the 16 patients in the FAC treatment arm of TAX 316 who were classified as having "ongoing" alopecia. Using this information, Dr. Kopreski

---

[27]   TAX 316 2010 Clinical Study Report; case report forms for patients 11702, 11710, 12314, 15002, 15006, 16301, 19801, 20610, 22312, 22702, 24411, 25010, 25601, 26802, 26804, 26809, 27304, 28101, 29701, 30001, 30204, 30702, and 40401; and Exhibits 14–15 from the Deposition of Michael S. Kopreski, M.D., December 13, 2018

[28]   For example, Deposition of Michael S. Kopreski, M.D., December 13, 2018, Exhibits 13–15 and 561:9–563:11; and Deposition of Michael S. Kopreski, M.D., April 3, 2019, 502:20–506:5

[29]   Exhibit 16 from the Deposition of Michael S. Kopreski, M.D., December 13, 2018: Curriculum vitae, Michael Steven Kopreski, M.D., May 2018

identified 18 patients who subsequently received additional alternative chemotherapy, were diagnosed with breast cancer relapse, or died, and thus were no longer eligible to be followed up for treatment-emergent alopecia related to TAC or FAC; 15 patients whose alopecia was recorded as having resolved; one patient with long-term follow-up but without recorded alopecia; two patients who withdrew consent for study participation or were lost to follow-up; and nine patients with ongoing alopecia at least six months after last treatment with TAC or FAC. Thus, Dr. Kopreski's findings based on the available documentation from TAX 316 are consistent with mine.[30] We had slightly different findings regarding the dates of certain events for patients 12314, 23907, and 27601; however, these discrepancies did not affect these patients' classification of irreversible alopecia.

Table 3 presents summary information on the 29 TAC-treated patients and the 16 FAC-treated patients in TAX 316 with "ongoing" treatment-emergent alopecia (i.e., the same patients as shown in Table 2 of my report), and the additional TAC-treated patient with "ongoing" non-treatment-emergent alopecia. In this table, the date of last study treatment with TAC or FAC is derived from the Sanofi Canada correspondence with TPD in March 2012, and it matches the TAX 316 documentation that I reviewed. Additional information is derived from the TAX 316 documentation that I reviewed, including the date on which alopecia was last recorded as being "ongoing," and whether each patient had possible irreversible alopecia, with explanations for why, if applicable, their alopecia did not meet the definition of irreversible alopecia.

In particular, patients 22702, 15002, 15006, 25010, 26802, 17608, 29701, 40401, 25501, 16301, and 27601 were no longer followed for alopecia because they switched to alternative chemotherapies. Patients 23907, 15808, 20610, 24411, 24520, 25601, 27304, and 32001 were no longer followed for alopecia because they experienced breast cancer relapse, which was noted in several cases to have been followed by alternative chemotherapy or death. Patients 12211, 12314, 22312, 12403,[31] 12612, 13605, 13607, 13610, 13615, 17603, 30702, 13608, 26804, 27610, and 19801 were explicitly noted no longer to have alopecia (i.e., their alopecia resolved) at a subsequent date after they were classified as having "ongoing" alopecia during follow-up. Patient 11738 withdrew consent for study participation, thereby ending follow-up. Patient 15606 was described as lost to follow-up more than 2.5 years after she was last recorded as having "ongoing" alopecia, with no intervening assessments of alopecia. Patient 32207 did not have any positive or negative reports of alopecia during 11 subsequent follow-up visits after she was classified as having "ongoing" alopecia. The remaining nine patients (11702, 11724, 15005, 26809, 17407, 28101, 11710, 30001, and 30204) meet the definition of possible

---

[30]   Exhibit 13 from the Deposition of Michael S. Kopreski, M.D., December 13, 2018

[31]   The correspondence between Sanofi and TPD shows that patient 12403 developed alopecia for a second time on January 1, 2004 (Sanofi_02368880), more than five years after her last study treatment on December 11, 1998. Her alopecia that arose during the treatment period was documented as resolved in January 1999 (pp. 14380 and 38267 of TAX 316 2010 Clinical Study Report).

irreversible alopecia, i.e., alopecia persisting for at least six months after last chemotherapy (in the case of TAX 316, with TAC or FAC), without documentation of subsequent resolution.

Thus, of the 46 patients in TAX 316 who were classified as having "ongoing" alopecia, only nine (20%) may fulfill the criteria for irreversible alopecia. Of the remaining patients, 11 (24%) were ineligible for follow-up for alopecia, per study protocol, due to switching to an alternative chemotherapeutic regimen; eight (17%) were ineligible for alopecia follow-up, per study protocol, due to breast cancer relapse; 15 (33%) had documented resolution of alopecia; two (4%) had early termination of follow-up due to study drop-out; and one (2%) had no notation of alopecia during documented long-term follow-up.

I also examined the case report forms (where available) and other clinical trial documentation from TAX 316 for all other TAC-treated patients and FAC-treated patients who were classified in the interim Clinical Study Report as having treatment-emergent alopecia that persisted into the follow-up period, with no recorded end date or multiple recorded end dates (Listing of Existing Signs and Symptoms at Baseline and Clinical Adverse Events, pp. 14109–22007); and those who were classified in the final Clinical Study Report as having treatment-emergent alopecia that persisted into the follow-up period, with no recorded end date (Table 14.2.7.1.10, pp. 37191–37454), or treatment-emergent alopecia related to study chemotherapy that persisted into the follow-up period, with no recorded end date or multiple recorded end dates (Table 14.2.7.2.6, pp. 37601–41974). None of these patients, other than those identified in Table 3 of my report as having possible irreversible alopecia, meet the definition of irreversible alopecia. On the contrary, these patients also did not fulfill the criteria for irreversible alopecia due to documented resolution of treatment-emergent alopecia (in some cases followed by a second occurrence of alopecia during follow-up attributed to tamoxifen, radiotherapy, or another cause besides study chemotherapy) or lack of follow-up for alopecia after study drop-out before 6 months of follow-up.[32]

---

[32] These patients include four participants in the TAX 316 trial who were addressed during my deposition on January 7, 2020 (pp. 218–230): patients 10712, 18107, 19901, and 27702. The TAX 316 2010 Clinical Study Report shows that patient 10712 developed alopecia during cycle 1 of TAC on December 2, 1998 (p. 16194). At her 18th follow-up visit on April 2, 2009 (p. 43765), her alopecia was recorded as having resolved on August 21, 2008 (p. 37764). Thus, patient 10712 does not meet the definition of irreversible alopecia.

The case report forms for patient 18107 show that she developed alopecia during cycle 1 of TAC on May 1, 1998 (Sanofi_03243557), and this alopecia resolved on January 8, 1999 (Sanofi_03243779). She then developed alopecia for a second time starting in October 2002, and "[t]he most likely cause was not considered to be study chemotherapy (entered as 'other')"; this second instance of alopecia was recorded as "stopped" on April 1, 2004 (Sanofi_03243781). Thus, patient 18107 does not meet the definition of irreversible alopecia.

The case report forms for patient 19901 show that she developed alopecia during cycle 1 of TAC on March 6, 1998 (Sanofi_03245126), and this alopecia was resolved as of her first follow-up visit on October 13, 1998, with an "unknown" stop date (Sanofi_03245303). Thus, patient 19901 does not meet the definition of irreversible alopecia.

Individual patient records from TAX 316 confirm that other adverse events (not only alopecia) in TAX 316 were classified as "ongoing" based on persistence into the follow-up period, but not necessarily to the end of overall follow-up for efficacy, and that follow-up for other adverse events (not only alopecia) could be terminated due to alternative chemotherapy, breast cancer relapse, adverse event resolution, or study withdrawal. For instance, I examined the records of the 11 patients in TAX 316 who were classified as having "ongoing" treatment-emergent pain during the follow-up period (Sanofi_02368874 and p. 37184 of TAX 316 2010 Clinical Study Report). Documentation in the TAX 316 2010 Clinical Study Report, along with case report forms available from my review of patients with "ongoing" alopecia, shows at least 10 of these patients do not meet the criteria for "irreversible pain," defined as pain persisting for at least six months after the end of study chemotherapy, without subsequent resolution. Specifically, two patients' pain resolved less than six months after the end of the treatment period (patients 12314 and 22312: Sanofi_05497883 and Sanofi_05498090, respectively), and one patient's pain resolved at 10 months (patient 17612: p. 20716 of TAX 316 2010 Clinical Study Report). Two patients were no longer followed for pain after switching to an alternative chemotherapy (patients 22702 and 29701: Sanofi_05498559 and Sanofi_05468939/p. 21041 of TAX 316 2010 Clinical Study Report, respectively). Five patients had pain that was documented as resolved during the treatment period, and then reported pain as a new adverse event during the follow-up period, with a "most likely cause" other than study chemotherapy (i.e., radiotherapy, tumor, or "other") (patients 14520, 25806, 23202, 26806, and 19902: pp. 20139–20140, p. 18173, p. 17971, pp. 19427–19432, and pp. 21710–21711, respectively, of TAX 316 2010 Clinical Study Report). Only one individual, patient 21501, reported pain as an adverse event during the treatment period and continuing at least six months into the follow-up period, without subsequent resolution; however, her pain during follow-up was attributed to her breast cancer relapse that occurred four months after study treatment, and she died at seven months (pp. 17859–17860 and 32830 of TAX 316 2010 Clinical Study Report). Thus, like alopecia, pain and other adverse events that were classified as "ongoing" in TAX 316 were not irreversible or even long-term in nature, and follow-up for these adverse events often ended for the reasons specified above.

---

The TAX 316 2010 Clinical Study Report shows that patient 27702 developed alopecia during cycle 1 of TAC on April 1, 1999 (p. 21282), and this alopecia resolved on February 14, 2000 (p. 21291). She then developed alopecia for a second time starting in May 2001, and the most likely cause was recorded as "tamoxifen," with no documented resolution date (p. 21292). Thus, patient 27702 does not meet the definition of irreversible alopecia.

**Plaintiffs' experts rely on results from the TAX 316 and GEICAM 9805 trials that do not pertain to irreversible or permanent alopecia and are not a valid scientific basis for evaluating the causation or incidence of permanent or irreversible alopecia among patients treated with docetaxel-containing chemotherapeutic regimens.**

In addition to his analyses of the FAERS and Sanofi global pharmacovigilance databases and his meta-analysis of four comparative observational studies, discussed earlier in this report, Dr. Madigan presents the results of his analyses of combined data from TAX 316 and GEICAM 9805 (2020 Report of David G. Madigan, pp. 23–26). His analyses include a comparison of time to resolution of alopecia between patients treated with TAC versus FAC, where patients with "ongoing" alopecia are considered to be unresolved; and a meta-analysis of the rate ratio of "ongoing" alopecia in TAC- versus FAC-treated patients. Dr. Madigan also provides results for the latter analysis based on TAX 316 only.

Dr. Kessler explicitly describes and relies upon Dr. Madigan's analyses of data from these trials (Supplemental Report of David A. Kessler, M.D., pp. 5–71; 2019 Deposition of David A. Kessler, M.D., 234:13–235:3), and Dr. Plunkett (2019 Report of Laura M. Plunkett, Ph.D., DABT, pp. 25–26) and Dr. Feigal (2020 Report of Ellen G. Feigal, M.D., pp. 36–37, 40–4) also make reference to the results for "ongoing" alopecia in TAX 316 and GEICAM 9805, without specifically citing Dr. Madigan's analyses.

As described in the preceding sections, "ongoing" alopecia, as classified in TAX 316 and GEICAM 9805, does not correspond to irreversible, permanent, or even long-term alopecia; on the contrary, it includes instances of alopecia that persisted for less than six months after the end of chemotherapy before subsequently resolving or ceasing follow-up due to receipt of additional anticancer therapy (including for breast cancer relapse), study withdrawal, or death. Consequently, Dr. Madigan's results based on his analyses of TAX 316 and GEICAM 9805 data, as well as the conclusions of Dr. Kessler, Dr. Plunkett, and Dr. Feigal based on information on "ongoing" alopecia in these trials, cannot be relied upon as providing valid information about irreversible or permanent alopecia among breast cancer patients treated with TAC or FAC.

The same problem applies to Dr. Madigan's analysis of patients in TAX 316 with "ongoing" alopecia and a duration of follow-up for alopecia greater than two years (2020 Report of David Madigan, Ph.D., p. 26; 2019 Deposition of David A. Kessler, M.D., 234:13–235:3). Among these five patients (subject IDs 11702, 11724, 12403, 12612, and 26809; Sanofi_02368847–02368848), at least two did not have irreversible or permanent alopecia: subject 12403 was

documented as having alopecia that resolved in January 1999 (pp. 14380 and 38267 of TAX 316 2010 Clinical Study Report); and subject 12612 was documented as having alopecia that resolved on December 18, 2001 (p. 17759 of TAX 316 2010 Clinical Study Report). The difference in proportions between three (0.4%) of 744 patients treated with TAC and zero (0%) of 736 patients treated with FAC is statistically nonsignificant (two-sided Fisher's exact $p = 0.25$).

Notably, two of the three FAC-treated patients with "ongoing" alopecia who were followed for alopecia for longer than one year (subject IDs 11710, 19801, and 30001; Sanofi_02368849) died before two years of follow-up: subject 11710 relapsed on October 13, 1998 (Sanofi_05494735), and died on March 1, 2000 (Sanofi_05494746), and subject 30001 relapsed on March 10, 1999 (Sanofi_02216680), and died on August 18, 2000 (Sanofi_02216691). If not for their breast cancer relapse and death, these patients, too, could have been followed for alopecia for longer than two years.

Besides inappropriately using "ongoing" alopecia instead of irreversible or permanent alopecia as the outcome of analysis, Dr. Madigan's approach also is unsound because it includes data from GEICAM 9805, which had highly incomplete follow-up for adverse events. Indeed, Dr. Madigan noted in his report that GEICAM 9805 (also called TAX 301) lacked follow-up for adverse events: "[A]lopecia status, whether resolved or not, failed to be recorded for the majority of patients … Follow-up in TAX 301 for non-alopecia adverse events also seems to be poor" (2020 Report of David Madigan, Ph.D., p. 24).

A key difference between TAX 316 and GEICAM 9805 is that ascertainment of treatment-emergent adverse events into the follow-up period was conducted "at the discretion of the Investigator" in GEICAM 9805 (p. 110 of 2009 Clinical Study Report for GEICAM 9805), whereas no such role of investigators' discretion was permitted in TAX 316. That is, extended follow-up for adverse events, including but not limited to alopecia, was conducted by investigators' choice in GEICAM 9805, whereas it was standardized across study sites in TAX 316. Leaving long-term ascertainment of adverse events to the investigators' discretion in GEICAM 9805 most likely resulted not only in the high degree of incomplete data, but also a strong possibility of bias due to differential safety follow-up between patients treated with TAC and those treated with FAC. Nonrandom ascertainment of adverse events would nullify the benefits of treatment randomization and produce spurious, noncausal associations between treatment group and adverse events.

In summary, due to the highly incomplete and potentially biased data on adverse events, including irreversible or permanent alopecia, during the follow-up period in GEICAM 9805, Dr. Madigan should not have used GEICAM 9805 data in his analyses of time to alopecia resolution and the rate ratio of "ongoing" alopecia in TAC-treated versus FAC-treated patients. Instead, he

should have limited his analysis to the substantially more complete and unbiased follow-up data from TAX 316 (as shown in the upper half of Table 9 of the 2020 Report of David Madigan, Ph.D., p. 26). Even focusing on TAX 316, however, Dr. Madigan, Dr. Kessler, Dr. Plunkett, and Dr. Feigal all rely inappropriately upon data for a study-defined outcome, "ongoing" alopecia, that does not correspond to irreversible or permanent alopecia; therefore, their opinions based on Sanofi's clinical trial results would not be relevant to irreversible or permanent alopecia even if they were restricted to data from TAX 316.

## The cumulative incidence of possible irreversible alopecia did not differ significantly between the TAC and FAC arms of TAX 316, indicating no statistically significant difference in the causal effect of docetaxel versus 5-fluorouracil on irreversible alopecia.

As documented in the case report forms and other reports from TAX 316, six (0.8%) of 744 patients treated with TAC and three (0.4%) of 736 patients treated with FAC developed possible irreversible alopecia during follow-up in TAX 316 (two-sided Fisher's exact p = 0.51).

Table 2 (p. 22) of Sanofi's 2010 Clinical Study Report for TAX 316 shows that 43 patients assigned to TAC and 39 assigned to FAC were lost to follow-up; if these 82 patients are excluded from the cumulative incidence estimates because they were not completely followed for alopecia, then six (0.9%) of 701 patients treated with TAC and three (0.4%) of 697 patients treated with FAC developed possible irreversible alopecia during follow-up (two-sided Fisher's exact p = 0.51).

As described above and shown in Table 3 of my report, one patient assigned to TAC withdrew consent (subject ID 11738), one patient assigned to TAC was lost to follow-up (subject ID 15606), and one patient assigned to FAC had no recorded data on alopecia during eleven follow-up visits (subject ID 32207). All other patients had documented reasons for stopping follow-up for alopecia based on the study protocol, or had recorded evidence of alopecia resolution. Under conservative assumptions, if all three patients with ambiguous alopecia status are classified as having possible irreversible alopecia and the 82 patients lost to follow-up are excluded from the at-risk population, then eight (1.1%) of 701 patients treated with TAC and four (0.6%) of 697 patients treated with FAC developed possible irreversible alopecia during follow-up (two-sided Fisher's exact p = 0.39).

Under highly conservative assumptions, if only the two TAC-treated patients with ambiguous alopecia status, but not the one FAC-treated patient with ambiguous alopecia status, are classified as having possible irreversible alopecia and the 82 patients lost to follow-up are excluded from the at-risk population, then eight (1.1%) of 701 TAC-treated patients and three

(0.4%) of 697 FAC-treated patients developed possible irreversible alopecia during follow-up (two-sided Fisher's exact p = 0.22).[33]

None of these comparisons, even those based on highly conservative assumptions, results in a statistically significant difference in the cumulative incidence of possible irreversible alopecia between node-positive operable breast cancer patients treated with TAC and those treated with FAC. That is, the long-term, large, randomized controlled TAX 316 trial demonstrates no meaningful difference in the causal effect of TAC versus FAC on the cumulative incidence of irreversible alopecia. For the difference between the two treatment groups to be statistically significant based on a two-sided Fisher's exact test, assuming that three (0.4%) of 697 FAC-treated patients developed possible irreversible alopecia during follow-up, 12 (1.7%) of the 701 TAC-treated patients would have had to develop possible irreversible alopecia (two-sided Fisher's exact p = 0.03). Given that the only distinction between these two treatment groups is a single chemotherapeutic agent (docetaxel or 5-fluorouracil), these findings do not demonstrate a causal effect of docetaxel versus 5-fluorouracil on irreversible alopecia, based on the best available evidence from a long-term, large, randomized controlled trial. Instead, these results are consistent with no additional effect or an equivalent effect of docetaxel or 5-fluorouracil on irreversible alopecia beyond a potential effect of doxorubicin and cyclophosphamide (i.e., AC).

---

[33]  Under extremely unrealistic assumptions, if all of the patients without available Case Report Forms are classified as having possible irreversible alopecia, then 19 of 701 TAC-treated patients and 10 of 697 FAC-treated patients fall into this category (two-sided Fisher's exact p = 0.13).

14.2.7.1.9          Number (%) of patients with TEAE during treatment phase that persisted during FUP (when occurrence is more than 1%) - Safety population

| | TAC (N=744) | | | | FAC (N=736) | | | |
|---|---|---|---|---|---|---|---|---|
| | All | Persisting into follow-up | Resolved[a] | Ongoing[a] | All | Persisting into follow-up | Resolved[a] | Ongoing[a] |
| MedDRA Preferred Term | n (%) | n (%) | n (%) | n (%) | n (%) | n (%) | n (%) | n (%) |
| Alopecia | 728 (97.8%) | 687 (92.3%) | 658 (95.8%) | 29 (4.2%) | 715 (97.1%) | 645 (87.6%) | 629 (97.5%) | 16 (2.5%) |
| Nausea | 599 (80.5%) | 35 (4.7%) | 25 (71.4%) | 10 (28.6%) | 648 (88.0%) | 25 (3.4%) | 24 (96.0%) | 1 (4.0%) |
| Asthenia | 592 (79.6%) | 236 (31.7%) | 207 (87.7%) | 29 (12.3%) | 513 (69.7%) | 180 (24.5%) | 164 (91.1%) | 16 (8.9%) |
| Stomatitis | 510 (68.5%) | 18 (2.4%) | 13 (72.2%) | 5 (27.8%) | 374 (50.8%) | 13 (1.8%) | 13 (100%) | 0 |
| Vomiting | 330 (44.4%) | 5 (0.7%) | 3 (60.0%) | 2 (40.0%) | 436 (59.2%) | 2 (0.3%) | 2 (100%) | 0 |
| Infection[b] | 324 (43.5%) | 19 (2.6%) | 17 (89.5%) | 2 (10.5%) | 306 (41.6%) | 14 (1.9%) | 14 (100%) | 0 |
| Pain | 313 (42.1%) | 31 (4.2%) | 21 (67.7%) | 10 (32.3%) | 264 (35.9%) | 21 (2.9%) | 20 (95.2%) | 1 (4.8%) |
| Fever in absence of infection | 273 (36.7%) | 2 (0.3%) | 1 (50.0%) | 1 (50.0%) | 61 (8.3%) | 0 | 0 | 0 |
| Constipation | 271 (36.4%) | 17 (2.3%) | 14 (82.4%) | 3 (17.6%) | 255 (34.6%) | 16 (2.2%) | 14 (87.5%) | 2 (12.5%) |
| Diarrhoea | 262 (35.2%) | 7 (0.9%) | 6 (85.7%) | 1 (14.3%) | 205 (27.9%) | 2 (0.3%) | 2 (100%) | 0 |
| Oedema peripheral | 250 (33.6%) | 119 (16.0%) | 100 (84.0%) | 19 (16.0%) | 92 (12.5%) | 23 (3.1%) | 19 (82.6%) | 4 (17.4%) |
| Amenorrhoea | 212 (28.5%) | 202 (27.2%) | 81 (40.1%) | 121 (59.9%) | 136 (18.5%) | 125 (17.0%) | 39 (31.2%) | 86 (68.8%) |
| Menstruation irregular | 211 (28.4%) | 55 (7.4%) | 50 (90.9%) | 5 (9.1%) | 165 (22.4%) | 71 (9.6%) | 60 (84.5%) | 11 (15.5%) |
| Dysgeusia | 206 (27.7%) | 57 (7.7%) | 53 (93.0%) | 4 (7.0%) | 112 (15.2%) | 22 (3.0%) | 19 (86.4%) | 3 (13.6%) |
| Myalgia | 199 (26.7%) | 30 (4.0%) | 24 (80.0%) | 6 (20.0%) | 73 (9.9%) | 6 (0.8%) | 6 (100%) | 0 |
| Peripheral sensory neuropathy | 185 (24.9%) | 84 (11.3%) | 74 (88.1%) | 10 (11.9%) | 70 (9.5%) | 15 (2.0%) | 13 (86.7%) | 2 (13.3%) |

FAC: 5-fluorouracil, doxorubicin, and cyclophosphamide, TAC: docetaxel, doxorubicin, and cyclophosphamide.
[a]Percentages are calculated over the number of patients for each event during follow-up period
[b]All adverse events mapped to the MedDRA SOC term Infections and infestations.
PGM=PRODOPS/XRP6976D/TAX316/CSR/REPORT/PGM/a7_aept_fup.sas  OUT=REPORT/OUTPUT/a7_aept_fup_x.rtf (06JUL2010 - 10:40)

Figure 5. Appendix 14.2.7.1.9 of TAX 316 Clinical Study Report: Number and percentage of patients with treatment-emergent adverse events during the treatment phase that persisted during the follow-up period (when occurrence is more than 1%) – safety population (continued on next 3 pages).

1904088.000 – 7267

April 17, 2020

| MedDRA Preferred Term | TAC (N=744) | | | | FAC (N=736) | | | |
|---|---|---|---|---|---|---|---|---|
| | All | Persisting into follow-up | Resolved[a] | Ongoing[a] | All | Persisting into follow-up | Resolved[a] | Ongoing[a] |
| | n (%) | n (%) | n(%) | n(%) | n (%) | n (%) | n(%) | n(%) |
| Hot flush | 184 (24.7%) | 129 (17.3%) | 91 (70.5%) | 38 (29.5%) | 147 (20.0%) | 109 (14.8%) | 66 (60.6%) | 43 (39.4%) |
| Dyspepsia | 179 (24.1%) | 18 (2.4%) | 15 (83.3%) | 3 (16.7%) | 132 (17.9%) | 11 (1.5%) | 10 (90.9%) | 1 (9.1%) |
| Skin disorder | 176 (23.7%) | 59 (7.9%) | 55 (93.2%) | 4 (6.8%) | 105 (14.3%) | 42 (5.7%) | 41 (97.6%) | 1 (2.4%) |
| Decreased appetite | 161 (21.6%) | 22 (3.0%) | 20 (90.9%) | 2 (9.1%) | 130 (17.7%) | 8 (1.1%) | 7 (87.5%) | 1 (12.5%) |
| Pyrexia | 156 (21.0%) | 4 (0.5%) | 3 (75.0%) | 1 (25.0%) | 88 (12.0%) | 2 (0.3%) | 2 (100%) | 0 |
| Headache | 154 (20.7%) | 11 (1.5%) | 9 (81.8%) | 2 (18.2%) | 169 (23.0%) | 5 (0.7%) | 5 (100%) | 0 |
| Arthralgia | 144 (19.4%) | 30 (4.0%) | 22 (73.3%) | 8 (26.7%) | 67 (9.1%) | 10 (1.4%) | 8 (80.0%) | 2 (20.0%) |
| Nail disorder | 135 (18.1%) | 106 (14.2%) | 102 (96.2%) | 4 (3.8%) | 103 (14.0%) | 79 (10.7%) | 73 (92.4%) | 6 (7.6%) |
| Weight increased | 131 (17.6%) | 89 (12.0%) | 56 (62.9%) | 33 (37.1%) | 108 (14.7%) | 61 (8.3%) | 36 (59.0%) | 25 (41.0%) |
| Insomnia | 122 (16.4%) | 26 (3.5%) | 22 (84.6%) | 4 (15.4%) | 83 (11.3%) | 17 (2.3%) | 16 (94.1%) | 1 (5.9%) |
| Lung disorder | 118 (15.9%) | 25 (3.4%) | 24 (96.0%) | 1 (4.0%) | 64 (8.7%) | 19 (2.6%) | 17 (89.5%) | 2 (10.5%) |
| Cough | 100 (13.4%) | 4 (0.5%) | 3 (75.0%) | 1 (25.0%) | 72 (9.8%) | 4 (0.5%) | 3 (75.0%) | 1 (25.0%) |
| Injection site reaction | 99 (13.3%) | 21 (2.8%) | 21 (100%) | 0 | 88 (12.0%) | 22 (3.0%) | 22 (100%) | 0 |
| Lacrimation increased | 87 (11.7%) | 22 (3.0%) | 22 (100%) | 0 | 52 (7.1%) | 8 (1.1%) | 8 (100%) | 0 |
| Hypersensitivity | 85 (11.4%) | 4 (0.5%) | 3 (75.0%) | 1 (25.0%) | 21 (2.9%) | 0 | 0 | 0 |
| Affective disorder | 83 (11.2%) | 15 (2.0%) | 12 (80.0%) | 3 (20.0%) | 77 (10.5%) | 15 (2.0%) | 12 (80.0%) | 3 (20.0%) |
| Dizziness | 63 (8.5%) | 4 (0.5%) | 3 (75.0%) | 1 (25.0%) | 50 (6.8%) | 2 (0.3%) | 2 (100%) | 0 |
| Oropharyngeal pain | 60 (8.1%) | 0 | 0 | 0 | 53 (7.2%) | 1 (0.1%) | 1 (100%) | 0 |
| Haemorrhoids | 57 (7.7%) | 1 (0.1%) | 0 | 1 (100%) | 35 (4.8%) | 2 (0.3%) | 2 (100%) | 0 |
| Chills | 53 (7.1%) | 2 (0.3%) | 0 | 2 (100%) | 29 (3.9%) | 1 (0.1%) | 1 (100%) | 0 |
| Flushing | 49 (6.6%) | 2 (0.3%) | 0 | 2 (100%) | 26 (3.5%) | 0 | 0 | 0 |
| Abdominal pain upper | 46 (6.2%) | 1 (0.1%) | 1 (100%) | 0 | 22 (3.0%) | 3 (0.4%) | 2 (66.7%) | 1 (33.3%) |
| Arrhythmia | 46 (6.2%) | 1 (0.1%) | 0 | 1 (100%) | 36 (4.9%) | 4 (0.5%) | 4 (100%) | 0 |
| Nasopharyngitis | 45 (6.0%) | 0 | 0 | 0 | 62 (8.4%) | 1 (0.1%) | 1 (100%) | 0 |
| Rhinorrhoea | 39 (5.2%) | 9 (1.2%) | 9 (100%) | 0 | 27 (3.7%) | 2 (0.3%) | 2 (100%) | 0 |
| Dry mouth | 36 (4.8%) | 10 (1.3%) | 10 (100%) | 0 | 43 (5.8%) | 12 (1.6%) | 12 (100%) | 0 |
| Upper respiratory tract infection | 36 (4.8%) | 0 | 0 | 0 | 54 (7.3%) | 1 (0.1%) | 1 (100%) | 0 |
| Dry skin | 32 (4.3%) | 17 (2.3%) | 17 (100%) | 0 | 36 (4.9%) | 11 (1.5%) | 11 (100%) | 0 |
| Lymphoedema | 32 (4.3%) | 11 (1.5%) | 5 (45.5%) | 6 (54.5%) | 8 (1.1%) | 1 (0.1%) | 0 | 1 (100%) |
| Pharyngitis | 31 (4.2%) | 0 | 0 | 0 | 21 (2.9%) | 0 | 0 | 0 |
| Conjunctivitis | 29 (3.9%) | 5 (0.7%) | 4 (80.0%) | 1 (20.0%) | 35 (4.8%) | 2 (0.3%) | 2 (100%) | 0 |
| Abdominal pain | 28 (3.8%) | 0 | 0 | 0 | 10 (1.4%) | 0 | 0 | 0 |

Figure 5, continued (1)

| MedDRA Preferred Term | TAC (N=744) All n (%) | Persisting into follow-up n (%) | Resolved[a] n(%) | Ongoing[a] n(%) | FAC (N=736) All n (%) | Persisting into follow-up n (%) | Resolved[a] n(%) | Ongoing[a] n(%) |
|---|---|---|---|---|---|---|---|---|
| Anxiety | 28 (3.8%) | 1 (0.1%) | 1 (100%) | 0 | 32 (4.3%) | 4 (0.5%) | 3 (75.0%) | 1 (25.0%) |
| Weight decreased | 28 (3.8%) | 13 (1.7%) | 11 (84.6%) | 2 (15.4%) | 22 (3.0%) | 5 (0.7%) | 4 (80.0%) | 1 (20.0%) |
| Peripheral motor neuropathy | 26 (3.5%) | 6 (0.8%) | 6 (100%) | 0 | 14 (1.9%) | 1 (0.1%) | 1 (100%) | 0 |
| Influenza like illness | 25 (3.4%) | 0 | 0 | 0 | 18 (2.4%) | 0 | 0 | 0 |
| Oral candidiasis | 23 (3.1%) | 2 (0.3%) | 1 (50.0%) | 1 (50.0%) | 8 (1.1%) | 1 (0.1%) | 1 (100%) | 0 |
| Dry eye | 22 (3.0%) | 7 (0.9%) | 7 (100%) | 0 | 19 (2.6%) | 8 (1.1%) | 8 (100%) | 0 |
| Vulvovaginal mycotic infection | 22 (3.0%) | 0 | 0 | 0 | 12 (1.6%) | 0 | 0 | 0 |
| Oral herpes | 21 (2.8%) | 2 (0.3%) | 2 (100%) | 0 | 21 (2.9%) | 1 (0.1%) | 1 (100%) | 0 |
| Dyspnoea | 20 (2.7%) | 7 (0.9%) | 3 (42.9%) | 4 (57.1%) | 8 (1.1%) | 2 (0.3%) | 2 (100%) | 0 |
| Epistaxis | 20 (2.7%) | 0 | 0 | 0 | 15 (2.0%) | 0 | 0 | 0 |
| Fatigue | 19 (2.6%) | 5 (0.7%) | 4 (80.0%) | 1 (20.0%) | 14 (1.9%) | 3 (0.4%) | 3 (100%) | 0 |
| Depression | 18 (2.4%) | 1 (0.1%) | 1 (100%) | 0 | 18 (2.4%) | 2 (0.3%) | 1 (50.0%) | 1 (50.0%) |
| Dysphagia | 18 (2.4%) | 0 | 0 | 0 | 5 (0.7%) | 0 | 0 | 0 |
| Dysuria | 18 (2.4%) | 0 | 0 | 0 | 14 (1.9%) | 0 | 0 | 0 |
| Pain in extremity | 18 (2.4%) | 2 (0.3%) | 2 (100%) | 0 | 14 (1.9%) | 2 (0.3%) | 2 (100%) | 0 |
| Influenza | 17 (2.3%) | 0 | 0 | 0 | 19 (2.6%) | 0 | 0 | 0 |
| Sinusitis | 16 (2.2%) | 0 | 0 | 0 | 19 (2.6%) | 0 | 0 | 0 |
| Vision blurred | 16 (2.2%) | 3 (0.4%) | 3 (100%) | 0 | 14 (1.9%) | 2 (0.3%) | 2 (100%) | 0 |
| Erythema | 15 (2.0%) | 0 | 0 | 0 | 12 (1.6%) | 2 (0.3%) | 2 (100%) | 0 |
| Lethargy | 15 (2.0%) | 10 (1.3%) | 7 (70.0%) | 3 (30.0%) | 20 (2.7%) | 11 (1.5%) | 9 (81.8%) | 2 (18.2%) |
| Respiratory tract infection | 15 (2.0%) | 1 (0.1%) | 1 (100%) | 0 | 6 (0.8%) | 1 (0.1%) | 1 (100%) | 0 |
| Candidiasis | 14 (1.9%) | 2 (0.3%) | 2 (100%) | 0 | 5 (0.7%) | 1 (0.1%) | 1 (100%) | 0 |
| Flatulence | 14 (1.9%) | 1 (0.1%) | 1 (100%) | 0 | 3 (0.4%) | 0 | 0 | 0 |
| Gastritis | 14 (1.9%) | 1 (0.1%) | 1 (100%) | 0 | 6 (0.8%) | 1 (0.1%) | 1 (100%) | 0 |
| Hypotension | 14 (1.9%) | 0 | 0 | 0 | 6 (0.8%) | 0 | 0 | 0 |
| Parosmia | 14 (1.9%) | 4 (0.5%) | 3 (75.0%) | 1 (25.0%) | 11 (1.5%) | 2 (0.3%) | 2 (100%) | 0 |
| Cardiac disorder | 13 (1.7%) | 5 (0.7%) | 4 (80.0%) | 1 (20.0%) | 4 (0.5%) | 2 (0.3%) | 2 (100%) | 0 |
| Eye irritation | 13 (1.7%) | 2 (0.3%) | 2 (100%) | 0 | 14 (1.9%) | 4 (0.5%) | 4 (100%) | 0 |
| Hyperhidrosis | 13 (1.7%) | 1 (0.1%) | 1 (100%) | 0 | 8 (1.1%) | 1 (0.1%) | 1 (100%) | 0 |
| Night sweats | 13 (1.7%) | 5 (0.7%) | 4 (80.0%) | 1 (20.0%) | 12 (1.6%) | 5 (0.7%) | 4 (80.0%) | 1 (20.0%) |
| Vaginal infection | 13 (1.7%) | 1 (0.1%) | 0 | 1 (100%) | 12 (1.6%) | 1 (0.1%) | 1 (100%) | 0 |
| Haemorrhage | 12 (1.6%) | 1 (0.1%) | 1 (100%) | 0 | 7 (1.0%) | 0 | 0 | 0 |

Figure 5, continued (2)

April 17, 2020

| MedDRA Preferred Term | TAC (N=744) | | | | FAC (N=736) | | | |
|---|---|---|---|---|---|---|---|---|
| | All | Persisting into follow-up | Resolved[a] | Ongoing[a] | All | Persisting into follow-up | Resolved[a] | Ongoing[a] |
| | n (%) | n (%) | n(%) | n(%) | n (%) | n (%) | n(%) | n(%) |
| Oesophagitis | 12 (1.6%) | 1 (0.1%) | 0 | 1 (100%) | 7 (1.0%) | 1 (0.1%) | 1 (100%) | 0 |
| Palpitations | 12 (1.6%) | 3 (0.4%) | 3 (100%) | 0 | 7 (1.0%) | 0 | 0 | 0 |
| Rhinitis | 12 (1.6%) | 0 | 0 | 0 | 9 (1.2%) | 0 | 0 | 0 |
| Dehydration | 11 (1.5%) | 0 | 0 | 0 | 9 (1.2%) | 0 | 0 | 0 |
| Vertigo | 11 (1.5%) | 1 (0.1%) | 1 (100%) | 0 | 6 (0.8%) | 0 | 0 | 0 |
| Vulvovaginal dryness | 11 (1.5%) | 2 (0.3%) | 2 (100%) | 0 | 5 (0.7%) | 3 (0.4%) | 1 (33.3%) | 2 (66.7%) |
| Gastrooesophageal reflux disease | 10 (1.3%) | 2 (0.3%) | 2 (100%) | 0 | 13 (1.8%) | 0 | 0 | 0 |
| Nasal congestion | 10 (1.3%) | 0 | 0 | 0 | 18 (2.4%) | 0 | 0 | 0 |
| Syncope | 10 (1.3%) | 0 | 0 | 0 | 7 (1.0%) | 0 | 0 | 0 |
| Tooth infection | 10 (1.3%) | 0 | 0 | 0 | 5 (0.7%) | 0 | 0 | 0 |
| Urinary tract infection | 10 (1.3%) | 0 | 0 | 0 | 21 (2.9%) | 0 | 0 | 0 |
| Abdominal discomfort | 9 (1.2%) | 0 | 0 | 0 | 10 (1.4%) | 1 (0.1%) | 1 (100%) | 0 |
| Abdominal distension | 9 (1.2%) | 2 (0.3%) | 1 (50.0%) | 1 (50.0%) | 6 (0.8%) | 0 | 0 | 0 |
| Anal fissure | 9 (1.2%) | 1 (0.1%) | 1 (100%) | 0 | 2 (0.3%) | 0 | 0 | 0 |
| Disturbance in attention | 9 (1.2%) | 2 (0.3%) | 2 (100%) | 0 | 11 (1.5%) | 3 (0.4%) | 3 (100%) | 0 |
| Ear pain | 9 (1.2%) | 0 | 0 | 0 | 3 (0.4%) | 0 | 0 | 0 |
| Mucosal inflammation | 9 (1.2%) | 0 | 0 | 0 | 4 (0.5%) | 0 | 0 | 0 |
| Phlebitis | 9 (1.2%) | 2 (0.3%) | 2 (100%) | 0 | 7 (1.0%) | 0 | 0 | 0 |
| Pneumonia | 9 (1.2%) | 0 | 0 | 0 | 3 (0.4%) | 0 | 0 | 0 |
| Seasonal allergy | 9 (1.2%) | 0 | 0 | 0 | 3 (0.4%) | 0 | 0 | 0 |
| Visual impairment | 9 (1.2%) | 2 (0.3%) | 2 (100%) | 0 | 12 (1.6%) | 1 (0.1%) | 1 (100%) | 0 |
| Vulvovaginal pruritus | 9 (1.2%) | 1 (0.1%) | 1 (100%) | 0 | 4 (0.5%) | 0 | 0 | 0 |
| Chest pain | 8 (1.1%) | 0 | 0 | 0 | 2 (0.3%) | 0 | 0 | 0 |
| Contusion | 8 (1.1%) | 2 (0.3%) | 2 (100%) | 0 | 4 (0.5%) | 0 | 0 | 0 |
| Electroencephalogram abnormal | 8 (1.1%) | 0 | 0 | 0 | 7 (1.0%) | 1 (0.1%) | 1 (100%) | 0 |
| Eyelid oedema | 8 (1.1%) | 1 (0.1%) | 1 (100%) | 0 | 1 (0.1%) | 0 | 0 | 0 |
| Menorrhagia | 8 (1.1%) | 2 (0.3%) | 1 (50.0%) | 1 (50.0%) | 5 (0.7%) | 0 | 0 | 0 |
| Tooth abscess | 8 (1.1%) | 1 (0.1%) | 1 (100%) | 0 | 2 (0.3%) | 0 | 0 | 0 |

Figure 5, continued (3)

Table 3. Patients in TAX 316 with "ongoing" alopecia, with classification of irreversible alopecia and reasons (if applicable) for lack of correspondence with "ongoing" alopecia, based on information from Sanofi Canada Response to Agency Request, Taxotere® (docetaxel), SNDS Control #150484, March 13, 2012 (Sanofi_02368847–02368849), TAX 316 Clinical Study Report, and case report forms

| Subject ID | Study Treatment | Last Study Treatment | Alopecia Still "Ongoing" | Possible Irreversible Alopecia? |
|---|---|---|---|---|
| 11702 | TAC | 1997-10-31 | 2007-12-14 (Sanofi_05524364) | Yes; ongoing at last follow-up (Sanofi_05524364) |
| 11724 | TAC | 1998-09-23 | 2001-10-09 (p. 14856) | Yes; ongoing at relapse (p. 32435) |
| 11738 | TAC | 1999-04-27 | 1999-08-23 (p. 14990) | No; withdrew consent 1999-09-20 (p. 32450) |
| 12211 | TAC | 1998-08-12 | 1998-08-12 (p. 17558) | No; resolved 1998-11-04 (p. 17559) |
| 12314 | TAC | 1999-02-18 | 1999-03-31 (Sanofi_05497892) | No; resolved 1999-04-22 (Sanofi_05497902) |
| 22312 | TAC | 1999-02-15 | 1999-04-19 (Sanofi_05498079) | No; resolved 1999-05-10 (Sanofi_05498089) |
| 12403 | TAC | 1998-12-11 | 1998-12-11 (p. 14379) | No; resolved 1999-01 (pp. 14380, 38267) |
| 12612 | TAC | 1999-05-11 | 2001-06-12 (p. 17759) | No; resolved 2001-12-18 (p. 17759) |
| 22702 | TAC | 1998-09-02 | 1998-11-25 (Sanofi_05498600) | No; switched to FAC 1998-09-23 (Sanofi_05498559) |
| 13605 | TAC | 1998-08-26 | 1998-08-26 (p. 19487) | No; resolved 1998-12-03 (p. 19488) |
| 13607 | TAC | 1998-09-16 | 1998-09-16 (p. 19492) | No; resolved 1998-11-23 (p. 19492) |
| 13610 | TAC | 1999-04-06 | 1999-04-06 (p. 19497) | No; resolved 1999-07-22 (p. 19497) |
| 13615 | TAC | 1999-06-15 | 1999-06-15 (p. 19506) | No; resolved 1999-11-05 (p. 19507) |
| 23907 | TAC | 1998-11-25 | 1st visit after 1998-11-25 (date not specified) (p. 19573) | No; relapsed 1998-11-10 (p. 651), alopecia not reported 1999-03-18 to 2003-03-06 (pp. 19573, 33204) |
| 15002 | TAC | 1998-08-26 | 1998-11-03 (Sanofi_05503641) | No; switched to AC 1998-09-23 (Sanofi_05503640) |
| 15005 | TAC | 1999-03-09 | 1999-09-28 (p. 18445) | Yes; ongoing at relapse (p. 32975), switched to vinorelbine (p. 517) |
| 15006 | TAC | 1998-12-23 | 1999-02-23 (Sanofi_05503716) | No; switched to AC 1999-01-12 (Sanofi_05503707) |
| 25010 | TAC | 1999-07-30 | 1999-11-25 (Sanofi_05503820) | No; switched to EC 1999-08-20 (Sanofi_05503819) |
| 15606 | TAC | 1998-12-04 | 1999-01-11 (p. 18545) | No; described as lost to follow-up 2001-07-25 (p. 33002) |
| 15808 | TAC | 1998-09-04 | 1998-12-30 (p. 18078) | No; relapsed 1998-12-30 (p. 539) |
| 26802 | TAC | 1998-09-07 | 1998-12-31 (Sanofi_05506770) | No; switched to AC 1998-09-28 (Sanofi_05506765) |
| 26809 | TAC | 1999-09-02 | 2008-11-18 (Sanofi_05520752) | Yes; ongoing at relapse (Sanofi_05520747) |
| 17407 | TAC | 1998-05-21 | 1998-11-25 (p. 21134) | Yes; ongoing at last follow-up (p. 21134), alopecia not reported during 11 visits, 1999-02-17 to 2003-01-15 (pp. 21134, 33663–33664) |

April 17, 2020

| Subject ID | Study Treatment | Last Study Treatment | Alopecia Still "Ongoing" | Possible Irreversible Alopecia? |
|---|---|---|---|---|
| 17603 | TAC | 1998-05-08 | 1999-02-19 (p. 20653) | No; resolved 1999-05-07 (p. 20654) |
| 17608 | TAC | 1998-06-23 | 1999-09-22 (p. 20682) | No; switched to AC 1998-07-14 (p. 35363) |
| 28101 | TAC | 1997-11-14 | 1998-08-12 (Sanofi_05464546) | Yes; ongoing at last follow-up (Sanofi_05464546), relapsed 1998-02-20, contralateral 2nd primary diagnosed 1998-03-09, died 1999-10-08 (p. 879) |
| 29701 | TAC | 1998-07-09 | 1998-11-12 (Sanofi_05468943) | No; switched to AC 1998-08-14 (Sanofi_05468939) |
| 40401 | TAC | 1998-07-02 | 1998-09-22 (Sanofi_03244449) | No; switched to AC 1998-08-03 (Sanofi_03244450) |
| 30702 | TAC | 1999-04-16 | 1999-04-16 (Sanofi_02228524) | No; resolved 1999-08-30 (Sanofi_02228542) |
| 32001 | TAC | 1998-03-27 | 1998-10-16 (Sanofi_02213831) | No; alopecia first documented at first follow-up visit on 1998-07-20 with onset in 1998-04 (Sanofi_02213722, Sanofi_02213819, Sanofi_02213824), relapsed 1998-09-24 (Sanofi_02213932), died 1999-05-31 (Sanofi_02213835) |
| 32207 | FAC | 1999-05-26 | 1999-09-15 (p.14164) | No; alopecia not reported during 11 visits, 1999-12-15 to 2003-06-25 (pp. 14164, 32309–32310) |
| 20610 | FAC | 1999-04-29 | 1999-07-08 (Sanofi_05501313) | No; relapsed 1999-05-31 (Sanofi_05501306), died 1999-08-30 (Sanofi_05501314) |
| 11710 | FAC | 1998-03-10 | 1998-10-13 (Sanofi_05494739) | Yes; ongoing at relapse (Sanofi_05494735), switched to T 1998-10-20 (p. 895) |
| 13608 | FAC | 1999-01-18 | 1999-01-18 (p. 19494) | No; resolved 1999-04-22 (p. 19494) |
| 24411 | FAC | 1999-03-10 | 1999-06-10 (Sanofi_05476993) | No; relapsed 1999-06-09 (Sanofi_05476994), switched to vinorelbine 1999-06-11 (Sanofi_05476995) |
| 24520 | FAC | 1999-02-11 | 1999-03-22 (p. 20363) | No; relapsed 1999-03-22 (p. 33458), switched to T 1999-04-07 (p. 35351) |
| 25501 | FAC | 1998-11-16 | 1999-02-12 (p. 18221) | No; metastasized 1999-02-02 (p. 34388), switched to T 1999-02-12 (p. 18221) |
| 25601 | FAC | 1998-04-03 | 1998-09-14 (Sanofi_05506285) | No; relapsed 1998-09-14 (Sanofi_05506286), switched to T 1998-09-19 (Sanofi_05506287) |
| 16301 | FAC | 1999-01-28 | 1999-05-26 (Sanofi_05511550) | No; switched to CMF 1999-03-11 (Sanofi_05511551) |
| 26804 | FAC | 1998-11-18 | 1998-11-18 (Sanofi_05506407) | No; resolved 1999-03-16 (Sanofi_05506423) |
| 27304 | FAC | 1999-08-09 | 1999-09-07 (p. 21746) | No; relapsed 1999-09-07 (Sanofi_05466978), died 1999-09-15 (p. 815) |

**April 17, 2020**

| Subject ID | Study Treatment | Last Study Treatment | Alopecia Still "Ongoing" | Possible Irreversible Alopecia? |
|---|---|---|---|---|
| 27601 | FAC | 1998-04-17 | 1998-09-08 (p. 20736) | No; switched to C/carboplatin/thiotepa 1998-08-05 (p. 35364) |
| 27610 | FAC | 1999-09-10 | 2000-03-03 (p. 20791) | No; relapsed 2000-06-09 (p. 817), resolved 2000-06-16 (p. 20792) |
| 19801 | FAC | 1998-03-17 | 1998-03-17 (Sanofi_02218448) | No; resolved 1998-05-12 (Sanofi_02218341) |
| 30001 | FAC | 1998-01-30 | 1999-03-10 (Sanofi_02216685) | Yes; ongoing at relapse (Sanofi_02216680), died 2000-08-18 (p. 987) |
| 30204 | FAC | 1999-03-05 | 1999-09-22 (Sanofi_02214170) | Yes; ongoing at last follow-up (Sanofi_02214166), alopecia not reported during 8 visits, 1999-12-15 to 2003-01-07 (pp. 21380, 33722) |

A: doxorubicin; C: cyclophosphamide; E: epirubicin; F: 5-fluorouracil; M: methotrexate; T: docetaxel

*Page numbers refer to the TAX 316 10-year Clinical Study Report; Bates numbers refer to TAX 316 case report forms. Dates may be documented separately on pages other than those cited for documentation of "ongoing" alopecia, resolved alopecia, therapy change, relapse, or other events.

# Evaluation of evidence from randomized controlled trials using the Hill guidelines does not establish a causal effect of docetaxel versus other chemotherapeutic agents on irreversible or permanent alopecia.

To structure their assessments of whether docetaxel causes irreversible or permanent alopecia, Dr. Kessler and Dr. Feigal use the Hill guidelines, described in the introduction to my report (Hill 1965) (Supplemental Report of David A. Kessler, M.D., pp. 9–10; 2020 Report of Ellen G. Feigal, M.D., pp. 34–35). As I stated earlier, the Hill guidelines are frequently used by epidemiologists as a framework for evaluating the overall weight of scientific evidence from epidemiological studies of a given exposure-outcome association. These guidelines are useful and relevant for causal analysis of the majority of exposure-outcome associations studied in epidemiology, which is typically an observational (as opposed to experimental) science. The Hill guidelines are important because a statistically significant association in any given observational epidemiological study may be due to bias, confounding, or chance; therefore, evaluation of the totality of epidemiological studies based on standard considerations, such as those described by Hill (1965), is needed to shed light on whether that association is likely to be causal.

However, the Hill guidelines are not necessary or even relevant to evaluate causation in the presence of reliable experimental evidence in humans, namely, large, randomized controlled trials. One of the nine considerations described by Hill (1965) is experimental evidence (emphasis added):

> **Occasionally it is possible to appeal to experimental, or semi-experimental, evidence**. For example, because of an observed association some preventive action is taken. Does it in fact prevent? The dust in the workshop is reduced, lubricating oils are changed, persons stop smoking cigarettes. Is the frequency of the associated events affected? **Here the strongest support for the causation hypothesis may be revealed**.

This excerpt indicates that the associations intended for evaluation according to Hill's framework usually are not those that can be addressed directly by high-quality experimental evidence, which provides the "strongest support for the causation hypothesis"; indeed, such experimental evidence can obviate nonexperimental evidence. In fact, Sir Austin Bradford Hill first introduced the concept of randomization in clinical trials to eliminate confounding and bias, which can compromise the validity of observational studies and nonrandomized trials; thus,

compared with the collective evidence from multiple studies that are each insufficient to reach a definitive conclusion, "the alternative of a trial that is large enough to provide a clear answer on its own is certainly preferable" (Doll 1992). In other words, where large, randomized controlled trials are available to address a given causal question regarding a medical intervention—as in the present matter—those trials can be sufficient to evaluate causation. Dr. Feigal testified that Hill's considerations of analogy and experiment "really aren't relevant to this case" (Jury Trial Testimony of Ellen G. Feigal, M.D., 1182:10–14), but this statement is incorrect; experimental evidence from randomized controlled trials is completely relevant and provides the highest-quality information in this matter.

Hill (1965) also specified that his considerations were meant to be used to evaluate "an association between two variables, perfectly clear-cut and beyond what we would care to attribute to the play of chance. What aspects of that association should we especially consider before deciding that the most likely interpretation of it is causation?" That is, the Hill guidelines should be used to evaluate the overall weight of scientific evidence pertaining to a *statistically significant* association that is deemed unlikely to be explained by chance.

Plaintiffs' experts acknowledge the primacy of randomized controlled trials for evaluating the potential causal effects of medical interventions. Dr. Madigan states: "Randomized controlled trials represent the gold standard in estimating the clinical effects of medical interventions" (2020 Report of David Madigan, Ph.D., p. 11). Dr. Kessler notes that in FDA's guidance regarding the "factors to be considered in assessing whether there is reasonable evidence of a causal association," those "factors do not include other kinds of epidemiological studies beyond controlled trials" (2018 Report of David A. Kessler, M.D., pp. 32, 37); that is, controlled trials are deemed sufficient by FDA to assess causation. Dr. Feigal lists "Prospective, randomized, controlled, clinical trials" at the top of her list of the "various types of study design … in descending order of strength" (2020 Report of Ellen G. Feigal, M.D., p. 33).

Several prominent examples help to illustrate the pitfalls of relying on observational studies to estimate potential causal effects of medical interventions. For instance, several large, randomized controlled trials of beta-carotene for lung cancer prevention were launched largely on the basis of findings of a protective statistical association in observational studies, yet none of the trials demonstrated a protective causal effect of beta-carotene (Alpha-Tocopherol 1994, Hennekens et al. 1996, Omenn et al. 1996, Lin et al. 2009). The spurious association detected in the observational studies was then ascribed to confounding and exposure measurement error. Similarly, two large, randomized controlled trials were conducted to evaluate a potential protective effect of bisphosphonates (drugs used to treat osteoporosis) against postmenopausal breast cancer, as had been suggested by observational studies (Hue et al. 2014). When no beneficial effect was found in the trials, the apparent association in observational studies was blamed on confounding by indication—that is, use of bisphosphonates by women with low bone

density, fractures, and bone loss, who may also have lower levels of reproductive hormones that increase postmenopausal breast cancer risk (Hue et al. 2014). These examples and others emphasize the critical importance of randomization to eliminate confounding and other biases that otherwise threaten the validity of studies of medical interventions.

Returning to the topic of docetaxel and irreversible or permanent alopecia, the causal question at issue is whether docetaxel increases the risk of irreversible or permanent alopecia in comparison with other accepted anticancer chemotherapies in breast cancer patients. Four observational comparative studies pertain to this question (Sedlacek 2006, Crown et al. 2017a, Crown et al. 2017b, Martin et al. 2018b, Kang et al. 2019), but their nonrandomized design renders them unreliable for assessing causation in light of the high potential for confounding and other bias.

Three randomized controlled trials—TAX 316, GEICAM 9805, and Sjostrom et al. (1999)—are available to address this causal question; however, the results of GEICAM 9805 are insufficient for this purpose because of its incomplete follow-up for safety. Sjostrom et al. (1999) is limited by its relatively small number of patients and short duration of follow-up for safety, but its randomized controlled design makes it otherwise a valid basis for evaluating causation. Neither TAX 316 nor Sjostrom et al. (1999) found a significant difference in the cumulative incidence of irreversible or permanent alopecia (or, per Sjostrom et al. (1999), "nonreversible" alopecia) between breast cancer patients treated with docetaxel and those treated with a nondocetaxel regimen. Therefore, evaluation of causality using the Hill guidelines is unnecessary, since the guidelines are designed for assessment of "perfectly clear-cut," statistically significant associations that are "beyond … the play of chance" (Hill 1965). Nevertheless, below I provide a brief summary using the Hill guidelines as a framework to evaluate the most appropriate evidence from two randomized controlled trials of docetaxel and irreversible or permanent alopecia, TAX 316 and Sjostrom et al. (1999).[34]

Both trials found no significant difference in the cumulative incidence of irreversible or permanent alopecia by treatment group. Therefore, the **strength** of the observed non-association is in line with no causal effect of docetaxel versus other anticancer chemotherapies on irreversible or permanent alopecia.

The two trials were **consistently null** in terms of detecting no significant effect of docetaxel on irreversible or permanent alopecia. That is, in two different patient populations (early-stage and

---

[34]   The study by Sjostrom et al. (1999) was not included by Dr. Madigan in his meta-analysis of randomized controlled trials (2020 Report of David Madigan, Ph.D., p. 26). In his 2020 deposition, Dr. Madigan stated that to determine whether to include it in his meta-analysis, he would like to see the clinical study report and the "raw patient-level data" for Sjostrom et al. (1999), and to consult with Dr. Tosti or Dr. Kessler (2020 Deposition of David Madigan, Ph.D., 80:17–21). Access to raw patient-level data, however, is not necessary to conduct a meta-analysis, including either of the two meta-analyses described by Dr. Madigan in his report.

metastatic breast cancer) and comparing two different sets of chemotherapeutic regimens (TAC versus FAC and docetaxel versus methotrexate and 5-fluorouracil), results consistently showed no significant difference in the effect of docetaxel versus other anticancer chemotherapies on the incidence of irreversible or permanent alopecia.

In both trials, irreversible or permanent alopecia occurred with nonzero frequency in both treatment arms, with or without docetaxel. Therefore, irreversible or permanent alopecia is **not specific** to treatment with docetaxel. Moreover, irreversible or permanent alopecia in association with the use of other medications was documented prior to the advent of docetaxel (WHO 1979, Miller et al. 1981, Brodin 1987, Lange et al. 1987, Lange et al. 1990, Vowels et al. 1993, Ljungman et al. 1995).

The proper **temporal** sequence of docetaxel treatment (the potential cause) preceding the onset of irreversible or permanent alopecia (the potential effect) is established in both trials.

Because both trials evaluated only one dose of docetaxel, neither provided results pertaining to a potential **biological gradient** or dose-response pattern between docetaxel treatment and incidence of irreversible or permanent alopecia.

To my understanding, the mechanism of action by which docetaxel may cause irreversible or permanent alopecia is unknown, and irreversible or permanent alopecia is histopathologically indistinguishable from reversible or temporary alopecia. Therefore, I generally consider any agent that can cause alopecia, including docetaxel and certain other anticancer chemotherapies, other types of medications, certain health conditions (including breast cancer and metastasis), physiological or physical stressors, age, and other risk factors, to be **biologically plausible** causes of irreversible or permanent alopecia (Chon et al. 2012, Patel et al. 2013, Saggar et al. 2013, Mubki et al. 2014b, a, Guzman-Sanchez and Asz-Sigall 2015, Phillips et al. 2017, Freites-Martinez et al. 2019b). Any potential causal impact of docetaxel, if any, on irreversible or permanent alopecia is challenging to disentangle from effects of these other factors.

A potential causal effect of docetaxel on irreversible or permanent alopecia is **coherent** with the generally known facts of the natural history and biology of alopecia. Again, however, potential causal effects of other anticancer chemotherapies, other medications, and comorbidities are also coherent with the natural history and biology of alopecia, and potential effects of these additional factors are difficult to distinguish from those of docetaxel.

Both randomized controlled trials provide direct **experimental evidence**—that is, the "strongest support for the causation hypothesis" (Hill 1965)—that suggests no causal effect of docetaxel versus other anticancer chemotherapies on irreversible or permanent alopecia.

April 17, 2020

As described earlier in this section, several **analogies** exist whereby associations found in observational studies are determined to be spurious when evaluated in randomized controlled trials that eliminate confounding or selection bias.

In summary, an evaluation of causation structured according to the Hill guidelines, based on randomized controlled trials of docetaxel versus nondocetaxel chemotherapeutic regimens in breast cancer patients, does not establish a causal effect of docetaxel compared with other anticancer chemotherapies on irreversible or permanent alopecia.

April 17, 2020

## Conclusions

In conclusion, the large, long-term, randomized controlled TAX 316 trial is the best available single study of the potential causal effect of docetaxel on irreversible or permanent alopecia in breast cancer patients. TAX 316 overcomes the methodological limitations of other available studies of irreversible or permanent alopecia following docetaxel treatment, including the following:

- Nonrandomized treatment assignment;
- Poor control for confounding;
- Lack of a comparison group without docetaxel treatment;
- Reliance on self-reported data on alopecia;
- Retrospective study design;
- Aggregation of multiple chemotherapeutic regimens;
- Short follow-up;
- Restriction to metastatic or advanced breast cancer;
- Poorly described or nonstandardized definition of irreversible or permanent alopecia;
- Small numbers;
- Incomplete follow-up for adverse events.

These problems invalidate the other available studies for use in evaluating potential causal effects of docetaxel on irreversible or permanent alopecia.

The results from TAX 316 do not show that docetaxel causes an increased incidence of irreversible or permanent alopecia in comparison with 5-fluorouracil when used in combination with doxorubicin and cyclophosphamide (i.e., TAC versus FAC) for node-positive operable breast cancer. Considering the results of TAX 316 together with other clinical findings, the collective evidence from randomized controlled trials does not demonstrate a causal effect of docetaxel compared with other anticancer chemotherapies on irreversible or permanent alopecia. Due to their nonrandomized design and other methodological limitations, observational studies do not establish that docetaxel causes an increased incidence of irreversible or permanent alopecia in comparison with other anticancer chemotherapies.

Plaintiffs' experts rely on the results of TAX 316 to estimate the cumulative incidence of irreversible alopecia in breast cancer patients treated with docetaxel (specifically, the TAC regimen); however, they inappropriately derive their estimates based on the outcome of "ongoing" alopecia, which does not denote irreversible, permanent, or even long-term alopecia. Even accepting plaintiffs' experts' assumption that TAX 316 data can yield a valid estimate of

April 17, 2020

the cumulative incidence of irreversible alopecia in docetaxel-treated breast cancer patients, the results of that trial show that the most plausible estimate of the cumulative incidence of irreversible alopecia among breast cancer patients treated with TAC is 0.9% (6 patients out of 701), with a highly conservative estimate of 1.1% (8 patients out of 701). Due to their concurrent medical and treatment history, along with the lack of an established causal effect of docetaxel, these cases of possible irreversible alopecia cannot be causally attributed to docetaxel.


_____

Ellen T. Chang, Sc.D.