1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  TAXOTERE (DOCETAXEL)    *      16-MD-2740
     PRODUCTS LIABILITY LITIGATION   *
5                                    *      Section H
                                     *
6    Relates to:  All Cases          *      July 12, 2022
                                     *
7    * * * * * * * * * * * * * * * * *

8

9                SHOW CAUSE HEARING BEFORE
            THE HONORABLE JANE TRICHE MILAZZO
10              UNITED STATES DISTRICT JUDGE

11

12   Appearances:

13

14   For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                                  & Warshauer, LLC
15                              BY:  M. PALMER LAMBERT, ESQ.
                                     CLAIRE B. KREIDER, ESQ.
16                              1100 Poydras Street, Suite 2800
                                New Orleans, Louisiana 70163
17

18   For the Sanofi             Irwin Fritchie Urquhart
     Defendants:                  & Moore, LLC
19                              BY:  KELLY E. BRILLEAUX, ESQ.
                                400 Poydras Street, Suite 2700
20                              New Orleans, Louisiana 70130

21   For the Sanofi             Shook Hardy & Bacon
     Defendants:                BY:  JORDAN C. BAEHR, ESQ.
22                              2555 Grand Boulevard
                                Kansas City, Missouri 64109
23

24

25

```
1    Appearances:

2

3    For the 505(b)(2)          Greenberg Traurig, LLP
     Defendants:                BY:  NICHOLAS A. INSOGNA, ESQ.
                                One International Place
4                               Suite 2000
                                Boston, Massachusetts 2110
5

6    For Accord Healthcare,     Tucker Ellis, LLP
     Inc.:                      BY:  BRENDA A. SWEET, ESQ.
7                               950 Main Avenue, Suite 1100
                                Cleveland, Ohio 44113
8

9    Also Participating:        Markita Hawkins, Esq.
                                David Diamond, Esq.
10                              Erin Wood, Esq.
                                Aaron Novasic, Esq.
11                              Pierce Jones, Esq.
                                Melanie Sulkin, Esq.
12                              Jacob Gower, Esq.
                                Jason Fraxedas, Esq.
13                              Pete Albanis, Esq.
                                Rick Root, Esq.
14                              Austin Whitten, Esq.
                                Ben Black, Esq.
15                              Joe Saunders, Esq.
                                Ryan Perdue, Esq.
16                              Alex Davis, Esq.
                                Travis Walker, Esq.
17                              Ryan Browne, Esq.
                                Robin Myers, Esq.
18                              Taylor Hardenstein, Esq.
                                Karen Menzies, Esq.
19                              Alexandra Robertson, Esq.
                                Jennifer Greene, Esq.
20                              Blake Weiman, Esq.
                                Eric Terry, Esq.
21                              Jennifer Nolte, Esq.
                                Bria Hanlon, Esq.
22                              Rhett McSweeney, Esq.
                                John Cowart, Esq.
23                              Mark Niemeyer, Esq.
                                Andrea Barient, Esq.
24                              Bret Stanley, Esq.
                                Javier Ortiz, Esq.
25                              Denise Dessel, Esq.
```

3

```
1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                      500 Poydras Street, Room B-275
2                                     New Orleans, Louisiana 70130
                                      (504) 589-7778
3

4

5
     Proceedings recorded by mechanical stenography using
6    computer-aided transcription software.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **<u>MORNING SESSION</u>**

2                        **(July 12, 2022)**

3        **THE COURT:**  Good morning.

4        **THE DEPUTY CLERK:**  Court is in session.  You may be

5 seated.

6              MDL 2740, *In re: Taxotere Products Liability*

7 *Litigation*.  Counsel, you can make your appearance for the

8 record.

9        **MR. INSOGNA:**  Good morning, Your Honor.  Nick

10 Insogna, Greenberg Traurig, for the 505(b)(2) defendants.

11        **THE COURT:**  Good morning.

12        **MR. LAMBERT:**  Good morning, Your Honor.  Palmer

13 Lambert, co-liaison counsel for plaintiffs.

14        **MS. KREIDER:**  Good morning.  Claire Kreider for

15 plaintiffs.

16        **THE COURT:**  Claire, I've got to write your name down.

17        **MS. SWEET:**  Brenda Sweet, one of the attorneys for

18 Accord Healthcare, Inc.

19        **THE COURT:**  Thank you.

20        **MS. BRILLEAUX:**  Kelly Brilleaux for Sanofi

21 defendants.

22        **MR. BAEHR:**  Jordan Baehr for Sanofi defendants.

23        **THE COURT:**  Thank you.

24        Mr. Insogna, are we ready to proceed?

25        **MR. INSOGNA:**  I am, Your Honor.  I have just a couple

10:05

1    of housekeeping matters sort of to orient us and let you know

2    of a few updates to the lists in particular.

3            First, we have two updates to the lists that you

4    have in front of you on the declaration of no contact list.  So

5    No. 160 on today's hearing list, Sharon Miseray-Bennett, has

6    moved to the declaration of no contact list.  We can skip that

7    case when we come to it and it can be added to that list.

8            Then on the statement of no defense list, we are

9    adding No. 150 from today's hearing list, Patti Aaron, case

10   17-16831.  We can also skip over that one.

11           THE COURT:  Okay.  Go ahead.

12           MR. INSOGNA:  Organizationally today, Your Honor, we

13   have obviously a combination of plaintiff fact sheet

14   deficiencies and product ID deficiencies.  What we have done is

15   organized the list by firm as we usually do.  The plaintiff

16   fact sheet deficiencies will come up first within each firm,

17   followed by cases that were rolled over from the previous

18   hearing, followed by product ID deficiencies, again working

19   within each firm as we go.

20           On the list that you have in front of you, we

21   have provided substantive objections where they were given.  In

22   a large number of cases, we did not receive any substantive

23   response or were told that a plaintiff intended to state her

24   objection for the record.  Fortunately, a number of those cases

25   came from the Bachus & Schanker firm, and they have since

10:07

1    withdrawn objections.  We can address those separately.

2                    Roughly 200 plaintiffs have indicated that they

3    have no objection to the dismissal, and we have prepared a

4    separate order identifying those plaintiffs that we will submit

5    to Your Honor after the hearing.  We propose to add those

6    roughly 80 Bachus & Schanker plaintiffs to that list, and when

7    we come to those cases today can just say, "This is a no

8    objection," and we can skip over it for today.

9                    There remain a small number of cases where the

10   plaintiff has either not provided a substantive objection or

11   said that they will state their objection for the record.

12   Obviously, Your Honor's order indicated that substantive

13   objections were to be provided to us, so defendants will take

14   the position that those cases should be dismissed so that we

15   don't have to respond on the fly to substantive objections that

16   we did not get notice of.

17                   We have discussed with Your Honor before the

18   hearing the innovator liability.  There will be a number of

19   cases on this list that have raised that issue.  It would be

20   our proposal, then, to just state that it's an innovator

21   liability claim and will continue it until we have had time to

22   engage in the briefing Your Honor has requested.

23                   Then, finally, we have another list of roughly

24   150 cases at this point with product ID deficiencies that we

25   would propose to serve after this hearing as we did with this

10:08

 1   list for this hearing.  To the extent there are any cases that
 2   are rolled over from today's hearing, we would propose to add
 3   those to the lists that they all be handled at the next
 4   hearing.
 5            THE COURT:  Okay.
 6            MR. INSOGNA:  Those are all the housekeeping matters
 7   that I had.
 8            THE COURT:  Okay.  Thank you.
 9            Mr. Lambert, do you have anything to raise?
10            MR. LAMBERT:  Your Honor, just two points there.
11   Mr. Insogna indicated that they would take the position that
12   objections were waived if not served on them timely.  That part
13   of the proposed order I think Your Honor removed, so if
14   somebody failed -- obviously, they shouldn't have failed to
15   provide a substantive objection, but if they bring one we would
16   just ask the Court consider it.
17            The second issue on PID dismissals, I made a
18   statement at the beginning of last hearing, a general objection
19   to dismissals on CMO 12A, and a number of people did tell us
20   that they wish to adopt that general objection to dismissals.
21   We just want that noted for the record.
22            THE COURT:  So ordered.
23            MR. LAMBERT:  Thank you.
24            THE COURT:  Before we get started, let me just go
25   through those cases.

10:09

1    First, we have a declaration of no contact list.
2    I'm going to just quickly run through the names because we
3    already have the docket numbers, and that's:  Dana Bell,
4    18-9250; Patricia Anderson, 16-17408; Hilda Nelson, 18-7706;
5    Kirsten Peterson, 17-15928; Victoria Prokop, 19-9335; and
6    Sharon Miseray-Bennett, 17-16741.
7    Here the defendants have provided a list of
8    plaintiffs whose counsel have filed a declaration of no
9    contact.  The cases are therefore dismissed with prejudice due
10   to plaintiff's failure to comply with the obligation to
11   communicate with counsel despite counsel's best efforts.
12   Then we have a statement of no defense list.
13   The following plaintiffs have filed a statement of no defense.
14   These matters are hereby dismissed with prejudice.  The cases
15   are:  Deborah Engle, 18-12544; Vesta Miyose, 17-10473;
16   Gloria Orr, 19-14509; Shannon Riddle, 17-15940; and Patti
17   Aaron, 17-14831.
18   Then we finally have the following plaintiffs
19   filed a stipulation of dismissal with prejudice before today's
20   hearing.  Accordingly, these matters have been dismissed with
21   prejudice:  Frances Hale, 17-11928; and Gale Heim, 18-54707.
22   Before we begin with the actual list, confirming
23   what was stated by Mr. Insogna, I visited with counsel -- I
24   know there are other people on the phone that are wondering
25   what's happening -- regarding the letter briefing that was

1    provided to me vis-à-vis innovator liability.  What I indicated
2    was I had reviewed the briefing.  It appeared to me that this
3    may be a complicated issue for the Court to resolve.  I'm
4    uncomfortable dismissing cases where there is a defense of
5    innovator liability without it being properly before the Court
6    in a motion to dismiss.
7                    I indicated and requested that counsel file a
8    motion to dismiss in the three states that are before me
9    regarding whether or not that was properly pled and whether or
10   not it is something that's available in this matter.  Those
11   cases are going to be brought to me properly in a motion
12   because I think that's the proper procedural matter to bring
13   that.  With that, we are ready to proceed.
14             **MS. BRILLEAUX:**  Thank you, Your Honor.  Just to let
15   Your Honor know, as you ordered a couple of hearings ago, we
16   have PTO 22A cases with discovery deficiencies mixed in with
17   the product ID cases under CMO 12A.  I'm going to be handling
18   all the PTO 22A cases.  They are still organized by firm, but I
19   think we will be able to proceed through this pretty quickly.
20             **THE COURT:**  Okay.
21             **MS. BRILLEAUX:**  The first case is represented by
22   Bernstein Liebhard.  It's Mary Crudup.  This is no PFS
23   submitted including the PFS declaration, proof of injury, proof
24   of use, authorization, CMO 12A, and PTO 71A certifications.
25   Also, this case has not been served.  The defendants have not

10:13   1   been served with process.

2           THE COURT:  Ms. Kreider.

3           MS. KREIDER:  Counsel does not oppose the dismissal

4   we have been told, and they have been advised to file the

5   appropriate forms next time.

6           THE COURT:  Okay.  This matter is dismissed with

7   prejudice.

8           MR. INSOGNA:  Thank you, Your Honor.  The next case

9   is Bonnie Doering, 17-6245.  This is a no product

10  identification case and no substantive objection was provided.

11  We were just told that counsel will object for the record.

12          THE COURT:  Ms. Hawkins, are you on the line?  Star

13  six.  Maybe you are on mute.

14          MS. HAWKINS:  Good morning.  This is Markita Hawkins

15  from Bruno & Bruno.

16          THE COURT:  Good morning, Ms. Hawkins.

17          MS. HAWKINS:  We don't have any objections noted for

18  our client.  We just wanted to make sure we were on the record

19  that we did try to obtain product ID for her and we were just

20  unsuccessful.

21          THE COURT:  With that the Court is going to dismiss

22  this matter with prejudice.

23          MR. INSOGNA:  Thank you, Your Honor.  The next case

24  is Connie Lee-Nunn, and I believe Ms. Nunn's counsel submitted

25  a letter brief to the Court last night.  I have reviewed that

10:14

1    letter brief.

2              Ms. Nunn sets forth the efforts that she has

3    made to find product identification, but concedes that she does

4    not have product identification and has asked for a continuance

5    is what I understand from the letter brief.  Obviously,

6    defendants oppose that and believe it is appropriate for

7    dismissal.

8              THE COURT:  Okay.  I haven't seen the letter brief.

9    Give me a break.

10             (Off the record.)

11             THE COURT:  It was received.  Ms. Flanders cannot

12   open it nor can she forward it to me.  It has been received.

13   Nobody has read it.  I don't know what to say.  Outlook is

14   down.

15             MS. KREIDER:  I think Mr. Diamond may be on the

16   phone.

17             THE COURT:  Mr. Diamond.

18             MR. DIAMOND:  I am on the phone.  Thank you,

19   Your Honor.  It's short.  It's only two pages.

20             THE COURT:  Well, that's two pages more than we

21   received, Mr. Diamond.

22             MR. DIAMOND:  I'm sorry.  Would you like me just to

23   summarize what I said?

24             THE COURT:  Yes, please.

25             MR. DIAMOND:  Essentially, I have a few cases in this

10:16

1  MDL.  All of them are proceeding fine.  This is the only case

2  where I've been having difficulty getting product

3  identification.  Ms. Lee-Nunn has suffered significant hair

4  loss.  I attached a picture in the letter.  We have really

5  taken a number of steps to find product ID.

6            We have in her medical record that she was

7  prescribed between August of 2011 and December of 2011

8  docetaxel, so we know that she received it.  Unfortunately, the

9  practice that her doctor was at has gone out of business.  They

10  purged the records, so there's no records there.  We checked

11  with his new practice.  Unfortunately, there's no records back

12  from 2011 there.

13            We have checked with her health insurer.  We

14  have checked with the supply companies that provided Taxotere

15  to --

16        THE COURT:  Well, let me cut to the chase,

17  Mr. Diamond, because this is what I'm looking at.  We have a

18  case that was filed in 2017, and it sounds like you have been

19  very diligent in your quest to find product ID or some basis to

20  determine who the manufacturer was.  What avenues do you

21  possibly have left that you have not covered?

22        MR. DIAMOND:  You're cutting to the chase, but

23  essentially there are three manufacturers, I guess, Cardinal,

24  Amerisource, and McKesson.  I didn't realize -- and it's

25  probably my fault, Your Honor.  We checked with ION oncology

10:18

1   supply and Lynx Mobile oncology supply thinking those were the

2   ones that we should check with.  I would still like to

3   subpoena, as sort of a last ditch attempt, Cardinal,

4   Amerisource, and McKesson to see if I could find out who

5   provided and what they were providing to the suppliers ION and

6   Lynx Mobile in this time period just prior to August of 2011

7   through December as a last ditch attempt.

8           My letter essentially concludes I'm just asking

9   for 90 days more to take this last step.  Maybe I should have

10  taken it before, but I didn't realize that that was another

11  opportunity available to me.  I have since recognized that it

12  was, but this will be the last thing.

13          Ms. Lee-Nunn is still quite disappointed that we

14  haven't been able to find anything and that her case might get

15  dismissed, particularly in light of what she has gone through.

16  Essentially, I'm just asking the Court for an additional

17  90 days to see if we can take one last stab.  If we can't, we

18  will come back and we will say, "Yes, we agree that we haven't

19  been able to find anything establishing product ID."

20          I did reach out to defense counsel about this

21  and did copy defense counsel with my letter to see if we could

22  work it out, but it has all sort of come together very recently

23  and so that's why I'm here.

24          **MR. INSOGNA:**  Your Honor, I just point out that

25  Case Management Order 7 was issued in 2017.  That's where we

10:20

1    provided plaintiffs the identities of distributors.  That CMO

2    authorizes written discovery to distributors.  I think given

3    how old this case is and the fact that the efforts were

4    available, there's a CMO that addressed how counsel could have

5    handled this, dismissal is appropriate at this point.

6            MR. DIAMOND:  In response, Your Honor, I would just

7    say I appreciate what defense counsel is saying.  If I had

8    fully understood that that was an avenue available, we would

9    have taken it.

10           THE COURT:  I'll tell you what.  I'm going to give

11   you 60 days.  I'm not giving you 90.  I'm going to give you

12   60 days.

13           MR. DIAMOND:  Thank you, Your Honor.

14           THE COURT:  Get moving.

15           MR. DIAMOND:  I'm going.  How do I now not stop from

16   being heard?  Do I hit star six again?

17           THE COURT:  I think you just hang up.

18           MR. INSOGNA:  This is counsel's only case, so I think

19   he can just --

20           THE COURT:  You're done.  Hang up.  Go get working.

21           MR. DIAMOND:  I'll go away.  You got rid of me.

22   Thanks.  Bye.

23           MR. INSOGNA:  Thank you, Your Honor.  The next case

24   is Joann Miller with the Fears Nachawati firm.  In this case

25   there is some indication -- it's not a CMO 12 approved, if you

10:21

1    will, record, but there's some indication that there might be

2    Hospira product identification.  So at this point we would ask

3    the other defendants for whom there is no proof of

4    identification be dismissed and that counsel be encouraged to

5    continue their efforts to confirm Hospira product

6    identification with some sort of valid proof.

7              THE COURT:  Ms. Wood, are you on the line?

8              MS. WOOD:  Good morning, Your Honor.  Yes.

9              THE COURT:  Good morning.

10             MS. WOOD:  Good morning, Your Honor.  Yes.  This is

11   Erin Wood on behalf of plaintiff, Joann Miller.

12                  As defense counsel has indicated, we have

13   provided what we believe is sufficient CMO 12 product

14   identification, which is the dispense receipt.  It was uploaded

15   back in 2020 and again --

16             THE COURT:  I think, Ms. Wood, what he is saying is

17   the other defendants should have been dismissed and then

18   further efforts to just confirm that it is --

19                  Hospira, you said?

20             MS. WOOD:  Sure.

21             MR. INSOGNA:  That's correct.

22             THE COURT:  Okay.  So what other defendants do --

23             MS. WOOD:  Correct.  We have been trying to procure

24   product identification for the other infusion dates.  We have

25   been unsuccessful, but we do have that Hospira identification.

10:23

1    So we would be comfortable dismissing those defendants that we

2    do not have that product identification for.  However, we do

3    believe what we have is sufficient for Hospira.

4           **THE COURT:**  Okay.  Then I need you to dismiss them

5    within seven days --

6           **MS. WOOD:**  Yes.

7           **THE COURT:**  -- or are you asking me to do this on the

8    record now?

9           **MR. INSOGNA:**  Either is fine, Your Honor, with us,

10   either a filed dismissal in seven days or on the record now.

11          **THE COURT:**  Is there any objection to me dismissing

12   the other defendants on the record now, Ms. Wood?

13          **MS. WOOD:**  No, Your Honor.

14          **THE COURT:**  Okay.  I don't have a list.

15          **MR. INSOGNA:**  I'm not sure which other defendants are

16   currently active, so maybe a filed dismissal in that case --

17          **THE COURT:**  Ms. Wood, here we go again.  Seven days,

18   file the dismissal dismissing the other defendants because we

19   are not certain about who is outstanding at this point.  We are

20   going to ask you to continue other research to confirm that it

21   was Hospira.  Thank you.

22          **MS. WOOD:**  Thank you, Your Honor.

23          **MR. INSOGNA:**  Thank you, Your Honor.

24          **THE COURT:**  Joann Miller.

25          **MS. BRILLEAUX:**  Your Honor, I have two PTO 22 cases.

10:24

1    The first one is Maria Taylor represented by Gardi & Haught.

2    I'm not sure if counsel is on the line.  I think counsel may

3    have had a conflict who reached out and I don't know if --

4         THE COURT:  I have Aaron Novasic.  Mr. Novasic, are

5    you on the line?

6         MR. NOVASIC:  Yes, Judge.  Aaron Novasic here.

7    Counsel who had a conflict, I'm covering for him.

8         THE COURT:  Okay.

9         MR. NOVASIC:  Yes, I am here.

10        MS. BRILLEAUX:  The deficiency here is just that the

11   case isn't served.  We just need that to be remedied.

12        MR. NOVASIC:  Yes.  Yes, Judge.  I was told by my

13   colleague they did file a summons yesterday.  We are waiting

14   for it to get stamped by the clerk's office.  We will serve

15   immediately after --

16        THE COURT:  Wait, wait, wait, wait, wait.  Stop,

17   stop, stop, stop, stop.

18            What's the PTO number that makes service --

19        MS. BRILLEAUX:  Does anyone know it off the top of

20   their head?

21        MR. NOVASIC:  I think it's PTO 22A.

22        MS. BRILLEAUX:  There's a streamlined service PTO,

23   Counsel, if you go to the Court's website.  None of us are

24   recalling the exact number off the top of our heads, but

25   there's no summons necessary.  There's a procedure that we set

10:25

1    forth.

2                    PTO 9.  Thank you, Mr. Baehr.

3            THE COURT:  PTO 9.  So just review PTO 9.  It's not

4    required that you issue summons.  There's a streamlined service

5    that was adopted very early in this MDL.  You should follow

6    that and have the case served within seven days.

7            MR. NOVASIC:  Yes, Your Honor.

8            THE COURT:  Thank you.

9            MS. BRILLEAUX:  Thank you, Your Honor.

10           MR. NOVASIC:  Thank you.

11           MS. BRILLEAUX:  The next case is represented by

12   Johnson Law Group.  It's Helen Reynolds.  The issue here, we

13   had this on the list with a deficiency for no PTO 71A

14   certification for electronic discovery signed by plaintiff.  We

15   noted that plaintiff is deceased.  We also noted in our

16   deficiency notice that we needed a suggestion of death filed

17   and proper parties substituted.

18                    To streamline this, we have seen that counsel

19   has filed the suggestion of death and got the parties

20   substituted.  We do, however, have an issue with the PTO 71A

21   certification.  We were able to find an obituary for

22   Ms. Reynolds.  She passed away a week before the date of

23   signing of the PTO 71A certification, so we don't believe that

24   that's accurate or valid.

25           THE COURT:  We just need whoever was substituted in

10:26

1    as party plaintiff to execute PTO 71.  Okay.  That is for the

2    Johnson Law Group.

3                 Mr. Lewis or Mr. Jones, are you on the line?

4         **MR. JONES:**  Yes.  This is Pierce Jones with the

5    Johnson Law Group.

6         **THE COURT:**  Okay.  Mr. Jones, we need the substituted

7    plaintiff to sign PTO 71A, that certification.  I need you to

8    get that done.  Can you get that done in 15 days?

9         **MR. JONES:**  Yes, we can.

10        **THE COURT:**  I'm going to give you 15 days to have

11   that --

12        **MS. BRILLEAUX:**  Thank you, Your Honor.

13        **THE COURT:**  -- cured.  Thank you.

14        **MR. INSOGNA:**  Thank you, Your Honor.  The next case

15   is Lanette Barbour, and this is a no product identification

16   case.  This case was rolled over from the April 28 hearing.

17                 The plaintiffs have uploaded a McKesson subpoena

18   response that shows that Hospira, Winthrop, and Sun docetaxel

19   was distributed to the plaintiff's infusion facility, but

20   there's no record connecting any particular manufacturer to the

21   plaintiff.

22        **THE COURT:**  Ms. Sulkin, are you on the line?  Hello?

23   Is anyone on the line --

24        **MS. SULKIN:**  Yes, I'm here.

25        **THE COURT:**  -- for the Kagan Legal Group?

10:28

1          **MS. SULKIN:**  Yes.  Yes, Your Honor, I am on the line.

2   I'm just pulling this up real quick as this was not on my list,

3   so I had thought that the defendants had no longer been

4   pursuing dismissal.  I'm just trying to get the subpoena

5   response up here right now.

6               Your Honor, it looks like during the time of

7   January 1, 2011, through November 30, 2011, there were only

8   three potential manufacturers that were even at the facility.

9   That's in response to a subpoena to McKesson.  We do believe

10  that this is sufficient to proceed against Hospira and Winthrop

11  if they are the only defendants that are named in the subpoena.

12              Additionally, McKesson didn't provide dates for

13  the purchasing history.  They only provided the manufacturer

14  and the NDC number.  We believe that if we could potentially

15  get McKesson to produce more than this, we could have an even

16  clearer answer as well.

17          **MR. INSOGNA:**  So, Your Honor, just to clarify -- and

18  I have McKesson's subpoena response if you would like to see

19  it -- they responded in May of 2020, so over a year ago, saying

20  that they distributed three manufacturers' docetaxel to

21  plaintiff's facility sometime in calendar year 2011 when

22  plaintiff's treatment occurred.  There's nothing further to

23  provide product identification.  It could have been any of the

24  three manufacturers, it could have been one, a combination.  We

25  have no idea.  It's not sufficient product ID to proceed

10:30

1    against all three when we don't know who it could be.

2              THE COURT:  Ms. Sulkin, is there any reason why this

3    was not pursued further?

4              MS. SULKIN:  Well, Your Honor, we did confirm that

5    McKesson was the only distributorship that the facility was

6    purchasing from at the time.  At the time that we got the

7    response from McKesson, I believe Ms. Barbour may have been

8    represented by another firm.  We do believe that there is a

9    factual dispute and that it would be up to the jury to decide

10   whether it was Hospira, Winthrop, or Sun Pharmaceutical.

11             MR. INSOGNA:  I don't know what a jury would do other

12   than guess.

13             THE COURT:  Yes.  Is there any further line of

14   inquiry that you feasibly can pursue that would identify the

15   defendant?

16             MS. SULKIN:  I believe there may be, Your Honor.

17             THE COURT:  Well, what?

18             MS. SULKIN:  I think some of it lies within the

19   response to the subpoena duces tecum that we are serving on

20   McKesson.  As they are a party to this action, maybe the Court

21   can give some guidance to McKesson's response to the subpoenas

22   so we don't have to file motions to compel to get actual

23   purchasing records or sales records --

24             THE COURT:  Let me see what you have.

25             MS. SULKIN:  -- and they can give those up on cases

10:32

1    where McKesson was indicated as the distributorship.  That

2    could help us narrow down what the product was also.

3              While the lifespan of the product, the

4    expiration date is generally two years, at least in most of the

5    facilities that I have spoken with, none of them will keep

6    product on their shelves for more than three months.  A lot of

7    oncology facilities will go through product within two to

8    three weeks.  So if we could get actual dates where these NDC

9    codes were actually shipped to the facilities, that will narrow

10   it down to which products were more likely than not in the

11   facility at the time plaintiff received her infusions.

12             I do think that the jury can make an informed

13   decision as to more likely than not which manufacturer they

14   believe was infused into our client.  It could be a situation

15   in which our client received all three, but that shouldn't bar

16   our client from proceeding against the two defendants in this

17   matter.

18             **MR. INSOGNA:**  Your Honor, you may recall that after

19   the first product ID show cause hearing, there were some letter

20   briefs submitted on this distributor issue and why this is

21   insufficient to proceed.

22             **THE COURT:**  I think part of the problem, Ms. Sulkin,

23   where I'm caught is you don't know your defendant.  You're

24   naming defendants that may be.  I'm not seeing a path forward

25   where you tell me, "There is this specific line of inquiry that

10:34

1    will provide us with the name of the proper defendant in this
2    case."  If you tell me, "Judge, I am going to explore this line
3    of inquiry.  For some reason it was insufficient.  I didn't get
4    the information, and this is going to tell me," but what you
5    are telling me is, "We can ask McKesson what did you send
6    when," and I don't think that's sufficient.
7                  It's a bit like me going into CVS and buying a
8    drug and saying, "I don't know.  I picked one of them and I
9    want to sue them all."  That's not how it works.  You have to
10   know who your defendant is.  CMO 12 says we need product ID,
11   and what you are not telling me is that you have any other line
12   of inquiry that's going to get us there at your disposal.
13        **MS. SULKIN:**  Your Honor, if I may briefly, generally
14   what we have been able to do in some situations is take a
15   deposition of a 30(b)(6) designee at the facility, and they
16   will tell us, "More likely than not, the product your client
17   was infused with would have been ordered within X or Y days or
18   months of their treatment."
19                  So then if from McKesson we do have purchasing
20   history showing the dates that the product was actually
21   furnished to the facility, then by a more likely than not
22   standard, which is the standard we must show to proceed against
23   a defendant in a civil matter, I think we would absolutely have
24   product identification.
25                  I think that the purchasing history, not just

10:36

1    "Here are the National Drug Codes that were sent to the

2    facility in this time period," but actual dates that each of

3    the NDC codes were shipped along with other information about

4    vial size and whatnot, not just sort of --

5              THE COURT:  Ma'am, do you have any information as to

6    what went into this plaintiff's body, which manufacturer's

7    product was administered to this plaintiff?  If there's a line

8    of inquiry that brings me there, not what McKesson shipped and

9    so it's probably one of these, it was probably something that

10   was shipped to the facility, but what went into her body

11   through NDC codes or some sort of statement from an authorized

12   person at that facility to say, "This is what we gave her, and

13   I know we gave her this because of this," that would be fine,

14   or medical billing or anything like that.

15             What you are telling me is we have something

16   that was shipped to the facility.  I don't think that's

17   sufficient to identify your defendant.  What I'm not hearing

18   is, "This is the line of inquiry that we can pursue that will

19   get me that information."  I'm hearing lots of other lines of

20   inquiry that will give us things that would be speculative.

21   Without that, I'm going to dismiss this case subject to your

22   objection.

23             MS. SULKIN:  Your Honor, for the record, can I just

24   put that I do believe that if we were able to depose somebody

25   from the facility and we were able to have them say more likely

10:38

1     than not a drug shipped within three weeks of plaintiff's

2     treatment was infused into her, I do believe that we could

3     reach that standard.

4              THE COURT:  Okay.  Your objection is noted for the

5     record.  This case has been pending since 2018, you have had a

6     response to the subpoena a year ago, and there has been no

7     further inquiry.  So with that the case is dismissed, but your

8     objection is noted for the record.

9              Let's go to the next case.

10             MR. INSOGNA:  Thank you, Your Honor.  Charlene

11    Derossett with the Laborde Earles Law Firm.  This is another

12    case with no product identification.  The only response that we

13    received is there is an outstanding subpoena to the facility.

14    We, on June 22, asked plaintiff to provide us documentation of

15    what request that is so we could assess when it was served, if

16    a response has been made.  We did not get any response to that.

17             THE COURT:  Mr. Gower, are you on the line.

18             MR. GOWER:  Yes, Your Honor, I am.  Can you hear me?

19             THE COURT:  Yes, I can.

20             MR. GOWER:  My apologies.  I don't know if the update

21    made its way to each of the defendants.  In response to a

22    subpoena after hours on Friday, we received confirmation of the

23    NDCs for my client.  We got the executed Exhibit B statement

24    regarding chemotherapy drug administered with checkboxes for

25    Hospira and for Sandoz.  We sent that over to defendants

10:40

1    yesterday, and then in that time went ahead and dismissed all
2    the other defendants except for Hospira and Sandoz.  We have
3    updated the plaintiff fact sheet and we updated MDL Centrality
4    to note the product ID and the dismissal of the defendants.
5    With that update, my apologies to everyone.
6              THE COURT:  Mr. Gower, what I'm going to do is give
7    the defendants seven days to confirm compliance.
8              MR. INSOGNA:  Thank you, Your Honor.
9              THE COURT:  Thank you.  Let's proceed.
10             MR. INSOGNA:  Yes, Your Honor.  Thank you.
11             THE COURT:  Jean Plaster.  That's the Maher Law Firm
12   and that is Mr. Fraxedas.
13             MS. BRILLEAUX:  I believe so, Your Honor.  This is a
14   case with multiple cancer diagnoses and treatments.  This
15   plaintiff was on the list for needing photos from after
16   Taxotere but before her second cancer treatment and
17   chemotherapy.
18             We received from counsel a screenshot of a
19   photo.  As Your Honor is aware, we need metadata for digital
20   photos.  We can tell it is a digital photo.  We have had some
21   communication with plaintiff's counsel, but we still need
22   production of the photo with the metadata.
23             THE COURT:  Okay.  Mr. Fraxedas.
24             MR. FRAXEDAS:  Your Honor, we are happy to continue
25   working regarding the metadata.  Just to bring you up to speed,

10:41

1    we sent counsel for Sanofi a photo that she has.  It was after
2    her Taxotere treatment but prior to her second chemotherapy
3    treatment.  On -- I believe it was last Thursday counsel asked
4    me about the metadata.  From that time we have been working
5    with our client, who is not extremely tech savvy, to try to
6    find different ways to get that metadata.
7              On Friday I sent counsel for Sanofi a
8    screenshot.  While I was on the phone with our client, we had
9    her right-click the properties button -- the picture was taken
10   on her Kindle.  The properties say that the photo was taken --
11   it provides the date and the time to the second of when the
12   photo was taken-- in April of 2017.  I forwarded that to
13   counsel for Sanofi to see if that would suffice for the time
14   being and I never heard back.
15        **MS. BRILLEAUX:**  Thank you, Counsel.
16              There are kind of two issues here.  Number one,
17   while we do appreciate the screenshot, we still do need the
18   photo with the metadata.  The other more important issue is
19   that the date that counsel just provided is actually during her
20   second cancer treatment, not the in-between photo that we
21   actually need.  It's not helpful to have a photo that is during
22   her second cancer treatment.  From the PFS, we note that in
23   2017 was when she was undergoing a second cancer treatment.
24        **MR. FRAXEDAS:**  If I may, her chemotherapy didn't
25   start until May 31, 2017, and the photo we provided you is from

10:43   1    April of 2017.

2              THE COURT:  Okay.  This is what I would suggest.  I

3    think, Ms. Brilleaux, you and Mr. Fraxedas need to sit down and

4    talk.  Being less than tech savvy myself, I can understand the

5    difficulty associated with sending somebody metadata.  I

6    appreciate you telling her to right-click and do these things.

7    That does give some information.  It sounds like you have the

8    information and you just need to resolve getting it to you.

9              MS. BRILLEAUX:  Correct.  We just need the original.

10             THE COURT:  I'm going to ask you to talk in the next

11   week or so.

12             MS. BRILLEAUX:  Thank you, Your Honor.

13             THE COURT:  We are going to just roll this over

14   pending this getting into compliance.

15             MR. FRAXEDAS:  Thank you, Your Honor.

16             MS. BRILLEAUX:  The next case, Your Honor, is

17   Diane Spradley represented by McCollum & Griggs.  This is a

18   case in which we have a plaintiff with multiple cancer

19   diagnoses indicated in the PFS, but we do not have the actual

20   specific information.  We have received some records that give

21   us a little bit more information, but the PFS has not been

22   completely filled out to show us the dates and types of

23   treatments for the multiple cancers.

24             THE COURT:  Ms. Kreider.

25             MS. KREIDER:  Your Honor, Counsel has let me know

10:45

1    that he does not intend to appear for this case today.

2              THE COURT:  Wait.  He is not what?

3              MS. KREIDER:  He does not intend to appear today for

4    the case.

5              THE COURT:  So I should just dismiss it with

6    prejudice.

7              MS. KREIDER:  Yes.

8              THE COURT:  Okay.  Thank you.

9              MS. BRILLEAUX:  Thank you, Your Honor.

10             THE COURT:  Morgan and Morgan.  We have --

11             MR. INSOGNA:  Yes, Your Honor.  Jacqueline Davis is

12    the next case.

13             THE COURT:  That's Mr. Albanis.

14             MR. ALBANIS:  Yes.  Good morning, Your Honor.

15             MR. INSOGNA:  I think this one can be dealt with

16    relatively quickly, Your Honor.  There was product ID submitted

17    for three cycles of plaintiff's treatment that reflect Hospira,

18    so at this point we would ask for the other defendants to be

19    dismissed and for plaintiff to continue her efforts as to the

20    outstanding cycles.

21             THE COURT:  Okay.  Mr. Albanis, any objection?

22             MR. ALBANIS:  No objection to that, Your Honor.

23             THE COURT:  Okay.  I'm going to give you seven days

24    to submit the formal dismissal as to the other defendants and

25    order that you continue the quest for the other information.

10:46

1   Thank you.

2           **MR. ALBANIS:**  Thank you, Your Honor.  May I raise

3   another issue, Your Honor?  And I do apologize.  My staff

4   advised me this morning that one of our clients made it onto

5   Exhibit A, which is the exhibit of cases to be potentially

6   dismissed, where we do have NDC on the case.  I do apologize

7   for that, but I wanted to just raise that with the Court and

8   counsel.

9           **THE COURT:**  Which case is that?

10          **MR. ALBANIS:**  It's the case of Catherine Baker, case

11  number 17-6404.  It appears as though it's numbered 224 on the

12  exhibit that I'm looking at.  We would just ask for seven days

13  to upload the NDC and to dismiss the remaining defendants that

14  we don't have in that case or an opportunity to address it with

15  counsel.

16          **MS. BRILLEAUX:**  So Ms. Baker is not going to be on

17  today's hearing list.  She was on the Exhibit A to the

18  dismissal order for nonobjecting plaintiffs.  It sounds to me

19  like counsel has realized that he has product ID and does not

20  intend for her to be on there.

21              Is that acceptable for the 505(b)(2) defendants?

22          **MR. INSOGNA:**  I think, Your Honor, we will take

23  seven days to confirm the product identification.

24          **THE COURT:**  I'm going to order seven days to confirm

25  compliance.  Thank you.  Thank you for raising that issue.

10:47

1     **MR. ALBANIS:**  Thank you so much, Your Honor.

2     **THE COURT:**  All right.  Then we have Hedy Webre.

3          Mr. Root, on you on the line?

4     **MS. BRILLEAUX:**  I believe this is one that was cured

5     late and we received authorizations.  The issue was

6     authorizations that were expired, and I believe that that was

7     corrected yesterday.

8          Is that correct, Mr. Root?

9     **MR. ROOT:**  Yes, I'm here, Your Honor.  Good morning.

10    **THE COURT:**  Good morning.

11    **MR. ROOT:**  That was entirely our error on the various

12    lists that we had.  We missed Ms. Webre when we indicated our

13    lack of objection on everyone else.  In Ms. Webre's case, as

14    soon as we realized that, we contacted her.  She is a compliant

15    client, and she gave us the signed authorizations which we

16    uploaded, I believe, the 8th.

17    **THE COURT:**  Okay.  That's fine.  I'm going to grant

18    the defendant seven days to confirm compliance.  Thank you,

19    Mr. Root.

20    **MR. ROOT:**  Thank you, Your Honor.

21    **THE COURT:**  Sarah Touchet.

22    **MS. BRILLEAUX:**  For Sarah Touchet, Your Honor, this

23    is another case where the PFS indicates the plaintiff had more

24    than one cancer diagnosis and treatment but did not provide the

25    information, dates of treatment, types of treatment.  We would

10:48

1 request that counsel update the PFS for all the cancer

2 diagnoses and treatments for this plaintiff.

3     **THE COURT:**  Mr. Whitten, are you on the line?

4     **MR. WHITTEN:**  Yes, Your Honor.  Good morning.

5     **THE COURT:**  Good morning.

6     **MR. WHITTEN:**  There are some issues with this case.

7 I sent a letter to Sanofi's counsel back in April trying to

8 explain some of the issues.

9     Ms. Touchet, we spoke to her after we received

10 the new deficiencies, and we were concerned about her mental

11 competency to sign an updated fact sheet.  We did confirm that

12 her other cancer diagnosis was a cancer from 1970 that's

13 unrelated to her breast cancer.  She had cervical cancer, and

14 she did not recall any of the information requested in the

15 defendant fact sheet other than she had a hysterectomy.  She

16 did not have any chemotherapy or radiation.

17     I put this in a letter in response because we

18 were not able to get Ms. Touchet to sign the updated PFS.  I

19 did not receive any response.  Yesterday our office located an

20 obituary for Ms. Touchet.  We had not been able to get in touch

21 had her or her immediate family members over the last few

22 months confirming that she did pass away a few months ago.

23     So if Your Honor thinks that these deficiencies

24 do require supplementation, we would just ask for adequate time

25 to try to locate a personal representative to substitute in so

10:50

1    that we can do that.

2            THE COURT:  I think you are going to have to under

3    any circumstance unless you dismiss the lawsuit.  You cannot

4    proceed without a personal representative.  What I think you

5    need to do is file a suggestion of death and then proceed

6    toward having someone appointed to represent Ms. Touchet's

7    estate, if that's what you want to do.

8            Now, if you just discovered that she died a

9    couple of months ago, I'm going to give you some time to do

10   that.  I'm going to set this matter for review in 60 days

11   because by that time you should file a suggestion of death.

12   I'm not sure you will have a personal representative appointed

13   by then because that requires action by other people, and I

14   don't know how quickly the probate courts can do that.  Let's

15   revisit this issue in 60 days from now.  We will not have it at

16   our next hearing, but perhaps the following, to see where we

17   are with this.

18           MS. BRILLEAUX:  Your Honor, could I just ask counsel

19   for the date of death of the plaintiff.

20           MR. WHITTEN:  Yes.  The obituary we received -- and,

21   again, I have not confirmed this with her family or anything --

22   says that she passed away April 22 of this year.

23           THE COURT:  Okay.  Thank you.

24           MS. BRILLEAUX:  Thank you.  The next PTO 22A case,

25   Your Honor, is Dara Kessler represented by Reich & Binstock.

10:52

1    This is a shell PFS.  There's an entire section on chemotherapy

2    and cancer treatment.  It's also completely blank for injury

3    dates, hair loss consultations, health care providers, and all

4    sorts of important information that we need to continue with

5    discovery.

6              THE COURT:  Mr. Black, are you on the line?

7              MR. BLACK:  Yes, Your Honor.  We received the

8    objection to the shell PFS.  We have amended this PFS.  I

9    believe we are on the seventh amended PFS.  We have four pages

10   of health care providers that she visited, so we were really

11   unsure what they meant by a shell PFS.  When we reached out to

12   defense counsel for clarification as to what they were

13   specifically objecting to, they simply responded that it was

14   incomplete and needed to be completed.  We are happy to update

15   it and add in information, but we didn't know what specifically

16   they were objecting to.

17             MS. BRILLEAUX:  Counsel, I did just read in the

18   things that we are missing, but it's Section V.5, all the

19   information on chemotherapy, other types of cancer treatment,

20   injury dates, hair loss consultations, expenses, health care

21   providers, facilities, labs, pharmacies and insurance.

22             THE COURT:  Okay.

23             MR. BLACK:  Yes.  We are happy to update it.  We can

24   update the fact sheet.

25             THE COURT:  Okay.  We are going to roll that over to

10:53

1    the next time, give you an opportunity to get that done.

2            **MS. BRILLEAUX:**  Thank you, Your Honor.

3            **MR. BLACK:**  Thank you, Your Honor.

4            **THE COURT:**  Thank you.

5            **MS. SWEET:**  The next case up is Loquita Darden

6    represented by Saunders & Walker, and that case involves an

7    innovator liability objection.  Pursuant to your comments

8    earlier, I suggest that we defer any discussion on this case.

9            **THE COURT:**  We defer that.  Thank you.

10           **MR. SAUNDERS:**  This is Joe Saunders for Loquita

11   Darden.  You are going to defer this for briefing by me

12   independently or by the steering committee?

13           **THE COURT:**  What's going to occur is I think there

14   will be one plaintiff from the various jurisdictions, and the

15   defendants will file a motion to dismiss for that plaintiff.

16   If it's yours, Mr. Saunders, you are going to have to work with

17   the plaintiffs' steering committee.

18           **MR. SAUNDERS:**  Okay.  I would be happy to do that and

19   happy to brief it if necessary.

20           **THE COURT:**  At this point we are just going to defer.

21           **MR. SAUNDERS:**  Very well.  Thank you very much,

22   Your Honor.

23           **THE COURT:**  Thank you.

24           **MS. SWEET:**  The next case is Andrieta Eason brought

25   by the Law Offices of Travis R. Walker.  In this case plaintiff

10:55

1    objected to dismissal on the grounds that requests remain

2    pending.  They were requesting pharmacy and insurance records.

3    We requested documentation of that back in June and did not

4    receive a response.

5              THE COURT:  Mr. Walker, are you on the line?

6    Mr. Walker?  Press star six.  Sometimes people forget to.  Then

7    we can hear you.

8                   Let's do this.  Let's just pass this one and we

9    will take it up at the end, and maybe we can send a text or

10   something to Mr. Walker's firm.

11             MS. SWEET:  Thank you.

12             THE COURT:  Carisa Etheridge.

13             MS. BRILLEAUX:  Yes, Your Honor.  There is a PTO 22A

14   case represented by Fernelius Simon.  This is a rollover case

15   from the May hearing.  Plaintiff received Taxotere between

16   April 2009 and July of 2009 and then had a second cancer

17   treatment beginning at the end of November of 2012 to February

18   of 2013.  The only after photos we have are from after that

19   second treatment.

20                  We did have a development in this case.  We

21   received an email from counsel with some photographs, but the

22   email noted that the photographs have metadata indicating that

23   they were taken in 2017.  It appears there's been some

24   confusion that counsel acknowledged.  What we need is photos

25   from between the end of that Taxotere treatment in 2009 and the

10:56

1   beginning of the subsequent cancer treatment in 2012.

2           THE COURT:  Mr. Perdue.

3           MR. PERDUE:  Yes.  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MR. PERDUE:  Counsel is correct that we did send

6   after photos that have metadata reflecting that they were taken

7   in 2017.  We have talked to our client a number of times to see

8   if she had any photograph of herself between 2009 and 2012, and

9   she has told us that she does not.  The photographs that we

10  sent are the closest in time that she has got to her treatment

11  after Taxotere for Taxotere use in 2009.

12          I believe at the last hearing -- and I did not

13  handle the last hearing, my partner did.  I believe when this

14  case was taken up in May, my partner's recollection was that we

15  had talked about working with Sanofi's counsel on some sort of

16  affidavit or acknowledgment on that.  Frankly, Your Honor, we

17  never heard anything further on that, and then the next thing

18  we knew we were on this show cause list.

19          THE COURT:  My guess is I asked you to work with

20  Ms. Kreider.  I'm going to ask you to work with Ms. Kreider.

21  Now, you don't sit down and wait for her to call you.  That's

22  your obligation to affirmatively contact Ms. Kreider, with the

23  plaintiffs' steering committee, to work through any other

24  alternative methods to find these photographs.  If we have

25  satisfied ourselves there is no further inquiry to be had, then

10:58   1   we can consider an affidavit at that time.

2           **MR. PERDUE:**  That makes sense, Your Honor.  We will

3   do that.  Thank you.

4           **THE COURT:**  Thank you.

5           **MS. BRILLEAUX:**  Thank you, Your Honor.

6           **MS. SWEET:**  Your Honor, the next two cases are

7   brought by the Finson Law Firm, Gwendolyn Hartford and Tykesha

8   Williams-Saunders.  Both have raised an innovator liability

9   defense so can be deferred.

10          **THE COURT:**  These matters will be deferred.

11          **MS. SWEET:**  The next two cases were brought by Gomez

12  Trial Attorneys, Adrienne Saldivar and Mary Seki, and the same

13  situation applies there.  They both object on the basis of

14  innovator liability so can be deferred.

15          **THE COURT:**  Thank you.  Thank you.

16          **MS. SWEET:**  The next case is Wylina Highsmith brought

17  by Jones Ward.  Plaintiff has objected to dismissal on the

18  basis they have requests remaining pending.

19          Back in June plaintiff had uploaded what they

20  believed was product identification, which was simply a

21  screenshot of an NDC website that had Accord's NDC placed on it

22  and nothing else, nothing that connected the plaintiff to this

23  record or what exactly this record was or what the source of it

24  was.

25          **THE COURT:**  Nothing since then?

11:00

1    **MS. SWEET:**  Nothing since then.

2          **THE COURT:**  Mr. Davis, are you on the line?  Hello?

3    Star 6, please.  Alex Davis?

4          **MR. DAVIS:**  Yes, Your Honor.  Alex Davis for Wylina

5    Highsmith.  Good morning, Your Honor.

6          **THE COURT:**  Good morning.  We are looking at product

7    ID for Ms. Highsmith.

8          **MR. DAVIS:**  Yes, Your Honor.  In the better late than

9    never category, we made several additional attempts over the

10   last several weeks, and just this morning we were able to

11   obtain the confirmation of NDC codes showing Sanofi's

12   manufacture of plaintiff's Taxotere cycles from 2013.  I

13   emailed that information to multiple defense lawyers and also

14   uploaded that information to MDL Centrality.  I apologize for

15   the late timing.  It is not ideal and it would not be my

16   preference, but nonetheless we have provided those codes.

17         **THE COURT:**  Okay.  I'm going to grant Sanofi

18   seven days to confirm compliance.

19               Evangeline Little.

20         **MR. DAVIS:**  That case, Your Honor, we have not had as

21   much success in.  I would ask for an additional 30 days, if the

22   Court is willing to provide it to us, but I do not, in all

23   candor, have any new information responsive to our requests.

24         **THE COURT:**  Well, that's what I've been asking,

25   Mr. Davis.  Is there some line of inquiry that you think is

11:01

1    promising or that will tell us exactly what manufacturer

2    manufactured the drug that was administered to your client?

3              MR. DAVIS:  Well, none other than the efforts that we

4    have been taking, although I would note that the exact same

5    paperwork that we sent in the Highsmith case we sent also in

6    the Little case.  So in Highsmith at least -- and granted

7    Ms. Highsmith actually does work at the same facility where her

8    infusions took place, so that may have made a little bit of a

9    difference here.  We did send the exact same paperwork in both

10   cases back in May.  The latest attempt --

11             THE COURT:  It was the same facility?

12             MR. DAVIS:  No, not the same facility, just the same

13   requests and paperwork.

14             THE COURT:  Okay.  I'm looking at that, Mr. Davis,

15   and this case has been pending since 2016.  I know you have

16   been diligent in your requests.  We need product ID at this

17   point.  So I'm going to dismiss this case, Ms. Evangeline

18   Little.

19             MR. DAVIS:  Understood.

20             THE COURT:  Thank you.

21             MS. SWEET:  Your Honor, at the risk of poking a

22   little bit, we have a concern about the request that was sent

23   in the Little case.  I realize the case has been dismissed, but

24   he is indicating that he is sending this request in other cases

25   as well.

11:03

1          The letter that's been attached that's being

2    sent to the infusion facilities indicates that -- it

3    essentially says that the facility has not turned over the

4    product documentation and "We essentially have two options to

5    satisfy the Court's order: one, your office can complete the

6    statement regarding chemotherapy; and, two, we can issue a

7    federal court subpoena to obtain the sworn deposition of the

8    person who possesses the requisite information."

9          We just have some concerns that this is exerting

10   some undue pressure on the facilities and not providing them

11   the full avenues.  If they don't have product ID, they can just

12   respond as much.  It also sounds like they are pressuring them

13   to just provide a number.  We are just worried that sometimes

14   this pressure might --

15        **THE COURT:**  I'm not impressed.  The reality is they

16   can issue a subpoena and have the person testify or they can

17   comply.

18        **MS. SWEET:**  Thank you, Your Honor.

19        **THE COURT:**  They can say, "We don't have it."  That's

20   a legitimate answer.  I thought you were going to say they were

21   threatening sanctions or something like that.

22        **MR. DAVIS:**  How would you have a copy of the letter

23   that we sent to that provider in the Little case, Counsel?

24        **MS. BRILLEAUX:**  Ms. Sweet is reading from the letter

25   sent to Ms. Little.  Your Honor pointed out what we believe the

11:04

1  issue is, which is that there is a third option that they don't

2  have the information and that they can just respond with that.

3       THE COURT:  Well, do you really think that letter is

4  going to have them make up numbers?

5       MS. BRILLEAUX:  I would hope not, but we don't think

6  that the phrasing of the letter is appropriate so we wanted to

7  raise it as an issue.

8       THE COURT:  Okay.  Thank you.  Let's move on.

9       MS. SWEET:  Going back briefly to Wylina Highsmith,

10  we would like seven days to confirm cure and for plaintiff at

11  that point to dismiss the other defendants if appropriate.

12       THE COURT:  Yes.  You need to dismiss the other

13  defendants, Mr. Davis.

14       MR. DAVIS:  Yes, Your Honor.

15       THE COURT:  Thank you.

16       MR. WALKER:  Your Honor --

17       THE COURT:  Yes.

18       MR. WALKER:  Hi.  This is Travis Walker.  I'm sorry.

19  I just got on the call.  I believe I had a case previously, and

20  I just want to let the Court know that I'm on the call.

21       THE COURT:  Oh, okay.  I don't know where you were,

22  Mr. Walker.

23       MS. KREIDER:  Number 16.

24       THE COURT:  Number 16?  Okay.  That was Andrieta

25  Eason.

11:05

1          **MS. SWEET:**  Yes, Your Honor.

2          **MR. WALKER:**  Yes, Your Honor.  Thank you.

3          **THE COURT:**  What's the issue with Ms. Eason?

4          **MS. SWEET:**  Plaintiff has objected to dismissal on

5    the grounds that they have been subpoenaing the pharmacy and

6    insurance records.  We asked for that documentation in June and

7    did not receive a response.

8          **THE COURT:**  Mr. Walker.

9          **MR. WALKER:**  Your Honor, we just received some of the

10   medical records this past week, and I can forward those on to

11   opposing counsel.  We are requesting some additional time to

12   ensure that we have all the records, and I can send those

13   medical records we received to opposing counsel today.

14         **THE COURT:**  Okay.  I think, Mr. Walker, the complaint

15   was they asked you to tell them --

16              What?

17         **MS. SWEET:**  Well, at that point the documentation

18   underlying their requests.  He did not respond, so we didn't

19   know who he had subpoenaed and when and what the timing of

20   everything was, which seems to make a difference at a hearing

21   where there's dismissal pending.  So we don't know if in those

22   medical records there are NDCs.  We haven't seen those records.

23         **THE COURT:**  Well, I think what I'm hearing is he just

24   received records.  So what I'm going to do is grant the

25   defendant seven days to confirm compliance.

1          Mr. Walker, are you waiting for other records?

2          **MR. WALKER:**  I believe we have most of the records.

3  I think there's a couple of outstanding ones, and I don't want

4  to put myself in a position where I think we have all the

5  records, but we do have a substantial amount of records that we

6  can now give to opposing counsel.  We just received them in the

7  last few days.

8          **THE COURT:**  I think we are going to roll this case

9  over to give them an opportunity to look to see what else is

10  outstanding, and then we will discuss it in the next hearing.

11  Thank you.

12          **MR. WALKER:**  Thank you, Your Honor.

13          **MS. SWEET:**  Thank you, Your Honor.

14          **THE COURT:**  I need to take a 10-minute recess.  Court

15  will be at recess for 10 minutes.

16          **THE DEPUTY CLERK:**  All rise.

17          (Recess.)

18          **THE COURT:**  Let me ask a quick question.  Do we know

19  who the innovator liability cases are?  Can we run through

20  those quickly and defer those?  Some people may be sitting on

21  the phone just to be told don't worry about this, and I don't

22  want that to occur.

23          **MR. INSOGNA:**  Yes, Your Honor.  Picking up where we

24  are at No. 24 on the list, I have No. 32, Alice Paxton.

25          **THE COURT:**  Okay.  That matter is going to be

1    deferred.

2              **MR. INSOGNA:**  Numbers 53, 54, and 55, Carol Grant,

3    Yumi Litke, and Mary Perry.

4              **THE COURT:**  Okay.

5              **MR. INSOGNA:**  Number 173, Sandra Acox.

6              **THE COURT:**  Okay.

7              **MR. INSOGNA:**  Number 190, Wendy Crone.

8              **THE COURT:**  Okay.

9              **MR. INSOGNA:**  Number 200, Maureen Goode.

10             **THE COURT:**  Okay.

11             **MR. INSOGNA:**  Numbers 220 and 221, Melinda Lopez and

12   Esther Lowry.  I believe that's all.

13             **THE COURT:**  Okay.  Thank you.

14             **MR. INSOGNA:**  Your Honor, the next case is Laurie

15   Ernst with the Lemmon Law Firm.  This is a case where we have

16   not received any substantive objection from plaintiff's

17   counsel.  It's a no product ID case.  We followed up with

18   counsel on June 22 and asked what the substantive objection

19   would be, and we got an indication from Mr. Lemmon that he was

20   going to be on vacation and asked for a continuance.

21             **THE COURT:**  I believe Ms. Kreider is ready.

22             **MS. KREIDER:**  Yes, Your Honor.  Counsel asked me to

23   request, Your Honor, for Ms. Ernst's case to be rolled over and

24   to read the following statement:

25                  "We have done everything we can imagine to

11:21

1    obtain the required information, and the facility has sent us
2    conflicting information.  We have not given up.  More
3    importantly, Ms. Ernst has not given up.  She is devastated by
4    this injury and is going to get to the bottom of this before
5    she gives up.  None of the product ID challenges are her fault,
6    and there is no question she received docetaxel.  No party is
7    prejudiced by her claim being preserved, yet she would be
8    extremely prejudiced by your dismissal of her claim as a result
9    of the actions or inactions of others."
10             So, in sum, he is requesting more time to figure
11   out the conflicting information from the facility that he
12   received.
13        **MR. INSOGNA:**  Your Honor, these are cases filed in
14   2017 and 2018.
15        **THE COURT:**  I'm aware, 2017 and 2018.  I will tell
16   you this.  I'm going to roll it over just because Mr. Lemmon is
17   not here.  I don't know what "conflicting information" means.
18   You can convey to him, Ms. Kreider, if he cannot come up with
19   some specificity, "This is the problem and we think we can find
20   it," I'm going to dismiss it next time.
21        **MS. KREIDER:**  Yes, Your Honor.
22        **THE COURT:**  Thank you.  I'm guessing Karen Jones we
23   have a different --
24        **MR. INSOGNA:**  Oh, I'm sorry, Your Honor.  Karen Jones
25   is, I believe, the same circumstance.

11:22

1      THE COURT:  Well, that's what I'm asking.  Do we have

2  a different thing to read?

3      MS. KREIDER:  Your Honor, Mr. Lemmon only requested I

4  refer to Mr. Lambert's general objections from the previous

5  product ID show cause hearing.

6      THE COURT:  Okay.  That matter is dismissed with

7  prejudice.

8                    Lashonda Cole.

9      MR. INSOGNA:  Thank you, Your Honor.  This is another

10 case where counsel has indicated that they are just asking for

11 more time.  They provided us a lengthy recitation of their

12 efforts, but at this point they don't have product

13 identification and don't have an excuse why they have not

14 obtained it.

15     THE COURT:  Okay.  Mr. Browne, are you on the line?

16     MR. BROWNE:  I'm here, Your Honor.  First, I know you

17 had some time out of the office.  I hope that was good earlier

18 this last month or so.

19     THE COURT:  It was wonderful, but I'm back here.

20     MR. BROWNE:  We all have to return, Your Honor, as

21 much as we would like to stay.  Okay.

22              So Ms. Cole, actually, we were pretty specific

23 in what we have been trying to do here.  This woman was

24 actually incarcerated at the Missouri Department of Corrections

25 at the time of her treatment.  She was treated by a doctor in

11:23

1    private practice.  We would reach out to the Missouri

2    Department of Corrections and send a subpoena.  They would then

3    say, "We don't have the records.  You have to check with the

4    private physician."  The private physician, the hospital kicked

5    us back to the Missouri Department of Corrections.  That was

6    not only us.  During the CMO 12 process, that was frankly the

7    defense as well.  We were both kind of getting the runaround.

8               I finally got ahold of somebody.  Dr. Hopkins

9    was Ms. Cole's doctor.  We have reached out.  She has now

10   joined another group in Jefferson City, Missouri, and we have

11   sent another subpoena.  We tried to send her letters, tried to

12   contact her.  We now sent her another subpoena by which they

13   have now -- I have stated that we served the subpoena.  She had

14   not responded.  We have now got them to respond.

15              They asked us last week -- they asked U.S.

16   Legal -- they asked for another week or 10 days to respond,

17   which frankly would be tomorrow or later this week.  We

18   followed that up again yesterday and said, "Hey, do you have

19   anything new?"  They did not.  We are in the process here.

20              I think we can get the doctor's attention.  She

21   supposedly has all of the files that she had from her treating

22   of this patient and supposedly can track that down, but it has

23   been a process where we have just been bounced around like a

24   pinball here.  We think we are close, and we ask for some

25   additional time to be able to close this out and get the NDCs.

11:25

1    THE COURT:  How much more time do you think you need?

2    MR. BROWNE:  I would say 60 days or less, Your Honor.

3    THE COURT:  I'm going to give you 60 days.  I'll give

4    you that.

5    MR. BROWNE:  Thank you, Your Honor.

6    THE COURT:  Theresa Pearce, where are we with that

7    one?

8    MR. BROWNE:  Yes, Your Honor.  So that one, actually

9    Theresa went back to the doctor's office in the last several

10   weeks, tried to be able to get the oncology department there to

11   be able to figure anything out.  She actually met with the

12   pharmacist, who said she would continue to go back and look for

13   things.  She has not been able to find something.

14         The pharmacist went, then, out of town, and last

15   night my client was able to provide me with the pharmacist's

16   information.  I have left her a message, frankly, as recently

17   as this morning.  I would ask for some additional time to see

18   if I can, with the information that we have, including that

19   Hospira -- we do have some information that Hospira did supply

20   the facility during that time frame.  Maybe I can give, "Okay.

21   Here's what we show.  Look here," try to be able to see if I

22   can nudge the pharmacist in the right direction.

23   THE COURT:  When did you get the information that

24   Hospira was --

25   MR. BROWNE:  Hospira filed their DFS, Your Honor, or

11:27

1   uploaded it, it looks, back in 2019.

2             THE COURT:  You're just running this down?

3             MR. BROWNE:  No, Your Honor.  No, we have

4   consistently -- we have done a lot here to be able to

5   consistently try to get -- it's both the Ieyoub Breast Center

6   (phonetic) as well as the University of Maryland.  They both

7   have pointed fingers, again, at each other as far as who may

8   have the information or saying, "We can't find the records."

9             The specific oncology office, we believe, the

10  Ieyoub Breast Cancer Center, they have a pharmacist there.  I

11  believe that if given the opportunity to be able to communicate

12  with her directly -- which I have never been able to do

13  previously despite our attempts to do so.  My client, frankly,

14  going up there has, I think, provided that entrée to be able to

15  hopefully speak with the pharmacist directly.  Maybe I can get

16  a different result.  I have had success with that in the past,

17  with either talking with the pharmacist directly or talking

18  with a lawyer, frankly, for the hospital --

19            THE COURT:  All right.  This is what I'm going to do.

20  I'm going to give you the 30 days until the next hearing, but

21  you are going to have to get on this because this suit was

22  filed in 2018.

23            MR. BROWNE:  Yes, Your Honor.

24            THE COURT:  It's been pending too long.

25            MR. BROWNE:  Yes, Your Honor.

11:28

1          THE COURT:  This could have taken place a long time

2     ago.  I am going to give you until the next hearing and that's

3     it.

4          MR. BROWNE:  Thank you, Your Honor.

5          MR. INSOGNA:  Thank you, Your Honor.  The next two

6     cases are with the Murray Law Firm, Pamela Burge and Michelle

7     Villarreal.  In both cases counsel has pointed to a defendant

8     fact sheet as being evidence of product ID.  I know we have

9     discussed that issue at some length before, Your Honor.  I can

10    walk you through the waterfall of reasons why that doesn't work

11    for product ID, but we think both of these cases are ripe for

12    dismissal at this point because there's no other evidence.

13         THE COURT:  Okay.  Ms. Myers.

14         MS. MYERS:  Yes.  Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MS. MYERS:  For Ms. Burge's case, I sent a subpoena

17    to her hospital, Essentia Health, in Minnesota, but we haven't

18    received a response to date.  Unlike other cases that I

19    represent like Ms. Villarreal, Ms. Burge was not put on the

20    product ID list until January of this year.  I will say that

21    the defense provided responses.  The only defendants that could

22    be identified are either Sanofi, Sandoz, or Hospira.

23              Unfortunately, I can't look at the documents

24    identified in the DFS for Sandoz or Hospira because those were

25    not provided, although attachments were referenced, and the

11:29

1   distributor used by Sandoz was also not identified --

2          THE COURT:  Wait, wait, wait.  You lost me.  I'm

3   having trouble following you.  Wait.  What do you have to show

4   product ID for Ms. Burge?

5          MS. MYERS:  We have a pending subpoena to have

6   records sent over from Essentia Health.  I do see that in

7   Sandoz' defendant fact sheet, they specifically identified

8   supplying her oncologist with docetaxel during the time that

9   she was being treated.  I would just request additional time to

10  get a response from her hospital or to have Ms. Burge bring

11  that infusion form, Exhibit B, to her doctor to have him

12  specifically identify the manufacturer.  I at least have

13  something that shows that it's pointing more towards Sandoz

14  being the manufacturer of her docetaxal during that time

15  period.

16         THE COURT:  Wait.  So what you have is Sandoz saying,

17  "We sold product to this facility during that time period"?

18         MS. MYERS:  Yes.  They specifically identified her

19  doctor and how much Taxotere was actually provided during that

20  time.

21         THE COURT:  Well, was that the only manufacturer that

22  provided docetaxel to that facility?

23         MS. MYERS:  Hospira referenced some attachments in

24  their defendant fact sheet, but those were never provided.  I'm

25  not sure what they provided, but I'm just asking for additional

11:31

1    time for Ms. Burge to go up there.  Maybe she would have more

2    luck than I would, you know, sending letters to the infusion

3    facility, to have the forms sent up there with her to have them

4    specifically fill it out.

5                MR. INSOGNA:  Your Honor, if I may briefly on the

6    defendant fact sheet because it's going to come up in a number

7    of cases.  First of all, a defendant only fills out a defendant

8    fact sheet if they are named and served in the case.

9    Obviously, we have many cases where not all defendants are

10   named and served.  To say that this defendant did respond and

11   say that they shipped to the facility does nothing to rule out

12   all the other defendants, some of whom may never have been

13   required to respond to a defendant fact sheet.

14                If you get beyond that problem and then say,

15   okay, every defendant responded and only one distributed to

16   this particular provider, you still have not eliminated ANDA

17   providers.  There are defendants who are putatively in this

18   lawsuit like Dr. Reddy's and Eagle Pharma who have never

19   appeared, never responded to a defendant fact sheet.

20                THE COURT:  No, I understand, because unless you have

21   the facility saying, "The only person we ever purchased from

22   was this manufacturer" --

23                MR. INSOGNA:  Right.  Even in that case, I know that

24   not all defendants have the distributor data to say, "We did or

25   did not ship to this particular facility."  The defendant fact

11:32

1  sheet response can never get us where we need to be on product

2  ID.

3  　　　　THE COURT:  No.

4  　　　　MS. MYERS:  I'm not relying on that specifically.  I

5  am just saying Ms. Burge would like the opportunity to go up

6  with the defendant fact sheet and say, "Can you please fill

7  this out for me," because I feel like she would have better

8  luck than just a law firm in New Orleans sending letters

9  repeatedly asking for them to fill out the form.  I'm just

10 asking for additional time for her to do that.

11 　　　　MR. INSOGNA:  Your Honor, I believe counsel indicated

12 that in January of this year they had the information that they

13 could have done that --

14 　　　　THE COURT:  What's the holdup, Ms. Myers?  Why wasn't

15 this done before?

16 　　　　MS. MYERS:  Because we were trying to do it through

17 the law firm so that it wouldn't -- I mean, it was COVID time,

18 so a lot of people are hesitant to actually go anywhere.  I

19 didn't want to send Ms. Burge out into COVID time trying to get

20 this information when we could just request it from our

21 offices.

22 　　　　　　We still do have the outstanding subpoena that

23 they haven't responded to, so it's just asking for additional

24 time.  I mean, she hasn't been pending forever, you know, or

25 since 2018 like some cases have.  She was just identified in

11:34

1    January of this year.

2            MR. INSOGNA:  Well, Your Honor, she was identified as

3    noncompliant with CMO 12 in January of this year.

4            THE COURT:  No, I understand.  I understand.  I have

5    to tell you, I guess I'm curious, Ms. Myers, as to what this

6    looks like.  So you're going to have your client appear at her

7    doctor's office with a defendant fact sheet to say, "We sold to

8    you.  Now fill out this paperwork and say that that's the" --

9            MS. MYERS:  No.  I'm going to have her appear with

10   that Exhibit B to have them fill that out.

11           MR. INSOGNA:  The statement of chemotherapy

12   administered?  I thought I heard that that had been provided in

13   connection with a subpoena to the facility that they haven't

14   responded to.

15           MS. MYERS:  They haven't responded, correct, so I'm

16   doing a last ditch effort to have her actually go up there with

17   it.

18           THE COURT:  And see if you can get them to fill it

19   out because they are not complying with the subpoena?

20           MS. MYERS:  Correct.  Yes, Your Honor.

21           THE COURT:  I'll give you 30 days and that's it.

22   That's it.  I will tell you, I don't think it's appropriate for

23   her to walk over with a defendant fact sheet that says, "We

24   supplied docetaxel to this facility," because I think it could

25   be misleading, and I don't want that to occur.  It's one thing

11:35

1  for her to say, "You didn't comply with this subpoena.  We need

2  this paperwork filled out."

3      **MS. MYERS:**  Yes.  No, it's just going to be the

4  infusion form identity.

5      **THE COURT:**  Okay.  I'll give you an opportunity to

6  try that.

7      **MS. MYERS:**  Thank you, Your Honor.

8      **MR. INSOGNA:**  I'm sorry, Your Honor.  Is it 30 days

9  or do we want to roll it --

10     **THE COURT:**  I'm going to roll it over to the next

11 hearing.  When I say 30 days, it's we are going to deal with it

12 next time.

13     **MR. INSOGNA:**  Thank you, Your Honor.  Michelle

14 Villareal is the same circumstance except that she has been

15 filed since 2018.

16     **MS. MYERS:**  Okay.  Yes.  So I've been working since

17 April of last year when Ms. Villareal was initially put on the

18 failure to provide product ID list.  I was repeatedly told by

19 her infusion center, Texas Oncology of San Antonio, that they

20 do not have NDC records.  I pushed back, and this month I

21 finally got an answer from them because, I mean, these aren't

22 drugs, you know, that you get off the street.  Someone has to

23 pay for them.

24          She indicated that they actually do have a

25 warehouse where they would store the invoices for the

11:36

1   chemotherapy they received during that time.  She requested our
2   firm's FedEx account number.  She said that the records they
3   had were too large to scan in, so I'm waiting on those records
4   to come in.  I'm also requesting additional time to get those
5   records in.
6           THE COURT:  Okay.  I'm going to roll this over as
7   well.  Thank you.
8           MS. MYERS:  Thank you, Your Honor.
9           THE COURT:  Viedline Exinor.
10          MR. INSOGNA:  Yes, Your Honor.  This is a case where
11  we have not received any substantive response or basis for the
12  objection.
13          THE COURT:  Mr. Rockstad.
14          MR. HARDENSTEIN:  Good morning, Your Honor.
15  Taylor Hardenstein for Ms. Exinor.
16          THE COURT:  Okay.
17          MR. HARDENSTEIN:  For Ms. Exinor and the next
18  plaintiff, Ms. Koontz, I'm simply here to state a limited
19  objection, as people have done earlier today, objecting to the
20  dismissal.
21          THE COURT:  Okay.  This matter is dismissed with
22  prejudice.  Ms. Koontz is dismissed with prejudice.  We have
23  deferred Alice Paxton.  I think we are completed with
24  Mr. Hardenstein.
25          MR. INSOGNA:  That's right, Your Honor.

11:38

1        **MR. HARDENSTEIN:**  Thank you, Your Honor.

2        **MR. INSOGNA:**  The next plaintiff is Erica

3 Gissendanner.  This is another case where the plaintiff is

4 pointing to a defendant fact sheet as evidence of product ID

5 saying that the responses they have that indicated they

6 distributed were from Hospira and Sanofi, but not ruling out

7 other defendants and all the issues we have discussed earlier.

8        **THE COURT:**  Ms. Menzies.  Star six, Ms. Menzies.

9        **MS. KREIDER:**  We will reach out to her, Your Honor.

10       **THE COURT:**  Okay.  Let's just circle this one and

11 proceed.

12       **MR. INSOGNA:**  Okay.  Numbers 33, 34, and 35 are

13 Gibbs Law Group.

14       **MS. MENZIES:**  Your Honor, can you hear me now?  My

15 apologies.  I just got the notice, "You're on mute."  I was

16 pressing star six.  It's Karen Menzies.

17       **THE COURT:**  Okay.  Thank you.  Yes, ma'am.

18       **MS. MENZIES:**  Yes.  Yes.  Thank you, Your Honor.  On

19 this one I just want to make sure the record is clear that we

20 had three potential defendants again, as we noted with the DFS,

21 that it provides evidence that points to Hospira and Sanofi.

22 Sanofi did not respond to the DFS with regard to any contact

23 with the facilities because they don't respond to them after a

24 certain period of time, once the 505(b)(2)s are on the market,

25 so we are missing information there.  Their interpretation is

11:39

1    they don't have to on the DFS.

2                Ms. Gissendanner's treatment was only

3    seven months after the non-Sanofi products went on the market,

4    and we just want to make sure it's clear for the record that

5    the evidence so far narrows the defendant manufacturers to

6    Hospira and Sanofi.  NDC codes from the medical providers are

7    not the only way that plaintiff can meet her burden to prove

8    which defendant manufactured the docetaxel administered to

9    Ms. Gissendanner.  She should not be precluded from conducting

10   case-specific discovery on remand.

11           THE COURT:  What information do you have?  Who is the

12   manufacturer of the drug that she was administered?

13           MS. MENZIES:  The evidence in the case so far

14   indicates it's either Hospira or Sanofi.  Again, she was

15   administered Taxotere only seven months after Hospira came on

16   the market, the only other 505(b)(2) that the evidence

17   potentially points to.  We don't have evidence from Sanofi

18   because they won't provide us with a DFS on contacts to that

19   facility.

20                Again, it's a limited -- I know you have heard

21   this argument from others, but we are very concerned about

22   cases being dismissed with prejudice when there is -- you can

23   consider it circumstantial, but it is -- there are paths that

24   can lead to additional discovery efforts in a case-specific

25   setting on remand, or whenever we get the opportunity to do

11:41

1  that, that would allow us to determine which of these two

2  defendants more than likely was the manufacturer.

3       MR. INSOGNA:  So, Your Honor, just so that the record

4  is clear, the evidence that plaintiff's counsel is referring to

5  is defendant fact sheets.  I'm not going to go through the

6  argument on defendant fact sheets.

7            In terms of other efforts, other avenues that

8  counsel could have pursued, they could have done that well

9  before now if there were actual viable avenues.  A number of

10  plaintiffs' firms have taken 30(b)(6) depositions of

11  facilities.  I, frankly, don't think they have been

12  particularly fruitful in many of those cases.  For cases filed

13  in 2017 and 2019, I think we are past the point of saying there

14  might be other avenues.

15       THE COURT:  So these all three, Ms. Menzies, are the

16  same issue, that the defendant said, "We sold to these

17  facilities in this time frame"?  Is that what you are telling

18  me?

19       MS. MENZIES:  When you say "these three," I'm not

20  sure.  I have four on the list.  Each of them have evidence

21  [audio distortion] Ms. Gissendanner.  We have a little bit less

22  information on the others, but all of them do indicate

23  evidence -- for example, there is another one that, you know,

24  we do have a subpoena received back where they checkmarked

25  Hospira.  That's in the Delit (phonetic) case.  All of the

11:42

1    cases I have raised objections to to Your Honor today related

2    to the PID, they are all very soon after the non-Sanofi

3    products came on the market.

4              The evidence that we received from defendants

5    narrows the list of defendants that would be likely.  And

6    because NDC codes aren't the only way to prove PID, we believe

7    that at a [audio distortion] stage of the plaintiff's case, now

8    that we are looking at remand, that we should have the

9    opportunity to continue to pursue discovery in these

10   plaintiffs' cases to meet our burden.

11             THE COURT:  Okay.  I'm looking at the cases Erica

12   Gissendanner, Gilda Green, and Debra Henly.  I'm asking you:

13   As to these three cases, do you have anything plaintiff

14   specific to say that they received certain medication?  What

15   I'm talking about is something from the plaintiff's

16   perspective, either NDC code or a statement from the facility

17   that says that this is the manufacturer of the drug that she

18   was administered, or billing, or anything that says --

19             MS. MENZIES:  At this stage, Your Honor -- I'm sorry.

20             THE COURT:  Are you telling me no?

21             MS. MENZIES:  Correct, Your Honor.  At this stage we

22   do not.  We have done subpoenas, many medical records requests.

23   We have exhausted what we can do within this process for

24   getting PID, as Your Honor has suggested, that's true.

25             THE COURT:  Okay.  So what we have is the defendant

11:44

1    fact sheet that says -- and I paraphrase -- "We sold docetaxel

2    to this facility in this time frame"?

3         **MS. MENZIES:**  That's correct, indirect sales for

4    particular ones.  We have one with Ms. Henly where it says that

5    they have information that they distributed to Advanced Medical

6    Group, which is one of plaintiff's medical providers.  For

7    example, she was treated only one month after Sandoz came on

8    the market and five months after non-Sanofi products came on.

9              We also have -- there's one more I wanted to

10   mention, Your Honor, the -- oh, I apologize.  That's a

11   different plaintiff.

12             You're understanding the facts correctly,

13   Your Honor, and we are stating our objection.  We do believe

14   the evidence might lead to a path that, if pursued on remand,

15   we would be able to reach our burden.

16        **THE COURT:**  All right.  Your objection is noted for

17   the record.  I'm going to dismiss these cases because I think

18   CMO 12 was clear.  At a certain point you have to be able to

19   identify the manufacturers through some of these other

20   indications that tell us that this is the manufacturer that

21   provided the medication that was administered to the plaintiff.

22   I'm going to dismiss these cases.  Thank you.  Your objection

23   is noted for the record.

24        **MR. INSOGNA:**  Thank you, Your Honor.

25        **MS. MENZIES:**  Thank you, Your Honor.

11:46

1          **MR. INSOGNA:**  Ms. Sweet is going to tag in for few.

2          **THE COURT:**  Okay.  Thank you.

3          **MS. SWEET:**  Your Honor, the next case is Emma

4    English-Pagan brought by Johnson Becker.  They have produced an

5    unsigned Exhibit B statement regarding chemotherapy that has

6    both Hospira and Sandoz checked off with a handwritten note

7    that says, "Product received.  No way to trace NDC/patient."

8    So it's defendant's position that this is not sufficient

9    product identification, and we advised them of this in June.

10          **THE COURT:**  Okay.  Ms. Robertson.

11          **MS. ROBERTSON:**  Good afternoon, Your Honor.  Can you

12   hear me?

13          **THE COURT:**  Yes, ma'am.

14          **MS. ROBERTSON:**  So for Emma English-Pagan what

15   defendant stated is correct.  However, in or around June 17, we

16   additionally provided an exhibit restatement that was signed by

17   the facility and provided treatment dates.  It checks boxes

18   Hospira and Sandoz, but as indicated it says, "Above product

19   received.  No way to trace NDC."

20          **THE COURT:**  So the facility tells you they can't tell

21   you which manufacturer of docetaxel she received.  Is that what

22   you are telling me?

23          **MS. ROBERTSON:**  They completed the statement

24   check-boxing Hospira and Sandoz saying, "Above product

25   received," but they did state there is no way to trace this

11:47   1   specific patient's NDC.

2           **THE COURT:**  I think we are back to where we started

3   from.  We have to know which manufacturer produced the drug

4   that she took.  I'm going to dismiss this case subject to your

5   objection.

6           **MS. ROBERTSON:**  Thank you, Your Honor.

7           **THE COURT:**  Brenda Frederick-Sorak.

8           **MS. SWEET:**  In this case they have subpoenaed the

9   records and have obtained distribution records that go for

10  several years.  They show many, many purchases of docetaxel,

11  but none of them are for the plaintiff's -- number one, we take

12  issue with use of these distribution records in this way, but

13  the primary issue is that these records don't even track the

14  dates of treatment.  She was treated in 2011, and these records

15  go from 2012 to 2016.

16          **THE COURT:**  Ms. Robertson.

17          **MS. ROBERTSON:**  That's correct, Your Honor.  We were

18  able to obtain purchase records from the facility that do not

19  overlap with the time period that Ms. Frederick-Sorak was

20  infused.  For this one we would like our objection stated for

21  the record.

22          **THE COURT:**  Okay.  This matter is dismissed.

23              Benita Harges.

24          **MS. SWEET:**  This is a case where plaintiff's counsel

25  has indicated to us that they are making progress on a

11:49

1    subpoena.

2              THE COURT:  Okay.  Ms. Robertson.

3              MS. ROBERTSON:  That's correct.  Defendants and I

4    have agreed to roll this case over, if it's acceptable with

5    Your Honor, and we provided the pending subpoena to defendants.

6              THE COURT:  Okay.  Well, you could have just told me

7    we were going to roll it over.

8              MS. SWEET:  Thanks, Your Honor.

9              THE COURT:  Thank you.

10             MS. SWEET:  The next three cases were brought by

11   Scott Vicknair, LLC.  The objection in all of them was the

12   same, that there was an outstanding subpoena to the facility.

13   We had requested documentation and some more information in

14   June and did not receive a response.

15             THE COURT:  Ms. Greene.

16             MS. GREENE:  Yes, Your Honor.  So in Ms. Atwell's

17   case there is a subpoena out -- excuse my voice -- to the

18   insurer and a subpoena out to McKesson.  I believe there's an

19   additional subpoena that we would like to send out in that one.

20                  In Ms. Giglio's case there's a subpoena out to

21   the hospital.  The hospital changed hospital groups, so they

22   said we need to re-serve them.  In that case we also found that

23   there was a time period where a charity was paying for her

24   chemotherapy treatment, and so we would like to subpoena that

25   information from the charity.

11:50

1          Your Honor, I'm going to cough, so I'm going to

2   mute myself briefly.

3          I apologize.  I didn't want to cough on the

4   Zoom.  We would like to send a subpoena to the charity.

5          Then in Ms. Ledesma's case we have a subpoena

6   out to -- I apologize.  I had to cough again -- McKesson.

7          **THE COURT:**  I figured that.  I'm going to roll these

8   cases over and allow you to pursue the subpoenas that have been

9   previously issued.

10         **MS. GREENE:**  Thank you, Your Honor.

11         Oh, Your Honor, what about the additional

12   subpoenas, the charity and having to reissue -- I just want to

13   make sure you are not saying we can't issue subpoenas in these

14   cases.

15         **THE COURT:**  No, I didn't say that.  Just go ahead and

16   issue the subpoenas.

17         **MS. GREENE:**  Oh, okay.  I just wanted to make sure.

18         **THE COURT:**  There is a specific line of inquiry that

19   you are pursuing and that's what I'm looking at --

20         **MS. GREENE:**  Yes, Your Honor.

21         **THE COURT:**  -- what is it you are looking at.

22         **MS. SWEET:**  The next three cases were brought by

23   TorHoerman Law, LLC:  Julie Griffin, Julia Mitchell, and

24   Barbara Phillips.  They all indicate that they have records

25   requests pending.  We do see that in May they issued subpoenas,

11:52

1    but in some of these cases, particularly Julie Griffin and

2    Barbara Phillips, the cases have been pending for a while,

3    since 2018 and 2019.

4           THE COURT:  Okay.  Mr. Terry.  Eric Terry.  Star six.

5              Okay.  Let's just push and move past that one

6    and go to Zoll & Kranz.

7           MR. INSOGNA:  Thank you, Your Honor.  The next case

8    with Zoll & Kranz is Brenda Dixon.

9           THE COURT:  Mr. Weiman.  That one was rolled over

10   from April.

11          MR. WEIMAN:  Yes, Your Honor.  This is Blake Weiman.

12   Can you hear me?

13          THE COURT:  Yes, I can.

14          MR. WEIMAN:  Okay.  Great.  As you are aware with

15   this particular case as to Ms. Dixon, we do have sort of an

16   ongoing probate issue.  We currently do lack product

17   identification, have attempted to request insurance records

18   prior to her death, which the production to that was not

19   responsive, but we haven't been able to address that since

20   without letters of authority.

21             I do want to thank the Court for extending, you

22   know, some latitude in the time that it's allowed so far.

23   Unfortunately, we still do not have authorization from the

24   probate court to move forward, so we are sort of stuck in

25   limbo.

11:53

1          **THE COURT:**  Okay.  We will just roll it over again.

2     Thank you.

3          **MR. WEIMAN:**  Thank you, Your Honor.

4          **THE COURT:**  Crystal Middleton.

5          **MR. INSOGNA:**  Your Honor, in Crystal Middleton's

6     case, plaintiffs indicated that they have an outstanding

7     request to Ohio Medicaid.  We asked for documentation of that

8     request and have not received any.  The plaintiff indicated

9     they believe there's a basis to dismiss Hospira, leaving only

10    Sanofi and Winthrop in the case.  Again, I don't know what that

11    basis is.  We don't have documentation for that.

12         **THE COURT:**  Mr. Weiman.

13         **MR. WEIMAN:**  Your Honor, that's based on the

14    defendant fact sheet response, but in addition to that -- and,

15    of course, we do have the pending request to Ohio Medicaid.  So

16    we think that, in conjunction with the way that the fact sheets

17    have been answered, would give us the opportunity, you know, to

18    show product ID for Sanofi and for Winthrop.

19         **THE COURT:**  Okay.  Well, I think you can tell I

20    haven't been impressed with just the defendant fact sheets

21    being a basis for this.  If you have issued a request to Ohio

22    Medicaid, I think that's appropriate.

23         **MR. WEIMAN:**  We have, Your Honor.  We have been

24    pursuing, you know, following up with, as far as I understand,

25    in recent weeks as well.  Our hope is that we will have

11:55

1  something soon from that, from that request, which is active

2  and just pending at this time.

3          THE COURT:  So what do you need, Mr. Insogna?

4          MR. INSOGNA:  We don't have any product

5  identification.

6          THE COURT:  I understand that.  If he has issued a

7  subpoena, you would want a copy of the subpoena?

8          MR. INSOGNA:  Well, generally, yes.  The Court's

9  order asked that they provide evidence of their efforts, in

10  particular in cases like this that have been pending since

11  2017, so we can see when the plaintiff served a subpoena and if

12  there's any justification for the four- or five-year delay in

13  getting these efforts underway.

14          THE COURT:  Okay.  Why don't you produce a copy of

15  the subpoena within the next 15 days to defense counsel.

16          MR. WEIMAN:  Yes, Your Honor.

17          THE COURT:  Then we have Virginia Tabron.

18          MR. INSOGNA:  Your Honor, Virginia Tabron is, I

19  think, a similar circumstance.  Plaintiff has indicated they

20  have an outstanding request to United Healthcare and then

21  something about partial dismissals based on defendant fact

22  sheets.  Obviously, defendant's position is the same, that

23  given the age of the case any steps should have been completed

24  by now.

25          THE COURT:  Mr. Weiman.

11:56

1      **MR. WEIMAN:**  Your Honor, this is a similar case to

2  the one we just discussed.  We do have active efforts that are

3  ongoing both, as defense counsel stated, for United Healthcare,

4  but we also have issued a subpoena to Cardinal Health for

5  purchasing records.  So we believe that, again, exploring those

6  lines of inquiry moving forward combined with the defendant

7  fact sheets, we should be able to find product identification.

8  If the Court would like us to provide evidence like in the

9  previous case, we can certainly do that.

10      **THE COURT:**  Mr. Weiman, I do have to ask you this.  I

11  have given you some time on the others, but these have been

12  pending since 2017.  That's five years.  Why the holdup in

13  issuing these subpoenas?

14      **MR. WEIMAN:**  Well, to the best of my understanding,

15  Your Honor -- and I have to say I haven't been working on the

16  case since 2017 -- my understanding is there has been a number

17  of issues with facilities and being responsive to those

18  requests and delays over the last couple of years in particular

19  with COVID.  I can't speak to the particularities of what those

20  issues have been specifically, but I know that we have not

21  received a full breadth of records that we think that our

22  requests have sought.  Most of that has led to additional

23  follow-up.

24      **THE COURT:**  Okay.  I'm going to order that you submit

25  the copy of those subpoenas within the next 15 days to defense

11:58   1   counsel, and we will roll this matter over.

2           **MR. TERRY:**  Your Honor, I apologize.  This is

3   Eric Terry from TorHoerman Law.  You called my cases a few

4   moments ago.  I have no idea what happened, so I switched

5   phones and I'm trying again.

6           **THE COURT:**  All right.

7           **MR. TERRY:**  I apologize.

8           **THE COURT:**  All right.  We have Julie Griffin,

9   Julia Mitchell, and Barbara Phillips.  Mr. Insogna.

10          **MR. INSOGNA:**  Your Honor, in Julie Griffin's case,

11  plaintiff has indicated they are awaiting a response to an

12  insurer that they served in May of 2022, and on that basis they

13  are saying they have not exhausted every opportunity.

14          I would just note that they emailed a request to

15  plaintiff's treatment facility in May of 2021 so have had

16  plenty of time to enforce that request.  I don't see any

17  justification for failing to serve this subpoena on the insurer

18  until now in a case that's been pending since 2019.

19          **MR. TERRY:**  Your Honor, my partner, Steve Davis,

20  handles these cases.  He was unavailable today dealing with a

21  personal issue.

22          My understanding on the Julie Griffin case is

23  records were received previously from Blue Cross Blue Shield

24  that had J codes which indicated that Taxotere was used.

25  However, there were no NDC codes confirming such.  That is one

11:59

1    of the main reasons that the subpoena was sent out in May of

2    2022.

3                    THE COURT:  I'm going to roll this matter over.

4                    Julia Mitchell.

5                    MR. INSOGNA:  Your Honor, I understand the

6    circumstance to be similar there.  A subpoena went to the

7    insurer in May of 2022, and that's all the information I have.

8                    MR. TERRY:  Again, Your Honor, my understanding is

9    Ms. Mitchell, again with the Blue Cross Blue Shield, that it

10   may be similar where there are records indicating J codes but

11   not the NDC codes.  That's what we are attempting to get.

12                   THE COURT:  Okay.  I'm going to roll this matter

13   over.  Is Barbara Phillips any different?

14                   MR. TERRY:  Your Honor, Barbara Phillips is Medicare.

15   Again, I don't know if it's the J code issue.  What Mr. Davis

16   told me was it just was a similar issue where we are just

17   trying to confirm information regarding that.

18                   MR. INSOGNA:  I understand the issue is the same.

19                   THE COURT:  I'm going to roll this matter over.

20                   I am going to go through the Allen & Nolte law

21   firm.  Gainsburgh Benjamin I think is deferred.  Anybody else,

22   we are going to take a break after those and then come back.

23                   MR. INSOGNA:  Your Honor, the first two Allen & Nolte

24   cases, Janet Martin and Diana Fessenden, I understand had late

25   cures, basically.  They are resolved.

12:01

 1          THE COURT:  I'm going to give you seven days to
 2    confirm compliance.
 3               Annie Givens.  We have for Allen & Nolte,
 4    Ms. Nolte.
 5          MS. NOLTE:  Yes.  Good morning, Your Honor.
 6          THE COURT:  Okay.  I'm listening.
 7          MR. INSOGNA:  I'm sorry, Your Honor.  This is a case
 8    where a subpoena was only served in May 2022.  The only
 9    response we have from plaintiffs is because they have efforts
10    ongoing, they are requesting more time.
11          THE COURT:  Ms. Nolte, what do you have specifically
12    ongoing that you didn't do before?
13          MS. NOLTE:  Well, Your Honor, for Annie Givens -- and
14    it's very similar with our next case, Chantee Leonard -- we
15    exhausted our initial efforts to obtain PID and so have sent
16    notices required by CMO 12A to defendants, triggering their
17    obligation to send a letter to the infusion center to request
18    PID.  We did that in May of this year.  I have not seen those
19    letters be sent out yet.
20          MR. INSOGNA:  Your Honor, this is sort of a silly
21    procedural question.  Under CMO 12 the plaintiffs send an
22    informal request to the facility.  If they don't get a
23    response, defendants send an informal request, and then
24    plaintiffs can subpoena the facility for records.
25               In these cases there have been subpoenas served.

12:02

1  I understand that counsel is saying that a defendant didn't

2  send an informal request, but if there has been a subpoena --

3          THE COURT:  There's a subpoena that's been served?

4          MS. NOLTE:  Your Honor, no, in Annie Givens' case

5  there has not been a subpoena that has been sent.  Our office

6  has not submitted one of those.

7              Now, in Chantee Leonard a subpoena was

8  submitted.  We notified defendants that we were going to do

9  that.  In response to our notification of that, they said,

10 "Okay.  You can go ahead and do that.  If that's unsuccessful,

11 you still have to go all the way back through CMO 12A."

12         MR. INSOGNA:  Your Honor, just to be clear, the note

13 that I have is that in Ms. Givens' case, the last effort to

14 obtain product ID was in December of 2020.  In Ms. Leonard's

15 case, it was in April of 2021.

16         THE COURT:  This is now getting confusing.  So in

17 Ms. Givens, in December 2020 an informal request was made?

18         MR. INSOGNA:  I thought that it was a subpoena,

19 Your Honor.

20         MS. NOLTE:  So, Your Honor, that was an informal

21 request.  That was our last-ditch effort in the first step to

22 CMO 12A to get those records.  Unfortunately, I realize it's

23 been a bit of time since then that we notified defendants.  The

24 person I had here working in the office on those cases has left

25 my office and somehow the deadlines got missed.  As soon as we

12:04   1   were put on notice from defendants that we were not in
2   compliance, we sent them the email notification requesting that
3   they send a letter to the infusion facility.
4           **THE COURT:**  Did you send a letter?
5           **MR. INSOGNA:**  I'm not sure I understood that one.  I
6   don't know standing here right now if defendants sent an
7   informal letter to the facility.  I would have to confirm that.
8           **THE COURT:**  What are you telling me, Ms. Nolte, that
9   Annie Givens kind of fell in the cracks and then you sent a
10  letter to the facility?
11          **MS. NOLTE:**  Right.
12          **THE COURT:**  And then you --
13          **MS. NOLTE:**  No, no.  Let me see if I can be a little
14  bit clearer.  I apologize.  We spent about a year and a half
15  going round and round with the various facilities trying to
16  obtain PID, eventually realized that we probably weren't going
17  to be able to obtain it by that method.  So pursuant to
18  CMO 12A, we have now sent notice of that to defendants, which
19  triggers their obligation to send the letter to the infusion
20  center requesting PID.  That's been my [audio distortion] where
21  we left off.
22          **THE COURT:**  Okay.  I have a question.  You sent that
23  letter to defendants in December 2020; is that correct?
24          **MS. NOLTE:**  No, that's not correct.  I'm sorry,
25  Your Honor.  We sent the email to defendants in May of this

1  year.

2      THE COURT:  Oh.  When was the last communication you

3  had with the infusion facility?

4      MS. NOLTE:  I believe that was either December 2020

5  or early 2021, but I think it was December 2020.

6      THE COURT:  You have never issued a subpoena?

7      MS. NOLTE:  We have not because we are waiting to

8  make it all the way through the CMO 12A steps.

9      THE COURT:  All right.  Well, this is what I'm going

10  to tell you.  Issue your subpoena.

11      MS. NOLTE:  Okay.  We will do that.

12      THE COURT:  Issue your subpoena, and we are going to

13  roll it over.

14      MS. NOLTE:  That's on Annie Givens.  Then on

15  Chantee Leonard's case --

16      THE COURT:  Have you heard back from the subpoena?

17      MS. NOLTE:  We did not hear back from the subpoena.

18      THE COURT:  When was that issued?

19      MS. NOLTE:  I think either April or May of 2021.

20      THE COURT:  Was there any follow-up with the facility

21  to determine why the subpoena was not --

22      MS. NOLTE:  Yes.  Correct.  We did follow up with

23  them by email --

24      THE COURT:  Tell me what happened.

25      MS. NOLTE:  So we followed up with them by email and

12:05

12:06

1    phone, and they never did respond to the subpoena.  According

2    to what we were advised by defendants, after we issued that

3    subpoena, if we didn't get any response, then we have to go

4    back through the CMO 12A process before we can do anything

5    else.  So it's my understanding that they still wanted us to

6    send them an email saying we couldn't obtain it and then move

7    forward from there.

8              THE COURT:  What have you done to move forward from

9    there?  I'm confused.  What I'm hearing is over a year ago you

10   issued a subpoena, you have gotten no response, and then what?

11             MS. NOLTE:  Right, Your Honor.  I guess maybe I'm a

12   little bit confused about what defendants wanted us to do when

13   we notified them that we were going to do that subpoena early

14   on in the process.  They said you may issue it, but it must go

15   through the CMO 12A process before we can do any further

16   discovery.  So it was my understanding that that meant that we

17   had to let them know, and then they needed to send a letter to

18   the infusion facility, etc.  I may have been incorrect in the

19   way I read that, but that was my understanding.

20             THE COURT:  I have to tell you, I'm perplexed because

21   I don't understand if you --

22             MS. NOLTE:  I am a little too.

23             THE COURT:  Do you have correspondence from the

24   defendant that you can send me where they told you what you

25   needed to do?

12:08

1        **MS. NOLTE:**  Sure, absolutely I do.

2        **THE COURT:**  Okay.  I'm going to ask that you send

3   that to Ms. Kreider with the plaintiffs' steering committee so

4   we can see if we can make heads or tails of where this matter

5   is.

6            You have issued a subpoena and the defendants

7   have just ignored it, is that what you are telling me?

8        **MS. NOLTE:**  Well, yes, I believe so.  I'm at this

9   point a little bit confused as well.

10        **THE COURT:**  I want to see that correspondence.

11        **MR. INSOGNA:**  Sure.

12        **MS. NOLTE:**  Yes, your Honor.

13        **MR. INSOGNA:**  To be clear, the defendants don't

14   respond to these subpoenas to the facility.  I think --

15        **THE COURT:**  What I'm hearing is, "I issued a

16   subpoena.  There was no response."  I want to see what the

17   response was from the defendants.

18        **MR. INSOGNA:**  I understand.  I have a suspicion, but

19   we can submit the documentation.

20        **THE COURT:**  Let me see.  Let me see.  All right.

21            We are just going to defer this, Ms. Nolte.  We

22   are going to roll it over, but first I'm going to hear from

23   Ms. Kreider.

24        **MS. KREIDER:**  Yes, Your Honor.

25        **THE COURT:**  Thank you.  All right.

12:09

1          **MS. NOLTE:**  Thank you, Your Honor.

2          **THE COURT:**  Then we go to Louise Candy-Hall.

3          **MR. INSOGNA:**  Yes, Your Honor.  I understand that

4    plaintiff's counsel has indicated that plaintiff is deceased,

5    and they are working on substituting a party plaintiff in this

6    case.  I would like to note, though, however, that the pharmacy

7    at plaintiff's infusion facility has responded to a subpoena.

8    It states on the face of it that Broward Health Medical Center

9    does not retain NDC codes.  So I don't know that they will ever

10   be able to obtain it if the facility doesn't have it.

11         **THE COURT:**  Maybe through insurance or something.  I

12   don't know.

13         **MR. INSOGNA:**  Possibly.

14         **THE COURT:**  There are other places.  We have medical

15   billing.  It could be one of those.

16         **MS. KREIDER:**  Your Honor, I realized that my client

17   was deceased, and I've been trying to get in touch with her

18   husband.  I didn't feel it was appropriate for me not to object

19   when I didn't have a client, but I have exhausted efforts by

20   speaking with the pharmacist, the insurance.  All those efforts

21   have not led me to an NDC code.

22         **THE COURT:**  Okay.  I'm going to dismiss this matter.

23   Thank you.

24              We are going to take a break until 1:30.  So

25   those people who have been on the line, I apologize.  I am

12:11   1    going to ask that you rejoin us at 1:30.

2                    I want to speak to counsel.

3            THE DEPUTY CLERK:  All rise.

4            (Lunch recess.)

5                              * * *

1          **<u>AFTERNOON SESSION</u>**

2          **(July 12, 2022)**

3          **THE DEPUTY CLERK:**  Court is back in session.  You may

4     be seated.

5          **THE COURT:**  Let's go.  We have Edith Fee.

6          **MS. SWEET:**  The next four cases, all from

7     MacArthur Heder, we received an email this morning from the PLC

8     that the plaintiffs will no longer be objecting.  So we will

9     add them to a dismissal list and submit it to the Court.

10          **THE COURT:**  All right.  So these next four cases will

11     be dismissed?

12          **MS. SWEET:**  Yes.

13          **THE COURT:**  All right.  They will be dismissed with

14     prejudice:  Edith Fee, Darla Jackson, Patricia Jones-Rucker,

15     and Margarita Santos.  Thank you.

16               All right.  We go to Patricia Watkins.

17          **MS. HANLON:**  Bria Hanlon for the plaintiff is on,

18     Your Honor.

19          **THE COURT:**  Hi, Ms. Hanlon.

20               Ms. Brilleaux.

21          **MS. HANLON:**  Before anybody says anything on

22     Ms. Watkins, we did file a dismissal on her case years ago, and

23     we were not aware of an error made.  I spoke to the court clerk

24     yesterday, so we are not --

25          **THE COURT:**  Wait, wait, wait, wait, wait, Ms. Hanlon.

01:34   1   Ms. Hanlon, stop.  Ms. Hanlon, stop.

2           **MS. HANLON:**  Yes.

3           **THE COURT:**  It was like an echo or something.  Wait.

4   We have to figure it out.  Just don't talk because --

5           **MS. HANLON:**  Oh, I'm so sorry.

6           **THE COURT:**  No, just stop talking.  Stop talking for

7   a second.

8                  All right.  Are we set?

9           **THE DEPUTY CLERK:**  Yes.

10          **THE COURT:**  Okay.  Now you can talk.  I'm sorry.

11   Please proceed.

12          **MS. HANLON:**  Okay.  All better?

13          **THE COURT:**  Yes.

14          **MS. HANLON:**  I was just going to say on Ms. Watkins'

15   case we previously filed a dismissal and there was an error.  I

16   spoke to the court clerk yesterday, so we are not opposing a

17   dismissal in her case, just to put that out there first before

18   anything else was mentioned on her.

19          **THE COURT:**  Thank you.

20          **MS. BRILLEAUX:**  So dismissing?

21          **THE COURT:**  This matter is dismissed with prejudice.

22          **MS. BRILLEAUX:**  Thank you.

23          **THE COURT:**  All right.  We go to Dana Jones.

24          **MS. SWEET:**  This case is a rollover from the last

25   CMO 12 hearing.  On that date they had indicated that they had

01:34

1   received some kind of response that had indicated Winthrop,

2   Hospira, and Sandoz.  When we look at the purchase records that

3   were received, it implicates three potential defendants.  There

4   are no dates of purchase that are included on here.  There is

5   no indication that would connect any of this docetaxel to the

6   plaintiff.

7           THE COURT:  Ms. Hanlon.

8           MS. HANLON:  Yes, that is correct.  So the subpoena

9   response that we got was from a Stefanie Cravens at the

10  facility, who is the risk management manager.  When we got that

11  back from her, we did indicate -- we got it right before the

12  last hearing, so we did indicate to her that that information

13  was most likely not going to be sufficient.

14          We have been in touch with her.  She has

15  indicated what she did prior, when she was searching for the

16  information, that their system changed at one point.  She is

17  working with IT to try to obtain the specific information for

18  Ms. Jones.  She has not given that to us yet.

19          I have been in touch with her.  She is

20  responsive to me.  So we are asking her to be rolled over in

21  the hopes that Ms. Cravens will get us the information on

22  Ms. Jones.  I understand the time period that has elapsed and

23  all of that.  However, we do still believe, just because of the

24  communications with the facility, that the information could

25  exist.

01:36

1       **THE COURT:**  I'm going to allow it to roll over.

2       **MS. HANLON:**  Thank you.

3       **THE COURT:**  Alice Hubbard.  Ms. Sweet.

4       **MS. SWEET:**  In this case plaintiff's objection is

5  that requests remain pending.  We note that when plaintiff sent

6  a summary of their efforts, they reflect efforts to obtain

7  product identification between June 2019 and March of 2021 to

8  the procedure, and there were no efforts for the next year.

9  They resumed efforts in April and June of 2022, but they were

10  to the same facilities that were subpoenaed in 2019 to 2021.

11       **THE COURT:**  Okay.  Ms. Hanlon.

12       **MS. HANLON:**  Yes.  I have an update on her.  The

13  latest subpoena that we sent, we have a response from -- it's

14  central release of information at the University of Maryland

15  Shore Medical Center at Easton, which is a different facility

16  than we previously subpoenaed.

17            We have been in touch with them, stalking them

18  almost at this point.  They have indicated they have mailed us

19  a response.  They wouldn't fax or email me.  They said I should

20  have it no later than this Thursday, which again I know the

21  time frame.  However, they have sworn the NDCs are in that.  So

22  our hope is that when we receive this disc in the mail, since

23  that is the only way they would send it to us, that the

24  information will be in there.  If we get that, we will be in

25  touch with defendants and just ask for her case to be rolled

01:37   1   over as well.

2           THE COURT:  I'm going to allow it to be rolled over.

3               Alice Hughes.

4           MS. SWEET:  When we communicated with plaintiffs

5   about this case in June, they indicated that the facility had

6   told them they would have a response by the end of June, and we

7   have not received anything.

8           THE COURT:  Ms. Hanlon.

9           MS. HANLON:  Yes.  That facility, we did get a

10   response on one pending subpoena from there.  That subpoena did

11   not indicate the information that we need.  We have one pending

12   request still with a billing department.  The billing

13   department has stated they are backed up now.  This is a

14   different department than the initial request.  Their billing

15   department stated they're backed up from April requests.  So we

16   are still pending one request on Ms. Hughes' case as of right

17   now.

18           THE COURT:  Okay.  I will allow it to roll over.

19               Antoinette Johnson.

20           MS. SWEET:  Based on the information we received from

21   plaintiff that they had attempted to obtain product

22   identification in December of 2020 and resumed efforts in May

23   with a new request to a different facility, we don't have

24   record of a subpoena being issued.

25           MS. HANLON:  I can provide the effort from the

01:38   1   subpoena being issued.  We did issue one to Northwest Oncology.
2   They did give us a response.  Her treatment is a little bit
3   confusing, but they indicated that they would carry inpatient
4   pharmacy records.  However, my client's treatment there,
5   considering it's outpatient, they have sent us to request from
6   an Alvin & Lois Cancer Center at Northwest Hospital, so just
7   like a different part of their hospital.
8              Our hope is we can also ask to roll this case
9   over to hopefully properly request Alvin & Lois Cancer Center.
10   They have indicated that they would most likely have this
11   information due to it being considered outpatient.  Our request
12   is just to roll over Ms. Johnson's case as well.
13          THE COURT:  I will allow it to roll over.
14   Ms. Hanlon, we were running out of time.
15          MS. HANLON:  I know.  I got it.  I'm on it.  Thank
16   you, Your Honor.
17          THE COURT:  Okay.  Thank you.
18              Charlene Barber with the McSweeney law firm, and
19   that should be Mr. McSweeney.  Are you here?
20          MR. MCSWEENEY:  Yes, I am, Your Honor.
21          THE COURT:  Thank you.
22              Ms. Sweet.
23          MS. SWEET:  In this case, Your Honor, plaintiff has
24   requested a rollover because they are very close to obtaining
25   some product identification.  We are agreeable to that.

01:40

1      THE COURT:  We will roll over Ms. Barber.

2           Then we get Mary McPeters.

3      MS. SWEET:  So the next four cases -- McPeters,

4  Poticha, Sanders, and Townsend -- all have the same general

5  objection, which is that the DFS evidence is sufficient to

6  establish product identification.

7      THE COURT:  Okay.  Mr. McSweeney, do you have

8  anything beyond the fact sheets?

9      MR. MCSWEENEY:  Yes, Your Honor, on some of them we

10 do.

11     THE COURT:  Okay.

12     MR. MCSWEENEY:  On Mary McPeters, we have recently

13 been able to get a number for Dr. Ebrahim, who was the

14 administer.  We have not been able to reach him, but we have

15 exchanged several voicemails.  According to the DFS, it's an

16 Accord only.  We are hoping that Dr. Ebrahim can confirm that.

17     THE COURT:  I will allow it to roll over because it's

18 just one and there seems to be some communication with the

19 actual facility.

20          Okay.  Christine Poticha.

21     MR. MCSWEENEY:  Christine Poticha, we are working off

22 of one document that we have.  We have her TC form from the

23 time of administration, and it's identifying a cost and a cost

24 per treatment.  We just got this document.  We are hoping that

25 we can backtrack by the cost per milligram and the cost per

01:41

1    treatment to identify whether it was Sanofi or Hospira, which

2    were identified in the DFS.

3           THE COURT:  You have what?  Is it an insurance form

4    or a payment form?

5           MR. MCSWEENEY:  No.  It's the form that she was given

6    at the time.  It's called a patient treatment information.

7    It's from the oncology associates where it was performed.  It

8    gives her all her information about what she should expect in

9    her docetaxel regimen.  It also outlines on one of the final

10   pages the cost per treatment, and it breaks it down per

11   milligram and per treatment.  We are hoping that we can

12   backtrack that information to identify which of the defendants

13   it is.

14          MS. SWEET:  Your Honor, I don't see how this will

15   help him establish which was the manufacturer.  Number one, all

16   of the DFS issues we have already identified.  There could be

17   other shipments to the facility that have nothing to do with

18   Sanofi or Hospira that were not reflected in the DFS.  In any

19   event, I'm not sure where they have the cost information to be

20   able to make that comparison.  If one is higher than the other,

21   it could be Hospira or another manufacturer.  It's not

22   necessarily one or the other.

23          THE COURT:  Mr. McSweeney, that's a long shot.  I'm

24   going to allow you to have this conversation with the facility,

25   but it's really hard for me to understand how an estimated cost

01:43

1   is going to get you there unless there's something in the way
2   that they outlined it that means something to the facility.  I
3   will allow you to ask them those questions.  I will roll it
4   over.  We are going to roll it over one time.  That's it.
5           MR. MCSWEENEY:  I understand, Your Honor.  We are
6   trying to do everything we can.  This is the last piece of
7   information, when I have combed through the file, that may lead
8   us to which of the defendants is the correct defendant.
9           THE COURT:  Well, the only reason why I'm going to
10  allow it in this case -- because I know other people are
11  listening and saying, "Oh, okay.  Well, now defendant fact
12  sheets get us there."  They do not.  They do not except that
13  this was something actually from the facility itself.
14              Now, I absolutely think it's a long shot, but
15  I'm going to give you an opportunity to run it down.  Perhaps
16  it means something to the facility that means nothing to us,
17  and I will allow you to ask those questions.
18              Arlanda Sanders.
19          MR. MCSWEENEY:  We are just going to make our
20  objection on the record.  It's been identified that Hospira was
21  the only provider, but we understand the judge's ruling.
22          THE COURT:  This matter is dismissed with prejudice.
23              Laura Townsend.
24          MR. MCSWEENEY:  Same objection, Your Honor.
25          THE COURT:  This matter is dismissed with prejudice.

01:44

1    Your objections are noted for the record.  Thank you.

2              **MR. MCSWEENEY:**  Thank you, Your Honor.

3              **THE COURT:**  Then we go to Sherri Banks.  That's

4    Shaw Cowart.

5                   Mr. Cowart, are you on the line?

6              **MR. COWART:**  Yes, Your Honor.  Can you hear me okay?

7              **THE COURT:**  I can.  Thank you.

8              **MS. BRILLEAUX:**  Your Honor, the deficiency for this

9    one, this is another case where we need photographs from after

10   the first chemotherapy but before the Taxotere treatment.  Here

11   plaintiff received Taxol in 2002 and 2003 and then received

12   Taxotere from 2006 and 2007.  So we need before photos from

13   before the 2006 Taxotere treatment.

14             **THE COURT:**  Okay.  Mr. Cowart.

15             **MR. COWART:**  Yes, Your Honor.  That's right.  We have

16   looked.  She is just having a difficult time coming up with any

17   photographs from that 2004-2005 time frame.  She is continuing

18   to look.  I guess after, you know, having the chemotherapy she

19   probably just wasn't in the picture-taking mood.  She just

20   can't find any.

21             **THE COURT:**  Okay.  I'm going to direct that you visit

22   with Ms. Kreider.  She will maybe help you get some ideas about

23   other places you might search for photographs.  I'm also going

24   to ask -- and, if not, prepare an appropriate affidavit and we

25   will consider it.  Thank you.

01:46

1    MR. COWART:  Yes, Your Honor.

2    THE COURT:  This matter will roll over.

3         Sharon Dickinson.

4    MS. BRILLEAUX:  Yes, Your Honor.  For this case the

5  PFS indicates that plaintiff had more than one cancer

6  diagnosis, but there's no information on the other cancer other

7  than the treatment with Taxotere.  So we need the PFS amended

8  to include that information.

9    MR. COWART:  Your Honor, Ms. Dickinson is deceased.

10  We have actually had some luck recently with her representative

11  that's been appointed.  She has found a family member who has

12  knowledge about that.  Apparently she had colon cancer in 2014.

13  Anyway, I think we are on the road to getting there on that --

14    THE COURT:  Well, have you filed the probate?  Do we

15  have a representative?

16    MR. COWART:  I'm sorry?

17    THE COURT:  Well, if she's deceased --

18    MR. COWART:  Yes, ma'am, we do.

19    THE COURT:  Okay.  All right.

20    MS. BRILLEAUX:  Your Honor, I just wanted to note I

21  don't believe that a suggestion of death has been filed.  I'm

22  not 100 percent certain on that.  We would ask that if one

23  hasn't been filed, that one be filed now.

24    THE COURT:  Okay.  Mr. Cowart, let's get that done

25  within 30 days, and then I'm going to need you to get that

01:47

1   information to us as well.  Thank you.

2         **MR. COWART:**  Yes, ma'am.  Thank you.

3         **THE COURT:**  Michele Malone.

4         **MS. BRILLEAUX:**  Yes, Your Honor.  This is a similar

5   situation.  The plaintiff was diagnosed and had treatment with

6   Taxotere in late 2001 and early 2002.  The PFS indicates that

7   there was a second cancer diagnosis, but we don't have

8   information other than we have some records showing that there

9   was a mastectomy around 2007.  So, again, we are asking for the

10  PFS to be updated with information on the other cancer

11  diagnoses and treatments.

12        **THE COURT:**  Mr. Cowart.

13        **MR. COWART:**  Yes, Your Honor.  I believe the fact

14  sheet does include the fact that she had thyroid cancer and

15  that's the other cancer that is at issue.  We will update the

16  fact sheet to make that more clear if it's not.

17        **THE COURT:**  All right.  Let's get that done within

18  15 days to outline exactly what that other treatment was, etc.

19        **MS. BRILLEAUX:**  Thank you.

20        **THE COURT:**  Ana Arce.

21        **MR. INSOGNA:**  Thank you, Your Honor.  In Ms. Arce's

22  case, plaintiff has submitted product identification for a

23  single cycle.  We don't have any evidence for the other cycles.

24  Similar to what we did before, we are asking that defendants

25  other than Sanofi be dismissed and that plaintiff continue her

01:49

1    efforts as to the other cycles.

2            THE COURT:  Mr. Cowart, I need you to dismiss the

3    other defendants that were not part of the product ID.

4            MR. COWART:  Will do, Your Honor.

5            THE COURT:  I'm going to give you 15 days to get that

6    done as well as continue efforts to confirm the other product

7    ID.

8                    Ida Hersh.

9            MR. INSOGNA:  Thank you, Your Honor.  In Ms. Hersh's

10   case, we received a statement of chemotherapy that does not

11   check any of the manufacturer boxes.  It just checks the

12   Taxotere versus Taxol box.  So we don't think that that's

13   product identification for any particular manufacturer, and we

14   have no other evidence.

15           THE COURT:  Okay.  Mr. Cowart.

16           MR. COWART:  Yes, Your Honor, he is correct.  It does

17   say the brand product that was used was Taxotere, and that is

18   everything we have got.  I would like to follow that up with a

19   subpoena, if we could have a little extra time to do that.

20           MR. INSOGNA:  It's a 2017 case.

21           THE COURT:  It's 2017.  What have you done to find

22   product ID?

23           MR. COWART:  Your Honor, we just got this information

24   in June of this year.  Other than send out the medical records

25   request, I'm not sure what else was done.

01:50

1   **THE COURT:**  I don't understand.  Did you issue a
2   request to the infusion facility?
3   **MR. COWART:**  Yes, ma'am, we did.
4   **THE COURT:**  Okay.  When was that?
5   **MR. COWART:**  I don't have that record, Your Honor,
6   exactly of when that happened.  I apologize.
7   **MR. INSOGNA:**  Your Honor, the statement regarding
8   chemotherapy drug administered that I referenced that checks
9   the Taxotere box has a fax header to the Shaw Cowart firm in
10  July of 2017.
11  **MR. COWART:**  Okay.  I see that.  It sure does.
12  **THE COURT:**  Okay.  You hadn't made a request since
13  then?
14  **MR. COWART:**  We haven't subpoenaed any records, no,
15  ma'am, not on this file.
16  **THE COURT:**  Have you requested the records?
17  **MR. COWART:**  Your Honor, I would say so.
18  **THE COURT:**  You don't know?
19  **MR. COWART:**  I believe we have, Your Honor, but I
20  don't know.  I don't have that pulled up.  I believe we have.
21  **MS. KREIDER:**  Your Honor, I would just request since
22  dismissal is such a harsh punishment an opportunity --
23  **THE COURT:**  I'm going to give you one rollover.
24  Okay.  You have to get on that.
25          Let's go to the next one.

01:52

1    **MR. COWART:**  Thank you, Your Honor.

2    **THE COURT:**  Mr. Niemeyer.

3    **MR. NIEMEYER:**  Good afternoon, Your Honor.

4    **THE COURT:**  Good afternoon, Mr. Niemeyer.

5    **MR. INSOGNA:**  The first case is plaintiff Elizabeth

6    Murphy.  This is another situation where we have a statement

7    showing a Sanofi NDC code for one infusion and no evidence as

8    to the others, so we would request dismissal of the other

9    defendants and continued efforts.

10    **THE COURT:**  Mr. Niemeyer, any objection?

11    **MR. NIEMEYER:**  No, ma'am.  We do have lot numbers on

12    two of the others that show Sanofi, but, no, we are on board

13    with that plan.  Thanks, Judge.

14    **THE COURT:**  Okay.  I grant you 15 days to get that

15    done.  Thank you.

16              Diane Coleman.

17    **MR. INSOGNA:**  Your Honor, in Ms. Coleman's case,

18    there is a subpoena response from McKesson indicating that it

19    supplied Sanofi and Winthrop medication to plaintiff's

20    facility.  We don't have any other evidence of product

21    identification.

22    **THE COURT:**  Mr. Niemeyer.

23    **MR. NIEMEYER:**  Yes, Your Honor.  So we have a letter

24    from the VA facility letting us know that McKesson was the

25    vendor, the supplier during the relevant time frame, and then

01:53

1    the records from McKesson show that Sanofi was the only

2    manufacturer supplier through McKesson during the relevant time

3    frame.  So by process of elimination, then, we believe we can

4    prove that Sanofi was the sole supplier manufacturer, and the

5    only manufacturer from whom Ms. Coleman could have received the

6    drugs.  We are more than happy to proceed against Sanofi alone.

7              MR. INSOGNA:  Okay.  So in that case I guess we would

8    just need dismissal of the other defendants.

9              THE COURT:  Yes.  We are going to need the dismissals

10   of the others.  This was actually the scenario we discussed

11   where I would not dismiss and allow you to proceed.  Okay.

12             MR. NIEMEYER:  Thank you.

13             THE COURT:  I need you in 15 days to file those other

14   dismissals.  Okay.

15             MR. NIEMEYER:  Will do.

16             THE COURT:  Sharon Conner.

17             MR. INSOGNA:  I believe in Ms. Conner's case,

18   Your Honor, that a dismissal was recently filed.

19             THE COURT:  Okay.

20             MR. INSOGNA:  So I think that one's --

21             THE COURT:  Dismissed with prejudice.

22             Okay.  Jacqueline Laden.

23             MR. NIEMEYER:  No, no, Judge.  I'm sorry.  Hang on.

24   We dismissed all of the defendants except for Hospira and

25   Sandoz because we do have a letter with NDC numbers and dates

01:54

1  of infusion indicating that those were the two specific

2  manufacturers.

3          THE COURT:  Okay.

4          MR. NIEMEYER:  I think that's what the defense was

5  referencing.  I just wanted to make sure the record was clear.

6          THE COURT:  Okay.  Well, thank you because that's not

7  what I referenced.  Okay.  So this one is in compliance.

8          MR. INSOGNA:  Yes.

9          THE COURT:  Thank you.  So that one is not dismissed.

10              Jacqueline Laden.

11          MR. INSOGNA:  That's correct, Your Honor.  In

12  Ms. Laden's case, the plaintiff has uploaded purchase records

13  that identify Sanofi, Winthrop, Hospira, and Sandoz but can't

14  determine which of those manufacturers was actually

15  administered to plaintiff.

16          THE COURT:  Mr. Niemeyer.

17          MR. NIEMEYER:  So, Judge, we would argue with that.

18  We have an email from the pharmacy director of the facility

19  stating that Cardinal Health was the supplier.  The records

20  from Cardinal Health tell us that during the time frame of the

21  first three treatments for Ms. Laden, the only supplier was

22  Sanofi.  During her last two treatments, it could have been

23  Sanofi, Hospira, or Sandoz.  Based upon the evidence on the

24  first three treatments, we are willing to proceed only against

25  Sanofi.

01:55

1    **MR. INSOGNA:**  I guess if we dismiss the other
2    defendants --
3        **THE COURT:**  Yes.  Have that done within 15 days.
4        **MR. NIEMEYER:**  Will do.  Thank you.
5        **THE COURT:**  Shanna Robinson.
6        **MR. INSOGNA:**  In this case, Your Honor, I believe we
7    have a dismissal of defendants other than -- hold on
8    Your Honor.  I'm sorry.
9            This one has been resolved.  My apologies,
10   Your Honor.
11       **THE COURT:**  Okay.  Thank you.
12           Bonnie Whitehurst.
13       **MR. INSOGNA:**  In Ms. Whitehurst's case again there
14   are purchase records identifying Sanofi and Winthrop.  So we
15   would need dismissal of the other defendants if plaintiff wants
16   to proceed against Sanofi only.
17       **THE COURT:**  Mr. Niemeyer.
18       **MR. NIEMEYER:**  Happy to do so, Your Honor.  Thank
19   you.
20       **THE COURT:**  Fifteen days to have that done.  Thank
21   you very much.
22       **MR. NIEMEYER:**  Yes, ma'am.  Thank you.
23       **THE COURT:**  Okay.  Ms. Sulkin is here with the Lowe
24   Law Group.
25       **MS. BRILLEAUX:**  Yes, Your Honor.  We have two PTO 22A

01:56

1    cases.  The first is Lakeesha Murray.  This is a case with a

2    plaintiff who had Taxotere in 2012 and then had a second cancer

3    occurrence in 2016.  So we need after photos between 2013 and

4    2015 before that second chemotherapy treatment.

5             THE COURT:  Okay.  Ms. Sulkin.

6             MS. SULKIN:  Good afternoon, Your Honor.  Our client

7    is looking for photographs in that time period.  Obviously,

8    that's not a ton of time, just the years 2013 through 2015.  We

9    ask for some time for her to be able to continue searching.  If

10   she is unable to find photographs in 2013 through 2015, we ask

11   that she be allowed to sign an affidavit that there are no

12   photographs in that time period.

13            THE COURT:  Okay.  I'm going to give you 45 days to

14   continue that search, and then the affidavit needs to be

15   particularized.  I think you can get some assistance from

16   Ms. Kreider as to what I'm looking for there.

17            Okay.  Denise Pellonari.

18            MS. BRILLEAUX:  Yes, Your Honor.  This is a similar

19   situation.  Plaintiff had chemotherapy between 1999 and 2009.

20   She had a recurrence in July 2012, which was the operative

21   Taxotere treatment.  So we need before photos that are from

22   before the 2009 chemotherapy.

23            Oh, I'm sorry.  I just misspoke.  The photos

24   that we have are from prior to the first cancer, which was not

25   with the Taxotere treatment.

01:58

1      **THE COURT:**  Wait.  I just want to make sure.  Did you

2    say the first treatment was 1999?

3           **MS. BRILLEAUX:**  But not Taxotere.

4           **THE COURT:**  Right.  1999, and she treated until when?

5           **MS. BRILLEAUX:**  So she had cancer in 1999 and in

6    2009.  She didn't have Taxotere until 2012.

7           **THE COURT:**  Okay.  Got it.

8           **MS. BRILLEAUX:**  All the before photos we have are

9    from earlier.  So we need a before photo from after her other

10   cancer treatment but before the Taxotere treatment.

11          **THE COURT:**  Okay.  All right.  So somewhere between

12   2009 and 2012.

13          **MS. BRILLEAUX:**  Correct.  Sorry.  That was more

14   complicated than it should have been.

15          **THE COURT:**  Thank you.

16             Ms.  Sulkin.

17          **MS. SULKIN:**  Your Honor, this particular plaintiff

18   passed away, and her husband is not being cooperative with us.

19   This is a situation where none of the forms really fit because

20   we don't have client consent.  I don't think we can certify

21   that we have been trying to contact the client knowing that she

22   is deceased.  We don't have any objection to her dismissal, but

23   we just felt uncomfortable --

24          **THE COURT:**  I understand.  I understand.  This matter

25   is dismissed with prejudice.

01:59

1        Okay.  We can take Ms. Brenda Aldridge.

2        **MS. SWEET:**  Your Honor, Ms. Aldridge and the next

3  five plaintiffs all indicated to us this morning that they will

4  no longer be objecting to dismissal.

5        **THE COURT:**  Okay.

6        **MS. SULKIN:**  Your Honor, just a point of

7  clarification on that.  We stand by Mr. Lambert's general

8  objection to dismissal for lack of product identification.  We

9  simply ask that these cases be dismissed without prejudice in

10 case they are able to find product identification.  That would

11 go for all the Bachus & Schanker cases that we are not arguing

12 a specific objection for.  I just wanted to put that on the

13 record now so we didn't have to go through each and every one

14 of those.

15       **THE COURT:**  Okay.  The objections previously raised

16 are noted for the record, but these matters are dismissed with

17 prejudice:  Brenda Aldridge, Diane Blackshell, Joyce Boutwell,

18 Patricia Holland, and Kathleen Ragland.  Thank you, ma'am.

19       Okay.  Then we go to the Pendley Baudin & Coffin

20 cases, and who do I have?  Ms. Barient, are you on the line?

21       **MS. BARIENT:**  Yes, Your Honor.  Good afternoon.

22       **THE COURT:**  Carolyn Bentley.

23       **MS. SWEET:**  The first two cases, Carolyn Bentley and

24 Shar-Ron Hewitt, were previously heard at the April 28 hearing.

25 They had indicated at the time that they were innovator

02:01

1    liability plaintiffs.  Then when the briefing came out, they

2    realized that they would no longer be asserting that objection,

3    and so we have asked for dismissal.

4            **THE COURT:**  Ms. Barient.

5            **MS. BARIENT:**  Good afternoon, Your Honor.  I can be

6    very brief.  Actually, everything that I have to say can apply

7    to all of our plaintiffs on the list, other than with the first

8    two that are rollovers I have slightly different dates.

9            With regards to the first two, we have

10   inadvertently put them on the innovator liability list, so

11   that's correct.  That's why they are a rollover from the last

12   hearing.  Over the years we have issued exhaustive requests,

13   subpoenas, and records depositions to the various facilities

14   with no success so far.  As recently as November for these two

15   cases, we have issued subpoenas to the insurance companies.  We

16   are still working with those subpoenas and waiting to hear back

17   from them.  If we want to just limit it to these first two

18   plaintiffs right now, that is the facts of them.

19           **THE COURT:**  Okay.  Were these the first subpoenas

20   that were issued in November for these cases?

21           **MS. BARIENT:**  No, Your Honor.  We have previously

22   issued subpoenas as well as sent records depositions to the

23   facility over a number of years.

24           **THE COURT:**  Okay.

25           **MS. BARIENT:**  These November subpoenas are to the

02:03

1    insurance companies, so they are to a new entity.  I believe
2    that's the first time the insurance has been subpoenaed.
3              THE COURT:  Well, that was some time ago.  It appears
4    that you have done everything you can to search this.  These
5    matters are dismissed with prejudice.
6                     As to the following ones, is it the same
7    objection?
8              MS. BARIENT:  It is, Your Honor, except that these
9    subpoenas to the insurance companies were actually issued in
10   May of 2022.  So we would just ask that these cases be rolled
11   over so that we have an adequate amount of time to follow up on
12   these subpoenas and see what we can drum up.  We have had the
13   most success with issuing subpoenas to insurance companies, but
14   it does take a while to establish communication and production.
15             THE COURT:  Thank you.  As to Cryethia Byers,
16   Sharlene Grant, Carol Philips, Jennifer Randle, and Nina
17   Williams, the Court is going to roll those over and give them
18   an opportunity to see if we get a response from the subpoena to
19   the insurance company.  Thank you.
20             MS. BARIENT:  Thank you, Your Honor.
21             THE COURT:  Okay.  Pulaski Law Firm.  We have
22   Mr. Stanley.
23             MR. STANLEY:  Good afternoon, Judge.  Bret Stanley on
24   behalf of Pulaski Law Firm.
25             THE COURT:  Thank you.

02:04

1    **MS. BRILLEAUX:**  Your Honor, the first case is Tandra

2    Johnson-Brinker.  This is another case that involves a cancer

3    recurrence.  She took Taxotere in 2006 and into 2007 and then

4    had a recurrence in 2018.  The only after photos that we have

5    are from 2019, so we need after photos that are taken within

6    that time frame.

7             I'll note that plaintiff's counsel did submit

8    photos that would have fit within that time frame that we are

9    looking for, 2008 to 2018, but the metadata in those photos

10   indicates that they were taken on December 28, 2021, and

11   January 16, 2022, and not in the time frame that they were

12   dated.  So we need genuine photographs from the applicable time

13   frame.

14   **MR. STANLEY:**  Judge, I can get with the plaintiff --

15   this is the first I'm hearing of the metadata issue -- and see

16   when these photos were from and why the metadata shows

17   otherwise.  I don't know if they were pulled down from some

18   other website that might have differing -- like from a social

19   media website that say on that day you have metadata that shows

20   that time.  I don't know, but I can ask her about that.  She

21   told us that they were from -- we have uploaded photos that we

22   believe are from 2005 and 2008 that would fit, so I would ask

23   for a rollover.  Then I can get with the defendant to make sure

24   that we have this ironed out.

25             **THE COURT:**  I will allow it to be rolled over and

02:06

1    review that.

2                    Roanna Smith.

3            **MS. BRILLEAUX:**  Roanna Smith is another case where

4    there was a recurrence of cancer.  Plaintiff's counsel did

5    submit additional photographs.  I think that we are working

6    with counsel on this one and conferring to get metadata.  I

7    think we have an agreement to roll that one over.

8            **THE COURT:**  Okay.  We are going to roll this over.

9    Thank you.

10           **MR. STANLEY:**  Okay.  Great.

11           **THE COURT:**  Frances Henderson.

12           **MR. INSOGNA:**  Your Honor, for Frances Henderson --

13           **MR. STANLEY:**  Judge, I might be able to cut through

14   some of this if you will allow me.

15           **THE COURT:**  Okay.

16           **MR. STANLEY:**  Plaintiffs have exhausted their

17   resources on trying to obtain records on the Henderson, Howell,

18   Lee, Moultry, Peters, Riley, and Stefanski cases.  We have

19   sought records from multiple entities and are unable to find

20   any to fulfill our requirements.

21           **THE COURT:**  Okay.  Thank you.  Those matters are

22   dismissed with prejudice as a result of plaintiff's failure to

23   be able to determine product ID.  Thank you.

24           **MR. STANLEY:**  Thank you.

25           **THE COURT:**  Subject to all objections that have been

02:07

1    raised.  Thank you.

2              Napoli Shkolnik, Mr. Ortiz.

3         **MR. ORTIZ:**  Good afternoon, Your Honor.

4         **THE COURT:**  Good afternoon.  Okay.  Please, we are

5    going to start with Ferial Alawar.

6         **MS. SWEET:**  Your Honor, plaintiff has objected on the

7    basis that they have submitted product identification.  But

8    when we looked to what was uploaded, they were statements that

9    didn't identify the manufacturer or they were statements from

10   the facilities saying they did not keep record of an NDC and

11   plaintiff also providing additional letters to different

12   facilities following up on the NDC.

13        **THE COURT:**  Okay.  Mr. Ortiz.

14        **MR. ORTIZ:**  Your Honor, in this case it was an error

15   on my part because it should have been the same objection to

16   all of my 18 cases.  The defendants are correct on this one,

17   Your Honor.

18             If I may, my only inquiry that I have been

19   pursuing that could lead us to confirm or not product ID at

20   this time is that we have subpoenaed McKesson for NDC codes,

21   but the issue here is that we are still waiting for the

22   response on all of my 18 cases, Your Honor.  So we kindly ask

23   the Court to grant us 30 days to try to get to the bottom of

24   this.

25        **THE COURT:**  Have you subpoenaed the infusion

02:09    1  facility?

 2          **MR. ORTIZ:**  McKesson, Your Honor.

 3          **THE COURT:**  McKesson is a distributor.  What about

 4  the infusion facility?

 5          **MR. ORTIZ:**  Yes, we have.  In the past we have done

 6  so, Your Honor, but we haven't been able to receive NDC codes

 7  from them.

 8          **MS. SWEET:**  Your Honor, if I may, this firm has

 9  probably two dozen cases on this list.  A subpoena was issued

10  to McKesson in every single one kind of raising doubts that

11  McKesson could possibly be the distributor for every single one

12  of these facilities.  Those were served in May.  The subpoena

13  process could have been put in place years ago.  We request

14  dismissal on all of these cases.

15          **THE COURT:**  I'm going to roll these over, and I tell

16  you why.  I don't think McKesson is dispositive.  But if we

17  find ourselves in the situation where one of these defendants

18  was at one infusion facility that only received medication from

19  a certain manufacturer and were able to show that she received

20  that medicine, it may be enough.  Since the subpoenas are

21  outstanding, I'm going to roll them over.

22              I will tell you, Mr. Ortiz, you better follow up

23  on these subpoenas because time is running out.

24          **MR. ORTIZ:**  Thank you, Your Honor.

25          **THE COURT:**  If you come back and say, "McKesson says

02:11

1   they distributed multiple drugs," it's done.  It has to show

2   the manufacturer.

3             **MR. ORTIZ:**  Understood.  Thank you, Your Honor.

4             **THE COURT:**  Okay.  By no stretch am I saying that is

5   in any way compliant.

6                   Bern & Partners.

7             **MS. BRILLEAUX:**  We have three PTO 22A cases,

8   Your Honor, the first one is Valerie Olin.  This is an issue

9   where the PFS needs to be amended to state whether plaintiff

10  has had cancer more than once.

11            **THE COURT:**  Ms. Dessel.

12            **MS. DESSEL:**  Hi.  Yes.  Good afternoon, Your Honor.

13  To my knowledge we have updated that plaintiff fact sheet to

14  indicate that the plaintiff has not had any other cancer, been

15  diagnosed with any other cancer.  That should be a nonissue.

16            **MS. BRILLEAUX:**  Counsel, do you know when that update

17  was made?

18            **THE COURT:**  When did you do that?

19            **MS. DESSEL:**  I don't have the exact date handy, no, I

20  do not.

21            **MS. BRILLEAUX:**  Do you know whether it was done

22  before the deadline for cures?

23            **MS. DESSEL:**  When was that, July 7?

24            **THE COURT:**  Yes, something like that.  I don't know.

25            **MS. DESSEL:**  I believe it was done before July 7.

02:13

1      **MS. BRILLEAUX:**  So we have that for the next case as

2  well, Shavonne White.  If the response is the same, we would

3  ask for seven days to confirm compliance.

4           **THE COURT:**  Is that the same for Shavonne White?

5           **MS. DESSEL:**  Yes, Your Honor, it is.

6           **THE COURT:**  All right.  I'm going to grant seven days

7  to confirm compliance.

8                    What about Beverly Allis?

9      **MS. BRILLEAUX:**  So this is a rollover case from the

10 April hearing, and it has to do with no before photos from

11 within five years of treatment.  I think the photo that we

12 originally had was 31 years prior to treatment.  Your Honor

13 ordered counsel to work with Ms. Kreider to exhaust all

14 avenues, and we haven't received anything since.

15      **MS. DESSEL:**  Yes, Your Honor.  Unfortunately, I have

16 spoken to the client.  I spoke to Ms. Kreider as well, and I

17 spoke to our client.  She does not have photos within those

18 five years.  She kind of just said, "Listen, I was old.  I

19 didn't want to take photos.  It wasn't as common back then."

20 So unfortunately that's where we are back with Beverly Allis.

21 She is not happy about it, but I let her know that, you know,

22 this is something that's needed, but unfortunately -- you know,

23 she doesn't have a license, she has nothing like that, so our

24 hands are kind of tied.

25           **THE COURT:**  Ms. Kreider.

02:14

1          **MS. KREIDER:**  Your Honor, I would suggest that I help

2    Ms. Dessel create an affidavit about these before photos.

3          **THE COURT:**  That's what I'm going to do.  I'm going

4    to order that an affidavit be prepared.

5          **MS. BRILLEAUX:**  Your Honor, just perhaps before you

6    rule, this is the only case that falls into both categories

7    PTO 22A and CMO 12A, so I'm going to let Mr. Insogna address

8    the CMO 12A issues.

9          **THE COURT:**  Okay.

10         **MR. INSOGNA:**  Sorry, Your Honor.

11         **THE COURT:**  Oh, I do see.

12         **MR. INSOGNA:**  I meant to call that out earlier, but

13   this case and a number of them that follow have the same issue.

14   So No. 124 through No. 136 are all CMO 12 rollovers from the

15   last hearing.  At that hearing the plaintiff indicated that

16   they had still pending efforts, still outstanding, and they

17   just asked for more time, and Your Honor granted them one

18   rollover, very clear that it was only one rollover.  Since then

19   we have not had any new uploads to MDL Centrality, no new

20   submissions, no indication of efforts, nothing, so we are

21   asking that each of those cases be dismissed today.

22         **THE COURT:**  Ms. Dessel.

23         **MS. DESSEL:**  Your Honor, I do appreciate that

24   rollover.  What defense said, unfortunately, is true.  We have

25   subpoenas pending from 2021, 2020, 2018, 2022.  We followed up

02:15

1    with the facilities on these subpoenas, and unfortunately our

2    efforts have been unsuccessful.  In good conscience I couldn't

3    just, you know -- technically the subpoenas are outstanding.

4              THE COURT:  I understand.

5              MS. DESSEL:  I just would like more time, obviously,

6    but I understand.

7              THE COURT:  It was rolled over from April.  We are

8    now in mid July.  These matters are dismissed with prejudiced.

9    That would be:  Beverly Allis, Linda Biektsza, Francesca Cozza,

10   Patricia Dennis, Patricia Dukes, Deena Frazier, Victoria Gibb,

11   Patricia Green, Mary Massino, Mary Meredith, Loretta Molt,

12   Terry Robinson, and Shari Smith.

13             MR. INSOGNA:  That is the list, Your Honor.

14             THE COURT:  Then we get to Orelia Castille.

15             MR. INSOGNA:  I think, Your Honor, there's another

16   block we can do together, Orelia Castille, No. 137, through

17   No. 149, the remainder of the Marc Bern plaintiffs.  The

18   objection we received is that the plaintiff needs to order

19   billing records and reissue prior subpoenas.  We don't have any

20   indication of any new avenue to pursue, just that plaintiffs

21   want to reinvigorate old efforts.  We requested documentation

22   of any pending efforts on June 22 and were told by plaintiff

23   that we would have a response to that by July 7, and we have

24   received no responses.

25             THE COURT:  Ms. Dessel.

02:17

1      **MS. DESSEL:**  Your Honor, on July 8 I did email
2  defense all of our previous efforts on these clients, and it's
3  not that we are revisiting avenues.  We would originally
4  request, when we sent a subpoena, for -- you know, we would
5  request medical records, and then it would be a rigmarole for
6  years to try to get these medical records and then, you know,
7  we got a subpoena defense, but now we are specifically honing
8  in on these billing records as basically, you know, a last
9  resort.  My original objection was, quite frankly, all avenues
10  need to be exhausted, and we have subpoenaed billing records
11  now for all of these.
12      **THE COURT:**  Okay.  I'm going to roll over this swath
13  of cases.  That would be:  Orelia Castille, Carolyn Childs,
14  Deborah Clelland, Donna Hall, Donna Hegenbart, Jennifer
15  Jennings, Romona Jimenez, Joan Jones, Theresa Kalsky,
16  Laura Nitto, Elena Petty, Janet Ross, and Eleanor Zubee.
17          Now, I will tell you, Ms. Dessel, this is it
18  unless you come in next time and say, "I am in negotiations
19  with these people, and I have a firm belief that there is
20  something there," because I'm giving you an opportunity to do
21  this last-ditch effort.  Okay.
22      **MS. DESSEL:**  I appreciate that very much, Your Honor.
23  Thank you very much.  I definitely will.
24      **THE COURT:**  Thank you.
25          Bachus & Schanker, and this is Ms. Sulkin.

02:19

1        **MS. BRILLEAUX:**  Okay.  We have a number of PTO 22A

2  cases to get through.  I'll try to move through them quickly.

3             The first one on the list is actually one that a

4  statement of no defense was filed on, so Patti Aaron has

5  already been dismissed.

6        **THE COURT:**  We have already dealt with that.

7        **MS. BRILLEAUX:**  The next one, Maria Andrade, that is

8  a late cure, so we can move on from that one.

9        **THE COURT:**  Do you need seven days to confirm?

10        **MS. BRILLEAUX:**  We have already confirmed the cure.

11        **THE COURT:**  So this one is satisfied.

12        **MS. BRILLEAUX:**  Yes.

13        **THE COURT:**  Thank you.

14        **MS. BRILLEAUX:**  The next case, Joan Brown, this is

15  another case in which the PFS doesn't indicate whether

16  plaintiff had more than one cancer occurrence.  So we need the

17  PFS to be amended to include all cancer diagnoses and

18  treatments.

19        **THE COURT:**  Ms. Sulkin, can you get that done in

20  15 days?

21        **MS. SULKIN:**  For Joan Brown, I sent an email to

22  defense counsel.  This is another situation in which the client

23  is deceased and the husband does not wish to be substituted as

24  a party.  I just felt there was no pleading that could be filed

25  in this instance.  We don't have any objection to dismissal.

02:20

1        **THE COURT:**  This matter is dismissed with prejudice.

2        **MS. BRILLEAUX:**  Thank you.

3        **THE COURT:**  Nioka Elder.

4        **MS. BRILLEAUX:**  Your Honor, Nioka Elder, I have a

5 similar note.

6        Ms. Sulkin, tell me if this is incorrect.  I

7 have Nioka Elder as another case in which I don't think that

8 the next of kin wants to proceed, but you didn't have a full

9 authorization for that.

10        **MS. SULKIN:**  Just for the record, it's not that next

11 of kin doesn't want to participate.  We have been unable to

12 locate next of kin.

13        **MS. BRILLEAUX:**  Excuse me.

14        **MS. SULKIN:**  We would ask for additional time to try

15 and find next of kin.  However, the plaintiff did pass away in

16 September 2020, but we only recently discovered that she had

17 passed.

18        **MS. BRILLEAUX:**  So am I correct, Counsel, that you do

19 not oppose dismissal in this case?

20        **MS. SULKIN:**  We don't oppose dismissal, no.

21        **THE COURT:**  This matter is dismissed with prejudice.

22        **MS. BRILLEAUX:**  The next case, Your Honor, Jean Ford,

23 this is another plaintiff fact sheet that needs to be updated

24 for providing information for other cancer diagnoses.

25        **THE COURT:**  Ms. Sulkin.

02:21

1      **MS. SULKIN:**  Your Honor, we provided additional

2   information for cancer diagnoses.  The only thing that's

3   missing are photographs, and the reason we didn't send a cured

4   email was because we are missing photographs from the time

5   period between the two cancers.  We request just additional

6   time to search for more photographs.  If our client is unable

7   to find photographs from the time period in between her two

8   cancer diagnoses, we simply ask that our client be allowed to

9   execute an affidavit that she has no photographs from that time

10  period.

11     **THE COURT:**  Okay.  We are going to roll over and

12  allow that to take place.

13     **MS. SULKIN:**  Your Honor, just for clarity, are we

14  waiting until the next hearing to see if the client can find

15  additional photographs?

16     **THE COURT:**  Yes.  I want you to look between the next

17  hearing.  If you are unable to locate something, then I'm going

18  to want you to execute an affidavit.  Ms. Sulkin -- and I've

19  told everybody -- these affidavits can't be she doesn't have

20  photos.  It has to be with more specificity as to why there are

21  no photos and what efforts have been made to locate

22  photographs.  Thank you.

23     Corliss Ladson is the next one; is that correct?

24     **MS. BRILLEAUX:**  Yes, Your Honor.  This is one that

25  I'm going to cut to the chase too.  This is a before photo

02:23

1    issue.  We received a before photo dated 2007.  It is a photo

2    of Ms. Ladson in front of the New York City skyline.  We have

3    conclusive evidence that the photo could not have been taken in

4    2007, that it was actually taken sometime after the end of

5    2012.  So we would just ask counsel to please provide a before

6    photo from the appropriate time frame.

7         MS. SULKIN:  Your Honor, it's our understanding that

8    it was taken in 2007.  I have not heard of this conclusive

9    evidence.  I would appreciate if the defendants would share

10   that with us.  I would have appreciated it before hearing about

11   it at this hearing.

12        MS. BRILLEAUX:  Sure.  I wanted to streamline it.

13   Obviously, the rebuilding of the World Trade Center area has

14   happened over a certain amount of time.  There's a spire that's

15   on the current World Trade Center building that wasn't placed

16   until the end of 2012, and that's present in the photograph.

17        MS. SULKIN:  Your Honor, we will take a look with our

18   client.

19        THE COURT:  Why don't we roll that one over.  I'm

20   going to ask you in the interim to contact your client and have

21   a frank discussion and cure the defect.  Okay.

22        MS. BRILLEAUX:  Thank you, Your Honor.

23        MS. SULKIN:  Yes, Your Honor.

24        MS. BRILLEAUX:  The next case is Jo'Ann Mapp.  This

25   is a shell PFS case and then we also have an issue with the

02:25

1   photographs.  The PFS indicates that she had a separate cancer

2   treatment in 2016 and 2017 with at least radiation therapy.  So

3   we need after photos from prior to that treatment but after her

4   Taxotere treatment and also the shell PFS.

5           THE COURT:  Ms. Sulkin.

6           MS. SULKIN:  Your Honor, we did update the plaintiff

7   fact sheet yesterday.  Then in terms of photographs, it's my

8   understanding that plaintiff was diagnosed with breast cancer

9   in 1999.  That's when Taxotere was administered.  She then had

10  neck cancer in 2008.  It's my understanding we need photographs

11  from 2000 to 2005, and our client is actively looking for

12  photographs.  If we cannot find photographs by the next

13  hearing, we would just ask that our client be allowed to

14  execute an affidavit.

15          MS. BRILLEAUX:  Counsel, I think I may have just

16  indicated this, although I'm not sure what I stated, but the

17  PFS indicates that she had a multiple myeloma with radiation in

18  2016 and 2017.  We need photos from before then.

19          THE COURT:  I thought --

20          MS. BRILLEAUX:  Oh, I'm sorry.

21          THE COURT:  I think that's what Ms. Sulkin said --

22          MS. BRILLEAUX:  I think I just got confused.  I just

23  wanted to clarify that.

24          THE COURT:  That's fine.  I'm going to roll it over

25  until the next hearing to complete what's missing from the

02:26

1    plaintiff fact sheet.

2              Carolyn McCosh.

3         **MS. BRILLEAUX:**  Yes, Your Honor.  This is a plaintiff

4    that had Taxotere in 2008.  The PFS indicates that she had more

5    than one cancer diagnosis, but we didn't have any information

6    about the second diagnosis.  There is some indication from the

7    records that she had chemotherapy later in 2015.  We also have

8    information that the plaintiff is deceased as of April of 2021.

9    We need information on all of the cancer diagnoses and

10   treatments, the filing of a suggestion of death, the proper

11   party substituted, and a death certificate for the plaintiff.

12        **THE COURT:**  Ms. Sulkin, are you in contact with next

13   of kin?

14        **MS. SULKIN:**  Yes.  We actually did file a suggestion

15   of death and a motion for substitution of party last week, so

16   we are in contact with the family.  We have provided the death

17   certificate both on Centrality and as an attachment to the

18   motion.  In terms of getting additional information about the

19   cancer diagnoses, we will work with the family to get as much

20   information as we possibly can, obviously understanding that

21   the best source of information for this has passed on.  So we

22   will do our best to supplement the plaintiff fact sheet.

23        **THE COURT:**  Okay.  I am going to give you 60 days to

24   substitute because it sounds like there's a lot going on.

25              Okay.  Mary McKenzie.

02:28

1          **MS. BRILLEAUX:**  Yes, Your Honor.  This is another

2    case with multiple cancer treatments.  Plaintiff received

3    Taxotere in 2010 and 2011 per the PFS.  She had a recurrence in

4    2015.  Then the only after photos we had were from 2019.  We

5    did receive a photograph from the in-between period, but it

6    indicated that the plaintiff was wearing a wig in the photo.

7    So we need one showing the state of her hair from the same time

8    period.

9          **THE COURT:**  I'm going to roll that over and ask that

10   you continue looking for photographs, and if you are unable to

11   find one that actually shows her hair that you should execute

12   an affidavit.

13         **MS. SULKIN:**  Thank you, Your Honor.

14         **MS. BRILLEAUX:**  The next case, Connie Mills, I

15   believe is another one that counsel indicated they do not

16   oppose dismissal if we want to streamline that one.

17         **THE COURT:**  Okay.  Ms. Sulkin, is that correct?

18         **MS. SULKIN:**  Yes, Your Honor.  She is deceased and we

19   cannot locate next of kin.

20         **THE COURT:**  This matter is dismissed with prejudice.

21         **MS. BRILLEAUX:**  For Sharon Miseray-Bennett, that was

22   a declaration of no contact that was filed, so that's off.

23              The next case is Elizabeth Parrish.  This is

24   another multiple cancer diagnosis case.  Plaintiff had Taxol in

25   2004 and then was treated with Taxotere in 2008.  The only

02:29

1   before photo that we have is from before the chemo with Taxol

2   in 2004, so we need photos from between 2005 and 2008.

3          THE COURT:  Okay.  Ms. Sulkin.

4          MS. SULKIN:  Your Honor, we uploaded a photo taken in

5   2007 and updated the plaintiff fact sheet yesterday.

6          THE COURT:  All right.  I'm going to grant seven days

7   to confirm compliance.

8              Mattie Patterson.

9          MS. BRILLEAUX:  Yes, Your Honor.  This is another

10  multiple diagnosis case.  Again, I'm going to cut to the chase

11  on this one.  A before photo was provided that was dated from

12  plaintiff's 50th birthday.  She is holding a 50th birthday

13  cake.  It's dated 11/15/2003, but the way that her 50th

14  birthday falls, it's the wrong year.  That's where we are on

15  that one.  It's misdated by a year, and we were able to check

16  by verifying the PFS.

17         THE COURT:  Okay.

18         MS. BRILLEAUX:  We need photos from late 2003 to mid

19  2007.  This one was actually taken in 2002 and we believe

20  incorrectly dated as a 2003 photo.

21         THE COURT:  Okay.

22         MS. SULKIN:  So just to be clear, it's in the correct

23  time frame.  You think the date is just incorrect?

24         THE COURT:  Wait a minute.  I'm wondering --

25         MS. BRILLEAUX:  Let me straighten it out a little

02:31  1   bit.

2              THE COURT:  What's the time frame that the photograph

3   has to cover?

4              MS. BRILLEAUX:  The photograph needs to come in late

5   2003 to mid 2007.

6              THE COURT:  Okay.  This photograph was from when?

7              MS. BRILLEAUX:  November 15, 2002.

8              THE COURT:  I thought you said the birthday was 2003.

9              MS. BRILLEAUX:  They have it dated 2003.

10             THE COURT:  Oh, okay.  And it's in late 2002?  It's

11  11/15/2002?

12             MS. BRILLEAUX:  It's on her 50th birthday, which

13  would have fallen on 11/15/2002.

14             THE COURT:  Okay.  All right.

15             MS. SULKIN:  Your Honor, I will check with my client.

16  There could be multiple reasons.  You can't necessarily read

17  who the birthday cake is even for.

18             THE COURT:  Oh, come on.

19             MS. SULKIN:  I'm looking at the photo right now.

20  It's just a photograph of her with a cake, but I will

21  double-check with the client and try and verify the year.

22             THE COURT:  All right.  We are going to roll this

23  over so that you can talk to your client and look for other

24  photographs as well.

25                   All right.  Madis Russell.

02:32

1        **MS. BRILLEAUX:**  For Ms. Russell, it appears that a

2   suggestion of death was filed here.  The issue here is that we

3   need information on other cancer diagnoses and treatments.  We

4   didn't have any information for what we understand to be

5   multiple cancer diagnoses to determine whether the photos are

6   representative.  The suggestion of death was filed, but we

7   don't know the date of death and I don't believe we -- oh,

8   sorry.  Let me correct that.  The suggestion of death was

9   filed, but according to MDL Centrality the death certificate

10   was produced back in January of 2019.

11        **THE COURT:**  Okay.

12        **MS. BRILLEAUX:**  We need the PFS updated and then just

13   what steps have been taken for probate since this plaintiff

14   died such a long time ago.

15        **THE COURT:**  Oh, okay.  Ms. Sulkin, what's going on?

16        **MS. SULKIN:**  Yes.  So we are in contact with Madis'

17   daughter and sister, who lived in a different state.  They are

18   not very sophisticated in terms of meeting with a probate

19   lawyer, but they are going to Louisiana and meeting with an

20   attorney there in the next 60 days.  We are also working with

21   them to try and get additional information for the plaintiff

22   fact sheet and will update the plaintiff fact sheet to the best

23   of their knowledge.

24        **THE COURT:**  Ms. Russell is from Louisiana?

25        **MS. SULKIN:**  Yes.  However, her sister and daughter

02:34  1   live in Arizona.

2          THE COURT:  I'm going to give you 60 days, but they

3   need to get this done.  Maybe some of these Louisiana lawyers

4   can help provide some guidance as to what needs to happen so

5   that we can get these people properly substituted.

6          MS. SULKIN:  Thank you, Your Honor.  I will let them

7   know.

8          THE COURT:  I think Ms. Kreider probably took

9   successions.

10         MS. KREIDER:  I did.  I can help her if she reaches

11  out.

12         THE COURT:  Okay.  Thank you.

13             Judy Smith.

14    MS. BRILLEAUX:  Yes, Your Honor.  For Judy Smith,

15  plaintiff was first diagnosed with cancer in 2006 and had a

16  recurrence in 2009 and was treated with Taxotere.  The only

17  before photo that we had was dated August 2006, which would

18  have been during plaintiff's first chemo.

19             This is kind of a tricky one, Your Honor.  We

20  believe that the photo that we have depicts plaintiff wearing a

21  wig and you can kind of see -- I brought copies, but it cuts

22  off what I wanted to show, and I did provide these to

23  plaintiff's counsel ahead of time.  This is the one photo.

24         THE COURT:  Do you think I can see that?

25         MS. BRILLEAUX:  I'm so sorry.  May I approach?  Thank

02:36

1    you.

2                 Your Honor, the important part is just

3    representative.  If you can see, the bottom of this photo is

4    the top of a second photo that we don't have.  It has what you

5    can see is the top of a bald head and then the rest of it is

6    cut off.  That photo has not been produced to us.  The quality

7    of the photo I'm showing you right now is not as good as I

8    wanted it to be if you could see the bottom of it.

9              **THE COURT:**  Wait.  Wait.  What?  So you got this

10   photograph?

11             **MS. BRILLEAUX:**  We got this photograph.

12             **THE COURT:**  How do you know what's in this

13   photograph.

14             **MS. BRILLEAUX:**  Because there's more that you can see

15   other than on this poor copy that I'm currently showing you.

16             **THE COURT:**  This is the one you are interested in?

17             **MS. BRILLEAUX:**  Well, first of all, we think that the

18   first one is showing plaintiff wearing a wig, which obviously

19   isn't helpful to us.

20             **THE COURT:**  Right.

21             **MS. BRILLEAUX:**  We are interested in the second photo

22   because it's another one that we believe to be of her that has

23   not separately been produced.  We just have a sliver of it.  I

24   know.  Had I had brought the better version of it --

25             **THE COURT:**  Ms. Brilleaux, are you telling me this is

02:37

1    what you have, and how on earth do you know that's the top of a
2    head.
3              MS. BRILLEAUX:  Because what printed is not the full
4    image, and that's my fault.
5              THE COURT:  This was helpful.  I'm glad you
6    brought --
7              MS. BRILLEAUX:  Understood.  I understand that.  I
8    can email the better version of it so that you can see.
9              THE COURT:  So what do we need?
10             MS. BRILLEAUX:  We need photos from after 2006 but
11   before the 2009 treatment that do not show her wearing a wig.
12             THE COURT:  Okay.  But you think perhaps that this
13   other one does?
14             MS. BRILLEAUX:  Perhaps.  In any event, that's still
15   a three-year period that we don't have photographs that we are
16   still asking for photographs to be produced.
17             THE COURT:  Ms. Sulkin.
18             MS. SULKIN:  Your Honor, our client is trying to look
19   for photographs from -- I believe it's probably late 2006
20   through 2009, obviously not a very long time frame and not a
21   time when everyone had cell phones, but our client is
22   diligently looking for photographs.  We just simply ask that
23   she be allowed to continue looking for photographs; and then if
24   she is unable to find any, execute an affidavit.
25             THE COURT:  I'm going to roll this over, but what I

02:38

1    do want you to do is explore the second photograph that I

2    didn't see that apparently shows the top of a head.

3              MS. BRILLEAUX:  I will email it.  I'm sorry,

4    Your Honor.

5              THE COURT:  You don't need to send it to me.  I think

6    you need to send it to Ms. Sulkin to see if we can run it by.

7    I'm going to roll it over.  Thank you.

8                   Ellen Swann.

9              MS. BRILLEAUX:  For Ellen Swann, this is another no

10   before photo case.  We received a photo that has been annotated

11   and it says before chemo November 2004 and indicates who the

12   plaintiff is.  It's a group of people.  The problem with this

13   photo is that it's at a restaurant with a bunch of iPhones on

14   the table.  The first iPhone wasn't released until after

15   2007, so we know that this photo can't be from 2004.

16             THE COURT:  Ms. Sulkin.

17             MS. SULKIN:  I'll speak with the plaintiff and see

18   what's going on here.

19             THE COURT:  We are going to roll it over, but you

20   need to clear that up.

21             MS. BRILLEAUX:  There's a before and an after photo

22   issue.  We also need photos that are after Taxotere treatment.

23   Plaintiff had Taxotere in 2004, at the end of 2004, and then

24   had a recurrence in 2010.  So we need after photos in between.

25             THE COURT:  After 2010 or between 2004 and 2010?

02:40

1              MS. BRILLEAUX:  Between 2004 and 2010.

2              THE COURT:  Okay.  The photograph that was provided

3     that shows iPhones was reported to cover what time frame?

4              MS. BRILLEAUX:  Like I said, we have a before and an

5     after photo issue, and it does get confusing because of the

6     multiple diagnoses.  We need a before photo from before 2004,

7     and then we need an after photo from after May of 2005 but

8     before the recurrence in 2010.

9              THE COURT:  The photo with the iPhones was

10    purported to be from what date?

11             MS. BRILLEAUX:  November 2004.

12             THE COURT:  And iPhones were from 2007?

13             MS. BRILLEAUX:  (Nods head.)

14             THE COURT:  Well, wouldn't that cover that time

15    frame?

16             MS. BRILLEAUX:  There are iPhones in the 2004

17    photo, so it couldn't be --

18             THE COURT:  No, but it could be 2004 to 2010.  That

19    could have been a 2007.

20             MS. BRILLEAUX:  But the photo is dated November 2004

21    and we know that the photo --

22             THE COURT:  That needs to be corrected.

23             MS. BRILLEAUX:  Correct.

24             THE COURT:  Okay.  We are going to roll that over.

25                  Do you understand that, Ms. Sulkin?

02:41

1      **MS. SULKIN:**  Yes, Your Honor.

2      **THE COURT:**  Thank you.

3           Tillie Todd.

4      **MS. BRILLEAUX:**  For Tillie Todd, this was Taxotere

5  treatment in October 2007 to April 2008 and then a recurrence

6  in 2012.  So all of our after photos are from 2018, and we need

7  after photos from between late 2008 and July of 2012.

8      **THE COURT:**  Ms. Sulkin.

9      **MS. SULKIN:**  Your Honor, our client again has been

10 looking for photographs.  So far none have been located, but

11 she will continue to look.  We would ask that this be rolled

12 over and we possibly receive an opportunity to have our client

13 execute an affidavit detailing her efforts to locate a photo

14 and why she does not have any photograph for that four-year

15 time period.

16     **THE COURT:**  All right.  I'm going to roll it over to

17 the next hearing and require that be done.

18          Okay.  Florean White.

19     **MS. BRILLEAUX:**  For Florean White, plaintiff had

20 Taxotere in 2002 and 2003 and then a recurrence in 2010,

21 another recurrence in 2014.  The only after photos we have are

22 from after 2014.  So we are going to need after photos from

23 after the completion of Taxotere treatment in 2003 but before

24 the 2010 chemotherapy.

25     **THE COURT:**  Between 2010 and 2014 as well?

02:42

1          MS. BRILLEAUX:  Before 2010 because there was a

2    recurrence in 2010 and a recurrence in --

3          THE COURT:  I'm just double-checking.  You have a

4    photograph between 2010 and 2014?

5          MS. BRILLEAUX:  We only have a photograph from after

6    2014, so we need a photograph from in between 2003 and 2010.

7          THE COURT:  Okay.  But none between the second

8    treatments and third recurrence?

9          MS. BRILLEAUX:  No, because that wasn't Taxotere

10   treatments, so the only thing that's relevant --

11         THE COURT:  Got it.  Thank you.

12             We are going to roll this over, Ms. Sulkin --

13         MS. SULKIN:  Thank you, Your Honor.

14         THE COURT:  -- so you can move toward compliance.

15         MS. BRILLEAUX:  Thank you.

16         MS. SWEET:  Your Honor, I think we can make very

17   quick work of this if that makes you feel any better.  What I

18   think we should do is discuss the rollovers, a very few

19   case-specific issues, and then the rest of them plaintiff has

20   indicated they will only be making a general objection.

21         THE COURT:  Okay.  Thank you.

22         MS. SWEET:  So the first five cases -- Johnna

23   Hohenberg, Dorothy Lawrence, Derhonda Mcclellan, Luz Pluguez,

24   and Mary Thomas -- are all rollovers from the May 2 show cause

25   hearing.  None of them have uploaded any product identification

02:44   1   or advised of any further efforts.

2        **MS. SULKIN:**  Your Honor, I have a few of these I

3   would like to address first.

4        **THE COURT:**  Okay.

5        **MS. SULKIN:**  Derhonda Mcclellan, we got word that the

6   records were shipped to our old address and so we are trying to

7   correct that.  We just ask that this case be rolled over.  If

8   by that point we have not received records, other than the

9   general objection as to Mr. Lambert's statements from the last

10   hearing --

11        **THE COURT:**  All right.  I just want to make sure I

12   understand.  So what we are saying is Ms. Johnna Hohenberg,

13   Dorothy Lawrence, the Court is going to dismiss those with

14   prejudice subject to the objection that was --

15        **MS. SULKIN:**  Oh, no, no.

16        **THE COURT:**  But not Derhonda Mcclellan.

17        **MS. SULKIN:**  No, I was just going through one by one.

18   They have different issues.  My apologies.

19        **THE COURT:**  Okay.  All right.  Let's go.  Johnna

20   Hohenberg.

21        **MS. SULKIN:**  Your Honor, we have located the correct

22   person to speak with.  He has responded this week.  We just ask

23   that this case be rolled over until next time.  Just like with

24   Ms. Mcclellan's case, we won't object with any specificity next

25   time if we are unable to receive the National Drug Code by that

02:45

1  time.

2          **MS. SWEET:**  Your Honor, I'm sorry.  I can't hear.

3          **THE COURT:**  I'm really struggling too.  Are you

4  telling me Ms. Hohenberg you located a correct address and you

5  have resubmitted what and whose address?

6          **MS. SULKIN:**  No.  Generally when we submit a subpoena

7  to a facility, just in general the facilities don't respond.

8  We have to kind of call them and bug them repeatedly.  We were

9  finally able to make contact with someone I believe in the risk

10 management department.  So now that we are in contact with

11 somebody who we believe that can help us track down the

12 National Drug Code -- I have found that a lot of times people

13 who work at hospitals generally don't know what a National Drug

14 Code is unless they frequently work with medications or are a

15 pharmacist.  So now that we have the ear of somebody who we

16 think we can get some help with, we would just like some more

17 time to explore that.

18         **MS. SWEET:**  Your Honor, these are all cases where you

19 had indicated in May that they would have one rollover and

20 that's it.

21         **THE COURT:**  I don't know what changes.  This subpoena

22 was issued months ago, right?

23         **MS. SULKIN:**  Yes, Your Honor, but sometimes it takes

24 a long time to get in touch with somebody at a facility,

25 especially with COVID.  A lot of people at the facility -- when

02:47

1   we send subpoenas, a lot of times they can't even get delivered

2   because the registered agent isn't where they are supposed to

3   be because everybody is working from home.

4         THE COURT:  Okay.  All right.  Wait.  Let me just

5   find out.  How many of these are affected by the -- let me just

6   put this one to the side.  I want to see what I'm dealing with.

7         Dorothy Lawrence.

8         MS. SULKIN:  Dorothy Lawrence, someone that I have

9   gotten product ID from before, the attorney that's representing

10  Cleveland Clinic, he finally responded to me yesterday asking

11  for the statement regarding chemotherapy.  I told him

12  Ms. Lawrence's case will get dismissed today if we don't

13  immediately receive something from him.  He said he didn't

14  think he could get something to me today, but thinks he can get

15  something to me in the next week or so.  I just ask that this

16  case be rolled over.

17        THE COURT:  Okay.  I'm really just trying to find out

18  if anything has changed.

19        Derhonda Mcclellan.

20        MS. SULKIN:  Derhonda Mcclellan is the one where the

21  facility sent their medical records and bills to the incorrect

22  address for us, and so we are just trying to get the facility

23  to resend the records to our current address.  The records were

24  sent to our old address and we didn't receive them.

25        THE COURT:  Luz Pluguez.  The next number, Luz

02:49

1    Pluguez.

2              **MS. SULKIN:**  We have been unable to secure product

3    ID, and at this point we don't have any specific objection to

4    her dismissal.

5              **THE COURT:**  That matter is dismissed with prejudice.

6                   Mary Thomas.

7              **MS. SULKIN:**  I'm sorry.  Mine was just organized a

8    little bit different.

9                   At this time we don't have any specific

10   objection to her dismissal.

11             **THE COURT:**  Those matters are dismissed with

12   prejudice subject to the objections previously raised.  We are

13   going to defer Sandra Acox.

14                  Vereece American.  Ms. Sweet.

15             **MS. SWEET:**  There's a line of cases where plaintiff

16   has indicated that they will only be adopting a general

17   objection.

18             **THE COURT:**  Okay.  Can we read those.

19             **MS. BRILLEAUX:**  Vereece American.  Mary Atkinson.

20   Maria Baez.  Yelena Barbosa.  Janet Bester.  Catherine Bishop.

21   Mildred Bohannon.  Jacqualyn Brown.  Leonora Campbell.  Shirley

22   Cardwell.  Randa Carrington.  Brenda Carter.  Maria Casas.

23   Aldonia Charles.  Cheryl Chupp.  Velma Cole.

24                  Wendy Crone was deferred for innovator

25   liability.

02:50

1          Felicia Dennis.  Lori Dimartino.  Dolores Dolan
2   Corallo.  Julie Entriken.  Linda Ferguson.  Nellie Figueroa.
3   Endya Fitch.  Yvonne Gamble.  Cynthia Golden.
4          The next case, Maureen Goode, was deferred for
5   innovator liability.
6          Patricia Grays.  Diane Gullette.  Joann Hege.
7   Antoinette Howell.  Patricia Iacovelli.  Leatha Johnson.
8   Shirley Johnson.  Yvonne Johnson.  Deborah Jones.  Donna Jones.
9   Esther Jones.  Shirley Jones.  Anne Klahn.  Denise Kohlmayer.
10  Barbara Lawrence.  Lolitta Leavell.  Melissa Leith.  Pam
11  Lencrerot.  Barbara Lewis.
12         The next two plaintiffs were deferred for
13  innovator liability.
14         And Holly Maietta.
15         The next case we can discuss separately once
16  everyone is up to speed.
17       **THE COURT:**  Okay.  Any objection to those absent the
18  general objection that was raised, Ms. Sulkin?
19       **MS. SULKIN:**  No, Your Honor.  I just want to make
20  sure that we have all the ones with innovator liability listed
21  that will be deferred:  Sandra Acox, Melinda Lopez, Esther
22  Lowry, Wendy Crone, Maureen Goode.
23       **THE COURT:**  Yes.
24         Those matters are dismissed with prejudice.
25       **MS. KREIDER:**  Can counsel confirm that No. 177,

02:53

1   Yelena Barbosa, does not have any other objections besides a
2   general objection?  We didn't have that one on our list.  It
3   may have just been our mistake.
4           THE COURT:  Yelena Barbosa.  Ms. Sulkin, that's just
5   a general objection?
6           MS. SULKIN:  Let me make sure.  We had been
7   originally -- yes.  At this point we don't have any specific
8   objection.  When we originally sent an email to defendants, we
9   had sent out a new request and were waiting on records.  I'm
10  double-checking right now, and we have not received -- the
11  records we were waiting on did not have the National Drug Code.
12          THE COURT:  Those matters are going to be dismissed
13  with prejudice subject to the general objection previously
14  raised.
15              Now we are on No. 223.
16          MS. SWEET:  Yes.  So Roberta Matthew uploaded some
17  CMO 12 product ID on Friday.  We just request an order
18  requiring plaintiff to dismiss the remaining defendants within
19  seven days.
20          THE COURT:  Ms. Sulkin.
21              I've been giving everybody 15 days.  I'm going
22  to give her 15 days to dismiss the remaining defendants.
23          MS. SULKIN:  Thank you, Your Honor.
24          THE COURT:  Gloria Mitchell.
25          MS. SWEET:  We can do another list of general

02:54    1    objections.

2              THE COURT:  Okay.

3              MS. SWEET:  Gloria Mitchell.  Linda Moore.  Gloria

4    Morgan.  Taufiqah Mubarak.  Adrienne Murphy.  Betty Myers.

5    Lorraine Newton.  Brenda Nichols.  Vicki Partee.  Kathy

6    Peterson.  Virginia Pryce.  Marcia Purrell-Barry.  Thelma

7    Regrut.  Faith Reid.  Coralia Reilly.  Jennifer Rossorelli.

8    Judith Serio.  Janice Sherman.  Benita Smiley.  Diana Snyder.

9    Garla Souza-Roy.  Charlotte Stoner.

10             THE COURT:  Ms. Sulkin, any objection as to the

11   dismissal of those?  Do you have anything to raise beyond the

12   general objection that was previously raised?

13             MS. SULKIN:  No, Your Honor.

14             THE COURT:  Those matters are dismissed with

15   prejudice subject to the general objection articulated by

16   Mr. Lambert previously.

17                  Deborah Sydnor.

18             MS. SWEET:  Just like the last case, she uploaded

19   product identification on Friday, and we request an order

20   requiring that plaintiff dismiss the remainder of the

21   defendants within 15 days.

22             THE COURT:  The Court is going to grant 15 days to

23   dismiss the remaining defendants.  Please proceed.

24             MS. SWEET:  The remaining cases are general

25   objections.

02:56

1          **THE COURT:**  Okay.  That would be: Brenda Thompson,

2   Terri Threet, Clementine West, Flame White, and Joretha Wilson.

3   Is that correct, Ms. Sulkin?

4          **MS. SULKIN:**  Yes, Your Honor.  I did want some

5   clarification on the three rollovers that --

6          **THE COURT:**  Oh, I'm going back to them.  I just

7   wanted to see what my universe looked like.

8                I'm going to dismiss those with prejudice

9   subject to the general objection that had previously been

10  raised.

11               I'm going to allow, in light of work that has

12  been done by Bachus & Schanker as to Johnna Hohenberg, Dorothy

13  Lawrence, Derhonda Mcclellan -- I think it's just those three.

14  I'm going to roll those over and see what plays out since

15  there's been some movement.  Is that it?

16         **MS. SWEET:**  Thank you, Your Honor.

17         **MS. SULKIN:**  Thank you, Your Honor.

18         **THE COURT:**  Anything further?  Thank you all.  Court

19  is adjourned.

20               (Proceedings adjourned.)

21                              *  *  *

22

23

24

25

1  <u>**CERTIFICATE**</u>

2        I, Toni Doyle Tusa, CCR, FCRR, Official Court

3  Reporter for the United States District Court, Eastern District

4  of Louisiana, certify that the foregoing is a true and correct

5  transcript, to the best of my ability and understanding, from

6  the record of proceedings in the above-entitled matter.

7

8

9                              _/s/ Toni Doyle Tusa_
                               Toni Doyle Tusa, CCR, FCRR
10                             Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25