# EXHIBIT 1

```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


IN RE:   TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION      *     16-MD-2740
                                   *
                                   *     Section H
Relates to:  16-CV-17039           *
                                   *     July 29, 2021
                                   *
* * * * * * * * * * * * * * * * *


                      ORAL ARGUMENT BEFORE
                 THE HONORABLE JANE T. MILAZZO
                  UNITED STATES DISTRICT JUDGE


Appearances:


For the Plaintiffs:         Gainsburgh Benjamin David Meunier
                              & Warshauer, LLC
                            BY:  M. PALMER LAMBERT, ESQ.
                            1100 Poydras Street, Suite 2800
                            New Orleans, Louisiana 70163


For the Sanofi              DLA Piper, LLP
Defendants:                 BY:   ILANA H. EISENSTEIN, ESQ.
                            1650 Market Street, Suite 5000
                            Philadelphia, Pennsylvania 19103


Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                            500 Poydras Street, Room B-275
                            New Orleans, Louisiana 70130
                            (504) 589-7778



Proceedings recorded by mechanical stenography using
computer-aided transcription software.
```

| | **INDEX** | |
|---|---|---|
| | | Page |
| | Oral Argument | |
| | Ilana H. Eisenstein, Esq. | 3 |
| | M. Palmer Lambert, Esq. | 9 |
| | Ilana H. Eisenstein, Esq. | 12 |

**PROCEEDINGS**

**(July 29, 2021)**

**THE COURT:**  Let's call the case.

**THE DEPUTY CLERK:**  This is in the matter of *Taxotere*, MDL 2740.  Would counsel arguing please make your appearances for the record.

**MS. EISENSTEIN:**  Good morning, Your Honor.  Ilana Eisenstein on behalf of the defendant, Sanofi.

**MR. LAMBERT:**  Good morning, Your Honor.  Palmer Lambert on behalf of Elizabeth Kahn.

**THE COURT:**  Ms. Eisenstein, it's your renewal of a renewal of a renewal.

**MS. EISENSTEIN:**  Do you want me to keep my mask on, Your Honor?

**THE COURT:**  You may take the mask off, yes.  Thank you.

**MS. EISENSTEIN:**  Thank you, Your Honor.  May it please the Court.  Your Honor, *Thibodeaux* established a high bar for the plaintiff to meet her burden to show *contra non valentem*, but *Thibodeaux* is a "no inquiry" case, as Your Honor knows.  The prescriptive period, the Court held, ends once the plaintiff has notice enough to call for inquiry, and the question is whether the cause of her injury was knowable in the exercise of reasonable inquiry.

In *Thibodeaux* the Court held that plaintiff

09:29

1   would have found the following evidence relevant to what a
2   reasonable inquiry by plaintiffs would have uncovered, and they
3   cited the various forms of evidence -- the "Taxotears" website,
4   the CBS news story, etc. -- that's cited in the master
5   complaint.  In light of that key information, the Court held
6   that diligence required that Taxotere be explored -- Taxotere
7   be explored -- as a possible explanation for hair loss.
8            Sanofi filed a motion for reconsideration at
9   that point, as Your Honor knows, and this Court distinguished
10  the plaintiffs in *Thibodeaux* because they were "no inquiry"
11  plaintiffs.  They had done nothing and performed no
12  investigation into their injuries.  Your Honor found that here,
13  by contrast, Ms. Kahn had investigated her injury because she
14  consulted with her doctor and was told that her age was causing
15  her hair loss.
16           *Durden* came out in the meantime, and *Durden* made
17  clear that that statement by Dr. Roberie that age was
18  potentially a cause of her hair thinning does not toll the
19  prescriptive period.  Making that simple inquiry, asking that
20  one question does not avoid summary judgment.  Rather, in
21  *Durden* the Fifth Circuit applied *Thibodeaux* and found that the
22  key information cited in the master complaint again required
23  the plaintiff to specifically consider Taxotere -- Taxotere --
24  as the potential root cause and that causes of action were
25  reasonably knowable.  It refused to distinguish *Thibodeaux*

09:31   1  along the inquiry/no inquiry line.
        2          **THE COURT:**  In *Durden* did she do any inquiry?
        3          **MS. EISENSTEIN:**  Yes.  So in *Durden* --
        4          **THE COURT:**  What did she do?
        5          **MS. EISENSTEIN:**  So she went to her dermatologist and
        6  she said -- there were two things she did.  She claimed her
        7  case was different because her doctor diagnosed her with female
        8  pattern hair loss, just like Roberie -- actually, it wasn't in
        9  response to an inquiry.  It was just Roberie offered that she
       10  thought her hair thinning was due to age.
       11          It's that same fact pattern.  The dermatologist
       12  that Durden went to actually gave her a specific diagnosis of
       13  female pattern hair loss, and she claimed that she also engaged
       14  in unspecified research into the permanency of her hair loss.
       15  The Court in *Durden* easily dismissed that diagnosis and the
       16  research.  It's not clear why that diagnosis makes any relevant
       17  difference, and there are two reasons for that.
       18          One is, just like here, there was no evidence
       19  that any doctor filtered in that her persistent hair loss was
       20  singularly attributable to female pattern hair loss to the
       21  exclusion of other causes.
       22          **THE COURT:**  Excuse me.  If you are on the line, would
       23  you please put your phone on mute.  Thank you.
       24          **MS. EISENSTEIN:**  What's more, just like in Ms. Kahn's
       25  case, in *Durden* there was no evidence that Durden herself

```
09:32   1   reasonably believed that her persistent hair loss was caused by
        2   female pattern baldness.  Rather, the Court held that summary
        3   judgment was warranted because Durden failed to consider
        4   Taxotere as a potential cause of her persistent hair loss.  She
        5   made no reasonable inquiry to determine Taxotere's effect on
        6   persistent hair loss.
        7               In this Court's prior decision, you have looked
        8   at whether or not there was an inquiry into the cause, but
        9   *Durden* clarifies that the inquiry that constitutes reasonable
       10   diligence is something far more specific.  It's an inquiry
       11   about Taxotere's potential cause of a hair loss, and there's a
       12   good reason why.
       13               It's distinguishable from the cases that
       14   plaintiffs cite where it wasn't reasonably knowable what the
       15   cause was; for example, the *Hoerner* case or the *Sharkey* case.
       16   In those cases the courts have found that it wasn't knowable
       17   whether the eye infection was being caused by bacteria or
       18   something to do with contact lenses, or whether Reye's syndrome
       19   was due to the use of the medication or whether it was
       20   something like polio, there's nothing you can do about it.
       21               In this case, however, the Court looked at the
       22   information.  The Fifth Circuit looked at the information that
       23   was out there regarding Taxotere and found it was reasonably
       24   knowable.  Here Ms. Kahn admitted she did not investigate
       25   Taxotere as the cause of persistent hair loss.
```

```
09:34    1                    "Have you ever talked to any health care
         2    provider about whether Taxotere caused or contributed to your
         3    hair thinning?"
         4                    "No."
         5                    She did not believe that what she described as
         6    balding was due to age either.  She talked a few times in her
         7    deposition transcript about her interaction with Dr. Roberie
         8    and she acknowledged the comment, "Well, as you get age, your
         9    hair gets thinner."  That was Dr. Roberie's comment.
        10                    Ms. Kahn testified she did not believe this was
        11    the cause.  She said, "I was 50 at the time, and most
        12    50-year-olds' hair don't thin.  80, maybe, but not 50.  So when
        13    she said that, I was a little taken aback and I dropped it."
        14                    Later she was asked, "Dr. Roberie was answering
        15    a question that you had air thinning," and she said --
        16    referring to the age thinning, she provided that answer, that
        17    it was due to age -- "I think she was trying to be kind."
        18                    "Even despite what Dr. Roberie said, you don't
        19    even think it's possible that hair thinning is due to age or
        20    menopause?"  That last part is given for context.
        21                    "Yes."
        22                    She distinguished in her mind, in the
        23    deposition, the difference -- Ms. Kahn did -- between what she
        24    described as hair thinning and what she described her own
        25    condition as, as hair balding.  She said, "I don't have hair
```

```
09:35   1   thinning.  I have hair balding.  It's two different things."
        2               She was asked, "Well, you said Dr. Roberie
        3   thought that hair thinning was a natural part of women's aging,
        4   correct?"
        5               "Yes, she did say that, but she didn't explain
        6   hair balding.  She talked about hair thinning.  As I said,
        7   those are two different things."
        8               She further testified that she attributed her
        9   initial hair loss to Taxotere.
       10               So in this case the fact that Dr. Roberie
       11   offered hair thinning is related to age and menopause does not
       12   void summary judgment.  Rather, just like in the Durden case,
       13   whatever that diagnosis significance is, it certainly is not
       14   singularly attributable, the hair loss, to aging or to
       15   menopause.  Rather, Durden, in her own mind, discounted that
       16   explanation.  She attributed her hair loss to Taxotere and/or
       17   the combination of chemotherapy agents.  Her obligation was to
       18   investigate Taxotere specifically as the cause of her injury,
       19   and she did not.  Rather, she waited six years to file suit,
       20   well past the one-year statute of limitation.
       21               I know that it is extraordinarily unusual to be
       22   here on multiple motions for reconsideration, Your Honor.
       23          THE COURT:  It sure is.
       24          MS. EISENSTEIN:  It certainly is an extraordinary
       25   posture, but I think that in this case the procedural history
```

does warrant Your Honor's reconsideration of the summary judgment motion because the Fifth Circuit has in the interim provided the succession of rulings that makes clear that Ms. Durden's inquiry did not suffice to toll the prescriptive period.

**THE COURT:** Thank you.

Mr. Lambert.

**MR. LAMBERT:** Yes, Your Honor. Good morning. I'm glad to make it here through the traffic.

**THE COURT:** If you want to take your mask -- for oral argument, it's very difficult.

**MR. LAMBERT:** Sure. May it please the Court. Your Honor, Palmer Lambert on behalf of Ms. Kahn and the PSC.

Your Honor, for the third time Sanofi asks this Court to reconsider its ruling denying summary judgment on liberative prescription. The only new information that Sanofi presents to this Court is the unpublished decision of the Fifth Circuit in *Durden*, which Sanofi itself acknowledges has no precedential value. Indeed, *Durden* does not change this Court's well-reasoned analysis that specifically distinguishes the facts in Ms. Kahn's case for Ms. Durden's.

Application of the liberative prescription rule is to rid a defendant from claims that have become stale, has always involved a fact-intensive analysis, and no two cases are exactly the same in terms of the facts. The Supreme Court has

09:38

1   said many times, the Louisiana Supreme Court, that prescriptive
2   statutes are to be strictly construed against prescription in
3   favor of the obligation sought to be distinguished.
4              In federal court cases, the Rule 56 burden on a
5   defendant to show no genuine issue of material fact does not
6   shift to the plaintiff.  That is an issue that the
7   Fifth Circuit has declined to address now twice and is
8   inconsistent with opposing counsel's statement that it's her
9   burden to overcome.
10             Additionally, the Fifth Circuit ruled without
11  the benefit of expert reports.  The Court in this case has seen
12  reports and issued *Daubert* opinions in this matter.  The Court
13  has seen three dermatologists on Sanofi's side of the "V" agree
14  with Dr. Roberie.  Thus a jury could easily find that Ms. Kahn
15  reasonably relied on Dr. Roberie's misdiagnosis, as bolstered
16  by her other physicians' inability to diagnose PCIA or advise
17  her that she sustained an injury as a result of Taxotere.  She
18  was even encouraged to take Biotin by a dermatologist, which
19  certainly is not a suggestion of permanency.
20             In this case there are genuine factual disputes
21  as to whether the company had sufficient knowledge to update
22  its warnings, whether plaintiff can prove general causation,
23  whether Ms. Kahn even has PCIA or permanent hair loss caused by
24  Taxotere as opposed to other potential alternatives, and it's
25  simply illogical that those factual disputes can remain and yet

```
09:40   1   this case can be prescribed based on the defendants' analysis.
        2                It's also hard to imagine how Ms. Kahn's case
        3   can be stale and untimely as to Sanofi if, according to Sanofi,
        4   she never even had the injury that she claims she had.  I think
        5   the Sharkey case does provide persuasive authority even though
        6   it's a Louisiana First Circuit case.  If defendants were
        7   correct, it is likely that all asbestos and benzene cases would
        8   be incorrectly determined by the Louisiana Supreme Court
        9   because they would be prescribed long before there was ever a
       10   diagnosis.
       11                Finally, it's important to judge the
       12   reasonableness of Ms. Kahn's action or inaction in light of all
       13   the circumstances outlined by the Supreme Court, and those
       14   factual issues are relevant to the contra non valentem
       15   analysis.  A company that writes an email internally along the
       16   lines of "This is going to be fun submitting a four-year-old
       17   label change to the FDA now" is not the kind of good actor that
       18   should reap the benefits of calling Ms. Kahn's claims stale,
       19   nor should a company that wipes the internet of Facebook
       20   references to permanent hair loss and reports those users to
       21   the social media entity in an attempt to get them kicked off of
       22   the social media platform.
       23                It's also important to note that unlike the
       24   Canadian news outlet Globe and Mail -- which I had never heard
       25   of before this litigation -- and unlike medical journals which
```

```
09:41   1   require subscriptions in order to see the information even if
        2   you can understand it, Facebook was the Instagram and Snapchat
        3   of the 2008 to 2015 era.
        4              This case is simply not the same as Durden's
        5   case, where she heard from a doctor who testified that she
        6   understood her hair was not likely coming back.  This is
        7   different than that.  We can't judge Ms. Kahn's actions in a
        8   vacuum.  We have to consider all of the circumstances of the
        9   *contra non valentem* test.
       10              We have to consider that she met with her
       11   doctors for multiple years after she took Taxotere, among the
       12   multiple chemotherapy agents that she took in her clinical
       13   trial.  Not once did any doctor over those years suggest that
       14   she had a permanent injury caused by Taxotere.  It's not simply
       15   that she stuck her head in the sand; she made a reasonable
       16   inquiry under the circumstances.  This Court should agree with
       17   itself for the third time in denying reconsideration.
       18              **THE COURT:**  Thank you.
       19              **MR. LAMBERT:**  Thank you.
       20              **THE COURT:**  Ms. Eisenstein.
       21              **MS. EISENSTEIN:**  Plaintiffs' arguments to a tee were
       22   raised in *Thibodeaux*.  They were raised again and rejected in
       23   that case.  They were raised and rejected in *Durden*.  That
       24   includes the argument about whether or not there was a
       25   diagnosis of PCIA, whether or not --
```

09:43   1            **THE COURT:** *Thibodeaux* and *Durden* were my decisions.
2   They affirmed what I already did.  I understand that, and I
3   understand what my analysis was for those, actually, four or
4   five cases that now have been dismissed on prescriptive
5   grounds.
6            **MS. EISENSTEIN:** Absolutely, Your Honor, and the
7   Fifth Circuit did affirm --
8            **THE COURT:** Uh-huh.
9            **MS. EISENSTEIN:** -- your decisions.  In doing so, it
10   did something else, which was an affirmative decision, but it
11   also clarified the standard because the plaintiffs raised not
12   only the argument they raised before Your Honor, but some of
13   the very arguments, including in the 28(j) letter that was
14   filed before *Durden* was decided, to try to distinguish
15   *Thibodeaux*.
16            In *Durden* one of the things that changed was
17   they got the *Thibodeaux* decision.  They had raised all those
18   same arguments in *Durden*.
19            They filed the 28(j) letter trying to say:
20   Whoa, whoa, whoa*.*  *Thibodeaux* doesn't control because
21   Ms. Durden received the female pattern baldness diagnosis,
22   because Ms. Durden had done research, because Ms. Durden had
23   grown some of her hair and thought it may come back.
24            Each and every one of those, the Fifth Circuit
25   walked through in the *Durden* opinion and said:  No, that does

09:45   1  not distinguish this case from *Thibodeaux*. You don't get out
        2  from under that.
        3          I think Mr. Lambert said it lacks precedential
        4  value. I think I would dispute that. While it is an
        5  unpublished, nonprecedential opinion, *Thibodeaux* is certainly a
        6  precedential opinion, and *Durden* was the Fifth Circuit
        7  application of that opinion. I think that, in clarifying what
        8  the *Thibodeaux* standard is, that certainly has precedential
        9  value here, if not extreme persuasive value.
       10          The question here is not whether the inquiry was
       11  reasonable. That's really not the question. The question is
       12  whether the cause of action was knowable in view of reasonable
       13  diligence. I think that's one key difference. To highlight
       14  that, to hold otherwise would be to say there would be two
       15  different standards for the discovery rule based on whether a
       16  plaintiff asked a single question or received once information
       17  from her doctor that didn't say exclude the possibility of
       18  Taxotere, but rather gave a plausible or possible diagnosis.
       19          *Durden* said that's just not enough. The
       20  plaintiff has to do more. They need to investigate. In light
       21  of the information that was publicly available about Taxotere
       22  and the obviousness of the injury, they were obligated to do
       23  more and to investigate Taxotere specifically as the cause, and
       24  Ms. Durden simply failed to do that. Thank you, Your Honor.
       25          **THE COURT:** I'm going to put my state court hat on

09:46

1 because we have a trial looming and lots of moving parts at
2 this point and I'm going to render from the bench, which is not
3 something that I frequently do.
4      In document 12805, I previously outlined the
5 legal standard on interlocutory judgments, and I'm going to
6 adopt that standard for today.  Before me is the second motion
7 to reconsider and the third time that I look at Ms. Kahn's
8 case.
9      I am reminded early on in this litigation
10 Judge Engelhardt, when he was presented with an open
11 prescriptive motion that all of these cases were prescribed,
12 said no.  Prescription, under Louisiana law, is a factually
13 intensive basis.
14      I think there's still factual issues for the
15 jury to consider, and this is what my thought process is.  I
16 specifically note that throughout this litigation the defendant
17 has pointed to multiple causes of alopecia.  Most are not tort
18 related.  Of interest is age-related alopecia.  What we hear
19 from countless experts is there are reasons that have nothing
20 to do with improper conduct that cause alopecia in women.  That
21 is a plausible cause of alopecia.
22      Here, the plaintiff sought and investigated a
23 cause for ongoing alopecia and was advised by her gynecologist
24 that she was not the victim of a tort, but rather the aging
25 process, and according to plaintiff she dropped it.  Now, did

09:48

1   she take vitamins?  Did she use other products to try to
2   facilitate hair growth?  She did that, but she dropped it.
3   Whether or not that was reasonable, to accept the opinion of
4   one physician, I think is for the jury to decide, so the motion
5   is denied.
6             Now, I really would like to talk to everybody
7   off the record.  We are going to have a quick status
8   conference.  Maybe we can just go into the jury room.  Thank
9   you.  Court is adjourned.
10            **THE DEPUTY CLERK:**  All rise.
11            (Proceedings adjourned.)
12                           * * *
13                        **CERTIFICATE**
14            I, Toni Doyle Tusa, CCR, FCRR, Official Court
15  Reporter for the United States District Court, Eastern District
16  of Louisiana, certify that the foregoing is a true and correct
17  transcript, to the best of my ability and understanding, from
18  the record of proceedings in the above-entitled matter.
19
20
21                              /s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
22                              Official Court Reporter
23
24
25