UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740** <br><br> *This document relates to:* <br><br> Hilda Adams, Case No. 16-cv-17583 <br> Gloria Cooper, Case No. 18-cv-194 <br> Carol Woodson, Case No. 17-cv-12674 <br> Arquice Conley, Case No. 18-cv-9799 <br> Tina Hickey, Case No. 18-cv-4731 |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO CERTIFY ORDER FOR
INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)**

Defendants Accord Healthcare, Inc., Sandoz Inc., and Hospira, Inc. and Hospira Worldwide, LLC ("Defendants") move the Court to certify its August 2, 2022 Order and Reasons (Rec. Doc. 14477) ("Order") for immediate appeal pursuant to 28 U.S.C. § 1292(b).

The Order involves difficult and novel legal issues related to the regulatory definition of "newly acquired information," 21 C.F.R. § 314.3(b), and the interplay between that regulation and the post-market surveillance and labeling obligations owed by 505(b)(2) manufacturers[1]—controlling questions of law as to which there is a substantial ground for difference of opinion. Indeed, as this Court has recognized, these are difficult questions of first impression. Appellate resolution of these issues—which affect thousands of cases that have been pending in this MDL for years—will materially advance the termination of this litigation. *See Spong v. Fidelity Nat'l Prop. & Cas. Ins. Co.*, 787 F.3d 296, 304 (5th Cir. 2015) ("Whether federal law preempts the [plaintiffs'] claims certainly falls within the ambit of 28 U.S.C. § 1292(b).").

---

[1] Reference to "505(b)(2)" is to § 505(b)(2) of the federal Food, Drug and Cosmetic Act.

1

Defendants therefore request that this Court amend its Order to include the language required by § 1292(b): "This Order involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Id.*

## THE LEGAL STANDARD

An interlocutory appeal is permitted when the district court certifies "in writing" (1) "that such order involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). If the district court so certifies, the appropriate court of appeals "may thereupon, in its discretion, permit an appeal to be taken from such order." *Id.* Federal preemption unquestionably falls within the ambit of § 1292(b) and is a common subject of interlocutory appeals. *See, e.g.*, *Spong*, 787 F.3d at 304; *Greenwich Ins. Co. v. Miss. Windstorm Underwriting Ass'n*, 808 F.3d 652, 655 (5th Cir. 2015) (deciding § 1292(b) interlocutory appeal of preemption ruling); *see also Manual for Complex Litigation* § 15.11 (4th ed. 2004) (explaining "orders … granting or denying motions disposing of pivotal claims or defenses" are just the kind of "crucial orders" well-suited for interlocutory appeal).

## WHY THE COURT SHOULD GRANT CERTIFICATION

**I.   The Court's Order Involves Controlling Questions of Law, Resolution of Which May Materially Advance the Termination of this Litigation.**

A controlling question of law for purposes of § 1292(b) "is one that would require reversal on appeal from a final judgment or would materially affect the outcome of the case" and that "generally must be purely legal in nature." *Adams v. Walker*, 2022 WL 457821, at *2 (E.D.

La. Feb. 15, 2022).[2] When the issue is federal preemption, the "controlling question of law" requirement is plainly satisfied because preemption is a legal question. *Merck, Sharpe & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019).[3] And that question is controlling because it is dispositive; a holding that Plaintiffs' failure-to-warn claims against Defendants are preempted would require dismissal of thousands of individual lawsuits filed in this MDL, obviating the need for remand of the cases to their respective transferor courts. *See Adams*, 2022 WL 457821, at *3 ("Resolution of a controlling question of law need not terminate the litigation entirely so long as it would have some significant impact ….").

This Order therefore plainly meets the criteria for certification of an interlocutory appeal.[4]

## II. The Order Involves Novel and Difficult Legal Questions as to Which There Are Substantial Grounds for Difference of Opinion.

As this Court and others have recognized, there are substantial grounds for difference of opinion "if novel and difficult questions of first impression are presented." *Adams*, 2022 WL 457821, at *3; *see also, e.g.*, *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013) (explaining

---

[2] Unless otherwise noted, all emphases are added and all citations and internal quotation marks are omitted.

[3] *See Knight v. Boehringer Ingelheim Pharms. Inc.*, 984 F.3d 329, 337 & n.8 (4th Cir. 2021) (concluding that whether there exists "newly acquired information," for purposes of preemption, is a legal question); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1016 (S.D. Cal. 2021) (same); *Lyons v. Boehringer Ingelheim Pharms., Inc.*, 491 F. Supp. 3d 1350, 1363 (N.D. Ga. 2020) ("Like all other court's that have addressed this question post-*Albrecht*, this Court finds that both the 'newly acquired information' and 'FDA action' questions are for a Judge to decide, not a jury.")

[4] Resolving the issue now by interlocutory appeal is appropriate because the issue is otherwise unlikely to receive appellate review anytime soon. No trials are currently scheduled for these Defendants, and, even were the Court to schedule a trial for one or more Defendants, any trial would likely be many months away.

grounds exist when "(1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions [or] (2) the question is difficult and of first impression"); *McGillicuddy v. Clements*, 746 F.2d 76, 76 n.1 (1st Cir. 1984) (explaining a substantial ground for difference of opinion exists where "the proposed intermediate appeal presents one or more difficult and pivotal questions of law not settled by controlling authority").[5]

The preemption issue addressed in the Order passes this test. First, the issue is novel. As this Court acknowledged in its Order, the § 505(b)(2) approval route is a hybrid approval pathway created by Congress through the Hatch-Waxman Amendments.[6] The Order is the *only* federal decision to address these preemption issues in the context of the § 505(b)(2) pathway. Neither the Order nor the parties' briefs cite a single case that has addressed how the CBE mechanism—or, more specifically, the "newly acquired information" requirement—should be applied with respect to FDA-approved labeling for such products. Second, the issues are difficult, as the Court itself has frequently acknowledged.

It also matters that this issue arises within the context of an MDL proceeding. Commentators have stated that the threshold for finding a substantial ground for difference of opinion should be lower in MDL proceedings, which typically involve numerous cases and take years to resolve. Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*

---

[5] The Fifth Circuit has not construed "substantial ground for difference of opinion," but numerous district courts in the Circuit have agreed that "substantial ground" exists "if novel and difficult questions of first impression are presented." *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 723-24 (N.D. Tex. 2006) (quoting 4 Am. Jur. 2d *Appellate Review* § 128 (2005)); *Riley v. Cantrell*, 2022 WL 855862, at *3 (E.D. La. Mar. 23, 2022) (same); *Napoleon v. Shows, Cali & Walsh, LLP*, 2022 WL 721560, at *5 (E.D. La. Mar. 10, 2022) (same); *Holcombe v. United States*, 2019 WL 13080126, at *2 (W.D. Tex. Sept. 10, 2019) (same).

[6] *See* Order at 3-5.

4

§ 3930 (3d ed. 2022) ("The level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case. If proceedings that threaten to endure for several years depend on an initial question of jurisdiction, limitations, or the like, certification may be justified at a relatively low threshold of doubt.").

There are substantial grounds for difference of opinion regarding at least three aspects of the Order:

- Whether the CBE regulation, 21 C.F.R. § 314.70(c)(6)(iii), requires—as a prerequisite for submitting a unilateral labeling change—that there be new scientific evidence showing that a risk occurs with greater severity or frequency;

- Whether manufacturers of a drug product approved under the § 505(b)(2) pathway owe a regulatory duty to reanalyze pre-approval data submitted to the FDA from other sources, and considered by the agency, prior to the date of FDA approval of the § 505(b)(2) NDA; and

- Whether the pre-approval and post-approval data available to Defendants as § 505(b)(2) manufacturers and considered by the Court was legally sufficient to determine whether the requirements for "newly acquired information" were met.

If there is a substantial ground for a difference of opinion as to any of these aspects of the Order, interlocutory review is appropriate because each would require reversal.

    **A.**    **There is substantial ground for disagreement as to whether information can be considered "newly acquired information" without a determination that it shows "risks of a different type or greater severity or frequency."**

The core issue in Defendants' motions was whether there was "newly acquired information" that showed "risks of a different type or greater severity or frequency" than the pre-approval information. 21 C.F.R. § 314.3(b). The Order, however, did not make a finding as to whether the post-approval information that it deemed "newly acquired information" satisfies this standard. Instead, the Court short-circuited the analysis based on a statement made by the FDA

5

in its review of comments regarding the agency's proposed 2008 amendment to the CBE regulation: "[I]f later data or analyses demonstrate that prior warnings were insufficient, such data would clearly qualify as newly acquired information under the rule." Order at 21 (quoting Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 49603, 49606 (Aug. 22, 2008)). The FDA, however never intended for that statement to be the end-point of a "newly acquired information" analysis; the quoted passage ends with the caveat: "***provided the other requirements of the rule are met***." 73 Fed. Reg. at 49606.

The Order asserts in a footnote that "the other requirements of the rule" referenced in the FDA's comment refers to just one requirement—that "the evidence of a causal association satisfies the standard for inclusion in the labeling under [21 C.F.R.] § 201.57(c)." *See id.* at 21 n.84. But the CBE regulation requires that the labeling change "reflect newly acquired information," the definition of which contains ***two*** requirements: (1) that the information not have been previously submitted ***and*** (2) that it reveal risks of "greater severity or frequency." 21 C.F.R. § 314.3(b). The causal-association threshold is a ***third*** requirement—certainly ***not*** the only "requirement." The very fact that the FDA referred to "requirements"—plural—makes clear that the CBE regulation consists of more than one requirement.

Indeed, in explaining why it had it had revised the January 2008 proposed amendment, the FDA in August 2008 explained:

> The definition of 'newly acquired information' has been revised ***to clarify*** that data, whether derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data … ***needs to be of a "different type or greater severity or frequency than previously included in submissions to FDA.***" The codified section of the January 2008 proposed rule suggested that this limitation applied only to data derived from reports of adverse events. Instead, ***it applies to***

6

> ***data derived from new clinical studies, reports of adverse events, and new analyses of previously submitted data.***[7]

Thus, the FDA was explicit that it amended the CBE regulation, not only to "make it clear" that a stronger warning must be supported by sufficient evidence of a causal association, but also "to clarify" that the "different type/greater severity/greater frequency" requirement applies to all forms of "newly acquired information," including new analyses of previously submitted data. In other words, the FDA clarified that new information revealing risks of greater severity or frequency are the *sine qua non* of "newly acquired information."

Thus, there is a substantial ground for disagreement as to whether a conclusion that Defendants possessed "newly acquired information" *must* include a finding that this information showed "risks of a different type or greater severity or frequency."

> **B.    There is substantial ground for disagreement as to whether manufacturers of a drug product approved under the § 505(b)(2) pathway owe a regulatory duty to reanalyze pre-approval data submitted to the FDA from other sources, and considered by the agency, prior to the date of FDA approval of the § 505(b)(2) NDA.**

The Order correctly states that FDA's initial approval of an NDA or ANDA "includes approval of the exact text" of the labeling.[8] Accordingly, a key element of the regulation is that a labeling change must be based on information that is "newly acquired"—*i.e.*, acquired ***after*** initial FDA approval.[9] The Court's subsequent analysis, however, effectively reads the "newly" out of "newly acquired information" by holding that "a post-approval analysis of the publicly available, ***pre***-approval data would have demonstrated that the standard for inclusion in the

---

[7]   Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 49603, 49604 (Aug. 22, 2008).

[8]   Order at 6; *see Wyeth v. Levine*, 555 U.S. 555, 568 (2009) ("The FDA's premarket approval of a new drug … includes the approval of the exact text in the proposed label.").

[9]   73 Fed. Reg. at 49606.

Adverse Reactions section had been met."[10] That is, according to the Order, there need not have been anything new—no new clinical studies, no new scientific literature, and no new adverse event reports. Defendants simply should have done a re-analysis of the pre-approval data and made a CBE labeling change. This approach to newly acquired information is inconsistent with the federal regulatory scheme governing § 505(b)(2) manufacturers.

First, the Order's rationale misconstrues what FDA-approval of a § 505(b)(2) drug's label in fact means by suggesting that § 505(b)(2) manufacturers must re-analyze the pre-approval scientific evidence immediately upon approval. A basic question for the preemption analysis is *when* did Defendants have "newly acquired information?" Dr. Ross would not say in his report or deposition testimony, nor would Plaintiffs in the summary judgment briefing. At oral argument, however, when the Court asked, "[A]re you saying, look, you were approved in 2011, you had … an obligation at that time to go back?" Plaintiffs answered yes. Tr. of Mot. for Summ. J. Based on Preemption Hr'g (April 14, 2022) at 17 (Mr. Mura: "We're saying you're approved in 2011, you had an obligation at that point as an NDA holder."). The Order appears to adopt this position, canvassing the scientific literature from 2001 to March 2011, when the FDA approved Hospira's NDA (and three months before approval of the Accord and Sandoz NDAs). In doing so, however, the Court diminishes the import that comes with FDA approval of a § 505(b)(2) drug. The FDA takes the position—in the same Federal Register notice quoted by this Court—that "[b]efore approving an NDA, … FDA undertakes *a detailed review* of the proposed labeling, *allowing only information for which there is a scientific basis* to be included in the FDA-approved labeling" and (2) "FDA's *comprehensive scientific evaluation* is embodied in the labeling for the product which reflects *thorough FDA review of the pertinent*

---

[10]  Order at 23.

8

*scientific evidence* and communicates to health care practitioners the agency's *formal, authoritative conclusions* regarding the conditions under which the product can be used safely and effectively." 73 Fed. Reg. at 49604.

Therefore, requiring a § 505(b)(2) to reevaluate pre-approval information immediately following approval would be duplicative of the analysis already performed by the FDA and inconsistent with the FDA's instructions to § 505(b)(2) applicants to rely to the fullest extent possible on pre-existing data for the brand-name drug, or RLD. A rule that requires § 505(b)(2) drug manufacturers to rely fully on what their § 505(b)(1) predecessors knew or investigated regarding a drug *up to* the day of approval, but which imposes an obligation the very next day to re-analyze pre-approval data in a quest for ascertaining newly acquired information, negates the efficiencies Congress sought when it created the § 505(b)(2) pathway by forcing § 505(b)(2) NDA holders to act like the predecessor brand-name equivalent.[11]

Second, there is also substantial ground for disagreement as to whether, and to what extent, FDA regulations impose an affirmative duty for drug manufacturers to re-analyze pre-approval information—without actually receiving any new information. In its Order, the Court correctly observed that the definition of "newly acquired information" encompasses "new analyses of previously submitted data"—a part of the regulatory definition that Defendants did not contest. *See* Order at 18. But the Order seemingly extended that aspect of the regulatory definition to imply that manufacturers have a *duty* immediately upon approval to re-analyze the

---

[11] The Order also takes no account of the fact that Sanofi was obligated to submit to FDA each year any new scientific literature relating to the safety, effectiveness, or labeling of the product. 21 C.F.R. § 314.81(b)(2). Thus, there is no basis to assume that FDA was unaware of the pre-approval scientific literature reviewed by the Order at pages 23-25; the presumption should be that FDA was aware of it as part of its "thorough … review of the pertinent scientific evidence." 73 Fed. Reg. at 49604.

9

previously submitted information to determine whether "a post-approval analysis of the publicly available, pre-approval data would have demonstrated that the standard for inclusion in the Adverse Reactions section had been met." *Id.* at 23.  Having implied that such a duty exists, the Court went on to find "that Defendants could have analyzed the relevant, publicly available scientific literature discussed above, and it would have shown that there was some basis to believe there was a causal relationship between docetaxel and the occurrence of permanent hair loss." *Id.* at 25.

The Order, however, does not cite any case law, regulation, or pharmacovigilance standard that imposes such a requirement.  While the regulation contemplates that new analyses of pre-approval data can constitute "newly acquired information," that requirement is satisfied only where such information actually exists.  *See Lyons v. Boehringer Ingelheim Pharms., Inc.*, 491 F. Supp. 3d 1350, 1364 (N.D. Ga. 2020) (recognizing that newly acquired information "cannot be rooted in conjecture or hypothesis," but plaintiff "must show that [the manufacturer] acquired the new information before [plaintiff's] alleged injury").  Neither the Order nor Plaintiffs have cited a single case, statute, or regulation to suggest that Defendants have a duty to immediately re-analyze the very evidence that was submitted to the FDA—without any new information to trigger such a re-analysis—where that evidence was part of the agency's comprehensive evaluation of the scientific evidence and where the approved labeling reflects the agency's authoritative conclusion about the evidence.

By holding § 505(b)(2) manufacturers responsible for affirmatively reevaluating pre-approval information submitted by the RLD and considered by the FDA at the time of approval, this Court imposes an obligation contrary to Congress's purpose in creating the § 505(b)(2) pathway in the first place.  The pathway was established as a hybrid pathway such that applicants

"can *avoid* preclinical and certain human studies necessary in full NDA applications." Order at 5 (citing 21 C.F.R. § 314.54(a)). Thus, manufacturers of § 505(b)(2) drugs "may rightly rely on the 'full reports of investigations' of the [listed] drug"—that is, the brand-name drug, which was first to market—"to establish the new drug's safety and efficacy." *Id.*; *see also Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 227 (3d Cir. 2013) (quoting 21 U.S.C. § 355(b)(1)). This is in furtherance of the policy goals enshrined in the Drug Price Competition and Patent Term Restoration Act, commonly called the Hatch-Waxman Amendments, *see* Order at 3, to bring new drugs to market more quickly than the expensive and resource-intensive approval process for traditional "stand alone" NDAs, which are regulated under § 505(b)(1).

To date, no other court has interpreted the post-market obligations of a § 505(b)(2) drug manufacturer. The result is that this Court's Order offers the only guidance on critical regulatory obligations owed by § 505(b)(2) manufacturers, and compounds the questions these manufacturers already face by calling into question the degree to which such manufacturers are responsible for analyzing pre-approval data. Appellate guidance clarifying this issue would therefore have considerable value. *See Adams*, 2022 WL 457821, at *3 (noting that substantial ground for difference of opinion exists where "novel and difficult questions of first impression are presented").

        **C.**    **There is substantial ground for disagreement about whether the pre-approval and post-approval data available to Defendants as § 505(b)(2) manufacturers and considered by the Court was legally sufficient to determine whether the requirements for "newly acquired information" were met.**

Defendants argued that the post-approval data—in particular, the post-approval scientific literature—did not reflect that permanent hair loss occurred with greater frequency than reported in the pre-approval literature (indeed, it reflected that it occurred less frequently). Plaintiffs did not contest the fact of that comparison—*i.e.*, that the ***post***-approval scientific literature does not

11

report a greater incidence of permanent hair loss than does the *pre*-approval literature. Nor does the Order. Under the definition of "newly acquired information" in 21 C.F.R. § 314.3(b), the absence of any such determination should have been dispositive.

Rather than address the "greater severity or frequency" requirement, the Order referred to Defendants' argument as "misleading" and "fallacious," asking "[h]ow, though, could [Defendants] have made this determination at the time in question if they did not have access to Sanofi's underlying clinical trial data?"[12] A different court could readily conclude, however, that the appropriate comparison is for the § 505(b)(2) Defendants to compare the publicly available pre-approval and post-approval scientific literature, which was not only ample, but also precisely what Defendants did in their Motions for Summary Judgment. Indeed, the Order relies exclusively on that same universe of literature—not at all on the confidential Sanofi clinical trial data—to conclude that "[a]n analysis of the publicly available scientific literature, *alone*, would have provided some basis to believe that there was a causal relationship between docetaxel and the occurrence of permanent alopecia."[13]

The very same publicly available literature permitted Defendants to compare the frequency of pre- and post-approval reports of permanent hair loss and to conclude correctly that the post-approval literature reported a *lower* incidence. The post-approval scientific literature consisted of two letters to journal editors, a poster abstract from a conference, and two articles that reported on studies of any size. The prevalence of permanent hair loss reported in the two studies (0.059 percent and ~2 percent), like that in the abstract (3.9 percent) was significantly lower than the prevalence rates (7.4 and 6.3 percent) reported in the pre-approval studies.

---

[12] Order at 19.
[13] *Id.* at 23.

To be sure, because the § 505(b)(2) Defendants did not have access to the clinical trial data, they could not know "the full extent of what was previously submitted to the FDA" by Sanofi.[14] But a § 505(b)(2) defendant can never know "the full extent" of what the NDA holder submitted to the FDA, if "full extent" includes the NDA holder's proprietary and confidential information.[15] If, as the Order states, a § 505(b)(2) defendant must know the clinical trial data in order to "determine whether [post-approval] information revealed risks of a different type or greater severity or frequency that included in previous submissions to the FDA"[16]—***and it is impossible for a § 505(b)(2) defendant to know that***—then there is a substantial ground for disagreement as to whether the Order correctly applies the CBE regulation. In that event, the Order in theory effectively nullifies an essential component of the definition of "newly acquired information"—namely, that such information "reveal risks of a different type or greater severity or frequency" than previously reported.[17] And, as noted above,[18] the Order does just that in practice: nowhere does it consider whether any of the purported post-approval "newly acquired information" reveals a greater frequency of permanent hair loss. Instead, the Order holds that "***any*** post-approval data or analysis that would have demonstrated that the warnings in Defendants' labels were insufficient would have qualified as newly acquired information under the CBE regulation."[19]

---

[14] *Id*. at 19.

[15] *Id*. ("[T]his Court knows that Defendants did not have a right of reference to Sanofi's clinical trial data ….").

[16] *Id*. ("Without knowing the full extent of what was previously submitted to the FDA, Defendants could never determine whether information revealed risks of a different type or greater severity or frequency than included in previous submissions to the FDA.").

[17] 21 C.F.R. § 314.3(b).

[18] *See* pp. 5-7, *supra*.

[19] Order at 21-22.

Whether "newly acquired information" can be construed to read the "risks of a different type or greater severity or frequency" element out of the regulatory definition is a novel and pivotal question—and, as the Court acknowledged, a difficult one as well.

## CONCLUSION

The criteria for interlocutory appeal are met. Preemption is a dispositive, and therefore controlling, issue. A holding by the Fifth Circuit that Plaintiffs' claims are preempted would materially advance the termination of the litigation. And there is no doubt that preemption, in the context of § 505(b)(2) defendants, presents novel and difficult issues.

Dated: August 17, 2022

Respectfully submitted,

/s/ Heidi K. Hubbard
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, D.C. 20024
Telephone: 202-434-5000
hhubbard@wc.com
rmoore@wc.com
nwadhwani@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Telephone: 504-858-7000
olinde@chaffe.com
protolo@chaffe.com

*Counsel for Defendants Hospira, Inc., Hospira Worldwide, LLC, and Pfizer Inc.*

/s/ Julie A. Callsen
Julie A. Callsen
Michael J. Ruttinger
Brenda Sweet

14

**TUCKER ELLIS LLP**
950 Main Avenue—Suite 1100
Cleveland, OH 44113-7213
Telephone: 216-592-5000
julie.callsen@tuckerellis.com
michael.ruttinger@tuckerellis.com
brenda.sweet@tuckerellis.com

*Counsel for Defendant Accord Healthcare, Inc.*

*/s/ Lori G. Cohen*
Lori G. Cohen
R. Clifton Merrell
Evan Holden
**GREENBERG TRAURIG, LLP**
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: 678-553-2100
cohenl@gtlaw.com
merrellc@gtlaw.com
holdene@gtlaw.com

Gregory E. Ostfeld
**GREENBERG TRAURIG, LLP**
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: 312-476-5056
ostfeldg@gtlaw.com

*Counsel for Defendant Sandoz Inc.*

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 17th day of August 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ <i>Heidi K. Hubbard</i>