# EXHIBIT

## "A"

**STRADLEY RONON STEVENS & YOUNG, LLP**
A Pennsylvania Limited Liability Partnership
By:     Francis X. Manning
LibertyView
457 Haddonfield Road, Suite 100
Cherry Hill, NJ  08002
(856) 321-2403
(856) 321-2415 (fax)
fmanning@stradley.com
*Attorneys for Defendants Hospira, Inc. and*
*Hospira Worldwide, LLC f/k/a Hospira*
*Worldwide, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARTINE REEDER, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SANOFI U.S. SERVICES INC., formerly | ) Case No.: _____ |
| known as SANOFI-AVENTIS U.S. INC; | ) |
| SANOFI-AVENTIS U.S. LLC, separately and | ) **NOTICE OF REMOVAL** |
| doing business as WINTHROP U.S.; | ) |
| SANDOZ, INC.; HOSPIRA, INC.; HOSPIRA | ) |
| WORLDWIDE, LLC F/K/A HOSPIRA | ) |
| WORLDWIDE, INC.; ACCORD | ) |
| HEALTHCARE, INC.; MCKESSON | ) |
| CORPORATION D/B/A MCKESSON | ) |
| PACKAGING; SUN PHARMA GLOBAL | ) |
| FZE; SUN PHARMACEUTICAL | ) |
| INDUSTRIES, INC. F/K/A CARACO | ) |
| PHARMACEUTICAL LABORATORIES, | ) |
| LTD.; ACTAVIS INC., NOW KNOWN AS | ) |
| ACTAVIS LLC; ACTAVIS PHARMA, INC.; | ) |
| ACTAVIS LLC F/K/A ACTAVIS INC. AND | ) |
| ACTAVIS PHARMA, INC.; JOHN DOE | ) |
| DRUG COMPANY DEFENDANTS #1-10, | ) |
| Defendants. | ) |

PLEASE TAKE NOTICE that under 28 U.S.C. §§ 1332, 1441, and 1446, Hospira, Inc. and

Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc. (together, the "Hospira Defendants")

submit this Notice of Removal of the above-captioned action from the Superior Court of New Jersey, Middlesex County, to the United States District Court for the District of New Jersey, and state as follows:

## BACKGROUND

1.      This case is one of a number of product liability actions alleging personal injury damages from persistent or permanent alopecia as a result of using docetaxel, a chemotherapeutic agent.  Docetaxel is available in both brand-name (Taxotere®) and generic formulations approved through § 505(b)(2) of the Food, Drug & Cosmetic Act ("FDCA").

2.      On October 4, 2016, pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation ("JPML") centralized and transferred Taxotere® (docetaxel) cases involving allegations of permanent alopecia for consolidated pretrial proceedings.  *See In re Taxotere (Docetaxel) Prods. Liab. Litig.*, Multidistrict Litigation ("MDL") 2740, 2016 WL 5845996 (J.P.M.L. Oct. 4, 2016).  The JPML reasoned that "[c]entralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary." *Id.* at 1.[1]  The MDL is pending before Judge Jane Triche Milazzo in the United States District Court for the Eastern District of Louisiana.

3.      On December 11, 2017, Plaintiff Martine Reeder, a resident of New Jersey, commenced this action by filing a Complaint in the Superior Court of New Jersey, Middlesex County, bearing Case No. MID-L-007794-18, against Sanofi U.S. Services Inc., formerly known as Sanofi Aventis U.S. Inc.; Sanofi-Aventis U.S. LLC, separately and doing business as Winthrop U.S.; Sandoz Inc. ("Sandoz"); Hospira, Inc.; Hospira Worldwide, LLC f/k/a Hospira Worldwide,

---

[1] Upon removal of this action, the Hospira Defendants intend to notify the JPML that this case is a "tag-along action" pursuant to Rule 7.1(a) of the Rules of Procedure of the JPML and seek transfer of this action to MDL 2740.

Inc.; Accord Healthcare, Inc. ("Accord"); Mckesson Corporation d/b/a Mckesson Packaging ("McKesson"); Sun Pharma Global FZE; Sun Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical Laboratories, Ltd. ("Sun Pharmaceutical"); Actavis Inc., now known as Actavis LLC; Actavis Pharma, Inc., Actavis LLC f/k/a Actavis Inc. and Actavis Pharma, Inc. (collectively, "Actavis"); and John Doe Drug Company Defendants #1-10.

4.      28 U.S.C. § 1446(a) requires that copies of all process, pleadings, or orders served on the Hospira Defendants are attached to this Notice.  However, as of the date of this Notice, Plaintiff has not yet served the Complaint on the Hospira Defendants.  A copy of the Complaint is attached hereto as **Exhibit A**.

5.      Sanofi U.S. Services Inc. and Sanofi-Aventis U.S. LLC (together, "Sanofi") manufacture Taxotere®, the brand-name version of docetaxel.  (Compl. ¶¶ 11, 12).  The remaining defendants are alleged to have manufactured and/or sold generic formulations of docetaxel approved by the FDA pursuant to § 505(b)(2) of the FDCA.  (*See id.* ¶¶ 25, 40, 51, 64, 74, 86.)

6.      Plaintiff initially asserted product liability claims against all Defendants named in the Complaint based on her alleged use of docetaxel while receiving chemotherapy from November 2015 to April 2016.  (*See id.* ¶ 9.)  Plaintiff's Complaint does not identify which of the Defendants manufactured or sold the docetaxel that allegedly caused her injuries.

7.      Just last month, on October 21, 2019, the Hospira Defendants received Plaintiff's Initial Plaintiff Fact Sheet ("Initial PFS") which states that Hospira was the manufacturer for all docetaxel given to Plaintiff.  A copy of the relevant excerpt from Plaintiff's Initial PFS is attached hereto as **Exhibit B**.

8.      All of Plaintiff's claims against Defendants other than the Hospira Defendants necessarily fail, and this case is now subject to federal diversity jurisdiction.  Under the New Jersey

Product Liability Act, product liability actions are only proper against the manufacturer or seller of the product that allegedly harmed the plaintiff. N.J.S.A. § 2A:58C-2. Accordingly, all Defendants but the Hospira Defendants have been fraudulently joined and their citizenship should be disregarded for purposes of determining diversity jurisdiction. The Hospira Defendants have corporate citizenship in states other than New Jersey; thus there is complete diversity of citizenship between the Hospira Defendants and Plaintiff. (*See* Compl. ¶¶ 6, 36, 37.)

I.  **THIS COURT HAS SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. §§ 1332 AND 1441.**

9.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of $75,000.00, exclusive of costs and interest, and is between citizens of different states.

A.  **The Amount in Controversy Exceeds $75,000.**

10.  It is apparent from the face of the Complaint that Plaintiff seeks recovery of an amount beyond $75,000.00, exclusive of costs and interest. Plaintiff seeks recovery of actual damages, costs of treatment, damages for neuropsychiatric, mental, physical, and economic pain and suffering, mental and emotional anguish, pre-judgment and post judgment interest, punitive damages, costs and expenses of litigation, and attorneys' fees. (*See* Compl., Prayer for Relief.) *See also Dugan v. Acme Markets, Inc.*, No. 15-5267 (RBK-KMW), 2016 WL 266350, at *3 (D.N.J. 2016) (denying motion to remand because general allegations of "severe and painful bodily injuries" satisfied the amount in controversy).

B.  **Complete Diversity of Citizenship Exists Between Plaintiff and the Properly Joined and Served Defendants.**

11.  Plaintiff is a citizen of Pleasantville, Atlantic County, New Jersey. (*See* Compl. ¶ 6.)

12.     Hospira, Inc. is a Delaware corporation with its principal place of business in Illinois.  Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc. is a Delaware limited liability company, and its only member is Hospira, Inc.  Like Hospira, Inc., it is a citizen of Delaware and Illinois.  *(See id.* ¶¶ 36, 37.)

13.     Sanofi U.S. Services Inc. f/k/a sanofi-aventis U.S. Inc. is alleged to be a Delaware corporation with its principal place of business in New Jersey.  (*See id.* ¶ 11.)  Sanofi-aventis U.S. LLC is alleged to be a Delaware limited liability company with its principal place of business in New Jersey.  (*See id.*  ¶ 12.)  Sanofi U.S. Services Inc. f/k/a sanofi-aventis U.S. Inc. is alleged to be the sole member of sanofi-aventis U.S. LLC.  *(See id.*).

14.     Sandoz is alleged to be a Colorado corporation with a principal place of business in New Jersey.  (*See id.* ¶ 22.)

15.     Accord is alleged to be a North Carolina corporation with its principal place of business in North Carolina.  (*See id.* ¶ 47.)

16.     McKesson is alleged to be a Delaware corporation with its principal place of business in California.  (*See id.* ¶ 48.)

17.     Sun Pharma Global FZE is alleged to be an Emirate of Sharjah corporation with its principal place of business in the United Arab Emirates.  (*See id.* ¶ 60.)

18.     Sun Pharmaceutical is alleged to be a New Jersey corporation with its principal place of business in New Jersey.  (*See id.* ¶ 63.)

19.     Pfizer Inc. is alleged to be a Delaware corporation with its principal place of business in New York.  (*See id.* ¶ 71.)[2]

---

[2] Although Plaintiff's Complaint includes allegations regarding Pfizer Inc. in the "Parties" section, Plaintiff's Complaint does not name Pfizer as a Defendant in the case caption or otherwise mention Pfizer as a Defendant in the Complaint.  Thus, Plaintiffs have not properly named Pfizer as a Defendant in this action.  Fed. R. Civ. P. 10(a) (requiring every party to an action be named in the complaint's caption); *see also Abbott v. Atlantic City*, No. 11–4851,

20.     Actavis Inc., now known as Actavis LLC, is a Delaware limited liability corporation with its principal place of business in New Jersey.  The sole member of Actavis LLC is Actavis US Holding LLC.  The sole member of Actavis US Holding LLC is Watson Laboratories, Inc., a Nevada corporation with its principal place of business in New Jersey.  Thus, for purposes of diversity jurisdiction, Actavis LLC is a citizen of Nevada and New Jersey.  Actavis Pharma, Inc. is alleged to be a Delaware corporation with its principal place of business in New Jersey.  (*See id.* ¶ 83.)

### C.     The Forum Defendant Rule Does Not Preclude Removal Because Sanofi, Sandoz, Sun Pharmaceutical, and Actavis Are Fraudulently Joined.

21.     Although Sanofi, Sandoz, Sun Pharmaceutical, and Actavis are New Jersey Defendants, removal is proper.  Where federal jurisdiction is premised only on diversity of the parties, the forum defendant rule applies.  The rule provides: "A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  28 U.S.C. § 1441(b)(2).  However, the fraudulent joinder doctrine "represents an exception to the requirement that removal be predicated solely on complete diversity."  *Brown v. Jevic*, 575 F.3d 322, 326 (3d Cir. 2009).

22.     Under the fraudulent joinder doctrine, joinder of a non-diverse defendant cannot defeat an out-of-state defendant's right of removal if "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendants or seek a joint judgment."  *Boyer v. Snap-on*

---

2017 WL 1137441, at *4 n.4 (D.N.J. Mar. 27, 2017) (finding that, where a party is neither named in the caption nor served with a summons, a complaint's only reference to party in one count insufficient to give the party actual notice they were a party to the action).

*Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (quoting *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 32 (3d Cir. 1985)).

23. If the plaintiff cannot establish a cause of action against a diversity-destroying defendant, the federal district court considering removal may disregard that defendant's citizenship, assume jurisdiction, dismiss that defendant, and retain jurisdiction over the case. *In re Briscoe*, 448 F.3d 201, 216 (3d Cir. 2006) (citing *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999)).

24. A plaintiff may maintain a product liability claim under New Jersey law only against the manufacturer or seller of the product that allegedly harmed the plaintiff. N.J.S.A. §§ 2A:58C-2; 2A:58C-1(b)(3); *see also Coundouris v. Wyeth*, No. ATL-L-1940-10, 2012, WL 2401776 (N.J. Super. Ct. Law Div. June 26, 2012).

25. In this case, because Plaintiff now alleges through her Plaintiff Fact Sheet that only the Hospira Defendants manufactured or sold the docetaxel she claims caused her injury, her claims against all other Defendants fail, and so their citizenship should be disregarded for the purposes of establishing diversity jurisdiction. This case is thus properly removed under 28 U.S.C. § 1441 because the Hospira Defendants are diverse from Plaintiff.

## II. ALL OTHER REQUIREMENTS FOR REMOVAL ARE SATISFIED.

26. Venue lies in this Court because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

27. To date, the Hospira Defendants have not been served. "[T]he removal period for a defendant does not begin to run until that defendant is properly served or until that defendant waives service. … The mere notice of an action, whether in the form of a courtesy copy of a complaint or the representations of counsel, does not start the notice of removal clock without

formal service of process." *Trobiano v. Lagano*, No. 2:19-CV-4886-MCA-SCM, 2019 WL 3416774, at *3 (D.N.J. July 29, 2019).

28.     The Hospira Defendants nonetheless are filing this timely Notice of Removal within 30 days of receipt of Plaintiff's Initial PFS on October 21, 2019, which constitutes the first pleading, process or other paper served on the Hospira Defendants from which it could be ascertained that the case is one that is or has become removable.[3]  28 U.S.C. § 1446(b); *see Foster v. Mutual Fire, Marine & Inland Ins. Co.*, 986 F.2d 48, 50-51 (3d Cir. 1993).  Plaintiff Fact Sheets are considered sufficient as "other paper" under the removal statute.  *Scearce v. 3M Co.*, No. CIV. 12-6676 RBK/JS, 2013 WL 2156060, at *4 n.5 (D.N.J. May 16, 2013).

29.     While this Notice of Removal is being filed more than one year after suit was filed, if removal is based on diversity of citizenship, the one-year limitation does not prohibit removal if "the plaintiff acted in bad faith to prevent the defendant from removing the action."  28 U.S.C. § 1446(c).  "Bad faith is satisfied when 'there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendants or seek a joint judgment.'"  *Hart v. Target Corp.*, No. CV 17–11267 (SRC), 2018 WL 447616, at *1 (D.N.J. Jan. 17, 2018) (citing *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992)).

30.     As of the date of this filing, Plaintiff has yet to serve the Complaint (filed nearly two years ago on December 11, 2017) on the Hospira Defendants or the other Defendants. Plaintiff's failure to properly join and serve Defendants, including the Hospira Defendants, and even after alleging in her Initial PFS that only Hospira's products were used in her treatment,

---

[3] By filing this Notice of Removal, the Hospira Defendants do not concede that Plaintiff has conclusively established product identification as to the Hospira Defendants.

demonstrates that Plaintiff has no real intention of prosecuting this action against the proper parties.

31.     Plaintiff acted in bad faith by suing New Jersey defendants despite having no evidence that their products were used in her treatment.  Plaintiff further acted in bad faith by delaying any efforts to ascertain product identification—the reasonable basis necessary for her to file her claims in the first place—until nearly two years after filing the Complaint.  As of the date of this filing, Plaintiff has not filed an Amended Complaint naming only the Hospira Defendants identified in her Initial PFS.

32.     If Plaintiff had made an effort to investigate product identification before filing suit, or in any reasonable amount of time thereafter—which she is obligated to do in all cases to investigate the merits of her claim—the Hospira Defendants would have had the product identification sent by Plaintiff's counsel long before the expiration of the one-year time period to remove the case.

33.     Plaintiff's bad-faith delay in investigating the basis of her claims, amending her Complaint as to the proper parties, and failure to properly serve the proper parties in interest has robbed the Hospira Defendants of their right to remove within the one-year time period.  This Notice of Removal is therefore timely under 28 U.S.C. § 1446(c).

34.     As required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on counsel for Plaintiff and a copy is being filed with the Superior Court of New Jersey, Middlesex County.

35.     Under 28 U.S.C. § 1446(b)(2)(A), only defendants who have been properly joined and served must join in or consent to the removal of the action.  As none of the Defendants have been served, no consent is required.

36.     Accordingly, the Hospira Defendants have satisfied the procedural requirements for removal, and this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332.

WHEREFORE, the Hospira Defendants respectfully remove this action from the New Jersey Superior Court, Middlesex County, to this Court.

Dated: November 20, 2019                 Respectfully submitted,

                                          By:/s/ Francis X. Manning

                                          Francis X. Manning, Esq.
                                          **STRADLEY RONON STEVENS &**
                                          **YOUNG, LLP**
                                          A Pennsylvania Limited Liability Partnership
                                          Liberty View
                                          457 Haddonfield Road, Suite 100
                                          Cherry Hill, NJ 08002

                                          *Counsel for Defendants Hospira, Inc. and*
                                          *Hospira Worldwide, LLC f/k/a Hospira*
                                          *Worldwide, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, this 20th day of November 2019, I caused to be served a true and correct copy of the above Notice of Removal on the following via electronic mail:

Rayna E. Kessler, Esq.
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
rkessler@robinskaplan.com

Andrew T. Kagan, Esq.
**KAGAN LEGAN GROUP, LLC**
295 Palmas Inn Way, Suite 6
Humanco, PR 00791
andrew@kaganlawgroup.com

*Counsel for Plaintiffs*

*Counsel for Plaintiffs*

**EXHIBIT A**

**ROBINS KAPLAN LLP**
RAYNA E. KESSLER, ESQ.
NJ ID No. 031782010
399 Park Avenue, Suite 3600
New York, NY  10022-4611
Telephone:  (212) 980-7431
Facsimile:  (212) 980-7499
RKessler@robinskaplan.com

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| MARTINE REEDER, | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION - BERGEN COUNTY |
| *Plaintiff,* | : | |
| | : | DOCKET NO.:_____ |
| v. | : | |
| | : | CIVIL ACTION |
| SANOFI U.S. SERVICES INC., | : | |
| formerly known as SANOFI-AVENTIS | : | |
| U.S. INC; SANOFI-AVENTIS U.S. | : | |
| LLC, separately and doing business as | : | **COMPLAINT &** |
| WINTHROP U.S.; | : | **JURY DEMAND** |
| SANDOZ, INC.; | : | |
| HOSPIRA, INC.; | : | |
| HOSPIRA WORLDWIDE, LLC F/K/A | : | |
| HOSPIRA WORLDWIDE, INC.; | : | |
| ACCORD HEALTHCARE, INC.; | : | |
| MCKESSON CORPORATION D/B/A | : | |
| MCKESSON PACKAGING; | : | |
| SUN PHARMA GLOBAL FZE; | : | |
| SUN PHARMACEUTICAL | : | |
| INDUSTRIES, INC. F/K/A | : | |
| CARACO PHARMACEUTICAL | : | |
| LABORATORIES, LTD.; | : | |
| ACTAVIS INC., NOW KNOWN AS | : | |
| ACTAVIS LLC; | : | |
| ACTAVIS PHARMA, INC.; | : | |
| ACTAVIS LLC F/K/A ACTAVIS INC. | : | |
| AND | : | |
| ACTAVIS PHARMA, INC.; | : | |
| JOHN DOE DRUG COMPANY | : | |
| DEFENDANTS #1-10, | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

Plaintiff MARTINE REEDER, by and through Plaintiff's undersigned counsel, brings this civil action against Defendants above-named for personal injuries suffered by Plaintiff MARTINE REEDER, and alleges as follows:

## INTRODUCTION

1.    Plaintiff MARTINE REEDER was injured as a result of her exposure to brand-name drug products Taxotere, Docefrez, Docetaxel Injection Concentrate, and Docetaxel Injection—products also known as docetaxel—(and collectively referred to herein as "Taxotere (docetaxel)"). The products at issue that were approved under Section 505(b) of the Federal Food, Drug, and Cosmetic Act ("FDCA"). These brand-name drug sponsors, manufacturers, labelers, and distributors—Defendants Sanofi U.S. Services, Inc., and Sanofi-Aventis U.S. LLC, separately and doing business as Winthrop U.S.; Sandoz, Inc.; Hospira, Inc.; Hospira Worldwoide, LLC f/k/a Hospira Worldwide, Inc.; Accord Healthcare, Inc.; McKesson Corporation d/b/a McKesson Packaging; Sun Pharma Globa; FZE; Sun Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical Laboratories, LTD.;  Actavis Inc., now known as Actavis, LLC., Actavis Pharma, Inc.; Actavis LLC f/k/a Actavis Inc.; Actavis Pharma, Inc.; and John Doe Defendants #1-10   (collectively "Defendants") —are liable to Plaintiff for damages and such other relief deemed just and proper.

2.    Taxotere (docetaxel) is a chemotherapy drug administered to many who suffer primarily from breast cancer. Defendants, as well as other brand-name drug sponsors, manufacturers, labelers, and distributors of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, have known for years that these drugs cause permanent hair loss, a now well-documented side effect that for years has been publicized in numerous scientific studies, articles, and presentations. Despite this, these brand-name entities failed to warn patients

2

and healthcare providers of the risk of permanent hair loss and report this risk to the Food and Drug Administration ("FDA"). Instead, Defendants hid this devastating side effect. In fact, some brand-name entities still fail to disclose that permanent hair loss is a common side effect.

3.     As a result, there are thousands of women, like the Plaintiff in this case, who underwent chemotherapy using Taxotere (docetaxel) and now suffer from permanent hair loss, a side effect for which they were not warned and were wholly unprepared. Had these women and their healthcare providers known that permanent hair loss could result, they would have selected a different treatment option—effective alternatives to these drugs that do not lead to this devastating side effect are used regularly. *See In re: Taxotere (docetaxel) Products Liability Litigation*, 2:16-md-02740-KDE-MBN (E.D. La.) (MDL No. 2740) (currently pending multidistrict litigation involving thousands of women alleging permanent, disfiguring hair loss due to Taxotere (docetaxel)).

4.     As a result of this undisclosed side effect, Plaintiff has struggled to return to normalcy, even after surviving cancer. An integral element of her identity—her hair—never returned. Plaintiff is stigmatized with the universal cancer signifier—baldness—long after she underwent cancer treatment. Her hair loss acts as a permanent reminder that she is a cancer victim. She defeated cancer yet the image she sees in the mirror each day is that of a cancer patient. This permanent change has altered Plaintiff's self-image, negatively impacted her relationships, and other's perceptions of her, leading to social isolation and depression even long after fighting cancer.

5.     Defendants failed, and still fail, to adequately warn that permanent or irreversible hair loss is a common side effect of Taxotere (docetaxel). As such, Plaintiff was unable to weigh the devastating possibility of permanent hair loss when deciding among a variety of treatment

options. Plaintiff seeks recovery for her mental and physical suffering stemming from permanent and irreversible hair loss.

## THE PARTIES

**A.     Plaintiff.**

6.      Plaintiff was at all relevant times a resident of Pleasantville, Atlantic County, New Jersey.

7.      Plaintiff MARTINE REEDER has suffered personal injuries as a result of the use of Taxotere (docetaxel), including permanent disfigurement and hair loss.

8.      Plaintiff was administered Taxotere (docetaxel) that had been designed, developed, manufactured, sold, distributed, labelled, packaged, promoted, advertised, marketed, tested, and otherwise produced by Defendants Sanofi U.S. Services, Inc., and Sanofi-Aventis U.S. LLC, separately and doing business as Winthrop U.S.; Sandoz, Inc.; Hospira, Inc.; Hospira Worldwoide, LLC f/k/a Hospira Worldwide, Inc.; Accord Healthcare, Inc.; McKesson Corporation d/b/a McKesson Packaging; Sun Pharma Globa; FZE; Sun Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical Laboratories, LTD.;  Actavis Inc., now known as Actavis, LLC., Actavis Pharma, Inc.; Actavis LLC f/k/a Actavis Inc.; Actavis Pharma, Inc.; and John Doe Defendants #1-10 (collectively "Defendants") .

9.      Plaintiff was administered Taxotere (docetaxel) between November 2015 to April 2016, in the State of New Jersey, at the AtlanticCare Cancer Care Institute in Egg Harbor Township, Atlantic County, New Jersey.

**B.     Sanofi-Related Entities & Taxotere (Docetaxel).**

10.     Upon information and belief, at the direction of Sanofi S.A., Aventis Pharma S.A. licensed the patents for Taxotere (docetaxel) to Sanofi US Services Inc. and Sanofi-Aventis U.S. LLC (collectively "Sanofi").

4

11.     Sanofi US Services Inc. f/k/a Sanofi-Aventis U.S. Inc. is a Delaware corporation, with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi US Services Inc. is a wholly owned subsidiary of Sanofi S.A. Sanofi US Services Inc. engages in research and development, testing, manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing of prescription drugs, including Taxotere (docetaxel).

12.     Sanofi-Aventis U.S. LLC is a Delaware limited liability company, with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi-Aventis U.S. LLC is a wholly owned subsidiary of Sanofi S.A., and Sanofi S.A. is Sanofi-Aventis U.S., LLC's sole member. Sanofi-Aventis U.S. LLC engages in research and development, testing, manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing of prescription drugs, including Taxotere (docetaxel).

13.     Sanofi-Aventis U.S. LLC d/b/a Winthrop U.S. operates, promotes, markets, sells, distributes generic pharmaceutical products under the name of Winthrop U.S., which is a business unit and/or division operating within and part of Sanofi-Aventis U.S. LLC.

14.     Since 2006, Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. have collectively served as the U.S. operational front for Sanofi S.A. in the U.S. prescription drug market. Prior to 2006, Aventis Pharmaceuticals Inc. served as the U.S. operational front for Sanofi S.A. in the U.S. prescription drug market until Aventis Pharmaceuticals Inc. merged with Sanofi S.A.

15.     Sanofi S.A. and Aventis Pharma S.A., through Sanofi-Aventis U.S. LLC and Sanofi US Services Inc., marketed Taxotere throughout the United States by providing marketing information regarding Taxotere (docetaxel) to health care providers and similarly soliciting purchases for the drug.

16.     Sanofi S.A. and Aventis Pharma S.A., through Sanofi-Aventis U.S. LLC and Sanofi US Services Inc., distributed and sold Taxotere (docetaxel) to healthcare providers and patients throughout the United States.

**C.     Other Brand Name Drug Sponsors, Manufacturers, Labelers, and Distributors & Taxotere (Docetaxel).**

17.     In addition to the Sanofi-related entities, other brand-name entities obtained approval to market new drugs with the proprietary names Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate. Their new drug applications were approved under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), codified at 21 U.S.C. § 355(b)(2).

18.     A 505(b)(2) application is a subset of NDA, and it is subject to the NDA approval requirements set out in section 505(b) and (c) of the FDCA. As such, it must satisfy the requirements for safety and effectiveness information.

19.     A 505(b)(2) application contains full reports of investigations of safety and effectiveness, where at least some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference.

20.     Accordingly, a 505(b)(2) applicant may rely on the findings of safety and effectiveness of a listed drug to the extent the new product seeking approval and the listed drug are the same. Otherwise, to the extent the products are different, a 505(b)(2) application, like a 505(b)(1) application, must include sufficient data to demonstrate that the product with those different aspects meets the statutory approval standard for safety and effectiveness.

21.     A drug approved under the 505(b)(2) approval pathway is not a generic copy of a brand-name drug. Section 505(b)(2) is not an appropriate approval pathway for an application for

a duplicate drug eligible for approval under section 505(j) of the FDCA (the Abbreviated New Drug Application process).

### 1.  *Sandoz.*

22.     Defendant Sandoz Inc. ("Sandoz") is a pharmaceutical company organized and existing under the laws of the State of Colorado with a principal place of business at 100 College Road West, Princeton, New Jersey 08540.

23.     Defendant Sandoz has transacted and conducted business throughout the United States, including the State of New Jersey.

24.     Defendant Sandoz has derived substantial revenue from goods and products designed, manufactured, marketed, advertised, promoted, sold, and distributed throughout the United States, including the State of New Jersey.

25.     At all relevant times, Defendant Sandoz has been in the business of designing, testing, manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing Docetaxel Injection approved by the FDA under New Drug Application ("NDA") #201525.

26.     The proprietary name for Defendant Sandoz's branded drug is Docetaxel Injection.

27.     Defendant Sandoz expected that Docetaxel Injection would be sold, purchased, and used throughout the United States.

28.     Defendant Sandoz filed NDA application #201525 on September 16, 2010, under Section 505(b)(2). Its application relied for its approval on FDA's findings of safety and effectiveness for the reference listed drug Taxotere.

29.     Sandoz's formulation of Docetaxel Injection, however, is different from Taxotere in that it contains less polysorbate 80 and more 96 percent ethanol. Also, it contains polyethylene glycol 300 as a solubizer and anhydrous citric acid for pH adjustment.

7

30.     Sandoz received FDA approval for NDA #201525 on June 29, 2011 and began marketing the drug in the United States on August 15, 2011.

31.     When the drug was approved, a portion of the Patient Counseling Information read as follows: "Explain to patients that side effects such as […] hair loss are associated with docetaxel administration." It also stated that one of the "most common side effects of Docetaxel Injection" is "hair loss." Neither of these statements refer to permanent hair loss.

32.     Since approval, Sandoz has submitted multiple Changes Being Effected Supplemental New Drug Applications ("CBE sNDA") to update labeling. It submitted a CBE sNDA (S-002) on July 29, 2011 that was approved on March 15, 2012, and a CBE sNDA (S-003) on August 15, 2013 that was approved on April 23, 2014. Neither submission, however, updated labeling concerning hair loss.

33.     On October 21, 2016, the FDA approved Sandoz's CBE sNDA, submitted on March 7, 2016, "to include information on permanent or irreversible alopecia to Section 6.2 (Post-marketing Experience), Section 17 (Patient Counseling Information) of the Package Insert, and the Patient Package Insert (PPI) labeling."

34.     As of December 2015, under "Post-Marketing Experiences," the labeling states: "Cases of permanent alopecia have been reported." Its Patient Counseling Information states that "side effects such as […] hair loss (cases of permanent hair loss have been reported) are associated with docetaxel administration." Its patient information also states that the "most common side effects" include "hair loss, in most cases normal hair growth should return. In some cases (frequency not known) permanent hair loss has been observed."

35.     There is no mention of the risk of permanent or irreversible hair loss, however, in the Warnings and Precautions or Adverse Reactions portions of its labeling.

2.    *Hospira Entities.*

36.    Defendant Hospira, Inc. is a pharmaceutical company organized and existing under the laws of the State of Delaware with a principal place of business at 275 N. Field Drive, Lake Forest, Illinois 60045.

37.    Defendant Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc. is a pharmaceutical company organized and existing under the laws of the State of Delaware with a principal place of business at 275 N. Field Drive, Lake Forest, Illinois 60045.

38.    Defendants Hospira, Inc. and Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc. (collectively "Hospira") have transacted and conducted business throughout the United States, including the State of Colorado.

39.    Hospira has derived substantial revenue from goods and products designed, manufactured, marketed, advertised, promoted, sold, and distributed throughout the United States, including the State of Colorado.

40.    At all relevant times, Hospira has been in the business of designing, testing, manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing Docetaxel Injection approved by the FDA under NDA #022234. Hospira expected that Docetaxel Injection would be sold, purchased, and used throughout the United States, including the State of Colorado.

41.    Hospira filed NDA #022234 on July 11, 2007 under Section 505(b)(2). Its application relied for its approval on FDA's findings of safety and effectiveness for the reference listed drug Taxotere.

42.    Hospira's formulation, however, is different from Taxotere's formulation in several ways. First, upon the filing of its NDA in 2007, its pre-mixed, one-vial solution differed from Taxotere's original two-vial formulation, which required initial dilution. (Taxotere's one-

9

vial, "ready-to-use" formulation was not FDA approved until 2010.) Second, it is packaged at a concentration of 10 mg / mL, which is one-fourth of the strength of two-vial Taxotere and one-half the strength of one-vial Taxotere. Third, Hospira's 10 mg / mL formulation was marketed in a 160 mg vial, in addition to 20 mg and 80 mg vials. Fourth, whereas Taxotere labels all its dosage forms as "single-use," Hospira's 80 mg and 160 mg formulations are marketed as "multi-use." Fifth, unlike Taxotere, Hospira's Docetaxel Injection contains both citric acid and polyethylene glycol 300.

43.     Hospira received FDA approval for NDA #022234 on March 8, 2011 and began marketing the drug in the United States on March 17, 2011.

44.     When the drug was approved, a portion of the Patient Counseling Information read as follows: "Explain to patients that side effects such as […] hair loss are associated with docetaxel administration." It also stated that one of the "most common side effects of Docetaxel Injection" is "hair loss." Neither of these statements refer to permanent hair loss.

45.     On September 11, 2013, Hospira submitted a "Prior Approval" sNDA (S-003) adding certain indications consistent with Taxotere's package insert at the time. Hospira also included in this sNDA new safety information concerning ethanol intoxication, which the FDA had requested Hospira add by letter of April 21, 2014. The FDA approved this sNDA on July 10, 2014. This update, the most recent revision, did not concern hair loss.

46.     There is no mention of the risk of permanent or irreversible hair loss in its labeling.

### 3., 4.     Accord Healthcare & McKesson.

47.     Accord Healthcare, Inc. ("Accord") is a pharmaceutical company organized and existing under the laws of the State of North Carolina with a principal place of business at 1009 Slater Road, Suite 210-B, Durham, North Carolina 27703.

48.     McKesson Corporation d/b/a McKesson Packaging ("McKesson") is a pharmaceutical company organized and existing under the laws of the State of Delaware with a principal place of business at One Post Street, San Francisco, California 94104.

49.     Accord and McKesson have transacted and conducted business throughout the United States.

50.     Accord and McKesson have derived substantial revenue from goods and products designed, manufactured, marketed, advertised, promoted, sold, and distributed throughout the United States.

51.     At all relevant times, Accord has been in the business of designing, testing, manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing Docetaxel Injection approved by the FDA under NDA #201195. Accord expected that Docetaxel Injection would be sold, purchased, and used throughout the United States.

52.     At all relevant times, McKesson has been in the business of packaging and distributing Docetaxel Injection approved by the FDA under NDA #201195. McKesson expected that Docetaxel Injection would be sold, purchased, and used throughout the United States.

53.     Accord filed NDA #201195 on December 7, 2010, under Section 505(b)(2). Its application relied for its approval on FDA's findings of safety and effectiveness for the reference listed drug Taxotere.

54.     Accord's two-vial formulation, however, was different from Taxotere's two-vial formulation in that it added new excipients citric acid (as a pH adjusting agent) and polyethylene glycol (PEG 400) (added to the diluent vial at 13 percent w/v). A one-vial formulation by Accord was later added in the same concentration and doses as the one-vial Taxotere, with the addition of a 160 mg / 8 mL "multiple dose" form.

55.     Accord received FDA approval for NDA #201195 on June 8, 2011 and began marketing the drug in the United States on August 15, 2011.

56.     When the drug was approved, a portion of the Patient Counseling Information read as follows: "Explain to patients that side effects such as […] hair loss are associated with docetaxel administration." It also stated that one of the "most common side effects of Docetaxel Injection" is "hair loss." Neither statement refers to permanent hair loss.

57.     On November 14, 2013, Accord submitted a CBE sNDA (S-006) that was unrelated to hair loss. It was approved on July 3, 2014. Prior to that, Accord had also submitted a Manufacturing sNDA (S-004) that, upon information and belief, resulted in various labeling changes on or before April 5, 2013, which did not relate to hair loss.

58.     Accord submitted a CBE sNDA (S-009) that was approved on July 26, 2016. As a result, the current label states that "[c]ases of permanent alopecia have been reported." Patient Counseling Information directs: "Explain to patients that side effects such as […] hair loss (cases of permanent hair loss have been reported) are associated with docetaxel administration." The Patient Information section now reads, in part: "The most common side effects of Docetaxel Injection include […] hair loss, in most cases normal hair growth should return. In some cases (frequency not known), permanent hair loss has been observed."

59.     There is no mention of the risk of permanent or irreversible hair loss, however, in the Warnings and Precautions or Adverse Reactions portions of its labeling.

### 5.     *Sun Pharma Entities.*

60.     Sun Pharma Global FZE ("Sun Pharma Global") is a pharmaceutical company organized and existing under the laws of the Emirate of Sharjah with a principal place of business at Executive Suite #43, Block &, SAIF Zone, P.O. Box 122304, Sharjah, United Arab Emirates.

61.     Sun Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical Laboratories, Ltd. ("Sun Pharma") is a pharmaceutical company organized and existing under the laws of New Jersey with a principal mailing address of 270 Prospect Plains Road Cranbury, NJ 08512 United States.

62.     Sun Pharma Global has transacted and conducted business throughout the United States, on its own behalf and through its agent and distributor Sun Pharma

63.     Sun Pharma Global and Sun Pharma have derived substantial revenue from goods and products designed, manufactured, marketed, advertised, promoted, sold, and distributed throughout the United States.

64.     At all relevant times, Sun Pharma Global and Sun Pharma have been in the business of designing, testing, manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing Docefrez, approved by the FDA under NDA #022534. Sun Pharma Global and Sun Pharma expected that Docefrez would be sold, purchased, and used throughout the United States.

65.     Sun Pharma Global filed NDA #022534 on April 23, 2009 under Section 505(b)(2). Its application relied for its approval on FDA's findings of safety and effectiveness for the reference listed drug Taxotere.

66.     Sun Pharma Global's two-vial docetaxel formulation, however, is different from Taxotere's two-vial formulation for several reasons. First, as opposed to Taxotere's active ingredient vial, which solution is viscous, Sun Pharma Global's active ingredient vial contains a powder. Second, and relatedly, Sun Pharma Global's polysorbate 80 is found in the diluent vial. Third, Sun Pharma Global's diluent vial contains a higher percentage of ethanol (35.4 percent) than Taxotere's (13 percent). Fourth, Sun Pharma Global's concentration is two times that of the

13

two-vial Taxotere.

67.    Sun Pharma Global received FDA approval for NDA #022534 on May 3, 2011

and began marketing the drug in the United States in May 2011.

68.    When the drug was approved, a portion of the Patient Counseling Information

read as follows: "Explain to patients that side effects such as […] hair loss are associated with

docetaxel administration." It also stated that one of the "most common side effects of" the drug

is "hair loss." Neither of these statements refer to permanent hair loss.

69.    Sun Pharma Global submitted, through its agent Sun Pharma, a CBE sNDA (S-

002) to the FDA on July 28, 2011, for a label change that was approved on July 13, 2012. It also

submitted a "Prior Approval" sNDA (S-004) for a label change through its agent Sun Pharma on

May 22, 2014, which was approved on October 30, 2014. Neither change related to hair loss.

70.    Sun Pharma Global and Sun Pharma ceased marketing Docefrez in November

2015, and at no time has the labeling for Docefrez referred to permanent or irreversible hair loss.

### 6.    *Pfizer.*

71.    Pfizer Inc. ("Pfizer") is a pharmaceutical company organized and existing under

the laws of the State of Delaware with a principal place of business at 235 E 42nd Street, New

York, New York 10017.

72.    Pfizer has transacted and conducted business throughout the United States.

73.    Pfizer has derived substantial revenue from goods and products designed,

manufactured, marketed, advertised, promoted, sold, and distributed throughout the United

States.

74.    At all relevant times, Pfizer has been in the business of designing, testing,

manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing Docetaxel

Injection approved by the FDA under NDA #202356. Pfizer expected that its Docetaxel Injection

14

would be sold, purchased, and used throughout the United States.

75.     Pfizer filed NDA #202356 on September 13, 2013, under Section 505(b)(2). Its application relied for its approval on FDA's findings of safety and effectiveness for the reference listed drug Taxotere.

76.     Pfizer's one-vial formulation, however, was different from Taxotere's one-vial formulation in that it added 130 mg / 13 mL and 200 mg / 20 mL dosage forms. Further, ethanol and propylene glycol were added as excipients in amounts greater than in Taxotere.

77.     Pfizer received FDA approval for NDA #202356 on March 13, 2014 and began marketing the drug in the United States on June 23, 2014.

78.     When the drug was approved, a portion of the Patient Counseling Information read as follows: "Explain to patients that side effects such as [...] hair loss are associated with docetaxel administration." It also stated that one of the "most common side effects of" the drug is "hair loss." Neither of these statements refer to permanent hair loss.

79.     Pfizer stopped marketing the 200 mg / 20 mL dosing of its Docetaxel Injection on October 31, 2016. In addition, Pfizer stopped marketing the 20 mg / 2 mL dosing and the 80 mg / 8 L dosing of its Docetaxel Injection on December 31, 2016.

80.     Upon information and belief, Pfizer continues to market that 130 mg / 13 mL dosing of its Docetaxel Injection.

81.     There is no mention of the risk of permanent or irreversible hair loss in its labeling.

### 7.     *Actavis Entities.*

82.     Actavis Inc., now known as Actavis LLC, is a pharmaceutical limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054.

83.     Actavis Pharma, Inc. is a pharmaceutical company organized and existing under the laws of the State of Delaware with a principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054. In 2016, Teva Pharmaceutical Industries, Ltd. acquired Actavis Pharma, Inc. Prior to 2016, Actavis Pharma, Inc. was a wholly owned subsidiary of Actavis LLC f/k/a Actavis Inc.

84.     Actavis LLC f/k/a Actavis Inc. and Actavis Pharma, Inc. (collectively "Actavis") transacted and conducted business throughout the United States.

85.     Actavis derived substantial revenue from goods and products designed, manufactured, marketed, advertised, promoted, sold, and distributed throughout the United States.

86.     At all relevant times, Actavis was in the business of designing, testing, manufacturing, labeling, advertising, marketing, promoting, selling and/or distributing Docetaxel Injection Concentrate approved by the FDA under NDA #203551. Actavis expected that Docetaxel Injection Concentrate would be sold, purchased, and used throughout the United States.

87.     Actavis filed NDA #203551 on March 14, 2012 under Section 505(b)(2). Its application relied for its approval on FDA's findings of safety and effectiveness for the reference listed drug Taxotere.

88.     Actavis' one-vial formulation, however, was different from Taxotere's one-vial formulation because it is offered at an additional 140 mg dosage form, contains excipients citric acid and Kollidor 12 PF (Povidone k12), and uses reduced levels of polysorbate 80. After Actavis' initial docetaxel approval, a 160 mg dosage form was also introduced.

89.     Actavis received FDA approval for NDA #203551 on April 12, 2013 and began

marketing these dosage forms on July 1, 2013.

90.    When the drug was approved, a portion of the Patient Counseling Information read as follows: "Explain to patients that side effects such as […] hair loss are associated with docetaxel administration." It also stated that one of the "most common side effects of" the drug is "hair loss." Neither of these statements refer to permanent hair loss.

91.    Actavis submitted a CBE sNDA (S-001) on May 14, 2013, which was approved on November 4, 2013. Actavis also submitted a "Prior Approval" sNDA (S-002) on March 21, 2014, which was approved on September 17, 2014. Neither resulting label change related to hair loss.

92.    There is no mention of the risk of permanent or irreversible hair loss in its labeling.

**D.    John Doe Defendants #1-10.**

93.    On information and belief, John Doe Drug Company Defendants #1-10, whose specific identities are currently unknown to Plaintiff, are the individuals, business entities, and corporations within the chain of commerce, that manufactured the Taxotere (docetaxel) products for marketing, sale and distribution to Plaintiff and other members of the American consuming public.  The pseudonymous designations are being used to preserve claims against these parties who will be named more fully if and when their identities are uncovered.

**E.    All Defendants.**

94.    The term "Defendants" is used hereafter to refer to all the entities named above.

95.    Defendants are corporations organized under the laws of various states of the United States of America that were or are doing business within the State of New Jersey.  The aforementioned Defendants designed, marketed, sold, distributed, packaged, promoted, labeled,

researched, tested or manufactured the Taxotere (docetaxel) product(s) which was administered to Plaintiff.

96.     At all times relevant to this action, all Defendants and each of them were in the capacity of the principal or agent of all of the other Defendants, and each of them, and acted within the scope of their principal and agent relationships in undertaking their actions, conduct, and omissions alleged in this Complaint.  All Defendants, and each of them, acted together in concert or aided and abetted each other and conspired to engage in the common course of misconduct alleged herein for the purpose of reaping substantial monetary profits from the sale of the Taxotere (docetaxel) products and for the purpose of enriching themselves financially to the serious detriment of Plaintiff's health and well-being.


## JURISDICTION AND VENUE

97.     At all times relevant to this action, the Defendants have been engaged either directly or indirectly in the business of marketing and promoting Taxotere (docetaxel) within the State of New Jersey, with a reasonable expectation that the products would be used or consumed in this state, and thus regularly solicited or transacted business in this state and across the United States.

98.     At all times relevant to this action, the Defendants have been engaged either directly or indirectly in the business of distributing Taxotere (docetaxel) within the State of New Jersey, with a reasonable expectation that the products would be used or consumed in this state and across the United States, and thus have regularly solicited or transacted business in this state.

99.     At all times relevant to this action, the Defendants have been engaged either directly or indirectly, in the business of selling Taxotere (docetaxel) within the State of New

Jersey, with a reasonable expectation that the products would be used or consumed in this state and across the United States, and thus have regularly solicited or transacted business in this state.

100.    At all times relevant to this action, the Defendants were engaged in disseminating inaccurate, false, and misleading information about the Taxotere (docetaxel) to physicians in all states in the United States, including the State of New Jersey, with a reasonable expectation that the misleading information would be used and relied upon by physicians throughout the United States, including the State of New Jersey.

101.    Defendant Sanofi US Services Inc. is a resident of New Jersey because its principal place of business is in the state.

102.    Defendant Sanofi-Aventis U.S. LLC is a resident of New Jersey because its principal place of business is in the state.

103.    Defendant Sandoz Inc. is a resident of New Jersey because its principal place of business is in the state.

104.    Venue is proper in this county pursuant to Rule 4:3-2 because the Defendants are doing business within Bergen County, including the sale, marketing, promotion and distribution of the Taxotere (docetaxel) products relevant to this action.

## FACTUAL BACKGROUND

I.    **Plaintiff.**

105.    Plaintiff MARTINE REEDER has suffered personal injuries as a result of the use of Taxotere (docetaxel), including permanent disfigurement, permanent hair loss.

106.    Plaintiff was administered Taxotere (docetaxel) between November 2015 to April 2016, in the State of New Jersey, at the AtlantiCare Cancer Care Institute in Egg Harbor

Township, Atlantic County.

107.   Plaintiff was administered Taxotere (docetaxel) that had been designed, developed, manufactured, sold, distributed, labelled, packaged, promoted, advertised, marketed, tested, and otherwise produced by Defendants.

108.   Plaintiff has suffered personal injuries as a direct and proximate result of Defendants' conduct and misconduct as described herein and in connection with the design, development, manufacture, testing, packaging, promotion, advertising, marketing, distribution, labeling, warning, and sale of Taxotere (docetaxel).

109.   Plaintiff files this lawsuit within the applicable statute of limitations period of first suspecting that these drugs made by these particular Defendants caused the appreciable harm she sustained and alleges herein. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of her injuries as the cause was unknown to Plaintiff. Plaintiff did not suspect, nor did she have reason to suspect that she had been injured, the cause of her injuries, or the tortious nature of the conduct causing her injuries until a date prior to the filing of these actions, which is less than the applicable limitations period for filing suit.

110.   Additionally, Plaintiff was prevented from discovering this information at an earlier date because: (1) Defendants misrepresented to the public, the FDA, and the medical profession that Taxotere (docetaxel) are free from permanent side effects; (2) Defendants failed to disclose to the public, the FDA, and the medical profession their knowledge of the risk of permanent side effects; and (3) Defendants fraudulently concealed facts and information that could have led Plaintiff to discover the liability of the Defendants.

111.   None of Plaintiff's injuries were warned of. Neither Defendants nor the healthcare providers who administered Taxotere (docetaxel) to Plaintiff had informed her that hair loss

would be permanent. To the contrary, Defendants had made representations, assertions, suggestions, and/or warnings that any hair loss suffered would be temporary in nature.

112.    Plaintiff believed Defendants' representations that her hair loss was temporary.

113.    Plaintiff would not have used Taxotere (docetaxel) had the Defendants properly disclosed the risks associated with its use.

## II.    Development, Approval, and Labeling Changes for Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez.

114.    Taxotere (docetaxel) is a drug used in the treatment of various forms of cancer, including breast cancer, and is a part of a family of cytotoxic drugs referred to as taxanes.

115.    Taxanes are derived from yew trees, and unlike other cytotoxic drugs, taxanes inhibit the multiplication of cancer cells by over-stabilizing the structure of a cancer cell, which prevents the cell from breaking down and reorganizing for cell reproduction. They are widely used as chemotherapy agents.

116.    The development of taxanes began in the 1960s. Bristol-Myers Squibb developed, manufactured, and distributed the first commercially available taxane in the United States, known as Taxol (paclitaxel).

117.    Taxol is the main competitor drug to Taxotere, and has been on the market since 1993.

118.    Both docetaxel (Taxotere) and paclitaxel (Taxol) disrupt the microtubular network in cells that is essential for mitotic and interphase cellular function in the cell multiplication process.

119.    Taxotere began as a two-vial product. One vial is called a concentrate, and it contains docetaxel, along with polysorbate 80 and residual amounts of ethanol. The other vial is a diluent, containing water and ethanol.

120.    The concentrate vial and the diluent vial are combined to form a "premix." A premix can be added to an intravenous bag to make a prefusion.

121.    Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez are not purchased by patients at a pharmacy; rather, patients use of these drugs occurs via administration through injection and/or intravenously at a physician's office or medical treatment facility.

122.    In the 1980s scientists at Rhône-Poulenc Rorer S.A., Sanofi S.A.'s predecessor-in-interest, began developing Taxotere with the intention of making a more potent taxane. Since that time, Sanofi S.A., Aventis Pharma S.A., Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and their affiliates and predecessors-in-interest (collectively "Sanofi") have controlled the development and been the owner, holder, or assignee of the patents related to Taxotere.

123.    Phase I clinical testing of Taxotere began in 1990 (called the "TAX 001" study) and continued until 1992. Sanofi reported the results of clinical testing in May 1994.

124.    Soon thereafter, on July 27, 1994, Sanofi applied for FDA approval for Taxotere under NDA #20449. The FDA's Oncologic Drugs Advisory Committee panel unanimously denied approval of the drug, requesting more data on toxicity, side effects, and phase III test results.

125.    After additional clinical testing, the FDA approved Taxotere in May 14, 1996 for limited use—namely, for the treatment of patients with locally advanced or metastatic breast cancer that had either (1) progressed during anthracycline-based therapy or (2) relapsed during anthracycline-based adjuvant therapy.

126.    After the initial approval, Sanofi sought and received FDA approval for additional indications. Based on self-sponsored clinical trials, Sanofi claimed Taxotere's superiority over

competing chemotherapy products approved for breast cancer treatment, including claiming superior efficacy over the lower potency paclitaxel (Taxol), its primary competitor.

127.    On June 22, 1998, the FDA approved a slightly broader indication for Taxotere that extended its use to patients with locally advanced or metastatic breast cancer as treatment after "failure of prior chemotherapy."

128.    That same year, Sanofi obtained FDA approval in December 1999 for use of Taxotere in treating "locally advanced or metastatic non-small cell lung cancer after failure of prior platinum-based chemotherapy."

129.    As with all prior FDA-approved indications for Taxotere, the drug was approved at this time, and until late 2002, only as a second-line of treatment, meaning that Sanofi was prohibited from promoting Taxotere for use in patients who had not undergone and failed a specified first-line of treatment.

130.    As of December 23, 1999, hair loss was listed as a "possible side effect[] of Taxotere." The label elaborated: "Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows, and eyelashes) [… .] Once you have completed all your treatments, hair generally grows back."

131.    Sanofi obtained FDA approval in November 2002 for use of Taxotere "in combination with cisplatin for the treatment of patients with unresectable, locally advanced or metastatic non-small cell lung cancer who have not previously received chemotherapy for this condition."

132.    Sanofi obtained FDA approval in May 2004 for use of Taxotere "in combination with prednisone as a treatment for patients with androgen independent (hormone refractory) metastatic prostate cancer."

23

133.    Later that year, Sanofi obtained FDA approval in August 2004 for use of Taxotere "in combination with doxorubicin and cyclophosphamide for the adjuvant treatment of patients with operable node-positive breast cancer."

134.    In March 2006, Sanofi obtained FDA approval for use of Taxotere "in combination with cisplatin and fluorouracil for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who have not received prior chemotherapy for advanced disease."

135.    Sanofi obtained FDA approval in October 2006 for use of Taxotere "in combination with cisplatin and fluorouracil for the induction treatment of patients with inoperable locally advanced squamous cell carcinoma of the head and neck (SCCHN)." In September 2007, FDA approved a broader SCCHN indication that removed the condition of inoperability.

136.    The 2010 version of the prescribing information stated under "Patient Counseling Information" that "side effects such as […] hair loss are associated with docetaxel administration." "Patient Information" indicated that the "most common side effects of TAXOTERE include: […] hair loss." The document contains no mention of irreversible or permanent hair loss. The November 2014 version of this labeling information contains the same text.

137.    Sanofi obtained FDA approval in May 2010 to add language related to pediatric safety and efficacy, including: "The overall safety profile of TAXOTERE in pediatric patients receiving monotherapy or TCF was consistent with the known safety profile for adults."

138.    Sanofi submitted a CBE sNDA on November 24, 2015 concerning "permanent or irreversible alopecia."

139.    On December 11, 2015, FDA approved the sNDA. Under "Patient Counseling Information," the new label text reads: "Explain to patients that side effects such as […] hair loss (cases of permanent hair loss have been reported) are associated with docetaxel administration." Additionally, under "Patient Information," the label states that the "most common side effects of TAXOTERE include: […] hair loss: in most cases normal hair growth should return. In some cases (frequency not known) permanent hair loss has been observed." This is the latest and currently operative warning regarding permanent or irreversible alopecia in the Taxotere label. The label contains no mention of irreversible or permanent hair loss under "Warnings and Precautions" or "Adverse Reactions."

### III.    Defendants' Duties Under the FDCA and State Law.

140.    The primary responsibility for timely communicating complete, accurate and current safety and efficacy information related to prescription drugs rests with NDA holders/drug sponsors (such as manufacturers or labelers) and their assigns or agents; they have superior, and in many cases exclusive, access to the relevant safety and efficacy information, including post-market complaints and data.

141.    To fulfill their essential responsibilities, these entities must vigilantly monitor all reasonably available information. They must closely evaluate the post-market clinical experience of their drugs and timely provide updated safety and efficacy information to the healthcare community and to consumers.

142.    When monitoring and reporting adverse events, as required by both federal regulations and state law, time is of the essence. The purpose of monitoring a product's post-market experience is to detect potential safety signals that could indicate to drug sponsors and the medical community that a public safety problem exists. If, for example, a manufacturer were

to delay in reporting post-market information, that delay could mean that researchers, FDA, and the medical community are years behind in identifying a public safety issue associated with the drug. In the meantime, more patients are harmed by using the product without knowing, understanding, and accepting its true risks. This is why drug sponsors must not only completely and accurately monitor, investigate and report post-market experiences, but they must also report the data in a timely fashion.

143.    Because complete information about the safety of a drug cannot be known at the time of approval, and because the true picture of a product's safety profile emerges over time because of use by patients, it is a central premise of federal drug regulation that the NDA holders and their assigns or agents—not the FDA—bear responsibility for the content of its label at all times. Consequently, NDA holders are primarily responsible for crafting an adequate label and ensuring that warnings remain adequate as long as the drug is on the market.

144.    A drug is "misbranded" in violation of the FDCA when its labeling is false and misleading, or does not provide adequate directions for use and adequate warnings. See 21 U.S.C. §§ 321(n); 331(a), (b), (k); 352(a), (f). A drug's labeling satisfies federal requirements if it gives physicians and pharmacists sufficient information—including indications for use and "any relevant hazards, contraindications, side effects, and precautions"—to allow those professionals "to use the drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.100(c)(1).

145.    As part of their responsibility to monitor post-market clinical experiences with the drug and provide updated safety and efficacy information to the healthcare community and to consumers, each approved NDA applicant, whether under 505(b)(1) or (2), "must promptly review all adverse drug experience information obtained or otherwise received by the applicant

from any source, foreign or domestic, including information derived from commercial marketing experience, post marketing clinical investigations, post marketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers." 21 C.F.R. § 314.80(b). Any report of a "serious and unexpected" drug experience, whether foreign or domestic, must be reported to the FDA within 15 days and must be promptly investigated by the manufacturer. 21 C.F.R. § 314.80(c)(1)(i-ii). Most other adverse event reports must be submitted quarterly for three years after the application is approved and annually thereafter. 21 C.F.R. § 314.80(c)(2)(i). These periodic reports must include a "history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated)." 21 C.F.R. § 314.80(c)(2)(ii).

146.    Federal law requires labeling to be updated as information accumulates: "labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 21 C.F.R. § 201.57(c)(6)(i). Thus, for example, drug manufacturers must warn of an adverse effect where there is "some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." 21 C.F.R. § 201.57(c)(7).

147.    All changes to drug labeling require FDA assent. 21 C.F.R. § 314.70(b)(2)(v)(A). Brand-name drug sponsors, including those whose drugs were approved under Section 505(b)(2), may seek to change their approved labels by filing a supplemental application. 21 C.F.R. § 314.70.

148.    One regulation, the "Changes Being Effected" (CBE) regulation, permits a manufacturer to unilaterally change a drug label to reflect "newly acquired information," subject to later FDA review and approval. 21 C.F.R. § 314.70(c)(6)(iii). Newly acquired information

includes "new analyses of previously submitted data." 21 C.F.R. § 314.3(b). Thus, for instance, if a drug sponsor were to determine that a warning were insufficient based on a new analysis of previously existing data, it could submit a CBE and change its labeling.

149.    The longer a drug sponsor delays updating its labeling so that it reflects current safety information, the more likely it is that medical professionals will continue to prescribe drugs without advising patients of harmful side effects, and the more likely it is that patients will suffer harmful side effects without the opportunity to evaluate risks for themselves.

## IV.    Defendants Knew That Taxotere (docetaxel) May Cause Permanent Alopecia.

150.    Beginning in 1998, Sanofi sponsored a trial entitled GEICAM 9805. It was initiated to compare the effects of a regimen of fluorouracil, doxorubicin, and cyclophosphamide ("FAC") with a regimen of docetaxel, doxorubicin, and cyclophosphamide ("TAC") in patients with high-risk, node-negative breast cancer. Between June 1999 and March 2003, a total of 1060 patients from 55 centers were randomly assigned to receive either TAC or FAC. By 2005, it knew that the GEICAM 9805 study demonstrated that 9.2 percent of patients who took Taxotere had persistent alopecia, or hair loss, for up to 10 years and 5 months, and in some cases longer.

151.    In December 2006, an oncologist from Denver, Colorado, Dr. Scot Sedlacek, presented a study entitled "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer." Dr. Sedlacek tracked patients in three groups: Group A (doxorubicin regimen without a taxane); Group B (doxorubicin plus paclitaxel) and Group C (doxorubicin plus docetaxel). No women in Group A or Group B experienced persistent significant alopecia, but 6.3 percent of those in Group C did. Dr. Sedlacek concluded "that when docetaxel is administered after 4 doses of AC, there is a small but significant possibility of poor hair regrowth lasting up to 7 years. Such an emotionally

devastating long term toxicity from this combination must be taken into account when deciding on adjuvant chemotherapy programs in women who likely will be cured of their breast cancer."

152.    On November 21, 2008, Sanofi responded to an inquiry from a patient in the United Kingdom concerning Taxotere and the incidence of permanent alopecia. That letter acknowledged that "one reference of non-reversible alopecia" had been identified. Its letter cited a paper published in the journal of Clinical Oncology for the proposition that "clinical studies … showed one case of non-reversible alopecia at the end of the study." The letter also cited another paper from the New England Journal of Medicine, which stated that "studies involving Taxotere in combination with doxorubicin and cyclophosphamide observed alopecia to be ongoing at the median follow-up time of 55 months in 3 percent of patients at the end of the chemotherapy."

153.    In 2009, the British Journal of Dermatology published an article entitled "Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer." That article reported a case in which a 58-year-old woman "developed diffuse and irreversible alopecia 7-years ago, after being treated with six cycles of docetaxel … every 3 weeks for a local occurrence." She did not have alopecia before administration of the chemotherapy. The article concluded "the irreversibility can be attributed only to the cytotoxic effect of docetaxel."

154.    On March 4, 2010, The Globe and Mail published an article entitled "Women who took chemo drug say they weren't warned of permanent hair loss." The article explained: "Women who took a drug to fight breast cancer say they were never warned of a side effect— permanent hair loss—that left them looking sick long after they were treated for the disease." The article described this permanent hair loss as a "lasting side effect of the chemotherapy drug Taxotere, in combination with other drugs." The article included sufferers from Montreal,

29

Canada; Brittany, France; and Oklahoma who had been treated with Taxotere. The article explained that the "side effect of persistent alopecia is suffered by about 3 percent of patients who take Taxotere with other chemotherapy drugs, according to the manufacturer's own studies," but that a "different study suggests that the incidence of persistent alopecia could be as high as 6 percent."

155.    The Globe and Mail article also cited medical oncologist Dr. Hugues Bourgeois of Le Mans, France, "who presented research on 82 patients with persistent alopecia at the San Antonio Breast Cancer symposium this winter." Dr. Bourgeois described the choice he gives his patients—twelve cycles of Taxol or four cycles of Taxotere, where the risk of hair loss is higher. According to Dr. Bourgeois, most choose Taxol, which Dr. Bourgeois said "works just as well on breast cancer."

156.    On March 6, 2010, CBS News published an article entitled "Sanofi's Latest Challenge: Women Who Say Its Chemotherapy Left Them Permanently Bald." The article described a group of women who called themselves "Taxotears" and encouraged women who have lost all their hair to report the adverse events to Sanofi and drug watchdog authorities. It also noted that "Taxotere's official prescribing information … makes no mention of permanent alopecia," and that "small studies suggest that as many as 6.3 percent of patients lose all their hair forever."

157.    The CBS News article also mentioned that the Medicines and Healthcare products Regulatory Agency in the United Kingdom noted that "it was aware of one study in which 22 of 687 patients (about 3 percent) had persistent baldness after nearly five years."

158.    On May 10, 2010, an article by Ben Tallon, MBChB, and others entitled "Permanent chemotherapy-induced alopecia: Case report and review of the literature" was

published online. That article described "a case of permanent hair loss following standard dose chemotherapy with docetaxel, carboplatin, and trastuzumab for the treatment of breast carcinoma." There, the "lack of evidence for alopecia with trastuzumab, and the exposure to only a single infusion of standard dose carboplatin, suggests that docetaxel is the implicated agent." The article also explained: "Permanent [chemotherapy-induced alopecia] has been described following the use of … docetaxel."

159.    In 2011, the American Journal of Dermatopathology published a study entitled "Permanent Alopecia After Systemic Chemotherapy: A Clinicopathological Study of 10 Cases," by Mariya Miteva, MD and others. The article discussed "the histological features of 10 cases of permanent alopecia after systematic chemotherapy with taxanes (docetaxel)," including 6 cases in which the patients took docetaxel for breast cancer. "All patients had moderate to very severe hair thinning … ."

160.    On May 9, 2012, the Annals of Oncology published an article entitled "Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients," by Nicolas Kluger, M.D.,Ph.D., among others. It reported that, since 2009, "nine cases of permanent scalp alopecia after systemic chemotherapy related to taxanes used to treat breast cancer have been reported … Docetaxel was almost always involved, alone in seven cases … or in association with carboplatin … and trastuzumab."

161.    In October 2013, Drs. Nicola Thorp, Felicity Swift, Donna Arundell and Helen Wong presented at Clatterbridge Cancer Centre in the United Kingdom on "Long Term Hair Loss in Patients with Early Breast Cancer Receiving Docetaxel Chemotherapy." Their study was based on a questionnaire sent in October 2013 to patients who received docetaxel in 2010. Out of

189 questionnaires, 134 were returned. "Of those responding 21 (15.8 percent) had significant persistent scalp hair loss." The presentation concluded: "Long term significant scalp alopecia (hear lasting for up to 3.5 years following completion of chemotherapy) may affect 10-15 percent of patients following docetaxel for EBC. This appears to be unrelated to other patient and treatment characteristics … This risk should be discussed routinely (as part of the process of informed consent) with all patients embarking upon docetaxel as a component of management of EBC."

162.    This Clatterbridge study was also published at the 2014 San Antonio Breast Cancer Symposium.

163.    On November 10, 2015, the Journal of Clinical Oncology published an article entitled "Epirubicin Plus Cyclophosphamide Followed by Docetaxel Versus Epirubicin Plus Docetaxel Followed by Capecitabine As Adjuvant Therapy for Node-Positive Early Breast Cancer: Results From the GEICAM/2003-10 Study." This article reviewed and reiterated the connection between docetaxel and long-term alopecia:

> Patients who received [docetaxel] not only had to wear a wig for a longer period of time but also reported a significantly higher proportion of long-term incomplete scalp hair recovery and permanent wig use after therapy. This adverse effect, probably related to docetaxel … has previously been described by others. Sedlacek reported that approximately 6% of patients who received adjuvant docetaxel for early BC had persistent alopecia, whereas this toxicity was not seen in 384 patients receiving nondocetaxel adjuvant regimens. Kluger et al reported 20 patients with BC with persistent hair loss of androgenetic-like pattern after adjuvant treatment with CEF followed by docetaxel. Consequently, a prospective study of the efficacy of scalp hypothermia in the prevention of docetaxel-induced persistent alopecia is ongoing at one of the centers participating in the present trial.

164.    Despite this, hair loss was listed as a "possible side effect[] of Taxotere" that "generally grows back" in a Patient Information Letter circulated by Sanofi beginning in December 23, 1999.

32

165.    By contrast, the labeling for Taxotere approved by the European Medicines Agency in 2005 acknowledged that "[c]ases of persisting alopecia have been reported." It also stated in a tabulated list of adverse reactions in breast cancer that took into account node-positive breast cancer (from a study entitled TAX 316) and node-negative breast cancer (from GEICAM 9805) that alopecia is a "[v]ery common adverse reaction," with persisting alopecia occurring under three percent of the time.

166.    In the September 28, 2007 version of the Highlights of Prescribing Information in the United States, alopecia is listed as one of the most common adverse reactions. There is no mention of permanent alopecia.

167.    The April 2010 version of Taxotere's United States labeling still stated that "hair generally grows back." That language does not appear in the 2011 version of Taxotere's label. Instead, the 2011 version of the prescribing information stated under "Patient Counseling Information" that "side effects such as … hair loss are associated with docetaxel administration." "Patient Information" indicated that the "most common side effects of TAXOTERE include: … hair loss." The document contains no mention of irreversible or permanent hair loss. Instead, it states that "alopecia" is one of the most common adverse reactions. The November 2014 version of this labeling information contains the same text.

168.    In May 2015, Sanofi UK updated its Taxotere label. That version states that a "[v]ery common" side effect is "hair loss (in most cases normal hair growth should return)."

169.    On June 12, 2015, Canada's Taxotere labeling changed. Its new labeling stated: "Hair loss may happen shortly after treatment has begun. Your hair should grow back once you've finished the treatment. However, some patients may experience persistent hair loss.

170.    In August 2015, Australia's Taxotere labeling changed. Its new labeling stated

33

that alopecia was "observed to be ongoing at the median follow-up time of 55 months."

171.   In the United States, Sanofi submitted a CBE on November 24, 2015 concerning permanent alopecia.

172.   On December 11, 2015, FDA approved the CBE. Under "Patient Counseling Information," the new text reads: "Explain to patients that side effects such as … hair loss (cases of permanent hair loss have been reported) are associated with docetaxel administration." Additionally, under "Patient Information," the label states that the "most common side effects of TAXOTERE include: … hair loss: in most cases normal hair growth should return. In some cases (frequency not known) permanent hair loss has been observed." The label contains no mention of irreversible or permanent hair loss under "Warnings and Precautions" or "Adverse Reactions."

173.   Upon information and belief, Defendants failed to comply with the FDA postmarketing reporting requirements under 21 C.F.R. § 314.80 by, among other things, failing to report each adverse drug experience concerning the Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate products, whether foreign or domestic, including Plaintiff' injuries complained of herein, as soon as possible but in no case later than 15 calendar days after initial receipt of the information by Defendants, failing to promptly investigate all adverse drug experiences concerning these drug products that are the subject of these postmarketing 15-day Alert reports, failing to submit follow up reports within 15 calendar days of receipt of new information or as requested by the FDA, and, if additional information is not obtainable, failing to maintain records of the unsuccessful steps taken to seek additional information.

174.   Also, consistent with the Changes Being Effected regulations, Defendants had and continue to have a duty to initiate a change to the products' labels to reflect the true levels of

risk, including the risk of developing Plaintiff' injuries complained of herein. To this day, Defendants have not adequately satisfied their duty to update the Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate products' labeling or prescribing information to reflect their knowledge as to the true risks of developing the injuries complained of herein.

## V.  Taxotere (docetaxel) Caused Permanent Alopecia in Many Breast Cancer Patients.

175.   Chemotherapy is known to cause temporary and reversible hair loss. Hair loss occurs because chemotherapy targets rapidly dividing cells (both normal, healthy cells as well as cancer cells) including hair follicles. Hair follicles, the structures in the skin filled with tiny blood vessels that make hair, are some of the fastest growing cells in the body, thus, hair follicles are some of the most likely cells to be damaged by chemotherapy.

176.   There are 100,000 hair follicles on the scalp that typically grow about 0.3 to 0.4 mm a day or about six inches a year. For hair production, hair follicles undergo a cycle that consists of three phases: the anagen phase (growth), the catagen phase (transition), and the telogen phase (resting). During the anagen phase, the cells at the root of the hair follicle are dividing rapidly and an entire hair shaft from tip to root is formed. The matrix cells, which build the hair shaft, have a cell cycle length of approximately 18 hours. Approximately 90 percent of the hair on the scalp is normally in the anagen phase.

177.   The catagen phase is a short transitional phase that occurs at the end of the anagen phase when growth of a hair stops. Only about 3 percent of hair follicles are in the catagen phase at any time.

178.   The hair follicle is completely at rest during the telogen phase and, at the end of the telogen phase, the hair falls out and a new hair is supposed to start growing in the hair follicle beginning the hair cycle again with the anagen phase. Around 6 to 8 percent of all hair is

regularly in the telogen phase.

179.   Chemotherapy causes the matrix cells to stop dividing abruptly in the anagen phase. As a result, the portion of the hair shaft that is the closest to the skull narrows and subsequently breaks within the hair canal. For this reason, hair loss usually begins one to three weeks after the initiation of chemotherapy and hair may fall out very quickly in clumps or gradually.

180.   Because the majority of hair on the scalp is in the anagen phase during any given period, the hair loss that results from chemotherapy can be quite significant and visible.

181.   The effects of chemotherapy on hair follicles results in temporary hair loss that lasts until the telogen phase is complete and a new hair cycle begins. According to the Mayo Clinic, hair can be expected to grow back after chemotherapy within three to six months. Dr. Ralph M. Trueb, the author of several articles related hair loss associated with chemotherapy, also states that hair regrowth following chemotherapy treatment will occur within three to six months after cessation of treatment.

182.   Unlike the temporary and reversible alopecia that ordinarily results from chemotherapy, Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate cause Permanent Chemotherapy Induced Alopecia, which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy. The Permanent Chemotherapy Induced Alopecia caused by Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate is not limited to the scalp and can affect hair follicles throughout the body.

183.   Patients who receive Taxotere without any other type of chemotherapy have experienced permanent hair loss all over their bodies. For example, one oncologist reported he

was unlikely to prescribe Taxotere in early stage breast cancer patients because of the toxicity of the drug. When prescribing Taxotere in early stage breast cancer cases, he recommended lower dosage levels over a longer period of time. His patients who have received Taxotere have experienced permanent hair loss.

184.    Also, the GEICAM 9805, a study sponsored by Sanofi produced evidence that over 9 percent of high risk breast cancer patients who were administered Taxotere suffered permanent alopecia with hair loss lasting, in some cases, over ten years.

185.    Dr. Sedlacek's 2006 study, as described above, further demonstrates that Taxotere causes permanent hair loss. His study divided patients he treated from January of 1994 to December of 2004 into three groups. The first group, which contained 258 patients, received Doxorubicin. None suffered permanent alopecia. The second group, which contained 126 patients, received Doxorubicin and Taxol. Again, none suffered permanent alopecia. The third group contained 112 patients who received Doxorubicin and Taxotere. Of those patiens, 6.3 percent suffered permanent alopecia with hair regrowth of less than 50 percent of the amount before chemotherapy.

186.    In addition and as detailed above, Dr. Tallon's 2010 article concluded that, when a cocktail of Taxotere, Trastuzumab, and Carboplatin was administered and there was resulting permanent alopecia, Taxotere was the implicated agent. Its reasoning was that there was a lack of evidence linking alopecia with Trastuzumab and limited exposure to Carboplatin. Trastuzumab does not contain a component that causes hair loss and does not increase the rate of hair loss when combined with standard chemotherapy. Similarly, Carboplatin causes only mild temporary alopecia in 5 percent of users.

187.    Likewise, the 2012 study by Dr. Kluger and others concluded that Taxanes were

responsible for permanent scalp alopecia among patients who were administered a sequential regimen of FEC (fluorouracil, epirubicin, and cyclophosphamide) followed by docetaxel. They noted that no patients treated with only anthracycline regimens (and not docetaxel) suffered from permanent severe scalp alopecia.

188. Further, Drs. Thorp, Swift, Arundell and Wong in their 2014 presentation reported that 15.8 percent of Taxotere patients surveyed had significant persistent scalp hair loss for up to 3.5 years following completion of chemotherapy.

189. Finally, Sanofi's change to the Taxotere label in 2015, described above, acknowledges that Taxotere causes permanent hair loss but fails to do so adequately. Moreover, some other Taxotere manufacturers have chosen not to adopt Sanofi's revised labeling. Under the "Patient Counseling Information" of the revised label, the new text reads: "Explain to patients that side effects such as … hair loss (cases of permanent hair loss have been reported) are associated with docetaxel administration." Additionally, under "Patient Information," the label states that the "most common side effects of TAXOTERE include: … hair loss: in most cases normal hair growth should return. In some cases (frequency not known) permanent hair loss has been observed." The label contains no mention of irreversible or permanent hair loss under "Warnings and Precautions" or "Adverse Reactions."

190. By contrast, in a report issued on Taxotere on May 12, 2016, the European Medicines Agency ("EMA") concluded that "[b]ased on review of the Sanofi global pharmacovigilance database, worldwide scientific literature, clinical studies, and biological plausibility, the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."

191. Because NDA holders and their assigns or agents are held to the knowledge of an

expert in the field concerning the products they sell, Defendants cannot plead ignorance of the scientific information publicly available or otherwise available to them that would have supported a label change, including the studies and information discussed herein.

**VI.     Sanofi Marketed & Promoted Taxotere Despite Knowing It Caused Permanent Alopecia.**

192.     Sanofi, including its predecessors and affiliates, have designed, directed, and/or engaged in a marketing scheme to over promote Taxotere directly to consumers and for off-label uses not approved by the FDA. As a result, Sanofi has earned in excess of €7 billion in revenue on its sales of Taxotere in the United States:

| Year | U.S. Sales as Reported by Sanofi S.A. |
|------|-----------------------------------|
| 2000 | €367,000,000 |
| 2001 | €541,000,000 |
| 2002 | €701,000,000 |
| 2003 | €733,000,000 |
| 2004 | Could not be located |
| 2005 | €695,000,000 |
| 2006 | €708,000,000 |
| 2007 | €691,000,000 |
| 2008 | €737,000,000 |
| 2009 | €827,000,000 |
| 2010 | €786,000,000 |
| 2011 | €243,000,000 |
| 2012 | €53,000,000 |
| 2013 | €42,000,000 |
| 2014 | €8,000,000 |
| 2015 | €-1,000,000 |
| 2016 | €4,000,000 |
| **Total** | **€7,135,000,000** |

193.     In or around 2000, Sanofi hired a marketing firm to conduct a study on the primary concerns of oncologists and breast cancer patients undergoing treatment. The results of the study revealed that breast cancer patients felt an innate need to stay 'connected' through various means.

194.    As a result of the marketing study, Sanofi launched a new sales promotional campaign in 2000 known as "Connection Cards" in which gift packages were offered to breast cancer patients at their oncologist's office. These gift packages initially included ten custom designed note cards and envelopes; a 30-minute prepaid long-distance calling card; a reference card with contact information for nationally recognized breast cancer organizations; a reference card with contact information with the company's breast cancer support program; and most importantly, a brochure giving detailed information about Taxotere.

195.    To maintain the effectiveness of the promotional campaign, Sanofi added coupons for wigs and vouchers for discounted taxi services to the gift packages provided to breast cancer patients. In 2002, Sanofi made available to U.S. patients approximately 60,000 "Connection Cards" through 150 sales representatives.

196.    Sanofi claimed the promotional campaign to be a success, adding the campaign to its permanent rotation of promotional materials.

197.    Sanofi also promoted Taxotere for the following breast cancer treatments, which at the time, were neither approved by the FDA nor supported by the available drug compendia: adjuvant breast cancer, neo-adjuvant breast cancer, weekly dose for metastatic breast cancer.

198.    Sanofi directed its U.S. sales force to misrepresent the safety and effectiveness of the off-label use of Taxotere to expand the market for Taxotere in unapproved settings, such as a first-line of treatment or for early-stage breast cancer.

199.    On July 26, 2001, the FDA's Division of Drug Marketing, Advertising and Communications, now known as the Office of Prescription Drug Promotion, sent a letter to Sanofi identifying promotional activities that were in violation of the FDCA and its implementing regulations on off-label promotion.

200.    In particular, FDA identified promotional brochures distributed at the American Society of Clinical Oncology Annual Meeting in May 2001 that stated that Taxotere was safe and effective for first-line treatment in combination with Adriamycin such as that it was "the only taxane combination approved for first-line treatment of locally advanced or metastatic breast cancer."

201.    This was considered off-label promotion because Taxotere in combination with Adriamycin was approved by FDA only for second-line treatment—not first-line treatment—of locally advanced or metastatic breast cancer. Likewise, as explained by FDA, other taxane combinations, as well as other classes of drug combinations, were approved for this first-line treatment. FDA demanded that Sanofi "immediately cease the distribution of these and similar promotional materials."

202.    FDA sent a second warnings letter to Sanofi on December 18, 2002, concerning promotional materials at the 2002 Annual Meeting, which featured queen chess pieces and stated that Taxotere was "at the center of more strategies every day." According to FDA, these promotional materials constituted "false or misleading promotion" which could "compromise patient survival and safety." FDA focused on Sanofi's claim that Taxotere resulted in "significant survival advantages," noting that this statement was not supported by clinical trial results. FDA also noted that Sanofi underemphasized information concerning severe risks that can result from using Taxotere.

203.    Sanofi responded to FDA on December 30, 2002, stating "we are discontinuing the use of these [ads], and any similar materials." Nonetheless, Sanofi continued its false and misleading promotional and marketing activities.

204.    Despite Sanofi's assurances that these and similar promotional materials would be

discontinued and destroyed, FDA sent Sanofi a third warnings letter on July 17, 2003, identifying two direct-to-consumer promotional pieces that raised "similar" concerns. These two promotional ads appeared on the back of People Magazine's circulation wrap and prominently featured the slogan "The Next Move May Be the Key to Your Survival" and "It's Your Move," which again featured the queen and chess piece theme.

205.    FDA found these ads to be misleading because the headline suggests that, if cancer patients want to survive breast or lung cancer, their "next move" should include Taxotere, thus implying that Taxotere is "more effective than has been demonstrated by substantial evidence or substantial clinical experience." FDA concluded that Sanofi's ads "reinforce[] the message that treatment with Taxotere will result in significant survival advantages," when the clinical data "did not necessarily represent longterm survival or a cure." FDA demanded that Sanofi submit a letter stating the status of these items (active or discontinued) as well a list of violative promotional materials.

206.    Sanofi replied on August 1, 2003, assuring FDA that the two ads had been discontinued and identifying another direct-to-consumer promotional piece, similar to the two ads. The third ad, which featured the same Taxotere slogans, "The *Next Move May Be the Key to Your Survival,"* and *"It's Your Move,"* had been disseminated in "Coping," "MAAM," and "Cure" Magazines between March and July 2003 and was planned to be disseminated in these magazines in addition to "Y-Me" magazine through December 2003. Only after follow-up telephone calls did Sanofi assure FDA in an August 21, 2003 letter that it had discontinued use of this additional misleading piece.

207.    FDA concluded on November 12, 2003 that these three ads likewise "misleadingly overstate[d] the survival benefits ... and impl[ied] that survival depends on

42

treatment with Taxotere," while simultaneously "minimizing the serious and potentially life-threatening risks associated with the drug."

208.    As late as January 2004, Sanofi distributed banned materials to physicians and other healthcare providers that promoted Taxotere, using materials with the same misleading slogans and substantially similar misleading information.

209.    In addition, Sanofi's salespeople were directed to "cherry pick" positive clinical study results. For example, in the breast cancer setting, Sanofi trained its salespeople to downplay the results of clinical trial results and the NIH Guidelines for Adjuvant Breast Cancer, which showed that evidence of taxanes' role in the adjuvant treatment of node positive breast cancer was inconclusive. By contrast, to emphasize Taxotere's superiority over Taxol, they were also instructed to highlight preliminary results and abstracts from weaker trials. Similarly, they were trained to emphasize the lower incidence of non-lethal side effects when compared with Taxol while omitting the lethal side effect of severe neutropenia that occurs more frequently when using Taxotere.

210.    In doing so, Sanofi continued to make false and misleading statements promoting the "superior efficacy" of Taxotere over the competing product paclitaxel (Taxol). In June 2008, Sanofi utilized marketing and promotional materials for Taxotere at the annual meeting for the American Society of Clinical Oncology, comparing the efficacy of Taxotere versus paclitaxel (Taxol). Specifically, Sanofi utilized a "reprint carrier," citing a clinical study published in the August 2005 edition of the Journal of Clinical Oncology. The cover of the reprint carrier claimed, among other things:

- "Taxotere demonstrated efficacy benefits vs paclitaxel"
- "This phase III study demonstrated that docetaxel is superior to paclitaxel in TTP, response duration, and OS [overall survival]."

43

- "Phase III trial demonstrated improved survival for Taxotere vs paclitaxel in metastatic breast cancer"

211.  Sanofi's statements in the "reprint carrier" marketing the conclusions of the 2005 Journal of Clinical Oncology study were false and/or misleading in light of the 2007 and 2008 studies finding that Taxotere was not more effective than paclitaxel (Taxol) in the treatment of breast cancer.

212.  Specifically, in August 2007, Cancer Treatment Reviews published a study that found no significant differences in the efficacy and outcomes obtained with Taxotere or Taxol (paclitaxel) in breast cancer treatment. Likewise, a 2008 study in the New England Journal of Medicine concluded that Taxol (paclitaxel) was more effective than Taxotere for patients undergoing standard adjuvant chemotherapy with doxorubicin and cyclophosphamide.

213.  As a result of these false and misleading statements, in 2009, the FDA issued a warning letter to Sanofi citing these unsubstantiated claims of superiority over paclitaxel stating:

> The Division of Drug Marketing, Advertising, and Communications (DDMAC) of the U.S. Food and Drug Administration (FDA) has reviewed a professional reprint carrier [US.DOC.07.04.078] for Taxotere (docetaxel) Injection Concentrate, Intravenous Infusion (Taxotere) submitted under cover of Form FDA 2253 by Sanofi-Aventis (SA) and obtained at the American Society of Clinical Oncology annual meeting in June 2008. The reprint carrier includes a reprint from the Journal of Clinical Oncology, which describes the TAX 311 study. This reprint carrier is false or misleading because it presents unsubstantiated superiority claims and overstates the efficacy of Taxotere. Therefore, this material misbrands the drug in violation of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. 352(a) and 321(n). *Cf.* 21 CFR 202.1(e)(6)(i), (ii) & (e)(7)(ii).
>
> …
>
> The reference cited in support of these claims … does not constitute substantial evidence or substantial clinical experience to support these claims and representations because, among other factors, the study failed to demonstrate statistical significance on the primary endpoint and has not been replicated.

214.  In addition, Sanofi also began indirectly promoting Taxotere through a series of direct-to-consumer television commercials that began airing in 2007. One of these commercials

showed breast cancer patients slowly removing their wigs as an omniscient voice stated: "Cancer is tough but so are you. Get the facts, share the feelings, look to the future—Sanofi Aventis—because health matters and so do you." These and other similar direct-to-consumer advertisements continued at least through 2010.

## VII.  Permanent Alopecia is Devastating for Plaintiff.

215.  Research indicates that a majority of women consider alopecia the most traumatic side effect of cancer treatment. One study states that 58 percent of women preparing for chemotherapy describe alopecia as the most disturbing anticipated side effect, and that 8 percent of women may choose to forego treatment based on possible alopecia. Although baldness is the most commonly recognized form of alopecia, chemotherapy-related hair loss can extend to eyebrows, eyelashes, arm and leg hair, pubic hair, etc.

216.  Women with cancer who experience alopecia, as compared with women with cancer who do not, report lower self-esteem, poorer body image, and a lower quality of life. Alopecia can be stigmatizing and may result in anger, anxiety, embarrassment, sadness, depression, shame, helplessness, fear, and loss of sense of self. Women with alopecia may experience a loss of sense of femininity, sexuality, attractiveness, self-confidence, and womanhood. Even if hair does grow back, studies have found that these negative thoughts and feelings remain; body image tends not to return to pre-treatment levels.

217.  Alopecia also alters how women interact with others and experience social situations. Alopecia symbolizes cancer identity and treatment, even when individuals wear wigs or garments to cover the hair loss. These symbols can heighten an individual's everyday awareness that she has or had cancer.

218.  Hair loss alters how women recognize themselves and how others interact with

45

them. Hair is a critical aspect of appearance that can facilitate recognition as female, young, and healthy. By contrast, loss of hair may cause others to categorize individuals as old and unhealthy. As a result, women who suffer from alopecia have a heightened awareness of their appearance during social interactions, and may be treated differently than they were before their hair loss.

219.    To cope, many avoid social situations because they are nervous that others will treat them differently. These fears are not unfounded. In one study of cancer survivors, 75 percent of participants reported experiencing silent stares from others that they attributed to their "cancer appearance." Participants also reported that people they knew avoided public contact with them.

220.    Hair loss can also increase risk of injury to the body. Nose hair, eyelashes, ear hair, etc. serve important bodily functions and are necessary for the protection against injury to organs critical to human senses. Hair loss in these areas places women at risk of permanent injuries.

221.    Even when, unlike here, patients were warned that cancer-related hair loss may occur, cancer patients have reported feeling that they were not given adequate information about how to manage cancer-related hair loss. This underscores the importance of healthcare providers appreciating the traumatic effect that cancer-related alopecia may have on their patients.

## THE CAUSES OF ACTION

## CLAIMS ASSERTED BY PLAINTIFF

222.    Plaintiff incorporates by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length herein.

46

## FIRST CAUSE OF ACTION

### Strict Products Liability – Design, Manufacturing and Warning

223.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

224.    At all relevant times, Defendants were in the business of designing, researching, manufacturing, testing, promoting, marketing, selling, and/or distributing pharmaceutical products, including the Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate as hereinabove described that was used by Plaintiff, or have recently acquired the entities that did the same.

225.    The Plaintiff brings this claim under the applicable state's common law, including the Restatement of Torts (Second).

226.    The Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate designed, formulated, produced, manufactured, sold, marketed, distributed, supplied and/or placed into the stream of commerce by Defendants failed to provide adequate warnings to users and their healthcare providers, including Plaintiff and Plaintiff's healthcare providers, of the risk of side effects associated with the use of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, particularly the risk of developing disfiguring, permanent alopecia.

227.    The Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate designed, formulated, produced, manufactured, sold, marketed, distributed, supplied and/or placed into the stream of commerce by Defendants and ultimately administered to Plaintiff lacked such warnings when it left Defendants' control.

228.    The risks of developing disfiguring, permanent alopecia were known to or reasonably scientifically knowable by Defendants at the time the Taxotere, Docefrez, Docetaxel

Injection, and Docetaxel Injection Concentrate left Defendants' control.

229.   Any warnings actually provided by Defendants did not sufficiently and/or accurately reflect the symptoms, type, scope, severity, and/or duration of these side effects, particularly the risks of developing disfiguring, permanent alopecia.

230.   Without adequate warning of these side effects, Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate are not reasonably fit, suitable, or safe for its reasonably anticipated or intended purposes.

231.   Plaintiff was a reasonably foreseeable user of Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate who used the drug in reasonably anticipated manners. Plaintiff did not misuse the product.

232.   Plaintiff would not have used Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate had she (and her Physicians) been provided an adequate warning by Defendants of the risk of these side effects.

233.   Further, Defendants misrepresented facts as set forth herein concerning the character or quality of the Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate that would be material to potential prescribers and purchasers or users of the product.

234.   Defendants' misrepresentations were made to potential prescribers and/or purchasers or users as members of the public at large.

235.   As a purchaser or user, Plaintiff and/or her healthcare providers reasonably relied on the misrepresentations.

236.   Plaintiff was a person who would reasonably be expected to use, consume, or be affected by the Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez.

237.    As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including, but not limited to: past and future medical expenses; psychological counselling and therapy expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement, including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### Negligence

238.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

239.    Defendants had a duty to exercise reasonable care in the design, research, formulation, manufacture, production, marketing, testing, supply, promotion, packaging, sale, and/or distribution of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, including a duty to assure that the product would not cause users to suffer unreasonable, disfiguring, and dangerous side effects.

240.    Defendants breached these duties when they put Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate into interstate commerce, unreasonably and

without adequate and/or proper warning to Plaintiff and her healthcare providers, a product that

Defendants knew or should have known created a high risk of unreasonable, disfiguring, and

dangerous side effects.

    241.    The negligence of Defendants, their agents, servants, and/or employees, included

but was not limited to, the following acts and/or omissions:

(a)    Manufacturing, producing, promoting, formulating, creating, and/or designing Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate without thoroughly, adequately, and/or sufficiently testing it—including pre-clinical and clinical testing and post-marketing surveillance—for safety and fitness for use and/or its dangers and risks;

(b)    Marketing Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate to Plaintiff, Plaintiff's healthcare providers, the public, and the medical and healthcare professions without adequately and correctly warning and/or disclosing the existence, severity, and duration of known or knowable side effects, including permanent alopecia;

(c)    Marketing Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate to Plaintiff, Plaintiff's healthcare providers, the public, and the medical and healthcare professions without providing adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez;

(d)    Advertising and recommending the use of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez; without sufficient knowledge of its safety profile;

(e)    Representing to Plaintiff, Plaintiff's healthcare providers, the public, and the medical and healthcare professions that Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate were superior to other commercially available products designed to treat the same forms of cancer Taxotere was designed to treat, when in fact they were not;

(f)    Designing, manufacturing, producing, and/or assembling Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate in a manner that was dangerous to its users;

(g)    Concealing information from Plaintiff, Plaintiff's healthcare providers, the public, other medical and healthcare professionals, and the FDA that Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate were unsafe, dangerous, and/or non-conforming with FDA regulations;

(h)    Concealing from and/or misrepresenting information to Plaintiff, Plaintiff's healthcare providers, other medical and healthcare professionals, and/or the FDA concerning the existence and severity of risks and dangers of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, as compared to other forms of treatment for cancer.; and

(i)    Encouraging the sale of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, either directly or indirectly, orally or in writing, to Plaintiff and Plaintiff's healthcare providers without warning about the need for more comprehensive and regular medical monitoring than usual to ensure early discovery of potentially serious side effects.

242.    Despite the fact that Defendants knew or should have known that Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate to consumers, including Plaintiff.

243.    Plaintiff and Plaintiff's healthcare providers were therefore forced to rely on safety information that did not accurately represent the risks and benefits associated with the use of Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate as compared to other products already commercially available to treat the same types of cancer Taxotere was designed to treat.

244.    Defendants knew or should have known that consumers such as Plaintiff would use their product and would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable care, as set forth above.

245.    Defendants' negligence was a proximate cause of Plaintiff's injuries, harms, damages, and losses, in connection with the use of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, including but not limited to: past and future medical expenses; psychological counseling and therapy expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement including

permanent and irreversible alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION

#### Negligent Misrepresentation

246.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

247.    Defendants had a duty to represent to Plaintiff, Plaintiff's healthcare providers, the medical and healthcare community, and the public in general that Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate had been tested and found to be safe and effective for the treatment of various forms of cancer.

248.    When warning of safety and risks of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, Defendants negligently represented to Plaintiff, Plaintiff's healthcare providers, the medical and healthcare community, and the public in general that they had been tested and was found to be safe and/or effective for its indicated use.

249.    Defendants concealed their knowledge of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, defects from Plaintiff, Plaintiff's healthcare providers, and the public in general and/or the medical community specifically.

250.    Defendants concealed their knowledge of the defects in their products from

Plaintiff, Plaintiff's healthcare providers, and the public in general.

251.    Defendants misrepresented the novel nature of their product in order to gain a market advantage resulting in billions of dollars in revenues at the expense of vulnerable cancer victims such as Plaintiff.

252.    Defendants made these misrepresentations with the intent of defrauding and deceiving Plaintiff, Plaintiff's healthcare providers, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing Plaintiff, Plaintiff's healthcare providers, the public in general, and the medical community in particular, to recommend, dispense, and/or purchase Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate for use in the treatments of various forms of cancer, including, but not limited to, breast cancer.

253.    Defendants failed to exercise ordinary and reasonable care in their representations of Taxotere while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, and Defendants negligently misrepresented the high risks of unreasonable, dangerous side effects of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez.

254.    Defendants breached their duty in misrepresenting Taxotere's, Docetaxel Injection's, Docetaxel Injection Concentrate's, and Docefrez's, serious side effects to Plaintiff, Plaintiff's healthcare providers, the medical and healthcare community, the FDA, and the public in general.

255.    Plaintiff and Plaintiff's healthcare providers reasonably relied on Defendants to fulfil their obligations to disclose all facts within their knowledge regarding the serious side effects of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez.

256.     As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including, but not limited to: past and future medical expenses; psychological counselling and therapy expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement, including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

### Fraudulent Misrepresentation

257.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

258.     Defendants represented to Plaintiff, Plaintiff's healthcare providers, the medical and healthcare community, and the public in general that Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate had been tested and was found to be safe and effective for the treatment of certain forms of cancer and was free of defects that could and would cause serious side effects, including permanent and irreversible hair loss.

259.     Defendants fraudulently omitted from these representations information that Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate could and did

cause serious side effects, including permanent and irreversible hair loss.

260.   These representations were material and false.

261.   Defendants made these representations and omissions:

(a)   with knowledge or belief of their falsity, and/or in the case of omissions, with knowledge or belief of falsity of the resulting statements;

(b)   positively and recklessly without knowledge of their truth or falsity;

(c)   with knowledge that they were made without any basis; and/or

(d)   without confidence in the accuracy of the representations or statements resulting from the omissions.

262.   Defendants made these false representations with the intention or expectation that Plaintiff, Plaintiff's healthcare providers, the public in general, and the medical community in particular, would recommend, dispense, and/or purchase Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate for use in the treatments of various forms of cancer, including, but not limited to, breast cancer, all of which evidenced a callous, reckless, willful, wanton, and depraved indifference to the health, safety, and welfare of Plaintiff.

263.   At the time Defendants made the aforesaid representations, and, at the time Plaintiff used Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, Plaintiff and Plaintiff's healthcare providers were unaware of the falsity of Defendants' representations, statements and/or implications and justifiably and reasonably relied upon Defendants' representations, statements, and implications, believing them to be true.

264.   In reliance upon Defendants' representations, Plaintiff and Plaintiff's healthcare providers were induced to and did use and prescribe Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, which caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and

non-economic damages, harms, and losses, including, but not limited to: past and future medical

expenses; psychological counseling and therapy expenses; past and future loss of earnings; past

and future loss and impairment of earning capacity; permanent disfigurement, including

permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of

future harm; past, present, and future physical and mental pain, suffering, and discomfort; and

past, present, and future loss and impairment of the quality and enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the above-named Defendants, jointly

and severally, for damages in an amount in excess of the jurisdictional limits of this Court,

together with all lawful fees, costs and such other relief as this Court deems just and proper.

### FIFTH CAUSE OF ACTION

### Fraudulent Concealment

265.    Plaintiff incorporates by reference each and every paragraph of this Complaint as

if fully set forth herein and further allege as follows.

266.    At all times during the course of dealing between Defendants and Plaintiff and

Plaintiff's healthcare providers, Defendants misrepresented the design characteristics and safety

of Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate for their

intended use.

267.    Defendants knew or were reckless in not knowing that its representations were

false.

268.    In representations made to Plaintiff and Plaintiff's healthcare providers,

Defendants fraudulently concealed and intentionally omitted the following material information:

     (a)    that Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection
            Concentrate were not as safe as other forms of treatment for which they were
            marketed and sold to cancer patients;

     (b)    that the risks of adverse events with Taxotere, Docefrez, Docetaxel Injection,

and Docetaxel Injection Concentrate were higher than those with other forms of treatment for which they were marketed and sold to cancer patients;

(c)     that the risks of adverse events with Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate were not adequately tested and/or known by Defendants;

(d)     that Defendants were aware of dangers in Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, in addition to and above and beyond those associated with other forms of treatment for cancer patients;

(e)     that Taxotere, Docefrez, Docetaxel Injection, Docetaxel Injection Concentrate, and Docetaxel Injection Concentrate were defective in that it caused dangerous side effects as well as other severe and permanent health consequences in a much more and significant rate than other forms of treatment for cancer patients.

269.    Defendants had a duty to disclose to Plaintiff and Plaintiff's healthcare providers the defective nature of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, including, but not limited to, the heightened risks of disfiguring, permanent alopecia.

270.    Defendants had sole access to material facts concerning the defective nature of Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate and their propensity to cause serious and dangerous side effects, and therefore cause damage to persons who used the drugs at issue, including Plaintiff, in particular.

271.    Defendants' concealment and omissions of material fact concerning the safety of Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate were made purposefully, wilfully, wantonly, and/or recklessly to mislead Plaintiff and Plaintiff's healthcare providers into reliance on the continued use of the drugs and to cause them to purchase, prescribe, and/or dispense Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate and/or use them.

272.    Defendants knew that Plaintiff and Plaintiff's healthcare providers had no way to determine the truth behind Defendants' concealment and omissions, including the material omissions of fact surrounding Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection

Concentrate set forth herein.

273.   Plaintiff and Plaintiff's healthcare providers reasonably relied on information revealed by Defendants that negligently, fraudulently, and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

274.   As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including, but not limited to: past and future medical expenses; psychological counseling and therapy expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement, including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION

### Fraud and Deceit

275.   Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

276.   Defendants committed fraud by omission in applying for and gaining patent protection for Taxotere resulting in increased sales and market penetration. This increased market penetration was the proximate cause of Plaintiff's exposure to the side effects of

Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez.

277.   Defendants fraudulently claimed superior efficacy over other products designed to treat the same conditions for which Taxotere was designed to treat. These fraudulent representations were the proximate cause of Plaintiff's exposure to the side effects of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez.

278.   As a result of Defendants' research and testing, or lack thereof, Defendants intentionally distributed false information, including, but not limited to, assuring Plaintiff, Plaintiff's healthcare providers and/or the public that Taxotere, Docefrez, Docetaxel Injection, or Docetaxel Injection Concentrate was safe and effective for use in the treatment of various forms of cancer, including breast cancer.

279.   As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted certain results of testing and or research to Plaintiff, Plaintiff's healthcare providers, healthcare professionals, and/or the public.

280.   Defendants had a duty when disseminating information to Plaintiff, Plaintiff's healthcare providers, and the public to disseminate truthful information.

281.   Defendants had a duty when disseminating information to Plaintiff, Plaintiff's healthcare providers, and the public not to deceive Plaintiff, Plaintiff' healthcare providers, and/or the public.

282.   The information Defendants distributed to Plaintiff, Plaintiff's healthcare providers, and the public, including, but not limited to, reports, press releases, advertising campaigns, and other forms of media contained material misrepresentations of fact and/or omissions.

283.   The information Defendants distributed to Plaintiff, Plaintiff's healthcare

providers, and the public intentionally included false representations that Defendants' drug Taxotere was safe and effective for the treatment of various forms of cancer, including breast cancer.

284.    The information Defendants distributed to Plaintiff, Plaintiff's healthcare providers, and the public intentionally included false representations that Defendants' drug Taxotere, Docefrez, Docetaxel Injection, or Docetaxel Injection Concentrate carried the same risks, hazards, and/or dangers as other forms of treatment for the same conditions for which Taxotere was designed to treat.

285.    The information Defendants distributed to Plaintiff, Plaintiff's healthcare providers, and the public intentionally included false representations that Taxotere was not injurious to the health and/or safety of its intended users.

286.    The information Defendants distributed to Plaintiff, Plaintiff's healthcare providers, and the public intentionally included false representations that Taxotere was no more injurious to the health and/or safety of its intended users as other forms of cancer treatments for which Taxotere was designed to treat.

287.    These representations by Defendants were all false and misleading.

288.    Defendants intentionally suppressed, ignored, and disregarded test results not favorable to Defendants and that demonstrated Taxotere was not safe as a means of treatment for certain types of cancer for which Taxotere was designed to treat.

289.    Defendants intentionally made material misrepresentations to Plaintiff, Plaintiff's healthcare providers, and the public in general, including the medical profession, regarding the safety of Taxotere, specifically, but not limited to, Taxotere not having dangerous and serious health and/or safety concerns.

290.    Defendants intentionally made material misrepresentations to Plaintiff, Plaintiff's healthcare providers, and the public in general, including the medical profession, regarding the safety of Taxotere, specifically, but not limited to, Taxotere being as safe as other products designed to treat the same conditions Taxotere was designed to treat.

291.    It was Defendants' intent and purpose in making these false representations to deceive and defraud Plaintiff, Plaintiff' healthcare providers, and/or the public and to gain the confidence of Plaintiff, Plaintiff's healthcare providers, the public, and/or healthcare professionals to falsely ensure the quality and fitness for use of Taxotere and induce Plaintiff, Plaintiff's healthcare providers, and the public, including the medical profession, to purchase, request, dispense, prescribe, recommend, and/or continue to use Taxotere.

292.    Defendants made the aforementioned false claims and false representations with the intent of convincing Plaintiff, Plaintiff's healthcare providers, the public, and/or healthcare professionals that Taxotere, Docefrez, Docetaxel Injection, or Docetaxel Injection Concentrate was fit and safe for use as treatment for certain types of cancer, including breast cancer.

293.    Defendants made the aforementioned false claims and false representations with the intent of convincing Plaintiff, Plaintiff's healthcare providers, the public, and/or healthcare professionals that Taxotere was fit and safe for use as treatment for certain forms of cancer and did not pose risks, dangers, or hazards above and beyond those identified and/or associated with other forms of treatment for which Taxotere, Docefrez, Docetaxel Injection, or Docetaxel Injection Concentrate was designed to treat.

294.    Defendants made false claims and false representations in its documents submitted to Plaintiff, Plaintiff's healthcare providers, the public, and healthcare professionals that Taxotere did not present risks related to disfigurement secondary to permanent alopecia.

295.     Defendants made false claims and false representations in its documents submitted to Plaintiff, Plaintiff's healthcare providers, the public, and healthcare professionals that Taxotere, Docefrez, Docetaxel Injection, or Docetaxel Injection Concentrate did not present health and/or safety risks greater than other forms of treatment for the same conditions Taxotere was designed to treat.

296.     Defendants made these and other representations with a pretense of actual knowledge when Defendants had no knowledge of the truth or falsity of these representations, and Defendants made these representations recklessly and without regard to the actual facts.

297.     Defendants made these and other representations with the intention of deceiving and defrauding Plaintiff and Plaintiff's healthcare providers.

298.     Defendants made these and other representations in order to induce Plaintiff and Plaintiff's healthcare providers to rely upon the misrepresentations.

299.     Defendants' false misrepresentations caused Plaintiff and/or Plaintiff's healthcare providers to purchase, use, rely on, request, dispense, recommend, and/or prescribe Taxotere.

300.     Defendants recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Taxotere to the public at large, and Plaintiff and Plaintiff's healthcare providers in particular, for the purpose of influencing the marketing of a product Defendants knew was dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for cancer.

301.     Defendants wilfully and intentionally failed to disclose, concealed, and/or suppressed the material facts regarding the dangerous and serious health and/or safety concerns related to Taxotere.

302.     Defendants wilfully and intentionally failed to disclose the truth and material facts

related to Taxotere and made false representations with the purpose and design of deceiving and lulling Plaintiff and Plaintiff's healthcare providers into a sense of security so that Plaintiff and Plaintiff's healthcare providers would rely on Defendants' representations to purchase, use, dispense, prescribe, and/or recommend Taxotere.

303.    Defendants, through their public relations efforts, which included, but were not limited to, public statements and press releases, knew or should have known that the public, including Plaintiff and Plaintiff's healthcare providers, would rely upon the information being disseminated.

304.    Plaintiff and/or Plaintiff's healthcare providers did in fact rely on and believe Defendants' false representations to be true at the time they were made, and they relied upon Defendants' false representations and superior knowledge of how Taxotere would treat certain forms of cancer for which Taxotere was designed to treat.

305.    At the time Defendants' false representations were made, Plaintiff and/or Plaintiff's healthcare providers did not know the truth and were not with reasonable diligence able to discover the truth with regard to the dangerous and serious health and/or safety concerns of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez.

306.    Plaintiff and Plaintiff's healthcare providers did not discover the true facts with respect to Defendants' false representations and the dangerous and serious health and/or safety concerns of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez, and Plaintiff and Plaintiff's healthcare providers with reasonable diligence could not have discovered the true facts.

307.    Had Plaintiff and Plaintiff's healthcare providers known the true facts with respect to the dangerous and serious health and/or safety concerns of Taxotere, Docetaxel

Injection, Docetaxel Injection Concentrate, or Docefrez, Plaintiff would not have purchased, used, and/or relied on Defendants' drug Taxotere.

308.    Defendants' aforementioned conduct constitutes fraud and deceit, and it was committed and/or perpetrated wilfully, wantonly, and/or purposefully on Plaintiff.

309.    As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including, but not limited to: past and future medical expenses; psychological counselling and therapy expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement, including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

### Violation of New Jersey Consumer Fraud Act

310.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

311.    Prescription drugs, such as Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez, are "merchandise" as defined by N.J.S.A. 56:8-1(c).

312.    Defendants are manufacturers, promoters, marketers, developers, sellers or

distributors of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez.

313.     Defendants knew or should have known that the use of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez causes serious side effects including compulsive behavior and compulsive gambling.

314.     Defendants' practice of promoting Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez (a) created or reinforced a false impression as to the safety of taking the drug (b) places all consumers of Taxotere (docetaxel) products at risk for serious side effects including compulsive behavior and compulsive gambling.

315.     Defendants' statements and omissions were undertaken with the intent that the FDA, physicians, and consumers, including Plaintiff, would rely on the Defendants' statements or omissions.

316.     Plaintiff's physician prescribed or otherwise provided Plaintiff with Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez, and Plaintiff consumed the drug(s), primarily for personal and family reasons and suffered ascertainable losses of money as a result of the Defendants' use or employment of the methods, acts, or practices alleged herein.

317.     The aforesaid promotion and release of the Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez products into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentation or knowing concealment, suppression, or omission in connection with the sale or advertisement of merchandise or services by Defendants, in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

318.     Defendants acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

319.   As a proximate result of consumer fraud set forth above, Plaintiff has purchased an unsafe product and incurred economic loss that includes the purchase price of the Taxotere (docetaxel) product(s) and other out-of-pocket healthcare related costs, for which Defendants are liable to Plaintiff for treble damages.

WHEREFORE, Plaintiff demands judgment in their favor and against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

### EIGHTH CAUSE OF ACTION

### Violation of Consumer Protection Laws

320.   Plaintiff incorporates by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length herein.

321.   Plaintiff was administered Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez primarily for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

322.   Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased or paid for the Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez, and would not have incurred related medical costs and injury.

323.   Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, monies from Plaintiff for Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez, that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

324.   Unfair methods of competition or deceptive acts or practices that were proscribed

by law, including the following:

    a.    Representing that goods or services has characteristics, ingredients, uses, benefits or quantities that they do not have;

    b.    Advertising goods or services with the intent not to sell them as advertised;

    c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

325.    Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct.  The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez.  Each aspect of Defendants' conduct combined to artificially create sales of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez.

326.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez.

327.    Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased or paid for Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez, and would not have incurred related medical costs.

328.    Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes applicable to this action.

329.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of applicable

state consumer protection statutes.

330.   Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of applicable state laws.

331.   Under the applicable statutes to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

332.   Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez, were fit to be used for the purpose for which they were intended, when in fact the drugs were defective and dangerous, and by other acts alleged herein.  These representations were made in uniform promotional materials.

333.   The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

334.   Defendants had actual knowledge of the defective and dangerous condition of the Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, or Docefrez products and failed to take any action to cure such defective and dangerous conditions.

335.   Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which products to use and prescribe.

336.   Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and

practices.

337.   By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable losses and damages.

338.   As a direct and proximate result of Defendants' violations of the states' consumer protection laws, Plaintiff has sustained economic losses and other damages and is entitled to statutory and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment in their favor and against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION

### Punitive Damages

339.   Plaintiff incorporates by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length herein.

340.   Plaintiff is entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and Defendants' reckless disregard for the public safety and welfare.  Defendants intentionally and fraudulently misrepresented facts and information to both the medical community and the general public, including Plaintiff, by making intentionally false and fraudulent misrepresentations about the safety and efficacy of the Taxotere (docetaxel) products. Defendants intentionally concealed the true facts and information regarding the serious risks of harm associated with the ingestion of the Taxotere (docetaxel) products, and intentionally downplayed the type, nature, and extent of the adverse side effects of ingesting the Taxotere

(docetaxel) products, despite Defendants' knowledge and awareness of the serious side effects and risks associated with these products.

341.    Defendants had knowledge of, and were in possession of evidence demonstrating that the Taxotere (docetaxel) products caused serious side effects.  Notwithstanding Defendants' knowledge of the serious side effects of the Taxotere (docetaxel) products, Defendants continued to market the drug products by providing false and misleading information with regard to the product's safety and efficacy to the regulatory agencies, the medical community, and consumers of the Taxotere (docetaxel) products.

342.    Although Defendants knew or recklessly disregarded the fact that the Taxotere (docetaxel) products cause debilitating and permanent side effects, Defendants continued to market, promote, and distribute the Taxotere (docetaxel) products to consumers, including Plaintiff, without disclosing these side effects when there were safer alternative methods for treating breast cancer.

343.    Defendants failed to provide warnings that would have dissuaded physicians from administering the Taxotere (docetaxel) products and consumers from purchasing and absorbing the Taxotere (docetaxel) products, thus depriving both from weighing the true risks against the benefits of prescribing, purchasing or consuming the Taxotere (docetaxel) products.

344.    Defendants knew of the Taxotere (docetaxel) products' defective nature as set forth herein, but continued to design, manufacturer, market, distribute, sell and/or promote the drug as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff in a conscious or negligent disregard of the foreseeable harm caused by the Taxotere (docetaxel) products.

345.    The aforementioned conduct of Defendants was committed with knowing,

conscious, and deliberate disregard of the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages in the amount appropriate to punish Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment in their favor and against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

## TENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

346.    Plaintiff incorporates by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length herein.

347.    Plaintiff was present during the injuries that are caused or associated with the Taxotere (docetaxel) product(s).

348.    As a result, Plaintiff suffered shock and severe emotional distress.

WHEREFORE, Plaintiff demands judgment against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plantiff Martine Reeder demands judgment in their favor and against the above-named Defendants, jointly and severally, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful fees, costs and such other relief as this Court deems just and proper as follows:

1.      Awarding actual damages to Plaintiff incidental to her administration of Taxotere (docetaxel) in an amount to be determined at trial;

2.      Awarding the costs of treatment for Plaintiff's injuries caused by Taxotere (docetaxel);

3.      Awarding damages for Plaintiff's neuropsychiatric, mental, physical, and economic pain and suffering;

4.      Awarding damages for Plaintiff's mental and emotional anguish;

5.      Awarding pre-judgment and post-judgment interest;

6.      Awarding punitive damages;

7.      Awarding the costs and expenses of this litigation;

8.      Awarding reasonable attorneys' fees and costs as provided by law;

9.      For such further relief as this Court deems necessary, just and proper

## DEMAND FOR JURY TRIAL

The Plaintiff demands trial by jury on all of the triable issues of this Complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35-1(a).

Dated: December 11, 2017                    Respectfully submitted,

                                            **ROBINS KAPLAN LLP**


                                            By: /s/ Rayna E. Kessler
                                            Rayna E. Kessler (NJ Bar # 031782010)
                                            399 Park Avenue, Suite 3600
                                            New York, NY  10022-4611
                                            Telephone: (212) 980-7431
                                            Facsimile: (212) 980-7499
                                            RKessler@robinskaplan.com

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Rayna Kessler, Esq., is hereby designated as trial counsel for Plaintiff.

/s/ Rayna E. Kessler
Rayna E. Kessler, Esq.

## CERTIFICATION PURSUANT TO RULE 4:5-1

I certify that the dispute about which I am suing is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit. In addition, I recognize my continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

/s/ Rayna E. Kessler
Rayna E. Kessler, Esq.

Dated:  December 11, 2017

# Civil Case Information Statement

## Case Details: BERGEN | Civil Part Docket# L-008721-17

**Case Caption:** REEDER MARTINE  VS SANOFI U.S. SERVICES  INC.

**Case Initiation Date:** 12/11/2017

**Attorney Name:** RAYNA ELIZABETH KESSLER

**Firm Name:** ROBINS KAPLAN LLP

**Address:** 399 PARK AVENUE STE 3600
NEW YORK NY 10022

**Phone:**

**Name of Party:** PLAINTIFF : REEDER, MARTINE

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** PRODUCT LIABILITY

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** YES

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
#### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

12/11/2017
Dated

/s/ RAYNA ELIZABETH KESSLER
Signed

**EXHIBIT B**

| **IN RE TAXOTERE LITIGATION** | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – MIDDLESEX COUNTY<br><br>CASE TYPE: MCL NO. 628<br>MASTER DOCKET NO.:<br>MID-L-4998-18-CM<br>               **CIVIL ACTION**<br>              **IN RE TAXOTERE LITIGATION** |
|---|---|

## PLAINTIFF FACT SHEET

This Fact Sheet must be completed by each plaintiff who has filed a lawsuit related to the use of Taxotere® by the plaintiff or a plaintiff's decedent. Please answer every question to the best of your knowledge. In completing this Fact Sheet, you are under oath and must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details requested, please provide as much information as you can. You must supplement your responses if you learn that they are incomplete or incorrect in any material respect.

     In filling out this form, please use the following definitions: (1) **"healthcare provider"** means any hospital, clinic, medical center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, dietary, psychiatric, or psychological care or advice, and any pharmacy, weight loss center, x-ray department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, physician, psychiatrist, osteopath, homeopath, chiropractor, psychologist, nutritionist, dietician, or other persons or entities involved in the evaluation, diagnosis, care, and/or treatment of the plaintiff or plaintiff's decedent; (2) **"document"** means any writing or record of every type that is in your possession, including but not limited to written documents, documents in electronic format, cassettes, videotapes, photographs, charts, computer discs or tapes, and x-rays, drawings, graphs, phone-records, non-identical copies, and other data compilations from which information can be obtained and translated, if necessary, by the respondent through electronic devices into reasonably usable form.

     **Information provided by plaintiff will only be used for purposes related to this litigation and may be disclosed only as permitted by the protective order in this litigation. This Fact Sheet is completed pursuant to the Federal Rules of Civil Procedure governing discovery (or, for state court case, the governing rules of civil of the state in which the case is pending).**

## I.   CORE CASE INFORMATION

Attorney Information

     Please provide the following information for the civil action that you filed:

1. Caption:  <u>Martine Reeder vs. Sanofi U.S. Services et al</u>
2. Court and Docket No.:  <u>2:16-md-02740-KDE-MBN</u>
3. MDL Docket No. (if different):
4. Date Lawsuit Filed:  <u>12/11/2017</u>
5. Plaintiff's Attorney:  <u>Eric W. Newell</u>
6. Plaintiff's Law Firm:  <u>Brent Coon & Associates</u>
7. Attorney's Address:  <u>215 Orleans St.</u>

22. Are you now or have you ever been a member of an alopecia support group?
Yes ☐ No ☑

    a) If yes, identify the group by name:

    b) When did you join the group?

| Group Name | When did you join the group? |
|---|---|
|  |  |

## III.   PRODUCT IDENTIFICATION

1. Were you treated with brand name Taxotere ®?  Yes ☐  No ☑  Unknown ☐

Other Docetaxel

2. Were you treated with another Docetaxel or generic Taxotere®?  Yes ☑  No ☐

3. If yes, select all that apply:

| Name of Drug | Yes |
|---|---|
| Docetaxel – Sanofi-Aventis U.S. LLC d/b/a Winthrop US | ☐ |
| Docetaxel – McKesson Corporation d/b/a McKesson Packaging | ☐ |
| Docetaxel – Actavis LLC f/k/a Actavis Inc. / Actavis Pharma, Inc. | ☐ |
| Docetaxel – Pfizer Inc. | ☐ |
| Docetaxel – Sandoz Inc. | ☐ |
| Docetaxel – Accord Healthcare, Inc. | ☐ |
| Docetaxel – Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc. / Hospira, Inc. | ☑ |
| Docefrez – Sun Pharma Global FZE | ☐ |
| Docefrez – Sun Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical Laboratories, Ltd. | ☐ |
| Docetaxel – Teva Parenteral Medicines, Inc. | ☐ |
| Docetaxel – Dr. Reddy's Laboratories Limited | ☐ |
| Docetaxel – Eagle Pharmaceuticals, Inc. | ☐ |
| Docetaxel – Northstar Rx LLC | ☐ |
| Docetaxel – Sagent Pharmaceuticals, Inc. | ☐ |
| Unknown | ☐ |

4. **IF YOU SELECTED "UNKNOWN" YOU MUST CERTIFY AS FOLLOWS:**

**I certify that I have made reasonable, good faith efforts to identify the manufacturer of the Docetaxel used in my treatment, including requesting records from my infusion pharmacy, and the manufacturer either remains unknown at this time or I am awaiting the records:** ☑

## IV.   MEDICAL INFORMATION

Case 1:19-cv-27498-JMT-MBD Document 481-3 Filed 11/20/22 Page 91 of 93

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Martine Reeder | Sanofi U.S. Services, Inc., f/k/a Sanofi-Aventis U.S. Inc., et al. |

| (b) County of Residence of First Listed Plaintiff   Atlantic<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
|---|---|
| (c) Attorneys *(Firm Name, Address, and Telephone Number)*<br>Rayna E. Kessler, Esq., Robbins Kaplan, LLP, 399 Park Avenue, Suite 3600, New York, NY 10022-4611 - (212) 980-7431 | Attorneys *(If Known)*<br>Francis X. Manning, Esq., atty. for Defendants, Hospira, Inc., Hospira Worldwide, LLC, f/k/a Hospira Worldwide, Inc. |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☒ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332, 1441

Brief description of cause:
Products Liability case (Taxanes)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE ___    DOCKET NUMBER ___

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 11/20/2019 | *[signature]* |

**FOR OFFICE USE ONLY**

RECEIPT #___    AMOUNT___    APPLYING IFP___    JUDGE___    MAG. JUDGE___

**STRADLEY RONON STEVENS & YOUNG, LLP**
A Pennsylvania Limited Liability Partnership
By:     Francis X. Manning
LibertyView
457 Haddonfield Road, Suite 100
Cherry Hill, NJ  08002
(856) 321-2403
(856) 321-2415 (fax)
fmanning@stradley.com
*Attorneys for Defendants*
*Hospira, Inc. and Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARTINE REEDER, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| SANOFI U.S. SERVICES INC., formerly | ) |
| known as SANOFI-AVENTIS  U.S. INC; | ) |
| SANOFI-AVENTIS U.S. LLC, separately and | ) |
| doing business as WINTHROP U.S.; | ) |
| SANDOZ, INC.; | ) |
| HOSPIRA, INC.; | ) |
| HOSPIRA WORLDWIDE, LLC F/K/A | ) |
| HOSPIRA WORLDWIDE, INC.;  ACCORD | ) |
| HEALTHCARE, INC.;  MCKESSON | ) |
| CORPORATION D/B/A  MCKESSON | ) |
| PACKAGING; | ) |
| SUN PHARMA GLOBAL FZE; SUN | ) |
| PHARMACEUTICAL   INDUSTRIES, INC. | ) |
| F/K/A   CARACO PHARMACEUTICAL | ) |
| LABORATORIES, LTD.; | ) |
| ACTAVIS INC., NOW KNOWN AS | ) |
| ACTAVIS LLC; | ) |
| ACTAVIS PHARMA, INC.;  ACTAVIS LLC | ) |
| F/K/A ACTAVIS INC.  AND | ) |
| ACTAVIS PHARMA, INC.; | ) |
| JOHN DOE DRUG COMPANY | ) |
| DEFENDANTS #1-10, | ) |
| Defendants. | ) |

Case No.: _____

**LOCAL RULE 11.2 CERTIFICATION**

I, Francis X. Manning, hereby certify that this matter in controversy is not the subject of

any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: November 20, 2019    By:   /s/ Francis X. Manning
                                   Francis X. Manning, Esquire
                                   457 Haddonfield Road, Suite 100
                                   Cherry Hill, NJ 08002
                                   T:  (856) 321-2403
                                   F:  (856) 321-2415
                                   E:  fmanning@stradley.com
                                   *Attorneys for Defendants, Hospira, Inc.; Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc.*