```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA


***************************************************************
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                        Civil Action No. 16-MD-2740
                        Section "H"(5)
                        New Orleans, Louisiana
                        October 28, 2022

THIS DOCUMENT RELATES TO ALL CASES
***************************************************************

                  TRANSCRIPT OF MOTION HEARING
      JOINT MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL
         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                  UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE PLAINTIFFS:

```
                   MATTHEW PALMER LAMBERT
                   GAINSBURGH BENJAMIN DAVID MEUNIER
                   & WARSHAUER
                   1100 POYDRAS STREET
                   SUITE 2800
                   NEW ORLEANS, LA 70163


                   ANDRE MURA (via Zoom)
                   GIBBS LAW GROUP, LLP
                   1111 BROADWAY
                   SUITE 2100
                   OAKLAND, CA 94607
```

FOR SANOFI S.A.:

```
                   DOUGLAS MOORE
                   IRWIN FRITCHIE URQUHART & MOORE
                   400 POYDRAS STREET
                   SUITE 2700
                   NEW ORLEANS, LA 70130
```

```
FOR HOSPIRA, INC., HOSPIRA WORLDWIDE, LLC,
FORMERLY DOING BUSINESS AS HOSPIRA WORLDWIDE, INC.,
AND PFIZER, INC.:

                    JOHN F. OLINDE
                    CHAFFE MCCALL
                    1100 POYDRAS STREET
                    SUITE 2300
                    NEW ORLEANS, LA 70163

                    RICHARD T. MOORE
                    WILLIAMS CONNOLLY, LLP
                    680 MAINE AVENUE SW
                    WASHINGTON, DC 20024


FOR SANDOZ, A NOVARTIS DIVISION:

                    J. DALE WAINWRIGHT
                    GREENBERG TRAURIG, LLP
                    300 WEST 6TH STREET
                    AUSTIN, TX 78701

                    R. CLIFTON MERRELL
                    EVAN HOLDEN
                    GREENBERG TRAURIG, LLP
                    TERMINUS 200
                    3333 PIEDMONT ROAD NE, SUITE 2500
                    ATLANTA, GA 30305


FOR ACCORD HEALTHCARE, INC.:

                    MICHAEL J. RUTTINGER
                    TUCKER ELLIS
                    950 MAIN AVENUE
                    SUITE 1100
                    CLEVELAND, OH 44113
```

PARTICIPATING VIA ZOOM:

                    Andrienne Byard
                    Ashley Burkett
                    Connie Matteo
                    Emily Jeffcoat
                    Emily King
                    Hannah Peterson
                    Javier Ortiz
                    Jon Strongman
                    Julie Callsen
                    Kathleen Kelly
                    Neelum Wadhwani
                    Nicholas Sullentrop
                    Nicola Larmand-Harvey
                    Parag Bhosale ReickBush
                    Stephen Nichols
                    Williams Hoffman


Official Court Reporter:      Nichelle N. Drake, RPR, CRR
                              500 Poydras Street, B-275
                              New Orleans, Louisiana 70130
                              (504) 589-7775


     Proceedings recorded by mechanical stenography,
transcript produced via computer.

1        **P R O C E E D I N G S**

2               (Call to order of the court.)

3        THE CASE MANAGER:  MDL No. 16-2740, *In Re:  Taxotere*

4   *Products Limited Liability Litigation*.

5        MR. OLINDE:  Good morning, Your Honor.  It's John

6   Olinde as the liaison for the 505(b)(2) defendants.

7               Just as a housekeeping matter, this is a motion to

8   certify an order for interlocutory appeal which was filed by

9   three defendants.  It was Accord, Sandoz, and Hospira.

10               Dale Wainwright, who I don't believe you have met, is

11   going to --

12        THE COURT:  Good morning, Mr. Wainwright.

13        MR. OLINDE:  He is from the firm Greenberg Traurig,

14   represents Sandoz, and he is going to make the argument today

15   on behalf of the defendants.  But there may be some comments

16   or questions that Hospira or Accord may wish to address after

17   Mr. Wainwright finishes.  And we have Rich Moore here who

18   represents --

19        THE COURT:  I saw Mr. Moore on the airplane

20   yesterday.

21        MR. OLINDE:  I heard that.

22        THE COURT:  He was in the front of the plane and I

23   was in the back.

24        MR. RICHARD MOORE:  It was a little embarrassing,

25   Your Honor.

1          THE COURT:  Oh, you seemed fine.

2          MR. OLINDE:  Can I move to strike that from the

3    record?

4          And also we have Mike Ruttinger, who is representing

5    Accord.  So after Mr. Wainwright finishes, they may have some

6    additional comments to make after that.

7          Thank you, Your Honor.

8          THE COURT:  Okay.  If you all will just give me two

9    minutes, I need to what I call change my hats.  Just let me

10   get organized.  I was in with SEACOR, so let me just get

11   myself a bit situated.

12         Do you have, Sherry, who is arguing?  I know Mr.

13   Wainwright.  Do we have the list of the others?  And Mr. Mura

14   is handling the plaintiffs?

15         Mr. Mura is going to handle the plaintiffs.  I see

16   him.

17         Are you handling the plaintiffs?

18         MR. LAMBERT:  That's correct, Your Honor.  Mr. Mura

19   will handle -- Ms. Jeffcoat is also on the Zoom, but Mr. Mura

20   is handling it.

21         THE COURT:  Okay.  Why don't you just get me the

22   names of who all is going to be arguing.

23         Are we ready, Mr. Wainwright?

24         Thank you.

25         MR. WAINWRIGHT:  Are these microphones in the right

1    place?  Do I need to pull them over?

2          THE CASE MANAGER:  You can pull them over.

3          THE COURT:  Yes, please.

4          MR. WAINWRIGHT:  Make sure you can hear me.

5          Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. WAINWRIGHT:  This is my first time in your court.

8    It's a pleasure to be here.  As you heard, Dale Wainwright

9    with Greenberg Traurig and I'll be making the arguments on

10   behalf of all the defendants.

11         As you know, Your Honor, all three defendants move

12   for summary judgment on the ground that the newly acquired

13   information requirement under federal drug administration

14   regs could not be met.  Therefore, defendants were not

15   permitted to change their label prior to 2016 on the drug

16   docetaxel.  However, plaintiffs allege state law claims for

17   failure to warn because there's a contradiction between our

18   inability to have changed our label.  And the plaintiffs

19   claim that we have to prove an adequate warning label.  Then

20   we have a contradiction and under the United States

21   Constitution Supremacy Clause, the state law claims are

22   preempted.

23         Now, that's not the issue -- we're not here on the

24   issue for summary judgment.  We're here on the requirements,

25   the conditions for 28 USC 1292(b) asking Your Honor to

1    certify this case for interlocutory appeal.  And as you know,

2    Your Honor, there's four requirements under 1292(b).  First,

3    the order must be in writing and then the issue must involve

4    in the order controlling questions of law.  There must be a

5    substantial ground for difference of opinion and an immediate

6    appeal from the order may materially advance the ultimate

7    termination of the litigation.

8         I'll touch each of those conditions briefly, but

9    focus on one more than the other because candidly, Your

10   Honor, I don't see much basis for the argument that the

11   issues in your order do not constitute controlling questions

12   of law.

13        As you wrote, Your Honor, in *Vintage* last year and in

14   *Adams* earlier this year, if a reversal of the order would

15   result in the termination of the litigation or a substantial

16   portion of it, I think you wrote an even -- even sometimes on

17   the motion to dismiss, if one claim for due process is

18   dismissed, then it is a controlling question of law.  I don't

19   think that's a close question, Your Honor.

20        I also want to point out as a preliminary matter also

21   before getting to the other two points, that these are

22   questions of law.  The Fourth Circuit held in *Knight* in 2021

23   that whether there exists newly acquired information for

24   purposes of preemption, it is a legal question.  *Lyons v.*

25   *Boehringer* from the Northern District of Georgia in 2022 said

1   also like all other courts that have addressed this question

2   post-*Albrecht*, Supreme Court case, this court finds that both

3   the newly acquired information question and the FDA action --

4   different issue in that case but both are questions for a

5   judge to decide, not a jury, and, Your Honor, that only

6   stands to reason.

7        Every time there's a question about newly acquired

8   information, to require a jury trial to determine it would

9   mean the system would not work.  It would break down.  I

10  think it would be hard to imagine that the U.S. Congress

11  intended where it would be a jury trial every time this

12  question arose.

13       Another reason that this is a question that is

14  subject to and many strong arguments for interlocutory appeal

15  is the *Pacifica* opinion from this circuit in 1961 that held

16  that preemption is generally a strong basis for certifying a

17  question for interlocutory appeal.

18       And, Your Honor, there is an interesting historical

19  background that I want to point out for the judge.  And it's

20  in the *Ryan* opinion which cites *Pacifica* and it explains that

21  when 1292(b) was passed, it was a judge-sought, judge-made,

22  judge-intended provision that was then approved by the U.S.

23  Conference of Courts and Congress followed that suggestion

24  and passed 1292(b) to allow for certified interlocutory

25  appeals.  And it was to conserve and use wisely the resources

1    of the judiciary.  That is a strong point here.

2          I think it goes without saying, although I will say

3    it, Your Honor, that as you know very well, there's some

4    3,000 cases that these three defendants here today are

5    dealing with and that your court is handling and that

6    plaintiffs are pursuing.  A resolution of all of those cases

7    is what 1292(b) is --

8          THE COURT:  Let me ask this --

9          MR. WAINWRIGHT:  -- intending to address --

10         THE COURT:  -- Mr. Wainwright.  Would it resolve all

11   3,000 cases?  And I'll tell you why, because I thought about

12   that too.  I mean, I think -- I'm not sure it would resolve

13   all of them.  Now, I think it would certainly make

14   substantial head way in terms of -- but, you know, there is

15   a -- there's a factual underpinning to all of these.  Well,

16   if you received it at this -- you know, your docetaxel was

17   administered at this point in time and it was approved at

18   this point in time, you know, that becomes a continuum if you

19   will as to at what point would there have been sufficient

20   newly acquired information.  So that would be -- that's just

21   one of the questions I had.  Now, do I think it would make

22   substantial progress?  Yes.  And --

23         MR. WAINWRIGHT:  I understand.

24         And, Your Honor, as you know and you put your finger

25   on it, substantial progress, substantial termination of parts

1    of the litigation is sufficient to constitute a controlling

2    question of law.

3         In terms of the continuum that you're talking about,

4    we should keep in mind that in 2011 when the FDA approved the

5    labels for the defendants following precisely --

6         THE COURT:  Right.

7         MR. WAINWRIGHT:  -- Sanofi's submission --

8         THE COURT:  Right.

9         MR. WAINWRIGHT:  -- and the FDA's clear and in-depth

10   analysis of the clinical and non-clinical and public

11   literature data, then in 2016 and '17 when the defendant's

12   warning label was approved by the FDA, again, an in-depth

13   analysis of clinical, non-clinical, public literature

14   studies, the FDA made the decision that in 2016 and '17 when

15   Hospira, Accord, and Sandoz warning labels adding permanent

16   risk or risk of permanent alopecia were added, that's when

17   the FDA decided there was sufficient newly acquired

18   information --

19        THE COURT:  They filed the CBE then.

20        MR. WAINWRIGHT:  They did at that point in time, but

21   they did not before that, Your Honor.  And, actually,

22   Hospira's Exhibit R to their summary judgment motion points

23   out how the FDA went through this analysis in great detail

24   and made a determination at which point there was sufficient

25   newly acquired information for that label change to include

1    permanent risk of alopecia.  But before that, the FDA had

2    just as much access to public literature and perused it and

3    monitored it closely and the defendants did the same thing.

4         And, Your Honor, we just had a disagreement that the

5    court's order does not require an analysis of whether there's

6    a greater risk of greater severity or frequency.  We think

7    that is a necessary determination.  It is not something that

8    is inconsequential to the outcome.  That's a question that

9    the industry nationwide would benefit from and guidance from

10   the U.S. Court of Appeals for Fifth Circuit would benefit

11   Your Honor, certainly would be much more efficient as opposed

12   to going down the road with incredible discovery, setting

13   perhaps bellwether cases for trial, having a final judgment

14   how far down the road is that, Your Honor knows better than

15   I, and then going up to Fifth Circuit on appeal, year and a

16   half or so coming back down, and then applying that guidance

17   to the cases as opposed to going up the ladder now, Your

18   Honor, to get that guidance that frontally would save

19   resources for plaintiffs as well as defendants and expedite a

20   final resolution, Your Honor, for thousands of cases or at

21   least a partial resolution, certainly important guidance for

22   thousands of cases.

23        Now, the issue about substantial ground for

24   difference of opinion seems to me, Your Honor, is the only

25   one of the three conditions that there's some argument on,

1    but looking at it closely, I believe clearly favors the

2    conclusion that there is substantial ground for difference of

3    opinion.  For one, your opinion, Your Honor, is the only one

4    that addresses this --

5              THE COURT:  I know.

6              MR. WAINWRIGHT:  -- newly acquired information issue

7    in the country --

8              THE COURT:  I know.

9              MR. WAINWRIGHT:  -- at this point.

10             I'm sorry?

11             THE COURT:  I know that.  We looked.  I know that.

12             MR. WAINWRIGHT:  Well, thank you for the courage to

13   make the decision, Judge.

14             We know that simply because it's a novel question

15   doesn't mean that it's certifiable.  However, Your Honor,

16   plaintiffs and defendants cite authority and argument and are

17   clearly at loggerheads on that issue.  The thousands of cases

18   need that guidance, Your Honor.  And we need to know not only

19   about newly acquired information generically, but also what

20   exactly is required for this different type of greater

21   severity or frequency of risk of permanent alopecia.

22             THE COURT:  And I've read that and this is just -- I

23   don't think that I ignored it --

24             MR. WAINWRIGHT:  I'm sorry?

25             THE COURT:  -- what newly acquired information

1    required that had greater risk and frequency.  I don't think

2    I ignored it and I think that's been something that I've read

3    from the defendants from the beginning.  I think the reality

4    is what had you submitted to the FDA, which was nothing, and

5    then there was information that was provided.  And the

6    question is, is it -- okay.

7         Just you can proceed.  Sometimes you just get a

8    little thorn in your side.

9         MR. WAINWRIGHT:  Yeah, I hear you.

10        THE COURT:  Because I don't think I ignored it.  I

11   think there is what is newly acquired information and then,

12   you know, there are -- and that it be greater frequency,

13   severity is -- is part of the newly acquired information and

14   then there was also -- then the causal association.  But I

15   don't think I completely ignored it and that's been something

16   that's been here, but --

17        MR. WAINWRIGHT:  And I understand, Your Honor.  Two

18   quick points here, one, we really want to hear what the thorn

19   in your side is, because we want an opportunity to address it

20   for you.  So thanks for bringing that up.

21        And, secondly, if I said ignored, I didn't intend to.

22   Your opinion does talk about literature and studies and the

23   determination was you didn't have to reach a determination of

24   whether there was a risk --

25        THE COURT:  Well, the problem is, you submitted

1    nothing and then you look back and say nothing was submitted,

2    but this isn't more than they already had and you don't know

3    what they had, so it's a little bit of a conundrum.  It's not

4    a little bit of a conundrum.  It's quite a conundrum to

5    determine what -- how do we determine what the FDA had when

6    you don't know and then you get information that shows that

7    there is this risk, certainly a greater frequency than you

8    submitted, but there is -- and there is no authority, so I

9    agree with you.  And we'll just let it go at that.

10         MR. WAINWRIGHT:  Thank you, Judge.  Thank you, Judge.

11         Couple of additional points on that with the 2011 FDA

12   approval of the label, there are some incidence of permanent

13   alopecia related to the docetaxel that were considered at

14   that point in time.  So this was not something that was --

15         THE COURT:  Considered by whom?

16         MR. WAINWRIGHT:  -- that was new.

17         I believe it was in the FDA's consideration.  I'm

18   going to ask Rich or Michael to address that in more detail

19   in just a minute if I may, Your Honor.

20         THE COURT:  Because I think that was part of it, what

21   I heard, but go ahead.

22         MR. WAINWRIGHT:  But under your adoption of the

23   Silverstein standard, on the shifting burden, plaintiffs have

24   a burden of production; defendants retain as required by law

25   the burden of persuasion.

1          THE COURT:  Persuasion.

2          MR. WAINWRIGHT:  Plaintiffs have to show that this --

3    there was at least some reason to believe there was

4    greater -- a risk of greater severity or frequency and just

5    submitting a few studies doesn't get you there, Your Honor.

6    They have to show that what they submitted was greater than

7    what existed prior to 2011, at least as a prima facie basis

8    before the burden shifts to us under the Silverstein standard

9    to show something to the contrary.  We don't think they carry

10   that burden, Judge.

11         And, Your Honor, if you have no more questions, what

12   I'll do is ask Mr. Moore or Mr. Ruttinger to address

13   specifically some of this literature that we're talking about

14   or data and then I'll of course return on rebuttal.

15         THE COURT:  Thank you.

16         MR. WAINWRIGHT:  Thank you, Judge.

17         MR. RICHARD MOORE:  Good morning, Your Honor.  Before

18   I address that question, I just want to address your first

19   question about how many cases were involved and what its fact

20   specific -- I can speak on behalf of Hospira.  This would

21   affect the vast majority of our cases.  I'm 80 percent,

22   90 percent, almost all the cases would have been before that

23   late or that 2014 time period.  So it doesn't have to be all

24   the cases first of all.  Second of all, I just wanted to --

25   as a factual matter, it's the majority of the documents.

1        And with regard -- I'm not -- I confess I'm not clear

2   exactly on what the question I'm supposed to address that he

3   didn't, but if you're talking about what was submitted before

4   and what was submitted after and who did, I think Your Honor

5   put your finger on it exactly, which it is a bit of a

6   conundrum, because the regulation is, as Your Honor points

7   out, no 505(b)(2) can ever have all the information that the

8   brand has.  But what we have is a legal -- what we see as a

9   -- it's not that you ignored the information, Your Honor.

10   It's that we have a disagreement with Your Honor on how the

11   regulation should be applied.  And that's what we think we

12   need guidance on.

13        THE COURT:  And I think, yeah, it is a conundrum

14   because unlike the generics, you do have access to CBE.

15        MR. RICHARD MOORE:  That's correct, Your Honor.

16        THE COURT:  And that's part of this and the question

17   then becomes, so what does that mean?  What does that mean?

18   We don't have to do anything ahead of time, but what do we do

19   once the label is there since we have access to CBE, so --

20        MR. RICHARD MOORE:  Precisely.

21        THE COURT:  That's why I said from the beginning this

22   was a bit complicated.

23        MR. RICHARD MOORE:  And we agree, Your Honor, and

24   that's why we think it would benefit from appellate review.

25   It's a thorny issue.  It's a conundrum.  It's an issue on

1  which we disagree.  There's substantial room for

2  disagreement.

3       Our position is that it does require a before and

4  after analysis as of the time of approval and that there was

5  sufficient literature out there for the 505(b)(2)s to do that

6  comparison, and if you do the comparison, you would not see

7  greater severity or frequency, but that's our interpretation

8  of the regulation.

9       And Your Honor had a different interpretation.  So

10  our point is simply that I think everyone would benefit from

11  some appellate guidance on this critical legal issue.

12       THE COURT:  Thank you, Mr. Moore.

13       MR. RUTTINGER:  Can I have about 90 seconds, Your

14  Honor?

15       THE COURT:  Sure.

16       MR. RUTTINGER:  Thank you, Your Honor.

17       Let me address two points that I think arise out of

18  the conundrum you mentioned here.  First off, when we're

19  talking about the matter of, you know -- you heard Mr. Moore

20  just talk about the need for the before and after comparison,

21  when we talk about the impact that the newly acquired

22  information regulation requiring risk of greater severity or

23  frequency, we're not just talking about materials submitted

24  by the 505(b)(2)s.  What you've noted is relatively small

25  submitted to the FDA by nature of the regulatory process.  We

1    believe that the definition correctly read also includes

2    information submitted either by Sanofi, which the 505(b)(2)s

3    don't have a right of reference to and also publicly

4    available articles and scientific journals of which the FDA

5    may have been aware, particularly given that the FDA conducts

6    its own review of those materials at the time of the

7    505(b)(2)'s approval.  So it's broader than simply before and

8    after of what exactly the 505(b)(2)s submitted.

9         The other aspect to this that we think creates the

10   substantial grounds for disagreement and necessitates

11   guidance from the Fifth Circuit is that the Court's ruling as

12   particularly Your Honor's application of the aspect of the

13   newly acquired information regulation that includes new

14   analyses of old information, which we agree is part of the

15   regulation, but how that is applied needs to be specifically

16   considered within the context of the 505(b)(2) approval

17   process because when we're talking about new analyses of

18   previous information, it's uncontested that 505(b)(2)s have a

19   different universe of access.  That's their very point to be

20   drawn from the fact of that we were -- lack of right of

21   reference, so we cannot conduct the same new analyses that a

22   505(b)(1) or an innovator drug could.  That's a really

23   important public policy guidance issue because if this

24   Court's application of the new analyses rule is to be

25   interpreted strictly, it could imply that on day 1,

1   post-approval, a 505(b)(2) has a burden, regulatory

2   obligation to go back and conduct the same kind of

3   pre-approval analyses that Congress and the FDA through the

4   Hatch-Waxman pathway said we don't want you doing that

5   because we want an abbreviated pathway to market.  So our

6   concern is that that ruling can be interpreted as creating

7   confusion as to the obligations both at the approval stage

8   and day 1 post-approval for the 505(b)(2) manufacturers.

9          THE COURT:  Thank you, Mr. Ruttinger.

10          Okay.  Mr. Mura?

11          MR. MURA:  Hi.  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. MURA:  Let me begin with what the standard is and

14   what this court's order was, because in our view, this

15   interlocutory appeal should not be granted.  Defendants have

16   to meet three strict conditions before an interlocutory

17   appeal is allowed here.  We do contest all three conditions.

18   We don't think defendants have met any of them.

19          And so first to understand why, I think you really

20   need to look at the question the defendants themselves have

21   framed as questions that they would like the Fifth Circuit to

22   answer.  And if you look at those questions, they're heavily

23   based on an analysis of the evidence.  It's a fact-found

24   analysis.  This Court's opinion was very thorough, went

25   through a lot of record evidence about pre-approval and

1    post-approval data and it did so all in the context of trying

2    to understand the preemption question here.  So the

3    defendants are essentially asking whether there was

4    sufficient evidence for a label change based on pre- and

5    post-approval data.  That's essentially their questions one

6    and three.  And they're also asking whether defendants were

7    obligated to re-analyze pre-approval data at all.  That's

8    really their question 2 and 3 and this Court went through the

9    record and made its determination.

10        None of those questions raised pure questions of law,

11   which the Court of Appeals have defined as an abstract legal

12   question that can be decided without having to study the

13   record.  So defendants here are not for example -- an

14   abstract legal question here might be something like do

15   defendants have access to CBE at all.  That's not a question

16   in this case.  Defendants are not saying that they're

17   generics.  They're not saying that they didn't legally have

18   access to CBE.  What they're saying is what happened once the

19   label is approved, right?

20        I mean, you just heard a discussion from three

21   different counsel arguing about the sufficiency of the

22   evidence and the amount of evidence that was there and they

23   make two arguments.  One, they really do focus on whether

24   they can look at pre-approval data and say whether it meets

25   the CBE standards and they talk about how they didn't have

1    the same information that Sanofi had submitted to the FDA.

2         THE COURT:  I guess, Mr. Mura, I will tell you, going

3    through these motions, there was no guidance for this court.

4    None.  And wouldn't it be beneficial to have review from the

5    circuit because, you know, the Supreme Court has addressed

6    the holders of -- I think they address generics.  And then we

7    have this in between body, if you will, that does have access

8    to CBE.  Everybody says that that's easy, but then the

9    question is, what do I do with a manufacturer that doesn't

10   have access to a great deal that was submitted to the FDA and

11   how do I make that determination?

12        And *Albrecht* says, you know, this is a thing for the

13   judge.  This is a matter of law.  Why wouldn't I seek

14   guidance from the circuit after I've struggled with it to

15   determine whether or not the analysis was correct or not?

16        MR. MURA:  Because this Court, first, reached two

17   alternative holdings.  I mean, first it looked at the

18   question of whether a post-approval analysis of publicly

19   available pre-approval data would have demonstrated the

20   standard --

21        THE COURT:  Right.

22        MR. MURA:  -- for approval.  So I guess that might be

23   the harder question.  But then the Court went on to say that

24   new pieces of information came available post-approval,

25   right, so it performed the traditional analysis that is

1   performed in every brand name manufacturer preemption motion.

2   You look at post-approval and you look at what information

3   was there.  There's no question that they had access to CBE.

4   That is a straightforward application of existing law and the

5   court independently found on that basis that the defendant's

6   preemption motion should be denied.  So you could have

7   written the same opinion, Your Honor, without addressing the

8   first half of the question.

9        The Court did a lot of work to provide guidance to

10  the 505(b)(2)s in that area as well, but it really does have

11  two holdings here and the Fifth Circuit would not even need

12  to reach the question that the 505(b)(2)s want answered, this

13  question of pre-approval data, because the court found that

14  there was sufficient post-approval data to require -- to

15  authorize a label change.  So really the question that they

16  want to raise is academic, and when you think about it in

17  this context, what it's going to do is delay the entire

18  litigation for a year and a half.  We are worried about the

19  collateral consequences to the entire MDL, the effects in

20  Sanofi as well, and dismissal here, I mean, they're just

21  presuming a reversal on appeal, but that's not the only way

22  to resolve this case.

23       I mean, this court provided a lengthy authoritative

24  opinion on the legal observations of 505(b)(2)s and half of

25  that decision is just applying settled law, the question of

1    preemption to a brand name manufacturer essentially and

2    post-approval evidence.  I mean, there's nothing new there.

3         And on the question of severity and risk and this

4    issue of whether defendants could never determine whether

5    information revealed risks of a different type or severity

6    without knowing the full extent of what was previously

7    submitted to the FDA, this court called those arguments

8    nonsensical.  I mean, that is a very strong rejection of that

9    position.  Courts typically don't send -- pause entire

10   litigations, let alone MDLs, to resolve questions that the

11   undersigned believes were nonsensical.  And, again, the court

12   didn't even need to reach those arguments because it

13   concluded that there was sufficient post-approval evidence.

14        I don't think that even a preemption decision from

15   the Fifth Circuit in these three or so cases is going to

16   resolve the entire MDL because you're going to have

17   fact-based arguments in each of the cases depending on the

18   time of the administration and so the question could very

19   well be different if it's a 2014 case, if it's a 2015 case,

20   if it's a 2013 case, and this is a small window of time,

21   right?

22        And so if the only argument, legal argument,

23   defendants have for reversal is this question of

24   pre-approval, we didn't know what was submitted to the FDA so

25   we could never determine whether we have an obligation to

1   submit more, I mean, the court's decision says that that's a

2   red herring, whether information would have triggered a new

3   analysis is irrelevant to the question of preemption in this

4   matter.  So the court ultimately -- if it's going to submit a

5   question to the Fifth Circuit, it has to write or propose

6   questions, and the questions that have been proposed to the

7   court are not suitable for an interlocutory appeal.  They are

8   very fact-based questions.  They're questions about the

9   sufficiency of the evidence.  A lot of them are focused on

10  pre-approval data, which, again, I think is academic once you

11  find that post-approval information would have been

12  sufficient.

13       All of that shows that this is not an appropriate

14  opinion to certify to the Fifth Circuit, especially given the

15  narrow and careful grounds that the court reached and the

16  court had alternative holdings here.  And so the court did

17  not issue some sweeping ruling on preemption that no court

18  has ever seen.  I mean, it essentially applied the framework

19  understanding that CBE is available, applying the regular

20  standards for that.  It would have reached the same

21  conclusion if -- instead of the defendants here being

22  505(b)(2)s, if they were just brand name drug manufacturers

23  and this was a new label, it would have done the same

24  analysis about the availability of information post-approval.

25  It would have reached the same conclusion.  And so there is

1    no reason and no special reason for these 505(b)(2)'s to be

2    asking for interlocutory appeal.

3         And, again, we do think it would seriously harm the

4    litigation.  It's not a question of whether just advancing

5    some subset of cases.  I mean, this is multi-district

6    litigation.  This court and the FEMA Trailer court have

7    written about the particular concerns about interlocutory

8    appeals and MDLs and causing delay and so the court can make

9    its own assessment and wisdom about whether it's appropriate

10   here.  We respectfully suggest that it would not and it would

11   be deleterious to the advancement of this case.

12        THE COURT:  Thank you.

13        MR. WAINWRIGHT:  Just a brief response, Your Honor,

14   looking back on some of the notes from co-counsel from your

15   mid-September hearing when you were musing and you said

16   something to the effect of why wouldn't it be helpful to get

17   some guidance from the Fifth Circuit, we think that was

18   directly on point, Judge.

19        There's a Harvard Law Review article that says one of

20   the questions of this type of analysis -- and, of course,

21   that's not authoritative, but interesting -- is could a

22   reasonable appellate judge have disagreed.  And I think the

23   question there is, yes.  There's lots of smart people and

24   sometimes smart people disagree, but in our hierarchy,

25   appellate court provides guidance for the trial courts and

1   that would be very helpful.

2        In terms of advancing the litigation and how

3   important that is, I think it's short-sided to say that the

4   outcome is all that we're talking about here, whether it's

5   reversed or affirmed, but how would the opinion be written,

6   what's the reasoning, what are the principles that are laid

7   out.  All of that will come back and apply to as opposing

8   counsel said whether it's a 2013 case or a 2014 case, the

9   Fifth Circuit tends to take, I think, great pleasure in

10  writing reasoned opinions including rationale.  Some people

11  may agree.  Some people may disagree.  But those

12  principles -- yes, the outcome is important, the principles

13  in that written opinion is what we painstakingly spend so

14  many late hours at night trying to figure out what they mean,

15  but they provide guidance for us and that is a big part of

16  what we're looking for as well.

17       And I've been in your shoes, Your Honor, and, you

18  know, some judges write an opinion around the hard question.

19  You addressed it and you said that, you know, as opposing

20  counsel said, irrelevant whether to get into some of these

21  points.  Again, not ignored or irrelevant.  And then you kind

22  of feel like you're on an island because you are, but you had

23  the guts to go there and, Your Honor, we're asking for the

24  guts to get some guidance from the Fifth Circuit.

25       Thank you, Judge.

1           THE COURT:  Anything further, Mr. Moore?

2           MR. RICHARD MOORE:  Just briefly.  I just want to

3    respond to a couple of things that plaintiff's counsel said

4    that I think were just incorrect and misconstruing Your

5    Honor's order.  Your Honor's order did analyze pre-approval

6    data in our case that's before 2011 and it also went on to

7    analyze the post-approval data after 2011.  It looked at

8    both, but what it did not do is determine whether the

9    post-approval information was of a greater severity or

10   frequency than the pre-approval and that's the legal issue

11   that we talked about.  So I think plaintiff's counsel is

12   mischaracterizing Your Honor's order when he says that it

13   determined that the post-approval information was sufficient.

14   Not under our review of the law.  That's why it's a legal

15   issue.  There's no comparison of before and after.

16           So, again, we go back to this, just -- there's just a

17   disagreement on the regulation and the plaintiffs' brief

18   itself says we have an issue about an interpretation of a

19   regulation.  That's a legal issue.  And so I think that's

20   exactly what we have here.  It's not a factual issue.  It's

21   not like we're arguing with a dispute of did the

22   post-approval information have a greater severity or

23   frequency than the pre-approval information, like that could

24   be a factual issue, but our point is that there wasn't the

25   analysis and therefore it's a legal issue.

1          THE COURT:  Thank you.

2          MR. LAMBERT:  Your Honor, Palmer Lambert, co-liaison

3    counsel for plaintiffs.

4          I just want to say for the record, we were not given

5    advanced notice before this morning that there would be an

6    in-tandem tag-team argument on this one motion, not three

7    separate motions.  So I just want to say that for the record.

8          I would also like to piggyback just on one thing.

9    This issue of 1292(b) interlocutory appeal is a matter of

10   great debate in the MDL world and whether or not it will

11   advance the conclusion of this litigation is also a matter of

12   great debate.  In my opinion, only if they're correct and

13   Your Honor grants 1292(b) and then they secure a reversal

14   will it have any meaningful impact.  If there's an

15   affirmance, they will still have all of the arguments and all

16   of the guidance that Your Honor has given over the last six

17   years in terms of learned-intermediary and statute of

18   limitations and PID and all of these other issues that Your

19   Honor has provided substantial guidance to the parties on.

20   And in this particular case, the court appointed settlement

21   committees, asked them to be involved in discussing the

22   potential to conclude this litigation.  That's another route

23   for discussion.

24          Now that process has been at a complete standstill

25   while these 505(b)(2) defendants asked for preemption

1    rulings.  We've now argued them three times, including today,

2    and Your Honor has provided the guidance to those committees

3    for them to do what they've been assigned to do.  And so I

4    would say, Your Honor, that this situation is a double-edge

5    sword.  It could have the potential to advance the

6    litigation.  It also could cause substantial delay.

7            THE COURT:  Thank you.

8            Thank you, Mr. Mura.

9            MR. MURA:  Thank you, Your Honor.

10           THE COURT:  Court's adjourned.

11                         (Recess taken.)

12                            * * * *

13        (WHEREUPON, the proceedings were adjourned.)

14                            * * * *

15

16

17

18

19

20

21

22

23

24

25

```
1                        REPORTER'S CERTIFICATE

2           I, Nichelle N. Wheeler, RMR, CRR, Official Court
    Reporter, United States District Court, Eastern District of
3   Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
4   understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

5

6                         /s/ Nichelle N. Wheeler
                          Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```