```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3   ********************************************************************
    IN RE: TAXOTERE (DOCETAXEL)        MDL NO. 2740
4   PRODUCTS LIABILITY LITIGATION      SECTION "H" (5)
                                       MARCH 14, 2023
5   This document relates to:
    All cases
6   ********************************************************************

7

8         TRANSCRIPT OF SHOW CAUSE HEARING VIA VIDEO CONFERENCE
           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
9                    UNITED STATES DISTRICT JUDGE

10

11

12  APPEARANCES:

13  FOR PLAINTIFFS:               M. Palmer Lambert, Esquire
                                  PENDLEY, BAUDIN & COFFIN
14                                1100 Poydras Street, Suite 2225
                                  New Orleans, LA 70163
15

16

17                                Claire E. Kreider, Esquire
                                  GAINSBURGH, BENJAMIN, DAVID
18                                  MEUNIER & WARSHAUER
                                  1100 Poydras Street, Suite 2800
19                                New Orleans, LA 70163

20

21

22  FOR DEFENDANTS:               Kelly E. Brilleaux, Esquire
                                  IRWIN, FRITCHIE, URQUHART & MOORE
23                                400 Poydras Street, Suite 2700
                                  New Orleans, LA  70130
24

25


                          OFFICIAL TRANSCRIPT
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR DEFENDANTS:              Julie A. Callsen, Esquire
                                 Brenda Sweet, Esquire
 4                               TUCKER ELLIS
                                 950 Main Avenue, Suite 1100
 5                               Cleveland, OH 44113

 6

 7                               Nicholas Insogna, Esquire
                                 GREENBURG TRAURIG
 8                               Terminus 200
                                 3333 Piedmont Road, NE
 9                               Atlanta, GA 30305

10

11

12   ALSO PRESENT VIA TELECONFERENCE:

13

14                               Dawn Barrios, Esquire
                                 Jordan Baehr, Esquire
15                               Danae Benton, Esquire
                                 Melanie Sulkin, Esquire
16                               Ryan Browne, Esquire
                                 Denise Dessel, Esquire
17                               Karen Menzies, Esquire
                                 Eric Newell, Esquire
18                               David Diamond, Esquire
                                 Lisa Gorshe, Esquire
19                               Rachel Richardson, Esquire
                                 Hunter Bryson, Esquire
20                               Javier Ortiz, Esquire
                                 Mark Niemeyer, Esquire
21                               Justin Roberts, Esquire
                                 Clint Casperson, Esquire
22                               John Cowart, Esquire

23

24

25


                         OFFICIAL TRANSCRIPT
```

```
 1  Official Court Reporter:          Alexis A. Vice, RPR, CRR
                                      500 Poydras Street, HB-275
 2                                    New Orleans, LA 70130
                                      (504) 589-7777
 3                                    Alexis_Vice@laed.uscourts.gov

 4

 5

 6

 7

 8  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

1                    P-R-O-C-E-E-D-I-N-G-S

2                        MARCH 14, 2023

3                     (SHOW CAUSE HEARING)

4

5              (The Court was called to order.)

6         **THE COURT:** Good morning.

7         **DEPUTY CLERK:** MDL 2740, *In Re:  Taxotere Products*

8   *Liability Litigation* set for a show cause hearing.

9              Counsel, if you could, please make your appearances.

10        **MS. CALLSEN:** Julie Callsen on behalf of Accord and

11  the 505(b)(2) defendants.

12        **MR. INSOGNA:** Nick Insogna on behalf of Sandoz and the

13  505(b)(2) defendants.

14        **MS. SWEET:** Brenda Sweet on behalf of Accord and the

15  502(b)(2) defendants.

16        **MS. BRILLEAUX:** Kelly Brilleaux on behalf of the

17  Sanofi defendants.

18        **MR. LAMBERT:** Palmer Lambert, co-liaison counsel for

19  plaintiffs.

20        **MS. KREIDER:** Claire Kreider for plaintiffs.

21        **MR. LAMBERT:** And I know Dawn Barrios is also on.

22  She's on the Zoom, Your Honor.

23        **MS. BRILLEAUX:** Mr. Baehr for Sanofi is also, I

24  believe, on the Zoom.

25        **THE COURT:** Okay, thank you.


                    OFFICIAL TRANSCRIPT

1          **MS. CALLSEN:** Good morning, Your Honor, on behalf of

2     the defendants, I just want to make a general statement.  The

3     parties have engaged in extensive efforts to resolve the

4     product ID deficiences about which you're going to hear today

5     since the last hearing was held in September now.  So that was

6     six months ago.

7          First of all, we negotiated, and then the Court

8     entered the addendum to CMO 12A on December 6th, 2022, and

9     that specific purpose of that addendum was to outline what

10    other evidence outside of CMO 12A would be acceptable and would

11    be considered at future hearings.  That addendum gave the

12    plaintiffs 30 days to obtain that evidence, and it's now been

13    more than 90 days.

14         In addition, then we agreed in that addendum there

15    were certain cases that we agreed to consider reinstatement

16    based on disputed evidence that was covered in the addendum,

17    and defendants then ordered, you know, agreed to certain cases,

18    and that reinstatement order was entered January 6th, 2023.

19    The plaintiffs were then to work on getting the addendum

20    evidence; so it's now been more than 60 days since that order

21    was entered.

22         Just dating back to in September, that initial notice

23    of noncompliance had 387 cases on it.  There were additional

24    cases added from rollovers and for the reinstatements.  Since

25    that time, 240 of those have resolved their product ID

OFFICIAL TRANSCRIPT

1  deficiences, and so they're removed from the list.  Almost 100

2  have agreed to dismissal.  And with respect to the remaining,

3  defendants have analyzed the product ID.  We've sought meet and

4  confers with numerous plaintiffs firms, and as a result, more

5  fell off the list or 43 of them were rolled over to the next

6  hearing because of continuing efforts.  So today, we have

7  whittled that list down to 114.

8            **THE COURT:** Thank you.

9            **MS. CALLSEN:** So like the last hearing, there's also

10  going to be PFS deficiences, and there will be a handful of

11  those cases addressed at the beginning by Kelly Brilleaux.  We

12  also organized the hearing list so that the cases that were not

13  heard in September go first.  So it's a little bit different

14  because, you know, so that those cases do get their time.

15            With respect to looking forward, our next notice will

16  have about 200 cases on there, and we will again streamline

17  substantially as we've just outlined the efforts we go through.

18  We're looking at a May or a June hearing; so we can work on

19  that date, perhaps, after the conclusion of this hearing so

20  that we have a date to work towards.

21            With respect to what you're going to hear today,

22  about 105 of those cases, plaintiffs have indicated that they

23  do plan to object to dismissal; so that's what you're going to

24  hear.

25            The hearing list is formatted differently as we

OFFICIAL TRANSCRIPT

1   talked about after the last hearing because it has plaintiff's
2   position as to the PID and defense position as to the PID.  And
3   we also have -- the defendants have the underlining documents
4   with us to the extent you want to walk through those.
5         As set forth in the addendum, the sufficiency of the
6   evidence depends on the facts of each individual case and the
7   documents produced.  So the documents may not be sufficient to
8   identify the proper defendant or avoid dismissal.
9         Again, we appreciate that the Court does not take
10  dismissal lightly based on product ID, but the ones that remain
11  on the list were those ones that it's defendant's belief that
12  they simply don't establish the identity of any one defendant
13  and it's just possibilities.  Those are the ones that are on
14  the list.
15        **THE COURT:** Thank you.
16        **MS. CALLSEN:** There is a listing of plaintiffs who
17  have filed declarations of no contact and no defense, and that
18  was a list of seven which we submitted when the hearing was
19  done March 9th.
20        Plaintiffs, are there any more to add to that list,
21  the list of seven?  Okay, that seven is complete.  Did you
22  already provide that?
23        **THE COURT:** I have it, yes.  I'm going to read this.
24  The following plaintiffs have filed a statement of no defense.
25  Their matters are therefore dismissed with prejudice.

OFFICIAL TRANSCRIPT

```
 1              Those cases are:  Kristina Bizier, Docket 18-13603;
 2   Doris Brown, Docket 16-16240; Michelle Carlisle, Docket
 3   21-01674; Terri Sue Collins, Docket 21-851; Doris Mitchell,
 4   Docket 21-1301; Patricia Simons, Docket 18-8415; and Sheryl
 5   Wray, Docket 18-5388.
 6              MS. CALLSEN: Thank you.  In addition to that, what we
 7   submitted, defendants submitted an order dismissing the cases
 8   subject to the hearing where the plaintiffs --
 9              THE COURT: Let me just say, you know, counsel for
10   plaintiff Doris Brown, Case No. 16-16240, has filed a
11   declaration of no contact which results in a statement of no
12   defense.  So plaintiff Doris Brown's case is dismissed with
13   prejudice due to plaintiff's failure to comply with the
14   obligation to communicate with counsel despite counsel's best
15   efforts.  I just want to make sure that it was just, she just
16   would not communicate with counsel.
17              But before we do anything else, I don't have my
18   realtime up here.
19                   (A recess was taken to address technology
20        issues.)
21              THE COURT: Please proceed.  And then I know
22   Mr. Lambert is going to have something.
23              MS. CALLSEN: Can I finish, or do you want to go?
24              MR. LAMBERT: I'm just going to do a general response.
25              MS. CALLSEN: Let me just finish this.
```

OFFICIAL TRANSCRIPT

 1          **MR. LAMBERT:** Sure.

 2          **MS. CALLSEN:** So in addition, there was a dismissal

 3    entry that had three cases on it with the plaintiffs who wanted

 4    to adopt the general objections, but otherwise, didn't plan to

 5    appear.

 6          It's our understanding that since the hearing list

 7    was submitted on Thursday, there's some additional plaintiffs

 8    who have indicated they plan to adopt the general objections,

 9    but don't otherwise plan to appear.  And I believe plaintiffs

10    want to go ahead and put those numbers on the record now, and

11    then we can skip them once we come to them during the hearing.

12          **THE COURT:** Right.

13          **MS. KREIDER:** Yes, Your Honor, it's about a little

14    over 20 cases.  Do you mind if I just stay here at the table to

15    be able to flip through?

16          **THE COURT:** Sure, that's fine.

17          **MS. KREIDER:** Your Honor, it starts with No. 10,

18    Lanette Barbour; No. 11, Mildred Bryant; No. 12, Gisele

19    Guthrie, No. 13; Patsy Ragland; No. 14, Linda Weitzel; No. 16,

20    Charlotte Jefferson; No. 18, Sheila Bias; No. 20, Cynthia

21    Burton-Crawford; No. 22, Velma Louise Day; No. 23, Angela

22    Griffin; 24 --

23          **THE COURT:** Wait, you said 22, 23, and 24?

24          **MS. KREIDER:** Yes, Your Honor.

25          **THE COURT:** Thank you.

                        OFFICIAL TRANSCRIPT

1          **MS. KREIDER:** 25, Regina Kelley; 26, Linda Kirby; 29,

2     Eleanor Mahood; 30, Astrida Miller; 31, Nkechi Omofoma; 33,

3     Pamela Perkins; 37, Patricia Robinson; 38, Frances Rogers; 40,

4     Marian Smith; 41, India Waiters; 44, Leslie McLaughlin; 45,

5     Melody Nutt; 46, Susan Doan; 47, Tammy Ross.

6          And then we skip to 106, Ms. Sally Kuhns; 107, Laura

7     Tapp.

8          **THE COURT:** 106, 107.  Why is this not working?  Okay,

9     would you just -- this is still not working.  Let's finish

10    this.  Go ahead, I'm sorry.

11         **MS. KREIDER:** The last three, Your Honor, 106, 107,

12    and 110.

13         **THE COURT:** Is that it?

14         **MS. KREIDER:** Yes, Your Honor.

15         **THE COURT:** Okay, thank you.  Do you want to make the

16    objection, Mr. Lambert?

17         **MR. LAMBERT:** Yes, Your Honor, thank you.  Again,

18    Palmer Lambert on behalf of plaintiffs.

19         Just very briefly, we appreciate all the efforts of

20    defense counsel, particularly, Ms. Callsen and Ms. Sweet, to

21    help streamline this in a way that hopefully will move today

22    expeditiously.

23         In addition to the general objections in the past, I

24    just would like to say that CMO 12A has sort of helped us

25    throughout this process.  It's worked.  We've also learned of

OFFICIAL TRANSCRIPT

1   some areas where additional evidence or information might be

2   helpful to the process.  That was the impetus for the addendum

3   to CMO 12A which was entered at the end of last year, and that

4   was to allow folks to get information of how long the

5   facilities kept the medication on the shelf and also whether or

6   not these were the sole purchases of docetaxel that they made

7   or this was the sole distributor that was used.  And that

8   information could be used by plaintiffs' counsel to narrow down

9   a particular infusion to only one defendant where it couldn't

10  be any other.

11          Just as a reminder to the Court and to the prior

12  objections, this information was never in the possession of the

13  individual plaintiffs.  It was always in the possession of the

14  facilities that treated them and administered the medication.

15  And so when we entered the addendum and it gave 30 days for

16  this additional information, that was probably a little bit

17  aggressive.

18          There are some folks that are still actively trying

19  to get these facilities to respond.  And because of the harsh

20  remedy of dismissal, we would just ask the Court to give some

21  lenience there if people are still actively trying and in

22  communication with the facilities.  Thank you, Your Honor.

23          **THE COURT:** Thank you --

24          Before we get started, I just really need to get my

25  realtime up.


OFFICIAL TRANSCRIPT

 1          (A recess was taken to address technology
 2      issues.)
 3          **MS. BRILLEAUX:** Good morning.  It's very nice to see
 4 you, Judge.
 5          I wanted to give you some good news about the PTO 22A
 6 cases.  You're going to only hear one today that's substantive.
 7 There is a broader issue for the first nine cases that I think
 8 is not really disputed.  It's more of a matter of procedure for
 9 Your Honor.
10          The first case, and I'll just explain which one.
11 It's the first case which is a Nachawati Law case, and then the
12 first eight of the Bachus & Schanker cases.  The issue here,
13 Judge, is that in each of these cases, the plaintiff is
14 deceased, and counsel for the plaintiff has had trouble
15 locating the next of kin.  And I'll allow counsel for either
16 Nachawati Law or Bachus to elaborate on this to the extent that
17 it needs further clarification or has further nuance.
18          But my understanding is that it would typically be a
19 case that would warrant a statement of no defense to dismissal,
20 but because of the specific language that we've used in those
21 forms which says that counsel has notified plaintiffs of her
22 obligations, counsel would rather address these with Your Honor
23 rather than fill out that statement.
24          Defendants are not opposed to whatever procedure Your
25 Honor decides is the best way to go, but we think, you know,

OFFICIAL TRANSCRIPT

1  whatever procedure we decide on, it may come up again.  So we
2  were hoping that we could get some clarification on the best
3  way to address it.

4         So the first case that involves this issue is Jamie
5  Ramsey, and that's the Nachawati Law case.

6         **THE COURT:**  Ms. Benton, are you on the line?

7         **MS. BENTON:**  Yes, Your Honor, good morning.

8         **THE COURT:**  Good morning.  I'm listening.

9         **MS. BENTON:**  On this matter, we are -- defense counsel
10 is partially correct.  We are in contact with Ms. Ramsey's
11 daughter.  She has not been appointed as a rep for her estate.
12 She's aware of the case.  She's aware of the fact that we need
13 her to be appointed as a rep so that we can sub her in on this
14 matter.

15        Unfortunately, there's just not been time for her to
16 get that done yet.  So we do not have a defense because we
17 don't have a client.  We don't have a plaintiff.

18        **THE COURT:**  Well, does she intend to continue to
19 pursue this?

20        **MS. BENTON:**  She has indicated that she does.

21        **THE COURT:**  Has she taken --

22        **MS. BENTON:**  She's been responsive as far as getting
23 us death certificates and things of that nature.

24        **THE COURT:**  Has she made any effort to open succession
25 or anything of that nature?

OFFICIAL TRANSCRIPT

1      **MS. BENTON:** That has not been communicated to us.  We

2  have communicated to her the need for that.  But she has not

3  communicated to us the status of her efforts on that or if she

4  has engaged anyone to assist her with that.

5      **THE COURT:** When did Ms. Ramsey pass away?

6      **MS. BENTON:** So she passed in 2020, 6/10 of 2020.

7      **THE COURT:** This is what I'm going to do for you,

8  Ms. Benton.  That's quite a while to have done nothing.  I'm

9  going to give you -- I'm going to roll this over to the next

10  time, and that's going to be it.  At that time, you need to

11  tell me that firm steps have been made to appoint Ms. Ramsey's

12  daughter a succession representative.

13      I can't force a judge to sign it timely, but she's

14  going to have to have firm steps.  It's not enough to say,

15  "Well, this is what I want to do."  She's going to have to have

16  done something, and you need to be able to report to me what

17  exactly those steps are.

18      **MS. BENTON:** Understood, Your Honor.

19      **THE COURT:** Thank you.

20      **MS. BRILLEAUX:** Thank you, Your Honor.

21      As I indicated, the next eight cases or seven cases,

22  perhaps, are the Bachus & Schanker firm.  One of them also has

23  a CMO 12A issue, but I would think the resolution of this issue

24  might obviate the need to address the second one.  I think

25  Ms. Sulkin may be on the line.

OFFICIAL TRANSCRIPT

1          The cases are Susie Abramowitz, Jackie Akromas,

2    Shirley Bridges, Virginia Brown, Nancy Cooper, Linda Estes,

3    Madis Russell, and Barbara Tobin.  I think that these might be

4    appropriate for dismissal at this point as opposed to the

5    Nachawati Law situation that we just discussed, but I'll let

6    Ms. Sulkin respond to that.

7          **THE COURT:** Okay.  Ms. Sulkin, do you want to take

8    these one at a time?  Let's talk about Ms. Abramowitz.

9          **MS. BRILLEAUX:** Star 6.

10         **THE COURT:** Ms. Sulkin?

11         **MS. SULKIN:** Can you hear me, Your Honor, my

12   apologies?

13         **THE COURT:** Yes, ma'am.

14         **MS. SULKIN:** We can take them one by one or in

15   bunches, whichever is easiest for you.

16         **THE COURT:** Well, what's the situation with these

17   plaintiffs that are deceased?

18         **MS. SULKIN:** In all of these cases, the plaintiff is

19   deceased, and the family either is not communicating with us,

20   or it's a situation where the family has indicated they are not

21   going to open an estate.

22         **THE COURT:** What I'm hearing is you basically have no

23   defense upon which to rely that there's anything, okay.

24         I'm going to dismiss these cases with prejudice, and

25   that's Susie Abramowitz, Docket 18-13448; Jackie Akromas,

OFFICIAL TRANSCRIPT

1  17-8399; Shirley Bridges, 18-1916; Virginia Brown, 16-16897;

2  Nancy Cooper, 17-8658; Linda Estes, 19-11902; Madis Russell,

3  Docket 17-117; Barbara Tobin, Docket 18-13489.  Thank you.

4          **MS. BRILLEAUX:** Thank you very much, Your Honor.

5          **MR. INSOGNA:** Good morning, Your Honor.  I believe

6  with all of the cases that we addressed at the outset, we're

7  now up to No. 15, Gwendolyn Crawford.  This is a case where

8  defendants are asking for a dismissal because there's not

9  product identification as to any defendant who is in the case.

10         So there is potentially product ID for one infusion

11  cycle as to Sanofi.  Sanofi has a pending motion to dismiss

12  under CMO 35 for failure to serve Sanofi.

13         As to the remainder of the infusions, the product

14  identification information that's been produced identifies only

15  multiple potential defendants.  It's a series of purchase

16  records, and for every infusion, there are more than one

17  possible.

18         And the other thing, Your Honor, is that the facility

19  indicated in its response that the medication most likely would

20  have been purchased within 30 days of treatment.  That's how we

21  get to Sanofi for that one infusion cycle.

22         **THE COURT:** Ms. Sulkin.

23         **MS. SULKIN:** Your Honor, this is also -- in addition

24  to the 30-day cycle, this is a case where Ms. Crawford began

25  her treatment on May 4th of 2011, so only, you know, less

1  than two full months after the 505(b)(2) defendants began

2  selling their product.  Up until May 4th and even past

3  May 4th, the only manufacturer that was purchased by this

4  facility was Sanofi.

5          We would be okay with dismissing all defendants

6  except for Sanofi.  Obviously, defendants have their motions

7  pending for lack of service, but it's my belief that we've now

8  effectuated service.

9          **THE COURT:** So she treated from May 11th to

10  August 11th?

11          **MR. INSOGNA:** May 4th of 2011 through August 31,

12  2011, that's right.

13          **MS. SULKIN:** So at least one date is confirmed to be

14  Sanofi.

15          **MR. INSOGNA:** The purchase records indicate that prior

16  to the first cycle, only Sanofi medication was purchased.  The

17  issue is just that Sanofi has not been served and has their

18  motion pending.

19          **THE COURT:** Well, that's not before me right now.

20          **MR. INSOGNA:** I understand.

21          **THE COURT:** So the request, if I'm understanding, is

22  dismissal of all those save Sanofi?

23          **MR. INSOGNA:** That's correct, Your Honor.

24          **THE COURT:** Is there an objection to that, Ms. Sulkin?

25          **MS. SULKIN:** No, Your Honor.

OFFICIAL TRANSCRIPT

 1          **MS. BRILLEAUX:** And Your Honor, that's fine for Sanofi
 2   as well.
 3          **THE COURT:** Well, then all defendants are dismissed,
 4   reserving rights to proceed against Sanofi.
 5          **MR. INSOGNA:** Thank you, Your Honor.
 6          **THE COURT:** Thank you.
 7          **MR. INSOGNA:** The next case is No. 17, Annette
 8   Bellmore.  This is a case where we're asking for dismissal
 9   based on lack of CMO 12A and CMO 12A addendum evidence.
10          The response from the facility is a letter which
11   indicates that they primarily purchased from Oncology Supply,
12   and that most likely the medication would have come from the
13   order placed in most recent proximity.  Clearly, by the wording
14   of that, Oncology Supply is not the only supplier to the
15   facility.  And even if it were, there are multiple
16   manufacturers who distributed to the facility.
17          **MS. SULKIN:** Your Honor, the Attachment A is actually
18   purchases of docetaxel by Dallas Oncology Consultants, and this
19   is the purchasing history that the facility itself provided to
20   us.  So we do believe that this is the only purchasing history
21   for that period of time.
22          Additionally, I think defendants are in agreement
23   that on at least one date, Sandoz was the closest in proximity
24   to the treatment for 7/2.  So we would ask that the Court
25   dismiss all the defendants except for Sandoz.


                          OFFICIAL TRANSCRIPT

1          **MR. INSOGNA:** Your Honor, I can provide you the

2    document if you'd like to look at it.  The problem that we have

3    is, and you'll see, there's a cover letter, as I said, that

4    states that they primarily purchased from Oncology Supply and

5    attaches a list of the purchases of docetaxel from July 2012 to

6    November 2012.  And there's a spreadsheet.  Would you like a

7    copy?

8          **THE COURT:** Yeah, please.

9          **MR. INSOGNA:** So, Your Honor, this is a case where we

10   think addendum evidence potentially could have gotten to the

11   issue, but plaintiff didn't obtain any or produce any.  And you

12   can see the order dates on here, but we have no information

13   about shelf life other than the statement that it most likely

14   would have come from the closest in time.

15         **MS. SULKIN:** Your Honor, this is a question of fact,

16   and we do think that we've met our burden.  Certainly,

17   defendants are open to have facts that are different than ours,

18   but I think it meets the burden of this more likely than not

19   being the manufacturer on at least one date of treatment would

20   be Sandoz.

21         **THE COURT:** Are all of these Sandoz purchases?

22         **MR. INSOGNA:** No, Your Honor.  I can take you through

23   the NDC codes if you'd like.  The Sandoz purchases are the

24   66758 number that you see on July 2 and July 20.

25         **THE COURT:** I'm going to allow this case to proceed.

OFFICIAL TRANSCRIPT

1   It's a very, very close call.  But you're asking me to dismiss

2   it with prejudice, and I'm concerned about that.  So I'm going

3   to allow it to proceed.  That might be a summary judgment

4   motion at a different time.

5           **MR. INSOGNA:** Understood, Your Honor.

6           **MS. SWEET:** Can we have clarification on which

7   defendant it will proceed as to on the record?

8           **THE COURT:** I thought it was Sandoz.

9           I think it's then No. 19, Elizabeth Bibbs.

10          **MR. INSOGNA:** Yes, Your Honor, Elizabeth Bibbs.  This

11  is a case where there is simply no product ID evidence that's

12  been produced.

13          **THE COURT:** Ms. Sulkin.

14          **MS. SULKIN:** Your Honor, we did provide purchasing

15  history, and I think the purchasing history provided for this

16  patient has --

17          **THE COURT:** Where?

18          **MS. SULKIN:** Almost all -- it looks like it was

19  uploaded yesterday, and I apologize for the lateness of this.

20  I was out all of last week in depositions.  So I apologize for

21  this.

22          But we did, it looks like, upload purchasing history

23  for Winship Cancer Institute where Ms. Bibbs treated, and it

24  looks like within the six months that she was treated,

25  exclusively Sandoz, almost exclusively Sandoz was ordered.

OFFICIAL TRANSCRIPT

1        **MR. INSOGNA:** Obviously, I have not seen that, Your

2   Honor.

3        **THE COURT:** Let's just pass this one, and we'll come

4   back to it.

5        Thelmira Collins.

6        **MR. INSOGNA:** In Thelmira Collins' case, Your Honor,

7   there's no product ID as to any named defendant.  There's a

8   submission, a CMO 12A statement of chemotherapy that identifies

9   Winthrop and Hospira, but plaintiff's health insurance claim

10  forms that were submitted at the time of treatment identify

11  Dr. Reddy's as the medication that was given to her.

12  Obviously, not a defendant in the litigation.

13       **MS. SULKIN:** Your Honor, this is a dispute of fact.

14  Pursuant to CMO 12, there are multiple forms of product ID that

15  we could proffer to satisfy CMO 12.

16       **THE COURT:** What did you present -- ma'am, wait.  Hold

17  on.  What did you present to show that it was a named

18  defendant?

19       **MS. SULKIN:** So the CMO 12 statement regarding

20  chemotherapy was executed by someone who works at the facility

21  where Ms. Collins treated, and she indicated that Ms. Collins

22  was administered Winthrop and Hospira.  So she fully executed

23  the form on February 24th of 2021, and that was uploaded to

24  Centrality.  This type of form and the facility furnishing this

25  form and executing this form is sufficient for CMO 12 purposes.

1          I understand that there is a separate document that

2     indicates otherwise, but again, I think that's a disagreement

3     of fact.

4          **MR. INSOGNA:** I can show Your Honor the documents.

5     This is the form submitted in 2021, and this is the health

6     insurance claim form contemporaneous with the treatment.

7          I can direct your attention, on the health insurance

8     claim form, to what it is that you want to be looking at.  On

9     the page that I flipped to, there's an entry that says J9171

10    which is the docetaxel code.  And the NDC that appears next to

11    that is a Dr. Reddy's NDC code, the N443598 number.

12         **THE COURT:** Mr. Insogna, what am I supposed to do with

13    this?

14         **MR. INSOGNA:** Your Honor, to my thinking and

15    defendant's thinking, the health insurance claim form submitted

16    contemporaneous with her treatment that has an NDC code entered

17    is the evidence of the medication that was used to treat her.

18    I understand that --

19         **THE COURT:** Are you asking me to resolve this,

20    basically this question of fact?  I don't know what information

21    Ms. Rebecca Maifeld was considering at that time.

22         **MR. INSOGNA:** I understand, Your Honor.  And I will

23    tell you that we've had a number of the chemotherapy statements

24    that have turned out to be erroneous, and defendants cannot

25    figure out what they are based on, if anything, or if

OFFICIAL TRANSCRIPT

1  facilities are just checking a box and returning the forms.

2          I understand, though, Your Honor.  It appears to be a

3  fact dispute.  Perhaps, a product ID deposition by defendants

4  would clear it up.

5          **THE COURT:** I think that's -- unfortunately, I don't

6  know how we get around that because I'm caught.  Yes, it could

7  absolutely be erroneous.  But I just think it's a factual

8  dispute that's going to have to be resolved by somebody that

9  has more information.

10          **MR. INSOGNA:** Can we then, I guess, Your Honor, roll

11  this one over and see if we can get that resolved in the

12  interim?

13          **THE COURT:** It can always be rolled over and put on --

14  I'm just not going to dismiss it with prejudice based upon

15  these two conflicting documents.

16          **MR. INSOGNA:** I understand.

17          **THE COURT:** I understand, you know, health insurance,

18  when you file those forms, that's very, very serious.  But I

19  don't know how to -- I don't know what was going on.  So

20  somebody's going to need to tell me.  But thank you.

21          Then I think we go to page -- is it No. 27?

22          **MR. INSOGNA:** No. 27, yes, Renee Koziol.  This is

23  another case, Your Honor, where there is product identification

24  evidence that's been supplied as to Accord, and Accord has a

25  motion pending under CMO 35 because they have not been served.

OFFICIAL TRANSCRIPT

 1          I think at this point, we're asking for dismissal of
 2   the non-Accord defendants, and then we'll await Your Honor's
 3   ruling on those motions.
 4          **THE COURT:** Okay, Ms. Sulkin.
 5          **MS. SULKIN:** Your Honor, I believe at this point,
 6   Accord has been served.
 7          **THE COURT:** That's not the question.  The question is:
 8   Is there any objection to dismissing the other defendants?
 9          **MS. SULKIN:** No objection, Your Honor.
10          **THE COURT:** All right, all defendants save Accord,
11   claims against Accord are preserved.  Okay.
12          **MR. INSOGNA:** Your Honor, the next case is No. 28,
13   Sherry Livingood.  In this case, there is a submission that's a
14   McKesson subpoena response that identifies three potential
15   manufacturers over the time period for which the subpoena
16   requested.  There are no individual sales or distribution
17   dates.  There's no evidence from the facility that McKesson was
18   their sole provider or how long they maintained medication on
19   their shelves.
20          **MS. SULKIN:** Your Honor, I (inaudible).
21          **THE COURT:** Ms. Sulkin, you're breaking up really
22   badly.
23          **MS. SULKIN:** My apologies, Your Honor.
24          I have a supplemental response to the subpoena we
25   served on McKesson that indicates that Hospira (inaudible).

OFFICIAL TRANSCRIPT

 1          **THE COURT:** You're breaking up again.

 2          **MS. SULKIN:** Hello?

 3          **THE COURT:** That's better.  Now what about

 4   Ms. Livingood?

 5          **MS. SULKIN:** We do have a supplemental response to a

 6   subpoena that we served on McKesson that indicates that for the

 7   year preceding Ms. Livingood's treatment, the only manufacturer

 8   that was ordered and received by the facility she treated at

 9   was manufactured by Hospira.  So we would ask the Court to

10   dismiss all defendants except for Hospira.

11          **THE COURT:** Where is the supplemental response?

12          **MS. SULKIN:** I apologize, I had thought that somebody

13   from my office had uploaded the supplemental subpoena.  It was

14   updated in regards to multiple cases because it was by the

15   facility versus the --

16          **THE COURT:** The question is:  When did it get

17   uploaded, or has it been?

18          **MS. SULKIN:** I have not yet -- it's not yet been

19   uploaded to this specific case, but defendants are in

20   possession of it in other cases.  But I can upload this to

21   Centrality right now.

22          **THE COURT:** All right, I'm going to dismiss claims

23   against Sanofi and Winthrop.  I'm going to roll over as to

24   Hospira to give them an opportunity to consider the evidence

25   you're uploading.


                        OFFICIAL TRANSCRIPT

 1            **MR. INSOGNA:** My only concern, Your Honor, is that the

 2    evidence itself is a McKesson subpoena response.  We don't know

 3    that McKesson was the only distributor to the facility.

 4            **THE COURT:** Well, I think we need to see all of that.

 5            **MR. INSOGNA:** Understand, Your Honor.  We can address

 6    it as to --

 7            **THE COURT:** We can agree to dismiss Sanofi and

 8    Winthrop?

 9            **MS. SULKIN:** Yes, Your Honor.

10            **MR. INSOGNA:** Ms. Sweet points out there are

11    additional defendants in the case as well.  So if we're rolling

12    over the case as to Sanofi and Winthrop, we also need to

13    dismiss Accord, McKesson, Sandoz, and Sun.

14            **THE COURT:** Any objection?

15            **MS. SULKIN:** No, Your Honor.

16            **THE COURT:** Okay, so ordered.

17            **MR. INSOGNA:** Your Honor, the next case is Azalia

18    Pena, No. 32.  This is a case where the evidence that's

19    produced identifies two potential manufacturers.  The purchase

20    records don't cover all of the alleged treatment dates, and we

21    don't have any evidence of the pharmacy's practices or

22    procedures with respect to docetaxel.

23            **THE COURT:** Ms. Sulkin.

24            **MS. SULKIN:** Your Honor, not only did this -- this

25    facility provided us with an executed statement regarding

OFFICIAL TRANSCRIPT

1    chemotherapy that indicates which drugs were actually

2    administered to the client or to the patient, and they've

3    selected two NDC codes by Accord and two NDC codes by Hospira.

4         There's nothing else indicating that what this

5    facility put on the statement regarding chemotherapy is just

6    based on purchase records.  It appears that this is the drugs

7    that were actually administered to the patient.

8         **MR. INSOGNA:** I understand what Ms. Sulkin is saying.

9    I'll provide you the document, Your Honor, so that you can look

10   at it.  The evidence that's been uploaded which is a subpoena

11   response, there is -- you'll see on the second-to-last page a

12   statement of chemotherapy administered; although it's not

13   signed.  Actually, the signature appears on the second page of

14   the document.

15        And what's appended to it is invoices showing

16   distributions of Hospira and Accord medications which cover

17   only August 3rd of 2011 to September 29, 2011, so only

18   really, at most, the final month of plaintiff's docetaxel

19   treatment.  And the distribution shows a number of Accord

20   distributions and a number of Hospira distributions.

21        We don't know what medication of those was used in

22   plaintiff's treatment.  It appears the statement is just

23   identifying what was provided to the facility.

24        **MS. SULKIN:** Your Honor, I think defendants are

25   inferring that this is how the facility came to its conclusion

OFFICIAL TRANSCRIPT

1  about what to put on the statement regarding chemotherapy.  But

2  oftentimes, facilities will provide both a statement regarding

3  chemotherapy and purchase history.

4         I think if you, I mean, I think that allowing

5  defendants to assert that this is just based on the purchasing

6  history without having a statement from the facility that the

7  statement regarding chemotherapy administered was solely based

8  on the purchase history is speculative.

9         I think that this is sufficient under CMO 12A

10  certainly.  It looks like the facility just provided

11  supplemental information about its purchasing history.

12         **THE COURT:** So what we have is this statement saying

13  it's Accord and Hospira, am I correct, and then this additional

14  purchase history?

15         **MR. INSOGNA:** So the facility's response was a

16  statement that checks off two Accord NDC codes and two Hospira

17  NDC codes and then appends purchase records that show purchases

18  of those exact four NDC codes over a limited time period.  And

19  that's all of the evidence that we have.

20         **MS. SULKIN:** And Your Honor, in every case, just the

21  form itself is sufficient.

22         **THE COURT:** I mean if you have this record from the

23  facility and they say this is what they used, and then for a

24  little lagniappe, they throw in the purchase records, is that

25  not sufficient to get us past this show cause?

OFFICIAL TRANSCRIPT

1          **MR. INSOGNA:** So Your Honor --

2          **THE COURT:** What's the problem?

3          **MR. INSOGNA:** The problem is it appears that the

4    statement is just them saying, "This is what we have in

5    inventory."  When they provide the purchase records as an

6    appendix to the statement, to me, that communicates, "This is

7    what we had in inventory," not, "This is what actually was

8    given to this patient," because there are no records provided

9    for what was given to the patient.

10          **THE COURT:** Ever?

11          **MR. INSOGNA:** In this case, that's correct, Your

12    Honor.

13          **THE COURT:** I guess what my problem is, we have the

14    facility saying, "This is what we gave her."  I know that they

15    threw in the purchase records.  I'm not sure why.  I guess

16    maybe to show that they actually had this.

17          **MR. INSOGNA:** What we're seeing, Your Honor, is that

18    facilities provide a statement and purchase records when that's

19    all the information that they have.  We've seen it in a number

20    of cases, the statement --

21          **THE COURT:** Well, do we know -- so I'm supposed to

22    disregard this and say this doesn't mean what it purports to

23    say?

24          **MR. INSOGNA:** That's how I interpret it, Your Honor.

25          **THE COURT:** I think you need to file a summary

OFFICIAL TRANSCRIPT

1    judgment somewhere.  I mean I just think we're in a show cause

2    hearing, and this is what I have from a facility that says this

3    is what we gave her.

4           And I just don't think it's enough for me to dismiss

5    a case with prejudice when I have something from the facility.

6    Whether or not it's as much as you'd like, it is something from

7    the facility that purports to indicate that she received this

8    medication.

9           **MR. INSOGNA:** I understand, Your Honor.

10          **THE COURT:** I'm going to deny that one.

11          I think we just all need to remember that this is a

12   show cause stage.  I don't know what I would do at summary

13   judgment when I had some affidavits or something to consider.

14          **MR. INSOGNA:** I understand, Your Honor.  Defendants'

15   position is based on the fact that after the last hearing where

16   we put in place the addendum where plaintiffs were supposed to

17   go out within 30 days and clarify these cases.

18          **THE COURT:** I understand.

19          **MR. INSOGNA:** All right, I won't belabor it, Your

20   Honor.

21          **THE COURT:** Thank you.  Go ahead, I'm sorry.

22          **MR. INSOGNA:** The next case, Your Honor, is No. 34,

23   Gail Phillips.  This is a case where we have no product ID

24   evidence submitted.

25          **THE COURT:** Ms. Sulkin.


                        OFFICIAL TRANSCRIPT

 1          **MS. SULKIN:** Your Honor, we did upload a statement

 2   regarding chemotherapy drug administered statement, and it

 3   indicates that Winthrop, Accord, and Sagent were all

 4   administered to this patient.

 5          **THE COURT:** Well, where is it?

 6          **MS. SULKIN:** Apologies again.  It looks like this was

 7   uploaded yesterday.  Somebody from my office had kind of taken

 8   over uploading these things.  So again, I do apologize.

 9          **THE COURT:** Ms. Sulkin, I have to tell you, this is so

10   frustrating.  This hearing has been put off multiple times

11   because of other events outside of anyone's control.  But here

12   we are, and it's months later, and it's still the eleventh

13   hour, putting in something that no one, no one can adequately

14   assess what it means.

15          And it's just eminently unfair to everyone.  It is

16   unfair to everyone.  But you know, you have a client, and I

17   don't want her to be punished because I am absolutely

18   frustrated with you.  So what am I supposed to do?

19          **MS. SULKIN:** I would ask that you roll this one over

20   and allow the parties some time to confer on the sufficiency of

21   what we've uploaded.

22          **MR. INSOGNA:** Obviously, I have not seen the evidence.

23          **THE COURT:** I know you haven't, Mr. Insogna, and I am

24   not frustrated with you one bit.  I am frustrated with the

25   situation.  I am frustrated with certain people that just can't

OFFICIAL TRANSCRIPT

1   seem to get anything done on time, particularly, when this has

2   been put off.  So that if you were late last time, you surely

3   should have gotten it in before this hearing.

4          But there is -- Ms. Phillips does have a claim, and

5   I'm going to give her, I'm going to roll it over, but I am --

6   yes, ma'am.

7          **MS. CALLSEN:** Your Honor, I was just going to ask

8   rather than roll it over, can you just give us 7 days?

9          **THE COURT:** I think that 7 days would be fine because

10  there's another one that we've circled.  So we'll give

11  Ms. Phillips 7 days.

12         And what is the other lady's name?  I circled it.

13  Ms. Bibbs, which is No. 19, 7 days for those.  And thank you.

14         We have Anna Marie Reyes, Mr. Insogna.  That's

15  No. 35.

16         **MR. INSOGNA:** Yes, Your Honor.  I'm getting to the

17  correct page.  In Ms. Reyes' case, the Centrality submission is

18  a letter from the facility that indicates it had NDCs for

19  Hospira and Sandoz in its inventory and that the treatment was

20  more likely than not one or more of those manufacturers'

21  medication.

22         **THE COURT:** Let me see.

23         **MR. INSOGNA:** Absolutely, Your Honor.

24         **MS. SULKIN:** Your Honor, I went and compared the two

25  dosages for the Sandoz and Hospira vials are different.  The

OFFICIAL TRANSCRIPT

1    Sandoz one is 10 milligrams whereas the Hospira one is
2    160 milligrams.
3           So I went to the billing for Ms. Reyes, and it looks
4    like she only received the 160-milligram vials based on her
5    billing.  So we would just ask the Court to dismiss all
6    defendants except for Hospira.
7           **THE COURT:** Did you submit that?
8           **MS. SULKIN:** Yes, her billing has been on Centrality
9    for quite a while.
10          **THE COURT:** This is what I'm going to do.  I'm going
11   to dismiss everything, but Hospira, and I'm going to give 7
12   days for Hospira to verify that because this is...
13          **MR. INSOGNA:** Yes, Your Honor.  Moving on to the next
14   case, the next case is Elizabeth Rhodes.  This is a submission.
15   It's a CMO 12 statement indicating Sanofi and Sandoz were
16   checked off as they were, and this is the quote from the
17   facility, "the NDCs administered to patients at Boston Medical
18   Center during 2013."  So this is one where the facility is
19   specifically saying this is what was available for
20   administration.
21          **THE COURT:** Okay.
22          **MS. SULKIN:** Your Honor, we think that this being
23   administered to patients during 2013 is indicative that it was
24   administered to Ms. Rhodes.  So we do think that this is
25   sufficient to survive at this hearing.

OFFICIAL TRANSCRIPT

```
 1              THE COURT:  So what they said is they only had Sanofi
 2    and Sandoz --
 3              MR. INSOGNA:  Correct.
 4              THE COURT:  -- available and we know she received
 5    docetaxel?
 6              MR. INSOGNA:  Correct.  We just don't know which of
 7    those two manufacturers was used in her treatment.  That's what
 8    they had available in calendar year 2013, but the facility was
 9    not able to narrow it further in her specific case.
10              THE COURT:  I'm going to dismiss all defendants save
11    Sanofi and Sandoz, and they can figure it out.
12              MR. INSOGNA:  So Your Honor, this is one of those
13    cases we think where it cannot be narrowed further.  This is
14    the kind of case we were addressing before where all plaintiff
15    has done is narrow it down to two possible manufacturers, but
16    cannot distinguish between them.  And I don't see how plaintiff
17    could ever get to a point where there's evidence to allow that
18    determination.
19              THE COURT:  Ms. Sulkin.
20              MS. SULKIN:  Your Honor, it does, in fact, say it was
21    actually administered to patients at the center, not just even
22    that it was purchased.  So we do think that there's a
23    difference between maybe this case and some other cases.
24              THE COURT:  How are you going to ever show that she
25    received Sanofi and/or Sandoz?  How do you do that?
```

OFFICIAL TRANSCRIPT

1          **MS. SULKIN:** I think potentially if we could get some

2    more information on vials and the dosages available, I think

3    that would probably suffice.  And it's also possible that she

4    received both of them.  Obviously, both were on the market

5    during the time.

6          **THE COURT:** I think what's problematic for me is when

7    I listen, you say it's also possible.  Lots of things are also

8    possible, but you're going to have to, you understand, identify

9    a manufacturer.

10         **MR. INSOGNA:** If I may, Your Honor, this is a case

11   that's been on the notice of noncompliance since July of 2022.

12   That's why we put the addendum in place is to allow plaintiffs

13   to try and further narrow, if possible.  And where it hasn't

14   happened, we think it's now the time for dismissal.

15         **THE COURT:** Ms. Sulkin, this is all you have?

16         **MS. SULKIN:** This is all we have right now, Your

17   Honor.

18         **THE COURT:** And you haven't been able to determine

19   from insurance records or medical records that one is the

20   actual -- would be the defendant?

21         **MS. SULKIN:** No, Your Honor.

22         **THE COURT:** Do you have any outstanding discovery or

23   issued any outstanding subpoenas that we're waiting for that

24   would narrow this search further?

25         **MS. SULKIN:** Not at this time.


                         OFFICIAL TRANSCRIPT

1          **THE COURT:** I'm going to dismiss this case.  I think

2     you're right.  You got to get something that tells me this is

3     the one.  Thank you.

4          Let's go to Carrie Rupert.

5          **MR. INSOGNA:** Yes, Your Honor.  This is another case

6     where the only submission is a McKesson subpoena response that

7     indicates that they distributed three different manufacturers

8     during the time period for which the subpoena was requested.

9          There's no individual sales dates of those shipments,

10    and there's no evidence from the facility either that McKesson

11    is their sole distributor or how long they cycled through

12    medication.

13         **THE COURT:** She received treatment for two months in

14    2012, and we don't know which of these drugs was being sold --

15    they were purchasing at that time?

16         **MR. INSOGNA:** The only response is McKesson responding

17    to a subpoena from plaintiff saying this is what we shipped to

18    the facility over a broad time.  They don't even break it down

19    by individual dates.

20         **THE COURT:** Okay, Ms. Sulkin.

21         **MS. SULKIN:** And Your Honor, we did get a supplemental

22    response.  It's that same subpoena that has been uploaded to

23    some cases, and I apologize, it hasn't been uploaded to others.

24         But the only manufacturer that was ordered in the

25    year 2012 at all was Hospira from this facility, and so I just

OFFICIAL TRANSCRIPT

1  uploaded this subpoena just now.  It's been uploaded in other

2  cases.

3       **THE COURT:** I'm going to dismiss all of the other

4  defendants save Hospira and give 7 days to confirm that they

5  were the sole provider during the times of treatment.

6       But let me just tell you, again, how frustrated I am.

7       **MS. SULKIN:** I do apologize, Your Honor.

8       **MR. INSOGNA:** And Your Honor, in those cases, I

9  understand what your ruling is and how it operates.

10      I just want to note for the record that because we

11  don't have evidence that McKesson was the only distributor,

12  Hospira may still take issue with it down the road.

13      **THE COURT:** That's fine.  But I think right now, let's

14  just give you time to look at it and clear out everyone else.

15      **MR. INSOGNA:** I understand.  Thank you, Your Honor.

16      The next case is Mandi Ayala with Lowe Law Group

17  which is No. 42 on the list.

18      **THE COURT:** Who do I have from the Lowe Law Group?

19      **MR. INSOGNA:** I believe these are still Ms. Sulkin.

20      **THE COURT:** Ms. Sulkin, you have the Lowe Law Group

21  too?

22      **MS. SULKIN:** I do, Your Honor.

23      **THE COURT:** Oh, okay.

24      **MR. INSOGNA:** In Ms. Ayala's case, this is another

25  McKesson subpoena response that covers the entire period, just

OFFICIAL TRANSCRIPT

1   like the last case, identifies multiple manufacturers.  I don't
2   know whether Ms. Sulkin is going to say this is another with a
3   supplemental response or not.

4            **THE COURT:** Ms. Sulkin.

5            **MS. SULKIN:** Your Honor, we just -- this one obviously
6   was handled by the Lowe Law Firm previous to us.  And so when I
7   asked McKesson to supplement, the subpoena we sent, it didn't
8   include the dates of Ms. Ayala's treatment.  But I'm going to
9   ask McKesson to supplement dates.  So we would just ask for a
10  brief extension because we do believe that McKesson has that
11  data.

12           **MR. INSOGNA:** So Your Honor, if I may, this is a case
13  that, again, has been pending since July of 2022.  And in this
14  case when it came up at the last hearing, Your Honor granted
15  one rollover to allow them to get shipment dates from McKesson.
16  So we've done exactly that already.

17           **MS. SULKIN:** And Your Honor, this must have just
18  gotten lost in the mix because this same facility, which is
19  Hickman Cancer Center, I had on my own cases that I had worked
20  up, sent a subpoena to McKesson for the same facility.  But I
21  didn't catch that my subpoena that I asked supplementation for
22  did not include Ms. Ayala's dates because she treated in 2013,
23  and the subpoena I sent, the request period was 2012.

24           So that is a mistake on my end, and I do apologize
25  for that.  But again, I would just ask for a brief extension.

OFFICIAL TRANSCRIPT

1 I will email McKesson to supplement the response to this

2 subpoena after this hearing.

3    **THE COURT:** I'm going to give you 30 days, Ms. Sulkin.

4 You know what, it's against my better judgment because I don't

5 think it -- I think it's encouraging bad behavior.  Because, I,

6 you know, give these, and it's like I'm talking to the wall.

7    But in 30 days, it will be dismissed if that

8 information is not uploaded.

9    **MS. SULKIN:** Thank you.

10    **MR. INSOGNA:** Your Honor, I believe the next case is

11 one Ms. Sweet is handling.

12    **MS. CALLSEN:** Wanda Hogan.

13    **MR. INSOGNA:** Did I miss one?  I'm sorry.  Ms. Hogan,

14 I thought that was a non-objection.

15    **MS. KREIDER:** No, we need to address it.

16    **MR. INSOGNA:** Okay, my apologies.  No. 43, Wanda Hogan

17 is a case where the submission on MDL Centrality is a facility

18 listing docetaxel purchases for portions of 2014.  It begins

19 one week before plaintiff's treatment and says the NDC codes

20 cannot be directly correlated to the particular administration.

21    So we have a number of possible manufacturers, and

22 they start just one week before treatment.  So we don't know

23 how quickly the facility was cycling through medication,

24 etcetera.

25    **THE COURT:** Ms. Sulkin.

OFFICIAL TRANSCRIPT

 1          **MS. SULKIN:** Your Honor, the only medication purchased

 2   before Ms. Hogan began her treatment was Sandoz.  And so we

 3   would just ask that the Court dismiss all defendants except for

 4   Sandoz.

 5          **THE COURT:** Do we know if that was the sole

 6   distributor?

 7          **MS. SULKIN:** This is actually -- it's not the

 8   distributor.  It's actually from the facility itself, what they

 9   had at that time.

10          **MR. INSOGNA:** Your Honor, what the facility's response

11   shows is that in the six days prior to plaintiff's first

12   administration, they only purchased Sandoz medication.  After

13   that, there are multiple manufacturers, and we have no idea

14   whether that six-day period, if they're using medication.

15          **THE COURT:** Let me see.

16          **MR. INSOGNA:** Yep.  I'm sorry, Your Honor.  I had

17   moved this one on to the other list.  Just bear with me a

18   moment while I find the correct paper.

19          **THE COURT:** Take your time.

20          **MR. INSOGNA:** Your Honor, the 66758 NDC codes are the

21   Sandoz NDC codes.

22          **THE COURT:** What is 409?

23          **MR. INSOGNA:** That's a Hospira NDC code.  And the

24   infusion dates are June 18th, July 9th, August 13th, and

25   September 3rd.

OFFICIAL TRANSCRIPT

1     **THE COURT:** Ms. Sulkin, do you have any information
2  how long, how Ochsner managed its medication?
3     **MS. SULKIN:** No, Your Honor.  But this is a document
4  that's certified by Ochsner.  It has the purchase history for
5  the Ochsner Medical Center for the pertinent portion of 2014.
6  And so this is Ochsner's representation that this is the
7  purchasing history that would be pertinent to the requested
8  dates.
9     And so before -- the first infusion date was 6/19 of
10 2014, and the only pertinent purchasing history prior to then
11 was for Sandoz.
12    **THE COURT:** I guess, you know, Mr. Insogna, I'm
13 looking at this, and I don't know what the request looked like.
14 But it says the following cannot be directly correlated, but
15 the information for docetaxel administered to Wanda Hogan, and
16 they give the dates.
17    Wouldn't this be their response that this is the
18 pertinent information for this patient?
19    **MR. INSOGNA:** Well, I would say, Your Honor, that
20 given the addendum and the steps we went through to get to the
21 addendum that this is a case where some clarification from the
22 facility that this covers what would actually have been
23 available to be used would have been appropriate.  I take Your
24 Honor's point.
25    **THE COURT:** Yeah, I think it could be better

OFFICIAL TRANSCRIPT

1    clarified.  But Ochsner is saying, look, this is the medication
2    that was -- the code information for the docetaxel, and then
3    they provide the dates.  So this is kind of, I read it as this
4    is what we have.
5              **MR. INSOGNA:** I mean it's a possible inference given
6    the response that we have.  I certainly wouldn't accept it as
7    conclusive, but I understand Your Honor is saying it's also not
8    conclusive for dismissal.
9              **THE COURT:** Right, I think that's probably -- so I'm
10   going to -- is it just Hospira and Sandoz that have been
11   identified for this patient?
12             **MR. INSOGNA:** Those are the only two defendants active
13   in the case at this point.
14             **THE COURT:** Okay, I'm going to deny your request for
15   dismissal.
16             **MR. INSOGNA:** Now I'll turn it over to Ms. Sweet.
17             **THE COURT:** Can we take a little five-minute recess?
18             **DEPUTY CLERK:** All rise.
19                  (A short recess was taken.)
20             **THE COURT:** Back on the record.
21             Ms. Sweet, I think we are on No. 48, page 15; is that
22   correct?
23             **MS. SWEET:** Yes, Gloria Awal case.
24             **THE COURT:** Who do I have on the phone from the Reyes,
25   Browne, Reilley?

OFFICIAL TRANSCRIPT

1          **MS. KREIDER:** Ryan Browne should be on the line, Your

2  Honor.

3          **THE COURT:** Thank you.  Mr. Browne, are you on the

4  line?

5          **MR. BROWNE:** I am here, Your Honor.

6          **THE COURT:** Thank you.

7          Ms. Sweet.

8          **MS. SWEET:** Your Honor, in the Awal case, the evidence

9  submitted does not tie a single manufacturer to any given

10  infusion.  In fact, the purchase records that were produced

11  identify at least three potential manufacturers, and plaintiffs

12  have not produced any evidence as to pharmacy practices and

13  procedures that would allow the infusions to be narrowed --

14  excuse me.  Allow the manufacturers to be narrowed to any

15  particular infusion.

16          **THE COURT:** Mr. Browne.

17          **MR. BROWNE:** Yes, Your Honor.  And thank you all.  I

18  also would like to -- I know there was a general objection by

19  Mr. Lambert this morning.  I believe there was also back in

20  April of '22, Mr. Niemeyer, Mark Niemeyer had given another

21  kind of objection as well.  But I would just like to -- I think

22  it was pages 34 through 38 of that transcript.  I'd like to

23  have those be reiterated here as well before I start these

24  cases.

25          But Your Honor, we did, we have -- with this one

OFFICIAL TRANSCRIPT

1    specifically, we have tried to be able to do everything we can

2    to be able to go to the facility, go to do supplier subpoenas

3    as well.  We have been able to, as Ms. Sweet has stated there,

4    we have Sandoz, Accord, and Hospira all identified there.  The

5    Hospira and Sandoz DFS's also do show shipments, and I've noted

6    the number of these.  There are a number of these shipments for

7    each one.  We've just not been able to narrow that down

8    further.

9           The oncologist office closed due to bankruptcies, and

10   their records have gone into the wind.  We've tried to flag

11   down a former office manager who supposedly had them, but had

12   no opportunity to be able to get these.  So we have what we

13   have as far as we can show it's these three defendants.  It

14   should be one of these three that was there at the time.

15         **THE COURT:**  Mr. Browne, I think we talked earlier that

16   the defendant fact sheet was insufficient because we needed

17   something more definitive as to who the manufacturer was.

18         I'm going to dismiss it subject to the objection that

19   had been previously raised, reserving all of those objections.

20   Thank you.

21         **MR. BROWNE:**  Thank you, Your Honor.

22         **THE COURT:**  Mr. Browne, I think then we go to Vilinie

23   Brown.

24         **MS. SWEET:**  Vilinie Brown, in that case, the product

25   ID evidence that is produced identifies at least four potential

OFFICIAL TRANSCRIPT

1  manufacturers, and they're unable to link up any particular

2  manufacturer to any of the infusions.

3       **MR. BROWNE:** Your Honor, here, I think that the

4  biggest thing here is that Ms. Brown started receiving Taxotere

5  or docetaxel March 22nd of 2011.  That's literally days after

6  this drug came off patent.  And I mean to dismiss Sanofi, I

7  think would be, at this stage especially, would be extremely

8  prejudicial.  I don't think that that calls for this at this

9  show cause hearing part as you have just stated in some of your

10 other rulings here today.  I do not think that that at all

11 serves justice.

12      I do believe that Ms. Sweet has laid out there, we

13 have been able to obtain supplier PID from Amerisource Bergen

14 showing that Sanofi/Winthrop, of course, did send to this

15 facility.  And also, there was Hospira shortly after.  But the

16 fact is that I just believe it would be extremely prejudicial

17 to dismiss Sanofi.  I understand -- or Sanofi, slash, Winthrop.

18 But I understand if Hospira would be dismissed at this point.

19      **THE COURT:** Okay.  So we have, I'm looking, Sanofi

20 only in March, and then Winthrop, Pfizer sales in April to the

21 same facility?

22      **MS. SWEET:** That's correct, Your Honor.

23      **THE COURT:** And Pfizer only.

24      **MS. SWEET:** Your Honor, the issue is that the first

25 treatment date was March 22nd of 2011, and Hospira came onto

OFFICIAL TRANSCRIPT

1  the market on March 17th of 2011.  So it is possible that

2  this was not the facility's sole distributor as well.  I just

3  want to point out that there were two potential manufacturers

4  for an infusion on March 22nd of 2011.

5          **THE COURT:** Do we have information that Hospira

6  distributed to this facility before March 22nd, or is it just

7  they were on the market?

8          **MS. SWEET:** We don't, Your Honor, and that's because

9  we can't confirm that this was the sole distributor to the

10 facility.  Plaintiff has not come forward with that evidence.

11         **MR. BROWNE:** Your Honor, I will look here at the

12 Amerisource Bergen PID to find out exactly when they show that

13 they started to send to the facility.  I'm connecting with this

14 now, Your Honor.

15         I mean I think that the -- again, as you just pointed

16 out, Your Honor, it's literally days after this comes off

17 patent.  There is potentially a five-day window there that

18 we're arguing about.  This doesn't seem to be the subject of a

19 show cause would be my position.

20         **THE COURT:** So the only defendant remaining is Sanofi?

21 I'm a bit confused, and I'm trying to read this as people are

22 talking.

23         **MS. SWEET:** Hospira and Sanofi are the remaining

24 defendants.

25         **MR. BROWNE:** Sure, Your Honor.


                        OFFICIAL TRANSCRIPT

 1          **THE COURT:** And Hospira came on to the market?

 2          **MS. SWEET:** On March 17th.

 3          **MR. BROWNE:** But here what the --

 4          **THE COURT:** Wait, wait, wait.  Do we have any

 5     information that says that Hospira was distributed to this

 6     facility in March of 2011?

 7          **MS. SWEET:** No, we don't.  But that information may be

 8     out there as plaintiff has indicated that this is from

 9     Amerisource Bergen which is only one potential distributor to

10     the facility.  We just don't have that closing of the logical

11     gap.

12          **THE COURT:** Okay.  Well, I'm not going to dismiss

13     Sanofi from this action.  I just think that's too close a call,

14     you know.  Maybe with other evidence presented that Hospira was

15     distributing to this facility as early as March 22nd, that

16     might be another thing for another judge at a summary judgment

17     stage.

18          **MS. SWEET:** Thank you, Your Honor.  Do you want to put

19     the dismissal of Hospira on the record, or should we submit a

20     partial dismissal later?  What would you prefer to do?

21          **THE COURT:** We can just put the dismissal of Hospira

22     on the record.  Thank you.

23          **MR. BROWNE:** Your Honor, just for the record, the

24     Amerisource Bergen records do show that the first shipment of

25     Pfizer injectable to the facility was 4/6 of 2011.

                          OFFICIAL TRANSCRIPT

1          **THE COURT:** Okay, thank you.

2          **MS. SWEET:** Next case is Melanie Donahue.  There has

3     been no product ID submitted.

4          **THE COURT:** Okay, Mr. Browne.

5          **MR. BROWNE:** Yes, Your Honor.  On Melanie Donahue, we

6     have, again, we served multiple subpoenas to the providers and

7     the distributors.  The Hollis Cancer Care Center in Florida at

8     Lakeland Regional Health says the records were purged.  They

9     show four cycles of docetaxel use from May to July of 2016.

10         We do show literally 110 shipments from Hospira to

11    this facility; and the very vast majority of those prior to

12    this patient's use, we do not show any manufacturer with any

13    other shipments.  And so we would assert that that should be

14    enough to be able to have things continue to proceed against

15    Hospira at this time.

16         **MS. SWEET:** Your Honor, he's referring to DFS

17    evidence, Your Honor, and that has not been provided to all of

18    the other defendants in this case.  So I'm not sure exactly

19    what he's referring to.

20         But as you know, DFS evidence is insufficient to

21    establish product ID as was held in the Tina Davis case.

22         **THE COURT:** Mr. Browne, do you know where Lakeland was

23    getting its meds from, this medicine?

24         **MR. BROWNE:** Your Honor, they have not been able to

25    identify that for us.  Lakeland and Hollis, they call it

OFFICIAL TRANSCRIPT

1  Lakeland Regional, slash, Hollis Cancer Center, and they just
2  say that these records were purged.

3       We had a letter from the director of pharmacy from
4  that facility saying that, and they have not provided us with
5  additional information.

6       We have done the suppliers subpoenas as well, but
7  have not been able to -- I think that they said McKesson was
8  their supplier, but McKesson says that they don't have
9  anything.  So we're looking at the DFS being this is the
10 only -- I mean many of these DFS's showed -- I would understand
11 if there were multiple DFS's that showed shipments to the
12 facility.  But Hospira is the only one that is responsive --

13      **THE COURT:** I understand that, but that does not
14 preclude other people, you know, generic manufacturers, does
15 it?

16      **MR. BROWNE:** Well, I understand what you're saying,
17 Your Honor.  I'm just thinking here at a show cause stage as
18 Your Honor has pointed out.

19      **THE COURT:** No, I know.  But I think we need something
20 more than these people sold it with not anything from someone
21 saying, "And this is who we bought it from."  I just, I think
22 there's got to be something -- unfortunately, Mr. Browne, I
23 just don't think that DFS carries the day because there were
24 just other possibilities.

25      I think if you don't have something from the facility

OFFICIAL TRANSCRIPT

1    itself, it becomes problematic because you don't know where
2    else they're purchasing from.  So I'm going to dismiss this
3    case.

4          **MR. BROWNE:** They said that McKesson was a supplier,
5    and then McKesson said that they don't have anything.  So
6    that's where we are.

7          **THE COURT:** I think I have to dismiss this case.
8          Okay, let's go to the next one.

9          **MR. BROWNE:** Can that be without prejudice, Your
10   Honor, to be able to -- if I get something additional, if I
11   follow up with McKesson and make sure that they don't have
12   anything and if there's anything there that we could be able to
13   refile or reassert.

14         **MS. SWEET:** If plaintiff is able to follow up with
15   McKesson upon dismissal and if they get evidence, they can file
16   a motion for reinstatement under 60(b).

17         **THE COURT:** I'm going to dismiss it with prejudice.
18   But if you get something, file a motion for me to reconsider,
19   and I will.  But you got to get something from -- the defendant
20   fact sheet doesn't tell us anything except they sold this
21   medicine.  I think we need something that ties this medicine to
22   this patient, whether a statement -- and I know they purged
23   their records.

24         But you know, if there was a manufacturer that was
25   the sole manufacturer to this facility and we know she received

1  it there, then we can look from there as to what they were

2  supplying.  But to know that the defendant sold it there

3  doesn't get us much of anything except that they sold it.  But

4  if you find something, file a motion to reconsider, and I will.

5          **MR. BROWNE:** Thank you, Your Honor.

6          **MS. SWEET:** The next case is Barbara Fanning.  That is

7  a case where no product ID has been submitted, and it appears

8  that plaintiffs are similarly relying on DFS evidence.

9          **THE COURT:** Mr. Browne.

10          **MR. BROWNE:** Ms. Sweet is correct, Your Honor.  We are

11  relying on DFS data for Sandoz and Hospira.  We have served

12  multiple subpoenas to the providers and distributors.  Counsel

13  for Orlando Health sent a letter in response saying they do not

14  have invoices or NDC numbers.  We obtained some records, but no

15  NDCs were ever provided.

16          The rest, it seems like we've just covered.  We,

17  again, we've seen these records from the DFS, but we have not

18  been able from -- the suppliers have not been able to provide

19  any of the information.

20          **THE COURT:** Okay, so for the same reasons I mentioned

21  in the previous case, this matter is dismissed with prejudice.

22          All right, Nancy Horne.

23          **MS. SWEET:** The next case, so this is an interesting

24  case.  The Centrality submission consists of an email from the

25  facility indicating that it ordered its docetaxel from

OFFICIAL TRANSCRIPT

 1  McKesson, and the CMO 12 statement has McKesson circled with
 2  purchased at McKesson.
 3          The issue is that this is not manufacturer
 4  identification of McKesson.  It simply establishes that --
 5          **THE COURT:** Do we know what McKesson -- there's no
 6  information as to what manufacturer --
 7          **MS. SWEET:** Correct.
 8          **THE COURT:** -- McKesson was distributing?
 9          **MS. SWEET:** Correct.  So the reason McKesson is
10  circled here, it's an option on the CMO 12 list, is that they
11  did label --
12          **THE COURT:** Purchase from McKesson.
13          **MS. SWEET:** Well, they labeled under Accord's NDA for
14  a very short period of time in 2015.  So what we have in the
15  Nancy Horne case and later on in the Holleigh Walker case,
16  they're very similar.  I can hand them up.  But they both have
17  purchased at McKesson circled, and the dates of -- the
18  indication that this is referring to, we bought them from
19  McKesson, not this is McKesson product, is that for one of the
20  cases, the treatment dates predate the timing that McKesson was
21  actually labeling docetaxel under Accord's NDA.
22          So the defense position is that this is simply
23  evidence that McKesson was the distributor, and there's no
24  other evidence of manufacturer in these two cases.
25          **THE COURT:** Let me see that.  Now Ms. Horne was in the

OFFICIAL TRANSCRIPT

1 | time that McKesson was packaging as Accord?

2 |            **MS. SWEET:** It is possible.

3 |            **THE COURT:** No, I asked you a time frame.  That should

4 | be a yes or no answer.

5 |            **MS. SWEET:** Yes, yes.  I'll put it this way, it's

6 | partial.  McKesson was on the market as a labeler in March of

7 | 2015, and treatment began in February of 2015.

8 |            **THE COURT:** Oh, okay, that's what I needed to know,

9 | thank you.

10 |            Do we know who McKesson -- what medicine McKesson was

11 | distributing at this time?

12 |            **MS. SWEET:** I think that's a question for plaintiff.

13 | We don't know.

14 |            **THE COURT:** Mr. Browne, do we know what McKesson was

15 | distributing at this time to this facility?

16 |            **MR. BROWNE:** We do not.  McKesson is still responding

17 | to our subpoena.  I've been going back and forth with counsel

18 | for McKesson actually as recently as this morning to try to

19 | follow up.  We had an issue about the subpoenas, and they were

20 | trying to hunt it down, things of that nature, Your Honor.

21 |            The thing, I think, from our obvious perspective is

22 | this was uploaded quite a long time ago, the McKesson Packaging

23 | Services.  And I think it's one that since everything was

24 | filled out here, I think that the idea was that this was -- it

25 | says McKesson Packaging Services purchased at McKesson, that

OFFICIAL TRANSCRIPT

1   that meant that, hey, they were able to narrow this down to say
2   McKesson Packaging Services.
3          I understand what Ms. Sweet's position is with regard
4   to the Walker case, the Holleigh Walker case in that McKesson
5   Packaging Services did not do it during that time frame.  I
6   would ask for additional time for us to be able to continue to
7   try and nail down evidence.
8          **THE COURT:** I'm going to roll these two over.  Because
9   I think if you're talking to the McKesson attorney and trying
10  to get the subpoenas straight, it just seems to me that there
11  may be more information available for you.  So let's just roll
12  these over.  But Mr. Browne, you got to get on it.
13         **MR. BROWNE:** We're on it, Your Honor.
14         **THE COURT:** Thank you.  Marcy Levington.
15         **MS. SWEET:** The next case is Dawn Marie Johnson.  This
16  is a case with two separate infusions.  Defendants agree that
17  the pre-2011 infusions were presumptive Sanofi and have
18  requested partial dismissal as the later infusions could have
19  involved 505(b)(2) manufacturers and there is not sufficient
20  product ID at this time to show which, if any, other
21  manufacturers would have been administered to the plaintiff.
22         **MR. BROWNE:** Your Honor, whenever you're ready.
23         **THE COURT:** I'm ready.
24         **MR. BROWNE:** Ms. Sweet and I actually discussed this
25  case yesterday again, and we are agreeing to proceed with

OFFICIAL TRANSCRIPT

1   Sanofi at this point and to dismiss the other defendants
2   subject to if we find additional information, to raising that
3   back with the Court.

4          But the post 2011 one, we have supplier PID.  There's
5   more than 3,000 orders.  We just are having trouble narrowing
6   that down any further.

7          **THE COURT:** So what are we going to do, dismiss
8   everyone except Sanofi?

9          **MR. BROWNE:** That's correct, Your Honor.  And if we
10  come back with the second infusion -- this woman had two
11  different infusions, one pre-2011, one in May of 2011, I think
12  started the second one.  If we find additional information, we
13  will come back to the Court at that time.

14         **THE COURT:** Okay, so ordered.

15         **MS. SWEET:** The next case of Marcy Levington, the
16  product ID is a letter from the facility stating that the NDC
17  numbers and inventory at the time were Hospira, Sandoz, and
18  Accord.  There's no way to narrow between these potential
19  manufacturers.

20         **THE COURT:** Mr. Browne.

21         **MR. BROWNE:** Yes, Your Honor.  This is from the chief
22  pharmacy officer of the facility, and that was actually
23  provided by their legal department.  It was back in 2019.  And
24  it stated that docetaxel inventory in stock during the time
25  frame of the treatment initiated in December of 2014 was

OFFICIAL TRANSCRIPT

1  Hospira, gave those NDC codes; Sandoz, gave those NDC codes;
2  and Accord.  And that, to me, I believe is -- and it was filled
3  out, Exhibit B, with all that information.

4       I think that this is somebody nailing this down to at
5  least be able to say these are the three things that the chief
6  pharmacy officer, they have complied with the subpoena to the
7  best of their ability, and I think it would be extremely
8  prejudicial to let anybody go at this stage.  Maybe we could be
9  able to, if we had the opportunity to sit down with the chief
10 pharmacy officer at a different point, be able to prod and
11 maybe push and maybe find out, "Oh, maybe I haven't looked at
12 that resource.  Maybe I could be able to determine that."

13      It's just very hard to get this person to be
14 responsive other than what they've already provided.  But
15 perhaps, in a deposition, I've seen it happen, where all of a
16 sudden, corporate reps or whatever, magically prod them to find
17 something additional.

18      **THE COURT:** But all you have now is these are the
19 medicines we bought.  We have no idea.  Is there any way for
20 you to find out which medicine she received?

21      **MR. BROWNE:** Well, I mean this is what they said.
22 This is what they actually had in stock at the time of her
23 treatment.  I think as my understanding from the previous
24 hearings, Your Honor, in trying to be able to determine in CMO
25 12A, trying to be able to narrow that down, when I go forward

OFFICIAL TRANSCRIPT

1  to a facility, I say, "Okay, what did you have in stock at the

2  time?"  And this is what they say that they have in stock.

3          It's possible as I said with a deposition you may be

4  able to get somebody.  To be able to get them on the phone, to

5  be able to be responsive to anything else, it's been difficult

6  to be able to try to say, "Hey, I've already given you this

7  information.  That's what I've got."

8          If there is some additional discovery that could be

9  done, potentially somebody has to comply differently.  And

10  especially, again, under a deposition, I could see somebody

11  coming up and saying, "Okay, well, you know what, let me do try

12  to go and narrow this down.  Maybe I do have another source

13  that I can look at."

14          But the idea is that these folks believe that they

15  have complied with telling us this and saying that they don't

16  have -- this is what they have, his response.  And it's a

17  completed Exhibit B with this.

18          **THE COURT:** Do you have -- I think this isn't like the

19  others, and I tell you why, but I'm going to look at it.

20          The other ones had something that indicated that this

21  manufacturer was what we had and what we were using at the

22  time.  Now in some of those, they had something that appeared

23  to be, perhaps, contradictory, but there was something that

24  said this is what the medicine she got or it was what we had in

25  stock.

1           What we have now are three different kinds, and we

2    don't know which of these she could have received.  I mean at

3    least in one of them, they had two different sources.  You

4    know, one was 10 milligrams; another one was 160.  So they were

5    able to connect through the medical records that she received

6    160.  That's what it's got to be.

7           This one here, all we have is three different kinds

8    of medicine, and I just don't know how that gets me closer to

9    anything.  Other than maybe, well, if I do something else, I'll

10   discover it.  But did you do anything else since this was put

11   on the call docket?

12           **MR. BROWNE:** We have reached back out to the facility

13   to try to be able to see if they could narrow it down further.

14   They've not been able to narrow it down further for us.  We've

15   not been able to get anybody to be able to go further for us.

16   With that said --

17           **MS. SWEET:** Your Honor, this case has --

18           **THE COURT:** Wait.  Go ahead, Mr. Browne.

19           **MR. BROWNE:** Yes, Your Honor.  I just on this one,

20   from the beginning when I got this list, and I mean, this is a

21   very clear and clean Exhibit B with somebody who took, you

22   know, great detail to be able to determine the actual NDC

23   codes.  I just feel like that, again, this is somebody who, if

24   they had the information, I'm sure they would try to be able to

25   continue to knock it down.  But this is somebody who is clearly

OFFICIAL TRANSCRIPT

1  trying to be able to -- this is what we had.

2        And I think with that specific thing, especially,

3  again, at this show cause stage, I just think that that's

4  enough to be able to get past for these three folks.  If we

5  have to go nail it down further at some point, then we have to

6  do that.  But this is really, really clear.  This is not

7  supplier PID.  This is not DFS evidence.  This is an actual

8  chief pharmacy officer signing off on this, and the legal

9  department helped with all this.  And so I just think that we

10  really, really, I think, have gone beyond the stage of the show

11  cause.  That's my position.

12        **THE COURT:** So which one did she get?

13        **MR. BROWNE:** Hospira, Sandoz, and Accord, Your Honor.

14        **THE COURT:** Excuse me?

15        **MR. BROWNE:** She got Hospira, Sandoz, and/or Accord.

16        **MS. SWEET:** Your Honor, I just wanted to add that this

17  case has been on the show cause list since July of 2022.  If

18  they wanted to do the additional discovery, they've had plenty

19  of notice, plenty of opportunity to do so.

20        And it seems as though there is nothing else to do in

21  terms of hopes of narrowing down these potential manufacturers.

22        **THE COURT:** I think I'm going to dismiss this.

23        **MR. BROWNE:** I don't think we've gone to the stages of

24  going and taking depositions of these people and really

25  noticing in those cases.  I think we've done subpoenas, and of

OFFICIAL TRANSCRIPT

1  course, we've done subpoenas.  But we haven't really noticed
2  this up like we would if this was a one-off case.
3          If this were a straight case against Hospira, if I
4  were to sue Hospira, Sandoz, and Accord and they tried to do a
5  12(b)(6) motion, they wouldn't be able to get there.  So we
6  would go down the road of doing discovery on all that.
7          And that's not what we've done here, and I think that
8  that's where we are.  And that, to me, is -- on this case, I do
9  see this one, Your Honor, as different as you just mentioned.
10 I don't think it falls in line with the others.
11         **MS. SWEET:** There are plaintiffs who have done
12 depositions.  There are plaintiffs who have subpoenaed the
13 facilities and gone forward through all the efforts.
14 Depositions were contemplated in the initial CMO 12 entered in
15 2018.
16         **THE COURT:** Mr. Browne, I'm going to dismiss this
17 case.  I think you need to have more than they had this on
18 stock.  Just something that connects this drug to this patient.
19 And sometimes it's, "This is the only one.  So we know what it
20 has to be, or this is the form of the administration that they
21 had on hand."  Maybe there's a reason they had three different
22 manufacturers because they were selling three different types
23 of product that we could tie.  But what we have here is just
24 that they had it.
25         Okay, let's go.


                        OFFICIAL TRANSCRIPT

1          **MS. SWEET:** The next case is Jackquelin Lewis.

2    Plaintiff has produced a subpoena response from McKesson in

3    which three potential manufacturers were identified as being

4    shipped to the facility during the time frame.  There are no

5    purchase dates or further information that would allow us to

6    narrow down any of these potential manufacturers to any given

7    infusion.

8          **THE COURT:** Mr. Browne.

9          **MR. BROWNE:** Yes, Your Honor.  On this one, again, the

10   dates here, we're talking June of 2011, and the acquired PID

11   shows Sanofi and Sanofi/Winthrop on there.  It also shows

12   Hospira and Sandoz.

13         But again, with the proximity to this coming off

14   patent, we think we should at least be able to move forward

15   against Sanofi/Winthrop at least due to the proximity of coming

16   off patent.  And I believe also the number of shipments, I

17   thought that we saw was higher for those as well.

18         **THE COURT:** Okay, so Sandoz began December of 2011

19   which postdates.  That's an easy one.

20         **MS. SWEET:** I think we were talking about Jackquelin

21   Lewis.  Are we on the same case?

22         **THE COURT:** Wait, maybe I moved up.

23         **MS. SWEET:** So Jackquelin Lewis, I heard you reference

24   Sandoz sales, and that's the next.  That's the Marcos-Mendez

25   case.

OFFICIAL TRANSCRIPT

1          **THE COURT:** Right.

2          **MS. SWEET:** So we're talking about Jackquelin Lewis.

3   What we have is McKesson distribution information.

4          **THE COURT:** Okay, I'm sorry.  I am on the wrong case.

5          **MS. SWEET:** And plaintiff made the point about the

6   time frame between going off patent for Sanofi and the first

7   infusion.  Well, it was more than three months, with the first

8   infusion on June 20th of 2011.

9          **THE COURT:** And they came off patent?

10         **MS. SWEET:** It came off in March, early March.

11         **THE COURT:** Do we have any information as to when

12  McKesson distributed Hospira, Sandoz to this facility?

13         **MS. SWEET:** Not on what was produced.

14         **MR. BROWNE:** Yes, Your Honor.  I'll point that

15  information out.  They do not show the time frames, Your Honor,

16  in the response from McKesson.  The McKesson subpoena response

17  does not show that information.

18         They do show five shipments or the NDC codes for

19  Sanofi.  They show two for Hospira and one for Sandoz, but they

20  do not show the time frame other than this is from January 1 of

21  2011 to December 31 of 2011.  As you've mentioned, Sandoz sales

22  began December of 2011.  Then we can knock out Sandoz; even

23  though that's not on the -- we should be able to knock out

24  Sandoz.  So it's really Hospira.

25         **MS. SWEET:** Sandoz sales started August 15, 2011 which

OFFICIAL TRANSCRIPT

 1   is within the time period of her treatment.

 2              **THE COURT:** It's August?

 3              **MS. SWEET:** August of 2011.  Hospira and Sanofi are

 4   both -- I'm sorry.  Hospira is March of 2011, and Sanofi

 5   obviously predates that.

 6              **THE COURT:** So my question -- that's when they're on

 7   market?

 8              **MS. SWEET:** Correct.

 9              **THE COURT:** When do we know McKesson distributed to

10   this facility any of these other medications?

11              **MS. SWEET:** All we know from their response is that

12   these manufacturers were shipped to this facility between

13   January of 2011 and December of 2011.

14              **THE COURT:** Let me see.  Mr. Browne.

15              **MR. BROWNE:** Yes, Your Honor.

16              **THE COURT:** I'm going to tell you, you need to get

17   back with Ms. Park from McKesson and find out when Hospira and

18   Sandoz were distributed to this facility.  I'm going to give

19   you 30 days.

20              **MR. BROWNE:** All right.  Will do, Your Honor.

21              **THE COURT:** Ethel Marcos-Mendez.

22              **MS. SWEET:** Yes.  This case, plaintiff has produced an

23   email from distributor Amerisource Bergen, and it shows both

24   Hospira and Sanofi sales to the facility for the entire

25   treatment period between April of 2011 to September of 2011.

OFFICIAL TRANSCRIPT

1   There are no date breakdowns to allow us to figure out if there
2   was a certain time period where only one distributed to the
3   facility and not the other.  Therefore, we have several
4   potential manufacturers.
5          There is reference to Sandoz on the chart, but that
6   postdated treatment.  So they are not concerned with it.
7          **THE COURT:** So what we have is Hospira and Sanofi?
8          **MS. SWEET:** Correct.
9          **THE COURT:** Do you have anything, Mr. Browne, that
10  ties it closer to one or the other?
11         **MR. BROWNE:** I don't believe so, Your Honor.  I
12  believe we could follow back up with Amerisource Bergen and
13  find out if they have anything additional to be able to narrow
14  that down as far as the time frame of when they actually sent
15  that.
16         **THE COURT:** Mr. Lambert, you have something?
17         **MR. LAMBERT:** When we get past this one, Your Honor, I
18  have something I'd like to raise off the record.
19         **MR. BROWNE:** It does -- Your Honor, it does nail down
20  the actual -- it has invoice dates, and it has the item size.
21  I mean as far as units, whether -- let me see here.
22         It does also, of course, have Taxotere down there,
23  the actual brand name Taxotere, from April of 2011 to July of
24  2011.  And the other one is a ten-day period in April, and it
25  has a bunch of shipments from that time frame, the 20-milligram

OFFICIAL TRANSCRIPT

1  vials or the 80-milligram vials.

2          But there's literally one, two, three, and then there

3  are three Hospira.  And then the rest is Winthrop and Sanofi

4  from the applicable time frame.

5          **MS. SWEET:** Do you want to take a look at this, Your

6  Honor?

7          **MR. BROWNE:** It does have shipment dates, Your Honor.

8          **THE COURT:** Wait, you're cutting out, Mr. Browne.  Let

9  me just look at this.

10         **MR. BROWNE:** Yes, Your Honor.

11         **MS. SWEET:** The problem with this one is that the

12  invoice date ranges aren't in order; so it's hard to interpret.

13  But if you look, you'll see the invoice dates.  The first one

14  for Hospira is April of 2011.  If you go down to the bottom,

15  the first invoice dates for Aventis is also April of 2011.  So

16  all of these dates overlap.  So then we are left with multiple

17  potential manufacturers for any given time period during her

18  treatment.

19         **THE COURT:** Do you have her medical records?

20         **MR. BROWNE:** We do have medical records, Your Honor.

21  As far as -- well, we do have medical records.  Obviously, we

22  have no NDC codes in those medical records.

23         **THE COURT:** I didn't ask you that.  I asked you if you

24  had medical records, okay.

25         **MR. BROWNE:** Yes.


                          OFFICIAL TRANSCRIPT

```
 1              THE COURT:  I think why don't we -- because it looks
 2    like what we have here is these were the manufacturers that
 3    they were receiving from.  Maybe we can find out through them,
 4    what's the --
 5              MS. SWEET:  Like the milligrams?
 6              THE COURT:  Uh-huh.
 7              MS. SWEET:  I will say I have looked at that in
 8    various cases, and I have found that some facilities will do,
 9    if it says 160, they might not get 160.  They might get two
10    80s.  So I'm just pointing out that that is not --
11              THE COURT:  But you could see that in the record?
12              MS. SWEET:  Not necessarily.  It's when you match up
13    the record to, for example, like an NDC code that has been
14    checked off.  You go, oh, these don't quite match up, but then
15    when you add them up, they do.
16              THE COURT:  Okay.  It looks like it's Hospira.
17              MS. SWEET:  So Your Honor, if you look at the first
18    date range for Hospira, April of 2011 to February of 2012.
19              THE COURT:  392 vials.
20              MS. SWEET:  Her treatment ended September -- her
21    treatment was August and September of 2011.
22              THE COURT:  Right.
23              MS. SWEET:  It could be Hospira.  It could be
24    Winthrop.  Wait, let me look.  It could be Hospira and/or
25    Winthrop.
```

OFFICIAL TRANSCRIPT

 1          **THE COURT:** Mr. Browne, it looks to me like it's

 2    either Hospira or Winthrop, you know, Sanofi.  Why don't you

 3    see if you can go back and get us some more information to see

 4    how the pharmacy managed this?

 5          And then I need to take a recess because I got to

 6    talk to you all.

 7          **MR. LAMBERT:** Judge, do you want to send everybody off

 8    for lunch for an hour?

 9          **THE COURT:** Yes.  We're going to take a noon recess

10    until 1:30.

11                    (A lunch recess was taken.)

12          **MS. CALLSEN:** All right, Your Honor, during the lunch

13    break, plaintiffs and defendants have met and conferred.  We've

14    reviewed the cases left to be heard, and defendants will agree

15    to roll over certain cases where they've indicated to us that

16    there are still ongoing efforts.

17          But we would just like a date certain by which those

18    efforts needed to be started and a date certain by which those

19    efforts either come to fruition or we are again before you

20    seeking dismissal.

21          **MR. LAMBERT:** Your Honor, that's correct.  And I think

22    as Ms. Callsen said if Your Honor could give direction that

23    those efforts under the addendum, the CMO 12A need to either be

24    commenced as of this date or immediately after today such that

25    these cases are rolled over and if the information is not there

                    OFFICIAL TRANSCRIPT

 1  next time, then.

 2          **THE COURT:** And I want to make -- I appreciate the

 3  work that you've done over the course of lunch to make this

 4  determination, and I agree.

 5          I will tell you CMO 12 was negotiated in good faith

 6  by all parties very early in this proceeding.  I think in 2016

 7  and 2017 when this case was being commenced, everyone

 8  recognized that this was going to be an ongoing issue and

 9  difficult.  Because as we've talked about before, you don't go

10  into the drugstore, your local pharmacy, and pick up your pack

11  of chemotherapy drugs.  So it created a problem, but that was

12  in 2016, 2017 when we recognized this problem.

13          Months ago, we began this process of saying now it's

14  time to, in the vernacular, put up or shut up, and here we are.

15  I will say it.  Our first show cause hearing, I ran into

16  difficulties because I thought I'm dismissing these cases with

17  prejudice, and perhaps, there is another way to make that

18  determination.

19          And then the addendum was negotiated, and I signed it

20  which outlined those steps that needed to be taken that,

21  perhaps, could show another way of determining who was the

22  manufacturer of the drug that was administered to these various

23  claimants.

24          So all parties understand, we have to identify a

25  manufacturer.  It's not enough to say it could have been one of

OFFICIAL TRANSCRIPT

1  these five.  Well, you have to sue someone, and you can't sue
2  just maybe one of these.  And so with that, I will agree to
3  what you've said.  But I'm kind of done.  I really am
4  frustrated that this -- that we're now here saying, again, one
5  more shot.
6          I want to make sure that this record is clear because
7  at some point maybe someone will be reading about this very
8  day, and I want the record to be very clear that the Court has
9  admonished plaintiffs' counsel at the various points in time.
10 So this is at least the third time that this conversation is
11 held.
12          So what I will say, and I will accept as a
13 stipulation from the parties or this negotiated thing is if
14 you -- that any steps to comply with CMO 12 the addendum have
15 to be started within the next 7 days.  Part of me wants to say
16 24 hours.  But I know someone might have an emergency hearing,
17 and so I'm giving you 7 days because I want to make sure that
18 there is no excuse that this has not, that this process has not
19 started.
20          And then I think there should be substantial
21 compliance within 30 days.  If for some reason the parties can
22 show reasonable signs and that they are in negotiations and
23 they get word from McKesson or some other distributor or Sloan
24 Kettering or some other cancer center that says, "We are
25 working diligently towards this, but it's going to take us more

OFFICIAL TRANSCRIPT

1  than these 30 days," I will consider it at that time.  But I've
2  got to know somebody is in the storage facility looking.  If
3  they're not, it's done.

4        And I understand these people are having difficulty
5  with their clients because their clients don't understand, but
6  it's not enough to say it could be one of these four possible
7  drugs because you have to have a defendant that is named in the
8  suit.  I don't know what else I can say about that, but it is
9  extraordinarily frustrating to me, and I think prejudicial to
10 everyone here, I mean physically present in this courtroom and
11 all parties, that we keep saying the same thing.

12       And apparently, people aren't listening because we
13 get these last-minute filings.  "Oh, well, now that I looked at
14 it, Judge, I've had it for five years.  I'm now looking at it,
15 and you're right.  If I go do some more, I can find it."  Well,
16 you better do it within 7 days.

17       **MR. LAMBERT:** Thank you, Your Honor.

18       And just as a reminder to everybody, and Dawn and I
19 will send an email, but we're here to help if anybody has any
20 questions about what that means or what the addendum requires
21 in terms of additional evidence.  Ms. Barrios, myself, or
22 Ms. Kreider are happy to answer those questions.

23       **THE COURT:** And basic products liability law is you
24 got to connect the product with the plaintiff.  It's got to be
25 connected to the plaintiff, okay?

OFFICIAL TRANSCRIPT

 1          Are we ready, Ms. Sweet?

 2          **MS. SWEET:** Your Honor, in particular, Mr. Browne and

 3 I spoke during the break, and we have reached agreements on

 4 certain cases.  So hopefully, we can go through this very

 5 quickly.

 6          **THE COURT:** Yes, ma'am.

 7          **MS. SWEET:** Is Mr. Browne on the Zoom?

 8          **MR. BROWNE:** I'm here.  I'm here.

 9          **MS. SWEET:** So for the first case, Connie Owens,

10 defendants, based on the Court's rulings today, we have asked

11 for dismissal of all defendants except Hospira subject to

12 contest later on down the road.

13          **THE COURT:** Is that correct, Mr. Browne?

14          **MR. BROWNE:** Yes, that's correct.

15          **THE COURT:** So ordered.

16          As to Ms. Pastore?

17          **MS. SWEET:** For Ms. Pastore, in this case, plaintiff

18 has produced invoices that immediately predate the plaintiff's

19 infusion on May 22nd of 2013.  Those invoices include one

20 that lists Sandoz and Hospira on April 29th and one invoice

21 for Hospira on May 15th.  That's all plaintiff has.

22          There's no way to connect which one was infused to

23 the plaintiff.  And when plaintiff's counsel and I spoke over

24 the break, he did not believe that he had any further efforts

25 that could address the product ID.

OFFICIAL TRANSCRIPT

1      **MR. BROWNE:** That's correct, Your Honor.  We have

2  talked with Jay Silva is the -- let me get his correct title.

3  I believe he's also the chief of the pharmacy department.  He's

4  the pharmacy department director, excuse me.  And he has stated

5  that, yes, McKesson was their primary supplier.

6      And again, the McKesson records show, and I mean we

7  have narrowed it down to those couple of invoices, narrowed it

8  down to the medications that are on those invoices.  I know the

9  Court is not, you know, looking clearly at the DFS only.  I

10  will say in this instance, the DFS is overwhelmingly Hospira.

11      **THE COURT:** Well, I think the bigger question -- I'm

12  not looking at DFS.  The bigger question in my view is how long

13  it stayed on the shelf.  Because it looks like Hospira is the

14  week before, and then two weeks preceding that, we have Sandoz

15  and Hospira.  If there is a question that they kept it -- they

16  bought it as they needed it, that might be sufficient.

17      **MR. BROWNE:** I can ask specifically to Mr. Silva.

18  We've been in contact with him as recently as last week to be

19  able to make sure I understood his latest.  I can follow up and

20  ask does he have any information on how long it was on the

21  shelf.

22      **THE COURT:** Okay, you know, you're going to get your 7

23  days to get started on that process is what we talked about,

24  but you've got to connect it to this patient.  That's part of

25  the addendum.  So I'm going to give you the 30 days to get

1    this, but you have to start within 7.

2              **MR. BROWNE:** Got it, Your Honor.

3              **MS. SWEET:** The next case is Marcia Rosen.  No product

4    ID has been submitted, and plaintiff intends to rely on DFS

5    evidence.

6              **MR. BROWNE:** These are the arguments that have been

7    previously made, Your Honor.  This was on the problem facility

8    list as to PSC.  We were never able to nail down things.  We

9    did prior PID.  We tried everything, and we show DFS's, but we

10   don't have anything further.

11             **THE COURT:** All right, this matter is dismissed.

12             **MS. SWEET:** Tawnya Salamanca, defendants will agree if

13   all defendants except Sanofi are dismissed.

14             **THE COURT:** Wait.  Let's go on to Ms. Salamanca.

15             **MS. SWEET:** Defendants request a partial dismissal as

16   to all, but Sanofi subject to further discovery down the road.

17             **THE COURT:** Any objection?

18             **MR. BROWNE:** Agreed.  No objection.

19             **THE COURT:** So ordered.

20             **MS. SWEET:** Ms. Vincent's case can be rolled over to

21   the next hearing.

22             **THE COURT:** So ordered.

23             **MS. SWEET:** Holleigh Walker has already been

24   addressed.  Her case was already rolled.

25              The case of Felicia White, defendants request

OFFICIAL TRANSCRIPT

1  dismissal of all defendants except Hospira subject to further
2  discovery.
3          **THE COURT:** Mr. Browne.
4          **MR. BROWNE:** No objection.
5          **THE COURT:** So ordered.
6          **MR. BROWNE:** Your Honor, I believe that's all of my
7  cases.  May I dismissed?
8          **THE COURT:** Yes, thank you.
9          **MR. BROWNE:** Thank you very much.  I appreciate it.
10 Thank you, Brenda.
11         **MS. CALLSEN:** We're on 64.  We haven't heard this yet.
12 This is one where plaintiffs are seeking to reinstate the case
13 pursuant to the addendum which set forth specific conditions
14 for reinstatement.
15         Defendants object to the reinstatement because the
16 dismissal was not based on disputed purchase and/or
17 distribution records.  The dismissal was based on the
18 production of purchase records which predated the time period
19 of treatment.
20         **MR. LAMBERT:** Your Honor, I think this is me for
21 Pendley, Baudin & Coffin.  There has been an additional request
22 made for this information.  Obviously, we had purchase records,
23 but for the wrong time period.  And I understand that this
24 case -- this should have already been done.  This was discussed
25 back at the September hearing.

OFFICIAL TRANSCRIPT

1          But we would still request additional time since we
2   have the pending request outstanding.
3          **MS. CALLSEN:** Can we have the 7-day, 30-day agreement,
4   please?
5          **THE COURT:** So ordered 7 days, 30 days.
6          **MS. CALLSEN:** And we've agreed that the rest of the
7   Pendley, Coffin cases, No. 65 through No. 72, that they would
8   again be rolled over subject to the 7-day, 30-day agreement.
9          **THE COURT:** Thank you.  Is that all of Pendley?
10         **MS. SWEET:** Yes.  The next case is Marc J. Bern, Janet
11  Ross.
12         **THE COURT:** Ms. Dessel?
13         **MS. DESSEL:** Good morning.
14         **MS. SWEET:** Your Honor, in the Janet Ross case, based
15  on this Court's rulings today, defendants request dismissal of
16  all, but Hospira subject to further discovery.
17         **THE COURT:** Ms. Dessel.
18         **MS. DESSEL:** Good afternoon, Your Honor.  Yes, for
19  Janet Ross, we did submit the NDC showing that it was, you
20  know, Hospira.  At this time, we have no objection to that.
21         **THE COURT:** Okay, so ordered.
22         **MS. SWEET:** The Yvonne Ceraio, we would agree to a
23  rollover pending the 7-day, 30-day rule.
24         **THE COURT:** 7-day, 30-day rule will apply.
25         **MS. SWEET:** The next case is Sheila Davidson.  We'd

OFFICIAL TRANSCRIPT

1  like to defer the CMO 12 issues, but there is a PTO 22
2  deficiency.
3          **MS. BRILLEAUX:** This is my one case, Your Honor.  So
4  for Sheila Davidson, we have a deficient insurance
5  authorization.  We were missing an insurance authorization.
6  One was uploaded.  It is both outdated and not witnessed.  So
7  all we need is a current, recently dated, witnessed insurance
8  authorization.
9          **THE COURT:** All right, Ms. Dessel, when can you get
10  that?
11          **MS. DESSEL:** I'm sorry, Your Honor?
12          **THE COURT:** They need an updated insurance
13  authorization.  That's it.
14          **MS. DESSEL:** Okay, thank you.
15          **THE COURT:** So when can you get it, 15 days?
16          **MS. DESSEL:** 15 days should be good, yes, Your Honor.
17          **THE COURT:** All right, I'll give you 15 days.
18          **MS. BRILLEAUX:** And just to make sure that counsel
19  heard, we need that to be witnessed too, Counsel.
20          **MS. DESSEL:** Okay.
21          **MS. BRILLEAUX:** Thank you.
22          **THE COURT:** Thank you.
23          **MS. SWEET:** The next case is Davida Deaton.  Based on
24  this Court's rulings today, defendants request dismissal of all
25  defendants except Sandoz subject to further discovery.

OFFICIAL TRANSCRIPT

1          **THE COURT:** Ms. Dessel.

2          **MS. DESSEL:** Your Honor, I understand defendants'

3   position on this.  However, what we did, you know, we're still

4   in the process.  What we did submit to MDL Centrality does show

5   both Sandoz and Hospira.  We're trying our best to kind of

6   figure out which of those two it is.

7          We would be willing to dismiss all defendants other

8   than Sandoz and Hospira at this time.  And if you could just

9   possibly provide, you know, roll it over to the next one, and

10  then hopefully, at that point, we'll figure out whether it's

11  Sandoz or Hospira, and we'll feel more comfortable dismissing

12  whichever it is not.

13         **THE COURT:** Ms. Sweet.

14         **MS. SWEET:** Your Honor, if they are able to come up

15  with the evidence as to Hospira, they can move for

16  reinstatement.

17         **THE COURT:** Sandoz only sales in November.  Sandoz and

18  Hospira in December.

19         **MS. SWEET:** Correct.

20         **THE COURT:** What's the difference?  Why are we

21  separating Sandoz and Hospira?

22         **MS. SWEET:** The infusion dates for Sandoz correspond

23  with November treatment dates where based on this Court's

24  rulings today, it appears there would be sufficient evidence.

25         **THE COURT:** Wait, I can't hear.  I'm sorry.

OFFICIAL TRANSCRIPT

1    **MS. SWEET:** So the Sandoz only sales in November.  And

2  she had infusions in late November, early December, that would

3  correspond with Sandoz only sales to the facility.

4    **THE COURT:** Well, what about the September infusions?

5    **MS. SWEET:** So Sandoz and Hospira sales were joined

6  together in September and October.  It could have been either

7  defendant for those infusions.

8    **THE COURT:** Well, that's what, I mean, I guess what I

9  heard is, you know, it's both Sandoz and Hospira.  Let us see

10 if we can connect it to which of the -- maybe I'm missing

11 something.

12    **MS. DESSEL:** Yes, Your Honor, I mean that's --

13    **THE COURT:** Why would we not just say Sandoz and

14 Hospira, and then you know, if it's not either, we'll dismiss

15 them both if they can't make that determination.  But why

16 dismiss it and have to reinstate if, indeed, we discover it's

17 Hospira?

18    I'm going to dismiss everyone except Sandoz and

19 Hospira.  But understand if we can't make that connection,

20 okay, thank you.

21    **MS. DESSEL:** Thank you, Your Honor.

22    **MS. SWEET:** The next case, Vivian Fox, we are

23 agreeable to a rollover.

24    **THE COURT:** So ordered.

25    **MS. SWEET:** The same with Valerie Jones.

OFFICIAL TRANSCRIPT

1          **THE COURT:** So ordered.

2          **MS. SWEET:** The Viana Minor case, no product ID has

3   been submitted.

4          **THE COURT:** We're on Viana Minor.

5          **MS. DESSEL:** Yes, Your Honor.  So we did submit, we

6   submitted I believe it was the insurance records.  They do have

7   a charge code and a CPT code, but we are, you know.  We can

8   still work -- we would appreciate any type of rollover.  We're

9   still working to get those records.  You know, we tried to get

10  what we can.  We're just in the process, but we did submit some

11  things.

12         **THE COURT:** When?

13         **MS. DESSEL:** The charge codes and CPT codes.

14         **THE COURT:** When did you submit something?

15         **MS. DESSEL:** Defendants do not, I mean, they've

16  claimed that we have submitted something.  They're just

17  claiming in the documents 528225 there is no products ID.

18         **MS. SWEET:** That's correct.

19         **THE COURT:** So you submitted the codes?  What did you

20  submit, Ms. Dessel?

21         **MS. DESSEL:** I believe we submitted insurance records

22  that have charge code and CPT codes to the specific medication

23  that Ms. Minor was taking.  That's what we were able to produce

24  at this time.

25         **MS. SWEET:** Your Honor, I have what was uploaded, and

OFFICIAL TRANSCRIPT

1  we have combed through the records trying to find the product
2  ID.  We have followed up with plaintiff's counsel asking have
3  we missed something, where is it, and we haven't received a
4  response.
5          **THE COURT:**  Who are you alleging she -- who is the
6  manufacturer you're alleging provided the medication?
7          **MS. DESSEL:**  I believe Accord, but my system right now
8  isn't loading.  So that's great.  I apologize, Your Honor.
9          **MS. CALLSEN:**  Your Honor, this is a case that names
10 all defendants possible.
11         **THE COURT:**  Are you telling me your computer is down?
12         **MS. DESSEL:**  I'm trying to pull up exactly what was
13 sent, and I myself am not seeing exactly -- I believe it's
14 Accord Health.
15         **THE COURT:**  Based on what?  You know, are you telling
16 me your computer is down, and you can't get to your notes?
17         **MS. DESSEL:**  Your Honor, I'm trying to locate exactly
18 what we uploaded.
19         **THE COURT:**  And you're telling me the defendant you
20 want is Accord Health?
21         **MS. DESSEL:**  Based on what I'm looking at, I'm not
22 100 percent sure, Your Honor.  But we had uploaded something
23 that someone on my team, my paralegal who has been doing this,
24 believed there was the NDC code, and I agreed at the time.  And
25 I, you know, at this time I -- my hands are tied.

OFFICIAL TRANSCRIPT

1          I'm not sure, Your Honor.  I'm sorry for this.

2          **THE COURT:** All right, this is what we're going to do

3  because I got to roll.  I'm going to circle 79.  We're going to

4  finish going through your list, and then we're going to come

5  back to this one.  But maybe your paralegal can get in there

6  and figure out what you're looking at so that I can determine

7  what it is.  I don't know what you've submitted.

8          Do you have anything?

9          **MS. SWEET:** I have what was submitted.  It's several

10  pages.  It's quite a few pages of medical records.  There are

11  no NDCs in here that we can find.

12          **THE COURT:** Okay, hold on to that.  We're coming back,

13  and I may even take you after I finish the rest of this docket.

14          Let's talk about Ms. Rathgeber.

15          **MS. SWEET:** Rathgeber, Your Honor, cases 80, 81, 82,

16  defendants are agreeable to a rollover.  That's Cindy

17  Rathgeber, Mary Wheeler, and Shavonne White.

18          **THE COURT:** We're going to roll those over.

19          **MS. DESSEL:** Thank you, Your Honor.

20          **THE COURT:** Ms. Dessel, keep looking for what you're

21  looking for.

22          **MS. DESSEL:** I will, Your Honor.  I appreciate that.

23  Than you very much.

24          **THE COURT:** I'm going to take up the Berezofsky Group

25  and Brent Coon.  Who do we have?  Ms. Menzies, are you on the

OFFICIAL TRANSCRIPT

1  line?  Ms. Menzies?

2           **MS. SWEET:** Whether she's able to call in, defendants

3  are agreeable to defer the case.

4           **THE COURT:** To do what?

5           **MS. SWEET:** To roll over the case.  We can keep

6  negotiating.

7           **THE COURT:** So ordered.

8           **MS. MENZIES:** Your Honor, I am on the call.  I'm sorry

9  I was having connection problems, but I'm on.  And that's fine

10  with me.

11          **THE COURT:** That's okay.  We agreed to roll it over.

12  So we're good, and you will continue to negotiate.

13          Mr. Newell.

14          **MR. NEWELL:** I'm here, Your Honor.

15          **THE COURT:** Okay, thank you.

16          Mr. Insogna.

17          **MR. INSOGNA:** That's right, Your Honor.  This case has

18  a CMO 12 statement submitted that identifies Sandoz and Hospira

19  and states, "These are the two NDCs used during the time

20  period.  No longer have records to indicate which was given."

21          **THE COURT:** Mr. Newell, how are we going to connect

22  one or the other of these to your client?

23          **MR. NEWELL:** I think we've turned over just about

24  every rock we can to try to connect one of the two.  I'm just

25  here to lodge an objection to dismissal due to the fact that

OFFICIAL TRANSCRIPT

1   it's only two possible defendants.

2            **THE COURT:** Thank you.  This matter is dismissed

3   subject to the objection lodged by counsel.

4            Diamond Law, Mr. Diamond, are you on the line?

5        **MR. DIAMOND:** Yes.  Can you hear me, Your Honor?

6        **THE COURT:** Yes, sir.

7        **MR. INSOGNA:** Your Honor, in Ms. Lee-Nunn's case, the

8   plaintiffs served a subpoena on Cardinal Health that requested

9   all shipments to the plaintiff's facility from 2009 to 2020.

10           The response that came back identified a single

11  shipment in November of 2011; and on that basis, plaintiff is

12  claiming Hospira product identification.  One shipment in 11

13  years, that cannot have been the only distributor, and there's

14  no other evidence submitted.

15       **THE COURT:** Mr. Diamond.

16       **MR. DIAMOND:** Your Honor, in brief, Ms. Lee-Nunn was

17  administered docetaxel in August through December of 2011 at a

18  facility Desert Oncology in Mesa, Arizona.  That facility

19  closed, went out of business, and so her records were lost.

20           However, we were able to get her infusion log showing

21  the dates that she received docetaxel.  That sort of began us

22  on our odyssey of trying to track down from her insurer, the

23  manufacturers, everybody, if we could sort of pinpoint who, you

24  know, what manufacturer provided it.

25           We subpoenaed in the last year distributors McKesson,

OFFICIAL TRANSCRIPT

1  Amerisource Bergen, and Cardinal Health.  McKesson responded

2  they didn't distribute any products, Taxotere, docetaxel, to

3  Desert Oncology.  Amerisource Bergen responded that they don't

4  have any records for that time frame.

5          And then the last distributor responded, and that was

6  Cardinal, identifying that they did supply docetaxel to Desert

7  Oncology on November 11th of 2011 which was before

8  Ms. Lee-Nunn received a couple of her chemotherapy treatments.

9  So that's as much as we can get.

10         So we believe a release -- we're hoping that this is

11  enough to show that she did receive -- that it was manufactured

12  by Hospira.  I should say that Hospira is the appropriate

13  defendant.

14         **MR. INSOGNA:** Your Honor, this is a case that was

15  addressed at the July hearing, and Your Honor said that you

16  would give the plaintiff 60 days and to get moving.

17         **THE COURT:** I think the problem I have, Mr. Diamond,

18  is that she started her infusions prior to the time of this one

19  Cardinal invoice.  So it has to have come from somewhere else.

20         So even though we have this Cardinal invoice, one,

21  I'm having difficulty.  I'm saying that can't be the only

22  distributor.  She was getting it before.  With nothing from --

23         **MR. DIAMOND:** We weren't able to --

24         **THE COURT:** I understand that.

25         **MR. DIAMOND:** I apologize, Your Honor.

OFFICIAL TRANSCRIPT

1    **THE COURT:** No, no, I understand that you weren't able
2  to get it, but therein lies the problem.  We need a defendant,
3  and this is tenuous at best.  I just don't think it carries the
4  ball over.  I just don't think it's there.

5    I'm going to dismiss this case simply because there's
6  got to be other people they were purchasing from.  And we may
7  discover that all of those people were distributing Hospira,
8  but there's no way that this was the sole distributor simply
9  because she was getting it before.  So I'll dismiss it.  If
10 you -- sir?

11   **MR. DIAMOND:** No, I didn't mean to cut you off, Your
12 Honor.  Go ahead.

13   **THE COURT:** You didn't cut me off.

14   **MR. DIAMOND:** I think you're exactly right.  I mean I
15 think she did receive three or four infusions before the
16 November 11th date, and we've just never been able to get any
17 records establishing the manufacturer for those.

18   **THE COURT:** Yeah.

19   **MR. DIAMOND:** All we do know is that she received a
20 couple of infusions after that November date at that facility,
21 and those are the only records that we have of any
22 manufacturer, and it's Hospira.

23   **THE COURT:** I know.  I'm not saying you did anything
24 wrong, Mr. Diamond.  It's just, unfortunately, it doesn't sound
25 like the records are available, and we need something to

OFFICIAL TRANSCRIPT

1    indicate that this was at least the sole distributor at that
2    time because there had to be somebody else.  That's my concern.
3    So this matter is dismissed.
4            We can go to the next one.  Thank you.
5            **MR. INSOGNA:** The next case is Kelly Lea Kohlenberg
6    with Johnson Becker.
7            **MS. GORSHE:** Yes, Your Honor, I'm on.
8            **MR. INSOGNA:** Your Honor, in this case, there's a
9    statement of chemotherapy administered that checks Hospira,
10   Sandoz, and Accord with a note that says, "According to our
11   purchasing records during this time frame, our pharmacy
12   purchased the following NDCs.  Any of these NDCs could have
13   been used to prepare the patient's doses."
14           **THE COURT:** Ms. Gorshe.
15           **MS. GORSHE:** Counsel is correct, and in this instance,
16   we are at the end of our ropes with this case.  As other
17   counsel have previously stated, we are unable to identify with
18   specificity outside of what was provided for those three
19   products.  So we'd object to the dismissal, but we are at the
20   end of our rope.
21           **THE COURT:** I understand.  This matter is dismissed
22   subject to the objection.
23           **MS. GORSHE:** May I be excused, Your Honor, for the
24   remainder?
25           **THE COURT:** Oh, yes, ma'am.

                          OFFICIAL TRANSCRIPT

1          **MS. GORSHE:** Thank you.

2          **MS. CALLSEN:** The next case, 87, is Marietta Myers

3    with McSweeney, and again, it's a case where plaintiffs are

4    seeking to reinstate.  Defendants object to that reinstatement

5    because there wasn't a disputed purchase record, purchase

6    history that the dismissal was based on.  Rather the dismissal

7    was based on potential three manufacturers, and they were

8    unable to narrow that down any further.

9          **THE COURT:** Ms. Richardson.

10         **MS. RICHARDSON:** Yes, Your Honor.  Can you guys hear

11   me?

12         **THE COURT:** Yes, ma'am.

13         **MS. RICHARDSON:** All right, perfect.  Yes, we did have

14   an affidavit from the facility that identified three potential

15   manufacturers that had distributed to that particular location

16   during the relevant time frame.  That affidavit along with the

17   defendant fact sheet leads us to believe that the only possible

18   defendant in this case would be Hospira.

19         Hospira is the only one that identified distributing

20   to this facility during the relevant time frame.  The other two

21   defendants didn't identify having any distribution during the

22   relevant time frame.  So that, along with the affidavit, is why

23   we would be moving to have this one reinstated.

24         **THE COURT:** Ma'am, I'm going to deny that motion.  I

25   mean you had from the facility saying we received from these

OFFICIAL TRANSCRIPT

1   three.  I don't know if they were dealing with a

2   distributorship.  But I don't think that warrants the Court

3   readdressing that.  Thank you.

4          **MS. CALLSEN:** The next one is Christina Westwood, and

5   it's with the Milberg Law Firm.  This was a case that we agreed

6   to reinstate.  And despite additional efforts taken by

7   plaintiffs, there still has been no product ID.  The additional

8   efforts were the deposition of a pharmacy director who

9   confirmed that they were unable to determine with any

10  specificity the defendants to whom, you know, that manufactured

11  the product infused.

12         Again, we're here seeking re-dismissal of this case.

13         **THE COURT:** Mr. Bryson.

14         **MR. BRYSON:** Good afternoon, Your Honor.  This case,

15  we did take a deposition of the pharmacy director, and they

16  said that they just went in and picked up a box and didn't have

17  anything labeled, you know.  This is obviously unfortunate, but

18  we would ask it not be dismissed, and you know, press on here.

19  But, you know, we did take a deposition, tried to get what we

20  could from this facility.

21         **THE COURT:** But it doesn't sound like you got it.

22  What you got is it could be any of these three, and who are you

23  going to sue?

24         **MR. BRYSON:** Well, you know, really, they just went

25  out there, and they just picked up a box and didn't record

OFFICIAL TRANSCRIPT

1  anything.  And they did take some snapshots of specific times
2  during the treatment dates in which they gave a screenshot in
3  time for that particular day of what they had on hand.
4  Obviously, that's not indicative of other days of treatment,
5  but you know, at least that's something.

6        So we would ask that we have more time to maybe just
7  dismiss out defendants that are not located on those snapshots.
8  But again, as the defendants will argue, that was just one day
9  in time rather than, you know, multiple days, but at least it's
10 something, you know, rather than nothing.

11       **THE COURT:** But even that doesn't tell you.  All that
12 tells you is that these products were on the shelf.  It doesn't
13 tell you which product, which manufacturer provided the
14 medicine on that day.

15       **MR. BRYSON:** Yes, that's true.

16       **THE COURT:** Mr. Bryson, I know you have worked very
17 diligently to find this.  Unfortunately, this looks like one of
18 those cases that's just not going to be able to carry the day.
19 And so this matter is dismissed.

20       **MR. BRYSON:** I understand.  Thank you, Your Honor.

21       **MS. CALLSEN:** The next case is just one by -- it's
22 Lana McDonnell by the Murray Law Firm.  And after reviewing the
23 evidence again over the lunch break, we're just going to allow
24 this one to proceed.  So it will just be withdrawn from the
25 list.

OFFICIAL TRANSCRIPT

1            **THE COURT:** Thank you.

2            **MS. SWEET:** The next case is a Napoli Shkolnik case,

3    Tammy Slape.

4            **THE COURT:** Mr. Ortiz, are you on the line?

5    Mr. Ortiz?

6            Let's go to Ms. Velesta Maxwell, and that should be

7    Mr. Niemeyer.

8            **MR. NIEMEYER:** Good afternoon, Your Honor.

9            **THE COURT:** Ms. Sweet.

10           **MS. SWEET:** In this case, the Centrality submission

11   consists of an email from Amerisource Bergen that the only

12   branded or generic Taxotere purchased in the time frame

13   covering the treatment was Accord or Sandoz.  "Please note that

14   we can only confirm purchases of this NDC number and cannot

15   confirm if it was administered to any specific patient."  There

16   is no way to narrow that further, and we are not aware of any

17   current efforts to obtain further evidence.

18           **THE COURT:** Mr. Niemeyer.

19           **MR. NIEMEYER:** Yes, ma'am.  So we have successfully

20   narrowed it to just Sandoz and Accord, and Your Honor, we have

21   been -- this is a case that my firm took over recently.  And

22   we've been in touch over the course of the last month with the

23   facility in an effort to, like we do in many of these, get the

24   actual supply dates.  Those weren't supplied by Amerisource

25   Bergen or the facility.

                        OFFICIAL TRANSCRIPT

1        So in getting the supply dates, we hope to be able to
2    do that exclusive analysis and see when Sandoz was supplied and
3    when Accord was supplied in the hopes of at least narrowing a
4    few of the doses down.  So we would ask for that, what I
5    understand I think the Court articulated kind of a 7-day,
6    30-day plan, if we could have that.
7        **THE COURT:** Mr. Niemeyer, you're going to get the 7/30
8    deal.  And you have a couple of cases at the end.
9        **MS. SWEET:** Your Honor, if I may, one more thing on
10   Ms. Maxwell, can we have a partial dismissal of all defendants
11   except Accord and Sandoz?
12       **THE COURT:** Any objection?
13       **MR. NIEMEYER:** No, no, ma'am.
14       **THE COURT:** Okay, so ordered.
15       Let's go to page 36 which is one of them.  Let's just
16   take these last four; so this lawyer can get off the phone.
17   Let's do these at the end, Glenda Hatchett.
18       **MS. CALLSEN:** The first one is 111.  Is that what we
19   want to go to?
20       **THE COURT:** Yes, ma'am.
21       **MS. CALLSEN:** 111, the plaintiffs are seeking to
22   reinstate the case, but defendants object to reinstatement
23   because the dismissal was not obtained on the basis of disputed
24   purchase or distribution records.  Rather, the dismissal was
25   based on the fact that no product ID was produced.

OFFICIAL TRANSCRIPT

1      **MR. NIEMEYER:** Judge, we followed up on that one only
2  to find out that now the hospital is closed, and any records
3  are now completely unavailable.  So we have nothing further to
4  say on that one unfortunately.

5      **THE COURT:** This matter is dismissed subject to the
6  objection.

7      Judith McCord.

8      **MS. CALLSEN:** It's already dismissed, Your Honor; so
9  it stays that way.

10      **THE COURT:** It stays dismissed, okay.

11      **MR. INSOGNA:** Your Honor, in Judith McCord's case, we
12  do not have any product identification evidence submitted.
13  Plaintiff has informed us that they've learned from the
14  facility that it was either Sandoz or Accord or both.  I have
15  not seen that evidence.

16      Again, if there are outstanding efforts that
17  plaintiff can identify for the record, we would agree to the
18  7-day, 30-day.  I just don't know that there even are
19  outstanding efforts.

20      **THE COURT:** Mr. Niemeyer.

21      **MR. NIEMEYER:** And there are, Your Honor.  This has
22  been quite a saga.  I won't bore you with all of it.  But the
23  latest is the facility has been very helpful in boiling it down
24  to just Sandoz and Accord.  And the final step now is to try
25  to -- they believe they can identify via dosing which one of

OFFICIAL TRANSCRIPT

1 │ the two it is.  So we would ask for the 7/30 program.

2 │         **THE COURT:** So ordered.

3 │         **MS. CALLSEN:** Can we get the dismissal of the rest of

4 │ the defendants?

5 │         **THE COURT:** Would you agree to a dismissal of the

6 │ other manufacturers?

7 │         **MR. NIEMEYER:** Certainly.

8 │         **THE COURT:** So ordered.

9 │         **MR. INSOGNA:** Your Honor, in Ms. Tammie Lackey's case,

10 │ we will agree to roll that one over.

11 │         **THE COURT:** All right, that one is rolled over.

12 │         **MR. INSOGNA:** Then the last with Niemeyer, Grabel &

13 │ Kruse is Yolanda Williford.  In this case, there's evidence

14 │ that narrows to three potential manufacturers, no evidence of

15 │ shelf life, that sort of thing.  The three potential are

16 │ Accord, Hospira, and Sandoz.

17 │         And the facility's response indicates, "We do not

18 │ track NDCs per patient."  And so we have dates of distributions

19 │ that cover a month.  And in the month of September before her

20 │ treatment, there was both Accord and Hospira.  In October

21 │ during treatment, there's Hospira.  In November, there's

22 │ Hospira and Sandoz.  So I don't think we can narrow any

23 │ particular cycle.

24 │         **THE COURT:** Mr. Niemeyer.

25 │         **MR. NIEMEYER:** Your Honor, this is one of those

OFFICIAL TRANSCRIPT

1  similar to the very beginning of the hearing today, back in the
2  morning, where we do have the Exhibit B statement of
3  chemotherapy from after those items of evidence just mentioned
4  by defense counsel.

5          And on December 16 of 2020, there's a chemo form that
6  indicates that each of the three was submitted.  So this is one
7  of those that we would say, you know, there is an issue of fact
8  here sufficient to make it through the show cause hearing based
9  upon that chemotherapy form that was subsequently produced by
10  the facility.

11          **THE COURT:** Okay.

12          **MR. INSOGNA:** This one, Your Honor, I think is clearly
13  where the statement is just what was ordered by the facility.
14  It comes attached to this cover letter where they've identified
15  the same NDCs, and they say specifically, "We did not track
16  NDCs per patient."  It's signed by Ms. Wood at the facility.
17  So I don't see how they possibly could have signed a statement
18  based on anything other than purchase records.

19          **MR. NIEMEYER:** Judge, I would point you to the form
20  signed by Ms. Waddell.

21          **THE COURT:** That's medical records.  You know, this
22  one is medical records.  This one is pharmacy.  I just think
23  this is one that's going to have to be fleshed out by somebody
24  else.  I'll let this one survive.  Perhaps, somebody at summary
25  judgment might have a different view once this is all

OFFICIAL TRANSCRIPT

 1  explained.

 2          **MR. INSOGNA:** Understood, Your Honor.

 3          **THE COURT:** Thank you.

 4          **MR. NIEMEYER:** Thank you, Your Honor.

 5          **THE COURT:** Then we go back to, let's see, Napoli.

 6  Mr. Ortiz, are you on the line?

 7          **MS. KREIDER:** He is.

 8          **MR. ORTIZ:** I'm here, Your Honor.  Good afternoon.

 9          **THE COURT:** 90.

10          **MS. SWEET:** Give me one second.  This is a case where

11  defendants, based on the records, had requested partial

12  dismissal as to Sanofi.  The remaining defendant would be

13  Hospira.

14          **THE COURT:** Mr. Ortiz.

15          **MR. ORTIZ:** We have an objection to that, Your Honor,

16  because we have provided evidence from the facility itself,

17  purchase records with NDC codes with positive ID as to Sanofi

18  and Hospira.  So at this time, we are not comfortable with a

19  partial dismissal at this point.

20          **MS. SWEET:** I can walk through the evidence quickly if

21  you would like.  Hospira and Sanofi are the only two

22  defendants.

23          **THE COURT:** Okay.  Are Hospira and Sanofi -- Sandoz

24  the only defendants in this case?

25          **MS. SWEET:** The only defendants are Hospira and

OFFICIAL TRANSCRIPT

1  Sanofi.

2         **THE COURT:** Sanofi, not Sandoz?

3         **MS. SWEET:** Correct, Sandoz is not a defendant.

4         **THE COURT:** Okay, Mr. Ortiz, do you have Sanofi as a

5  defendant -- I mean Sandoz as a defendant?

6         **MR. ORTIZ:** Not at this time, Your Honor.

7         **THE COURT:** But you have Sanofi?

8         **MR. ORTIZ:** That's correct.

9         **THE COURT:** And you have purchase records from Sanofi?

10         **MR. ORTIZ:** That's correct, they were uploaded to

11  Centrality on February 24th, 2022.

12         **MS. SWEET:** Your Honor, if I may briefly describe.

13  First infusion was August 27th of 2012.  There are no

14  purchase records predating that infusion, okay.

15         Infusion No. 2 was September 26th of 2012.  In the,

16  let's just say the seven-day period before that infusion, there

17  were Hospira, Sandoz, and Sanofi purchases.

18         The third infusion, October 18, the only infusion

19  within the month is Hospira.  Therefore, we've agreed -- and

20  the same with the last infusion.  So the only thing they have

21  as to Sanofi is one infusion where it's one of three potential

22  manufacturers.

23         **THE COURT:** Okay, Mr. Ortiz, how are you going to tie

24  Sanofi?

25         **MR. ORTIZ:** Connect the two of them; right?

OFFICIAL TRANSCRIPT

1              **THE COURT:** Yes, sir.

2              **MR. ORTIZ:** Well, the question is:  Was the product on

3     the shelf?  Most probably, yes.  So a dismissal at this time,

4     it will be premature.

5              **THE COURT:** Well, I understand there was product on

6     the shelf.  But how are you going to connect that product to

7     this defendant and this patient, the Sanofi product?

8              Because you have to know who you're suing.

9              **MR. ORTIZ:** I know, Your Honor, but it's not

10    conclusive enough for a dismissal, I think, at this point.

11             **THE COURT:** Have you made efforts with the hospital to

12    determine what medication she received?

13             **MR. ORTIZ:** Yes.

14             **THE COURT:** NDC codes?

15             **MR. ORTIZ:** We uploaded business records to Centrality

16    also with the records that they have provided and they are

17    purchased over the time.  So the facility has only purchased

18    from Sanofi --

19             **THE COURT:** Hospira and Sandoz.

20             **MR. ORTIZ:** -- and Hospira.

21             **THE COURT:** So they purchased from all three.  Is it

22    your intent to sue all three and just hope you can -- you have

23    to connect the product to the plaintiff.

24             And so my question is:  Are you attempting to do

25    anything to do that, and what would those efforts look like?

OFFICIAL TRANSCRIPT

1        **MR. ORTIZ:** We have looked over the medical records,

2  over ten thousands of pages to see if we can connect the NDC

3  codes that were provided from the facility to the records.  But

4  at this time, we're still working on it, Your Honor.

5            But if I'm not mistaken, this hearing has been about

6  the efforts that have been made by all the plaintiffs in this

7  matter.  So at this time, we have been able to get all the

8  information that we need.  The only thing that we ask is for a

9  little bit of time to try to connect the two of them.

10       **THE COURT:** I'm going to give you the 7/30 deal.

11       **MR. ORTIZ:** I understand, Your Honor.  Thank you.

12       **THE COURT:** You have to connect the product to the

13  plaintiff, okay.  Thank you.

14       **MR. ORTIZ:** Yes, thank you.

15       **MS. SWEET:** The next case is Gainsburgh Benjamin.  The

16  defendants have requested partial dismissal as to all except

17  Sanofi.

18       **THE COURT:** Mr. Lambert.

19       **MR. LAMBERT:** Yes, Your Honor.  So there was a little

20  bit of a delay in the changeover in representation here, but we

21  are doing this in the next two cases, Brooks and Stoops.  We

22  will be making the dismissals as necessary as soon as I'm --

23  it's withdrawn from Gainsburgh, and it's properly at Pendley.

24       **THE COURT:** So we have agreed?

25       **MR. LAMBERT:** These steps are going to be taken.


OFFICIAL TRANSCRIPT

 1              **THE COURT:** Thank you.

 2              **MS. SWEET:** Stoops has already been dismissed?

 3              **MR. LAMBERT:** Yes, we filed that one.

 4              **THE COURT:** Roberts & Roberts.

 5              **MS. SWEET:** The partial dismissal was filed yesterday.

 6    So that case is cured.

 7              **THE COURT:** For Carol Haynes?

 8              **MS. SWEET:** Yes, for Carol Haynes.

 9              **THE COURT:** And then I have Kathryn Joyner.

10              **MS. SWEET:** Yes, same with Kathryn Joyner.

11              **THE COURT:** So that one is satisfied?

12              **MS. SWEET:** Correct.

13              **THE COURT:** Thank you.  Elaine Huey.

14              **MR. INSOGNA:** Yes, Your Honor.

15              **THE COURT:** That would be Casperson.

16              **MR. CASPERSON:** Good afternoon, Your Honor, Clint

17    Casperson for the plaintiff.  Can you hear me okay?

18              **THE COURT:** I can, sir.  Thank you very much.

19              **MR. INSOGNA:** Your Honor, in this case, we've received

20    two sets of records that both identify multiple possible

21    manufacturers, Sanofi, Winthrop, and Hospira, that were

22    apparently provided to the facility.  Distributed or purchased,

23    it's not clear.  But we don't have the dates for any of that

24    distribution or purchase.

25              And the subpoena response specifically says, "any NDC

OFFICIAL TRANSCRIPT

1  included therein is not necessarily representative of the

2  medications plaintiff may have received."  So we're at a point

3  where we've got three possibles and no further narrowing.

4          **THE COURT:** Mr. Casperson.

5          **MR. CASPERSON:** Yes, Your Honor, we're going to ask

6  the Court to deny this motion because this is properly picked

7  back up, I think, as a summary judgment on product ID.

8          As part of our efforts, we subpoenaed records

9  directly from the infusion facility.  What they provided to us

10  was an IV room snapshot which is essentially an inventory log

11  which identified Sanofi, Hospira, and Winthrop as product

12  that's on their shelf.

13          Now while it is true that the IV room log report

14  itself is not dated.  You have to read that in conjunction with

15  the subpoena which was tailored to dates in and around.

16          **THE COURT:** Okay, let me ask this, Mr. Casperson.  How

17  are you going to identify which manufacturer provided medicine

18  to your client?

19          **MR. CASPERSON:** I think we are partially there for

20  purposes of the show cause hearing, and I do have a plan going

21  forward.

22          **THE COURT:** You have a plan going forward, okay.  You

23  got a plan, and you have additional steps you're going to take.

24  What are those steps?

25          **MR. CASPERSON:** For here now, for purposes of this

OFFICIAL TRANSCRIPT

1  hearing, we also have records from Cardinal Health which I
2  believe identify Hospira as a viable defendant as of October of
3  2013.
4          A little background, she was taking the product from
5  August through November.  So in conjunction with the affidavit
6  from the pharmacy director that we got, I think we do have more
7  than a possibility for the last infusion which I believe we can
8  link to Hospira.
9          Going forward to address a summary judgment challenge
10 on product ID, now that I know that the practices of the
11 pharmacies were to not keep this stuff on the shelf very long,
12 I think their affidavit says the average life span on the shelf
13 was five days.  So I think we can exclude the mystery vial back
14 in the storeroom.
15         And now that I know from their subpoena response that
16 they have the ability to take these, what they call IV room
17 snapshots, which to me are essentially an inventory log, what I
18 would do to defeat, hopefully defeat a summary judgment motion
19 coming down the pipe is do a 30(b)(6) --
20         **THE COURT:** Whoa, whoa, whoa, whoa.  If we can't
21 connect it at least in a way that shows some evidence
22 connecting this drug to this plaintiff, it's not going to get
23 to summary judgment.
24         When I said this looks like summary judgment
25 material, it's because there was conflicting evidence, that

OFFICIAL TRANSCRIPT

1  there was an attempt to read something into it, and I said I'm
2  not reading into anything.  You've got to be able to connect a
3  manufacturer to your client.

4        I tell you what I will give you.  I'm going to give
5  you the 7/30 deal.  It sounds like you've done some work, but
6  you just haven't been able to make that showing.  So as to
7  Ms. Huey, I'll give you 7 days to begin your quest to narrow it
8  down.

9        But look, you can't -- you have got to decide which
10 manufacturer it is.  You have to know a manufacturer gave
11 medicine to your client.  And you have to have some evidence
12 that you can show me, "This is" -- now they may have
13 countervailing evidence -- "We think it was this."  And in that
14 circumstance, say, look, that's for summary judgment.  But you
15 have to be able to connect it, at least make a prima -- I don't
16 know if I would call it a prima facie showing.  But you got to
17 show me something that says she got this medicine from Sanofi,
18 Winthrop, or somebody.

19        **MR. CASPERSON:** I understand, Your Honor.

20        **THE COURT:** Then we have -- what's the next case for
21 this firm, Suzanne Wease.

22        **MR. INSOGNA:** Your Honor, this occurs to me.  In these
23 cases where we're doing the 7-day, 30-day, and maybe
24 Mr. Lambert's email will address this.  But I assume the
25 plaintiffs will be submitting to defendants some evidence of

OFFICIAL TRANSCRIPT

1    what they did in the 7 days so that we know that.

2            **THE COURT:** Yes.  Because we got to have some evidence

3    that these steps are made and that at the conclusion of 30

4    days, where we are.  Hopefully, they will have the evidence,

5    and that's the assumption by this rule.

6            And if they don't, they better have very good reason

7    why it's not in hand because these cases have been pending for

8    a long time.

9            **MR. INSOGNA:** So in the cases where if after 7 days we

10   have a plaintiff that hasn't provided evidence that they've

11   started, I guess we can address that with Mr. Lambert, a letter

12   to the Court or something.

13           **THE COURT:** Thank you.

14           **MR. INSOGNA:** Your Honor, in Ms. Wease's case, we have

15   a submission that identified Accord and Sanofi as possible.  We

16   also have Hospira and Sandoz as defendants named in the case.

17   We've told plaintiff that if they will dismiss defendants other

18   than Hospira and Sandoz, we'll allow the case to proceed.  And

19   I'm not clear exactly on why plaintiffs are not agreeing to

20   that.

21           Sorry, it's as to Sanofi.  There's evidence

22   sufficient to support Sanofi as a manufacturer, and our request

23   is that the other defendants be dismissed.

24           **MR. CASPERSON:** Your Honor, I looked at the short form

25   complaint this morning, and maybe we can roll this one over so

OFFICIAL TRANSCRIPT

1   that I can confer with the defendant.  I was in a pretrial in a

2   Roundup matter the past few weeks; so I've been out of touch on

3   this.

4          Ms. Wease is from Illinois, and I looked at the short

5   form this morning.  We didn't sue Hospira in this case.  I

6   think there's a little bit of confusion over who the active

7   defendants are.

8          Based on what I looked at, it's Sanofi and Accord,

9   and we do have some purchase records indicating Accord was

10  bought by the facility while she was receiving infusions there.

11  So we would think that would be, you know, more than a

12  possibility that they're a viable defendant.

13         **THE COURT:** Do you have -- do you know who's --

14         **MR. INSOGNA:** I do, Your Honor.  I have the records if

15  you'd like to see them.  So we have purchase records that show

16  that from March of 2011 to September of 2011 only Sanofi

17  medication was purchased which covers plaintiff's first four

18  infusions.  That's why we've agreed that those could only be a

19  Sanofi medication.

20         **THE COURT:** Right.

21         **MR. INSOGNA:** In September, both Accord and Sanofi

22  were purchased.  And in October, after plaintiff's infusions,

23  Hospira was purchased.  So based on that evidence, we're

24  agreeing that Sanofi is supported.

25         **THE COURT:** Sanofi and Accord?

OFFICIAL TRANSCRIPT

1        **MR. INSOGNA:** No, only Sanofi.  Because in September,

2   both Accord and Sanofi were purchased, and there's an infusion

3   the following day.  Presumably, it could have been either

4   Sanofi or Accord.  So we're asking that Accord and all the

5   other non-Sanofi defendants be dismissed from the case.

6        **MR. CASPERSON:** May I respond, Your Honor?

7        **THE COURT:** Yes.

8        **MR. CASPERSON:** Okay.  Very briefly, we do have some

9   purchase logs, and I think the temporality with the most

10  contemporaneous infusion, I think, makes this more than just a

11  mere possibility that she received Accord product for purposes

12  of a show cause hearing like that.  I'm happy to stop there

13  unless you have any questions.

14       **THE COURT:** Who is named in the short form complaint?

15  Because that's what we started on and now we're down some other

16  rabbit hole.

17       **MR. INSOGNA:** Your Honor, what I show is that Hospira,

18  Sandoz, and Sanofi are the active defendants in this case.

19       What counsel is referring to as prima facie evidence

20  for a court is that on one day, September 15th, both Accord

21  and Sanofi were purchased together.  That's the only evidence

22  that would support Accord who does not appear as even an active

23  defendant in the case.

24       **THE COURT:** Well, that's it.  I mean that's the real

25  kicker is that Accord is not named as a defendant.  Now Hospira

OFFICIAL TRANSCRIPT

1  is named as a defendant, and Hospira was purchased it looks

2  like, perhaps, sometime right before that last infusion.  But

3  Sanofi and Hospira potentially could have, if there's some

4  connection, if they've been able to connect it.

5        **MR. INSOGNA:** Right.  At this point, they have not.

6        **MR. CASPERSON:** Your Honor, I'm looking at the file

7  stamped complaint, and Hospira is not a party to the case.  And

8  that's because Ms. Wease is from Illinois.  So if Hospira were

9  in the case, I'd have a different problem with subject matter

10  jurisdiction.

11        **MS. SWEET:** Your Honor, I pulled up the court docket.

12  It says that Accord and Sanofi are the only defendants.  We

13  must have an error on our chart.

14        **MR. INSOGNA:** It sounds like I have an error.  It's

15  only Accord and Sanofi that are active at this point.

16        **THE COURT:** All right, Accord and Sanofi are the only

17  defendants in this case.  And you want Accord dismissed because

18  there was only one purchase of Accord, but it was at that time

19  that she was receiving treatment.

20        **MR. INSOGNA:** Well, the issue is that it's both Accord

21  and Sanofi purchased on the same day.  To narrow between those

22  two for her next infusion is impossible.

23        **THE COURT:** Unless the pharmacy can do it.

24        **MR. INSOGNA:** Unless the pharmacy -- well, there's no

25  evidence at this point that would allow us to do that.

OFFICIAL TRANSCRIPT

1        **THE COURT:** So that's the real question is how are you

2   going to connect Accord to this plaintiff.  And please don't

3   tell me they bought both, and so surely she got one or the

4   other because that doesn't carry the day.  What are you going

5   to do to tell me she got it?

6        **MR. CASPERSON:** I'd have to get an affidavit from the

7   pharmacy director.  So I think that would trigger the 7/30.

8        **THE COURT:** I'm going to give you an opportunity to do

9   that.  But understand, Mr. Casperson, if the pharmacy director

10  said it could have been Sanofi or Accord, that does not carry

11  the day.  You're going to have to connect the drug to the

12  plaintiff.

13            **MR. CASPERSON:** Understood, Your Honor.  Thank you.

14            I believe that's all of my cases.  May I be excused?

15        **THE COURT:** Yes.

16        **MR. CASPERSON:** Thank you, Your Honor.

17        **THE COURT:** Mr. Bryson.

18        **MR. BRYSON:** Yes.

19        **THE COURT:** Barbara Bain.

20        **MR. INSOGNA:** Yes, Your Honor.  In Ms. Bain's case,

21  sort of similar to the last one, there are purchase records

22  that identify only Hospira purchases, no other defendant.

23            We told plaintiff that if they dismissed Sanofi, who

24  is also a defendant in the case, we would allow them to proceed

25  against Hospira.  And plaintiff responded that they've been

OFFICIAL TRANSCRIPT

1  informed that there's a two-year shelf life; so the purchase
2  records are not sufficient.
3          I think at this point, I'll just turn it over to
4  plaintiff's counsel because I don't understand exactly.
5          **THE COURT:** Okay, Mr. Bryson.
6          **MR. BRYSON:** We've had a lot of issue getting
7  defendants here for a deposition that we've got -- we've tried
8  to serve them multiple times.  We've had patients out in
9  California and people not accepting service there.  This is a
10 Sutter Roseville facility out there.  It's been a nightmare.
11         You know, the issue I have with dismissing, you know,
12 Sanofi is if, you know, they'll say -- then Hospira will come
13 back and say that what I have is insufficient to identify them,
14 and then they'll say gotcha.
15         So I can't just dismiss Sanofi until I get a
16 deposition, and we have not sat on our hands on this.  We have
17 worked on this.  So we would ask this be rolled over to try to
18 get a deposition of this Sutter Roseville facility to confirm
19 that, you know, it was only Hospira, and they can give us some
20 certainty.
21         **THE COURT:** So you have evidence that they kept this
22 chemotherapy drug for two years?  I know that we heard people
23 speak about this earlier.
24         But you have evidence -- you believe there's evidence
25 that this facility kept some of these chemotherapy drugs for

OFFICIAL TRANSCRIPT

1  two years?

2          **MR. BRYSON:** That's what they told us, and I mean

3  until I ask them some more questions, that's what they said.

4          **MR. INSOGNA:** Your Honor, the issue I have with that

5  is there's not any evidence to support Sanofi at this point.

6  Plaintiff doesn't want to dismiss a defendant because it might

7  be a problem down the road, but they don't actually have any

8  evidence to support that defendant.

9          **THE COURT:** That they purchased Sanofi at all?

10         **MR. INSOGNA:** Correct.

11         **THE COURT:** Do you have any evidence that they

12  purchased from Sanofi?

13         **MR. BRYSON:** Not that I'm aware of, no.

14         **THE COURT:** Mr. Bryson, what am I supposed to do with

15  that?  I guess, you know, if you said they purchased, they had

16  old purchasing records for Sanofi, that would be one thing.

17  But to say they just -- I would guess --

18         **MR. BRYSON:** Fair enough.  Yeah, fair enough.  I

19  understand, Your Honor.

20         **THE COURT:** I think you might be one of the people

21  that actually -- I'm going to dismiss everybody, but Hospira.

22  Thank you.

23         **MR. INSOGNA:** The last case with Whitfield, Bryson,

24  Mason is Mary Elaine Scott.  In this case, plaintiff is trying

25  to apparently narrow between Hospira, Pfizer, and Sandoz.  My

OFFICIAL TRANSCRIPT

1  understanding is their position is that they want to roll over
2  to take a facility deposition.  I know you understand our
3  position, that the time for that is passed.
4         If they want to do the 7-day, 30-day to take that
5  deposition, we'll agree to that.
6         **THE COURT:** 7-day, 30, I think that's fine,
7  Mr. Bryson, because we have to show that you've taken active
8  steps within 7 days, okay.
9         **MR. BRYSON:** Okay, I will.
10         **THE COURT:** Thank you.  Gibbs Law Group, that's
11  Ms. Menzies.  I should have finished her first.
12         **MS. CALLSEN:** We're in the home stretch, Your Honor.
13         This is a case where plaintiff was seeking
14  reinstatement pursuant to the addendum, and defendants objected
15  to the seeking of reinstatement because the dismissal was not
16  obtained on the basis of disputed records.  Rather the only
17  product ID produced were purchase records which predated
18  treatment by seven months.
19         **THE COURT:** Ms. Menzies.
20         **MS. MENZIES:** I misheard.  We're talking about the
21  Welch case; is that correct?
22         **MS. CALLSEN:** Yes, I'm sorry, Sherri Welch.  I'm
23  sorry.  If I didn't say the name, I apologize.
24         **MS. MENZIES:** That's okay, no problem.  I just wanted
25  to make sure that was the one.

OFFICIAL TRANSCRIPT

1          Yes, Your Honor, this one is we have -- it's actually

2     based on facility records during the months she was treated.

3     So we have two identified by NDC code for Ms. Welch.  In the

4     past, those cases were dismissed, and that's why we want this

5     reinstated.  It's from the facility, and it's the month that

6     she was treated.  It does have two defendants on it.  Everybody

7     else has been dismissed.  Actually, the case has been dismissed

8     now.

9          **MS. CALLSEN:** Right, there wasn't a dispute about the

10    records.  Remember, the reinstatement is based on if there was

11    a dispute about the records, and it was dismissed anyway.

12    Here, there were just simply no records, and that's why it was

13    dismissed.

14         **MS. MENZIES:** We have the purchase records.  I don't

15    know if we're looking at the same thing.  I think that's Julie.

16         I have NDC, I'm looking right now, purchase

17    agreement -- I mean, I'm sorry, purchase records that have NDC

18    codes for the two defendants, Accord and Sagent.

19         And then I actually have, Your Honor, I also have

20    a -- I thought I had a form that was filled out too.  I don't

21    see that here.

22         **THE COURT:** Ms. Menzies, you're requesting

23    reinstatement because now you have records you didn't have at

24    that time?  Is that what the --

25         **MS. MENZIES:** We had these records before, Your Honor.

OFFICIAL TRANSCRIPT

1  They were purchase records, but they identified two different

2  defendants.  And then we had information form the DFS's, and so

3  those cases back then were getting dismissed because we

4  couldn't narrow it down to one.  But I do have NDC code records

5  for two defendants.

6          **MS. CALLSEN:** Which predated treatment by seven

7  months.

8          **MS. MENZIES:** Julie, I -- Judge, maybe we have to

9  confer on this because what I'm seeing from the treatment, it

10 says based on the month that the plaintiff was treated.  And we

11 have the dates in there from January 2015.  I hesitate to take

12 the Court's time on this.

13         **MS. CALLSEN:** Karen, you and I -- can we agree to 7

14 days to consider the reinstatement, and then we'll advise the

15 Court if we agree?

16         **THE COURT:** So ordered.  If we've now -- because I

17 know that cases earlier, we kind of readdressed it, and I don't

18 want anybody to be impacted because they weren't taken out by

19 the time of the addendum.  So I'm going to give you all 7 days

20 on that.

21         **MS. MENZIES:** Thank you, Your Honor.

22         **THE COURT:** What about Joanne Hoyt?

23         **MS. MENZIES:** For this one, Your Honor, this is a

24 mixed use plaintiff.  We have documentation from the facility

25 directly to the patient for two different defendants, and so

OFFICIAL TRANSCRIPT

1   they're both -- we have gotten rid of everybody else.  So this

2   is definitely a summary judgment.

3          I think we'll be able to do more discovery on this

4   specific case when it's remanded to help sort this out.

5          **MS. SWEET:** Your Honor, based on your rulings earlier

6   today, we withdraw this case.

7          **THE COURT:** Okay, thank you.

8          **MS. MENZIES:** Thank you.

9          **MS. SWEET:** The next case is Teri Navarro.  In that

10  case, you have seen this sort of submission before.  It's a

11  McKesson subpoena response indicating that it distributed

12  Hospira and Sanofi to a facility between June of 2009 and

13  December of 2011, and we are not aware of any current efforts

14  being taken by plaintiff to try to shore up the evidence to tie

15  any infusion to a manufacturer.

16         **MS. MENZIES:** So it is narrowed down with NDC codes

17  for Sanofi and Hospira.  And we've got -- I've got to go back

18  and talk to one of my colleagues on whether they sent the

19  letter out yet or not.  I'm unsure if they have.

20         Can we do the 7/30 on this one?

21         **THE COURT:** Can we dismiss other defendants?  Are we

22  down to Sanofi and Hospira before?

23         **MS. CALLSEN:** That's correct.

24         **THE COURT:** So I'll give you the 7/30 bargain.

25         **MS. MENZIES:** Thank you.

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | **THE COURT:** Scott Vicknair, who is on the phone for |
| 2 | Mr. Vicknair's firm? |
| 3 | **MS. KREIDER:** I'll be handling for Counsel. |
| 4 | **THE COURT:** Thank you. |
| 5 | **MS. CALLSEN:** This is another where defendants have |
| 6 | objected to the reinstatement.  The reinstatement -- the |
| 7 | dismissal was not based on disputed product purchase records or |
| 8 | distribution records.  It was based on a rollover, and no |
| 9 | efforts have been taken. |
| 10 | **MS. KREIDER:** Counsel has let me know that they will |
| 11 | not appear to make any specific objections in this case other |
| 12 | than the general objections made by Mr. Lambert at the |
| 13 | beginning of the hearing. |
| 14 | **THE COURT:** Okay, this matter is dismissed.  The |
| 15 | reinstatement is denied subject to the objection. |
| 16 | **MS. CALLSEN:** The other two cases from Scott Vicknair, |
| 17 | we'll agree to the 7/30 rollover, or do you have something |
| 18 | else? |
| 19 | **MS. KREIDER:** He -- yeah, that's it. |
| 20 | **MS. CALLSEN:** 106 and 107 are already done, have |
| 21 | already been addressed.  So 108. |
| 22 | **THE COURT:** Mr. Cowart. |
| 23 | I think we have two more, and then I have to go back |
| 24 | to the person that was looking up notes. |
| 25 | Mary Howard.  Mr. Cowart, are you on the line? |

OFFICIAL TRANSCRIPT

1        **MR. COWART:** Yes, ma'am, I wanted to make sure you

2 knew I was.

3        **THE COURT:** Okay, thank you.  Please proceed.

4        **MR. INSOGNA:** In this case, and maybe I misunderstood.

5 I thought this one was one where plaintiff was making only a

6 form objection.

7        The confusion I have is that all we've asked for is a

8 partial dismissal as to Hospira and Sanofi.  There is product

9 ID submitted as to Accord; although they're not a defendant in

10 the case.  So we would ask for 14 days for plaintiff to amend

11 the complaint to add Accord and dismiss the other defendants.

12        **THE COURT:** Mr. Cowart.

13        **MR. COWART:** That's agreeable, Your Honor.

14        **THE COURT:** So ordered.

15        And Joanne Moran.

16        **MR. INSOGNA:** In Ms. Moran's case, we have a subpoena

17 response from Oncology Supply that identifies certain

18 distributions of Accord, Winthrop, Eagle, and Hospira between

19 October and September of 2016 -- oh, sorry.  Between August and

20 September of 2016.  We don't have anything for the prior

21 infusions, and we don't have any evidence that Oncology Supply

22 is the only distributor.

23        **THE COURT:** Mr. Cowart.

24        **MR. COWART:** Your Honor, I would agree that the facts

25 are accurate.  I would like to have the 7/30 deal if I could.

OFFICIAL TRANSCRIPT

1   I got an email from my client last night who believes that her

2   doctor thinks that he can help us figure that out.  I would

3   like to at least let her take that step before her case is

4   dismissed.

5           **THE COURT:** Okay, Mr. Cowart, you get the 7/30 deal.

6           What was the one that I said we were going to go back

7   to?

8           **MS. DESSEL:** Your Honor, that is Viana Minor.  This is

9   Denise Dessel for the plaintiff.

10          **THE COURT:** What number is that?

11          **MS. DESSEL:** 79.

12          **THE COURT:** Okay, this is 79.  Where are we with this

13  one?

14          **MS. DESSEL:** Your Honor, so I looked -- I spoke with

15  my paralegal, and it turns out that the records that were

16  submitted claiming that the NDCs, you know, were on them was

17  back in April, an April 4th upload.  It was based on a

18  subpoena March 7, 2022.  And it was by a partner that, of

19  course, is no longer with the firm.

20          So I do apologize, but those records do not seem to

21  have the NDC on them.  And so we were hoping since, you know,

22  now the case is in my hands, if we can at least just get it

23  into the rollover, I'd really appreciate that, Your Honor.

24          **THE COURT:** I tell you what, I'm going to give you the

25  7/30 special.

OFFICIAL TRANSCRIPT

1          **MS. DESSEL:** All right, sounds good, Your Honor.

2   Thank you so much.

3          **THE COURT:** Thank you.

4          **MS. CALLSEN:** I believe that's it.  I just want to

5   confirm that we are done, Your Honor.

6          **THE COURT:** Thank you.

7                (Whereupon this concludes the proceedings.)

8

9

10

11

12                        **CERTIFICATE**

13

14

15       I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

16   the United States District Court, Eastern District of

17   Louisiana, do hereby certify that the foregoing is a true and

18   correct transcript, to the best of my ability and

19   understanding, from the record of the proceedings in the

20   above-entitled and numbered matter.

21

22                        */s/Alexis A. Vice, RPR, CRR*
                          Alexis A. Vice, RPR, CRR
23                        Official Court Reporter

24

25

                        OFFICIAL TRANSCRIPT