# EXHIBIT G

Ellen Feigal, Ph.D.

```
 1              UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA

 2

 3    ********************************************

 4    IN RE: TAXOTERE

      (DOCETAXEL) PRODUCTS

 5    LIABILITY LITIGATION

 6                              MDL NO. 2740

 7                              SECTION "H"

 8    THIS DOCUMENT RELATES TO:

      ALL CASES

 9

      ********************************************

10

11

12        The videotaped CMO 36 trial preservation

13    deposition of ELLEN FEIGAL, PH.D., VOLUME II,

14    taken in connection with the captioned cause,

15    pursuant to the following stipulations before DIXIE

16    VAUGHAN, Certified Court Reporter, January 27,

17    2023, beginning at 8:10 a.m.

18

19

20

21

22

23

24

25
```

Ellen Feigal, Ph.D.

```
 1        A.    Correct.

 2        Q.    And it's a lengthy expert report, yes?

 3        A.    It's an expert report.

 4        Q.    Okay.  And you included all of your

 5   opinions and conclusions.  There's a section on

 6   conclusions at the end; correct?

 7        A.    Yes.

 8        Q.    And nowhere in your expert report do you

 9   render those opinions, do you?  Nowhere in your

10   expert report do you say, "I conducted the

11   analysis and I have determined that Adriamycin

12   cannot cause pCIA"?

13        A.    I do not have that exact sentence,

14   that's correct.

15        Q.    And I think you were asked the same sort

16   of questions about cyclophosphamide and Taxol as

17   well by Mr. Miceli; correct?

18        A.    Correct.

19        Q.    And you didn't have any opinions about

20   whether or not those agents can cause or are

21   capable of causing pCIA in your expert report, did

22   you?

23        A.    In the expert report, I don't have that

24   exact sentence, that's correct.

25        Q.    In fact, you've been deposed numerous
```

Ellen Feigal, Ph.D.

```
1    times on your expert report in this case, and

2    every time you were asked that question, whether

3    or not you've made that conclusion, you said, "I

4    didn't do the analysis."

5         MR. MICELI:  Object to the form.

6         A.   Because there wasn't sufficient data to

7    do that analysis.  You can't do an analysis on

8    nothing.

9    BY MR. MOORE:

10        Q.   And if you don't do the analysis, you

11   can't make the conclusion; correct?

12        MR. MICELI:  Objection to form.

13        A.   If there's no data to support it, you

14   can't make the conclusion that it exists.

15   BY MR. MOORE:

16        Q.   So despite the fact that there are cases

17   of permanent alopecia associated with all of those

18   agents and despite the fact that you did not do an

19   analysis, a causation analysis on those agents,

20   you're still offering the opinion for the first

21   time in this setting that those agents do not

22   cause pCIA; is that what you're trying to tell

23   this jury?

24        MR. MICELI:  Objection to form.

25        A.   I'm not sure it's inconsistent with my
```

Ellen Feigal, Ph.D.

```
 1   prior depositions where I consistently say there

 2   are anecdotal cases, there's not sufficient data

 3   to support a causation analysis.

 4   BY MR. MOORE:

 5        Q.   Why don't we take a look at what you

 6   said in your other deposition, since you brought

 7   them up?

 8        A.   I'm pretty sure I recall correctly.

 9        Q.   You have your binder there?  Yes?

10        A.   Yes.

11        Q.   Okay.  Let's go to tab 6, if we could,

12   page 83.

13        A.   What page?

14        Q.   Page 83, please.

15             And I'll read it into the record,

16   starting at line 13.

17        MR. MICELI:  Excuse me.  For the record, what

18        we have is excerpts of pages.  We may need to

19        have a completeness issued because of where

20        the answers and questions.  But go ahead.

21   BY MR. MOORE:

22        Q.   Beginning on line 13:  "In reaching your

23   conclusions about whether Taxotere is capable of

24   causing pCIA, did you determine whether Adriamycin

25   is also capable of causing pCIA?"
```

Ellen Feigal, Ph.D.

```
 1              "ANSWER:  I did not do a Bradford Hill
 2    analysis on Adriamycin."
 3              Did I read that correctly?
 4         A.   You read it correctly, but it's not
 5    complete in the context --
 6         Q.   Okay.  Well, it's your testimony and the
 7    testimony --
 8         A.   -- of the rest of the testimony.
 9         Q.   Hold on.  My question --
10         MR. MICELI:  No, no, no.  No, hold on.
11         Excuse me.  Objection.  You cannot cut her
12         off and tell her:  No, no, don't talk
13         anymore.
14         MR. MOORE:  Yeah, I can.
15         MR. MICELI:  No, you can't.
16         MR. MOORE:  N.  She has to be responsive to
17         my question.
18         MR. MICELI:  She is being responsive.
19         MR. MOORE:  This is my deposition.  It's my
20         time to ask questions.  It's no speech --
21         MR. MICELI:  She's telling you it's not
22         complete.
23         MR. MOORE:  No.  Now you're testifying.  Sit
24         down.  You made your form objection.  I'm
25         going to continue to examine the witness.
```

Ellen Feigal, Ph.D.

```
 1        MR. MICELI:  We can get the judge if you
 2        like.  But you cannot instruct her that it's
 3        complete when you have page 83 and 97.
 4        MR. MOORE:  Okay.
 5   BY MR. MOORE:
 6        Q.  Let's read the next question and see if
 7   this helps complete it.
 8            "QUESTION": -- on line 19 -- "In reading
 9   your conclusion on whether Taxotere is capable of
10   causing pCIA, did you determine whether
11   cyclophosphamide is capable of causing pCIA?"
12            "ANSWER:  I did not do a Bradford Hill
13   analysis on cyclophosphamide."
14            Did I read that correctly?
15        A.  You're reading an excerpt from a much
16   longer testimony correctly.
17        Q.  I'm reading your sworn testimony
18   correctly; right?
19        A.  You're reading this excerpt of what I
20   said correctly.
21        Q.  Yes, what you said under oath; correct?
22        MR. MICELI:  Object to the form.
23        A.  Everything I said under oath was
24   correct, including the stuff that isn't here.
25   BY MR. MOORE:
```

Ellen Feigal, Ph.D.

```
 1        Q.   Let me ask you, since you brought up
 2   your depositions -- let me ask it, I think, a
 3   little differently.
 4             You would agree with me that it is not
 5   an appropriate takeaway from your expert report in
 6   this case to say that Adriamycin, cyclophosphamide
 7   or paclitaxel do not cause pCIA?
 8        A.   It's not a yes-or-no answer.  Would you
 9   like me to explain?
10        Q.   Why don't we look at what you said
11   before.  Let's go to tab 7.
12        MR. MICELI:  Objection.  Improper
13        impeachment.
14   BY MR. MOORE:
15        Q.   Okay.  So in response to the question I
16   just asked you today under oath, you testified
17   "it's not a yes-or-no answer.  Would you like me
18   to explain?"  Okay?
19             Now, you were asked this question, under
20   oath, beginning on line 4:
21             "QUESTION:  Would it be an appropriate
22   takeaway from reading" --
23        A.   I'm sorry.  What page are you on?
24        Q.   141.  It's on the screen right there.
25        MR. MICELI:  I'm objecting to the
```

Ellen Feigal, Ph.D.

```
 1        completeness.

 2   BY MR. MOORE:

 3        Q.   "Would it be an appropriate takeaway

 4   from reading your report to say that Adriamycin,

 5   cyclophosphamide or aromatase inhibitors or

 6   paclitaxel do not cause pCIA?"

 7             Miceli objects and then you answer:

 8   "What can you say -- what you can say from my

 9   report is about the causation of the

10   docetaxel/Taxotere.  I'm not opining on other

11   products that aren't the topic for the

12   litigation."

13             And so then Mr. Insogna continues --

14        A.   Where is this coming from?  What

15   deposition is this on?

16        Q.   This is your deposition dated

17   September 1st, 2020.

18        A.   On what?

19        Q.   If you want to look at the caption, the

20   first page is the caption.

21        A.   Right.  I'm reading what it's about too.

22   But --

23        Q.   It's about your expert report.

24        A.   Yeah, I know.

25        Q.   And whether or not --
```

Ellen Feigal, Ph.D.

1        MR. MICELI:  Object to the form.

2   BY MR. MOORE:

3        Q.   And so Mr. Insogna continues:  "So I

4   think that answered my question.  You could not

5   take away, from reading your report, that those

6   other medicines do not cause pCIA?"

7             "ANSWER:  I'm silent on that."  Another

8   objection from Miceli.

9             And then you go on, "Yeah, I mean, I'm

10   talking about risk and causal association of

11   docetaxel/Taxotere.  So, you know, I can't comment

12   any further than that."

13             Did I read that correctly?

14        MR. MICELI:  Objection.

15        A.   You read --

16        MR. MICELI:  Excuse me, objection on

17        completeness.

18        A.   Yes.

19   BY MR. MOORE:

20        Q.   Did I read it correctly?

21        A.   You read that excerpt of my testimony

22   correctly.

23        Q.   All right.  Let's move over to a new

24   subject matter.  You can put the binder down.

25        A.   Okay.

Ellen Feigal, Ph.D.

```
1        Q.   I want to talk about the concept of
2   attribution.  I heard you say during your direct
3   examination -- I thought I heard you say that you
4   only -- and to set this up, we're talking about
5   table 2 in your expert report, the one that counts
6   all the cases for the various selected regimens
7   that you put in the column headers.  Are you with
8   me?
9        A.   Yeah.
10       Q.   And so I thought I heard you say that
11  you only included a case in the various columns if
12  the author of the study had attributed to that
13  agent?  Did I hear that right?
14       MR. MICELI:  Object to the form.
15       A.   To that regimen, I think, is what would
16  be accurate.
17  BY MR. MOORE:
18       Q.   Okay.  So you're not saying that the
19  authors of these studies concluded that it was the
20  Taxotere that caused the event as opposed to the
21  Adriamycin or the cyclophosphamide or the
22  endocrine therapy, if it applies, for whatever
23  study you're talking about?  The authors didn't
24  conclude it was Taxotere; correct?
25       A.   The authors -- what I said, the Taxotere
```

Ellen Feigal, Ph.D.

```
 1   regimen versus the nonTaxotere regimen.  So
 2   wasn't -- it wasn't seen in the nonTaxotere, seen
 3   in the Taxotere regimen.
 4        Q.   Okay.  What about cases that didn't have
 5   other regimens?
 6        A.   Well, then I can't do a comparison.  But
 7   some of them were the -- was Taxotere.  So I'm
 8   looking at cumulative data.
 9        Q.   Right.  So --
10        A.   But the regimen is a Taxotere regimen,
11   so that's correct.
12        Q.   So if a study had a case report in it
13   and it was -- it had Taxotere in the regimen, you
14   counted that in the Taxotere column; right?
15        A.   That's correct.
16        Q.   Regardless of whether they took any
17   other chemotherapy agents; correct?
18        A.   That's correct.  It wasn't a Taxotere
19   regimen.
20        Q.   And regardless of whether they took
21   endocrine therapy; correct?  You still put it in
22   the Taxotere regimen even if they took other
23   chemotherapies and other endocrine therapy; right?
24        A.   The methodologies -- correct, I put a
25   Taxotere regimen in the Taxotere column.
```

Ellen Feigal, M.D.

1        Q.   So if it was a Taxotere regimen and a

2   scalp-cooling study, no comparator arm, nothing to

3   compare it to, it goes into the Taxotere column;

4   correct?

5        A.   That's right.  That's right.

6        Q.   So when you said that you only included

7   cases where there was attribution, you weren't

8   saying that the authors of those studies

9   attributed the event to Taxotere, you were simply

10  saying those patients had taken Taxotere as part

11  of some regimen and you included it in the

12  Taxotere column?

13       MR. MICELI:  Objection to form.

14       A.   Yeah.  I think it was the Taxotere

15  regimen, that's correct.  The authors may or might

16  not have attributed it to the Taxotere component,

17  but it was a Taxotere regimen, that's correct.

18  BY MR. MOORE:

19       Q.   All right.  Let's switch gears for a

20  second.  I want to ask you about your methodology

21  in collecting the literature.  You describe -- I

22  think it is in the footnote, the very first

23  footnote under the table 2.  I'll have to get my

24  glasses for this one.

25            On page 40, footnote 79:  "I conducted a

Eileen Pelligri - Ph.D.

```
 1   brought it up.  Okay.

 2            We'll mark this as Exhibit No. 23.

 3        MR. MOORE:  Can we do a two-part exhibit,

 4        Dave, and just get the response and the table

 5        together, or do you want to make them

 6        separate exhibits?

 7        MR. MICELI:  I'd rather make them separate

 8        exhibits.

 9        MR. MOORE:  All right.

10        MR. MICELI:  It will keep it cleaner.

11        MR. MOORE:  Okay.  That makes sense.

12            So Exhibit No. 23, we're going to make

13        the response to agency request, which is

14        dated January of 2013.  We'll make that

15        Exhibit 23.  And then the accompanying chart,

16        we'll make as Exhibit 24.

17            (Document marked as EXHIBIT 23 for

18        identification.)

19            (Document marked as EXHIBIT 24 for

20        identification.)

21   BY MR. MOORE:

22        Q.  Okay.  All right.

23            In this request, I think this is what

24   you were just talking about.  The request says:

25   "It is mentioned in the product information:
```

Eileen Pelfgar, Ph.D.

1    Taxotere in combination with doxorubicin and

2    cyclophosphamide:  Alopecia grade 3/4 -- alopecia

3    grade 3/4, less than zero, 1 percent."

4            Do you see that?  It says:  "Could you

5    please clarify the number/percentage of patients

6    with long-term alopecia following the pivotal

7    breast cancer studies?"  Do you see that?

8       A.   Yes.

9       Q.   And this is the response that you're

10   referring to:  TAX316 of the TAC group, it says:

11   "728 patients experienced alopecia during the

12   treatment period.  Among those patients, alopecia

13   persisted in the post-treatment period in 687

14   patients.  By the end of the follow-up period, 29

15   patients still had persistent alopecia."

16           Do you see that?

17      A.   Yes.

18      Q.   Okay.  But the person who sent this in

19   to the European agency simply said "by the end of

20   the follow-up period"; correct?

21      A.   That's correct.

22      Q.   He doesn't -- or she doesn't define what

23   the follow-up period is in this submission; right?

24   In the explanation?  There's no explanation here

25   as there is in the Canadian document about the

Ellen Feigal, M.D.

1    follow-up period for adverse events versus the

2    follow-up period for the entire study?

3        A.   Well, they provided a table, didn't

4    they --

5        Q.   Yes.

6        A.   -- with the same submission, and they

7    said the follow-up duration.

8        Q.   Right.  That's what I've marked as --

9        A.   And I have the table.

10       Q.   Right.  That's what I have marked as

11   Exhibit 24.  Yes?

12       A.   Correct.

13       Q.   Let's take a look at Exhibit 24, if we

14   can.

15       A.   Uh-huh.

16       Q.   Okay.  Okay.  So what we see here in

17   table 20 -- in Exhibit 24, the table accompanying

18   the European submission, you're correct they

19   state:  "Date of last follow-up."

20       MR. MICELI:  I'm going to object to the form

21       to the question, but go ahead.

22       MR. MOORE:  What did I say?

23       MR. MICELI:  You said this is to the European

24       agency.

25       MR. MOORE:  Right.

Eileen Pelgar, Ph.D.

```
 1          MR. MICELI:  I'll clear it up on redirect.

 2          MR. MOORE:  All right.

 3     A.   I mean, it says "Kapreski."  Is that --

 4  what am I looking at?

 5  BY MR. MICELI:

 6     Q.   That's just an exhibit stamp.  That's

 7  just an exhibit stamp.

 8          Let's just talk about with this table,

 9  wherever it was, whether it came from --

10     A.   Okay.

11     Q.   -- whether it was submitted to the

12  European, Dave will tell us what it's about.

13          But this table, you would agree,

14  includes the same type of columns at the top;

15  right?

16     A.   Well, it is important to know whether --

17  what was submitted to the European agency.  But I

18  can read what's on here.  I'm just not -- I'm not

19  clear if this is actually the table that was

20  submitted.

21     Q.   Okay.

22     A.   So I think it would be a bit misleading.

23  I mean, I want to see what was submitted to the

24  agency.

25          MR. MOORE:  Let's go off the record for a
```

Ellen Feigal, Ph.D.

```
 1        second.
 2        THE VIDEOGRAPHER:  We're off the record,
 3        9:16 a.m.
 4            (Recess taken at 9:16 a.m.  Back on record
 5            at 9:18 a.m.)
 6        THE VIDEOGRAPHER:  We're back on the record,
 7        9:18 a.m.
 8   BY MR. MOORE:
 9        Q.   All right.  Back to Exhibit 24.  And
10   Mr. Miceli will probably have some questions for
11   you about this exhibit.  I may have referred to it
12   as being attached to the European submission.  It
13   may be a slightly later version because I do note
14   there's a date down here on the data run of
15   March of 2012 -- well, it may be earlier, but
16   Mr. Miceli will clear that up if it's material.
17        A.   Okay.
18        Q.   But what I really want to focus on,
19   though, is that wherever this data is going and
20   for whatever purpose, if it's comparable to what
21   was sent to the European regulator or if it's just
22   run for another reason.
23        A.   Okay.
24        Q.   What this shows or what my question was,
25   was about the headers, where it has:  "Preferred
```

Eileen Pesigan, Ph.D.

1    term, Treatment arm, Subject ID, Date of last IV

2    plus 30 days, Date of last follow-up, follow-up

3    duration (years)."  Do you see that?

4        A.   Yes.

5        Q.   And those are the same headers that are

6    in the response to the Canadian regulator except

7    there's one difference.  This column that says:

8    "Date of last follow-up of adverse event" in the

9    Canadian document and then in the other table, it

10   says: "Date of last follow-up."

11       A.   Yeah, I can see that.

12       Q.   Okay.  All right.  And the dates that

13   they give, it's the exact same patients, the first

14   patient's 11702, first patient in Canadian chart,

15   11702.  Duration 10.04 years.  They're the same?

16       A.   Yeah.  I see that.

17       Q.   But then the next patient, 11724:

18   Follow-up duration of last follow-up, 6.57 years;

19   Follow-up duration, last follow-up of adverse

20   event, 2.96.  Do you see that?  Here?

21       A.   I'm sorry.  Where are you?  What line

22   are you on?

23       Q.   I'm right here.  So this patient,

24   Follow-up duration 2.96 years in the Canadian

25   chart --

Eileen Pergal, Ph.D.

```
 1        A.   I don't see the two-point -- I'm so
 2   sorry.  I did not see the 2.96.
 3        Q.   Sorry.
 4        A.   There it is.  It wasn't on the screen.
 5   Thank you.
 6        Q.   I'm sorry.  And that's different than
 7   the number that's captured in Exhibit 24; correct?
 8        A.   Yes, it is.
 9        Q.   All right.  And then look at this third
10   patient in Exhibit 24.  They were only followed
11   for .32 years.  Do you see that?
12        A.   Yes, I do see that.
13        Q.   And .32 years is an insufficient
14   duration of follow-up to determine if that patient
15   has permanent chemotherapy-induced alopecia.
16        A.    If that's correct, that would be less
17   than six months, that's correct.
18        Q.   And so what I want to do is just ask
19   you, given that we have these two tables, both
20   coming from Sanofi, one definitely submitted to a
21   regulator, one -- maybe it was or maybe there's a
22   similar version submitted to a regulator -- that
23   have different follow-up periods.  How can we
24   figure out which one's correct?
25        MR. MICELI:  Objection to form.
```

Eileen Feingal, Ph.D.

```
 1        A.    Well, you're talking about apples and

 2   oranges.  The follow-up that Sanofi did submit to

 3   the European agency in response to their question

 4   about persistent or long-lasting permanent

 5   alopecia came back with 29 and 16.  That's Sanofi.

 6   I'm not manipulating the numbers.  That is what

 7   they told the agency.

 8   BY MR. MOORE:

 9        Q.    Yes.

10        A.    In response to the question about

11   permanent alopecia, that was their response.  And

12   that's actually what's on their label.

13        MR. MOORE:  Move to strike.

14   BY MR. MOORE:

15        Q.    So the statement you just made, the

16   statement you just made is inconsistent with the

17   highlighted statement at the bottom of the last

18   paragraph submitted to the Canadian regulator;

19   correct?

20        A.    Now which document are you talking

21   about?

22        Q.    I'm going back to Exhibit No. 22.

23        A.    So you're going back to the Canadian

24   document?

25        Q.    Yes.
```

Ellen Feigal, Ph.D.

```
 1        A.    I'm talking about the European document.

 2        Q.    My question is about the Canadian

 3   document.

 4        A.    In the Canadian document, it sounds like

 5   they can't be precise, it's ongoing.  I'm not

 6   assuming.  It resolved immediately.

 7        Q.    You're assuming --

 8        A.    Defini- -- I'm not assuming.  I'm just

 9   going by the Sanofi definition.  It was ongoing.

10        Q.    You're assuming that if it was ongoing

11   at -- let's just take a look at some of the

12   patients.  You're assuming that for patient 11738,

13   who was last followed for the adverse event for

14   only .24 years, less than three months, you're

15   assuming that that person's alopecia never

16   resolved, even though they weren't followed for

17   alopecia after that time.  That's an assumption

18   built into the conclusion you're drawing; correct?

19        A.    I am going by Sanofi's definition of how

20   they describe ongoing alopecia and how they

21   responded to a federal agency's request for

22   long-term permanent alopecia and what is on their

23   label.

24        Q.    And their response in the Canadian

25   document to a federal regulator was:  "Thus,
```

1    ongoing does not necessarily mean that these

2    adverse events were ongoing for the entire

3    ten-year follow-up period; rather, it means that

4    they were noted as ongoing at the last follow-up

5    visit."  Right?

6         A.    You're reading that sentence correctly.

7         Q.    Okay.  And that's a sentence that you

8    are ignoring in favor of the statement that you

9    like better to the European regulator; correct?

10        MR. MICELI:  Object to the form.

11        A.    No.  That wouldn't be an appropriate

12   characterization of what I'm trying to

13   communicate.

14   BY MR. MOORE:

15        Q.    Okay.

16        A.    Sanofi is the sponsor of this study.

17   Sanofi set the definitions.  Sanofi is sending

18   information to regulatory agencies and Sanofi is

19   responsible for their label, which currently still

20   reads 29 and 16.

21        MR. MOORE:  Move to strike.

22   BY MR. MOORE:

23        Q.    Doctor, you would agree that the

24   information communicated in these two submissions,

25   can we at least agree it's inconsistent?

Ellen Feigal, Ph.D.

```
 1        A.   I'm sorry, I couldn't hear your last
 2   word.
 3        Q.   Can we at least agree that the
 4   statements made in the two submissions that we
 5   showed you, the Canadian submission and the other
 6   submission, would you agree that they're
 7   inconsistent?
 8        A.   Not necessarily.
 9        Q.   If you wanted to know -- just based on
10   the information that I showed you, if you said:
11   You know what, maybe I need to see if they really
12   were followed for more than six months, the way to
13   do that would be to look at the case report forms
14   for the 29 patients to see what happened to them;
15   right?
16        A.   No.
17        Q.   When you were doing clinical trials,
18   you're aware that the clinical information for the
19   patients are captured in case report forms for
20   every single patient in the study.  That's
21   something that happens?
22        A.   Yes.  And Sanofi is aware of it and did
23   that.
24        Q.   Right.  And those case report forms, the
25   clinical data for all 29 of these patients is
```

Ellen Feigal, Ph.D.

1   analysis of the entire trial.

2   BY MR. MOORE:

3        Q.   If those patients were not followed for

4   alopecia for more than six months, then they do

5   not have permanent chemotherapy-induced alopecia;

6   correct?

7        MR. MICELI:  Object to the form.

8        A.   They were followed for more than

9   six months except for that one that may have had

10  .32 follow-up.  All of them were followed for

11  longer.

12  BY MR. MOORE:

13       Q.   Were they followed for the adverse event

14  for longer than six months?

15       A.   Sanofi is in charge of their database,

16  not me.  And they're the ones who responded to a

17  very specific question about how many long-term,

18  permanent alopecia cases you have on the TAC and

19  the FAC.  And Sanofi answered them.  I'm not doing

20  a post hoc look at a subset of documents.  That's

21  not the appropriate way to evaluate this.

22       Q.   Okay.  But we're not in a scientific

23  classroom.  We're not in --

24       A.   Clearly.

25       Q.   -- a scientific setting.  You're not

Eileen Pergan, Ph.D.

1   giving a lecture on statistics to a bunch of

2   students.  You're in front of a jury in a

3   courtroom and in a courtroom, the truth matters,

4   and the truth about whether those patients were

5   followed for more than six months for alopecia is

6   in the case report forms, isn't it?

7        MR. MICELI:  Object to the form.

8        A.   No.

9   BY MR. MOORE:

10       Q.   Let's look at one, then.  Let's just

11  look at one.

12       MR. MICELI:  We'll mark this as Exhibit

13       Number 25.

14            (Document marked as EXHIBIT 25 for

15       identification.)

16  BY MR. MOORE:

17       Q.   Okay.  What I've handed you, Doctor, as

18  Exhibit No. 25 are pages from the confidential

19  patient data for Patient No. 15002.  Do you see

20  that?

21       A.   Yes.

22       Q.   Okay.  And this is the type of document

23  that records the clinical data for a clinical

24  study participant; correct?

25       A.   I've just been handed it.  I assume