# EXHIBIT K

Pierre Mancini

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

     -------------------------------§
 3   IN RE: TAXOTERE (DOCETAXEL)     § MDL No. 2740
     PRODUCTS LIABILITY LITIGATION   §
 4                                   § SECTION: "N" (5)
     This Document Relates To:       §
 5   ALL CASES                       § JUDGE ENGELHARDT
                                     §
 6                                   § MAG. JUDGE NORTH
     -------------------------------§
 7

 8                    - - -
 9            Friday, March 23, 2018
10                    - - -
11

12        Videotaped deposition of PIERRE MANCINI,
          held at DLA Piper UK LLP, 3 Noble Street, London,
          United Kingdom, commencing at 8:19 a.m., on the
13        above date, before Susan D. Wasilewski,
          Registered Professional Reporter, Certified
14        Realtime Reporter, Certified Realtime Captioner,
          Certified Manager of Reporting Services, Florida
15        Professional Reporter, Certified Court Reporter
          (NJ), and Realtime Systems Administrator
16
                      - - -
17

              GOLKOW LITIGATION SERVICES
18        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
19
20
21
22
23
24
25
```

Pierre Mancini

1    correct?

2        A.    Exactly.

3        Q.    But you don't do that on a daily basis; you

4    have people within your department that do that for

5    you?

6        A.    Yes.

7        Q.    So if you wanted to, you could go to a

8    person within your department and say, let's pull up

9    the data sets from TAX316, and you would be able to

10   do that by going to the WISE system?

11            MR. McCULLY:  Object to form.

12       Q.    Correct?

13            MR. McCULLY:  Sorry.  Object to form.

14       A.    Yeah.  If we have a table to generate, we

15   can, you know, assign a statistician and a

16   programmer and ask them to generate that.

17       Q.    But if you wanted to see the data sets that

18   were already generated for, say, a clinical study

19   report, you could go find those on WISE as well?

20       A.    Yes.

21       Q.    And you could find the SAS data programs on

22   WISE as well?

23       A.    Of course.

24       Q.    Okay.  Have you ever had to look at those

25   yourself?

Pierre Mancini

1    Q.    -- of 250?

2    A.    Oh, no.  Yeah, you're right.

3    Q.    10?

4    A.    Sorry, sorry.  I'm --

5    Q.    That's okay.

6    A.    Yeah.  We have many numbers, a lot of

7    things.

8    Q.    So we have 10 people out of 251 in Study

9    TAX324 that have Grade 3/4 -- or excuse me -- that

10   are reflected in this document as having alopecia

11   (G3/4, 4 percent), which is 10 individuals; whereas,

12   in the pooled analysis that you did, you had 1,276

13   individuals, yet one -- only one person had G3/4,

14   or 0.1 percent had Grade 3/4 alopecia.

15        MR. McCULLY:  Object to form.  Is there --

16   A.    I --

17        MR. McCULLY:  Do you have a question?

18        MR. MICELI:  Yeah.

19   Q.    That's -- is that a correct statement?

20        MR. McCULLY:  Thank you.

21   A.    Okay.  Yes, this is a correct statement.

22   Q.    Okay.  Did you, in doing your statistical

23   analysis, your pooled analysis of GEICAM and TAX316,

24   did you do any follow-up investigation into how the

25   adverse events were collected?

Pierre Mancini

```
1      A.   This is not in my scope of responsibilities.

2    I'm analyzing data --

3      Q.   And that's --

4      A.   -- which are -- which are -- which are

5    validated and clean.  I'm not in charge of doing the

6    follow-up.

7      Q.   When you say "validated and clean," would --

8    do you mean by that that the data that you receive

9    and you operate upon is data that has been provided

10   to you from clinical trials that you believe to be

11   validated and accurate?

12     A.   Yes.

13     Q.   Okay.  We'll talk about that in due course

14   of this deposition.

15          MR. MICELI:  We've been going for about

16     another hour, I think, haven't we?

17          THE VIDEOGRAPHER:  We've been going for

18     another 58 minutes.

19          MR. MICELI:  Would -- how are you doing?

20     Would you like to take a break?

21          MR. McCULLY:  If you're at a stopping point.

22          MR. MICELI:  I'm at a natural stopping

23     point.  I don't -- I think I'd be at a better one

24     to do it later -- I don't think I would be.

25          THE VIDEOGRAPHER:  We are going off the
```

Pierre Mancini

1    expectation from FDA.  I don't know -- I don't

2    presume it was the case before systemically.

3        Q.   Okay.

4        A.   I know today it's true.  Yeah.

5        Q.   Today you --

6        A.   Today in 2018.

7        Q.   You would expect that if clinical trial

8    information was being provided to FDA, you would

9    include all the data sets to go with it?

10       A.   Yes.

11       Q.   But you don't know -- you can't tell me, as

12   a matter of fact, that for TAX316, that the data

13   sets were provided to FDA?

14       A.   No, I cannot say that, especially because I

15   was not the trial statistician.  I was not involved

16   in that submission.  I only contributed to that

17   labeling discussion.

18       Q.   Okay.  Do you know Linda Gustavson?

19       A.   Linda?

20       Q.   Does that name ring a bell?

21       A.   I'm not sure.

22       Q.   Okay.  Concerning the statistical analysis

23   plans -- now, are you familiar with what a

24   statistical analysis plan is?

25       A.   Yes.

Pierre Mancini

```
 1        Q.   Okay.  And that's the plan that is set up

 2   before a clinical trial is done that describes how

 3   the data will ultimately be analyzed, correct?

 4        A.   Yes.

 5        Q.   Okay.  Where are statistical data plans

 6   kept?  What system are they kept on?

 7        A.   In DOMASYS.

 8             MR. McCULLY:  Object to form.

 9        Q.   Okay.  On DOMASYS?

10        A.   Yeah.

11        Q.   Okay.  Okay.  All righty.  Let's continue on

12   this e-mail at the top of Page 3.  We had gotten

13   through this -- through the sentence that ends that

14   Emanuel -- mentioned by Emanuel below, and the

15   proposed wording is also fine with me.

16             Then your next statement is:  Maybe it

17   would, however, be better to only provide

18   information on alopecia as extracted from Tables

19   7 -- from Table 7 and Table 47 (respective CSRs) --

20   that's clinical study reports?

21        A.   Yes.

22        Q.   Okay.  -- to avoid generation further

23   questions on other information contained in these

24   tables.

25             That was your comment, correct?
```

Pierre Mancini

 1      A.   Oh, okay.  Those that are, you know, are --

 2   have gone through quality controls by other people

 3   and have sufficient quality to be analyzed and

 4   reported.

 5      Q.   Okay.  Just so we're -- just so we're clear,

 6   the quality control that you're referring to is

 7   something that you have no knowledge of yourself,

 8   correct?  You weren't part of it?

 9      A.   I'm not working on the quality control, no.

10      Q.   Right.

11      A.   Yeah.

12      Q.   So you don't know the integrity of the

13   follow-up that was connected with the women in the

14   GEICAM study?

15      A.   I think I know when data have, you know --

16   available for analysis, that certain processes has

17   been done to clean those data and that, you know,

18   they are sufficient quality so that they can be

19   passed on to biostatistics for analysis.  That, I

20   know.

21      Q.   Okay.  I think I understand.  I think we're

22   talking about two different issues, and I want to

23   try to clear it up with you.

24           When you receive data, you understand and

25   believe, particularly within the company you work

Pierre Mancini

```
 1   for, that that information and data has gone through

 2   certain quality control measures that speak to

 3   its -- or its validity by the time it gets to you

 4   such that you can use it in generating reports, like

 5   Table 47 and Table 7?

 6       A.   It is more than that.  I know it has gone

 7   through the appropriate quality test by, you know,

 8   the people that are responsible for that, and they

 9   are ready for analysis.

10       Q.   Okay.

11       A.   I don't believe.  I know.

12       Q.   Okay.  Who did it for GEICAM?

13       A.   That, I'm -- I was not involved in that

14   study as study statistician, so I cannot say for

15   sure who did it, you know.

16       Q.   Okay.  So the answer is you don't know?

17       A.   The answer is that I know that when the data

18   are studied by biostatistics department, they were

19   clean before.

20       Q.   Okay.

21       A.   And they have sufficient cleaning to be

22   analyzed and reported in a clinical study report

23   sent to an authority.

24       Q.   What steps were taken to do the quality

25   control on the GEICAM study follow-up?
```

1    Statistical analysis plan, and it gives the number,

2    316, and it says "approved."

3            Correct?

4    A.   Correct.

5    Q.   Okay.  Now let's go to Page 4.  Okay?  Well,

6    Pages -- Pages 2, 3, and 4 of 47 are the table of

7    contents, correct?

8    A.   2, 3, 4, 5, yeah.

9    Q.   Okay.  Let's look at Page 4.

10   A.   Okay.

11   Q.   Under Section 11.7, the title is

12   "reversibility."  Correct?

13   A.   Yes.

14   Q.   Okay.  Now, reversibility means what?

15           MR. McCULLY:  Object to form.

16   A.   I think I -- yeah.  If you, you know, want

17   me to answer that question, I will have to look at

18   11.7, you know.

19   Q.   Okay.  We're going to go to 11.7.

20   A.   Okay.  That's --

21   Q.   In fact, let's go there now.  It's on Page

22   30.  Okay.  Now, reversibility, 11.7, it says:

23   Reversibility of the following adverse events will

24   be analyzed:  And the very first one listed is

25   alopecia, correct?

Pierre Mancini

1      A.    Yes.

2      Q.    Okay.  Now, you wouldn't be studying

3   reversibility unless the adverse event was either

4   long-standing, persisting, or permanent, correct?

5          MR. McCULLY:  Object to form.

6      A.    No, I don't think so.

7      Q.    Well, say if you didn't use the word -- they

8   didn't -- they used the word "reversibility."  They

9   didn't use "not persistent."  Correct?

10         MR. McCULLY:  Object to form.

11     A.    I think the statistical analysis plan was

12  written in 2002.  We talk about a table generated

13  eight years after, after multiple regulatory

14  discussion.

15     Q.    That's fine.  I'm not -- I'm not worried

16  about multiple regulatory discussions or 2002.

17     A.    So --

18     Q.    This is Sanofi's statistical analysis plan.

19     A.    Yeah.

20     Q.    And in 2002, before the last patient was

21  even enrolled in the -- in the study and the first

22  patient was out of the study, they had planned to

23  study the reversibility of alopecia.  That's what

24  this document says, right?

25     A.    Yeah.