UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                         MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                    SECTION "H" (5)

THIS DOCUMENT RELATES TO:
ALL CASES

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
TO EXCLUDE EXPERT TESTIMONY OF DR. LAURA PLUNKETT

Although "an expert's conclusory allegations regarding a defendant's state of mind are not helpful or admissible," *Marlin v. Moody National Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007), the Plaintiffs' Steering Committee ("PSC") converted its toxicologist-turned-regulatory-expert, Dr. Laura Plunkett, into an oracle of Sanofi's state of mind at the *Kahn* bellwether trial:

> In the Kahn case I described what was -- what the company knew, what the company themselves knew at the time before Ms. Earnest [sic] was exposed to Taxotere. So I relied upon the knowledge of the company at that time. And that was the focus of the testimony.[1]

The Court nearly struck Dr. Plunkett's testimony at trial for failing to disclose the bases of her opinions. Now that Dr. Plunkett has issued two supplemental reports, which expand the scope and bases for her to divine Sanofi's state of mind, the Court should strike these opinions under Federal Rule of Evidence 702. Dr. Plunkett offers little more than a recitation of the PSC's closing argument, cobbled together from snippets of fact testimony and company documents. The PSC intends to preserve this improper testimony for courts across the country. Sanofi requests that the Court exclude the following four opinions in Dr. Plunkett's supplemental reports.[2]

---

[1]   **Ex. A**, Plunkett Dep. 111:17–23 (June 2, 2022).

[2]   **Ex. B**, Plunkett Suppl. Rpt. ¶¶ 109(1)–(3) (Apr. 29, 2022); **Ex. C**, Plunkett Second Suppl. Rpt. (Dec. 29, 2022).

**Opinions 1–3:**  Dr. Plunkett purports to opine on when Sanofi had a duty to update the Adverse Reactions section of the Taxotere label to warn of permanent hair loss.[3]  But she fails to use a reliable methodology or answer relevant questions that assist the trier of fact.

*First*, Dr. Plunkett does not base her opinions on the Court-approved FDA guidance that Dr. David Kessler applied to assess whether there was "some basis to believe there is a causal relationship" between Taxotere and permanent hair loss.  Instead, Dr. Plunkett employs an unreliable methodology that imputes "knowledge" to Sanofi through a selective review of fact testimony and company documents.

*Second*, Dr. Plunkett's opinions should be excluded because they are not relevant under Rule 702 for at least three reasons:

- Dr. Plunkett's opinions do not fit the facts of the case because Sanofi's knowledge is irrelevant under the applicable regulatory standards;

- Sanofi's knowledge is a lay matter that the trier of fact can determine without Dr. Plunkett's testimony; and

- Dr. Plunkett's narrative recitation of company documents and fact testimony is unhelpful to the trier of fact.

**Opinion 4:**  Dr. Plunkett also opines on Sanofi's policy of "harmonizing" a drug's labeling with labeling used in other countries.[4]  The Court should exclude this harmonization opinion because it is not tied to any applicable regulatory standard.  Instead, this opinion turns on what foreign regulatory agencies required of Sanofi, which is evidence this Court has excluded in both bellwether trials.

---

[3]   Ex. B, Plunkett Suppl. Rpt. ¶¶ 109(1)–(3) (Apr. 29, 2022).

[4]   *Id.* ¶ 109(4).

## **BACKGROUND**

The PSC first disclosed Dr. Plunkett as an expert witness in November 2018, when it sought to offer her toxicology opinions in the first bellwether case (*Earnest*).[5] The Court excluded Dr. Plunkett's opinion that Taxotere was "more toxic" than Taxol, but permitted her to opine that Taxotere was associated with a greater risk of permanent alopecia.[6]

Before the second bellwether trial (*Kahn*), Dr. Plunkett issued a new report with expanded toxicology opinions and new general causation opinions.[7] The Court, again, excluded Dr. Plunkett's "more toxic" opinion.[8] The Court also excluded Dr. Plunkett's "causation-based" testimony because "she did not conduct an analysis to assess general causation."[9]

The PSC then moved to substitute Dr. Plunkett for Dr. Kessler as its regulatory expert.[10] The PSC represented that Dr. Plunkett's supplemental report "primarily" addressed "the standard that must be met for a Section 6 label change[.]"[11] The PSC also told the Court and Sanofi that Dr. Plunkett's opinions were "based solely upon the standard or relate solely to the standard set out in the [Code of Federal Regulations]."[12] The Court permitted Dr. Plunkett to file her supplemental report, which was limited to "whether the toxic effects of Taxotere demonstrate a basis to believe that a causal association exists between the drug and permanent chemotherapy-

---

[5]   *See generally* **Ex. D**, Plunkett Expert Rpt. (Nov. 4, 2018).

[6]   Rec. Doc. 8097 (Order & Reasons Denying in Part and Deferring in Part Sanofi's Mot. to Exclude Expert Test. of Dr. Laura Plunkett). The PSC conceded that Dr. Plunkett would not offer opinions on causation, regulatory matters, Taxotere's efficacy, and promotional activities related to Sanofi and Taxotere. *Id.* at 3–4.

[7]   *See generally* **Ex. E**, Plunkett Expert Rpt. (Mar. 13, 2020).

[8]   Rec. Doc. 11823 at 4–5 (Order & Reasons Granting in Part and Denying in Part Sanofi's Mot. to Exclude Expert Test. of Dr. Laura Plunkett).

[9]   *Id.* at 5.

[10]   *See* **Ex. F**, PSC Letter Brief (Feb. 15, 2021); **Ex. G**, Sanofi's Letter Brief (Feb. 15, 2021).

[11]   **Ex. H**, Status Conference Tr. 6:24–25 (Feb. 17, 2021).

[12]   *Id.* at 8:6–11.

induced alopecia (PCIA)."[13]   After briefing on Sanofi's motion to exclude Dr. Plunkett's supplemental report under Rule 702, the Court permitted Dr. Plunkett to offer her regulatory opinion but again excluded Dr. Plunkett's "causation-based" opinions.[14]

At the *Kahn* trial, Dr. Plunkett dropped most of the previously disclosed bases for her regulatory opinion—the bases that the Court analyzed in its Rule 702 order—in favor of new company documents and employee testimony.[15]   Specifically, Dr. Plunkett had relied on seven key items to support her regulatory opinion in her supplemental report before trial: (1) Dr. David Madigan's FDA Adverse Event Reporting System analysis;[16] (2) Dr. Madigan's analysis of Sanofi's pharmacovigilance database;[17] (3) Dr. Madigan's meta-analysis of the TAX 316 and TAX 301 clinical trials;[18] (4) a scientific article by J.M. Nabholtz;[19] (5) a scientific abstract by Dr. Scot Sedlacek;[20] (6) interim data from the TAX 316 study;[21] and (7) her toxicology and pharmacology opinions.[22]

At trial, however, Dr. Plunkett claimed her opinion was supported by the following: (1) a comment by Sanofi Global Safety Officer Dr. Amy Freedman;[23] (2) an April 2006 meeting

---

[13]   **Ex. I**, Plunkett Suppl. Rpt. 1 (Feb. 7, 2021).

[14]   Rec. Doc. 13131 at 6 (Order & Reasons Granting in Part and Denying in Part Sanofi's Mot. to Exclude Suppl. Expert Op. of Dr. Laura Plunkett).

[15]   As the Court recognized, "it just seemed like that was not the clear underpinnings of her report.  I thought her report relied primarily on Dr. Madigan's work[.]"  **Ex. J**, Kahn Trial Tr. 1018:5–9 (Nov. 12, 2021); *see also* **Ex. K**, Hr'g Tr. 21:1–6 (Mar. 8, 2022) ("THE COURT: . . . And to be clear, Dr. Plunkett's testimony -- was it Plunkett, yes -- completely turned on its head in trial, the last trial, from what her report was.").

[16]   Ex. I, Plunkett Suppl. Rpt. ¶ 94 (Feb. 7, 2021).

[17]   *Id.*

[18]   *See id.* ¶ 92.

[19]   *Id.* ¶ 96.

[20]   *Id.*

[21]   *Id.* ¶ 98.

[22]   *Id.* ¶ 90.

[23]   Ex. J, Kahn Trial Tr. 1004:4–5 (Nov. 12, 2021).

at Sanofi;[24] (3) the Sedlacek abstract;[25] (4) an email from Sanofi Global Safety Officer Dr. Emanuel Palatinsky;[26] and (5) a generalized reference to Sanofi's pharmacovigilance database.[27] Sanofi moved to strike Dr. Plunkett's trial testimony. Although the Court denied Sanofi's motion, the Court stated that it was a "very, very close call."[28]

After the Fifth Circuit reversed and remanded Ms. Earnest's case for a new trial, Dr. Plunkett issued *another* supplemental report.[29] In it, Dr. Plunkett purports to discern "Sanofi's knowledge and awareness of the difference between the typical/common reversible chemotherapy-induced alopecia seen with exposure to most chemotherapy drugs, including Taxotere, and the persistent alopecia described in the medical literature as CIPAL/PCIA related to Taxotere."[30] This is not the applicable regulatory standard. Instead, Dr. Plunkett offers a "bad company" narrative from the selected company documents and testimony, which she annotates with her personal interpretation of Sanofi and its employees' intent, motive, and state of mind:

- An April 2006 Sanofi meeting: "Sanofi's former Clinical Trial Manager, Jean-Philippe Aussel agreed that Exhibit 19 to his deposition was evidence that **the company was aware** in 2006 of cases of alopecia that were not reversible, and that the company was discussing differentiating temporary and irreversible alopecia based on duration and severity."[31]

- A Sanofi sales representative's email regarding Dr. Sedlacek.[32]

---

[24] *Id.* at 1004:6–8.

[25] *Id.* at 1004:9–10.

[26] *Id.* at 1004:11–13.

[27] *Id.* at 1004:18–1005:5. Dr. Plunkett's generic reference to Sanofi's pharmacovigilance database should not be misinterpreted to mean that Dr. Plunkett performed her own analysis of the database. She did not. She relied only on Dr. Madigan's analysis of Sanofi's database, as she stated repeatedly in her report.

[28] **Ex. L**, Kahn Trial Tr. 1096:14–16 (Nov. 15, 2021).

[29] Ex. B, Plunkett Suppl. Rpt. (Apr. 29, 2022).

[30] *Id.* ¶ 94; *see also id.* ("Additionally, it was enlightening to see the candid responses of Sanofi's employees who admitted that they were never told about PCIA, as well as those that clearly discussed the difference between reversible alopecia and permanent, irreversible alopecia.").

[31] *Id.* ¶ 94(4) (emphasis added).

[32] *Id.* ¶ 94(5) n.39.

▪ Dr. Palatinssy's revisions to an informed consent form in 2007: "Thus, **Sanofi knew** in 2007 that 'permanent' hair loss was a separate injury as compared to the initial drug-induced alopecia seen with Taxotere use."[33]

▪ Deposition testimony from Sanofi's TAX 316 Clinical Study Manager Kimberly Bassi: "[Bassi's testimony] reveals that by 2008 **Sanofi was aware** that the rate of persistent or irreversible alopecia in TAX316 in TAC patients (Taxotere group) was greater than double the rate in the FAC group, and that this disparity raised concern over Taxotere's toxicity with the European Medicines Agency[.]"[34]

▪ Deposition testimony of Dr. Palatinsky and Sanofi's Head of Global Regulatory Affairs Dr. Sunil Gupta: "**Sanofi recognized** that permanent or irreversible alopecia (CIPAL/PCIA) was a serious and significant adverse reaction for patients, in particular women."[35]

▪ Sanofi Global Safety Officer Dr. Nanae Hangai's 2015 Clinical Overview: "[I]t is reasonable to conclude that **Dr. Hangai purposefully selected a criteria that would yield a lower number of events**."[36]

▪ Deposition testimony of Sanofi employee Isabelle Richard-Cassin regarding an April 2006 meeting: "[Ms. Richard-Cassin] . . . **confirm[ed] that Sanofi was discussing** what might be included in a patient leaflet."[37]

▪ Deposition testimony of Dr. Freedman: "Dr. Freedman[] testified that in 2006 **Sanofi knew** that Taxotere could cause irreversible alopecia."[38]

▪ Deposition testimony of Sanofi's Senior Director of Regulatory Labeling Gerrit-Jan Nijveldt regarding a 2011 Country Labeling Desk Audit Report: "What is particularly interesting concerning the above evidence, and all of the documents that I have reviewed that were authored or dated before the initiation of this litigation, is the fact that at no time did Sanofi, either internally or with any regulatory agency, take the position that '*hair generally grows back*' was intended to encompass a warning for CIPAL/PCIA, or even the term persisting alopecia."[39]

▪ A November 2015 email from Sanofi employee Frances Polizzano: "Frances Polizzano remarked that '*this is going to be fun submitting >4 year old labeling changes to the FDA*

---

[33] *Id.* ¶ 94(6) (emphasis added).

[34] *Id.* ¶ 94(7) (emphasis added).

[35] *Id.* ¶ 94(8) (emphasis added).

[36] *Id.* ¶ 94(9) n.45 (emphasis added); *see also id.* ¶ 94(9) ("Evidence reviewed in this report was **known or should have been discoverable by Sanofi** prior to Ms. Earnest's use of Taxotere." (emphasis added)).

[37] *Id.* ¶ 94(10) (emphasis added).

[38] *Id.* ¶ 94(11) (emphasis added).

[39] *Id.* ¶ 94(12).

*now.'* . . . **Based on the e-mail thread, it is fair to assume** the '>4 years' statement by Ms. Polizzano refers to the final clinical study report of TAX316 dated September 9, 2010 (more than four years prior). Thus, the failure to update the label with this particular information regarding Taxotere and persisting alopecia within TAX316 went back nearly five years."[40]

▪ The 2015 Taxotere labeling change: "But the company failed to include the information from its own clinical trial datasets (TAX316 and GEICAM9805) that were **known by Sanofi** to include cases of permanent/irreversible alopecia."[41]

▪ A March 2017 Label Review Committee meeting: "As a regulatory expert that has worked for years in similar litigation on issues related to the need to update labeling with safety information, it is unusual, and interesting to note, that it was only after the current MDL commenced in October 2016 that Sanofi ultimately attempted to include the TAX316 data on persisting/permanent/irreversible alopecia in its label, and then only with the involvement of the same counsel involved in this litigation (not FDA regulatory counsel)."[42]

From these sources, all of which were produced years before, Dr. Plunkett concludes in her initial supplemental report:

> [I]t is clear that Sanofi **knew or should have known** well before 2011 when Mrs. Earnest was diagnosed with breast cancer that Taxotere use was associated with a different type of alopecia than the typical reversible drug-induced form seen at the initiation of treatment, and there was at least some basis to believe that a causal relationship existed between CIPAL/PCIA and Taxotere.[43]

Then, before Dr. Plunkett's pre-preservation deposition, the PSC served Sanofi with Dr. Plunkett's second supplemental report.[44] In it, Dr. Plunkett cites additional testimony and exhibits

---

[40] *Id.* ¶ 94(13) (emphasis added).

[41] *Id.* ¶ 94(14) (emphasis added). It is unclear whether Dr. Plunkett is opining that the 2015 Taxotere label remained inadequate. To the extent that she is, this opinion is barred by this Court's holding that the 2015 labeling was adequate as a matter of law. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 462 F. Supp. 3d 650, 651 (E.D. La. 2020).

[42] Ex. B, Plunkett Suppl. Rpt. ¶ 94(15) (Apr. 29, 2022).

[43] *Id.* (emphasis added).

[44] Ex. C, Plunkett Second Suppl. Rpt. (Dec. 29, 2022).

from the depositions of Sanofi employees Jean-Phillipe Aussel and Frances Polizzano, as well as the testimony of former Sanofi sales representative Ruth Avila.[45]  Dr. Plunkett states:

> The testimony of these Sanofi employees is relevant to my opinions that Sanofi never warned physicians and their patients about permanent hair loss with Taxotere when used in the adjuvant care of early-stage breast cancer even though **the company was aware as early as 2006 that there was more than just "some basis to believe there is a causal relationship"** between Taxotere and the adverse reaction of permanent-chemotherapy-induced alopecia.[46]

Dr. Plunkett packs more company and witness mindreading into her second supplemental report, including:

- Deposition testimony of Mr. Aussel: "**Like me, Mr. Aussel believed** that any Taxotere label using words such as 'hair generally grows back' or 'alopecia' was not telling physicians that Taxotere use had been linked to permanent or irreversible hair loss."[47]

- Deposition testimony of Dr. Palatinsky: "Thus, by 2007 **Dr. Palatinsky, too, knew** that the evidence showing that Taxotere was associated with permanent hair loss was strong enough to warrant placing a warning about it in an informed consent."[48]

- A 2006 Nurse Tear Sheet: "Before any litigation had been initiated, and when deciding how to tell nurses and patients what 'alopecia' means, **Sanofi chose to define** it as a 'common, yet temporary, side effect' as was discussed in the Polizzano deposition."[49]

- Testimony of Ms. Avila regarding a 2006 national sales meeting: "Despite multiple admissions by Sanofi employees, including evidence discussed in my April 2022 report, **that Sanofi knew** about the association between Taxotere and permanent hair loss, Sanofi never itself attempted to change the label to warn about PCIA."[50]

- Deposition testimony of Dr. Polizzano: "Review of her deposition makes clear that **Dr. Polizzano, by 2015, also believed** that the label should have warned about permanent/irreversible hair loss, did not actually warn about it, and should have been changed more than four years before 2015 to warn about it."[51]

---

[45] *Id.* ¶ 113.

[46] *Id.* (emphasis added).

[47] *Id.* ¶ 115 (emphasis added).

[48] *Id.* ¶ 116 n.5 (emphasis added).

[49] *Id.* ¶ 116 (emphasis added).

[50] *Id.* ¶ 117 (emphasis added).

[51] *Id.* ¶ 118 (emphasis added).

- ▪ Labeling for Sanofi's drugs Apida, Avalide, Lantus, and Lovenox: "**Sanofi knew** it could make a change to irreversibility as a separate and distinct outcome and had for other drugs by 2006."[52]

Before the parties proceeded with Dr. Plunkett's preservation deposition under Case Management Order 36—a deposition with the potential to be played in federal district courts across the country—the Court permitted Sanofi to file this Rule 702 motion to address the new opinions (and bases for those opinions) in Dr. Plunkett's supplemental reports.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, the threshold inquiry is whether an individual has the requisite qualifications. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 4178670, at *2 (E.D. La. Sept. 3, 2019). Then, the Court "assesses whether the opinions are reliable and relevant." *Id.* (citing *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010)).

"The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015).

---

[52] *Id.* ¶ 118 n.8 (emphasis added).

To assess reliability, the Court considers if the reasoning or methodology underlying the expert's testimony is valid. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 4178670, at *2 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)). The "reliability analysis applies to all aspects of an expert's testimony," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). An expert's testimony "must be reliable at each and every step or else it is inadmissible." *Id.*

After assessing reliability, the Court evaluates relevance—that is, "whether the expert's reasoning or methodology 'fits' the facts of the case and will thereby assist the trier of fact in understanding the evidence." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 4178670, at *2 (citing *Burst*, 120 F. Supp. 3d at 551).

## ARGUMENT

At the *Kahn* trial, the PSC discarded Dr. Plunkett's previous bases for her regulatory opinions (e.g., Dr. Madigan's analyses, clinical trial data, and medical publications) in favor of previously un-vetted bases—namely, company witness testimony and documents. Although Dr. Plunkett now discloses these bases (and more) in her supplemental reports, her expanded regulatory opinions do not satisfy Rule 702.

The Court should exclude Opinions 1–3 in Dr. Plunkett's Supplemental Report (April 29, 2022).[53] First, Dr. Plunkett's methodology is not reliable. Notably, Dr. Plunkett does not apply

---

[53] Dr. Plunkett offers six regulatory opinions. Ex. B, Plunkett Suppl. Rpt. ¶¶ 109(1)–(6) (Apr. 29, 2022). Dr. Plunkett does not explain in her report which data goes with which regulatory opinion, but she premises Opinions 1, 2, and 3 on her interpretation of Sanofi's knowledge. *Id.* ¶ 109(1) ("Evidence in this case shows that at least by 2006, Sanofi recognized that Taxotere was associated with permanent, irreversible or persistent alopecia . . . ."), ¶ 109(2) ("Even the 2015 label change by Sanofi failed to communicate accurately and completely what Sanofi knew about Taxotere and its relationship with persisting/permanent alopecia (CIPAL/PCIA)."), ¶ 109(3) ("It is not sufficient to provide data in submissions without analyses and explanation of what the data demonstrates. This is particularly true where the company has demonstrated knowledge of the risk.").

the methodology applied by Dr. Kessler and previously accepted by this Court to determine whether there was "some basis to believe there is a causal relationship" between Taxotere and permanent hair loss.  Instead, Dr. Plunkett's ad hoc methodology has no basis in the applicable FDA guidance, and the PSC has not met its burden to establish its reliability.

Second, these three opinions do not fit the case and are unhelpful to the trier of fact. Opinions 1–3, which are premised on Sanofi's knowledge, do not fit this litigation because knowledge is not the relevant regulatory standard.  These opinions are also unhelpful because the trier of fact can assess company knowledge and draw inferences from company documents and witness testimony without the help of an expert's narrative testimony.

The Court should also exclude Dr. Plunkett's Opinion 4—her labeling "harmonization" opinion—because it is premised on previously excluded foreign regulatory requirements.

## I.    Dr. Plunkett Did Not Apply a Reliable Methodology Under Rule 702.

### A.    Dr. Plunkett identifies, but does not apply, the FDA guidance previously used by Dr. Kessler and accepted by this Court as a reliable methodology.

Under Rule 702, the Court must ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 269 (5th Cir. 2020). In the pharmaceutical regulatory context, an expert must reliably apply the regulatory standards to the facts.  *Cf. In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 4178670, at *3 (holding Dr. David Kessler applied a reliable methodology to offer certain regulatory opinions), *with In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1349 n.34 (S.D. Fla. 2010) (excluding regulatory expert opinion where "[r]egulatory analysis—the critical link between the facts and the broad conclusions they are intended to support—[was] missing").

11

The Court's ruling on Dr. Kessler's testimony is illustrative.  As the Court is aware, the PSC identified Dr. Kessler, a former FDA Commissioner, to testify that "as early as 2009 Sanofi had 'reasonable evidence of a causal association' between Taxotere and irreversible alopecia." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 4178670, at *2.  In his expert report, Dr. Kessler explained his methodology:

> In my report, I have analyzed the available data in a manner consistent with the FDA's "Guidance for Industry on Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products — Content and Format" from 2011, which provides guidance to drug manufacturers on "how to decide which adverse reactions or other potential safety hazards are significant enough to warrant inclusion in the WARNINGS AND PRECAUTIONS section."[54]

The 2011 FDA guidance set out seven factors to assess whether there is "reasonable evidence of a causal association," the regulatory standard for inclusion of a potential safety hazard in the Warnings and Precautions section of a drug's labeling.[55]  As Dr. Kessler explained, FDA directs that these same seven factors be used to determine whether there is "some basis to believe there is a causal relationship between occurrence of an adverse event and the use of a drug," the regulatory standard for inclusion of a potential safety hazard in the Adverse Reactions section of a drug's labeling.[56]

Sanofi moved to exclude Dr. Kessler's testimony, in part based on his methodology.  In opposition, the PSC asserted that Dr. Kessler's "methodology matched and utilized the methods

---

[54] **Ex. M**, Kessler Rpt. ¶ 98 (Nov. 6, 2018).

[55] *Id.* ¶ 100.  The seven factors identified by FDA are: (1) the frequency of reporting, (2) whether the adverse event rate for the drug exceeds the placebo rate, (3) the extent of dose-response, (4) the extent to which the adverse event is consistent with the pharmacology of the drug, (5) the timing of the event relative to the time of drug exposure, (6) existence of challenge and dechallenge experience, and (7) whether the adverse event is known to be caused by related drugs.  *Id.*

[56] *Id.* ¶ 101.1 (citing FDA, GUIDANCE FOR INDUSTRY: ADVERSE REACTIONS SECTION OF LABELING FOR HUMAN PRESCRIPTION DRUG AND BIOLOGICAL PRODUCTS — CONTENT AND FORMAT 8 (2006)).

called for by FDA"[57] and that it was "the proper standard for making the [labeling] determination in this context, i.e., the same standard that Sanofi should have used in whether irreversible alopecia should have been included in the Warnings section of the Taxotere label."[58]  In denying Sanofi's motion, the Court reasoned that Dr. Kessler identified and applied a reliable methodology:

> Using the experience that he gained as Commissioner of the FDA, Dr. Kessler considered the seven factors that the FDA uses in determining whether there is "reasonable evidence of a causal association." . . . Dr. Kessler is qualified and used a reliable methodology in forming his opinion[.]

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 4178670, at *3.

Although Dr. Plunkett identified the relevant FDA guidance in her expert report,[59] she made *no attempt* to apply the same methodology that Dr. Kessler used and that this Court previously accepted.  *See id.*; *cf. Tsao v. Ferring Pharms., Inc.*, 2018 WL 3649714, at *12–13 (S.D. Tex. Apr. 19, 2018) (excluding Dr. Plunkett's opinion that drug was "misbranded" and "adulterated" as unreliable where she ignored FDA guidance documents).

Instead, Dr. Plunkett contravenes FDA guidance.  FDA guidance states that manufacturers should update the Adverse Reactions section based on "controlled trials or epidemiologic studies conducted after marketing approval, manufacturer's safety-related labeling supplements, and other analysis of postmarketing adverse events, including single cases or case series from the literature or from spontaneous reporting."[60]  This makes sense, as this data could be assessed under the seven

---

[57]   Rec. Doc. 7467 at 8 (Pl.'s Opp. to Sanofi's Mot. to Exclude Expert Test. of David A. Kessler, M.D., J.D.).

[58]   *Id.* at 10.

[59]   Ex. B, Plunkett Suppl. Rpt. ¶ 91 (Apr. 29, 2022) ("Given that it is the Adverse Reactions section of the Taxotere label that is applicable in this case, it also is important to note that FDA has issued guidance for manufacturers of human drugs on the format and content of the adverse reactions section of the label.  In its guidance, the agency discusses how to determine what types of information to include in the Adverse Reactions section of a drug label as well as how to present the information.").

[60]   **Ex. N**, FDA, GUIDANCE FOR INDUSTRY: ADVERSE REACTIONS SECTION OF LABELING FOR HUMAN PRESCRIPTION DRUG AND BIOLOGICAL PRODUCTS — CONTENT AND FORMAT 11 (2006).

FDA guidance factors (e.g., "the extent of dose-response"), while much of the evidence Dr. Plunkett cites cannot be. Dr. Plunkett, for example, cites Ms. Avila's trial testimony about an abstract by Dr. Scot Sedlacek.[61] But it is the abstract, not Ms. Avila's trial testimony, which could be analyzed under the seven FDA guidance factors.

Dr. Plunkett has foregone the methodology previously applied by Dr. Kessler and accepted by the Court. And as explained below, Dr. Plunkett fails to establish that her alternative methodology is sufficiently reliable under Rule 702(c).

**B.     Dr. Plunkett's alternative methodology—asking "What was known and when did they know it?"—is not reliable under Rule 702(c).**

The PSC has the burden to establish the reliability of Dr. Plunkett's methodology. *See Burst v. Shell Oil Co.*, 2015 WL 3620111, at *2 (E.D. La. May 9, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016). But aside from Dr. Plunkett's passing reference to FDA guidance (which she does not apply), she fails to identify any discernible regulatory methodology in her supplemental reports.[62] *See id.* at *5 (holding expert's general causation opinion was "wholly conclusory *ipse dixit*" where the expert's report exhibited no application of an appropriate methodology).

Instead, at her supplemental depositions, Dr. Plunkett asserted that her methodology was to ask, "What was known and when did they know it?"[63] To answer this question, Dr. Plunkett

---

61   Ex. C, Plunkett Second Suppl. Rpt. ¶ 117 (Dec. 29, 2022).

62   At most, Dr. Plunkett states that her "March [13, 2020] Report provides a description of the general methodology used in forming my opinions during this litigation, a methodology that remains unchanged[.]" Ex. B, Plunkett Suppl. Rpt. ¶ 71 (Apr. 29, 2022). The methodology Dr. Plunkett identified in her March 13, 2020, report was used to prepare her toxicology and pharmacology opinions, not regulatory opinions. Dr. Plunkett does not clarify these discrepancies by, for example, explaining (1) why a "human health risk assessment" or a "weight-of-the-evidence assessment" used to prepare her toxicology and pharmacology opinions was an appropriate methodology to form her new regulatory opinions, or (2) how these methodologies were applied to do so. *See id.*

63   Ex. A, Plunkett Dep. 197:14–200:7 (June 2, 2022) ("As a regulatory expert . . . the method you would use would be to look at what I laid out for you: What was known and when did they know it?").

asked plaintiffs' counsel "for depositions related to topics initially."[64]  These depositions included those that plaintiffs' counsel "selected independent[ly]" and "that the attorneys felt must have been relevant to [her] opinions."[65]  From those depositions, Dr. Plunkett "select[ed] the exhibits that [she] felt were most relevant to [her] opinions[.]"[66]  But "[i]f it was not an exhibit to a deposition, then some of those documents were ones that may have been provided directly through plaintiffs' counsel, some that they brought to [her] attention."[67]  Dr. Plunkett also selected literature from a public literature search, from expert reports, and from documents used by defense counsel.[68]

Dr. Plunkett put this information into "buckets" of (1) "what the company knew"; (2) "what was in the published literature or known out there generally"; and (3) "information based upon the internal company documents that aren't necessarily what they knew but what they discuss."[69]  Dr. Plunkett did not outline how each piece of evidence fit into each bucket or how each piece of evidence might be ranked or weighted.[70]  She simply reached her opinions based on the "totality of the evidence" she reviewed.[71]

This is not a reliable methodology.  *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d at 1347 (finding regulatory expert's methodology unreliable where expert "generally [took] a collection of facts, impute[d]

---

[64]   *Id.* at 100:18–101:11.

[65]   *Id.*

[66]   *Id.* at 130:18–131:22.

[67]   *Id.*

[68]   *Id.* at 130:18–132:17.

[69]   *Id.* at 151:14–152:3.

[70]   *Id.* at 159:21–160:23.

[71]   *Id.* at 128:21–130:6.

motive and knowledge, and [drew] unsupported conclusions unrelated to any regulatory expertise"); *Newman ex rel. Newman v. McNeil Consumer Healthcare*, 2013 WL 9936293, at *5 (N.D. Ill. Mar. 29, 2013).

In *Newman*, the Northern District of Illinois excluded Dr. Plunkett's similar testimony regarding the defendants' failure to comply with FDA regulations, which "[f]or the most part . . . relie[d] on the deposition testimony of McNeil employees and consultants to establish Defendants' alleged noncompliance." *Id.* Dr. Plunkett's methodology was "suspect" because, among other reasons, she relied "on self-serving portions of testimony without evaluating the context of the testimony or other relevant portions of the same testimony." *Id.*; *see also id.* ("Dr. Plunkett focuses on out-of-context answers given in depositions that are amenable to different interpretations and that were offered in response to questions that, more often than not, lacked clarity themselves.").

As in *Newman*, Dr. Plunkett's regulatory opinions should be excluded because she relies on a one-sided version of the record to conclude that Sanofi failed to comply with FDA regulations.

By way of example:

- Dr. Plunkett cites to Ms. Avila's trial testimony in her second supplemental report.[72] Dr. Plunkett conceded that she only reviewed Ms. Avila's trial testimony from *Kahn*.[73] She did not review *Earnest* trial testimony, nor did she ask to see this testimony.[74] She did not review any of Ms. Avila's deposition testimony.[75] And more globally, Dr. Plunkett conceded she had not reviewed the testimony of any other sales representative deposed in the litigation.[76]

---

[72] Ex. C, Plunkett Second Suppl. Rpt. ¶ 117 (Dec. 29, 2022).

[73] **Ex. O**, Plunkett Dep. 45:3–17 (Mar. 28, 2023).

[74] *Id.* at 45:7–17.

[75] *Id.* at 43:17–25.

[76] *Id.* at 38:24–40:9.

▪       Dr. Plunkett cites to select portions Mr. Aussel's deposition to opine that "Like me, Mr. Aussel believed that any Taxotere label language using words such as 'hair generally grows back' or 'alopecia' was not telling physicians that Taxotere use has been linked to permanent or irreversible hair loss."[77]  When directed to conflicting deposition testimony from Mr. Aussel, Dr. Plunkett stated, "I think that the statements he gives of the pages I cite are what they are, and I'll let them speak for themselves."[78]

▪       Dr. Plunkett cites to excerpts of Dr. Palatinsky's deposition for the proposition that "Dr. Palatinsky . . . testified that at no time while he was global safety officer did the U.S. label warn of permanent hair loss."[79]  Again, when directed to portions of Dr. Palatinsky's deposition that contradicted this assertion, Dr. Plunkett conceded that "it's not surprising that the way the questions are asked will certainly elicit, potentially, something that appears inconsistent" but she simply did not "believe it [was inconsistent], based upon the way the questions were asked on the first day [by plaintiffs' counsel]."[80]

Dr. Plunkett identifies no methodology for the regulatory opinions in her supplemental reports.  And the methodology she belatedly set out at her deposition is not sufficiently reliable under Rule 702.  Instead, under her "What was known and when did they know it?" standard, Dr. Plunkett has taken a collection of company documents and witness testimony (some of which were hand-picked by the PSC) to impute motive and knowledge to Sanofi and its employees.  Because Dr. Plunkett's methodology has no basis in any applicable FDA guidance and relies on a suspect review of the litigation record, her regulatory opinions should be excluded.

---

[77]   Ex. C, Plunkett Second Suppl. Rpt. ¶ 115 (Dec. 29, 2022).

[78]   Ex. O, Plunkett Dep. 65:12– 67:22 (Mar. 28, 2023).

[79]   Ex. C, Plunkett Second Suppl. Rpt. ¶ 115 (Dec. 29, 2022).

[80]   Ex. O, Plunkett Dep. 85:10–87:5 (Mar. 28, 2023).

## II.  Dr. Plunkett's Opinions About Sanofi's Knowledge Do Not Fit the Facts of the Case and Will Not Help the Trier of Fact.

### A.  Dr. Plunkett's opinions do not fit the facts of the case because Sanofi's knowledge is irrelevant under the applicable regulatory standards.

As the PSC's designated regulatory expert in these pharmaceutical failure-to-warn cases, Dr. Plunkett's role should be limited to admissible testimony on the applicable requirements of the Food, Drug & Cosmetic Act ("FDCA") and FDA regulations.  *See, e.g.*, *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d at 1345 ("Most of Dr. Parisian's testimony will not assist the trier of fact because she makes no effort to confine it to her area of expertise: the FDA regulatory scheme.").

Dr. Plunkett strays well beyond her purported expertise by applying a methodology to determine "what Sanofi knew, could have known, or should have known."[81]  Dr. Plunkett, for example, opines that "What the company knows, to me, is highly relevant and important because of the fact that that alone triggers a duty within what the regulations state."[82]

The applicable standard under FDA regulations, however, is not actual or constructive knowledge.  It is whether there is "some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."  21 C.F.R. § 201.57(c)(7).  These are not equivalent standards.  Rather, testifying as to what Sanofi "knew" only serves to mislead and inflame future juries by suggesting that Sanofi did not take action between 2006 and 2015 despite concrete knowledge of an association between Taxotere and permanent hair loss.[83]  Because Dr. Plunkett

---

[81]  Ex. B, Plunkett Suppl. Rpt. ¶ 94 (Apr. 29, 2022).

[82]  Ex. A, Plunkett Dep. 160:14–17 (June 2, 2022).

[83]  *See e.g.*, Ex. C, Plunkett Second Suppl. Rpt. ¶ 113 (Dec. 29, 2022) ("[Sanofi] was aware as early as 2006 that there was more than just 'some basis to believe there is a causal relationship' between Taxotere and the adverse reaction of permanent-chemotherapy-induced alopecia."), ¶ 115 ("At the very least, the language Sanofi did include was not in compliance with FDA labeling requirements because it lacked information about duration and severity of the side effect, both of which were known (not just 'some basis to believe') by Sanofi.").

addresses a question with no basis in the applicable regulatory standards, her regulatory opinions based on Sanofi's knowledge will not help the trier of fact.

### B.     Sanofi's knowledge is a lay matter that the trier of fact can determine without Dr. Plunkett's testimony.

As the Fifth Circuit has recognized, "an expert's conclusory allegations regarding a defendant's state of mind are not helpful or admissible" because "an expert's credentials do not place him in a better position than the jury to draw conclusions about a defendant's state of mind." *Marlin*, 248 F. App'x at 541.  And before both MDL bellwether trials, the Court applied this principle to exclude "speculative testimony on Defendant's intent, motive, or state of mind," and permitted only "factual evidence" on these topics.[84]

Consistent with the Fifth Circuit and this Court, federal district courts across the country have excluded regulatory expert opinions on a pharmaceutical manufacturer's state of mind or knowledge because a jury can address this issue without expert testimony.  In *In re Trasylol Products Liability Litigation*, for example, the Southern District of Florida excluded the testimony of regulatory expert Dr. Susan Parisian in full.  709 F. Supp. 2d at 1328.  The court reasoned that Dr. Parisian made "conclusory opinions regarding Bayer's and the FDA's state of mind and knowledge based on her reading of internal Bayer documents and FDA correspondence."  *Id.* at 1346.  The court held that this testimony would not assist the jury because the "jury [could] infer intent from this evidence directly[.]"  *Id.*; *accord In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 628 (S.D. W. Va. 2013) ("Bard's knowledge, intent, or motives are simply not appropriate subjects for expert testimony.  The documents and testimony should be presented directly to the jury, not through [Dr. Kessler].").

---

[84]    Rec. Doc. 8206 at 3 (Order & Reasons in *Earnest*); Rec. Doc. 13260 at 5 (Order & Reasons in *Kahn*).

Like Dr. Parisian, Dr. Plunkett devotes the majority of her supplemental reports to offer conclusory opinions about Sanofi's state of mind and the intent of its employees.  For example:

- Citing Mr. Aussel's testimony and exhibits, Dr. Plunkett opines that "**the company was aware** in 2006 of cases of alopecia that were not reversible[.]"[85]

- Dr. Plunkett interprets Dr. Palatinsky's revision of an informed consent form in 2007 to infer that "**Sanofi knew** in 2007 that 'permanent' hair loss was a separate injury as compared to the initial drug-induced alopecia seen with Taxotere use."[86]

- Dr. Plunkett imputes a motive to Dr. Hangai's preparation of the 2015 Clinical Overview by opining that "it is reasonable to conclude that **Dr. Hangai purposefully selected a criteria that would yield a lower number of events**."[87]

- Dr. Plunkett restates Ms. Avila and a Sanofi employee's testimony to divine that "**[d]espite multiple admissions by Sanofi employees**, including evidence discussed in my April 2022 report, **that Sanofi knew about the association between Taxotere and permanent hair loss**, Sanofi never itself attempted to change the label to warn about PCIA."[88]

Dr. Plunkett's credentials do not place her in a better position than the trier of fact to draw conclusions about Sanofi's state of mind.  Indeed, when Dr. Plunkett has attempted to do so, courts across the country have excluded her opinions.  *See, e.g.*, *Newman*, 2013 WL 9936293, at *5 ("Dr. Plunkett relies on the deposition testimony of McNeil employees and consultants to establish Defendants' alleged noncompliance.  Such evidence will be available to the jury absent Dr. Plunkett's testimony."); *see also Kiker v. SmithKline Beecham Corp.*, 2016 WL 8189286, at *16 (S.D. Ohio Dec. 15, 2016) (excluding as speculative Dr. Plunkett's testimony about manufacturer's state of mind); *Roberto v. Boehringer Ingelheim Pharms., Inc.*, 2019 WL 1983299, at *1 (Conn. Super. Ct. Apr. 1, 2019) (similar).

---

[85] Ex. B, Plunkett Suppl. Rpt. ¶ 94(4) (Apr. 29, 2022).

[86] *Id.* ¶ 94(6).

[87] *Id.* ¶ 94(9) n.45 (emphasis added); *see also id.* ¶ 94(9) ("Evidence reviewed in this report was **known or should have been discoverable by Sanofi** prior to Ms. Earnest's use of Taxotere.") (emphasis added).

[88] Ex. C, Plunkett Second Suppl. Rpt. ¶ 117 (Dec. 29, 2022).

**C.      Dr. Plunkett's recitation of company documents and testimony is narrative testimony that is unhelpful to the trier of fact.**

An expert who draws inferences from or repeats facts or opinions stated by other potential witnesses or in documents produced in discovery is not helpful because these are "lay matters which a jury is capable of understanding without the expert's help." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). Such testimony "does no more than counsel for plaintiff[s] will do in argument, i.e., propose a particular interpretation of [defendant]'s conduct." *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2019 WL 5685269, at *9 (D. Mass. Nov. 1, 2019) (citation omitted); *see also Kaufman v. Pfizer Pharms., Inc.*, 2011 WL 10501233, at *2 (S.D. Fla. Aug. 10, 2011) ("Dr. Parisian's mere summarization of documents authored by others and her conclusions as to what Wyeth knew or should have known, or did or failed to do at the time . . . is not expert opinion—it is advocacy.").

Dr. Plunkett devotes the bulk of her supplemental reports to an advocacy-focused presentation of what the company and witness "evidence reviewed demonstrates" about "Sanofi's knowledge and awareness."[89] This is not helpful to the jury, as Dr. Plunkett's *Kahn* testimony makes clear. There, Dr. Plunkett's testimony served as a narrative read-and-response to the PSC's preferred sound bites from millions of pages of discovery:

> Q. Okay. And can you tell us what you found?
>
> A. I found that there were actually admissions by corporate employees, global safety officers that made statement -- they understood or they knew or they actually made statements in depositions that Taxotere use was -- could cause, in some people, permanent alopecia.
>
> Q. Okay.

---

[89]   Ex. B, Plunkett Suppl. Rpt. ¶ 94 (Apr. 29, 2022); *see also id.* ¶¶ 94(1)–(15); Ex. C, Plunkett Second Suppl. Rpt. ¶¶ 114–19 (Dec. 29, 2022).

A. That's an example.

Q. Who said that?

A. So that was Amy Freedman who was a global safety officer for Taxotere.

Q. Did she indicate when she said Sanofi knew that?

A. Yes. She's talking about 2006, there's questions in the deposition about that time period.

Q. Okay.

A. So in 2006, that evidence shows me that the company knew that there was a relationship, some basis to believe, that Taxotere could -- had been associated or was -- had a causal relationship with permanent alopecia.[90]

\*\*\*

Q. Dr. Plunkett, do you recognize this document?

A. Yes, this is another document.

Q. Okay. What is this document?

A. So this document -- oh, I'm sorry. This isn't that document. I apologize. Yes. This is the document that is showing an invitation to this internal meeting that happened in April of 2006.

Q. Okay. And did you learn from reading this document what the purpose of the meeting was for?

A. Yes. It was discussing changes to the labeling within the adverse reaction section of Taxotere.[91]

Dr. Plunkett cannot serve as a conduit for the PSC to introduce selective company documents and testimony. *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("Stated more directly, the trial judge ought to insist that a proffered expert bring

---

[90]   Ex. J, Kahn Trial Tr. 985:17–986:10 (Nov. 12, 2021).

[91]   *Id.* at 987:3–13.

to the jury more than the lawyers can offer in argument."). If the PSC wants to introduce Dr. Freedman's deposition testimony, it may designate this testimony to be played for the jury. If the PSC wishes to argue that Sanofi's internal meetings suggest knowledge or intent, it may do so in closing argument. What the PSC cannot do is use Dr. Plunkett to usurp the role of future juries.

### III.    Dr. Plunkett's Labeling "Harmonization" Opinion Should Be Excluded.

This Court has previously excluded evidence "regarding what any foreign regulatory bodies required of Sanofi"[92] and evidence "as to Sanofi's compliance with foreign regulations."[93] *See also In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 2780760, at *6 ("What is not admissible, however, is what the Defendants did or what they put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies. This information is irrelevant."); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 965 (D. Minn. 2009) ("The Court finds that any discussion of foreign regulatory actions is irrelevant to the current litigation and should therefore be excluded."); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 223140, at *6 (M.D. Fla. Jan. 30, 2009) ("The foreign Seroquel labels and the foreign regulatory actions have no relevance to [p]laintiffs' main case."), *aff'd*, 601 F. Supp. 2d 1313 (M.D. Fla. 2010).

Dr. Plunkett attempts to circumvent this Court's holding by opining about labeling harmonization—that is, a policy of "changing labeling for products across markets if a change is requested or made in one of the major markets, particularly with respect to safety concerns."[94] As a result of harmonization policies, Dr. Plunkett asserts that "requests for labeling changes by regulators in European countries is [sic] highly relevant to labeling in the US"[95] and that "there is

---

[92]   Rec. Doc. 8201 at 5 (Order & Reasons).

[93]   Rec. Doc. 13260 at 7 (Order & Reasons).

[94]   Ex. B, Plunkett Suppl. Rpt. ¶ 92 (Apr. 29, 2022).

[95]   *Id.*

no reason for Sanofi to include safety information from its clinical trials in a European label and not submit the same data for inclusion in labeling in the United States."[96]  Dr. Plunkett's opinion squarely implicates what a foreign regulatory body—the European Medicines Agency—required of Sanofi and should be excluded consistent with the Court's previous orders.[97]

## CONCLUSION

The PSC cannot meet its burden to establish the reliability of Dr. Plunkett's expert testimony.  Dr. Plunkett has foregone any attempt to provide admissible regulatory opinions.  Instead, Dr. Plunkett divines what Sanofi and its employees "knew" about the risk of permanent hair loss and Taxotere based on a selective review of Sanofi documents and employee deposition testimony.  Dr. Plunkett has not applied a reliable methodology, nor is her testimony helpful to the trier of fact.  As a result, Sanofi requests that the Court grant Sanofi's motion and exclude Opinions 1–4 in Dr. Plunkett's supplemental reports.

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART**
**MOORE & DANIELS LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

-and-

---

[96]  *Id.* ¶ 102(4).

[97]  *Id.*

Harley V. Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*

25