# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
      BARBARA EARNEST,            :
 3                                :
           Plaintiff,             :
 4                                :
           v.                     :   CASE NO.
 5                                :   2:16-cv-17144
      SANOFI-AVENTIS U.S.         :
 6    L.L.C. and SANOFI US        :
      SERVICES, INC.,             :
 7                                :
           Defendants.            :
 8
 9
10    *******************************************
11         VIDEOTAPED / REALTIMED DEPOSITION OF
12            LAURA M. PLUNKETT, Ph.D., DABT
13                    JUNE 2, 2022
14    *******************************************
15
16
17
18
19
20
21
22
23    Reported By:
24    Pat English-Arredondo, CSR, RMR, CRR, CLR
25    Job No:  5260044
```

Page 98

1  would be to compare the various lists in your
2  pharm and tox report, the list in the Kahn
3  report, and this list to try and discern
4  which ones are ones that you reviewed
5  specifically for the Earnest supplement.
6  Right?
7       A.   Yes.  And I can tell you when
8  we prepared Exhibit 8 for the Kahn report, I
9  know Freedman was one that had not been
10 listed, I believe, in my Earnest list that I
11 had.  So that's why that went there.
12           Because I had talked about
13 Amy Freedman, I believe, in my original
14 report.  Gupta, though, is one that I would
15 have gotten or seen our read, I guess, for
16 the first time in preparing my Kahn report,
17 because I remember that because I had a
18 section dealing with the severity of the
19 injury.  And I was addressing the fact that
20 it was a serious adverse event.
21      Q.   When -- for any of the
22 depositions that you reviewed since the
23 preparation of your Kahn report, how would
24 you come to have those in your possession?
25      A.   All of those are a part of the

Page 99

1  discovery in this case and provided to me
2  through plaintiffs' counsel.  They are not
3  things that were -- they're all part of my
4  confidentiality agreement, from what I
5  understand.
6       Q.   Let me back up.  Is that true
7  for all of the depositions that you would
8  have reviewed in preparation for your expert
9  report in this litigation, they would have
10 been provided to you by counsel?
11      A.   Yes.  I have not sought -- for
12 example, I did not seek to go and see if I
13 could get a transcript of something myself,
14 no.
15           I asked for certain ones.  I
16 asked for -- I talked about this in my first
17 deposition.  You know, I asked -- I think I
18 was asked question.  I answered it generally,
19 yes, indeed, I was interested in deposition
20 testimony that dealt with my issues,
21 pharmacology and toxicology and now
22 regulatory.
23           So I have looked at some
24 additional detail in the regulatory
25 depositions or the labeling depositions,

Page 100

1  people that were in labeling, like
2  Mr. Nijveldt.
3           There are additional stuff I
4  talk about -- or I shouldn't say "stuff" --
5  but additional documents I bring out because
6  now it's relevant to the things I'm bringing
7  out, which it wasn't necessarily directly
8  relevant to tox and pharm.
9       Q.   But I guess what I'm trying to
10 understand is, do you know how many
11 depositions were taken in the case, in the
12 litigation?
13      A.   The exact number, no.
14      Q.   Have you been given a list of
15 all of the individuals that have been deposed
16 with the description of their subject matter?
17      A.   I don't think so, no.
18      Q.   So in terms of the depositions
19 that you have been provided and that you're
20 citing in your supplemental report in the
21 Earnest case, those are depositions that were
22 selected and given to you by counsel?
23      A.   I shouldn't say "selected."  I
24 actually asked for depositions related to
25 topics initially.

Page 101

1           And so they would have gone to
2  find them, if that's what you mean by
3  "selected," yes, that did happen.
4           And then some depositions were
5  ones I was sent initially that were, I
6  believe, that the attorneys felt must have
7  been relevant to my opinions.
8           So I think it's a combo of
9  those things, things I asked for and things
10 that they selected independent of me asking
11 the question.
12      Q.   And then what about expert
13 reports?  It looks like a list of expert
14 reports and exhibits and depositions for
15 expert reports has grown since the Kahn
16 report.  Is that right?
17      A.   Yes.
18      Q.   And tell me why that's
19 expanded.
20           MR. MICELI:  Objection to the
21      form.
22      A.   It has to do with my interest
23 in being able to provide a complete response
24 to issues that have been addressed in front
25 of me, for example, at deposition or trial.

Page 110

1  FAERS adverse event analysis, did you?
2         MR. MICELI:  Object to the
3     form.
4     A.    I answered the questions asked;
5  and if that was not asked, I did not discuss
6  it, no.
7     Q.    (By Mr. Moore)  And you also
8  didn't have any discussion of Dr. Madigan's
9  analysis of Sanofi's pharmacovigilance
10 database, did you?
11        MR. MICELI:  Object to the
12    form.
13    A.    It's the same answer.  I
14 answered the questions asked and I provided
15 opinions in that case -- or at that trial
16 based upon what I needed to be able to
17 describe to support my opinions.
18    Q.    (By Mr. Moore)  And who did
19 -- well, before I get to that, let me just
20 get through my list.
21        Madigan's meta-analysis, you
22 didn't refer to that as the basis for your
23 opinion when you got on the stand in the Kahn
24 trial.  Correct?
25        MR. MICELI:  Object to the

Page 111

1     form.
2     A.    Again, I wasn't asked questions
3  about it, although I will say this.  On the
4  issue of Dr. Madigan, he was coming to the
5  trial after me; so it's not that that wasn't
6  presented to the jury.  But certainly no, I
7  was not asked questions about that.
8     Q.    (By Mr. Moore)  It wasn't
9  presented to the jury as information that you
10 relied upon in forming your labeling opinions
11 in the Kahn case.  Correct?
12        MR. MICELI:  Object to the
13    form.
14    A.    I did not describe it.  I
15 answered questions asked.  Again, my -- in
16 the Kahn case -- maybe this is helpful.
17        In the Kahn case I described
18 what was -- what the company knew, what the
19 company themselves knew at the time before
20 Ms. Earnest was exposed to Taxotere.
21        So I relied upon the knowledge
22 of the company at that time.  And that was
23 the focus of the testimony.
24    Q.    (By Mr. Moore)  Right.  I'm
25 going to get to that in just a second.

Page 112

1         And then the interim data from
2  the TAX316 study, the Nabholtz article, you
3  didn't discuss either of those as forming the
4  basis of your regulatory and labeling
5  opinions when you got on the stand in the
6  Kahn case.  Correct?
7         MR. MICELI:  Object to the
8     form.
9     A.    Same answer.  I answered the
10 questions asked.  I was not asked a question,
11 I believe, about Nabholtz.
12        I thought we did discuss
13 TAX316.  Maybe not.  Maybe not the interim
14 data.  That may be true.
15    Q.    (By Mr. Moore)  Okay.
16    A.    I would have to go back an
17 look.  I don't remember.
18    Q.    And you keep saying, Well, I
19 wasn't asked questions about that.
20        That seems to imply that had
21 you been asked questions about that, you
22 would have answered them.
23        Is that what you're saying?
24        MR. MICELI:  Object to the
25    form.

Page 113

1     A.    I would answer any question I
2  could if I have the knowledge and the ability
3  to do so, absolutely.
4         I mean, I don't make the -- I'm
5  not the one who asks the questions.  I'm
6  there to answer questions and provide
7  testimony consistent with my report in the
8  case, which is what I did.
9     Q.    Okay.  We will get to that in
10 just a second.
11        Who made the decision that you
12 would not discuss Dr. Madigan's analyses, the
13 Nabholtz article, or the TAX316 data as
14 forming the basis for your regulatory and
15 labeling opinions when you got on the stand
16 in the Kahn case?
17        MR. MICELI:  Object to the
18    form.  And I instruct you not to
19    answer.  We can call the judge now if
20    you're going to keep going down this
21    road.
22        You're not going to ask her
23    about my trial strategy.  We can do
24    whatever you want.
25        MR. MOORE:  There's no speaking

29 (Pages 110 - 113)

Page 126

1  I want to attach -- you talked
2 earlier about being able to compare
3 documents, and so what we will mark as
4 Exhibit No. 10 is a redline copy of -- it's a
5 document comparison of your February reports
6 and your April reports that an individual in
7 Mr. DePaz's office put together.
8      (Marked was Plunkett Exhibit 10.)
9      Q.   (By Mr. Moore)  And I'm going
10 to ask you some questions about some of the
11 things that are -- some of the things that
12 are highlighted here.
13      If you need to go back and look
14 at the other two reports to confirm that the
15 revision that I'm pointing to, either the
16 thing that you deleted or the thing that you
17 added in, truly have been changed between the
18 two reports, feel free to do that since you
19 do have both reports marked as an exhibit.
20      A.   Can I ask clarifying question?
21      Q.   Sure.
22      A.   So if it's struck through in
23 red, that's information you're saying was in
24 my Kahn report but is not in my -- said that
25 way, exactly that way, in my Earnest

Page 127

1 report --
2      Q.   Right.
3      A.   -- for 2022?
4      Q.   So a red strike-through is a
5 deletion?
6      A.   Okay.
7      Q.   A blue underline is an
8 addition.  And then if it's green, that means
9 it's been moved somewhere else.
10      So if you look on the second
11 page, you will see there is a green
12 strike-through and then a green underline at
13 the same phrase.  That means that phrase has
14 been moved somewhere else.
15      A.   Okay, I understand now.  Thank
16 you.  I just wanted to make sure I was
17 understanding your color coding.
18      Q.   And I'm not going to go through
19 in tremendous granular detail, but there are
20 some just sections I wanted to ask you about.
21      MR. MICELI:  And Doug, we will
22   take your representation that this is
23   what you represent it to be; but we
24   don't want to take the time at this
25   point to read it.

Page 128

1      MR. MOORE:  Subject to any
2   issues you can find.  I don't think
3   that -- like I said, if we need to
4   compare the other two documents just
5   to make sure the part that I'm going
6   to ask about is there and not there,
7   then we can do that.
8      MR. MICELI:  Right.
9      A.   I have all three in front of
10 me; so if I need to do that, I will.
11      Q.   (By Mr. Moore)  And I
12 think that there's -- you know, if there is
13 any discrepancies with what your actual
14 reports are, we will obviously --
15      MR. MICELI:  Doug, for your
16   benefits, it's Exhibits 1, 7 and 10.
17   Is that right, that we're looking at?
18      What you have in front of you.
19      MR. MOORE:  Yes, 1, 7 and 10.
20      A.   Yes, I have them.
21      Q.   (By Mr. Moore)  So if we look
22 at the first page of what's been marked as
23 Exhibit No. 10, there in the second paragraph
24 that starts "the opinions I have formed
25 relate to the pharmacology and toxicology of

Page 129

1 Taxotere," and then you add a phrase that
2 says, "and the impact of such effects on
3 Sanofi's regulatory and labeling obligations
4 as demonstrated through the documents,
5 testimony, literature cited and included in
6 my Appendix A ('Materials Reviewed'), I have
7 considered how, when viewed in the context
8 of" -- and this is the phrase I want to ask
9 you about -- "the totality of the evidence,
10 the toxic effects of Taxotere that were
11 observed in humans demonstrate some basis to
12 believe that a causal relationship between
13 Taxotere and the adverse reaction of PCIA."
14      When you describe "the totality
15 of the evidence," what are you referring to?
16      A.   Everything listed in my report
17 or in my Materials Reviewed appendix.  So
18 it's everything that I have reviewed, any of
19 my deposition testimony I've given where I
20 discussed evidence, any documents that I have
21 listed for you in my appendices.
22      Q.   And so when you say "the
23 totality of evidence," you're talking about
24 the totality of evidence that you have looked
25 at, not every deposition in the case, not

Page 130

1  every document in the case, not every piece
2  of literature, but just the things that you
3  have in your report.  Correct?
4      A.   That's correct.  Because when I
5  say "I have considered," if I haven't looked
6  at it, I can't consider it.
7      Q.   Right.
8      A.   So yes, that's correct.
9      Q.   And were you given any sort of
10 inventory or description of the documents
11 produced in the case so that you could select
12 from that inventory which documents might be
13 relevant from the totality of evidence to
14 include in your evaluation?
15     A.   I don't know how to answer that
16 question because I think it's yes and no.
17          Do you want me to explain?
18     Q.   Sure.
19     A.   Sorry.  I'm not trying to be
20 difficult.
21          I would say yes that if I have
22 a -- when I have what's given or had access
23 to a deposition, I would select the exhibits
24 that I felt were most relevant to
25 opinions -- my opinions in this case.

Page 131

1           So even though I might have
2  considered and I had access to every exhibit,
3  you will notice that I don't necessarily
4  discuss every exhibit to every deposition
5  that I describe.
6           So Dr. Nijveldt, for example,
7  had 40, maybe, exhibits to his deposition and
8  I may only mention eight of them here.
9           But some of the other things I
10 mention may have been the exhibits to
11 somebody else's depositions, so any way...
12          I did select and I did look
13 based on a list that I had from the
14 depositions.  If it was not an exhibit to a
15 deposition, then some of those documents were
16 ones that may have been provided directly
17 through plaintiffs' counsel, some that they
18 brought to my attention.
19          And I can't tell you which
20 those are; but certainly that is true, that
21 some of them could have come that way as
22 well.
23          And then some of the documents
24 in my totality of the evidence were ones that
25 are from the public literature that I did

Page 132

1  searches of.  So, you know, some of that I
2  selected myself.
3           Or some of the literature that
4  may have been brought to my attention that I
5  hadn't seen by defense counsel during a
6  deposition or that I saw cited in an expert
7  report of one of the defense experts, for
8  example, or even one of the other experts in
9  the litigation.
10          So not a corporate witness or
11 someone that was an employee of Sanofi,
12 but -- say, for example, Dr. Kessler's
13 deposition, Dr. Arrowsmith's deposition,
14 Dr. Glaspy's deposition -- I'm sorry, report.
15 Actually, where I said "deposition" I meant
16 "reports."  The report of Dr. Feigal,
17 Dr. Madigan, things like that.
18     Q.   But in terms of
19 company -- well, strike that.
20          I want to ask you if you can
21 flip the page for me.
22     A.   In the compare document?
23     Q.   Yes, in the compare document.
24          You see in the middle of the
25 first paragraph there is a blue addition that

Page 133

1  starts with, "My opinions," and then the next
2  sentence reads, "Also included in this
3  supplemental report is a discussion of
4  additional materials I reviewed in forming my
5  opinions, ones that were not included in my
6  list of reliance materials in Appendix C of
7  my March 13, 2020 report."
8           Do you see that?
9      A.   Yes.
10     Q.   And the March 13, 2020 report,
11 was that your toxicology and pharmacology
12 report in the Kahn case?
13     A.   No, no, no.  It's my Earnest
14 report, I think.  Isn't it?  Maybe I'm wrong.
15 2019?  I may have the date wrong.
16          Did I have a...
17     Q.   You can't ask him questions.
18     A.   No, I'm thinking.  I'm sorry.
19 I'm not asking him.  I'm thinking to myself.
20 I might have the wrong date on there.  I
21 believe there was a March 2020 report,
22 though.
23          Isn't that referred to in my
24 Kahn case?
25     Q.   Well, that's what I'm trying to

34 (Pages 130 - 133)

Page 150

1  looked at that one that I cited. I think I
2  cite to a 2020 label. I think that is the
3  most recent label change.
4     Q.   All right. Did you do any
5  Internet research or look on PubMed or any of
6  the other online resources?
7     A.   Not in prep for the depo. I
8  had done that -- I think I told you that
9  earlier.
10    Q.   My question is about prep for
11 the depo.
12    A.   No, I did not.
13    Q.   Did you have any conversations
14 with anyone other than Mr. Lambert and
15 Mr. Miceli?
16    A.   No.
17    Q.   Did you speak to any of the
18 other experts on behalf of the plaintiff?
19    A.   No.
20    Q.   Okay. I wanted to -- before
21 getting back to the annotated report,
22 Exhibit No. 10, I wanted to ask you a couple
23 more questions about the evidence that
24 underlies or that forms the basis of your
25 regulatory and labeling opinion in this case.

Page 151

1           And I understand you
2  don't -- you're not going to ask yourself
3  questions when you get on the stand in the
4  Earnest trial.
5           But you are going to be the one
6  answering the questions. Right?
7     A.   Yes, I hope -- well, I plan to
8  be, yes.
9     Q.   And you're offering an opinion
10 in the case that -- whatever Taxotere label
11 was inadequate at the time of Ms. Earnest's
12 prescription?
13    A.   Yes.
14    Q.   And if you were asked the
15 question on the stand, what is your basis for
16 that opinion, what would your answer be?
17    A.   I would say there are different
18 buckets of information that form the basis of
19 my opinion.
20          I have information related to
21 what the company knew.
22          I have information related to
23 what was in the published medical literature
24 or known out there generally.
25          And then I have information

Page 152

1  based upon the internal company documents
2  that aren't necessarily what they knew but
3  what they discuss.
4           So there's parts of the
5  internal company documents that I talk about,
6  where it talks about the company actually
7  making specific statements about that
8  they -- or in their depositions they made
9  specific statements that they understood that
10 the company understood or they understood at
11 that point in time that permanent alopecia
12 was an adverse reaction associated with the
13 use of Taxotere.
14          So that's kind of the three
15 buckets of information. So it would be
16 internal company data, what the company
17 stated as what they knew within documents or
18 deposition, and then the scientific
19 literature as well.
20    Q.   And for any of these three
21 buckets, is there any one piece of evidence
22 that is necessary for your opinion?
23          MR. MICELI: Object to the
24     form.
25    A.   I don't think I can answer that

Page 153

1  because that's not how I approached the
2  problem. I don't try to say -- I haven't
3  approached the problem or my opinions related
4  to, without this, I couldn't make an opinion.
5  Because I have the data I have. I have the
6  information I have.
7           Does that answer your question?
8     Q.   (By Mr. Moore) I'm not sure.
9  Let me ask it a little bit differently,
10 focusing on, you know, "what the company
11 knew" bucket.
12          So you have this bucket of
13 information. And when you say "information,"
14 you're talking about the evidence cited in
15 your report, whatever form it's in;
16 testimony, exhibit, document, literature.
17          Is there one piece of
18 information in that bucket that is necessary
19 for you to be able to form your opinion, or
20 is it all of it together?
21    A.   I don't think I've thought
22 about it that way. Again, that's not how I
23 approach the problem.
24          The other thing you have to
25 understand is I approach this problem based

39 (Pages 150 - 153)

Page 158

1  document? I would say to you, no, based on
2  what we talked about in Kahn. Because I
3  believe, as I stated in Kahn, it was my
4  opinion that there was some basis to believe,
5  based on the documents and the information
6  that we put before the jury in that case.
7      Q.   The six pieces of evidence you
8  put before the jury in Kahn?
9      A.   Yes.
10         MR. MICELI: Object to the
11     form. Go ahead.
12     A.   I don't know that there were
13 six. I think there were -- were there five?
14 Maybe there were six. I didn't count them
15 up. Whatever was in Kahn. That's exactly
16 right.
17     Q.   (By Mr. Moore) But in terms of
18 your testimony in the Earnest case, we will
19 just have to wait and see what you say when
20 you get on the stand. Correct?
21     A.   I don't think --
22         MR. MICELI: Object to the
23     form.
24     A.   I don't think you have to wait
25 and see what I say, other than I don't know

Page 159

1  what questions they're going to ask. So
2  obviously what I will answer will be driven
3  by the answer.
4          I will say to you, you should
5  expect to hear things that are in my report.
6  I don't -- I don't anticipate being asked
7  about something that isn't in my report.
8      Q.   Is the Sedlacek article one of
9  the top seven most important pieces of
10 evidence that support your labeling opinion.
11         MR. MICELI: Object to the
12     form.
13     A.   I haven't formed the opinion
14 that it's one of the top seven important. If
15 you're going to limit it to 2006, I think
16 it's one of the ones that is certainly
17 discussed when you look at my opinion.
18         I talk about -- do you want me
19 to point you to the paragraph? I have a
20 paragraph where I summarize it.
21     Q.   I have it. I know. I'm just
22 trying to get a sense of where it ranks in
23 terms of the hierarchy of importance.
24         But what I'm discerning from
25 your testimony is you haven't undertaken an

Page 160

1  effort to really rank which piece of evidence
2  is more important compared to another.
3  Right?
4      A.   In terms of my labeling
5  opinions? I have not -- I have not attempted
6  to do an analysis to say that when you look
7  at what the company knew and what they could
8  have known -- and, actually, Sedlacek falls
9  into the what they knew because we have
10 evidence to indicate they were aware of that
11 study.
12         Both of those pieces of
13 information are important, obviously, as I
14 discussed in Kahn. What the company knows,
15 to me, is highly relevant and important
16 because of the fact that that alone triggers
17 a duty within what the regulations state.
18         When the company has a
19 knowledge and an understanding and they are
20 discussing it internally and we have
21 documents that talk about that, that is
22 directly related to what the duty of the
23 company is by the regulations.
24     Q.   If you had made an effort to
25 rank or estimate the relative importance to

Page 161

1  your labeling opinion of the litany of
2  evidence that's cited in your Earnest report,
3  if you had done that, would that -- would
4  that analysis help me in understanding what
5  testimony you might provide when you're on
6  the stand in the Earnest case?
7          MR. MICELI: Object to the
8      form.
9      A.   I don't think so because I
10 think I have told you how I identify
11 information. I've given you the general
12 categories: What the company knew, what they
13 could have known, and what they should have
14 known.
15         I think I've talked about all
16 three of those kinds of pieces of evidence in
17 my report. So two general categories,
18 obviously, are what they knew and what was in
19 the scientific literature that they could
20 have known.
21         So those are -- those, I would
22 say, would fit -- answer your question; but
23 it's not a ranking. To me, it's more of an
24 identification of what evidence was available
25 at different points in time and then

41 (Pages 158 - 161)

Page 194

1  Earnest case? I assume you're subsuming any
2  of my testimony?
3      Q.   (By Mr. Moore) Yes.
4      A.   Yeah, and the answer to that
5  would be, that's true. Yeah, I don't think
6  you need to do that. I don't believe so.
7           Again, this is why, though, I
8  have tried to give you a more fulsome report
9  here so that things are very clear where I
10 stand on certain documents and certain issues
11 that may not have been as clear because they
12 weren't described in as much detail before,
13 even though I talked about them generally or
14 I cited to them.
15     Q.   When we get to the end of
16 page -- the end of paragraph -- what I
17 believe is Paragraph 90, you indicate --
18 there is a sentence added at the end of that
19 paragraph, the very last sentence, which
20 reads, "Sanofi knew or should have known that
21 evidence supported 'some basis to believe
22 that a causal relationship between' Taxotere
23 and PCIA, and that its duration and severity
24 was different than common, reversible
25 chemotherapy induced alopecia."

Page 195

1           Do you see that?
2      A.   I do.
3      Q.   And that's the same regulatory
4  conclusion that you had reached in your prior
5  report. Correct?
6      A.   I don't know if it's the exact
7  same words; but yeah, that's been an opinion
8  that I've had since the Kahn case, yes.
9      Q.   And I'm not trying to play a
10 trick on you. I'm just confirming it's the
11 same opinion.
12          And let's move forward, and we
13 get to Paragraph 92. And it looks like
14 starting at Paragraph 92 most of that is blue
15 underline.
16          And so it looks like this
17 narrative discussion that begins at
18 Paragraph 92 and then concludes -- let's just
19 go through the end of Paragraph 94.
20 Paragraph 94 had several subparts to it,
21 correct?
22     A.   Yes.
23     Q.   This is all information that's
24 been added since the Kahn report. This is a
25 new sort of narrative that you've prepared

Page 196

1  here?
2      A.   So, some of the things that are
3  in Paragraph 94 were in the Kahn report; but
4  this narrative was drafted to be more clear.
5           And I tried to make it very
6  clear because I do think there was some
7  confusion over whether or not there were
8  information that I was -- had reviewed or not
9  and what opinions I formed.
10          So I'm making it very clear.
11 These are all of the different pieces of
12 evidence that I think are important to any
13 analysis over time. That's what 94 is,
14 building over time.
15     Q.   Uh-huh.
16     A.   And the reason that this ICH
17 discussion is here, is that is relevant
18 to -- I thought it was important in this
19 report to talk a little bit more about label
20 harmonization because there is testimony
21 about that, that I talk about.
22          And that was post-2008, so it
23 wasn't something that was described in my
24 Kahn report.
25     Q.   And if we focus on this

Page 197

1  section --
2           MR. MICELI: Doug, can I
3      interrupt you?
4           MR. MOORE: Yes.
5           MR. MICELI: We've been going
6      for about an hour; and if you're
7      getting ready to get into the 19
8      subpoints of Paragraph 94, can we take
9      a quick break?
10          MR. MOORE: Let me cover a
11     couple of things, and we will take a
12     break before we get to Point 1.
13          MR. MICELI: Okay.
14     Q.   (By Mr. Moore) I just want to
15 make sure I understand what you've done for
16 preparation of kind of the points that are
17 contained here, which really are the subject
18 points to this narrative, sort of chronology,
19 that you've included in your report that
20 begins at Paragraph 94.
21          So what is the methodology, the
22 scientific methodology you're employing, when
23 you go through this section of the report?
24          Is it looking at testimony and
25 looking at exhibits and then making

50 (Pages 194 - 197)

Page 198

1  statements about what the company knew?
2       MR. MICELI: Object to the
3    form.
4    A.   No, I would say that the
5  methodology I'm using is -- the question I'm
6  trying to answer is: What is my evidence to
7  say I -- that summary opinion you've read, I
8  said, there is some basis to believe. Right?
9  Based on duration, severity. You know, you
10 asked me about that summary opinion; and that
11 is my opinion.
12      So now I'm going to be stepping
13 through the evidence that develops. As a
14 regulatory expert, someone who deals with
15 these issues, the method you would use would
16 be to look at what I laid out for you: What
17 was known and when did they know it? And
18 what could have been done, based upon what
19 you're supposed to do under the regulatory
20 paradigm as a prescription drug manufacturer?
21      So those are the pieces of
22 evidence that I'm looking for within the
23 documents.
24      I do apply weight of the
25 evidence here as well. So, for example, if I

Page 199

1  have -- looking at -- if I'm talking about
2  what they could have known, that's probably
3  the hardest one to deal with, what could they
4  have known.
5       Because there are some -- you
6  know, there's the standard, what they are
7  supposed to be doing; but then the question
8  is: What am I pointing to and how easily
9  accessible was that information?
10      And it is a type of information
11 that drug companies or this company, we know,
12 tended to look for and collected, because
13 there are different kinds of companies and
14 different levels of experience, somebody who
15 has their first drug on the market, somebody
16 who has been at the company that has been
17 operating for years in this space.
18      So the weight of the
19 evidence -- a paradigm is also used looking
20 at what I have, how much of it I have, and
21 whether or not I see a consistency in the
22 information.
23      So when I talk about what the
24 company knew, it's not just one person in the
25 company that knew; but there's multiple

Page 200

1  individuals in the company that admit they
2  know something. So that's the weight of the
3  evidence type approach that you apply.
4       But it's really a process
5  driven by the regulatory standard and using
6  that to compare against the information
7  available.
8    Q.   And the information available
9  is just the documents and the testimony?
10   A.   And the scientific literature,
11 too. And what I know about the toxicity
12 generally. In other words, I know that PCIA
13 is something that -- you know, I talked about
14 that in my first report.
15      It's biologically plausible.
16 We know that this drug -- that this drug is
17 attacking hair follicles. Right? So we know
18 that those things occur. So it's all of that
19 as well.
20      But it is -- most of the
21 evidence I'm citing is going to be either
22 from the scientific literature or it's going
23 to be from the company's internal documents
24 or the company's clinical data, and/or the
25 testimony around that.

Page 201

1    Q.   And the conclusions you're
2  drawing in these various subpoints about
3  knowledge or availability of knowledge,
4  you're basing that based on the particular
5  citations to the particular pieces of
6  evidence that are referenced in the
7  particular subpoint?
8    A.   Yes. If you're talking about
9  Paragraph 94 with the subpoints, that's how I
10 approached that, yes.
11      I tried to lay out for you so
12 you would really have a clear understanding
13 of what document I'm talking about, what
14 pieces of that document were important to me,
15 and what I believe that document -- how that
16 fits into the puzzle of some basis to
17 believe.
18      Now, I stepped through it
19 chronologically because I have to in this
20 case because I have a time period that I have
21 to stop at.
22   Q.   The time period you have to
23 stop at is Ms. Earnest's prescription?
24   A.   What was known or could have
25 been known at the time of her prescription,