# EXHIBIT B

**SUPPLEMENTAL REPORT**
**Dr. Laura M. Plunkett, Ph.D., DABT**
**April 29, 2022**

This supplemental report was prepared at the request of Plaintiff's counsel and provides additional opinions that I have formed based on my training and experience as well as my review of publicly available documents, documents produced during litigation by Sanofi Aventis (hereafter referred to as Sanofi) as part of a discovery process, deposition testimony and exhibits to depositions of company representatives, as well as expert reports and deposition testimony of other experts[1] in the litigation. My opinions relate to the use of Taxotere in the adjuvant care of early-stage breast cancer.

The opinions I have formed relate to the pharmacology and toxicology of Taxotere, and the impact of such effects on Sanofi's regulatory and labeling obligations, as demonstrated through the documents, testimony, and literature cited herein, and included in my Appendix A ("Materials Reviewed"). I have considered how, when viewed in the context of the totality of the evidence, the toxic effects of Taxotere that were observed in humans demonstrate "some basis to believe there is a causal relationship" between Taxotere and the adverse reaction of permanent-chemotherapy-induced alopecia.[2] Further, and also based on the totality of the evidence, Sanofi was obligated to update its Taxotere label to provide physicians and their patients with accurate adverse reaction information so that they can make fully informed choices on the use of Taxotere. My additional opinions were developed because Plaintiff's prior regulatory expert, Dr. David Kessler, is currently unable to serve as an expert in this case after taking a new position to head up vaccine development and distribution efforts in the Biden-Harris administration. Dr. Kessler provided testimony about the addition of information related to toxic adverse effects of Taxotere, specifically adding the risk of persistent or irreversible alopecia associated with Taxotere use, to the adverse reactions section (Section 6) of Taxotere's prescription drug labeling. Although I had earlier testified that I was not providing regulatory opinions, Dr. Kessler's withdrawal from the

---

[1] The expert reports and/or depositions reviewed included those of experts for the defense (*i.e.,* Dr. Glaspy, Dr. Chang and Dr. Freites-Martinez) and experts for the plaintiff (*i.e.,* Dr. Madigan, Dr. Feigal, Dr. Bosserman, Dr. Kessler).

[2] Throughout this report I use the terms CIPAL/PCIA, permanent, irreversible and persistent alopecia to refer to the same adverse reaction.

case has changed the situation, and counsel asked that I review additional material and evaluate whether the toxic effects of Taxotere demonstrate some basis to believe that a causal relationship exists between exposure to Taxotere (docetaxel) and permanent chemotherapy-induced alopecia (PCIA). The following is a discussion of my additional opinions and the basis and support for my opinions. Also included in this supplemental report is a discussion of additional materials I reviewed in forming my opinions, ones that were not included in my list of reliance materials in Appendix C of my March 13, 2020, report (hereafter referred to as my "March Report"). Additionally, I understand that the court has made rulings concerning my March Report and proposed testimony. Subject to those rulings, I incorporate by reference the remaining opinions set out in my March Report. All opinions expressed in this supplemental report are based on my review of all materials referenced in my March Report (including the appendices to that report), my review of additional materials as listed in Appendix A to this report, my knowledge, training, and experience as a pharmacologist and toxicologist, my prior work as a consultant to the regulated drug industry, as well as my experience working as an expert in prior litigation.[3]  All opinions expressed in this report are stated to a reasonable degree of scientific certainty.

## IX.    Additional Information on Qualifications and Training

65.    My March Report includes a description of my qualifications and training (paragraphs 1 thorough 8). I would like to provide additional discussion of my experience and training in the area of FDA regulations for human prescription drug products and the role, duties, and obligations of a drug manufacturer like Sanofi under the applicable sections of the Code of Federal Regulations (CFR), and with respect to ensuring that physicians and patients are timely provided with accurate, complete, and up-to-date information about the risks and benefits of the drug company's products. My work as a toxicologist includes, significantly, investigating the adverse/ toxic effects and risk profile of drug products.

66.    I am a pharmacologist, toxicologist, and patent agent that specializes in regulation of products by the United States Food and Drug Administration (FDA). I am a partner in a

---

[3] My litigation work has included cases in the Eastern District of Louisiana including the Xarelto litigation and the Vioxx litigation, as well as cases in Louisiana state court such as my work on behalf of the Attorney General for the State of Louisiana in the Risperdal litigation.

company known as BioPolicy Solutions LLC (BPS). BPS was formed just after I completed my March Report and has offices in Houston, TX, and Ventura, CA. It is a boutique consulting firm that focuses on emerging technologies and their use in the development of consumer products. Consultants at BPS work at the interface of biological science, regulatory affairs, and business decisions to provide its clients with science-based solutions to issues associated with development and marketing of products. Before BPS was formed, I was a principal in the consulting firm known as Integrative Biostrategies, LLC (2001 to 2020) and head of a consulting firm known as Plunkett & Associates (1997 to 2001).

67.    I am board-certified as a Diplomate of the American Board of Toxicology (DABT). I also am a registered patent agent (USPTO Registration No. 45,015). I am a member of several professional organizations and have authored or co-authored numerous scientific publications, including a book chapter on pharmacovigilance practices in the United States, one on the regulation of food additives, and another related to drug injuries related to the prescription drug ketorolac (listed in Appendix B). I have over thirty years of experience providing regulatory support to companies manufacturing and marketing products regulated by the FDA, and in the areas of pharmacology and toxicology. I have worked in both government and academic research. I have taught pharmacology and toxicology at the undergraduate and postgraduate levels and have lectured on US laws and regulations related to human drugs, devices, foods and cosmetics.

68.    My experience over the last thirty years (starting in 1989 at ENVIRON Corporation) has included a great deal of work concerning products regulated by the FDA, including human prescription drugs. I have acted as a resource to my clients for projects dealing with many different aspects of the FDA regulations that relate to human prescription drugs during all parts of the lifecycle of a drug product. In every project, I apply my skills in pharmacology, toxicology and human health risk assessment. I have advised my clients on regulatory issues and strategies for their products (relating to both Canadian and American regulations), designed preclinical and clinical studies for both efficacy and safety, advised clients on issues related to statements regarding efficacy and warnings for their products based on the current labeling regulations, and generally acted as a regulatory affairs staff for small companies in their early stages of product development. This work began in 1989 when I joined ENVIRON Corporation.

3

At ENVIRON, our clients were mainly large companies that were developing products regulated by the FDA or attorneys representing such clients. At ENVIRON between 1989 and 1997, I worked on projects for most of the large pharmaceutical companies that did business in the US in the 1990's including Johnson & Johnson, Schering Plough, Merck, Abbott, Eli Lilly, Glaxo Welcome, *etc*. When I left ENVIRON in 1997, I continued to work on projects related to human drug development and FDA regulation of drugs. Over the years since 1997, my work has been focused more on smaller companies or start-ups, often as a result of my work with inventors and their desire to move their inventions from the laboratory to the marketplace. The work in the area of FDA regulation of drugs from 1989 through 2021 (non-litigation projects) has included projects where I have drafted parts of FDA submissions (*e.g.,* INDs, NDAs, sNDAs), designed and monitored preclinical and clinical studies that were planned for use as part of an FDA drug approval process, advised clients on regulatory strategies for new products, including products that would be sold as drugs, advised clients on the type of information that would be need to be collected in order to populate a drug label, assisted in developing standards for safety signal detection, and generally assisted clients with understanding their responsibilities under the FDA regulations.

69.     As I stated in my March Report, with respect to my experience that is directly relevant to the issues in this case, I have done a great deal of work on projects that have required me to examine the demonstrated risks associated with exposure to drugs of all types, through their pharmacologic and toxicologic activity, including drugs to treat cancer. I have worked on many projects involving mechanisms of action of drugs, as well as mechanisms that underlie the ways that drugs and chemicals produce their toxic effects in humans and in animals. I have assisted clients in obtaining patent protection for inventions related to anti-cancer drug products or treatments. In addition to training in FDA regulations that was a result of my work with former FDA officials (at ENVIRON) and with the regulated community, I received training from the Food, Drug and Law Institute (FDLI) on the regulation of FDA products, including courses that focused on human prescription drug products. In addition to attendance of courses early in my consulting career that focused on overviews of FDA regulation of drugs, medical devices and foods, I continue to stay current in my education on changes to the Food Drug & Cosmetic Act (FDCA) as they occur to ensure that I am familiar with the current FDA regulations and the impacts

such changes may have on my clients. I have lectured to graduate students, law students and pharmacy students on FDA regulations, including the regulations that apply specifically to human prescription drugs, both general overview lectures on the development, labeling and marketing of prescription drugs in the US and lectures specifically discussing strategies for reducing adverse reactions related to prescription drug products.

70.     I have testified in both state and federal courts on the FDA regulations that apply to prescription drugs in the US, including the labeling of human drugs. Pharmacology and toxicology data are critical to the information conveyed to physicians in prescription drug labeling, including but not limited to the warnings/ precautions and adverse reactions sections of drug labels. It is the pharmacology and toxicology of a drug product that forms the basis for the risk-benefit assessments that are required before a drug product is approved for use in humans. As part of my work in litigation, and based on my training and experience, I have addressed the general pharmacology and toxicology of drug products, the importance of pharmacokinetics and drug metabolism information to understanding the risks and benefits posed by certain drug products, standards for establishing safety and efficacy of human drugs, safety signal detection methods and analyses for marketed drugs, labeling requirements for human drugs, labeling changes necessitated by new toxicity information that is identified after drug approval, the scientific standards that apply to inclusion of toxicity information in different sections of a drug label, and the importance of postmarket surveillance activities to ensuring patient safety.

71.     Although my March Report provides a description of the general methodology used in forming my opinions during this litigation, a methodology that remains unchanged, I would like to discuss in a bit more detail the literature searches I have done related to the link of different drugs used to treat early-stage breast cancer and CIPAL/ PCIA. I performed such searches because there has been discussion in the litigation of a small number of case reports of permanent or irreversible alopecia with use of drugs other than Taxotere (see the expert report of John Glaspy at pages 23-25). As a result, I searched the publicly available literature to identify cases of CIPAL/PCIA[4] that may have been reported in association with other drugs used to treat early-stage

---

[4] As I discussed in my March Report, CIPAL/ PCIA refers to names found in the scientific literature for permanent, irreversible alopecia. "CIPAL" is chemotherapy-induced permanent alopecia, and also is referred to by some

breast cancer. The databases I searched included the NIH database known as "PubMed" as well as a subscription database known as Dialog®. I also looked at the labeling for such drugs that can be found on the FDA website (drugs@FDA) and reviewed the FAERS analyses performed by Dr. Madigan related to this issue. The drugs that I focused on included Taxol, an alternative taxane agent used to treat early-stage breast cancer, and cyclophosphamide, 5-FU, and Adriamycin (doxorubicin), as those three drugs were studied by Sanofi in their Taxotere clinical trials. I also searched for information in the literature and labeling for drugs mentioned by Dr. Glaspy[5] that are not standard treatments for early-stage breast cancer.

## X.      Regulation of Human Prescription Drug Products in the United States

72.      In order to manufacture and sell a human drug product in the US, federal law requires that a company obtain approval from the FDA (21 USC § 355(a)).[6] The manufacturing and marketing of all human prescription drug products are regulated by the FDA; these regulations are found at 21 CFR § 200 through 499 (in particular).  FDA regulations pertain to the approval of new drug products, as well as the continued marketing of drugs once approved for human use. This includes a company's obligation to update its product label to accurately reflect the toxicities and adverse effects associated with product use. Sanofi Aventis (hereafter referred to as Sanofi), through its predecessor Rhone-Poulenc Rorer, was the company that submitted the Taxotere NDA. As a result, Sanofi is responsible for complying with all applicable regulations set forth in the CFR, as well as ensuring that its label accurately reflects Taxotere's adverse effects profile.

73.      With respect to development of human prescription drug products, the FDA does no testing itself. This means that the FDA does not conduct or monitor clinical trials, nor does the FDA choose the investigators involved in the clinical trials or the sites where the study is conducted. Instead, the FDA relies on drug companies to conduct all testing, preclinical, clinical and post-marketing, and to provide the agency with the results of testing that are accurate and reliable, show that the drug has therapeutic activity, and show that the drug is safe for use in

---

physicians as "PCIA" or permanent chemotherapy-induced alopecia.  Because it is a toxicity that results in lack of hair regrowth, permanent, irreversible hair loss is a different condition from chemotherapy-induced, or drug-induced, alopecia.

[5] These drugs included carboplatin, methotrexate (part of CMF), cisplatin, epirubicin, etoposide, and busulfan.

[6] *"No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug."* [21 USC § 355(a)]

humans. This includes analyzing data concerning new adverse reactions when a company's drug is tested in a new population or for a new indication, as Taxotere was in TAX316.[7] The FDA makes its decisions about drug approval and labeling based on the information provided by the applicant in its New Drug Application, or NDA (or in a supplemental NDA known as a sNDA). There is a resource at FDA's website denoted "Drugs@FDA" (https://www.accessdata.fda.gov/scripts/cder/daf/) where I was able to access not only the chronology of Taxotere labeling changes since the drug was first approved for use in May of 1996 up to the most recent change on 15, May 2020, but also the review documents generated by the FDA reviewers and letters reflecting different review decisions made by the FDA over time. I referred to this website in order to obtain copies of Taxotere labels. This same website was referred to for copies of labels of other chemotherapeutic drugs discussed in my March Report and in this supplemental report (*e.g.,* labels for Taxol, cyclophosphamide, Adriamycin/doxorubicin, 5-FU, *etc.*).

74.     In addition to clinical study data, the data companies develop includes preclinical (*i.e.,* non-human) data that examines the pharmacology of the active ingredient, as well as the toxicology of the active ingredient and the formulated drug product. The toxicology studies that companies sponsor or perform typically are animal studies that use common mammalian species such as rats, mice, and dogs. In some cases, studies may be performed using non-human primates, pigs, guinea pigs and rabbits. These preclinical studies form the basis of the submission to the FDA referred to as the Investigational New Drug (IND) application. Also submitted with the IND application is a proposed clinical testing plan. Once the FDA has reviewed and approved the IND application, clinical testing can begin. Clinical studies for human prescription drugs typically include three phases (*i.e.,* Phase I, Phase II and Phase III).

75.     Phase I clinical studies typically are performed in healthy adults and are designed to investigate the pharmacokinetics of the drug product under development and to identify safe

---

[7] TAX316 is only one of two randomized clinical trials that directly compares chemotherapy regimens for the adjuvant care of early-stage breast cancer, with long-term follow-up. As a result of its design, the trial gave Sanofi its first opportunity to investigate the long-term toxicities of Taxotere. [See Glaspy deposition dated 1/9/2020 at pages 60:9 to 63:10; 45:6 – 46:21; Mackey *et al.* 2013. Adjuvant docetaxel, doxorubicin, and cyclophosphamide in node-positive breast cancer: 10-year follow-up of the phase 3 randomized BCIRG 001 trial. *The Lancet Oncology* 14:79]

doses for human testing. Phase II clinical studies typically are performed in patients, and are the first studies of human efficacy, but also include measures of human safety. Phase III clinical studies are often referred to as "pivotal" clinical studies because they are the studies upon which the FDA bases its final determination of whether the drug is safe and effective for use in humans for the indication that will be on the drug's label. Phase III studies are large (usually thousands of patients), complex and expensive to perform. As a result, Phase III clinical studies should be carefully designed in terms of the characteristics of the patients included (*e.g.,* inclusion versus exclusion criteria are applied), the number of patients studied, and the endpoints used to determine both efficacy and safety. In this report, TAX316 was one such Phase III study that Sanofi conducted to expand the use of Taxotere to include a new indication for the adjuvant treatment of patients with operable node-positive breast cancer.[8]

76.     A fourth type of study that may be performed after a drug is marketed, or approved for marketing by FDA, is a Phase IV study. Phase IV studies typically are performed in humans and can include both controlled clinical studies and observational studies; they are designed to answer a specific safety question that needs to be addressed. In some FDA approval decisions, the agency may mention that there is a "Phase IV commitment" that is part of the approval decision, meaning a manufacturer is expected to perform the study immediately in the initial phase of marketing. Sanofi's TAX316 study also included a post-marketing commitment to complete the 10-year follow-up of study patients.[9]

77.     As mentioned above, the FDA does no clinical testing itself. Thus, the FDA, like physicians and their patients, must rely on drug manufacturers to properly design and conduct the clinical trials that are used by the FDA in their NDA/sNDA approval decisions, *i.e.,* when the Agency determines whether a drug is safe and effective for its indicated use. Similarly, the FDA, physicians and their patients must rely on drug manufacturers to provide full and accurate reporting and disclosure of all clinical study data and analyses performed. It also is important to understand that before approval a drug has only been tested in a relatively small population of patients, as compared to the overall population that will use the drug, and that the patients in the trials were

---

[8] 20-449/s_029, Approval Letter
[9] *Id.*

selected to be as homogeneous as possible in terms of the characteristics of the patients; the population was selected to control for inter-individual differences that might affect drug response. As a result, the clinical testing done pre-approval often is incapable of detecting infrequent or rare adverse events, events that may have a long latency, or events that affect types of patients not included or inadequately represented in the pre-approval testing (Strom, B.L.  2006. What is pharmacoepidemiology? In: *Textbook of Pharmacoepidemiology*, Strom and Kimmel (eds.), John Wiley & Sons, Ltd.: Hoboken, NJ, chapter 1).  It has been estimated that a study would need to have more than 600,000 subjects in order to have 95% chance of detecting adverse events that may affect one to two patients per 1000 subjects tested (Lasagna, 1983. *JAMA* 249:2224-2225).  This is one reason why postmarket surveillance and proactive identification of drug-related safety concerns, and the new analysis of data and timely reporting the of newly discovered risks, are such important obligations for the company in the FDA regulatory process.  This is particularly so when a drug like Taxotere is being studied in a new population for a new expanded indication, as it was in TAX316.  Sanofi had no prior experience in a clinical study with long-term follow-up of women whose goal was to be cured of their early-stage breast cancer.[10]

78.     Labeling for a human drug product is written by the manufacturer, not the FDA. In the case of the initial labeling for a human prescription drug product, there is a negotiation process that occurs between the company and the FDA that results in an agreement being reached about the initial product labeling language. After a drug has been marketed, it is the NDA holder (in this case Sanofi) that is responsible for drafting changes to labeling and ensuring that the product's label remains an accurate reflection of the safety and efficacy of the drug during the post market period. The term labeling includes all advertising and promotional materials.[11]  This would include materials such as Sanofi's *"Partnering With Your Patients Along Their Journey,"* what it called a

---

[10] Glaspy 1/9/2020 deposition at pages 59:9 to 63:10; 45:6 to 46:21; Jean-Philippe Aussel deposition at pages 39:22 to 43:6; 50:9 to 51:1.

[11] As explained by FDA employees in a recent paper (Kalola and Dean, 2019): *"See 21 U.S.C. 352(a); 21 U.S.C. 352(n). The term "labeling" has been interpreted broadly by the U.S. Supreme Court to include materials that supplement or explain an article. Kordel v. United States, 355 U.S. 345 (1948) (holding that the term accompanying such article" does not restrict the definition of labeling to materials that physically accompany the article). No physical attachment is necessary between the materials and the article; rather, the textual relationship of the items will determine whether the printed, written, or graphic material constitutes labeling. This includes both FDA-required labeling and promotional labeling."*

"comprehensive chemotherapy patient care kit," and the "Nurse Tear Sheets" in the kit.[12] Specifically speaking, when Sanofi states in its Alopecia tear sheet that *"alopecia is a common, yet temporary, side effect,"* the statement must be consistent with what is described in the approved labeling; this is because the marketing piece is an extension of Taxotere's label. When Sanofi includes this information in the tear sheet it is saying to physicians and patients, "this is what our label means." Also, a Medication Guide is labeling intended for distribution directly to patients. In addition, letters or communications described in 21 CFR § 200.5, commonly referred to as "Dear Doctor Letters" or "Dear Healthcare Provider Letters" are regulated under the CFRs, the rules drug companies must abide by, and the agency asks that companies consult with them before disseminating such information to make sure that the letters are fair and balanced, and accurate, just like all other forms of communication with physicians.[13]

79.     Federal regulations require the manufacturer/ NDA holder to include in the labeling of its products complete and accurate information about health risks, adequate instructions regarding use of the drug product, and adequate warnings to ensure that patient health is protected (*e.g.,* 21 CFR § 201.56; 21 CFR § 201.57; 21 CFR § 314.70; 21 CFR § 314.80). The manufacturer has the responsibility for drafting the initial labeling for their product and for ensuring that the labeling continues to reflect current knowledge concerning risks posed by the drug (see 21 CFR § 314.80 entitled *"Postmarketing Reporting of Adverse Drug Experiences"*). In the text of 21 CFR § 314.80, it is stated: *"Each applicant having an approved application under § 314.50 or, in the case of a 505(b)(2) application, an effective approved application, must promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience, postmarketing clinical investigations, postmarketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers."* Thus, there are a variety of sources of information that Sanofi is, and was, at all times responsible for monitoring. As a result of information identified as part of these duties under 21 CFR § 314.80, the manufacturer can make changes to its labeling by obtaining prior approval of a supplemental NDA

---

[12] Sanofi_01038470; Gerrit-Jan Nijveldt deposition date 2/15/2018 at pages 56:18 to 57:9.

[13] https://www.fda.gov/files/drugs/published/Dear-Health-Care-Provider-Letters--Improving-Communication-of-Important-Safety-Information.pdf

submission (sNDA; 21 CFR § 314.70(c)), or, alternatively, without first obtaining FDA agreement and submitting a supplement to its NDA, if the change is to *"add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under 201.57(c)"* (21 CFR § 314.70(c)(6)(iii)(A)). As part of its sNDA 020449_S029 for use of Taxotere in adjuvant care of early-stage breast cancer, Sanofi declared (specifically the pages were signed by the Director of U.S. Regulatory Affairs, Mr. Daniel Bollag) under the penalty of criminal prosecution that it would abide by, among other things, FDA regulations related to updating of its labeling for Taxotere regarding safety information. Specifically, Sanofi declared (document from the Administrative Correspondence file Taxotere; pages 52-53 of 120):

> *"I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings. precautions, or adverse reactions in the draft labeling. I agree to submit Safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following*
>
> > *1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, parts 908, and/or 820;*
> >
> > *2. Biological establishment standards in 21 CFR Part 600.*
> >
> > *3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.*
> >
> > *4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.*
> >
> > *5. Regulations on making changes in applications in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601 12.*
> >
> > *6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.8O, and 600.81.*
> >
> > *7. Local, state and Federal environmental Impact laws."* …
> >
> > *… Warning: a willfully false statement is a criminal offense, U.S. Code, title 18, section 1011."*

80.     All prescription drug products marketed in the US are required to have a label (sometimes referred to as a package insert) setting forth, among other things, the identity of the

product, its manufacturer, and directions for use (see, *e.g.,* 21 CFR § 201.1 through § 201.26). Also included in the label is information on the most serious health risks associated with use of a drug.

81.     Drug labeling is regulated in terms of general requirements on its content (21 CFR 201.56) as follows:

*"Sec. 201.56 Requirements on content and format of labeling for human prescription drug and biological products.*

*(a) General requirements. Prescription drug labeling described in § 201.100(d) must meet the following general requirements:*

*(1) The labeling must contain a summary of the essential scientific information needed for the safe and effective use of the drug.*

*(2) The* **labeling must be informative and accurate and neither promotional in tone nor false or misleading in any particular**. *In accordance with §§ 314.70 and 601.12 of this chapter,* **the labeling must be updated when new information becomes available that causes the labeling to become inaccurate, false, or misleading**.

*(3) The labeling must be based whenever possible on data derived from human experience. No implied claims or suggestions of drug use may be made if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness. Conclusions based on animal data but necessary for safe and effective use of the drug in humans must be identified as such and included with human data in the appropriate section of the labeling." [emphasis added]*

The labeling regulations also dictate what information must be included in the label, as well as how that information is presented (21 CFR § 201.57 entitled *"Specific requirements on content and format of labeling for human prescription drug and biological products described in § 201.56(b)(1)"*). This provision requires that a drug's labeling contain *"adequate directions for use"* (including a statement of all conditions, purposes, and uses for which the drug is intended) and *"adequate warnings against use."* This latter provision becomes important when taking or administering the drug can be dangerous, posing a risk to human health. All human prescription drug products pose some risk to human health that require the addition of safety/ toxicity information to the product labeling. A label lacks adequate directions for use and adequate

warnings against use when it fails to disclose harmful side effects of taking the drug. There are several sections within FDA human prescription drug labeling where physicians and their patients are provided with warnings against use, or safety information, including the Contraindications section, the Warnings section, the Precautions section[14], and the Adverse Reactions section. In this report, I have formed opinions about the need to provide physicians and their patients with information about the association of Taxotere use with CIPAL/ PCIA in the "Adverse Reactions" section of the Taxotere labeling.

82.     In the period before drug approval by the FDA, the premarket period, the adequacy of a drug's label is assessed as part of the normal drug approval process for a NDA or a supplemental New Drug Application (sNDA); the proposed drug labeling is submitted by the manufacturer as part of the NDA or sNDA. In the post-marketing period for human prescription drug products, the FDA enforces this part of the regulations when they become aware of information, through either the drug manufacturer or through other sources, showing that the risk profile of the drug has changed, or that the use patterns of the drug have changed. But it always remains the duty and obligation of the drug manufacturer to proactively assess its drug's risks and propose labeling updates as directed by 21 CFR parts 201.57 and 314.80, among others.

83.     FDA regulations also require that a manufacturer or NDA holder update its labeling for a drug *"when new information becomes available that causes labeling to become inaccurate, false, or misleading"* ([https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources](https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources)). FDA decisions about whether a drug's label is false or misleading thus can depend on a manufacturer providing the agency with complete, accurate and timely information that they are aware exists and would impact the safety and/or efficacy of its drug. This includes the analysis of new and prior submitted data, and even the new analysis of previously submitted data alone.[15] Apart from the actual drug product label, all patient information materials such as a Medication

---

[14] It is discussed in this report how the Warnings and the Precautions sections have been merged into one label section as a result of the Physician Labeling Rule (the PLR) that was made Final in 2006.

[15] See 21 CFR 314.3 definition of "newly acquired information" which *"is data, analyses, or other information not previously submitted to the Agency, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA."*

Guide (21 CFR § 208[16]) are considered to be part of FDA drug product labeling, as are advertising and promotional materials for prescription drug products (21 CFR § 202.1); all of these materials are subject to similar standards with respect to being accurate and complete reflections of the drug's efficacy and safety profile (e.g., what the company knows) and not false or misleading (Gaur, 2019[17]). Based on my experience with drug labeling regulations and their application, as well as FDA guidance[18] on this topic, another way to describe drug labeling in "positive" terms, instead of the negative connotations of *"false and misleading"*, would be use of labeling language that is *"clear and unambiguous"*.

84.     As noted above with respect to updating of labeling, the issue of *"when new information becomes available"[19]* is relevant. It is incorrect, however, to assert that *"new information"* must be information that has not ever been reported or known to someone. Instead, it can be a new analysis of old information, data or studies as long as the new analysis results in information that would cause the existing drug labeling to become *"inaccurate, false, or misleading"* if the change were not made (see 21 CFR 201.56(a)(2)). In the case of this litigation, this issue surrounds defining "permanent" versus "reversible" alopecia (as discussed in more detail in the next section of this report).

85.     The FDA human prescription drug regulations make clear that information regarding harmful side effects of the drug <u>must be disclosed immediately</u>. FDA allows a drug company to strengthen a warning for a drug without prior approval by the FDA (see 21 CFR § 201 and 202; Federal Register Volume 44, No. 124, June 26, 1979, Final Rule: Labeling and Prescription Drug Advertising: Content and Format for Human Prescription Drugs). In particular, the Final Rule states:

> *"The Commissioner also advises that these labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals*

---

[16] The *"Partnering With Your Patients Along Their Journey,"* Comprehensive Care Kit, including the Taxotere Nurse Tear Sheets, Sanofi_01038470, contained the same type of information as a Medication Guide and also would be considered to be drug labeling.

[17] Gaur, A. 2019 Prescription drug labeling, advertising and promotion. In: *Fundamentals of US Regulatory Affairs, 11th edition*. Chapter 19.

[18] See FDA (2009) entitled "Guidance for Industry Presenting Risk Information in Prescription Drug and Medical Device Promotion" (https://www.fda.gov/media/76269/download).

[19] https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources

*whenever possibly harmful adverse effects associated with use of the drug are discovered*. *The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., "Dear Doctor" letters containing such information) is not prohibited by these regulations. As stated above, the act and FDA regulations require a warning in drug labeling as soon as a hazard is associated with the use of a drug.  In the case of a drug subject to an approved NDA, 314.8(d) (21 CFR § 314.8(d)) permits the addition to the drug's labeling or advertising of information about a hazard without advance approval of the supplemental application by FDA." [see page 37447 at 44 FR 124] [emphasis added]*

86.     In 2008, the FDA published an update to the 1979 labeling rule (22 August 2008 Fed. Reg. Volume 73, No. 164 pp. 49603-49610). Again, the FDA confirmed that drug manufacturers have the ability to update their labeling to strengthen warnings to physicians and patients without prior FDA approval. Therefore, drug manufacturers, such as Sanofi, always have the ability under the FDA regulations to update labeling to strengthen warnings to physicians and patients. Thus, when a manufacturer has identified a safety signal for their drug product, they have the responsibility to investigate that signal (see 21 CFR § 314.80(b)) and to consider strengthening their labeling even if the evidence is still developing as it pertains to cause and effect (see 21 CFR § 201.57). These responsibilities of companies that develop and market human prescription drug products have been recognized by the companies themselves and the industry generally (*e.g.,* Allan, M.C. 1992a. *J. Pharm Technol* 8:162-167; Allan, M.C. 1992b. *J. Pharm. Technol.* 8:198-202.; Allan, M.C. 1992c. *J. Pharm. Technol.* 8:259-273; Gibson *et al.* 2008. *Pharmacoepidemiol. Drug Saf.* 17:110–114).

87.     With respect to patient safety information that is included in prescription drug labeling, the regulations provide specific direction as to where information is to be listed and the distinctions between the types of safety information that appear on a drug label. Before implementation of the Physician Labeling Rule (PLR) in 2006, the content of human prescription drug labeling contained four major sections that related directly to patient safety and warnings to physicians about these safety issues; these sections were required in labeling and described in 21

15

CFR § 201.57 (2006) sections (d) through (g). Since Taxotere was developed and marketed before implementation of this rule and is still marketed today, both the regulations in place before January 2006 (*i.e.,* referred to herein as pre-PLR regulations) and those after 2006 (*i.e.,* PLR regulations) are relevant.

88.     Pre-PLR, the major patient safety sections of a human prescription drug label included "Contraindications," "Warnings," "Precautions" and "Adverse Reactions." The pre-PLR regulations stated that the "Contraindications" section of the labeling *"shall describe those situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit."* (21 CFR § 201.57(d)(5)). The regulations stated also that the "Warnings" section of the label *"shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur."* (21 CFR § 201.57(e)). The regulations stated that the "Precautions" section must contain a description of special care instructions to be exercised for safe and effective use of a given drug product. Typically, the "Precautions" section has information relating to, for example, laboratory tests, drug interactions, pregnancy information, and geriatric use (21 CFR § 201.57(f)). The "Adverse Reactions" section of the label is a section where undesirable effects, *i.e.,* "adverse reactions", are listed (21 CFR § 201.57(g)). The standard applied pre-PLR for adding a Warning statement (21 CFR § 201.57(e)) was *"as soon as there is reasonable evidence of an association of a serious hazard with a drug; **a causal relationship need not have been proved"** [**emphasis** added].* The standard applied pre-PLR for adding a toxic effect to the "Adverse Reactions" section also was not definitive proof of causation but instead was *"an adverse reaction is an undesirable effect, reasonably associated with the use of the drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence"* (21 CFR 201.57(g)). The pre-PLR regulations also included provisions for listing the frequency with which adverse reactions have occurred (pre-PLR provision 21 CFR § 210.57(g)(2)). It is important to note that the fact that the FDA labeling regulations do not require proof of causation before toxicity information is added into a drug label is an opinion held by the former FDA Commissioner, Dr. David Kessler[20], and also was agreed to

---

[20] See expert report of Dr. David Kessler at pages 2-4 (Supplemental Report dated October 21, 2019).

by Sanofi's regulatory expert, Dr. Janet Arrowsmith.[21]  I agree with this as well.  Thus, there is no controversy surrounding the standard that applies to FDA drug labeling in terms of <u>not</u> requiring proof of a cause-and-effect relationship in order to add a toxic reaction, or adverse reaction, into a drug's labeling.

89.     Therefore, while I am not offering causation opinions in this case, it is important to note that the standard for drug labeling was, is, and always has been, less than the standard of a full causation analysis as is undertaken when scientists are assessing the weight-of-the-evidence when applying Bradford Hill considerations for general causation.

90.     On January 24, 2006, the FDA published the final rule that amended the requirements for the content and format of labeling for human prescription drug and biological products (PLR); the PLR has been discussed in recent guidance.[22] The PLR was developed to make the information found in prescription drug labeling easier for health care practitioners to access, read, and use. Under the PLR, labeling now includes three sections: Highlights of Prescribing Information (Highlights), a Table of Contents (Contents), and the Full Prescribing Information (FPI). Even with these format changes as part of the PLR, however, the standards for drug labeling have remained the same in terms of the types of information required to be presented and the obligation of the manufacturer to continually update the labeling when new safety information is identified.  It should be noted that the Final Rule states that the adverse reactions section is to be used as follows:

> *"This section must describe the overall adverse reaction profile of the drug based on the entire safety database. For purposes of prescription drug labeling, an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence. This definition does not include all adverse events observed during use of a drug,* **only those adverse events for which there is some basis to believe there is a causal relationship**

---

[21] See 7/29/2020 deposition of Dr. Arrowsmith at pages 57:1- 21 (Discussing 21 CFR § 201.57(c)(7)) and 164:23 – 165:25 (Dr. Arrowsmith confuses the standard for a Warnings/Precautions – "reasonable evidence of a causal association, causation need not be proven" – and Adverse Reactions – "some basis to believe a causal relationship exists between the drug and the adverse reaction.").

[22] https://www.fda.gov/downloads/drugs/guidances/ucm075082.pdf (last viewed 15 December 2019).

*between the drug and the occurrence of the adverse event." [emphasis added] [see PLR*
*Final Rule at Fed. Reg. 71, No. 15, January 24, 2006 at 3990]*

Thus, the standard in terms of when to include information in a drug's label is not a causation standard but, instead, the fact that information exists such that there is some reason to believe that the drug and the reaction are causally related to one another. Interestingly, and as mentioned above, Janet Arrowsmith M.D., Sanofi's regulatory expert, agrees that 21 CFR 201.57(c)(7) provides the appropriate standard for including an adverse reaction in Section 6 of a drug label.[23] In addition to the discussion of the standard for adverse reactions and labeling, the Final Rule also discusses events that occur in clinical trials. The Final Rule states:

*"For adverse reactions with significant clinical implications, the listings must be*
*supplemented with additional detail about the nature, frequency, and severity of the*
*adverse reaction and the relationship of the adverse reaction to drug dose and*
*demographic characteristics, if data are available and important." [see PLR Final Rule*
*2006 at 71 Fed. Reg. 3922-3997 at 3990-3991]*

Thus, severity and duration information also must be included, if available (FDA, 2006; 21 CFR § 201.57(c)(7)(ii)(A)). Although I am not a physician, as a pharmacologist and toxicologist I am often asked to assess clinical data and to identify toxic reactions, or adverse reactions, that would be important patient safety concerns, *i.e.,* have implications for clinical use. Thus, in this case, I have applied my education, training and experience in pharmacology, toxicology, human physiology, and FDA regulations in forming my opinion that Sanofi should have updated its Taxotere label, and specifically (and at a minimum) the Adverse Reactions section (Section 6), to include information on CIPAL/ PCIA.  Sanofi knew or should have known that evidence supported *"some basis to believe there is a causal relationship between"* Taxotere and PCIA, and that its duration and severity was different than common, reversible chemotherapy induced alopecia.

91.     Given that it is the Adverse Reactions section of the Taxotere label that is applicable in this case, it also is important to note that FDA has issued guidance for manufacturers of human

---

[23] See J. Arrowsmith deposition, 7/29/2020 at pages 56:9 to 59:16 ("Q. So the standard for adding an adverse reaction to the label, there must be some basis to believe that there is a causal relationship between the drug and the occurrence of the adverse event, right? A. That's correct.", *Id.* 57:10-16)

drugs on the format and content of the adverse reactions section of the label.[24] In its guidance, the agency discusses how to determine what types of information to include in the Adverse Reactions section of a drug label as well as how to present the information. With respect to the process of choosing adverse events for inclusion in labeling, the guidance states:

> *"Decisions on whether there is some basis to believe there is a causal relationship are a matter of judgment and are based on factors such as: (1) the frequency of reporting, (2) whether the adverse event rate for the drug exceeds the placebo rate, (3) the extent of dose-response, (4) the extent to which the adverse event is consistent with the pharmacology of the drug, (5) the timing of the event relative to the time of drug exposure, (6) existence of challenge and dechallenge experience, and (7) whether the adverse event is known to be caused by related drugs."[FDA Guidance, 2006 at page 8]*

Then, with respect to information on adverse reactions that might be found in clinical trial data, the agency states:

> *"The presentation of adverse reactions identified from clinical trials is the major component of the ADVERSE REACTIONS section. The ADVERSE REACTIONS section must include a listing of all such reactions that occurred at or above a specified rate that is appropriate to the drug's safety database (see III.B.3), a separate listing of those adverse reactions that occurred below the specified rate, but for which there is some basis to believe there is a causal relationship between the drug and the event (see III.B.4), and, to the extent information is available and relevant, additional detail about the nature, frequency, severity, duration, dose-response, and demographic characteristics of those adverse reactions with significant clinical implications" (21 CFR § 201.57(c)(7)(ii)(A))."*

The FDA guidance provides important context for how the agency expects decisions to be made by a company.  Sanofi failed to do this in its Taxotere label.   Further, Sanofi provided inconsistent and incomplete information on PCIA.[25]

92.     Finally, with respect to standards for safety assessment for prescription drugs and postmarket surveillance, it is important to point out that since human prescription drugs are global

---

[24] Guidance entitled *"Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products: Content and Format,"* January 2006.
[25] As I have outlined in this report but also as shown in Mancini Exhibits 34, 37, 38 and 39; Pierre Mancini deposition dated 3/23/2018 at pages 273:24 - 278:22.

products, with most products sold worldwide instead of only in a single country, regulatory authorities in the major markets for human drugs have attempted to harmonize the way that such tasks are undertaken. The International Conference on Harmonization (ICH) has three regulatory authority founding members: the EC (Europe); the FDA (United States) and the MHLW/PMDA (Japan).[26] Among the industry founding members is the group known as PhRMA or the Pharmaceutical Research and Manufacturers of America, a trade organization for the pharmaceutical industry.[27] As a result of the ICH activities since its inception in 1990, a variety of initiatives have been undertaken to facilitate harmonization of regulatory principles across the world. Based on my experience over the years, it is common for multi-national human pharmaceutical companies to harmonize the labeling of their products by changing labeling for products across markets if a change is requested or made in one of the major markets, particularly with respect to safety concerns. As a result, requests for labeling changes by regulators in European countries is highly relevant to labeling in the US. Based on my experience with the regulations and guidance related to prescription drug labeling in the US, Europe, Canada, and Japan, although the format of labeling may differ across the world, and even the name of what constitutes a label may differ (*i.e.,* product insert, drug monograph, summary of product characteristics, *etc.*), all of the major markets/countries require disclosure to physicians of known risks/ patient safety concerns for prescription drugs.[28] Sanofi's Senior Director/Regulatory Labeling, Gerrit-Jan Nijveldt, testified that Sanofi attempts to harmonize labels across the world and that it maintains a Company Core Data Sheet  (CCDS) that contains the company's positions on labeling for each product, and provides the basis for worldwide labeling.[29] Mr. Nijveldt described Sanofi's procedures for labeling worldwide, including the use of the CCDS to develop labeling to include core information in all submissions for labeling, and including updates.  This is consistent with Sanofi's QSOP-000775 that Mr. Nijveldt helped create, and which describes Sanofi's goal of worldwide harmonization of labeling.[30]

---

[26] https://www.ich.org/page/members-observers
[27] Sanofi is a member company of PhRMA. See. https://www.phrma.org/About
[28] EU:  https://ec.europa.eu/health/system/files/2016-11/smpc_guideline_rev2_en_0.pdf; Japan: https://www.jpma.or.jp/english/about/parj/eki4g6000000784o-att/2020e_ch05.pdf and https://www.jpma.or.jp/english/about/parj/eki4g6000000784o-att/2020e_ch02.pdf; Canada: https://www.canada.ca/content/dam/hc-sc/migration/hc-sc/dhp-mps/alt_formats/pdf/prodpharma/applic-demande/guide-ld/monograph/pm-guid-ld-mp-eng.pdf
[29] Nijveldt deposition dated 2/15/2018 at pages 40:4 to 24, 67:18 to 68:22, 91:6 to 93:7, 346 to 358:6
[30] Sanofi_01027732, sec 4.1

**XI.     Regulatory Opinions Related to Sanofi's Actions and Taxotere**

93.     Before focusing on the need to add the CIPAL/ PCIA to the Taxotere labeling, it would be helpful to provide a discussion of the new information that helped form the basis of my supplemental opinions. In addition to the evidence discussed in my March Report, I now have reviewed additional materials that provide information that further inform my opinions regarding deficiencies in Sanofi's Taxotere labeling, and the need to provide physicians and patients with accurate, complete, clear and unambiguous information about CIPAL/PCIA. These additional materials include the reports and depositions (including exhibits) of experts: Dr. Ellen Feigal, Dr. David Madigan, Dr. Linda Bosserman, Dr. David Kessler, Dr. Azael Freites-Martinez, Dr. John Glaspy, and Dr. Ellen Chang, as well as depositions (including exhibits) of several Sanofi employees, including Jean Philippe Aussel, Amy Freedman, Emanuel Palatinsky, Suzanne Thornton-Jones, Gerrit-Jan Nijveldt, and Pierre Mancini.

94.     When forming my opinions regarding the need to add warning information into the Adverse Reactions section of Taxotere's label regarding CIPAL/ PCIA, it is important to understand what Sanofi knew, could have known, or should have known, about this new and previously unstudied adverse reaction. The testimony and documents used during depositions with company employees were highly relevant and informative in understanding Sanofi's knowledge and awareness of the difference between the typical/common reversible chemotherapy-induced alopecia seen with exposure to most chemotherapy drugs, including Taxotere, and the persistent alopecia described in the medical literature as CIPAL/ PCIA related to Taxotere.[31] Additionally, it was enlightening to see the candid responses of Sanofi's employees who admitted that they were never told about PCIA, as well as those that clearly discussed the difference between reversible alopecia and permanent, irreversible alopecia. For example, a non-exhaustive list of evidence reviewed demonstrates the following.

1)    At the time Taxotere was approved by FDA in 1996, the labeling for the drug used the term *"hair generally grows back"* after Taxotere use, a statement that was made in the context of no long-term studies on the drug that would have allowed for identification

---

[31] My March Report has a more detailed discussion of CIPAL/ PCIA overall.

of permanent or irreversible hair loss, only the common reversible drug-induced alopecia that was known to occur.[32]  Sanofi' s TAX316 study was the first opportunity to follow patients for a long time to study long-term endpoints.[33]

2) In January 2001, Jean-Marc Nabholtz, M.D. published an article in the *Journal of Clinical Oncology* that reported that 4 of 54 patients enrolled in a Sanofi-sponsored Phase II clinical study with Taxotere (in a TAC regimen) in patients with metastatic breast cancer experienced alopecia lasting longer than 2 years.[34]  The fact that Dr. Nabholtz was an investigator for Sanofi made this paper of particular importance in terms of Sanofi's knowledge over time.[35]

3) In January 2004, Sanofi received its interim 55-month follow-up report for the TAX316 study, the only long-term clinical study available at the time. The data in that report suggested a greater incidence of persisting alopecia, in the TAC arm of the study as compared to the FAC arm.[36]

4) In April of 2006, two years after Sanofi had received the interim TAX316 data, and five years after the Nabholtz publication, Sanofi had an internal meeting (at which Sanofi's US Global Safety Officer, Amy Freedman, was an invitee[37]) to discuss changing the patient information leaflet in the EU to differentiate temporary and permanent or persisting alopecia. At that meeting, draft proposals for labeling changes were made that differentiated and more specifically described the adverse reaction alopecia (hair loss) that was associated with Taxotere use; the discussion included differentiating temporary alopecia from permanent/irreversible alopecia, or hair loss "that did not reverse at the end of study."  Sanofi's former Clinical Trial Manager, Jean-Philippe Aussel agreed that Exhibit 19 to his deposition was evidence that the company was aware in 2006 of cases of alopecia that were not reversible, and that the company was discussing differentiating temporary and irreversible

---

[32] Jean-Philippe Aussel deposition at pages 39:22 to 43:6; 50:9 to 51:1; Glaspy deposition dated 1/9/2020 at pages 60:9 to 63:10, 45:6 to 46:21

[33] Glaspy deposition dated 1/9/2020 at pages 45:6 to 46:6

[34] Nabholtz *et al.* 2001. Phase II Study of Docetaxel, Doxorubicin, and Cyclophosphamide as First-Line Chemotherapy for Metastatic Breast Cancer, *J. Clin. Oncol*, 19:314-318. (the "most common treatment-related chronic non-hematologic toxicity was alopecia (87%) with long-lasting (longer than 2 years) partial alopecia in four patients").

[35] Linda Gustavson, Ph.D., 5/3/2018 deposition at pages 331:5 – 332:18; Sanofi_05097326.

[36] Sanofi_05097326 at page 136.

[37] Freedman Exhibit 11; Sanofi_05364125

alopecia based upon duration and severity.  It should be noted that this testimony by Aussel was consistent with the actions suggested by Dr. Palatinsky in 2007 (discussed below in more detail) where he recommended a change to the wording of risks specifically related to Taxotere regarding alopecia in an Informed Consent Form document to differentiate among types of alopecia that had been associated with Taxotere use (see point 4 above). Dr. Palatinsky, Sanofi's Global Safety Officer at the time, determined the words "permanent hair loss" were appropriate to characterize that particular risk in the section of the Informed Consent Form related to docetaxel. He did not recommend similar wording be included in the sections of the Informed Consent Form pertaining to cyclophosphamide or doxorubicin.  Most importantly, in April of 2006, Sanofi took no actions to provide US physicians and their patients with information about CIPAL/PCIA in April 2006.

5) Eight months later, in December 2006, Dr. Sedlacek presented findings from a clinical case series at the annual San Antonio Breast Cancer Symposium (SABCS) entitled *"Persistent Significant Alopecia (PSA) from Adjuvant Docetaxel After Doxorubicin/Cyclophosphamide (AC) Chemotherapy in Women With Breast Cancer"*.[38] Dr. Sedlacek's presentation described his experience in treating breast cancer through a retrospective review of patient data in his clinical practice.  The data that Dr. Sedlacek presented was available to Sanofi prior to the SABCS in December 2006.[39] His study would be described as a "case series" which is one type of epidemiological observational investigation. He noted in his presentation that *"the one side effect possibly most dreaded by the patient is alopecia."* He further describes that he called *"persistent significant alopecia."* ("PSA"). He reported PSA rates for three different treatment groups in his practice: PSA was observed in 6.3% in women administered doxorubicin plus Taxotere (AC/Tax; ATax; ACTax, AC/TaxXeloda;

---

[38] Sedlacek *et al.,* (2006). Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/ cyclophosphamide (AC) chemotherapy in women with breast cancer, *SABCS*.

[39] Sanofi_04633925; a document relating to a visit of a marketing person at Sanofi with Dr, Sedlacek in August 2006 it is stated *"With Dr. Sedlacek, he is bending, but not breaking. He informed you that he is no longer using dose dense for he er+ patients, but is now using traditional AC followed by Taxol. There is no reason why this should have been his regimen of choice. The excuse of permanent alopecia is a concern of his but should not stop him from giving TAC an opportunity. He even mentioned that he had limited experience in that area. Keep your sales calls consistent with him and don't back down. He likes the confrontation and I have seen you do some of your best work when pushed up against the wall with him. Don't let him off the hook!!!!!"*

AC/TaxHerceptin; ATax/CAF; CAF/Tax), while no PSA (0%) was found in women administered doxorubicin plus Taxol (AC/T; AT/T; AC/T dose dense; ATC; AC/THerceptin) and none (0%) in women administered doxorubicin without a taxane (AC; FAC; A/CMF). The comparison of the Taxotere and Taxol experiences with and without doxorubicin allowed for consideration of the contribution of each drug independently to the risk in the patients. Taxotere use was associated with an increased risk of PSA whereas PSA was not seen in patients administered doxorubicin alone or doxorubicin combined with Taxol use. Thus, these results in Dr. Sedlacek's study, when considered together, provide evidence that Taxotere (docetaxel) carried an independent risk for developing CIPAL/ PCIA.  Moreover, when Dr. Sedlacek's data are viewed in conjunction with the publication of Dr. Nabholtz and colleagues (2001), Sanofi's TAX316 interim data, and Sanofi's internal discussion of *"differentiating common, temporary alopecia and permanent persisting alopecia,"* the study provides in 2006 *"some basis to believe there is a causal relationship between"* Taxotere and CIPAL/PCIA.

6)  As mentioned above regarding Sanofi's actions in 2007, Sanofi's Global Safety Officer Dr. Emanuel Palatinsky reviewed consent language for a 2007 clinical trial involving Taxotere and indicated that "permanent" hair loss was "sufficient once" in the warnings specific to docetaxel[40]  Thus, Sanofi knew in 2007 that "permanent" hair loss was a separate injury as compared to the initial drug-induced alopecia seen with Taxotere use. Moreover, Dr. Palatinsky provided *"additional detail about the nature … severity, duration, … of [the] adverse reaction[]"* for this informed consent form, yet Sanofi failed to convey this information as required by FDA regulations. See 21 CFR § 201.57(c)(7)(ii)(A).

7)  Deposition testimony by another Sanofi employee, TAX316 Clinical Study Manager Kimberly Bassi reveals that by 2008 Sanofi was aware that the rate of persistent or irreversible alopecia in TAX316 in TAC patients (Taxotere group) was greater than double the rate in the FAC group, and that this disparity raised concern over Taxotere's

---

[40] Emanuel Palatinsky, 8/9/2018, 343:3 - 350:11, Ex. 19 to deposition.

toxicity with the European Medicines Agency (EMA), that is sometimes known unofficially as the "EMEA" or the European Medicines Evaluation Agency.[41]

8) Sanofi recognized that permanent or irreversible alopecia (CIPAL/ PCIA) was a serious and significant adverse reaction for patients, in particular women.[42] This recognition is consistent with that of regulatory authorities in Europe and the US who have described permanent or irreversible alopecia (CIPAL/ PCIA) as a serious and/or significant adverse reaction.[43]

9) Sanofi's Safety Management Committee in 2015 stated that the weighted cumulative evidence was *"sufficient to support a causal association between Docetaxel [Taxotere] and Permanent/ Irreversible alopecia in patients who receive docetaxel"* (Sanofi_03242093).   This statement mimics the findings of Dr. Nanae Hangai's 2015 clinical overview, yet much of the evidence in Dr. Hangai's overview predates 2015, including significant evidence from before June 2011 when Ms. Earnest began treatment with Taxotere.[44]  Specifically, Dr. Hangai lists the basis for her conclusion as *"Sanofi's pharmacovigilance database, worldwide scientific literature, clinical studies, and biologic plausibility."* When the events in the Sanofi pharmacovigilance database identified by Dr. Hangai are considered, it is seen that a significant number of the adverse events Dr. Hangai identified were received in 2011 or earlier (73 of 117).[45] The worldwide scientific literature that Dr. Hangai references as a basis for her statement includes Miteva *et al.* (2011) which was published before Ms. Earnest's initial use in 2011. Although Dr. Hangai does not reference other studies published after June 2011, Sanofi has a duty under the FDA regulations (21 CFR 314.80(b)) to evaluate the scientific literature as a source of adverse event reports related to use of a

---

[41] Kimberly Bassi, 8/10/2018, 301:19 – 303:3, 305:13 – 309:23, see Exhibit 13 to K. Bassi deposition.
[42] E. Palatinsky, 8/9/2018, 180:2-25; S. Gupta, 4/10/2018, 103:10 - 104:16.
[43] Sanofi_04864365; Sanofi_02540992; FDA, 2018. Voice of the Patient: Alopecia Areata. March
[44] Sanofi_01268143, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia; Sanofi_01827600, Docetaxel – Permanent/Irreversible Alopecia.
[45]  See Sanofi_01268143.  Dr. Hangai used a more stringent criteria for her Clinical Overview than did Dr. Palatinsky in 2011, and when pressed on the reason for the change in definition responded that two years was chosen because if one year was used there would have been too many events. Sanofi_02664951 at p.2. So, it is reasonable to conclude that Dr. Hangai purposefully selected a criteria that would yield a lower number of events. Dr. Hangai reiterates, *"cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."*

drug where they are the NDA or sNDA holder.[46]  The clinical studies Dr Hangai refers to in her assessment are TAX316 and GEICAM9805, both of which were Sanofi clinical trials; interim data from TAX316 was available to Sanofi in 2003/2004, and its final Clinical Study Report was completed September 9, 2010. When Dr. Hangai refers to "biologic plausibility" evidence in her statements, she indicates that biologic plausibility has been known to Sanofi, or at the very least evidence was available to the company. Dr. Hangai points to this as part of her causation evaluation in 2015, although I have not seen evidence that she elucidated or described the mechanism to investigate any plausible hypotheses.  Plausibility is one of the Hill criteria, but it is not necessary to "prove" the exact mechanism, and the 2015 Clinical Overview simply notes the known mechanism of cytotoxic chemotherapies.[47]  Both of the Clinical Overviews authored by Sanofi (Sanofi_01268143 and Sanofi_03242093) post-date 2011, yet the overwhelming majority of evidence upon which they are based pre-dates 2011. Evidence reviewed in this report was known or should have been discoverable by Sanofi prior to Ms. Earnest's use of Taxotere.

10) Sanofi employee Isabelle Richard-Cassin attended the April 25, 2006 meeting, and confirmed the contents of Exhibits 22 through 25 in her deposition, including confirming that Sanofi was discussing what might be included in a patient leaflet.[48] Sanofi's Global Safety Officer with responsibilities for Taxotere, Dr. Amy Freedman, also attended the meeting and agreed in her deposition that the labeling proposals differentiate two types or kinds of alopecia.[49]  These discussions are important information that I used in evaluating Sanofi's obligations under 21 CFR § 201.57(c)(7) and § 314.80, particularly in light of their timing in relation to Dr. Sedlacek's presentation at the SABCS in December 2006. Sanofi's discussions indicating the company considered differentiating separate adverse reaction warnings statements for temporary alopecia and PCIA prior to Dr. Sedlacek's presentation, along with its own

---

[46] Dr. Hangai failed to include the following papers from the scientific literature:  Nabholtz *et al.* (2001), Sedlacek *et al.* 2006, Prevezas *et al.* 2009, Bourgeois *et al.* 2009, Tallon *et al.* 2010, Miteva *et al.* 2011, Palamaras *et al.* 2011, Bourgeois *et al.* 2012, Kluger *et al.* 2012, Tosti *et al.* 2013, Bertrand *et al.* 2013, and Martin *et al.* 2015.
[47] Hill, "Proceedings of the Royal Society of Medicine," January 14, 1965, p. 295. ("Plausibility: It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the biological knowledge of the day.")
[48] Richard-Cassin deposition dated 5/4/2018 at pages 124:11 to 129:9.
[49] Amy Freedman deposition dated 10/26/2018 at pages 170:20 to 192:7, Exhibit 11.

data from the interim report of TAX316, and the addition of the Sedlacek abstract/presentation, as well as other evidence I have described above, identifies the initial point in time (*i.e.,* 2006) where Sanofi possessed *"some basis to believe"* there is a causal relationship between Taxotere and PCIA.

11) Sanofi's Global Safety Officer, Dr. Amy Freedman, testified that in 2006 Sanofi knew that Taxotere could cause irreversible alopecia. [50]

12) On April 18, 2011, a Country Labeling Desk Audit Report was circulated to Sanofi employees Gerrit-Jan Nijveldt and Mark Gaydos that stated *"In an effort to ensure that sanofi-aventis communicates important safety information on its products worldwide while assuring compliance with all applicable laws and regulations, . . ."* an audit was conducted to ensure labeling consistency, including *"core safety information and timeliness of implement[ing]"* necessary label changes.[51]  The audit revealed that there were several *"core safety information statements"* that were not in the United States label, and referred to Appendix 2 of the report (see page 2 of the audit report). One such item the audit uncovered as not included in the August 2010 Taxotere label was alopecia persisting at 55 months in the TAX316 study. Mr. Nijveldt explained that Sanofi's standard operating procedure for labeling requires that core safety information in the CCDS be submitted to health authorities, and that once Sanofi submits safety information for inclusion in the label, consistent with the company's Core Data Sheet, that quarterly written follow-up communications to the regulatory authority should occur until approval.[52] But the April 25, 2011 audit report reveals that Sanofi's August 2010 label failed to include core safety information.  From the April 25, 2011 audit report and related emails of March 10, 2015, it is clear that the 2010 label failed to include core safety information, and that no submission was not made to US regulators concerning a labeling change to the Taxotere label regarding persisting alopecia based on TAX316 data to correct this deficiency, and that no

---

[50] In her deposition 10/26/2018 Amy Freedman states, at pages 195:20 to 196:2: "Q. Just going back, my question was, to make sure I have the question actually answered on the record, based upon your knowledge at Sanofi in 2006, Sanofi knew that Taxotere could cause irreversible alopecia in 2006, correct?   A. Yes."
[51] Sanofi_ 02983328
[52] See Nijveldt deposition dated 2/15/2018 at pages 241:14 to 243:25.

quarterly written follow-up communications occurred.[53] What is particularly interesting concerning the above evidence, and all of the documents I have reviewed that were authored or dated before the initiation of this litigation, is the fact that at no time did Sanofi, either internally or with any regulatory agency, take the position that *"hair generally grows back"* was intended to encompass a warning for CIPAL/PCIA, or even the term persisting alopecia.  Even as late as March 10, 2015, in e-mail exchanges attempting to determine why language identified in the 2011 audit was not added to the label, no one within Sanofi that comments on the labeling issues takes the position that *"hair generally grows back"* is a sufficient warning for CIPAL/PCIA or irreversible hair loss.[54] And the audit in None of the Sanofi employees on the March 10, 2015, email exchanges that were addressing the  states that "*hair generally grows back"* is sufficient to convey what was known about the persisting alopecia identified in the TAX316 dataset, in pharmacovigilance database, and the scientific literature.

13) Also, with respect to the issues of labeling changes and the Audit Report findings, in November 2015, Sanofi employee Frances Polizzano remarked that *"this is going to be fun submitting >4 year old labeling changes to the FDA now."*[55] Based on the e-mail thread, it is fair to assume the *">4 years"* statement by Ms. Polizzano refers to the final clinical study report of TAX316 dated September 9, 2010 (more than 4 years prior). Thus, the failure to update the label with this particular information regarding Taxotere and persisting alopecia within TAX316 went back nearly five years.  And again, Ms. Polizzano did not take the position or comment that *"hair generally grows back"* is sufficient to convey what was known about permanent/irreversible or persisting alopecia.

14) I would note that in December 2015, Sanofi did update the US Taxotere label to include the statement in the Adverse Reactions section "Postmarketing Experience" that *"cases of permanent alopecia have been reported."* But the company failed to include the information from its own clinical trial datasets (TAX316 and

---

[53] It should be noted that the April 18, 2011, Audit Report examined the August 2010 Taxotere label against the company's CCDSv24, dated December 14, 2009, which included the persisting alopecia data.

[54] 3287582

[55] Sanofi_05207927; S. Thornton-Jones deposition dated 3/29/2018 at pages 479:1 to 494:20.

GEICAM9805) that were known by Sanofi to include cases of permanent/irreversible alopecia.

15) On March 16, 2017, Sanofi's Label Review Committee ("LRC") met to finally update the US Taxotere label with the data from TAX316 that was the topic of the 2011 Desk Audit, the string of e-mails from March 10, 2015, and the Polizzano-Vestea e-mails of November 2015.[56]   Sanofi's counsel in this litigation, Mr. Harley Ratliff, who has deposed me on two occasions, attended the 16 March 2017, meeting of the LRC where the agenda of the meeting was to update the US Taxotere label to refer to the 10-year follow-up data from TAX 316, including data on persisting/permanent/irreversible alopecia; the LRC Executive Summary includes *"Supportive Data/Documentation: TAX316: Clinical Study Report-Docetaxel-TAX316 (EFC6041/BCIRG001) 10-year follow-up – 09-Sep-2010."* The only supporting documentation listed in the Executive Summary for this update is the *"09-Sep-2010 Clinical Study Report."* Like the 2011 Desk Audit (reviewing the August 2010 Taxotere label), the March 10, 2015, string of e-mails, and the November 2015 Polizzano-Vestea e-mails, Sanofi's only justification for updating the US Taxotere label in March 2017 was the TAX316 data, as included in the 10-year follow-up Clinical Study Report, and Sanofi's CCDS.   Moreover, consistent with Sanofi's representations to European authorities in January 2013, the numbers of events to be listed in the US label as a result of the March 16, 2017 LRC meeting were pulled directly from Table 7 of the September 9, 2010, TAX316 Final Clinical Study Report.[57]   As a regulatory expert that has worked for years in similar litigation on issues related to the need to update labeling with safety information, it is unusual, and interesting to note, that it was only <u>after</u> the current MDL litigation had commenced in October 2016 that Sanofi ultimately attempted to include the TAX316 data on persisting/permanent/irreversible alopecia in its label, and then only with the involvement of the same counsel involved in this litigation (not FDA regulatory counsel).   The action necessary to provide physicians and their patients with core safety information from Sanofi's own pivotal clinical trial data was not taken until 2017, despite multiple internal communications on the topic dating back to at least

---

[56] Sanofi_05173852
[57] Sanofi_00724262, 00724298

April 2006, the growing recognition of the adverse reaction of CIPAL/PCIA in the scientific literature beginning with Nabholtz and Sedlacek in 2001 and 2006, respectively, and Sanofi's own TAX316 data. The fact that in 2008 the EMA drew Sanofi's attention to concern over PCIA in its communication to the company, and in 2013 Sanofi utilizing the same data to answer a direct question from EMEA concerning "long term/permanent alopecia from the pivotal breast cancer studies," also is relevant here.[58] In all my experience in assisting clients in regulatory matters, and involvement in prior pharmaceutical litigations, this is the first time I have seen such a scenario.

Therefore, as discussed in the 15 points listed above, and considering the totality of the evidence, it is clear that Sanofi knew or should have known well before 2011 when Mrs. Earnest was diagnosed with breast cancer that Taxotere use was associated with a different type of alopecia than the typical reversible drug-induced form seen at the initiation of treatment, and that there was at least some basis to believe that a causal relationship existed between CIPAL/ PCIA and Taxotere.

95.     Although I have already mentioned above the Clinical Overviews completed by Emanuel Palatinsky and Nanae Hangai, in 2011 and 2015, respectively, I mention them here, again, because it is important to point out that a significant number of reports of "Docetaxel and Permanent Alopecia" included in each overview occurred during or prior to 2011. Similarly, other significant evidence reviewed in the Clinical Overviews, and that was not included in the Overviews, but should have been, pre-dates 2011. Neither Clinical Overview included statements that CIPAL/PCIA is not an identifiable and distinguishable injury, separate and apart from drug-induced temporary, reversible alopecia. To the contrary, the 2011 Clinical Overview concluded that *"with the administration of docetaxel . . . that alopecia occurs very commonly, though its persistence cannot be predicted, and the available evidence does not show that irreversible alopecia is caused by docetaxel alone."* Dr. Palatinsky does not conclude that PCIA does not occur, only that, in his estimation, available evidence does not show irreversible alopecia is caused by Taxotere alone. But Dr. Hangai concluded in the 2015 Clinical Overview that *"Based on review*

---

[58] See Sanofi 03923729, Bassi Exhibit 13, p. 8; Sanofi 01282459.

of the Sanofi global pharmacovigilance database, worldwide scientific literature, clinical studies, and biological plausibility, the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel." Both Sanofi documents recognize CIPAL/permanent/irreversible alopecia with the use of Taxotere as a distinguishable adverse event/reaction, but the 2015 Clinical Overview goes further in its conclusion of a causal association. The reliance of both Sanofi documents on data, literature, and events that pre-date Ms. Earnest's first use of Taxotere is what is important to me in these documents. And finally, while Sanofi's two Clinical Overviews reach different ultimate conclusions on causation and attribution to Taxotere, they both include as a basis for their respective conclusions pre-2011 evidence that offers support for my opinion that there is some basis to believe a causal relationship exists between Taxotere and CIPAL/PCIA.

96.     I would also like to point to another issue that has arisen in the litigation that I think is important to discuss in light of the information I provided in my March Report, *i.e.,* the number of cases of persistent alopecia observed in TAX316 at the end of the study. In January of 2013, Sanofi submitted a response to a request from the European regulators concerning *"the number/percentage of patients with long term/permanent alopecia from the pivotal breast cancer studies."*[59] In its response, Sanofi only references two pivotal breast cancer studies: TAX316 and GEICAM9805. Sanofi states with respect to the results of the TAX316 study that *"by the end of the 10-year follow-up period of the trial, 29 TAC patients (4.2%) still had persistent alopecia."* With respect to the GEICAM9805 (TAX 301) study, Sanofi states that by the end of the follow-up period, 3 TAC patients (6.1%) still had *"persistent alopecia."* I have searched Sanofi's labeling in the United States and Europe and have not found where Sanofi has ever represented to any regulatory authority persistent/permanent or irreversible alopecia numbers different from those represented in its January 22, 2013, submission in Europe. Moreover, Sanofi began representing the persistent/permanent or irreversible alopecia numbers from the TAX316 final Clinical Study Report in its October 2018 US label as follows:*". . . , alopecia was observed to be ongoing in 29 TAC patients (3.9%) and 16 FAC patients (2.2%).*[60]*"* The fact that Sanofi continues to represent

---

[59] Sanofi_01282459
[60] The October 2018 label is the first updated Taxotere label in the US following the March 16, 2018, LRC meeting attended by Sanofi's trial counsel.

these numbers as accurate in its current label, a label that was approved as part of sNDA 084 on May 5, 2020, is important given the assertions made in the litigation by Sanofi concerning the TAX316 data that the 29 reports of persistent alopecia are not an accurate accounting of the rate of persisting alopecia in TAX316.  Further, the representation of the TAX316 numbers in the current US label as "ongoing," along with the representation of the same numbers in the SmPC as "persistent," demonstrate Sanofi is equating the terms as synonymous, particularly given the company's QSOP000775 concerning label harmonization.

97.     In making regulatory decisions it is common that I rely upon the expertise of other subject matter experts. I have reviewed the reports of some of Plaintiff's other experts, and while my opinions are based on my independent review of the evidence referenced in my report, and included on my "Materials Reviewed" list, Appendix C to this report, I find my opinions are supported by the opinions and work of David Madigan, Ph.D. and Ellen Feigal, MD.

98.     Dr. Madigan is a biostatistics expert for the Plaintiff.  I have reviewed Dr. Madigan's March 23, 2020, report in this litigation; I also have heard Dr. Madigan's testimony in trial. Dr. Madigan's report includes his signal detection analysis of the FDA's Adverse Event Reporting System database known as "FAERS; an analysis of Sanofi's own internal pharmacovigilance database; a meta-analysis of the final, validated TAX316 and GEICAM9805/TAX301 clinical trial data to examine the event rate for permanent/irreversible alopecia; and the analysis of four observational studies with a Taxotere group and a comparator group. I am familiar with the FAERS database, although I do not conduct analyses in it myself.  I am aware of FDA's recognition of such analyses of FAERS for signal detection.  Concerning Dr. Madigan's analysis of the clinical study data sets, I was able to confirm that the numbers used by Dr. Madigan when performing his meta-analysis are precisely the same numbers that Sanofi continues to represent in its current US labeling for Taxotere.  Regarding the four observational studies included in paragraph 55 of Dr. Madigan's March 23, 2020, report, I confirmed that the numbers of events used by Dr. Madigan in his description of the studies are accurate representations from the published articles. And finally, I reviewed, as stated previously, the 2011 and 2015 Clinical Overviews that I understand were, in large part, extracted from Sanofi's pharmacovigilance database, and noted the large number of cases of permanent alopecia identified

by Sanofi's Global Safety Officers, Emanuel Palatinsky and Nanae Hangai. In reviewing Dr. Madigan's report, I also noted that he reviewed the same type of evidence that Drs. Palatinsky and Hangai reviewed in their Clinical Overviews. Dr. Madigan describes his analysis and mentions on page 20 of his report that he confirmed the list of search terms used in his analysis of Sanofi's global pharmacovigilance database. Based on my training and experience in FDA postmarket surveillance regulations and my understanding of FDA's approach to drug safety signal detection, Dr. Madigan's analysis is the type of analysis that is performed by FDA themselves within their pharmacovigilance group (see FDA, 2012; https://www.fda.gov/files/drugs/published/Advances-in-FDA%27s-Safety-Program-for-Marketed-Drugs-%28PDF---188KB%29.pdf). As discussed by FDA in their 2012 Drug Safety report, the Division of Biometrics VII (DBVII), focuses on full-cycle drug safety evaluation using methods such as evaluation of randomized trials designed primarily to evaluate safety, design and analysis of observational studies (including propensity score and marginal structural models expertise), meta-analyses, signal detection, survey methodology, Bayesian methods in drug safety, data-mining techniques, time series analysis, graphical and computational methods for quantitative safety evaluation, and analyses of registry and health care databases (FDA, 2012). I consider the methods used by Dr. Madigan to fit within this overall approach to safety signal detection and drug safety evaluation that is used by FDA.

99.     Based on my review of Dr. Madigan's report, the Taxotere FAERS analysis provides a clear and constant safety signal for Taxotere use and irreversible/ permanent alopecia (CIPAL/ PCIA) starting in 2000 in one or more of the matrixes used; the signal was consistently detectable from 2000 to 2017. Additionally, Sanofi's pharmacovigilance database contained adverse event reports as far back as 1999 that provide additional support for the safety signal identified by Dr. Madigan in the FAERS database. These analyses by Dr. Madigan provide additional support and basis for my opinion regarding when Sanofi had some basis to believe there was a causal relationship between Taxotere and CIPAL/ PCIA. The meta-analysis of Taxotere clinical trial data performed by Dr. Madigan provides further support for my regulatory opinions. It is further supportive evidence of when Sanofi had reason to know that the severity, duration and frequency of CIPAL/ PCIA was different than the well-known drug-induced, reversible alopecia, and Dr. Madigan's Table 8 demonstrates multiple time intervals in the clinical studies, when considered in conjunction with other evidence, demonstrates *"some basis to believe there is a*

33

*causal relationship"* between Taxotere and CIPAL/PCIA, and that an adverse reaction warning for CIPAL/PCIA should have been added to the Taxotere label.

100.    Dr. Ellen Feigal also is an expert for the Plaintiff in this litigation. She is an oncologist with experience as a clinical researcher involved in pharmaceutical and chemotherapy product development; she served as the Deputy Director of the National Cancer Institute, Division of Cancer Treatment and Diagnosis, and as the Acting Director of the Division. Dr. Feigal provides opinions about the causal relationship between Taxotere used in the adjuvant treatment for breast cancer and the development of CIPAL/ PCIA. A review of Dr. Feigal's report shows that she has reviewed and relied upon some of the same evidence and information that I have relied on in forming both my regulatory opinions and my toxicology opinions. I also noted that Dr. Feigal has used the Bradford Hill factors (Hill, 1965) to guide her causation analysis. I am not a causation expert in this litigation, however, the methodology often referred to as the "Hill Criteria" and that has been used by Dr. Feigal is the same method I have used in the past when addressing cause-and-effect (for general causation assessment) and performing such analyses; this method also is one recognized by courts[61] as being an appropriate methodology. Specific evidence that I have reviewed in this case includes the scientific information listed in Table 2 of Dr. Feigal's report as well as Clinical Study Reports for TAX316 and GEICAM9805. Concerning the literature included in Table 2 of Dr. Feigal's report, I note that she and I have reviewed and utilized much of the same literature. Dr. Feigal accurately summarized the scientific information and evidence she includes in her report and in Table 2. I have taken into account Dr. Feigal's opinion on general causation concerning the relationship between Taxotere exposure and CIPAL/ PCIA.  Dr. Feigal's report and testimony provide further support for my opinion that sufficient evidence existed to find that there is some basis to believe that a causal relationship exists between Taxotere use and CIPAL/ PCIA in patients taking Taxotere as an adjuvant treatment for early-stage breast cancer (consistent with FDA regulations at 21 CFR 201.57).

---

[61] See the *Reference Manual on Scientific Evidence, 3rd Edition* (2011) which is published by the Committee on Science, Technology, and Law, Policy and Global Affairs, of the Federal Judicial Center. (National Academies of Sciences, Engineering, and Medicine. Washington, DC: The National Academies Press. https://doi.org/10.17226/13163)

101. I have reviewed the report and deposition of Dr. Freites-Martinez, a witness identified as an expert for Sanofi and the lead author of several journal articles, including a quality-of-life observational study.[62] I have reviewed Dr. Freites-Martinez's quality-of-life paper because it has been repeatedly referred to by defense counsel to insinuate that the publication can be used to demonstrate rates of events, or relative risks of CIPAL/PCIA, with various chemotherapy drugs and non-chemotherapy drugs. This is simply incorrect, and while I reviewed this publication in forming opinions in this case, it does not establish a relative risk level or rate associated with any drug mentioned in the article.  I reviewed Dr. Freites-Martinez's deposition very carefully to understand his interpretation of his 2019 quality of life article, and he testified that his paper cannot be used to assess incidence rates for CIPAL/PCIA in patients that have undergone treatment with different chemotherapy drugs, or non-chemotherapy drugs listed in his article.[63] Thus, contrary to suggestions by defense counsel in this case, the data in Dr. Freites-Martinez's quality-of-life paper cannot be used to assess incidence rates for CIPAL/ PCIA.

102. With respect to the report and testimony of Dr. Glaspy, it is his opinions and statements related to cases of persistent alopecia being *reported* with non-Taxotere drugs that are relevant to my regulatory opinions. First, I agree with Dr. Glaspy that a statement that "cases have been reported" does not imply causation.[64]  Second, as the NDA holder for Taxotere, Sanofi's responsibility is for its Taxotere labeling. Sanofi is not responsible for labeling for other drugs that may or may not be used in combinations with Taxotere in cancer patients. Although there may be sporadic case reports of CIPAL/PCIA in patients exposed to drugs such as cyclophosphamide and doxorubicin (Adriamycin), the fact is that "cases have been reported" is not the same as a causation analysis, and does not imply causation.[65] In fact, "cases have been reported" is not an analysis under the labeling standards for prescription drugs in the US as I have set out in this report. Unlike

---

[62] Freites-Martinez, et al., "Assessment of Quality of Life and Treatment Outcomes of Patients With Persistent Postchemotherapy Alopecia," JAMA Dermatology, June 2019, Volume 155, Number 6.

[63] Freites-Martinez deposition dated 10/20/2020 at pages 205:18 to 212:8 (*"And so to be very clear, and I want to make sure we're very clear on this part.  You do not – you agree with me that you cannot calculate an incidence rate for pCIA based upon -- for either Taxotere or Taxol, based on the data that you reviewed for your JAMA Dermatology quality of life assessment, correct?  A.   We cannot calculate the incidence of any drug or any chemotherapy regimen or any endocrine therapy in this paper.  This was not an incidence paper. It was a retrospective cohort study to describe a disease that was not clearly, let's say, described before."*; 211:17 – 212:8); 216:4 – 22.

[64] Glaspy deposition dated 5/13/2020 at page 69:11 – 17.

[65] Glaspy deposition dated 1/9/2020 at page 83:7-14; and his deposition dated 5/13/2020 at page 69:11- 17.

the other drugs Dr. Glaspy mentions in his report and in his testimony, only some of those drugs are used to treat early stage breast cancer and in no case is the same type of consistent evidence to be found in the published literature and publicly available adverse event data,[66] as has accumulated with Taxotere, evidence that could show there is some basis to believe that there is a causal relationship between the drug and CIPAL/ PCIA. As I have described before, the evidence for the safety concern of Taxotere use and CIPAL/ PCIA includes clinical trial data as well as the case reports, case series, multiple peer-reviewed articles demonstrating attribution of cause, Dr. Madigan's FAERS safety signal analyses, examination of Sanofi's pharmacovigilance database and his meta-analysis of Sanofi's clinical trials, and Dr. Feigal's Bradford-Hill causation analysis. Moreover, unlike other drugs listed in Dr. Glaspy's report, Taxotere has been shown to be repeatedly linked with CIPAL/ PCIA. I have reviewed the labels for cyclophosphamide, doxorubicin, 5-FU and Taxol and none carry a warning for CIPAL/PCIA. Yet, all of these drugs have had much longer market exposure than Taxotere; in the case of cyclophosphamide and doxorubicin, the drugs have been on the market 40-50 years longer than Taxotere, with only sporadic reports persisting or permanent alopecia (*i.e.,* a different form of hair loss than the commonly observed drug-induced hair loss).

103.     Dr. Glaspy also has testified in deposition that the progression for the development and testing for chemotherapy drugs for breast cancer is to first establish the effectiveness and safety profile in the treatment of metastatic cancer, and, if the risk/ benefit profile is favorable, move to testing in the adjuvant setting.[67]  He further explained that patients being treated for metastatic cancer are less likely to result in collection of robust adverse reaction data due to both short-term use (higher mortality rate in this patient group due to the stage of disease), and the fact that if a treatment is not effective patients are typically switched to another chemotherapy regimen, thus confounding any ability to follow any one regimen to identify long-term, or persisting, adverse reactions.  This progress of development was followed with Taxotere, where initial clinical studies were in patients with metastatic disease (TAX311), followed by clinical trials in the adjuvant setting (TAX316).[68] As mentioned in my March Report and as discussed by Dr. Glaspy, TAX311

---

[66] See Dr. Madigan's analyses of FAERS data (discussed in this report as well at paragraph 98).
[67] See Glaspy deposition dated 1/9/2020 at pages 45:6 to 47:2
[68] See Glaspy deposition dated 1/9/2020 at page 48:3-13.

is a head-to-head, monotherapy study of Taxotere versus Taxol.[69] Head-to-head, monotherapy studies are the best way to be able to compare relative toxicity profiles of drugs.  In TAX311, Taxotere demonstrated greater toxicity than Taxol in several important categories:

TABLE 46 Safety Summary

| | Treatment Group | | | |
|---|---|---|---|---|
| | Taxotere N=222 | | Paclitaxel N=222 | |
| | N | % | N | % |
| **Number of Patients with at least:** | | | | |
| One adverse event possibly/probably related to treatment | 219 | 98.6% | 209 | 94.1% |
| One NCI Grade 3/4 (or severe/life threatening) adverse event possibly/probably related to treatment | 123 | 55.4% | 51 | 23.0% |
| One NCI Grade 4 (or severe/life threatening) adverse event possibly/probably related to treatment | 50 | 22.5% | 5 | 2.3% |
| **Number of Patients withdrawn due to adverse event(s):** | | | | |
| Any adverse event | 58 | 26.1% | 17 | 7.7% |
| **Most frequent adverse events leading to withdrawal:** | | | | |
| Sensory disturbance NOS | 17 | 7.7% | 8 | 3.6% |
| Motor dysfunction NOS | 11 | 5.0% | 3 | 1.4% |
| Asthenia | 6 | 2.7% | 1 | 0.5% |
| Peripheral edema | 12 | 5.4% | 0 | 0.0% |
| Infection | 7 | 3.2% | 0 | 0.0% |
| **Number of Patients with:** | | | | |
| At least One SAE | 117 | 52.7% | 66 | 29.7% |
| At least One SAE related* to treatment | 89 | 40.1% | 14 | 6.3% |
| Febrile neutropenia only | 20 | 9.0% | 1 | 0.5% |
| At least one SAE at first cycle | 75 | 33.8% | 27 | 12.2% |
| At least one related* SAE at first cycle | 60 | 27.0% | 6 | 2.7% |
| Febrile neutropenia only | 14 | 6.3% | 1 | 0.5% |
| **Death within 30 days of last infusion:** | | | | |
| Malignant disease | 6 | 2.7% | 8 | 3.6% |
| Toxicity from study drug treatment | 3 | 1.4% | 0 | 0.0% |
| Other | 3 | 1.4% | 1 | 0.5% |

Inspection of the data from Table 46, the company's summary of safety data from TAX311, reveals that virtually all measures of toxicity or "safety" summarized by Sanofi and listed in Table 46, with the exception of a measure related to efficacy (death within 30 days due to malignant disease), show that a higher percentage of patients in the trial given Taxotere experienced toxicity or adverse events (a measure of toxicity) as compared to Taxol. Thus,

---

[69] See Glaspy deposition dated 5/13/2020 at page 101:4-11 and Exhibit 7 to the deposition (Sanofi_05617796).

review of data from the only head-to-head, monotherapy, randomized, controlled clinical study performed by Sanofi shows that Taxotere is more toxic than Taxol.

104.    A review of the reports and testimony of Dr. Chang raises concerns about the methods used to develop her opinions concerning the long-term safety results of TAX316 when her methods are compared to those used by Sanofi's Deputy Global Head of Oncology Biostatistics, Pierre Mancini.  Mr. Mancini described how Sanofi analyzes clinical data through SAS data files, and applying SAS programming files, in order to investigate issues and answer questions concerning rates of adverse events, including in response to inquiries from regulators.[70] Mr. Mancini examined the issue of rates of persistent or ongoing alopecia in patients in TAX316 and GEICAM9805 at different times, and very clearly stated: *"the point [he is] making is that we have a definition for persistent alopecia that we report."*[71]  In contrast, Dr. Chang did not review the final clinical trial datasets for TAX316 or GEICAM9805 or refer to Mr. Mancini's analysis of long term/permanent/persistent alopecia set out in Sanofi's Response to Agency Request of January 22, 2013.[72]  Instead, Dr. Chang reviewed an incomplete set of unvalidated, partial clinical report forms selected and compiled for her by Sanofi's counsel.[73]  Then, as discussed in her deposition of May 2020, Dr. Chang also did not review the final, validated TAX316 dataset that Dr. Mancini used for his analyses, and that Dr. Madigan used to perform his analyses.[74]

105.    With the background regarding FDA regulations of human drug labeling, the ongoing safety signal demonstrated in Dr. Madigan's FAERS disproportionality analysis, evidence from Sanofi's global pharmacovigilance database, the worldwide scientific literature, data from Sanofi's clinical studies, biological plausibility, as well as the ample evidence of Sanofi's knowledge of CIPAL/PCIA as an adverse reaction separate and distinct from commonly understood "reversible alopecia." I have formed opinions about the safety information that should be included in the Taxotere labeling specific to CIPAL/ PCIA. It is my opinion to a reasonable

---

[70] P. Mancini deposition dated 3/23/2018 at pages 68:24 to 69:24, 280:15 to 281:11; and his deposition dated 10/12/2018 at pages 354:24 to 356:15, and 422:20 – 25.
[71] P. Mancini deposition dated 3/23/2018 at pages 280:19 – 20.
[72] Sanofi_01282459
[73] Chang deposition dated 5/19/2020 at pages 64:7 to 69:23.
[74] Chang deposition dated 5/19/2020 at pages 61:16 to 69:23.

degree of scientific certainty that there is some basis to believe that there is a causal relationship between Taxotere use and CIPAL/ PCIA in patients taking Taxotere as an adjuvant treatment for early-stage breast cancer.  It is my opinion that sufficient evidence to meet this standard existed as early as 2006, and as further evidence accumulated, there is greater support for this opinion. Certainly, long before Ms. Earnest's first use of Taxotere, there was more than sufficient evidence of *"some basis to believe"* a causal relationship between Taxotere use and CIPAL/ PCIA existed in patients taking Taxotere as an adjuvant treatment for early-stage breast cancer.  This applicable standard for including safety information in the Adverse Reactions section of a prescription drug label in the US (both pre-PLR and post-PLR) is in the Code of Federal Regulation (21 CFR 201.57(c)(7)). As already discussed in detail above in this report, based on what Sanofi knew or should have known about the relationship between Taxotere use in early-stage breast cancer and permanent alopecia, physicians and their patients should have been provided with safety information on CIPAL/PCIA and a warning should have been placed in the Adverse Reactions section of the Taxotere label at least by 2006.

106.    Sanofi has identified a causal association between Taxotere (docetaxel) and irreversible alopecia (Sanofi_01101022; Sanofi_01827599; Sanofi_04876339; Sanofi_01268143[75]). The company states based on their own review that: *"The cumulative weighted evidence **is sufficient to support a causal association** between Docetaxel and Permanent/Irreversible alopecia in patients who receive docetaxel."* [**emphasis** *added*] Again, a large portion of data upon which Sanofi (Nanae Hangai) based this conclusion, and as clearly seen in the Clinical Overview, pre-dates Ms. Earnest's first use of Taxotere.  Equally as important is the fact that Sanofi failed to include other evidence supporting this conclusion that could or should have been known to the company, evidence that would include but not be limited to the publications known as Nabholtz *et al.* (2001), Sedlacek *et al.* 2006, Prevezas *et al.* 2009, Bourgeois *et al.* 2009, Tallon *et al.* 2010, Miteva *et al.* 2011, Palamaras *et al.* 2011, Bourgeois *et al.* 2012, Kluger *et al.* 2012, Tosti *et al.* 2013, Bertrand *et al.* 2013, and Martin *et al.* 2015. Notably, the information reviewed and referenced by Sanofi in 2015 as support for its conclusion included their pharmacovigilance database (adverse events reported to the company), only two literature articles (Kluger *et al.* 2012 and Miteva *et al.* 2011) and two Taxotere clinical studies (TAX316 and

---

[75] Exhibit 6 to the Hangai deposition of February 1, 2018 (page 192)

TAX301). Sanofi's identification of support for a causal association, where they admit a causal association, includes much less than the evidence presented by Dr. Feigal and Dr. Madigan, and demonstrates a level of evidence that meets, and even exceeds, the regulatory standard for adding information into the "Adverse Reactions" section of the Taxotere label prior to Ms. Earnest's first use of Taxotere.[76]  As a final point on the Clinical Overviews, it is worth noting that Dr. Palatinsky and Dr. Hangai used two different definitions for the duration of alopecia when identifying adverse events (*i.e.,* alopecia lasting more than two years or alopecia lasting more than one year); when Dr. Hangai was asked why she expanded the duration of alopecia to two years from one year for the 2015 Clinical Overview, she stated that *"if set less, we know we have more cases."*[77] Taking that candid statement to its logical conclusion, had Dr. Hangai remained consistent with Dr. Palatinsky's use of alopecia lasting more than one year it is reasonable to conclude the 2015 Clinical Overview would have included a greater number of adverse events for permanent/persisting alopecia. A larger number of events would provide an even stronger safety signal for the event and strengthened the evidence for Dr. Hangai's conclusion regarding the causal association between CIPAL/PCIA and Taxotere.

107.    As I already mentioned above, it was not until December 2015 that Sanofi added permanent or irreversible alopecia to the "Postmarketing Experience" section (6.2) within the Adverse Reactions section (Section 6) of its US label, even though evidence existed at least as early as 2006 that justified a label change.  It is important to note that Sanofi recognized the existence of permanent or irreversible alopecia in company documents in 2006, and at later times, but prior to Ms. Earnest's first use of Taxotere in 2011.  Sanofi again acknowledged the TAX316 long term/permanent, persistent alopecia data in its January 2013 response to European regulators, addressing a direct request from regulators on the issue.[78] Sanofi's response to the regulators was pulled directly from its TAX316, 10-year follow-up, Clinical Study Report of September 9, 2010.[79] Although Sanofi's response to the European regulators occurred in 2013, the entirety of its response was based on data and information that had been held internally by Sanofi since

---

[76] See the guidance from FDA regarding data to support an Adverse Reactions statement (https://www.fda.gov/media/72139/download).
[77] Sanofi_02664951
[78] Sanofi 01282459
[79] Sanofi_00724262, Table 7

September 9, 2010, and earlier with the TAX316 interim data. Thus, Sanofi should have been aware that there was *"some basis to believe"* a causal relationship exists between Taxotere used as an adjuvant treatment in patients with early-stage breast cancer and CIPAL/PCIA prior to 2011, and as early as 2006. I would point out as well, since the 2015 label change made by Sanofi failed to describe the TAX316 data and the conclusions of Dr. Hangai in the 2015 Clinical Overview, the label failed to provide physicians and their patients with complete and accurate information about the relationship of Taxotere use and CIPAL/PCIA.

108.     Perhaps more important is that when Sanofi made submissions to regulators outside the United States regarding CIPAL/PCIA, it continued to reference its TAX316 data: 29 patients in the TAC arm of the study had persisting alopecia at the end of the 10-year follow-up period.[80] Similarly, in March 2017, Sanofi's lead counsel in the present litigation – Harley Ratliff – advocated to Sanofi's Label Review Committee (LRC) for the inclusion of the TAX316 adverse reaction data to harmonize the USPI and EU-SPC (Summary of Product Characteristics).[81]  The March 16, 2017 LRC Executive Summary does not include any post-2010 justification or support for the US label update that was being discussed at the time.  The LRC Executive Summary has a shaded box over the text of the table titled *"Persistent reactions in patients receiving \*TM\* in combination with doxorubicin and cyclophosphamide. (TAX316)"*; however, the first label update that follows the March LRC meeting is dated October 5, 2018, and includes the same numbers represented by Sanofi to the European regulators in January 2013 (Sanofi 01282459), numbers that are represented in the TAX316, 10-year follow-up Clinical Study Report (Sanofi_00724262, Table 7).[82]

109.     To summarize my regulatory opinions:

1) Evidence in this case shows that at least by 2006, Sanofi recognized that Taxotere use was associated with permanent, irreversible or persistent alopecia (CIPAL/PCIA), and that it was a different adverse event than temporary or typical drug-induced alopecia.

---

[80] Sanofi 01282459
[81] Sanofi 05173852
[82] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process. (Taxotere Label, 10/2018, page 23.  Percentage changes from 4.2% to 3.9% due to a change in denominator to 744 from 687, respectively.)

CIPAL/PCIA is different in terms of both duration and severity from common, temporary alopecia. Despite the evidence showing that Sanofi recognized the nature, character, severity and duration of CIPAL/PCIA, and that it is a different and distinct adverse reaction associated with the use of Taxotere, as well as that there is some basis to believe that a causal relationship existed between Taxotere and CIPAL/PCIA, there is no evidence to suggest that Sanofi communicated its understanding to the FDA in 2006, or anytime prior to Ms. Earnest's first use of Taxotere in 2011.

2) Even the 2015 label change by Sanofi failed to communicate accurately and completely what Sanofi knew about Taxotere and its relationship with persisting/permanent alopecia (CIPAL/PCIA). The documents and testimony addressed in this report and included in my Appendix A ("Materials Reviewed") demonstrate Sanofi's recognition of the separate and distinct adverse reaction of CIPAL/PCIA, and that it differs in severity and duration from temporary alopecia.  Sanofi's obligations under 21 CFR § 201.57(c)(7) and § 314.80 required the drug company to provide separate Adverse Reaction section warnings when events are *"symptomatically and pathophysiologically related to an event listed in the labeling but differ from the event because of greater severity or specificity."*  In this instance, both temporary and permanent alopecia result in a patient losing their hair.  But in one type, temporary hair loss, the hair returns; in the other, permanent hair loss, the hair does not return to its pre-chemotherapy level.  One is temporary and one is permanent; they are of different durations.

3) As a regulatory expert, this distinction between CIPAL/PCIA and temporary alopecia commonly seen with chemotherapy drugs is important given that the FDA regulations require that physicians and their patients be provided with accurate and complete information about the risks and benefits of a drug.  Failure to provide accurate and complete information about the risks and benefits of a drug render it misbranded, and false and misleading.  It is not sufficient to provide data in submissions without analyses and explanation of what the data demonstrates. This is particularly true where the company has demonstrated knowledge of the risk.

4) Also, in keeping with Sanofi's own QSOP-000775, with a stated goal of worldwide harmonization of safety labeling, there is no reason for Sanofi to include safety information from its clinical trials in a European label and not submit the same data for inclusion in

labeling in the United States.[83] In my experience, regulators such as those at the FDA that were involved in the oversight and review of Taxotere's submissions can only make decisions and recommendations based on the information they have available for review, which comes from the company, and with proper analysis provided by the drug sponsor (Sanofi), *i.e.,* based on what they know.  Evidence in this case shows that my experience and understanding is consistent with what Sanofi's employees understood as well (see deposition testimony of Gerrit-Jan Nijveldt, global regulatory affairs, dated 15 February 2018 at pages 61-80).

5)  Dr. Arrowsmith, Sanofi's regulatory expert, appears to believe that since MedDRA did not include a listing for temporary alopecia or persistent alopecia, that labeling for Taxotere could not be changed to use the adjectives in conjunction with "alopecia" (see pages 61-70 of Dr. Arrowsmith's deposition dated 29 July 2020, and paragraph 68 of her report dated 9 December 2019). This is not true based on a discussion of this issue in a recent paper (Wu *et al.* 2019 at page 135 of 149): *"Of note, MedDRA is used as the adverse event reporting terminology by many drug regulatory authorities and the pharmaceutical industry worldwide but is not required for FDA-approved drug labeling."* Additionally, evidence in this case related to the 2015 label changes by Sanofi shows that the term "permanent alopecia" was included in the Taxotere label (see 2015 Taxotere label at the website "drugs@FDA").

6)  Finally, to reiterate my opinions regarding other drugs used in chemotherapy regimens with Taxotere and the difference in the level of evidence that exists for a causal association between use of drugs other than Taxotere and CIPAL/ PCIA (see paragraphs 33 and 45-48 of my March Report). As stated in paragraph 45 of my March Report, careful review of the literature shows that the level of evidence that exists to support a causal association between CIPAL/ PCIA and any particular chemotherapeutic drug used in early-stage breast cancer treatment other than Taxotere is not the same type of evidence that exists for Taxotere/ docetaxel. I pointed as well to the fact that the majority of the peer-reviewed, published medical/scientific literature that attempts to attribute a cause for CIPAL/ PCIA attribute the condition to docetaxel.  With the review of Dr. Madigan's report, I would now point to his FAERS disproportionality analysis (discussed above) that demonstrates that

---

[83]See Nijveldt deposition at pages 435:4 to 438:1.

Taxotere's signal for permanent or irreversible alopecia within FAERS was continual, *i.e.,* a permanent signal exists, while the signal for other drugs examined by Dr. Madigan did not exhibit a continual signal, or any signal at all. Available scientific information, including FAERS data and Dr. Madigan's analysis, clearly show that other drugs used in treatment of early-stage breast cancer do not carry the level of risk of CIPAL/ PCIA that is posed by Taxotere.

## XII.    Summary of Regulatory Opinions

110.    Based on my training and experience in pharmacology, toxicology and FDA regulation of human drug products, it is my opinion to a reasonable degree of scientific certainty that Sanofi should have updated the Taxotere label at least by 2006 to provide physicians and their patients with an Adverse Reactions warning in the Taxotere Label.  It is my opinion to a reasonable degree of scientific certainty sufficient evidence existed at least by 2006, but certainly before Ms. Earnest was diagnosed in February 2011, to meet the regulatory threshold of *"some basis to believe"* there is a causal relationship between Taxotere and permanent, irreversible or persistent alopecia (CIPAL/PCIA). The basis for my opinions, and the supporting documentation and testimony are set out in this report and are further based upon my review of the materials listed on Appendix A to this report.

## XIII.   Compensation

111.    My compensation by plaintiff's attorneys in this matter is at the rate of $300.00 per hour.


_____

Laura M. Plunkett, Ph.D., DABT