# EXHIBIT J

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

*************************************************************
IN RE:   TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                            Civil Action No. 16-MD-2740
                            Section "H"(5)
                            New Orleans, Louisiana
                            November 12, 2021

THIS CASE RELATES TO ELIZABETH KAHN 16-CV-17039
*************************************************************

                       TRANSCRIPT OF JURY TRIAL
           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
                      DAY 4 AFTERNOON SESSION
```

APPEARANCES:

FOR THE PLAINTIFF:

        MATTHEW PALMER LAMBERT
        GAINSBURGH BENJAMIN DAVID MEUNIER
        & WARSHAUER
        1100 POYDRAS STREET
        SUITE 2800
        NEW ORLEANS, LA 70163


        CHRISTOPHER COFFIN
        PENDLEY BAUDIN & COFFIN
        1515 POYDRAS STREET
        NEW ORLEANS, LA 70112


        KAREN BARTH MENZIES
        GIBBS LAW GROUP
        400 CONTINENTAL BOULEVARD
        EL SUGUNDO, CA 90245


        DARIN L. SCHANKER
        BACHUS & SCHANKER
        1899 WYNKOOP STREET
        SUITE 700
        DENVER, CO 80202

1  it.  So it's the idea that that information has to be
2  accurate.  In this case, that is an issue because of the fact
3  that there are actually two kinds of alopecia, not just
4  alopecia that is temporary.
5      Q.  Thank you.
6          Now, we've talked about the standard.  You've talked
7  about how you go about doing your work.  How do you go
8  about -- or what did you review in gathering information for
9  facts to apply against your standard?
10     A.  So as I told you, I went -- started with what the
11 company knows, so I went to depositions.  There's about 20
12 different depositions, I believe, of corporate employees or
13 company employees that I reviewed as well as exhibits to
14 those depositions.  And I looked for information in those
15 depositions about what the company knew about the
16 relationship between Taxotere use and permanent alopecia.
17     Q.  Okay.  And can you tell us what you found?
18     A.  I found that there were actually admissions by
19 corporate employees, global safety officers that made
20 statement -- they understood or they knew or they actually
21 made statements in depositions that Taxotere use was -- could
22 cause, in some people, permanent alopecia.
23     Q.  Okay.
24     A.  That's an example.
25     Q.  Who said that?

**1**  **A.** So that was Amy Freedman who was a global safety
**2** officer for Taxotere.
**3**  **Q.** Did she indicate when she said Sanofi knew that?
**4**  **A.** Yes. She's talking about 2006, there's questions in
**5** the deposition about that time period.
**6**  **Q.** Okay.
**7**  **A.** So in 2006, that evidence shows me that the company
**8** knew that there was a relationship, some basis to believe,
**9** that Taxotere could -- had been associated or was -- had a
**10** causal relationship with permanent alopecia.
**11**  **Q.** Okay. Was there anything else that you saw?
**12**  **A.** Yes, there's more than that. That sort of was a
**13** starting point for the depositions.
**14**  **Q.** What's the next piece of evidence that you saw?
**15**  **A.** Also, in 2006, I believe April, there was an internal
**16** meeting among global safety officers and others in the
**17** company about labeling for Taxotere. And they discussed
**18** adding information into the adverse reaction section for
**19** Taxotere labeling, and it distinguishes between temporary
**20** hair loss and permanent hair loss. So it's a recognition of
**21** that difference.
**22**  **Q.** Okay.
**23**     MR. MICELI: Can I approach, Your Honor?
**24**     THE COURT: Yes, you may.
**25**     MR. MICELI: Okay. Dr. Plunkett, I'll just hand it

OFFICIAL TRANSCRIPT
Page 986

1 to you now and I'll get back to the microphone.
2 BY MR. MICELI:
3  **Q.** Dr. Plunkett, do you recognize this document?
4  **A.** Yes, this is another document.
5  **Q.** Okay. What is this document?
6  **A.** So this document -- oh, I'm sorry. This isn't that
7 document. I apologize. Yes. This is the document that is
8 showing an invitation to this internal meeting that happened
9 in April of 2006.
10  **Q.** Okay. And did you learn from reading this document
11 what the purpose of the meeting was for?
12  **A.** Yes. It was discussing changes to the labeling
13 within the adverse reaction section of Taxotere.
14  **Q.** Okay. I'm going to put --
15      THE COURT: I think we have an objection.
16      (WHEREUPON, the following proceedings were held at
17 the bench:)
18      THE COURT: All right. I thought we had decided we
19 would not talk about this meeting as a meeting to change a
20 label because it now it sounds like there was an internal
21 meeting about changing this label.
22      MR. STRONGMAN: Correct.
23      THE COURT: And this is a foreign label.
24      MR. MICELI: Okay.
25      THE COURT: So how are we going to fix that?

1  over five different pieces of evidence, I think.  Amy
2  Freedman -- I can flip back through.  Let's see.
3      **A.**  Yes, five.
4      **Q.**  Amy Freedman's comment?
5      **A.**  Yes.
6      **Q.**  I'm going to go back through this.  The meeting where
7  they differentiated?
8      **A.**  Yes, in April of 2006.
9      **Q.**  The Sedlacek article?
10     **A.**  Yes, also 2006.
11     **Q.**  And Emanuel Palatinsky's e-mail and suggested edits,
12  correct?
13     **A.**  Yes.
14     **Q.**  I guess that's four so far.  Is there anything else
15  you've reviewed?
16     **A.**  Yes.
17     **Q.**  What is that?
18     **A.**  So in addition to this, there is information
19  documents that I have reviewed that have showed that within
20  the pharmacovigilance database of Sanofi -- it's one of the
21  requirements of being a prescription drug manufacturer.  You
22  have to collect internally reports that are sent to you about
23  adverse events -- and within this pharmacovigilance database
24  up to the time looking at events that were in the database
25  before Ms. Kahn took the drug, it shows that there were

1    reports where the word verbatim is used, either "permanent"
2    or "irreversible alopecia" when it's describing the events.
3    So in other words, there were events being identified in
4    their own database showing adverse events of permanent or
5    irreversible alopecia.
6       Q.   Okay.  And how far back did these go?
7       A.   I believe the first ones are -- first one is maybe
8    1999.
9       Q.   Okay.  And you looked through, what, 2007?
10      A.   Yes.  I stopped -- well, I looked at the -- in the
11   pharmacovigilance database, the numbering system allows you
12   to see the year, so I looked through the year 2007.  I didn't
13   go any further because I didn't want to include something
14   that may not have been reported until after Ms. Kahn had --
15   was exposed in, I guess, May of 2008.
16      Q.   It's important for me to ask this I think.  Are you
17   the person that categorized those reports within Sanofi's
18   pharmacovigilance database as permanent or irreversible,
19   using those words?
20      A.   No.  These were actually in the documents in the
21   database.  I don't categorize it; that's what is listed.  So,
22   again, in my view, it is more evidence for what the company
23   knew based upon the evidence they had.
24      Q.   Okay.  Now we're at five pieces of evidence.  So at
25   this point, did you need to go any further to find evidence

1    THE COURT: We talked about that. We talked about
2 all those things that they were mentioned in her report. But
3 it didn't -- I guess -- I felt like maybe, I'll be honest
4 with you, I thought maybe I hadn't read the report carefully
5 enough because it just seemed like that was not the clear
6 underpinnings of her report. I thought her report relied
7 primarily on Madigan's work and then some other work that she
8 had done and then mentioned these things in a side. We
9 didn't hear about Dr. Madigan. We didn't hear anything about
10 --
11    MR. MICELI: We'll hear from him on Monday.
12    THE COURT: I got that. But, you know, her report --
13 report relied a great deal on Madigan's analysis. And I know
14 we'll hear from him, but that's not what she said today. She
15 didn't even mention him, not even on an aside. And then -- I
16 don't know what to tell you, Mr. Strongman, I just --
17    MR. MICELI: He should just forego his cross is what
18 my opinion was, Your Honor.
19    THE COURT: I always find it interesting that y'all
20 have really clear ideas about what the other side should do
21 in their cases. But there was nothing in her report about
22 the number of --
23    MR. MICELI: Which number of reports -- the
24 pharmacovigilance database is in her reports and it's in
25 Madigan's report. And I did not ask her the number before