# EXHIBIT O

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2
3
                                    : MDL No. 2740
4    IN RE:   TAXOTERE              : Section "H" (5)
     (DOCETAXEL) PRODUCTS           :
5    LIABILITY LITIGATION           : VIDEOTAPED
                                    :   DEPOSITION UPON
6                                   :   ORAL EXAMINATION
                                    :        OF
7                                   : LAURA PLUNKETT, PhD
                                    :
8                                 X
9
10
11          TRANSCRIPT of the stenographic notes of
12   the proceedings in the above-entitled matter, as
13   taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,
14   held via ZOOM VIDEOCONFERENCE from various locations,
15   with the witness located at the offices of FLEMING,
16   NOLEN & JEZ, 2800 Post Oak Boulevard, Suite 400,
17   Houston, Texas, on Tuesday, March 28, 2023,
18   commencing at 9:05 a.m. Central Daylight Time.
19
20
21
22
23
24
25

|  |  |
|---|---|
| Page 38 | Page 40 |
| 1  advocates before, in my own experience.  But not | 1  given sworn testimony in the litigation.  Correct? |
| 2  necessarily -- I'm not a person who typically works | 2      A.    I don't believe I have.  I'd have to go |
| 3  as a consultant on marketing issues with companies, | 3  back and look at my initial deposition list, whether |
| 4  although marketing documents are labeling, and | 4  anyone of those that I might have reviewed several |
| 5  that's what the nurse tear sheet -- what was the | 5  years ago were. |
| 6  importance of it there for me. | 6              But I certainly haven't cited to anyone |
| 7              So even though I might not typically | 7  in my report, if that's what you're asking. |
| 8  seek a deposition by somebody like Ms. Avila, it was | 8              Maybe that's the best way to answer it: |
| 9  highly relevant, because that document is an | 9  I'm not citing to anyone else. |
| 10 important one, in terms of what was communicated to | 10             And again, I think -- I think it's very |
| 11 patients. | 11 important to understand that I don't -- I haven't |
| 12     Q.    And you described her as a nurse who | 12 formed opinions in this case about the -- whether or |
| 13 interfaced with patients.  Is that -- did I hear | 13 not the sales reps were doing everything they should |
| 14 that right? | 14 have been doing.  What I did -- indeed was relying |
| 15     A.    So I'd have to go back and look at her | 15 upon, in terms of this issue related to the sales |
| 16 actual training, but that's my understanding, yes. | 16 rep, had to do with a particular piece that's so |
| 17     Q.    Okay. | 17 important in my view, in terms of information that |
| 18     A.    That she was someone who was | 18 would be given to patients about what the adverse |
| 19 involved -- I believe she was a sales and marketing | 19 effects of the drug could be. |
| 20 person -- | 20             And to me, if you read my report, you |
| 21     Q.    For trials -- | 21 know it's in my opinion that that piece was |
| 22     A.    Yes, exactly. | 22 misleading. |
| 23     Q.    Okay.  How many sales reps have been -- | 23     Q.    And the piece you're referring to is |
| 24 given sworn testimony in the litigation, to your | 24 the nurse tear sheet, yes? |
| 25 knowledge? | 25     A.    Yes, that's correct. |
| Page 39 | Page 41 |
| 1      A.    I can't count them, I don't know.  I | 1      Q.    And the testimony you're discussing is |
| 2  have not asked for every sales rep's testimony, | 2  the testimony of Ruth Avila.  Correct? |
| 3  because sometimes the sales rep testimony is more at | 3      A.    She is the one who introduced -- first |
| 4  issue for a particular case, and a particular | 4  introduced it, in terms of what I had seen in |
| 5  interface with a particular doctor, and I don't do | 5  testimony, yes.  But I had seen it and reviewed it |
| 6  those kinds of specific causation. | 6  and analyzed it on my own, in addition to that. |
| 7      Q.    Did you ask for any testimony from | 7      Q.    Okay.  And Ruth Avila was fired from |
| 8  other sales reps who may have been examined about | 8  Sanofi for engaging in improper marketing |
| 9  the nurse tear sheet? | 9  activities -- |
| 10     A.    I don't recall if I did or not. | 10             Mr. Miceli:  Object to the form. |
| 11     Q.    Okay. | 11     Q.    You're aware of that; yes? |
| 12     A.    I did ask for testimony around the | 12     A.    I'm not -- |
| 13 nurse tear sheet, once I saw it. | 13             Mr. Miceli:  Same objection. |
| 14     Q.    Then the only testimony that you've | 14     A.    I -- I -- |
| 15 seen around the nurse tear sheet is what you saw on | 15             MR. MOORE:  And just make sure we're |
| 16 the stand in the Kahn trial, with Ms. Avila? | 16 not talking over each other, for the court reporter |
| 17     A.    It may have been an exhibit in other | 17 that's on the Zoom. |
| 18 depositions; I'd have to go back and look. | 18             (Court stenographer clarification.) |
| 19     Q.    Okay. | 19     A.    I'm not personally aware of that.  I |
| 20     A.    It may have been an exhibit in another | 20 have not spoken to her.  But certainly in the trial |
| 21 deposition.  But certainly the details of it, in | 21 testimony that I heard, that was part of the |
| 22 terms of how she described it, were within her | 22 cross-examination, yes, was talking -- and maybe |
| 23 testimony at trial in the courtroom. | 23 even in the direct. |
| 24     Q.    And -- but you certainly haven't | 24     Q.    And I think you also heard that she |
| 25 reviewed the testimony of any other sales rep who've | 25 sued the company and lost.  Correct? |

11 (Pages 38 - 41)

Page 42

1      Mr. Miceli:  Object to the form.
2   A.   I don't remember that she lost.  I do
3 remember there being a lawsuit that was discussed,
4 yes.
5   Q.   Given that Ruth Avila was fired for
6 improper marketing activities, sued the company, and
7 lost, would testimony from other sales reps about
8 the nurse tear sheet be of any interest to you?
9   A.   If my issue had -- was more broad, on
10 sales practices, possibly.  But again, my issue with
11 the nurse tear sheet is what it says, and whether or
12 not that information is consistent with what the
13 company knew.  That was really the crux of what was
14 important to me about the Avila testimony:  The idea
15 that she does confirm it was indeed distributed; it
16 was something that the company and the sales reps
17 were distributing, number one.
18      And then if it's being distributed to
19 patients, what's important is, what does it say.
20 And if you read my discussion of the nurse tear
21 sheet, I'm continually tying it back to my opinions
22 related to the fact that the language in that nurse
23 tear sheet is not teaching that hair may be -- hair
24 loss may be permanent.  Instead, it's teaching
25 something very different.  And that's -- I hope

Page 43

1 that's clear when you read my reports.
2   Q.   I'll ask you more about the nurse tear
3 sheet when we get to that part of the report.
4      I'm just focusing on, you know, your --
5 getting back to my original topic is:  How do you
6 account for bias or credibility issues when you're
7 looking at testimony that you're citing and relying
8 upon when doing your supplemental report.
9      Would it surprise you to know there's
10 been over 60 sales representatives who have given
11 sworn testimony in this litigation?
12   A.   No, based on the fact that in my
13 experience, individual sales reps are often deposed,
14 because they relate to visits to individual doctors
15 that have to do with individual plaintiffs.  So that
16 doesn't surprise me, no.
17   Q.   And does -- is it your belief or
18 understanding that Ms. Avila was deposed in some
19 other way?
20   A.   I don't -- I did not see a deposition.
21 I have only seen her -- or heard and saw her on the
22 stand at trial.
23   Q.   Okay.
24   A.   So I have not reviewed a deposition by
25 her.

Page 44

1   Q.   All right.  Are you aware that she did
2 give a deposition?
3   A.   I assumed that she did, based upon the
4 rules of evidence in courtrooms, but I did not ask
5 for it.
6      Again, the reason being that, with --
7 even without having read Ms. Avila's -- or having
8 heard her trial testimony, the nurse tear sheet
9 alone can be viewed and evaluated, based on my
10 experience and training.  So the fact that she talks
11 about, in some of the information she conveys, about
12 confirming that it indeed was a tool used by the
13 company, that's important.  Because obviously, if it
14 was a piece of information that was never used, that
15 may have a different weight in the way you may form
16 an opinion about the adequacy or inadequacy of the
17 language.
18   Q.   I'm getting a little concerned about us
19 being able to finish about 12:15.  We're going to
20 stop at 12:15; I'm just worried about us being
21 finished.
22      So my question was just:  Are you -- do
23 you know whether she gave a deposition?
24   A.   And I answered that to start.  I
25 typically start by answering you.  I said, I'm aware

Page 45

1 she should have.  I have not reviewed it, which I
2 also have already told you.
3   Q.   Okay.  Correct.  And are you aware that
4 she gave trial testimony, not just once, but twice?
5   A.   I did not see it, no, so I don't know.
6 I did not know.
7   Q.   And you haven't reviewed the transcript
8 from the first trial in the multidistrict
9 litigation, as it relates Ms. Avila's testimony?
10   A.   Are you talking about the Earnest case?
11   Q.   Yes, Earnest?
12   A.   I don't think that's what I had.  I
13 think I had the Kahn case testimony.  So -- but
14 again, I'm not surprised she testified more than
15 once, but I have not seen it.
16   Q.   And you haven't asked to see it?
17   A.   No.
18   Q.   All right.  Okay.  Let's go back to
19 Exhibit 5, and let's look at Paragraph Number 112.
20 It reads in the first sentence, "This second
21 supplemental report was prepared at the request of
22 plaintiff's counsel, and provides additional
23 opinions that I have formed based on my training and
24 experience, as well as my review of additional
25 documents related to this litigation."

Page 62

1  of words, or these kind of descriptions of phrases.
2          And this investigation within the
3  Aussel deposition, again, was triggered by what
4  defense was telling -- was trying to assert with me
5  on the stand, and I just disagree that that is true.
6          And so this is an additional
7  information or additional evidence that I believe
8  supports the position that those things are not the
9  same.
10     Q.   Okay.  And you have two citations
11  there, on page 63 and page 79.  Is that right?
12     A.   I have pages 63 to 65, and then 79 to
13  82.
14     Q.   I see that.  And that was the testimony
15  that you selected to cite in your expert report from
16  Jean-Philippe Aussel; yes?
17     A.   Yes, because it addresses that specific
18  question or issue that I'm talking about in this
19  particular sentence.
20     Q.   Okay.  Let's turn to page 308 of the
21  deposition, if we could.  Line 25.
22     A.   Do you want to start with something
23  more than one just line, or --
24     Q.   Yeah, I'm going to read it to you.  I
25  just want you -- are you there?

Page 63

1     A.   Yes, I am.
2     Q.   Okay.  All right.  Page 308, line 25.
3          "QUESTION:  Have you ever worked in
4  Sanofi's Pharmacovigilance Department?
5          "ANSWER:  Never.
6          "QUESTION:  Have you ever been involved
7  in making safety signal analysis?
8          "ANSWER:  No.
9          "Have you ever been involved in or
10  engaged in any sort of determinations about the
11  causal association or causal relationship between
12  Taxotere and any particular side effect?
13          "ANSWER:  No.  It was up to the
14  investigator to do it, not up to me.
15          "QUESTION:  That would never -- making
16  determinations as to safety analysis or safety
17  signal analysis or causal relationship, has that
18  ever, at any point in your time at Sanofi, been part
19  of your roles or responsibilities?
20          "ANSWER:  No, never."
21          Does the testimony I just read to you,
22  is that material to you in the reliance that you're
23  placing on Mr. Aussel's testimony, as it relates to
24  the labeling language?
25     A.   No, because in the sections of the

Page 64

1  deposition that I describe where he's being asked
2  questions, he's being asked questions about the
3  general meaning what of those terms convey, which I
4  don't think requires him to be someone who's an
5  expert in safety signal analysis, or even to have
6  worked within the Pharmacovigilance Department.
7          He is someone who deals with clinical
8  trials, and he understands generally that safety
9  endpoints are measured.
10     Q.   Let's look at page 312, line 5.
11          "QUESTION:  At any time at Sanofi, have
12  you been involved or part of any type of labeling
13  group or labeling working committee or labeling
14  review committee?
15          "ANSWER:  No, I've never been part of
16  these kinds of committees."
17          At line 13: "QUESTION:  Have you ever
18  drafted or provided input as to what should go in a
19  particular label?
20          "ANSWER:  No, I did not."
21          Line 17: "QUESTION:  Have you ever
22  been given a label to -- a proposed label to review
23  or provide comment on, as it relates to Taxotere?
24          "ANSWER:  No, I have not."
25          Do you see that?

Page 65

1     A.   I do.
2     Q.   Okay.  Does that indicate to you that
3  Mr. Aussel's responsibilities at the company did not
4  involved providing input for safety information for
5  labeling?
6     A.   No, I wouldn't state it that way.  I
7  would say that what this indicates is he was not
8  involved in the drafting of the labeling, which is
9  what the labeling group was doing.
10          So I mean, I was aware of that.  I am
11  absolutely aware that he was not involved in that.
12     Q.   Okay.  But it's your testimony that he
13  believed that any Taxotere label language using
14  words such as "hair generally grows back" or
15  "alopecia" was not telling physicians that Taxotere
16  use had been linked to permanent, irreversible hair
17  loss.  Do you see that?
18     A.   That's what I state --
19          Mr. Miceli:  Objection to form.
20     A.   And I stand by that, based upon the
21  questions that he was asked and the way he answered
22  them.
23          Because the issue here is not -- the
24  issue here is not whether or not there was "some
25  basis to believe" that there was permanent or

17 (Pages 62 - 65)

Page 66

1 irreversible hair loss; the labeling standard. The
2 issue here is whether or not those words convey or
3 include that description, and that's what I'm
4 discussing here.
5    Q.   Okay. Let's look at page 317, line 5.
6         "QUESTION: Okay. And you'll see a
7 section on hair loss. The last sentence in the
8 first paragraph, it says, 'Once you have completed
9 all your treatments, hair generally grows back.' Do
10 you see that?
11        "I see, yeah.
12        "QUESTION: And I know you're not in
13 pharmacovigilance, but at least in your experience
14 in helping run a number of breast cancer trials
15 involving Taxotere, would you say that statement is
16 accurate?
17        "ANSWER: I think it is a correct
18 statement. Indeed, yes, hair generally grows back.
19        "QUESTION: That once you take
20 Taxotere, you may lose your hair, and then it
21 generally grows back?
22        "ANSWER: Correct.
23        "In your experience, would you say
24 that's an accurate statement?
25        "ANSWER: Yes, it is.

Page 67

1         "And does that statement say that once
2 you've taken Taxotere, that your hair will always
3 grow back?
4         "ANSWER: No, it's within the
5 'generally grow back'."
6         And then finally, the question on
7 line 11, page 318.
8         "Does it say, we're giving a
9 100 percent guarantee that your hair will grow back
10 exactly as it was before?
11        "ANSWER: No, it doesn't see that --
12 say that."
13        Do you see that?
14    A.   I do.
15    Q.   Okay. Is that consistent with what you
16 put in the Taxotere -- or in the expert report, that
17 Mr. Aussel believed that the labeling "hair
18 generally grows back" is not telling physicians that
19 there is a risk that the hair might not grow back?
20    A.   I think that the statements he gives of
21 the pages I cite are what they are, and I'll let
22 them speak for themselves.
23        I would say that this doesn't say
24 that -- ask the other question, which is: What's
25 pertinent, when I believe that the questions were

Page 68

1 being asked earlier in the deposition, was whether
2 or not there's an understanding that there's a
3 difference between permanent hair loss and alopecia,
4 where the hair grows back. And that there are other
5 alternatives, which are not being described by that
6 particular language.
7    Q.   Who is the label for?
8    A.   It depends on the label. There's the
9 label -- there's the physician's labeling, and then
10 there's the consumer labeling. So there's a
11 medication guide and/or the nurse tear sheet. Those
12 kinds of things are for the -- are for the patients
13 themselves. And then the label, the PDR version, is
14 for the physician.
15   Q.   Right. The prescribing information,
16 the PDR version; that's something that is provided
17 to physicians so the physicians can learn about the
18 potential adverse events associated with the
19 medicines, so they can make their risk/benefit
20 decision. Correct?
21   A.   Yes, that's the general audience.
22   Q.   How many physicians have given
23 testimony about that labeling language in this MDL?
24   A.   I have no idea, because I'm not a
25 case-specific expert, which is where I would believe

Page 69

1 the physicians are.
2        I do know that there's a discussion of
3 it. Dr. Arrowsmith's a physician, and I know she
4 describes it. And I can't remember if -- Dr. Glaspy
5 is a physician. I don't recall whether he described
6 that in testimony. I don't know; I'd have to go
7 back and look.
8    Q.   But aside from retained experts, I'm
9 talking about doctors who've actually read this
10 label, read this prescribing information in their
11 practice, and prescribed the medicine for patients.
12       Do you know how many of those people
13 have been deposed in the litigation?
14   A.   No, I can't answer that. But even if
15 they have, the important thing is not what an
16 individual physician may or may not interpret. It's
17 what the company knew, and they need to provide that
18 complete information to the physicians. So the
19 issue here is, regardless of whether or not a
20 physician could interpret it a different way, the
21 issue is the company understood that these were two
22 separate injuries, and they never provided
23 physicians with that information.
24   Q.   You mentioned the Kahn trial earlier.
25 What we'll do is, we'll mark as exhibit number --

18 (Pages 66 - 69)

Page 82

1  struck through. Do you see that?
2      A.   Well, it's just not that; there's a
3  whole -- there's also some sections above. But yes,
4  it's one of the things that a strike-through --
5  there's a strike-through, yes.
6      Q.   Okay. All right. So does that answer
7  the question to you as to who struck out the section
8  on "Other Persistent Language" -- Persistent
9  Reactions" that was proposed in 2004?
10     A.   Well, it indicates to me that it's --
11 that the strike-through document is being sent
12 through FDA, but it doesn't tell me why it was
13 struck through.
14         And that's what I was -- I think you
15 and I had this conversation. I'm used to seeing
16 draft labeling in this what I call the negotiation
17 process, which is what this is, happen with -- there
18 would be comment boxes about why it is, and I don't
19 see that here.
20     Q.   Okay. All right.
21     A.   Again, based on my experience.
22     Q.   Okay. And it's FDA that has ultimate
23 say as to the content of FDA-approved drug labels?
24         Mr. Miceli: Object to the form.
25     A.   If by "ultimate say," is they must make

Page 83

1  a final approval decision, that is true.
2      Q.   Okay. All right. Let's go to
3  Paragraph 116 -- wait, well, before we get that, get
4  to that. It says -- I skipped over something.
5          You referenced there a footnote in
6  Paragraph 115 relating to the deposition testimony
7  of Emanuel Palatinsky. Do you see that?
8      A.   I do.
9      Q.   It says, "This testimony" -- going back
10 up to where Footnote 4, the sentence that's
11 footnoted with Footnote 4 -- "This testimony from
12 Mr. Aussel is further supported by the testimony of
13 Dr. Palatinsky, who testified that at no time while
14 he was global safety officer did the U.S. label warn
15 of permanent hair loss."
16         Do you see that?
17     A.   I do.
18     Q.   Okay. And then you cite his testimony
19 there, on page 4?
20     A.   Yes, I say go to pages -- I went to
21 page -- well, I cite to page 223 of his -- and he
22 has different dates; this is the August 9th.
23         Mr. Miceli: I think you said page 4,
24 Doug. I think you meant Footnote 4.
25     Q.   Footnote 4, sorry. And you refer us to

Page 84

1  page 223, line 3, to 223, Line 8. Correct?
2      A.   Of the August 9, 2018, yes.
3      Q.   All right. Let's take a look at --
4          Mr. Miceli: Number 10, Exhibit 10.
5          MR. MOORE: We'll make this Exhibit 10.
6          Well, strike that.
7      Q.   You indicated that there was multiple
8  days of his depositions, and you were looking at
9  the -- the August 9 transcript? Is that what those
10 pages refer to?
11     A.   Yes, I gave you -- that's what I
12 stated. And when I went back and confirmed that,
13 that's what I pulled up on my computer, yes.
14     Q.   Okay. And did Dr. Palatinsky -- let's
15 see. Okay. Did Dr. Palatinsky talk about the
16 labeling language on the second day of his
17 deposition?
18     A.   I'd have to pull it. I assume he would
19 have, but I'd have to pull it. I don't remember, I
20 think he had three days of deposition, but I may be
21 wrong.
22         MR. MOORE: Let me mark as Exhibit 10
23 the transcript from August 10, 2018.
24         (Exhibit Plunkett-10, Transcript of
25 Deposition of Dr. Emanuel Palatinsky taken

Page 85

1  August 10, 2018, was received and marked for
2  identification.)
3      Q.   And I'd ask if you could turn to
4  page -- oh, sorry.
5          Mr. Miceli: That's all right.
6      Q.   Ask if you could turn to page 500,
7  line 9. Okay.
8      A.   I'm there.
9      Q.   Line 9.
10         "QUESTION: You'll see the section on
11 'Hair Loss.' Do you see that?
12         "ANSWER: Yes, I can see that.
13         "And it says, 'Loss of hair occurs in
14 most patients taking Taxotere, including hair on
15 your underarm, pubic hair, eyebrows and eyelashes.'
16 And it goes on to state, quote, 'Hair loss will
17 begin after the first few treatments, and varies
18 from patient to patient. Once you've completed all
19 of your treatments, hair generally -- generally
20 grows back.'
21         "What does that statement mean to you
22 as global safety officer and as a doctor and medical
23 professional?"
24         And the answer that Dr. Palatinsky gave
25 is: "It tells me that this document is

Page 86

1 communicating to the reader that in a majority of
2 patients, the hair loss will recover, and in a
3 minority of patients, it may not."
4             Do you see that?
5     A.    I see that testimony, yes.
6     Q.    Okay. And is that consistent or
7 inconsistent with the statement you make in your
8 expert report in Paragraph 115, that says, "The
9 testimony of Dr. Palatinsky...testified that at no
10 time while he was the global safety officer did the
11 U.S. label warn of permanent hair loss"?
12            Mr. Miceli: Object to the form.
13     A.    It's not inconsistent, if you actually
14 read his testimony, where he answers that question
15 as I'm citing to. So --
16     Q.    Well, how do you --
17     A.    Under --
18     Q.    Strike that.
19            I thought you were done, go ahead?
20     A.    No, I'm sorry.
21            I was going to say, understanding that
22 the section you're reading from is his -- his direct
23 or redirect, I don't know what you want to call it,
24 at the deposition, from defense counsel; versus the
25 section I'm pointing to, which was his answers to

Page 87

1 plaintiff counsel's question, it's not surprising
2 that the way the questions are asked will certainly
3 elicit, potentially, something that appears
4 inconsistent. But I don't believe it is, based upon
5 the way the questions were asked on the first day.
6     Q.    How do you decide --
7     A.    And I would say: In order to explain
8 it to you, maybe we could pull out the section I'm
9 referring to, to look at the context and the way the
10 questions were asked --
11     Q.    How do you decide which testimony is
12 relevant to a particular issue when you're preparing
13 your supplemental report? Is there a reason you
14 didn't cite the testimony that I just read, where he
15 indicates that that labeling language indicates to
16 him, as global safety officer, a doctor and a
17 medical professional, that the hair might not grow
18 back?
19            Mr. Miceli: Object to the form.
20     Q.    Why was that testimony not testimony
21 that you felt necessary to at least acknowledge in
22 your report?
23            Mr. Miceli: Object to the form.
24     A.    It's not that I don't acknowledge it;
25 it's not the specific point I'm making, which is the

Page 88

1 understanding -- which Dr. Palatinsky had at that
2 time. Definitely in 2008, he understood that
3 permanent or persisting alopecia was a different
4 adverse event than drug-induced --
5 chemotherapy-drug-induced alopecia.
6            And regardless of what he says here in
7 this question, the way you're asking it, the
8 questions as asked, I believe, in the other section
9 of the deposition that I'm referring to, have to do
10 with that particular issue. In other words, what --
11 whether or not there is a particular injury of
12 persistent or permanent alopecia, and whether or not
13 the label ever specifically warned of that. And
14 that's where he says no, it does not.
15     Q.    Where -- where -- why do you believe he
16 had the understanding in 2007 or 2008 -- I thought I
17 heard you say in 2007 -- that persistent alopecia or
18 persistent hair loss was something different?
19            Mr. Miceli: Object to the form.
20     A.    Well, you go to his changes to the
21 informed consent document, where he uses the
22 specific term "persistent alopecia," not just
23 "alopecia."
24     Q.    Okay.
25     A.    That's -- and if you read his testimony

Page 89

1 around that, that's what he talks about.
2     Q.    Okay.
3     A.    He also -- and then I would also point
4 you to in my April 2022 report, I talk about the
5 analysis he did a little bit later, even, in time.
6 That wouldn't be '08, I think that was 2010, where
7 he recognizes that it's a separate injury.
8     Q.    Okay. So let's talk about -- let's go
9 ahead, since you brought it up, to this
10 Paragraph 116.
11            It says, "The testimony of
12 Dr. Palatinsky," and then there's a footnote. Do
13 you see that?
14     A.    Yes. This is the -- this is where I'm
15 talking about the informed consent.
16     Q.    The informed consent. Okay.
17            And so what you're -- describe for me
18 again what happened there? So he was provided an
19 informed consent and did what? What happened?
20     A.    He was editing it or correcting the
21 Taxotere section for I guess consistency, or making
22 sure it was an accurate reflection, in order to pass
23 it and use it for clinical trials with
24 investigators.
25            So he was editing or correcting -- I

23 (Pages 86 - 89)