UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IN RE:  TAXOTERE (docetaxel)
PRODUCTS LIABILITY LITIGATION

                    Civil Action No. 16-MD-2740
                    Section "H"(5)
                    New Orleans, Louisiana
                    July 11, 2023

THIS DOCUMENT RELATES TO ALL CASES
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


TRANSCRIPT OF SHOW CAUSE HEARING
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:


                    MATTHEW PALMER LAMBERT
                    PENDLEY BAUDIN & COFFIN
                    1100 POYDRAS STREET
                    SUITE 2225
                    NEW ORLEANS, LA 70163



FOR SANOFI S.A.:

                    JULIE CALLSEN
                    JORDAN BAEHR
                    SHOOK HARDY & BACON
                    2555 GRAND BOULEVARD
                    KANSAS CITY, MS 64108

                    KELLY E. BRILLEAUX
                    IRWIN FRITCHIE URQUHART & MOORE
                    400 POYDRAS STREET
                    SUITE 2700
                    NEW ORLEANS, LA 70130

FOR SANDOZ, A NOVARTIS DIVISION:

                    NICHOLAS INSOGNA
                    GREENBERG TRAURIG
                    3333 PIEDMONT ROAD NE
                    SUITE 2500
                    ATLANTA, GA 30305


FOR ACCORD HEALTHCARE, INC.:

                    BRENDA A. SWEET
                    TUCKER ELLIS
                    950 MAIN AVENUE
                    SUITE 1100
                    CLEVELAND, OH 44113

```
PARTICIPATING VIA PHONE:    MELANIE SULKIN
                            ERIC NEWELL
                            JENNIFER DOMER
                            DAVID DIAMOND
                            RAND NOLEN
                            LINDSAY STEVENS
                            DAVID FRIEND
                            SIMONE WHITE
                            LISA GORSHE
                            DAVID BONNIN
                            DENISE DESSEL
                            LARRY CENTOLA
                            MARK NIEMEYER
                            PETER GOSS
                            ROBIN MYERS
                            SAMUEL WENDT
                            DAVID MICELI
                            AMEENA ALAUDDIN
                            JOHN CAREY
                            KAREN MENZIES
                            RACHEL RICHARDSON
                            LEE THWEATT
                            JAVIER ORTIZ
                            LOWELL FINSON
                            TREVOR ROCKSTAD
                            RYAN BROWNE
                            JENNIFER GREENE
                            BRIA HANLON
                            ARATI FURNESS
                            ANDREW GEIGER
                            PIERCE JONES
                            BETSY BARNES
```

```
Official Court Reporter:    Nichelle N. Drake, RPR, CRR
                            500 Poydras Street, B-275
                            New Orleans, Louisiana 70130
                            (504) 589-7775
```

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

1          **P R O C E E D I N G S**

2              (Call to order of the court.)

3          THE COURT:  I'm going to go through those cases

4    that are being dismissed for reasons that you previously

5    sent.  We've done a little bit out of order because you

6    submitted it to me with No Contact and No Defense all

7    mixed up.  And so I want to just do those separately so

8    that I can indicate why they're being dismissed and then

9    we'll go through those very quickly.

10         MS. CALLSEN:  And then I believe that there are

11   more to be added to each category that have been filed

12   since Friday.  So at the end of the category that you're

13   going through them, maybe Kate or Palmer want to add the

14   additional dismissals.  Does that make sense?  Or do you

15   want to do that as you go through?

16         THE COURT:  However you want to do it.  I'm going

17   to go through my initial list.  I'm going to deal with

18   Declaration of No Contact and then I'll read the cases.

19   And if there are any dismissals related to no contact,

20   I'll ask you to add those at the conclusion.

21             So defendants have provided a list of plaintiffs

22   whose counsel has filed a Declaration of No Contact.  The

23   following cases are therefore dismissed with prejudice

24   due to plaintiff's failure to comply with the obligations

25   to communicate with counsel despite counsel's best

1    efforts.

2          These cases are Docket No. 17-5705, Joyce Burns;

3    Docket 17-13977, Linnie Fowler; Docket 17-14999, Ina

4    Rankins; Docket 18-3098, Hilda Bynum; Docket 17-17331,

5    Amber Cobren; Docket 17-14074, Maureen Benson; Docket

6    20-03172, Annette Martin.

7          Are there other cases that should be included in

8    the Declaration of No Contact list?

9          MR. LAMBERT:  No, Your Honor.

10         THE COURT:  Okay.  Thank you.

11         The following plaintiffs have filed a Statement of

12   No Defense.  Their matters are therefore dismissed with

13   prejudice.  Those cases are Docket 17-15110, Diana

14   Vermilyer; Docket 18-8311, Jacquelyn Edge; Docket

15   17-13831, Friella McGee; Docket 18-3322, Delois Leavell;

16   Docket 18-11313, Paula Buckley; Docket 17-10018, Janis

17   Griffin; Docket 17-12373, Lori Hess; Docket 18-2083,

18   Lorraine Hoverman; Docket 17-12354, Catherine Loccisano;

19   Docket 17-11116, Danielle Osley; Docket 17-11206, Gail

20   Wooden; Docket 18-722, Mary Dotson, and Docket 17-11325.

21         Are there any other cases that should be added to

22   that list?  Mr. Lambert?

23         MR. LAMBERT:  Yes, Your Honor, Palmer Lambert,

24   co-liaison counsel for plaintiffs.

25         That last one that you read, Sharon McNeal,

1   17-11325, that firm filed a withdrawal of their notice

2   yesterday.  That's Docket No. 16-150 and that should be

3   removed from the list.

4        THE COURT:  Wait.  I have that as 17-11325.  Let's

5   check that.

6        MR. LAMBERT:  Yes, 17-11325.

7        THE COURT:  Okay.  So that one would not be

8   dismissed with prejudice and, in fact, instated.  Okay.

9        MR. LAMBERT:  Yes.

10       And then to add to the statement list, we have

11  Docket No. 17-14459, that's Magdalene Long; Docket No.

12  17-12992, Lorraine Howard; Docket 16-17919, Opal McNeal;

13  Docket 18-06035, Daisy Lawson; Docket 16-15842, Loretta

14  Moore, and Docket 18-06100, Lillian Myles.

15       MS. CALLSEN:  Palmer, it might be helpful if you

16  identify where they fall on the hearing list as well.

17       MR. LAMBERT:  Yes.  I'm sorry.

18       THE COURT:  That's okay.

19       MR. LAMBERT:  Those are on the hearing list

20  numbers 49 --

21       THE COURT:  Give me a second.

22       You can go ahead.  Just tell me where they are.

23  It's going to take me a while to find it, because this

24  list is --

25       MR. LAMBERT:  Okay.  It's numbers 49 --

1          THE COURT:  Okay.

2          MR. LAMBERT:  -- 56 --

3          THE COURT:  Okay.

4          MR. LAMBERT:  -- 57 --

5          THE COURT:  Okay.

6          MR. LAMBERT:  -- 116 --

7          THE COURT:  All right.

8          MR. LAMBERT:  -- 118 --

9          THE COURT:  Okay.

10         MR. LAMBERT:  -- and 123.

11         THE COURT:  Thank you.

12         All right.  Now we have the following plaintiffs

13    have filed Stipulations of Dismissal with prejudice

14    before today's hearing.  These matters are dismissed with

15    prejudice.  This is Docket 17-14810, June Burton; Docket

16    17-17221, Cindy Auwater, and Docket 17-10301, Melda

17    Biddix.

18         Is there anything else that should be added to

19    that list of dismissed cases?

20         MR. LAMBERT:  Yes, Your Honor, just one more.

21    That's Docket 16-15609, Janet Bodden, and that's No. 121

22    on the hearing list.

23         THE COURT:  Okay.  Thank you.

24         MS. CALLSEN:  All right.  I'm going to start with

25    some introductory comments.  Is that okay?  Are you ready

1    for me?

2              THE COURT:  Always ready for you, Ms. Callsen.

3              MS. CALLSEN:  I was going to start by telling you

4    I believe this hearing will be shorter than the previous

5    one.  The cases listed for these hearings were noticed

6    back in April; is that right?

7              MS. SWEET:  March.

8              MR. BAEHR:  March.

9              MS. CALLSEN:  And they were done by looking

10   through a comprehensive listing of various categories of

11   CMO 12A and the addendum.

12              As you may recall in the past, we have dealt with

13   buckets.  You know, this hearing, we're kind of dealing

14   with miscellaneous kinds of CMO 12A because we're trying

15   to do a comprehensive sweep of all the issues we've

16   identified.

17              And there is one additional issue that was

18   surfaced that we talked about at the leading liaison

19   conference last week, last month, and it was the issue of

20   plaintiffs who have -- have product ID, but have sat on

21   it for years and have not yet taken any steps to amend

22   their complaints.  So they've just recently through the

23   CMO 12A docket process realized that the product ID they

24   had uploaded to MDL Centrality back in 2018, 2019 was not

25   any defendant that they had named in their complaint.

1    And, therefore, we have a listing of cases already that

2    we've submitted that we're going to brief.  And so that's

3    a new issue that raised.

4         But in addition, there are several cases that

5    you're going to hear today where steps have not yet been

6    taken to amend the complaint.  So in other words, you'll

7    have -- there's no product ID for any named defendant.

8    So our position is that that defendant for whom there is

9    no product ID should be dismissed.  And our position

10    would be that the case should be dismissed in its

11    entirety because there are currently no product ID

12    against any named defendant and no steps have been taken

13    to amend the complaint.

14         There is also only a handful of cases that we

15    believe that the Court needs to look at purchase records

16    and other product ID.  You know, we negotiated the

17    addendum specifically to outline evidence outside the

18    parameters of CMO 12 that would be acceptable.  And so,

19    you know, we dealt with those issues, you know, since

20    April and it gave plaintiffs a certain amount of time to

21    obtain that.  Our position is that if they're currently

22    on the list today it's because that time has passed and

23    it's elapsed without them obtaining the evidence that

24    they've been put on notice would suffice.

25         In addition, there's a handful of cases where

1   reinstatement is sought.  Recall that we allowed

2   reinstatement in order for plaintiffs to obtain the

3   addendum type of evidence, so the reinstatement issues

4   will either address that the time has elapsed since they

5   were reinstated to obtain that evidence or they're still

6   seeking reinstatement.  However, the dismissal was not

7   based on a dispute regarding that type of evidence that

8   the addendum was enacted.

9           THE COURT:  When I reviewed the -- as I was going

10  through these cases, it looks like some of these were

11  dismissed over a year ago.

12          MS. CALLSEN:  Correct.  Correct.  So some of

13  them -- there are a few on the list where they were

14  dismissed in April of '22.

15          THE COURT:  Right.

16          MS. CALLSEN:  Our position is that those cases do

17  not merit reinstatement because the reinstatement was

18  specifically if they were dismissed based on a dispute

19  over the distributor type records that led to the

20  addendum.  The dismissals in those cases, we will address

21  them as they come up, but we say they're outside the

22  parameters.  So that's why some of those do appear on

23  there.

24          In addition, there were a number of cases that we

25  stipulated to roll over in advance of the March hearing

1    to streamline that, so those are going to be on the list.

2    And many of those, you know, have led to -- you know,

3    they've cured.  There were over 400 that we did roll over

4    and many of those have cured and/or dismissed.  And some

5    of those, they're still making some efforts to obtain

6    PID, and so in those cases, we will ask for an additional

7    30 days.  We found that that was helpful after the last

8    hearing where they had 30 days.  They were in the

9    process.  Efforts were being made.  We would allow

10   30 days and we would come back to the Court after 30 days

11   and outline our various -- either they're cured or we

12   would seek dismissal at that time.

13        And, again, these were -- you know, the Initial

14   Notice of Compliance had 400.  Now we're down to -- there

15   were 167, and based on the additional, I think we're down

16   to, what, maybe 157.  Yeah, something like that.  So it's

17   already decreased and they're split between product ID

18   and the PTO 22A deficiencies like the last hearing we

19   had.

20        The PTO 22A deficiencies mainly involve plaintiffs

21   who have been deceased for many years, but they have not

22   yet filed a substitution.  You rolled over many of these

23   last time to allow for a substitution.  You know, our

24   position is, if they haven't yet filed the substitution,

25   it should be dismissed.  And for those plaintiffs who

 1   have passed away more recently, we're merely asking for a

 2   Suggestion of Death to be filed, substitution to be

 3   followed, and the steps to be taken.

 4       As far as any further cases we have not yet

 5   submitted a Notice of Compliance, we anticipate we may be

 6   identifying those because through this process.

 7   Complaints have been amended.  New Plaintiff Fact Sheets

 8   have come up.  And so our position is that how about in

 9   October we'll let you know where we are on that process

10   and whether anything further needs to be taken.

11       THE COURT:  Thank you.

12       Ready to proceed?

13       MR. LAMBERT:  Your Honor, just briefly in

14   response, I'm not going to pre-argue the issue that

15   Ms. Callsen raised about the timeliness of amendments on

16   complaints.  We have agreed on a schedule to submit

17   letter briefing on that and we will deal with it at that

18   point.

19       Just suffice it to say that the plaintiffs

20   disagree, that those amendments are untimely as they're

21   consistent with CMO 12A.  And there is no -- they're not

22   bellwether cases.  They're not subject to any trial

23   scheduling order.  We think that they're timely.

24       The handful of cases that Ms. Callsen alluded to

25   for the Court to adjudicate the evidence, our position in

1  general on those is that if there are fact issues to deal

2  with, those should be deferred to the transferor courts,

3  but they can be cleaned up in terms of the -- the

4  defendant that they believe the evidence supports should

5  be the only one remaining in those cases.

6          THE COURT:  Thank you.

7          MR. LAMBERT:  Thank you.

8          THE COURT:  All right.  Ms. Brilleaux?

9          MS. BRILLEAUX:  Good morning, Judge, Kelly

10  Brilleaux for the Sanofi defendants.  I'm going to be

11  addressing most of the 22A deficiencies this morning.

12          The first four are rather straightforward.

13  They're all filed by or they're all cases that are being

14  litigated by Bachus & Schanker.  It's Leora Barnett,

15  Jameta Barnwell, Bernice Leinweber and Ida Paden.

16          THE COURT:  Okay.

17          MR. BRILLEAUX:  And all of these are --

18          THE COURT:  Wait.

19          Ms. Sulkin, are you on the phone?  Sorry.  Hello?

20  Ms. Sulkin, are you on the phone?

21          Star what?

22          MS. BRILLEAUX:  Six.

23          THE COURT:  Star six.

24          We can push those to the rest of Bachus & Schanker

25  if we need to.

1          MR. LAMBERT:  Your Honor, I believe my notes say

2     these are for plaintiffs who unfortunately have passed

3     away --

4          THE COURT:  Right.

5          MR. LAMBERT:  -- and I believe they have not been

6     able to locate next of kin or substitute plaintiffs.  We

7     can push them to Bachus & Schanker's group, but that's

8     the issue --

9          MS. BRILLEAUX:  I'll just say that we have

10    received e-mails from Bachus & Schanker that say they do

11    not oppose dismissal, but because of the situation with

12    the deceased plaintiff and not being able to locate next

13    of kin, they cannot file a dismissal in this action.  So

14    --

15         THE COURT:  All right.  I mean --

16         MR. BRILLEAUX:  -- I don't think that they oppose

17    dismissal, so our request would be that the cases be

18    dismissed with prejudice.

19         MS. SULKIN:  Your Honor, my apologies.  This is

20    Melanie Sulkin.  I've been trying to unmute myself.

21         And Ms. Brilleaux is correct.  We don't oppose

22    dismissal in these four cases.  We just don't feel that

23    we can sign a pleading on behalf of these plaintiffs

24    given we've not substituted the parties.

25         THE COURT:  These matters are dismissed with

1  prejudice.  Plaintiffs are deceased.  They have not filed

2  a -- a Suggestion of Death has not been filed timely nor

3  is there any next of kin to be notified.  These matters

4  are dismissed.

5       Okay.  Then we go to --

6       MR. INSOGNA:  Aquaquenetta Daniels.

7       THE COURT:  Aquaquenetta Daniels.

8       MR. INSOGNA:  This is with Brent Coon &

9  Associates.

10       THE COURT:  All right.  Who do I have?

11       Mr. Newell, are you on the line?

12       MR. NEWELL:  Yes, Your Honor.

13       THE COURT:  Okay.  Thank you.

14       MR. INSOGNA:  Your Honor, in this case, we have

15  purchase records that plaintiff has produced identifying

16  four manufacturers, all with the date September 13th,

17  presumably 2013.  Plaintiff's treatment was from

18  June 2013 to September 10, 2013.  There are no more

19  specific dates to narrow, so we believe plaintiff is at

20  the end of the line on the product ID.

21       THE COURT:  Mr. Newell, you need a defendant.

22       MR. NEWELL:  I know, Your Honor.  We've made

23  attempts to get additional records.  Duke University, the

24  facility where she was treated, basically said they don't

25  have anything else at this point and I'm just here to

1    lodge my objection to this --

2           THE COURT:  Okay.  This matter is dismissed with

3    prejudice.  I know you have -- and I just want the record

4    to indicate that you have made really diligent efforts to

5    find product ID, and, unfortunately, you have not been

6    able to do so.  Thank you.

7           MR. NEWELL:  Your Honor, am I dismissed?

8           THE COURT:  You're dismissed and your case is

9    dismissed.

10          All right.  We have Ms. Domer with Cutter Law?

11          MS. BRILLEAUX:  I believe, Your Honor, for Mary

12   Jones with Cutter Law a Suggestion of Death and a Motion

13   for Substitution was filed, which was the relief we were

14   seeking.  So I believe that one can be removed --

15          THE COURT:  It's satisfied.

16          MR. BRILLEAUX:  -- from the list.

17          THE COURT:  Okay.  Thank you.

18          MS. DOMER:  Yes, Your Honor, this is Ms. Domer.

19   That is correct.

20          THE COURT:  Okay.  Thank you.

21          Nancy Tanner with Diamond Law, Mr. Diamond, are

22   you on the line?  Mr. Diamond?

23          Have we agreed to a -- it looks like he's waiting

24   --

25          MR. DIAMOND:  I'm on the line now, Your Honor, if

1    you can hear me.

2         THE COURT:  I can.  Thank you.

3         All right.  It looks like he's waiting for a

4    response?  Have you all discussed --

5         MR. BAEHR:  We have discussed.  We reached out,

6    and if that's the best thing to do, then we can give them

7    30 days.  That's fine.

8         THE COURT:  All right.  Court's going to grant

9    30 days.

10        MR. DIAMOND:  Thank you, Your Honor.

11        THE COURT:  Thank you.

12        Okay.  And we have June Rittscher from Nolen

13   Fleming (sic).

14        Mr. Nolen, are you on the line?

15        MR. NOLEN:  Yes, Your Honor.

16        THE COURT:  Okay.

17        MS. SWEET:  Your Honor, in this case, plaintiff

18   has produced a fax from the facility that has a printout

19   of the website with an Accord NDC code, but the issue is

20   that that Accord NDC was not available, it was not on the

21   market at the time of plaintiff's treatment.

22        THE COURT:  I know that there's an outstanding --

23   I have lots of yellow highlight on this one.  There are

24   outstanding requests to Medicare as I appreciate it and

25   the distributor; is that correct, Mr. Nolen?

1          MR. NOLEN:  Yes, Your Honor.  Yes, it is.

2          THE COURT:  I'll give you 30 days to run that down

3     since there are outstanding requests.  Thank you.

4          MR. NOLEN:  Thank you, Your Honor.

5          THE COURT:  Elizabeth DeGraff and that's with

6     Lindsay Stevens.  Are you on the line?

7          MS. STEVENS:  Yes, Your Honor, I'm here.  This is

8     Lindsay Stevens with Gomez Trial Attorneys.

9          THE COURT:  Is this one satisfied?

10          MR. BAEHR:  This is a late cure.

11          THE COURT:  Okay.  All right.  Thank you.

12          We can go to the next case, Marcella Lacy, and

13     that's Mr. Friend.  Are you on the line?

14          MR. FRIEND:  Yes, Your Honor, David Friend for

15     Marcella Lacy.

16          THE COURT:  It looks like you're on your last leg,

17     but is there an outstanding subpoena that's been issued.

18          MR. FRIEND:  There is an outstanding -- there is

19     an outstanding subpoena.  In fact, we just received a

20     response to that subpoena yesterday, but it consisted of

21     what looks to be an Excel spread sheet data dump that's

22     about a thousand pages long that looks like it was

23     created just for litigation.  So it's not the actual

24     records that we were seeking.  So I'm going to try to

25     work it out with the records provider to provide actual

 1   records as opposed to an Excel spread sheet, which really

 2   means nothing.  But if that does not work, I'm going to

 3   be seeking a motion to enforce the subpoena.

 4         THE COURT:  Mr. Friend, I'll be honest with you,

 5   you know.  As I went through this, it looks like you have

 6   been working very diligently to try to get this.  But,

 7   you know, I'm going to let you continue running this

 8   down, but like I said earlier --

 9         MR. FRIEND:  We do have a --

10         THE COURT:  -- you may be on your last leg, but

11   we're going to give you an opportunity to run this down.

12   So let's just roll this one over until the next one.

13         MR. BAEHR:  The only question I have for that is

14   it presumes that there will be a next hearing like this,

15   which if that's the operating assumption, that's fine.

16         THE COURT:  I don't want this.

17         This is my problem.  I don't know how to give

18   Mr. Friend a deadline because it looks like he's being --

19   they're just not cooperating.

20         MR. BAEHR:  Certainly.

21         THE COURT:  And if I was a suspicious person, I

22   would say it was intentional.

23         MR. LAMBERT:  May I suggest, Your Honor, a status

24   report from Mr. Friend in 30 days?

25         THE COURT:  Why don't you give me a status -- you

1  know what, Mr. Friend, I'm going to give you 45 days to

2  send a status report and we'll see where we are.

3       MS. CALLSEN:  Your Honor, the only suggestion --

4       MR. FRIEND:  Thank you, Your Honor.  That's fine.

5       MS. CALLSEN:  The suggestion I was going to make,

6  the previous order that was entered on the 30-day deal,

7  so to speak, just asked for a substantial compliance that

8  they show they're, you know, making substantial

9  compliance towards obtaining --

10       THE COURT:  Well, I think that's what the

11  status -- it is apparent to me from everything that there

12  has been serious work trying to get this, but he's been

13  -- it seems like the facility is obstructing.

14       MR. FRIEND:  We had success with another case by

15  issuing a subpoena and got the exact records they were

16  looking for.  It's just this time we got an Excel spread

17  sheet as opposed to actual records --

18       THE COURT:  Right.

19       MR. FRIEND:  -- so we might have to move to

20  enforce the subpoena.

21       THE COURT:  Okay.  Why don't you give me a status

22  report within 45 days and we'll deal with it.  I want to

23  make sure that there is continuous movement on this.

24  But, anyway --

25       MR. LAMBERT:  And, Your Honor, just as a reminder

 1   to counsel, there is a pretrial order, I think it's 97

 2   off the top of my head, but if Mr. Friend needs help,

 3   liaison counsel can help with the enforcement of subpoena

 4   pretrial orders.

 5          THE COURT:  Thank you.

 6          MR. FRIEND:  Thank you.

 7          THE COURT:  Then we go to Ms. White and this is

 8   Shirley Johnson Hill?

 9          MS. WHITE:  Hi, Your Honor, this is Simone White

10   for Shirley Johnson-Hill.

11          THE COURT:  Okay.  I read what you submitted.  I'm

12   not sure how that's getting us to product ID.

13          MS. WHITE:  Yes, Your Honor.  We talked to a

14   couple of different pharmacists and the inpatient

15   pharmacist and they recently recommended that we try to

16   reach out to the physician in the legal department

17   because they no longer have it.  So we are going to try

18   those final steps of doing that.  But that's where we are

19   so far.

20          And to add complication to the matter,

21   Ms. Johnson-Hill is part of the Wave 2 remand, so we

22   still need to confer with Sanofi on that as well.

23          THE COURT:  Okay.

24          MR. BAEHR:  I'm not sure I heard it exactly.

25          THE COURT:  She's part of the remand --

1          MR. BAEHR:  Oh, okay.

2          THE COURT:  So they're going to have to confer

3    with -- but I don't understand the -- the infusion center

4    didn't have the NDC codes; am I correct?

5          MS. WHITE:  Correct, Your Honor.

6          THE COURT:  How would the physicians have those

7    codes?

8          MS. WHITE:  I know, Your Honor.  It seems a little

9    like a -- it seems like a little perhaps somewhat futile,

10   but that's what they recommended on the phone call.  But

11   that would be the only leads that we would have to follow

12   up on for the infusion center.

13         THE COURT:  Have you contacted the physicians yet?

14         MS. WHITE:  No, Your Honor, we have not yet

15   contacted the physicians.  That is something that we are

16   going to do.

17         MS. CALLSEN:  The physicians would not have it,

18   Your Honor.  I know from experience.

19         THE COURT:  I know they won't.  I think so does

20   Ms. White.  I think she knows they don't.

21         You know, I'll allow you to send them a request

22   and I think what you're going to hear pretty quickly is

23   this is -- I mean, that's going to be an infusion center

24   and I think you know that.  This seems like a wild goose

25   chase, but I will allow you to make the request.  But

1    since it is part of the remand process, I think this is

2    going to flush out in that --

3         MR. BAEHR:  There will be a separate challenge

4    based on that list.  Yeah.

5         THE COURT:  Right.  Right.  So I'm going to allow

6    you to ask the physicians, but, Ms. White, I wouldn't

7    count on it.

8         MR. BAEHR:  I will say, Your Honor, because the

9    remand process doesn't contemplate sort of you're at the

10   end of the line, you're going to get dismissed for PID,

11   we would just ask that she be given the 30 days

12   applicable in other cases so that she can still proceed

13   in this posture as, you know, you've come to the end of

14   the line, you got to go.

15        THE COURT:  Okay.  I'll grant you 30 days.  How

16   about that, Ms. White?

17        MS. WHITE:  Yes, Your Honor.  Thank you.

18        THE COURT:  Okay.  Ruby Goble and that's Hughes

19   and Coleman.

20        Ms. Sulkin, are you on the line?

21        MS. SULKIN:  I am, Your Honor.

22        MS. BRILLEAUX:  Your Honor, this is a PTO 22A

23   case.  This is no PFS submitted including no MDL

24   Centrality profile, no signed authorizations, no PTO 71A.

25   The only thing we have in this case is one page of

1  billing records.  That's it.

2       THE COURT:  Ms. Sulkin?

3       MS. SULKIN:  Your Honor, originally, we were not

4  going to oppose dismissal, but we just recently were able

5  to locate Ms. Goble and she is working with our firm to

6  fill out the Plaintiff Fact Sheet.  All I would request

7  is 30 days to give her the opportunity to fill it out,

8  and if not, we will not oppose dismissal and will file --

9  we'll either file a Declaration of No Contact or a --

10  that we don't oppose, just based on what happens within

11  the next 30 days.

12       THE COURT:  Ms. Sulkin, you know this case has

13  been pending seven years?

14       I'm going to give you seven days, not thirty days,

15  seven days.  And it needs to be completely completed out,

16  and if there's anything that's not part of it, it's being

17  dismissed with prejudice in seven days.

18       MS. BRILLEAUX:  Thank you, Judge.

19       THE COURT:  All right.  Valerie Campbell.  That's

20  Johnson Becker, Ms. Gorshe.

21       MS. GORSHE:  Yes, I am on the line, Your Honor.

22       THE COURT:  Okay.  Thank you.

23       MR. INSOGNA:  And, Your Honor, this is a case

24  where there are purchase records that have been

25  submitted.  The facility has responded that there was a

1    four-week shelf life for product at the facility, and

2    based on the purchase records, every infusion could have

3    been either Sandoz or Hospira and there is no way for

4    plaintiffs to narrow further.  So at this point, we think

5    dismissal is appropriate.

6         THE COURT:  Ms. Gorshe?

7         MS. GORSHE:  I don't dispute what defendants are

8    saying.  However, Ms. Campbell has asked me, has been

9    completely responsive in assisting our firm, and

10   Ms. Campbell has asked me to argue.  And I do agree with

11   her that it is more likely than not that at least one of

12   the infusions was Sandoz based upon their ordering

13   history because their volume for Sandoz far outweighed

14   that for Hospira.

15        MR. INSOGNA:  Your Honor, I think plaintiff's

16   argument is that there's more Sandoz purchased prior to

17   each infusion than there is Hospira, but there are still

18   in the tens of units of Hospira available at each

19   infusion.

20        THE COURT:  You know, Ms. Gorshe, I think you're

21   going to, you know, have to show who the defendant is and

22   which drug you received.  And this is a situation where

23   it could be this one.  It could be that one.  And I don't

24   think that's sufficient to survive this process.

25        I will note that you have done everything possible

 1   to determine that and I find that you've been diligent in

 2   your search.  Unfortunately, we need to know what the

 3   product is.  This matter is dismissed.

 4          MS. GORSHE:  Thank you, Your Honor.

 5          THE COURT:  Thank you.

 6          MR. INSOGNA:  Thank you.

 7          THE COURT:  Mr. Bonnin.  And this is Virgenia

 8   Brown.

 9          MR. BONNIN:  Yes, Your Honor, I am present.

10          THE COURT:  Okay.

11          MR. BAEHR:  Your Honor, this is a case where

12   something short of CMO 12, something less than even the

13   addendum evidence has been submitted, and because of the

14   nature of it, it's not possible to identify really the

15   source of that information.  So our ask here is just that

16   plaintiffs be given 30 days to get something signed and

17   certified that complies with CMO 12 or the addendum to

18   allow some authentication of the evidence that's been

19   provided.

20          THE COURT:  Mr. Bonnin?

21          MR. BONNIN:  Your Honor, we believe that the

22   evidence that's been submitted is issued to establish

23   product ID under almost any factual standard.  The

24   evidence itself consists of a 39-page fax that has

25   indicia of being a single fax across the top of the page.

1    You can see sort of the fax stamp.

2         And the evidence is the return of our record

3    requests followed by a couple of pages of e-mails between

4    staff at the facility laying out that they specifically

5    need to provide us, our firm, with the NDC code.  And

6    they have done so in handwriting on the fax.  It says

7    "NDC" and reads off a number that matches with Sanofi.

8         Now, this evidence was gathered prior to CMO 12

9    even being entered.  And so our position is that from the

10   start this evidence has been sufficient to establish NDC

11   as Sanofi-Aventis.

12        However, if Your Honor feels that this evidence is

13   not sufficient to establish product ID, I mean, I'm happy

14   to reach out to the specific staff members who are in the

15   document and see if they can authenticate this further.

16        THE COURT:  I mean, he's got something from the

17   facility saying this is the NDC code.  You just don't

18   like the form that it's in?

19        MR. BAEHR:  It's not that I don't or it's not that

20   I assume anything about the truth of what he's saying.

21   It's just that there is no documentation that what he is

22   saying is accurate.  It's not clear that the NDC is from

23   the facility, that the handwriting was written by the

24   facility.  What it is, is handwriting on a fax sent by

25   his office.  And then there's an e-mail between that

1   appears to be between two employees of the facility

2   saying this is how you have to go get the NDC.  And this

3   is two pages with missing pages in between.  It's an

4   incomplete record.  It's admittedly hodgepodge.  So

5   that's why we're just saying get something signed,

6   something with a claimed author so that we can attribute

7   where this information is coming from.

8        If you'd like, I know you prefer not to be

9   reviewing documents, but if it would be helpful, I'm

10  happy to show you the documents.  I have them there.

11       THE COURT:  Show me the documents, because I will

12  tell you, at first, I asked my question because this

13  might be a problem for the transferee judge.

14       MR. BAEHR:  I understand, Your Honor.

15       THE COURT:  You know, I'm not --

16       MR. BONNIN:  Your Honor, I appreciate you taking

17  the time to look at this.  I would just sort of dispute

18  one thing that counsel said, one characterization that he

19  made of this document.  He said that it's an NDC code

20  handwritten on a fax that we sent.  That is incorrect.

21  This is a handwritten NDC code on a fax sent by the

22  facility to us.

23       THE COURT:  This is a problem perhaps for the

24  transferee judge.  I mean, it's handwritten at the bottom

25  of the note from the facility.  There may be a time when

1    you need more than that, but not today.

2         MR. BAEHR:  Okay.  Just so we're clear on the

3    record and I understand your outcome, but just so the

4    record is clear, this fax is on the letterhead of the law

5    firm.  There's nothing in this -- on this document that

6    attributes it to any other source.  And that's not to

7    question the truth of what Mr. -- what counsel is saying.

8    It's just to say that it's not documented anywhere and

9    this is what the record says.

10        MR. BONNIN:  Again, for the record --

11        THE COURT:  Okay.  Gosh.  Stop.  You know, you won

12   already.  So stop, Mr. Bonnin.

13        MR. BONNIN:  Yes, Your Honor.

14        THE COURT:  I just -- we have been going through

15   product ID for five years at least and it's been a

16   difficult process.  People have had a great deal of

17   difficulty getting this information from infusion

18   centers.  What we have is a letter and an e-mail that

19   says, hey, this is in proper form, go do this and

20   handwritten, this is the manufacturer, this is the NDC

21   code.

22        I'm going to allow it at this stage.  I'm

23   certainly not going to dismiss it after 30 days.  I'm

24   going to allow it and we're going to proceed.

25        MR. BAEHR:  Understood, Your Honor.

1          THE COURT:  I understand your frustration --

2          MR. BONNIN:  Thank you, Your Honor.

3          THE COURT:  -- but here we go.

4          Arezinia Bennett and that is MacArthur and that is

5    Ms. Sulkin.

6          Is this a 30-day request?

7          MR. BAEHR:  That's our request, Your Honor.

8          THE COURT:  Okay.  Court is going to grant

9    30 days.

10         Ms. Sulkin?

11         MS. SULKIN:  Your Honor, we have product ID

12   showing Sanofi and Sandoz and I believe Your Honor has

13   heard this case before and declined to dismiss the case.

14   We have one statement regarding chemotherapy drug

15   administered that checks the boxes for Sanofi and Sandoz.

16   It's signed by the facility.  It complies with the

17   requirements.

18         And so at this -- and then there was a second

19   request sent, I guess, and then nothing was checked off.

20   But we do think there is a difference in facts and so --

21         THE COURT:  I'm noticing -- I'm reading what you

22   submitted, which was submitted a request to facility

23   after the deficiency notice, which was recently received,

24   now going through CMO 12A process.  And I'm giving you

25   30 days to do that.  So I'm a bit perplexed.

1          MS. SULKIN:  I think my notes might -- I think I

2    might have put it in the incorrect box.  I think that's

3    an error on my end, Your Honor, and I do apologize.  But

4    I believe this case has previously been heard and the

5    Court declined to dismiss it.  And we do have product ID

6    showing Sanofi is Aventis and Sandoz.

7          MR. BAEHR:  I don't believe the case has been

8    previously heard, but, obviously --

9          THE COURT:  I mean, I don't know.

10         MR. BAEHR:  My understanding of their position is

11   the same as yours based on what's on the form.

12         THE COURT:  I'm going to grant you 30 days and

13   then we will -- because I don't know what you produced is

14   a copy of the same form, but this time, the Sanofi and

15   Sandoz box is erased.  There's also a letter attached

16   which states that after searching their records the

17   facility was unable to find out when they began

18   purchasing generics and therefore could not provide NDC

19   codes for plaintiff's treatment.

20         MR. LAMBERT:  Your Honor, just a note from the

21   Steering Committee that the first infusion appears to be

22   in the month, the exact month that Sanofi's patent

23   exclusivity expired.

24         THE COURT:  Right.

25         MR. LAMBERT:  So that first infusion is very

 1    likely to be a Sanofi product.

 2          THE COURT:  Right.

 3          MR. BAEHR:  Your Honor, different argument that

 4    has been made previously.  What we find to be true in

 5    many of these cases is that the first infusion wasn't

 6    actually Taxotere.  They got a sequence of drugs.  We

 7    don't know that the first date of treatment is

 8    necessarily the first infusion of Taxotere and that ends

 9    up mattering.  Had that been the argument made in

10    previous conferrals, that's, you know, what we would have

11    looked into.  So we would just ask for the 30 days to

12    clear it up.

13          THE COURT:  I think we need 30 days to clean this

14    up because the arguments are changing as we go.

15          All right.  Lydedra Loveless and this is Ms.

16    Dessel.

17          MS. DESSEL:  Hi.  Yes.  Good morning, Your Honor,

18    Denise Dessel with Marc J. Bern for Lydedra Loveless.

19          THE COURT:  Okay.

20          MS. DESSEL:  So what we had submitted, it is an

21    e-mail from -- what we know to be the Cancer Treatment

22    Centers of America.  There is the signature.

23          When it was sent over to our firm, they had

24    blacked out the information, but it provides details --

25    it says docetaxel, 80 milligrams, the NDC codes which

1    links up to the Winthrop, which is, you know, a -- and a

2    company within Sanofi.  It provides the date.  So if the

3    defense is claiming that this isn't enough because it

4    doesn't provide the name in accordance with CMO 12, we

5    would then just ask for 30 days to, you know, get

6    something, some type of authentication saying this is

7    from Cancer Treatment Centers of America.

8              THE COURT:  Okay.  I'll grant 30 days.

9              MS. DESSEL:  Thank you.

10             THE COURT:  All right.  Catherine Stewart.  Mr.

11   Lambert?

12             MR. BAEHR:  Just to hopefully streamline, our ask

13   here is going to be 30 days as well, Your Honor.

14             THE COURT:  Mr. Lambert, that's your case?

15             MR. LAMBERT:  Yes, Your Honor.  That's fine.

16             THE COURT:  Thank you.

17             Blynda Smith, Mr. Centola, are you on the line?

18             MR. CENTOLA:  Yes, Your Honor.

19             MR. BAEHR:  Right, Your Honor.  This is a case

20   where their facility has said they don't have NDC codes.

21   There's no argument that there is any sort of pending

22   request or anything like that.

23             It appears plaintiff wants to stand on April 28th

24   as the first date of infusion being presumptive evidence

25   of Sanofi product and that's just -- that's -- we don't

1   agree.  We think that's too far after the patent

2   exclusion.  We have multiple cases of confirmed 505

3   treatment in March of 2011, April of 2011, so that's not

4   sufficient.

5           THE COURT:  Mr. Centola?

6           MR. CENTOLA:  And, Your Honor, it's not just the

7   dates.  The dates line up with the records.  The records

8   say Taxotere.  The records mention Taxotere all

9   throughout.  There is no mention of Docetaxel and so the

10  use of the name brand Taxotere is enough to create a

11  prima facie case that it is, in fact, Taxotere that was

12  infused when there's only -- it's in April is the

13  infusion and the first docetaxel product goes on the

14  market in March.

15          So in light of the evidence in the record and in

16  light of the time frame, there's a prima facie case that

17  Taxotere was what was actually infused.  And we have

18  response from the facility itself that says we don't have

19  NDC codes, we didn't keep them back then.

20          And Sanofi is more than welcome to prove that it's

21  not Taxotere somehow, someway, and they say that they

22  have evidence in other cases that there are 505s being

23  infused even when it says Taxotere.  But in this

24  particular case, it says Taxotere --

25          THE COURT:  But that's your -- you have to show

1    what the drug is.  That's your burden.  And I'm not

2    impressed with, you know, it being, well, they wrote in

3    records Taxotere.  I mean, people write in Tylenol all

4    the time and you get generic acetaminophen.  And I think

5    it's a leap for you to say, well, they couldn't have made

6    -- Hospira could not have made it to Baton Rouge at that

7    time.  I think it's just one of those very difficult

8    cases -- it's just insufficient evidence of product ID.

9    I'm going to dismiss the case.  And your objection is

10   noted.  Thank you.

11          Mr. Niemeyer, are you on the line for Deborah

12   Allen?  30 days?  Mr. Niemeyer?

13          MS. BRILLEAUX:  Star six.

14          THE COURT:  Star six?

15          MS. SCHARNHORST:  Your Honor?

16          THE COURT:  Hello?

17          MS. SCHARNHORST:  Your Honor?

18          THE COURT:  Yes.

19          MS. SCHARNHORST:  This is Dawn Scharnhorst for

20   Mark Niemeyer.

21          THE COURT:  Okay.  Great.

22          MS. SCHARNHORST:  His father passed away this

23   morning, so he asked me to handle this for him.

24          THE COURT:  Oh, my gosh.  I'm so sorry.

25          MS. SCHARNHORST:  Yes.

1          So on Deborah Allen, we were able -- we had been

2     trying to reach her family and we finally heard back from

3     her family and they are wanting to move forward.  And

4     they requested some time to work through the probate and

5     representative issues, if we can get time to do that.

6          THE COURT:  I'll give you 30 days to file a

7     Suggestion of Death and then you can get the succession

8     rolling.

9          MS. SCHARNHORST:  Okay.

10          THE COURT:  All right.  Thank you.

11          MS. SCHARNHORST:  That would be wonderful.

12          THE COURT:  Please express my condolences to Mr.

13     Niemeyer.

14          MS. SCHARNHORST:  I certainly will.  Thank you,

15     Your Honor.

16          THE COURT:  Mary Downs, that's -- who is this one?

17     Powers Santola.  Okay.  I don't have -- is this somebody?

18          MR. LAMBERT:  Your Honor, I have a note that

19     partial dismissal was filed yesterday.  That's Record

20     Document 16145 to cure.  Could defendants have seven days

21     to confirm?

22          MR. BAEHR:  So the actual issue in this case is

23     that there's two cases.  There's duplicate cases filed.

24     One names the proper defendant, Sandoz, that's not listed

25     here.  So this case -- the cure wasn't -- a partial

1  dismissal was a full dismissal of the case so that only

2  the other duplicate case would proceed.

3         MR. LAMBERT:  Okay.  Your Honor, we will confer --

4         THE COURT:  Can you take care of that, Mr.

5  Lambert?

6         MR. LAMBERT:  Yes, Your Honor.

7         THE COURT:  Mr. Lambert will take care of that.

8  Because I think my guess is counsel is not on the phone

9  because they thought that this was cured.  Thank you.

10        Okay.  Now, Dawn Figley, Reich and Binstock,

11  Mr. Black, are you on the line?

12        MR. BLACK:  Yes, Your Honor, Ben Black here for

13  the plaintiff.

14        THE COURT:  You don't have a Plaintiff Fact Sheet?

15        MR. BLACK:  We agreed to dismiss the case.  I

16  apologize.  The dismissal hasn't been filed yet, but

17  we're in agreement --

18        THE COURT:  All right.  This case is --

19        MR. BLACK:  -- for no contact.

20        THE COURT:  Okay.  This case is dismissed with

21  prejudice.

22        All right.  Celia Spencer.  And counsel is, let me

23  see, Ms. Gorshe.  You again.

24        MS. GORSHE:  Yes, Your Honor.

25        MS. SWEET:  Your Honor, the issue in this case is

1    simply that plaintiff has not set forth the evidence that

2    Amerisource Bergen was the sole distributor from the

3    facility consistent with the addendum to CMO 12.  If

4    she's able to obtain that, we agree that the case can

5    proceed.

6         And we advised plaintiff of our position back in

7    February.  We rolled the case over from the March show

8    cause hearing and there's no indication that anything

9    further has been pursued.

10        THE COURT:  Ms. Gorshe?

11        MS. GORSHE:  We have been in continuous contact

12   with the facility Nuvance and the best that they can

13   provide us is a person who was ordering at that time,

14   it's her best recollection that oncology supply, which is

15   a division of Amerisource Bergen, was their sole facility

16   distributor.  Unfortunately, the person who handled it

17   and was in charge of that department is retired and so

18   they have -- no one will sign a statement that they can

19   provide me saying, yes, they are the -- were the sole

20   distributor.

21        THE COURT:  I'll tell you what I'm going to do.

22   I'm going to give you 30 days to see if you can hunt down

23   that retired employee.

24        MS. GORSHE:  I will keep trying, Your Honor.

25        THE COURT:  30 days.  Thank you.

1      MS. GORSHE:  Thank you.

2      THE COURT:  Mary Meadows.

3      MS. SWEET:  Your Honor, I'm not sure if

4  plaintiff's counsel is on the line, but we can agree to

5  30 days.

6      THE COURT:  30 days.  Okay.  For Ms. Mary Meadows.

7      MS. SEITHEL:  Thank you, Your Honor.

8      THE COURT:  What about Patricia Craig?  That's

9  with Shaw Cowart.

10      MR. BAEHR:  Your Honor, my understanding is this

11  case is one where plaintiffs make only general

12  objections.  Counsel can confirm.

13      THE COURT:  I don't have anybody listed that's

14  going to appear.

15      Mr. Lambert, do you know anything about Patricia

16  Craig?

17      MR. LAMBERT:  Yes, Your Honor.  Counsel indicated

18  that they wanted to adopt the general objections, but

19  that there was --

20      THE COURT:  Thank you.  This matter is dismissed

21  with prejudice.

22      Helen Cooke?

23      MR. BAEHR:  I have the same thing for this case.

24      MR. LAMBERT:  Yes, Your Honor, same general

25  objections.

1          THE COURT:  This matter is dismissed with

2     prejudice.

3          Cleo Elkins.  And this would be Mr. Peter Goss.

4          MR. GOSS:  Yes, Your Honor.

5          THE COURT:  All right.  What's your game plan?

6          MR. GOSS:  So, Your Honor, we would like to

7     request 30 days.  As we note in the documentation, this

8     administering facility has been shut down by the FBI and

9     we're working with the FBI to see if they can give us any

10    determination of manufacturer.  If they don't within the

11    next 30 days, we would be willing to agree to stipulate

12    to a dismissal.

13         THE COURT:  I'll give you 30 days.

14         You think the FBI is going to -- are you working

15    with the FBI?

16         MR. GOSS:  We have been in contact with them to

17    try to get what we need.  I don't know if we'll get a --

18    there's some issues with the recordkeeping at the

19    facility to say the least.

20         THE COURT:  Okay.  I'm going to give you 30 days.

21    Thank you.

22         MR. GOSS:  Great.  Thank you.

23         THE COURT:  Joanne Smialek, that's Ms. Meyers.

24    Are you on the line?

25         Ms. Myers:  Yes, Your Honor, I'm here.

```
1            THE COURT:  Okay.
2            MS. MYERS:  On the 6th, I filed a Suggestion of
3   Death and I admitted -- I uploaded the death certificate
4   into Centrality and we just need to do the substitution
5   for -- I think it's her son that's going to proceed for
6   her.
7            THE COURT:  All right.  I'm going to give you
8   seven days to confirm.
9            MS. BRILLEAUX:  And, Your Honor, we would also
10  request that the substitution be filed within the 90 days
11  required by Federal Rule of Civil Procedure 25.
12           THE COURT:  That's what the rules say.  Okay.
13           MR. BRILLEAUX:  Thank you.
14           THE COURT:  We're going to follow the rules.
15           All right.  Sandra Conley.  That's Mr. Wendt.  Are
16  you on the line?
17           MR. WENDT:  Yes, Your Honor.
18           THE COURT:  I have the Suggestion of Death.  I'm
19  going to give you 30 days to file that.
20           MS. BRILLEAUX:  And, Your Honor, I just wanted to
21  note that this plaintiff has been deceased since 2019.
22  So we are well-past the appropriate time for filing that.
23           MS. MYERS:  Your Honor, the Suggestion of Death
24  was filed on July 6th.  We first learned of her passing I
25  think within about a month of filing the suggestion.
```

1    We'd ask for 30 days for us to confirm contact with the

2    next of kin and get a substitution filed.

3          THE COURT:  Well, what's going to happen is, I'm

4    going to grant the defendant seven days to confirm that

5    you filed the Suggestion of Death and then you're going

6    to have to operate under federal rules and I think you

7    need to do that -- 90 days?

8          MS. BRILLEAUX:  90 days.

9          THE COURT:  90 days.  Thank you.

10         MS. MYERS:  Okay.  Thank you.

11         THE COURT:  All right.  We have Sharon Cain.

12         Mr. Miceli, are you on the line?

13         MR. MICELI:  I'm on the line.  Can you hear me?

14         THE COURT:  Yes, I can hear you.

15         All right.

16         MR. MICELI:  Okay.

17         THE COURT:  30 days.

18         MR. MICELI:  I reached out to counsel.

19    Thirty days would be sufficient.  Thank you, Your Honor.

20         THE COURT:  Okay.  Court is going to grant

21    30 days.

22         All right.  And then we have several cases with

23    Zoll & Krantz.  Those cases include Tracey Belcher, Susie

24    Curlin, Angela Gadsden, Jana Holmes, Iretha Manning,

25    Beverly Murphy, Arnetta Overton and Deanna Potter.  These

1   are all related to -- well, wait.

2            Ms. Potter we should take off the list.  But these

3   are all no psychiatric records, no authorizations.

4            MS. BRILLEAUX:  Correct, Your Honor, all of them

5   except for Deanna Potter.  Those are PFS's where the

6   plaintiff has claimed emotional damages and has not

7   submitted a HIPAA authorization for psychiatric records,

8   so we need that to proceed.

9            THE COURT:  Okay.  Ms. Alauddin, are you on the

10  line?  Star six.

11           MS. BRILLEAUX:  Star six.

12           MS. ALAUDDIN:  Good afternoon.

13           THE COURT:  Good afternoon.

14           MS. ALAUDDIN:  Good afternoon.

15           THE COURT:  Okay.  Good morning.  I'm going to

16  give you 30 days to get those psychiatric authorizations.

17           MS. ALAUDDIN:  So Tracy Belcher, Susie Curlin --

18           THE COURT:  I can't -- wait.  Why is it not -- I

19  can't hear you.  Wait.  Here we go.  All right.  Try

20  again.

21           MS. ALAUDDIN:  Hello, Your Honor, can you hear me?

22           THE COURT:  Now I can.

23           MS. ALAUDDIN:  Okay.  For plaintiffs Tracy

24  Belcher, Susie Curlin, Jana Holmes and Arnetta Overton,

25  authorizations have been uploaded.

1          THE COURT:  Okay.

2          MS. ALAUDDIN:  For Iretha Manning, she has

3     confirmed that she will be signing.  We just have not

4     received her authorization yet, so we will be able to

5     upload that authorization shortly.

6          THE COURT:  All right.  Well, I was going to grant

7     30 days for those.  Those that have been filed, I'm going

8     to give the defendant seven days to confirm compliance.

9     And for those that have not been filed, I'll give you

10     30 days.

11          Now let's talk about Ms. Potter, who is deceased,

12     and we need a Suggestion of Death filed.

13          MS. BRILLEAUX:  Yes, Your Honor.  This plaintiff

14     has been deceased since July of 2020.

15          THE COURT:  Has a Suggestion of Death been filed?

16          MS. ALAUDDIN:  We have not filed a Suggestion of

17     Death, but we have contacted her next of kin.  They are

18     not looking to pursue the case, but we have not had

19     authority to dismiss the case.

20          THE COURT:  All right.  I'll tell you what I'm

21     going to do.  I'm going to give you 30 days to file a

22     Suggestion of Death, and if you don't do it within that

23     time, I will dismiss it and that will give you

24     opportunity to have that conversation.

25          MS. ALAUDDIN:  We have contacted them and they are

```
 1   not looking to pursue the case.
 2         THE COURT:  All right.  So you're ready for me to
 3   dismiss it today?
 4         MS. ALAUDDIN:  Yes.
 5         THE COURT:  This matter is dismissed with
 6   prejudice.  Thank you.
 7         Marshell Coleman.
 8         MS. CALLSEN:  Right.  And, Your Honor, this was a
 9   case that reinstated in January of '23, pursuant to the
10   whole addendum history that we entered into, and there's
11   been no evidence submitted since that time.
12         MS. ALAUDDIN:  Your Honor, we have pursued formal
13   options of following up on our previous requests by
14   issuing a subpoena.  The facility has identified an
15   individual who is the office manager who will be able to
16   provide addendum evidence.  We just have not been able to
17   coordinate the logistics of actually signing the addendum
18   evidence, so we would request 30 days for that to be
19   uploaded.
20         THE COURT:  I'll give you 30 days.  No more.
21         Yes, ma'am.
22         MS. ALAUDDIN:  Your Honor, just to save some time,
23   for the remaining cases, we have issued recent subpoenas
24   and we have had responses from them.  So if we could just
25   have the 30 days to track the addendum evidence down,
```

1    that would --

2          THE COURT:  But these are -- on the other cases

3    you're asking for reinstatement, right?

4          MS. CALLSEN:  Correct.  And the next case is

5    dismissed currently.

6          THE COURT:  Right.

7          MS. CALLSEN:  And so we -- again --

8          THE COURT:  Why is this on the list if it was

9    dismissed?

10          MS. CALLSEN:  Well, because plaintiffs were

11    seeking reinstatement, so we agreed to consider

12    reinstatement.  And then we rolled over all these cases

13    from March to streamline the hearing at that time because

14    there were so many cases.  But our position was that

15    there -- they should not be reinstated because there was

16    no product ID submitted and that was the basis for

17    dismissal.  Plaintiffs disputed that, but rather than

18    bring it to the Court's attention in March, we agreed to

19    roll it over to the next hearing because the March

20    hearing was so bulky as it was.  I mean, simply our

21    position was --

22          THE COURT:  When I was going through this, I have

23    to tell you, I was a bit perplexed because I thought

24    there was a motion filed to reinstate.  Because if this

25    has been dismissed over a year, what --

1          MS. CALLSEN:  What happened with the reinstatement

2   was that -- after the addendum --

3          THE COURT:  Right.

4          MS. CALLSEN:  -- there was a process where

5   plaintiffs could approach us and seek reinstatement --

6          THE COURT:  Right.

7          MS. CALLSEN:  -- based on addendum evidence.

8          THE COURT:  Right.

9          MS. CALLSEN:  So we agreed to several of those.

10   On some of those, we rejected because the dismissal

11   wasn't based on addendum.  It was based on other grounds.

12   This is one of those cases.  The dismissal in March -- in

13   April of 2022 was based on lack of any product ID

14   whatsoever, but they continue to -- that was -- the cases

15   where we disagreed, we met and conferred.  The cases

16   where we disagreed as to the relief, we agreed to put on

17   a show cause list.  And then because the March list was

18   so bulky, we rolled it over.  So the issue is the same as

19   what you would have heard in March.  And our position is

20   it should not be reinstated because it wasn't based on

21   addendum evidence.

22          THE COURT:  Ms. Alauddin?

23          MS. ALAUDDIN:  Yes, Your Honor.

24          THE COURT:  Maybe we need to go over these.  I'm

25   looking at Ms. Dickerson's case and it doesn't look like

1  you have anything.

2  MS. ALAUDDIN:  For Ms. Dickerson's case, we have

3  re-issued a subpoena and have had follow-up

4  communications with legal counsel there.  So we have had

5  additional follow-up that indicates that they would be

6  able to provide us that information.

7  MS. CALLSEN:  We agreed that the reinstatement

8  process was not going to be to just give them more time.

9  It was specific to the addendum.

10  THE COURT:  Yeah.  I remember we had -- people

11  were concerned about facilities not having the NDC codes,

12  but we determined that there was some facilities that

13  only distributed certain product at certain times, and so

14  from there, we could say there was enough to survive this

15  for another date.

16  MS. CALLSEN:  Yeah, if they could track down --

17  THE COURT:  And that could be something that could

18  go to the transferee judge at some later point, but that

19  was certainly sufficient to get us over the hump at this

20  stage.  And what I'm looking at is --

21  MS. CALLSEN:  And they're just basically

22  restarting --

23  THE COURT:  What have you found since then, even

24  if you -- you know, if I would consider reinstatement,

25  what have you found?

1       MS. ALAUDDIN:  We have not been able to acquire

2  any additional records yet.  We have just been able to

3  reissue the subpoena and have had some informal

4  communications with the facility to obtain more evidence.

5       THE COURT:  When did you issue a subpoena and to

6  whom was that subpoena issued?

7       MS. ALAUDDIN:  We issued it on June 23rd to the

8  facility.

9       MS. CALLSEN:  June 23rd of what year?

10      MS. ALAUDDIN:  The 23rd of this year.

11      MS. CALLSEN:  June 23rd of this year?

12      That was a year after it was already dismissed,

13 Your Honor.

14      THE COURT:  When did we agree to the addendum?

15      MR. BAEHR:  December.

16      MS. CALLSEN:  December of 2022.

17      MR. INSOGNA:  The difficulty, Your Honor, is that

18 because of the addendum process where plaintiffs asked to

19 be reinstated, the way the process was laid out was, if

20 we disagreed with reinstatement because they had been

21 dismissed for an entirely separate reason, our only

22 recourse was to put it on a show cause list.  These cases

23 never would have been on the list but for our inability

24 to do anything else with them.

25      THE COURT:  No, I understand.  I understand.

1          I mean, I will tell you, if you said, hey, you

2    know, right away I got involved in it and I have these

3    documents, but what -- I will tell you what my notes say.

4    It says you don't have anything.  Am I missing something?

5          MS. ALAUDDIN:  No, Your Honor.

6          THE COURT:  All right.  Ma'am, I'm not going to

7    reinstate a case unless there has been some significant

8    change.

9          Now let's go to Diane Pineda.

10          MS. CALLSEN:  Now, this is similar.  Again, the

11    case was dismissed in April of 2022 based on the lack of

12    any product ID submitted.

13          THE COURT:  And as I appreciate it, there's

14    nothing you've received since then; is that correct?

15          MS. ALAUDDIN:  Yes, Your Honor.  Diane Pineda is

16    similar to Elizabeth Dickerson where we reissued a

17    subpoena on June 23rd of this year and have had follow-up

18    communications with them.  However, we don't have any

19    additional evidence at this moment.

20          THE COURT:  I'm not going to reinstate this case

21    unless there's something firm that would --

22          MS. CALLSEN:  Cynthia Thomas is similar.  Again,

23    we object to reinstatement because it was dismissed back

24    in April of 2022 based on lack of any product IDs

25    produced.

1          THE COURT:  Right.

2          MS. ALAUDDIN:  Cynthia Thomas is in a similar

3     position.  We have been trying to contact the facility

4     who administered her clinical drug trial to obtain

5     manufacturer information and they have not been able to

6     provide us with any additional evidence yet.

7          THE COURT:  She was in a clinical trial?

8          MS. CALLSEN:  This is 2013, 2014 treatment, so

9     clinical trials were -- clinical trials could have used

10    anybody's product.

11         THE COURT:  I didn't know if there was something

12    that they were sponsored by one of the -- ma'am, you

13    know, it's just nothing for me to use to reinstate.  I'm

14    not going to reinstate this case.

15         That's Cynthia Thomas.

16         And who else do we have?

17         MS. CALLSEN:  And the next one, Sharron Ward,

18    again, is similar, that the dismissal was not obtained

19    based on disputed purchase, but rather obtained because

20    there was no product ID evidence produced.

21         Your Honor, we actually recently found out that

22    Ms. Sharron Ward is deceased and we have contacted her

23    next of kin and they are not looking to pursue the case.

24    However, we did not have the authority for dismissal.

25         MS. CALLSEN:  It's already dismissed.

1          THE COURT:  It's dismissed with prejudice.

2          MS. CALLSEN:  Sorry.

3          Okay.  And the next case, Willie Weathers, was

4    reinstated in January of '23.  However, there's been no

5    new evidence submitted since reinstatement.

6          THE COURT:  Okay.  Where are we --

7          MS. CALLSEN:  We're on No. 43.

8          THE COURT:  No.  I'm talking to Ms. Alauddin.  I

9    didn't get this far in going through.

10          For Ms. Weathers, she was included in the list of

11    people that we had reissued subpoenas for on

12    January 23rd.  We have had contact with her treatment

13    facility and they have identified an office manager as

14    the individual who was in charge of purchasing at the

15    time and would be able to narrow down the affidavit.  She

16    has stated her intent to help us with that, but we have

17    not coordinated the logistics of her finding that.

18          THE COURT:  I'm giving you 30 days and not one day

19    more.

20          MS. ALAUDDIN:  Thank you, Your Honor.

21          THE COURT:  And Lenora Hartso.

22          MS. ALAUDDIN:  For Ms. Hartso, we have tried to

23    continue to engage in communications with the facility.

24    They've had a lot of turnaround, turnover at this

25    facility, so I could narrow exactly who would be able to

1  speak to the evidence that we're looking for to provide
2  addendum evidence for her --
3      THE COURT:  Have you been talking -- let me --
4  have you been talking to the facility?
5      MS. ALAUDDIN:  Yes, we have been in communications
6  with the facility.  I have spoken to the onsite manager
7  and business manager and members of the pharmacy team who
8  wanted to coordinate a mass call together in order to
9  narrow down who would be providing that addendum
10 evidence.
11     THE COURT:  I'm going to give you 30 days, ma'am.
12     MS. ALAUDDIN:  Thank you, Your Honor.
13     THE COURT:  Adrienne Kout.
14     MR. INSOGNA:  Your Honor, this case is one where
15 plaintiff has submitted purchase records, but they don't
16 cover the time period of plaintiff's treatment.  They
17 predate her chemotherapy infusions, so we don't have any
18 product ID evidence.
19     THE COURT:  Ms. Alauddin?
20     MS. ALAUDDIN:  Your Honor, this is -- yes.  Your
21 Honor, this is another one where the ownership of the
22 facility has changed over time and so it's been a little
23 bit difficult to narrow down -- to locate those records.
24 We have been in contact with the business manager there
25 and she has been helping us with trying to narrow that

1    down.  So if we could have an additional 30 days.

2         THE COURT:  I'm going to give you 30 days and

3    that's it.

4         MS. ALAUDDIN:  Yes.  Thank you, Your Honor.

5         THE COURT:  And Crystal Middleton.

6         MS. ALAUDDIN:  This one is the same.  We have

7    submitted a request to obtain her Medicaid information

8    and that will take 30 days.  But that request was made

9    last week.  So we have not been able to obtain additional

10   information yet, but we do have outstanding records.

11        MR. INSOGNA:  And, Your Honor, this is a case

12   that's been rolled over since the July 2022 hearing.  I

13   think plaintiffs are at the end of the road on this one.

14        THE COURT:  I mean, it was a case that was filed

15   in 2017.  She received treatment in 2011.

16        I'll give you 30 days.  I got to tell you, I'm

17   starting to truly lose my patience.

18        MS. ALAUDDIN:  Thank you, Your Honor.

19        MR. INSOGNA:  And, Your Honor, the next case,

20   Latoshia Polk, is one where the facility has responded

21   identifying that they purchased Sanofi and Sandoz, but

22   then specifically wrote on the form "I have marked the to

23   be purchased.  I have no way to track further."

24        THE COURT:  Ms. Alauddin?

25        MS. ALAUDDIN:  Yes, Your Honor.  We have been in

1   contact with the nurse practitioner at that facility who

2   was in charge of purchasing docetaxel at the time, so she

3   has confirmed that she would be able to help us provide

4   addendum evidence, but we just have not been able to

5   coordinate that.

6        THE COURT:  When they say these are the two we

7   purchased, but we can't do anything further, what are you

8   going to do with that?

9        MS. ALAUDDIN:  From my understanding, the person

10  who filled out that form is different than the nurse

11  practitioner we've been in contact with and she is the

12  one that was in charge of purchasing at the time.

13       THE COURT:  You know, I'll give you 30 days, but

14  it seems you're continuing to grasp as straws.

15       MR. INSOGNA:  I think the 30 days will be

16  self-executing.

17       Yeah.  And that's it.  It is.  I'm not -- okay.

18       And then we have Virginia Tabron.

19       MR. INSOGNA:  And I would just note on Virginia

20  Tabron there are purchase records that don't narrow it

21  down more than six different defendants.  And this was

22  rolled over again from July 2022 so that plaintiff could

23  reach out to Cardinal Health.  I don't think there's been

24  any progress since then.

25       MS. ALAUDDIN:  Yes, Your Honor, we have made

1   attempts to contact Cardinal Health and we have not been

2   able to obtain additional evidence.  But we did want to

3   just note that we did take the opportunity to get that.

4   We want to note our objection.

5           THE COURT:  This case is dismissed with prejudice.

6           MR. INSOGNA:  Thank you, Your Honor.

7           MS. ALAUDDIN:  Thank you, Your Honor.

8           THE COURT:  Okay.  Magdalene Long.

9           MS. SWEET:  This is a case where the plaintiff

10  filed a Statement of No Defense.

11          THE COURT:  This matter is dismissed with

12  prejudice.

13          Was it on our list?

14          MS. SWEET:  Yes.

15          THE COURT:  Okay.  Thank you.

16          MR. INSOGNA:  Your Honor, the next case is Georgia

17  Mason with Carey, Danis & Lowe.

18          THE COURT:  Mr. Carey, are you on the line?

19          MR. INSOGNA:  My understanding in this case, Your

20  Honor, is that counsel filed the Suggestion of Death and

21  a Motion to Substitute a representative.  The issue is

22  that after that is effectuated, they will need to dismiss

23  Hospira because there is product ID for Sanofi, for

24  pre-March 8, 2011, infusions.  So we just need the

25  dismissal as to Hospira.

1          THE COURT:  But I'm seeing an objection.

2          MR. INSOGNA:  That's right, Your Honor.  In this

3    case, plaintiff does not want to dismiss because there is

4    one infusion that could by date be a Hospira infusion.

5    And they do not want to dismiss.  They don't have any

6    product ID evidence for Hospira.  It's just a

7    possibility.

8          THE COURT:  Mr. Carey, are you on the line?  Star

9    six.

10          MR. CAREY:  This is John Carey.

11          THE COURT:  There you go.

12          Mr. Carey, do you have any evidence that it is

13   Hospira?

14          MR. CAREY:  We have an outstanding subpoena issued

15   to Aetna, the health insurance company for the plaintiff,

16   and we will determine within 30 days whether it was

17   Hospira or not.

18          THE COURT:  Okay.

19          MR. CAREY:  If that doesn't satisfy, then we will

20   agree to dismiss Hospira.  But they've acknowledged

21   receipt of the subpoena and they said they will get back

22   to us within 30 days.

23          THE COURT:  Thank you.  I'll grant 30 days.

24          MR. CAREY:  You got it.

25          THE COURT:  Ms. Valerie Smith-Jackson.

1          Mr. Carey, are you on the line?

2          MR. CAREY:  Yes.

3          MR. BAEHR:  This is another case, Your Honor,

4    where the facility has indicated that NDC codes cannot be

5    provided and that the plaintiff would have received

6    either one of Hospira or Winthrop docetaxel.  And this

7    was also rolled over from the March show cause hearing.

8          THE COURT:  Mr. Carey?

9          MR. CAREY:  We've been in communications with the

10   attorneys for the infusion center.  We provided an

11   affidavit to that counsel.  We're continuing to subpoena

12   records and investigate.  We need 30 more days to make a

13   final determination.

14         THE COURT:  Court will grant 30 days.

15         All right.  And then we have Ernestine Deggs, need

16   a Suggestion of Death?

17         MS. BRILLEAUX:  And, Your Honor, for this case, a

18   Suggestion of Death was actually filed back in 2018, so

19   under Federal Rule of Civil Procedure 25, substitution

20   should have been filed within 90 days and it was not.  So

21   our position is that it should be dismissed.

22         THE COURT:  Is anyone on the line from Fernelius

23   Simon?

24         MR. STANLEY:  Good morning, Your Honor.  This is

25   Bret Stanley with Pulaski Kherkher.  Fernelius Simon is

1    winding down their practice and Pulaski Kherkher will be

2    making an appearance on this case.

3         I'd ask 30 days that I could go through and

4    double-check if there is an error.  And then if there is

5    not an error, we would like to proceed and we will

6    dismiss the case.

7         THE COURT:  That's fine.  Court will grant

8    30 days.

9         What about Teresa Thompson?

10        MR. BAEHR:  Your Honor, in this case --

11        MR. STANLEY:  Bret Stanley -- go ahead.  Sorry.

12   Thank you.

13        MR. BAEHR:  There is a Statement of Chemotherapy

14   form, but it's not in the proper form.  It doesn't have

15   the appropriate information.  So we would just ask for

16   30 days to --

17        THE COURT:  To clean it up.

18        MR. BAEHR:  Correct.

19        THE COURT:  Okay.  I'm going to grant 30 days.

20        MR. STANLEY:  And I looked at this, Judge.  The

21   only listed defendant is Sanofi-Aventis.  It lists the

22   client's name, her date of birth.  The thing that's

23   missing is the date of treatment.  But there's not

24   another defendant listed as a possibility on this, and so

25   they have there that Sanofi-Aventis was the docetaxel

1    Taxotere that was administered.  It just doesn't have the

2    dates of treatment.

3         THE COURT:  Yeah, I think that's what we need is

4    the dates of treatment.  And I'll give you 30 days to get

5    that done.

6         MR. STANLEY:  Thank you, Judge.

7         THE COURT:  Thank you.

8         Ramona Litton.

9         Ms. Menzies, are you on the line?

10        MS. MENZIES:  Good morning, Your Honor.  Yes.

11        THE COURT:  Okay.

12        MS. MENZIES:  Yes.  Good morning, Your Honor.

13        THE COURT:  I think we need a Suggestion of Death.

14        MS. MENZIES:  Yes.  We have been in touch with the

15   daughter and she agreed not to pursue, but we haven't

16   been able to confirm in writing.  So we're not able to

17   submit that suggestion without that writing.  So, you

18   know, looking at the rules, if any party can submit the

19   Suggestion of Death, if they want to advance the timing,

20   and if it's not opposed or a Motion to Substitute is done

21   in 90 days, it can be dismissed.  But we're not in a

22   position where we can dismiss --

23        THE COURT:  Ms. Menzies, do you know when she

24   died?

25        MS. BRILLEAUX:  It was December of 2020.

1            Sorry, Ms. Menzies.

2            MS. MENZIES:  Thank you.  I didn't have that.

3            MS. BRILLEAUX:  And just based on counsel's

4    comments, Your Honor, Sanofi's request would be that this

5    be dismissed with prejudice at this time because there's

6    no one pursuing the case.

7            THE COURT:  So she died in 2020?  I'm sorry.

8    Y'all are both talking.

9            MR. BRILLEAUX:  Yes, December of 2020.

10           THE COURT:  The Court is going to dismiss this

11   matter with prejudice since the Suggestion of Death was

12   not timely filed.

13           MS. BRILLEAUX:  And a similar case, Your Honor,

14   with the next one --

15           THE COURT:  Lesa --

16           MR. BRILLEAUX:  -- Lesa Neace, this plaintiff has

17   also been deceased since June of 2020.

18           THE COURT:  Ms. Menzies?

19           MS. MENZIES:  Yes, Your Honor.  Thank you.

20           We have confirmed with the sister that she is not

21   interested in pursuing either.  The same situation.  We

22   can't get it in writing --

23           THE COURT:  Okay.  Since the Suggestion of Death

24   was not timely filed, the Court is going to dismiss this

25   matter with prejudice.

1           Lorraine Howard.

2           MS. BRILLEAUX:  I believe Lorraine Howard and Opal

3  McNeal have Statements of No Defense filed and have been

4  removed from the list.

5           THE COURT:  Okay.  Thank you.

6           MR. BRILLEAUX:  Thank you.

7           THE COURT:  And then we go to --

8           MS. SWEET:  Number 58 is Frankie Dilling.

9           THE COURT:  Frankie Dilling.  Okay.

10          MS. SWEET:  Your Honor, this plaintiff cured on

11  Friday.

12          THE COURT:  Okay.  Court's going to grant seven

13  days to confirm compliance.

14          And then Ms. Richardson -- we have Debbie Reinert,

15  Ms. Richardson.

16          Ms. Richardson?  Star six.  Ms. Richardson, please

17  press star six.  We're talking about Debbie Reinert.

18          Maybe let's just skip that one.

19          MR. LAMBERT:  We can reach out.

20          MR. BAEHR:  That's fine.  Our ask is 30 days if

21  that makes a difference, but we can come back to it.

22          THE COURT:  I'm going to grant 30 days.  I'm going

23  to direct Mr. Lambert to make sure that Ms. Richardson

24  gets this information.

25          MR. LAMBERT:  Yes, Your Honor.

```
 1           MR. BAEHR:  I thought I heard something.

 2           THE COURT:  I know.  I thought I heard something

 3    too, but I'm not sure what that is.

 4           Ms. Richardson, is that you?

 5           Okay.  Anita Blakely, that is Mr. Miceli.

 6           MR. MICELI:  Excuse me.  Yes, I'm here.

 7           And this is one that I have to admittedly say I

 8    don't have much knowledge on because the attorney that

 9    primarily oversees this and the paralegal are both out of

10    the country.  And what I would ask is just 14 days to

11    consult with them and get back with Ms. Brilleaux and we

12    can update the Court.

13           MR. BRILLEAUX:  And, Your Honor, I would just note

14    this is a plaintiff that has been deceased since March of

15    2019.

16           THE COURT:  I'm going to grant 30 days like

17    everybody else.  Thank you.

18           All right.  Nancy Haeni and that is --

19           MS. RICHARDSON:  Your Honor, this is Rachel

20    Richardson with McSweeney/Langevin.  I got disconnected.

21    I am here for Debbie Reinert.  Any way we can talk about

22    that one?

23           THE COURT:  Okay.  So you're talking about Debbie

24    Reinert?

25           MS. RICHARDSON:  Yeah, No. 59.  I'm sorry.  I just
```

```
 1    got disconnected --
 2              THE COURT:  Okay.  Okay.  I'm going to grant
 3    30 days.
 4              MS. RICHARDSON:  Okay.  Yeah.  I am continuing to
 5    follow up with the facility to get them to sign that
 6    form.  I think that's completely reasonable.  Thank you.
 7              THE COURT:  Okay.  Thank you.
 8              All right.  And then we are back to Anita Blakely
 9    and this is Mr. Miceli.  Oh, no.
10              MR. MICELI:  Nancy Haeni.
11              THE COURT:  Nancy Haeni.  Okay.
12              MR. BAEHR:  And, Your Honor, in this case, a
13    deposition has taken --
14              MR. MICELI:  Go ahead.  I'm sorry.
15              MR. BAEHR:  Yeah.  Sorry.
16              A deposition has taken place.  The result of that
17    deposition was, I think, the last question of the
18    deposition was, well, is there anybody -- is there
19    another witness who does have the information that the
20    witness who was deposed doesn't have.  That person
21    identified -- I mean, the deponent identified another
22    witness.  I understand plaintiff intends to depose that
23    person, so we would ask for 30 days to see if that person
24    has the missing information.
25              MR. MICELI:  That would be excellent.  We're
```

1   already attempting to get that scheduled.  So 30 days.

2   We could either have it done or give an update as to when

3   the depo would take place.

4         THE COURT:  Thank you.

5         Pulaski Law Firm --

6         MR. MICELI:  Your Honor, that's the last one I

7   think that I'm involved in.  Can I be excused from the

8   rest of the hearing?

9         THE COURT:  Yes, please.

10        MR. MICELI:  Congratulations to your baseball team

11   by the way.

12        THE COURT:  Oh, man.  Pretty amazing, huh?

13        MR. MICELI:  It was.  It was.  Thank you, Your

14   Honor.

15        THE COURT:  And, you know, Tré Morgan's mom works

16   in this building.

17        MR. MICELI:  Oh, my goodness.  We may need to

18   bring some baseballs the next time we're there to get her

19   to pass on to her son.

20        THE COURT:  I know.  I know.  Okay.  Thank you.

21        MS. BRILLEAUX:  Your Honor, these two cases from

22   Pulaski Law Firm they both involve deceased plaintiffs

23   where Suggestions of Death have been filed.  We just need

24   the death certificates to be submitted to MDL Centrality.

25        MR. LAMBERT:  And, Your Honor, our notes show that

1  they were submitted to Centrality yesterday.

2      THE COURT:  Okay.  I'm going to give you seven

3  days to confirm compliance.

4      Cynthia DeCamara.  Mr. Terry?  Mr. Thweatt?  I

5  don't know how to say your name.  Is anybody on the line?

6      MR. THWEATT:  Yes, Your Honor.  Good morning.

7  This is Lee Thweatt.

8      THE COURT:  Is it Thweatt?  Okay.  Thank you.

9      MR. BRILLEAUX:  Your Honor, for this case, we have

10  one submission to MDL Centrality, which is the CMO 12A

11  product ID form, but what we don't have almost five years

12  after filing is a Plaintiff Fact Sheet or any other

13  discovery responses or documents.

14      THE COURT:  Mr. Thweatt?

15      MR. THWEATT:  Your Honor, yesterday my office

16  informed me that they supplemented the requested

17  documents and I don't know if counsel has had a chance to

18  take a look at that or not, but that's what I'm being

19  told was filed.  And if that's inaccurate, I apologize.

20  Mr. Terry is on vacation.  I'm filling in for him, but

21  that's what they say occurred.

22      THE COURT:  All right.  I'm going to grant seven

23  days to confirm compliance.

24      And then Sharon McCall, same thing it looks like.

25      MS. BRILLEAUX:  It's similar, Your Honor.  These

1 are both -- for Sharon McCall and Anita Jacobs, these are

2 PFS's that have been submitted.  They indicate a second

3 cancer diagnosis, but without any information as to the

4 diagnosis or treatment.  And so we would need that

5 information to be able to make proper determinations for

6 the case.

7    MR. THWEATT:  With respect to Ms. McCall, Your

8 Honor, my understanding is that the issue was a health

9 authorization that I guess had the wrong date on it or

10 something like that.  I am informed that Ms. McCall had a

11 cancer diagnosis, something like 20 years ago, and that

12 she has not been able to obtain records with respect to

13 that cancer diagnosis because the facility where she

14 treated apparently is no longer in business or something

15 to that effect.  But we have provided an updated HIPAA

16 authorization.  I don't know how useful it will be since

17 the facilities apparently are no longer in existence, but

18 to the extent, that that was the issue that's been

19 corrected.  So that's my --

20    MS. BRILLEAUX:  If I could just address those

21 points, Your Honor.  As you know, we've run into issues

22 with the Plaintiff Fact Sheet where we just need the date

23 of diagnosis, the type of cancer diagnosed, and the type

24 of treatment most importantly that the plaintiff received

25 for the other cancer.  If, you know -- we don't know

1    where in time the second cancer diagnosis came, whether

2    it was before or after the breast cancer diagnosis for

3    which she was treated for Taxotere.  There is also a

4    deficiency for no PTO 71A authorization, which is the

5    authorization for electronic discovery.  So those are the

6    two outstanding issues for Sharon McCall.

7           THE COURT:  Okay.  This is what I'm going to do.

8    I'm going to give you 30 days to get this form in proper

9    order because it sounds like the Plaintiff Fact Sheet is

10   not just completed and that needs to be done.  So I'm

11   going to grant 30 days for that, for you to take care of

12   that.

13          MS. BRILLEAUX:  And then for Anita Jacobs, Judge,

14   it's a similar issue we know --

15          THE COURT:  Wait.  Wait.  That's a different law

16   firm.

17          MR. BRILLEAUX:  Oh, I'm so sorry.  Sorry about

18   that.

19          THE COURT:  Mr. Ortiz, are you on the line?

20          MR. ORTIZ:  I am, Your Honor.

21          THE COURT:  Okay.

22          MS. BRILLEAUX:  You're right.  They both have

23   second cancer diagnosis issues and they're for two

24   different firms.  I apologize.

25          THE COURT:  Okay.  Mr. Ortiz?

1

2          MR. ORTIZ:  Well, regarding this case, Your Honor,

3    we have issued new subpoenas to the treatment facility in

4    order to get the information about the second cancer to

5    complete the PFS, but we would wait 30 days.

6          THE COURT:  Wait.  I'm sorry.  I didn't

7    understand.

8          MS. BRILLEAUX:  Counsel, did you say you are

9    waiting on a response to a subpoena for additional

10   records regarding the second cancer diagnosis?

11         MR. ORTIZ:  That is correct.

12         MS. BRILLEAUX:  I guess my question then on behalf

13   of Sanofi is whether the plaintiff doesn't have any

14   information about her diagnosis treatment timing, et

15   cetera, or whether the medical records are necessary to

16   complete that portion of the PFS.

17         THE COURT:  I mean, it seems like she would know

18   when that diagnosis and what treatment she received.

19         MR. ORTIZ:  Yes, Your Honor.  But we want to make

20   sure that we have the full complete records in order to

21   provide the correct information in the PFS.

22         THE COURT:  Okay.  This is what I'm going to tell

23   you.  You're going to -- I need you to fill out the PFS

24   within 30 days.  If there is --

25         MR. ORTIZ:  Thank you, Your Honor.

1          THE COURT:  -- something that she does not recall

2    accurately, I think that's just something you include in

3    the Plaintiff Fact Sheet that this is her best

4    recollection that it was, I don't know, you know, colon

5    cancer in 2015 and I was treated with whatever -- and she

6    might say this is my best recollection, but it gives

7    everyone a starting point.  Okay?

8          MR. ORTIZ:  Understood, Your Honor.  Thank you.

9          THE COURT:  I'll give you 30 days on that.

10         Now let's talk about Ms. Caroll, Linda Caroll.

11         MR. BAEHR:  Your Honor, in this case, the

12   purported product ID submitted identifies two potential

13   manufacturers, Winthrop and Accord, no basis to narrow

14   down between the two of them.  So it's insufficient.

15         THE COURT:  Mr. Ortiz, can you get us any -- can

16   you determine which ones should be your defendant?

17         MR. ORTIZ:  Well, for this deficiency, Your Honor,

18   we have sent the statement regarding chemotherapy and the

19   treatment forms to this treatment facility.  We're

20   waiting on this -- we sent those on June 30th, so we

21   respectfully request 30 days to get these statements,

22   fill out and submit them into MDL Centrality as soon as

23   they arrive.

24         THE COURT:  I'll give you 30 days, but that's it

25   because this has been pending a long time.

1          MR. ORTIZ:  Thank you, Your Honor.

2          THE COURT:  Okay.  And then we have Ms. Prag,

3    Theresa.

4          MR. BAEHR:  Your Honor, in this case, it's a bit

5    confusing admittedly, but the upshot is that the

6    materials submitted don't identify a facility.  They

7    don't have any name or letterhead other than the

8    plaintiff counsel.  It's unclear where the documents came

9    from.  And so our ask here is for something signed and

10   certified identifying that it's from a facility within

11   30 days.

12         THE COURT:  Mr. Ortiz?

13         MR. ORTIZ:  We can work with the treatment

14   facility to get the statements.  We only ask the Court

15   for 30 days to get this filled out.

16         THE COURT:  So ordered.  You get 30 days.

17         MR. ORTIZ:  Thank you, Your Honor.

18         THE COURT:  All right.

19         MR. BAEHR:  Your Honor, in the next two cases, the

20   parties have agreed that they shouldn't be heard at this

21   time.

22         THE COURT:  Okay.

23         MR. BAEHR:  So we can skip.

24         THE COURT:  So defer.  Defer.  That's Earlene

25   Garrett and Gloria Allen.

1          And now we go to Emma Whitted.

2          And this should be Ms. Roberts, Mr. Cost.  Who is

3    on the line?

4          MS. SWEET:  Your Honor, Ms. Whitted lodged a

5    general objection.

6          MR. LAMBERT:  That's consistent with our notes.

7          THE COURT:  Okay.  This matter is dismissed with

8    prejudice.

9          Then we have Gwendolyn Hartford.  She's with the

10   Finson Law Firm.

11         Mr. Finson, are you on the line?

12         MR. FINSON:  Your Honor, can you hear me?

13         THE COURT:  Yes, I can.

14         MR. FINSON:  Okay.

15         MR. BRILLEAUX:  Your Honor, this is a case that we

16   think is appropriate for dismissal.  It's been rolled

17   over at least twice, maybe three times at this point.

18   The case was previously included on one of the

19   stipulation lists that we included to roll over, so

20   counsel has been on notice for several months.  But this

21   is an authorization issue with the insurance

22   authorization not witnessed.

23         THE COURT:  Mr. Finson?

24         MR. FINSON:  Your Honor, the authorization --

25            (Court reporter asks for clarification.)

1          THE COURT:  Mr. Finson, we can't understand you.

2          MR. FINSON:  Hold on one second.

3          Can you hear me now?

4          THE COURT:  Yes.

5          MR. FINSON:  All right.  We sent it to the client.

6    It just seems to me it would be unfair to dismiss this

7    case because of the lack of one signed document that's

8    been sitting around for a long time.  We apologize, but

9    we are going to get on it and we'll get it to the Court

10   as soon as possible.  That's the only problem.

11         THE COURT:  I know.  What's taking you so long to

12   get an authorization that's witnessed?  I mean, it's been

13   -- we've had this on -- it's not the first time it's been

14   here.

15         MR. FINSON:  I understand, Your Honor.  However,

16   we had some problems getting together with the client,

17   but we'll make sure it gets done within the next 30 days.

18   Again, this is -- I know it's been around for a while,

19   but it's not a substantial problem that I think requires

20   and demands dismissal.  That's all I'm saying.

21         THE COURT:  I'm going to give you 30 days.

22         And I will sign the dismissal on day 31, Ms.

23   Brilleaux.

24         MS. BRILLEAUX:  Thank you, Your Honor.

25         MR. FINSON:  Thank you, Your Honor.

1          THE COURT:  Anita Manley.

2          MS. SWEET:  Your Honor, the Manley case and the

3   Rooney case are similarly situated.  Plaintiffs have not

4   uploaded product identification and we are not aware of

5   the current status of any pending subpoenas or other

6   efforts.

7          Your Honor, in the -- in the Manley case -- well,

8   the only thing to say about Manley is we did issue a

9   subpoena a while back and we asked the defense counsel to

10  assist us.  We didn't follow up properly, so I would ask

11  for some time to follow up with defense counsel to get --

12  to see if we can't get some response to that subpoena.

13         THE COURT:  All right.  I'm seeing in Ms. Manley's

14  case that you submitted a subpoena in 2022.  What have

15  you done --

16         MR. FINSON:  That's correct.

17         THE COURT:  What have you done since then to find

18  product ID?

19         MR. FINSON:  We've been trying to get together

20  with the -- check it out.  And I agree we probably could

21  have done more.  But when we sent a copy of subpoenas to

22  defense counsel, I thought they would assist us, but they

23  apparently didn't.  That's all I have to say about that.

24  I don't want to take more of the Court's time on this

25  one.

1          THE COURT:  All right.  Since there is no NDC at

2     all and no product ID in Ms. Manley's case and a subpoena

3     was filed in 2022 and nothing done since then, the Court

4     is going to dismiss this matter.

5          MR. FINSON:  Note our objection, Your Honor.

6     That's all.

7          THE COURT:  Now, Donna Rooney, same thing for

8     Ms. Rooney.

9          MR. FINSON:  Well, no.  In Ms. Rooney's case, we

10    issued a subpoena in March of 2023.  We sent the subpoena

11    out to the defendant to ask for their assistance and they

12    did not assist us.

13         But there is a little bit more to Rooney than

14    that.  Number one, the defendant's actions in this case

15    indicated -- I know it's totally sufficient -- that the

16    -- Hospira sent product to this facility on the date in

17    question, and because they sent it there, I think we

18    should likely assume that that was the product they used

19    on our client.

20         Well, there's a little bit more to it than that

21    because -- indicated that they sent products to this

22    facility, but the dates were off by a year.  So what we

23    would like to do because we realize that it may be

24    helpful to subpoena to see if --

25         THE COURT:  All right.  Stop.  Stop.  Stop.  I'm

1   going to grant 30 days because it looks like there was a

2   subpoena issued in March of 2023.  And I'll grant 30 days

3   to determine product ID.

4         All right.  And then we go to Janet Schoenbeck.

5         MR. FINSON:  Schoenbeck.

6         THE COURT:  Schoenbeck.

7         Okay.  Records no longer existed.

8         MR. FINSON:  Your Honor, the only defense I have

9   is the records were sent.  So I'm not going to take up

10  the Court's time any more than that.  If you're going to

11  dismiss it, I object to it.  That's all.

12        THE COURT:  Okay.  The Court is going to dismiss

13  that with prejudice.

14        Okay.  We'll go to Davis --

15        MR. FINSON:  May I be excused, Your Honor?

16        THE COURT:  Yes, you may be excused.

17        MR. FINSON:  Thank you, Your Honor.

18        THE COURT:  Thank you.

19        Davis & Crump, Mr. Rockstad.

20        MR. ROCKSTAD:  Yes, Your Honor.  Can you hear me?

21        THE COURT:  Yes, I can.

22        Sandra Lemarr is deceased.  I'll give you 30 days

23  to file a Suggestion of Death.

24        MR. BRILLEAUX:  I just wanted to note --

25        MR. ROCKSTAD:  We are in touch with her heirs and

1   can do that, Your Honor.

2          THE COURT:  Thank you.

3          Patricia Pappas?

4          MR. ROCKSTAD:  Same on that one.  We were not

5   aware -- I believe earlier this year we found out she was

6   deceased and had trouble finding an heir.  We are now in

7   communication with her next of kin.

8          THE COURT:  Okay.  Court's going to grant 30 days.

9          Vivian Castano?

10          MR. BAEHR:  Your Honor, in this --

11          MR. ROCKSTAD:  In this one, Your Honor, sorry, we

12   filed the Motion to Amend to dismiss Sanofi.  We were a

13   little late filing it, but we did get it filed on the

14   7th.  It's Document No. 16115, so I believe this one is

15   cured.

16          THE COURT:  Okay.  I'll grant seven days to

17   confirm compliance.

18          And Ester Williams?

19          MR. BAEHR:  In this case, we're asking for 30 days

20   for the plaintiff to continue ongoing efforts.  There's

21   an outstanding subpoena.

22          THE COURT:  Okay.  Mr. Rockstad, 30 days.

23          MR. ROCKSTAD:  That's excellent.  Thank you,

24   Counsel.

25          And actually we uploaded a signed NDC form to

1    Centrality this morning.  Our subpoena worked and we got

2    that from the facility.

3            THE COURT:  Great.  Thank you.

4            All right.

5            MR. ROCKSTAD:  Thank you, Your Honor.

6            THE COURT:  Number 80 is Mr. Browne.  Are you on

7    the line?  JoAnn --

8            MR. BROWNE:  I am, Your Honor.

9            THE COURT:  -- Dannenfelser, I don't know how to

10   pronounce her name.

11           MR. BROWNE:  Dannenfelser.

12           THE COURT:  Okay.  We need you to submit a death

13   certificate to Centrality.  I'll give you 30 days to do

14   that.

15           MR. BROWNE:  Judge, we did that last -- on the 6th

16   of last week and the doc. number is 541911 and I sent

17   that -- when I saw the final hearing notice yesterday, I

18   sent that to Sanofi's counsel to say, "Hey, I submitted

19   this last week."

20           THE COURT:  Okay.  All right.  I'll give you seven

21   days to confirm compliance.

22           MS. BRILLEAUX:  Thank you, Your Honor.

23           THE COURT:  Diane Nofsinger.

24           MR. INSOGNA:  Your Honor, this case is a little

25   bit different from anything --

1          THE COURT:  Wait, wait, wait.

2          Mr. Insogna.

3          MR. INSOGNA:  This is a little bit different from

4     cases you addressed previously.  Plaintiffs submitted a

5     CMO 12 statement on which somebody handwrote an NDC code

6     for Baxter, who is not a defendant.  They're a related

7     company to Sandoz.  They did not begin marketing

8     docetaxel until February 2018.  This plaintiff was

9     treated in January to March of 2015.  So clearly it's not

10    Baxter docetaxel.

11         We have been communicating with Reyes Brown

12    Rielley for more than a year about this issue.  And

13    there's no product ID in support of any other defendant.

14    So we're asking that the case be dismissed at this point.

15         THE COURT:  Mr. Browne?

16         MR. BROWNE:  Yes, Your Honor.  Sorry.  More than a

17    year?  Maybe some of the other correspondence goes back,

18    but literally the first time that this really kind of hit

19    my desk was here within the last couple of months, and

20    since that time, I have talked with leadership.  I was

21    able to talk with Mr. Lambert actually about this last

22    week, as this is all kind of news to me.  This is not

23    kind of how everybody knows about.

24         We filed this Exhibit B, Your Honor.  It was fine

25    back in 2018.  And so, you know, we thought this

1    issue was dead.  So when it came up -- and I've now

2    reached back out to Carla Haust, who is the manager of

3    the cancer program with Pete's help.  I've also spoken

4    with the risk manager there, L.J. Raleigh, and spoke with

5    them, communicated with them on several occasions, again,

6    as of yesterday.  And they are going back through their

7    electronic medical records system to be able to try to

8    track this down and see if, indeed, this is what they

9    were provided by the pharmacy, the number that they wrote

10   down, but maybe the pharmacy was in err --

11         THE COURT:  I'll tell you what, I'm going to give

12   you 30 days.

13         MR. BROWNE:  That sounds good, Your Honor.  They

14   are working on it.

15         THE COURT:  Thank you.

16         MR. BROWNE:  Thank you.

17         May I be excused, Your Honor?  I believe that was

18   my final one.

19         THE COURT:  I think it is.  Okay.

20         MR. BROWNE:  All right.  And congratulations to

21   LSU on the big win.

22         THE COURT:  You know, I don't coach, but I'm

23   always just as happy.

24         MS. BRILLEAUX:  Well done, Judge.

25         THE COURT:  Yeah.  It's all on me.

1          MR. BROWNE:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Ms. Greene?

4          MS. GREENE:  Yes, Your Honor.

5          THE COURT:  Delores Romero, need a Suggestion of

6     Death.  I'll give you 30 days.

7          MS. GREENE:  Thank you, Your Honor.  That's all we

8     would ask for.

9          THE COURT:  And then we have Peggy Newton.  Where

10    are we?  You need to file a partial dismissal?

11         MS. GREENE:  Well, Your Honor, Ms. Newton's suit

12    was only filed against the Sanofi defendants and so we

13    needed to file an amended short form complaint.

14    Unfortunately, I was out of the office for the last few

15    weeks.  But I did reach out to counsel for Accord.  I

16    just haven't heard back from them to find out if they

17    would object to us filing a short form -- an Amended

18    Short Form Complaint.  So I would just ask for a little

19    additional time so I can confer with them.

20         MS. CALLSEN:  Your Honor, wait.  I got a voicemail

21    yesterday when I was en route.  I was unable to address

22    it, but it appears to us that this should be in the

23    briefing process because the product ID was obtained in

24    2018.  But this is the first we've heard that they're

25    trying to amend to add Accord, so therefore it would be

1    untimely.  So it would be in that briefing process we've

2    already agreed to.

3            THE COURT:  All right.

4            MS. GREENE:  And, Your Honor, I would agree with

5    everything that counsel just stated.  All of that is

6    accurate as far as I'm concerned.

7            THE COURT:  Okay.  Thank you.

8            MS. CALLSEN:  I'm sorry.  But Sanofi should be

9    dismissed, right?  That's the issue we have.

10           MR. BAEHR:  Yeah.  Our position is that Sanofi

11   should be dismissed at this point because the one thing

12   we know is that they're the wrongfully named defendant.

13   They shouldn't be in the case, but that's up to Your

14   Honor.

15           THE COURT:  Ms. Greene?

16           MS. GREENE:  Well, Your Honor, at this point,

17   because we don't have the other defendants named, we

18   couldn't file a partial dismissal as to -- excuse my

19   voice -- we couldn't file a partial dismissal as to

20   Sanofi, so that's why we didn't go forward with that.

21           THE COURT:  I don't know if that's going to relate

22   back.

23           MR. LAMBERT:  Your Honor, this is one -- I agree

24   with Ms. Callsen.  This should be part of that letter

25   briefing process.  I think the issue is it goes all the

1    way back to Judge Englehardt in this beginning of this

2    process.  He would not allow folks to just add all the

3    defendants to the complaint --

4              THE COURT:  I understand that.

5              MR. LAMBERT:  And it leads to this process and it

6    always was contemplated that folks could change the

7    defendants if necessary.  I understand that's not the way

8    the defendants interpreted that, but that's -- I think it

9    should be part of that process.

10             THE COURT:  No, I understand.  But that's a

11   separate question.  What I'm hearing and what I think and

12   I'm not sure if I'm picking this up, I think Ms. Greene

13   is concerned about dismissing Sanofi because -- whether

14   or not it's going to relate back.  But I don't know if

15   that would have any relation.  But that's a whole

16   different animal.  So we're going to wait until this

17   briefing is done, but I don't --

18             MR. BAEHR:  Understood, Your Honor.  And that's a

19   very reasonable outcome.  I think it's a little bit

20   distinct from some cases that are coming up, but I'll

21   save the argument for those.  But, yes, that's fine.

22             THE COURT:  I don't want to make a legal

23   determination at this point that not -- that

24   dismissing you -- anyway.

25             MR. BAEHR:  Understood.

1          THE COURT:  Sit tight.

2          MR. BAEHR:  I think the next case is in the same

3    boat, but I don't actually know if counsel has filed a

4    Motion to Amend or what the status is.

5          THE COURT:  In the Neredia Ruiz, Ms. Greene.

6          MS. GREENE:  That's the same situation, Your

7    Honor.  And I spoke with counsel for Hospira and was

8    informed that they would object to us filing an Amended

9    Short Form Complaint.  And I think I had a very fruitful

10   discussion with her.  She was wonderful and very helpful

11   and said she believes these would be part of the letter

12   briefing for the Court --

13         THE COURT:  So that will be part of the briefing.

14   Okay.

15         MS. GREENE:  Thank you, Your Honor.

16         THE COURT:  And Julie Yoho is the same?

17         MR. BAEHR:  I believe so, but I don't know if a

18   MOTION TO AMEND has been filed.

19         MS. GREENE:  Yes, Your Honor, that's the same.

20         THE COURT:  So that will be part of the briefing.

21         MS. GREENE:  Yes, Your Honor.

22         THE COURT:  That will be deferred.

23         Okay.  Now we have Geraldine --

24         MS. GREENE:  Thank you, Your Honor.

25         THE COURT:  Thank you.

1          Geraldine White, Gainsburgh.  Palmer.  Mr.

2     Lambert.  I'm sorry.

3          MS. SWEET:  Yes, Your Honor.  We have met and

4     conferred on this case.  Plaintiff's position is that the

5     last two infusions can be attributed to Sanofi products,

6     but there's no pharmacy practice or procedure evidence

7     that has been produced along those lines.  And I'll just

8     say that the Winthrop -- the span of time where Winthrop

9     was being purchased consecutively was less than 30 days.

10     So without that kind of addendum evidence, we think the

11     case should be dismissed.

12          MR. LAMBERT:  Your Honor, this one to us seems

13     like a question of fact.  There are purchases, at least

14     eight consecutive purchases of Winthrop products over a

15     span of more than two of her infusions.  We have

16     contacted the facility to try to get pharmacy practices,

17     procedures and we're certainly willing to take somebody's

18     deposition if we need to.  But this one seems like a fact

19     issue to us.

20          THE COURT:  I'll give you 30 days because I think

21     I was very clear about what it is I was looking for when

22     you don't have the actual NDC codes, that it's got to be

23     more than, oh, they buy Winthrop.  It's got to be

24     something that would focus on that particular drug at

25     that particular time.

1          Okay.  Faith Campbell, Mr. Lambert, this is we

2    need proper parties substituted?

3          MR. LAMBERT:  Yes, Your Honor.  The Suggestions of

4    Death have been filed June 28th and we're in the process

5    of trying to locate appropriate representations for or to

6    represent to the Court that there are.

7          THE COURT:  You got 90 days.

8          MS. BRILLEAUX:  That was going to be my ask, Your

9    Honor, if we can get these dismissed if the substitution

10   isn't effected in 90 days.

11         THE COURT:  Toneka Terry?

12         MR. LAMBERT:  Same issue.

13         THE COURT:  Okay.  Thank you.

14         Sharlene Grant?

15         MS. SWEET:  Your Honor, this case was actually on

16   the 730 rollover list from the last hearing, and

17   following that hearing, plaintiff uploaded some product

18   ID as to Accord for the last infusion, but plaintiff --

19   we've met and conferred on this case as well.  They've

20   expressed some concerns about that product ID, so

21   Accord's position is if they have concerns, then the case

22   should be dismissed with prejudice at this point.  And

23   I'll say based -- it's a letter from the facility

24   indicating that they had -- she had Accord administered

25   during all the infusions.  Accord was only available for

1  the very last infusion.

2         MR. LAMBERT:  And, Your Honor, I did have that

3  conferral with Ms. Sweet and I did indicate I would get

4  back to her after I discussed it with my colleagues and I

5  admittedly did not get back on it.  We will go ahead and

6  dismiss everybody, but Accord in this case.  There may be

7  a need for additional discovery at some point.  But we'll

8  go ahead and take that step as the defendant proposed.

9         THE COURT:  Do you need 30 days to do that?

10        MR. LAMBERT:  We can do that in seven days.

11        THE COURT:  Or you want me to do that right now?

12        Do it in 30 days.  I'll give you 30.

13        Elaine Mcduell?

14        MR. BAEHR:  Your Honor, in this case, this is

15  another one where there is a variety of documents that

16  don't add up to the type of evidence described in CMO 12

17  or the addendum.  It doesn't appear that any subpoena or

18  other discovery or efforts are underway.  What we do have

19  is a letter from the facility that refers to records, but

20  we don't have those records and then a Statement of

21  Chemotherapy that doesn't have any information that's not

22  signed, it doesn't identify the plaintiff or anything

23  like that.  So given that there is no outstanding

24  efforts, we would ask for dismissal, but at the minimum,

25  we would ask for 30 days to get something signed,

1    something that's described in CMO 12 or the addendum.

2         MR. LAMBERT:  Your Honor, on this one, we believe

3    this is a fact question.  There is representation from

4    the facility that it's a Winthrop product.  You know,

5    it's not -- I agree.  It's not done in the right form.

6    It's not signed, et cetera, et cetera, but it does seem

7    like there's a -- there's information coming from the

8    facility confirming that it's a Winthrop product.

9         THE COURT:  Let me see.  Okay.

10        MR. LAMBERT:  And we believe it's a fact issue for

11   the transferor judge to consider.

12        MR. BAEHR:  If you would like to see the

13   documents, Your Honor --

14        THE COURT:  Let me see.  It's a little bit

15   confusing to me.

16        MR. BAEHR:  So a few things, the first page refers

17   to a photographic copy of medical records that doesn't

18   appear to be present in any of the other documents.  The

19   second page does have a sort of fax header or some fax

20   headers, but that doesn't appear on the first page or the

21   third page.  And so it's just a little bit difficult to

22   relate all these documents together.  Again, our ask

23   would just be 30 days for something that meets the

24   descriptions provided in CMO 12 and the addendum.

25        MR. LAMBERT:  Your Honor, again, I mean, it's not

1   perfect.

2          THE COURT:  It's not perfect, but it's --

3          MR. LAMBERT:  They refer to the certificate.  The

4   certificate does say Ms. Mcduell's name.  It's

5   handwritten, the NDC number of a specific drug.  The two

6   forms relate to each other.

7          THE COURT:  This is -- you know, I will tell you,

8   I'm not going to -- I think the transferee judge may have

9   to handle this at another time.  I think it's pretty

10  clear to me that the facility says see attached, see the

11  certificate.  And is it in proper or perfect form?  No.

12  But I think it's sufficient to get past this proceeding.

13         Now, Mr. Lambert, if I was you, I might start

14  trying to get something more in line, but I think it's

15  sufficient to get us past here.  I think there's enough

16  here.

17         MR. LAMBERT:  Thank you, Judge.

18         THE COURT:  Atkins & Markoff.

19         All right.  Ms. Hanlon, are you on the line?

20         MS. HANLON:  Yes, I'm here, Your Honor.

21         THE COURT:  Okay.  We have Joann Washington.  We

22  need proper parties substituted.

23         MS. HANLON:  Yes.  I filed -- I filed that the

24  other day.  I need 90 days and I will complete the next

25  two steps of the proper party substituted and I'm working

1   on getting the death certificate from the son currently.

2          THE COURT:  Thank you.

3          Gloria Colton.

4          MR. INSOGNA:  Your Honor, this is a case where

5   Plaintiff has submitted some purchase records showing

6   only three purchases, two of Hospira, one of Sanofi

7   during plaintiff's treatment.  But the facility response

8   says they would have kept docetaxel on their shelf for up

9   to 80 weeks, so those three purchases are not sufficient.

10         THE COURT:  Ms. Hanlon.

11         MS. HANLON:  That is -- yes, Your Honor.  So we

12  have been in touch with the facility.  They have been

13  really responsive.  The regional director of pharmacy and

14  infusion services, she sent me that on the 23rd on

15  February.  I conferred with defendants.  Scott was

16  informed that I do need additional information to try to

17  narrow that between Hospira and Sanofi if there's any way

18  possible.  I haven't gotten anything back to him to date.

19  We do still have one outstanding request to him to try to

20  narrow that further, but that's currently where I'm at.

21         THE COURT:  Okay.  If you have one outstanding

22  request, I'll give you 30 days, but it sounds like it's

23  your last -- a last ditch effort.

24         MS. HANLON:  Yes.

25         THE COURT:  Okay.

1          MS. HANLON:  The next --

2          THE COURT:  Okay.  Altha Edwards, you said the

3    next two, is there something in Suzette --

4          MS. HANLON:  Yeah, I just wanted to state some

5    previous comments on today's hearing.  I do believe these

6    two need to be part of the briefing process.  Both Palmer

7    and defense counsel have identified Sagent is the correct

8    manufacturer for the third case.  Hospira is the correct

9    manufacturer for the second case.  Unfortunately, Sanofi

10   is the only defendant named on these cases, so I do not

11   want to -- I don't want to dismiss -- I mean, I'm okay

12   with dismissing.  I just think that in order to move

13   forward I need to name somebody else.

14         THE COURT:  So these would be part of the briefing

15   process?

16         MS. CALLSEN:  But they haven't filed.

17         MS. HANLON:  Yes.

18         THE COURT:  Right.  Right.  But I think that's

19   what she's saying because sometimes it's just hard --

20         MS. HANLON:  We need to file, yes.

21         MR. BAEHR:  Your Honor, we don't have any

22   objection I don't think to them being a part of the

23   briefing process, but because there's no Motion to Amend

24   on file, there's no sort of avenue for Sanofi to get out

25   of the case.

1          THE COURT:  Okay.  Ms. Hanlon, you got to get that

2     motion filed, Motion to Amend.

3          MS. HANLON:  I can do it within seven days.

4          THE COURT:  All right.  I'll give you seven days.

5          MR. LAMBERT:  Your Honor, just in Ms. Hanlon's

6     defense, as the defendants requested that briefing

7     process, I think they suggested to various counsel that

8     that should proceed before Motions to Amend.

9          MS. CALLSEN:  No, we never made that

10    representation.

11         MR. LAMBERT:  Okay.  Well, I was unclear about

12    that.  But those motions obviously can be filed, but the

13    letter briefing will go on simultaneously.

14         THE COURT:  Yeah.  Thank you.

15         Kim Whittaker.

16         MR. INSOGNA:  Your Honor, this is another case

17    with insufficient product ID evidence.  This one was

18    discussed at the 2022 show cause hearing.  The Court

19    granted one rollover for plaintiff to go back and see if

20    the facility could narrow between Sanofi, Hospira and

21    Sagent, which were the manufacturers purchased during the

22    time period.  There has been no update since then.

23         MS. HANLON:  Your Honor, this is a case -- the

24    facility has been very responsive.  However, multiple

25    letters and correspondence later, they have not been able

1   to narrow between the three.  So while I do object to the

2   dismissal, I don't have anything else from this facility

3   and they've indicated they won't be able to narrow

4   between those three.

5          THE COURT:  This matter is dismissed.

6          MR. INSOGNA:  And, Your Honor, the next case,

7   Patricia Whitted is in a similar position.  This was

8   rolled over on the March -- it actually was first on a

9   Notice of Non-Compliance in September of 2022 and

10  Plaintiff was going to try to see if they could narrow

11  further between Sanofi, Hospira and Sandoz.  I understand

12  plaintiff has have been in touch with the facility, but

13  they have not been able to provide any additional

14  information.

15         THE COURT:  Ms. Hanlon?

16         MS. HANLON:  Yes.  Ken is responsive.  The last

17  correspondence I had from him he asked me to write

18  language for him that would be sufficient.  I indicated

19  that that wasn't going to be okay.  I clarified with him

20  after talking to defendants the points in which we need

21  clarified.  I followed up with him over the past two

22  weeks.  I haven't heard back on it yet, but we still are

23  awaiting more correspondence from Ken Walsh, who is their

24  vice president in quality and risk.  We would ask for

25  30 days again --

1          THE COURT:  All right.  I'll grant you 30 days.

2          MS. HANLON:  Thank you, Your Honor.

3          THE COURT:  All right.  Is that it for Ms. Hanlon?

4     Okay.  Mr. Furness.

5          MR. FURNESS:  Yes, Arati Furness for Nachawati Law

6     Group.  Good morning, Your Honor.

7          THE COURT:  Okay.  Vickie Hammond, we need proper

8     parties substituted, so Suggestion of Death has been

9     filed?

10          MS. BRILLEAUX:  Yes, Your Honor.

11          THE COURT:  All right.  And when was that?

12          MS. BRILLEAUX:  It was -- the Suggestion of Death

13     was filed on June 15th for plaintiff who died in July

14     of 2019 --

15          THE COURT:  She's got 90 days from the Suggestion

16     of Death.

17          MS. BRILLEAUX:  Yes, Your Honor.

18          THE COURT:  Okay.  So this is a reminder.  It's

19     got to be done within 60 days now.

20          MS. BRILLEAUX:  Right.  Thank you, Your Honor.

21          THE COURT:  Mr. Furness, you understand that?

22          MR. FURNESS:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. BRILLEAUX:  The next case for Sarah Haney,

25     this one is an interesting one.  It was previously on the

1   list for no PFS submitted.  Those were all cured except

2   for the plaintiff has not submitted a CMO 12A initiation.

3   I know it's been a while since we've talked about that

4   since we're heavily into product ID now, but they've done

5   nothing on the product ID front at this point.

6           THE COURT:  Mr. Furness?

7           MR. FURNESS:  This case was filed in 2022.  And we

8   are still working on getting that.  We do think we can

9   get that.  We are asking 30 days, Your Honor.

10          THE COURT:  Court's going to grant 30 days.

11          And then we have Nancy Krazter, no proof of use.

12          MS. BRILLEAUX:  Yes, Your Honor.  This was, yeah,

13  no records submitted showing proof of use, Taxotere, no

14  declaration that's been signed by Plaintiff.  This case

15  has been pending since 2020 and it's our position that it

16  should be dismissed.

17          MR. FURNESS:  The client just recently passed away

18  in May 2023.  We did file a Suggestion of Death.  We are

19  in contact with the next of kin.  And so we just need an

20  additional 30 days to confirm how they want to move

21  forward and what else we can try to cure that issue.

22          THE COURT:  All right.  I'll grant 30 days.

23          All right.  Then Allan Berger.

24          Mr. Geiger, are you on the line?

25          Debra Chetta.

1          Mr. Berger.  I mean, Mr. Geiger.  Star six,
2    please.
3          MR. GEIGER:  Yes, Your Honor, I am here.  Sorry
4    about that.
5          THE COURT:  That's okay.
6          MR. GEIGER:  Ms. Chetta's case -- go ahead.
7          MR. BAEHR:  Your Honor, this is a case similar to
8    ones we just discussed.  The Plaintiff has obtained
9    product ID for Hospira, but Sanofi is the named
10   defendant.  They haven't yet moved to amend, so we would
11   ask for the seven days you recently granted for them to
12   get a Motion to Amend on file and then it would be
13   subject to -- for the briefing.
14         THE COURT:  The briefing.
15         Okay.  Mr. Berger -- God, why do I keep doing
16   that?  Mr. Geiger.
17         MR. GEIGER:  That's fine.  No objection.
18         Two of her cycles we know are Hospira.  We just
19   don't know about the four others.  We have sent
20   correspondence, but haven't heard back yet.  So we agree
21   with counsel's suggestion.
22         THE COURT:  Okay.  Sandra Coleman, we need a
23   Suggestion of Death.
24         MR. GEIGER:  Yes.  And we are happy to file that
25   if we can get 30 days to do so.

1            THE COURT:  I'll grant 30 days.

2            Wonza Dillard Singleton.

3            MR. INSOGNA:  Your Honor, this is a case that was

4    rolled over from the March hearing and was first on a

5    list in September 22nd.  There is a purchase history that

6    identifies four manufacturers, but post-dates plaintiff's

7    treatment.  So we have no evidence at all during the time

8    of plaintiff's treatment.  We've met and conferred with

9    plaintiff's counsel a few times on this.  I know that

10   they have been trying to do more, but I think given the

11   amount of time that's passed since that first September

12   Notice of Non-Compliance, we're at the point where

13   dismissal is appropriate.

14            THE COURT:  Mr. Geiger?

15            MR. GEIGER:  Your Honor, this is one -- this is

16   one that we sent correspondence to see if there's

17   anything out there that will help us.  But that's kind of

18   where we are.

19            THE COURT:  When was your last -- do you have

20   outstanding correspondence?

21            MR. GEIGER:  We do.  We sent correspondence.  We

22   had a meet and confer with counsel, I believe, in early

23   May on this one and we sent correspondence shortly

24   thereafter.  So it's been less than 60 days since we sent

25   it.

1          THE COURT:  Okay.  I'm going to give you --

2          MR. GEIGER:  Perhaps if we got another 30 days.

3          THE COURT:  All right.  I'm going to give you

4     another 30 days and that's it.  Okay?

5          And then --

6          MR. GEIGER:  Okay.

7          THE COURT:  -- Janice Guilbeau.

8          MR. INSOGNA:  Your Honor, Janice Guilbeau is a

9     similar situation.  There are purchase records that

10    identify Sandoz and Hospira.  Plaintiff could have

11    received either of them.  Again, we met and conferred

12    with counsel in May.  I know that they have been making

13    efforts.  They just have not borne any fruit yet.

14         THE COURT:  Mr. Geiger?

15         MR. GEIGER:  I agree with the lack of fruit.  I

16    have -- similar to the prior case, we have correspondence

17    outstanding, just haven't heard back.  Perhaps we can get

18    30 days and then make a decision --

19         THE COURT:  All right.  That's your last bit of

20    correspondence.  30 days.

21         And then Willie Manuel -- I've heard these names I

22    think every -- every time we have a show cause hearing.

23         MR. INSOGNA:  There are a number that keep coming

24    up.

25         Ms. Manuel's situation is different this time.

1  This is one where it would be a Motion to Amend issue.

2  The wrinkle in this case is that plaintiff was treated in

3  2008.  Her treatment could only have been Sanofi.

4  There's never been any request to amend.  It would

5  clearly be untimely at this point.

6           THE COURT:  Mr. Geiger?

7           MR. GEIGER:  Yes, Your Honor.  So, obviously, our

8  desire is to be able to file a Motion to Amend to name

9  Sanofi.

10          THE COURT:  This is what I'm going to let you do.

11  You have to do that within 70 (sic) days and it will

12  probably be part of the briefing process and we'll just

13  deal with it at that time.

14          MR. GEIGER:  I'm sorry, Your Honor.  You said

15  seven days?

16          THE COURT:  Seven days.

17          MR. GEIGER:  Thank you.

18          THE COURT:  All right.  Now we have --

19          MR. INSOGNA:  Zannette Mccrea.

20          THE COURT:  Zannette Mccrea.

21          MR. INSOGNA:  Your Honor, this is another case

22  where there is purchase history insufficient to identify

23  which manufacturer was administered in plaintiff's

24  treatment.  I have spoken to Mr. Geiger about this case.

25  I know they've made efforts, but, again, they do not have

1    product ID evidence.

2             THE COURT:  Mr. Geiger.

3             MR. GEIGER:  Yes, Your Honor.  Same as with the

4    ones that we previously spoke about.  We have sent

5    correspondence to confirm which manufacturers were

6    involved in various treatments.  We do have a number of

7    defendants that we know are involved, but perhaps if we

8    can have 30 days to clear the picture up.

9             THE COURT:  30 days.

10            But, listen, you know, Mr. Geiger, these names I

11   recognize, which just seems like we're always here.  So

12   this is it.  And it's only because there's outstanding

13   correspondence, but this is it.  You're going to have to

14   find who your defendant is.

15            MR. GEIGER:  I appreciate that.

16            THE COURT:  Okay.  And then we have --

17            MR. GEIGER:  I appreciate that, Your Honor.

18            THE COURT:  Cuedette Smith and that's the same

19   thing.

20            MR. INSOGNA:  It's the same circumstance, Your

21   Honor.

22            THE COURT:  All right.  30 days.  And then that's

23   it.

24            Okay.

25            MR. GEIGER:  Thank you, Your Honor.

1    THE COURT:  And then we go to Johnson Law Group.

2    MS. BRILLEAUX:  Yes, Your Honor.  And the first

3  case that we have here, Karen Harrison, we have no

4  Suggestion of Death filed and this plaintiff has been

5  deceased since November of 2018.

6    THE COURT:  Who do I have on the line for the

7  Johnson Law Group?

8    MR. JONES:  This is Pierce Jones from the Johnson

9  Law Group if you can hear me.

10    THE COURT:  All right.  Yes, Mr. Jones, I can hear

11  you.  Let me mark this.

12    Okay.  Suggestion of Death, what's the situation

13  here?

14    MR. JONES:  This one we were able to finally speak

15  with the spouse and he noted a desire not to proceed with

16  the case.

17    THE COURT:  All right.  This matter is dismissed

18  with prejudice.

19    MS. BRILLEAUX:  Thank you, Your Honor.

20    The next one, Rosemarie Newcomb is basically a

21  similar situation with plaintiff deceased as of

22  February of 2020.  And, you know, we would ask that the

23  case be dismissed at this time.

24    THE COURT:  Mr. Jones?

25    MR. JONES:  For this one, we were able to speak

1   with the next of kin on July 5th and they're determining

2   if they want to move forward.  So I would just ask

3   30 days on this one.

4          THE COURT:  All right.  I'm going to grant

5   30 days.

6          Anne Riley, same thing?

7          MS. BRILLEAUX:  Yes, Your Honor, and this --

8          MR. JONES:  Anne Riley -- sorry.  Go ahead.

9          MS. BRILLEAUX:  Oh, I was just going to say this

10  plaintiff has been deceased since April of 2019.

11         MR. JONES:  For this one, we were able to speak to

12  the son and he has noted a desire not to pursue with the

13  case.

14         THE COURT:  This matter is dismissed with

15  prejudice.

16         Madeline Wells?

17         MS. BRILLEAUX:  This plaintiff has been deceased

18  since October of 2021, not quite as long, so we would ask

19  for either a Suggestion of Death or a dismissal.

20         MR. JONES:  And for this one, we are still trying

21  to track down the daughter.  We were able to locate a

22  social media profile that we've reached out to.  So I

23  would just ask for a little extra time to kind of exhaust

24  all efforts.

25         THE COURT:  I'm going to give you 30 days for a

1   Suggestion of Death.

2        And then we have Lisa Mack.  Where are we here?

3        MR. BAEHR:  We're 111.

4        THE COURT:  I know.

5        Okay.  Mr. Pierce, do we have -- you need to

6   dismiss the remaining defendants.  You have Hospira.

7        MR. JONES:  Yeah.  We originally had submitted a

8   new request to kind resolve why there was Sanofi and

9   Hospira NDC codes, but after re-reviewing it, I am

10  inclined to file the partial dismissal.

11       MR. BAEHR:  Can we just get it on the record?

12       THE COURT:  Well, you know, inclined.  I think we

13  need a decision.

14       MR. JONES:  I'm sorry.  I'll clarify.  I will file

15  a partial dismissal.

16       THE COURT:  Okay.  All right.  So I'm going to

17  order that that be done within seven days or we can

18  dismiss it today.

19       MR. BAEHR:  No objection.  That would be our

20  preference.

21       THE COURT:  Let me dismiss Sanofi today.

22       MR. JONES:  Yes, Your Honor, we'll get that on

23  file.

24       THE COURT:  No.  All right.  Sanofi is dismissed

25  with prejudice.

1          MR. BAEHR:  Thank you, Your Honor.

2          THE COURT:  Cathy Tavanello.

3          MR. INSOGNA:  Your Honor, in this case, in October

4    of 2022, plaintiff said they were in the process of

5    trying to confirm whether Hospira or Accord was

6    administered.  We've had no update on that.  I know

7    plaintiffs represented that they're still working with

8    the facility, but we've not gotten --

9          THE COURT:  What does that mean, that you're still

10   working with the facility?  Where are we, Mr. Jones, and

11   what's actually been done?

12         MR. JONES:  Well, I have actually good news.  The

13   facility responded to us in the middle of this hearing

14   and provided a signed statement regarding chemotherapy.

15   I just uploaded it to MDL Centrality.  It will be

16   Document 542024.  So that is where we're at right now.

17         THE COURT:  So do you know if it's Hospira --

18         MR. JONES:  Yes.  Sorry.  And it notes only

19   Hospira.  It does not note Accord.

20         THE COURT:  Okay.  All right.  I'm going to give

21   you seven days to clean up the filings.  I know -- if you

22   get in the middle of a hearing, it's not fair for me to

23   ask you to dismiss somebody until you've had an

24   opportunity to review it, but I'll give you seven days.

25         All right.  What about Catherine Thomas?

1          MR. BAEHR:  In this case, there is a CMO 12 form.

2    It is missing a lot of the requisite information.

3    Plaintiff says they have submitted a new request.  I

4    don't know when that was submitted or whether it's

5    outstanding currently.

6          THE COURT:  Okay.  Where are we, Mr. Jones?

7          MR. JONES:  We submitted that about two weeks ago

8    after noting that the issue here is that the facility

9    noted a proper NDC code, but they didn't note -- they

10   haven't put the client's name, date of birth or SSN on

11   it.  They also didn't put the treatment dates, so we

12   think it will be pretty easy for them to provide that --

13         THE COURT:  I'll give you -- I'll give you

14   30 days.

15         And Brenda Zurlo.

16         MR. BAEHR:  In this case --

17         MR. JONES:  For this -- sorry.  Go ahead.

18         MR. BAEHR:  -- the plaintiff submitted a table of

19   unknown origin, similar to one we heard earlier.  It's

20   not signed.  It doesn't state where information came

21   from.  So we would ask again that they be given 30 days

22   to provide something with the author identified compliant

23   with CMO 12.

24         THE COURT:  Mr. Jones, that sounds reasonable.

25         MR. JONES:  All right.  We will follow up with

1    that then.

2            THE COURT:  All right.  Let me just tell you, I

3    think I told counsel before we got on the record this

4    morning that I've got to leave here at noon.  I have an

5    appointment with -- well, actually, I'm having lunch with

6    someone associated with Fulbright from Bulgaria, so I

7    kind of cannot be late.  I think if we get through the

8    Morris Bart cases we might have to then take a break for

9    lunch.  Do you think -- but I'm going to recess at noon.

10   So I'm certain we can get through Ms. Barnes.  I think we

11   can get through your cases.  The question is if we will

12   be able to get into the Bachus Schanker, Kagan --

13           MS. BRILLEAUX:  And, Judge, just while we're

14   discussing it, do you plan to resume the hearing this

15   afternoon after your lunch?

16           THE COURT:  Uh-huh.

17           MS. BRILLEAUX:  Okay.  Would that be 1:00, 1:30,

18   just for travel schedules?

19           THE COURT:  Okay.  Well, I was thinking we're

20   supposed to meet at 12:15.  Probably be done at 1:30.  Is

21   that --

22           MS. BRILLEAUX:  Start back at 2:00?  Start back at

23   2:00 or we can be here at 1:45?

24           THE COURT:  Be here at 1:45.

25           What's the travel?  What time are you flying out?

 1          MR. BAEHR:  I'm late, so I'm fine.

 2          MS. SWEET:  I'm late.

 3          MR. INSOGNA:  I think the last flight option for

 4    me is 5:20.

 5          THE COURT:  We'll be done before then.

 6          MR. INSOGNA:  Yeah, that's fine for me.

 7          THE COURT:  Okay.  All right.  So we'll be fine.

 8          All right.  Let's get started.  Let me get with

 9    Ms. Barnes and see where we are.

10          Lovie Howard?

11          MS. BRILLEAUX:  I believe that one, Your Honor,

12    just to streamline this is the Suggestion of Death and

13    substitution were filed in this one, but very recently,

14    like maybe yesterday.

15          THE COURT:  Well, then it's satisfied.

16          MS. BRILLEAUX:  And then the same for No. 117,

17    Darlene Materre-Haynes and then Daisy Lawson and Loretta

18    Moore both had no Statements of No Defense filed, so

19    they're no longer on the list.

20          THE COURT:  But Ms. Materre-Haynes, that's

21    satisfied, Ms. Barnes?

22          MS. BARNES:  Yes.

23          THE COURT:  Okay.  Great.

24          MS. BRILLEAUX:  And same for Lisa Tuyes?

25          THE COURT:  Ms. Barnes?

1          MS. BARNES:  Yes, as well.  We filed -- we filed a

2     Suggestion of Death and we're substituting her husband as

3     plaintiff.

4          THE COURT:  Okay.

5          MS. BRILLEAUX:  And then I -- this isn't even mine

6     to cover, but I will say that I saw a Stipulation of

7     Dismissal was filed this morning for Shirley Barnett.

8          Is that accurate, Ms. Barnes?

9          MS. BARNES:  That is.  I had thought we filed that

10    yesterday, but we did not.  It was filed this morning.  I

11    apologize for the delay.

12         THE COURT:  All right.  That one is dismissed for

13    prejudice as was Janet Bodden; is that correct?

14         MS. BARNES:  Bodden.

15         THE COURT:  Okay.  And then we go to No. 122,

16    which is Gloria Hartzog.  Okay.

17         MS. CALLSEN:  I believe the partial dismissal was

18    filed, right?

19         MS. BARNES:  Yeah, partial dismissal, keeping only

20    Sandoz.

21         MS. CALLSEN:  Keeping only Sandoz did she say?  Is

22    that correct?

23         MS. BARNES:  Yes.

24         THE COURT:  All right.  So is there anything?  Any

25    other complaint?  So that one is satisfied as well.

1          Okay.  And then we have Lillian Myles.

2          MS. CALLSEN:  A Statement of Defense had been

3    filed -- Statement of No Defense had been filed.

4          THE COURT:  That matter has been dismissed with

5    prejudice.

6          And then we get to that Kagan Law Group.

7          MR. BRILLEAUX:  And I think we can knock out these

8    last few before Bachus & Schanker, Your Honor.  It should

9    go fairly quickly.

10          For Kagan Law Group, for Jean Brand, this is a

11    plaintiff who has been deceased since 2020 that we

12    believe should be dismissed or alternatively a Suggestion

13    of Death filed.

14          THE COURT:  Ms. Sulkin?

15          MS. SULKIN:  Your Honor, we can definitely file a

16    Suggestion of Death.  And then the family is working on

17    getting probate documents for the decedent, so we will

18    follow up with the Substitution of Parties after we file

19    the Suggestion of Death.

20          THE COURT:  Okay.  That matter is -- I'll grant

21    30 days.

22          Elizabeth Ladner.

23          MS. BRILLEAUX:  Your Honor, this is a case -- this

24    is Lowe Law Group.  We need information in the PFS

25    regarding a second cancer treatment and diagnosis.

1           MS. SULKIN:  Your Honor, we have updated the

2    Plaintiff Fact Sheet to include the information related

3    to the second cancer diagnosis and we've ordered

4    additional medical records for the additional cancer

5    diagnosis.  And so we just need additional time to make

6    sure we get those additional documents in.

7           THE COURT:  Okay.  I'm going to give you seven

8    days to confirm compliance if you already uploaded the

9    actual information.

10          Okay.  Jaqueline Sand.

11          MS. BRILLEAUX:  This is a plaintiff who has been

12   deceased since January of 2018.  This case is appropriate

13   for dismissal at this time.

14          THE COURT:  Ms. Sulkin?

15          MS. SULKIN:  Your Honor, we just located her

16   family.  My notes -- and I'm sorry.  I'm looking.

17          My notes say that she has been deceased since

18   January of 2023 and we located her son who is willing to

19   continue the case.

20          THE COURT:  I'm going to give you 30 days to file

21   your Suggestion of Death.

22          All right.  Tamika Grace.

23          MS. BRILLEAUX:  This case, Your Honor, we need an

24   insurance authorization that is witnessed.

25          THE COURT:  All right.  I'm going to give you

1    30 days to clean that up.

2              MR. INSOGNA:  That's a Bachus case.

3              MS. BRILLEAUX:  It is.  I know.

4         But do you want to just keep going until we stop?

5         For Diana Graves, this is a case, Your Honor, I

6    know that plaintiff's position is going to be they

7    submitted administration records, but Sanofi's position

8    is that there's no proof of use here.  The records

9    clearly indicate the plaintiff never took Taxotere even

10   though she was recommended to take Taxotere.  That's

11   clear from the records.

12             THE COURT:  Ms. Sulkin?

13             MS. SULKIN:  Your Honor, there seems to be a

14   dispute as to facts.  We've exhausted all of our efforts

15   to get additional proof of use.  We would submit that

16   it's a factual issue at this point --

17             THE COURT:  Well, what evidence do you have that

18   she took docetaxel?

19             MS. SULKIN:  We have the recommendation for

20   Taxotere.

21             THE COURT:  Do you have anything from the infusion

22   center saying they gave her docetaxel?

23             MS. SULKIN:  We do not, Your Honor.

24             THE COURT:  Now, you know you need more than a

25   recommendation.  I'm going to have you -- is there any

1    place else for you to look?

2          MS. SULKIN:  We believe that we've exhausted all

3    of our efforts at this time.

4          THE COURT:  All right.  This matter is dismissed.

5          Bobbie Gaither?

6          MS. BRILLEAUX:  Your Honor, for this one, the

7    Suggestion of Death was filed back in March of 2023.  So

8    it's our understanding that under Federal Rule of Civil

9    Procedure 25, this should be dismissed at this time.

10         MS. SULKIN:  Your Honor, the family of our client

11   is still working on getting the probate documents.  They

12   actually enlisted an attorney who has the documents and

13   they're waiting for the attorney to release those

14   documents to them.

15         THE COURT:  Let me -- okay.  What you need to do

16   is file your Suggestion of Death.

17         MS. BRILLEAUX:  Sorry, Judge.  Just to be clear,

18   the Suggestion of Death was filed in March, so the

19   90 days has run and this case should be dismissed under

20   Rule 25.

21         THE COURT:  See, I have here "needs Suggestion of

22   Death filed."

23         MS. BRILLEAUX:  Right.  Apologies for the

24   confusion.  That has been filed, Record Doc. 15701.

25         MS. SULKIN:  Your Honor, as I previously stated,

1   our client is awaiting for the probate documents to be

2   released from the probate attorney, and as soon as we get

3   those, then we can file the Substitution of Parties.

4          THE COURT:  What are they waiting on from the

5   attorney?  I mean, they can't -- are you telling me that

6   probate has been filed, but the attorney won't give them

7   the documents?

8          MS. SULKIN:  I can't speak for what's exactly

9   going on as I'm obviously not representing these folks

10   for their probate matter, but that's the information that

11   they've relayed to us, that they're waiting to get these

12   documents from the probate attorney and that there is a

13   -- there's a case already open.

14          THE COURT:  All right.  Unfortunately, Rule 25

15   says, the case must be dismissed.  I don't think I have

16   much flexibility in that matter because of the delay and

17   it was filed on March 20th?

18          MS. BRILLEAUX:  That's correct, Your Honor.

19          THE COURT:  I'm going to have to dismiss --

20   dismiss this because it's a must.  It's not may, should;

21   it's a must.

22          MR. LAMBERT:  Your Honor, I -- admittedly I don't

23   know whether or not that 90-day deadline can be extended

24   by motion, but it does sound like there's good cause

25   since these efforts are underway.

1           THE COURT:  I got it.  And I think maybe if

2     something had occurred before the 90 days ran in the

3     request perhaps I could have considered it, but I think

4     -- wait.  Let me get the language out.

5           And, you know, it's harsh.  It's very harsh.  But

6     it is what it is, too.

7           "If a party dies and a claim is not extinguished,

8     the court may order substitution of proper party.  A

9     motion for substitution may be made by any party."  Blah,

10    blah, blah.  "If the motion is not made within 90 days

11    after service of a statement noting the death, the action

12    by or against a decedent must be dismissed."

13          Ms. Sulkin, I have to dismiss this case.

14          MS. BRILLEAUX:  Your Honor, just to streamline,

15    the next case, Faith Hernandez, is nearly the exact same

16    situation, Suggestion of Death filed on March 20, 2023,

17    for Ms. Hernandez as well with no substitution.  So we

18    believe that one also must be dismissed.

19          THE COURT:  Ms. Sulkin?

20          I mean, I guess the only question is whether or

21    not there's a different date that the Suggestion of Death

22    was filed.

23          MS. SULKIN:  Your Honor, I don't have it in front

24    of me, but it's the same situation in which we're working

25    on obtaining probate papers.

1           And I guess this is another issue as well.  I

2    mean, if there is this strict deadline and there's not

3    really a mechanism by which we can move to extend the

4    deadline past 90 days, is that some sort of mechanism

5    maybe by which we can delay filing the Suggestion of

6    Death so it doesn't start taking -- sometimes these

7    matters take quite a while to open and get papers

8    finalized.

9           THE COURT:  I understand.

10           MR. LAMBERT:  Your Honor, I am looking.  There are

11    some Advisory Committee Notes about Subsection A of

12    Rule 25 that reference Rule 6(b) and there's an Advisory

13    Committee Note on 6(b) as part of the 1963 Amendments

14    that removes the prohibition against extending the time

15    for taking action under Rule 25 and that a motion to

16    extend under 6(b) can either be filed before the

17    expiration of the time frame 6(b)(1)(A) or (1)(B) after

18    the time has expired, if the party failed to act because

19    of excusable neglect.  I assume --

20           THE COURT:  This is what it is.

21           11:57.  We are going to be at recess until 1:45.

22    I will ask Natalie to do a little work.

23           MS. BRILLEAUX:  Can I just state one thing for the

24    record before we recess, Judge?

25           THE COURT:  You can state two things because we

1    have three minutes.

2              MR. BRILLEAUX:  Excellent.  Thank you.

3              Sanofi's position on this, Your Honor, is going to

4    be exactly what Your Honor said, which is if any action

5    had been taken at the timing of the filing of the

6    Suggestion of Death or even timely in response to this

7    Notice to Show Cause hearing list, perhaps that would be

8    something that we could consider.  But given the language

9    of the rule and circumstances and the fact that these

10   cases have been on the docket since 2018, 2017 and some

11   cases that we still have to tackle, we believe the

12   dismissal is appropriate at this time.

13             THE COURT:  Okay.  I'm going to ask that you all

14   look at it again.  We have until 1:45.

15             MS. BRILLEAUX:  Thank you, Your Honor.

16             THE COURT:  Court's at recess.

17                        (Recess taken.)

18                        (In open court.)

19             THE COURT:  To be perfectly frank with you, I

20   immediately went to lunch and did my thing and we were

21   walking back in.  So I've had about all of ten seconds to

22   visit with Natalie, but she did do the research.  And in

23   it, it appears that the court can extend the time because

24   of excusable neglect.

25             MS. BRILLEAUX:  Correct, Your Honor.  We agree

1   with that.

2        We actually also looked at it over lunch and we're

3   not in a position to disagree that for excusable neglect

4   you can extend it.  Sanofi's position quite frankly is

5   just that excusable neglect should not and does not apply

6   here because of the circumstances of these cases.  I

7   mean, these have been cases that have been pending since

8   2018.  We've got plaintiffs who passed away in 2020 and

9   some maybe even earlier than that.

10       And just as a reminder to Your Honor, the reason

11  that these suggestions --

12       THE COURT:  Wait, wait, wait, wait.

13       MS. BRILLEAUX:  Of course.

14       THE COURT:  Is Ms. Sulkin on the line?

15       Ms. Sulkin, are you on the line?

16       MS. SULKIN:  Your Honor, can you hear me?

17       THE COURT:  Yes.

18       Please proceed.

19       MS. BRILLEAUX:  The reason that these Suggestions

20  of Death were filed back in March of 2023, we looked back

21  at some of the transcripts during our lunch break from

22  the prior show cause hearings and we put -- I don't know

23  if you recall, but we put a number of cases on the show

24  cause docket in September of 2022 because we noticed that

25  was the only way we could get to this point.  So we

1   essentially had to put the plaintiffs for months of

2   notice on a show cause docket to file a Suggestion of

3   Death, which arguably was delayed until that point,

4   until, you know, in some cases they were ordered to do

5   so.  And now more than 90 days after the filing of that

6   Suggestion of Death there is no substitution, no motion

7   for substitution that has been filed and there's no

8   reason that it can't be filed.

9        And we heard plaintiff's argument about the fact

10  that, you know, probate proceedings take long.  I mean,

11  that's dependent on state law.  It's dependent on whether

12  the plaintiff died untested and there's nothing that's

13  preventing them from filing a Motion to Substitute at any

14  time.  A further Motion to Substitute could be filed

15  later.  We're not challenging the substance of those.  It

16  just hasn't been done in the deadline that's set forth in

17  the Rules of Civil Procedure.

18       THE COURT:  Ms. Sulkin?

19       MS. SULKIN:  Your Honor, a few things I just want

20  to point out.  First, it doesn't really matter when the

21  claim was filed.  The plaintiff died after suit was

22  filed.  So regardless of whether or not it's filed in

23  2016, 2017, 2018, these plaintiffs didn't pass away that

24  long ago.

25       Second, there's not necessarily requirement that a

1    Suggestion of Death be filed.  In the brief review of the

2    case law cited in the notes of decision, the 90 days,

3    when it starts running, one, starts running from the date

4    the substitution is filed, not when counsel has notice of

5    it, not when it's stated in a hearing.  And there is not

6    really any deadline to file that per at least the limited

7    research I was able to do during the lunch break.

8         The next issue is the defendants were the ones

9    that demanded that these be filed.  I think in past

10   hearings, you know, it's been my prerogative to wait

11   until the probate paperwork has been completed so that we

12   can file a Suggestion of Death and a Motion For

13   Substitution of Counsel at the same time to avoid this

14   issue all together.

15        And then I've also seen cases in which the court

16   does have a discretion to just enlarge the amount of

17   time.  Unfortunately, with the MDL procedure, there's not

18   a real good way for us to move to extend the deadline

19   from 90 days in these individual cases.  There's not

20   really a mechanism by which we can do that.

21        We have obviously pretrial orders for amending

22   complaints.  We have pretrial orders for other types of

23   filings, but not really for extending deadlines.

24        And, here, it kind of is excusable neglect.  These

25   are lay plaintiffs who don't know anything about probate.

1     We don't represent them for their probate case and

2     they've done the work in hiring an attorney to try and

3     open up an estate so that they can properly substitute

4     the parties.

5          I don't quite understand and I can't see who is in

6     front of you right now, but I don't understand

7     defendant's argument that we can file a different

8     Substitution of Parties at a later date.  I do think that

9     we need to provide some evidence to the Court of why

10    somebody is the proper party.

11         And so in my mind, I think the easiest and most

12    substantive way to do that would be through the probate

13    filings.  And if Your Honor has a different procedure or

14    if it's just a motion that doesn't require any

15    attachments or exhibits, that's one thing and we can get

16    those types of documents on file.

17         However, that 90 days can prove to be very

18    difficult when, you know, sometimes we don't find out

19    that a plaintiff has died until a month or sometimes even

20    years later until the plaintiff is brought up on a show

21    cause docket and their family hasn't had the opportunity

22    or knowledge set to open up an estate in order to

23    substitute in.  And sometimes it's a matter of getting

24    the funds together.  Sometimes it's the matter of even

25    contacting an attorney.  They just don't know where to

1   start.  And it's not like we have a network of attorneys
2   around the country that deal in probate.
3        And so I would submit that to the extent excusable
4   neglect is necessary for an extension, which we believe
5   it is not, we would submit that there is excusable
6   neglect here that warrant a continuation of these
7   deadlines so that these plaintiffs have enough time to
8   file the appropriate paperwork.
9        MS. BRILLEAUX:  Your Honor, if I could just
10  respond to a couple of things that Ms. Sulkin said,
11  plaintiffs are put on notice of this by going on the show
12  cause list at the very least.  Even if that's not being
13  uncovered in their own investigations, there is a reason
14  we have a whole procedure.
15       The final hearing list is submitted days before
16  the hearing.  It's filed 14 days before the hearing.  The
17  30-day list goes out before that.  That in and of itself
18  is enough time to put them on notice to contact their
19  clients, even if they have not done that beforehand.  So
20  I cannot agree with Ms. Sulkin that this could in any
21  context constitute excusable neglect when it's just not
22  moving forward or not understanding the rules.
23       THE COURT:  I am going to make a few observations.
24  One -- Mr. Lambert, did you want to say something first?
25       MR. LAMBERT:  I do because I think there's a

1    little bit of conflation of issues here.

2         THE COURT:  That was going to be my observation.

3         MR. LAMBERT:  The rule says if the party failed to

4    act and Ms. Sulkin is in kind of a rock and a hard place

5    situation because she doesn't have a plaintiff.  And the

6    plaintiff is not on notice because there is no plaintiff

7    right now until those representatives actually come into

8    the case.  And so I think --

9         THE COURT:  Yeah, but isn't that what this

10   substitution of parties is all about?

11        MR. LAMBERT:  It is.

12        THE COURT:  I mean, in every case, your plaintiff

13   dies and you don't have a client until somebody is

14   substituted in.

15        MR. LAMBERT:  Right.  But in this situation --

16   exactly.  I think that's the point.  So if the party

17   failed to act because of excusable neglect is referring

18   not to Ms. Sulkin as the attorney, but the

19   representatives and those representatives are not failing

20   to act, they're in the process of doing the things that

21   would be necessary for them to have the authority to hire

22   a lawyer and to substitute in as proper parties in this

23   case -- and so I think the spirit of the rule is

24   satisfied and I think the Court can on, you know, motion,

25   extend that period of time to allow them to come in.

1          THE COURT:  Well, this is -- there are a couple of

2     things that I want to notice -- that I see as conflated

3     dates.  It doesn't matter when this lawsuit was filed.

4          MS. BRILLEAUX:  Agreed, Your Honor.

5          THE COURT:  I mean, it's kind of silly.

6          MS. BRILLEAUX:  Yes.  But it does matter when the

7     plaintiff passed away.

8          THE COURT:  Well, but the 90 days comes after

9     service of a statement noting a death.  That's when your

10    90 days starts running.

11         MS. BRILLEAUX:  Correct.

12         THE COURT:  And so we order this.  But then you're

13    in a situation where you serve the 90-day notice.  I

14    mean, you file the Notice of Death.  And then the 90 days

15    starts running.  And then the question is if the party

16    failed to act because of excusable neglect.

17         And my question is, does it matter that there's

18    another lawyer handling the probate and you've kind of --

19    you're stuck with his time frame and with this probate

20    court?  Because I'm not quite sure who can substitute in

21    if you're not a succession representative.

22         MS. BRILLEAUX:  I understand, Your Honor.

23         So two things about that, first of all, to

24    directly answer your question, my understanding -- and,

25    obviously, we've had limited time to look at this very,

1    very closely, is that -- well, first of all, probate law

2    differs from state to state.  So it is --

3          THE COURT:  It does indeed.

4          MR. BRILLEAUX:  -- probably very different based

5    on each state.  But I am not personally aware of any

6    requirement that any probate proceedings have to be

7    handled and completed before a Motion to Substitute can

8    be filed.  Anyone can be substituted in in theory.

9    There's nothing stopping them --

10         THE COURT:  You don't have to be a succession

11   representative?

12         MS. BRILLEAUX:  I suppose I don't know under

13   individual state laws.  But I don't think there's a

14   requirement under the federal rules that the probate

15   proceedings be completed before a Motion of Substitution

16   -- to substitute can be filed.

17         The second point, which you alluded to and I think

18   there is some disagreement on this, is that, no, there is

19   not a timeline for filing a Suggestion of Death, but if

20   the plaintiff knows that their client, if a plaintiff's

21   attorney knows that their client has been dead for four

22   years and just is not filing it, that prejudices us

23   because it's not within the spirit of the rule -- to use

24   Mr. Lambert's term -- to only wait until you know exactly

25   who it is going to be and then do the substitution when

1    the plaintiff has been dead for years.  It's not

2    equitable.

3          THE COURT:  I will tell you, I'm very -- I really

4    want to look at this a little more carefully, because

5    this is a drastic remedy.  This is a dismissal with

6    prejudice.  And I just -- want to satisfy myself because

7    I don't know that anybody can be substituted in.  I don't

8    know if your kindergarten teacher can be substituted in

9    --

10         MR. BRILLEAUX:  Understood.

11         THE COURT:  -- is it just my children?  Is it my

12   sister?  I mean, you know, that seems like that's

13   probably -- but I don't know.

14         MS. BRILLEAUX:  And I don't know either.

15         THE COURT:  And so I'm uncomfortable saying that

16   if the probate file is on a lawyer's desk and the judge

17   has not signed the order naming someone as succession

18   representative, if that -- if they can just proceed.  I

19   don't know.  I don't know.  And I am -- I would like to

20   look at it.  So what I would suggest and I think I find

21   myself always in this situation, but if we could look at

22   those cases that cover this time, Natalie and I can look

23   at it.  If you want to do letter briefing on the issue

24   from plaintiffs and defendants and I can just include

25   those names whether or not -- and that excusable neglect,

1    I mean, it doesn't mean -- even if there is excusable

2    neglect, it does not mean there is a matter of right.

3        And, Ms. Sulkin, when I was listening to you talk,

4    you said, I am entitled and you are not entitled to any

5    of this.  The question is whether or not it is excusable

6    neglect that the court deems, that the court decides it's

7    going to give you extra time.  But there is no entitle to

8    anything.  This is at this point hoping the court grants

9    your request, but there is nothing that says that I --

10       MS. SULKIN:  Your Honor -- and my apologies if I

11   suggested entitlement.  I meant to only say that that was

12   one basis for granting an extension.

13       But case law from around the country suggests that

14   excusable neglect is not the only basis from which the

15   court has discretion to grant an extension in this type

16   of situation.

17       I also just wanted to briefly address one of the

18   representations made by defendants at least in the state

19   of Colorado.  You cannot -- and I don't have a 50-state

20   compendium on probate issues, but you can't simply

21   substitute anybody for a party.  You have to be appointed

22   by a court as a representative in some capacity.  And

23   it's been my experience that that's the case in other

24   states I practice in.

25       And as a point of clarification, did you want a

1   letter brief on each individual plaintiff and would you

2   like the parties to confer on the substantive state law

3   for probate matters in each of these states prior to

4   submitting these letter briefs?

5        Because I imagine that it's going to be the case

6   in most of these states, that somebody needs to actually

7   be appointed by a court in order to proceed with an

8   action, at least a very close family member.

9        THE COURT:  I would think that that's the law as

10   well and these are -- yes.

11        MR. BAEHR:  Well, I would just point out that the

12   deadline is to move for the substitution, not to affect

13   the substitution.  And, obviously, we're not inviting

14   them to file bad faith motions.

15        THE COURT:  And who are they going to move to

16   substitute in?

17        MR. BAEHR:  The person who is applying to be the

18   probate representative, the person who is seeking that

19   from the court.

20        THE COURT:  And I'm supposed to sign this only to

21   discover that they're not qualified to serve in that

22   capacity?

23        MR. BAEHR:  I don't think you have to rule on it

24   in order for them to meet the deadline, but if they don't

25   do anything, as is the case here, that doesn't comply

1    with the rules.  And we have not opposed, again, any

2    motion for substitution of a party on the basis of who

3    that party is.  I'm not saying we're waiving that defense

4    completely for all time, but it's just not a practical --

5         THE COURT:  What you're offering is not practical

6    either that I'm going to allow someone just to file a

7    motion to substitute in even though there was no basis

8    for them to serve as the representative.  I mean, I

9    applied but -- and I'm hoping the judge signs it and if

10   he doesn't, I mean --

11        MR. LAMBERT:  Therein lies the problem --

12        THE COURT:  I mean, that's a little -- I'm

13   uncomfortable with that.  Because I think then you have

14   to represent -- what do you represent?  That I'm hoping

15   that I'm going to be named succession representative --

16        MR. BAEHR:  Seeking appointment as the executor,

17   executrix and, you know, you believe that you are -- at

18   this point, you are the most proper party, the only

19   proper party, to be -- to substitute in.  Because I think

20   the alternative is really the 90-day deadline can't have

21   almost any meaning, right, if it's always postponed if

22   probate is ongoing then --

23        THE COURT:  I guess.

24        MS. SULKIN:  Your Honor, that's why it is my

25   proposal that in these types of cases to avoid confusion

1    in the future is to potentially provide the Court with

2    status reports as to where we are in the probate process,

3    and if after a certain amount of time the plaintiffs

4    aren't doing anything or they're not paying for an

5    attorney or something like that, we're not -- we've shown

6    the Court and I think opposing counsel before that if a

7    family doesn't want to participate or family is not doing

8    anything, we've not objected to dismissal except to the

9    extent we don't represent anybody living at the time.

10    And so I think maybe a better mechanism --

11           THE COURT:  Yeah, but you know what's problematic,

12    Ms. Sulkin, is waiting -- somebody has been dead for

13    three years and now we're finally going to file a

14    Suggestion of Death and, oh, now we're going to start

15    looking at probate.  I mean, that's part of it, too.

16           I mean, this is -- you know, if someone died -- I

17    will tell you if someone died end of, you know,

18    October 2022 and you filed a Suggestion of Death, you

19    know, March '23 because you were busy doing other things,

20    it's -- it's easier to be sympathetic.

21           MR. LAMBERT:  Your Honor, sometimes we don't know.

22           THE COURT:  What I'm curious about is, how do you

23    know people are dead?  And their lawyers don't.

24           MS. BRILLEAUX:  Well, that's a very good point,

25    Your Honor.  I mean, the Internet is probably how we have

1   collectively learned in researching the cases that are

2   not moving forward.

3      MR. LAMBERT: We don't always get a call from, you

4   know, the deceased person's husband saying they passed

5   away and I want to go forward. Some of these women are

6   kind of private about their lawsuits and don't share a

7   lot with their family members. But I think sort of

8   therein lies the problem with Mr. Baehr's suggestion is

9   these people would have to come in *pro se*, no lawyer is

10   going to sign a retainer with somebody who doesn't have

11   authority to sign the retainer to be the plaintiff in a

12   case. And so, you know, they would have the *pro se* come

13   in and there would have to be some evaluation as to

14   whether or not they have the capacity. And that's why I

15   think the language of the rule says, you know, the party

16   and whether that party has committed excusable neglect

17   and the party -- the question of who the party is, is

18   these potential representative plaintiffs that aren't

19   here yet that are, as far as Ms. Sulkin represents,

20   taking the steps necessary to try to get there. So I

21   think it would be pretty unfair that those people have

22   not committed excusable neglect by going through the

23   process in trying to get to where they can substitute in.

24      MS. BRILLEAUX: And, Judge, I think Mr. Lambert is

25   quoting from the language of Rule 6, which is -- is that

1    correct, Mr. Lambert?

2            MR. LAMBERT:  (Nods head.)

3            MR. BRILLEAUX:  Regarding the extension and I

4    think it's a little tricky to try and apply that language

5    to exactly how we define the party when we're dealing

6    with a decedent under Rule 25.  I mean, it says --

7            THE COURT:  The note to the '63 Amendment states

8    that a motion to substitute may -- you know, and then

9    they talk about unless a period is extended pursuant to

10   Rule 6(b).

11           MS. BRILLEAUX:  Right.  I think my point and it

12   goes to the point of how do we know.  These are people

13   who have filed lawsuits and that have attorneys

14   representing them in their lawsuits.  And if no one is

15   moving forward, then we don't have a plaintiff moving

16   forward with this case and these cases are just kind of

17   in limbo.

18           THE COURT:  How many of these cases do we have,

19   the 90 days?  I see No. 128, Diana Graves; 129 --

20           MS. BRILLEAUX:  Maybe five.  And, Your Honor --

21           THE COURT:  130.

22           MS. BRILLEAUX:  -- if Your Honor's preference is

23   for us to file letter briefing, we obviously will comply

24   with whatever Your Honor prefers.  But perhaps we can --

25           THE COURT:  I think I know what the arguments are.

1   I think what I am most concerned with, if you want to

2   know the truth, is less about when this lawsuit was

3   filed, because that's irrelevant --

4           MR. BRILLEAUX:  Of course.

5           THE COURT:  -- to, you know, filing it knowing I'm

6   going to die next week.  When they died, when the

7   Suggestion of Death was filed, I think that's what my

8   concern is.

9           And then from plaintiffs, what have you done?

10  Because the Notice of Suggestion of Death I think in all

11  of these cases came through motion of defense counsel.

12  And so at some point then they were put on notice that

13  your client has died and something has to happen.  So I

14  would be curious to hear from plaintiffs what have you

15  done from that time that you were put on notice, because

16  when one considers excusable neglect, I just think for me

17  to make a determination as to whether or not you fit in

18  that category, I have to know what the circumstances are,

19  because excusable neglect in my view is always fact

20  intensive.  And if I don't know when they were apprised

21  of their client's death, what did they do?  When was the

22  suggestion filed?  What's been the holdup?  It could be

23  that when they were put on the list they contacted the

24  family only to confirm that the client's dead.  And then

25  an opportunity to meet with these people, because I think

1   Mr. Lambert is right, I don't think you can just

2   substitute somebody in without -- as a lawyer.  I

3   wouldn't do that unless he was named succession

4   representative.

5        So I think you have to know, did they make an

6   appointment?  Did the people say, "We just need a minute

7   because we have to clean out mama's closet first"?

8        MS. BRILLEAUX:  Judge, if I can ask you a

9   question, because I'm just thinking of solutions here

10  other than letter briefing.  Suppose we agreed to give

11  them 30 days.  Then how long does that get pushed out?

12  Because in theory there's never a deadline if we're

13  waiting in theory on probate proceedings to conclude,

14  right?

15       THE COURT:  Well, I think -- that's a good

16  question.  That's a good question.  And I wish,

17  Ms. Brilleaux, I could tell you that I have not been in a

18  circumstance where I can't get a judge to sign the

19  probate paperwork.

20       MR. BRILLEAUX:  Understood, Your Honor.

21       THE COURT:  I've seen it.  And so that does not

22  mean that you don't have an attorney that has prepared it

23  and filed it and submitted it to the court for filing.

24  That's one thing.  But to say that, "Well, we called

25  after we were on this docket and we made an appointment

1    with a lawyer for next month," you know, that's not

2    necessarily excusable neglect.  But if -- I mean, you're

3    asking me to make -- tell you what I would think is

4    excusable neglect only when I don't know what the

5    circumstances are.  And I can't tell you.  But I will

6    tell you, if I visited a lawyer's office and they have

7    prepared the paperwork and I've signed every affidavit

8    and I've done everything, I can't get it signed --

9         MS. BRILLEAUX:  I'm thinking through solutions,

10   which I don't want to speak out of turn.

11        MS. SULKIN:  Your Honor, may I propose -- may I

12   propose a solution of conferring with defendants on these

13   cases where this is the circumstance 30 days from now,

14   and if the plaintiffs have not taken any steps or any

15   additional steps from today forward to try and get their

16   case moving, unless it's obviously sitting in front of a

17   court waiting for signature, then we're not going to

18   continue with these cases when our deceased plaintiff

19   family's members aren't moving things along?

20        However, you know, I think it would save the

21   parties and the court some time if we just keep an open

22   line of communication and kept defense counsel updated on

23   the efforts these people are making.  And sometimes it's

24   that we're skip-tracing these people and we're finding

25   next of kin by skip-tracing family members and tracking

1    them down.  It's not as if we have the contact

2    information readily available.

3         THE COURT:  Well, you see, therein lies a problem,

4    Ms. Sulkin.  Therein lies a problem.  That's not

5    excusable neglect.  That's being apprised that your

6    client is deceased and you scooting around trying to find

7    the next of kin.  That's not the same as probate

8    proceedings sitting on a lawyer's desk or having been

9    filed and the judge not signing it.  That means that for

10   at least, oh, gosh, more than that, you know, 120 days

11   that you've been aware.  And if, you know, you were

12   searching and that's -- that's not -- that's not --

13   that's not in my view what excusable neglect is.  And

14   that's why I said so much of this is fact intensive.

15        If you found out your client was deceased and for

16   some reason they hadn't called you, okay, but then you

17   find the next of -- then at that point, you've got to

18   move with due speed in finding the next of kin.  And it's

19   not just, well, I'm going to wait until I'm on a call

20   docket, then I'm going to file a Suggestion of Death,

21   then I'm going to hope I'm going to find a next of kin,

22   and then once I get that person in line then -- you know,

23   that's not what in my view encompasses excusable neglect.

24        Now, would I prefer to skip the letter briefing?

25   You bet.  But I think --

1          MR. BRILLEAUX:  Your Honor --

2          THE COURT:  -- this is my problem.  I'm seeing

3     both sides of this and everybody --

4          MS. BRILLEAUX:  I'm going to make --

5          THE COURT:  I think that's why it's my job.  I'm

6     supposed to see both sides, but it is not as easy as you

7     would both pretend is.  When you are called to make a

8     determination on excusable neglect, it is by its very

9     nature very fact intensive.  That's my problem.

10         So this is what I'll do.  If we're only talking

11    about five cases -- listen to me.  Everybody needs to be

12    forewarned.  Excusable neglect is not after six months

13    deciding you're going to look for next of kin.  But I

14    will give you an opportunity to engage in meet and confer

15    to come up with something rather than letter briefing.

16         MS. BRILLEAUX:  We agree.

17         THE COURT:  I think I've told you what my problem

18    is, both sides of it.

19         MS. BRILLEAUX:  We will confer with Ms. Sulkin and

20    Mr. Lambert.  I will request his assistance, too, just

21    because he is here for it and we will report back to Your

22    Honor on what we propose mutually to be a decision.

23    That's where -- oh, please.

24         MR. BAEHR:  It's not going to be -- it's just a

25    related point, not disputing anything that's said, but

1    are you done, Ms. Brilleaux?

2         MS. BRILLEAUX:  I am.

3         THE COURT:  What?

4         MR. BAEHR:  Your Honor, the related point is just,

5    as we've all been looking at this rule more carefully and

6    the Advisory Committee Notes to the rule, they also do

7    provide that any party may file a Suggestion of Death.

8    Now, up until this point, we, the defendants, have not

9    filed them.  We've brought them to plaintiff's attention

10   so that they may file them in their time.  I think given

11   all that's transpired, it might make sense for us to

12   start filing them ourselves given that the rules provide

13   for that.  And I just wanted to let you know so that

14   nobody got --

15        THE COURT:  Well, I don't know how you're

16   blind-sided if somebody tells you your client died.

17        MR. BAEHR:  Fair enough.  I just wanted to put

18   that out there.

19        MS. BRILLEAUX:  And the federal rule states that

20   explicitly in the text of the rule any party can file a

21   Suggestion of Death, you know.  Perhaps we should just

22   start filing them.

23        MS. SULKIN:  Your Honor, I imagine this

24   situation might -- by defendants filing it, Suggestions

25   of Death, would we then be allowed to file motions for

1    extension of time to substitute in proper parties?

2    Because I feel like this is just going to create the same

3    situation all over again.

4          THE COURT:  If you read Federal Rule 6(b), it

5    says, "The court may for good cause extend the time with

6    or without motion or notice if the court acts or if a

7    request is made before the original time or its extension

8    expires."  So, yes, for good cause, you can extend the

9    90 days.

10          The problem is, once the 90 days passes, you're

11    then asking me to extend it and that's when it becomes

12    trickier.

13          MS. SULKIN:  Yes, Your Honor.  Would you like us

14    to do that by motion or contacting chambers to make that

15    request?

16          THE COURT:  I think do it by motion.  I think you

17    have to do it by motion.

18          MS. SULKIN:  Okay.

19          MR. LAMBERT:  Your Honor, we're happy to confer

20    over a letter briefing schedule.  We would ask though if

21    they do decide to start filing their own Suggestions of

22    Death that they serve those on particular counsel.  I

23    mean, I think that would be fair.

24          THE COURT:  And you can do it, the service through

25    e-mail, like everything that's been served that way.  I

1   agree.  I agree, Mr. Lambert.  I think -- but I hope -- I

2   feel like this is going to be -- I feel like I rambled a

3   bit and that happens when you begin thinking out loud,

4   but I'm just trying to convey that excusable neglect can

5   take many forms and what I might see is excusable neglect

6   and what I see might not be.  And so there's a reason I

7   went on this little rambling monolog if you will.  But

8   you were thinking in my head of the many different

9   scenarios that can play out and what would be before me

10  and why I can't tell you today any of this.

11       Now, I will tell you I have dismissed I think on

12  the record Diana Graves and I don't know if I did Bobbie

13  Gaither.

14       MS. BRILLEAUX:  I don't think Your Honor ruled on

15  Bobbie Gaither.  I think we left off with those two,

16  which were both Suggestions of Death filed in March.

17       THE COURT:  Right.  So I am uncomfortable --

18       MR. BRILLEAUX:  We can reserve ruling on those.

19       THE COURT:  I'm going to reserve ruling on those,

20  and if I did rule on Diana Graves --

21       MS. CALLSEN:  Diana Graves was not this issue.

22  That was a no proof of use case.

23       MR. BRILLEAUX:  It was.

24       THE COURT:  Oh, okay.  So the only person I have,

25  I just want to make sure, because I don't want anybody to

1    be compromised, okay, so I'm going to defer ruling on

2    those.

3         MS. BRILLEAUX:  Okay.  There are a couple of -- do

4    you want to go ahead and --

5         THE COURT:  Faith Hernandez, that's another one

6    that I'm deferring on.

7         MS. BRILLEAUX:  Yes.  Yes.  I'm just going to try

8    to go through these quickly.

9         Lisa Sheard is a different issue.

10        THE COURT:  Okay.

11        MR. BRILLEAUX:  This is a multiple rollover case.

12   This is at least the second, maybe the third time being

13   rolled over.  And what we're asking for is for the PFS to

14   be amended to have information on the diagnosis and

15   treatment of a second cancer.

16        THE COURT:  Ms. Sulkin?

17        MS. SULKIN:  Your Honor, we're working with the

18   daughter for that information.  This plaintiff is

19   deceased and so the daughter is trying to get that

20   information for us.

21        THE COURT:  How many times has this been rolled

22   over?

23        MS. BRILLEAUX:  At least two, maybe three.

24        I don't know.  Jordan, if you have any -- they've

25   been on notice for several months, Your Honor.  I'm

1    comfortable saying that.

2         THE COURT:  Ms. Sulkin, listen to me and mark your

3    calendar.  On 31 days, it's being dismissed if it's not

4    amended.  I'm not going to -- on day 32, it's going to be

5    too late.  Day 31, it's going to be too late.

6         MS. SULKIN:  Yes, Your Honor.

7         MS. BRILLEAUX:  For Ernestine Dials, this is

8    another Suggestion of Death filed on March 30th, so we

9    can reserve ruling on that one if that's suitable for

10   Your Honor.

11        THE COURT:  Okay.

12        MS. BRILLEAUX:  Same with Mary Gaston, so we can

13   pass that one.

14        For Arlene Green.

15        THE COURT:  Wait a minute.  What about

16   authorizations, fraudulent witness signatures?

17        MS. BRILLEAUX:  So those are issues that are

18   also -- those are issues that are still at issue in this

19   case, but at the same time, Sanofi's position is that

20   they should be dismissed.  So I suppose we can defer the

21   other issues until after we've resolve the Rule 25 issue.

22        THE COURT:  All right.

23        MR. BRILLEAUX:  Arlene Green is also a March

24   Suggestion of Death case, so we'll reserve ruling if Your

25   Honor is agreeable.

1          Deane Labrot is also -- this is a Suggestion of

2  Death that was actually filed in September of 2022, but

3  I'm assuming that you would still rather reserve ruling

4  on that rather than dismiss it.

5          THE COURT:  Let's defer.  But that's a long time.

6          Okay.  All right.  Jeanette Garcia, is there

7  anything to do there?

8          MS. BRILLEAUX:  For Janette Garcia.

9          THE COURT:  That looks like that's satisfied.

10          MS. BRILLEAUX:  I believe we are still waiting on

11  a substitution in that case as well.

12          THE COURT:  Well, you have "proper party

13  substituted."  Are they or not?

14          MR. BAEHR:  I think the note just means that they

15  need to be substituted.

16          THE COURT:  All right.  Ms. Sulkin?

17          MS. SULKIN:  Do you need any argument from me on

18  this or are we deferring?

19          THE COURT:  Well, is she --

20          MS. BRILLEAUX:  Ms. Sulkin, do you know when the

21  Suggestion of Death was filed?  I don't have a note for

22  that one.

23          MS. SULKIN:  Off the top of my head, I don't.

24          MS. BRILLEAUX:  I think that one might fall in the

25  same category, Judge.

1          THE COURT:  Okay.  We'll defer it.

2          All right.  Kim Jackson.  You need to file a

3    Suggestion of Death?

4          MS. BRILLEAUX:  Yes.

5          THE COURT:  Ms. Sulkin, do that within 30 days.

6          MS. SULKIN:  Yes, Your Honor.

7          THE COURT:  Jewel Jones.

8          MR. BRILLEAUX:  So for Jewel Jones, this is

9    actually a 505 case, but since we're blowing through

10   these, I believe this is a shell PFS that does not

11   include all the complete information.

12         MS. CALLSEN:  You got it.

13         THE COURT:  Ms. Sulkin, this was filed in 2016.

14         MS. SULKIN:  Yes, Your Honor.  We've been trying

15   to locate this client.  We recently found a new address

16   for her and possible family members.  We ask for a brief

17   extension, and if she's not still cooperating or still

18   not able to get in contact with her, we will --

19         MS. CALLSEN:  When was your last contact?

20         THE COURT:  Yeah.  When was the last contact?

21         All right.

22         MS. SULKIN:  Excuse me, Your Honor.  I apologize.

23         MS. CALLSEN:  Pardon me.  January she said?

24         MS. SULKIN:  It looks like it's been quite a

25   while.

1      THE COURT:  This matter is dismissed with

2  prejudice.  This is 2016.  If we haven't filled out a

3  Plaintiff Fact Sheet by then.

4      All right.  Rosemary Karam.

5      MS. BRILLEAUX:  Yes, Your Honor.  This is a

6  plaintiff who has been deceased since 2019, May of 2019,

7  and we have not had a Suggestion of Death filed.

8      THE COURT:  Ms. Sulkin, you have 30 days to file a

9  Suggestion of Death.  It's 2019.  She's been dead for

10  over four years.

11      MS. SULKIN:  Yes, Your Honor.

12      THE COURT:  And so I would not count on anything

13  after 90 days once you file that Suggestion of Death.

14      All right.  Nicole Lucas.

15      MS. BRILLEAUX:  Yes, Your Honor.  This is a

16  slightly different one.  This is similar to one that I

17  argued before Your Honor before lunch.  Just no CMO A

18  process initiated.

19      THE COURT:  Ms. Sulkin?

20      MS. SULKIN:  Your Honor, we did start the CMO

21  process and we sent a fax to the facility after receiving

22  it, the Notice of Non-Compliance.  So this was a case

23  that I believe was filed in 2022.  It hadn't been pending

24  for very long, but we are going through the CMO 12

25  process and we will be sending a proof of -- a packet

1   indicating proof of our efforts to defendants in

2   accordance with CMO 12.

3        THE COURT:  All right.  You have to do that within

4   30 days.

5        Shirley Oliver.

6        MS. BRILLEAUX:  Yes, Your Honor.  A Suggestion of

7   Death was filed recently in this case on June 19, 2023.

8   So we believe that the substitution should be done within

9   the 90-day period set forth by Rule 25.

10        THE COURT:  Okay.

11        MS. SULKIN:  Your Honor, I would request at this

12   time an extension of those deadlines.  We've been

13   notified by the daughter, Ms. Feebie Langley, that she

14   was in contact with an attorney and has made an

15   appointment and is going through the probate procedure.

16        THE COURT:  Well, when you get to the 90 days --

17   before you get to the 90 days, if there is some hold up,

18   you should file a motion to extend it.  But I'm not going

19   to extend it if they've already been to see an attorney

20   because -- let's just wait and see.

21        Barbara Podesta.

22        MS. BRILLEAUX:  Yes, Your Honor.  No Suggestion of

23   Death has been filed.  The plaintiff has been deceased

24   since January of 2022.

25        THE COURT:  Okay.  Ms. Sulkin, I'll give you

1    30 days to file that Suggestion of Death.

2          Shirley Sampson.

3          MS. CALLSEN:  You want me to address it?

4          MR. BRILLEAUX:  Oh, yes, please.

5          MS. CALLSEN:  You don't have to.

6          This is a PFS deficiency.  There is a failure to

7    amend the PFS of the identified dates of treatment,

8    prescribing physician, treatment facility, and there's no

9    medical records that have been submitted.

10         THE COURT:  Ms. Sulkin.

11         MS. SULKIN:  Your Honor, this is a plaintiff that

12   passed away.  I don't think that we identified yet who

13   would take over the estate.  We would just request a

14   brief period of time to try and locate her next of kin.

15         MS. CALLSEN:  And also then to file a Suggestion

16   of Death, please.

17         THE COURT:  30 days.

18         MS. SULKIN:  Yes.  Thank you.

19         THE COURT:  Barbara Shea.

20         MS. BRILLEAUX:  Yes, Your Honor, for Barbara Shea,

21   the plaintiff has been deceased since March of 2019.  No

22   Suggestion of Death has been filed.

23         THE COURT:  30 days.

24         MS. SULKIN:  Your Honor, I do believe we filed a

25   Suggestion of Death.  My notes indicate here we did file

1    a Suggestion of Death.  I don't have the document in

2    front of me.  We would ask for 30 days to just ascertain

3    whether or not anybody would be substituting in on her

4    behalf, and if not, we have no objection to dismissal.

5        THE COURT:  Okay.  Cindy Thompson.

6        MR. BRILLEAUX:  Yes, Your Honor.  For Cindy

7    Thompson, I noted that a Statement of No Defense was

8    filed today.

9        THE COURT:  Okay.

10       MR. BRILLEAUX:  So we can skip that one.

11       For Martha Turner, this is a plaintiff who has

12   been deceased since March of 2021.  We do have a

13   Suggestion of Death on file.  So we would ask for the

14   substitution to be made within the 90-day period set

15   forth in Rule 25.

16       THE COURT:  So ordered.

17       MS. BRILLEAUX:  That's the last case for me.

18       THE COURT:  Cindy Wardwell.

19       MS. CALLSEN:  Yes.  This actually was a late cure.

20   There was no CMO 12A statement.  It was just submitted,

21   so we would ask seven days to confirm compliance.

22       THE COURT:  So ordered.

23       Jo Ann Patrick.

24       MR. BAEHR:  Your Honor, in this case, as you see,

25   the plaintiff's position is they were waiting for a

1  subpoena, and if they didn't get a response, they would

2  adopt general objections.  My understanding is there

3  hasn't been any further update.

4          THE COURT:  Okay.  When was the subpoena

5  requested?

6          MS. SULKIN:  I don't have that information

7  directly in front of me.  However, I would have to

8  imagine we have not had much luck from the clinic, it's

9  UAD Kirkland, and so we do adopt the general

10  objections --

11          THE COURT:  This matter is dismissed with

12  prejudice subject to the general objections.

13          All right.  Marjorie Anderson.

14          MR. BAEHR:  This case is similar to some that we

15  discussed that are subject to the Motion to Amend

16  briefing, but it has one distinction which is one of the

17  defendants for whom there is product ID is already named

18  in the case.  There is another defendant that hasn't been

19  named, so they'll have to settle that in briefing.  But

20  because one of the proper parties is named, we are

21  requesting dismissal of all the other parties because the

22  case won't be extinguished and we won't have those

23  complications.

24          THE COURT:  Which one?  You're asking for as to

25  Hospira, McKesson, Sandoz, Sanofi and Sun?

1      MR. BAEHR:  And Actavis.

2      THE COURT:  And Actavis.  I don't see Actavis.

3  But there is product ID as to --

4      MS. CALLSEN:  Accord.

5      THE COURT:  Accord.  And Sagent.

6      MS. CALLSEN:  Correct.  But they haven't filed the

7  Motion to Amend either.

8      MR. BAEHR:  Correct.  We understand -- so they

9  should have seven days to file on a Motion to Amend to

10  add Sagent.

11      MS. SULKIN:  Your Honor, I do believe we filed a

12  Motion to Amend.

13      MR. BAEHR:  Okay.  Then we'll take that.  All

14  we're asking at this point is dismissal of all defendants

15  other than Accord, which again is Actavis, Hospira,

16  McKesson, Sandoz, Sanofi and Sun.

17      MS. SULKIN:  Your Honor, we don't oppose that in

18  this matter since the Court --

19      THE COURT:  All right.  The Court's going to grant

20  dismissal as to Hospira, McKesson, Sandoz, Sanofi and

21  Sun.

22      Okay.  Renee Bornfreund.

23      MR. BAEHR:  We can skip this one as it's subject

24  to the Motion to Amend briefing.

25      THE COURT:  Okay.  Joanne Boyland.

1          MR. BAEHR:  We can skip this one for the same

2     reason.

3          THE COURT:  Okay.  Chantae Brown.

4          MR. BAEHR:  This is a late cure, so we can skip

5     this one as well.

6          THE COURT:  Vivian Burgan.

7          MR. BAEHR:  In this case, there are some -- there

8     has been evidence submitted that's a spread sheet of

9     purchases.  However, the timeline doesn't line up with

10    plaintiff's treatment and actually for some reason

11    excludes the period of plaintiff's treatment.  So there's

12    really no evidence of what was at the facility or in use

13    at the time of the plaintiff's treatment.

14          MS. SULKIN:  Your Honor, this purchasing history

15    reflects both before, during and after the plaintiff's

16    treatment.  And all of the purchases before and during

17    and even most of it directly after is Sanofi or Winthrop.

18    Just because there's no purchasing from the exact dates

19    of treatment doesn't mean this is what the facility had

20    in stock.  So this is purchasing history from this

21    facility and it only indicates Sanofi was on the shelves

22    at that time.  So we would submit that --

23          THE COURT:  Based on what?  Because what I'm

24    looking at is -- wait a minute.  She had chemo from July

25    until September 2011, right?  And then -- but the spread

1    sheet has invoice dates from January to April and then

2    December.

3          Do you have anything from May, June, July, August

4    September?

5          MS. SULKIN:  No, Your Honor.  But this facility --

6    this is what they had ordered.  And so sometimes

7    facilitates go through product very quickly.  Sometimes

8    they do not and so this is what they had in stock at the

9    time.

10         THE COURT:  So they didn't order anything from

11   May, June, July, August, September, October and November?

12         MS. SULKIN:  That's what the documentation shows.

13         THE COURT:  Where is this?

14         MR. BAEHR:  I don't --

15         MS. SULKIN:  It's Seema Health System and so it's

16   not a facility that's exclusively an oncology center.

17   And so just in my experience I found that centers that

18   aren't necessarily oncology centers don't order quite as

19   much as oncology centers.

20         THE COURT:  Okay.  This is what I think you need

21   to do.  I think you need to get some verification that

22   they ordered nothing for those months between April and

23   September.

24         MR. BAEHR:  I'll also point out the document

25   actually does reflect purchase of Hospira product in

1    December 2011.

2          THE COURT:  Yeah, but she wasn't taking it.

3          MR. BAEHR:  Understood.  But it isn't true that

4    the record only indicates they only purchased Sanofi or

5    Winthrop.

6          THE COURT:  That's what I'm saying.  You know, if

7    -- I think we need more than that because it just

8    doesn't -- I think there needs to be verification as to

9    what was ordered when and that if there were no

10   medications ordered during this time frame, that just --

11   it just doesn't sound right to be honest.  So I think

12   there's a lot that needs to be worked up in this to get

13   where I'm comfortable saying it was more likely than not

14   than this -- this manufacturer.  Okay.

15         MR. BAEHR:  30 days for the plaintiff?

16         THE COURT:  30 days.

17         Janice Caudal.

18         MS. CALLSEN:  Yes.  This is a similar situation

19   that we talked about earlier, that the only CMO 12A shows

20   Baxter Healthcare, which didn't start the market until

21   February 19 of 2018 and the dates of administration here

22   were 2013.

23         MS. SULKIN:  Your Honor, when we got it -- this is

24   the first time obviously with this show cause docket

25   we've gotten a notification that there was anything wrong

1  with the product ID and we did initiate the CMO 12A

2  process.  And so we would just request that within

3  30 days we can file a notice of proof of our efforts in

4  trying to locate the correct product ID.  It was my

5  interpretation that Baxter Healthcare and Sandoz were

6  connected in some way, so I believe Sandoz is the only

7  defendant at this time and we would just be -- we would

8  just ask the Court to allow us to proceed with the CMO

9  12A process.

10       MS. CALLSEN:  We'll agree to give them 30 days.

11       THE COURT:  So ordered.

12       MS. CALLSEN:  Baxter wasn't on the market five

13  years after her treatment.

14       THE COURT:  30 days.

15       Okay.  Yvette Cordell.

16       MS. CALLSEN:  The next two are subject to the

17  motion, Untimely Motion to Amend, both Cordell and

18  Craddieth.  They're already on the list.

19       THE COURT:  Thank you.

20       Barbara Dannhardt.

21       MR. BAEHR:  This is a case where plaintiff

22  indicated they were waiting for further documentation,

23  that if they didn't get it, they would adopt general

24  objections.  I'm not aware of any further documentation.

25       THE COURT:  Okay.

1          MS. SULKIN:  Your Honor, we did submit product

2     ID -- I don't know how that made that on here because I

3     believe we've had product ID since 2019 and it wasn't

4     opposed until this point.  But we have a more likely than

5     not statement from the pharmacy and oncology regional

6     director saying it's more likely than not that Hospira

7     was the drug administered to our client.

8          MR. BAEHR:  The statement is not of the type

9     described in CMO 12 and it also doesn't make sense.  It

10    refers to records that aren't provided and it's some sort

11    of legal conclusion that doesn't seem to be actual

12    evidence of product ID.  So I guess --

13         THE COURT:  I'm going to give you 30 days, but I'm

14    going to require more than a pharmacy saying they more

15    likely than not had this.  I think what you need is --

16    and we work through that process of things outside of NDC

17    codes that we would consider, but it's not enough to say

18    we bought more of this than that so it's probably this

19    one.  I think you have to have a defendant.  So I'll give

20    you 30 days to clear that up.

21         MS. SULKIN:  Your Honor, just for clarification,

22    he didn't just say it.  He said after careful review of

23    our records as well and our ordering trend.  So it's not

24    just that he is drawing some conclusion out of nothing --

25         THE COURT:  I didn't say he drew it out of

1    nothing.  I didn't say he drew it out of nothing.

2         I said that if you recall we set up a clear

3    protocol that would look at what the purchasing records

4    were to satisfy ourselves that certain pharmacies kept --

5    because I extended it beyond NDC codes, which was not

6    what was initially negotiated.  But I was concerned about

7    dismissing these cases.  So I said I would consider

8    purchase histories, but the purchase histories had to be

9    more concrete than we purchased more than this.  So what

10   I'm saying is, the purchase records have to show, for

11   example, that we buy Hospira, we keep drugs no longer

12   than 30 days on the shelf at this period of time.  This

13   is what we were buying so that this is the drug that they

14   would administer rather than just NDC codes because they

15   became very problematic.  But I don't know what he's

16   basing it on to say more likely than not.  It's got to be

17   more clear than that.

18        But I wanted facts upon which we could determine a

19   plaintiff received a certain manufacturer's drug, and

20   those facts, I extended it outside of NDC codes and to

21   include purchasing history, shelf life, what -- that sort

22   of thing.  And I thought y'all had negotiated what that

23   would look like.

24        MS. CALLSEN:  We did.  We negotiated an

25   addendum --

1          THE COURT:  Which was pretty clear, but it's --
2  okay.
3          Shirley Dixon.
4          MS. CALLSEN:  Shirley Dixon.  Yes.  There's no
5  product ID submitted.  They did submit a CMO 12
6  statement, but it's for a different plaintiff.
7          THE COURT:  Okay.  Ms. Sulkin?
8          MS. SULKIN:  Your Honor, it's our position that
9  it's not for a different plaintiff and that we do have
10  for -- for two cycles we have product ID showing for the
11  last two cycles they were able to fill out a statement
12  regarding chemotherapy indicating that Hospira is the
13  manufacturer of the drug for her final two cycles.
14          MS. CALLSEN:  That's -- I mean, I know we sent an
15  e-mail to you in May asking to meet and confer as to
16  this, but no response was received.  But that information
17  is new to me.
18          THE COURT:  I'm going to give you seven days.
19          MS. CALLSEN:  Seven days.  Okay.
20          THE COURT:  Thank you.
21          And Gloria --
22          MS. CALLSEN:  Actually, the next four, Durham,
23  Ford, Gubala and Harris are subject to the Motion to
24  Amend, Untimely Motion to Amend briefing, so we can defer
25  those.

1          And the next one is 163 then, Hilley, and there's
2     been no product ID submitted.  And, again, we sent a meet
3     and confer request in May and we received no response.
4          THE COURT:  Ms. Sulkin?
5          MS. SULKIN:  Your Honor, we got a bill and paid it
6     for the most recent request for product ID and we made
7     payment on that invoice.  And we would just request
8     30 days to be able to look at that.  And if after that
9     point we still cannot obtain the product ID, we will
10    adopt general objections.
11         THE COURT:  Okay.  I'll give 30 days.
12         Erica Lieberman.
13         MR. BAEHR:  Your Honor, in this case, there have
14    been some records submitted.  A billing record appears to
15    be what plaintiff is relying on.  They have made an
16    argument regarding the concentration of the particular
17    drug administered.  I will confess I don't fully
18    understand the nature of the argument.  I will note that
19    whatever it may be it isn't evidence of the type
20    described in CMO 12A and it seems to me similar to the
21    type of arguments that you may recall were made in the
22    Angela Durden case many moons ago that ultimately proved
23    unsuccessful.
24         So if plaintiff can explain the argument a little
25    bit better, then obviously she's welcome to.  Otherwise,

1    our request would just be 30 days to get the type of

2    evidence described in CMO 12A and the addendum.

3            THE COURT:  Ms. Sulkin?

4            MS. SULKIN:  Your Honor, this evidence has been

5    first off submitted in 2019, and, again, if the Court

6    doesn't accept my argument, we would request obviously

7    additional time.

8            However, the purchasing history here, there's one

9    dosage that goes with Sanofi and one that goes with

10   Hospira.  And the one milliliter concentrate, which is

11   reflected on the billing, that could only possibly be

12   Sanofi or Winthrop.  The other ones are different dosages

13   and the plaintiff was billed once for what looks like on

14   the bill to be the two milliliter dosage, but we would be

15   okay just proceeding against Sanofi if the Court doesn't

16   allow for -- would rather do it that way because

17   overwhelmingly the purchases reflected on the billing was

18   for the one milliliter dosage.

19           THE COURT:  I don't think that works.  But I will

20   give you 30 days to see if you can get something that's

21   more in line with the addendum.

22           MS. SULKIN:  Thank you, Your Honor.

23           THE COURT:  All right.  Okay.  Robin Noll.

24           MR. BAEHR:  This case is similar to one we

25   discussed a few moments ago where there are a multitude

1    of defendants named.  There is product ID as to some of

2    them.  There's also product ID for an unnamed defendant,

3    so it will be subject to the Motion to Amend briefing,

4    but in the meantime, we would request dismissal of the

5    wrong defendants and those would be Hospira, McKesson,

6    Sandoz and Sun.

7         THE COURT:  Any objection?

8         MS. SULKIN:  No, none to those defendants.

9         THE COURT:  Court's going to dismiss as to

10   Hospira, McKesson, Sandoz and Sun.

11        Angela Perez.

12        MR. BAEHR:  Similarly, although I don't think

13   there is a motion to amend issue, we're requesting

14   dismissal of Accord, Actavis, McKesson, Pfizer, Sanofi

15   and Sun.

16        THE COURT:  Wait.  Which ones?  Accord?

17        MR. BAEHR:  Accord, Actavis, McKesson, Pfizer

18   Sanofi and Sun.

19        THE COURT:  Any objection?

20        MS. SULKIN:  Your Honor, I'm just double-checking

21   that the two defendants, Sandoz and Hospira, identified

22   are parties in this matter.  If so, then we would not

23   have any objection.  Otherwise, we would request time to

24   file an amended complaint.  I'm checking on that right

25   now.

1          Your Honor, no objection to the other defendants.

2          THE COURT:  As to Angela Perez, the Court

3  dismisses as to Accord, Actavis, McKesson, Pfizer, Sanofi

4  and Sun.

5          And I believe we have the same issue with Lisa

6  Pointer, to dismiss all defendants except Hospira; is

7  that correct?

8          MR. BAEHR:  That is correct.  Although the only

9  named defendant is Sanofi and the PID is for Hospira.  So

10  this would be -- I would say seven days to amend if they

11  haven't already.

12          THE COURT:  So ordered.

13          MS. SULKIN:  Thank you, Your Honor.

14          Just a point of clarification, seven days to

15  circulate it to defendants?

16          THE COURT:  Yes.

17          MS. SULKIN:  Because under the PTO 37 --

18          THE COURT:  Yes.  Yes.

19          MS. SULKIN:  Okay.  Thank you, Your Honor.

20          THE COURT:  Yes.  Thank you.

21                      *  *  *  *

22          (WHEREUPON, the proceedings were adjourned.)

23                      *  *  *  *

24

25

1

2                        REPORTER'S CERTIFICATE

3          I, Nichelle N. Wheeler, RMR, CRR, Official
    Court Reporter, United States District Court, Eastern
4   District of Louisiana, do hereby certify that the
    foregoing is a true and correct transcript, to the best
5   of my ability and understanding, from the record of the
    proceedings in the above-entitled and numbered matter.

6

7                        /s/ Nichelle N. Wheeler
                        Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25