# Exhibit 3

# Expert Report
# Justin R. Victoria

JR Victoria Consulting LLC
1 Farmhouse Lane
Mendham, NJ  07945
jrvictoriaconsulting@gmail.com
December 28, 2018

I, Justin R. Victoria, have been retained as an expert in the Taxotere litigation by sanofi-aventis U.S. LLC and Sanofi US Services Inc. (Sanofi).  If asked, I am prepared to testify at trial regarding the matters set forth in this report.

I. ## Qualifications

Since November of 2009, I have served as the founder and owner of JR Victoria Consulting LLC, a consulting firm specializing in providing advice to healthcare companies on regulatory affairs issues, including the design and implementation of regulatory compliant product development programs to facilitate regulatory review and approval, financial communication issues, and pharmaceutical product litigation.

Before beginning my consulting work, I worked for 32 years in the pharmaceutical industry in the United States, including nearly twenty years in positions of increasing responsibility and functional leadership in regulatory affairs, two years in project management, and nine years in a leadership position in Investor Relations.

I received a Bachelor of Science degree in Biochemistry from Rensselaer Polytechnic Institute in Troy, New York in 1976.  I received a Master of Science degree in Biochemistry from the State University of New York at Buffalo in 1977 based upon work at the Roswell Park Memorial Cancer Research Institute.  I also received a Master of Business Administration degree in Pharmaceutical Marketing and Management from Fairleigh Dickinson University in Teaneck, New Jersey in 1983.

I started working in the pharmaceutical industry in 1977 at Hoffmann La-Roche (Roche), where my initial position was in basic research in immunology.  In 1978, I transferred to a

1

substantial evidence of its effectiveness for use from adequate and well-controlled clinical trials,[30] and that the labeling contains a summary of the essential scientific information needed for the safe and effective use of the drug.[31]  If these standards are met, and there are no other reasons to deny approval, FDA approves the NDA[32], approves the labeling and, thus, approves the drug for market.   As will be described in the next section of the report below, FDA then continues to review the adequacy of the labeling throughout the life of the product in the market.  FDA recognizes that a drug's labeling cannot contain everything that is known about a drug.  Such labeling would be too voluminous to be useful.[33]  It is meant to provide a summary of the actions of the drug in humans and relevant safety, efficacy and use information so that a health professional can appropriately weigh the benefits and risks of the drug for individual patients.[34]

###    5.   **Post-Marketing Surveillance**

After the drug is approved, the FDA continues to monitor a drug's safety profile and the adequacy of its labeling.  This is done by the medical experts in the Office of New Drugs that originally reviewed the NDA, as well as experts from the Office of Surveillance and Epidemiology (OSE), a group trained specifically to evaluate information relating to the safety of drug products.  FDA has the authority to require changes to a drug's labeling after it is approved, just as it does before approval.  If the sponsor does not make the required changes to the labeling, FDA could consider the drug misbranded and subject to regulatory action, including removal from the market.

To facilitate this oversight, the sponsor continues to monitor the safety of the drug in the marketplace and provides post-approval update reports to FDA.[35,36] In an NDA Annual Report[37] the sponsor is to summarize significant new information that it has received or otherwise obtained during the previous year that might affect the safety, effectiveness or

---

[30] 21 CFR 314.126.
[31] 21 CFR 201.56.
[32] 21 CFR 314.125.
[33] Guidance for Industry – Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, pp. 2, 5.
[34] 21 CFR 201.56(a).
[35] 21 CFR 314.80.
[36] 21 CFR 314.81.
[37] 21 CFR 314.81(b)(2).

Labeling Rule (PLR).

The new labeling format requires that prescription drug labeling include a Highlights section, a Table of Contents, and a description of Recent Major Changes to the label, and reordered certain labeling sections in an effort to make it easier for prescribers to read and use the labeling information to enhance the safe and effective use of drug products and reduce adverse reactions.[118]

With respect to clinical safety information in prescription drug labeling, while certain safety information is included in the Highlights section, and the Warnings section and Precautions section in the previous labeling regulation was consolidated into one combined Warnings and Precautions section, the essential content of the safety information in the Contraindications, the Warnings and Precautions, and the Adverse Reactions sections of the prescription drug labeling regulations is little changed from the previous version of the prescription drug labeling content and format implemented in 1979.[119]  For example, the new PLR regulation retains the same definition of an adverse reaction as before; "(a)n adverse reaction is an undesirable effect, reasonably associated with the use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence," but adds that, "This definition does not include all adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."[120] Thus, the listing of an adverse reaction for a drug product under this regulation does not establish that a definitive causal relationship between the product and the adverse reaction has been established, only that there is a reasonable association between the two.  Similarly, even a drug Warning is to be listed where "there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."[121] Importantly, FDA "emphasizes that reviewer and applicant **judgment** remain critical in assessing **how** or **whether** to present information on an adverse reaction"[122] (emphasis added).

---

[118] 71 FR 3922.
[119] 44 FR 37434-37467.
[120] 21 CFR 201.57(b)(7).
[121] 21 CFR 201.57(b)(6).
[122] Guidance for Industry:  Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, p. 1.

It is also my opinion that Sanofi acted reasonably, appropriately and with urgency to clearly respond to regulatory authority inquiries about the potential risk of alopecia and persistent or permanent alopecia with Taxotere.

It is also my opinion that Sanofi reasonably and appropriately labeled for alopecia in Taxotere labeling at all times as an Adverse Reaction, not a Warning, consistent with pharmaceutical product labeling regulations and with the judgment of the regulatory authorities to provide adequate directions for the product to be safely used for its approved indications and that Sanofi demonstrated a willingness to consider appropriate labeling revisions at all times with the regulatory authorities.

It is also my opinion that Sanofi reasonably and appropriately promoted Taxotere for adjuvant breast cancer treatment consistent with the labeling described above, in compliance with FDA regulations and consistent with industry practices.

This report represents the opinions I have formed in this matter to date. It reflects my review of the materials listed in Exhibit C and my experience in drug development and regulatory affairs in the pharmaceutical industry. I reserve the right to revise or amend my opinions based upon new information that might arise in the course of this case or my continuing assessment of the materials already reviewed. If called to testify at trial, I may further explain the opinions, principles, and terminology contained in this report and the cited materials reviewed. The opinions offered herein are made to a reasonable degree of professional regulatory probability.

Submitted,

_____

Justin R. Victoria

December 28, 2018