# Exhibit 17

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   ******************************

 6   IN RE:  TAXOTERE (DOCETAXEL)      MDL NO. 2740

 7   PRODUCTS LIABILITY LITIGATION     SECTION H

 8   THIS DOCUMENT RELATES TO:         JUDGE MILAZZO

 9   ALL CASES                         MAG. JUDGE NORTH

10   ******************************

11

12

13              VIDEOTAPED DEPOSITION OF:

14              EMANUEL PALATINSKY, M.D.

15                  ROPES & GRAY LLP

16                  Prudential Tower

17                 800 Boylston Street

18                Boston, Massachusetts

19         August 9, 2018        8:52 a.m.

20

21

22

23              Darlene M. Coppola

24            Registered Merit Reporter

25            Certified Realtime Reporter
```

| | | |
|---|---|---|
| 1 | A. | They might not be consistent. |
| 2 | Q. | Well, if we use your own definition of |
| 3 | | "consistent," how could they be consistent, if |
| 4 | | one person loses their hair forever and the |
| 5 | | other person regrows all of their hair and |
| 6 | | those are the outcomes that we're comparing |
| 7 | | for consistency purposes? |
| 8 | | MR. RATLIFF:  Same objection. |
| 9 | A. | They are different. |
| 10 | BY MR. BACHUS: | |
| 11 | Q. | They're inconsistent, right? |
| 12 | A. | You can call them inconsistent. |
| 13 | Q. | Okay.  And so can you, right? |
| 14 | A. | I -- I would need to look at the case |
| 15 | | and what I was -- |
| 16 | Q. | So what I was telling -- |
| 17 | | MR. RATLIFF:  Kyle.  Kyle, let |
| 18 | | him finish. |
| 19 | A. | What I was telling you is that the |
| 20 | | impact of losing part of the hair permanently, |
| 21 | | a slight hair loss, could be much more severe |
| 22 | | or felt more severely from a patient than |
| 23 | | losing the entire amount of hair only for a |
| 24 | | partial -- for a part of a time.  That's what |
| 25 | | I was saying. |

```
 1        A.   I do not recall this e-mail, but,
 2   obviously, I read through it.
 3        Q.   This is an e-mail -- on the first page
 4   of Exhibit 19 is an e-mail that is -- the
 5   document indicates is from you, dated Friday,
 6   January 26, the year 2007; is that correct?
 7        A.   Yes.
 8        Q.   And it's an e-mail to Penny Kegg?
 9        A.   (Witness nodding.)
10        Q.   Yes?
11        A.   Yes, it's what the document says.
12        Q.   I know.  I need to make a record --
13        A.   Yes.
14        Q.   -- of the document.
15        A.   Yes.
16        Q.   Who is Penny Kegg?
17        A.   I cannot recall who she is.
18        Q.   All right.  Below the e-mail that is
19   from you is an e-mail from Penny Kegg to you,
20   dated January 26, 2007, at 12:05 p.m.
21             Do you see that at the bottom of
22   page 1 of Exhibit 19?
23        A.   I see it.
24        Q.   And that e-mail indicates that
25   "Dr. Mackey's site in Canada" --  do you know
```

```
 1      a Dr. Mackey?
 2          A.   I know that he was one of the
 3      investigators, but I don't recall more about
 4      him.
 5          Q.   One of the investigators in Canada?
 6          A.   Yes, of that particular study.
 7          Q.   That "Dr. Mackey's site in Canada has
 8      revised the risk section of ICF for
 9      Docetaxel-L-713."
10               Do you see that?
11          A.   Yes.
12          Q.   What does "the ICF" mean?
13          A.   The informed consent form.
14          Q.   So this is an e-mail indicating that
15      Dr. Mackey in Canada has revised the informed
16      consent form the Docetaxel 713 study,
17      correct?
18          A.   That's what the message says.
19          Q.   It asks of you, "Do you approve?"
20               Correct?
21          A.   Yes.  That's the question to me.
22          Q.   And you respond, later that same day,
23      about eight hours later, according to the
24      e-mail, right?
25          A.   Yes, I responded sometime later.
```

1        Q.   And you indicate to Penny that you
2   looked at the content of docetaxel section on
3   page 8, correct?
4        A.   Yes.
5        Q.   And can you turn to page 8 of --
6        A.   I have page 8 in front of me.
7        Q.   And if you look at page 8 of the
8   informed consent form with respect to
9   docetaxel and you move forward to page 6 of
10  16.
11       A.   I have 19 pages in total.  I don't
12  think we're looking at the same document.
13            MR. BACHUS:  Great.
14            MR. RATLIFF:  Kyle, what page
15  were you talking about?  I can give him my
16  copy.
17            MR. BACHUS:  I have six.
18  There's multiple copies of this.
19            THE WITNESS:  Page 6 of 19.
20  That might help.
21            MR. RATLIFF:  Let me see, real
22  quick.
23            THE VIDEOGRAPHER:  Can I use
24  this opportunity to change the disk?
25            MR. BACHUS:  Sure.

```
 1                    THE VIDEOGRAPHER:  Going off the
 2      record.  The time is 5:40.
 3
 4                    (Off the record.)
 5
 6                    THE VIDEOGRAPHER:  Back on the
 7      record.  The time is 5:40.
 8                    MR. RATLIFF:  I think you guys
 9      were on page 8.
10                    MR. BACHUS:  We were on page 8.
11      BY MR. BACHUS:
12          Q.   And I was directing you to page 6, now
13      page 6 of 19.
14               And do you see where it says, "What
15      are the side effects"?
16          A.   Yes.
17          Q.   And then below where it says, "What
18      are the side effects," in the last paragraph
19      above the table, where it says, "The following
20      are side effects of each drug used in this
21      study."
22               Do you see that?
23          A.   Yes.
24          Q.   And then it says, "These side effects
25      may or may not be more severe when the drugs
```

1      are taken together."

2             Do you see that?

3      A.    Yes.

4      Q.    And then it says, "These are the side

5      effects we know about at present."

6             Do you see that?

7      A.    Yes.

8      Q.    And then if you go to page 8, the

9      docetaxel side effects are listed in draft

10     form on page 8.

11            Would you agree with that?

12     A.    Yes.

13     Q.    And on the left-hand column, where it

14     says, "Hair loss," that is stricken through?

15     A.    Yes.

16     Q.    And if you move to the right-hand side

17     of the column, it says, "Permanent hair loss."

18            Do you see that?

19     A.    I see it.

20     Q.    Going back to page 1 of Exhibit 19,

21     your e-mail dated Friday, January 26, 2007,

22     you indicate that you have looked only at the

23     content of the docetaxel section on page 8 and

24     you have a few comments.

25            Do you see that?

```
 1          A.    That was a -- that is what I wrote.
 2          Q.    And the third bullet point down in
 3    terms of your comments, you say, "Hair loss is
 4    repetitive," and then in parens, you say,
 5    "(permanent HI is sufficient once)"?
 6          A.    HL.
 7          Q.    HL, hair loss?
 8          A.    Yes.
 9          Q.    I'm sorry.
10                "...is sufficient once"?
11          A.    Yes.
12          Q.    And the HL meant hair loss?
13          A.    Hair loss, right.
14          Q.    So what you were saying is that hair
15    loss is repetitive; permanent hair loss is
16    sufficient once, correct?
17          A.    Yes.
18          Q.    And so in the draft, you have
19    maintained permanent hair loss in the informed
20    consent form related to docetaxel but have
21    removed the term "hair loss"?
22          A.    Yeah, because it was a duplicate.
23          Q.    So when I asked you a few moments ago
24    about when in time Sanofi expected that some
25    portion of the users would experience
```

Emanuel Palatinsky, M.D.

1   permanent hair loss and you -- because time

2   has passed, you were unable to definitively

3   provide a timetable, correct?

4        A.   Yes, I cannot recall.

5        Q.   What we -- what we do know is that at

6   least by Friday, January 26, 2007, Sanofi did

7   have an expectation that some of its users

8   would experience permanent hair loss,

9   correct?

10              MR. RATLIFF:  Object to form.

11       A.   There was knowledge that reports -- or

12  at least a single report was known to have

13  been received.

14  BY MR. BACHUS:

15       Q.   But in terms of answering that

16  question of when in time did Sanofi begin

17  expecting that some of the users of its

18  product would experience permanent hair loss,

19  this document from January of 2007 let us know

20  that by that time, permanent hair loss is on

21  the radar as a potential adverse event because

22  it's included in this list of side effects

23  that we know about at present, correct?

24              MR. RATLIFF:  Object to form.

25       A.   The document tells me that at that

Emanuel Palatinsky, M.D.

1     time, we knew of at least one report of

2     permanent hair loss.

3     BY MR. BACHUS:

4          Q.   And here, at least, when you were

5     making a determination as to what was the best

6     warning of that potential side effect, you, as

7     the global safety officer, in this document

8     made the decision to delete the word "hair

9     loss" and leave in "permanent hair loss,"

10    correct?

11         A.   Yes, I did.

12         Q.   Does this document, Exhibit No. 19,

13    refresh your recollection in any way about how

14    long prior to or before January 26, 2007 that

15    permanent hair loss was an expected potential

16    result of the use of the product?

17         A.   No.

18              MR. RATLIFF:  Object to form.

19         A.   It doesn't.

20

21              (Exhibit No. 20 marked for

22    identification.)

23

24              (Witness reviews document.)

25