# Exhibit 23

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4    *******************************

 5    IN RE:  TAXOTERE (DOCETAXEL)

 6    PRODUCTS LIABILITY              MDL No. 2740

 7    LITIGATION                      Section: "N"(5)

 8                                    Judge Engelhardt

 9    This Document Relates to:    Mag. Judge North

10    All Cases

11    *******************************

12

13

14    VIDEOTAPED DEPOSITION OF ISABELLE RICHARD-CASSIN

15

16             Friday, May 4th, 2018

17                  8:56 a.m.

18

19        Held At:

20             DLA Piper LLP

21             3 Noble Street

22             London, United Kingdom

23

24    REPORTED BY:

25    Maureen O'Connor Pollard, RMR, CLR, CSR
```

1    I'm at the top of the second page, draft one

2    proposal for possible side effects --

3            MR. McCULLY:  You gave me the wrong

4    one.

5            MR. MICELI:  Did I?  There you go.

6    I'm sorry.

7            MR. McCULLY:  That's coming, right?

8            MR. MICELI:  That will come next.  You

9    can have both of them if you want.  That will be

10   25.

11           (Whereupon, Richard-Cassin Exhibit

12           Number 25 was marked for

13           identification.)

14   BY MR. MICELI:

15      Q.   So Exhibit 24, first full textual

16   page, draft one proposal, "Possible Side

17   Effects.  Like all other anticancer medicines,

18   Taxotere will cause undesirable effects."

19           Do you see those words?

20      A.   Yes.

21      Q.   Okay.  And then if you drop down to

22   the "Very Common" listing a little bit below

23   halfway down the page it say, "Very Common

24   (experienced in more than 1 in 10 patients)."

25           Do you see that?

Isabelle Richard-Cassin

1     A.    Yes.

2     Q.    Okay.  Now, with regard to very

3  common, 1 in 10 patients, do you have some

4  understanding as to how they come up with why 1

5  in 10 patients is very common?

6     A.    It is a definition.  It is in the

7  guidelines, it is a definition, frequency.

8     Q.    Okay.  Definition in the guidelines.

9  Do you know which guidelines?

10    A.    The SmPC guidelines.

11    Q.    Okay.  The fourth heart down from the

12  Very Common listing says, "short term hair loss.

13  After treatment normal hair growth should

14  return."

15          Do you see that?

16    A.    Yes.

17    Q.    Okay.  So from the original, or the

18  current patient leaflet to Draft Proposal Number

19  I, the word "temporary" has been removed and

20  they put in "short-term hair loss."

21          Do you see that?

22    A.    It is a proposal, but I think it is

23  not exhaustive.  You have to go to -- you have

24  also alopecia.

25    Q.    I'm going to get there, don't worry.

```
 1   We're going to get there.  Let's not jump ahead.
 2           What's under Very Common is "short
 3   term hair loss," correct?
 4       A.   Yes, it is what is written.
 5       Q.   Okay.  And "After treatment normal
 6   hair growth should return."
 7       A.   Yes.
 8       Q.   You see that language?
 9           Okay.  Now, if you flip the page, rare
10   is listed as "Alopecia (hair loss) that did not
11   reverse at the end of study."
12           Do you see that?
13       A.   Yes.  I see that, but it is a
14   proposal.
15       Q.   I know, it is a proposal.
16       A.   It is a working document.
17       Q.   It's a working document within Sanofi,
18   correct?
19       A.   Correct.
20       Q.   This is one of the things that Sanofi
21   is considering telling patients in a patient
22   leaflet, right?
23       A.   It is a discussion.  It is a
24   discussion, yes.
25       Q.   It is a discussion about what
```

Isabelle Richard-Cassin

1  Sanofi -- I want to make sure we agree on this.
2  This is a discussion about what Sanofi might
3  tell patients, because until it's final we don't
4  know what they're going to tell them, it's a
5  discussion about what Sanofi just might tell
6  patients in 2006, correct?
7           MR. McCULLY:  Object to form.
8      A.   It is only -- it is not -- it is a
9  working document which is not -- it is not a
10 proposal made by Sanofi, it was not submitted to
11 the health authorities, so it is a working
12 document.  And it is all -- if I understand the
13 context, it was a reorganization of the section,
14 of the possible side effect section as requested
15 by the health authorities.  And it is only a
16 working document that could.  That means that
17 you cannot necessarily have accurate information
18 at this stage.  It has not been validated by any
19 people at this time.
20 BY MR. MICELI:
21     Q.   Okay.  Let's back up.  I want to break
22 down what you've said there.
23          You said it's a working document,
24 correct?
25     A.   Yes.

Isabelle Richard-Cassin

1    Q.    It's a working document that is being
2  discussed among employees of Sanofi?
3    A.    Yes.
4    Q.    To your knowledge, it has not, at this
5  point in time in 2006, has not been shared with
6  anybody outside of the company?
7    A.    At this stage, no.  It is people
8  working on labeling document.  It is for -- yes,
9  it's a working document.
10   Q.    Right.  My only thing is, I'm afraid
11 with all the words that come after "yes," it's
12 not going to be understood when somebody listens
13 to this.
14         But this is a working document, which
15 means it has not been shared outside of Sanofi,
16 correct?
17   A.    At this time, no.
18   Q.    Thank you.
19         Then you said "understanding the
20 context."  Do you have a specific recollection
21 of this meeting where people inside of Sanofi
22 were discussing what the current patient leaflet
23 was in the EMA, and what the first proposal was
24 to the EMA?
25   A.    No.

```
 1        Q.    So your statement about understanding
 2   the context is really based upon your review of
 3   it while we're sitting here this morning on
 4   May 4th of 2018, correct?
 5        A.    Could you repeat?
 6        Q.    Sure.
 7              You don't have a specific recollection
 8   of this meeting?
 9        A.    No.
10        Q.    Okay.  So when you say you want to
11   give it some context, you used the word
12   "context," to understand the context surrounding
13   this document, you don't have a specific
14   recollection of what the context was of this
15   meeting, it's just based upon the context you
16   were putting into your mind based upon reviewing
17   documents today?
18              MR. McCULLY:  Object to form.
19        A.    No, it was -- I have the context
20   because I wrote the message, and I understood
21   the context.  I don't have now information in
22   regards to the context.  But I could understand
23   that a request came from the European health
24   authority to reorganize the patient leaflets.
25   So at this time, I don't know in which context
```