# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL)  )    MDL No. 16-2740
PRODUCTS LIABILITY              )
LITIGATION                      )    SECTION: "H" (5)
                                )
This document relates to all cases.  )

## ORDER AND REASONS

Before the Court is a Motion to Reconsider and Vacate CMO 36 and to Strike General Experts' Improper Testimony (Doc. 15673). For the following reasons, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel,[1] that Plaintiffs were administered for the treatment of cancer. Among these companies are Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. (collectively, "Sanofi" or "Defendants"). Plaintiffs allege that the drug caused permanent chemotherapy-induced alopecia ("PCIA"). Plaintiffs bring various claims, including failure to warn, negligent misrepresentation, and fraudulent misrepresentation.

In April 2022, the Court granted the Plaintiffs' Steering Committee's ("the PSC") Motion to Preserve Expert Testimony and later entered Case Management Order No. 36 ("CMO 36").[2] CMO 36 permits "expert preservation

---

[1] Docetaxel is the generic version of Taxotere, although the Court uses the term "generic" loosely.
[2] Doc. 14925.

depositions" of "general" experts for potential use at trial in transferred cases. The purpose of CMO 36 is to avoid further duplication of efforts, to appropriately limit expenses to the parties and wasting of resources, to allow the PSC to create a trial package, and to promote the efficient preparation for eventual remand and transfer of cases. Pursuant to CMO 36, the parties conducted preservation depositions for two of the PSC's experts, Drs. David Madigan and Ellen Feigal. Now before the Court is Sanofi's Motion to Reconsider and Vacate CMO 36 and to Strike General Experts' Improper Testimony. The PSC opposes.

## LAW AND ANALYSIS

Sanofi first requests this Court to reconsider and vacate Case Management Order No. 36. Motions to reconsider interlocutory orders are governed by Rule 54(b), which allows a district court to "revise[] at any time" "any order or other decision . . . [that] does not end the action."[3] "Under Rule 54(b), 'the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'"[4] This authority is "committed to the discretion of the district court, and that discretion is not cabined by the heightened standards for reconsideration governing final orders."[5]

Sanofi urges this Court to vacate CMO 36 for three reasons. First, Sanofi argues that the PSC violated CMO 36 during the first two depositions by

---

[3] FED. R. CIV. P. 54(b).

[4] Austin v. Kroger Texas, L.P., 864 F.3d 326, 336 (5th Cir. 2017) (quoting Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds by* Little v. Liquid Air Corp., 37 F.3d 1069, 1075 n.14 (5th Cir. 1994)).

[5] *Id*. at 337 (quoting Saint Annes Dev. Co. v. Trabich, 443 F. App'x 829, 832 (4th Cir. 2011) (internal quotations omitted)).

introducing new and previously excluded testimony. According to Sanofi, these violations alone warrant vacating CMO 36. Second, Sanofi contends that by committing these violations, the PSC has eliminated any perceived efficiencies gained under CMO 36. Finally, Sanofi argues that it will be prejudiced because the transferor courts may reasonably assume that testimony provided under CMO 36 is admissible. This Court disagrees. Out of fourteen hours of preserved testimony, Sanofi alleges only five violations. Each of the reasons articulated by Sanofi in favor of vacatur can be cured by striking the improper testimony of Drs. Feigal and Madigan. Moreover, CMO 36 specifically provides that this Court will not pre-adjudicate issues related to admissibility or availability— for example, whether the parties may introduce preservation deposition testimony at trial. Rather, admissibility determinations are reserved to the receiving courts upon transfer or remand. This Court, therefore, declines to vacate CMO 36.

Next, Sanofi moves to strike certain testimony provided by Drs. David Madigan and Ellen Feigal during their expert preservation depositions. CMO 36 places two limitations on expert preservation depositions. First, such deposition testimony is "subject to the Court's prior rulings as they relate to these witnesses," including the Court's Rule 702 rulings.[6] Additionally, if any of the PSC's witnesses intend to offer opinions that previously were not disclosed in this litigation, the PSC is required to furnish a supplemental report to Sanofi.[7] Then, Sanofi has an opportunity to conduct a discovery deposition of the expert concerning its supplemental report.[8] Sanofi contends that the PSC violated these restrictions by eliciting new, undisclosed and

---

[6] Doc. 14925 at 1–2, 6.

[7] *Id*. at 4.

[8] *Id*.

previously excluded testimony from Drs. Madigan and Feigal. The Court will address each of Sanofi's challenges in turn.

### i.   Dr. David Madigan

Dr. David Madigan is a biostatistician who the Court permitted to opine on whether there was a statistically significant association between Taxotere and PCIA—the first prong of general causation.[9] The Court, however, precluded Dr. Madigan from opining on whether Taxotere actually causes PCIA—the second prong of general causation.[10] This is because Dr. Madigan has not conducted a proper analysis to assess whether a true causal relationship underlies the statistical association he has identified.[11] The Court explained that he "must take care to state only that the evidence shows an association between" docetaxel and PCIA.[12] Nevertheless, in his preservation deposition, Dr. Madigan stated that he "concluded that there is adequate statistical evidence that docetaxel causes permanent/irreversible alopecia."[13] Because the Court previously excluded this exact opinion, it must be stricken.[14]

Sanofi further argues that the PSC attempted to circumvent the Court's ruling by evoking a new phrase—"inference of causation." In his preservation deposition, Dr. Madigan offered the following:

---

[9] Docs. 8094 at 4–7; 12098 at 1–2, 4–5. As the Court explained in its January 2020 Order and Reasons, to assess whether general causation exists between an agent and a disease, the case law recognizes a two-prong test. First, there must be evidence showing a "statistically significant association" between the agent and the disease. Second, once an association is found, researchers assess whether a true causal relationship underlies the association. Typically, an expert applies the Bradford Hill criteria to evaluate this second prong. Doc. 12098 at 5.

[10] *See* Docs. 8094 at 6; 12098 at 4–6.

[11] Plaintiff Kahn conceded that Dr. Madigan has not conducted a Bradford Hill analysis. *See* Doc. 12098 at 5.

[12] Doc. 12098 at 5.

[13] Doc. 15673-7 at 43:23–44:12.

[14] Doc. 12098 at 4–5 ("In his report for Plaintiff Kahn, Dr. Madigan concludes that 'there is adequate statistical evidence that docetaxel causes irreversible alopecia.' As revised, this opinion improperly encroaches on the second prong of the general causation inquiry—a prong that Dr. Madigan has not analyzed.").

Q. . . . Do the findings of your metaanalysis [of TAX 316/301] support your conclusion of a statistical association and **inference of causation** between tax-- between docetaxel and permanent chemotherapy-induced alopecia?

MR. STRONGMAN: Objection; form.

A. Yes.[15]

***

Q. Okay. Did the findings of your FAERS analysis support your conclusion of the statistical association and **inference of causation** between docetaxel and permanent chemotherapy-induced alopecia?

MR. STRONGMAN: Objection; form.

A. Yes, it's important.[16]

***

Q. . . . Do your findings and review of the pharmacovigilance database and your analysis of it support your conclusion of a statistical association and **inference of causation** between docetaxel and PCIA?

A. Yes.[17]

***

Q. All right. Based upon all of the evidence that you have reviewed and that we've talked about today and the investigations and analyses you have performed, have you formed an opinion, to a reasonable degree of scientific certainty, that docetaxel use demonstrates a statistically significant increased risk and a **causal inference** for permanent chemotherapy-induced alopecia?

MR. STRONGMAN: Objection; form.

A. Yes, I have.[18]

Sanofi correctly argues that these opinions run afoul of the Court's prior Orders.[19] The PSC confusingly asserts that this Court "has ruled, over and over, that Dr. Madigan's testimony regarding statistical association and inferences supporting causation are acceptable under Rule 702 standards."[20]

---

[15] Doc. 15673-7 at 73:9–19 (emphasis added).
[16] *Id*. at 112:12–19 (emphasis added).
[17] *Id*. at 124:20–125:2 (emphasis added).
[18] *Id*. at 141:11–21 (emphasis added).
[19] *See* Docs. 8094 at 6; 12098 at 4–6.
[20] Doc. 15767 at 10.

Not so. Again, the Court only permitted Dr. Madigan to opine on statistical association and no more. "Statistical association" and "causal inference" are not coterminous.[21] The PSC appears to concede this much by stating that Dr. Madigan "is simply pointing out that the evidence is more than a mere association."[22] An opinion that the evidence supports an inference of causation, therefore, "improperly encroaches on the second prong of the general causation inquiry—a prong that Dr. Madigan has not analyzed."[23] This testimony, too, must be stricken.

Sanofi also moves to strike Dr. Madigan's preservation testimony regarding his "Chemo 2" analysis. Specifically, on redirect by the PSC, Dr. Madigan testified that he conducted a statistical analysis of the TAX 316 study where he removed the patients reporting ongoing alopecia from the TAC and FAC arms who switched to another chemotherapy regimen.[24] Based on this analysis, he testified that he determined statistical significance between the TAC and FAC arms in TAX 316 alone.[25] Sanofi contends that this opinion should be stricken because it has never been disclosed in Dr. Madigan's expert reports. The Court disagrees. Although CMO 36 requires the PSC to serve a supplemental report reflecting "any opinions that previously have not been disclosed in this litigation,"[26] it further clarifies that it does not "provide an opportunity for any defendant to re-examine the PSC's general experts in a discovery deposition on opinions previously expressed and included in their

---

[21] "Determining whether an association is causal is a matter of scientific judgment, and scientists reliably applying the Bradford Hill factors may reasonably come to different conclusions about whether a causal inference may be drawn." In re Abilify (Aripiprazole) Prods. Liab. Litig., 299 F. Supp. 3d 1291, 1307.
[22] Doc. 15767 at 11.
[23] Doc. 12098 at 4.
[24] Doc. 15673-8 at 405:25–407:23.
[25] *Id*. at 407:1–23.
[26] Doc. 14925 at 4.

prior respective reports *and testimony*."[27] Testimony regarding Chemo 2 is not a new opinion; Dr. Madigan previously expressed his Chemo 2 opinion on cross-examination during the *Kahn* trial.[28] Moreover, this opinion was not elicited on direct examination at his preservation deposition. Rather, it was offered on redirect in response to Sanofi's cross-examination regarding how Sanofi counted its TAX316 alopecia events.[29] As a result, the Court declines to strike Dr. Madigan's Chemo 2 testimony.

Lastly, Sanofi challenges the following undisclosed testimony of Dr. Madigan:

> Q. Do drug companies have an obligation to monitor the drug safety -- their drug safety?
> A. Yes.
> MR. STRONGMAN: Just undisclosed opinion as well, outside the expertise as well.[30]
> ***
> Q. Okay. How were -- how could it be that Sanofi has events in its pharmacovigilance database that are not -- for irreversible alopecia that are not in the FAERS database?
> MR. STRONGMAN: Objection; form, undisclosed opinion.
> A. I don't know. I mean, it's possible that they were never sent. It's possible they were sent and never entered.[31]

The PSC does not address these opinions in its Opposition. After reviewing Dr. Madigan's expert report, the Court finds that this testimony is indeed undisclosed. Nowhere in the report does Dr. Madigan mention drug manufacturers' monitoring obligations. Nor does it explain the difference in event reporting between Sanofi's database and the FAERS database. Moreover, the PSC does not point to any prior deposition or trial testimony

---

[27] *Id.* at 5 (emphasis added).
[28] *See* Doc. 15767-15 at 3–4.
[29] See Doc. 15767-14 at 8–10.
[30] Doc. 15673-8 at 423:21–424:1.
[31] *Id.* at 411:8–16.

where Dr. Madigan offers these opinions. Accordingly, this undisclosed testimony must be stricken.

ii.   *Dr. Ellen Feigal*

Dr. Ellen Feigal is an oncologist with experience in clinical trials, pharmacological product development, and pharmacovigilance who the Court allowed to opine that Taxotere causes PCIA—the second prong of general causation.[32] Sanofi raises two challenges to Dr. Feigal's preservation testimony.

First, Sanofi maintains that the PSC elicited causation opinions on other chemotherapies which were not disclosed in Dr. Feigal's expert report:

> Q. With regard to Adriamycin, have you investigated whether or not reliable scientific evidence establishes that Adriamycin causes permanent chemotherapy-induced alopecia?
> A. No, I do not have evidence to support that.
> ***
> Q.   And so from 1974 to 2004, did you find any evidence that Adriamycin can cause permanent chemotherapy-induced alopecia?
> MR. MOORE: Object to form.
> A. No. As I said, all I saw were anecdotal cases. Nothing -- nothing to support causation.
> ***
> Q. Okay. Did you find any reliable scientific evidence that said from between 1959 to 2004, when Taxotere was approved for early-stage breast -- use of adjuvant care in early-stage breast cancer, that cyclophosphamide can cause permanent chemotherapy-induced alopecia?
> MR. MOORE: Object to form.
> A. No.[33]

On cross-examination, Dr. Feigal conceded that these opinions were not stated in her expert report.[34] She explained that she never conducted a general

---

[32] *See* Docs. 8094 at 5–8, 11–17; 11810 at 1–2, 6.
[33] Doc. 15673-3.
[34] On cross-examination, Dr. Feigal stated:

causation analysis on non-Taxotere chemotherapies "[b]ecause there wasn't sufficient data to do that analysis."[35] The PSC insists that this testimony is consistent with Dr. Feigal's prior deposition and trial testimony. Upon review of Dr. Feigal's expert report, trial testimony, and prior deposition testimony, the Court agrees.

In her January 2019 deposition, Dr. Feigal testified that there have been anecdotal reports of permanent hair loss after treatment with Adriamycin.[36] Then, in the September 2019 *Earnest* trial, Dr. Feigal stated:

> Q. Now, Dr. Feigal, because this jury has been told that A and C may have caused Ms. Earnest's lack of hair regrowth, I have to ask you, have you reviewed -- in your review of all of the scientific evidence and medical literature that's out there, have you seen evidence that A or C has been related -- causally related to permanent irreversible hair loss, hair that doesn't grow back when it's supposed to?
> A. **I haven't seen evidence for causal relationship**. You'll see those anecdotal cases that have been reported in the published literature.[37]

Again, in a November 2019 discovery deposition, Dr. Feigal stated:

> no one's arguing there may be cases recorded, but there's no – no similar experience with another drug. We don't even – you know, prior to 2001, we actually didn't even start to see permanent chemotherapy induced alopecia with conventional doses of

---

Q. And nowhere in your expert report do you render those opinions, do you? Nowhere in your expert report do you say, "I conducted the analysis and I have determined that Adriamycin cannot cause PCIA"?

A. I do not have that exact sentence, that's correct.

Q. And I think you were asked the same sort of questions about cyclophosphamide and Taxol as well by Mr. Miceli; correct?

A. Correct.

Q. And you didn't have any opinions about whether or not those agents can cause or are capable of causing PCIA in your expert report, did you?

A. In the expert report, I don't have that exact sentence, that's correct.

Doc. 15673-4 at 262:8–24.

[35] Doc. 15767-7 at 4.

[36] *See* Doc. 15767-4 at 3.

[37] Doc. 15767-6 at 3 (emphasis added).

Taxotere. So, this was a new phenomenon. The AC and CMF, they were around for decades and you didn't have published studies with permanent irreversible alopecia. . . .[38]

Dr. Feigal further explained that she's seen anecdotal cases of permanent or persisting alopecia associated with other chemotherapy regimens, but "not having the level of evidence that [she has] with Taxotere."[39] She continued: "For example, there are no randomized clinical trials with any of these other chemotherapy agents showing an increased incidence of permanent chemotherapy induced alopecia as compared to any other control arm."[40] Ultimately, the Court finds that Dr. Feigal's preservation testimony remains consistent with her previous trial and deposition testimony that although there are anecdotal cases of PCIA associated with other chemotherapies, she has not seen sufficient evidence to support a general causation analysis. Thus, the Court declines to strike this testimony.

Finally, Sanofi contends that Dr. Feigal's references to label changes should be struck because such evidence was previously excluded by this Court under Federal Rule of Evidence 407:

> Q. And so what I want to do is just ask you, given that we have these two tables, both coming from Sanofi, one definitely submitted to a regulator, one -- maybe it was or maybe there's a similar version submitted to a regulator – that have different follow-up periods. How can we figure out which one's correct?
> MR. MICELI: Objection to form.
> A. Well, you're talking about apples and oranges. The followup that Sanofi did submit to the European agency in response to their question about persistent or long-lasting permanent alopecia came

---

[38] Doc. 15767-5 at 3–4.

[39] Doc. 15767-5 at 4.

[40] *Id*. Again, in an April 2020 deposition, Dr. Feigal stated: "I analyzed those drugs in the context of answering the question about Taxotere. I found no evidence to the degree I found it with Taxotere, for general causation. But no, I did not do general causation analysis on any of the other chemotherapy drugs, other than Taxotere." Doc. 15767-8 at 3.

back with 29 and 16. That's Sanofi. I'm not manipulating the numbers. That is what they told the agency.

BY MR. MOORE:

Q. Yes.

A. In response to the question about permanent alopecia, that was their response. **And that's actually what's on their label.**

MR. MOORE: Move to strike.[41]

***

Q. Okay. And that's a sentence that you are ignoring in favor of the statement that you like better to the European regulator; correct?

MR. MICELI: Object to the form.

A. . . . Sanofi is the sponsor of this study. Sanofi set the definitions. Sanofi is sending information to regulatory agencies and **Sanofi is responsible for their label, which currently still reads 29 and 16.**

MR. MOORE: Move to strike.[42]

***

Q. And if those patients were not followed for their adverse event of alopecia for more than six months, the truth is, it is impossible to say that they have permanent chemotherapy-induced alopecia as defined in your report; isn't that true?

MR. MICELI: Object to the form.

A. No. I'm going with how Sanofi analyzed their data. They continued to follow these patients. I don't know if other data exists in the medical records. They have a factory of people who do this study. **And they're responsible for truthful labeling. Unless you're telling me what they have on the label is false and misleading, I believe what they have.**

BY MR. MOORE:

Q. And what they have is ongoing at the last follow-up visit; correct?

MR. MICELI: Objection to form.

A. **Actually, I think to this date it's called permanent.**

MR. MOORE: Move to strike. Move to strike the prior answer. Let's go off the record.[43]

---

[41] Doc. 15673-4 at 4–5.

[42] *Id.* at 6.

[43] *Id.* at 7–8.

The PSC contends that Sanofi opened the door to this testimony by insisting on its own version of what the TAX316 data represents, i.e., that 29 and 16 are not accurate. According to the PSC, "the history of Sanofi's representation of the TAX316 patients with 'ongoing,' permanent, or persisting alopecia remained, and remains, consistent: from the TAX316 CSR, September 2010; to the European agency, January 2013; to the March 3, 2017 Label Review Committee meeting to include the TAX316 CSR numbers in the label; to the current label."[44] Based on this consistency, the PSC argues that Dr. Feigal should be able to point out Sanofi's contradictory position. Yet, Sanofi avers that it only questioned Dr. Feigal on Sanofi's responses to regulatory agencies and the underlying case reports in TAX316, and never asked her to opine on Taxotere's labeling. The Court agrees with Sanofi.

Prior to each bellwether trial, the Court precluded evidence of labeling changes post-dating Plaintiff Kahn's treatment in 2008 and Plaintiff Earnest's treatment in 2011.[45] Specifically, the Court prohibited evidence of Sanofi's 2015 and 2018 label changes adding (1) language that "cases of permanent alopecia have been reported," and (2) the "ongoing alopecia" data from the TAX316 study. Dr. Feigal's references to the inclusion of the TAX316 data in the current labeling directly contravenes this prohibition. As such, it must be stricken.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Reconsider and Vacate CMO 36 and to Strike General Experts' Improper Testimony (Doc. 15673) is **GRANTED IN PART** and **DENIED IN PART**.

---

[44] Doc. 15767 at 9.
[45] *See* Doc. 8201 (Earnest); Doc. 13260 (Kahn).

New Orleans, Louisiana, this 5th day of January, 2023

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**