## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: TAXOTERE (DOCETAXEL) | ) | MDL No. 2740 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| This document relates to: | ) | SECTION: "H" (5) |
| *Hilda Adams v. Accord Healthcare, Inc.* | ) | |
| *Gloria J. Cooper v. Accord Healthcare, Inc.* | ) | |
| *Carol Woodson v. Accord Healthcare, Inc.* | ) | |
| *Tina Hickey v. Hospira, Inc.* | ) | |
| | ) | |
| | ) | |
| Case No. 2:16-cv-17583 | ) | |
| Case No. 2:18-cv-00194 | ) | |
| Case No. 2:17-cv-12674 | ) | |
| Case No. 2:18-cv-04731 | ) | |

## ORDER AND REASONS

Before the Court are two Motions: (1) Accord Healthcare, Inc.'s Motion for Summary Judgment on Preemption Grounds (Rec. Doc. 13425) and (2) Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc.; and Hospira, Inc.'s Motion for Summary Judgment Based on Preemption (Rec. Doc. 13857). For the reasons set forth herein, the Motions are **GRANTED**.

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel,[1] that Plaintiffs were administered for the treatment of cancer. Among these companies are Defendants sanofi-

---

[1] Docetaxel is the generic version of Taxotere, although the Court uses the term "generic" loosely.

aventis U.S. LLC and Sanofi U.S. Services Inc. (collectively, "Sanofi"); Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc., and Hospira, Inc. (collectively, "Hospira"); and Accord Healthcare, Inc. ("Accord"). and Plaintiffs allege that the drug caused permanent alopecia—in other words, permanent hair loss— also referred to as "permanent chemotherapy-induced alopecia" ("PCIA"). Plaintiffs allege, inter alia, that Defendant manufacturers violated state law by failing to warn them that docetaxel could cause PCIA.

### 1. Regulatory Background

Under the Food, Drug, and Cosmetics Act ("FDCA"), a drug manufacturer must obtain approval from the Food and Drug Administration ("FDA") before selling its drug in the United States.[2] The FDCA lays out several methods of approval.[3] Pursuant to § 505(b)(1), manufacturers seeking approval of the first drug of a specific kind, or reference listed drug ("RLD"), must submit New Drug Applications containing data and reports on the safety and efficacy of the drug.[4]

Thereafter, manufacturers who prepare drugs that are either the same or similar to the RLD may obtain approval through one of two abbreviated pathways.[5] Pursuant to § 505(b)(j), manufacturers seeking approval of drugs that are the "same" as the RLD may rely on the safety and efficacy data in the RLD's NDA.[6] On the other hand, pursuant to § 505(b)(2), a manufacturer seeking approval of drugs that "differ in ways that are slight enough for the manufacturer to still rely on the RLD's safety and efficacy data" must submit

---

[2] Hickey v. Hospira, 102 F.4th 748, 750 (5th Cir. 2024) (citing 21 U.S.C. § 355(a)).

[3] *See id.* at 751.

[4] *Id.* at 750–51 (citing 21 U.S.C. § 355(b)(1)). The Fifth Circuit and "the parties refer to this provision and its counterparts—§§ 505(b)(2) and (j)—by their location in the FDCA rather than their location in the United States Code." *Id.* at 760 n.1.

[5] *See id.* at 751.

[6] *Id.* (citing 21 U.S.C. § 355(j)).

an abbreviated application, which need only include information that is "needed to support the modification(s) of the listed drug."[7]

"When the FDA approves a new drug, it also approves the exact text that will be included on the drug's labeling."[8] "Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application."[9] Sometimes, however, a manufacturer may unilaterally change its label first seeking approval from the FDA via the changes-being-effected ("CBE") regulation.[10] The CBE regulation allows a manufacturer to change a label to "reflect newly acquired information" if the changes "add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c). . . ."[11]

Thus, to trigger a label change, there must be (1) newly acquired information about (2) evidence of a causal association between the drug and the harm. As to the first requirement, "newly acquired information" is defined as "data, analyses, or other information not previously submitted to the Agency," including but not limited to, "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA."[12]

---

[7] *Id.* (citing 21 C.F.R. § 314.54).
[8] *Id.* (citing Wyeth v. Levine, 555 U.S. 555, 568 (2009)).
[9] *Id.* (quoting *Wyeth*, 555 U.S. at 568).
[10] *Id.* (citing 21 C.F.R. § 314.70(c)(6)).
[11] 21 C.F.R. § 314.70(c)(6)(iii)(A).
[12] 21 C.F.R. § 314.3(b).

As to the second requirement, to make a change in the Adverse Reactions section of the label, there must also be "some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."[13]

## 2. Factual and Procedural Background

After Sanofi's patent on Taxotere (the branded version of docetaxel) expired, Hospira and Accord sought approval to sell docetaxel under § 505(b)(2).[14] The FDA approved Hospira's application on March 9, 2011, and Accord's on June 8, 2011. As of 2011, all labels included identical warnings about alopecia but did not state whether alopecia could be permanent.[15] In March 2015, after oncology patient-advocates contacted the FDA, the FDA requested Sanofi's internal data.[16] In response, Sanofi produced more than 2,000 reports on alopecia generally, including reports on irreversible alopecia, permanent alopecia, or alopecia lasting longer than two years.[17] In October 2015, after reviewing Sanofi's submission, the FDA requested additional information and instructed Sanofi to update its label.[18] Sanofi updated its label via the CBE regulation to state that "[c]ases of permanent alopecia have been

---

[13] 21 C.F.R. § 201.57. "FDA regulations set out requirements for the content, the format, and the order of the safety information on the drug label." Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 304 (2019) (citing 21 C.F.R. § 201.57(c)). The sections of the label include, inter alia, "Adverse Reactions." See id. at 307; 21 C.F.R. § 201.57. "At a high level . . . the Adverse Reactions section describes "the overall adverse reaction profile of the drug." In re Tepezza Mktg. No. 23 C 3568, 2025 WL 81338, at *1 (N.D. Ill. Jan. 10, 2025) (citing 21 C.F.R. § 201.57(6), (7)). An adverse reaction is "an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." Id. (citing 21 C.F.R. § 201.57(7)). Relevant here, as of 2011, Defendants' labels all included identical warnings about alopecia, that is hair loss, as an "an adverse reaction and instructed doctors to explain that hair loss was one of the drug's most common side effects." Hickey, 102 F.4th at 752. The label did not state whether the hair loss could be permanent. Id.

[14] Hickey, 102 F.4th at 752.

[15] Id.

[16] Id.

[17] Id.

[18] Id.

reported."[19] The FDA approved the updated label but stated that it did not conclude that the cases of permanent alopecia were necessarily caused by the docetaxel.[20] Three weeks later, Accord updated its label with the same changes via the CBE regulation, which the FDA approved in July 2016. Hospira also made similar changes via the CBE regulation in March 2017, which the FDA approved in September 2017.[21]

Plaintiff Tina Hickey sued Hospira and Plaintiffs Hilda Adams, Gloria J. Cooper, and Carol Woodson sued Accord. Plaintiffs allege state law claims against Defendants based on, inter alia, Defendants' "failure to provide adequate warnings to users and their healthcare providers of the risk of developing disfiguring, permanent alopecia."[22]

In 2022, Accord and Hospira each filed a motion for summary judgment on the basis that Plaintiffs' state law failure-to-warn claims were preempted by federal law.[23] Defendants contended that the regulations were not available to them because they did not have "newly acquired information." As such, it would have been impossible for them to comply with their alleged state law duties. In their briefings, the parties disagreed about who had the initial burden of production of information, as well as the burden and proof and applicable test.

On August 2, 2022, this Court denied Hospira and Accord's motions, holding that Defendants were not entitled to summary judgment based on

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Rec. Doc. 4407 at 47 ¶ 223 (Plaintiffs' Second Amended Master Long Form Complaint) (alleging that Defendants failed to warn them of the side effects of Taxotere and/or docetaxel, "particularly the risks of developing disfiguring, permanent alopecia"); *see also* Rec. Doc. 16511 at 75 (Case Management Order No. 39).

[23] Rec. Doc. 13425 (Accord); Rec. Doc. 13857 (Hospira).

preemption.[24] In its August 2, 2022 Order and Reasons, this Court noted that there are two ways Defendants can prove the affirmative defense of "impossibility preemption when a plaintiff challenges a label that was previously approved by the FDA: (1) if the CBE regulation was not available to it, or (2) by presenting 'clear evidence' that the FDA would not have approved the warning that state law requires."[25]

As to the burden issue, this Court found that "Plaintiffs bear the initial burden of identifying the specific information that they contend manufacturer could have used to modify the drug's label."[26] Thereafter, "the manufacturer bears the burden of proving that it does not meet the requirements of the CBE regulation."[27]

Next, this Court reasoned that because the § 505(b)(2) Defendants did not have a "right of reference" to Sanofi's safety and efficacy data, or access to Sanofi's adverse event reports, Defendants could never determine whether the information revealed "risks of a different type or greater severity or frequency than included in previous submissions to the FDA."[28] As such, this Court analyzed only "whether certain information revealed a causal relationship between docetaxel and permanent alopecia."[29] After finding that the data before it satisfied this standard, this Court held that Plaintiffs' claims were not preempted.[30]

---

[24] Rec. Doc. 14477.
[25] *Id.* at 12 (citing *Wyeth*, 555 U.S. at 555). As to the "clear evidence" test, Plaintiffs argued that Defendants "failed to provide any evidence that it submitted, and that the FDA rejected, the label change Plaintiff alleges was required by Louisiana law." Rec. Doc. 13978 at 11; 13595 at 19. Defendants did not dispute this point.
[26] Rec. Doc. 14477 at 16–17.
[27] *Id.* at 17.
[28] *Id.* at 19.
[29] *Id.* at 31.
[30] *Id.* at 26.

On appeal, Defendants did not contest this Court's ruling that the causal association standard was satisfied. Rather, Defendants argued that there was no "newly acquired information" because the relevant scientific literature did not reveal "risks of a different type or greater frequency or severity."[31] On May 24, 2024, the Fifth Circuit vacated and remanded this Court's holding. As to the burden issue, the court found that

> [b]ecause the parties agree that Defendants bear the ultimate burden of proving that the information at issue does not meet the requirements of the CBE regulation, and because plaintiffs have already identified the information at issue, we need not decide which party bears the initial burden of producing the information at issue. We hold only that Defendants bear the ultimate burden of proving that the information at issue does not meet the requirements of the CBE regulation.[32]

The court further held "that the availability of the CBE regulation is a threshold issue to the clear evidence test," but found that this Court erred in analyzing "whether certain information revealed a causal relationship between docetaxel and PCIA" without first addressing "whether such data or analysis 'reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA.'"[33]

### a. The Fifth Circuit's analysis

As to whether the studies revealed risks of a greater severity or frequency, the court first noted that as "to the general potential for permanent alopecia, Hospira acknowledged that 'the pre-and post-approval scientific literature provided a basis for [Defendants] to compare and evaluate whether or not the "new" information revealed a greater incidence of permanent hair

---

[31] *Hickey*, 102 F.4th at 753–54 (quoting *Albrecht*, 587 U.S. at 314).
[32] *Id.* at 755.
[33] *Id.* at 756 (quoting 21 C.F.R. § 314.3(b)).

loss.'"[34] They noted that "[l]ikewise, Accord acknowledged that 'if a manufacturer were to receive a measurable uptick in adverse event reports that reflected a "greater severity or frequency" than the incidence rates conveyed by pre-approval literature,' that could constitute newly acquired information."[35]

The Fifth Circuit reviewed the cumulative body of literature identified by the parties, which included "the scientific literature on the risk of docetaxel-induced PCIA and Hospira's adverse event reports."[36] The court compared the "pre-approval scientific literature" with the "post-approval scientific literature."[37] The pre-approval information included information issued pre-March and June of 2011.[38] The FDA's approval of Hospira's label in March of 2011, and Accord's label in June of 2011, rendered those labels adequate as a matter of law as of those dates.[39] Accordingly, only information issued after March 2011 or June 2011 could possibly justify a CBE labeling change.[40] Post-approval information was limited to Plaintiffs' treatment dates.[41]

If any study issued *after* initial approval of Defendants' labels showed a "risks of a different type or greater severity or frequency" than the studies issued before the initial approval of Defendants' label, such a study would satisfy the standard for "newly acquired information."[42]

### b. *Pre-approval baseline*

---

[34] *Id.* at 755.
[35] *Id.*
[36] *Id.* at 756.
[37] *Id.*
[38] *Id.*
[39] *See id.* at 752.
[40] *See id.* at 757.
[41] *See id.*
[42] *Id.*

The Nabholtz Study (2001) and the Sedlacek Study (2006) form the baseline of the analysis.[43] The Nabholtz Study showed an "incidence rate"[44] of 7.4% as to "long-lasting (longer than two years) partial alopecia."[45] The Sedlacek study revealed a 6.3% "incidence rate" of "hair regrowth less than 50% of the pre-chemotherapy amount of hair," and noted that there was a possibility of poor hair regrowth lasting up to 7 years.[46] The court compared the incidence rates of permanent alopecia in the pre-approval studies to the incidence rates in the post-approval studies.[47] The court concluded that, as to each study, the post-approval literature did not show a higher incidence rate of PCIA "with the possible exception of the Bertrand Abstract."[48]

### c. Post-approval literature—the Bertrand Abstract

In December 2013, M. Bertrand and others published an Abstract for a presentation at the San Antonio Breast Cancer Symposium.[49] Seventy-nine patients were treated with "fluorouracil, epirubicin, cyclophosphamide (FEC-100) and docetaxel for early breast cancer" between 2005 and 2007.[50] Five years after the end of treatment, 26 patients still experienced alopecia—21 "minimal," 2 "moderate," and 3 "severe."[51] The Abstract did not define those terms.[52]

In their initial motion, Hospira argued that several pieces of scientific literature, including the Bertrand Abstract, did not constitute "newly

---

[43] Id.

[44] To measure this, the Fifth Circuit divided the number of cases of the relevant injury by the total population of the study. Id.

[45] Id.

[46] Id.

[47] Id. at 757–58.

[48] Id. at 758.

[49] Id.

[50] Id.

[51] Id.

[52] Id.

acquired" information because, including only severe cases of alopecia, it indicated that "the prevalence of permanent hair loss reported" was only 3/79 patients, or 3.8%.[53] Plaintiffs and Accord did not mention the Abstract. On appeal, Plaintiffs argued that the Bertrand Abstract presented 26/79 patients, or 33%, who developed permanent alopecia.[54] Defendants Accord and Hospira contended that the incidence rate reflected in Bertrand was 3.8%.[55]

In its opinion, the Fifth Circuit noted that the Bertrand Abstract included patients who "were significantly older and more often postmenopausal than in the control group" and identified menopause as "a significant risk factor for developing alopecia."[56] The court stated that including only "moderate" and "severe" cases of alopecia, the Abstract showed the "incidence rate of alopecia five years after the end of treatment was 6.3%."[57] This rate "is the same as Sedlacek and less than Nabholtz."[58] The court explained that "[o]ne issue that was not addressed in the district court is what the 'minimal' cases were" and that, if those cases were to be included, "the incidence rate is higher than the pre-approval literature. Accordingly, we will remand on this point."[59] The Fifth Circuit thus remanded on "the question of the effect of the Bertrand Abstract results."[60] The parties filed supplemental briefing on this issue, which the Court now considers.[61]

---

[53] Rec. Doc. 13857-1 at 20; Brief of Appellants Hospira, Inc. and Hospira Worldwide, LLC at 47, Hickey v. Hospira, 102 F.4th 748 (5th Cir. 2024) (No. 23-3023).

[54] Brief of Plaintiffs-Appellees Tina Hickey, Hilda Adams, Gloria J. Cooper, and Carol R. Woodson at 33, Hickey v. Hospira, 102 F.4th 748 (5th Cir. 2024) (No. 23-3023).

[55] Brief of Appellants Hospira, Inc. and Hospira Worldwide, LLC at 47, Hickey v. Hospira, 102 F.4th 748 (5th Cir. 2024) (No. 23-3023); Reply Brief of Defendant-Appellant Accord Healthcare, Inc. at 19, 102 F.4th 748 (5th Cir. 2024) (No. 23-3023).

[56] *Hickey*, 102 F.4th at 758.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] Rec. Docs. 17209 (Accord Brief), 17211 (Hospira Brief), 17305 (Plaintiff Opposition), 17393 (Accord Reply), 17394 (Hospira Reply).

## LEGAL STANDARD

### 1. Law on Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[62]  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[63]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[64] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[65] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[66] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[67] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the

---

[62] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[63] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[64] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).
[65] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[66] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[67] Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

necessary facts."[68] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[69]

## 2. Preemption

The doctrine of preemption derives from the U.S. Constitution's Supremacy Clause, which provides that "federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"[70] "Where state and federal law 'directly conflict,' state law must give way."[71] Such a conflict exists "where it is 'impossible for a private party to comply with both state and federal requirements.'"[72] In the context of state-law claims concerning the adequacy of drug labeling, the Supreme Court has instructed that "the question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it."[73] Here, the question is whether Defendants could change their label by way of the CBE regulation.[74] "Defendants bear the ultimate burden of proving that the information at issue does not meet the requirements of the CBE regulation."[75]

## LAW AND ARGUMENT

## 1. Plaintiffs Hilda Adams and Carol Woodson

Regardless of whether the Bertrand Abstract is "newly acquired information," Plaintiffs Hilda Adams and Carol Woodson's claims are

---

[68] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[69] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).
[70] PLIVA v. Mensing, 564 U.S. 604, 617 (2011) (quoting U.S. CONST. art. VI, cl. 2).
[71] Id. (quoting Wyeth, 555 U.S. at 583).
[72] Id. at 618 (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).
[73] Id. at 620 (citing Wyeth, 555 U.S. at 573).
[74] Hickey, 102 F.4th at 751.
[75] Id. at 755.

preempted. Plaintiff Adams completed treatment by April 24, 2013.[76] Plaintiff Woodson completed her treatment by July 3, 2013.[77] The Bertrand Abstract was presented in December 2013.[78] The Fifth Circuit did not contemplate, and Plaintiffs do not argue, that there existed other possible information from the relevant period. Accordingly, Plaintiffs' claims must be dismissed.

## 2. Plaintiffs Gloria J. Cooper and Tina Hickey

Plaintiff Gloria J. Cooper and Tina Hickey both completed treatment after the Bertrand Abstract was published.[79] As the Fifth Circuit explained, Defendants are "not liable to these particular Plaintiffs on their state law failure-to-warn claims" unless the Bertrand Abstract is "newly acquired information showing that PCIA occurred with any greater severity or frequency than before the approval of" Defendants' docetaxel.[80]

Plaintiffs and Defendants disagree as to scope of the Fifth Circuit's remand. Defendants argue that the Abstract is not "newly acquired information" because it does not contain enough information to decide whether it presents a "risk of a different type or greater severity or frequency" than the scientific literature available to Defendants, as it is unclear what minimal means.[81] Defendants point out that all patients were treated with docetaxel

---

[76] Rec. Doc. 17209 at 10.

[77] *Id.*

[78] *Id.*

[79] Rec. Doc. 17305 at 14. Plaintiff Cooper was treated from November 17, 2014 to March 23, 2015. Rec. Doc. 13425-4 at 9. Plaintiff Hickey received treatment from October 25, 2013 to February 6, 2014. Rec. Doc. 17211 at 12.

[80] *Hickey*, 102 F.4th at 759.

[81] To the extent that Defendants argue that a poster abstract like Bertrand cannot be considered newly acquired information because it is not sufficiently reliable, this Court rejects that contention. *See* Knight v. Boehringer, 984 F.3d 329, 340 (4th Cir. 2021) (rejecting a poster abstract reflecting "preliminary conclusions" that differed from the ultimate conclusions in the published paper but noting that "our decision today, however, should not be construed to require final, peer-reviewed publication of an analysis to constitute newly acquired information"). Plaintiffs also point out that this Court found that Sedlacek, which was also a poster abstract, was "newly acquired information." *In re* Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn), 508 F. Supp. 3d 71, 85 (E.D. La. Dec. 18, 2020).

and FEC, both of which are associated with permanent alopecia.[82] Thus, even if minimal cases are included, Defendants contend that the Bertrand Abstract cannot be compared to other studies that had a control or comparator group. They argue that the Bertrand Abstract also failed to account for the presence of other "confounding factors," such as age.[83] Finally, Accord argues that even if the Abstract satisfies the requirements for "newly acquired information," the Bertrand Abstract fails to meet the causal association standard in § 201.57(c).

### a. Whether the Bertrand Abstract is "newly acquired information"

To satisfy the standard for "newly acquired information," the Bertrand Abstract must "reveal risks of a different type or greater severity or frequency" than the pre-approval literature.[84] Focusing on the issue of frequency, the Fifth Circuit remanded on the issue of whether the Bertrand Abstract indicated a higher "incidence rate" of permanent alopecia following chemotherapy than the pre-approval literature.[85] This is true only if patients with minimal alopecia are included.

Here, the definition of the injury is somewhat confused. Plaintiffs' claims are based on Defendants' failure to update the Adverse Reactions section of their label to include instances of permanent alopecia.[86] In their Master Complaint, Plaintiffs allege that "[t]he effects of chemotherapy on hair follicles results in temporary hair loss that lasts until the telogen phase is complete

---

[82] Rec. Doc. 17211 at 10. Plaintiffs respond that the Nabholtz Study also failed to implement such controls.

[83] Rec. Doc. 17209 at 7; Rec. Doc. 17211 at 8.

[84] *Hickey*, 102 F.4th at 755 (citing 21 C.F.R. § 314.3).

[85] *Id.* at 758.

[86] Rec. Doc. 4407 at 47 ¶ 223 (Plaintiffs' Second Amended Master Long Form Complaint) (alleging that Defendants failed to warn them of the side effects of Taxotere and/or docetaxel, "particularly the risks of developing disfiguring, permanent alopecia"); *see also* Rec. Doc. 16511 at 75 (Case Management Order No. 39).

and a new hair cycle begins," and that "[a]ccording to the Mayo Clinic, hair can be expected to grow back after chemotherapy within three to six months."[87] They allege that "[u]nlike the temporary and reversible alopecia that ordinarily results from chemotherapy," Defendants' drugs cause Permanent Chemotherapy Induced Alopecia, or PCIA, "which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy."[88] The Fifth Circuit has held that "[a]s a matter of law, the injury of 'an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy' is sustained when, six months after the completion of chemotherapy, a person has an absence of or incomplete hair regrowth."[89]

Defendants argue that an incidence rate of PCIA cannot be determined because the Bertrand Abstract does not define the terms "severe," "moderate," or "minimal" alopecia. They argue that "the absence of any follow-up publications means that there is nowhere else to learn how or why the authors made the categorizations they made, or whether their methodology was scientifically reliable."[90] Plaintiffs respond that it is nonsensical to suggest that permanent alopecia cannot present as minimal.[91] They contend that instead, the question on remand is whether cases of minimal alopecia were linked to

---

[87] *See* Rec. Doc. 4407 at 36 ¶ 180.

[88] *Id.* at ¶ 181. This Court has previously recognized that Plaintiffs' experts have opined that "the medical literature generally defines the condition as the 'complete loss of growth or partial regrowth at least 6 months after chemotherapy.'" *In re* Taxotere (Docetaxel) Prods. Liab. Litig., No. 16-2740, 16-17144, 2019 WL 4178670, at *3 (E.D. La. Sept. 3, 2019).

[89] *In re* Taxotere (Docetaxel) Prods. Liab. Litig., 995 F.3d 384, 390 (5th Cir. 2021).

[90] Rec. Doc. 17209 at 6.

[91] Plaintiffs note that "[w]ithin this context, then, the question that the manufacturers address—whether 'minimal' cases of alopecia were severe enough to be permanent—is nonsensical, akin to asking whether a particular rock is heavy enough to be tall." Rec. Doc. 17305 at 4. The Court finds this point persuasive; nevertheless, the Fifth Circuit remanded on the question of whether minimal cases should be included in the incidence rate of permanent alopecia.

15

chemotherapy and that a plain reading of the Bertrand Abstract indicates that they were.[92]

The Bertrand Abstract states that "Chemotherapy-induced alopecia (CIA) persisting for more than 6 months after the end of chemotherapy is defined as permanent alopecia."[93] Although the authors state that they "evaluated the prevalence and risk factors of permanent CIA in breast cancer patients receiving (neo)adjuvant chemotherapy," the study was only focused on the efficacy of scalp cooling used during chemotherapy. The authors evaluated patients' scalps five years after chemotherapy and grouped them into two categories regardless of severity: those with "alopecia" and those without.[94] The authors did not determine that any one patient had "CIA"—although they concluded that "the risk of permanent alopecia induced by anthracyclins and taxans based on chemotherapy should not be underestimated."

The Bertrand Abstract *could* be read as reporting that "permanent alopecia"—that is, alopecia that persisted more than six months following chemotherapy—occurred in 33% of cases. [95] But the authors themselves do not

---

[92] *Id.* at 7.

[93] Rec. Doc. 17305-1. In evaluating other studies, the Fifth Circuit appeared to consider both the legal definition of PCIA and the specific definitions used in each study. As an aside, in their motion to exclude Plaintiff's regulatory expert, Dr. Kessler, Defendant Sanofi pointed out that defining permanent alopecia was challenging and noted that "[f]or 'irreversible alopecia,' there is no consensus on its definition in the medical community." Rec. Doc. 6146 at 5. They stated that "there is necessarily a diagnostic component of whether any individual case of hair loss is actually 'irreversible alopecia' from chemotherapy." *Id.* Sanofi also pointed out that the "definition of 'complete loss of growth or partial regrowth at least 6 months after chemotherapy' accounts for a failure to regrow hair without it being attributable to chemotherapy." *Id.* They argued that this definition was incorrect because "a six-month cutoff may not accurately capture cases of truly 'irreversible' alopecia because hair can begin to regrow more than six months after chemotherapy," that and that "there may be patients who have had chemotherapy and experience hair loss, and even patients whose hair does not regrow after chemotherapy, all having nothing to do with chemotherapy being the cause." Rec. Doc. 6146.

[94] Rec. Doc. 17305-1.

[95] Defendants contend that Dr. Fryzek, their expert on causation, opined that "[w]ithout a comparison group, the risk of permanent alopecia cannot be calculated." Rec. Doc. 17211 at

16

explicitly indicate that any cases of alopecia, including minimal, were cases of permanent alopecia; nor do they quantify the number of cases of alopecia that were associated with chemotherapy.[96]

It is also unclear whether the authors of the two baseline studies include minimal alopecia in their analyses. The Sedlacek Study clearly does not, as it defines "Persistent Significant Alopecia" as "hair regrowth less than 50% of the pre-chemotherapy amount of hair as judged by both the patient and the author."[97] The Nabholtz does not include the qualifying term "minimal." Its authors state that "alopecia," which may be graded as 1 or 2,[98] was the most common treatment-related chronic nonhematologic toxicity and observed "long-lasting (longer than 2 years) partial alopecia in four patients."[99]

At bottom, neither the Bertrand Abstract nor the parties provide enough information such that the Court may determine—as the Fifth Circuit explicitly

---

8. Dr. Fryzek opines that other "important confounders of hair loss," "such as patient age, family history of hair loss, and smoking, among others," are "not specified as permanent." Rec. Doc. 17211-3 at 7.

[96] By contrast, the other studies analyzed by the Fifth Circuit stated the number of patients who had "Persistent Significant Alopecia" (Sedlacek); "Permanent alopecia," which was "defined as absent or incomplete hair regrowth at > 6 months post-chemotherapy," (Kluger); "permanent alopecia after systematic chemotherapy with taxanes (docetaxel) (Miteva); "permanent alopecia following high-dose doxetaxel chemotherapy" (Tosti); and "Chemotherapy-induced permanent alopecia ("CIPAL") (Palamaras). Nabholtz noted that the "most common treatment-related chronic nonhematologic toxicity was alopecia (87%), with long-lasting (longer than 2 years) partial alopecia in four patients." Thus, each study labelled patients as having "permanent alopecia" and/or explicitly connected the number of patients to the treatment.

[97] Rec. Doc. 13857-31 at 3.

[98] Rec. Doc. 13384-4 at 15. "PCIA is graded as 1 or 2 depending on severity and psychological impact according to the Common Terminology Criteria for AEs (CTCAE) Version 4.0: Grade 1 is hair loss of less than 50% of normal for that individual and is not obvious from a distance but only on close inspection; it does not require camouflage. Grade 2 is hair loss of 50% or more of normal for that individual and is readily apparent to others; camouflage is necessary if the patient desires, and it is associated with negative psychosocial effects." *Id; see also* Rec. Doc. 17209-2 at 3 ("The World Health Organization criteria for chemotherapy-induced alopecia is grade 0 = no loss, grade 1 = mild hair loss, and grade 2 = pronounced or complete hair loss.").

[99] Rec. Doc. 13857-30 at 6. The authors of Nabholtz did not assign a grade to their patients.

instructed—what "minimal" alopecia means. Critically, the warning provided on Defendants' labels already included a warning for alopecia. Absent further clarification, the Court cannot include those cases in the incidence rate and cannot determine whether the Bertrand Abstract is newly acquired information.

Hospira also argues that the Bertrand Abstract is not newly acquired information because it reflects what was already known: that "by 70 years of age, 38% of women have female-pattern hair loss."[100] Plaintiff counters that this point is only relevant to whether the causal requirement of the regulation is met, rather than whether the Abstract reveals "risks of a greater frequency." The Fifth Circuit's remand, however, suggests that to calculate an incidence rate, the Court would need to determine whether minimal cases were linked to or associated with chemotherapy, rather than another cause. As the Fifth Circuit observed, the authors explicitly noted that many patients in the alopecia group were "significantly older and more often postmenopausal" than those without alopecia and "identified menopause as 'a significant risk factor for developing alopecia.'"[101]

Hospira also points out that Dr. Tosti, Plaintiff's expert on causation, stated in her report that

> [p]atients with PCIA have moderate to very severe hair thinning, with short miniaturized hairs. Hair thinning is diffuse but often more prominent on androgendependent scalp regions. This can possibly be explained by the fact that mild androgenetic alopecia affects up to 50% of women and some women might have a mild androgenetic alopecia before PCIA.[102]

---

[100] *Id.* (citing Jerry Shapiro, M.D., *Hair Loss in Women*, 357 NEW ENGL. J. MED. 1620 (2013)).
[101] *Hickey*, 102 F.4th at 758. As an aside, the Nabholtz Study indicated that "the study population consisted of women aged 18 to 70 years." Rec. Doc. 13857-30.
[102] Rec. Doc. 17394 at 2.

Dr. Tosti also opines that PCIA may present as "Grade 1 or 2" and that "Grade 1 is hair loss of less than 50% of normal for that individual and is not obvious from a distance but only on close inspection; it does not require camouflage. Grade 2 is hair loss of 50% or more of normal for that individual and is readily apparent to others; camouflage is necessary if the patient desires, and it is associated with negative psychosocial effects."[103] In light of this information, and in keeping with the Fifth Circuit's mandate, this Court cannot determine that "minimal" cases of alopecia should be included in the incidence rate, and the Bertrand Abstract cannot be newly acquired information.[104]

## CONCLUSION

For the foregoing reasons, the Motions for Summary Judgment filed by Accord and Hospira are **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**

---

[103] *Id.* Because the Court finds that the Bertrand Abstract is not "newly acquired information," it need not address Hospira's argument that a labeling change would not have prevented Ms. Hickey's alleged injury.

[104] Additionally, the Court need not reach Accord's argument that the causal association standard in § 201.57(c) is not met. In any event, this argument is likely waived. Under the mandate rule, "a district court on remand must 'implement both the letter and spirit of the [appellate court's] mandate,' and may not disregard the 'explicit directives' of that court." Crowe v. Smith, 261 F.3d 558, 562 (5th Cir. 2001) (alterations in original) (internal quotations omitted) (quoting United States v. Becerra, 155 F.3d 740, 752 (5th Cir. 1998)). Where further proceedings of the district court are specified in the mandate of the court of appeals, "the district court is limited to holding such as are directed." *Id.* (internal quotations omitted). Thus, "'an issue of . . . law decided on appeal may not be reexamined by the district court on remand or by the appellate court on a subsequent appeal.'" Med. Ctr. Pharm. v. Holder, 634 F.3d 830, 834 (5th Cir. 2011) (alterations in original) (quoting United States v. Lee, 358 F.3d 315, 320 (5th Cir. 2004)). "Conversely, an issue that is not expressly or implicitly decided on appeal does not become part of the law of the case." *Id.* (citing Alpha/Omega Inc. Servs., Inc. v. Prudential Ins. Co. of Am., 272 F.3d 276, 279 (5th Cir. 2001)). This latter rule, however, "is qualified by the waiver doctrine, which holds that an issue that could have been but was not raised on appeal is forfeited and may not be revisited by the district court on remand." *Id.* As Plaintiffs point out, on appeal, Defendants failed to contest that the causal requirement was satisfied.

New Orleans, Louisiana this 30th day of April, 2025.

_____
**HON. JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**